# 24-3161

# United States Court of Appeals for the District of Columbia

THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
Hon. Randolph D. Moss
United States District Court Case 1-21-cr-00399-RDM-1

## APPENDIX
## Volume I of XVII (Pages Appx001 - Appx0440)

TOR EKELAND, ESQ.
TOR EKELAND LAW PLLC
*Attorneys for Defendant-Appellant*
30 Wall Street, 8th Floor
New York, New York 10005
(718) 737-7264
tor@torekeland.com

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
*Attorneys for Defendant-Appellant*
800 Third Avenue, 20th Floor
New York, New York 10022
(212) 446-2346
maf@fernichlaw.com

MAKSIM NEMTSEV, ESQ.
MAKSIM NEMTSEV PC
*Attorneys for Defendant-Appellant*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
max@mnpc.law

AARON DANIEL, ESQ.
ASYMMETRIC LEGAL
*Attorneys for Defendant-Appellant*
11900 Biscayne Blvd, Suite 400
Miami, Florida 33181
(305) 979-9296
aaron@asymmetric.legal

*(See Inside Cover for Additional Counsel)*

3914



**ELECTRONIC PARALEGAL**

_____

AMY C. COLLINS, ESQ.
THE LAW OFFICE OF
   AMY C. COLLINS
*Attorneys for Defendant-Appellant*
888 17th Street, NW, Suite 1200
Washington DC 20006
(228) 424-0609
amy@amyccollinslaw.com

_____

# TABLE OF CONTENTS

District Court Docket – US v. Sterlingov, 21-CR-00399-RDM .............Appx001

Protective Order of Governing Discovery of Hon. Randolph D. Moss,
Dated September 17, 2021 (ECF Doc. No. 18) ......................................Appx074

Preliminary Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 336) ......................................Appx079

Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 14, 2024 (ECF Doc. No. 338) ....................................Appx085

Judgment in a Criminal Case of Hon. Randolph D. Moss,
Dated November 13, 2024 (ECF Doc. No. 340) ....................................Appx091

Transcript of Motion Hearing, Dated January 13, 2023
(ECF Doc. No. 114) ...............................................................................Appx099

Transcript of Motion Hearing, Dated January 31, 2023
(ECF Doc. No. 115) ...............................................................................Appx190

Transcript of Motions Hearing, Dated June 16, 2023
(ECF Doc. No. 223) ...............................................................................Appx345

Transcript of Motions Hearing, Dated June 23, 2023
(ECF Doc. No. 224) ...............................................................................Appx501

Transcript of Motions Hearing, Dated July 19, 2023
(ECF Doc. No. 225) ...............................................................................Appx682

Transcript of Continued Motions Hearing, Dated July 20, 2023
(ECF Doc. No. 226) ...............................................................................Appx895

Transcript of Motions Hearing, Dated August 22, 2023
(ECF Doc. No. 228) .............................................................................Appx1040

Transcript of Continued Motions Hearing, Dated August 23, 2023
(ECF Doc. No. 229) .............................................................................Appx1266

Transcript of Motions Hearing, Dated August 29, 2023
(ECF Doc. No. 231) .............................................................................Appx1466

Transcript of Pretrial Conference, Dated September 7, 2023
(ECF Doc. No. 232) ................................................................Appx1524

Transcript of Pretrial Conference, Dated September 8, 2023
(ECF Doc. No. 233) ................................................................Appx1741

Transcript of Pretrial Conference, Dated September 13, 2023
(ECF Doc. No. 234) ................................................................Appx1861

Transcript of Pretrial Conference, Dated September 15, 2023
(ECF Doc. No. 235) ................................................................Appx1999

Transcript of Pretrial Conference, Dated September 18, 2023
(ECF Doc. No. 236) ................................................................Appx2141

Transcript of Pretrial Conference, Dated September 21, 2023
(ECF Doc. No. 237) ................................................................Appx2235

Transcript of Motion Conference, Dated November 13, 2023
(ECF Doc. No. 238) ................................................................Appx2302

Transcript of Jury Trial, Dated February 12, 2024
(ECF Doc. No. 276) ................................................................Appx2350

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ................................................................Appx2620

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ................................................................Appx2688

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 278) ................................................................Appx2825

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 327) ................................................................Appx2948

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ................................................................Appx3074

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ................................................................Appx3189

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) .................................................................Appx3331

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) .................................................................Appx3446

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 281) .................................................................Appx3572

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 328) .................................................................Appx3697

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) .................................................................Appx3858

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) .................................................................Appx3982

Transcript of Jury Trial, Dated February 23, 2024
(ECF Doc. No. 329) .................................................................Appx4122

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) .................................................................Appx4251

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) .................................................................Appx4394

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 284) .................................................................Appx4419

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 330) .................................................................Appx4550

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) .................................................................Appx4581

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) .................................................................Appx4698

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 285) .................................................................Appx4836

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 286) ...................................................................Appx4955

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 331) ...................................................................Appx5074

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 287) ...................................................................Appx5198

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 332) ...................................................................Appx5344

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...................................................................Appx5359

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...................................................................Appx5496

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 289) ...................................................................Appx5621

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 333) ...................................................................Appx5762

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 290) ...................................................................Appx5900

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 334) ...................................................................Appx6004

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...................................................................Appx6087

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...................................................................Appx6190

Transcript of Jury Trial, Dated March 11, 2024
(ECF Doc. No. 292) ...................................................................Appx6324

Transcript of Jury Trial, Dated March 12, 2024
(ECF Doc. No. 293) ...................................................................Appx6344

Virtual Asset Analysis Expert Report of Luke Scholl,
Dated December 8, 2022.................................................................Appx6400

Expert Report #1 of Elizabeth Bisbee (Nov. 2022).....................Appx6465

Expert Report #2 of Elizabeth Bisbee (Dec. 2022) .....................Appx6493

Expert Report #3 of Elizabeth Bisbee (Jul. 2023)......................Appx6522

CS-Mazars Expert Report - Device Review Summary,
Dated May 5, 2023 .......................................................................Appx6529

CS-Mazars Expert Report - IP Overlap Analysis,
Dated November 9, 2022 ..............................................................Appx6532

CS-Mazars Expert Report - IP Graph Data Excel File..............Appx6539

Criminal Complaint, Dated April 26, 2021 (ECF Doc. No. 1) .............Appx6542

Arrest Warrant, Dated April 26, 2021 (ECF Doc. No. 5).....................Appx6556

Indictment, Filed June 14, 2021 (ECF Doc. No. 8) .............................Appx6557

Superseding Indictment, Filed July 18, 2022 (ECF Doc. No. 43) .......Appx6561

Defendant's Supporting Memorandum of Law,
Dated August 1, 2022 (ECF Doc. No. 46) ...........................................Appx6567

Attachment to Memorandum of Law -
Proposed Order of Hon. Randolph D. Moss Granting Defendant's
Motion to Dismiss (ECF Doc. No. 46-1) ....................................Appx6585

Attachment to Memorandum of Law -
Defendant's Notice of Motion to Dismiss, Dated August 1, 2022
(ECF Doc. No. 46-2) ....................................................................Appx6586

Government's Opposition to Motion, Filed August 29, 2022
(ECF Doc. No. 52) ................................................................................Appx6589

Defendant's Reply to Government's Opposition to Motion,
Dated September 7, 2022 (ECF Doc. No. 57) ......................................Appx6623

Exhibit A to Defendant's Reply -
Second Declaration of Eric Garland, Dated September 7, 2022
(ECF Doc. No. 57-1) ......................................................Appx6635

Defendant's Motions in *Limine*, Dated October 24, 2022
(ECF Doc. No. 59) .........................................................Appx6644

Exhibit A to Motions in *Limine* -
Letter from Tor Ekeland to Christopher B. Brown and
C. Alden Pelker, Dated September 23, 2022, with Exhibit A
(ECF Doc. No. 59-1) ......................................................Appx6664

Defendant's Opposition to the Government's Motions in *Limine*,
Dated November 7, 2022 (ECF Doc. No. 68) ........................Appx6680

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated March 6, 2023 (ECF Doc. No. 116) ...........................Appx6689

Notice of Bill of Particulars for Forfeiture, Filed May 17, 2023
(ECF Doc. No. 119) ......................................................Appx6709

Defendant's Notice of Intent to Present Expert Testimony,
Dated July 7, 2023 (ECF Doc. No. 145) ..............................Appx6711

Exhibit A to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Francisco Cabanas (ECF Doc. No. 145-1) ..........................Appx6716

Exhibit B to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Itiel Dror (ECF Doc. No. 145-2) ...........................Appx6725

Exhibit C to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jeffrey Fischbach (ECF Doc. No. 145-3)...................................Appx6731

Exhibit D to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jonelle Still (ECF Doc. No. 145-4) .............................Appx6737

Exhibit E to Notice of Intent -
Summary of Qualifications and Expected Testimony for
J.W. Verret (ECF Doc. No. 145-5) ...............................................Appx6741

Supplemental Summary of Qualifications and Expected
Testimony for Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 157) ...................................................................Appx6756

Notice of Expert Report for Defense Expert Jonelle Still of
Ciphertrace, Dated August 8, 2023 (ECF Doc. No. 159) .....................Appx6761

Attachment to Notice of Expert Report -
Defense Expert Report of Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 159-1) .................................................................Appx6764

Exhibit A to Notice of Expert Report -
Data Credibility in Cryptocurrency Investigations of Ciphertrace
(ECF Doc. No. 159-2) .................................................................Appx6805

Exhibit B to Notice of Expert Report -
Article Titled "Bitcoin: A Peer-to-Peer Electronic Cash System"
(ECF Doc. No. 159-3) .................................................................Appx6822

Notice of Bill of Particulars, Filed August 28, 2023
(ECF Doc. No. 173) ...................................................................Appx6832

Defense Response to Government's Motion to Admit Certain
Exhibits, Dated September 4, 2023 (ECF Doc. No. 177) .....................Appx6834

Notice of Source Code Expert Bryan Bishop Regarding Independent
Analysis of Chainalysis Reactor Source Code and Request for
Production of Chainalysis Reactor Source Code and Relevant
Related Brady Material, Dated September 5, 2023
(ECF Doc. No. 179) ...................................................................Appx6843

Chainalysis' Notice in Response to the Court's Request Regarding
Protective Order, Dated September 12, 2023
(ECF Doc. No. 195) ...................................................................Appx6860

Exhibit A to Notice in Response -
[Proposed] Heuristic Information Protective Order of
Hon. Randolph D. Moss (ECF Doc. No. 195-1)...........................Appx6862

Exhibit B to Notice in Response -
[Proposed] Heuristic Information Protective Order to Jonelle Still
of Hon. Randolph D. Moss (ECF Doc. No. 195-2).......................Appx6869

Heuristic Information Protective Order to Jonelle Still of Hon.
Randolph D. Moss, Dated September 13, 2023 (ECF Doc. No. 196)...Appx6877

Notice Regarding Court's Proposed Protective Order Governing
Review of Chainalysis' Proprietary Information,
Dated September 20, 2023 (ECF Doc. No. 199) ..................................Appx6884

Notice Regarding Ciphertrace Expert Testimony and Review of
Latest Chainalysis Production, Dated September 22, 2023
(ECF Doc. No. 205) .................................................................Appx6888

Government's Response to September 18, 2023 Minute Order
Regarding Defendant's Access to Sensitive Heuristics Information
Provided by Chainalysis, Filed September 22, 2023
(ECF Doc. No. 206) .................................................................Appx6892

Defendant's Opposition to Government's Response to
September 18, 2023, Minute Order Regarding Defendant's Access
to Sensitive Heuristics Information Provided by Chainalysis,
Dated September 29, 2023 (ECF Doc. No. 207) ..................................Appx6901

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 4, 2023 (ECF Doc. No. 210) ..................................Appx6912

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 30, 2023 (ECF Doc. No. 213) ..................................Appx6930

Defendant's Motion to Exclude any Testimony About Deepweb
Marketplaces, Dated February 8, 2024 (ECF Doc. No. 247)...............Appx6942

Attachment to Motion to Exclude -
[Proposed] Order of Hon. Randolph D. Moss
(ECF Doc. No. 247-2) ...............................................................Appx6950

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated February 29, 2024 (ECF Doc. No. 259).....................................Appx6951

Final Jury Instructions and Charges, Filed March 7, 2024
(ECF Doc. No. 265) .......................................................................Appx6982

Government's Motion for Preliminary Order of Forfeiture,
Filed June 7, 2024 (ECF Doc. No. 297)..............................................Appx7061

  Attachment to Motion for Preliminary Order of Forfeiture -
  Proposed Preliminary Order of Forfeiture Hon.
  Randolph D. Moss (ECF Doc. No. 297-1)...................................Appx7072

Defendant's Opposition to Government's Motion for Preliminary
Order of Forfeiture, Dated June 21, 2021 (ECF Doc. No. 305) ...........Appx7078

  Exhibit A to Defendant's Opposition -
  Article Titled "Chainalysis: Most Mixed Bitcoin Not Used
  For Illicit Purposes", Dated August 26, 2019
  (ECF Doc. No. 305-1) ................................................................Appx7095

  Exhibit B to Defendant's Opposition -
  Blockchain Address Search Result from Blockchain.com
  (ECF Doc. No. 305-2) ................................................................Appx7107

Government's Memorandum in Aid of Sentencing,
Filed August 1, 2024 (ECF Doc. No. 314)..........................................Appx7112

Sentencing Memorandum on behalf of Roman Sterlingov,
Dated August 15, 2024 (ECF Doc. No. 321) .......................................Appx7157

Memorandum Opinion of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 337) ....................................Appx7194

Defendant's Notice of Appeal, Dated November 19, 2024
(ECF Doc. No. 343) .......................................................................Appx7214

Memorandum for All Department Employees from The Deputy
Attorney General, Subjecting "Ending Regulation by Prosecution",
Dated April 7, 2025..........................................................................Appx7217

**Trial Exhibits:**

Trial Exhibit 601 -
Darknet Market Vendor Transaction Summary
(Document in Evidence and to be Produced Upon Request Due
to Volume) ......................................................................................Appx7221

Trial Exhibit 624.............................................................................Appx7222

Trial Exhibit 625.............................................................................Appx7223

Trial Exhibit 626.............................................................................Appx7224

Trial Exhibit 627.............................................................................Appx7225

Trial Exhibit 628(A)........................................................................Appx7226

Trial Exhibit 628(B)........................................................................Appx7227

Trial Exhibit 629.............................................................................Appx7229

Trial Exhibit 630(A)........................................................................Appx7230

Trial Exhibit 630(B)........................................................................Appx7244

Trial Exhibit 631.............................................................................Appx7247

Trial Exhibit 632.............................................................................Appx7248

Trial Exhibit 633.............................................................................Appx7252

Defense Exhibit 138 -
The-Message-Game, Written by Ice White .........................................Appx7253

Defense Exhibit 139 -
Extracted Page from The-Message-Game, Written by Ice White ......Appx7413

Government Exhibit 721 and Defense Exhibit 143 -
Boox Chat ......................................................................................Appx7414

Exhibit B to Fischbach Declaration -
Declaration of Jeffrey M. Fischbach, for Defendant, Dated August 14, 2024,
with Attachment
(ECF Doc. No. 321-2) ...............................................................Appx7415

APPEAL,CAT B,CLOSED

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:21-cr-00399-RDM-1

Case title: USA v. STERLINGOV             Date Filed: 06/14/2021

Magistrate judge case number: 1:21-mj-00400-RMM

Assigned to: Judge Randolph D. Moss

Appeals court case number: 24-3161

### Defendant (1)

**ROMAN STERLINGOV**      represented by   **Maksim Nemtsev**
MAKSIM NEMTSEV PC
20 Park Plaza
Suite 1000
Boston, MA 02116
347-251-4800
Email: menemtsev@gmail.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Marc Fernich**
LAW OFFICE OF MARC FERNICH
800 Third Avenue
Ste Floor 20
New York, NY 10022
212-446-2346
Email: maf@fernichlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Tor Ekeland**
TOR EKELAND LAW PLLC
30 Wall Street
8th Floor
Brooklyn, NY 10005
718-737-7264
Fax: 718-504-5417
Email: tor@torekeland.com
*LEAD ATTORNEY*

Appx001

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Justin V. Shur**
MOLOLAMKEN LLP
600 New Hampshire Avenue, NW
Suite 660
Washington, DC 20037
(202) 556-2005
Email: jshur@mololamken.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Marina Medvin**
MEDVIN LAW PLC
277 S Washington St
Suite 210
Alexandria, VA 22314
703-870-3300
Email: marina@medvinlaw.com
*TERMINATED: 05/23/2023*
*Designation: Retained*

**Michael Hassard**
TOR EKELAND LAW PLLC
30 Wall Street
8th Floor
New York, NY 10005
718-737-7264
Email: michael@torekeland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Sabrina P. Shroff**
SABRINA P. SHROFF, ESQ.
80 Broad Street
19th Floor
NYC, NY 10004
646-763-1490
Email: sabrinashroff@gmail.com
*TERMINATED: 03/22/2022*
*Designation: Public Defender or*
*Community Defender Appointment*

**Pending Counts**                                                            **Disposition**

Appx002

| | |
|---|---|
| 18 U.S.C. 1956(a)(3)(A), (B); MONEY LAUNDERING - FRAUD, OTHER; Money Laundering (1) | Dismissed-Superseding filed |
| 18 U.S.C. § 1956(h); MONEY LAUNDERING - FRAUD, OTHER; Money Laundering Conspiracy (1s) | Defendant sentenced to 150 months to run concurrent with counts 2s, 3s and 4s |
| 18 U.S.C. 1960(a); MONETARY LAUNDERING; Operating an Unlicensed Money Transmitting Business (2) | Dismissed-Superseding filed |
| 18 U.S.C. § 1956(a)(3)(A), (B); MONEY LAUNDERING - FRAUD, OTHER; Money Laundering (2s) | Defendant sentenced to 150 months to run concurrent with counts 1s, 3s and 4s |
| D.C. Code 26-1023(c); FEDERAL STATUTES, OTHER; Money Transmission Without a License (3) | Dismissed-Superseding filed |
| 18 U.S.C. §§ 1960(a) & 2; MONETARY LAUNDERING; Operating an Unlicensed Money Transmitting Business and Aiding and Abetting (3s) | Defendant sentenced to in 60 months to run concurrent with counts 1s, 2s, and 4s |
| D.C. Code § 26-1023(c); FEDERAL STATUTES, OTHER; Money Transmission Without a License (4s) | Defendant sentenced to in 60 months to run concurrent with counts 1s, 2s, and 3s |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| COMPLAINT in Violation of 18:1960(a), 18:1956(a)(3) and D.C. Code 26-1023(c) | |

**Movant**

**CHAINANALYSIS INC.**        represented by   **James M. Koukios**
MORRISON & FOERSTER LLP
2100 L Street NW
Suite 900
Washington, DC 20037
202-887-1590
Fax: 202-887-0763
Email: JKoukios@mofo.com
*LEAD ATTORNEY*
*Designation: Retained*

**William Frentzen**
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
415-268-7000
Fax: 415-268-7522
Email: wfrentzen@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

---

**Movant**

**MICHAEL GRONAGER**        represented by   **William Frentzen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James M. Koukios**
(See above for address)
*TERMINATED: 06/28/2023*
*Designation: Retained*

---

**Movant**

**JONATHAN LEVIN**        represented by   **William Frentzen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James M. Koukios**
(See above for address)
*TERMINATED: 06/28/2023*
*Designation: Retained*

---

**Movant**

**YOULI LEE**        represented by   **James M. Koukios**
(See above for address)
*TERMINATED: 06/28/2023*
*LEAD ATTORNEY*
*Designation: Retained*

**William Frentzen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

---

**Plaintiff**

**USA**        represented by   **Catherine Pelker**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave NW
Washington, DC 20530
202-616-5007
Email: catherine.pelker@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Christopher Brodie Brown**
DOJ-Nsd
950 Pennsylvania Avenue NW
Ste 6744a
Washington, DC 20530
202-353-0018
Email: Christopher.Brown8@usdoj.gov
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Jeffrey Pearlman**
DOJ-CRM
Ccips
US Dept of Justice
1301 New York Ave. NW
Washington, DC 20005
202-579-6543
Email: jeffrey.pearlman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

Appx005

| Date Filed | # | Docket Text |
|---|---|---|
| 04/26/2021 | 1 | SEALED COMPLAINT as to ROMAN STERLINGOV (1). (Attachments: # 1 Statement of Facts) (zstd) [1:21-mj-00400-RMM] (Entered: 04/26/2021) |
| 04/26/2021 | 3 | MOTION to Seal Case by USA as to ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(zstd) [1:21-mj-00400-RMM] (Entered: 04/26/2021) |
| 04/26/2021 | 4 | ORDER granting 3 Motion to Seal Case as to ROMAN STERLINGOV (1). Signed by Magistrate Judge Robin M. Meriweather on 04/26/2021. (zstd) [1:21-mj-00400-RMM] (Entered: 04/26/2021) |
| 04/27/2021 | 5 | Arrest Warrant Returned Executed on 04/27/2021 in Los Angeles, California as to ROMAN STERLINGOV. (zstd) [1:21-mj-00400-RMM] (Entered: 04/27/2021) |
| 04/27/2021 | | Case unsealed as to ROMAN STERLINGOV (zstd) [1:21-mj-00400-RMM] (Entered: 04/27/2021) |
| 04/27/2021 | | Arrest of Defendant ROMAN STERLINGOV in Los Angeles, California. (kk) (Entered: 06/25/2021) |
| 05/10/2021 | 11 | Rule 5(c)(3) Documents Received as to ROMAN STERLINGOV from US District Court for the Central District of California Case Number 21-mj-2068 (bb) (Entered: 08/17/2021) |
| 06/14/2021 | 8 | INDICTMENT as to ROMAN STERLINGOV (1) count(s) 1, 2, 3. (FORFEITURE ALLEGATION) (zltp) (Entered: 06/16/2021) |
| 06/15/2021 | | MINUTE ORDER as to ROMAN STERLINGOV (1): It is hereby ORDERED that ROMAN STERLINGOV appear for an initial appearance on 6/16/2021 at 2:00 p.m. before Magistrate Judge Zia M. Faruqui. The hearing will be conducted by video teleconference; call-in instructions will be provided to counsel prior to the hearing. Counsel for the United States is directed to ensure that counsel for Defendant has received this Order and will provide the information to Defendant. If Defendant does not have counsel, counsel for the United States is directed to contact the Office of the Federal Public Defender for the District of Columbia and provide their office with the information contained in this Order. If the parties have questions about this Order or the scheduled hearing, please contact the Courtroom Deputy at 202-354-3173. So Ordered by Magistrate Judge Zia M. Faruqui on 6/15/2021. (ztl) [1:21-mj-00400-RMM] (Entered: 06/15/2021) |
| 06/15/2021 | 6 | NOTICE OF ATTORNEY APPEARANCE Catherine Pelker appearing for USA. (Pelker, Catherine) [1:21-mj-00400-RMM] (Entered: 06/15/2021) |
| 06/15/2021 | 7 | NOTICE OF ATTORNEY APPEARANCE: Sabrina P. Shroff appearing for ROMAN STERLINGOV (Shroff, Sabrina) [1:21-mj-00400-RMM] (Entered: 06/15/2021) |
| 06/15/2021 | | Attorney update in case as to ROMAN STERLINGOV : Attorney Sabrina P. Shroff added as counsel for Defendant ROMAN STERLINGOV. (kk) (Entered: 06/22/2021) |
| 06/17/2021 | | Set/Reset Hearings as to ROMAN STERLINGOV: Initial Appearance continued to 6/23/2021 at 02:00 PM in Telephonic/VTC before Magistrate Judge Robin M. Meriweather. (zpt) (Entered: 06/17/2021) |

Appx006

| 06/23/2021 | 10 | PRETRIAL SERVICES REPORT as to ROMAN STERLINGOV This document is for informational purposes only. No action is requested.(Copes, John) (Entered: 06/23/2021) |
|---|---|---|
| 06/23/2021 | | ORAL MOTION by Defendant ROMAN STERLINGOV to Appoint Counsel. (kk) (Entered: 06/25/2021) |
| 06/23/2021 | | ORAL MOTION by USA for an Exclusion of Time Under the Speedy Trial Act from 6/23/2021 until 7/19/2021 as to Defendant ROMAN STERLINGOV. (kk) (Entered: 06/25/2021) |
| 06/23/2021 | | Minute Entry for Initial Appearance and Arraignment as to ROMAN STERLINGOV held by video before Magistrate Judge Robin M. Meriweather on 6/23/2021 : The defendant consents to appearing remotely. Oral Motion by ROMAN STERLINGOV to Appoint Counsel. The Court finds that the defendant is eligible for court-appointed counsel and will continue Ms. Shroff's representation of the defendant. Plea of Not Guilty entered by ROMAN STERLINGOV to Counts 1, 2 and 3. Request by the defense for notification of the defendant's consular officials of his arrest. The Government stated that it has already notified both the Swedish and Russian consulates of the defendant's situation. The Court advised the Government of its due process obligations under Rule 5(f). Status Hearing set before Judge Randolph D. Moss on 7/19/2021 at 3:30 PM by telephonic/VTC. The defendant had a detention hearing in California and was ordered detained pending trial. Oral Motion by USA for an Exclusion of Time Under the Speedy Trial Act from 6/23/2021 until 7/19/2021, with agreement by the defense, heard and granted in the interest of justice. Bond Status of Defendant: Defendant remains committed. Court Reporter: Courtroom deputy operator error of FTR equipment; hearing not recorded. Defense Attorney: Sabrina Shroff; U.S. Attorney: Jacob Steiner for Catherine Pelker and Christopher Brown; Pretrial Officer: Andre Sidbury. (kk) (Entered: 06/25/2021) |
| 07/19/2021 | | MINUTE ORDER as to ROMAN STERLINGOV (1): Pursuant to the Due Process Protections Act, it is hereby ORDERED that all government counsel shall review their disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, as set forth in Local Criminal Rule 5.1, and comply with those provisions. The failure to comply could result in dismissal of the indictment or information, dismissal of individual charges, exclusion of government evidence or witnesses, continuances, Bar discipline, or any other remedy that is just under the circumstances. Signed by Judge Randolph D. Moss on 07/19/2021. (lcrdm3) (Entered: 07/19/2021) |
| 07/19/2021 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Video (Zoom) Status Conference as to ROMAN STERLINGOV held on 7/19/2021. Due Process Protections Act Order read into the record by the Court. Defendant consents to appearing by video. Oral motion by Defendant to be housed at the Alexandria Detention Center; HEARD and HELD IN ABEYANCE. The Court will make a request with the U.S. Marshal Service to see if Defendant can be accommodated. A further Status Conference is set for 9/1/2021, at 3:30 PM, by video, before Judge Randolph D. Moss. The parties shall utilize the same link for connecting to the hearing. Speedy Trial (XT) is tolled in the interest of justice from 7/19/2021 to 9/1/2021. Bond Status of Defendant: Defendant remains committed; Court Reporter: Janice Dickman; Defense Attorneys: Michelle Peterson (stand-in until Ms. Shroff's arrival) and Sabrina Shroff (by telephone); U.S Attorneys: Christopher Brown and |

Appx007

| | | |
|---|---|---|
| | | Catherine Pelker. (kt) Modified on 7/19/2021 to add speedy trial language (kt). (Entered: 07/19/2021) |
| 08/30/2021 | 13 | MOTION for Protective Order by USA as to ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 08/30/2021) |
| 08/31/2021 | 14 | Joint MOTION to Continue *Status Hearing*, Joint MOTION for Speedy Trial *Exclusion of Time* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 08/31/2021) |
| 08/31/2021 | | MINUTE ORDER as to ROMAN STERLINGOV (1): Upon consideration of the government's motion for protective order, Dkt. 13 , it is hereby ORDERED that (1) the Defendant shall respond on or before September 3, 2021; and (2) the government shall file its reply on or before September 8, 2021. Signed by Judge Randolph D. Moss on 08/31/2021. (lcrdm3) (Entered: 08/31/2021) |
| 08/31/2021 | | MINUTE ORDER as to ROMAN STERLINGOV (1): Upon consideration of the joint motion to continue status hearing and exclude time, Dkt. 14 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that (1) the status hearing currently scheduled for September 1, 2021, at 3:30 p.m. is hereby VACATED and RESCHEDULED for September 29, 2021, at 2:00 p.m., to occur via video teleconference; and (2) time shall be excluded under the ends of justice exception to the Speedy Trial Act, 18 U.S.C. 3161, from August 31, 2021 to September 29, 2021. The parties represent that "[t]he government has produced a substantial volume of discovery in this case," including more than 8 gigabytes of records, and that "[f]orensic examination of the defendant's seized electronic devices is ongoing." Dkt. 14 at 2. The parties further represent that "the government anticipates [providing] further discovery of those electronic device records" and that "[t]he Defendant joins the motion to continue the status hearing and waives his rights under the Speedy Trial Act." *Id*. at 2-3. Finally, in their proposed order the parties note the need "to allow time for the parties to continue their discussions for a disposition of this matter short of trial." Dkt. 14-1 at 1. In light of ongoing discovery, the parties' reference to possible plea negotiations, and Defendant's representations regarding his rights under the Speedy Trial Act, the Court finds that the ends of justice served by the continuance outweigh the best interest of the public and the defendant in a speedy trial under 18 U.S.C. 3161(h)(7)(A). The parties are directed to use the video teleconference access information previously provided by the Courtroom Deputy Clerk. Signed by Judge Randolph D. Moss on 08/31/2021. (lcrdm3) Modified on 8/31/2021 to change time of hearing to comply with facility where defendant is housed (kt). (Entered: 08/31/2021) |
| 08/31/2021 | | Set/Reset Hearings as to ROMAN STERLINGOV: Status Conference set for 9/29/2021, at 2:00 PM, by video, before Judge Randolph D. Moss. (kt) (Entered: 08/31/2021) |
| 09/02/2021 | | MINUTE ORDER as to ROMAN STERLINGOV: In light of a scheduling conflict at the facility where the defendant is being housed, it is hereby ORDERED that the status conference set for September 29, 2021 at 2:00 p.m. is RESCHEDULED for 3:00 p.m. The video teleconference link remains the same. Signed by Judge Randolph D. Moss on 9/2/2021. (kt) (Entered: 09/02/2021) |

**Appx008**

| | | |
|---|---|---|
| 09/04/2021 | 15 | Memorandum in Opposition by ROMAN STERLINGOV re 13 MOTION for Protective Order *Assistant Federal Public Defender* (Shroff, Sabrina) (Entered: 09/04/2021) |
| 09/08/2021 | 16 | REPLY in Support by USA as to ROMAN STERLINGOV re 13 MOTION for Protective Order (Brown, Christopher) (Entered: 09/08/2021) |
| 09/13/2021 | 17 | MOTION for Bond by ROMAN STERLINGOV. (Attachments: # 1 Exhibit)(Shroff, Sabrina) (Entered: 09/13/2021) |
| 09/17/2021 | 18 | PROTECTIVE ORDER as to ROMAN STERLINGOV: Upon consideration of the government's motion for protective order, Dkt. 13 , it is hereby ORDERED that the motion is GRANTED in part and DENIED in part. When the government is seeking a protective order, it bears the burden of showing that good cause exists for its issuance. *United States v. Dixon*, 355 F. Supp. 3d 1, 4 (D.D.C. 2019); *see also United States v. Cordova*, 806 F.3d 1085, 1090 (D.C. Cir. 2015) (per curiam). Where good cause exists, "courts should take care to ensure that the protection afforded to [discovery] information is no broader than is necessary to accomplish the [proffered] goals of the protective order." *United States v. Smith*, 985 F. Supp. 2d 506, 524 (S.D.N.Y. 2013) (quoting *United States v. Lindh*, 198 F. Supp. 2d 739, 741-42 (E.D. Va. 2002)). Accordingly, the Court adopts a version of the government's proposed protective order, with revisions that permit the government to designate certain materials as sensitive but provides for a mechanism to resolve disputes, balancing the government's concerns regarding sensitive information with Defendant's need to review the evidence against him. See attached Order for details. The Court notes that, based on the government's representations, the number and scope of any such disputes should be limited. According to its motion, the government has produced more than 8 gigabytes of records so far, and has yet to designate even one record as "sensitive." Dkt. 16 at 3. The government further "anticipates that 'sensitive' discovery will amount to a relatively small share of the total discovery in this case." *Id*. at 8. Signed by Judge Randolph D. Moss on 09/17/2021. (lcrdm3) (Entered: 09/17/2021) |
| 09/20/2021 | | MINUTE ORDER as to ROMAN STERLINGOV (1): Upon consideration of Defendant's motion for bond, Dkt. 17 , it is hereby ORDERED that the government shall respond on or before September 23, 2021. Signed by Judge Randolph D. Moss on 09/20/2021. (lcrdm3) (Entered: 09/20/2021) |
| 09/23/2021 | 19 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 17 MOTION for Bond (Brown, Christopher) (Entered: 09/23/2021) |
| 09/24/2021 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's motion for bond, Dkt. 17 , and the government's opposition, Dkt. 19 , it is hereby ORDERED that Defendant shall file his reply on or before September 28, 2021. Signed by Judge Randolph D. Moss on 09/24/2021. (lcrdm3) (Entered: 09/24/2021) |
| 09/25/2021 | 20 | First MOTION for Extension of Time to File Response/Reply *in further support of his application for bond* by ROMAN STERLINGOV. (Shroff, Sabrina) (Entered: 09/25/2021) |
| 09/26/2021 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's motion for extension, Dkt. 20 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Defendant shall file his reply brief on or before October 12, 2021. Signed by Judge Randolph D. Moss on 09/26/2021. (lcrdm3) (Entered: |

| | | |
|---|---|---|
| | | 09/26/2021) |
| 09/27/2021 | | Set/Reset Deadlines as to ROMAN STERLINGOV: Defendant's Reply due by 9/28/2021. (kt) (Entered: 09/27/2021) |
| 09/27/2021 | | Set/Reset Deadlines as to ROMAN STERLINGOV: Defendant's Reply due by 10/12/2021. (kt) (Entered: 09/27/2021) |
| 09/29/2021 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Video (Zoom) Status Conference as to ROMAN STERLINGOV held on 9/29/2021. Defendant consented to appearing by video. For the reasons stated on the record, the parties shall file a Joint Status Report by 11/30/2021. A Detention Hearing is set for 10/19/2021, at 2:00 PM, by video, before Judge Randolph D. Moss. The parties shall utilize the same link for connecting to the hearing. Speedy Trial (XT) is tolled in the interest of justice from 9/29/2021 to 11/30/2021. Bond Status of Defendant: Defendant remains committed; Court Reporter: Jeff Hook; Defense Attorney: Sabrina Shroff; U.S. Attorneys: Christopher Brown and Catherine Pelker. (kt) (Entered: 09/29/2021) |
| 10/12/2021 | 21 | MOTION FOR EXTENSION OF TIME by ROMAN STERLINGOV. (Shroff, Sabrina) Modified text and event type on 10/12/2021 (zltp). (Entered: 10/12/2021) |
| 10/12/2021 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's motion to continue, Dkt. 21 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Defendant shall file his reply brief in support of his motion for bond before 11 a.m. on October 19, 2021. Signed by Judge Randolph D. Moss on 10/12/2021. (lcrdm3) (Entered: 10/12/2021) |
| 10/18/2021 | 22 | REPLY in Support by ROMAN STERLINGOV re 17 MOTION for Bond *Assistant Federal Public Defender* (Shroff, Sabrina) (Entered: 10/18/2021) |
| 10/19/2021 | 23 | MOTION to Continue by ROMAN STERLINGOV. (Shroff, Sabrina) (Entered: 10/19/2021) |
| 10/19/2021 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the motion to continue, Dkt. 23 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that (1) the hearing set for October 19, 2021, at 2:00 p.m., is hereby VACATED and RESCHEDULED for October 25, 2021, at 10:00 a.m., in Courtroom 21; and (2) time shall be excluded under the ends of justice exception to the Speedy Trial Act, 18 U.S.C. 3161, from October 19, 2021, to October 25, 2021. Counsel represents that the Defendant has requested an in-person hearing, Dkt. 23 at 1, and has separately informed the Court that due to extenuating circumstances she is currently unavailable for such a hearing. Based on these representations, and the limited nature of the requested continuance, the Court finds that the ends of justice served by the continuance outweigh the best interest of the public and the defendant in a speedy trial under 18 U.S.C. 3161(h)(7)(A). Signed by Judge Randolph D. Moss on 10/19/2021. (lcrdm3) (Entered: 10/19/2021) |
| 10/21/2021 | | MINUTE ORDER as to ROMAN STERLINGOV: The Court tolled time under the Speedy Trial Act until October 25, 2021, when granting Defendant Sterlingov's motion to continue, Dkt. 23 , the detention hearing in this matter. *See* Minute Order (Oct. 19, 2021). But the Court had already tolled time until November 30, 2021, *see* Minute Entry (Sept. 29, 2021), and so upon the Court's own motion, it is hereby ORDERED that time remains excluded under the ends of justice exception to the Speedy Trial Act, 18 U.S.C. 3161, until November 30, 2021, for the reasons given on the record at the |

Appx010

| | | |
|---|---|---|
| | | status conference on September 29, 2021. Signed by Judge Randolph D. Moss on 10/21/2021. (lcrdm3) (Entered: 10/21/2021) |
| 10/25/2021 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Detention Hearing as to ROMAN STERLINGOV held on 10/25/2021. Motion HEARD and TAKEN UNDER ADVISEMENT. Bond Status of Defendant: Defendant remains committed; Court Reporter: Jeff Hook; Defense Attorney: Sabrina Shroff; U.S. Attorneys: Catherine Pelker and Christopher Brown; Pretrial Services: Andre Sidbury; Witness: Alexander Kosiakov. (kt) (Entered: 10/25/2021) |
| 10/26/2021 | 24 | REPLY in Support by ROMAN STERLINGOV re 17 MOTION for Bond (Shroff, Sabrina) (Entered: 10/26/2021) |
| 11/10/2021 | 25 | MEMORANDUM OPINION AND ORDER as to ROMAN STERLINGOV: For the reasons given in the attached Memorandum Opinion and Order, Defendant Sterlingov's motion to revoke pretrial detention, Dkt. 17 , is DENIED. See document for details. Signed by Judge Randolph D. Moss on 11/10/2021. (lcrdm3) Modified on 11/12/2021 to change document type to "opinion"(kt). (Entered: 11/10/2021) |
| 11/30/2021 | 26 | Joint STATUS REPORT *and Motion To Exclude Time Under Speedy Trial Act* by USA as to ROMAN STERLINGOV (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 11/30/2021) |
| 11/30/2021 | 27 | MOTION to Exclude Time Under the Speedy Trial Act by USA as to ROMAN STERLINGOV. (See docket entry 26 to view document.) (zltp) (Entered: 12/02/2021) |
| 12/01/2021 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the parties' joint status report and motion to exclude time, Dkt. 26 , it is hereby ORDERED that (1) the parties shall file a further status report on or before January 13, 2022; and (2) time shall be excluded under the ends of justice exception to the Speedy Trial Act, 18 U.S.C. 3161, from December 1, 2021, to January 13, 2022. The parties represent that the "the government has produced discovery[,] including more than 8 gigabytes of records;" that [t]he government is preparing a plea offer and anticipates an offer will be forthcoming in the next one to two weeks;" and that this "additional period is necessary to allow the defendant to fully review the discovery in the case, and to allow the parties to engage in discussions regarding possible resolutions of the case short of trial." Dkt. 26 at 2. According to the joint status report, moreover, "defendant consents to waive his rights under the Speedy Trial Act." *Id*. In light of these representations, the volume and complexity of the discovery in this case, and the ongoing plea negotiations, the Court finds the ends of justice served by the continuance outweigh the best interest of the public and the defendant in a speedy trial under 18 U.S.C. 3161(h)(7)(A). Signed by Judge Randolph D. Moss on 12/1/2021. (lcrdm3) (Entered: 12/01/2021) |
| 12/01/2021 | | Set/Reset Deadlines as to ROMAN STERLINGOV: Joint Status Report due by 1/13/2022. (kt) (Entered: 12/01/2021) |
| 01/14/2022 | 28 | Joint STATUS REPORT *and Motion To Exclude Time Under Speedy Trial Act* by USA as to ROMAN STERLINGOV (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 01/14/2022) |
| 01/14/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the joint status report, Dkt. 28 , it is hereby ORDERED that (1) the parties shall file a further status report on or before March 14, 2022; and (2) time shall be excluded under the |

Appx011

| | | |
|---|---|---|
| | | ends of justice exception to the Speedy Trial Act, 18 U.S.C. 3161, from January 14, 2022, until March 14, 2022. The parties represent that the government was only able to extend a plea offer on January 10, 2022, and "request a continuance of approximately 60 days to facilitate review of discovery and discussions between the parties about possible resolution of this case short of trial." Dkt. 28 at 1. Counsel for defendant "consents on behalf of her client" to this requested continuance and exclusion of time. *Id.* at 2. In light of these representations and the ongoing plea negotiations in this matter, the Court finds that the ends of justice served by the continuance outweigh the best interest of the public and the Defendant in a speedy trial under 18 U.S.C. 3161(h)(7)(A). Signed by Judge Randolph D. Moss on 1/14/2022. (lcrdm3) (Entered: 01/14/2022) |
| 01/14/2022 | 29 | MOTION TO EXCLUDE TIME UNDER SPEEDY TRIAL ACT by USA as to ROMAN STERLINGOV. (See docket entry 28 to view document.) (zltp) (Entered: 01/19/2022) |
| 03/14/2022 | 30 | Joint STATUS REPORT *and Motion To Exclude Time Under Speedy Trial Act* by USA as to ROMAN STERLINGOV (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 03/14/2022) |
| 03/14/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the joint status report, Dkt. 30 , it is hereby ORDERED that (1) the parties shall file a further status report on or before April 13, 2022; and (2) time shall be excluded under the ends of justice exception to the Speedy Trial Act, 18 U.S.C. 3161, from March 14, 2022, until April 13, 2022. The government represents that on February 18, 2022, "attorneys from the firm Tor Ekeland Law, PLLC contacted the government and stated that they had been retained by the defendant in this case." Dkt. 30 at 1. "In light of the defendant's anticipated change in representation, the parties respectfully request a continuance of approximately 30 days to allow new counsel to review discovery and to facilitate discussions between the parties about possible resolution of this case short of trial." *Id.* at 1-2. The government further represents that "[t]his additional period is necessary to allow the defendant's prospective new counsel to fully review the discovery in the case, and to allow the parties to engage in discussions regarding possible resolutions of the case short of trial." *Id.* at 2. Finally, the government represents that "defense counsel consents on behalf of her client" to the proposed continuance and exclusion of time. *Id.* In light of these representations, the potential for new counsel to enter this case and the need for any such counsel to review the voluminous discovery in this case, and the ongoing plea negotiations in this matter, the Court finds that the ends of justice served by the continuance outweigh the best interest of the public and the Defendant in a speedy trial under 18 U.S.C. 3161(h)(7)(A). Signed by Judge Randolph D. Moss on 03/14/2022. (lcrdm3) (Entered: 03/14/2022) |
| 03/14/2022 | 31 | MOTION to Exclude time under the Speedy Trial Act by USA as to ROMAN STERLINGOV. (See docket entry 30 to view document.) (zltp) (Entered: 03/15/2022) |
| 03/16/2022 | 32 | MOTION for Leave to Appear Pro Hac Vice Tor Ekeland Fee Status: Fee Paid, Receipt No. 201786. by ROMAN STERLINGOV. (Attachments: # 1 Declaration Hand-signed declaration of Tor Ekeland, # 2 Exhibit Certificate of Good Standing) (Medvin, Marina) Modified fee status on 3/30/2022 (zltp). (Entered: 03/16/2022) |

**Appx012**

| 03/22/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's motion for leave to appear pro hac vice, Dkt. 32 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Tor Ekeland is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a).** Counsel is further instructed to promptly pay the fee associated with the instant motion. *See* LCrR 44.1(d). Signed by Judge Randolph D. Moss on 03/22/2022. (lcrdm3) (Entered: 03/22/2022) |
|---|---|---|
| 03/22/2022 | 33 | NOTICE OF ATTORNEY APPEARANCE: Tor Ekeland appearing for ROMAN STERLINGOV (Ekeland, Tor) (Entered: 03/22/2022) |
| 03/22/2022 | 34 | MOTION for Leave to Appear Pro Hac Vice Michael Hassard Fee Status: Fee Paid, Receipt No. 201944. by ROMAN STERLINGOV. (Attachments: # 1 Certificate of Good Standing, # 2 Declaration Declaration)(Medvin, Marina) Modified fee status on 4/13/2022 (zltp). (Entered: 03/22/2022) |
| 03/23/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the motion to appear pro hac vice, Dkt. 54 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Michael Hassard is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a).** Counsel is further instructed to promptly pay the fee associated with the instant motion. *See* LCrR 44.1(d). Signed by Judge Randolph D. Moss on 03/23/2022. (lcrdm3) (Entered: 03/23/2022) |
| 04/04/2022 | 35 | NOTICE OF ATTORNEY APPEARANCE: Michael Hassard appearing for ROMAN STERLINGOV (Hassard, Michael) (Main Document 35 replaced on 4/13/2022) (znmw). (Entered: 04/04/2022) |
| 04/13/2022 | 36 | Joint STATUS REPORT *and Motion To Exclude Time Under Speedy Trial Act* by USA as to ROMAN STERLINGOV (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 04/13/2022) |
| 04/13/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the parties' joint status report, Dkt. 36 , it is hereby ORDERED that (1) the parties shall submit a further status report on or before May 13, 2022; and (2) time shall be excluded under the ends of justice exception to the Speedy Trial Act, 18 U.S.C. 3161, from April 13, 2022, to May 13, 2022. The parties represent that new counsel for the Defendant recently appeared in this matter and that the "government is in the process of re-producing discovery to [new] defense counsel." Dkt. 36 at 1. The parties, accordingly, "respectfully request a continuance of approximately 30 days to allow defense counsel to review discovery and to facilitate discussions between the parties about possible resolution of this case short of trial." *Id*. at 1-2. The government "further moves to exclude time under the Speedy Trial Act in the interests of justice" during the intervening time and represents that the defense "does not object to . . . exclusion of time under the Speedy Trial Act." *Id*. at 2. In light of these representations, and in particular the need for new counsel for the Defendant to review the discovery in this case and consult with the Defendant regarding possible plea negotiations, the Court finds that the ends of justice served by the continuance outweigh the best interest of the public and the defendant in a speedy trial under 18 U.S.C. 3161(h)(7)(A). Signed by Judge Randolph D. Moss on 04/13/2022. (lcrdm3) (Entered: 04/13/2022) |

Appx013

| 04/13/2022 | 37 | MOTION to Exclude Time under the Speedy Trial Act by USA as to ROMAN STERLINGOV. (See docket entry 36 to view document.) (zltp) (Entered: 04/14/2022) |
|---|---|---|
| 05/13/2022 | 38 | Joint STATUS REPORT *and Motion for Status Hearing and To Exclude Time Under Speedy Trial Act* by USA as to ROMAN STERLINGOV (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 05/13/2022) |
| 05/13/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the parties' joint status report, Dkt. 38 , it is hereby ORDERED that (1) the parties shall appear for a status conference on June 9, 2022, at 3:00 p.m., in Courtroom 8; and (2) time shall be excluded under the ends of justice exception to the Speedy Trial Act, 18 U.S.C. 3161, from May 13, 2022, to June 9, 2022. The parties represent that the government "has produced discovery including more than 23 gigabytes of records comprising investigative records produced by FBI and IRS-Criminal Investigation, records of undercover transactions, grand jury subpoena returns, electronic search warrant returns, and other records," and that the "government sent a plea offer to the defendant, but the offer was not accepted." Dkt. 38 at 1. The parties, accordingly, "request a Status Hearing to schedule a jury trial and set a pretrial briefing schedule" and agree that exclusion of time is appropriate under the Speedy Trial Act. *Id.* at 2. Specifically, the government represents (and Defendant does not object) that "[t]his additional period is necessary to allow the defendants counsel to fully review the discovery in the case, and to allow the parties to engage in discussions regarding possible resolutions of the case short of trial." *Id.* In light of these representations, and in particular the need to ensure time for Defendant to continue to review the evidence and consider the possibility of a plea, the Court finds that the ends of justice served by the continuance outweigh the best interest of the public and the defendant in a speedy trial under 18 U.S.C. 3161(h)(7)(A). Signed by Judge Randolph D. Moss on 05/13/2022. (lcrdm3) (Entered: 05/13/2022) |
| 05/13/2022 | 39 | MOTION for Status Hearing and MOTION to Exclude Time under the Speedy Trial Act by USA as to ROMAN STERLINGOV. (See docket entry 38 to view document.) (zltp) (Entered: 05/16/2022) |
| 05/23/2022 | 40 | NOTICE *of Bill of Particulars for Forfeiture* by USA as to ROMAN STERLINGOV (Brown, Christopher) (Entered: 05/23/2022) |
| 06/09/2022 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Status Conference as to ROMAN STERLINGOV held on 6/9/2022. For the reasons stated on the record, that parties shall confer with each other and contact the Courtroom Deputy Clerk as to potential trial dates, then file a Joint Status Report with the Court on or before 6/30/2022. Speedy Trial (XT) tolled in the interest of justice from 6/9/2022 to 6/30/2022. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Bryan Wayne; Defense Attorneys: Tor Ekeland and Michael Hassard; U.S. Attorneys: Christopher Brown and Catherine Pelker. (kt) (Entered: 06/09/2022) |
| 06/30/2022 | 41 | Joint STATUS REPORT *and Motion To Exclude Time Under Speedy Trial Act* by USA as to ROMAN STERLINGOV (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 06/30/2022) |
| 06/30/2022 | 42 | MOTION to Exclude Time under the Speedy Trial Act by USA as to ROMAN STERLINGOV. (See docket entry 41 to view document.)(zltp) (Entered: 07/01/2022) |

**Appx014**

| | | |
|---|---|---|
| 07/01/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the parties' joint status report, Dkt. 41 , it is hereby ORDERED that the following schedule shall govern pretrial proceedings in this matter: (1) any pretrial motions other than motions in limine shall be filed on or before August 1, 2022; (2) oppositions to any such motions shall be filed on or before August 29, 2022; (3) replies in support of any such motion shall be filed on or before September 7, 2022; (4) any motions in limine shall be filed on or before October 24, 2022; (5) oppositions to any motions in limine shall be filed on or before November 7, 2022; (6) replies in support of any motions in limine shall be filed on or before November 14, 2022; and (7) a joint pretrial statement, to include a neutral statement of the case, any case-specific voir dire, and proposed preliminary and final jury instructions, shall be filed on or before November 21, 2022. It is further ORDERED that (1) the parties shall appear for a pretrial conference in this matter on December 1, 2022, at 10:00 a.m., in Courtroom 8; (2) jury selection shall begin in this matter on January 4, 2023, at 9:30 a.m., in Courtroom 8; and (3) time shall be excluded under the ends of justice exception to the Speedy Trial Act, 18 U.S.C. 3161, from July 1, 2022, to January 4, 2023. The government "moves, pursuant to 18 U.S.C. § 3161(h)(7)(A), to exclude time under the Speedy Trial Act in the interests of justice from June 30, 2022 until the date ultimately selected by this Court for trial," and represents that "[t]his additional period is necessary for defense counsel to fully review the voluminous and complex discovery in the case and to adequately prepare for trial, and to allow the parties to engage in discussions regarding possible resolutions of the case short of trial." Dkt. 41 at 2. The government further represents that it "has conferred with defense counsel regarding this motion" and that "[d]efense counsel does not object to the motion or to exclusion of time under the Speedy Trial Act." *Id.* Given these representations, the volume of discovery in this unique and complex case, and the potential for further plea negotiations, the Court finds that the ends of justice served by the continuance outweigh the best interest of the public and the Defendant in a speedy trial under 18 U.S.C. 3161(h)(7)(A). Signed by Judge Randolph D. Moss on 07/01/2022. (lcrdm3) (Entered: 07/01/2022) |
| 07/18/2022 | 43 | SUPERSEDING INDICTMENT as to ROMAN STERLINGOV (1) count(s) 1s, 2s, 3s, 4s. (FOREFEITURE ALLEGATION) (zltp) (Entered: 07/19/2022) |
| 07/19/2022 | | NOTICE OF HEARING as to ROMAN STERLINGOV: Arraignment set for 7/27/2022, at 3:30 PM, by video, before Judge Randolph D. Moss. (kt) (Entered: 07/19/2022) |
| 07/27/2022 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Video (Zoom) Arraignment/Status Conference as to ROMAN STERLINGOV held on 7/27/2022. Defendant arraigned on Counts 1s, 2s, 3s, and 4s of the Superseding Indictment. Plea of Not Guilty entered on ALL Counts. Bond Status of Defendant: Defendant remains committed; Court Reporter: Lisa Edwards; Defense Attorneys: Tor Ekeland and Michael Hassard; U.S. Attorneys: Catherine Pelker and Christopher Brown. (kt) (Entered: 07/27/2022) |
| 08/01/2022 | 45 | MOTION for Bill of Particulars by ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order, # 2 Notice to Counsel/Party)(Ekeland, Tor) (Entered: 08/01/2022) |
| 08/01/2022 | 46 | MOTION to Dismiss Case by ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order, # 2 Notice to Counsel/Party)(Ekeland, Tor) (Entered: 08/01/2022) |

Appx015

| | | |
|---|---|---|
| 08/01/2022 | 47 | MOTION for Reconsideration re 25 Order on Motion for Bond, by ROMAN STERLINGOV. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order, # 4 Notice to Counsel/Party)(Ekeland, Tor) (Entered: 08/01/2022) |
| 08/01/2022 | 48 | First MOTION for Release of Funds by ROMAN STERLINGOV. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order, # 4 Notice to Counsel/Party)(Ekeland, Tor) (Entered: 08/01/2022) |
| 08/01/2022 | 49 | MOTION for Discovery *12(b)(4)(B) Request* by ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order, # 2 Notice to Counsel/Party)(Ekeland, Tor) (Entered: 08/01/2022) |
| 08/17/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: In light of Mr. Sterlingov's motion for reconsideration 47 of the Court's November 10, 2021 order on motion for bond 25 , it is hereby ORDERED that (1) the government shall respond to Mr. Sterlingov's motion on or before August 24, 2022; and (2) Mr. Sterlingov shall file any reply on or before August 31, 2022. Signed by Judge Randolph D. Moss on 08/17/2022. (lcrdm3) (Entered: 08/17/2022) |
| 08/24/2022 | 50 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 47 Motion for Reconsideration *of Pretrial Detention* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Pelker, Catherine) (Entered: 08/24/2022) |
| 08/29/2022 | 51 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 45 Motion for Bill of Particulars (Brown, Christopher) (Entered: 08/29/2022) |
| 08/29/2022 | 52 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 46 Motion to Dismiss Case (Brown, Christopher) (Entered: 08/29/2022) |
| 08/29/2022 | 53 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 48 Motion for Release of Funds (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Declaration of FBI Specialist Luke Scholl)(Brown, Christopher) (Entered: 08/29/2022) |
| 08/29/2022 | 54 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 49 Motion for Discovery (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Brown, Christopher) (Entered: 08/29/2022) |
| 08/31/2022 | 55 | REPLY TO OPPOSITION to Motion by ROMAN STERLINGOV re 47 MOTION for Reconsideration re 25 Order on Motion for Bond, (Attachments: # 1 Exhibit Exhibit A)(Ekeland, Tor) (Entered: 08/31/2022) |
| 09/07/2022 | 56 | REPLY TO OPPOSITION to Motion by ROMAN STERLINGOV re 48 First MOTION for Release of Funds (Ekeland, Tor) (Entered: 09/07/2022) |
| 09/07/2022 | 57 | REPLY TO OPPOSITION to Motion by ROMAN STERLINGOV re 46 MOTION to Dismiss Case (Attachments: # 1 Declaration)(Ekeland, Tor) (Entered: 09/07/2022) |
| 10/05/2022 | 58 | ORDER: For the reasons explained herein, Defendant's motion for reconsideration, Dkt. 47 , of the Court's order on his motion for bond, Dkt. 25 , is hereby DENIED. Signed by Judge Randolph D. Moss on 10/5/2022. (lcrdm3) (Entered: 10/05/2022) |
| 10/24/2022 | 59 | MOTION in Limine by ROMAN STERLINGOV. (Attachments: # 1 Exhibit A)(Ekeland, Tor) (Entered: 10/24/2022) |

Appx016

| Date | No. | Docket Text |
|---|---|---|
| 10/24/2022 | 60 | MOTION in Limine *for Attorney-Directed Voir Dire* by ROMAN STERLINGOV. (Ekeland, Tor) (Entered: 10/24/2022) |
| 10/24/2022 | 61 | NOTICE *OF INTENT TO PRESENT EXPERT TESTIMONY* by USA as to ROMAN STERLINGOV (Pelker, Catherine) (Entered: 10/24/2022) |
| 10/24/2022 | 62 | MOTION in Limine *AND NOTICE OF INTENT TO ADMIT CERTAIN EXHIBITS* by USA as to ROMAN STERLINGOV. (Pelker, Catherine) (Entered: 10/24/2022) |
| 10/24/2022 | 63 | MOTION for 404(b) Evidence *Notice and Motion in Limine To Admit Evidence as Intrinsic Evidence or, in the Alternative, as 404(b) Evidence* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 10/24/2022) |
| 10/24/2022 | 64 | MOTION in Limine , MOTION To Preclude Defense from Calling Prosecutor as Witness for the Defense by USA as to ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 10/24/2022) |
| 10/24/2022 | 65 | MOTION in Limine *To Preclude Certain Impermissible Defense Arguments and Evidence* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 10/24/2022) |
| 10/24/2022 | 66 | MOTION in Limine *and Notice Regarding Willful Blindness Instruction as to Counts One and Three, and Permission To Refer to Willful Blindness in Opening Statement* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 10/24/2022) |
| 11/01/2022 |  | MINUTE ORDER as to ROMAN STERLINGOV: Due a conflict in the Court's schedule, it is hereby ORDERED that the pre-trial conference in this case currently scheduled for December 1, 2022, is VACATED and RESCHEDULED for December 9, 2022, at 10:00 a.m., in Courtroom 8. It is further ORDERED that jury selection in this case, currently scheduled to begin January 4, 2023, is hereby VACATED and RESCHEDULED to begin on January 9, 2023, at 9:30 a.m., in the Ceremonial Courtroom. Signed by Judge Randolph D. Moss on 11/1/2022. (lcrdm1) (Entered: 11/01/2022) |
| 11/07/2022 | 67 | Memorandum in Opposition by ROMAN STERLINGOV re 64 Motion in Limine, Motion for Miscellaneous Relief (Ekeland, Tor) (Entered: 11/07/2022) |
| 11/07/2022 | 68 | Memorandum in Opposition by ROMAN STERLINGOV re 66 Motion in Limine, (Ekeland, Tor) (Entered: 11/07/2022) |
| 11/07/2022 | 69 | Memorandum in Opposition by ROMAN STERLINGOV re 65 Motion in Limine (Ekeland, Tor) (Entered: 11/07/2022) |
| 11/07/2022 | 70 | Memorandum in Opposition by ROMAN STERLINGOV re 63 Motion for 404(b) Evidence (Ekeland, Tor) (Entered: 11/07/2022) |
| 11/07/2022 | 71 | Memorandum in Opposition by ROMAN STERLINGOV re 62 Motion in Limine (Ekeland, Tor) (Entered: 11/07/2022) |
| 11/07/2022 | 72 | MOTION in Limine *in Opposition to the Government's Notice of Expert Witnesses [Dkt. 61]* by ROMAN STERLINGOV. (Ekeland, Tor) (Entered: 11/07/2022) |

Appx017

| | | |
|---|---|---|
| 11/07/2022 | 73 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 59 Motion in Limine *Defendant's Omnibus Motions in Limine* (Attachments: # 1 Exhibit 1)(Brown, Christopher) (Entered: 11/07/2022) |
| 11/07/2022 | 74 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 60 Motion in Limine *for Attorney-Directed Voir Dire* (Brown, Christopher) (Entered: 11/07/2022) |
| 11/14/2022 | 75 | REPLY TO OPPOSITION to Motion by ROMAN STERLINGOV re 60 MOTION in Limine *for Attorney-Directed Voir Dire* (Ekeland, Tor) (Entered: 11/14/2022) |
| 11/14/2022 | 76 | REPLY TO OPPOSITION to Motion by ROMAN STERLINGOV re 59 MOTION in Limine (Ekeland, Tor) (Entered: 11/14/2022) |
| 11/14/2022 | 77 | REPLY by USA as to ROMAN STERLINGOV re 61 Notice (Other) *OF INTENT TO PRESENT EXPERT TESTIMONY* (Pelker, Catherine) (Entered: 11/14/2022) |
| 11/14/2022 | 78 | REPLY in Support by USA as to ROMAN STERLINGOV re 62 MOTION in Limine *AND NOTICE OF INTENT TO ADMIT CERTAIN EXHIBITS* (Pelker, Catherine) (Entered: 11/14/2022) |
| 11/14/2022 | 79 | REPLY in Support by USA as to ROMAN STERLINGOV re 63 MOTION for 404(b) Evidence *Notice and Motion in Limine To Admit Evidence as Intrinsic Evidence or, in the Alternative, as 404(b) Evidence* (Brown, Christopher) (Entered: 11/14/2022) |
| 11/14/2022 | 80 | REPLY in Support by USA as to ROMAN STERLINGOV re 64 MOTION in Limine MOTION To Preclude Defense from Calling Prosecutor as Witness for the Defense (Brown, Christopher) (Entered: 11/14/2022) |
| 11/14/2022 | 81 | REPLY in Support by USA as to ROMAN STERLINGOV re 65 MOTION in Limine *To Preclude Certain Impermissible Defense Arguments and Evidence* (Brown, Christopher) (Entered: 11/14/2022) |
| 11/14/2022 | 82 | REPLY in Support by USA as to ROMAN STERLINGOV re 66 MOTION in Limine *and Notice Regarding Willful Blindness Instruction as to Counts One and Three, and Permission To Refer to Willful Blindness in Opening Statement* (Brown, Christopher) (Entered: 11/14/2022) |
| 11/17/2022 | 83 | MOTION to Continue by ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Ekeland, Tor) (Entered: 11/17/2022) |
| 11/17/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's motion to continue, Dkt. 83 , the government is hereby ORDERED to respond on or before November 22, 2022. Signed by Judge Randolph D. Moss on 11/17/2022. (lcrdm1) (Entered: 11/17/2022) |
| 11/18/2022 | 84 | RESPONSE by USA as to ROMAN STERLINGOV re 83 MOTION to Continue (Brown, Christopher) (Entered: 11/18/2022) |
| 11/21/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's motion to continue trial, Dkt. 83 , and the government's response, Dkt. 84 , the parties are hereby ORDERED to appear for a status conference to be held via Zoom on December 1, 2022, at 3:30 p.m. Signed by Judge Randolph D. Moss on 11/21/2022. (lcrdm1) (Entered: 11/21/2022) |

Appx018

| 11/21/2022 | 85 | Proposed Jury Instructions by ROMAN STERLINGOV (Ekeland, Tor) (Entered: 11/21/2022) |
|---|---|---|
| 11/21/2022 | 86 | Proposed Jury Instructions by ROMAN STERLINGOV (Ekeland, Tor) (Entered: 11/21/2022) |
| 11/21/2022 | 87 | Proposed Voir Dire by ROMAN STERLINGOV (Ekeland, Tor) (Entered: 11/21/2022) |
| 11/21/2022 | 88 | STATEMENT OF CASE by ROMAN STERLINGOV (Ekeland, Tor) (Entered: 11/21/2022) |
| 11/21/2022 | 89 | NOTICE *of Filing of Pretrial Statement Materials* by USA as to ROMAN STERLINGOV (Brown, Christopher) (Entered: 11/21/2022) |
| 11/21/2022 | 90 | STATEMENT OF CASE by USA as to ROMAN STERLINGOV (Brown, Christopher) (Entered: 11/21/2022) |
| 11/21/2022 | 91 | Proposed Voir Dire by USA as to ROMAN STERLINGOV (Brown, Christopher) (Entered: 11/21/2022) |
| 11/21/2022 | 92 | Proposed Jury Instructions by USA as to ROMAN STERLINGOV (Brown, Christopher) (Entered: 11/21/2022) |
| 11/23/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Due to a scheduling conflict at the facility where the Defendant is being held, it is hereby ORDERED that the status conference set for December 1, 2022 is VACATED and RESCHEDULED for November 30, 2022, at 3:30 p.m., by video. Signed by Judge Randolph D. Moss on 11/23/2022. (kt) (Entered: 11/23/2022) |
| 11/29/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Due to another scheduling conflict at the facility where the Defendant is being held, it is hereby ORDERED that the status conference set for November 30, 2022 is VACATED and RESCHEDULED for December 2, 2022, at 2:00 p.m., by video. Signed by Judge Randolph D. Moss on 11/29/2022. (kt) (Entered: 11/29/2022) |
| 11/30/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Due to continued scheduling conflicts with the facility where the Defendant is being held, it is hereby ORDERED that the parties shall appear in person for the status conference set for December 2, 2022, at 2:00 p.m., which will take place in Courtroom 8. Signed by Judge Randolph D. Moss on 11/30/2022. (lcrdm1) (Entered: 11/30/2022) |
| 11/30/2022 | 93 | MOTION to Quash *Early-Return Rule 17(c) Subpoenas* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Exhibit 1, # 2 Text of Proposed Order)(Brown, Christopher) (Entered: 11/30/2022) |
| 12/02/2022 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Status Conference as to ROMAN STERLINGOV held on 12/2/2022. The Jury Selection/Jury Trial set for 1/4/2023 is VACATED and RESCHEDULED for 9/14/2023, at 9:30 AM, in Courtroom 8, before Judge Randolph D. Moss. Defendant's supplement to his 48 First Motion for Release of Funds is due by 12/21/2022; Government's Response due by 1/6/2023. A Motion Hearing on the matter is set for 1/13/2023, at 2:00 PM, in Courtroom 8, before Judge Randolph D. Moss. A Daubert Hearing and Motion Hearing on the pretrial motions and motions in limine is set for 4/12/2023, at 10:00 AM, in Courtroom 8, before Judge Randolph D. Moss. The Pretrial Conference set for 1/9/2023 is VACATED and RESCHEDULED for 8/30/2023, at 2:00 PM, in |

Appx019

| | | |
|---|---|---|
| | | Courtroom 8, before Judge Randolph D. Moss. Speedy Trial (XT) is tolled in the interest of justice from 1/4/2023 to 9/14/2023. Bond Status of Defendant: Committed/ Commitment Issued; Court Reporter: Jeff Hook; Defense Attorneys: Tor Ekeland and Michael Hassard; U.S. Attorneys: Christopher Brown and Catherine Pelker. (kt) (Entered: 12/02/2022) |
| 12/09/2022 | 94 | NOTICE of Attorney Appearance as to YOULI LEE, JONATHAN LEVIN, MICHAEL GRONAGER, CHAINANALYSIS INC. "Leave to file GRANTED" by Judge Randolph D. Moss on 12/9/2022. (zltp) (Entered: 12/09/2022) |
| 12/09/2022 | 95 | MOTION to Quash Subpoena by YOULI LEE, JONATHAN LEVIN, MICHAEL GRONAGER, CHAINANALYSIS INC. as to ROMAN STERLINGOV. "Leave to file GRANTED" by Judge Randolph D. Moss on 12/9/2022. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(zltp) (Entered: 12/09/2022) |
| 12/09/2022 | 96 | MOTION for Leave to Appear Pro Hac Vice William Frentzen Filing fee $ 100, receipt number ADCDC-9725297. Fee Status: Fee Paid. by YOULI LEE, JONATHAN LEVIN, MICHAEL GRONAGER, CHAINANALYSIS INC. as to ROMAN STERLINGOV. (Attachments: # 1 Frentzen Declaration with Certificate of Good Standing, # 2 Text of Proposed Order)(Koukios, James) (Entered: 12/09/2022) |
| 12/14/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of movant's motion for admission pro hac vice, Dkt. 96 , it is hereby ORDERED that the motion is GRANTED. WILLIAM FRENTZEN is hereby granted leave to appear pro hac vice in this case. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a). Click for Instructions**. Signed by Judge Randolph D. Mo ss on 12/14/2022. (lcrdm1) (Entered: 12/14/2022) |
| 12/14/2022 | 97 | Memorandum in Opposition by ROMAN STERLINGOV re 93 Motion to Quash (Attachments: # 1 Exhibit A)(Ekeland, Tor) (Entered: 12/14/2022) |
| 12/21/2022 | 98 | NOTICE *of Appearance for Non-Parties* by YOULI LEE, JONATHAN LEVIN, MICHAEL GRONAGER, CHAINANALYSIS INC. as to ROMAN STERLINGOV (Frentzen, William) (Entered: 12/21/2022) |
| 12/21/2022 | 99 | REPLY in Support by USA as to ROMAN STERLINGOV re 93 MOTION to Quash *Early-Return Rule 17(c) Subpoenas* (Brown, Christopher) (Entered: 12/21/2022) |
| 12/21/2022 | 100 | MOTION for Leave to File *Exhibit B Under Seal* by ROMAN STERLINGOV. (Ekeland, Tor) (Entered: 12/21/2022) |
| 12/21/2022 | 101 | Supplemental MOTION for Release of Funds by ROMAN STERLINGOV. (Attachments: # 1 Exhibit A)(Ekeland, Tor) (Entered: 12/21/2022) |
| 12/23/2022 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's motion for leave to file Exhibit B under seal, Dkt. 100 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Defendant's Exhibit B shall be filed under seal. Signed by Judge Randolph D. Moss on 12/23/2022. (lcrdm1) (Entered: 12/23/2022) |
| 12/23/2022 | 103 | Memorandum in Opposition by ROMAN STERLINGOV re 95 Motion to Quash, (Ekeland, Tor) (Entered: 12/23/2022) |

**Appx020**

| 12/30/2022 | 105 | REPLY in Support by YOULI LEE, JONATHAN LEVIN, MICHAEL GRONAGER, CHAINANALYSIS INC. as to ROMAN STERLINGOV re 95 MOTION to Quash *Subpoena* (Frentzen, William) (Entered: 12/30/2022) |
|---|---|---|
| 01/06/2023 | 106 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 101 Motion for Release of Funds (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Brown, Christopher) (Entered: 01/06/2023) |
| 01/10/2023 | 107 | NOTICE *of Intent to Present Expert Testimony* by ROMAN STERLINGOV (Ekeland, Tor) (Entered: 01/10/2023) |
| 01/12/2023 | 108 | REPLY TO OPPOSITION to Motion by ROMAN STERLINGOV re 101 Supplemental MOTION for Release of Funds (Ekeland, Tor) (Entered: 01/12/2023) |
| 01/13/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Motion Hearing as to ROMAN STERLINGOV held on 1/13/2023 re: 48 First MOTION for Release of Funds filed by ROMAN STERLINGOV. Motion Hearing CONTINUED to 1/31/2023 at 10:00 AM, in Courtroom 8, before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued. Court Reporter: Jeff Hook; Defense Attorneys: Tor Ekeland, Michael Hassard; U.S. Attorneys: Catherine Pelker and Christopher Brown; Witness: Roman Sterlingov. (zglw) (Entered: 01/17/2023) |
| 01/13/2023 | 109 | EXHIBIT LIST by USA as to ROMAN STERLINGOV. (zglw) (Entered: 01/17/2023) |
| 01/13/2023 | 110 | EXHIBIT LIST by ROMAN STERLINGOV. (zglw) (Entered: 01/17/2023) |
| 01/24/2023 | 111 | RESPONSE by USA as to ROMAN STERLINGOV re 107 Notice (Other) *of Intent To Present Expert Testimony* (Brown, Christopher) (Entered: 01/24/2023) |
| 01/25/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: Due to a conflict in the Court's schedule, the motion hearing currently scheduled for April 12, 2023, is VACATED and RESCHEDULED for July 20, 2023, at 10:00 a.m. Signed by Judge Randolph D. Moss on 1/25/2023. (lcrdm1) (Entered: 01/25/2023) |
| 01/31/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Motion Hearing re: Motion for release of funds as to ROMAN STERLINGOV held on 1/31/202. Witness Notice due on or before 5/19/2023. Motion Hearing set for 6/16/2023 and 6/23/23 at 10:00 AM in Courtroom 8 before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Jeff Hook; Defense Attorney: Tor Ekeland and Michael Hassard; US Attorney: Christopher Brown and Catherine Pelker; Witnesses sworn and provided testimony: Roman Sterlingov and Luke Scholl. (zglw) (Entered: 01/31/2023) |
| 01/31/2023 | 112 | EXHIBIT LIST by ROMAN STERLINGOV (zglw) (Entered: 02/06/2023) |
| 02/06/2023 | 113 | EXHIBIT LIST by USA (zglw) (Entered: 02/06/2023) |
| 02/28/2023 | 114 | TRANSCRIPT OF MOTION HEARING in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on January 13, 2023. Page Numbers: 1 - 91. Date of Issuance: February 28, 2023. Court Reporter: Jeff Hook. Telephone number: 202-354-3373. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, |

Appx021

| | | |
|---|---|---|
| | | (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/21/2023. Redacted Transcript Deadline set for 3/31/2023. Release of Transcript Restriction set for 5/29/2023.(Hook, Jeff) (Entered: 02/28/2023) |
| 02/28/2023 | 115 | TRANSCRIPT OF MOTION HEARING in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on January 31, 2023. Page Numbers: 1 - 155. Date of Issuance: February 28, 2023. Court Reporter: Jeff Hook. Telephone number: 202-354-3373. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/21/2023. Redacted Transcript Deadline set for 3/31/2023. Release of Transcript Restriction set for 5/29/2023.(Hook, Jeff) (Entered: 02/28/2023) |
| 03/06/2023 | 116 | MEMORANDUM OPINION AND ORDER as to ROMAN STERLINGOV: For the reasons given in the attached Memorandum Opinion and Order, Defendant Sterlingov's first motion for release of funds, Dkt. 48 , and supplemental motion for release of funds, Dkt. 101 , are DENIED. See document for details. Signed by Judge Randolph D. Moss on 3/6/2023. (lcrdm1) (Entered: 03/06/2023) |
| 03/21/2023 | 117 | MOTION to Appoint Counsel *Tor Ekeland CJA* by ROMAN STERLINGOV. (Ekeland, Tor) (Entered: 03/21/2023) |
| 03/22/2023 | 118 | ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's motion to appoint counsel, Dkt. 117 , it is hereby ORDERED that the motion is GRANTED. Defendant previously qualified for appointment of counsel under the Criminal Justice Act ("CJA"), and the Court finds that Defendant is presently financially unable to obtain counsel to continue the case. Therefore, pursuant to the CJA, the Court appoints Defendant's current attorneys, Tor Ekeland and Michael Hassard, effective March 22, 2023. See document for details. Signed by Judge Randolph D. Moss on 3/22/2023. (lcrdm1) (Entered: 03/22/2023) |
| 05/17/2023 | 119 | NOTICE *of Bill of Particulars for Forfeiture (Superseding Indictment)* by USA as to ROMAN STERLINGOV (Brown, Christopher) (Entered: 05/17/2023) |

**Appx022**

| 05/18/2023 | 120 | MOTION to Quash *Defense Subpoena to the Government Prosecutor* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Text of Proposed Order)(Brown, Christopher) (Entered: 05/18/2023) |
|---|---|---|
| 05/18/2023 | 121 | MOTION for Order to Show Cause *Regarding Ongoing Violations of Local Criminal Rule 57.7(b)* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 05/18/2023) |
| 05/19/2023 | 122 | NOTICE *of Expert Witnesses* by ROMAN STERLINGOV. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Ekeland, Tor) Modified text to remove "motion" on 5/24/2023 (zltp). (Entered: 05/19/2023) |
| 05/19/2023 | 123 | MOTION to Withdraw as Attorney by Marina Medvin. by ROMAN STERLINGOV. (Medvin, Marina) (Entered: 05/19/2023) |
| 05/19/2023 | 124 | NOTICE *(SUPPLEMENTAL) OF INTENT TO PRESENT EXPERT TESTIMONY* by USA as to ROMAN STERLINGOV re 61 Notice (Other) (Attachments: # 1 Exhibit 1 (Scholl), # 2 Exhibit 2 (Bisbee), # 3 Exhibit 3 (St. Jean/Mazars de Mazarin), # 4 Exhibit 4 (Vlahakis), # 5 Exhibit 5 (Glave), # 6 Exhibit 6 (Translators))(Pelker, Catherine) (Entered: 05/19/2023) |
| 05/23/2023 |  | MINUTE ORDER: Upon consideration of Marina Medvin's motion to withdraw as attorney, Dkt. 123 , it is hereby ORDERED that the motion is GRANTED. Signed by Judge Randolph D. Moss on 5/23/2023. (lcrdm1) (Entered: 05/23/2023) |
| 05/23/2023 | 125 | MOTION for Order to Show Cause *Regarding Government's Ongoing Violations of Local Criminal Rule 57.7(b)* by ROMAN STERLINGOV. (Ekeland, Tor) (Entered: 05/23/2023) |
| 05/23/2023 |  | Attorney update in case as to ROMAN STERLINGOV. Attorney Marina Medvin terminated. (zglw) (Entered: 05/25/2023) |
| 05/25/2023 |  | MINUTE ORDER as to ROMAN STERLINGOV: The Court has received from counsel for Defendant a set of resumes for five experts Defendant intends to call at the upcoming motions hearings. There are numerous pending motions in this case as well as experts for which Daubert hearings may need to be held. So that the most efficient use can be made of the time allotted for motions and Daubert hearings, the parties are hereby ORDERED to meet and confer and to file a joint status report on or before June 1, 2023. This joint status report should indicate: (1) which motions the parties intend to cover at each hearing; (2) what witnesses, if any, the parties intend to call related to those motions; and (3) whether the parties anticipate dedicating any part of the June 16, 2023 and June 23, 2023 hearings to Daubert issues and, if so, to which experts. At the June 16, 2023 hearing, the parties should be prepared to address at a minimum: (1) the motions to quash the Rule 17(c) subpoenas Defendant has caused to be issued to Chainalysis and its employees, 93 , 95 ; (2) the government's motion to quash the subpoena Defendant has caused to be issued to government attorney Ms. Pelker, 120 ; (3) the government's motion to preclude the defense from calling Ms. Pelker as a witness, 64 ; (4) Defendant's motion to dismiss the indictment for improper venue, 46 ; (5) Defendant's motion for a bill of particulars, 45 ; and (6) the parties' respective motions for orders to show cause regarding alleged violations of Local Criminal Rule 57.7(b), 121 , 125 . Because the Court intends to address the motions to quash the Rule 17(c) subpoenas that have been issued to Chainalysis and its employees at the outset of |

| | | |
|---|---|---|
| | | the hearing, counsel for Chainalysis is ORDERED to appear at the June 16, 2023 hearing, at 10:00 a.m., in Courtroom 8. The Court does not anticipate argument on the motions to quash to last longer than one hour, and counsel for Chainalysis need not be present for the rest of the hearing. Signed by Judge Randolph D. Moss on 5/25/2023. (lcrdm1) (Entered: 05/25/2023) |
| 05/26/2023 | 126 | MOTION to Quash *Subpoena* by MICHAEL GRONAGER as to ROMAN STERLINGOV. (Attachments: # 1 Exhibit A, # 2 [Proposed] Order)(Frentzen, William) (Entered: 05/26/2023) |
| 05/31/2023 | 127 | RESPONSE by USA as to ROMAN STERLINGOV re 125 MOTION for Order to Show Cause *Regarding Government's Ongoing Violations of Local Criminal Rule 57.7(b)* (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 05/31/2023) |
| 06/01/2023 | 128 | Joint STATUS REPORT *in response to May 25, 2023 Minute Order* by USA as to ROMAN STERLINGOV (Brown, Christopher) (Entered: 06/01/2023) |
| 06/01/2023 | 129 | Memorandum in Opposition by ROMAN STERLINGOV re 120 Motion to Quash *Defense Subpoena to the Government Prosecutor* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Ekeland, Tor) (Entered: 06/01/2023) |
| 06/02/2023 | 130 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 122 Motion for Disclosure, *of Expert Witnesses* (Brown, Christopher) (Entered: 06/02/2023) |
| 06/07/2023 | 131 | Memorandum in Opposition by ROMAN STERLINGOV re 126 Motion to Quash *Subpoena Ad Testificandum as to Michael Gronager* (Attachments: # 1 Exhibit A) (Ekeland, Tor) (Entered: 06/07/2023) |
| 06/08/2023 | 132 | REPLY in Support by USA as to ROMAN STERLINGOV re 120 MOTION to Quash *Defense Subpoena to the Government Prosecutor* (Brown, Christopher) (Entered: 06/08/2023) |
| 06/09/2023 | 133 | REPLY TO OPPOSITION to Motion by ROMAN STERLINGOV re 122 MOTION for Disclosure *of Expert Witnesses* (Attachments: # 1 Exhibit A)(Hassard, Michael) (Entered: 06/09/2023) |
| 06/14/2023 | 134 | Memorandum in Opposition by ROMAN STERLINGOV re 121 Motion for Order to Show Cause *by Government* (Hassard, Michael) (Entered: 06/14/2023) |
| 06/14/2023 | 135 | REPLY in Support by MICHAEL GRONAGER as to ROMAN STERLINGOV re 126 MOTION to Quash *Subpoena* (Frentzen, William) (Entered: 06/14/2023) |
| 06/14/2023 | 138 | MOTION to Strike *Defendant's Late-Filed Opposition to Government's Notice and Motion for Order To Show Cause Regarding Ongoing Violations of Local Criminal Rule 57.7(b)* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 06/14/2023) |
| 06/16/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Motion Hearing as to ROMAN STERLINGOV held on 6/16/2023 re 121 MOTION for Order to Show Cause *Regarding Ongoing Violations of Local Criminal Rule 57.7(b)* filed by USA, 125 MOTION for Order to Show Cause *Regarding Government's Ongoing Violations of Local Criminal Rule 57.7(b)* filed by ROMAN STERLINGOV, 126 MOTION to Quash *Subpoena* filed by MICHAEL GRONAGER, 93 MOTION to Quash *Early-Return Rule 17(c) Subpoenas* filed by USA, 95 MOTION to Quash filed by |

| | | |
|---|---|---|
| | | CHAINANALYSIS INC., MICHAEL GRONAGER, JONATHAN LEVIN, YOULI LEE. FOR THE REASONS STATED ON THE RECORD <u>95</u> is Granted; <u>93</u> is Denied as Moot; <u>126</u> is Granted w/o prejudice; <u>121</u> and <u>125</u> are Denied w/o prejudice. A Daubert Hearing was held on 6/16/2023; Witness: Franciso Cabanas. Defendant's Exhibits A and B admitted; Government's Exhibits 5-9, 14 and 15 admitted. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Tammi Sefranek; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker and Christopher Brown. (zglw) (Entered: 06/16/2023) |
| 06/20/2023 | <u>139</u> | NOTICE *of Supplemental Authority* by USA as to ROMAN STERLINGOV re <u>52</u> Memorandum in Opposition (Attachments: # <u>1</u> Exhibit)(Brown, Christopher) (Entered: 06/20/2023) |
| 06/21/2023 | <u>140</u> | SUPPLEMENT by USA as to ROMAN STERLINGOV re <u>62</u> MOTION in Limine *AND NOTICE OF INTENT TO ADMIT CERTAIN EXHIBITS for Admission of Mt. Gox Records* (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4) (Brown, Christopher) (Entered: 06/21/2023) |
| 06/23/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Motion Hearing as to ROMAN STERLINGOV held on 6/23/2023. For the reasons stated on the record <u>120</u> MOTION to Quash *Defense Subpoena to the Government Prosecutor* filed by USA is GRANTED; <u>64</u> MOTION in Limine MOTION To Preclude Defense from Calling Prosecutor as Witness for the Defense filed by USA is GRANTED; <u>46</u> MOTION to Dismiss Case filed by ROMAN STERLINGOV TAKEN UNDER ADVISEMENT. Daubert Hearing held on 6/23/2023 with witnesses: Luke Scholl & Elizabeth Bisbee. Defendant to file Expert Discloures onor before 7/7/2023. Daubert/ Motion Hearing set for 7/19/2023 at 10:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Tammi Sefranek; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker and Christopher Brown. (zglw) (Entered: 06/23/2023) |
| 06/28/2023 | <u>141</u> | MOTION to Withdraw as Attorney by James M. Koukios. by YOULI LEE, JONATHAN LEVIN, MICHAEL GRONAGER, CHAINANALYSIS INC. as to ROMAN STERLINGOV. (Attachments: # <u>1</u> Text of Proposed Order)(Koukios, James) (Entered: 06/28/2023) |
| 06/28/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Mr. Koukios' motion to withdraw as attorney, Dkt. <u>141</u> , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court is directed to terminate Mr. Koukios as attorney in this matter. Signed by Judge Randolph D. Moss on 6/28/2023. (lcrdm3) (Entered: 06/28/2023) |
| 06/28/2023 | | Attorney update in case as to ROMAN STERLINGOV. Attorney James M. Koukios terminated. (zglw) (Entered: 06/28/2023) |
| 06/28/2023 | | Attorney update in case as to ROMAN STERLINGOV. Attorney James M. Koukios terminated. (zglw) (Entered: 07/10/2023) |
| 07/05/2023 | <u>144</u> | Memorandum in Opposition by ROMAN STERLINGOV re <u>62</u> Motion in Limine *Dkt. 140* (Attachments: # <u>1</u> Text of Proposed Order)(Hassard, Michael) (Entered: 07/05/2023) |

**Appx025**

| 07/07/2023 | 145 | NOTICE *of Supplemental Expert Witness Disclosures* by ROMAN STERLINGOV re 122 MOTION for Disclosure *of Expert Witnesses* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Hassard, Michael) (Entered: 07/07/2023) |
| --- | --- | --- |
| 07/11/2023 | 146 | REPLY in Support by USA as to ROMAN STERLINGOV re 62 MOTION in Limine *AND NOTICE OF INTENT TO ADMIT CERTAIN EXHIBITS* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Pelker, Catherine) (Entered: 07/11/2023) |
| 07/14/2023 | 147 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 122 Motion for Disclosure, *of Intent to Present Expert Testimony* (Pelker, Catherine) (Entered: 07/14/2023) |
| 07/17/2023 |  | MINUTE ORDER as to ROMAN STERLINGOV: Government's motion, Dkt. 138 , to strike Defendant's late-filed opposition, Dkt. 134 , to Government's notice and motion for order to show cause regarding ongoing violations of Local Criminal Rule 57.7(b), Dkt. 121 , is hereby DENIED as moot because the Government's underlying motion, Dkt. 121 , has been denied without prejudice by the Court, *see* Min. Entry (June 16, 2023). Signed by Judge Randolph D. Moss on 07/17/2023. (lcrdm3) (Entered: 07/17/2023) |
| 07/17/2023 | 148 | SUPPLEMENT by USA as to ROMAN STERLINGOV re 52 Memorandum in Opposition (Attachments: # 1 Exhibit 1)(Brown, Christopher) (Entered: 07/17/2023) |
| 07/18/2023 | 149 | SUPPLEMENT by USA as to ROMAN STERLINGOV re 124 Notice (Other), (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Pelker, Catherine) (Entered: 07/18/2023) |
| 07/19/2023 |  | .Minute Entry for proceedings held before Judge Randolph D. Moss:Daubert Hearing held on 7/19/2023 and continued to 7/20/23 at 10:00 AM. Defendants Reply due on or before 7/24/2023. Expert Report due on or before 8/7/2023. Daubert Hearing set for 8/22/2023 at 10:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Pretrial Conference reset for 9/6/2023 at 11:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Tammi Sefranek; Defense Attorney: Tor Ekland & Michael Hassard; US Attorney: Catherine Pelker & Christopher Brown. Witnesses: Itiel Dror & JW Verrett (zglw) (Entered: 07/20/2023) |
| 07/20/2023 |  | Minute Entry for proceedings held before Judge Randolph D. Moss: Daubert Hearing held on 7/20/2023. For the reasons stated on the record {45] MOTION for Bill of Particulars filed by ROMAN STERLINGOV is Denied in part and Granted in part. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Tammi Sefranek; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker and Christopher Brown. Witness: JW Verrett (zglw) (Entered: 07/24/2023) |
| 07/21/2023 | 150 | REPLY by ROMAN STERLINGOV *to Government's Opposition to Defendant's Supplemental Notice of Intent to Present Expert Testimony* (Ekeland, Tor) (Entered: 07/21/2023) |
| 07/24/2023 | 151 | REPLY TO OPPOSITION to Motion by ROMAN STERLINGOV re 46 MOTION to Dismiss Case *in Reply to Government's Supplemental Opposition* (Hassard, Michael) (Entered: 07/24/2023) |

Appx026

| 07/28/2023 | 152 | MOTION to Access *Defendant to Prepare for Trial and Transfer to an Appropriate Federal Facility* by ROMAN STERLINGOV. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Hassard, Michael) (Entered: 07/28/2023) |
|---|---|---|
| 07/31/2023 | 153 | NOTICE *(Supplemental) of Intent to Present Expert Testimony* by USA as to ROMAN STERLINGOV re 124 Notice (Other), 61 Notice (Other) (Pelker, Catherine) (Entered: 07/31/2023) |
| 08/02/2023 | 154 | TRANSCRIPT OF DETENTION HEARING in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on October 25, 2021. Page Numbers: 1 - 75. Date of Issuance: August 2, 2023. Court Reporter: Jeff Hook. Telephone number: 202-354-3373. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/23/2023. Redacted Transcript Deadline set for 9/2/2023. Release of Transcript Restriction set for 10/31/2023.(Hook, Jeff) (Entered: 08/02/2023) |
| 08/02/2023 | 155 | MOTION for Leave to File *Motion to Authorize Issuance and Pretrial Return of Subpoena Duces Tecum to Chainalysis, Inc. Under Federal Rule of Criminal Procedure 17(c)* by ROMAN STERLINGOV. (Attachments: # 1 Memorandum in Support of Motion to Authorize Issuance and Pretrial Return of Subpoena Duces Tecum to Chainalysis, Inc. Under Federal Rule of Criminal Procedure 17(c), # 2 Exhibit A, # 3 Exhibit B)(Ekeland, Tor) (Entered: 08/02/2023) |
| 08/07/2023 | | MINUTE ORDER: Upon consideration of Defendant's motion for leave to file motion to authorize issuance and pretrial return of subpoena *duces tecum* to Chainalysis, Inc., Dkt. 155 , the Government is hereby ORDERED to respond on or before August 10, 2023 at 12:00 p.m. Signed by Judge Randolph D. Moss on 08/07/2023. (lcrdm3) (Entered: 08/07/2023) |
| 08/07/2023 | 156 | NOTICE OF ATTORNEY APPEARANCE Jeffrey Pearlman appearing for USA. (Pearlman, Jeffrey) (Entered: 08/07/2023) |
| 08/07/2023 | 157 | NOTICE *of Supplemental Expert Witness Disclosure for J. Still* by ROMAN STERLINGOV re 145 Notice (Other), (Ekeland, Tor) (Entered: 08/07/2023) |
| 08/07/2023 | 158 | NOTICE *of Supplemental Expert Witness Disclosure for J.W. Verret* by ROMAN STERLINGOV (Attachments: # 1 Exhibit A - Expert's Slide Summary, # 2 Exhibit B-BTC Price History)(Hassard, Michael) (Entered: 08/07/2023) |

Appx027

| | | |
|---|---|---|
| 08/08/2023 | 159 | NOTICE *of Ciphertrace Expert Report* by ROMAN STERLINGOV re 157 Notice (Other) (Attachments: # 1 Supplement Ciphertrace Expert Report, # 2 Exhibit A - Ciphertrace Data Credibility in Cryptocurrency Investigations Slide Deck, # 3 Exhibit B - Satoshi Nakamoto Bitcoin Whitepaper)(Ekeland, Tor) (Entered: 08/08/2023) |
| 08/09/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: In light of Defendant's recent transfer from the Northern Neck Regional Jail to a different facility, it is hereby ORDERED that Defendant's motion to access, Dkt. 152 , is DENIED as moot. Signed by Judge Randolph D. Moss on 08/09/2023. (lcrdm3) (Entered: 08/09/2023) |
| 08/10/2023 | 160 | Memorandum in Opposition by CHAINANALYSIS INC. as to ROMAN STERLINGOV re 155 Motion for Leave to File, (Attachments: # 1 Exhibit A) (Frentzen, William) (Entered: 08/10/2023) |
| 08/10/2023 | 161 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 155 Motion for Leave to File, (Pelker, Catherine) (Entered: 08/10/2023) |
| 08/11/2023 | 162 | TRANSCRIPT OF STATUS CONFERENCE in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on December 2, 2022. Page Numbers: 1 - 22. Date of Issuance: August 11, 2023. Court Reporter: Jeff Hook. Telephone number: 202-354-3373. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 9/1/2023. Redacted Transcript Deadline set for 9/11/2023. Release of Transcript Restriction set for 11/9/2023.(Hook, Jeff) (Entered: 08/11/2023) |
| 08/16/2023 | 163 | Second MOTION to Access *Defendant to Prepare for Trial and Transfer to an Appropriate Federal Facility* by ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Ekeland, Tor) (Entered: 08/16/2023) |
| 08/16/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's second motion to access, Dkt. 163 , it is hereby ORDERED that the motion is DENIED as premature. Defense counsel is directed to confer with the U.S. Marshals Service (USMS) about their concerns and, in particular, about the location of Defendant's discovery materials, when those materials will be delivered to him, whether Defendant can be provided with additional telephone access to counsel, and whether arrangements can be made to permit him to meet with counsel and retained experts in an attorney-client meeting room. If counsel is unable to resolve these issues with the USMS, counsel may renew this motion. Signed by Judge Randolph D. Moss on 08/16/2023. (lcrdm3) (Entered: 08/16/2023) |

| Date | Dkt | Description |
|---|---|---|
| 08/17/2023 | 164 | REPLY TO OPPOSITION to Motion by ROMAN STERLINGOV re 155 MOTION for Leave to File *Motion to Authorize Issuance and Pretrial Return of Subpoena Duces Tecum to Chainalysis, Inc. Under Federal Rule of Criminal Procedure 17(c)* (Attachments: # 1 Exhibit A)(Ekeland, Tor) (Entered: 08/17/2023) |
| 08/18/2023 | 165 | NOTICE *of Rule 57 violations* by USA as to ROMAN STERLINGOV (Attachments: # 1 Exhibit Exhibit A)(Pearlman, Jeffrey) (Entered: 08/18/2023) |
| 08/21/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's motion for attorney-directed *voir dire*, Dkt. 60 , it is hereby ORDERED that the motion is DENIED. The Court will conduct *voir dire* in the normal manner and, pursuant to Federal Rule of Criminal Procedure 24(a)(2)(A), will, after examining the jurors itself, allow the attorneys for the parties to "ask further questions that the court considers proper." Signed by Judge Randolph D. Moss on 08/21/2023. (lcrdm3) (Entered: 08/21/2023) |
| 08/21/2023 | 166 | NOTICE *of Supplemental Expert Witness Disclosure for Jeff Fischbach* by ROMAN STERLINGOV re 145 Notice (Other), (Hassard, Michael) (Entered: 08/21/2023) |
| 08/22/2023 | 167 | MOTION to Quash *Trial Subpoena and Preclude Trial Testimony* by YOULI LEE, JONATHAN LEVIN, MICHAEL GRONAGER as to ROMAN STERLINGOV. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Frentzen, William) (Entered: 08/22/2023) |
| 08/22/2023 | 168 | MOTION Regarding Briefing and Scheduling of Hearing on Defendants Rule 17(c) Subpoena by CHAINANALYSIS INC. as to ROMAN STERLINGOV. (Attachments: # 1 [Proposed] Order)(Frentzen, William) (Entered: 08/22/2023) |
| 08/22/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Daubert Hearing held on 8/22/2023. Daubert Hearing continued to 8/23/2023 at 09:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. The defendant shall file a response to governments notice of Rule 57 violation 165 on or before 8/25/2023. For the reasons stated on the record the defendant is directed to find an expert; the parties are directed to meet with Chainanalysis and develop a plan to have that expert identify what it is the expert needs to look for in the source code, is the expert someone that Chainanalysis would be comfortable being subject to the protective order, what portion of the source code are they going to need to look at, where it will take place and under what conditions. A Motion Hearing will be held on this matter on 8/29/2023 at 09:30 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Tammi Sefranek; Defense Attorney: Tor Ekeland and Michael Hassard; US Attorney: Catherine Pelker, Christopher Brown and Jeff Pearlman. (zglw) (Entered: 08/23/2023) |
| 08/23/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Daubert Hearing held on 8/23/2023. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Tammi Sefranek; Defense Attorney: Tor Ekeland; US Attorney: Catherine Pelker and Christopher Brown. Witnesses: J. Still & V. Mazars de Mazarin (zglw) (Entered: 08/23/2023) |
| 08/24/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: The parties are hereby advised that, at the hearing on Tuesday, August 29 at 10:30 a.m., they should be prepared to answer the Court's questions, if any, regarding the venue issue raised in Defendant's motion to dismiss the superseding indictment, Dkt. 46 , in addition to the issues previously |

| | | |
|---|---|---|
| | | noticed. Signed by Judge Randolph D. Moss on 08/24/2023. (lcrdm3) (Entered: 08/24/2023) |
| 08/25/2023 | | NOTICE OF HEARING as to ROMAN STERLINGOV Pretrial Conference is reset to 9/7/2023 at 10:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. (zglw) (Entered: 08/25/2023) |
| 08/25/2023 | 169 | EXHIBIT LIST by ROMAN STERLINGOV from Daubert Hearings (zglw). (Entered: 08/25/2023) |
| 08/25/2023 | 170 | EXHIBIT LIST by USA as to ROMAN STERLINGOV from Daubert Hearings. (zglw) (Entered: 08/25/2023) |
| 08/25/2023 | 171 | RESPONSE by ROMAN STERLINGOV re 165 Notice (Other) *Regarding Local Criminal Rule 57.7* (Hassard, Michael) (Entered: 08/25/2023) |
| 08/28/2023 | | NOTICE OF HEARING as to ROMAN STERLINGOV Motion Hearing reset for 8/29/2023 at 01:00 PM in before Judge Randolph D. Moss. (zglw) (Entered: 08/28/2023) |
| 08/28/2023 | 172 | MOTION to Quash *Defense Subpoena to Former Government Prosecutor Lee* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Exhibit 1, # 2 Text of Proposed Order)(Brown, Christopher) (Entered: 08/28/2023) |
| 08/28/2023 | 173 | NOTICE *of Bill of Particulars* by USA as to ROMAN STERLINGOV (Brown, Christopher) (Entered: 08/28/2023) |
| 08/29/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Motion Hearing as to ROMAN STERLINGOV held on 8/29/2023. Defendant and Defense Counsel appeared by video upon consent. Minute Order to follow.Bond Status of Defendant: Committed; Court Reporter: Tammi Sefranek; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker Jeffrey Pearlman and Christopher Brown. (zglw) (Entered: 08/29/2023) |
| 08/30/2023 | 174 | ORDER as to ROMAN STERLINGOV: The attached order further addresses Defendant's motion pursuant to Rule 17(c), Dkt. 155 , and other matters discussed at the August 29, 2023 hearing. See document for details. Signed by Judge Randolph D. Moss on 08/30/2023. (lcrdm3) (Entered: 08/30/2023) |
| 08/31/2023 | 175 | NOTICE *IN RESPONSE TO THE COURT'S ORDER REGARDING REACTOR HEURISTICS* by CHAINANALYSIS INC. as to ROMAN STERLINGOV re 174 Order,, Set Deadlines, (Frentzen, William) (Entered: 08/31/2023) |
| 09/05/2023 | 176 | RESPONSE TO ORDER OF THE COURT by USA as to ROMAN STERLINGOV re 174 Order,, Set Deadlines, *Government's Response Regarding D.C. Money Transmitters Act and Bank Secrecy Act* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Brown, Christopher) (Entered: 09/05/2023) |
| 09/05/2023 | 177 | RESPONSE TO ORDER OF THE COURT by ROMAN STERLINGOV re 174 Order,, Set Deadlines, *Defense Response Regarding Government Motions to Admit Certain Evidence* (Hassard, Michael) (Entered: 09/05/2023) |
| 09/05/2023 | 178 | RESPONSE TO ORDER OF THE COURT by ROMAN STERLINGOV re 174 Order,, Set Deadlines, *Defense Response Regarding the Government's Foreign Language Translations* (Hassard, Michael) (Entered: 09/05/2023) |

**Appx030**

| 09/05/2023 | 179 | RESPONSE TO ORDER OF THE COURT by ROMAN STERLINGOV re 174 Order,, Set Deadlines, *Defense Response Regarding Notice of Source Code Expert Bryan Bishop* (Hassard, Michael) (Entered: 09/05/2023) |
| 09/06/2023 |  | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's notice of source code expert Bryan Bishop, Dkt. 179 , the Government and Chainalysis are hereby ORDERED to respond on or before September 8, 2023, at 5:00 p.m. Chainalysis's response should include a proposed protective order. Signed by Judge Randolph D. Moss on 09/06/2023. (lcrdm3) (Entered: 09/06/2023) |
| 09/06/2023 | 180 | ORDER as to ROMAN STERLINGOV: The parties are hereby ORDERED to review the draft voir dire provided herein and should be prepared to raise any objections or suggestions at the pretrial conference. See document for details. Signed by Judge Randolph D. Moss on 09/06/2023. (lcrdm3) (Entered: 09/06/2023) |
| 09/07/2023 |  | Minute Entry for proceedings held before Judge Randolph D. Moss:Pretrial Conference as to ROMAN STERLINGOV held on 9/7/2023 and continued to 9/8/2023 at 01:00 PM & 3:00 PM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Tammi Sefranek; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker Jeffrey Pearlman and Christopher Brown. (zglw) (Entered: 09/07/2023) |
| 09/08/2023 | 182 | ORDER as to ROMAN STERLINGOV: The parties are hereby ORDERED to review the draft preliminary jury instructions provided herein and should be prepared to raise any objections or suggestions at the pretrial conference on September 8, 2023. See document for details. Signed by Judge Randolph D. Moss on 09/08/2023. (lcrdm3) (Entered: 09/08/2023) |
| 09/08/2023 | 183 | ORDER as to ROMAN STERLINGOV: The parties are advised that a revised draft of the preliminary jury instructions has been posted. See document for details.Signed by Judge Randolph D. Moss on 09/08/2023. (lcrdm3) (Entered: 09/08/2023) |
| 09/08/2023 | 184 | REPLY by ROMAN STERLINGOV re 176 Response to Order of the Court, *Defence Reply to Government's Response to the Court's Aug. 30th Order* (Hassard, Michael) (Entered: 09/08/2023) |
| 09/08/2023 |  | MINUTE ORDER as to ROMAN STERLINGOV: As discussed during yesterday's pretrial conference, the Government is hereby ORDERED to file on or before Monday, September 11, 2023, at 5:00 p.m. a list identifying for the Court any evidence, reports, analyses or other material or experience tending to confirm Reactors reliability. At the same time, both the Government and the Defense are directed to file notices directing the Court's attention to any caselaw or other material addressing the admissibility of expert testimony about the relevant statutory and regulatory context. Signed by Judge Randolph D. Moss on 09/08/2023. (lcrdm3) (Entered: 09/08/2023) |
| 09/08/2023 | 185 | RESPONSE by CHAINANALYSIS INC. as to ROMAN STERLINGOV re 179 Response to Order of the Court, Order,, Set Deadlines, (Attachments: # 1 Declaration Of Elizabeth Bisbee, # 2 Declaration of William Frentzen, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 Exhibit N)(Frentzen, William) (Entered: 09/08/2023) |

Appx031

| | | |
|---|---|---|
| 09/08/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: As discussed during today's pretrial conference, the Government and Defense are hereby ORDERED to file on or before Monday, September 11, 2023, at 5:00 p.m.: (1) a notice directing the Court's attention to: (a) the case law described above, *see* Min. Entry (Sept. 8, 2023), and (b) cases addressing the admissibility of expert testimony about cognitive or confirmation bias; and (2) a joint status report regarding the trial management concern that the Government raised with respect to when its translators may testify. Signed by Judge Randolph D. Moss on 09/08/2023. (lcrdm3) (Entered: 09/08/2023) |
| 09/08/2023 | 186 | TRIAL ORDER as to ROMAN STERLINGOV: The parties are instructed to comply with the directives set forth in the attached Trial Order. The parties are also hereby ORDERED to review the final voir dire and preliminary jury instructions appended to the Trial Order. See document for details. Signed by Judge Randolph D. Moss on 09/08/2023. (Attachments: # 1 Appendix Voir Dire, # 2 Appendix Preliminary Jury Instructions) (lcrdm3) (Entered: 09/08/2023) |
| 09/09/2023 | 187 | RESPONSE by USA as to ROMAN STERLINGOV re 179 Response to Order of the Court (Pelker, Catherine) (Entered: 09/09/2023) |
| 09/09/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Pretrial Conference as to ROMAN STERLINGOV held on 9/9/2023. Defense counsel present via video. Defendant present via video upon consent for the first portion of hearing. Defendant waives appearance for 2nd portion of hearing due to unavailability of zoom at the jail. A Joint Status Report is due on or before 9/11/2023. Bond Status of Defendant: Committed; Court Reporter: Tammy Sefranek; Defense Attorney: Tor Ekland & Michael Hassard; US Attorney: Catherine Pelker, Jeff Pearlman & Christopher Brown. (zglw) (Entered: 09/11/2023) |
| 09/10/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's notice of source code expert Bryan Bishop, Dkt. 179 , and the Government and Chainalysis's responses thereto, Dkts. 185 , 187 , the Government is hereby ORDERED to file, under seal if necessary, the disclosure that was made to the Defense pursuant to the Court's order at Dkt. 174 on or before Monday, September 11, 2023, at 10:00 a.m. The parties are further ORDERED to appear for a hearing on Defendant's pending motion for leave to authorize issuance and pretrial return of subpoena *duces tecum*, Dkt. 155 , on Tuesday, September 12, 2023, at 12:00 p.m., in Courtroom 8. Signed by Judge Randolph D. Moss on 09/10/2023. (lcrdm3) (Entered: 09/10/2023) |
| 09/11/2023 | 188 | RESPONSE TO ORDER OF THE COURT by USA as to ROMAN STERLINGOV re Order,,, Set Deadlines/Hearings,, (Pelker, Catherine) (Entered: 09/11/2023) |
| 09/11/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: Due to a scheduling conflict at the facility where the Defendant is being held, it is hereby ORDERED that the hearing set for Tuesday, September 12, 2023, is VACATED and RESCHEDULED for Wednesday, September 13, 2023, at 9:00 a.m., in Courtroom 8. Signed by Judge Randolph D. Moss on 09/11/2023. (lcrdm3) (Entered: 09/11/2023) |
| 09/11/2023 | 189 | NOTICE *of Defense Objections to Government's Proposed Opening Demonstratives* by ROMAN STERLINGOV re 186 Order, (Attachments: # 1 Exhibit A - Government's Demonstratives)(Hassard, Michael) (Entered: 09/11/2023) |
| 09/11/2023 | 190 | Joint STATUS REPORT *Regarding Government Translations of Foreign Language Documents* by ROMAN STERLINGOV (Hassard, Michael) (Entered: 09/11/2023) |

**Appx032**

| | | |
|---|---|---|
| 09/11/2023 | 191 | RESPONSE TO ORDER OF THE COURT by USA as to ROMAN STERLINGOV re Order,,, Set Deadlines,, Order,,, Set Deadlines,, *Regarding Expert Testimony on Statutory and Regulatory Context and Cognitive Bias* (Attachments: # 1 Exhibit 1) (Brown, Christopher) (Entered: 09/11/2023) |
| 09/11/2023 | 192 | NOTICE *of Relevant Caselaw Regarding the Admissibility of Expert Testimony* by ROMAN STERLINGOV re Order,,, Set Deadlines,, Order,,, Set Deadlines,, (Hassard, Michael) (Entered: 09/11/2023) |
| 09/11/2023 | 193 | RESPONSE TO ORDER OF THE COURT by USA as to ROMAN STERLINGOV re Order,,, Set Deadlines,, (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Pelker, Catherine) (Entered: 09/11/2023) |
| 09/12/2023 | 195 | NOTICE *IN RESPONSE TO THE COURT S REQUEST REGARDING PROTECTIVE ORDER* by CHAINANALYSIS INC. as to ROMAN STERLINGOV (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Frentzen, William) (Entered: 09/12/2023) |
| 09/13/2023 | 196 | ORDER as to ROMAN STERLINGOV: The Court hereby adopts with revisions Chainalysis's proposed heuristic information protective order. It is hereby ORDERED that the parties shall comply with the directives set forth in the attached protective order. See document for details. Signed by Judge Randolph D. Moss on 09/13/2023. (lcrdm3) Modified on 9/13/2023 to add the Ordered directive (zglw). (Entered: 09/13/2023) |
| 09/13/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: For the reasons stated on the record, Defendant's oral motion to continue trial is GRANTED. It is ORDERED that: (1) the new trial start date tentatively is set for February 12, 2024, with the understanding that the Court will advise the parties if it is able to accommodate an earlier start date and (2) the time between September 13, 2023 and February 12, 2024 is tolled under the ends of justice exception to the Speedy Trial Act. The Court finds that a continuance will serve the ends of justice because it will afford the Defendant greater time to prepare for trial and will permit the parties, if appropriate, to prepare and to exchange supplemental expert reports relating to the specific heuristics and related processes disclosed to the defense earlier today. The Court notes that the government and Court were prepared to begin jury selection tomorrow, September 14, 2023, and that the government objected to continuing the trial, but that the Defendant, after conferring with his counsel and after discussing alternative trial dates with the Court and his counsel, requested that the Court postpone the trial date. The Court therefore concludes that the ends of justice served by a continuance outweigh the best interests of the public and Defendant in a speedy trial. *See* 18 U.S.C. 3161(h)(7)(a). <br><br> It is further ORDERED that: (1) the Defense shall file a supplemental report prepared by its expert, Ms. Still, concerning Chainalysis's recently provided heuristic information on or before September 28, 2023 and (2) the Government shall file a supplemental expert report in response on or before October 12, 2023. The Defense is directed to limit the content of its supplemental expert report to the newly disclosed heuristic information, and the Government likewise is directed to limit the contents of its response to the Defense's supplemental expert report. The Court will hold defendant's *Daubert* challenges to the use of Chainanalysis Reactor in abeyance pending the filing of the supplemental expert reports, if any, and the Court's consideration of any such supplemental reports. |

| | | |
|---|---|---|
| | | Signed by Judge Randolph D. Moss on 09/13/2023. (lcrdm3) (Entered: 09/13/2023) |
| 09/13/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Pretrial Conference and Motions Hearing as to ROMAN STERLINGOV held on 9/13/2023. For the reasons stated on the record- MOTION to Quash *Trial Subpoena and Preclude Trial Testimony* filed by MICHAEL GRONAGER, JONATHAN LEVIN, YOULI LEE 167 -GRANTED; MOTION for Leave to File *Motion to Authorize Issuance and Pretrial Return of Subpoena Duces Tecum to Chainalysis, Inc. Under Federal Rule of Criminal Procedure 17(c)* filed by ROMAN STERLINGOV 155 DENIED. Pretrial Conference set for 9/15/2023 at 10:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Tammy Sefranek; Defense Attorney: Tor Ekland & Michael Hassard; US Attorney: Catherine Pelker, Jeff Pearlman & Christopher Brown; Movant: William Frentzen. (zglw) (Entered: 09/14/2023) |
| 09/14/2023 | 197 | MOTION for Leave to Appear Pro Hac Vice Tauseef S. Ahmed *for Defendant Roman Sterlingov for Defendant Roman Sterlingov* Filing fee $ 100, receipt number ADCDC-10352824. Fee Status: Fee Paid. by ROMAN STERLINGOV. (Attachments: # 1 USCA Order Proposed Order)(Ekeland, Tor) Modified date terminated on 10/26/2023 (zltp). (Entered: 09/14/2023) |
| 09/15/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: The Court granted Chainalysis's motion to quash trial subpoena to Youli Lee, Dkt. 167 , from the bench on September 13, 2023, *see* Min. Entry (Sept. 14, 2023); accordingly, the Court hereby DENIES as moot the Government's motion to quash the same, Dkt. 172 . The Court further DENIES as moot Chainalysis's motion regarding briefing and scheduling of hearing, Dkt. 168 , as the hearing in question took place on August 29, 2023. *See* Min. Entry (Aug. 29, 2023). Signed by Judge Randolph D. Moss on 09/15/2023. (lcrdm3) (Entered: 09/15/2023) |
| 09/15/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Pretrial Conference as to ROMAN STERLINGOV held on 9/15/2023. Defendant withdraws his request to proceed in forma pauperis and receive CJA funding. He will proceed with his current counsel as retained counsel. 65 MOTION in Limine *To Preclude Certain Impermissible Defense Arguments and Evidence* filed by USA---GRANTED for reasons stated on the record. Pretrial Conference set for 9/18/2023 at 10:30 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Tammi Sefranek; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker and Christopher Brown and Jeff Pearlman. (zglw) (Entered: 09/15/2023) |
| 09/18/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Pretrial Conference as to ROMAN STERLINGOV held on 9/18/2023. For the reasons stated on the record 66 MOTION in Limine *and Notice Regarding Willful Blindness Instruction as to Counts One and Three, and Permission To Refer to Willful Blindness in Opening Statement* filed by USA is Granted in Part and Denied in Part. The government shall file on or before September 22, 2023 a brief in support of its position that the protective order at Dkt. 196 restricts Defendant from viewing the materials in question, and the Defense shall file a response on or before September 29, 202. Defense shall file on or before September 19, 2023 at 5:00 p.m. a written statement detailing the availability of their expert witnesses for the proposed October and |

**Appx034**

|  |  |  |
|---|---|---|
|  |  | February trial dates. Motion Hearing set for 9/21/2023 at 10:00 AM in Courtroom 8-In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Tammi Sefranek (AM) & Sherry Lindsay (PM); Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman and Christopher Brown. (zglw) (Entered: 09/18/2023) |
| 09/20/2023 |  | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's motion for leave to file document under seal, Dkt. 198 , it is hereby ORDERED that the motion is DENIED on the ground that the filing does not contain any sensitive information. Signed by Judge Randolph D. Moss on 09/20/2023. (lcrdm3) (Entered: 09/20/2023) |
| 09/20/2023 | 199 | NOTICE *Regarding Court's Proposed Protective Order Governing Review of Chainalysis's Proprietary Information* by ROMAN STERLINGOV re 196 Order, (Hassard, Michael) (Entered: 09/20/2023) |
| 09/20/2023 | 200 | NOTICE *of Summary of Defense Expert Witnesses' Availability* by ROMAN STERLINGOV re Pretrial Conference,,,,, Set Deadlines/Hearings,,,,, Terminate Motions,,,, (Hassard, Michael) (Entered: 09/20/2023) |
| 09/20/2023 | 201 | Amended MOTION for Leave to Appear Pro Hac Vice Tauseef Ahmed *Filing fee previously paid $ 100 at 197 , receipt number ADCDC-10352824. Filing fee previously paid $ 100 at 197 , receipt number ADCDC-10352824.* Fee Status: No Fee Paid. by ROMAN STERLINGOV. (Attachments: # 1 Declaration Hand-Signed Declaration of Tauseef Ahmed, # 2 Exhibit Certificate of Good Standing)(Ekeland, Tor) (Entered: 09/20/2023) |
| 09/20/2023 | 202 | RESPONSE by USA as to ROMAN STERLINGOV re 199 Notice (Other) (Pelker, Catherine) (Entered: 09/20/2023) |
| 09/21/2023 |  | MINUTE ORDER: Upon consideration of Defendant's Motion for Admission Pro Hac Vice, Dkt. 197 , it is hereby ORDERED that the motion is GRANTED. Tauseef S. Ahmed is hereby granted leave to appear pro hac vice in this case. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)/LCrR 44.5(a). Click for Instructions**. Signed by Judge Randolph D. Moss on 09/21/2023. (lcrdm3) (Entered: 09/21/2023) |
| 09/21/2023 |  | Minute Entry for proceedings held before Judge Randolph D. Moss:Pretrial Conference as to ROMAN STERLINGOV held on 9/21/2023. Defendant to file a notice containing the information requested from Mr. Fischbach concerning his availability on or before Noon 9/22/2023. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Tammi Sefranek (AM) & Sherry Lindsay (PM); Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker and Christopher Brown. (zglw) (zglw) (Entered: 09/21/2023) |
| 09/21/2023 |  | MINUTE ORDER: This ORDER clarifies that the original protective order entered in this case, Dkt. 18 , applies to each and every individual who has viewed or will view information provided by Chainalysis; each and every individual must personally sign Attachment A attached to Dkt. 18 . The Court further clarifies what it has always understood to be true: Any individual who receives information provided by Chainalysis (1) may not disclose that information to any other person who is not subject to the protective order at Dkt. 18 and who has not also signed Attachment A and (2) may not use that information for any purpose other than in connection with this |

Appx035

| | | |
|---|---|---|
| | | case. The Court further understands that, at the request of counsel for Ciphertrace and counsel for Chainalysis, the material from Chainalysis that the government first offered to produce to the Defense on September 9 or 10, 2023 will be viewed by Ms. Still (and any other Ciphertrace employee working with her who signs Attachment A and abides by the conditions herein) at a neutral location to be agreed upon by the parties, shall not be removed from that location, and shall not be downloaded on any computers or servers other than those mutually agreed upon by the parties. It is further ORDERED that those who have received or will receive access to the Chainalysis material first offered for production by the government on September 9 or 10, 2023 shall not disclose or discuss that information with anyone who is not a signatory to the protective order at Dkt. 196 without prior leave of Court. Signed by Judge Randolph D. Moss on 09/21/2023. (lcrdm3) (Entered: 09/21/2023) |
| 09/21/2023 | 203 | NOTICE *of Expert Witness Availability* by ROMAN STERLINGOV re Pretrial Conference,,, Set Deadlines,, (Hassard, Michael) (Entered: 09/21/2023) |
| 09/22/2023 | 204 | RESPONSE by USA as to ROMAN STERLINGOV re 203 Notice (Other) (Brown, Christopher) (Entered: 09/22/2023) |
| 09/22/2023 | 205 | NOTICE *Regarding Ciphertrace Expert Testimony and Review of Latest Chainalysis Production* by ROMAN STERLINGOV re 196 Order, Order,,,,, (Hassard, Michael) (Entered: 09/22/2023) |
| 09/22/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: On September 13, 2023, the Court granted the Defense's oral motion to continue trial. *See* Min. Order (Sept. 13, 2023). The Defense had requested a two-to-four-week continuance. At that time, the Court had a trial scheduled for October and therefore tentatively scheduled the trial for February 2024. But the Court also promised to "advise the parties if it [became] able to able to accommodate an earlier start date." *Id*. Two days later, on September 15, 2023, the Court advised the parties that time had opened up on its calendar and that it could try this case beginning on October 10, 2023. Notwithstanding the Defendant's earlier request for a trial date in October 2023, the Defense opposed going to trial in October and requested a continuance until the February 2024 date.

Upon consideration of the Defense's motion to continue trial to February 12, 2024, and in light of the Defense's representations: (1) that its expert, Mr. Jeffrey Fischbach, needs to be in Kansas from October 16, 2023 through November 10, 2023, and is unavailable to be in D.C. during any portion of that time period; (2) that it will not seek leave to designate any additional expert witnesses at this late date (which is long past the date for identifying experts); and (3) that all of its expert witnesses are available for trial February 12-March 9, 2024, and in light of Mr. Sterlingov's request for additional time to prepare for trial, the Court will GRANT the Defense's motion to continue trial in this case until February 12, 2024. All other deadlines remain unchanged. The parties are cautioned that the February trial date is firm and that the Court fully expects counsel and all of their witnesses to be prepared for a trial that commences on that date. For the reasons stated on the record at yesterday's hearing, time between September 22, 2023 and February 12, 2024 is tolled under the ends of justice exception to the Speedy Trial Act. *See* 18 U.S.C. 3161(h)(7)(a); *see also* Min. Order (Sept. 13, 2023).

Signed by Judge Randolph D. Moss on 09/22/2023. (lcrdm3) (Entered: 09/22/2023) |

| | | |
|---|---|---|
| 09/22/2023 | 206 | RESPONSE TO ORDER OF THE COURT by USA as to ROMAN STERLINGOV re Pretrial Conference,,,,, Set Deadlines/Hearings,,,,, Terminate Motions,,,, *Regarding Defendant's Access to Sensitive Heuristics Information* (Brown, Christopher) (Entered: 09/22/2023) |
| 09/29/2023 | 207 | RESPONSE by ROMAN STERLINGOV re 206 Response to Order of the Court *Regarding Defendant's Access to Personally Review Specific, Produced, Novel, Material Evidence* (Hassard, Michael) (Entered: 09/29/2023) |
| 10/05/2023 | 208 | NOTICE *of Request for Clarification of the Court's Minute Order Regarding Heuristic Information Trade Secrets* by CHAINANALYSIS INC. as to ROMAN STERLINGOV re Order,,,,,, (Frentzen, William) (Entered: 10/05/2023) |
| 10/27/2023 | 209 | NOTICE *Regard Pro Hac Vice Application of T. Ahmed* by ROMAN STERLINGOV re 201 Amended MOTION for Leave to Appear Pro Hac Vice Tauseef Ahmed *Filing fee previously paid $ 100 at 197 , receipt number ADCDC-10352824. Filing fee previously paid $ 100 at 197 , receipt number ADCDC-10352824.* Fee Status: (Ekeland, Tor) (Entered: 10/27/2023) |
| 11/04/2023 | 210 | ORDER as to ROMAN STERLINGOV: Upon consideration of the parties' respective filings concerning Defendant's access to the heuristic material, Dkt. 206; Dkt. 207, it is hereby ORDERED that the parties appear for a hearing on November 13, 2023 at 1:30 p.m., in Courtroom 8. See document for details. Signed by Judge Randolph D. Moss on 11/04/2023. (lcrdm3) (Entered: 11/04/2023) |
| 11/13/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Status Conference as to ROMAN STERLINGOV held on 11/13/2023. Bond Status of Defendant: Committed; Court Reporter: Tammi Sefranek; Defense Attorney: Tor Ekeland and Michael Hassard; US Attorney: Chatherine Pelker, Christopher B. Brown and Jeffrey Pearlman. (dot) (Entered: 11/13/2023) |
| 11/13/2023 | | MINUTE ORDER as to ROMAN STERLINGOV: Defense counsel ex parte filed on the record signed protective order acknowledgement forms. Dkt. 211 . Several of the forms provided are not acceptable because they do not include an individual's full name, but instead include what appear to be monikers or nicknames. The Court directs defense counsel's attention in particular to page 46 of the PDF (Dkt. 211 at 42), page 51 of the PDF (Dkt. 211 at 47), and page 106 of the PDF (Dkt. 211 at 102). Defense counsel is hereby ORDERED to file signed acknowledgement forms that contain real names on or before November 17, 2023. Signed by Judge Randolph D. Moss on 11/13/2023. (lcrdm3) (Entered: 11/13/2023) |
| 11/30/2023 | 213 | ORDER as to ROMAN STERLINGOV: Upon consideration of the parties' respective filings, Dkt. 206 ; Dkt. 207 , as well as their representations at the hearing held on the matter, *see* Min. Entry (Nov. 13, 2023), it is hereby ORDERED that good cause exists to restrict defendant Roman Sterlingov from personally reviewing the sensitive, supplemental heuristic information in this case. See document for details. Signed by Judge Randolph D. Moss on 11/30/2023. (lcrdm3) (Entered: 11/30/2023) |
| 12/28/2023 | 215 | NOTICE *of Supplemental Authority* by ROMAN STERLINGOV re 46 MOTION to Dismiss Case (Attachments: # 1 Exhibit A - Supplemental Authority)(Ekeland, Tor) (Entered: 12/28/2023) |

| 01/02/2024 | 216 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 9/18/2023; Page Numbers: 1-94. Date of Issuance:1/2/2024. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/23/2024. Redacted Transcript Deadline set for 2/2/2024. Release of Transcript Restriction set for 4/1/2024.(stl) (Entered: 01/02/2024) |
| 01/02/2024 | 217 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 9/21/2023; Page Numbers: 1-67. Date of Issuance:1/2/2024. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/23/2024. Redacted Transcript Deadline set for 2/2/2024. Release of Transcript Restriction set for 4/1/2024.(stl) (Entered: 01/02/2024) |
| 01/03/2024 | 218 | RESPONSE by USA as to ROMAN STERLINGOV re 215 Notice (Other) *of Supplemental Authority* (Brown, Christopher) (Entered: 01/03/2024) |
| 01/16/2024 | 219 | MOTION for Order to Show Cause *Regarding Defense Counsel's Violation of Local Criminal Rule 57.7(b)* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 01/16/2024) |
| 01/17/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the Government's motion for an order to show cause, Dkt. 219 , it is hereby ORDERED that Defendant shall respond on or before January 17, 2024, at 5:00 p.m. Signed by Judge Randolph D. Moss on 1/17/2024. (lcrdm3) (Entered: 01/17/2024) |

| 01/17/2024 | 220 | RESPONSE by ROMAN STERLINGOV re 219 MOTION for Order to Show Cause *Regarding Defense Counsel's Violation of Local Criminal Rule 57.7(b)* (Attachments: # 1 Text of Proposed Order)(Hassard, Michael) (Entered: 01/17/2024) |
|---|---|---|
| 01/22/2024 | 221 | MOTION in Limine *for Expedited Appointment of Conflict-Free Counsel and Conflict Inquiry Hearing*, MOTION to Appoint Counsel by USA as to ROMAN STERLINGOV. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Brown, Christopher) (Entered: 01/22/2024) |
| 01/26/2024 | 222 | RESPONSE by ROMAN STERLINGOV re 221 MOTION in Limine *for Expedited Appointment of Conflict-Free Counsel and Conflict Inquiry Hearing* MOTION to Appoint Counsel (Hassard, Michael) (Entered: 01/26/2024) |
| 02/01/2024 | 223 | TRANSCRIPT OF MOTION HEARING in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 6/16/23; Page Numbers: 1-156. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/01/2024 | 224 | TRANSCRIPT OF MOTIONS HEARING in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 6/23/23; Page Numbers: 1-181. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. |

Appx039

| | | |
|---|---|---|
| | | Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/01/2024 | 225 | TRANSCRIPT OF MOTIONS HEARING - PARTIALLY REDACTED in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 7/19/23; Page Numbers: 1-213. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the Transcript Order Form <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br> Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/01/2024 | 226 | TRANSCRIPT OF CONTINUED MOTIONS HEARING in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 7/20/23; Page Numbers: 214-358. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the Transcript Order Form <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br> Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/01/2024 | 227 | MOTION in Limine *to Compel* by ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Hassard, Michael) (Entered: 02/01/2024) |
| 02/01/2024 | 228 | TRANSCRIPT OF MOTIONS HEARING in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 8/22/23; Page Numbers: 1-226. Date of |

**Appx040**

|  |  |  |
|---|---|---|
|  |  | Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/01/2024 | 229 | TRANSCRIPT OF CONTINUED MOTIONS HEARING in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 8/23/23; Page Numbers: 227-426. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/01/2024 | 230 | MOTION in Limine *for Defendant's Pretrial Transfer* by ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Hassard, Michael) (Entered: 02/01/2024) |
| 02/01/2024 | 231 | TRANSCRIPT OF MOTIONS HEARING in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 8/29/23; Page Numbers: 1-58. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, |

| | | |
|---|---|---|
| | | (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/01/2024 | 232 | TRANSCRIPT OF PRETRIAL CONFERENCE in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 9/7/23; Page Numbers: 1-217. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/01/2024 | 233 | TRANSCRIPT OF CONTINUED PRETRIAL CONFERENCE in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 9/8/23; Page Numbers: 1-120. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

Appx042

| | | |
|---|---|---|
| | | Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/01/2024 | 234 | TRANSCRIPT OF PRETRIAL CONFERENCE in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 9/13/23; Page Numbers: 1-138. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/01/2024 | 235 | TRANSCRIPT OF PRETRIAL CONFERENCE in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 9/15/23; Page Numbers: 1-142. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/01/2024 | 236 | TRANSCRIPT OF PRETRIAL CONFERENCE in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 9/18/23; Page Numbers: 1-66. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, |

Appx043

Telephone number 202-354-3246, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024)

| 02/01/2024 | 237 | TRANSCRIPT OF MOTIONS HEARING in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 9/21/23; Page Numbers: 1-66. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/01/2024 | 238 | TRANSCRIPT OF MOTION HEARING in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 11/13/23; Page Numbers: 1-48. Date of Issuance:02/01/2024. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal |

Appx044

| | | |
|---|---|---|
| | | identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/3/2024. Release of Transcript Restriction set for 5/1/2024.(Sefranek, Tamara) (Entered: 02/01/2024) |
| 02/02/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the Government's renewed motion for order to show cause, Dkt. 219 , it is hereby ORDERED that the motion is DENIED as MOOT. The Government's motion appears to be limited in scope to defense counsel's planned X Space broadcast, *see* Dkt. 219, but the defense has represented that it cancelled the event in question, Dkt. 220 at 3. There is, accordingly, no need for the Court to consider whether and how defense counsel's untaken actions might have violated Rule 57.7. Signed by Judge Randolph D. Moss on 2/2/2024. (lcrdm3) (Entered: 02/02/2024) |
| 02/02/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's motion to compel, Dkt. 227, it is hereby ORDERED that: (1) the government shall file a response on or before February 6, 2024, at 12:00 p.m. and (2) Defendant shall file a reply on or before February 7, 2024, at 12:00 p.m. Signed by Judge Randolph D. Moss on 2/2/2024. (lcrdm3) (Entered: 02/02/2024) |
| 02/02/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: The Court previously posted a trial order, final voir dire, and final preliminary jury instructions. *See* Dkt. 186. The parties are hereby ORDERED to submit a notice on or before February 7, 2024 with the names of individuals who may testify or whose names will be mentioned during the trial. If that list does not differ from the list of names already included in the final voir dire, Dkt. 186-1 at 5-6, the notice should simply state that no changes have been made. Signed by Judge Randolph D. Moss on 2/2/2024. (lcrdm3) (Entered: 02/02/2024) |
| 02/04/2024 | 239 | Emergency MOTION in Limine , MOTION for Discovery *for Rule 16 Expert Discovery in Light of Disclosure that "Parts of the Ciphertrace Report Are Unreliable"* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Brown, Christopher) (Entered: 02/04/2024) |
| 02/04/2024 | 240 | RESPONSE by USA as to ROMAN STERLINGOV re 227 MOTION in Limine *to Compel* (Brown, Christopher) (Entered: 02/04/2024) |
| 02/04/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the government's emergency motion in limine, Dkt. 239, it is hereby ORDERED that the defense shall file a response on or before February 5, 2024, at 3:00 p.m. It is further ORDERED that the parties shall file a notice on or before February 5, 2024, at 3:00 p.m. with their best estimate of how many trial days they will need to present their witnesses, including a reasonable amount of time for cross-examination. Signed by Judge Randolph D. Moss on 2/4/2024. (lcrdm3) (Entered: 02/04/2024) |
| 02/05/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's motion to compel, Dkt. 227 , it is hereby ORDERED that the motion is DENIED as MOOT based on the government's representation, Dkt. 240 , that it has furnished defense counsel with the contact information at issue. Signed by Judge Randolph D. Moss on 2/5/2024. (lcrdm3) (Entered: 02/05/2024) |

| 02/05/2024 | 241 | RESPONSE TO ORDER OF THE COURT by USA as to ROMAN STERLINGOV re Order,,, Set Deadlines,, *Regarding Trial Scheduling* (Brown, Christopher) (Entered: 02/05/2024) |
|---|---|---|
| 02/05/2024 | 242 | RESPONSE TO ORDER OF THE COURT by ROMAN STERLINGOV re Order,,, Set Deadlines,, (Attachments: # 1 Text of Proposed Order)(Hassard, Michael) (Entered: 02/05/2024) |
| 02/05/2024 | 243 | RESPONSE TO ORDER OF THE COURT by ROMAN STERLINGOV re Order,,, Set Deadlines,, (Hassard, Michael) (Entered: 02/05/2024) |
| 02/05/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's Notice of Withdrawal, Dkt. 242 , it is hereby ORDERED that attorney Tauseef S. Ahmed is removed from this case. Signed by Judge Randolph D. Moss on 2/5/2024. (lcrdm3) (Entered: 02/05/2024) |
| 02/07/2024 | 244 | RESPONSE TO ORDER OF THE COURT by USA as to ROMAN STERLINGOV re Order,,, Set Deadlines,, (Pelker, Catherine) (Entered: 02/07/2024) |
| 02/07/2024 | 245 | RESPONSE TO ORDER OF THE COURT by ROMAN STERLINGOV re Order,,, Set Deadlines,, (Hassard, Michael) (Entered: 02/07/2024) |
| 02/07/2024 | 246 | TRIAL ORDER as to ROMAN STERLINGOV: The parties are hereby instructed to comply with the directives set forth in the attached Trial Order. For the parties' convenience, the Court re-posts the final voir dire and preliminary jury instructions it posted on September 8, 2023. *See* Dkt. 186. The final preliminary jury instructions have not been changed, and the final voir dire has been updated only to reflect the new trial date, withdrawal of Mr. Ahmed, and the changes noted by the parties, Dkt. 244; Dkt. 245, regarding testifying witnesses and individuals who may be referenced during trial. The parties are hereby ORDERED to view the final voir dire and preliminary jury instructions re-appended here. On the morning of February 12, 2024, the parties should be prepared to identify a reasonable basis for believing that admissible testimony may be offered that mentions each of the names listed by the parties, including, for example, Magistrate Judge Faruqui. Signed by Judge Randolph D. Moss on 2/7/2024. (Attachments: # 1 Voir Dire, # 2 Preliminary Jury Instructions) (lcrdm3) (Entered: 02/07/2024) |
| 02/08/2024 | 247 | MOTION to Exclude *Evidence Under FRE 401 & 403* by ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Hassard, Michael) (Entered: 02/08/2024) |
| 02/09/2024 | 248 | MOTION in Limine *Objecting to Government's Proposed Opening Slide Deck* by ROMAN STERLINGOV. (Attachments: # 1 Exhibit A - Government's Opening Slide Deck)(Hassard, Michael) (Entered: 02/09/2024) |
| 02/09/2024 | | MINUTE ORDER: The parties are advised that jury selection will begin on Monday, February 12, 2024, at 9:00 a.m. in the Ceremonial Courtroom, not Courtroom 8. The parties are further advised that the Court intends to sit for part of the day on Friday, February 16, 2024. Signed by Judge Randolph D. Moss on 2/9/2024. (lcrdm3) (Entered: 02/09/2024) |
| 02/10/2024 | 249 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 247 Motion to Exclude (Brown, Christopher) (Entered: 02/10/2024) |

**Appx046**

| 02/10/2024 | 250 | MOTION in Limine *for Preliminary Jury Instructions, Motion To Exclude Under Rule 403, and Motion for Other Miscellaneous Relief* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Brown, Christopher) (Entered: 02/10/2024) |
|---|---|---|
| 02/10/2024 | 253 | MOTION to Exclude Under Rule 403, and MOTION For Other Miscellaneous Relief by USA as to ROMAN STERLINGOV. (See docket entry 250 to view document.) (zltp) (Entered: 02/15/2024) |
| 02/11/2024 | 251 | MOTION in Limine *Objecting to Late Rule 16 Production by the Government and Miscellaneous Requests* by ROMAN STERLINGOV. (Attachments: # 1 Exhibit A - Dr. Cabanas CTCE Certificate, # 2 Exhibit B - Prof. Verret CCFI Certificate)(Hassard, Michael) (Entered: 02/11/2024) |
| 02/12/2024 | | MINUTE ORDER: The Court having impaneled the jury in this action, it is hereby ORDERED that during trial and deliberations all meals for said jury shall be paid by the Clerk of the Court for the U.S. District Court for the District of Columbia. Approved by Judge Randolph D. Moss on 2/12/2024. (zglw) (Entered: 02/12/2024) |
| 02/12/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Selection as to ROMAN STERLINGOV held and completed on 2/12/2024 ROMAN STERLINGOV (1). Jury Trial to begin on 2/13/2024 at 10:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Commitment Issued; Court Reporter: Sherry Lindsay; Defense Attorney: Tor Ekland & Michael Hassard; US Attorney: Catherin Pelker, Christopher Brown, Jeffrey Pearlman. (zglw) (Entered: 02/12/2024) |
| 02/13/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 2/13/2024 ROMAN STERLINGOV (1) Count 1s,2s,3s,4s. Same jury and alternates. Opening Statements by both sides. Jury Trial continued to 2/24/2024 at 09:30 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Sherry Lindsay/ Jan Dickman; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. (zglw) (Entered: 02/14/2024) |
| 02/14/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 2/14/2024 ROMAN STERLINGOV (1) Count 1s,2s,3s,4s. Same jury and alternates. Jury Trial continued tor 2/15/2024 at 09:30 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Sherry Lindsay & Lisa Edwards; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Christopher Brown, Jeffrey Pearlman, Catherine Pelker; Witness- Price. (zglw) (Entered: 02/14/2024) |
| 02/15/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 2/15/2024 ROMAN STERLINGOV (1) Count 1s,3s,4s. Same jury and alternates. Jury Trial continued to 2/20/2024 at 09:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Sherry Lindsay & Jan Dickman; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witnesses: Price, Krulikowski, Mirroff and Rovensky (zglw) (Entered: 02/15/2024) |

Appx047

| | | |
|---|---|---|
| 02/20/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Given the Defense's request that the jury be retained to determine forfeiture in the event it returns a guilty verdict, in accordance with Federal Rule of Criminal Procedure 32.2(b)(5)(B), the Government is hereby ORDERED to submit on or before February 26, 2024 "a proposed Special Verdict form listing each property subject to forfeiture and asking the jury to determine whether the government has established the requisite nexus between the property and the offense committed by the defendant." The Defense is hereby ORDERED to submit any objections or comments on or before March 1, 2024. Signed by Judge Randolph D. Moss on 2/20/2024. (lcrdm3) (Entered: 02/20/2024) |
| 02/20/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 2/20/2024 ROMAN STERLINGOV (1) Count 1s,2s,3s,4s. Same jury and alternates. Jury Trial continued to 2/21/2024 at 09:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Sherry Lindsay/ Jan Dickman; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witness: Rovensky (zglw) (Entered: 02/20/2024) |
| 02/21/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 2/21/2024 ROMAN STERLINGOV (1). Same jury and alternates. Jury Trial continued to 2/22/2024 at 09:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/ Commitment Issued; Court Reporter: Sherry Lindsay & Lisa Edwards; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witnesses: Rovensky, Townson & Scholl (zglw) (Entered: 02/21/2024) |
| 02/21/2024 | 255 | ORDER as to ROMAN STERLINGOV: It is hereby ORDERED that the U.S. Marshals Service shall permit Defendant to shave daily until the close of trial in this matter. See document for details. Signed by Judge Randolph D. Moss on 2/21/2024. (lcrdm3) (Entered: 02/21/2024) |
| 02/22/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 2/22/2024 ROMAN STERLINGOV (1). Same jury and alternates. Jury Trial continued to 2/23/2024 at 10:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/ Commitment Issued; Court Reporter: Sherry Lindsay & Jan Dickmnan; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witness: Scholl (zglw) (Entered: 02/23/2024) |
| 02/23/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 2/23/2024 ROMAN STERLINGOV (1) Same jury and alternates. Jury Trial continued to 2/26/2024 at 09:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/ Commitment Issued; Court Reporter: Lisa Edwards; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witness: Scholl (zglw) (Entered: 02/23/2024) |
| 02/25/2024 | 256 | MOTION to Exclude *"Supplemental" Expert Testimony by Prof. Verret First Disclosed in the Middle of Trial* by USA as to ROMAN STERLINGOV. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Brown, Christopher) (Entered: 02/25/2024) |

Appx048

| | | |
|---|---|---|
| 02/25/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the Government's motion to exclude, Dkt. 256 , it is hereby ORDERED that Defendant shall respond on or before February 27, 2024, at 5:00 p.m. Signed by Judge Randolph D. Moss on 2/25/2024. (lcrdm3) Modified on 2/26/2024 to change date to 2/25/24(zglw). (Entered: 02/25/2024) |
| 02/26/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 2/26/2024 ROMAN STERLINGOV (1). Same jury and alternates. Jury Trial continued to 2/27/2024 at 09:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/ Commitment Issued; Court Reporter: Sherry Lindsay; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown.Witnesses: Scholl & Lichtstein (zglw) (Entered: 02/26/2024) |
| 02/26/2024 | 257 | PROPOSED VERDICT FORM as to ROMAN STERLINGOV (Brown, Christopher) (Entered: 02/26/2024) |
| 02/27/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 2/27/2024 ROMAN STERLINGOV (1). Same jury and alternates. Jury Trial continued to 2/28/2024 at 09:30 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/ Commitment Issued; Court Reporter: Sherry Lindsay; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witnesses: Lichtenstein, Glave & Mazars de Mazarin (zglw) (Entered: 02/27/2024) |
| 02/27/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Status Conference as to ROMAN STERLINGOV held on 2/27/2024. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Lisa Edwards; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. (zglw) (Entered: 02/27/2024) |
| 02/27/2024 | 258 | RESPONSE by ROMAN STERLINGOV re 256 MOTION to Exclude *"Supplemental" Expert Testimony by Prof. Verret First Disclosed in the Middle of Trial* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Hassard, Michael) (Entered: 02/27/2024) |
| 02/28/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of defendant's response, Dkt. 258 , it is hereby ORDERED that the government shall reply on or before February 29, 2024, at 7:00 p.m. Signed by Judge Randolph D. Moss on 2/28/2024. (lcrdm3) (Entered: 02/28/2024) |
| 02/28/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 2/28/2024 ROMAN STERLINGOV (1). Same jury and alternates. Jury Trial continued to 2/29/2024 at 09:15 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/ Commitment Issued; Court Reporter: Sherry Lindsay & Jan Dickman; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witness: Mazars de Mazarin (zglw) (Entered: 02/28/2024) |
| 02/29/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 2/29/2024 ROMAN STERLINGOV (1). Same jury and alternates. Jury Trial continued to 3/1/2024 at 09:00 AM in Courtroom 8- In |

**Appx049**

| | | Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/ Commitment Issued; Court Reporter: Sherry Lindsay/ Lisa Edwards; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witnesses: Mazard de Mazarin, T. Vlahakis, L. Harmon & E. Bisbee (zglw) (Entered: 02/29/2024) |
|---|---|---|
| 02/29/2024 | 259 | MEMORANDUM OPINION AND ORDER as to ROMAN STERLINGOV: For the reasons stated on the record and further explained in the attached memorandum opinion, the Court finds that the government has demonstrated by a preponderance of the evidence that the blockchain analysis generated by Chainalysis Reactor is the product of reliable principles and methods, Fed. R. Evid. 702(c), and is otherwise admissible under Federal Rule of Evidence 702. The Court, accordingly, DENIES defendant's requests to exclude the testimony and evidence based on that analysis, see Dkt. 59; Dkt. 72; Dkt. 251. See document for details. Signed by Judge Randolph D. Moss on 2/29/2024. (lcrdm3) (Entered: 02/29/2024) |
| 02/29/2024 | 260 | REPLY in Support by USA as to ROMAN STERLINGOV re 256 MOTION to Exclude *"Supplemental" Expert Testimony by Prof. Verret First Disclosed in the Middle of Trial* (Attachments: # 1 Exhibit 1)(Brown, Christopher) (Entered: 02/29/2024) |
| 03/01/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 3/1/2024 ROMAN STERLINGOV (1). Jury Trial continued to 3/4/2024 at 09:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Sherry Lindsay; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witnesses: Comolliy & Santell (zglw) (Entered: 03/01/2024) |
| 03/03/2024 | 261 | NOTICE *of Proffered Demonstrative Slide Deck for Defense Expert Professor J.W. Verret* by ROMAN STERLINGOV (Attachments: # 1 Exhibit A)(Hassard, Michael) (Entered: 03/03/2024) |
| 03/03/2024 | 262 | RESPONSE by USA as to ROMAN STERLINGOV re 261 Notice (Other) (Attachments: # 1 Exhibit 1)(Brown, Christopher) (Entered: 03/03/2024) |
| 03/04/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 3/4/2024 ROMAN STERLINGOV (1). Same jury and alternates. Jury Trial continued to 3/5/2024 at 09:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/ Commitment Issued; Court Reporter: Sherry Lindsay/ Jan Dickman; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witnesses: Verret, Fischback (zglw) (Entered: 03/04/2024) |

| 03/05/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 3/5/2024 ROMAN STERLINGOV (1) Same jury and alternates. Jury Trial continued to 3/6/2024 at 09:30 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/ Commitment Issued; Court Reporter: Sherry Lindsay & Lisa Edwards; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witnesses: Fischback & Sterlingov (zglw) (Entered: 03/05/2024) |
|---|---|---|
| 03/06/2024 | 263 | ORDER as to ROMAN STERLINGOV: The parties are hereby ORDERED to review the draft final jury instructions provided herein. Any comments not raised by either party will be deemed waived. Signed by Judge Randolph D. Moss on 3/6/2024. (lcrdm3) (Entered: 03/06/2024) |
| 03/06/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 3/6/2024 ROMAN STERLINGOV (1). Same jury and alternates. Jury Trial continued 3/7/2024 at 09:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Sherry Lindsay & Lisa Edwards; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witnesses: Sterlingov (zglw) (Entered: 03/06/2024) |
| 03/06/2024 | 264 | ORDER as to ROMAN STERLINGOV: Attached are slightly revised draft final jury instructions, which correct typographical errors, as well as a draft jury verdict form for the parties' review and comment. Signed by Judge Randolph D. Moss on 3/6/2024. (Attachments: # 1 Draft Jury Verdict Form) (lcrdm3) (Entered: 03/06/2024) |
| 03/06/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: It is hereby ORDERED that the government's motion in limine, Dkt. 239 , is DENIED as moot given that the defense subsequently withdrew Jonelle Still as a testifying expert, Dkt. 243 . It is further ORDERED that the government's motions in limine at Dkt. 62 and Dkt. 63 are hereby DENIED as moot. To the extent an issue was raised concerning the Mt. Gox documents, that issue was mooted by the government's submission of a supplemental certification. To the extent the defense objected on the grounds that Mt. Gox had been subject to a hack, the Court previously explained from the bench that that argument does not go to the authenticity of the records produced by the bankruptcy trustee as constituting the Mt. Gox records. Finally, it is further ORDERED that any forfeiture phase jury instructions the defense would like the Court to consider shall be filed on or before March 8, 2024, at 12:00 p.m. Signed by Judge Randolph D. Moss on 3/6/2024. (lcrdm3) (Entered: 03/06/2024) |
| 03/07/2024 | 265 | ORDER as to ROMAN STERLINGOV: Attached are draft final jury instructions for the parties' final review. Signed by Judge Randolph D. Moss on 3/7/2024. (lcrdm3) (Entered: 03/07/2024) |
| 03/11/2024 | 266 | NOTICE of Filing by USA as to ROMAN STERLINGOV (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Pelker, Catherine) (Entered: 03/11/2024) |
| 03/11/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial as to ROMAN STERLINGOV held on 3/11/2024 ROMAN STERLINGOV (1). Government and Defendant rest their case. Same jury and alternates. Alternates |

Appx051

| | | released at the end of the day. Jury Deliberation set for 3/8/2024 at 09:30 AM. Jury Trial/ Deliberation set for 3/11/2024 at 09:30 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Sherry Lindsay & Jan Dickman; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. (zglw) (Entered: 03/11/2024) |
|---|---|---|
| 03/11/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Deliberation as to ROMAN STERLINGOV held on 3/8/2024 and 3/11/24. (zglw) (Entered: 03/11/2024) |
| 03/11/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Deliberations as to ROMAN STERLINGOV held on 3/11/2024 ROMAN STERLINGOV (1). Same jury. Jur note read and answered. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Sherry Lindsay; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. (zglw) (Entered: 03/11/2024) |
| 03/12/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Jury Trial/ Deliberation as to ROMAN STERLINGOV held on 3/12/2024 ROMAN STERLINGOV (1) on Counts 1s,2s,3s,4s and Forfeiture. Same jury. Defendant found Guilty on all counts. Sentencing set for 7/15/2024 at 10:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss. Government's Sentencing Memorandum due on or before 7/1/2024. Defendant's Sentencing Memo due on or before 7/8/2024. REFERRAL TO PROBATION OFFICE for Presentence Investigation. Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Sherry Lindsay; Defense Attorney: Tor Ekeland, Michael Hassard; US Attorney: Catherine Pelker, Jeffrey Pearlman, and Christopher Brown. Witness: Scholl (zglw) (Entered: 03/12/2024) |
| 03/12/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:JURY VERDICT as to ROMAN STERLINGOV (1) Guilty on Count 1s,2s,3s,4s. (zglw) (Entered: 03/12/2024) |
| 03/13/2024 | 268 | Jury Instructions as to ROMAN STERLINGOV (zglw) (Entered: 03/13/2024) |
| 03/13/2024 | 269 | Jury Note as to ROMAN STERLINGOV (zglw) (Entered: 03/13/2024) |
| 03/13/2024 | 270 | **Signature Page of Foreperson** as to ROMAN STERLINGOV in Jury Note. (Access to the PDF Document is restricted pursuant to the E-Government Act. Access is limited to Counsel of Record and the Court.) (zglw) (Entered: 03/13/2024) |
| 03/13/2024 | 271 | VERDICT FORM as to ROMAN STERLINGOV (zglw) (Entered: 03/13/2024) |
| 03/13/2024 | 272 | **Signature Page of Foreperson** as to ROMAN STERLINGOV in Jury Verdict. (Access to the PDF Document is restricted pursuant to the E-Government Act. Access is limited to Counsel of Record and the Court.) (zglw) (Entered: 03/13/2024) |
| 03/13/2024 | 273 | Forfeiture Jury Instructions as to ROMAN STERLINGOV (zglw) (Entered: 03/13/2024) |

**Appx052**

| 03/13/2024 | 274 | SPECIAL VERDICT FORM as to ROMAN STERLINGOV (zglw) (Entered: 03/13/2024) |
|---|---|---|
| 03/13/2024 | 275 | **Signature Page of Foreperson**<br><br>as to ROMAN STERLINGOV in Forfeiture Jury Verdict. (Access to the PDF Document is restricted pursuant to the E-Government Act. Access is limited to Counsel of Record and the Court.) (zglw) (Entered: 03/13/2024) |
| 03/16/2024 | 276 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 2/12/24; Page Numbers: 1-270. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 03/16/2024 | 277 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 2/13/24 AM; Page Numbers: 1-68. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 03/16/2024 | 278 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 2/14/24 AM; Page Numbers: 1-123. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number |

**Appx053**

| | | |
|---|---|---|
| | | 202-354-3053, Transcripts may be ordered by submitting the <u>Transcript Order Form</u> |
| | | For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. |
| | | **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |
| | | Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 03/16/2024 | <u>279</u> | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 2/15/24; Page Numbers: 1-115. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the <u>Transcript Order Form</u> |
| | | For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. |
| | | **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |
| | | Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 03/16/2024 | <u>280</u> | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 2/20/24 AM; Page Numbers: 1-115. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the <u>Transcript Order Form</u> |
| | | For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. |
| | | **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at |

**Appx054**

| | | |
|---|---|---|
| | | www.dcd.uscourts.gov.<br><br>Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 03/16/2024 | 281 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 2/21/24 AM; Page Numbers: 1-125. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 03/16/2024 | 282 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 2/22/24 AM; Page Numbers: 1-124. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 03/16/2024 | 283 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 2/26/24 AM; Page Numbers: 1-143. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. |

| | | |
|---|---|---|
| | | After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 03/16/2024 | 284 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 2/27/24 AM; Page Numbers: 1-131. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |

| 03/16/2024 | 285 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 2/28/24 AM; Page Numbers: 1-117. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 03/16/2024 | 286 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 2/29/24 AM; Page Numbers: 1-119. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 03/16/2024 | 287 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 3/1/24 AM; Page Numbers: 1-146. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one |

**Appx057**

days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024)

| 03/16/2024 | 288 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 3/4/24 AM; Page Numbers: 1-137. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 03/16/2024 | 289 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 3/5/24 AM; Page Numbers: 1-141. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 03/16/2024 | 290 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 3/6/24 AM; Page Numbers: 1-104. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number |

**Appx058**

202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024)

| 03/16/2024 | 291 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 3/7/24 AM; Page Numbers: 1-103. Date of Issuance:3/16/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 4/6/2024. Redacted Transcript Deadline set for 4/16/2024. Release of Transcript Restriction set for 6/14/2024.(stl) (Entered: 03/16/2024) |
| 04/19/2024 | 292 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 3/11/24; Page Numbers: 1-20. Date of Issuance:4/19/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at |

Appx059

| | | |
|---|---|---|
| | | www.dcd.uscourts.gov.<br><br>Redaction Request due 5/10/2024. Redacted Transcript Deadline set for 5/20/2024. Release of Transcript Restriction set for 7/18/2024.(stl) (Entered: 04/19/2024) |
| 04/19/2024 | 293 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 3/12/24; Page Numbers: 1-56. Date of Issuance:4/19/24. Court Reporter/Transcriber Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/10/2024. Redacted Transcript Deadline set for 5/20/2024. Release of Transcript Restriction set for 7/18/2024.(stl) (Entered: 04/19/2024) |
| 05/06/2024 | 294 | TRANSCRIPT OF VIDEO (ZOOM) STATUS CONFERENCE in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on September 29, 2021. Page Numbers: 1 - 11. Date of Issuance: May 6, 2024. Court Reporter: Jeff Hook. Telephone number: 202-354-3373. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/27/2024. Redacted Transcript Deadline set for 6/6/2024. Release of Transcript Restriction set for 8/4/2024.(Hook, Jeff) (Entered: 05/06/2024) |
| 05/09/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Based upon the request of defense counsel, which the government does not oppose, the sentencing currently set for July 15, 2024, at 10:00 a.m., is hereby RESCHEDULED to July 15, 2024, at 1:00 p.m., in Courtroom 8. Signed by Judge Randolph D. Moss on 5/9/2024. (lcrdm3) (Entered: 05/09/2024) |

**Appx060**

| | | |
|---|---|---|
| 05/16/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Pursuant to Federal Rule of Criminal Procedure 32.2, the government is hereby ORDERED to file a recommended "preliminary order of forfeiture" on or before June 7, 2024. Fed. R. Crim. P. 32.2(b)(2); *see McIntosh v. United States*, 144 S. Ct. 980, 991 n.6 (2024). Defendant may file any proposed revisions or modifications on or before June 14, 2024, and the Government may file any reply on or before June 21, 2024. Signed by Judge Randolph D. Moss on 5/16/2024. (lcrdm3) (Entered: 05/16/2024) |
| 05/27/2024 | 295 | ENTERED IN ERROR.....MOTION to Permit *Defense to Speak with Jurors* by ROMAN STERLINGOV. (Ekeland, Tor) Modified on 6/5/2024 (zhsj). (Entered: 05/27/2024) |
| 05/27/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's letter request, Dkt. 295 , the Government is hereby ORDERED to respond on or before May 31, 2024 at 12:00 p.m. Defense counsel is directed to refrain from contacting any juror pending further order of the Court. *See* LCrR 24.2(b) ("If no request to speak with jurors is made before discharge of the jury, no party or attorney shall speak with a juror concerning the case except when permitted by the Court for good cause shown in writing."); *see also United States v. Davis*, 420 F. Supp. 2d 252, 264-66 & n.8 (D.D.C. 2005). Signed by Judge Randolph D. Moss on 5/27/2024. (lcrdm3) (Entered: 05/27/2024) |
| 05/27/2024 | | NOTICE OF ERROR as to ROMAN STERLINGOV regarding 295 MOTION to Permit *Defense to Speak with Jurors*. The following error(s) need correction: Incorrect format (Letter)- correspondence is not permitted (LCrR 49(f)(4)). Please refile. (zhsj) (Entered: 06/05/2024) |
| 05/31/2024 | 296 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 295 Motion to Permit *Defense To Speak with Jurors* (Brown, Christopher) (Entered: 05/31/2024) |
| 06/07/2024 | 297 | MOTION for Forfeiture of Property by USA as to ROMAN STERLINGOV. (Attachments: # 1 Text of Proposed Order)(Pelker, Catherine) (Entered: 06/07/2024) |
| 06/10/2024 | 298 | MOTION for Leave to Appear Pro Hac Vice Maksim Nemtsev Filing fee $ 100, receipt number ADCDC-10952886. Fee Status: Fee Paid. by ROMAN STERLINGOV. (Attachments: # 1 Certificate of Good Standing, # 2 Declaration Declaration of Maksim Nemtsev)(Hawes, Walter) (Entered: 06/10/2024) |
| 06/11/2024 | 299 | MOTION to Permit *Defense to Speak with Jurors* by ROMAN STERLINGOV. (Hassard, Michael) (Entered: 06/11/2024) |
| 06/11/2024 | 300 | MOTION to Permit *Defense to Speak with Jurors* by ROMAN STERLINGOV. (Attachments: # 1 Exhibit 1)(Hassard, Michael) (Entered: 06/11/2024) |
| 06/13/2024 | 301 | First MOTION to Continue *Defendant's Response to Government's Motion for Preliminary Order of Forfeiture for One Week (Unopposed)* by ROMAN STERLINGOV. (Hassard, Michael) (Entered: 06/13/2024) |
| 06/13/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's unopposed motion for an extension of time, Dkt. 301 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Defendant may submit any proposed revisions or modifications to the Government's recommended preliminary order of forfeiture, Dkt. 297 , on or before June 21, 2024 and the Government may file any reply on or before June 28, 2024. Signed by Judge Randolph D. Moss on |

| | | |
|---|---|---|
| | | 6/13/2024. (lcrdm3) (Entered: 06/13/2024) |
| 06/13/2024 | | Set/Reset Deadlines as to ROMAN STERLINGOV: Defendant may submit any proposed revisions or modifications to the Government's recommended preliminary order of forfeiture, Dkt. 297 , on or before June 21, 2024 and the Government may file any reply on or before June 28, 2024. (zglw) (Entered: 06/13/2024) |
| 06/13/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's Motion for Admission Pro Hac Vice, Dkt. 298 , it is hereby ORDERED that the motion is GRANTED. Maksim Nemtsev is hereby granted leave to appear pro hac vice in this case. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)/LCrR 44.5(a). Click for Instructions**. Signed by Judge Randolph D. Moss on 6/13/2024. (lcrdm3) (Entered: 06/13/2024) |
| 06/14/2024 | 302 | Memorandum in Opposition by USA as to ROMAN STERLINGOV re 300 Motion to Permit (Pelker, Catherine) (Entered: 06/14/2024) |
| 06/14/2024 | 303 | NOTICE OF ATTORNEY APPEARANCE: Maksim Nemtsev appearing for ROMAN STERLINGOV (Nemtsev, Maksim) (Entered: 06/14/2024) |
| 06/21/2024 | 304 | REPLY TO OPPOSITION to Motion by ROMAN STERLINGOV re 300 MOTION to Permit *Defense to Speak with Jurors* (Attachments: # 1 Exhibit A - Declaration of Jeff Fischbach)(Hassard, Michael) (Entered: 06/21/2024) |
| 06/21/2024 | 305 | Memorandum in Opposition by ROMAN STERLINGOV re 297 Motion for Forfeiture of Property (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Ekeland, Tor) (Entered: 06/21/2024) |
| 06/24/2024 | 306 | Unopposed MOTION to Continue *Sentencing Hearing to August 15, 2024* by ROMAN STERLINGOV. (Hassard, Michael) (Entered: 06/24/2024) |
| 06/24/2024 | 307 | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's Motion to Permit Defense to Speak with Jurors, Dkt. 300 , it is hereby ORDERED that the motion is DENIED. *See also* Dkt. 295 ; Dkt. 299 . See document for details. Signed by Judge Randolph D. Moss on 6/24/2024. (lcrdm3) (Entered: 06/24/2024) |
| 06/24/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Defendant's unopposed motion for continuance, Dkt. 306 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that the sentencing hearing currently scheduled for July 15, 2024, is RESCHEDULED to August 21, 2024, at 1:30 p.m., in Courtroom 8. Signed by Judge Randolph D. Moss on 6/24/2024. (lcrdm3) (Entered: 06/24/2024) |
| 06/27/2024 | 308 | Unopposed MOTION for Extension of Time to File *Sentencing Memoranda* by USA as to ROMAN STERLINGOV. (Pearlman, Jeffrey) (Entered: 06/27/2024) |
| 06/28/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of the Government's unopposed motion to reschedule the filing of sentencing memoranda, Dkt. 308 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that the Government shall file its sentencing memorandum on or before August 1, 2024 and that Defendant shall file his sentencing memorandum on or before August 8, 2024. Signed by Judge Randolph D. Moss on 6/28/2024. (lcrdm3) (Entered: 06/28/2024) |

**Appx062**

| 06/28/2024 | 309 | ENTERED IN ERROR.....REPLY in Support by USA as to ROMAN STERLINGOV re 297 MOTION for Forfeiture of Property. (Brown, Christopher) Modified on 7/2/2024 (zhsj). (Entered: 06/28/2024) |
|---|---|---|
| 06/28/2024 | | NOTICE OF ERROR as to ROMAN STERLINGOV regarding 309 Reply in Support. The following error(s) need correction: Invalid attorney signature- signature on document must match PACER login. Please refile. (zhsj) (Entered: 07/02/2024) |
| 07/03/2024 | 310 | REPLY in Support by USA as to ROMAN STERLINGOV re 297 MOTION for Forfeiture of Property (Pelker, Catherine) (Entered: 07/03/2024) |
| 07/17/2024 | 311 | DRAFT PRESENTENCE INVESTIGATION REPORT [prepared by USPO Hana Field] as to ROMAN STERLINGOV (Lustig, Crystal) (Entered: 07/17/2024) |
| 08/01/2024 | 314 | SENTENCING MEMORANDUM by USA as to ROMAN STERLINGOV (Brown, Christopher) (Entered: 08/01/2024) |
| 08/05/2024 | 315 | MOTION for Extension of Time to File *Defendant's Sentencing Submission by One Week* by ROMAN STERLINGOV. (Nemtsev, Maksim) (Entered: 08/05/2024) |
| 08/05/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: In light of Mr. Sterlingov's motion for extension of time to file defendant's sentencing submission by one week, Dkt. 315 , it is hereby ORDERED that the Government shall file its response on or before August 7, 2024, at 12:00 p.m. Signed by Judge Randolph D. Moss on 8/5/2024. (lcrdm3) (Entered: 08/05/2024) |
| 08/06/2024 | 316 | RESPONSE by USA as to ROMAN STERLINGOV re 315 MOTION for Extension of Time to File *Defendant's Sentencing Submission by One Week* (Brown, Christopher) (Entered: 08/06/2024) |
| 08/06/2024 | 317 | REPLY TO OPPOSITION to Motion by ROMAN STERLINGOV re 315 MOTION for Extension of Time to File *Defendant's Sentencing Submission by One Week* (Nemtsev, Maksim) (Entered: 08/06/2024) |
| 08/07/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Mr. Sterlingov's motion for extension of time to file defendant's sentencing submission by one week, Dkt. 315 , and the government's response, Dkt. 316 , it is hereby ORDERED that the motion is GRANTED. Mr. Sterlingov shall file his sentencing submission on or before August 15, 2024. To the extent the government requires additional time to prepare for sentencing or respond to Mr. Sterlingov's submission, the government may seek a commensurate extension. Signed by Judge Randolph D. Moss on 8/7/2024. (lcrdm3) (Entered: 08/07/2024) |
| 08/14/2024 | 318 | FINAL PRESENTENCE INVESTIGATION REPORT [prepared by USPO Hana Field] as to ROMAN STERLINGOV (Lustig, Crystal) (Entered: 08/14/2024) |
| 08/14/2024 | 319 | RECOMMENDATION of FINAL PRESENTENCE INVESTIGATION REPORT [prepared by USPO Hana Field] as to ROMAN STERLINGOV (Lustig, Crystal) (Entered: 08/14/2024) |
| 08/14/2024 | 320 | ORDER as to ROMAN STERLINGOV: For the reasons stated in the accompanying Order, it is hereby ORDERED that the sentencing scheduled for August 21, 2024, is VACATED and CONTINUED pending resolution of the government's motion for forfeiture of property, Dkt. 297 . It is further ORDERED that the parties shall appear for a hearing regarding the government's pending motion for forfeiture on August 21, |

Appx063

| | | |
|---|---|---|
| | | 2024, at 1:30 p.m. in Courtroom 8. See document for details. Signed by Judge Randolph D. Moss on 8/14/2024. (lcrdm3) (Entered: 08/14/2024) |
| 08/15/2024 | 321 | SENTENCING MEMORANDUM by ROMAN STERLINGOV (Attachments: # 1 Exhibit A - Letters, # 2 Exhibit B - Declaration of Jeff Fischbach, # 3 Exhibit C - Declaration of Joel Sickler)(Hassard, Michael) (Entered: 08/15/2024) |
| 08/20/2024 | | Set/Reset Hearings as to ROMAN STERLINGOV: Motion Hearing set for 8/21/2024 at 01:30 PM in Courtroom 8- In Person before Judge Randolph D. Moss. Sentencing set for 8/21/24 VACATED. (zglw) (Entered: 08/20/2024) |
| 08/21/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss:Motion Hearing as to ROMAN STERLINGOV held on 8/21/2024 re 297 MOTION for Forfeiture of Property filed by USA Sentencing set for 11/8/2024 at 01:30 PM in Courtroom 8- In Person before Judge Randolph D. Moss. Oral Argument heard. Matter taken under advisement.Bond Status of Defendant: Committed/Commitment Issued; Court Reporter: Sherry Lindsay; Defense Attorney: Tor Ekeland & Michael Hassard; US Attorney: Christopher Brown, Jeffrey Pearlman, Catherine Pelker. (zglw) (Entered: 08/22/2024) |
| 08/27/2024 | 322 | Unopposed MOTION for Hearing *regarding Sentencing to be Reset from Nov. 8, 2024 at 1:30 PM to Oct. 3rd, 2024, at 1:30 PM* by ROMAN STERLINGOV. (Hassard, Michael) (Entered: 08/27/2024) |
| 09/01/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: Upon consideration of Mr. Sterlingov's unopposed motion for hearing regarding sentencing to be reset, Dkt. 322 , it is hereby ORDERED that the motion is GRANTED. The sentencing set for November 8, 2024, is VACATED and RESCHEDULED for October 3, 2024, at 1:30 p.m. in Courtroom 8. Signed by Judge Randolph D. Moss on 9/1/2024. (lcrdm3) (Entered: 09/01/2024) |
| 09/23/2024 | 323 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 8/21/24; Page Numbers: 1-86. Date of Issuance:9/23/24. Court Reporter Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/14/2024. Redacted Transcript Deadline set for 10/24/2024. Release of Transcript Restriction set for 12/22/2024.(stl) (Entered: 09/23/2024) |
| 09/26/2024 | 324 | MOTION for Leave to Appear Pro Hac Vice Marc Fernich Filing fee $ 100, receipt number ADCDC-11187795. Fee Status: Fee Paid. by ROMAN STERLINGOV. |

**Appx064**

| | | |
|---|---|---|
| | | (Attachments: # <u>1</u> Declaration Declaration of Marc Fernich, # <u>2</u> Exhibit Certificate of Good Standing)(Shur, Justin) (Entered: 09/26/2024) |
| 09/26/2024 | | MINUTE ORDER as to ROMAN STERLINGOV: It is hereby ORDERED that the sentencing set for October 3, 2024, is VACATED and RESCHEDULED for November 8, 2024, at 2:00 p.m. in Courtroom 8. Signed by Judge Randolph D. Moss on 9/26/2024. (lcrdm3) (Entered: 09/26/2024) |
| 09/26/2024 | | MINUTE ORDER: Upon consideration of Defendant's Motion for Admission *Pro Hac Vice* <u>324</u> , it is hereby ORDERED that the motion is GRANTED. Marc Allan Fernich is hereby granted leave to appear *pro hac vice* in this case. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a). Click for Instructions**. Signed by Judge Randolph D. Moss on 9/26/2024. (lcrdm3) (Entered: 09/26/2024) |
| 09/30/2024 | <u>325</u> | NOTICE OF ATTORNEY APPEARANCE: Marc Fernich appearing for ROMAN STERLINGOV (Fernich, Marc) (Entered: 09/30/2024) |
| 10/29/2024 | <u>326</u> | NOTICE as to ROMAN STERLINGOV regarding data from the U.S. Sentencing Commission. See document for details. Signed by Judge Randolph D. Moss on 10/29/2024. (lcrdm3) (Entered: 10/29/2024) |
| 10/31/2024 | <u>327</u> | TRANSCRIPT OF JURY TRIAL (AFTERNOON SESSION) in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on February 14, 2024; Page Numbers: 1-126. Date of Issuance: October 31, 2024. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 11/21/2024. Redacted Transcript Deadline set for 12/1/2024. Release of Transcript Restriction set for 1/29/2025.(Edwards, Lisa) (Entered: 10/31/2024) |
| 10/31/2024 | <u>328</u> | TRANSCRIPT OF JURY TRIAL (AFTERNOON SESSION) in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on February 21, 2024; Page Numbers: 1-161. Date of Issuance: October 31, 2024. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, |

**Appx065**

| | | |
|---|---|---|
| | | (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 11/21/2024. Redacted Transcript Deadline set for 12/1/2024. Release of Transcript Restriction set for 1/29/2025.(Edwards, Lisa) (Entered: 10/31/2024) |
| 10/31/2024 | 329 | TRANSCRIPT OF JURY TRIAL in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on February 23, 2024; Page Numbers: 1-129. Date of Issuance: October 31, 2024. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 11/21/2024. Redacted Transcript Deadline set for 12/1/2024. Release of Transcript Restriction set for 1/29/2025.(Edwards, Lisa) (Entered: 10/31/2024) |
| 10/31/2024 | 330 | TRANSCRIPT OF JURY TRIAL (AFTERNOON SESSION) in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on February 27, 2024; Page Numbers: 1-31. Date of Issuance: October 31, 2024. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

Appx066

| | | |
|---|---|---|
| | | Redaction Request due 11/21/2024. Redacted Transcript Deadline set for 12/1/2024. Release of Transcript Restriction set for 1/29/2025.(Edwards, Lisa) (Entered: 10/31/2024) |
| 10/31/2024 | 331 | TRANSCRIPT OF JURY TRIAL (AFTERNOON SESSION) in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on February 29, 2024; Page Numbers: 1-124. Date of Issuance: October 31, 2024. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 11/21/2024. Redacted Transcript Deadline set for 12/1/2024. Release of Transcript Restriction set for 1/29/2025.(Edwards, Lisa) (Entered: 10/31/2024) |
| 10/31/2024 | 332 | TRANSCRIPT OF JURY TRIAL (AFTERNOON SESSION) in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on March 1, 2024; Page Numbers: 1-15. Date of Issuance: October 31, 2024. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 11/21/2024. Redacted Transcript Deadline set for 12/1/2024. Release of Transcript Restriction set for 1/29/2025.(Edwards, Lisa) (Entered: 10/31/2024) |
| 10/31/2024 | 333 | TRANSCRIPT OF JURY TRIAL (AFTERNOON SESSION) in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on March 5, 2024; Page Numbers: 1-138. Date of Issuance: October 31, 2024. Court Reporter/Transcriber Lisa |

Appx067

| | | |
|---|---|---|
| | | Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 11/21/2024. Redacted Transcript Deadline set for 12/1/2024. Release of Transcript Restriction set for 1/29/2025.(Edwards, Lisa) (Entered: 10/31/2024) |
| 10/31/2024 | <u>334</u> | TRANSCRIPT OF JURY TRIAL (AFTERNOON SESSION) in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on March 6, 2024; Page Numbers: 1-83. Date of Issuance: October 31, 2024. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 11/21/2024. Redacted Transcript Deadline set for 12/1/2024. Release of Transcript Restriction set for 1/29/2025.(Edwards, Lisa) (Entered: 10/31/2024) |
| 11/04/2024 | <u>335</u> | NOTICE *of Supplemental Authority* by ROMAN STERLINGOV (Attachments: # <u>1</u> Exhibit A - Letter from Evgeniy Demyanov, # <u>2</u> Exhibit B - Letter from Ilona Akhmetgaryaeva)(Hassard, Michael) (Entered: 11/04/2024) |
| 11/04/2024 | <u>336</u> | PRELIMINARY ORDER OF FORFEITURE as to ROMAN STERLINGOV. See document for details. Signed by Judge Randolph D. Moss on 11/4/2024. (lcrdm3) (Entered: 11/04/2024) |
| 11/04/2024 | <u>337</u> | MEMORANDUM OPINION as to ROMAN STERLINGOV: For the reasons contained herein, the Court has entered a Preliminary Order of Forfeiture as to Roman Sterlingov, Dkt. <u>336</u> , pursuant to Federal Rule of Criminal Procedure 32.2(b)(2). *See* |

**Appx068**

|  |  |  |
|---|---|---|
|  |  | *McIntosh v. United States*, 144 S. Ct. 980, 991 n.6 (2024). Under Federal Rule of Criminal Procedure 32.2, the parties may "suggest revisions or modifications before the order becomes final as to the defendant" at sentencing. Fed. R. Crim. P. 32.2(b)(2)(B). Accordingly, at sentencing, the parties will be provided an opportunity to make any objections to the preliminary order of forfeiture. Signed by Judge Randolph D. Moss on 11/4/2024. (lcrdm3) (Entered: 11/04/2024) |
| 11/08/2024 |  | Minute Entry for proceedings held before Judge Randolph D. Moss:Sentencing held on 11/8/2024 as to ROMAN STERLINGOV (1). Defendant sentenced to 150 months on counts 1s and 2s to run concurrent with all other counts. Defendant sentenced to 60 months on counts 3s and 4s to run concurrent with all other counts.<br><br>Defendant Committed/Commitment Issued; Court Reporter: Sherry Lindsay; Defense Attorney: Tor Ekland & Michael Hassard; US Attorney: Catherine Pelker & Christopher Brown; Probation Officer: Hana Field. (zglw) (Entered: 11/12/2024) |
| 11/13/2024 | 340 | JUDGMENT as to ROMAN STERLINGOV. Statement of Reasons Not Included. Signed by Judge Randolph D. Moss on 11/13/2024. (zstd) (Entered: 11/15/2024) |
| 11/13/2024 | 341 | STATEMENT OF REASONS as to ROMAN STERLINGOV re 340 Judgment Access to the PDF Document is restricted per Judicial Conference Policy. Access is limited to Counsel of Record and the Court. Signed by Judge Randolph D. Moss on 11/13/2024. (zstd) (Entered: 11/15/2024) |
| 11/14/2024 | 338 | ORDER DIRECTING FORFEITURE OF PROPERTY as to ROMAN STERLINGOV. Signed by Judge Randolph D. Moss on 11/14/2024. (lcrdm3) (Entered: 11/14/2024) |
| 11/14/2024 | 339 | NOTICE *of Request for Judcial Recommendation of Placement* by ROMAN STERLINGOV (Hassard, Michael) (Entered: 11/14/2024) |
| 11/15/2024 | 342 | REVISED FINAL PRESENTENCE INVESTIGATION REPORT prepared by SrUSPO Hana Field as to ROMAN STERLINGOV(Baker, Sherry) (Entered: 11/15/2024) |
| 11/19/2024 | 343 | ENTERED IN ERROR.....NOTICE *of Appeal* by ROMAN STERLINGOV re 340 Judgment (Hassard, Michael) Modified on 11/20/2024 (znmw). (Entered: 11/19/2024) |
| 11/20/2024 |  | NOTICE OF ERROR as to ROMAN STERLINGOV regarding 343 Notice (Other). The following error(s) need correction: Incorrect event. Please refile using the event Notice of Appeal - Final Judgment. (znmw) (Entered: 11/20/2024) |
| 11/20/2024 | 344 | NOTICE OF APPEAL - Final Judgment by ROMAN STERLINGOV re 340 Judgment. Filing fee $ 605, receipt number ADCDC-11311465. Fee Status: Fee Paid. Parties have been notified. (Hassard, Michael) (Entered: 11/20/2024) |
| 11/21/2024 | 345 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid as to ROMAN STERLINGOV re 344 Notice of Appeal - Final Judgment. (znmw) (Entered: 11/21/2024) |
| 11/22/2024 |  | USCA Case Number as to ROMAN STERLINGOV 24-3161 for 344 Notice of Appeal - Final Judgment filed by ROMAN STERLINGOV. (zstd) (Entered: 11/22/2024) |
| 11/22/2024 | 346 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on 11/8/2024; Page Numbers: 1-106. Date of |

| | | |
|---|---|---|
| | | Issuance:11/22/24. Court Reporter Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/13/2024. Redacted Transcript Deadline set for 12/23/2024. Release of Transcript Restriction set for 2/20/2025.(stl) (Entered: 11/22/2024) |
| 03/21/2025 | 347 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on February 13, 2024; Page Numbers: 1-137. Date of Issuance: March 21, 2024. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/11/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/19/2025.(Dickman, Janice) (Entered: 03/21/2025) |
| 03/21/2025 | 348 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on February 15, 2024; Page Numbers: 1-142. Date of Issuance:March 21, 2025. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made |

**Appx070**

| | | |
|---|---|---|
| | | available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/11/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/19/2025.(Dickman, Janice) (Entered: 03/21/2025) |
| 03/21/2025 | 349 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on February 20, 2024; Page Numbers: 1-126. Date of Issuance:March 21, 2025. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/11/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/19/2025.(Dickman, Janice) (Entered: 03/21/2025) |
| 03/21/2025 | 350 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on February 22, 2024; Page Numbers: 1-140. Date of Issuance:March 21, 2025. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/11/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/19/2025.(Dickman, Janice) (Entered: 03/21/2025) |
| 03/21/2025 | 351 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on February 26, 2024; Page Numbers: 1-25. Date of |

Appx071

| | | |
|---|---|---|
| | | Issuance:March 21, 2025. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/11/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/19/2025.(Dickman, Janice) (Entered: 03/21/2025) |
| 03/21/2025 | <u>352</u> | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on February 28, 2024; Page Numbers: 1-138. Date of Issuance:March 21, 2025. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/11/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/19/2025.(Dickman, Janice) (Entered: 03/21/2025) |
| 03/21/2025 | <u>353</u> | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on March 4, 2024; Page Numbers: 1-125. Date of Issuance:March 21, 2025. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal |

**Appx072**

| | | |
|---|---|---|
| | | identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/11/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/19/2025.(Dickman, Janice) (Entered: 03/21/2025) |
| 03/21/2025 | 354 | TRANSCRIPT OF PROCEEDINGS in case as to ROMAN STERLINGOV before Judge Randolph D. Moss held on March 7, 2024; Page Numbers: 1-134. Date of Issuance: March 21, 2025. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/11/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/19/2025.(Dickman, Janice) (Entered: 03/21/2025) |
| 03/21/2025 | 355 | NOTICE OF WITHDRAWAL OF APPEARANCE by USA as to ROMAN STERLINGOV (Brown, Christopher) (Entered: 03/21/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/10/2025 18:18:32 | | | |
| **PACER Login:** | torekelandpllc | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cr-00399-RDM |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

Appx073

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **CRIMINAL NO. 21-cr-399 (RDM)** |
| v. | : | |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

## PROTECTIVE ORDER GOVERNING DISCOVERY

To expedite the flow of discovery material between the parties and adequately protect personal identity information entitled to be kept confidential, it is, pursuant to the Court's authority under Fed. R. Crim. P. 16(d)(1) and with the consent of the parties, ORDERED:

### All Materials

1.     All materials provided by the United States in preparation for, or in connection with, any stage of this case (collectively, "the materials") are subject to this protective order ("the Order") and may be used by the defendant and defense counsel (defined as counsel of record in this case) solely in connection with the defense of this case, and for no other purpose, and in connection with no other proceeding, without further order of this Court.

2.     The defendant and defense counsel shall not disclose the materials or their contents directly or indirectly to any person or entity other than persons employed to assist in the defense (including experts), persons who are interviewed as potential witnesses or experts, counsel for potential witnesses, and other persons to whom disclosure is made for purposes of this litigation or to whom the Court may authorize disclosure (collectively, "authorized persons"). Potential witnesses, experts, and their counsel may be shown copies of the materials as necessary to prepare the defense, but they may not retain copies without signing the acknowledgment form attached as Attachment A to this Order, pursuant to the provisions of Paragraph 8 of this Order, or prior permission of the Court.

3.     The defendant, defense counsel, and authorized persons shall not copy or reproduce the materials except in order to provide copies of the materials for use in connection with this case by defendant, defense counsel, and authorized persons. Such copies and reproductions shall be treated in the same manner as the original materials. The defendant, defense counsel, and

**Appx074**

authorized persons shall not disclose any notes or records of any kind that they make in relation to the contents of the materials, other than to authorized persons, and all such notes or records are to be treated in the same manner as the original materials.

4.      Before providing materials to an authorized person, defense counsel must provide the authorized person with a copy of this Order.

5.      Upon conclusion of all stages of this case, all of the materials and all copies made thereof shall be destroyed or returned to the United States, unless otherwise ordered by the Court. The Court may require a certification as to the disposition of any such materials.

6.      The restrictions set forth in this Order do not apply to documents that are or become part of the public court record, including documents that have been received in evidence at other trials, nor do the restrictions in this Order limit defense counsel in the use of the materials in judicial proceedings in this case, except as described below.

### Sensitive Materials

7.      The United States may produce materials containing individuals' personal information (such as name and address), financial information (such as bank account information), and identifying numbers (such as taxpayer identification numbers), and other sensitive personal information; as well as non-public information about or relating to third parties and potential witnesses to this matter ("sensitive materials") to defense counsel, pursuant to the defendants' discovery requests. Sensitive materials shall be plainly marked as "sensitive" by the United States prior to disclosure.

8.      No sensitive materials, or the information contained therein, may be disclosed to any persons other than the defendant, defense counsel, persons employed to assist the defense (including experts), or the person to whom the sensitive information solely and directly pertains, except if the person to whom disclosure is made signs the acknowledgment form attached as Attachment A to this Order. Defense counsel shall maintain a copy of any signed acknowledgment form and shall provide such copy of the signed acknowledgement form to the Court for *ex parte* review upon request by the Court or the United States. Absent prior permission from the Court, information marked as sensitive shall not be included in any public filing with the Court, and instead shall be submitted under seal (except if the defendant chooses to include in a public document sensitive information relating solely and directly to the defendant).

2

9.      Sensitive materials must be maintained in the custody and control of defense counsel or persons employed to assist the defense, including experts retained by the defense. Defense counsel may show sensitive materials to the defendant as necessary to assist in preparation of the defense, however, defense counsel may not provide a copy of sensitive materials to the defendant. Moreover, if defense counsel does show sensitive materials to the defendant, defense counsel may not allow the defendant to write down any personal identity information as identified in Rule 49.1 of the Federal Rules of Criminal Procedure that is contained in the sensitive materials.

10.      Should defense counsel notify counsel for the government that defendant needs to review specific, sensitive materials at a time when defense counsel is not present (presumably because the volume or detailed nature of the sensitive materials make it impractical to review the materials while defense counsel is present), government counsel shall provide the defense with a copy of the sensitive materials redacted of sensitive material about or relating to third parties and potential witnesses to this matter for defendant's use. If redaction is not reasonably achievable for technical or similar reasons, government counsel shall promptly notify defense counsel, and the parties shall meet and confer regarding potential solutions. Moreover, should defense counsel conclude that the quantity or nature of sensitive material produced by the government renders the above-described approach unduly burdensome or intrusive, the parties shall meet and confer to discuss possible solutions. If the parties are unable to resolve any such dispute, the parties shall notify the Court, and the Court will schedule a hearing to address the issue.

11.      The procedures for use of designated sensitive materials during any hearing or the trial of this matter shall be determined by the parties and the Court in advance of the hearing or trial. No party shall disclose designated sensitive documents in open court without prior consideration by the Court.

12.      Absent prior agreement by the parties or permission from the Court, no party shall disclose materials designated as sensitive in any public filing with the Court. Such materials shall be submitted under seal. Absent statutory authority, no party shall file such materials under seal without an order from the Court pursuant to Local Rule of Criminal Procedure 49(f)(6).

### Scope of this Order

13.      **Modification Permitted.** Nothing in this Order shall prevent any party from seeking modification of this Order or from objecting to discovery that it believes to be otherwise improper.

3

14.  **No Waiver**. The failure by the United States to designate any materials as "sensitive" upon disclosure shall not constitute a waiver of the United States' ability to later designate the materials as sensitive.

15.  **No Ruling on Discoverability or Admissibility**.  This Order does not constitute a ruling on the question of whether any particular material is properly discoverable or admissible and does not constitute any ruling on any potential objection to the discoverability of any material.

SO ORDERED this 17th day of Sept., 2021.

RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

4

## ATTACHMENT A

ACKNOWLEDGMENT

The below-signed has read the attached Protective Order Governing Discovery, and agrees to abide by its terms. Counsel for Defendant Roman Sterlingov represents that disclosure to the below-signed individual, someone who is not an employee of Counsel's organization and is a non-party to this litigation, is necessary for the purpose of this litigation and that a copy of this acknowledgment will be provided to the Court for *ex parte* review upon request by the Court or the United States.

Date:_____         _____
                                        Counsel for Roman Sterlingov

Date: _____         _____
                                        (Printed Name:                                    )

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 21-cr-399 (RDM) |
| v. | : | |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

## PRELIMINARY ORDER OF FORFEITURE

*WHEREAS*, the Superseding Indictment, ECF No. 43, provided notice to the defendant

Roman Sterlingov, pursuant to Federal Rule of Criminal Procedure 32.2(a), that the government

will seek the forfeiture of property, that is, forfeiture of any property, real or personal, involved in

the offenses charged in Counts One, Two, and Three, and any property traceable thereto, pursuant

to Title 18, United States Code, Section 982(a)(1);

*WHEREAS*, the Superseding Indictment provided notice to the defendant, Roman

Sterlingov, that the government will seek the forfeiture of the following specific property upon

conviction of the offenses charged in Counts One, Two, and Three:

a. $349,625.72, seized from Kraken accounts #AA68 N84G QUXT DGMY, held in
the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name
of TO THE MOON LTD | ROMAN;

b. Approximately 0.10877 Bitcoin (BTC) cryptocurrency (after required fees), seized
from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman
Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON
LTD | ROMAN;

c. Approximately 205.9625 Ethereum (ETH) cryptocurrency (after required fees),
seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of
Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE
MOON LTD | ROMAN;

1

d. Approximately 9,371.52683 Stellar (XLM) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

e. Approximately 35.9998 Monero (XMR) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN; and

f. Approximately 1,354 BTC currently held in the Bitcoin Fog wallet, identified by root address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw;

*WHEREAS*, the Superseding Indictment provided notice to the defendant, Roman Sterlingov, that the government will seek a forfeiture money judgment against the defendant and in favor of the United States for a sum of money equal to the value of any property, real or personal, involved in the offenses charged in Counts One, Two, and Three, and any property traceable thereto;

*WHEREAS*, the Superseding Indictment provided notice to the defendant, Roman Sterlingov, that the government will seek the forfeiture of substitute property, pursuant to Title 21, United States Code, Section 853(p);

*WHEREAS*, on March 12, 2024, a jury returned a verdict of guilty against the defendant on Counts One, Two, Three, and Four of the Superseding Indictment;

*WHEREAS*, on March 12, 2024, a jury returned a Special Verdict Form finding that each of the following specific properties was property, real or personal, involved in the offenses for which the defendant had been convicted as charged in Counts One, Two and Three, or property traceable thereto:

a. $349,625.72, seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

2

b. Approximately 0.10877 Bitcoin (BTC) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

c. Approximately 205.9625 Ethereum (ETH) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

d. Approximately 9,371.52683 Stellar (XLM) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

e. Approximately 35.9998 Monero (XMR) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN; and

f. Approximately 1,354 BTC currently held in the Bitcoin Fog wallet, identified by root address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw;

**WHEREAS**, pursuant to Federal Rule of Criminal Procedure 32.2(b)(1), this Court determines, based upon the evidence and information before it, including the evidence presented at trial, that any property, real or personal, involved in the offenses charged in Counts One, Two, and Three, for which the defendant was convicted, and any property traceable thereto, is subject to forfeiture pursuant to Title 18, United States Code, Section 982(a)(1);

**WHEREAS**, pursuant to Federal Rule of Criminal Procedure 32.2(b)(2), this Court determines, based upon the evidence and information before it, including the evidence presented at trial, that entry of a forfeiture money judgment against the defendant and in favor of the United States in the amount of $395,563,025.39 is appropriate, pursuant to Title 18, United States Code, Section 982(a)(1);

**WHEREAS**, Title 21, United States Code, Section 853(p) authorizes the forfeiture of substitute property;

3

Appx081

*WHEREAS*, the Court finds that the United States has satisfied the statutory criteria to forfeit substitute property under Title 21, United States Code, Section 853(p), and that property involved in the offenses charged in Counts One, Two, and Three have been dissipated by the defendant and cannot be located upon the exercise of due diligence; have been transferred or sold to, or deposited with, a third party; and/or have been placed beyond the jurisdiction of the Court;

*WHEREAS,* the entry of a preliminary order of forfeiture authorizes the Attorney General or a designee, pursuant to Federal Rule of Criminal Procedure 32.2(b)(3), to seize property subject to forfeiture, and Title 21, United States Code, Section 853(g) authorizes the Attorney General to seize all property ordered forfeited upon such terms and conditions as the Court shall deem proper;

*WHEREAS,* the net proceeds the United States realizes from the forfeiture and liquidation of the specific property and substitute property listed in this Order shall be credited towards the money judgment upon final forfeiture of such property to the United States;

*WHEREAS*, upon entry of a forfeiture order, Federal Rule of Criminal Procedure 32.2(b)(3) authorizes the Attorney General or a designee to conduct any discovery the Court considers proper in identifying, locating, or disposing of property subject to forfeiture;

*NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED*:

1. The following property is declared forfeited to the United States: (1) any property, real or personal, involved in the offenses charged in Counts One, Two, and Three, and any property traceable thereto, pursuant to Title 18, United States Code, Section 982(a)(1). The following specific property is declared forfeited:

   a. $349,625.72, seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

4

b. Approximately 0.10877 Bitcoin (BTC) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

c. Approximately 205.9625 Ethereum (ETH) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

d. Approximately 9,371.52683 Stellar (XLM) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

e. Approximately 35.9998 Monero (XMR) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN; and

f. Approximately 1,354 BTC currently held in the Bitcoin Fog wallet, identified by root address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw.

2. A forfeiture money judgment in the amount of $395,563,025.39 is entered against the defendant and in favor of the United States.

3. The Court finds that the United States has satisfied the statutory criteria to forfeit substitute property under Title 21, United States Code, Section 853(p), and that property involved in the offenses charged in Counts One, Two, and Three have been dissipated by the defendant and cannot be located upon the exercise of due diligence; have been transferred or sold to, or deposited with, a third party; and/or have been placed beyond the jurisdiction of the Court.

4. The following property is declared forfeited, pursuant to Title 21, United States Code, Section 853(p), as substitute property:

a. Approximately 10.25623378 BTC cryptocurrency (after required fees), seized from nine Mycelium wallet accounts located on one Samsung Galaxy S8+ Mobile Telephone.

5

**Appx083**

5.  Upon final forfeiture of the specific property and substitute property identified in the previous paragraphs to the United States, the net proceeds realized by the United States shall be credited to the forfeiture money judgment.

6.  The Court shall retain jurisdiction to enforce this Order, and to amend it as necessary, pursuant to Rule 32.2(e) of the Federal Rules of Criminal Procedure.

7.  Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Order of Forfeiture shall become final as to the defendant at the time of sentencing, and shall be made part of the sentence and included in the judgment.

8.  The Attorney General or a designee is authorized to seize, inventory, and otherwise maintain custody and control of the specific property and substitute property identified in the previous paragraphs of this Order, pursuant to Federal Rule of Criminal Procedure 32.2(b)(3) and Title 21, United States Code, Section 853(g).

6.  The Attorney General or a designee, pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, is authorized to conduct any discovery to identify, locate, or dispose of property subject to this Order.

7.  The Clerk of the Court shall forward a certified copy of this Order to USADC.AFMLS2@usdoj.gov.

Dated this ___4th___ day of ~~July~~ Nov., 2024.

_____
RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

6

**Appx084**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 21-cr-399 (RDM) |
| v. | : | |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

## ORDER OF FORFEITURE

*WHEREAS*, the Superseding Indictment, ECF No. 43, provided notice to the defendant Roman Sterlingov, pursuant to Federal Rule of Criminal Procedure 32.2(a), that the government will seek the forfeiture of property, that is, forfeiture of any property, real or personal, involved in the offenses charged in Counts One, Two, and Three, and any property traceable thereto, pursuant to Title 18, United States Code, Section 982(a)(1);

*WHEREAS*, the Superseding Indictment provided notice to the defendant, Roman Sterlingov, that the government will seek the forfeiture of the following specific property upon conviction of the offenses charged in Counts One, Two, and Three:

    a. $349,625.72, seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

    b. Approximately 0.10877 Bitcoin (BTC) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

    c. Approximately 205.9625 Ethereum (ETH) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

1

**Appx085**

d. Approximately 9,371.52683 Stellar (XLM) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

e. Approximately 35.9998 Monero (XMR) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN; and

f. Approximately 1,354 BTC currently held in the Bitcoin Fog wallet, identified by root address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw;

*WHEREAS*, the Superseding Indictment provided notice to the defendant, Roman Sterlingov, that the government will seek a forfeiture money judgment against the defendant and in favor of the United States for a sum of money equal to the value of any property, real or personal, involved in the offenses charged in Counts One, Two, and Three, and any property traceable thereto;

*WHEREAS*, the Superseding Indictment provided notice to the defendant, Roman Sterlingov, that the government will seek the forfeiture of substitute property, pursuant to Title 21, United States Code, Section 853(p);

*WHEREAS*, on March 12, 2024, a jury returned a verdict of guilty against the defendant on Counts One, Two, Three, and Four of the Superseding Indictment;

*WHEREAS*, on March 12, 2024, a jury returned a Special Verdict Form finding that each of the following specific properties was property, real or personal, involved in the offenses for which the defendant had been convicted as charged in Counts One, Two and Three, or property traceable thereto:

a. $349,625.72, seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

2

**Appx086**

b. Approximately 0.10877 Bitcoin (BTC) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

c. Approximately 205.9625 Ethereum (ETH) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

d. Approximately 9,371.52683 Stellar (XLM) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

e. Approximately 35.9998 Monero (XMR) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN; and

f. Approximately 1,354 BTC currently held in the Bitcoin Fog wallet, identified by root address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw;

**WHEREAS**, pursuant to Federal Rule of Criminal Procedure 32.2(b)(1), this Court determines, based upon the evidence and information before it, including the evidence presented at trial, that any property, real or personal, involved in the offenses charged in Counts One, Two, and Three, for which the defendant was convicted, and any property traceable thereto, is subject to forfeiture pursuant to Title 18, United States Code, Section 982(a)(1);

**WHEREAS**, pursuant to Federal Rule of Criminal Procedure 32.2(b)(2), this Court determines, based upon the evidence and information before it, including the evidence presented at trial, that entry of a forfeiture money judgment against the defendant and in favor of the United States in the amount of $395,563,025.39 is appropriate, pursuant to Title 18, United States Code, Section 982(a)(1);

**WHEREAS**, Title 21, United States Code, Section 853(p) authorizes the forfeiture of substitute property;

3

**Appx087**

*WHEREAS*, the Court finds that the United States has satisfied the statutory criteria to forfeit substitute property under Title 21, United States Code, Section 853(p), and that property involved in the offenses charged in Counts One, Two, and Three have been dissipated by the defendant and cannot be located upon the exercise of due diligence; have been transferred or sold to, or deposited with, a third party; and/or have been placed beyond the jurisdiction of the Court;

*WHEREAS*, the entry of a preliminary order of forfeiture authorizes the Attorney General or a designee, pursuant to Federal Rule of Criminal Procedure 32.2(b)(3), to seize property subject to forfeiture, and Title 21, United States Code, Section 853(g) authorizes the Attorney General to seize all property ordered forfeited upon such terms and conditions as the Court shall deem proper;

*WHEREAS*, the net proceeds the United States realizes from the forfeiture and liquidation of the specific property and substitute property listed in this Order shall be credited towards the money judgment upon final forfeiture of such property to the United States;

*WHEREAS*, upon entry of a forfeiture order, Federal Rule of Criminal Procedure 32.2(b)(3) authorizes the Attorney General or a designee to conduct any discovery the Court considers proper in identifying, locating, or disposing of property subject to forfeiture;

***NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:***

1. The following property is declared forfeited to the United States: (1) any property, real or personal, involved in the offenses charged in Counts One, Two, and Three, and any property traceable thereto, pursuant to Title 18, United States Code, Section 982(a)(1). The following specific property is declared forfeited:

   a. $349,625.72, seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

4

**Appx088**

b. Approximately 0.10877 Bitcoin (BTC) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

c. Approximately 205.9625 Ethereum (ETH) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

d. Approximately 9,371.52683 Stellar (XLM) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

e. Approximately 35.9998 Monero (XMR) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN; and

f. Approximately 1,354 BTC currently held in the Bitcoin Fog wallet, identified by root address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw.

2.    A forfeiture money judgment in the amount of $395,563,025.39 is entered against the defendant and in favor of the United States.

3.    The Court finds that the United States has satisfied the statutory criteria to forfeit substitute property under Title 21, United States Code, Section 853(p), and that property involved in the offenses charged in Counts One, Two, and Three have been dissipated by the defendant and cannot be located upon the exercise of due diligence; have been transferred or sold to, or deposited with, a third party; and/or have been placed beyond the jurisdiction of the Court.

4.    The following property is declared forfeited, pursuant to Title 21, United States Code, Section 853(p), as substitute property:

a. Approximately 10.25623378 BTC cryptocurrency (after required fees), seized from nine Mycelium wallet accounts located on one Samsung Galaxy S8+ Mobile Telephone.

5

5.      Upon final forfeiture of the specific property and substitute property identified in the previous paragraphs to the United States, the net proceeds realized by the United States shall be credited to the forfeiture money judgment.

6.      The Court shall retain jurisdiction to enforce this Order, and to amend it as necessary, pursuant to Rule 32.2(e) of the Federal Rules of Criminal Procedure.

7.      Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Order of Forfeiture shall become final as to the defendant at the time of sentencing, and shall be made part of the sentence and included in the judgment.

8.      The Attorney General or a designee is authorized to seize, inventory, and otherwise maintain custody and control of the specific property and substitute property identified in the previous paragraphs of this Order, pursuant to Federal Rule of Criminal Procedure 32.2(b)(3) and Title 21, United States Code, Section 853(g).

6.      The Attorney General or a designee, pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, is authorized to conduct any discovery to identify, locate, or dispose of property subject to this Order.

7.      The Clerk of the Court shall forward a certified copy of this Order to USADC.AFMLS2@usdoj.gov.

Dated this ___1⁴ᵗʰ___ day of ~~July~~ Nov., 2024.

RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

6

**Appx090**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 1

# UNITED STATES DISTRICT COURT

District of Columbia     ▾

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| v. | ) | |
| ROMAN STERLINGOV | ) | Case Number: 21-CR-399-RDM-1 |
| | ) | |
| | ) | USM Number: 42008-509 |
| | ) | |
| | ) | Tor Ekeland |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)     1s-4s _____
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy | 4/27/2021 | 1s |
| 18 U.S.C. § 1956(a)(3)(A) | Money Laundering | 4/27/2021 | 2s |
| 18 U.S.C. §§ 1960(a) & 2 | Operating an Unlicensed Money Transmitting Business and | 4/27/2021 | 3s |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

                                        11/8/2024
Date of Imposition of Judgment

Signature of Judge

Randolph D. Moss, United States District Judge
Name and Title of Judge

11/13/24
Date

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 1A

Judgment—Page __2__ of __7__

DEFENDANT: ROMAN STERLINGOV
CASE NUMBER: 21-CR-399-RDM-1

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| see above | Aiding and Abetting | | 3s cont'd |
| D.C. Code § 26-1023(c) | Money Transmission Without a License | 4/27/2021 | 4s |

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___3___ of ___7___

DEFENDANT:   ROMAN STERLINGOV
CASE NUMBER:   21-CR-399-RDM-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

150 months as to counts and 1s and 2s and 60 months as to counts 3s and 4s to all run concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:

The defendant be placed at DC Jail pending appeal or FCI Danbury or FCI Fort Dix.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m.   ☐ p.m.   on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 5 — Criminal Monetary Penalties

Judgment — Page   4   of   7  

DEFENDANT: ROMAN STERLINGOV
CASE NUMBER: 21-CR-399-RDM-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 400.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

    If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | |
|---|---|---|
| **TOTALS** | $      0.00 | $      0.00 |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
               Sheet 5A — Criminal Monetary Penalties

Judgment—Page   5   of    7  

DEFENDANT:  ROMAN STERLINGOV
CASE NUMBER:  21-CR-399-RDM-1

### ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

The financial obligations as to Counts 1-3 for a total of $300.00 is immediately payable to the Clerk of the Court for the U.S. District Court, 333 Constitution Ave NW, Washington, DC 20001. Within 30 days of any change of address, you shall notify the Clerk of the Court of the change until such time as the financial obligation is paid in full.

The financial obligations as to Count 4 in the amount of $100.00 is immediately payable to the District of Columbia Superior Court, Attn: Budget and Finance Office, 500 Indiana Avenue, NW, Suite 4002, Washington, DC 20001, for deposit into the Crime Victims Compensation Fund. 4 DCC § 516 (Victims of Violent Crime Compensation Emergency Amendment Act of 1996). Within 30 days of any change of address, you shall notify the Budget & Finance Office of DC Courts of the change until such time as the financial obligation is paid in full.

Appx095

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___6___ of __ 7 ___

DEFENDANT: ROMAN STERLINGOV
CASE NUMBER: 21-CR-399-RDM-1

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ __400.00__ due immediately, balance due

     ☐ not later than _____ , or
     ☑ in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:
Counts 1-3 are immediately payable to the Clerk of the Court for the U.S. District Court, 333 Constitution Ave NW, Washington, DC 20001. Within 30 days of any change of address, you shall notify the Clerk of the Court of the change until such time as the financial obligation is paid in full. Count 4 is immediately payable to the District of Columbia Superior Court, Attn: Budget and Finance Office, 500 Indiana Avenue, NW, Suite 4002, Washington, DC 20001, for deposit into the Crime Victims Compensation Fund. Within 30 days of any change of address, you shall notify the Budget & Finance Office of DC Courts of the change until such time as the financial obligation is fully paid.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:

Please see next page

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
      Sheet 6A — Schedule of Payments

Judgment—Page _____ of ____7

DEFENDANT:  ROMAN STERLINGOV
CASE NUMBER:  21-CR-399-RDM-1

## ADDITIONAL DEFENDANTS AND CO-DEFENDANTS HELD JOINT AND SEVERAL

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6B — Schedule of Payments

Judgment—Page __7__ of __7__

DEFENDANT: ROMAN STERLINGOV
CASE NUMBER: 21-CR-399-RDM-1

## ADDITIONAL FORFEITED PROPERTY

Pursuant to Rule 32.2(a) of the Fed. Rules of Crim Proc., you, Roman Sterlingov, shall forfeit a money judgment for a sum of money equal to the value of any property, real or personal, involved in Counts One, Two, and Three, and any property traceable thereto. A forfeiture money judgment in the amount of $395,563,025.39 is entered against the defendant and in favor of the United States. You shall also forfeit the following specific property:

1. $349,625.72, seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of To The Moon LTD/Roman;

2. Approximately 0.10877 Bitcoin (BTC) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of To The Moon LTD/Roman;

3. Approximately 205.9625 Ethereum (ETH) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of To The Moon LTD/Roman;

4. Approximately 9,371.52683 Stellar (XLM) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of To The Moon LTD/Roman;

5. Approximately 35.9998 Monero (XMR) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of To The Moon LTD/Roman; and

6. Approximately 1,354 BTC currently held in the Bitcoin Fog wallet, identified by root address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw

The Court finds that the United States has satisfied the statutory criteria to forfeit substitute property under Title 21, United States Code, Section 853(p). The following property is declared forfeited, pursuant to Title 21, United States Code, Section 853(p), as substitute property:

1. Approximately 10.25623378 BTC cryptocurrency (after required fees), seized from nine Mycelium wallet accounts located on one Samsung Galaxy S8+ Mobile Telephone.

Upon final forfeiture of the specific property and substitute property identified in the previous paragraphs to the United States, the net proceeds realized by the United States shall be credited to the forfeiture money judgment.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                  Plaintiff,

      vs.

ROMAN STERLINGOV,

            Defendant.

_____/

Criminal Action
No. 1:21-cr-0399

Washington, DC
January 13, 2023

2:15 p.m.

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

For the Government:      **CHRISTOPHER BROWN**
           USAO-DOJ
           601 D Street, NW
           Washington, DC 20001

           **ALDEN PELKER**
           U.S. DOJ
           950 Pennsylvania Ave, NW
           Washington, DC 20530

For the Defendant:       **TOR EKELAND**
           **MICHAEL HASSARD**
           Tor Ekeland Law PLLC
           30 Wall Street, 8th Floor
           Brooklyn, NY 10005

Court Reporter:         **JEFF M. HOOK**
           Official Court Reporter
           U.S. District & Bankruptcy Courts
           333 Constitution Avenue, NW
           Room 4700-C
           Washington, DC 20001

INDEX

**Witness**                                                    **Page**

ROMAN STERLINGOV

   Direct Examination by Mr. Ekeland                    31

   Cross-Examination by Mr. Brown                        44

   Redirect Examination by Mr. Ekeland                   69


**Exhibit**                                                    **Page**

Defense Exhibit K              Admitted into evidence          28


Government's Exhibit 2         Admitted into evidence          69

Government's Exhibit 5         Admitted into evidence          69

Government's Exhibit 7         Admitted into evidence          69

Government's Exhibit 8         Admitted into evidence          69

Government's Exhibit 10        Admitted into evidence          69

Government's Exhibit 11        Admitted into evidence          69

P R O C E E D I N G S

**DEPUTY CLERK:** Calling criminal case number 21-399, United States of America v. Roman Sterlingov. Counsel, please state your name for the record, starting with Government counsel.

**MR. BROWN:** Good afternoon, Your Honor. AUSA Chris Brown for the Government.

**MS. PELKER:** Good afternoon, Your Honor. Alden Pelker for the United States.

**THE COURT:** Good afternoon.

**MR. EKELAND:** Good afternoon, Your Honor. Tor Ekeland and Michael Hassard for Defendant Roman Sterlingov, who's in court, along with Corrine Mullin who will be putting in her pro hac vice application in this case next week. We have our expert Jeff Fischbach back in the gallery.

**THE COURT:** Thank you. Good afternoon to all of you. So we're here this afternoon for a hearing on the defendant's motion to release the seized assets in this case so they would be available to assist him with respect to his defense. As you all know, under 18 U.S.C. section 982(a)(1), assets are subject to seizure if they were involved in the offense or the property is traceable to the property involved in the offense.

Under 21 U.S.C. section 853(e), the Government can

seize an indicted defendant's property in advance of trial if the Government can convince the court that there's probable cause to believe the defendant has committed an offense permitting forfeiture, and the property at issue has the requisite connection to that crime. If there is probable cause to believe that the property will be forfeitable upon the defendant's conviction, the Government can secure that in advance, which is what has happened already in this case. And it's that determination which is subject to challenge here.

Where a defendant moves for release of seized assets, the defendant has to make two showings. He first has to make a showing of need. And if, and only if, the defendant makes the requisite showing of need, then at that point in time the court can conduct a hearing, and must conduct a hearing, with respect to the second step in the process. And that second step of the process asks whether the assets at issue are traceable to the offense alleged in the indictment. As the Supreme Court established in the Kaley case, a defendant has no right to attack the grand jury's determination of probable cause that he's committed an offense permitting forfeiture. So the inquiry is both narrow, but also demanding.

So I think the way we ought to proceed today is to address the question of need first. And then if I conclude

that the defense has carried its burden with respect to need, we can move to the second step. I have reviewed the affidavits and materials that have been submitted to date, and I can tell you that I think you're part of the way there, but that the -- there's some missing aspects to what's in those materials. There's no real analysis of what even the magnitude of the costs are likely to be, the nature of those costs, where the costs can be avoided, where they can't be avoided. So I think we do need to roll up our sleeves more with respect to that.

And then the final thing I want to say, just by way of introductory remarks today, is that it's an unusual circumstance in which a defendant who is charged with a felony is offering evidence in the proceeding in the form of a declaration and/or testifying. And I just want to make sure, particularly since Mr. Sterlingov is not from the United States, that he does understand his right not to do that, and that there are other ways to present evidence to the Court with respect to the financial needs of putting together a defense. It may be the defense has to rely, to some extent, on Mr. Sterlingov with respect to the simple assertion as to whether he has any other assets. But beyond that, I'm not sure that there's any need for him to go beyond that.

And to the extent he does go beyond it, I just

want to make clear to him that he is opening the door by doing that, and would be subject to cross-examination by the Government. But also that anything that he says here in court or that he's said in his declaration is something that the Government could offer against him at trial.

So Mr. Sterlingov, I just want to make sure you understand that. Have you had enough time to confer with your lawyers about the risks of your becoming a witness in this case, and do you understand your rights in that regard?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And Mr. Sterlingov, I know this from other proceedings, but also maybe just for the record, are you fluent in English?

THE DEFENDANT: Yes.

THE COURT: Okay. Well, in that case, why don't we go ahead and proceed with respect to the question of need. Why don't we start with the defense, and I'll let the Government follow up.

MR. EKELAND: May I proceed, Your Honor?

THE COURT: Yes, please.

MR. EKELAND: Thank you. Excuse me, my voice is going a bit. If you don't understand me, please let me know. We received the Court's e-mail yesterday saying that you wanted to start this proceeding with Mr. Sterlingov's need. So this morning I pulled a draft trial budget that we

did in April of this year for this trial. I didn't have time to revise it. It's labeled for identification as Defendant's Exhibit K, and we can also put the top sheet up on the screen.

Yes, this is a copy of our trial budgets that we use for all our trials. It's based on our trials that we've done in the last 10 years. This is a very provisional budget. Already on this, I look at the expert's witness numbers and think those are low. But you can see that the ballpark here for the grand total, the low end for this trial is about $830,000 and the high end's about $2.6 million.

There's a number of things that are unique about this case, as this Court well knows. The number one thing being that it's a very complex blockchain forensics case turning on a newly emergent blockchain forensic technology. And experts in that area that we've been talking to are -- they're quite expensive. Another thing that adds to the costs in this case is that the defendant is located in jail two hours outside of D.C., and six hours outside of New York City. That significantly adds to the cost. Just the expenses and everybody showing up today were about $5,000.

So you can look at the list and just see the basic things that we see in trial. This is anticipated to be a month-long trial where we're anticipating having to bring in

experts to talk about the blockchain forensics.  We're talking about having lodging down here in D.C. for at least the length of the trial and sometime beforehand.  A trial tech for a case like this, a good one, if we bring them in, is about $1,000 a day is what we were quoted on that.  We're happy to submit an updated budget, but I think this kind of gives you the idea of the expenses involved in a case like this.

THE COURT:  Are these all future expenses or are some of these expenses ones that have already been incurred?

MR. EKELAND:  This is from April, so it doesn't reflect some of the expenses we've already incurred.  I just looked at our trial management software, and we've -- it looks like we've got $25,000 in outstanding expenses right now.  We've basically been going out-of-pocket in the hopes that we'll be able to find money, because we think this is an important case.  Everybody sitting at counsel table right now is not getting paid, and hopefully they will get paid.  And Mr. Fischbach is here voluntarily under the hopes that he will get paid.  I'm basically calling in a lot of favors.

THE COURT:  And the experts have done a fair amount of work to date already, correct?

MR. EKELAND:  I haven't gotten the blockchain forensics experts I need because I can't afford it.  I've had experts in that I was unhappy with, and they left, and I

wasn't happy with the quality of the work. And as I get a better understanding of the blockchain forensics at issue here -- like for instance, there's a Sarah Meiklejohn who is somebody who has worked with Chainalysis a lot, and she sort of wrote the seminal papers on these concepts of clustering.

I've started to talk to experts at a company called Breadcrumbs, which is a Chainalysis competitor, and they're quoting me anywhere something on the low end of $25,000 to like a quarter of a million. It's hard with a case like this, particularly if -- and Mr. Fischbach can testify to this a little bit. There's just a lot of grunt analysis with all the wallet addresses. And if one letter is off -- you know, Bitcoin wallet addresses are case sensitive. So if it's not a capital A and a lowercase A, everything can get thrown off. We've had problems matching some of the tracing that the Government's done. But I can't tell at this point if we're making the mistake, they made a typo or what's going on. So it's extremely labor intensive. And then on top of that, this is an entirely new forensic methodology, and that lends a level of uncertainty to the analysis that requires even more work.

So it's hard -- it's always hard to do a trial budget, because you never know what's going to happen at trial, right. So we always try to do it as cheaply as possible, but this is not striking me as a cheap case.

**THE COURT:** I'm not sure as a matter of law that this matters -- and I should say as a matter of preface, I think that lawyers deserve to get paid for their work. But how much of this is work or effort that would simply not occur, and how much of it is work that will occur, but at the hardship of the lawyers or the experts who are going to have to eat their costs?

**MR. EKELAND:** I just had trouble hearing what you were saying. How much of this is real work and how much of this is fluff, is that the question?

**THE COURT:** No, not at all. I have to say, based on my experience with the cost of litigation, this doesn't strike me as a fluffy budget. But what I'm asking is -- and just to give you an analogy. When an indigent defendant's case is granted in the Supreme Court, that person will often get telephone calls from some of the most superb appellate advocates in the country saying: I'll do it, and do it for free, because this is such a great case that I want to do.

I suppose the question I'm asking -- and I really don't know whether, as a matter of law, this is relevant or not, but I just want to ask it in case it is relevant. If I were to deny the motion and say I'm sorry, does that mean that there are portions of this that are just not going to happen or does it mean that the experts and the lawyers are going to have some hardship because they're not going to get

paid?

MR. EKELAND: First of all, that's an excellent question. There's not an easy answer to it. I'm here, and everybody at this table is here, because we believe in this case. However, there's just the reality that we all need to pay our rent, eat and everything like that. I would probably just try and find money somewhere, right. But we tried legal fundraising, and we haven't gotten any money, right. I mean, I would try to do this case, but I realistically don't think I'd be able to do it, I wouldn't be able to afford it.

THE COURT: On the issue of finding money somewhere, have you explored the possibility of whether Criminal Justice Act funding might be available to cover at least some of the litigation costs? Again, I don't know the answer to that question, but I do know that there was previously a finding that Mr. Sterlingov was entitled to appointed counsel. If he had appointed counsel, the appointed counsel would be able to, with court approval, retain experts, and the CJA account would be used to pay the experts under those circumstances.

Have you explored at all whether, under these circumstances, there's any way I could do something that would make those funds available so you could retain experts, even if I were to conclude that you don't prevail

on this motion?

MR. EKELAND: We were actually discussing that this morning, but we haven't explored it. I mean, if I understand it, you're right, you're asking if we've explored if we can get CJA money for the experts but we still stay on as counsel, right, which would still raise the problem of we'd be working for free if we were on it. I mean --

THE COURT: Unless you could be appointed as well. And I don't know -- again, I don't know the answers to this. My suspicion is that the Federal Public Defender, who manages this budget, probably does not typically support doing that simply because then people would say: I don't want my appointed counsel, I'm going to hire a lawyer and now you pay for the lawyer. But it may be, depending on how things come out today, you may want to have a conversation with AJ Kramer, who is the Federal Public Defender for the District of Columbia. He may be able to at least provide you with some insight. It may be his answer is no, there is nothing that can be done, or there may be things that can be done.

MR. EKELAND: If we're denied today -- if we lose today, we're definitely going to explore that, I can guarantee you.

THE COURT: Okay. With respect to the expert witnesses, my impression from you in your papers was that

some of the work -- and perhaps it was a substantial amount of work, was going to go into things like just data entry and uploading the blockchain data to be able to run your own blockchain analysis; is that right?

MR. EKELAND: I think what you're referring to is we -- there was like 3 terabytes worth of data discovered from the Government. We were uploading it, and all of a sudden we got a $10,000 bill from our e-discovery vendor. We stopped it and found a cheaper thing. So it's not so much that the expenses are -- I mean, they charge for -- a reputable e-discovery vendor, they charge you because they're secure and everything like that. But I think the major expense would just be their time. I mean, we generally try to flat fee experts because that time can get out of control really quickly.

But I expect a significant amount of time is just going to be grunt work and tracing. Like you have to enter these wallet addresses into whatever tracer you're using, Chainalysis, Breadcrumbs or whatever. Then you start jumping around, and you can have one transaction and spend eight hours on it.

THE COURT: Would the experts be the ones to do that then?

MR. EKELAND: I would always try to use the cheapest person; so like, again, a legal assistant to plate

it up. But in my experience, what we've been doing lately is we've just been doing it or we have the expert do it.

THE COURT: I suppose you could have someone do it at the direction or under the supervision of an expert.

MR. EKELAND: Yeah, but what's interesting about this to me -- and again, this is like new to me too. I think, like everybody else, with this kind of analysis, there's a lot of guesswork, right. So you'll go -- for instance, the whole cluster concept is based on this heuristic which is basically an inductive method of guessing. You're saying, okay, I think it's probable that this cluster belongs to Bitcoin Fog or this is Coinbase. But as somebody pointed out to me yesterday, if you go across different platforms, they will have different attributions. So there's a lot of guesswork that you need. I think somebody in -- to explain and make the guess and back it up. Because it's not a deductive science, it's an inductive, heuristic methodology that requires external validation. That's what is so tricky about this.

THE COURT: Have you been at this point able to upload all the data you've received from the Government or is that still in process?

MR. EKELAND: The Government's totally met their -- been fine. We've had one problem with one set of productions that we haven't been able to upload, but we're

going to call them and figure that out.  But yeah, we've been --

THE COURT:  I wasn't so much asking about the Government's discovery obligations, just about your budget and whether you've had --

MR. EKELAND:  We've had to go low budget on our e-discovery review.  But, you know, you make it work if you have to.  I would prefer to use Logical, the one we had to stop.  But, I mean, we've made it work for now.

THE COURT:  Well, let me ask Mr. Brown whether he wants to do anything to actually -- before we get to arguing about this, anything with respect to the factual basis for the budget.  The expert is in the room here.  The lawyers are in the room here.  I don't know whether you feel as though you need to ask any questions to confirm what is in the budget here or whether you're prepared to accept the budget as a reasonable estimate of what the costs will be.

MR. BROWN:  Your Honor, starting with the expert, I don't think we need to ask him.  I think one of the overarching points to be aware of is the expert -- to the extent he testifies here today, he has a direct and predictable financial stake in the outcome of this hearing, and it's just a clear financial interest.

THE COURT:  That's understandable, and I can take that into consideration.  On the other hand, experts do

charge money, so there's going to be some cost involved.

MR. BROWN: Yes, Your Honor. The only reason I bring it up is -- and that kind of goes to a larger point. There seems to be an incentive here to highball the litigation estimate here. And it's understandable, because there are some significant deficiencies and inconsistencies in the defendant's listing of assets. But if your litigation estimate here is high enough, then it doesn't matter. It doesn't matter if there's some inconsistency in the matter of hundreds of thousands of dollars for the assets when the estimate for expenses here is in the millions of dollars.

THE COURT: Although just on the question of highballing or lowballing it, if we really are talking about a month-long trial -- and I don't even have to rely on what is here, it's not at all unusual, for example, for a partner at a firm to charge in excess of $500 an hour, right?

MR. BROWN: No -- yes, Your Honor, you're correct.

THE COURT: I left the private practice of law over eight years ago, and my billing rate was I think at least $1,000 an hour when I left. And I understand that I was at a firm that was -- had billing rates that were on the higher end of things. But if it's eight years later, one would think that just an estimate of maybe $500 an hour seems reasonable.

MR. BROWN: Yes, Your Honor. And looking at this budget estimate, it's not so much the attorney billing estimate here -- and by the way, the first time we saw this was immediately before the hearing.

THE COURT: Fair enough.

MR. BROWN: But just upon immediately going through this, a few things jumped out at us. This seems to have all the bells and whistles. This has a trial workshop for a hundred thousand dollars, a mock trial jury for --

THE COURT: We can stick to the low end for present purposes and not --

MR. BROWN: Even at the low end, I mean, this is just -- a couple of things. This is just inconsistent. We can't figure out how the top half of that fits together with the bottom half. There seems to be a labor quarter on the bottom half, the bottom left quarter, which is different from the labor cost that's quoted on the top half. Mr. Ekeland has already said this is -- this was a loose estimate in April. We don't understand, we raised the issue of the defense litigation expenses at the end of August of this year. The defense filed their supplement in December of this year. And here it is January -- December of last year, January of this year we're just now seeing this.

Mr. Ekeland said this is not -- this was from April. It is -- it gives you an idea of what their

anticipated litigation expenses will be, but this is not a real -- a rigorous estimate of litigation expenses. Mr. Ekeland also said that the expert witness will be much more than what's quoted here. There's just a lot in this -- I mean, there's just a lot in these numbers that are not very reliable based on Mr. Ekeland's summary.

And then what we see here, even looking at the low end, there's just a lot of extra expense here. Jury selection -- you know, just for jury selection, $28,000 to $94,000. Opening preparation -- preparation of opening statements, $43,000 to $188,000.

THE COURT: That seems like a lot for writing an opening statement, if that's what that means.

MR. BROWN: Mr. Ekeland mentioned that his discovery vendor sent them a $10,000 bill and that caused them to shut down. But they are quoting expenses for discovery and legal research up to $390,000. So based on Mr. Ekeland's representations, this seems like it's not a very firm estimate. And looking at the estimate itself, it looks like it's just highballing it. It's including all the bells and whistles.

THE COURT: But just for a moment, I take it -- and we can let Mr. Ekeland respond to some of that. But take that all away, and just say you've gone out and hung out your shingle in private practice, and someone comes to

you with a case that's a month-long trial. I think that $500 an hour for skilled trial counsel is not at all unusual, and probably is -- I mean, it's considerably higher than the CJA amount, but it's not unusual if you had two lawyers for four weeks of trial. And if it was just 40 hours a week -- which it never -- it's probably double that for anyone who is actually trying a case, that would be $160,000 right there just for the trial time.

But we know that's not realistic in that no one tries a case and works 40 hours a week. So it's probably, again, maybe minimum $250,000 just for the trial itself. Any lawyer who's going to discharge their responsibility is going to spend at least as much time in the trial as they are -- in the preparation as they are in the trial. So maybe it's a minimum of $500,000, sort of reasonable seat of the pants, for the lawyers doing it -- private lawyers, so they're not getting CJA fund payments which are going to be lower. But private lawyers, it certainly seems $500,000 for trying a case of this nature is probably on the low end for the attorneys involved.

Experts, you know, again, dealing with fairly sophisticated blockchain analysis where they're going to have to do some work in advance with the numbers. I mean, again, complete off-the-cuff ballpark, but probably $100,000 is a reasonable or a low number on that. So that's $600,000

there, which substantially exceeds the amounts that Mr. Sterlingov says and has attested to that he has access to at this point with the freezing.

So I guess my question for you is does that at least get us to the second step in the analysis and the tracing consideration, or do you have doubts about his showing as to the assets that he has? Or do you just disagree with me that -- you know, truth be told, most law firms, to do a case of this nature, I suspect is going to be in the range -- certainly in the -- not significantly lower than the low range of $830,000. Maybe it's $700,000 or something like that. I guess I'd be surprised if you could get lawyers to try a case like this for much less than that, and to prepare for it in a reasonable fashion.

MR. BROWN: Your Honor, with respect to the math, and stipulating the figures as you have sort of laid out there, if the anticipated litigation costs are in the neighborhood of $600,000, what's missing from that analysis is the roughly $184,000 plus the Bitcoin plus the Monero which brings us to about $200,000 that Mr. Sterlingov has disclosed that he either -- that he has accessed and either spent already or is in the process of accessing to spend for attorney's fees. So we're looking at -- to take your math, we're looking at something close to $400,000 which is less -- I haven't checked the prices today, but that's

likely less than the total value of the seized funds. So I think that we do need to -- we can't just spitball this.

THE COURT: Although you may be right about that, but that may be the question of if I conclude -- and I'm not saying I will conclude. But if I did conclude that the funds should be unfrozen, it may be a question of how much. But one way or the other, we're still going to have the hearing on traceability. And if I conclude that there's not traceability, then we don't ever have to get down to that level of nuance, because even though there may be a need, there's not a right in light of the governing standard.

MR. BROWN: Yes, understood, Your Honor.

THE COURT: I really don't mean to be arguing this with you, I'm really trying to figure out what the right answer is. If there's some reason why I'm wrong with that analysis, you should let me know. And if there's something you disagree with with respect to the showing otherwise -- and it does seem to me, though, that the budget is not -- of $830,000 at the low end is not surprising to me. It may be that maybe you could do it a little bit cheaper and shave off some things and say, well, there's not a constitutional right to a mock jury trial and knock that off. Maybe you say there's not a Sixth Amendment right to war room supplies -- if that means cookies or whatever. I don't know what it might mean.

But if you're doing that, you're maybe knocking it down to the range you were talking about a minute ago, conceivably down to $600,000. But it still exceeds the amount, at least as reported by Mr. Sterlingov, of available funds.

**MR. BROWN:** Your Honor, this is the defendant's burden, and it's his burden that is a threshold burden before he's entitled to call a government witness and cross-examine a government witness prior to trial. So we would --

**THE COURT:** But his burden at this point -- I think as you had said, I think, is only to show that his expenses for trial -- of having counsel of his choice and being able to prepare a reasonable or an appropriate defense has to exceed $184,000 before you then get -- to clear the hurdle to get to the second step, right?

**MR. BROWN:** Well, Your Honor, that gets into the question of how reliable is that financial disclosure. As we've previewed in our filing and communications with chambers, we do not think that's a reliable estimate of the defendant's assets. In addition --

**THE COURT:** So do you want to examine Mr. Sterlingov on that?

**MR. BROWN:** Yes, we would. But before we get there, the burden for the defendant is to show that absent

access to the seized funds, he will be deprived of counsel of his choice. And that gets to a point that you had asked Mr. Ekeland about, which is, is it legally relevant whether there's a possibility -- you brought up the example of the Supreme Court advocate who's willing to take on a loss-leading case pro bono because it's an important case. That is legally relevant, and it's actually directly addressed in the Supreme Court's decision in Caplin & Drysdale. That's cited on page 15 of our supplemental brief where the Supreme Court says: "Nor is it necessarily the case that a defendant who possesses nothing but assets the Government seeks to have forfeited will be prevented from" --

THE COURT: I'm sorry, for the court reporter, you need to slow down.

MR. BROWN: Yeah, I don't need to read --

THE COURT: No, no, actually I want to hear it, just do it slowly.

MR. BROWN: Sorry. So the Supreme Court said: "Nor is it necessarily the case that a defendant who possesses nothing but assets the Government seeks to have forfeited will be prevented from retaining counsel of choice. Defendants" -- and there's an ellipses, "may be able to find lawyers willing to represent them hoping that their fees will be paid in the event of acquittal or via

some other means that the defendant might come by in the future. The burden placed on defendants by the forfeiture law is therefore a limited one."

So the Supreme Court is saying that it may be the case that a defendant doesn't have to pay as he goes, that there could be other arrangements. There could be a contingent fee arrangement. In this case --

THE COURT: I'm not sure that's legal -- or ethical in a criminal case.

MR. BROWN: Fair enough. But there could be other -- you know, Mr. Ekeland --

THE COURT: There could be a debt that may or may not be paid, but that's different than a contingency.

MR. BROWN: Yeah, there could be a debt that may or may not get paid. As Mr. Ekeland said, this is all new to him. He is expanding into a new area of law. This case is something that he has put out there in the public sphere as a means of raising the publicity for him and his firm. So I could see -- even absent those funds, I could see this defense team -- which seems to be growing day by day, I could see this defense team taking this case, taking it to trial because, as he says, he believes it's an important case, and it's a new area for him to get into. So we do think that that's relevant. It's not at all clear that if he loses this motion today, that they will be unable to

proceed with his representation.

THE COURT: Do you have any thoughts on the question I posed about whether CJA funds might be available to at least pay for experts, if not counsel?

MR. BROWN: Your Honor, I just don't know the ins and outs of CJA fund availability. I would imagine that with that would come some element of supervision, whether it's from the Court or the CJA panel for the expenses.

THE COURT: The Court does have to approve the expenses under CJA, but the first question is just whether it's available in the first place. Usually it's only available where there's appointed counsel, which there's not now at this point.

MR. BROWN: Yes, Your Honor.

THE COURT: Why don't we do this, why don't I give Mr. Ekeland a chance to respond to what you've just said. And then perhaps, Mr. Ekeland, if you want both to respond to the argument with respect to whether -- the Caplin & Drysdale argument that Mr. Brown just made as well as if you want to put Mr. Sterlingov on the stand you're welcome to do so, to ask about the assets that he has. I'm not telling you to do it, but if you'd like to do it, you're welcome to.

MR. EKELAND: Certainly. And I just -- the Caplin & Drysdale argument you wanted me to respond to, could you just restate it for me, please?

THE COURT: Of course. I think the argument is -- to back up, I had asked you -- I don't know the answer to the legal question of whether you would do the case or handle the case in any event even if the funds were not released. There's some funds that are available, you'd be doing it at a substantially reduced rate, but whether you'd be in a position in which you could do it anyway.

When I posed that question to you, I said I don't know the legal answer as to whether that's relevant or not, because I think lawyers deserve to get paid; to which Mr. Brown responded by saying: Well, Judge, I know the answer to the legal question, and the Supreme Court provided it in the Caplin & Drysdale case when the Supreme Court said if counsel's available to do it on a reduced fee or no fee basis, that resolves the issue and there's not a need at that point.

MR. EKELAND: I think the honest answer to that question is I'd want to, I would try to do it because I believe in this case. But I wouldn't really be able to afford to do it because I'd be out on the street. I've already gone out-of-pocket on this case a fair amount of money because I believe in it. I'm at my limit with that. In terms of --

THE COURT: So just for purposes of responding, you're representing to the Court, as an officer of the

Court, that you would not be able to do this case without funding?

MR. EKELAND: Yes, Your Honor.

THE COURT: We'd be back to appointing counsel if we did that?

MR. EKELAND: Yes, Your Honor.

THE COURT: Or I suppose another effort to try and raise money if you could.

MR. EKELAND: Honestly, I would try to secure other funding from I don't know who. I would make an effort before I left this case, because I don't want to leave this case because I do believe in it. But I don't think it's realistic, given my financial situation right now, to do that. And I do want to comment on the right to counsel of choice, because it's my understanding -- I believe it's under United States v. Gonzalez, that assuming that the funds aren't illicit proceeds and he has access to them, to be deprived of counsel of choice is a structural error. It doesn't matter if the counsel that comes in is Clarence Darrow or whomever, if the defendant is deprived, it's a structural error. So I just wanted to make that point.

THE COURT: No, I don't disagree with that. But that doesn't mean that I still don't have to go through the two-part --

MR. EKELAND: I agree with that, absolutely, Your

Honor. I think that's the big question. I don't have much to say. I mean, we can argue numbers -- like he mentioned that the discovery number is high. I think one of the reasons for that is that's brute force doc review labor, you know. If you have to go through 3 terabytes of data and look at every single piece, that gets expensive. Having been in the doc review salt mines as a junior associate, it's a very laborious process, and it's not an easy one. I don't have much more to say about this budget. I'm happy to answer any more questions about it.

THE COURT: Let me ask Mr. Brown whether there's any objection to admitting Exhibit K into evidence, just so we have a complete record in the case?

MR. BROWN: No objection to admitting it.

THE COURT: So Exhibit K is admitted, Defense Exhibit K is admitted.

(Defense Exhibit K admitted into evidence)

THE COURT: I suppose, though, Mr. Ekeland, I'm still a little bit at a loss as to how to proceed with respect to the first step. Because Mr. Brown is right, that the Supreme Court has held that it is a burden to the Government at this point in the proceeding to have to put on a mini version of its case, and to establish the traceability and to put its expert on and so forth at this point in the process.

The Supreme Court and the D.C. Circuit have made clear that we only do that if you or your client have established need.  I haven't gone back to look at the Caplin & Drysdale case, but taking Mr. Brown at his word, he describes that case as saying it does make a difference if counsel can do it without access to the seized funds.  And from you, I'm feeling still a little bit of equivocation on that point, which is you don't think you can do it, but you'd try.

So the question for you is whether -- I just need a firmer answer one way or the other on that question before we get to the second step.

MR. EKELAND:  If we don't get paid on this case, we're going to have to withdraw.

THE COURT:  And what about other sources of funding?

MR. EKELAND:  I don't -- I could look, but there's no immediate obvious source of funding.  And we've been looking.  You'll see it in the Government's exhibits, we've had a legal defense fund website up which has received exactly zero dollars.  I think the Government thought that we got a donation from that, but we're actually getting a payment from someone else, and it was going to our crypto account for like $25,000.  But we've received zero dollars. The only payments we've gotten Mr. Sterlingov could talk

about or we can go through in -- we disclosed in our declaration.

THE COURT: And how much money is available as of today?

MR. EKELAND: I'm sorry, what?

THE COURT: How much money is available as of today?

MR. EKELAND: As of today, I think it's in the -- Mr. Sterlingov's statement of net worth. I want to say it's about, off the top of my head -- I don't have it in front of me, about $760,000 roughly. Part of the problem is it's not clear to us, I'm not a hundred percent sure if the Government exchanged that money and stored it in U.S. dollars or if it's in crypto.

THE COURT: I'm sorry, you misunderstood my question. I wasn't asking how much money is available in the seized account, frozen account, I'm asking outside of the frozen account, how much money does he have towards --

MR. EKELAND: That's also -- we tried to estimate in the declaration. There is a Mycelium account that -- it's in the -- I don't want to misstate it so I'm going to go grab the declaration if I may -- or we can have Mr. Sterlingov go through this.

THE COURT: You're welcome to do that if you want to.

MR. EKELAND: Yeah.

THE COURT: Okay, that's fine. He can take the stand if you want to.

MR. EKELAND: For the purposes of this or should we -- or this is still for the first prong?

THE COURT: We're still on the first prong. You can recall him later if you want to on other issues, but he's on the first prong now -- which is probably wise anyway, to take it one step at a time, given the risk to him of testifying.

MR. EKELAND: The defense calls Mr. Sterlingov.

DEPUTY CLERK: Please raise your right hand. Do you solemnly swear that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

DEPUTY CLERK: Thank you. You may be seated. Please make sure you speak into the microphone.

### DIRECT EXAMINATION OF ROMAN STERLINGOV

BY MR. EKELAND:

Q. Mr. Sterlingov, you've got the defendant's exhibit list book in front of you?

A. Yes.

Q. If you could turn to tab B. I think the Court and everyone has copies of this. Could you just take a look at

what's labeled there as Exhibit B, and just flip through the pages a second.  Just let me know when you're done.

(Witness reviews document)

A.  Yes.

Q.  Do you recognize this document?

A.  Yes.

Q.  And is this the statement of net worth that we put together with you at the Northern Neck Regional Jail?

A.  Yes.

Q.  Taking a look at this -- and I guess we just start with the top, you see at the top it lists a Tesla, right?

A.  Right.

Q.  That was a Tesla that you owned in Sweden?

A.  Yes.

Q.  And you sold that Tesla to pay your legal fees, some of your legal fees, correct?

A.  Yes.  It took almost a year to do that because I was locked up, but yes.

Q.  And you got roughly about a hundred thousand dollars and then you paid that to us, correct?

A.  Yes.

Q.  And then underneath that, there's a Jeep that's listed.  You've got a value for about $5,000 there, right?

A.  Yes.  We have been trying to sell the Jeep.  It turned out there was a hidden problem with it, so it's much

harder to sell than we anticipated. That's the estimated realistic price --

Q. Right.

A. -- that we can hope to get for it --

Q. You're guessing at it.

A. -- if anybody is going to buy it at all.

Q. And that money hasn't -- because it hasn't been sold it hasn't been paid --

A. No.

Q. -- as far as your legal fees. And then you see it lists a Nordea bank account, and you're approximating the amount in that account, right?

A. Yes, it's -- there's no significant money there.

Q. Has it been easy for you to gain access to your assets or information about your assets while you've been in jail?

A. No, it has been really hard I guess to use the time. I have to say that it is -- I don't understand how the Government can say that, because they have provided you, or my public defender before I was working with you, with some of the files, that it was easy for me to access all of this information in all of these accounts. I have been locked up for this whole time. I don't have any access to a computer with internet or a phone or anything like that. It took me a long time to even just be able to call my family,

because most of them are in Sweden.

It took some money to even access some of the accounts. Like the car, we had to re-register the car. My mother had to move the car. We had do a checkup. So it has been really hard. It took a lot of time. And some of these accounts, we -- my understanding is that we still cannot access them.

Q. But you have been able to access some of your accounts, correct, right?

A. Yes.

Q. And how have you -- I'm sorry?

MR. BROWN: I'm sorry to interrupt. I know this is not a trial, but counsel is mostly leading the defendant through his testimony.

MR. EKELAND: I'll ask open questions if you'd like and we can be here a while.

THE COURT: Since this is not trial and I'm going to take it for what it's worth, I'll leave it up to you how you want to pose the questions. You can proceed however you think appropriate.

BY MR. EKELAND:

Q. Thank you, Your Honor.

But you have had help accessing your accounts, correct?

A. Yes.

Q.   And how have you done that?

A.   I have tried to contact my family, my friends. You guys have helped.  Maksim Nemtsev has helped.

Q.   Who is Maksim Nemtsev?  Because we see his name come up a lot in the Government's papers.  Could you explain your relationship to him, and how he helps you access your assets?

A.   Maksim is an attorney that I contacted through Alex.  Maksim is a friend of the family.  He said right from the start that he will not be able to represent me or run the case for me.  First there were no funds at that time available, and also he is not admitted to D.C.  I understand that an attorney has to -- whether it's called being admitted or something else I'm not sure, but he's not -- he cannot practice law as the main attorney for me here.  He has helped me open some of these accounts.  He has helped me establish contact with my family.  He has helped connect me with Alex so that Alex could send me small amounts of money to the jail for like basic necessities, as this jail does not provide, for example, underwear.  It's hard to mention such details here, but -- so yeah, he has helped with a lot of things that I required outside of legal representation.

Q.   And when you say -- when you refer to Alex, you're talking about Alex --

A.   Alex Kosiakov, he is my cousin.

Q. And he's been helping you, too?

A. Yes.

Q. And since we're talking about Mr. Nemtsev, do you see those two entries directly below the bank account that say gold and gold?

A. Yes.

Q. And you did see, I believe it was in the Government papers, where they showed you a communication between you and Max talking about gold bullion under pillows?

A. Yeah, I understand that we have filed some sort of motion where we -- I don't know if we say that I had no gold or something like that, I don't remember exactly. My understanding is that we had a miscommunication between me and you guys where I don't think I -- I never actually said that I have no gold, but I don't have any significant gold holdings, I never have. I mean, these amounts here are actually on the high end. I think the physical part is more something like $5,000 or something like that, I'm not sure. So when we recognized that we had this miscommunication, we put the correct information back into this report.

Q. And right here, these two entries for the gold, to the best of your knowledge, that's all the gold assets that you have anywhere?

A. Yes, that I've ever had. Let me just also mention

that I've never had any gold stored with anybody else in somebody else's name or with any relatives. My mother has this gold now, and she's trying to sell it because I'm here.

Q. Below the entry for the gold, you see it says there's a cryptocurrency account which is your Kraken account, right?

A. Right.

Q. So up until now, none of those assets listed above the cryptocurrency account have been seized by the Government, right?

A. That is correct.

Q. But that Kraken account the Government did seize, right?

A. Yes.

Q. And you see that number -- well, that number's from the Government. You don't have access to that account because the Government seized it, right?

A. Yes, they seized the account. They also seized my devices, which I believe I need to access it, I'm not sure.

Q. And then beneath that, there's another Kraken account listed below there, To The Moon, LTD. That was your account for your VPN business; is that correct?

A. Correct.

Q. And then there's a number of other accounts there, going down the page --

THE COURT: I'm sorry, just before you move off of the second Kraken account --

MR. EKELAND: I'm sorry, I didn't hear you.

THE COURT: Before you move off of the second Kraken account, it says amounts unknown and refers to it as a small amount. I guess I'd like to know what Mr. Sterlingov's best estimate is.

THE WITNESS: I think it's much less than $10,000. That business and that account, there was never any significant amounts of money there.

THE COURT: That's fine, you've answered my question. Thank you.

BY MR. EKELAND:

Q. So below that, there's four crypto accounts listed below that, the Binance, the Eclair -- well, let's start with the Binance and the Eclair. Those are your accounts. The first Binance account, it looks like you sold the 1.9 Bitcoin there and paid it out for legal fees; is that true?

A. I think so, yes.

Q. And then the Eclair account directly underneath that which lists roughly $8,000, you can't access that account right now, can you?

A. No, I cannot. I believe we need the phone that the Government has seized -- or I don't know if we can do it somehow with the information that the Government has

provided. But I understand they have sent some data from the phone. I believe we have had difficulties accessing that.

Q. But if you had your phone, you'd be able to access it?

A. Yes.

Q. And then underneath there, the Mycelium account which says roughly three to five Bitcoin approximately valued at $50,000, you can't access that either, can you?

A. Yeah, exactly, I cannot. It's the same situation with this account as with Eclair.

Q. If you had your phone, you'd be able to access it?

A. Yeah, I believe so.

Q. And then there's a Poloniex account that says roughly zero BTC. Do you know, is there -- is it just you don't know what's in there or you're guessing or there isn't anything?

A. Yeah, I'm just not sure. I cannot access this account to check or...

Q. Do you have any reason to believe there's a substantial amount of money in it?

A. No, no, absolutely not.

Q. Going to the next page which starts with cryptocurrency account Bitfinex, and basically the same questions. You've got listed roughly .1 Bitcoin for

approximately a thousand dollars. Is that just your best guess as to what's in that account?

A. Yeah, I believe we have tried to access that account, and that's what we've seen there.

Q. Is that an account you need your phone to access or is that an account you can access in some other way?

A. I'm not sure.

Q. That's a fair enough answer. And then directly below that, a Bleutrade account with .3 to .4 Bitcoin in it, roughly $4,000. You can't access that account either, can you?

A. It's my understanding that we cannot. I tried giving you guys all the information that I have, and it looks like we cannot access it right now.

Q. And --

A. I certainly cannot access it from jail in any way, I have to rely on people like you and my family to try helping with that.

Q. Right. But you have no reason to believe there's a substantial amount of like money in there, there's like thousands of Bitcoin or anything like that in there, right?

A. No. For the Bleutrade, I am very certain that that is the maximum value.

Q. And then there is a Jaxx account there directly -- it's the third -- what is it, the third row down, saying

roughly two Bitcoin and eight Ethereum worth roughly $43,000. That was actually accessed and sold to pay your attorney's fees, right?

A. I believe so.

Q. And then beneath that is a Monero account where it says there's -- it says you sold it and that there's roughly 33.4 XMR, but the amount is at zero. Why is that?

A. I'm not sure. I think this is the money we have used already. I don't know if that's the reason why it says zero.

Q. It's been paid out, so that's -- maybe we need to correct that.

THE COURT: I'm sorry, this is where the leading is being a little confusing.

MR. EKELAND: What's that?

THE COURT: This is where the leading is a little confusing, because I think the witness doesn't know and you're just making assertions. So it would be better to figure out what the witness knows about this.

MR. EKELAND: Yes, Your Honor, absolutely. I can change.

Q. Directing your attention to the rows that start -- it's the fifth row down, it says various old crypto accounts.

THE COURT: I'm sorry, can you go back to the one

above it.  I'm still not sure I know the witness' answer as to where that money went.

BY MR. EKELAND:

Q.    Do you know where -- so on the cryptocurrency account, in the third row that says it's the Monero account that says it was sold, do you know where that money went?

A.    I'm sure that money went to you guys or Maksim.

Q.    Do you remember how much that was?

A.    Yeah, I think it was, I'm going to say, around $12,000 equivalent.  Maybe at the maximum 20.

Q.    But you don't think more than 20?

A.    Excuse me?

Q.    You don't think more than $20,000?

A.    No.

Q.    And then going to the row directly below that where it says various old crypto accounts.  Can you explain what you mean by various old crypto accounts?

A.    Yeah, I thought that it might be confusing that we put just unknown, unknown on everything there.  I don't know if we could have explained this better.  I have no reason to believe that I have any crypto accounts with any significant amounts of money anywhere.  The reason I mentioned this is just because I was an enthusiast, I was registering a lot of different wallets on a lot of different exchanges.  If there is an exchange somewhere that I registered five years ago

and forget about and there's like a change amount of like a hundred dollars there, with the prices of crypto going up and down all the time -- a lot sometimes, there was just no way for me to know the exact value. That's the best I can say about this account. I don't know what they are. I have no -- this is not -- if there's any one account that I've forgotten or lost on some hard drive or something...

Q. Would it be fair to say you're just listing this out of an abundance of caution, and you can't actually recall any particular crypto account?

A. I cannot recall any particular crypto account that would -- that this row would represent.

Q. Is it correct to say that just because you've been in Bitcoin for a long time, you're concerned that you might have some old wallets out there that you've forgotten about?

A. Yes, especially since I don't have great access to my files. I do believe that my attorneys have had some access to the files provided by the Government, and they have looked through and gone through everything. All of the accounts that I could remember we have put as a separate -- especially, I guess it's also worth mentioning, since I've seen that the Government is claiming that I have some sort of cluster of accounts or something like that. In the superseding indictment, they put a wallet there with like a thousand Bitcoin or something like that. I don't have that

or anything resembling that. That is not what various crypto accounts means.

THE COURT: Okay.

MR. EKELAND: I pass the witness, subject to recall, Your Honor.

THE COURT: Okay, thank you. Mr. Brown.

MR. BROWN: Your Honor, just before we get started, to the extent that we proceed into the second stage of this proceeding and Mr. Sterlingov's declaration and/or testimony regarding the source of those funds becomes an issue, we would want to recall him for further cross. But for now I can confine it to his assets.

THE COURT: Okay, thank you.

CROSS-EXAMINATION OF ROMAN STERLINGOV

BY MR. BROWN:

Q. Good afternoon, Mr. Sterlingov.

A. Hello.

Q. So you've been looking at your financial statement, and that's Defense Exhibit B, right?

A. Yes.

Q. You assisted your lawyers in preparing that statement, correct?

A. Yes.

Q. And you reviewed it before it was filed in this case, right?

A.   Yes.

Q.   In addition, your lawyer's also submitted a sworn declaration from you; is that correct?

A.   Submitted what?

Q.   Your lawyer's also submitted a sworn declaration made by you?

A.   Yes.

Q.   And you wrote that declaration?

A.   Correct, I have -- we typed it together.  I didn't type it, but I was with -- we typed it with my attorneys for every element of it.

Q.   So with your attorney's assistance you prepared that statement, right?

A.   Yes.

Q.   And you read it before it was submitted, correct?

A.   I didn't read the final version, but I read the points, all the points that were there.

Q.   And you also signed that declaration?

A.   Yes.

Q.   Did you read it before you signed it or did you sign it -- or did you read it through before you signed it?

A.   Yes.

Q.   Looking at -- you have a binder of government exhibits in front of you, don't you?

A.   Yeah.

Q. Just very quickly looking at what's been marked as Government's Exhibit 2 -- and you can go ahead and pull that out of the -- it's in a plastic sleeve.

Is that the declaration you signed?

A. It looks like that. If that is the document that you got from us, then yes.

Q. And directing your attention to paragraph 51 of that declaration, which I believe is on page nine. In your declaration you state: "Outside of what is listed in Exhibit B, I have no other assets that I am aware of that the Government has not seized."

Do you see where that is?

A. Yes.

Q. And is that your statement?

A. Let me check again. Yes.

Q. Exhibit B, of course that's your financial statement?

A. Right.

Q. Now, standing here today, you testified earlier about correcting one of the figures for the value of some of the gold, the physical gold, that's in your mother's possession, right?

A. Right, I said that we put a higher amount just to be safe, because I don't know exactly what the amount is. After thinking more about that, I think the amount is

actually lower.

Q. And you testified earlier, I think you said the amount was about $5,000, the value there?

A. Yes.

Q. Aside from that, looking at your financial declaration, are there any other corrections that you would make to that financial declaration?

A. I think the only one is just the Monero row which said zero in the dollar amount. There was a Monero amount, but zero in the dollar amount, which --

Q. So what correction would you make to the dollar amount?

A. The Monero amount is the correct one, I believe.

Q. I believe you testified -- and I don't have the exact exchange rate in front of me, but you testified that you would estimate the exchange rate results in a dollar value of about 12,000 to 20,000, somewhere in that range; is that right?

A. Yes.

Q. So aside from those two corrections, are there any other changes you would make to your financial statement here?

A. No.

Q. Now going back to the first page of your financial statement. You list a bank account at Nordea Bank, correct?

**A.** Yes.

**Q.** That's a bank account in Sweden?

**A.** This is correct, yes.

**Q.** And that's your only bank account that you have, correct?

**A.** This is the only bank account where I have any money. I have -- there's an account in Germany, N26 account, I believe it's empty.

**Q.** So what was the account in Germany? Could you explain and give us a little more detail.

**A.** It's a bank called N26.

**Q.** So you have a bank account at N26 Bank in Germany, correct?

**A.** Yes.

**Q.** And it's your testimony that you believe the account has no money in it?

**A.** Right.

**Q.** Are you sure about that?

**A.** I'm sure.

**Q.** Because just a minute ago you couldn't even remember that you had a bank account in Germany, but now you're certain that you know how much money is there?

**MR. EKELAND:** Objection, asked and answered.

**THE COURT:** Overruled.

BY MR. BROWN:

Q.   Do you have any other bank accounts?

A.   My understanding of this statement here is that we listed all of the accounts that had any substantial, or even remotely substantial, amounts of money.  If you're asking about all bank accounts period, the only one I can think of is if you count the bank account for the Moon VPN business. I don't know if you count that as mine.  I believe it has no money in it.

Q.   So tell us more about the bank account for the Moon VPN business, what bank account is this?

A.   It's a bank account for my Moon VPN business, it's in the business name.

Q.   What bank is that at?

A.   It's called, I think, Sparkasse.

Q.   And where is that bank located?

A.   That is in -- actually, I'm not sure where the bank is located.  The company was located in Malta.

Q.   So you have a bank account in Germany, a bank account in Malta.  And what's the balance of the Moon VPN bank account in Germany -- excuse me, in Malta?

A.   I believe it to be zero.  I know that if it had any residual funds from when I was trying to run the business, I know that now that I haven't been in contact with them for two years, it must be they must have closed the account I think or taken all the money for the fees and

everything for it. So I don't believe it has any money it.

Q. So it's your testimony they must have closed the account. Why do you say that?

A. Because there were fees I believe for operating the account that would -- with the time that has passed, if there was any money in it -- which I don't think there was anyway, but by this time, they must have closed it.

Q. Are you sure about that?

A. I'm not sure that they have closed it, no.

THE COURT: Mr. Sterlingov, you gave an answer to a question earlier that prompts another question in my mind, which is you've indicated the assets that you have in the declaration and the attachment.

Are there any other assets, whether they're in your name, the name of a company or in the name of anybody else, that you would have access to or control over that are not listed?

THE WITNESS: No, I do not. I do not have any companies other than this Moon VPN, which I'm not sure I have it anymore. I haven't been in contact with them for two years. I do not have any other companies anywhere else in the world. I do not have any money in anybody else's name or anybody else's account or anything like that.

THE COURT: Okay, thank you.

BY MR. BROWN:

Q. Now, that Nordea Bank account -- we've reviewed the other bank accounts. Before we move on, are there any other bank accounts that you have or believe you may have in various countries?

A. I don't think so. Let me just take a second just to be completely sure. No, I don't think I've ever had any. At the very least, now I don't have any other bank accounts.

Q. So in your financial statement, you've listed a lot of cryptocurrency assets. You've listed the Nordea Bank account, and then you've listed some other assets like the gold and the vehicles that you sold. But at the time you traveled to America in April of 2021, is it your testimony that the only bank account with national currency that you possessed was that Nordea Bank account with approximately $500 in it?

A. I'm sorry, before I answer, I have to -- because just the way you phrased it, I have to --

Q. Would it help if I rephrased?

A. Yes. I just want to mention that now I also have an American bank account that my attorneys have registered for me -- which we have in the declaration, which I assume you include in the bank accounts.

Q. And that's not my question. Let me try to break it up into smaller pieces. So you traveled in April 2021 I guess first to Russia, correct?

A. I was traveling --

Q. It's a yes or no question. You traveled to Russia in April 2021, yes or no?

A. Yes.

Q. And you stayed there for about two weeks?

A. Yes, that was for quarantining myself to be able to enter the United States.

Q. And then you traveled to the United States towards the end of April 2021, right?

A. Yes.

Q. And you were planning to stay in the United States for a pretty extended period of time, correct?

A. I think I planned to stay for three weeks, three or four weeks. I'm not sure if you want to call that an extended amount of time.

Q. What was the duration of the flight training that you signed up for?

A. I believe it was two weeks.

Q. So you were in Russia for two weeks, and America you were planning two to three weeks. And the only fiat money -- do you understand what I mean by fiat money?

THE COURT: I'm not sure I do, so why don't you define it.

BY MR. BROWN:

Q. So in the cryptocurrency world, people often refer

to cryptocurrency as opposed to fiat money.  Are you familiar with that?

> A.  Yes.

> Q.  And fiat just means government money, because it's money by fiat, right?

> A.  Yes.

> Q.  So all I'm getting at is at the time you traveled to Russia and the United States for at least five weeks, it's your testimony that the only national currency assets of any kind that you had was $500 approximately in a Swedish bank?

> A.  Well, I had some cash on me that has been seized.

> Q.  But aside from the cash that was seized, the only other national currency asset that you had of any kind was that Swedish bank account, right?

> A.  The only other national currency.  I mean, if you phrase it like that, I guess you would have to include the Kraken account as well because it had Euros.  Is that what you mean?

> Q.  It's a question for you to answer, it's not what I mean.  Have you had any other businesses besides Moon VPN?

> A.  We had a studio in Sweden, yes.  The answer is yes.

> Q.  Did you ever have a business called Bitcoaster Ventures?

A.   Yeah, that's a part of the Moon VPN.

Q.   Are there any other financial accounts for Bitcoaster Ventures?

A.   I do believe there was -- I think the two companies that are part of the Moon VPN, I think they have -- I don't know if the account is split in two between those two businesses, but they're part of the same company or the same operation.  I don't know if you mean -- if that's what you mean.  I think Bitcoaster -- there were two companies in the Moon VPN, because that's how they structure companies in Malta.  It is possible that each of those had like an individual account, and both being part of the Moon VPN business.

Q.   So there may be a second bank account in Malta for Bitcoaster Ventures, yes or no?

A.   It's part of Moon VPN, yes.  I guess so, yeah.

Q.   Would there be a separate bank account for Bitcoaster Ventures at the bank in Malta?

A.   I don't know whether you would count it as separate because it's part of the same business maybe.

Q.   And what's the balance of any separate bank account for Bitcoaster Ventures?

A.   It's -- like I said, for the Moon VPN business, I believe the balance certainly by now should be zero.  That was included in my estimation of the Moon VPN bank account.

Q.   I'd like to clarify some of the cryptocurrency account entries in your financial statement.  Just to begin with, do you understand what I mean if I talk about a custodial service for cryptocurrency?

A.   I believe so, yeah.

Q.   So a custodial service is a service that holds your keys or holds your cryptocurrency for you, right?

A.   Right.

Q.   And that's different from a self-hosted wallet or storage device, right?

A.   Right.

Q.   And so just for clarification, some of these that are listed as cryptocurrency accounts in your financial statement, those are accounts with a custodial service, with a third party, right?

A.   Like Kraken, for example?

Q.   Is that an example of a custodial service?

A.   I think, yes.

Q.   And some of these are -- they're not accounts at a third party institution, they are wallets that you have on your phone or other electronic devices, right?

A.   Some of the other entries you mean?

Q.   Yes.

A.   Yes.

Q.   And so for the custodial services, to start out

there, so you mentioned Kraken. That's what we would call a custodial service, right?

A. Yes.

Q. And there's also Binance, Poloniex, Bitfinex and Bleutrade?

A. Yes.

Q. And those are all custodial services, right, accounts at a third party?

A. I think so, yes.

Q. Those are all accounts at a third party, just to be clear, yes?

A. I believe you can call them custodial, yeah.

Q. Did you ever have an account at blockchain.com, also known as blockchain.info?

A. Could you repeat, please, if I ever had an account?

Q. Did you ever have an account or wallet hosted by blockchain.com, formerly known as blockchain.info?

A. I'm not sure, it's possible.

Q. It's possible. Would that be one of the various old crypto accounts that you can't remember?

A. I'm not sure.

Q. Now looking at the software wallets you have listed here. So there's Eclair, Mycelium, Jaxx. Those are the only software wallets you're aware of, correct?

A.   Eclair, Mycelium, Jaxx, Monero, yes.

Q.   You mentioned Monero.  Monero is not a wallet, is it, right?

A.   I thought it was, I'm not sure.

Q.   Is Monero a form of cryptocurrency?

A.   I think so.

Q.   So it's a form of cryptocurrency like Bitcoin or Ethereum, right?

A.   Right.

Q.   It's not the software that you use to store the keys, correct?

A.   I'm not sure.  I thought there's a software called Monero, but I may be wrong.

THE COURT:  Mr. Brown, how much longer do you have?  I'm just thinking about whether we need to take a break.

MR. BROWN:  Your Honor, I'd say maybe 10 minutes depending on the witness' answer, 10 or 15 minutes.

THE COURT:  Why don't we go ahead and take a break now, and we'll come back at five minutes until 4:00.

MR. BROWN:  Yes, Your Honor.

THE COURT:  See you then, thank you.

(Off the record at 3:42 p.m.)

(Back on the record at 4:06 p.m.)

THE COURT:  Mr. Brown, you may continue.

BY MR. BROWN:

Q. Mr. Sterlingov, could you take a look at Government's Exhibit 7 in your binder. Do you recognize these notes, Mr. Sterlingov?

A. Vaguely, yes.

Q. So these are part of a larger file, correct?

A. Okay. They could be, yeah.

Q. They could be. Do you recall, do you have a memory of these notes?

A. Vaguely, yeah. Yeah, I think I have -- yeah.

Q. And these notes were stored in a file called masked in one of your devices?

A. Okay.

Q. And these notes are obviously not in English, are they?

A. Sorry?

Q. These notes are not in English?

A. Right.

Q. They appear to be in Russian; is that correct?

A. Yes, this is Russian.

Q. And you speak Russian?

A. I speak Russian.

Q. And you prepared these notes for yourself?

A. Come again?

Q. Did you prepare these notes?

A.    This file contains some of my own notes.  It contains some things that I found on the internet or I quoted from somebody else.  I'm not sure, especially -- yeah.

Q.    So you may have copied and pasted something from the internet or from a message from somebody else into this masked file; is that correct?

A.    Some of them, yeah.

Q.    Some of them, and then some of them are notes that you wrote to yourself?

A.    Yes.

Q.    Now in this masked file, turning to that second page at the top, there are some I guess English words in here towards the top of this second page.

Do you see a word called VirWoX?

A.    Yes.

Q.    Is VirWoX a virtual currency exchange or a cryptocurrency exchange?

A.    I think so, if you say it is.  I think so.

Q.    Do you have any accounts at VirWoX or have you ever had any accounts at VirWoX?

A.    I'm not sure, I had a lot of accounts on a lot of different websites.  I don't believe that I have an account with any substantial amount of money there.

Q.    If you'd turn to Government's Exhibit 10.

A. Yes.

Q. And is this also a printout of a file that you prepared for yourself?

A. Yes, looks like it.

Q. I'm sorry, could you say that again?

A. It looks like that yes.

Q. At the top of this Government's Exhibit 10, there's a label that looks like text specific mask; is that right?

A. Yes.

Q. So is this file also a file that you have notes for yourself in?

A. Sure. Also, since you're asking about this file, I just have to kind of explain a little bit. I struggled with depression for some time, and I've been seeing different people that were trying to help me. In the worst times, I had periods where I had difficulties even like going around my everyday life and just thinking normally and being able to operate. And I've been trying to deal with that. And one of the things that has been recommended to me is that I can write down different notes; that if I have various thoughts in my head, I can write things down and that will clear them up. It has worked for me.

When I'm seeing this file, I'm seeing that some of this is more notes or just a collection of thoughts. I have

to say, some of them might be things that I wanted to do. Some of this might be something that I saw on the internet and just copied because it reminded me of something. Some of them might be just thoughts I had for one day and then forgot the next day. This is really -- this is a mix of a lot of different things. I mean, you can probably even see just the structure of this is a little bit OCD in a way or something. I can try to answer to the best of my ability if you ask me about something specific from here.

Q.   Do you -- just to begin with, do you recall approximately the time when you prepared this text specific masked file?

A.   I'm not sure, it's hard to say. It could be -- it doesn't look really recent to me. I couldn't tell you a date, I'm sorry.

Q.   Turning to the second page of this document, towards the top of that page there's a bullet I guess in the upper section about midway to two-thirds of the way down that upper section of the page two that says "Bisq project," B-I-S-Q.

Do you see where I'm looking?

A.   Yes.

Q.   What is Bisq?

A.   Bisq is an exchange, I guess. I guess it's a software -- it's an exchange which is a software that you

have to install on your computer to be able to exchange funds.

Q. Immediately below that bullet there's another bullet that says: "Put in more money for trades"; is that right?

A. Right.

Q. Did you -- were you putting money into Bisq at the time you prepared this document?

A. That could be the case, yes.

Q. Is Bisq one of the various old cryptocurrency accounts you couldn't remember when you prepared your financial declaration?

A. You know, I thought about the Bisq account when I made the declaration. I was relatively certain that it was empty at the time. Is there -- do you have different information about that?

Q. Sorry, the Court's indulgence. Oh, so looking a little bit further down that document, there's a heading that says text specific to do, and then there are a number of bullets. Maybe 13 bullets down, there's a bullet that says: "Try to withdraw some Monero from WEX when the lock will be released."

Do you see that?

A. Uh-huh, yes.

Q. And what is WEX?

A.    I believe WEX was the same thing as BTC-e.

Q.    And what was --

A.    And they just changed the name.  It's an exchange -- was an exchange.

Q.    Did you have an account at BTC-e or WEX?

A.    Yes.

Q.    And what's the balance of that account right now?

A.    I believe WEX closed years ago and there's no there's no access to any of the accounts I believe.

Q.    Could you please turn to --

A.    It looks like that was going on maybe at this time, because it says:  "Is it possible to move the money out of WEX?"

Q.    So you had some money there?

A.    Right.

Q.    And you were trying to figure out if you could move the money out?

A.    Right.

Q.    If you could turn to Government's Exhibit 5.

A.    Yes.

Q.    So at the time that you were arrested, you were carrying handwritten notes; is that right?

A.    Yes.

Q.    And those are notes you prepared yourself, right?

A.    Yes.  They are of a similar nature to what I've

explained about the previous file, as you can maybe see.

Q.   So these notes would have been prepared close in time to April of 2021 when you were arrested, right?

A.   I'm not sure, this could be older.

Q.   Well, they wouldn't be more than a year older, right?

A.   Why don't we say two years to be safe, I'm not sure.

Q.   So you were carrying handwritten notes that were two years old when you were arrested?

A.   Yeah, as we have shared in the affidavit, I carried a lot of things with me since I was traveling and I couldn't leave them in my intermediate stops.

Q.   Turning to page two of Government's Exhibit 5. About three-quarters of the way down that page, in the middle of the page there's the word Goldmoney.

Do you see that?

A.   Did you say three-quarters down?

Q.   Yeah.

A.   Yeah, I think I got it.

Q.   Did you ever have a Goldmoney account?

A.   Yeah, this is the account that we -- I've been trying to open.

Q.   And then looking further down that same page, in the next to the last line it says:  "Check SushiSwap

Uniswap." Do you see that?

A. Yes.

Q. And what is SushiSwap or Uniswap?

A. You know what, I still don't know. I think I was trying to figure that out when I put the note there, and I still haven't gotten to it. I'm not sure.

Q. Are you aware that SushiSwap only launched in 2020?

A. I was not.

Q. And so if you had made these notes to yourself, they would have been on or after the date that SushiSwap existed?

A. Right, that sounds logical.

Q. So could you explain what SushiSwap is?

A. I don't know, like I said.

Q. Is it --

A. I was interested in figuring that out.

Q. Is it a -- do you have an understanding that SushiSwap is a decentralized exchange?

A. I do not. I don't know what SushiSwap is.

Q. How about Uniswap? Is it your testimony that you don't know what Uniswap is either?

A. It is, I do not know what Uniswap is.

Q. And so you're not aware that SushiSwap and Uniswap allow you to stake cryptocurrencies?

MR. EKELAND: Objection, Your Honor. This is asked and answered over three times now.

THE COURT: Sustained.

BY MR. BROWN:

Q. Could you turn back to the first page of Government's Exhibit 5. Now, approximately halfway down that page, there is a note that says: "ETH staking." Do you see that?

A. Yes.

Q. And ETH is a common abbreviation for the cryptocurrency Ethereum?

A. Ethereum, yes.

Q. Ethereum staking is the process of putting your money in a pool, and allowing that money to be lent out and you earn interest on it, right?

A. I have a very vague understanding of Ethereum staking. What I know is you are somehow supposed to lock an amount of Ethereum, and it's supposed to grow in Ethereum amount -- not necessarily in dollar amount, but Ethereum amount. I don't know if it's lent out or what the mechanism is.

Q. Is anyone else paying for your legal expenses, Mr. Sterlingov?

A. Is anyone else paying for my legal expenses?

Q. Besides yourself. Family, friends, others?

A.   I believe Alex has borrowed -- my cousin has borrowed a small amount of money.  I think it's something like 20,000, I'm not sure.

Q.   And Alex is your cousin, Alex Kosiakov, correct?

A.   Yes.  I'm not sure if that's true.  Could I check with my attorney?

Q.   No, you're under oath right now.

A.   Okay.  I'm not sure if he is paying.  I hear that he could have borrowed some amount of money.  I don't think he's paying for it, I think he expects me to pay it back.

Q.   A few minutes ago we took a break in this case. During that break, did you discuss your testimony with anybody else?

A.   No.

Q.   Who is paying for -- has anyone else paid for Maksim Nemtsev aside from you out of your Binance account?

A.   I don't think anybody does.  It would be -- I would be really surprised if anybody did and I didn't know about it.

Q.   But to your knowledge nobody else is paying?

A.   No.

Q.   And you're aware that your lawyers are soliciting donations or contributions for your legal expenses?

A.   Yes.

Q.   And there's a Bitcoin address on your lawyer's

firm's website for those donations to your legal expenses, correct?

A. I have heard about that, yeah.

Q. And are you aware that on December 22nd, 2022, someone donated 1.9899 Bitcoin to that address?

A. I was not.

Q. And at contemporary prices, that's about $33,000?

A. What was the date, I'm sorry?

Q. The date was December 22nd, 2022. So it was one day after your lawyers filed their supplemental filing before the Court. If you could turn to Government's Exhibit 11. Actually, also pull out Government's Exhibit 8, please. So if you'd look at Government's Exhibit 8, at the top of that printout.

This is a printout from your lawyer's website, correct?

A. I would have to trust you, I don't have any internet or access to --

Q. Understood. And I'm pointing at the space near the top that says "Donate" -- or in the middle that says "Donate BTC." And then there's an address that starts 38 --

A. Right.

Q. -- lowercase T, uppercase T, correct?

A. Yes.

Q. Then in Government's Exhibit 11, this is a

printout from a commonly used blockchain explorer called walletexplorer.com, correct?

    A.   It looks like that.

    Q.   And it has that same address, 38 lowercase T, uppercase T, so forth, and that shows a transaction for 1.9899 Bitcoin on December 22nd, 2022, correct?

    A.   Yes.

    Q.   But you have no knowledge of that contribution?

    A.   I do not.

    MR. BROWN:  No further questions, Your Honor.

    THE COURT:  Redirect.

    MR. BROWN:  Your Honor, sorry, one last housekeeping measure.  The Government would move to admit the Government's Exhibits 2, 5, 7, 8, 10 and 11.

    THE COURT:  Any objection?

    MR. EKELAND:  No objection, Your Honor.

    THE COURT:  Those exhibits are admitted.

   (Government's Exhibits 2, 5, 7, 8, 10 and 11 admitted into evidence)

**REDIRECT EXAMINATION OF ROMAN STERLINGOV**

BY MR. EKELAND:

    Q.   Directing your attention to the defendants -- excuse me, may I have one moment, Your Honor?

    THE COURT:  Yes.

    MR. EKELAND:  Thank you.  May I proceed?

THE COURT: You may proceed.

BY MR. EKELAND:

Q. Mr. Sterlingov, directing your attention to the defendant's exhibit book, tab B.

A. Yes.

Q. Just directing your attention to the first page, the first row, and then the column -- the second column from all the way on the right that's titled U.S. dollar value on December 21st, 2022.

Do you see that?

A. Yes.

Q. Does that mean that the values that you gave in this statement of net worth were the values that you believed to be correct on that day, December 21st, 2022?

A. Yes.

Q. And directing your attention to the Jaxx account, which is --

A. I do believe that explains Monero as well.

Q. I'm sorry, I didn't hear you?

A. I think I said earlier that I thought there was a typo in the Monero entry. I think that explains the -- I think that there is a typo, so the value of Monero at the time was zero dollars.

Q. Okay. And you recall that we've been trying to -- we've tried to and accessed your crypto accounts to pay for

your legal defense, correct?

A. Yes, we have been trying to access everything we can and find money wherever we can.

Q. And it's your understanding that when we, the firm, manage to access one of your accounts and we liquidate it, that we transfer it to the firm's crypto account, correct?

A. Yes.

Q. And you have no reason to think that when we do those transfers, we wouldn't transfer it to the same Bitcoin wallet address as we use for your legal defense fund, do you?

A. I haven't thought about that. It doesn't sound strange to me.

Q. Right, because you don't actually have any direct knowledge of how our law firm transfers crypto payments to our law firm, do you?

A. I really do not.

Q. And you weren't involved in setting up the legal defense fund, were you?

A. No, you guys did that.

Q. But as far as you know, there hasn't been a single donation to your legal defense fund, has there?

A. As far as I know, there haven't been any donations to my legal defense fund.

Q.   And as far as you know, beyond what you said about Mr. Kosiakov, Alex, perhaps borrowing some money to fund this defense, has anyone but you funded this defense?

A.   Nobody.

MR. EKELAND:  I pass.  No further questions subject to recall, if we get to part two, Your Honor.

THE COURT:  Well, thank you.  So we're obviously, just at a minimum for time reasons, not going to get to part two today.  And let me tell you just a little bit of my thinking -- and I should stress that this is all tentative, and I need to go look at some of the case law and look at things more carefully at this point.  But I think that there's a good chance, to my mind, that the defendant has satisfied the requirements to get to step two.  My concern, though, is that this is a highly technical case that does require counsel with experience dealing with the type of technology that's at issue here.

Based on the papers, and not having heard any of the testimony at this point, I'm concerned that even if we get to the step two of the analysis, that the Government is going to be able to carry its burden of showing traceability.  And just to give you one example of that.  As I understand it, Mr. Sterlingov does not dispute the proposition that the money that is in the frozen account did come from the account -- I'm sorry, from the Bitcoin Fog

account. And the Government makes -- at least without having heard argument on it and having heard from the witnesses, what strikes me as a plausible argument that if I assume the probable cause is satisfied with respect to the charges in the indictment, that part of the function of the Bitcoin Fog is to mix as much cryptocurrency as possible. And that to the extent the funds came out of Bitcoin Fog, and assuming probable cause with respect to the findings, it strikes me as at least plausible.

I obviously need to hear more that that would be sufficient on its own to establish traceability without the other arguments that the Government has made. My concern is that if we end up going down that road, that the result may be that Mr. Sterlingov may in effect lose not only the counsel of his choice here, but counsel with some experience dealing with novel issues as those presented here. And so what I've been trying to do is think through whether there's some other solutions.

And I'm not giving you a ruling on anything at this point. The reason I'm teeing this up for you is I want you all to at least have the benefit of my thinking to see if we can come up with a creative solution that allows him to have the counsel of his choice, but consistent with the law. And in particular, the law governing the seizure of accounts that may be subject to forfeiture at the end of the

case.

One thing that occurred to me as a possibility that, Mr. Ekeland, maybe you want to pursue -- and I'm happy to pursue it myself if you'd think it would be helpful for me to do so, would be to see if the Federal Public Defender might be willing, in light of Mr. Sterlingov's financial circumstances, to reenter an appearance in this case, but then to permit you to serve as co-counsel with them. And if the Federal Public Defender is counsel in the case, I suspect under those circumstances the CJA funds -- or the funds from their office would be available to pay reasonable expert fees under the circumstances.

If we did it in that fashion, it may be that it would put less of a strain as well on your firm and you personally, even if the funds weren't available to you to pay your usual rates. But if you had experienced D.C. co-counsel from the Federal Public Defender working with you, maybe that's a workable solution. I'm not saying I've reached that conclusion that that's what should happen. I suppose all I'm doing at this point is saying before we return for a continuation of the hearing, is that something that you would like me to explore with the Federal Public Defender, Mr. Ekeland, or is it something you'd like to explore with him, or do you want to confer with Mr. Sterlingov before you answer that question?

MR. EKELAND: We're happy to have the Court explore that, Your Honor. I was talking to Mr. Fischbach on the break, and he said what are the issues. And I haven't confirmed this with the CJA, but it's that they don't pay you until the end of the case. So that would cause problems for bringing in Mr. Fischbach, but --

THE COURT: Mr. Fischbach is the expert?

MR. EKELAND: The expert that we were bringing in. But I think it's certainly worth exploring, because I think this is a really important case. So if the Court is willing to do that --

THE COURT: That's something you would be doing is serving in what might be a pro bono capacity as co-counsel along with --

MR. EKELAND: I don't think pro bono, but if I'm going --

THE COURT: If they can pay you a CJA rate for it, that would be fine with me. I just don't know the answer to the question of whether they can do that or not.

MR. EKELAND: I think we should explore it. I think this is an important case. And I will say that my one experience when I've ever asked to -- my few experiences asking to co-counsel with federal defenders, they've always said no. But if the Judge asks, maybe they'll change their policy.

THE COURT: Well, I'm not sure that I carry the particular weight in that regard. But it does strike me that they might see some benefit in somebody who actually has experience dealing with the relevant technology. And I have had at least one complicated case where the Federal Public Defender was counsel, and at their request I appointed another lawyer to be co-counsel with them just because it was such a large case or a labor intensive case.

So I'll call and see what they say. And if I think that it would be helpful to have a conversation about it, I may just get you all on the telephone just to talk about those logistics.

MR. EKELAND: Thank you.

THE COURT: In the meantime, I think we should go ahead and schedule phase two of this proceeding. I think January 31st is the day that everyone was available?

MR. EKELAND: Yes.

MR. BROWN: That's right.

THE COURT: Do you want to talk to your expert there for a minute, Mr. Ekeland?

MR. EKELAND: We're fine, Your Honor. Thank you.

THE COURT: What time, Kristin?

DEPUTY CLERK: 10:00 a.m.

THE COURT: So 10:00 a.m. So we'll see you all back here at 10:00 a.m. on the 31st. We'll talk before then

if there's something to confer about. And I assume that, Mr. Brown, the Government just doesn't have a stake one way or the other with respect to the Federal Public Defender's views?

MR. BROWN: Your Honor, no, we don't. But just for the Court's attention, just based on our personal experience, we've had cases involving cryptocurrency with FPD, and they have very capable attorneys who are very knowledgeable in this field.

THE COURT: On that issue as well, I know they have very capable lawyers. I wasn't sure whether they had it on this issue.

MR. BROWN: They're all very capable, but with experience with cryptocurrency.

THE COURT: Well, that's good to know, thank you. So I will see you all back here on the 31st, and we'll talk in the interim if necessary.

(Proceedings adjourned at 4:42 p.m.)

# C E R T I F I C A T E

I, **Jeff M. Hook, Official Court Reporter**, certify that the foregoing is a true and correct transcript of the record of proceedings in the above-entitled matter.

February 9, 2023

DATE

Jeff M. Hook

**$**

$1,000 [2]    8/5
 16/21
$10,000 [3]    13/8
 18/15 38/8
$100,000 [1]    19/24
$12,000 [1]    42/10
$160,000 [1]    19/8
$184,000 [2]    20/19
 22/15
$188,000 [1]    18/11
$2.6 [1]    7/12
$2.6 million [1]
 7/12
$20,000 [1]    42/13
$200,000 [1]    20/20
$25,000 [3]    8/14
 9/9 29/24
$250,000 [1]    19/11
$28,000 [1]    18/9
$33,000 [1]    68/7
$390,000 [1]    18/17
$4,000 [1]    40/10
$400,000 [1]    20/24
$43,000 [2]    18/11
 41/2
$5,000 [4]    7/22
 32/23 36/19 47/3
$50,000 [1]    39/9
$500 [5]    16/17
 16/24 19/2 51/15
 53/10
$500,000 [2]    19/15
 19/18
$600,000 [3]    19/25
 20/18 22/3
$700,000 [1]    20/11
$760,000 [1]    30/11
$8,000 [1]    38/21
$830,000 [3]    7/11
 20/11 21/19
$94,000 [1]    18/10

**.**

.1 [1]    39/25
.3 [1]    40/9
.4 [1]    40/9

**0**

0399 [1]    1/4

**1**

1.9 [1]    38/17
1.9899 [2]    68/5
 69/6
10 [8]    2/21 7/7
 57/17 57/18 59/25
 60/7 69/14 69/18
10005 [1]    1/20
10:00 a.m [3]    76/23
 76/24 76/25
11 [5]    2/22 68/12
 68/25 69/14 69/18
12,000 [1]    47/17
13 [2]    1/5 62/20
15 [2]    23/9 57/18
18 [1]    3/21
1:21-cr-0399 [1]
 1/4

**2**

20 [2]    42/10 42/11
20,000 [2]    47/17
 67/3
20001 [2]    1/14 1/25
2020 [1]    65/8
2021 [5]    51/12
 51/24 52/3 52/9
 64/3
2022 [5]    68/4 68/9
 69/6 70/9 70/14
2023 [1]    1/5
20530 [1]    1/16
21 [1]    3/25
21-399 [1]    3/3
21st [2]    70/9 70/14
22nd [3]    68/4 68/9
 69/6
28 [1]    2/15
2:15 [1]    1/6

**3**

30 [1]    1/19
31 [1]    2/5
31st [3]    76/16
 76/25 77/16
33.4 [1]    41/7
333 [1]    1/24
38 [2]    68/21 69/4
399 [1]    3/3
3:42 p.m [1]    57/23

**4**

40 [2]    19/5 19/10
44 [1]    2/6
4700-C [1]    1/24
4:00 [1]    57/20
4:06 [1]    57/24
4:42 p.m [1]    77/18

**5**

51 [1]    46/7

**6**

601 [1]    1/13
69 [7]    2/7 2/17
 2/18 2/19 2/20 2/21
 2/22

**8**

853 [1]    3/25
8th [1]    1/19

**9**

950 [1]    1/16
982 [1]    3/22

**A**

a.m [3]    76/23 76/24
 76/25
abbreviation [1]
 66/10
ability [1]    61/8
able [21]    8/16
 11/10 11/11 11/19
 12/17 13/3 14/20
 14/25 22/14 23/24
 26/19 27/1 33/25
 34/8 35/10 39/4

39/12 52/6 60/19
 62/1 72/21
above [3]    37/8 42/1
 78/5
above-entitled [1]
 78/5
absent [2]    22/25
 24/19
absolutely [3]
 27/25 39/22 41/20
abundance [1]    43/9
accept [1]    15/16
access [31]    20/2
 23/1 27/17 29/6
 33/14 33/21 33/23
 34/2 34/7 34/8 35/6
 37/16 37/19 38/21
 39/4 39/9 39/12
 39/18 40/3 40/5
 40/6 40/10 40/14
 40/16 43/16 43/18
 50/16 63/9 68/18
 71/2 71/5
accessed [3]    20/21
 41/2 70/25
accessing [3]    20/22
 34/23 39/2
account [92]
accounts [38]    33/22
 34/3 34/6 34/9
 34/23 35/16 37/24
 38/14 38/16 41/24
 42/16 42/17 42/21
 43/20 43/23 44/2
 49/1 49/3 49/5 51/2
 51/3 51/7 51/22
 54/2 55/13 55/14
 55/19 56/8 56/10
 56/21 59/20 59/21
 59/22 62/11 63/9
 70/25 71/5 73/25
acquittal [1]    23/25
across [1]    14/14
Act [1]    11/14
Action [1]    1/3
actually [15]    12/2
 15/11 19/7 23/7
 23/17 29/22 36/15
 36/18 41/2 43/9
 47/1 49/16 68/12
 71/15 76/3
addition [2]    22/21
 45/2
address [6]    4/25
 67/25 68/5 68/21
 69/4 71/11
addressed [1]    23/8
addresses [3]    9/12
 9/13 13/18
adds [2]    7/18 7/21
adjourned [1]    77/18
admit [1]    69/13
admitted [14]    2/15
 2/17 2/18 2/19 2/20
 2/21 2/22 28/15
 28/16 28/17 35/12
 35/14 69/17 69/18
admitting [2]    28/12
 28/14
advance [3]    4/1 4/8

19/23
advocate [1]    23/5
advocates [1]    10/17
affidavit [1]    64/11
affidavits [1]    5/3
afford [3]    8/24
 11/11 26/20
afternoon [7]    3/6
 3/8 3/10 3/11 3/17
 3/18 44/16
again [10]    11/15
 12/9 13/25 14/6
 19/11 19/21 19/24
 46/15 58/24 60/5
against [1]    6/5
ago [6]    16/20 22/2
 42/25 48/20 63/8
 67/11
agree [1]    27/25
ahead [4]    6/16 46/2
 57/19 76/15
AJ [1]    12/16
ALDEN [2]    1/15 3/8
Alex [10]    35/9
 35/18 35/18 35/23
 35/24 35/25 67/1
 67/4 67/4 72/2
alleged [1]    4/18
allow [1]    65/25
allowing [1]    66/14
allows [1]    73/22
almost [1]    32/17
along [2]    3/13
 75/14
Although [2]    16/13
 21/3
always [4]    9/22
 9/24 13/24 75/23
Amendment [1]    21/23
AMERICA [4]    1/3 3/3
 51/12 52/19
American [1]    51/20
amount [29]    8/22
 13/1 13/16 19/4
 22/4 26/21 33/12
 38/6 39/21 40/20
 41/7 43/1 46/23
 46/24 46/25 47/3
 47/9 47/9 47/10
 47/12 47/13 52/15
 59/24 66/18 66/19
 66/19 66/20 67/2
 67/9
amounts [7]    20/1
 35/18 36/17 38/5
 38/10 42/22 49/4
analogy [1]    10/14
analysis [10]    5/6
 9/12 9/21 13/4 14/7
 19/22 20/5 20/18
 21/16 72/20
and/or [2]    5/15
 44/9
answered [3]    38/11
 48/23 66/2
anticipated [4]
 7/24 18/1 20/17
 33/1
anticipating [1]
 7/25

# A

anymore [1]    50/20
appear [1]    58/19
appearance [1]    74/7
APPEARANCES [1]
  1/11
appellate [1]    10/16
application [1]
  3/14
appointed [7]    11/18
  11/18 11/19 12/8
  12/13 25/12 76/7
appointing [1]    27/4
appropriate [2]
  22/14 34/20
approval [1]    11/19
approve [1]    25/9
approximately [6]
  39/8 40/1 51/14
  53/10 61/11 66/6
approximating [1]
  33/11
April [9]    7/1 8/11
  17/19 17/25 51/12
  51/24 52/3 52/9
  64/3
April 2021 [3]
  51/24 52/3 52/9
area [3]    7/17 24/16
  24/23
argue [1]    28/2
arguing [2]    15/11
  21/13
argument [6]    25/18
  25/19 25/24 26/1
  73/2 73/3
arguments [1]    73/12
around [3]    13/20
  42/9 60/18
arrangement [1]
  24/7
arrangements [1]
  24/6
arrested [3]    63/21
  64/3 64/10
aside [4]    47/5
  47/20 53/13 67/16
aspects [1]    5/5
assertion [1]    5/22
assertions [1]
  41/18
asset [1]    53/14
assets [24]    3/19
  3/22 4/12 4/18 5/22
  16/7 16/11 20/7
  22/21 23/11 23/21
  25/21 33/15 33/15
  35/7 36/23 37/8
  44/12 46/10 50/12
  50/14 51/9 51/10
  53/9
assist [1]    3/20
assistance [1]
  45/12
assistant [1]    13/25
assisted [1]    44/21
associate [1]    28/7
assume [3]    51/21
  73/4 77/1

assuming [2]    27/16
  73/8
attachment [1]
  50/13
attack [1]    4/20
attention [7]    41/22
  46/7 69/22 70/3
  70/6 70/16 77/6
attested [1]    20/2
attorney [5]    17/2
  35/8 35/13 35/15
  67/6
attorney's [3]
  20/23 41/3 45/12
attorneys [5]    19/20
  43/17 45/10 51/20
  77/8
attributions [1]
  14/15
August [1]    17/20
AUSA [1]    3/6
availability [1]
  25/6
available [16]    3/20
  11/14 11/24 22/4
  25/3 25/11 25/12
  26/5 26/14 30/3
  30/6 30/16 35/12
  74/11 74/15 76/16
Ave [1]    1/16
Avenue [1]    1/24
avoided [2]    5/8 5/9
aware [7]    15/20
  46/10 56/25 65/7
  65/24 67/22 68/4
away [1]    18/24

# B

B-I-S-Q [1]    61/20
back [14]    3/15
  14/17 26/2 27/4
  29/3 36/21 41/25
  47/24 57/20 57/24
  66/5 67/10 76/25
  77/16
balance [4]    49/19
  54/21 54/24 63/7
ballpark [2]    7/10
  19/24
bank [39]    33/11
  36/4 47/25 47/25
  48/2 48/4 48/6
  48/11 48/12 48/12
  48/21 49/1 49/5
  49/6 49/9 49/10
  49/11 49/13 49/15
  49/17 49/18 49/18
  49/20 51/1 51/2
  51/3 51/7 51/9
  51/13 51/14 51/20
  51/22 53/11 53/15
  54/14 54/17 54/18
  54/21 54/25
Bankruptcy [1]    1/23
based [7]    7/6 10/11
  14/9 18/6 18/17
  72/18 77/6
basic [2]    7/23
  35/19
basically [4]    8/15

8/20 14/10 39/24
basis [2]    15/12
  26/15
becomes [1]    44/10
becoming [1]    6/8
beforehand [1]    8/3
begin [2]    55/2
  61/10
believes [1]    24/22
bells [2]    17/8
  18/21
belongs [1]    14/12
below [8]    36/4 37/4
  37/21 38/14 38/15
  40/9 42/15 62/3
beneath [2]    37/20
  41/5
benefit [2]    73/21
  76/3
besides [2]    53/21
  66/25
best [5]    36/23 38/7
  40/1 43/4 61/8
better [3]    9/2
  41/18 42/20
beyond [4]    5/22
  5/24 5/25 72/1
big [1]    28/1
bill [2]    13/8 18/15
billing [3]    16/20
  16/22 17/2
Binance [5]    38/15
  38/16 38/17 56/4
  67/16
binder [2]    45/23
  58/3
Bisq [6]    61/19
  61/23 61/24 62/7
  62/10 62/13
bit [9]    6/22 9/11
  21/20 28/19 29/7
  60/14 61/7 62/18
  72/9
Bitcoaster [6]
  53/24 54/3 54/9
  54/15 54/18 54/22
Bitcoin [19]    9/13
  14/12 20/19 38/18
  39/8 39/25 40/9
  40/21 41/1 43/14
  43/25 57/7 67/25
  68/5 69/6 71/10
  72/25 73/6 73/7
Bitfinex [2]    39/24
  56/4
Bleutrade [3]    40/9
  40/22 56/5
blockchain [9]    7/15
  7/16 8/1 8/23 9/2
  13/3 13/4 19/22
  69/1
blockchain.com [2]
  56/13 56/18
blockchain.info [2]
  56/14 56/18
bono [3]    23/6 75/13
  75/15
book [2]    31/22 70/4
borrowed [3]    67/1
  67/2 67/9

borrowing [1]    72/2
both [3]    4/22 25/17
  54/12
bottom [3]    17/15
  17/16 17/16
Breadcrumbs [2]    9/7
  13/19
break [6]    51/23
  57/16 57/19 67/11
  67/12 75/3
brief [1]    23/9
bring [3]    7/25 8/4
  16/3
bringing [2]    75/6
  75/8
brings [1]    20/20
Brooklyn [1]    1/20
brought [1]    23/4
BROWN [13]    1/12 2/6
  3/7 15/10 25/19
  26/11 28/11 28/20
  29/4 44/6 57/14
  57/25 77/2
brute [1]    28/4
BTC [4]    39/15 63/1
  63/5 68/21
BTC-e [2]    63/1 63/5
budget [14]    6/25
  7/8 8/6 9/23 10/13
  12/11 15/4 15/6
  15/13 15/16 15/17
  17/2 21/18 28/9
budgets [1]    7/5
bullet [4]    61/17
  62/3 62/4 62/20
bullets [2]    62/20
  62/20
bullion [1]    36/9
burden [9]    5/1 22/7
  22/7 22/7 22/11
  22/25 24/2 28/21
  72/21
business [11]    37/22
  38/9 49/6 49/10
  49/11 49/12 49/23
  53/24 54/13 54/20
  54/23
businesses [2]
  53/21 54/7
buy [1]    33/6

# C

call [7]    15/1 22/8
  33/25 52/14 56/1
  56/12 76/9
called [9]    9/7
  35/13 48/11 49/14
  53/24 57/12 58/11
  59/15 69/1
calling [2]    3/2
  8/20
calls [2]    10/16
  31/11
came [1]    73/7
can [55]    3/25 4/2
  4/8 4/15 5/2 5/4
  5/8 7/3 7/9 7/23
  9/10 9/15 12/5
  12/19 12/19 12/22
  13/14 13/20 15/24

# C

can... [36]   17/10 18/23 28/2 29/6 29/8 30/1 30/22 31/2 31/7 33/4 33/19 34/16 34/19 38/22 38/24 39/9 40/6 40/10 41/20 41/25 42/16 43/4 44/12 46/2 49/5 56/12 60/21 60/22 61/6 61/8 64/1 71/3 71/3 73/22 75/17 75/19

capable [3]   77/8 77/11 77/13

capacity [1]   75/13

capital [1]   9/14

Caplin [5]   23/8 25/18 25/23 26/13 29/3

car [3]   34/3 34/3 34/4

carefully [1]   72/12

carried [2]   5/1 64/12

carry [2]   72/21 76/1

carrying [2]   63/22 64/9

case [65]   3/2 3/14 3/19 4/9 4/20 6/9 6/15 7/14 7/15 7/19 8/4 8/7 8/17 9/10 9/13 9/25 10/15 10/18 10/21 11/5 11/9 19/1 19/7 19/10 19/19 20/9 20/13 23/6 23/6 23/11 23/20 24/5 24/7 24/9 24/16 24/21 24/23 26/3 26/4 26/13 26/19 26/21 27/1 27/11 27/12 28/13 28/23 29/4 29/5 29/13 35/11 44/25 62/9 67/11 72/11 72/15 74/1 74/7 74/9 75/5 75/10 75/21 76/5 76/8 76/8

cases [1]   77/7

cash [2]   53/12 53/13

cause [6]   4/3 4/6 4/21 73/4 73/8 75/5

caused [1]   18/15

caution [1]   43/9

certain [3]   40/22 48/22 62/14

certainly [6]   19/18 20/10 25/23 40/16 54/24 75/9

certify [1]   78/4

Chainalysis [3]   9/4 9/7 13/19

challenge [1]   4/10

chambers [1]   22/20

chance [2]   25/16

72/13

change [3]   41/21 43/1 75/24

changed [1]   63/3

changes [1]   47/21

charge [4]   13/10 13/11 16/1 16/17

charged [1]   5/13

charges [1]   73/5

cheap [1]   9/25

cheaper [2]   13/9 21/20

cheapest [1]   13/25

cheaply [1]   9/24

check [4]   39/19 46/15 64/25 67/5

checked [1]   20/25

checkup [1]   34/4

choice [7]   22/13 23/2 23/23 27/15 27/18 73/15 73/23

Chris [1]   3/7

CHRISTOPHER [1] 1/12

circuit [1]   29/1

circumstance [1] 5/13

circumstances [5] 11/21 11/23 74/7 74/10 74/12

cited [1]   23/9

City [1]   7/21

CJA [11]   11/20 12/5 19/4 19/17 25/3 25/6 25/8 25/10 74/10 75/4 75/17

claiming [1]   43/22

Clarence [1]   27/19

clarification [1] 55/12

clarify [1]   55/1

clear [8]   6/1 15/23 22/15 24/24 29/2 30/12 56/11 60/23

client [1]   29/2

close [2]   20/24 64/2

closed [5]   49/24 50/2 50/7 50/9 63/8

cluster [3]   14/9 14/12 43/23

clustering [1]   9/5

co [5]   74/8 74/17 75/13 75/23 76/7

co-counsel [5]   74/8 74/17 75/13 75/23 76/7

Coinbase [1]   14/12

collection [1] 60/25

COLUMBIA [2]   1/1 12/17

column [2]   70/7 70/7

comment [1]   27/14

committed [2]   4/3 4/21

common [1]   66/10

commonly [1]   69/1

communication [1]

36/8

communications [1] 22/19

companies [5]   50/19 50/21 54/5 54/10 54/11

company [4]   9/6 49/17 50/15 54/7

competitor [1]   9/7

complete [2]   19/24 28/13

completely [1]   51/6

complex [1]   7/15

complicated [1] 76/5

computer [2]   33/24 62/1

conceivably [1] 22/3

concept [1]   14/9

concepts [1]   9/5

concern [2]   72/14 73/12

concerned [2]   43/14 72/19

conclude [6]   4/25 11/25 21/4 21/5 21/5 21/8

conclusion [1] 74/19

conduct [2]   4/15 4/16

confer [3]   6/7 74/24 77/1

confine [1]   44/12

confirm [1]   15/15

confirmed [1]   75/4

confusing [3]   41/14 41/17 42/18

connect [1]   35/17

connection [1]   4/5

considerably [1] 19/3

consideration [2] 15/25 20/6

consistent [1] 73/23

Constitution [1] 1/24

constitutional [1] 21/21

contact [4]   35/2 35/17 49/23 50/20

contacted [1]   35/8

contains [2]   59/1 59/2

contemporary [1] 68/7

contingency [1] 24/13

contingent [1]   24/7

continuation [1] 74/21

continue [1]   57/25

contribution [1] 69/8

contributions [1] 67/23

control [2]   13/15 50/16

conversation [2] 12/15 76/10

conviction [1]   4/7

convince [1]   4/2

cookies [1]   21/24

copied [2]   59/5 61/3

copies [1]   31/25

copy [1]   7/5

correcting [1] 46/20

correction [1] 47/11

corrections [2] 47/6 47/20

Corrine [1]   3/13

cost [4]   7/21 10/12 16/1 17/17

costs [8]   5/7 5/8 5/8 7/19 10/7 11/15 15/17 20/17

counsel [31]   3/4 3/5 8/17 11/18 11/18 11/19 12/6 12/13 19/2 22/13 23/1 23/22 25/4 25/12 27/4 27/14 27/18 27/19 29/6 34/13 72/16 73/15 73/15 73/23 74/8 74/9 74/17 75/13 75/23 76/6 76/7

counsel's [1]   26/14

count [3]   49/6 49/7 54/19

countries [1]   51/4

country [1]   10/17

couple [1]   17/13

course [2]   26/1 46/16

court [30]   1/1 1/22 1/23 3/13 4/2 4/15 4/19 5/19 6/4 7/14 10/15 11/19 23/5 23/10 23/14 23/19 24/4 25/8 25/9 26/12 26/13 26/25 27/1 28/21 29/1 31/24 68/11 75/1 75/10 78/3

Court's [4]   6/23 23/8 62/17 77/6

Courts [1]   1/23

cousin [3]   35/25 67/1 67/4

cover [1]   11/14

cr [1]   1/4

creative [1]   73/22

crime [1]   4/5

criminal [4]   1/3 3/2 11/14 24/9

cross [5]   2/6 6/2 22/9 44/11 44/14

cross-examination [3] 2/6 6/2 44/14

cross-examine [1] 22/9

crypto [15]   29/23 30/14 38/14 41/23 42/16 42/17 42/21

**C**

crypto... [8]   43/2
43/10 43/11 44/2
56/21 70/25 71/6
71/16
cryptocurrencies [1]
65/25
cryptocurrency [19]
37/5 37/9 39/24
42/4 51/9 52/25
53/1 55/1 55/4 55/7
55/13 57/5 57/7
59/18 62/10 66/11
73/6 77/7 77/14
cuff [1]   19/24
currency [5]   51/13
53/9 53/14 53/16
59/17
custodial [8]   55/4
55/6 55/14 55/17
55/25 56/2 56/7
56/12

**D**

D.C [5]   7/20 8/2
29/1 35/12 74/16
Darrow [1]   27/20
data [6]   13/2 13/3
13/6 14/21 28/5
39/1
date [7]   5/3 8/22
61/15 65/11 68/8
68/9 78/10
day [8]   8/5 24/20
24/20 61/4 61/5
68/10 70/14 76/16
DC [4]   1/5 1/14
1/16 1/25
deal [1]   60/19
dealing [4]   19/21
72/16 73/16 76/4
debt [2]   24/12
24/14
December [7]   17/21
17/22 68/4 68/9
69/6 70/9 70/14
December 21st [2]
70/9 70/14
December 22nd [3]
68/4 68/9 69/6
decentralized [1]
65/19
decision [1]   23/8
declaration [19]
5/15 6/4 30/2 30/20
30/22 44/9 45/3
45/5 45/8 45/18
46/4 46/8 46/9 47/6
47/7 50/13 51/21
62/12 62/14
deductive [1]   14/17
defendant [18]   1/7
1/18 3/12 4/3 4/11
4/12 4/14 4/20 5/13
7/19 22/25 23/11
23/20 24/1 24/5
27/20 34/13 72/13
defendant's [10]
3/19 4/1 4/7 7/3

10/14 16/7 22/6
22/21 31/21 70/4
defendants [3]
23/23 24/2 69/22
defender [8]   12/10
12/16 33/20 74/5
74/9 74/17 74/23
76/6
Defender's [1]   77/3
defenders [1]   75/23
defense [23]   2/15
3/21 5/1 5/20 5/20
6/17 17/20 17/21
22/14 24/20 24/21
28/15 28/17 29/20
31/11 44/19 71/1
71/11 71/20 71/23
71/25 72/3 72/3
deficiencies [1]
16/6
define [1]   52/23
definitely [1]
12/22
demanding [1]   4/23
denied [1]   12/21
deny [1]   10/22
depending [2]   12/14
57/18
depression [1]
60/15
deprived [3]   23/1
27/18 27/20
describes [1]   29/5
deserve [2]   10/3
26/10
detail [1]   48/10
details [1]   35/21
determination [2]
4/9 4/21
device [1]   55/10
devices [3]   37/19
55/21 58/12
difference [1]   29/5
different [12]
14/14 14/14 17/16
24/13 42/24 42/24
55/9 59/23 60/16
60/21 61/6 62/15
difficulties [2]
39/2 60/17
direct [4]   2/5
15/21 31/19 71/15
directing [6]   41/22
46/7 69/22 70/3
70/6 70/16
direction [1]   14/4
directly [6]   23/7
36/4 38/20 40/8
40/24 42/15
disagree [3]   20/8
21/17 27/22
discharge [1]   19/12
disclosed [2]   20/21
30/1
disclosure [1]
22/18
discovered [1]   13/6
discovery [7]   13/8
13/11 15/4 15/7
18/15 18/17 28/3

discuss [1]   67/12
discussing [1]   12/2
dispute [1]   72/23
DISTRICT [5]   1/1
1/1 1/10 1/23 12/17
doc [2]   28/4 28/7
document [6]   32/3
32/5 46/5 61/16
62/8 62/18
DOJ [2]   1/13 1/15
dollar [6]   47/9
47/10 47/11 47/16
66/19 70/8
dollars [10]   16/10
16/12 17/9 29/21
29/24 30/14 32/20
40/1 43/2 70/23
Donate [2]   68/20
68/21
donated [1]   68/5
donation [2]   29/22
71/23
donations [3]   67/23
68/1 71/24
done [7]   7/7 8/21
9/16 12/19 12/20
32/2 35/1
door [1]   6/1
double [1]   19/6
doubts [1]   20/6
down [20]   8/2 18/16
21/9 22/2 22/3
23/15 37/25 40/25
41/23 43/3 60/21
60/22 61/18 62/18
62/20 64/15 64/18
64/24 66/6 73/13
draft [1]   6/25
drive [1]   43/7
Drysdale [5]   23/9
25/19 25/24 26/13
29/4
duration [1]   52/16
During [1]   67/12

**E**

e-discovery [3]
13/8 13/11 15/7
e-mail [1]   6/23
earlier [4]   46/19
47/2 50/11 70/20
earn [1]   66/15
easy [4]   11/3 28/8
33/14 33/21
eat [2]   10/7 11/6
Eclair [6]   38/15
38/16 38/20 39/11
56/24 57/1
effect [1]   73/14
effort [3]   10/4
27/7 27/10
eight [4]   13/21
16/20 16/23 41/1
either [5]   20/21
20/21 39/9 40/10
65/22
EKELAND [19]   1/18
1/19 2/5 2/7 3/12
17/18 17/24 18/3
18/14 18/23 23/3

24/11 24/15 25/16
25/17 28/18 74/3
74/23 76/20
Ekeland's [2]   18/6
18/18
electronic [1]
55/21
element [2]   25/7
45/11
ellipses [1]   23/23
else [13]   14/7
29/23 35/14 37/1
50/16 50/21 59/3
59/6 66/22 66/24
67/13 67/15 67/20
else's [3]   37/2
50/22 50/23
emergent [1]   7/16
empty [2]   48/8
62/15
end [14]   7/10 9/8
16/23 17/10 17/12
17/20 18/8 19/19
21/19 36/18 52/9
73/13 73/25 75/5
end's [1]   7/11
English [4]   6/13
58/14 58/17 59/13
enough [5]   6/7 16/8
17/5 24/10 40/8
enter [2]   13/17
52/7
enthusiast [1]
42/23
entirely [1]   9/19
entitled [3]   11/17
22/8 78/5
entries [4]   36/4
36/22 55/2 55/22
entry [3]   13/2 37/4
70/21
equivalent [1]
42/10
equivocation [1]
29/7
error [2]   27/18
27/21
especially [3]
43/16 43/21 59/3
establish [3]   28/23
35/17 73/11
established [2]
4/19 29/3
estimate [15]   15/17
16/5 16/8 16/11
16/24 17/2 17/3
17/19 18/2 18/19
18/19 22/20 30/19
38/7 47/16
estimated [1]   33/1
estimation [1]
54/25
ETH [2]   66/7 66/10
Ethereum [9]   41/1
57/8 66/11 66/12
66/13 66/16 66/18
66/18 66/19
ethical [1]   24/9
Euros [1]   53/18
even [17]   5/7 9/21

# E

even... [15]   11/25
16/15 17/12 18/7
21/10 24/19 26/4
33/25 34/2 48/20
49/3 60/17 61/6
72/19 74/15
event [2]   23/25
26/4
everybody [4]   7/22
8/17 11/4 14/7
everyday [1]   60/18
everyone [2]   31/25
76/16
evidence [12]   2/15
2/17 2/18 2/19 2/20
2/21 2/22 5/14 5/18
28/12 28/17 69/19
exact [2]   43/4
47/15
exactly [4]   29/21
36/13 39/10 46/24
examination [7]   2/5
2/6 2/7 6/2 31/19
44/14 69/20
examine [2]   22/9
22/22
example [6]   16/16
23/4 35/20 55/16
55/17 72/22
exceed [1]   22/15
exceeds [2]   20/1
22/3
excellent [1]   11/2
excess [1]   16/17
exchange [11]   42/25
47/15 47/16 59/17
59/18 61/24 61/25
62/1 63/4 63/4
65/19
exchanged [1]   30/13
exchanges [1]   42/24
excuse [4]   6/21
42/12 49/20 69/23
exhibit [30]   2/14
2/15 2/17 2/18 2/19
2/20 2/21 2/22 7/3
28/12 28/15 28/16
28/17 31/22 32/1
44/19 46/2 46/10
46/16 58/3 59/25
60/7 63/19 64/14
66/6 68/12 68/12
68/13 68/25 70/4
Exhibit 10 [2]
59/25 60/7
Exhibit 11 [2]
68/12 68/25
Exhibit 2 [1]   46/2
Exhibit 5 [3]   63/19
64/14 66/6
Exhibit 7 [1]   58/3
Exhibit 8 [2]   68/12
68/13
Exhibit B [3]   32/1
46/10 46/16
Exhibit K [3]   7/3
28/15 28/16
exhibit list [1]

31/22
exhibits [5]   29/19
45/24 69/14 69/17
69/18
existed [1]   65/12
expanding [1]   24/16
expect [1]   13/16
expects [1]   67/10
expense [2]   13/13
18/8
expenses [19]   7/22
8/7 8/9 8/10 8/12
8/14 13/10 16/11
17/20 18/1 18/2
18/16 22/13 25/8
25/10 66/22 66/24
67/23 68/1
expensive [2]   7/18
28/6
experience [8]
10/12 14/1 72/16
73/15 75/22 76/4
77/7 77/14
experienced [1]
74/16
experiences [1]
75/22
expert [13]   3/15
12/24 14/2 14/4
15/13 15/18 15/20
18/3 28/24 74/12
75/7 75/8 76/19
expert's [1]   7/8
experts [17]   7/17
8/1 8/21 8/24 8/25
9/6 10/6 10/24
11/20 11/21 11/25
12/5 13/14 13/22
15/25 19/21 25/4
explain [6]   14/16
35/5 42/16 48/10
60/14 65/14
explained [2]   42/20
64/1
explains [2]   70/18
70/21
explore [5]   12/22
74/22 74/24 75/2
75/20
explored [4]   11/13
11/22 12/3 12/4
explorer [1]   69/1
exploring [1]   75/9
extended [2]   52/12
52/15
extent [5]   5/21
5/25 15/21 44/8
73/7
external [1]   14/18
extra [1]   18/8
extremely [1]   9/18

# F

factual [1]   15/12
fair [6]   8/21 17/5
24/10 26/21 40/8
43/8
fairly [1]   19/21
familiar [1]   53/2
family [6]   33/25

35/2 35/9 35/17
40/17 66/25
far [4]   33/10 71/22
71/24 72/1
fashion [2]   20/14
74/13
favors [1]   8/20
federal [9]   12/10
12/16 74/5 74/9
74/17 74/22 75/23
76/5 77/3
fee [4]   13/14 24/7
26/14 26/14
feel [1]   15/14
feeling [1]   29/7
fees [10]   20/23
23/25 32/15 32/16
33/10 38/18 41/3
49/25 50/4 74/12
felony [1]   5/14
few [3]   17/7 67/11
75/22
fiat [5]   52/20
52/21 53/1 53/4
53/5
field [1]   77/9
fifth [1]   41/23
figure [6]   15/1
17/14 21/14 41/19
63/16 65/5
figures [2]   20/16
46/20
figuring [1]   65/17
file [12]   58/6
58/11 59/1 59/7
59/12 60/2 60/11
60/11 60/13 60/24
61/12 64/1
filed [4]   17/21
36/11 44/24 68/10
files [3]   33/21
43/17 43/18
filing [2]   22/19
68/10
final [2]   5/11
45/16
financial [17]   5/19
15/22 15/23 22/18
27/13 44/18 46/16
47/5 47/7 47/21
47/24 51/8 54/2
55/2 55/13 62/12
74/6
find [4]   8/16 11/7
23/24 71/3
finding [2]   11/12
11/17
findings [1]   73/8
fine [5]   14/24 31/2
38/11 75/18 76/21
firm [8]   16/17
16/22 18/19 24/18
71/5 71/16 71/17
74/14
firm's [2]   68/1
71/6
firmer [1]   29/11
firms [1]   20/9
first [17]   4/12
4/25 11/2 17/3

25/10 25/11 28/20
31/5 31/6 31/8
35/11 38/17 47/24
51/25 66/5 70/6
70/7
Fischbach [6]   3/15
8/19 9/10 75/2 75/6
75/7
fits [1]   17/14
five [4]   39/8 42/25
53/8 57/20
flat [1]   13/14
flight [1]   52/16
flip [1]   32/1
Floor [1]   1/19
fluent [1]   6/13
fluff [1]   10/10
fluffy [1]   10/13
Fog [4]   14/12 72/25
73/6 73/7
follow [1]   6/18
For the Defendant [1]
1/18
force [1]   28/4
foregoing [1]   78/4
forensic [2]   7/16
9/19
forensics [4]   7/15
8/1 8/24 9/2
forfeitable [1]   4/7
forfeited [2]   23/12
23/22
forfeiture [4]   4/4
4/22 24/2 73/25
forget [1]   43/1
forgot [1]   61/5
forgotten [2]   43/7
43/15
form [3]   5/14 57/5
57/7
formerly [1]   56/18
forth [2]   28/24
69/5
found [2]   13/9 59/2
four [3]   19/5 38/14
52/14
FPD [1]   77/8
free [2]   10/18 12/7
freezing [1]   20/3
friend [1]   35/9
friends [2]   35/2
66/25
front [4]   30/10
31/22 45/24 47/15
frozen [3]   30/17
30/18 72/24
function [1]   73/5
fund [8]   19/17 25/6
29/20 71/11 71/20
71/23 71/25 72/2
funded [1]   72/3
funding [5]   11/14
27/2 27/10 29/16
29/18
fundraising [1]
11/8
funds [19]   11/24
21/1 21/6 22/5 23/1
24/19 25/3 26/4
26/5 27/17 29/6

## F

funds... [8]    35/11
44/10 49/22 62/2
73/7 74/10 74/11
74/15
further [5]    44/11
62/18 64/24 69/10
72/5
future [2]    8/9 24/2

## G

gain [1]    33/14
gallery [1]    3/16
gave [2]    50/10
70/12
generally [1]    13/14
Germany [6]    48/7
48/9 48/12 48/21
49/18 49/20
gets [3]    22/17 23/2
28/6
given [2]    27/13
31/9
gives [2]    8/7 17/25
giving [2]    40/13
73/19
God [1]    31/15
goes [2]    16/3 24/5
gold [14]    36/5 36/5
36/9 36/12 36/16
36/16 36/22 36/23
37/1 37/3 37/4
46/21 46/21 51/11
Goldmoney [2]    64/16
64/21
Gonzalez [1]    27/16
good [9]    3/6 3/8
3/10 3/11 3/17 8/4
44/16 72/13 77/15
governing [2]    21/11
73/24
government [36]
1/12 3/5 3/7 3/25
4/2 4/7 6/3 6/5
6/18 13/7 14/21
22/8 22/9 23/12
23/21 28/22 29/21
30/13 33/19 36/8
37/10 37/12 37/16
37/17 38/24 38/25
43/18 43/22 45/23
46/11 53/4 69/13
72/20 73/1 73/12
77/2
Government's [24]
2/17 2/18 2/19 2/20
2/21 2/22 9/16
14/23 15/4 29/19
35/5 46/2 58/3
59/25 60/7 63/19
64/14 66/6 68/11
68/12 68/13 68/25
69/14 69/18
grab [1]    30/22
grand [2]    4/20 7/10
granted [1]    10/15
great [2]    10/18
43/16
grow [1]    66/18

growing [1]    24/20
grunt [2]    9/11
13/17
guarantee [1]    12/23
guess [15]    14/16
20/4 20/12 32/10
33/17 38/6 40/2
43/21 51/25 53/17
54/16 59/13 61/17
61/24 61/24
guessing [3]    14/11
33/5 39/16
guesswork [2]    14/8
14/15
guys [5]    35/3 36/15
40/13 42/7 71/21

## H

hac [1]    3/14
half [4]    17/14
17/15 17/16 17/17
halfway [1]    66/6
hand [2]    15/25
31/12
handle [1]    26/4
handwritten [2]
63/22 64/9
happen [3]    9/23
10/24 74/19
happened [1]    4/8
happy [5]    8/6 9/1
28/9 74/3 75/1
hard [8]    9/9 9/22
9/22 33/17 34/5
35/20 43/7 61/13
harder [1]    33/1
hardship [2]    10/6
10/25
HASSARD [2]    1/18
3/12
have towards [1]
30/18
head [2]    30/10
60/22
heading [1]    62/18
hear [5]    23/17 38/3
67/8 70/19 73/10
heard [4]    68/3
72/18 73/2 73/2
hearing [9]    1/9
3/18 4/15 4/16 10/8
15/22 17/4 21/8
74/21
held [1]    28/21
Hello [1]    44/17
help [4]    31/15
34/23 51/18 60/16
helped [6]    35/3
35/3 35/16 35/16
35/17 35/21
helpful [2]    74/4
76/10
helping [2]    36/1
40/18
helps [1]    35/6
heuristic [2]    14/10
14/18
hidden [1]    32/25
high [4]    7/11 16/8
28/3 36/18

highball [1]    16/4
highballing [2]
16/14 18/20
higher [3]    16/23
19/3 46/23
highly [1]    72/15
hire [1]    12/13
holdings [1]    36/17
holds [2]    55/6 55/7
honest [1]    26/17
Honestly [1]    27/9
Honor [33]    3/6 3/8
3/11 6/10 6/19
15/18 16/2 16/18
17/1 20/15 21/12
22/6 22/17 25/5
25/14 27/3 27/6
28/1 34/22 41/20
44/5 44/7 57/17
57/21 66/1 69/10
69/12 69/16 69/23
72/6 75/2 76/21
77/5
HONORABLE [1]    1/9
HOOK [3]    1/22 78/3
78/10
hope [1]    33/4
hopefully [1]    8/18
hopes [2]    8/15 8/19
hoping [1]    23/24
hosted [2]    55/9
56/17
hour [4]    16/17
16/21 16/24 19/2
hours [5]    7/20 7/20
13/21 19/6 19/10
housekeeping [1]
69/13
huh [1]    62/24
hundred [4]    17/9
30/12 32/19 43/2
hundreds [1]    16/10
hung [1]    18/24
hurdle [1]    22/16

## I

idea [2]    8/7 17/25
identification [1]
7/2
illicit [1]    27/17
imagine [1]    25/6
immediate [1]    29/18
immediately [3]
17/4 17/6 62/3
important [5]    8/17
23/6 24/22 75/10
75/21
impression [1]
12/25
incentive [1]    16/4
include [2]    51/22
53/17
included [1]    54/25
including [1]    18/20
inconsistencies [1]
16/6
inconsistency [1]
16/9
inconsistent [1]
17/13

incurred [2]    8/10
8/12
indicated [1]    50/12
indicted [1]    4/1
indictment [3]    4/19
43/24 73/5
indigent [1]    10/14
individual [1]
54/12
inductive [2]    14/10
14/18
indulgence [1]
62/17
information [6]
33/15 33/22 36/21
38/25 40/13 62/16
inquiry [1]    4/22
ins [1]    25/5
insight [1]    12/18
install [1]    62/1
instance [2]    9/3
14/9
institution [1]
55/20
intensive [2]    9/18
76/8
interest [2]    15/23
66/15
interested [1]
65/17
interesting [1]
14/5
interim [1]    77/17
intermediate [1]
64/13
internet [5]    33/24
59/2 59/6 61/2
68/18
interrupt [1]    34/12
into [22]    2/15 2/17
2/18 2/19 2/20 2/21
2/22 13/2 13/18
15/25 22/17 24/16
24/23 28/12 28/17
31/18 36/21 44/8
51/24 59/6 62/7
69/19
introductory [1]
5/12
involved [6]    3/23
3/24 8/7 16/1 19/20
71/19
involving [1]    77/7
issue [10]    4/4 4/18
9/2 11/12 17/19
26/15 44/11 72/17
77/10 77/12
issues [3]    31/7
73/16 75/3

## J

jail [6]    7/19 32/8
33/16 35/19 35/19
40/16
January [4]    1/5
17/22 17/23 76/16
January 31st [1]
76/16
Jaxx [4]    40/24
56/24 57/1 70/16

**J**

Jeep [2]    32/22
32/24
JEFF [4]    1/22 3/15
78/3 78/10
JUDGE [3]    1/10
26/11 75/24
jumped [1]    17/7
jumping [1]    13/20
junior [1]    28/7
jury [4]    17/9 18/8
18/9 21/22
jury's [1]    4/21
Justice [1]    11/14

**K**

Kaley [1]    4/20
keys [2]    55/7 57/11
kind [6]    8/6 14/7
16/3 53/10 53/14
60/14
knock [1]    21/22
knocking [1]    22/1
knowledge [4]    36/23
67/20 69/8 71/16
knowledgeable [1]
77/9
known [2]    56/14
56/18
knows [2]    7/14
41/19
Kosiakov [3]    35/25
67/4 72/2
Kraken [8]    37/5
37/12 37/20 38/2
38/5 53/18 55/16
56/1
Kramer [1]    12/16
Kristin [1]    76/22

**L**

label [1]    60/8
labeled [2]    7/2
32/1
labor [5]    9/18
17/15 17/17 28/4
76/8
laborious [1]    28/8
laid [1]    20/16
large [1]    76/8
larger [2]    16/3
58/6
last [4]    7/7 17/22
64/25 69/12
lately [1]    14/1
later [2]    16/23
31/7
launched [1]    65/7
law [13]    1/19 10/1
10/20 16/19 20/8
24/3 24/16 35/15
71/16 71/17 72/11
73/24 73/24
lawyer [4]    12/13
12/14 19/12 76/7
lawyer's [4]    45/2
45/5 67/25 68/15
lawyers [16]    6/8
10/3 10/6 10/24

15/13 19/5 19/16
19/16 19/18 20/13
23/24 26/10 44/21
67/22 68/10 77/11
leading [4]    23/6
34/13 41/13 41/16
least [14]    8/2
11/15 12/17 16/21
19/13 20/5 22/4
25/4 51/7 53/8 73/1
73/9 73/21 76/5
leave [3]    27/11
34/18 64/13
left [5]    8/25 16/19
16/21 17/16 27/11
legal [22]    11/8
13/25 18/17 24/8
26/3 26/9 26/12
29/20 32/15 32/16
33/10 35/22 38/18
66/22 66/24 67/23
68/1 71/1 71/11
71/19 71/23 71/25
legally [2]    23/3
23/7
lends [1]    9/20
length [1]    8/3
lent [2]    66/14
66/20
less [5]    20/13
20/25 21/1 38/8
74/14
letter [1]    9/12
level [2]    9/20
21/10
life [1]    60/18
light [2]    21/11
74/6
likely [2]    5/7 21/1
limit [1]    26/22
limited [1]    24/3
line [1]    64/25
liquidate [1]    71/5
list [3]    7/23 31/22
47/25
listed [13]    32/23
37/8 37/21 38/14
39/25 46/9 49/3
50/17 51/8 51/9
51/10 55/13 56/24
listing [2]    16/7
43/8
lists [3]    32/11
33/11 38/21
litigation [8]
10/12 11/15 16/5
16/8 17/20 18/1
18/2 20/17
little [11]    9/11
21/20 28/19 29/7
41/14 41/16 48/10
60/14 61/7 62/18
72/9
located [4]    7/19
49/15 49/17 49/17
lock [2]    62/21
66/17
locked [2]    32/18
33/23
lodging [1]    8/2

logical [2]    15/8
65/13
logistics [1]    76/12
long [5]    7/25 16/15
19/1 33/25 43/14
longer [1]    57/14
look [12]    7/8 7/23
28/6 29/3 29/17
31/25 32/10 58/2
61/14 68/13 72/11
72/11
looked [2]    8/13
43/19
looking [14]    17/1
18/7 18/19 20/23
20/24 29/19 44/18
45/23 46/1 47/5
56/23 61/21 62/17
64/24
looks [10]    8/14
18/20 38/17 40/14
46/5 60/4 60/6 60/8
63/11 69/3
loose [1]    17/18
lose [2]    12/21
73/14
loses [1]    24/25
loss [2]    23/6 28/19
loss-leading [1]
23/6
lost [1]    43/7
lot [20]    8/20 9/4
9/11 14/8 14/15
18/4 18/5 18/8
18/12 34/5 35/5
35/21 42/23 42/24
43/3 51/9 59/22
59/22 61/6 64/12
low [11]    7/9 7/10
9/8 15/6 17/10
17/12 18/7 19/19
19/25 20/11 21/19
lowballing [1]
16/14
lower [3]    19/18
20/10 47/1
lowercase [3]    9/14
68/23 69/4
LTD [1]    37/21

**M**

magnitude [1]    5/7
mail [1]    6/23
main [1]    35/15
major [1]    13/13
makes [2]    4/14 73/1
making [2]    9/17
41/18
Maksim [6]    35/3
35/4 35/8 35/9 42/7
67/16
Malta [6]    49/17
49/19 49/20 54/11
54/14 54/18
manage [1]    71/5
management [1]    8/13
manages [1]    12/11
marked [1]    46/1
mask [1]    60/8
masked [4]    58/12

59/7 59/12 61/12
matching [1]    9/15
materials [2]    5/3
5/6
math [2]    20/15
20/23
matter [8]    10/1
10/2 10/20 16/9
16/9 16/10 27/19
78/5
matters [1]    10/2
Max [1]    36/9
maximum [2]    40/23
42/10
may [33]    5/20 6/19
12/14 12/15 12/17
12/18 12/19 21/3
21/4 21/6 21/10
21/19 23/23 24/4
24/12 24/12 24/14
24/15 30/22 31/17
51/3 54/14 57/13
57/25 59/5 69/23
69/25 70/1 73/13
73/14 73/25 74/13
76/11
maybe [18]    6/12
16/24 19/11 19/15
20/11 21/20 21/22
22/1 41/11 42/10
54/20 57/17 62/20
63/11 64/1 74/3
74/18 75/24
mean [28]    10/22
10/24 11/9 12/3
12/7 13/10 13/13
15/9 17/12 18/5
19/3 19/23 21/13
21/25 27/23 28/2
36/17 42/17 52/21
53/16 53/19 53/21
54/8 54/9 55/3
55/22 61/6 70/12
means [6]    18/13
21/24 24/1 24/18
44/2 53/4
meantime [1]    76/14
measure [1]    69/13
mechanism [1]    66/20
Meiklejohn [1]    9/3
memory [1]    58/9
mention [3]    35/20
36/25 51/19
mentioned [5]    18/14
28/2 42/22 56/1
57/2
mentioning [1]
43/21
message [1]    59/6
met [1]    14/23
method [1]    14/10
methodology [2]
9/20 14/18
MICHAEL [2]    1/18
3/12
microphone [1]
31/18
middle [2]    64/16
68/20
midway [1]    61/18

**M**

might [12] 11/14 21/25 24/1 25/3 42/18 43/14 61/1 61/2 61/4 74/6 75/13 76/3

million [2] 7/12 9/9

millions [1] 16/12

mind [2] 50/11 72/13

mine [1] 49/7

mines [1] 28/7

mini [1] 28/23

minimum [3] 19/11 19/15 72/8

minute [3] 22/2 48/20 76/20

minutes [4] 57/17 57/18 57/20 67/11

miscommunication [2] 36/14 36/20

missing [2] 5/5 20/18

misstate [1] 30/21

mistake [1] 9/17

misunderstood [1] 30/15

mix [2] 61/5 73/6

mock [2] 17/9 21/22

moment [2] 18/22 69/23

Monero [15] 20/19 41/5 42/5 47/8 47/9 47/13 57/1 57/2 57/2 57/5 57/13 62/21 70/18 70/21 70/22

money [52] 8/16 11/7 11/8 11/12 12/5 16/1 26/22 27/8 30/3 30/6 30/13 30/16 30/18 33/7 33/13 34/2 35/18 38/10 39/21 40/20 41/8 42/2 42/6 42/7 42/22 48/7 48/16 48/22 49/4 49/8 49/25 50/1 50/6 50/22 52/21 52/21 53/1 53/4 53/5 59/24 62/4 62/7 63/12 63/14 63/17 66/14 66/14 67/2 67/9 71/3 72/2 72/24

money hasn't [1] 33/7

month [3] 7/25 16/15 19/1

month-long [3] 7/25 16/15 19/1

Moon [14] 37/21 49/6 49/10 49/11 49/19 50/19 53/21 54/1 54/5 54/10 54/12 54/16 54/23 54/25

more [16] 5/10 9/21

18/4 28/9 28/10 36/18 42/11 42/13 46/25 48/10 49/9 60/25 62/4 64/5 72/12 73/10

morning [2] 6/25 12/3

MOSS [1] 1/9

most [3] 10/16 20/8 34/1

mostly [1] 34/13

mother [2] 34/4 37/2

mother's [1] 46/21

motion [6] 1/9 3/19 10/22 12/1 24/25 36/12

move [8] 5/2 34/4 38/1 38/4 51/2 63/12 63/17 69/13

moves [1] 4/11

Mr. [61] 5/16 5/21 6/6 6/11 6/24 8/19 9/10 11/17 15/10 17/18 17/24 18/3 18/6 18/14 18/18 18/23 20/2 20/20 22/4 22/23 23/3 24/11 24/15 25/16 25/17 25/19 25/20 26/11 28/11 28/18 28/20 29/4 29/25 30/9 30/23 31/11 31/21 36/3 38/7 44/6 44/9 44/16 50/10 57/14 57/25 58/2 58/4 66/23 70/3 72/2 72/23 73/14 74/3 74/6 74/23 74/25 75/2 75/6 75/7 76/20 77/2

Mr. Brown [10] 15/10 25/19 26/11 28/11 28/20 29/4 44/6 57/14 57/25 77/2

Mr. Ekeland [14] 17/18 17/24 18/3 18/14 18/23 23/3 24/11 24/15 25/16 25/17 28/18 74/3 74/23 76/20

Mr. Ekeland's [2] 18/6 18/18

Mr. Fischbach [5] 8/19 9/10 75/2 75/6 75/7

Mr. Kosiakov [1] 72/2

Mr. Nemtsev [1] 36/3

Mr. Sterlingov [23] 5/16 5/21 6/6 6/11 11/17 20/2 20/20 22/4 22/23 25/20 29/25 30/23 31/11 31/21 44/16 50/10 58/2 58/4 66/23 70/3 72/23 73/14

74/25

Mr. Sterlingov's [5] 6/24 30/9 38/7 44/9 74/6

much [23] 10/4 10/5 10/9 10/9 13/10 15/3 17/2 18/3 19/13 20/13 21/6 28/1 28/9 30/3 30/6 30/16 30/18 32/25 38/8 42/8 48/22 57/14 73/6

Mullin [1] 3/13

must [5] 4/15 49/24 49/24 50/2 50/7

Mycelium [4] 30/20 39/7 56/24 57/1

myself [2] 52/6 74/4

**N**

N26 [3] 48/7 48/11 48/12

name [9] 3/4 35/4 37/2 49/12 50/15 50/15 50/15 50/23 63/3

narrow [1] 4/23

national [4] 51/13 53/9 53/14 53/16

nature [4] 5/7 19/19 20/9 63/25

near [1] 68/19

necessarily [3] 23/10 23/20 66/19

necessary [1] 77/17

necessities [1] 35/19

Neck [1] 32/8

need [27] 4/13 4/14 4/25 5/2 5/9 5/23 6/17 6/25 8/24 11/5 14/15 15/15 15/19 21/2 21/10 23/15 23/16 26/15 29/3 29/10 37/19 38/23 40/5 41/11 57/15 72/11 73/10

needs [1] 5/19

neighborhood [1] 20/18

Nemtsev [4] 35/3 35/4 36/3 67/16

net [3] 30/9 32/7 70/13

new [6] 7/20 9/19 14/6 24/15 24/16 24/23

newly [1] 7/16

next [4] 3/14 39/23 61/5 64/25

nine [1] 46/8

nobody [2] 67/20 72/4

none [1] 37/8

Nor [2] 23/10 23/20

Nordea [5] 33/11 47/25 51/1 51/9 51/14

normally [1] 60/18

Northern [1] 32/8

note [2] 65/5 66/7

notes [17] 58/4 58/9 58/11 58/14 58/17 58/23 58/25 59/1 59/9 60/11 60/21 60/25 63/22 63/24 64/2 64/9 65/10

novel [1] 73/16

nuance [1] 21/10

number [8] 3/2 7/13 7/14 19/25 28/3 37/15 37/24 62/19

number's [1] 37/15

numbers [4] 7/9 18/5 19/23 28/2

NW [3] 1/13 1/16 1/24

NY [1] 1/20

**O**

oath [1] 67/7

objection [6] 28/12 28/14 48/23 66/1 69/15 69/16

obligations [1] 15/4

obvious [1] 29/18

obviously [3] 58/14 72/7 73/10

occur [2] 10/5 10/5

occurred [1] 74/2

OCD [1] 61/7

off [9] 9/13 9/15 19/24 21/21 21/22 30/10 38/1 38/4 57/23

off-the-cuff [1] 19/24

offense [5] 3/23 3/24 4/4 4/18 4/22

offer [1] 6/5

offering [1] 5/14

office [1] 74/11

officer [1] 26/25

official [2] 1/23 78/3

often [2] 10/15 52/25

old [7] 41/23 42/16 42/17 43/15 56/21 62/10 64/10

older [2] 64/4 64/5

one [36] 7/14 8/4 9/12 13/20 14/24 14/24 15/8 15/19 16/23 19/9 21/7 24/3 28/3 28/8 29/11 31/9 41/25 43/6 46/20 47/8 47/13 49/5 56/20 58/12 60/20 61/4 62/10 68/9 69/12 69/23 71/5 72/22 74/2 75/21 76/5 77/2

ones [2] 8/10 13/22

only [18] 4/13 16/2 22/12 25/11 29/2

# O

only... [13]   29/25
47/8 48/4 48/6 49/5
51/13 52/20 53/9
53/13 53/16 56/25
65/7 73/14
open [3]   34/15
35/16 64/23
opening [4]   6/1
18/10 18/10 18/13
operate [1]   60/19
operating [1]   50/4
operation [1]   54/8
opposed [1]   53/1
others [1]   66/25
otherwise [1]   21/17
ought [1]   4/24
out [32]   8/15 12/15
13/15 14/13 15/1
17/7 17/14 18/24
18/25 20/16 21/14
24/17 26/20 26/21
32/25 38/18 41/11
41/19 43/9 43/15
46/3 55/25 63/13
63/16 63/17 65/5
65/17 66/14 66/20
67/16 68/12 73/7
out-of-pocket [2]
8/15 26/21
outcome [1]   15/22
outs [1]   25/6
outside [5]   7/20
7/20 30/17 35/22
46/9
outstanding [1]
8/14
over [3]   16/20
50/16 66/2
overarching [1]
15/20
Overruled [1]   48/24
own [3]   13/3 59/1
73/11
owned [1]   32/13

# P

p.m [4]   1/6 57/23
57/24 77/18
page [19]   2/3 2/14
23/9 37/25 39/23
46/8 47/24 59/13
59/14 61/16 61/17
61/19 64/14 64/15
64/16 64/24 66/5
66/7 70/6
pages [1]   32/2
paid [15]   8/18 8/18
8/20 10/3 11/1
23/25 24/13 24/15
26/10 29/13 32/20
33/8 38/18 41/11
67/15
panel [1]   25/8
pants [1]   19/16
papers [5]   9/5
12/25 35/5 36/8
72/18
paragraph [1]   46/7

part [14]   5/4 27/24
30/11 36/18 54/1
54/5 54/7 54/12
54/16 54/20 58/6
72/6 72/8 73/5
particular [4]
43/10 43/11 73/24
76/2
particularly [2]
5/16 9/10
partner [1]   16/16
party [4]   55/15
55/20 56/8 56/10
pass [2]   44/4 72/5
passed [1]   50/5
pasted [1]   59/5
pay [13]   11/6 11/20
12/14 24/5 25/4
32/15 41/2 67/10
70/25 74/11 74/16
75/4 75/17
paying [6]   66/22
66/24 67/8 67/10
67/15 67/20
payment [1]   29/23
payments [3]   19/17
29/25 71/16
PELKER [2]   1/15 3/9
Pennsylvania [1]
1/16
people [4]   12/12
40/17 52/25 60/16
percent [1]   30/12
perhaps [3]   13/1
25/17 72/2
period [2]   49/5
52/12
periods [1]   60/17
permit [1]   74/8
permitting [2]   4/4
4/22
person [2]   10/15
13/25
personal [1]   77/6
personally [1]
74/15
phase [1]   76/15
phone [7]   33/24
38/23 39/2 39/4
39/12 40/5 55/21
phrase [1]   53/17
phrased [1]   51/17
physical [2]   36/18
46/21
piece [1]   28/6
pieces [1]   51/24
pillows [1]   36/10
place [1]   25/11
placed [1]   24/2
Plaintiff [1]   1/4
planned [1]   52/13
planning [2]   52/11
52/20
plastic [1]   46/3
plate [1]   13/25
platforms [1]   14/14
plausible [2]   73/3
73/9
please [9]   3/4 6/20
6/22 25/25 31/12

31/18 56/15 63/10
68/13
PLLC [1]   1/19
plus [2]   20/19
20/19
pocket [2]   8/15
26/21
point [17]   4/15
9/17 14/20 16/3
20/3 22/11 23/2
25/13 26/16 27/21
28/22 28/25 29/8
72/12 72/19 73/20
74/20
pointed [1]   14/13
pointing [1]   68/19
points [3]   15/20
45/17 45/17
policy [1]   75/25
Poloniex [2]   39/14
56/4
pool [1]   66/14
portions [1]   10/23
pose [1]   34/19
posed [2]   25/3 26/8
position [1]   26/7
possessed [1]   51/14
possesses [2]   23/11
23/21
possession [1]
46/22
possibility [3]
11/13 23/4 74/2
possible [6]   9/25
54/11 56/19 56/20
63/12 73/6
practice [3]   16/19
18/25 35/15
predictable [1]
15/22
preface [1]   10/2
prefer [1]   15/8
preparation [3]
18/10 18/10 19/14
prepare [3]   20/14
22/14 58/25
prepared [9]   15/16
45/12 58/23 60/3
61/11 62/8 62/11
63/24 64/2
preparing [1]   44/21
present [2]   5/18
17/11
presented [1]   73/16
pretty [1]   52/12
prevail [1]   11/25
prevented [2]   23/12
23/22
previewed [1]   22/19
previous [1]   64/1
previously [1]
11/17
price [1]   33/2
prices [3]   20/25
43/2 68/7
printout [4]   60/2
68/14 68/15 69/1
prior [1]   22/9
private [4]   16/19
18/25 19/16 19/18

pro [4]   3/14 23/6
75/13 75/15
probable [6]   4/3
4/6 4/21 14/11 73/4
73/8
probably [9]   11/7
12/11 19/3 19/6
19/10 19/19 19/24
31/8 61/6
problem [4]   12/6
14/24 30/11 32/25
problems [2]   9/15
75/5
proceed [9]   4/24
6/16 6/19 25/1
28/19 34/19 44/8
69/25 70/1
proceeding [5]   5/14
6/24 28/22 44/9
76/15
proceedings [3]
6/12 77/18 78/5
proceeds [1]   27/17
process [7]   4/17
4/17 14/22 20/22
28/8 28/25 66/13
productions [1]
14/25
project [1]   61/19
prompts [1]   50/11
prong [3]   31/5 31/6
31/8
property [5]   3/23
3/24 4/1 4/4 4/6
proposition [1]
72/24
provide [2]   12/17
35/20
provided [4]   26/12
33/19 39/1 43/18
provisional [1]   7/7
public [10]   12/10
12/16 24/17 33/20
74/5 74/9 74/17
74/22 76/6 77/3
publicity [1]   24/18
pull [2]   46/2 68/12
pulled [1]   6/25
purposes [3]   17/11
26/24 31/4
pursue [2]   74/3
74/4
put [14]   7/3 24/17
25/20 28/22 28/24
32/7 36/21 42/19
43/20 43/24 46/23
62/4 65/5 74/14
putting [4]   3/14
5/19 62/7 66/13

# Q

quality [1]   9/1
quarantining [1]
52/6
quarter [3]   9/9
17/15 17/16
quarters [2]   64/15
64/18
quickly [2]   13/15
46/1

**Q**

quite [1]   7/18
quoted [4]   8/5
17/17 18/4 59/3
quoting [2]   9/8
18/16

**R**

raise [3]   12/6 27/8
31/12
raised [1]   17/19
raising [1]   24/18
RANDOLPH [1]   1/9
range [4]   20/10
20/11 22/2 47/17
rate [5]   16/20 26/6
47/15 47/16 75/17
rates [2]   16/22
74/16
re [1]   34/3
re-register [1]
34/3
reached [1]   74/19
read [6]   23/16
45/15 45/16 45/16
45/20 45/21
real [3]   5/6 10/9
18/2
realistic [3]   19/9
27/13 33/2
realistically [1]
11/10
reality [1]   11/5
really [13]   10/19
13/15 16/14 21/13
21/14 26/19 33/17
34/5 61/5 61/14
67/18 71/18 75/10
reason [9]   16/2
21/15 39/20 40/19
41/9 42/20 42/22
71/9 73/20
reasonable [7]
15/17 16/25 19/15
19/25 20/14 22/14
74/11
reasons [2]   28/4
72/8
recall [9]   31/7
43/10 43/11 44/5
44/11 58/8 61/10
70/24 72/6
received [4]   6/23
14/21 29/20 29/24
recent [1]   61/14
recognize [2]   32/5
58/3
recognized [1]
36/20
recommended [1]
60/20
record [6]   3/4 6/12
28/13 57/23 57/24
78/5
Redirect [3]   2/7
69/11 69/20
reduced [2]   26/6
26/14
reenter [1]   74/7

refer [2]   35/23
52/25
referring [1]   13/5
refers [1]   38/5
reflect [1]   8/12
regard [2]   6/9 76/2
regarding [1]   44/10
Regional [1]   32/8
register [1]   34/3
registered [2]
42/25 51/20
registering [1]
42/23
relationship [1]
35/6
relatively [1]
62/14
relatives [1]   37/2
release [2]   3/19
4/11
released [2]   26/5
62/22
relevant [7]   10/20
10/21 23/3 23/7
24/24 26/9 76/4
reliable [3]   18/6
22/18 22/20
rely [3]   5/20 16/15
40/17
remarks [1]   5/12
remember [6]   36/13
42/8 43/20 48/21
56/21 62/11
reminded [1]   61/3
remotely [1]   49/4
rent [1]   11/6
repeat [1]   56/15
rephrased [1]   51/18
report [1]   36/21
reported [1]   22/4
reporter [4]   1/22
1/23 23/14 78/3
represent [3]   23/24
35/10 43/12
representation [2]
25/1 35/22
representations [1]
18/18
representing [1]
26/25
reputable [1]   13/11
request [1]   76/6
require [1]   72/16
required [1]   35/22
requirements [1]
72/14
requires [2]   9/21
14/18
requisite [2]   4/5
4/14
research [1]   18/17
resembling [1]   44/1
residual [1]   49/22
resolves [1]   26/15
respect [16]   3/20
4/16 5/1 5/10 5/19
5/21 6/16 12/24
15/12 20/15 21/17
25/18 28/20 73/4
73/8 77/3

respond [4]   18/23
25/16 25/17 25/24
responded [1]   26/11
responding [1]
26/24
responsibility [1]
19/12
restate [1]   25/25
result [1]   73/13
results [1]   47/16
retain [2]   11/20
11/24
retaining [1]   23/22
return [1]   74/21
review [3]   15/7
28/4 28/7
reviewed [3]   5/2
44/24 51/1
reviews [1]   32/3
revise [1]   7/2
right [81]
rights [1]   6/9
rigorous [1]   18/2
risk [1]   31/9
risks [1]   6/8
road [1]   73/13
roll [1]   5/9
ROMAN [7]   1/6 2/4
3/3 3/12 31/19
44/14 69/20
room [4]   1/24 15/13
15/14 21/23
roughly [11]   20/19
30/11 32/19 38/21
39/8 39/15 39/25
40/10 41/1 41/1
41/6
row [7]   40/25 41/23
42/5 42/15 43/12
47/8 70/7
rows [1]   41/22
ruling [1]   73/19
run [3]   13/3 35/10
49/22
Russia [4]   51/25
52/2 52/19 53/8
Russian [4]   58/19
58/20 58/21 58/22

**S**

safe [2]   46/24 64/7
salt [1]   28/7
same [9]   39/10
39/24 54/7 54/8
54/20 63/1 64/24
69/4 71/10
Sarah [1]   9/3
satisfied [2]   72/14
73/4
saw [2]   17/3 61/2
saying [11]   6/23
10/9 10/17 14/11
21/5 24/4 26/11
29/5 40/25 74/18
74/20
schedule [1]   76/15
science [1]   14/17
screen [1]   7/4
seat [1]   19/15
seated [1]   31/17

second [16]   4/16
4/17 5/2 20/5 22/16
29/12 32/2 38/2
38/4 44/8 51/5
54/14 59/12 59/14
61/16 70/7
section [4]   3/21
3/25 61/18 61/19
secure [3]   4/8
13/12 27/9
seeing [4]   17/23
60/15 60/24 60/24
seeks [2]   23/12
23/21
seem [1]   21/18
seems [8]   16/4
16/25 17/7 17/15
18/12 18/18 19/18
24/20
seize [2]   4/1 37/12
seized [14]   3/19
4/11 21/1 23/1 29/6
30/17 37/9 37/17
37/18 37/18 38/24
46/11 53/12 53/13
seizure [2]   3/22
73/24
selection [2]   18/9
18/9
self [1]   55/9
self-hosted [1]
55/9
sell [3]   32/24 33/1
37/3
seminal [1]   9/5
send [1]   35/18
sensitive [1]   9/14
sent [2]   18/15 39/1
separate [4]   43/20
54/17 54/20 54/21
serve [1]   74/8
service [6]   55/4
55/6 55/6 55/14
55/17 56/2
services [2]   55/25
56/7
serving [1]   75/13
set [1]   14/24
setting [1]   71/19
shared [1]   64/11
shave [1]   21/20
sheet [1]   7/3
shingle [1]   18/25
show [2]   22/12
22/25
showed [1]   36/8
showing [6]   4/13
4/14 7/22 20/7
21/17 72/21
showings [1]   4/12
shows [1]   69/5
shut [1]   18/16
sign [1]   45/21
signed [5]   45/18
45/20 45/21 46/4
52/17
significant [6]
13/16 16/6 33/13
36/16 38/10 42/21
significantly [2]

Appx186

## S

significantly... [2]  7/21 20/10
similar [1]  63/25
simple [1]  5/21
simply [2]  10/4 12/12
single [2]  28/6 71/22
sitting [1]  8/17
situation [2]  27/13 39/10
six [1]  7/20
Sixth [1]  21/23
skilled [1]  19/2
sleeve [1]  46/3
sleeves [1]  5/10
slow [1]  23/15
slowly [1]  23/18
small [3]  35/18 38/6 67/2
smaller [1]  51/24
software [7]  8/13 56/23 56/25 57/10 57/12 61/25 61/25
sold [7]  32/15 33/8 38/17 41/2 41/6 42/6 51/11
solemnly [1]  31/13
soliciting [1] 67/22
solution [2]  73/22 74/18
solutions [1]  73/18
somebody [7]  9/4 14/13 14/16 37/2 59/3 59/6 76/3
somehow [2]  38/25 66/17
someone [4]  14/3 18/25 29/23 68/5
sometime [1]  8/3
sometimes [1]  43/3
somewhere [4]  11/7 11/13 42/25 47/17
sophisticated [1] 19/22
sorry [20]  10/22 23/14 23/19 30/5 30/15 34/11 34/12 38/1 38/3 41/13 41/25 51/16 58/16 60/5 61/15 62/17 68/8 69/12 70/19 72/25
sort [5]  9/4 19/15 20/16 36/11 43/22
sound [1]  71/13
sounds [1]  65/13
source [2]  29/18 44/10
sources [1]  29/15
space [1]  68/19
Sparkasse [1]  49/14
speak [3]  31/18 58/21 58/22
specific [4]  60/8 61/9 61/11 62/19
spend [3]  13/20

19/13 20/22
spent [1]  20/22
sphere [1]  24/17
spitball [1]  21/2
split [1]  54/6
stage [1]  44/8
stake [3]  15/22 65/25 77/2
staking [3]  66/7 66/13 66/17
stand [2]  25/20 31/3
standard [1]  21/11
standing [1]  46/19
start [8]  6/17 6/24 13/19 32/10 35/10 38/15 41/22 55/25
started [2]  9/6 44/8
starting [2]  3/4 15/18
starts [2]  39/23 68/21
state [2]  3/4 46/9
statement [15] 18/13 30/9 32/7 44/19 44/22 45/13 46/14 46/17 47/21 47/25 49/2 51/8 55/2 55/14 70/13
statements [1] 18/11
STATES [11]  1/1 1/3 1/10 3/3 3/9 5/17 27/16 52/7 52/8 52/11 53/8
stay [3]  12/5 52/11 52/13
stayed [1]  52/5
step [10]  4/16 4/17 5/2 20/5 22/16 28/20 29/12 31/9 72/14 72/20
STERLINGOV [30]  1/6 2/4 3/3 3/12 5/16 5/21 6/6 6/11 11/17 20/2 20/20 22/4 22/23 25/20 29/25 30/23 31/11 31/19 31/21 44/14 44/16 50/10 58/2 58/4 66/23 69/20 70/3 72/23 73/14 74/25
Sterlingov's [5] 6/24 30/9 38/7 44/9 74/6
stick [1]  17/10
still [14]  12/5 12/6 14/22 21/7 22/3 27/23 28/19 29/7 31/5 31/6 34/6 42/1 65/4 65/6
stipulating [1] 20/16
stop [1]  15/9
stopped [1]  13/9
stops [1]  64/13
storage [1]  55/10
store [1]  57/10
stored [3]  30/13

37/1 58/11
strain [1]  74/14
strange [1]  71/14
street [3]  1/13 1/19 26/20
stress [1]  72/10
strike [2]  10/13 76/2
strikes [2]  73/3 73/9
striking [1]  9/25
structural [2] 27/18 27/21
structure [2]  54/10 61/7
struggled [1]  60/14
studio [1]  53/22
subject [6]  3/22 4/10 6/2 44/4 72/6 73/25
submit [1]  8/6
submitted [5]  5/3 45/2 45/4 45/5 45/15
substantial [6] 13/1 39/21 40/20 49/3 49/4 59/24
substantially [2] 20/1 26/6
sudden [1]  13/8
sufficient [1] 73/11
summary [1]  18/6
superb [1]  10/16
superseding [1] 43/24
supervision [2] 14/4 25/7
supplement [1] 17/21
supplemental [2] 23/9 68/10
supplies [1]  21/24
support [1]  12/11
suppose [5]  10/19 14/3 27/7 28/18 74/20
supposed [2]  66/17 66/18
Supreme [11]  4/19 10/15 23/5 23/8 23/10 23/19 24/4 26/12 26/13 28/21 29/1
sure [40]  5/16 5/23 6/6 10/1 24/8 30/12 31/18 35/14 36/19 37/19 39/18 40/7 41/8 42/1 42/7 48/18 48/19 49/16 50/8 50/9 50/19 51/6 52/14 52/22 56/19 56/22 57/4 57/12 59/3 59/22 60/13 61/13 64/4 64/8 65/6 67/3 67/5 67/8 76/1 77/11
surprised [2]  20/12 67/18
surprising [1]

21/19
SushiSwap [8]  64/25 65/3 65/7 65/11 65/14 65/19 65/20 65/24
suspect [2]  20/9 74/10
suspicion [1]  12/10
Sustained [1]  66/3
swear [1]  31/13
Sweden [4]  32/13 34/1 48/2 53/22
Swedish [2]  53/10 53/15
sworn [2]  45/2 45/5

## T

tab [2]  31/24 70/4
table [2]  8/17 11/4
talk [8]  8/1 9/6 29/25 55/3 76/11 76/19 76/25 77/16
talking [8]  7/17 8/2 16/14 22/2 35/24 36/3 36/9 75/2
talking about [1] 35/24
team [2]  24/20 24/21
tech [1]  8/4
technical [1]  72/15
technology [3]  7/16 72/17 76/4
teeing [1]  73/20
telephone [2]  10/16 76/11
telling [1]  25/21
tentative [1]  72/10
terabytes [2]  13/6 28/5
terms [1]  26/23
terms of [1]  26/23
Tesla [3]  32/11 32/13 32/15
testified [4]  46/19 47/2 47/14 47/15
testifies [1]  15/21
testify [1]  9/11
testifying [2]  5/15 31/10
testimony [10] 31/13 34/14 44/10 48/15 50/2 51/12 53/9 65/21 67/12 72/19
the question [1] 75/19
therefore [1]  24/3
thinking [5]  46/25 57/15 60/18 72/10 73/21
third [7]  40/25 40/25 42/5 55/15 55/20 56/8 56/10
thirds [1]  61/18
though [5]  15/15 21/10 21/18 28/18 72/15
thought [7]  29/21

## T

thought... [6]
42/18 57/4 57/12
62/13 70/20 71/13
thoughts [4]   25/2
60/22 60/25 61/4
thousand [4]   17/9
32/19 40/1 43/25
thousands [2]   16/10
40/21
three [7]   39/8
52/13 52/13 52/20
64/15 64/18 66/2
three-quarters [2]
64/15 64/18
threshold [1]   22/7
thrown [1]   9/15
times [2]   60/17
66/2
titled [1]   70/8
to read [1]   23/16
today [14]   4/24
5/12 7/22 12/15
12/21 12/22 15/21
20/25 24/25 30/4
30/7 30/8 46/19
72/9
together [4]   5/20
17/14 32/8 45/9
told [1]   20/8
took [5]   32/17
33/25 34/2 34/5
67/11
top [13]   7/3 9/19
17/14 17/17 30/10
32/11 32/11 59/13
59/14 60/7 61/17
68/14 68/20
TOR [3]   1/18 1/19
3/11
total [2]   7/10 21/1
totally [1]   14/23
towards [4]   30/18
52/8 59/14 61/17
traceability [5]
21/8 21/9 28/24
72/22 73/11
traceable [2]   3/23
4/18
tracer [1]   13/18
tracing [3]   9/16
13/17 20/6
trades [1]   62/4
training [1]   52/16
transaction [2]
13/20 69/5
transcript [2]   1/9
78/4
transfer [2]   71/6
71/10
transfers [2]   71/10
71/16
traveled [5]   51/12
51/24 52/2 52/8
53/7
traveling [2]   52/1
64/12
trial [29]   4/1 6/5
6/25 7/1 7/5 7/11

7/24 7/25 8/3 8/3
8/13 9/22 9/24
16/15 17/8 17/9
19/1 19/2 19/5 19/8
19/11 19/13 19/14
21/22 22/9 22/13
24/22 34/13 34/17
trials [2]   7/6 7/6
tricky [1]   14/19
tried [6]   11/8
30/19 35/2 40/3
40/12 70/25
tries [1]   19/10
trouble [1]   10/8
true [3]   38/18 67/5
78/4
trust [1]   68/17
truth [4]   20/8
31/14 31/14 31/15
try [14]   9/24 11/7
11/9 13/14 13/24
20/13 26/18 27/7
27/9 29/9 40/17
51/23 61/8 62/21
trying [14]   19/7
19/19 21/14 32/24
37/3 49/22 60/16
60/19 63/16 64/23
65/5 70/24 71/2
73/17
turn [6]   31/24
59/25 63/10 63/19
66/5 68/11
turned [1]   32/25
turning [4]   7/16
59/12 61/16 64/14
two [28]   4/12 7/20
19/4 27/24 36/4
36/22 41/1 47/20
49/24 50/21 52/5
52/18 52/19 52/20
54/4 54/6 54/7 54/9
61/18 61/19 64/7
64/10 64/14 72/6
72/9 72/14 72/20
76/15
two-part [1]   27/24
two-thirds [1]
61/18
type [2]   45/10
72/16
typed [2]   45/9
45/10
typically [1]   12/11
typo [3]   9/18 70/21
70/22

## U

U.S [4]   1/15 1/23
30/13 70/8
U.S.C [2]   3/21 3/25
Uh [1]   62/24
unable [1]   24/25
uncertainty [1]
9/20
under [12]   3/21
3/25 8/19 11/21
11/22 14/4 25/10
27/16 36/9 67/7
74/10 74/12

underneath [3]
32/22 38/20 39/7
understandable [2]
15/24 16/5
understood [2]
21/12 68/19
underwear [1]   35/20
unfrozen [1]   21/6
unhappy [1]   8/25
unique [1]   7/13
Uniswap [6]   65/1
65/3 65/21 65/22
65/23 65/24
UNITED [11]   1/1 1/3
1/10 3/3 3/9 5/17
27/16 52/7 52/8
52/11 53/8
unknown [3]   38/5
42/19 42/19
Unless [1]   12/8
unusual [4]   5/12
16/16 19/3 19/4
up [24]   5/9 6/18
7/3 7/22 14/1 14/17
16/3 18/17 23/4
26/2 29/20 32/18
33/23 34/18 35/5
37/8 43/2 51/24
52/17 60/23 71/19
73/13 73/20 73/22
updated [1]   8/6
upload [2]   14/21
14/25
uploading [2]   13/3
13/7
upon [2]   4/7 17/6
upper [2]   61/18
61/19
uppercase [2]   68/23
69/5
USAO [1]   1/13
USAO-DOJ [1]   1/13
use [6]   7/6 13/24
15/8 33/17 57/10
71/11
used [3]   11/20 41/9
69/1
using [1]   13/18
usual [1]   74/16
Usually [1]   25/11

## V

vague [1]   66/16
Vaguely [2]   58/5
58/10
validation [1]
14/19
value [9]   21/1
32/23 40/23 43/4
46/20 47/3 47/17
70/8 70/22
valued [1]   39/9
values [2]   70/12
70/13
various [8]   41/23
42/16 42/17 44/1
51/4 56/20 60/22
62/10
vehicles [1]   51/11
vendor [3]   13/8

13/11 18/15
Ventures [5]   53/25
54/3 54/15 54/18
54/22
version [2]   28/23
45/16
via [1]   23/25
vice [1]   3/14
views [1]   77/4
virtual [1]   59/17
VirwoX [4]   59/15
59/17 59/20 59/21
voice [1]   6/21
voluntarily [1]
8/19
VPN [14]   37/22 49/6
49/10 49/11 49/19
50/19 53/21 54/1
54/5 54/10 54/13
54/16 54/23 54/25

## W

wall [1]   1/19
wallet [8]   9/12
9/13 13/18 43/24
55/9 56/17 57/2
71/11
walletexplorer.com [1]
69/2
wallets [5]   42/24
43/15 55/20 56/23
56/25
wants [1]   15/11
war [1]   21/23
Washington [4]   1/5
1/14 1/16 1/25
way [16]   4/24 5/4
5/12 11/23 17/3
21/7 29/11 40/6
40/16 43/4 51/17
61/7 61/18 64/15
70/8 77/2
ways [1]   5/18
website [3]   29/20
68/1 68/15
websites [1]   59/23
week [3]   3/15 19/6
19/10
weeks [8]   19/5 52/5
52/13 52/14 52/18
52/19 52/20 53/8
weight [1]   76/2
welcome [3]   25/20
25/22 30/24
weren't [2]   71/19
74/15
WEX [6]   62/21 62/25
63/1 63/5 63/8
63/13
what's [14]   5/6
9/18 9/23 14/5 18/4
20/18 32/1 39/16
40/2 41/15 46/1
49/19 54/21 63/7
wherever [1]   71/3
whistles [2]   17/8
18/21
who's [3]   3/13
19/12 23/5
whole [3]   14/9

| W | 41/10 47/9 47/10 49/21 54/24 70/23 | | |
|---|---|---|---|
| whole... [2]   31/14 33/23 | | | |
| whomever [1]  27/20 | | | |
| willing [4]  23/5 23/24 74/6 75/11 | | | |
| willing to [1] 75/11 | | | |
| wise [1]  31/8 | | | |
| withdraw [2]  29/14 62/21 | | | |
| without [4]  27/1 29/6 73/1 73/11 | | | |
| witness [10]  2/3 6/8 7/8 18/3 22/8 22/9 32/3 41/17 41/19 44/4 | | | |
| witness' [2]  42/1 57/18 | | | |
| witnesses [2]  12/25 73/3 | | | |
| word [3]  29/4 59/15 64/16 | | | |
| words [1]  59/13 | | | |
| work [13]  8/22 9/1 9/21 10/3 10/4 10/5 10/9 13/1 13/2 13/17 15/7 15/9 19/23 | | | |
| workable [1]  74/18 | | | |
| worked [2]  9/4 60/23 | | | |
| working [3]  12/7 33/20 74/17 | | | |
| works [1]  19/10 | | | |
| workshop [1]  17/8 | | | |
| world [2]  50/22 52/25 | | | |
| worst [1]  60/16 | | | |
| worth [8]  13/6 30/9 32/7 34/18 41/1 43/21 70/13 75/9 | | | |
| write [2]  60/21 60/22 | | | |
| writing [1]  18/12 | | | |
| wrong [2]  21/15 57/13 | | | |
| wrote [3]  9/5 45/8 59/10 | | | |
| **X** | | | |
| XMR [1]   41/7 | | | |
| **Y** | | | |
| year [7]  7/1 17/21 17/22 17/23 17/23 32/17 64/5 | | | |
| years [9]  7/7 16/20 16/23 42/25 49/24 50/21 63/8 64/7 64/10 | | | |
| yesterday [2]  6/23 14/13 | | | |
| York [1]  7/20 | | | |
| you have [1]  63/5 | | | |
| **Z** | | | |
| zero [10]  29/21 29/24 39/15 41/7 | | | |

Appx189

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

ROMAN STERLINGOV,

        Defendant.

_____/

Criminal Action
No. 1:21-cr-0399

Washington, DC
January 31, 2023

10:21 a.m.

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:    CHRISTOPHER BROWN
        USAO-DOJ
        601 D Street, NW
        Washington, DC 20001

        ALDEN PELKER
        U.S. DOJ
        950 Pennsylvania Ave, NW
        Washington, DC 20530

For the Defendant:    TOR EKELAND
        MICHAEL HASSARD
        Tor Ekeland Law PLLC
        30 Wall Street, 8th Floor
        Brooklyn, NY 10005

Court Reporter:    JEFF M. HOOK
        Official Court Reporter
        U.S. District & Bankruptcy Courts
        333 Constitution Avenue, NW
        Room 4700-C
        Washington, DC 20001

**I N D E X**

| WITNESS | PAGE |
|---|---|
| ROMAN STERLINGOV | |
| Direct Examination by Mr. Ekeland | 6 |
| Cross-Examination by Mr. Brown | 39 |
| | |
| LUKE SCHOLL | |
| Direct Examination by Mr. Brown | 107 |
| Cross-Examination by Mr. Ekeland | 111 |
| Redirect Examination by Mr. Brown | 114 |
| Recross-Examination by Mr. Ekeland | 116 |

| EXHIBIT | | PAGE |
|---|---|---|
| Government 1: | Admitted into Evidence | 111 |
| Government 9: | Admitted into Evidence | 88 |
| Government 19: | Admitted into Evidence | 69 |
| Government 20: | Admitted into Evidence | 69 |
| Government 22: | Admitted into Evidence | 88 |
| Government 23: | Admitted into Evidence | 88 |
| Government 24: | Admitted into Evidence | 88 |
| Government 25: | Admitted into Evidence | 52 |

<u>P R O C E E D I N G S</u>

**DEPUTY CLERK:** This is criminal case 21-399, United States of America v. Roman Sterlingov. Counsel, please state your name for the record, starting with government counsel.

**MR. BROWN:** Good morning, Judge Moss. AUSA Chris Brown for the government.

**MS. PELKER:** Good morning, Your Honor. Alden Pelker for the United States.

**THE COURT:** Good morning.

**MR. EKELAND:** Good morning, Your Honor. Tor Ekeland for Defendant Roman Sterlingov, who is present in court.

**THE COURT:** Good morning.

**MR. HASSARD:** Good morning, Your Honor. Michael Hassard for Defendant Roman Sterlingov.

**THE COURT:** Good morning to you as well. Well, we're here for a continuation of the hearing on the defendant's motion for release of funds. I'm happy to proceed however the parties want.

Let me ask, Mr. Ekeland, do you have anything else to present with respect to need at this point?

**MR. EKELAND:** No, Your Honor.

**THE COURT:** Can I ask you one question, which is what is the hourly rate you're charging in this case?

MR. EKELAND: My standard hourly rate is $800.

THE COURT: No, no, I'm asking what the hourly rate is you're charging in this case?

MR. EKELAND: In this case, $800 an hour.

THE COURT: You're charging $800 an hour?

MR. EKELAND: Yes.

THE COURT: Okay. How do you want to proceed with respect to the question of traceability?

MR. EKELAND: I'd like to put on the only evidence there is for the origin of the funds, and that's the testimony of Mr. Sterlingov as to where these funds came from.

THE COURT: Does that make sense to the government to proceed that way by putting Mr. Sterlingov on the stand?

MR. BROWN: Yes, Your Honor. Your Honor, we already heard testimony from Mr. Sterlingov. If he wants to testify further, we're prepared to hear that on the question of financial need. I assume we're still --

THE COURT: No, no, I don't think he's talking about need now, I think he's talking about traceability. Is that right?

MR. EKELAND: I'm talking about the origin of the funds in question.

MR. BROWN: Yes, if we are proceeding to the question of traceability, the government absolutely wants to

cross-examine Mr. Sterlingov about his declaration and his testimony.

THE COURT: So you're welcome to put him on the stand then, Mr. Ekeland.

MR. EKELAND: The defense calls Mr. Sterlingov.

THE COURT: Just beforehand I want to, once again, inquire of Mr. Sterlingov about his desire to testify in this proceeding. You obviously have a right in a criminal proceeding to remain silent and not testify. You have a right to testify if you want to. I just want to make sure you feel as though you've had enough time to confer with your counsel about the risks and benefits of doing so, and that after a thorough discussion of all those risks and benefits, that you've made a decision that you do want to actually testify at this proceeding?

THE DEFENDANT: I believe so, yes.

THE COURT: Okay. You can come to the witness box.

DEPUTY CLERK: Mr. Sterlingov, before you sit down, would you please raise your right hand. Do you solemnly swear that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE DEFENDANT: Yes, I do.

DEPUTY CLERK: Thank you. You may be seated.

MR. EKELAND: Your Honor, do you still have the exhibit book?

THE COURT: I do. Actually, you know what, I think I may have accidentally left that on my desk. Do you want to hold it up just so my --

MR. EKELAND: I have an extra copy.

THE COURT: Well, I have a copy on my desk. Can you hold it up so he knows what it looks like, so he can see it. Thanks.

(Brief interruption)

THE COURT: Okay, you may proceed.

**DIRECT EXAMINATION OF ROMAN STERLINGOV**

**BY MR. EKELAND:**

Q. Thank you, Your Honor. Good morning, Mr. Sterlingov.

A. Good morning.

Q. Were you able to get any sleep last night before you came here?

A. No, this is actually an issue with this jail where I'm being housed. Every time they bring me to the courthouse, I'm not able to get any sleep the night before because they have people running around until 3:00 a.m. And then they wake you up at 3:00 a.m., and they move you to a room where no sleep is possible. And then throughout the morning, they're moving you between different rooms and

things like that. So I just want the Court to know that this is a real issue, you know. If I'm expected to testify and be a part of this proceeding, I need to get my sleep.

THE COURT: Do you feel as though you're in a position to be able to testify today?

THE WITNESS: Yes.

THE COURT: And you feel sufficiently awake and comfortable to testify?

THE WITNESS: I do feel sufficiently awake, but my concern is especially if we're going to trial. If this is going to be day after day, a situation that's going to repeat day after day, this is not going to work.

THE COURT: What facility are you at?

THE WITNESS: It's called Northern Neck Regional Jail.

THE COURT: I appreciate your letting me know. Okay, thank you. I think that I'll confer with the Marshals Service. But I suspect when we go to trial, that Mr. Sterlingov will -- it will probably be easier to house him at the D.C. jail for coming and going each day, but we'll check on that.

BY MR. EKELAND:

Q. Thank you, Your Honor. I hope so, I hope he doesn't have to proceed without any sleep.

Mr. Sterlingov, you've got the defendant's exhibit

list book right there in front of you?

A.   Yes.

Q.   If I could just direct your attention to what's marked for identification as Exhibit A.  If you could just take a quick look at that, and when you're done looking at it, just look up at me.

(Witness reviews document)

A.   Yes.

Q.   And do you recognize that document?

A.   Yes, this is my declaration.

Q.   And this is the declaration that you've -- that's your signature at the end of the document?

A.   Yes.

Q.   I'd just like to use this document as a framework to -- well, to go through your basic story.  And then if you see anything in error in this document as we go along, please correct it.

But my first basic question is:  Where were you born?

A.   I was born in Voronezh, Russia.

Q.   And did you grow up in Russia?

A.   I was 14 when we moved to Sweden.  Until that point, I was growing up in Russia.

Q.   When you say we moved to Sweden, who are you referring to?

A. I moved to Sweden with my mother.

Q. You didn't move with your father?

A. No. We haven't had any contact with my father for a really long time.

Q. And since you moved to Sweden at age 14, have you lived in Sweden ever since?

A. Yes.

Q. Before your arrest, have you ever been to Washington, D.C.?

A. No, never.

Q. Have you ever done any business in Washington, D.C.?

A. Never.

Q. Do you have any friends or family or any kind of contacts in Washington, D.C.?

A. I do not.

Q. So when you moved to Sweden at age 14, where did you move to?

A. We moved to a town called Jonkoping.

Q. And that's the town that's referred to in paragraph three of your declaration, correct?

A. Yes.

Q. And how long did you live in Jonkoping?

A. Possibly around 10 years, nine or 10 years.

Q. And where did you move after that?

A.   After that I moved to Gothenburg, which is a town two hours from Jonkoping.

Q.   And what year roughly was that?

A.   When I moved to Gothenburg?

Q.   Yes.

A.   It must have been 2009, I think.

Q.   And had you graduated high school at that point?

A.   Yes, I graduated high school, and after that I moved to Gothenburg.

Q.   And when you moved to Gothenburg, did you have a job?

A.   Yes, I was working at marketing and web firm in Jonkoping.

Q.   And what was the name of that marketing firm?

A.   It's Capo Marknadskommunikation.

Q.   You said Capo Marknadskommunikation?

A.   Capo Marknadskommunikation in Swedish.

Q.   And that's the company referred to in paragraph six of your declaration, correct?

A.   Yes.

Q.   So can you just describe briefly what that company did?

A.   That company did produce printed materials for other companies like catalogs, brochures.  They made websites, they made animations and similar -- other similar.

Q. What kind of work did you do for Capo Marknadskommunikation?

A. I was kind of doing mixed work, pretty much everything that needed to be done. Most of it had to do with computers. Like I've made some catalogs, I've worked on some websites, things like that.

Q. Just roughly, how long did you work for Capo Marknadskommunikation?

A. It must be something like five years, four or five years.

Q. And do you know what a DNS registration is?

A. Yes.

Q. Can you just briefly tell us what a DNS registration is?

A. A DNS is what you type -- when you type an address in the browser, that name is a DNS.

Q. And so as part of your job for Capo Marknadskommunikation, did you ever register any website names for your employer for clients?

A. Yes, I did several times. I have also had other small freelance projects that I took where that was a common task.

Q. And on top of your job with Capo Marknadskommunikation, are you testifying that you also did freelance work?

A. Yes, I was taking a number of small freelance projects on the side.

Q. And just generally, could you describe what type of freelance projects you took or did?

A. They would be IT related. I was looking for other professionals and people who were working in this sphere to maybe try to work for them or try to learn from them. If it was possible, be maybe a part of their project or to offer them some kind of help. And that's basically where most freelance projects came from.

Q. You just testified that you said you were looking to learn from the people that you were working with. What, if anything, were you seeking to learn?

A. I was basically looking for different ways to like make money on the internet or get any tradable skills that I could use in the future.

Q. And during this time period, did you learn about Bitcoin?

A. Yes, at a certain point I learned about Bitcoin.

Q. Do you remember when that was, just about?

A. This must have been around 2010, 2009 to 2010.

Q. And when you learned about Bitcoin, what, if anything, did you do in relation to your interest in Bitcoin?

A. I started to look for other people who were also

interested in Bitcoin. I started meeting them, seeking them out, you know, talking with them. I started going to meet-ups. At one point, I started buying and selling this Bitcoin as well, you know, using it -- using the actual software, the Bitcoin software.

Q. I just want to back up. You said you started going to meet-ups. Can you explain what a meet-up is?

A. A meet-up is just a group of people who are interested in the same theme. In this case, Bitcoin or other IT related themes that are just meeting at a place to talk and discuss things.

Q. And where were these meet-ups?

A. A lot of the times in like restaurants, like a bar, restaurant bars. Sometimes at different locations like -- like if the organizer had access to another location like a school, you know, after school hours, just locations like that.

Q. And did you have an apartment in Gothenburg?

A. I had an apartment in Gothenburg, yes.

Q. And did you ever have people over at your apartment for meet-ups?

A. I wouldn't say for meet-ups, I never hosted an actual meet-up in my apartment. But I had people from the meet-ups and people that I knew at the time visit me in my apartment, and we would discuss similar things as well. I

guess you could call it kind of a small meet-up, but it wasn't advertised.

Q. Did you have wifi at your apartment?

A. Yes, I had wifi in my apartment.

Q. And you shared your wifi with the people who came over to your apartment?

A. Well, yes, I think it's pretty normal. I think -- I would say most people do that just as I did, if guests come over and they need internet, I would give them my wifi. I didn't see any harm in that.

Q. Now, you mentioned -- I think, if I heard you right, you testified that you started -- did you say that you started trading Bitcoin around this time, too, around 2010, 2011?

A. More buying and selling, certainly. I don't know, I think trading refers more to -- I'm not sure, but I think it refers more to being on some platform and trying to guess the price movements in the future. I think I started -- I started doing that as well, but I think I started doing that later.

Q. Well, initially at first, were there any exchanges that you could do any trading on?

A. No. Early on, you couldn't really buy Bitcoin anywhere really other than another person that has Bitcoin. They started -- some exchanges started coming up, but for a

long time a lot of the people didn't really trust them because nobody knew what they -- whether they were regulated or who runs them or what is going to happen with the money if you send any money there. So there was a long period there where it was really hard to exchange on a platform.

Q. You said you went to meet-ups. When you went to meet-ups, did you buy and sell Bitcoin at these meet-ups?

A. Sometimes.

Q. And at some point, did you ever hear or learn about Bitcoin Fog?

A. Yes, I was introduced to it as a means to mix my transactions. Several people had mentioned it to me after one of them was really adamant about making me understand that it's a privacy practice that probably everybody should do, so then I started using Bitcoin Fog.

Q. Why would you use Bitcoin Fog for privacy reasons?

A. Well, the way it was explained to me is that every transaction in Bitcoin is public. It's there on the internet, and it's available for everybody to see. And if you don't do any kind of mixing or any kind of -- yeah, mixing essentially, then anybody who can see your address -- for example, if I buy Bitcoin from somebody who I meet in person and they see who I am, they see my identity, my face, and they also see my address, from that point on they can track all of my transactions and how much money I have, and

where do I send it and things like that.

I didn't -- that seemed like a basic privacy concern. I was also really concerned about being robbed or hacked, either at one of those meet-ups or if a person that I'm trading with, maybe later after our trade, they will get my information and then they will go after me one way or another. I wanted to prevent that.

Q. And so you became a user of Bitcoin Fog, am I understanding you correctly?

A. Yes.

Q. Did you ever operate or administer Bitcoin Fog?

A. No, I never operated Bitcoin Fog or administered it.

Q. And the funds that you used -- that you mixed through Bitcoin Fog, where did they come from?

A. They were just the money that I had at the time. They came from my job essentially.

Q. Would it be fair to say that you were mixing the proceeds of your paycheck?

A. Yes. Yes, you could say that.

Q. And after you mixed your legitimate funds through Bitcoin Fog, where did you deposit them?

A. I would have them in my wallets on my computer. I would -- I've used a lot of different wallets and different services over the years --

Q. And does that include --

A. -- in a lot of different places.

Q. Does that include your Kraken account -- Kraken accounts, I'm sorry, plural?

A. Yes, that includes my Kraken accounts.

Q. So turning your attention to the period around 2013 and 2014. Did there come a time where you took a break from your job at Capo Marknadskommunikation?

A. Yes, I took a six-month leave, and they said that I can come back pretty much at any point, you know, in the near future. So that gave me more confidence to try to leave my job like that. At that point, my savings had gone up to a point where I felt that six months is a time that I could do without my job and still be okay financially.

Q. And after that six months was up, did you go back to work for Capo Marknadskommunikation?

A. I never went back full-time, I think I went back a couple of short periods of time to help them out with certain things that -- like maybe there were some questions that they felt that I could answer in the best way or perform certain tasks.

Q. And how did you make ends meet if you didn't go back to work full-time with Capo Marknadskommunikation?

A. It was my savings, my Bitcoin. The price has gone up a lot already at that point, and it continued to go

further up and up.  The consensus that I was reading and I was hearing from other people involved was that it is -- it was very likely to go up even more.  I trusted that for some reason.  But then again, I also -- I knew that I can go back to my job at any point.  And also living in Sweden, I know that you can't really become homeless in Sweden unless you really, really want to.  Sweden has a really high standard Social Security network.  I was young, I wanted to experiment.

Q.    During this time period, after you left Capo Marknadskommunikation, did you experiment with any other kind of projects or businesses or work or anything like that?

A.    Yes, I had a lot of ideas that I wanted to pursue. A big one was my mental health coaching.  It was a long time dream and aspiration of mine to become a mental health coach.  I saw that it is relatively hard to make a lot of money on that in the short term for somebody like me who doesn't have a well established name, so I used the time to educate myself on that.  We had opened a music studio in Gothenburg with some friends.  Eventually I started working on my VPN project.

Q.    I'm sorry, the VPN project, is that -- that you're referring to, is that the To the Moon VPN?

A.    Yes.

Q.   Could you just briefly describe that business and what happened to it?

A.   Well, I had the idea that I can make a VPN business like Nord VPN. I think a lot of people maybe are familiar with them. It looked relatively easy, because I didn't see how much those businesses were doing kind of on the back end. I was still interested in Bitcoin, so I had the idea that if you allow people to pay with Bitcoin, that would kind of generate a lot of -- a lot of people would just come to this business just by -- just because of that. It didn't really work out. My best explanation is that it just was much more work than I anticipated. There are a lot of other VPN businesses out there. I don't know if I should have thought about that before I started, you know.

But yeah, I developed it for -- you know, it took some time to make the website. I had to get help of some people to work on more technical stuff that I couldn't really do. I used -- there are a lot of other VPN businesses out there, so there are ready-made solutions which you can just kind of download and configure to your own desires. You don't really have to make -- you don't really have to develop that much. Eventually I just gave up. I understood that it wasn't -- it was a lot more work than I expected, and I wasn't that interested.

Q.   As part of that business, did To the Moon VPN have

servers?

A.    Yes.

Q.    Were those servers in Romania?

A.    There was the main server in Romania, yeah.

Q.    Do you know if the government seized that server as part of this prosecution?

A.    I believe so.

Q.    As far as you know, is there a trace of evidence on that server or anything related to that business that shows that you had anything to do with operating Bitcoin Fog?

MR. BROWN:    Objection, argumentative.

THE COURT:    Overruled.

BY MR. EKELAND:

Q.    You can answer.

A.    I don't see how there could be, and no, I don't think so.

Q.    As far as you're aware, has the government ever found the Bitcoin Fog servers?

A.    I have to rely on what my attorneys were telling me, which is no, I don't think they have.  I think we have --

Q.    And you've never seen anything in the discovery that you've reviewed having anything to do with the operation of Bitcoin Fog, have you?

A. No, I don't really have good access to my discovery. I'm locked up, I have very limited -- I was able to look at a very limited number of files from the discovery. But to my knowledge, no.

Q. So going back to this period around 2014. Is that roughly when you set up your Kraken account?

A. That could be the case, I'm not sure.

Q. And that Kraken account you set up in your own name, correct?

A. Yes.

Q. And you provided a photo ID to set it up?

A. Yes.

Q. And what did you use those Kraken accounts for?

A. I used my personal Kraken account to trade Bitcoin and other cryptocurrencies. I was spending a lot of time on learning how to trade -- how to predict the price movements, to make money on the volatility of the market, which takes a lot of time and a lot of experimentation. So that was one purpose for my Kraken account. You said Kraken accounts, plural. The only other Kraken account that I know of is the one for the VPN, my VPN business. And that was only used for the transactions that are related to that business.

Q. And what were the source of the funds that you deposited in your Kraken account?

A. It was my Bitcoin that has gone up in value --

Q. And how --

A. -- a lot.

Q. Sorry. And how did you pay for that Bitcoin?

A. Well, originally I paid with -- like I said before, with my paycheck. The original Bitcoin that I ever bought, that I first bought, that was just the money that I had at the time. And all the money that I had at the time came pretty much from my paycheck.

Q. So is it fair to say that the money that you had in your Kraken account and all your wallets that you've been talking about came from the money that you earned at your job, and then those Bitcoin and whatnot appreciated substantially during the period that you had them in there; would that be fair to say?

A. Yes, they appreciated astronomically. They appreciated more than any people in the meet-ups that I'd met had ever thought they would. They went from below a dollar to like tens of thousands of dollars.

Q. And so now we're talking about the period from 2014 on. At any time -- well, actually, at any time, did you visit the United States?

A. Yes, I visited the United States a couple times for vacationing and visiting friends.

Q. And are you aware that the government put you under surveillance during one of these visits?

MR. BROWN: Objection, relevance.

THE COURT: Overruled.

BY MR. EKELAND:

Q. You can answer.

A. I can answer?

Q. Yes.

A. I was not aware at the time of course, I don't know how I would be. I am aware about that now.

Q. And so you mentioned your music studio. Whatever -- what, if anything, ever happened to your music studio?

A. It was operating for a number of years, three, four years I think. There were some people coming there recording their projects. We were also using it for making our own content like the mental health related content, like audio and video. In the end, there were three people that were in the studio project, and they all -- including me, pretty much we all wanted to kind of go forward. So we -- at one point, we just decided that we're going to sell it.

Q. And did you sell it?

A. That was the end of that, yes.

Q. You mentioned -- you said you had three other partners in the music studio?

A. Two others.

Q. As far as you were aware, did the United States

Government ever interview your partners?

A. As far as I'm aware, no.

Q. As far as you're aware, has the United States Government interviewed any of your family or friends or anybody in your life in Sweden regarding your -- any alleged connection to Bitcoin Fog?

A. No, as far as I know, they haven't.

Q. And did anybody from either Swedish law enforcement or the United States Government ever bother to interview you before you were arrested?

A. No, never.

Q. As a matter of fact, I know you said you've had limited access to discovery. But in your review of your discovery, have you seen any witness interviews of anyone?

A. I haven't seen any interviews with anybody that I know.

Q. So I just want to turn your attention to paragraph 36 in the declaration. I want you to just take a look at that. It says in 2021 you signed up for flight school?

A. Yes.

Q. Is that accurate?

A. Yes.

Q. And why, if you have a reason, did you sign up for a flight school intensive in Sacramento, California?

A. Well, I had no continuous income at that point, I

guess if you don't really count trading.  But I wasn't that
proficient in trading at that point yet.  I didn't know if I
was ever going to be.  Bitcoin was still going up a lot, but
I couldn't count on it still doing that forever, you know.
I looked for something to -- a source of income.  I looked
for a job or a project that I can do.  After researching for
a long while, I concluded that being a small aviation pilot
could be a good occupation for me.  I talked to several
pilots.  I thought that my -- that with my interests, I
could learn to be a pilot.  I know they could make good
money working in that field.  So I started researching
schools and the different licenses that you can have.

And it turns out that the U.S. FAA license is the
most practical one that you can have in the whole world,
because a lot of the small airplanes in the world are
registered in the U.S. and so you need the U.S. license.
There was a network of airports and schools in the U.S. that
is really extensive, it's really friendly for people trying
to learn that, so I decided that that would be a good bet.

Q.   And could you just briefly describe the program
that you signed up for?

A.   The program was going to be, I believe, a two-week
intensive where you are -- there's at least six hours of
actual flying training every day.  There's also
additional -- I believe two or more hours of training on the

ground. This would allow you to get the first step of the commercial aviation license in three weeks. Of course, this is not counting the time that I've spent before studying the theoretical parts of the program.

Q. And it was this flight school that you were headed to when you were arrested at LAX, Los Angeles International Airport, correct?

A. I landed in LAX to -- with the main purpose to go to my flight school, yes.

Q. Just directing your attention to paragraph 37 in the declaration. You mentioned that you quarantined in Russia before you arrived in Los Angeles. Can you explain why you did that?

A. Yes. So when I had already planned my training in this flight school, I discovered that the U.S. at the time still had COVID-19 related restrictions on who can enter the country. And for some reason, they had a restriction that said that nobody who was in any country in the Schengen zone in the EU for the last 14 days could enter the United States. Surprisingly -- somewhat surprisingly to me, Russia was on the list of the few countries that the U.S. was actually allowing people to enter from. Since I had the Russian passport, I just decided to go there for 14 days to be allowed to enter into the United States so that I wouldn't miss my intensive and expensive flight training.

Also, at the time, it's a strange fact, but a lot of the flights around the world were being canceled like two days or a day before. Even if you had a ticket for like weeks in advance, they would cancel a flight the day before. Because I think so many airplanes were shut down or grounded because of COVID-19, and the companies couldn't make it work with the whole mess of the situation that that was. But surprisingly people on the internet wrote that most flights from Moscow were actually keeping the schedule for some reason.

Q. Just for the record, Sweden is part of the Schengen zone?

A. Yes.

Q. And you mentioned in paragraph 38 of your declaration, I think, that you had -- you have four passports. Could you explain why you have four passports?

A. Yes. I am still a citizen of Russia, where I was born. In Russia, they make you have two passports, they require you to have two passports. Although they do that, it's only one of those passports that can actually be used for travel outside of Russia. So really, it's more like one passport unless you're in Russia. This is why I had two Russian passports, I'm required by law to have two passports there.

I also had two Swedish passports, which were --

one is essentially a copy of the other one. They're in the same name, in my real name, of course. I'm not sure, but I think they might actually have the same passport number. And they were issued by the Swedish government through the official channels, the Swedish government knows about that. There was nothing illegal or clandestine or whatever about my two Swedish passports. I try to bring all of my passports with me wherever I travel, because I'm not trying to hide anything, I'm not trying to hide any documents. I know that sometimes they ask -- on the border they can ask for all of your passports and all of your documents, so I just bring them with me.

Q. And your Russian passports, just for clarity on the record, those were legitimately issued by the Russian government?

A. Yes, of course my Russian passports were as well fully legitimate.

Q. And do you recall at some point in this prosecution being accused of having fake passports?

MR. BROWN: Objection, that misrepresents (inaudible).

THE COURT: You can answer the question.

THE WITNESS: I certainly remember that it was at least insinuated.

BY MR. EKELAND:

Q. Just turning your attention to your arrest at Los Angeles International Airport, or LAX.

THE COURT: I'm sorry, I'm not entire following what this has to do with the question of traceability.

MR. EKELAND: I will connect --

THE COURT: He's accused of having false --

MR. EKELAND: I can connect, because the next thing I'm going to discuss is the evidence that was seized at the airport and what was on it.

THE COURT: Okay.

MR. EKELAND: And so -- and it also will go to his initial pretrial services detention interview and the conditions that that was conducted under, which the government has made an issue. So I will connect, Your Honor. If you think that's inadequate, please let me know.

THE COURT: Okay.

BY MR. EKELAND:

Q. So turning your attention, Mr. Sterlingov, to your arrest which was on April 27th, 2021, correct?

A. 26th or 27th or something, yes.

Q. Could you just briefly describe what happened when you arrived at the airport?

A. Yes. As I was exiting the airplane and the corridor, I was stopped by two agents that told me that this was some kind of random check. They did not tell me that I

was under arrest. They took all of my luggage. I was brought to a room for inspection where they started going through my luggage and started asking me a lot of questions. I was answering all of their questions like I normally always do, truthfully and calmly and just giving them the facts. This went on for almost like close to an hour.

After a while, they started asking really invasive and personal questions. I started to suspect that something else was going on there. After that hour, they moved me to a different room. I met four different agents. At that point, there was -- that was the first time that they told me that I was under arrest. At that point, I was shocked. I didn't really understand what was going on. After being handled like that by the first agents and the second agents, I was thinking that something fishy or something not right was going on in that situation. I told them that I wanted to speak to an attorney. They said okay. After that, they still continued to ask me some questions. They continued talking to me for another hour or so while they were also transporting me to something like a holding facility.

Q. You mentioned that they seized your luggage at the airport when they arrested you. Did I hear that correctly?

A. Yes.

Q. Just directing your attention to what's been marked for identification as Defendant's Exhibit D, it's

behind tab D.  You can just take a quick look at that, and look up when you're done.

(Witness reviews document)

A.  Yes.

Q.  Is that a fairly accurate list of what you were carrying and that was seized from you at the airport?

A.  Yes.  Aside from some typos and some small inaccuracies, yes, it's pretty much accurate.

Q.  Just directing your attention to control number one, suitcase number one, the first entry there where they're describing what's seized by the government.  It says unlabeled DVD-R in jewel case, do you see that, and three they say prepared SIM cards?

A.  Yes.

Q.  Why were you carrying those SIM cards?

MR. BROWN:  Objection, relevance.

MR. EKELAND:  This is directly relevant -- Your Honor, the government has maintained that Mr. Sterlingov operated Bitcoin Fog for 10 years and money laundered $334,000,000.  They caught him with all his computers, his SIM cards and cellphones.  This is directly relevant whether or not he operated Bitcoin Fog.

THE COURT:  But that's not relevant to today's proceeding, because under the Kaley decision, I have to rely on the indictment for purposes of those allegations.

MR. EKELAND: Your Honor, Luis, which supersedes Kaley, makes very clear that the grand jury's determination -- and I can give you the citation, I've got it right here actually. It's Luis v. United States, it's 2016, it's 136 S. Ct. 1083. It makes it very clear that the grand jury's determination as to probable cause does not settle the traceability question.

THE COURT: Agreed.

MR. EKELAND: So I don't understand why -- I guess my question is why that the evidence that was seized at the airport, that all would go directly to him operating Bitcoin Fog, when the government maintains that after his arrest Bitcoin Fog stopped, has absolutely nothing on it that shows that he ever operated Bitcoin Fog.

THE COURT: But the allegation in the indictment is that he operated Bitcoin Fog, and under Kaley, I need to accept that finding of probable cause with respect to the operation of Bitcoin Fog. Although you're right, that the question of traceability and whether the assets here are traceable to that allegedly unlawful conduct. But I have to assume for purposes of these proceedings that he did -- that he did what the indictment charges that he did, which is operating Bitcoin Fog.

MR. EKELAND: But the issue with traceability -- and here's the problem with this issue and why Kaley is a

bit confused --

THE COURT: Well, whether it's confused or not, it's binding on me.

MR. EKELAND: Even Kaley says in footnote nine by Justice Kagan that the traceability issue is separate. But the problem that you have here is that what the government is alleging Mr. Sterlingov's money came from is that he's getting royalty payments from the operation of Bitcoin Fog. And the fact that if he's not operating it, that goes directly to the traceability, because none of those funds are coming from his operation. It's a bit of a catch 22 here, right.

THE COURT: It may be, but it's what the law is. And the Supreme Court did distinguish between the inquiry about whether he did what he's alleged to have done, and whether the funds at issue are traceable to that conduct. And with respect to the allegations in the indictment, I think the Supreme Court was completely clear that the probable cause that underlays -- or underlied the grand jury's determination can't be revisited for purposes of this proceeding. The only thing we can now consider is whether the funds at issue are traceable to that alleged unlawful conduct.

MR. EKELAND: Then, Your Honor, I'm just going to note my objection for the record and make a proffer to say

that all this -- what this proffered testimony here would show is that none of the funds are traceable, and that the fact that --

THE COURT: I'm not cutting you off, you can make your record. I'm just telling you what my understanding of the law is here. If you've got a gripe with that, you may need to go to the Supreme Court pretty quickly. But I can't ignore what the Supreme Court has told me.

MR. EKELAND: Well, given how many times this issue has come up in front of the Court recently, that's something I can really see happening. Because this is a fundamental right that we're talking about, and we are talking about structural error if the determination is made wrong. You know, it's very serious. When I look at the case law here, the Court's all over the place. And Luis -- but it's -- what's happened here, you've got essentially -- you're seizing funds pretrial, which is in derogation of the common law.

And you're effectively preventing a defendant from mounting a defense based on -- like I think this case is a classic example, based on the flimsiest allegations without any support. They seize all his assets at the airport, everything, all his computers, his diary, everything. And there's not a shred of evidence in it, not even of him operating or any funds being traced to him. In this entire

time, in the two and a half years of this case, nobody's identified a single crime, a single specific crime that's tied to Mr. Sterlingov, yet he's been in jail two and a half years.

THE COURT: Well, part of that is at your request that we put off the trial.

MR. EKELAND: What's that?

THE COURT: That's in part at your request that we put off the trial.

MR. EKELAND: And we had no choice, because we don't have 42 billion dollars for the government, and the government has seized all his money pretrial.

THE COURT: If there's no evidence, then there's no reason you can't just go to trial and show that there's no evidence. I mean, if your point is that the government to this day has unearthed not a single piece of evidence tying Mr. Sterlingov to the operation of Bitcoin Fog, you know, we can call a jury right away and we can go to trial on that.

MR. EKELAND: We are going to trial on that.

THE COURT: I know, but you're the one who wanted to -- my only point is I understand and I'm concerned about how long Mr. Sterlingov has been in jail. But that was his decision and your decision to continue the trial date.

MR. EKELAND: Yes, but it wasn't our decision to

incarcerate him pretrial.

**THE COURT:** Understood.

**MR. EKELAND:** That was fought like three times.

**THE COURT:** Well, I understand. Let me say this: If you want to make your record, you're welcome to make your record. I just want to make clear to you my understanding of the law and that I'm bound by what the Supreme Court says; and that even if you don't think it makes any sense, it's binding on me. You can argue all day long with me about whether what the Supreme Court said made sense or not, but it's not going to move me in the slightest because I'm bound by their decisions.

**MR. EKELAND:** Absolutely, Your Honor. I'm merely noting I think I interpret the law differently than the Court. And also, I think the Supreme Court is again somewhat confused on this issue. One of the problems you have here is that you really -- the question of whether -- of operating Bitcoin Fog and the traceability, they're mixed. They're mixed together. It's like this kind of artificial distinction that people are trying to make, like this kind of cookie cutter approach to this, right. What's very difficult about this case is we're being forced to prove negatives.

The fact that they seized all his computers at the airport and there's nothing on there that he's operating

Bitcoin Fog, that there's not a shred of evidence --

THE COURT: Can I make a suggestion, this is legal argument and we can get to the legal argument later. Why don't you finish with the examination. You're welcome to make your record, and then you can argue to me about the Supreme Court precedents. If I'm misunderstanding them, you can explain to me why I'm misunderstanding them. But why don't we continue with the examination.

BY MR. EKELAND:

Q.    Yes, Your Honor, excellent.

So Mr. Sterlingov, I'm turning your attention back to -- it says three prepared SIM cards. What's a prepared SIM card?

A.    I don't know what that is. My best guess is it's just a prepaid, it's a typo.

Q.    And why were you carrying SIM cards -- and you see below it says mobile phones. Why were you carrying SIM cards with you and mobile phones with you?

A.    I use SIM cards for my phone, for my internet connection, for -- yeah, for those things.

Q.    And you see -- taking you down -- I'll just speed ahead a little bit here. You see control number five in suitcase one, it says that they seized an MSI laptop?

A.    Yes.

Q.    And that was your laptop?

A.   Yes.

Q.   It also says that they seized two Raspberry Pi mini computers; is that correct?  That's on the bottom of page one.

A.   Yes, I assume that's correct.

Q.   And then you see on the top of page two it says that they seized storage cards and USB storage sticks?

A.   Yes.

Q.   And as you go down here, you can see number 11, they seized another Raspberry Pi computer; is that correct?

A.   Yes.

Q.   And you see in number 14 it says they seized financial documents and handwritten notes?

A.   Yes.

Q.   And then just directing your attention to the next page.  You see on that page where they -- the government seized more of your receipts and notes and handwritten notes and IT documents?

A.   Yes.

Q.   And they seized all of that?

A.   I believe so.

Q.   And in all of that, in all those computers and all those storage devices and everything, are you aware of a single shred of evidence that you ever operated Bitcoin Fog?

A.   I don't see how there could be, and I'm not aware

of any, no.

Q. And are you aware of a single piece of evidence in all of that -- your computers, your hard drives that they seized, and I believe they seized your diaries, that shows that any of the funds that you had in any of your wallets are traceable to any illicit proceeds or any kind of crime whatsoever?

A. No, not that I know of.

Q. Are any of your proceeds at all in any of your accounts traceable to any crime at all?

A. No.

MR. EKELAND: I pass the witness, Your Honor.

THE COURT: Okay. Cross-examination.

CROSS-EXAMINATION OF ROMAN STERLINGOV

BY MR. BROWN:

Q. Good morning, Mr. Sterlingov.

A. Good morning.

Q. I'd like to re-center your testimony a little bit and talk about the two Kraken accounts that are at issue today.

Do you understand that this hearing is about those two Kraken accounts, right?

A. Yes.

Q. And the first account was in the name of Roman Sterlingov with account number AA68N84GQUXTDGMY, correct?

A. I don't recognize that number. I assume you're referring to my personal Kraken account.

Q. But you owned a personal Kraken account?

A. A personal Kraken account.

Q. And it's your understanding that the testimony today is about that personal Kraken account, right?

A. Yes.

Q. And there was a second account, right?

A. The VPN account?

Q. There was a second Kraken account, correct?

A. Which one is that? Is that the account of the VPN business?

Q. There was an account in the name of To the Moon, LTD at Kraken, correct?

A. Yes.

Q. And that was your account, right?

A. That was the account of the business.

Q. Of the business. There was another account holder on that, right?

A. There was -- I'm not sure about that. I'm certain that what they require you to have is something they call an ultimate beneficial owner. And I do believe that that was me, that was set to my name.

Q. So To the Moon, LTD was a Malta corporation, right?

A.    Yes.

Q.    And was there some requirement for a Malta corporation that you had a Maltese citizen on an account that was a business account?

A.    Yes.

Q.    But to your knowledge, that was really your account, you were the real person controlling that account, right?

A.    I was controlling the business, and the business controlled the account.

Q.    Well, let's just make sure that we're clear on this.  Is this your account, To the Moon, LTD?

A.    This is the account that belongs to the business.

Q.    Do you have a claim to the funds in the To the Moon, LTD account?

A.    What does that mean?  I don't understand.

Q.    Do you have a right to use the funds in To the Moon, LTD to spend as you like?

A.    If they're in the business, then I would say no. If you're asking if by virtue of being -- of that business being my business, if I can take the money out of the business and then use it for any personal uses, then I would say yes.

Q.    So it is your account effectively, correct?

A.    It is the account of the business.  I don't think

it's my personal account, no. It's not my personal account.

Q. It's not your personal account, you don't have a right to use funds in that account for your personal expenses?

A. I do not.

Q. Now, the --

A. I'm not sure actually --

Q. There's no question in front of you right now.

THE COURT: I'm sorry, if he wants to clarify his answer, he can do so.

BY MR. BROWN:

Q. Okay.

A. I'm not sure if there's any law regarding that in Malta or however that works, but that would not be I guess the right way to do business certainly.

Q. Now, would it be fair to say that you opened the account in the name of Roman Sterlingov on May 18th, 2014?

A. Which account?

Q. The account in your own name at Kraken. Roman Sterlingov is your name, right?

A. Yes.

Q. And you opened an account in the name of Roman Sterlingov on May 18th, 2014; is that correct?

A. I'm not sure, it could be correct. I don't remember the exact date.

Q. You don't remember the exact date, but --

THE COURT: I'm sorry, it's impossible for the court reporter if you're talking at the same time. So make sure you give each other a chance to finish and then proceed.

BY MR. BROWN:

Q. Yes, Your Honor. Do you have any reason to believe it was not in May of 2014 that you opened that account?

A. I just don't have the exact memory of the date.

Q. And the Kraken account in the name of To the Moon, LTD, was that opened on May 24th, 2014?

A. I don't know. I don't know that it was not.

Q. Does that sound plausible to you, that it was opened in May of 2014?

A. It could be, yes.

Q. It could be. Do you have any reason to believe it was not opened in May of 2014?

A. Like I said, no, I do not.

Q. In this proceeding, we're also talking about a LocalBitcoins account. Do you understand what I am referring to when I talk about LocalBitcoins or LocalBitcoins.com?

A. Yes.

Q. And LocalBitcoins is a website where you can

advertise for buying and selling Bitcoin, right?

A.   Yes.

Q.   And you can also keep money on account with your LocalBitcoins account, right?

A.   Yes.

Q.   And you had a LocalBitcoins account with the user name of GothenCoin, correct?

A.   Yes.

Q.   And that was registered in your true name, in the name of Roman Sterlingov, right?

A.   Yes, I believe so.

Q.   Do you have or have you ever had any other LocalBitcoins accounts?

A.   I'm not sure.  I could have, I could have not.

Q.   What level of confidence do you have that you may have had any other LocalBitcoins accounts?

MR. EKELAND:  Objection.

THE COURT:  What's the objection?

MR. EKELAND:  Calls for speculation.

THE COURT:  Overruled.

BY MR. BROWN:

Q.   You can answer.

A.   I really couldn't tell you, I don't know.

Q.   So you really cannot say whether or not that was your only LocalBitcoins account?

A.    Over the years, I had numerous accounts on wallets and services.  As an enthusiast, I was trying different services and accounts.

Q.    And LocalBitcoins is just one service, right?

A.    Right.

Q.    But you think you may have opened more than one account on that one service, right?

A.    It is possible, I don't know.

Q.    If you opened another account on LocalBitcoins.com, what would your user name have been?

A.    I don't know.

Q.    Would you have registered under your true name Roman Sterlingov or used a different name?

A.    I don't remember if LocalBitcoins was a website that was enforcing real names.  I know it was not a bank.  I don't think it was a financial institution.  I don't know if it -- I don't remember if it required you to give any name.

Q.    In this particular case, you did register an account using your name on LocalBitcoins, correct?

A.    The GothenCoin account, is that the one you're talking about?

Q.    The question is before you.  Did you register a LocalBitcoins account in your own name of Roman Sterlingov?

A.    I think so.

Q.    You think so?

A.   Yes.

Q.   If you could -- do you have the government exhibits in front of you?

A.   No.

MR. BROWN:   Your Honor, may I approach the witness?

THE COURT:   You may, but let me ask you, what would be a good time to take a break?  Do you want to take a break now or I'm happy to give you a few more minutes?  Whatever you want.

MR. BROWN:   Your Honor, if I could just follow through with this line of questioning.

THE COURT:   That's fine.  You can approach the witness.

BY MR. BROWN:

Q.   Thank you.  Mr. Sterlingov, if you turn to the very last page in that notebook -- I believe I had it opened to that last page when I handed it to you, there's an exhibit that's marked as Government's Exhibit 25.

Do you see that?

A.   I see that.

Q.   And this is -- these are account records that were produced to the government from LocalBitcoins.com related to an account.  Do you see the -- up near the top there's a line that says account user name, and then below that

there's a line that says real name.

Do you see those two lines at the top?

A. Yes.

Q. And at the very top it says account user name, GothenCoin, right?

A. Yes.

Q. And then below that it says real name, Roman Sterlingov, right?

A. Yes.

Q. And so when you registered this account on LocalBitcoins, you gave your real name, right?

A. Yes, it appears so.

Q. If you registered any other accounts on LocalBitcoins, would you have given your real name or would you have given a fake name?

A. I don't know if I would have given a fake name. I don't know an answer. I know that whenever I'm on the internet in general and giving any sort of information, if it's not a banking institution that requires me to have my -- to verify my identity, sometimes I'm reluctant to just give every website all the information about myself. I don't know if that was the case with any other account.

Q. Are there cryptocurrency exchanges that don't require that they verify your identity?

A. I don't know.

Q.   To your knowledge -- so LocalBitcoins was an example, this was a service where you actually sent and received Bitcoin from LocalBitcoins, right?

A.   Yes.

Q.   Are there any other services that you signed up for where you sent and received Bitcoins where you did not use your real name when you set up the account?

A.   Where I sent and received, are you talking about trading in person or are you talking about any sort of wallet period?

Q.   So LocalBitcoins, it's a third party, right?

A.   Okay.

Q.   It's a company, right?

A.   Okay.

Q.   Do you -- yes or no?

A.   Yes.

Q.   And you can sign up for a service on LocalBitcoins, right?

A.   Yes.

Q.   And you set up an account, right?

A.   Yes.

Q.   And you use that account to do a few things.  But one of the things that you can do is you have a Bitcoin account on LocalBitcoins, and you can send money to it and you can take money out of it, correct?

**A.** Are you talking about a wallet? I think they call it a wallet usually, okay.

**Q.** So you have a wallet on LocalBitcoins, right?

**A.** Yes.

**Q.** Are there any other services that you have signed up for where you have a Bitcoin or other cryptocurrency wallet where you did not sign up in your true name of Roman Sterlingov?

**A.** I mean, certainly I think there are wallets that don't even ask for your name, or if they ask for your name, they don't enforce it. It is possible that I've at some point registered for a service like that and did not give them a name --

**Q.** What --

**A.** -- or I did not verify my account.

**Q.** What other names would you have used when signing up for cryptocurrency accounts?

**A.** I don't use any other names. I don't know.

**Q.** Do you ever use the name Max?

**A.** Max is -- yes, Max is my first name in Sweden. When we first moved to Sweden, I had encountered a fair amount of -- I don't know if you want to call it racism or just prejudice against Russian people. So whenever I would introduce myself as Roman, that would make the person I'm talking to be prejudiced against me -- which I noticed

several times.  So in Sweden, I've used the name Max because it's a Swedish name.

Q.    And do you ever go by the name of Max Power?

A.    Max Power is just my Facebook account name.

Q.    So would it be possible that you signed up for other cryptocurrency accounts in the name of Max, in the name of Max Power or other names that are not your legal name?

A.    I'm not sure, I think it's unlikely.  Because whenever -- if there is an account where they wanted to verify my legal name -- like if it's a bank or if it's an exchange that is regulated, they always ask for your legal name and I always give my legal name.  But I'm not sure if I've ever used Max on any websites that don't require you to verify your account.

Q.    And to your knowledge, was LocalBitcoins a website that required you to verify your account?

A.    I'm not sure, I think they've been changing that.

Q.    When you --

A.    I think at some point they did not --

Q.    -- did -- I'm sorry.

THE COURT:  Go ahead, you can go ahead.

THE WITNESS:  I'm not sure, I think maybe at one point they did not.  I'm just not sure.

BY MR. BROWN:

Q. But you signed up for an account on LocalBitcoins, right?

A. Right.

Q. And when you did, did they verify your account -- did they verify your identity as Roman Sterlingov?

A. I don't remember. Here it says not verified in this document.

Q. But you're reading the document. The question is do you have a recollection of your identity being verified when you signed up for LocalBitcoins?

A. I do not have --

Q. It's a yes or no question.

A. I do not have a recollection of that. If it was, it seems like a trivial, everyday thing that happens on some of the websites. I don't know if I would have remembered that.

Q. So to sum it up, it's your testimony that this is your LocalBitcoins account, the GothenCoin account in the name of Roman Sterlingov, and you're not sure if you had any other Bitcoin accounts; is that accurate?

A. Yes.

MR. BROWN: The government moves to admit Government's Exhibit 25.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT:  Exhibit 25 is admitted.

(Government Exhibit 25 admitted into evidence)

MR. BROWN:  I'm happy to take a break now, Your Honor.

THE COURT:  Let's go ahead and take a 15-minute break, and we'll come back at five minutes of 12:00.

(Recess taken at 11:45 a.m.)

(Back on the record at 12:10 p.m.)

THE COURT:  Mr. Brown, you may continue.

BY MR. BROWN:

Q.  Hello again, Mr. Sterlingov.

A.  Hello.  Excuse me, I would just like to mention that from the questions that you asked earlier, it seemed to me that it -- you kind of made it sound like I was using the To the Moon VPN Kraken account for like my personal -- some sort of personal usage, like I was abusing the company for doing something for myself personally.  I'd just like to state that I don't think that ever happened.  I also -- I don't know --

Q.  Mr. Sterlingov, this will go faster if you wait for a question to be asked.  You will have an opportunity after cross-examination when your lawyer can get up and ask you questions if there's any part of your testimony that you feel the need to explain further.  But right now, just to be efficient about this, this will go better if I ask the

questions and you answer.

A. Okay.

Q. Now, we were just on break, right?

A. Yes.

Q. And you are still under oath, correct?

A. Yes.

Q. Did you -- during the break, did you speak to your lawyers or anyone else about the subject matter of your testimony?

A. No.

Q. Now, your lawyers submitted a document called the declaration of Roman Sterlingov, right?

A. Yes.

Q. And that's been admitted as Defense Exhibit A, correct?

A. Yes.

Q. And that's your declaration that represents, in part, your testimony before this Court, right?

A. Yes.

Q. And you reviewed it before your lawyers submitted it, right?

A. Yes.

Q. And you signed it, correct?

A. Yes.

Q. And you stated in paragraph 54 of that

declaration: "It was a common security practice of mine to mix any assets through Bitcoin Fog before depositing them into my Kraken account," right?

A. Yes.

Q. And that's true, right?

A. It's true.

Q. And is it true that you mixed most, if not all, of the deposits into that Kraken account through Bitcoin Fog before depositing them?

A. Yes.

Q. And just for the sake of clarity, we're talking about both those accounts, the Roman Sterlingov and To the Moon, LTD, right?

A. Yes, although I don't have exact recollection of every transaction. But in general, that describes the general picture, yes.

Q. But it was your practice in general to mix Bitcoin through Bitcoin Fog before you deposit it into either of those Kraken accounts, correct?

A. At some point before that, yes.

Q. And that's because sometimes the money went from Bitcoin Fog to LocalBitcoins or somewhere else before it ended up in the Kraken accounts, right?

A. It seems like that -- those transactions that you're talking about have happened. I would really like

to -- I saw in the document that you have submitted that it sounds like those are the transactions that you are trying to call layering or --

Q. We'll get to this, Mr. Sterlingov. There's no question before you right now. I'll walk through this. And like I said, your lawyer will have an opportunity --

A. Okay, I would like to return to that.

Q. Your lawyer will let you have an opportunity to explain anything further that came up during cross-examination.

But it's fair to say that most, if not all, of the funds that went into those two Kraken accounts at some point went through Bitcoin Fog, right?

A. Yes.

Q. Now, have you read the declaration that the government submitted by FBI staff operations specialist Luke Scholl?

A. Not in full, no.

Q. Are you familiar with that document, have lawyers showed it to you?

A. I'm not sure.

Q. You're not sure. Have your lawyers discussed with you an FBI analysis --

MR. EKELAND: Objection, Your Honor. This is privileged -- he's asking for privileged --

THE COURT: Sustained.

BY MR. BROWN:

Q. Withdraw the question.

Mr. Sterlingov, do you have an understanding that an FBI employee has prepared an analysis and filed a declaration before the Court about those two Kraken accounts?

A. Yes.

Q. And do you have an understanding of the contents of that declaration?

A. No, not in detail, no.

Q. And if the conclusion of that declaration was that one could trace Bitcoin from Bitcoin Fog directly or indirectly to those two Kraken accounts, would you disagree with that?

A. Conclusion that what?

Q. Let me rephrase the question.

THE COURT: Isn't this asked and answered? Hasn't he already testified that he agrees that the funds in the two Kraken accounts were -- could be traced directly or indirectly to Bitcoin Fog? I thought --

MR. BROWN: Yes, Your Honor, and I will withdraw the question.

THE COURT: Okay.

BY MR. BROWN:

Q. I think the point has been made.

A. I would please like to return to that question afterwards.

MR. BROWN: Well, Your Honor, may I -- it sounds like the witness wants to --

THE COURT: You can follow up, yes.

BY MR. BROWN:

Q. So Mr. Sterlingov, so those two Kraken accounts, do you agree or disagree that most, if not all, of the funds in those two Kraken accounts comes directly or indirectly from Bitcoin Fog?

A. Well, no, they don't come from Bitcoin Fog, they come through Bitcoin Fog.

Q. Okay.

A. They come from my own funds that I was mixing using Bitcoin Fog. They don't originate in Bitcoin Fog.

Q. So it's your testimony that the funds started someplace else before they went to Bitcoin Fog, right?

A. Yes.

Q. But you have no disagreement with the conclusion that funds came from Bitcoin Fog to your Kraken accounts, whether directly or indirectly?

A. Yes.

Q. Now, you testified on direct about how the government has never interviewed you or anybody that you

know, right?

A. Right.

Q. Now, what are some of the names of individuals that the government should interview to get a better sense of your story?

A. Members of my family, my friends in Sweden.

Q. So do you remember the names of any of your friends in Sweden who would have information relevant to this case?

A. Relevant to what specifically, to my --

Q. Mr. Sterlingov, you testified on direct examination that oh, the government has never interviewed any of my friends about my activities in Sweden. Which friends are you thinking of?

A. Any.

Q. What are their names?

A. Do you want the names of every person that I've ever met in Sweden? I don't understand the question.

Q. If you believe that your friends have relevant information related to this case, what are their names?

MR. EKELAND: Objection, Your Honor. Mr. Brown's question misstates the defendant's testimony. The defendant never testified that any of his friends have any relevant information. His testimony was that the government never bothered to interview anybody in Sweden regarding what

happened.

THE COURT: Well, you can rephrase the question in light of that, Mr. Brown.

BY MR. BROWN:

Q. You testified that the government never bothered to interview anybody who knew you in Sweden, right?

A. As far as I know, yeah.

Q. Now, what names of individuals in Sweden would you believe would have relevant information related to this case, related to your guilt or innocence in this case?

MR. EKELAND: Objection, Your Honor.

THE COURT: Overruled.

BY MR. BROWN:

Q. You can answer the question.

A. Okay. Are you asking -- what do you mean by relevant information?

Q. I will move on. Now, you also testified on direct examination that the government never bothered to talk to you or interview you; is that correct?

A. Right, that's correct.

Q. Isn't it true, though, that we actually met before, right? Isn't it true that -- met before you appeared in this courtroom, let me put it this way. We met at Northern Neck Regional Jail, right?

A. Yes.

Q. And that's because the government went out with my co-counsel and agents to go present evidence to you in something that we call a reverse proffer, right?

A. Yes.

Q. And your attorney was present there, right?

A. My public defender at the time was present.

Q. Right, because you had two attorneys, you had the public attorney and Max Nemtsev at the time. So your public defender was there, right?

A. Maksim Nemtsev could not represent me in this case because he cannot operate in D.C., so I did not have two attorneys for this case.

Q. Is Max Nemtsev your attorney or not?

A. Yes.

Q. He is your attorney?

A. Yes.

Q. And he was your attorney at the time that you were represented by the Federal Public Defender, correct?

A. Yes.

Q. So isn't it also true that we offered to let you come in and conduct something called a proffer, which is where you speak to the government and you can tell us anything that you want, right?

A. I'm not completely sure as I understand your conversation was with my attorney. We did speak shortly

when I was there, so I don't know exactly what was said.

Q. Let me interrupt you. I'm not asking about what you discussed with your attorney, and I don't want you to tell me. But do you understand that the government has offered to let you come in and tell us anything that you want?

A. Yes, I understand that, that the government has offered this after arresting me, putting me in Northern Neck Regional Jail without access to my family, to my friends. This is also after --

Q. Excuse me, do you also understand --

MR. EKELAND: Your Honor, he keeps --

THE COURT: Yes, I'm sorry?

MR. EKELAND: Mr. Brown keeps interrupting my client's answers before he finishes.

MR. BROWN: These are yes or no answers.

THE COURT: You're interrupting each other right now. There's not going to be any interrupting in this courtroom. So let him finish his answers, and everyone should avoid speaking over one another.

BY MR. BROWN:

Q. All right. You can finish your answer.

A. Yes, what I said before was that nobody from any government has ever approached me with any questions -- with anything related to this case before my arrest. Of course,

after my arrest and after me being locked up, being jailed -- at the point of my arrest, I was talking to the agent at the beginning of my arrest, I was already talking to the agents, and I was completely open and I was completely truthful. The farther that went, the worse my situation got.

Afterwards, I found out that even the things that I told them there, they have already -- even though they're not related to the case, they still try to use them against me. So I'd just like to say that that's quite a different situation than if somebody would come to me before arresting me and asking me whatever, do you know anything about this, about this, about this person, about this person. Yes, thank you.

Q. And do you also understand that the government's offer to let you proffer would be accompanied by something called a proffer letter which gives you legal protection and prevents the government from using what you tell us during the proffer session against you in a criminal proceeding?

A. I do not know all the details and implications of that, I do not.

Q. Now, Mr. Sterlingov, I'd like to sort of clarify the timeline of your declaration. You testified that you began buying Bitcoin -- when did you begin buying Bitcoin?

A. It must have been somewhere around 2010.

Q. And you were active in the Bitcoin community, right?

A. Somewhat.

Q. And you were active -- you testified about going to meet-ups and hosting people in your apartment, right?

A. Yes.

Q. And you were also active online, right?

A. Yes.

Q. And you posted on the forum website called BitcoinTalk.org, correct?

A. I think I had an account, yes.

Q. And you posted under the name or the moniker of Killdozer, is that correct?

A. That's an account that I was using -- I'm not sure if I was the only one using that account. It was common practice if somebody didn't have an account, we could share them.

Q. Who did you share the Killdozer account with?

A. I don't have any specific recollection at this point, I just know it was a common occurrence.

Q. It was a common occurrence to share the Killdozer online account on BitcoinTalk.org?

A. I'm not sure about that account specifically, I'm talking in general about online accounts. Like when -- if somebody didn't have an account on a certain platform and

somebody else did and they needed to share that, that could happen.

Q. So is it your testimony that you shared the Killdozer account with another specific individual?

A. I do not have any specific recollection of that.

Q. Do you believe -- if you had shared that account with another individual, how would you have done it?

MR. EKELAND: Objection, calls for speculation.

MR. BROWN: I'm asking for his recollection.

THE COURT: Overruled. You can answer.

BY MR. BROWN:

Q. How would you have shared that account with another specific individual?

A. Typically if we're hanging out at the same place and somebody needs to do something on a platform and they don't have an account, you would give them the account. It's typically for like a smaller purpose, for a smaller task.

Q. And what sort of smaller tasks would somebody be doing on the BitcoinTalk.org forum that required them to use the Killdozer account?

A. Like I said, I don't know specifically about this account, I'm just saying about the general -- like the things that were happening in general with accounts on various platforms.

Q.   I'm not asking about accounts on general platforms -- in general, I'm asking about BitcoinTalk.org and the Killdozer account.  What specific task would somebody need to conduct that would require them to use the Killdozer account?

A.   I'm not sure.  It's a forum, right, post something on a forum, I don't know.  I don't know, I don't have any specific recollection of that.

Q.   Okay.  But you believe it's likely that you shared that account?

A.   Yes, it's possible.

Q.   And whom would you have shared the account with?

A.   It would be some people that I was hanging out.

Q.   Do you remember any names of people you were hanging out with who might have shared that account with you?

A.   Like I said, I don't remember specifically sharing that account, so I don't have any particular like instances where that would have happened.

Q.   So you have --

A.   I just mentioned it in general, because that's what we were doing with various accounts.

Q.   You have no recollection of ever sharing the Killdozer account, right?

A.   I do not.

Q. Do you think it's unlikely that you ever shared the Killdozer account with another person?

A. I don't know.

Q. You don't know. And you can't remember the names of a single person with whom you might have shared that account?

A. I don't have a specific recollection. I don't want to speculate under oath.

Q. Do you have a sense of what their names might have been or where you knew them from?

A. No. Like I said, I don't have any specific recollection of that happening with that particular account.

Q. Mr. Sterlingov, could you turn to what's been marked as Government's Exhibit 20.

A. I don't have the folder.

MR. BROWN: Your Honor, may I approach?

THE COURT: You may.

BY MR. BROWN:

Q. Mr. Sterlingov, do you recognize Government's Exhibit 20?

A. Yes.

Q. So this is an account summary for an account on BitcoinTalk.org, right?

A. Yes, it looks like that.

Q. It's an account summary for an account in the name

of Killdozer, correct?

A. Yes.

Q. And this is your account, right?

A. I was primarily using that account, yes.

Q. You were primarily using that account, and you don't recall if you ever shared it with somebody else, correct?

A. I don't recall any specific instances of sharing that account. I know that sharing was a common thing that was happening with this type of account.

MR. BROWN: Your Honor, may I approach?

THE COURT: You may.

BY MR. BROWN:

Q. Mr. Sterlingov, I've just handed you what's been marked as Government's Exhibit 19. Do you recognize this document?

A. I don't really recognize it. It looks like an e-mail.

Q. And this is an e-mail from Heavydist@gmail.com?

A. It looks like it.

Q. Heavydist@gmail.com was your e-mail account, one of them?

A. Yes.

Q. The name associated with this account is Roman Heavydist, right?

A.     Right.

Q.     Now, this e-mail is in Swedish, right?

A.     Yes.

Q.     But you can understand Swedish?

A.     Yes.

Q.     And you wrote this e-mail in the first place, didn't you?

A.     I have no reason to believe that I did not.  I don't remember writing it.  But this is in 2012, I don't --

Q.     Now, could you take a moment and read just the first line of that e-mail?

A.     Yes.

Q.     And do you understand that first line, correct?

A.     Yes.

Q.     Now, at trial we will have translators who have translated all these e-mails.  We don't have them here today.  But you understand that e-mail, don't you?

A.     Yes.

Q.     And could you translate for the Court, what does that first line say in English?

A.     It says:  "Hi Maks" -- which is a Swedish name, "I am a guy from Gothenburg.  You can find me on Bitcoin.se and BitcoinTalk as 'Killdozer.'"

MR. BROWN:  Your Honor, the government moves to admit Government's Exhibits 19 and 20 at this time.

THE COURT: Any objection?

MR. EKELAND: No objection, Your Honor.

THE COURT: 19 and 20 are admitted.

(Government Exhibits 19 and 20 admitted into evidence)

BY MR. BROWN:

Q. So you, as Killdozer, first started posting in August of 2011, correct?

A. I'm not sure, that could be the case. I don't remember everything from 2011.

Q. Indeed you do not, Mr. Sterlingov. Now moving on, you stated that you started working for a marketing company called Capo Marknadskommunikation, correct?

A. Yes, that's what I stated.

Q. And what were your duties at Capo Marknadskommunikation?

A. I was a junior worker. Like I said, I worked with various small jobs that they had, whether it's data entry or printed catalogs or websites.

Q. And you started -- I forget what your testimony was. What was the approximate year, was it 2009 when you started?

A. When I started at Capo Marknadskommunikation?

Q. Yes.

A. Maybe even earlier, 2008 or 7.

Q. And during that time, what were the names of your

supervisors at Capo?

A.   One of my supervisors were this Peter Gustafson.

Q.   That was one of them.  Were there any others?

A.   They were different -- they changed a lot.  I think they had somebody named Tobias, I don't remember the last name.

THE COURT:  I'm not quite sure where you're going with this, but I don't think this is simply an opportunity to take discovery, if that's what's going on.

MR. BROWN:  Yes, Your Honor.  We'll get there, but it gets to just his ability to recollect the nature of his work at Capo and how he claims to have earned this money.

THE COURT:  Okay.

BY MR. BROWN:

Q.   So was it full-time or part-time?

A.   It was full-time.

Q.   So did you go into an office at Capo?

A.   Certain days we had to be in the office, certain days we could work from home.

Q.   And did you receive a salary or was it -- was the pay structured in some other way?

A.   There was a salary.

Q.   And what was your salary?

A.   I think somewhere around 25,000 kroners.  It's like 2,500 in U.S.

Q. Around 2,500 U.S.?

A. Yeah.

Q. And was that a monthly salary?

A. Yes, yes, that's a monthly.

Q. Did you receive payment for individual projects or was it only that salary?

A. I think it was pretty much only salary.

Q. You also testified on direct that you did some freelance work, right?

A. Right.

Q. And what was the timeframe for when you were doing freelance work?

A. I was doing it throughout the years. A lot of freelance projects were really small. I just don't know what else to call them. They were more like tasks or assignments.

Q. What was the most that you ever earned from a single freelance project?

A. I'm not sure. I want to say somewhere around 10,000 kroners, but I'm really not sure because they were really different, all of them.

Q. And 10,000 kroners would be around --

A. A thousand dollars U.S.

Q. And what was your rent while you were in Gothenburg?

A. 5,000 kroners. It went up during -- through the years, but around 5,000.

Q. And that's monthly?

A. Yes.

Q. And when did you end your employment at Capo?

A. It must be 2013 I think.

Q. In your declaration, I think it says 2013/2014. Can you be a little bit more specific about when that was?

A. I cannot, I don't remember exactly.

Q. Would it have been closer to the end of 2014, right in the middle, closer to the beginning of --

A. I cannot be any more specific, I don't remember. I don't have any access to any of my files either, I'm locked up, so I can't --

Q. At some point in 2013 or 2014, you took a six-month break from Capo, correct?

A. Yes.

Q. And at the end of that six-month break, you decided not to return to your job, correct?

A. Yes.

Q. Now, this wasn't in your declaration, but on direct you also stated that you also periodically came back to do individual projects with Capo, right?

A. Yeah, like one or two times.

Q. One or two times. Now, you started buying Bitcoin

in -- was it 2011?

A.   I think it was around 2010.

Q.   Okay.  And you testified -- or you stated in your declaration that after you took your leave of absence from Capo and then never went back full-time, from that time forward you lived off the savings you had accumulated through Bitcoin; is that correct?

A.   Yes, mostly.

Q.   But you stated that you had no other significant sources of income, right?

A.   Right.

Q.   And we'll talk about the other sources of income.  You opened the first Kraken account in March of 2014 or thereabouts; is that correct?

A.   That sounds like it could be correct.

Q.   And in your declaration, you said around this time -- meaning around the time that you opened the Kraken accounts, you, quote, eventually stopped buying Bitcoin because I had no new income from which to buy it, right?

A.   Right.

Q.   So you had no new income after about March of 2014, correct?

A.   Right, I had no -- I had income from the price appreciation, but I can't use that to buy more Bitcoin, you know, because it's from the Bitcoin.

Q.    And so from early 2014 until the date of your arrest in 2021, you did not have any other sources of income to pay for new Bitcoin purchases, right?

A.    No significant source of income.

Q.    And you testified on direct about a company called To the Moon, LTD, right?

A.    Right.

Q.    And approximately what time period did you set that up?  Your declaration, if you look at paragraph 33, states 2015 to 2016.

Can you be a little bit more specific?

A.    It was a longer process.  I had that idea for a while, and I think it took me a long time to kind of get all the steps in order.  So it spanned, I think.

Q.    And in your declaration at paragraph 33, you state:  "The business never took off.  I underestimated the amount of work this would take," right?

A.    Right.

Q.    So To the Moon, LTD was never a significant source of income for you, right?

A.    No.

Q.    Now, you had a Kraken account in the name of To the Moon, LTD, right?

A.    Right.

Q.    And you testified on direct that you only used --

or that you used the Kraken account for business expenses, right?

A.   Right.

Q.   What were some of the business expenses that you spent money from the Kraken account on?

A.   I don't remember specifically the Kraken account, but the business expenses in the Moon VPN were the accounting, the company in Malta that helped me set up the company and perform all the legal work there as well as the servers and the development.

Q.   So did you ever use your Kraken account to pay for an accountant or accounting services for To the Moon, LTD?

A.   I'm not sure if I used the Kraken account or the bank account, I don't remember.

Q.   Did you ever use the Kraken account to pay for establishing a company in Malta or doing whatever paperwork you needed to do in Malta?

A.   I don't remember such details.  It was either the Kraken account or the bank account in the company -- the company's bank account.  I don't know.

Q.   You don't --

A.   I don't have my records either.

Q.   You don't remember?

A.   I can't look it up.

Q.   Did you ever use the Kraken account to pay for the

servers that were running To the Moon, LTD?

A. I don't remember, I could have.

Q. You could have, but you don't remember; is that your testimony?

A. Yes.

Q. And the money that was flowing into the Kraken account for To the Moon, LTD, that wasn't customer payments, was it?

A. I think some very few of them were. I think a lot of them were just my own money that I had to put in the company for -- to make it run.

Q. Now I'd like to talk more about the LocalBitcoins.com activity. You opened that LocalBitcoins account -- going back to Government's Exhibit 25.

A. I don't have the folder here.

MR. BROWN: Oh, I'm sorry. Your Honor, may I approach?

THE COURT: You may.

BY MR. BROWN:

Q. So this is Government's Exhibit 25. Down at the third line from the bottom it says account creation date, and then it says 2012, 9/20 -- meaning September 20th, 2012, right?

A. I see that.

Q. Do you think you might have created this

LocalBitcoins account on September 20th, 2012?

A.    Yes.

Q.    You say yes.  Do you think you did?

A.    Yes.

Q.    Shortly thereafter, you got started trading on LocalBitcoins.com, right?

A.    Again, that sounds plausible.  I don't really have my records here.

MR. BROWN:  May I approach?

THE COURT:  You may.

BY MR. BROWN:

Q.    So Mr. Sterlingov, I've handed you what has been marked as Government's Exhibits 22, 23 and 24.

A.    I only have 22 and 23.  Oh, I'm sorry, 24 is here.

Q.    24 is a single page, it should be at the bottom. So do you have all three of those exhibits?

A.    Yes.

Q.    And these are account records that were provided to the government from LocalBitcoins.  They are account records for the account that we've been discussing, the GothenCoin LocalBitcoins account.  Looking at Government's Exhibit 22, this is a spreadsheet as it was produced to the government showing receive transactions into the LocalBitcoins account.

Are you looking at Government's Exhibit 22?

A.    Yes.

Q.    And so the very first transaction -- and these have been sorted in order of chronological order.  The very first transaction at the top of the upper left hand corner is a transaction on 2022, October 4th.

Do you see that?

A.    You mean 2012?

Q.    2012.  If I misspoke, yes, 2012, October 4th?

A.    Yes, that's what it says here.

Q.    And on that date, there's a record for Bitcoin in the amount of 120 Bitcoin being sent into your LocalBitcoins account.  Do you see that?

A.    Yes.

Q.    And do you have any personal recollection of making that -- of sending 120 Bitcoins to your LocalBitcoins account?

A.    I do not.

Q.    Do you think it's -- do you have any reason to believe that this is inaccurate, that first transaction there?

A.    I do not.

Q.    Do you have a recollection generally of uploading money into your LocalBitcoins account so you could get started trading?

A.    Yes.

Q. And so the next transaction beneath that is a transaction in 2013 on March 25th. Do you see that?

A. Yes.

Q. And that's another nine Bitcoins uploaded to your LocalBitcoins account, do you see that?

A. I can see that.

Q. And so you uploaded a total of 129 Bitcoin in late 2012 and early 2013, right?

A. Right.

Q. And you didn't add any more Bitcoin to that account until 2015, right?

A. That's what it looks like.

Q. Now turning to Government's Exhibit 23, and that's the next multipage exhibit that I handed you. This is a record of trades that you made on -- using LocalBitcoins.

Do you have that in front of you?

A. I have that, yes.

Q. And so these are trades that you made in peer-to-peer transactions, right?

A. Yes, that sounds correct.

Q. Do you understand what I mean when I talk about peer-to-peer transactions?

A. I mean, I guess you can clarify it just for --

Q. So these would be transactions where you either met in person or online and directly sent money or Bitcoin

to another individual as opposed to going through an exchange or another intermediary.

A. Right, that sounds correct. Maybe one thing I would add is that I don't know if all of these are individuals, because I think there are some businesses running on LocalBitcoins and they are trading on there.

Q. And so when you met -- were most of these transactions -- let me ask you this: Were most of these transactions transactions done in person -- in other words, where you met physically with another person?

A. If I'm looking at the list here, it looks like most of them are not in person.

Q. So would most of these have been conducted over e-mail or text message?

A. Right.

Q. And they're recorded in your LocalBitcoins account, because LocalBitcoins essentially served as an escrow service, right?

A. Right.

Q. So you could sell Bitcoins, and LocalBitcoins would hold those Bitcoins until you received payment, right?

A. Yeah, that sounds familiar.

Q. So this spreadsheet has also been sorted in chronological order, and it begins with a transaction on 2012, November 5th. Do you see that at the very top line

containing transaction data?

A. Yes.

Q. And the payment method says cash. What does that mean to you, if the payment was made in cash?

A. It sounds like it was in person.

Q. And the buyer user name, it looks like for this first transaction, is a buyer by the name of Sirius, right?

A. Right.

Q. That's just the user name for somebody else on LocalBitcoins, right?

A. I think so.

Q. And then the seller user name, that's GothenCoin, right?

A. Right.

Q. And that's your account, right?

A. Right.

Q. And then the amount in currency, it says 1,000 SEK. What's your understanding of what 1,000 SEK would be?

A. My understanding?

Q. What does SEK normally stand for?

A. It's Swedish kroner.

Q. And the amount in currency would have been 1,000 for this first transaction, right?

A. Yes.

Q. And then moving over, it says amount in BTC. That

means Bitcoin, right?

A.   Right.

Q.   And this first transaction, you have a transaction for 13.9454 Bitcoin, right?

A.   Right.

Q.   And so reading this first transaction altogether, is it fair to say that you sold 13.9454 Bitcoin to a user by the name of Sirius for 1,000 Swedish kroner?

A.   Yes, I think that's the correct -- yes.

Q.   And it's your testimony that your sales on LocalBitcoins were a mix of in person and online or remote transactions, correct?

A.   Right.

Q.   So if you look at the trades here, on the second column to the left, going down the trade ID, there's kind of a jump after eight transactions.  There's a jump from trade ID that starts with the number 16 to a number that starts 33.

Do you see where I'm looking at?

A.   No, could you --

Q.   So if you count down to the eighth transaction listed on the spreadsheet --

A.   Okay.

Q.   So the eighth line down lists a transaction in 2013 on March 11th, right?

A.    Right.

Q.    So -- and then the next transaction isn't until 2015, right?

A.    Right.

Q.    So moving over, keeping your eye on that same row, the eighth row down, there are eight trades between 2012 and 2013 where you sold Bitcoin for currency, right?

A.    Right.

Q.    And the total -- I won't ask you to do the math, but the total, if you add up those eight trades for Bitcoin, it adds up to 109.4169 Bitcoin.  Just glancing at the sheet here, do you have any reason to doubt that?

A.    Right.

Q.    And so, in other words, from October 2012 to March of 2013, you uploaded 129 Bitcoin, and you sold 109 and some change, correct?

A.    On this platform?

Q.    On this platform?

A.    Right.

Q.    Isn't it true that you had run out of Bitcoin by 2013?

A.    I don't know.

MR. BROWN:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. BROWN:

Q. Mr. Sterlingov, I'm handing you what's been marked as Government's Exhibit 9. Government's Exhibit 9 contains two e-mails, right? It's a two-page exhibit --

A. I see it.

Q. -- with -- and there's an e-mail on each page, right? Now, the first big e-mail is dated April 15th, 2013, right?

A. Right.

Q. And you're e-mailing with somebody from the e-mail address info@janemedia.se?

A. Yes.

Q. And if you look at the message that you're replying to that has been appended to the bottom of that e-mail, you see a message asking you: "Hi, are you still in business...what price," right?

A. Yes.

Q. And the message line -- the subject line of this message was LocalBitcoins, right?

A. Yes.

Q. And then you responded up at the top of this e-mail message: "Suddenly a lot more people wanted to buy, so I've been running out quickly," right?

A. Right.

Q. Now looking at the next page, there's an e-mail dated November 11th, 2013, right?

A.   Right.

Q.   And this is an e-mail thread with the same individual using the e-mail address info@janemedia.se, correct?

A.   Correct.

Q.   And down at the bottom -- which is the first message in that thread, on November 10th, 2013, info@janemedia.se wrote to you asking:  "Hi, do you still have coins," right?

A.   Right.

Q.   And you responded the next day:  "Hi man, I'm out right now unfortunately"?

A.   Right.

Q.   And then at the top of that message, in a further message back to info@janemedia.se, you said:  "I sold all mine and I'll have to wait until the price gets down," correct?

A.   Correct.

Q.   So it's not really true that you accumulated all of your Bitcoin before 2014 and then just lived off the capital gains, is it?

A.   It is true.  This e-mail -- I don't remember exactly what the context of this e-mail was.  There was a number of different issues.  I remember certain people were like pestering me to meet them again and again.  I would be

trying to get rid of them in any way possible. I know I was putting some Bitcoin into cold storage. Some of it I was trading. If I had Bitcoin in cold storage at this point, I wouldn't go and uncover it and put it in a wallet and go through all that to just accommodate somebody who wants to buy.

Q. You also --

A. I mean, that's what I told him, yes, but this is not about all my Bitcoin that I had anywhere.

Q. And you wrote further to him: "I'll have to wait until the price gets down or maybe it goes up as" -- F word -- "so I'll buy it anyway," right?

A. Right.

Q. Now, you also wrote in your declaration, on paragraph 56, quote: "In almost all of my transactions, I deal exclusively in Euros or Swedish kroner. I rarely, if ever, use U.S. dollars, and have never had any significant holdings in U.S. dollars," right?

A. Right.

Q. That's your testimony, isn't it?

A. What was the number?

Q. Paragraph 56.

A. Yes.

Q. But that's not true, is it?

A. I think it was. Why would you say that it's not

true?

Q.    If you turn to what I've already handed to you as Government's Exhibit 24, this is from the same spreadsheet as Government's Exhibit 23.  It's a record of your trades on LocalBitcoins.  The only difference is this spreadsheet has been filtered for U.S. dollar transactions.

A.    Right.

Q.    And so on May 3rd, 2017 -- which is about seven lines down, there's a transaction for May 3rd, 2017.  Do you see that?

A.    Yes.

Q.    And you purchased -- in this case, you were buying Bitcoin in 2017, right?

A.    Right.

Q.    And you purchased Bitcoin from a user named Raul Litovigia (phonetic), right?

A.    Yes.

Q.    And you paid 2,000 U.S. dollars for approximately 1.266 Bitcoin, correct?

A.    Right.

Q.    Now, that's your purchase using U.S. dollars.  All the rest of these entries on this spreadsheet show your sales for U.S. dollars.  And if you add up all the other entries on the spreadsheet, it adds up to 11.6895 approximately Bitcoin.  And the total U.S. dollars that you

received for that was $31,450.

Do you have any reason to doubt the accuracy of those numbers?

A. I do. Like I wrote there, rarely, if ever, I use U.S. dollars. I live in Sweden, most of my transactions are in U.S. kroners. I have dealt in U.S. dollars at some point, especially -- like I mentioned there, whenever I'm in the U.S. or vacationing. One of the lines -- one of the terms here in the spreadsheet, it says gift card code, Amazon. I don't think I have any choice to deal in any other currency on Amazon. I'm pretty sure that's the reason for me to deal in U.S. dollars there. It is true that I have sometimes dealt in U.S. dollars. It's not something I look for or primarily conduct my finances in.

MR. BROWN: Your Honor, at this time the government moves to admit Government's Exhibits 9, 22, 23, 24 and 25.

THE COURT: Any objection?

MR. EKELAND: No objection, Your Honor.

THE COURT: Those exhibits are admitted.

(Government Exhibits 9, 22, 23 and 24 admitted into evidence)

(Government Exhibit 25 previously admitted)

THE COURT: Is this a good breaking point for lunch, Mr. Brown?

**MR. BROWN:** Yes, Your Honor.

**THE COURT:** So it's five minutes past 1:00. Why don't we come back at 2:15.

(Recess taken at 1:09 p.m.)

(Back on the record at 2:30 p.m.)

**THE COURT:** Mr. Sterlingov, let me remind you that you're still under oath. You may continue, Mr. Brown. And just for the sake of time, I would encourage everybody to try and focus on the issues that are of importance today, and not indulge the opportunity to examine a witness in a deposition type style. So make sure we're focused.

**MR. BROWN:** Yes, Your Honor, understood. And just in fairness, the defendant's direct started with the day that he was born, so the scope of the direct is quite wide. I'm just trying to --

**THE COURT:** It may have been wider than it needed to be, but in any event, you should just focus on what matters for the purposes of today's hearing.

BY MR. BROWN:

Q. Yes, Your Honor. Mr. Sterlingov, in your declaration, you state that you were a user of Bitcoin Fog, correct?

A. Yes.

Q. And you state, quote: "I have never run, operated or had any administrative access to Bitcoin Fog"?

A.   That's correct.

Q.   Did you ever set up the Bitcoin Fog Clearnet domain, www.bitcoinfog.com?

A.   I'm not sure.  I've seen some of the transactions that are used in the complaint and other documents.  I have to say, I don't remember doing those transactions.  I know that I was taking a lot of freelance jobs at the time. Setting up a domain name was a common task that I was doing, so I'm not really sure.  I do know that I never accepted any offer or job where somebody would come to me and say hey, let's work on an illegal money laundering operation or something like that.

Q.   The question was just about the domain.  And is it fair to say that your testimony is you don't remember if you did, you don't remember if you didn't?

A.   It is fair.

Q.   And that's what you told two wired reporters, right?

A.   Two?

Q.   Two reporters.  When you gave an interview to two reporters about your case, that's what you told them, right?

A.   That might have been the case.

Q.   And you said:  "That was 11 years ago, it's really hard for me to say anything specific"?

A.   Yes.

Q. But you did not deny it to them, and you're not denying it today, right?

A. That's correct.

Q. Now, as part of your job, was it normal for you to pay out of your own pocket to set up domains?

A. Sometimes. I wouldn't say it was normal.

Q. So you sometimes paid out of your own pocket to set up a domain as part of your job?

A. Yeah, I think definitely something like a domain name, which is usually quite cheap, right. It's around, I don't know, $10 or something.

Q. And would it be --

A. That wouldn't -- if somebody asked me to do that, I wouldn't have any good reason not to.

Q. Would it be normal to start with your Mt. Gox Bitcoin account, transfer to a second Mt. Gox account and then to a third Mt. Gox account, convert to U.S. dollars, sent to RM exchange, and then sent to a Liberty Reserve account and use the Liberty Reserve account to pay for the domain registration as part of your freelance work?

A. That does not sound like a common or a regular way.

Q. In paragraph 15 of your declaration, you stated that: "Early on, somebody recommended I use Bitcoin Fog to secure and protect my transactions," right?

A. Yes.

Q. And you testified on direct that somebody was adamant that this was something you needed to do to protect your privacy?

A. Yes.

Q. And of course you don't remember who it was who told you to use Bitcoin Fog, right?

A. It was one of the people that I was trading with.

Q. And I'm sure you can't remember their name, can you?

A. I'm afraid I cannot. This must have been 10 years ago. Somebody I met for 15 minutes 10 years ago, no, unfortunately I cannot remember their name.

Q. It's somebody you met for 15 minutes who told you something that you adopted as your regular security practice for more than 10 years, right, that's your testimony?

A. Like I said, he wasn't the first person who mentioned mixing to me. That was probably more like the final straw where I actually realized when a lot of different people are mentioning something. And I remember this person was really -- they made me think that I was kind of dumb to not mix when I'm trading in person with the way they were animated about it, so that made me look into it, yes.

Q. And you testified on direct that you were

concerned about your privacy, right, and that's why you used Bitcoin Fog?

A.    Yes.

Q.    You also testified that you were concerned about maybe getting robbed, right?

A.    Yes.

Q.    And you were thinking that you might get robbed by maybe one of the people that you sold Bitcoin to or one of the people that you met in one of those meet-ups, right?

A.    Right, or anybody I bought something from with Bitcoin or any other Bitcoin transaction.

Q.    And so if somebody -- if you met somebody in person at a meet-up or doing one of these peer-to-peer sales and then you mixed your Bitcoin afterward, how does that protect you from being robbed?

A.    As I understand it, it makes my wallets and transactions not visible to anybody who had my address -- which this person would have had at this point.

Q.    So just to be clear, you're not concerned about somebody physically robbing you, right?

A.    Well, yes, I am.

Q.    Well, Bitcoin Fog doesn't help with that at all, does it?

A.    As I understand it, it absolutely does.  Because if you're meeting a person and you are buying 2,000 kroners,

$200 worth of Bitcoin or something like that, I mean, I don't think it's -- I don't think there's a high chance that somebody's going to go and rob you for that small amount. However, if they can track your transactions and they can see your maybe other wallets, how much money you have where, they might -- that's when they are -- they might lock into you and go after you.

Q.    But if you're meeting with somebody, that person is already there in front of you, you are already physically exposed to that person.  Going and mixing your Bitcoin transactions after the fact doesn't help you from that risk of a robbery, does it?

A.    I think it does, I think it absolutely does. Because in one case, they don't know if you have any other Bitcoin, where your transactions go.  In the other case, they see everything that you do.  I think there's a significant risk.

Q.    So it's your testimony --

A.    I've read about people -- I'm sorry.

Q.    This might be a situation --

THE COURT:  Let him go ahead and finish and then you can ask your question.

MR. BROWN:  I'm just trying to keep things moving, Your Honor.

THE WITNESS:  I've read about people being robbed

in their homes even when somebody found out about their wallets or about them owning certain crypto. People found out about their identity and their information. You might not even know who you were trading with, that might not be the person that robs you. This is not to mention hacking. You can be hacked as well, that's another risk I think, in addition to robbery. I'm done.

**BY MR. BROWN:**

Q. So you opened these Kraken accounts in your true name -- or associated with your true name, correct?

A. Yes.

Q. Roman Sterlingov and then To the Moon, LTD which is associated with a corporation that's associated with your name, right?

A. Yes.

Q. So the Kraken accounts are not anonymous?

A. They're not.

Q. So you mixed funds going into the Kraken accounts for privacy purposes, right?

A. Right, protection.

Q. And you never sent any money from the Kraken accounts back to Bitcoin Fog, did you?

A. I'm not sure if I did. I was certainly more careful with the wallets that I had on my computer or phone where the person that you're trading with, they can see your

address. That's how I understood it. Like if they see your address, that's what gives them like a point of attacking you. I'm not sure if Kraken works the same way, if they can really go into your transactions in the same scale.

Q. Now, before you -- you claim that all the money that went through Bitcoin Fog and ended up in your Kraken account started out as just Bitcoin that you bought from your legitimate payroll from Capo Marknadskommunikation, right?

A. Right, and my trading and price appreciation.

Q. So for every transaction that we see going from Bitcoin Fog to Kraken, you should be able to show a corresponding transaction on the other side where you have legitimate Bitcoin that is going to Bitcoin Fog, right?

A. Right.

Q. And but there are no records of any of your wallet addresses or any transactions from any account associated with you sending into Bitcoin Fog; isn't that true?

A. There must be somewhere on the blockchain for sure. Like I said, there were my wallets that I had on my computer that I was using Bitcoin Fog with them. I was careful about that.

Q. And for any of the funds coming out of Bitcoin Fog being sent to your LocalBitcoins account or your Kraken account, would there be a way for anybody to go back to that

Bitcoin Fog cluster and trace it back to where the funds started out?

    **A.**  I don't know.  One of the things that we have discussed is if --

    **THE COURT:**  I'm sorry, if you're talking and wanted to say something you discussed with your lawyer, you may not want to do that.

    **THE WITNESS:**  Yeah, I'm not supposed to talk about that?

    **THE COURT:**  Well, no, because those are private conversations.  If there's something he wants to ask you about, that's fine.  The problem is if you say something about what you've discussed with your lawyer, you open the door and then the government can ask you other questions about conversations with your lawyer.

    **MR. EKELAND:**  For the record, Your Honor, I'm going to object on privilege grounds.

    **MR. BROWN:**  Your Honor, there was no question anyway.

    **THE COURT:**  No, it was the witness who brought it up.  But I think you're directing your client not to answer questions that involve attorney-client.

    **MR. EKELAND:**  Your Honor, I'm just instructing my client not to answer that question on the basis of attorney-client privilege.

THE COURT: I think it wasn't a question, he was just offering --

MR. BROWN: There was no question before the witness.

THE COURT: But I take your point just to be instructing your client not to disclose attorney-client conversations which is fine, okay. You can continue.

THE WITNESS: I'm sorry, let's just go forward.

MR. BROWN: Your Honor, I'm trying to let the witness speak.

THE COURT: No, I understand. That's fine. Proceed.

BY MR. BROWN:

Q. Mr. Sterlingov, did you ever use any other mixers besides Bitcoin Fog?

A. I think I went on the website at some point, but I haven't used -- I haven't used any other mixers for any large amounts of Bitcoin.

Q. Do you think you might have used other mixers for small amounts of Bitcoin?

A. It's possible.

Q. But you don't remember?

A. It worked. I was careful with it in the beginning, like I wouldn't trust any other website out there. I got my money out, it kept working. I never had

any reason to look into anything else really.

Q. Okay. I'm just trying to make sure that we have a clear answer on the record. Do you think that you ever used any other mixers besides Bitcoin Fog?

A. It is possible, I'm not sure.

Q. It's your testimony that you believed using Bitcoin Fog was completely legal, right?

A. Yes.

Q. Now, you were active in meet-ups and online. Did you ever tell anybody else about Bitcoin Fog?

A. I'm not sure, I don't know, it's possible.

Q. Do you think you did or do you think you didn't?

A. I just don't know. I don't remember all of my conversations on all of them, you know, I don't know.

Q. I mean, this obviously a very important part of your privacy practices according to your testimony, and somebody clued you in to Bitcoin Fog. But you're sure you just can't say one way or the other whether you ever told anybody else about Bitcoin Fog?

A. I really don't remember.

Q. We talked about your account Killdozer on BitcoinTalk.org, right?

A. Right.

Q. An account that you used and maybe, maybe not you shared it with some other people, but you can't remember,

right?

    A.    Right.

    Q.    The Killdozer account made 203 posts on BitcoinTalk.org.  Does that sound about right?

    A.    Yeah, it could be.

    Q.    And not once did Killdozer ever post saying you should mix your coins or you should use Bitcoin Fog, correct?

    A.    I'm not sure.

    Q.    But you have no --

    A.    I mean, one thing is I don't -- if something -- part of my privacy routine or something that I'm trying to like do in order to prevent people from robbing me or hacking me or something by discovering where my Bitcoin is and how much Bitcoin is there, I'm usually not going to tell anything about that routine to anyone.

    Q.    And does that also account for using VPNs or any other security measures, you would just never post about those?

    A.    I think VPN is a little bit different since I was trying to create a VPN service.  But I'm not sure if I ever posted about a VPN outside of To the Moon VPN.

          MR. BROWN:  May I approach?

          THE COURT:  You may.

BY MR. BROWN:

Q. Mr. Sterlingov, I've just handed you what has been marked as Government's Exhibit 4. Take a moment to flip through it. These are records from the cryptocurrency exchange Bitstamp. There are some redactions, because this is the version that we filed online in the public docketing system.

You had an account at Bitstamp, correct?

A. Yes.

Q. And Bitstamp is a cryptocurrency exchange, right?

A. Yes.

Q. Now on August 3rd, 2016. If you'd turn to -- if you look at the top of these pages, they're page numbers blank of 14. If you turn to page five of 14.

A. Yes.

Q. At the bottom of that page, there's a message from an employee of Bitstamp dated August 3rd, 2016?

A. Yes.

Q. And this is a message from Bitstamp to you because they are conducting further -- they're asking further questions about your account and its usage, right?

A. Yes.

Q. And down at the very bottom of that page, carrying over onto the next page, the employee of Bitstamp asks you, number two: "Additionally, could you confirm if you were using any cryptocurrency tumblers? We thank you for your

cooperation and look forward to hearing from you." And then you responded in the next message, which is on page six. There's a paragraph there from you.

Those are your words, right, under Roman Sterlingov --

A.   Yes.

Q.   -- at the top of the page?

A.   I can see that, yes.

Q.   And if you look about two-thirds of the way down that paragraph, there's Roman numeral two, and you repeated the question that was asked you: "Additionally, could you confirm if you were using any cryptocurrency tumblers?" And then you answered: "I don't know if I did with the specific funds sent to your exchange. It's not impossible, I did a lot of experimenting with Bitcoins back in the day. It was a very new and exciting technology. I haven't done this recently, but my account here is very old. I don't really remember."

Those are your words, right?

A.   Right.

Q.   Why didn't you just tell Bitstamp that Bitcoin Fog is completely legal and you do it for privacy purposes?

A.   Well, I did tell them that I was using it with the funds sent to their exchange.

THE COURT:  I have to say, obviously you're

guessing what I'm going to say. I just don't know what this has to do with this hearing. It just feels to me like this is taking discovery for purposes of the trial versus answering the question presented.

MR. BROWN: Your Honor, the defendant is arguing -- he doesn't contest the tracing, but he has --

MR. EKELAND: Actually, Your Honor, we do contest the tracing. I just want to put that on the record.

THE COURT: Go ahead.

MR. BROWN: So -- well, okay, I think the defense has been inconsistent in their position as to the tracing.

THE COURT: I'm sorry, this is a waste of time. Don't mention tracing, just address my question.

MR. BROWN: Your Honor, I'm just trying to get at -- the defense has an alternative story of where these come from, and so we're trying to explore that story.

THE COURT: Right, I understand that. But now what you're trying to get at is not just whether he was involved, but what his knowledge was, his state of mind, his mens rea. I don't want to prejudice the -- usually you would not have a defendant who would subject himself to a deposition in a criminal case, and I'm just afraid that it's turning into that.

MR. BROWN: Understood, Your Honor. That's not our intent. First of all, this is within the scope of his

declaration and within the scope of his direct. Our intent is not to take discovery, but to probe what we think is a very implausible story about the reason why he claims that he was just a user of Bitcoin Fog. It's a plausibility inquiry, and we believe that we are -- we're crossing to uncover inconsistencies and implausible details in his testimony. That's all we're trying do. I'm not trying to waste the Court's time or engage in discovery, Your Honor.

THE COURT: I'm much more concerned about discovery than wasting the Court's time.

Yes, Mr. Ekeland.

MR. EKELAND: The defense merely wants to say that after a 10-year investigation, you're seeing the gigantic holes in the government's case.

THE COURT: Well, okay.

MR. EKELAND: They don't know where any of the funds came from and --

THE COURT: I don't think -- from either of you, I don't think that's what this hearing should be about.

MR. BROWN: Your Honor, I agree, but this is within the scope of the defense's direct.

THE COURT: As long as you can just be as targeted as you can to the issues that were raised on the direct.

BY MR. BROWN:

Q.   Yes, Your Honor. Just one last line of questions.

Mr. Sterlingov, you were signed up for a two-week pilot school program, right?

A.    Yeah, two or three weeks.

Q.    Two or three weeks, and you'd never taken any pilot training before?

A.    I have not.

Q.    And this was to start a whole new career as a pilot?

A.    Yes.

Q.    And you were one of the first adopters of Bitcoin. You're a technically adept individual, and you just decided you want to become a pilot?

A.    I didn't just decide it, it took a long time, a lot of research, a lot of studying for -- the two-week course is the practical part of the course. Before that, I had to study the theoretical part of the course for myself.

MR. BROWN:  No further questions.

THE COURT:  Okay.  Redirect.

MR. EKELAND:  Just one moment, Your Honor, I just want to check.

Your Honor, we have no redirect.  But depending on what witnesses, if at all, the government calls, we'd just like to make Mr. Sterlingov subject to recall if possible.

THE COURT:  He's here, so you can call him.

MR. EKELAND:  No further questions of the witness

subject to recall.

THE COURT: Mr. Sterlingov, you can step down. Thank you.

THE WITNESS: Can I mention something?

THE COURT: Why don't you do this: Why don't you take a minute to talk to your attorney. And if you want to come back on the stand, I'll let you do that.

(Discussion off the record)

MR. EKELAND: Your Honor, we have no further questions, again, with the witness subject to recall.

THE COURT: Okay. Were there any other witnesses that you intend to call today?

MR. EKELAND: Your Honor, we've got Mr. Fischbach on standby as a rebuttal witness should the government call their expert witness. But otherwise, no.

THE COURT: Okay. Mr. Brown?

MR. BROWN: Your Honor, we have obviously proffered Mr. Scholl's declaration. He's outside, he's available. I can put him on just to have him adopt the declaration, introduce himself, and then the defense is welcome to cross him.

THE COURT: I think that's a wise way of doing it. It saves the time of having to repeat what's in the declaration.

DEPUTY CLERK: Before you sit down, would you

please raise your right hand.  Do you solemnly swear that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

**THE WITNESS:**  I do.

**DEPUTY CLERK:**  Thank you.  Please be seated.

**THE COURT:**  You may proceed.

DIRECT EXAMINATION OF LUKE SCHOLL

BY MR. BROWN:

Q.  Good afternoon, Mr. Scholl.  Could you please introduce yourself, spelling your first and last name.

A.  My name is Luke Scholl, L-U-K-E, S-C-H-O-L-L.

Q.  And how are you employed?

A.  I'm currently employed as a staff operations specialist for the FBI.

Q.  How long have you worked for the FBI?

A.  I started interning with the FBI in 2014, and have been in my current role since 2015.

Q.  What is your current role?

A.  I'm currently assigned to the Department of Justice's National Cryptocurrency Enforcement Team.  My job title is staff operations specialist.  Prior to the NCET, I was assigned to an intelligence squad and embedded on a cyber criminal threat squad.

Q.  Do you have any particular experience in cryptocurrency?

A. I've been working with cryptocurrency in the course of my work since 2015.

THE COURT: Can I ask you to slow down a little bit. It makes life easier for the court reporter if you go slower.

THE WITNESS: Yes, sir. Sorry, sir.

MR. BROWN: May I approach, Your Honor?

THE COURT: Yes.

BY MR. BROWN:

Q. So I'm showing you what's been marked as Government's Exhibit 1. Do you recognize this document, Mr. Scholl?

A. Yes, sir, I do.

Q. And what is it?

A. It's a declaration I wrote in regards to this case.

Q. And you drafted the entire declaration?

A. Yes, sir, I did.

Q. What records did you review in drafting this declaration?

A. I reviewed account records from LocalBitcoins and Kraken associated with Mr. Sterlingov's accounts as well as an IRS undercover transaction to Bitcoin Fog.

Q. And did you also review records from Kraken?

A. Yes, sir, reviewed two different accounts at

Kraken.

Q. Now turning to page two of this exhibit, it looks like there's some redactions in this exhibit. Do you see those?

A. Yes, sir, I do.

Q. And are those redactions because this is the version that was filed on the public docket and is available to the public?

A. Yes, sir.

Q. Now, in the version that you wrote yourself, are those redactions there?

A. No, sir.

Q. And what's underneath those redactions?

A. The full account numbers associated with those accounts.

Q. Now, have you had a chance to review your declaration?

A. Yes, sir, I have.

Q. And are there any corrections that you would make to that declaration?

A. Yes, sir, there are.

Q. And what are those?

A. The user name for the LocalBitcoins account in this declaration, it's GotheCoin and it should be GothenCoin on pages two and three. There's also a typographical error

in the onion address or the dark web address of Bitcoin Fog, it's missing a D.

Q. And on what page is that, is the onion address?

A. On the bottom of page two: "IRS special agent accessed Bitcoin Fog via its TOR hidden service address" --

COURT REPORTER: You have got to slow down, please. Thanks.

THE WITNESS: Sorry, sir. "The dark web address at FOGGED -- there should be a second D after the first D, IRZTRCAR2.onion.

BY MR. BROWN:

Q. And are there any other changes?

A. The name of the second LocalBitcoins account. Target account two should not have a bar Sterlingov after it on pages two and I believe six.

Q. Mr. Scholl, I think you said the LocalBitcoins account. Is that the account that you mean?

A. No, the Kraken account, I'm sorry. To the Moon, LTD, bar Roman should just read To the Moon, LTD without the bar Roman.

Q. And that's in paragraph 2A, right?

A. On the second page, yeah, paragraph 2A. And then paragraph 16 on page six.

Q. Now, with those corrections that you've just gone over, do you adopt this declaration as corrected as your

testimony on direct today?

A.   Yes, sir.

Q.   And generally speaking, what was your bottom line conclusion from the analysis that you conducted here?

A.   That there was a significant flow of funds from Bitcoin Fog into Sterlingov's accounts.

MR. BROWN:   Your Honor, the government moves to admit Government's Exhibit 1.

THE COURT:   Any objection?

MR. EKELAND:   No objection.

THE COURT:   Exhibit 1 is admitted.

(Government Exhibit 1 admitted into evidence)

MR. BROWN:   No further questions on direct.

THE COURT:   Mr. Ekeland, your witness, you may proceed.

CROSS-EXAMINATION OF LUKE SCHOLL

BY MR. EKELAND:

Q.   Thank you, Your Honor.  Mr. Scholl, you just testified you reviewed some records in preparation for the declaration that was just admitted into evidence, correct?

A.   Yes, sir.

Q.   As part of your review, did you review any server logs to the Bitcoin Fog server?

A.   No, sir, I did not.

Q.   To your knowledge, has the government seized the

Bitcoin Fog servers?

A. Not to my knowledge, sir, no.

Q. And at any time did you review any communications from Mr. Sterlingov to any of the co-conspirators in this case?

A. I'm not aware of what co-conspirators you're speaking of, sir.

Q. And as you sit here today, can you name a single co-conspirator in this case?

A. Sir, my testimony is about the flow of funds from Bitcoin Fog into the Sterlingov accounts, it's beyond the scope of my testimony.

Q. And so let's talk about the flow of funds from Bitcoin Fog. You didn't trace any flow of funds into Bitcoin Fog, did you? You only traced the flow of funds from Bitcoin Fog to Mr. Sterlingov's Kraken account, correct?

A. For the purpose of this declaration, yes, sir, I didn't trace flows of funds into Bitcoin Fog. In addition to tracing funds to his Kraken account, we also traced funds to the LocalBitcoins account, and then from the LocalBitcoins account into the Kraken accounts.

Q. But you can't tell me as you sit here today the origin of any of those funds, can you?

A. The nature of Bitcoin Fog, sir, is that it

obfuscates the input from the output, and I can't testify to the input of those flows of funds that went ultimately to the Kraken accounts, no, sir.

Q. So it's your testimony that you don't know the origin of any of the funds that are going from the Bitcoin Fog mixer to Mr. Sterlingov's accounts; is that correct?

A. As far as this declaration's concerned, yes, sir, that's correct.

Q. And you said you reviewed the IRS undercover transaction, correct?

A. Yes, sir, I did.

Q. And as part of that IRS transaction, the government sent a message I believe it was -- attempted to send a message to Bitcoin Fog's administrators, correct?

A. I don't recall. There were two IRS undercover transactions. I don't recall if this particular transaction that I reviewed for the declaration was that transaction or not. But I'm aware that a message was sent by IRS undercover agents in the process of making transactions with Bitcoin Fog.

Q. And there was no response to that message, correct?

A. I do not recall, sir.

Q. But you did review the transaction?

A. Yes, sir.

Q. You just can't recall whether or not there was a response to the message?

A. Again, sir, this declaration was mostly focused on the flow of funds and not the underlying communication.

Q. And when you say flow of funds, you just mean the flow of funds from Bitcoin Fog to Mr. Sterlingov's accounts, correct?

A. Yes, sir, for --

Q. And you --

A. -- the purposes of this declaration.

Q. When you reference flow of funds, you don't know anything about the flow of funds going into Bitcoin Fog?

MR. BROWN: Objection, asked and answered.

THE COURT: Overruled.

MR. EKELAND: No further questions, Your Honor.

THE COURT: Any redirect?

REDIRECT EXAMINATION OF LUKE SCHOLL

BY MR. BROWN:

Q. Very quickly, Your Honor. Mr. Scholl, you testified that you reviewed IRS records of an undercover transaction with Bitcoin Fog, right?

A. Yes, sir.

Q. And what was your focus in those records in conducting this analysis?

A. The focus was to obtain attribution for the

Bitcoin Fog cluster and Chainanalysis.

THE COURT: Keep reminding yourself to keep it slow.

THE WITNESS: Yes, sir. Sorry, sir. The focus was to identify the addresses associated with Bitcoin Fog.

BY MR. BROWN:

Q. And so knowing the address the IRS interacted with on Bitcoin Fog, could you draw any conclusion from that with respect to attribution of the Bitcoin Fog cluster?

A. Right, I reviewed the address that was obtained by IRS from Bitcoin Fog. When they're conducting the transaction, Bitcoin Fog provided a deposit address. I verified that that deposit address was identified by Chainanalysis as belonging to the Bitcoin Fog cluster, and confirmed that attribution with an open source tool on the internet available to anyone called WalletExplorer.

Q. And so looking -- being able to check the IRS undercover transaction, did that give you more or less confidence in the attribution or identification of the Bitcoin Fog cluster?

A. It gave us more confidence in the attribution from Chainanalysis and the Bitcoin Fog cluster, because we had an address that we knew belonged to Bitcoin Fog and it was properly identified and attributed by Chainanalysis as Bitcoin Fog.

MR. BROWN:  No further redirect.

THE COURT:  All right, thank you.

MR. EKELAND:  Recross?

THE COURT:  Well, is there something you need to ask on recross?  Is there some narrow focused question you need to ask on recross?

MR. EKELAND:  Yes, there is.

THE COURT:  Okay, go ahead.

<u>RECROSS-EXAMINATION OF LUKE SCHOLL</u>

BY MR. EKELAND:

Q.   Agent Scholl, you testified you used, what was it, Chainanalysis to conduct your tracing?

A.   Yes, sir, I did.

Q.   And in general, do you find Chainanalysis to be reliable?

MR. BROWN:  Objection, outside the scope of redirect.

MR. EKELAND:  Well, he testified to using Chainanalysis for his tracing, Your Honor, and his attribution.

THE COURT:  Overruled.

BY MR. EKELAND:

Q.   Thank you, Your Honor.  I'm sorry, I think I just asked this, but generally you consider Chainanalysis to be reliable; is that correct?

Appx305

A.    Yes, sir, I do.

MR. EKELAND:  Your Honor, may I approach the witness just to hand him an exhibit?

THE COURT:  Yes, but I am getting concerned that you're going beyond the scope of the redirect.  So what is it you want to get into now?  Usually I'll allow a question or two, but it seems like you're opening a whole new line of inquiry.

MR. EKELAND:  The question I'm asking is if Chainanalysis is so reliable, I'd like to ask him his opinion on this Chainanalysis report that says 90 percent of mixed funds are mixed for privacy and security reasons.

THE COURT:  Well, I think it's agreed that that's the reason funds are mixed.  I don't think that's a disputed question.

MR. EKELAND:  This is a Chainanalysis -- this is a story about a Chainanalysis report verifying that fact.

MR. BROWN:  Your Honor, we'll need to have re-redirect if we go down this road.

THE COURT:  Yeah, I think I'm not going to allow it at this point.  You can step down, thank you.

THE WITNESS:  Thank you, sir.

THE COURT:  Did you want to call a witness?

MR. EKELAND:  No, Your Honor, I think we're done. We'd like to obviously make a closing argument, but we have

no further witnesses.

THE COURT: That's fine. Let me ask, do the parties at this point just want to make closing arguments or is there a need for any additional briefing on anything?

MR. BROWN: Your Honor, I think it's fully briefed and ripe for decision.

MR. EKELAND: I couldn't hear what he said.

THE COURT: He said it's fully briefed in his view.

MR. EKELAND: Well, we welcome the opportunity for supplemental briefing, but we're happy to just rest on our arguments here if necessary, Your Honor.

THE COURT: Well, is there some issue that has not been addressed that you need to address in supplemental briefing?

MR. EKELAND: No, I think we're in good shape, Your Honor.

THE COURT: Okay. How much time do you want for your argument now?

MR. EKELAND: I don't think I need that long, but then -- you know, like, I don't know, 10, 15 minutes maybe.

THE COURT: The government, about the same?

MR. BROWN: Much less, Your Honor, unless the Court has specific questions.

THE COURT: All right, go ahead.

**MR. EKELAND:** I think one thing, Your Honor -- may I proceed, sorry?

**THE COURT:** Yes.

**MR. EKELAND:** I think one thing that's clear from this hearing, Your Honor, is that the government doesn't know the source of any of these funds, and they haven't established the traceability of the funds to any illicit proceeds of any crime. And that's because they don't have any evidence, because Mr. Sterlingov did not commit any crimes. And here we are, Your Honor, after a seven-year investigation, and they're asking him what his profession was, what his salary was, who his friends were, who his family is. They're sitting in this court after he's been in jail now over two years asking him basic questions about his income, about his job, about his life.

The one thing that I think comes out in this hearing is how little the government actually bothered to investigate Mr. Sterlingov's life. What you have is a bunch of people sitting at desks 6,000 miles away with a multi-year investigation that they realize is weak, and then somebody decides to roll the dice seven years in. And if you look in the discovery, you see all sorts of other names -- Andrew White, for instance, who's actually tied to the shormint address that registers this DNS, right.

After seven years, they roll the dice and arrest

him at the airport with all of his computers, with his personal diary, with his backup codes, with his handwritten notes. And there's not a trace on any of that of him operating Bitcoin Fog. And I know we're not here to challenge the grand jury's probable cause decision, but we are here to talk about traceability. Mr. Sterlingov's actual innocence goes to that traceability. Because the government is arguing that Mr. Sterlingov is getting payments on a regular basis, royalties, from Bitcoin Fog. That is nowhere in the record. There's no evidence of that, just like there's no evidence at all that he operated Bitcoin Fog.

We put Mr. Sterlingov up on the stand, the government could ask all the questions they wanted. Mr. Sterlingov answered them honestly. The money that went into his Kraken account was the money that he earned from his job in Sweden, the job that the government knows nothing about. They're sitting in this courtroom today saying to him who are your friends. That is something that's telling, Your Honor. There's not a single eyewitness in this case. Everything in this case, everywhere that you turn in this case, it's speculation and a hop, skip and a jump away. There is no direct evidence in this case. After a 10-year investigation, they cannot even name a single specific crime, not one. And we've been asking.

And if you look at the forfeiture allegations in the superseding indictment, they're asking for forfeiture under 21 U.S.C. 853(p). That's the substitute asset forfeiture provision of the United States Code, Your Honor. I argue under Luis that you cannot constitutionally seize pretrial substitute assets to deprive a defendant of counsel of their choice, and that's what's happening here. And I think the dissent that Justice Roberts lays out in Kaley is very, very on point. What's going on here is that the government is trying to thwart Mr. Sterlingov's defense, yet they cannot point to a single --

THE COURT: But he was in dissent.

MR. EKELAND: What's that?

THE COURT: Chief Justice Roberts was in dissent.

MR. EKELAND: I think he was in dissent in Kaley, that's what I'm talking about.

THE COURT: Right, but that's not the law if he was in dissent, what matters is what the majority said.

MR. EKELAND: Right, and the majority says you can't challenge the grand jury's determination of probable cause, but that traceability is a separate prong. I don't even think that's in question. Justice Kagan says that in footnote nine, and Justice Roberts agrees. But what we're talking about here is a fundamental constitutional right. And these pretrial asset forfeitures are a new 20th century

invention here. There's not a single crime here that this can be traced back to. The government essentially admits that they're tracing stops halfway. They use words in their briefing, they say, oh, the funds originate with Bitcoin Fog. No, they originate with Mr. Sterlingov's paycheck.

Mr. Sterlingov went on the stand and told everyone in this court, subject to cross-examination, where his funds came from. And the government -- the government comes up, and they don't know, they're asking him about his income, what his salary is. There's no evidence at all anywhere in the record that any of these funds are traceable to any illicit proceeds. And the government's own expert Chainanalysis -- and we put this in our supplemental briefing, has issued a report saying that 90 percent of mixed funds are mixed for privacy and security reasons. The standard here is probable cause, probable cause that the funds -- that's under Monsanto, that it's probable cause that the funds are tied to a crime. What crime? Nobody's named it. There's no evidence. Everything's speculation, everything's a hop, skip and a jump away.

And Mr. Sterlingov finally had his opportunity to speak in open court, and he was honest and he was forthright. The government's unable to contradict his story. That's why they waited seven years to arrest him. They rolled the dice. They knew it was weak. None of the

evidence in this case at all changed. The only thing that changed was their quote, unquote unilateral IRS sting investigation to manufacture venue in a district that he has never been in, that he's never set foot in, he has no friends in, no family in, and he's never done business in.

I don't know what else to say, Your Honor. I mean, an innocent man has been in jail pretrial for a felony sentence on the flimsiest of evidence. I mean, somebody, please, name the crime, point it out. Where's the direct evidence? They didn't know what he did for his job, because nobody bothered. Nobody bothered to do what you have to do with this kind of blockchain tracing. Tracing is not a form of identification, it requires external verification.

In all the other cases -- Silk Road, Ross Ulbricht is caught in the public library with his laptop open to the admin panel to Silk Road. When they seize his diaries, there's all sorts of details in his diaries about what he did. The government seized Mr. Sterlingov's diaries here at the airport. They seized all his computers, his storage drives, everything. Not a trace. Not a trace anywhere of him ever operating Bitcoin Fog. They've charged him with conspiracy to operate Bitcoin Fog. There's not a single communication anywhere. What's astonishing about this case is the lack of corroborating evidence. Even in Harmon, Harmon accidentally took a photo of the Helix I think admin

panel with his Google Glass. All the other cases, they all have external empirical verification. Here, you just have people sitting at desks with all sorts of conflicted motives waiting years, and then finally rolling the dice because they need to get somebody, they need to arrest somebody.

But as I sit here in front of this Court, nobody can still tell me what crime these proceeds are tied to, and he languishes in jail. They've taken all this money away from his defense. That's a fundamental constitutional violation. The government has not met its burden of probable cause of tying any of these funds to any illicit activity, because Mr. Sterlingov is completely, completely innocent.

**THE COURT:** Okay, thank you. Mr. Brown.

**MR. BROWN:** Your Honor, I can't possibly respond to the entire argument about everything about this case. But just narrowly focused on the issues before the Court for this proceeding, assuming that Mr. Sterlingov has established financial need -- and the government believes that he's been evasive and incomplete in his disclosures. But assuming that he has established financial need, the question becomes whether the seized funds are traceable to the offense that's been indicted.

Now, in Mr. Sterlingov's testimony -- well, to begin with, there's no -- I know the defense says that they

dispute the tracing, but I haven't heard any evidence or factual argument to dispute that the funds in the seized Kraken accounts are traceable to Bitcoin Fog. The defense argument is they came from somewhere else before then. We think that Mr. Sterlingov's testimony on cross-examination casts doubt on his story about where the funds came from beforehand. It seems like he ran out of Bitcoin sometime in 2013 before he even opened up these accounts, and then he had some other source -- not his job, for continued Bitcoin purchases.

But setting all of that aside, the standard here is probable cause. The Court has in front of it an indictment for money laundering, conspiracy through Bitcoin Fog, essentially as a business, and an indictment for operating an unlicensed money transmitting business. Both of those offenses give rise to forfeiture of any property involved in the offense. However you slice it, money -- here's a defendant who's been indicted for the conduct. The money that was seized comes from that conduct, it comes from the unlicensed money transmitting business, and it comes from the money laundering conspiracy business. The Court is entitled to draw a fair inference based on those two facts.

This is a bit like somebody who's been indicted for robbing a bank, and they're found to be in possession of dollar bills from the bank. They may have a different story

of how those dollar bills -- maybe there was a dye pack and the bills have dye on them. They may have a different story for how those bills ended up in their possession, but the Court can and should draw a fair totality of the circumstances probable cause determination that in the bank robbery example, that there is a fair probability that the indicted bank robber, who's in possession of money from the bank robbery, that those funds represent the proceeds of the bank robbery. And the same logic holds true here. We have an indicted defendant. We have funds that come from the indicted defenses. There's at least a fair probability -- which is all the government has to prove, assuming we even bear the burden of proof. There is at least a fair probability for this Court to find that those funds are subject to seizure and forfeiture.

I'm happy to answer any questions the Court has. I'm happy to talk about Luis as opposed to Kaley. I'm happy to talk about the indictment. But I don't want to belabor the point any further unless the Court has any further questions.

THE COURT: I don't think I do at this point, thank you.

MR. BROWN: Thank you.

THE COURT: Anything further?

MR. EKELAND: I think the fundamental problem with

the government's position is that if they are correct, then the government can simply seize all of the defendant's assets merely on a grand jury indictment. We know that's not the law, and we know that's not constitutional. What's happening here is unconstitutional. There's a difference between a grand jury issuing a finding of probable cause and producing an accusatory instrument and whether or not the funds in question are traceable to any crime.

Now, note the government's not arguing that just the mere operation of mixing or Bitcoin Fog is illegal. We have not seen any evidence at all anywhere in this case, anywhere in what happened today, in any of the briefings of any of the proceeds being connected to any illicit activity. It's all speculation. And if the government can seize a defendant's assets on such a flimsy standard, then no defendant in any federal court is ever going to be able to pay for a defense lawyer. And this is what Justice Roberts was getting at in his Kaley defense. Because no lawyer is going to want to defend someone when they think the government is going to just take their money. That's the fundamental problem with the government's argument.

They want to say that essentially they can seize whatever they want just upon grand jury indictment. But that's not our constitutional system, and this is a fundamental -- this seizure is a fundamental violation of

Mr. Sterlingov's Sixth Amendment right to counsel of his choice.

THE COURT: All right, thank you. So I appreciate the arguments and the hearing today. I'll give this a little bit of thought and will get you all an opinion. I do want to spend a minute talking about scheduling before we adjourn. I know my clerk has been going back and forth with you about scheduling the hearing or argument on the pending motions. I think my clerk heard back that counsel thinks that two days might be needed just for the Daubert hearing. I will tell you, I am in trial almost continuously for May, June and portions of July, as well as additional trials before then. I have a 10-week trial that starts in May. My intention is not to sit every Friday at least, and to at least take off Friday afternoons. But I don't know that before August I'm going to have any time in which I have two or three available days for the entire day for a Daubert hearing and for argument.

The question for you all is do we think we can do this in a more abbreviated fashion or do you want to wait until August when I will have some more availability and schedule it in August? Mr. Brown.

MR. BROWN: Your Honor, I mean, the government will do its best to -- I think that we are going to be on the receiving end of the -- on the defensive side of these

Daubert hearings. But in terms of scheduling, August seems very close to trial to us. And given that this is -- it's not the biggest part of the government's case, but it's something that requires a lot of preparation, it will have a significant impact on trial preparation. So if there's any way to do this sooner, maybe consecutive Fridays, you know, continue one week, that would be preferable to us. We just think the earlier the better, Your Honor, but we understand the Court is busy.

**THE COURT:** Mr. Ekeland.

**MR. EKELAND:** Your Honor, the defense is flexible as to dates. But I do think given the nature of this case and everything about it being a unique blockchain prosecution with a host of novel issues, that it is going to take up some time. But we're willing to do whatever we need to do. I do agree with the government that August is getting close to the trial, but we're flexible, Your Honor.

**MR. BROWN:** Sorry, just one other note, Your Honor. We filed our response to the defense expert notice. We have a pending motion before the Court where we'd like a -- actually a fulsome expert notice if the defense is going to notice a cryptocurrency expert. And so we will need time to respond. And we may be on -- I said we're going to be on the defensive side, but we may be on the offensive side to the extent the defense actually notices

any sort of experts.

THE COURT: Are you going to be noticing experts, Mr. Ekeland?

MR. EKELAND: If I can afford them, yes.

THE COURT: I think you should go ahead and notice them in any event. I don't know how I'm going to come out on this motion, but even if I end up ruling against the defense on this motion, there will be funds that will be made available. Even if I rule against the defense on this motion, I think there are funds that could be available through the CJA act. So I think you should go ahead and notice your experts.

MR. EKELAND: Your Honor, if these funds aren't unfrozen, I don't think I can afford to do this case. So I'm going to -- I mean, I'm going to have to look at that, but I just don't think that's realistic based on what I've heard. And I've talked to Mr. Fischbach about his experience with CJA, the rates and amount of time. I know Mr. Fischbach won't work on this case for CJA rates given its complexity and the amount of hours required.

THE COURT: Mr. Fischbach is your expert?

MR. EKELAND: Yeah, he's the one who was waiting -- he's one of my experts. It's just -- it's too complex of a case. This is precisely what Justice Roberts --

THE COURT: Indigent defendants are entitled to experts. Even if your client doesn't have funds, he's entitled to the money he needs to hire appropriate experts. So if the experts are needed in the case, there will be a way that's found to pay those experts.

MR. EKELAND: Then perhaps we should cross that bridge when we get to it. Like I don't -- you know, I mean, this is -- people are already going out-of-pocket on this case.

THE COURT: I'm not asking you to go out-of-pocket on anything.

MR. EKELAND: Yeah, but, you know...

THE COURT: And Mr. Brown, when are you out of town?

MR. BROWN: Your Honor, I'm leaving -- I'm not sure if it's the -- I'm leaving the 6th or 7th of July, and I don't get back until the -- I think it's the 24th to be on the safe side.

THE COURT: Well, then how about setting aside the 16th and 23rd of June, two Fridays in a row? I think we're going to have to be efficient about how we approach this. I'm going to ask counsel to be as focused as they can be. I don't think we have the luxury of three days of motions practice. I think we can do everything we need to do in two easily.

MR. BROWN: Yes, Your Honor. So the 16th and the 23rd of June?

THE COURT: Yes.

MR. BROWN: Our Chainanalysis expert, Ms. Beth Bisbee, isn't available on the 16th, but she would, as far as we know, be available on the 23rd.

THE COURT: I can do the 23rd and the 30th.

MR. BROWN: Or we could do those two dates and we could just have her on the 23rd. But the 23rd and 30th would work.

THE COURT: Well, the 30th may be a problem for me.

MR. BROWN: We could try to make the 16th and 23rd work, because we've obviously noticed two cryptocurrency blockchain experts.

THE COURT: Let's do the 16th and 23rd. Does that work for you, Mr. Ekeland?

MR. EKELAND: Of June, Your Honor?

THE COURT: Correct.

MR. EKELAND: Yes, Your Honor.

THE COURT: So we'll put that down. I will get you an opinion as soon as I can on the seizure issue. And if I end up rejecting the motion, we may then have to confer about how we're going to proceed with the case. If I end up rejecting the motion to unfreeze, we'll have to schedule

something to figure out how to proceed with the case in light of that.

MR. BROWN: Your Honor, on the scheduling -- just one last housekeeping issue. We don't have to decide it now, but the government would ask that we have a date certain in advance of the motions hearing in June for the defense to file any expert notices so we have sufficient time to review, draft our own motion if needed.

THE COURT: Mr. Ekeland, any thoughts on that date?

MR. EKELAND: I'm sorry, I didn't hear the date.

THE COURT: He just wants a date certain in advance of the -- sufficiently in advance of the 16th and 23rd hearing dates so they'll be able to prepare for the hearing on those days.

MR. EKELAND: I'm sorry, dates for what?

THE COURT: For you to designate an expert, if you're going to designate one.

MR. EKELAND: What was the date proposed?

THE COURT: I'm sorry?

MR. EKELAND: Did he propose --

THE COURT: He didn't propose one.

MR. EKELAND: We're fine with picking a date certain.

MR. BROWN: How about maybe four to six weeks to

give us time.

THE COURT: How about the 19th of May?

MR. EKELAND: The 19th of May?

THE COURT: Yeah.

MR. EKELAND: That's fine.

MR. BROWN: Yes.

DEPUTY CLERK: Your Honor, what time on the 16th and the 23rd?

THE COURT: Both days will be at 10:00 a.m. for the hearings.

MR. EKELAND: I'm assuming that -- the only thing we ask is that the government adhere to the same deadline for their experts, that we both have the same date certain for disclosure of experts.

MR. BROWN: We've already noticed our experts.

MR. EKELAND: So there's nobody else that you're going to call, you've noticed everybody that you're going to?

MR. BROWN: Yeah.  I mean, if we have any more we'll --

MR. EKELAND: You'll do it by that date, okay, that's fine.

THE COURT: Anything else while you're at the microphone you want to bring up before we adjourn?

MR. EKELAND: No, Your Honor.  Thank you very

much.

THE COURT: Mr. Brown, anything else before we adjourn?

MR. BROWN: No, Your Honor.

THE COURT: Okay, thank you.

(Proceedings adjourned at 3:38 p.m.)

# C E R T I F I C A T E

I, **Jeff M. Hook, Official Court Reporter,** certify that the foregoing is a true and correct transcript of the record of proceedings in the above-entitled matter.

February 22, 2023

DATE

Jeff M. Hook

Appx325

**$**

$10 [1]   91/11
$200 [1]   94/1
$31,450 [1]   88/1
$334,000,000 [1]
  31/20
$800 [3]   4/1 4/4
  4/5

**'**

'Killdozer.' [1]
  68/23

**0**

0399 [1]   1/4

**1**

1,000 [4]   81/17
  81/18 81/22 82/8
1.266 [1]   87/19
10 [7]   9/24 9/24
  31/19 92/11 92/12
  92/16 118/21
10,000 [2]   71/20
  71/22
10-week [1]   128/13
10-year [2]   104/13
  120/23
10005 [1]   1/20
107 [1]   2/8
1083 [1]   32/5
109 [1]   83/15
109.4169 [1]   83/11
10:00 a.m [1]   134/9
10:21 [1]   1/6
10th [1]   85/7
11 [2]   38/9 90/23
11.6895 [1]   87/24
111 [2]   2/9 2/16
114 [1]   2/10
116 [1]   2/11
11:45 a.m [1]   52/7
11th [2]   82/25
  84/25
120 [2]   78/11 78/15
129 [2]   79/7 83/15
12:00 [1]   52/6
12:10 p.m [1]   52/8
13.9454 [2]   82/4
  82/7
136 [1]   32/5
14 [8]   8/22 9/5
  9/17 26/19 26/23
  38/12 101/13 101/13
15 [4]   91/23 92/12
  92/14 118/21
15-minute [1]   52/5
15th [1]   84/6
16 [2]   82/17 110/23
16th [7]   131/20
  132/1 132/5 132/13
  132/16 133/13 134/7
18th [2]   42/17
  42/23
19 [6]   2/18 26/16
  27/6 67/15 68/25
  69/4
19 and [1]   69/3
19th [2]   134/2

134/3
1:00 [1]   89/2
1:09 p.m [1]   89/4
1:21-cr-0399 [1]
  1/4

**2**

2,000 [2]   87/18
  93/25
2,500 [2]   70/25
  71/1
20 [7]   2/19 66/14
  66/20 68/25 69/3
  69/4 76/22
20001 [2]   1/14 1/25
2008 [1]   69/24
2009 [3]   10/6 12/21
  69/20
2010 [5]   12/21
  12/21 14/14 62/25
  73/2
2011 [4]   14/14 69/7
  69/9 73/1
2012 [11]   68/9
  76/22 76/22 77/1
  78/7 78/8 78/8 79/8
  80/25 83/6 83/14
2013 [13]   17/7 72/6
  72/15 79/2 79/8
  82/25 83/7 83/15
  83/21 84/6 84/25
  85/7 125/8
2013/2014 [1]   72/7
2014 [17]   17/7 21/5
  22/20 42/17 42/23
  43/8 43/12 43/15
  43/18 72/7 72/10
  72/15 73/13 73/22
  74/1 85/20 107/16
2015 [5]   74/10
  79/11 83/3 107/17
  108/2
2016 [4]   32/5 74/10
  101/11 101/16
2017 [3]   87/8 87/9
  87/13
2021 [3]   24/19
  29/19 74/2
2022 [1]   78/5
2023 [1]   1/5
203 [1]   100/3
20530 [1]   1/16
20th [3]   76/22 77/1
  121/25
21 [1]   121/3
21-399 [1]   3/2
22 [8]   2/20 33/11
  77/13 77/14 77/22
  77/25 88/16 88/21
23 [7]   2/21 77/13
  77/14 79/13 87/4
  88/16 88/21
23rd [10]   131/20
  132/2 132/6 132/7
  132/9 132/9 132/13
  132/16 133/14 134/8
24 [6]   2/22 77/13
  77/14 87/3 88/17
  88/21
24 is [1]   77/15

24th [2]   43/12
  131/17
25 [9]   2/23 46/19
  51/23 52/1 52/2
  76/14 76/20 88/17
  88/23
25,000 [1]   70/24
25th [1]   79/2
26th [1]   29/20
27th [2]   29/19
  29/20
2:15 [1]   89/3
2:30 p.m [1]   89/5
2A [2]   110/21
  110/22

**3**

30 [1]   1/19
30th [3]   132/7
  132/9 132/11
31 [1]   1/5
33 [3]   74/9 74/15
  82/18
333 [1]   1/24
36 [1]   24/18
37 [1]   26/10
38 [1]   27/14
39 [1]   2/5
399 [1]   3/2
3:00 a.m [2]   6/22
  6/23
3:38 p.m [1]   135/6
3rd [4]   87/8 87/9
  101/11 101/16

**4**

42 [1]   35/11
4700-C [1]   1/24
4th [2]   78/5 78/8

**5**

5,000 [2]   72/1 72/2
52 [1]   2/23
54 [1]   53/25
56 [2]   86/15 86/22
5th [1]   80/25

**6**

6,000 miles [1]
  119/19
601 [1]   1/13
69 [2]   2/18 2/19
6th [1]   131/16

**7**

7th [1]   131/16

**8**

853 [1]   121/3
88 [4]   2/17 2/20
  2/21 2/22
8th [1]   1/19

**9**

9/20 [1]   76/22
90 percent [2]
  117/11 122/14
950 [1]   1/16

**A**

a.m [5]   1/6 6/22

6/23 52/7 134/9
AA68N84GQUXTDGMY [1]
  39/25
abbreviated [1]
  128/20
ability [1]   70/11
able [8]   6/17 6/21
  7/5 21/2 96/12
  115/17 127/16
  133/14
above [1]   136/5
above-entitled [1]
  136/5
absence [1]   73/4
absolutely [5]   4/25
  32/13 36/13 93/24
  94/13
abusing [1]   52/16
accept [1]   32/17
accepted [1]   90/9
access [6]   13/15
  21/1 24/13 61/9
  72/13 89/25
accessed [1]   110/5
accidentally [2]
  6/4 123/25
accommodate [1]
  86/5
accompanied [1]
  62/16
according [1]   99/16
account [168]
accountant [1]
  75/12
accounting [2]   75/8
  75/12
accounts [45]   17/4
  17/5 21/13 21/19
  39/10 39/19 39/22
  44/13 44/16 45/1
  45/3 47/13 49/17
  50/6 51/20 54/12
  54/19 54/23 55/12
  56/7 56/14 56/20
  57/8 57/10 57/21
  63/24 64/24 65/1
  65/22 73/18 95/9
  95/16 95/18 95/22
  108/22 108/25
  109/15 111/6 112/11
  112/22 113/3 113/6
  114/6 125/3 125/8
accumulated [2]
  73/6 85/19
accuracy [1]   88/2
accurate [4]   24/21
  31/5 31/8 51/20
accusatory [1]
  127/7
accused [2]   28/19
  29/6
act [1]   130/11
Action [1]   1/3
active [4]   63/1
  63/4 63/7 99/9
activities [1]
  58/13
activity [3]   76/13
  124/12 127/13
actual [4]   13/4

## A

actual... [3]   13/23 25/24 120/7

actually [18]   5/15 6/3 6/19 22/20 26/22 27/9 27/20 28/3 32/4 42/7 48/2 59/21 92/19 103/7 119/17 119/23 129/21 129/25

adamant [2]   15/13 92/3

add [4]   79/10 80/4 83/10 87/23

addition [2]   95/7 112/19

additional [3] 25/25 118/4 128/12

Additionally [2] 101/24 102/11

address [21]   11/15 15/21 15/24 84/10 85/3 93/17 96/1 96/2 103/13 110/1 110/1 110/3 110/5 110/8 115/7 115/10 115/12 115/13 115/23 118/14 119/24

addressed [1] 118/14

addresses [2]   96/17 115/5

adds [2]   83/11 87/24

adept [1]   105/11

adhere [1]   134/12

adjourn [3]   128/7 134/24 135/3

adjourned [1]   135/6

admin [2]   123/16 123/25

administer [1] 16/11

administered [1] 16/12

administrative [1] 89/25

administrators [1] 113/14

admit [4]   51/22 68/25 88/16 111/8

admits [1]   122/2

admitted [19]   2/16 2/17 2/18 2/19 2/20 2/21 2/22 2/23 52/1 52/2 53/14 69/3 69/4 88/20 88/21 88/23 111/11 111/12 111/20

adopt [2]   106/19 110/25

adopted [1]   92/15

adopters [1]   105/10

advance [4]   27/4 133/6 133/13 133/13

advertise [1]   44/1

advertised [1]   14/2

afford [2]   130/4

130/14

afraid [2]   92/11 103/22

afternoon [1]   107/9

afternoons [1] 128/15

afterward [1]   93/14

afterwards [2]   57/3 62/7

again [9]   5/6 18/4 36/15 52/11 77/7 85/25 85/25 106/10 114/3

against [6]   49/23 49/25 62/9 62/19 130/7 130/9

age [2]   9/5 9/17

agent [3]   62/3 110/4 116/11

agents [7]   29/24 30/10 30/14 30/14 60/2 62/4 113/19

ago [3]   90/23 92/12 92/12

agree [3]   57/9 104/20 129/16

agreed [2]   32/8 117/13

agrees [2]   56/19 121/23

ahead [10]   37/22 50/22 50/22 52/5 94/21 103/9 116/8 118/25 130/5 130/11

airplane [1]   29/23

airplanes [2]   25/15 27/5

airport [11]   26/7 29/2 29/9 29/22 30/22 31/6 32/11 34/22 36/25 120/1 123/19

airports [1]   25/17

ALDEN [2]   1/15 3/8

allegation [1] 32/15

allegations [4] 31/25 33/17 34/21 121/1

alleged [3]   24/5 33/15 33/22

allegedly [1]   32/20

alleging [1]   33/7

allow [4]   19/8 26/1 117/6 117/20

allowed [1]   26/24

allowing [1]   26/22

almost [3]   30/6 86/15 128/11

along [1]   8/16

alternative [1] 103/15

although [3]   27/19 32/18 54/14

altogether [1]   82/6

always [3]   30/5 50/12 50/13

Amazon [2]   88/10 88/11

Amendment [1]   128/1

AMERICA [2]   1/3 3/3

amount [9]   49/22 74/17 78/11 81/17 81/22 81/25 94/3 130/18 130/20

amounts [2]   98/18 98/20

analysis [4]   55/23 56/5 111/4 114/24

Andrew [1]   119/23

Angeles [3]   26/6 26/12 29/2

animated [1]   92/23

animations [1] 10/25

anonymous [1]   95/16

answered [4]   56/18 102/13 114/13 120/15

anticipated [1] 19/12

apartment [9]   13/18 13/19 13/21 13/23 13/25 14/3 14/4 14/6 63/5

APPEARANCES [1] 1/11

appeared [1]   59/23

appears [1]   47/12

appended [1]   84/13

appreciate [2]   7/16 128/3

appreciated [3] 22/12 22/15 22/16

appreciation [2] 73/24 96/10

approach [12]   36/21 46/5 46/13 66/16 67/11 76/17 77/9 83/23 100/23 108/7 117/2 131/21

approached [1] 61/24

appropriate [1] 131/3

approximate [1] 69/20

approximately [3] 74/8 87/18 87/25

April [2]   29/19 84/6

April 15th [1]   84/6

April 27th [1] 29/19

argue [3]   36/9 37/5 121/5

arguing [3]   103/6 120/8 127/9

argument [10]   37/3 37/3 117/25 118/19 124/16 125/2 125/4 127/21 128/8 128/18

argumentative [1] 20/12

arguments [3]   118/3 118/12 128/4

around [18]   6/22 9/24 12/21 14/13 14/13 17/6 21/5 27/2 62/25 70/24

71/1 71/19 71/22 72/2 73/2 73/16 73/17 91/10

arrest [14]   9/8 29/1 29/19 30/1 30/12 32/12 61/25 62/1 62/2 62/3 74/2 119/25 122/24 124/5

arrested [3]   24/10 26/6 30/22

arresting [2]   61/8 62/11

arrived [2]   26/12 29/22

artificial [1] 36/20

aside [3]   31/7 125/11 131/19

aspiration [1] 18/16

asset [2]   121/3 121/25

assets [6]   32/19 34/22 54/2 121/6 127/3 127/15

assigned [2]   107/19 107/22

assignments [1] 71/16

associated [8] 67/24 95/10 95/13 95/13 96/17 108/22 109/14 115/5

assume [4]   4/18 32/21 38/5 40/1

assuming [4]   124/18 124/21 126/12 134/11

astonishing [1] 123/23

astronomically [1] 22/15

attacking [1]   96/2

attempted [1] 113/13

attention [10]   8/3 17/6 24/17 26/10 29/1 29/18 30/24 31/9 37/11 38/15

attorney [12]   30/17 60/5 60/8 60/13 60/15 60/17 60/25 61/3 97/22 97/25 98/6 106/6

attorney-client [3] 97/22 97/25 98/6

attorneys [3]   20/20 60/7 60/12

attributed [1] 115/24

attribution [6] 114/25 115/9 115/15 115/19 115/21 116/20

audio [1]   23/16

August [8]   69/7 101/11 101/16 128/16 128/21 128/22 129/1 129/16

August 3rd [2]

## A

August 3rd... [2]
101/11 101/16
AUSA [1]  3/6
availability [1]
128/21
available [9]  15/19
106/19 109/7 115/16
128/17 130/9 130/10
132/5 132/6
Ave [1]  1/16
Avenue [1]  1/24
aviation [2]  25/7
26/2
avoid [1]  61/20
awake [2]  7/7 7/9
aware [12]  20/18
22/24 23/7 23/8
23/25 24/2 24/3
38/23 38/25 39/2
112/6 113/18
away [5]  35/18
119/19 120/22
122/20 124/8

## B

back [27]  13/6
17/10 17/15 17/17
17/17 17/23 18/4
19/7 21/5 37/11
52/6 52/8 72/22
73/5 76/14 85/15
89/3 89/5 95/22
96/25 97/1 102/15
106/7 122/2 128/7
128/9 131/17
backup [1]  120/2
bank [11]  45/15
50/11 75/14 75/19
75/20 125/24 125/25
126/5 126/7 126/8
126/9
banking [1]  47/19
Bankruptcy [1]  1/23
bar [4]  13/14
110/14 110/19
110/20
bars [1]  13/14
based [4]  34/20
34/21 125/22 130/16
basic [4]  8/15 8/18
16/2 119/14
basically [2]  12/9
12/14
basis [2]  97/24
120/9
be on [1]  129/23
bear [1]  126/13
became [1]  16/8
become [3]  18/6
18/16 105/12
becomes [1]  124/22
beforehand [2]  5/6
125/7
began [1]  62/24
begin [2]  62/24
124/25
beginning [3]  62/3
72/11 98/24

begins [1]  80/24
behind [1]  31/1
belabor [1]  126/18
believes [1]  124/19
belonged [1]  115/23
belonging [1]
115/14
belongs [1]  41/13
below [4]  22/17
37/17 46/25 47/7
beneath [1]  79/1
beneficial [1]
40/22
benefits [2]  5/12
5/14
besides [2]  98/15
99/4
best [4]  17/20
19/11 37/14 128/24
bet [1]  25/19
Beth [1]  132/4
better [3]  52/25
58/4 129/8
beyond [2]  112/11
117/5
big [2]  18/15 84/6
biggest [1]  129/3
billion [1]  35/11
bills [4]  125/25
126/1 126/2 126/3
binding [2]  33/3
36/9
Bisbee [1]  132/5
bit [10]  33/1 33/11
37/22 39/18 72/8
74/11 100/20 108/4
125/23 128/5
Bitcoin [178]
Bitcoin.se [1]
68/22
Bitcoins [6]  48/6
78/15 79/4 80/20
80/21 102/15
BitcoinTalk [1]
68/23
BitcoinTalk.org [7]
63/10 63/22 64/20
65/2 66/23 99/22
100/4
Bitstamp [7]  101/4
101/7 101/9 101/16
101/18 101/23
102/21
blank [1]  101/13
blockchain [4]
96/19 123/12 129/13
132/15
book [2]  6/2 8/1
border [1]  28/10
born [4]  8/19 8/20
27/18 89/14
both [4]  54/12
125/15 134/9 134/13
bother [1]  24/9
bothered [6]  58/25
59/5 59/18 119/17
123/11 123/11
bottom [9]  38/3
76/21 77/15 84/13
85/6 101/15 101/22

110/4 111/3
bought [4]  22/6
22/6 93/10 96/7
bound [2]  36/7
36/12
box [1]  5/18
break [9]  17/7 46/8
46/9 52/3 52/6 53/3
53/7 72/16 72/18
breaking [1]  88/24
bridge [1]  131/7
Brief [1]  6/10
briefed [2]  118/5
118/8
briefing [5]  118/4
118/11 118/15 122/4
122/14
briefings [1]
127/12
briefly [5]  10/21
11/13 19/1 25/20
29/21
bring [4]  6/20 28/7
28/12 134/24
brochures [1]  10/24
Brooklyn [1]  1/20
brought [2]  30/2
97/20
BROWN [15]  1/12 2/5
2/8 2/10 3/7 52/9
59/3 61/14 88/25
89/7 106/16 124/14
128/22 131/13 135/2
Brown's [1]  58/21
browser [1]  11/16
BTC [1]  81/25
bunch [1]  119/18
burden [2]  124/10
126/13
business [30]  9/11
19/1 19/4 19/10
19/25 20/9 21/21
21/22 40/12 40/17
40/18 41/4 41/9
41/9 41/13 41/19
41/20 41/21 41/22
41/25 42/15 74/16
75/1 75/4 75/7
123/5 125/14 125/15
125/20 125/21
business...what [1]
84/15
businesses [5]
18/12 19/6 19/13
19/19 80/5
busy [1]  129/9
buy [8]  14/23 15/7
15/22 73/19 73/24
84/21 86/6 86/12
buyer [2]  81/6 81/7
buying [9]  13/3
14/15 44/1 62/24
62/24 72/25 73/18
87/12 93/25

## C

California [1]
24/24
call [13]  14/1
35/18 40/21 49/1

49/22 55/3 60/3
71/15 105/24 106/12
106/14 117/23
134/17
called [9]  7/14
9/19 53/11 60/21
62/17 63/9 69/12
74/5 115/16
calls [4]  5/5 44/19
64/8 105/22
calmly [1]  30/5
came [15]  4/11 6/18
12/10 14/5 16/17
22/8 22/11 33/7
55/9 57/21 72/22
104/17 122/8 125/4
125/6
came from [1]
104/17
can [95]  3/24 5/17
6/7 6/8 10/21 11/13
13/7 15/21 15/24
17/10 18/4 19/3
19/20 20/15 23/4
23/5 25/6 25/12
25/14 26/12 26/16
27/20 28/10 28/22
29/7 31/1 32/3
33/21 34/4 34/11
35/18 35/18 36/9
37/2 37/3 37/5 37/7
38/9 41/21 42/10
43/25 44/3 44/22
46/13 48/17 48/23
48/24 48/25 50/22
52/22 57/6 59/2
59/14 60/22 61/22
64/10 68/4 68/22
72/8 74/11 79/6
79/23 92/9 94/4
94/4 94/22 95/6
95/25 96/3 97/14
98/7 102/8 104/22
104/23 105/24 106/2
106/4 106/19 108/3
112/8 112/24 117/21
122/2 124/7 126/4
127/2 127/14 127/22
128/19 130/4 130/14
131/22 131/24 132/7
132/22
cancel [1]  27/4
canceled [1]  27/2
capital [1]  85/21
Capo [22]  10/15
10/16 10/17 11/1
11/7 11/17 11/23
17/8 17/16 17/23
18/10 69/12 69/14
69/22 70/1 70/12
70/17 72/5 72/16
72/23 73/5 96/8
card [2]  37/13 88/9
cards [8]  31/13
31/15 31/21 37/12
37/16 37/18 37/19
38/7
career [1]  105/7
careful [3]  95/24
96/22 98/23

## C

carrying [5]    31/6
31/15 37/16 37/17
101/22
case [49]    3/2 3/25
4/3 4/4 13/9 21/7
31/12 34/15 34/20
35/1 36/22 45/18
47/22 58/9 58/20
59/10 59/10 60/10
60/12 61/25 62/9
69/8 87/12 90/21
90/22 94/14 94/15
103/22 104/14
108/16 112/5 112/9
120/20 120/21
120/22 120/23 123/1
123/23 124/16
127/11 129/3 129/12
130/14 130/19
130/24 131/4 131/9
132/24 133/1
cases [2]    123/14
124/1
cash [2]    81/3 81/4
casts [1]    125/6
catalogs [3]    10/24
11/5 69/18
catch [1]    33/11
caught [2]    31/20
123/15
cause [12]    32/6
32/17 33/19 120/5
121/21 122/16
122/16 122/17
124/11 125/12 126/5
127/6
cellphones [1]
31/21
center [1]    39/18
century [1]    121/25
certain [13]    12/19
17/19 17/21 40/20
63/25 70/18 70/18
85/24 95/2 133/6
133/12 133/24
134/13
certainly [5]    14/15
28/23 42/15 49/9
95/23
certify [1]    136/4
Chainanalysis [14]
115/1 115/14 115/22
115/24 116/12
116/14 116/19
116/24 117/10
117/11 117/16
117/17 122/13 132/4
challenge [2]    120/5
121/20
chance [3]    43/4
94/2 109/16
change [1]    83/16
changed [3]    70/4
123/1 123/2
changes [1]    110/12
changing [1]    50/18
channels [1]    28/5
charged [1]    123/21

charges [1]    32/22
charging [3]    3/25
4/3 4/5
cheap [1]    91/10
check [4]    7/21
29/25 105/20 115/17
chief [1]    121/14
choice [4]    35/10
88/10 121/7 128/2
Chris [1]    3/6
CHRISTOPHER [1]
1/12
chronological [2]
78/3 80/24
circumstances [1]
126/5
citation [1]    32/3
citizen [2]    27/17
41/3
CJA [3]    130/11
130/18 130/19
claim [2]    41/14
96/5
claims [2]    70/12
104/3
clandestine [1]
28/6
clarify [3]    42/9
62/22 79/23
clarity [2]    28/13
54/11
classic [1]    34/21
clear [8]    32/2 32/5
33/18 36/6 41/11
93/19 99/3 119/4
Clearnet [1]    90/2
clerk [2]    128/7
128/9
client [7]    97/21
97/22 97/24 97/25
98/6 98/6 131/2
client's [1]    61/15
clients [1]    11/19
close [3]    30/6
129/2 129/17
closer [2]    72/10
72/11
closing [2]    117/25
118/3
clued [1]    99/17
cluster [6]    97/1
115/1 115/9 115/14
115/20 115/22
co [4]    60/2 112/4
112/6 112/9
co-conspirator [1]
112/9
co-conspirators [2]
112/4 112/6
co-counsel [1]    60/2
coach [1]    18/17
coaching [1]    18/15
code [2]    88/9 121/4
codes [1]    120/2
coins [2]    85/9
100/7
cold [2]    86/2 86/3
COLUMBIA [1]    1/1
column [1]    82/15
comfortable [1]    7/8

comfortable to [1]
7/8
coming [5]    7/20
14/25 23/13 33/11
96/23
commercial [1]    26/2
commit [1]    119/9
common [9]    11/21
34/18 54/1 63/15
63/20 63/21 67/9
90/8 91/21
communication [2]
114/4 123/23
communications [1]
112/3
community [1]    63/1
companies [2]    10/24
27/6
company [12]    10/18
10/21 10/23 48/13
52/16 69/11 74/5
75/8 75/9 75/16
75/19 76/11
company's [1]    75/20
complaint [1]    90/5
completely [8]
33/18 60/24 62/4
62/5 99/7 102/22
124/12 124/12
complex [1]    130/24
complexity [1]
130/20
computer [4]    16/23
38/10 95/24 96/21
computers [9]    11/5
31/20 34/23 36/24
38/3 38/22 39/3
120/1 123/19
concern [2]    7/10
16/3
concerned [8]    16/3
35/22 93/1 93/4
93/19 104/9 113/7
117/4
concluded [1]    25/7
conclusion [5]
56/12 56/16 57/20
111/4 115/8
conditions [1]
29/13
conduct [9]    32/20
33/16 33/23 60/21
65/4 88/14 116/12
125/18 125/19
conducted [3]    29/13
80/13 111/4
conducting [3]
101/19 114/24
115/11
confer [3]    5/11
7/17 132/23
confidence [4]
17/11 44/15 115/19
115/21
configure [1]    19/20
confirm [2]    101/24
102/12
confirmed [1]
115/15
conflicted [1]

124/3
confused [3]    33/1
33/2 36/16
connect [3]    29/5
29/7 29/14
connected [1]
127/13
connection [2]    24/6
37/20
consecutive [1]
129/6
consensus [1]    18/1
consider [2]    33/21
116/24
conspiracy [3]
123/22 125/13
125/21
conspirator [1]
112/9
conspirators [2]
112/4 112/6
Constitution [1]
1/24
constitutional [4]
121/24 124/9 127/4
127/24
constitutionally [1]
121/5
contact [1]    9/3
contacts [1]    9/15
containing [1]    81/1
contains [1]    84/2
content [2]    23/15
23/15
contents [1]    56/9
contest [2]    103/6
103/7
context [1]    85/23
continuation [1]
3/18
continue [6]    35/24
37/8 52/9 89/7 98/7
129/7
continued [4]    17/25
30/18 30/18 125/9
continuous [1]
24/25
continuously [1]
128/11
contradict [1]
122/23
control [2]    31/9
37/22
controlled [1]
41/10
controlling [2]
41/7 41/9
conversation [1]
60/25
conversations [4]
97/11 97/15 98/7
99/14
convert [1]    91/17
cookie [1]    36/21
cooperation [1]
102/1
copy [3]    6/6 6/7
28/1
corner [1]    78/4
corporation [3]

# C

corporation... [3] 40/24 41/3 95/13
corrected [1] 110/25
corrections [2] 109/19 110/24
correctly [2] 16/9 30/22
corresponding [1] 96/13
corridor [1] 29/24
corroborating [1] 123/24
counsel [8] 3/3 3/5 5/12 60/2 121/6 128/1 128/9 131/22
count [3] 25/1 25/4 82/21
counting [1] 26/3
countries [1] 26/21
country [2] 26/17 26/18
couple [2] 17/18 22/22
course [10] 23/7 26/2 28/2 28/16 61/25 92/6 105/15 105/15 105/16 108/2
court [36] 1/1 1/22 1/23 3/13 7/1 33/14 33/18 34/7 34/8 34/10 36/7 36/10 36/15 36/15 37/6 43/3 53/18 56/6 68/19 108/4 118/24 119/13 122/7 122/22 124/6 124/17 125/12 125/21 126/4 126/14 126/16 126/19 127/16 129/9 129/20 136/3
Court's [3] 34/15 104/8 104/10
courthouse [1] 6/21
courtroom [3] 59/23 61/19 120/18
Courts [1] 1/23
COVID [2] 26/16 27/6
COVID-19 [2] 26/16 27/6
cr [1] 1/4
create [1] 100/21
created [1] 76/25
creation [1] 76/21
crime [12] 35/2 35/2 39/6 39/10 119/8 120/25 122/1 122/18 122/18 123/9 124/7 127/8
crimes [1] 119/10
criminal [6] 1/3 3/2 5/8 62/19 103/22 107/23
cross [12] 2/5 2/9 5/1 39/13 39/14 52/22 55/10 106/21 111/16 122/7 125/5

131/6
cross-examination [9] 2/5 2/9 39/13 39/14 52/22 55/10 111/16 122/7 125/5
cross-examine [1] 5/1
crossing [1] 104/5
crypto [1] 95/2
cryptocurrencies [1] 21/15
cryptocurrency [13] 47/23 49/6 49/17 50/6 101/3 101/9 101/25 102/12 107/20 107/25 108/1 129/22 132/14
Ct [1] 32/5
currency [4] 81/17 81/22 83/7 88/11
current [2] 107/17 107/18
currently [2] 107/13 107/19
customer [1] 76/7
cutter [1] 36/21
cutting [1] 34/4
cyber [1] 107/23

# D

D.C [5] 7/20 9/9 9/12 9/15 60/11
dark [2] 110/1 110/8
data [2] 69/17 81/1
date [16] 35/24 42/25 43/1 43/10 74/1 76/21 78/10 133/5 133/10 133/11 133/12 133/19 133/23 134/13 134/21 136/10
dated [3] 84/6 84/25 101/16
dates [4] 129/12 132/8 133/14 133/16
Daubert [3] 128/10 128/17 129/1
day [14] 7/11 7/11 7/12 7/12 7/20 25/24 27/3 27/4 35/16 36/9 85/11 89/13 102/15 128/17
days [10] 26/19 26/23 27/3 70/18 70/19 128/10 128/17 131/23 133/15 134/9
DC [4] 1/5 1/14 1/16 1/25
deadline [1] 134/12
deal [3] 86/16 88/10 88/12
dealt [2] 88/6 88/13
decide [2] 105/13 133/4
decided [5] 23/19 25/19 26/23 72/19 105/11
decides [1] 119/21

decision [7] 5/14 31/24 35/24 35/24 35/25 118/6 120/5
decisions [1] 36/12
declaration [41] 5/1 8/10 8/11 9/21 10/19 24/18 26/11 27/15 53/12 53/17 54/1 55/15 56/6 56/10 56/12 62/23 72/7 72/21 73/4 73/16 74/9 74/15 86/14 89/21 91/23 104/1 106/18 106/20 106/24 108/15 108/17 108/20 109/17 109/20 109/24 110/25 111/20 112/18 113/17 114/3 114/10
declaration's [1] 113/7
defend [1] 127/19
defendant [12] 1/7 1/18 3/12 3/16 34/19 58/22 103/5 103/21 121/6 125/18 126/10 127/16
defendant's [7] 3/19 7/25 30/25 58/22 89/13 127/2 127/15
defendants [1] 131/1
defender [3] 60/6 60/9 60/18
defense [20] 5/5 34/20 53/14 103/10 103/15 104/12 106/20 121/10 124/9 124/25 125/3 127/17 127/18 129/11 129/19 129/21 129/25 130/8 130/9 133/7
defense's [1] 104/21
defenses [1] 126/11
defensive [2] 128/25 129/24
definitely [1] 91/9
deny [1] 91/1
denying [1] 91/2
Department [1] 107/19
depending [1] 105/21
deposit [4] 16/22 54/18 115/12 115/13
deposited [1] 21/24
depositing [2] 54/2 54/9
deposition [2] 89/11 103/22
deposits [1] 54/8
deprive [1] 121/6
derogation [1] 34/17
describe [5] 10/21 12/3 19/1 25/20

29/21
describes [1] 54/15
describing [1] 31/11
designate [2] 133/17 133/18
desire [1] 5/7
desires [1] 19/21
desk [2] 6/4 6/7
desks [2] 119/19 124/3
detail [1] 56/11
details [4] 62/20 75/18 104/6 123/17
detention [1] 29/12
determination [6] 32/3 32/6 33/20 34/13 121/20 126/5
develop [1] 19/22
developed [1] 19/15
development [1] 75/10
devices [1] 38/23
diaries [4] 39/4 123/16 123/17
123/18
diary [2] 34/23 120/2
dice [4] 119/21 119/25 122/25 124/4
difference [2] 87/5 127/5
different [20] 6/25 12/14 13/14 16/24 16/24 17/2 25/12 30/10 30/10 45/2 45/13 62/10 70/4 71/21 85/24 92/20 100/20 108/25 125/25 126/2
differently [1] 36/14
difficult [1] 36/22
direct [23] 2/4 2/8 6/12 8/3 57/24 58/11 59/17 71/8 72/22 74/5 74/25 89/13 89/14 92/2 92/25 104/1 104/21 104/23 107/7 111/1 111/13 120/23 123/9
directing [5] 26/10 30/24 31/9 38/15 97/21
directly [9] 31/17 31/21 32/11 33/10 56/13 56/20 57/10 57/22 79/25
disagree [2] 56/14 57/9
disagreement [1] 57/20
disclose [1] 98/6
disclosure [1] 134/14
disclosures [1] 124/20
discovered [1] 26/15
discovering [1]

**D**

discovering... [1]
100/14
discovery [11]
20/23 21/2 21/4
24/13 24/14 70/9
103/3 104/2 104/8
104/10 119/22
discuss [3]  13/11
13/25 29/8
discussed [5]  55/22
61/3 97/4 97/6
97/13
discussing [1]
77/20
discussion [2]  5/13
106/8
dispute [2]  125/1
125/2
disputed [1]  117/14
dissent [5]  121/8
121/12 121/14
121/15 121/18
distinction [1]
36/20
distinguish [1]
33/14
district [5]  1/1
1/1 1/10 1/23 123/3
DNS [5]  11/11 11/13
11/15 11/16 119/24
do not [1]  51/11
docket [1]  109/7
docketing [1]  101/5
document [13]  8/7
8/9 8/12 8/14 8/16
31/3 51/7 51/8
53/11 55/1 55/19
67/16 108/11
documents [5]  28/9
28/11 38/13 38/18
90/5
DOJ [2]  1/13 1/15
dollar [4]  22/18
87/6 125/25 126/1
dollars [14]  22/18
35/11 71/23 86/17
86/18 87/18 87/21
87/23 87/25 88/5
88/6 88/12 88/13
91/17
domain [6]  90/3
90/8 90/13 91/8
91/9 91/20
domains [1]  91/5
done [11]  8/5 9/11
11/4 31/2 33/15
64/7 80/9 95/7
102/16 117/24 123/5
door [1]  97/14
doubt [3]  83/12
88/2 125/6
down [22]  5/20 27/5
37/21 38/9 76/20
82/15 82/21 82/24
83/6 85/6 85/16
86/11 87/9 101/22
102/9 106/2 106/25
108/3 110/6 117/19

117/21 132/21
download [1]  19/20
draft [1]  133/8
drafted [1]  108/17
drafting [1]  108/19
draw [3]  115/8
125/22 126/4
dream [1]  18/16
drives [2]  39/3
123/20
dumb [1]  92/22
during [9]  12/17
18/10 22/13 22/25
53/7 55/9 62/18
69/25 72/1
duties [1]  69/14
DVD [1]  31/12
DVD-R [1]  31/12
dye [2]  126/1 126/2

**E**

e-mail [18]  67/18
67/19 67/21 68/2
68/6 68/11 68/17
80/14 84/5 84/6
84/9 84/14 84/21
84/24 85/2 85/3
85/22 85/23
e-mailing [1]  84/9
e-mails [2]  68/16
84/3
earlier [3]  52/13
69/24 129/8
early [4]  14/23
74/1 79/8 91/24
earned [4]  22/11
70/12 71/17 120/16
easier [2]  7/19
108/4
easily [1]  131/25
easy [1]  19/5
educate [1]  18/20
effectively [2]
34/19 41/24
efficient [2]  52/25
131/21
eight [3]  82/16
83/6 83/10
eighth [3]  82/21
82/24 83/6
either [8]  16/4
24/8 54/18 72/13
75/18 75/22 79/24
104/18
EKELAND [14]  1/18
1/19 2/4 2/9 2/11
3/12 3/21 5/4
104/11 111/14
129/10 130/3 132/17
133/9
else [17]  3/21 30/9
53/8 54/22 57/18
64/1 67/6 71/15
81/9 99/1 99/10
99/19 123/6 125/4
134/16 134/23 135/2
embedded [1]  107/22
empirical [1]  124/2
employed [2]  107/12
107/13

employee [3]  56/5
101/16 101/23
employer [1]  11/19
employment [1]  72/5
encountered [1]
49/21
encourage [1]  89/8
end [11]  8/12 19/7
23/16 23/21 72/5
72/10 72/18 128/25
130/7 132/23 132/24
ended [3]  54/23
96/6 126/3
ends [1]  17/22
enforce [1]  49/11
enforcement [2]
24/9 107/20
enforcing [1]  45/15
engage [1]  104/8
English [1]  68/20
enough [1]  5/11
enter [4]  26/16
26/19 26/22 26/24
enthusiast [1]  45/2
entire [5]  29/3
34/25 108/17 124/16
128/17
entitled [4]  125/22
131/1 131/3 136/5
entries [2]  87/22
87/24
entry [2]  31/10
69/17
error [3]  8/16
34/13 109/25
escrow [1]  80/18
especially [2]  7/10
88/7
essentially [8]
15/21 16/17 28/1
34/16 80/17 122/2
125/14 127/22
established [4]
18/19 119/7 124/19
124/21
establishing [1]
75/16
EU [1]  26/19
Euros [1]  86/16
evasive [1]  124/20
even [19]  18/3 27/3
33/4 34/24 36/8
49/10 62/7 62/8
69/24 95/1 95/4
120/24 121/22
123/24 125/8 126/12
130/7 130/9 131/2
event [2]  89/17
130/6
eventually [3]
18/21 19/22 73/18
everybody [4]  15/14
15/19 89/8 134/17
everyday [1]  51/14
everyone [2]  61/19
122/6
everything's [2]
122/19 122/20
everywhere [1]
120/21

evidence [37]  2/16
2/17 2/18 2/19 2/20
2/21 2/22 2/23 4/9
20/8 29/8 32/10
34/24 35/13 35/15
35/16 37/1 38/24
39/2 52/2 60/2 69/4
88/22 111/12 111/20
119/9 120/10 120/11
120/23 122/10
122/19 123/1 123/8
123/10 123/24 125/1
127/11
exact [4]  42/25
43/1 43/10 54/14
exactly [3]  61/1
72/9 85/23
examination [21]
2/4 2/5 2/8 2/9
2/10 2/11 6/12 37/4
37/8 39/13 39/14
52/22 55/10 58/12
59/18 107/7 111/16
114/17 116/9 122/7
125/5
examine [2]  5/1
89/10
example [4]  15/22
34/21 48/2 126/6
excellent [1]  37/10
exchange [8]  15/5
50/12 80/2 91/18
101/4 101/9 102/14
102/24
exchanges [3]  14/21
14/25 47/23
exciting [1]  102/16
exclusively [1]
86/16
Excuse [2]  52/12
61/11
exhibit [34]  2/15
6/2 7/25 8/4 30/25
46/19 46/19 51/23
52/1 52/2 53/14
66/14 66/20 67/15
76/14 76/20 77/22
77/25 79/13 79/14
84/2 84/2 84/3 87/3
87/4 88/23 101/2
108/11 109/2 109/3
111/8 111/11 111/12
117/3
Exhibit 1 [3]
108/11 111/8 111/11
Exhibit 19 [1]
67/15
Exhibit 20 [2]
66/14 66/20
Exhibit 22 [2]
77/22 77/25
Exhibit 23 [2]
79/13 87/4
Exhibit 24 [1]  87/3
Exhibit 25 [5]
46/19 51/23 52/1
76/14 76/20
Exhibit 4 [1]  101/2
Exhibit 9 [2]  84/2
84/2

**E**

Exhibit A [2]   8/4
53/14
Exhibit D [1]   30/25
exhibits [8]   46/3
68/25 69/4 77/13
77/16 88/16 88/20
88/21
exiting [1]   29/23
expected [2]   7/2
19/24
expenses [4]   42/4
75/1 75/4 75/7
expensive [1]   26/25
experience [2]
107/24 130/18
experiment [2]   18/9
18/11
experimentation [1]
21/18
experimenting [1]
102/15
expert [9]   106/15
122/12 129/19
129/21 129/22
130/21 132/4 133/7
133/17
experts [12]   130/1
130/2 130/12 130/23
131/2 131/3 131/4
131/5 132/15 134/13
134/14 134/15
explain [6]   13/7
26/12 27/16 37/7
52/24 55/9
explained [1]   15/17
explanation [1]
19/11
explore [1]   103/16
exposed [1]   94/10
extensive [1]   25/18
extent [1]   129/25
external [2]   123/13
124/2
extra [1]   6/6
eye [1]   83/5
eyewitness [1]
120/20

**F**

FAA [1]   25/13
face [1]   15/23
Facebook [1]   50/4
facility [2]   7/13
30/20
fact [7]   24/12 27/1
33/9 34/3 36/24
94/11 117/17
facts [2]   30/6
125/22
factual [1]   125/2
fair [14]   16/18
22/9 22/14 42/16
49/21 55/11 82/7
90/14 90/16 125/22
126/4 126/6 126/11
126/13
fairly [1]   31/5
fairness [1]   89/13

fake [3]   28/19
47/15 47/16
false [1]   29/6
familiar [3]   19/5
55/19 80/22
family [6]   9/14
24/4 58/6 61/9
119/13 123/5
far [9]   20/8 20/18
23/25 24/2 24/3
24/7 59/7 113/7
132/5
farther [1]   62/5
fashion [1]   128/20
faster [1]   52/20
father [2]   9/2 9/3
FBI [6]   55/16 55/23
56/5 107/14 107/15
107/16
federal [2]   60/18
127/16
feel [5]   5/11 7/4
7/7 7/9 52/24
feels [1]   103/2
felony [1]   123/7
felt [2]   17/13
17/20
few [4]   26/21 46/9
48/22 76/9
field [1]   25/11
figure [1]   133/1
file [1]   133/7
filed [4]   56/5
101/5 109/7 129/19
files [2]   21/3
72/13
filtered [1]   87/6
final [1]   92/19
finally [2]   122/21
124/4
finances [1]   88/14
financial [5]   4/18
38/13 45/16 124/19
124/21
financially [1]
17/14
find [3]   68/22
116/14 126/14
finding [2]   32/17
127/6
fine [8]   46/13
97/12 98/7 98/11
118/2 133/23 134/5
134/22
finish [5]   37/4
43/4 61/19 61/22
94/21
finishes [1]   61/15
firm [2]   10/12
10/14
first [30]   8/18
14/21 22/6 26/1
30/11 30/14 31/10
39/24 49/20 49/21
68/6 68/11 68/13
68/20 69/6 73/13
78/2 78/4 78/19
81/7 81/23 82/3
82/6 84/6 85/6
92/17 103/25 105/10

107/10 110/9
Fischbach [4]
106/13 130/17
130/19 130/21
fishy [1]   30/15
five [6]   11/9 11/9
37/22 52/6 89/2
101/13
flexible [2]   129/11
129/17
flight [7]   24/19
24/24 26/5 26/9
26/15 26/25 27/4
flights [2]   27/2
27/8
flimsiest [2]   34/21
123/8
flimsy [1]   127/15
flip [1]   101/2
Floor [1]   1/19
flow [10]   111/5
112/10 112/13
112/14 112/15 114/4
114/5 114/6 114/11
114/12
flowing [1]   76/6
flows [2]   112/19
113/2
flying [1]   25/24
focus [5]   89/9
89/17 114/23 114/25
115/4
focused [5]   89/11
114/3 116/5 124/17
131/22
Fog [100]   15/10
15/15 15/16 16/8
16/11 16/12 16/15
16/22 20/11 20/19
20/25 24/6 31/19
31/22 32/12 32/13
32/14 32/16 32/18
32/23 33/8 35/17
36/18 37/1 38/24
54/2 54/8 54/18
54/22 55/13 56/13
56/21 57/11 57/12
57/13 57/16 57/16
57/18 57/21 89/21
89/25 90/2 91/24
92/7 93/2 93/22
95/22 96/6 96/12
96/14 96/18 96/21
96/23 97/1 98/15
99/4 99/7 99/10
99/17 99/19 100/7
102/21 104/4 108/23
110/1 110/5 111/6
111/23 112/1 112/11
112/14 112/15
112/16 112/19
112/25 113/6 113/20
114/6 114/12 114/21
115/1 115/5 115/8
115/9 115/11 115/12
115/14 115/20
115/22 115/23
115/25 120/4 120/9
120/12 122/5 123/21
123/22 125/3 125/14

127/10
Fog's [1]   113/14
FOGGED [1]   110/9
folder [2]   66/15
76/15
follow [2]   46/11
57/6
following [1]   29/3
foot [1]   123/4
footnote [2]   33/4
121/23
for disclosure [1]
134/14
For the Defendant [1]
1/18
forced [1]   36/22
foregoing [1]   136/4
forever [1]   25/4
forfeiture [5]
121/1 121/2 121/4
125/16 126/15
forfeitures [1]
121/25
forget [1]   69/19
form [1]   123/12
forth [1]   128/7
forthright [1]
122/23
forum [4]   63/9
64/20 65/6 65/7
forward [4]   23/18
73/6 98/8 102/1
fought [1]   36/3
found [6]   20/19
62/7 95/1 95/2
125/24 131/5
four [6]   11/9 23/13
27/15 27/16 30/10
133/25
framework [1]   8/14
freelance [11]
11/21 11/25 12/1
12/4 12/10 71/9
71/12 71/14 71/18
90/7 91/20
Friday [2]   128/14
128/15
Fridays [2]   129/6
131/20
friendly [1]   25/18
friends [14]   9/14
18/21 22/23 24/4
58/6 58/8 58/13
58/14 58/19 58/23
61/9 119/12 120/19
123/5
front [8]   8/1 34/10
42/8 46/3 79/16
94/9 124/6 125/12
full [7]   17/17
17/23 55/18 70/15
70/16 73/5 109/14
full-time [5]   17/17
17/23 70/15 70/16
73/5
fully [3]   28/17
118/5 118/8
fulsome [1]   129/21
fundamental [7]
34/12 121/24 124/9

# F

fundamental... [4] 126/25 127/21 127/25 127/25

funds [67] 3/19 4/10 4/11 4/23 16/14 16/21 21/23 33/10 33/16 33/22 34/2 34/17 34/25 39/5 41/14 41/17 42/3 55/12 56/19 57/9 57/15 57/17 57/21 95/18 96/23 97/1 102/14 102/24 104/17 111/5 112/10 112/13 112/14 112/15 112/19 112/20 112/20 112/24 113/2 113/5 114/4 114/5 114/6 114/11 114/12 117/12 117/14 119/6 119/7 122/4 122/7 122/11 122/15 122/17 122/18 124/11 124/22 125/2 125/6 126/8 126/10 126/14 127/8 130/8 130/10 130/13 131/2

further [18] 4/17 18/1 52/24 55/9 85/14 86/10 101/19 101/19 105/17 105/25 106/9 111/13 114/15 116/1 118/1 126/19 126/19 126/24

future [3] 12/16 14/18 17/11

# G

gains [1] 85/21

gave [5] 17/11 19/22 47/11 90/20 115/21

general [11] 47/18 54/15 54/16 54/17 63/24 64/23 64/24 65/1 65/2 65/21 116/14

generally [4] 12/3 78/22 111/3 116/24

generate [1] 19/9

gets [3] 70/11 85/16 86/11

gift [1] 88/9

gigantic [1] 104/13

given [7] 34/9 47/14 47/15 47/16 129/2 129/12 130/19

gives [2] 62/17 96/2

giving [2] 30/5 47/18

glancing [1] 83/11

Glass [1] 124/1

gmail.com [2] 67/19 67/21

God [2] 5/23 107/3

goes [3] 33/9 86/11 120/7

good [20] 3/6 3/8 3/10 3/11 3/14 3/15 3/17 6/14 6/16 21/1 25/8 25/10 25/19 39/16 39/17 46/8 88/24 91/14 107/9 118/16

Google [1] 124/1

GotheCoin [1] 109/24

Gothenburg [9] 10/1 10/4 10/9 10/10 13/18 13/19 18/21 68/22 71/25

GothenCoin [7] 44/7 45/20 47/5 51/18 77/21 81/12 109/24

government [83] 1/12 2/16 2/17 2/18 2/19 2/20 2/21 2/22 2/23 3/5 3/7 4/13 4/25 20/5 20/18 22/24 24/1 24/4 24/9 28/4 28/5 28/15 29/14 31/11 31/18 32/12 33/6 35/11 35/12 35/15 38/16 46/2 46/23 51/22 52/2 55/16 57/25 58/4 58/12 58/24 59/5 59/18 60/1 60/22 61/4 61/7 61/24 62/18 68/24 69/4 77/19 77/23 88/16 88/21 88/23 97/14 105/22 106/14 111/7 111/12 111/25 113/13 118/22 119/5 119/17 120/8 120/14 120/17 121/10 122/2 122/8 122/8 123/18 124/10 124/19 126/12 127/2 127/14 127/20 128/23 129/16 133/5 134/12

government's [28] 46/19 51/23 62/15 66/14 66/19 67/15 68/25 76/14 76/20 77/13 77/21 77/25 79/13 84/2 84/2 87/3 87/4 88/16 101/2 104/14 108/11 111/8 122/12 122/23 127/1 127/9 127/21 129/3

Gox [3] 91/15 91/16 91/17

graduated [2] 10/7 10/8

grand [8] 32/2 32/6 33/19 120/5 121/20 127/3 127/6 127/23

gripe [1] 34/6

ground [1] 26/1

grounded [1] 27/5

grounds [1] 97/17

group [1] 13/8

grow [1] 8/21

growing [1] 8/23

guess [7] 14/1 14/17 25/1 32/9 37/14 42/14 79/23

guessing [1] 103/1

guests [1] 14/8

guilt [1] 59/10

Gustafson [1] 70/2

guy [1] 68/22

# H

hacked [2] 16/4 95/6

hacking [2] 95/5 100/14

half [2] 35/1 35/3

halfway [1] 122/3

hand [4] 5/20 78/4 107/1 117/3

handed [6] 46/18 67/14 77/12 79/14 87/2 101/1

handing [1] 84/1

handled [1] 30/14

handwritten [3] 38/13 38/17 120/2

hanging [3] 64/14 65/13 65/15

happen [2] 15/3 64/2

happened [9] 19/2 23/10 29/21 34/16 52/18 54/25 59/1 65/19 127/12

happening [6] 34/11 64/24 66/12 67/10 121/7 127/5

happens [1] 51/14

happy [7] 3/19 46/9 52/3 118/11 126/16 126/17 126/17

hard [4] 15/5 18/17 39/3 90/24

harm [1] 14/10

Harmon [2] 123/24 123/25

HASSARD [2] 1/18 3/16

having false [1] 29/6

headed [1] 26/5

health [3] 18/15 18/16 23/15

hear [5] 4/17 15/9 30/22 118/7 133/11

heard [5] 4/16 14/11 125/1 128/9 130/17

hearing [17] 1/9 3/18 18/2 39/21 89/18 102/1 103/2 104/19 119/5 119/17 128/4 128/8 128/10 128/18 133/6 133/14 133/15

hearings [2] 129/1 134/10

Heavydist [3] 67/19

67/21 67/25

Helix [1] 123/25

Hello [2] 52/11 52/12

help [7] 5/23 12/9 17/18 19/16 93/22 94/11 107/3

helped [1] 75/8

here's [2] 32/25 125/18

hey [1] 90/10

Hi [4] 68/21 84/14 85/8 85/11

hidden [1] 110/5

hide [2] 28/9 28/9

high [4] 10/7 10/8 18/7 94/2

himself [2] 103/21 106/20

hire [1] 131/3

hold [3] 6/5 6/8 80/21

holder [1] 40/18

holding [1] 30/20

holdings [1] 86/18

holds [1] 126/9

holes [1] 104/14

home [1] 70/19

homeless [1] 18/6

homes [1] 95/1

honest [1] 122/22

honestly [1] 120/15

Honor [90] 3/8 3/11 3/15 3/23 4/15 4/15 6/1 6/14 7/23 29/15 31/18 32/1 33/24 36/13 37/10 39/12 43/7 46/5 46/11 52/4 55/24 56/22 57/4 58/21 59/11 61/12 66/16 67/11 68/24 69/2 70/10 76/16 83/23 88/15 88/19 89/1 89/12 89/20 94/24 97/16 97/18 97/23 98/9 103/5 103/7 103/14 103/24 104/8 104/20 104/25 105/19 105/21 106/9 106/13 106/17 108/7 111/7 111/18 114/15 114/19 116/19 116/23 117/2 117/18 117/24 118/5 118/12 118/17 118/23 119/1 119/5 119/10 120/20 121/4 123/6 124/15 128/23 129/8 129/11 129/17 129/19 130/13 131/15 132/1 132/18 132/20 133/3 134/7 134/25 135/4

HONORABLE [1] 1/9

HOOK [3] 1/22 136/3 136/10

hop [2] 120/22 122/20

hope [2] 7/23 7/23

host [1] 129/14

## H

hosted [1]    13/22
hosting [1]    63/5
hour [5]    4/4 4/5
30/6 30/9 30/19
hourly [3]    3/25 4/1
4/2
hours [5]    10/2
13/16 25/23 25/25
130/20
house [1]    7/19
housed [1]    6/20
housekeeping [1]
133/4

## I

ID [3]    21/11 82/15
82/17
idea [3]    19/3 19/8
74/12
ideas [1]    18/14
identification [4]
8/4 30/25 115/19
123/13
identified [3]    35/2
115/13 115/24
identify [1]    115/5
identity [6]    15/23
47/20 47/24 51/5
51/9 95/3
ignore [1]    34/8
illegal [3]    28/6
90/11 127/10
illicit [5]    39/6
119/7 122/12 124/11
127/13
impact [1]    129/5
implausible [2]
104/3 104/6
implications [1]
62/20
importance [1]    89/9
important [1]    99/15
impossible [2]    43/2
102/14
inaccuracies [1]
31/8
inaccurate [1]
78/19
inadequate [1]
29/15
inaudible [1]    28/21
incarcerate [1]
36/1
include [2]    17/1
17/3
includes [1]    17/5
including [1]    23/17
income [12]    24/25
25/5 73/10 73/12
73/19 73/21 73/23
74/2 74/4 74/20
119/15 122/9
incomplete [1]
124/20
inconsistencies [1]
104/6
inconsistent [1]
103/11

Indeed [1]    69/10
indicted [6]    124/23
125/18 125/23 126/7
126/10 126/11
indictment [10]
31/25 32/15 32/22
33/17 121/2 125/13
125/14 126/18 127/3
127/23
Indigent [1]    131/1
indirectly [4]
56/14 56/21 57/10
57/22
individual [8]    64/4
64/7 64/13 71/5
72/23 80/1 85/3
105/11
individuals [3]
58/3 59/8 80/5
indulge [1]    89/10
inference [1]
125/22
info [4]    84/10 85/3
85/8 85/15
information [9]
16/6 47/18 47/21
58/8 58/20 58/24
59/9 59/16 95/3
initial [1]    29/12
initially [1]    14/21
innocence [2]    59/10
120/7
innocent [2]    123/7
124/13
input [2]    113/1
113/2
inquire [1]    5/7
inquiry [3]    33/14
104/5 117/8
insinuated [1]
28/24
inspection [1]    30/2
instance [1]    119/23
instances [2]    65/18
67/8
institution [2]
45/16 47/19
instructing [2]
97/23 98/6
instrument [1]
127/7
intelligence [1]
107/22
intend [1]    106/12
intensive [3]    24/24
25/23 26/25
intent [2]    103/25
104/1
intention [1]
128/14
interacted [1]
115/7
interest [1]    12/23
interested [4]    13/1
13/9 19/7 19/24
interests [1]    25/9
intermediary [1]
80/2
International [2]
26/6 29/2

internet [7]    12/15
14/9 15/19 27/8
37/19 47/18 115/16
interning [1]
107/16
interpret [1]    36/14
interrupt [1]    61/2
interrupting [3]
61/14 61/17 61/18
interruption [1]
6/10
interview [8]    24/1
24/10 29/12 58/4
58/25 59/6 59/19
90/20
interviewed [3]
24/4 57/25 58/12
interviews [2]
24/14 24/15
into [39]    2/16 2/17
2/18 2/19 2/20 2/21
2/22 2/23 26/24
52/2 54/3 54/8
54/18 55/12 69/4
70/17 76/6 77/23
78/11 78/23 86/2
88/21 92/23 94/6
95/18 96/4 96/18
99/1 103/23 111/6
111/12 111/20
112/11 112/14
112/19 112/22
114/12 117/6 120/16
introduce [3]    49/24
106/20 107/10
introduced [1]
15/11
invasive [1]    30/7
invention [1]    122/1
investigate [1]
119/18
investigation [5]
104/13 119/11
119/20 120/24 123/3
involve [1]    97/22
involved [3]    18/2
103/19 125/17
IRS [11]    108/23
110/4 113/9 113/12
113/15 113/18
114/20 115/7 115/11
115/17 123/2
IRZTRCAR2.onion [1]
110/10
is busy [1]    129/9
issue [14]    6/19 7/2
29/14 32/24 32/25
33/5 33/16 33/22
34/10 36/16 39/19
118/13 132/22 133/4
issued [3]    28/4
28/14 122/14
issues [5]    85/24
89/9 104/23 124/17
129/14
issuing [1]    127/6

## J

jail [10]    6/19 7/15
7/20 35/3 35/23

59/24 61/9 119/14
123/7 124/8
jailed [1]    62/2
janemedia.se [4]
84/10 85/3 85/8
85/15
January [1]    1/5
JEFF [3]    1/22 136/3
136/10
jewel [1]    31/12
job [20]    10/11
11/17 11/23 16/17
17/8 17/12 17/14
18/5 22/12 25/6
72/19 90/10 91/4
91/8 107/20 119/15
120/17 120/17
123/10 125/9
jobs [2]    69/17 90/7
Jonkoping [4]    9/19
9/23 10/2 10/13
JUDGE [2]    1/10 3/6
July [2]    128/12
131/16
jump [4]    82/16
82/16 120/22 122/20
June [5]    128/12
131/20 132/2 132/18
133/6
junior [1]    69/16
jury [4]    35/18
127/3 127/6 127/23
jury's [5]    32/2
32/6 33/20 120/5
121/20
Justice [7]    33/5
121/8 121/14 121/22
121/23 127/17
130/24
Justice's [1]
107/20

## K

Kagan [2]    33/5
121/22
Kaley [9]    31/24
32/2 32/16 32/25
33/4 121/8 121/15
126/17 127/18
keep [4]    44/3 94/23
115/2 115/2
keeping [2]    27/9
83/5
keeps [2]    61/12
61/14
kept [1]    98/25
Killdozer [14]
63/13 63/18 63/21
64/4 64/21 65/3
65/5 65/24 66/2
67/1 69/6 99/21
100/3 100/6
kind [21]    9/14 11/1
11/3 12/9 14/1
15/20 15/20 18/12
19/6 19/9 19/20
23/18 29/25 36/19
36/21 39/6 52/14
74/13 82/15 92/21
123/12

**K**

knew [7]    13/24 15/2
18/4 59/6 66/10
115/23 122/25
knowing [1]    115/7
knowledge [7]    21/4
41/6 48/1 50/16
103/19 111/25 112/2
knows [3]    6/8 28/5
120/17
Kraken [64]    17/3
17/3 17/5 21/6 21/8
21/13 21/14 21/19
21/19 21/20 21/24
22/10 39/19 39/22
40/2 40/3 40/4 40/6
40/10 40/14 42/19
43/11 52/15 54/3
54/8 54/19 54/23
55/12 56/6 56/14
56/20 57/8 57/10
57/21 73/13 73/17
74/22 75/1 75/5
75/6 75/11 75/13
75/15 75/19 75/25
76/6 95/9 95/16
95/18 95/21 96/3
96/6 96/12 96/24
108/22 108/24 109/1
110/18 112/16
112/20 112/22 113/3
120/16 125/3
kroner [3]    81/21
82/8 86/16
kroners [6]    70/24
71/20 71/22 72/1
88/6 93/25

**L**

L-U-K-E [1]    107/11
lack [1]    123/24
landed [1]    26/8
languishes [1]
124/8
laptop [3]    37/23
37/25 123/15
large [1]    98/18
last [8]    6/17 26/19
46/17 46/18 70/6
104/25 107/10 133/4
late [1]    79/7
later [3]    14/20
16/5 37/3
laundered [1]    31/19
laundering [3]
90/11 125/13 125/21
law [12]    1/19 24/8
27/23 33/13 34/6
34/15 34/18 36/7
36/14 42/13 121/17
127/4
lawyer [8]    52/22
55/6 55/8 97/6
97/13 97/15 127/17
127/18
lawyers [5]    53/8
53/11 53/20 55/19
55/22
LAX [3]    26/6 26/8

29/2
layering [1]    55/3
lays [1]    121/8
learn [7]    12/7
12/12 12/13 12/17
15/9 25/10 25/19
learned [2]    12/19
12/22
learning [1]    21/16
least [6]    25/23
28/24 126/11 126/13
128/14 128/15
leave [3]    17/9
17/12 73/4
leaving [2]    131/15
131/16
left [4]    6/4 18/10
78/4 82/15
legal [10]    37/2
37/3 50/7 50/11
50/12 50/13 62/17
75/9 99/7 102/22
legitimate [4]
16/21 28/17 96/8
96/14
legitimately [1]
28/14
less [2]    115/18
118/23
letter [1]    62/17
letting [1]    7/16
level [1]    44/15
Liberty [2]    91/18
91/19
library [1]    123/15
license [3]    25/13
25/16 26/2
licenses [1]    25/12
life [4]    24/5 108/4
119/15 119/18
light [2]    59/3
133/2
likely [2]    18/3
65/9
limited [3]    21/2
21/3 24/13
line [14]    46/12
46/25 47/1 68/11
68/13 68/20 76/21
80/25 82/24 84/17
84/17 104/25 111/3
117/7
lines [3]    47/2 87/9
88/8
list [4]    8/1 26/21
31/5 80/11
listed [1]    82/22
lists [1]    82/24
Litovigia [1]    87/16
little [8]    37/22
39/18 72/8 74/11
100/20 108/3 119/17
128/5
live [2]    9/23 88/5
lived [3]    9/6 73/6
85/20
living [1]    18/5
LocalBitcoins [50]
43/21 43/22 43/25
44/4 44/6 44/13

44/16 44/25 45/4
45/14 45/19 45/23
47/11 47/14 48/1
48/3 48/11 48/18
48/24 49/3 50/16
51/1 51/10 51/18
54/22 76/13 77/1
77/19 77/21 77/24
78/11 78/15 78/23
79/5 79/15 80/6
80/16 80/17 80/20
81/10 82/11 84/18
87/5 96/24 108/21
109/23 110/13
110/16 112/21
112/22
LocalBitcoins.com [5]
43/23 45/10 46/23
76/13 77/6
location [1]    13/15
locations [2]    13/14
13/16
lock [1]    94/6
locked [3]    21/2
62/1 72/14
logic [1]    126/9
logs [1]    111/23
long [14]    9/4 9/23
11/7 15/1 15/4
18/15 25/7 35/23
36/9 74/13 104/22
105/13 107/15
118/20
longer [1]    74/12
look [21]    8/5 8/6
12/25 21/3 24/18
31/1 31/2 34/14
74/9 75/24 82/14
84/12 88/14 92/23
99/1 101/12 102/1
102/9 119/22 121/1
130/15
looked [3]    19/5
25/5 25/5
looking [10]    8/5
12/5 12/11 12/14
77/21 77/25 80/11
82/19 84/24 115/17
looks [8]    6/8 66/24
67/17 67/20 79/12
80/11 81/6 109/2
Los [3]    26/6 26/12
29/1
lot [31]    13/13 15/1
16/24 17/2 17/25
18/14 18/17 19/4
19/9 19/9 19/12
19/18 19/23 21/15
21/18 21/18 22/2
25/3 25/15 27/1
30/3 70/4 71/13
76/9 84/21 90/7
92/19 102/15 105/14
105/14 129/4
LTD [16]    40/14
40/24 41/12 41/15
41/18 43/12 54/13
74/6 74/19 74/23
75/12 76/1 76/7
95/12 110/19 110/19

luggage [3]    30/1
30/3 30/21
Luis [5]    32/1 32/4
34/15 121/5 126/17
LUKE [7]    2/7 55/16
107/7 107/11 111/16
114/17 116/9
lunch [1]    88/25
luxury [1]    131/23

**M**

mail [18]    67/18
67/19 67/21 68/2
68/6 68/11 68/17
80/14 84/5 84/6
84/9 84/14 84/21
84/24 85/2 85/3
85/22 85/23
mailing [1]    84/9
mails [2]    68/16
84/3
main [2]    20/4 26/8
maintained [1]
31/18
maintains [1]    32/12
majority [2]    121/18
121/19
makes [5]    32/2 32/5
36/8 93/16 108/4
making [4]    15/13
23/14 78/15 113/19
Maks [1]    68/21
Maksim [1]    60/10
Malta [6]    40/24
41/2 42/14 75/8
75/16 75/17
Maltese [1]    41/3
man [2]    85/11 123/7
manufacture [1]
123/3
many [2]    27/5 34/9
March [5]    73/13
73/21 79/2 82/25
83/14
March 11th [1]
82/25
March 25th [1]    79/2
marked [9]    8/4
30/25 46/19 66/14
67/15 77/13 84/1
101/2 108/10
market [1]    21/17
marketing [3]    10/12
10/14 69/11
Marknadskommunikation [15]
10/15 10/16 10/17
11/2 11/8 11/18
11/24 17/8 17/16
17/23 18/11 69/12
69/15 69/22 96/8
Marshals [1]    7/17
materials [1]    10/23
math [1]    83/9
matter [3]    24/12
53/8 136/5
matters [2]    89/18
121/18
Max [11]    49/19
49/20 49/20 50/1
50/3 50/4 50/6 50/7

**M**

Max... [3]    50/14
60/8 60/13
may [49]    5/25 6/4
6/11 33/13 34/6
42/17 42/23 43/8
43/12 43/15 43/18
44/15 45/6 46/5
46/7 52/9 57/4
66/16 66/17 67/11
67/12 76/16 76/18
77/9 77/10 83/23
83/24 87/8 87/9
89/7 89/16 97/7
100/23 100/24 107/6
108/7 111/14 117/2
119/1 125/25 126/2
128/11 128/13
129/23 129/24
132/11 132/23 134/2
134/3
May 18th [2]    42/17
42/23
May 24th [1]    43/12
May 3rd [2]    87/8
87/9
maybe [18]    12/7
12/8 16/5 17/19
19/4 50/23 69/24
80/3 86/11 93/5
93/8 94/5 99/24
99/24 118/21 126/1
129/6 133/25
mean [20]    35/15
41/16 49/9 59/15
78/7 79/21 79/23
81/4 86/8 94/1
99/15 100/11 110/17
114/5 123/7 123/8
128/23 130/15 131/7
134/19
meaning [2]    73/17
76/22
means [2]    15/11
82/1
measures [1]    100/18
meet [22]    13/3 13/7
13/7 13/8 13/12
13/21 13/22 13/23
13/24 14/1 15/6
15/7 15/7 15/22
16/4 17/22 22/16
63/5 85/25 93/9
93/13 99/9
meet-up [5]    13/7
13/8 13/23 14/1
93/13
meet-ups [14]    13/3
13/7 13/12 13/21
13/22 13/24 15/6
15/7 15/7 16/4
22/16 63/5 93/9
99/9
meeting [4]    13/1
13/10 93/25 94/8
Members [1]    58/6
memory [1]    43/10
mens [1]    103/20
mental [3]    18/15

18/16 23/15
mention [4]    52/12
95/5 103/13 106/4
mentioned [10]
14/11 15/12 23/9
23/22 26/11 27/14
30/21 65/21 88/7
92/18
mentioning [1]
92/20
mere [1]    127/10
merely [3]    36/13
104/12 127/3
mess [1]    27/7
message [17]    80/14
84/12 84/14 84/17
84/18 84/21 85/7
85/14 85/15 101/15
101/18 102/2 113/13
113/14 113/18
113/21 114/2
met [14]    22/17
30/10 58/18 59/21
59/22 59/23 79/25
80/7 80/10 92/12
92/14 93/9 93/12
124/10
method [1]    81/3
MICHAEL [2]    1/18
3/15
microphone [1]
134/24
middle [1]    72/11
might [14]    28/3
65/15 66/5 66/9
76/25 90/22 93/7
94/6 94/6 94/20
95/3 95/4 98/19
128/10
miles [1]    119/19
mind [1]    103/19
mine [3]    18/16 54/1
85/16
mini [1]    38/3
minute [3]    52/5
106/6 128/6
minutes [6]    46/9
52/6 89/2 92/12
92/14 118/21
misrepresents [1]
28/20
miss [1]    26/25
missing [1]    110/2
misspoke [1]    78/8
misstates [1]    58/22
misunderstanding [2]
37/6 37/7
mix [6]    15/11 54/2
54/17 82/11 92/22
100/7
mixed [13]    11/3
16/14 16/21 36/19
36/19 54/7 93/14
95/18 117/12 117/12
117/14 122/15
122/15
mixer [1]    113/6
mixers [4]    98/14
98/17 98/19 99/4
mixing [7]    15/20

15/21 16/18 57/15
92/18 94/10 127/10
mobile [2]    37/17
37/18
moment [3]    68/10
101/2 105/19
money [43]    12/15
15/3 15/4 15/25
16/16 18/18 21/17
22/6 22/7 22/9
22/11 25/11 31/19
33/7 35/12 41/21
44/3 48/24 48/25
54/21 70/12 75/5
76/6 76/10 78/23
79/25 90/11 94/5
95/21 96/5 98/25
120/15 120/16 124/8
125/13 125/15
125/17 125/19
125/20 125/21 126/7
127/20 131/3
moniker [1]    63/12
Monsanto [1]    122/17
month [3]    17/9
72/16 72/18
monthly [3]    71/3
71/4 72/3
months [2]    17/13
17/15
Moon [21]    18/24
19/25 40/13 40/24
41/12 41/15 41/18
43/11 52/15 54/13
74/6 74/19 74/23
75/7 75/12 76/1
76/7 95/12 100/22
110/18 110/19
more [31]    14/15
14/16 14/17 17/11
18/3 19/12 19/17
19/23 22/16 25/25
27/21 38/17 45/6
46/9 71/15 72/8
72/12 73/24 74/11
76/12 79/10 84/21
92/16 92/18 95/23
104/9 115/18 115/21
128/20 128/21
134/19
morning [12]    3/6
3/8 3/10 3/11 3/14
3/15 3/17 6/14 6/16
6/25 39/16 39/17
Moscow [1]    27/9
MOSS [2]    1/9 3/6
most [14]    11/4 12/9
14/8 25/14 27/8
54/7 55/11 57/9
71/17 80/7 80/8
80/12 80/13 88/5
mostly [2]    73/8
114/3
mother [1]    9/1
motion [9]    1/9 3/19
129/20 130/7 130/8
130/10 132/23
132/25 133/8
motions [3]    128/9
131/23 133/6

motives [1]    124/3
mounting [1]    34/20
move [6]    6/23 9/2
9/18 9/25 36/11
59/17
moved [12]    8/22
8/24 9/1 9/5 9/17
9/19 10/1 10/4 10/9
10/10 30/9 49/21
movements [2]    14/18
21/16
moves [4]    51/22
68/24 88/16 111/7
moving [5]    6/25
69/10 81/25 83/5
94/23
Mr. [88]    3/21 4/11
4/14 4/16 5/1 5/4
5/5 5/7 5/19 6/15
7/19 7/25 29/18
31/18 33/7 35/3
35/17 35/23 37/11
39/16 46/16 52/9
52/11 52/20 55/4
56/4 57/8 58/11
58/21 59/3 61/14
62/22 66/13 66/19
67/14 69/10 77/12
84/1 88/25 89/7
89/20 98/14 101/1
104/11 105/1 105/23
106/2 106/13 106/16
106/18 107/9 108/12
108/22 110/16
111/14 111/18 112/4
112/16 113/6 114/6
114/19 119/9 119/18
120/6 120/8 120/13
120/15 121/10 122/5
122/6 122/21 123/18
124/12 124/14
124/18 124/24 125/5
128/1 128/22 129/10
130/3 130/17 130/19
130/21 131/13
132/17 133/9 135/2
Mr. Brown [10]    52/9
59/3 61/14 88/25
89/7 106/16 124/14
128/22 131/13 135/2
Mr. Brown's [1]
58/21
Mr. Ekeland [8]
3/21 5/4 104/11
111/14 129/10 130/3
132/17 133/9
Mr. Fischbach [4]
106/13 130/17
130/19 130/21
Mr. Scholl [5]
107/9 108/12 110/16
111/18 114/19
Mr. Scholl's [1]
106/18
Mr. Sterlingov [45]
4/11 4/14 4/16 5/1
5/5 5/7 5/19 6/15
7/19 7/25 29/18 31/18
35/3 35/17 35/23
37/11 39/16 46/16

**M**

**Mr. Sterlingov... [28]**
52/11 52/20 55/4
56/4 57/8 58/11
62/22 66/13 66/19
67/14 69/10 77/12
84/1 89/20 98/14
101/1 105/1 105/23
106/2 112/4 119/9
120/8 120/13 120/15
122/6 122/21 124/12
124/18
**Mr. Sterlingov will [1]**
7/19
**Mr. Sterlingov's [13]**
33/7 108/22 112/16
113/6 114/6 119/18
120/6 121/10 122/5
123/18 124/24 125/5
128/1
**Ms. [1]**    132/4
**Ms. Beth [1]**    132/4
**MSI [1]**    37/23
**Mt [3]**    91/15 91/16
91/17
**much [16]**    11/3
15/25 17/10 19/6
19/12 19/22 22/8
23/18 31/8 71/7
94/5 100/15 104/9
118/18 118/23 135/1
**multi [1]**    119/20
**multi-year [1]**
119/20
**multipage [1]**    79/14
**music [4]**    18/20
23/9 23/10 23/23
**must [7]**    10/6 11/9
12/21 62/25 72/6
92/11 96/19
**myself [5]**    18/20
47/21 49/24 52/17
105/16

**N**

**name [75]**    3/4 10/14
11/16 18/19 21/9
28/2 28/2 39/24
40/13 40/23 42/17
42/19 42/20 42/22
43/11 44/7 44/9
44/10 45/10 45/12
45/13 45/17 45/19
45/23 46/25 47/1
47/4 47/7 47/11
47/14 47/15 47/16
48/7 49/7 49/10
49/10 49/13 49/19
49/20 50/1 50/2
50/3 50/4 50/6 50/7
50/8 50/11 50/13
50/13 51/19 63/12
66/25 67/24 68/21
70/6 74/22 81/6
81/7 81/9 81/12
82/8 90/8 91/10
92/9 92/13 95/10
95/10 95/14 107/10
107/11 109/23

110/13 112/8 120/24
123/9
**named [3]**    70/5
87/15 122/19
**names [16]**    11/19
45/15 49/16 49/18
50/7 58/3 58/7
58/16 58/17 58/20
59/8 65/14 66/4
66/9 69/25 119/23
**narrow [1]**    116/5
**narrowly [1]**    124/17
**National [1]**    107/20
**nature [3]**    70/11
112/25 129/12
**NCET [1]**    107/21
**near [2]**    17/11
46/24
**necessary [1]**
118/12
**Neck [3]**    7/14 59/24
61/8
**need [23]**    3/22 4/18
4/20 7/3 14/9 25/16
32/16 34/7 52/24
65/4 116/4 116/6
117/18 118/4 118/14
118/20 124/5 124/5
124/19 124/21
129/15 129/23
131/24
**needed [8]**    11/4
64/1 75/17 89/16
92/3 128/10 131/4
133/8
**needs [2]**    64/15
131/3
**negatives [1]**    36/23
**Nemtsev [3]**    60/8
60/10 60/13
**network [2]**    18/8
25/17
**new [7]**    73/19 73/21
74/3 102/16 105/7
117/7 121/25
**next [9]**    29/7 38/15
79/1 79/14 83/2
84/24 85/11 101/23
102/2
**night [2]**    6/17 6/21
**nine [4]**    9/24 33/4
79/4 121/23
**nobody [7]**    15/2
26/18 61/23 123/11
123/11 124/6 134/16
**nobody's [2]**    35/1
122/18
**none [3]**    33/10 34/2
122/25
**Nord [1]**    19/4
**normal [4]**    14/7
91/4 91/6 91/15
**normally [2]**    30/4
81/20
**Northern [3]**    7/14
59/24 61/8
**note [3]**    33/25
127/9 129/18
**notebook [1]**    46/17
**notes [4]**    38/13

38/17 38/17 120/3
**notice [5]**    129/19
129/21 129/22 130/5
130/12
**noticed [4]**    49/25
132/14 134/15
134/17
**notices [2]**    129/25
133/7
**noticing [1]**    130/2
**noting [1]**    36/14
**novel [1]**    129/14
**November [3]**    80/25
84/25 85/7
**November 10th [1]**
85/7
**November 11th [1]**
84/25
**November 5th [1]**
80/25
**nowhere [1]**    120/10
**number [16]**    12/1
21/3 23/12 28/3
31/9 31/10 37/22
38/9 38/12 39/25
40/1 82/17 82/17
85/24 86/21 101/24
**numbers [3]**    88/3
101/12 109/14
**numeral [1]**    102/10
**numerous [1]**    45/1
**NW [3]**    1/13 1/16
1/24
**NY [1]**    1/20

**O**

**oath [3]**    53/5 66/8
89/7
**obfuscates [1]**
113/1
**object [1]**    97/17
**objection [21]**
20/12 23/1 28/20
31/16 33/25 44/17
44/18 51/24 51/25
55/24 58/21 59/11
64/8 69/1 69/2
88/18 88/19 111/9
111/10 114/13
116/16
**obtain [1]**    114/25
**obtained [1]**    115/10
**obviously [6]**    5/8
99/15 102/25 106/17
117/25 132/14
**occupation [1]**    25/8
**occurrence [2]**
63/20 63/21
**October [3]**    78/5
78/8 83/14
**October 2012 [1]**
83/14
**October 4th [2]**
78/5 78/8
**off [8]**    34/4 35/6
35/9 73/6 74/16
85/20 106/8 128/15
**offense [2]**    124/23
125/17
**offenses [1]**    125/16

**offensive [1]**
129/25
**offer [3]**    12/8
62/16 90/10
**offered [3]**    60/20
61/5 61/8
**offering [1]**    98/2
**office [2]**    70/17
70/18
**official [3]**    1/23
28/5 136/3
**old [1]**    102/17
**once [2]**    5/6 100/6
**one [62]**    3/24 13/3
15/13 16/4 16/6
18/15 21/18 21/21
22/25 23/19 25/14
27/20 27/21 28/1
28/1 31/10 31/10
35/21 36/16 37/23
38/4 40/11 45/4
45/6 45/7 45/20
48/23 50/23 56/13
61/20 63/15 67/21
70/2 70/3 72/24
72/25 80/3 88/8
88/8 92/8 93/8 93/8
93/9 93/13 94/14
97/3 99/18 100/11
104/25 105/10
105/19 119/1 119/4
119/16 120/25 129/7
129/18 130/22
130/23 133/4 133/18
133/22
**onion [2]**    110/1
110/3
**online [7]**    63/7
63/22 63/24 79/25
82/11 99/9 101/5
**only [16]**    4/9 21/20
21/21 27/20 33/21
35/22 44/25 63/15
71/6 71/7 74/25
77/14 87/5 112/15
123/1 134/11
**onto [1]**    101/23
**open [5]**    62/4 97/13
115/15 122/22
123/15
**opened [15]**    18/20
42/16 42/22 43/8
43/12 43/15 43/18
45/6 45/9 46/17
73/13 73/17 76/13
95/9 125/8
**opening [1]**    117/7
**operate [3]**    16/11
60/11 123/22
**operated [8]**    16/12
31/19 31/22 32/14
32/16 38/24 89/24
120/11
**operating [11]**
20/10 23/12 32/11
32/23 33/9 34/25
36/18 36/25 120/4
123/21 125/15
**operation [7]**    20/25
32/18 33/8 33/11

**O**

operation... [3] 35/17 90/11 127/10
operations [3] 55/16 107/13 107/21
opinion [3] 117/11 128/5 132/22
opportunity [7] 52/21 55/6 55/8 70/8 89/10 118/10 122/21
opposed [2] 80/1 126/17
order [5] 74/14 78/3 78/3 80/24 100/13
organizer [1] 13/15
origin [4] 4/10 4/22 112/24 113/5
original [1] 22/5
originally [1] 22/4
originate [3] 57/16 122/4 122/5
others [2] 23/24 70/3
otherwise [1] 106/15
out [34] 13/2 17/18 19/11 19/13 19/19 25/13 41/21 48/25 60/1 62/7 64/14 65/13 65/15 83/20 84/22 85/11 91/5 91/7 95/1 95/3 96/7 96/23 97/2 98/24 98/25 119/16 121/8 123/9 125/7 130/6 131/8 131/10 131/13 133/1
out-of-pocket [2] 131/8 131/10
output [1] 113/1
outside [4] 27/21 100/22 106/18 116/16
over [13] 13/20 14/6 14/9 16/25 34/15 45/1 61/20 80/13 81/25 83/5 101/23 110/25 119/14
Overruled [7] 20/13 23/2 44/20 59/12 64/10 114/14 116/21
own [11] 19/21 21/8 23/15 42/19 45/23 57/15 76/10 91/5 91/7 122/12 133/8
owned [1] 40/3
owner [1] 40/22
owning [1] 95/2

**P**

p.m [4] 52/8 89/4 89/5 135/6
pack [1] 126/1
page [24] 2/2 2/15 38/4 38/6 38/16 38/16 46/17 46/18 77/15 84/3 84/5 84/24 101/12 101/13 101/15 101/22 101/23 102/2 102/7 109/2 110/3 110/4 110/22 110/23
pages [3] 101/12 109/25 110/15
paid [3] 22/4 87/18 91/7
panel [2] 123/16 124/1
paperwork [1] 75/16
paragraph [16] 9/21 10/18 24/17 26/10 27/14 53/25 74/9 74/15 86/15 86/22 91/23 102/3 102/10 110/21 110/22 110/23
part [21] 7/3 11/17 12/8 19/25 20/6 27/11 35/5 35/8 52/23 53/18 70/15 91/4 91/8 91/20 99/15 100/12 105/15 105/16 111/22 113/12 129/3
part-time [1] 70/15
particular [5] 45/18 65/18 66/12 107/24 113/16
parties [2] 3/20 118/3
partners [2] 23/23 24/1
parts [1] 26/4
party [1] 48/11
pass [1] 39/12
passport [3] 26/23 27/22 28/3
passports [14] 27/16 27/16 27/18 27/19 27/20 27/23 27/23 27/25 28/7 28/8 28/11 28/13 28/16 28/19
past [1] 89/2
pay [11] 19/8 22/3 70/21 74/3 75/11 75/15 75/25 91/5 91/19 127/17 131/5
paycheck [4] 16/19 22/5 22/8 122/5
payment [4] 71/5 80/21 81/3 81/4
payments [3] 33/8 76/7 120/9
payroll [1] 96/8
peer [6] 79/19 79/19 79/22 79/22 93/13 93/13
peer-to-peer [3] 79/19 79/22 93/13
PELKER [2] 1/15 3/9
pending [2] 128/8 129/20
Pennsylvania [1] 1/16
people [42] 6/22 12/6 12/12 12/25 13/8 13/20 13/23 13/24 14/5 14/8 15/1 15/12 18/2 19/4 19/8 19/9 19/17 22/16 23/13 23/16 25/18 26/22 27/8 36/20 49/23 63/5 65/13 65/14 84/21 85/24 92/8 92/20 93/8 93/9 94/19 94/25 95/2 99/25 100/13 119/19 124/3 131/8
percent [2] 117/11 122/14
perform [2] 17/21 75/9
perhaps [1] 131/6
period [9] 12/17 15/4 17/6 18/10 21/5 22/13 22/19 48/10 74/8
periodically [1] 72/22
periods [1] 17/18
person [27] 14/24 15/23 16/4 41/7 48/9 49/24 58/17 62/13 62/13 66/2 66/5 79/25 80/9 80/10 80/12 81/5 82/11 92/17 92/21 92/22 93/13 93/18 93/25 94/8 94/10 95/5 95/25
personal [15] 21/14 30/8 40/2 40/3 40/4 40/6 41/22 42/1 42/1 42/2 42/3 52/15 52/16 78/14 120/2
personally [1] 52/17
pestering [1] 85/25
Peter [1] 70/2
phone [2] 37/19 95/24
phones [2] 37/17 37/18
phonetic [1] 87/16
photo [2] 21/11 123/25
physically [3] 80/10 93/20 94/9
Pi [2] 38/2 38/10
picking [1] 133/23
picture [1] 54/16
piece [2] 35/16 39/2
pilot [6] 25/7 25/10 105/2 105/5 105/8 105/12
pilots [1] 25/9
place [4] 13/10 34/15 64/14 68/6
places [1] 17/2
Plaintiff [1] 1/4
planned [1] 26/14
platform [6] 14/17 15/5 63/25 64/15 83/17 83/18
platforms [2] 64/25 65/2
plausibility [1] 104/4
plausible [2] 43/14 77/7
please [10] 3/4 5/20 8/17 29/15 57/2 107/1 107/5 107/9 110/7 123/9
PLLC [1] 1/19
plural [2] 17/4 21/20
pocket [4] 91/5 91/7 131/8 131/10
point [43] 3/22 8/23 10/7 12/19 13/3 15/9 15/24 17/10 17/12 17/13 17/25 18/5 23/19 24/25 25/2 28/18 30/11 30/12 35/15 35/22 49/12 50/20 50/24 54/20 55/12 57/1 62/2 63/20 72/15 86/3 88/7 88/24 93/18 96/2 98/5 98/16 117/21 118/3 121/9 121/11 123/9 126/19 126/21
point they [1] 50/20
portions [1] 128/12
position [3] 7/5 103/11 127/1
possession [3] 125/24 126/3 126/7
possible [11] 6/24 12/8 45/8 49/11 50/5 65/11 86/1 98/21 99/5 99/11 105/23
possibly [2] 9/24 124/15
post [3] 65/6 100/6 100/18
posted [3] 63/9 63/12 100/22
posting [1] 69/6
posts [1] 100/3
Power [3] 50/3 50/4 50/7
practical [2] 25/14 105/15
practice [6] 15/14 54/1 54/17 63/16 92/15 131/24
practices [1] 99/16
precedents [1] 37/6
precisely [1] 130/24
predict [1] 21/16
preferable [1] 129/7
prejudice [2] 49/23 103/20
prejudiced [1] 49/25

Appx338

**P**

prepaid [1]   37/15
preparation [3]
  111/19 129/4 129/5
prepare [1]   133/14
prepared [5]   4/17
  31/13 37/12 37/12
  56/5
present [5]   3/12
  3/22 60/2 60/5 60/6
presented [1]   103/4
pretrial [7]   29/12
  34/17 35/12 36/1
  121/6 121/25 123/7
pretty [9]   11/3
  14/7 17/10 22/8
  23/18 31/8 34/7
  71/7 88/11
prevent [2]   16/7
  100/13
preventing [1]
  34/19
prevents [1]   62/18
previously [1]
  88/23
price [8]   14/18
  17/24 21/16 73/23
  84/15 85/16 86/11
  96/10
primarily [3]   67/4
  67/5 88/14
printed [2]   10/23
  69/18
Prior [1]   107/21
privacy [11]   15/14
  15/16 16/2 92/4
  93/1 95/19 99/16
  100/12 102/22
  117/12 122/15
private [1]   97/10
privilege [2]   97/17
  97/25
privileged [2]
  55/25 55/25
probability [3]
  126/6 126/11 126/14
probable [12]   32/6
  32/17 33/19 120/5
  121/20 122/16
  122/16 122/17
  124/11 125/12 126/5
  127/6
probably [3]   7/19
  15/14 92/18
probe [1]   104/2
problem [6]   32/25
  33/6 97/12 126/25
  127/21 132/11
problems [1]   36/16
proceed [12]   3/20
  4/7 4/14 6/11 7/24
  43/5 98/12 107/6
  111/15 119/2 132/24
  133/1
proceeding [10]
  4/24 5/8 5/9 5/15
  7/3 31/24 33/21
  43/20 62/19 124/18
proceedings [3]

  32/21 135/6 136/5
proceeds [8]   16/19
  39/6 39/9 119/8
  122/12 124/7 126/8
  127/13
process [2]   74/12
  113/19
produce [1]   10/23
produced [2]   46/23
  77/22
producing [1]   127/7
profession [1]
  119/11
professionals [1]
  12/6
proffer [6]   33/25
  60/3 60/21 62/16
  62/17 62/19
proffered [2]   34/1
  106/18
proficient [1]   25/2
program [4]   25/20
  25/22 26/4 105/2
project [6]   12/8
  18/22 18/23 23/17
  25/6 71/18
projects [9]   11/21
  12/2 12/4 12/10
  18/12 23/14 71/5
  71/14 72/23
prong [1]   121/21
proof [1]   126/13
properly [1]   115/24
property [1]   125/16
propose [2]   133/21
  133/22
proposed [1]   133/19
prosecution [3]
  20/6 28/19 129/14
protect [3]   91/25
  92/3 93/15
protection [2]
  62/17 95/20
prove [2]   36/23
  126/12
provided [3]   21/11
  77/18 115/12
provision [1]   121/4
public [9]   15/18
  60/6 60/8 60/8
  60/18 101/5 109/7
  109/8 123/15
purchase [1]   87/21
purchased [2]   87/12
  87/15
purchases [2]   74/3
  125/10
purpose [4]   21/19
  26/8 64/17 112/18
purposes [8]   31/25
  32/21 33/20 89/18
  95/19 102/22 103/3
  114/10
pursue [1]   18/14
put [13]   4/9 5/3
  22/24 35/6 35/9
  59/23 76/10 86/4
  103/8 106/19 120/13
  122/13 132/21
putting [3]   4/14

  61/8 86/2

**Q**

quarantined [1]
  26/11
quick [2]   8/5 31/1
quickly [3]   34/7
  84/22 114/19
quite [4]   62/10
  70/7 89/14 91/10
quote [4]   73/18
  86/15 89/24 123/2

**R**

racism [1]   49/22
raise [2]   5/20
  107/1
raised [1]   104/23
ran [1]   125/7
RANDOLPH [1]   1/9
random [1]   29/25
rarely [2]   86/16
  88/4
Raspberry [2]   38/2
  38/10
rate [3]   3/25 4/1
  4/3
rates [2]   130/18
  130/19
Raul [1]   87/15
re [2]   39/18 117/19
re-center [1]   39/18
re-redirect [1]
  117/19
rea [1]   103/20
read [5]   55/15
  68/10 94/19 94/25
  110/19
reading [3]   18/1
  51/8 82/6
ready [1]   19/19
ready-made [1]
  19/19
real [9]   7/2 28/2
  41/7 45/15 47/1
  47/7 47/11 47/14
  48/7
realistic [1]
  130/16
realize [1]   119/20
realized [1]   92/19
really [41]   9/4
  14/23 14/24 15/1
  15/5 15/13 16/3
  18/6 18/7 18/7 18/7
  19/11 19/18 19/21
  19/22 21/1 25/1
  25/18 25/18 27/21
  30/7 30/13 34/11
  36/17 41/6 44/23
  44/24 54/25 67/17
  71/14 71/20 71/21
  77/7 85/19 90/9
  90/23 92/21 96/4
  99/1 99/20 102/17
reason [16]   18/4
  24/23 26/17 27/10
  35/14 43/7 43/17
  68/8 78/18 83/12
  88/2 88/11 91/14

  99/1 104/3 117/14
reasons [3]   15/16
  117/12 122/15
rebuttal [1]   106/14
recall [10]   28/18
  67/6 67/8 105/23
  106/1 106/10 113/15
  113/16 113/23 114/1
receipts [1]   38/17
receive [3]   70/20
  71/5 77/23
received [5]   48/3
  48/6 48/8 80/21
  88/1
receiving [1]
  128/25
recently [2]   34/10
  102/17
Recess [2]   52/7
  89/4
recognize [6]   8/9
  40/1 66/19 67/15
  67/17 108/11
recollect [1]   70/11
recollection [12]
  51/9 51/13 54/14
  63/19 64/5 64/9
  65/8 65/23 66/7
  66/12 78/14 78/22
recommended [1]
  91/24
record [20]   3/4
  27/11 28/14 33/25
  34/5 36/5 36/6 37/5
  52/8 78/10 79/15
  87/4 89/5 97/16
  99/3 103/8 106/8
  120/10 122/11 136/5
recorded [1]   80/16
recording [1]   23/14
records [13]   46/22
  75/22 77/8 77/18
  77/20 96/16 101/3
  108/19 108/21
  108/24 111/19
  114/20 114/23
recross [5]   2/11
  116/3 116/5 116/6
  116/9
Recross-Examination [2]
  2/11 116/9
redactions [5]
  101/4 109/3 109/6
  109/11 109/13
redirect [9]   2/10
  105/18 105/21
  114/16 114/17 116/1
  116/17 117/5 117/19
reference [1]
  114/11
referred [2]   9/20
  10/18
referring [4]   8/25
  18/24 40/2 43/22
refers [2]   14/16
  14/17
regarding [3]   24/5
  42/13 58/25
regards [1]   108/15
Regional [3]   7/14

**R**

Regional... [2]
59/24 61/9
register [3]    11/18
45/18 45/22
registered [6]
25/16 44/9 45/12
47/10 47/13 49/12
registers [1]
119/24
registration [3]
11/11 11/14 91/20
regular [3]    91/21
92/15 120/9
regulated [2]    15/2
50/12
rejecting [2]
132/23 132/25
related [12]    12/5
13/10 20/9 21/22
23/15 26/16 46/23
58/20 59/9 59/10
61/25 62/9
relation [1]    12/23
relatively [2]
18/17 19/5
release [1]    3/19
relevance [2]    23/1
31/16
relevant [9]    31/17
31/21 31/23 58/8
58/10 58/19 58/23
59/9 59/16
reliable [3]    116/15
116/25 117/10
reluctant [1]    47/20
rely [2]    20/20
31/24
remain [1]    5/9
remember [36]    12/20
28/23 42/25 43/1
45/14 45/17 51/6
58/7 65/14 65/17
66/4 68/9 69/9 70/5
72/9 72/12 75/6
75/14 75/18 75/23
76/2 76/3 85/22
85/24 90/6 90/14
90/15 92/6 92/9
92/13 92/20 98/22
99/13 99/20 99/25
102/18
remembered [1]
51/15
remind [1]    89/6
reminding [1]    115/2
remote [1]    82/11
rent [1]    71/24
repeat [2]    7/12
106/23
repeated [1]    102/10
rephrase [2]    56/17
59/2
replying [1]    84/13
report [3]    117/11
117/17 122/14
reporter [5]    1/22
1/23 43/3 108/4
136/3

reporters [3]    90/17
90/20 90/21
represent [2]    60/10
126/8
represented [1]
60/18
represents [1]
53/17
request [2]    35/5
35/8
require [5]    27/19
40/21 47/24 50/14
65/4
required [5]    27/23
45/17 50/17 64/20
130/20
requirement [1]
41/2
requires [3]    47/19
123/13 129/4
research [1]    105/14
researching [2]
25/6 25/11
Reserve [2]    91/18
91/19
respect [5]    3/22
4/8 32/17 33/17
115/9
respond [2]    124/15
129/23
responded [3]    84/20
85/11 102/2
response [3]    113/21
114/2 129/19
rest [2]    87/22
118/11
restaurant [1]
13/14
restaurants [1]
13/13
restriction [1]
26/17
restrictions [1]
26/16
return [3]    55/7
57/2 72/19
reverse [1]    60/3
review [9]    24/13
108/19 108/24
109/16 111/22
111/22 112/3 113/24
133/8
reviewed [9]    20/24
53/20 108/21 108/25
111/19 113/9 113/17
114/20 115/10
reviews [2]    8/7
31/3
revisited [1]    33/20
rid [1]    86/1
right [195]
ripe [1]    118/6
rise [1]    125/16
risk [3]    94/11
94/17 95/6
risks [2]    5/12 5/13
RM [1]    91/18
road [3]    117/19
123/14 123/16
rob [1]    94/3

robbed [5]    16/3
93/5 93/7 93/15
94/25
robber [1]    126/7
robbery [5]    94/12
95/7 126/6 126/8
126/9
robbing [3]    93/20
100/13 125/24
Roberts [5]    121/8
121/14 121/23
127/17 130/25
robs [1]    95/5
role [2]    107/17
107/18
roll [2]    119/21
119/25
rolled [1]    122/25
rolling [1]    124/4
ROMAN [27]    1/6 2/3
3/3 3/12 3/16 6/12
39/14 39/24 42/17
42/19 42/22 44/10
45/13 45/23 47/7
49/7 49/24 51/5
51/19 53/12 54/12
67/24 95/12 102/4
102/10 110/19
110/20
Romania [2]    20/3
20/4
room [4]    1/24 6/24
30/2 30/10
rooms [1]    6/25
Ross [1]    123/14
roughly [3]    10/3
11/7 21/6
routine [2]    100/12
100/16
row [3]    83/5 83/6
131/20
royalties [1]    120/9
royalty [1]    33/8
rule [1]    130/9
ruling [1]    130/7
run [3]    76/11 83/20
89/24
running [4]    6/22
76/1 80/6 84/22
runs [1]    15/3
Russia [9]    8/20
8/21 8/23 26/12
26/20 27/17 27/18
27/21 27/22
Russian [6]    26/23
27/23 28/13 28/14
28/16 49/23

**S**

S-C-H-O-L-L [1]
107/11
Sacramento [1]
24/24
safe [1]    131/18
sake [2]    54/11 89/8
salary [8]    70/20
70/22 70/23 71/3
71/6 71/7 119/12
122/10
sales [3]    82/10

87/23 93/13
same [14]    13/9 28/2
28/3 43/3 64/14
83/5 85/2 87/3 96/3
96/4 118/22 126/9
134/12 134/13
saves [1]    106/23
savings [3]    17/12
17/24 73/6
saw [2]    18/17 55/1
saying [4]    64/23
100/6 120/18 122/14
scale [1]    96/4
schedule [3]    27/9
128/22 132/25
scheduling [4]
128/6 128/8 129/1
133/3
Schengen [2]    26/18
27/12
SCHOLL [13]    2/7
55/17 107/7 107/9
107/11 108/12
110/16 111/16
111/18 114/17
114/19 116/9 116/11
Scholl's [1]    106/18
school [10]    10/7
10/8 13/16 13/16
24/19 24/24 26/5
26/9 26/15 105/2
schools [2]    25/12
25/17
scope [7]    89/14
103/25 104/1 104/21
112/12 116/16 117/5
seated [2]    5/25
107/5
second [8]    30/14
40/8 40/10 82/14
91/16 110/9 110/13
110/22
secure [1]    91/25
security [6]    18/8
54/1 92/15 100/18
117/12 122/15
seeing [1]    104/13
seeking [2]    12/13
13/1
seemed [2]    16/2
52/13
seems [5]    51/14
54/24 117/7 125/7
129/1
seize [6]    34/22
121/5 123/16 127/2
127/14 127/22
seized [23]    20/5
29/8 30/21 31/6
31/11 32/10 35/12
36/24 37/23 38/2
38/7 38/10 38/12
38/17 38/20 39/4
39/4 111/25 123/18
123/19 124/22 125/2
125/19
seizing [1]    34/17
seizure [3]    126/15
127/25 132/22
SEK [3]    81/18 81/18

# S

SEK... [1]    81/20
sell [4]    15/7 23/19
 23/20 80/20
seller [1]    81/12
selling [3]    13/3
 14/15 44/1
send [4]    15/4 16/1
 48/24 113/14
sending [2]    78/15
 96/18
sense [5]    4/13 36/8
 36/10 58/4 66/9
sent [13]    48/2 48/6
 48/8 78/11 79/25
 91/18 91/18 95/21
 96/24 102/14 102/24
 113/13 113/18
sentence [1]    123/8
separate [2]    33/5
 121/21
September [2]    76/22
 77/1
September 20th [2]
 76/22 77/1
serious [1]    34/14
served [1]    80/17
server [5]    20/4
 20/5 20/9 111/22
 111/23
servers [6]    20/1
 20/3 20/19 75/10
 76/1 112/1
service [9]    7/18
 45/4 45/7 48/2
 48/17 49/12 80/18
 100/21 110/5
services [7]    16/25
 29/12 45/2 45/3
 48/5 49/5 75/12
session [1]    62/19
set [12]    21/6 21/8
 21/11 40/23 48/7
 48/20 74/8 75/8
 90/2 91/5 91/8
 123/4
setting [3]    90/8
 125/11 131/19
settle [1]    32/7
seven [5]    87/8
 119/10 119/21
 119/25 122/24
seven-year [1]
 119/10
several [4]    11/20
 15/12 25/8 50/1
shape [1]    118/16
share [4]    63/16
 63/18 63/21 64/1
shared [11]    14/5
 64/3 64/6 64/12
 65/9 65/12 65/15
 66/1 66/5 67/6
 99/25
sharing [4]    65/17
 65/23 67/8 67/9
sheet [1]    83/11
shocked [1]    30/12
shormint [1]    119/24

short [2]    17/18
 18/18
shortly [2]    60/25
 77/5
show [4]    34/2 35/14
 87/22 96/12
showed [1]    55/20
showing [2]    77/23
 108/10
shows [3]    20/10
 32/13 39/4
shred [3]    34/24
 37/1 38/24
shut [1]    27/5
side [6]    12/2 96/13
 128/25 129/24
 129/25 131/18
sign [3]    24/23
 48/17 49/7
signature [1]    8/12
signed [9]    24/19
 25/21 48/5 49/5
 50/5 51/1 51/10
 53/23 105/1
significant [7]
 73/9 74/4 74/19
 86/17 94/17 111/5
 129/5
signing [1]    49/16
silent [1]    5/9
Silk [2]    123/14
 123/16
SIM [8]    31/13 31/15
 31/21 37/12 37/13
 37/16 37/17 37/19
similar [3]    10/25
 10/25 13/25
simply [2]    70/8
 127/2
single [14]    35/2
 35/2 35/16 38/24
 39/2 66/5 71/18
 77/15 112/8 120/20
 120/24 121/11 122/1
 123/22
Sirius [2]    81/7
 82/8
sit [6]    5/19 106/25
 112/8 112/23 124/6
 128/14
sitting [4]    119/13
 119/19 120/18 124/3
situation [6]    7/11
 27/7 30/16 62/6
 62/11 94/20
six [11]    10/19 17/9
 17/13 17/15 25/23
 72/16 72/18 102/2
 110/15 110/23
 133/25
six-month [3]    17/9
 72/16 72/18
sixth [1]    128/1
skills [1]    12/15
skip [2]    120/22
 122/20
sleep [5]    6/17 6/21
 6/24 7/3 7/24
slice [1]    125/17
slightest [1]    36/11

slow [3]    108/3
 110/6 115/3
slower [1]    108/5
small [10]    11/21
 12/1 14/1 25/7
 25/15 31/7 69/17
 71/14 94/3 98/20
smaller [3]    64/17
 64/17 64/19
Social [1]    18/8
software [2]    13/5
 13/5
sold [5]    82/7 83/7
 83/15 85/15 93/8
solemnly [2]    5/21
 107/1
solutions [1]    19/19
somebody [31]    15/22
 18/18 62/11 63/16
 63/25 64/1 64/15
 64/19 65/4 67/6
 70/5 81/9 84/9 86/5
 90/10 91/13 91/24
 92/2 92/12 92/14
 93/12 93/12 93/20
 94/8 95/1 99/17
 119/21 123/8 124/5
 124/5 125/23
somebody's [1]    94/3
someone [1]    127/19
someplace [1]    57/18
sometime [1]    125/7
sometimes [8]    13/14
 15/8 28/10 47/20
 54/21 88/13 91/6
 91/7
somewhat [3]    26/20
 36/16 63/3
somewhere [6]    54/22
 62/25 70/24 71/19
 96/19 125/4
soon [1]    132/22
sooner [1]    129/6
sorry [24]    17/4
 18/23 22/3 29/3
 42/9 43/2 50/21
 61/13 76/16 77/14
 94/19 97/5 98/8
 103/12 108/6 110/8
 110/18 115/4 116/23
 119/2 129/18 133/11
 133/16 133/20
sort [6]    47/18 48/9
 52/16 62/22 64/19
 130/1
sorted [2]    78/3
 80/23
sorts [3]    119/22
 123/17 124/3
sound [4]    43/14
 52/14 91/21 100/4
sounds [8]    55/2
 57/4 73/15 77/7
 79/20 80/3 80/22
 81/5
source [7]    21/23
 25/5 74/4 74/19
 115/15 119/6 125/9
sources [3]    73/10
 73/12 74/2

spanned [1]    74/14
speak [6]    30/17
 53/7 60/22 60/25
 98/10 122/22
speaking [3]    61/20
 111/3 112/7
special [1]    110/4
specialist [3]
 55/16 107/14 107/21
specific [17]    35/2
 63/19 64/4 64/5
 64/13 65/3 65/8
 66/7 66/11 67/8
 72/8 72/12 74/11
 90/24 102/13 118/24
 120/24
specifically [5]
 58/10 63/23 64/22
 65/17 75/6
speculate [1]    66/8
speculation [5]
 44/19 64/8 120/22
 122/19 127/14
speed [1]    37/21
spelling [1]    107/10
spend [2]    41/18
 128/6
spending [1]    21/15
spent [2]    26/3 75/5
sphere [1]    12/6
spreadsheet [8]
 77/22 80/23 82/22
 87/3 87/5 87/22
 87/24 88/9
squad [2]    107/22
 107/23
staff [3]    55/16
 107/13 107/21
stand [6]    4/14 5/4
 81/20 106/7 120/13
 122/6
standard [5]    4/1
 18/7 122/16 125/11
 127/15
standard hourly [1]
 4/1
standby [1]    106/14
start [2]    91/15
 105/7
started [33]    12/25
 13/1 13/2 13/3 13/6
 14/12 14/13 14/18
 14/19 14/19 14/25
 14/25 15/15 18/21
 19/14 25/11 30/2
 30/3 30/7 30/8
 57/17 69/6 69/11
 69/19 69/21 69/22
 72/25 77/5 78/24
 89/13 96/7 97/2
 107/16
starting [1]    3/4
starts [3]    82/17
 82/17 128/13
state [6]    3/4 52/18
 74/16 89/21 89/24
 103/19
stated [7]    53/25
 69/11 69/13 72/22
 73/3 73/9 91/23

**S**

states [15]   1/1 1/3
1/10 3/3 3/9 22/21
22/22 23/25 24/3
24/9 26/20 26/24
32/4 74/10 121/4
step [3]   26/1 106/2
117/21
steps [1]   74/14
STERLINGOV [71]   1/6
2/3 3/3 3/12 3/16
4/11 4/14 4/16 5/1
5/5 5/7 5/19 6/12
6/15 7/19 7/25
29/18 31/18 35/3
35/17 35/23 37/11
39/14 39/16 39/25
42/17 42/20 42/23
44/10 45/13 45/23
46/16 47/8 49/8
51/5 51/19 52/11
52/20 53/12 54/12
55/4 56/4 57/8
58/11 62/22 66/13
66/19 67/14 69/10
77/12 84/1 89/6
89/20 95/12 98/14
101/1 102/5 105/1
105/23 106/2 110/14
112/4 112/11 119/9
120/8 120/13 120/15
122/6 122/21 124/12
124/18
Sterlingov's [14]
33/7 108/22 111/6
112/16 113/6 114/6
119/18 120/6 121/10
122/5 123/18 124/24
125/5 128/1
sticks [1]   38/7
still [15]   4/18 6/1
17/14 19/7 25/3
25/4 26/16 27/17
30/18 53/5 62/9
84/14 85/8 89/7
124/7
sting [1]   123/2
stopped [3]   29/24
32/13 73/18
stops [1]   122/3
storage [6]   38/7
38/7 38/23 86/2
86/3 123/19
story [10]   8/15
58/5 103/15 103/16
104/3 117/17 122/24
125/6 125/25 126/2
strange [1]   27/1
straw [1]   92/19
Street [2]   1/13
1/19
structural [1]
34/13
structured [1]
70/21
studio [5]   18/20
23/9 23/11 23/17
23/23
study [1]   105/16

studying [2]   26/3
105/14
stuff [1]   19/17
style [1]   89/11
subject [8]   53/8
84/17 103/21 105/23
106/1 106/10 122/7
126/15
submitted [4]   53/11
53/20 55/1 55/16
substantially [1]
22/13
substitute [2]
121/3 121/6
Suddenly [1]   84/21
sufficient [1]
133/7
sufficiently [3]
7/7 7/9 133/13
suggestion [1]   37/2
suitcase [2]   31/10
37/23
sum [1]   51/17
summary [2]   66/22
66/25
supersedes [1]   32/1
superseding [1]
121/2
supervisors [2]
70/1 70/2
supplemental [3]
118/11 118/14
122/13
support [1]   34/22
supposed [1]   97/8
Supreme [8]   33/14
33/18 34/7 34/8
36/7 36/10 36/15
37/6
sure [43]   5/10
14/16 21/7 28/2
40/20 41/11 42/7
42/13 42/24 43/4
44/14 50/9 50/13
50/18 50/23 50/24
51/19 55/21 55/22
60/24 63/14 63/23
65/6 69/8 70/7
71/19 71/20 75/13
88/11 89/11 90/4
90/9 92/9 95/23
96/3 96/20 99/2
99/5 99/11 99/17
100/9 100/21 131/16
surprisingly [3]
26/20 26/20 27/8
surveillance [1]
22/25
suspect [2]   7/18
30/8
Sustained [1]   56/1
swear [2]   5/21
107/1
Sweden [23]   8/22
8/24 9/1 9/5 9/6
9/17 18/5 18/6 18/7
24/5 27/11 49/20
49/21 50/1 58/6
58/8 58/13 58/18
58/25 59/6 59/8

88/5 120/17
Swedish [13]   10/17
24/8 27/25 28/4
28/5 28/7 50/2 68/2
68/4 68/21 81/21
82/8 86/16
system [2]   101/6
127/24

**T**

tab [1]   31/1
talk [13]   13/11
39/19 43/22 59/18
73/12 76/12 79/21
97/8 106/6 112/13
120/6 126/17 126/18
talked [3]   25/8
99/21 130/17
talking [25]   4/19
4/20 4/22 13/2
22/11 22/19 30/19
34/12 34/13 43/3
43/20 45/21 48/8
48/9 49/1 49/25
54/11 54/25 62/2
62/3 63/24 97/5
121/16 121/24 128/6
Target [1]   110/14
targeted [1]   104/22
task [4]   11/22
64/18 65/3 90/8
tasks [3]   17/21
64/19 71/15
Team [1]   107/20
technical [1]   19/17
technically [1]
105/11
technology [1]
102/16
telling [3]   20/20
34/5 120/19
tens [1]   22/18
term [1]   18/18
terms [2]   88/9
129/1
testified [21]
12/11 14/12 56/19
57/24 58/11 58/23
59/5 59/17 62/23
63/4 71/8 73/3 74/5
74/25 92/2 92/25
93/4 111/19 114/20
116/11 116/18
testify [9]   4/17
5/7 5/9 5/10 5/15
7/2 7/5 7/8 113/1
testifying [1]
11/24
testimony [32]   4/11
4/16 5/2 5/21 34/1
39/18 40/5 51/17
52/23 53/9 53/18
57/17 58/22 58/24
64/3 69/19 76/4
82/10 86/20 90/14
92/16 94/18 99/6
99/16 104/7 107/2
111/1 112/10 112/12
113/4 124/24 125/5
Thanks [2]   6/9

110/7
theme [1]   13/9
themes [1]   13/10
theoretical [2]
26/4 105/16
thereabouts [1]
73/14
thereafter [1]   77/5
thinking [3]   30/15
58/14 93/7
third [3]   48/11
76/21 91/17
thirds [1]   102/9
this is [1]   131/8
thorough [1]   5/13
though [4]   5/11 7/4
59/21 62/8
thought [5]   19/14
22/17 25/9 56/21
128/5
thoughts [1]   133/9
thousand [1]   71/23
thousands [1]   22/18
thread [2]   85/2
85/7
threat [1]   107/23
three [14]   9/21
23/12 23/16 23/22
26/2 31/12 36/3
37/12 77/16 105/3
105/4 109/25 128/17
131/23
throughout [2]   6/24
71/13
thwart [1]   121/10
ticket [1]   27/3
tied [4]   35/3
119/23 122/18 124/7
timeframe [1]   71/11
timeline [1]   62/23
times [8]   11/20
13/13 22/22 34/9
36/3 50/1 72/24
72/25
title [1]   107/21
Tobias [1]   70/5
today [13]   7/5
39/20 40/6 68/17
89/9 91/2 106/12
111/1 112/8 112/23
120/18 127/12 128/4
today's [2]   31/23
89/18
together [1]   36/19
told [12]   29/24
30/11 30/16 34/8
62/8 86/8 90/17
90/21 92/7 92/14
99/18 122/6
took [12]   11/21
12/4 17/7 17/9
19/15 30/1 72/15
73/4 74/13 74/16
105/13 123/25
tool [1]   115/15
top [11]   11/23 38/6
46/24 47/2 47/4
78/4 80/25 84/20
85/14 101/12 102/7
TOR [4]   1/18 1/19

**T**

TOR... [2] 3/11 110/5
total [4] 79/7 83/9 83/10 87/25
totality [1] 126/4
town [4] 9/19 9/20 10/1 131/14
trace [8] 20/8 56/13 97/1 112/14 112/19 120/3 123/20 123/20
traceability [14] 4/8 4/20 4/25 29/4 32/7 32/19 32/24 33/5 33/10 36/18 119/7 120/6 120/7 121/21
traceable [10] 32/20 33/16 33/22 34/2 39/6 39/10 122/11 124/22 125/3 127/8
traced [5] 34/25 56/20 112/15 112/20 122/2
tracing [11] 103/6 103/8 103/11 103/13 112/20 116/12 116/19 122/3 123/12 123/12 125/1
track [2] 15/25 94/4
tradable [1] 12/15
trade [5] 16/5 21/14 21/16 82/15 82/16
trades [6] 79/15 79/18 82/14 83/6 83/10 87/4
trading [16] 14/13 14/16 14/22 16/5 25/1 25/2 48/9 77/5 78/24 80/6 86/3 92/8 92/22 95/4 95/25 96/10
training [5] 25/24 25/25 26/14 26/25 105/5
transaction [31] 15/18 54/15 78/2 78/4 78/5 78/19 79/1 79/2 80/24 81/1 81/7 81/23 82/3 82/3 82/6 82/21 82/24 83/2 87/9 93/11 96/11 96/13 108/23 113/10 113/12 113/16 113/17 113/24 114/21 115/12 115/18
transactions [28] 15/12 15/25 21/22 54/24 55/2 77/23 79/19 79/22 79/24 80/8 80/9 80/9 82/12 82/16 86/15 87/6 88/5 90/4 90/6

91/25 93/17 94/4 94/11 94/15 96/4 96/17 113/16 113/19
transcript [2] 1/9 136/4
transfer [1] 91/16
translate [1] 68/19
translated [1] 68/16
translators [1] 68/15
transmitting [2] 125/15 125/20
transporting [1] 30/20
travel [2] 27/21 28/8
trial [15] 7/10 7/18 35/6 35/9 35/14 35/18 35/20 35/24 68/15 103/3 128/11 128/13 129/2 129/5 129/17
trials [1] 128/12
trivial [1] 51/14
true [20] 44/9 45/12 49/7 54/5 54/6 54/7 59/21 59/22 60/20 83/20 85/19 85/22 86/24 87/1 88/12 95/9 95/10 96/18 126/9 136/4
trust [2] 15/1 98/24
trusted [1] 18/3
truth [6] 5/22 5/22 5/22 107/2 107/3 107/3
truthful [1] 62/5
truthfully [1] 30/5
try [7] 12/7 12/7 17/11 28/7 62/9 89/9 132/13
trying [20] 14/17 25/18 28/8 28/9 36/20 45/2 55/2 86/1 89/15 94/23 98/9 99/2 100/12 100/21 103/14 103/16 103/18 104/7 104/7 121/10
tumblers [2] 101/25 102/12
turn [7] 24/17 46/16 66/13 87/2 101/11 101/13 120/21
turning [7] 17/6 29/1 29/18 37/11 79/13 103/23 109/2
turns [1] 25/13
two [58] 10/2 23/24 25/22 25/25 27/2 27/18 27/19 27/22 27/23 27/25 28/7 29/24 35/1 35/3 38/2 38/6 39/19 39/22 47/2 55/12 56/6 56/14 56/20

57/8 57/10 60/7 60/11 72/24 72/25 84/3 84/3 90/17 90/19 90/20 90/20 101/24 102/9 102/10 105/1 105/3 105/4 105/14 108/25 109/2 109/25 110/4 110/14 110/15 113/15 117/7 119/14 125/22 128/10 128/16 131/20 131/24 132/8 132/14
two-page [1] 84/3
two-thirds [1] 102/9
two-week [3] 25/22 105/1 105/14
tying [2] 35/17 124/11
type [5] 11/15 11/15 12/3 67/10 89/11
typically [2] 64/14 64/17
typo [1] 37/15
typographical [1] 109/25
typos [1] 31/7

**U**

U.S [25] 1/15 1/23 25/13 25/16 25/16 25/17 26/15 26/21 70/25 71/1 71/23 86/17 86/18 87/6 87/18 87/21 87/23 87/25 88/5 88/6 88/6 88/8 88/12 88/13 91/17
U.S.C [1] 121/3
Ulbricht [1] 123/14
ultimate [1] 40/22
ultimately [1] 113/2
unable [1] 122/23
unconstitutional [1] 127/5
uncover [2] 86/4 104/6
under [15] 22/25 29/13 30/1 30/12 31/24 32/16 45/12 53/5 63/12 66/8 89/7 102/4 121/3 121/5 122/17
undercover [6] 108/23 113/9 113/15 113/19 114/20 115/18
underestimated [1] 74/16
underlays [1] 33/19
underlied [1] 33/19
underlying [1] 114/4
underneath [1] 109/13
understood [5] 19/23 36/2 89/12

96/1 103/24
unearthed [1] 35/16
unfortunately [2] 85/12 92/13
unfreeze [1] 132/25
unfrozen [1] 130/14
unilateral [1] 123/2
unique [1] 129/13
UNITED [14] 1/1 1/3 1/10 3/3 3/9 22/21 22/22 23/25 24/3 24/9 26/19 26/24 32/4 121/4
unlabeled [1] 31/12
unlawful [2] 32/20 33/22
unless [4] 18/6 27/22 118/23 126/19
unlicensed [2] 125/15 125/20
unlikely [2] 50/9 66/1
unquote [1] 123/2
up [75] 6/5 6/8 6/23 8/6 8/21 8/23 13/6 13/7 13/8 13/23 14/1 14/25 17/13 17/15 17/25 18/1 18/1 18/3 19/23 21/2 21/6 21/8 21/11 21/25 24/19 24/23 25/3 25/21 31/2 34/10 46/24 48/5 48/7 48/17 48/20 49/6 49/7 49/17 50/5 51/1 51/10 51/17 52/22 54/23 55/9 57/6 62/1 72/1 72/14 74/9 75/8 75/24 83/10 83/11 84/20 86/11 87/23 87/24 90/2 90/8 91/5 91/8 93/13 96/6 97/21 105/1 120/13 122/8 125/8 126/3 129/15 130/7 132/23 132/24 134/24
up just [1] 6/5
uploaded [3] 79/4 79/7 83/15
uploading [1] 78/22
upon [1] 127/23
upper [1] 78/4
ups [14] 13/3 13/7 13/12 13/21 13/22 13/24 15/6 15/7 15/7 16/4 22/16 63/5 93/9 99/9
usage [2] 52/16 101/20
USAO [1] 1/13
USAO-DOJ [1] 1/13
USB [1] 38/7
use [27] 8/14 12/16 15/16 21/13 37/19 41/17 41/22 42/3 48/7 48/22 49/18

**U**

use... [16]   49/19
62/9 64/20 65/4
73/24 75/11 75/15
75/25 86/17 88/4
91/19 91/24 92/7
98/14 100/7 122/3
used [22]   16/14
16/24 18/19 19/18
21/14 21/21 27/20
45/13 49/16 50/1
50/14 74/25 75/1
75/13 90/5 93/1
98/17 98/17 98/19
99/3 99/24 116/11
user [13]   16/8 44/6
45/10 46/25 47/4
81/6 81/9 81/12
82/7 87/15 89/21
104/4 109/23
uses [1]   41/22
using [22]   13/4
13/4 15/15 23/14
45/19 52/14 57/16
62/18 63/14 63/15
67/4 67/5 79/15
85/3 87/21 96/21
99/6 100/17 101/25
102/12 102/23
116/18
usually [5]   49/2
91/10 100/15 103/20
117/6

**V**

vacationing [2]
22/23 88/8
value [1]   21/25
various [3]   64/25
65/22 69/17
venue [1]   123/3
verification [2]
123/13 124/2
verified [3]   51/6
51/9 115/13
verify [8]   47/20
47/24 49/15 50/11
50/15 50/17 51/4
51/5
verifying [1]
117/17
version [3]   101/5
109/7 109/10
versus [1]   103/3
via [1]   110/5
video [1]   23/16
view [1]   118/9
violation [2]
124/10 127/25
virtue [1]   41/20
visible [1]   93/17
visit [2]   13/24
22/21
visited [1]   22/22
visiting [1]   22/23
visits [1]   22/25
volatility [1]
21/17
Voronezh [1]   8/20

VPN [18]   18/22
18/23 18/24 19/3
19/4 19/13 19/18
19/25 21/21 21/21
40/9 40/11 52/15
75/7 100/20 100/21
100/22 100/22
VPNs [1]   100/17

**W**

wait [4]   52/20
85/16 86/10 128/20
waited [1]   122/24
waiting [2]   124/4
130/23
wake [1]   6/23
walk [1]   55/5
wall [1]   1/19
wallet [7]   48/10
49/1 49/2 49/3 49/7
86/4 96/16
WalletExplorer [1]
115/16
wallets [11]   16/23
16/24 22/10 39/5
45/1 49/9 93/16
94/5 95/2 95/24
96/20
wants [8]   4/16 4/25
42/9 57/5 86/5
97/11 104/12 133/12
washington [7]   1/5
1/14 1/16 1/25 9/9
9/11 9/15
waste [2]   103/12
104/8
wasting [1]   104/10
way [17]   4/14 15/17
16/6 17/20 42/15
59/23 70/21 86/1
91/22 92/22 96/3
96/25 99/18 102/9
106/22 129/6 131/5
ways [1]   12/14
we're still [1]
4/18
weak [2]   119/20
122/25
web [3]   10/12 110/1
110/8
website [9]   11/18
19/16 43/25 45/14
47/21 50/16 63/9
98/16 98/24
websites [5]   10/25
11/6 50/14 51/15
69/18
week [5]   25/22
105/1 105/14 128/13
129/7
weeks [5]   26/2 27/4
105/3 105/4 133/25
welcome [5]   5/3
36/5 37/4 106/21
118/10
what's [21]   8/3
30/24 31/11 34/16
35/7 36/21 37/12
44/18 66/13 67/14
70/9 81/18 84/1

106/23 108/10
109/13 121/7 121/9
121/13 123/23 127/4
whatnot [1]   22/12
whatsoever [1]   39/7
whenever [4]   47/17
49/23 50/10 88/7
where's [1]   123/9
wherever [1]   28/8
white [1]   119/23
who's [4]   119/23
125/18 125/23 126/7
whole [6]   5/22
25/14 27/7 105/7
107/3 117/7
wide [1]   89/14
wider [1]   89/16
wifi [4]   14/3 14/4
14/5 14/9
willing [1]   129/15
wired [1]   90/17
wise [1]   106/22
withdraw [2]   56/3
56/22
within [3]   103/25
104/1 104/21
without [5]   7/24
17/14 34/21 61/9
110/19
witness [20]   2/2
5/17 8/7 24/14 31/3
39/12 46/6 46/14
57/5 89/10 97/20
98/4 98/10 105/25
106/10 106/14
106/15 111/14 117/3
117/23
witnesses [3]
105/22 106/11 118/1
word [1]   86/11
words [5]   80/9
83/14 102/4 102/19
122/3
work [27]   7/12 11/1
11/3 11/7 11/25
12/7 17/16 17/23
18/12 19/11 19/12
19/17 19/23 27/6
70/12 70/19 71/9
71/12 74/17 75/9
90/11 91/20 108/2
130/19 132/10
132/14 132/17
worked [4]   11/5
69/16 98/23 107/15
worker [1]   69/16
working [8]   10/12
12/6 12/12 18/21
25/11 69/11 98/25
108/1
works [2]   42/14
96/3
world [3]   25/14
25/15 27/2
worse [1]   62/5
worth [1]   94/1
writing [1]   68/9
wrong [1]   34/14
wrote [8]   27/8 68/6
85/8 86/10 86/14

88/4 108/15 109/10
www.bitcoinfog.com [1]
90/3

**Y**

year [6]   10/3 69/20
104/13 119/10
119/20 120/23
years [22]   9/24
9/24 11/9 11/10
16/25 23/12 23/13
31/19 35/1 35/4
45/1 71/13 72/2
90/23 92/11 92/12
92/16 119/14 119/21
119/25 122/24 124/4
young [1]   18/8

**Z**

zone [2]   26/18
27/12

**Appx344**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Action |
| | ) | No. 1:21-CR-0399 |
| Plaintiff, | ) | |
| | ) | **MOTIONS HEARING** |
| vs. | ) | |
| | ) | Washington, D.C. |
| ROMAN STERLINGOV, | ) | **June 16, 2023** |
| | ) | **Time:  10:00 A.M.** |
| Defendant. | ) | |

**TRANSCRIPT OF MOTIONS HEARING**
BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For the Plaintiff:      CHRISTOPHER BROWN
                        USAO-DOJ
                        601 D Street, NW
                        Washington, DC 20001

                        ALDEN PELKER
                        U.S. DEPARTMENT OF JUSTICE
                        950 Pennsylvania Avenue, NW
                        Washington, DC 20530

For the Defendant:      TOR EKELAND
                        MICHAEL HASSARD
                        Tor Ekeland Law, PLLC
                        30 Wall Street, 8th Floor
                        New York, NY 10005

For the Movants:        WILLIAM FRENTZEN
                        MORRISON & FOERSTER, LLP
                        425 Market Street
                        San Francisco, CA 94105


Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
                        Official Court Reporter
                        United States Courthouse, Room 6714
                        333 Constitution Avenue, NW
                        Washington, DC  20001
                        202-354-3246

INDEX

WITNESS                                                    PAGE

DR. FRANCISCO CABANAS

Direct Examination
By Mr. Ekeland                                              78

Cross-Examination
By Ms. Pelker                                              102

Redirect Examination
By Mr. Ekeland                                             127


EXHIBITS ADMITTED                                          PAGE

Defense Exhibit A                                           86

Defense Exhibit B                                           96

Exhibits 5 through 9                                       126

Exhibits 14 and 15                                         126

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Calling criminal Case 21-399, United States of America v. Roman Sterlingov.

Would counsel state their name for the record, starting with government counsel.

MR. BROWN:  Good morning, Your Honor.  AUSA Chris Brown for the government.

MS. PELKER:  Good morning, Your Honor.  Alden Pelker for the United States.

THE COURT:  Good morning to both of you.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for Defendant Roman Sterlingov, who is present in court.

THE COURT:  Good morning.

MR. HASSARD:  Good morning, Your Honor.  Michael Hassard for Defendant Roman Sterlingov.

THE COURT:  Good morning to you and good morning to Mr. Sterlingov as well.

So we're here today for the first of our hearings on the various pretrial motions.  I am happy to proceed as the parties have proposed with respect to scheduling and to start with the Rule 17 subpoenas, the motions to quash, and then turn to the order to show cause relating to alleged violations of local Criminal Rule 5.7.  And then we can figure out where to go from there after our lunch break.

So why don't we go ahead and start with the motions

to quash. The first set of those are Docket Numbers 93 and 95. 93 is the government's Motion to Quash Early-Return Rule 17 Subpoena; and 95 is the Motion to Quash Subpoena by Nonparty, Chainalysis, Inc., Michael Gronager, Jonathan Levin and Youli Lee, and Incorporated Memorandum of Law.

So why don't I start with the government on Docket 93.

MR. BROWN: Yes, Your Honor. The government is moving to quash the Rule 17(c) early-return subpoenas served on the third-party Chainalysis, Inc., and several associated individuals, essentially, for two reasons.

Number one, those subpoenas are procedurally improper. They were served without leave of court for an early return date. And, number two, the subpoenas are grossly overbroad. They don't meet the *Nixon* test and they reflect an impermissible fishing expedition.

The government's concerns here are not only -- the government's primary concern here is about policing the boundaries of relevance in this case. The subpoenas seek materials that fall far outside anything directly relevant to any element of guilt or innocence for the defendant, and the government is concerned that the defense, with these subpoenas, as well as some other motions by the defense, the defense is essentially seeking to turn the defense case in this case into something that's not really about Roman Sterlingov's guilt or

innocence, but it's about something else. It's about the defense counsel's theories and allegations with respect to Chainalysis at large.

That's not appropriate for a criminal trial. That's the definition of a Rule 403 excludable presentation because it is not really relevant to guilt or innocence or any of the elements of the offense, and it is going to be highly distracting to the jury. And it's part of an effort to, essentially, tar our expert -- our one expert from Chainalysis by innuendo with all of these allegations of general wrongdoing about Chainalysis.

THE COURT: What is the government's standing to move to quash a subpoena served on a third party?

MR. BROWN: Your Honor, the government's standing has to do with, again, policing the boundaries of relevance, procedural propriety --

THE COURT: That may go to admissibility.

MR. BROWN: Your Honor, the defendants, on authority, *United States v. Cartagena-Albaladejo* from 299 F. Supp. 3d 378, says that even -- that the government does have standing and an interest in preventing "harassment of potential witnesses" -- which is exactly what this is -- as well as undue lengthening of the trial in discovery process with evidence that may either be -- that may neither be relevant nor admissible.

And that's exactly the case here. We are talking

about undue lengthening of the trial with distracting and --

THE COURT: But it's not lengthening the trial at all if I just say none of it is admissible, right?

MR. BROWN: That's true, Your Honor. But even if the Court allows -- even if the Court excludes it at trial, we're still talking about a substantial volume of irrelevant discovery that the government will also have to review. I mean, those materials -- if it's an early-return subpoena, those materials need to be shared with the government so we can review them. That's going to add a significant burden on the government, as well as the defense.

We also have an interest in preventing what is a clear case of harassment of Chainalysis. Defense counsel -- I don't think that this is coming from the defendant himself. Defense counsel have a fixation with Chainalysis. This is exhibited both in their filings where in their latest filing they're threatening Chainalysis with all of this extraneous civil litigation, which is an improper reason to ask for discovery.

In their podcasts they have said, "Chainalysis, we're going to sue the crap out of them." That's from *The Vonu Podcast*. That's quoted in ECF No. 120. In another podcast --

THE COURT: Sue them for what?

MR. BROWN: Sue the crap out of them. Ask defense counsel. They're talking about post-trial they're planning to

sue Chainalysis.

In another podcast, the *Bitcoin Miami* podcast -- and we can supply the Court with the URL -- at one hour and 42 minutes, defense counsel says, "This is our opportunity to take down Chainalysis."

That's what they're saying about this trial. It's not about the defendant's guilt or innocence. It's about prosecuting defense counsel's pet theories about Chainalysis.

And to ask for this volume of really abusive, irrelevant, inadmissible discovery, which is a clear fishing expedition, will burden not only defense, but will burden the government, and will lead to just prolonging the trial. Even if the Court excludes it, we'll still have to litigate these questions of admissibility about whether communications relating to penetration testing for Chainalysis software are relevant and admissible to this case.

There's a whole slew of totally irrelevant document requests in those subpoenas that we will have to address at trial unless the Court, at least, enforces the procedural requirement that early-return subpoenas need to be approved by prior leave of court.

THE COURT: Although, isn't the authority split on that question?

MR. BROWN: Your Honor, I'm not aware of an authority clearly holding that early-return subpoenas do not require

leave of court. But I am aware of Judge Sullivan's very forceful opinion in the *Binh Vo* case, where at least in this district -- in the U.S. Attorney's Office, we're all familiar with that case, and we are well aware of Judge Sullivan's analysis there -- that Rule 17(c) explicitly calls for approval by the Court for an early-return subpoena.

And as Judge Sullivan explained, this is not a formality. This is part of the Court's responsibility to supervise the propriety of subpoenas that are issued in the Court's name.

THE COURT: Doesn't the *United States v. Urlacher*, *United States v. Cartagena*, which you mentioned, support the other; and Wright and Miller [sic] says that a motion in advance of issuing a Rule 17(c)(1) subpoena is an orderly and desirable procedure and one frequently followed, but the rule does not require it, and the question can be raised as well on a motion to quash. It's Wright and Miller.

MR. BROWN: Your Honor, there are understandably different ways to read Rule 17(c). We read it as the way that Judge Sullivan read it, which is clear. The Court may direct a witness to produce the designated items in court before trial or before they are to be offered in evidence. That's Rule 17(c)(1). And, Your Honor --

THE COURT: That is true with respect to early-return, perhaps. It's not true with respect to the first

sentence of (c)(1), which is, "A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates."

So it may be, then, that an arguable reading of (c)(1) is that the subpoena can just order that the materials be produced for trial, and it may be on the day of trial or the day before trial or something like that. And then we might have to have an adjournment if there is a big pile of exhibits that are produced and people need time to go and review them.

But it's only the second sentence that really talks about the Court's discretion, saying that the Court can order it earlier.

MR. BROWN: Yes, Your Honor. That's exactly how Judge Sullivan read this. He said there's a general rule, which is prior leave of court is not required if the production is beyond the day of testimony.

But it carves out an exception to that general rule. And your point about, would we need an adjournment if there's a large volume, I think that dovetails with the point about the substantive requirements for issuing a Rule 17(c) subpoena.

If the proposed production is so voluminous that the parties need some sort of adjournment to review it, that shows it's a fishing expedition. Rule 17(c) is designed for specific discrete items of evidence that will be admitted at trial or at a hearing.

If the defense is asking for such a volume of documents that there's no way that anyone can absorb that within a day, then that does show that it fails the *Nixon* test of admissibility, specificity, and relevance.

I would also direct the Court on the question of prior leave of court to the D.C. Circuit's decision, *United States v. Haldeman*, 559 F.2d 31. That's cited in ECF 93 at 3. The D.C. Circuit said the Court "indulges pretrial inspection of subpoena papers only upon a showing," and then it lists out the qualitative tests that they are --

THE COURT: Do you know if Rule 17 read the same way all the way back in the 1970s?

MR. BROWN: Your Honor, I think it was substantively the same. The exact wording may have changed over time, but they're reading, as far as I understand it, the similar wording, but I don't know for sure.

THE COURT: There's a version, it was from the 1970s, but that's years ago at this point.

MR. BROWN: Yes, Your Honor. Yes, Your Honor. But, I mean, courts to this day -- I think if you read *Binh Vo*, *Binh Vo* is still citing *Bowman Dairy*, other cases from much earlier, involving earlier versions of Rule 17. I think *Bowman Dairy* is a good example.

That is an older case, but it does elucidate the -- that there is a substantive threshold for early-return

subpoenas, and there's a role for the Court in policing the propriety of those subpoenas.

THE COURT: Okay. So let me hear, then, from counsel for Chainalysis and the others.

MR. FRENTZEN: Good morning, Your Honor. William Frentzen from Morrison & Foerster on behalf of Chainalysis, Michael Gronager, Jonathan Levin, and Youli Lee. Thank you, first of all, to the Court for hearing us today. We appreciate that.

We, similarly, believe that the subpoenas, the 17(c) subpoenas, that have been issued should be quashed in this instance. And, additionally, just so the Court is aware, there is an, effectively, sort of a copycat subpoena for Michael Gronager specifically to appear here next Friday on the 23rd, which has been fully briefed; a motion to quash that subpoena on the basis that that, as well, is -- it is similar in the sense that it is a further move simply to try to harass my clients and to try to obtain irrelevant information.

But, specifically, it is clearly not relevant to the issues that the Court has said it wants to hear about here today and next Friday as we've --

THE COURT: Let's get to that separate one, the subpoena for the *Daubert* hearing later just so I take these things in order.

MR. FRENTZEN: Absolutely, Your Honor.

THE COURT: I'll give you a chance to address that as well.

MR. FRENTZEN: I appreciate that, Your Honor.

So in terms of the 17(c) subpoenas, we, of course, agree with the government. As we've explained under the plain language in the case law, we believe that, for early production, the moving party needs to have a 17(c) subpoena issued by the Court.

And so here, instead, we simply got 17(c) subpoenas which were not endorsed by the Court, and that is not just a procedural failing. It's also a failing demonstrative of what was in those subpoenas.

It is 81 requests in total. I think it's, like, 50 pages or so in length. And the requests are incredibly broad and not directed to anything in particular. And in addition to the *Nixon* test, which we believe is the law, that they've not been able to show any specificity, any relevance, or admissibility, which is what they have to show to the Court in order to get this early return that these claims are -- sorry -- these requests fail.

In addition, Your Honor, the case law on 17(c) subpoenas is clear. That it is not an end-around on discovery. In other words, what the defendant is supposed to get, generally speaking, in the case includes Rule 16 and disclosures from the government. It is clear from these

requests that the requests are, effectively, a broad fishing expedition -- I mean, in other words, in order to get early return on a 17(c) subpoena, you have to say, this is a piece of evidence that exists and that is relevant and is admissible, but I need it in advance.

It's not an opportunity, as in a civil case, for wide-ranging discovery on issues where, among other places, they should be going to the government and asking for discovery.

And so within the requests here, you have things that allegedly relate to expert testimony and disclosures that they say are necessary to test experts. Well, Rule 16 has, in fact -- I think it's Part G on behalf of the government, I think it's A-something subpart G. Sorry. And that includes, you know, appropriate disclosures and discovery regarding experts, and that's how they should be testing the experts in this case.

Instead, you've got wide-ranging requests for any manner of things. It also includes, in large part, requests for communications with the government. Well, if there are requests for communications with the government which exist and are relevant, then Rule 16 exists to obtain evidence from the government. But it's not a basis on which you just make wide-ranging requests that are not really aimed at or specific to anything.

And part of the problem here, Your Honor, is that -- for example, Chainalysis has a number of different products, and those products can perform a wide variety of functions. Rather than coming to the Court and saying, there is a specific issue here, it is something that we contend that the other side's expert got wrong; by way of example.

And we need to test that one specific issue or we need -- we believe this information is admissible related to that, then that's something that they're supposed to come to the Court in the first instance and spell it out, and then the Court can analyze and decide whether or not such a subpoena should issue. But in the first instance, whether or not it's covered by Rule 16, in which case 17(c) is not the appropriate means of getting at it.

And so those sorts of narrowly tailored requests are one thing. That is not what the Court has here. It is a wide-ranging fishing expedition. The requests are also factually inaccurate to the extent that they, for example, call for testimony and evidence from Youli Lee, as one example here.

Youli Lee is an individual who was an AUSA and now is a lawyer at Chainalysis. Well, obviously, what she's doing as a lawyer for Chainalysis is largely privileged. What she did in the government as an AUSA is covered by, among other things, privileges there, but also the *Touhy* regs.

There's been no description or explanation about how

any of this is relevant to anything or admissible. In addition, they've taken the extra step, which was either lazy and inaccurate or an outright false statement in saying that she was negotiating with Chainalysis while she was at the government.

When Youli Lee left the government, she took a job with a different company, not Chainalysis, unrelated to Chainalysis, and then subsequently took a job with Chainalysis. So even that sort of type of speculative mudslinging is just flat-out wrong.

Again, we believe that all of this comes back to the information, and I don't need to sort of read back through what counsel for the government already referenced. But in the letter -- I won't say 17(c) subpoena even since it wasn't authorized by a court -- but in the letter, the cover letter accompanying those documents from counsel, there was a threat of a lawsuit against Chainalysis. He did, in fact, say they we're going to sue the crap out of Chainalysis.

THE COURT: For what?

MR. FRENTZEN: That's unclear to me, Your Honor. Other than general dislike for Chainalysis and its products. And a theory that somehow, if his client is acquitted, that somehow Chainalysis faces some sort of liability, which is sort of patently absurd. But that's the best I can make of his theory here.

THE COURT: Can I ask you a question?

MR. FRENTZEN: Of course, Your Honor.

THE COURT: You referred to the rules relating to expert disclosures.

MR. FRENTZEN: Yes, Your Honor.

THE COURT: The rule requires the government to disclose the bases for an expert's opinion. If an expert opines that some type of complex analysis was done that led to a particular result, and that complex analysis involved running computer simulations or computer models, just hypothetically, in your view, under Rule 16 would the government be required to produce all that underlying data, computer code, everything that was done?

And if not, then how does a defendant in a case in which his liberty is at stake get an opportunity to fairly challenge an expert's opinion?

MR. FRENTZEN: So, Your Honor, what I think that is required -- and if the Court gives me some indulgence before I come back up; I know we cited a case that the -- an expert's reliance on an underlying, for example, piece of software --

THE COURT: Right.

MR. FRENTZEN: -- does not mean that the software -- now, the software itself is, of course, disclosable and has been disclosed, and they have --

THE COURT: Disclosable by whom? By the government

and as part of --

MR. FRENTZEN: Sorry. The Court would have to ask the government about -- but Chainalysis is available, obviously, to the defense. In other words, the software is an interactive software which the defense can utilize and, among other things, can spot-check.

It's -- there's a very specific purpose for which the software has been used in this case. It's an investigative software that does a ton of different things. Here, as I understand the two parties' cases, which is probably the least in the room, but in any event --

THE COURT: No. The second least.

MR. FRENTZEN: I doubt that, but thank you, Your Honor.

There is clustering and there is a variety of means of clustering. The basics of the clustering -- there are several different ways in which these types of transactions in bitcoin or other cryptocurrency can be clustered.

That has been explained, can be explained by probably -- well, I know Ms. Bisbee, who will be testifying as an expert for the government and is employed at Chainalysis and understands these things, but also, I believe, by other experts in the case.

And that is, A, a sort of a -- there are known processes to do that, and there are several. But those are

known, and those are understood by both sides.

Those processes further may be spot-checked.  Now, that spot-checking -- they could be, I believe, thoroughly checked.  That is, it takes time and is voluminous.  But they may be spot-checked and analyzed for that purpose, and they have access to the basic software.

In other words, it can be checked.  It can be tested, and witnesses, as I understand it, are going to testify about that.

What has been requested here is documents -- effectively, documents and records related to the development of the entirety of the software.  It is a totally broad, irrelevant fishing expedition.

THE COURT:  What about just -- I mean, I understand that it's, I assume, proprietary, and there would have to be some type of protective order in place.  But if the software is -- the use of the software is of central importance in the case and that is the basis for expert testimony, doesn't the defense have an -- shouldn't the defense have an opportunity to look at that software and -- I understand you might be able to confirm whether it's working right through other types of checks, but their expert might look at them and say, wait a second, this -- this code doesn't make any sense here, and it generated these results because there's a code here, if you actually look at it, that says, computer, when you don't know

the answer to this question, assume the following. And that assumption may be something the defense could show, hypothetically, is just a completely false assumption. And, therefore, the results are not meaningful.

Don't they -- shouldn't they have an opportunity to do that type of analysis?

MR. FRENTZEN: Your Honor, what the Court has just described is an example of what could be done in this case. It is not the example before the Court. In other words --

THE COURT: I understand.

MR. FRENTZEN: -- the defense has not actually pointed to any specific or particular issue with anything that we or the government are able to respond to.

And it may be, Your Honor, that a proper expert may say, I have an issue with X, and that expert -- then the defense and the government may discuss that, they may take a look into it; there may be a very specific response or answer which makes sense or doesn't make sense to that expert.

And that, I think, is a specific request about a particular aspect of a product that could be further delved into, as the Court properly points out, under Rule 16. It is not a basis to issue a Rule 17(c) subpoena without asking the Court in the first place or describing the first scintilla of information, let alone specificity to do a dump of 51 requests that have nothing to do with nothing [sic] and, frankly, Your

Honor, don't actually go to the specific question which the Court just asked. So that's part of the reason why the 17(c) is inappropriate and should be quashed in its entirety.

And then, if there are specific, well-founded requests regarding the experts' opinions and the bases therefor, rather than give us everything you've developed from the time of your inception and potentially before, because we want all that information because, apparently, we're going to try to sue the crap out of you, you know, say we don't think it works, there's one specific -- and, instead, what we've gotten in their response and their opposition is just this general, well, we don't know and, therefore, give us everything, and we'll hunt through it until we try to figure out whether, you know, we can find something or not; which is exactly what the law forbids.

THE COURT: I understand. Thank you.

MR. FRENTZEN: If there's nothing further, Your Honor, I'll wait to discuss the subpoena specifically to Michael Gronager.

THE COURT: That's fine to do that. Mr. Ekeland?

MR. EKELAND: Good morning, Your Honor.

THE COURT: Good morning.

MR. EKELAND: First, the defense objects to the government's standing to move to quash what they're calling a third-party subpoena. But the --

THE COURT: What other word is there for it?

MR. EKELAND: What?

THE COURT: What other word is there if it's not a third-party subpoena?

MR. EKELAND: Well, the issue here is that Chainalysis has acted like a government agent.

THE COURT: Then they do have standing.

MR. EKELAND: Well, then that raises the issue of why this information shouldn't just be produced under Rule 16 and under --

THE COURT: That's not in front of me now. That is not a motion in front of me now. You haven't made a motion under Rule 16. You've made a motion --

MR. EKELAND: Perhaps it's a motion to compel.

THE COURT: You haven't. What's in front of me is a rule -- a motion to quash the Rule 17 subpoenas. That's what I'm addressing at the moment.

If there's a separate motion you want to make or that you have made saying the government hasn't complied with its discovery obligations, I can take that up in due course.

MR. EKELAND: Your Honor, what's occurring to me here as we talk about this is that, essentially, if this was -- this was all work done by FBI cyber -- right? -- and not a private vendor. The government would have an obligation to produce it.

So if the Court is saying that the proper remedy for

that is a motion to compel under Rule 16, then that's, perhaps, what the defense should do.

THE COURT: I'm not saying that at all. You're saying that. I'm just saying you're arguing about something that is not raised in front of me at this point.

You're coming up here and saying that Chainalysis is the government's agent, and, therefore, they should be required to produce under Rule 16. I don't have any basis to think that's true or not true. That's your argument.

That's just not what's in front of me at the moment. We're not just streaming here and changing our arguments as we go. I need to take up what's in front of me.

MR. EKELAND: I'm just picking up on what the Court was noting about the government's standing on this issue. We can turn to the 17(c) subpoenas.

So the 17(c) subpoenas are doing two things. One, they're asking for the testimony of material fact witnesses in this case; of Jonathan Levin and Michael Gronager, who are involved in the investigation of --

THE COURT: Testimony at trial?

MR. EKELAND: What?

THE COURT: Testimony at trial?

MR. EKELAND: Testimony at trial.

THE COURT: We can come to that. What I'd like to talk about at this point in time, to start with at least, are

the subpoenas to Chainalysis for -- the subpoenas duces tecum. And not for trial testimony. We can take the trial testimony up later.

MR. EKELAND: We're specifically asking for a number of things in there. For instance, we are asking for the source code to Chainalysis Reactor. And counsel for Chainalysis said that we have access to this, and we don't.

We also don't know what --

THE COURT: I don't think he said you had access to the source code.

MR. EKELAND: He said we had access to the software, which we haven't had access to it because we don't know what versions they used when they did this investigation, because this investigation dates back to 2015.

THE COURT: Is there any reason not to just disclose to the defense which version was used?

MS. PELKER: Your Honor, it's the current version is what we'll be presenting at trial. If they have an expert -- and there are many out there who have access to Chainalysis Reactor -- they can load up into Chainalysis Reactor right now. We've produced them, expecting that they will do this, based on defense's request for them in that format so that their expert can look at it live and do that analysis.

THE COURT: I think you've got the answer to that question at least.

MR. EKELAND: Well, regardless, we need to see the source code. Just for the reasons that the Court raised is that there's all sorts of assumptions in this software. It's what's called a heuristic software, which means it's a probabilistic software, sort of doing a statistical analysis.

A lot of what goes on with that software depends on how the algorithms are designed and how they're implemented in that code.

THE COURT: Point me to which one of the document requests is seeking the source code.

MR. EKELAND: I don't have that in front of me. Mike, could you find that? I know we asked for that in there.

Generally, in my experience in other courts, when we've issued these kinds of subpoenas, counsel calls us up, and we work through these issues before anyone files any motion to quash. That hasn't happened here.

And what my concern is, is that -- and I don't want to bang on this other point -- is that the government is, effectively, avoiding its obligations under Rule 16 and *Brady* by hiding behind a private vendor. That's what's duly highly problematic about this case and makes it different than, say, *Nixon* and all these other 1970 cases that are not dealing with computer forensics.

I mean, this whole case, there are no eyewitnesses, there are nothing -- this entire case turns on the computer

forensics. It's at the core of this case. They have no eyewitnesses; they have nothing. It's all this analysis.

The analysis in the criminal complaint the government has already changed because they botched the analysis and they left out a transaction and then their expert, Scholl, then went to go correct it. It's not as simple as the software is just some sort of input/output very simplistic thing. It's incredibly complex.

Chainalysis has been involved in this investigation since the beginning. We haven't seen any of their communications. They're withholding a lot of information here. We cannot analyze the forensics in this case without a production from Chainalysis. And if that production is going to come in the trial, then we're going to have to ask for a continuance.

Right now we're about, roughly, three months out from trial. We'd have time to analyze this stuff and look at it. If we're getting this dump at trial, you know -- and I truly expect that we would just negotiate with Chainalysis about what should be produced, and then, if there was an issue, come back to the Court instead of -- I didn't get any phone call from counsel or anything. That's what happens in all my other cases.

In that sense, the Federal Rules of Criminal Procedure are a little bit outdated because the practice is

something different, and the rules haven't really been amended to reflect what happens. In all my cases --

THE COURT: The rule on expert disclosures was just amended very recently.

MR. EKELAND: I'm sorry. I couldn't hear you.

THE COURT: The rule on expert disclosures was just amended very recently.

MR. EKELAND: Yeah. It was amended on certain points.

But what has happened in practice in all my other cases around the country is opposing counsel, counsel calls me up, we go through the list, we narrow it down. Part of the problem here is so much stuff has been hidden, and the government has moved its investigation from actually doing it in the FBI to a private vendor, and that makes everything opaque. That changes that -- the posture of this case from *Nixon*, from *Haldeman*, all of those cases. This is very different.

This isn't about the President's audiotapes in his office, right? This is about heuristic algorithmic software that's never been tested in any court anywhere, and we're asking to see what that software is comprised of, and nobody wants to show it to us.

Our client has been accused of hiding all this stuff and doing all this stuff, but everywhere I turn in this case,

the government doesn't want to produce anything. If they've really got such a strong case, why not just show it to us? Why do I have to go and chase this stuff?

Why don't they just produce a copy of Chainalysis Reactor, give us a license for us to go look at this stuff? Instead, you know, his funds have been seized, thousands of miles away from home. If we want to call any witnesses, like his friends or family, we have to fly them in, like, 6,000 miles. Everywhere we turn, we're getting sandbagged, and the government --

THE COURT: I'm not quite sure that that's fair. If you had very specifically asked for something as is required under *Nixon* and they said, tough, go to court, I get that. But I've got to tell you, I have -- and I realize this case is different.

I have never in a criminal case seen anything that approaches this and even if this were a civil case where the civil rules apply, I would have real pause over the breadth of these requests. I mean, they're breathtaking, what you're asking for, and they show no specificity whatsoever. If you really wanted to get something from them meaningful, you could have been a lot more specific about it.

I don't think it's quite fair for you to say that they're stonewalling you, and this is all some great scam to stick it to your client and you. You haven't done what you're

supposed to do under the rules.

MR. EKELAND: We've asked for the source code.

THE COURT: Where? I asked for that.

MR. HASSARD: Request No. 8 in the subpoena.

MR. EKELAND: Request No. 8 in the initial subpoena.

THE COURT: That request is -- it's No. 8 in a subpoena that has 19 requests in it. And if that's what you're really focusing on, I'm curious as to why it's No. 8.

Even that request is all documents, records, and communications, including individual notes to one's self exchanged between Chainalysis and any researcher from the University College London, IC3, the Austrian Institute of Technology, or the Complexity Science Hub Vienna, including but not limited to George Kappos, Haaroon Yousaf, Rainer Stutz, Sofia Rollet, Bernhard Haslhofer or Sarah Meiklejohn -- I'll give the reporter the spellings of these later -- related to the presumption of the white paper at the U-S-E-N-I-X Security Symposium and the investigation that led to the prosecution in the *United States v. Roman Sterlingov*. This includes data sets, draft versions of white papers, source code, object code, algorithms, heuristics, methodologies, and Chainalysis research sent to researchers, as well as all software additions with complete code in the native file format, when the rules require specificity, that just boggles the mind.

MR. EKELAND: Well, Your Honor, let's address that,

because that is a reference to the USENIX conference where Chainalysis took evidence in this case in a pending criminal trial, circulated it to researchers that they were paying, and then presented it publicly at a conference in Boston, saying that -- implicating Mr. Sterlingov. We're asking for the data sets that they used there and what they did.

That's an affirmative act on Chainalysis' part for information that we're under a protective order on. I was shocked to see that happen. It's a public presentation.

THE COURT: You're shifting gears on me again here. Okay? We're trying to be more specific here.

What is it where there's a specific need where there is a real necessity -- let me finish.

MR. EKELAND: The -- sorry, Your Honor.

THE COURT: I kind of get the point that if there's source code that is used and you have a computer expert who needs to analyze the source code who can say to me specifically, here's what I'm looking for; my concern is that they may have used the following types of source codes which could have the following assumptions in it, which could prejudice the results, and I need to be able to look at that. I get that.

You're now talking about -- again, sort of pointing the finger at the government, saying, you see, this shows the government is playing unfair here by releasing stuff. I want

to know specifically for the purposes of what's really material to the defense, not whether the government was behaving badly or not by sharing something with someone else; that's not really relevant to the defense one way or the other. You're just shifting gears and talking about that and sort of making accusations rather than helping me by saying, Judge, this is the very specific information I need in order to prepare a fair defense in this case.

MR. EKELAND: Your Honor, in that request, we are asking for the information that Chainalysis used and produced to outside researchers to write a specific white paper implicating Mr. Sterlingov that they presented at the USENIX conference in April 2022 in Boston.

That is, they're using evidence in this case; they're giving it to expert researchers; I think they're paying those researchers. And then they publicly presented it and it's also on YouTube. And what we're specifically asking for there is the data set that they used, all the information that they used, and everything that we're entitled to ask about because they wrote a white paper implicating our client and publicly published it. That's a very specific thing.

THE COURT: Why is it relevant in the case, what they did in a proceeding, even if they were implicating your client? What is the relevance of that case? If the government went off and said, we have source code, it shows he did these terrible

things somewhere, that's not relevant or admissible in the case.

What matters is, sort of, the underlying facts in the case. It may be that they've violated some other rule by doing that, and they shouldn't have done it. That's not -- I'm not addressing that now. I'm still sort of wrestling with -- it seems to me extremely unfocused on what's material and relevant in the criminal case that's in front of me rather than more of just kind of throwing up a sense of government impropriety rather than saying, no, here's what we need to know in order to put on our defense.

MR. EKELAND: In that instance, it's not clear to us that we've been given that data that they used. That's relevant, because the way they're processing the data and how they're using their data sets is directly relevant to their output. It would show us what kind of heuristic stuff they're using, right?

THE COURT: Can I make a suggestion here to try and move us along?

MR. EKELAND: Yes, sir.

THE COURT: I do think that this subpoena is -- if there is a definition of failing the specificity test in *Nixon*, this subpoena satisfies that and is probably a model of it. It is just such a sweeping subpoena that is just -- if this were just in a normal civil litigation, I would think that this was

a fishing expedition, even in that context, as compared to a criminal case.

I agree with the statement that was made to me earlier that Rule 17 is not intended to open the door to the types of broad, sweeping discovery that takes place in civil litigation.

But I also, as I indicated earlier, am sympathetic to the notion that you may need specific information in order to put on your defense.

Do you have a computer modeling expert or an expert on computer code, someone who is going to be able to say and -- look at the code and say, here's a problem with the code in this case?

MR. EKELAND:  Yes, we do, Your Honor.

THE COURT:  Can you have that person prepare a declaration or a statement?  I don't -- it doesn't have to be anything that's subject to the penalty of perjury, as far as I'm concerned.  But a statement that says, here's what I need to know in order to do my work, in order to make an assessment of whether this computer model is fairly predictive or fairly captures what you need to know.  Here are the particular facts that I need to know in order to do that analysis.

Prepare that, give it to Chainalysis, give it to the government, and then have the discussion that you're talking about.  Then if there are other things like that in nature, if

you can show them with specificity, here's what we need and here's why we need it, then I think you're moving towards satisfying the Rule 17 standard.

I understand why you may need this before trial, if you then need the opportunity for someone to do complicated analysis, and they need time to do that analysis. I would recommend moving quickly in doing that. But I think you need to get down to that level of specificity in order to satisfy the Rule 17 standard. Does that make sense?

MR. EKELAND: I think that's an excellent idea. We're happy to do that, Your Honor.

THE COURT: What I'm going to do is I'm going to grant Chainalysis' motion to quash without prejudice, and understand that you can come back and with greater specificity. I'm going to simply deny the government's motion as moot, and that way I don't have to decide the standing issue at this point anyway because I'm not sure whether the government has standing.

Since I'm already quashing the subpoena, the government's motion, I don't need to reach that, in any event. I do think there's at least a question as to standing that the government may have there, but I think granting Chainalysis' motion to quash is sufficient for those present purposes.

I would just encourage you-all to get your heads together quickly on that and for you to get the specificity you

need to the government and Chainalysis because I don't want to put you in a position in which we're back here in another month and a half and then, by the time you actually get what you need, you can't prepare in time for trial.

And then the other thing I will say is, I just would encourage everyone, both sides, everyone involved in this to work together as cooperatively -- and have some discussions that you were talking about, to get that done, because I do think that there's information, it sounds to me like, you're going to need to do this properly. But it's not an invitation to sweep too broadly, and there are significant limits on this. I think you just all have to work cooperatively to do this.

If you need to come back or even have a -- get me on the telephone at some point to try and resolve these issues to move quickly, I'd like to do that, because I don't want to be in a position on which we're on the eve of trial and you're telling me, Judge, we just got the code last Thursday and my expert is telling me they need 60 days to review it. Okay? Yes?

MR. BROWN: Your Honor, may I be heard on the Rule 16 issue?

THE COURT: Yes, of course.

MR. BROWN: With respect to our obligation to disclose the bases for the expert reports, I pulled it up on my computer. I could even somehow figure out how to plug it in.

It's not that the defense has nothing for Ms. Bisbee's expert report. We produced literally hundreds of megabytes of CSV Excel files showing --

THE COURT: I don't know what CSV is.

MR. BROWN: Comma-spaced something. Essentially, Excel files, just the raw data.

So the data that Chainalysis software is pulling from is just the public blockchain. It's just Bitcoin addresses that are out there in transactional information that's publicly available. We produced appendices for those reports for all of the underlying analysis done by the expert.

Just to give you one example, we produced an appendix showing every single Bitcoin address that is clustered for Bitcoin Fog, and that runs to over 925,000 entries. It's a gigantic spreadsheet.

Their expert can take all of this raw data; they don't need Chainalysis. There are lots of other blockchain explorers that allow you to conduct analysis of the transactional data on the blockchain. They don't need -- they have the raw data; they have our conclusions.

What I would analogize it to, if we put up a government expert who says I ran this calculation in Excel and what I got was 2 plus 2 equals 5; you know, one way for the defense to rebut that would be, you know, well, we need to see the Microsoft Excel source code; what command were you using;

how did Microsoft Excel calculate that?

Another way to address it is we have the inputs, we have the outputs, and we can put up our own expert saying 2 plus 2 is not 5; 2 plus 2 is 4.

THE COURT:  But isn't the defense entitled to do both of those things?

MR. BROWN:  Your Honor --

THE COURT:  If Excel really was showing 2 plus 2 equals 5, maybe you don't get every piece of the source code for Excel and maybe the expert for the defense says, I've got a pretty good idea what the problem must be here; we all know that there's a potential glitch, and I need to see this portion of the source code there.  They get the source code and put someone in front of the jury and say, you look at the source code here; there's the mistake; yes, that's the mistake.

MR. BROWN:  I mean, if it's in the source code, that's obviously not something the expert relied upon.  I think the D.C. Circuit has been clear with the Excel example, that experts don't have to have a source code-level understanding of software tools that they use.

And so what the experts need to understand is what is the input, how is the analysis being conducted, and what is the output.  All of that has been produced to defense counsel.  That's my only point.  And this idea that they need to have the source code is a little bit of a red herring.

THE COURT: And I don't mean to prejudge whether they're entitled to the source code or not here. My point is just that they need to be specific about it. If they can be specific about it, then they may be entitled to it. If they have an expert who can say, we think this is a potential problem with the source code in this particular narrow area here and this is what our concern is, and we have an expert in source code who thinks that if they look at this, this is what they're likely to see here because it's the only thing that explains the reason we're getting this anomalous -- what we regard to be an anomalous result. Therefore, we're not asking to see every line of the source code, but we do need to see the portion that does X in the source code because this is -- based on my expert opinion, I'm pretty sure that this is what's going wrong here.

That type of specificity might be sufficient, then, to support producing the source code, or at least a portion of the source code.

MR. BROWN: Perhaps. But that's not the only way to challenge an expert's opinion. You can challenge an opinion by saying I understand what the computation is supposed to be; I understand the inputs and the outputs, and I just come up with something different. Here's how I do it.

THE COURT: Just to give you a much more accessible, for me at least, analogy, you have a witness who testifies --

testified that they saw the defendant go into the bank.  The defense says, we've got an alibi witness; we know he didn't go into the bank, couldn't have possibly robbed the bank that day, but there's also the camera footage from the bank.

And the defense says -- serves a subpoena and says, we want the camera footage from the bank.  I don't think you can come in front of me and say, Judge, look, they can prove it another way.  They've got the alibi witness who will say that the defendant was somewhere else that day; therefore, they're not entitled to the camera footage of who went into the bank that day.

My point is just that, if they can be specific and show that there is something that is not just a fishing expedition, but they have reason to think that there is problem, for example, in a particular area of the source code, they may be entitled to that.

MR. BROWN:  Understood, Your Honor.  It's not my practice to sort of fact-check everything in the litigation, but I do want to put on the record that this allegation about the government or Chainalysis sharing materials that are under the protective order to these researchers for this white paper, it is absolutely false.  It is a fantasy concocted by defense counsel.  There's no basis to it whatsoever.

Again, we can't respond to every false statement that the defense makes in front of this Court, but I just wanted to

correct the record, that that is -- it is a ludicrous theory.

THE COURT: All right. Thank you.

So that's what I'm going to do with that motion. The other thing I should just say for the record, I don't think it's necessary to my decision here, but I do think that it is a fair reading of Rule 17 to say that the first clause doesn't require -- or 17(c)(1), the first clause doesn't require the Court's prior approval, but the better reading of the second sentence seems to be that the Court's prior approval is required.

But in a case like this one, where producing things like source code on the eve of trial would likely require an adjournment to provide time to analyze it, there may be good reason for the Court under the second clause to -- if there's something that isn't where the *Nixon* standard of specificity, relevance, and admissibility is satisfied, there may be good reason in a case of this nature to require the early production, at least of records, that would require detailed analysis.

Mr. Ekeland, can I ask you one question?

MR. EKELAND: Sure.

THE COURT: I'm a little bit concerned by the accusation or the assertion that there's been some harassment of Chainalysis. If you've indicated that you're going to sue them, can you tell me what your theory is?

MR. EKELAND: If I recall the -- first of all, these are on podcasts directed at the Bitcoin community; these are not directed at Chainalysis.

The basis is that, when we first addressed them, we wanted to put them on notice of their preservation -- their document preservation obligations in case there is a civil suit. We've never said, oh, we're going to sue them. But if there is an acquittal, we do intend to pursue a malicious prosecution civil action against Chainalysis.

THE COURT: Is there any precedent for suing a government expert on a malicious prosecution theory? I am concerned that that could be taken as intimidating or harassing a witness.

MR. EKELAND: That's not the intent. I will refrain from any more comments on that if that is what the Court is concerned about.

I certainly would say that in this case, I think the theory -- not to go into, like, a 1983 suit or whatever it is, but the theory would be, essentially, that Chainalysis has worked so intimately with the government that they're a government actor and that they, in the process of being busy with marketing their software, they cared more about marketing their software than the accuracy of the software, and that led to Mr. Sterlingov's false arrest and incarceration for now two and a half years for something that he just didn't do. And

there's still no evidence anywhere in the record of him ever operating Bitcoin Fog, which, Your Honor, incidentally, is still operational.

THE COURT: I'm not going to opine on the merits of a hypothetical civil suit, but my concern is that that appears to be novel and a stretch, and I am just worried about anyone who might be making statements that could be reasonably perceived to be threatening to a potential witness.

MR. EKELAND: Your Honor, while we're up here, if I can address what the government said about that white paper. The -- Chainalysis took evidence from this case and gave it to academic researchers and publicly presented it in the paper that's been published, which we're happy to give to the Court. But that's not false. That's just what happened.

What the government's involvement in that is I don't know. But, again, you have the problem here with the government using private vendors for what FBI cyber used to do, and now you've got this information circulating in the public that the defense is under an obligation under a protective order not to circulate. I was shocked by that.

So this fact that the government said it's false we disagree with.

THE COURT: All I can say about it -- I don't know the truth of the matter asserted, but I can just tell you that Mr. Brown is shaking his head. There's, obviously, a

disagreement between the parties about this.

MR. EKELAND: Yes.

THE COURT: All right. Why don't we take a short break now, and then we can come back and take up the subpoena directed at Mr. Gronager and the subpoena directed at Ms. Pelker.

So let's come back -- it's ten after. Why don't we come back at 11:25.

(Recess taken.)

THE COURT: All right. So the next motion that I have up is 126. As I promised, I'll hear from Chainalysis on this one. This is the motion to quash the subpoena of Michael Gronager.

MR. FRENTZEN: Thank you, Your Honor. Appreciate it. We are moving to quash a subpoena that was issued to Mr. Gronager for testimony here next Friday on the 23rd, and we view this as just another opportunity for counsel for the defendant to kind of continue his -- whatever his purposes are that are separate from what the Court should be doing -- and trying to get executives from Chainalysis to come here into court on irrelevant matters. And, you know, both he and his associate are, effectively, putting this stuff out in public through blog posts and through Twitter as some sort of a cause for which they are also, apparently, fundraising.

But in any event, just getting to the merits of it,

even in light of that obvious -- what I'd refer to as -- atmospherics, it's just not relevant for the purposes that the Court has set out for today and next Friday, as we understand them.

We accepted service of the subpoena for Mr. Gronager to alleviate the need for the defendant to have to utilize resources to serve him in person. I think, as the Court knows, that does not mean that we think that the subpoena should be effective.

And we did, in fact, discuss that with counsel and -- sorry, I'll just deviate for a moment just to let the Court know, I was a little surprised to hear counsel earlier say that there had been no discussion about the scope of the 17(c) subpoena, because that was actually a subject of discussion that we had, basically, if you want to try to narrow this substantially, we'll consider that. And that was an invitation that was not taken up.

But in any event, we did discuss the potential testimony, and at that time I was simply told that they wanted to ask questions of Mr. Gronager related to Mt. Gox, Mt. Gox data, and Reactor, which is the name of the software at large.

So we moved to -- getting no more information than that, effectively, we moved to quash the subpoena, understanding what we understood about the Court's purposes here. And, basically, we then spelled out for the Court why

Mr. Gronager's testimony is not relevant to the expert qualifications of Ms. Bisbee and what Ms. Bisbee is supposed to be here to testify about, or any other, so far as we knew, issues relevant to the *Daubert* hearings. Mr. Gronager has not been noticed as an expert by either side; and, therefore, his potential testimony is just not relevant to the *Daubert* issues.

And so we also indicated that, with respect to the Mt. Gox data, we don't see how that's relevant to the motions in limine, which typically are a legal analysis of the admissibility of certain evidence.

THE COURT: Can you describe the Mt. Gox and Mt. Gox data to me a little bit?

MR. FRENTZEN: As best we understand what the defense wants to get into, Your Honor, it's this. Mr. Gronager, at a certain point, did some work for the Mt. Gox bankruptcy trustee. In the course of that work, he examined the Mt. Gox data that was furnished by the bankruptcy trustee.

In analyzing that data, among other things, Mr. Gronager noticed some irregularities, which, as best I understand it is, for example, only half of a transaction. So if the Court imagines seeing certain input but not an output, as one would expect from the nature of these types of Bitcoin transactions, and -- so he noticed a few of these things.

He then, subsequently, had a meeting with Mark Karpeles. Mark Karpeles was sort of the, at that time the --

or prior to the bankruptcy trustee -- sorry -- but the custodian or administrator of Mt. Gox. I may get his title wrong. If I do, I apologize. Basically, the person being considered as responsible for Mt. Gox.

And Mt. Gox had had issues related to, number one, a hack, which people recently have been actually charged by the federal government for the hack, as well as a -- other allegations that led to the collapse, if you will, and the bankruptcy status of Mt. Gox.

Mr. Gronager then had a conversation with Mr. Karpeles about the data; effectively, sort of some of the things that he had seen, which he opined were issues with the data. And Mr. Karpeles allegedly gave him an explanation that related to a description of a hack being accomplished on Mt. Gox; and Mr. Gronager then sort of going back to his work -- and a lot of the bankruptcy work, obviously, Your Honor, was bankruptcy work. Right? Like, who owes what to who and trying to resolve that.

And so in the course of that, this is an observation that Mr. Gronager made. So with respect to the Mt. Gox --

THE COURT: What was -- the observation was the one-sided transactions, or what was the observation that he made?

MR. FRENTZEN: The observation, generically, Your Honor, is that there were some gaps in the data.

THE COURT: Okay.

MR. FRENTZEN: So to be clear, Mr. Gronager is not a percipient witness to the collection of the Mt. Gox data. He's not a percipient witness to the means by which any of this data is or is not questionable; let's put it that way.

He had opinions in viewing it that there were a few potential gaps in the data he was examining. The government is using, as I understand it, a version of the Mt. Gox data, which comes from the Japanese government, and that, as I understand it -- though, I don't know, nor does my client -- but that comes from the bankruptcy trustee at some point.

All of which is to say that Mr. Gronager is a third-party observer of a data set. There is a data set that will be used in this case. People can examine it and opine about gaps or issues, et cetera, with the Mt. Gox data set.

Mr. Gronager's specific opinions are not relevant to either a *Daubert* hearing or a motion in limine in the context of this case because he's just a third party examining the data and reaching certain opinions. He has not been announced as an expert by either side; therefore, he's not in a position to express those opinions.

What the current data set is or is not is, you know, something at issue, but not something that he has directly examined that we know of. His conversation with Mr. Karpeles is, at best, hearsay and inadmissible as far as we can tell.

But in any event, it's not relevant to the issues before the Court on next Friday, which is *Daubert* and motion in limine related to the Mt. Gox data. I mean, in other words, the Court can take Mr. Gronager's statement that the defense has cited from whatever book, although it's not his direct statement; it's a third-party reporter.

But in any event, it still wouldn't be relevant or admissible to the issues before the Court for this hearing. It's just an opportunity to try to get Mr. Gronager into court and go wherever with him for however long the Court will put up with it.

THE COURT: Mr. Gronager is the co-founder and CEO of Chainalysis, right?

MR. FRENTZEN: That's correct, Your Honor.

THE COURT: Ms. Bisbee works for Chainalysis?

MR. FRENTZEN: That's correct, Your Honor.

THE COURT: Is it Ms. Bisbee or Chainalysis that's been retained by the government as its expert?

MR. FRENTZEN: Well, Your Honor, I don't know.

MR. BROWN: Ms. Bisbee. But she is an employee of Chainalysis.

THE COURT: Okay. Is the retention, though, with both or with her?

MR. BROWN: Your Honor, I think the contract and the payment is -- the payment is made to Chainalysis. Ms. Bisbee

is not directly receiving the witness fees. She's just being paid as an employee.

THE COURT: What is her position at Chainalysis?

MR. FRENTZEN: Your Honor, I'll look it up. But she is, effectively, in a -- what I would describe as a supervisory position related to investigations.

THE COURT: Okay.

MR. FRENTZEN: But I'll get you her exact title. I think it's in the -- Your Honor, she's director of investigative solutions.

THE COURT: Okay.

MR. FRENTZEN: I'm sorry. Did the Court have further questions?

THE COURT: No, no. That's fine.

MR. FRENTZEN: Okay. Thank you, Your Honor. I mean, the issue here is we have described why *Daubert* does not invite or require some form of third-party testimony even if it were relevant and admissible, which this is not. In fact, in their opposition, the defense, effectively, dropped the *Daubert* issue and went with the Mt. Gox data. And, presumably, the motion in limine is the reason to call Mr. Gronager.

But as I've also described, his testimony is not relevant to a motion in limine. Motion in limine is not a fact investigation. The Court can make decisions based on the law, typically, is what a motion in limine is. To the extent that

someone wants to challenge in some form underlying evidence, that's an issue for the jury at a jury trial.

Here, it's -- again, we view it as inadmissible, in any event. But even if it were admissible for some purpose, that would only be a trial rather than for a motion in limine hearing. I can only imagine what would happen to the Court's calendar if every motion in limine was an invitation to bring in testimony and evidence.

I was an AUSA for 25 years. I don't recall ever calling a witness for testimony in support or in opposition to a motion in limine. So we think that this is, yet again, just a reach by counsel given his, obviously, well-documented animosity and irrelevant efforts aimed at Chainalysis, which the Court has already heard about; and also reflected in -- most recently in a Twitter feed by his associate which, among other things, he was retweeting nonsense about, for example, an accusation that Chainalysis has somehow attacked a fundraiser for Mr. -- for the defendant to make it harder for people to contribute to his legal defense fund, which doesn't make sense and is -- but is out there, you know, for the public on a regular basis. This is as recent as June 13th.

We just think this is a copycat additional effort -- I don't think the Court -- the Court may not have a hearing until this case goes to trial where they don't try to subpoena somebody from Chainalysis for some purpose.

THE COURT: All right. Let me hear from Mr. Ekeland. Thank you.

MR. EKELAND: First, Your Honor, I'd just like to point out, to the extent it's not obvious to the Court, the centrality of the Mt. Gox data to this case. If you -- I believe we put this in our opposition brief, which is at Docket 131.

THE COURT: Yes.

MR. EKELAND: The primary accusation and the primary piece of evidence that the government is claiming shows that Mr. Sterlingov operated Bitcoin Fog is a multihop tracing that they did which they put a diagram of in their criminal complaint saying that Mr. Sterlingov used a layered transaction through multiple Mt. Gox accounts -- I believe there's three or four in the diagram. The diagram speaks for itself -- leading to a payment for the domain name, registration for the www.bitcoinfog.com clearnet website. And when I say clearnet, I mean a website on the internet, not the site that they allege mixes the funds.

Now, the reason we're calling -- we subpoenaed Mr. Gronager as a fact witness to testify to the authenticity of this Mt. Gox data is that in 2014 --

THE COURT: To the authenticity or the inauthenticity?

MR. EKELAND: The inauthenticity.

THE COURT: Okay.

MR. EKELAND: The inauthenticity. The 901 question. He has unique knowledge of this database. It wasn't some ancillary thing when he went to Japan to go and to try and chip-trace the Bitcoin that was hacked out of Mt. Gox.

Mt. Gox is one of the forced Bitcoin exchanges where you can exchange Bitcoin for dollars. It went under; it declared bankruptcy; it got hacked.

The data that he received, as we list in our brief and is well-documented in this book that Mr. Gronager gave multiple interviews for -- *Tracers in the Dark* by Andy Greenberg -- there's a whole chapter on him receiving the Mt. Gox data.

And one of the things that he discovers when he gets the Mt. Gox data is that there's deleted files, there's missing files, there's missing counterparties; basically, that this data is corrupt.

The other thing that he has percipient knowledge of is the fact that he asked Mark Karpeles -- who was the CEO of Mt. Gox, who was subsequently convicted for data fraud in a Japanese court for falsifying the Mt. Gox data -- he, according to the book, asked Mr. Karpeles, is there a backup of this data; you know, essentially, I've seen all these mistakes and errors in it. And Mr. Karpeles told him, no, there was no backup of the data.

So Mr. Gronager is a witness to the fact that the data set that the government is using and the data set that came out of the trustee -- the Japanese bankruptcy trustees that they want to certify as authentic is actually corrupt.

THE COURT: I'm sorry. Just a second. No, no. I just wanted to ask the question.

My question is, one of the things you want Mr. Gronager for is because Mr. Karpeles told Mr. Gronager there was no backup; is that -- do I have that right?

MR. EKELAND: In part.

THE COURT: Is that, in part, one of the things?

MR. EKELAND: Yes.

THE COURT: Why isn't it just hearsay?

MR. EKELAND: Because it's effect on listener.

THE COURT: That's not an effect on the listener. That's what you say when you don't have an exception to the hearsay rule.

MR. EKELAND: That's true; I agree with that.

Well, he can testify to what he saw is missing in the data. He could testify to --

THE COURT: The question I have is why couldn't somebody else do that? I mean, why couldn't your own expert look at that and see what's missing? Why do you need Mr. Gronager to do that?

MR. EKELAND: Because he may have personal knowledge

of the fact that it's the only copy.  One thing -- one question we have here is that the Mt. Gox data got dumped on the internet in about 2013, 2014.  When we're analyzing the Mt. Gox data, we see all sorts of errors, right?

But we don't know what, actually, the government has and what Gronager's work on it was when he did it and what he saw.  He's a fact witness from day one as to the authenticity and inauthenticity of this data.

THE COURT:  So that may be an area of -- again, where the parties could have some discussion.  And I think, through counsel, you could simply ask whether Mr. Gronager has any personal knowledge as to whether there's a backup or not.  You know, it may be able to explore that way.

If he's someone who has personal knowledge of that, maybe that is relevant in a very limited sense.  Quite frankly, if that's the case, I'm not sure that you actually need his appearance at a hearing in front of this Court.  You could just get a declaration from him as to that fact one way or the other.

Obviously, if it's a question for the jury, you might need him to testify to that, but just take things in small steps.  If, in fact, he has personal knowledge that there was no backup, maybe he can give you a declaration on that or give you a declaration saying I don't have personal knowledge.  That may obviate the need to call him as a witness, at least at the

pretrial stage.

MR. EKELAND:  Your Honor, we maintain for the purposes of these hearings that he's a material fact witness with unique knowledge as to the authenticity of the Mt. Gox data giving his unique position in 2014 and 2015 when he goes to Japan to work for the trustees, and he works in a way with firsthand contact with Mark Karpeles.  He works on it -- with the Japanese bankruptcy trustees that the government are using to try and certify this data as authentic.

And so we think that his testimony goes directly to the authenticity of this data, not just in what he saw, but in the way that the bankruptcy court handled it and whether or not it's the sole copy.  This is not an ancillary issue to this case.

THE COURT:  I understand that.  I understand the importance.

MR. EKELAND:  That's our position.

THE COURT:  I understand the importance to the case. But I do think that, particularly if you're pretrial and you want to subpoena a witness, I need to know that this is, again, something more than a fishing expedition and the person has something that is relevant, specific, and admissible to offer.

And if there's any, just, hearsay, that someone told him something, that's not going to clear the admissibility hurdle.  And with respect to specificity and relevance, if he

just simply reviewed the data set and saw there was something missing and your expert could do the same thing, I'm not sure you need him for that purpose.

MR. EKELAND: Not only did he analyze it in a way that we think is unique and that he's got personal knowledge of it that nobody else has, he has knowledge --

THE COURT: If it exists, can't someone else just look at it?

MR. EKELAND: No. Because we don't know what, if any, version is authentic. And that's a problem. Because Mark Karpeles himself was convicted for data fraud for falsifying these records.

THE COURT: Isn't what matters is whether the version that the government seeks to use in this case is authentic, right? That's what matters.

MR. EKELAND: But this raises questions about that. If that's the same version that Mr. -- that Mr. Gronager saw. But I don't know -- like, in order to evaluate what the government has, we need to cross Mr. Gronager.

And not only that, he has personal knowledge of how the Mt. Gox data was incorporated and used by Chainalysis Reactor software. This is a threshold evidentiary issue in this case. I don't see how the government's case stands if this data doesn't come in.

It's not just Mr. Gronager who is out there saying

that this data is inauthentic. We've since discovered --

THE COURT: I'm not sure he said it was inauthentic.

MR. EKELAND: I'm sorry?

THE COURT: I don't know that he said it was inauthentic. That's a legal conclusion.

MR. EKELAND: Point taken, Your Honor. He has personal knowledge as to the state of the Mt. Gox data in its original form, whether or not it's unique, how it was used by Chainalysis Reactor. And, you know, from day one, he's also got knowledge of how it was handled by the Japanese bankruptcy trustees, which goes directly to the government certification.

I mean, I think you get our point. So he's got personal knowledge from analyzing this data and at least telling Mr. Greenberg that he saw serious flaws in it. He's got personal knowledge to the issue of whether or not it's the only copy, and he's also got direct personal knowledge of how it's incorporated --

THE COURT: I'm not sure that we've established he has personal knowledge as to whether it's the only copy. I mean, all -- he was told by somebody else --

MR. EKELAND: Sure. We submit that it likely does, Your Honor. That's something we feel the defense is entitled to cross-examine him about to -- because we maintain we're, obviously, going to be arguing that this data is corrupt and inauthentic, and it's foundational to the government's case.

So we submit that we'd rather address those issues in-depth before trial rather than having that hold up the whole trial.

THE COURT: I'm not sure that holds up the trial, frankly, on this one, unlike where there's someone who needs to do analysis. If you wanted to call him as a trial witness and put him on the stand and examine him, you might be able to do that if he had personal knowledge that he could testify to with respect to the authenticity of the data set. And if I concluded at trial that it was authentic, then I could grant a motion with respect to that.

Or you could argue to the jury that there's a question with respect to the reliability of the data set based on that testimony, but it would have to be that he actually has personal knowledge of this where he could testify as to that. And then he can just be a trial witness for that purpose.

MR. EKELAND: But then if he testifies to something related to the Mt. -- authenticity or inauthenticity of the Mt. Gox data that requires us to ask for a continuance, then --

THE COURT: Why would it require a continuance?

MR. EKELAND: I can't predict the future.

THE COURT: That's true of any witness.

MR. EKELAND: Yes. But this witness has unique personal knowledge of this Mt. Gox data, which is foundational to the case.

THE COURT: I guess, you have yet to convince me that he has unique personal knowledge. Unique is an important word. And if the data set -- if there's a data set that the government is relying on in this case and if there are flaws that someone who is expert in the field can see by looking at the data set, for example, seeing that there's some one-sided transactions which don't make any sense -- as an example, your expert can look at that, as well as Mr. Gronager can look at it, and your expert could take the stand in a way which you probably would have a lot more control over what happens at trial if your expert testified about that rather than putting somebody on the stand who you're not quite sure what he's going to say.

MR. EKELAND: Well, Your Honor, we'd maintain that this goes directly to the government -- the government is seeking to certify this Mt. Gox data pretrial as authentic, and we maintain that Mr. Gronager is a necessary witness to testify as to the inauthenticity of this data that the government is seeking to certify.

We do not agree to that certification. That's the basis for our motion in limine. And we think under 901, it's inauthentic.

THE COURT: I want to hear from the government. To the extent the government is seeking to certify the authenticity, why isn't the defense entitled to call somebody

as a witness at that hearing who may have something of value to say on that question?

MR. BROWN: Your Honor, the reason is that the threshold for authenticity and authenticity ruling is it is minimal under well-established case law. The government is not required to establish beyond any sort of doubt that the evidence is what we claim it is. All we're required to do is provide enough information for the jury to make that finding.

This exact issue was raised in front of Judge Friedman in the *Safavian* case, which is 435 F. Supp. 2d 36 from 2006. There was a challenge to the authenticity of emails that the government was introducing.

The defense came in with arguments that some of the emails might have been altered. In particular, if somebody were forwarding an email, and there's the forwarded email at the bottom, the defense argued, well, somebody, before forwarding the email, could have altered that.

And Judge Friedman, basically, said that's not relevant to the admissibility, the authentication -- well, the authentication part of admissibility. That the government is -- "The possibility of alteration does not and cannot be the basis for excluding emails." Judge Friedmann went on to rule that the defendant is "free to raise this issue with the jury and put on evidence that the emails are capable of being altered before they're passed on."

But that was not a reason for Judge Friedman to deny the authentication of those emails. So to the extent --

THE COURT: Is the hearing on the authentication issue where you're seeking certification set for June 23rd? Is that one of the things we're taking up then?

MR. BROWN: Your Honor, it's not set for June 23rd. That's one of our motions in limine. We'd be happy to argue that June 23rd.

THE COURT: It's later in the case then?

MR. BROWN: Your Honor, we assume that all of our motions in limine will be addressed at the pretrial conference.

THE COURT: Right, right.

MR. BROWN: This is one motion, however, that it would be -- it would be beneficial to both sides for the Court to make some sort of ruling about the authentication of these records in advance of the summer of trial of preparation simply because they are -- you know, they are important to --

THE COURT: Mr. Ekeland is nodding his head yes to this.

MR. EKELAND: Yes, Your Honor.

MR. BROWN: And, Your Honor, there's no reason to question that these are records from what we say they are; that they're records from the Mt. Gox trustee. The defense is claiming -- making claims about the reliability of those records, not about -- these records are what the proponent says

they are, which is the only question before the Court.

THE COURT: Right. This is what I think we should do with respect to the motion to quash the subpoena directed at Mr. Gronager. I'm going to deny the motion without prejudice -- I'm going to grant the motion without prejudice to renewing a subpoena for his appearance.

I think we should move up the hearing on the government's motion to certify the admissibility of the authentication of the Mt. Gox data set -- or data, I guess it is, to the 23rd. Maybe something on the 23rd may have to get pushed off to make room for that.

If at that point, at that hearing I conclude that I have enough of a question that I think I need to hear from Mr. Gronager before ruling on that question, we'll schedule another date to do that relatively soon so you'll have an answer to that question before trial.

I don't see any basis as I -- for present purposes why we need to hear from Mr. Gronager for purposes of the *Daubert* hearing relating to any expert opinion by Ms. Bisbee, but I'll say the same thing there. At that *Daubert* hearing, if something comes up and he's unable to answer some question where I conclude that her qualification to offer expert testimony and the reliability of the expert testimony that she seeks to offer turns on information that Mr. Gronager may be uniquely able to provide, I can revisit the question of his

appearance at that point, and we can continue that hearing, if need be.

Otherwise, if the defense thinks it's appropriate and there's good basis to list him as one of their witnesses for trial and wants to subpoena him for trial, you can do that.

All right. So the next one I have on my list is the Rule 57.7(b) motion, and I can hear from the government to start with on that. You may proceed.

MR. BROWN: Yes, Your Honor. I'll just note at the outset that the defense filed a four-week-late opposition to our opening Rule 57.7 motion. On Wednesday we filed a motion to strike that response simply because it's two days before oral argument. It's unfair to the Court and to the parties.

THE COURT: And what relief are you seeking?

MR. BROWN: Your Honor, the relief we're seeking is the proposed order, which is docketed at 127-1. What that proposed order, essentially, does is enforce the obligations that are already in place on attorneys practicing before this Court; those obligations which are spelled out in Rule 57.7(b).

THE COURT: I have that rule in front of me, so you don't need to quote it for me.

MR. BROWN: And the basis for this motion is spelled out in our pleadings, which is that the defense has embarked on -- after receiving CJA funding, the defense has embarked on a worldwide press tour where they are giving podcast

appearances, speaking engagements, and they are carrying on about this case, and the witnesses in this case, my co-counsel, prosecutors in this case, evidence in this case, in the most egregiously inflammatory and inaccurate terms, and this does -- these sorts of statements being put out repeatedly on Twitter, on podcasts, and in-person appearances, these do pose a clear and present danger of tainting the jury pool.

This is a very avoidable problem simply by enforcing the obligations that Mr. Ekeland and Mr. Hassard are already subject to under 57.7(b):  To wit, not commenting about the merits of the case; not commenting about the identity, testimony, or credibility of prospective witnesses; so on and so forth.

The defense has, in their late-filed opposition two days ago -- without giving us the chance to reply or this Court to evaluate that -- they've raised certain objections.  Well, the first thing that they did is they filed a copycat motion. They saw our motion, and then they literally copied and pasted from our motion a cross-motion.

And the difference between their motion and our motion is our motion identified specific statements by the defendants that are inflammatory and inaccurate.  We identified with specific time stamps where you could see an attorney appearing in a criminal case before this Court making statements that are in violation of 57.7(b).

Their copycat motion was just sort of, well, the government is doing it too. But the difference is they don't actually point to any statements by any government attorney about the merits of this case, the evidence, so on and so forth.

And we assumed that that was their response. It was sort of, you know, I'm rubber and you're glue; and that's what they thought was an appropriate response to that. So it wasn't until Wednesday that we actually first learned that they opposed our motion.

But none of their arguments in response are really persuasive. You know, they claim they need to go out and make these false, inflammatory ad hominem attacks in the media in order to attract experts.

THE COURT: Can you make a representation to the Court that no one from the government spoke with the author of *Tracers in the Dark* about this case?

MR. BROWN: About this case? No member of the prosecution team, neither myself nor Ms. Pelker spoke a single word to Mr. Greenberg --

THE COURT: What about --

MR. BROWN: -- about this case.

THE COURT: What about other agents or others associated with the case?

MR. BROWN: Your Honor, it does appear that an agent

who is not a case agent on this case but who participated in the arrest who had since left government did speak to Mr. Greenberg. That agent is not a government employee; he's not one of our witnesses.

But no -- Rule 57.7(b) binds attorneys practicing in this court, not to mention the D.C. Rules of Professional Conduct and the D.C. Voluntary Standards of Civility; which the defense team routinely violates with their ad hominem attacks.

I can tell you no member, no attorney for the government has made a single statement to the media about this case, period.

THE COURT: Okay. I appreciate that.

MR. BROWN: Your Honor, there's no hardship to the defense. This doesn't impair the right of the press to cover this. It binds only the attorneys; it doesn't bind anybody else.

And the proposed order here does nothing more than -- again, the language here is lifted specifically from 57.7(b); specifically, I think it's (b)(3), (4) and (6) -- and make that enforceable until the jury is selected in this trial. And the purpose of that is to avoid jury prejudice.

Now, the defendant's statements to the press and on podcasts and public audiences have already made this Court's task more difficult for the voir dire. We are going to have to examine witnesses [sic] very carefully, especially witnesses

who are familiar with cryptocurrency. That's going to make the whole witness selection process more difficult. It's going to make it harder to find witnesses -- excuse me -- jurors who are going to be able to hear and understand the evidence in this case.

And it's totally gratuitous. There's no reason that the defense needs to make these statements, and there's a clear harm to the integrity of the trial. And the government is entitled to a fair trial and an untainted jury pool just as much as the defense is.

MS. PELKER: Your Honor, I want to make sure the record is entirely clear that Mr. Greenberg asked about Bitcoin Fog and Mr. Sterlingov's case, and that my response was that we couldn't discuss it because it was ongoing.

Just to the extent that Mr. Brown said that there wasn't a single word said, that would have been the only word.

MR. BROWN: No substantive word.

MS. PELKER: Just to make that clear.

MR. BROWN: For the record, the day that the complaint was unsealed, Mr. Greenberg called me, and I told him I couldn't comment.

THE COURT: Okay.

MR. BROWN: And that was the end of it.

THE COURT: Okay. All right. I appreciate that. Thank you. Mr. Ekeland?

MR. EKELAND: The government has had extensive conversations with Mr. Greenberg.

THE COURT: Wait, wait, wait. Are you telling me that these two lawyers who are here in front of me are making misrepresentations to the Court?

MR. EKELAND: No. No, I am not.

THE COURT: The rule applies to government lawyers. Identify a lawyer to me who has had a conversation with the --

MR. EKELAND: Former prosecutor on this case, Mr. Faruqui, is on page 270.

THE COURT: I can't enter an order that deals with a former prosecutor, and I'm not sure the rule does apply to a former prosecutor.

The question is, is there somebody who is a prosecutor in this case who has violated the rule or is violating the rule? All I can do is prospectively issue an order saying comply with this rule. If there's nobody on the prosecution team who is violating the rule, there's nothing for me to do.

MR. EKELAND: Your Honor, I would maintain that there are extensive interviews by the prosecution -- members of the prosecution team with Mr. Greenberg hyping the very -- blockchain forensics that are essential to the evidence in this case.

THE COURT: I'm willing to put people on the stand

and under oath, including you, if I have to here.

MR. EKELAND:  Yes, sir.

THE COURT:  I want to know, are you saying that anyone on the prosecution -- current prosecution team has spoken to any member of the press about this case?

MR. EKELAND:  I don't know if about this case, but they've --

THE COURT:  Well, that's the issue.

MR. EKELAND:  Well, Your Honor, I think it goes beyond.  The fact that they're promoting this kind of blockchain forensics and hyping it, I think that potentially affects the juror pool.

I do think, based on the case law in this district, there is no reasonable probability that any juror is going to be tainted, because of the size of the venue in this district and the fact of voir dire.  These conversations that we've been having haven't been to a senior newspaper for a national magazine, like *WIRED*.

I do have a quote in this book saying Mr. Sterlingov we believe has been falsely accused.  I happen to know Andy Greenberg; I've known him for ten years.  So he told me the full extent of the conversations he had with members of the -- former members of the prosecution team and members of the current prosecution team.

Again, I'm not saying they specifically referenced

this case, but to the extent that I can read things about this case in the book that isn't in discovery -- for instance, the conversation from the arresting officer, Tigran Gambaryan, that's happening at the time that these prosecutors are on the case.

THE COURT: Well, the prosecution just explained to me that there was a former agent who did talk to a reporter, and they don't have control over former government employees.

MR. EKELAND: That was at the same time that they were talking to Mr. Greenberg as well. They may have not made direct comments.

THE COURT: You're talking about these lawyers right here who just told me that --

MR. EKELAND: Ms. Pelker is all over the index to this book; Mr. Brown is not.

THE COURT: I'm tempted to put you all on the stand and examine this and hold somebody in contempt here today if anyone is lying to me.

You're telling me that she is lying to me when she tells me she did not speak to him other than to say I won't talk to you,

MR. EKELAND: No, I am not.

THE COURT: That's a serious accusation.

MR. EKELAND: No, I am not.

THE COURT: You've made it about three times in front

of me here with no basis whatsoever for it.

MR. EKELAND: Your Honor, I am not saying that Ms. Pelker spoke to Mr. Greenberg about this particular case. But I am saying that Ms. Pelker -- and I think she just admitted it in court -- spoke to Mr. Greenberg and --

THE COURT: And told him she couldn't talk about the case.

MR. EKELAND: What?

THE COURT: And told him she could not comment. That's exactly what you expect of her.

MR. EKELAND: But the context of this book, Your Honor, is beyond the case. It's seeking to validate the blockchain forensics that are used in this case. And in that sense, that is a potential taint to the jury pool.

But I think, given the case law in this district and the fact of venire and voir dire, I don't think there's any reasonable probability of any juror taint. The comments that we made, we made in Europe, in Munich, and Berlin at blockchain meetups.

THE COURT: I thought you also made them on YouTube or --

MR. EKELAND: We made them on podcasts directed at the blockchain community. It's been very important for us. Mr. Sterlingov has a right -- First Amendment right to reply to the publicity on this case, and there is publicity on this

case. There was a WIRED article released on the day of his arrest; there was a DOJ press release tarring him as the operator of Bitcoin Fog.

We've also, because of our public outreach, have had people come up to us and tell us instances where Chainalysis was used to arrest people on charges that were dropped. And that made us realize that, when they're touting all the successes of Chainalysis Reactor, what they're not telling you about is all the errors and the matters that were quietly dropped.

We haven't -- although this Court has approved us for CJA, we're told by CJA that we probably won't see any money until after the trial. So this public outreach has also raised necessary funds.

THE COURT: You can come to me and request an interim payment.

MR. EKELAND: I'm sorry, what? I didn't hear you.

THE COURT: You can come to me and request an interim payment.

MR. EKELAND: Your Honor, I will. What I'm, effectively, told by the federal defenders who are running the CJA is that they're so swamped with dealing with the January 6th cases, just to get onto the eVoucher system, just to get set up on it, took us about two to three weeks. So it's --

THE COURT: Anyway, I don't care what the case is about. One ought not be engaged in fundraising activities that violate the Code of -- the Code of Conduct for attorneys in criminal cases before this Court.

You're perfectly welcome to raise funds, but you can't violate the rules of this court in the process of doing it.

MR. EKELAND: It's our understanding that the rule says that if there's a reasonable possibility that a juror will be influenced -- and we think that the case law and the fact of the venire and voir dire just rules out any reasonable possibility.

THE COURT: But I don't think it's fair to say, it's possible that some prospective jurors will have heard about this. We'll just exclude them and strike them for cause. I don't think that cures the problem. If I'm striking people for cause -- that's a problem -- because of statements counsel has made.

MR. EKELAND: Your Honor, courts in this district, in the face of overwhelming negative national publicity from the January 6th cases, reject arguments saying that there's -- the negative press tainted the venire to the point where a transfer is necessary. This case is nothing like the level of publicity of any of the January 6th cases.

THE COURT: I'm just saying that there are rules of

conduct of attorneys in criminal cases here. I expect the lawyers appearing in front of me to comply with them. And I don't think it's an answer to say, yeah, we might taint some prospective jurors, but we can just strike them.

MR. EKELAND: Isn't that the point of venire and voir dire?

THE COURT: I mean, come on. So you mean to say that you could go out and, like, go out in the hallway during jury process and go up to five jurors and say, by the way, my client is innocent. But don't worry, when it comes out in the voir dire, you can just strike those people because I haven't done anything wrong?

MR. EKELAND: Well, we're going to have to ask them whether or not they've read Mr. Greenberg's book; we're going to have to ask them if they've read any WIRED articles about --

THE COURT: You're barking up the wrong tree here. I do not think you should be violating this rule, and I don't think the answer is to say we'll just strike people from the venire based on my reading of the rule. I expect you to comply with this rule.

MR. EKELAND: Okay, Your Honor. We submit that we are complying by the rule because we don't think there's any reasonable probability that any juror --

THE COURT: You're posting stuff on Twitter. If you're having a private conversation that's not being placed on

the internet with people in Europe, fine; I don't see a problem there. I get that.

But if you're doing stuff that is being posted on the internet, on Twitter and YouTube, I think that there is a risk that you're tainting the jury venire by doing that.

MR. EKELAND: How does the DOJ press release not do that? How does not a national article in *WIRED* magazine with -- from Chainalysis working with the government saying this validates our forensics, how is that not something that the defense has to reply to?

THE COURT: If there is something that someone has done that you think violates this rule, bring it to my attention.

MR. EKELAND: We filed that in our motion as well.

THE COURT: I don't have any reason to think that the press release -- the rule contemplates that there can be press releases from the government at the initiation of the case, and it also contemplates that the defense can, at the commencement of a case, indicate that -- it does permit the defense at the commencement of the case -- I'm looking for the exact language -- to indicate -- to generally deny the allegations. But neither side can go beyond those sort of limited types of statements.

I have to say, it's particularly disturbing when it's done just in terms of, sort of, ad hominem attacks on the

prosecutors in the case, or if it were the other way around. I don't think you would appreciate it if the government were saying about you the types of things that you're saying about them.

MR. EKELAND: Accusing somebody of money laundering $334 million worth of drug money is also an ad hominem attack.

THE COURT: That's what an indictment is.

MR. EKELAND: Well, that's --

THE COURT: I think you've heard me on this. I expect everyone in this case to comply with this rule, and if they don't, there will be consequences for doing so.

MR. EKELAND: Yes, Your Honor.

THE COURT: Okay. At this point in time, I don't think it's necessary for me to enter an order. But I will say this. If I do see other violations, and other violations of Rule 57.7(b) are brought to my attention, at that point in time I'm just going to enter an order. If you violate that order, you will be in contempt, and there will be consequences for that.

But as of now, I expect everyone to comply with the rule. As I said, if any further violations are brought to my attention, I will actually issue an order directing compliance and hold the violating parties in contempt after that.

But I will, for present purposes, deny both the government's and the defendant's motions that I issue orders

under Rule 57.7(b). I expect the lawyers who appear in this court to be familiar with the rules of this court and to comply with them in all respects. And if we have any further problems, you should bring it to my attention, and I will, as I said, issue an order, and that will be followed up by contempt proceedings if there are further violations.

Anything else you want to raise before the lunch break?

MR. EKELAND: Your Honor, maybe Ms. Pelker's --

THE COURT: I mean, we can do that, I suppose -- is that okay to do that after the lunch break?

MR. BROWN: Yes, Your Honor.

THE COURT: Let's do it after the lunch break.

MR. FRENTZEN: I'm sorry, Your Honor. I don't want to hold things up, but does the Court need me any longer for the rest of the proceedings today?

THE COURT: I don't think so. Anyone else think so?

MR. EKELAND: No, Your Honor.

THE COURT: Okay. I appreciate you being here.

MR. FRENTZEN: Appreciate it.

THE COURT: I will see you all back here at 1:30.

(Lunch recess taken at 12:30 p.m. until 1:35 p.m., after which the following proceedings were had:)

THE COURT: All right. Why don't we go ahead and take up the motion to quash the subpoena for Ms. Pelker and the

motion to preclude the defense from calling Ms. Pelker as a witness at trial.

MR. BROWN: Your Honor, we're happy to launch into this and address the motions in whatever order the Court wants. We wanted to -- we spoke to defense counsel briefly. Being mindful of the Court's time, and I think the Court has other matters scheduled this afternoon --

THE COURT: I do.

MR. BROWN: -- the two defense witnesses who are here today, I believe, are unavailable next week. So if the Court's amenable, we can also frontload the defense.

THE COURT: That's fine. If you want to start with those, that's fine with me.

MR. BROWN: Thank you, Your Honor.

MR. EKELAND: May I proceed, Your Honor?

THE COURT: Yes. I just want to make sure I have the right motion in front of me. All right. You may proceed.

MR. EKELAND: Your Honor, the defense calls proffered expert Dr. Francisco Cabanas.

THE COURT: Okay.

THE COURTROOM DEPUTY: Would you please raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Thank you. Please be seated.

THE COURT: All right. This is the expert notice at

Docket 122 and the government's opposition, which is at Docket 130.

You may proceed.

MR. EKELAND:  Thank you, Your Honor.

DIRECT EXAMINATION OF

DR. FRANCISCO CABANAS

BY MR. EKELAND:

Q.  Dr. Cabanas, could you just briefly summarize your educational experience for the Court.

A.  I obtained my Ph.D. in physics, in experimental physics from the University of British Columbia in 1988; and I obtained my master's in physics in 1982; and my bachelor's in physics and mathematics, double honors, in 1979; and completed my high school education, with a Governor General's medal, in 1975.

Q.  And in relation to your doctoral -- your doctorate in physics, did you have any particular focus of study?

A.  I focused on experimental physics and -- I worked in experimental physics.  Experimental physics involves a lot of data analysis and -- for both my master's and Ph.D.  And those are also a lot of computational analysis and the processing of the data.

And so one has to really deal with things such as the systematic errors or systemic bias on one side and random errors or noise or random noise on the other side.  There are two fundamental types of errors.  The only difference being

that noise you can address by results, while systemic bias you cannot.

Q. And outside of the educational experience that you just described, do you have any other educational experience?

A. I self-taught myself to program Fortran assembler and ASIC at the time. I also self-taught myself to do LAN administration, and subsequently to that, I self-taught myself starting in 2011 a lot about blockchain, Bitcoin and Monero.

Q. You mentioned that you have experience as a network administrator. Could you please just explain that a little bit for the Court.

A. Basically, one of the -- I did work for my own company for myself, and I also did work for a contractor for the Canadian federal government. And my role was to secure critically private sensitive information from attacks and hackers, which I was largely successful at. And I also had roles, such as removing malware, maintaining the service, et cetera, and it was a Windows analytic system. At the time it would have been Windows 2003 server, Windows XP, and later Windows 7 that I worked specifically in this work.

After that, I basically managed my own computing and my own computers and my own businesses. I've done the odd consulting work on network administration also.

Q. What experience, if any, do you have with cryptocurrencies like bitcoin?

A.   Well, I started researching bitcoin in August of 2011.  I started buying bitcoin in October of 2011.  At the time I was a resident of Prince George.  My first purchase was $100 Canadian; I got a little over 18 bitcoins.  In early 2012, I became a member of the BitcoinTalk forum.

And then I continued to invest and trade in bitcoin through 2012 and 2013.  I came across Monero mainly because I was studying at the time, which I was still very concerned about the scaling capabilities of bitcoin and the fixed block-size problems associated with bitcoin.  And so I started learning about Monero.  I realized that Monero --

THE COURT:  What word are you saying?  You started learning about what?

THE WITNESS:  Monero.

THE COURT:  Monero.

THE WITNESS:  It's another cryptocurrency.

THE COURT:  Okay.

THE WITNESS:  It's number 25 on CoinMarketCap, or 24, in that range.

THE COURT:  Okay.

THE WITNESS:  So I started learning about Monero.  In June of 2014, I started purchasing Monero.  My research about Bitcoin gave me a lot of concerns about its long-term security.  And by September of 2015, I had sold over 99 percent of my bitcoin for Monero because I had very serious concerns about

the future of Bitcoin. And the last Bitcoin was sold for Monero in 2017.

In 2016, I joined the Monero team -- this is because I was already doing a fair amount of work for the Monero project, volunteer work related to everything from scaling, also some elements of the then ring signature were filed, which was -- ring signature is a means of obfuscating the signer of a transaction. So I did some work for that -- on that.

And I became very involved in the Monero project, primarily -- a major focus on the scaling of the cryptocurrency, the ability of Monero to grow as a cryptocurrency, fee, and ending with spam attacks, in particular, some types of DDoS attacks and how to price them. So that's a major area of my work in Monero.

And I also have to interact very closely with all of the people that are working on the privacy elements of the coin, in particular, because of transaction sizes and certain types of attacks that can be mitigated by setting fees correctly and by setting various medians that control the growth of blockchain.

BY MR. EKELAND:

Q. If I heard you correctly, I think you said you started researching Bitcoin and other cryptocurrencies in 2011?

A. In August of 2011.

Q. And could you just briefly describe for the Court, like,

the nature of your research and what you --

A. Well, the first thing I have to do is understand what it did. I have to understand the security of Bitcoin, particularly how it was secured and how the public keys and the private keys worked and what potential attack is the worse of this technology.

I was approaching from the perspective of an investor who was looking at investing in this or is there some flaw in the design which I should keep away. And my overall conclusions were that, with the exception of the falling block reward in Bitcoin and the security issues it raises, I had no fundamental problems with Bitcoin.

I did have a very serious problem -- I had a very -- a lot of problems with the security and the inability of Bitcoin to scale. It's a well-known element of Bitcoin that it basically captured around six transactions a second. It, therefore, on the base layer will never be able to be an alternative on a worldwide basis to cash. There's some second-layer solutions that some people claim work. I have some serious doubts about them.

So I had focused a lot on that element. That, in my mind, combined with the falling block reward, is my biggest concern so -- I had some real concerns about Bitcoin. I think it has serious problems down the road, probably within the decade.

Q.   You mentioned private keys.  Could you just explain to the Court briefly what your understanding of a private key is for those of us who aren't --

A.   The technology behind Bitcoin is what's called a public/private key technology.  And, essentially, the -- what we see as a Bitcoin address is derived from the public key.  And there is a private key that allows you to sign a Bitcoin transaction, and that key allows you then to spend Bitcoin.

What you see as an address is basically derived from the public key.  So that's the -- kind of the basic structure of it, how it functions.  So when you transfer a Bitcoin, how it functions, that's the element of the cryptography.

So the basic approach when you sign a transaction, you would sign a public key, sign with a private key, you then transfer funds.  Whoever owns -- holds the private key actually controls the funds.  The public key is actually an anonymous data set.  Contrary to a lot of the commentary, public keys and Bitcoin are -- are anonymous, and also in a derived -- the address is decoupled from an individual.

So whoever signs the public -- sorry.  Whoever signs that private key can move the bitcoins.  And that private key, for example, can be transferred up chain without anything showing up on the chain.  I can give you my Bitcoin private key, and you will be able to spend my bitcoin.

Q.   Had you ever heard of Bitcointalk.org?

A. Bitcointalk?

Q. Yeah. Bitcointalk.

A. Bitcointalk, I've been a member of Bitcointalk since 2012, and I'm actually a legendary member there.

Q. Could you explain to the Court what Bitcointalk is.

A. It's basically a forum that was created to discuss Bitcoin and also to discuss a lot of the alternate currencies. If you were involved, particularly in 2000 -- about 2014, it was the place to be if you really wanted to learn about cryptocurrency, what was happening in there, and learn what's happening in Bitcoin. But also with a lot of the other coins, coins such as Monero and Dash and Litecoin. That was the place to be to find out about this kind of stuff.

Q. Are you familiar with Mt. Gox?

A. I was a user of Mt. Gox, and I'm proud to say that I escaped unscathed. I had -- I did do some trading in Mt. Gox. I sold some Bitcoins through Mt. Gox.

At one point in September of 2013, I had about 30,000 Canadian dollars in Mt. Gox, and I tried to withdraw it, and I was given a bit of the runaround; the same arguments that were used to -- with U.S. Dollars.

And one thing that really struck me about Mt. Gox was that the excuses that were given were very specific to the U.S. Government; like the reason we cannot withdraw funds from Mt. Gox was that the U.S. Government, U.S. banking system is

preventing that.

Well, Mt. Gox was based in Japan, and I was withdrawing Canadian dollars to Canada, so it does not affect the U.S. Government at all. I was getting exactly the same problems. I realized there was very likely serious financial problems in there.

When Silk Road was seized, there was an immediate drop in the price of bitcoin. I went back, contacted their -- I said, put my Canadian dollars back in my account. I bought bitcoin back with my Canadian dollars, and I did manage at that time to withdraw my bitcoin out of Mt. Gox. So I have a bit of a soft spot for the U.S. Government because they saved my 30,000 Canadian dollars. I averted the crash and the situation. I, basically, realized at the time that Mt. Gox was a problem. I see it coming.

Then before they shut down, I went to the trouble of taking images of all my account and downloading data from my account so that I could comply with Canadian taxation regulations primarily. But also in the future, if I needed to do any anti-money laundering or KYC compliance, further exchanges that I have done in Mt. Gox. But a few days --

THE COURT: Make sure you keep going slower, as slow as you can.

THE WITNESS: I should repeat myself.

After I've withdrawn all my data, so I had my data

out of there so I could comply with all these things, Mt. Gox went dark. And it was done -- there was the bankruptcy and the rest is history.

So, yes, my experience with Mt. Gox was some trading and escaping unscathed.

MR. EKELAND: Your Honor, may I approach?

THE COURT: Yes.

BY MR. EKELAND:

Q. Dr. Cabanas, I've just handed you what's been marked for identification as Defendant's Exhibit A.

Could you just take a look at that and just look up when you're done looking at it. Can you -- do you know what that is.

A. This is my resume, curriculum vitae.

Q. And is that an accurate copy of your resume and reflects your CV?

A. Yes, that's correct.

MR. EKELAND: Your Honor, at this time we'd like to move what's been marked for identification as Defendant's Exhibit A into evidence.

THE COURT: Any objection?

MS. PELKER: No objection, Your Honor.

THE COURT: Exhibit A is admitted.

(Defendant's Exhibit A was admitted.)

MR. EKELAND: Thank you.

BY MR. EKELAND:

Q.  Dr. Cabanas, I'd like to move on to the scope of some of your experience.

Do you have any experience with Chainalysis Reactor or any other kind of blockchain forensic software?

A.  I have studied it from a global impact perspective in the sense that I have not used it directly myself.  I have done some research on open-source versions of this type of software and have some understanding.

One of my research about what I call blockchain surveillance software was a report from the Financial Action Task Force where they compared six different blockchain surveillance companies in one example and seven in the other. They looked at comparisons in data for the question, what is a percentage of illicit addresses in the Bitcoin blockchain. It's a very, very wide variation.

From memory, some cases, like between .4 and about over 12 on a particular year on the question of the -- if a particular Bitcoin address is associated with illicit activity as a percentage of the total number of addresses.  And also the question of whether a wallet was associated with an exchange or a VASP.  I think you used the term VASP, which is the term used by the Financial Action Task Force.

And there's huge variations there, between 10 and 80 percent, depending on what particular proprietary set of --

well, you call it Reactor from different companies. And the companies -- remember, with Chainalysis, DRM, Ciphertrace, Elliptic; there's a couple other ones. I'd like to see the document to refresh myself. But there's a very, very wide variation; over a -- I believe I remember about a four- to five-year period.

MR. EKELAND: Your Honor, may I approach?

THE COURT: You may.

BY MR. EKELAND:

Q. Dr. Cabanas, I just handed you what's been marked for identification as Defendant's Exhibit B.

When you -- take a look at it. When you're done, if you could just look up.

A. Yes. This is the document I'm talking about. The graphs in question are on section -- page 26.

Q. Dr. Cabanas, could you just state for the record what document that is.

A. This is the second 12-month review of the revised FATF standards on virtual assets and Virtual Asset Service Providers.

Q. Do you know what FATF stands for?

A. Financial Action Task Force.

Q. And do you know what the Financial Action Task Force is?

A. It's an international body that provides recommendations to governments around the world, including the U.S. Government,

with respect to anti-money laundering and countering terrorism financing, and how to draft regulations and -- appropriate to address concerns in that area.

Q. If I recall your testimony correctly, you said that that document published certain ranges in relation to percentage of illicit activity on certain exchanges; is that correct?

A. Well, it actually -- the data is on page 26 of the document, and it's a graph too. It gives an example here. This is the VASP data; then there's another one with respect to illicit activity. I think it's on the following page. And on page -- this graph, 3. So there's two graphs. Page 27, Graph 3, it says: Proportion of identified illicit Bitcoin transactions between 2016 and 2020. The left, number of transactions; right, USD value.

It lists in the number of transactions, six different blockchain surveillance companies. For example, the ranges in 2019 range from .5 percent to 12.7 percent.

Q. And what, if any, significance does that variation in ranges have?

A. What it tells me is that they're very substantial systemic bias, and you can measure it as a relative to each company. So what this is telling me is that the difference between the systemic bias in the companies themselves ranges in that range of 2.5 and .7.

It cannot tell you if there is a bias, a systemic

bias, that is applicable to all the companies.  It's also silent on any random errors because, given the size of the data sets that they're using here, I would say that they mitigated the random errors or the noise or random noise in the data.  So what we're seeing here is the relative systemic bias.  The range, the differences, is a systemic bias inherent in the design of the system.

Then you asked the question why.  What could cause this?  In my opinion, it is very likely, although there could be other causes also, the different heuristics that are used and the biases used by the heuristics.

Q.  I just want to back up one second.  When you used the phrase systemic bias, is it fair to say that that's just another way of saying systemic error?

A.  Yes.  You could say systematic errors is the common term used in science -- in the natural sciences.  Another term is systemic bias; it's essentially the same.  It's basically the same thing.  You can also refer to this as bias.

The reason why we use the word systematic and systemic is to differentiate it from random or noise-type errors that can be averaged out.

So a systematic error -- give you an example of a systematic error.  It would be, let's say, in law enforcement you have a radar gun to measure the speed of a -- velocity of a motor vehicle, and you miscalibrated it, and it measures

kilometers per hour but records miles per hour.  It would create a systematic error or systemic bias of 1.6 times.

So the law enforcement officer will see a speed of miles per hour, but, actually, the device has measured the speed in kilometers per hour.  So that would be an example of what a systematic error is.

The example of a random error in that case would be how you aim it, the velocity of the vehicle from which it's been moved, et cetera.  That could vary.  If you were measuring large numbers of vehicles, by averaging, you would not eliminate this error of mistaking kilometers for miles, but you would eliminate the other noise-type errors.

This example here would be an example of a systematic error or a bias or a systemic bias.

Q.  And you used the word heuristic, I believe, in your testimony?

A.  Yes.

Q.  Could you just explain for us what that term means; heuristic.

A.  In a typical situation, it is an educated guess; it is a hunch.  It's maybe based on statistics; maybe not.  Where you do not have the actual data itself, so you replace the data with a hunch.

An example would be -- and I can give you an example, for example, in Bitcoin.  You would make an assumption that

every transfer happens on chain.  That's a heuristic.

Q.  I'm sorry.  Could you explain that.  When you say every transfer happens on chain, could you explain that for the uninitiated here.

A.  What that would be, would be that when ownership of a bitcoin is transferred, it's because you actually sent the bitcoin on chain.

Q.  I want to slow you down.  When you say chain, you're talking about the blockchain?

A.  On the blockchain itself, yes.

Q.  Which is -- what is the blockchain?

A.  The blockchain is the record of the transactions.  When you issue a Bitcoin transaction, then it gets mined by miner.  They collect all the transactions into a block, and that block has a hash, and it's mined.  And the miner gets compensated by that by a mining reward, which is the dominant amount of the funds and the fees paid by the transactions.  So that is what a block is.

And that's the ledger of Bitcoin.  And so each block is built on the next one and so on.  So that's -- the normal way you would transfer bitcoin would be to do it on the blockchain.  There are other ways to transfer bitcoin, some illicit.  A good example of that would be if I simply take my private key and I put it on a floppy drive or on a USB drive and hand it to you.  In that case, that would be an example I

just gave you my private key; you now have control of my bitcoin. But there's nothing showing on chain.

A fairly common example and an illicit example would be where a person hacks into someone's computer, and they steal the private key. And then they have control of that bitcoin, and they can spend the bitcoin. Again, nothing happens on the blockchain. But now you have a transfer of control to that other person.

If the original -- copies of the original private key are lost in the original computer, that other person has complete control. So it's possible that they're completely surrendered. If there's copies, both sides have control, so either one can spend the bitcoin.

Q. Am I correct in understanding you that there is no way to tell from the public blockchain who actually controls the bitcoin that's documented on the chain?

A. That is correct. You start moving the private keys around, nothing shows in the blockchain at all. It's impossible to ascertain that from the blockchain; that is correct.

Q. And going back to the heuristics, you said they were -- did I understand you correctly in saying that they're sort of a guessing methodology to fill in the blanks about what you don't know?

A. That's an accurate assessment. You're taking an educated guess or a hunch as to what -- the blanks that you don't know.

Q. Did I understand you correctly when you -- I think you testified that -- I think you used the term blockchain surveillance company.

A. Yes, that's correct.

Q. Could you clarify that phrase for us. Why are you calling them blockchain surveillance companies?

A. The distinction I make -- and this is important -- if you are just analyzing the anonymous public keys on the blockchain, that could be considered analytics. And that's totally deterministic because you're just looking at relationships between these anonymous public keys, which is represented by Bitcoin addresses. If, on the other hand, you start saying which person or persons or entities are controlling these keys, then we're moving into the role of surveillance.

One element of a surveillance which is different is that you have to make sure that the surveilled don't realize how you're surveilling them. For example, you may want to keep many of our heuristics private or not disclose them because that could cause the change of behavior of the person or persons you're surveilling.

What is occurring is you have a series of public addresses which are anonymous, and then we are making that leap from those anonymous addresses to person or persons or entities.

Now, it's important -- in the Bitcoin white paper, it

specifically says this is the model for privacy in Bitcoin. The idea is that you break the link between the anonymous public address, which is essentially derived from the public key, and person, or persons.

So the moment you do that, you apply a whole bunch of heuristics that go into the surveillance. And the reason surveillance may be so popular is because you have to hide from the surveilled how you do it. If you reveal everything to the people you're surveilling, then they may change their behavior and then you would, presumably, not get the results you're looking for.

Q. Does the type of heuristic employed by a blockchain forensic or surveillance company, as you call it, would that affect the accuracy of the tracing of that software?

A. Absolutely. And not only will it affect it, the publicly disclosed ones, but also the implied ones. A good example -- let's say, for example, you say that all the transactions, all the inputs into a transaction are from the same private/public key pair. You assume that it's a heuristic.

Then you move and say, okay, some people are doing a coinjoin. And in a coinjoin, what happens is you have different public/private key pairs submitting inputs into one transaction. Well, if your heuristic doesn't take that into account, you're going to create a systematic bias or a systematic error in your results.

In fact, that was one of the explanations that I have for these -- for the discrepancies in the FATF data that was presented.

MR. EKELAND: Your Honor, at this point in time, I'd like to move the -- what's been marked for identification as Defendant's Exhibit B into evidence.

THE COURT: Any objection?

MS. PELKER: None.

THE COURT: B is admitted.

(Defendant's Exhibit B was admitted.)

BY MR. EKELAND:

Q. Dr. Cabanas, are you familiar with the term cluster in relation to Bitcoin?

A. Yes. I mean, cluster is an attribution of related addresses. One of the heuristics that are used in determining a cluster is, for example, the concept that all of the inputs come from the same key pair, from the same public/private key pair into the cluster. It may not take into consideration the impact of coinjoins.

So when you define a cluster, which is a group of related addresses, what can happen is if you have a -- if your heuristic is inaccurate, the range of that cluster, the size of that cluster, and the attribution of that cluster could change and could change significantly.

Q. I think you testified earlier about scaling. Is that --