# 24-3161

# United States Court of Appeals for the District of Columbia

THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
Hon. Randolph D. Moss
United States District Court Case 1-21-cr-00399-RDM-1

## APPENDIX
## Volume II of XVII (Pages Appx0441 - Appx0880)

TOR EKELAND, ESQ.
TOR EKELAND LAW PLLC
*Attorneys for Defendant-Appellant*
30 Wall Street, 8th Floor
New York, New York 10005
(718) 737-7264
tor@torekeland.com

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
*Attorneys for Defendant-Appellant*
800 Third Avenue, 20th Floor
New York, New York 10022
(212) 446-2346
maf@fernichlaw.com

MAKSIM NEMTSEV, ESQ.
MAKSIM NEMTSEV PC
*Attorneys for Defendant-Appellant*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
max@mnpc.law

AARON DANIEL, ESQ.
ASYMMETRIC LEGAL
*Attorneys for Defendant-Appellant*
11900 Biscayne Blvd, Suite 400
Miami, Florida 33181
(305) 979-9296
aaron@asymmetric.legal

*(See Inside Cover for Additional Counsel)*

3914



ELECTRONIC
PARALEGAL

AMY C. COLLINS, ESQ.
THE LAW OFFICE OF
   AMY C. COLLINS
*Attorneys for Defendant-Appellant*
888 17th Street, NW, Suite 1200
Washington DC 20006
(228) 424-0609
amy@amyccollinslaw.com

# TABLE OF CONTENTS

District Court Docket – US v. Sterlingov, 21-CR-00399-RDM .............Appx001

Protective Order of Governing Discovery of Hon. Randolph D. Moss,
Dated September 17, 2021 (ECF Doc. No. 18) ......................................Appx074

Preliminary Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 336) ......................................Appx079

Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 14, 2024 (ECF Doc. No. 338) ....................................Appx085

Judgment in a Criminal Case of Hon. Randolph D. Moss,
Dated November 13, 2024 (ECF Doc. No. 340) ....................................Appx091

Transcript of Motion Hearing, Dated January 13, 2023
(ECF Doc. No. 114) ................................................................................Appx099

Transcript of Motion Hearing, Dated January 31, 2023
(ECF Doc. No. 115) ................................................................................Appx190

Transcript of Motions Hearing, Dated June 16, 2023
(ECF Doc. No. 223) ................................................................................Appx345

Transcript of Motions Hearing, Dated June 23, 2023
(ECF Doc. No. 224) ................................................................................Appx501

Transcript of Motions Hearing, Dated July 19, 2023
(ECF Doc. No. 225) ................................................................................Appx682

Transcript of Continued Motions Hearing, Dated July 20, 2023
(ECF Doc. No. 226) ................................................................................Appx895

Transcript of Motions Hearing, Dated August 22, 2023
(ECF Doc. No. 228) ..............................................................................Appx1040

Transcript of Continued Motions Hearing, Dated August 23, 2023
(ECF Doc. No. 229) ..............................................................................Appx1266

Transcript of Motions Hearing, Dated August 29, 2023
(ECF Doc. No. 231) ..............................................................................Appx1466

Transcript of Pretrial Conference, Dated September 7, 2023
(ECF Doc. No. 232) ...................................................................Appx1524

Transcript of Pretrial Conference, Dated September 8, 2023
(ECF Doc. No. 233) ...................................................................Appx1741

Transcript of Pretrial Conference, Dated September 13, 2023
(ECF Doc. No. 234) ...................................................................Appx1861

Transcript of Pretrial Conference, Dated September 15, 2023
(ECF Doc. No. 235) ...................................................................Appx1999

Transcript of Pretrial Conference, Dated September 18, 2023
(ECF Doc. No. 236) ...................................................................Appx2141

Transcript of Pretrial Conference, Dated September 21, 2023
(ECF Doc. No. 237) ...................................................................Appx2235

Transcript of Motion Conference, Dated November 13, 2023
(ECF Doc. No. 238) ...................................................................Appx2302

Transcript of Jury Trial, Dated February 12, 2024
(ECF Doc. No. 276) ...................................................................Appx2350

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ...................................................................Appx2620

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ...................................................................Appx2688

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 278) ...................................................................Appx2825

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 327) ...................................................................Appx2948

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ...................................................................Appx3074

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ...................................................................Appx3189

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ........................................................Appx3331

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ........................................................Appx3446

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 281) ........................................................Appx3572

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 328) ........................................................Appx3697

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ........................................................Appx3858

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ........................................................Appx3982

Transcript of Jury Trial, Dated February 23, 2024
(ECF Doc. No. 329) ........................................................Appx4122

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ........................................................Appx4251

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ........................................................Appx4394

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 284) ........................................................Appx4419

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 330) ........................................................Appx4550

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ........................................................Appx4581

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ........................................................Appx4698

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 285) ........................................................Appx4836

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 286) ...................................................................Appx4955

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 331) ...................................................................Appx5074

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 287) ...................................................................Appx5198

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 332) ...................................................................Appx5344

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...................................................................Appx5359

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...................................................................Appx5496

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 289) ...................................................................Appx5621

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 333) ...................................................................Appx5762

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 290) ...................................................................Appx5900

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 334) ...................................................................Appx6004

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...................................................................Appx6087

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...................................................................Appx6190

Transcript of Jury Trial, Dated March 11, 2024
(ECF Doc. No. 292) ...................................................................Appx6324

Transcript of Jury Trial, Dated March 12, 2024
(ECF Doc. No. 293) ...................................................................Appx6344

Virtual Asset Analysis Expert Report of Luke Scholl,
Dated December 8, 2022................................................................Appx6400

Expert Report #1 of Elizabeth Bisbee (Nov. 2022)......................Appx6465

Expert Report #2 of Elizabeth Bisbee (Dec. 2022) ......................Appx6493

Expert Report #3 of Elizabeth Bisbee (Jul. 2023)........................Appx6522

CS-Mazars Expert Report - Device Review Summary,
Dated May 5, 2023 .......................................................................Appx6529

CS-Mazars Expert Report - IP Overlap Analysis,
Dated November 9, 2022 ..............................................................Appx6532

CS-Mazars Expert Report - IP Graph Data Excel File..............Appx6539

Criminal Complaint, Dated April 26, 2021 (ECF Doc. No. 1) .............Appx6542

Arrest Warrant, Dated April 26, 2021 (ECF Doc. No. 5)....................Appx6556

Indictment, Filed June 14, 2021 (ECF Doc. No. 8) ............................Appx6557

Superseding Indictment, Filed July 18, 2022 (ECF Doc. No. 43) .......Appx6561

Defendant's Supporting Memorandum of Law,
Dated August 1, 2022 (ECF Doc. No. 46) ...........................................Appx6567

Attachment to Memorandum of Law -
Proposed Order of Hon. Randolph D. Moss Granting Defendant's
Motion to Dismiss (ECF Doc. No. 46-1) ....................................Appx6585

Attachment to Memorandum of Law -
Defendant's Notice of Motion to Dismiss, Dated August 1, 2022
(ECF Doc. No. 46-2) ...................................................................Appx6586

Government's Opposition to Motion, Filed August 29, 2022
(ECF Doc. No. 52) .............................................................................Appx6589

Defendant's Reply to Government's Opposition to Motion,
Dated September 7, 2022 (ECF Doc. No. 57) ......................................Appx6623

Exhibit A to Defendant's Reply -
Second Declaration of Eric Garland, Dated September 7, 2022
(ECF Doc. No. 57-1) ......................................................................Appx6635

Defendant's Motions in *Limine*, Dated October 24, 2022
(ECF Doc. No. 59) ..........................................................................Appx6644

Exhibit A to Motions in *Limine* -
Letter from Tor Ekeland to Christopher B. Brown and
C. Alden Pelker, Dated September 23, 2022, with Exhibit A
(ECF Doc. No. 59-1) ......................................................................Appx6664

Defendant's Opposition to the Government's Motions in *Limine*,
Dated November 7, 2022 (ECF Doc. No. 68) ........................................Appx6680

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated March 6, 2023 (ECF Doc. No. 116) ...........................................Appx6689

Notice of Bill of Particulars for Forfeiture, Filed May 17, 2023
(ECF Doc. No. 119) ........................................................................Appx6709

Defendant's Notice of Intent to Present Expert Testimony,
Dated July 7, 2023 (ECF Doc. No. 145) ...............................................Appx6711

Exhibit A to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Francisco Cabanas (ECF Doc. No. 145-1) ...........................Appx6716

Exhibit B to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Itiel Dror (ECF Doc. No. 145-2) ..........................................Appx6725

Exhibit C to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jeffrey Fischbach (ECF Doc. No. 145-3)....................................Appx6731

Exhibit D to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jonelle Still (ECF Doc. No. 145-4) .............................................Appx6737

Exhibit E to Notice of Intent -
Summary of Qualifications and Expected Testimony for
J.W. Verret (ECF Doc. No. 145-5) ................................................Appx6741

Supplemental Summary of Qualifications and Expected
Testimony for Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 157) .......................................................................Appx6756

Notice of Expert Report for Defense Expert Jonelle Still of
Ciphertrace, Dated August 8, 2023 (ECF Doc. No. 159) .....................Appx6761

Attachment to Notice of Expert Report -
Defense Expert Report of Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 159-1) ...................................................................Appx6764

Exhibit A to Notice of Expert Report -
Data Credibility in Cryptocurrency Investigations of Ciphertrace
(ECF Doc. No. 159-2) ...................................................................Appx6805

Exhibit B to Notice of Expert Report -
Article Titled "Bitcoin: A Peer-to-Peer Electronic Cash System"
(ECF Doc. No. 159-3) ...................................................................Appx6822

Notice of Bill of Particulars, Filed August 28, 2023
(ECF Doc. No. 173) .......................................................................Appx6832

Defense Response to Government's Motion to Admit Certain
Exhibits, Dated September 4, 2023 (ECF Doc. No. 177) .....................Appx6834

Notice of Source Code Expert Bryan Bishop Regarding Independent
Analysis of Chainalysis Reactor Source Code and Request for
Production of Chainalysis Reactor Source Code and Relevant
Related Brady Material, Dated September 5, 2023
(ECF Doc. No. 179) .......................................................................Appx6843

Chainalysis' Notice in Response to the Court's Request Regarding
Protective Order, Dated September 12, 2023
(ECF Doc. No. 195) .......................................................................Appx6860

Exhibit A to Notice in Response -
[Proposed] Heuristic Information Protective Order of
Hon. Randolph D. Moss (ECF Doc. No. 195-1)............................Appx6862

Exhibit B to Notice in Response -
[Proposed] Heuristic Information Protective Order to Jonelle Still
of Hon. Randolph D. Moss (ECF Doc. No. 195-2).......................Appx6869

Heuristic Information Protective Order to Jonelle Still of Hon.
Randolph D. Moss, Dated September 13, 2023 (ECF Doc. No. 196)...Appx6877

Notice Regarding Court's Proposed Protective Order Governing
Review of Chainalysis' Proprietary Information,
Dated September 20, 2023 (ECF Doc. No. 199) ..................................Appx6884

Notice Regarding Ciphertrace Expert Testimony and Review of
Latest Chainalysis Production, Dated September 22, 2023
(ECF Doc. No. 205) ............................................................................Appx6888

Government's Response to September 18, 2023 Minute Order
Regarding Defendant's Access to Sensitive Heuristics Information
Provided by Chainalysis, Filed September 22, 2023
(ECF Doc. No. 206) ............................................................................Appx6892

Defendant's Opposition to Government's Response to
September 18, 2023, Minute Order Regarding Defendant's Access
to Sensitive Heuristics Information Provided by Chainalysis,
Dated September 29, 2023 (ECF Doc. No. 207) .................................Appx6901

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 4, 2023 (ECF Doc. No. 210) ...................................Appx6912

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 30, 2023 (ECF Doc. No. 213) .................................Appx6930

Defendant's Motion to Exclude any Testimony About Deepweb
Marketplaces, Dated February 8, 2024 (ECF Doc. No. 247)..............Appx6942

Attachment to Motion to Exclude -
[Proposed] Order of Hon. Randolph D. Moss
(ECF Doc. No. 247-2) ...............................................................Appx6950

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated February 29, 2024 (ECF Doc. No. 259)......................................Appx6951

Final Jury Instructions and Charges, Filed March 7, 2024
(ECF Doc. No. 265) .................................................................................Appx6982

Government's Motion for Preliminary Order of Forfeiture,
Filed June 7, 2024 (ECF Doc. No. 297)..................................................Appx7061

     Attachment to Motion for Preliminary Order of Forfeiture -
     Proposed Preliminary Order of Forfeiture Hon.
     Randolph D. Moss (ECF Doc. No. 297-1)...................................Appx7072

Defendant's Opposition to Government's Motion for Preliminary
Order of Forfeiture, Dated June 21, 2021 (ECF Doc. No. 305) ...........Appx7078

     Exhibit A to Defendant's Opposition -
     Article Titled "Chainalysis: Most Mixed Bitcoin Not Used
     For Illicit Purposes", Dated August 26, 2019
     (ECF Doc. No. 305-1) ................................................................Appx7095

     Exhibit B to Defendant's Opposition -
     Blockchain Address Search Result from Blockchain.com
     (ECF Doc. No. 305-2) ................................................................Appx7107

Government's Memorandum in Aid of Sentencing,
Filed August 1, 2024 (ECF Doc. No. 314)...........................................Appx7112

Sentencing Memorandum on behalf of Roman Sterlingov,
Dated August 15, 2024 (ECF Doc. No. 321) .......................................Appx7157

Memorandum Opinion of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 337) ....................................Appx7194

Defendant's Notice of Appeal, Dated November 19, 2024
(ECF Doc. No. 343) ...............................................................................Appx7214

Memorandum for All Department Employees from The Deputy
Attorney General, Subjecting "Ending Regulation by Prosecution",
Dated April 7, 2025...............................................................................Appx7217

**Trial Exhibits:**

Trial Exhibit 601 -
Darknet Market Vendor Transaction Summary
(Document in Evidence and to be Produced Upon Request Due
to Volume) ...................................................................................Appx7221

Trial Exhibit 624.........................................................................Appx7222

Trial Exhibit 625.........................................................................Appx7223

Trial Exhibit 626.........................................................................Appx7224

Trial Exhibit 627.........................................................................Appx7225

Trial Exhibit 628(A).....................................................................Appx7226

Trial Exhibit 628(B).....................................................................Appx7227

Trial Exhibit 629.........................................................................Appx7229

Trial Exhibit 630(A).....................................................................Appx7230

Trial Exhibit 630(B).....................................................................Appx7244

Trial Exhibit 631.........................................................................Appx7247

Trial Exhibit 632.........................................................................Appx7248

Trial Exhibit 633.........................................................................Appx7252

Defense Exhibit 138 -
The-Message-Game, Written by Ice White .........................................Appx7253

Defense Exhibit 139 -
Extracted Page from The-Message-Game, Written by Ice White ......Appx7413

Government Exhibit 721 and Defense Exhibit 143 -
Boox Chat ...................................................................................Appx7414

Exhibit B to Fischbach Declaration -
Declaration of Jeffrey M. Fischbach, for Defendant, Dated August 14, 2024,
with Attachment
(ECF Doc. No. 321-2) ............................................................................Appx7415

A.   That is correct.  Yes.  One of the things I work on blockchain, particularly Monero, is on the ability of the blockchain to scale.  This is an interesting problem in a different sense because if you're going to do this type of blockchain surveillance, one of the problems you'll run into is, as you make the blockchain larger, then relative to the size of your transactions, then you have a much harder task in actually identifying or trying to track transactions.

Like, for example, let's say you have $7 to $21 million of the Bitcoin; that's like one in 3 million approximately.  So you have a lot much larger volume of transactions in which you can hide the $7 transaction.  Another example, let's say you have $5 billion out of a trillion dollars.  That's a factor of 200.  So now you have a much smaller group of transactions that you can -- in which you can hide.

So the relative size of the transactions to the overall size of the blockchain is critical in determining the ability to do this type of blockchain surveillance work.  The other thing you run into -- and this is an interesting problem.  If I have an output in a blockchain, and let's say I attach a certain degree of criminality or illicit activity to a subset K, well, the total number of ways that you can choose K out of N is actually well-known theory; it's a binomial theorem in mathematics.

And that scales as N factorial divided by K factorial times N minus K factorial. And that grows faster than an exponential. So as you grow the blockchain, it becomes harder and harder to identify particular trends and transactions. It's important to look at over time the relative size of the transactions to the overall size of the blockchain in dollar value. And also at the same time, the overall number of transactions in the blockchain and the number or size of your clusters that you identify.

The larger the blockchain becomes with respect to what you're trying to identify, the harder it is.

MR. EKELAND: I'm sorry. I lost track of time. I want to make sure I'm not running over.

THE COURT: It's ten minutes past 2:00. I do have another matter at 3:00 and then one at 3:30, just so you know.

MR. EKELAND: I'm going to ask one more question, and I'll pass the witness to the government.

BY MR. EKELAND:

Q. Dr. Cabanas, the government's proffered an expert from Chainalysis named Elizabeth Bisbee in this case. She produced an expert report to the defense.

Did you have an opportunity to read that?

A. I had an opportunity to read the report, yes.

Q. And could you just briefly state for the Court what your thoughts are on that report.

A.   I have some concerns.  One of them that's very significant is the fact that there is no taking into account of coinjoins.  In particular, the heuristic that's applied, according to the report, is based on there's no conjoins and then it's supplied to a set of -- subset set of markets where one would expect significant use of coinjoins, or at least more than typically, which it was called a darknet market.

And people who will be participating in those markets may want to hide that they're participating there, so far more likely to be using coinjoins.  And they're trying to attribute clustering to these darknet markets.

And there are serious concerns when you're not taking, for example, coinjoins into account in that situation.  That's a good example.  The other problem you get into with the whole, what I call the implied heuristic, and the implied heuristic is that there's an implied assumption that everything is happening on chain.

So we're not dealing with a situation where a private key has been transferred off-chain to another person or persons.  So there's an implicit assumption that we're talking a key pair or a wallet and we're aligning that with an entity or with a person.  In fact, that is an implicit heuristic, because the assumption that has been made is that there's no off-chain transfer of private keys.

Q.   Real briefly, could you just explain the concept of

coinjoin.

A.   Coinjoin is where you would take a series of transactions that come from different private/public key pairs, and then you take transactions from those different public/private key pairs and you put them into one transaction.  Typically -- this is the assumption in Ms. Bisbee's report.  They're all going to come from the same key pair.

But in a coinjoin, you have them coming from multiple key pairs.  So that has a profound impact on your conclusions and particularly clustering.

THE COURT:  When would you want to use a coinjoin? When would you do that?

THE WITNESS:  Well, the reason you'd want to do that is to hide your spend -- that you're the person in the spend. Let's say, for example, I want to spend today .01 bitcoin, and I don't want anybody to know that I want to spend .01 bitcoin.

So I do a coinjoin with, say, 50 other people that want to spend .01 bitcoin.  And then at the end of the coinjoin, the .01 bitcoin goes somewhere.  But you don't know which of the 50 people spent it to what respective outputs.

THE COURT:  So why would the other 49 people do it?

THE WITNESS:  Same reason.  For the very same reason. That is that they want to hide where they're sending.  It's a way of getting privacy.

THE COURT:  Logistically, how do you do a coinjoin?

THE WITNESS: Logistically, what happens is there's typically someone who organizes them. You send all the transactions, and then you sign them and then a party would --

THE COURT: Is there a service that does this?

THE WITNESS: There are services. There's wallet services. In fact, there's even an entire coin called Dash that has a privacy function based on coinjoins, and they have --

THE COURT: Do you have a way of assessing or is there a way to assess -- is there a way to assess or evaluate what percentage of the transactions in a chain are coinjoin transactions?

THE WITNESS: Well, it can be very difficult. It may not be possible.

THE COURT: Is there anything you could do to figure that out? I mean, you know they exist. Do you have any idea, in general, the percentage of transactions in --

THE WITNESS: I don't have an idea of what percentage are in coinjoins, no.

MR. EKELAND: I pass the witness, Your Honor.

THE COURT: Thank you. Ms. Pelker?

MS. PELKER: Thank you, Your Honor. If you don't mind, would it be all right with the Court if I passed the binders up to the witness to flip through?

THE COURT: That's fine.

(Tendering documents to witness.)

CROSS-EXAMINATION OF

DR. FRANCISCO CABANAS

BY MS. PELKER:

Q. Dr. Cabanas, you were a physicist at the University of British Columbia until 2000; is that right?

A. Yes. I worked at Department of Physics, and then I did -- I also took a postdoctoral fellowship at -- in the Department of Chemistry, and then I worked as a research associate until 2000; that's correct, yes.

Q. What was the circumstance under which you left the university and the field?

A. Oh, I left the field for a very simple reason. I'm a baby boomer. There were no jobs in that particular market. It's just simple demographics. If you happen to be born and the generation after you is much smaller, there is not a big demand for academics that would teach that large group of people.

So I went -- I left the field simply because there was no opportunities for me in the field, simply because of the demographics.

Q. And why leave the university?

A. Pardon me?

Q. Why leave the university?

A. Well, that's precisely, because it applies to every field, every type of academic endeavor. If I was going to go to be in

the faculty, where there's less students to teach, and so that was the main reason.

So I got into other things. I got into real estate, and then I moved over to Prince George, and I did a different type of work.

Q. What is Aspen Investments?

A. Aspen Investments is my company which I now use to hold my real estate portfolio in Vancouver. I created it in 1992, and I used it initially to invest, actually, in property in the United States.

Q. Does Aspen Investments, in addition to your real estate work, also cover employment consultancy, web design, network administration?

A. What it covers is some computer work in web design for its own websites.

Q. You mentioned that around 2014 into 2017 you converted most of your Bitcoin holdings into Monero; is that right?

A. Most of it occurred in 2014, 2015. Very small percentage in 2017.

Q. Is a substantial portion of your income and retirement plan now tied in Monero?

A. I would say realistically, 50 percent, and 50 percent between real estate and cash holdings.

Q. And you've worked with the Monero core dev team since 2016, right?

A.   Yes, I was a member of the Core Team since 2016, and I was doing work for Monero considerably earlier than that.

Q.   And you've also been a part of the Monero Policy Working Group since 2020; is that right?

A.   That is correct.

Q.   And has that group written a number of papers, as well as blog posts, about Monero policy issues?

A.   Absolutely.

Q.   And looking now in the binder there, are Tabs 5 through 9 examples of that work?

A.   Let me take a look at them.  Yes, there is.  This is a response to the European Council -- European Union, that is correct.  I'm one of the authors of that work.

6, you have a response to the Financial Action Task Force.  That is correct.  Yep, that's the document.

7 is a public consultation on money laundering and finance by European Commission.  We responded to that.  And there's a response to FinCEN, a call for responses, and we responded to that.

I would say this one is interesting because we actually -- in many of the other cases we were not supportive of what was proposed.  In this particular case, we were.

Q.   Are these positions with the Monero Core Team and the Monero Policy Working Group full-time jobs?

A.   No.  They're totally volunteer.  Everything I do for the

Monero project in its entirety is completely volunteer.  I do not receive any financing at all or money from any work I do for the Monero Core Team or the Monero project in any way, shape, or form.

Q.  How many hours a month do you spend on average working for either Monero Core Team or the Monero Policy Working Group?

A.  Well, overall, on Monero, I would say I could easily spend on a monthly basis somewhere about six, seven hours a month; in that kind of range.  In some cases I may go to a talk.  After this, I'm going to Prague to give a talk at Monero conferences.  Obviously, this week I'll be spending a lot more time.  Other times it could be less.

But, yeah, I would say realistically on a monthly basis, I mean, like, easily about 10, 20 hours; in that kind of range.

Q.  I'm sorry.  Did you say 6 to 7 or 10 to 20?

A.  Per month?

Q.  Yes, per month.

A.  On a monthly basis, 10 to 20 hours is reasonable.

Q.  Do you also advocate for Monero publicly using the name Artic Mine?

A.  That is correct.  I've used that name since I signed up in Bitcointalk in 2012.

Q.  And looking at Tabs 10 and 11, do those show your profiles on the Bitcointalk -- I think you said you were a legendary

user -- as well as on Reddit using Artic Mine?

A. Let me see. This is on Tab --

Q. Tab 10 should be the Artic Mine on Reddit; 10 -- 11 should be --

A. Reddit is me, yes. 11, that's my profile on Bitcoin forum; that is correct, Bitcointalk.

Q. Do you also post under the name Artic Mine in the Monero community IRC channels?

A. That is correct, yes.

Q. Do you share your login credentials for those accounts with anyone else or allow --

A. No, absolutely not.

Q. Do you allow anyone to post on your behalf?

A. Absolutely not.

Q. Is this your first time working as an expert witness?

A. Yes.

Q. And are you being paid for your work on this case?

A. No.

Q. And are you being reimbursed for your travel expenses?

A. The vast majority, no. I've had, I think, one room paid for me and a couple of meals, but that's about it. The majority of it, no.

Q. Is that a room here in Washington, D.C., for this hearing?

A. Yes.

Q. And would you expect your travel expenses to be paid,

including lodging, for trial?

A.   No.

THE COURT:  What is a legendary user?

THE WITNESS:  Oh, a legendary user is basically a -- it's because you've been in Bitcointalk for enough time, you've contributed, and it's kind of like a status.

THE COURT:  It's like being a premiere member?

THE WITNESS:  Yes.  Someone who is there early who contributed to the project.  I'm not active, but I still have access to the account.  I do go in there regularly.

THE COURT:  Okay.

BY MS. PELKER:

Q.  How many hours have you worked on this case so far?

A.   In this particular case, probably in the nature of eight to ten at least or more; but, of course, you also have to allow the travel time, et cetera, to New York and to --

Q.  Not including travel time, just work spent on the case.

A.  Oh, work spent, yeah, I would say easily into ten hours.

Q.  How many hours would you expect to work if the case goes to trial?

A.  Well, that depends on how it goes.  But it could easily be 30, 40.

Q.  And you intend to volunteer your time for that?

A.  Absolutely.

Q.  When were you first contacted by defense counsel for this

case?

A. I actually contacted defense counsel.

Q. And when was that?

A. At the MoneroTopia meeting in Mexico City on May the 5th.

Q. May the 5th or --

A. Of this year.

Q. This year. What made you contact defense counsel?

A. I wanted, among other things, to advise them about the Financial Action Task Force report, Defendant's Exhibit B.

Q. And how had you learned about this case?

A. I learned through *Monero Talk*, and I also listened to the talk in Mexico City.

Q. *Monero Talk* is one of the public podcasts that the defense --

A. Yes, that is correct. I learned about it also when I went to MoneroTopia to give a talk myself, and I listened to the attorneys present in Mexico City.

Q. Did you, in fact, speak on a panel with defense counsel at MoneroTopia?

A. That is correct. Oh, yes.

Q. And at that point, was that part of your work on this case?

A. Well, I was starting on it.

Q. You were starting on it?

A. Yeah. I started after that. That was before I started to work and had any information about the specifics of the case in

particular because I hadn't signed any of the disclosure requirements at that point in time. I have signed them afterwards, but not at that time.

Q. So you hadn't received any of the discovery, reviewed any of it, knew anything about the case when you appeared on that talk at MoneroTopia?

A. That is correct.

Q. And you understand that on that talk at MoneroTopia, you were appearing alongside defense counsel talking about how the defendant was innocent?

A. Well, I had some very serious doubts about the methodology, which I've had for a long period of time, of using -- of surveilling the blockchain and blockchain surveillance as a means of assigning guilt or innocence in a trial. So if you go from the premise of innocent until proven guilty and you're dealing with a very -- a methodology that I have very serious doubts about, that, I think, is a reasonable presumption. A presumption of innocence is -- I believe, is standard.

Q. At that point you hadn't actually independently done any expert review of the materials to make a determination as to guilt or innocence?

A. What I knew about the case is that it was based on these type of forensics. What I had reviewed in great detail is the document that is Defense Exhibit B because I knew that ahead of time. So that I had definitely reviewed.

Q. How many hours have you spent actually reviewing the discovery produced by the government in this case?

A. I would say, like I said, most of my time has been discovery review.

Q. And does that include reviewing the defendant's financial documents?

A. Well, that, I admit, I have not as much spent because I focused primarily on the area that I have experience, which is an understanding that I've been studying, which is the blockchain surveillance part of it.

Q. You understand that part of blockchain analysis is coupling activity that's happening on the blockchain with records from other data sets, like the financial records, like Mt. Gox, like Liberty Reserve; would you agree that's part of blockchain analysis?

A. Well, it can be, but it doesn't necessarily have to be. But it is an attempt to break that relationship between the public key -- anonymous public key and assigning it to an individual or individuals.

Q. The defense expert disclosure describes you as, quote, a key contributor to the European Union's public consultation on preventing money laundering and terrorism financing; is that right?

A. That is correct.

Q. Now, turning to Tab 5, this shows the public comment that

you, as part of the Monero Policy Working Group, submitted to the EU on that point; is that correct?

A. That is correct, yes.

Q. And is that the work that the defense is describing as being a key contributor?

A. Well, this is one of them. Response for -- this is one of them, yes.

Q. And is other work regarding your contributions on Tabs 6, 7, and 8?

A. That is correct, yes.

Q. These are public comment documents; is that correct?

A. That is correct.

Q. And that's because EU, FATF, FinCEN put their work out for public comment and solicit input; is that right?

A. That is correct.

Q. FinCEN, for example, isn't it true that your comment was one of thousands of contributions from the public for input --

A. I don't remember how many comments were. I know ours was one of the few that actually supported the position of FinCEN.

Q. Now, you aren't, and you and no member of the Monero Policy Working Group are actually involved in drafting the resulting reports or the resulting regulations from the EU, from FinCEN, or from FATF?

A. I am not personally involved, but I cannot speak for the rest of the members of the group.

Q.   Speaking about FATF, we spoke a bit with defense counsel regarding the FATF document that's Defense Exhibit B, also should now be in front of you, at Tab 1 after that yellow page there.

A.   Yeah.  I got the report.

Q.   Now, is your understanding that the Financial Action Task Force sought input from the blockchain analytics companies because they are viewed as providing a source of information about illicit activity on the Bitcoin blockchain?

A.   That would be my understanding of why it was selected, yes.

Q.   And that they're, in fact, very widely used by the entities that FATF regulates?

A.   That is correct.

Q.   And turning your attention to paragraph 81 of this report -- it should be page 28 of what you have in front of you, but it was --

A.   It's paragraph 28?

Q.   Paragraph 81.  It's on page 28.

A.   Oh, page 28, paragraph 81.

         THE COURT:  I'm sorry.  This is exceedingly difficult for the court reporter, because you're both talking at the same time.  You need to wait until the question is finished before you answer, and also just speak -- continue to speak slowly.

         MS. PELKER:  For ease of reference, this would be paragraph 24 under -- page 24 of what the defense previously

admitted as Exhibit B.

THE COURT:  Okay.

THE WITNESS:  So we are talking paragraph 81, and it's important to note that each company?

BY MS. PELKER:

Q.  Yes.  Additionally, the FATF -- does that paragraph -- "Additionally, the FATF recognizes that blockchain analytics companies normally focus on detecting and tracking illicit activity as opposed to providing metrics on the size of the P2P market.  Thus, the conditions embarked on conducting this exceedingly difficult research at the request of the FATF and some may have less experience in conducting this type of macro-level analysis."

Is that what's written there in that paragraph?

A.  That is correct.

Q.  And so is this indicating that, in fact, what the FATF has asked to do and what -- the companies to do and what's shown in this report is different than the companies' usual work in blockchain analysis and tracing?

A.  That is not correct.  I don't agree with that.  Because they actually also reported on illicit activity, which is the very thing that they are supposed to be detecting on a usual micro basis.

Furthermore, they are also reporting on -- in their regular work, their also work on risk/high-risk exchanges.  So

they would need to identify those exchanges, as well as the high risk. And the first step in doing that is identifying if they're an exchange or not.

So the P2P portion of it, which it got even worse for them than the individual data on illicit activity, it's also critical to identifying high-risk exchanges. And if you look at what work these companies do, they do on a micro basis. What you're doing here is you're averaging their work, particularly in the illicit case, over large numbers of transactions, and that allows you to extract the systemic error and bias from the data set that could otherwise be -- so what has occurred here is, if you apply the same methodology that has occurred in individual day-to-day work that they're doing and you average that over the entire blockchain or very significant portions of the blockchain, then what happens is you will actually -- can easily identify a systemic bias or a systematic error or a bias.

And if I were -- what the report does identify is the relative bias. I'll emphasize this. This is the relative bias between the companies. It does not tell you whether there is a systemic bias that applies to all the companies. So what we're dealing with in this report, what that data tells you, if you take the methodologies and, yes, they say the difference -- and apply them across the entire blockchain, you're trying to identify the percentage of illicit activity by using that

methodology that's on individual cases, you get this wide range of bias.

Q. And doesn't it also then carry that, if this is not relating to the systemic bias of an individual company, but, rather, relative across the two, that there's no comparison here to the data from Chainalysis to ground truth in order to calculate what that bias may or may not be?

A. Well, it is. Because it's an indication between the relative bias from the ones that were chosen by FATF, specifically which was Chainalysis and also TRM --

THE COURT REPORTER: I'm sorry. You need to slow down.

THE WITNESS: Let me rephrase slowly. My apologies, Your Honor.

It is indicative of the relative bias between the companies involved. It does not tell you what the absolute bias is, including Chainalysis and TRM Labs, which were actually in the FATF request. We're talking about illicit activities in the Bitcoin blockchain.

What this is telling you is what the relative bias is. So it is indicative of the relative bias. It should be seen as a minimum amount of bias. It does not take into account any bias that is applicable systemic across all the companies, and it would not also take into account any random noise or any random errors with individual results. So it's an

indicative of bias.

And, again, it's common when large numbers of heuristics are used to find that one of the results is a systemic bias in the data. This is not specifically applicable in this case. This is a well-known result in the scientific literature where -- in many fields, where if you have a series of heuristics and then you apply them on our last data set, you will get systemic bias.

What I find in the FATF report is very consistent with what I would read, for example, of someone describing a medical situation or a completely different situation, where you have a set of heuristics and then you -- all a scientific situation of a set of heuristics and you, because they're applied systematically, same heuristics to a large data set, you get these systemic biases.

BY MS. PELKER:

Q. And you're basing this on your review of the FATF report in front of you, not of an independent review or statistical analysis that you've done of the --

A. No, I have not done it. I do not have access to the information. In fact, one of the difficulties with this is because a lot of the data is proprietary and, more importantly, the actual heuristics of proprietary and how they're applied. Some are disclosed; some are not.

So it is impossible to do any kind of independent

statistical review of this data unless one has all of the heuristics involved, not just the ones that are specifically disclosed.

THE COURT: By heuristics, do you simply mean assumptions?

THE WITNESS: Assumptions. Yes, assumptions. Thank you, Your Honor. That is actually a better description because it's easier to understand. Assumptions. I will use that word instead.

So the assumptions that are involved, which in many cases are -- most cases are held proprietary; unless you know that, it is not possible to do any kind of statistical analysis of the data or any kind of independent analysis. So the only report that I have found is this, and I have to do what is called -- basically, a black box report.

I'm thinking, instead of one reactor by Chainalysis, there's six reactors, and I'm looking at the different results, you get this relative bias. But to actually specifically get a handle on the actual bias itself, you need to see those assumptions that are made, which are held proprietary, and then, with knowing those assumptions, then you know what the biases are and even if the results are even feasible because there's simply too many assumptions, and what the risk and probability of error is. But without knowing the assumptions, it's impossible to do any kind of analysis.

BY MS. PELKER:

Q. To be clear, Dr. Cabanas, you've never actually used Chainalysis; is that right?

A. No, never. I don't need to.

Q. And you don't need to because Monero is considered blockchain analysis resistant, right?

A. Well, that's not actually true. Monero --

THE COURT: We're really short on time. I only have 20 minutes left. We're very short on time. Make sure you just answer her question.

THE WITNESS: My answer on this particular question is no, I don't believe that it's 100 percent resistant and, in fact, there's considerable work going on in Monero to make it more resistant.

BY MS. PELKER:

Q. And you don't actually trace blockchain transactions as part of your job?

A. No.

Q. And you don't spend any work each week devoted to blockchain analysis?

A. Well, other than what I'm describing, which is actually looking at the macro picture and how these assumptions lead to systemic errors, which you can detect without actually having to deal with it.

THE COURT: I just want to cut through this a little

bit in light of the timing here.

My understanding, based on the testimony I've heard -- correct me if I'm wrong -- my understanding is that chart you showed us early on and the chart shows a big disparity in the identification of illicit or potentially illicit transactions using Bitcoin, and given the disparity in that chart and given no other explanation for why those disparities over time would exist, you conclude, premise one, or -- that there must be some systemic bias in the system; is that fair?

THE WITNESS:  Absolutely correct, Your Honor.

THE COURT:  And how did that chart come to your attention?  How did you reach that conclusion?

THE WITNESS:  I came to that chart because I did research.  I actually downloaded a document from the Financial Action Task Force website.

THE COURT:  So someone didn't point you to that; you on your own found that chart and you reached that conclusion on your own based on that chart; is that right?

THE WITNESS:  That is correct, Your Honor.

THE COURT:  Then my question is, you then assume -- then your next step is to say there must be some assumptions that are made that are not disclosed, and some of those assumptions must inject systemic error into the blockchain analysis because you have no other explanation of why the

discrepancy would exist?

THE WITNESS: I would say that is correct. But I will say that it's relative systemic error between the -- so what this chart tells me is what the relative systemic error in between the blockchain analysis companies is. It cannot tell me what the absolute is.

THE COURT: Okay.

BY MS. PELKER:

Q. Just a couple other points.

THE COURT: I'll let you finish up. I'm sorry to interrupt.

MS. PELKER: No, no. Not at all, Your Honor. Whatever is most helpful for the Court.

BY MS. PELKER:

Q. Now, Dr. Cabanas, your primary focus is Monero; is that right?

A. In a cryptocurrency right now, it is. Although I'm -- actually, on a talk that I'm going to be giving in Prague also deals with Bitcoin.

Q. And Monero is based on a different code than Bitcoin; isn't that right?

A. In the sense of the actual transaction structure, yes, that is correct.

Q. And Monero is specifically designed to be less traceable than Bitcoin?

A.   That is correct, yes.

Q.   And Monero, in fact, has a nontransparent blockchain, unlike the Bitcoin blockchain, which is transparent; is that right?

A.   No.   I disagree with that point of view because I do not believe that the Bitcoin blockchain is totally transparent. Once you move from the -- we are dealing with anonymous public keys, and we're trying to ascertain them to person to person.

So I do not believe on the premise that Bitcoin blockchain is transparent at all.   It is designed to create plausible deniability.

Q.   And the Bitcoin blockchain information that's recorded includes transaction inputs, transaction outputs, and amount; is that right?

A.   Yes.   That is correct, yes.

Q.   And that information is, in fact, concealed on the Monero blockchain?

A.   The amounts are concealed; that is correct.

Q.   And that's --

A.   Well, let me explain.

THE COURT:   I'm sorry.   I would let you explain ordinarily, but we're so short on time.   If you can just answer her questions, that would be helpful.

BY MS. PELKER:

Q.   And isn't it true that blockchain analysis for Bitcoin

relies on that public transaction ledger with inputs, outputs, amounts that's not viewable on Monero?

A. Yes, that's correct, and relies -- however, relies is a separate question.

Q. Is part of your work with the Monero Core Group and the Monero Policy Working Group to encourage adoption of Monero?

A. That is correct.

Q. Isn't one of the barriers to Monero adoption, as you perceive it, that many exchanges with anti-money laundering programs have banned Monero?

A. Well, I would say the perception is that, by relying on blockchain surveillance as opposed to more traditional forms of anti-money laundering technique, such as what was proposed by FinCEN, it disadvantages [sic] more error; that is correct.

This is one of the reasons why we supported -- United States is actually the exception as far as this matter. Because both U.S. Congress and FinCEN took a position that the way to deal with this was to deal with traditional approach that you would use for anti-money laundering, which is, essentially, know your customer as opposed to attempting to surveil the blockchain.

So we -- this is one of the reasons why we were supportive of the FinCEN proposal and not supportive of a lot of the EU proposals.

Q. Now, turning your attention briefly to Tab 9 of that Monero

Policy Working Group material, the Monero Policy Working Group has, in fact, observed every respective -- quote, every respectable exchange uses blockchain analysis; is that right?

A. I think that they observe that it's the case because they feel obligated, yes.

Q. And, in fact, don't you blame the blockchain analysis companies, like Chainalysis, for contributing to Monero delisting on the exchanges?

A. I have very strong suspicions, what I would consider circumstantial evidence, that Chainalysis was involved in delisting exchanges, Monero from exchanges, yes; that is correct.

Q. Have you vocally made public comments to that effect criticizing Chainalysis and blockchain analysis --

A. I'm specifically being critical of the technique, and it would apply to all the blockchain surveillance companies, that is correct.

Q. And, in fact, at a *Monero Talk* interview in 2021, did you say, quote, the Monero is under attack and one of the major threats that Monero faces right now is attacks by certain companies that want to engage in blockchain surveillance; and you then tied that blockchain surveillance and blockchain analysis to a major drop in the price of Monero as a result of delisting?

A. There was a delisting and a major drop, but, yes, it is a

factor in my opinion.  It can be a factor.  I would agree with that point of view.

I mean, because, essentially, what Monero does is it demonstrates the failure of blockchain surveillance.  It fails in Bitcoin, but Monero actually makes it obvious that it doesn't work.  I would argue right now that one of the major arguments for Monero is to avoid false accusations.

Q.  Isn't it actually true that you see yourself and the Monero community in an arms race with blockchain analysis companies like Chainalysis?

A.  I don't think we can win the arms race.  But the Monero community responds to what are in many cases, we're going to do this and we're going to do that; they turn around and simply erase the -- the number of rings from, say, 11 to 16 in response to claims made by blockchain surveillance companies.

But that doesn't mean those -- it's simply a risk-averse response.  I mean, you hear the claims, and then you turn around and harden the protocol.

Q.  Did you do an interview with the podcast *Crypto Vigilante* where you said:  The evidence is the blockchain surveillance or chain analysis companies will not be able to break Monero, and we will keep toughening it up; after characterizing yourself as in an arms race against privacy with chain analysis companies on Reddit?

A.  I believe that would be very difficult for them to break

Monero.  I believe that the potential for false accusations and a lot of harm is actually -- of Monero from blockchain surveillance, yes.

Q.  I'd like to turn your attention to Tabs 14 and 15.

MS. PELKER:  And then I'll wrap up, Your Honor.  I know we're short on time here.

THE COURT:  Okay.

THE WITNESS:  15 you have -- that would be an extract from Reddit from what I can tell.  That's before that.

BY MS. PELKER:

Q.  Are these, in fact, public comments that you've made about your views of the blockchain analysis companies and their work?

A.  That would be Tab 15, you say?

Q.  Yes.  14 should be a post there.

A.  That would be a comment that I would make.  That is correct.  That would be my views.

Q.  Are you aware that defense counsel has indicated that they're going to put Chainalysis on trial and put blockchain analysis on trial?

A.  Pardon me?

Q.  Are you aware that defense counsel --

A.  That is something that I have heard privately when I was in Mexico City, yes.

MS. PELKER:  Okay.  Your Honor, at this point we would seek to admit Exhibits 14, 15, 9, and I believe that is

it.

THE COURT: There were some others that you pointed me towards.

MS. PELKER: To the extent the Court thinks that they're helpful, 4, 5, 6 -- sorry -- 5, 6, 7, 8.

THE COURT: 5, 6, 7, 8, 9, 14, 15?

MS. PELKER: 5, 6, 7, 8, 9 -- I think the others were just for identification -- and then 14 and 15.

THE COURT: Any objection, Mr. Ekeland?

MR. EKELAND: Just to be clear, Exhibits 5 through 9 and 14 and 15?

THE COURT: Correct.

MR. EKELAND: No objection.

THE COURT: Okay. Those exhibits are admitted.

(Exhibits 5 through 9 and 14 and 15 were admitted.)

MS. PELKER: Thank you, Your Honor.

THE COURT: All right. It's about ten minutes of 3:00. Mr. Ekeland, if you want a few minutes for redirect, I'll give that to you.

MR. EKELAND: I'll keep it short.

THE COURT: I think, unfortunately, we're going to have to bring the other witness back another day, I'm afraid.

MR. EKELAND: That's okay. I don't need to go too long.

THE COURT: We only have ten minutes, so we're not

going to handle the other witness in ten minutes.

MR. EKELAND:  I think we've sufficiently established his credentials.  I would like to ask him one more question, if possible.

THE COURT:  I'm telling you, you have time if you want.

MR. EKELAND:  Okay.  Thank you.

REDIRECT EXAMINATION OF

DR. FRANCISCO CABANAS

BY MR. EKELAND:

Q.  Dr. Cabanas, you mentioned that -- you said that you don't think that the blockchain is completely transparent.  Did I hear you correct on that?

A.  Yes.  Actually, what it does in the case of Bitcoin -- I presume you're talking about Bitcoin?

Q.  Yes.

A.  The blockchain is designed to create plausible deniability. This is actually a design that is described right in the actual Bitcoin white paper when it was written back in 2008.  I think that there is an underestimation of the degree of privacy in Bitcoin.

Q.  I also -- if I heard you correctly, I think you testified that one of your concerns with the blockchain surveillance companies was a possibility of false accusations and the harm that follows from that.

Could you just elaborate why you think there's this danger of false accusations resulting from blockchain surveillance software?

A. Well, basically, because what can happen is that a person could have -- they could be in jail for some number of years. Even if you then turn around and prove innocence and the person gets acquitted or gets -- there's real potential for harm just by -- not only by creating a false positive in a person who is falsely accused; but at the same time, for every false positive, there's also a false negative. So there is a guilty person that is running around free.

MR. EKELAND: No further questions, Your Honor.

THE COURT: So you're welcome to step down. Thank you.

I don't know what, if anything, you-all want to do with the next ten minutes we have, and we're going to have to reschedule for the remainder of the proceeding.

MS. PELKER: Your Honor, do you expect your sentencing to go up through the end of the day rather than --

THE COURT: I have a hearing in a criminal matter at 3:00 and then a sentencing at 3:30, which is going to go to 4:30. I'm reluctant to keep the staff here much beyond that on a Friday afternoon.

MS. PELKER: Understood, Your Honor. We do have time in the schedule next Friday given that Mr. Gronager will not be

appearing, so that we can handle the motion arguments then. I'm not sure what Mr. Scott's availability is going to be for next Friday.

One other flag, though, Your Honor. The government does not believe that the defense has met their burden to *Daubert*. The government's non-blockchain experts, which would be Ms. Mazars de Mazarin and Mr. St. Jean -- and we'd be happy to be heard on that. But, most importantly, Ms. Mazars de Mazarin's partner very unexpectedly passed away on Wednesday, and she is not going to be at work next week. We're going to need to reschedule her hearing.

THE COURT: That's not a problem at all. You can pass along the Court's condolences. We have enough time that we can reschedule that in a period of time when it's appropriate.

MS. PELKER: Thank you, Your Honor.

THE COURT: That's not an issue.

Mr. Ekeland, anything else you want to address before we --

MR. EKELAND: I need to check with Mr. Scott on --

THE COURT REPORTER: Can you please speak into the mic.

MR. EKELAND: So I need to check on Mr. Scott's schedule, but I don't expect this to be a problem, particularly if we're able to take his testimony via Zoom; that's okay with

the defense.

THE COURT: If it's okay with the government, I don't mind doing it that way.

MR. BROWN: Your Honor, we created -- Your Honor, we previewed in our expert opposition that the concerns with Mr. Scott are particularly deep, and we believe that we really do need in-person testimony --

THE COURT: Okay.

MR. BROWN: -- for Mr. Scott.

THE COURT: We'll just have to find a time when he's available to do it in person then.

MR. EKELAND: The defense understands that. That may mean we won't be able to do it on next Friday, but we'll figure it out.

THE COURT: We'll find some time over the course of the summer to schedule all of that.

Are there other experts, Mr. Ekeland, that overlap with Mr. Cabanas, or is he the principal expert that you're offering on those topics?

MR. EKELAND: We've got Dr. Cabanas; we have Mr. Fischbach who, if I recall what the government's response to Mr. Fischbach was, depending on if we change our expert disclosure -- modify our expert disclosure in some way, we might be able to come to an agreement on him.

Am I remembering that right.

MS. PELKER: Yes. The government's objection to the expert disclosure, Your Honor, is that it basically just copies/pastes for each individual witness. It's very difficult to tell. Dr. Cabanas was supposedly an expert in blockchain tracing; it's clear that he doesn't do blockchain tracing. So we really have no idea what any of the experts are testifying to.

THE COURT: That was sort of -- you're going in the direction that I was. I'm not saying I'm going to exclude him as an expert witness at this point. I don't know. But it did seem clear to me that the -- to the extent he is an expert, his area of expertise is fairly limited, and that he's -- so I just have concerns about offering him as your principal expert in the case. I just wanted to make sure you had more in the works. I didn't want to put you in a position where I end up excluding him as an expert, and you're back to ground zero looking for an expert on the core issue in the case.

MR. EKELAND: I didn't totally hear what you said, Your Honor, the last part.

THE COURT: What I said was that I had concerns about his testimony. It may be that the notice is just overbroad and you don't intend to offer him for all the purposes. But you certainly didn't lay a foundation of his expertise as to many of the topics in the expert notice.

And, even more narrowly, I do have some concerns, and

I just wanted to make sure that you weren't going to be caught off-guard where he was your principal expert in the case that, I take it, will be very expert-driven. And so I just wanted to put you on some notice as to that.

If you have other experts that overlap, that's less of an issue. If you don't, I just wanted to make sure that I was flagging that for you so that, even if at a late date you still need to identify another expert, you can.

But dealing with someone who is trained in physics, who didn't really have any expertise, as far as I can tell, in blockchain analysis itself other than having read some papers and having been himself involved in the cryptocurrency industry as an investor and as an advocate, I do have concerns more broadly about his expertise. And there may be narrow areas in which he can offer expert testimony.

I'm just offering that now to you. This is not my opinion or decision on this; I want to study things more carefully. I'm just mentioning this now because I want to make sure you're not caught without an expert on key issues.

Okay. I will see you-all then next Friday unless there's anything else you want me to address today?

MS. PELKER: Nothing further from the government, Your Honor.

THE COURT: Mr. Ekeland, anything else?

MR. EKELAND: Nothing further from the defense, Your

Honor.  Thank you.

THE COURT:  Thank you all.

(The hearing adjourned at 3:00 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, TAMARA M. SEFRANEK, do hereby certify that the
above and foregoing constitutes a true and accurate transcript
of my stenographic notes and is a full, true and complete
transcript of the proceedings to the best of my ability.
        Dated this 30th day of June, 2023.



                        /s/ Tamara M. Sefranek
                        Tamara M. Sefranek, RMR, CRR, CRC
                        Official Court Reporter
                        Room 6714
                        333 Constitution Avenue, N.W.
                        Washington, D.C.  20001

| $ | | 2021 | 2022 | 2023 | 20530 |
|---|---|---|---|---|---|

**$**

**$100** [1] - 80:3
**$21** [1] - 97:10
**$334** [1] - 75:6

**/**

**/s** [1] - 134:9

**0**

**01** [4] - 100:15, 100:16, 100:18, 100:19

**1**

**1** [1] - 112:3
**1.6** [1] - 91:2
**10** [7] - 87:24, 105:14, 105:16, 105:19, 105:24, 106:3
**100** [1] - 118:12
**10005** [1] - 1:17
**102** [1] - 2:6
**10:00** [1] - 1:6
**11** [4] - 105:24, 106:3, 106:5, 124:14
**11:25** [1] - 42:8
**12** [1] - 87:18
**12-month** [1] - 88:18
**12.7** [1] - 89:17
**120** [1] - 6:22
**122** [1] - 78:1
**126** [3] - 2:13, 2:14, 42:11
**127** [1] - 2:8
**127-1** [1] - 62:16
**12:30** [1] - 76:22
**130** [1] - 78:2
**131** [1] - 50:7
**13th** [1] - 49:21
**14** [8] - 2:14, 125:4, 125:14, 125:25, 126:6, 126:8, 126:11, 126:15
**15** [9] - 2:14, 125:4, 125:8, 125:13, 125:25, 126:6, 126:8, 126:11, 126:15
**16** [14] - 1:5, 12:24, 13:12, 13:22, 14:13, 16:11, 19:21, 21:9, 21:13, 22:1, 22:8, 24:19, 34:20, 124:14
**17** [9] - 3:21, 4:2, 10:11, 10:22, 21:16, 32:4, 33:3, 33:9,

39:6
**17(c** [17] - 4:9, 8:5, 9:20, 9:23, 11:10, 12:4, 12:7, 12:9, 12:21, 13:3, 14:13, 15:14, 19:22, 20:2, 22:15, 22:16, 43:13
**17(c)** [1] - 8:19
**17(c)(1** [2] - 8:14, 39:7
**17(c)(1)** [1] - 8:23
**18** [1] - 80:4
**19** [1] - 28:7
**1970** [1] - 24:22
**1970s** [2] - 10:12, 10:17
**1975** [1] - 78:14
**1979** [1] - 78:13
**1982** [1] - 78:12
**1983** [1] - 40:18
**1988** [1] - 78:11
**1992** [1] - 103:8
**1:21-CR-0399** [1] - 1:3
**1:30** [1] - 76:21
**1:35** [1] - 76:22

**2**

**2** [8] - 35:23, 36:3, 36:4, 36:8
**2.5** [1] - 89:24
**20** [4] - 105:14, 105:16, 105:19, 118:9
**200** [1] - 97:14
**2000** [3] - 84:8, 102:6, 102:10
**20001** [3] - 1:12, 1:24, 134:11
**2003** [1] - 79:19
**2006** [1] - 59:11
**2008** [1] - 127:19
**2011** [5] - 79:8, 80:1, 80:2, 81:23, 81:24
**2012** [4] - 80:4, 80:7, 84:3, 105:23
**2013** [3] - 53:3, 80:7, 84:18
**2014** [7] - 50:22, 53:3, 54:5, 80:22, 84:8, 103:16, 103:18
**2015** [4] - 23:14, 54:5, 80:24, 103:18
**2016** [4] - 81:3, 89:13, 103:24, 104:1
**2017** [3] - 81:2, 103:16, 103:19
**2019** [1] - 89:17
**202-354-3246** [1] - 1:24
**2020** [2] - 89:13, 104:4

**2021** [1] - 123:18
**2022** [1] - 30:13
**2023** [2] - 1:5, 134:7
**20530** [1] - 1:14
**21-399** [1] - 3:2
**23rd** [7] - 11:14, 42:16, 60:4, 60:6, 60:8, 61:10
**24** [3] - 80:18, 112:25
**25** [2] - 49:9, 80:18
**26** [2] - 88:15, 89:7
**27** [1] - 89:11
**270** [1] - 67:10
**28** [4] - 112:15, 112:17, 112:18, 112:19
**299** [1] - 5:19
**2:00** [1] - 98:14
**2d** [1] - 59:10

**3**

**3** [4] - 10:7, 89:11, 89:12, 97:10
**30** [3] - 1:17, 107:22, 128:22
**30,000** [2] - 84:18, 85:13
**30th** [1] - 134:7
**31** [1] - 10:7
**333** [2] - 1:23, 134:11
**36** [1] - 59:10
**378** [1] - 5:19
**3:00** [4] - 98:15, 126:18, 128:21, 133:3
**3:30** [2] - 98:15, 128:21
**3d** [1] - 5:19

**4**

**4** [5] - 36:4, 65:19, 87:17, 126:5, 128:21
**40** [1] - 107:22
**403** [1] - 5:5
**42** [1] - 7:3
**425** [1] - 1:19
**435** [1] - 59:10
**49** [1] - 100:21

**5**

**5** [14] - 2:13, 35:23, 36:4, 36:9, 89:17, 97:13, 104:9, 110:25, 126:5, 126:6, 126:7, 126:10, 126:15
**5.7** [1] - 3:23

**50** [5] - 12:13, 100:17, 100:20, 103:22
**51** [1] - 19:24
**559** [1] - 10:7
**57.7** [1] - 62:11
**57.7(b** [5] - 62:7, 63:10, 65:5, 65:18, 75:16
**57.7(b)** [3] - 62:19, 63:25, 76:1
**5th** [2] - 108:4, 108:5

**6**

**6** [8] - 65:19, 104:14, 105:16, 111:8, 126:5, 126:6, 126:7
**6,000** [1] - 27:8
**60** [1] - 34:18
**601** [1] - 1:11
**6714** [2] - 1:23, 134:10
**6th** [3] - 71:23, 72:21, 72:24

**7**

**7** [10] - 79:19, 89:24, 97:9, 97:12, 104:16, 105:16, 111:9, 126:5, 126:6, 126:7
**78** [1] - 2:5

**8**

**8** [8] - 28:4, 28:5, 28:6, 28:8, 111:9, 126:5, 126:6, 126:7
**80** [1] - 87:24
**81** [5] - 12:13, 112:14, 112:18, 112:19, 113:3
**86** [1] - 2:11
**8th** [1] - 1:17

**9**

**9** [8] - 2:13, 104:9, 122:25, 125:25, 126:6, 126:7, 126:10, 126:15
**901** [2] - 51:2, 58:21
**925,000** [1] - 35:14
**93** [4] - 4:1, 4:2, 4:7, 10:7
**94105** [1] - 1:20
**95** [2] - 4:1, 4:3
**950** [1] - 1:14
**96** [1] - 2:12
**99** [1] - 80:24

**A**

**A-something** [1] - 13:14
**A.M** [1] - 1:6
**ability** [4] - 81:11, 97:2, 97:19, 134:6
**able** [15] - 12:17, 18:20, 19:13, 29:21, 32:11, 53:13, 57:7, 61:25, 66:4, 82:17, 83:24, 124:21, 129:25, 130:13, 130:24
**absolute** [2] - 115:16, 120:6
**absolutely** [8] - 11:25, 38:22, 95:15, 104:8, 106:12, 106:14, 107:24, 119:11
**absorb** [1] - 10:2
**absurd** [1] - 15:24
**abusive** [1] - 7:9
**academic** [2] - 41:12, 102:25
**academics** [1] - 102:17
**accepted** [1] - 43:5
**access** [8] - 18:6, 23:7, 23:9, 23:11, 23:12, 23:19, 107:10, 116:20
**accessible** [1] - 37:24
**accompanying** [1] - 15:16
**accomplished** [1] - 45:14
**according** [2] - 51:21, 99:3
**account** [9] - 85:9, 85:17, 85:18, 95:24, 99:2, 99:13, 107:10, 115:23, 115:24
**accounts** [2] - 50:14, 106:10
**accuracy** [2] - 40:23, 95:14
**accurate** [3] - 86:15, 93:24, 134:4
**accusation** [4] - 39:23, 49:17, 50:9, 69:23
**accusations** [5] - 30:6, 124:7, 125:1, 127:24, 128:2
**accused** [3] - 26:24, 68:20, 128:9
**accusing** [1] - 75:5
**acquittal** [1] - 40:8
**acquitted** [2] - 15:22,

128:7
act [1] - 29:7
acted [1] - 21:6
Action [9] - 1:2, 87:11, 87:23, 88:22, 88:23, 104:14, 108:9, 112:6, 119:16
action [1] - 40:9
active [1] - 107:9
activities [2] - 72:2, 115:19
activity [10] - 87:19, 89:6, 89:10, 97:22, 110:12, 112:9, 113:9, 113:21, 114:5, 114:25
actor [1] - 40:21
actual [5] - 91:22, 116:23, 117:19, 120:22, 127:18
ad [4] - 64:13, 65:8, 74:25, 75:6
add [1] - 6:10
addition [4] - 12:15, 12:21, 15:2, 103:11
additional [1] - 49:22
Additionally [1] - 113:7
additionally [2] - 11:12, 113:6
additions [1] - 28:22
address [17] - 7:18, 12:1, 28:25, 35:13, 36:2, 41:10, 57:1, 77:4, 79:1, 83:6, 83:9, 83:19, 87:19, 89:3, 95:3, 129:18, 132:21
addressed [2] - 40:4, 60:11
addresses [8] - 35:8, 87:15, 87:20, 94:12, 94:22, 94:23, 96:15, 96:21
addressing [2] - 21:17, 31:6
adjourned [1] - 133:3
adjournment [4] - 9:8, 9:18, 9:22, 39:13
administration [3] - 79:7, 79:23, 103:13
administrator [2] - 45:2, 79:10
admissibility [10] - 5:17, 7:14, 10:4, 12:18, 39:16, 44:10, 54:24, 59:19, 59:20, 61:8
admissible [11] - 5:24, 6:3, 7:16, 13:4, 14:8,

15:1, 31:1, 47:8, 48:18, 49:4, 54:22
admit [2] - 110:7, 125:25
admitted [9] - 9:24, 70:5, 86:23, 86:24, 96:9, 96:10, 113:1, 126:14, 126:15
ADMITTED [1] - 2:10
adoption [2] - 122:6, 122:8
advance [3] - 8:14, 13:5, 60:16
advise [1] - 108:8
advocate [2] - 105:20, 132:13
affect [3] - 85:3, 95:14, 95:15
affects [1] - 68:12
afraid [1] - 126:22
afternoon [2] - 77:7, 128:23
afterwards [1] - 109:3
agent [6] - 21:6, 22:7, 64:25, 65:1, 65:3, 69:7
agents [1] - 64:23
ago [2] - 10:18, 63:15
agree [7] - 12:5, 32:3, 52:18, 58:20, 110:14, 113:20, 124:1
agreement [1] - 130:24
ahead [3] - 3:25, 76:24, 109:24
aim [1] - 91:8
aimed [2] - 13:24, 49:13
Albaladejo [1] - 5:19
ALDEN [1] - 1:13
Alden [1] - 3:8
algorithmic [1] - 26:20
algorithms [2] - 24:7, 28:21
alibi [2] - 38:2, 38:8
aligning [1] - 99:21
allegation [1] - 38:19
allegations [4] - 5:2, 5:10, 45:8, 74:21
allege [1] - 50:18
alleged [1] - 3:22
allegedly [2] - 13:11, 45:13
alleviate [1] - 43:6
allow [4] - 35:18, 106:11, 106:13, 107:15
allows [4] - 6:5, 83:7, 83:8, 114:10

alone [1] - 19:24
alongside [1] - 109:9
alteration [1] - 59:21
altered [3] - 59:14, 59:17, 59:25
alternate [1] - 84:7
alternative [1] - 82:18
amenable [1] - 77:11
amended [4] - 26:1, 26:4, 26:7, 26:8
Amendment [1] - 70:24
America [1] - 3:3
AMERICA [1] - 1:2
amount [4] - 81:4, 92:16, 115:22, 121:13
amounts [2] - 121:18, 122:2
analogize [1] - 35:21
analogy [1] - 37:25
analysis [43] - 8:5, 16:8, 16:9, 19:6, 23:23, 24:5, 25:2, 25:3, 25:4, 32:22, 33:6, 35:11, 35:18, 36:22, 39:19, 44:9, 57:6, 78:19, 78:20, 110:11, 110:15, 113:13, 113:19, 116:19, 117:12, 117:13, 117:25, 118:6, 118:20, 119:25, 120:5, 121:25, 123:3, 123:6, 123:14, 123:23, 124:9, 124:21, 124:23, 125:12, 125:19, 132:11
analytic [1] - 79:18
analytics [3] - 94:9, 112:7, 113:7
analyze [6] - 14:11, 25:12, 25:17, 29:17, 39:13, 55:4
analyzed [1] - 18:5
analyzing [4] - 44:18, 53:3, 56:13, 94:8
ancillary [2] - 51:4, 54:13
Andy [2] - 51:11, 68:20
animosity [1] - 49:13
announced [1] - 46:19
anomalous [2] - 37:10, 37:11
anonymous [9] - 83:16, 83:18, 94:8, 94:11, 94:22, 94:23,

95:2, 110:18, 121:7
answer [11] - 19:1, 19:17, 23:24, 61:16, 61:21, 73:3, 73:18, 112:23, 118:10, 118:11, 121:22
anti [5] - 85:20, 89:1, 122:9, 122:13, 122:19
anti-money [5] - 85:20, 89:1, 122:9, 122:13, 122:19
anyway [2] - 33:17, 72:1
apologies [1] - 115:13
apologize [1] - 45:3
appear [3] - 11:14, 64:25, 76:1
appearance [3] - 53:17, 61:6, 62:1
appearances [2] - 63:1, 63:6
appeared [1] - 109:5
appearing [4] - 63:24, 73:2, 109:9, 129:1
appendices [1] - 35:10
appendix [1] - 35:12
applicable [3] - 90:1, 115:23, 116:4
applied [3] - 99:3, 116:14, 116:23
applies [3] - 67:7, 102:24, 114:21
apply [7] - 27:18, 67:12, 95:5, 114:12, 114:24, 116:7, 123:16
appreciate [8] - 11:8, 12:3, 42:14, 65:12, 66:24, 75:2, 76:19, 76:20
approach [4] - 83:13, 86:6, 88:7, 122:18
approaches [1] - 27:17
approaching [1] - 82:7
appropriate [7] - 5:4, 13:15, 14:13, 62:3, 64:8, 89:2, 129:15
approval [3] - 8:5, 39:8, 39:9
approved [2] - 7:20, 71:11
April [1] - 30:13
area [7] - 37:6, 38:15, 53:9, 81:14, 89:3, 110:8, 131:12
areas [1] - 132:14

arguable [1] - 9:4
argue [3] - 57:12, 60:7, 124:6
argued [1] - 59:16
arguing [2] - 22:4, 56:24
argument [2] - 22:9, 62:13
arguments [7] - 22:11, 59:13, 64:11, 72:21, 84:20, 124:7, 129:1
arms [3] - 124:9, 124:11, 124:23
arrest [4] - 40:24, 65:2, 71:2, 71:6
arresting [1] - 69:3
Artic [4] - 105:21, 106:1, 106:3, 106:7
article [2] - 71:1, 74:7
articles [1] - 73:15
ascertain [2] - 93:19, 121:8
ASIC [1] - 79:5
aspect [1] - 19:20
Aspen [3] - 103:6, 103:7, 103:11
assembler [1] - 79:5
asserted [1] - 41:24
assertion [1] - 39:23
assess [2] - 101:10
assessing [1] - 101:9
assessment [2] - 32:19, 93:24
Asset [1] - 88:19
assets [1] - 88:19
assigning [2] - 109:14, 110:18
associate [3] - 42:22, 49:15, 102:9
associated [5] - 4:10, 64:24, 80:10, 87:19, 87:21
assume [5] - 18:15, 19:1, 60:10, 95:19, 119:21
assumed [1] - 64:6
assumption [7] - 19:2, 19:3, 91:25, 99:16, 99:20, 99:23, 100:6
assumptions [14] - 24:3, 29:20, 117:5, 117:6, 117:8, 117:10, 117:20, 117:21, 117:23, 117:24, 118:22, 119:22, 119:24
atmospherics [1] - 43:2
attach [1] - 97:21
attack [3] - 75:6, 82:5,

123:19
**attacked** [1] - 49:17
**attacks** [8] - 64:13, 65:8, 74:25, 79:15, 81:12, 81:13, 81:18, 123:20
**attempt** [1] - 110:17
**attempting** [1] - 122:20
**attention** [8] - 74:13, 75:16, 75:22, 76:4, 112:14, 119:13, 122:25, 125:4
**attorney** [3] - 63:23, 64:3, 65:9
**Attorney's** [1] - 8:3
**attorneys** [6] - 62:18, 65:5, 65:15, 72:3, 73:1, 108:17
**attract** [1] - 64:14
**attribute** [1] - 99:10
**attribution** [2] - 96:14, 96:23
**audiences** [1] - 65:23
**audiotapes** [1] - 26:19
**August** [2] - 80:1, 81:24
**AUSA** [4] - 3:6, 14:20, 14:23, 49:9
**Austrian** [1] - 28:12
**authentic** [6] - 52:4, 54:9, 55:10, 55:14, 57:10, 58:16
**authentication** [6] - 59:19, 59:20, 60:2, 60:3, 60:15, 61:9
**authenticity** [11] - 50:21, 50:23, 53:7, 54:4, 54:11, 57:9, 57:18, 58:25, 59:4, 59:11
**author** [1] - 64:16
**authority** [3] - 5:18, 7:22, 7:24
**authorized** [1] - 15:15
**authors** [1] - 104:13
**availability** [1] - 129:2
**available** [3] - 17:3, 35:10, 130:11
**Avenue** [3] - 1:14, 1:23, 134:11
**average** [2] - 105:5, 114:14
**averaged** [1] - 90:21
**averaging** [2] - 91:10, 114:8
**averse** [1] - 124:17
**averted** [1] - 85:13
**avoid** [2] - 65:21, 124:7

**avoidable** [1] - 63:8
**avoiding** [1] - 24:19
**aware** [6] - 7:24, 8:1, 8:4, 11:12, 125:17, 125:21

**B**

**b)(3** [1] - 65:19
**baby** [1] - 102:13
**bachelor's** [1] - 78:12
**backup** [5] - 51:22, 51:25, 52:9, 53:12, 53:23
**badly** [1] - 30:2
**bang** [1] - 24:18
**bank** [6] - 38:1, 38:3, 38:4, 38:6, 38:10
**banking** [1] - 84:25
**bankruptcy** [13] - 44:15, 44:17, 45:1, 45:9, 45:16, 45:17, 46:11, 51:8, 52:3, 54:8, 54:12, 56:10, 86:2
**banned** [1] - 122:10
**barking** [1] - 73:16
**barriers** [1] - 122:8
**base** [1] - 82:17
**based** [14] - 23:21, 37:13, 48:24, 57:13, 68:13, 73:19, 85:2, 91:21, 99:4, 101:7, 109:22, 119:2, 119:19, 120:20
**bases** [3] - 16:7, 20:5, 34:24
**basic** [3] - 18:6, 83:10, 83:13
**basics** [1] - 17:16
**basing** [1] - 116:17
**basis** [20] - 11:16, 13:23, 18:18, 19:22, 22:8, 38:23, 40:4, 49:21, 58:21, 59:22, 61:17, 62:4, 62:22, 70:1, 82:18, 105:8, 105:14, 105:19, 113:23, 114:7
**became** [2] - 80:5, 81:9
**becomes** [2] - 98:3, 98:10
**BEFORE** [1] - 1:8
**beginning** [1] - 25:10
**behalf** [3] - 11:6, 13:13, 106:13
**behaving** [1] - 30:2
**behavior** [2] - 94:19, 95:9

**behind** [2] - 24:20, 83:4
**beneficial** [1] - 60:14
**Berlin** [1] - 70:18
**Bernhard** [1] - 28:15
**best** [5] - 15:24, 44:13, 44:19, 46:25, 134:6
**better** [2] - 39:8, 117:7
**between** [16] - 28:11, 42:1, 63:20, 87:17, 87:24, 89:13, 89:22, 94:11, 95:2, 103:23, 110:17, 114:20, 115:8, 115:15, 120:3, 120:5
**beyond** [6] - 9:16, 59:6, 68:10, 70:12, 74:22, 128:22
**bias** [37] - 78:23, 79:1, 89:21, 89:23, 89:25, 90:1, 90:5, 90:6, 90:13, 90:17, 90:18, 91:2, 91:14, 95:24, 114:11, 114:16, 114:17, 114:19, 114:21, 115:2, 115:4, 115:7, 115:9, 115:15, 115:17, 115:20, 115:21, 115:22, 115:23, 116:1, 116:4, 116:8, 117:18, 117:19, 119:9
**biases** [3] - 90:11, 116:15, 117:22
**big** [3] - 9:8, 102:16, 119:4
**biggest** [1] - 82:22
**billion** [1] - 97:13
**bind** [1] - 65:15
**binder** [1] - 104:9
**binders** [1] - 101:24
**binds** [2] - 65:5, 65:15
**Binh** [3] - 8:2, 10:20
**binomial** [1] - 97:24
**Bisbee** [9] - 17:20, 44:2, 47:15, 47:17, 47:20, 47:25, 61:19, 98:20
**bisbee's** [1] - 100:6
**Bisbee's** [1] - 35:1
**bit** [9] - 25:25, 36:25, 39:22, 44:12, 79:10, 84:20, 85:11, 112:1, 119:1
**Bitcoin** [62] - 7:2, 35:8, 35:13, 35:14, 40:2, 41:2, 44:22, 50:11, 51:5, 51:6, 51:7, 66:12, 71:3,

79:8, 80:23, 81:1, 81:23, 82:3, 82:11, 82:12, 82:15, 82:23, 83:4, 83:6, 83:7, 83:8, 83:11, 83:18, 83:23, 84:6, 84:11, 87:15, 87:19, 89:12, 91:25, 92:13, 92:19, 94:12, 94:25, 95:1, 96:13, 97:10, 103:17, 106:5, 112:9, 115:19, 119:6, 120:19, 120:20, 120:25, 121:3, 121:6, 121:9, 121:12, 121:25, 124:5, 127:14, 127:15, 127:19, 127:21
**bitcoin** [25] - 17:18, 79:25, 80:1, 80:2, 80:6, 80:9, 80:10, 80:25, 83:24, 85:8, 85:10, 85:11, 92:6, 92:7, 92:21, 92:22, 93:2, 93:5, 93:6, 93:13, 93:16, 100:15, 100:16, 100:18, 100:19
**bitcoins** [2] - 80:4, 83:21
**Bitcoins** [1] - 84:17
**Bitcointalk** [10] - 80:5, 84:1, 84:2, 84:3, 84:5, 105:23, 105:25, 106:6, 107:5
**Bitcointalk.org** [1] - 83:25
**black** [1] - 117:15
**blame** [1] - 123:6
**blanks** [2] - 93:22, 93:25
**block** [7] - 80:10, 82:10, 82:22, 92:14, 92:17, 92:19
**block-size** [1] - 80:10
**blockchain** [89] - 35:8, 35:17, 35:19, 67:23, 68:11, 70:13, 70:18, 70:23, 79:8, 81:20, 87:5, 87:10, 87:12, 87:15, 89:16, 92:9, 92:10, 92:11, 92:12, 92:22, 93:7, 93:15, 93:18, 93:19, 94:2, 94:6, 94:8, 95:12, 97:2, 97:3, 97:5, 97:6, 97:18, 97:19, 97:21, 98:3, 98:6, 98:8, 98:10, 109:13,

110:10, 110:11, 110:12, 110:14, 112:7, 112:9, 113:7, 113:19, 114:14, 114:15, 114:24, 115:19, 118:6, 118:16, 118:20, 119:24, 120:5, 121:2, 121:3, 121:6, 121:10, 121:12, 121:17, 121:25, 122:12, 122:21, 123:3, 123:6, 123:14, 123:16, 123:21, 123:22, 124:4, 124:9, 124:15, 124:20, 125:2, 125:12, 125:18, 127:12, 127:17, 127:23, 128:2, 129:6, 131:4, 131:5, 132:11
**blog** [2] - 42:23, 104:7
**body** [1] - 88:24
**boggles** [1] - 28:24
**book** [8] - 47:5, 51:10, 51:22, 68:19, 69:2, 69:15, 70:11, 73:14
**books** [1] - 9:2
**boomer** [1] - 102:14
**born** [1] - 102:15
**Boston** [2] - 29:4, 30:13
**botched** [1] - 25:4
**bottom** [1] - 59:16
**bought** [1] - 85:9
**boundaries** [2] - 4:19, 5:15
**Bowman** [2] - 10:21, 10:22
**box** [1] - 117:15
**Brady** [1] - 24:19
**breadth** [1] - 27:18
**break** [9] - 3:24, 42:4, 76:8, 76:11, 76:13, 95:2, 110:17, 124:21, 124:25
**breathtaking** [1] - 27:19
**brief** [2] - 50:6, 51:9
**briefed** [1] - 11:15
**briefly** [7] - 77:5, 78:8, 81:25, 83:2, 98:24, 99:25, 122:25
**bring** [4] - 49:7, 74:12, 76:4, 126:22
**British** [2] - 78:11, 102:6
**broad** [4] - 12:14, 13:1, 18:12, 32:5

broadly [2] - 34:11, 132:14
brought [2] - 75:16, 75:21
Brown [4] - 3:7, 41:25, 66:15, 69:15
BROWN [42] - 1:10, 3:6, 4:8, 5:14, 5:18, 6:4, 6:24, 7:24, 8:18, 9:13, 10:13, 10:19, 34:20, 34:23, 35:5, 36:7, 36:16, 37:19, 38:17, 47:20, 47:24, 59:3, 60:6, 60:10, 60:13, 60:21, 62:9, 62:15, 62:22, 64:18, 64:22, 64:25, 65:13, 66:17, 66:19, 66:23, 76:12, 77:3, 77:9, 77:14, 130:4, 130:9
built [1] - 92:20
bunch [1] - 95:5
burden [4] - 6:10, 7:11, 129:5
businesses [1] - 79:22
busy [1] - 40:21
buying [1] - 80:2
BY [18] - 78:7, 81:21, 86:8, 87:1, 88:9, 96:11, 98:18, 102:4, 107:12, 113:5, 116:16, 118:1, 118:15, 120:8, 120:14, 121:24, 125:10, 127:10

## C

c)(1 [2] - 9:1, 9:5
CA [1] - 1:20
Cabanas [15] - 77:19, 78:8, 86:9, 87:2, 88:10, 88:16, 96:12, 98:19, 102:5, 118:2, 120:15, 127:11, 130:18, 130:20, 131:4
CABANAS [4] - 2:3, 78:6, 102:3, 127:9
calculate [2] - 36:1, 115:7
calculation [1] - 35:22
calendar [1] - 49:7
camera [3] - 38:4, 38:6, 38:10
Canada [1] - 85:3
Canadian [8] - 79:13, 80:4, 84:19, 85:3, 85:9, 85:10, 85:13,

85:18
cannot [7] - 25:12, 59:21, 79:2, 84:24, 89:25, 111:24, 120:5
capabilities [1] - 80:9
capable [1] - 59:24
captured [1] - 82:16
captures [1] - 32:21
care [1] - 72:1
cared [1] - 40:22
carefully [2] - 65:25, 132:18
carry [1] - 115:3
carrying [1] - 63:1
Cartagena [2] - 5:19, 8:12
Cartagena-Albaladejo [1] - 5:19
carves [1] - 9:17
case [127] - 4:19, 4:24, 5:25, 6:13, 7:16, 8:2, 8:4, 10:24, 12:6, 12:21, 12:24, 13:6, 13:17, 14:13, 16:14, 16:19, 17:8, 17:23, 18:18, 19:8, 22:18, 24:21, 24:24, 24:25, 25:1, 25:12, 26:16, 26:25, 27:2, 27:14, 27:16, 27:17, 29:2, 30:8, 30:14, 30:22, 30:24, 31:2, 31:4, 31:8, 32:2, 32:13, 39:11, 39:17, 40:6, 40:17, 41:11, 46:14, 46:18, 49:24, 50:5, 53:16, 54:14, 54:18, 55:14, 55:23, 56:25, 57:25, 58:4, 59:5, 59:10, 60:9, 63:2, 63:3, 63:11, 63:24, 64:4, 64:17, 64:18, 64:22, 64:24, 65:1, 65:11, 66:5, 66:13, 67:9, 67:15, 67:24, 68:5, 68:6, 68:13, 69:1, 69:2, 69:5, 70:3, 70:7, 70:12, 70:13, 70:15, 70:25, 71:1, 72:1, 72:10, 72:23, 74:17, 74:19, 74:20, 75:1, 75:10, 91:7, 92:25, 98:20, 104:22, 106:17, 107:13, 107:14, 107:17, 107:19, 108:1, 108:10, 108:21, 108:25, 109:5, 109:22, 110:2, 114:9, 116:5,

123:4, 127:14, 131:14, 131:17, 132:2
Case [1] - 3:2
cases [19] - 10:21, 17:10, 24:22, 25:23, 26:2, 26:11, 26:17, 71:23, 72:4, 72:21, 72:24, 73:1, 87:17, 104:21, 105:9, 115:1, 117:11, 124:12
cash [2] - 82:18, 103:23
caught [2] - 132:1, 132:19
causes [1] - 90:10
central [1] - 18:17
centrality [1] - 50:5
CEO [2] - 47:12, 51:19
certain [11] - 26:8, 44:10, 44:15, 44:21, 46:19, 63:16, 81:17, 89:5, 89:6, 97:22, 123:20
certainly [2] - 40:17, 131:23
CERTIFICATE [1] - 134:1
certification [3] - 56:11, 58:20, 60:4
certify [7] - 52:4, 54:9, 58:16, 58:19, 58:24, 61:8, 134:3
cetera [4] - 46:15, 79:17, 91:9, 107:16
chain [14] - 83:22, 83:23, 92:1, 92:3, 92:7, 92:8, 93:2, 93:16, 99:17, 99:19, 99:24, 101:11, 124:21, 124:23
Chainalysis [82] - 4:4, 4:10, 5:3, 5:9, 5:11, 6:13, 6:15, 6:17, 6:20, 7:1, 7:5, 7:8, 7:15, 11:4, 11:6, 14:2, 14:21, 14:22, 15:4, 15:7, 15:8, 15:17, 15:18, 15:21, 15:23, 17:3, 17:21, 21:6, 22:6, 23:1, 23:6, 23:19, 23:20, 25:9, 25:13, 25:19, 27:4, 28:11, 28:21, 29:2, 30:10, 32:23, 34:1, 35:7, 35:17, 38:20, 39:24, 40:3, 40:9, 40:19, 41:11, 42:11, 42:20, 47:13,

47:15, 47:17, 47:21, 47:25, 48:3, 49:13, 49:17, 49:25, 55:21, 56:9, 71:5, 71:8, 74:8, 87:4, 88:2, 98:20, 115:6, 115:10, 115:17, 117:16, 118:3, 123:7, 123:10, 123:14, 124:10, 125:18
Chainalysis' [3] - 29:7, 33:13, 33:22
challenge [5] - 16:16, 37:20, 49:1, 59:11
chance [2] - 12:1, 63:15
change [5] - 94:19, 95:9, 96:23, 96:24, 130:22
changed [2] - 10:14, 25:4
changes [1] - 26:16
changing [1] - 22:11
channels [1] - 106:8
chapter [1] - 51:12
characterizing [1] - 124:22
charged [1] - 45:6
charges [1] - 71:6
chart [8] - 119:4, 119:7, 119:12, 119:14, 119:18, 119:19, 120:4
chase [1] - 27:3
check [4] - 17:6, 38:18, 129:20, 129:23
checked [4] - 18:2, 18:4, 18:5, 18:7
checking [1] - 18:3
checks [1] - 18:22
Chemistry [1] - 102:9
chip [1] - 51:5
chip-trace [1] - 51:5
choose [1] - 97:23
chosen [1] - 115:9
Chris [1] - 3:6
CHRISTOPHER [1] - 1:10
Ciphertrace [1] - 88:2
Circuit [2] - 10:8, 36:18
Circuit's [1] - 10:6
circulate [1] - 41:20
circulated [1] - 29:3
circulating [1] - 41:18
circumstance [1] - 102:11
circumstantial [1] -

123:10
cited [3] - 10:7, 16:19, 47:5
citing [1] - 10:21
City [4] - 108:4, 108:12, 108:17, 125:23
civil [9] - 6:18, 13:6, 27:17, 27:18, 31:25, 32:5, 40:6, 40:9, 41:5
Civility [1] - 65:7
CJA [4] - 62:24, 71:12, 71:22
claim [3] - 59:7, 64:12, 82:19
claiming [2] - 50:10, 60:24
claims [4] - 12:19, 60:24, 124:15, 124:17
clarify [1] - 94:5
clause [3] - 39:6, 39:7, 39:14
clear [17] - 6:13, 7:10, 8:20, 12:22, 12:25, 31:12, 36:18, 46:2, 54:24, 63:6, 66:7, 66:12, 66:18, 118:2, 126:10, 131:5, 131:11
clearly [2] - 7:25, 11:19
clearnet [2] - 50:17
client [7] - 15:22, 26:24, 27:25, 30:20, 30:23, 46:10, 73:9
clients [1] - 11:18
closely [1] - 81:15
cluster [8] - 96:12, 96:14, 96:16, 96:18, 96:20, 96:22, 96:23
clustered [2] - 17:18, 35:13
clustering [5] - 17:15, 17:16, 99:11, 100:10
clusters [1] - 98:9
co [2] - 47:12, 63:2
co-counsel [1] - 63:2
co-founder [1] - 47:12
Code [2] - 72:3
code [37] - 16:12, 18:23, 18:24, 23:6, 23:10, 24:2, 24:8, 24:10, 28:2, 28:20, 28:23, 29:16, 29:17, 30:25, 32:11, 32:12, 34:17, 35:25, 36:9, 36:13, 36:15, 36:16, 36:19, 36:25, 37:2,

37:6, 37:8, 37:12, 37:13, 37:17, 37:18, 38:15, 39:12, 120:20

**code-level** [1] - 36:19

**codes** [1] - 29:19

**coin** [2] - 81:17, 101:6

**coinjoin** [10] - 95:21, 100:1, 100:2, 100:8, 100:11, 100:17, 100:19, 100:25, 101:11

**coinjoins** [7] - 96:19, 99:2, 99:6, 99:10, 99:13, 101:7, 101:19

**CoinMarketCap** [1] - 80:18

**coins** [2] - 84:11

**collapse** [1] - 45:8

**collect** [1] - 92:14

**collection** [1] - 46:3

**College** [1] - 28:12

**COLUMBIA** [1] - 1:1

**Columbia** [2] - 78:11, 102:6

**combined** [1] - 82:22

**coming** [5] - 6:14, 14:4, 22:6, 85:15, 100:8

**comma** [1] - 35:5

**comma-spaced** [1] - 35:5

**command** [1] - 35:25

**commencement** [2] - 74:18, 74:20

**comment** [7] - 66:21, 70:9, 110:25, 111:11, 111:14, 111:16, 125:15

**commentary** [1] - 83:17

**commenting** [2] - 63:10, 63:11

**comments** [6] - 40:15, 69:11, 70:17, 111:18, 123:13, 125:11

**Commission** [1] - 104:17

**common** [3] - 90:15, 93:3, 116:2

**communications** [5] - 7:14, 13:20, 13:21, 25:11, 28:10

**community** [5] - 40:2, 70:23, 106:8, 124:9, 124:12

**companies** [25] - 87:13, 88:1, 88:2, 89:16, 89:23, 90:1, 94:6, 112:7, 113:8,

113:17, 114:7, 114:20, 114:21, 115:16, 115:24, 120:5, 123:7, 123:16, 123:21, 124:9, 124:15, 124:21, 124:23, 125:12, 127:24

**companies'** [1] - 113:18

**company** [8] - 15:7, 79:12, 89:21, 94:3, 95:13, 103:7, 113:4, 115:4

**compared** [2] - 32:1, 87:12

**comparison** [1] - 115:5

**comparisons** [1] - 87:14

**compel** [2] - 21:14, 22:1

**compensated** [1] - 92:15

**complaint** [3] - 25:3, 50:13, 66:20

**complete** [3] - 28:23, 93:11, 134:5

**completed** [1] - 78:13

**completely** [5] - 19:3, 93:11, 105:1, 116:11, 127:12

**complex** [3] - 16:8, 16:9, 25:8

**Complexity** [1] - 28:13

**compliance** [2] - 75:22, 85:20

**complicated** [1] - 33:5

**complied** [1] - 21:19

**comply** [8] - 67:17, 73:2, 73:19, 75:10, 75:20, 76:2, 85:18, 86:1

**complying** [1] - 73:22

**comprised** [1] - 26:22

**computation** [1] - 37:21

**computational** [1] - 78:20

**computer** [14] - 16:10, 16:12, 18:25, 24:23, 24:25, 29:16, 32:10, 32:11, 32:20, 34:25, 93:4, 93:10, 103:14

**computers** [1] - 79:22

**computing** [1] - 79:21

**concealed** [2] - 121:16, 121:18

**concept** [2] - 96:16, 99:25

**concern** [6] - 4:18, 24:17, 29:18, 37:7, 41:5, 82:23

**concerned** [6] - 4:22, 32:18, 39:22, 40:12, 40:16, 80:8

**concerns** [13] - 4:17, 80:23, 80:25, 82:23, 89:3, 99:1, 99:12, 127:23, 130:5, 131:13, 131:20, 131:25, 132:13

**conclude** [3] - 61:12, 61:22, 119:8

**concluded** [1] - 57:10

**conclusion** [3] - 56:5, 119:13, 119:18

**conclusions** [3] - 35:20, 82:10, 100:9

**concocted** [1] - 38:22

**conditions** [1] - 113:10

**condolences** [1] - 129:13

**Conduct** [2] - 65:7, 72:3

**conduct** [2] - 35:18, 73:1

**conducted** [1] - 36:22

**conducting** [2] - 113:10, 113:12

**conference** [4] - 29:1, 29:4, 30:13, 60:11

**conferences** [1] - 105:10

**confirm** [1] - 18:21

**Congress** [1] - 122:17

**conjoins** [1] - 99:4

**consequences** [2] - 75:11, 75:18

**consider** [2] - 43:16, 123:9

**considerable** [1] - 118:13

**considerably** [1] - 104:2

**consideration** [1] - 96:18

**considered** [3] - 45:4, 94:9, 118:5

**consistent** [1] - 116:9

**constitutes** [1] - 134:4

**Constitution** [2] - 1:23, 134:11

**consultancy** [1] - 103:12

**consultation** [2] - 104:16, 110:21

**consulting** [1] - 79:23

**contact** [2] - 54:7,

108:7

**contacted** [3] - 85:8, 107:25, 108:2

**contemplates** [2] - 74:16, 74:18

**contempt** [4] - 69:17, 75:18, 75:23, 76:5

**contend** [1] - 14:5

**context** [3] - 32:1, 46:17, 70:11

**continuance** [3] - 25:15, 57:19, 57:20

**continue** [3] - 42:18, 62:1, 112:23

**continued** [1] - 80:6

**contract** [1] - 47:24

**contractor** [1] - 79:13

**contrary** [1] - 83:17

**contribute** [1] - 49:19

**contributed** [2] - 107:6, 107:9

**contributing** [1] - 123:7

**contributions** [2] - 111:8, 111:17

**contributor** [2] - 110:21, 111:5

**control** [8] - 58:10, 69:8, 81:19, 93:1, 93:5, 93:7, 93:11, 93:12

**controlling** [1] - 94:13

**controls** [2] - 83:16, 93:15

**conversation** [5] - 45:10, 46:24, 67:8, 69:3, 73:25

**conversations** [3] - 67:2, 68:16, 68:22

**converted** [1] - 103:16

**convicted** [2] - 51:20, 55:11

**convince** [1] - 58:1

**cooperatively** [2] - 34:7, 34:12

**copied** [1] - 63:18

**copies** [2] - 93:9, 93:12

**copies/pastes** [1] - 131:3

**copy** [6] - 27:4, 53:1, 54:13, 56:16, 56:19, 86:15

**copycat** [4] - 11:13, 49:22, 63:17, 64:1

**core** [3] - 25:1, 103:24, 131:17

**Core** [5] - 104:1, 104:23, 105:3, 105:6, 122:5

**correct** [47] - 25:6, 39:1, 47:14, 47:16, 86:17, 89:6, 93:14, 93:17, 93:19, 94:4, 97:1, 102:10, 104:5, 104:13, 104:15, 105:22, 106:6, 106:9, 108:15, 108:20, 109:7, 110:24, 111:2, 111:3, 111:10, 111:11, 111:12, 111:15, 112:13, 113:15, 113:20, 119:3, 119:11, 119:20, 120:2, 120:23, 121:1, 121:15, 121:18, 122:3, 122:7, 122:14, 123:12, 123:17, 125:16, 126:12, 127:13

**correctly** [6] - 81:19, 81:22, 89:4, 93:21, 94:1, 127:22

**corrupt** [3] - 51:17, 52:4, 56:24

**Council** [1] - 104:12

**counsel** [32] - 3:4, 3:5, 6:13, 6:15, 6:25, 7:4, 11:3, 15:13, 15:16, 23:6, 24:14, 25:22, 26:11, 36:23, 38:23, 42:17, 43:10, 43:12, 49:12, 53:11, 63:2, 72:17, 77:5, 107:25, 108:2, 108:7, 108:18, 109:9, 112:1, 125:17, 125:21

**counsel's** [2] - 5:2, 7:8

**countering** [1] - 89:1

**counterparties** [1] - 51:16

**country** [1] - 26:11

**couple** [3] - 88:3, 106:21, 120:9

**coupling** [1] - 110:11

**course** [9] - 12:4, 16:2, 16:23, 21:20, 34:22, 44:16, 45:19, 107:15, 130:15

**Court** [78] - 1:22, 1:22, 6:5, 7:3, 7:13, 7:19, 8:6, 8:20, 9:11, 10:5, 10:8, 11:1, 11:8, 11:12, 11:20, 12:8, 12:10, 12:18, 14:4, 14:10, 14:11, 14:16, 16:18, 17:2, 19:7,

19:9, 19:21, 19:23, 20:2, 21:25, 22:13, 24:2, 25:21, 38:25, 39:14, 40:15, 41:13, 42:19, 43:3, 43:7, 43:11, 43:25, 44:21, 47:2, 47:4, 47:8, 47:10, 48:12, 48:24, 49:14, 49:23, 50:4, 53:17, 60:14, 61:1, 62:13, 62:19, 63:15, 63:24, 64:16, 67:5, 71:11, 72:4, 76:15, 77:4, 77:6, 78:9, 79:11, 81:25, 83:2, 84:5, 98:24, 101:23, 120:13, 126:4, 134:10

**court** [20] - 3:12, 4:13, 7:21, 8:1, 8:21, 9:15, 10:6, 15:15, 26:21, 27:13, 42:21, 47:9, 51:21, 54:12, 65:6, 70:5, 72:6, 76:2, 112:21

**COURT** [209] - 1:1, 3:10, 3:13, 3:16, 5:12, 5:17, 6:2, 6:23, 7:22, 8:11, 8:24, 10:11, 10:17, 11:3, 11:22, 12:1, 15:19, 16:1, 16:3, 16:6, 16:21, 16:25, 17:12, 18:14, 19:10, 20:16, 20:20, 20:22, 21:1, 21:3, 21:7, 21:11, 21:15, 22:3, 22:20, 22:22, 22:24, 23:9, 23:15, 23:24, 24:9, 26:3, 26:6, 27:11, 28:3, 28:6, 29:10, 29:15, 30:22, 31:18, 31:21, 32:15, 33:12, 34:22, 35:4, 36:5, 36:8, 37:1, 37:24, 39:2, 39:22, 40:10, 41:4, 41:23, 42:3, 42:10, 44:11, 45:21, 46:1, 47:12, 47:15, 47:17, 47:22, 48:3, 48:7, 48:11, 48:14, 50:1, 50:8, 50:23, 51:1, 52:5, 52:11, 52:13, 52:15, 52:21, 53:9, 54:15, 54:18, 55:7, 55:13, 56:2, 56:4, 56:18, 57:4, 57:20, 57:22, 58:1, 58:23, 60:3, 60:9, 60:12, 60:18, 61:2, 62:14, 62:20, 64:15,

64:21, 64:23, 65:12, 66:22, 66:24, 67:3, 67:7, 67:11, 67:25, 68:3, 68:8, 69:6, 69:12, 69:16, 69:23, 69:25, 70:6, 70:9, 70:20, 71:15, 71:18, 72:1, 72:13, 72:25, 73:7, 73:16, 73:24, 74:11, 74:15, 75:7, 75:9, 75:13, 76:10, 76:13, 76:17, 76:19, 76:21, 76:24, 77:8, 77:12, 77:16, 77:20, 77:25, 80:12, 80:15, 80:17, 80:20, 85:22, 86:7, 86:21, 86:23, 88:8, 96:7, 96:9, 98:14, 100:11, 100:21, 100:25, 101:4, 101:9, 101:15, 101:21, 101:25, 107:3, 107:7, 107:11, 112:20, 113:2, 115:11, 117:4, 118:8, 118:25, 119:12, 119:17, 119:21, 120:7, 120:10, 121:21, 125:7, 126:2, 126:6, 126:9, 126:12, 126:14, 126:17, 126:21, 126:25, 127:5, 128:13, 128:20, 129:12, 129:17, 129:21, 130:2, 130:8, 130:10, 130:15, 131:8, 131:20, 132:24, 133:2, 134:1

**Court's** [11] - 8:8, 8:10, 9:11, 39:8, 39:9, 43:24, 49:6, 65:23, 77:6, 77:10, 129:13

**Courthouse** [1] - 1:23

**COURTROOM** [3] - 3:2, 77:21, 77:24

**courts** [3] - 10:20, 24:13, 72:19

**cover** [3] - 15:15, 65:14, 103:12

**covered** [2] - 14:13, 14:23

**covers** [1] - 103:14

**crap** [4] - 6:21, 6:24, 15:18, 20:9

**crash** [1] - 85:13

**CRC** [2] - 1:22, 134:9

**create** [4] - 91:2, 95:24, 121:10, 127:17

**created** [3] - 84:6, 103:8, 130:4

**creating** [1] - 128:8

**credentials** [2] - 106:10, 127:3

**credibility** [1] - 63:12

**Criminal** [3] - 1:2, 3:23, 25:24

**criminal** [12] - 3:2, 5:4, 25:3, 27:16, 29:2, 31:8, 32:2, 50:12, 63:24, 72:4, 73:1, 128:20

**criminality** [1] - 97:22

**critical** [3] - 97:18, 114:6, 123:15

**critically** [1] - 79:14

**criticizing** [1] - 123:14

**CROSS** [1] - 102:2

**Cross** [1] - 2:6

**cross** [3] - 55:19, 56:23, 63:19

**CROSS-EXAMINATION** [1] - 102:2

**Cross-Examination** [1] - 2:6

**cross-examine** [1] - 56:23

**cross-motion** [1] - 63:19

**CRR** [2] - 1:22, 134:9

**Crypto** [1] - 124:19

**cryptocurrencies** [2] - 79:24, 81:23

**cryptocurrency** [8] - 17:18, 66:1, 80:16, 81:11, 81:12, 84:9, 120:17, 132:12

**cryptography** [1] - 83:12

**CSV** [2] - 35:2, 35:4

**cures** [1] - 72:16

**curious** [1] - 28:8

**currencies** [1] - 84:7

**current** [4] - 23:17, 46:22, 68:4, 68:24

**curriculum** [1] - 86:14

**custodian** [1] - 45:2

**customer** [1] - 122:20

**cut** [1] - 118:25

**CV** [1] - 86:16

**cyber** [2] - 21:23, 41:17

**D**

**D.C** [8] - 1:5, 10:6, 10:8, 36:18, 65:6, 65:7, 106:23, 134:11

**Dairy** [2] - 10:21, 10:22

**danger** [2] - 63:7, 128:2

**dark** [1] - 86:2

**Dark** [2] - 51:11, 64:17

**darknet** [2] - 99:7, 99:11

**Dash** [2] - 84:12, 101:6

**data** [95] - 9:2, 16:12, 28:19, 29:5, 30:18, 31:13, 31:14, 31:15, 35:6, 35:7, 35:16, 35:19, 35:20, 43:21, 44:8, 44:12, 44:17, 44:18, 45:11, 45:13, 45:25, 46:3, 46:4, 46:7, 46:8, 46:13, 46:15, 46:18, 46:22, 47:3, 48:20, 50:5, 50:22, 51:9, 51:13, 51:15, 51:17, 51:20, 51:21, 51:23, 51:25, 52:2, 52:20, 53:2, 53:4, 53:8, 54:5, 54:9, 54:11, 55:1, 55:11, 55:21, 55:24, 56:1, 56:7, 56:13, 56:24, 57:9, 57:13, 57:19, 57:24, 58:3, 58:6, 58:16, 58:18, 61:9, 78:19, 78:21, 83:17, 85:17, 85:25, 87:14, 89:7, 89:9, 90:2, 90:4, 91:22, 96:2, 110:13, 114:5, 114:11, 114:22, 115:6, 116:4, 116:7, 116:14, 116:22, 117:1, 117:13

**database** [1] - 51:3

**date** [3] - 4:14, 61:15, 132:7

**Dated** [1] - 134:7

**dates** [1] - 23:14

**Daubert** [10] - 11:23, 44:4, 44:6, 46:17, 47:2, 48:16, 48:19, 61:19, 61:20, 129:6

**day-to-day** [1] - 114:13

**days** [4] - 34:18, 62:12, 63:15, 85:21

**DC** [3] - 1:12, 1:14,

1:24

**DDoS** [1] - 81:13

**de** [2] - 129:7, 129:8

**deal** [4] - 78:22, 118:24, 122:18

**dealing** [7] - 24:22, 71:22, 99:18, 109:16, 114:22, 121:7, 132:9

**deals** [2] - 67:11, 120:19

**decade** [1] - 82:25

**decide** [2] - 14:11, 33:16

**decision** [3] - 10:6, 39:5, 132:17

**decisions** [1] - 48:24

**declaration** [4] - 32:16, 53:18, 53:23, 53:24

**declared** [1] - 51:8

**decoupled** [1] - 83:19

**deep** [1] - 130:6

**defendant** [11] - 4:21, 6:14, 12:23, 16:14, 38:1, 38:9, 42:18, 43:6, 49:18, 59:23, 109:10

**Defendant** [4] - 1:6, 1:15, 3:12, 3:15

**defendant's** [4] - 7:7, 65:22, 75:25, 110:5

**Defendant's** [7] - 86:10, 86:19, 86:24, 88:11, 96:6, 96:10, 108:9

**defendants** [2] - 5:18, 63:22

**defenders** [1] - 71:21

**Defense** [4] - 2:11, 2:12, 109:24, 112:2

**defense** [81] - 4:22, 4:23, 4:24, 5:2, 6:11, 6:13, 6:15, 6:24, 7:4, 7:8, 7:11, 10:1, 17:4, 17:5, 18:19, 19:2, 19:11, 19:16, 20:23, 22:2, 23:16, 30:2, 30:4, 30:8, 31:11, 32:9, 35:1, 35:24, 36:5, 36:10, 36:23, 38:2, 38:5, 38:22, 38:25, 41:19, 44:13, 47:4, 48:19, 49:19, 56:22, 58:25, 59:13, 59:16, 60:23, 62:3, 62:10, 62:23, 62:24, 63:14, 65:8, 65:14, 66:7, 66:10, 74:10, 74:18, 74:19, 77:1,

77:5, 77:9, 77:11, 77:18, 98:21, 107:25, 108:2, 108:7, 108:14, 108:18, 109:9, 110:20, 111:4, 112:1, 112:25, 125:17, 125:21, 129:5, 130:1, 130:12, 132:25
**defense's** [1] - 23:22
**define** [1] - 96:20
**definitely** [1] - 109:25
**definition** [2] - 5:5, 31:22
**degree** [2] - 97:22, 127:20
**deleted** [1] - 51:15
**delisting** [4] - 123:8, 123:11, 123:24, 123:25
**delved** [1] - 19:20
**demand** [1] - 102:16
**demographics** [2] - 102:15, 102:20
**demonstrates** [1] - 124:4
**demonstrative** [1] - 12:11
**deniability** [2] - 121:11, 127:17
**deny** [5] - 33:15, 60:1, 61:4, 74:21, 75:24
**DEPARTMENT** [1] - 1:13
**Department** [2] - 102:7, 102:8
**depth** [1] - 57:2
**DEPUTY** [3] - 3:2, 77:21, 77:24
**derived** [4] - 83:6, 83:9, 83:18, 95:3
**describe** [3] - 44:11, 48:5, 81:25
**described** [5] - 19:8, 48:16, 48:22, 79:4, 127:18
**describes** [1] - 110:20
**describing** [4] - 19:23, 111:4, 116:10, 118:21
**description** [3] - 14:25, 45:14, 117:7
**design** [5] - 82:9, 90:7, 103:12, 103:14, 127:18
**designated** [1] - 8:21
**designates** [1] - 9:3
**designed** [5] - 9:23, 24:7, 120:24,

121:10, 127:17
**desirable** [1] - 8:15
**detail** [1] - 109:23
**detailed** [1] - 39:18
**detect** [1] - 118:23
**detecting** [2] - 113:8, 113:22
**determination** [1] - 109:20
**determining** [2] - 96:15, 97:18
**deterministic** [1] - 94:10
**dev** [1] - 103:24
**developed** [1] - 20:6
**development** [1] - 18:11
**deviate** [1] - 43:11
**device** [1] - 91:4
**devoted** [1] - 118:19
**diagram** [3] - 50:12, 50:15
**difference** [5] - 63:20, 64:2, 78:25, 89:22, 114:23
**differences** [1] - 90:6
**different** [24] - 8:19, 14:2, 15:7, 17:9, 17:17, 24:21, 26:1, 26:18, 27:15, 37:23, 87:12, 88:1, 89:15, 90:10, 94:15, 95:22, 97:4, 100:3, 100:4, 103:4, 113:18, 116:11, 117:17, 120:20
**differentiate** [1] - 90:20
**difficult** [7] - 65:24, 66:2, 101:13, 112:20, 113:11, 124:25, 131:3
**difficulties** [1] - 116:21
**dire** [6] - 65:24, 68:16, 70:16, 72:11, 73:6, 73:11
**Direct** [1] - 2:4
**direct** [5] - 8:20, 10:5, 47:5, 56:16, 69:11
**DIRECT** [1] - 78:5
**directed** [7] - 12:15, 40:2, 40:3, 42:5, 61:3, 70:22
**directing** [1] - 75:22
**direction** [1] - 131:9
**directly** [8] - 4:20, 31:15, 46:23, 48:1, 54:10, 56:11, 58:15, 87:7

**director** [1] - 48:9
**disadvantages** [1] - 122:14
**disagree** [2] - 41:22, 121:5
**disagreement** [1] - 42:1
**disclosable** [2] - 16:23, 16:25
**disclose** [4] - 16:7, 23:15, 34:24, 94:18
**disclosed** [5] - 16:24, 95:16, 116:24, 117:3, 119:23
**disclosure** [5] - 109:1, 110:20, 130:23, 131:2
**disclosures** [6] - 12:25, 13:11, 13:15, 16:4, 26:3, 26:6
**discovered** [1] - 56:1
**discovers** [1] - 51:14
**discovery** [14] - 5:23, 6:7, 6:19, 7:10, 12:22, 13:7, 13:9, 13:15, 21:20, 32:5, 69:2, 109:4, 110:2, 110:4
**discrepancies** [1] - 96:2
**discrepancy** [1] - 120:1
**discrete** [1] - 9:24
**discretion** [1] - 9:11
**discuss** [7] - 19:16, 20:18, 43:10, 43:18, 66:14, 84:6, 84:7
**discussion** [4] - 32:24, 43:13, 43:14, 53:10
**discussions** [1] - 34:7
**dislike** [1] - 15:21
**disparities** [1] - 119:8
**disparity** [2] - 119:5, 119:6
**distinction** [1] - 94:7
**distracting** [2] - 5:8, 6:1
**DISTRICT** [3] - 1:1, 1:1, 1:8
**district** [5] - 8:3, 68:13, 68:15, 70:15, 72:19
**disturbing** [1] - 74:24
**divided** [1] - 98:1
**Docket** [5] - 4:1, 4:7, 50:7, 78:1, 78:2
**docketed** [1] - 62:16
**doctoral** [1] - 78:15
**doctorate** [1] - 78:15

**document** [12] - 7:17, 24:9, 40:6, 88:4, 88:14, 88:17, 89:5, 89:8, 104:15, 109:24, 112:2, 119:15
**documented** [3] - 49:12, 51:10, 93:16
**documents** [9] - 9:2, 10:2, 15:16, 18:10, 18:11, 28:9, 102:1, 110:6, 111:11
**DOJ** [3] - 1:11, 71:2, 74:6
**dollar** [1] - 98:6
**Dollars** [1] - 84:21
**dollars** [7] - 51:7, 84:19, 85:3, 85:9, 85:10, 85:13, 97:14
**domain** [1] - 50:16
**dominant** [1] - 92:16
**done** [20] - 16:8, 16:13, 19:8, 21:23, 27:25, 31:5, 34:8, 35:11, 73:11, 74:12, 74:25, 79:22, 85:21, 86:2, 86:12, 87:7, 88:12, 109:19, 116:19, 116:20
**door** [1] - 32:4
**double** [1] - 78:13
**doubt** [2] - 17:13, 59:6
**doubts** [3] - 82:20, 109:11, 109:17
**dovetails** [1] - 9:19
**down** [8] - 7:5, 26:12, 33:8, 82:24, 85:16, 92:8, 115:12, 128:13
**downloaded** [1] - 119:15
**downloading** [1] - 85:17
**DR** [4] - 2:3, 78:6, 102:3, 127:9
**Dr** [14] - 77:19, 78:8, 86:9, 87:2, 88:10, 88:16, 96:12, 98:19, 102:5, 118:2, 120:15, 127:11, 130:20, 131:4
**draft** [2] - 28:20, 89:2
**drafting** [1] - 111:21
**drive** [2] - 92:24
**driven** [1] - 132:3
**DRM** [1] - 88:2
**drop** [3] - 85:8, 123:23, 123:25
**dropped** [3] - 48:19, 71:6, 71:10
**drug** [1] - 75:6

**duces** [1] - 23:1
**due** [1] - 21:20
**duly** [1] - 24:20
**dump** [2] - 19:24, 25:18
**dumped** [1] - 53:2
**during** [1] - 73:8

## E

**early** [15] - 4:9, 4:13, 6:8, 7:20, 7:25, 8:6, 8:25, 10:25, 12:6, 12:19, 13:2, 39:17, 80:4, 107:8, 119:4
**Early** [1] - 4:2
**early-return** [7] - 4:9, 6:8, 7:20, 7:25, 8:6, 8:25, 10:25
**Early-Return** [1] - 4:2
**ease** [1] - 112:24
**easier** [1] - 117:8
**easily** [5] - 105:7, 105:14, 107:18, 107:21, 114:16
**ECF** [2] - 6:22, 10:7
**educated** [2] - 91:20, 93:24
**education** [1] - 78:14
**educational** [3] - 78:9, 79:3, 79:4
**effect** [3] - 52:14, 52:15, 123:13
**effective** [1] - 43:9
**effectively** [10] - 11:13, 13:1, 18:11, 24:19, 42:22, 43:23, 45:11, 48:5, 48:19, 71:21
**effort** [2] - 5:8, 49:22
**efforts** [1] - 49:13
**egregiously** [1] - 63:4
**eight** [1] - 107:14
**either** [7] - 5:24, 15:2, 44:5, 46:17, 46:20, 93:13, 105:6
**EKELAND** [115] - 1:15, 3:11, 20:21, 20:23, 21:2, 21:5, 21:8, 21:14, 21:21, 22:13, 22:21, 22:23, 23:4, 23:11, 24:1, 24:11, 26:5, 26:8, 28:2, 28:5, 28:25, 29:14, 30:9, 31:12, 31:20, 32:14, 33:10, 39:21, 40:1, 40:14, 41:9, 42:2, 50:3, 50:9, 50:25, 51:2, 52:10, 52:12, 52:14, 52:18,

52:25, 54:2, 54:17, 55:4, 55:9, 55:16, 56:3, 56:6, 56:21, 57:17, 57:21, 57:23, 58:14, 60:20, 67:1, 67:6, 67:9, 67:20, 68:2, 68:6, 68:9, 69:9, 69:14, 69:22, 69:24, 70:2, 70:8, 70:11, 70:22, 71:17, 71:20, 72:8, 72:19, 73:5, 73:13, 73:21, 74:6, 74:14, 75:5, 75:8, 75:12, 76:9, 76:18, 77:15, 77:18, 78:4, 78:7, 81:21, 86:6, 86:8, 86:18, 86:25, 87:1, 88:7, 88:9, 96:4, 96:11, 98:12, 98:16, 98:18, 101:20, 126:10, 126:13, 126:20, 126:23, 127:2, 127:7, 127:10, 128:12, 129:20, 129:23, 130:12, 130:20, 131:18, 132:25

**Ekeland** [15] - 1:16, 2:5, 2:8, 3:11, 20:20, 39:20, 50:1, 60:18, 63:9, 66:25, 126:9, 126:18, 129:18, 130:17, 132:24

**elaborate** [1] - 128:1

**element** [5] - 4:21, 82:15, 82:21, 83:12, 94:15

**elements** [3] - 5:7, 81:6, 81:16

**eliminate** [2] - 91:11, 91:12

**Elizabeth** [1] - 98:20

**Elliptic** [1] - 88:3

**elucidate** [1] - 10:24

**email** [3] - 59:15, 59:17

**emails** [5] - 59:11, 59:14, 59:22, 59:24, 60:2

**embarked** [3] - 62:23, 62:24, 113:10

**emphasize** [1] - 114:19

**employed** [2] - 17:21, 95:12

**employee** [3] - 47:20, 48:2, 65:3

**employees** [1] - 69:8

**employment** [1] -

103:12

**encourage** [3] - 33:24, 34:6, 122:6

**end** [5] - 12:22, 66:23, 100:18, 128:19, 131:15

**end-around** [1] - 12:22

**endeavor** [1] - 102:25

**ending** [1] - 81:12

**endorsed** [1] - 12:10

**enforce** [1] - 62:17

**enforceable** [1] - 65:20

**enforcement** [2] - 90:23, 91:3

**enforces** [1] - 7:19

**enforcing** [1] - 63:8

**engage** [1] - 123:21

**engaged** [1] - 72:2

**engagements** [1] - 63:1

**enter** [3] - 67:11, 75:14, 75:17

**entire** [4] - 24:25, 101:6, 114:14, 114:24

**entirely** [1] - 66:12

**entirety** [3] - 18:12, 20:3, 105:1

**entities** [3] - 94:13, 94:24, 112:11

**entitled** [9] - 30:19, 36:5, 37:2, 37:4, 38:10, 38:16, 56:22, 58:25, 66:9

**entity** [1] - 99:21

**entries** [1] - 35:14

**equals** [2] - 35:23, 36:9

**erase** [1] - 124:14

**error** [16] - 90:14, 90:22, 90:23, 91:2, 91:6, 91:7, 91:11, 91:14, 95:25, 114:10, 114:17, 117:24, 119:24, 120:3, 120:4, 122:14

**errors** [13] - 51:24, 53:4, 71:9, 78:23, 78:24, 78:25, 90:2, 90:4, 90:15, 90:21, 91:12, 115:25, 118:23

**escaped** [1] - 84:16

**escaping** [1] - 86:5

**especially** [1] - 65:25

**essential** [1] - 67:23

**essentially** [13] - 4:11, 4:24, 5:9, 21:22,

35:5, 40:19, 51:23, 62:17, 83:5, 90:17, 95:3, 122:20, 124:3

**establish** [1] - 59:6

**established** [3] - 56:18, 59:5, 127:2

**estate** [4] - 103:3, 103:8, 103:11, 103:23

**et** [4] - 46:15, 79:17, 91:9, 107:16

**EU** [4] - 111:2, 111:13, 111:22, 122:24

**Europe** [2] - 70:18, 74:1

**European** [4] - 104:12, 104:17, 110:21

**evaluate** [3] - 55:18, 63:16, 101:10

**eve** [2] - 34:16, 39:12

**event** [7] - 17:11, 33:20, 42:25, 43:18, 47:1, 47:7, 49:4

**everywhere** [2] - 26:25, 27:9

**evidence** [24] - 5:23, 8:22, 9:24, 13:4, 13:22, 14:19, 29:2, 30:14, 41:1, 41:11, 44:10, 49:1, 49:8, 50:10, 59:7, 59:24, 63:3, 64:4, 66:4, 67:23, 86:20, 96:6, 123:10, 124:20

**evidentiary** [1] - 55:22

**eVoucher** [1] - 71:23

**exact** [4] - 10:14, 48:8, 59:9, 74:20

**exactly** [6] - 5:22, 5:25, 9:13, 20:14, 70:10, 85:4

**EXAMINATION** [3] - 78:5, 102:2, 127:8

**Examination** [3] - 2:4, 2:6, 2:7

**examine** [5] - 46:14, 56:23, 57:7, 65:25, 69:17

**examined** [2] - 44:16, 46:24

**examining** [2] - 46:7, 46:18

**example** [42] - 10:23, 14:2, 14:6, 14:18, 14:19, 16:20, 19:8, 19:9, 35:12, 36:18, 38:15, 44:20, 49:16, 58:6, 58:7, 83:22, 87:13, 89:8, 89:16,

90:22, 91:5, 91:7, 91:13, 91:24, 91:25, 92:23, 92:25, 93:3, 94:17, 95:16, 95:17, 96:16, 97:9, 97:13, 99:13, 99:14, 100:15, 111:16, 116:10

**examples** [1] - 104:10

**exceedingly** [2] - 112:20, 113:11

**Excel** [8] - 35:3, 35:6, 35:22, 35:25, 36:1, 36:8, 36:10, 36:18

**excellent** [1] - 33:10

**exception** [4] - 9:17, 52:16, 82:10, 122:16

**exchange** [4] - 51:7, 87:21, 114:3, 123:3

**exchanged** [1] - 28:11

**exchanges** [10] - 51:6, 85:21, 89:6, 113:25, 114:1, 114:6, 122:9, 123:8, 123:11

**excludable** [1] - 5:5

**exclude** [2] - 72:15, 131:9

**excludes** [2] - 6:5, 7:13

**excluding** [2] - 59:22, 131:16

**excuse** [1] - 66:3

**excuses** [1] - 84:23

**executives** [1] - 42:20

**Exhibit** [13] - 2:11, 2:12, 86:10, 86:20, 86:23, 86:24, 88:11, 96:6, 96:10, 108:9, 109:24, 112:2, 113:1

**exhibited** [1] - 6:16

**EXHIBITS** [1] - 2:10

**exhibits** [3] - 2:13, 9:8, 126:14

**Exhibits** [4] - 2:14, 125:25, 126:10, 126:15

**exist** [4] - 13:21, 101:16, 119:8, 120:1

**exists** [3] - 13:4, 13:22, 55:7

**expect** [13] - 25:19, 44:22, 70:10, 73:1, 73:19, 75:10, 75:20, 76:1, 99:5, 106:25, 107:19, 128:18, 129:24

**expecting** [1] - 23:21

**expedition** [9] - 4:16, 7:11, 9:23, 13:2, 14:17, 18:13, 32:1,

38:14, 54:21

**expenses** [2] - 106:19, 106:25

**experience** [11] - 24:13, 78:9, 79:3, 79:4, 79:9, 79:24, 86:4, 87:3, 87:4, 110:8, 113:12

**experimental** [4] - 78:10, 78:17, 78:18

**expert** [71] - 5:9, 13:11, 14:6, 16:4, 16:7, 17:21, 18:18, 18:22, 19:14, 19:15, 19:18, 23:18, 23:22, 25:5, 26:3, 26:6, 29:16, 30:15, 32:10, 34:18, 34:24, 35:1, 35:11, 35:16, 35:22, 36:3, 36:10, 36:17, 37:5, 37:7, 37:14, 40:11, 44:1, 44:5, 46:20, 47:18, 52:22, 55:2, 58:5, 58:8, 58:9, 58:11, 61:19, 61:22, 61:23, 77:19, 77:25, 98:19, 98:21, 106:15, 109:20, 110:20, 130:5, 130:18, 130:22, 130:23, 131:2, 131:4, 131:10, 131:11, 131:13, 131:16, 131:17, 131:24, 132:2, 132:3, 132:8, 132:15, 132:19

**expert's** [4] - 16:7, 16:16, 16:19, 37:20

**expert-driven** [1] - 132:3

**expertise** [4] - 131:12, 131:23, 132:10, 132:14

**experts** [11] - 13:12, 13:16, 17:22, 36:19, 36:21, 64:14, 129:6, 130:17, 131:6, 132:5

**experts'** [1] - 20:5

**explain** [9] - 79:10, 83:1, 84:5, 91:18, 92:2, 92:3, 99:25, 121:20, 121:21

**explained** [5] - 8:7, 12:5, 17:19, 69:6

**explains** [1] - 37:10

**explanation** [4] - 14:25, 45:13, 119:7, 119:25

**explanations** [1] -

96:1
**explicitly** [1] - 8:5
**explore** [1] - 53:13
**explorers** [1] - 35:18
**exponential** [1] - 98:3
**express** [1] - 46:21
**extensive** [2] - 67:1, 67:21
**extent** [10] - 14:18, 48:25, 50:4, 58:24, 60:2, 66:15, 68:22, 69:1, 126:4, 131:11
**extra** [1] - 15:2
**extract** [2] - 114:10, 125:8
**extraneous** [1] - 6:17
**extremely** [1] - 31:7
**eyewitnesses** [2] - 24:24, 25:2

## F

**F.2d** [1] - 10:7
**face** [1] - 72:20
**faces** [2] - 15:23, 123:20
**fact** [35] - 13:13, 15:17, 22:17, 38:18, 41:21, 43:10, 48:18, 48:23, 50:21, 51:19, 52:1, 53:1, 53:7, 53:18, 53:22, 54:3, 68:10, 68:16, 70:16, 72:10, 96:1, 99:2, 99:22, 101:6, 108:18, 112:11, 113:16, 116:21, 118:13, 121:2, 121:16, 123:2, 123:6, 123:18, 125:11
**fact-check** [1] - 38:18
**factor** [3] - 97:14, 124:1
**factorial** [3] - 98:1, 98:2
**facts** [2] - 31:3, 32:21
**factually** [1] - 14:18
**faculty** [1] - 103:1
**fail** [1] - 12:20
**failing** [3] - 12:11, 31:22
**fails** [2] - 10:3, 124:4
**failure** [1] - 124:4
**fair** [9] - 27:11, 27:23, 30:7, 39:6, 66:9, 72:13, 81:4, 90:13, 119:10
**fairly** [5] - 16:15, 32:20, 93:3, 131:12

**fall** [1] - 4:20
**falling** [2] - 82:10, 82:22
**false** [15] - 15:3, 19:3, 38:22, 38:24, 40:24, 41:14, 41:21, 64:13, 124:7, 125:1, 127:24, 128:2, 128:8, 128:9, 128:10
**falsely** [2] - 68:20, 128:9
**falsifying** [2] - 51:21, 55:11
**familiar** [5] - 8:3, 66:1, 76:2, 84:14, 96:12
**family** [1] - 27:8
**fantasy** [1] - 38:22
**far** [9] - 4:20, 10:15, 32:17, 44:3, 46:25, 99:9, 107:13, 122:16, 132:10
**Faruqui** [1] - 67:10
**faster** [1] - 98:2
**FATF** [16] - 88:18, 88:21, 96:2, 111:13, 111:23, 112:1, 112:2, 112:12, 113:6, 113:7, 113:11, 113:16, 115:9, 115:18, 116:9, 116:17
**FBI** [3] - 21:23, 26:15, 41:17
**feasible** [1] - 117:22
**federal** [3] - 45:7, 71:21, 79:14
**Federal** [1] - 25:24
**fee** [1] - 81:12
**feed** [1] - 49:15
**fees** [3] - 48:1, 81:18, 92:17
**fellowship** [1] - 102:8
**few** [5] - 44:23, 46:6, 85:21, 111:19, 126:18
**field** [6] - 58:5, 102:12, 102:13, 102:18, 102:19, 102:24
**fields** [1] - 116:6
**figure** [5] - 3:23, 20:13, 34:25, 101:15, 130:13
**file** [1] - 28:23
**filed** [6] - 62:10, 62:11, 63:14, 63:17, 74:14, 81:6
**files** [5] - 24:15, 35:3, 35:6, 51:15, 51:16
**filing** [1] - 6:16
**filings** [1] - 6:16

**fill** [1] - 93:22
**finance** [1] - 104:17
**financial** [4] - 85:5, 88:22, 110:5, 110:13
**Financial** [7] - 87:11, 87:23, 88:23, 104:14, 108:9, 112:6, 119:15
**financing** [3] - 89:2, 105:2, 110:22
**FinCEN** [8] - 104:18, 111:13, 111:16, 111:19, 111:22, 122:14, 122:17, 122:23
**fine** [6] - 20:20, 48:14, 74:1, 77:12, 77:13, 101:25
**finger** [1] - 29:24
**finish** [2] - 29:13, 120:10
**finished** [1] - 112:22
**First** [1] - 70:24
**first** [21] - 3:18, 4:1, 8:25, 11:8, 14:10, 14:12, 19:23, 20:23, 39:6, 39:7, 40:1, 40:4, 50:3, 63:17, 64:9, 80:3, 82:2, 106:15, 107:25, 114:2
**firsthand** [1] - 54:7
**fischbach** [2] - 130:21, 130:22
**fishing** [9] - 4:16, 7:10, 9:23, 13:1, 14:17, 18:13, 32:1, 38:13, 54:21
**five** [2] - 73:9, 88:6
**five-year** [1] - 88:6
**fixation** [1] - 6:15
**fixed** [1] - 80:9
**flag** [1] - 129:4
**flagging** [1] - 132:7
**flat** [1] - 15:10
**flat-out** [1] - 15:10
**flaw** [1] - 82:8
**flaws** [2] - 56:14, 58:4
**flip** [1] - 101:24
**Floor** [1] - 1:17
**floppy** [1] - 92:24
**fly** [1] - 27:8
**focus** [4] - 78:16, 81:10, 113:8, 120:15
**focused** [3] - 78:17, 82:21, 110:8
**focusing** [1] - 28:8
**Foerster** [1] - 11:6
**FOERSTER** [1] - 1:19
**Fog** [5] - 35:14, 41:2,

50:11, 66:13, 71:3
**followed** [2] - 8:15, 76:5
**following** [5] - 19:1, 29:19, 29:20, 76:23, 89:10
**follows** [1] - 127:25
**footage** [3] - 38:4, 38:6, 38:10
**FOR** [1] - 1:1
**forbids** [1] - 20:15
**Force** [8] - 87:12, 87:23, 88:22, 88:23, 104:15, 108:9, 112:7, 119:16
**forced** [1] - 51:6
**forceful** [1] - 8:2
**foregoing** [1] - 134:4
**forensic** [2] - 87:5, 95:13
**forensics** [8] - 24:23, 25:1, 25:12, 67:23, 68:11, 70:13, 74:9, 109:23
**form** [4] - 48:17, 49:1, 56:8, 105:4
**formality** [1] - 8:8
**format** [2] - 23:22, 28:23
**former** [6] - 67:9, 67:12, 67:13, 68:23, 69:7, 69:8
**forms** [1] - 122:12
**forth** [2] - 63:13, 64:5
**Fortran** [1] - 79:5
**forum** [3] - 80:5, 84:6, 106:5
**forwarded** [1] - 59:15
**forwarding** [2] - 59:15, 59:17
**foundation** [1] - 131:23
**foundational** [2] - 56:25, 57:24
**founded** [1] - 20:4
**founder** [1] - 47:12
**four** [3] - 50:15, 62:10, 88:5
**four-week-late** [1] - 62:10
**Francisco** [2] - 1:20, 77:19
**FRANCISCO** [4] - 2:3, 78:6, 102:3, 127:9
**frankly** [3] - 19:25, 53:15, 57:5
**fraud** [2] - 51:20, 55:11
**free** [2] - 59:23, 128:11
**Frentzen** [1] - 11:6

**FRENTZEN** [27] - 1:18, 11:5, 11:25, 12:3, 15:20, 16:2, 16:5, 16:17, 16:22, 17:2, 17:13, 19:7, 19:11, 20:17, 42:14, 44:13, 45:24, 46:2, 47:14, 47:16, 47:19, 48:4, 48:8, 48:12, 48:15, 76:14, 76:20
**frequently** [1] - 8:15
**Friday** [10] - 11:14, 11:21, 42:16, 43:3, 47:2, 128:23, 128:25, 129:3, 130:13, 132:20
**Friedman** [3] - 59:10, 59:18, 60:1
**Friedmann** [1] - 59:22
**friends** [1] - 27:8
**front** [21] - 21:11, 21:12, 21:15, 22:5, 22:10, 22:12, 24:11, 31:8, 36:14, 38:7, 38:25, 53:17, 59:9, 62:20, 67:4, 69:25, 73:2, 77:17, 112:3, 112:15, 116:18
**frontload** [1] - 77:11
**full** [3] - 68:22, 104:24, 134:5
**full-time** [1] - 104:24
**fully** [1] - 11:15
**function** [1] - 101:7
**functions** [3] - 14:3, 83:11, 83:12
**fund** [1] - 49:19
**fundamental** [2] - 78:25, 82:12
**funding** [1] - 62:24
**fundraiser** [1] - 49:17
**fundraising** [2] - 42:24, 72:2
**funds** [8] - 27:6, 50:19, 71:14, 72:5, 83:15, 83:16, 84:24, 92:16
**furnished** [1] - 44:17
**furthermore** [1] - 113:24
**future** [3] - 57:21, 81:1, 85:19

## G

**Gambaryan** [1] - 69:3
**gaps** [3] - 45:25, 46:7, 46:15
**gears** [2] - 29:10, 30:5
**general** [6] - 5:10,

9:14, 9:17, 15:21, 20:11, 101:17
**General's** [1] - 78:14
**generally** [3] - 12:24, 24:13, 74:21
**generated** [1] - 18:24
**generation** [1] - 102:16
**generically** [1] - 45:24
**George** [3] - 28:14, 80:3, 103:4
**gigantic** [1] - 35:15
**given** [9] - 31:13, 49:12, 70:15, 84:20, 84:23, 90:2, 119:6, 119:7, 128:25
**glitch** [1] - 36:12
**global** [1] - 87:6
**glue** [1] - 64:7
**government** [93] - 3:5, 3:7, 4:6, 4:8, 4:22, 5:20, 6:7, 6:9, 6:11, 7:12, 12:5, 12:25, 13:8, 13:13, 13:20, 13:21, 13:23, 14:23, 15:5, 15:6, 15:13, 16:6, 16:11, 16:25, 17:3, 17:21, 19:13, 19:16, 21:6, 21:19, 21:24, 24:18, 25:3, 26:14, 27:1, 27:10, 29:24, 29:25, 30:2, 30:24, 31:9, 32:24, 33:17, 33:22, 34:1, 35:22, 38:20, 40:11, 40:20, 40:21, 41:10, 41:17, 41:21, 45:7, 46:7, 46:9, 47:18, 50:10, 52:2, 53:5, 54:8, 55:14, 55:19, 56:11, 58:4, 58:15, 58:18, 58:23, 58:24, 59:5, 59:12, 59:20, 62:7, 64:2, 64:3, 64:16, 65:2, 65:3, 65:10, 66:8, 67:1, 67:7, 69:8, 74:8, 74:17, 75:2, 79:14, 98:17, 110:2, 129:4, 130:2, 132:22
**Government** [5] - 84:24, 84:25, 85:4, 85:12, 88:25
**government's** [20] - 4:2, 4:17, 4:18, 5:12, 5:14, 20:24, 22:7, 22:14, 33:15, 33:20, 41:15, 55:23, 56:25, 61:8, 75:25, 78:1, 98:19, 129:6,

130:21, 131:1
**governments** [1] - 88:25
**Governor** [1] - 78:14
**Gox** [51] - 43:20, 44:8, 44:11, 44:15, 44:16, 45:2, 45:4, 45:5, 45:9, 45:15, 45:20, 46:3, 46:8, 46:15, 47:3, 48:20, 50:5, 50:14, 50:22, 51:5, 51:6, 51:13, 51:15, 51:20, 51:21, 53:2, 53:3, 54:4, 55:21, 56:7, 57:19, 57:24, 58:16, 60:23, 61:9, 84:14, 84:15, 84:16, 84:17, 84:19, 84:22, 84:25, 85:2, 85:11, 85:14, 85:21, 86:1, 86:4, 110:13
**grant** [3] - 33:13, 57:10, 61:5
**granting** [1] - 33:22
**graph** [2] - 89:8, 89:11
**Graph** [1] - 89:12
**graphs** [2] - 88:14, 89:11
**gratuitous** [1] - 66:6
**great** [2] - 27:24, 109:23
**greater** [1] - 33:14
**Greenberg** [12] - 51:12, 56:14, 64:20, 65:3, 66:12, 66:20, 67:2, 67:22, 68:21, 69:10, 70:3, 70:5
**Greenberg's** [1] - 73:14
**Gronager** [38] - 4:4, 11:7, 11:14, 20:19, 22:18, 42:5, 42:13, 42:16, 43:5, 43:20, 44:4, 44:14, 44:19, 45:10, 45:15, 45:20, 46:2, 46:12, 47:9, 47:12, 48:21, 50:21, 51:10, 52:1, 52:8, 52:24, 53:11, 55:17, 55:19, 55:25, 58:8, 58:17, 61:4, 61:14, 61:18, 61:24, 128:25
**Gronager's** [4] - 44:1, 46:16, 47:4, 53:6
**grossly** [1] - 4:14
**ground** [2] - 115:6, 131:16
**group** [5] - 96:20, 97:15, 102:17, 104:6, 111:25

**Group** [9] - 104:4, 104:24, 105:6, 111:1, 111:21, 122:5, 122:6, 123:1
**grow** [2] - 81:11, 98:3
**grows** [1] - 98:2
**growth** [1] - 81:20
**guard** [1] - 132:2
**guess** [4] - 58:1, 61:9, 91:20, 93:25
**guessing** [1] - 93:22
**guilt** [6] - 4:21, 4:25, 5:6, 7:7, 109:14, 109:21
**guilty** [2] - 109:15, 128:10
**gun** [1] - 90:24

## H

**Haaroon** [1] - 28:14
**hack** [3] - 45:6, 45:7, 45:14
**hacked** [2] - 51:5, 51:8
**hackers** [1] - 79:15
**hacks** [1] - 93:4
**Haldeman** [2] - 10:7, 26:17
**half** [3] - 34:3, 40:25, 44:20
**hallway** [1] - 73:8
**hand** [3] - 77:22, 92:25, 94:12
**handed** [2] - 86:9, 88:10
**handle** [3] - 117:19, 127:1, 129:1
**handled** [2] - 54:12, 56:10
**happy** [6] - 3:19, 33:11, 41:13, 60:7, 77:3, 129:7
**harass** [1] - 11:17
**harassing** [1] - 40:12
**harassment** [3] - 5:21, 6:13, 39:23
**harden** [1] - 124:18
**harder** [6] - 49:18, 66:3, 97:7, 98:3, 98:4, 98:11
**hardship** [1] - 65:13
**harm** [4] - 66:8, 125:2, 127:24, 128:7
**hash** [1] - 92:15
**Haslhofer** [1] - 28:15
**HASSARD** [3] - 1:16, 3:14, 28:4
**Hassard** [2] - 3:15, 63:9
**head** [2] - 41:25, 60:18

**heads** [1] - 33:24
**hear** [15] - 11:3, 11:20, 26:5, 42:11, 43:12, 50:1, 58:23, 61:13, 61:18, 62:7, 66:4, 71:17, 124:17, 127:13, 131:18
**heard** [10] - 34:20, 49:14, 72:14, 75:9, 81:22, 83:25, 119:3, 125:22, 127:22, 129:8
**hearing** [19] - 9:25, 11:8, 11:23, 46:17, 47:8, 49:6, 49:23, 53:17, 59:1, 60:3, 61:7, 61:12, 61:19, 61:20, 62:1, 106:23, 128:20, 129:11, 133:3
**HEARING** [2] - 1:4, 1:7
**hearings** [3] - 3:18, 44:4, 54:3
**hearsay** [4] - 46:25, 52:13, 52:17, 54:23
**held** [2] - 117:11, 117:20
**helpful** [3] - 120:13, 121:23, 126:5
**helping** [1] - 30:6
**hereby** [1] - 134:3
**herring** [1] - 36:25
**heuristic** [14] - 24:4, 26:20, 31:16, 91:15, 91:19, 92:1, 95:12, 95:19, 95:23, 96:22, 99:3, 99:15, 99:16, 99:22
**heuristics** [15] - 28:21, 90:10, 90:11, 93:20, 94:18, 95:6, 96:15, 116:3, 116:7, 116:12, 116:13, 116:14, 116:23, 117:2, 117:4
**hidden** [1] - 26:13
**hide** [6] - 95:7, 97:12, 97:16, 99:9, 100:14, 100:23
**hiding** [2] - 24:20, 26:24
**high** [3] - 78:13, 114:2, 114:6
**high-risk** [1] - 114:6
**highly** [2] - 5:7, 24:20
**himself** [3] - 6:14, 55:11, 132:12
**history** [1] - 86:3
**hold** [5] - 57:2, 69:17,

75:23, 76:15, 103:7
**holding** [1] - 7:25
**holdings** [2] - 103:17, 103:23
**holds** [2] - 57:4, 83:15
**home** [1] - 27:7
**hominem** [4] - 64:13, 65:8, 74:25, 75:6
**Honor** [111] - 3:6, 3:8, 3:11, 3:14, 4:8, 5:14, 5:18, 6:4, 7:24, 8:18, 8:23, 9:13, 10:13, 10:19, 11:5, 11:25, 12:3, 12:21, 14:1, 15:20, 16:2, 16:5, 16:17, 17:14, 19:7, 19:14, 20:1, 20:18, 20:21, 21:21, 23:17, 28:25, 29:14, 30:9, 32:14, 33:11, 34:20, 36:7, 38:17, 41:2, 41:9, 42:14, 44:14, 45:17, 45:25, 47:14, 47:16, 47:19, 47:24, 48:4, 48:9, 48:15, 50:3, 54:2, 56:6, 56:22, 58:14, 59:3, 60:6, 60:10, 60:20, 60:21, 62:9, 62:15, 64:25, 65:13, 66:11, 67:20, 68:9, 70:2, 70:12, 71:20, 72:19, 73:21, 75:12, 76:9, 76:12, 76:14, 76:18, 77:3, 77:14, 77:15, 77:18, 78:4, 86:6, 86:18, 86:22, 88:7, 96:4, 101:20, 101:22, 115:14, 117:7, 119:11, 119:20, 120:12, 125:5, 125:24, 126:16, 128:12, 128:18, 128:24, 129:4, 129:16, 130:4, 131:2, 131:19, 132:23, 133:1
**HONORABLE** [1] - 1:8
**honors** [1] - 78:13
**hour** [5] - 7:3, 91:1, 91:4, 91:5
**hours** [8] - 105:5, 105:8, 105:14, 105:19, 107:13, 107:18, 107:19, 110:1
**Hub** [1] - 28:13
**huge** [1] - 87:24
**hunch** [3] - 91:21,

91:23, 93:25
**hundreds** [1] - 35:2
**hunt** [1] - 20:13
**hurdle** [1] - 54:25
**hyping** [2] - 67:22, 68:11
**hypothetical** [1] - 41:5
**hypothetically** [2] - 16:10, 19:3

## I

**IC3** [1] - 28:12
**idea** [7] - 33:10, 36:11, 36:24, 95:2, 101:16, 101:18, 131:6
**identification** [6] - 86:10, 86:19, 88:11, 96:5, 119:5, 126:8
**identified** [3] - 63:21, 63:22, 89:12
**identify** [9] - 67:8, 98:4, 98:9, 98:11, 114:1, 114:16, 114:18, 114:25, 132:8
**identifying** [3] - 97:8, 114:2, 114:6
**identity** [1] - 63:11
**illicit** [17] - 87:15, 87:19, 89:6, 89:10, 89:12, 92:23, 93:3, 97:22, 112:9, 113:8, 113:21, 114:5, 114:9, 114:25, 115:18, 119:5, 119:6
**images** [1] - 85:17
**imagine** [1] - 49:6
**imagines** [1] - 44:21
**immediate** [1] - 85:7
**impact** [3] - 87:6, 96:19, 100:9
**impair** [1] - 65:14
**impermissible** [1] - 4:16
**implemented** [1] - 24:7
**implicating** [4] - 29:5, 30:12, 30:20, 30:23
**implicit** [2] - 99:20, 99:22
**implied** [4] - 95:16, 99:15, 99:16
**importance** [3] - 18:17, 54:16, 54:18
**important** [7] - 58:2, 60:17, 70:23, 94:7, 94:25, 98:5, 113:4
**importantly** [2] - 116:22, 129:8

**impossible** [3] - 93:18, 116:25, 117:25
**improper** [2] - 4:13, 6:18
**impropriety** [1] - 31:9
**IN** [1] - 1:1
**in-depth** [1] - 57:2
**in-person** [2] - 63:6, 130:7
**inability** [1] - 82:14
**inaccurate** [5] - 14:18, 15:3, 63:4, 63:22, 96:22
**inadmissible** [3] - 7:10, 46:25, 49:3
**inappropriate** [1] - 20:3
**inauthentic** [5] - 56:1, 56:2, 56:5, 56:25, 58:22
**inauthenticity** [6] - 50:24, 50:25, 51:2, 53:8, 57:18, 58:18
**Inc** [2] - 4:4, 4:10
**incarceration** [1] - 40:24
**inception** [1] - 20:7
**incidentally** [1] - 41:2
**include** [1] - 110:5
**includes** [5] - 12:24, 13:14, 13:19, 28:19, 121:13
**including** [7] - 28:10, 28:13, 68:1, 88:25, 107:1, 107:17, 115:17
**income** [1] - 103:20
**incorporated** [2] - 55:21, 56:17
**Incorporated** [1] - 4:5
**incredibly** [2] - 12:14, 25:8
**independent** [3] - 116:18, 116:25, 117:13
**independently** [1] - 109:19
**index** [1] - 69:14
**indicate** [2] - 74:19, 74:21
**indicated** [4] - 32:7, 39:24, 44:7, 125:17
**indicating** [1] - 113:16
**indication** [1] - 115:8
**indicative** [3] - 115:15, 115:21, 116:1
**indictment** [1] - 75:7
**individual** [10] - 14:20,

28:10, 83:19, 110:19, 114:5, 114:13, 115:1, 115:4, 115:25, 131:3
**individuals** [2] - 4:11, 110:19
**indulgence** [1] - 16:18
**indulges** [1] - 10:8
**industry** [1] - 132:12
**inflammatory** [3] - 63:4, 63:22, 64:13
**influenced** [1] - 72:10
**information** [24] - 11:18, 14:8, 15:12, 19:24, 20:8, 21:9, 25:11, 29:8, 30:7, 30:10, 30:18, 32:8, 34:9, 35:9, 41:18, 43:22, 59:8, 61:24, 79:15, 108:25, 112:8, 116:21, 121:12, 121:16
**inherent** [1] - 90:6
**initial** [1] - 28:5
**initiation** [1] - 74:17
**inject** [1] - 119:24
**innocence** [8] - 4:21, 5:1, 5:6, 7:7, 109:14, 109:18, 109:21, 128:6
**innocent** [3] - 73:10, 109:10, 109:15
**innuendo** [1] - 5:10
**input** [5] - 36:22, 44:21, 111:14, 111:17, 112:7
**input/output** [1] - 25:7
**inputs** [7] - 36:2, 37:22, 95:18, 95:22, 96:16, 121:13, 122:1
**inspection** [1] - 10:8
**instance** [6] - 11:12, 14:10, 14:12, 23:5, 31:12, 69:2
**instances** [1] - 71:5
**instead** [7] - 12:9, 13:18, 20:10, 25:21, 27:6, 117:9, 117:16
**Institute** [1] - 28:12
**integrity** [1] - 66:8
**intend** [3] - 40:8, 107:23, 131:22
**intended** [1] - 32:4
**intent** [1] - 40:14
**interact** [1] - 81:15
**interactive** [1] - 17:5
**interest** [2] - 5:21, 6:12
**interesting** [3] - 97:3, 97:20, 104:20

**interim** [2] - 71:15, 71:18
**international** [1] - 88:24
**internet** [4] - 50:18, 53:3, 74:1, 74:4
**interrupt** [1] - 120:11
**interview** [2] - 123:18, 124:19
**interviews** [2] - 51:11, 67:21
**intimately** [1] - 40:20
**intimidating** [1] - 40:12
**introducing** [1] - 59:12
**invest** [2] - 80:6, 103:9
**investigation** [7] - 22:19, 23:13, 23:14, 25:9, 26:14, 28:18, 48:24
**investigations** [1] - 48:6
**investigative** [2] - 17:8, 48:10
**investing** [1] - 82:8
**Investments** [3] - 103:6, 103:7, 103:11
**investor** [2] - 82:7, 132:13
**invitation** [3] - 34:10, 43:16, 49:7
**invite** [1] - 48:16
**involved** [13] - 16:9, 22:19, 25:9, 34:6, 81:9, 84:8, 111:21, 111:24, 115:16, 117:2, 117:10, 123:10, 132:12
**involvement** [1] - 41:15
**involves** [1] - 78:18
**involving** [1] - 10:22
**IRC** [1] - 106:8
**irregularities** [1] - 44:19
**irrelevant** [7] - 6:6, 7:10, 7:17, 11:18, 18:13, 42:21, 49:13
**issue** [31] - 14:5, 14:7, 14:12, 19:12, 19:15, 19:22, 21:5, 21:8, 22:14, 25:20, 33:16, 34:21, 46:23, 48:16, 48:19, 49:2, 54:13, 55:22, 56:15, 59:9, 59:23, 60:4, 67:16, 68:8, 75:22, 75:25, 76:5, 92:13, 129:17, 131:17, 132:6

**issued** [5] - 8:9, 11:11, 12:8, 24:14, 42:15
**issues** [15] - 11:20, 13:7, 24:15, 34:14, 44:4, 44:6, 45:5, 45:12, 46:15, 47:1, 47:8, 57:1, 82:11, 104:7, 132:19
**issuing** [2] - 8:14, 9:20
**items** [2] - 8:21, 9:24
**itself** [6] - 16:23, 50:15, 91:22, 92:10, 117:19, 132:11

## J

**jail** [1] - 128:5
**January** [3] - 71:23, 72:21, 72:24
**Japan** [3] - 51:4, 54:6, 85:2
**Japanese** [5] - 46:9, 51:21, 52:3, 54:8, 56:10
**jean** [1] - 129:7
**job** [3] - 15:6, 15:8, 118:17
**jobs** [2] - 102:14, 104:24
**joined** [1] - 81:3
**Jonathan** [3] - 4:4, 11:7, 22:18
**JUDGE** [2] - 1:8, 1:8
**Judge** [12] - 8:1, 8:4, 8:7, 8:20, 9:14, 30:6, 34:17, 38:7, 59:9, 59:18, 59:22, 60:1
**June** [7] - 1:5, 49:21, 60:4, 60:6, 60:8, 80:22, 134:7
**juror** [5] - 68:12, 68:14, 70:17, 72:9, 73:23
**jurors** [4] - 66:3, 72:14, 73:4, 73:9
**jury** [15] - 5:8, 36:14, 49:2, 53:20, 57:12, 59:8, 59:23, 63:7, 65:20, 65:21, 66:9, 70:14, 73:8, 74:5
**JUSTICE** [1] - 1:13

## K

**Kappos** [1] - 28:14
**Karpeles** [11] - 44:25, 45:11, 45:13, 46:24, 51:19, 51:22, 51:24, 52:8, 54:7, 55:11

keep [6] - 82:9, 85:22, 94:17, 124:22, 126:20, 128:22
key [33] - 83:2, 83:5, 83:6, 83:7, 83:8, 83:10, 83:14, 83:15, 83:16, 83:21, 83:24, 92:24, 93:1, 93:5, 93:9, 95:4, 95:19, 95:22, 96:17, 99:19, 99:21, 100:3, 100:4, 100:7, 100:9, 110:18, 110:21, 111:5, 132:19
keys [10] - 82:4, 82:5, 83:1, 83:17, 93:17, 94:8, 94:11, 94:13, 99:24, 121:8
kilometers [3] - 91:1, 91:5, 91:11
kind [15] - 29:15, 31:9, 31:16, 42:18, 68:10, 83:10, 84:13, 87:5, 105:9, 105:14, 107:6, 116:25, 117:12, 117:13, 117:25
kinds [1] - 24:14
knowing [2] - 117:21, 117:24
knowledge [21] - 51:3, 51:18, 52:25, 53:12, 53:14, 53:22, 53:24, 54:4, 55:5, 55:6, 55:20, 56:7, 56:10, 56:13, 56:15, 56:16, 56:19, 57:8, 57:15, 57:24, 58:2
known [6] - 17:24, 18:1, 68:21, 82:15, 97:24, 116:5
knows [1] - 43:7
KYC [1] - 85:20

**L**

Labs [1] - 115:17
LAN [1] - 79:6
language [3] - 12:6, 65:18, 74:21
large [9] - 5:3, 9:19, 13:19, 43:21, 91:10, 102:17, 114:9, 116:2, 116:14
largely [2] - 14:22, 79:16
larger [3] - 97:6, 97:11, 98:10
last [4] - 34:17, 81:1, 116:7, 131:19

late [3] - 62:10, 63:14, 132:7
late-filed [1] - 63:14
latest [1] - 6:16
launch [1] - 77:3
laundering [8] - 75:5, 85:20, 89:1, 104:16, 110:22, 122:9, 122:13, 122:19
Law [2] - 1:16, 4:5
law [11] - 12:6, 12:16, 12:21, 20:15, 48:24, 59:5, 68:13, 70:15, 72:10, 90:23, 91:3
lawsuit [1] - 15:17
lawyer [3] - 14:21, 14:22, 67:8
lawyers [5] - 67:4, 67:7, 69:12, 73:2, 76:1
lay [1] - 131:23
layer [2] - 82:17, 82:19
layered [1] - 50:13
lazy [1] - 15:2
lead [2] - 7:12, 118:22
leading [1] - 50:15
leap [1] - 94:22
learn [2] - 84:9, 84:10
learned [4] - 64:9, 108:10, 108:11, 108:15
learning [3] - 80:11, 80:13, 80:21
least [14] - 7:19, 8:2, 17:10, 17:12, 22:25, 23:25, 33:21, 37:17, 37:25, 39:18, 53:25, 56:13, 99:6, 107:15
leave [7] - 4:13, 7:21, 8:1, 9:15, 10:6, 102:21, 102:23
led [4] - 16:8, 28:18, 40:23, 45:8
ledger [2] - 92:19, 122:1
Lee [5] - 4:5, 11:7, 14:19, 14:20, 15:6
left [8] - 15:6, 25:5, 65:2, 89:13, 102:11, 102:13, 102:18, 118:9
legal [3] - 44:9, 49:19, 56:5
legendary [4] - 84:4, 105:25, 107:3, 107:4
length [1] - 12:14
lengthening [3] - 5:22, 6:1, 6:2
less [5] - 103:1, 105:12, 113:12,

120:24, 132:5
letter [3] - 15:14, 15:15
level [4] - 33:8, 36:19, 72:23, 113:13
Levin [3] - 4:4, 11:7, 22:18
liability [1] - 15:23
Liberty [1] - 110:14
liberty [1] - 16:15
license [1] - 27:5
lifted [1] - 65:18
light [2] - 43:1, 119:1
likely [6] - 37:9, 39:12, 56:21, 85:5, 90:9, 99:10
limine [13] - 44:9, 46:17, 47:3, 48:21, 48:23, 48:25, 49:5, 49:7, 49:11, 58:21, 60:7, 60:11
limited [4] - 28:14, 53:15, 74:22, 131:12
limits [1] - 34:11
line [1] - 37:12
link [1] - 95:2
list [4] - 26:12, 51:9, 62:4, 62:6
listened [2] - 108:11, 108:16
listener [2] - 52:14, 52:15
lists [2] - 10:9, 89:15
Litecoin [1] - 84:12
literally [2] - 35:2, 63:18
literature [1] - 116:6
litigate [1] - 7:13
litigation [4] - 6:18, 31:25, 32:6, 38:18
live [1] - 23:23
LLP [1] - 1:19
load [1] - 23:20
local [1] - 3:23
lodging [1] - 107:1
login [1] - 106:10
logistically [2] - 100:25, 101:1
London [1] - 28:12
long-term [1] - 80:23
look [24] - 18:20, 18:22, 18:25, 19:17, 23:23, 25:17, 27:5, 29:21, 32:12, 36:14, 37:8, 38:7, 48:4, 52:23, 55:8, 58:8, 86:11, 88:12, 88:13, 98:5, 104:11, 114:6
looked [1] - 87:14
looking [12] - 29:18,

58:5, 74:20, 82:8, 86:12, 94:10, 95:11, 104:9, 105:24, 117:17, 118:22, 131:17
lost [2] - 93:10, 98:12
ludicrous [1] - 39:1
Lunch [1] - 76:22
lunch [4] - 3:24, 76:7, 76:11, 76:13
lying [2] - 69:18, 69:19

**M**

macro [2] - 113:13, 118:22
macro-level [1] - 113:13
magazine [2] - 68:18, 74:7
main [1] - 103:2
maintain [5] - 54:2, 56:23, 58:14, 58:17, 67:20
maintaining [1] - 79:17
major [6] - 81:10, 81:14, 123:19, 123:23, 123:25, 124:6
majority [2] - 106:20, 106:22
malicious [2] - 40:8, 40:11
malware [1] - 79:17
manage [1] - 85:10
managed [1] - 79:21
manner [1] - 13:19
Mark [4] - 44:24, 51:19, 54:7, 55:10
mark [1] - 44:25
marked [4] - 86:9, 86:19, 88:10, 96:5
Market [1] - 1:19
market [3] - 99:7, 102:14, 113:10
marketing [2] - 40:22
markets [3] - 99:5, 99:8, 99:11
master's [2] - 78:12, 78:19
material [5] - 22:17, 30:1, 31:7, 54:3, 123:1
materials [6] - 4:20, 6:8, 6:9, 9:5, 38:20, 109:20
mathematics [2] - 78:13, 97:25
matter [4] - 41:24,

98:15, 122:16, 128:20
matters [6] - 31:3, 42:21, 55:13, 55:15, 71:9, 77:7
Mazarin [1] - 129:7
Mazarin's [1] - 129:9
Mazars [2] - 129:7, 129:8
meals [1] - 106:21
mean [27] - 6:8, 10:20, 13:2, 16:22, 18:14, 24:24, 27:19, 36:16, 37:1, 43:8, 47:3, 48:15, 50:18, 52:22, 56:12, 56:20, 73:7, 76:10, 96:14, 101:16, 105:14, 117:4, 124:3, 124:16, 124:17, 130:13
meaningful [2] - 19:4, 27:21
means [7] - 14:14, 17:15, 24:4, 46:4, 81:7, 91:18, 109:14
measure [2] - 89:21, 90:24
measured [1] - 91:4
measures [1] - 90:25
measuring [1] - 91:9
medal [1] - 78:14
media [2] - 64:13, 65:10
medians [1] - 81:19
medical [1] - 116:11
meet [1] - 4:15
meeting [2] - 44:24, 108:4
meetups [1] - 70:19
megabytes [1] - 35:2
Meiklejohn [1] - 28:15
member [9] - 64:18, 65:9, 68:5, 80:5, 84:3, 84:4, 104:1, 107:7, 111:20
members [5] - 67:21, 68:22, 68:23, 111:25
Memorandum [1] - 4:5
memory [1] - 87:17
mention [1] - 65:6
mentioned [5] - 8:12, 79:9, 83:1, 103:16, 127:11
mentioning [1] - 132:18
merits [4] - 41:4, 42:25, 63:11, 64:4
met [1] - 129:5
methodologies [2] -

28:21, 114:23

**methodology** [5] - 93:22, 109:11, 109:16, 114:12, 115:1

**metrics** [1] - 113:9

**Mexico** [4] - 108:4, 108:12, 108:17, 125:23

**Miami** [1] - 7:2

**mic** [1] - 129:22

**Michael** [7] - 3:14, 4:4, 11:7, 11:13, 20:19, 22:18, 42:12

**MICHAEL** [1] - 1:16

**micro** [2] - 113:23, 114:7

**Microsoft** [2] - 35:25, 36:1

**might** [10] - 9:7, 18:20, 18:22, 37:16, 41:7, 53:20, 57:7, 59:14, 73:3, 130:24

**Mike** [1] - 24:12

**miles** [5] - 27:7, 27:9, 91:1, 91:4, 91:11

**Miller** [2] - 8:13, 8:17

**million** [3] - 75:6, 97:10

**mind** [4] - 28:24, 82:22, 101:23, 130:3

**mindful** [1] - 77:6

**Mine** [4] - 105:21, 106:1, 106:3, 106:7

**mined** [2] - 92:13, 92:15

**miner** [2] - 92:13, 92:15

**minimal** [1] - 59:5

**minimum** [1] - 115:22

**mining** [1] - 92:16

**minus** [1] - 98:2

**minutes** [8] - 7:4, 98:14, 118:9, 126:17, 126:18, 126:25, 127:1, 128:16

**miscalibrated** [1] - 90:25

**misrepresentations** [1] - 67:5

**missing** [5] - 51:15, 51:16, 52:19, 52:23, 55:2

**mistake** [2] - 36:15

**mistakes** [1] - 51:23

**mistaking** [1] - 91:11

**mitigated** [2] - 81:18, 90:3

**mixes** [1] - 50:19

**model** [3] - 31:23, 32:20, 95:1

**modeling** [1] - 32:10

**models** [1] - 16:10

**modify** [1] - 130:23

**moment** [4] - 21:17, 22:10, 43:11, 95:5

**Monero** [68] - 79:8, 80:7, 80:11, 80:14, 80:15, 80:21, 80:22, 80:25, 81:2, 81:3, 81:4, 81:9, 81:11, 81:14, 84:12, 97:2, 103:17, 103:21, 103:24, 104:2, 104:3, 104:7, 104:23, 104:24, 105:1, 105:3, 105:6, 105:7, 105:10, 105:20, 106:7, 108:11, 108:13, 111:1, 111:20, 118:5, 118:7, 118:13, 120:15, 120:20, 120:24, 121:2, 121:16, 122:2, 122:5, 122:6, 122:8, 122:10, 122:25, 123:1, 123:7, 123:11, 123:18, 123:19, 123:20, 123:23, 124:3, 124:5, 124:7, 124:8, 124:11, 124:21, 125:1, 125:2

**MoneroTopia** [5] - 108:4, 108:16, 108:19, 109:6, 109:8

**money** [11] - 71:12, 75:5, 75:6, 85:20, 89:1, 104:16, 105:2, 110:22, 122:9, 122:13, 122:19

**month** [5] - 34:2, 105:5, 105:8, 105:17, 105:18

**monthly** [3] - 105:8, 105:13, 105:19

**months** [1] - 25:16

**moot** [1] - 33:15

**morning** [11] - 3:6, 3:8, 3:10, 3:11, 3:13, 3:14, 3:16, 11:5, 20:21, 20:22

**Morrison** [1] - 11:6

**MORRISON** [1] - 1:19

**MOSS** [1] - 1:8

**most** [8] - 49:15, 63:3, 103:16, 103:18, 110:3, 117:11,

120:13, 129:8

**motion** [52] - 8:13, 8:17, 11:15, 21:12, 21:13, 21:14, 21:16, 21:18, 22:1, 24:15, 33:13, 33:15, 33:20, 33:23, 39:3, 42:10, 42:12, 46:17, 47:2, 48:20, 48:23, 48:25, 49:5, 49:7, 49:11, 57:11, 58:21, 60:13, 61:3, 61:4, 61:5, 61:8, 62:7, 62:11, 62:22, 63:17, 63:18, 63:19, 63:20, 63:21, 64:1, 64:10, 74:14, 76:25, 77:1, 77:17, 129:1

**Motion** [2] - 4:2, 4:3

**MOTIONS** [2] - 1:4, 1:7

**motions** [9] - 3:19, 3:21, 3:25, 4:23, 44:8, 60:7, 60:11, 75:25, 77:4

**motor** [1] - 90:25

**Movants** [1] - 1:18

**move** [12] - 5:12, 11:17, 20:24, 31:19, 34:15, 61:7, 83:21, 86:19, 87:2, 95:20, 96:5, 121:7

**moved** [5] - 26:14, 43:22, 43:23, 91:9, 103:4

**moving** [7] - 4:9, 12:7, 33:2, 33:7, 42:15, 93:17, 94:14

**MR** [182] - 3:6, 3:11, 3:14, 4:8, 5:14, 5:18, 6:4, 6:24, 7:24, 8:18, 9:13, 10:13, 10:19, 11:5, 11:25, 12:3, 15:20, 16:2, 16:5, 16:17, 16:22, 17:2, 17:13, 19:7, 19:11, 20:17, 20:21, 20:23, 21:2, 21:5, 21:8, 21:14, 21:21, 22:13, 22:21, 22:23, 23:4, 23:11, 24:1, 24:11, 26:5, 26:8, 28:2, 28:4, 28:5, 28:25, 29:14, 30:9, 31:12, 31:20, 32:14, 33:10, 34:20, 34:23, 35:5, 36:7, 36:16, 37:19, 38:17, 39:21, 40:1, 40:14, 41:9, 42:2, 42:14, 44:13, 45:24,

46:2, 47:14, 47:16, 47:19, 47:20, 47:24, 48:4, 48:8, 48:12, 48:15, 50:3, 50:9, 50:25, 51:2, 52:10, 52:12, 52:14, 52:18, 52:25, 54:2, 54:17, 55:4, 55:9, 55:16, 56:3, 56:6, 56:21, 57:17, 57:21, 57:23, 58:14, 59:3, 60:6, 60:10, 60:13, 60:20, 60:21, 62:9, 62:15, 62:22, 64:18, 64:22, 64:25, 65:13, 66:17, 66:19, 66:23, 67:1, 67:9, 67:20, 68:2, 68:6, 68:9, 69:9, 69:14, 69:22, 69:24, 70:2, 70:8, 70:11, 70:22, 71:17, 71:20, 72:8, 72:19, 73:5, 73:13, 73:21, 74:6, 74:14, 75:5, 75:8, 75:12, 76:9, 76:12, 76:14, 76:18, 76:20, 77:3, 77:9, 77:14, 77:15, 77:18, 78:4, 78:7, 81:21, 86:6, 86:8, 86:18, 86:25, 87:1, 88:7, 88:9, 96:4, 96:11, 98:12, 98:16, 98:18, 101:20, 126:10, 126:13, 126:20, 126:23, 127:2, 127:7, 127:10, 128:12, 129:20, 129:23, 130:4, 130:9, 130:12, 130:20, 131:18, 132:25

**MS** [29] - 3:8, 23:17, 66:11, 66:18, 86:22, 96:8, 101:22, 102:4, 107:12, 112:24, 113:5, 116:16, 118:1, 118:15, 120:8, 120:12, 120:14, 121:24, 125:5, 125:10, 125:24, 126:4, 126:7, 126:16, 128:18, 128:24, 129:16, 131:1, 132:22

**Mt** [52] - 43:20, 44:8, 44:11, 44:15, 44:16, 45:2, 45:4, 45:5, 45:9, 45:15, 45:20, 46:3, 46:8, 46:15,

47:3, 48:20, 50:5, 50:14, 50:22, 51:5, 51:6, 51:13, 51:15, 51:20, 51:21, 53:2, 53:3, 54:4, 55:21, 56:7, 57:18, 57:19, 57:24, 58:16, 60:23, 61:9, 84:14, 84:15, 84:16, 84:17, 84:19, 84:22, 84:25, 85:2, 85:11, 85:14, 85:21, 86:1, 86:4, 110:13

**mudslinging** [1] - 15:9

**multihop** [1] - 50:11

**multiple** [3] - 50:14, 51:11, 100:8

**Munich** [1] - 70:18

**must** [4] - 36:11, 119:9, 119:22, 119:24

---

## N

**N.W** [1] - 134:11

**name** [7] - 3:4, 8:10, 43:21, 50:16, 105:20, 105:22, 106:7

**named** [1] - 98:20

**narrow** [4] - 26:12, 37:6, 43:15, 132:14

**narrowly** [2] - 14:15, 131:25

**national** [3] - 68:17, 72:20, 74:7

**native** [1] - 28:23

**natural** [1] - 90:16

**nature** [5] - 32:25, 39:17, 44:22, 82:1, 107:14

**necessarily** [1] - 110:16

**necessary** [6] - 13:12, 39:5, 58:17, 71:14, 72:23, 75:14

**necessity** [1] - 29:13

**need** [65] - 6:9, 7:20, 9:9, 9:18, 9:22, 13:5, 14:7, 14:8, 15:12, 22:12, 24:1, 29:12, 29:21, 30:7, 31:10, 32:8, 32:18, 32:21, 32:22, 33:1, 33:2, 33:4, 33:5, 33:6, 33:7, 33:20, 34:1, 34:4, 34:10, 34:13, 34:18, 35:17, 35:19, 35:24, 36:12, 36:21, 36:24, 37:3, 37:12, 43:6, 52:23, 53:16,

**Appx491**

53:21, 53:25, 54:20, 55:3, 55:19, 61:13, 61:18, 62:2, 62:21, 64:12, 76:15, 112:22, 114:1, 115:11, 117:19, 118:4, 118:5, 126:23, 129:11, 129:20, 129:23, 130:7, 132:8
**needed** [1] - 85:19
**needs** [4] - 12:7, 29:17, 57:5, 66:7
**negative** [3] - 72:20, 72:22, 128:10
**negotiate** [1] - 25:19
**negotiating** [1] - 15:4
**network** [3] - 79:9, 79:23, 103:12
**never** [6] - 26:21, 27:16, 40:7, 82:17, 118:2, 118:4
**New** [2] - 1:17, 107:16
**newspaper** [1] - 68:17
**next** [16] - 11:14, 11:21, 42:10, 42:16, 43:3, 47:2, 62:6, 77:10, 92:20, 119:22, 128:16, 128:25, 129:3, 129:10, 130:13, 132:20
**Nixon** [8] - 4:15, 10:3, 12:16, 24:22, 26:17, 27:13, 31:22, 39:15
**nobody** [3] - 26:22, 55:6, 67:17
**noise** [8] - 78:24, 79:1, 90:4, 90:20, 91:12, 115:25
**noise-type** [2] - 90:20, 91:12
**non** [1] - 129:6
**non-blockchain** [1] - 129:6
**none** [3] - 6:3, 64:11, 96:8
**Nonparty** [1] - 4:3
**nonsense** [1] - 49:16
**nontransparent** [1] - 121:2
**normal** [2] - 31:25, 92:20
**normally** [1] - 113:8
**note** [2] - 62:9, 113:4
**notes** [2] - 28:10, 134:5
**nothing** [14] - 19:25, 20:17, 24:25, 25:2, 35:1, 65:17, 67:18,

72:23, 93:2, 93:6, 93:18, 132:22, 132:25
**notice** [5] - 40:5, 77:25, 131:21, 131:24, 132:4
**noticed** [3] - 44:5, 44:19, 44:23
**noting** [1] - 22:14
**notion** [1] - 32:8
**novel** [1] - 41:6
**number** [15] - 4:12, 4:14, 14:2, 23:4, 45:5, 80:18, 87:20, 89:13, 89:15, 97:23, 98:7, 98:8, 104:6, 124:14, 128:5
**numbers** [3] - 91:10, 114:9, 116:2
**Numbers** [1] - 4:1
**NW** [3] - 1:11, 1:14, 1:23
**NY** [1] - 1:17

## O

**oath** [1] - 68:1
**obfuscating** [1] - 81:7
**object** [1] - 28:20
**objection** [6] - 86:21, 86:22, 96:7, 126:9, 126:13, 131:1
**objections** [1] - 63:16
**objects** [2] - 9:2, 20:23
**obligated** [1] - 123:5
**obligation** [3] - 21:24, 34:23, 41:19
**obligations** [6] - 21:20, 24:19, 40:6, 62:17, 62:19, 63:9
**observation** [4] - 45:19, 45:21, 45:22, 45:24
**observe** [1] - 123:4
**observed** [1] - 123:2
**observer** [1] - 46:13
**obtain** [2] - 11:18, 13:22
**obtained** [2] - 78:10, 78:11
**obviate** [1] - 53:25
**obvious** [3] - 43:1, 50:4, 124:5
**obviously** [9] - 14:21, 17:4, 36:17, 41:25, 45:16, 49:12, 53:20, 56:24, 105:11
**occurred** [3] - 103:18, 114:12, 114:13

**occurring** [2] - 21:21, 94:21
**October** [1] - 80:2
**odd** [1] - 79:22
**OF** [8] - 1:1, 1:2, 1:7, 1:13, 78:5, 102:2, 127:8, 134:1
**off-chain** [2] - 99:19, 99:24
**off-guard** [1] - 132:2
**offense** [1] - 5:7
**offer** [5] - 54:22, 61:22, 61:24, 131:22, 132:15
**offered** [1] - 8:22
**offering** [3] - 130:19, 131:13, 132:16
**office** [1] - 26:20
**Office** [1] - 8:3
**officer** [2] - 69:3, 91:3
**Official** [2] - 1:22, 134:10
**OFFICIAL** [1] - 134:1
**older** [1] - 10:24
**once** [1] - 121:7
**One** [1] - 72:2
**one** [82] - 4:12, 5:9, 7:3, 8:15, 11:22, 14:7, 14:16, 14:19, 20:10, 22:16, 24:9, 30:4, 35:12, 35:23, 39:11, 39:20, 42:12, 44:22, 45:5, 45:22, 51:6, 51:14, 52:7, 52:11, 53:1, 53:7, 53:18, 56:9, 57:5, 58:6, 60:5, 60:7, 60:13, 62:4, 62:6, 64:16, 65:4, 78:22, 78:23, 79:12, 84:18, 84:22, 87:10, 87:13, 89:9, 90:12, 92:20, 93:13, 94:15, 95:22, 96:1, 96:15, 97:1, 97:5, 97:10, 98:15, 98:16, 99:1, 99:5, 100:5, 104:13, 104:20, 106:20, 108:13, 111:6, 111:17, 111:19, 116:3, 116:21, 117:1, 117:16, 119:8, 122:8, 122:15, 122:22, 123:19, 124:6, 127:3, 127:23, 129:4
**one's** [1] - 28:10
**one-sided** [2] - 45:22, 58:6
**ones** [5] - 88:3, 95:16,

115:9, 117:2
**ongoing** [1] - 66:14
**opaque** [1] - 26:16
**open** [2] - 32:4, 87:8
**open-source** [1] - 87:8
**opening** [1] - 62:11
**operated** [1] - 50:11
**operating** [1] - 41:2
**operational** [1] - 41:3
**operator** [1] - 71:3
**opine** [2] - 41:4, 46:14
**opined** [1] - 45:12
**opines** [1] - 16:8
**opinion** [10] - 8:2, 16:7, 16:16, 37:14, 37:20, 61:19, 90:9, 124:1, 132:17
**opinions** [5] - 20:5, 46:6, 46:16, 46:19, 46:21
**opportunities** [1] - 102:19
**opportunity** [10] - 7:4, 13:6, 16:15, 18:19, 19:5, 33:5, 42:17, 47:9, 98:22, 98:23
**opposed** [4] - 64:10, 113:9, 122:12, 122:20
**opposing** [1] - 26:11
**opposition** [8] - 20:11, 48:19, 49:10, 50:6, 62:10, 63:14, 78:1, 130:5
**oral** [1] - 62:13
**order** [32] - 3:22, 9:1, 9:5, 9:11, 11:24, 12:19, 13:2, 18:16, 29:8, 30:7, 31:10, 32:8, 32:19, 32:22, 33:8, 38:21, 41:20, 55:18, 62:16, 62:17, 64:14, 65:17, 67:11, 67:17, 75:14, 75:17, 75:22, 76:5, 77:4, 115:6
**orderly** [1] - 8:14
**orders** [1] - 75:25
**ordinarily** [1] - 121:22
**organizes** [1] - 101:2
**original** [4] - 56:8, 93:9, 93:10
**otherwise** [2] - 62:3, 114:11
**ought** [1] - 72:2
**outdated** [1] - 25:25
**output** [4] - 31:16, 36:23, 44:21, 97:21
**outputs** [5] - 36:3,

37:22, 100:20, 121:13, 122:1
**outreach** [2] - 71:4, 71:13
**outright** [1] - 15:3
**outset** [1] - 62:10
**outside** [3] - 4:20, 30:11, 79:3
**overall** [5] - 82:9, 97:18, 98:6, 98:7, 105:7
**overbroad** [2] - 4:15, 131:21
**overlap** [2] - 130:17, 132:5
**overwhelming** [1] - 72:20
**owes** [1] - 45:17
**own** [9] - 36:3, 52:22, 79:12, 79:21, 79:22, 103:15, 119:18, 119:19
**ownership** [1] - 92:5
**owns** [1] - 83:15

## P

**p.m** [3] - 76:22, 133:3
**P2P** [2] - 113:9, 114:4
**PAGE** [2] - 2:2, 2:10
**page** [11] - 67:10, 88:15, 89:7, 89:10, 89:11, 112:3, 112:15, 112:18, 112:19, 112:25
**pages** [1] - 12:14
**paid** [5] - 48:2, 92:17, 106:17, 106:20, 106:25
**pair** [5] - 95:19, 96:17, 96:18, 99:21, 100:7
**pairs** [4] - 95:22, 100:3, 100:4, 100:9
**panel** [1] - 108:18
**paper** [8] - 28:17, 30:11, 30:20, 38:21, 41:10, 41:12, 94:25, 127:19
**papers** [5] - 9:2, 10:9, 28:20, 104:6, 132:11
**paragraph** [8] - 112:14, 112:17, 112:18, 112:19, 112:25, 113:3, 113:6, 113:14
**pardon** [2] - 102:22, 125:20
**Part** [1] - 13:13
**part** [20] - 5:8, 8:8, 13:19, 14:1, 17:1,

20:2, 26:12, 29:7, 52:10, 52:11, 59:20, 104:3, 108:21, 110:10, 110:11, 110:14, 111:1, 118:17, 122:5, 131:19
**participated** [1] - 65:1
**participating** [2] - 99:8, 99:9
**particular** [22] - 12:15, 16:9, 19:12, 19:20, 32:21, 37:6, 38:15, 59:14, 70:3, 78:16, 81:13, 81:17, 87:18, 87:19, 87:25, 98:4, 99:3, 102:14, 104:22, 107:14, 109:1, 118:11
**particularly** [9] - 54:19, 74:24, 82:4, 84:8, 97:2, 100:10, 114:9, 129:24, 130:6
**parties** [6] - 3:20, 9:22, 42:1, 53:10, 62:13, 75:23
**parties'** [1] - 17:10
**partner** [1] - 129:9
**party** [10] - 4:10, 5:13, 12:7, 20:25, 21:4, 46:13, 46:18, 47:6, 48:17, 101:3
**pass** [3] - 98:17, 101:20, 129:13
**passed** [3] - 59:25, 101:23, 129:9
**past** [1] - 98:14
**pasted** [1] - 63:18
**patently** [1] - 15:24
**pause** [1] - 27:18
**paying** [2] - 29:3, 30:15
**payment** [5] - 47:25, 50:16, 71:16, 71:19
**PELKER** [30] - 1:13, 3:8, 23:17, 66:11, 66:18, 86:22, 96:8, 101:22, 102:4, 107:12, 112:24, 113:5, 116:16, 118:1, 118:15, 120:8, 120:12, 120:14, 121:24, 125:5, 125:10, 125:24, 126:4, 126:7, 126:16, 128:18, 128:24, 129:16, 131:1, 132:22
**Pelker** [10] - 2:6, 3:8,

42:6, 64:19, 69:14, 70:3, 70:4, 76:25, 77:1, 101:21
**Pelker's** [1] - 76:9
**penalty** [1] - 32:17
**pending** [1] - 29:2
**penetration** [1] - 7:15
**Pennsylvania** [1] - 1:14
**people** [20] - 9:9, 45:6, 46:14, 49:18, 67:25, 71:5, 71:6, 72:16, 73:11, 73:18, 74:1, 81:16, 82:19, 95:9, 95:20, 99:8, 100:17, 100:20, 100:21, 102:17
**per** [6] - 91:1, 91:4, 91:5, 105:17, 105:18
**perceive** [1] - 122:9
**perceived** [1] - 41:7
**percent** [7] - 80:24, 87:25, 89:17, 103:22, 118:12
**percentage** [8] - 87:15, 87:20, 89:5, 101:11, 101:17, 101:18, 103:18, 114:25
**perception** [1] - 122:11
**percipient** [3] - 46:3, 46:4, 51:18
**perfectly** [1] - 72:5
**perform** [1] - 14:3
**perhaps** [4] - 8:25, 21:14, 22:1, 37:19
**period** [4] - 65:11, 88:6, 109:12, 129:14
**perjury** [1] - 32:17
**permit** [1] - 74:19
**person** [23] - 32:15, 43:7, 45:3, 54:21, 63:6, 93:4, 93:8, 93:10, 94:13, 94:19, 94:23, 95:4, 99:19, 99:22, 100:14, 121:8, 128:4, 128:6, 128:8, 128:11, 130:7, 130:11
**personal** [16] - 52:25, 53:12, 53:14, 53:22, 53:24, 55:5, 55:20, 56:7, 56:13, 56:15, 56:16, 56:19, 57:8, 57:15, 57:24, 58:2
**personally** [1] - 111:24
**persons** [5] - 94:13, 94:20, 94:23, 95:4,

99:20
**perspective** [2] - 82:7, 87:6
**persuasive** [1] - 64:12
**pet** [1] - 7:8
**Ph.D** [2] - 78:10, 78:19
**phone** [1] - 25:21
**phrase** [2] - 90:13, 94:5
**physicist** [1] - 102:5
**physics** [9] - 78:10, 78:12, 78:16, 78:17, 78:18, 132:9
**Physics** [1] - 102:7
**picking** [1] - 22:13
**picture** [1] - 118:22
**piece** [4] - 13:3, 16:20, 36:9, 50:10
**pile** [1] - 9:8
**place** [6] - 18:16, 19:23, 32:5, 62:18, 84:9, 84:12
**placed** [1] - 73:25
**places** [1] - 13:7
**plain** [1] - 12:5
**Plaintiff** [2] - 1:3, 1:10
**plan** [1] - 103:20
**planning** [1] - 6:25
**plausible** [2] - 121:11, 127:17
**playing** [1] - 29:25
**pleadings** [1] - 62:23
**PLLC** [1] - 1:16
**plug** [1] - 34:25
**plus** [4] - 35:23, 36:4, 36:8
**Podcast** [1] - 6:22
**podcast** [5] - 6:22, 7:2, 62:25, 124:19
**podcasts** [6] - 6:20, 40:2, 63:6, 65:23, 70:22, 108:13
**point** [36] - 9:18, 9:19, 10:18, 22:5, 22:25, 24:9, 24:18, 29:15, 33:17, 34:14, 36:24, 37:2, 38:12, 44:15, 46:11, 50:4, 56:6, 56:12, 61:12, 62:1, 64:3, 72:22, 73:5, 75:13, 75:16, 84:18, 96:4, 108:21, 109:2, 109:19, 111:2, 119:17, 121:5, 124:2, 125:24, 131:10
**pointed** [2] - 19:12, 126:2
**pointing** [1] - 29:23
**points** [3] - 19:21,

26:9, 120:9
**policing** [3] - 4:18, 5:15, 11:1
**Policy** [8] - 104:3, 104:24, 105:6, 111:1, 111:20, 122:6, 123:1
**policy** [1] - 104:7
**pool** [4] - 63:7, 66:9, 68:12, 70:14
**popular** [1] - 95:7
**portfolio** [1] - 103:8
**portion** [5] - 36:12, 37:13, 37:17, 103:20, 114:4
**portions** [1] - 114:15
**pose** [1] - 63:6
**position** [10] - 34:2, 34:16, 46:20, 48:3, 48:6, 54:5, 54:17, 111:19, 122:17, 131:15
**positions** [1] - 104:23
**positive** [2] - 128:8, 128:10
**possibility** [4] - 59:21, 72:9, 72:12, 127:24
**possible** [5] - 72:14, 93:11, 101:14, 117:12, 127:4
**possibly** [1] - 38:3
**post** [4] - 6:25, 106:7, 106:13, 125:14
**post-trial** [1] - 6:25
**postdoctoral** [1] - 102:8
**posted** [1] - 74:3
**posting** [1] - 73:24
**posts** [2] - 42:23, 104:7
**posture** [1] - 26:16
**potential** [11] - 5:21, 36:12, 37:5, 41:8, 43:18, 44:6, 46:7, 70:14, 82:5, 125:1, 128:7
**potentially** [3] - 20:7, 68:11, 119:5
**practice** [3] - 25:25, 26:10, 38:18
**practicing** [2] - 62:18, 65:5
**Prague** [2] - 105:10, 120:18
**precedent** [1] - 40:10
**precisely** [1] - 102:24
**preclude** [1] - 77:1
**predict** [1] - 57:21
**predictive** [1] - 32:20
**prejudge** [1] - 37:1

**prejudice** [5] - 29:21, 33:13, 61:5, 65:21
**premiere** [1] - 107:7
**premise** [3] - 109:15, 119:8, 121:9
**preparation** [1] - 60:16
**prepare** [4] - 30:7, 32:15, 32:23, 34:4
**present** [6] - 3:12, 33:23, 61:17, 63:7, 75:24, 108:17
**presentation** [2] - 5:5, 29:9
**presented** [5] - 29:4, 30:12, 30:16, 41:12, 96:3
**presenting** [1] - 23:18
**preservation** [2] - 40:5, 40:6
**President's** [1] - 26:19
**press** [9] - 62:25, 65:14, 65:22, 68:5, 71:2, 72:22, 74:6, 74:16
**presumably** [2] - 48:20, 95:10
**presume** [1] - 127:15
**presumption** [3] - 28:17, 109:17, 109:18
**pretrial** [6] - 3:19, 10:8, 54:1, 54:19, 58:16, 60:11
**pretty** [2] - 36:11, 37:14
**preventing** [4] - 5:21, 6:12, 85:1, 110:22
**previewed** [1] - 130:5
**previously** [1] - 112:25
**price** [3] - 81:13, 85:8, 123:23
**primarily** [3] - 81:10, 85:19, 110:8
**primary** [4] - 4:18, 50:9, 120:15
**Prince** [2] - 80:3, 103:4
**principal** [3] - 130:18, 131:13, 132:2
**privacy** [6] - 81:16, 95:1, 100:24, 101:7, 124:23, 127:20
**private** [23] - 21:23, 24:20, 26:15, 41:17, 73:25, 79:15, 82:5, 83:1, 83:2, 83:7, 83:14, 83:15, 83:21, 83:23, 92:24, 93:1,

93:5, 93:9, 93:17, 94:18, 99:18, 99:24
**private/public** [2] - 95:18, 100:3
**privately** [1] - 125:22
**privileged** [1] - 14:22
**privileges** [1] - 14:24
**probabilistic** [1] - 24:5
**probability** [4] - 68:14, 70:17, 73:23, 117:24
**problem** [19] - 14:1, 26:13, 32:12, 36:11, 37:6, 38:15, 41:16, 55:10, 63:8, 72:16, 72:17, 74:1, 82:13, 85:15, 97:3, 97:20, 99:14, 129:12, 129:24
**problematic** [1] - 24:21
**problems** [8] - 76:4, 80:10, 82:12, 82:14, 82:24, 85:5, 85:6, 97:5
**procedural** [3] - 5:16, 7:19, 12:11
**procedurally** [1] - 4:12
**procedure** [1] - 8:15
**Procedure** [1] - 25:25
**proceed** [5] - 3:19, 62:8, 77:15, 77:17, 78:3
**proceeding** [2] - 30:23, 128:17
**proceedings** [4] - 76:6, 76:16, 76:23, 134:6
**process** [5] - 5:23, 40:21, 66:2, 72:6, 73:9
**processes** [2] - 17:25, 18:2
**processing** [2] - 31:14, 78:20
**produce** [7] - 8:21, 9:2, 16:12, 21:24, 22:8, 27:1, 27:4
**produced** [12] - 9:6, 9:9, 21:9, 23:21, 25:20, 30:10, 35:2, 35:10, 35:12, 36:23, 98:20, 110:2
**producing** [2] - 37:17, 39:11
**product** [1] - 19:20
**production** [6] - 9:15, 9:21, 12:7, 25:13, 39:18
**products** [3] - 14:2, 14:3, 15:21

**Professional** [1] - 65:6
**proffered** [2] - 77:18, 98:19
**profile** [1] - 106:5
**profiles** [1] - 105:24
**profound** [1] - 100:9
**program** [1] - 79:5
**programs** [1] - 122:10
**project** [5] - 81:5, 81:9, 105:1, 105:3, 107:9
**prolonging** [1] - 7:12
**promised** [1] - 42:11
**promoting** [1] - 68:10
**proper** [2] - 19:14, 21:25
**properly** [2] - 19:21, 34:10
**property** [1] - 103:9
**proponent** [1] - 60:25
**proportion** [1] - 89:12
**proposal** [1] - 122:23
**proposals** [1] - 122:24
**proposed** [7] - 3:20, 9:21, 62:16, 62:17, 65:17, 104:22, 122:13
**proprietary** [6] - 18:15, 87:25, 116:22, 116:23, 117:11, 117:20
**propriety** [3] - 5:16, 8:9, 11:2
**prosecuting** [1] - 7:8
**prosecution** [12] - 28:18, 40:9, 40:11, 64:19, 67:18, 67:21, 67:22, 68:4, 68:23, 68:24, 69:6
**prosecutor** [4] - 67:9, 67:12, 67:13, 67:15
**prosecutors** [3] - 63:3, 69:4, 75:1
**prospective** [3] - 63:12, 72:14, 73:4
**prospectively** [1] - 67:16
**protective** [4] - 18:16, 29:8, 38:21, 41:19
**protocol** [1] - 124:18
**proud** [1] - 84:15
**prove** [2] - 38:7, 128:6
**proven** [1] - 109:15
**provide** [3] - 39:13, 59:8, 61:25
**Providers** [1] - 88:20
**provides** [1] - 88:24
**providing** [2] - 112:8, 113:9

**public** [34] - 29:9, 35:8, 41:18, 42:22, 49:20, 65:23, 71:4, 71:13, 82:4, 83:6, 83:10, 83:14, 83:16, 83:17, 83:20, 93:15, 94:8, 94:11, 94:21, 95:3, 104:16, 108:13, 110:18, 110:21, 110:25, 111:11, 111:14, 111:17, 121:7, 122:1, 123:13, 125:11
**public/private** [4] - 83:5, 95:22, 96:17, 100:4
**publicity** [4] - 70:25, 72:20, 72:23
**publicly** [7] - 29:4, 30:16, 30:20, 35:9, 41:12, 95:15, 105:20
**published** [3] - 30:21, 41:13, 89:5
**pulled** [1] - 34:24
**pulling** [1] - 35:7
**purchase** [1] - 80:3
**purchasing** [1] - 80:22
**purpose** [7] - 17:7, 18:5, 49:4, 49:25, 55:3, 57:16, 65:21
**purposes** [10] - 30:1, 33:23, 42:18, 43:2, 43:24, 54:3, 61:17, 61:18, 75:24, 131:22
**pursue** [1] - 40:8
**pushed** [1] - 61:11
**put** [25] - 31:11, 32:9, 34:2, 35:21, 36:3, 36:13, 38:19, 40:5, 46:5, 47:10, 50:6, 50:12, 57:7, 59:24, 63:5, 67:25, 69:16, 85:9, 92:24, 100:5, 111:13, 125:18, 131:15, 132:4
**putting** [2] - 42:22, 58:11

# Q

**qualification** [1] - 61:22
**qualifications** [1] - 44:2
**qualitative** [1] - 10:10
**quash** [16] - 3:21, 4:1, 4:9, 5:13, 8:17, 11:15, 20:24, 21:16, 24:16, 33:13, 33:23,

42:12, 42:15, 43:23, 61:3, 76:25
**Quash** [2] - 4:2, 4:3
**quashed** [2] - 11:11, 20:3
**quashing** [1] - 33:19
**questionable** [1] - 46:5
**questions** [6] - 7:14, 43:20, 48:13, 55:16, 121:23, 128:12
**quickly** [3] - 33:7, 33:25, 34:15
**quietly** [1] - 71:9
**quite** [4] - 27:11, 27:23, 53:15, 58:12
**quote** [5] - 62:21, 68:19, 110:20, 123:2, 123:19
**quoted** [1] - 6:22

# R

**race** [3] - 124:9, 124:11, 124:23
**radar** [1] - 90:24
**Rainer** [1] - 28:14
**raise** [4] - 59:23, 72:5, 76:7, 77:21
**raised** [6] - 8:16, 22:5, 24:2, 59:9, 63:16, 71:13
**raises** [3] - 21:8, 55:16, 82:11
**ran** [1] - 35:22
**RANDOLPH** [1] - 1:8
**random** [9] - 78:23, 78:24, 90:2, 90:4, 90:20, 91:7, 115:24, 115:25
**range** [8] - 80:19, 89:17, 89:23, 90:6, 96:22, 105:9, 105:15, 115:1
**ranges** [4] - 89:5, 89:16, 89:19, 89:23
**ranging** [4] - 13:7, 13:18, 13:24, 14:17
**rather** [11] - 14:4, 20:6, 30:6, 31:8, 31:10, 49:5, 57:1, 57:2, 58:11, 115:5, 128:19
**raw** [3] - 35:6, 35:16, 35:20
**reach** [3] - 33:20, 49:12, 119:13
**reached** [1] - 119:18
**reaching** [1] - 46:19
**Reactor** [10] - 23:6,

23:20, 27:5, 43:21, 55:22, 56:9, 71:8, 87:4, 88:1
**reactor** [1] - 117:16
**reactors** [1] - 117:17
**read** [14] - 8:19, 8:20, 9:14, 10:11, 10:20, 15:12, 69:1, 73:14, 73:15, 98:22, 98:23, 116:10, 132:11
**reading** [5] - 9:4, 10:15, 39:6, 39:8, 73:19
**real** [9] - 27:18, 29:13, 82:23, 99:25, 103:3, 103:8, 103:11, 103:23, 128:7
**realistically** [2] - 103:22, 105:13
**realize** [3] - 27:14, 71:7, 94:16
**realized** [3] - 80:11, 85:5, 85:14
**really** [20] - 4:25, 5:6, 7:9, 9:10, 13:24, 26:1, 27:2, 27:21, 28:8, 30:1, 30:4, 36:8, 64:11, 78:22, 84:9, 84:22, 118:8, 130:6, 131:6, 132:10
**reason** [22] - 6:18, 20:2, 23:15, 37:10, 38:14, 39:14, 39:17, 48:21, 50:20, 59:3, 60:1, 60:21, 66:6, 74:15, 84:24, 90:19, 95:6, 100:13, 100:22, 102:13, 103:2
**reasonable** [7] - 68:14, 70:17, 72:9, 72:11, 73:23, 105:19, 109:17
**reasonably** [1] - 41:7
**reasons** [4] - 4:11, 24:2, 122:15, 122:22
**rebut** [1] - 35:24
**receive** [1] - 105:2
**received** [2] - 51:9, 109:4
**receiving** [3] - 48:1, 51:12, 62:24
**recent** [1] - 49:21
**recently** [4] - 26:4, 26:7, 45:6, 49:15
**recess** [1] - 76:22
**Recess** [1] - 42:9
**recognizes** [1] - 113:7
**recommend** [1] - 33:7
**recommendations** [1]

- 88:24

**record** [9] - 3:4, 38:19, 39:1, 39:4, 41:1, 66:12, 66:19, 88:16, 92:12

**recorded** [1] - 121:12

**records** [12] - 18:11, 28:9, 39:18, 55:12, 60:16, 60:22, 60:23, 60:25, 91:1, 110:12, 110:13

**red** [1] - 36:25

**Reddit** [5] - 106:1, 106:3, 106:5, 124:24, 125:9

**redirect** [1] - 126:18

**Redirect** [1] - 2:7

**REDIRECT** [1] - 127:8

**refer** [2] - 43:1, 90:18

**reference** [2] - 29:1, 112:24

**referenced** [2] - 15:13, 68:25

**referred** [1] - 16:3

**reflect** [2] - 4:15, 26:2

**reflected** [1] - 49:14

**reflects** [1] - 86:15

**refrain** [1] - 40:14

**refresh** [1] - 88:4

**regard** [1] - 37:11

**regarding** [4] - 13:15, 20:5, 111:8, 112:2

**regardless** [1] - 24:1

**registration** [1] - 50:16

**regs** [1] - 14:24

**regular** [2] - 49:21, 113:25

**regularly** [1] - 107:10

**regulates** [1] - 112:12

**regulations** [3] - 85:19, 89:2, 111:22

**reimbursed** [1] - 106:19

**reject** [1] - 72:21

**relate** [1] - 13:11

**related** [12] - 14:8, 18:11, 28:16, 43:20, 45:5, 45:14, 47:3, 48:6, 57:18, 81:5, 96:14, 96:21

**relating** [5] - 3:22, 7:15, 16:3, 61:19, 115:4

**relation** [3] - 78:15, 89:5, 96:13

**relationship** [1] - 110:17

**relationships** [1] - 94:10

**relative** [15] - 89:21, 90:5, 97:6, 97:17, 98:5, 114:19, 115:5, 115:9, 115:15, 115:20, 115:21, 117:18, 120:3, 120:4

**relatively** [1] - 61:15

**release** [3] - 71:2, 74:6, 74:16

**released** [1] - 71:1

**releases** [1] - 74:17

**releasing** [1] - 29:25

**relevance** [7] - 4:19, 5:15, 10:4, 12:17, 30:24, 39:16, 54:25

**relevant** [27] - 4:20, 5:6, 5:24, 7:16, 11:19, 13:4, 13:22, 15:1, 30:4, 30:22, 31:1, 31:7, 31:14, 31:15, 43:2, 44:1, 44:4, 44:6, 44:8, 46:16, 47:1, 47:7, 48:18, 48:23, 53:15, 54:22, 59:19

**reliability** [3] - 57:13, 60:24, 61:23

**reliance** [1] - 16:20

**relied** [1] - 36:17

**relief** [2] - 62:14, 62:15

**relies** [3] - 122:1, 122:3

**reluctant** [1] - 128:22

**relying** [2] - 58:4, 122:11

**remainder** [1] - 128:17

**remedy** [1] - 21:25

**remember** [3] - 88:2, 88:5, 111:18

**remembering** [1] - 130:25

**removing** [1] - 79:17

**renewing** [1] - 61:6

**repeat** [1] - 85:24

**repeatedly** [1] - 63:5

**rephrase** [1] - 115:13

**replace** [1] - 91:22

**reply** [3] - 63:15, 70:24, 74:10

**report** [17] - 35:2, 87:11, 98:21, 98:23, 98:25, 99:4, 100:6, 108:9, 112:5, 112:15, 113:18, 114:18, 114:22, 116:9, 116:17, 117:14, 117:15

**reported** [1] - 113:21

**reporter** [4] - 28:16,

47:6, 69:7, 112:21

**REPORTER** [3] - 115:11, 129:21, 134:1

**Reporter** [3] - 1:22, 1:22, 134:10

**reporting** [1] - 113:24

**reports** [3] - 34:24, 35:10, 111:22

**representation** [1] - 64:15

**represented** [1] - 94:11

**request** [11] - 19:19, 23:22, 28:4, 28:5, 28:6, 28:9, 30:9, 71:15, 71:18, 113:11, 115:18

**requested** [1] - 18:10

**requests** [18] - 7:18, 12:13, 12:14, 12:20, 13:1, 13:10, 13:18, 13:19, 13:21, 13:24, 14:15, 14:17, 19:24, 20:5, 24:10, 27:19, 28:7

**require** [10] - 7:25, 8:16, 28:23, 39:7, 39:12, 39:17, 39:18, 48:17, 57:20

**required** [8] - 9:15, 16:11, 16:18, 22:7, 27:12, 39:10, 59:6, 59:7

**requirement** [1] - 7:20

**requirements** [2] - 9:20, 109:2

**requires** [2] - 16:6, 57:19

**reschedule** [3] - 128:17, 129:11, 129:14

**research** [8] - 28:21, 80:22, 82:1, 87:8, 87:10, 102:9, 113:11, 119:15

**researcher** [1] - 28:11

**researchers** [7] - 28:22, 29:3, 30:11, 30:15, 30:16, 38:21, 41:12

**researching** [2] - 80:1, 81:23

**Reserve** [1] - 110:14

**resident** [1] - 80:3

**resistant** [3] - 118:6, 118:12, 118:14

**resolve** [2] - 34:14, 45:18

**resources** [1] - 43:7

**respect** [15] - 3:20, 5:2, 8:24, 8:25, 34:23, 44:7, 45:20, 54:25, 57:9, 57:11, 57:13, 61:3, 89:1, 89:9, 98:10

**respectable** [1] - 123:3

**respective** [2] - 100:20, 123:2

**respects** [1] - 76:3

**respond** [2] - 19:13, 38:24

**responded** [2] - 104:17, 104:19

**responds** [1] - 124:12

**response** [14] - 19:17, 20:11, 62:12, 64:6, 64:8, 64:11, 66:13, 104:12, 104:14, 104:18, 111:6, 124:15, 124:17, 130:21

**responses** [1] - 104:18

**responsibility** [1] - 8:8

**responsible** [1] - 45:4

**rest** [3] - 76:16, 86:3, 111:25

**result** [4] - 16:9, 37:11, 116:5, 123:23

**resulting** [3] - 111:21, 111:22, 128:2

**results** [10] - 18:24, 19:4, 29:21, 79:1, 95:10, 95:25, 115:25, 116:3, 117:17, 117:22

**resume** [2] - 86:14, 86:15

**retained** [1] - 47:18

**retention** [1] - 47:22

**retirement** [1] - 103:20

**return** [10] - 4:9, 4:14, 6:8, 7:20, 7:25, 8:6, 8:25, 10:25, 12:19, 13:3

**Return** [1] - 4:2

**retweeting** [1] - 49:16

**reveal** [1] - 95:8

**review** [11] - 6:7, 6:10, 9:9, 9:22, 34:18, 88:18, 109:20, 110:4, 116:17, 116:18, 117:1

**reviewed** [4] - 55:1, 109:4, 109:23, 109:25

**reviewing** [2] - 110:1, 110:5

**revised** [1] - 88:18

**revisit** [1] - 61:25

**reward** [3] - 82:11, 82:22, 92:16

**ring** [2] - 81:6, 81:7

**rings** [1] - 124:14

**risk** [6] - 74:4, 113:25, 114:2, 114:6, 117:23, 124:17

**risk-averse** [1] - 124:17

**risk/high** [1] - 113:25

**risk/high-risk** [1] - 113:25

**RMR** [2] - 1:22, 134:9

**road** [1] - 82:24

**Road** [1] - 85:7

**robbed** [1] - 38:3

**role** [3] - 11:1, 79:14, 94:14

**roles** [1] - 79:16

**Rollet** [1] - 28:15

**Roman** [5] - 3:3, 3:12, 3:15, 4:25, 28:19

**ROMAN** [1] - 1:5

**room** [4] - 17:11, 61:11, 106:20, 106:23

**Room** [2] - 1:23, 134:10

**roughly** [1] - 25:16

**routinely** [1] - 65:8

**rubber** [1] - 64:7

**rule** [26] - 8:15, 9:14, 9:17, 16:6, 21:16, 26:3, 26:6, 31:4, 52:17, 59:22, 62:20, 67:7, 67:12, 67:15, 67:16, 67:17, 67:18, 72:8, 73:17, 73:19, 73:20, 73:22, 74:12, 74:16, 75:10, 75:21

**Rule** [37] - 3:21, 3:23, 4:2, 4:9, 5:5, 8:5, 8:14, 8:19, 8:22, 9:20, 9:23, 10:11, 10:22, 12:24, 13:12, 13:22, 14:13, 16:11, 19:21, 19:22, 21:9, 21:13, 21:16, 22:1, 22:8, 24:19, 32:4, 33:3, 33:9, 34:20, 39:6, 62:7, 62:11, 62:19, 65:5, 75:16, 76:1

**Rules** [2] - 25:24, 65:6

**rules** [9] - 16:3, 26:1, 27:18, 28:1, 28:23, 72:6, 72:11, 72:25, 76:2

| | | | | |
|---|---|---|---|---|
| **ruling** [3] - 59:4, 60:15, 61:14<br>**run** [2] - 97:5, 97:20<br>**runaround** [1] - 84:20<br>**running** [4] - 16:9, 71:21, 98:13, 128:11<br>**runs** [1] - 35:14<br><br>**S**<br><br>**Safavian** [1] - 59:10<br>**San** [1] - 1:20<br>**sandbagged** [1] - 27:9<br>**Sarah** [1] - 28:15<br>**satisfied** [1] - 39:16<br>**satisfies** [1] - 31:23<br>**satisfy** [1] - 33:8<br>**satisfying** [1] - 33:3<br>**saved** [1] - 85:12<br>**saw** [8] - 38:1, 52:19, 53:7, 54:11, 55:1, 55:17, 56:14, 63:18<br>**scale** [2] - 82:15, 97:3<br>**scales** [1] - 98:1<br>**scaling** [4] - 80:9, 81:5, 81:10, 96:25<br>**scam** [1] - 27:24<br>**schedule** [4] - 61:14, 128:25, 129:24, 130:16<br>**scheduled** [1] - 77:7<br>**scheduling** [1] - 3:20<br>**Scholl** [1] - 25:5<br>**school** [1] - 78:14<br>**science** [1] - 90:16<br>**Science** [1] - 28:13<br>**sciences** [1] - 90:16<br>**scientific** [2] - 116:5, 116:12<br>**scintilla** [1] - 19:23<br>**scope** [2] - 43:13, 87:2<br>**Scott** [3] - 129:20, 130:6, 130:9<br>**Scott's** [2] - 129:2, 129:23<br>**seated** [1] - 77:24<br>**second** [10] - 9:10, 17:12, 18:23, 39:8, 39:14, 52:5, 82:16, 82:19, 88:18, 90:12<br>**second-layer** [1] - 82:19<br>**section** [1] - 88:15<br>**secure** [1] - 79:14<br>**secured** [1] - 82:4<br>**Security** [1] - 28:17<br>**security** [4] - 80:23, 82:3, 82:11, 82:14<br>**see** [29] - 24:1, 26:22, 29:9, 29:24, 35:24, | 36:12, 37:9, 37:12, 44:8, 52:23, 53:4, 55:23, 58:5, 61:17, 63:23, 71:12, 74:1, 75:15, 76:21, 83:6, 83:9, 85:15, 88:3, 91:3, 106:2, 117:19, 124:8, 132:20<br>**seeing** [3] - 44:21, 58:6, 90:5<br>**seek** [2] - 4:19, 125:25<br>**seeking** [9] - 4:24, 24:10, 58:16, 58:19, 58:24, 60:4, 62:14, 62:15, 70:12<br>**seeks** [2] - 55:14, 61:24<br>**seem** [1] - 131:11<br>**Sefranek** [3] - 1:22, 134:9, 134:9<br>**SEFRANEK** [1] - 134:3<br>**seized** [2] - 27:6, 85:7<br>**selected** [2] - 65:20, 112:10<br>**selection** [1] - 66:2<br>**self** [4] - 28:10, 79:5, 79:6, 79:7<br>**self-taught** [3] - 79:5, 79:6, 79:7<br>**send** [1] - 101:2<br>**sending** [1] - 100:23<br>**senior** [1] - 68:17<br>**sense** [14] - 11:17, 18:23, 19:18, 25:24, 31:9, 33:9, 49:19, 53:15, 58:7, 70:14, 87:7, 97:4, 120:22<br>**sensitive** [1] - 79:15<br>**sent** [2] - 28:22, 92:6<br>**sentence** [3] - 9:1, 9:10, 39:9<br>**sentencing** [2] - 128:19, 128:21<br>**separate** [4] - 11:22, 21:18, 42:19, 122:4<br>**September** [2] - 80:24, 84:18<br>**series** [3] - 94:21, 100:2, 116:6<br>**serious** [10] - 56:14, 69:23, 80:25, 82:13, 82:20, 82:24, 85:5, 99:12, 109:11, 109:16<br>**serve** [1] - 43:7<br>**served** [3] - 4:9, 4:13, 5:13<br>**server** [1] - 79:19<br>**serves** [1] - 38:5 | **service** [3] - 43:5, 79:17, 101:4<br>**Service** [1] - 88:19<br>**services** [2] - 101:5, 101:6<br>**set** [28] - 4:1, 30:18, 43:3, 46:13, 46:15, 46:22, 52:2, 55:1, 57:9, 57:13, 58:3, 58:6, 60:4, 60:6, 61:9, 71:24, 83:17, 87:25, 99:5, 114:11, 116:7, 116:12, 116:13, 116:14<br>**sets** [5] - 28:20, 29:6, 31:15, 90:3, 110:13<br>**setting** [2] - 81:18, 81:19<br>**seven** [2] - 87:13, 105:8<br>**several** [3] - 4:10, 17:17, 17:25<br>**shaking** [1] - 41:25<br>**shape** [1] - 105:4<br>**share** [1] - 106:10<br>**shared** [1] - 6:9<br>**sharing** [2] - 30:3, 38:20<br>**shifting** [2] - 29:10, 30:5<br>**shocked** [2] - 29:9, 41:20<br>**short** [6] - 42:3, 118:8, 118:9, 121:22, 125:6, 126:20<br>**show** [12] - 3:22, 10:3, 12:17, 12:18, 19:2, 26:23, 27:2, 27:20, 31:16, 33:1, 38:13, 105:24<br>**showed** [1] - 119:4<br>**showing** [6] - 10:9, 35:3, 35:13, 36:8, 83:23, 93:2<br>**shown** [1] - 113:17<br>**shows** [7] - 9:22, 29:24, 30:25, 50:10, 93:18, 110:25, 119:4<br>**shut** [1] - 85:16<br>**sic** [4] - 8:13, 19:25, 65:25, 122:14<br>**side** [5] - 44:5, 46:20, 74:22, 78:23, 78:24<br>**side's** [1] - 14:6<br>**sided** [2] - 45:22, 58:6<br>**sides** [4] - 18:1, 34:6, 60:14, 93:12<br>**sign** [5] - 83:7, 83:13, 83:14, 101:3<br>**signature** [2] - 81:6, | 81:7<br>**signed** [3] - 105:22, 109:1, 109:2<br>**signer** [1] - 81:7<br>**significance** [1] - 89:18<br>**significant** [5] - 6:10, 34:11, 99:1, 99:6, 114:15<br>**significantly** [1] - 96:24<br>**signs** [2] - 83:20<br>**silent** [1] - 90:2<br>**Silk** [1] - 85:7<br>**similar** [2] - 10:15, 11:16<br>**similarly** [1] - 11:10<br>**simple** [3] - 25:6, 102:13, 102:15<br>**simplistic** [1] - 25:7<br>**simply** [16] - 11:17, 12:9, 33:15, 43:19, 53:11, 55:1, 60:16, 62:12, 63:8, 92:23, 102:18, 102:19, 117:4, 117:23, 124:13, 124:16<br>**simulations** [1] - 16:10<br>**single** [4] - 35:13, 64:19, 65:10, 66:16<br>**site** [1] - 50:18<br>**situation** [7] - 85:14, 91:20, 99:13, 99:18, 116:11, 116:13<br>**six** [5] - 82:16, 87:12, 89:15, 105:8, 117:17<br>**size** [11] - 68:15, 80:10, 90:2, 96:22, 97:7, 97:17, 97:18, 98:5, 98:6, 98:8, 113:9<br>**sizes** [1] - 81:17<br>**slew** [1] - 7:17<br>**slow** [3] - 85:22, 92:8, 115:11<br>**slower** [1] - 85:22<br>**slowly** [2] - 112:23, 115:13<br>**small** [2] - 53:21, 103:18<br>**smaller** [2] - 97:15, 102:16<br>**Sofia** [1] - 28:15<br>**soft** [1] - 85:12<br>**software** [34] - 7:15, 16:20, 16:22, 16:23, 17:4, 17:5, 17:8, 17:9, 18:6, 18:12, 18:16, 18:17, 18:20, | 23:11, 24:3, 24:4, 24:5, 24:6, 25:6, 26:20, 26:22, 28:22, 35:7, 36:20, 40:22, 40:23, 43:21, 55:22, 87:5, 87:8, 87:11, 95:14, 128:3<br>**sold** [3] - 80:24, 81:1, 84:17<br>**sole** [1] - 54:13<br>**solicit** [1] - 111:14<br>**solutions** [2] - 48:10, 82:19<br>**someone** [16] - 30:3, 32:11, 33:5, 36:14, 49:1, 53:14, 54:23, 55:7, 57:5, 58:5, 74:11, 101:2, 107:8, 116:10, 119:17, 132:9<br>**somewhere** [4] - 31:1, 38:9, 100:19, 105:8<br>**soon** [1] - 61:15<br>**sorry** [21] - 12:20, 13:14, 17:2, 26:5, 29:14, 43:11, 45:1, 48:12, 52:5, 56:3, 71:17, 76:14, 83:20, 92:2, 98:12, 105:16, 112:20, 115:11, 120:10, 121:21, 126:5<br>**sort** [26] - 9:22, 11:13, 15:9, 15:12, 15:23, 17:24, 24:5, 25:7, 29:23, 30:5, 31:3, 31:6, 38:18, 42:23, 44:25, 45:11, 45:15, 59:6, 60:15, 64:1, 64:7, 74:22, 74:25, 93:21, 131:8<br>**sorts** [4] - 14:15, 24:3, 53:4, 63:5<br>**sought** [1] - 112:7<br>**sounds** [1] - 34:9<br>**source** [29] - 23:5, 23:10, 24:2, 24:10, 28:2, 28:20, 29:16, 29:17, 29:19, 30:25, 35:25, 36:9, 36:13, 36:14, 36:16, 36:19, 36:25, 37:2, 37:6, 37:8, 37:12, 37:13, 37:17, 37:18, 38:15, 39:12, 87:8, 112:8<br>**spaced** [1] - 35:5<br>**spam** [1] - 81:12<br>**speaking** [3] - 12:24, 63:1, 112:1<br>**speaks** [1] - 50:15 |

**specific** [26] - 9:23, 13:24, 14:4, 14:7, 17:7, 19:12, 19:17, 19:19, 20:1, 20:4, 20:10, 27:22, 29:11, 29:12, 30:7, 30:11, 30:21, 32:8, 37:3, 37:4, 38:12, 46:16, 54:22, 63:21, 63:23, 84:23
**specifically** [19] - 11:14, 11:19, 20:18, 23:4, 27:12, 29:18, 30:1, 30:17, 65:18, 65:19, 68:25, 79:20, 95:1, 115:10, 116:4, 117:2, 117:18, 120:24, 123:15
**specificity** [13] - 10:4, 12:17, 19:24, 27:20, 28:24, 31:22, 33:1, 33:8, 33:14, 33:25, 37:16, 39:15, 54:25
**specifics** [1] - 108:25
**speculative** [1] - 15:9
**speed** [3] - 90:24, 91:3, 91:5
**spell** [1] - 14:10
**spelled** [3] - 43:25, 62:19, 62:22
**spellings** [1] - 28:16
**spend** [12] - 83:8, 83:24, 93:6, 93:13, 100:14, 100:15, 100:16, 100:18, 105:5, 105:7, 118:19
**spending** [1] - 105:11
**spent** [5] - 100:20, 107:17, 107:18, 110:1, 110:7
**split** [1] - 7:22
**spoken** [1] - 68:5
**spot** [5] - 17:6, 18:2, 18:3, 18:5, 85:12
**spot-check** [1] - 17:6
**spot-checked** [2] - 18:2, 18:5
**spot-checking** [1] - 18:3
**spreadsheet** [1] - 35:15
**St** [1] - 129:7
**staff** [1] - 128:22
**stage** [1] - 54:1
**stake** [1] - 16:15
**stamps** [1] - 63:23
**stand** [5] - 57:7, 58:9, 58:12, 67:25, 69:16
**standard** [4] - 33:3, 33:9, 39:15, 109:18

**Standards** [1] - 65:7
**standards** [1] - 88:19
**standing** [9] - 5:12, 5:14, 5:20, 20:24, 21:7, 22:14, 33:16, 33:18, 33:21
**stands** [2] - 55:23, 88:21
**start** [8] - 3:20, 3:25, 4:6, 22:25, 62:8, 77:12, 93:17, 94:12
**started** [9] - 80:1, 80:2, 80:10, 80:12, 80:21, 80:22, 81:22, 108:24
**starting** [4] - 3:5, 79:8, 108:22, 108:23
**state** [4] - 3:4, 56:7, 88:16, 98:24
**statement** [8] - 15:3, 32:3, 32:16, 32:18, 38:24, 47:4, 47:6, 65:10
**statements** [9] - 41:7, 63:5, 63:21, 63:25, 64:3, 65:22, 66:7, 72:17, 74:23
**STATES** [3] - 1:1, 1:2, 1:8
**States** [10] - 1:23, 3:3, 3:9, 5:19, 8:11, 8:12, 10:7, 28:19, 103:10, 122:16
**statistical** [4] - 24:5, 116:18, 117:1, 117:12
**statistics** [1] - 91:21
**status** [2] - 45:9, 107:6
**steal** [1] - 93:4
**stenographic** [1] - 134:5
**step** [4] - 15:2, 114:2, 119:22, 128:13
**steps** [1] - 53:22
**STERLINGOV** [1] - 1:5
**Sterlingov** [11] - 3:3, 3:12, 3:15, 3:17, 28:19, 29:5, 30:12, 50:11, 50:13, 68:19, 70:24
**Sterlingov's** [3] - 4:25, 40:24, 66:13
**stick** [1] - 27:25
**still** [10] - 6:6, 7:13, 10:21, 31:6, 41:1, 41:3, 47:7, 80:8, 107:9, 132:8
**stonewalling** [1] - 27:24

**streaming** [1] - 22:11
**Street** [3] - 1:11, 1:17, 1:19
**stretch** [1] - 41:6
**strike** [5] - 62:12, 72:15, 73:4, 73:11, 73:18
**striking** [1] - 72:16
**strong** [2] - 27:2, 123:9
**struck** [1] - 84:22
**structure** [2] - 83:10, 120:22
**students** [1] - 103:1
**studied** [1] - 87:6
**study** [2] - 78:16, 132:17
**studying** [2] - 80:8, 110:9
**stuff** [12] - 25:17, 26:13, 26:24, 26:25, 27:3, 27:5, 29:25, 31:16, 42:22, 73:24, 74:3, 84:13
**Stutz** [1] - 28:14
**subject** [3] - 32:17, 43:14, 63:10
**submit** [3] - 56:21, 57:1, 73:21
**submitted** [1] - 111:1
**submitting** [1] - 95:22
**subpart** [1] - 13:14
**Subpoena** [2] - 4:3
**subpoena** [42] - 5:13, 6:8, 8:6, 8:14, 9:1, 9:3, 9:5, 9:20, 10:9, 11:13, 11:15, 11:23, 12:7, 13:3, 14:11, 15:14, 19:22, 20:18, 20:25, 21:4, 28:4, 28:5, 28:7, 31:21, 31:23, 31:24, 33:19, 38:5, 42:4, 42:5, 42:12, 42:15, 43:5, 43:8, 43:14, 43:23, 49:24, 54:20, 61:3, 61:6, 62:5, 76:25
**subpoenaed** [1] - 50:20
**subpoenas** [24] - 3:21, 4:9, 4:12, 4:14, 4:19, 4:22, 7:18, 7:20, 7:25, 8:9, 11:1, 11:2, 11:10, 11:11, 12:4, 12:9, 12:12, 12:22, 21:16, 22:15, 22:16, 23:1, 24:14
**subsequently** [4] - 15:8, 44:24, 51:20, 79:7

**subset** [2] - 97:22, 99:5
**substantial** [3] - 6:6, 89:20, 103:20
**substantially** [1] - 43:16
**substantive** [3] - 9:20, 10:25, 66:17
**substantively** [1] - 10:13
**successes** [1] - 71:8
**successful** [1] - 79:16
**sue** [8] - 6:21, 6:23, 6:24, 7:1, 15:18, 20:9, 39:24, 40:7
**sufficient** [2] - 33:23, 37:16
**sufficiently** [1] - 127:2
**suggestion** [1] - 31:18
**suing** [1] - 40:10
**suit** [3] - 40:7, 40:18, 41:5
**Sullivan** [3] - 8:7, 8:20, 9:14
**Sullivan's** [2] - 8:1, 8:4
**summarize** [1] - 78:8
**summer** [2] - 60:16, 130:16
**supervise** [1] - 8:9
**supervisory** [1] - 48:5
**Supp** [2] - 5:19, 59:10
**supplied** [1] - 99:4
**supply** [1] - 7:3
**support** [3] - 8:12, 37:17, 49:10
**supported** [2] - 111:19, 122:15
**supportive** [3] - 104:21, 122:23
**suppose** [1] - 76:10
**supposed** [6] - 12:23, 14:9, 28:1, 37:21, 44:2, 113:22
**supposedly** [1] - 131:4
**surprised** [1] - 43:12
**surrendered** [1] - 93:12
**surveil** [1] - 122:21
**surveillance** [24] - 87:11, 87:13, 89:16, 94:3, 94:6, 94:14, 94:15, 95:6, 95:7, 95:13, 97:5, 97:19, 109:13, 110:10, 122:12, 123:16, 123:21, 123:22, 124:4, 124:15, 124:20, 125:3,

127:23, 128:3
**surveilled** [2] - 94:16, 95:8
**surveilling** [4] - 94:17, 94:20, 95:9, 109:13
**suspicions** [1] - 123:9
**swamped** [1] - 71:22
**sweep** [1] - 34:11
**sweeping** [2] - 31:24, 32:5
**sworn** [1] - 77:23
**sympathetic** [1] - 32:7
**Symposium** [1] - 28:18
**system** [5] - 71:23, 79:18, 84:25, 90:7, 119:9
**systematic** [11] - 78:23, 90:15, 90:19, 90:22, 90:23, 91:2, 91:6, 91:13, 95:24, 95:25, 114:17
**systematically** [1] - 116:14
**systemic** [26] - 78:23, 79:1, 89:20, 89:23, 89:25, 90:5, 90:6, 90:13, 90:14, 90:17, 90:20, 91:2, 91:14, 114:10, 114:16, 114:21, 115:4, 115:23, 116:4, 116:8, 116:15, 118:23, 119:9, 119:24, 120:3, 120:4

**T**

**Tab** [5] - 106:2, 110:25, 112:3, 122:25, 125:13
**tab** [1] - 106:3
**Tabs** [4] - 104:9, 105:24, 111:8, 125:4
**tailored** [1] - 14:15
**taint** [3] - 70:14, 70:17, 73:3
**tainted** [2] - 68:15, 72:22
**tainting** [2] - 63:7, 74:5
**talks** [1] - 9:10
**TAMARA** [1] - 134:3
**Tamara** [3] - 1:22, 134:9, 134:9
**tar** [1] - 5:9
**tarring** [1] - 71:2
**Task** [8] - 87:12, 87:23, 88:22, 88:23, 104:14, 108:9,

112:6, 119:16
**task** [2] - 65:24, 97:7
**taught** [3] - 79:5, 79:6, 79:7
**taxation** [1] - 85:18
**teach** [2] - 102:17, 103:1
**team** [9] - 64:19, 65:8, 67:18, 67:22, 68:4, 68:23, 68:24, 81:3, 103:24
**Team** [4] - 104:1, 104:23, 105:3, 105:6
**technique** [2] - 122:13, 123:15
**Technology** [1] - 28:13
**technology** [3] - 82:6, 83:4, 83:5
**tecum** [1] - 23:1
**telephone** [1] - 34:14
**tempted** [1] - 69:16
**ten** [9] - 42:7, 68:21, 98:14, 107:15, 107:18, 126:17, 126:25, 127:1, 128:16
**tendering** [1] - 102:1
**term** [8] - 80:23, 87:22, 90:15, 90:16, 91:18, 94:2, 96:12
**terms** [3] - 12:4, 63:4, 74:25
**terrible** [1] - 30:25
**terrorism** [2] - 89:1, 110:22
**test** [6] - 4:15, 10:3, 12:16, 13:12, 14:7, 31:22
**tested** [2] - 18:7, 26:21
**testified** [5] - 38:1, 58:11, 94:2, 96:25, 127:22
**testifies** [2] - 37:25, 57:17
**testify** [9] - 18:8, 44:3, 50:21, 52:19, 52:20, 53:21, 57:8, 57:15, 58:17
**testifying** [2] - 17:20, 131:6
**testimony** [30] - 9:16, 13:11, 14:19, 18:18, 22:17, 22:20, 22:22, 22:23, 23:2, 42:16, 43:19, 44:1, 44:6, 48:17, 48:22, 49:8, 49:10, 54:10, 57:14, 61:23, 63:12, 89:4,

91:16, 119:2, 129:25, 130:7, 131:21, 132:15
**testing** [2] - 7:15, 13:16
**tests** [1] - 10:10
**THE** [234] - 1:1, 1:1, 1:8, 3:2, 3:10, 3:13, 3:16, 5:12, 5:17, 6:2, 6:23, 7:22, 8:11, 8:24, 10:11, 10:17, 11:3, 11:22, 12:1, 15:19, 16:1, 16:3, 16:6, 16:21, 16:25, 17:12, 18:14, 19:10, 20:16, 20:20, 20:22, 21:1, 21:7, 21:11, 21:15, 22:3, 22:20, 22:22, 22:24, 23:9, 23:15, 23:24, 24:9, 26:3, 26:6, 27:11, 28:3, 28:6, 29:10, 29:15, 30:22, 31:18, 31:21, 32:15, 33:12, 34:22, 35:4, 36:5, 36:8, 37:1, 37:24, 39:2, 39:22, 40:10, 41:4, 41:23, 42:3, 42:10, 44:11, 45:21, 46:1, 47:12, 47:15, 47:17, 47:22, 48:3, 48:7, 48:11, 48:14, 50:1, 50:8, 50:23, 51:1, 52:5, 52:11, 52:13, 52:15, 52:21, 53:9, 54:15, 54:18, 55:7, 55:13, 56:2, 56:4, 56:18, 57:4, 57:20, 57:22, 58:1, 58:23, 60:3, 60:9, 60:12, 60:18, 61:2, 62:14, 62:20, 64:15, 64:21, 64:23, 65:12, 66:22, 66:24, 67:3, 67:7, 67:11, 67:25, 68:3, 68:8, 69:6, 69:12, 69:16, 69:23, 69:25, 70:6, 70:9, 70:20, 71:15, 71:18, 72:1, 72:13, 72:25, 73:7, 73:16, 73:24, 74:11, 74:15, 75:7, 75:9, 75:13, 76:10, 76:13, 76:17, 76:19, 76:21, 76:24, 77:8, 77:12, 77:16, 77:20, 77:21, 77:24, 77:25, 80:12, 80:14, 80:15, 80:16, 80:17, 80:18, 80:20, 80:21, 85:22, 85:24, 86:7, 86:21,

86:23, 88:8, 96:7, 96:9, 98:14, 100:11, 100:13, 100:21, 100:22, 100:25, 101:1, 101:4, 101:5, 101:9, 101:13, 101:15, 101:18, 101:21, 101:25, 107:3, 107:4, 107:7, 107:8, 107:11, 112:20, 113:2, 113:3, 115:11, 115:13, 117:4, 117:6, 118:8, 118:11, 118:25, 119:11, 119:12, 119:14, 119:17, 119:20, 119:21, 120:2, 120:7, 120:10, 121:21, 125:7, 125:8, 126:2, 126:6, 126:9, 126:12, 126:14, 126:17, 126:21, 126:25, 127:5, 128:13, 128:20, 129:12, 129:17, 129:21, 130:2, 130:8, 130:10, 130:15, 131:8, 131:20, 132:24, 133:2
**themselves** [1] - 89:23
**theorem** [1] - 97:24
**theories** [2] - 5:2, 7:8
**theory** [8] - 15:22, 15:25, 39:1, 39:25, 40:11, 40:18, 40:19, 97:24
**therefor** [1] - 20:6
**therefore** [8] - 19:4, 20:12, 22:7, 37:11, 38:9, 44:5, 46:20, 82:17
**they've** [9] - 12:16, 15:2, 27:1, 31:4, 38:8, 63:16, 68:7, 73:14, 73:15
**thinking** [1] - 117:16
**thinks** [3] - 37:8, 62:3, 126:4
**third** [8] - 4:10, 5:13, 20:25, 21:4, 46:13, 46:18, 47:6, 48:17
**third-party** [6] - 4:10, 20:25, 21:4, 46:13, 47:6, 48:17
**thoroughly** [1] - 18:3
**thoughts** [1] - 98:25
**thousands** [2] - 27:6,

111:17
**threat** [1] - 15:16
**threatening** [2] - 6:17, 41:8
**threats** [1] - 123:20
**three** [4] - 25:16, 50:14, 69:25, 71:24
**threshold** [3] - 10:25, 55:22, 59:4
**throwing** [1] - 31:9
**Thursday** [1] - 34:17
**tied** [2] - 103:21, 123:22
**Tigran** [1] - 69:3
**timing** [1] - 119:1
**title** [2] - 45:2, 48:8
**today** [9] - 3:18, 11:8, 11:21, 43:3, 69:17, 76:16, 77:10, 100:15, 132:21
**together** [2] - 33:25, 34:7
**ton** [1] - 17:9
**took** [7] - 15:6, 15:8, 29:2, 41:11, 71:24, 102:8, 122:17
**tools** [1] - 36:20
**topics** [2] - 130:19, 131:24
**TOR** [1] - 1:15
**Tor** [2] - 1:16, 3:11
**total** [3] - 12:13, 87:20, 97:23
**totally** [7] - 7:17, 18:12, 66:6, 94:9, 104:25, 121:6, 131:18
**tough** [1] - 27:13
**toughening** [1] - 124:22
**Touhy** [1] - 14:24
**tour** [1] - 62:25
**touting** [1] - 71:7
**towards** [2] - 33:2, 126:3
**trace** [2] - 51:5, 118:16
**traceable** [1] - 120:24
**Tracers** [2] - 51:11, 64:17
**tracing** [5] - 50:11, 95:14, 113:19, 131:5
**track** [2] - 97:8, 98:12
**tracking** [1] - 113:8
**trade** [1] - 80:6
**trading** [2] - 84:16, 86:4
**traditional** [2] - 122:12, 122:18
**trained** [1] - 132:9
**transaction** [16] -

25:5, 44:20, 50:13, 81:8, 81:17, 83:8, 83:13, 92:13, 95:18, 95:23, 97:12, 100:5, 120:22, 121:13, 122:1
**transactional** [2] - 35:9, 35:19
**transactions** [29] - 17:17, 44:23, 45:22, 58:7, 82:16, 89:13, 89:14, 89:15, 92:12, 92:14, 92:17, 95:17, 97:7, 97:8, 97:12, 97:15, 97:17, 98:4, 98:6, 98:8, 100:2, 100:4, 101:3, 101:11, 101:12, 101:17, 114:10, 118:16, 119:6
**TRANSCRIPT** [1] - 1:7
**transcript** [2] - 134:4, 134:6
**transfer** [9] - 72:22, 83:11, 83:15, 92:1, 92:3, 92:21, 92:22, 93:7, 99:24
**transferred** [3] - 83:22, 92:6, 99:19
**transparent** [4] - 121:3, 121:6, 121:10, 127:12
**travel** [4] - 106:19, 106:25, 107:16, 107:17
**tree** [1] - 73:16
**trends** [1] - 98:4
**trial** [52] - 5:4, 5:23, 6:1, 6:2, 6:5, 6:25, 7:6, 7:12, 7:19, 8:21, 9:6, 9:7, 9:24, 22:20, 22:22, 22:23, 23:2, 23:18, 25:14, 25:17, 25:18, 29:3, 33:4, 34:4, 34:16, 39:12, 49:2, 49:5, 49:24, 57:2, 57:3, 57:4, 57:6, 57:10, 57:16, 58:11, 60:16, 61:16, 62:5, 65:20, 66:8, 66:9, 71:13, 77:2, 107:1, 107:20, 109:14, 125:18, 125:19
**tried** [1] - 84:19
**trillion** [1] - 97:13
**TRM** [2] - 115:10, 115:17
**trouble** [1] - 85:16
**true** [13] - 6:4, 8:24,

8:25, 22:9, 52:18, 57:22, 111:16, 118:7, 121:25, 124:8, 134:4, 134:5
**truly** [1] - 25:18
**trustee** [6] - 44:16, 44:17, 45:1, 46:11, 52:3, 60:23
**trustees** [4] - 52:3, 54:6, 54:8, 56:11
**truth** [2] - 41:24, 115:6
**try** [11] - 11:17, 11:18, 20:9, 20:13, 31:18, 34:14, 43:15, 47:9, 49:24, 51:4, 54:9
**trying** [8] - 29:11, 42:20, 45:18, 97:8, 98:11, 99:10, 114:24, 121:8
**turn** [9] - 3:21, 4:24, 22:15, 26:25, 27:9, 124:13, 124:18, 125:4, 128:6
**turning** [3] - 110:25, 112:14, 122:25
**turns** [2] - 24:25, 61:24
**Twitter** [5] - 42:23, 49:15, 63:5, 73:24, 74:4
**two** [13] - 4:11, 4:14, 17:10, 22:16, 40:24, 62:12, 63:14, 67:4, 71:24, 77:9, 78:25, 89:11, 115:5
**type** [15] - 15:9, 16:8, 18:16, 19:6, 37:16, 87:8, 90:20, 91:12, 95:12, 97:4, 97:19, 102:25, 103:5, 109:23, 113:12
**types** [10] - 17:17, 18:21, 29:19, 32:5, 44:22, 74:22, 75:3, 78:25, 81:13, 81:18
**typical** [1] - 91:20
**typically** [5] - 44:9, 48:25, 99:6, 100:5, 101:2

## U

**U.S** [10] - 1:13, 8:3, 84:21, 84:23, 84:25, 85:4, 85:12, 88:25, 122:17
**unable** [1] - 61:21
**unavailable** [1] - 77:10
**unclear** [1] - 15:20

**under** [26] - 12:5, 16:11, 19:21, 21:9, 21:10, 21:13, 22:1, 22:8, 24:19, 27:13, 28:1, 29:8, 38:20, 39:14, 41:19, 51:7, 58:21, 59:5, 63:10, 68:1, 76:1, 102:11, 106:7, 112:25, 123:19
**underestimation** [1] - 127:20
**underlying** [5] - 16:12, 16:20, 31:3, 35:11, 49:1
**understandably** [1] - 8:18
**understood** [4] - 18:1, 38:17, 43:24, 128:24
**undue** [2] - 5:22, 6:1
**unexpectedly** [1] - 129:9
**unfair** [2] - 29:25, 62:13
**unfocused** [1] - 31:7
**unfortunately** [1] - 126:21
**uninitiated** [1] - 92:4
**Union** [1] - 104:12
**Union's** [1] - 110:21
**unique** [8] - 51:3, 54:4, 54:5, 55:5, 56:8, 57:23, 58:2
**uniquely** [1] - 61:25
**UNITED** [3] - 1:1, 1:2, 1:8
**United** [10] - 1:23, 3:3, 3:9, 5:19, 8:11, 8:12, 10:6, 28:19, 103:10, 122:15
**University** [3] - 28:12, 78:11, 102:5
**university** [3] - 102:12, 102:21, 102:23
**unless** [4] - 7:19, 117:1, 117:11, 132:20
**unlike** [2] - 57:5, 121:3
**unrelated** [1] - 15:7
**unscathed** [2] - 84:16, 86:5
**unsealed** [1] - 66:20
**untainted** [1] - 66:9
**up** [44] - 16:19, 21:20, 22:6, 22:12, 22:13, 23:3, 23:20, 24:14, 26:12, 31:9, 34:24, 35:21, 36:3, 37:22, 41:9, 42:4, 42:11,

43:17, 47:10, 48:4, 57:2, 57:4, 60:5, 61:7, 61:21, 71:5, 71:24, 73:9, 73:16, 76:5, 76:15, 76:25, 83:22, 83:23, 86:11, 88:13, 90:12, 101:24, 105:22, 120:10, 124:22, 125:5, 128:19, 131:15
**URL** [1] - 7:3
**Urlacher** [1] - 8:11
**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**USB** [1] - 92:24
**USD** [1] - 89:14
**USENIX** [3] - 28:17, 29:1, 30:12
**user** [4] - 84:15, 106:1, 107:3, 107:4
**uses** [1] - 123:3
**usual** [2] - 113:18, 113:22
**utilize** [2] - 17:5, 43:6

## V

**validate** [1] - 70:12
**validates** [1] - 74:9
**value** [3] - 59:1, 89:14, 98:7
**Vancouver** [1] - 103:8
**variation** [3] - 87:16, 88:5, 89:18
**variations** [1] - 87:24
**variety** [2] - 14:3, 17:15
**various** [2] - 3:19, 81:19
**vary** [1] - 91:9
**VASP** [3] - 87:22, 89:9
**vast** [1] - 106:20
**vehicle** [2] - 90:25, 91:8
**vehicles** [1] - 91:10
**velocity** [2] - 90:24, 91:8
**vendor** [3] - 21:24, 24:20, 26:15
**vendors** [1] - 41:17
**venire** [6] - 70:16, 72:11, 72:22, 73:5, 73:19, 74:5
**venue** [1] - 68:15
**version** [7] - 10:17, 23:16, 23:17, 46:8, 55:10, 55:13, 55:17
**versions** [4] - 10:22, 23:13, 28:20, 87:8

**via** [1] - 129:25
**Vienna** [1] - 28:13
**view** [5] - 16:11, 42:17, 49:3, 121:5, 124:2
**viewable** [1] - 122:2
**viewed** [1] - 112:8
**viewing** [1] - 46:6
**views** [2] - 125:12, 125:16
**Vigilante** [1] - 124:19
**violate** [3] - 72:3, 72:6, 75:17
**violated** [2] - 31:4, 67:15
**violates** [2] - 65:8, 74:12
**violating** [4] - 67:16, 67:18, 73:17, 75:23
**violation** [1] - 63:25
**violations** [5] - 3:22, 75:15, 75:21, 76:6
**virtual** [1] - 88:19
**Virtual** [1] - 88:19
**vitae** [1] - 86:14
**Vo** [3] - 8:2, 10:20, 10:21
**vocally** [1] - 123:13
**voir** [6] - 65:24, 68:16, 70:16, 72:11, 73:5, 73:10
**volume** [5] - 6:6, 7:9, 9:19, 10:1, 97:11
**voluminous** [2] - 9:21, 18:4
**Voluntary** [1] - 65:7
**volunteer** [4] - 81:5, 104:25, 105:1, 107:23
**Vonu** [1] - 6:21
**vs** [1] - 1:4

## W

**wait** [6] - 18:22, 20:18, 67:3, 112:22
**Wall** [1] - 1:17
**wallet** [3] - 87:21, 99:21, 101:5
**wants** [6] - 11:20, 26:23, 44:14, 49:1, 62:5, 77:4
**Washington** [6] - 1:5, 1:12, 1:14, 1:24, 106:23, 134:11
**ways** [4] - 8:19, 17:17, 92:22, 97:23
**web** [2] - 103:12, 103:14
**website** [3] - 50:17,

50:18, 119:16
**websites** [1] - 103:15
**Wednesday** [3] - 62:11, 64:9, 129:9
**week** [5] - 62:10, 77:10, 105:11, 118:19, 129:10
**weeks** [1] - 71:24
**welcome** [2] - 72:5, 128:13
**well-documented** [2] - 49:12, 51:10
**well-established** [1] - 59:5
**well-founded** [1] - 20:4
**well-known** [3] - 82:15, 97:24, 116:5
**whatsoever** [3] - 27:20, 38:23, 70:1
**white** [8] - 28:17, 28:20, 30:11, 30:20, 38:21, 41:10, 94:25, 127:19
**whole** [7] - 7:17, 24:24, 51:12, 57:2, 66:2, 95:5, 99:15
**wide** [8] - 13:7, 13:18, 13:24, 14:3, 14:17, 87:16, 88:4, 115:1
**wide-ranging** [4] - 13:7, 13:18, 13:24, 14:17
**widely** [1] - 112:11
**William** [1] - 11:5
**WILLIAM** [1] - 1:18
**willing** [1] - 67:25
**win** [1] - 124:11
**Windows** [4] - 79:18, 79:19
**WIRED** [4] - 68:18, 71:1, 73:15, 74:7
**wit** [1] - 63:10
**withdraw** [3] - 84:19, 84:24, 85:11
**withdrawing** [1] - 85:3
**withdrawn** [1] - 85:25
**withholding** [1] - 25:11
**WITNESS** [23] - 2:2, 80:14, 80:16, 80:18, 80:21, 85:24, 100:13, 100:22, 101:1, 101:5, 101:13, 101:18, 107:4, 107:8, 113:3, 115:13, 117:6, 118:11, 119:11, 119:14, 119:20, 120:2, 125:8

**witness** [35] - 8:21, 9:1, 37:25, 38:2, 38:8, 40:13, 41:8, 46:3, 46:4, 48:1, 49:10, 50:21, 52:1, 53:7, 53:25, 54:3, 54:20, 57:6, 57:16, 57:22, 57:23, 58:17, 59:1, 66:2, 77:2, 77:23, 98:17, 101:20, 101:24, 102:1, 106:15, 126:22, 127:1, 131:3, 131:10

**witnesses** [12] - 5:21, 18:8, 22:17, 27:7, 62:4, 63:2, 63:12, 65:4, 65:25, 66:3, 77:9

**word** [11] - 21:1, 21:3, 58:2, 64:20, 66:16, 66:17, 80:12, 90:19, 91:15, 117:8

**wording** [2] - 10:14, 10:16

**words** [6] - 12:23, 13:2, 17:4, 18:7, 19:9, 47:3

**works** [5] - 20:10, 47:15, 54:6, 54:7, 131:15

**world** [1] - 88:25

**worldwide** [2] - 62:25, 82:18

**worried** [1] - 41:6

**worry** [1] - 73:10

**worse** [2] - 82:5, 114:4

**worth** [1] - 75:6

**wrap** [1] - 125:5

**wrestling** [1] - 31:6

**Wright** [2] - 8:13, 8:17

**write** [1] - 30:11

**written** [3] - 104:6, 113:14, 127:19

**wrongdoing** [1] - 5:10

**wrote** [1] - 30:20

**www.bitcoinfog.com** [1] - 50:17

## X

**XP** [1] - 79:19

## Y

**year** [4] - 87:18, 88:6, 108:6, 108:7

**years** [5] - 10:18, 40:25, 49:9, 68:21, 128:5

**yellow** [1] - 112:3

**York** [2] - 1:17, 107:16

**you-all** [3] - 33:24, 128:15, 132:20

**Youli** [5] - 4:4, 11:7, 14:19, 14:20, 15:6

**yourself** [2] - 124:8, 124:22

**Yousaf** [1] - 28:14

**YouTube** [3] - 30:17, 70:20, 74:4

## Z

**zero** [1] - 131:16

**Zoom** [1] - 129:25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          ) Criminal Action
                                    ) No. 1:21-CR-0399
                Plaintiff,          )
                                    ) **MOTIONS HEARING**
vs.                                 )
                                    ) Washington, D.C.
ROMAN STERLINGOV,                   ) **June 23, 2023**
                                    ) **Time:  10:00 A.M.**
                Defendant.          )

**TRANSCRIPT OF MOTIONS HEARING**
BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For the Plaintiff:       CHRISTOPHER BROWN
                         USAO-DOJ
                         601 D Street, NW
                         Washington, DC 20001

                         ALDEN PELKER
                         U.S. DEPARTMENT OF JUSTICE
                         950 Pennsylvania Avenue, NW
                         Washington, DC 20530

For the Defendant:       TOR EKELAND
                         MICHAEL HASSARD
                         Tor Ekeland Law, PLLC
                         30 Wall Street, 8th Floor
                         New York, NY 10005

Court Reporter:          Tamara M. Sefranek, RMR, CRR, CRC
                         Official Court Reporter
                         United States Courthouse, Room 6714
                         333 Constitution Avenue, NW
                         Washington, DC  20001
                         202-354-3246

I N D E X

WITNESS                                                    PAGE

LUKE SCHOLL

    Direct Examination
    By Ms. Pelker                                        41

    Cross-Examination
    By Mr. Ekeland                                       73

    Redirect Examination
    By Ms. Pelker                                        89

    Recross-Examination
    By Mr. Ekeland                                       94

ELIZABETH BISBEE

    Direct Examination
    By Ms. Pelker                                        95

    Cross-Examination
    By Mr. Ekeland                                       119

    Redirect Examination
    By Ms. Pelker                                        134

    Recross-Examination
    By Mr. Ekeland                                       139


EXHIBITS ADMITTED                                          PAGE

Government Exhibit 1                                        45

Government Exhibit 2                                        58

Government Exhibit 3                                        60

Government Exhibit 4                                        104

Government Exhibits 5 and 6                                 109

PROCEEDINGS

THE COURTROOM DEPUTY:  Calling Criminal Case 21-399, United States of America v. Roman Sterlingov.

Would counsel please state their name for the record, starting with government counsel.

MS. PELKER:  Good morning, Your Honor.  Alden Pelker for the United States.

THE COURT:  Good morning.

MR. BROWN:  Good morning, Your Honor.  AUSA Christopher Brown for the government.

THE COURT:  Good morning.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for Defendant Roman Sterlingov, who is present in court.

THE COURT:  All right.  Good morning to all of you.

MR. HASSARD:  Good morning, Your Honor.  Michael Hassard for Defendant Roman Sterlingov.

THE COURT:  Good morning.  So I know that you have witnesses here today, and I want to accommodate your schedules.  So I'll allow -- rather than having the Court dictate which motions we take up and in which order, I'll allow you to tell me which motions you want to take up so that we don't inconvenience witnesses who may have had to travel today.

The one thing I did want to take up, though, before opening the floor up to whatever you want to put on, was the motion that we didn't get to last time we were here -- or the

pair of motions with respect to the subpoena directed at Ms. Pelker and the motion to quash that subpoena, as well as the motion to exclude her testimony.

So I'm happy to hear from the parties on that. I guess I should probably start -- good. I guess the motion to quash, you're welcome to go first.

MR. BROWN: Yes, Your Honor. We assume that the Court has read the voluminous briefing on this matter, so I don't want to repeat every point in the briefing. I do want to, sort of, frame this by addressing the ad hominem nature of the defense counsel's comments towards Ms. Pelker. It's really unusual in my practice.

I've been an AUSA in this district for eight years. I've never seen defense counsel go after their colleagues at the bench in such personal ways. I think that's important to understand because that frames the context for their subpoena to Ms. Pelker.

Their subpoena and their motion to quash do not appear to be in good faith. And the reason you can tell that is because they have not provided any specific summary of the testimony that they expect to elicit from Ms. Pelker. They have not addressed the legal framework for calling a prosecutor as a witness. They have refused to engage in the *Touhy* regulations, the *Touhy* procedures, for calling the Department of Justice prosecutor as a witness. And this whole thing

appears to be a transparent pretext for a motion to disqualify.

Now, to address the legal standards here, there are legal standards. These are cited in our briefing. It's the 2nd Circuit, 7th Circuit, 8th Circuit, 9th Circuit, 10th Circuit. They all agree that to call a prosecutor in a case a defendant has to make a certain showing, and that showing is that the testimony to be taken is vital to their case and that they cannot obtain the same testimony elsewhere through other sources.

And through those two showings, they establish a compelling need. The defense has not offered -- first of all, the defense has not addressed this legal framework at all. They have not offered anything other than sort of generic buzzwords about what they expect to elicit from Ms. Pelker.

Number one, they talk about Chainalysis. Whatever the merits of their theories about Chainalysis and the Department of Justice's contracting relationship with Chainalysis, first of all, it is not vital to the defense case.

The cases that recognize a vital interest in calling a prosecutor are very few and far between, and it would be a very unusual situation, such as where the prosecutor may be the only person who sat in on an interview with a witness or a proffer with the defendant, and the prosecutor -- and maybe the agent is no longer available to testify.

In those cases, sometimes the prosecutor may be the

only witness to a certain key statement that's made by a witness in the case who is otherwise unavailable to testify. This is not that case. This is, sort of, vagaries of government contracting. This is -- this sort of sham argument about venue, that my co-counsel is somehow a witness to venue.

Of course, venue doesn't depend in any way on where the case was investigated. It's a legal determination and entirely part of the prosecutor's function as prosecutors in this case. So we don't think that they've met the compelling needs standard.

As a procedural matter, there's a procedural bar set forth in the *Touhy* regulations. Numerous courts have held that this is a procedure that defendants are required to go through in order to call a Department of Justice witness. *Touhy* regulations don't say no, categorically, you can't ever call a prosecutor; they just say you have to go through a procedure. You have to provide a written summary of the expected testimony so that the Department of Justice can then make a determination whether certain privileges or protections apply. So just deliberative process privilege or attorney work product. The defendants have refused to do so.

And, finally, the defendant's motion for disqualification, such as it is -- it's always been sort of indirect -- that is the real agenda, and it is totally meritless. They claim jury confusion, but they are the only

ones who are going to cause jury confusion by calling a prosecutor as a witness.

And the normal -- as we've sort of outlined in our briefing, the rationale for the advocate witness rule is simply not present here in a situation where the defense calls a prosecutor as an adverse witness who is testifying under compulsion. The rationale for the advocate witness rule is that there's a bolstering effect when somebody acts as an advocate and a fact witness, because then there's some confusion.

It sort of enhances the advocacy by cloaking them in the aura of somebody who has personal knowledge of the case. That's absolutely not this situation where the advocate is being called adversely by the opposing party. That's squarely addressed in the 11th Circuit case that we cited.

Your Honor, if the Court has questions, I'm happy to address them. But we think that this is a straightforward case of the defense not meeting a very well-established legal standard to justify calling the prosecutor.

THE COURT: Why don't I let Mr. Ekeland go, and then if he offers some explanation that you'd like to respond to, I'll let you do that.

MR. BROWN: Thank you, Your Honor.

THE COURT: Mr. Ekeland?

MR. EKELAND: Good morning, Your Honor.

THE COURT: Good morning.

MR. EKELAND: Ms. Pelker starts this case as the lead FBI intelligence analyst on it. On October 28, 2014, she writes an intelligence report all about Bitcoin Fog, which, to my understanding, was distributed on the FBI intranet.

This case starts in Philadelphia at the United States Department of Justice. I think -- I believe it starts at the Russia desk.

Ms. Pelker doesn't graduate from law school in Georgetown until 2016. Somehow -- and it's my understanding, upon information and belief -- she's instrumental in the transfer of this case from Philadelphia to Washington, D.C., where she graduates law school and then becomes an assistant United States Attorney, who then gets appointed the lead prosecutor on this case.

Now, in my decade of doing federal criminal defense, I've never had a case where the lead investigator, the lead FBI agent on the case, is appointed a prosecutor on the case.

THE COURT: I seem to recall 35 or 40 years ago, when I was a law clerk, that Louis Freeh was the lead prosecutor on the Pizza Connection trial and was -- had been an FBI agent beforehand. I can't say for certain, but I suspect that he was actually involved in the investigation as the FBI agent on the matter before he became the lead prosecutor on that case. I'm not sure that it's unheard of.

MR. EKELAND: But it's very rare. And the issue, I think, with saying that *Touhy* applies is that we're not really calling the prosecutor here. We're attempting to call the lead FBI agent on the case who is a material fact witness, not only to the investigation and what was done with the Chainalysis in the first two years of the case, roughly --

THE COURT: Say again? I missed what you just said.

MR. EKELAND: I'm sorry. What?

THE COURT: Can you repeat what you said. I missed it.

MR. EKELAND: I just said the first -- roughly, the first two years of this investigation, Ms. Pelker is the FBI intelligence analyst on the case, and it's our understanding she's the lead agent on the case.

She's interacting with Mr. Bice over at the IRS, who is one of the lead IRS investigators. She's instrumental, in our understanding, from what we've seen in the discovery, in bringing Chainalysis Reactor and all that analysis over from treasury to DOJ. She's the driving investigator, as far as we can tell from the discovery, and then all of a sudden she's appointed the prosecutor.

I think the Court can see the problem here with -- if the DOJ can do this, then they can just remove material fact witnesses, their agents, from the case by appointing them prosecutors.

THE COURT: It seems to me improbable this was a gamesmanship by the Department of Justice where they made her the lead prosecutor on an important case simply to avoid having her being called as a witness in the case. That seems a stretch.

MR. EKELAND: Well, I don't know what happened there. Why did that happen? Why was the -- didn't anybody at DOJ look and say, look, here's the lead FBI intelligence analyst on this case, the person who asked us probably -- I'm guessing right now; speculating a little bit -- asked us to move it from Philadelphia to D.C. --

THE COURT: What does that matter? Why is that relevant?

MR. EKELAND: Because it's a material fact as to relation to venue, and the defense maintains that --

THE COURT: I'm sorry. Stop for a second. You have to explain to me what facts she would offer as a witness on the stand versus her opinion or what was done. I mean, there's either venue or there's not. With the -- the venue or not doesn't turn on what the motivation was of the Justice Department; it turns on where the relevant facts occurred.

And she's not changing where the relevant facts occurred in some respect.

MR. EKELAND: But if the jury is wondering why they're in D.C., we submit to the Court that --

THE COURT: But motivation is not -- I wouldn't allow that as testimony anyway, what their motivation was for bringing a case in D.C.

MR. EKELAND: Well, it was moved to D.C. from Philadelphia, and we submit that that is a relevant fact for the jury and, of course, if the Court rules that it's not, we'll accept that.

THE COURT: I just -- I guess I don't -- at least you have yet to persuade me why that would be a relevant fact and certainly one that was vital or even important to the defense in the case because venue is just a question of where the events occurred, not what any motivation was, not where it might have been brought otherwise, not where the Department of Justice initially thought about bringing it. None of that is relevant.

MR. EKELAND: I think it's relevant to the jury in determining whether or not venue is proper because the jury could well conclude that the only reason that the case is in D.C. is because Ms. Pelker wanted it there. And I think that's a salient fact.

THE COURT: So why not, then, in every criminal case call the prosecutors and say -- in the case and say, look, why are you bringing -- any case where it could have been brought in more than one venue and the prosecutors made a decision, in consultation with the investigators, about where the case

should be brought, why not in every case, then, disqualify the prosecutor, put the prosecutor on the stand and say, why did you bring this case in D.C. instead of Northern Virginia? The transaction took place in both places across the borders. Why did you bring it here?

MR. EKELAND: Well, I think if the cases involved an FBI investigator who then became an AUSA and appointed the lead prosecutor on the case, and then that FBI investigator was responsible for moving the case to the district, we submit that that is a relevant fact for the jury to consider in making their venue determination.

THE COURT: Why?

MR. EKELAND: Because it shows that that's the only thing -- the only real reason it's there.

THE COURT: Cite me a single case in the history of the United States in which the motivation of the Department of Justice is being considered as a relevant fact by a jury in deciding venue.

MR. EKELAND: I'm not saying it's the motivation. It's the fact of the transfer itself by the investigator to a convenient forum for them. I don't know of any other case where -- maybe this Freeh case -- I haven't looked at it -- where the government has taken their lead FBI investigator and made them a prosecutor in the case. I can't find one, I mean, in the history of the United States.

THE COURT: I can go back and check on this. I think my recollection is correct that Louis Freeh was, in fact, an FBI agent who I think investigated this matter -- that ended up being the longest criminal trial in the history of the federal system ever -- and then became the lead prosecutor on the case.

MR. EKELAND: And was that challenged by the defense?

THE COURT: I don't even -- you haven't shown me an argument as to why it's relevant. I don't understand the relevance of it.

MR. EKELAND: Your Honor, we submit -- and I'll just leave it at this. We submit that it's relevant that the lead FBI investigator in this case --

THE COURT: Let me just put a little more of a point on this. I think if you want to disqualify one of the prosecutors in the case, the standard is a high one.

And you have to -- I think that whether the standard, as Mr. Brown articulated, is precisely the standard, he is certainly correct that the standard, in general, is that if you want to disqualify a prosecutor by calling the prosecutor, you need to demonstrate that there's a compelling need to do so. And that includes showing me that there's evidence that that person has that you could not obtain elsewhere.

I don't see anything that you've done that shows me some element or material fact in this case that would be admissible to the jury where you've shown me or indicated to

me, Ms. Pelker is the only person who we can call who would know this.

MR. EKELAND: Yes, Your Honor. There are facts like that. Her interactions with Chainalysis and communications about the initial investigation. Most of the evidence you're seeing in this case comes from the period where she's an FBI intelligence analyst.

What I'm hearing now is that we're likely not going to be able to call the main FBI intelligence analyst in this case who was privy to unique knowledge about the investigation, how Chainalysis Reactor was used.

THE COURT: I'm just telling you, you haven't made any showing of that effect. I just need to know what the specific facts are.

MR. EKELAND: The specific fact is that she's the lead FBI intelligence analyst, who in August -- sorry -- October 28, 2014, writes a big report on Bitcoin Fog, says, if you have any questions about it, contact me. We haven't been given everything. I think there might be a motion to compel here.

But it's clear to us that she's the lead investigator and intelligence analyst on the case, and that's what we're seeking to call her as. Venue is one issue, but that's not the only issue. She's the main FBI agent or intelligence analyst -- excuse me -- that interacts with Chainalysis from

the beginning. She's intimately involved.

THE COURT: Why can't you call Chainalysis, then, about those issues?

MR. EKELAND: Because they don't have the unique perspective that she has as an FBI intelligence analyst making decisions for the DOJ. In every other case, I'm able to cross-examine the FBI investigative agent.

I'm saying, for the same compelling reasons that the Constitution allows us to do that, the defense should be able to call the lead FBI intelligence analyst on this case for two years before she becomes a prosecutor. That's what we're asking.

THE COURT: So tell me -- give me an example, what question you want to ask her that would establish some fact that is material in the case, and not something atmospheric, but some specific fact that you think that she would have access to that you could not obtain otherwise.

MR. EKELAND: Well, for instance, in the criminal complaint, as we'll probably discuss later today, there's an error in the tracing. And so one of the -- they missed a transaction that Mr. Scholl will correct it in his expert report, but it's a legitimate question.

What kind of quality controls; what did you use to verify and validate your information; what other errors are there? She has intimate knowledge of all of that.

THE COURT: Why couldn't you just call Chainalysis on that? If it's Chainalysis's analysis that you think is flawed, even if Chainalysis was doing it at the request of the FBI, why can't you just ask Chainalysis those questions?

MR. EKELAND: Because Chainalysis is not the only entity involved in making decisions about this case; in analyzing the investigative reports; in checking the validity of Chainalysis's work.

There's first questions, certainly, from Chainalysis -- right? -- how they validated their work; what were their accuracy rates. But there's also serious questions about how DOJ validated its work and why this mistake, which is central to the criminal complaint and that wasn't corrected until after Mr. Sterlingov was arrested, how that was left in. What was done to validate? It goes directly to the accuracy and the methodology and the verifiability of the forensics in this case. That turns entirely, entirely on probabilistic digital forensics.

THE COURT: Is she the one who was doing the forensics, or was it someone else who was doing the forensics?

MR. EKELAND: We haven't gotten enough in discovery.

THE COURT: So maybe your motion is premature then on that.

MR. EKELAND: There's a lot of stuff that's been held back. I think we'll be filing a motion to compel shortly on

that basis.

But it's our opinion, Your Honor -- I think we've been clear; I don't want to beat this to death -- that she's a material fact witness as the lead FBI intelligence analyst who has unique knowledge as to DOJ's position, and it's not just enough to call Chainalysis because they're only half the picture.

THE COURT: All right. Let me hear, then, from Mr. Brown.

MR. BROWN: Yes, Your Honor. With respect to the question of whom else the defense could call --

THE COURT: Can you just back up before you get to that for a second.

Is Mr. Ekeland correct that Ms. Pelker was for two critical years of this investigation the lead FBI intelligence analyst in the case?

MR. BROWN: I think that is a wild exaggeration. I don't -- there's some record correction that needs to happen with respect to the case history. We don't concede the relevance of any of this.

But to give just a little bit of background, there were actually two Bitcoin Fog investigations. The first investigation -- so there was an investigation opened between IRS Criminal Investigative Division at the U.S. Attorney's Office for the District of Columbia. That was opened in 2015.

This is explained in our reply in support of our motion to quash.

So that was opened in 2015. The FBI and my co-counsel had nothing whatsoever to do with opening that investigation in the District of Columbia. Separately, there was an FBI investigation that was opened in Philadelphia; then Intelligence Analyst Pelker provided some support to that investigation.

She wrote an intelligence product that was, essentially, open source research about, what is Bitcoin Fog, you know, how -- what are people saying about it on the internet; with some cross-referencing to internal law enforcement databases. She was not the lead agent.

In the FBI, investigations are led by 1811 agents. That lead agent was Kathleen Kaderabek. The defense has -- Special Agent Kaderabek is no longer employed by the FBI. The defense -- among the many subpoenas they served on the government, there was one for that special agent. She was the lead investigator initially.

At some point in early 2016, January or February 2016 -- in January of 2016, the FBI investigation in Philadelphia was transferred to the Washington field office. In January or February, the WFO, the FBI agents from the Washington Field Office, the two investigations sort of discovered each other. FBI started working with the U.S.

Attorney's Office for the District of Columbia and the IRS in a preexisting investigation.

It wasn't until nearly the end of that year, October of 2016, that my co-counsel joined the Department of Justice, and initially she didn't even work on this case. She was invited on it by staff from my office in December of 2016.

But she was mostly busy doing a rotation in our superior court division. So she didn't, sort of, provide a lot of substantive work on the case until a little later into 2016, 2017.

In terms of was she ever the primary investigator, she wasn't the primary investigator because she wasn't the lead case agent. What she did on the case was, essentially, open source research. She never -- in the course of her work as an intelligence analyst, she never identified Roman Sterlingov. There's no attribution of Roman Sterlingov in anything that my co-counsel did. It's just, this is Bitcoin Fog; we should find out what's going on with Bitcoin Fog.

I think that what defense counsel is referring to in, for example, communications with Chainalysis -- well, the defense has also subpoenaed eight other -- that we know of -- eight other current and former government employees. In addition to their ability to cross-examine our case agents and our expert witnesses, they've subpoenaed three IRS agents, including the IRS agent, Devin Beckett, who signed the

affidavit in support of the criminal complaint.

So if the defense wants to cross-examine somebody about the tracing -- by the way, Trial Attorney Pelker had nothing to do with the tracing that was in the criminal complaint.

If they want to cross-examine somebody about the tracing that was in the criminal complaint, they can cross-examine IRS Special Agent Devin Beckett, who is the affiant on that affidavit in support of that criminal complaint.

If they want to cross-examine somebody about communications with Aaron Bice, they have subpoenaed Aaron Bice. They can cross-examine Aaron Bice about his communications in his work, whether for IRS or on behalf of Chainalysis.

There's nothing that they can point to -- let me just say with respect to venue, what they're talking about is really not where the case was investigated. What they're talking about is where and why was the case charged.

And in addition to the points the Court has brought up, where the case is charged, that is a legal decision, that is core prosecutorial function that would absolutely be protected under a number of privileges. I think it belies their claim that they aren't interested in her work as a prosecutor.

THE COURT: Can you describe -- you indicated that she did open source work on Bitcoin Fog.

Anything other than that as an FBI agent? She's welcome to address the Court as well, whatever --

MS. PELKER: Again, without waiving any DOJ privilege that may or may not apply, it was -- my role was to identify significant platforms of money laundering concerns. Bitcoin Fog was one of those platforms.

We write these reports; we send them out to the field; and then the field will occasionally call us with questions about those reports and the services or systems that we've referred out. I was never assigned to FBI Philadelphia. I was never on that squad. The case agent would occasionally call in with general questions.

THE COURT: Were you involved in doing any of the -- or working with Chainalysis on the tracing analysis?

MS. PELKER: Your Honor, this is -- we'll get at -- we'll discuss this later on.

This is just a misconception that defense counsel has about Chainalysis's role in this case. There's a Chainalysis software product and service that FBI gained access to at some point during this case or investigation. Chainalysis wasn't retained to do tracing on this case, aside from the retention now of Ms. Bisbee for their work.

THE COURT: Were you the one who then used the tool

for the FBI, to do the analysis for the FBI?

MS. PELKER: So -- and we produced this to defense counsel. At some point when we were doing a demo, we were able to see that Bitcoin Fog was identified as receiving funds from darknet markets, and that was noted in a Chainalysis tool. That was the extent of it.

We didn't, then, have -- the actual tracing that was done with all of the detailed analysis, including tracing to Mr. Sterlingov and out to all the accounts, was not done by me. It was done later in the investigation by other individuals.

THE COURT: And this first portion of it, when you said we, were there others involved in it? There's others who can testify as to what was done, or you're the only person who can testify as to what was done?

MS. PELKER: I don't have an independent recollection of it. My only recollection is when we were putting the discovery together, there's an email from the case agent or a note from the case agent that indicates that she had spoken with me and that, in a demo for Chainalysis, we observed that Bitcoin Fog was receiving funds from different darknet markets.

THE COURT: Okay. Thank you.

MR. BROWN: And, Your Honor, can I just emphasize that, whatever was done in the past -- the defense is very focused on challenging work that was done during the flow of this investigation, but that's not our evidence at trial.

We are going to present witnesses and fresh evidence and everything at trial. That's going to be the evidence at trial. There's no direct -- you know, they can -- in the course of many investigations, the government goes down different roads. We explore different possibilities.

That's not -- they can say, well, you went down this road, and that was a mistake. But that doesn't -- that's not directly relevant to the evidence that we present at trial. There's nothing that Ms. Pelker touched while at FBI that the government intends to introduce affirmatively in our case in chief, or even not affirmatively. I don't think we would ever, under any circumstance, introduce anything that she touched as part of our case.

I think it's clear -- the narrative that the defense wants to tell in this case is careerism; that this case was my co-counsel's baby, all of that. That's the story that they want to tell to the jury. That's why they're trying to squeeze in this -- you know, somehow find some relevance hook for just work -- this is not direct evidence of anything.

Working with Chainalysis is no different from looking up the same data on a blockchain explorer, which is publicly available. It's just -- it is using a tool that pulls from a publicly available database. It's no different from looking up somebody in a CLEAR database or other -- or Accurint or some other, sort of, proprietary databases.

Many people might have done that. Many attorneys do that. You know, I have access to certain law enforcement tools. That doesn't make me a material fact witness. I have certain firsthand knowledge of this case; any prosecutor does. That doesn't make the prosecutor a necessary witness in a case.

I think that this sort of illustrates why there is -- there's a heightened standard, because there's so much room for requests like this to be abused; which I think is exactly what's going on in this case.

THE COURT: All right. Thank you. Mr. Ekeland, you want to respond?

MR. EKELAND: Briefly, Your Honor. We disagree with the government when the government says that this information and the testimony we're seeking is not directly relevant.

And the reason for that is that the software that's being used here, which is -- I think this is one of the first times it's -- if not the first time, it's been directly challenged in any federal court, is a probabilistic heuristic software that's based on assumptions. So it's not as simple as just entering in a case name and getting the citation and getting some sort of deterministic result.

The opinions and attitudes of the people involved and the assumptions that they make and the guesses that they make go directly into interpreting -- not only interpreting the results, but the Chainalysis Reactor software itself.

THE COURT: But this -- in a case where you're not -- in a different sort of case, in a murder case, drug-trafficking case, something like that, where you have a case agent who has gone out and looked at the scene, collected the evidence, interviewed the witnesses, I get why that individual's testimony can be critical in a case.

This is not that type of case because it's largely a forensics case. What matters is the forensics that the government puts on in support of its case. And what the government's motivation was, how it decided to follow up, to pursue something in the first place, I don't really see the relevance of that.

It's not as though your position is that Ms. Pelker has some percipient evidence; she saw something; she interviewed somebody. Assume that she walked in one day into someone's office and said, you know what, I've been out there doing a lot of reading on this and surfing around on the internet, and I really think that Bitcoin Fog is up to no good, and you guys have got to look into that.

I don't really see why that would be relevant in the case even if that happened because then someone goes and looks at it and either they find evidence or they don't find evidence, and the forensic evidence either maps it out or it doesn't map it out.

And what the motivation was of the government, if --

again, I'm not saying there's any truth to this.  If there was a tape recording where Ms. Pelker said, I'm going to make my career on this case, I don't see why that would be relevant in this case in any way.

MR. EKELAND:  I submit that it would be relevant because confirmation bias is a scientifically documented phenomenon in relation to this type of forensic science.

THE COURT:  Confirmation by whom?  She's not the witness; she's not the analyst; she's not the one who has done the forensics.

MR. EKELAND:  For instance, you can have traces with Chainalysis Reactor or other tracing software that points to seven different types of transactions that you can I.D.  So someone's got to pick.  Somebody has to make a decision as to what trace they're going to say, we're going to use here; right?

You have to -- everywhere with this software -- I think there's a misconception of the forensics here that it has some kind of scientific certainty.  One of the experts that we're proffering is an expert in confirmation biases who, it's my understanding, trained the FBI on how to avoid confirmation bias with their fingerprint database.

The problem is you do not have deterministic software that is executing some kind of equation like E equals MC2 and then giving you a certain result.  As you heard from Cabanas --

and the government itself will have to admit and Chainalysis admits -- this is software that's based on assumptions.

It's not just assumptions going in -- it's assumptions going in -- it's assumptions going into the operating of the software that's behind the design of the algorithms, and it's assumptions in the interpretation of the software.

THE COURT: So is there any evidence or reason to believe that whoever did the analysis here was biased in some way by something that Ms. Pelker did?

MR. EKELAND: We're certainly entitled to cross-examine on that if she's somebody who was intimately involved in it.

THE COURT: But intimately involved in it -- I mean, I just heard a description, including from Ms. Pelker, about her involvement, and I think intimately involved in it -- first of all, I don't know what the "it" is in all of that. But it does seem like an overstatement based on what she's described to me and what Mr. Brown has described to me.

MR. EKELAND: Your Honor, essentially, what -- just so we don't spend all day on this and we can get to the other witnesses. Essentially, the defense submits that Ms. Pelker is one of Mr. Sterlingov's accusers under the Sixth Amendment, and we have a right to call her because she was the intelligence analyst on this case for two years, and she's got unique

knowledge of conversations.

THE COURT: You just said she was the intelligence analyst on this case. That's not what was described to me.

MR. EKELAND: I misspoke, Your Honor. She was an intelligent analyst on this case starting in 2014 from Philadelphia. She has conversations, we've seen in the discovery, with Aaron Bice, who is the IRS CI. She's involved with Chainalysis Reactor. And because Chainalysis Reactor is a heuristic software, the government's assumptions and guesses come into play there.

We're just saying we're entitled to cross-examine her on that point. We're not looking to examine her on anything as her role as a prosecutor. We're simply looking to cross-examine her as a witness in this case.

THE COURT: That would disqualify her as the prosecutor in the case.

MR. EKELAND: I'm sorry, what?

THE COURT: That would disqualify her as the prosecutor in the case. You're saying we're not asking about anything as a prosecutor, but you would seek to disqualify her.

MR. EKELAND: We'd seek to cross-examine her as an FBI intelligence analyst who starts on this case in Philadelphia in 2014 and works on the Bitcoin Fog investigation as an FBI intelligence analyst through 2016 until whenever she becomes a federal prosecutor and is then appointed on this

case.

THE COURT: Okay. Thank you.

So the standard for requiring the testimony of a prosecutor at a trial is that -- the prosecutor -- let me strike that and start over.

The testimony of a prosecutor in a trial in which she is participating as counsel is permitted "only if required by compelling need." That's *United States v. Tamura* at 694 F.2d 591 at 601 from the 9th Circuit, 1982.

And a defendant has an obligation to exhaust other available sources of evidence before a court should sustain a defendant's efforts to call a participating prosecutor as a witness. And that's *United States v. Prantil* at 764 F.2d 548 to 551 from the 9th Circuit, 1985.

There's not an absolute bar on calling a prosecutor, but the standard is a demanding one. For -- among other reasons, it can be used as a means of simply disqualifying a prosecutor in a case.

That is, essentially, the standard that Mr. Brown outlined to me, and the defense doesn't point to any contrary law. In fact -- I'm just pulling up the brief here. One second here.

In fact, I think it only cites to *Crawford* in its brief and certainly doesn't contest that's the correct standard. I don't think *Crawford* applies here because

Ms. Pelker is not a witness against Mr. Sterlingov. And, therefore, there's no right to confront her because she's not a witness against him.

And as far as I can tell, nothing that she has done is being offered affirmatively by the government into evidence in the case. So the question is just whether that demanding standard has been satisfied here.

And the defense, in its opposition brief to the motion -- government's motion to quash -- contains a long quote from *Crawford*, an assertion that Ms. Pelker is the initial accuser of the defendant, and then, essentially, just two pages of analysis, and really only one -- well, there's one page is the venue, which I think is not a serious issue here; and one page on what she could offer relating to the facts in the case.

But I don't think that the defense has at this point satisfied its demanding burden of showing that her participation is either vital to the case or that there's a compelling need to have her as a witness, nor has the defense made any showing with respect to whether it has exhausted other available sources of evidence regarding to any issue that might arise.

So I'm going to grant the government's motion to quash and the government's motion to preclude calling her as a witness in the case at this time.

If, for some reason, in the course of discovery or

otherwise in the case, there's a reason to believe that Ms. Pelker has exclusive access to evidence that is of vital importance to the case or where there's a compelling need and she -- that evidence is not available from some other source, the defense is welcome to renew its request to call her as a witness.

But based on what I've seen, I'm not yet close to convinced that that demanding standard has been satisfied here; and I don't think that the government's motivation for bringing a case, even who it was in the government who instigated the decision to bring the case -- and I don't have any reason to think that was Ms. Pelker. But even if it were, I don't see why that is relevant to the essential elements of the case or is relevant to any defense in the case.

And, at least, as has been described to me, without any factual rebuttal, her involvement with this particular case as an investigating agent was, by no means, critical and was relatively minimal, nor do I have any reason to think that she has any access to or could offer any evidence, percipient or otherwise, that is not available from some other source in this case.

As I indicated, I think the case is largely a forensics case in which the government's motivation is not relevant. So that's my ruling on it.

If there's something else that comes up down the

road, the defense can renew its request to call her as a witness. But it will have to make the showing required under the case law that I described, which requires a particularized showing and not just general assertions that she was an agent involved in the case, but something far more specific than that, and that where the evidence is not available from other sources and where there's a compelling need.

What motion do you want to move to next?

MS. PELKER: Your Honor, we spoke with defense counsel earlier this week, and we think that the best way to proceed is to proceed with witnesses and then move on to the additional motions, hoping that we have enough time in the afternoon to finish them.

THE COURT: That's fine.

MS. PELKER: Previously, last week the defense had Mr. Scott here available to testify. We didn't get to him last week. We had initially indicated that the government would object to proceeding by Zoom. We later informed defense counsel that, given the issues with scheduling, that we would be fine with proceeding by Zoom for both Mr. Scott and Mr. Dror. But we understand that they are not available by Zoom today.

So we're seeking to reschedule their testimony as soon as the Court's calendar allows.

THE COURT: I think I will have some time. In part,

I think I'm pretty soon going to have a jury that's out deliberating. So we can do it while my jury is deliberating.

MS. PELKER: I understand that defense counsel indicated that they would not be available next week, though that would work for the government.

THE COURT: Mr. Ekeland, what do you want to do about scheduling? The question is, what do you want to do about scheduling for the two witnesses who aren't available today?

You need to be at a microphone or else the court reporter never hears it. Just so you all know, she wears the headphones. If you speak not into the microphone, she doesn't hear you.

MR. EKELAND: We were hoping we could maybe do something in July. Next week my schedule is out of control. We also, on top of Mr. Scott and Mr. Dror, I think we've got Mazarin, who we don't know when she is going to be available because --

THE COURT: Let me ask the Deputy Clerk real quick if we can find a date in early July. How much time do we need?

MS. PELKER: Your Honor, the government does have a number of scheduling conflicts in July, which is part of why we scheduled these now.

I think we'll need probably at least 90 minutes for Mr. Scott; and, Dr. Dror, the government would argue that we can -- that there's no relevance to Dr. Dror's testimony and

that we could likely exclude him on the papers, but understand if the Court would --

THE COURT: What is the topic he's proposed to testify about?

MS. PELKER: Cognitive bias.

THE COURT: I'm happy to do it in two stages if you want to first argue that and then turn to a *Daubert* hearing if I conclude that it's relevant. It also may be easier just to do it together because evaluating whether it really is relevant may turn on what he's going to say.

MS. PELKER: Understood, Your Honor, which does bring us to the other issue, which is that the defense disclosures for their experts failed to comply with Rule 16. We really are having a hard time determining which additional government experts we do need to *Daubert*, because it's just unclear to us who is testifying to what.

THE COURT: Rule 16 was amended fairly recently requiring greater specificity. I think a lot of counsel are still operating under, sort of past practice, which didn't require as much specificity.

Mr. Ekeland, is there more specificity you can provide by updating those notices?

MR. EKELAND: We're happy to update. We'll go back and look at the rule and update. There's really -- when I was looking at it, I don't think there really is that much to

update.  There's signatures, I think, on the disclosures.

THE COURT:  What you need to do now is you need to explain the basis for the opinions.  And that doesn't mean the basis for my opinion is my 27 years of experience in the field.  It means, my basis for this expert opinion is this study that was conducted in 1987 by this person that is published in this journal, which is peer-reviewed, and this analysis that I ran using this computer program -- and so it has to be detailed like that.  That's what the rule requires.

MS. PELKER:  Not to further belabor this point, Your Honor, because I think we've set it out extensively in the government's opposition to the defense expert notice, but the defense notice doesn't even comply with the old version of the rules.  They indicate that their experts have alternative tracing.  We haven't received a single report from any defense expert.

They suggest that each one of their five noticed experts -- four of the five noticed experts have done this tracing.  It's very clear from Dr. Cabanas' testimony last week that he doesn't do blockchain analysis.

THE COURT:  I will tell you all that I just had a *Daubert* hearing in this criminal trial that I'm in right now, and I held the defense to the particular studies that revealed or disclosed in the report as the basis for the report.  I did not allow testimony that was based on other studies because

you're supposed to disclose the basis for your expert conclusions, and they identified seven or eight articles or books.

And when the witness wanted to testify about other articles and books, I said no, because they were not -- it was not disclosed as a basis for the opinion.

So I don't want to prejudice the defense. And if you can promptly update by providing the detail, I would provide you with some opportunity to do so, particularly before we actually get to the hearing. You have to do so quickly enough so the government has a chance to be prepared for a *Daubert* hearing. Okay?

MR. EKELAND: Yes, Your Honor.

THE COURT: Okay.

MS. PELKER: And with regard to Ms. Mazarin, we're happy to make her or the government's experts available to the extent that the Court finds that the government has met their burden for -- has actually launched a *Daubert* challenge of any of our non-blockchain forensics experts. But it's still unclear to us what defense is actually challenging with regard to their testimony about basic computer forensics.

THE COURT: I think that Mr. Ekeland is certainly previewed for us a fair amount of what his views are about the blockchain analysis and why it's not reliable.

MS. PELKER: Yes, Your Honor. We have both of our

blockchain analysis experts here today. Our understanding --
Ms. Mazarin is not testifying about the blockchain analysis.

THE COURT: What is she testifying about?

MS. PELKER: The computer forensics. Really, just
that she reviewed the files on the defendant's computer; this
is how you retrieve files from those computers. She also did
an IP address analysis that says this is what an IP address is,
and here's where they overlap.

THE COURT: Mr. Ekeland, you want to address whether
we need a *Daubert* hearing on those questions, and if so, why?

MR. EKELAND: Given the critical nature of the IP
address analysis in this case, we are seeking to challenge it
at this point.

THE COURT: But I guess my question is, on what basis
is your -- are you questioning whether the ability to identify
or draw any conclusions from an IP address doesn't comply
with --

MR. EKELAND: It's not a forensically sound method
for identifying anybody.

THE COURT: Okay. Is that a *Daubert* issue, or is it
just a -- an argument to the jury?

MR. EKELAND: The reliability and reproducibility of
the methodologies used to arrive at an opinion of
identification, I would submit --

THE COURT: I suppose, in part, that depends on what

the witness says.  If the witness simply says, this is the IP address that I found, then that doesn't sound like that's questionable.

If the person says, this is the IP address I found, and from that I know that it must have been Mr. Sterlingov because his name is in the IP address, and people put their names in IP addresses or whatever that might be.  That's a different matter.

But I suppose the question is whether there's any -- whether it's purely more than a factual nature.  This is what was on the computer file; this is what we pulled up, which doesn't sound terribly controversial; or whether the witness has actually drawn conclusions had from that.

Ms. Pelker, I don't know if you can shed light on that question.

MS. PELKER:  Yes, Your Honor.  There's an IP overlap analysis in which Mazars de Mazarin finds, basically, notes that -- IP accesses for different accounts and matches them together showing that the same IP was used at this period of time to access this account; this same IP was then used to access this account.  We think that's more appropriate for cross-examination.

If that's what defense is specifically challenging, we would note that, to the extent the Court does think that should be subject to *Daubert*, that the examination should be

very limited to just that IP address.

THE COURT: Mr. Ekeland?

MR. EKELAND: We would like to *Daubert* Ms. Mazarin on the methodologies that she used to do her IP address overlap because there's a lot of guessing and there's a lot of assumptions in there.

THE COURT: Okay. That's fine. We'll have to schedule that as well.

MS. PELKER: That's fine, Your Honor.

THE COURT: It sounds to me like what I probably better do is set aside a day if I have it. I don't know whether we're going to -- we're not moving with great speed today already.

My clerk was just reminding me we also have the motions to dismiss, and I want to make sure I have time to give you for argument on those issues as well, if you want that. So let me ask the deputy clerk what we have available and maybe if we have a day available, or the next time we have a full day available; maybe when my jury is out deliberating.

THE COURTROOM DEPUTY: So, Your Honor, we have -- in order to try to give everybody enough time, we have July 19th. I don't know if everybody wants to wait that long; Wednesday, July 19th.

MS. PELKER: I'm available, Your Honor. I believe my co-counsel may not be.

MR. BROWN:  If it's just witnesses, we can --

THE COURT:  If we do that, I guess, maybe what I can do is find an earlier date to do any argument, if we don't get to it today, on the motions to dismiss.

MS. PELKER:  So we have two witnesses.  I believe we can do Mr. Scholl prior to lunch, we can proceed with Ms. Bisbee immediately after lunch, and that should still give us time.

THE COURT:  Let's see how much progress we make today and we'll figure out how to reschedule the rest of things.  Why don't we move along.  Let me ask, could the court reporter use a break before we call the first witness?  Why don't we take just a five- or ten-minute break, and then you can call your first witness.

MS. PELKER:  Yes, Your Honor.

(Recess taken.)

THE COURT:  All right.  I think our goal ought to be to at least reserve 45 minutes or an hour today for arguments on the motion to dismiss; put on whatever evidence we can and then on the 19th, you can put on the rest of the *Daubert* evidence.

Go ahead and call your witness.

MS. PELKER:  Thank you, Your Honor.

The government calls Mr. Luke Scholl to testify.  With the Court's permission, just for ease of exhibits, would

you mind if I put the government's exhibit binder on the witness stand?

THE COURT: That's fine.

MS. PELKER: Thank you.

THE COURTROOM DEPUTY: Would you please raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Thank you. You may be seated.

DIRECT EXAMINATION OF

LUKE SCHOLL

BY MS. PELKER:

Q. Hello, Mr. Scholl. Could you please state and spell your name for the record.

A. My name is Luke Scholl. L-u-k-e, S-c-h-o-l-l.

Q. Mr. Scholl, where do you work?

A. I work at the Federal Bureau of Investigation. I'm currently assigned to the Department of Justice's National Cryptocurrency Enforcement Team.

Q. Could you please briefly describe your educational and professional background, including any degrees that you hold.

A. Yes, ma'am. I hold a bachelor's in science from the University of Rochester in optics. I then entered the United States Navy and served as a submarine warfare officer for five years.

I went back to school to get a master's in science in

cyber security from Stevens Institute of Technology.

Q. And when did you join the FBI?

A. I started at the FBI in 2014 as an intern, and started full-time in 2015 as a staff operations specialist.

Q. What does your current assignment detailed to the National Cryptocurrency Enforcement Team entail?

A. My current assignment to the National Cryptocurrency Enforcement Team entails providing blockchain analysis support on the team's investigations, as well as expert advice and consultation.

Q. Are you also a member of the FBI's Virtual Currency Response Team?

A. Yes, ma'am, I am.

Q. Could you explain what that team is.

A. The FBI's Virtual Currency Response Team is a team made up of field personnel with expertise in blockchain analysis that can provide support in general investigative techniques, blockchain analysis, and seizure operations to investigations across the FBI.

Q. How long have you been a member of the Virtual Currency Response Team for FBI?

A. I've been a member since the beginning of the Virtual Currency Response Team. The date escapes me, ma'am. It should be on the CV.

Q. How long have you been working on virtual currency,

generally, for the FBI?

A. I've been working with virtual currency matters with the FBI since 2015.

Q. And what sort of cases and matters have you worked on over those past eight years?

A. I've worked on predominantly computer intrusion cases; I support a cybercriminal squad in -- I supported a cybercriminal squad in Newark. Those cases include ransomware investigations, distributed denial service attacks, SIM swaps, insider threats, and darknet market investigations.

Q. Have you also received training related to virtual currency and blockchain analysis?

A. Yes, ma'am, I have.

Q. Could you describe, generally, what those trainings entail?

A. Yes, ma'am. In general, I received multiple trainings from the FBI produced by the FBI in blockchain analysis throughout the last eight years, as well as attending training at conferences put on by the National Cyber Joint Investigative Task Force. I've also received training from Chainalysis and TRM and received certifications from those companies.

Q. Now, you mentioned that you hold trainings -- hold certifications from Chainalysis, TRM in blockchain analysis.

Could you explain briefly what the trainings for those certifications and the certification tests entail.

A. Yes. Both Chainalysis and TRM now have certification

courses; they start with cryptocurrency fundamentals, explaining what a blockchain is, how this all works, and move through investigative techniques and then advanced topics in blockchain analysis.

Q. Do you also give your own trainings and presentations and teach others about cryptocurrency and blockchain analysis?

A. Yes, ma'am, I do. I've provided trainings to the FBI, locally at my field office, as well as at other field offices. I provided trainings to the FBI's Virtual Currency Response Team. I've provided training external to the FBI to U.S. Attorney's Offices, as well as the National Cryptocurrency Enforcement Team.

Q. How much of your work, Mr. Scholl, is currently focused on cryptocurrency, including blockchain analysis?

A. The vast majority of my current work is based on blockchain analysis.

Q. I'd like to direct your attention in the binder in front of you to what's marked as Government's Exhibit 1.

Is this a copy of your curriculum vitae?

A. Yes, ma'am, it is.

Q. And does that exhibit and document accurately set forth a summary of your experience and qualifications pertaining to your testimony today and your work on this case?

A. Yes, ma'am, it does.

MS. PELKER: Government would move to admit

Government's Exhibit 1, Mr. Scholl's CV.

THE COURT:  Any objection?

MR. EKELAND:  No, objection, Your Honor.

THE COURT:  Exhibit 1 is admitted.

(Government's Exhibit 1 was admitted.)

BY MS. PELKER:

Q.  Mr. Scholl, I'd like to spend a little bit of time going through some key concepts for cryptocurrency and blockchain analysis.

Could you explain, in your own words, what is virtual currency?

A.  Virtual currency, or cryptocurrency, is a digital currency that is administered and operated by a decentralized network that transmits, validates, and records those transactions.

Q.  What are some common types of virtual currency?

A.  The most common -- the most popular or well-known type is probably Bitcoin.  There's many others, including Ethereum, Litecoin, Dogecoin.  There are many.

Q.  If I want to buy bitcoin, where could I go to get it?

A.  Most users would go to an exchange to purchase cryptocurrency.  Such exchanges include Kraken or Coinbase. You would visit their website and create an account and link a bank account and purchase cryptocurrency with your bank account.

Q.  And when you say an exchange, do you mean, basically, an

online financial institution, kind of like a bank, but dealing in virtual currency?

A. Yes, ma'am; I'd say that's accurate.

Q. What type of information would an exchange collect from someone buying cryptocurrency or bitcoin from the exchange?

A. Many of the exchanges include -- collect personal information, including name, date of birth, sometimes phone numbers, but usually email addresses; that sort of personal identifiable information.

Q. In your investigations do you often seek and review records from exchanges?

A. Very frequently we seek information from exchanges, yes, ma'am.

Q. What sort of information do you receive from the exchange?

A. For a subpoena to an exchange for an account, we would receive customer information, that kind of KYC information that we talked about. We would receive information about who the account belongs to, to include their name and date of birth, email address, that sort of information; as well as activity on the account, including login information, as well as virtual currency transactions, deposits, withdrawals, and trades.

Q. So similar to what you might get from a subpoena from a bank, but dealing in cryptocurrency?

A. Yes, ma'am.

Q. Once people have bought bitcoin on the exchange, can they

continue to store funds on an account at the exchange, like a bank account?

A.  Yes, ma'am.  Users can elect to keep their funds on their exchange account.

Q.  Are there other ways that people can store their bitcoin if they don't want to keep it at the exchange?

A.  Yes, ma'am.  Users could store their own bitcoin on a personal wallet, a software application that they can download from the internet, and then transfer funds from their exchange account on to their personal wallet account; that would be on their laptop or mobile device.

Q.  Could you explain what a Bitcoin address is.

A.  Yes, ma'am.  A Bitcoin address is like an account number. A Bitcoin address is what holds value on the Bitcoin blockchain.  It's a string of numbers and letters that is representative of the public key and -- a private/public key pair like is used in cryptocurrencies.

Q.  And does each Bitcoin wallet on someone's computer just have one Bitcoin address in it?

A.  A wallet can have a single address, but more commonly, Bitcoin wallets contain multiple addresses.

Q.  What happens when a user wants to send funds from their Bitcoin wallet to another user or a business?

A.  So, first, a user would have to have received funds in their wallet to make this transaction.  But once those funds

are received, they would need to know the address of the person that they were trying to transfer the funds to and determine how much of their bitcoin they'd like to transfer.

They would open their wallet application; input the address that they'd like to send funds to; input how much bitcoin they'd like to send; and then click send in their wallet, essentially, and transmit that to the Bitcoin network.

Q. Once that information is transmitted to the Bitcoin network and verified, how is that transaction recorded?

A. The transaction is recorded in the Bitcoin blockchain. It is mined into a block with other transactions around that time. That transaction is given -- has a unique transaction hash or transaction I.D., which is a unique identifier for the transaction.

And the blockchain records the addresses that are involved, how much funds were transferred to and from those addresses, and the fees involved in the transaction.

Q. You mentioned it records the addresses involved.

Does each transaction have just one input address spending the funds and one output address receiving the funds?

A. No, ma'am. A Bitcoin transaction can have just a single input or output address, but it can have any number of input addresses and any number of output addresses.

Q. Could you walk us through an example of a transaction that would have more than one input address.

A. Yes, ma'am. Let's say that I had a Bitcoin wallet and I received bitcoin two times; the first time I received two bitcoin; and the second time I used a different address to receive three bitcoin.

If I wanted to transfer you five bitcoin, I would need to spend both of those inputs that I previously received. So I would create a transaction sending to your address; I would tell my wallet that I want to send five bitcoin. My wallet would figure out for me that it needs to use both of these addresses and the two bitcoin and the three bitcoin that I previously received, and then construct the transaction and send it to your address.

Q. So if you have an address A with two bitcoin, an address B with three bitcoin, you can send a transaction with five bitcoin because you can combine those two, both address A and address B, in a single transaction?

A. That's correct, ma'am.

Q. And does each transaction have -- why would a transaction have more than one output or receiving address?

A. Most bitcoin transactions have more than one output or receiving address because the Bitcoin network requires you to spend an entire input. So if I had that three-bitcoin input that I wanted to spend to just send you one bitcoin, I can't spend just one bitcoin from that three-bitcoin input. I need to spend the entire input.

I would send you three -- I would send you one bitcoin; my wallet would create an additional address or a change address that the remaining two bitcoin would get sent to.

We often use the example of a coffee shop transaction.  If you wanted to buy a $5 coffee at a coffee shop and you only had a $10 bill in your wallet, you can't just rip the $10 bill in half and hand it to the cashier; you need to spend the entire bill, that entire denomination, and receive change.  So the cashier creates $5 of change and hands it back to you, and it comes back to your wallet.

Q.  All of this information would, then, still be recorded on the blockchain that's publicly available?

A.  Yes, ma'am.

Q.  Could you explain what is blockchain analysis and what's meant by that term.

A.  Yes, ma'am.  So all of the bitcoin transactions from 2009 until today are recorded on the Bitcoin blockchain.

Blockchain analysis is taking the information about those transactions that's been recorded on the blockchain and determining things like where the money came from and where the money went for a specific address or a specific transaction.

Part of that includes determining which address in an output is change and which is the payment.  So we try to determine which way control moves in a series of outputs.

Q. Does it also include what's called sometimes co-spend or common input analysis where you're looking at multiple inputs to a transaction?

A. Yes, ma'am, it does.

Q. And when you see multiple inputs to a transaction like what you've previously described, what can that indicate to you about who controls the addresses?

A. In the case of multiple input addresses to a single transaction, that can indicate that both of those addresses are controlled by the same wallet because both of those addresses need to be signed with their private keys at the same time in order to make that transaction.

Q. How do you typically start off your blockchain analysis for a new case that you might be working on?

A. So to start a blockchain analysis investigation, we take whatever identifiers we have; that may be the transaction hash or that unique identifier for a transaction; it may be an address. I would search that in an online block explorer and take a quick look at how much money is involved in this transaction or how much money is moved through this address and look at where funds came from and where funds go to, depending on the context.

Q. Could you explain what you mean by an online block explorer.

A. Yes, ma'am. There are many online block explorers that

provide a user interface to information from the Bitcoin blockchain. Some examples are blockchain.com, mempool.space, blockchair.com. There's websites that you can go to and query information from the Bitcoin blockchain that gets presented on a web interface.

Q. Now, if the Bitcoin blockchain is a public data set that you can go through and manually review yourself, why use one of these online services rather than search the blockchain data file yourself?

A. It's all just about the user interface that it provides. You can conveniently search on this web interface by just having to go through a ton of data. The Bitcoin blockchain is approximately 500 gigabytes at this point.

Q. Is it fair to say that scrolling through the 500-gigabyte data file looking for each individual address would be a bit labor-intensive?

A. Yes, ma'am.

THE COURT: I'm sorry. Is there -- I'm going to convey my ignorance on the topic.

Is there an administrator for Bitcoin that maintains the blockchain? Who maintains that?

THE WITNESS: Yeah. That's a great question, sir. The Bitcoin blockchain is, essentially, administered by the peers of the network; so just users of the network. This is why we call it a decentralized network.

They have rules that they have codified into a protocol. And as long as the protocol is being enforced, they administer themselves, essentially.

THE COURT: When you say they, who is the they?

THE WITNESS: Anyone using the Bitcoin network. In particular about administration, anyone who is operating a full node on the Bitcoin blockchain, which is doing things like listening for new transactions, and then validating that that transaction is valid; that it's had the money to send that it is going to send; that it received that input somewhere else; and that it hasn't spent it yet.

And the miners go about -- so a miner is a person who creates a block. They operate a node and they go about trying to collect all those transactions that haven't yet been included in the blockchain and check that they're valid, and then mint them, essentially, into a new block on the blockchain.

THE COURT: Okay. Thank you.

BY MS. PELKER:

Q. Do you have a rough estimate of the number of full nodes on the Bitcoin blockchain? I know it changes over time.

A. Off the top of my head, I don't, ma'am. Thousands of full nodes on the Bitcoin blockchain.

Q. Have you yourself at one point run a full node on the Bitcoin blockchain?

A. That's correct, ma'am. I had a full node running at one point. I wasn't mining. I was just listening to every transaction and retaining them.

Q. And each one of these block explorers on the internet also runs a full node or communicates with a full node?

A. I don't know that for a fact, but that's my understanding in general; yes, ma'am.

Q. And the way that the Bitcoin network is set up, the blockchain that would be verified on, say, your full node would be the exact same set of records and data that would be on anyone else's full node; is that right?

A. Yes, ma'am, that's correct.

Q. We spoke -- we've talked about your use of these public online tools available to the public.

Do you also use commercial tools like Chainalysis, TRM, and others?

A. Yes, ma'am, I do.

Q. Why use a commercial tool instead of just relying on the publicly available tools?

A. The commercial tools provide several advantages or several features for blockchain analysis. The first is that they provide clustering of addresses. Actually, I'll start again.

The first thing is that they provide a graphical user interface. They provide -- instead of just reviewing page after page after page of blockchain data, they put this into a

graph that makes it easy to look back and look forward and understand.

The second thing that they provide, from my perspective, is clustering or grouping of addresses together, which is part of what we're trying to do in blockchain analysis. These tools make determinations about which addresses they believe belong to the same entity and present that information in their tool.

The third thing that the tools provide is attribution information to a limited extent. What I mean by that is they can frequently infer or know that some cluster or group of addresses that they've identified belong together, belongs to a particular entity. So we call that attribution, and that's the third thing they provide.

And then the fourth thing is a lot of analysis tools, or analysis tools in general; like -- they can do aggregate flow analysis and calculate things like that quickly.

Q. Does the underlying blockchain data that's in Chainalysis accurately reflect what's actually on the blockchain and available on any other Bitcoin node?

A. Yes, ma'am. In my experience, the transaction information displayed in Chainalysis matches what you'll find on any block explorer.

Q. In your work, have you also had the occasion to validate the clusters and attributions in Chainalysis?

A. Very frequently, ma'am. Every time we send a subpoena to an exchange to get back account information, we have the opportunity to check that those Bitcoin addresses that belong to this account at this exchange were properly attributed by Chainalysis to the exchange that we subpoenaed.

Q. So breaking that down a bit more, if you see funds in Chainalysis going to what Chainalysis has clustered and attributed as an exchange, you send the exchange a subpoena for records from that address.

Is it your testimony that the response back from the exchange verifying with records from that address that the exchange does control that address a validation of Chainalysis's clustering?

A. Yes, ma'am, I believe it is.

Q. Do you have a -- is this something that you and your colleagues do frequently in your blockchain analysis type cases?

A. Yes, ma'am. We do this every day.

Q. Do you have a sense of the rough estimate of the volume there?

A. I'd imagine a thousand times a day throughout the FBI; not me personally.

Q. You would be very busy.

Were you asked to do blockchain analysis of the sort you've described for the Bitcoin Fog case?

A. Yes, ma'am, I was.

Q. What specifically were you asked to do on Mr. Sterlingov and the Bitcoin Fog investigation?

A. I was asked to conduct a source of funds analysis and determine the amount of funds in Mr. Sterlingov's accounts that came from Bitcoin Fog. I was also asked to look at specific payments and transactions associated with the investigation.

Q. And we heard testimony from you earlier this year in your declaration regarding your source of funds analysis for some of the accounts.

Did you also complete an expert report detailing your work on the tracing?

A. Yes, ma'am, I did.

Q. And I'd like to direct your attention to Government's Exhibit 2.

Is this a copy of the report that you completed?

A. Yes, ma'am, it is.

Q. And is that your signature next to the date of December 8, 2022, at the bottom?

A. Yes, ma'am, it is.

Q. And does this report accurately reflect your work doing the tracing on this case?

A. Yes, ma'am, it does.

MS. PELKER: Government would seek to admit Government's Exhibit 2.

THE COURT: Any objection?

MR. EKELAND: Yes, Your Honor. We object because it's not -- the defense objects on the basis that this report is not based on any scientific verifiable methodology that's cited anywhere. It contains a number of conclusions based on an untested heuristic assumption-based software.

Nowhere in it does it cite a single instance of any scientific support for the methodology used, any peer-reviewed papers, or anything except for conclusory statements. There is no assessment of error rates; there is no scientific analysis of accuracy; and there is nothing that establishes the validity of all of the heuristics used in the report.

So on the basis that it is, essentially, unscientific and unvalidated and conclusory, we object.

THE COURT: I mean, I think that's what this hearing is about. For present purposes, I'm just admitting it for purposes of the *Daubert* hearing. I'm not admitting it for purposes of trial at this point, but I think it's appropriate to admit it for purposes of the *Daubert* hearing. That's what we're here to discuss.

Exhibit 2 is admitted for purposes of today's hearing.

MS. PELKER: Thank you, Your Honor.

(Government's Exhibit 2 was admitted.)

BY MS. PELKER:

Q. Mr. Scholl, did the report also include a number of voluminous attachments as well?

A. Yes, ma'am, it did.

Q. Turning your attention to Government's Exhibit 3 in the binder in front of you, if you could look through those several pages.

Are these, essentially, screenshots of the different files and the attachments to the report that you provided?

A. Yes, ma'am, they are.

Q. Could you describe, generally, what's included in these attachments.

A. Included in the attachments were all of the addresses that Chainalysis Reactor has attributed to the darknet markets in the report that are discussed, direct transfers from the Bitcoin Fog cluster and Chainalysis to Mr. Sterlingov's accounts, and then information from Mr. Sterlingov's Mycelium wallet and his -- several of his accounts.

Q. And is it accurate to say that each of these are very lengthy CSVs and spreadsheets listing off thousands and thousands of Bitcoin addresses that underlie your analysis?

A. That's correct, ma'am.

MS. PELKER: Government would move to also admit Government's Exhibit 3.

THE COURT: Any objection to admitting Exhibit 3 simply for purposes of the *Daubert* hearing?

MR. EKELAND: No.

THE COURT: Okay. Exhibit 3 is admitted for the *Daubert* hearing.

(Government's Exhibit 3 was admitted.)

BY MS. PELKER:

Q. Mr. Scholl, could you describe what data sources you reviewed in conducting your analysis for this case.

A. Yes, ma'am. I reviewed undercover transactions that were conducted by the FBI and IRS CI. I reviewed an extensive amount of information from the Bitcoin blockchain. I reviewed records from Mr. Sterlingov's cryptocurrency accounts, as well as some search warrant email returns.

Q. Was part of your work corroborating the group of addresses controlled by Bitcoin Fog?

A. Yes, ma'am, it was.

Q. Attached to your report was a list of over 900,000 addresses associated with Bitcoin Fog.

What was the sourcing of those addresses?

A. The 900,000, approximately, addresses that were included in the Bitcoin Fog attachment were exported from Chainalysis. Chainalysis is the source of those 900,000, approximately, addresses.

Q. Did you take additional steps to validate those addresses that they exist and then that they are included, that they are appropriately attributed to Bitcoin Fog?

A.   Yes, ma'am, I did.

Q.   What did you do on that point?

A.   First, we used the undercover transactions that the government performed to validate those transactions -- to validate some of those addresses, rather.  And then we compared addresses in Chainalysis to other clusters that were relevant to the investigation to other tools, including TRM.

Q.   Speaking specifically to the undercover transactions, is this further detailed starting on page 8 of your report?

A.   Yes, ma'am, it is.

Q.   And I'd like to draw attention to the chart shown on the bottom of page 10.

Could you explain what is shown here.

A.   Yes, ma'am.  The chart on the bottom of page 10 in the report displays Bitcoin addresses associated with Bitcoin Fog as they relate to the undercover transactions.

First, the FBI undercover payment sent to an address that they received from the Bitcoin Fog service and then withdrew funds from Bitcoin Fog, and then the IRS CI in the same fashion.  The chart attempts to explain what addresses were attributed by Chainalysis and what addresses the government knows belong to Bitcoin Fog.

Q.   So is it your testimony that you were able to look at the undercover transactions, outside of anything that Chainalysis said about Bitcoin Fog, and determine that, because in an

undercover capacity the funds were going to and from these addresses, that you knew from IRS and FBI that these were Bitcoin Fog addresses?

A.  That's correct, ma'am.

Q.  And then what's the distinction between this red box that says Bitcoin Fog cluster and then the blue box addresses known to belong to Bitcoin Fog based on undercover transactions?

A.  Right.  So the blue box contains all addresses that we know from the undercover transactions belonging to Bitcoin Fog; the red box is those attributed by Chainalysis to Bitcoin Fog.

The significance is that there are no addresses that were improperly attributed in this case to Bitcoin Fog cluster. And in one case there is an address that Chainalysis did not attribute to Bitcoin Fog that the government is aware of.  I think that this is consistent with my experience using Chainalysis and its attribution, in general, is that it is generally reliable and conservative in that, if it's not sure if an address belongs to the cluster, the address will not appear in Chainalysis's Bitcoin Fog cluster.

Q.  And so that Bitcoin Fog Withdrawal Address 3, how do you know that it is actually associated with Bitcoin Fog?

A.  Bitcoin Fog Withdrawal Address 3 was provided to the IRS CI undercover agent -- correction -- is the address that they received funds from.  So the IRS CI undercover goes to the Bitcoin Fog service, makes a withdrawal of their funds from

Bitcoin Fog, and provided an address that they wanted to receive the payment to.

Bitcoin Fog Withdrawal Address 3 is where that money came from, where Bitcoin Fog -- where the money came out to the withdrawal address the UC was using.

Q.  Why is it significant in your analysis that four of the addresses were included in the Bitcoin Fog cluster in Chainalysis but one was not?

A.  Again, the four being included in the cluster shows that Chainalysis attribution is accurate.  The one not being included shows that Chainalysis is conservative, that not all addresses that belong to a service are in the cluster, but generally, addresses that are in the cluster belong to the service.

Q.  Did you take any other steps, in addition to reviewing the undercover transactions, to validate the cluster of addresses that Chainalysis had identified as the Bitcoin Fog cluster?

A.  Yes, ma'am, I did.

Q.  And what was that?

A.  I reviewed relevant addresses from this investigation in TRM Labs and confirmed the attribution from another private company.

Q.  And what is TRM Labs?

A.  TRM Labs is a competitor of Chainalysis.  It provides similar blockchain analysis tools.

Q.   In addition to validating the Bitcoin Fog cluster, were you also asked to look at transactions between Bitcoin Fog and a variety of darknet markets?

Yes, ma'am, I was

Q.   How did you do that analysis?

A.   I did that analysis using Chainalysis Reactor and its bulk analysis tools.

Q.   Why use Chainalysis rather than doing it by hand?

A.   The number of transactions involved between these darknet markets and Bitcoin Fog is massive.

Q.   We're talking hundreds of thousands of transactions?

A.   Yes, ma'am.

Q.   Turning your attention to page 18, does the table there summarize your findings?

A.   Yes, ma'am, it does.

Q.   And is that further detailed in the preceding pages in the report, as well as in the attachments to your report?

A.   Yes, ma'am, it is.

Q.   Mr. Scholl, did you additionally conduct a source of funds analysis from Mr. Sterlingov's accounts at a variety of exchanges?

A.   Yes, ma'am, I did.

Q.   Is a source of funds analysis something that you frequently do in your work?

A.   Yes, ma'am, it is.

Q. Generally speaking, what was the source of funds deposited into Mr. Sterlingov's various exchange accounts?

A. The analysis showed that there was a significant amount of funds coming from Bitcoin Fog into Mr. Sterlingov's accounts.

Q. Did that include instances where the funds were transferred directly from the Bitcoin Fog cluster to the defendant's accounts at various exchanges?

A. Yes, ma'am, it did.

Q. And in other cases were the funds sent through a series of intermediary addresses before being sent to the exchange?

A. Yes, ma'am.

Q. I'd like to direct your attention to the chart on the bottom of -- or, I guess, the top of page 22.

Could you walk us through this chart.

A. Yes, ma'am. This chart shows the flow of funds that were sent from Bitcoin Fog to Mr. Sterlingov's Kraken account. The chart shows that there's multiple transactions in between Bitcoin Fog and the Kraken account; in this case six transactions sending funds to Bitcoin addresses outside of Bitcoin Fog and the Kraken account -- so on the blockchain -- and the total amount of funds that was ultimately transferred into the Kraken account from Bitcoin Fog.

Q. There's a note at the top of the box -- rectangle on the right-hand side that says peel chain.

Could you explain what a peel chain is.

A. Yes, ma'am. A peel chain is a behavior in transactions in which a large amount of bitcoin that was initially received is spent in relatively smaller subsequent transactions, sending that change that we talked about forward to a new address in the wallet, forming this chain where the next address receives the change and then another payment happens, sending a portion of that funds to the payment address and forwarding change to the next address in the peel chain.

Q. What did your review of this peel chain shown on page 22 suggest to you about the addresses in the peel chain?

A. My analysis showed that these addresses were likely controlled by the same wallet.

Q. After writing this report, did you receive additional information about these addresses?

A. Yes, ma'am, I did.

Q. What was that?

A. Received information about the addresses and Mr. Sterlingov's Mycelium wallet.

Q. And why was that significant?

A. It was significant because all of the addresses that I sensed belonged to this peel chain did, in fact, belong to Mr. Sterlingov's Mycelium wallet.

Q. Is it fair to say that that validates your original assessment in your tracing?

A. Yes, ma'am.

Q. Are you generally aware that Mr. Sterlingov has testified and made statements that the source of his funds in his various accounts was, in fact, coming from Bitcoin Fog?

A. I'm generally aware, yes, ma'am.

Q. Does that also further corroborate your analysis and the validation of the Bitcoin Fog cluster?

A. I believe it does, yes, ma'am.

Q. Do the other pages in the report following page 22 through page 34 further describe tracing from Bitcoin Fog to other accounts controlled by Mr. Sterlingov?

A. Yes, ma'am.

Q. Did you apply, generally, the same methodology for those accounts and that work as you just described for the Kraken account and the chart on page 22?

A. Yes, ma'am, I did.

Q. Mr. Scholl, were you also asked to review particular payments for Bitcoin Fog infrastructure?

A. I was.

Q. And in doing that work, did you combine information from the blockchain with records from various virtual currency exchanges and services?

A. Yes, ma'am, I did.

Q. Is it common for you to do that sort of analysis: Combining the records from the blockchain with records from exchanges, financial institutions; seize data sets?

A. Yes, ma'am, that's common.

Q. Directing your attention to page 35 of the report and this chart under the section specific payments, could you walk us through what's shown here on this chart.

A. What's shown here is a movement of funds from an account at Mt. Gox associated with the email address plasma@plasmadivision.com. Those funds were withdrawn from accounts to the Bitcoin blockchain, made three hops on -- in Bitcoin transactions, were deposited to a second account at Mt. Gox associated with the email address NFS9000@hotmail.com.

Those funds were then converted by redemption codes and sent to a third Mt. Gox account where the Bitcoin was converted to U.S. dollars and then withdrawn from the third Mt. Gox account and sent to the Aurum Xchange. We didn't have information about what specific accounts at the Aurum Xchange they were sent to, but there were similar transactions out of Aurum Xchange to the Liberty Reserve account, Shormint LR account referenced in the report.

And then, further, that those funds were subsequently spent at various web service providers.

Q. And just to be very clear, what portion of this tracing was based on information on the Bitcoin blockchain?

A. The green arrows at the top moving from Mt. Gox to the Bitcoin blockchain, and then the one transaction on the Bitcoin blockchain, and then the transaction back to the Mt. Gox

account, the second Mt. Gox account, are based on Bitcoin transactions that are recorded on the Bitcoin blockchain.

Q. There are screenshots shown on pages 37 and 38 of your report.

Could you explain what those screenshots are.

A. Those screenshots are screenshots from the block explorer mempool.space. They show those three transactions that I just spoke about as they were recorded on the Bitcoin blockchain.

Q. And this data that you're showing from mempool.space, you could also go and search on the blockchain DAT file as well?

A. Yes, ma'am.

Q. Are these screenshots, just to be clear, from Chainalysis?

A. No, ma'am, they're not.

Q. And does anything on page 35 rely on Chainalysis Reactor?

A. No, ma'am, it does not.

Q. Did you, though, separately review these same transactions in Chainalysis?

A. Yes, ma'am, I did.

Q. And did what was shown in Chainalysis match what was shown on the public block explorer and what's shown on your chart on page 35?

A. Yes, ma'am, it does.

Q. Did you additionally review confirmation emails from Mt. Gox contained in the defendant's Plasma Division email account?

A. Yes, ma'am, I did.

Q. Is one example shown on page 36 of the report?

A. Yes, ma'am, it is.

Q. And were you able to match up what you were seeing in the records from Mt. Gox, from Liberty Reserve to what you were seeing outside of those data sets; so from the other data sets, from the blockchain, and from the emails?

A. In many cases, yes, ma'am, I was able to corroborate that information.

Q. And did that further corroborate your tracing and the analysis that's shown on page 35 and elsewhere in your report?

A. Yes, ma'am, it does.

Q. Mr. Scholl, did you also look at early transactions into Bitcoin Fog?

A. Yes, ma'am, I did.

Q. Why focus on these early transactions in a criminal case?

A. Investigators often focus on early transactions, ma'am, looking for potential mistakes. Generally, throughout an actor's career, as they're gaining experience, their operational security improves, and they make less mistakes. So we like to look at early transactions while things were still being figured out, potentially.

Q. What did you find when you looked at those early transfers into Bitcoin Fog?

A. I found that the first transaction into the Chainalysis

Bitcoin Fog cluster contained funds from the same Mt. Gox account.

Q.  That's the plasma@plasmadivision account that was opened by the defendant?

A.  Yes, ma'am.

Q.  Could you turn to page 49 and explain what's shown on the chart there.

A.  Page 49 has a chart that displays the path that funds took from the Mt. Gox account into the Bitcoin Fog cluster.

Q.  And could you -- did you observe any patterns that stood out to you in the transfer of those funds from the Mt. Gox account into Bitcoin Fog?

A.  Yes, ma'am, I did.

Q.  Could you explain what that was.

A.  There are multiple transactions sending funds to the same addresses, and in some cases a transaction that sends funds to two different addresses within the same wallet.

Q.  And what made these particular transactions notable to you?

A.  It's notable because it's not a logical way to transact in bitcoin; that it appeared to be an attempt to obscure the source or destination of funds.

Q.  Did you also review posts and announcements from Bitcointalk and Twitter announcing the launch of the Bitcoin Fog service in 2011?

A.  Yes, ma'am, I did.

Q. Did those posts and the timing of them inform your analysis of these funds transfers?

A. Yes, ma'am, it did.

Q. And what is the significance of the timing of the transfers from Mr. Sterlingov's account at Mt. Gox with regard to the public announcements of Bitcoin Fog?

A. The significance of the timing is that the funds from Mr. Sterlingov's Mt. Gox account reached addresses, I believe, to be controlled by Bitcoin Fog prior to the announcement of the service.

Q. Mr. Scholl, does your report go on to detail analysis of additional transactions, including transactions connected to Bitcoin Fog and Mr. Sterlingov?

A. I'm sorry, ma'am. Can you repeat that.

Q. Elsewhere in your report, do you also do further analysis of additional transactions connected to Bitcoin Fog and Mr. Sterlingov?

A. Yes, ma'am.

Q. Did you use the same methodology and techniques in that analysis as what you've testified to here?

A. Yes, ma'am, I did.

Q. Mr. Scholl, are you familiar with Monero?

A. Generally, ma'am, yes, I'm familiar with Monero.

Q. And is it accurate that Monero is based on a different underlying code and different blockchain features than Bitcoin

is?

A. Yes, ma'am; that's accurate.

Q. And would the blockchain analysis techniques described in your report apply to Monero?

A. No, ma'am.

MS. PELKER: Court's indulgence to check in with Mr. Brown?

THE COURT: Yes.

MS. PELKER: Nothing further from the government, Your Honor.

THE COURT: All right. Thank you. Mr. Ekeland?

MR. EKELAND: May I proceed, Your Honor?

THE COURT: You may proceed.

MR. EKELAND: Thank you.

CROSS-EXAMINATION OF

LUKE SCHOLL

BY MR. EKELAND:

Q. Are you ready, Mr. Scholl?

A. Yes, sir.

Q. Thank you. You said you received a certification from Chainalysis in a blockchain analysis; did I hear that correctly?

A. Yes, sir.

Q. As part of that certification, you were trained on Chainalysis Reactor; is that correct?

A. In some of them, yes, sir.

Q. Can you tell me what the statistical error rate is for Chainalysis Reactor?

A. No, sir, I cannot.

Q. Can you tell me the rate of false positives when it comes to Chainalysis Reactor?

A. No, sir, I cannot.

Q. Can you tell me the rate for false negatives when it comes to Chainalysis Reactor?

A. No, sir, I cannot.

Q. Can you cite me any scientific peer-reviewed papers analyzing the accuracy of Chainalysis?

A. No, sir, I cannot.

Q. So, essentially, if I heard your testimony right, your assessment of the accuracy of Chainalysis Reactor is based solely on your experience?

A. Yes, sir.

Q. And you have no scientific paper or any peer-reviewed paper or any kind of academic paper at all that you can point me to that analyzes and validates the accuracy of Chainalysis Reactor; is that correct?

A. That's correct, sir.

Q. Okay. So Chainalysis Reactor was what you primarily used in your investigation of Bitcoin Fog; is that correct?

A. I would say of the proprietary tools, it is correct that I

used predominantly Chainalysis Reactor, yes, sir.

Q. You also said, I think, you used one from TRM?

A. Yes, sir.

Q. Did you use anything from Excygent, LLC?

A. No, sir, I did not.

Q. So your understanding of -- can you tell the Court what the word heuristic means?

A. Heuristic is like a pattern of behavior that we apply to make determinations, I guess, generally.

Q. Would it be fair to say that a heuristic is an assumption that's made in order to make a probabilistic determination in relation to a particular trace?

A. I don't think that the -- necessarily the heuristic itself is an assumption. It's a pattern of behavior, but I take --

Q. Would you argue with me that the etymology of the word heuristic comes from the Greek word for guessing?

A. I was not familiar with that.

Q. You would agree with me that there are -- well, you would agree with me that Chainalysis Reactor is a probabilistic software and not deterministic in the sense that it doesn't give you 100 percent accurate results?

A. I would like to clarify. I think that there's a couple of things that are very accurately portrayed in Chainalysis, and there are things that it applies heuristics to in order to do clustering and things like that.

But the transaction data in Chainalysis is not, in my opinion, like, up for debate. The fact that Bitcoin went from this address to this address, as displayed in Chainalysis, is consistent with the Bitcoin blockchain. It's the clustering of addresses, I believe, that you're referring to and potentially the attribution of those clusters to an entity.

But I think that there's factual information that's displayed in Chainalysis

Q. Precisely. I mean, you would agree with me saying that Chainalysis is accessing the public blockchain for some of its information; is that correct?

A. Yes.

Q. And what you're saying is that it's -- when it accesses the public blockchain, it portrays information from the public blockchain, that's accurately reflected on the public blockchain?

A. Yes, sir. I think that maybe we could use an example from the report to talk about that, if you'd like.

Q. We can get to that, but I just want to ask more questions about this because I want to get clear on the distinction.

But that's quite a common feature of any number of blockchain tracing software readily available on the internet; that you can just use it to graphically represent the tracing of the blockchain, right?

A. Most block explorers don't do that, but some potentially

do, yes.

Q. But what we're -- the proprietary part of Chainalysis comes in is it's -- in its heuristics, correct?

A. Among other things, potentially, but sure.

Q. And would you agree with me that you learned in your training that Chainalysis Reactor primarily uses three types of heuristics, correct?

A. I think that there may potentially be more than that; but, yes, sir.

Q. Can you name me all the heuristics that Chainalysis Reactor uses as you sit here today?

A. No, sir.

Q. But you'd agree with me that the primary heuristic that it uses is called the co-spending?

A. I would agree, yes, sir.

Q. And that's what, I believe, you described earlier to the Court.

That's where you assumed that all the inputs to a particular output address or pair of output addresses, if one is a change address, you assume that all those inputs are controlled by the same entity or person, correct?

A. That's what co-spend -- that's what the co-spend heuristic is about, yes, sir.

Q. Right. And do you know what a coinjoin is?

A. Yes, sir, I do.

Q. What is a coinjoin?

A. A coinjoin is when one or more -- two or more individuals combine their transactions into one large transaction.

Q. And so a coinjoin is an example of where the co-spending heuristic just isn't true, because the coinjoin defeats the underlying assumption that one singular entity controls all the inputs, correct?

A. In general, that's -- that's true that the heuristic doesn't work, but there's ways to detect coinjoins. I am aware that Chainalysis is identifying those transaction patterns and signatures and in some cases -- well, they're accounting for that in a lot of their clustering.

Q. Can you tell me, as you sit here on the stand today, precisely how Chainalysis deals with the coinjoin problem when it comes to the co-spending heuristic?

A. I can give you examples. But Ms. Bisbee, I believe, is going to potentially represent Chainalysis after me.

But the examples that I would give you are things like Chaumian coinjoins that occur with Wasabi Wallet, for example, where Chainalysis does actually cluster all those addresses and labels it as an entity which is known to perform coinjoins. And that's something that Chainalysis does with other examples too.

In some cases, when a coinjoin is detected but the service -- the specific service or entity is not known, I've

seen times when Chainalysis doesn't cluster the co-spends in the coinjoin because it knows that that's a coinjoin and, therefore, we're not going to cluster it.

Q. You said Chainalysis knows. But you can't specifically tell me how it determines whether something is a coinjoin or is part of a co-spend, correct?

A. Chainalysis knows how Wasabi coinjoins work, or shared coin, whatever coinjoin service. They can look at those transactions and fingerprint them.

But to your point, it's possible that somebody could create a coinjoin that isn't detected by Chainalysis heuristics that I think is --

Q. I'm sorry. I cut you off. I didn't mean to cut you off.

A. No.

Q. And so you just agreed with me that a coinjoin is a potential problem for the co-spending heuristic, correct?

A. In general, yes, sir, I agree with that.

Q. And can you cite me any statistics or any kind of scientific peer-reviewed paper addressing the accuracy of Chainalysis Reactor's detection of coinjoins in a co-spending heuristic analysis?

A. No, sir, I cannot.

Q. Okay. And then the second -- moving on to the second type of heuristic that I understand Chainalysis Reactor to use, that's a behavioral analysis, correct?

A. Something like that, yes, sir.

Q. Something like that.

A. If you're going to describe --

Q. Sure. I think Ms. Bisbee's report covers this a little bit. That's basically looking at the timing of transactions; the type of transactions, whether it's a multisag, whether there's a time lock on it; just sort of looking at the -- well, like, the timing and the signatures and stuff like that. Would you --

A. Yes, sir.

Q. -- agree with me on that?

Are you aware of any scientific validation, any kind of peer-reviewed papers attesting to the accuracy of the behavioral heuristic?

A. No, sir, I'm not.

Q. Okay. And then the -- I believe the third type of heuristic is an intelligence heuristic in the sense of OSINT. Does that sound right to you?

A. Generally, yes, sir.

Q. Right. So when I say that, you wouldn't disagree with me that the intelligence heuristic is, essentially, one that relies on data scraping from the open internet, correct?

A. I'll let Ms. Bisbee talk to that heuristic, sir.

Q. Is it your testimony here that you really don't understand the intelligence heuristic that's involved in Chainalysis

Reactor?

A.  I don't know the full extent of what Chainalysis is doing for that heuristic, no, sir.

Q.  And have you ever reviewed Chainalysis Reactor's source code?

A.  No, sir, I have not.

Q.  I want to go quickly to -- I think you covered the -- let me find -- I just need to find the right page here.

The initial Mt. Gox transaction that first appears in the criminal complaint; I believe it's on page 35.  And it's on the page in your expert report that starts Section 5, specific payments.  Do you see that?

A.  Yes, sir, I do.

Q.  Now, that tracing there, that is based on -- it appears in a slightly different form in the original criminal complaint in this matter, correct?

A.  I don't recall, but this graph is generated by me.  So it would not have been in the complaint; that's correct.

Q.  No.  But did you review the initial criminal complaint in this matter?

A.  I did.

Q.  Right.  Are you aware that there is a trace that is illustrated in the criminal complaint going from this Mt. Gox Account Number 1 all the way through to the payments out of the Shormint Liberty Reserve account?

A.  I actually do not recall that, sir, but I'm happy to look at it.

Q.  So when you prepared this report, you didn't review the criminal complaint?

A.  I think there are things in this report -- in the declaration and in this report that reference the criminal complaint, but I don't recall all elements of the criminal complaint, sir.

Q.  Fair enough.  I just want to walk through this trace slightly just to illustrate some of these points.  You've got -- on that Mt. Gox Account Number 1, you've got 44 bitcoin right there, and you've got a green arrow pointing to a little Bitcoin symbol inside a Bitcoin blockchain with a wallet address.

I can't even see what the wallet address begins with.  I think it's like 122BU; is that right?  Do you see that?

A.  1JZBU, sir.

Q.  Now, are you familiar with what a sweep transaction is?

A.  Yes, sir, I am.

Q.  And a sweep transaction, at least the way I'm defining it, is a transaction with one input and one output, correct?

A.  That's correct.

Q.  And that's what we're looking at there; there's one input and one out- -- one input address and one output address right there, correct?

A. I mean, in the chart that's the way it appears, sir. But if you look at page 37, that transaction is the top figure. That's not a sweep, sir.

Q. So on page -- actually, what is on this graph is not accurately depicting what you have on page 37; is that correct?

A. No. The graph does accurately depict the flow of funds, sir, but the transaction is more complicated than a single address. You'll notice that at Mt. Gox, I did not put a Bitcoin address initially with that 44 bitcoin. It wasn't out of an address that was associated with his account because Mt. Gox was operating as a custodial exchange.

So that transaction, which appears in Figure 20 at the top of page 37, is not a sweep, sir. There's two inputs and two outputs.

Q. There's two inputs and there's two outputs; but that's not reflected on your graph?

A. The graph shows the flow of funds. I did not show all outputs for all transactions. The graph connects the dots between the plasma@plasmadivision Mt. Gox account and the Liberty Reserve account.

Q. So that graph is not an accurate depiction of all the transactions involved in this trace; is that correct?

A. It doesn't capture all of the information included in the Bitcoin blockchain about those -- all of those addresses. It captures the information about the flow of funds from the

Mt. Gox account to the Liberty Reserve account.

Q. But it doesn't show all the wallet addresses, and it doesn't show the full scope of all the transactions?

A. That's correct. It shows that funds came out of the Mt. Gox account according to the Mt. Gox records and sent to the address 1JZBU.

Q. You said that Mt. Gox was a custodial wallet, correct?

A. Yes, sir.

Q. And isn't it true that Mt. Gox -- if you were a Mt. Gox accountholder, you didn't actually have a separate wallet; that Mt. Gox was just one, basically, big wallet, correct?

A. I'm not familiar with the backend of Mt. Gox, sir.

Q. You're not familiar with the backend of Mt. Gox?

A. No, sir.

Q. Did you check the accuracy of any of the Mt. Gox data in this case?

A. As it is reflected in this graph, I verified that the Mt. Gox transaction records sending funds in bitcoin to that address, I verified that that was accurately recorded in the Bitcoin blockchain, which confirms the validity of the record.

Q. When you say you accurately checked it, when you were using the Mt. Gox data, did you use the government's Mt. Gox database?

A. Yes, sir, I did.

Q. Did you check the accuracy of the data in that database?

A. The entire database, no, sir.

Q. Okay. And isn't it true about the blockchain, at least the public blockchain, that it doesn't record any; any personally identifying information linking any person to any transaction? Is that true?

A. I'd say it's true, sir. The blockchain is pseudonymous.

Q. Right. So when it comes to making attributions as to people who are controlling, say, the input address or the output address, you basically have to make an educated guess; isn't that true?

A. Not in the case of sending a subpoena to an exchange. If we've traced funds to an exchange, they can tell me that, yes, this exchange, we were responsible for these transactions, they belong to an account; off-chain -- like, off the exchanges and on the blockchain, I would say that that's true.

Q. Sure. Essentially, what I'm saying is -- what I'm saying is you have to get external sources of information outside of the blockchain to actually make any kind of personal attribution; is that correct?

A. That is one way to get personal attribution. There are others, sir.

Q. Right. That personal identifying information is not contained anywhere in the blockchain?

A. That's correct, sir.

Q. That's why, to make any kind of guesses or any kind of

identification, you need external information?

A. Such as like we search Mr. Sterlingov's device and find a wallet there, we attribute those addresses in that wallet to Mr. Sterlingov; but, yes, sir.

Q. Did you review those searches of Mr. Sterlingov's devices?

A. I reviewed the 302.

Q. The 302. And you didn't see any actual evidence of him ever operating Bitcoin Fog, did you?

A. In the Mycelium wallet, sir?

Q. Anywhere in anything --

THE COURT: I'm sorry. You're talking over each other, and you're going too quickly.

MR. EKELAND: I'm sorry. I didn't hear you.

THE COURT: You're talking over each other and going too quickly.

MR. EKELAND: I apologize.

THE COURT: Go ahead.

THE WITNESS: Can you restate the question, sir.

BY MR. EKELAND:

Q. I sure can. Actually, I'm going to withdraw it.

So you -- well, the government doesn't have the Bitcoin Fog servers, correct?

A. That's my understanding, yes, sir.

Q. So you've never actually reviewed any information from the Bitcoin Fog servers, correct?

A. That's correct, yes, sir.

Q. And you've never reviewed -- as part of your external information used to confirm your traces, you've never reviewed any communications between Mr. Sterlingov and anyone about operating Bitcoin Fog?

THE COURT: This seems like it's beyond the scope of the *Daubert* hearing.

MR. EKELAND: I'm asking for the basis of his opinions, and he said that he relied on external information because you cannot personally identify anybody from the information within the blockchain. So I'm trying to find out what he's using to verify his attributions in his expert report.

THE COURT: All right. I'll allow it.

MR. EKELAND: Thank you, Your Honor.

BY MR. EKELAND:

Q. I'll be -- I don't think I have that much more.

Did you review any -- as part of your validation of your attribution and your tracing, did you review any eyewitness statements?

A. Not unless you count the undercover transactions, sir.

Q. When you say undercover transaction, you just mean the transaction by the IRS CI where they -- when is that? -- in November 2016?

A. I could look, sir.

Q. Feel free to look at your expert report if that refreshes your recollection.

A. September 2019, sir, is what's referenced in the report.

Q. And so -- and that's not the same transaction reference in the superseding indictment, correct?

A. I'm not sure, sir.

Q. Did you review the superseding indictment before writing the report?

A. I'm not sure, sir.

Q. But your analysis and your trace isn't in the superseding indictment, correct?

A. I was not part -- the first contribution to this case was the declaration for the Monsanto hearing and then this work. I'm not sure of the dates you're referencing, but I believe the answer is no.

Q. Basically, you didn't come on, start working on this case until after Mr. Sterlingov was arrested; is that correct?

A. That's correct, sir.

MR. EKELAND: No further questions, Your Honor.

THE COURT: All right. Any redirect?

MS. PELKER: Just briefly, Your Honor. I know we're hitting up against lunchtime.

THE COURT: That's okay.

REDIRECT EXAMINATION OF

LUKE SCHOLL

BY MS. PELKER:

Q. Mr. Scholl, Mr. Ekeland asked you a number of questions about existing academic research.

Is it fair to say that your work in blockchain analysis is focused on practical applications and that you're not an academic researcher?

A. That's fair to say, yes, ma'am.

Q. And is it possible that there are a number of -- that there is, in fact, academic research that you wouldn't otherwise be aware of or familiar with in your work?

A. I'm sorry. Can you repeat the question, ma'am.

Q. Is part of your work necessarily involving keeping up with all of the different academic work in the field of blockchain analysis?

A. No, ma'am.

Q. Regarding coinjoin, what is your experience with Chainalysis's accurate detection of coinjoin in blockchain analysis?

A. My experience is that, looking at Wasabi wallet coinjoins, as I described on the cross-examination, I'm familiar with multiple instances where Chainalysis is accounting for coinjoins, but I acknowledge that there are possible -- more, like, one-off kinds of coinjoins that don't necessarily use a service that would be very difficult to detect.

Q. Did you see any indication in your review that there was a

coinjoin being performed by Mr. Sterlingov or Bitcoin Fog that would have produced any sort of false positive?

A. No, ma'am.

THE COURT: Can I ask a follow-up question on that. Did you do anything that would have allowed you to make that assessment?

THE WITNESS: I've looked at all of the transactions as discussed in the report in reasonable detail and looked at several transactions at Bitcoin Fog. Obviously, I've not reviewed every transaction at Bitcoin Fog.

So, again, I didn't see any evidence of those large-scale services that do coinjoins that have a pattern where there's, like, 100 input addresses and 100 output addresses or something like that. It leaves open the possibility that there is a small -- two friends get together and decide to do this thing called a coinjoin and that occurred.

In general, my opinion is that it's unlikely that that would change the overarching assessment, but it might change specific transaction amounts or something like that.

THE COURT: How would you know if there was significant coinjoin occurring?

THE WITNESS: Again, most coinjoins -- and this is a little anecdotal, perhaps, here, but most coinjoins are using a service where you can meet up with other people, essentially,

to do --

THE COURT: Like Wasabi Wallet?

THE WITNESS: Right, sir. So those have kind of a fingerprint. You can tell this is not a normal transaction whatsoever.

But if two people were just to find each other on some corner of the internet and decide that they were going to make a coinjoin transaction with two inputs and two outputs, that would be much more difficult to detect.

THE COURT: Thank you.

THE WITNESS: Yes, sir.

BY MS. PELKER:

Q. Mr. Scholl, defense counsel asked you about the Mt. Gox withdrawals and whether or not it was a sweep.

Could you explain how withdrawals from exchanges like Mt. Gox or others are typically structured and why that pertains to your chart.

A. Withdrawals from exchanges are coming out of addresses that the exchange controls. They've had an internal ledger that documents how much bitcoin is in your account. So when you make a deposit to an exchange, those funds aren't just left in your deposit address.

They're swept into the coffers of the exchange, and then the exchange pays out from its coffers when you'd like to make a withdrawal. So those particular addresses aren't

necessarily associated with that Mt. Gox account; they're associated with the exchange in general.

Q. So how can you, in your analysis, be confident that what you've shown on your chart on that page is a withdrawal from the defendant's account at Mt. Gox to that particular Bitcoin address?

A. Do you have the page number available, ma'am?

Q. I believe that's page 35. And the question is just for that, the withdrawal that defense counsel was asking you about from the Mt. Gox box into the 1JZBU, which is then shown at the screenshot on page 37. How do you know that that is, in fact, a withdrawal from the defendant's Mt. Gox account to that particular Bitcoin address?

A. Yes, ma'am. Very clearly in the Mt. Gox records -- at the bottom of page 36, this is documented in the report -- the Mt. Gox records say that there is a withdrawal from this account to Bitcoin address 1JZBU. And then I'd look at the Bitcoin blockchain, similar date and time; there is a transaction to the same address in the same amount as recorded in the Mt. Gox logs.

Q. To emphasize, what records did you review that were connected to Mr. Sterlingov when conducting your analysis?

Did you review records from a number of virtual currency exchanges --

A. Yes, ma'am.

Q. -- that were in Mr. Sterlingov's name?

A. Yes, ma'am, I did.

Q. Did you also review Mr. Sterlingov's emails and the contents of those email accounts?

A. Specific emails, yes, ma'am; not necessarily the entire email account.

Q. Did you review records that were retrieved from his phone seized at the time of his arrest, as well as numerous electronic devices?

A. Again, ma'am, specific records from the phone and the electronic devices -- not all of them -- yes, ma'am.

Q. And the specific records related to the transactions at issue from Mt. Gox, from Kraken, from local bitcoins and from other virtual currency exchanges?

A. Yes, ma'am.

Q. And are those sources set forth in your report, I believe, beginning on page 19?

A. Yes, ma'am, they are.

MS. PELKER: Court's indulgence?

THE COURT: Yes.

MS. PELKER: No further questions from the government.

THE COURT: Thank you. If you have one or two, I would allow it.

MR. EKELAND: Yes, brief.

THE COURT:  That's fine.

RECROSS-EXAMINATION OF

LUKE SCHOLL

BY MR. EKELAND:

Q.  Mr. Scholl, you testified that you weren't familiar with any kind of academic literature or any kind of peer review of the accuracy of Chainalysis Reactor; is that correct?

A.  Yes, sir, that's correct.

Q.  Before you ever embarked on using Chainalysis Reactor, did you bother to do any research as to the accuracy of Chainalysis Reactor?

A.  No, sir, not specifically.

MR. EKELAND:  No further questions.

THE COURT:  Thank you.  All right.  Let's take our lunch break now and come back at 1:30, and you can call your next witness at 1:30.

MS. PELKER:  Thank you, Your Honor.

THE COURT:  Do you have another copy of the exhibits so my clerk can follow as well?

MS. PELKER:  We don't.

MR. BROWN:  We can email one.

THE COURT:  If you can do that.  If not, I suppose the other thing you can do is use the ELMO when you're working with the witness if you're showing the witness particular pages.

MS. PELKER:  Yes, Your Honor.  We'll work on that.

THE COURT:  The witness is excused, correct?

MS. PELKER:  Yes.

(Lunch recess taken at 12:35 p.m. until 1:40 p.m., after which the following proceedings were had:)

MS. PELKER:  Thank you, Your Honor.  The government calls Ms. Elizabeth Bisbee to the stand.

And with the Court's permission, we'd request to return the exhibit binder.

THE COURT:  That's fine.

THE COURTROOM DEPUTY:  Would you please rise and raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY:  Thank you.  You may be seated.

DIRECT EXAMINATION OF

ELIZABETH BISBEE

BY MS. PELKER:

Q.  Ms. Bisbee, are you able to hear me all right?

A.  Yes, thank you.

Q.  Ms. Bisbee, could you please state and spell your name for the record?

A.  Yes.  Elizabeth, E-l-i-z-a-b-e-t-h, Bisbee, B-i-s-b-e-e.

Q.  Ms. Bisbee, where do you currently work?

A.  With Chainalysis.

Q.  Could you please briefly explain your educational

background, including any degrees that you hold.

A.   Yes.   I have a bachelor's of science in human services and a minor in criminal justice from Old Dominion University.   I have a forensic psychology degree; it's a master's of arts from Argosy University; and then an investigative and psychology master's in science from University of Liverpool.

Q.   When did you begin working in financial investigations?

A.   In 2014.

Q.   And when did you join the Drug Enforcement Administration?

A.   In 2014.

Q.   Could you explain your work with the DEA.

A.   Yes.   So I was an intelligence research specialist, which is very similar to an intelligence analyst.   And I was first assigned into a traditional money laundering section where I provided case support for ongoing investigations for both foreign and domestic offices for DEA.

Q.   When did you begin working on cases relating to cryptocurrency?

A.   Towards the end of 2014.

Q.   When you first started working on cases related to cryptocurrency almost a decade ago, how did you set out learning about cryptocurrency?

A.   So as I had stated earlier, I worked for traditional money laundering section.   So what that usually entailed was reviewing bank statements and records and being able to do flow

analysis for financial records.

And my supervisor had gotten a request from the field to support an investigation that included Bitcoin and a darknet market vendor.  He asked for who is interested in it, and I raised my hand.  So I did not have a background with what Bitcoin was or what darknet markets were, so I started just doing initial research.

So that research included open source research and understanding what Bitcoin was, how it operated within the space.  Part of that included understanding what and how it was registered onto the public blockchain and what that actually meant.

But understanding that also included me doing research onto what scientific methods were actually being leveraged.  So I came across an academic journal article on just being able to trace blockchain transactions and how it was an anonymous form of digital payments.  So leveraged that just to be able to understand a little bit on the fundamental side of what it looked like to follow funds on the blockchain.

I also, because I was with the government, had reached out to other government agencies to see what they had done in this space of cryptocurrency and how they had done investigations previously.  So I was able to get information from them to be able to leverage different aspects and components for that.

I also just, from the background of being a traditional financial investigator, in order for law enforcement to get records -- do I need to speak up?

THE COURT: No. It's fine.

THE WITNESS: Okay. In order to get records for any type of financial institution, you have to serve legal process. And so law enforcement does reach out to financial institutions to get that information.

So I leveraged that mentality to be able to do that with exchanges that operate similarly to financial institutions, but for cryptocurrency. And so I reached out to multiple exchanges just to understand what type of information law enforcement would be able to get, how it actually interacts with the ecosystem, and how valuable that would be in order to, like, conduct the actual investigations.

And then I also wanted to figure out how I could actually learn how to trace what the cryptocurrency transactions were looking like. So I actually obtained my own bitcoin and made transactions in order to actually learn how to follow funds.

So piecing all of those different components together is how I was able to then start working on the first investigation that I raised my hand for in order to identify an individual that had been transacting with cryptocurrency.

BY MS. PELKER:

Q.   After your initial work on that first case back in 2014, did you do additional work on other investigations at DEA involving cryptocurrency?

A.   So after that investigation, it became kind of word-of-mouth within DEA.  If you have a cryptocurrency investigation or a component of cryptocurrency or even a darknet market investigation, to reach out to Beth.  And so I became a primary point of contact for many of the investigations that ensued over the time that I was at DEA.

Q.   Do you have an estimate of how many cases you worked on while you were at DEA?

A.   Yeah.  Approximately 400.

Q.   And those involved cryptocurrency specifically?

A.   Yes.

Q.   Why were there so many cases involving cryptocurrency at DEA at that time?

A.   Yes.  So DEA is a single-mission agency.  So they focus on drugs and money laundering.  And so back in 2014, 2015, it was predominantly known that darknet markets were leveraging drug sales, and that was the main service of goods for that.

And that was prevalent from the initiation of the takedown of Silk Road, which was the very first darknet marketplace.  Once that was taken down, there was a whole multitude of different marketplaces that came into existence.  And so in the cryptocurrency landscape, hand-in-hand with DEA,

that's why there were so many cryptocurrency investigations because it was primarily determined for the selling of drugs.

Q. What did your work on these 400 cases entail, generally speaking?

A. So it ran kind of the gamut for it. Some of it was case initiation support. So it was always a support function just because I was an intel analyst. That would either be of providing, like, blockchain analysis support or being able to advise on how to create undercover transactions for the special agents that would be able to conduct that. So I advised on setting those operations up.

I also became, quote-unquote, the seizing agent for DEA when it came to cryptocurrency. So when there were funds that needed to be seized, I was typically deployed to go and recover those funds and then follow the investigation process for that.

So for all of the investigations, I touched different components and aspects of those investigations.

Q. Was blockchain analysis a significant portion of your work while at DEA?

A. Yes.

Q. What methods and tools did you use to conduct your blockchain analysis while with the government?

A. So when I first started doing blockchain analysis, I did everything manual. So what does manual mean? It means going

to a public block explorer and viewing the transactions and being able to piece them together.

So I didn't have a tool to be able to do that. So I used spreadsheets to be able to follow the funds and find associated addresses to be able to then do that.

Along the journey, if you will, of my career at DEA, I then was exposed to other tools and platforms, so commercial tools as well. So I was very fortunate that I had access to a multitude of commercial tools; Chainalysis being one of them, Ciphertrace, Elliptic and what is now known as Coinbase Analytics.

Q. Did you use open source tools as well during your time at DEA?

A. Yes.

Q. How did you determine that Chainalysis and the other commercial tools were reliable and verifiable for your work?

A. So the reliability for these tools was based off of when we sent legal process or when we were recovering evidence. So that evidence could be from during a seizure and the recovery of a wallet, identifying all the addresses that are in that wallet, and being able to provide that context.

Also, if there were, like, seized data sets that occurred, being able to map that to the information that was derived on the commercially available tools.

Q. During your time at DEA using Chainalysis and these other

tools on so many different cases, did you find Chainalysis to be reliable?

A.   Yes.  So Chainalysis was the primary tool that I leveraged when I was at DEA.  I, of course, had access to others, but for the attribution aspects, so being able to send legal process to exchanges, Chainalysis had the most reliability for that for accuracy of the records.

Q.   In your time at DEA, did you have additional responsibilities related to cryptocurrency beyond supporting individual cases?

A.   Yes.  So I also created DEA's -- what is now known as their cyber investigations course, which is a week-long course.  It initially started as just a blockchain analytics course for the intel research specialists that were within DEA.  That, then, grew into doing an entire week.

So understanding how to set up your computers in order to do these types of investigations, as well as undercover operations to the blockchain analysis to the seizure of that.

So that training, actually, became part of the DEA Academy.  So it's a certified course now that individuals within DEA can take.

Q.   When did you move from DEA to Chainalysis?

A.   In January of 2021.

Q.   Can you tell us a little bit about Chainalysis and what it

does, just briefly.

A. Yes. So Chainalysis is a software company that provides two different types of tools to be able to gain insight into transactions that are occurring on the blockchain. So those two different tools are the investigative tool, which is known as Reactor, and then there's a compliance tool, which is called KYT. The KYT is for know your transaction.

Q. What's your current role at Chainalysis?

A. I'm the director of investigation solutions.

Q. What type of work does your team do?

A. So my team focuses on providing case support for the U.S. public sector. That case support can entail and it -- can entail, like, lead generation, as well as ongoing case support for various investigations for U.S. public sector.

Q. How much of your work involves blockchain analysis?

A. Probably 75 percent.

Q. How do you keep abreast of developments in the field?

A. One, it's my job. Because in order to be able to do that and do an effective way of managing an investigative team, being able to have access to different journal articles that come out that talk about blockchain analysis, being able to be part of communities; so forums and different things where there's talk about that, as well as the information that is derived from various companies that are within the space.

Q. Have you also given presentations at conferences or

trainings regarding your work?

A. Yes, I have.

Q. Do you have a rough estimate of how many?

A. Probably, approximately, more than 50.

Q. Have you testified previously in federal court regarding cryptocurrency and blockchain analysis?

A. Yes, I have.

Q. Have you been qualified as an expert in those topics?

A. Yes, I have.

Q. Directing your attention to Government's Exhibit 4 -- there's a tab in the binder in front of you -- is that a copy of your curriculum vitae?

A. Yes.

Q. And does this document accurately set forth the relevant qualifications and professional experience relevant to your testimony today?

A. Yes, it does.

MS. PELKER: Government would move to admit Government's Exhibit 4.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: Exhibit 4 is admitted.

(Government Exhibit 4 was admitted.)

BY MS. PELKER:

Q. Ms. Bisbee, could you explain, in your own words, what is

blockchain analysis?

A. So blockchain analysis is being able to take information that is on a publicly available ledger, which is known as the blockchain, and being able to assess the flow of funds and the origin and destination of those funds.

Q. Is part of blockchain analysis also identifying groups of addresses held in the same wallet or controlled by the same entity?

A. Yes, it is.

Q. How do you go about identifying a group of addresses or cluster controlled by a particular entity?

A. So there's different aspects to look at for how to determine the ownership, if you will, of the entity that's moving the funds. The most common one is known as common spend or co-spend.

And that's where you have input addresses on one side of the transaction. And the reason why that is important is because the private keys for -- that allow for transactions to go through, typically, are considered to have to spend at the same time in order for funds to move.

Q. Now, I'd like to direct your attention to pages -- to Government's Exhibit 5, specifically pages 6 through 9.

Is Government's Exhibit 5 a report that you put together regarding your work on this case?

A. Yes, it is.

Q. And are some of the different methods that you use for determining the common ownership or clustering of addresses set forth on pages 6 through 9?

A. Yes. It is how Chainalysis does the clustering, yes.

Q. You spoke about co-spend clustering.

Are there other ways that you can use to identify groups of addresses?

A. Yes. So there is what is known as the behavioral heuristic. What that is, is the behavior of how the transactions are occurring on the blockchain.

So the best way to think about that is, when you put your hand on a table, there's a transfer of your fingerprints. So every time a transaction occurs on the blockchain, there's a digital fingerprint that is left behind. So the assessment of what that looks like is part of looking at the heuristics.

So it's a combination of the digital fingerprint, as well as the address type and how the address is actually operating within that, and then there's also the way that the wallet software actually operates on the blockchain.

So as transactions occur on the blockchain, there's change that's stipulated within that. That's because the Bitcoin protocol operates on what is known as UTXO; so unspent transaction output. That unspent transaction output is that change and that change address that's indicated.

So from prior testimony today, a good example of that

is if you're trying to spend something and you have a $20 bill and it costs $10, you can't rip it up. You have to give the entire thing.

So the way that wallet software works on the blockchain is that all funds have to be spent; you can't break up the bitcoin. So the wallet software will generate a new address to, then, account for that change so that it keeps the ownership within that wallet.

So that's called the change address analysis. It's part of a behavior heuristic that's identified with wallet software.

Q. Now, the underlying data that you're describing for the co-spend heuristic and the behavioral heuristics, that is information -- is that information that's publicly available on the blockchain?

A. Yes, it is.

Q. Could you do this same work or analysis outside of the Chainalysis Reactor software?

A. Yes, you can. There's several block explorers that allow you to do this.

Q. Chainalysis also uses what's called intelligence-based clustering; is that right?

A. Correct.

Q. Could you explain what's meant by intelligence-based clustering.

A.   Yes.   Intelligence-based clustering is where there's addresses that are provided in verifiable data.   So court documents is a good way for that collection to occur, as well as data leaks that are verified, and then third-party relationships that Chainalysis has in order to have the appropriate clustering for those services.

Q.   Turning specifically to Bitcoin Fog and this case, what were you hired by the government to do?

A.   So I was hired by the government to assess the Chainalysis clustering of eight services, as well as the aggregate flow of funds.

Q.   To be clear, did your work involve identifying Roman Sterlingov, the defendant?

A.   No.

Q.   Did your work involve reviewing Mt. Gox transaction records?

A.   No.

Q.   Did you complete a report summarizing your findings and detailing your methodology?

A.   Yes.

Q.   Is that the report that's shown here in Government's Exhibit 5?

A.   Yes.

Q.   And turning to page 2 of that report, the index, this lists the different services whose clusters you verified starting

with Bitcoin Fog and proceeding through a number of darknet markets?

A. Yes, that's correct.

Q. And did the report also include numerous attachments?

A. Yes, it did.

Q. Directing you to Government's Exhibit -- or Tab 6, is this a summary of the different attachments as far as multiple CSV and spreadsheet files that were attached to your report containing the list of Bitcoin addresses for each of those clusters?

A. Yes, it appears so.

Q. And each of these is a voluminous spreadsheet listing out thousands, or even in some cases hundreds of thousands, of Bitcoin addresses?

A. Yes, that's correct.

MS. PELKER: Government would move to admit Exhibit 5, the expert report, as well as Exhibit 6, the attachment list.

THE COURT: Any objection to admitting those exhibits for purposes of today's hearing?

MR. EKELAND: No, Your Honor.

THE COURT: Okay. Exhibit 5 and Exhibit 6 are admitted.

(Government Exhibits 5 and 6 were admitted.)

BY MS. PELKER:

Q. Ms. Bisbee, I'd like to direct your attention to page 9 of the report in front of you.

Does this describe -- starting with the section Bitcoin Fog, does this describe the set of addresses that you've determined were controlled by Bitcoin Fog and listed in the Bitcoin Fog cluster?

A. Yes.

Q. It references an attachment, BitcoinFog_addresses.csv.

Is that one of the attachments containing a list of 925,743 addresses that Chainalysis has determined were controlled by Bitcoin Fog?

A. Yes.

Q. Could you explain how you determined that those addresses were associated with Bitcoin Fog.

A. Yes. So within Chainalysis Reactor, the data that then represents the Bitcoin Fog cluster are those addresses. And in order to identify the associated addresses, there were two different heuristics that were leveraged to be able to group the association of those addresses.

The first heuristic was co-spend, and that's the common spend where there's the inputs versus the outputs and common ownership for that. So that was one method that was leveraged.

Then the second was the behavioral, which looked at, again, the digital fingerprint for the transactions that

occurred, as well as the address type and the change address analysis for the operation of the behavioral side.

Q.  As part of your work, did you also study the transaction activity of those addresses within the fog cluster as they relate to one another?

A.  Yes.

Q.  What did you observe regarding the pattern of movement within the Bitcoin Fog cluster?

A.  So the -- are we talking -- I'm sorry.  Clarification.  Are we talking about a transaction or just in general?

Q.  Whether you observed any pattern of movement of funds within the Bitcoin Fog cluster.

A.  Oh, yes.  Sorry.  There was a movement of funds. So there's what is known as the consolidation address.  So, typically, what services will do is they'll have individuals that deposit funds into their platform.  And then, in order to consolidate the funds that they're going to be moving, there's called consolidation addresses.

And so those are identified within the movement of the Bitcoin Fog cluster.

Q.  And so is it accurate to describe, then, that within this larger universe of 925 [sic] addresses, a subset of those are consolidation addresses?

A.  Yes.

Q.  And then, were you able to see how the broader universe of

those over 900,000 addresses all had common transaction patterns into the -- or across the consolidation addresses?

A. Yes.

Q. And did you also notice other commonalities in the transaction features or wallet types within the Bitcoin Fog cluster?

A. Yes, I did.

Q. Did all of that help you further corroborate the cluster in addition to the co-spend and behavioral heuristics?

A. Yes.

Q. What steps were taken to identify and validate that Bitcoin Fog was the entity that actually controlled this group of addresses?

A. So Chainalysis conducted a transaction with Bitcoin Fog in order to identify a deposit address, so the address that, then, they send the funds to; and also the withdrawal address, so where the funds are being sent to a Chainalysis wallet.

Q. And what is the role of that sort of a test transaction in blockchain analysis?

A. So it allows to be able to identify and confirm a service exists. It also identifies two different addresses that you can then identify to then put into the heuristics to then determine if they're played together.

So, for instance, if there's co-spend, and one of the addresses that was transacted with, then, is part of the

co-spend, that then confirms that that is the entity and that that is the cluster; same with the withdrawal. The input on that withdrawal transaction, again, if it's part of co-spend or change address analysis, it will be grouped together with that; and, again, further confirming the attribution behind that service.

Q. Did you do similar work to identify and verify the clusters of the other darknet markets that are enumerated in this report?

A. Yes, I did.

Q. Is that what's set out in the corresponding sections of the report?

A. Yes, it is.

Q. In addition to verifying or identifying the clusters themselves, were you also asked to do a flow of funds analysis?

A. Yes, I was.

Q. Directing your attention to page 27 of your report, is that what's described here and in the corresponding referenced text, as well as attachments?

A. Yes, that's correct.

Q. Ms. Bisbee, you've heard about co-spend heuristics. Are there -- and other heuristics.

Are there criminal services that actively seek to prevent tracing by law enforcement or by Chainalysis on the blockchain?

A.  Yes.

Q.  Could you give some examples.

A.  Yes.  So mixing services are one.  So coinjoin is one of those tactics that are leveraged.  So coinjoin operates where individuals can pool their -- they can take their input address and put their input addresses with others in order to obfuscate the ownership for the output.

So as described earlier with the co-spend analysis and change address analysis, coinjoin does make this more difficult.

Q.  So is the goal of coinjoin to, essentially, try to trick law enforcement or others who are doing blockchain analysis to make it harder for them to trace the funds?

A.  Yes, it does.

Q.  But does Chainalysis detect and control for mixing and coinjoin?

A.  Yes, we do.

Q.  And did you see any indications that coinjoin was used to create false positives or to obscure the tracing or the accuracy in the clusters at issue in this case?

A.  No, I did not.

Q.  Is the information that you've relayed in this report also relied on by other users of Chainalysis software relating to the Chainalysis clusters and the underlying information at large?

A. I'm sorry. Can you restate the question.

Q. Is the underlying information, so the information at Chainalysis Reactor software, also relied on by other users of Chainalysis?

A. Yes.

Q. And how are you able to determine that this is reliable information for your work and that of other investigations?

A. So as I had indicated, there's two different platforms. There's an investigative software and there's also the KYT software. So that -- all of that data is the same.

So for the KYT software, it alerts illicit activity for exchanges so that they can protect their platform. So if it's wrong, those exchanges, then, are alerting on the wrong thing. So the reliability of our data is crucial for just the ecosystem in general.

On the investigative side, which is what Reactor is for, being able to follow flow of funds in various aspects, it's crucial for the users that have been leveraging Reactor for years.

THE COURT: Can I ask you to review that one more time for me. I want to make sure I understand what you just said.

THE WITNESS: I can't hear you.

THE COURT: Can you go through that one more time. I want to make sure I understand what you were saying there. I

see.  I'm sorry.  Can you hear me now?

THE WITNESS:  Yes.

THE COURT:  I was asking if you could go through that one more time for me.  I just want to make sure I understood your analysis.

THE WITNESS:  Yes.  So our data relies on -- our underlying data surfaces for two different types of software that we have.  So one of the software is our KYT, which is know your transaction, which is leveraged by compliance firms; so exchanges in order to be compliant with the policies and regulations.

So if the data is incorrect, they then are incorrectly flagging things on their accounts, which they don't want to do.  So that's one of the really valuable things is that they rely on that in order to have credibility within the ecosystem.

THE COURT:  So are they giving you feedback when they get false hits and letting you know that they've received a false hit?

THE WITNESS:  Yes.

THE COURT:  Okay.

MS. PELKER:  Court's indulgence.  I think we're just about finished.

THE COURT:  Okay.

MS. PELKER:  No further questions, Your Honor.

THE COURT:  Can I ask you to ask one follow-up question for me.

MS. PELKER:  Yes, Your Honor.

THE COURT:  It's following up on the question I was just asking.  If you can ask if they collect data or maintain information relating to error rate or false positives in light of that feedback they're getting.

BY MS. PELKER:

Q.  Ms. Bisbee, does Chainalysis collect any information about error rate or false positives, including based on feedback from exchanges?

A.  Not to my knowledge.

THE COURT:  Okay.  I'm sorry.  Can you follow up on one more.  I'm curious, she indicated to me that one of the ways they verify or they know that their product is accurate is based on that data.

So if she can explain to me how often or what her sense is of how frequently errors are being flagged and what they do when there's an error.

MS. PELKER:  Yes.

BY MS. PELKER:

Q.  Ms. Bisbee, could you explain how often, to the extent that you know, errors are flagged by any Chainalysis customer or to the extent -- and what Chainalysis's response reaction would be if such errors were indicated?

A. Yes. So the response that we typically get back is because we have a conservative approach to our clustering. So if a response is made from whether it's an exchange or from a law enforcement entity, it's typically because we have a conservative approach to the clustering.

And so, for instance, for like legal process being served for an exchange, it may be one hop out; so like an intermediary that's not clustered together because it's more of a conservative approach.

THE COURT: Okay. Thank you.

BY MS. PELKER:

Q. What is -- why does Chainalysis think that it's important or valuable to take a conservative approach rather than risk potential false positives?

A. Because you could identify incorrectly and provide information that doesn't allow for streamlined processes for law enforcement and compliance.

Q. And is it important for Chainalysis, for the business at large but also for you, that that information is, in fact, accurate and reliable?

A. Yes.

Q. And have you found it to be accurate, conservative, and reliable in your own use of the tool?

A. Yes.

THE COURT: Thank you. Mr. Ekeland?

CROSS-EXAMINATION OF

ELIZABETH BISBEE

BY MR. EKELAND:

Q. Ms. Bisbee, can you hear me okay?

A. Yeah. Thank you.

Q. Just let me get settled for a second. You testified that Chainalysis takes a conservative approach to its clustering.

But did I hear you correctly saying that Chainalysis doesn't collect any information on false positive rates with the Chainalysis Reactor software?

A. I wouldn't know if we do or not. That wouldn't be me that does that.

Q. It's your testimony that you don't know whether or not Chainalysis collects any information as to false positives in relation to the Chainalysis Reactor software; is that correct?

A. That's correct.

Q. And I've got the same question. As part of its conservative approach, does it collect any statistical information on the occurrence of false negatives from Chainalysis Reactor software?

A. Not to my knowledge.

Q. And as you sit here today, can you even just tell me what the statistical error rate is for Chainalysis Reactor?

A. I would not.

Q. Okay. And you work -- I just want to get it straight.

There's actually two Chainalysis companies, correct?

A. Correct.

Q. There's Chainalysis, Incorporated, which initially developed Chainalysis Reactor; is that correct?

A. Correct.

Q. And you actually work for Chainalysis Global Solutions, correct?

A. Chainalysis Government Solutions.

Q. Government Solutions. And that is the -- is it a subsidiary of Chainalysis, Incorporated?

A. It is.

Q. And that subsidiary was created solely so that Chainalysis could enter into government contracts in the United States; is that correct?

A. It wasn't solely to do that, no.

Q. But was that part of the reason?

A. It was to service government contracts better, but not solely.

Q. Okay. And that's who you work for, Chainalysis Government Solutions. Okay.

Now, if I recall your testimony correctly, you've made no attributions regarding Mr. Sterlingov anywhere in your expert report, correct?

A. Correct.

Q. And the only place that Mr. Sterlingov's name appears on

your expert report is on the title page, correct?

A. Correct.

Q. The majority of the report, it's really -- if it's fair to say -- divided into two parts.

You generally talk about the heuristic underlying the Chainalysis Reactor software, and then you speak about clustering in relation to certain, what you call darknet sites -- is that correct? -- like Agora?

A. So the heuristics are the clustering.

Q. I'm sorry. I just didn't hear you.

A. The heuristics are the clustering methodology.

Q. Right. So let's talk about the heuristics.

You mentioned that the first heuristic that Chainalysis Reactor uses is the co-spend heuristic, correct?

A. Correct.

Q. And then you testified that coinjoins pose a problem for the co-spend heuristic, correct?

A. That's correct.

Q. And then you testified, I believe, that Chainalysis Reactor uses some sort of algorithm or something that screens for the coinjoins; is that correct?

A. We have controls in place to identify coinjoins, yes.

Q. Can you identify those controls for me.

A. It's based off of the heuristics. So with the heuristic model as a co-spend and what coinjoin actually is, with

coinjoin there's going to be number of inputs and outputs that are equal. They're typically done in various levels of amounts for that, that are consistent with the service.

So some of the services, Wasabi, Samurai Wallet, Joinmarket, are all different mechanisms that utilize coinjoin technology for that. And so the models that are used for co-spend or common spend heuristic would be able to identify that that's not part of that because of the deterministic availability of the amounts on the inputs and outputs do not make sense for that heuristic.

Q. But my question was something a little bit different. I was asking if you could actually specifically identify for me what Chainalysis Reactor does in the form of an algorithm or its code or whatever to identify specifically that a coinjoin is present or isn't.

A. So I'm not a developer.

Q. As you sit here today, can you point or direct me to or cite any scientific paper or any kind of peer-reviewed paper or any kind of independent analysis that discusses the accuracy rate of Chainalysis Reactor's coinjoin identification methodology?

A. No.

Q. As a matter of fact, in your entire expert report, you don't cite to a single scientific peer-reviewed paper attesting to the accuracy of Chainalysis Reactor, do you?

A. No.

Q. And can you point me to a single scientific peer-reviewed paper or anything of the sort that attests to the accuracy of the co-spend heuristic as it's implemented in Chainalysis Reactor?

A. So the co-spend heuristic that is identified within Reactor is the co-spend heuristic that is commonly used within the protocol; the Bitcoin protocol. So there are scientific articles about that that is specific for that. So --

Q. Can you cite me one today as you sit here on the stand?

A. I wouldn't be able to name the article, but it's the article that I first learned how to do blockchain tracing on.

Q. Is that the Sarah Meiklejohn article?

A. Possibly, yes.

Q. You can't recall what the article was that you read in 2014 about co-spend?

A. I know that it was from George Mason University, and I actually sat in a lecture for it. I just can't recall the title of it or necessarily who the author or authors were.

Q. But Chainalysis Reactor didn't exist in 2014, correct?

A. Correct.

Q. You still -- unless I misheard you, you still can't point me to any independent analysis about the accuracy of Chainalysis's use of the co-spend heuristic in the Reactor software, correct?

A. But it's the same. So, I mean, you would be able to take any of the information that's in Reactor for a co-spend and put it into a block explorer, and you'd be able to see that it's co-spend. And then that would be able to be confirmed with the scientific journal article that talks about how co-spend occurs.

Q. But I believe you just testified that Chainalysis Reactor uses proprietary techniques and software to analyze whether or not coinjoin is disrupting the co-spend heuristic, correct?

A. I didn't -- I don't recall saying that.

Q. Well, does Chainalysis Reactor use particular algorithms or source code or software to screen for coinjoins?

A. It does.

Q. And is that proprietary?

A. No.

Q. It's not proprietary. But you can't -- it's not proprietary, but you can't tell me what it is?

A. It wasn't part of my expert report.

Q. You didn't consider coinjoins when you wrote your expert report?

A. It wasn't part of any of the heuristics for any of the eight services that were identified.

Q. So you didn't consider coinjoins for any of the heuristics that were used to write your expert report; is that your testimony?

A. The heuristics that were identified for those nine services do not include the coinjoin heuristic.

Q. Okay. So that was co-spend. The other heuristic, I believe you said, was the behavioral heuristic, correct? And you said that that was solely based on information from the public blockchain?

A. Yes.

Q. So it's -- nothing in the Chainalysis Reactor behavioral heuristic is proprietary?

A. No. It's based off of the information of the digital fingerprints that occur for transactions.

Q. Okay. And then the third heuristic, I think you said, was the intelligence heuristic?

A. Uh-huh.

Q. What sources are you using for that heuristic?

A. So it's verifiable data. So that can be from court documents; it can be provided by third-party entities; and it can also be from data leaks that are then verified by our research and global intelligence team.

Q. But as you sit here today, can you name me those sources that were used as the basis for your expert report?

A. So if I recall correctly, in the AlphaBay cluster there was intelligence based from --

Q. I'm sorry. I couldn't hear you.

A. Oh, I'm sorry. From my recollection in my report, AlphaBay

was one of the marketplaces that actually did leverage intelligence heuristic, which was based off of information provided by the U.S. government.

Q.  Okay.  And any other sources, or is it just the AlphaBay that you can cite me?

A.  I'd have to review my report again to say that.

Q.  Okay.  Do you have your expert report in front of you?

A.  Yes, I do.

Q.  I'm directing your attention to page 9, right under Section 1 where it says Bitcoin Fog.

A.  Uh-huh.

Q.  Do you see how it says the Bitcoin Fog cluster contains 925,743 addresses?

A.  Uh-huh.

Q.  And then directing your attention to page 13, third paragraph down, that starts with the word "Approximately."

Do you see how it says approximately 50.26 percent of the clustering for Bitcoin Fog was dependent on heuristic 1?

A.  Yep.

Q.  And that's the co-spend heuristic, correct?

A.  Correct.

Q.  And then you see how it says representing 46,532 addresses that co-spent.  That's, obviously, not 50 percent of 925,000, so could you just explain the math there and how that's working.

A.   Yeah, sure.  So with the heuristics that are identified, there's not just one heuristic that's used for clustering. Sometimes there's multiple that are leveraged.  So of the 46,532 addresses that were co-spend, those are only co-spend, only.

Q.   I'm sorry, the 46,000, or did you say 460,000?

A.   No.  46,532.  However, there's 50 percent that have co-spend that also include the second heuristic, which is behavioral.

Q.   So what's the heuristic, then, for the other 880,000 addresses?

A.   It's the behavioral analysis.

Q.   So it's the behavioral analysis.  As you sit here today, can you cite me a single scientifically verified or peer-reviewed paper discussing the accuracy of Chainalysis Reactor's use of the behavioral heuristic?

A.   Again, so the behavioral heuristic is based off of the way that the transactions occur and the digital fingerprints that are left behind from the interaction of a wallet software.  So that is provable because it's done and replicated time and time again and very reliable.

Q.   But as you sit here, you can't name me a single scientific paper that's peer-reviewed that attests to the accuracy of Chainalysis's behavioral heuristic as it's implemented in Chainalysis Reactor, can you?

A. I can't right now, no. But I can say that the reliability of it is used, and it's a common use case for the Bitcoin protocol, and you can replicate it by looking at the public blockchain.

Q. But you can't cite me a paper --

MS. PELKER: Your Honor, I think this is asked and answered.

THE COURT: That is asked and answered.

MR. EKELAND: Fair enough.

BY MR. EKELAND:

Q. Now, one of the things -- it seems to me that all you have, am I correct in saying, you only have anecdotal evidence from your own experience as to the accuracy of Chainalysis Reactor; is that correct?

A. Can you rephrase that question.

Q. Sure. You don't have scientific, peer-reviewed papers or anything published anywhere attesting to the accuracy of Chainalysis Reactor, do you?

A. No.

Q. It's all just based on your own personal experience; is that correct?

A. No.

Q. What -- so it's not based on -- what is it based on besides your personal experience?

A. So the Chainalysis Reactor, from the certifications that I

have from it, as well as being able to do blockchain analysis manually, confirm from the experience that I've had of doing trainings and also have confirmation of those trainings from other users of this and the success that they've also had with their investigations, then indicate that it's not just me that's able to identify that, but other people are able to say that the use of Reactor is reliable.

Q. So you can't cite any scientific papers attesting to its accuracy, but you're saying your training and other people have told you that it's accurate; is that correct?

A. Yes.

Q. And Chainalysis was the vendor -- are you familiar with FTX?

A. Yes.

Q. And Chainalysis was the compliance vendor for FTX, correct?

A. I can't speak to that.

MS. PELKER: We would object to the whole line -- the whole relevance of the ensuing line of questioning related to FTX.

THE COURT: It's hard for me to know until I've heard the questions. You may be right. I don't know where he's going with it.

BY MR. EKELAND:

Q. Do you know what -- Ms. Bisbee, you know what FTX is correct?

A.  Yes.

Q.  Can you tell the Court what FTX is.

A.  FTX is an exchange that ended up going corrupt.

Q.  And Sam Bankman-Fried, I believe is his name, was the head of FTX, correct?

A.  Yes.

Q.  And he's currently being criminally prosecuted by the United States, correct?

A.  Yes.

Q.  And Chainalysis was the compliance vendor for FTX, correct?

THE COURT:  I guess -- I mean, I just know from news accounts about this, but I didn't believe that there was anything in the news accounts that related to the type of analysis that we're hearing here.

So if you can tie this somehow into the reliability of Chainalysis, that's fine.  But --

MR. EKELAND:  Certainly, Your Honor.  I'll make a connection.  And that's -- the only evidence that's being offered in this courtroom for the accuracy of Chainalysis Reactor is purely anecdotal.  There's no scientific evidence. They cannot produce any peer-reviewed paper.  There are none cited in the expert report.  Now, I'm being told that we've got anecdotal evidence.

So I'm turning to anecdotal evidence of Chainalysis's own clients that it used compliance software for and pointing

to what looks like a massive failure.

THE COURT: I guess my question, though, is, is there any evidence or reason to believe that the failure of FTX was in any way related to the type of analysis that Chainalysis does?

The fact that FTX -- the founders may have been taking money out of the account, using people's money for improper purposes, withdrawing funds for their own personal uses, I'm not quite sure why that would have anything to do with Chainalysis.

It's a little bit -- I'm just asking you to tie it in. One wouldn't say, for example, that the fact that --

MR. EKELAND: Let me see if I can --

THE COURT: It's only relevant to my mind if it actually has anything to do with what Chainalysis was studying, not whether there was some sort of fraud that was going on that was unrelated to what they were studying.

MR. EKELAND: Well, let me see if I can connect it. If not, I'll drop it.

THE COURT: Okay.

BY MR. EKELAND:

Q. So Chainalysis Government Solutions offers private companies compliance services, correct?

A. No.

Q. No, it doesn't?

A. Chainalysis Government Solutions is for U.S. public sector.

Q. I didn't hear you. I'm sorry.

A. Chainalysis Government Solutions is for U.S. public sector.

Q. Public sector. So is it Chainalysis, Incorporated that offers compliance services?

A. Yes.

Q. And as part of their compliance services, they use Chainalysis Reactor, correct?

A. Restate the question.

Q. Yes. As part of Chainalysis's services to its compliance clients, Chainalysis uses Chainalysis Reactor, correct?

A. So for compliance side, they typically will use the KYT, which is know your transaction. And that's separate from the investigative tool.

Q. But do they use -- you said typically. Do they use Chainalysis Reactor ever in their compliance work?

A. I wouldn't be able to speak to that. I don't know.

Q. So you don't know. Okay.

You make a distinction in your report between, I believe it is, indirect tracing and direct tracing; is that correct?

A. Uh-huh.

Q. Could you briefly describe for the Court the difference between the two.

A. Yes. So it has to do with direct and indirect exposure.

So what direct transactions and exposure means is that, when you have one entity transacting directly with another, that's a direct exposure. When you have an indirect, it means that there's intermediaries in between that; so indirectly associated with the transfer of funds.

Q. And it's fair to say that the more intermediaries or the more hops in a particular transaction you're tracing, the probability of error increases, correct?

A. Yes.

MR. EKELAND: I pass the witness.

THE COURT: Okay. Thank you.

Ms. Pelker, I think the reliability of the tool is, obviously, something that is important for the Court to consider as part of the *Daubert* analysis. I am curious about whether there's more -- what I've heard thus far is that the witness herself has been able to confirm, by going back and looking at the blockchain itself, that Chainalysis was working properly and also that she gets feedback from clients when they're not spotting something.

I think it would be helpful for me if you could explore those issues a little bit more for me so I have some sense of whether the reliability of the tool has been tested in some way even if -- I don't think there's anything wrong with it being anecdotal, but it has to be verifiable or tested in some way.

MS. PELKER: Yes, Your Honor.

REDIRECT EXAMINATION OF

ELIZABETH BISBEE

BY MS. PELKER:

Q. Ms. Bisbee, you testified that you don't know an exact number for the error rate in Chainalysis.

But is it also your testimony that you have found in your own work Chainalysis Reactor to be reliable?

A. Correct.

Q. And have you received feedback from Chainalysis's customers, whether that's Government Solutions or on the compliance side, about the use of Chainalysis Reactor and the clusters in investigations?

A. Yes.

Q. Could you speak, generally, without divulging any sort of sensitive details on a particular case, about instances where Chainalysis Reactor is used and has been found to be reliable.

A. So in all of the investigations that my team supports, we provide investigative reports to our public sector customers. They're then able to leverage that to further their investigations, and we have never, in the last two and a half years I've been with Chainalysis, ever received anything back that says that it was not correct or that it was incorrectly attributed for the information we provided.

Q. And are you aware whether information from Chainalysis

Reactor has been used in support of search warrants in criminal investigations?

A. Yes.

Q. And have you received feedback that the information relating to Chainalysis Reactor, when those search warrants were executed, was then corroborated by information found in the search warrant responsive?

A. Yes. So I can attest to that when I was at DEA, because I used Reactor and also supported many search warrants and seizure warrants and was able to corroborate the information with that.

Q. Was there -- were there also instances where you were able to -- either you or agents that you worked with debriefed or proffered the subjects or defendants of investigations whose tracing you or one of your colleagues had done using Chainalysis Reactor?

A. Yes.

Q. And were there -- anecdotally, were there numerous instances where those defendants or subjects then corroborated and admitted to you the information in the tracing?

A. Yes.

Q. And are you aware of how law enforcement uses Chainalysis Reactor in support of thousands of different investigations across the country?

A. Yes.

Q.   And is Chainalysis also used by investigators globally, as well as those in exchanges and on the compliance side?

A.   Yes.

Q.   And do you receive feedback from a variety of Chainalysis customers regarding the utility of the tool?

A.   Yes.

Q.   And have they provided information to you about the tool being accurate and reliable in their investigations?

A.   Yes.

Q.   And have you had the occasion to also verify that the information in the tool is corroborated by the outside data sets, whether that's the blockchain or information gathered through subpoenas to financial institutions, search warrants, and other sources?

A.   Yes.

Q.   Ms. Bisbee, defense counsel asked you about lines of academic research.

     Is it fair to say that your focus in blockchain analytics is not academic research at large?

A.   Correct.

Q.   Are you aware, though, that there are academic researchers who are very interested in blockchain analysis?

A.   Yes

Q.   And could you speak to that, generally, again, understanding that you aren't the ones -- you are not someone

who is peer-reviewing any of these papers.

A. Yes. So any type of verifying information for doing an investigation, you want to be able to make sure that you have some sort of source or backing to be able to trust what you're actually doing on the blockchain. So that requires to be able to review individuals that actually go and test the validity of what's actually occurring on the blockchain.

So that includes the different heuristics that are leveraged. So common, or co-spend, or the change address or behavioral features, as well as the obfuscation techniques that are leveraged in order to help one hinder the ability to actually follow the flow of funds; and then also be able to deter individuals from being able to identify the destination or origin of those funds.

Q. Ms. Bisbee, I wanted to follow up briefly on a specific point that the defense raised regarding the clustering for the Bitcoin Fog cluster discussed on page 13 of your report.

A. Yep.

Q. Those 46,532 addresses, those were addresses that were only identified through the co-spend heuristic; is that right?

A. Correct.

Q. But 50 percent of the addresses in total -- so we're looking at closer to 500,000 addresses -- were identified by both the co-spend heuristic and the behavioral heuristic; is that right?

A.   That's correct.

Q.   And the specific heuristics of whether it was co-spend only or not co-spend only is set out in the attachment to your report; is that correct?

A.   That's correct.

MS. PELKER:   Unless the Court has any other questions that we can help -- address any questions with regard to reliability --

THE COURT:   If you can ask the witness whether, in her experience, she has identified any cases or anyone has brought to her attention any cases in which there were false positives.

I think she's indicated that there may have been false negatives because it's a conservative tool in her view. But I'm curious as to whether she's ever received -- or identified a false positive and, if so, on how many occasions that has occurred.

BY MS. PELKER:

Q.   Ms. Bisbee, in your work at Chainalysis, has anyone brought to your attention specific instances of false positives where Chainalysis said something was clustered in a way that was not correct?

A.   Not to my knowledge.

THE COURT:   What about while at the DEA as well?

BY MS. PELKER:

Q. While at the DEA, were there any instances?

A. No, not to my knowledge.

Q. How many addresses -- or how many clusters and addresses would you say that you and Chainalysis users who are reporting directly to you would review on a regular basis?

A. Thousands. I mean, a lot. We service a lot of investigations.

Q. Fair to say in your work doing hundreds of investigations with thousands upon thousands of addresses, you're not aware of a single false positive instance by you or anyone working with you?

A. Not to my knowledge.

THE COURT: Okay. Thank you. Mr. Ekeland?

RECROSS-EXAMINATION OF

ELIZABETH BISBEE

BY MR. EKELAND:

Q. Ms. Bisbee, can you hear me?

A. Yes, thank you.

Q. Is it your testimony that Chainalysis Reactor is 100 percent accurate?

A. No.

Q. Are you aware of any internal analysis at Chainalysis of the error rates for Chainalysis Reactor?

A. No.

Q. And you said it's been used thousands of times?

A.   Yeah.

Q.   And do you individually review each of those cases or instances?

A.   No.  But I oversee thousands of investigations.

Q.   You oversee.  And you oversee thousands of investigations.

But there is no internal analysis at Chainalysis about the accuracy of Chainalysis Reactor; is that correct?

A.   It's dependent upon the -- when we send it back to our customers, and we've never gotten a negative response from our customers about the information that we provide.

Q.   But you've never -- Chainalysis has never done an analysis of the error rate of its entire use of its entire data set of customers, has it?

A.   Not to my knowledge.

MR. EKELAND:  No further questions.

THE COURT:  All right.  Thank you.  The witness is excused.  You can let her know.  Thank you.

(Witness excused.)

THE COURT:  Ms. Pelker, I would be interested if there have been -- this witness may not know about it.  I would be interested as to whether the people, in preparing the software or in building the product, have done any -- any efforts to verify the accuracy of the product.

MS. PELKER:  We'll definitely look into that further, Your Honor.  Our understanding is that the software -- there

are definitely false negatives and that is by design, but that the software is designed to have a zero percent acceptable error rate because they don't view any false positive as an acceptable outcome.  But we can --

THE COURT:  If there's somebody who can tell me that or explain that to me or explain to me why that's the case or how it's been designed in order to ensure that, that would be helpful.

MS. PELKER:  Yes, Your Honor.

THE COURT:  Mr. Ekeland?

MR. EKELAND:  Your Honor, we have heard, anecdotally, about false arrests.  Somebody came up to us, I think down in Miami or in Europe, and told us about an instance -- which we haven't looked up and haven't verified -- where somebody in the UK was, essentially, charged with, I believe, trafficking and child pornography based on a Chainalysis Reactor search.  He was arrested.  It's my understanding he was held for months, and then he was just quietly released.

THE COURT:  If there's any evidence that you wanted to bring to my attention, I'd be happy to consider that.

We have just another 15 minutes before my next hearing.  I did have a couple of questions about the motion to dismiss; maybe I could ask those now.

And why don't I start with you, Mr. Brown.  I know it's the defense's motion, but the two questions I had for

you -- and I'd be interested in Mr. Ekeland's view on this as well.

As I read the case law with respect to the venue question, the majority view seems to be that it is enough simply to allege venue and then a transaction or a relevant event occurred within a jurisdiction, and as long as on the face the indictment alleges that that's the end of the matter. There is some authority for the proposition -- and there's a concurring opinion, I think, from Judge Fletcher from the 9th Circuit, who suggests that if the defense comes forward with evidence and says here's the evidence that shows why there can't possibly be venue -- that the Court can take that up at the motion to dismiss stage. And now I'm just talking about a motion to dismiss an indictment, not, obviously, what happens on the merits of the case.

So I'm curious as to whether you -- I guess as to what the government's position is with respect to that and whether the government thinks it's enough simply to allege that there was an act that occurred in the relevant district or whether, at the motion to dismiss stage, we really do something on a venue motion that you don't do with most other motions that start getting into the merits and say, okay, what does the evidence show, and do I think the government can carry its burden if we were at trial.

So that was my first question, I guess; what you

think the correct standard is and whether I should be, in fact, having almost a minitrial at this point, or at least having a proffer of what the evidence will show at trial and then deciding whether I think it's sufficient, which I, obviously, wouldn't do, for example, with respect to -- if there was adequate evidence of identifying an assailant or something like that.

MR. BROWN: Yes, Your Honor. I think, to address that question, our starting point is -- I mean, the case law is clear that venue is not in itself an element of the offense that necessarily needs to even be pleaded in an indictment.

THE COURT: Right.

MR. BROWN: So courts do look beyond the four corners of an indictment to see -- if there's a motion challenging venue, courts do look beyond the four corners to see if --

THE COURT: Do they where it's pled in the indictment as it is here other than the Judge Fletcher concurrence?

MR. BROWN: Your Honor, let me say two things. Number one, I don't think -- and I'm not familiar with this concurrence, so I'm a little bit at a disadvantage.

THE COURT: I guess put that aside. The majority view, I think -- maybe it's more than Judge Fletcher on this. The majority view is, if you plead it, that's sufficient. But if I'm wrong about that, I want you to let me know.

MR. BROWN: Your Honor, I don't think that there's

any reason to doubt that majority view; that if you plead it, it's sufficient. A motion to dismiss -- the general standard for motion to dismiss an indictment is, you know, is there some defect that, no matter what the facts, as they fall out, is there some defect in the way that the case is pled that categorically makes that indictment infirm.

And I think what you're talking about is, I don't think that on a motion to dismiss for lack of venue, I don't think that the Court should engage in that kind of minitrial that you referred to.

The second point I wanted to make here, though, is I don't think the Court needs to reach that question because I think the disagreement here is really about the law and how the law applies to facts that are really not in dispute; namely, there were undercover transactions conducted from the District of Columbia.

THE COURT: How many? There were two; is that it, or was there more than two?

MR. BROWN: There were a number. I think there are -- at least four. There's one that's pled in the indictment specifically. That's in Count 2.

There are, I think, more than that referred to in the affidavit in support of the criminal complaint. There may be two. There were other transactions that were just pure undercover transactions; they weren't accompanied with the

representation of, these are dirty funds.

THE COURT: Right.

MR. BROWN: So there are several transactions in the District of Columbia. I don't think that the defense is disputing the fact that those transactions occurred. I understand the defense to be arguing that it doesn't matter or, you know, there's some other evidentiary argument about that.

The other fact here is the absence of D.C. licensure and FinCEN registration; registration with Financial Crimes Enforcement Network. I understand those are also facts that I don't think the defense is disputing.

THE COURT: That may vary from jurisdiction -- I mean, from count to count. You may be stronger on some counts than others.

MR. BROWN: So those two facts. The undercover transactions and then the lack of licensure or registration in various combinations address venue for each of the four counts in the indictment.

But you're correct that it's not the same argument for each count in the indictment.

THE COURT: And then this relates to the other question I had, which is, is there other evidence of venue that might come in at trial? I mean, I know that you've now identified maybe four undercover transactions from the District of Columbia, failure to register here.

Is there other evidence that may still come in or still even being developed with respect to venue that might make it premature for me to say, this is it, there's these four, and I either conclude this is sufficient or not for purposes of venue?

MR. BROWN: With respect to venue, I don't think that there's any other evidence other than the fact of undercover transactions and the fact --

THE COURT: I'm sorry. So you think I can and should just rely on those four undercover transactions is all that you have at this point, then?

MR. BROWN: Those four undercover transactions. We can confirm exactly how many and on what dates there were undercover transactions.

THE COURT: That would be helpful for me to have. If you want to do something to update me just to let me know exactly what it is you're relying on in that regard.

MR. BROWN: Okay.

THE COURT: And you indicated also that the failure to license or to obtain a license in D.C. was a venue-related event in D.C. I sort of wonder whether that's right or not because I think the crime is operating a business without a license. The fact that you didn't get a license isn't sufficient. You're actually operating the business. If there's no evidence that you actually operated the business in

D.C., the fact that you didn't get a license in D.C. is not going to establish venue.

MR. BROWN: Well, these are -- the crime consists of both operating a business and that omission, that inaction. And the courts have been clear that you don't have to have every element of the offense occur in the same district in order to venue the prosecution in that district.

I think it is, actually, correct that an omission in a district, such as the District of Columbia, is sufficient in itself to venue a prosecution. And the examples are the examples that we cite in our brief; the *Hassanshahi* case, which was in -- a sanctions evasion. I don't know all the details, but it was a sanctions evasion case.

The only event in the District of Columbia was the omission, the failure to obtain a license. The other parts of that offense, the illegal export or import or whatever it was, based on my reading of that case, the other elements of that offense, did not occur in the District of Columbia. It had nothing to do with the District of Columbia.

Judge Contreras read that and said there is an element of the offense, which is the omission. The same applies to the civil forfeiture case.

THE COURT: Is the only place that one would apply to get a license to conduct a money-transmitting business in the District of Columbia? Is that the only place you can go to get

a license?

MR. BROWN: For -- so there's a license -- sorry. There's a license which is issued by the D.C. government, the Department of Insurance, Securities and Banking.

THE COURT: Right.

MR. BROWN: And then there's registering as an MSB with the Financial Crimes Enforcement Network. For the registration crime, yes, the FinCEN is only located in the District of Columbia.

THE COURT: The form has to be actually submitted in D.C.?

MR. BROWN: Yes, Your Honor. And it's received and read and stored in the District of Columbia.

There are many prosecutions under 1960 for failure to obtain FinCEN registration in other districts. That's because other parts of the offense may touch those districts. The defendant may be located there; some of the transactions may be there.

It just so happens that for our case, you know, our argument about the omission, that is a D.C.-specific omission. But that's been recognized by Judge Contreras, Judge -- former Judge Ketanji Brown Jackson. The *Johnston v. United States* --

THE COURT: You can call her now Justice if you want.

MR. BROWN: Yes, Your Honor. And *Johnston v. United States*, a Supreme Court case, which is cited in our brief,

says: Where a crime charged is a failure to do a legally required act, the place fixed for its performance fixes the situs of the crime.

I would also point the Court to the discussion of this in one of the defendant's leading authorities, the *Auernheimer* case in the 3rd Circuit. In that case, the court contrasted the situation there with the situation where there is a preexisting legal duty to do something. The examples were things like failing to file a tax return, failing to show up to a draft registration board, where the offenses punish inaction.

I think if you read the text of 1960(b)(1)(A) and (b)(1)(B), those offenses include both actions, namely, operating a money services business or money transmitting business, and inaction; failing to obtain a license, failing to register with FinCEN. It's both of those. We do have a preexisting legal duty.

I think it's well-established that omission does suffice.

THE COURT: For those counts?

MR. BROWN: Yes, Your Honor.

THE COURT: Okay.

MR. BROWN: For those counts. And also, as we pointed out in our brief, the failure to register with FinCEN is also another kind of overt act in furtherance of the money laundering conspiracy.

Part of registering with FinCEN is subjecting yourself to FinCEN's supervision over your business, which includes supervision of your Bank Secrecy Act compliance, your anti-money laundering obligations.

THE COURT: Can you have an overt act of failing to act jurisdiction?

MR. BROWN: Your Honor, it isn't -- I mean, I think yes. This is something that an illegal mixing service like Bitcoin Fog deliberately does. They deliberately do not operate what they call a KYC service provider, know your customer. There are KYC service providers, like Coinbase, mainstream exchanges; and there are the non-KYC providers, like an illegal mixer, like some other noncompliant exchanges.

And I think in this case -- I mean, we would talk about the evidence --

THE COURT: Do you know -- I mean, I can take a look at the case law. I don't know off the top of my head whether there have been cases in which a court has said, you can have a failure to act that constitutes an overt action, in general, for purposes of a conspiracy.

MR. BROWN: I don't know off the top of my head. But also the Court doesn't have to decide because that's not our sole basis for an overt act.

THE COURT: Okay. Let me give Mr. Ekeland time on this as well. Same questions for you.

MR. EKELAND: I believe we cited in our papers some of the cases, I think in this district, that looked outside the four corners of the indictment for evidence as to venue. On that point, I would --

THE COURT: Are there any cases, though, in which the indictment actually alleges on its face venue; that they actually go beyond the scope of the indictment itself?

MR. EKELAND: I just didn't hear the question.

THE COURT: Any cases from this district where the indictment itself alleged venue; alleged that acts occurred in the district where the courts went beyond the scope of the indictment?

MR. EKELAND: I don't know off the top of my head. I would have to go look.

I would point out that I believe the venue right is the only right explicitly mentioned twice in the United States Constitution in Article III, the Sixth Amendment. As a threshold issue, I don't think it's a minor one.

THE COURT: It's certainly not a minor one, but it is also one where the Supreme Court has just reaffirmed in the past week or two weeks that it's not an element of the offense. You're right, it's not a minor right.

MR. EKELAND: But it is an issue for the jury to hear.

THE COURT: It can be. If it's raised, it can be an

issue for the jury.

MR. EKELAND:  It's certainly affecting this case because any witnesses that we want to fly in are in Sweden.

THE COURT:  That was the other question I was going to ask you that invites -- in your view, is there venue anywhere in the United States?

MR. EKELAND:  No, not that I've seen from the discovery because there's no evidence of anything actually happening in the United States.  There's nothing -- there's no evidence that I've seen in the discovery of anything happening in D.C. besides the unilateral acts of the government.

And I think the issue there -- and I think this is a very interesting issue, just computer law in general.  They're referring to sort of this undercover transaction.  Where is the mens rea in terms of you're saying there's a crime here?  They're sending a message, not getting any response.

They're then taking some bitcoin from a government account; allegedly mixing it in Bitcoin Fog, which I believe this Court said that's legal if you're not trying to launder money; and then putting it back in a government account.

Where is the mens rea and where is the crime actually in D.C. that justifies a criminal prosecution?  That's not at all clear to me.  There's -- maybe if there was something else in the discovery that showed -- but as a matter of law, I think the way that the indictment is pled, it's just defective

legally.

It doesn't meet the locus delicti test; it doesn't meet the substantial conduct test; and it certainly doesn't meet the test of my favorite case, *United States v. Auernheimer*, of essential conduct. You don't have anything happening in D.C., and this is the classic case that I think the framers were concerned about.

THE COURT: I really, really doubt the framers were concerned about international transactions involving cryptocurrency.

MR. EKELAND: But they were concerned about American Revolutionaries being arrested in Philadelphia and taken to London for a jury trial. That's, I think, one of the main reasons you have the venue clause, and that's why it's in the Constitution twice.

THE COURT: That's -- it doesn't make any sense whatsoever because the venue clause would do nothing whatsoever with respect to restricting the ability of Great Britain to try somebody. There may be concerns about someone grabbing someone in Great Britain from the United States, but it's not grabbing someone in Philadelphia and bringing them to Great Britain.

MR. EKELAND: It's a concern --

THE COURT: That wouldn't apply at all.

MR. EKELAND: It's a concern about the venire. It's a recognition by, I think, something like three-quarters of the

trial lawyers who wrote the Constitution of that important aspect, of that -- that you need to have the trial where the crime actually occurred because that's where the witnesses are.

And here, in this case, we have people in Sweden who can come in and testify that Roman wasn't operating Bitcoin Fog. What do we have to do? We have to fly them all to the United States. Some of them are worried they're going to get arrested by the United States Government after they've seen what's happened to Roman. That's a big factor in this case.

The government doesn't have any eyewitnesses at all that can attest to anything happening in this district. Nothing happened in this district except the unilateral acts of the government, and those acts have no mens rea. I don't understand how you can have criminal venue in this district and have it be constitutional.

THE COURT: All right. Thank you. All right.

So I guess we're going to reconvene on the 19th. If the government wants to provide me any update with respect to -- well, I guess two things. One is anything specific to what the venue allegations are or the facts are with respect to venue; and two, any verification or testing or analysis of the Chainalysis tool that may not have been something that the witnesses themselves had on hand, that would be helpful to have.

MS. PELKER: Yes, Your Honor. And could we also have

the Court enter an order or issue some instruction to defense counsel regarding a deadline for the expert disclosure.

THE COURT: You mean about updating them in light of where I said they could update them?

MS. PELKER: Yes, Your Honor.

THE COURT: Mr. Ekeland, when can you get that done by?

MR. EKELAND: Can we have two weeks?

THE COURT: Is that acceptable to the government? So that would be July 7th.

MS. PELKER: That will be July 7th. And just clarification that on July 7th, the government will expect actual reports of the defense blockchain analysis, as well as specifying what witness is testifying to what.

THE COURT: Okay.

MR. EKELAND: I think there's a misconception that we have done this blockchain analysis beyond just looking at the general tracing. In terms of, like, final expert reports for this case -- because it sounds like the government may need to update their thing if they find anything in terms of verifying stuff -- I would suggest August 14th for final expert reports. That's about a month before the trial.

MS. PELKER: Your Honor, the misconception comes from the defense in their expert disclosure saying that their experts did blockchain analysis and that they're going to use

it to rebut the government's experts.

The amended rule is very clear. We had our expert reports done well in advance of the *Daubert* hearing. We need an opportunity to review the expert reports before the now rescheduled *Daubert* hearing. We continued the January trial because defense said they needed more time to do these expert reports. We can't get them less than a month before trial.

THE COURT: I think I agree under the circumstances. I may need to have hearings that any updated expert disclosures or reports should be served on or before the 7th of July.

MR. EKELAND: Okay.

THE COURT: All right. Thank you. I will see you all on the 19th.

(The hearing adjourned at 3:08 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 3rd day of July, 2023.

/s/ Tamara M. Sefranek
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C.  20001

**$**

**$10** [3] - 50:7, 50:8, 107:2
**$20** [1] - 107:1

**/**

**/s** [1] - 157:9

**1**

**1** [9] - 2:19, 44:18, 45:1, 45:4, 45:5, 81:24, 82:11, 126:10, 126:18
**10** [2] - 61:12, 61:14
**100** [4] - 75:21, 90:13, 139:20
**10005** [1] - 1:17
**104** [1] - 2:22
**109** [1] - 2:23
**10:00** [1] - 1:6
**10th** [1] - 5:5
**119** [1] - 2:13
**11th** [1] - 7:15
**122BU** [1] - 82:16
**12:35** [1] - 95:4
**13** [2] - 126:15, 137:17
**134** [1] - 2:15
**139** [1] - 2:16
**14th** [1] - 155:21
**15** [1] - 141:21
**16** [2] - 34:13, 34:17
**18** [1] - 64:13
**1811** [1] - 18:14
**19** [1] - 93:17
**1960** [1] - 148:14
**1960(b)(1)(A** [1] - 149:11
**1982** [1] - 29:9
**1985** [1] - 29:14
**1987** [1] - 35:6
**19th** [5] - 39:21, 39:23, 40:20, 154:17, 156:13
**1:21-CR-0399** [1] - 1:3
**1:30** [2] - 94:15, 94:16
**1:40** [1] - 95:4
**1JZBU** [4] - 82:17, 84:6, 92:10, 92:17

**2**

**2** [7] - 2:20, 57:15, 57:25, 58:21, 58:24, 108:24, 144:21
**20** [1] - 83:12
**20001** [3] - 1:12, 1:23, 157:11

**2009** [1] - 50:17
**2011** [1] - 71:24
**2014** [12] - 8:3, 14:17, 28:5, 28:23, 42:3, 96:8, 96:10, 96:19, 99:1, 99:18, 123:15, 123:20
**2015** [5] - 17:25, 18:3, 42:4, 43:3, 99:18
**2016** [9] - 8:10, 18:20, 18:21, 19:4, 19:6, 19:9, 28:24, 87:24
**2017** [1] - 19:10
**2019** [1] - 88:3
**202-354-3246** [1] - 1:23
**2021** [1] - 102:24
**2022** [1] - 57:19
**2023** [2] - 1:5, 157:7
**20530** [1] - 1:14
**21-399** [1] - 3:2
**22** [4] - 65:13, 66:9, 67:8, 67:14
**23** [1] - 1:5
**27** [2] - 35:4, 113:17
**28** [2] - 8:3, 14:17
**2nd** [1] - 5:4

**3**

**3** [9] - 2:21, 59:4, 59:23, 59:24, 60:2, 60:4, 62:20, 62:22, 63:3
**30** [1] - 1:17
**302** [2] - 86:6, 86:7
**333** [2] - 1:22, 157:11
**34** [1] - 67:9
**35** [7] - 8:19, 68:2, 69:14, 69:21, 70:11, 81:10, 92:8
**36** [2] - 70:2, 92:15
**37** [5] - 69:3, 83:2, 83:5, 83:13, 92:11
**38** [1] - 69:3
**3:08** [1] - 156:14
**3rd** [2] - 149:6, 157:7

**4**

**4** [5] - 2:22, 104:10, 104:19, 104:22, 104:23
**40** [1] - 8:19
**400** [2] - 99:12, 100:3
**41** [1] - 2:5
**44** [2] - 82:11, 83:9
**45** [2] - 2:19, 40:18
**46,000** [1] - 127:6
**46,532** [4] - 126:22,

127:4, 127:7, 137:19
**460,000** [1] - 127:6
**49** [2] - 71:6, 71:8

**5**

**5** [10] - 2:23, 50:6, 50:10, 81:11, 105:22, 105:23, 108:22, 109:17, 109:22, 109:24
**50** [4] - 104:4, 126:23, 127:7, 137:22
**50.26** [1] - 126:17
**500** [1] - 52:13
**500,000** [1] - 137:23
**500-gigabyte** [1] - 52:14
**548** [1] - 29:13
**551** [1] - 29:14
**58** [1] - 2:20
**591** [1] - 29:9

**6**

**6** [7] - 2:23, 105:22, 106:3, 109:6, 109:17, 109:22, 109:24
**60** [1] - 2:21
**601** [2] - 1:11, 29:9
**6714** [2] - 1:22, 157:10
**694** [1] - 29:8

**7**

**73** [1] - 2:6
**75** [1] - 103:16
**764** [1] - 29:13
**7th** [5] - 5:4, 155:10, 155:11, 155:12, 156:10

**8**

**8** [2] - 57:18, 61:9
**880,000** [1] - 127:10
**89** [1] - 2:8
**8th** [2] - 1:17, 5:4

**9**

**9** [4] - 105:22, 106:3, 110:1, 126:9
**90** [1] - 33:23
**900,000** [4] - 60:16, 60:19, 60:21, 112:1
**925** [1] - 111:22
**925,000** [1] - 126:23
**925,743** [2] - 110:10,

126:13
**94** [1] - 2:9
**95** [1] - 2:12
**950** [1] - 1:14
**9th** [4] - 5:4, 29:9, 29:14, 142:10

**A**

**A.M** [1] - 1:6
**Aaron** [4] - 20:12, 20:13, 28:7
**ability** [5] - 19:23, 37:15, 137:11, 153:18, 157:6
**able** [54] - 14:9, 15:6, 15:9, 22:3, 61:23, 70:4, 70:8, 95:18, 96:25, 97:16, 97:18, 97:23, 97:24, 98:9, 98:13, 98:22, 100:8, 100:10, 101:2, 101:3, 101:4, 101:5, 101:21, 101:23, 102:5, 103:3, 103:18, 103:20, 103:21, 105:2, 105:4, 110:18, 111:25, 112:20, 115:6, 115:17, 122:7, 123:11, 124:1, 124:3, 124:4, 129:1, 129:6, 132:17, 133:16, 134:20, 135:10, 135:12, 137:3, 137:4, 137:5, 137:12, 137:13
**abreast** [1] - 103:17
**absence** [1] - 145:8
**absolute** [1] - 29:15
**absolutely** [2] - 7:13, 20:22
**abused** [1] - 24:8
**academic** [10] - 74:19, 89:3, 89:6, 89:9, 89:13, 94:6, 97:15, 136:17, 136:19, 136:21
**Academy** [1] - 102:21
**accept** [1] - 11:7
**acceptable** [3] - 141:2, 141:4, 155:9
**access** [10] - 15:17, 21:21, 24:2, 31:2, 31:19, 38:20, 38:21, 101:8, 102:4, 103:20
**accesses** [2] - 38:18, 76:13
**accessing** [1] - 76:10

**accommodate** [1] - 3:18
**accompanied** [1] - 144:25
**according** [1] - 84:5
**account** [54] - 38:20, 38:21, 45:22, 45:23, 45:24, 46:15, 46:18, 46:20, 47:1, 47:2, 47:4, 47:10, 47:13, 56:2, 56:4, 65:16, 65:18, 65:20, 65:22, 67:14, 68:5, 68:9, 68:12, 68:14, 68:17, 68:18, 69:1, 69:25, 71:2, 71:3, 71:9, 71:12, 72:5, 72:8, 81:25, 83:10, 83:19, 83:20, 84:1, 84:5, 85:14, 91:20, 92:1, 92:5, 92:12, 92:17, 93:6, 107:7, 131:7, 152:18, 152:20
**Account** [2] - 81:24, 82:11
**accountholder** [1] - 84:10
**accounting** [2] - 78:11, 89:21
**accounts** [20] - 22:9, 38:18, 57:5, 57:10, 59:16, 59:17, 60:11, 64:20, 65:2, 65:4, 65:7, 67:3, 67:10, 67:13, 68:8, 68:15, 93:4, 116:13, 130:12, 130:13
**accuracy** [26] - 16:11, 16:15, 58:11, 74:12, 74:15, 74:20, 79:19, 80:13, 84:15, 84:25, 94:7, 94:10, 102:7, 114:20, 122:19, 122:25, 123:3, 123:23, 127:15, 127:23, 128:13, 128:17, 129:9, 130:19, 140:7, 140:23
**accurate** [16] - 46:3, 59:18, 63:10, 72:24, 73:2, 75:21, 83:21, 89:17, 111:21, 117:15, 118:20, 118:22, 129:10, 136:8, 139:20, 157:4
**accurately** [10] - 44:21, 55:19, 57:21, 75:23, 76:15, 83:5, 83:6, 84:19, 84:21,

104:14
**Accurint** [1] - 23:24
**accuser** [1] - 30:11
**accusers** [1] - 27:23
**acknowledge** [1] - 89:22
**act** [8] - 142:19, 149:2, 149:24, 150:3, 150:5, 150:6, 150:19, 150:23
**Action** [1] - 1:2
**action** [1] - 150:19
**actions** [1] - 149:12
**actively** [1] - 113:23
**activity** [3] - 46:19, 111:4, 115:11
**actor's** [1] - 70:19
**acts** [5] - 7:8, 151:10, 152:11, 154:12, 154:13
**actual** [4] - 22:7, 86:7, 98:15, 155:13
**ad** [1] - 4:10
**addition** [6] - 19:23, 20:20, 63:15, 64:1, 112:9, 113:14
**additional** [9] - 32:12, 34:14, 50:2, 60:23, 66:13, 72:12, 72:16, 99:2, 102:8
**additionally** [2] - 64:19, 69:23
**address** [98] - 5:2, 7:17, 21:4, 37:7, 37:9, 37:12, 37:16, 38:2, 38:4, 38:6, 39:1, 39:4, 46:19, 47:12, 47:13, 47:14, 47:19, 47:20, 48:1, 48:5, 48:19, 48:20, 48:22, 48:25, 49:3, 49:7, 49:12, 49:13, 49:15, 49:16, 49:19, 49:21, 50:2, 50:3, 50:22, 50:23, 51:18, 51:20, 52:15, 56:9, 56:11, 56:12, 61:17, 62:13, 62:18, 62:20, 62:22, 62:23, 63:1, 63:3, 63:5, 66:4, 66:5, 66:7, 66:8, 68:6, 68:10, 76:3, 77:19, 77:20, 82:14, 82:15, 82:24, 83:8, 83:9, 83:10, 84:6, 84:19, 85:8, 85:9, 91:22, 92:6, 92:13, 92:17, 92:19, 106:17, 106:24, 107:7, 107:9, 111:1,

111:14, 112:15, 112:16, 113:4, 114:5, 114:9, 137:9, 138:7, 143:8, 145:17
**addressed** [3] - 4:22, 5:12, 7:15
**addresses** [98] - 38:7, 46:8, 47:21, 48:15, 48:17, 48:18, 48:23, 49:10, 51:7, 51:8, 51:9, 51:10, 54:22, 55:4, 55:7, 55:12, 56:3, 59:12, 59:20, 60:13, 60:17, 60:18, 60:19, 60:22, 60:23, 61:5, 61:6, 61:15, 61:20, 61:21, 62:2, 62:3, 62:6, 62:8, 62:11, 63:7, 63:12, 63:13, 63:16, 63:20, 65:10, 65:19, 66:10, 66:11, 66:14, 66:17, 66:20, 71:16, 71:17, 72:8, 76:5, 77:19, 78:21, 83:24, 84:2, 86:3, 90:13, 90:14, 91:18, 91:25, 101:5, 101:20, 105:7, 105:10, 105:16, 106:2, 106:7, 108:2, 109:9, 109:14, 110:4, 110:10, 110:13, 110:16, 110:17, 110:19, 111:4, 111:18, 111:22, 111:23, 112:1, 112:2, 112:13, 112:21, 112:25, 114:6, 126:13, 126:22, 127:4, 127:11, 137:19, 137:22, 137:23, 139:3, 139:9
**addressing** [2] - 4:10, 79:19
**adequate** [1] - 143:6
**adjourned** [1] - 156:14
**administer** [1] - 53:3
**administered** [2] - 45:13, 52:23
**administration** [2] - 53:6, 96:9
**administrator** [1] - 52:20
**admissible** [1] - 13:25
**admit** [7] - 27:1, 44:25, 57:24, 58:19, 59:22, 104:18, 109:16
**admits** [1] - 27:2

**ADMITTED** [1] - 2:18
**admitted** [11] - 45:4, 45:5, 58:21, 58:24, 60:2, 60:4, 104:22, 104:23, 109:23, 109:24, 135:20
**admitting** [4] - 58:16, 58:17, 59:24, 109:19
**advance** [1] - 156:3
**advanced** [1] - 44:3
**advantages** [1] - 54:20
**adverse** [1] - 7:6
**adversely** [1] - 7:14
**advice** [1] - 42:9
**advise** [1] - 100:9
**advised** [1] - 100:10
**advocacy** [1] - 7:11
**advocate** [4] - 7:4, 7:7, 7:9, 7:13
**affecting** [1] - 152:2
**affiant** [1] - 20:9
**affidavit** [3] - 20:1, 20:9, 144:23
**affirmatively** [3] - 23:10, 23:11, 30:5
**afternoon** [1] - 32:13
**agencies** [1] - 97:21
**agency** [1] - 99:17
**agenda** [1] - 6:24
**agent** [23] - 5:24, 8:18, 8:21, 8:23, 9:4, 9:14, 13:3, 14:24, 15:7, 18:13, 18:15, 18:18, 19:13, 19:25, 21:3, 21:13, 22:17, 22:18, 25:3, 31:17, 32:4, 62:23, 100:12
**Agent** [2] - 18:16, 20:8
**agents** [7] - 9:24, 18:14, 18:23, 19:23, 19:24, 100:10, 135:13
**aggregate** [2] - 55:16, 108:10
**ago** [2] - 8:19, 96:21
**Agora** [1] - 121:8
**agree** [10] - 5:5, 75:18, 75:19, 76:9, 77:5, 77:13, 77:15, 79:17, 80:11, 156:8
**agreed** [1] - 79:15
**ahead** [2] - 40:22, 86:17
**Alden** [1] - 3:6
**ALDEN** [1] - 1:13
**alerting** [1] - 115:13
**alerts** [1] - 115:11
**algorithm** [2] - 121:20, 122:13

**algorithms** [2] - 27:6, 124:11
**allegations** [1] - 154:20
**allege** [2] - 142:5, 142:18
**alleged** [2] - 151:10
**allegedly** [1] - 152:18
**alleges** [2] - 142:7, 151:6
**allow** [9] - 3:19, 3:20, 11:1, 35:25, 87:14, 93:24, 105:18, 107:19, 118:16
**allowed** [1] - 90:5
**allows** [3] - 15:9, 32:24, 112:20
**almost** [2] - 96:21, 143:2
**AlphaBay** [3] - 125:22, 125:25, 126:4
**alternative** [1] - 35:14
**amended** [2] - 34:17, 156:2
**Amendment** [2] - 27:23, 151:17
**AMERICA** [1] - 1:2
**America** [1] - 3:3
**American** [1] - 153:11
**amount** [7] - 36:23, 57:5, 60:10, 65:3, 65:21, 66:2, 92:19
**amounts** [3] - 90:20, 122:2, 122:9
**analysis** [107] - 9:18, 16:2, 21:16, 22:1, 22:8, 27:9, 30:12, 35:7, 35:20, 36:24, 37:1, 37:2, 37:7, 37:12, 38:17, 42:8, 42:16, 42:18, 43:12, 43:16, 43:22, 44:4, 44:6, 44:14, 44:16, 45:9, 50:15, 50:19, 51:2, 51:13, 51:15, 54:21, 55:6, 55:15, 55:16, 55:17, 56:16, 56:24, 57:4, 57:9, 58:10, 59:20, 60:7, 63:6, 63:25, 64:5, 64:6, 64:7, 64:20, 64:23, 65:3, 66:11, 67:5, 67:23, 70:11, 72:1, 72:11, 72:15, 72:20, 73:3, 73:21, 79:21, 79:25, 88:10, 89:5, 89:14, 89:18, 92:3, 92:22, 97:1, 100:8, 100:19, 100:23, 100:24,

102:18, 103:15, 103:21, 104:6, 105:1, 105:2, 105:6, 107:9, 107:17, 111:2, 112:19, 113:4, 113:15, 114:8, 114:9, 114:12, 116:5, 122:19, 123:23, 127:12, 127:13, 129:1, 130:14, 131:4, 133:14, 136:22, 139:22, 140:6, 140:11, 154:21, 155:13, 155:17, 155:25
**analyst** [21] - 8:3, 9:13, 10:8, 14:7, 14:9, 14:16, 14:22, 14:25, 15:5, 15:10, 17:4, 17:16, 19:15, 26:9, 27:25, 28:3, 28:5, 28:22, 28:24, 96:13, 100:7
**Analyst** [1] - 18:7
**analytics** [3] - 101:11, 102:13, 136:19
**analyze** [1] - 124:8
**analyzes** [1] - 74:20
**analyzing** [2] - 16:7, 74:12
**anecdotal** [6] - 90:24, 128:12, 130:20, 130:23, 130:24, 133:24
**anecdotally** [2] - 135:18, 141:11
**announcement** [1] - 72:9
**announcements** [2] - 71:22, 72:6
**announcing** [1] - 71:23
**anonymous** [1] - 97:17
**answer** [1] - 88:15
**answered** [2] - 128:7, 128:8
**anti** [1] - 150:4
**anti-money** [1] - 150:4
**anyway** [1] - 11:2
**apologize** [1] - 86:16
**appear** [2] - 4:19, 62:19
**appeared** [1] - 71:20
**application** [2] - 47:8, 48:4
**applications** [1] - 89:5
**applies** [5] - 9:2, 29:25, 75:24,

144:14, 147:22
**apply** [7] - 6:19, 21:6, 67:12, 73:4, 75:8, 147:23, 153:23
**appointed** [5] - 8:14, 8:18, 9:21, 12:7, 28:25
**appointing** [1] - 9:24
**approach** [6] - 118:2, 118:5, 118:9, 118:13, 119:7, 119:18
**appropriate** [3] - 38:21, 58:18, 108:6
**appropriately** [1] - 60:25
**Argosy** [1] - 96:5
**argue** [3] - 33:24, 34:7, 75:15
**arguing** [1] - 145:6
**argument** [8] - 6:4, 13:8, 37:21, 39:16, 40:3, 145:7, 145:19, 148:20
**arguments** [1] - 40:18
**arise** [1] - 30:21
**arrest** [1] - 93:8
**arrested** [5] - 16:14, 88:17, 141:17, 153:12, 154:8
**arrests** [1] - 141:12
**arrive** [1] - 37:23
**arrow** [1] - 82:12
**arrows** [1] - 68:23
**Article** [1] - 151:17
**article** [6] - 97:15, 123:11, 123:12, 123:13, 123:15, 124:5
**articles** [4] - 36:2, 36:5, 103:20, 123:9
**articulated** [1] - 13:17
**arts** [1] - 96:4
**aside** [3] - 21:23, 39:11, 143:21
**aspect** [1] - 154:2
**aspects** [5] - 97:24, 100:18, 102:5, 105:12, 115:17
**assailant** [1] - 143:6
**assertion** [1] - 30:10
**assertions** [1] - 32:4
**assess** [2] - 105:4, 108:9
**assessment** [6] - 58:10, 66:24, 74:15, 90:6, 90:19, 106:14
**assigned** [3] - 21:12, 41:17, 96:14
**assignment** [2] - 42:5,

42:7
**assistant** [1] - 8:13
**associated** [13] - 57:7, 60:17, 61:15, 62:21, 68:6, 68:10, 83:10, 92:1, 92:2, 101:5, 110:14, 110:17, 133:5
**association** [1] - 110:19
**assume** [3] - 4:7, 25:15, 77:20
**assumed** [1] - 77:18
**assumption** [4] - 58:6, 75:10, 75:14, 78:6
**assumption-based** [1] - 58:6
**assumptions** [9] - 24:19, 24:23, 27:2, 27:3, 27:4, 27:6, 28:9, 39:6
**atmospheric** [1] - 15:15
**attached** [2] - 60:16, 109:8
**attachment** [4] - 60:20, 109:18, 110:8, 138:3
**attachments** [9] - 59:2, 59:8, 59:11, 59:12, 64:17, 109:4, 109:7, 110:9, 113:19
**attacks** [1] - 43:9
**attempt** [1] - 71:20
**attempting** [1] - 9:3
**attempts** [1] - 61:20
**attending** [1] - 43:17
**attention** [16] - 44:17, 57:14, 59:4, 61:11, 64:13, 65:12, 68:2, 104:10, 105:21, 110:1, 113:17, 126:9, 126:15, 138:11, 138:20, 141:20
**attest** [2] - 135:8, 154:11
**attesting** [4] - 80:13, 122:24, 128:17, 129:8
**attests** [2] - 123:3, 127:23
**attitudes** [1] - 24:22
**Attorney** [2] - 8:14, 20:3
**attorney** [1] - 6:20
**Attorney's** [2] - 17:24, 19:1
**attorney's** [1] - 44:11
**attorneys** [1] - 24:1

**attribute** [2] - 62:14, 86:3
**attributed** [8] - 56:4, 56:8, 59:13, 60:25, 61:21, 62:10, 62:12, 134:24
**attribution** [12] - 19:16, 55:9, 55:13, 62:16, 63:10, 63:21, 76:6, 85:19, 85:20, 87:19, 102:5, 113:5
**attributions** [4] - 55:25, 85:7, 87:12, 120:22
**Auernheimer** [2] - 149:6, 153:5
**August** [2] - 14:16, 155:21
**aura** [1] - 7:12
**Aurum** [3] - 68:14, 68:15, 68:17
**AUSA** [3] - 3:9, 4:13, 12:7
**author** [1] - 123:19
**authorities** [1] - 149:5
**authority** [1] - 142:8
**authors** [1] - 123:19
**availability** [1] - 122:9
**available** [27] - 5:24, 23:22, 23:23, 29:11, 30:20, 31:4, 31:20, 32:6, 32:16, 32:21, 33:4, 33:8, 33:16, 36:16, 39:17, 39:18, 39:19, 39:24, 50:13, 54:14, 54:19, 55:20, 76:22, 92:7, 101:24, 105:3, 107:14
**Avenue** [3] - 1:14, 1:22, 157:11
**avoid** [2] - 10:3, 26:21
**aware** [12] - 62:14, 67:1, 67:4, 78:9, 80:12, 81:22, 89:10, 134:25, 135:22, 136:21, 139:9, 139:22

---

## B

**b)(1)(B** [1] - 149:12
**B-i-s-b-e-e** [1] - 95:22
**baby** [1] - 23:16
**bachelor's** [2] - 41:21, 96:2
**backend** [2] - 84:12, 84:13
**background** [5] - 17:21, 41:20, 96:1, 97:5, 98:1

**backing** [1] - 137:4
**bank** [7] - 45:23, 46:1, 46:23, 47:2, 96:25, 150:3
**banking** [1] - 148:4
**Bankman** [1] - 130:4
**Bankman-Fried** [1] - 130:4
**bar** [2] - 6:11, 29:15
**based** [32] - 24:19, 27:2, 27:18, 31:7, 35:25, 44:15, 58:4, 58:5, 58:6, 62:7, 68:22, 69:1, 72:24, 74:15, 81:14, 101:17, 107:21, 107:24, 108:1, 117:10, 117:16, 121:24, 125:5, 125:10, 125:23, 126:2, 127:17, 128:20, 128:23, 141:16, 147:17
**basic** [1] - 36:21
**basis** [14] - 17:1, 35:3, 35:4, 35:5, 35:24, 36:1, 36:6, 37:14, 58:3, 58:13, 87:8, 125:21, 139:5, 150:23
**beat** [1] - 17:3
**became** [7] - 8:24, 12:7, 13:5, 99:4, 99:8, 100:12, 102:20
**Beckett** [2] - 19:25, 20:8
**becomes** [3] - 8:13, 15:11, 28:25
**BEFORE** [1] - 1:8
**beforehand** [1] - 8:22
**begin** [2] - 96:7, 96:17
**beginning** [3] - 15:1, 42:22, 93:17
**begins** [1] - 82:15
**behalf** [1] - 20:14
**behavior** [5] - 66:1, 75:8, 75:14, 106:9, 107:10
**behavioral** [17] - 79:25, 80:14, 106:8, 107:13, 110:24, 111:2, 112:9, 125:4, 125:8, 127:9, 127:12, 127:13, 127:16, 127:17, 127:24, 137:10, 137:24
**behind** [4] - 27:5, 106:14, 113:5, 127:19

**belabor** [1] - 35:10
**belief** [1] - 8:11
**belies** [1] - 20:23
**belong** [9] - 55:7, 55:12, 56:3, 61:22, 62:7, 63:12, 63:13, 66:21, 85:14
**belonged** [1] - 66:21
**belonging** [1] - 62:9
**belongs** [3] - 46:18, 55:12, 62:18
**bench** [1] - 4:15
**best** [3] - 32:10, 106:11, 157:6
**Beth** [1] - 99:7
**better** [2] - 39:11, 120:17
**between** [11] - 5:20, 17:23, 62:5, 64:2, 64:9, 65:17, 83:19, 87:4, 132:19, 132:24, 133:4
**beyond** [7] - 87:6, 102:9, 143:13, 143:15, 151:7, 151:11, 155:17
**bias** [3] - 26:6, 26:22, 34:5
**biased** [1] - 27:9
**biases** [1] - 26:20
**Bice** [5] - 9:15, 20:12, 20:13, 28:7
**big** [3] - 14:17, 84:11, 154:9
**bill** [4] - 50:7, 50:8, 50:9, 107:1
**binder** [5] - 41:1, 44:17, 59:5, 95:9, 104:11
**birth** [2] - 46:7, 46:18
**Bisbee** [21] - 21:24, 40:7, 78:16, 80:23, 95:7, 95:18, 95:20, 95:22, 95:23, 104:25, 110:1, 113:21, 117:9, 117:22, 119:4, 129:24, 134:5, 136:16, 137:15, 138:19, 139:17
**BISBEE** [5] - 2:10, 95:16, 119:2, 134:3, 139:15
**Bisbee's** [1] - 80:4
**bit** [12] - 10:10, 17:21, 45:7, 52:15, 56:6, 80:5, 97:18, 102:25, 122:11, 131:11, 133:21, 143:20
**bitcoin** [34] - 45:19,

46:5, 46:25, 47:5, 47:7, 48:3, 48:6, 49:2, 49:3, 49:4, 49:5, 49:8, 49:10, 49:13, 49:14, 49:15, 49:20, 49:22, 49:23, 49:24, 50:2, 50:3, 50:17, 66:2, 71:20, 82:11, 83:9, 84:18, 91:20, 98:19, 107:6, 152:17

**Bitcoin** [157] - 8:4, 14:17, 17:22, 18:10, 19:17, 19:18, 21:2, 21:7, 22:4, 22:20, 25:18, 28:23, 45:17, 47:12, 47:13, 47:14, 47:18, 47:19, 47:21, 47:23, 48:7, 48:8, 48:10, 48:21, 49:1, 49:21, 50:18, 52:1, 52:4, 52:6, 52:12, 52:20, 52:23, 53:5, 53:7, 53:21, 53:23, 53:25, 54:8, 55:20, 56:3, 56:25, 57:3, 57:6, 59:15, 59:20, 60:10, 60:14, 60:17, 60:20, 60:25, 61:15, 61:18, 61:19, 61:22, 61:25, 62:3, 62:6, 62:7, 62:9, 62:10, 62:12, 62:14, 62:19, 62:20, 62:21, 62:22, 62:25, 63:1, 63:3, 63:4, 63:7, 63:17, 64:1, 64:2, 64:10, 65:4, 65:6, 65:16, 65:18, 65:19, 65:20, 65:22, 67:3, 67:6, 67:9, 67:17, 68:8, 68:9, 68:12, 68:22, 68:24, 69:1, 69:2, 69:8, 70:14, 70:24, 71:1, 71:9, 71:12, 71:23, 72:6, 72:9, 72:13, 72:16, 72:25, 74:24, 76:2, 76:4, 82:13, 83:9, 83:24, 84:20, 86:8, 86:22, 86:25, 87:5, 90:1, 90:9, 90:10, 92:5, 92:13, 92:17, 92:18, 97:3, 97:6, 97:9, 106:22, 108:7, 109:1, 109:9, 109:14, 110:4, 110:5, 110:6, 110:11, 110:14, 110:16, 111:8, 111:12, 111:20,

112:5, 112:11, 112:14, 123:8, 126:10, 126:12, 126:18, 128:2, 137:17, 150:9, 152:18, 154:5

**BitcoinFog_ addresses.csv** [1] - 110:8

**bitcoins** [1] - 93:13
**Bitcointalk** [1] - 71:23
**block** [14] - 48:11, 51:18, 51:23, 51:25, 53:13, 53:16, 54:4, 55:22, 69:6, 69:20, 76:25, 101:1, 107:19, 124:3

**blockchain** [125] - 23:21, 35:20, 36:19, 36:24, 37:1, 37:2, 42:8, 42:16, 42:18, 43:12, 43:16, 43:22, 44:2, 44:4, 44:6, 44:14, 44:15, 45:8, 47:15, 48:10, 48:15, 50:13, 50:15, 50:18, 50:19, 50:20, 51:13, 51:15, 52:2, 52:4, 52:6, 52:8, 52:12, 52:21, 52:23, 53:7, 53:15, 53:17, 53:21, 53:23, 53:25, 54:9, 54:21, 54:25, 55:5, 55:18, 55:19, 56:16, 56:24, 60:10, 63:25, 65:20, 67:20, 67:24, 68:8, 68:22, 68:24, 68:25, 69:2, 69:8, 69:10, 70:7, 72:25, 73:3, 73:21, 76:4, 76:10, 76:14, 76:15, 76:16, 76:22, 76:24, 82:13, 83:24, 84:20, 85:2, 85:3, 85:6, 85:15, 85:18, 85:23, 87:11, 89:4, 89:13, 89:17, 92:18, 97:11, 97:16, 97:19, 100:8, 100:19, 100:23, 100:24, 102:13, 102:18, 103:4, 103:15, 103:21, 104:6, 105:1, 105:2, 105:4, 105:6, 106:10, 106:13, 106:19, 106:20, 107:5, 107:15, 112:19, 113:25, 114:12, 123:12, 125:6, 128:4, 129:1,

133:17, 136:12, 136:18, 136:22, 137:5, 137:7, 155:13, 155:17, 155:25

**blockchain.com** [1] - 52:2
**blockchair.com** [1] - 52:3
**blue** [2] - 62:6, 62:8
**board** [1] - 149:10
**bolstering** [1] - 7:8
**books** [2] - 36:3, 36:5
**borders** [1] - 12:4
**bother** [1] - 94:10
**bottom** [5] - 57:19, 61:12, 61:14, 65:13, 92:15
**bought** [1] - 46:25
**box** [6] - 62:5, 62:6, 62:8, 62:10, 65:23, 92:10
**break** [4] - 40:12, 40:13, 94:15, 107:5
**breaking** [1] - 56:6
**brief** [7] - 29:21, 29:24, 30:8, 93:25, 147:11, 148:25, 149:23
**briefing** [4] - 4:8, 4:9, 5:3, 7:4
**briefly** [8] - 24:12, 41:19, 43:23, 88:21, 95:25, 103:1, 132:23, 137:15
**bring** [5] - 12:3, 12:5, 31:11, 34:11, 141:20
**bringing** [6] - 9:18, 11:3, 11:14, 11:23, 31:9, 153:21
**Britain** [3] - 153:18, 153:20, 153:21
**broader** [1] - 111:25
**brought** [6] - 11:13, 11:23, 12:1, 20:20, 138:11, 138:19
**Brown** [7] - 3:10, 13:17, 17:9, 27:19, 29:19, 73:7, 141:24
**brown** [1] - 148:22
**BROWN** [28] - 1:10, 3:9, 4:7, 7:23, 17:10, 17:17, 22:22, 40:1, 94:21, 143:8, 143:13, 143:18, 143:25, 144:19, 145:3, 145:15, 146:6, 146:12, 146:18, 147:3, 148:2, 148:6,

148:12, 148:24, 149:20, 149:22, 150:7, 150:21
**building** [1] - 140:22
**bulk** [1] - 64:6
**burden** [3] - 30:16, 36:18, 142:24
**Bureau** [1] - 41:16
**business** [10] - 47:23, 118:18, 146:22, 146:24, 146:25, 147:4, 147:24, 149:13, 149:14, 150:2
**busy** [2] - 19:7, 56:23
**buy** [2] - 45:19, 50:6
**buying** [1] - 46:5
**buzzwords** [1] - 5:14
**BY** [26] - 41:11, 45:6, 53:19, 58:25, 60:5, 73:17, 86:19, 87:16, 89:1, 91:12, 94:4, 95:17, 98:25, 104:24, 109:25, 117:8, 117:21, 118:11, 119:3, 128:10, 129:23, 131:21, 134:4, 138:18, 138:25, 139:16

## C

**Cabanas** [1] - 26:25
**Cabanas'** [1] - 35:19
**calculate** [1] - 55:17
**calendar** [1] - 32:24
**cannot** [8] - 5:8, 74:4, 74:7, 74:10, 74:13, 79:22, 87:10, 130:21
**capacity** [1] - 62:1
**capture** [1] - 83:23
**captures** [1] - 83:25
**career** [3] - 26:3, 70:19, 101:6
**careerism** [1] - 23:15
**carry** [1] - 142:23
**case** [161] - 5:6, 5:8, 5:18, 6:2, 6:3, 6:7, 6:9, 7:12, 7:15, 7:17, 8:2, 8:6, 8:12, 8:15, 8:17, 8:18, 8:24, 9:4, 9:6, 9:13, 9:14, 9:24, 10:3, 10:4, 10:9, 11:3, 11:11, 11:18, 11:21, 11:22, 11:23, 11:25, 12:1, 12:3, 12:8, 12:9, 12:15, 12:21, 12:22, 12:24, 13:5, 13:12, 13:15,

13:24, 14:6, 14:10, 14:22, 15:6, 15:10, 15:15, 16:6, 16:17, 17:16, 17:19, 19:5, 19:9, 19:13, 19:23, 20:18, 20:19, 20:21, 21:13, 21:20, 21:22, 21:23, 22:17, 22:18, 23:10, 23:13, 23:15, 24:4, 24:5, 24:9, 24:20, 25:1, 25:2, 25:3, 25:6, 25:7, 25:8, 25:9, 25:21, 26:3, 26:4, 27:25, 28:3, 28:5, 28:14, 28:16, 28:19, 28:22, 29:1, 29:18, 30:6, 30:14, 30:17, 30:24, 31:1, 31:3, 31:10, 31:11, 31:13, 31:14, 31:16, 31:21, 31:22, 31:23, 32:3, 32:5, 37:12, 44:23, 51:8, 51:14, 56:25, 57:22, 60:7, 62:12, 62:13, 65:18, 70:16, 84:16, 85:11, 88:12, 88:16, 96:15, 99:1, 100:5, 103:11, 103:12, 103:13, 105:24, 108:7, 114:20, 128:2, 134:16, 141:6, 142:3, 142:15, 143:9, 144:5, 147:11, 147:13, 147:17, 147:22, 148:19, 148:25, 149:6, 150:14, 150:17, 152:2, 153:4, 153:6, 154:4, 154:9, 155:19
**Case** [1] - 3:2
**cases** [27] - 5:19, 5:25, 12:6, 43:4, 43:6, 43:8, 56:17, 65:9, 70:8, 71:16, 78:11, 78:24, 96:17, 96:20, 99:10, 99:15, 100:3, 102:1, 102:10, 109:13, 138:10, 138:11, 140:2, 150:18, 151:2, 151:5, 151:9
**cashier** [2] - 50:8, 50:10
**categorically** [2] - 6:15, 144:6
**central** [1] - 16:13
**certain** [8] - 5:6, 6:1, 6:19, 8:22, 24:2,

24:4, 26:25, 121:7
**certainly** [10] - 11:10, 13:18, 16:9, 27:11, 29:24, 36:22, 130:17, 151:19, 152:2, 153:3
**certainty** [1] - 26:19
**CERTIFICATE** [1] - 157:1
**certification** [4] - 43:24, 43:25, 73:20, 73:24
**certifications** [4] - 43:20, 43:22, 43:24, 128:25
**certified** [1] - 102:21
**certify** [1] - 157:3
**chain** [9] - 65:24, 65:25, 66:1, 66:5, 66:8, 66:9, 66:10, 66:21, 85:14
**Chainalysis** [197] - 5:15, 5:16, 5:18, 9:5, 9:18, 14:4, 14:11, 14:25, 15:2, 16:1, 16:3, 16:4, 16:5, 16:10, 17:6, 19:20, 20:15, 21:16, 21:20, 21:22, 22:5, 22:19, 23:20, 24:25, 26:12, 27:1, 28:8, 43:19, 43:22, 43:25, 54:15, 55:18, 55:22, 55:25, 56:5, 56:7, 59:13, 59:15, 60:20, 60:21, 61:6, 61:21, 61:24, 62:10, 62:13, 62:16, 63:8, 63:10, 63:11, 63:17, 63:24, 64:6, 64:8, 69:12, 69:14, 69:17, 69:19, 70:25, 73:21, 73:25, 74:3, 74:6, 74:9, 74:12, 74:15, 74:20, 74:23, 75:1, 75:19, 75:23, 76:1, 76:3, 76:8, 76:10, 77:2, 77:6, 77:10, 78:10, 78:14, 78:17, 78:20, 78:22, 79:1, 79:4, 79:7, 79:11, 79:20, 79:24, 80:25, 81:2, 81:4, 89:21, 94:7, 94:9, 94:10, 95:24, 101:9, 101:15, 101:25, 102:1, 102:3, 102:6, 102:23, 102:25, 103:2, 103:8, 106:4, 107:18, 107:21, 108:5, 108:9,

110:10, 110:15, 112:14, 112:17, 113:24, 114:15, 114:23, 114:24, 115:3, 115:4, 117:9, 117:23, 118:12, 118:18, 119:7, 119:8, 119:10, 119:14, 119:15, 119:20, 119:23, 120:1, 120:3, 120:4, 120:6, 120:8, 120:10, 120:12, 120:19, 121:6, 121:14, 121:19, 122:13, 122:20, 122:25, 123:4, 123:20, 124:7, 124:11, 125:8, 127:15, 127:25, 128:13, 128:18, 128:25, 129:12, 129:15, 130:10, 130:16, 130:19, 131:4, 131:10, 131:15, 131:22, 132:1, 132:3, 132:4, 132:8, 132:11, 132:16, 133:17, 134:6, 134:8, 134:12, 134:17, 134:22, 134:25, 135:5, 135:16, 135:22, 136:1, 136:4, 138:19, 138:21, 139:4, 139:19, 139:22, 139:23, 140:6, 140:7, 140:11, 141:16, 154:22
**Chainalysis's** [12] - 16:2, 16:8, 21:20, 56:13, 62:19, 89:17, 117:24, 123:24, 127:24, 130:24, 132:10, 134:10
**challenge** [2] - 36:18, 37:12
**challenged** [2] - 13:6, 24:18
**challenging** [4] - 22:24, 36:20, 38:23, 143:14
**chance** [1] - 36:11
**change** [19] - 50:3, 50:10, 50:24, 66:4, 66:6, 66:7, 77:20, 90:19, 90:20, 106:21, 106:24, 107:7, 107:9, 111:1,

113:4, 114:9, 137:9
**changes** [1] - 53:21
**changing** [1] - 10:22
**charged** [4] - 20:19, 20:21, 141:15, 149:1
**chart** [16] - 61:11, 61:14, 61:20, 65:12, 65:14, 65:15, 65:17, 67:14, 68:3, 68:4, 69:20, 71:7, 71:8, 83:1, 91:17, 92:4
**Chaumian** [1] - 78:19
**check** [6] - 13:1, 53:15, 56:3, 73:6, 84:15, 84:25
**checked** [1] - 84:21
**checking** [1] - 16:7
**chief** [1] - 23:11
**child** [1] - 141:16
**CHRISTOPHER** [1] - 1:10
**Christopher** [1] - 3:10
**CI** [6] - 28:7, 60:9, 61:19, 62:22, 62:24, 87:23
**Ciphertrace** [1] - 101:10
**Circuit** [7] - 5:4, 7:15, 29:9, 29:14, 142:10
**circuit** [3] - 5:4, 5:5, 149:6
**circumstance** [1] - 23:12
**circumstances** [1] - 156:8
**citation** [1] - 24:20
**cite** [12] - 12:15, 58:7, 74:11, 79:18, 122:18, 122:24, 123:10, 126:5, 127:14, 128:5, 129:8, 147:11
**cited** [6] - 5:3, 7:15, 58:5, 130:22, 148:25, 151:1
**cites** [1] - 29:23
**civil** [1] - 147:22
**claim** [2] - 6:25, 20:24
**clarification** [2] - 111:9, 155:12
**clarify** [1] - 75:22
**classic** [1] - 153:6
**clause** [2] - 153:14, 153:17
**clear** [12] - 14:21, 17:3, 23:14, 35:19, 68:21, 69:12, 76:20, 108:12, 143:10, 147:5, 152:23, 156:2
**CLEAR** [1] - 23:24

**clearly** [1] - 92:14
**Clerk** [1] - 33:18
**clerk** [4] - 8:20, 39:14, 39:17, 94:19
**click** [1] - 48:6
**clients** [3] - 130:25, 132:11, 133:18
**cloaking** [1] - 7:11
**close** [1] - 31:7
**closer** [1] - 137:23
**cluster** [33] - 55:11, 59:15, 62:6, 62:12, 62:18, 62:19, 63:7, 63:9, 63:12, 63:13, 63:16, 63:17, 64:1, 65:6, 67:6, 71:1, 71:9, 78:20, 79:1, 79:3, 105:11, 110:6, 110:16, 111:4, 111:8, 111:12, 111:20, 112:6, 112:8, 113:2, 125:22, 126:12, 137:17
**clustered** [3] - 56:7, 118:8, 138:21
**clustering** [23] - 54:22, 55:4, 56:13, 75:25, 76:4, 78:12, 106:2, 106:4, 106:5, 107:22, 107:25, 108:1, 108:6, 108:10, 118:2, 118:5, 119:7, 121:7, 121:9, 121:11, 126:18, 127:2, 137:16
**clusters** [11] - 55:25, 61:6, 76:6, 108:25, 109:10, 113:7, 113:14, 114:20, 114:24, 134:13, 139:3
**co** [50] - 6:5, 18:4, 19:4, 19:17, 23:16, 39:25, 51:1, 77:14, 77:22, 78:4, 78:15, 79:1, 79:6, 79:16, 79:20, 105:15, 106:5, 107:13, 110:20, 112:9, 112:24, 113:1, 113:3, 113:21, 114:8, 121:14, 121:17, 121:25, 122:7, 123:4, 123:6, 123:7, 123:16, 123:24, 124:2, 124:4, 124:5, 124:9, 125:3, 126:20,

126:23, 127:4, 127:8, 137:9, 137:20, 137:24, 138:2, 138:3
**co-counsel** [5] - 6:5, 18:4, 19:4, 19:17, 39:25
**co-counsel's** [1] - 23:16
**co-spend** [37] - 51:1, 77:22, 79:6, 105:15, 106:5, 107:13, 110:20, 112:9, 112:24, 113:1, 113:3, 113:21, 114:8, 121:14, 121:17, 121:25, 122:7, 123:4, 123:6, 123:7, 123:16, 123:24, 124:2, 124:4, 124:5, 124:9, 125:3, 126:20, 127:4, 127:8, 137:9, 137:20, 137:24, 138:2, 138:3
**co-spending** [5] - 77:14, 78:4, 78:15, 79:16, 79:20
**co-spends** [1] - 79:1
**co-spent** [1] - 126:23
**code** [4] - 72:25, 81:5, 122:14, 124:12
**codes** [1] - 68:11
**codified** [1] - 53:1
**coffee** [3] - 50:5, 50:6
**coffers** [2] - 91:23, 91:24
**cognitive** [1] - 34:5
**coin** [1] - 79:8
**Coinbase** [3] - 45:21, 101:10, 150:11
**coinjoin** [32] - 77:24, 78:1, 78:2, 78:4, 78:5, 78:14, 78:24, 79:2, 79:5, 79:8, 79:11, 79:15, 89:16, 89:17, 90:1, 90:16, 90:22, 91:8, 114:3, 114:4, 114:9, 114:11, 114:16, 114:18, 121:25, 122:1, 122:5, 122:14, 122:20, 124:9, 125:2
**coinjoins** [17] - 78:9, 78:19, 78:22, 79:7, 79:20, 89:19, 89:22, 89:23, 90:12, 90:23, 90:24, 121:16, 121:21, 121:22,

124:12, 124:19, 124:23

**colleagues** [3] - 4:14, 56:16, 135:15

**collect** [7] - 46:4, 46:6, 53:14, 117:5, 117:9, 119:9, 119:18

**collected** [1] - 25:4

**collection** [1] - 108:3

**collects** [1] - 119:14

**Columbia** [13] - 17:25, 18:5, 19:1, 144:16, 145:4, 145:25, 147:9, 147:14, 147:18, 147:19, 147:25, 148:9, 148:13

**COLUMBIA** [1] - 1:1

**combination** [1] - 106:16

**combinations** [1] - 145:17

**combine** [3] - 49:15, 67:19, 78:3

**combining** [1] - 67:24

**coming** [3] - 65:4, 67:3, 91:18

**comments** [1] - 4:11

**commercial** [6] - 54:15, 54:18, 54:20, 101:7, 101:9, 101:16

**commercially** [1] - 101:24

**common** [15] - 45:15, 45:16, 51:2, 67:23, 68:1, 76:21, 105:14, 106:2, 110:21, 110:22, 112:1, 122:7, 128:2, 137:9

**commonalities** [1] - 112:4

**commonly** [2] - 47:20, 123:7

**communicates** [1] - 54:5

**communications** [5] - 14:4, 19:20, 20:12, 20:14, 87:4

**communities** [1] - 103:22

**companies** [4] - 43:20, 103:24, 120:1, 131:23

**company** [2] - 63:22, 103:2

**compared** [1] - 61:5

**compel** [2] - 14:19, 16:25

**compelling** [8] - 5:11, 6:9, 13:20, 15:8,

29:8, 30:18, 31:3, 32:7

**competitor** [1] - 63:24

**complaint** [15] - 15:19, 16:13, 20:1, 20:5, 20:7, 20:10, 81:10, 81:15, 81:18, 81:19, 81:23, 82:4, 82:7, 82:8, 144:23

**complete** [3] - 57:11, 108:18, 157:5

**completed** [1] - 57:16

**compliance** [15] - 103:6, 116:9, 118:17, 129:15, 130:10, 130:25, 131:23, 132:5, 132:7, 132:10, 132:12, 132:16, 134:12, 136:2, 150:3

**compliant** [1] - 116:10

**complicated** [1] - 83:7

**comply** [3] - 34:13, 35:13, 37:16

**component** [1] - 99:6

**components** [3] - 97:25, 98:21, 100:18

**compulsion** [1] - 7:7

**computer** [8] - 35:8, 36:21, 37:4, 37:5, 38:11, 43:6, 47:18, 152:13

**computers** [2] - 37:6, 102:16

**concede** [1] - 17:19

**concepts** [1] - 45:8

**concern** [2] - 153:22, 153:24

**concerned** [3] - 153:7, 153:9, 153:11

**concerns** [2] - 21:7, 153:19

**conclude** [3] - 11:18, 34:8, 146:4

**conclusions** [4] - 36:2, 37:16, 38:13, 58:5

**conclusory** [2] - 58:9, 58:14

**concurrence** [2] - 143:17, 143:20

**concurring** [1] - 142:9

**conduct** [8] - 57:4, 64:19, 98:15, 100:10, 100:22, 147:24, 153:3, 153:5

**conducted** [4] - 35:6, 60:9, 112:14, 144:15

**conducting** [2] - 60:7, 92:22

**conferences** [2] - 43:18, 103:25

**confident** [1] - 92:3

**confirm** [5] - 87:3, 112:20, 129:2, 133:16, 146:13

**confirmation** [6] - 26:6, 26:8, 26:20, 26:21, 69:23, 129:3

**confirmed** [2] - 63:21, 124:4

**confirming** [1] - 113:5

**confirms** [2] - 84:20, 113:1

**conflicts** [1] - 33:21

**confront** [1] - 30:2

**confusion** [3] - 6:25, 7:1, 7:10

**connect** [1] - 131:18

**connected** [3] - 72:12, 72:16, 92:22

**Connection** [1] - 8:21

**connection** [1] - 130:18

**connects** [1] - 83:18

**conservative** [10] - 62:17, 63:11, 118:2, 118:5, 118:9, 118:13, 118:22, 119:7, 119:18, 138:14

**consider** [5] - 12:10, 124:19, 124:23, 133:14, 141:20

**considered** [2] - 12:17, 105:19

**consistent** [3] - 62:15, 76:4, 122:3

**consists** [1] - 147:3

**consolidate** [1] - 111:17

**consolidation** [4] - 111:14, 111:18, 111:23, 112:2

**conspiracy** [2] - 149:25, 150:20

**constitutes** [2] - 150:19, 157:4

**Constitution** [6] - 1:22, 15:9, 151:17, 153:15, 154:1, 157:11

**constitutional** [1] - 154:15

**construct** [1] - 49:11

**consultation** [2] - 11:25, 42:10

**contact** [2] - 14:18, 99:8

**contain** [1] - 47:21

**contained** [3] - 69:24, 71:1, 85:23

**containing** [2] - 109:9, 110:9

**contains** [4] - 30:9, 58:5, 62:8, 126:12

**contents** [1] - 93:4

**contest** [1] - 29:24

**context** [3] - 4:16, 51:22, 101:21

**continue** [1] - 47:1

**continued** [1] - 156:5

**contracting** [2] - 5:17, 6:4

**contracts** [2] - 120:13, 120:17

**contrary** [1] - 29:20

**contrasted** [1] - 149:7

**Contreras** [2] - 147:20, 148:21

**contribution** [1] - 88:12

**control** [4] - 33:14, 50:25, 56:12, 114:15

**controlled** [11] - 51:10, 60:14, 66:12, 67:10, 72:9, 77:21, 105:7, 105:11, 110:5, 110:11, 112:12

**controlling** [1] - 85:8

**controls** [6] - 15:23, 51:7, 78:6, 91:19, 121:22, 121:23

**controversial** [1] - 38:12

**convenient** [1] - 12:21

**conveniently** [1] - 52:11

**conversations** [2] - 28:1, 28:6

**converted** [2] - 68:11, 68:13

**convey** [1] - 52:19

**convinced** [1] - 31:8

**copy** [4] - 44:19, 57:16, 94:18, 104:11

**core** [1] - 20:22

**corner** [1] - 91:7

**corners** [3] - 143:13, 143:15, 151:3

**correct** [101] - 13:2, 13:18, 15:21, 17:14, 29:24, 49:17, 54:1, 54:12, 59:21, 62:4, 73:25, 74:21, 74:22, 74:24, 74:25, 76:11, 77:3, 77:7, 77:21, 78:7, 79:6, 79:16, 79:25, 80:22, 81:16,

81:18, 82:21, 82:22, 82:25, 83:5, 83:22, 84:4, 84:7, 84:11, 85:19, 85:24, 86:22, 86:25, 87:1, 88:5, 88:11, 88:17, 88:18, 94:7, 94:8, 95:2, 107:23, 109:3, 109:15, 113:20, 119:15, 119:16, 120:1, 120:2, 120:4, 120:5, 120:7, 120:14, 120:23, 120:24, 121:1, 121:2, 121:8, 121:14, 121:15, 121:17, 121:18, 121:21, 123:20, 123:21, 123:25, 124:9, 125:4, 126:20, 126:21, 128:12, 128:14, 128:21, 129:10, 129:15, 129:25, 130:5, 130:8, 130:10, 131:23, 132:8, 132:11, 132:21, 133:8, 134:9, 134:23, 136:20, 137:21, 138:1, 138:4, 138:5, 138:22, 140:7, 143:1, 145:19, 147:8

**corrected** [1] - 16:13

**correction** [2] - 17:18, 62:23

**correctly** [4] - 73:22, 119:8, 120:21, 125:22

**corresponding** [2] - 113:11, 113:18

**corroborate** [5] - 67:5, 70:8, 70:10, 112:8, 135:10

**corroborated** [3] - 135:6, 135:19, 136:11

**corroborating** [1] - 60:13

**corrupt** [1] - 130:3

**costs** [1] - 107:2

**counsel** [20] - 3:4, 3:5, 4:14, 6:5, 18:4, 19:4, 19:17, 19:19, 21:19, 22:3, 29:7, 32:10, 32:19, 33:3, 34:18, 39:25, 91:13, 92:9, 136:16, 155:2

**counsel's** [2] - 4:11, 23:16

Count [1] - 144:21
count [4] - 87:21, 145:13, 145:20
country [1] - 135:24
counts [4] - 145:13, 145:17, 149:19, 149:22
couple [2] - 75:22, 141:22
course [10] - 6:6, 11:6, 19:14, 23:4, 30:25, 102:4, 102:12, 102:13, 102:21
courses [1] - 44:1
Court [29] - 1:21, 1:21, 3:19, 4:8, 7:16, 9:22, 10:25, 11:6, 20:20, 21:4, 34:2, 36:17, 38:24, 75:6, 77:17, 130:2, 132:23, 133:13, 138:6, 142:12, 144:9, 144:12, 148:25, 149:4, 150:22, 151:20, 152:19, 155:1, 157:10
court [11] - 3:13, 19:8, 24:18, 29:11, 33:9, 40:11, 104:5, 108:2, 125:16, 149:6, 150:18
COURT [164] - 1:1, 3:8, 3:11, 3:14, 3:17, 7:20, 7:24, 8:1, 8:19, 9:7, 9:9, 10:1, 10:12, 10:16, 11:1, 11:8, 11:21, 12:12, 12:15, 13:1, 13:7, 13:13, 14:12, 15:2, 15:13, 16:1, 16:19, 16:22, 17:8, 17:12, 21:1, 21:15, 21:25, 22:11, 22:21, 24:10, 25:1, 26:8, 27:8, 27:14, 28:2, 28:15, 28:18, 29:2, 32:14, 32:25, 33:6, 33:18, 34:3, 34:6, 34:17, 35:2, 35:21, 36:14, 36:22, 37:3, 37:9, 37:14, 37:20, 37:25, 39:2, 39:7, 39:10, 40:2, 40:9, 40:17, 41:3, 45:2, 45:4, 52:18, 53:4, 53:18, 58:1, 58:15, 59:24, 60:2, 73:8, 73:11, 73:13, 86:11, 86:14, 86:17, 87:6, 87:14, 88:20, 88:23, 90:4, 90:21,

91:2, 91:10, 93:20, 93:23, 94:1, 94:14, 94:18, 94:22, 95:2, 95:10, 98:4, 104:20, 104:22, 109:19, 109:22, 115:20, 115:24, 116:3, 116:17, 116:21, 116:24, 117:1, 117:4, 117:13, 118:10, 118:25, 128:8, 129:20, 130:11, 131:2, 131:14, 131:20, 133:11, 138:9, 138:24, 139:13, 140:16, 140:19, 141:5, 141:10, 141:19, 143:12, 143:16, 143:21, 144:17, 145:2, 145:12, 145:21, 146:9, 146:15, 146:19, 147:23, 148:5, 148:10, 148:23, 149:19, 149:21, 150:5, 150:16, 150:24, 151:5, 151:9, 151:19, 151:25, 152:4, 153:8, 153:16, 153:23, 154:16, 155:3, 155:6, 155:9, 155:15, 156:8, 156:12, 157:1
court's [3] - 73:6, 93:19, 116:22
Court's [3] - 32:24, 40:25, 95:8
Courthouse [1] - 1:22
courtroom [1] - 130:19
COURTROOM [6] - 3:2, 39:20, 41:5, 41:8, 95:11, 95:14
courts [5] - 6:12, 143:13, 143:15, 147:5, 151:11
covered [1] - 81:7
covers [1] - 80:4
Crawford [3] - 29:23, 29:25, 30:10
CRC [2] - 1:21, 157:9
create [6] - 45:22, 49:7, 50:2, 79:11, 100:9, 114:19
created [2] - 102:11, 120:12
creates [2] - 50:10,

53:13
credibility [1] - 116:15
crime [8] - 146:22, 147:3, 148:8, 149:1, 149:3, 152:15, 152:21, 154:3
Crimes [1] - 145:9
crimes [1] - 148:7
Criminal [3] - 1:2, 3:2, 17:24
criminal [24] - 8:16, 11:21, 13:4, 15:18, 16:13, 20:1, 20:4, 20:7, 20:9, 35:22, 70:16, 81:10, 81:15, 81:19, 81:23, 82:4, 82:6, 82:7, 96:3, 113:23, 135:1, 144:23, 152:22, 154:14
criminally [1] - 130:7
critical [4] - 17:15, 25:6, 31:17, 37:11
CROSS [2] - 73:15, 119:1
Cross [2] - 2:6, 2:13
cross [14] - 15:7, 18:12, 19:23, 20:2, 20:6, 20:8, 20:11, 20:13, 27:12, 28:11, 28:14, 28:21, 38:22, 89:20
cross-examination [2] - 38:22, 89:20
CROSS-EXAMINATION [2] - 73:15, 119:1
Cross-Examination [2] - 2:6, 2:13
cross-examine [11] - 15:7, 19:23, 20:2, 20:6, 20:8, 20:11, 20:13, 27:12, 28:11, 28:14, 28:21
cross-referencing [1] - 18:12
CRR [2] - 1:21, 157:9
crucial [2] - 115:14, 115:18
cryptocurrencies [1] - 47:17
cryptocurrency [30] - 42:6, 42:7, 44:1, 44:6, 44:14, 45:8, 45:12, 45:21, 45:23, 46:5, 46:23, 60:11, 96:18, 96:21, 96:22, 97:22, 98:11, 98:17, 98:24, 99:3, 99:5, 99:6, 99:13, 99:15,

99:25, 100:1, 100:13, 102:9, 104:6, 153:10
Cryptocurrency [2] - 41:18, 44:11
CSV [1] - 109:7
CSVs [1] - 59:19
curious [4] - 117:14, 133:14, 138:15, 142:16
currency [17] - 42:11, 42:15, 42:20, 42:23, 42:25, 43:2, 43:11, 44:9, 45:11, 45:12, 45:15, 46:2, 46:21, 67:20, 92:24, 93:14
current [5] - 19:22, 42:5, 42:7, 44:15, 103:8
curriculum [2] - 44:19, 104:12
custodial [2] - 83:11, 84:7
customer [3] - 46:16, 117:23, 150:11
customers [6] - 134:11, 134:19, 136:5, 140:9, 140:10, 140:13
cut [2] - 79:13
CV [2] - 42:24, 45:1
cyber [3] - 42:1, 43:18, 102:12
cybercriminal [2] - 43:7

## D

D.C [19] - 1:5, 8:12, 10:11, 10:25, 11:3, 11:4, 11:19, 12:3, 145:8, 146:20, 146:21, 147:1, 148:3, 148:11, 152:11, 152:22, 153:6, 157:11
D.C.-specific [1] - 148:20
darknet [14] - 22:5, 22:20, 43:10, 59:13, 64:3, 64:9, 97:3, 97:6, 99:7, 99:19, 99:22, 109:1, 113:8, 121:7
DAT [1] - 69:10
data [34] - 23:21, 52:6, 52:8, 52:12, 52:15, 54:10, 54:25, 55:18, 60:6, 67:25, 69:9, 70:6, 76:1, 80:22,

84:15, 84:22, 84:25, 101:22, 107:12, 108:2, 108:4, 110:15, 115:10, 115:14, 116:6, 116:7, 116:12, 117:5, 117:16, 125:16, 125:18, 136:11, 140:12
database [6] - 23:23, 23:24, 26:22, 84:23, 84:25, 85:1
databases [2] - 18:13, 23:25
date [7] - 33:19, 40:3, 42:23, 46:7, 46:18, 57:18, 92:18
Dated [1] - 157:7
dates [2] - 88:14, 146:13
Daubert [18] - 34:7, 34:15, 35:22, 36:11, 36:18, 37:10, 37:20, 38:25, 39:3, 40:20, 58:17, 58:19, 59:25, 60:3, 87:7, 133:14, 156:3, 156:5
DC [3] - 1:12, 1:14, 1:23
de [1] - 38:17
DEA [23] - 96:11, 96:16, 99:2, 99:5, 99:9, 99:11, 99:16, 99:17, 99:25, 100:13, 100:20, 101:6, 101:13, 101:25, 102:4, 102:8, 102:14, 102:20, 102:22, 102:23, 135:8, 138:24, 139:1
DEA's [1] - 102:11
deadline [1] - 155:2
dealing [2] - 46:1, 46:23
deals [1] - 78:14
death [1] - 17:3
debate [1] - 76:2
debriefed [1] - 135:13
decade [2] - 8:16, 96:21
December [2] - 19:6, 57:18
decentralized [2] - 45:13, 52:25
decide [3] - 90:16, 91:7, 150:22
decided [1] - 25:10
deciding [2] - 12:18, 143:4

decision [4] - 11:24, 20:21, 26:14, 31:11
decisions [2] - 15:6, 16:6
declaration [3] - 57:9, 82:6, 88:13
defeats [1] - 78:5
defect [2] - 144:4, 144:5
defective [1] - 152:25
defendant [7] - 5:6, 5:23, 29:10, 30:11, 71:4, 108:13, 148:17
Defendant [4] - 1:6, 1:15, 3:13, 3:16
defendant's [8] - 6:22, 29:12, 37:5, 65:6, 69:24, 92:5, 92:12, 149:5
defendants [4] - 6:13, 6:21, 135:14, 135:19
defense [55] - 4:11, 4:14, 5:11, 5:12, 5:18, 7:5, 7:18, 8:16, 10:15, 11:10, 13:6, 15:9, 17:11, 18:15, 18:17, 19:19, 19:21, 20:2, 21:19, 22:2, 22:23, 23:14, 27:22, 29:20, 30:8, 30:15, 30:18, 31:5, 31:14, 32:1, 32:9, 32:15, 32:18, 33:3, 34:12, 35:12, 35:13, 35:15, 35:23, 36:7, 36:20, 38:23, 58:3, 91:13, 92:9, 136:16, 137:16, 142:10, 145:4, 145:6, 145:11, 155:1, 155:13, 155:24, 156:6
defense's [1] - 141:25
defining [1] - 82:20
definitely [2] - 140:24, 141:1
degree [1] - 96:4
degrees [2] - 41:20, 96:1
deliberately [2] - 150:9
deliberating [3] - 33:2, 39:19
deliberative [1] - 6:20
delicti [1] - 153:2
demanding [4] - 29:16, 30:6, 30:16, 31:8
demo [2] - 22:3, 22:19
demonstrate [1] -

13:20
denial [1] - 43:9
denomination [1] - 50:9
DEPARTMENT [1] - 1:13
Department [12] - 4:24, 5:17, 6:14, 6:18, 8:7, 10:2, 10:21, 11:13, 12:16, 19:4, 41:17, 148:4
dependent [2] - 126:18, 140:8
depict [1] - 83:6
depicting [1] - 83:5
depiction [1] - 83:21
deployed [1] - 100:14
deposit [4] - 91:21, 91:22, 111:16, 112:15
deposited [2] - 65:1, 68:9
deposits [1] - 46:21
deputy [1] - 39:17
Deputy [1] - 33:18
DEPUTY [6] - 3:2, 39:20, 41:5, 41:8, 95:11, 95:14
derived [2] - 101:24, 103:24
describe [11] - 21:1, 41:19, 43:14, 59:10, 60:6, 67:9, 80:3, 110:3, 110:4, 111:21, 132:23
described [13] - 27:18, 27:19, 28:3, 31:15, 32:3, 51:6, 56:25, 67:13, 73:3, 77:16, 89:20, 113:18, 114:8
describing [1] - 107:12
description [1] - 27:15
design [2] - 27:5, 141:1
designed [2] - 141:2, 141:7
desk [1] - 8:8
destination [3] - 71:21, 105:5, 137:13
detail [3] - 36:8, 72:11, 90:8
detailed [5] - 22:8, 35:8, 42:5, 61:9, 64:16
detailing [2] - 57:11, 108:19
details [2] - 134:16, 147:12
detect [4] - 78:9,

89:24, 91:9, 114:15
detected [2] - 78:24, 79:11
detection [2] - 79:20, 89:17
deter [1] - 137:13
determination [4] - 6:7, 6:18, 12:11, 75:11
determinations [2] - 55:6, 75:9
determine [8] - 48:2, 50:25, 57:5, 61:25, 101:15, 105:13, 112:23, 115:6
determined [4] - 100:2, 110:5, 110:10, 110:13
determines [1] - 79:5
determining [5] - 11:17, 34:14, 50:21, 50:23, 106:2
deterministic [4] - 24:21, 26:23, 75:20, 122:8
developed [2] - 120:4, 146:2
developer [1] - 122:16
developments [1] - 103:17
device [2] - 47:11, 86:2
devices [3] - 86:5, 93:9, 93:11
Devin [2] - 19:25, 20:8
dictate [1] - 3:19
difference [1] - 132:23
different [37] - 22:20, 23:5, 23:20, 23:23, 25:2, 26:13, 38:8, 38:18, 49:3, 59:7, 71:17, 72:24, 72:25, 81:15, 89:13, 97:24, 98:21, 99:24, 100:17, 102:1, 103:3, 103:5, 103:20, 103:22, 105:12, 106:1, 108:25, 109:7, 110:18, 112:21, 115:8, 116:7, 122:5, 122:11, 135:23, 137:8
difficult [3] - 89:24, 91:9, 114:10
digital [8] - 16:18, 45:12, 97:17, 106:14, 106:16, 110:25, 125:10, 127:18

DIRECT [2] - 41:9, 95:15
Direct [2] - 2:4, 2:11
direct [13] - 23:3, 23:19, 44:17, 57:14, 59:14, 65:12, 105:21, 110:1, 122:17, 132:20, 132:25, 133:1, 133:3
directed [1] - 4:1
directing [6] - 68:2, 104:10, 109:6, 113:17, 126:9, 126:15
directly [8] - 16:15, 23:8, 24:14, 24:17, 24:24, 65:6, 133:2, 139:5
director [1] - 103:9
dirty [1] - 145:1
disadvantage [1] - 143:20
disagree [2] - 24:12, 80:20
disagreement [1] - 144:13
disclose [1] - 36:1
disclosed [2] - 35:24, 36:6
disclosure [2] - 155:2, 155:24
disclosures [3] - 34:12, 35:1, 156:9
discovered [1] - 18:25
discovery [9] - 9:17, 9:20, 16:21, 22:17, 28:7, 30:25, 152:8, 152:10, 152:24
discuss [3] - 15:19, 21:18, 58:20
discussed [3] - 59:14, 90:8, 137:17
discusses [1] - 122:19
discussing [1] - 127:15
discussion [1] - 149:4
dismiss [10] - 39:15, 40:4, 40:19, 141:23, 142:13, 142:14, 142:20, 144:2, 144:3, 144:8
displayed [3] - 55:22, 76:3, 76:8
displays [2] - 61:15, 71:8
dispute [1] - 144:14
disputing [2] - 145:5, 145:11
disqualification [1] - 6:23

disqualify [7] - 5:1, 12:1, 13:14, 13:19, 28:15, 28:18, 28:20
disqualifying [1] - 29:17
disrupting [1] - 124:9
distinction [3] - 62:5, 76:20, 132:19
distributed [2] - 8:5, 43:9
District [13] - 17:25, 18:5, 19:1, 144:15, 145:4, 145:24, 147:9, 147:14, 147:18, 147:19, 147:25, 148:9, 148:13
district [12] - 4:13, 12:9, 142:19, 147:6, 147:7, 147:9, 151:2, 151:9, 151:11, 154:11, 154:12, 154:14
DISTRICT [3] - 1:1, 1:1, 1:8
districts [2] - 148:15, 148:16
divided [1] - 121:4
division [2] - 19:8, 69:24
Division [1] - 17:24
divulging [1] - 134:15
document [2] - 44:21, 104:14
documented [2] - 26:6, 92:15
documents [3] - 91:20, 108:3, 125:17
Dogecoin [1] - 45:18
DOJ [7] - 1:11, 9:19, 9:23, 10:7, 15:6, 16:12, 21:5
DOJ's [1] - 17:5
dollars [1] - 68:13
domestic [1] - 96:16
dominion [1] - 96:3
done [25] - 9:5, 10:18, 13:23, 16:15, 22:8, 22:9, 22:10, 22:13, 22:14, 22:23, 22:24, 24:1, 26:9, 30:4, 35:18, 97:22, 122:2, 127:20, 135:15, 140:11, 140:22, 155:6, 155:17, 156:3
dots [1] - 83:18
doubt [2] - 144:1, 153:8
down [7] - 23:4, 23:6, 31:25, 56:6, 99:23,

126:16, 141:12
**download** [1] - 47:8
**Dr** [3] - 33:24, 33:25, 35:19
**draft** [1] - 149:10
**draw** [2] - 37:16, 61:11
**drawn** [1] - 38:13
**driving** [1] - 9:19
**drop** [1] - 131:19
**Dror** [3] - 32:21, 33:15, 33:24
**Dror's** [1] - 33:25
**drug** [3] - 25:2, 96:9, 99:19
**drug-trafficking** [1] - 25:2
**drugs** [2] - 99:18, 100:2
**during** [5] - 21:22, 22:24, 101:12, 101:19, 101:25
**duty** [2] - 149:8, 149:16

## E

**early** [7] - 18:20, 33:19, 70:13, 70:16, 70:17, 70:21, 70:23
**ease** [1] - 40:25
**easier** [1] - 34:8
**easy** [1] - 55:1
**ecosystem** [3] - 98:14, 115:15, 116:16
**educated** [1] - 85:9
**educational** [2] - 41:19, 95:25
**effect** [2] - 7:8, 14:13
**effective** [1] - 103:19
**efforts** [2] - 29:12, 140:23
**eight** [8] - 4:13, 19:21, 19:22, 36:2, 43:5, 43:17, 108:10, 124:22
**either** [7] - 10:19, 25:22, 25:23, 30:17, 100:7, 135:13, 146:4
**EKELAND** [81] - 1:15, 3:12, 7:25, 8:2, 9:1, 9:8, 9:11, 10:6, 10:14, 10:24, 11:4, 11:16, 12:6, 12:13, 12:19, 13:6, 13:10, 14:3, 14:15, 15:4, 15:18, 16:5, 16:21, 16:24, 24:12, 26:5, 26:11, 27:11, 27:20, 28:4, 28:17, 28:21, 33:13, 34:23, 36:13,

37:11, 37:18, 37:22, 39:3, 45:3, 58:2, 60:1, 73:12, 73:14, 73:17, 86:13, 86:16, 86:19, 87:8, 87:15, 87:16, 88:19, 93:25, 94:4, 94:13, 104:21, 109:21, 119:3, 128:9, 128:10, 129:23, 130:17, 131:13, 131:18, 131:21, 133:10, 139:16, 140:15, 141:11, 151:1, 151:8, 151:13, 151:23, 152:2, 152:7, 153:11, 153:22, 153:24, 155:8, 155:16, 156:11
**Ekeland** [22] - 1:16, 2:6, 2:9, 2:13, 2:16, 3:12, 7:20, 7:24, 17:14, 24:10, 33:6, 34:21, 36:22, 37:9, 39:2, 73:11, 89:2, 118:25, 139:13, 141:10, 150:24, 155:6
**Ekeland's** [1] - 142:1
**elect** [1] - 47:3
**electronic** [2] - 93:9, 93:11
**element** [5] - 13:24, 143:10, 147:6, 147:21, 151:21
**elements** [3] - 31:13, 82:7, 147:17
**elicit** [2] - 4:21, 5:14
**Elizabeth** [2] - 95:7, 95:22
**ELIZABETH** [6] - 2:10, 95:16, 95:22, 119:2, 134:3, 139:15
**Elliptic** [1] - 101:10
**ELMO** [1] - 94:23
**elsewhere** [4] - 5:8, 13:22, 70:11, 72:15
**email** [10] - 22:17, 46:8, 46:19, 60:12, 68:6, 68:10, 69:24, 93:4, 93:6, 94:21
**emails** [4] - 69:23, 70:7, 93:3, 93:5
**embarked** [1] - 94:9
**emphasize** [2] - 22:22, 92:21
**employed** [1] - 18:16
**employees** [1] - 19:22
**end** [3] - 19:3, 96:19,

142:7
**ended** [2] - 13:3, 130:3
**enforced** [1] - 53:2
**Enforcement** [2] - 41:18, 145:10
**enforcement** [15] - 18:13, 24:2, 42:6, 42:8, 44:12, 96:9, 98:3, 98:7, 98:13, 113:24, 114:12, 118:4, 118:17, 135:22, 148:7
**engage** [2] - 4:23, 144:9
**enhances** [1] - 7:11
**ensued** [1] - 99:9
**ensuing** [1] - 129:18
**ensure** [1] - 141:7
**entail** [6] - 42:6, 43:14, 43:24, 100:3, 103:12, 103:13
**entailed** [1] - 96:24
**entails** [1] - 42:8
**enter** [2] - 120:13, 155:1
**entered** [1] - 41:22
**entering** [1] - 24:20
**entire** [11] - 49:22, 49:25, 50:9, 85:1, 93:5, 102:15, 107:3, 122:23, 140:12
**entirely** [3] - 6:8, 16:17
**entities** [1] - 125:17
**entitled** [2] - 27:11, 28:11
**entity** [15] - 16:6, 55:7, 55:13, 76:6, 77:21, 78:6, 78:21, 78:25, 105:8, 105:11, 105:13, 112:12, 113:1, 118:4, 133:2
**enumerated** [1] - 113:8
**equal** [1] - 122:2
**equals** [1] - 26:24
**equation** [1] - 26:24
**error** [12] - 15:20, 58:10, 74:2, 117:6, 117:10, 117:19, 119:23, 133:8, 134:6, 139:23, 140:12, 141:3
**errors** [4] - 15:24, 117:18, 117:23, 117:25
**escapes** [1] - 42:23
**essential** [2] - 31:13, 153:5

**essentially** [18] - 18:10, 19:13, 27:20, 27:22, 29:19, 30:11, 48:7, 52:23, 53:3, 53:16, 58:13, 59:7, 74:14, 80:21, 85:16, 90:25, 114:11, 141:15
**establish** [3] - 5:10, 15:14, 147:2
**established** [2] - 7:18, 149:17
**establishes** [1] - 58:11
**estimate** [4] - 53:20, 56:19, 99:10, 104:3
**Ethereum** [1] - 45:17
**etymology** [1] - 75:15
**Europe** [1] - 141:13
**evaluating** [1] - 34:9
**evasion** [2] - 147:12, 147:13
**event** [3] - 142:6, 146:21, 147:14
**events** [1] - 11:12
**everywhere** [1] - 26:17
**evidence** [46] - 13:21, 14:5, 22:25, 23:1, 23:2, 23:8, 23:19, 25:4, 25:14, 25:22, 25:23, 27:8, 29:11, 30:5, 30:20, 31:2, 31:4, 31:19, 32:6, 40:19, 40:21, 86:7, 90:11, 101:18, 101:19, 128:12, 130:18, 130:20, 130:23, 130:24, 131:3, 141:19, 142:11, 142:23, 143:3, 143:6, 145:22, 146:1, 146:7, 146:25, 150:15, 151:3, 152:8, 152:10
**evidentiary** [1] - 145:7
**exact** [2] - 54:10, 134:5
**exactly** [3] - 24:8, 146:13, 146:17
**exaggeration** [1] - 17:17
**EXAMINATION** [8] - 41:9, 73:15, 88:24, 94:2, 95:15, 119:1, 134:2, 139:14
**examination** [3] - 38:22, 38:25, 89:20
**Examination** [8] - 2:4,

2:6, 2:7, 2:9, 2:11, 2:13, 2:14, 2:16
**examine** [12] - 15:7, 19:23, 20:2, 20:6, 20:8, 20:11, 20:13, 27:12, 28:11, 28:12, 28:14, 28:21
**example** [11] - 15:13, 19:20, 48:24, 50:5, 70:2, 76:17, 78:4, 78:20, 106:25, 131:12, 143:5
**examples** [8] - 52:2, 78:16, 78:18, 78:23, 114:2, 147:10, 147:11, 149:8
**except** [2] - 58:9, 154:12
**exchange** [32] - 45:20, 45:25, 46:4, 46:5, 46:14, 46:15, 46:25, 47:1, 47:4, 47:6, 47:9, 56:2, 56:4, 56:5, 56:8, 56:11, 56:12, 65:2, 65:10, 83:11, 85:11, 85:12, 85:13, 91:19, 91:21, 91:23, 91:24, 92:2, 118:3, 118:7, 130:3
**exchanges** [23] - 45:21, 46:6, 46:11, 46:12, 64:21, 65:7, 67:21, 67:25, 85:14, 91:15, 91:18, 92:24, 93:14, 98:10, 98:12, 102:6, 115:12, 115:13, 116:10, 117:11, 136:2, 150:12, 150:13
**exclude** [2] - 4:3, 34:1
**exclusive** [1] - 31:2
**excuse** [1] - 14:25
**excused** [3] - 95:2, 140:17, 140:18
**Excygent** [1] - 75:4
**executed** [1] - 135:6
**executing** [1] - 26:24
**exhaust** [1] - 29:10
**exhausted** [1] - 30:19
**Exhibit** [29] - 2:19, 2:20, 2:21, 2:22, 44:18, 45:1, 45:4, 45:5, 57:15, 57:25, 58:21, 58:24, 59:4, 59:23, 59:24, 60:2, 60:4, 104:10, 104:19, 104:22, 104:23, 105:22, 105:23, 108:22, 109:6, 109:17,

109:22
**exhibit** [3] - 41:1, 44:21, 95:9
**EXHIBITS** [1] - 2:18
**exhibits** [3] - 40:25, 94:18, 109:19
**Exhibits** [2] - 2:23, 109:24
**exist** [2] - 60:24, 123:20
**existence** [1] - 99:24
**existing** [1] - 89:3
**exists** [1] - 112:21
**expect** [3] - 4:21, 5:14, 155:12
**expected** [1] - 6:17
**experience** [14] - 35:4, 44:22, 55:21, 62:15, 70:19, 74:16, 89:16, 89:19, 104:15, 128:13, 128:20, 128:24, 129:2, 138:10
**expert** [31] - 15:21, 19:24, 26:20, 35:5, 35:12, 35:16, 36:1, 42:9, 57:11, 81:11, 87:12, 88:1, 104:8, 109:17, 120:23, 121:1, 122:23, 124:18, 124:19, 124:24, 125:21, 126:7, 130:22, 155:2, 155:18, 155:21, 155:24, 156:2, 156:4, 156:6, 156:9
**expertise** [1] - 42:16
**experts** [11] - 26:19, 34:13, 34:15, 35:14, 35:18, 36:16, 36:19, 37:1, 155:25, 156:1
**explain** [25] - 10:17, 35:3, 42:14, 43:23, 45:10, 47:12, 50:15, 51:23, 61:13, 61:20, 65:25, 69:5, 71:6, 71:14, 91:15, 95:25, 96:11, 104:25, 107:24, 110:13, 117:17, 117:22, 126:24, 141:6
**explained** [1] - 18:1
**explaining** [1] - 44:2
**explanation** [1] - 7:21
**explicitly** [1] - 151:16
**explore** [2] - 23:5, 133:21
**explorer** [8] - 23:21, 51:18, 51:24, 55:23,

69:6, 69:20, 101:1, 124:3
**explorers** [4] - 51:25, 54:4, 76:25, 107:19
**export** [1] - 147:16
**exported** [1] - 60:20
**exposed** [1] - 101:7
**exposure** [3] - 132:25, 133:1, 133:3
**extensive** [1] - 60:9
**extensively** [1] - 35:11
**extent** [7] - 22:6, 36:17, 38:24, 55:10, 81:2, 117:22, 117:24
**external** [5] - 44:10, 85:17, 86:1, 87:2, 87:9
**eyewitness** [1] - 87:20
**eyewitnesses** [1] - 154:10

**F**

**F.2d** [2] - 29:8, 29:13
**face** [2] - 142:7, 151:6
**fact** [36] - 7:9, 9:4, 9:23, 10:14, 11:5, 11:9, 11:20, 12:10, 12:17, 12:20, 13:2, 13:24, 14:15, 15:14, 15:16, 17:4, 24:3, 29:21, 29:23, 54:6, 66:21, 67:3, 76:2, 89:9, 92:11, 118:19, 122:23, 131:6, 131:12, 143:1, 145:5, 145:8, 146:7, 146:8, 146:23, 147:1
**factor** [1] - 154:9
**facts** [11] - 10:17, 10:21, 10:22, 14:3, 14:14, 30:14, 144:4, 144:14, 145:10, 145:15, 154:20
**factual** [3] - 31:16, 38:10, 76:7
**failed** [1] - 34:13
**failing** [5] - 149:9, 149:14, 150:5
**failure** [9] - 131:1, 131:3, 145:25, 146:19, 147:15, 148:14, 149:1, 149:23, 150:19
**fair** [12] - 36:23, 52:14, 66:23, 75:10, 82:9, 89:4, 89:7, 121:3, 128:9, 133:6, 136:18, 139:8
**fairly** [1] - 34:17

**faith** [1] - 4:19
**fall** [1] - 144:4
**false** [20] - 74:5, 74:8, 90:2, 114:19, 116:18, 116:19, 117:6, 117:10, 118:14, 119:9, 119:14, 119:19, 138:11, 138:14, 138:16, 138:20, 139:10, 141:1, 141:3, 141:12
**familiar** [11] - 72:22, 72:23, 75:17, 82:18, 84:12, 84:13, 89:10, 89:20, 94:5, 129:12, 143:19
**far** [6] - 5:20, 9:19, 30:4, 32:5, 109:7, 133:15
**fashion** [1] - 61:20
**favorite** [1] - 153:4
**FBI** [53] - 8:3, 8:5, 8:17, 8:21, 8:23, 9:4, 9:12, 10:8, 12:7, 12:8, 12:23, 13:3, 13:12, 14:6, 14:9, 14:16, 14:24, 15:5, 15:7, 15:10, 16:3, 17:4, 17:15, 18:3, 18:6, 18:14, 18:16, 18:21, 18:23, 18:25, 21:3, 21:12, 21:21, 22:1, 23:9, 26:21, 28:22, 28:24, 42:2, 42:3, 42:19, 42:21, 43:1, 43:3, 43:16, 44:7, 44:10, 56:21, 60:9, 61:17, 62:2
**FBI's** [3] - 42:11, 42:15, 44:9
**feature** [1] - 76:21
**features** [4] - 54:21, 72:25, 112:5, 137:10
**February** [2] - 18:20, 18:23
**federal** [5] - 8:16, 13:4, 24:18, 28:25, 104:5
**Federal** [1] - 41:16
**feedback** [7] - 116:17, 117:7, 117:10, 133:18, 134:10, 135:4, 136:4
**fees** [1] - 48:17
**few** [1] - 5:20
**field** [10] - 18:22, 21:10, 35:4, 42:16, 44:8, 89:13, 97:2, 103:17

**Field** [1] - 18:24
**Figure** [1] - 83:12
**figure** [4] - 40:10, 49:9, 83:2, 98:16
**figured** [1] - 70:22
**file** [5] - 38:11, 52:9, 52:15, 69:10, 149:9
**files** [4] - 37:5, 37:6, 59:8, 109:8
**filing** [1] - 16:25
**final** [2] - 155:18, 155:21
**finally** [1] - 6:22
**Financial** [1] - 145:9
**financial** [10] - 46:1, 67:25, 96:7, 97:1, 98:2, 98:6, 98:7, 98:10, 136:13, 148:7
**FinCEN** [6] - 145:9, 148:8, 148:15, 149:15, 149:23, 150:1
**FinCEN's** [1] - 150:2
**findings** [2] - 64:14, 108:18
**fine** [9] - 32:14, 32:20, 39:7, 39:9, 41:3, 94:1, 95:10, 98:4, 130:16
**fingerprint** [6] - 26:22, 79:9, 91:4, 106:14, 106:16, 110:25
**fingerprints** [3] - 106:12, 125:11, 127:18
**finish** [1] - 32:13
**finished** [1] - 116:23
**firms** [1] - 116:9
**first** [35] - 4:6, 5:11, 5:18, 9:6, 9:11, 9:12, 16:9, 17:22, 22:11, 24:16, 24:17, 25:11, 27:16, 34:7, 40:12, 40:14, 47:24, 49:2, 54:21, 54:23, 61:3, 61:17, 70:25, 81:9, 88:12, 96:13, 96:20, 98:22, 99:1, 99:22, 100:24, 110:20, 121:13, 123:12, 142:25
**firsthand** [1] - 24:4
**five** [7] - 35:17, 35:18, 40:13, 41:23, 49:5, 49:8, 49:14
**fixed** [1] - 149:2
**fixes** [1] - 149:2
**flagged** [2] - 117:18, 117:23
**flagging** [1] - 116:13

**flawed** [1] - 16:2
**Fletcher** [3] - 142:9, 143:17, 143:22
**floor** [1] - 3:24
**Floor** [1] - 1:17
**flow** [12] - 22:24, 55:17, 65:15, 83:6, 83:17, 83:25, 96:25, 105:4, 108:10, 113:15, 115:17, 137:12
**fly** [2] - 152:3, 154:6
**focus** [4] - 70:16, 70:17, 99:17, 136:18
**focused** [3] - 22:24, 44:13, 89:5
**focuses** [1] - 103:11
**Fog** [94] - 8:4, 14:17, 17:22, 18:10, 19:17, 19:18, 21:2, 21:8, 22:4, 22:20, 25:18, 28:23, 56:25, 57:3, 57:6, 59:15, 60:14, 60:17, 60:20, 60:25, 61:15, 61:18, 61:19, 61:22, 61:25, 62:3, 62:6, 62:7, 62:9, 62:10, 62:12, 62:14, 62:19, 62:20, 62:21, 62:22, 62:25, 63:1, 63:3, 63:4, 63:7, 63:17, 64:1, 64:2, 64:10, 65:4, 65:6, 65:16, 65:18, 65:20, 65:22, 67:3, 67:6, 67:9, 67:17, 70:14, 70:24, 71:1, 71:9, 71:12, 71:24, 72:6, 72:9, 72:13, 72:16, 74:24, 86:8, 86:22, 86:25, 87:5, 90:1, 90:9, 90:10, 108:7, 109:1, 110:4, 110:5, 110:6, 110:11, 110:14, 110:16, 111:8, 111:12, 111:20, 112:5, 112:12, 112:14, 126:10, 126:12, 126:18, 137:17, 150:9, 152:18, 154:6
**fog** [1] - 111:4
**follow** [12] - 25:10, 90:4, 94:19, 97:19, 98:20, 100:15, 101:4, 115:17, 117:1, 117:13, 137:12, 137:15
**follow-up** [2] - 90:4, 117:1

**following** [3] - 67:8, 95:5, 117:4
**FOR** [1] - 1:1
**force** [1] - 43:19
**foregoing** [1] - 157:4
**foreign** [1] - 96:16
**forensic** [3] - 25:23, 26:7, 96:4
**forensically** [1] - 37:18
**forensics** [12] - 16:16, 16:18, 16:20, 25:8, 26:10, 26:18, 31:23, 36:19, 36:21, 37:4
**forfeiture** [1] - 147:22
**form** [4] - 81:15, 97:17, 122:13, 148:10
**former** [2] - 19:22, 148:21
**forming** [1] - 66:5
**forth** [5] - 6:12, 44:21, 93:16, 104:14, 106:3
**fortunate** [1] - 101:8
**forum** [1] - 12:21
**forums** [1] - 103:22
**forward** [3] - 55:1, 66:4, 142:10
**forwarding** [1] - 66:7
**founders** [1] - 131:6
**four** [12] - 35:18, 63:6, 63:9, 143:13, 143:15, 144:20, 145:17, 145:24, 146:4, 146:10, 146:12, 151:3
**fourth** [1] - 55:15
**frame** [1] - 4:10
**framers** [2] - 153:7, 153:8
**frames** [1] - 4:16
**framework** [2] - 4:22, 5:12
**fraud** [1] - 131:16
**free** [1] - 88:1
**Freeh** [3] - 8:20, 12:22, 13:2
**frequently** [6] - 46:12, 55:11, 56:1, 56:16, 64:23, 117:18
**fresh** [1] - 23:1
**Fried** [1] - 130:4
**friends** [1] - 90:15
**front** [5] - 44:17, 59:5, 104:11, 110:2, 126:7
**FTX** [10] - 129:13, 129:15, 129:19, 129:24, 130:2, 130:3, 130:5, 130:10, 131:3, 131:6

**full** [14] - 39:18, 42:4, 53:6, 53:20, 53:22, 53:24, 54:1, 54:5, 54:9, 54:11, 81:2, 84:3, 157:5
**full-time** [1] - 42:4
**function** [3] - 6:8, 20:22, 100:6
**fundamental** [1] - 97:18
**fundamentals** [1] - 44:1
**funds** [78] - 22:4, 22:20, 47:1, 47:3, 47:9, 47:22, 47:24, 47:25, 48:2, 48:5, 48:16, 48:20, 51:21, 56:6, 57:4, 57:5, 57:9, 61:19, 62:1, 62:24, 62:25, 64:19, 64:23, 65:1, 65:4, 65:5, 65:9, 65:15, 65:19, 65:21, 66:7, 67:2, 68:5, 68:7, 68:11, 68:19, 71:1, 71:8, 71:11, 71:15, 71:16, 71:21, 72:2, 72:7, 83:6, 83:17, 83:25, 84:4, 84:18, 85:12, 91:21, 97:19, 98:20, 100:13, 100:15, 101:4, 105:4, 105:5, 105:14, 105:20, 107:5, 108:11, 111:11, 111:13, 111:16, 111:17, 112:16, 112:17, 113:15, 114:13, 115:17, 131:8, 133:5, 137:12, 137:14, 145:1
**furtherance** [1] - 149:24

**G**

**gain** [1] - 103:3
**gained** [1] - 21:21
**gaining** [1] - 70:19
**gamesmanship** [1] - 10:2
**gamut** [1] - 100:5
**gathered** [1] - 136:12
**general** [18] - 13:18, 21:14, 32:4, 42:17, 43:15, 54:7, 55:16, 62:16, 78:8, 79:17, 90:18, 92:2, 111:10, 115:15, 144:2,

150:19, 152:13, 155:18
**generally** [17] - 43:1, 43:14, 59:10, 62:17, 63:13, 65:1, 67:1, 67:4, 67:12, 70:18, 72:23, 75:9, 80:19, 100:3, 121:5, 134:15, 136:24
**generate** [1] - 107:6
**generated** [1] - 81:17
**generation** [1] - 103:13
**generic** [1] - 5:13
**George** [1] - 123:17
**Georgetown** [1] - 8:10
**gigabytes** [1] - 52:13
**given** [5] - 14:19, 32:19, 37:11, 48:12, 103:25
**global** [2] - 120:6, 125:19
**globally** [1] - 136:1
**goal** [2] - 40:17, 114:11
**goods** [1] - 99:20
**government** [58] - 3:5, 3:10, 6:4, 12:23, 18:18, 19:22, 23:4, 23:10, 24:13, 25:9, 25:25, 27:1, 30:5, 31:10, 32:17, 33:5, 33:20, 33:24, 34:14, 36:11, 36:17, 40:24, 44:25, 57:24, 59:22, 61:4, 61:22, 62:14, 73:9, 86:21, 93:22, 95:6, 97:20, 97:21, 100:23, 104:18, 108:8, 108:9, 109:16, 120:8, 120:9, 120:13, 120:17, 120:19, 126:3, 142:18, 142:23, 148:3, 152:11, 152:17, 152:20, 154:10, 154:13, 154:18, 155:9, 155:12, 155:19
**Government** [12] - 2:19, 2:20, 2:21, 2:22, 2:23, 104:23, 109:24, 131:22, 132:1, 132:3, 134:11, 154:8
**government's** [13] - 25:10, 28:9, 30:9, 30:22, 30:23, 31:9, 31:23, 35:12, 36:16,

41:1, 84:22, 142:17, 156:1
**Government's** [15] - 44:18, 45:1, 45:5, 57:14, 57:25, 58:24, 59:4, 59:23, 60:4, 104:10, 104:19, 105:22, 105:23, 108:21, 109:6
**Gox** [44] - 68:6, 68:10, 68:12, 68:14, 68:23, 68:25, 69:1, 69:24, 70:5, 71:1, 71:9, 71:11, 72:5, 72:8, 81:9, 81:23, 82:11, 83:8, 83:11, 83:19, 84:1, 84:5, 84:7, 84:9, 84:11, 84:12, 84:13, 84:15, 84:18, 84:22, 91:13, 91:16, 92:1, 92:5, 92:10, 92:12, 92:14, 92:16, 92:20, 93:13, 108:15
**grabbing** [2] - 153:19, 153:20
**graduate** [1] - 8:9
**graduates** [1] - 8:13
**grant** [1] - 30:22
**graph** [9] - 55:1, 81:17, 83:4, 83:6, 83:16, 83:17, 83:18, 83:21, 84:17
**graphical** [1] - 54:23
**graphically** [1] - 76:23
**Great** [3] - 153:18, 153:20, 153:21
**great** [2] - 39:12, 52:22
**greater** [1] - 34:18
**Greek** [1] - 75:16
**green** [2] - 68:23, 82:12
**grew** [1] - 102:15
**group** [5] - 55:11, 60:13, 105:10, 110:18, 112:12
**grouped** [1] - 113:4
**grouping** [1] - 55:4
**groups** [2] - 105:6, 106:7
**guess** [15] - 4:5, 11:8, 37:14, 40:2, 65:13, 75:9, 85:9, 130:11, 131:2, 142:16, 142:25, 143:21, 154:17, 154:19
**guesses** [3] - 24:23, 28:9, 85:25
**guessing** [3] - 10:9, 39:5, 75:16

**guys** [1] - 25:19

**H**

**half** [3] - 17:6, 50:8, 134:21
**hand** [11] - 41:6, 50:8, 64:8, 65:24, 95:12, 97:5, 98:23, 99:25, 106:12, 154:23
**hand-in-hand** [1] - 99:25
**hands** [1] - 50:10
**happy** [7] - 4:4, 7:16, 34:6, 34:23, 36:16, 82:1, 141:20
**hard** [2] - 34:14, 129:20
**harder** [1] - 114:13
**hash** [2] - 48:12, 51:16
**Hassanshahi** [1] - 147:11
**Hassard** [1] - 3:16
**HASSARD** [2] - 1:16, 3:15
**head** [5] - 53:22, 130:4, 150:17, 150:21, 151:13
**headphones** [1] - 33:11
**hear** [16] - 4:4, 17:8, 33:12, 73:21, 86:13, 95:18, 115:23, 116:1, 119:4, 119:8, 121:10, 125:24, 132:2, 139:17, 151:8, 151:24
**heard** [8] - 26:25, 27:15, 57:8, 74:14, 113:21, 129:20, 133:15, 141:11
**hearing** [20] - 14:8, 34:7, 35:22, 36:10, 36:12, 37:10, 58:15, 58:17, 58:19, 58:22, 59:25, 60:3, 87:7, 88:13, 109:20, 130:14, 141:22, 156:3, 156:5, 156:14
**HEARING** [2] - 1:4, 1:7
**hearings** [1] - 156:9
**hears** [1] - 33:10
**heightened** [1] - 24:7
**held** [5] - 6:12, 16:24, 35:23, 105:7, 141:17
**hello** [1] - 41:12
**help** [3] - 112:8, 137:11, 138:7
**helpful** [4] - 133:20,

Appx668

141:8, 146:15, 154:23
**hereby** [1] - 157:3
**herself** [1] - 133:16
**heuristic** [58] - 24:18, 28:9, 58:6, 75:7, 75:8, 75:10, 75:13, 75:16, 77:13, 77:22, 78:5, 78:8, 78:15, 79:16, 79:21, 79:24, 80:14, 80:17, 80:21, 80:23, 80:25, 81:3, 106:9, 107:10, 107:13, 110:20, 121:5, 121:13, 121:14, 121:17, 121:24, 122:7, 122:10, 123:4, 123:6, 123:7, 123:24, 124:9, 125:2, 125:3, 125:4, 125:9, 125:12, 125:13, 125:15, 126:2, 126:18, 126:20, 127:2, 127:8, 127:10, 127:16, 127:17, 127:24, 137:20, 137:24
**heuristics** [23] - 58:12, 75:24, 77:3, 77:7, 77:10, 79:11, 106:15, 107:13, 110:18, 112:9, 112:22, 113:21, 113:22, 121:9, 121:11, 121:12, 121:24, 124:21, 124:23, 125:1, 127:1, 137:8, 138:2
**high** [1] - 13:15
**hinder** [1] - 137:11
**hired** [2] - 108:8, 108:9
**history** [4] - 12:15, 12:25, 13:4, 17:19
**hit** [1] - 116:19
**hits** [1] - 116:18
**hitting** [1] - 88:22
**hold** [5] - 41:20, 41:21, 43:21, 96:1
**holds** [1] - 47:14
**hominem** [1] - 4:10
**Honor** [59] - 3:6, 3:9, 3:12, 3:15, 4:7, 7:16, 7:23, 7:25, 13:10, 14:3, 17:2, 17:10, 21:17, 22:22, 24:12, 27:20, 28:4, 32:9, 33:20, 34:11, 35:11,

36:13, 36:25, 38:16, 39:9, 39:20, 39:24, 40:15, 40:23, 45:3, 58:2, 58:23, 73:10, 73:12, 87:15, 88:19, 88:21, 94:17, 95:1, 95:6, 109:21, 116:25, 117:3, 128:6, 130:17, 134:1, 140:25, 141:9, 141:11, 143:8, 143:18, 143:25, 148:12, 148:24, 149:20, 150:7, 154:25, 155:5, 155:23
**HONORABLE** [1] - 1:8
**hook** [1] - 23:18
**hop** [1] - 118:7
**hoping** [2] - 32:12, 33:13
**hops** [2] - 68:8, 133:7
**hour** [1] - 40:18
**human** [1] - 96:2
**hundreds** [3] - 64:11, 109:13, 139:8

---

# I

**I.D** [2] - 26:13, 48:13
**identifiable** [1] - 46:9
**identification** [3] - 37:24, 86:1, 122:20
**identified** [16] - 19:15, 22:4, 36:2, 55:12, 63:17, 107:10, 111:19, 123:6, 124:22, 125:1, 127:1, 137:20, 137:23, 138:10, 138:16, 145:24
**identifier** [2] - 48:13, 51:17
**identifiers** [1] - 51:16
**identifies** [1] - 112:21
**identify** [19] - 21:6, 37:15, 87:10, 98:23, 106:6, 110:17, 112:11, 112:15, 112:20, 112:22, 113:7, 118:15, 121:22, 121:23, 122:7, 122:12, 122:14, 129:6, 137:13
**identifying** [10] - 37:19, 78:10, 85:4, 85:22, 101:20, 105:6, 105:10, 108:12, 113:14,

143:6
**ignorance** [1] - 52:19
**III** [1] - 151:17
**illegal** [3] - 147:16, 150:8, 150:13
**illicit** [1] - 115:11
**illustrate** [1] - 82:10
**illustrated** [1] - 81:23
**illustrates** [1] - 24:6
**imagine** [1] - 56:21
**immediately** [1] - 40:7
**implemented** [2] - 123:4, 127:24
**import** [1] - 147:16
**importance** [1] - 31:3
**important** [8] - 4:15, 10:3, 11:10, 105:17, 118:12, 118:18, 133:13, 154:1
**improbable** [1] - 10:1
**improper** [1] - 131:8
**improperly** [1] - 62:12
**improves** [1] - 70:20
**IN** [1] - 1:1
**inaction** [3] - 147:4, 149:10, 149:14
**include** [11] - 43:8, 45:21, 46:6, 46:18, 51:1, 59:1, 65:5, 109:4, 125:2, 127:8, 149:12
**included** [13] - 53:15, 59:10, 59:12, 60:19, 60:24, 63:7, 63:9, 63:11, 83:23, 97:3, 97:8, 97:10, 97:13
**includes** [4] - 13:21, 50:23, 137:8, 150:3
**including** [12] - 19:25, 22:8, 27:15, 41:20, 44:14, 45:17, 46:7, 46:20, 61:7, 72:12, 96:1, 117:10
**inconvenience** [1] - 3:22
**incorporated** [2] - 120:3, 120:10
**Incorporated** [1] - 132:4
**incorrect** [1] - 116:12
**incorrectly** [3] - 116:13, 118:15, 134:23
**increases** [1] - 133:8
**independent** [3] - 22:15, 122:19, 123:23
**index** [1] - 108:24
**indicate** [4] - 35:14, 51:6, 51:9, 129:5

**indicated** [11] - 13:25, 21:1, 31:22, 32:17, 33:4, 106:24, 115:8, 117:14, 117:25, 138:13, 146:19
**indicates** [1] - 22:18
**indication** [1] - 89:25
**indications** [1] - 114:18
**indictment** [19] - 88:5, 88:7, 88:11, 142:7, 142:14, 143:11, 143:14, 143:16, 144:3, 144:6, 144:21, 145:18, 145:20, 151:3, 151:6, 151:7, 151:10, 151:12, 152:25
**indirect** [4] - 6:24, 132:20, 132:25, 133:3
**indirectly** [1] - 133:4
**individual** [3] - 52:15, 98:24, 102:10
**individual's** [1] - 25:5
**individually** [1] - 140:2
**individuals** [7] - 22:10, 78:2, 102:21, 111:15, 114:5, 137:6, 137:13
**indulgence** [3] - 73:6, 93:19, 116:22
**infer** [1] - 55:11
**infirm** [1] - 144:6
**inform** [1] - 72:1
**information** [78] - 8:11, 15:24, 24:13, 46:4, 46:7, 46:9, 46:12, 46:14, 46:16, 46:17, 46:19, 46:20, 48:8, 50:12, 50:19, 52:1, 52:4, 55:8, 55:10, 55:21, 56:2, 59:16, 60:10, 66:14, 66:17, 67:19, 68:15, 68:22, 70:9, 76:7, 76:11, 76:14, 83:23, 83:25, 85:4, 85:17, 85:22, 86:1, 86:24, 87:3, 87:9, 87:11, 97:23, 98:8, 98:12, 101:23, 103:23, 105:2, 107:14, 114:22, 114:24, 115:2, 115:7, 117:6, 117:9, 118:16, 118:19, 119:9, 119:14, 119:19,

124:2, 125:5, 125:10, 126:2, 134:24, 134:25, 135:4, 135:6, 135:10, 135:20, 136:7, 136:11, 136:12, 137:2, 140:10
**informed** [1] - 32:18
**infrastructure** [1] - 67:17
**initial** [6] - 14:5, 30:10, 81:9, 81:19, 97:7, 99:1
**initiation** [2] - 99:21, 100:6
**input** [22] - 48:4, 48:5, 48:19, 48:22, 48:25, 49:22, 49:24, 49:25, 51:2, 51:8, 53:10, 82:21, 82:23, 82:24, 85:8, 90:13, 105:16, 113:2, 114:5, 114:6
**inputs** [12] - 49:6, 51:2, 51:5, 77:18, 77:20, 78:7, 83:13, 83:15, 91:8, 110:21, 122:1, 122:9
**inside** [1] - 82:13
**insider** [1] - 43:10
**insight** [1] - 103:3
**instance** [7] - 15:18, 26:11, 58:7, 112:24, 118:6, 139:10, 141:13
**instances** [8] - 65:5, 89:21, 134:16, 135:12, 135:19, 138:20, 139:1, 140:3
**instead** [3] - 12:3, 54:18, 54:24
**instigated** [1] - 31:10
**Institute** [1] - 42:1
**institution** [2] - 46:1, 98:6
**institutions** [4] - 67:25, 98:7, 98:11, 136:13
**instruction** [1] - 155:1
**instrumental** [2] - 8:11, 9:16
**insurance** [1] - 148:4
**intel** [2] - 100:7, 102:14
**Intelligence** [1] - 18:7
**intelligence** [31] - 8:3, 8:4, 9:13, 10:8, 14:7, 14:9, 14:16, 14:22, 14:24, 15:5, 15:10, 17:4, 17:15, 18:9,

19:15, 27:24, 28:2, 28:22, 28:24, 80:17, 80:21, 80:25, 96:12, 96:13, 107:21, 107:24, 108:1, 125:13, 125:19, 125:23, 126:2
**intelligence-based** [3] - 107:21, 107:24, 108:1
**intelligent** [1] - 28:5
**intends** [1] - 23:10
**intensive** [1] - 52:16
**interacting** [1] - 9:15
**interaction** [1] - 127:19
**interactions** [1] - 14:4
**interacts** [2] - 14:25, 98:13
**interest** [1] - 5:19
**interested** [6] - 20:24, 97:4, 136:22, 140:19, 140:21, 142:1
**interesting** [1] - 152:13
**interface** [5] - 52:1, 52:5, 52:10, 52:11, 54:24
**intermediaries** [2] - 133:4, 133:6
**intermediary** [2] - 65:10, 118:8
**intern** [1] - 42:3
**internal** [4] - 18:12, 91:19, 139:22, 140:6
**international** [1] - 153:9
**internet** [7] - 18:12, 25:18, 47:9, 54:4, 76:22, 80:22, 91:7
**interpretation** [1] - 27:6
**interpreting** [2] - 24:24
**interview** [1] - 5:22
**interviewed** [2] - 25:5, 25:15
**intimate** [1] - 15:25
**intimately** [4] - 15:1, 27:12, 27:14, 27:16
**intranet** [1] - 8:5
**introduce** [2] - 23:10, 23:12
**intrusion** [1] - 43:6
**investigated** [3] - 6:7, 13:3, 20:18
**investigating** [1] - 31:17
**Investigation** [1] -

41:16
**investigation** [31] - 8:23, 9:5, 9:12, 14:5, 14:10, 17:15, 17:23, 18:5, 18:6, 18:8, 18:21, 19:2, 21:22, 22:10, 22:25, 28:23, 51:15, 57:3, 57:7, 61:7, 63:20, 74:24, 97:3, 98:23, 99:4, 99:6, 99:7, 100:15, 103:9, 137:3
**investigations** [34] - 17:22, 18:14, 18:24, 23:4, 42:9, 42:18, 43:9, 43:10, 46:10, 96:7, 96:15, 97:23, 98:15, 99:2, 99:9, 100:1, 100:17, 100:18, 102:12, 102:17, 103:14, 115:7, 129:5, 134:13, 134:18, 134:21, 135:2, 135:14, 135:23, 136:8, 139:7, 139:8, 140:4, 140:5
**investigative** [12] - 15:7, 16:7, 42:17, 43:18, 44:3, 96:5, 103:5, 103:19, 115:9, 115:16, 132:14, 134:19
**Investigative** [1] - 17:24
**investigator** [12] - 8:17, 9:19, 12:7, 12:8, 12:20, 12:23, 13:12, 14:21, 18:19, 19:11, 19:12, 98:2
**investigators** [4] - 9:16, 11:25, 70:17, 136:1
**invited** [1] - 19:6
**invites** [1] - 152:5
**involve** [2] - 108:12, 108:15
**involved** [20] - 8:23, 12:6, 15:1, 16:6, 21:15, 22:12, 24:22, 27:13, 27:14, 27:16, 28:7, 32:5, 48:16, 48:17, 48:18, 51:19, 64:9, 80:25, 83:22, 99:13
**involvement** [2] - 27:16, 31:16
**involves** [1] - 103:15
**involving** [4] - 89:12, 99:3, 99:15, 153:9

**IP** [14] - 37:7, 37:11, 37:16, 38:1, 38:4, 38:6, 38:7, 38:16, 38:18, 38:19, 38:20, 39:1, 39:4
**IRS** [15] - 9:15, 9:16, 17:24, 19:1, 19:24, 19:25, 20:8, 20:14, 28:7, 60:9, 61:19, 62:2, 62:22, 62:24, 87:23
**issue** [15] - 9:1, 14:23, 14:24, 30:13, 30:20, 34:12, 37:20, 93:13, 114:20, 151:18, 151:23, 152:1, 152:12, 152:13, 155:1
**issued** [1] - 148:3
**issues** [4] - 15:3, 32:19, 39:16, 133:21
**itself** [9] - 12:20, 24:25, 27:1, 75:13, 133:17, 143:10, 147:10, 151:7, 151:10

**J**

**Jackson** [1] - 148:22
**January** [5] - 18:20, 18:21, 18:23, 102:24, 156:5
**job** [1] - 103:18
**Johnston** [2] - 148:22, 148:24
**join** [2] - 42:2, 96:9
**joined** [1] - 19:4
**joinmarket** [1] - 122:5
**joint** [1] - 43:18
**journal** [4] - 35:7, 97:15, 103:20, 124:5
**journey** [1] - 101:6
**Judge** [4] - 142:9, 143:17, 143:22, 148:21
**JUDGE** [2] - 1:8, 1:8
**judge** [3] - 147:20, 148:21, 148:22
**July** [10] - 33:14, 33:19, 33:21, 39:21, 39:23, 155:10, 155:11, 155:12, 156:10, 157:7
**June** [1] - 1:5
**jurisdiction** [3] - 142:6, 145:12, 150:6
**jury** [17] - 6:25, 7:1, 10:24, 11:6, 11:16, 11:17, 12:10, 12:17,

13:25, 23:17, 33:1, 33:2, 37:21, 39:19, 151:23, 152:1, 153:13
**justice** [2] - 96:3, 148:23
**Justice** [9] - 4:25, 6:14, 6:18, 8:7, 10:2, 10:20, 11:14, 12:17, 19:4
**JUSTICE** [1] - 1:13
**Justice's** [2] - 5:17, 41:17
**justifies** [1] - 152:22
**justify** [1] - 7:19

**K**

**Kaderabek** [2] - 18:15, 18:16
**Kathleen** [1] - 18:15
**keep** [3] - 47:3, 47:6, 103:17
**keeping** [1] - 89:12
**keeps** [1] - 107:7
**Ketanji** [1] - 148:22
**key** [4] - 6:1, 45:8, 47:16
**keys** [2] - 51:11, 105:18
**kind** [20] - 15:23, 26:19, 26:24, 46:1, 46:16, 74:19, 79:18, 80:12, 85:18, 85:25, 91:3, 94:6, 99:4, 100:5, 122:18, 122:19, 144:9, 149:24
**kinds** [1] - 89:23
**knowledge** [12] - 7:12, 14:10, 15:25, 17:5, 24:4, 28:1, 117:12, 119:21, 138:23, 139:2, 139:12, 140:14
**known** [13] - 45:16, 62:6, 78:21, 78:25, 99:19, 101:10, 102:11, 103:5, 105:3, 105:14, 106:8, 106:22, 111:14
**knows** [4] - 61:22, 79:2, 79:4, 79:7
**Kraken** [7] - 45:21, 65:16, 65:18, 65:20, 65:22, 67:13, 93:13
**KYC** [4] - 46:16, 150:10, 150:11, 150:12

**KYT** [6] - 103:7, 115:9, 115:11, 116:8, 132:12

**L**

**labels** [1] - 78:21
**labor** [1] - 52:16
**labor-intensive** [1] - 52:16
**Labs** [3] - 63:21, 63:23, 63:24
**lack** [2] - 144:8, 145:16
**landscape** [1] - 99:25
**laptop** [1] - 47:11
**large** [6] - 66:2, 78:3, 90:12, 114:25, 118:19, 136:19
**large-scale** [1] - 90:12
**largely** [2] - 25:7, 31:22
**larger** [1] - 111:22
**last** [6] - 3:25, 32:15, 32:16, 35:19, 43:17, 134:21
**launch** [1] - 71:23
**launched** [1] - 36:18
**launder** [1] - 152:19
**laundering** [6] - 21:7, 96:14, 96:24, 99:18, 149:25, 150:4
**Law** [1] - 1:16
**law** [22] - 8:9, 8:13, 8:20, 18:12, 24:2, 29:21, 32:3, 98:2, 98:7, 98:13, 113:24, 114:12, 118:3, 118:17, 135:22, 142:3, 143:9, 144:13, 144:14, 150:17, 152:13, 152:24
**lawyers** [1] - 154:1
**lead** [25] - 8:2, 8:14, 8:17, 8:20, 8:24, 9:3, 9:14, 9:16, 10:3, 10:8, 12:7, 12:23, 13:5, 13:11, 14:16, 14:21, 15:10, 17:4, 17:15, 18:13, 18:15, 18:19, 19:12, 103:13
**leading** [1] - 149:5
**leaks** [2] - 108:4, 125:18
**learn** [2] - 98:17, 98:19
**learned** [2] - 77:5, 123:12
**learning** [1] - 96:22

**least** [8] - 11:8, 31:15, 33:23, 40:18, 82:20, 85:2, 143:2, 144:20
**leave** [1] - 13:11
**leaves** [1] - 90:14
**lecture** [1] - 123:18
**led** [1] - 18:14
**ledger** [2] - 91:19, 105:3
**left** [4] - 16:14, 91:21, 106:14, 127:19
**legal** [14] - 4:22, 5:2, 5:3, 5:12, 6:7, 7:18, 20:21, 98:6, 101:18, 102:5, 118:6, 149:8, 149:16, 152:19
**legally** [2] - 149:1, 153:1
**legitimate** [1] - 15:22
**lengthy** [1] - 59:19
**less** [2] - 70:20, 156:7
**letters** [1] - 47:15
**letting** [1] - 116:18
**levels** [1] - 122:2
**leverage** [3] - 97:24, 126:1, 134:20
**leveraged** [11] - 97:15, 97:17, 98:9, 102:3, 110:18, 110:23, 114:4, 116:9, 127:3, 137:9, 137:11
**leveraging** [2] - 99:19, 115:18
**Liberty** [5] - 68:17, 70:5, 81:25, 83:20, 84:1
**license** [11] - 146:20, 146:23, 147:1, 147:15, 147:24, 148:1, 148:2, 148:3, 149:14
**licensure** [2] - 145:8, 145:16
**light** [3] - 38:14, 117:6, 155:3
**likely** [3] - 14:8, 34:1, 66:11
**limited** [2] - 39:1, 55:10
**line** [2] - 129:17, 129:18
**lines** [1] - 136:16
**link** [1] - 45:22
**linking** [1] - 85:4
**list** [4] - 60:16, 109:9, 109:18, 110:9
**listed** [1] - 110:5
**listening** [2] - 53:8, 54:2
**listing** [2] - 59:19,

109:12
**lists** [1] - 108:24
**Litecoin** [1] - 45:18
**literature** [1] - 94:6
**Liverpool** [1] - 96:6
**LLC** [1] - 75:4
**local** [1] - 93:13
**locally** [1] - 44:8
**located** [2] - 148:8, 148:17
**lock** [1] - 80:7
**locus** [1] - 153:2
**logical** [1] - 71:19
**login** [1] - 46:20
**logs** [1] - 92:20
**London** [1] - 153:13
**longest** [1] - 13:4
**look** [27] - 10:7, 10:8, 11:22, 25:19, 34:24, 51:19, 51:21, 55:1, 57:6, 59:5, 61:23, 64:2, 70:13, 70:21, 79:8, 82:1, 83:2, 87:25, 88:1, 92:17, 105:12, 140:24, 143:13, 143:15, 150:16, 151:14
**looked** [9] - 12:22, 25:4, 70:23, 90:7, 90:8, 97:19, 110:24, 141:14, 151:2
**looking** [18] - 23:21, 23:24, 28:12, 28:13, 34:25, 51:2, 52:15, 70:18, 80:5, 80:7, 82:23, 89:19, 98:18, 106:15, 128:3, 133:17, 137:23, 155:17
**looks** [3] - 25:21, 106:15, 131:1
**Louis** [2] - 8:20, 13:2
**LR** [1] - 68:17
**Luke** [2] - 40:24, 41:14
**LUKE** [6] - 2:3, 41:10, 41:14, 73:16, 88:25, 94:3
**Lunch** [1] - 95:4
**lunch** [3] - 40:6, 40:7, 94:15
**lunchtime** [1] - 88:22

## M

**ma'am** [98] - 41:21, 42:13, 42:23, 43:13, 43:15, 44:7, 44:20, 44:24, 46:3, 46:13, 46:24, 47:3, 47:7, 47:13, 48:21, 49:1,

49:17, 50:14, 50:17, 51:4, 51:25, 52:17, 53:22, 54:1, 54:7, 54:12, 54:17, 55:21, 56:1, 56:14, 56:18, 57:1, 57:13, 57:17, 57:20, 57:23, 59:3, 59:9, 59:21, 60:8, 60:15, 61:1, 61:10, 61:14, 62:4, 63:18, 64:4, 64:12, 64:15, 64:18, 64:22, 64:25, 65:8, 65:11, 65:15, 66:1, 66:15, 66:25, 67:4, 67:7, 67:11, 67:15, 67:22, 68:1, 69:11, 69:13, 69:15, 69:18, 69:22, 70:1, 70:3, 70:8, 70:12, 70:15, 70:17, 71:5, 71:13, 71:25, 72:3, 72:14, 72:18, 72:21, 72:23, 73:2, 73:5, 89:7, 89:11, 89:15, 90:3, 92:7, 92:14, 92:25, 93:2, 93:5, 93:10, 93:11, 93:15, 93:18
**main** [4] - 14:9, 14:24, 99:20, 153:13
**mainstream** [1] - 150:12
**maintain** [1] - 117:5
**maintains** [3] - 10:15, 52:20, 52:21
**majority** [6] - 44:15, 121:3, 142:4, 143:21, 143:23, 144:1
**managing** [1] - 103:19
**manual** [2] - 100:25
**manually** [2] - 52:7, 129:2
**map** [2] - 25:24, 101:23
**maps** [1] - 25:23
**marked** [1] - 44:18
**market** [3] - 43:10, 97:4, 99:7
**marketplace** [1] - 99:23
**marketplaces** [2] - 99:24, 126:1
**markets** [9] - 22:5, 22:20, 59:13, 64:3, 64:10, 97:6, 99:19, 109:2, 113:8
**Mason** [1] - 123:17
**massive** [2] - 64:10, 131:1

**master's** [3] - 41:25, 96:4, 96:6
**match** [2] - 69:19, 70:4
**matches** [2] - 38:18, 55:22
**material** [7] - 9:4, 9:23, 10:14, 13:24, 15:15, 17:4, 24:3
**math** [1] - 126:24
**matter** [13] - 4:8, 6:11, 8:24, 10:12, 13:3, 38:8, 81:16, 81:20, 122:23, 142:7, 144:4, 145:6, 152:24
**matters** [3] - 25:8, 43:2, 43:4
**Mazarin** [5] - 33:16, 36:15, 37:2, 38:17, 39:3
**Mazars** [1] - 38:17
**MC2** [1] - 26:24
**mean** [23] - 10:18, 12:24, 27:14, 35:3, 45:25, 51:23, 55:10, 58:15, 76:9, 79:13, 83:1, 87:22, 100:25, 124:1, 130:11, 139:6, 143:9, 145:13, 145:23, 150:7, 150:14, 150:16, 155:3
**means** [7] - 29:17, 31:17, 35:5, 75:7, 100:25, 133:1, 133:3
**meant** [3] - 50:16, 97:12, 107:24
**mechanisms** [1] - 122:5
**meet** [4] - 90:25, 153:2, 153:3, 153:4
**meeting** [1] - 7:18
**Meiklejohn** [1] - 123:13
**member** [3] - 42:11, 42:20, 42:22
**mempool.space** [3] - 52:2, 69:7, 69:9
**mens** [3] - 152:15, 152:21, 154:13
**mentality** [1] - 98:9
**mentioned** [4] - 43:21, 48:18, 121:13, 151:16
**meritless** [1] - 6:25
**merits** [3] - 5:16, 142:15, 142:22
**message** [1] - 152:16
**met** [2] - 6:9, 36:17
**method** [2] - 37:18,

110:22
**methodologies** [2] - 37:23, 39:4
**methodology** [8] - 16:16, 58:4, 58:8, 67:12, 72:19, 108:19, 121:11, 122:21
**methods** [3] - 97:14, 100:22, 106:1
**Miami** [1] - 141:13
**Michael** [1] - 3:15
**MICHAEL** [1] - 1:16
**microphone** [2] - 33:9, 33:11
**might** [10] - 11:13, 14:19, 24:1, 30:20, 38:7, 46:22, 51:14, 90:19, 145:23, 146:2
**mind** [2] - 41:1, 131:14
**mined** [1] - 48:11
**miner** [1] - 53:12
**miners** [1] - 53:12
**minimal** [1] - 31:18
**mining** [1] - 54:2
**minitrial** [2] - 143:2, 144:9
**minor** [4] - 96:3, 151:18, 151:19, 151:22
**mint** [1] - 53:16
**minute** [1] - 40:13
**minutes** [3] - 33:23, 40:18, 141:21
**misconception** [4] - 21:19, 26:18, 155:16, 155:23
**misheard** [1] - 123:22
**missed** [3] - 9:7, 9:9, 15:20
**mission** [1] - 99:17
**misspoke** [1] - 28:4
**mistake** [2] - 16:12, 23:7
**mistakes** [2] - 70:18, 70:20
**mixer** [1] - 150:13
**mixing** [4] - 114:3, 114:15, 150:8, 152:18
**mobile** [1] - 47:11
**model** [1] - 121:25
**models** [1] - 122:6
**Monero** [4] - 72:22, 72:23, 72:24, 73:4
**money** [19] - 21:7, 50:21, 50:22, 51:19, 51:20, 53:9, 63:3, 63:4, 96:14, 96:23,

99:18, 131:7, 147:24, 149:13, 149:24, 150:4, 152:20

**money-transmitting** [1] - 147:24

**Monsanto** [1] - 88:13

**month** [2] - 155:22, 156:7

**months** [1] - 141:17

**morning** [10] - 3:6, 3:8, 3:9, 3:11, 3:12, 3:14, 3:15, 3:17, 7:25, 8:1

**MOSS** [1] - 1:8

**most** [11] - 14:5, 45:16, 45:20, 49:20, 76:25, 90:23, 90:24, 102:6, 105:14, 142:21

**mostly** [1] - 19:7

**motion** [27] - 3:25, 4:2, 4:3, 4:5, 4:18, 5:1, 6:22, 14:19, 16:22, 16:25, 18:1, 30:9, 30:22, 30:23, 32:8, 40:19, 141:22, 141:25, 142:13, 142:14, 142:20, 142:21, 143:14, 144:2, 144:3, 144:8

**MOTIONS** [2] - 1:4, 1:7

**motions** [7] - 3:20, 3:21, 4:1, 32:12, 39:15, 40:4, 142:21

**motivation** [10] - 10:20, 11:1, 11:2, 11:12, 12:16, 12:19, 25:10, 25:25, 31:9, 31:23

**mouth** [1] - 99:5

**move** [11] - 10:10, 32:8, 32:11, 40:11, 44:2, 44:25, 59:22, 102:23, 104:18, 105:20, 109:16

**moved** [2] - 11:4, 51:20

**movement** [5] - 68:5, 111:7, 111:11, 111:13, 111:19

**moves** [1] - 50:25

**moving** [6] - 12:9, 39:12, 68:23, 79:23, 105:14, 111:17

**MR** [108] - 3:9, 3:12, 3:15, 4:7, 7:23, 7:25, 8:2, 9:1, 9:8, 9:11, 10:6, 10:14, 10:24,

11:4, 11:16, 12:6, 12:13, 12:19, 13:6, 13:10, 14:3, 14:15, 15:4, 15:18, 16:5, 16:21, 16:24, 17:10, 17:17, 22:22, 24:12, 26:5, 26:11, 27:11, 27:20, 28:4, 28:17, 28:21, 33:13, 34:23, 36:13, 37:11, 37:18, 37:22, 39:3, 40:1, 45:3, 58:2, 60:1, 73:12, 73:14, 73:17, 86:13, 86:16, 86:19, 87:8, 87:15, 87:16, 88:19, 93:25, 94:4, 94:13, 94:21, 104:21, 109:21, 119:3, 128:9, 128:10, 129:23, 130:17, 131:13, 131:18, 131:21, 133:10, 139:16, 140:15, 141:11, 143:8, 143:13, 143:18, 143:25, 144:19, 145:3, 145:15, 146:6, 146:12, 146:18, 147:3, 148:2, 148:6, 148:12, 148:24, 149:20, 149:22, 150:7, 150:21, 151:1, 151:8, 151:13, 151:23, 152:2, 152:7, 153:11, 153:22, 153:24, 155:8, 155:16, 156:11

**MS** [69] - 3:6, 21:5, 21:17, 22:2, 22:15, 32:9, 32:15, 33:3, 33:20, 34:5, 34:11, 35:10, 36:15, 36:25, 37:4, 38:16, 39:9, 39:24, 40:5, 40:15, 40:23, 41:4, 41:11, 44:25, 45:6, 53:19, 57:24, 58:23, 58:25, 59:22, 60:5, 73:6, 73:9, 88:21, 89:1, 91:12, 93:19, 93:21, 94:17, 94:20, 95:1, 95:3, 95:6, 95:17, 98:25, 104:18, 104:24, 109:16, 109:25, 116:22, 116:25, 117:3, 117:8, 117:20, 117:21, 118:11, 128:6, 129:17,

134:1, 134:4, 138:6, 138:18, 138:25, 140:24, 141:9, 154:25, 155:5, 155:11, 155:23

**MSB** [1] - 148:6

**Mt** [44] - 68:6, 68:10, 68:12, 68:14, 68:23, 68:25, 69:1, 69:24, 70:5, 71:1, 71:9, 71:11, 72:5, 72:8, 81:9, 81:23, 82:11, 83:8, 83:11, 83:19, 84:1, 84:5, 84:7, 84:9, 84:11, 84:12, 84:13, 84:15, 84:18, 84:22, 91:13, 91:16, 92:1, 92:5, 92:10, 92:12, 92:14, 92:16, 92:20, 93:13, 108:15

**multiple** [11] - 43:15, 47:21, 51:2, 51:5, 51:8, 65:17, 71:15, 89:21, 98:12, 109:7, 127:3

**multisag** [1] - 80:6

**multitude** [2] - 99:24, 101:9

**murder** [1] - 25:2

**must** [1] - 38:5

**Mycelium** [4] - 59:16, 66:18, 66:22, 86:9

---

## N

**N.W** [1] - 157:11

**name** [15] - 3:4, 24:20, 38:6, 41:13, 41:14, 46:7, 46:18, 77:10, 93:1, 95:20, 120:25, 123:11, 125:20, 127:22, 130:4

**namely** [2] - 144:14, 149:12

**names** [1] - 38:7

**narrative** [1] - 23:14

**national** [2] - 43:18, 44:11

**National** [3] - 41:17, 42:5, 42:7

**nature** [3] - 4:10, 37:11, 38:10

**Navy** [1] - 41:23

**nearly** [1] - 19:3

**necessarily** [7] - 75:13, 89:12, 89:23, 92:1, 93:5, 123:19, 143:11

**necessary** [1] - 24:5

**need** [27] - 5:11,

13:20, 14:13, 29:8, 30:18, 31:3, 32:7, 33:9, 33:19, 33:23, 34:15, 35:2, 37:10, 48:1, 49:6, 49:24, 50:8, 51:11, 81:8, 86:1, 98:3, 154:2, 155:19, 156:3, 156:9

**needed** [2] - 100:14, 156:6

**needs** [5] - 6:10, 17:18, 49:9, 143:11, 144:12

**negative** [1] - 140:9

**negatives** [4] - 74:8, 119:19, 138:14, 141:1

**network** [11] - 45:13, 48:7, 48:8, 49:21, 52:24, 52:25, 53:5, 54:8, 145:10, 148:7

**never** [14] - 4:14, 8:17, 19:14, 19:15, 21:12, 21:13, 33:10, 86:24, 87:2, 87:3, 134:21, 140:9, 140:11

**New** [1] - 1:17

**new** [5] - 51:14, 53:8, 53:16, 66:4, 107:6

**Newark** [1] - 43:8

**news** [2] - 130:11, 130:13

**next** [9] - 32:8, 33:4, 33:14, 39:18, 57:18, 66:5, 66:8, 94:16, 141:21

**NFS9000@hotmail. com** [1] - 68:10

**nine** [1] - 125:1

**node** [9] - 53:7, 53:13, 53:24, 54:1, 54:5, 54:9, 54:11, 55:20

**nodes** [2] - 53:20, 53:23

**non** [2] - 36:19, 150:12

**non-blockchain** [1] - 36:19

**non-KYC** [1] - 150:12

**noncompliant** [1] - 150:13

**none** [2] - 11:14, 130:21

**normal** [2] - 7:3, 91:4

**Northern** [1] - 12:3

**notable** [2] - 71:18, 71:19

**note** [3] - 22:18, 38:24, 65:23

**noted** [1] - 22:5

**notes** [2] - 38:17, 157:5

**nothing** [12] - 18:4, 20:4, 20:16, 23:9, 30:4, 58:11, 73:9, 125:8, 147:19, 152:9, 153:17, 154:12

**notice** [4] - 35:12, 35:13, 83:8, 112:4

**noticed** [2] - 35:17, 35:18

**notices** [1] - 34:22

**November** [1] - 87:24

**nowhere** [1] - 58:7

**Number** [2] - 81:24, 82:11

**number** [20] - 5:15, 20:23, 33:21, 47:13, 48:22, 48:23, 53:20, 58:5, 59:1, 64:9, 76:21, 89:2, 89:8, 92:7, 92:23, 109:1, 122:1, 134:6, 143:19, 144:19

**numbers** [2] - 46:8, 47:15

**numerous** [4] - 6:12, 93:8, 109:4, 135:18

**NW** [3] - 1:11, 1:14, 1:22

**NY** [1] - 1:17

---

## O

**obfuscate** [1] - 114:6

**obfuscation** [1] - 137:10

**object** [4] - 32:18, 58:2, 58:14, 129:17

**objection** [7] - 45:2, 45:3, 58:1, 59:24, 104:20, 104:21, 109:19

**objects** [1] - 58:3

**obligation** [1] - 29:10

**obligations** [1] - 150:4

**obscure** [2] - 71:20, 114:19

**observe** [2] - 71:10, 111:7

**observed** [2] - 22:19, 111:11

**obtain** [7] - 5:8, 13:22, 15:17, 146:20, 147:15, 148:15, 149:14

**obtained** [1] - 98:18

**obviously** [5] - 90:9, 126:23, 133:13,

142:14, 143:4
**occasion** [2] - 55:24, 136:10
**occasionally** [2] - 21:10, 21:13
**occasions** [1] - 138:16
**occur** [7] - 78:19, 106:20, 108:3, 125:11, 127:18, 147:6, 147:18
**occurred** [12] - 10:21, 10:23, 11:12, 90:17, 101:23, 111:1, 138:17, 142:6, 142:19, 145:5, 151:10, 154:3
**occurrence** [1] - 119:19
**occurring** [4] - 90:22, 103:4, 106:10, 137:7
**occurs** [2] - 106:13, 124:6
**October** [3] - 8:3, 14:17, 19:3
**OF** [13] - 1:1, 1:2, 1:7, 1:13, 41:9, 73:15, 88:24, 94:2, 95:15, 119:1, 134:2, 139:14, 157:1
**off-chain** [1] - 85:14
**offense** [7] - 143:10, 147:6, 147:16, 147:18, 147:21, 148:16, 151:21
**offenses** [2] - 149:10, 149:12
**offer** [3] - 10:17, 30:14, 31:19
**offered** [4] - 5:11, 5:13, 30:5, 130:19
**offers** [3] - 7:21, 131:22, 132:5
**Office** [3] - 17:25, 18:24, 19:1
**office** [4] - 18:22, 19:6, 25:16, 44:8
**officer** [1] - 41:23
**offices** [3] - 44:8, 44:11, 96:16
**OFFICIAL** [1] - 157:1
**Official** [2] - 1:21, 157:10
**often** [5] - 46:10, 50:5, 70:17, 117:17, 117:22
**Old** [1] - 96:3
**old** [1] - 35:13
**omission** [7] - 147:4, 147:8, 147:15,

147:21, 148:20, 149:17
**once** [4] - 46:25, 47:25, 48:8, 99:23
**one** [96] - 3:23, 5:15, 9:16, 11:10, 11:24, 12:24, 13:14, 13:15, 14:23, 15:20, 16:19, 18:18, 21:8, 21:25, 24:16, 25:15, 26:9, 26:19, 27:23, 29:16, 29:21, 30:12, 30:13, 35:17, 47:19, 48:19, 48:20, 48:25, 49:19, 49:20, 49:23, 49:24, 50:1, 52:7, 53:24, 54:1, 54:4, 62:13, 63:8, 63:10, 68:24, 70:2, 75:2, 77:19, 78:2, 78:3, 78:6, 80:21, 82:21, 82:23, 82:24, 84:11, 85:20, 89:23, 93:23, 94:21, 101:9, 103:18, 105:14, 105:16, 110:9, 110:22, 111:5, 112:24, 114:3, 115:20, 115:24, 116:4, 116:8, 116:14, 117:1, 117:14, 118:7, 123:10, 126:1, 127:2, 128:11, 131:12, 133:2, 135:15, 137:11, 143:19, 144:20, 147:23, 149:5, 151:18, 151:19, 151:20, 153:13, 154:19
**one-off** [1] - 89:23
**ones** [2] - 7:1, 136:25
**ongoing** [2] - 96:15, 103:13
**online** [6] - 46:1, 51:18, 51:23, 51:25, 52:8, 54:14
**open** [8] - 18:10, 19:13, 21:2, 48:4, 80:22, 90:14, 97:8, 101:12
**opened** [5] - 17:23, 17:25, 18:3, 18:6, 71:3
**opening** [2] - 3:24, 18:4
**operate** [3] - 53:13, 98:10, 150:10
**operated** [3] - 45:13, 97:9, 146:25

**operates** [3] - 106:19, 106:22, 114:4
**operating** [12] - 27:5, 34:19, 53:6, 83:11, 86:8, 87:5, 106:18, 146:22, 146:24, 147:4, 149:13, 154:5
**operation** [1] - 111:2
**operational** [1] - 70:20
**operations** [4] - 42:4, 42:18, 100:11, 102:18
**opinion** [9] - 10:18, 17:2, 35:4, 35:5, 36:6, 37:23, 76:2, 90:18, 142:9
**opinions** [3] - 24:22, 35:3, 87:9
**opportunity** [3] - 36:9, 56:3, 156:4
**opposing** [1] - 7:14
**opposition** [2] - 30:8, 35:12
**optics** [1] - 41:22
**order** [25] - 3:20, 6:14, 39:21, 51:12, 75:11, 75:24, 98:2, 98:5, 98:14, 98:19, 98:23, 102:17, 103:18, 105:20, 108:5, 110:17, 111:16, 112:15, 114:6, 116:10, 116:15, 137:11, 141:7, 147:7, 155:1
**origin** [2] - 105:5, 137:14
**original** [2] - 66:23, 81:15
**OSINT** [1] - 80:17
**otherwise** [6] - 6:2, 11:13, 15:17, 31:1, 31:20, 89:9
**ought** [1] - 40:17
**outcome** [1] - 141:4
**outlined** [2] - 7:3, 29:20
**output** [15] - 48:20, 48:22, 48:23, 49:19, 49:20, 50:24, 77:19, 82:21, 82:24, 85:9, 90:13, 106:23, 114:7
**outputs** [8] - 50:25, 83:14, 83:15, 83:18, 91:8, 110:21, 122:1, 122:9
**outside** [7] - 61:24, 65:19, 70:6, 85:17, 107:17, 136:11, 151:2

**overarching** [1] - 90:19
**overlap** [3] - 37:8, 38:16, 39:4
**oversee** [3] - 140:4, 140:5
**overstatement** [1] - 27:18
**overt** [4] - 149:24, 150:5, 150:19, 150:23
**own** [11] - 44:5, 45:10, 47:7, 98:18, 104:25, 118:23, 128:13, 128:20, 130:25, 131:8, 134:8
**ownership** [5] - 105:13, 106:2, 107:8, 110:22, 114:7

## P

**p.m** [3] - 95:4, 156:14
**page** [41] - 30:12, 30:14, 54:24, 54:25, 61:9, 61:12, 61:14, 64:13, 65:13, 66:9, 67:8, 67:9, 67:14, 68:2, 69:14, 69:21, 70:2, 70:11, 71:6, 71:8, 81:8, 81:10, 81:11, 83:2, 83:4, 83:5, 83:13, 92:4, 92:7, 92:8, 92:11, 92:15, 93:17, 108:24, 110:1, 113:17, 121:1, 126:9, 126:15, 137:17
**PAGE** [2] - 2:2, 2:18
**pages** [9] - 30:11, 59:6, 64:16, 67:8, 69:3, 94:25, 105:21, 105:22, 106:3
**pair** [3] - 4:1, 47:17, 77:19
**paper** [12] - 74:18, 74:19, 79:19, 122:18, 122:24, 123:3, 127:15, 127:23, 128:5, 130:21
**papers** [8] - 34:1, 58:9, 74:11, 80:13, 128:16, 129:8, 137:1, 151:1
**paragraph** [1] - 126:16
**part** [33] - 6:8, 23:13, 32:25, 33:21, 37:25, 50:23, 55:5, 60:13,

73:24, 77:2, 79:6, 87:2, 87:18, 88:12, 89:12, 97:10, 102:20, 103:22, 105:6, 106:15, 107:10, 111:3, 112:25, 113:3, 119:17, 120:16, 122:8, 124:18, 124:21, 132:7, 132:10, 133:14, 150:1
**participating** [2] - 29:7, 29:12
**participation** [1] - 30:17
**particular** [16] - 31:16, 35:23, 53:6, 55:13, 67:16, 71:18, 75:12, 77:19, 91:25, 92:5, 92:13, 94:24, 105:11, 124:11, 133:7, 134:16
**particularized** [1] - 32:3
**particularly** [1] - 36:9
**parties** [1] - 4:4
**parts** [3] - 121:4, 147:15, 148:16
**party** [3] - 7:14, 108:4, 125:17
**pass** [1] - 133:10
**past** [4] - 22:23, 34:19, 43:5, 151:21
**path** [1] - 71:8
**pattern** [5] - 75:8, 75:14, 90:12, 111:7, 111:11
**patterns** [3] - 71:10, 78:10, 112:2
**payment** [5] - 50:24, 61:17, 63:2, 66:6, 66:7
**payments** [6] - 57:7, 67:17, 68:3, 81:12, 81:24, 97:17
**pays** [1] - 91:24
**peel** [7] - 65:24, 65:25, 66:1, 66:8, 66:9, 66:10, 66:21
**peer** [15] - 35:7, 58:8, 74:11, 74:18, 79:19, 80:13, 94:6, 122:18, 122:24, 123:2, 127:15, 127:23, 128:16, 130:21, 137:1
**peer-reviewed** [13] - 35:7, 58:8, 74:11, 74:18, 79:19, 80:13,

122:18, 122:24, 123:2, 127:15, 127:23, 128:16, 130:21

**peer-reviewing** [1] - 137:1

**peers** [1] - 52:24

**PELKER** [70] - 1:13, 3:6, 21:5, 21:17, 22:2, 22:15, 32:9, 32:15, 33:3, 33:20, 34:5, 34:11, 35:10, 36:15, 36:25, 37:4, 38:16, 39:9, 39:24, 40:5, 40:15, 40:23, 41:4, 41:11, 44:25, 45:6, 53:19, 57:24, 58:23, 58:25, 59:22, 60:5, 73:6, 73:9, 88:21, 89:1, 91:12, 93:19, 93:21, 94:17, 94:20, 95:1, 95:3, 95:6, 95:17, 98:25, 104:18, 104:24, 109:16, 109:25, 116:22, 116:25, 117:3, 117:8, 117:20, 117:21, 118:11, 128:6, 129:17, 134:1, 134:4, 138:6, 138:18, 138:25, 140:24, 141:9, 154:25, 155:5, 155:11, 155:23

**Pelker** [31] - 2:5, 2:8, 2:12, 2:15, 3:6, 4:2, 4:11, 4:17, 4:21, 5:14, 8:2, 8:9, 9:12, 11:19, 14:1, 17:14, 18:7, 20:3, 23:9, 25:13, 26:2, 27:10, 27:15, 27:22, 30:1, 30:10, 31:2, 31:12, 38:14, 133:12, 140:19

**Pennsylvania** [1] - 1:14

**people** [13] - 18:11, 24:1, 24:22, 38:6, 46:25, 47:5, 85:8, 90:25, 91:6, 129:6, 129:9, 140:21, 154:4

**people's** [1] - 131:7

**percent** [8] - 75:21, 103:16, 126:17, 126:23, 127:7, 137:22, 139:20, 141:2

**percipient** [2] - 25:14,

31:19

**perform** [1] - 78:21

**performance** [1] - 149:2

**performed** [2] - 61:4, 90:1

**perhaps** [1] - 90:24

**period** [2] - 14:6, 38:19

**permission** [2] - 40:25, 95:8

**permitted** [1] - 29:7

**person** [11] - 5:22, 10:9, 13:22, 14:1, 22:13, 35:6, 38:4, 48:1, 53:12, 77:21, 85:4

**personal** [12] - 4:15, 7:12, 46:6, 46:8, 47:8, 47:10, 85:18, 85:20, 85:22, 128:20, 128:24, 131:8

**personally** [3] - 56:22, 85:3, 87:10

**personnel** [1] - 42:16

**perspective** [2] - 15:5, 55:4

**persuade** [1] - 11:9

**pertaining** [1] - 44:22

**pertains** [1] - 91:17

**phenomenon** [1] - 26:7

**Philadelphia** [11] - 8:6, 8:12, 10:11, 11:5, 18:6, 18:22, 21:12, 28:6, 28:23, 153:12, 153:21

**phone** [3] - 46:7, 93:7, 93:10

**pick** [1] - 26:14

**picture** [1] - 17:7

**piece** [1] - 101:2

**piecing** [1] - 98:21

**Pizza** [1] - 8:21

**place** [7] - 12:4, 25:11, 120:25, 121:22, 147:23, 147:25, 149:2

**places** [1] - 12:4

**Plaintiff** [2] - 1:3, 1:10

**plasma** [1] - 69:24

**plasma@ plasmadivision** [2] - 71:3, 83:19

**plasma@ plasmadivision. com** [1] - 68:7

**platform** [2] - 111:16, 115:12

**platforms** [4] - 21:7, 21:8, 101:7, 115:8

**play** [1] - 28:10

**played** [1] - 112:23

**plead** [2] - 143:23, 144:1

**pleaded** [1] - 143:11

**pled** [4] - 143:16, 144:5, 144:20, 152:25

**PLLC** [1] - 1:16

**point** [30] - 4:9, 13:13, 18:20, 20:16, 21:22, 22:3, 28:12, 29:20, 30:15, 35:10, 37:13, 52:13, 53:24, 54:2, 58:18, 61:2, 74:19, 79:10, 99:8, 122:17, 123:2, 123:22, 137:16, 143:2, 143:9, 144:11, 146:11, 149:4, 151:4, 151:15

**pointed** [1] - 149:23

**pointing** [2] - 82:12, 130:25

**points** [3] - 20:20, 26:12, 82:10

**policies** [1] - 116:10

**pool** [1] - 114:5

**popular** [1] - 45:16

**pornography** [1] - 141:16

**portion** [4] - 22:11, 66:6, 68:21, 100:19

**portrayed** [1] - 75:23

**portrays** [1] - 76:14

**pose** [1] - 121:16

**position** [3] - 17:5, 25:13, 142:17

**positive** [5] - 90:2, 119:9, 138:16, 139:10, 141:3

**positives** [8] - 74:5, 114:19, 117:6, 117:10, 118:14, 119:14, 138:12, 138:20

**possibilities** [1] - 23:5

**possibility** [1] - 90:15

**possible** [3] - 79:10, 89:8, 89:22

**possibly** [2] - 123:14, 142:12

**posts** [2] - 71:22, 72:1

**potential** [3] - 70:18, 79:16, 118:14

**potentially** [6] - 70:22, 76:5, 76:25, 77:4, 77:8, 78:17

**practical** [1] - 89:5

**practice** [2] - 4:12, 34:19

**Prantil** [1] - 29:13

**preceding** [1] - 64:16

**precisely** [3] - 13:17, 76:9, 78:14

**preclude** [1] - 30:23

**predominantly** [3] - 43:6, 75:1, 99:19

**preexisting** [3] - 19:2, 149:8, 149:16

**prejudice** [1] - 36:7

**premature** [2] - 16:22, 146:3

**prepared** [2] - 36:11, 82:3

**preparing** [1] - 140:21

**present** [7] - 3:13, 7:5, 23:1, 23:8, 55:7, 58:16, 122:15

**presentations** [2] - 44:5, 103:25

**presented** [1] - 52:4

**pretext** [1] - 5:1

**pretty** [1] - 33:1

**prevalent** [1] - 99:21

**prevent** [1] - 113:24

**previewed** [1] - 36:23

**previously** [6] - 32:15, 49:6, 49:11, 51:6, 97:23, 104:5

**primarily** [3] - 74:23, 77:6, 100:2

**primary** [5] - 19:11, 19:12, 77:13, 99:8, 102:3

**private** [4] - 51:11, 63:21, 105:18, 131:22

**private/public** [1] - 47:16

**privilege** [2] - 6:20, 21:5

**privileges** [2] - 6:19, 20:23

**privy** [1] - 14:10

**probabilistic** [4] - 16:17, 24:18, 75:11, 75:19

**probability** [1] - 133:8

**problem** [5] - 9:22, 26:23, 78:14, 79:16, 121:16

**procedural** [2] - 6:11

**procedure** [2] - 6:13, 6:16

**procedures** [1] - 4:24

**proceed** [5] - 32:11, 40:6, 73:12, 73:13

**proceeding** [3] - 32:18, 32:20, 109:1

**proceedings** [2] - 95:5, 157:6

**process** [6] - 6:20, 98:6, 100:15, 101:18, 102:5, 118:6

**processes** [1] - 118:16

**produce** [1] - 130:21

**produced** [3] - 22:2, 43:16, 90:2

**product** [6] - 6:20, 18:9, 21:21, 117:15, 140:22, 140:23

**professional** [2] - 41:20, 104:15

**proffer** [2] - 5:23, 143:3

**proffered** [1] - 135:14

**proffering** [1] - 26:20

**program** [1] - 35:8

**progress** [1] - 40:9

**promptly** [1] - 36:8

**proper** [1] - 11:17

**properly** [2] - 56:4, 133:18

**proposed** [1] - 34:3

**proposition** [1] - 142:8

**proprietary** [8] - 23:25, 74:25, 77:2, 124:8, 124:14, 124:16, 124:17, 125:9

**prosecuted** [1] - 130:7

**prosecution** [3] - 147:7, 147:10, 152:22

**prosecutions** [1] - 148:14

**prosecutor** [40] - 4:22, 4:25, 5:5, 5:20, 5:21, 5:23, 5:25, 6:16, 7:2, 7:6, 7:19, 8:15, 8:18, 8:20, 8:24, 9:3, 9:21, 10:3, 12:2, 12:8, 12:24, 13:5, 13:19, 15:11, 20:25, 24:4, 24:5, 28:13, 28:16, 28:19, 28:20, 28:25, 29:4, 29:6, 29:12, 29:15, 29:18

**prosecutor's** [1] - 6:8

**prosecutorial** [1] - 20:22

**prosecutors** [5] - 6:8, 9:25, 11:22, 11:24, 13:15

**protect** [1] - 115:12

**protected** [1] - 20:23
**protections** [1] - 6:19
**protocol** [6] - 53:2, 106:22, 123:8, 128:3
**provable** [1] - 127:20
**provide** [18] - 6:17, 19:8, 34:22, 36:8, 42:17, 52:1, 54:20, 54:22, 54:23, 54:24, 55:3, 55:9, 55:14, 101:21, 118:15, 134:19, 140:10, 154:18
**provided** [14] - 4:20, 18:7, 44:7, 44:9, 44:10, 59:8, 62:22, 63:1, 96:15, 108:2, 125:17, 126:3, 134:24, 136:7
**provider** [1] - 150:10
**providers** [3] - 68:20, 150:11, 150:12
**provides** [3] - 52:10, 63:24, 103:2
**providing** [4] - 36:8, 42:8, 100:8, 103:11
**pseudonymous** [1] - 85:6
**psychology** [2] - 96:4, 96:5
**public** [21] - 47:16, 52:6, 54:13, 54:14, 69:20, 72:6, 76:10, 76:14, 76:15, 85:3, 97:11, 101:1, 103:12, 103:14, 125:6, 128:3, 132:1, 132:3, 132:4, 134:19
**publicly** [6] - 23:22, 23:23, 50:13, 54:19, 105:3, 107:14
**published** [2] - 35:6, 128:17
**pulled** [1] - 38:11
**pulling** [1] - 29:21
**pulls** [1] - 23:22
**punish** [1] - 149:10
**purchase** [2] - 45:20, 45:23
**pure** [1] - 144:24
**purely** [2] - 38:10, 130:20
**purposes** [10] - 58:16, 58:17, 58:18, 58:19, 58:21, 59:25, 109:20, 131:8, 146:5, 150:20
**pursue** [1] - 25:11
**put** [16] - 3:24, 12:2, 13:13, 38:6, 40:19,

40:20, 41:1, 43:18, 54:25, 83:8, 105:23, 106:11, 112:22, 114:6, 124:2, 143:21
**puts** [1] - 25:9
**putting** [2] - 22:16, 152:20

### Q

**qualifications** [2] - 44:22, 104:15
**qualified** [1] - 104:8
**quality** [1] - 15:23
**quarters** [1] - 153:25
**quash** [6] - 4:2, 4:6, 4:18, 18:2, 30:9, 30:23
**query** [1] - 52:3
**questionable** [1] - 38:3
**questioning** [2] - 37:15, 129:18
**questions** [21] - 7:16, 14:18, 16:4, 16:9, 16:11, 21:11, 21:14, 37:10, 76:19, 88:19, 89:2, 93:21, 94:13, 116:25, 129:21, 138:6, 138:7, 140:15, 141:22, 141:25, 150:25
**quick** [2] - 33:18, 51:19
**quickly** [5] - 36:10, 55:17, 81:7, 86:12, 86:15
**quietly** [1] - 141:18
**quite** [2] - 76:21, 131:9
**quote** [2] - 30:9, 100:12
**quote-unquote** [1] - 100:12

### R

**raise** [2] - 41:5, 95:12
**raised** [4] - 97:5, 98:23, 137:16, 151:25
**ran** [2] - 35:7, 100:5
**RANDOLPH** [1] - 1:8
**ransomware** [1] - 43:8
**rare** [1] - 9:1
**rate** [10] - 74:2, 74:5, 74:8, 117:6, 117:10, 119:23, 122:20, 134:6, 140:12, 141:3
**rates** [4] - 16:11,

58:10, 119:9, 139:23
**rather** [5] - 3:19, 52:8, 61:5, 64:8, 118:13
**rationale** [2] - 7:4, 7:7
**rea** [3] - 152:15, 152:21, 154:13
**reach** [3] - 98:7, 99:7, 144:12
**reached** [3] - 72:8, 97:21, 98:11
**reaction** [1] - 117:24
**Reactor** [70] - 9:18, 14:11, 24:25, 26:12, 28:8, 59:13, 64:6, 69:14, 73:25, 74:3, 74:6, 74:9, 74:15, 74:21, 74:23, 75:1, 75:19, 77:6, 77:10, 79:24, 81:1, 94:7, 94:9, 94:11, 103:6, 107:18, 110:15, 115:3, 115:16, 115:18, 119:10, 119:15, 119:20, 119:23, 120:4, 121:6, 121:14, 121:19, 122:13, 122:25, 123:5, 123:6, 123:20, 123:24, 124:2, 124:7, 124:11, 125:8, 127:25, 128:13, 128:18, 128:25, 129:7, 130:20, 132:8, 132:11, 132:16, 134:8, 134:12, 134:17, 135:1, 135:5, 135:9, 135:16, 135:23, 139:19, 139:23, 140:7, 141:16
**Reactor's** [4] - 79:20, 81:4, 122:20, 127:16
**read** [6] - 4:8, 123:15, 142:3, 147:20, 148:13, 149:11
**readily** [1] - 76:22
**reading** [2] - 25:17, 147:17
**ready** [1] - 73:18
**reaffirmed** [1] - 151:20
**real** [3] - 6:24, 12:14, 33:18
**really** [20] - 4:11, 9:2, 20:17, 25:11, 25:18, 25:20, 30:12, 34:9, 34:13, 34:24, 34:25, 37:4, 80:24, 116:14, 121:3, 142:20,

144:13, 144:14, 153:8
**reason** [13] - 4:19, 11:18, 12:14, 24:15, 27:8, 30:25, 31:1, 31:11, 31:18, 105:17, 120:16, 131:3, 144:1
**reasonable** [1] - 90:8
**reasons** [3] - 15:8, 29:17, 153:14
**rebut** [1] - 156:1
**rebuttal** [1] - 31:16
**receive** [8] - 46:14, 46:16, 46:17, 49:4, 50:9, 63:2, 66:13, 136:4
**received** [23] - 35:15, 43:11, 43:15, 43:19, 43:20, 47:24, 48:1, 49:2, 49:6, 49:11, 53:10, 61:18, 62:24, 66:2, 66:17, 73:20, 116:18, 134:10, 134:22, 135:4, 138:15, 148:12
**receives** [1] - 66:5
**receiving** [5] - 22:4, 22:20, 48:20, 49:19, 49:21
**recently** [1] - 34:17
**recess** [1] - 95:4
**Recess** [1] - 40:16
**recognition** [1] - 153:25
**recognize** [1] - 5:19
**recognized** [1] - 148:21
**recollection** [5] - 13:2, 22:15, 22:16, 88:2, 125:25
**reconvene** [1] - 154:17
**record** [6] - 3:4, 17:18, 41:13, 84:20, 85:3, 95:21
**recorded** [9] - 48:9, 48:10, 50:12, 50:18, 50:20, 69:2, 69:8, 84:19, 92:19
**recording** [1] - 26:2
**records** [27] - 45:14, 46:10, 48:15, 48:18, 54:10, 56:9, 56:11, 60:11, 67:20, 67:24, 70:5, 84:5, 84:18, 92:14, 92:16, 92:21, 92:23, 93:7, 93:10, 93:12, 96:25, 97:1, 98:3, 98:5, 102:7,

108:16
**recover** [1] - 100:15
**recovering** [1] - 101:18
**recovery** [1] - 101:19
**Recross** [2] - 2:9, 2:16
**RECROSS** [2] - 94:2, 139:14
**Recross-Examination** [2] - 2:9, 2:16
**RECROSS-EXAMINATION** [2] - 94:2, 139:14
**rectangle** [1] - 65:23
**red** [2] - 62:5, 62:10
**redemption** [1] - 68:11
**redirect** [1] - 88:20
**Redirect** [2] - 2:7, 2:14
**REDIRECT** [2] - 88:24, 134:2
**reference** [2] - 82:6, 88:4
**referenced** [3] - 68:18, 88:3, 113:18
**references** [1] - 110:8
**referencing** [2] - 18:12, 88:14
**referred** [3] - 21:12, 144:10, 144:22
**referring** [3] - 19:19, 76:5, 152:14
**reflect** [2] - 55:19, 57:21
**reflected** [3] - 76:15, 83:16, 84:17
**refreshes** [1] - 88:1
**refused** [2] - 4:23, 6:21
**regard** [5] - 36:15, 36:20, 72:5, 138:7, 146:17
**regarding** [11] - 30:20, 57:9, 89:16, 104:1, 104:5, 105:24, 111:7, 120:22, 136:5, 137:16, 155:2
**register** [3] - 145:25, 149:15, 149:23
**registered** [1] - 97:11
**registering** [2] - 148:6, 150:1
**registration** [6] - 145:9, 145:16, 148:8, 148:15, 149:10
**regular** [1] - 139:5
**regulations** [4] - 4:24, 6:12, 6:15, 116:11

relate [2] - 61:16, 111:5
related [8] - 43:11, 93:12, 96:20, 102:9, 129:18, 130:13, 131:4, 146:20
relates [1] - 145:21
relating [5] - 30:14, 96:17, 114:23, 117:6, 135:5
relation [5] - 10:15, 26:7, 75:12, 119:15, 121:7
relationship [1] - 5:17
relationships [1] - 108:5
relatively [2] - 31:18, 66:3
relayed [1] - 114:22
released [1] - 141:18
relevance [6] - 13:9, 17:20, 23:18, 25:12, 33:25, 129:18
relevant [28] - 10:13, 10:21, 10:22, 11:5, 11:9, 11:15, 11:16, 12:10, 12:17, 13:8, 13:11, 23:8, 24:14, 25:20, 26:3, 26:5, 31:13, 31:14, 31:24, 34:8, 34:9, 61:6, 63:20, 104:14, 104:15, 131:14, 142:5, 142:19
reliability [9] - 37:22, 101:17, 102:6, 115:14, 128:1, 130:15, 133:12, 133:22, 138:8
reliable [12] - 36:24, 62:17, 101:16, 102:2, 115:6, 118:20, 118:23, 127:21, 129:7, 134:8, 134:17, 136:8
relied [3] - 87:9, 114:23, 115:3
relies [2] - 80:22, 116:6
rely [3] - 69:14, 116:15, 146:10
relying [2] - 54:18, 146:17
remaining [1] - 50:3
reminding [1] - 39:14
remove [1] - 9:23
renew [2] - 31:5, 32:1
repeat [4] - 4:9, 9:9, 72:14, 89:11
rephrase [1] - 128:15

replicate [1] - 128:3
replicated [1] - 127:20
reply [1] - 18:1
report [69] - 8:4, 14:17, 15:22, 35:15, 35:24, 57:11, 57:16, 57:21, 58:3, 58:12, 59:1, 59:8, 59:14, 60:16, 61:9, 61:15, 64:17, 66:13, 67:8, 68:2, 68:18, 69:4, 70:2, 70:11, 72:11, 72:15, 73:4, 76:18, 80:4, 81:11, 82:3, 82:5, 82:6, 87:13, 88:1, 88:3, 88:8, 90:8, 92:15, 93:16, 105:23, 108:18, 108:21, 108:24, 109:4, 109:8, 109:17, 110:2, 113:9, 113:12, 113:17, 114:22, 120:23, 121:1, 121:3, 122:23, 124:18, 124:20, 124:24, 125:21, 125:25, 126:6, 126:7, 130:22, 132:19, 137:17, 138:4
REPORTER [1] - 157:1
Reporter [3] - 1:21, 1:21, 157:10
reporter [2] - 33:10, 40:11
reporting [1] - 139:4
reports [11] - 16:7, 21:9, 21:11, 134:19, 155:13, 155:18, 155:21, 156:3, 156:4, 156:7, 156:10
represent [2] - 76:23, 78:17
representation [1] - 145:1
representative [1] - 47:16
representing [1] - 126:22
represents [1] - 110:16
reproducibility [1] - 37:22
request [5] - 16:3, 31:5, 32:1, 95:8, 97:2
requests [1] - 24:8
require [1] - 34:20

required [4] - 6:13, 29:7, 32:2, 149:2
requires [4] - 32:3, 35:9, 49:21, 137:5
requiring [2] - 29:3, 34:18
reschedule [2] - 32:23, 40:10
rescheduled [1] - 156:5
research [14] - 18:10, 19:14, 89:3, 89:9, 94:10, 96:12, 97:7, 97:8, 97:14, 102:14, 125:19, 136:17, 136:19
researcher [1] - 89:6
researchers [1] - 136:21
Reserve [5] - 68:17, 70:5, 81:25, 83:20, 84:1
reserve [1] - 40:18
respect [14] - 4:1, 10:23, 17:10, 17:19, 20:17, 30:19, 142:3, 142:17, 143:5, 146:2, 146:6, 153:18, 154:18, 154:20
respond [2] - 7:21, 24:11
response [11] - 42:12, 42:15, 42:21, 42:23, 44:9, 56:10, 117:24, 118:1, 118:3, 140:9, 152:16
responsibilities [1] - 102:9
responsible [2] - 12:9, 85:13
responsive [1] - 135:7
rest [2] - 40:10, 40:20
restate [3] - 86:18, 115:1, 132:9
restricting [1] - 153:18
result [2] - 24:21, 26:25
results [2] - 24:25, 75:21
retained [1] - 21:23
retaining [1] - 54:3
retention [1] - 21:23
retrieve [1] - 37:6
retrieved [1] - 93:7
return [2] - 95:9, 149:9
returns [1] - 60:12
revealed [1] - 35:23
review [25] - 46:10, 52:7, 66:9, 67:16,

69:16, 69:23, 71:22, 81:19, 82:3, 86:5, 87:18, 87:19, 88:7, 89:25, 92:21, 92:23, 93:3, 93:7, 94:6, 115:20, 126:6, 137:6, 139:5, 140:2, 156:4
reviewed [25] - 35:7, 37:5, 58:8, 60:7, 60:8, 60:9, 60:10, 63:20, 74:11, 74:18, 79:19, 80:13, 81:4, 86:6, 86:24, 87:2, 87:3, 90:10, 122:18, 122:24, 123:2, 127:15, 127:23, 128:16, 130:21
reviewing [5] - 54:24, 63:15, 96:25, 108:15, 137:1
revolutionaries [1] - 153:12
right-hand [1] - 65:24
rip [2] - 50:7, 107:2
rise [1] - 95:11
risk [1] - 118:13
RMR [2] - 1:21, 157:9
Road [1] - 99:22
road [2] - 23:7, 32:1
roads [1] - 23:5
Rochester [1] - 41:22
role [5] - 21:6, 21:20, 28:13, 103:8, 112:18
ROMAN [1] - 1:5
Roman [8] - 3:3, 3:13, 3:16, 19:15, 19:16, 108:12, 154:5, 154:9
room [1] - 24:7
Room [2] - 1:22, 157:10
rotation [1] - 19:7
rough [3] - 53:20, 56:19, 104:3
roughly [2] - 9:6, 9:11
Rule [1] - 34:13
rule [6] - 7:4, 7:7, 34:17, 34:24, 35:9, 156:2
rules [3] - 11:6, 35:14, 53:1
ruling [1] - 31:24
run [1] - 53:24
running [1] - 54:1
runs [1] - 54:5
Russia [1] - 8:8

**S**

S-c-h-o-l-l [1] - 41:14

sales [1] - 99:20
salient [1] - 11:20
Sam [1] - 130:4
Samurai [1] - 122:4
sanctions [2] - 147:12, 147:13
Sarah [1] - 123:13
sat [2] - 5:22, 123:18
satisfied [3] - 30:7, 30:16, 31:8
saw [1] - 25:14
scale [1] - 90:12
scene [1] - 25:4
schedule [2] - 33:14, 39:8
scheduled [1] - 33:22
schedules [1] - 3:18
scheduling [4] - 32:19, 33:7, 33:8, 33:21
scholl [1] - 15:21
Scholl [18] - 40:6, 40:24, 41:12, 41:14, 41:15, 44:13, 45:7, 59:1, 60:6, 64:19, 67:16, 70:13, 72:11, 72:22, 73:18, 89:2, 91:13, 94:5
SCHOLL [5] - 2:3, 41:10, 73:16, 88:25, 94:3
Scholl's [1] - 45:1
school [3] - 8:9, 8:13, 41:25
science [5] - 26:7, 41:21, 41:25, 96:2, 96:6
scientific [18] - 26:19, 58:4, 58:8, 58:10, 74:11, 74:18, 79:19, 80:12, 97:14, 122:18, 122:24, 123:2, 123:8, 124:5, 127:22, 128:16, 129:8, 130:20
scientifically [2] - 26:6, 127:14
scope [4] - 84:3, 87:6, 151:7, 151:11
Scott [4] - 32:16, 32:20, 33:15, 33:24
scraping [1] - 80:22
screen [1] - 124:12
screens [1] - 121:20
screenshot [1] - 92:11
screenshots [6] - 59:7, 69:3, 69:5, 69:6, 69:12
scrolling [1] - 52:14
search [12] - 51:18,

52:8, 52:11, 60:12, 69:10, 86:2, 135:1, 135:5, 135:7, 135:9, 136:13, 141:16
**searches** [1] - 86:5
**seated** [2] - 41:8, 95:14
**second** [13] - 10:16, 17:13, 29:22, 49:3, 55:3, 68:9, 69:1, 79:23, 110:24, 119:6, 127:8, 144:11
**secrecy** [1] - 150:3
**section** [4] - 68:3, 96:14, 96:24, 110:3
**Section** [2] - 81:11, 126:10
**sections** [1] - 113:11
**sector** [6] - 103:12, 103:14, 132:1, 132:3, 132:4, 134:19
**securities** [1] - 148:4
**security** [2] - 42:1, 70:20
**see** [29] - 9:22, 13:23, 22:4, 25:11, 25:20, 26:3, 31:12, 40:9, 51:5, 56:6, 81:12, 82:15, 82:16, 86:7, 89:25, 90:11, 97:21, 111:25, 114:18, 116:1, 124:3, 126:12, 126:17, 126:22, 131:13, 131:18, 143:14, 143:15, 156:12
**seeing** [3] - 14:6, 70:4, 70:6
**seek** [6] - 28:20, 28:21, 46:10, 46:12, 57:24, 113:23
**seeking** [4] - 14:23, 24:14, 32:23, 37:12
**seem** [2] - 8:19, 27:18
**SEFRANEK** [1] - 157:3
**Sefranek** [3] - 1:21, 157:9, 157:9
**seize** [1] - 67:25
**seized** [3] - 93:8, 100:14, 101:22
**seizing** [1] - 100:12
**seizure** [4] - 42:18, 101:19, 102:18, 135:10
**selling** [1] - 100:2
**send** [18] - 21:9, 47:22, 48:5, 48:6, 49:8, 49:12, 49:14, 49:23, 50:1, 53:9,

53:10, 56:1, 56:8, 102:5, 112:16, 140:8
**sending** [8] - 49:7, 65:19, 66:3, 66:6, 71:15, 84:18, 85:11, 152:16
**sends** [1] - 71:16
**sense** [7] - 56:19, 75:20, 80:17, 117:18, 122:10, 133:22, 153:16
**sensed** [1] - 66:21
**sensitive** [1] - 134:16
**sent** [11] - 50:3, 61:17, 65:9, 65:10, 65:16, 68:12, 68:14, 68:16, 84:5, 101:18, 112:17
**separate** [2] - 84:10, 132:13
**separately** [2] - 18:5, 69:16
**September** [1] - 88:3
**series** [2] - 50:25, 65:9
**serious** [2] - 16:11, 30:13
**serve** [1] - 98:6
**served** [4] - 18:17, 41:23, 118:7, 156:10
**servers** [2] - 86:22, 86:25
**service** [23] - 21:21, 43:9, 61:18, 62:25, 63:12, 63:14, 68:20, 71:24, 72:10, 78:25, 79:8, 89:24, 90:25, 99:20, 112:20, 113:6, 120:17, 122:3, 139:6, 150:8, 150:10, 150:11
**services** [19] - 21:11, 52:8, 67:21, 90:12, 96:2, 108:6, 108:10, 108:25, 111:15, 113:23, 114:3, 122:4, 124:22, 125:1, 131:23, 132:5, 132:7, 132:10, 149:13
**set** [16] - 6:11, 35:11, 39:11, 44:21, 52:6, 54:8, 54:10, 93:16, 96:21, 102:16, 104:14, 106:2, 110:4, 113:11, 138:3, 140:12
**sets** [5] - 67:25, 70:6, 101:22, 136:12
**setting** [1] - 100:11
**settled** [1] - 119:6
**seven** [2] - 26:13, 36:2

**several** [7] - 54:20, 59:5, 59:17, 90:9, 107:19, 145:3
**sham** [1] - 6:4
**shared** [1] - 79:7
**shed** [1] - 38:14
**shop** [2] - 50:5, 50:6
**Shormint** [2] - 68:17, 81:25
**shortly** [1] - 16:25
**show** [7] - 69:7, 83:17, 84:2, 84:3, 142:23, 143:3, 149:9
**showed** [3] - 65:3, 66:11, 152:24
**showing** [11] - 5:6, 5:7, 13:21, 14:13, 30:16, 30:19, 32:2, 32:4, 38:19, 69:9, 94:24
**showings** [1] - 5:10
**shown** [17] - 13:7, 13:25, 61:11, 61:13, 66:9, 68:4, 68:5, 69:3, 69:19, 69:20, 70:2, 70:11, 71:6, 92:4, 92:10, 108:21
**shows** [9] - 12:13, 13:23, 63:9, 63:11, 65:15, 65:17, 83:17, 84:4, 142:11
**sic** [1] - 111:22
**side** [8] - 65:24, 97:18, 105:16, 111:2, 115:16, 132:12, 134:12, 136:2
**signature** [1] - 57:18
**signatures** [3] - 35:1, 78:11, 80:8
**signed** [2] - 19:25, 51:11
**significance** [3] - 62:11, 72:4, 72:7
**significant** [7] - 21:7, 63:6, 65:3, 66:19, 66:20, 90:22, 100:19
**Silk** [1] - 99:22
**SIM** [1] - 43:9
**similar** [6] - 46:22, 63:25, 68:16, 92:18, 96:13, 113:7
**similarly** [1] - 98:10
**simple** [1] - 24:19
**simply** [8] - 7:4, 10:3, 28:13, 29:17, 38:1, 59:25, 142:5, 142:18
**single** [14] - 12:15, 35:15, 47:20, 48:21, 49:16, 51:8, 58:7, 83:7, 99:17, 122:24,

123:2, 127:14, 127:22, 139:10
**single-mission** [1] - 99:17
**singular** [1] - 78:6
**sit** [8] - 77:11, 78:13, 119:22, 122:17, 123:10, 125:20, 127:13, 127:22
**sites** [1] - 121:8
**situation** [5] - 5:21, 7:5, 7:13, 149:7
**situs** [1] - 149:3
**six** [1] - 65:18
**Sixth** [2] - 27:23, 151:17
**slightly** [2] - 81:15, 82:10
**small** [1] - 90:15
**smaller** [1] - 66:3
**software** [40] - 21:21, 24:15, 24:19, 24:25, 26:12, 26:17, 26:23, 27:2, 27:5, 27:7, 28:9, 47:8, 58:6, 75:20, 76:22, 103:2, 106:19, 107:4, 107:6, 107:11, 107:18, 114:23, 115:3, 115:9, 115:10, 115:11, 116:7, 116:8, 119:10, 119:15, 119:20, 121:6, 123:25, 124:8, 124:12, 127:19, 130:25, 140:22, 140:25, 141:2
**sole** [1] - 150:23
**solely** [5] - 74:16, 120:12, 120:15, 120:18, 125:5
**solutions** [5] - 103:9, 120:6, 120:8, 120:9, 120:20
**Solutions** [4] - 131:22, 132:1, 132:3, 134:11
**someone** [7] - 16:20, 25:21, 46:5, 136:25, 153:19, 153:21
**sometimes** [4] - 5:25, 46:7, 51:1, 127:3
**somewhere** [1] - 53:10
**soon** [2] - 32:24, 33:1
**sorry** [22] - 9:8, 10:16, 14:16, 28:17, 52:18, 72:14, 79:13, 86:11, 86:13, 89:11, 111:9, 111:13, 115:1,

116:1, 117:13, 121:10, 125:24, 125:25, 127:6, 132:2, 146:9, 148:2
**sort** [30] - 4:10, 5:13, 6:3, 6:4, 6:23, 7:3, 7:11, 18:24, 19:8, 23:25, 24:6, 24:21, 25:2, 34:19, 43:4, 46:8, 46:14, 46:19, 56:24, 67:23, 80:7, 90:2, 112:18, 121:20, 123:3, 131:16, 134:15, 137:4, 146:21, 152:14
**sound** [4] - 37:18, 38:2, 38:12, 80:18
**sounds** [2] - 39:10, 155:19
**source** [18] - 18:10, 19:14, 21:2, 31:4, 31:20, 57:4, 57:9, 60:21, 64:19, 64:23, 65:1, 67:2, 71:21, 81:4, 97:8, 101:12, 124:12, 137:4
**sources** [11] - 5:9, 29:11, 30:20, 32:7, 60:6, 85:17, 93:16, 125:15, 125:20, 126:4, 136:14
**sourcing** [1] - 60:18
**space** [3] - 97:10, 97:22, 103:24
**speaking** [3] - 61:8, 65:1, 100:4
**Special** [2] - 18:16, 20:8
**special** [2] - 18:18, 100:9
**specialist** [2] - 42:4, 96:12
**specialists** [1] - 102:14
**specific** [21] - 4:20, 14:14, 14:15, 15:16, 32:5, 50:22, 57:6, 68:3, 68:15, 78:25, 81:11, 90:20, 93:5, 93:10, 93:12, 123:9, 137:15, 138:2, 138:20, 154:19
**specifically** [11] - 38:23, 57:2, 61:8, 79:4, 94:12, 99:13, 105:22, 108:7, 122:12, 122:14, 144:21
**specificity** [3] - 34:18,

34:20, 34:21
**specifying** [1] - 155:14
**speculating** [1] - 10:10
**speed** [1] - 39:12
**spell** [2] - 41:12, 95:20
**spend** [50] - 27:21, 45:7, 49:6, 49:22, 49:23, 49:24, 49:25, 50:9, 51:1, 77:22, 79:6, 105:14, 105:15, 105:19, 106:5, 107:1, 107:13, 110:20, 110:21, 112:9, 112:24, 113:1, 113:3, 113:21, 114:8, 121:14, 121:17, 121:25, 122:7, 123:4, 123:6, 123:7, 123:16, 123:24, 124:2, 124:4, 124:5, 124:9, 125:3, 126:20, 127:4, 127:8, 137:9, 137:20, 137:24, 138:2, 138:3
**spending** [6] - 48:20, 77:14, 78:4, 78:15, 79:16, 79:20
**spends** [1] - 79:1
**spent** [5] - 53:11, 66:3, 68:20, 107:5, 126:23
**spoken** [1] - 22:18
**spotting** [1] - 133:19
**spreadsheet** [2] - 109:8, 109:12
**spreadsheets** [2] - 59:19, 101:4
**squad** [3] - 21:13, 43:7, 43:8
**squarely** [1] - 7:14
**squeeze** [1] - 23:17
**staff** [2] - 19:6, 42:4
**stage** [2] - 142:13, 142:20
**stages** [1] - 34:6
**stand** [6] - 10:18, 12:2, 41:2, 78:13, 95:7, 123:10
**standard** [15] - 6:10, 7:19, 13:15, 13:16, 13:17, 13:18, 24:7, 29:3, 29:16, 29:19, 29:25, 30:7, 31:8, 143:1, 144:2
**standards** [2] - 5:2, 5:3

**start** [10] - 4:5, 29:5, 44:1, 51:13, 51:15, 54:22, 88:16, 98:22, 141:24, 142:22
**started** [7] - 18:25, 42:3, 96:20, 97:6, 100:24, 102:13
**starting** [6] - 3:5, 28:5, 61:9, 108:25, 110:3, 143:9
**starts** [6] - 8:2, 8:6, 8:7, 28:22, 81:11, 126:16
**state** [3] - 3:4, 41:12, 95:20
**statement** [1] - 6:1
**statements** [4] - 58:9, 67:2, 87:20, 96:25
**STATES** [3] - 1:1, 1:2, 1:8
**States** [21] - 1:22, 3:3, 3:7, 8:6, 8:14, 12:16, 12:25, 29:8, 29:13, 41:23, 120:13, 130:8, 148:22, 148:25, 151:16, 152:6, 152:9, 153:4, 153:20, 154:7, 154:8
**statistical** [3] - 74:2, 119:18, 119:23
**statistics** [1] - 79:18
**stenographic** [1] - 157:5
**steps** [3] - 60:23, 63:15, 112:11
**Sterlingov** [21] - 3:3, 3:13, 3:16, 16:14, 19:15, 19:16, 22:9, 30:1, 38:5, 57:2, 67:1, 67:10, 72:13, 72:17, 86:4, 87:4, 88:17, 90:1, 92:22, 108:13, 120:22
**STERLINGOV** [1] - 1:5
**Sterlingov's** [18] - 27:23, 57:5, 59:15, 59:16, 60:11, 64:20, 65:2, 65:4, 65:16, 66:18, 66:22, 72:5, 72:8, 86:2, 86:5, 93:1, 93:3, 120:25
**Stevens** [1] - 42:1
**still** [9] - 34:19, 36:19, 40:7, 50:12, 70:21, 123:22, 146:1, 146:2
**stipulated** [1] - 106:21
**stood** [1] - 71:10
**stop** [1] - 10:16
**store** [3] - 47:1, 47:5, 47:7

**stored** [1] - 148:13
**story** [1] - 23:16
**straight** [1] - 119:25
**straightforward** [1] - 7:17
**streamlined** [1] - 118:16
**Street** [2] - 1:11, 1:17
**stretch** [1] - 10:5
**strike** [1] - 29:5
**string** [1] - 47:15
**stronger** [1] - 145:13
**structured** [1] - 91:16
**studies** [2] - 35:23, 35:25
**study** [2] - 35:5, 111:3
**studying** [2] - 131:15, 131:17
**stuff** [3] - 16:24, 80:8, 155:21
**subject** [1] - 38:25
**subjecting** [1] - 150:1
**subjects** [2] - 135:14, 135:19
**submarine** [1] - 41:23
**submit** [7] - 10:25, 11:5, 12:9, 13:10, 13:11, 26:5, 37:24
**submits** [1] - 27:22
**submitted** [1] - 148:10
**subpoena** [9] - 4:1, 4:2, 4:16, 4:18, 46:15, 46:22, 56:1, 56:8, 85:11
**subpoenaed** [4] - 19:21, 19:24, 20:12, 56:5
**subpoenas** [2] - 18:17, 136:13
**subsequent** [1] - 66:3
**subsequently** [1] - 68:19
**subset** [1] - 111:22
**subsidiary** [2] - 120:10, 120:12
**substantial** [1] - 153:3
**substantive** [1] - 19:9
**success** [1] - 129:4
**sudden** [1] - 9:20
**suffice** [1] - 149:18
**sufficient** [6] - 143:4, 143:23, 144:2, 146:4, 146:24, 147:9
**suggest** [3] - 35:17, 66:10, 155:21
**suggests** [1] - 142:10
**summarize** [1] - 64:14
**summarizing** [1] - 108:18
**summary** [4] - 4:20,

6:17, 44:22, 109:7
**superior** [1] - 19:8
**superseding** [3] - 88:5, 88:7, 88:10
**supervision** [2] - 150:2, 150:3
**supervisor** [1] - 97:2
**support** [20] - 18:1, 18:7, 20:1, 20:9, 25:9, 42:8, 42:17, 43:7, 58:8, 96:15, 97:3, 100:6, 100:8, 103:11, 103:12, 103:13, 135:1, 135:23, 144:23
**supported** [2] - 43:7, 135:9
**supporting** [1] - 102:9
**supports** [1] - 134:18
**suppose** [3] - 37:25, 38:9, 94:22
**supposed** [1] - 36:1
**Supreme** [2] - 148:25, 151:20
**surfaces** [1] - 116:7
**surfing** [1] - 25:17
**suspect** [1] - 8:22
**sustain** [1] - 29:11
**swaps** [1] - 43:9
**Sweden** [2] - 152:3, 154:4
**sweep** [5] - 82:18, 82:20, 83:3, 83:13, 91:14
**swept** [1] - 91:23
**sworn** [2] - 41:7, 95:13
**symbol** [1] - 82:13
**system** [1] - 13:5
**systems** [1] - 21:11

## T

**tab** [1] - 104:11
**Tab** [1] - 109:6
**table** [2] - 64:13, 106:12
**tactics** [1] - 114:4
**takedown** [1] - 99:22
**talks** [1] - 124:5
**Tamara** [3] - 1:21, 157:9, 157:9
**TAMARA** [1] - 157:3
**Tamura** [1] - 29:8
**tape** [1] - 26:2
**task** [1] - 43:19
**tax** [1] - 149:9
**teach** [1] - 44:6
**Team** [1] - 41:18
**team** [15] - 42:6, 42:8,

42:12, 42:14, 42:15, 42:21, 42:23, 44:10, 44:12, 103:10, 103:11, 103:19, 125:19, 134:18
**team's** [1] - 42:9
**techniques** [6] - 42:17, 44:3, 72:19, 73:3, 124:8, 137:10
**technology** [1] - 122:6
**Technology** [1] - 42:1
**ten** [1] - 40:13
**ten-minute** [1] - 40:13
**term** [1] - 50:16
**terms** [4] - 19:11, 152:15, 155:18, 155:20
**terribly** [1] - 38:12
**test** [5] - 112:18, 137:6, 153:2, 153:3, 153:4
**tested** [2] - 133:22, 133:24
**testified** [9] - 67:1, 72:20, 94:5, 104:5, 119:6, 121:16, 121:19, 124:7, 134:5
**testify** [9] - 5:24, 6:2, 22:13, 22:14, 32:16, 34:4, 36:4, 40:24, 154:5
**testifying** [5] - 7:6, 34:16, 37:2, 37:3, 155:14
**testimony** [28] - 4:3, 4:21, 5:7, 5:8, 6:17, 11:2, 24:14, 25:6, 29:3, 29:6, 32:23, 33:25, 35:19, 35:25, 36:21, 44:23, 56:10, 57:8, 61:23, 74:14, 80:24, 104:16, 106:25, 119:13, 120:21, 124:25, 134:7, 139:19
**testing** [1] - 154:21
**tests** [1] - 43:24
**text** [2] - 113:18, 149:11
**THE** [183] - 1:1, 1:1, 1:8, 3:2, 3:8, 3:11, 3:14, 3:17, 7:20, 7:24, 8:1, 8:19, 9:7, 9:9, 10:1, 10:12, 10:16, 11:1, 11:8, 11:21, 12:12, 12:15, 13:1, 13:7, 13:13, 14:12, 15:2, 15:13, 16:1, 16:19, 16:22, 17:8, 17:12, 21:1,

21:15, 21:25, 22:11, 22:21, 24:10, 25:1, 26:8, 27:8, 27:14, 28:2, 28:15, 28:18, 29:2, 32:14, 32:25, 33:6, 33:18, 34:3, 34:6, 34:17, 35:2, 35:21, 36:14, 36:22, 37:3, 37:9, 37:14, 37:20, 37:25, 39:2, 39:7, 39:10, 39:20, 40:2, 40:9, 40:17, 41:3, 41:5, 41:8, 45:2, 45:4, 52:18, 52:22, 53:4, 53:5, 53:18, 58:1, 58:15, 59:24, 60:2, 73:8, 73:11, 73:13, 86:11, 86:14, 86:17, 86:18, 87:6, 87:14, 88:20, 88:23, 90:4, 90:7, 90:21, 90:23, 91:2, 91:3, 91:10, 91:11, 93:20, 93:23, 94:1, 94:14, 94:18, 94:22, 95:2, 95:10, 95:11, 95:14, 98:4, 98:5, 104:20, 104:22, 109:19, 109:22, 115:20, 115:23, 115:24, 116:2, 116:3, 116:6, 116:17, 116:20, 116:21, 116:24, 117:1, 117:4, 117:13, 118:10, 118:25, 128:8, 129:20, 130:11, 131:2, 131:14, 131:20, 133:11, 138:9, 138:24, 139:13, 140:16, 140:19, 141:5, 141:10, 141:19, 143:12, 143:16, 143:21, 144:17, 145:2, 145:12, 145:21, 146:9, 146:15, 146:19, 147:23, 148:5, 148:10, 148:23, 149:19, 149:21, 150:5, 150:16, 150:24, 151:5, 151:9, 151:19, 151:25, 152:4, 153:8, 153:16, 153:23, 154:16, 155:3, 155:6, 155:9, 155:15, 156:8, 156:12

**themselves** [3] - 53:3, 113:15, 154:23
**theories** [1] - 5:16
**therefore** [2] - 30:2, 79:3
**they've** [7] - 6:9, 19:24, 55:12, 91:19, 116:18, 129:4, 154:8
**thinks** [1] - 142:18
**third** [9] - 55:9, 55:14, 68:12, 68:13, 80:16, 108:4, 125:12, 125:17, 126:15
**third-party** [2] - 108:4, 125:17
**thousand** [1] - 56:21
**thousands** [13] - 53:22, 59:19, 59:20, 64:11, 109:13, 135:23, 139:6, 139:9, 139:25, 140:4, 140:5
**threats** [1] - 43:10
**three** [11] - 19:24, 49:4, 49:10, 49:14, 49:22, 49:24, 50:1, 68:8, 69:7, 77:6, 153:25
**three-bitcoin** [2] - 49:22, 49:24
**three-quarters** [1] - 153:25
**threshold** [1] - 151:18
**throughout** [3] - 43:16, 56:21, 70:18
**tie** [2] - 130:15, 131:11
**timing** [5] - 72:1, 72:4, 72:7, 80:5, 80:8
**title** [2] - 121:1, 123:19
**today** [21] - 3:18, 3:22, 15:19, 32:22, 33:8, 37:1, 39:13, 40:4, 40:9, 40:18, 44:23, 50:18, 77:11, 78:13, 104:16, 106:25, 119:22, 122:17, 123:10, 125:20, 127:13
**today's** [2] - 58:21, 109:20
**together** [12] - 22:17, 34:9, 38:19, 55:4, 55:12, 90:15, 98:21, 101:2, 105:24, 112:23, 113:4, 118:8
**ton** [1] - 52:12
**took** [2] - 12:4, 71:8
**tool** [18] - 21:25, 22:5, 23:22, 54:18, 55:8, 101:3, 102:3, 103:5,

103:6, 118:23, 132:14, 133:12, 133:22, 136:5, 136:7, 136:11, 138:14, 154:22
**tools** [24] - 24:3, 54:14, 54:15, 54:19, 54:20, 55:6, 55:9, 55:15, 55:16, 61:7, 63:25, 64:7, 74:25, 100:22, 101:7, 101:8, 101:9, 101:12, 101:16, 101:17, 101:24, 102:1, 103:3, 103:5
**top** [10] - 33:15, 53:22, 65:13, 65:23, 68:23, 83:2, 83:13, 150:17, 150:21, 151:13
**topic** [2] - 34:3, 52:19
**topics** [2] - 44:3, 104:8
**TOR** [1] - 1:15
**Tor** [2] - 1:16, 3:12
**total** [2] - 65:21, 137:22
**totally** [1] - 6:24
**touch** [1] - 148:16
**touched** [3] - 23:9, 23:12, 100:17
**Touhy** [5] - 4:23, 4:24, 6:12, 6:14, 9:2
**towards** [2] - 4:11, 96:19
**trace** [9] - 26:15, 75:12, 81:22, 82:9, 83:22, 88:10, 97:16, 98:17, 114:13
**traced** [1] - 85:12
**traces** [2] - 26:11, 87:3
**tracing** [30] - 15:20, 20:3, 20:4, 20:7, 21:16, 21:23, 22:7, 22:8, 26:12, 35:15, 35:19, 57:12, 57:22, 66:24, 67:9, 68:21, 70:10, 76:22, 76:23, 81:14, 87:19, 113:24, 114:19, 123:12, 132:20, 133:7, 135:15, 135:20, 155:18
**trades** [1] - 46:21
**traditional** [3] - 96:14, 96:23, 98:2
**trafficking** [2] - 25:2, 141:15
**trained** [2] - 26:21, 73:24
**training** [7] - 43:11,

43:17, 43:19, 44:10, 77:6, 102:20, 129:9
**trainings** [10] - 43:14, 43:15, 43:21, 43:23, 44:5, 44:7, 44:9, 104:1, 129:3
**transact** [1] - 71:19
**transacted** [1] - 112:25
**transacting** [2] - 98:24, 133:2
**transaction** [73] - 12:4, 15:21, 47:25, 48:9, 48:10, 48:12, 48:13, 48:14, 48:17, 48:19, 48:21, 48:24, 49:7, 49:11, 49:14, 49:16, 49:18, 50:6, 50:22, 51:3, 51:5, 51:9, 51:12, 51:16, 51:17, 51:20, 53:9, 54:3, 55:21, 68:24, 68:25, 70:25, 71:16, 76:1, 78:3, 78:10, 81:9, 82:18, 82:20, 82:21, 83:2, 83:7, 83:12, 84:18, 85:4, 87:22, 87:23, 88:4, 90:10, 90:20, 91:4, 91:8, 92:19, 103:7, 105:17, 106:13, 106:23, 108:15, 111:3, 111:10, 112:1, 112:5, 112:14, 112:18, 113:3, 116:9, 132:13, 133:7, 142:5, 152:14
**transactions** [78] - 26:13, 45:14, 46:21, 48:11, 49:20, 50:17, 50:20, 53:8, 53:14, 57:7, 60:8, 61:3, 61:4, 61:8, 61:16, 61:24, 62:7, 62:9, 63:16, 64:2, 64:9, 64:11, 65:17, 65:19, 66:1, 66:3, 68:9, 68:16, 69:2, 69:7, 69:16, 70:13, 70:16, 70:17, 70:21, 71:15, 71:18, 72:12, 72:16, 78:3, 79:9, 80:5, 80:6, 83:18, 83:22, 84:3, 85:13, 87:21, 90:7, 90:9, 93:12, 97:16, 98:18, 98:19, 100:9, 101:1, 103:4, 105:18, 106:10, 106:20, 110:25,

125:11, 127:18, 133:1, 144:15, 144:24, 144:25, 145:3, 145:5, 145:16, 145:24, 146:8, 146:10, 146:12, 146:14, 148:17, 153:9
**TRANSCRIPT** [1] - 1:7
**transcript** [2] - 157:4, 157:6
**transfer** [9] - 8:12, 12:20, 47:9, 48:2, 48:3, 49:5, 71:11, 106:12, 133:5
**transferred** [4] - 18:22, 48:16, 65:5, 65:21
**transfers** [4] - 59:14, 70:23, 72:2, 72:4
**transmit** [1] - 48:7
**transmits** [1] - 45:14
**transmitted** [1] - 48:8
**transmitting** [2] - 147:24, 149:13
**transparent** [1] - 5:1
**travel** [1] - 3:22
**treasury** [1] - 9:19
**Trial** [1] - 20:3
**trial** [19] - 8:21, 13:4, 22:25, 23:2, 23:3, 23:8, 29:4, 29:6, 35:22, 58:18, 142:24, 143:3, 145:23, 153:13, 154:1, 154:2, 155:22, 156:5, 156:7
**trick** [1] - 114:11
**TRM** [9] - 43:20, 43:22, 43:25, 54:16, 61:7, 63:21, 63:23, 63:24, 75:2
**true** [10] - 78:5, 78:8, 84:9, 85:2, 85:5, 85:6, 85:10, 85:15, 157:4, 157:5
**trust** [1] - 137:4
**truth** [1] - 26:1
**try** [4] - 39:21, 50:24, 114:11, 153:18
**trying** [7] - 23:17, 48:2, 53:13, 55:5, 87:11, 107:1, 152:19
**turn** [4] - 10:20, 34:7, 34:10, 71:6
**turning** [5] - 59:4, 64:13, 108:7, 108:24, 130:24
**turns** [2] - 10:21, 16:17

| | | | | |
|---|---|---|---|---|
| **twice** [2] - 151:16, 153:15<br>**Twitter** [1] - 71:23<br>**two** [49] - 5:10, 9:6, 9:12, 15:10, 17:14, 17:22, 18:24, 27:25, 30:11, 33:8, 34:6, 40:5, 49:2, 49:10, 49:13, 49:15, 50:3, 71:17, 78:2, 83:13, 83:14, 83:15, 90:15, 91:6, 91:8, 93:23, 103:3, 103:5, 110:17, 112:21, 115:8, 116:7, 120:1, 121:4, 132:24, 134:21, 141:25, 143:18, 144:17, 144:18, 144:24, 145:15, 151:21, 154:19, 154:21, 155:8<br>**type** [16] - 25:7, 26:7, 45:16, 46:4, 56:16, 79:23, 80:6, 80:16, 98:6, 98:12, 103:10, 106:17, 111:1, 130:13, 131:4, 137:2<br>**types** [7] - 26:13, 45:15, 77:6, 102:17, 103:3, 112:5, 116:7<br>**typically** [10] - 51:13, 91:16, 100:14, 105:19, 111:15, 118:1, 118:4, 122:2, 132:12, 132:15 | 144:25, 145:15, 145:24, 146:7, 146:10, 146:12, 146:14, 152:14<br>**underlie** [1] - 59:20<br>**underlying** [8] - 55:18, 72:25, 78:6, 107:12, 114:24, 115:2, 116:7, 121:5<br>**understood** [2] - 34:11, 116:4<br>**unheard** [1] - 8:25<br>**unilateral** [2] - 152:11, 154:12<br>**unique** [7] - 14:10, 15:4, 17:5, 27:25, 48:12, 48:13, 51:17<br>**United** [21] - 1:22, 3:3, 3:7, 8:6, 8:14, 12:16, 12:25, 29:8, 29:13, 41:22, 120:13, 130:8, 148:22, 148:24, 151:16, 152:6, 152:9, 153:4, 153:20, 154:7, 154:8<br>**UNITED** [3] - 1:1, 1:2, 1:8<br>**universe** [2] - 111:22, 111:25<br>**university** [2] - 96:3, 96:5<br>**University** [3] - 41:22, 96:6, 123:17<br>**unless** [3] - 87:21, 123:22, 138:6<br>**unlikely** [1] - 90:18<br>**unquote** [1] - 100:12<br>**unrelated** [1] - 131:17<br>**unscientific** [1] - 58:13<br>**unspent** [2] - 106:22, 106:23<br>**untested** [1] - 58:6<br>**unusual** [2] - 4:12, 5:21<br>**unvalidated** [1] - 58:14<br>**up** [36] - 3:20, 3:21, 3:23, 3:24, 13:3, 17:12, 20:21, 23:21, 23:24, 25:10, 25:18, 29:21, 31:25, 38:11, 42:15, 54:8, 70:4, 76:2, 88:22, 89:12, 90:4, 90:25, 98:3, 100:11, 102:16, 107:2, 107:6, 117:1, 117:4, 117:13, 130:3, 137:15, 141:12, 141:14, | 142:12, 149:9<br>**update** [8] - 34:23, 34:24, 35:1, 36:8, 146:16, 154:18, 155:4, 155:20<br>**updated** [1] - 156:9<br>**updating** [2] - 34:22, 155:3<br>**USAO** [1] - 1:11<br>**USAO-DOJ** [1] - 1:11<br>**user** [6] - 47:22, 47:23, 47:24, 52:1, 52:10, 54:23<br>**users** [9] - 45:20, 47:3, 47:7, 52:24, 114:23, 115:3, 115:18, 129:4, 139:4<br>**uses** [10] - 77:6, 77:11, 77:14, 107:21, 121:14, 121:20, 124:8, 131:9, 132:11, 135:22<br>**utility** [1] - 136:5<br>**utilize** [1] - 122:5<br>**UTXO** [1] - 106:22<br><br>**V**<br><br>**vagaries** [1] - 6:3<br>**valid** [2] - 53:9, 53:15<br>**validate** [8] - 15:24, 16:15, 55:24, 60:23, 61:4, 61:5, 63:16, 112:11<br>**validated** [2] - 16:10, 16:12<br>**validates** [3] - 45:14, 66:23, 74:20<br>**validating** [2] - 53:8, 64:1<br>**validation** [4] - 56:12, 67:6, 80:12, 87:18<br>**validity** [4] - 16:7, 58:11, 84:20, 137:6<br>**valuable** [3] - 98:14, 116:14, 118:13<br>**value** [1] - 47:14<br>**variety** [3] - 64:3, 64:20, 136:4<br>**various** [10] - 65:2, 65:7, 67:2, 67:20, 68:20, 103:14, 103:24, 115:17, 122:2, 145:17<br>**vary** [1] - 145:12<br>**vast** [1] - 44:15<br>**vendor** [4] - 97:4, 129:12, 129:15, 130:10 | **venire** [1] - 153:24<br>**venue** [40] - 6:5, 6:6, 10:15, 10:19, 11:11, 11:17, 11:24, 12:11, 12:18, 14:23, 20:17, 30:13, 142:3, 142:5, 142:12, 142:21, 143:10, 143:15, 144:8, 145:17, 145:22, 146:2, 146:5, 146:6, 146:20, 147:2, 147:7, 147:10, 151:3, 151:6, 151:10, 151:15, 152:5, 153:14, 153:17, 154:14, 154:20, 154:21<br>**venue-related** [1] - 146:20<br>**verifiability** [1] - 16:16<br>**verifiable** [5] - 58:4, 101:16, 108:2, 125:16, 133:24<br>**verification** [1] - 154:21<br>**verified** [9] - 48:9, 54:9, 84:17, 84:19, 108:4, 108:25, 125:18, 127:14, 141:14<br>**verify** [6] - 15:24, 87:12, 113:7, 117:15, 136:10, 140:23<br>**verifying** [4] - 56:11, 113:14, 137:2, 155:20<br>**version** [1] - 35:13<br>**versus** [2] - 10:18, 110:21<br>**view** [8] - 138:14, 141:3, 142:1, 142:4, 143:22, 143:23, 144:1, 152:5<br>**viewing** [1] - 101:1<br>**views** [1] - 36:23<br>**Virginia** [1] - 12:3<br>**virtual** [16] - 42:11, 42:15, 42:20, 42:22, 42:25, 43:2, 43:11, 44:9, 45:10, 45:12, 45:15, 46:2, 46:20, 67:20, 92:23, 93:14<br>**visit** [1] - 45:22<br>**vitae** [2] - 44:19, 104:12<br>**vital** [6] - 5:7, 5:18, 5:19, 11:10, 30:17, 31:2 | **volume** [1] - 56:19<br>**voluminous** [3] - 4:8, 59:2, 109:12<br>**vs** [1] - 1:4<br><br>**W**<br><br>**wait** [1] - 39:22<br>**waiving** [1] - 21:5<br>**walk** [4] - 48:24, 65:14, 68:3, 82:9<br>**walked** [1] - 25:15<br>**Wall** [1] - 1:17<br>**Wallet** [3] - 78:19, 91:2, 122:4<br>**wallet** [42] - 47:8, 47:10, 47:18, 47:20, 47:23, 47:25, 48:4, 48:7, 49:1, 49:8, 49:9, 50:2, 50:7, 50:11, 51:10, 59:17, 66:5, 66:12, 66:18, 66:22, 71:17, 82:13, 82:15, 84:2, 84:7, 84:10, 84:11, 86:3, 86:9, 89:19, 101:20, 101:21, 105:7, 106:19, 107:4, 107:6, 107:8, 107:10, 112:5, 112:17, 127:19<br>**wallets** [1] - 47:21<br>**wants** [5] - 20:2, 23:15, 39:22, 47:22, 154:18<br>**warfare** [1] - 41:23<br>**warrant** [2] - 60:12, 135:7<br>**warrants** [5] - 135:1, 135:5, 135:9, 135:10, 136:13<br>**Wasabi** [5] - 78:19, 79:7, 89:19, 91:2, 122:4<br>**Washington** [8] - 1:5, 1:12, 1:14, 1:23, 8:12, 18:22, 18:24, 157:11<br>**ways** [5] - 4:15, 47:5, 78:9, 106:6, 117:15<br>**wears** [1] - 33:10<br>**web** [3] - 52:5, 52:11, 68:20<br>**website** [1] - 45:22<br>**websites** [1] - 52:3<br>**Wednesday** [1] - 39:22<br>**week** [9] - 32:10, 32:15, 32:17, 33:4, 33:14, 35:19, |

**U**

**U.S** [10] - 1:13, 17:24, 18:25, 44:10, 68:13, 103:11, 103:14, 126:3, 132:1, 132:3<br>**UC** [1] - 63:5<br>**UK** [1] - 141:15<br>**ultimately** [1] - 65:21<br>**unavailable** [1] - 6:2<br>**unclear** [2] - 34:15, 36:20<br>**under** [10] - 7:6, 20:23, 23:12, 27:23, 32:2, 34:19, 68:3, 126:9, 148:14, 156:8<br>**undercover** [25] - 60:8, 61:3, 61:8, 61:16, 61:17, 61:24, 62:1, 62:7, 62:9, 62:23, 62:24, 63:16, 87:21, 87:22, 100:9, 102:18, 144:15,

102:12, 102:15, 151:21

**week-long** [1] - 102:12

**weeks** [2] - 151:21, 155:8

**welcome** [3] - 4:6, 21:4, 31:5

**well-established** [2] - 7:18, 149:17

**well-known** [1] - 45:16

**WFO** [1] - 18:23

**whatsoever** [4] - 18:4, 91:5, 153:17

**whole** [4] - 4:25, 99:23, 129:17, 129:18

**wild** [1] - 17:17

**withdraw** [1] - 86:20

**withdrawal** [13] - 62:20, 62:22, 62:25, 63:3, 63:5, 91:25, 92:4, 92:9, 92:12, 92:16, 112:16, 113:2, 113:3

**withdrawals** [4] - 46:21, 91:14, 91:15, 91:18

**withdrawing** [1] - 131:8

**withdrawn** [2] - 68:7, 68:13

**withdrew** [1] - 61:19

**witness** [48] - 4:23, 4:25, 5:22, 6:1, 6:2, 6:5, 6:14, 7:2, 7:4, 7:6, 7:7, 7:9, 9:4, 10:4, 10:17, 17:4, 24:3, 24:5, 26:9, 28:14, 29:13, 30:1, 30:3, 30:18, 30:24, 31:6, 32:2, 36:4, 38:1, 38:12, 40:12, 40:14, 40:22, 41:2, 41:7, 94:16, 94:24, 95:2, 95:13, 133:10, 133:16, 138:9, 140:16, 140:18, 140:20, 155:14

**WITNESS** [13] - 2:2, 52:22, 53:5, 86:18, 90:7, 90:23, 91:3, 91:11, 98:5, 115:23, 116:2, 116:6, 116:20

**witnesses** [14] - 3:18, 3:22, 9:24, 19:24, 23:1, 25:5, 27:22, 32:11, 33:8, 40:1, 40:5, 152:3, 154:3, 154:23

**wonder** [1] - 146:21

**wondering** [1] - 10:24

**word** [5] - 75:7, 75:15, 75:16, 99:5, 126:16

**word-of-mouth** [1] - 99:5

**words** [2] - 45:10, 104:25

**works** [3] - 28:23, 44:2, 107:4

**worried** [1] - 154:7

**write** [2] - 21:9, 124:24

**writes** [2] - 8:4, 14:17

**writing** [2] - 66:13, 88:7

**written** [1] - 6:17

**wrote** [3] - 18:9, 124:19, 154:1

---

## X

**Xchange** [3] - 68:14, 68:15, 68:17

---

## Y

**year** [2] - 19:3, 57:8

**years** [13] - 4:13, 8:19, 9:6, 9:12, 15:11, 17:15, 27:25, 35:4, 41:24, 43:5, 43:17, 115:19, 134:22

**York** [1] - 1:17

**yourself** [4] - 52:7, 52:9, 53:24, 150:2

---

## Z

**zero** [1] - 141:2

**Zoom** [3] - 32:18, 32:20, 32:22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       ) Criminal Action
                                 ) No. 1:21-CR-0399
              Plaintiff,   )
                                 ) **MOTIONS HEARING**
vs.                               )
                                 ) Washington, D.C.
ROMAN STERLINGOV,            ) **July 19, 2023**
                                 ) **Time:  10:30 A.M.**
              Defendant.   )

**TRANSCRIPT OF MOTIONS HEARING**
BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For the Plaintiff:      CHRISTOPHER BROWN - VIA ZOOM
                          USAO-DOJ
                          601 D Street, NW
                          Washington, DC 20001

                          ALDEN PELKER
                          U.S. DEPARTMENT OF JUSTICE
                          950 Pennsylvania Avenue, NW
                          Washington, DC 20530

For the Defendant:      TOR EKELAND
                          MICHAEL HASSARD
                          Tor Ekeland Law, PLLC
                          30 Wall Street, 8th Floor
                          New York, NY 10005

Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
                          Official Court Reporter
                          United States Courthouse, Room 6714
                          333 Constitution Avenue, NW
                          Washington, DC  20001
                          202-354-3246

I N D E X

WITNESS                                              PAGE

DR. ITIEL DROR

        Direct Examination
        By Mr. Ekeland                               33

        Cross-Examination
        By Mr. Brown                                 45

        Redirect Examination
        By Mr. Ekeland                               88


J.W. VERRET

        Direct Examination
        By Mr. Ekeland                               92

        Cross-Examination
        By Mr. Brown                                 131



EXHIBITS ADMITTED                                    PAGE

Defense Exhibits B, C and D                          32

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Calling Criminal Case No. 21-399, United States of America v. Roman Sterlingov.

Would counsel please state your names for the record, starting with government counsel.

MS. PELKER:  Good morning, Your Honor.  Alden Pelker for the United States.

THE COURT:  Good morning, Ms. Pelker.

MS. PELKER:  And I'm joined by Mr. Brown on Zoom.

THE COURT:  Mr. Brown, welcome.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for defendant, Roman Sterlingov, who is present in court.

THE COURT:  Good morning to both of you.

MR. HASSARD:  Good morning, Your Honor.  Michael Hassard for defendant, Roman Sterlingov.

THE COURT:  Okay.  Good morning to you as well.

So I take it that there's some scheduling issues counsel wanted to discuss before we turn to the substance today.

MS. PELKER:  Yes, Your Honor.  I think there are a couple housekeeping matters.

First and foremost, the government, in our last set of *Daubert* hearings, if the Court recalls, had planned to put on Ms. Mazars de Mazarin, the FBI computer scientist who did work on this case.  She had a death of a loved one just before

the first hearing.

We had anticipated to have her testify today. Unfortunately -- we let defense counsel know earlier this week -- she has still not yet returned to full-time regular work. Our expectation is that she will be back and available to testify at trial and for -- if the Court deems it needed -- a *Daubert* hearing closer to the trial date.

Out of an abundance of caution, the government is also looking at alternatives of having someone who could cover her area of testimony, if needed. Particularly, the IP address testimony that we understand is the substance of the defense challenge, including potentially having that area of testimony covered by the FBI case agent who is a former computer scientist and with a computer science background. We hope to give the Court and defense counsel an update on that by early next week.

I think one note on that, too, is something that the government would reiterate its position on that this is not the subject -- an appropriate subject of a *Daubert* proceeding. Our understanding is that the defense is challenging the IP address analysis. All Ms. Mazars de Mazarin's testimony is is that she reviewed different accounts, different devices, found that the same IP address were accessing various accounts. She'll testify to that.

Defense can cross-examine her and can put on their

expert who says that the accesses were too far apart in time, that IP addresses can be used by multiple people. But that's appropriate for cross-examination at trial, not a *Daubert* inquiry.

THE COURT: If I understand correctly, what you're saying is that she's not offering an expert opinion at all, but merely fact testimony, that she saw certain digits in a particular order on a particular computer file or history and then went and looked somewhere else and saw the same digits organized in the same order somewhere else.

MS. PELKER: That's correct. And her report focuses on certain ones that she found particularly significant because they were close in time. The defense can argue that they're not significant for XYZ reason.

THE COURT: Is she offering an opinion that things that are close in time are often associated in some way?

MS. PELKER: I do believe that that would be an opinion or an analysis she would be offering, yes.

THE COURT: I suppose, if she's offering an opinion, then there's a question about what the basis is for the opinion. It may be that much of what she wants to say is -- testify to is factual in nature, but to the extent she's offering an opinion, I suppose I'd need to figure out whether there's a sufficient basis for that opinion.

MS. PELKER: And we would just argue that that can be

done on the papers with the face of the report, and we understand what defense counsel's, we think, position and objection is.

THE COURT: Okay. Well, there also may be -- frankly, that is -- assuming that is the only issue, that it is a narrow enough one that, even if we had to do it early in the morning or sometime during the course of trial, it could be done that way as well.

MS. PELKER: The other scheduling issue -- and defense can speak to this further -- there's two other scheduling issues. Our understanding was that Ms. Mazars de Mazarin was the --

THE COURT: I'm sorry. Can you say that name and spell it for me again.

MS. PELKER: Yes. Mazars, M-a-z-a-r-s, de, d-e, Mazarin, M-a-z-a-r-i-n.

THE COURT: Okay. Thank you.

MS. PELKER: Our understanding was that Ms. Mazars de Mazarin was the only outstanding government expert that had been noticed that the defense intended to challenge through *Daubert* proceedings. They advised us on Monday that they also intend to challenge Ms. Glave, the forensic accountant, and Mr. Vlahakis, the FinCEN expert.

Those are two purely fact witnesses. They were noticed out of an abundance of caution. They are not going to

be opining on anything. We're still not clear what the grounds are for any *Daubert* challenge of their testimony.

THE COURT: Okay.

MS. PELKER: And the last scheduling matter is Ms. Still, the defense -- the newly retained defense blockchain expert. We understand that she was not available today, and so we'd be seeking scheduling of a *Daubert* hearing for her. That *Daubert* hearing may be unnecessary if we can just get a report of what her work actually is on this case.

I know that's been the subject of lengthy discussions. And at the last hearing, the Court ordered defense counsel to produce any supplemental expert reports by July 7th, and we had discussions about that, including any blockchain analysis report. We still don't have one.

We don't know what she's going to testify to. We don't anticipate challenging her qualifications, but we don't know what she's going to testify to, so we don't know whether we need to *Daubert* her or not.

THE COURT: All right. Thank you. Mr. Ekeland?

MR. EKELAND: Good morning, Your Honor. To address what counsel just said, to start with Ms. Mazarin, she is offering an opinion as to the IP address attribution. She -- if you look at her disclosure and her report, she says the IP address attribution is -- she uses adjectives like likely and positive. She also uses a software -- whose name I forget, but

it's in the report -- to do that analysis, of which there's no known error rates or accuracy rates, and we're not clear at all on the scientific validity of that software.

Essentially, she's offering an opinion as to the fact of whether or not these IP addresses at question here can be attributed to Mr. Sterlingov. So that's not a question --

THE COURT: Can you explain that to me a little bit more. What is the process that she's going through to attribute?

MR. EKELAND: She's taking the Mt. Gox database records, which, obviously, we take issue with as inauthentic for all the issues that we've raised in our papers. She's using the Mt. Gox data and what she's claiming to be IP addresses, logins for Mr. Sterlingov. And then she's running a software analysis through software to then say that, because of the temporal proximity between the IP address that she's attributing to Mr. Sterlingov, based on the IP address attribution, that because of its temporal proximity to other IP addresses that the government is claiming are associated with the setup of Bitcoin Fog -- and if I recall correctly, the DNS, the clearnet website registration in 2011 -- a completely legal act, by the way.

She's saying that it's likely and it's possible that the IP address that she alleges that Mr. Sterlingov used from his Mt. Gox account, based on what we maintain are inauthentic

records, is matching email address, IP addresses on a proxy server and that, therefore, the user of -- like an email address, like volfprius@hotmail.com and Roman Sterlingov are the same person. That's a matter of opinion. That's speculation.

And you can just see that by -- and Mr. Fischbach today, one of our experts that we're proffering, can talk about this a little bit. That's speculative, and that comes squarely into *Daubert*. So there's a very strong disagreement here with the government that this is just a simple matter of fact.

I think that's one of the underlying problems here with the forensics in this entire case. The government is taking this approach that, oh, it's just this fact that you look up. But, as you can see from the government's late-filed newly disclosed expert report that they filed last night from Ms. Bisbee, there's --

THE COURT: That was filed at my request.

MR. EKELAND: Yes, Your Honor. Not only -- you just asked for additional academic papers or any kind of scientific peer-reviewed stuff. Ms. Bisbee's declaration has all sorts of new information in it.

It's been no secret that from day one, we've been saying that this software has no scientific validation, there's no known error rates, there's nothing. In her disclosure that was filed at 10:30 last night, we've essentially gotten a whole

new expert report with all sorts of information about unnamed data scientists and a whole host of information that we need to address in an expert report; and Ms. Still can do that, and we would like to submit Ms. Still's expert report on -- by Friday, August 18th, if that works for the Court.

THE COURT: That seems like an awfully long time from now given the fact that these are late to start with. I'm just worried that we start pressing up against trial, and if we have to have a *Daubert* hearing --

MR. EKELAND: Your Honor, there's a massive amount of information that was disclosed last night that has not been previously disclosed.

THE COURT: A massive amount? Are you talking about the seven or eight pages that were filed with me?

MR. EKELAND: Yes, Your Honor, because they also attached the white paper from Sarah Meiklejohn which contains a whole tracing now. That paper -- that white paper that they attached, Your Honor, that was commissioned by Chainalysis, and the government and Chainalysis has known about that paper for a year now.

We mentioned that paper in our motions in limine. We mentioned it in our 57-7 motion for sanctions with the Court. And Ms. Bisbee, when she testified -- when she testified on direct, she said that she was -- kept up with all the literature in this area, that she was -- basically, said she

was an expert and current on all the literature.

THE COURT: I'm sorry, Mr. Ekeland. Just to try and make things more efficient here, you have a little bit of a tendency to go off and just make an argument that's unrelated to, sort of, what I'm asking about. I understand you want to argue the merits of it.

I'm just asking about timing now and the work that needs to be done, and you're using that as, sort of, a springboard to attack the government's case.

MR. EKELAND: Your Honor --

THE COURT: I'm sorry. I'm speaking. You need to address what my question is, timing, and what the basis is for thinking you need an entire month to prepare an expert report. Particularly given -- frankly, the expert reports that I've received have been scanned, at best, so far.

MR. EKELAND: Your Honor, we need the time because Ms. Still tells me that she's going through, and she's trying to recreate Mr. Scholl's tracing, and there's significant errors and omissions in the tracing. There's a significant amount of information that was disclosed for the first time last night.

If you look at the white paper that specifically addresses this case, there's a tracing in it that we requested the underlying data set for; we have not been given that. We've, essentially, been given a new expert report last night

at 10:30, and we need the time in this case that turns entirely on blockchain forensics that both the government's experts admitted they have no known error rates, and now we're getting told something entirely new and different.

We filed for a bill of particulars almost a year ago in this case. And everything is changing. They've gone down from saying in their press release that Mr. Sterlingov laundered $334 million worth of illicit drug fronts; then in the --

THE COURT: I'm sorry. You're doing it again.

MR. EKELAND: But, Your Honor, here's the thing. You're asking us to -- everything is changing repeatedly. We're being told, okay, it's easy to write an expert report.

Part of the problem, what's taking so much time, we haven't gotten full disclosure from the government, and their case keeps on changing, right? The trace in the criminal complaint is different from the trace in the Scholl report, which looks like it's different from the trace in the white paper.

And we need a month to go through this stuff carefully. And something else; under Rule 16, if you read the committee notes to the new rule, it says that the Court should give consideration to appointed counsel's needs and the time it takes to find the money to acquire proper experts. That's part of the reason that we've been slowed down here.

We haven't had the funding. The CJA process is incredibly slow.

THE COURT: So the reason that you identified Ms. Still's late in the process was the funding issue?

MR. EKELAND: That's one of the issues.

THE COURT: Can you explain that to me. I want to make sure that that's an accurate statement to the Court.

The forms are submitted to me. I haven't seen anything submitted requesting authorization for the expert; certainly, not months ago or weeks ago in that regard. So I'm a little surprised by that.

MR. EKELAND: Your Honor, because it took weeks for us just merely, after we submitted our forms to CJA here, to get on the eVoucher system. It's an incredibly slow system. What we've been told by the administrators of that system, they have a whole host of cases that they could give us if we wanted to take CJA because other attorneys in this district don't want to work with the CJA system. It's not an efficient system.

THE COURT: Let me say this. If you're having any problem getting anything approved promptly, just let me know.

MR. EKELAND: I will then, Your Honor. That's helpful. It's also not just what -- it's not just the money. It's also what happened with Mr. Scott. ███████████ ████████████████████████████████

MS. PELKER: Your Honor --

THE COURT: Let's not get --

MR. EKELAND: Your Honor, there's a whole host of reasons. What we're asking for is permission from the Court to submit an expert report from Ms. Still --

THE COURT: I'm not saying that you shouldn't be allowed to. I'm saying that a month seems an awful lengthy period of time at this point in the case since we're coming up on trial.

MR. EKELAND: Your Honor, everything in this case turns on the blockchain tracing. And at our last hearing, this Court candidly admitted that you didn't --

THE COURT: I don't admit things. I mean -- they weren't admitted --

MR. EKELAND: That's actually what you said in the transcript. You asked if there was an administrator to the blockchain. And if you're asking --

THE COURT: The courts don't make admissions. I'm not on one side or the other. What are you talking about, an admission?

MR. EKELAND: What the Court was saying is that you didn't fundamentally know the basics of the blockchain. And one of the fundamental facts of the blockchain is that there is no administrator.

So what I'm saying is I asked the Court to look at the complexity of the situation and understand that it's just

not as simple as some sort of bank account. And part of *Daubert* is not just whether the methodology is scientifically valid or if there's error rates; it's also if that methodology has been reliably applied.

And Scholl's report, I'm being told by Ms. Still, has significant omissions and errors in it, and we're having to hand enter some of the data that was given to us from the government, like in the Mycelium account, because it hasn't been given to us in a form that's easy to work with.

So there's a lot of delay here just based on the information that we've gotten. There's still data -- I think we are going to need to file a motion to compel next week that we haven't gotten. I think, based on what we're seeing -- with this new expert report and everything, we're going to have to file a motion to compel, and we need to see the source code from Chainalysis. There's a whole host of things.

Someone's liberty is at stake here, and we need to be careful about this tracing because there's nothing simple about this tracing. You sat in this courtroom. I was in this courtroom. Everybody was here when the government's witnesses, both of them, admitted that they couldn't name one scientific paper attesting to the accuracy of this.

THE COURT: Mr. Ekeland, we're going to be here for days if you just -- every time I ask a question about scheduling or timing, you go into a 20-minute spiel about the

merits of the case.

MR. EKELAND: Your Honor, I'm just simply trying to tell you, it's not as simple as something that can be sat down and be done in a couple of hours. And that is --

THE COURT: I'm not talking about a couple of hours. I'm talking about whether you need a month when -- what are we at this point? -- seven weeks from trial, something like that.

MR. EKELAND: Your Honor, the government has had seven years. You know, our client's liberty is at stake.

THE COURT: Would you be okay with adjourning the trial date, then? Your client is incarcerated. It seems to me that's what you're kind of pushing for, frankly.

MR. EKELAND: No, Your Honor. We're two months ahead of trial. If we get this in August 18th, the government is going to have a month to evaluate it. And as -- they're always of the opinion that this is very simple, everything is straightforward.

They've done the tracing. What we're doing is we're looking to make sure that their tracing is accurate, right? If they had done their job and their tracing is accurate, it's not going to be a big deal for them to rebut this.

THE COURT: I'm not concerned about the time the government has for rebuttal. I'm concerned about, I need to have a *Daubert* hearing, and they, obviously, would need enough time to analyze what you're doing and for me to have a hearing

on these issues on the eve of trial when we have a bunch of other *Daubert* hearings we have to have, other motions that we have to decide; a great proliferation of paperwork in this case.

I guess the reason I'm asking the question is whether it's realistic that we go to trial on the date that's scheduled given the fact that things are not being narrowed. They're being dramatically expanded and delayed as we go.

MR. EKELAND: Well, Your Honor, if we need to take some time at the start of trial -- first of all, I'm not clear that this trial is going to take a month. I'm not clear on what other witnesses the government has besides the experts. This entire trial, the government's case, simply turns on expert testimony based on the forensics.

This is not an ancillary issue. It's critical. And it deserves the proper time to be analyzed. What I've been told by Ms. Still is that she needs a month. This is with, like, four or five people at CipherTrace going through these traces to properly prepare a report. That was before we got what is, essentially, a new expert report last night from the government.

THE COURT: I have to tell you, I really do have some questions about your candor to the Court right now. You stood up a minute ago and just told me the reason you needed the month was because of this new expert report; now you tell me

you needed a month beforehand, and that is just adding to it.

MR. EKELAND: Your Honor, that's because she's new.

THE COURT: That's not what you said to me.

MR. EKELAND: Your Honor, the expert report requires the time. Ms. Still tells me -- when she started going through Scholl's report -- and she's new; we had to replace Mr. Scott, right?

She tells me that, because of the way that the data was presented by government and the number of omissions and errors that she's seeing from Mr. Scholl's trace, that she needs that time to prepare a proper report. If we get a report in on August 18th, that's still almost a month before trial.

This is the crux of the government's case. It's not an ancillary issue, Your Honor. We're simply asking for an opportunity to fairly examine, now, with the witness -- an expert witness that the government admits is qualified, present a proper written report to rebut or examine or whatever, and put forth our defense -- and put on a complete defense against the government's accusations against Mr. Sterlingov.

THE COURT: All right. Well, let me hear from Ms. Pelker about this.

MS. PELKER: A few things, Your Honor, that I think the Court has already picked up on. The filing last night was not any sort of substantive addition to anyone's expert report. It was simply intended to be responsive to the Court's prior

inquiry.

Defense counsel has had months with the government's expert reports, with detailed expert reports, detailed attachments that we filed back in December before the original --

THE COURT: What about the fact that, due to facts beyond the control of the defense, their other expert is not available to testify, so they need a new expert now?

MS. PELKER: I think that that might be better addressed at sidebar, Your Honor, and we did want to speak about the transcript on that matter. But with everyone on Zoom, based on the Court's preference, whether we address that now or --

THE COURT: I guess I don't think you need to get into the substance of it. My point was just that they needed a new expert for reasons that may be beyond their control.

MS. PELKER: They are entirely within the defense control. Your Honor, the defense has been on notice that this expert had -- the government had serious concerns and issues with this expert. It is not at all clear to the government how this -- Mr. Scott was ever identified as a potential blockchain analysis expert. He's simply not a blockchain analysis expert. That was always going to be an issue.

I understand that it takes some time to put together an expert report, but defense counsel has been on notice,

they've had extended periods of time. They're now looking at another month, more than a month to put together -- from when they actually retained Ms. Still, to put together an expert report that simply is not going to give the government sufficient time to respond.

We also have concerns about what the sufficiency of that expert report is going to look like based on the prior iterations with now several rounds of defense counsel coming back and failing to provide any sort of adequate disclosure under Rule 16.

I think the government strongly opposes any continuance in this matter. We have pushed this trial out extensively at defense's request and putting that out -- particularly when Mr. Sterlingov is incarcerated. Even so, the government is going to be prepared to go to trial in September, and we're going to oppose any sort of continuance.

THE COURT: What would you propose that I do with respect to an expert report from Ms. Still?

MS. PELKER: I think setting an early August deadline for the report. I recognize that Ms. Still likely does need time to go through the report. She, presumably, has begun that process and needs some time to actually put together a robust report. But we just think that August 18th is far too late.

If the Court doesn't mind, I can grab my phone with my calendar to look at potential dates.

THE COURT: That's fine. Remind me of the trial date.

MS. PELKER: Trial date is September 14th. The pretrial conference is currently scheduled for August 30th, but we understand that that may be rescheduled.

The government would propose August 7th as a deadline. That gives Ms. Still almost three weeks, and will give the government time to review and quickly try to prepare for a *Daubert* hearing, if necessary, prior to the pretrial conference.

THE COURT: All right. What do you propose with scheduling any additional *Daubert* hearings? When are we going to do that?

MS. PELKER: Just pending whatever the Court's availability is. I think rulings on it are going to be helpful, but we are looking at a compressed schedule now into August.

THE COURT: Right.

MS. PELKER: Possibly the week of -- if August 18th is available or, I guess, early the week of the 21st.

THE COURT: Let me just look at my calendar here. Well, I currently have a trial scheduled the week of August 21st, but it may get delayed. I don't know. I'll find out in the next day or so.

I suppose we could tentatively schedule further

*Daubert* hearings for that week and possibly into Monday or Tuesday the week of the 28th. I can't do it after that. So I think we're going to have to wrap up all the *Daubert* issues no later than the 28th or 29th of August.

Would the government be ready for a *Daubert* hearing the week of the 21st if I direct that the defense file the Still expert report on or before the 7th of August?

MS. PELKER: Yes, Your Honor.

THE COURT: Okay. Then that's what I'll do. I'm going to order that the expert report be filed on or before August 7th. And then let's just pick a day when counsel is available the week of the 21st for a *Daubert* hearing.

That's all contingent on my trial being put off, but I suspect it is going to get put off. What days that week are counsel available?

MS. PELKER: The government can be available any day. We have some conflict on the 21st. I believe Mr. Brown has another hearing. We can move it if that's the only date that works; otherwise, any other day that week.

THE COURT: Mr. Ekeland, what's your availability that week?

MR. EKELAND: We're available that week of the 21st, Your Honor.

THE COURT: Why don't we do this. Why don't we schedule time on the 22nd and 23rd, and that's going to be to

resolve any outstanding *Daubert* motions that we don't get through today, I guess, or tomorrow, if we're going into tomorrow, in the next -- that will be all of the remaining *Daubert* issues.

MR. EKELAND: I'm sorry, Your Honor. Did you say we were scheduled tomorrow?

THE COURT: No, no. I had originally reserved some time for tomorrow if we needed it. But it sounds to me like you probably are not going to have the witnesses to put on tomorrow anyway.

MR. EKELAND: No. We weren't planning on being here tomorrow. We didn't realize that there was time scheduled tomorrow, Your Honor.

THE COURT: That's fine. So August 22nd and 23rd I'm just going to reserve, assuming my trial is canceled or postponed, for any remaining *Daubert* hearings. And that will be both for further *Daubert* hearings that are needed with respect to the defense witnesses and the government witnesses that we don't get to before then.

That really is pushing up against the schedule because I can't do anything, really -- I have very little availability the last week of August and the first week of September, and then that puts us into the week when the trial is supposed to take place. And I've got the Judicial Conference of the United States, which is taking place on the

11th and 12th of September. So that puts us right up to the trial date.

I guess maybe we should pick another date now for our pretrial conference as well. I think -- I need to confirm this, but I think I can do it on September 6th, if that works for the parties. I do have to confirm that, but I think so. Let me just double-check something.

MR. EKELAND: That works for the defense, Your Honor.

THE COURT: Okay. Just a second here.

MS. PELKER: That works for the government as well.

THE COURT: Give me one moment here. Yes, I can do it on the 6th. Should we schedule that for 10:00 a.m., then, on the 6th?

MS. PELKER: That works for the government, Your Honor.

THE COURT: Actually, let's make -- schedule it for 11:00. That will probably be better. Schedule it for 11:00 on the 6th.

All right. Any other preliminary matters before we turn to the substance of the day?

MS. PELKER: No, Your Honor. I think just a note on scheduling for today. My understanding is that we'll have Dr. Dror, followed by Mr. Verret, and then Mr. Fischbach. And then we still have, if the Court wants to hear, follow-on arguments from some of the motions that we didn't get to on

June 16th or 23rd that the Court had initially indicated it wanted to hear; namely, the Mt. Gox authentication, the bill of particulars, and any further follow-up questions or argument that the Court wanted to hear on the issue of venue.

THE COURT: Okay. All right. So then why don't we turn to the first witness.

MR. EKELAND: Your Honor, the defense has a couple of things that they'd like to raise.

THE COURT: Okay.

MR. EKELAND: One with regard to the government's supplemental filing on the venue issues. It was our understanding that the Court had taken that on consideration and the argument was closed. So either we ask that it be -- that the Court strike it as untimely filed or give us an opportunity to reply to the -- they filed a supplemental opposition.

We filed our motion to dismiss a year ago on the venue issue, and the Court in its minute order said it had taken the issue into consideration, which the defense took to mean that the argument on it was closed.

THE COURT: So when would you like to file a reply?

MR. EKELAND: Seven days from now. Does that put us into the middle of next week?

THE COURT: I will give you until July 24th to reply on the venue issue. It's not really a new issue or a new

filing. I mean, I think what happened is I actually asked the government at the last hearing whether at trial it intended to rely on any additional facts to establish venue beyond the fairly limited ones that were set forth in the motions. And I think that was responsive to that filing.

And, quite frankly, my own take on it is that it's difficult to resolve a venue issue, at least in this context as a pretrial matter, but I take it that both parties want me to do so. So I need to know what the evidence would be at trial for that purpose. But if there's any conflicting evidence or new basis to question the evidence the government has proffered, you're welcome to respond to that.

MR. EKELAND: Thank you, Your Honor. Then just one more issue.

Given the filing last night at 10:30, with the additional information from Ms. Bisbee, we would like to recall her as a witness to cross-examine her as to what was filed last night at the upcoming *Daubert* hearings.

THE COURT: All right. Ms. Pelker?

MS. PELKER: Your Honor, I think defense counsel had ample opportunity to cross-examine Ms. Bisbee on the exact issues that were raised. This is not new revelatory information. It simply was being responsive to the Court's question.

Defense counsel, frankly, seems intent on using

*Daubert* proceedings as civil-style depositions, which is not the purpose of a *Daubert* challenge. If there's specific additional information that the Court would find helpful in assessing whether this is appropriate trial testimony, we're happy to put that on.

THE COURT: All right. Mr. Ekeland?

MR. EKELAND: Your Honor, the -- just having read it cursorily last night, there's a wealth of information going directly to the *Daubert* issues in Ms. Bisbee's disclosures. For instance, she discusses the algorithms underlying the Chainalysis Reactor software and its error rates, and she calls the software deterministic and not probabilistic, which goes directly to the error rate, which is a core issue of *Daubert*. She also references numerous unnamed data scientists who worked for Chainalysis, whom she claims verifies the accuracy of the software.

There's a whole wealth of information that was not disclosed in the initial cross-examination, in the initial *Daubert* hearing, which goes directly to the issues of the scientific validity and accuracy of the software, the error rate of the software, the rate of false positives, and the rate of false negatives; and the defense submits that we're entirely within our rights to *Daubert* her on that information because it goes directly to the bases of her opinions.

THE COURT: All right. Well, let me think about this

one. It may be that the thing to do is, if I conclude by trial that there's a need for some brief period of additional questioning, I just allow it outside the presence of the jury in the context of trial.

But let me -- I need to go back and reread her testimony to figure out the extent to which what was offered fundamentally changes anything. I will let you know about that. I guess my current inclination is not to recall her at the hearing -- the hearings that I've now scheduled, but if there's a need for some brief examination outside the presence of the jury during trial, then I would permit that. As I said, I'll look at it again, and if I have a different view, I'll let you know.

MS. PELKER: Thank you, Your Honor. And just to emphasize, last night's filing does not expand what the government intends to elicit from Ms. Bisbee at trial. That is covered by our previous notice and the disclosure.

THE COURT: Right. I take it, it was responsive to the question that I had posed?

MS. PELKER: Yes, Your Honor.

THE COURT: Fair enough. All right. Mr. Ekeland?

MR. EKELAND: Your Honor, given the filing last night and what was revealed in the *Daubert* hearings and our Rule 16 requests that we've made starting September 23rd of 2022, the defense anticipates having to file a motion to compel for

discovery from the government, and I'm just wondering if we should set scheduling for that. We can file our motion sometime next week.

Particularly, what we seek is the source code for Chainalysis Reactor given Ms. Bisbee's disclosures last night about the software and the algorithms and the heuristics involved. Given that we haven't been given any information on its error rates in the filing last night, we would like direct access to the source code, as well as change logs that document the changes made in the software over the course of time that's being used to directly accuse Mr. Sterlingov.

THE COURT: Ms. Pelker?

MS. PELKER: Your Honor, I think that this was extensively discussed and briefed at the June 16th hearing. The Court gave defense counsel clear instructions that their requests were incredibly broad and that if they had specific asks, they should come back to the Court -- first to Chainalysis and the government, and then come back to the Court. They haven't done so. They continue to get up and make these grand arguments.

THE COURT: Mr. Ekeland? I think that's an accurate description of what happened.

MR. EKELAND: Yes. But we have made a specific request for the source code from the government in our September 23rd, 2022, Rule 16 letter.

THE COURT: No, no, no. But the point was, I said last time we talked about this, you've asked for everything under the sun. That's not the way it works here. This is not civil discovery. You need to be more specific.

If that's what you're asking for and you're saying this is what we really need, then you need to have a conversation with government counsel or send them a letter saying the judge told us to be narrow and more focused; here is our more narrow and more focused request.

MR. EKELAND: Specifically, the defense requests the source code to Chainalysis Reactor and the change logs documenting all changes in the software over the course of the use of Chainalysis Reactor in this investigation.

THE COURT: Okay. Well, I think it's premature now for me to set a schedule on briefing on the motion on that since you've just made that request at this moment. If, after discussions and good faith meeting, conferring with the government, there's still a disagreement, then you can file a motion at that point.

I would just urge you to make sure you have those conversations promptly. Ms. Pelker?

MS. PELKER: We can address it afterwards.

THE COURT: Okay. Should we call the first witness?

MR. EKELAND: Your Honor, just another minor housekeeping thing in terms of the exhibits for today. Both

the government and the defense have agreed to stipulate that the CVs for the expert witnesses are -- come into evidence, and that would be -- Dr. Dror's CV would come in as Exhibit B; Mr. Verret's CV would come in as Exhibit C.

THE COURT: I'm sorry. Hold on a second. Is this the binder I should be looking at?

MR. EKELAND: Defense experts. Yes, Your Honor. We did send the CVs to the Court. We also have hard copies here if you need them.

THE COURT: There's been so much paper in this case that has been submitted in such a haphazard way, I have stacks and stacks of materials. When you say you're referring to X document, usually I would have, like, a binder in front of me that the parties say: Here are the exhibits we're going to use for examining this witness, and we move the admission of a particular exhibit.

I can't, sort of, go back and start digging through my desk and see if I can find a copy of a CV that someone e-mailed to the Court.

MR. EKELAND: We have hard copies.

THE COURT: That's fine. I just need to have in front of me whatever you're talking about.

MS. PELKER: Your Honor, I believe the binder in front of you were government exhibits for the defense experts, including ones that we did not get to because of --

THE COURT: Okay. So then -- perhaps it's this one here then?

All right. So I do have a copy now in front of me of the Dror CV. Okay. And I have Mr. Fischbach's CV, and I have Mr. Verret's CV. Okay.

MR. EKELAND: Thank you, Your Honor. Just for the record, Exhibit B would be Dr. Dror's CV, Exhibit C would be Mr. Verret's CV, and Exhibit D would be Mr. Fischbach's, with Exhibit A having been our expert disclosures as filed on the docket.

THE COURT: Okay. These are admitted for purposes of today's hearing.

(Defense Exhibits B, C, and D were admitted.)

MR. EKELAND: Thank you. Your Honor, the defense calls Dr. Itiel Dror.

THE COURT: Okay.

THE COURTROOM DEPUTY: Dr. Dror, would you please raise your right hand.

(Witness sworn on Zoom.)

THE COURTROOM DEPUTY: Thank you.

MR. EKELAND: Your Honor, may I proceed?

THE COURT: You may.

MR. EKELAND: Thank you.

DIRECT EXAMINATION OF

DR. ITIEL DROR

BY MR. EKELAND:

Q.  Dr. Dror, could you state your educational background.

A.  I have a number of degrees, including a master and a doctorate Ph.D. from Harvard University.

Q.  And do you have --

A.  Can you hear me well?  I just want to make sure you can hear me well.

Q.  We can hear you.

A.  Okay.  Great.

Q.  And do you have any other additional degrees?

A.  Yes.  I have also a bachelor's and another master's in philosophy.

Q.  And have you published any academic articles?

A.  Yes.  I've published about over 150 articles.

Q.  What's your primary focus of academic research?

A.  My area of expertise is human cognition.  I'm interested how people perceive information, how people interpret information, how they make judgment and decisions.  And when I talk about it, I'm not really interested in everyday decisions of everyday people; for example, where people decide to go to holiday or how do they decide how to hire the babysitter.

I'm interested in expert decision-making, so the decision made by experts; and I should also emphasize that I do not have any interest in experts who are incompetent or unmotivated or negligent.  So I'm interested, in a nutshell,

why smart people do stupid things.  So it's unintentional mistakes of experts who are dedicated and competent.

Q.  And in relation to your work on expert decision-making, do you do any work in the area of forensics?

A.  Yes.  I do work in a whole range of areas of experts all over the world.  But, for example, in the United States I worked with the U.S. Air Force on pilot decision-making; or in the medical and healthcare domain, I work with MGH, Massachusetts General Hospital.

In terms of policing, I've trained homicide detectives in California.  They've taken out the police -- investigating police shooting, and it's done by special agents of the DOJ.  So I trained them.

Specifically, in forensics, yes, I've worked and trained the FBI, NYPD, LAPD, dozens of different agencies in the United States and other countries.  For example, in the United Kingdom, the SFO, the Serious Fraud Office of the government that investigates major fraud, I trained all their digital forensic examiners.

And only yesterday I got invited by the United Kingdom IRS to train all the digital forensics, the 170 digital forensic experts in their IRS of the UK, and we scheduled it for January and February.

So I've done a lot of different work in many expert domains, including forensics and digital forensics.

Q. I believe you mentioned that you worked with the FBI. What was the nature of your work for the FBI?

A. So I've done a variety of stuff, from being invited to train their experts in the forensic lab in Quantico. They've also funded a lot of my work; grants from the FBI to research forensic errors. And the FBI, in many of its supports, including, for example, part of the error in the case of the Madrid bomber, what they've done to improve the procedures, they cite and rely on my research and my work.

Q. You mentioned that you trained the FBI on the issue of forensic error.

Could you just elaborate a little bit more on what you mean by forensic error.

A. So, again, we're talking about FBI forensic examiners, highly competent, highly capable, highly motivated people, but nevertheless, because of the architecture of the brain, the way the brain processes information, unintentionally, hard-working experts can make mistakes. So to explain to them when it happens, how it happens, and ways to minimize such mistakes.

Q. And when you said forensic errors and mistakes in relation to law enforcement, can you just give some concrete examples of the kind of forensic errors you see that are made by law enforcement?

A. Law enforcement and forensics. Law enforcement is not a scientific endeavor, but if we talk about the science of

experts, we're talking about fingerprinting, handwriting analysis, digital forensics. We show that given the same data, the same facts, and it puts that in quotation, can get a totally different conclusion, conflicted conclusion, based on cognitive errors and cognitive bias.

And, again, cognitive bias, not the everyday use of bias if it associates with intentional, discriminatory -- we're talking about cognitive bias that makes them make mistakes in their analysis.

Q. Could you just elaborate a little bit more on the concept of cognitive bias and how it's different than the -- I think what you said, the layperson's understanding of what bias is.

A. The everyday use of the word bias that we all hear about is -- and we talk about intentional and implicit, discriminatory bias that comes from stereotypes and prejudice. Here we're talking about the constraints of the human brain; of how the brain processes information and how it distorts our perception, interpretation, judgment, and decision-making.

Q. I think you've read the government's opposition to your expert disclosure. If you recall, I think one of the things the government says is that you lack experience in blockchain analysis.

Does that affect, in your opinion, your ability to assess forensic error in a case like this?

A. I have no experience or expertise in blockchain analysis,

but I don't have any expertise in flying a plane, let alone a supersonic fighter plane, or being a medical doctor or a DNA examiner. I'm looking at the cognitive level.

So I'm not talking about incompetence and expert mistakes because I don't know their expertise. I'm talking about experts who know their domain, who are competent but fall into that meta-expertise when they make a mistake, and it's not because of incompetence. It has nothing to do with an actual expertise on the topic.

That's why I can train U.S. Air Force pilots or medical doctors or DNA examiners where I have no expertise on those specific areas. I'm talking about how the brain processes information and how that can bias and give rise to errors.

Q. Would it be fair to say that the way that the brain processes information doesn't change with the type of technology that's in front of the person who has the brain?

A. I'm not sure what you're asking. We all have a brain. We all have different brains. There are certain commonalities, but there are certain differences between different domains.

But the basic mechanisms of how the brain processes information, what we call top-down/bottom-up processing, is the same for every person.

Q. And would it be fair to say that in a forensic process that involves assumptions and, essentially, guesses, that cognitive

bias is a real danger?

A. I don't think necessarily there are guesses or assumptions. Even without guesses and even without assumptions, bias and errors can happen by forensic examiners.

For example, if they go backwards, what we call backwards reasoning, instead of letting the data reach the conclusion, they're working backwards from the conclusion and looking for the data to support the hypothesis that they come -- kind of a confirmation bias, so to speak. If they don't adopt certain procedures, that blinds them to irrelevant information that can bias them, that they don't need for the case, that can influence their judgment, in their decision. Even without assumptions and guesses, they can fall into those cognitive vulnerabilities.

Q. Have you ever done any work on error rates in forensic examinations?

A. Yeah. We've looked at error rates in a number of domains and bias rates in a number of domains.

And, in fact, in a *Daubert* hearing in federal court in the United States, Washington, D.C., there was a *Daubert* hearing on error rates in firearms examination, and the prosecution commissioned me for the *Daubert* hearing in defense of the forensic examiner. So I was commissioned by the D.C. prosecutor in a *Daubert* hearing on error rates in firearm examination and we have a number of papers on error rates and

how complicated and how complex they are.

For example, I have a paper entitled, "The Error in Error Rates."

Q. And have you testified in courts besides the one time that you just referenced?

A. I don't testify a lot in court. I'm a scientist. I like to be in my lab and to do research, but I like to connect my research to the real world.

So, yes, I've testified in court a number of times, but not many times in the U.S., in the UK, and other countries.

Q. In any of those instances -- in all those instances, did the Court qualify you as an expert?

A. Yes. Every time. It depend if I appeared for the prosecution or the defense, the opposing side made motions to exclude my evidence because it's irrelevant or because it's within the normal knowledge of a juror. In each and every case in the U.S. and in the UK, I've been accepted by the Court and, in fact, the judges were very interested in cognitive bias and invited me to train them.

So I've trained judges in Michigan, I've trained judges in Massachusetts, where I trained the judges to understand cognitive bias. And then even a Supreme Court judge of Michigan, the Chief Supreme Court Judge of Michigan and I wrote an article together about what cognitive bias is, and that was published in the *Judges' Journal*.

So this is a very important topic not only for the jurors but for the judges. As well, I've been invited by the district attorney. So I've trained the district attorney. They've invited me in New York, in California, in Massachusetts to train the prosecutors about cognitive bias, as well as public defenders.

So it's a topic that everyone needs to learn because people do not fully understand that.

THE COURT: Can you give me the name of the case in the District of Columbia where you were qualified as an expert, if you recall?

THE WITNESS: There are two cases. One case was a *Daubert* hearing. And the other case was the prosecution and the defense e-mailed me, and both wanted me to be an expert on the same case, and they even agreed to have me as a joint expert. I think Federal Rule of Evidence 706.

But both cases were plea bargained. I can look it up and see.

THE COURT: In the case where you testified in or qualified, do you remember when that occurred?

THE WITNESS: The two cases I didn't testify because they plea bargained before it got to court.

THE COURT: I see. Okay. Thank you.

THE WITNESS: I'm happy to send you the name of the two cases.

THE COURT: Perhaps if you can provide that information to Mr. Ekeland, and Mr. Ekeland can share that with the Court.

MR. EKELAND: Your Honor, I can't find it right now. I thought we did disclose that. If we have it, we'll disclose it.

THE COURT: I was looking through -- it may be in here. I just didn't see it, flipping through the report. Maybe it's there.

MR. EKELAND: I can't readily find it, but I do remember writing it. If it hasn't been disclosed, we will disclose it. We did make a diligent effort to meet the new Rule 16.

THE COURT: Okay. Thank you.

MR. EKELAND: I remember doing a search for it. We'll get that to the Court or point out where it is.

THE COURT: Thank you.

BY MR. EKELAND:

Q. Mr. Dror, one more question before I hand you off to the government.

You said, I think -- before Judge Moss asked you this question, you mentioned that there were certain things that the public just didn't understand about cognitive bias that you felt was important. Could you just elaborate on that a little bit.

A. There are six fallacies about bias and about what people think. One of the fallacies that the general public believe is that people who are biased are bad apples, they're immoral, bad people, and that is wrong because bias affects everyone. So they think bias is only if we have a cooperative individual.

Another misconception, fallacy, is that experts, because they're experts, they are immune from biases, and they're not susceptible. And experts are susceptible to biases like everybody else.

And a third misconception, just to give you a few, is that illusion of control that people believe; if you're aware of bias, you can control cognitive bias. You can't control how the brain processes information.

So these are just a few examples of what people believe about bias, not to mention that it's intentional. Again, we're talking about something totally different.

Q. I think that you mentioned there were six total. What are the -- was that all of them?

A. There are those three. There's another one about technological protection. People believe, including the experts, that if they use technology, then there's no bias because a human is not involved. That's also incorrect.

MR. EKELAND: Your Honor, I think the case that Dr. Dror was referencing is *United States v. Resper*, R-e-s-p-e-r, and the date I have for that is August 2nd, 2016.

I don't have an index number right now, but I believe that's in this district court.

THE COURT: Okay. Thank you.

MR. EKELAND: And I pass the witness.

THE COURT: Before we pass the witness, I haven't really heard yet from the witness -- maybe I have, but what would you actually propose that he testify to in this case? You've covered his credentials and the fact that there is such a thing as cognitive bias and it has different forms.

But I'm curious as to what he would actually testify to in the case. The government can ask those questions or you can. Either way is fine.

MR. EKELAND: I'm happy to do that to the extent I'm just looking -- it's in our expert disclosure here on page 3 of his -- this is Docket 145.

BY MR. EKELAND:

Q. Dr. Dror, are you familiar with the word heuristic; the use of heuristics in the software at issue in this case, namely, Chainalysis Reactor?

A. Before I answer that, can I respond to the judge's comment, please?

Q. Yes, you may. Of course.

A. This has been raised in court a number of times, what I will testify. And sometimes the honorable judge decided that I can educate the jurors about cognitive bias and give them tools

to decide if cognitive bias exists, but not testify about the specific case if there was bias.

In other cases, the honorable judge decided that I will give the tools, the understanding, but also, in addition, I will voice an opinion where there was bias in the specific case. That would be for your decision what you want me to testify for; whether you want me to just educate the jurors and give them tools without voicing an opinion about the specific case, or you will also want my opinion about bias in the specific case.

THE COURT: Well, let me ask you, have you formed an opinion about whether there was bias in this particular case?

THE WITNESS: I haven't finished reviewing all the materials, so I have no opinion.

THE COURT: Okay.

THE WITNESS: Also, I'd like to emphasize, especially coming from the UK, I don't see myself as working for the defense or for the prosecution. I'm here to help the Court reach a decision, and my focus is on the Court and not the defense or the prosecution and their adversarial views.

THE COURT: All right. You can continue.

MR. EKELAND: I pass the witness, Your Honor.

THE COURT: Okay.

CROSS-EXAMINATION OF

DR. ITIEL DROR

BY MR. BROWN:

Q. Good morning, Dr. Dror. Can you hear me okay?

A. I can hear you very well. Thank you.

Q. Thank you. My name is Chris Brown. I'm one of the prosecutors on this case. I'll be asking you a few questions.

Maybe to start out, just to be clear, it's your testimony that you have no opinion as to whether there is or is not cognitive bias in this case, right?

A. At this stage I have not formed an opinion because I haven't reviewed the materials yet.

Q. And in the expert disclosure that was filed on your behalf -- do you recall seeing that expert disclosure?

A. Yes. And I have it in front of me.

Q. And your signature is at the bottom, on page 5 of the disclosure, correct?

A. Yes.

Q. And so you reviewed all, I guess, 16 items of prospective testimony, correct?

A. Yes.

Q. And those 16 items of prospective testimony represent what you plan to testify to at trial, correct?

A. Not what I plan to testify to; what I plan to testify on.

Q. Maybe this is --

A. Semantics, but maybe not.

Q. Yeah. You are the one with the Ph.D.

But just to be clear, for each one of these numbered lists, you plan to express the opinion that is set forth there, correct?

A. Again, there's no opinion. For example, Item No. 1 says I'm going to testify about cognitive bias. There's no opinion here. I'm giving the facts of how the brain processes information, what gives rise to cognitive bias, what are the hallmarks of cognitive bias.

So there's no opinion here. It's testifying on this information.

Q. So, for example, Item No. 7 states, "He will explain" -- sorry.

Item No. 9: "He will explain evidence of confirmation bias in the government's discovery."

A. Yes.

Q. That's your prospective testimony, correct?

A. I will look at what it says and what I read it to say, I will look at the government's discovery and look and explain if and what signs of bias exist there. There may be a little, there may be more, there may be -- I'm not sure. I haven't gone through it. I can look at it.

THE COURT: I thought I would cut this short. Mr. Ekeland, would you agree that -- at this point that, to the extent that the witness has not formed any opinions, that it's too late now, and that his opinions have to be set forth in the

disclosure.

So if he hasn't actually reviewed the materials and formed an opinion, you wouldn't be offering that in the case?

MR. EKELAND: No, Your Honor. I disagree in the aspect, number one, we're entitled to have Dr. Dror come in as a rebuttal witness. Number two, we are two months before the trial.

THE COURT: Rebuttal witness. That's just another way of saying a defense witness, right?

MR. EKELAND: Well, he is a defense witness.

THE COURT: I understand. But I think we're wasting our time here. If he hasn't yet reviewed the material and formed opinions, maybe we should just bring him back.

But I just think there's no point in -- maybe I would exclude it anyway for the reasons that the witness already indicated. If it's testifying on the ultimate questions on the case or the questions that are better for the jury. But it does seem to be kind of a waste of my time to hear at a *Daubert* hearing from a witness who says I haven't looked at the materials yet and, therefore, I haven't formed any opinions about what I'm here to testify about.

MR. EKELAND: Your Honor, one of the issues is we have not gotten full disclosure on the discovery here and just like --

THE COURT: I'm not fighting you on that. I'm just

questioning about the best use of my time. We're having a *Daubert* hearing on something he's not prepared to testify about yet. Tell us what his opinions are.

MR. EKELAND: Maybe we do need to recall him, but I think there's two questions when it comes to the *Daubert* hearing. One, is he qualified to testify as an expert in the area being proffered, and we're proffering him as an expert in cognitive bias. There doesn't seem to be that there's any question of that.

Now, if we want to come back at a later *Daubert* hearing and have him testify as to opinions coming up, that, to me, strikes me as a separate question.

THE COURT: I mean, you have an obligation to file an expert report that sets forth the opinions he's going to offer and the bases for those opinions. It's a waste of my time to sit here and have a witness say, I haven't formed opinions yet on it because I haven't looked at the evidence.

So there are two answers to that. Either this is premature and we should just stop and you need to file very promptly a supplemental report that sets forth his expert opinions, or you need to tell me you're not intending to offer that at trial. It has to be one of those two things.

MR. EKELAND: Your Honor, we would like to offer him at trial. Maybe what we do is we recall him for the later *Daubert* hearing because we -- there's a number of -- discovery

we just haven't gotten, so to --

THE COURT: What discovery do you need for this particular witness?

MR. EKELAND: We need to know what -- the underlying heuristic assumptions that are being used in the software as disclosed by Ms. Bisbee last night. She said there's unnamed data scientists who have done all sorts of work.

We need to see the source code for Chainalysis Reactor, which, again, we asked for almost a year ago and it hasn't been produced.

THE COURT: But this witness is not going to review the source code.

MR. EKELAND: What?

THE COURT: This witness is not going to review the source code.

MR. EKELAND: But we can look in conjunction with our other experts that discuss the algorithmic assumptions underlying the heuristics in the case. The whole problem and the reason we brought him in --

THE COURT: I'm sorry. We're just wasting time here. If the witness is not ready to testify on this, that's fine, and we just should stop.

But then you need to tell me when you're going to file your supplemental expert report and we'll schedule him for the other hearing.

MR. EKELAND: That's entirely dependent on what we get from the government. That's the problem. We do need to get the underlying information on the heuristics that we've been asking for. We're not asking for new stuff. This is stuff we've repeatedly asked for in Rule 16 letters.

THE COURT: I discussed this with you earlier. I told you at the last hearing, or whenever we discussed this, that your requests were way overbroad and, if there was particular things you needed, you needed to tell the government about that. Today, as far as I can tell, is the first time you've done that.

MR. EKELAND: Your Honor, last night was the first time we saw a lot of disclosure from the government.

THE COURT: I've read what the government filed, and that is not credible.

MR. EKELAND: Your Honor, then, we're just going to disagree with the Court, and we're going to register our disagreement on the record, and then we ask that we can recall this witness at the later *Daubert* hearings and file a supplemental disclosure from this expert.

It's hard because, depending on what we get from the government, if we have to file a motion to compel, we might have to revisit his opinions based on what's disclosed. Can we get two weeks on that?

THE WITNESS: May I make a suggestion, please?

THE COURT: Yes.

THE WITNESS: The defense counselor may not like or the prosecutor may not like it. Maybe I should only testify what cognitive bias is and give the jurors an understanding and tools for them to decide if there was bias in this case. But not opinion about this case, but only about the general understanding of what cognitive bias is and how you can determine if it exists; but not offer an opinion about this case.

That's a suggestion. I don't know. Maybe everybody doesn't like it.

THE COURT: Mr. Ekeland?

MR. EKELAND: If that's amenable to the government and the Court, that's amenable to the defense.

THE COURT: Mr. Brown?

MR. BROWN: Your Honor, I agree that any testimony that -- I agree that the witness should not testify about his theories as applied to this case because he has no opinion now. It hasn't been disclosed pursuant to Rule 16.

With respect to the witness's suggestion that he only testify generally about his theories, we oppose that on -- really, it's on relevance grounds. It's not going to be helpful for the jury to hear this sort of abstract theorizing.

We also don't think that the abstract theorizing is necessarily scientifically reliable in itself, and it is

certainly not -- there's no opinion that represents a reliable application of his theories to the facts of this case if he's not going to opine as to the facts of this case --

THE COURT: I assume you also object to him --

MR. BROWN: -- at the *Daubert* today or at the next hearing on whatever portion of his disclosure the defense actually wants to follow through on.

THE WITNESS: May I make a comment, please?

THE COURT: You may.

THE WITNESS: The United States National Commission on Forensic Science, joined by the Department of Justice and the National Institute of Standards of Technology, has established and published a document about cognitive bias being scientific and effective forensic evidence.

I can send you, but it's a document on the U.S. National Commission on Forensic Science. It's not my theory that has not been validated. It's been adopted by the United States National Commission on Forensic Science.

MR. BROWN: Mr. Dror, I was giving argument and responding to the Court's question. It was not an invitation for you to testify.

THE COURT: I'm sorry. The witness asked me, and I said it was fine for him to say something. The witness was responding to me. That's completely fine.

Let me ask, Dr. Dror, if you were to offer anything

more specific in this case, what is it that would be more specific -- I mean, would you look at particular models and opine on whether a particular model reflects bias, or is it -- I'm not quite sure whether that's something you would typically do in any event, or I feel you have the expertise to look at heuristic assumptions and opine whether those were appropriate assumptions or whether they're bias things, or whether your approach is really generally more at a higher level of addressing cognitive bias as a function of human thought versus looking at particular models and deciding whether a particular model is biased or not?

THE WITNESS:  I think it's somewhere in the middle. For example, I see cases where the investigator is told by the district attorney, I know this person is guilty, I have -- you need to find it, keep looking so I see something like that.

That biases the examiner looking at the data; giving a certain expectation of what they're going to find before they look at it.  So that's an example of things that I look for. But not a specific algorithm, no.

THE COURT:  Mr. Brown, why don't I allow you -- if there are further questions you want to ask -- I cut off your examination.  Why don't I allow you to do that.

I don't think, for present purposes, that we need to get into the opinions that Dr. Dror has not yet formed in this case, and then we can address whether he should be provided

with the opportunity to form further opinions.

MR. BROWN: Very well, Your Honor. And to be clear, we would be happy to save the entire examination for the next hearing, or we could do this -- sort of the general theorizing today and, if necessary, if Dr. Dror is going to supplement his --

THE COURT: It's not clear to me whether -- at this point whether the defense is seeking to offer him on the more specifics or not. Mr. Ekeland did say that he would be -- it would be acceptable to him to -- for Dr. Dror to just testify sort of more generally about cognitive bias.

But if Mr. Ekeland does want him to testify about the particulars of this case of whether there is evidence of cognitive bias on the particular facts of this case, then that's, obviously, premature; and there's the separate legal question about whether that's a proper subject matter of testimony, in any event.

Mr. Ekeland, I don't know if you had anything else you wanted to add on that before Mr. Brown continues?

MR. EKELAND: No, Your Honor.

THE COURT: Am I correct in my understanding that you would be content with Dr. Dror testifying more at the high level, just about cognitive bias more generally?

MR. EKELAND: Yes, Your Honor, with the caveat that if we do get subsequent disclosures that change that opinion,

we can raise that with the Court.

THE COURT: You're welcome at any time to raise anything that's appropriate. I might conclude it's untimely, but you're welcome at any time to raise anything.

Okay. With that in mind, Mr. Brown, I think we're proceeding on the assumption now, I think, that Dr. Dror will testify just at the higher level about cognitive bias without the particulars of this case. So you're welcome to proceed then, and then the parties can, obviously, make any separate arguments to me with respect to relevance later.

MR. BROWN: Very well, Your Honor.

BY MR. BROWN:

Q. Dr. Dror, are you being paid for your work on this case?

A. Yes.

Q. And what are your fees?

A. If you want to know my annual salary, it's capped at $60,000 a year, and any money made above 60,000 goes to paying for research and subsidizing my research.

So, actually, I think I'm paid $60,000. So I'm not getting paid personally any money for this case. The money goes to pay for research that I do. Because once I get $60,000 in all my cases, in all my training and everything I do, I don't get paid over $60,000 a year, which I think I've already gotten paid.

Q. Thank you for that background. My question was, what are

your fees in this case?

A. The fees, I think, that were done was $15,000 initially for the retainer, and then with a -- it was a bit open, but around another, I believe, $35,000.

Q. And you said your annual salary is capped at $60,000 and any surplus goes to pay for your research.

So does that surplus go to the university you work at?

A. I don't work at the university anymore. I worked at the university until January this year, and then I left the university because too much bureaucracy, too much paperwork, I can't get my research done.

So the company, Cognitive Consultants International, that gets the fees from -- mainly from training, research grants, and the company pays me $60,000 a year, and the rest of the money in the company goes to pay for the research.

Q. Who owns Cognitive Consultants International?

A. My wife.

Q. How many times have you testified in U.S. courts?

A. I cannot remember exact number, but I assume over the years, maybe six, seven, eight, maybe ten times.

Q. Okay. And the case that you mentioned in the District of Columbia, just to be clear about your testimony, for that case you never testified in court, correct?

A. There are two cases, and in both of them I didn't testify

in court.

Q. You did not testify in court, correct?

A. Correct.

Q. Is it fair to say that you're selective about which cases you choose to testify in?

A. Yes. I get dozens of requests, and I just take a few cases.

Q. How did you become involved in this case?

A. I'm not 100 percent sure, but I think that the defense attorney asked another expert on cognitive bias, and he was very, very busy, and he asked me if I want to hear about the case, and I said yes. And he gave my details to defense counsel.

Q. Is it -- you have not reviewed any discovery in this case, correct?

A. I started to look at a few of the materials that were sent to me, but I have not reviewed all of it or any of it properly.

Q. What portion of the discovery have you reviewed in this case?

A. They sent me many, many files. So I would say a very, very small portion.

Q. So have you reviewed financial account records?

A. No. I would not -- I would not review that. That's not the kind of things that I look for.

Q. Have you reviewed blockchain records or records from

cryptocurrency exchanges?

A. First of all, I have not reviewed any files. The files that I looked at, I believe, were some of the testimonies from the *Daubert* hearing and transcripts.

Q. In your understanding of the case, is it fair to say that your understanding of the case is mostly based on representations made to you by defense counsel?

A. I would say not most, but all.

Q. You also offered training seminars to U.S. law enforcement and law enforcement in other countries, correct?

A. Law enforcement and forensic experts, yes.

Q. And those training seminars are aimed at training forensic technicians, other government personnel on how to reduce cognitive bias; is that right?

A. Yes.

Q. How much money do you or your company, Cognitive Consultants, LLC, make on average per year from these training seminars?

A. I think, if you look at all the countries, not only the United States -- I do them in Australia, in Taiwan, in the Netherlands, Finland -- I would say around 100-, 150,000, but that's a guess.

My wife was a banker, and she runs the company. So she does all the paperwork and all the accounting. I don't get involved in all the contracts and the paperwork. I don't like

paperwork, and my wife does it.

Q. You testified, "I have no experience or expertise in blockchain analysis"; is that correct?

A. Very correct, yes.

Q. And your undergraduate degree is in philosophy, right?

A. I do also have a supplement undergraduate degree in computer science. Again, I have no understanding of blockchain. It's not my area of expertise or my understanding.

Q. Have you ever received any training in blockchain analysis?

A. No. And I even refuse personally to invest in Bitcoin. I stay away from it.

Q. Have you ever conducted any blockchain analysis by hand?

A. I have no idea what it is and definitely haven't done it.

Q. And so you haven't ever used a blockchain analysis software tool, have you?

A. No.

Q. Have you ever used any open-source blockchain explorer, like blockchain.com, Blockchair, Breadcrumbs, Wallet Explorer, any of those?

A. I'm happy to continue to answer your question. But no analysis, no chain block of any kind, of any sort I've ever looked at.

Q. Now, in your research, one of the things that you have examined is whether a forensic technician is examining the sort -- a data point.

And that data point contains extraneous or contextual information that might be a source of cognitive bias; is that fair to say?

A. That's part of my research. But I've also done specific research in digital forensics, which I published a number of articles with my Ph.D. student, who is a digital forensic examiner, where they got hard drives, they got huge emails, huge data sets.

So we've also looked at that and published a number of scientific peer-reviewed articles specifically on digital forensics.

Q. Well, I'm interested in this question of contextual information, and I want to drill down a little bit more into that.

One point that I've read of your work is if -- you look at different kinds of forensic data and different kinds of contextual information, right?

A. Yes.

Q. One example is, I think you contrasted a fingerprint versus a voice print -- the voice sample used for voice-pattern analysis, correct?

A. Can you repeat that, please.

Q. I can repeat it. Let me try to break it down into smaller pieces.

So if a forensic technician is looking at a

fingerprint, the fingerprint itself is data, but it doesn't contain contextual information, right?  If you're just looking at a fingerprint, there's no extra information about who that person was, what circumstances the fingerprint was made, all of that?  There's no extraneous information, correct?

A.  In some types of forensic data, there isn't a fingerprint.  In other forensic domains, there are.  Depends on the forensic domain.

Q.  And so it depends on the forensic domain.  If you're looking at a voice-pattern analysis or voice-print analysis, that is an example of a data source that contains extraneous information, right?

A.  Yes.

Q.  So are you familiar with what blockchain data looks like?

A.  I can repeat that I have no knowledge or experience with blockchain data, but you're welcome to ask me again.

I have no idea; not looked at it.  I don't know what you're talking about when you talk about blockchain data.

Q.  So if I just tell you that a Bitcoin address or a transaction hash just contains a bunch of -- a string of letters and numbers, if I just proffer that somebody is looking at a string of letters and numbers, there's no contextual information in that string of letters and numbers, is there?

A.  In the data itself, if that's so, there's no contextual information.  But there is a wider level of contextual

information.  I can explain if you want.

Q.  We'll try to keep moving.

I have to ask you, are you familiar with the co-spending heuristic?

A.  No.

Q.  And so you would have no opinion about whether a -- an examiner looking at a co-spending transaction, you'd have no opinion about whether that transaction that involves co-spending contains extraneous or contextual information that might be the source of cognitive bias?

A.  It depends.  For example, our research with digital forensic shows when they have many numbers, if they have a context to expect to find certain patterns, they see those patterns.  If there's a context to expect different patterns, they see different numbers and different patterns.

So if it was the same numbers and digits that have no context, what you see, the patterns and the conclusions, especially when they have a huge data set, enables you to misinterpret the data because you see and perceive certain patterns depending on the contextual information that you are given; that we have demonstrated in digital forensics.

Q.  And you're generalizing to blockchain analysis of a specific transaction from your work in digital forensics, correct?

A.  I would say that the answer depends on the degree of the

freedom. Sometimes if the data set does not lend itself to different interpretation, then we don't have a problem. When the data set allows different interpretation, then there is bias.

The blockchain analysis allows different interpretations, I cannot tell you what because I don't know enough about blockchain analysis. But that would be my question, whether the data is fit into a very small data or there's leeway for people to see different things in the data. That is the crux of the matter.

Q. Maybe -- actually, if I could ask you to explain your work in digital forensics. What do you mean by digital forensics? What specific techniques or processes have you studied?

A. So what we've studied is that there -- in one paper there is an investigation about somebody selling company secrets and whether they tried to distort some of the emails and some of the recordings and some of the digital logs, and they get the hard drive and they get all the emails and all the logs, and they have to explore it to determine if there was anything there or not. So that's for an example of what was done.

Q. So it's specific processes, such as examining emails; is that correct?

A. It was emails and logs of emails and logs of different transactions in the company. Because I'm not a digital forensic examiner, my collaborator, my Ph.D. student, is a

forensic digital examiner, and they built the hard drives and the data sets. That is the technical part of what is done.

And I can send you the two articles if you're interested.

Q. In your research you've spent a considerable amount of time observing forensic work; is that fair to say?

A. Did you say observing?

Q. Observing, yes.

A. I don't know what considerable is, but yes.

Q. How much time would you estimate you've spent talking to or observing the work of fingerprint examiners?

A. Hundreds of hours. In fact, I have a grant from the FBI to collect standard operating procedures of forensic labs and shadow forensic labs. I've done quite a lot. Again, quite a lot is a fluid, nonscientific term.

If I had to estimate, hundreds of hours. But it's across domains. It's not one forensic domain, but across different forensic domain, and I have not shadowed any digital forensic examiners, in case that's what you want to know.

Q. So you said across digital domains. So that includes DNA examiners?

A. DNA examiners, fingerprint examiners, CSI examiners, forensic pathologists.

Q. And what about airline pilots, is it fair to say that you've spent a considerable amount of time talking to or

observing airline pilots?

A. There are two pieces of work when it comes to aviation. One of them is military, U.S. aviation, which I don't think I can talk about. And the other one, I'm investigating a plane crash and, again, it's an ongoing investigation which I cannot talk about. It's aviation. I have talked to pilots in reference to that, yes.

Q. And in your work, it's not purely anecdotal; you've conducted experimental work. Is that correct?

A. None of my work is anecdotal. It's all experimental.

Q. And so you've conducted experiments to identify cognitive bias in fingerprint examination; is that correct?

A. Yes, and not only.

Q. And what other forensic domains have you conducted experimental work in?

A. Fingerprint, DNA, handwriting, digital forensics, forensic anthropology, forensic astrology. I don't remember off the top of my head all of them, but forensic examiner experts don't like to acknowledge that they're biased.

I showed in fingerprinting, the DNA examiner versus fingerprint examiners are not DNA examiners, so I did it in DNA; and then the firearm examiner and anthropology. So we've done a wide range of a forensic domain, but not all of them.

Q. So a typical experiment might be presenting the same data to different examiners presenting different contextual

information and seeing how that affects the result; is that correct?

A. Yes. And even better, because different examiners have different training which shows the same data to the same examiner twice without their knowledge and gives them different expectations, and they reach different conclusions, the same examiner on the same data.

So it's not only between examiners, but the same examiner checking would they reach the same conclusion on the same data when they get different expectations of what they're going to find.

Q. And you mentioned experimental work in digital forensics. Can I ask you to be more specific.

What experiments have you run in the field of digital forensics?

A. I think I answered that question, but let me repeat it. We've done a number of experiments where digital experts get hard drives and files and logs, and they have to determine whether there was fraudulent activity there, whether people tried to tamper with the data, whether a person was guilty of sending confidential information.

I don't remember all the technical details, but I'm happy to send you and the Court the two articles published in digital investigation and forensic science international digital where I did all the technical details.

THE COURT: Mr. Brown, can I ask you, how much more time do you think you're going to need? The reason I'm asking is the court reporter has been going for a very long time. I don't know whether we need to take a -- or should take a break. So how much time do you think you'll need to complete your examination?

MR. BROWN: Yes, Your Honor. I think we will need a fair amount of more time, at least another half an hour, if not a bit longer.

THE COURT: I assume Mr. Ekeland is going to want some redirect. Why don't we go ahead and -- let me ask, Dr. Dror, would it be okay with you if we took our lunch break and came back in an hour? Does that work for your schedule?

THE WITNESS: I'll go and have dinner. Not a problem.

THE COURT: All right. Why don't we let you have your dinner; we'll have our lunch. We'll give the court reporter a break. It's ten minutes past 12:00 here. So why don't we come back at 1:15 to continue.

Before we do so, Doctor, I have one just general question for you about your testimony thus far.

I don't have any doubt that the expectations of an analyst and to what they're going to find can affect the results, at least where there is any subjective element to their analysis. But what -- beyond that, what can you say in a

way that is more quantifying or provides a -- would provide a jury with some assessment of what that actually means?

And is that going to vary from circumstance to circumstance, and so it's going to depend on the particular forensics involved, the particular assumptions involved, and in some cases it could be an error rate that is as high as, I suppose, 50 percent when you show people the photograph of the woman in the dress and some people see a green dress and some people see a gold dress. Maybe that's a 50 percent -- I don't know if error is the right way to think about that.

But there are other circumstances in which I imagine it's very, very small. There's still some circumstances in which a pathologist who is looking at a lab sample might, one out of every thousand times, conclude that something is not malignant when it is, in fact, malignant, and maybe some other background assumptions might do it.

How do you quantify this or provide, sort of, a meaningful analytic tool for a jury other than sort of just the background notion that, when there's a subjective element, it can affect your -- the accuracy of what you're doing?

THE WITNESS: There is much more. I do two or three days of training on this. So let me very briefly comment and start with your last comment on forensic pathology.

We just published a paper last week showing that, if you give the forensic pathologist one theory of what happened,

they're supposed to find the evidence to support it. But if you give them two different hypotheses on the same medical data, then some of them support one theory, some of them support another theory. So it puts them in a mindset if they're provided one theory. That's very specific because you mentioned pathology.

THE COURT: Sorry to interrupt you for a second there. I assume that that varies. So that if you had a doctor who was just looking at cells to determine whether they were malignant or not, and there are clear markers for that, but it's -- there's some element of -- it's 99 percent science and one percent art in being a pathologist of that type.

I assume that you're not going to say that if you said to the doctor or the pathologist, we think this is cancer, that every time they look at it, they're going to say it's cancer even when it's not. So the question, I guess, is what is the error rate, or how do you get about thinking about the error rate?

THE WITNESS: Okay. So, again, great question. I'll answer very briefly.

Because we have an article specifically looking at cells to decide if it's a cancerous cell or not. And the right procedure -- and they're changing it. They used to get context before looking at the slide, and now they're starting to look at the slide before they get the context. Because when they

get the context, it impacts whether they find cancerous cells or not.

THE COURT: Right.

THE WITNESS: In terms of quantifying it, it depends on two things. A, the level of subjectivity of the judgment. If it's more subjective, you're going to be impacted more. And, two, it's a level of context, because it can be a little context or a big context expectation.

So it depends on the level of context. So that, too, interacts; the level of expectation context and the level of subjectivity of the domain. And this is exactly what I can explain to the jurors to give them examples.

THE COURT: Okay. That's very helpful. Thank you.

So why don't we take our lunch break, and we'll come back at 1:15 -- or dinner break. Thank you.

THE WITNESS: Thank you.

(Lunch recess from 12:15 p.m. to 1:25 p.m.)

THE COURT: All right. Mr. Brown, you may continue.

BY MR. BROWN:

Q. Dr. Dror, just to finish the line of questioning we began before lunch, have you ever conducted any experiment to detect cognitive bias in the field of blockchain analysis?

A. No.

Q. Have you ever reviewed any literature involving experiments to detect cognitive bias in blockchain analysis?

A. No.

Q. And to the extent -- to the extent that you're claiming your theories apply to the field of blockchain analysis, you're just extrapolating from first principles; is that fair to say?

A. No, it's not fair to say.

Q. To apply your theories to the field of blockchain analysis, is that based on any scientific or academically peer-reviewed process?

A. First of all, you're saying my theories; not my theories. Well-established principles of anyone who studied the brain and expert performance, so it's not my theories. It's accepted theories by everyone who studies the brain in human cognition.

Point number two, the fundamental does not matter if it's blockchain analysis, fingerprint, DNA, pilots, medical doctors; everyone has a human brain, and I'm talking about the constraints and architecture of the human brain. So I'm not applying my theories general to this domain.

I'm talking about what we know about human processing, how the brain works and how experts process information.

Q. And even if you accept that everybody has cognitive biases, because that's how the human brain works, it is your testimony, isn't it, that cognitive biases express in different ways depending on the data that a forensic technician is reviewing?

A. I'm not sure what you mean by express. I would say it's

manifested differently in different domain. But the end result of reaching a biased conclusion is the same across domains.

Q. Now, what extra sources of information would you need in this case to form an opinion about the presence or absence of cognitive bias in any of the blockchain analysis in this case?

A. To form a specific opinion about this case, I would need to review the laboratory notes and SOP, standard operating procedures, of the experts who conduct the analyses and examine if they followed best practices, like blinding to irrelevant contextual information, use of linear, sequential and masking, and other things that have been mandated by the U.S. National Commission on Forensic Science, to minimize bias.

Q. Would you review computer source code if it were given to you?

A. No.

Q. Your work also focuses on what you call countermeasures to cognitive bias; isn't that correct?

A. I also try to find ways to minimize bias by understanding when bias arises and also try to develop best practices.

Q. You provide training to forensic technicians and government agencies about how to reduce cognitive bias; isn't that true?

A. Yes.

Q. So even if a forensic discipline is prone to cognitive bias, there's steps that can be taken to improve the outcomes of those processes; is that correct?

A. Yes. Steps can and should be taken, absolutely.

Q. And you're not aware of what steps may or may not be taken in the field of blockchain analysis, correct?

A. No, I'm not. Even though some of the general procedures that apply across domain I'm very familiar, like -- example I can give you, if you're interested.

Q. And in this case specifically, you're not aware of what efforts may or may not have been taken to review or validate results of blockchain analysis, right?

A. Correct.

Q. Now, picking up on what the Court was asking before lunch, in a given case, how do you test for the presence or absence of cognitive bias?

A. I'm sorry, I didn't hear you.

Q. In a given case, how do you test for the presence or absence of cognitive bias?

A. In a given case, I look -- for example, I like to receive, if possible, all the emails and corresponding between the investigators and the people doing the actual work. I look what information was available to the forensic examiner during the work.

For example, when they did the work of a -- did the suspect have a criminal record; the detective believes they're guilty; a lot of contextual irrelevant information that the forensic examiner needs not to know and base their decision on

the actual data.  So I look for different things that cause a certain expectation not derived from the data itself, for example.

Q.  So is it fair to say that this is a subjective evaluation; emails and contextual information and other extraneous materials is subject of judgment about whether or not cognitive bias was present in that case, correct?

A.  I would say two things.  First of all, a specific case will -- whether the examiner was exposed to irrelevant information and contextual bias is not a subjective opinion. It's a matter of fact.

But what is subjective -- and I would not testify to that in any case -- is did it affect the examiner; would the examiner reach a different conclusion if they were not exposed to the bias.  This, I would -- it's a subjective opinion, and I would never give that.

Q.  And we'll get to that.  But staying on the presence or absence of cognitive bias in a given case, is it fair to say that there's no scientific method that you're following to test whether cognitive bias exists?  It's just the subjective judgment that you make based on the presence of emails or any contextual information, right?

A.  No.  I think we're confusing or mixing two things together. One is whether the examiner was exposed to information that could have biased him, irrelevant contextual formation.  One --

and that is a matter of fact. This is very simple.

For example, in fingerprinting, whether a suspect had a criminal record or not is not relevant to looking at the fingerprints and making a judgment if the pair of fingerprints match. That is not, kind of, a subjective judgment.

However, whether that context biased and to what extent it biased the examiner and did it influence upon the judgment is a subjective decision, evaluation.

Q. Is there any -- this testing, just determining whether or not there is cognitive bias, you're saying you have a 100 percent accuracy rate in making that judgment?

A. Again, you're reframing what they're saying in a way that I don't feel comfortable. I make a presentation in a specific case -- and I understand that in this case I'm not going to do it, but if I do, I make a judgment that, knowing the past criminal record of a suspect, when the fingerprint examiner is comparing fingerprints, is irrelevant contextual information.

There's no error rate in determining that because that is determined not by me, because I'm not the fingerprint examiner. It's determined by the forensic expert themselves. They have to say if it's relevant or not relevant because I'm not a fingerprint examiner. And they may say it's relevant and have to explain why it's relevant or not.

But it's a matter of fact whether this information is needed for the forensic examiner to make a decision about their

expertise in the area.

Q. Maybe if I understand you correctly, you're saying it is a matter of fact and there's no room for disagreement about whether contextual information was made available through a forensic technician, but that's a little bit different from saying whether cognitive bias informs the forensic technician's process?

A. First of all, it's a bit more complicated. If you're asking, one of the problems in many forensic domains is that some things, all or great is not relevant. But some pieces of information, the forensic examiners themselves don't agree if it's relevant or not; it needs to be used in their decision. That's an added complexity.

All I can say is that if they were exposed to irrelevant contextual information, it's got into the brain, and it influenced the cognitive processing. To what extent, I'm not going to be able to say, and especially whether they would reach a different conclusion if they didn't have the context. This, I will not be able to make an opinion because it's subjective.

I can also say -- sometimes I can say that the contextual information would -- a lot of it versus a little, and that would be a subjective judgment. This, I probably -- if I were to voice an opinion on this specific case, I may be able to say that. But maybe not. I don't know; depends what I

see if I looked at it, which doesn't seem like it.

Q. And in the field of blockchain analysis, you have no basis to draw any opinion about what is or is not irrelevant contextual information, correct?

A. No. Incorrect. Because if the detective told the expert in forensic analysis, I know this guy is guilty and I need you to help me prove it, then that is irrelevant contextual information that could bias an examiner and is inappropriate. They don't need to be an expert in blockchain analysis to know that this is irrelevant contextual information, for example.

Q. But you've never spoken to a blockchain analyst or observed any blockchain analysis or reviewed any literature related to blockchain analysis, so you have no -- you're just speculating here that you would know it if you saw it -- is that right? -- about whether it's irrelevant contextual information?

A. No. The first part you're right, and at the risk of repeating myself, no, I have no knowledge of blockchain analysis. You're correct.

The second part you're incorrect because without any understanding of blockchain analysis, I can determine -- and I think any person can determine -- that the detective telling them a person is guilty or not or telling them I want you to work day or night and don't come back to me until you show that there is, because I need your help, that I don't need to be understanding of blockchain analysis, and it's not a

speculation to say that that is irrelevant contextual information putting the forensic examiner in chain block [sic] analysis in the frame of mind, in an expectation what they're going to find rather than letting the data itself determine the findings that come with an expectation given to them.

And that is bad and that part is bias, and that's not a speculation.

Q. Have you ever tested the efficacy of your trainings to reduce cognitive bias?

A. The procedures that I and others suggest, it's very hard to quantify them. But, for example, if we suggest in some domains to do everything -- do a lineup, like they do ID parade through witnesses, they don't show a witness one suspect, the suspect, and say, "Is that him?" They show a few people. There's an ID parade, which suggests to do it also sometimes in forensic examination. So when they get the latent prints from the crime, they don't compare it to one, the suspect, but similar to a lineup.

So this is a lot of, kind of, basic things that have been adopted in the criminal justice system and other things in the medical domain to reduce bias, but how to measure the efficacy is very complicated.

Q. Is it your testimony that there's just no statistically rigorous way to evaluate a before-and-after case, so before your training and after your training?

A. There is an efficacy and people who take the training agree whether they are biased or not and agree or not whether they should take measures. If they're taught the measures, there's not any quantification if and to what degree it actually reduces bias.

Q. And so there's no confidence interval or error rate in measuring the efficacy of your training in reducing cognitive bias?

A. Correct.

Q. Now, to be clear, it's your testimony that cognitive bias exists everywhere in all situations, right?

A. Cognitive bias is part of the human brain process, yes.

Q. Just because there's a presence of cognitive bias with a given forensic technician doing the given task, that doesn't necessarily mean the forensic technician comes up with the incorrect result, right?

A. That is absolutely correct. And in my experimental data, I find that sometimes they get the wrong conclusion, but sometimes they don't. And as to the measures to minimize them, there is no scientific proven data on that, but the U.S. National Commission on Forensic Science spent a lot of time examining and evaluating the different procedures and has adopted the procedures that have mandated by the U.S. National Commission; which was a group of experts in forensic examination and DOJ and lawyers and judges, and they've all

adopted those techniques to minimize cognitive bias.

So they have approved this and considered it in detail.

Q. Just to be clear, you can't assign a probability that, you know, given test condition A, there is cognitive bias, there is X percent of arriving at an inaccurate result, right?

A. Absolutely not able to do that.

Q. And so there's no statistically significant prediction in a given case whether cognitive bias will lead to an inaccurate result?

A. No, incorrect.

MR. EKELAND: You're Honor, I'm going to object.

THE WITNESS: You're talking about a specific case that we have article after article, dozens of articles, not only mine, but other scientists, including forensic scientists, which have done the experiment where they give the same data, the same evidence to different examiners and a different context and find statistically significant differences; or giving the same forensic examiner the same data twice with different expectations and findings that are statistically significant they will reach different conclusions.

This has been done and published by many people, including myself. What has not been done in the specific thing you're asking me, given a specific case and specific evidence and specific context, what is the likelihood that they will

reach a different conclusion, this we cannot do.

THE COURT: There's an objection. Mr. Ekeland?

MR. EKELAND: It's just asked and answered on these statistical questions. I think we've covered that point.

THE COURT: Okay.

BY MR. BROWN:

Q. Dr. Dror, going back to your expert disclosure, your disclosure states: "He will also testify as to the distorting effects of the financial and status incentives involved in the government's use of private forensic investigators, like Chainalysis, and the government's extensive use of publicity to promote this case."

Are you prepared to testify as to that today?

A. As I explained, I haven't reviewed the material, so I cannot evaluate and testify without reviewing the materials and evaluate it. So I have no opinion on that.

I will testify on what I find if I'm asked. I cannot tell you what I will find and what my opinion will be.

Q. So you're not prepared to opine about the government's "extensive use of publicity to promote this case"?

MR. EKELAND: Objection. Asked and answered, Your Honor.

THE COURT: Overruled.

THE WITNESS: So before I look at it, I cannot have an opinion, no. I have not looked at it, and I've not looked

at what the government has or has not done, so I have no opinion on it.

BY MR. BROWN:

Q. Dr. Dror, what percentage of criminal cases would you estimate has some form of cognitive bias in it?

A. If you're including the police investigation, then I would say the vast majority.

Q. And is that based on any experimental work, or is that just your feeling?

A. It's not my feeling, but it's not based on experimental work. It's based on following detectives and talking to them and looking what information they use and how they use information, and the cross-contamination that happens in criminal investigations where, for example, the police investigating, the DA, and the forensic crime lab are different entities, and often they work very closely and influence one another. And that happens in many cases, unfortunately.

Q. You're extrapolating from your anecdotal experience and studies, correct?

A. I wouldn't phrase it that way, but yes.

Q. Your expert disclosure states the following: "He will explain how miscarriages of justice and misleading evidence highlight human error as an issue within forensic science and the threat they pose in this case."

I have a hard time following that sentence. Would

you be able to explain it in your own words.

A. Yes. For example, the Innocence Project in New York that have exonerated hundreds of people who have been convicted wrongly, found and looked what caused the wrongful conviction.

And when I read the article, I was hoping that the wrongful conviction was because the defense lawyers didn't do their job, the prosecution didn't disclose evidence. Unfortunately, they found that in about half the cases the people were wrongfully convicted, flawed or exaggerated forensic science evidence contributed to their false conviction.

Q. So when the disclosure talks about a "miscarriage of justice," what you mean is a wrongful conviction; is that fair?

A. Is that what?

Q. You mean to say wrongful conviction is what you're referring to as a miscarriage of justice?

A. Yes.

Q. And you're saying that, based on the Innocence Project data, about 50 percent wrongful convictions sampled there were the result of cognitive bias?

A. That's one example. There are other examples that I can bring, if you want. I'm just giving you an illustration of what I mean, but it's based on many more things. And if you want, I'm happy to elaborate.

Q. Is it fair to say that the inverse of that is not

necessarily true? In other words, the presence of cognitive bias does not mean that 50 percent of the vast majority of criminal cases are wrongful convictions, right?

A. Of course not.

Q. That would be a logical fallacy, right?

A. Absolutely. Because that was looking not at the random sample; looking specifically on those who were wrongfully convicted.

Q. Now, I have to ask, but have you reviewed the declaration of FBI staff operations specialist Luke Scholl which was previously filed in this case?

A. No, I have not.

Q. If I provide you with a brief summary, I want to ask you if you'd consider this.

A. I prefer not to, because it's the second time you're saying assume blockchain analysis is this or that. I don't rely on what you say; assume nothing, believe no one, and check everything.

So I can't rely on what you tell me is in a document or what is chain block analysis to give my opinion on it before I actually read it and see. So with all due respect, I would not rely on what you're conveying what you think it means. If you'd like me to answer, I will.

THE COURT: I think what the -- what Mr. Brown can do, he can pose a hypothetical to you, and it's appropriate

with an expert to answer a hypothetical, and he can give you a hypothetical, and you can answer that.

THE WITNESS: Sounds good.

BY MR. BROWN:

Q. So if an analyst, hypothetically, were to conduct an analysis tracing funds from the Bitcoin Fog Bitcoin cluster through one or more intermediate accounts to two target accounts and found that a certain large proportion of those funds in the target accounts were derived directly or indirectly from Bitcoin Fog, what steps in that analysis do you think cognitive bias would affect?

A. The question is, first of all, hypothetically speaking, what was he tasked to do, what was he told to do, what knowledge was he given about the investigation, and how much it was driven by the actual data.

Also, the question is how many different interpretations are possible on the data that you presented or how much it's one-to-one, or there can be different interpretation of the data. These are the kinds of things that I would be interested to know to make an evaluation.

Q. Now, moving on to the second question, after you've made an evaluation to the presence or absence of cognitive bias, could you assign a specific probability that the analyst would come out with the correct outcome?

A. No, definitely not able to assign a probability. I would

be able to generally quantify the amount of bias in the case.

Also, I would like to say that the fact that there is bias doesn't -- even if the bias is very strong, doesn't mean they've reached the wrong conclusion; they've reached a conclusion, nevertheless.

Q. So if the analyst came up with what was, indeed, the right answer -- let's say the defendant testified in a hearing and confirmed the forensic technician's analysis, his conclusions.

What does that tell you about the role of your analysis with cognitive bias and predicting the correct or incorrect outcome?

A. I'm not totally following your question. It's very general. I'm not sure what you're asking. I'm really trying to answer your questions.

Q. Understood. I appreciate it, and I appreciate that you have not reviewed any of the evidence in this case.

If the forensic technician came out with the right answer despite areas where he may be prone to cognitive bias, what role in the analysis is it even plain to say whether cognitive bias exists or not in this process?

A. Well, the problem with the criminal justice system and crime, we don't know if we've reached the right answer because the criminals are not always nice and leave such nice evidence. So it's very problematic.

We don't know if it is the right answer or not to

begin with. So I don't find -- and the conclusion, the question is how reliable the conclusion is.

Q. And so, essentially, if he comes up with the right answer, your theory is still right because you're not predicting an incorrect answer; and if he comes up with the incorrect answer, your theory is still right because your theory predicts bad outcomes because of cognitive bias?

A. In case I am in danger of repeating myself, it's not my theory. You keep referring to my theory.

We're talking about established facts agreed by every cognitive neuroscientist, and anyone who studies the brain and human decision-making will say about that. So it's not my theory.

We are affected. The same thing, we can -- I can give you more examples, but it's going to complicate the matter. I'm trying to keep it simple.

The point is, if they're exposed to bias, that may or may not influence their final decision.

Q. And you have no way of quantifying probability of how that cognitive bias would affect the final decision, correct?

A. Again, at the risk of repeating myself, no, we cannot in a specific case calculate the probability that they would have reached a different conclusion. But, A, we know and do statistical analysis showing that such context and bias can and does influence their decision.

The way to do it, and a court in the United States allowed me to do it, is to hire forensic examiners in the domain and give them the data without context and see what they would find and decide.  And that is the right decision based on the data.

So that's something that can be done, and even a court in the United States took up that idea to have independent examiners appointed by the Court, not working for the prosecution or the defense, and not briefed by them, and just get the data and hear their opinion.  That will be the most objective and most reliable conclusion.

Q.  And you have never done any of that sort of experiment in the field of blockchain analysis, correct?

A.  Correct.

MR. BROWN:  Your Honor, no further questions at this time.

THE COURT:  All right.  Mr. Ekeland?

REDIRECT EXAMINATION OF

DR. ITIEL DROR

BY MR. EKELAND:

Q.  Dr. Dror, I just want to follow up on some of the questions, briefly, that Mr. Brown asked you in relation to the creation of expectations and the context given to a forensic investigator.

In your expert opinion, if a forensic investigator

who has not been involved in the criminal investigation but is brought in after the defendant is arrested and is told that the defendant has been arrested and then is asked to do forensic work in the case, is that a situation where cognitive bias is a concern?

A. Yes. But to what degree, I would need to get more details.

Q. But it is your testimony that cognitive bias in that situation, because of the context, where the forensic examiner has been told that the defendant has been arrested for the crime, that that potentially will affect the outcome of the forensic examiner's decision?

A. Yes. And it's not a speculation to say that the forensic examiner doing the blockchain analysis does not need to know if the person was arrested or not. That is not relevant to their expertise in blockchain analysis. But it's totally irrelevant contextual information.

Q. And is it your expert opinion that best practices for a forensic investigator brought in to analyze the forensic data in a case after a defendant has been arrested, that it's best practice not to tell that forensic examiner that the individual that they're investigating has been arrested; is that correct?

A. That is correct. But not only my opinion, but the opinion of the U.S. National Commission on Forensic Science.

Q. Just one more question, just to follow up on what Mr. Brown asked you.

In your opinion, in a criminal prosecution where there's a private forensic investigating company, like in this instance Chainalysis Reactor, that has hundreds of millions of dollars' worth of contracts with the government, is that a situation where cognitive bias would come into play with the forensic examiners?

A. It could. But depending how it's done and what the company has done. But it could, but not necessarily.

MR. EKELAND: No further questions, Your Honor.

THE COURT: All right. Thank you. Dr. Dror, thank you --

THE WITNESS: Can I add something?

THE COURT: You may.

THE WITNESS: Thank you.

I know I don't understand the legal questions, but it seems to me to be a very simple decision about generally educating the jurors about cognitive bias because if the DA prosecutor advised me in order to educate him and the public defenders and the judges bring me from London to educate them, so if the judges and the lawyers request an education on cognitive bias, it seems quite clear that the jurors don't know more than the lawyers and the judges.

I've done this kind of education to jurors multiple times in the United States, and it's very important that they understand the difference between bias and cognitive bias, that

experts are susceptible, and understand the different ingredients and how they work with one another.

But, again, there may be legal issues, but to me it seems like a very simple decision.

THE COURT: All right. Thank you. So, Dr. Dror, you are excused. And I don't know if the parties want to make any argument on this now or whether you want to make the argument with respect to particular witnesses later. I'm happy to proceed however you want.

MR. EKELAND: I would like to reserve that argument for later, Your Honor.

THE COURT: Okay. Well, while we have the witnesses here, maybe we're better off spending as much of our time with witnesses. So why don't we just move to the next witness.

MR. EKELAND: Your Honor, may I have five minutes to run to the restroom.

THE COURT: We'll take a few-minute break and come back in about ten minutes.

(Recess taken.)

THE COURT: All right. Mr. Ekeland, you want to call your next witness.

MR. EKELAND: Yes, Your Honor. The defense calls J.W. Verret.

THE COURTROOM DEPUTY: Hello, Mr. Verret. Before you sit down, would you raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY:  Thank you.  Please be seated.

MR. EKELAND:  May I proceed, Your Honor?

THE COURT:  You may, please.

MR. EKELAND:  Thank you.

DIRECT EXAMINATION OF

J.W. VERRET

BY MR. EKELAND:

Q.  Mr. Verret, could you -- are you ready, Mr. Verret?

A.  Yes.

Q.  Mr. Verret, could you just state your educational background for the Court.

A.  Sure.  I've got a bachelor's degree from Louisiana State University in accounting.  I have a law degree from Harvard. I have a master's in public policy from the Harvard Kennedy School of Government with a concentration in financial regulation.

And you just want the degrees or --

Q.  Degrees and any certifications and trainings that you have had that are relevant.

A.  Sure.  So I'm licensed to practice law.  I'm a licensed certified public accountant in the state of Virginia.  I hold the CFF designation, Certified Financial Forensics, that is awarded by the AICPA.  I hold the CFE designation, Certified in Fraud Examination, that is awarded by ASCFE, American Society

of Certified Fraud Examiners; the CVA, which is certified in valuation analysis -- Certified Valuation Analyst.

Just to describe those briefly, the CPA you're probably familiar with, Certified Public Accountant. The CFF designation is awarded by the AICPA. You have to hold the CPA designation to be a CFF. You undertake additional training in financial forensics, forensic accounting, and forensics more generally. And you have to have experience in investigative work to hold the CFF designation.

And it was, I guess a simple explanation, created by the AICPA to help CPAs working in forensic accounting. It's a field that grew out of -- I think originally out of the prohibition and the forensic accountants working on the investigation into Al Capone. That's where the field harkens back to. So the CFF helps CPAs to specialize in forensic accounting.

And then the CFE is a designation that is somewhat a little like the CFF. The CFE is -- you don't have to be a CPA to be a CFE. You just have to have a bachelor's degree. It's relatively much easier to obtain relative to the CFF.

And the CVA is focused on valuation matters that can be -- you know, like valuing something in litigation or something like that.

Q. Just briefly, what kind of training and standards, if any, are involved in the CFF certification?

A.  So the training in the CFF designation involves pretty rigorous training in everything from opening investigations, conflicts checks, and engagement letters on the practice side, to initial interviews, scoping out financial forensic investigation, conducting the forensic investigation, much of it on creating the paper trail, necessary paper trail, and learning how to review the paper trail, learning some of the tools that are also used in auditing for the purposes of financial forensics.

So, for example, ways to follow money trails, typical topologies of financial fraud or other financial crimes, like the types of schemes that tend to persist in embezzlements or in money laundering or in fraud, things like that, of that nature.

And there's training in computer forensics as well, so that you can either make determinations on your own or know what to do with evidence to make sure you maintain the chain of evidence.  You do your best not to ruin the reliability of the computer forensics, and that you know how to collaborate and rely on, if you need to use a digital or computer forensics expert.  There's some training in that aspect as well, as it kind of spans the gamut

Q.  Just to --

A.  Also, I should say, in the last couple of years, the folks at the AICPA who manage this license are very cognizant of the

growing field of cryptocurrency and fraud and compliance.

So there's no shortage of classes in continuing education to take in crypto forensics. And it's the area I've been most excited about for a few years, so I think I might be the only forensic accountant who takes more continuing education than he needs to because I can't get enough of the crypto forensic classes. Anyway --

Q. So as part of your continuing education as a certified, I think you said fraud forensics -- what's the CFF stand for again? I'm sorry.

A. Certified in Financial Forensics.

Q. Certified in Financial Forensics. As part of your continuing education requirements, as I understand you, you've had training in digital currencies in the blockchain; is that correct?

A. Everything from the basics of blockchain, blockchain tracing, types of schemes that criminals use blockchain for; from ransomware, it's used to -- you know, embezzlements and phishing scams and those kinds of things; to understanding blockchain analytics and understanding on-chain data and some applications to decentralized finance, which is a more complicated end of crypto forensics than the issues in this case.

So yes is the answer to your question.

Q. And outside of your continuing education classes as part of

your CFF certification, what experience do you have in general with the blockchain and cryptocurrencies?

A.  So I have a certification from the Wharton School of Business in the economics of blockchain that was an education -- I forget now how many hours went into it.  But it was roughly three months of about 10, 15 hours a week to obtain that certification.

THE COURT:  What does that mean, the economics of blockchain?  I thought blockchain was a mode of analysis.  What is the economics of blockchain?

THE WITNESS:  So this is understanding -- understanding the applications of blockchain to the economy.

So right now the clearest cases for blockchain are for payments for the transfer of value over a decentralized computer network and for the storage of data that represents ownership.  So this is what NFTs are about.  This is the pictures that people trade, which is, essentially, digital art traded on the blockchain.  So it's understanding those two applications, the application for gaming, the application of blockchain for real-world assets being represented on-chain.

The economy is not there yet, but there are changes in the Uniform Commercial Code going on that I think will eventually get us there to where, rather than a deed to your house being at the courthouse, it exists on-chain.  So that makes it a lot easier to eventually transfer.  So those are the

future applications, and we studied some of those.

But I found out that -- that part of my education was useful for crypto forensics because it helps me understand how to value things, it helps me understand the legitimate economic projects that are subject to the problems that are endemic to blockchain, like scams, like phishing, like hacking.  Yeah.

THE COURT:  That's helpful.  Thank you.

THE WITNESS:  Okay.  Sure.

BY MR. EKELAND:

Q.  I think it might be helpful, Mr. Verret, if you can give us a brief description of your understanding of just what the blockchain is and how it works.

A.  Sure.  I think, in answer to your last question, I didn't want to miss that I've also -- in addition to taking continuing education courses, I've also given them in blockchain issues, in addition to my teaching at the law school; teaching forensic accounting at the law school.  I've done more than a few courses for continuing education for attorneys in crypto forensics issues and crypto regulatory issues for the American Bar Association, for the Federalist Society, and those are all online and googleable.

In answer to your question, the basics of blockchain, a blockchain is a mode of storing data that involves hashing. So you take a record of something that happened, kind of like the record you would have on a central ledger that you might

have on Microsoft Excel, but instead of storing it in one place where you have to rely on the place it's stored and the person who controls where it's stored, the genius of blockchain that was demonstrated, I think, in the Bitcoin blockchain -- and has been in other blockchains to varying extents, depending how good they are -- the genius of it is that the system is designed so that it incentivizes a larger group of decentralized computers controlled by a larger group of people to continue changes to this shared distributed system in a way that rewards -- rewards truthful updates to the chain that -- and that makes it very difficult, even if you wanted to, to make an inaccurate or false update to the chain unless you controlled the majority of the nodes.

So as the group of nodes grows bigger, that becomes more and more difficult. And as the individuals running the nodes are -- like in Bitcoin, there are a lot of companies that mine bitcoin that own a lot of bitcoin. So they would hate to see something bad happen to the reputation of Bitcoin and the bitcoins that they own.

So that creates how you have a -- people often use the analogy of made its way into the popular press of Napster. Remember Napster in the '90s? The idea was you trade music with someone else and that, obviously, had a lot of copyright issues and was illegal in a lot of ways.

But the technology itself, it was very interesting.

It allowed different people, rather than a central library, it allowed a lot of different people to share what they had in a way that required someone else to share with them. So it was a precursor to some of the ideas that made their way here. It itself changed the music industry, I think; led the way for streaming.

In the same way, one of the hopes of blockchain is to decentralize economic activity in such a way that would be kind of -- it no longer has to rely on central gatekeepers who can charge economic rents for access to what they control. So the hope behind some blockchain developers -- and this still has to be realized.

There's not much to that hope yet, but you can see how it's logical -- is that it would decentralize social media.

So then -- rather than going on Facebook or Twitter or whatever and interacting with people. But that entire connection is controlled by a central company, and they get to decide what to charge, and they use your data and charge advertisers and whatever. There's a possibility for an alternative business model where the whole thing exists on a blockchain. There's no central party that controls it.

And so your identity is linked to the chain in such a way that applications can be developed by other programmers who are kind of open-source developers who are interested in building applications they can link to the blockchain, an

alternative vision of social media. That might not work out because it's hard to overcome the established -- I think, the establishment of the big social media companies.

But, anyway, you can see how similar applications could develop for other things, like just basic transfer of value to someone. Bitcoin is very valuable in that way. It's proven it's very valuable.

If you were in Ukraine when the war started and the banks shut down, there are a lot of people who have a story that, you know, I had to get out of there. I couldn't go to my bank. If I had had money on me, it would have gotten taken at the border. You know what, I memorized my seed phrase. I got to Poland, and then I got access to a computer and access to my Bitcoin.

So I walked out of Ukraine with the shirt on my back, walked past guards, and didn't have to worry about the risk of losing that value. That's one of the benefits of -- I'm kind of going off here, so stop me when I'm talking about --

Q. I do want to ask you one question. Is it correct to say that when you characterize the blockchain as decentralized, what that means is that there is no central authority or any single person that controls the blockchain?

A. Yes. And I think that is true of Bitcoin, and it's somewhat true of other blockchains and really not true of some blockchains. But, obviously, that's probably fairly beyond the

scope.

Q. I think I heard you say that your identity is linked somehow to the blockchain.

But are you saying that a person has their personally identifying information on the blockchain, or just what are you referring to when you say that?

A. So the ideas that I was talking about that are experimental, that might come in the future, might involve putting personally identifiable information or information about property in the blockchain, but that's not the case now. And I don't want to confuse anyone in talking about Bitcoin because that's not the case for Bitcoin.

Q. For Bitcoin specifically, just what information is kept on-chain, so to speak, on the blockchain?

A. So your -- as a user of Bitcoin, you end up with two primary pieces of information, a public key and a private key. You can think of your private key like your password; you can think of your public key like your bank account, though it's a little more complicated than that.

A lot of information is contained on-chain about particular transactions that describe the hash, that describe the date, that describe the number of blocks that have come before and stuff like that. Basically, you have a public key and a private key.

Your private key controls your public key and the

assets at your public key. So it's like your password, it's like your Swiss bank account key. You can think of it that way. You don't share your private key with anyone. You want to keep that secret, especially if you're custodying yourself; you're not leaving it on exchange. That is the most secret thing that you need to be very careful about, how you custody that.

And share it with no one and try to figure out -- this is a difficult question -- what do you do with it if you die, how do you make sure your heirs get it, and stuff like that. That's your private key.

Your public key is connected to the UTXOs unspent transaction amounts. Think of it generally; it's connected to the bitcoin that you own. The bitcoin you own is connected to your public key.

So if I download the Bitcoin blockchain or, more easily, if I use one of the blockchain explorers online that has been described, like blockchain.com, I can look at it as of a current block height, a record of the Bitcoin blockchain. If I knew your public key, I could learn a lot about you; I could learn a lot of interesting stuff about you, if I know your public key, if you told me what your public key is.

If I don't know what's associated with you, then I've got to figure out how to link that with you. And if I'm trying to link that with you -- we can get into that -- but the

easiest way is either you tell me it is linked to you or it's in a KYC'd account and it shows me it's linked to your KYC'd information.  That might allow me to have a reasonable inference that it's linked to you.

Or if I see that you've written down the private key, if I find a secret note hidden away in your house, and it says this is my private key, don't show it to anyone, and I see your private key right there, usually it's a reasonable inference that that private key that's associated with the public key and the bitcoins of the public key are under your control and, therefore, owned by you.

But I think, generally speaking, what you're getting at and what I'm trying to describe is that attributing ownership of bitcoin is a -- can be a lot easier if I know that you and the public key are linked.  So it's potentially a threat to privacy.  But if I don't know that already, it can be hard to make that link.

Q.  Is it fair to say that just simply looking at the blockchain, which as I -- if I'm understanding you correctly is just sort of a digital -- a decentralized digital ledger of transactions, that there's no way just simply to look at the blockchain itself with the information in it and the transactions that are reported in the blockchain and identify anybody without more information outside the blockchain?  Is that correct?

A. That's correct.

Q. So I want to turn to the discovery in this case. And have you reviewed the discovery in this case?

A. I have.

Q. And did you review the deposits to Mr. Sterlingov's Kraken account that the government has alleged are the service fees for Bitcoin Fog?

A. I have. Yes.

Q. And --

A. And their other cryptocurrency accounts as well.

Q. Did you review those accounts as well?

A. Yes.

Q. In general, do you have an opinion as to the government's assertion, and I believe also the assertion by the government's noticed expert, Ms. Sarah Glave, that the deposits to Mr. Sterlingov's Kraken accounts are service fees from Bitcoin Fog?

A. So my opinion is I cannot determine that they are service fees from Bitcoin Fog, and I have not seen information consistent with that description of what those amounts are.

Q. And why do you think that?

A. Well, a few reasons. First, there's the question of the missing bitcoin. So one of the first questions you have to answer in trying to assess what's going on here is, to assess the government's assertion that Mr. Sterlingov ran Bitcoin Fog,

what are the toll fees, mixing fees for operating Bitcoin Fog. You have to make a determination on that.

Maybe you can try to look at clustering and try to get some guess about direct transactions and add them up. But a very easy and accurate back-of-the-envelope calculation you can make is to say, okay, the government has an assertion about how much bitcoin went through Bitcoin Fog; the government has made that assertion. About a million bitcoin.

The average fee for Bitcoin Fog was -- well, it changed over time, but it was 2 percent, then it was variable between 2 and 3 percent. You can try to figure out a reasonable estimate of the fees. Let's say 2 percent is fairly conservative for the low amount of fees you'd expect and, therefore, a low estimate of the fees that are missing. But you could make an estimate closer to 3 percent or 2.5 percent. Let's go with 2.5.

That's 2.5 percent times a million bitcoin going through, right? Or is it 2.6, 2.7? I don't know. 24,000 bitcoin -- from 24,000 bitcoin to 30,000 bitcoin would be the fees for operating Bitcoin Fog. That's a lot of bitcoin. That's a lot of money.

There was a point at which, in the history of bitcoin, that would make you a billionaire.

So -- okay. Let's go with the lowest number; 24,000 bitcoin, roughly speaking. I don't have my calculator in front

of me, so don't say I'm mischaracterizing if it's 23,700-something. Roughly speaking, 2 percent times a million of bitcoin going through, right?

So where is the missing bitcoin? The government's -- the documents they have shown demonstrate 1600 bitcoin. So I've got 21,000, 22,000 bitcoin I can't account for. So there's 1600 bitcoin that these documents can account for. 1600. But then there's 22,000 bitcoin that -- where did those fees go if he was the operator?

I don't see anything to demonstrate to me where that went. So that's inconsistent with the assertion that he was running the mixer, and that bitcoin -- post mix that the government search was mixed through Bitcoin Fog was fees. But it is consistent with the assertion, I believe, that he was a user of Bitcoin Fog; that he was just a bitcoin owner who wanted to get some privacy on a network that's very hard to obtain privacy if anyone knows your public key.

We can get into how there's a few reasons -- ways people can learn more actual public keys. You can transact with them or they could hack the exchange that you interact with and that you have KYC'd information at. Anyway, for a second -- there's a question of missing bitcoin.

THE COURT: Sir, can you define KYC. You said --

THE WITNESS: Know your customer information. This is when you give your license to the exchange you interact

with.  And KYC is shorthand for, you know, the anti-money laundering regime administered by --

BY MR. EKELAND:

Q.  And just to be clear, the Kraken account was a KYC account; is that correct?

A.  Yes, that's correct.

Q.  In your opinion, would somebody who was running a mixer like Bitcoin Fog and if the bitcoin -- would somebody like that deposit their service fees in a KYC Kraken account?

A.  See, this is the second reason why, in addition to the missing bitcoin.  The second reason why the evidence I've reviewed is inconsistent with -- just doesn't support the government's assertion that these funds at Kraken and other KYC'd accounts that were mixed at Bitcoin Fog and sent back to a KYC'd exchange -- this is inconsistent with the government's framing that Roman ran Bitcoin Fog.

So in crypto privacy -- which is something I'm writing a book about right now for MIT Press.  It's something I teach my students, it's something I care a lot about.  We haven't talked about how I serve on the foundation that does research into the zero-knowledge proof cryptography that underlies some of the private cryptocurrencies that were built to solve this problem in bitcoin.

The number one thing you have to know, the first lesson, the rookie thing about crypto privacy is if you use a

privacy tool of some kind, that can delink your future transactions from your history.  But the moment you bring it back to something connected to you, you have obviated any benefit you've created from using that privacy tool.

Whether it's a mixing tool, like these centralized mixers that existed a long time ago, whether it's a coinjoin, whether it's using a privacy coin, you have to be very careful about what you do after using the privacy tool not to relink it to you if you're trying to keep that private in some way.

Now, if Mr. Sterlingov is -- and another point that's important, I think, in forming my opinion, is I've seen the BitcoinFog.com clearnet website, and whoever wrote that -- I don't know who wrote that, but whoever wrote it understands that.  They're very clear that they understand the notion of post-mix privacy and maintaining post-mix privacy.

They understand so well, they talk about tracing techniques.  And whoever wrote that was fairly sophisticated in this regard.

Q.  Just a real quick question.  When you referenced the BitcoinFog.com clearnet site, are you referring to just a website on the World Wide Web, a normal -- that anybody can access with a normal browser?

A.  Sure.  And particularly various iterations of it on the Wayback Machine that can show me what it looked like back in 2011, 2012.

Q.   And just to follow up, a question on that, was the BitcoinFog.com website, is that the site that you would actually mix your bitcoin on?

A.   No.  It's not even clear from the term, that website, that it was necessarily created by whoever was running the mixer. But it described the mixer, it told you how to get to the mixer, and it gave some tips about using it, including not doing anything like sending your post-mix tokens back to your KYC'd account.

Q.   Just real briefly, where would it send you?  Where was it pointing you to, to actually do the mixing?

A.   So there's various iterations of it on the Wayback Machine. The ones that I saw pointed you to a different kind of website contained on the -- a Tor onion router viewable site on the -- people call it the dark web.  It's a pejorative term.  It's a web that's not on the publicly surveilled World Wide Web.

Q.   So just to be clear, the clearnet site doesn't mix bitcoin at all?

A.   That's correct.  That's correct as well, yes.

Q.   Okay.  And then in your expert opinion, are --

A.   Can I make one last point that I didn't give to you?

Q.   Yes.

A.   If you were using -- you have to weigh hypotheticals as a -- in financial forensics and understand which one is more likely, reasonable, and consistent with the evidence.

If you were trying to put yourself in Roman's position, if you were a bitcoin owner and you wanted some privacy, you didn't need to hide from Kraken because you trust Kraken. But you're going to maybe Bitcoin meetups and you're sending some bitcoin to somebody. But you don't want them to track your wallet, see how much you own. He was very early, and he had a lot. Sometimes people get kidnapped for how much they have in bitcoin.

If you wanted privacy from people who you interact with in the world, you're not an illicit actor, you're not doing crime, so you're not afraid of Kraken, this KYC'd exchange, knowing that it came from Bitcoin Fog and knowing that it's easily readily subpoenable; that the post mix, post Bitcoin Fog mixed bitcoin or at Kraken, if that's who you are, there would be no reason to send post-mix tokens back to Kraken.

Now, if you were some criminal mastermind running a Bitcoin Fog mixer that you know was the subject of government investigations, then you could be very careful about what you did with post-mix tokens, whether they were the result of fees or not. You wouldn't want that touching anything that was KYC'd.

So that's another reasonable inference that suggests to me that Mr. Sterlingov's bitcoin contained in the KYC'd accounts listed in the government's evidence were not the

proceeds of running a mixer but were, instead, the proceeds of just using the tool, the privacy tool, to obtain personal privacy.

Q. And from the context of your CFF certification and the standards involved in forensic accounting, is it your opinion that the government's conclusion that Mr. Sterlingov was receiving service fees from Bitcoin Fog, is that forensically sound in your opinion?

A. I don't believe it is forensically sound. I was expecting to see, when I began to review the evidence, that one of the most common tools used in financial forensics, forensic accounting, is a tool of indirectly finding hidden money, so-called net worth or net income analysis. I was expecting to see that, and I haven't seen it.

And I referenced an article that describes it, I think, in a pretty succinct way in the disclosure. That's a standard tool of the trade to try to determine whether illicit money that you can't see is somehow present in the form of other assets. It was converted to some other asset in some way or some other expenditure that will suggest what is missing. And I didn't see any of that analysis either.

There was not sufficient data to conduct a net worth or net income analysis in the government's -- the evidence they turned over.

Q. And you've reviewed the government's expert disclosure for,

I believe, Ms. Sarah Glave; is that correct?

A. Yes.

Q. And in that expert disclosure, I think she makes a statement saying that one thing she's going to testify to at trial is that Mr. Sterlingov -- the returns that Mr. Sterlingov got from bitcoin are not consistent with the returns that an average bitcoin investor would get.

In your opinion, is that a forensically sound conclusion?

A. I didn't see enough evidence in the government's disclosures to come to that conclusion at all. Not only do I not agree with it, but I think it would be forensically unsound, for example, just given the change in the price of bitcoin from 2011 to the time when Mr. Sterlingov was arrested.

In 2011, bitcoin was bouncing around in the $30 range, and it's now around $30,000. But it hit $60,000 at its height; 60-something. So to get to 1600 bitcoins in 2011, I mean, you multiply that 1600 times 30. That seems to be within the range of what Mr. Sterlingov could have spent on bitcoin. We don't have a full amount that he spent on bitcoin.

Even if you -- you can't make the assumption that he was only buying -- even if you relied on Mt. Gox data -- which I'm not willing to; hopefully, I get a chance to describe why. If you rely on Kraken data -- which, unless there's some reason not to, I'm willing to rely on Kraken data because their

reputation with me -- I know them pretty well -- is pretty sound. But even if you rely on all of that, if -- you still don't know whether or not Roman was buying bitcoin in ways that didn't involve KYC exchanges.

He could have been buying them on peer-to-peer platforms. He could have been receiving them at Bitcoin meetups. You meet up someone and pull out your wallet and you transfer bitcoin. We don't know whether he was engaged in one-on-one transactions. We don't know if he was buying bitcoin on peer-to-peer transactions that do not comply with KYC and that would not be readily subpoenable.

And all of that could have gone through the Bitcoin Fog mixer, and that could be some of what we're seeing in -- what's in the Kraken account right now. There's no way to know that.

Q. Is the only way to transfer ownership of bitcoin, is the only way to do that on-chain, so to speak, by recording a transaction on-chain, or are there other ways to transfer ownership and control through Bitcoin that aren't recorded on the blockchain?

A. So one of the things that fascinates me most about blockchain as it touches all the areas I teach in -- as a law professor and as someone who teaches accounting to lawyers -- is blockchain changes the nature of ownership itself.

Certainly, there are traditional concepts of property

law that will still apply no matter the asset, right?  But to the extent you're thinking about something like control, let's say if I wanted to give you a Bitcoin tour today, so you could pull out your wallet, and I could pull out my wallet, and I could transfer it to you, a bitcoin to you, in an on-chain transaction.

Or I could just say, here's my private key.  Maybe the fees are high and you trust me.  You trust that I'm not going to secretly keep my private key.  I just say, look, I didn't memorize it.  You trust me.  I can just give it to you. Now it's yours.

Q.  And so just to sum up, if somebody -- somebody can transfer ownership of bitcoin by simply transferring or stealing a private key, and it would show up nowhere on the blockchain?

A.  Right.  That's right.

Q.  And real briefly, you mentioned that you don't trust the Mt. Gox data.  Why is that?

A.  So before this -- before I even learned about this case, I knew something about Mt. Gox.

Q.  I'm sorry.  One second.  Just explain for the Court what Mt. Gox was.

A.  Sure.  Mt. Gox started as an exchange for -- there's always good stories in Bitcoin.  It started as a forum to exchange Magic: The Gathering collecting cards.  That's where the name Mt. Gox came from.

It came to be a platform for the exchange of bitcoin. And part of my research for the book on bitcoin privacy and forensics that I'm doing for MIT, I listened to a podcast with Mr. Mark Karpeles, who was the CEO of -- or the owner/CEO/president -- I don't remember the title -- the owner/controller/manager of Mt. Gox at the time it went down.

Q. What time was that, just to put this in a --

A. I can't remember the time it went into bankruptcy, but it was hacked multiple times over the course of 2011, 2012; I think 2014. I might be getting the dates wrong. That's my general understanding. It's very early in Bitcoin.

So I listened to a podcast he did recently, last year, after the FTX blowup. And anybody who wants to can listen to it. It's on a podcast called *Up Only*. Popular phrase in Bitcoin. *Up Only* podcast with Mr. Mark Karpeles.

They wanted to talk to him about the FTX event that they want -- given he was at the head of an exchange that went down, the first one. They wanted to talk about his story. He's talked in-depth about how when he bought Mt. Gox, he was shocked to learn the state of the records that he got. He said it was a disaster. That the logs were all wrong, that the servers were all not secure, that the records were off.

So much so that he wanted to sue the person -- I think he wanted to sue the person who had sold it to him. He felt they had violated the terms of the deal because of the

state that Mt. Gox was in when he bought it, controlled it.

And I know that Mt. Gox was hacked multiple times. Those stories have been relayed quite a bit. I followed the Mt. Gox bankruptcy.

Q. Why did Mt. Gox go bankrupt?

A. I think it, principally, went bankrupt because of the hacks; because of the bitcoin that was stolen from Mt. Gox.

So when I came into this case, I mean, I have those prior -- that prior knowledge from learning about Mt. Gox. It's hard not to know that. In my role as a forensic accountant and financial forensic analyst -- I guess is a good phrase -- I can't unknow that. I know that. I have to trust the integrity of what I'm looking at.

Sometimes this can even come up in traditional institutions. I've been involved in a financial forensic investigation where the reliability of Bank of America's records was at issue because there was some problems with them taking wrongfully endorsed checks, and their compliance system wasn't working.

So that can happen in traditional institutions, and you have to make a judgment about the records that you see and whether you rely on them as a forensic investigator. If that can happen in that context, think about Mt. Gox. That was -- that its own owner described as unreliable and -- own records unreliable before he knew of the hack that hacked bitcoin.

I don't feel comfortable relying on Mt. Gox data as part of an assessment in this matter.

Q. Would you consider it forensically sound to -- under the standards you were taught in your CFF certification and everything that you know about forensic accounting and the standards that apply, do you consider it forensically sound to rely on the Mt. Gox data for any kind of financial analysis?

A. I wouldn't rely on Mt. Gox data unless someone else could, in a trustful way, verify for me -- in which case I wouldn't --

THE COURT REPORTER: I'm sorry. You need to slow down.

THE WITNESS: Sorry.

The short answer is, I guess, to repeat what I just said, I wouldn't rely on Mt. Gox data unless someone else independently verified it for me that I could trust, in which case I wouldn't be relying on the Mt. Gox data anymore. I'd be relying on this third party that could verify it for me.

BY MR. EKELAND:

Q. Just to change topics slightly, are you familiar with Chainalysis Reactor?

A. Sure.

Q. And can you just briefly describe your understanding of how Chainalysis Reactor works.

A. My understanding, it's a tool that uses blockchain data, a combination of blockchain data taken from the blockchain itself

and from -- in some blockchains from the nodes that Chainalysis runs.

Q. Can you stop for one second. Could you just explain to the Court what -- for everybody, what a node is.

A. Sure. A node is just a computer interface that interacts with the blockchain and makes changes to it, or that can make changes to it. But in the ordinary sense, it just communicates with it and keeps a record of it.

Q. I want to get clear, to go back to the concept of decentralization, when you're saying interacting with the blockchain, where is the blockchain? Is it a central place, or is it existing on the node, or how does that work?

A. It's -- copies of it are stored on -- for Bitcoin, hundreds of thousands of computers around the world.

Q. Is it fair to say that a copy of the blockchain is stored on every node?

A. Right, yes. Regularly updated every block.

Q. So any change to the blockchain is a change to the blockchain on every node, and in that sense it's decentralized; is that correct?

A. That's good, yes. Accurate.

Q. Going back to your knowledge of Chainalysis, you were describing your understanding -- Chainalysis Reactor, how it works, you can continue with that.

A. I should say my understanding of Reactor is based just

on -- mostly on Chainalysis's own description of it.  Because they were protective of this tool, such that --

Q.  Could I just ask a question about that.  Why would somebody be protective if everything that your software is dealing with it just a matter of public record?

A.  I mean, I don't want to cast aspersions.  They might be conflicted.  There might be issues with the tools.  I've seen them say it's all because of proprietary issues, but I don't think that's the whole reason because I know that there are issues with the heuristics that have gone into that tool.  That must be part of --

Q.  If I could stop you there and take this bit by bit because this is complex.

When you say heuristics going into the tool, what do you mean by heuristics?

A.  I'll answer that question, but -- not to be annoying, but there's a point in the last question --

Q.  Please finish up the last question, and then we'll --

A.  You asked me if I was comfortable relying on Chainalysis.  One, I don't know enough about the black box that is Reactor.  I do know that it uses blockchain data.  They describe that they use their own nodes and they use data from the nodes that is off-chain, and they use other stuff too.

I know at one point they did kind of a honey-pot wallet explorer; that you could use the explorer, but they

don't realize that Chainalysis is actually surveilling the wallets that connect to explorer. Anyway, that's all from their description and from some stuff that is leaked.

You asked me why I wouldn't be comfortable relying on on it. One of the reasons is just one of my colleagues -- at a firm called J.S. Held that I do some stuff with -- we were talking about building a program where we could do some pro bono crypto forensics work for families who got hacked and for law enforcement agencies that came forward that had families that can't afford -- that can't afford tools and that need help.

We talked about using Chainalysis Reactor. And one of my colleagues said, it's unreliable, and I feel more comfortable building my own API, the --

THE COURT: I'm sorry. Can you slow down a little bit. You're not talking, I think, carefully. I apologize. It's very hard for the court reporter when you talk that fast and don't talk clearly.

THE WITNESS: I apologize. I'm sorry.

THE COURT: Okay. Go ahead.

THE WITNESS: Based on the representations of my colleague at J.S. Held, he didn't trust Chainalysis Reactor and was more comfortable using his own API to interact with the blockchain.

That's another reason why I would not feel

comfortable using it. I also don't know enough about what happens in a black box of Reactor. I happen to know that -- I assumed -- maybe I might be wrong, but I assumed that they tend to have an exclusive relationship with law enforcement based on the grants they've gotten from the DOJ and the treasury department, and I assume that if I would have called in to use it for defense side work, they would have told me no. They're very exclusive about who they let take the training and the tools.

So for all these reasons, I wouldn't feel comfortable using it. But I think the most important one is that I know the heuristics that went into the tool, and I know -- I'm pretty familiar with the literature on blockchain forensics and the questions raised about the reliability of those heuristics for anything other than generating initial leads in an investigation.

BY MR. EKELAND:

Q. So just briefly, just -- if you could just explain for everybody here what a heuristic is.

Is it something that's just a deterministic logical certainty or what? Is it a --

A. No. A heuristic is just a fancy word for a guess. Of course, guesswork is important in any forensic investigation. You've got to make a lot of guesses.

I wouldn't rely on it to tell me the fact of

something. I wouldn't rely on it alone. I think a heuristic is interesting to get started, but if that's all you've got in financial forensics, then you've got nothing.

Q. So what -- are there different types of heuristics?

A. There are different types of -- sure. I'm familiar with a few that Chainalysis has referenced in the brief report that they provided in this case that are also described in the academic literature that precedes the establishment of that fund.

Particularly, the multi-input heuristic and the peel chain heuristic that helps to try to cluster bitcoin public keys together to support an assumption that they all are controlled by the same person.

Q. So if I understand your testimony correctly, there's -- clustering is, basically, fancy guesswork; saying that certain bitcoin addresses are all associated with each other. Is that a correct way to understand it?

A. That's correct, yes.

Q. And when you said that there's -- I forget -- the multi -- what did you say, the multi-spend heuristic?

A. Multi-input.

Q. Is that the same as the co-spend?

A. Yes.

Q. Okay. And so is it your understanding that the co-spend heuristic is one of the primary heuristics that Chainalysis

Reactor uses?

A. Yes. I was anticipating you'd ask me to define it.

Q. Do you think, in your expert opinion, is the co-spend heuristic a reliable heuristic in terms of its accuracy related to its attributions, whether it's clustering or attributing blockchain -- bitcoin transactions to an individual?

A. The thing is, sometimes it's right and sometimes it's wrong. I don't know the error rate for when it's wrong, and I have not seen anything to demonstrate that in the literature I'm aware of.

There are some articles that have it all over the map. But I have not seen it reliably demonstrated -- error rate reliably demonstrated in the evidence in this case. Sometimes it's right, sometimes it's wrong, which makes it interesting to generate leads in an investigation and learn where to deploy resources or your time.

But like I said before, if that's all you've got, you've got nothing.

Q. What are some of the potential problems with the co-spend heuristic?

A. So the co-spend heuristic is based on an assumption that -- it's based on the fact that the Bitcoin blockchain -- that the model of how transactions work in Bitcoin is a UTXO model, an unspent transaction amount model.

If you want to send it -- bitcoin from a public key,

you actually -- if you want to send some of what you have but not all of it to a destination, then you have to send part of it to your destination and then send the rest to another destination that you control; that's associated with your wallet.

Wallet software is designed to do this easily for years. So they don't have to think about it. They don't even notice it when they send bitcoin. You don't notice that I have ten bitcoin associated with my wallet and public key that my wallet controls.

I send it -- I want to send you one bitcoin. I don't think about the fact that my wallet -- my public key actually sends the ten bitcoin out, the nine come back to another address I control, one goes to you. And so --

Q. Would that be the spend and change address?

A. Sure.

Q. So the one I'm sending -- you're sending it to me because you're buying a can of Coke for me; that's the spend address. And then the change address is what's left over; is that correct?

A. Correct. And because that's a part of what happens in a transaction where one party sends to another, you can derive something from that.

You can also -- because you can't send it all -- whenever you want to send an amount, it might be the case that

you are sending more than the amount of that particular public key, and so the amount of two Bitcoin public keys come together to send the amount that you want to send.

So these two basic facts about how the Bitcoin blockchain works leads to the kinds of heuristics that Chainalysis uses; these two leading heuristics: The multi-input heuristic and the peel chain heuristic.

Now, like I said, these are sometimes true, but sometimes not true. So the multi-input heuristic might not be true if you and I decide, let's say, after the hearing, you know, St. Jude's takes bitcoin donations -- which they do. I've donated to St. Jude's; I love them. Maybe I say, Tor, let's both send a bitcoin to each -- to St. Jude's; let's do it as a multi-input transaction, and we'll send it together. We can do that. In fact, maybe we should do that after the hearing.

That would look like the same thing that -- Chainalysis might come along and say we're using that heuristic, and they might say both of those belong to J.W. And you would be wrong. Because the two inputs come from two different individuals rather than the same individual.

The same thing could be true for the assumption that the second destination of a bitcoin transaction is the change address that's used to create the peel chain heuristic. That could very much not be true because I could decide that I want

to send some to you and some to Mike -- I'm sorry -- to co-counsel, in the same transaction.

So what might look like Mr. -- Mr. Hassard's public key might look to -- overuse of the peel chain heuristic might look like my change address, but it's not mine anymore because I already sent it to Mike.

Q. Is it fair to say that at every step of a transaction that's being analyzed with this co-spend heuristic, an assumption is involved as to who is controlling the transaction?

A. Yeah. You're assuming -- with both of those heuristics, you're making assumptions about the inputs and the outputs. And there's a third assumption they're making as well in a lot of the tracing that Chainalysis does and in this case, which is that most of the time when there are multiple hops in a series of transactions, the same person is just resending to a different wallet that they control. And sometimes that's true. Sometimes it's not true.

It could be that I'm sending to someone else in real time, a real person in real life. And if that does happen, then it confounds one of the assumptions that really underlies Chainalysis's work.

Q. As I believe you testified earlier, isn't it possible that at any stage in a hop, somebody could just simply transfer the private keys, and you wouldn't see anything on-chain?

A.   That's true as well.  That's a good point.

Q.   Then just briefly, the other -- actually, I do want to ask one more question about the co-spend heuristic.

Are you familiar with what a coinjoin is?

A.   Sure.

Q.   And could you just explain briefly what a coinjoin is for the Court.

A.   So the idea behind a coinjoin is to join different public keys together in the same transaction.  We could do that together to send money to St. Jude's, if we want, in the same transaction.  It would save us transaction fees.  Or we could do it to obtain some privacy.

We could do it -- and there are tools that do it.  I think it's fair to say that coinjoins were always possible going back to the early days; '09, 2010.  They were always possible.  They became popular when someone wrote about it in a post that I mentioned in my disclosures around 2013.

And then I'd say now they are a substantial portion of activity on-chain; involves bitcoins that have been through some kind of a coinjoin to obtain privacy.

THE COURT:  When you say a substantial portion, can you quantify that?

THE WITNESS:  Well, I don't remember the exact percentage, but one of the articles I mentioned in my disclosure does speak to that and tries to provide an estimate

of the Bitcoin UTXOs that have been through one of those coinjoins.

I don't remember -- I know that estimate, and that estimate is something north of 500 million, less than a billion, I think.

THE COURT: Can you give me that percentage-wise? I don't have any benchmark to figure out whether that's a small percentage or a large percentage. I assume it's not a large percentage, but -- just given the volume of the market.

THE WITNESS: It would be difficult to try to figure out what is coinjoins and what is individuals just inputting together versus a form of coinjoin. But I think the best estimate I've seen is that article -- Your Honor, I don't remember the percentage off the top of my head, but it's in the article referenced in my disclosure.

THE COURT: Okay. What is the --

THE WITNESS: About coinjoins. Coinjoin is in the title, I believe.

THE COURT: But if it's between 500 million and a billion dollars, I think you said, what is the size of the overall --

THE WITNESS: Well, that would depend upon the market cap of bitcoin at the time of that study, and I don't know that offhand either.

THE COURT: Okay.

BY MR. EKELAND:

Q. Did you finish with your last answer? I'll move on.

A. Yes.

Q. What, if anything -- what effect, if anything, does -- do coinjoins have on the co-spend heuristic tracing?

A. So this is something that in the early papers about Bitcoin tracing, early academic papers that talked about this -- and one of the leaders in this literature is Sarah Meiklejohn, who is a -- I think the leader in this literature that led to what was later monetized in what Chainalysis became. She very early talked about the limitations of the multi-input heuristic.

And one of those is that people could be doing coinjoins, which totally confounds this heuristic. In an assessment that's described in the YouTube video that's linked in my disclosures, I think the quote she has when she describes the past history of that heuristic, that multi-input heuristic, she describes relying on it as potentially horribly dangerous.

Q. I'm sorry. I didn't hear what you said.

A. As horribly dangerous. The outcomes it could lead to, the wrongful assertions.

Q. And did you review the supplemental notice of disclosure that the government filed last night that contained a white paper?

A. I did.

Q. And was one of the authors of that white paper Sarah

Meiklejohn?

A.   Yeah.   I understand it was Sarah and some of her research assistants.   As I understand it, she was previewing that paper at the presentation in the YouTube video described in my disclosures.   I had seen that.

I think I had seen that -- actually, might have been before I got on this case, as part of my research for the book. But, yeah, I -- don't quiz me on everything in that article, But I had briefly read it last year when it first came out.

Q.   And then -- so when you say that she says in the video, the YouTube video, that this heuristic is horribly unsafe, is she referring to the types of heuristics that she's documenting in that white paper?

A.   She is.   And she's referring to the types of heuristics mentioned in Chainalysis's report that has been submitted in this case.

MR. EKELAND:   And I just -- I'm going to wrap up, Your Honor, because I'm aware of the time.

BY MR. EKELAND:

Q.   So then I want to make sure I understood you when you said that Sarah Meiklejohn is one of the or the originator of this type of heuristics, and she's come out and said that they're horribly unsafe?

A.   Those are both correct, yes.   I think -- to be fair to her, I think she was describing it as relying on these alone without

modification as being horribly unsafe.

MR. EKELAND: I pass the witness, Your Honor.

THE COURT: Okay. Well, why don't we go ahead and take a break. It's 3:15. Why don't we come back at 3:30 and do your cross.

(Recess taken.)

THE COURT: All right. Who is conducting the cross?

MS. PELKER: Mr. Brown.

THE COURT: Mr. Brown.

MR. BROWN: Thank you.

THE COURT: Can you see Mr. Brown on your screen there?

THE WITNESS: No.

THE COURT: All right. Mr. Brown, you may proceed.

CROSS-EXAMINATION OF

J.W. VERRET

BY MR. BROWN:

Q. Good afternoon, Professor Verret.

A. Good afternoon.

Q. Just to note, I believe you can see me, but I can't see you, so I will try to listen carefully to make sure that I know when to ask the next question.

THE COURTROOM DEPUTY: Mr. Brown, hold on. Let me see if I can fix that.

BY MR. BROWN:

Q.   To begin with, Professor Verret, you are not a computer hacking expert, are you?

A.   No.

Q.   And you are not a computer forensics expert, are you?

A.   I have been trained in how to use computer forensics as part of a forensic accounting or financial forensic investigation such that I could rely on computer forensics experts.

I would not hold myself out as a stand-alone computer forensics expert.  I want to be clear in my answer.

Q.   And you are also not a law enforcement expert; is that correct?

A.   I would hold myself out as an expert in banking law, which includes components of anti-money laundering KYC that are applicable to this case, but I have not been in law enforcement.  I mean, I've worked on government investigations for Congress, but not in law enforcement, if you define it as the executive branch.

Q.   Enforcement of criminal laws; you have no experience in enforcement of criminal laws, correct?

A.   Only as I've testified for defendants in criminal cases, and I've been involved in client issues involving violations of criminal law, including theft of cryptocurrency.  But I have not been a law enforcement officer.

Q.   And you have no expertise in Department of Justice policy,

correct?

A. The internal policies of Department of Justice, no, I wouldn't hold myself out as an expert in DOJ policy.

Q. And have you ever testified in a criminal case before?

A. No. In a judicial criminal case, no, I have not testified. I have been an expert before, but those matters have settled before testimony was required.

Q. And you've never practiced any sort of criminal law; is that correct?

A. That's correct.

Q. And you've never published any scholarly articles on criminal law, correct?

A. It depends on how you define criminal law. I've published articles on anti-money laundering issues, as that is a component of banking law, which has criminal applications to it.

So I don't think no is an accurate answer to your question. There are components that touch on criminal law in which I have expertise; particularly, in financial regulation and in banking law.

Frankly, to be clear, in some ways securities law can become criminal as well. So I would hold myself out, for example, as an expert in securities law, which includes the criminal components of security law.

Q. Maybe if I narrow that question. You're not an expert in

criminal investigations?

A. I'm an expert in financial forensic investigations, which can be criminal.

Q. And your academic and professional expertise is in accounting, banking law, and securities law, correct?

A. When you say accounting, I would add forensic accounting and securities law, banking law, and corporate law.

Q. Are you being paid for your work on this case?

A. Yes. Well, that's an open question. I have a rate described in an engagement letter. That rate is $400 an hour. That is roughly half my usual rate. I usually charge 750 an hour as an expert. That is half my own rate.

Secondly, I did not ask for a retainer in this case, though it's pretty unheard of for me to never have a retainer -- to not have a retainer before I began an expert matter. And in discussions with counsel, they've made clear, when they've described that the defendant's assets were frozen, they said, look, just to be clear, you might not get paid. And I told them very specifically that, after reviewing the issues in this case, if this ends up becoming, because of all that, effectively, a pro bono matter, I'm comfortable with that.

I haven't been paid anything else, and I haven't been paid anything, I haven't been given a retainer. I haven't even submitted invoices, actually, at this point, which is not anything I've ever done in a case, including a criminal case.

So I have a rate. That rate is half my normal rate. That rate is $400 an hour. It's described in an engagement letter. But I had a conversation with counsel where I told him that I was -- if this, effectively, becomes a pro bono matter, I am comfortable with that outcome.

So I'm sorry I'm giving you the fulsome answer, but I think that's the most honest answer I can give you to your question.

Q. And approximately how many hours do you think you've spent on this case to date?

A. I would say the last -- I have to check my records of everything, but at some points as much as 40 or 50 hours during a week; at some weeks as low as 5 or 10 hours during the week for something like the last five or six months. So a substantial amount of time.

THE COURT: What's your best estimate on total hours you've put in?

THE WITNESS: It's north of 250, 300 hours.

BY MR. BROWN:

Q. How did you first become involved in this case?

A. So I listened to a podcast with Mr. Ekeland and Mr. Hassard describing the case, on a crypto privacy podcast. I listened to it, and I was intrigued by what I heard. Probably because I'm interested in crypto generally and crypto forensics and, in part, because of the description that counsel offered. I'm

always skeptical about how counsel describe their case because, obviously, they're advocates, and my job is different.

So I looked it up, and I read the criminal indictment. And my reaction to the criminal indictment was, wow, it surprised me that someone could be held on the thin evidence contained in the criminal indictment.

And so I reached out to Mr. Hassard and Mr. Ekeland. And I said I'd like to get involved. You know, here's some of my writings in this area on my *Cointelegraph* column that I referenced in my disclosures. I think I summarized my bio. I said I'd love to talk to you more about this, and we started from there.

Q. Was that the *Monero Talk* podcast?

A. That's correct, yes.

Q. And you're writing a book about cryptocurrency privacy, correct?

A. Cryptocurrency privacy and forensics, yes, which I think --

Q. The working title --

A. They're two sides of the same coin.

Q. And the working title of the book is *Hide Money Using Crypto*, right?

A. *Hide Money Using Crypto: Blockchain Privacy and Forensics* is the full working title of the book in the proposal that's being peer-reviewed right now. But don't hold me to it because I'm sure it will be adjusted over time.

Q. You appeared on the *Monero Talk* podcast on June 4th, 2023, correct?

A. Yes.

Q. And you talked about the book that you were writing --

A. Correct.

Q. -- in that podcast?

And you stated that you wanted to, quote, teach normies about crypto privacy?

A. That's correct, yes.

Q. And you also talked about your work on the Zcash Foundation, correct?

A. Correct.

Q. And you stated, I want to get involved in the fight, right?

A. Sure.

Q. Now, you serve on the board of the Zcash Foundation?

A. Correct.

Q. And Zcash is an alternative form of cryptocurrency, alternative to Bitcoin?

A. Alternative to Bitcoin, yes. A private alternative to bitcoin.

Q. Is Zcash a kind of cryptocurrency that's sometimes referred to as a privacy coin because it does not always have a publicly available blockchain the way Bitcoin does?

A. Correct.

Q. And Zcash is not accepted at many cryptocurrency exchanges

because of perceived money laundering risk; is that right?

A. That's not accurate, no.

Q. Is Zcash --

A. To be specific, Zcash --

THE COURT: I'm sorry. One at a time.

THE WITNESS: Zcash is accepted at Coinbase. Zcash is accepted at Kraken. Zcash is accepted at Gemini. Those are the three leading crypto exchanges in the United States.

At one point they were delisted in Europe because of some misperception that they would run up against changes in the travel rule, but those exchanges actually reversed that decision and realized that that was not the case.

So your description, I would say, is very much inaccurate.

BY MR. BROWN:

Q. Are there any major cryptocurrency exchanges that do not accept Zcash?

A. Overseas, I think that's been an issue in the past. In other -- maybe in Japan; Asian country, I think.

Q. But it's your testimony that every major cryptocurrency exchange currently accepts Zcash?

A. In the United States, yes. It's accepted at Coinbase. It's accepted at Gemini and accepted at Kraken, which is -- I would describe as the three major crypto exchanges in the United States. I know it's not Binance because Binance U.S.

has been shut down, effectively.

Q. You serve on the Zcash Foundation board in a purely policy role; is that correct?

A. It's a nonprofit foundation, so I wouldn't describe it as a policy role, no. It's an oversight role of the foundation. The foundation funds cryptography research in -- in zero-knowledge proof cryptography, which is used in the Zcash blockchain, which is used in other blockchains, and which is used also in a number of applications in regular commerce.

I think there are aspects of zero-knowledge proof cryptography in, for example, logins with major social media companies as well. So it's a wild field.

So it funds research by cryptographers and computer science experts and coders that have applications for privacy -- generally in privacy on the Zcash blockchain and with respect to zero-knowledge proof cryptography applications.

Q. Professor Verret, just be aware, I'm trying to let you finish your answers, but please listen to the question asked and try to make sure that you're answering the question that's been asked to you.

A. Sure. Absolutely. And when the preface of the question is inaccurate, I feel I need to mention that.

Q. You're not a -- you don't conduct any technical work on behalf of Zcash cryptocurrency, right?

A. I don't perform technical work on behalf of Zcash, that's

correct.

Q. You're not a computer programmer; you don't develop Zcash code or maintain the Zcash network, correct?

A. Those three things are correct, yes.

Q. You also don't process Zcash transactions, right?

A. Right.

Q. So your work on the Zcash board is not directed towards technically maintaining the Zcash network as a cryptocurrency, correct?

A. It's indirectly related because it funds the cryptography research that supports those functions, but I do not directly get involved in those functions.

Q. Now, in this case, Professor Verret, have you conducted your own independent blockchain analysis of any aspect?

A. Can you tell me what you mean by blockchain analysis?

Q. Have you conducted any blockchain analysis in this case, any analysis of blockchain --

A. Looking at block explorers, looking at the government's evidence, making assessments of the evidence here and looking at addresses contained in the evidence on blockchain explorers independently, yes, I've done all of that.

And I've also had discussions with fellow experts in the case about their work in that capacity as well.

Q. And in your work evaluating transactions or doing other blockchain analysis work that you just testified about, has any

of that work been memorialized?

A. We have had discussions with the experts. Memorialized -- I mean, we've had emails. We have an email chain discussion among the experts.

Q. I'm asking about you yourself. Have you ever evaluated any transactions in this case in a way that you have memorialized the record of your work?

A. I would say the language in my disclosures was language that I wrote or memorializations of my work in this case.

Q. Is it fair to say that you have not conducted an independent blockchain analysis in this case?

A. No, that's not fair to say, no.

Q. And what -- your disclosures, is it fair to say that your disclosures don't actually explain any blockchain tracing that you have done in this case?

A. They explain the results, my opinions based on review of the tracing evidence contained in this case; based on my own review of the documents and based on my own work looking at individual public keys contained in the disclosures on blockchain explorers.

Q. Professor Verret, could I ask you to look at the expert disclosure that you signed and was submitted in this case.

A. I don't have it in front of me. Can someone --

THE COURT: Can you provide a copy?

MR. EKELAND: Sure. May I approach, Your Honor?

THE COURT: You may.

THE WITNESS: I have it in front of me.

BY MR. BROWN:

Q. Professor Verret, could you point out any blockchain analysis conclusions and the bases therefor contained in this report?

A. Yeah. Sure. So I would say No. 1, Item No. 1. I would describe as blockchain analysis.

THE COURT: I'm sorry. I'm sorry to interrupt. Just for my benefit, what I'm looking for is an actual -- it is my expert opinion that X, Y, and Z and the basis for it. I base that on the following analysis that I conducted and here is the analysis that I conducted.

That's -- under the rules, that's what I need to see. So if you can point me to anything that says that, that would be helpful.

THE WITNESS: So I believe what Mr. Brown is getting at is he wants to say that the only blockchain analysis that counts is tracing done in the way that Chainalysis does tracing. I have not done Chainalysis-level tracing, but I have conducted what I will describe, I believe accurately, as blockchain analysis in reviewing the government's assertions with respect to what the proceeds of the post-mix transfers to Kraken represents, and I believe that involves blockchain analysis.

THE COURT: So you testified on direct that you've looked at the amount of money that was in the Kraken account, and you've looked at the -- you've made some estimates as to how much money you think that Mr. Sterlingov would have earned were he proprietor of Bitcoin Fog, right? Is that what you're talking about there?

THE WITNESS: Yes, Your Honor.

THE COURT: Anything other than that?

THE WITNESS: So I would count as blockchain analysis my opinion that is skeptical of Chainalysis's tracing that is based on the literature review of the heuristics that go into --

THE COURT: Again, on direct you testified that there are certain assumptions that are used in the algorithm like -- that relate to coinjoin and things like that, that you think make the algorithm not 100 percent accurate and introduce some potential error rate in the algorithm, although you don't know what that error rate; is that fair?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. Anything other than that?

THE WITNESS: As a component of the last thing you talked about, I would say, for example, that my representation that we can't know for sure all of the individual bitcoin purchases Mr. Sterlingov made because he could have made them on a peer-to-peer platform, I would consider that utilizing

knowledge of blockchain practices and, therefore, blockchain analysis.

THE COURT: Okay. I think the problem here is you, Mr. Brown, are just using the phrase blockchain analysis differently. But you can continue, Mr. Brown.

MR. BROWN: Thank you, Your Honor.

BY MR. BROWN:

Q. Just one last question on this thread. Professor Verret, having reviewed the expert reports from FBI staff operations specialist Luke Scholl and Chainalysis expert Elizabeth Bisbee, are there any specific instances of individual transactions or individual clusters that you -- for which you have conducted an alternative analysis where you can say this transaction didn't occur this way, or this cluster is incorrect for XYZ reasons?

A. Not myself, no. I'm relying on the -- in part, relying on the opinions of my fellow experts and, in part, relying on the description of the reasons for skepticism that I spoke of on direct and that are contained in the disclosures.

Q. And which other experts' opinions are you relying upon?

A. So, primarily, Mr. Fischbach's.

Q. Now, you mentioned that you --

A. I'm sorry. Also the new addition to the team from CipherTrace.

THE COURT: Presumably, you're not relying on anything she's done because she hasn't done it yet, though.

THE WITNESS:  Correct.  I anticipate reliance on the continued things that she will do.  Yes.

BY MR. BROWN:

Q.  You mentioned that the two reasons why you wouldn't rely on Chainalysis is because it's a black box, as you put it, and because a --

THE COURT REPORTER:  I'm sorry.  Can you repeat the question, please.

THE COURT:  Yes, can you repeat the question, please.  You dropped off.

BY MR. BROWN:

Q.  You mentioned that you would not personally rely on Chainalysis because it's a black box, as you put it, and because a colleague told you it was unreliable?

A.  Those were two of the reasons, but those are not the only reasons.

Q.  Okay.  What other reason?

A.  Two other reasons.  One, that I'm familiar with the issues with the heuristics that went into Chainalysis's product that I described on direct and that are described in the analysis here.

And, secondly, I'm aware of Chainalysis's close relationship with the Department of Justice and the Department of Treasury and the -- the Department of Homeland Security and the sizable grants that they have received, which I anticipate

would bias their work.

Q. Have you ever personally tested the reliability of Chainalysis; for instance, by looking at a transaction through Chainalysis and comparing it to the same transactional data on a -- on the public blockchain through a blockchain explorer?

A. I can't do that because I don't have access to what I would need to do that. And doing it once would be insufficient because you would not have a reliable statistically significant sample size. But -- so no. That's the reason why the answer to your question is no.

Q. You don't have access because you don't have a Chainalysis license; is that correct?

A. Correct.

Q. Have you ever tested the reliability of a Chainalysis cluster by comparing it to ground truth from a publicly known cluster, say, for a company that accepts bitcoin, like eBay or Kraken?

A. No.

Q. So you have no opinion about the reliability of the clustering in Chainalysis?

A. The clustering relies on the heuristics, and I do have opinions on the heuristics and, thus, I have an opinion on the reliability of the clustering.

Q. Well, that gets to my next question, which is you discussed various heuristics. I want to start with co-spending.

Isn't it true that co-spending heuristic is based on commonly observed patterns of transactional behavior?

A.  They are sometimes observed, yes.  I don't know how common they are, and that speaks to the --

Q.  But you don't know -- you can't say for co-spends what percentage is true co-spend versus a coinjoin or another?

A.  And neither can the government, which is a part of the reason for my skepticism of the evidence.

Q.  Just to be clear, the answer to that question was yes?

A.  Correct.

Q.  Isn't the co-spend heuristics something that was actually brought up in the original Bitcoin white paper by Satoshi Nakamoto?

A.  A lot of privacy issues were brought up in the original white paper.  That is something that, I think, is safe to assume was a known issue, and the possibility of coinjoins, similarly, was a known possibility going back pretty far.

Q.  Now, talking about the change address heuristic, isn't that also a commonly observed pattern of transactional activity on the blockchain?

A.  Again, it is a pattern that is observed often, but I don't know how often.  I don't have a percentage on how often, which goes to the error rate.

Q.  You gave a counter-example on direct, which is that you could send -- you could execute one transaction where you're

bar
148

sending two payments to two different people, correct?

A. You could -- yeah. You could have multiple outputs.

Q. Isn't that exceedingly rare, though?

A. I know that it is very common today. I don't know percentages for the time period that's at issue in this case.

Q. In order to execute that one-person-sending-to-two-people-simultaneously-type transaction that you described, you would have to have exactly the amount of bitcoin in your sending wallet that you want to divide up between two simultaneous transactions, correct?

A. Sure.

Q. So if you wanted to send five bitcoin to Mr. A and three bitcoin to Mr. B, you would have to have exactly eight bitcoin sitting in your wallet, correct?

A. Or -- I mean --

Q. If we're talking about a situation where there's no change address.

A. Right. Sure.

Q. And you would also want to make those two transactions simultaneously instead of one after the other, correct?

A. They would occur simultaneously, yes.

Q. And you have no basis to say that these transactions are a common transaction seen on the Bitcoin blockchain, correct?

A. I don't have any basis to say that they are not common.

Q. But you don't have any basis to say that they are, correct?

A. I don't know the percentage of transactions that involve that type of activity.

Q. Now, isn't it true that co-spend heuristic and change heuristic, while there may be exceptions, but these are both commonly accepted within the blockchain analysis community?

A. You say the blockchain analysis community. It's, basically, just a couple of forensics firms that have a -- kind of an oligopoly on this field that they kind of invented and that they gave a name to. So it kind of depends on how you describe that.

If you're describing literature, I would say those are both commonly discussed, but commonly critiqued as unreliable in and of themselves.

Q. Moving on to coinjoins, this is a transaction where multiple unrelated users pool their transactions -- pool their bitcoin together, and in one transaction they send to the multiple recipients, but each bitcoin wallet is not traceable directly to the recipient wallet, correct?

A. Yes. Correct. That's how most coinjoins work, yeah.

Q. So, generally speaking, in order to have a proper coinjoin transaction, you would have to have exactly matching inputs and outputs for each user, correct?

A. Yes. And those are facilitated by coordinators or for coinjoins or for payjoins, which are a closely related type of spend to coinjoin.

Q. Before we talk about the facilitating services, if you wanted to execute a coinjoin transaction on your own, you know, just you and your friend, that would be very difficult to arrange logistically, correct?

A. You could arrange it via a peer-to-peer platform, the same way peer-to-peer purchase and sale of bitcoin occurred. The advent of coordinators made it even more easier to facilitate.

Q. So outside of a service, though, it would be logistically tricky, and you would have to agree on the exact moment of the transaction and the exact amounts and exactly how the transaction was going to be split up, correct?

A. Yes. You would have to agree to those things, like you could if you were at a Bitcoin meetup and playing around with this technology as people did in the early days of Bitcoin.

Q. And so if you wanted to increase the anonymity step by having more inputs and more outputs, that would correspondingly increase the logistical difficulties of arranging one of these coinjoin transactions on your own, correct?

A. Most of the larger coinjoins are -- use coordinators, use coordination.

Q. Now, a transaction with matching inputs and outputs looks different from a traditional co-spend transaction, correct?

A. It can or it can be carefully designed so it doesn't. I have literature in my disclosure attempting to identify coinjoins. So what you said can be correct.

Q.   Before we get -- but a coinjoin transaction among ten users, for example, will have at least ten outputs; isn't that right?

A.   Right.

Q.   And maybe more outputs, because there may be change addresses for individual users, correct?

A.   Which is why the coordinated coinjoins are easier to identify because of the -- you can use the -- if they have a standard; like if five inputs are standard -- five inputs and five outputs, that attribute can be used to try to identify that particular coordinator of those particular coinjoins, but coinjoins can be designed in different ways as well.

Q.   But, necessarily, you're going to have many outputs if you have many inputs, correct?

A.   That's correct, yes.

Q.   And so that differs from a traditional co-spend transaction where you may have ten inputs and two outputs where one is the spend address and one is the change address?

A.   That might be true, yes.

Q.   So looking at a coinjoin transaction on the blockchain is going to jump out in a way that a traditional co-spend transaction will not?

A.   Again, I will say that it may, depending on how the coinjoin is designed.

Q.   In fact, one of the papers cited in your disclosure, the

Stockinger [sic] paper from 2022, isn't it true that that paper analyzes characteristics of coinjoins and comes up with a very reliable heuristic to detect coinjoin transactions?

A.  That's the paper I just referenced in my last answer to you, and that paper does describe itself as having achieved that result.  I haven't independently tested whether that paper has or not.

Q.  And in that paper one of the heuristics looked at transactions that were known to be through one of the coinjoin service providers, Wasabi Wallet, correct?

A.  Correct.

Q.  And found that 7,325 transactions -- applying the heuristic to detect coinjoins, more than 7,000 transactions were true positives; meaning that the heuristic predicted the coinjoin, and it was confirmed by showing association with Wasabi Wallet. Compared to the 7,325 true positives, there were only 153 false positives and only 8 false negatives; isn't that correct?

A.  I don't have it in front of me, but if you tell me that's what's described in the paper, it doesn't sound inaccurate with what I remember reading.

        But I would say I would not -- the two types of mixing services studied in that paper are very different, and Wasabi is known to be much more easily traceable than Whirlpool or Samurai as described in the paper -- described by the wallet that uses that particular coinjoin pool.  It doesn't surprise

me that that is true of Wasabi transactions.

Q. And how do you know that Wasabi is more easily traceable than other coinjoin service providers?

A. Analysis of Wasabi in the wake of the -- of your department's investigation of Lichtenstein and Heather Morgan, which is --

Q. Did you conduct the analysis of Wasabi?

A. I'm sorry?

Q. Did you conduct the analysis of Wasabi?

A. I did not. But I'm relying on my knowledge of that -- of the questions asked about Wasabi's process.

Q. Was this an academic paper examining Wasabi?

A. This was a presentation over YouTube. I can try to find it after this proceeding if you're interested in learning more about how to use Wasabi Wallet. Or whether --

Q. Who gave this presentation over YouTube?

A. This was the -- someone associated with Samurai Wallet; the other coordinator or wallet described in that paper that we're talking about right now.

Q. So the presenter from Samurai Wallet presented evidence that Wasabi was easier to detect than Samurai Wallet; is that accurate?

A. That's correct, yes.

Q. And have you reviewed the underlying data?

A. I have not reviewed the underlying data, but I have

reviewed the presentation and found it to be credible.

Q. And you found it to be credible based on the authority of the person giving the presentation or based on the data underlying the presentation?

A. Based on the walk-through of wallet that was used in the particular video.

Q. Is it fair to say that most people who want to conduct a coinjoin transaction use these services that will coordinate and arrange the coinjoin for them?

A. I think that's accurate today, but I don't know whether that was accurate during the earlier time frame at issue in this case.

Q. And Wasabi Wallet and Samurai Wallet are much more recent innovations -- correct? -- much more recent than 2011?

A. That's correct. They are much more recent than two- -- I think they've come into prominence more recently.

THE COURT: One at a time.

THE WITNESS: I don't recall the date they began. I think Samurai might go back pretty far. I think the -- I think the size of the -- we can go back and look at the amount of money going into the Bitcoin Whirlpool that Samurai Wallet works with. I know it's been recently at about $100 million worth of bitcoin.

But I don't know the -- I think it may have started in the mid teens or something around that time frame. I don't

know how far back it goes. I don't want to give you an inaccurate answer. I know it has become more and more prominent over time. I don't know exactly the date that it began.

BY MR. BROWN:

Q. But each one of these services, number one, it adds time to the transaction; is that fair to say?

A. Some element of time, yes, just like any bitcoin transaction will take time to load on a new block.

Q. But this is more time than it takes to simply clear a transaction through the Bitcoin output, correct?

A. It depends on if you're remixing, mixing multiple times, doing multiple coinjoins. But I wouldn't necessarily say --

THE COURT: I'm sorry. One at a time, please.

THE WITNESS: I wouldn't necessarily say every coinjoin would always take more time than every other bitcoin -- noncoinjoin transaction. I don't know that to be the case.

BY MR. BROWN:

Q. To use a coinjoin service, isn't it true that you have to wait until other users join a pool to execute a given coinjoin transaction?

A. So if there's lots of people already in the pool and people remixing in the pool who have already mixed, then I don't think you would have to wait, no.

Q.  So some people take more time for their transactions necessarily, and other people join the pool at the end and they don't have to wait; is that true?

A.  I don't know that to be true, no.

Q.  So it's your testimony that coinjoin transactions are always executed simultaneously -- instantaneously, or as fast as the Bitcoin network can clear a transaction?

A.  That's not what I just said.  I said I don't know your last statement to be true.  You're mischaracterizing me.

Q.  I'm not trying to characterize your testimony in any way. I'm just trying to make sure I understand what your testimony is.

But is it fair to say that using a coinjoin will add some amount of time to a transaction that you're undertaking?

A.  It may.  It may.  But it's also fair to say that it could confound the heuristics, as I've said already, that go into Chainalysis's tracing.

Q.  And my question wasn't about heuristics that go into Chainalysis's tracing.  I'm just asking if it takes more time.

A.  If it were that easy to use, the dimension of time, to clearly know what is a coinjoin and what is not --

THE COURT:  I'm sorry.  That's not his question.  His question is just whether at least some of the time, because of the need to wait for someone else who wants to make a transaction, that it takes some additional time.

THE WITNESS: I can see that being true some of the time.

THE COURT: Okay.

BY MR. BROWN:

Q. And it also adds fees; isn't that true?

A. With the coordinators, it adds fees.

Q. So if you're using a centralized service, usually there's some sort of fee added to the transaction?

A. That is true. And my understanding is they take good care to make sure that those fees don't add a traceability aspect to the nature of the coinjoin.

Q. Isn't it true that these coinjoin services, such as Wasabi Wallet or Samurai Wallet, are very well-known on the blockchain; readily identifiable on the blockchain?

A. I don't know that to be true. I know it to be true that Chainalysis -- blockchain tracing companies generally sell a compliance tool, as I understand, to crypto exchanges that purports to be able to do that; that makes guesses about how many hops away you are from a coinjoin and whether or not a coinjoin has occurred. I know that that is true.

And I know that sometimes they are identifiable, but I think your description was readily identifiable, easily identifiable; I don't know that to be true.

Q. You testified earlier about how identifiable Wasabi Wallet transactions used to be?

A.   I testified that Wasabi has been described as a potentially traceable tool because of some privacy issues identified in a presentation that I saw.  That doesn't lead me to inference about coinjoins generally; for me at least.

Q.   You have no specialized knowledge of any measures that Chainalysis takes to detect or control for coinjoin transactions?

A.   I have knowledge about that from -- it's my understanding that they measure the number of hops away from -- they provide tools that are risk management tools, as I've heard them described by representatives from -- could have been Chainalysis, could have been other blockchain --

THE COURT:  I'm sorry.  Slow down for the court reporter.

THE WITNESS:  I'm sorry.  I have knowledge that they provide a tool that allows -- my understanding is they allow the exchanges to use the data that they provide to make their own risk assessment, and part of that includes whether or not there's a coinjoin in the history of the UTXO for that bitcoin and how many hops away it is from that alleged coinjoin transaction.  I know that exists.  I don't have independent knowledge of its reliability.

BY MR. BROWN:

Q.   And you have no independent knowledge of whether Chainalysis identifies known coinjoin service providers, such

as Wasabi Wallet or Samurai Wallet?

A.   No.

Q.   And you have no independent knowledge of whether Chainalysis looks for unique features of the coinjoin transaction?

A.   Again, the black box nature of Chainalysis's work limits what I know about what they do.

Q.   Professor Verret, what portion of the discovery have you reviewed in this case?

A.   The portions applicable and necessary for the opinion described in my disclosure, with particular application to expert reports, review of Mr. Sterlingov's bank accounts and crypto accounts, and review of the rest of the disclosures that have been provided.

THE COURT:  I just want to make sure I understand -- I'm sorry to interrupt.  I want to make sure I understand.

You reviewed the expert disclosures in the case, and you reviewed information relating to Mr. Sterlingov's bank accounts and crypto accounts.  Anything else you've reviewed, or is that it?

THE WITNESS:  No, that's not it, Your Honor.  I would say all or substantially all of the evidence that counsel has -- that's on the place where it's stored for counsel that I understand to be a comprehensive description of everything the government has turned over.

THE COURT:  As far as you know, you've reviewed all of the discovery provided in the case?

THE WITNESS:  I've reviewed all that's necessary to come to my opinion, and as described, in particular, focus on the accounts and stuff.

As far as I know, I've reviewed nearly all of it, yes.

THE COURT:  I mean, saying you've reviewed everything necessary to form your opinion doesn't help me because I don't know what that is.  I take it, you're saying, as far as you know, you've reviewed virtually all of the discovery provided in the case?

THE WITNESS:  Most or nearly all.

THE COURT:  That's helpful.  Thank you.  Sorry, Mr. Brown.

MR. BROWN:  I think that covers some of my questions.

BY MR. BROWN:

Q.  And have you reviewed the financial disclosure produced by the defendant in this case?

A.  Which particular financial disclosure?  I've seen his bank accounts and his crypto accounts.

Q.  The defendant submitted a, quote, statement of net worth in this proceeding in which he himself represented that he had so many bank accounts and crypto accounts.

Have you reviewed that?

A. I don't have a particular memory of that particular document, but I might have, particularly if it was stored near the bank accounts and crypto accounts.

Q. And in the discovery that you reviewed, have you reviewed device images from Mr. Sterlingov's seized devices?

A. Some of them, yes.

Q. Which ones?

A. I've seen descriptions of a -- translations of a document from Russian about how to conduct transactions, as I recall.

Q. And that's it?

A. I don't want to say that's it because there's a lot of documents in there. So it's what I can recall right now as we're sitting here talking.

Q. Did you review records from Mr. Sterlingov's bank accounts at Nordea Bank in Sweden?

A. Yes.

Q. Did you review records of Mr. Sterlingov's bank accounts at N26 Bank in Germany?

A. I don't recall German banking. Maybe. I do remember the Nordic bank accounts, yes.

Q. Have you reviewed records of bank accounts belonging to the defendant at Sparkasse Bank in Malta?

A. I do remember some Malta documents, yes.

Q. Were those bank account records or other Malta documents?

A. I just remember Malta. I do remember Malta.

Q. Have you conducted a full financial analysis of the defendant's financial accounts?

A. I've conducted an analysis of what I've seen. I don't believe I have enough to conduct a full financial analysis just because I don't -- again, I don't know where the missing bitcoin is that I described in the initial discussion.

Q. And you have no written work product of that financial analysis?

A. That's correct.

Q. It's all in your head?

A. I wouldn't say it's all in my head. It's all based on a review of what I've seen and calculation of what was there. Frankly, it surprised me as I got into this case that I didn't need to create the kinds of spreadsheets that you usually do in a forensic investigation because of the falsity of the government's evidence in this matter.

THE COURT: Can I interrupt again just for a second. I would have thought that if you were doing an analysis and saying that, based on the amount of cryptocurrency or bitcoin that Mr. Sterlingov originally had, that one would think that he generated so much income over -- based on the growth of that bitcoin over time, and that reasonably matches up with the amount that was in the accounts that were seized.

But have you actually done that work where you've said, okay, here's what he originally had, here's what the

growth of bitcoin was over time; as far as I can tell, the money was put into it with the accounts on such and such a date in such a way that matches up with the growth of the -- of the bitcoin, and so I can actually make some dollar-figure calculation?

THE WITNESS: Well, first, you have to, early on, rely on the reliability of the Mt. Gox data, which I've said I'm not willing to do; I don't feel I can do.

Secondly, the government has described post-mix bitcoin in this Kraken and other destinations as illicit, but I disagree with the contingent that it's illicit at all.

THE COURT: I'm not asking you about your critique of the government's case. I'm asking about your own affirmative argument where you've said to me, affirmatively, based on the amount of bitcoin that I believe he had at this early stage when the value of bitcoin was quite low and based on my understanding of the growth of bitcoin over time that I think that the most plausible hypothesis is that all the money in the Kraken account came from simply the growth in his original investment in Bitcoin.

But to do that analysis or to say that, I assume what you need to do is to say he had X bitcoin on such and such a date, he acquired some more bitcoin on another date, he acquired some more on another date, that grew over time, and here's a transaction into the Kraken account that occurred on

such and such a date when the value of the bitcoin would have been as follows, and here's another transaction into the Kraken account on another date.  And you can match it up and say, yes, it is a plausible, if not compelling, hypothesis with the money in the Kraken account or any other accounts that he came -- that he has came from the natural growth and the value of Bitcoin from his original investments; which is what I take it you were telling us?

THE WITNESS:  I can make a determination about what amount would be reasonable to purchase of bitcoin in the early days that would represent what's contained in Kraken now.  I can't match, sort of, pre-Bitcoin Fog bitcoin and get a full picture of everything he ever bought versus Kraken post Bitcoin Fog because I don't know everything he's ever bought.  So much of Bitcoin is outside of the KYC world altogether.

So I just don't know how much he's ever bought or received as transfers from other people; particularly because after it went through Bitcoin Fog, it's untraceable at that point.  So I don't know where it came from.

THE COURT:  So in that case, it sounds to me like you're not opining or you don't propose to opine that the money in the -- that the most plausible scenario or hypothesis is that the money in the Kraken account came from the growth of the bitcoin.

What you're telling me now is you just don't know one

way or the other because you don't have enough information to make that judgment?

THE WITNESS: That's not accurate. I'm saying, if I make the reasonable assumption that he spent roughly $20,000, $30,000 over the early couple years of Bitcoin, I can account for what he has in Kraken now. I think that's a reasonable assumption to make.

I don't know the actual amount he bought originally, but based on that reasonable assumption, I can account for what he has now post Bitcoin Fog.

THE COURT: I mean, I suppose you could just say, if one were to hypothetically assume that he purchased that amount, you can't say that that's a reasonable assumption. You have no idea, I assume, how much money he had or anything to make an assumption about what he had. But you can say --

THE WITNESS: I have some understanding. You know, based on my review, certainly, of the Nordic Bank accounts, of some money going in that seemed to be comparable to -- based on a rough estimate of conversion rates, what he was making, if he wanted to go all in, he would have enough money to buy 20,000 or 30,000 of bitcoin over the first few years.

I think that assumption is reasonable, but I don't have a full picture of the exact number of bitcoins he purchased.

THE COURT: I guess what I'm asking, though, is if

you've done what you just did, did you not put that down on a piece of paper somewhere and say here's the information from the Nordic Bank accounts on such and such a date, that translates into such value in bitcoin on that date, and here's the growth rate to a particular day that I'm hypothesizing that he took the money out and transferred it into the Kraken account, and that's what the dollar figure would have been?

THE WITNESS:  As I said -- Your Honor, I used a calculator, I reviewed the evidence.  It was a pretty simplistic calculation to get what I described; the amount of money going through Bitcoin Fog, the amount of money that would represent fees.  And a review of the post KYC accounts gets me to a total that's similar to the government's total, what's contained in the crypto accounts.  So it's just a couple of numbers.

THE COURT:  The answer is no, you didn't write anything down?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Can you describe to me, once again, though, what it is you did with the analysis.  For your starting figure of -- on a particular -- is there a particular date that's your start date, and how much money did you assume that Mr. Sterlingov had on that date that he then used to purchase bitcoin and how many bitcoins he would have bought on that date?

THE WITNESS: Well, I just used the Bitcoin price range, roughly in the 30s in 2011, and a review of historical prices of bitcoin, and I mentioned I would add -- I mentioned that it would be useful to share, potentially, with the jury a historical bitcoin price chart, and then you can make your own reasonable guesses about how much someone in his position would have been able to purchase in the early years and get to a total that gets you to 1600 bitcoin, which is roughly what he has at this point.

And then that still leaves you with, of course, also the missing bitcoin.

THE COURT: Did you make an assumption about when he took the money out of Bitcoin Fog and transferred it to the Kraken account? And I guess it's not all bitcoin. He has other cryptocurrencies.

THE WITNESS: He has a few other things as well, yes. But assuming the government's totals of the post-Bitcoin Fog transfers, assuming the government's totals, this is what I get to, and then I explain it. I'm able to draw an opinion based on a reasonable estimate of what you could have purchased bitcoin for in 2011.

THE COURT: So how many bitcoin are you assuming he purchased in 2011?

THE WITNESS: Well, if he bought, let's say, 500 or a thousand, a third or two-thirds.

THE COURT: Okay. That's helpful. Thank you.

Mr. Brown?

BY MR. BROWN:

Q. Professor Verret, have you reviewed the defendant's testimony during the hearings in this case on January 13th and January 31st, 2023?

A. I'm not sure if I have reviewed them. The trial transcripts?

Q. The hearing transcripts for evidentiary hearings --

A. I'm not sure I have.

Q. -- at which the defendant testified.

Have you reviewed the defendant's LocalBitcoin account records?

A. I think that was contained in the government's production. So I believe so.

Q. Is that a yes, you have reviewed the LocalBitcoin's account records?

A. Again, I don't remember specifically, but I think I probably did.

Q. Are you aware that the defendant testified during the January hearings that he quit his job in 2013 or 2014, and after that he had, quote, no other significant sources of income?

A. That was relayed to me, yes.

Q. And are you aware that the defendant's sales of bitcoin on

LocalBitcoin, occurred in 2012 and 2013, and then there was about a two-year hiatus until he started selling bitcoin again in 2015?

A. Well, this would have been on that particular LocalBitcoin account. I don't know whether he was engaged in any transactions on nondisclosed or non-KYC peer-to-peer platforms or with individuals, in individual transactions.

Q. Are you aware that in Mr. Sterlingov's emails, there are emails from interested buyers of bitcoin from Mr. Sterlingov, and as of -- in mid to late 2013, he told one of them, quote, I've been running out quickly; and by November he told another, quote, I'm out right now, unfortunately, end quote, I sold all mine, and I'll have to wait until the price is down; are you aware of those messages?

A. I don't recall those specifically, no.

Q. Going back to the Kraken analysis, is your analysis, essentially, just a comparison of aggregate numbers on the one hand; you're asking the fee income from Bitcoin Fog, and on the other hand the balances on the Kraken account?

A. It's also a review of the transfers themselves and to determine whether any pattern appeared to be happening in the transfers to his Kraken account. I couldn't find a discernible pattern other than random blockchain activity.

Q. What pattern are you looking for?

A. Well, first of all, it's hard to discern a pattern with

amounts that low relative to the fees except -- expected from someone who is running a mixer, that's mixing as much as what's going through here. So those amounts are so much smaller than the actual fees that it would be difficult to find a pattern because of the relative size differential.

I mean, I can only attribute something like 7 or 8 percent of bitcoin to Roman of the percentage that you would expect someone running this mixer to have. So with that size differential, the total fee is 13 times what the total bitcoin I can attribute to Roman's ownership.

Now, it's hard to find patterns. But I could not find one, mostly probably because of that size differential.

Q. And you're looking -- you're talking about what you would expect from somebody running a mixer.

What's your basis for opining about what you would expect from somebody running a mixer?

A. The basis -- again, the basis for all of my opinions is my experience or training that's described in everything I filed. But part of the basis for my opinion is what I've already discussed, which is the average fees for the mixer.

THE COURT: What are the average fees for other mixers?

THE WITNESS: Other mixers, as I understand, are fairly comparable to this one, which is 2 to 2.5 -- 2 to 3 percent -- 2 percent at one point, 2 to 3 percent at one

point, which probably is a reasonable average of 2.5 percent after it changed.

BY MR. BROWN:

Q. All of this analysis, you're assuming that the government's claim is that funds -- fee income from Bitcoin Fog is transferred automatically to the defendant's accounts; is that correct?

A. I'm sorry. What do you mean by automatically?

Q. In order to -- the theory that you're trying to knock down is that Bitcoin Fog automatically sent fees to Kraken, and you're saying the numbers don't add up; is that fair to say?

A. No.

Q. So if the numbers don't add up, is it because not all fees were automatically sent to Kraken; would that be a possibility?

A. I mean, I hesitate to speculate on why they would not send their fees to Kraken. I just can't account for the overwhelming majority of the fees.

Q. You're assuming that there's -- you're assuming that there's some claim the government is making that 100 percent of fees were automatically sent to Kraken.

Can you point to anywhere in the discovery work papers that you've reviewed other than the podcast where the government has made that assertion?

A. So that's my understanding, is the case -- my understanding of the criminal indictment and the various filings I've

reviewed is that the government is asserting that those fees were the result of -- that post-Bitcoin Fog mixed bitcoin was fees from running the mixer. And I do not find that credible because I do not find it credible that someone would get that much bitcoin, and we would only see less than 7 percent of it.

The other 93 percent that at one point is worth a billion dollars would -- we would not see any evidence of it. I mean, that kind of -- that kind of amount of wealth leaves a heck of a wake, and I have not seen any evidence of that wake in anything that I have reviewed or done.

Q. I guess my question is -- goes to the difference between manually withdrawing fee income, like the Bitcoin Fog cluster, versus having some sort of automated process set up.

And if it's a manual withdrawal, then how does your pattern analysis make any sense?

A. I could not find pattern analysis, in part, because of the incredible differential between what's in his Kraken accounts and the fees that you would expect someone running the mixer to have. So I hesitate to speculate on whoever is running the account, whether their withdrawals are automatic or not, because I don't need to speculate about that because I'm comfortable with my opinion that relies on, again, my question about the missing bitcoin.

Q. And you're relying, again, upon your assumptions about what someone running a mixer would do. It sounds like you don't

have any real basis -- no academic or professional basis to opine about what the average person running a mixer -- the darknet mixer would do with the money?

A. I teach money laundering; I write about money laundering. I'm trained in crypto forensics. So I believe I have an accurate basis to have an opinion about what you would expect from someone running Bitcoin Fog and the amount of wealth you'd expect them to possess and that wealth would leave a wake in some way.

Q. But one claim in your expert disclosure is the following: Someone with the expertise that the creator of Bitcoin Fog has exhibited would not send proceeds from running a mixer back to their own KYC'd accounts.

And you go on to claim that they would do something else, like layer money through fake accounts purchased on Tor or trading peer to peer; is that correct?

A. Those are some ways they could try to move it, yes.

Q. Are you aware that a substantial portion of the funds going into the defendant's Kraken accounts were first -- first transited the defendant's LocalBitcoins peer-to-peer sales account?

A. I wouldn't make any assumptions just about the use of LocalBitcoin, but, sure, I am aware of the use of LocalBitcoin.

Q. And you claim that nobody -- no true person running a bitcoin mixer would ever use a KYC account, right?

A. I think they might use a KYC account, and they have been found to use KYC accounts, but not their own. They would try to move it on a KYC account using a login that you can buy on the dark web and moving that login and then change it for something else and move it out.

I think that's more likely for someone running that kind of an operation.

Q. So you're not really saying that they would never --

A. That's one path. That's one path. What my opinion is is that you would not -- if you were -- I can understand using -- sending post-mix bitcoin intended to be private back to a KYC'd account if you wanted privacy from the world, but you weren't -- there was no predicate crime that would make your mixing potentially money laundering or that would indicate that you were running Bitcoin Fog. So it doesn't stand to reason to me that someone running that would send post-mix tokens back to the KYC'd account.

Q. Now, you teach money laundering. So you're familiar with the traditional theory of money laundering where there's placement, layering, and integration; those are the three steps of money laundering?

A. True.

Q. And so isn't that last part, integration, the process of taking your post-laundered funds and placing them into accounts in your own name or in accounts in a way that you can enjoy the

fruits of those proceeds?

A. I would not describe -- so if we're not talking about the Kraken account specifically and not using an example of what you're describing, what you're basically describing is an accurate description of the integration stage of money laundering, yes.

Q. So let's say, total hypothetical, there's a mobster who has generated illegal gambling proceeds. The mobster owns a restaurant. Commingles the funds from the gambling of the restaurant and then pays himself a salary out of the restaurant.

That's an example of integrating post-laundered funds, right?

A. That's a pattern that's been seen in the past, yes.

Q. Now, you have no specialized knowledge --

A. Can I just disclose something? I anticipated leaving at -- starting at 10:00. I'm sorry. I have a kid pickup thing. Is it okay if I need to leave by 5:00, or do I need to make arrangements? I don't know if we'll go past 5:00.

THE COURT: Mr. Brown, how much more time do you need?

MR. BROWN: Your Honor, I'm sure I will go past 5:00, but maybe not past 5:30. But if he needs to leave at 5:00, we can reconvene.

THE WITNESS: I have a hard stop at 5:05.

MR. EKELAND: And, Your Honor, I have a 6:00 train I need to catch back to New York.

THE COURT: What do you want to do about finishing things up? Do you want to do the whole thing remotely to continue, or do you want to do it in person? It's up to you.

MS. PELKER: Does Your Honor still have the time blocked for tomorrow? Is that still an option? Because we have Mr. Fischbach as well who we didn't get to at all today.

THE COURT: I know. Let's see here.

MS. PELKER: And I'm local. I'm happy to come in, but I'm also fine with doing it remote.

THE COURT: So I do have some time tomorrow. I have from 9:00 or 9:30 until 11:00, and then I have a short hearing at 11:00, and then I have from 11:30 until 12:30.

So we can reconvene tomorrow morning, and I'll just have to take a break for -- probably be about 15 or 20 minutes -- for a status hearing on another case. So I can do that.

MS. PELKER: Does that work for defense counsel and Mr. Verret?

THE COURT: Mr. Ekeland, if you want to appear remotely like Mr. Brown is today, that's okay with me as well.

MR. EKELAND: I think we'd need to -- excuse me. I think we'd need to appear remotely, but if we can just check our calendar.

THE COURT: If one of you could be here, if Mr. Hassard could be here maybe, Mr. Ekeland, if you need to be remote. It would be nice to have somebody sitting here with your client in the room.

MR. EKELAND: Yes. Can we take five minutes?

MR. HASSARD: I have a flight scheduled to Canada at 10:00 tonight. We'll have to figure this one out.

THE COURT: I'll let you --

MR. EKELAND: I mean -- I'm sorry. I guess I could cancel the train or just get a hotel overnight and just appear tomorrow and bill it to CJA or something.

THE COURT: If you can do that, I'd appreciate it. We do need to make some progress on all of these *Daubert* hearings we have.

MR. HASSARD: We then also have the issue of the documents that are to be submitted on Friday. We have deadlines in this case.

MR. EKELAND: I mean, we could deal with that. I'll just work late.

THE COURT: If you can be here tomorrow morning, Mr. Ekeland, that would, I think, help things.

MR. EKELAND: I will make it happen, Your Honor. What time?

THE COURT: Can the witness be here tomorrow morning?

THE WITNESS: What time was it again?

THE COURT: You tell me. When can you be here?

THE WITNESS: 10:00.

THE COURT: We could start in the morning with --

MS. PELKER: Fischbach is West Coast.

THE COURT: He's West Coast. I see. We'll just have to move with some efficiency.

I can give you from 10:00 until 12:30 with a short break that I need to take for another status conference. We can do that, but we have to make sure we move with some efficiency.

MR. EKELAND: From 10:00 to 12:30 tomorrow, and then is that it?

THE COURT: Well, no. I can pick up after lunch until -- I have a 3:00 meeting that I need to be on.

MR. EKELAND: 10:00 and then lunch and until, roughly, 3:00 tomorrow; is that what we're saying?

THE COURT: I can do that.

MR. EKELAND: Okay. I'll see what I can do. Yes.

THE COURT: In that case, why don't I just ask Mr. Brown, is this a good breaking point or do you want to go for another five minutes now? It's up to you.

MR. BROWN: No, Your Honor. This is a good breaking point.

THE COURT: We'll pick up at 10:00 tomorrow morning again then. If you can let Mr. Fischbach know. Let him know

that we'll pick him up as soon as we're done with this witness. I don't anticipate needing more than, I hope, 45 minutes or an hour to finish up with this witness here. Okay. Let's do that. We'll just adjourn for the day.

So you're welcome to go. I just ask that you not discuss your testimony until you're done testifying.

MS. PELKER: Your Honor, can we address at sidebar the transcript issue?

THE COURT: Yes, you can. Why don't we do this. Why don't you -- we can let you go. Why don't I go ahead and clear the courtroom instead of having to do a sidebar.

Anyone who is not counsel in the case or associated with their counsel in the case, why don't we go and we'll have a sidebar.

MS. PELKER: Thank you, Your Honor.

MR. BROWN: Your Honor, I'm not sure if the sidebar is available via Zoom. I'm happy to log off.

THE COURT: No. It's -- is anyone else on Zoom other than Mr. Brown?

THE COURTROOM DEPUTY: There are some other people on the call.

MR. HASSARD: Our experts.

THE COURT: As long as everyone other than Mr. Brown logs off of the Zoom. You can stay on the Zoom, Mr. Brown. I think the deputy clerk can make sure that we've dismissed

everyone else.

THE COURTROOM DEPUTY:  I'm doing it now, Your Honor.

MR. BROWN:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Everyone has been removed, Your Honor.

THE COURT:  Thank you.

(End of public record at 4:50 p.m.)

(Sealed proceedings followed.)











(The hearing adjourned July 19, 2023, at 4:55 p.m.

until 10:00 a.m. July 20, 2023.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 30th day of July, 2023.

/s/ Tamara M. Sefranek
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C.  20001

**$**

**$100** [1] - 154:22
**$15,000** [1] - 56:2
**$20,000** [1] - 165:4
**$30** [1] - 112:15
**$30,000** [2] - 112:16, 165:5
**$334** [1] - 12:8
**$35,000** [1] - 56:4
**$400** [2] - 134:10, 135:2
**$60,000** [7] - 55:17, 55:19, 55:21, 55:23, 56:5, 56:15, 112:16

**'**

**'09** [1] - 127:15
**'90s** [1] - 98:22

**/**

**/s** [1] - 185:9

**1**

**1** [3] - 46:4, 142:7
**10** [2] - 96:6, 135:13
**100** [5] - 57:9, 58:21, 75:11, 143:16, 171:19
**10005** [1] - 1:17
**10:00** [9] - 24:12, 175:17, 177:7, 178:2, 178:7, 178:11, 178:15, 178:24, 184:22
**10:30** [4] - 1:6, 9:25, 12:1, 26:15
**11:00** [4] - 24:17, 176:13, 176:14
**11:30** [1] - 176:14
**11th** [1] - 24:1
**12:00** [1] - 67:18
**12:15** [1] - 70:17
**12:30** [3] - 176:14, 178:7, 178:11
**12th** [1] - 24:1
**13** [1] - 170:9
**131** [1] - 2:12
**13th** [1] - 168:5
**145** [1] - 43:15
**14th** [1] - 21:3
**15** [2] - 96:6, 176:16
**150** [1] - 33:14
**150,000** [1] - 58:21
**153** [1] - 152:16
**16** [9] - 12:21, 20:10, 28:23, 29:25, 41:13,

45:17, 45:20, 50:5, 51:19
**1600** [6] - 106:5, 106:7, 106:8, 112:17, 112:18, 167:8
**16th** [2] - 25:1, 29:14
**170** [1] - 34:21
**18th** [5] - 10:5, 16:14, 18:12, 20:23, 21:19
**19** [2] - 1:5, 184:21
**1:15** [2] - 67:19, 70:15
**1:21-CR-0399** [1] - 1:3
**1:25** [1] - 70:17

**2**

**2** [8] - 105:10, 105:11, 105:12, 106:2, 170:24, 170:25
**2.5** [5] - 105:15, 105:16, 105:17, 170:24, 171:1
**2.6** [1] - 105:18
**2.7** [1] - 105:18
**20** [2] - 176:16, 184:22
**20,000** [1] - 165:20
**20-minute** [1] - 15:25
**20001** [3] - 1:12, 1:23, 185:11
**2010** [1] - 127:15
**2011** [10] - 8:21, 108:25, 112:14, 112:15, 112:17, 115:9, 154:14, 167:2, 167:21, 167:23
**2012** [3] - 108:25, 115:9, 169:1
**2013** [4] - 127:17, 168:21, 169:1, 169:10
**2014** [2] - 115:10, 168:21
**2015** [1] - 169:3
**2016** [1] - 42:25
**202-354-3246** [1] - 1:23
**2022** [3] - 28:24, 29:25, 152:1
**2023** [6] - 1:5, 137:1, 168:6, 184:21, 184:22, 185:7
**20530** [1] - 1:14
**21,000** [1] - 106:6
**21-399** [1] - 3:3
**21st** [6] - 21:20, 21:23, 22:6, 22:12, 22:17, 22:22
**22,000** [2] - 106:6,

106:8
**22nd** [2] - 22:25, 23:14
**23,700-something** [1] - 106:2
**23rd** [5] - 22:25, 23:14, 25:1, 28:24, 29:25
**24,000** [3] - 105:18, 105:19, 105:24
**24th** [1] - 25:24
**250** [1] - 135:18
**28th** [2] - 22:2, 22:4
**29th** [1] - 22:4
**2nd** [1] - 42:25

**3**

**3** [5] - 43:14, 105:11, 105:15, 170:25
**30** [2] - 1:17, 112:18
**30,000** [2] - 105:19, 165:21
**300** [1] - 135:18
**30s** [1] - 167:2
**30th** [2] - 21:4, 185:7
**31st** [1] - 168:6
**32** [1] - 2:16
**33** [1] - 2:5
**333** [2] - 1:22, 185:11
**3:00** [2] - 178:14, 178:16
**3:15** [1] - 131:4
**3:30** [1] - 131:4

**4**

**40** [1] - 135:12
**45** [2] - 2:6, 179:2
**4:50** [1] - 180:7
**4:55** [1] - 184:21
**4th** [1] - 137:1

**5**

**5** [2] - 45:14, 135:13
**50** [5] - 68:7, 68:9, 83:19, 84:2, 135:12
**500** [3] - 128:4, 128:19, 167:24
**57-7** [1] - 10:22
**5:00** [4] - 175:18, 175:19, 175:22, 175:23
**5:05** [1] - 175:25
**5:30** [1] - 175:23

**6**

**60,000** [1] - 55:17
**60-something** [1] -

112:17
**601** [1] - 1:11
**6714** [2] - 1:22, 185:10
**6:00** [1] - 176:1
**6th** [4] - 24:5, 24:12, 24:13, 24:18

**7**

**7** [3] - 46:11, 170:6, 172:5
**7,000** [1] - 152:13
**7,325** [2] - 152:12, 152:16
**706** [1] - 40:16
**750** [1] - 134:11
**7th** [4] - 7:13, 21:6, 22:7, 22:11

**8**

**8** [2] - 152:17, 170:6
**88** [1] - 2:8
**8th** [1] - 1:17

**9**

**9** [1] - 46:13
**92** [1] - 2:11
**93** [1] - 172:6
**950** [1] - 1:14
**99** [1] - 69:11
**9:00** [1] - 176:13
**9:30** [1] - 176:13

**A**

**a.m** [2] - 24:12, 184:22
**A.M** [1] - 1:6
**ability** [2] - 36:23, 185:6
**able** [10] - 76:17, 76:19, 76:25, 80:7, 83:1, 85:25, 86:1, 157:18, 167:7, 167:19
**absence** [5] - 72:4, 73:12, 73:16, 74:18, 85:22
**absolutely** [5] - 73:1, 79:17, 80:7, 84:6, 139:21
**abstract** [2] - 51:23, 51:24
**abundance** [2] - 4:8, 6:25
**academic** [8] - 9:19, 33:13, 33:15, 122:8, 129:7, 134:4, 153:12, 173:1

**academically** [1] - 71:7
**accept** [2] - 71:21, 138:17
**acceptable** [1] - 54:10
**accepted** [10] - 39:17, 71:11, 137:25, 138:6, 138:7, 138:22, 138:23, 149:5
**accepts** [2] - 138:21, 146:16
**access** [7] - 29:9, 99:10, 100:13, 108:22, 146:6, 146:11
**accesses** [1] - 5:1
**accessing** [1] - 4:23
**account** [40] - 8:25, 15:1, 15:8, 57:22, 101:18, 102:2, 103:2, 104:6, 106:6, 106:7, 107:4, 107:9, 109:9, 113:14, 143:2, 161:24, 163:19, 163:25, 164:3, 164:5, 164:23, 165:5, 165:9, 166:7, 167:14, 168:13, 168:16, 169:5, 169:19, 169:22, 171:16, 172:20, 173:21, 173:25, 174:1, 174:3, 174:12, 174:17, 175:3
**accountant** [4] - 6:22, 92:22, 95:5, 116:11
**Accountant** [1] - 93:4
**accountants** [1] - 93:13
**accounting** [14] - 58:24, 92:14, 93:7, 93:11, 93:16, 97:17, 111:5, 111:12, 113:23, 117:5, 132:6, 134:5, 134:6
**accounts** [41] - 4:22, 4:23, 85:7, 85:8, 85:9, 104:10, 104:11, 104:16, 107:14, 110:25, 159:12, 159:13, 159:19, 160:5, 160:21, 160:24, 161:3, 161:14, 161:17, 161:20, 161:21, 162:2, 162:23, 163:2,

**Appx867**

164:5, 165:17, 166:3, 166:12, 166:14, 171:6, 172:17, 173:13, 173:15, 173:19, 174:2, 174:24, 174:25

**accuracy** [7] - 8:2, 15:22, 27:15, 27:20, 68:20, 75:11, 123:4

**accurate** [16] - 13:7, 16:19, 16:20, 29:21, 105:5, 118:21, 133:17, 138:2, 143:16, 153:22, 154:10, 154:11, 165:3, 173:6, 175:5, 185:4

**accurately** [1] - 142:21

**accusations** [1] - 18:19

**accuse** [1] - 29:11

**achieved** [1] - 152:5

**acknowledge** [1] - 65:19

**acquire** [1] - 12:24

**acquired** [2] - 163:23, 163:24

**act** [1] - 8:22

**Action** [1] - 1:2

**activity** [6] - 66:19, 99:8, 127:19, 147:19, 149:2, 169:23

**actor** [1] - 110:10

**actual** [8] - 37:8, 73:19, 74:1, 85:15, 106:19, 142:10, 165:8, 170:4

**add** [9] - 54:19, 90:12, 105:4, 134:6, 156:13, 157:10, 167:3, 171:11, 171:13

**added** [2] - 76:13, 157:8

**adding** [1] - 18:1

**addition** [6] - 18:24, 44:4, 97:14, 97:16, 107:10, 144:22

**additional** [9] - 9:19, 21:12, 26:3, 26:16, 27:3, 28:2, 33:10, 93:6, 156:25

**address** [28] - 4:10, 4:20, 4:23, 7:20, 7:22, 7:24, 8:16, 8:17, 8:24, 9:1, 9:3, 10:3, 11:12, 19:12,

30:22, 53:25, 61:19, 124:14, 124:15, 124:18, 124:19, 125:24, 126:5, 147:18, 148:17, 151:18, 179:7

**addressed** [1] - 19:10

**addresses** [9] - 5:2, 8:5, 8:14, 8:19, 9:1, 11:23, 122:16, 140:20, 151:6

**addressing** [1] - 53:9

**adds** [3] - 155:6, 157:5, 157:6

**adequate** [1] - 20:9

**adjectives** [1] - 7:24

**adjourn** [1] - 179:4

**adjourned** [1] - 184:21

**adjourning** [1] - 16:10

**adjusted** [1] - 136:25

**administered** [1] - 107:2

**administrator** [2] - 14:15, 14:23

**administrators** [1] - 13:15

**admission** [2] - 14:19, 31:15

**admissions** [1] - 14:17

**admit** [1] - 14:12

**admits** [1] - 18:16

**admitted** [6] - 12:3, 14:11, 14:13, 15:21, 32:11, 32:13

**ADMITTED** [1] - 2:15

**adopt** [1] - 38:10

**adopted** [4] - 52:17, 78:20, 79:23, 80:1

**advent** [1] - 150:7

**adversarial** [1] - 44:20

**advertisers** [1] - 99:19

**advised** [2] - 6:21, 90:18

**advocates** [1] - 136:2

**affect** [7] - 36:23, 67:23, 68:20, 74:13, 85:11, 87:20, 89:10

**affected** [1] - 87:14

**affects** [2] - 42:4, 66:1

**affirmatively** [1] - 163:14

**afford** [2] - 120:10

**afraid** [1] - 110:11

**afternoon** [2] - 131:18, 131:19

**afterwards** [1] - 30:22

**agencies** [3] - 34:15, 72:21, 120:9

**agent** [1] - 4:13

**agents** [1] - 34:12

**aggregate** [1] - 169:17

**ago** [7] - 12:5, 13:10, 17:24, 25:17, 49:9, 108:6

**agree** [9] - 46:23, 51:16, 51:17, 76:11, 79:1, 79:2, 112:12, 150:9, 150:12

**agreed** [3] - 31:1, 40:15, 87:10

**ahead** [5] - 16:13, 67:11, 120:20, 131:3, 179:10

**AICPA** [4] - 92:24, 93:5, 93:11, 94:25

**aimed** [1] - 58:12

**Air** [2] - 34:7, 37:10

**airline** [2] - 64:24, 65:1

**AI** [1] - 93:14

**ALDEN** [1] - 1:13

**Alden** [1] - 3:6

**algorithm** [4] - 53:19, 143:14, 143:16, 143:17

**algorithmic** [1] - 49:17

**algorithms** [2] - 27:10, 29:6

**alleged** [2] - 104:6, 158:20

**alleges** [1] - 8:24

**allow** [5] - 28:3, 53:20, 53:22, 103:3, 158:16

**allowed** [4] - 14:6, 88:2, 99:1, 99:2

**allows** [3] - 63:3, 63:5, 158:16

**almost** [4] - 12:5, 18:12, 21:7, 49:9

**alone** [4] - 37:1, 122:1, 130:25, 132:9

**alternative** [7] - 99:20, 100:1, 137:17, 137:18, 137:19, 144:13

**alternatives** [1] - 4:9

**altogether** [1] - 164:15

**amenable** [2] - 51:13, 51:14

**America** [1] - 3:3

**AMERICA** [1] - 1:2

**America's** [1] - 116:16

**American** [2] - 92:25, 97:19

**amount** [29] - 10:10, 10:13, 11:20, 64:5, 64:25, 67:8, 86:1, 105:13, 112:20, 123:24, 124:25,

125:1, 125:2, 125:3, 135:15, 143:2, 148:9, 154:20, 156:14, 162:19, 162:23, 163:15, 164:10, 165:8, 165:13, 166:10, 166:11, 172:8, 173:7

**amounts** [5] - 102:13, 104:20, 150:10, 170:1, 170:3

**ample** [1] - 26:21

**analogy** [1] - 98:21

**analyses** [1] - 72:8

**analysis** [92] - 4:21, 5:18, 7:14, 8:1, 8:15, 19:22, 36:2, 36:9, 36:22, 36:25, 59:3, 59:9, 59:12, 59:14, 59:21, 60:21, 61:10, 62:22, 63:5, 63:7, 67:25, 70:22, 70:25, 71:3, 71:6, 71:14, 72:5, 73:3, 73:9, 77:2, 77:6, 77:9, 77:12, 77:13, 77:18, 77:20, 77:25, 78:3, 84:16, 84:20, 85:6, 85:10, 86:8, 86:10, 86:19, 87:24, 88:13, 89:13, 89:15, 93:2, 96:9, 111:13, 111:21, 111:23, 117:7, 140:14, 140:15, 140:16, 140:17, 140:25, 141:11, 142:5, 142:8, 142:12, 142:13, 142:18, 142:22, 142:25, 143:9, 144:2, 144:4, 144:13, 145:20, 149:5, 149:6, 153:4, 153:7, 153:9, 162:1, 162:3, 162:4, 162:8, 162:18, 163:21, 166:20, 169:16, 171:4, 172:15, 172:16

**analyst** [6] - 67:23, 77:11, 85:5, 85:23, 86:6, 116:11

**Analyst** [1] - 93:2

**analytic** [1] - 68:18

**analytics** [1] - 95:20

**analyze** [2] - 16:25, 89:18

**analyzed** [2] - 17:16, 126:8

**analyzes** [1] - 152:2

**ancillary** [2] - 17:15, 18:14

**anecdotal** [3] - 65:8, 65:10, 82:18

**annoying** [1] - 119:16

**annual** [2] - 55:16, 56:5

**anonymity** [1] - 150:15

**answer** [31] - 43:20, 59:20, 62:25, 69:20, 84:23, 85:1, 85:2, 86:7, 86:14, 86:18, 86:22, 86:25, 87:3, 87:5, 95:24, 97:13, 97:22, 104:24, 117:13, 119:16, 129:2, 132:10, 133:17, 135:6, 135:7, 146:9, 147:9, 152:4, 155:2, 166:16

**answered** [3] - 66:16, 81:3, 81:21

**answering** [1] - 139:19

**answers** [2] - 48:18, 139:18

**anthropology** [2] - 65:17, 65:22

**anti** [3] - 107:1, 132:14, 133:14

**anti-money** [3] - 107:1, 132:14, 133:14

**anticipate** [4] - 7:16, 145:1, 145:25, 179:2

**anticipated** [2] - 4:2, 175:16

**anticipates** [1] - 28:25

**anticipating** [1] - 123:2

**anyway** [6] - 23:10, 47:15, 95:7, 100:4, 106:21, 120:2

**apart** [1] - 5:1

**API** [2] - 120:14, 120:23

**apologize** [2] - 120:16, 120:19

**appear** [3] - 176:21, 176:24, 177:10

**appeared** [3] - 39:13, 137:1, 169:21

**apples** [1] - 42:3

**applicable** [2] - 132:15, 159:10

**application** [4] - 52:2, 96:19, 159:11

**applications** [11] - 95:21, 96:12, 96:19,

97:1, 99:23, 99:25, 100:4, 133:15, 139:9, 139:14, 139:16
**applied** [2] - 15:4, 51:18
**apply** [5] - 71:3, 71:6, 73:5, 114:1, 117:6
**applying** [2] - 71:17, 152:12
**appointed** [2] - 12:23, 88:8
**appreciate** [3] - 86:15, 177:12
**approach** [3] - 9:13, 53:8, 141:25
**appropriate** [6] - 4:19, 5:3, 27:4, 53:6, 55:3, 84:25
**approved** [2] - 13:20, 80:2
**architecture** [2] - 35:16, 71:16
**area** [10] - 4:10, 4:12, 10:25, 33:16, 34:4, 48:7, 59:8, 76:1, 95:3, 136:9
**areas** [4] - 34:5, 37:12, 86:18, 113:22
**argue** [3] - 5:13, 5:25, 11:6
**argument** [9] - 11:4, 25:3, 25:13, 25:20, 52:19, 91:7, 91:10, 163:14
**arguments** [3] - 24:25, 29:20, 55:10
**arises** [1] - 72:19
**arrange** [3] - 150:4, 150:5, 154:9
**arrangements** [1] - 175:19
**arranging** [1] - 150:17
**arrested** [7] - 89:2, 89:3, 89:9, 89:14, 89:19, 89:21, 112:14
**arriving** [1] - 80:6
**art** [2] - 69:12, 96:17
**article** [9] - 39:24, 69:21, 80:14, 83:5, 111:15, 128:13, 128:15, 130:8
**articles** [11] - 33:13, 33:14, 60:6, 60:10, 64:3, 66:23, 80:14, 123:11, 127:24, 133:11, 133:14
**ASCFE** [1] - 92:25
**Asian** [1] - 138:19
**aspect** [4] - 47:5,

94:21, 140:14, 157:10
**aspects** [1] - 139:10
**aspersions** [1] - 119:6
**asserting** [1] - 172:1
**assertion** [9] - 104:14, 104:25, 105:6, 105:8, 106:11, 106:14, 107:13, 171:23
**assertions** [2] - 129:20, 142:22
**assess** [3] - 36:24, 104:24
**assessing** [1] - 27:4
**assessment** [4] - 68:2, 117:2, 129:14, 158:18
**assessments** [1] - 140:19
**asset** [2] - 111:19, 114:1
**assets** [4] - 96:20, 102:1, 111:19, 134:17
**assign** [3] - 80:4, 85:23, 85:25
**assistants** [1] - 130:3
**associated** [9] - 5:16, 8:19, 102:23, 103:9, 122:16, 124:4, 124:9, 153:17, 179:12
**associates** [1] - 36:7
**association** [1] - 152:15
**Association** [1] - 97:20
**assume** [14] - 52:4, 56:20, 67:10, 69:8, 69:13, 84:16, 84:17, 121:6, 128:8, 147:16, 163:21, 165:12, 165:14, 166:22
**assumed** [2] - 121:3
**assuming** [9] - 6:5, 23:15, 126:11, 167:17, 167:18, 167:22, 171:4, 171:18
**assumption** [14] - 55:6, 112:21, 122:12, 123:21, 125:22, 126:9, 126:13, 165:4, 165:7, 165:9, 165:13, 165:15, 165:22, 167:12
**assumptions** [15] -

37:25, 38:2, 38:3, 38:13, 49:5, 49:17, 53:6, 53:7, 68:5, 68:16, 126:12, 126:21, 143:14, 172:24, 173:22
**astrology** [1] - 65:17
**attached** [2] - 10:16, 10:18
**attachments** [1] - 19:4
**attack** [1] - 11:9
**attempting** [1] - 150:24
**attesting** [1] - 15:22
**attorney** [4] - 40:3, 53:14, 57:10
**attorneys** [2] - 13:17, 97:18
**attribute** [4] - 8:9, 151:10, 170:6, 170:10
**attributed** [1] - 8:6
**attributing** [3] - 8:17, 103:13, 123:5
**attribution** [3] - 7:22, 7:24, 8:18
**attributions** [1] - 123:5
**auditing** [1] - 94:8
**August** [16] - 10:5, 16:14, 18:12, 20:19, 20:23, 21:4, 21:6, 21:17, 21:19, 21:23, 22:4, 22:7, 22:11, 23:14, 23:22, 42:25
**Australia** [1] - 58:20
**authentication** [1] - 25:2
**authority** [2] - 100:21, 154:2
**authorization** [1] - 13:9
**authors** [1] - 129:25
**automated** [1] - 172:13
**automatic** [1] - 172:20
**automatically** [5] - 171:6, 171:8, 171:10, 171:14, 171:20
**availability** [3] - 21:15, 22:20, 23:22
**available** [12] - 4:5, 7:6, 19:8, 21:20, 22:12, 22:15, 22:16, 22:22, 73:20, 76:4, 137:23, 179:17
**Avenue** [3] - 1:14, 1:22, 185:11
**average** [7] - 58:17,

105:9, 112:7, 170:20, 170:21, 171:1, 173:2
**aviation** [3] - 65:2, 65:3, 65:6
**awarded** [3] - 92:24, 92:25, 93:5
**aware** [13] - 42:11, 73:2, 73:7, 123:10, 130:18, 139:17, 145:22, 168:20, 168:25, 169:8, 169:14, 173:18, 173:23
**awful** [1] - 14:6
**awfully** [1] - 10:6

### B

**babysitter** [1] - 33:21
**bachelor's** [3] - 33:11, 92:13, 93:19
**back-of-the-envelope** [1] - 105:5
**background** [6] - 4:14, 33:2, 55:25, 68:16, 68:19, 92:12
**backwards** [3] - 38:5, 38:6, 38:7
**bad** [5] - 42:3, 78:6, 87:6, 98:18
**balances** [1] - 169:19
**Bank** [6] - 116:16, 161:15, 161:18, 161:22, 165:17, 166:3
**bank** [14] - 15:1, 100:11, 101:18, 102:2, 159:12, 159:18, 160:20, 160:24, 161:3, 161:14, 161:17, 161:20, 161:21, 161:24
**banker** [1] - 58:23
**banking** [6] - 132:13, 133:15, 133:20, 134:5, 134:7, 161:19
**bankrupt** [2] - 116:5, 116:6
**bankruptcy** [2] - 115:8, 116:4
**banks** [1] - 100:9
**Bar** [1] - 97:20
**bargained** [2] - 40:17, 40:22
**base** [2] - 73:25, 142:11
**based** [40] - 8:17, 8:25, 15:10, 15:13,

17:14, 19:12, 20:7, 36:4, 50:23, 58:6, 71:7, 74:21, 82:8, 82:10, 82:11, 83:18, 83:23, 88:4, 118:25, 120:21, 121:4, 123:21, 123:22, 141:16, 141:17, 141:18, 143:11, 147:1, 154:2, 154:3, 154:5, 162:11, 162:19, 162:21, 163:14, 163:16, 165:9, 165:17, 165:18, 167:19
**bases** [3] - 27:24, 48:15, 142:5
**basic** [4] - 37:21, 78:19, 100:5, 125:4
**basics** [3] - 14:21, 95:16, 97:22
**basis** [16] - 5:20, 5:24, 11:12, 26:11, 77:2, 142:11, 148:22, 148:24, 148:25, 170:15, 170:17, 170:19, 173:1, 173:6
**became** [2] - 127:16, 129:10
**become** [4] - 57:8, 133:22, 135:20, 155:2
**becomes** [2] - 98:14, 135:4
**becoming** [1] - 134:20
**BEFORE** [1] - 1:8
**before-and-after** [1] - 78:24
**beforehand** [1] - 18:1
**began** [5] - 70:20, 111:10, 134:15, 154:18, 155:4
**begin** [2] - 87:1, 132:1
**begun** [1] - 20:21
**behalf** [3] - 45:12, 139:24, 139:25
**behavior** [1] - 147:2
**behind** [2] - 99:11, 127:8
**believes** [1] - 73:23
**belong** [1] - 125:19
**belonging** [1] - 161:21
**benchmark** [1] - 128:7
**benefit** [2] - 108:4, 142:10
**benefits** [1] - 100:17
**best** [10] - 11:15, 48:1, 72:9, 72:19, 89:17, 89:19, 94:18, 128:12, 135:16,

185:6
**better** [5] - 19:9, 24:17, 47:17, 66:3, 91:13
**between** [10] - 8:16, 37:20, 66:8, 73:18, 90:25, 105:11, 128:19, 148:10, 172:11, 172:17
**beyond** [5] - 19:7, 19:16, 26:3, 67:25, 100:25
**bias** [110] - 36:5, 36:6, 36:7, 36:8, 36:11, 36:12, 36:13, 36:15, 37:13, 38:1, 38:3, 38:9, 38:11, 38:18, 39:18, 39:22, 39:24, 40:5, 41:23, 42:1, 42:4, 42:5, 42:12, 42:15, 42:21, 43:9, 43:25, 44:1, 44:2, 44:5, 44:9, 44:12, 45:8, 46:5, 46:7, 46:8, 46:14, 46:19, 48:8, 51:4, 51:5, 51:7, 52:13, 53:3, 53:7, 53:9, 54:11, 54:14, 54:23, 55:7, 57:10, 58:14, 60:2, 62:10, 63:4, 65:12, 70:22, 70:25, 72:5, 72:12, 72:17, 72:18, 72:19, 72:21, 72:24, 73:13, 73:16, 74:7, 74:10, 74:15, 74:18, 74:20, 75:10, 76:6, 77:8, 78:6, 78:9, 78:21, 79:5, 79:8, 79:10, 79:12, 79:13, 80:1, 80:5, 80:9, 82:5, 83:20, 84:2, 85:11, 85:22, 86:1, 86:3, 86:10, 86:18, 86:20, 87:7, 87:17, 87:20, 87:24, 89:4, 89:7, 90:5, 90:17, 90:21, 90:25, 146:1
**biased** [8] - 42:3, 53:11, 65:19, 72:2, 74:25, 75:6, 75:7, 79:2
**biases** [5] - 42:7, 42:8, 53:16, 71:21, 71:23
**big** [3] - 16:21, 70:8, 100:3
**bigger** [1] - 98:14
**bill** [3] - 12:5, 25:2, 177:11
**billion** [3] - 128:5,

128:20, 172:7
**billionaire** [1] - 105:23
**Binance** [2] - 138:25
**binder** [3] - 31:6, 31:13, 31:23
**bio** [1] - 136:10
**Bisbee** [7] - 9:16, 10:23, 26:16, 26:21, 28:16, 49:6, 144:10
**Bisbee's** [3] - 9:20, 27:9, 29:5
**bit** [15] - 8:7, 9:8, 11:3, 35:12, 36:10, 41:25, 56:3, 60:13, 67:9, 76:5, 76:8, 116:3, 119:12, 120:16
**bitcoin** [111] - 98:17, 102:14, 103:14, 104:23, 105:7, 105:8, 105:17, 105:19, 105:20, 105:23, 105:25, 106:3, 106:4, 106:5, 106:6, 106:7, 106:8, 106:12, 106:15, 106:22, 107:8, 107:11, 107:23, 109:3, 109:17, 110:2, 110:5, 110:8, 110:14, 110:24, 112:6, 112:7, 112:14, 112:15, 112:19, 112:20, 113:3, 113:8, 113:10, 113:16, 114:5, 114:13, 115:1, 115:2, 116:7, 116:25, 122:11, 122:16, 123:6, 123:25, 124:8, 124:9, 124:11, 124:13, 125:11, 125:13, 125:23, 128:23, 137:20, 143:23, 146:16, 148:9, 148:12, 148:13, 149:16, 149:17, 150:6, 154:23, 155:8, 155:17, 158:19, 162:6, 162:19, 162:22, 163:1, 163:4, 163:10, 163:15, 163:16, 163:17, 163:22, 163:23, 164:1, 164:10, 164:12, 164:24, 165:21, 166:4, 166:24, 167:3, 167:5, 167:8,

167:11, 167:14, 167:21, 167:22, 168:25, 169:2, 169:9, 170:7, 170:9, 172:2, 172:5, 172:23, 173:25, 174:11
**Bitcoin** [81] - 8:20, 59:10, 61:19, 85:6, 85:10, 98:4, 98:16, 98:18, 100:6, 100:14, 100:23, 101:11, 101:12, 101:13, 101:15, 102:16, 102:19, 104:7, 104:16, 104:19, 104:25, 105:1, 105:7, 105:9, 105:20, 106:13, 106:15, 107:8, 107:14, 107:16, 110:4, 110:12, 110:14, 110:18, 111:7, 113:6, 113:12, 113:19, 114:3, 114:23, 115:11, 115:15, 118:13, 123:22, 123:23, 125:2, 125:4, 128:1, 129:6, 137:18, 137:19, 137:23, 143:5, 147:12, 148:23, 150:13, 150:14, 154:21, 155:11, 156:7, 163:20, 164:7, 164:12, 164:13, 164:15, 164:18, 165:5, 165:10, 166:11, 167:1, 167:13, 167:17, 169:18, 171:5, 171:10, 172:2, 172:12, 173:7, 173:11, 174:15
**BitcoinFog.com** [3] - 108:12, 108:20, 109:2
**bitcoins** [6] - 98:19, 103:10, 112:17, 127:19, 165:23, 166:24
**black** [5] - 119:20, 121:2, 145:5, 145:13, 159:6
**blinding** [1] - 72:9
**blinds** [1] - 38:10
**block** [7] - 59:21, 78:2, 84:20, 102:19,

118:17, 140:18, 155:9
**Blockchain** [1] - 136:22
**blockchain** [134] - 7:5, 7:14, 12:2, 14:10, 14:16, 14:21, 14:22, 19:21, 19:22, 36:21, 36:25, 57:25, 59:3, 59:8, 59:9, 59:12, 59:14, 59:17, 61:14, 61:16, 61:18, 62:22, 63:5, 63:7, 70:22, 70:25, 71:3, 71:6, 71:14, 72:5, 73:3, 73:9, 77:2, 77:9, 77:11, 77:12, 77:13, 77:17, 77:20, 77:25, 84:16, 88:13, 89:13, 89:15, 95:14, 95:16, 95:17, 95:20, 96:2, 96:4, 96:9, 96:10, 96:12, 96:13, 96:18, 96:20, 97:6, 97:12, 97:15, 97:22, 97:23, 98:3, 98:4, 99:7, 99:11, 99:21, 99:25, 100:20, 100:22, 101:3, 101:5, 101:10, 101:14, 102:16, 102:17, 102:19, 103:19, 103:22, 103:23, 103:24, 113:20, 113:22, 113:24, 114:14, 117:24, 117:25, 118:6, 118:11, 118:15, 118:18, 118:19, 119:21, 120:24, 121:13, 123:6, 123:22, 125:5, 137:23, 139:8, 139:15, 140:14, 140:15, 140:16, 140:17, 140:20, 140:25, 141:11, 141:14, 141:20, 142:4, 142:8, 142:18, 142:22, 142:24, 143:9, 144:1, 144:4, 146:5, 147:20, 148:23, 149:5, 149:6, 151:20, 157:14, 157:16, 158:12, 169:23
**blockchain.com** [2] - 59:18, 102:18
**blockchains** [5] - 98:5, 100:24,

100:25, 118:1, 139:8
**Blockchair** [1] - 59:18
**blocked** [1] - 176:7
**blocks** [1] - 101:22
**blowup** [1] - 115:13
**board** [3] - 137:15, 139:2, 140:7
**bomber** [1] - 35:8
**bono** [3] - 120:8, 134:21, 135:4
**book** [7] - 107:18, 115:2, 130:7, 136:15, 136:20, 136:23, 137:4
**border** [1] - 100:12
**bottom** [1] - 45:14
**bought** [8] - 115:19, 116:1, 164:13, 164:14, 164:16, 165:8, 166:24, 167:24
**bouncing** [1] - 112:15
**box** [5] - 119:20, 121:2, 145:5, 145:13, 159:6
**brain** [20] - 35:16, 35:17, 36:16, 36:17, 37:12, 37:15, 37:17, 37:18, 37:21, 42:13, 46:6, 71:10, 71:12, 71:15, 71:16, 71:19, 71:22, 76:15, 79:12, 87:11
**brains** [1] - 37:19
**branch** [1] - 132:18
**Breadcrumbs** [1] - 59:18
**break** [10] - 60:23, 67:4, 67:12, 67:18, 70:14, 70:15, 91:17, 131:4, 176:16, 178:8
**breaking** [2] - 178:20, 178:22
**brief** [5] - 28:2, 28:10, 84:13, 97:11, 122:6
**briefed** [2] - 29:14, 88:9
**briefing** [1] - 30:15
**briefly** [12] - 68:22, 69:20, 88:22, 93:3, 93:24, 109:10, 114:16, 117:22, 121:18, 127:2, 127:6, 130:9
**bring** [4] - 47:13, 83:22, 90:19, 108:2
**broad** [1] - 29:16
**brought** [5] - 49:19, 89:2, 89:18, 147:12, 147:14

**BROWN** [36] - 1:10, 45:1, 51:16, 52:5, 52:19, 54:2, 55:11, 55:12, 67:7, 70:19, 81:6, 82:3, 85:4, 88:15, 131:10, 131:17, 131:25, 135:19, 138:15, 142:3, 144:6, 144:7, 145:3, 145:11, 155:5, 155:19, 157:4, 158:23, 160:16, 160:17, 168:3, 171:3, 175:22, 178:22, 179:16, 180:3

**Brown** [31] - 2:6, 2:12, 3:9, 3:10, 22:17, 45:4, 51:15, 53:20, 54:19, 55:5, 67:1, 70:18, 84:24, 88:22, 89:24, 131:8, 131:9, 131:11, 131:14, 131:23, 142:17, 144:4, 144:5, 160:15, 168:2, 175:20, 176:22, 178:20, 179:19, 179:23, 179:24

**browser** [1] - 108:22

**building** [3] - 99:25, 120:7, 120:14

**built** [2] - 64:1, 107:23

**bunch** [2] - 17:1, 61:20

**bureaucracy** [1] - 56:11

**business** [1] - 99:20

**Business** [1] - 96:4

**busy** [1] - 57:11

**buy** [2] - 165:20, 174:3

**buyers** [1] - 169:9

**buying** [5] - 112:22, 113:3, 113:5, 113:9, 124:18

**BY** [31] - 33:1, 41:18, 43:16, 45:1, 55:12, 70:19, 81:6, 82:3, 85:4, 88:20, 92:8, 97:9, 107:3, 117:18, 121:17, 129:1, 130:19, 131:25, 135:19, 138:15, 142:3, 144:7, 145:3, 145:11, 155:5, 155:19, 157:4, 158:23, 160:17, 168:3, 171:3

## C

**calculate** [1] - 87:22

**calculation** [4] - 105:5, 162:12, 163:5, 166:10

**calculator** [2] - 105:25, 166:9

**calendar** [3] - 20:25, 21:21, 176:25

**California** [2] - 34:11, 40:4

**Canada** [1] - 177:6

**cancel** [1] - 177:10

**canceled** [1] - 23:15

**cancer** [2] - 69:14, 69:16

**cancerous** [2] - 69:22, 70:1

**candidly** [1] - 14:11

**candor** [1] - 17:23

**cannot** [9] - 56:20, 63:6, 65:5, 81:1, 81:15, 81:17, 81:24, 87:21, 104:18

**cap** [1] - 128:23

**capable** [1] - 35:15

**capacity** [1] - 140:23

**Capone** [1] - 93:14

**capped** [2] - 55:16, 56:5

**cards** [1] - 114:24

**care** [2] - 107:19, 157:9

**careful** [4] - 15:18, 102:6, 108:7, 110:19

**carefully** [4] - 12:21, 120:16, 131:21, 150:23

**case** [145] - 3:25, 4:13, 7:9, 9:12, 11:9, 11:23, 12:1, 12:6, 12:16, 14:7, 14:9, 16:1, 17:4, 17:13, 18:13, 31:10, 35:7, 36:24, 38:12, 39:16, 40:9, 40:12, 40:13, 40:15, 40:19, 42:23, 43:7, 43:11, 43:18, 44:2, 44:6, 44:9, 44:10, 44:12, 45:5, 45:8, 47:3, 47:17, 49:18, 51:5, 51:6, 51:9, 51:18, 52:2, 52:3, 53:1, 53:25, 54:13, 54:14, 55:8, 55:13, 55:20, 56:1, 56:22, 56:23, 57:8, 57:12, 57:14, 57:19, 58:5, 58:6, 64:19, 72:4, 72:5, 72:6, 73:7, 73:12, 73:15, 73:17, 74:7, 74:8, 74:13, 74:18, 75:14, 76:24, 78:24, 80:9, 80:13, 80:24, 81:12, 81:20, 82:24, 84:11, 86:1, 86:16, 87:8, 87:22, 89:4, 89:19, 95:23, 101:10, 101:12, 104:2, 104:3, 114:18, 116:8, 117:9, 117:16, 122:7, 123:13, 124:25, 126:14, 130:7, 130:16, 132:15, 133:4, 133:5, 134:8, 134:13, 134:20, 134:25, 135:10, 135:20, 135:22, 136:1, 138:12, 140:13, 140:16, 140:23, 141:6, 141:9, 141:11, 141:15, 141:17, 141:22, 148:5, 154:12, 155:18, 159:9, 159:17, 160:2, 160:12, 160:19, 162:13, 163:13, 164:20, 168:5, 171:24, 176:17, 177:17, 178:19, 179:12, 179:13

**Case** [1] - 3:2

**cases** [18] - 13:16, 40:12, 40:17, 40:21, 40:25, 44:3, 53:13, 55:22, 56:25, 57:4, 57:7, 68:6, 82:4, 82:17, 83:8, 84:3, 96:13, 132:21

**cast** [1] - 119:6

**catch** [1] - 176:2

**caused** [1] - 83:4

**caution** [2] - 4:8, 6:25

**caveat** [1] - 54:24

**cell** [1] - 69:22

**cells** [3] - 69:9, 69:22, 70:1

**central** [7] - 97:25, 99:1, 99:9, 99:17, 99:21, 100:21, 118:11

**centralized** [2] - 108:5, 157:7

**CEO** [1] - 115:4

**certain** [13] - 5:7, 5:12, 37:19, 37:20, 38:10, 41:22, 53:17, 62:13, 62:19, 74:2, 85:8, 122:15, 143:14

**certainly** [4] - 13:10, 52:1, 113:25, 165:17

**certainty** [1] - 121:21

**CERTIFICATE** [1] - 185:1

**certification** [6] - 93:25, 96:1, 96:3, 96:7, 111:4, 117:4

**certifications** [1] - 92:19

**certified** [5] - 92:22, 93:1, 95:8, 95:11, 95:12

**Certified** [5] - 92:23, 92:24, 93:1, 93:2, 93:4

**certify** [1] - 185:3

**CFE** [4] - 92:24, 93:17, 93:18, 93:19

**CFF** [13] - 92:23, 93:4, 93:6, 93:9, 93:15, 93:18, 93:20, 93:25, 94:1, 95:9, 96:1, 111:4, 117:4

**chain** [23] - 59:21, 78:2, 84:20, 94:17, 95:20, 96:20, 96:24, 98:10, 98:12, 99:22, 101:14, 101:20, 113:17, 113:18, 114:5, 119:23, 122:11, 125:7, 125:24, 126:4, 126:25, 127:19, 141:3

**Chainalysis** [43] - 10:18, 10:19, 15:16, 27:11, 27:15, 29:5, 29:18, 30:11, 30:13, 43:19, 49:8, 81:11, 90:3, 117:20, 117:23, 118:1, 118:22, 118:23, 119:19, 120:1, 120:12, 120:22, 122:6, 122:25, 125:6, 125:18, 126:14, 129:10, 142:19, 142:20, 144:10, 145:5, 145:13, 146:3, 146:4, 146:11, 146:14, 146:20, 157:16, 158:6, 158:12, 158:25, 159:4

**Chainalysis's** [9] - 119:1, 126:22, 130:15, 143:10, 145:19, 145:22, 156:17, 156:19, 159:6

**Chainalysis-level** [1] - 142:20

**challenge** [5] - 4:12, 6:20, 6:22, 7:2, 27:2

**challenging** [2] - 4:20, 7:16

**chance** [1] - 112:23

**change** [18] - 29:9, 30:11, 37:16, 54:25, 112:13, 117:19, 118:18, 124:15, 124:19, 125:23, 126:5, 147:18, 148:16, 149:3, 151:5, 151:18, 174:4

**changed** [3] - 99:5, 105:10, 171:2

**changes** [9] - 28:7, 29:10, 30:12, 96:21, 98:9, 113:24, 118:6, 118:7, 138:10

**changing** [4] - 12:6, 12:12, 12:16, 69:23

**characteristics** [1] - 152:2

**characterize** [2] - 100:20, 156:10

**charge** [4] - 99:10, 99:18, 134:11

**chart** [1] - 167:5

**check** [4] - 24:7, 84:17, 135:11, 176:24

**checking** [1] - 66:9

**checks** [2] - 94:3, 116:18

**Chief** [1] - 39:23

**choose** [1] - 57:5

**Chris** [1] - 45:4

**CHRISTOPHER** [1] - 1:10

**CipherTrace** [2] - 17:18, 144:23

**circumstance** [2] - 68:3, 68:4

**circumstances** [3] - 61:4, 68:11, 68:12

**cite** [1] - 35:9

**cited** [1] - 151:25

**civil** [2] - 27:1, 30:4

**civil-style** [1] - 27:1

**CJA** [5] - 13:1, 13:13, 13:17, 13:18, 177:11

**claim** [5] - 171:5,

171:19, 173:10, 173:14, 173:24
**claiming** [3] - 8:13, 8:19, 71:2
**claims** [1] - 27:15
**classes** [3] - 95:2, 95:7, 95:25
**clear** [28] - 7:1, 8:2, 17:10, 17:11, 19:20, 29:15, 45:6, 46:1, 54:2, 54:7, 56:23, 69:10, 79:10, 80:4, 90:21, 107:4, 108:14, 109:4, 109:17, 118:9, 132:10, 133:21, 134:16, 134:18, 147:9, 155:10, 156:7, 179:10
**clearest** [1] - 96:13
**clearly** [2] - 120:18, 156:21
**clearnet** [4] - 8:21, 108:12, 108:20, 109:17
**clerk** [1] - 179:25
**client** [3] - 16:11, 132:22, 177:4
**client's** [1] - 16:9
**close** [3] - 5:13, 5:16, 145:22
**closed** [2] - 25:13, 25:20
**closely** [2] - 82:16, 149:24
**closer** [2] - 4:7, 105:15
**cluster** [6] - 85:6, 122:11, 144:14, 146:15, 146:16, 172:12
**clustering** [6] - 105:3, 122:15, 123:5, 146:20, 146:21, 146:23
**clusters** [1] - 144:12
**co** [21] - 62:4, 62:7, 62:9, 122:22, 122:24, 123:3, 123:19, 123:21, 126:2, 126:8, 127:3, 129:5, 146:25, 147:1, 147:5, 147:6, 147:11, 149:3, 150:22, 151:16, 151:21
**co-counsel** [1] - 126:2
**co-spend** [14] - 122:22, 122:24, 123:3, 123:19,

123:21, 126:8, 127:3, 129:5, 147:6, 147:11, 149:3, 150:22, 151:16, 151:21
**co-spending** [5] - 62:4, 62:7, 62:9, 146:25, 147:1
**co-spends** [1] - 147:5
**Coast** [2] - 178:4, 178:5
**Code** [1] - 96:22
**code** [10] - 15:15, 29:4, 29:9, 29:24, 30:11, 49:8, 49:12, 49:15, 72:13, 140:3
**coders** [1] - 139:14
**cognition** [2] - 33:16, 71:12
**Cognitive** [3] - 56:13, 56:17, 58:16
**cognitive** [76] - 36:5, 36:6, 36:8, 36:11, 37:3, 37:25, 38:14, 39:18, 39:22, 39:24, 40:5, 41:23, 42:12, 43:9, 43:25, 44:1, 45:8, 46:5, 46:7, 46:8, 48:8, 51:4, 51:7, 52:13, 53:9, 54:11, 54:14, 54:23, 55:7, 57:10, 58:14, 60:2, 62:10, 65:11, 70:22, 70:25, 71:21, 71:23, 72:5, 72:17, 72:21, 72:23, 73:13, 73:16, 74:6, 74:18, 74:20, 75:10, 76:6, 76:16, 78:9, 79:7, 79:10, 79:12, 79:13, 80:1, 80:5, 80:9, 82:5, 83:20, 84:1, 85:11, 85:22, 86:10, 86:18, 86:20, 87:7, 87:11, 87:20, 89:4, 89:7, 90:5, 90:17, 90:21, 90:25
**cognizant** [1] - 94:25
**coin** [3] - 108:7, 136:19, 137:22
**Coinbase** [2] - 138:6, 138:22
**coinjoin** [38] - 108:6, 127:4, 127:6, 127:8, 127:20, 128:12, 128:17, 143:15, 147:6, 149:20, 149:25, 150:2, 150:18, 151:1, 151:20, 151:24,

152:3, 152:9, 152:14, 152:25, 153:3, 154:8, 154:9, 155:16, 155:20, 155:21, 156:5, 156:13, 156:21, 157:11, 157:12, 157:19, 157:20, 158:6, 158:19, 158:20, 158:25, 159:4
**coinjoins** [19] - 127:14, 128:2, 128:11, 128:17, 129:5, 129:13, 147:16, 149:14, 149:19, 149:24, 150:19, 150:25, 151:7, 151:11, 151:12, 152:2, 152:13, 155:13, 158:4
**Cointelegraph** [1] - 136:9
**Coke** [1] - 124:18
**collaborate** [1] - 94:19
**collaborator** [1] - 63:25
**colleague** [2] - 120:22, 145:14
**colleagues** [2] - 120:5, 120:13
**collect** [1] - 64:13
**collecting** [1] - 114:24
**COLUMBIA** [1] - 1:1
**Columbia** [2] - 40:10, 56:23
**column** [1] - 136:9
**combination** [1] - 117:25
**comfortable** [11] - 75:13, 117:1, 119:19, 120:4, 120:14, 120:23, 121:1, 121:10, 134:21, 135:5, 172:22
**coming** [4] - 14:7, 20:8, 44:17, 48:11
**comment** [4] - 43:20, 52:8, 68:22, 68:23
**commerce** [1] - 139:9
**Commercial** [1] - 96:22
**commingles** [1] - 175:9
**Commission** [7] - 52:10, 52:16, 52:18, 72:12, 79:21, 79:24, 89:23

**commissioned** [3] - 10:18, 38:22, 38:23
**committee** [1] - 12:22
**common** [5] - 111:11, 147:3, 148:4, 148:23, 148:24
**commonalities** [1] - 37:19
**commonly** [5] - 147:2, 147:19, 149:5, 149:12
**communicates** [1] - 118:7
**community** [2] - 149:5, 149:6
**companies** [4] - 98:16, 100:3, 139:12, 157:16
**company** [11] - 56:13, 56:15, 56:16, 58:16, 58:23, 63:15, 63:24, 90:2, 90:7, 99:17, 146:16
**comparable** [2] - 165:18, 170:24
**compare** [1] - 78:17
**compared** [1] - 152:16
**comparing** [3] - 75:17, 146:4, 146:15
**comparison** [1] - 169:17
**compel** [4] - 15:12, 15:15, 28:25, 50:22
**compelling** [1] - 164:4
**competent** [3] - 34:2, 35:15, 37:6
**complaint** [1] - 12:17
**complete** [3] - 18:18, 67:5, 185:5
**completely** [2] - 8:21, 52:24
**complex** [2] - 39:1, 119:13
**complexity** [2] - 14:25, 76:13
**compliance** [3] - 95:1, 116:18, 157:17
**complicate** [1] - 87:15
**complicated** [5] - 39:1, 76:8, 78:22, 95:22, 101:19
**comply** [1] - 113:10
**component** [2] - 133:15, 143:21
**components** [3] - 132:14, 133:18, 133:24
**comprehensive** [1] - 159:24
**compressed** [1] -

21:16
**computer** [19] - 3:24, 4:13, 4:14, 5:8, 59:7, 72:13, 94:15, 94:19, 94:20, 96:15, 100:13, 118:5, 132:1, 132:4, 132:5, 132:7, 132:9, 139:13, 140:2
**computers** [2] - 98:8, 118:14
**concentration** [1] - 92:16
**concept** [2] - 36:10, 118:9
**concepts** [1] - 113:25
**concern** [1] - 89:5
**concerned** [2] - 16:22, 16:23
**concerns** [2] - 19:19, 20:6
**conclude** [3] - 28:1, 55:3, 68:14
**conclusion** [19] - 36:4, 38:7, 66:9, 72:2, 74:14, 76:18, 79:18, 81:1, 86:4, 86:5, 87:1, 87:2, 87:23, 88:11, 111:6, 112:9, 112:11
**conclusions** [5] - 62:17, 66:6, 80:21, 86:8, 142:5
**concrete** [1] - 35:21
**condition** [1] - 80:5
**conduct** [9] - 72:8, 85:5, 111:22, 139:23, 153:7, 153:9, 154:7, 161:9, 162:4
**conducted** [14] - 59:12, 65:9, 65:11, 65:14, 70:21, 140:13, 140:16, 141:10, 142:12, 142:13, 142:21, 144:12, 162:1, 162:3
**conducting** [2] - 94:5, 131:7
**conference** [4] - 21:4, 21:10, 24:4, 178:8
**Conference** [1] - 23:25
**conferring** [1] - 30:17
**confidence** [1] - 79:6
**confidential** [1] - 66:21
**confirm** [2] - 24:4, 24:6
**confirmation** [2] -

38:9, 46:14

**confirmed** [2] - 86:8, 152:15

**conflict** [1] - 22:17

**conflicted** [2] - 36:4, 119:7

**conflicting** [1] - 26:10

**conflicts** [1] - 94:3

**confound** [1] - 156:16

**confounds** [2] - 126:21, 129:13

**confuse** [1] - 101:11

**confusing** [1] - 74:23

**Congress** [1] - 132:17

**conjunction** [1] - 49:16

**connect** [2] - 39:7, 120:2

**connected** [4] - 102:12, 102:13, 102:14, 108:3

**connection** [1] - 99:17

**conservative** [1] - 105:13

**consider** [4] - 84:14, 117:3, 117:6, 143:25

**considerable** [3] - 64:5, 64:9, 64:25

**consideration** [3] - 12:23, 25:12, 25:19

**considered** [1] - 80:2

**consistent** [4] - 104:20, 106:14, 109:25, 112:6

**constitutes** [1] - 185:4

**Constitution** [2] - 1:22, 185:11

**constraints** [2] - 36:16, 71:16

**Consultants** [3] - 56:13, 56:17, 58:17

**contain** [1] - 61:2

**contained** [13] - 101:20, 109:14, 110:24, 129:22, 136:6, 140:20, 141:17, 141:19, 142:5, 144:18, 164:11, 166:14, 168:14

**contains** [5] - 10:16, 60:1, 61:11, 61:20, 62:9

**contamination** [1] - 82:13

**content** [1] - 54:22

**context** [23] - 26:7, 28:4, 62:13, 62:14, 62:17, 69:23, 69:25, 70:1, 70:7, 70:8,

70:9, 70:10, 75:6, 76:18, 80:18, 80:25, 87:24, 88:3, 88:23, 89:8, 111:4, 116:23

**contextual** [26] - 60:1, 60:12, 60:17, 61:2, 61:22, 61:24, 61:25, 62:9, 62:20, 65:25, 72:10, 73:24, 74:5, 74:10, 74:22, 74:25, 75:17, 76:4, 76:15, 76:22, 77:4, 77:7, 77:10, 77:15, 78:1, 89:16

**contingent** [2] - 22:13, 163:11

**continuance** [2] - 20:12, 20:16

**continue** [9] - 29:19, 44:21, 59:20, 67:19, 70:18, 98:9, 118:24, 144:5, 176:5

**continued** [1] - 145:2

**continues** [1] - 54:19

**continuing** [7] - 95:2, 95:5, 95:8, 95:13, 95:25, 97:14, 97:18

**contracts** [2] - 58:25, 90:4

**contrasted** [1] - 60:19

**contributed** [1] - 83:10

**control** [14] - 19:7, 19:16, 19:18, 42:11, 42:12, 99:10, 103:10, 113:19, 114:2, 124:4, 124:14, 126:17, 158:6

**controlled** [5] - 98:8, 98:13, 99:17, 116:1, 122:13

**controlling** [1] - 126:9

**controls** [5] - 98:3, 99:21, 100:22, 101:25, 124:10

**conversation** [2] - 30:7, 135:3

**conversations** [1] - 30:21

**conversion** [1] - 165:19

**converted** [1] - 111:19

**conveying** [1] - 84:22

**convicted** [3] - 83:3, 83:9, 84:8

**conviction** [5] - 83:4, 83:6, 83:11, 83:13, 83:15

**convictions** [2] -

83:19, 84:3

**cooperative** [1] - 42:5

**coordinate** [1] - 154:8

**coordinated** [1] - 151:7

**coordination** [1] - 150:20

**coordinator** [2] - 151:11, 153:18

**coordinators** [4] - 149:23, 150:7, 150:19, 157:6

**copies** [3] - 31:8, 31:20, 118:13

**copy** [4] - 31:18, 32:3, 118:15, 141:24

**copyright** [1] - 98:23

**core** [1] - 27:13

**corporate** [1] - 134:7

**correct** [105] - 5:11, 45:15, 45:18, 45:21, 46:3, 46:16, 54:21, 56:24, 57:2, 57:3, 57:15, 58:10, 59:3, 59:4, 60:21, 61:5, 62:24, 63:22, 65:9, 65:12, 66:2, 72:17, 72:25, 73:3, 73:10, 74:7, 77:4, 77:18, 79:9, 79:17, 82:19, 85:24, 86:10, 87:20, 88:13, 88:14, 89:21, 89:22, 95:15, 100:19, 103:25, 104:1, 107:5, 107:6, 109:19, 112:1, 118:20, 122:17, 122:18, 124:20, 124:21, 130:24, 132:12, 132:20, 133:1, 133:9, 133:10, 133:12, 134:5, 136:14, 136:16, 137:2, 137:5, 137:9, 137:11, 137:12, 137:16, 137:24, 139:3, 140:1, 140:3, 140:4, 140:9, 145:1, 146:12, 146:13, 147:10, 148:1, 148:10, 148:14, 148:20, 148:23, 148:25, 149:18, 149:19, 149:22, 150:4, 150:11, 150:18, 150:22, 150:25, 151:6, 151:14, 151:15, 152:10, 152:11,

152:17, 153:23, 154:14, 154:15, 155:11, 162:9, 171:7, 173:16

**correctly** [5] - 5:5, 8:20, 76:2, 103:19, 122:14

**corresponding** [1] - 73:18

**correspondingly** [1] - 150:16

**counsel** [28] - 3:4, 3:5, 3:18, 4:3, 4:15, 7:12, 7:21, 19:2, 19:25, 20:8, 22:11, 22:15, 26:20, 26:25, 29:15, 30:7, 57:13, 58:7, 126:2, 134:16, 135:3, 135:25, 136:1, 159:22, 159:23, 176:19, 179:12, 179:13

**counsel's** [2] - 6:2, 12:23

**counselor** [1] - 51:2

**count** [1] - 143:9

**counter** [1] - 147:24

**counter-example** [1] - 147:24

**countermeasures** [1] - 72:16

**countries** [4] - 34:16, 39:10, 58:10, 58:19

**country** [1] - 138:19

**counts** [1] - 142:19

**couple** [8] - 3:21, 16:4, 16:5, 25:7, 94:24, 149:7, 165:5, 166:14

**course** [8] - 6:7, 29:10, 30:12, 43:22, 84:4, 115:9, 121:23, 167:10

**courses** [2] - 97:15, 97:18

**court** [16] - 3:12, 38:19, 39:6, 39:9, 40:22, 43:2, 43:23, 56:24, 57:1, 57:2, 67:3, 67:17, 88:1, 88:7, 120:17, 158:13

**Court** [48] - 1:21, 1:21, 3:23, 4:6, 4:15, 7:11, 10:5, 10:22, 12:22, 13:7, 14:3, 14:11, 14:20, 14:24, 17:23, 18:23, 20:24, 24:24, 25:1, 25:4, 25:12, 25:14, 25:18, 27:3, 29:15, 29:17, 29:19,

31:8, 31:19, 39:12, 39:17, 39:22, 39:23, 41:3, 41:16, 44:18, 44:19, 50:17, 51:14, 55:1, 66:23, 73:11, 88:8, 92:12, 114:20, 118:4, 127:7, 185:10

**COURT** [194] - 1:1, 3:8, 3:10, 3:13, 3:16, 5:5, 5:15, 5:19, 6:4, 6:13, 6:17, 7:3, 7:19, 8:7, 9:17, 10:6, 10:13, 11:2, 11:11, 12:10, 13:3, 13:6, 13:19, 14:1, 14:5, 14:12, 14:17, 15:23, 16:5, 16:10, 16:22, 17:22, 18:3, 18:20, 19:6, 19:14, 20:17, 21:1, 21:11, 21:18, 21:21, 22:9, 22:20, 22:24, 23:7, 23:14, 24:9, 24:11, 24:16, 25:5, 25:9, 25:21, 25:24, 26:19, 27:6, 27:25, 28:18, 28:21, 29:12, 29:21, 30:1, 30:14, 30:23, 31:5, 31:10, 31:21, 32:1, 32:11, 32:16, 32:22, 40:9, 40:19, 40:23, 41:1, 41:7, 41:14, 41:17, 43:3, 43:5, 44:11, 44:15, 44:21, 44:23, 46:22, 47:8, 47:11, 47:25, 48:13, 49:2, 49:11, 49:14, 49:20, 50:6, 50:14, 51:1, 51:12, 51:15, 52:4, 52:9, 52:22, 53:20, 54:7, 54:21, 55:2, 67:1, 67:10, 67:16, 69:7, 70:3, 70:13, 70:18, 81:2, 81:5, 81:23, 84:24, 88:17, 90:10, 90:13, 91:5, 91:12, 91:17, 91:20, 92:4, 96:8, 97:7, 106:23, 117:10, 120:15, 120:20, 127:21, 128:6, 128:16, 128:19, 128:25, 131:3, 131:7, 131:9, 131:11, 131:14, 135:16, 138:5, 141:24, 142:1, 142:9, 143:1, 143:8, 143:13, 143:20, 144:3, 144:24, 145:7, 145:9,

154:17, 155:14, 156:22, 157:3, 158:13, 159:15, 160:1, 160:8, 160:14, 162:17, 163:12, 164:20, 165:11, 165:25, 166:16, 166:19, 167:12, 167:22, 168:1, 170:21, 175:20, 176:3, 176:9, 176:12, 176:21, 177:1, 177:8, 177:12, 177:20, 177:24, 178:1, 178:3, 178:5, 178:13, 178:17, 178:19, 178:24, 179:9, 179:18, 179:23, 180:6, 185:1

**Court's** [5] - 18:25, 19:12, 21:14, 26:23, 52:20

**courthouse** [1] - 96:24

**Courthouse** [1] - 1:22

**courtroom** [3] - 15:19, 15:20, 179:11

**COURTROOM** [9] - 3:2, 32:17, 32:20, 91:24, 92:2, 131:23, 179:20, 180:2, 180:4

**courts** [3] - 14:17, 39:4, 56:19

**cover** [1] - 4:9

**covered** [4] - 4:13, 28:17, 43:8, 81:4

**covers** [1] - 160:16

**CPA** [3] - 93:3, 93:5, 93:18

**CPAs** [2] - 93:11, 93:15

**crash** [1] - 65:5

**CRC** [2] - 1:21, 185:9

**create** [2] - 125:24, 162:14

**created** [3] - 93:10, 108:4, 109:5

**creates** [1] - 98:20

**creating** [1] - 94:6

**creation** [1] - 88:23

**creator** [1] - 173:11

**credentials** [1] - 43:8

**credible** [5] - 50:15, 154:1, 154:2, 172:3, 172:4

**crime** [6] - 78:17, 82:15, 86:22, 89:10, 110:11, 174:13

**crimes** [1] - 94:11

**Criminal** [2] - 1:2, 3:2

**criminal** [32] - 12:16, 73:23, 75:3, 75:16, 78:20, 82:4, 82:14, 84:3, 86:21, 89:1, 90:1, 110:17, 132:19, 132:20, 132:21, 132:23, 133:4, 133:5, 133:8, 133:12, 133:13, 133:15, 133:18, 133:22, 133:24, 134:1, 134:3, 134:25, 136:3, 136:4, 136:6, 171:25

**criminals** [2] - 86:23, 95:17

**critical** [1] - 17:15

**critique** [1] - 163:12

**critiqued** [1] - 149:12

**cross** [8] - 4:25, 5:3, 26:17, 26:21, 27:18, 82:13, 131:5, 131:7

**Cross** [2] - 2:6, 2:12

**CROSS** [2] - 44:24, 131:15

**cross-contamination** [1] - 82:13

**cross-examination** [2] - 5:3, 27:18

**Cross-Examination** [2] - 2:6, 2:12

**CROSS-EXAMINATION** [2] - 44:24, 131:15

**cross-examine** [3] - 4:25, 26:17, 26:21

**CRR** [2] - 1:21, 185:9

**crux** [2] - 18:13, 63:10

**crypto** [23] - 95:3, 95:7, 95:22, 97:3, 97:18, 97:19, 107:17, 107:25, 120:8, 135:22, 135:24, 137:8, 138:8, 138:24, 157:17, 159:13, 159:19, 160:21, 160:24, 161:3, 166:14, 173:5

**Crypto** [2] - 136:21, 136:22

**cryptocurrencies** [3] - 96:2, 107:22, 167:15

**cryptocurrency** [14] - 58:1, 95:1, 104:10, 132:23, 136:15, 136:17, 137:17, 137:21, 137:25, 138:16, 138:20,

139:24, 140:8, 162:19

**cryptographers** [1] - 139:13

**cryptography** [6] - 107:21, 139:6, 139:7, 139:11, 139:16, 140:10

**CSI** [1] - 64:22

**curious** [1] - 43:10

**currencies** [1] - 95:14

**current** [3] - 11:1, 28:8, 102:19

**cursorily** [1] - 27:8

**custody** [1] - 102:6

**custodying** [1] - 102:4

**customer** [1] - 106:24

**cut** [2] - 46:22, 53:21

**CV** [8] - 31:3, 31:4, 31:18, 32:4, 32:5, 32:7, 32:8

**CVA** [2] - 93:1, 93:21

**CVs** [2] - 31:2, 31:8

## D

**D.C** [4] - 1:5, 38:20, 38:23, 185:11

**DA** [2] - 82:15, 90:17

**danger** [2] - 38:1, 87:8

**dangerous** [2] - 129:17, 129:19

**dark** [2] - 109:15, 174:4

**darknet** [1] - 173:3

**data** [77] - 8:13, 10:2, 11:24, 15:7, 15:11, 18:8, 27:14, 36:2, 38:6, 38:8, 49:7, 53:16, 59:25, 60:1, 60:8, 60:16, 61:1, 61:6, 61:11, 61:14, 61:16, 61:18, 61:24, 62:18, 62:19, 63:1, 63:3, 63:8, 63:9, 64:2, 65:24, 66:4, 66:7, 66:10, 66:20, 69:3, 71:24, 74:1, 74:2, 78:4, 79:17, 79:20, 80:16, 80:19, 83:19, 85:15, 85:17, 85:19, 88:3, 88:5, 88:10, 89:18, 95:20, 96:15, 97:23, 99:18, 111:22, 112:22, 112:24, 112:25, 114:17, 117:1, 117:7, 117:8, 117:14, 117:16, 117:24, 117:25,

119:21, 119:22, 146:4, 153:24, 153:25, 154:3, 158:17, 163:7

**database** [1] - 8:10

**date** [25] - 4:7, 16:11, 17:6, 21:2, 21:3, 22:18, 24:2, 24:3, 42:25, 101:22, 135:10, 154:18, 155:3, 163:2, 163:23, 163:24, 164:1, 164:3, 166:3, 166:4, 166:22, 166:23, 166:25

**Dated** [1] - 185:7

**dates** [2] - 20:25, 115:10

**Daubert** [46] - 3:23, 4:7, 4:19, 5:3, 6:21, 7:2, 7:7, 7:8, 7:18, 9:9, 10:9, 15:2, 16:24, 17:2, 21:9, 21:12, 22:1, 22:3, 22:5, 22:12, 23:1, 23:4, 23:16, 23:17, 26:18, 27:1, 27:2, 27:9, 27:13, 27:19, 27:23, 28:23, 38:19, 38:20, 38:22, 38:24, 40:13, 47:18, 48:2, 48:5, 48:10, 48:25, 50:19, 52:5, 58:4, 177:13

**days** [7] - 15:24, 22:14, 25:22, 68:22, 127:15, 150:14, 164:11

**DC** [3] - 1:12, 1:14, 1:23

**DE** [1] - 6:15

**de** [5] - 3:24, 4:21, 6:11, 6:15, 6:19

**deadline** [2] - 20:19, 21:7

**deadlines** [1] - 177:17

**deal** [3] - 16:21, 115:25, 177:18

**dealing** [1] - 119:4

**death** [1] - 3:25

**December** [1] - 19:4

**decentralization** [1] - 118:10

**decentralize** [2] - 99:8, 99:14

**decentralized** [6] - 95:21, 96:14, 98:8, 100:20, 103:20, 118:19

**decide** [10] - 17:3,

33:20, 33:21, 44:1, 51:5, 69:22, 88:4, 99:18, 125:10, 125:25

**decided** [2] - 43:24, 44:3

**deciding** [1] - 53:10

**decision** [21] - 33:22, 33:23, 34:3, 34:7, 36:18, 38:12, 44:6, 44:19, 73:25, 75:8, 75:25, 76:12, 87:12, 87:18, 87:20, 87:25, 88:4, 89:11, 90:16, 91:4, 138:12

**decision-making** [5] - 33:22, 34:3, 34:7, 36:18, 87:12

**decisions** [2] - 33:18, 33:19

**declaration** [2] - 9:20, 84:9

**dedicated** [1] - 34:2

**deed** [1] - 96:23

**deems** [1] - 4:6

**Defendant** [2] - 1:6, 1:15

**defendant** [12] - 3:12, 3:15, 86:7, 89:2, 89:3, 89:9, 89:19, 160:19, 160:22, 161:22, 168:11, 168:20

**defendant's** [8] - 134:17, 162:2, 168:4, 168:12, 168:25, 171:6, 173:19, 173:20

**defendants** [1] - 132:21

**defenders** [2] - 40:6, 90:19

**Defense** [2] - 2:16, 32:13

**defense** [54] - 4:3, 4:11, 4:15, 4:20, 4:25, 5:13, 6:2, 6:10, 6:20, 7:5, 7:12, 18:18, 19:2, 19:7, 19:17, 19:18, 19:25, 20:8, 22:6, 23:18, 24:8, 25:7, 25:19, 26:20, 26:25, 27:22, 28:25, 29:15, 30:10, 31:1, 31:7, 31:24, 32:14, 38:22, 39:14, 40:14, 44:18, 44:20, 47:9, 47:10, 51:2, 51:14, 52:6, 54:8, 57:9, 57:12, 58:7,

83:6, 88:9, 91:22, 121:7, 176:19
**defense's** [1] - 20:13
**define** [4] - 106:23, 123:2, 132:17, 133:13
**definitely** [2] - 59:13, 85:25
**degree** [8] - 59:5, 59:6, 62:25, 79:4, 89:6, 92:13, 92:14, 93:19
**degrees** [4] - 33:3, 33:10, 92:18, 92:19
**delay** [1] - 15:10
**delayed** [2] - 17:8, 21:23
**delink** [1] - 108:1
**delisted** [1] - 138:9
**demonstrate** [3] - 106:5, 106:10, 123:9
**demonstrated** [4] - 62:21, 98:4, 123:12, 123:13
**DEPARTMENT** [1] - 1:13
**Department** [6] - 52:11, 132:25, 133:2, 145:23, 145:24
**department** [1] - 121:6
**department's** [1] - 153:5
**dependent** [1] - 50:1
**deploy** [1] - 123:16
**deposit** [1] - 107:9
**depositions** [1] - 27:1
**deposits** [2] - 104:5, 104:15
**depth** [1] - 115:19
**deputy** [1] - 179:25
**DEPUTY** [9] - 3:2, 32:17, 32:20, 91:24, 92:2, 131:23, 179:20, 180:2, 180:4
**derive** [1] - 124:22
**derived** [2] - 74:2, 85:9
**describe** [17] - 93:3, 101:21, 101:22, 103:13, 112:23, 117:22, 119:21, 136:1, 138:24, 139:4, 142:8, 142:21, 149:10, 152:5, 166:19, 175:2
**described** [24] - 102:18, 109:6, 116:24, 122:7, 129:14, 130:4,

134:10, 134:17, 135:2, 145:20, 148:8, 152:19, 152:24, 153:18, 158:1, 158:11, 159:11, 160:4, 162:6, 163:9, 166:10, 170:18
**describes** [3] - 111:15, 129:15, 129:17
**describing** [6] - 118:23, 130:25, 135:22, 149:11, 175:4
**description** [11] - 29:22, 97:11, 104:20, 119:1, 120:3, 135:25, 138:13, 144:17, 157:22, 159:24, 175:5
**descriptions** [1] - 161:8
**deserves** [1] - 17:16
**designation** [7] - 92:23, 92:24, 93:5, 93:6, 93:9, 93:17, 94:1
**designed** [5] - 98:7, 124:6, 150:23, 151:12, 151:24
**desk** [1] - 31:18
**despite** [1] - 86:18
**destination** [4] - 124:2, 124:3, 124:4, 125:23
**destinations** [1] - 163:10
**detail** [1] - 80:3
**detailed** [2] - 19:3
**details** [4] - 57:12, 66:22, 66:25, 89:6
**detect** [6] - 70:21, 70:25, 152:3, 152:13, 153:21, 158:6
**detective** [3] - 73:23, 77:5, 77:21
**detectives** [2] - 34:11, 82:11
**determination** [2] - 105:2, 164:9
**determinations** [1] - 94:16
**determine** [10] - 51:8, 63:19, 66:18, 69:9, 77:20, 77:21, 78:4, 104:18, 111:17, 169:21

**determined** [2] - 75:19, 75:20
**determining** [2] - 75:9, 75:18
**deterministic** [2] - 27:12, 121:20
**develop** [3] - 72:19, 100:5, 140:2
**developed** [1] - 99:23
**developers** [2] - 99:11, 99:24
**device** [1] - 161:5
**devices** [2] - 4:22, 161:5
**die** [1] - 102:10
**difference** [2] - 90:25, 172:11
**differences** [2] - 37:20, 80:18
**different** [63] - 4:22, 12:4, 12:17, 12:18, 28:12, 34:15, 34:24, 36:4, 36:11, 37:19, 37:20, 42:16, 43:9, 60:16, 62:14, 62:15, 63:2, 63:3, 63:5, 63:9, 63:23, 64:18, 65:25, 66:3, 66:4, 66:5, 66:6, 66:10, 69:2, 71:23, 72:1, 74:1, 74:14, 76:5, 76:18, 79:22, 80:17, 80:20, 80:21, 81:1, 82:15, 85:16, 85:18, 87:23, 91:1, 99:1, 99:2, 109:13, 122:4, 122:5, 125:21, 126:17, 127:8, 136:2, 148:1, 150:22, 151:12, 152:22
**differential** [4] - 170:5, 170:9, 170:12, 172:17
**differently** [2] - 72:1, 144:5
**differs** [1] - 151:16
**difficult** [7] - 26:7, 98:11, 98:15, 102:9, 128:10, 150:3, 170:4
**difficulties** [1] - 150:17
**digging** [1] - 31:17
**digital** [29] - 34:19, 34:21, 34:25, 36:2, 60:5, 60:6, 60:10, 62:11, 62:21, 62:23, 63:12, 63:17, 63:24, 64:1, 64:18, 64:20, 65:16, 66:12, 66:14,

66:17, 66:24, 66:25, 94:20, 95:14, 96:17, 103:20
**digits** [3] - 5:7, 5:9, 62:16
**diligent** [1] - 41:12
**dimension** [1] - 156:20
**dinner** [3] - 67:14, 67:17, 70:15
**Direct** [2] - 2:4, 2:10
**DIRECT** [2] - 32:24, 92:6
**direct** [9] - 10:24, 22:6, 29:8, 105:4, 143:1, 143:13, 144:18, 145:20, 147:24
**directed** [1] - 140:7
**directly** [8] - 27:9, 27:13, 27:19, 27:24, 29:11, 85:9, 140:11, 149:18
**disagree** [3] - 47:4, 50:17, 163:11
**disagreement** [4] - 9:9, 30:18, 50:18, 76:3
**disaster** [1] - 115:21
**discern** [1] - 169:25
**discernible** [1] - 169:22
**discipline** [1] - 72:23
**disclose** [5] - 41:5, 41:12, 83:7, 175:16
**disclosed** [9] - 9:15, 10:11, 10:12, 11:20, 27:18, 41:11, 49:6, 50:23, 51:19
**disclosure** [32] - 7:23, 9:24, 12:15, 20:9, 28:17, 36:20, 43:14, 45:11, 45:12, 45:15, 47:1, 47:23, 50:13, 50:20, 52:6, 81:7, 81:8, 82:21, 83:12, 111:16, 111:25, 112:3, 127:25, 128:15, 129:21, 141:22, 150:24, 151:25, 159:11, 160:18, 160:20, 173:10
**disclosures** [16] - 27:9, 29:5, 32:9, 54:25, 112:11, 127:17, 129:15, 130:5, 136:10, 141:8, 141:13, 141:14, 141:19,

144:18, 159:13, 159:17
**discovery** [16] - 29:1, 30:4, 46:14, 46:18, 47:23, 48:25, 49:2, 57:14, 57:18, 104:2, 104:3, 159:8, 160:2, 160:11, 161:4, 171:21
**discriminatory** [2] - 36:7, 36:15
**discuss** [3] - 3:18, 49:17, 179:6
**discussed** [6] - 29:14, 50:6, 50:7, 146:24, 149:12, 170:20
**discusses** [1] - 27:10
**discussion** [2] - 141:3, 162:6
**discussions** [6] - 7:11, 7:13, 30:17, 134:16, 140:22, 141:2
**dismiss** [1] - 25:17
**dismissed** [1] - 179:25
**distort** [1] - 63:16
**distorting** [1] - 81:8
**distorts** [1] - 36:17
**distributed** [1] - 98:9
**District** [2] - 40:10, 56:22
**DISTRICT** [3] - 1:1, 1:1, 1:8
**district** [5] - 13:17, 40:3, 43:2, 53:14
**divide** [1] - 148:10
**DNA** [9] - 37:2, 37:11, 64:20, 64:22, 65:16, 65:20, 65:21, 65:22, 71:14
**DNS** [1] - 8:20
**Docket** [1] - 43:15
**docket** [1] - 32:10
**Doctor** [1] - 67:20
**doctor** [3] - 37:2, 69:8, 69:14
**doctorate** [1] - 33:4
**doctors** [2] - 37:11, 71:15
**document** [7] - 29:9, 31:13, 52:13, 52:15, 84:19, 161:2, 161:8
**documenting** [2] - 30:12, 130:12
**documents** [7] - 106:5, 106:7, 141:18, 161:12, 161:23, 161:24, 177:16

**DOJ** [5] - 1:11, 34:13, 79:25, 121:5, 133:3
**dollar** [2] - 163:4, 166:7
**dollar-figure** [1] - 163:4
**dollars** [2] - 128:20, 172:7
**dollars'** [1] - 90:4
**domain** [13] - 34:8, 37:6, 61:8, 61:9, 64:17, 64:18, 65:23, 70:11, 71:17, 72:1, 73:5, 78:21, 88:3
**domains** [11] - 34:25, 37:20, 38:17, 38:18, 61:7, 64:17, 64:20, 65:14, 72:2, 76:9, 78:11
**donated** [1] - 125:12
**donations** [1] - 125:11
**done** [45] - 6:1, 6:8, 11:8, 16:4, 16:18, 16:20, 29:19, 34:12, 34:24, 35:3, 35:8, 38:15, 49:7, 50:11, 56:2, 56:12, 59:13, 60:4, 63:20, 64:2, 64:14, 65:23, 66:17, 80:16, 80:22, 80:23, 82:1, 88:6, 88:12, 90:7, 90:8, 90:23, 97:17, 134:25, 140:21, 141:15, 142:19, 142:20, 144:25, 162:24, 166:1, 172:10, 179:1, 179:6
**double** [1] - 24:7
**double-check** [1] - 24:7
**doubt** [1] - 67:22
**down** [18] - 12:6, 12:25, 16:3, 60:13, 60:23, 91:25, 100:9, 103:5, 115:6, 115:18, 117:11, 120:15, 139:1, 158:13, 166:1, 166:17, 169:13, 171:9
**down/bottom** [1] - 37:22
**download** [1] - 102:16
**dozens** [3] - 34:15, 57:6, 80:14
**DR** [4] - 2:3, 32:25, 44:25, 88:19
**Dr** [24] - 24:23, 31:3, 32:7, 32:15, 32:17,

33:2, 42:24, 43:17, 45:2, 47:5, 52:25, 53:24, 54:5, 54:10, 54:22, 55:6, 55:13, 67:12, 70:20, 81:7, 82:4, 88:21, 90:10, 91:5
**dramatically** [1] - 17:8
**draw** [2] - 77:3, 167:19
**dress** [3] - 68:8, 68:9
**drill** [1] - 60:13
**drive** [1] - 63:18
**driven** [1] - 85:15
**drives** [3] - 60:7, 64:1, 66:18
**dropped** [1] - 145:10
**DROR** [4] - 2:3, 32:25, 44:25, 88:19
**Dror** [25] - 24:23, 32:4, 32:15, 32:17, 33:2, 41:19, 42:24, 43:17, 45:2, 47:5, 52:19, 52:25, 53:24, 54:5, 54:10, 54:22, 55:6, 55:13, 67:12, 70:20, 81:7, 82:4, 88:21, 90:10, 91:5
**Dror's** [2] - 31:3, 32:7
**drug** [1] - 12:8
**due** [2] - 19:6, 84:21
**during** [8] - 6:7, 28:11, 73:20, 135:12, 135:13, 154:11, 168:5, 168:20

## E

**e-mailed** [2] - 31:19, 40:14
**early** [16] - 4:15, 6:6, 20:19, 21:20, 110:6, 115:11, 127:15, 129:6, 129:7, 129:10, 150:14, 163:6, 163:15, 164:10, 165:5, 167:7
**earned** [1] - 143:4
**easier** [6] - 93:20, 96:25, 103:14, 150:7, 151:7, 153:21
**easiest** [1] - 103:1
**easily** [6] - 102:17, 110:13, 124:6, 152:23, 153:2, 157:22
**easy** [4] - 12:13, 15:9, 105:5, 156:20
**eBay** [1] - 146:16
**economic** [3] - 97:4, 99:8, 99:10

**economics** [3] - 96:4, 96:8, 96:10
**economy** [2] - 96:12, 96:21
**educate** [4] - 43:25, 44:7, 90:18, 90:19
**educating** [1] - 90:17
**education** [11] - 90:20, 90:23, 95:3, 95:6, 95:8, 95:13, 95:25, 96:5, 97:2, 97:15, 97:18
**educational** [2] - 33:2, 92:11
**effect** [1] - 129:4
**effective** [1] - 52:14
**effectively** [3] - 134:21, 135:4, 139:1
**effects** [1] - 81:9
**efficacy** [4] - 78:8, 78:22, 79:1, 79:7
**efficiency** [2] - 178:6, 178:10
**efficient** [2] - 11:3, 13:18
**effort** [1] - 41:12
**efforts** [1] - 73:8
**eight** [3] - 10:14, 56:21, 148:13
**either** [7] - 25:13, 43:12, 48:18, 94:16, 103:1, 111:21, 128:24
**eKELAND** [1] - 41:18
**EKELAND** [94] - 1:15, 3:11, 7:20, 8:10, 9:18, 10:10, 10:15, 11:10, 11:16, 12:11, 13:5, 13:12, 13:21, 14:2, 14:9, 14:14, 14:20, 16:2, 16:8, 16:13, 17:9, 18:2, 18:4, 22:22, 23:5, 23:11, 24:8, 25:7, 25:10, 25:22, 26:13, 27:7, 28:22, 29:23, 30:10, 30:24, 31:7, 31:20, 32:6, 32:14, 32:21, 32:23, 33:1, 41:4, 41:10, 41:15, 42:23, 43:4, 43:13, 43:16, 44:22, 47:4, 47:10, 47:22, 48:4, 48:23, 49:4, 49:13, 49:16, 50:1, 50:12, 50:16, 51:13, 54:20, 54:24, 80:12, 81:3, 81:21, 88:20, 90:9, 91:10, 91:15, 91:22, 92:3, 92:5, 92:8,

97:9, 107:3, 117:18, 121:17, 129:1, 130:17, 130:19, 131:2, 141:25, 176:1, 176:23, 177:5, 177:9, 177:18, 177:22, 178:11, 178:15, 178:18
**Ekeland** [28] - 1:16, 2:5, 2:8, 2:11, 3:11, 7:19, 11:2, 15:23, 22:20, 27:6, 28:21, 29:21, 41:2, 46:23, 51:12, 54:9, 54:12, 54:18, 67:10, 81:2, 88:17, 91:20, 135:21, 136:7, 176:21, 177:2, 177:21
**elaborate** [4] - 35:12, 36:10, 41:24, 83:24
**element** [4] - 67:24, 68:19, 69:11, 155:8
**elicit** [1] - 28:16
**Elizabeth** [1] - 144:10
**email** [3] - 9:1, 9:2, 141:3
**emails** [12] - 60:7, 63:16, 63:18, 63:21, 63:23, 73:18, 74:5, 74:21, 141:3, 169:8, 169:9
**embezzlements** [2] - 94:12, 95:18
**emphasize** [3] - 28:15, 33:23, 44:16
**enables** [1] - 62:18
**End** [1] - 180:7
**end** [5] - 72:1, 95:22, 101:15, 156:2, 169:12
**endeavor** [1] - 35:25
**endemic** [1] - 97:5
**endorsed** [1] - 116:18
**ends** [1] - 134:20
**enforcement** [15] - 35:21, 35:23, 35:24, 58:9, 58:10, 58:11, 120:9, 121:4, 132:11, 132:16, 132:17, 132:19, 132:20, 132:24
**engaged** [2] - 113:8, 169:5
**engagement** [3] - 94:3, 134:10, 135:2
**enjoy** [1] - 174:25
**enter** [1] - 15:7
**entire** [5] - 9:12,

11:13, 17:13, 54:3, 99:16
**entirely** [5] - 12:1, 12:4, 19:17, 27:22, 50:1
**entities** [1] - 82:16
**entitled** [2] - 39:2, 47:5
**envelope** [1] - 105:5
**error** [29] - 8:2, 9:24, 12:3, 15:3, 27:11, 27:13, 27:20, 29:8, 35:7, 35:11, 35:13, 36:24, 38:15, 38:17, 38:21, 38:24, 38:25, 68:6, 68:10, 69:17, 69:18, 75:18, 79:6, 82:23, 123:8, 123:12, 143:17, 143:18, 147:23
**Error** [2] - 39:2, 39:3
**errors** [9] - 11:19, 15:6, 18:10, 35:6, 35:20, 35:22, 36:5, 37:14, 38:4
**especially** [4] - 44:16, 62:18, 76:17, 102:4
**essentially** [8] - 8:4, 9:25, 11:25, 17:20, 37:25, 87:3, 96:17, 169:17
**establish** [1] - 26:3
**established** [4] - 52:13, 71:10, 87:10, 100:2
**establishment** [2] - 100:3, 122:8
**estimate** [13] - 64:10, 64:16, 82:5, 105:12, 105:14, 105:15, 127:25, 128:3, 128:4, 128:13, 135:16, 165:19, 167:20
**estimates** [1] - 143:3
**Europe** [1] - 138:9
**evaluate** [4] - 16:15, 78:24, 81:15, 81:16
**evaluated** [1] - 141:5
**evaluating** [2] - 79:22, 140:24
**evaluation** [4] - 74:4, 75:8, 85:20, 85:22
**eve** [1] - 17:1
**event** [3] - 53:5, 54:17, 115:16
**eventually** [2] - 96:23, 96:25
**everyday** [4] - 33:19, 33:20, 36:6, 36:13

**everywhere** [1] - 79:11
**Evidence** [1] - 40:16
**evidence** [38] - 26:9, 26:10, 26:11, 31:2, 39:15, 46:13, 48:17, 52:14, 54:13, 69:1, 80:17, 80:24, 82:22, 83:7, 83:10, 86:16, 86:23, 94:17, 94:18, 107:11, 109:25, 110:25, 111:10, 111:23, 112:10, 123:13, 136:6, 140:19, 140:20, 141:17, 147:8, 153:20, 159:22, 162:16, 166:9, 172:7, 172:9
**evidentiary** [1] - 168:9
**eVoucher** [1] - 13:14
**exact** [6] - 26:21, 56:20, 127:23, 150:9, 150:10, 165:23
**exactly** [6] - 70:11, 148:8, 148:13, 149:21, 150:10, 155:3
**exaggerated** [1] - 83:9
**Examination** [6] - 2:4, 2:6, 2:7, 2:10, 2:12, 92:25
**EXAMINATION** [5] - 32:24, 44:24, 88:18, 92:6, 131:15
**examination** [11] - 5:3, 27:18, 28:10, 38:21, 38:25, 53:22, 54:3, 65:12, 67:6, 78:16, 79:25
**examinations** [1] - 38:16
**examine** [6] - 4:25, 18:15, 18:17, 26:17, 26:21, 72:8
**examined** [1] - 59:24
**examiner** [30] - 37:3, 38:23, 53:16, 60:7, 62:7, 63:25, 64:1, 65:18, 65:20, 65:22, 66:5, 66:7, 66:9, 73:20, 73:25, 74:9, 74:13, 74:14, 74:24, 75:7, 75:16, 75:20, 75:22, 75:25, 77:8, 78:2, 80:19, 89:8, 89:13, 89:20
**examiner's** [1] - 89:11
**examiners** [20] -

34:19, 35:14, 37:11, 38:4, 64:11, 64:19, 64:21, 64:22, 65:21, 65:25, 66:3, 66:8, 76:11, 80:17, 88:2, 88:8, 90:6
**Examiners** [1] - 93:1
**examining** [5] - 31:15, 59:24, 63:21, 79:22, 153:12
**example** [33] - 33:20, 34:6, 34:16, 35:7, 38:5, 39:2, 46:4, 46:11, 53:13, 53:18, 60:19, 61:11, 62:11, 63:20, 73:5, 73:17, 73:22, 74:3, 75:2, 77:10, 78:11, 82:14, 83:2, 83:21, 94:10, 112:13, 133:23, 139:11, 143:22, 147:24, 151:2, 175:3, 175:12
**examples** [5] - 35:21, 42:14, 70:12, 83:21, 87:15
**exceedingly** [1] - 148:3
**Excel** [1] - 98:1
**except** [1] - 170:1
**exceptions** [1] - 149:4
**exchange** [10] - 102:5, 106:20, 106:25, 107:15, 110:12, 114:22, 114:23, 115:1, 115:17, 138:21
**exchanges** [9] - 58:1, 113:4, 137:25, 138:8, 138:11, 138:16, 138:24, 157:17, 158:17
**excited** [1] - 95:4
**exclude** [2] - 39:15, 47:15
**exclusive** [2] - 121:4, 121:8
**excuse** [1] - 176:23
**excused** [1] - 91:6
**execute** [4] - 147:25, 148:6, 150:2, 155:21
**executed** [1] - 156:6
**executive** [1] - 132:18
**Exhibit** [6] - 31:3, 31:4, 32:7, 32:8, 32:9
**exhibit** [1] - 31:16
**exhibited** [1] - 173:12
**EXHIBITS** [1] - 2:15
**exhibits** [3] - 30:25,

31:14, 31:24
**Exhibits** [2] - 2:16, 32:13
**exist** [1] - 46:19
**existed** [1] - 108:6
**existing** [1] - 118:12
**exists** [8] - 44:1, 51:8, 74:20, 79:11, 86:20, 96:24, 99:20, 158:21
**exonerated** [1] - 83:3
**expand** [1] - 28:15
**expanded** [1] - 17:8
**expect** [9] - 62:13, 62:14, 105:13, 170:8, 170:14, 170:16, 172:18, 173:6, 173:8
**expectation** [7] - 4:5, 53:17, 70:8, 70:10, 74:2, 78:3, 78:5
**expectations** [5] - 66:6, 66:10, 67:22, 80:20, 88:23
**expected** [1] - 170:1
**expecting** [2] - 111:9, 111:13
**expenditure** [1] - 111:20
**experience** [9] - 36:21, 36:25, 59:2, 61:15, 82:18, 93:8, 96:1, 132:19, 170:18
**experiment** [4] - 65:24, 70:21, 80:16, 88:12
**experimental** [8] - 65:9, 65:10, 65:15, 66:12, 79:17, 82:8, 82:10, 101:8
**experiments** [4] - 65:11, 66:14, 66:17, 70:24
**expert** [94] - 5:1, 5:6, 6:19, 6:23, 7:6, 7:12, 9:15, 10:1, 10:3, 10:4, 11:1, 11:13, 11:14, 11:25, 12:13, 13:9, 14:4, 15:14, 17:14, 17:20, 17:25, 18:4, 18:16, 18:24, 19:3, 19:7, 19:8, 19:16, 19:19, 19:20, 19:22, 19:25, 20:3, 20:7, 20:18, 22:7, 22:10, 31:2, 32:9, 33:22, 34:3, 34:24, 36:20, 37:4, 39:12, 40:10, 40:14, 40:16, 43:14, 45:11, 45:12, 48:6, 48:7, 48:14,

48:20, 49:24, 50:20, 57:10, 71:11, 75:20, 77:5, 77:9, 81:7, 82:21, 85:1, 88:25, 89:17, 94:21, 104:15, 109:20, 111:25, 112:3, 123:3, 132:2, 132:4, 132:10, 132:11, 132:13, 133:3, 133:6, 133:23, 133:25, 134:2, 134:12, 134:15, 141:21, 142:11, 144:9, 144:10, 159:12, 159:17, 173:10
**expertise** [16] - 33:16, 36:25, 37:1, 37:5, 37:7, 37:9, 37:11, 53:5, 59:2, 59:8, 76:1, 89:15, 132:25, 133:19, 134:4, 173:11
**experts** [34] - 9:7, 12:2, 12:24, 17:12, 31:7, 31:24, 33:23, 33:24, 34:2, 34:5, 34:22, 35:4, 35:18, 36:1, 37:6, 42:6, 42:7, 42:8, 42:21, 49:17, 58:11, 65:18, 66:17, 71:19, 72:8, 79:24, 91:1, 132:8, 139:14, 140:22, 141:2, 141:4, 144:16, 179:22
**experts'** [1] - 144:19
**explain** [19] - 8:7, 13:6, 35:18, 46:11, 46:13, 46:18, 62:1, 63:11, 70:12, 75:23, 82:22, 83:1, 114:20, 118:3, 121:18, 127:6, 141:14, 141:16, 167:19
**explained** [1] - 81:14
**explanation** [1] - 93:10
**explore** [1] - 63:19
**explorer** [5] - 59:17, 119:25, 120:2, 146:5
**Explorer** [1] - 59:18
**explorers** [4] - 102:17, 140:18, 140:20, 141:20
**exposed** [5] - 74:9, 74:14, 74:24, 76:14, 87:17
**express** [3] - 46:2,

71:23, 71:25
**extended** [1] - 20:1
**extensive** [2] - 81:11, 81:20
**extensively** [2] - 20:13, 29:14
**extent** [9] - 5:22, 28:6, 43:13, 46:24, 71:2, 75:7, 76:16, 114:2
**extents** [1] - 98:5
**extra** [2] - 61:3, 72:3
**extraneous** [5] - 60:1, 61:5, 61:11, 62:9, 74:5
**extrapolating** [2] - 71:4, 82:18

**F**

**face** [1] - 6:1
**Facebook** [1] - 99:15
**facilitate** [1] - 150:7
**facilitated** [1] - 149:23
**facilitating** [1] - 150:1
**fact** [23] - 5:7, 6:24, 8:4, 9:10, 9:13, 10:7, 17:7, 19:6, 38:19, 39:18, 43:8, 64:12, 68:15, 74:11, 75:1, 75:24, 76:3, 86:2, 121:25, 123:22, 124:12, 125:15, 151:25
**facts** [10] - 14:22, 19:6, 26:3, 36:3, 46:6, 52:2, 52:3, 54:14, 87:10, 125:4
**factual** [1] - 5:22
**failing** [1] - 20:9
**fair** [29] - 28:21, 37:15, 37:24, 57:4, 58:5, 60:3, 64:6, 64:24, 67:8, 71:4, 71:5, 74:4, 74:18, 83:13, 83:25, 103:18, 118:15, 126:7, 127:14, 130:24, 141:10, 141:12, 141:13, 143:18, 154:7, 155:7, 156:13, 156:15, 171:11
**fairly** [6] - 18:15, 26:4, 100:25, 105:12, 108:17, 170:24
**faith** [1] - 30:17
**fake** [1] - 173:15
**fall** [2] - 37:6, 38:13
**fallacies** [2] - 42:1, 42:2

fallacy [2] - 42:6, 84:5
false [6] - 27:21, 27:22, 83:10, 98:12, 152:16, 152:17
falsity [1] - 162:15
familiar [11] - 43:17, 61:14, 62:3, 73:5, 93:4, 117:19, 121:13, 122:5, 127:4, 145:18, 174:18
families [2] - 120:8, 120:10
fancy [2] - 121:22, 122:15
far [12] - 5:1, 11:15, 20:23, 50:10, 67:21, 147:17, 154:19, 155:1, 160:1, 160:6, 160:10, 163:1
fascinates [1] - 113:21
fast [2] - 120:17, 156:6
FBI [12] - 3:24, 4:13, 34:15, 35:1, 35:2, 35:5, 35:6, 35:10, 35:14, 64:12, 84:10, 144:9
features [1] - 159:4
February [1] - 34:23
Federal [1] - 40:16
federal [1] - 38:19
Federalist [1] - 97:20
fee [6] - 105:9, 157:8, 169:18, 170:9, 171:5, 172:12
fees [36] - 55:15, 56:1, 56:2, 56:14, 104:6, 104:16, 104:19, 105:1, 105:12, 105:13, 105:14, 105:20, 106:9, 106:13, 107:9, 110:20, 111:7, 114:8, 127:11, 157:5, 157:6, 157:10, 166:12, 170:1, 170:4, 170:20, 170:21, 171:10, 171:13, 171:16, 171:17, 171:20, 172:1, 172:3, 172:18
fellow [2] - 140:22, 144:16
felt [2] - 41:24, 115:25
few [15] - 18:22, 42:10, 42:14, 45:5, 57:6, 57:16, 78:14, 91:17, 95:4, 97:17, 104:22, 106:18, 122:6,

165:21, 167:16
few-minute [1] - 91:17
field [12] - 66:14, 70:22, 71:3, 71:6, 73:3, 77:2, 88:13, 93:12, 93:14, 95:1, 139:12, 149:8
fight [1] - 137:13
fighter [1] - 37:2
fighting [1] - 47:25
figure [11] - 5:23, 28:6, 102:8, 102:24, 105:11, 128:7, 128:10, 163:4, 166:7, 166:21, 177:7
file [13] - 5:8, 15:12, 15:15, 22:6, 25:21, 28:25, 29:2, 30:18, 48:13, 48:19, 49:24, 50:19, 50:22
filed [18] - 9:14, 9:15, 9:17, 9:25, 10:14, 12:5, 19:4, 22:10, 25:14, 25:15, 25:17, 26:17, 32:9, 45:11, 50:14, 84:11, 129:22, 170:18
files [4] - 57:20, 58:2, 66:18
filing [8] - 18:23, 25:11, 26:1, 26:5, 26:15, 28:15, 28:22, 29:8
filings [1] - 171:25
final [2] - 87:18, 87:20
finance [1] - 95:21
financial [23] - 57:22, 81:9, 92:16, 93:7, 94:4, 94:9, 94:11, 109:24, 111:11, 116:11, 116:15, 117:7, 122:3, 132:6, 133:19, 134:2, 160:18, 160:20, 162:1, 162:2, 162:4, 162:7
Financial [3] - 92:23, 95:11, 95:12
FinCEN [1] - 6:23
findings [2] - 78:5, 80:20
fine [8] - 21:1, 23:14, 31:21, 43:12, 49:21, 52:23, 52:24, 176:11
fingerprint [15] - 60:19, 61:1, 61:3, 61:4, 61:6, 64:11, 64:22, 65:12, 65:16, 65:21, 71:14, 75:16, 75:19, 75:22

fingerprinting [3] - 36:1, 65:20, 75:2
fingerprints [3] - 75:4, 75:17
finish [5] - 70:20, 119:18, 129:2, 139:18, 179:3
finished [1] - 44:13
finishing [1] - 176:3
Finland [1] - 58:21
firearm [2] - 38:24, 65:22
firearms [1] - 38:21
firm [1] - 120:6
firms [1] - 149:7
first [28] - 3:22, 4:1, 11:20, 17:10, 23:22, 25:6, 29:17, 30:23, 50:10, 50:12, 58:2, 71:4, 71:9, 74:8, 76:8, 77:16, 85:12, 104:22, 104:23, 107:24, 115:18, 130:9, 135:20, 163:6, 165:21, 169:25, 173:19
Fischbach [5] - 9:6, 24:23, 176:8, 178:4, 178:25
Fischbach's [3] - 32:4, 32:8, 144:20
fit [1] - 63:8
five [9] - 17:18, 91:15, 135:14, 148:12, 151:9, 151:10, 177:5, 178:21
fix [1] - 131:24
flawed [1] - 83:9
flight [1] - 177:6
flipping [1] - 41:8
Floor [1] - 1:17
fluid [1] - 64:15
flying [1] - 37:1
focus [3] - 33:15, 44:19, 160:4
focused [3] - 30:8, 30:9, 93:21
focuses [2] - 5:11, 72:16
Fog [37] - 8:20, 85:6, 85:10, 104:7, 104:17, 104:19, 104:25, 105:1, 105:7, 105:9, 105:20, 106:13, 106:15, 107:8, 107:14, 107:16, 110:12, 110:14, 110:18, 111:7, 113:13, 143:5,

164:12, 164:14, 164:18, 165:10, 166:11, 167:13, 167:17, 169:18, 171:5, 171:10, 172:2, 172:12, 173:7, 173:11, 174:15
folks [1] - 94:24
follow [7] - 24:24, 25:3, 52:7, 88:21, 89:24, 94:10, 109:1
follow-on [1] - 24:24
follow-up [1] - 25:3
followed [4] - 24:23, 72:9, 116:3, 180:8
following [7] - 74:19, 82:11, 82:21, 82:25, 86:12, 142:12, 173:10
follows [1] - 164:2
FOR [1] - 1:1
Force [2] - 34:7, 37:10
foregoing [1] - 185:4
foremost [1] - 3:22
forensic [103] - 6:22, 34:19, 34:22, 35:4, 35:6, 35:11, 35:13, 35:14, 35:20, 35:22, 36:24, 37:24, 38:4, 38:15, 38:23, 52:14, 58:11, 58:12, 59:24, 60:6, 60:16, 60:25, 61:6, 61:7, 61:9, 62:12, 63:25, 64:1, 64:6, 64:13, 64:14, 64:17, 64:18, 64:19, 64:23, 65:14, 65:16, 65:17, 65:18, 65:23, 66:24, 68:23, 68:25, 71:24, 72:20, 72:23, 73:20, 73:25, 75:20, 75:25, 76:5, 76:6, 76:9, 76:11, 77:6, 78:2, 78:15, 79:14, 79:15, 79:24, 80:15, 80:19, 81:10, 82:15, 82:23, 83:10, 86:8, 86:17, 88:2, 88:23, 88:25, 89:3, 89:8, 89:11, 89:12, 89:18, 89:20, 90:2, 90:6, 93:7, 93:11, 93:13, 93:15, 94:4, 94:5, 95:5, 95:7, 97:16, 111:5, 111:11, 116:10, 116:11, 116:15, 116:22, 117:5, 121:23, 132:6, 134:2, 134:6,

162:15
Forensic [6] - 52:11, 52:16, 52:18, 72:12, 79:21, 89:23
forensically [6] - 111:7, 111:9, 112:8, 112:12, 117:3, 117:6
Forensics [4] - 92:23, 95:11, 95:12, 136:22
forensics [45] - 9:12, 12:2, 17:14, 34:4, 34:14, 34:21, 34:25, 35:24, 36:2, 60:5, 60:11, 62:21, 62:23, 63:12, 65:16, 66:12, 66:15, 68:5, 93:7, 94:9, 94:15, 94:19, 94:20, 95:3, 95:9, 95:22, 97:3, 97:19, 109:24, 111:11, 115:3, 120:8, 121:13, 122:3, 132:4, 132:5, 132:7, 132:10, 135:24, 136:17, 149:7, 173:5
forget [3] - 7:25, 96:5, 122:19
form [9] - 15:9, 54:1, 72:4, 72:6, 82:5, 111:18, 128:12, 137:17, 160:9
formation [1] - 74:25
formed [8] - 44:11, 45:9, 46:24, 47:3, 47:13, 47:20, 48:16, 53:24
former [1] - 4:13
forming [1] - 108:11
forms [3] - 13:8, 13:13, 43:9
forth [6] - 18:18, 26:4, 46:2, 46:25, 48:14, 48:20
forum [1] - 114:23
forward [1] - 120:9
foundation [4] - 107:20, 139:4, 139:5, 139:6
Foundation [3] - 137:11, 137:15, 139:2
four [1] - 17:18
frame [3] - 78:3, 154:11, 154:25
framing [1] - 107:16
frankly [7] - 6:5, 11:14, 16:12, 26:6, 26:25, 133:21, 162:13
Fraud [3] - 34:17,

92:25, 93:1
**fraud** [5] - 34:18, 94:11, 94:13, 95:1, 95:9
**fraudulent** [1] - 66:19
**freedom** [1] - 63:1
**Friday** [2] - 10:4, 177:16
**friend** [1] - 150:3
**front** [10] - 31:13, 31:22, 31:24, 32:3, 37:17, 45:13, 105:25, 141:23, 142:2, 152:18
**fronts** [1] - 12:8
**frozen** [1] - 134:17
**fruits** [1] - 175:1
**FTX** [2] - 115:13, 115:16
**full** [10] - 4:4, 12:15, 47:23, 112:20, 136:23, 162:1, 162:4, 164:12, 165:23, 185:5
**full-time** [1] - 4:4
**fully** [1] - 40:8
**fulsome** [1] - 135:6
**function** [1] - 53:9
**functions** [2] - 140:11, 140:12
**fund** [1] - 122:9
**fundamental** [2] - 14:22, 71:13
**fundamentally** [2] - 14:21, 28:7
**funded** [1] - 35:5
**funding** [2] - 13:1, 13:4
**funds** [11] - 85:6, 85:9, 107:13, 139:6, 139:13, 140:10, 171:5, 173:18, 174:24, 175:9, 175:13
**future** [3] - 97:1, 101:8, 108:1

### G

**gambling** [2] - 175:8, 175:9
**gaming** [1] - 96:19
**gamut** [1] - 94:22
**gatekeepers** [1] - 99:9
**Gathering** [1] - 114:24
**Gemini** [2] - 138:7, 138:23
**General** [1] - 34:9
**general** [10] - 42:2, 51:6, 54:4, 67:20,

71:17, 73:4, 86:13, 96:1, 104:13, 115:11
**generalizing** [1] - 62:22
**generally** [14] - 51:21, 53:8, 54:11, 54:23, 86:1, 90:16, 93:8, 102:13, 103:12, 135:24, 139:15, 149:20, 157:16, 158:4
**generate** [1] - 123:15
**generated** [2] - 162:21, 175:8
**generating** [1] - 121:15
**genius** [2] - 98:3, 98:6
**German** [1] - 161:19
**Germany** [1] - 161:18
**given** [33] - 10:7, 11:14, 11:24, 11:25, 15:7, 15:9, 17:7, 26:15, 28:22, 29:5, 29:7, 36:2, 62:21, 72:13, 73:12, 73:15, 73:17, 74:18, 78:5, 79:14, 80:5, 80:9, 80:24, 85:14, 88:23, 97:15, 112:13, 115:17, 128:9, 134:23, 155:21
**Glave** [3] - 6:22, 104:15, 112:1
**gold** [1] - 68:9
**googleable** [1] - 97:21
**government** [67] - 3:5, 3:22, 4:8, 4:18, 6:19, 8:19, 9:10, 9:12, 10:19, 12:15, 15:8, 16:8, 16:14, 16:23, 17:12, 17:21, 18:9, 18:16, 19:19, 19:20, 20:4, 20:11, 20:15, 21:6, 21:8, 22:5, 22:16, 23:18, 24:10, 24:14, 26:2, 26:11, 28:16, 29:1, 29:18, 29:24, 30:7, 30:18, 31:1, 31:24, 34:18, 36:21, 41:20, 43:11, 50:2, 50:9, 50:13, 50:14, 50:22, 51:13, 58:13, 72:20, 82:1, 90:4, 104:6, 105:6, 105:7, 106:13, 110:18, 129:22, 132:16, 147:7, 159:25, 163:9, 171:19, 171:23, 172:1

**Government** [1] - 92:16
**government's** [35] - 9:14, 11:9, 12:2, 15:20, 17:13, 18:13, 18:19, 19:2, 25:10, 36:19, 46:14, 46:18, 81:10, 81:11, 81:19, 104:13, 104:14, 104:25, 106:4, 107:13, 107:15, 110:25, 111:6, 111:23, 111:25, 112:10, 140:18, 142:22, 162:16, 163:13, 166:13, 167:17, 167:18, 168:14, 171:4
**Gox** [25] - 8:10, 8:13, 8:25, 25:2, 112:22, 114:17, 114:19, 114:21, 114:22, 114:25, 115:6, 115:19, 116:1, 116:2, 116:4, 116:5, 116:7, 116:9, 116:23, 117:1, 117:7, 117:8, 117:14, 117:16, 163:7
**grab** [1] - 20:24
**grand** [1] - 29:20
**grant** [1] - 64:12
**grants** [4] - 35:5, 56:15, 121:5, 145:25
**great** [4] - 17:3, 33:9, 69:19, 76:10
**green** [1] - 68:8
**grew** [2] - 93:12, 163:24
**ground** [1] - 146:15
**grounds** [2] - 7:1, 51:22
**group** [4] - 79:24, 98:7, 98:8, 98:14
**growing** [1] - 95:1
**grows** [1] - 98:14
**growth** [8] - 162:21, 163:1, 163:3, 163:17, 163:19, 164:6, 164:23, 166:5
**guards** [1] - 100:16
**guess** [18] - 17:5, 19:14, 21:20, 23:2, 24:3, 28:8, 45:17, 58:22, 69:16, 93:10, 105:4, 116:11, 117:13, 121:22, 165:25, 167:14, 172:11, 177:9

**guesses** [7] - 37:25, 38:2, 38:3, 38:13, 121:24, 157:18, 167:6
**guesswork** [2] - 121:23, 122:15
**guilty** [5] - 53:14, 66:20, 73:24, 77:6, 77:22
**guy** [1] - 77:6

### H

**hack** [2] - 106:20, 116:25
**hacked** [4] - 115:9, 116:2, 116:25, 120:8
**hacking** [2] - 97:6, 132:2
**hacks** [1] - 116:7
**half** [5] - 67:8, 83:8, 134:11, 134:12, 135:1
**hallmarks** [1] - 46:8
**hand** [7] - 15:7, 32:18, 41:19, 59:12, 91:25, 169:18, 169:19
**handwriting** [2] - 36:1, 65:16
**haphazard** [1] - 31:11
**happy** [10] - 27:5, 40:24, 43:13, 54:3, 59:20, 66:23, 83:24, 91:8, 176:10, 179:17
**hard** [18] - 31:8, 31:20, 35:17, 50:21, 60:7, 63:18, 64:1, 66:18, 78:10, 82:25, 100:2, 103:17, 106:16, 116:10, 120:17, 169:25, 170:11, 175:25
**hard-working** [1] - 35:17
**harkens** [1] - 93:14
**Harvard** [3] - 33:4, 92:14, 92:15
**hash** [2] - 61:20, 101:21
**hashing** [1] - 97:23
**Hassard** [4] - 3:15, 135:21, 136:7, 177:2
**HASSARD** [5] - 1:16, 3:14, 177:6, 177:15, 179:22
**Hassard's** [1] - 126:3
**hate** [1] - 98:17
**head** [5] - 65:18, 115:17, 128:14, 162:10, 162:11

**healthcare** [1] - 34:8
**hear** [16] - 18:20, 24:24, 25:2, 25:4, 33:6, 33:7, 33:8, 36:13, 45:2, 45:3, 47:18, 51:23, 57:11, 73:14, 88:10, 129:18
**heard** [4] - 43:6, 101:2, 135:23, 158:10
**hearing** [40] - 4:1, 4:7, 7:7, 7:8, 7:11, 10:9, 14:10, 16:24, 16:25, 21:9, 22:5, 22:12, 22:18, 26:2, 27:19, 28:9, 29:14, 32:12, 38:19, 38:21, 38:22, 38:24, 40:13, 47:19, 48:2, 48:6, 48:11, 48:25, 49:25, 50:7, 52:6, 54:4, 58:4, 86:7, 125:10, 125:16, 168:9, 176:13, 176:17, 184:21
**HEARING** [2] - 1:4, 1:7
**hearings** [14] - 3:23, 17:2, 21:12, 22:1, 23:16, 23:17, 26:18, 28:9, 28:23, 50:19, 168:5, 168:9, 168:21, 177:14
**Heather** [1] - 153:5
**heck** [1] - 172:9
**height** [2] - 102:19, 112:17
**heirs** [1] - 102:10
**held** [1] - 136:5
**Held** [2] - 120:6, 120:22
**hello** [1] - 91:24
**help** [7] - 44:18, 77:7, 77:24, 93:11, 120:11, 160:9, 177:21
**helpful** [10] - 13:22, 21:16, 27:3, 51:23, 70:13, 97:7, 97:10, 142:16, 160:14, 168:1
**helps** [4] - 93:15, 97:3, 97:4, 122:11
**hereby** [1] - 185:3
**hesitate** [2] - 171:15, 172:19
**heuristic** [36] - 43:17, 49:5, 53:6, 62:4, 121:19, 121:22, 122:1, 122:10,

**Appx879**

122:11, 122:20, 122:25, 123:4, 123:20, 123:21, 125:7, 125:9, 125:19, 125:24, 126:4, 126:8, 127:3, 129:5, 129:11, 129:13, 129:16, 130:11, 147:1, 147:18, 149:3, 149:4, 152:3, 152:12, 152:14

**heuristics** [26] - 29:6, 43:18, 49:18, 50:3, 119:10, 119:14, 119:15, 121:12, 121:14, 122:4, 122:25, 125:5, 125:6, 126:11, 130:12, 130:14, 130:22, 143:11, 145:19, 146:21, 146:22, 146:25, 147:11, 152:8, 156:16, 156:18

**hiatus** [1] - 169:2
**hidden** [2] - 103:6, 111:12
**hide** [2] - 110:3, 136:22
**Hide** [1] - 136:20
**high** [3] - 54:22, 68:6, 114:8
**higher** [2] - 53:8, 55:7
**highlight** [1] - 82:23
**highly** [3] - 35:15
**himself** [2] - 160:23, 175:10
**hire** [2] - 33:21, 88:2
**historical** [2] - 167:2, 167:5
**history** [5] - 5:8, 105:22, 108:2, 129:16, 158:19
**hit** [1] - 112:16
**hold** [11] - 31:5, 92:22, 92:24, 93:5, 93:9, 131:23, 132:9, 132:13, 133:3, 133:22, 136:24
**holiday** [1] - 33:21
**Homeland** [1] - 145:24
**homicide** [1] - 34:10
**honest** [1] - 135:7
**honey** [1] - 119:24
**honey-pot** [1] - 119:24
**Honor** [90] - 3:6, 3:11, 3:14, 3:20, 7:20, 9:18, 10:10, 10:15, 10:18, 11:10, 11:16,

12:11, 13:12, 13:21, 13:25, 14:2, 14:9, 16:2, 16:8, 16:13, 17:9, 18:2, 18:4, 18:14, 18:22, 19:10, 19:18, 22:8, 22:23, 23:5, 23:13, 24:8, 24:15, 24:21, 25:7, 26:13, 26:20, 27:7, 28:14, 28:20, 28:22, 29:13, 30:24, 31:7, 31:23, 32:6, 32:14, 32:21, 41:4, 42:23, 44:22, 47:4, 47:22, 48:23, 50:12, 50:16, 51:16, 54:2, 54:20, 54:24, 55:11, 67:7, 80:12, 81:22, 88:15, 90:9, 91:11, 91:15, 91:22, 92:3, 128:13, 130:18, 131:2, 141:25, 143:7, 143:19, 144:6, 159:21, 166:8, 175:22, 176:1, 176:6, 177:22, 178:22, 179:7, 179:15, 179:16, 180:2, 180:3, 180:5

**honorable** [2] - 43:24, 44:3
**HONORABLE** [1] - 1:8
**hop** [1] - 126:24
**hope** [4] - 4:14, 99:11, 99:13, 179:2
**hopefully** [1] - 112:23
**hopes** [1] - 99:7
**hoping** [1] - 83:5
**hops** [4] - 126:15, 157:19, 158:9, 158:20
**horribly** [5] - 129:17, 129:19, 130:11, 130:23, 131:1
**Hospital** [1] - 34:9
**host** [4] - 10:2, 13:16, 14:2, 15:16
**hotel** [1] - 177:10
**hour** [6] - 67:8, 67:13, 134:10, 134:12, 135:2, 179:3
**hours** [11] - 16:4, 16:5, 64:12, 64:16, 96:5, 96:6, 135:9, 135:12, 135:13, 135:16, 135:18
**house** [2] - 96:24, 103:6
**housekeeping** [2] - 3:21, 30:25

**huge** [3] - 60:7, 60:8, 62:18
**human** [12] - 33:16, 36:16, 42:22, 53:9, 71:12, 71:15, 71:16, 71:18, 71:22, 79:12, 82:23, 87:12
**hundreds** [5] - 64:12, 64:16, 83:3, 90:3, 118:13
**hypotheses** [1] - 69:2
**hypothesis** [4] - 38:8, 163:18, 164:4, 164:22
**hypothesizing** [1] - 166:5
**hypothetical** [4] - 84:25, 85:1, 85:2, 175:7
**hypothetically** [3] - 85:5, 85:12, 165:12
**hypotheticals** [1] - 109:23

## I

**ID** [2] - 78:12, 78:14
**idea** [6] - 59:13, 61:17, 88:7, 98:22, 127:8, 165:14
**ideas** [2] - 99:4, 101:7
**identifiable** [6] - 101:9, 157:14, 157:21, 157:22, 157:23, 157:24
**identified** [3] - 13:3, 19:21, 158:2
**identifies** [1] - 158:25
**identify** [5] - 65:11, 103:23, 150:24, 151:8, 151:10
**identifying** [1] - 101:5
**identity** [2] - 99:22, 101:2
**illegal** [2] - 98:24, 175:8
**illicit** [5] - 12:8, 110:10, 111:17, 163:10, 163:11
**illusion** [1] - 42:11
**illustration** [1] - 83:22
**images** [1] - 161:5
**imagine** [1] - 68:11
**immoral** [1] - 42:3
**immune** [1] - 42:7
**impacted** [1] - 70:6
**impacts** [1] - 70:1
**implicit** [1] - 36:14
**important** [6] - 40:1, 41:24, 90:24,

108:11, 121:11, 121:23
**improve** [2] - 35:8, 72:24
**IN** [1] - 1:1
**in-depth** [1] - 115:19
**inaccurate** [7] - 80:6, 80:9, 98:12, 138:14, 139:22, 152:19, 155:2
**inappropriate** [1] - 77:8
**inauthentic** [2] - 8:11, 8:25
**incarcerated** [2] - 16:11, 20:14
**incentives** [1] - 81:9
**incentivizes** [1] - 98:7
**inclination** [1] - 28:8
**includes** [4] - 64:20, 132:14, 133:23, 158:18
**including** [13] - 4:12, 7:13, 31:25, 33:3, 34:25, 35:7, 42:20, 80:15, 80:23, 82:6, 109:7, 132:23, 134:25
**income** [7] - 111:13, 111:23, 162:21, 168:23, 169:18, 171:5, 172:12
**incompetence** [2] - 37:4, 37:8
**incompetent** [1] - 33:24
**inconsistent** [3] - 106:11, 107:12, 107:15
**incorrect** [9] - 42:22, 77:5, 77:19, 79:16, 80:11, 86:11, 87:5, 144:14
**increase** [2] - 150:15, 150:17
**incredible** [1] - 172:17
**incredibly** [3] - 13:2, 13:14, 29:16
**indeed** [1] - 86:6
**independent** [6] - 88:8, 140:14, 141:11, 158:21, 158:24, 159:3
**independently** [3] - 117:15, 140:21, 152:6
**index** [1] - 43:1
**indicate** [1] - 174:14
**indicated** [2] - 25:1, 47:16

**indictment** [4] - 136:4, 136:6, 171:25
**indirectly** [3] - 85:10, 111:12, 140:10
**individual** [10] - 42:5, 89:20, 123:6, 125:21, 141:19, 143:23, 144:11, 144:12, 151:6, 169:7
**individuals** [4] - 98:15, 125:21, 128:11, 169:7
**industry** [1] - 99:5
**inference** [4] - 103:4, 103:8, 110:23, 158:3
**influence** [5] - 38:12, 75:7, 82:16, 87:18, 87:25
**influenced** [1] - 76:16
**information** [78] - 9:21, 10:1, 10:2, 10:11, 11:20, 15:11, 26:16, 26:23, 27:3, 27:8, 27:17, 27:23, 29:7, 33:17, 33:18, 35:17, 36:17, 37:13, 37:16, 37:22, 38:11, 41:2, 42:13, 46:7, 46:10, 50:3, 60:2, 60:13, 60:17, 61:2, 61:3, 61:5, 61:12, 61:23, 61:25, 62:1, 62:9, 62:20, 66:1, 66:21, 71:20, 72:3, 72:10, 73:20, 73:24, 74:5, 74:10, 74:22, 74:24, 75:17, 75:24, 76:4, 76:11, 76:15, 76:22, 77:4, 77:8, 77:10, 77:15, 78:2, 82:12, 82:13, 89:16, 101:5, 101:9, 101:13, 101:16, 101:20, 103:3, 103:22, 103:24, 104:19, 106:21, 106:24, 159:18, 165:1, 166:2
**informs** [1] - 76:6
**ingredients** [1] - 91:2
**initial** [5] - 27:18, 94:4, 121:15, 162:6
**Innocence** [2] - 83:2, 83:18
**innovations** [1] - 154:14
**input** [7] - 122:10, 122:21, 125:7, 125:9, 125:14, 129:11, 129:16