# 24-3161

# United States Court of Appeals for the District of Columbia

THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
Hon. Randolph D. Moss
United States District Court Case 1-21-cr-00399-RDM-1

## APPENDIX
## Volume III of XVII (Pages Appx0881 - Appx1320)

TOR EKELAND, ESQ.
TOR EKELAND LAW PLLC
*Attorneys for Defendant-Appellant*
30 Wall Street, 8th Floor
New York, New York 10005
(718) 737-7264
tor@torekeland.com

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
*Attorneys for Defendant-Appellant*
800 Third Avenue, 20th Floor
New York, New York 10022
(212) 446-2346
maf@fernichlaw.com

MAKSIM NEMTSEV, ESQ.
MAKSIM NEMTSEV PC
*Attorneys for Defendant-Appellant*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
max@mnpc.law

AARON DANIEL, ESQ.
ASYMMETRIC LEGAL
*Attorneys for Defendant-Appellant*
11900 Biscayne Blvd, Suite 400
Miami, Florida 33181
(305) 979-9296
aaron@asymmetric.legal

*(See Inside Cover for Additional Counsel)*

3914


ELECTRONIC PARALEGAL

AMY C. COLLINS, ESQ.
THE LAW OFFICE OF
   AMY C. COLLINS
*Attorneys for Defendant-Appellant*
888 17th Street, NW, Suite 1200
Washington DC 20006
(228) 424-0609
amy@amyccollinslaw.com

# TABLE OF CONTENTS

District Court Docket – US v. Sterlingov, 21-CR-00399-RDM .............Appx001

Protective Order of Governing Discovery of Hon. Randolph D. Moss,
Dated September 17, 2021 (ECF Doc. No. 18) ......................................Appx074

Preliminary Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 336) ......................................Appx079

Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 14, 2024 (ECF Doc. No. 338) ....................................Appx085

Judgment in a Criminal Case of Hon. Randolph D. Moss,
Dated November 13, 2024 (ECF Doc. No. 340) ....................................Appx091

Transcript of Motion Hearing, Dated January 13, 2023
(ECF Doc. No. 114) ...............................................................................Appx099

Transcript of Motion Hearing, Dated January 31, 2023
(ECF Doc. No. 115) ...............................................................................Appx190

Transcript of Motions Hearing, Dated June 16, 2023
(ECF Doc. No. 223) ...............................................................................Appx345

Transcript of Motions Hearing, Dated June 23, 2023
(ECF Doc. No. 224) ...............................................................................Appx501

Transcript of Motions Hearing, Dated July 19, 2023
(ECF Doc. No. 225) ...............................................................................Appx682

Transcript of Continued Motions Hearing, Dated July 20, 2023
(ECF Doc. No. 226) ...............................................................................Appx895

Transcript of Motions Hearing, Dated August 22, 2023
(ECF Doc. No. 228) .............................................................................Appx1040

Transcript of Continued Motions Hearing, Dated August 23, 2023
(ECF Doc. No. 229) .............................................................................Appx1266

Transcript of Motions Hearing, Dated August 29, 2023
(ECF Doc. No. 231) .............................................................................Appx1466

Transcript of Pretrial Conference, Dated September 7, 2023
(ECF Doc. No. 232) ...................................................................Appx1524

Transcript of Pretrial Conference, Dated September 8, 2023
(ECF Doc. No. 233) ...................................................................Appx1741

Transcript of Pretrial Conference, Dated September 13, 2023
(ECF Doc. No. 234) ...................................................................Appx1861

Transcript of Pretrial Conference, Dated September 15, 2023
(ECF Doc. No. 235) ...................................................................Appx1999

Transcript of Pretrial Conference, Dated September 18, 2023
(ECF Doc. No. 236) ...................................................................Appx2141

Transcript of Pretrial Conference, Dated September 21, 2023
(ECF Doc. No. 237) ...................................................................Appx2235

Transcript of Motion Conference, Dated November 13, 2023
(ECF Doc. No. 238) ...................................................................Appx2302

Transcript of Jury Trial, Dated February 12, 2024
(ECF Doc. No. 276) ...................................................................Appx2350

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ...................................................................Appx2620

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ...................................................................Appx2688

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 278) ...................................................................Appx2825

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 327) ...................................................................Appx2948

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ...................................................................Appx3074

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ...................................................................Appx3189

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ...................................................................Appx3331

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ...................................................................Appx3446

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 281) ...................................................................Appx3572

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 328) ...................................................................Appx3697

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ...................................................................Appx3858

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ...................................................................Appx3982

Transcript of Jury Trial, Dated February 23, 2024
(ECF Doc. No. 329) ...................................................................Appx4122

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ...................................................................Appx4251

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ...................................................................Appx4394

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 284) ...................................................................Appx4419

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 330) ...................................................................Appx4550

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ...................................................................Appx4581

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ...................................................................Appx4698

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 285) ...................................................................Appx4836

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 286) ..................................................................Appx4955

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 331) ..................................................................Appx5074

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 287) ..................................................................Appx5198

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 332) ..................................................................Appx5344

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ..................................................................Appx5359

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ..................................................................Appx5496

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 289) ..................................................................Appx5621

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 333) ..................................................................Appx5762

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 290) ..................................................................Appx5900

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 334) ..................................................................Appx6004

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ..................................................................Appx6087

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ..................................................................Appx6190

Transcript of Jury Trial, Dated March 11, 2024
(ECF Doc. No. 292) ..................................................................Appx6324

Transcript of Jury Trial, Dated March 12, 2024
(ECF Doc. No. 293) ..................................................................Appx6344

Virtual Asset Analysis Expert Report of Luke Scholl,
Dated December 8, 2022..............................................................Appx6400

Expert Report #1 of Elizabeth Bisbee (Nov. 2022).....................Appx6465

Expert Report #2 of Elizabeth Bisbee (Dec. 2022) .....................Appx6493

Expert Report #3 of Elizabeth Bisbee (Jul. 2023)......................Appx6522

CS-Mazars Expert Report - Device Review Summary,
Dated May 5, 2023 .....................................................................Appx6529

CS-Mazars Expert Report - IP Overlap Analysis,
Dated November 9, 2022 .............................................................Appx6532

CS-Mazars Expert Report - IP Graph Data Excel File..............Appx6539

Criminal Complaint, Dated April 26, 2021 (ECF Doc. No. 1) .............Appx6542

Arrest Warrant, Dated April 26, 2021 (ECF Doc. No. 5).....................Appx6556

Indictment, Filed June 14, 2021 (ECF Doc. No. 8) .............................Appx6557

Superseding Indictment, Filed July 18, 2022 (ECF Doc. No. 43) .......Appx6561

Defendant's Supporting Memorandum of Law,
Dated August 1, 2022 (ECF Doc. No. 46) ............................................Appx6567

Attachment to Memorandum of Law -
Proposed Order of Hon. Randolph D. Moss Granting Defendant's
Motion to Dismiss (ECF Doc. No. 46-1) ....................................Appx6585

Attachment to Memorandum of Law -
Defendant's Notice of Motion to Dismiss, Dated August 1, 2022
(ECF Doc. No. 46-2) ...................................................................Appx6586

Government's Opposition to Motion, Filed August 29, 2022
(ECF Doc. No. 52) ..............................................................................Appx6589

Defendant's Reply to Government's Opposition to Motion,
Dated September 7, 2022 (ECF Doc. No. 57) .......................................Appx6623

Exhibit A to Defendant's Reply -
Second Declaration of Eric Garland, Dated September 7, 2022
(ECF Doc. No. 57-1) ........................................................................Appx6635

Defendant's Motions in *Limine*, Dated October 24, 2022
(ECF Doc. No. 59) ...........................................................................Appx6644

Exhibit A to Motions in *Limine* -
Letter from Tor Ekeland to Christopher B. Brown and
C. Alden Pelker, Dated September 23, 2022, with Exhibit A
(ECF Doc. No. 59-1) ........................................................................Appx6664

Defendant's Opposition to the Government's Motions in *Limine*,
Dated November 7, 2022 (ECF Doc. No. 68) ...................................Appx6680

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated March 6, 2023 (ECF Doc. No. 116) .......................................Appx6689

Notice of Bill of Particulars for Forfeiture, Filed May 17, 2023
(ECF Doc. No. 119) ..........................................................................Appx6709

Defendant's Notice of Intent to Present Expert Testimony,
Dated July 7, 2023 (ECF Doc. No. 145) ...........................................Appx6711

Exhibit A to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Francisco Cabanas (ECF Doc. No. 145-1) ...........................Appx6716

Exhibit B to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Itiel Dror (ECF Doc. No. 145-2) ..........................................Appx6725

Exhibit C to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jeffrey Fischbach (ECF Doc. No. 145-3)......................................Appx6731

Exhibit D to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jonelle Still (ECF Doc. No. 145-4) ..............................................Appx6737

Exhibit E to Notice of Intent -
Summary of Qualifications and Expected Testimony for
J.W. Verret (ECF Doc. No. 145-5)................................................Appx6741

Supplemental Summary of Qualifications and Expected
Testimony for Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 157) ....................................................................Appx6756

Notice of Expert Report for Defense Expert Jonelle Still of
Ciphertrace, Dated August 8, 2023 (ECF Doc. No. 159) .....................Appx6761

Attachment to Notice of Expert Report -
Defense Expert Report of Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 159-1) ................................................................Appx6764

Exhibit A to Notice of Expert Report -
Data Credibility in Cryptocurrency Investigations of Ciphertrace
(ECF Doc. No. 159-2) ................................................................Appx6805

Exhibit B to Notice of Expert Report -
Article Titled "Bitcoin: A Peer-to-Peer Electronic Cash System"
(ECF Doc. No. 159-3) ................................................................Appx6822

Notice of Bill of Particulars, Filed August 28, 2023
(ECF Doc. No. 173) ....................................................................Appx6832

Defense Response to Government's Motion to Admit Certain
Exhibits, Dated September 4, 2023 (ECF Doc. No. 177) .....................Appx6834

Notice of Source Code Expert Bryan Bishop Regarding Independent
Analysis of Chainalysis Reactor Source Code and Request for
Production of Chainalysis Reactor Source Code and Relevant
Related Brady Material, Dated September 5, 2023
(ECF Doc. No. 179) ....................................................................Appx6843

Chainalysis' Notice in Response to the Court's Request Regarding
Protective Order, Dated September 12, 2023
(ECF Doc. No. 195) ....................................................................Appx6860

Exhibit A to Notice in Response -
[Proposed] Heuristic Information Protective Order of
Hon. Randolph D. Moss (ECF Doc. No. 195-1)............................Appx6862

Exhibit B to Notice in Response -
[Proposed] Heuristic Information Protective Order to Jonelle Still
of Hon. Randolph D. Moss (ECF Doc. No. 195-2).......................Appx6869

Heuristic Information Protective Order to Jonelle Still of Hon.
Randolph D. Moss, Dated September 13, 2023 (ECF Doc. No. 196)...Appx6877

Notice Regarding Court's Proposed Protective Order Governing
Review of Chainalysis' Proprietary Information,
Dated September 20, 2023 (ECF Doc. No. 199) ..................................Appx6884

Notice Regarding Ciphertrace Expert Testimony and Review of
Latest Chainalysis Production, Dated September 22, 2023
(ECF Doc. No. 205) ...............................................................................Appx6888

Government's Response to September 18, 2023 Minute Order
Regarding Defendant's Access to Sensitive Heuristics Information
Provided by Chainalysis, Filed September 22, 2023
(ECF Doc. No. 206) ...............................................................................Appx6892

Defendant's Opposition to Government's Response to
September 18, 2023, Minute Order Regarding Defendant's Access
to Sensitive Heuristics Information Provided by Chainalysis,
Dated September 29, 2023 (ECF Doc. No. 207) ..................................Appx6901

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 4, 2023 (ECF Doc. No. 210) ....................................Appx6912

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 30, 2023 (ECF Doc. No. 213) ..................................Appx6930

Defendant's  Motion to Exclude any Testimony About Deepweb
Marketplaces, Dated February 8, 2024 (ECF Doc. No. 247)...............Appx6942

Attachment to Motion to Exclude -
[Proposed] Order of Hon. Randolph D. Moss
(ECF Doc. No. 247-2) ..............................................................Appx6950

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated February 29, 2024 (ECF Doc. No. 259)......................................Appx6951

Final Jury Instructions and Charges, Filed March 7, 2024
(ECF Doc. No. 265) ...............................................................................Appx6982

Government's Motion for Preliminary Order of Forfeiture,
Filed June 7, 2024 (ECF Doc. No. 297).................................................Appx7061

      Attachment to Motion for Preliminary Order of Forfeiture -
      Proposed Preliminary Order of Forfeiture Hon.
      Randolph D. Moss (ECF Doc. No. 297-1)....................................Appx7072

Defendant's Opposition to Government's Motion for Preliminary
Order of Forfeiture, Dated June 21, 2021 (ECF Doc. No. 305) ...........Appx7078

      Exhibit A to Defendant's Opposition -
      Article Titled "Chainalysis: Most Mixed Bitcoin Not Used
      For Illicit Purposes", Dated August 26, 2019
      (ECF Doc. No. 305-1) ...................................................................Appx7095

      Exhibit B to Defendant's Opposition -
      Blockchain Address Search Result from Blockchain.com
      (ECF Doc. No. 305-2) ...................................................................Appx7107

Government's Memorandum in Aid of Sentencing,
Filed August 1, 2024 (ECF Doc. No. 314)............................................Appx7112

Sentencing Memorandum on behalf of Roman Sterlingov,
Dated August 15, 2024 (ECF Doc. No. 321) ........................................Appx7157

Memorandum Opinion of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 337) .....................................Appx7194

Defendant's Notice of Appeal, Dated November 19, 2024
(ECF Doc. No. 343) ...............................................................................Appx7214

Memorandum for All Department Employees from The Deputy
Attorney General, Subjecting "Ending Regulation by Prosecution",
Dated April 7, 2025...............................................................................Appx7217

**Trial Exhibits:**

Trial Exhibit 601 -
Darknet Market Vendor Transaction Summary
(Document in Evidence and to be Produced Upon Request Due
to Volume) ..........................................................................................Appx7221

Trial Exhibit 624................................................................................Appx7222

Trial Exhibit 625................................................................................Appx7223

Trial Exhibit 626................................................................................Appx7224

Trial Exhibit 627................................................................................Appx7225

Trial Exhibit 628(A)...........................................................................Appx7226

Trial Exhibit 628(B)...........................................................................Appx7227

Trial Exhibit 629................................................................................Appx7229

Trial Exhibit 630(A)...........................................................................Appx7230

Trial Exhibit 630(B)...........................................................................Appx7244

Trial Exhibit 631................................................................................Appx7247

Trial Exhibit 632................................................................................Appx7248

Trial Exhibit 633................................................................................Appx7252

Defense Exhibit 138 -
The-Message-Game, Written by Ice White .........................................Appx7253

Defense Exhibit 139 -
Extracted Page from The-Message-Game, Written by Ice White ......Appx7413

Government Exhibit 721 and Defense Exhibit 143 -
Boox Chat ...........................................................................................Appx7414

Exhibit B to Fischbach Declaration -
Declaration of Jeffrey M. Fischbach, for Defendant, Dated August 14, 2024,
with Attachment
(ECF Doc. No. 321-2) ...............................................................Appx7415

inputs [9] - 125:20, 126:12, 149:21, 150:16, 150:21, 151:9, 151:14, 151:17
inputting [1] - 128:11
inquiry [2] - 5:4, 19:1
instance [3] - 27:10, 90:3, 146:3
instances [3] - 39:11, 144:11
instantaneously [1] - 156:6
instead [5] - 38:6, 98:1, 111:1, 148:20, 179:11
Institute [1] - 52:12
institutions [2] - 116:15, 116:20
instructions [1] - 29:15
insufficient [1] - 146:7
integrating [1] - 175:12
integration [3] - 174:20, 174:23, 175:5
integrity [1] - 116:13
intend [1] - 6:22
intended [4] - 6:20, 18:25, 26:2, 174:11
intending [1] - 48:21
intends [1] - 28:16
intent [1] - 26:25
intentional [3] - 36:7, 36:14, 42:15
interact [4] - 106:20, 106:25, 110:9, 120:23
interacting [2] - 99:16, 118:10
interacts [2] - 70:10, 118:5
interest [1] - 33:24
interested [13] - 33:16, 33:19, 33:22, 33:25, 39:18, 60:12, 64:4, 73:6, 85:20, 99:24, 135:24, 153:14, 169:9
interesting [4] - 98:25, 102:21, 122:2, 123:15
interface [1] - 118:5
intermediate [1] - 85:7
internal [1] - 133:2
International [2] - 56:13, 56:17
international [1] - 66:24

interpret [1] - 33:17
interpretation [4] - 36:18, 63:2, 63:3, 85:19
interpretations [2] - 63:6, 85:17
interrupt [4] - 69:7, 142:9, 159:16, 162:17
interval [1] - 79:6
interviews [1] - 94:4
intrigued [1] - 135:23
introduce [1] - 143:16
invented [1] - 149:8
inverse [1] - 83:25
invest [1] - 59:10
investigates [1] - 34:18
investigating [5] - 34:12, 65:4, 82:15, 89:21, 90:2
investigation [17] - 30:13, 63:15, 65:5, 66:24, 82:6, 85:14, 89:1, 93:14, 94:5, 116:16, 121:16, 121:23, 123:15, 132:7, 153:5, 162:15
investigations [6] - 82:14, 94:2, 110:19, 132:16, 134:1, 134:2
investigative [1] - 93:8
investigator [5] - 53:13, 88:24, 88:25, 89:18, 116:22
investigators [2] - 73:19, 81:10
investment [1] - 163:20
investments [1] - 164:7
investor [1] - 112:7
invitation [1] - 52:20
invited [5] - 34:20, 35:3, 39:19, 40:2, 40:4
invoices [1] - 134:24
involve [3] - 101:8, 113:4, 149:1
involved [17] - 29:7, 42:22, 57:8, 58:25, 68:5, 81:9, 89:1, 93:25, 111:5, 116:15, 126:9, 132:22, 135:20, 136:8, 137:13, 140:12
involves [6] - 37:25, 62:8, 94:1, 97:23,

127:19, 142:24
involving [2] - 70:24, 132:22
IP [13] - 4:10, 4:20, 4:23, 5:2, 7:22, 7:23, 8:5, 8:13, 8:16, 8:17, 8:18, 8:24, 9:1
irrelevant [14] - 38:10, 39:15, 72:9, 73:24, 74:9, 74:25, 75:17, 76:15, 77:3, 77:7, 77:10, 77:15, 78:1, 89:15
IRS [2] - 34:21, 34:22
issue [25] - 6:5, 6:9, 8:11, 13:4, 17:15, 18:14, 19:23, 25:4, 25:18, 25:19, 25:25, 26:7, 26:14, 27:13, 35:10, 43:18, 82:23, 116:17, 138:18, 147:16, 148:5, 154:11, 177:15, 179:8
issues [28] - 3:17, 6:11, 8:12, 13:5, 17:1, 19:19, 22:3, 23:4, 25:11, 26:22, 27:9, 27:19, 47:22, 91:3, 95:22, 97:15, 97:19, 98:24, 119:7, 119:8, 119:10, 132:22, 133:14, 134:19, 145:18, 147:14, 158:2
Item [3] - 46:4, 46:11, 142:7
item [1] - 46:13
items [2] - 45:17, 45:20
iterations [3] - 20:8, 108:23, 109:12
ITIEL [4] - 2:3, 32:25, 44:25, 88:19
Itiel [1] - 32:15
itself [12] - 51:25, 61:1, 61:24, 63:1, 74:2, 78:4, 98:25, 99:5, 103:22, 113:24, 117:25, 152:5

## J

J.S [2] - 120:6, 120:22
J.W [5] - 2:9, 91:23, 92:7, 125:19, 131:16
January [5] - 34:23, 56:10, 168:5, 168:6, 168:21

Japan [1] - 138:19
job [4] - 16:20, 83:7, 136:2, 168:21
join [3] - 127:8, 155:21, 156:2
joined [2] - 3:9, 52:11
joint [1] - 40:15
Journal [1] - 39:25
Jude's [4] - 125:11, 125:12, 125:13, 127:10
JUDGE [2] - 1:8, 1:8
judge [4] - 30:8, 39:22, 43:24, 44:3
Judge [2] - 39:23, 41:21
judge's [1] - 43:20
judges [9] - 39:18, 39:20, 39:21, 40:2, 79:25, 90:19, 90:20, 90:22
Judges' [1] - 39:25
judgment [14] - 33:18, 36:18, 38:12, 70:5, 74:6, 74:21, 75:4, 75:5, 75:8, 75:11, 75:15, 76:23, 116:21, 165:2
Judicial [1] - 23:24
judicial [1] - 133:5
July [6] - 1:5, 7:13, 25:24, 184:21, 184:22, 185:7
jump [1] - 151:21
June [3] - 25:1, 29:14, 137:1
juror [1] - 39:16
jurors [8] - 40:2, 43:25, 44:7, 51:4, 70:12, 90:17, 90:21, 90:23
jury [7] - 28:3, 28:11, 47:17, 51:23, 68:2, 68:18, 167:4
justice [5] - 78:20, 82:22, 83:13, 83:16, 86:21
Justice [4] - 52:11, 132:25, 133:2, 145:23
JUSTICE [1] - 1:13

## K

Karpeles [2] - 115:4, 115:15
keep [7] - 53:15, 62:2, 87:9, 87:16, 102:4, 108:9, 114:9
keeps [2] - 12:16,

118:8
Kennedy [1] - 92:15
kept [2] - 10:24, 101:13
key [33] - 101:16, 101:17, 101:18, 101:23, 101:24, 101:25, 102:1, 102:2, 102:3, 102:11, 102:12, 102:15, 102:20, 102:22, 103:5, 103:7, 103:8, 103:9, 103:10, 103:15, 106:17, 114:7, 114:9, 114:14, 123:25, 124:9, 124:12, 125:2, 126:4
keys [6] - 106:19, 122:12, 125:2, 126:25, 127:9, 141:19
kid [1] - 175:17
kidnapped [1] - 110:7
kind [28] - 9:19, 16:12, 35:22, 38:9, 47:18, 57:24, 59:21, 75:5, 78:19, 90:23, 93:24, 94:22, 97:24, 99:8, 99:24, 100:17, 108:1, 109:13, 117:7, 119:24, 127:20, 137:21, 149:7, 149:8, 149:9, 172:8, 174:7
kinds [6] - 60:16, 85:19, 95:19, 125:5, 162:14
Kingdom [2] - 34:17, 34:21
knock [1] - 171:9
knowing [3] - 75:15, 110:12
knowledge [20] - 39:16, 61:15, 66:5, 77:17, 85:14, 107:21, 116:9, 118:22, 139:7, 139:10, 139:16, 144:1, 153:10, 158:5, 158:8, 158:15, 158:22, 158:24, 159:3, 175:15
known [11] - 8:2, 9:24, 10:19, 12:3, 146:15, 147:16, 147:17, 152:9, 152:23, 157:13, 158:25
knows [1] - 106:17

**Kraken** [39] - 104:5, 104:16, 107:4, 107:9, 107:13, 110:3, 110:4, 110:11, 110:14, 110:16, 112:24, 112:25, 113:14, 138:7, 138:23, 142:24, 143:2, 146:17, 163:10, 163:19, 163:25, 164:2, 164:5, 164:11, 164:13, 164:23, 165:6, 166:6, 167:14, 169:16, 169:19, 169:22, 171:10, 171:14, 171:16, 171:20, 172:17, 173:19, 175:3

**KYC** [14] - 106:23, 107:1, 107:4, 107:9, 113:4, 113:11, 132:14, 164:15, 166:12, 169:6, 173:25, 174:1, 174:2, 174:3

**KYC'd** [12] - 103:2, 106:21, 107:14, 107:15, 109:9, 110:11, 110:22, 110:24, 173:13, 174:11, 174:17

### L

**lab** [4] - 35:4, 39:7, 68:13, 82:15
**laboratory** [1] - 72:7
**labs** [2] - 64:13, 64:14
**lack** [1] - 36:21
**language** [2] - 141:8
**LAPD** [1] - 34:15
**large** [3] - 85:8, 128:8
**larger** [3] - 98:7, 98:8, 150:19
**last** [42] - 3:22, 7:4, 7:11, 9:15, 9:25, 10:11, 11:21, 11:25, 14:10, 17:20, 18:23, 23:22, 26:2, 26:15, 26:17, 27:8, 28:15, 28:22, 29:5, 29:8, 30:2, 49:6, 50:7, 50:12, 68:23, 68:24, 94:24, 97:13, 109:21, 115:12, 119:17, 119:18, 129:2, 129:22, 130:9, 135:11,

135:14, 143:21, 144:8, 152:4, 156:8, 174:23
**late** [7] - 9:14, 10:7, 13:4, 20:23, 46:25, 169:10, 177:19
**late-filed** [1] - 9:14
**latent** [1] - 78:16
**laundered** [3] - 12:8, 174:24, 175:12
**laundering** [12] - 94:13, 107:2, 132:14, 133:14, 138:1, 173:4, 174:14, 174:18, 174:19, 174:21, 175:6
**Law** [1] - 1:16
**law** [35] - 35:21, 35:22, 35:24, 58:9, 58:10, 58:11, 92:14, 92:21, 97:16, 97:17, 113:22, 114:1, 120:9, 121:4, 132:11, 132:13, 132:15, 132:17, 132:23, 132:24, 133:8, 133:12, 133:13, 133:15, 133:18, 133:20, 133:21, 133:23, 133:24, 134:5, 134:7
**laws** [2] - 132:19, 132:20
**lawyers** [5] - 79:25, 83:6, 90:20, 90:22, 113:23
**layer** [1] - 173:15
**layering** [1] - 174:20
**layperson's** [1] - 36:12
**lead** [3] - 80:9, 129:19, 158:3
**leader** [1] - 129:9
**leaders** [1] - 129:8
**leading** [2] - 125:6, 138:8
**leads** [3] - 121:15, 123:15, 125:5
**leaked** [1] - 120:3
**learn** [6] - 40:7, 102:20, 102:21, 106:19, 115:20, 123:15
**learned** [1] - 114:18
**learning** [4] - 94:7, 116:9, 153:14
**least** [6] - 26:7, 67:8, 67:24, 151:2, 156:23, 158:4

**leave** [4] - 86:23, 173:8, 175:18, 175:23
**leaves** [2] - 167:10, 172:8
**leaving** [2] - 102:5, 175:16
**led** [2] - 99:5, 129:9
**ledger** [2] - 97:25, 103:20
**leeway** [1] - 63:9
**left** [2] - 56:10, 124:19
**legal** [4] - 8:21, 54:15, 90:15, 91:3
**legitimate** [1] - 97:4
**lend** [1] - 63:1
**lengthy** [2] - 7:10, 14:6
**less** [2] - 128:4, 172:5
**lesson** [1] - 107:25
**letter** [4] - 29:25, 30:7, 134:10, 135:3
**letters** [5] - 50:5, 61:21, 61:22, 61:23, 94:3
**letting** [2] - 38:6, 78:4
**level** [11] - 37:3, 53:8, 54:23, 55:7, 61:25, 70:5, 70:7, 70:9, 70:10, 142:20
**liberty** [2] - 15:17, 16:9
**library** [1] - 99:1
**license** [3] - 94:25, 106:25, 146:12
**licensed** [2] - 92:21
**Lichtenstein** [1] - 153:5
**life** [1] - 126:20
**likelihood** [1] - 80:25
**likely** [5] - 7:24, 8:23, 20:20, 109:25, 174:6
**limine** [1] - 10:21
**limitations** [1] - 129:11
**limited** [1] - 26:4
**limits** [1] - 159:6
**line** [1] - 70:20
**linear** [1] - 72:10
**lineup** [2] - 78:12, 78:18
**link** [4] - 99:25, 102:24, 102:25, 103:17
**linked** [7] - 99:22, 101:2, 103:1, 103:2, 103:4, 103:15, 129:14
**listed** [1] - 110:25
**listen** [3] - 115:14,

131:21, 139:18
**listened** [4] - 115:3, 115:12, 135:21, 135:22
**lists** [1] - 46:2
**literature** [12] - 10:25, 11:1, 70:24, 77:12, 121:13, 122:8, 123:9, 129:8, 129:9, 143:11, 149:11, 150:24
**litigation** [1] - 93:22
**LLC** [1] - 58:17
**load** [1] - 155:9
**local** [1] - 176:10
**LocalBitcoin** [5] - 168:12, 169:1, 169:4, 173:23
**LocalBitcoin's** [1] - 168:16
**LocalBitcoins** [1] - 173:20
**log** [1] - 179:17
**logical** [3] - 84:5, 99:14, 121:20
**login** [2] - 174:3, 174:4
**logins** [2] - 8:14, 139:11
**logistical** [1] - 150:17
**logistically** [2] - 150:4, 150:8
**logs** [9] - 29:9, 30:11, 63:17, 63:18, 63:23, 66:18, 115:21, 179:24
**London** [1] - 90:19
**look** [39] - 7:23, 9:14, 11:22, 14:24, 20:7, 20:25, 21:21, 28:12, 40:17, 46:17, 46:18, 46:21, 49:16, 53:2, 53:5, 53:18, 57:16, 57:24, 58:19, 60:16, 69:15, 69:24, 73:17, 73:19, 74:1, 81:24, 102:18, 103:21, 105:3, 114:9, 125:17, 126:3, 126:4, 126:5, 134:18, 141:21, 154:20
**looked** [17] - 5:9, 38:17, 47:19, 48:17, 58:3, 59:22, 60:9, 61:17, 77:1, 81:25, 83:4, 108:24, 136:3, 143:2, 143:3, 152:8
**looking** [36] - 4:9, 16:19, 20:1, 21:16,

31:6, 37:3, 38:8, 41:7, 43:14, 53:10, 53:15, 53:16, 60:25, 61:2, 61:10, 61:21, 62:7, 68:13, 69:9, 69:21, 69:24, 75:3, 82:12, 84:6, 84:7, 103:18, 116:13, 140:18, 140:19, 141:18, 142:10, 146:3, 151:20, 169:24, 170:13
**looks** [4] - 12:18, 61:14, 150:21, 159:4
**losing** [1] - 100:17
**Louisiana** [1] - 92:13
**love** [2] - 125:12, 136:11
**loved** [1] - 3:25
**low** [5] - 105:13, 105:14, 135:13, 163:16, 170:1
**lowest** [1] - 105:24
**Luke** [2] - 84:10, 144:10
**lunch** [8] - 67:12, 67:17, 70:14, 70:17, 70:21, 73:11, 178:13, 178:15

### M

**M-a-z-a-r-i-n** [1] - 6:16
**Machine** [2] - 108:24, 109:12
**Madrid** [1] - 35:8
**Magic** [1] - 114:24
**mailed** [2] - 31:19, 40:14
**maintain** [3] - 8:25, 94:17, 140:3
**maintaining** [2] - 108:15, 140:8
**major** [5] - 34:18, 138:16, 138:20, 138:24, 139:11
**majority** [4] - 82:7, 84:2, 98:13, 171:17
**malignant** [3] - 68:15, 69:10
**Malta** [5] - 161:22, 161:23, 161:24, 161:25
**manage** [1] - 94:25
**management** [1] - 158:10
**mandated** [2] - 72:11, 79:23
**manifested** [1] - 72:1
**manual** [1] - 172:14

manually [1] - 172:12
map [1] - 123:12
mark [2] - 115:4, 115:15
markers [1] - 69:10
market [2] - 128:9, 128:22
masking [1] - 72:10
Massachusetts [3] - 34:9, 39:21, 40:4
massive [2] - 10:10, 10:13
master [1] - 33:3
master's [2] - 33:11, 92:15
mastermind [1] - 110:17
match [3] - 75:5, 164:3, 164:12
matches [2] - 162:22, 163:3
matching [3] - 9:1, 149:21, 150:21
material [2] - 47:12, 81:14
materials [8] - 31:12, 44:14, 45:10, 47:2, 47:20, 57:16, 74:6, 81:15
matter [21] - 7:4, 9:4, 9:10, 19:11, 20:12, 26:8, 54:16, 63:10, 71:13, 74:11, 75:1, 75:24, 76:3, 87:16, 114:1, 117:2, 119:5, 134:16, 134:21, 135:4, 162:16
matters [4] - 3:21, 24:19, 93:21, 133:6
Mazarin [5] - 3:24, 6:12, 6:16, 6:19, 7:21
Mazarin's [1] - 4:21
MAZARS [1] - 6:15
Mazars [5] - 3:24, 4:21, 6:11, 6:15, 6:18
mean [31] - 14:12, 25:20, 26:1, 35:13, 48:13, 53:2, 63:12, 71:25, 79:15, 83:13, 83:15, 83:23, 84:2, 86:3, 96:8, 112:18, 116:8, 119:6, 119:15, 132:16, 140:15, 141:3, 148:15, 160:8, 165:11, 170:6, 171:8, 171:15, 172:8, 177:9, 177:18

meaning [1] - 152:14
meaningful [1] - 68:18
means [3] - 68:2, 84:22, 100:21
measure [2] - 78:21, 158:9
measures [4] - 79:3, 79:19, 158:5
measuring [1] - 79:7
mechanisms [1] - 37:21
media [4] - 99:14, 100:1, 100:3, 139:11
medical [6] - 34:8, 37:2, 37:11, 69:2, 71:14, 78:21
meet [2] - 41:12, 113:7
meeting [2] - 30:17, 178:14
meetup [1] - 150:13
meetups [2] - 110:4, 113:7
Meiklejohn [4] - 10:16, 129:8, 130:1, 130:21
memorializations [1] - 141:9
memorialized [3] - 141:1, 141:2, 141:6
memorize [1] - 114:10
memorized [1] - 100:12
memory [1] - 161:1
mention [2] - 42:15, 139:22
mentioned [18] - 10:21, 10:22, 35:1, 35:10, 41:22, 42:17, 56:22, 66:12, 69:6, 114:16, 127:17, 127:24, 130:15, 144:21, 145:4, 145:12, 167:3
merely [2] - 5:7, 13:13
merits [2] - 11:6, 16:1
messages [1] - 169:14
meta [1] - 37:7
meta-expertise [1] - 37:7
method [1] - 74:19
methodology [2] - 15:2, 15:3
MGH [1] - 34:8
Michael [1] - 3:14
MICHAEL [1] - 1:16
Michigan [3] - 39:20, 39:23
Microsoft [1] - 98:1
mid [2] - 154:25, 169:10

middle [2] - 25:23, 53:12
might [32] - 19:9, 50:22, 55:3, 60:2, 62:10, 65:24, 68:13, 68:16, 95:4, 97:10, 97:25, 100:1, 101:8, 103:3, 115:10, 119:6, 119:7, 121:3, 124:25, 125:9, 125:18, 125:19, 126:3, 126:4, 130:6, 134:18, 151:19, 154:19, 161:2, 174:1
Mike [2] - 126:1, 126:6
military [1] - 65:3
million [7] - 12:8, 105:8, 105:17, 106:2, 128:4, 128:19, 154:22
millions [1] - 90:3
mind [3] - 20:24, 55:5, 78:3
mindset [1] - 69:4
mine [4] - 80:15, 98:17, 126:5, 169:13
minimize [5] - 35:19, 72:12, 72:18, 79:19, 80:1
minor [1] - 30:24
minute [3] - 17:24, 25:18, 91:17
minutes [7] - 67:18, 91:15, 91:18, 176:17, 177:5, 178:21, 179:2
miscarriage [2] - 83:12, 83:16
miscarriages [1] - 82:22
mischaracterizing [2] - 106:1, 156:9
misconception [2] - 42:6, 42:10
misinterpret [1] - 62:19
misleading [1] - 82:22
misperception [1] - 138:10
miss [1] - 97:14
missing [9] - 104:23, 105:14, 106:4, 106:22, 107:11, 111:20, 162:5, 167:11, 172:23
mistake [1] - 37:7
mistakes [6] - 34:2, 35:18, 35:19, 35:20, 36:8, 37:5
MIT [2] - 107:18, 115:3

mix [13] - 106:12, 108:15, 109:3, 109:8, 109:17, 110:13, 110:15, 110:20, 142:23, 163:9, 174:11, 174:16
mixed [5] - 106:13, 107:14, 110:14, 155:24, 172:2
mixer [20] - 106:12, 107:7, 109:5, 109:6, 109:7, 110:18, 111:1, 113:13, 170:2, 170:8, 170:14, 170:16, 170:20, 172:3, 172:18, 172:25, 173:2, 173:3, 173:12, 173:25
mixers [3] - 108:6, 170:22, 170:23
mixing [8] - 74:23, 105:1, 108:5, 109:11, 152:22, 155:12, 170:2, 174:14
mobster [2] - 175:7, 175:8
mode [2] - 96:9, 97:23
model [6] - 53:3, 53:11, 99:20, 123:23, 123:24
models [2] - 53:2, 53:10
modification [1] - 131:1
moment [4] - 24:11, 30:16, 108:2, 150:9
Monday [2] - 6:21, 22:1
Monero [2] - 136:13, 137:1
monetized [1] - 129:10
money [43] - 12:24, 13:22, 55:17, 55:20, 56:16, 58:16, 94:10, 94:13, 100:11, 105:21, 107:1, 111:12, 111:18, 127:10, 132:14, 133:14, 138:1, 143:2, 143:4, 154:21, 163:2, 163:18, 164:4, 164:22, 164:23, 165:14, 165:18, 165:20, 166:6, 166:11, 166:22,

167:13, 173:3, 173:4, 173:15, 174:14, 174:18, 174:19, 174:21, 175:5
Money [2] - 136:20, 136:22
month [12] - 11:13, 12:20, 14:6, 16:6, 16:15, 17:11, 17:17, 17:25, 18:1, 18:12, 20:2
months [6] - 13:10, 16:13, 19:2, 47:6, 96:6, 135:14
Morgan [1] - 153:5
morning [14] - 3:6, 3:8, 3:11, 3:13, 3:14, 3:16, 6:7, 7:20, 45:2, 176:15, 177:20, 177:24, 178:3, 178:24
MOSS [1] - 1:8
Moss [1] - 41:21
most [16] - 58:8, 88:11, 95:4, 102:5, 111:11, 113:21, 121:11, 126:15, 135:7, 149:19, 150:19, 154:7, 160:13, 163:18, 164:22
mostly [3] - 58:6, 119:1, 170:12
motion [9] - 10:22, 15:12, 15:15, 25:17, 28:25, 29:2, 30:15, 30:19, 50:22
MOTIONS [2] - 1:4, 1:7
motions [6] - 10:21, 17:2, 23:1, 24:25, 26:4, 39:14
motivated [1] - 35:15
move [9] - 22:18, 31:15, 91:14, 129:2, 173:17, 174:3, 174:5, 178:6, 178:9
moving [4] - 62:2, 85:21, 149:14, 174:4
MR [133] - 3:11, 3:14, 7:20, 8:10, 9:18, 10:10, 10:15, 11:10, 11:16, 12:11, 13:5, 13:12, 13:21, 14:2, 14:9, 14:14, 14:20, 16:2, 16:8, 16:13, 17:9, 18:2, 18:4, 22:22, 23:5, 23:11, 24:8, 25:7, 25:10,

25:22, 26:13, 27:7, 28:22, 29:23, 30:10, 30:24, 31:7, 31:20, 32:6, 32:14, 32:21, 32:23, 33:1, 41:4, 41:10, 41:15, 41:18, 42:23, 43:4, 43:13, 43:16, 44:22, 45:1, 47:4, 47:10, 47:22, 48:4, 48:23, 49:4, 49:13, 49:16, 50:1, 50:12, 50:16, 51:13, 51:16, 52:5, 52:19, 54:2, 54:20, 54:24, 55:11, 55:12, 67:7, 70:19, 80:12, 81:3, 81:6, 81:21, 82:3, 85:4, 88:15, 88:20, 90:9, 91:10, 91:15, 91:22, 92:3, 92:5, 92:8, 97:9, 107:3, 117:18, 121:17, 129:1, 130:17, 130:19, 131:2, 131:10, 131:17, 131:25, 135:19, 138:15, 141:25, 142:3, 144:6, 144:7, 145:3, 145:11, 155:5, 155:19, 157:4, 158:23, 160:16, 160:17, 168:3, 171:3, 175:22, 176:1, 176:23, 177:5, 177:6, 177:9, 177:15, 177:18, 177:22, 178:11, 178:15, 178:18, 178:22, 179:16, 179:22, 180:3

**MS** [36] - 3:6, 3:9, 3:20, 5:11, 5:17, 5:25, 6:9, 6:15, 6:18, 7:4, 13:25, 18:22, 19:9, 19:17, 20:19, 21:3, 21:14, 21:19, 22:8, 22:16, 24:10, 24:14, 24:21, 26:20, 28:14, 28:20, 29:13, 30:22, 31:23, 131:8, 176:6, 176:10, 176:19, 178:4, 179:7, 179:15
**Mt** [25] - 8:10, 8:13, 8:25, 25:2, 112:22, 114:17, 114:19, 114:21, 114:22, 114:25, 115:6, 115:19, 116:1, 116:2, 116:4, 116:5,

116:7, 116:9, 116:23, 117:1, 117:7, 117:8, 117:14, 117:16, 163:7
**multi** [9] - 122:10, 122:19, 122:20, 122:21, 125:7, 125:9, 125:14, 129:11, 129:16
**multi-input** [7] - 122:10, 122:21, 125:7, 125:9, 125:14, 129:11, 129:16
**multi-spend** [1] - 122:20
**multiple** [10] - 5:2, 90:23, 115:9, 116:2, 126:15, 148:2, 149:15, 149:17, 155:12, 155:13
**multiply** [1] - 112:18
**music** [2] - 98:22, 99:5
**must** [1] - 119:11
**Mycelium** [1] - 15:8

## N

**N.W** [1] - 185:11
**N26** [1] - 161:18
**Nakamoto** [1] - 147:13
**name** [9] - 6:13, 7:25, 15:21, 40:9, 40:24, 45:4, 114:24, 149:9, 174:25
**namely** [2] - 25:2, 43:18
**names** [1] - 3:4
**Napster** [2] - 98:21, 98:22
**narrow** [4] - 6:6, 30:8, 30:9, 133:25
**narrowed** [1] - 17:7
**National** [8] - 52:10, 52:12, 52:16, 52:18, 72:11, 79:21, 79:23, 89:23
**natural** [1] - 164:6
**nature** [6] - 5:22, 35:2, 94:14, 113:24, 157:11, 159:6
**near** [1] - 161:2
**nearly** [2] - 160:6, 160:13
**necessarily** [10] - 38:2, 51:25, 79:15, 84:1, 90:8, 109:5, 151:13, 155:13, 155:15, 156:2

**necessary** [6] - 21:9, 54:5, 94:6, 159:10, 160:3, 160:9
**need** [73] - 5:23, 7:18, 10:2, 11:11, 11:13, 11:16, 12:1, 12:20, 15:12, 15:15, 15:17, 16:6, 16:23, 16:24, 17:9, 19:8, 19:14, 20:20, 24:4, 26:9, 28:2, 28:5, 28:10, 30:4, 30:6, 31:9, 31:21, 38:11, 48:4, 48:19, 48:21, 49:2, 49:4, 49:8, 49:23, 50:2, 53:15, 53:23, 67:2, 67:4, 67:5, 67:7, 72:3, 72:6, 77:6, 77:9, 77:24, 89:6, 89:13, 94:20, 102:6, 110:3, 117:10, 120:11, 139:22, 142:14, 146:7, 156:24, 162:14, 163:22, 172:21, 175:18, 175:21, 176:2, 176:23, 176:24, 177:2, 177:13, 178:8, 178:14
**needed** [10] - 4:6, 4:10, 17:24, 18:1, 19:15, 23:8, 23:17, 50:9, 75:25
**needing** [1] - 179:2
**needs** [10] - 11:8, 12:23, 17:17, 18:11, 20:22, 40:7, 73:25, 76:12, 95:6, 175:23
**negatives** [2] - 27:22, 152:17
**negligent** [1] - 33:25
**net** [5] - 111:13, 111:22, 111:23, 160:22
**Netherlands** [1] - 58:21
**network** [5] - 96:15, 106:16, 140:3, 140:8, 156:7
**neuroscientist** [1] - 87:11
**never** [8] - 56:24, 74:16, 77:11, 88:12, 133:8, 133:11, 134:14, 174:8
**nevertheless** [2] - 35:16, 86:5
**new** [20] - 9:21, 10:1, 11:25, 12:4, 12:22,

15:14, 17:20, 17:25, 18:2, 18:6, 19:8, 19:16, 25:25, 26:11, 26:22, 41:12, 50:4, 144:22, 155:9
**New** [4] - 1:17, 40:4, 83:2, 176:2
**newly** [2] - 7:5, 9:15
**next** [12] - 4:16, 15:12, 21:24, 23:3, 25:23, 29:3, 52:5, 54:3, 91:14, 91:21, 131:22, 146:24
**NFTs** [1] - 96:16
**nice** [3] - 86:23, 177:3
**night** [17] - 9:15, 9:25, 10:11, 11:21, 11:25, 17:20, 18:23, 26:15, 26:18, 27:8, 28:22, 29:5, 29:8, 49:6, 50:12, 77:23, 129:22
**night's** [1] - 28:15
**nine** [1] - 124:13
**nobody** [1] - 173:24
**node** [5] - 118:4, 118:5, 118:12, 118:16, 118:19
**nodes** [6] - 98:13, 98:14, 98:16, 118:1, 119:22
**non** [1] - 169:6
**non-KYC** [1] - 169:6
**noncoinjoin** [1] - 155:17
**nondisclosed** [1] - 169:6
**none** [1] - 65:10
**nonprofit** [1] - 139:4
**nonscientific** [1] - 64:15
**Nordea** [1] - 161:15
**Nordic** [3] - 161:20, 165:17, 166:3
**normal** [4] - 39:16, 108:21, 108:22, 135:1
**normies** [1] - 137:8
**north** [2] - 128:4, 135:18
**note** [4] - 4:17, 24:21, 103:6, 131:20
**notes** [3] - 12:22, 72:7, 185:5
**nothing** [6] - 9:24, 15:18, 37:8, 84:17, 122:3, 123:18
**notice** [6] - 19:18, 19:25, 28:17, 124:8, 129:21
**noticed** [3] - 6:20,

6:25, 104:15
**notion** [2] - 68:19, 108:14
**November** [1] - 169:11
**nowhere** [1] - 114:14
**number** [22] - 18:9, 33:3, 38:17, 38:18, 38:25, 39:9, 43:1, 43:23, 47:5, 48:25, 56:20, 60:5, 60:9, 66:17, 71:13, 101:22, 105:24, 107:24, 139:9, 155:6, 158:9, 165:23
**Number** [1] - 47:6
**numbered** [1] - 46:1
**numbers** [10] - 61:21, 61:22, 61:23, 62:12, 62:15, 62:16, 166:15, 169:17, 171:11, 171:13
**numerous** [1] - 27:14
**nutshell** [1] - 33:25
**NW** [3] - 1:11, 1:14, 1:22
**NY** [1] - 1:17
**NYPD** [1] - 34:15

## O

**object** [2] - 52:4, 80:12
**objection** [3] - 6:3, 81:2, 81:21
**objective** [1] - 88:11
**obligation** [1] - 48:13
**observed** [5] - 77:11, 147:2, 147:3, 147:19, 147:21
**observing** [5] - 64:6, 64:7, 64:8, 64:11, 65:1
**obtain** [6] - 93:20, 96:6, 106:17, 111:2, 127:12, 127:20
**obviated** [1] - 108:3
**obviously** [7] - 8:11, 16:24, 54:15, 55:9, 98:23, 100:25, 136:2
**occur** [2] - 144:14, 148:21
**occurred** [5] - 40:20, 150:6, 157:20, 163:25, 169:1
**OF** [10] - 1:1, 1:2, 1:7, 1:13, 32:24, 44:24, 88:18, 92:6, 131:15, 185:1
**off-chain** [1] - 119:23
**offer** [6] - 48:14,

48:21, 48:23, 51:8, 52:25, 54:8
**offered** [3] - 28:6, 58:9, 135:25
**offering** [8] - 5:6, 5:15, 5:18, 5:19, 5:23, 7:22, 8:4, 47:3
**offhand** [1] - 128:24
**Office** [1] - 34:17
**officer** [1] - 132:24
**OFFICIAL** [1] - 185:1
**Official** [2] - 1:21, 185:10
**often** [6] - 5:16, 82:16, 98:20, 147:21, 147:22
**oligopoly** [1] - 149:8
**omissions** [3] - 11:19, 15:6, 18:9
**on-chain** [10] - 95:20, 96:20, 96:24, 101:14, 101:20, 113:17, 113:18, 114:5, 126:25, 127:19
**once** [3] - 55:21, 146:7, 166:19
**one** [125] - 3:25, 4:17, 6:6, 7:14, 9:7, 9:11, 9:22, 13:5, 14:18, 14:22, 15:21, 24:11, 25:10, 26:13, 28:1, 32:1, 36:20, 39:4, 40:12, 41:19, 42:2, 42:19, 45:4, 45:25, 46:1, 47:5, 47:22, 48:6, 48:22, 59:23, 60:15, 60:19, 63:14, 64:17, 65:3, 65:4, 67:20, 68:13, 68:25, 69:3, 69:5, 69:12, 74:24, 74:25, 76:9, 78:13, 78:17, 82:16, 83:21, 84:17, 85:7, 85:18, 89:24, 91:2, 98:1, 99:7, 100:17, 100:19, 102:8, 102:17, 104:23, 107:24, 109:21, 109:24, 111:10, 112:4, 113:9, 113:21, 114:20, 115:18, 118:3, 119:20, 119:24, 120:5, 120:12, 121:11, 122:25, 124:11, 124:14, 124:17, 124:22, 126:21, 127:3, 127:24, 128:1,

129:8, 129:12, 129:25, 130:21, 138:5, 138:9, 144:8, 145:18, 147:25, 148:7, 148:20, 149:16, 150:17, 151:17, 151:18, 151:25, 152:8, 152:9, 154:17, 155:6, 155:14, 162:20, 164:25, 165:12, 169:10, 169:17, 170:12, 170:24, 170:25, 172:6, 173:10, 174:9, 177:1, 177:7
**one-on-one** [1] - 113:9
**one-person-sending -to-two-people- simultaneously- type** [1] - 148:7
**one-to-one** [1] - 85:18
**ones** [5] - 5:12, 26:4, 31:25, 109:13, 161:7
**ongoing** [1] - 65:5
**onion** [1] - 109:14
**online** [2] - 97:21, 102:17
**open** [4] - 56:3, 59:17, 99:24, 134:9
**open-source** [2] - 59:17, 99:24
**opening** [1] - 94:2
**operating** [4] - 64:13, 72:7, 105:1, 105:20
**operation** [1] - 174:7
**operations** [2] - 84:10, 144:9
**operator** [1] - 106:9
**opine** [6] - 52:3, 53:3, 53:6, 81:19, 164:21, 173:2
**opining** [3] - 7:1, 164:21, 170:15
**opinion** [70] - 5:6, 5:15, 5:18, 5:19, 5:21, 5:23, 5:24, 7:22, 8:4, 9:4, 16:16, 36:23, 44:5, 44:8, 44:9, 44:12, 44:14, 45:7, 45:9, 46:2, 46:4, 46:5, 46:9, 47:3, 51:6, 51:8, 51:18, 52:1, 54:25, 62:6, 62:8, 72:4, 72:6, 74:10, 74:15, 76:19, 76:24, 77:3, 81:16, 81:18, 81:25, 82:2, 84:20, 88:10,

88:25, 89:17, 89:22, 90:1, 104:13, 104:18, 107:7, 108:11, 109:20, 111:5, 111:8, 112:8, 123:3, 142:11, 143:10, 146:19, 146:22, 159:10, 160:4, 160:9, 167:19, 170:19, 172:22, 173:6, 174:9
**opinions** [19] - 27:24, 46:24, 46:25, 47:13, 47:20, 48:3, 48:11, 48:14, 48:15, 48:16, 48:21, 50:23, 53:24, 54:1, 141:16, 144:16, 144:19, 146:22, 170:17
**opportunity** [4] - 18:15, 25:15, 26:21, 54:1
**oppose** [2] - 20:16, 51:21
**opposes** [1] - 20:11
**opposing** [1] - 39:14
**opposition** [2] - 25:16, 36:19
**option** [1] - 176:7
**order** [8] - 5:8, 5:10, 22:10, 25:18, 90:18, 148:6, 149:20, 171:9
**ordered** [1] - 7:11
**ordinary** [1] - 118:7
**organized** [1] - 5:10
**original** [5] - 19:5, 147:12, 147:14, 163:19, 164:7
**originally** [5] - 23:7, 93:12, 162:20, 162:25, 165:8
**originator** [1] - 130:21
**otherwise** [1] - 22:19
**outcome** [4] - 85:24, 86:11, 89:10, 135:5
**outcomes** [3] - 72:24, 87:7, 129:19
**output** [1] - 155:11
**outputs** [10] - 126:12, 148:2, 149:22, 150:16, 150:21, 151:2, 151:5, 151:10, 151:13, 151:17
**outside** [6] - 28:3, 28:10, 95:25, 103:24, 150:8, 164:15
**outstanding** [2] - 6:19, 23:1

**overall** [1] - 128:21
**overbroad** [1] - 50:8
**overcome** [1] - 100:2
**overnight** [1] - 177:10
**overruled** [1] - 81:23
**overseas** [1] - 138:18
**oversight** [1] - 139:5
**overuse** [1] - 126:4
**overwhelming** [1] - 171:17
**own** [26] - 26:6, 83:1, 94:16, 98:17, 98:19, 102:14, 110:6, 116:24, 119:1, 119:22, 120:14, 120:23, 134:12, 140:14, 141:17, 141:18, 150:2, 150:18, 158:18, 163:13, 167:5, 173:13, 174:2, 174:25
**owned** [1] - 103:11
**owner** [3] - 106:15, 110:2, 116:24
**owner/CEO/ president** [1] - 115:5
**owner/controller/ manager** [1] - 115:6
**ownership** [7] - 96:16, 103:14, 113:16, 113:19, 113:24, 114:13, 170:10
**owns** [2] - 56:17, 175:8

### P

**p.m** [4] - 70:17, 180:7, 184:21
**PAGE** [2] - 2:2, 2:15
**page** [2] - 43:14, 45:14
**pages** [1] - 10:14
**paid** [9] - 55:13, 55:19, 55:20, 55:23, 55:24, 134:8, 134:18, 134:22, 134:23
**pair** [1] - 75:4
**paper** [33] - 10:16, 10:17, 10:19, 10:21, 11:22, 12:19, 15:22, 31:10, 39:2, 63:14, 68:24, 94:6, 94:7, 129:23, 129:25, 130:3, 130:13, 147:12, 147:15, 152:1, 152:4, 152:5, 152:6, 152:8, 152:19, 152:22, 152:24, 153:12,

153:18, 166:2
**papers** [8] - 6:1, 8:12, 9:19, 38:25, 129:6, 129:7, 151:25, 171:22
**paperwork** [5] - 17:3, 56:11, 58:24, 58:25, 59:1
**parade** [2] - 78:12, 78:15
**part** [29] - 12:14, 12:24, 15:1, 35:7, 60:4, 64:2, 77:16, 77:19, 78:6, 79:12, 95:8, 95:12, 95:25, 97:2, 115:2, 117:2, 119:11, 124:2, 124:21, 130:7, 132:6, 135:25, 144:15, 144:16, 147:7, 158:18, 170:19, 172:16, 174:23
**particular** [29] - 5:8, 31:16, 44:12, 49:3, 50:9, 53:2, 53:3, 53:10, 54:14, 68:4, 68:5, 91:8, 101:21, 125:1, 151:11, 152:25, 154:6, 159:11, 160:4, 160:20, 161:1, 166:5, 166:21, 169:4
**particularly** [10] - 4:10, 5:12, 11:14, 20:14, 29:4, 108:23, 122:10, 133:19, 161:2, 164:17
**particulars** [4] - 12:5, 25:3, 54:13, 55:8
**parties** [5] - 24:6, 26:8, 31:14, 55:9, 91:6
**party** [3] - 99:21, 117:17, 124:22
**pass** [4] - 43:4, 43:5, 44:22, 131:2
**password** [2] - 101:17, 102:1
**past** [9] - 67:18, 75:15, 100:16, 129:16, 138:18, 175:14, 175:19, 175:22, 175:23
**path** [2] - 174:9
**pathologist** [4] - 68:13, 68:25, 69:12, 69:14
**pathologists** [1] - 64:23

pathology [2] - 68:23, 69:6
pattern [12] - 60:20, 61:10, 147:19, 147:21, 169:21, 169:23, 169:24, 169:25, 170:4, 172:15, 172:16, 175:14
patterns [8] - 62:13, 62:14, 62:15, 62:17, 62:20, 147:2, 170:11
pay [3] - 55:21, 56:6, 56:16
paying [1] - 55:17
payjoins [1] - 149:24
payments [2] - 96:14, 148:1
pays [2] - 56:15, 175:10
peel [4] - 122:10, 125:7, 125:24, 126:4
peer [20] - 9:20, 60:10, 71:7, 113:5, 113:10, 136:24, 143:25, 150:5, 150:6, 169:6, 173:16, 173:20
peer-reviewed [4] - 9:20, 60:10, 71:7, 136:24
peer-to-peer [7] - 113:5, 113:10, 143:25, 150:5, 150:6, 169:6, 173:20
pejorative [1] - 109:15
PELKER [37] - 1:13, 3:6, 3:9, 3:20, 5:11, 5:17, 5:25, 6:9, 6:15, 6:18, 7:4, 13:25, 18:22, 19:9, 19:17, 20:19, 21:3, 21:14, 21:19, 22:8, 22:16, 24:10, 24:14, 24:21, 26:20, 28:14, 28:20, 29:13, 30:22, 31:23, 131:8, 176:6, 176:10, 176:19, 178:4, 179:7, 179:15
Pelker [6] - 3:6, 3:8, 18:21, 26:19, 29:12, 30:21
pending [1] - 21:14
Pennsylvania [1] - 1:14
people [48] - 5:2, 17:18, 33:17, 33:20, 34:1, 35:15, 40:8, 42:1, 42:3, 42:4, 42:11, 42:14, 42:20, 63:9, 66:19, 68:7,

68:8, 68:9, 73:19, 78:14, 79:1, 80:22, 83:3, 83:9, 96:17, 98:8, 98:20, 99:1, 99:2, 99:16, 100:9, 106:19, 109:15, 110:7, 110:9, 129:12, 148:1, 148:7, 150:14, 154:7, 155:23, 156:1, 156:2, 164:17, 179:20
per [1] - 58:17
perceive [2] - 33:17, 62:19
perceived [1] - 138:1
percent [25] - 57:9, 68:7, 68:9, 69:11, 69:12, 75:11, 80:6, 83:19, 84:2, 105:10, 105:11, 105:12, 105:15, 105:17, 106:2, 143:16, 170:7, 170:25, 171:1, 171:19, 172:5, 172:6
percentage [11] - 82:4, 127:24, 128:6, 128:8, 128:9, 128:14, 147:6, 147:22, 149:1, 170:7
percentage-wise [1] - 128:6
percentages [1] - 148:5
perception [1] - 36:18
perform [1] - 139:25
performance [1] - 71:11
perhaps [2] - 32:1, 41:1
period [3] - 14:7, 28:2, 148:5
periods [1] - 20:1
permission [1] - 14:3
permit [1] - 28:11
persist [1] - 94:12
person [22] - 9:4, 37:17, 37:23, 53:14, 61:4, 66:20, 77:21, 77:22, 89:14, 98:2, 100:22, 101:4, 115:23, 115:24, 122:13, 126:16, 126:20, 148:7, 154:3, 173:2, 173:24, 176:5
personal [1] - 111:2
personally [6] - 55:20, 59:10, 101:4, 101:9,

145:12, 146:2
personnel [1] - 58:13
Ph.D [4] - 33:4, 45:25, 60:6, 63:25
philosophy [2] - 33:12, 59:5
phishing [2] - 95:19, 97:6
phone [1] - 20:24
photograph [1] - 68:7
phrase [5] - 82:20, 100:12, 115:15, 116:12, 144:4
pick [5] - 22:11, 24:3, 178:13, 178:24, 179:1
picked [1] - 18:23
picking [1] - 73:11
pickup [1] - 175:17
picture [2] - 164:13, 165:23
pictures [1] - 96:17
piece [1] - 166:2
pieces [4] - 60:24, 65:2, 76:10, 101:16
pilot [1] - 34:7
pilots [5] - 37:10, 64:24, 65:1, 65:6, 71:14
place [6] - 23:24, 23:25, 98:1, 98:2, 118:11, 159:23
placement [1] - 174:20
placing [1] - 174:24
plain [1] - 86:19
Plaintiff [2] - 1:3, 1:10
plan [4] - 45:21, 45:22, 46:2
plane [3] - 37:1, 37:2, 65:4
planned [1] - 3:23
planning [1] - 23:11
platform [3] - 115:1, 143:25, 150:5
platforms [2] - 113:6, 169:6
plausible [3] - 163:18, 164:4, 164:22
play [1] - 90:5
playing [1] - 150:13
plea [2] - 40:17, 40:22
PLLC [1] - 1:16
podcast [10] - 115:3, 115:12, 115:14, 115:15, 135:21, 135:22, 136:13, 137:1, 137:6, 171:22
point [33] - 14:7, 16:7, 19:15, 30:1, 30:19,

41:16, 46:23, 47:14, 54:8, 59:25, 60:1, 60:15, 71:13, 81:4, 87:17, 105:22, 108:10, 109:21, 119:17, 119:24, 127:1, 134:24, 138:9, 142:4, 142:15, 164:19, 167:9, 170:25, 171:1, 171:21, 172:6, 178:20, 178:23
pointed [1] - 109:13
pointing [1] - 109:11
points [1] - 135:12
Poland [1] - 100:13
police [4] - 34:11, 34:12, 82:6, 82:14
policies [1] - 133:2
policing [1] - 34:10
policy [5] - 92:15, 132:25, 133:3, 139:2, 139:5
pool [7] - 149:15, 152:25, 155:21, 155:23, 155:24, 156:2
popular [3] - 98:21, 115:14, 127:16
portion [7] - 52:6, 57:18, 57:21, 127:18, 127:21, 159:8, 173:18
portions [1] - 159:10
pose [2] - 82:24, 84:25
posed [1] - 28:19
position [4] - 4:18, 6:2, 110:2, 167:6
positive [1] - 7:25
positives [4] - 27:21, 152:14, 152:16, 152:17
possess [1] - 173:8
possibility [4] - 99:19, 147:16, 147:17, 171:14
possible [6] - 8:23, 73:18, 85:17, 126:23, 127:14, 127:16
possibly [2] - 21:19, 22:1
post [20] - 106:12, 108:15, 109:8, 110:13, 110:15, 110:20, 127:17, 142:23, 163:9, 164:13, 165:10, 166:12, 167:17,

172:2, 174:11, 174:16, 174:24, 175:12
post-Bitcoin [2] - 167:17, 172:2
post-laundered [2] - 174:24, 175:12
post-mix [9] - 108:15, 109:8, 110:15, 110:20, 142:23, 163:9, 174:11, 174:16
postponed [1] - 23:16
pot [1] - 119:24
potential [4] - 19:21, 20:25, 123:19, 143:17
potentially [7] - 4:12, 89:10, 103:15, 129:17, 158:1, 167:4, 174:14
practice [3] - 89:20, 92:21, 94:3
practiced [1] - 133:8
practices [4] - 72:9, 72:19, 89:17, 144:1
pre [1] - 164:12
pre-Bitcoin [1] - 164:12
precedes [1] - 122:8
precursor [1] - 99:4
predicate [1] - 174:13
predicted [1] - 152:14
predicting [2] - 86:10, 87:4
prediction [1] - 80:8
predicts [1] - 87:6
preface [1] - 139:21
prefer [1] - 84:15
preference [1] - 19:12
prejudice [1] - 36:15
preliminary [1] - 24:19
premature [3] - 30:14, 48:19, 54:15
prepare [4] - 11:13, 17:19, 18:11, 21:8
prepared [4] - 20:15, 48:2, 81:13, 81:19
presence [10] - 28:3, 28:10, 72:4, 73:12, 73:15, 74:17, 74:21, 79:13, 84:1, 85:22
present [5] - 3:12, 18:16, 53:23, 74:7, 111:18
presentation [8] - 75:13, 130:4, 153:13, 153:16, 154:1, 154:3, 154:4, 158:3

**presented** [3] - 18:9, 85:17, 153:20
**presenter** [1] - 153:20
**presenting** [2] - 65:24, 65:25
**press** [2] - 12:7, 98:21
**Press** [1] - 107:18
**pressing** [1] - 10:8
**presumably** [2] - 20:21, 144:24
**pretrial** [4] - 21:4, 21:9, 24:4, 26:8
**pretty** [9] - 94:1, 111:16, 113:1, 121:13, 134:14, 147:17, 154:19, 166:9
**previewing** [1] - 130:3
**previous** [1] - 28:17
**previously** [2] - 10:12, 84:11
**price** [4] - 112:13, 167:1, 167:5, 169:13
**prices** [1] - 167:3
**primarily** [1] - 144:20
**primary** [3] - 33:15, 101:16, 122:25
**principally** [1] - 116:6
**principles** [2] - 71:4, 71:10
**print** [2] - 60:20, 61:10
**prints** [1] - 78:16
**Privacy** [1] - 136:22
**privacy** [28] - 103:16, 106:16, 106:17, 107:17, 107:25, 108:1, 108:4, 108:7, 108:8, 108:15, 110:3, 110:9, 111:2, 111:3, 115:2, 127:12, 127:20, 135:22, 136:15, 136:17, 137:8, 137:22, 139:15, 147:14, 158:2, 174:12
**private** [20] - 81:10, 90:2, 101:16, 101:17, 101:24, 101:25, 102:3, 102:11, 103:5, 103:7, 103:8, 103:9, 107:22, 108:9, 114:7, 114:9, 114:14, 126:25, 137:19, 174:11
**pro** [3] - 120:8, 134:21, 135:4
**probabilistic** [1] - 27:12

**probability** [5] - 80:4, 85:23, 85:25, 87:19, 87:22
**problem** [9] - 12:14, 13:20, 49:18, 50:2, 63:2, 67:15, 86:21, 107:23, 144:3
**problematic** [1] - 86:24
**problems** [5] - 9:11, 76:9, 97:5, 116:17, 123:19
**procedure** [1] - 69:23
**procedures** [8] - 35:8, 38:10, 64:13, 72:8, 73:4, 78:10, 79:22, 79:23
**proceed** [5] - 32:21, 55:8, 91:9, 92:3, 131:14
**proceeding** [4] - 4:19, 55:6, 153:14, 160:23
**proceedings** [4] - 6:21, 27:1, 180:8, 185:6
**proceeds** [6] - 111:1, 142:23, 173:12, 175:1, 175:8
**process** [14] - 8:8, 13:1, 13:4, 20:22, 37:24, 71:8, 71:19, 76:7, 79:12, 86:20, 140:5, 153:11, 172:13, 174:23
**processes** [10] - 35:17, 36:17, 37:13, 37:16, 37:21, 42:13, 46:6, 63:13, 63:21, 72:25
**processing** [3] - 37:22, 71:19, 76:16
**produce** [1] - 7:12
**produced** [2] - 49:10, 160:18
**product** [2] - 145:19, 162:7
**production** [1] - 168:14
**professional** [2] - 134:4, 173:1
**Professor** [3] - 131:18, 132:1, 140:13
**professor** [7] - 113:23, 139:17, 141:21, 142:4, 144:8, 159:8, 168:4
**proffer** [1] - 61:21
**proffered** [2] - 26:12, 48:7

**proffering** [2] - 9:7, 48:7
**program** [1] - 120:7
**programmer** [1] - 140:2
**programmers** [1] - 99:23
**progress** [1] - 177:13
**prohibition** [1] - 93:13
**Project** [2] - 83:2, 83:18
**projects** [1] - 97:5
**proliferation** [1] - 17:3
**prominence** [1] - 154:16
**prominent** [1] - 155:3
**promote** [2] - 81:12, 81:20
**promptly** [3] - 13:20, 30:21, 48:20
**prone** [2] - 72:23, 86:18
**proof** [4] - 107:21, 139:7, 139:10, 139:16
**proper** [6] - 12:24, 17:16, 18:11, 18:17, 54:16, 149:20
**properly** [2] - 17:19, 57:17
**property** [2] - 101:10, 113:25
**proportion** [1] - 85:8
**proposal** [1] - 136:23
**propose** [5] - 20:17, 21:6, 21:11, 43:7, 164:21
**proprietary** [1] - 119:8
**proprietor** [1] - 143:5
**prosecution** [8] - 38:22, 39:14, 40:13, 44:18, 44:20, 83:7, 88:9, 90:1
**prosecutor** [3] - 38:24, 51:3, 90:18
**prosecutors** [2] - 40:5, 45:5
**prospective** [3] - 45:17, 45:20, 46:16
**protection** [1] - 42:20
**protective** [2] - 119:2, 119:4
**prove** [1] - 77:7
**proven** [2] - 79:20, 100:7
**provide** [11] - 20:9, 41:1, 68:1, 68:17, 72:20, 84:13, 127:25, 141:24, 158:9, 158:16,

158:17
**provided** [6] - 53:25, 69:5, 122:7, 159:14, 160:2, 160:11
**providers** [3] - 152:10, 153:3, 158:25
**provides** [1] - 68:1
**proximity** [2] - 8:16, 8:18
**proxy** [1] - 9:1
**Public** [1] - 93:4
**public** [33] - 40:6, 41:23, 42:2, 90:18, 92:15, 92:22, 101:16, 101:18, 101:23, 101:25, 102:1, 102:12, 102:15, 102:20, 102:22, 103:9, 103:10, 103:15, 106:17, 106:19, 119:5, 122:11, 123:25, 124:9, 124:12, 125:1, 125:2, 126:3, 127:8, 141:19, 146:5, 180:7
**publicity** [2] - 81:11, 81:20
**publicly** [3] - 109:16, 137:22, 146:15
**published** [11] - 33:13, 33:14, 39:25, 52:13, 60:5, 60:9, 66:23, 68:24, 80:22, 133:11, 133:13
**pull** [3] - 113:7, 114:4
**purchase** [4] - 150:6, 164:10, 166:24, 167:7
**purchased** [5] - 165:12, 165:24, 167:20, 167:23, 173:15
**purchases** [1] - 143:24
**purely** [3] - 6:24, 65:8, 139:2
**purports** [1] - 157:18
**purpose** [2] - 26:10, 27:2
**purposes** [3] - 32:11, 53:23, 94:8
**pursuant** [1] - 51:19
**pushed** [1] - 20:12
**pushing** [2] - 16:12, 23:20
**put** [20] - 3:23, 4:25, 18:18, 19:24, 20:2, 20:3, 20:22, 22:13, 22:14, 23:9, 25:22,

27:5, 110:1, 115:7, 135:17, 145:5, 145:13, 163:2, 166:1
**puts** [4] - 23:23, 24:1, 36:3, 69:4
**putting** [3] - 20:13, 78:2, 101:9

**Q**

**qualifications** [1] - 7:16
**qualified** [4] - 18:16, 40:10, 40:20, 48:6
**qualify** [1] - 39:12
**Quantico** [1] - 35:4
**quantification** [1] - 79:4
**quantify** [4] - 68:17, 78:11, 86:1, 127:22
**quantifying** [3] - 68:1, 70:4, 87:19
**questioning** [3] - 28:3, 48:1, 70:20
**questions** [18] - 17:23, 25:3, 43:11, 45:5, 47:16, 47:17, 48:5, 53:21, 81:4, 86:14, 88:15, 88:22, 90:9, 90:15, 104:23, 121:14, 153:11, 160:16
**quick** [1] - 108:19
**quickly** [2] - 21:8, 169:11
**quit** [1] - 168:21
**quite** [7] - 26:6, 53:4, 64:14, 90:21, 116:3, 163:16
**quiz** [1] - 130:8
**quotation** [1] - 36:3
**quote** [7] - 129:15, 137:7, 160:22, 168:22, 169:10, 169:12

**R**

**raise** [6] - 25:8, 32:18, 55:1, 55:2, 55:4, 91:25
**raised** [4] - 8:12, 26:22, 43:23, 121:14
**ran** [2] - 104:25, 107:16
**RANDOLPH** [1] - 1:8
**random** [2] - 84:6, 169:23
**range** [5] - 34:5, 65:23, 112:16,

112:19, 167:2
**ransomware** [1] - 95:18
**rare** [1] - 148:3
**rate** [24] - 27:13, 27:21, 68:6, 69:17, 69:18, 75:11, 75:18, 79:6, 123:8, 123:13, 134:9, 134:10, 134:11, 134:12, 135:1, 135:2, 143:17, 143:18, 147:23, 166:5
**Rates** [1] - 39:3
**rates** [14] - 8:2, 9:24, 12:3, 15:3, 27:11, 29:8, 38:15, 38:17, 38:18, 38:21, 38:24, 38:25, 165:19
**rather** [5] - 78:4, 96:23, 99:1, 99:15, 125:21
**reach** [8] - 38:6, 44:19, 66:6, 66:9, 74:14, 76:18, 80:21, 81:1
**reached** [5] - 86:4, 86:22, 87:23, 136:7
**reaching** [1] - 72:2
**reaction** [1] - 136:4
**Reactor** [16] - 27:11, 29:5, 30:11, 30:13, 43:19, 49:9, 90:3, 117:20, 117:23, 118:23, 118:25, 119:20, 120:12, 120:22, 121:2, 123:1
**read** [10] - 12:21, 27:7, 36:19, 46:17, 50:14, 60:15, 83:5, 84:21, 130:9, 136:3
**readily** [5] - 41:10, 110:13, 113:11, 157:14, 157:22
**reading** [1] - 152:20
**ready** [3] - 22:5, 49:21, 92:9
**real** [10] - 38:1, 39:8, 96:20, 108:19, 109:10, 114:16, 126:19, 126:20, 173:1
**real-world** [1] - 96:20
**realistic** [1] - 17:6
**realize** [2] - 23:12, 120:1
**realized** [2] - 99:12, 138:12
**really** [13] - 17:22, 23:20, 23:21, 25:25,

30:6, 33:19, 43:6, 51:22, 53:8, 86:13, 100:24, 126:21, 174:8
**reason** [17] - 5:14, 12:25, 13:3, 17:5, 17:24, 49:19, 67:2, 107:10, 107:11, 110:15, 112:24, 119:9, 120:25, 145:17, 146:9, 147:8, 174:15
**reasonable** [14] - 103:3, 103:8, 105:12, 109:25, 110:23, 164:10, 165:4, 165:6, 165:9, 165:13, 165:22, 167:6, 167:20, 171:1
**reasonably** [1] - 162:22
**reasoning** [1] - 38:6
**reasons** [13] - 14:3, 19:16, 47:15, 104:22, 106:18, 120:5, 121:10, 144:14, 144:17, 145:4, 145:15, 145:16, 145:18
**rebut** [2] - 16:21, 18:17
**rebuttal** [3] - 16:23, 47:6, 47:8
**receive** [1] - 73:17
**received** [4] - 11:15, 59:9, 145:25, 164:17
**receiving** [2] - 111:7, 113:6
**recent** [3] - 154:13, 154:14, 154:15
**recently** [3] - 115:12, 154:16, 154:22
**recess** [3] - 70:17, 91:19, 131:6
**recipient** [1] - 149:18
**recipients** [1] - 149:17
**recognize** [1] - 20:20
**reconvene** [2] - 175:24, 176:15
**record** [13] - 3:4, 32:7, 50:18, 73:23, 75:3, 75:16, 97:24, 97:25, 102:19, 118:8, 119:5, 141:7, 180:7
**recorded** [1] - 113:19
**recording** [1] - 113:17
**recordings** [1] - 63:17
**records** [17] - 8:11, 9:1, 57:22, 57:25, 115:20, 115:22,

116:17, 116:21, 116:24, 135:11, 161:14, 161:17, 161:21, 161:24, 168:13, 168:17
**recreate** [1] - 11:18
**redirect** [1] - 67:11
**REDIRECT** [1] - 88:18
**Redirect** [1] - 2:7
**reduce** [4] - 58:13, 72:21, 78:9, 78:21
**reduces** [1] - 79:5
**reducing** [1] - 79:7
**reference** [1] - 65:7
**referenced** [7] - 39:5, 108:19, 111:15, 122:6, 128:15, 136:10, 152:4
**references** [1] - 27:14
**referencing** [1] - 42:24
**referred** [1] - 137:21
**referring** [7] - 31:12, 83:16, 87:9, 101:6, 108:20, 130:12, 130:14
**reflects** [1] - 53:3
**reframing** [1] - 75:12
**refuse** [1] - 59:10
**regard** [3] - 13:10, 25:10, 108:18
**regime** [1] - 107:2
**register** [1] - 50:17
**registration** [1] - 8:21
**regular** [2] - 4:4, 139:9
**regularly** [1] - 118:17
**regulation** [2] - 92:17, 133:19
**regulatory** [1] - 97:19
**reiterate** [1] - 4:18
**relate** [1] - 143:15
**related** [4] - 77:12, 123:4, 140:10, 149:24
**relating** [1] - 159:18
**relation** [3] - 34:3, 35:20, 88:22
**relationship** [2] - 121:4, 145:23
**relative** [3] - 93:20, 170:1, 170:5
**relatively** [1] - 93:20
**relayed** [2] - 116:3, 168:24
**release** [1] - 12:7
**relevance** [2] - 51:22, 55:10
**relevant** [9] - 75:3, 75:21, 75:22, 75:23, 76:10, 76:12, 89:14, 92:20

**reliability** [9] - 94:18, 116:16, 121:14, 146:2, 146:14, 146:19, 146:23, 158:22, 163:7
**reliable** [7] - 51:25, 52:1, 87:2, 88:11, 123:4, 146:8, 152:3
**reliably** [3] - 15:4, 123:12, 123:13
**reliance** [1] - 145:1
**relied** [1] - 112:22
**relies** [2] - 146:21, 172:22
**relink** [1] - 108:8
**rely** [21] - 26:3, 35:9, 84:16, 84:19, 84:22, 94:20, 98:2, 99:9, 112:24, 112:25, 113:2, 116:22, 117:7, 117:8, 117:14, 121:25, 122:1, 132:7, 145:4, 145:12, 163:7
**relying** [14] - 117:1, 117:16, 117:17, 119:19, 120:4, 129:17, 130:25, 144:15, 144:16, 144:19, 144:24, 153:10, 172:24
**remaining** [2] - 23:3, 23:16
**remember** [18] - 40:20, 41:11, 41:15, 56:20, 65:17, 66:22, 98:22, 115:5, 115:8, 127:23, 128:3, 128:14, 152:20, 161:19, 161:23, 161:25, 168:18
**remind** [1] - 21:1
**remixing** [2] - 155:12, 155:24
**remote** [2] - 176:11, 177:3
**remotely** [3] - 176:4, 176:22, 176:24
**removed** [1] - 180:4
**rents** [1] - 99:10
**repeat** [7] - 60:22, 60:23, 61:15, 66:16, 117:13, 145:7, 145:9
**repeatedly** [2] - 12:12, 50:5
**repeating** [3] - 77:17, 87:8, 87:21
**replace** [1] - 18:6
**reply** [3] - 25:15, 25:21, 25:24

**report** [42] - 5:11, 6:1, 7:8, 7:14, 7:23, 8:1, 9:15, 10:1, 10:3, 10:4, 11:13, 11:25, 12:13, 12:17, 14:4, 15:5, 15:14, 17:19, 17:20, 17:25, 18:4, 18:6, 18:11, 18:17, 18:24, 19:25, 20:4, 20:7, 20:18, 20:20, 20:21, 20:23, 22:7, 22:10, 41:8, 48:14, 48:20, 49:24, 122:6, 130:15, 142:6
**reported** [1] - 103:23
**REPORTER** [3] - 117:10, 145:7, 185:1
**reporter** [4] - 67:3, 67:18, 120:17, 158:14
**Reporter** [3] - 1:21, 1:21, 185:10
**reports** [6] - 7:12, 11:14, 19:3, 144:9, 159:12
**represent** [3] - 45:20, 164:11, 166:12
**representation** [1] - 143:22
**representations** [2] - 58:7, 120:21
**representatives** [1] - 158:11
**represented** [2] - 96:20, 160:23
**represents** [3] - 52:1, 96:15, 142:24
**reputation** [2] - 98:18, 113:1
**request** [6] - 9:17, 20:13, 29:24, 30:9, 30:16, 90:20
**requested** [1] - 11:23
**requesting** [1] - 13:9
**requests** [5] - 28:24, 29:16, 30:10, 50:8, 57:6
**required** [2] - 99:3, 133:7
**requirements** [1] - 95:13
**requires** [1] - 18:4
**reread** [1] - 28:5
**rescheduled** [1] - 21:5
**research** [24] - 33:15, 35:5, 35:9, 39:7, 39:8, 55:18, 55:21, 56:6, 56:12, 56:14, 56:16, 59:23, 60:4, 60:5, 62:11, 64:5,

107:21, 115:2, 130:2, 130:7, 139:6, 139:13, 140:11

**resending** [1] - 126:16

**reserve** [2] - 23:15, 91:10

**reserved** [1] - 23:7

**resolve** [2] - 23:1, 26:7

**resources** [1] - 123:16

**respect** [8] - 20:18, 23:18, 51:20, 55:10, 84:21, 91:8, 139:16, 142:23

**resper** [1] - 42:24

**RESPER** [1] - 42:25

**respond** [3] - 20:5, 26:12, 43:20

**responding** [2] - 52:20, 52:24

**responsive** [4] - 18:25, 26:5, 26:23, 28:18

**rest** [3] - 56:15, 124:3, 159:13

**restaurant** [3] - 175:9, 175:10, 175:11

**restroom** [1] - 91:16

**result** [9] - 66:1, 72:1, 79:16, 80:6, 80:10, 83:20, 110:20, 152:6, 172:2

**results** [3] - 67:24, 73:9, 141:16

**retained** [2] - 7:5, 20:3

**retainer** [5] - 56:3, 134:13, 134:15, 134:23

**returned** [1] - 4:4

**returns** [2] - 112:5, 112:6

**revealed** [1] - 28:23

**revelatory** [1] - 26:22

**reversed** [1] - 138:11

**review** [24] - 21:8, 49:11, 49:14, 57:23, 72:7, 72:13, 73:8, 94:7, 104:5, 104:11, 111:10, 129:21, 141:16, 141:18, 143:11, 159:12, 159:13, 161:14, 161:17, 162:12, 165:17, 166:12, 167:2, 169:20

**reviewed** [49] - 4:22, 9:20, 45:10, 45:17, 47:2, 47:12, 57:14, 57:17, 57:18, 57:22, 57:25, 58:2, 60:10, 70:24, 71:7, 77:12,

81:14, 84:9, 86:16, 104:3, 107:12, 111:25, 136:24, 144:9, 153:24, 153:25, 154:1, 159:9, 159:17, 159:18, 159:19, 160:1, 160:3, 160:6, 160:8, 160:11, 160:18, 160:25, 161:4, 161:21, 166:9, 168:4, 168:7, 168:12, 168:16, 171:22, 172:1, 172:10

**reviewing** [5] - 44:13, 71:24, 81:15, 134:19, 142:22

**revisit** [1] - 50:23

**rewards** [2] - 98:10

**rights** [1] - 27:23

**rigorous** [2] - 78:24, 94:2

**rise** [2] - 37:13, 46:7

**risk** [6] - 77:16, 87:21, 100:16, 138:1, 158:10, 158:18

**RMR** [2] - 1:21, 185:9

**robust** [1] - 20:22

**role** [6] - 86:9, 86:19, 116:10, 139:3, 139:5

**ROMAN** [1] - 1:5

**Roman** [7] - 3:3, 3:12, 3:15, 9:3, 107:16, 113:3, 170:7

**Roman's** [2] - 110:1, 170:10

**rookie** [1] - 107:25

**Room** [2] - 1:22, 185:10

**room** [2] - 76:3, 177:4

**rough** [1] - 165:19

**roughly** [8] - 96:6, 105:25, 106:2, 134:11, 165:4, 167:2, 167:8, 178:16

**rounds** [1] - 20:8

**router** [1] - 109:14

**ruin** [1] - 94:18

**Rule** [8] - 12:21, 20:10, 28:23, 29:25, 40:16, 41:13, 50:5, 51:19

**rule** [2] - 12:22, 138:11

**rules** [1] - 142:14

**rulings** [1] - 21:15

**run** [3] - 66:14, 91:16, 138:10

**running** [23] - 8:14,

98:15, 106:12, 107:7, 109:5, 110:17, 111:1, 169:11, 170:2, 170:8, 170:14, 170:16, 172:3, 172:18, 172:19, 172:25, 173:2, 173:7, 173:12, 173:24, 174:6, 174:15, 174:16

**runs** [2] - 58:23, 118:2

**Russian** [1] - 161:9

## S

**safe** [1] - 147:15

**salary** [3] - 55:16, 56:5, 175:10

**sale** [1] - 150:6

**sales** [2] - 168:25, 173:20

**sample** [4] - 60:20, 68:13, 84:7, 146:9

**sampled** [1] - 83:19

**Samurai** [9] - 152:24, 153:17, 153:20, 153:21, 154:13, 154:19, 154:21, 157:13, 159:1

**sanctions** [1] - 10:22

**Sarah** [7] - 10:16, 104:15, 112:1, 129:8, 129:25, 130:2, 130:21

**sat** [2] - 15:19, 16:3

**Satoshi** [1] - 147:12

**save** [2] - 54:3, 127:11

**saw** [6] - 5:7, 5:9, 50:13, 77:14, 109:13, 158:3

**scams** [2] - 95:19, 97:6

**scanned** [1] - 11:15

**scenario** [1] - 164:22

**schedule** [10] - 21:16, 21:25, 22:25, 23:20, 24:12, 24:16, 24:17, 30:15, 49:24, 67:13

**scheduled** [8] - 17:6, 21:4, 21:22, 23:6, 23:12, 28:9, 34:22, 177:6

**scheduling** [9] - 3:17, 6:9, 6:11, 7:4, 7:7, 15:25, 21:12, 24:22, 29:2

**schemes** [2] - 94:12, 95:17

**scholarly** [1] - 133:11

**Scholl** [3] - 12:17, 84:10, 144:10

**Scholl's** [4] - 11:18, 15:5, 18:6, 18:10

**school** [2] - 97:16, 97:17

**School** [2] - 92:16, 96:3

**science** [8] - 4:14, 35:25, 59:7, 66:24, 69:11, 82:23, 83:10, 139:14

**Science** [6] - 52:11, 52:16, 52:18, 72:12, 79:21, 89:23

**scientific** [11] - 8:3, 9:19, 9:23, 15:21, 27:20, 35:25, 52:14, 60:10, 71:7, 74:19, 79:20

**scientifically** [2] - 15:2, 51:25

**scientist** [3] - 3:24, 4:14, 39:6

**scientists** [5] - 10:2, 27:14, 49:7, 80:15

**scope** [1] - 101:1

**scoping** [1] - 94:4

**Scott** [3] - 13:23, 18:6, 19:21

**screen** [1] - 131:11

**Sealed** [1] - 180:8

**search** [2] - 41:15, 106:13

**seated** [1] - 92:2

**second** [13] - 24:9, 31:5, 69:7, 77:19, 84:15, 85:21, 106:22, 107:10, 107:11, 114:20, 118:3, 125:23, 162:17

**secondly** [3] - 134:13, 145:22, 163:9

**secret** [4] - 9:22, 102:4, 102:5, 103:6

**secretly** [1] - 114:9

**secrets** [1] - 63:15

**secure** [1] - 115:22

**securities** [4] - 133:21, 133:23, 134:5, 134:7

**Security** [1] - 145:24

**security** [1] - 133:24

**see** [48] - 9:6, 9:14, 15:15, 31:18, 35:22, 40:18, 40:23, 41:8, 44:17, 49:8, 53:13, 53:15, 62:13, 62:15, 62:17, 62:19, 63:9,

68:8, 68:9, 77:1, 84:21, 88:3, 98:18, 99:13, 100:4, 103:5, 103:7, 106:10, 107:10, 110:6, 111:10, 111:14, 111:18, 111:21, 112:10, 116:21, 126:25, 131:11, 131:20, 131:24, 142:14, 157:1, 172:5, 172:7, 176:9, 178:5, 178:18

**seed** [1] - 100:12

**seeing** [5] - 15:13, 18:10, 45:12, 66:1, 113:13

**seek** [1] - 29:4

**seeking** [2] - 7:7, 54:8

**seem** [3] - 47:18, 48:8, 77:1

**Sefranek** [3] - 1:21, 185:9, 185:9

**SEFRANEK** [1] - 185:3

**seized** [2] - 161:5, 162:23

**selective** [1] - 57:4

**sell** [1] - 157:16

**selling** [2] - 63:15, 169:2

**semantics** [1] - 45:24

**seminars** [3] - 58:9, 58:12, 58:18

**send** [29] - 30:7, 31:8, 40:24, 52:15, 64:3, 66:23, 109:10, 110:15, 123:25, 124:1, 124:2, 124:3, 124:8, 124:11, 124:24, 124:25, 125:3, 125:13, 125:14, 126:1, 127:10, 147:25, 148:12, 149:16, 171:15, 173:12, 174:16

**sending** [11] - 66:21, 109:8, 110:5, 124:17, 125:1, 126:19, 148:1, 148:7, 148:9, 174:11

**sends** [2] - 124:13, 124:22

**sense** [3] - 118:7, 118:19, 172:15

**sent** [7] - 57:16, 57:20, 107:14, 126:6, 171:10, 171:14, 171:20

sentence [1] - 82:25
separate [3] - 48:12, 54:15, 55:9
September [7] - 20:15, 21:3, 23:23, 24:1, 24:5, 28:24, 29:25
sequential [1] - 72:10
series [1] - 126:15
serious [1] - 19:19
Serious [1] - 34:17
serve [3] - 107:20, 137:15, 139:2
server [1] - 9:2
servers [1] - 115:22
service [11] - 104:6, 104:16, 104:18, 107:9, 111:7, 150:8, 152:10, 153:3, 155:20, 157:7, 158:25
services [5] - 150:1, 152:22, 154:8, 155:6, 157:12
set [11] - 3:22, 11:24, 26:4, 29:2, 30:15, 46:2, 46:25, 62:18, 63:1, 63:3, 172:13
sets [4] - 48:14, 48:20, 60:8, 64:2
setting [1] - 20:19
settled [1] - 133:6
setup [1] - 8:20
seven [5] - 10:14, 16:7, 16:9, 25:22, 56:21
several [1] - 20:8
SFO [1] - 34:17
shadow [1] - 64:14
shadowed [1] - 64:18
share [6] - 41:2, 99:2, 99:3, 102:3, 102:8, 167:4
shared [1] - 98:9
shirt [1] - 100:15
shocked [1] - 115:20
shooting [1] - 34:12
short [4] - 46:22, 117:13, 176:13, 178:7
shortage [1] - 95:2
shorthand [1] - 107:1
show [8] - 36:2, 68:7, 77:23, 78:13, 78:14, 103:7, 108:24, 114:14
showed [1] - 65:20
showing [3] - 68:24, 87:24, 152:15
shown [1] - 106:5
shows [3] - 62:12,

66:4, 103:2
shut [2] - 100:9, 139:1
sic [2] - 78:2, 152:1
side [4] - 14:18, 39:14, 94:3, 121:7
sidebar [5] - 19:10, 179:7, 179:11, 179:14, 179:16
sides [1] - 136:19
signature [1] - 45:14
signed [1] - 141:22
significant [10] - 5:12, 5:14, 11:18, 11:19, 15:6, 80:8, 80:18, 80:21, 146:8, 168:22
signs [1] - 46:19
similar [3] - 78:17, 100:4, 166:13
similarly [1] - 147:17
simple [10] - 9:10, 15:1, 15:18, 16:3, 16:16, 75:1, 87:16, 90:16, 91:4, 93:10
simplistic [1] - 166:10
simply [13] - 16:2, 17:13, 18:14, 18:25, 19:22, 20:4, 26:23, 103:18, 103:21, 114:13, 126:24, 155:10, 163:19
simultaneous [1] - 148:10
simultaneously [4] - 148:7, 148:20, 148:21, 156:6
single [1] - 100:22
sit [2] - 48:16, 91:25
site [4] - 108:20, 109:2, 109:14, 109:17
sitting [3] - 148:14, 161:13, 177:3
situation [5] - 14:25, 89:4, 89:8, 90:5, 148:16
situations [1] - 79:11
six [4] - 42:1, 42:17, 56:21, 135:14
sizable [1] - 145:25
size [6] - 128:20, 146:9, 154:20, 170:5, 170:8, 170:12
skeptical [2] - 136:1, 143:10
skepticism [2] - 144:17, 147:8
slide [2] - 69:24, 69:25
slightly [1] - 117:19
slow [5] - 13:2, 13:14, 117:10, 120:15,

158:13
slowed [1] - 12:25
small [4] - 57:21, 63:8, 68:12, 128:7
smaller [2] - 60:23, 170:3
smart [1] - 34:1
so-called [1] - 111:13
social [4] - 99:14, 100:1, 100:3, 139:11
Society [2] - 92:25, 97:20
software [18] - 7:25, 8:3, 8:15, 9:23, 27:11, 27:12, 27:16, 27:20, 27:21, 29:6, 29:10, 30:12, 43:18, 49:5, 59:14, 119:4, 124:6
sold [2] - 115:24, 169:12
solve [1] - 107:23
someone [25] - 4:9, 31:18, 98:23, 99:3, 100:6, 113:7, 113:23, 117:8, 117:14, 126:19, 127:16, 136:5, 141:23, 153:17, 156:24, 167:6, 170:2, 170:8, 172:4, 172:18, 172:25, 173:7, 173:11, 174:6, 174:16
sometime [2] - 6:7, 29:3
sometimes [19] - 43:24, 63:1, 76:21, 78:15, 79:18, 79:19, 110:7, 116:14, 123:7, 123:14, 125:8, 125:9, 126:17, 126:18, 137:21, 147:3, 157:21
somewhat [2] - 93:17, 100:24
somewhere [4] - 5:9, 5:10, 53:12, 166:2
soon [1] - 179:1
SOP [1] - 72:7
sophisticated [1] - 108:17
sorry [35] - 6:13, 11:2, 11:11, 12:10, 23:5, 31:5, 46:12, 49:20, 52:22, 69:7, 73:14, 95:10, 114:20, 117:10, 117:12, 120:15, 120:19,

126:1, 129:18, 135:6, 138:5, 142:9, 144:22, 145:7, 153:8, 155:14, 156:22, 158:13, 158:15, 159:16, 160:14, 171:8, 175:17, 177:9
sort [20] - 11:5, 11:8, 15:1, 18:24, 20:9, 20:16, 31:17, 51:23, 54:4, 54:11, 59:21, 59:25, 68:17, 68:18, 88:12, 103:20, 133:8, 157:8, 164:12, 172:13
sorts [3] - 9:20, 10:1, 49:7
sound [7] - 111:8, 111:9, 112:8, 113:2, 117:3, 117:6, 152:19
sounds [4] - 23:8, 85:3, 164:20, 172:25
source [14] - 15:15, 29:4, 29:9, 29:24, 30:11, 49:8, 49:12, 49:15, 59:17, 60:2, 61:11, 62:10, 72:13, 99:24
sources [2] - 72:3, 168:22
spans [1] - 94:22
Sparkasse [1] - 161:22
speaking [6] - 11:11, 85:12, 103:12, 105:25, 106:2, 149:20
speaks [1] - 147:4
special [1] - 34:12
specialist [2] - 84:10, 144:10
specialize [1] - 93:15
specialized [2] - 158:5, 175:15
specific [31] - 27:2, 29:16, 29:23, 30:4, 37:12, 44:2, 44:5, 44:8, 44:10, 53:1, 53:2, 53:19, 60:4, 62:23, 63:13, 63:21, 66:13, 69:5, 72:6, 74:8, 75:13, 76:24, 80:13, 80:23, 80:24, 80:25, 85:23, 87:22, 138:4, 144:11
specifically [12] - 11:22, 30:10, 34:14, 60:10, 69:21, 73:7, 84:7, 101:13,

134:19, 168:18, 169:15, 175:3
specifics [1] - 54:9
speculate [3] - 171:15, 172:19, 172:21
speculating [1] - 77:13
speculation [4] - 9:5, 78:1, 78:7, 89:12
speculative [1] - 9:8
spell [1] - 6:14
spend [19] - 122:20, 122:22, 122:24, 123:3, 123:19, 123:21, 124:15, 124:18, 126:8, 127:3, 129:5, 147:6, 147:11, 149:3, 149:25, 150:22, 151:16, 151:18, 151:21
spending [6] - 62:4, 62:7, 62:9, 91:13, 146:25, 147:1
spends [1] - 147:5
spent [8] - 64:5, 64:10, 64:25, 79:21, 112:19, 112:20, 135:9, 165:4
spiel [1] - 15:25
split [1] - 150:11
spoken [1] - 77:11
spreadsheets [1] - 162:14
springboard [1] - 11:9
squarely [1] - 9:8
St [4] - 125:11, 125:12, 125:13, 127:10
stacks [2] - 31:11, 31:12
staff [2] - 84:10, 144:9
stage [4] - 45:9, 126:24, 163:15, 175:5
stake [2] - 15:17, 16:9
stand [3] - 95:9, 132:9, 174:15
stand-alone [1] - 132:9
standard [5] - 64:13, 72:7, 111:17, 151:9
Standards [1] - 52:12
standards [4] - 93:24, 111:5, 117:4, 117:6
start [10] - 7:21, 10:7, 10:8, 17:10, 31:17, 45:6, 68:23, 146:25, 166:22, 178:3

**started** [9] - 18:5, 57:16, 100:8, 114:22, 114:23, 122:2, 136:11, 154:24, 169:2
**starting** [5] - 3:5, 28:24, 69:24, 166:21, 175:17
**State** [1] - 92:13
**state** [6] - 3:4, 33:2, 92:11, 92:22, 115:20, 116:1
**statement** [4] - 13:7, 112:4, 156:9, 160:22
**states** [3] - 46:11, 81:8, 82:21
**STATES** [3] - 1:1, 1:2, 1:8
**States** [17] - 1:22, 3:3, 3:7, 23:25, 34:6, 34:16, 38:20, 42:24, 52:10, 52:18, 58:20, 88:1, 88:7, 90:24, 138:8, 138:22, 138:25
**statistical** [2] - 81:4, 87:24
**statistically** [5] - 78:23, 80:8, 80:18, 80:20, 146:8
**status** [3] - 81:9, 176:17, 178:8
**stay** [2] - 59:11, 179:24
**staying** [1] - 74:17
**stealing** [1] - 114:13
**stenographic** [1] - 185:5
**step** [2] - 126:7, 150:15
**steps** [5] - 72:24, 73:1, 73:2, 85:10, 174:20
**stereotypes** [1] - 36:15
**STERLINGOV** [1] - 1:5
**Sterlingov** [24] - 3:3, 3:12, 3:15, 8:6, 8:14, 8:17, 8:24, 9:3, 12:7, 18:19, 20:14, 29:11, 104:25, 108:10, 111:6, 112:5, 112:14, 112:19, 143:4, 143:24, 162:20, 166:23, 169:9
**Sterlingov's** [9] - 104:5, 104:16, 110:24, 159:12, 159:18, 161:5, 161:14, 161:17,

169:8
**still** [26] - 4:4, 7:1, 7:5, 7:14, 10:3, 11:17, 15:5, 15:11, 17:17, 18:5, 18:12, 20:3, 20:18, 20:20, 21:7, 24:24, 30:18, 68:12, 87:4, 87:6, 99:11, 113:2, 114:1, 167:10, 176:6, 176:7
**Still** [2] - 14:4, 22:7
**still's** [2] - 10:4, 13:4
**stipulate** [1] - 31:1
**Stockinger** [1] - 152:1
**stolen** [1] - 116:7
**stood** [1] - 17:23
**stop** [6] - 48:19, 49:22, 100:18, 118:3, 119:12, 175:25
**storage** [1] - 96:15
**stored** [6] - 98:2, 98:3, 118:13, 118:15, 159:23, 161:2
**stories** [2] - 114:23, 116:3
**storing** [2] - 97:23, 98:1
**story** [2] - 100:9, 115:18
**straightforward** [1] - 16:17
**streaming** [1] - 99:6
**Street** [2] - 1:11, 1:17
**strike** [1] - 25:14
**strikes** [1] - 48:12
**string** [3] - 61:20, 61:22, 61:23
**strong** [2] - 9:9, 86:3
**strongly** [1] - 20:11
**student** [2] - 60:6, 63:25
**students** [1] - 107:19
**studied** [5] - 63:13, 63:14, 71:10, 97:1, 152:22
**studies** [3] - 71:12, 82:19, 87:11
**study** [1] - 128:23
**stuff** [12] - 9:20, 12:20, 35:3, 50:4, 50:5, 101:23, 102:10, 102:21, 119:23, 120:3, 120:6, 160:5
**stupid** [1] - 34:1
**style** [1] - 27:1
**subject** [7] - 4:19, 7:10, 54:16, 74:6, 97:5, 110:18
**subjective** [12] -

67:24, 68:19, 70:6, 74:4, 74:10, 74:12, 74:15, 74:20, 75:5, 75:8, 76:20, 76:23
**subjectivity** [2] - 70:5, 70:11
**submit** [2] - 10:4, 14:4
**submits** [1] - 27:22
**submitted** [9] - 13:8, 13:9, 13:13, 31:11, 130:15, 134:24, 141:22, 160:22, 177:16
**subpoenable** [2] - 110:13, 113:11
**subsequent** [1] - 54:25
**subsidizing** [1] - 55:18
**substance** [4] - 3:18, 4:11, 19:15, 24:20
**substantial** [4] - 127:18, 127:21, 135:15, 173:18
**substantially** [1] - 159:22
**substantive** [1] - 18:24
**succinct** [1] - 111:16
**sue** [2] - 115:23, 115:24
**sufficiency** [1] - 20:6
**sufficient** [3] - 5:24, 20:5, 111:22
**suggest** [3] - 78:10, 78:11, 111:20
**suggestion** [3] - 50:25, 51:10, 51:20
**suggests** [2] - 78:15, 110:23
**sum** [1] - 114:12
**summarized** [1] - 136:10
**summary** [1] - 84:13
**sun** [1] - 30:3
**supersonic** [1] - 37:2
**supplement** [2] - 54:5, 59:6
**supplemental** [7] - 7:12, 25:11, 25:15, 48:20, 49:24, 50:20, 129:21
**support** [6] - 38:8, 69:1, 69:3, 69:4, 107:12, 122:12
**supports** [2] - 35:6, 140:11
**suppose** [5] - 5:19, 5:23, 21:25, 68:7, 165:11

**supposed** [2] - 23:24, 69:1
**Supreme** [2] - 39:22, 39:23
**surplus** [2] - 56:6, 56:7
**surprise** [1] - 152:25
**surprised** [3] - 13:11, 136:5, 162:13
**surveilled** [1] - 109:16
**surveilling** [1] - 120:1
**susceptible** [3] - 42:8, 91:1
**suspect** [7] - 22:14, 73:23, 75:2, 75:16, 78:13, 78:17
**Sweden** [1] - 161:15
**Swiss** [1] - 102:2
**sworn** [2] - 32:19, 92:1
**system** [10] - 13:14, 13:15, 13:18, 78:20, 86:21, 98:6, 98:9, 116:18

---

**T**

**Taiwan** [1] - 58:20
**talks** [1] - 83:12
**TAMARA** [1] - 185:3
**Tamara** [3] - 1:21, 185:9, 185:9
**tamper** [1] - 66:20
**target** [2] - 85:7, 85:9
**task** [1] - 79:14
**tasked** [1] - 85:13
**taught** [2] - 79:3, 117:4
**teach** [5] - 107:19, 113:22, 137:7, 173:4, 174:18
**teaches** [1] - 113:23
**teaching** [2] - 97:16
**team** [1] - 144:22
**technical** [5] - 64:2, 66:22, 66:25, 139:23, 139:25
**technically** [1] - 140:8
**technician** [7] - 59:24, 60:25, 71:24, 76:5, 79:14, 79:15, 86:17
**technician's** [2] - 76:6, 86:8
**technicians** [2] - 58:13, 72:20
**techniques** [3] - 63:13, 80:1, 108:17
**technological** [1] - 42:20
**Technology** [1] -

52:12
**technology** [4] - 37:17, 42:21, 98:25, 150:14
**teens** [1] - 154:25
**temporal** [2] - 8:16, 8:18
**ten** [8] - 56:21, 67:18, 91:18, 124:9, 124:13, 151:1, 151:2, 151:17
**tend** [2] - 94:12, 121:3
**tendency** [1] - 11:4
**tentatively** [1] - 21:25
**term** [3] - 64:15, 109:4, 109:15
**terms** [5] - 30:25, 34:10, 70:4, 115:25, 123:4
**test** [4] - 73:12, 73:15, 74:19, 80:5
**tested** [4] - 78:8, 146:2, 146:14, 152:6
**testified** [20] - 10:23, 39:4, 39:9, 40:19, 56:19, 56:24, 59:2, 86:7, 126:23, 132:21, 133:4, 133:5, 140:25, 143:1, 143:13, 157:24, 158:1, 168:11, 168:20
**testify** [39] - 4:2, 4:6, 4:24, 5:22, 7:15, 7:17, 19:8, 39:6, 40:21, 43:7, 43:10, 43:24, 44:1, 44:7, 45:21, 45:22, 46:5, 47:21, 48:2, 48:6, 48:11, 49:21, 51:3, 51:17, 51:21, 52:21, 54:10, 54:12, 55:7, 56:25, 57:2, 57:5, 74:12, 81:8, 81:13, 81:15, 81:17, 112:4
**testifying** [4] - 46:9, 47:16, 54:22, 179:6
**testimonies** [1] - 58:3
**testimony** [29] - 4:10, 4:11, 4:12, 4:21, 5:7, 7:2, 17:14, 27:4, 28:6, 45:7, 45:18, 45:20, 46:16, 51:16, 54:17, 56:23, 67:21, 71:22, 78:23, 79:10, 89:7, 122:14, 133:7, 138:20, 156:5, 156:10, 156:11, 168:5, 179:6
**testing** [1] - 75:9

THE [264] - 1:1, 1:1, 1:8, 3:2, 3:8, 3:10, 3:13, 3:16, 5:5, 5:15, 5:19, 6:4, 6:13, 6:17, 7:3, 7:19, 8:7, 9:17, 10:6, 10:13, 11:2, 11:11, 12:10, 13:3, 13:6, 13:19, 14:1, 14:5, 14:12, 14:17, 15:23, 16:5, 16:10, 16:22, 17:22, 18:3, 18:20, 19:6, 19:14, 20:17, 21:1, 21:11, 21:18, 21:21, 22:9, 22:20, 22:24, 23:7, 23:14, 24:9, 24:11, 24:16, 25:5, 25:9, 25:21, 25:24, 26:19, 27:6, 27:25, 28:18, 28:21, 29:12, 29:21, 30:1, 30:14, 30:23, 31:5, 31:10, 31:21, 32:1, 32:11, 32:16, 32:17, 32:20, 32:22, 40:9, 40:12, 40:19, 40:21, 40:23, 40:24, 41:1, 41:7, 41:14, 41:17, 43:3, 43:5, 44:11, 44:13, 44:15, 44:16, 44:21, 44:23, 46:22, 47:8, 47:11, 47:25, 48:13, 49:2, 49:11, 49:14, 49:20, 50:6, 50:14, 50:25, 51:1, 51:2, 51:12, 51:15, 52:4, 52:8, 52:9, 52:10, 52:22, 53:12, 53:20, 54:7, 54:21, 55:2, 67:1, 67:10, 67:14, 67:16, 68:21, 69:7, 69:19, 70:3, 70:4, 70:13, 70:16, 70:18, 80:13, 81:2, 81:5, 81:23, 81:24, 84:24, 85:3, 88:17, 90:10, 90:12, 90:13, 90:14, 91:5, 91:12, 91:17, 91:20, 91:24, 92:2, 92:4, 96:8, 96:11, 97:7, 97:8, 106:23, 106:24, 117:10, 117:12, 120:15, 120:19, 120:20, 120:21, 127:21, 127:23, 128:6, 128:10, 128:16, 128:17, 128:19, 128:22, 128:25, 131:3, 131:7, 131:9, 131:11, 131:13, 131:14, 131:23, 135:16, 135:18, 138:5, 138:6, 141:24, 142:1, 142:2, 142:9, 142:17, 143:1, 143:7, 143:8, 143:9, 143:13, 143:19, 143:20, 143:21, 144:3, 144:24, 145:1, 145:7, 145:9, 154:17, 154:18, 155:14, 155:15, 156:22, 157:1, 157:3, 158:13, 158:15, 159:15, 159:21, 160:1, 160:3, 160:8, 160:13, 160:14, 162:17, 163:6, 163:12, 164:9, 164:20, 165:3, 165:11, 165:16, 165:25, 166:8, 166:16, 166:18, 166:19, 167:1, 167:12, 167:16, 167:22, 167:24, 168:1, 170:21, 170:23, 175:20, 175:25, 176:3, 176:9, 176:12, 176:21, 177:1, 177:8, 177:12, 177:20, 177:24, 177:25, 178:1, 178:2, 178:3, 178:5, 178:13, 178:17, 178:19, 178:24, 179:9, 179:18, 179:20, 179:23, 180:2, 180:4, 180:6

theft [1] - 132:23

themselves [4] - 75:20, 76:11, 149:13, 169:20

theories [10] - 51:18, 51:21, 52:2, 71:3, 71:6, 71:9, 71:11, 71:12, 71:17

theorizing [3] - 51:23, 51:24, 54:4

theory [13] - 52:16, 68:25, 69:3, 69:4, 69:5, 87:4, 87:6, 87:9, 87:13, 171:9, 174:19

therefor [1] - 142:5

therefore [5] - 9:2, 47:20, 103:11, 105:14, 144:1

They've [1] - 40:4

they've [13] - 12:6, 16:18, 20:1, 34:11, 35:4, 35:8, 79:25, 86:4, 121:5, 134:16, 134:17, 154:16

thin [1] - 136:5

thinking [3] - 11:13, 69:17, 114:2

third [4] - 42:10, 117:17, 126:13, 167:25

thirds [1] - 167:25

thousand [2] - 68:14, 167:25

thousands [1] - 118:14

thread [1] - 144:8

threat [2] - 82:24, 103:16

three [9] - 21:7, 42:19, 68:21, 96:6, 138:8, 138:24, 140:4, 148:12, 174:20

timing [3] - 11:7, 11:12, 15:25

tips [1] - 109:7

title [5] - 115:5, 128:18, 136:18, 136:20, 136:23

today [16] - 3:19, 4:2, 7:6, 9:7, 23:2, 24:22, 30:25, 50:10, 52:5, 54:5, 81:13, 114:3, 148:4, 154:10, 176:8, 176:22

today's [1] - 32:12

together [13] - 19:24, 20:2, 20:3, 20:22, 39:24, 74:23, 122:12, 125:2, 125:14, 127:9, 127:10, 128:12, 149:16

tokens [4] - 109:8, 110:15, 110:20, 174:16

toll [1] - 105:1

tomorrow [16] - 23:2, 23:3, 23:6, 23:8, 23:10, 23:12, 23:13, 176:7, 176:12, 176:15, 177:11, 177:20, 177:24, 178:11, 178:16, 178:24

tonight [1] - 177:7

took [6] - 13:12, 25:19, 67:12, 88:7, 166:6, 167:13

tool [18] - 59:15, 68:18, 108:1, 108:4, 108:5, 108:8, 111:2, 111:12, 111:17, 117:24, 119:2, 119:10, 119:14, 121:12, 157:17, 158:2, 158:16

tools [12] - 43:25, 44:4, 44:8, 51:5, 94:8, 111:11, 119:7, 120:10, 121:9, 127:13, 158:10

top [3] - 37:22, 65:17, 128:14

top-down/bottom-up [1] - 37:22

topic [3] - 37:9, 40:1, 40:7

topics [1] - 117:19

topologies [1] - 94:11

TOR [1] - 1:15

Tor [5] - 1:16, 3:11, 109:14, 125:12, 173:15

total [8] - 42:17, 135:16, 166:13, 167:8, 170:9, 175:7

totally [5] - 36:4, 42:16, 86:12, 89:15, 129:13

totals [2] - 167:17, 167:18

touch [1] - 133:18

touches [1] - 113:22

touching [1] - 110:21

tour [1] - 114:3

towards [1] - 140:7

trace [4] - 12:16, 12:17, 12:18, 18:10

traceability [1] - 157:10

traceable [4] - 149:17, 152:23, 153:2, 158:2

traces [1] - 17:19

tracing [25] - 10:17, 11:18, 11:19, 11:23, 14:10, 15:18, 15:19, 16:18, 16:19, 16:20, 85:6, 95:17, 108:16, 126:14, 129:5, 129:7, 141:14, 141:17, 142:19, 142:20, 143:10, 156:17, 156:19, 157:16

track [1] - 110:6

trade [3] - 96:17, 98:22, 111:17

traded [1] - 96:18

trading [1] - 173:16

traditional [7] - 113:25, 116:14, 116:20, 150:22, 151:16, 151:21, 174:19

trail [3] - 94:6, 94:7

trails [1] - 94:10

train [7] - 34:21, 35:4, 37:10, 39:19, 40:5, 176:1, 177:10

trained [11] - 34:10, 34:13, 34:15, 34:18, 35:10, 39:20, 39:21, 40:3, 132:5, 173:5

training [23] - 55:22, 56:14, 58:9, 58:12, 58:17, 59:9, 66:4, 68:22, 72:20, 78:25, 79:1, 79:7, 93:6, 93:24, 94:1, 94:2, 94:15, 94:21, 95:14, 121:8, 170:18

trainings [2] - 78:8, 92:19

transact [1] - 106:19

transaction [48] - 61:20, 62:7, 62:8, 62:23, 102:13, 113:18, 114:6, 123:24, 124:22, 125:14, 125:23, 126:2, 126:7, 126:10, 127:9, 127:11, 144:13, 146:3, 147:25, 148:8, 148:23, 149:14, 149:16, 149:21, 150:2, 150:10, 150:11, 150:21, 150:22, 151:1, 151:16, 151:20, 151:22, 154:8, 155:7, 155:9, 155:11, 155:17, 155:22, 156:7, 156:14, 156:25, 157:8, 158:21, 159:5, 163:25, 164:2

transactional [3] - 146:4, 147:2, 147:19

transactions [33] - 63:24, 101:21, 103:21, 103:23, 105:4, 108:2, 113:9, 113:10, 123:6, 123:23, 126:16, 140:5, 140:24, 141:6, 144:11,

148:10, 148:19, 148:22, 149:1, 149:15, 150:18, 152:3, 152:9, 152:12, 152:13, 153:1, 156:1, 156:5, 157:25, 158:7, 161:9, 169:6, 169:7
**transcript** [5] - 14:15, 19:11, 179:8, 185:4, 185:6
**TRANSCRIPT** [1] - 1:7
**transcripts** [3] - 58:4, 168:8, 168:9
**transfer** [9] - 96:14, 96:25, 100:5, 113:8, 113:16, 113:18, 114:5, 114:12, 126:24
**transferred** [3] - 166:6, 167:13, 171:6
**transferring** [1] - 114:13
**transfers** [5] - 142:23, 164:17, 167:18, 169:20, 169:22
**transited** [1] - 173:20
**translates** [1] - 166:4
**translations** [1] - 161:8
**travel** [1] - 138:11
**treasury** [1] - 121:5
**Treasury** [1] - 145:24
**trial** [37] - 4:6, 4:7, 5:3, 6:7, 10:8, 14:8, 16:7, 16:11, 16:14, 17:1, 17:6, 17:10, 17:11, 17:13, 18:12, 20:12, 20:15, 21:1, 21:3, 21:22, 22:13, 23:15, 23:23, 24:2, 26:2, 26:9, 27:4, 28:1, 28:4, 28:11, 28:16, 45:21, 47:7, 48:22, 48:24, 112:5, 168:7
**tricky** [1] - 150:9
**tried** [2] - 63:16, 66:20
**tries** [1] - 127:25
**true** [37] - 72:21, 84:1, 100:23, 100:24, 125:8, 125:9, 125:10, 125:22, 125:25, 126:17, 126:18, 127:1, 147:1, 147:6, 149:3, 151:19, 152:1, 152:13, 152:16, 153:1, 155:20, 156:3, 156:4, 156:9, 157:1, 157:5, 157:9,

157:12, 157:15, 157:20, 157:23, 173:24, 174:22, 185:4, 185:5
**trust** [8] - 110:3, 114:8, 114:10, 114:16, 116:12, 117:15, 120:22
**trustful** [1] - 117:9
**truth** [1] - 146:15
**truthful** [1] - 98:10
**try** [19] - 11:2, 21:8, 60:23, 62:2, 72:18, 72:19, 102:8, 105:3, 105:11, 111:17, 122:11, 128:10, 131:21, 139:19, 151:10, 153:13, 173:17, 174:2
**trying** [13] - 11:17, 16:2, 86:13, 87:16, 102:24, 103:13, 104:24, 108:9, 110:1, 139:17, 156:10, 156:11, 171:9
**Tuesday** [1] - 22:2
**turn** [4] - 3:18, 24:20, 25:6, 104:2
**turned** [2] - 111:24, 159:25
**turns** [3] - 12:1, 14:10, 17:13
**twice** [2] - 66:5, 80:19
**Twitter** [1] - 99:15
**two** [45] - 6:10, 6:24, 16:13, 40:12, 40:21, 40:25, 47:6, 48:5, 48:18, 48:22, 50:24, 56:25, 64:3, 65:2, 66:23, 68:21, 69:2, 70:5, 70:7, 71:13, 74:8, 74:23, 85:7, 96:18, 101:15, 125:2, 125:4, 125:6, 125:20, 136:19, 145:4, 145:15, 145:18, 148:1, 148:7, 148:10, 148:19, 151:17, 152:21, 154:15, 167:25, 169:2
**two-thirds** [1] - 167:25
**two-year** [1] - 169:2
**type** [6] - 37:16, 69:12, 130:22, 148:7, 149:2, 149:24
**types** [8] - 61:6, 94:12, 95:17, 122:4, 122:5, 130:12, 130:14,

152:21
**typical** [2] - 65:24, 94:10
**typically** [1] - 53:4

## U

**U.S** [14] - 1:13, 34:7, 37:10, 39:10, 39:17, 52:15, 56:19, 58:9, 65:3, 72:11, 79:20, 79:23, 89:23, 138:25
**UK** [4] - 34:22, 39:10, 39:17, 44:17
**Ukraine** [2] - 100:8, 100:15
**ultimate** [1] - 47:16
**under** [6] - 12:21, 20:10, 30:3, 103:10, 117:3, 142:14
**undergraduate** [2] - 59:5, 59:6
**underlies** [2] - 107:22, 126:21
**underlying** [9] - 9:11, 11:24, 27:10, 49:4, 49:18, 50:3, 153:24, 153:25, 154:4
**understood** [2] - 86:15, 130:20
**undertake** [1] - 93:6
**undertaking** [1] - 156:14
**unfortunately** [4] - 4:3, 82:17, 83:8, 169:12
**unheard** [1] - 134:14
**Uniform** [1] - 96:22
**unintentional** [1] - 34:1
**unintentionally** [1] - 35:17
**unique** [1] - 159:4
**UNITED** [3] - 1:1, 1:2, 1:8
**United** [19] - 1:22, 3:3, 3:7, 23:25, 34:6, 34:16, 34:17, 34:20, 38:20, 42:24, 52:10, 52:17, 58:20, 88:1, 88:7, 90:24, 138:8, 138:22, 138:25
**University** [2] - 33:4, 92:14
**university** [4] - 56:7, 56:9, 56:10, 56:11
**unknow** [1] - 116:12
**unless** [4] - 98:12, 112:24, 117:8, 117:14

**unmotivated** [1] - 33:25
**unnamed** [3] - 10:1, 27:14, 49:6
**unnecessary** [1] - 7:8
**unrelated** [2] - 11:4, 149:15
**unreliable** [5] - 116:24, 116:25, 120:13, 145:14, 149:13
**unsafe** [3] - 130:11, 130:23, 131:1
**unsound** [1] - 112:13
**unspent** [2] - 102:12, 123:24
**untimely** [2] - 25:14, 55:3
**untraceable** [1] - 164:18
**up** [53] - 9:14, 10:8, 10:24, 14:7, 17:24, 18:23, 22:3, 23:20, 24:1, 25:3, 29:19, 37:22, 40:17, 48:11, 73:11, 79:15, 86:6, 87:3, 87:5, 88:7, 88:21, 89:24, 101:15, 105:4, 109:1, 113:7, 114:12, 114:14, 115:15, 116:14, 119:18, 130:17, 134:20, 136:3, 138:10, 147:12, 147:14, 148:10, 150:11, 152:2, 162:22, 163:3, 164:3, 171:11, 171:13, 172:13, 176:4, 176:5, 178:13, 178:21, 178:24, 179:1, 179:3
**Up** [1] - 115:14
**upcoming** [1] - 26:18
**update** [2] - 4:15, 98:12
**updated** [1] - 118:17
**updates** [1] - 98:10
**urge** [1] - 30:20
**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**useful** [2] - 97:3, 167:4
**user** [4] - 9:2, 101:15, 106:15, 149:22
**users** [4] - 149:15, 151:2, 151:6, 155:21
**uses** [7] - 7:24, 7:25, 117:24, 119:21,

123:1, 125:6, 152:25
**usual** [1] - 134:11
**utilizing** [1] - 143:25
**UTXO** [2] - 123:23, 158:19
**UTXOs** [2] - 102:12, 128:1

## V

**valid** [1] - 15:3
**validate** [1] - 73:8
**validated** [1] - 52:17
**validation** [1] - 9:23
**validity** [2] - 8:3, 27:20
**valuable** [2] - 100:6, 100:7
**valuation** [2] - 93:2, 93:21
**Valuation** [1] - 93:2
**value** [8] - 96:14, 97:4, 100:6, 100:17, 163:16, 164:1, 164:6, 166:4
**valuing** [1] - 93:22
**variable** [1] - 105:10
**varies** [1] - 69:8
**variety** [1] - 35:3
**various** [5] - 4:23, 108:23, 109:12, 146:25, 171:25
**vary** [1] - 68:3
**varying** [1] - 98:5
**vast** [2] - 82:7, 84:2
**venue** [6] - 25:4, 25:11, 25:18, 25:25, 26:3, 26:7
**verified** [1] - 117:15
**verifies** [1] - 27:15
**verify** [2] - 117:9, 117:17
**VERRET** [3] - 2:9, 92:7, 131:16
**Verret** [17] - 24:23, 91:23, 91:24, 92:9, 92:11, 97:10, 131:18, 132:1, 139:17, 140:13, 141:21, 142:4, 144:8, 159:8, 168:4, 176:20
**Verret's** [3] - 31:4, 32:5, 32:8
**versus** [8] - 53:9, 60:19, 65:20, 76:22, 128:12, 147:6, 164:13, 172:13
**via** [2] - 150:5, 179:17
**VIA** [1] - 1:10
**video** [5] - 129:14,

130:4, 130:10, 130:11, 154:6
**view** [1] - 28:12
**viewable** [1] - 109:14
**views** [1] - 44:20
**violated** [1] - 115:25
**violations** [1] - 132:22
**Virginia** [1] - 92:22
**virtually** [1] - 160:11
**vision** [1] - 100:1
**Vlahakis** [1] - 6:23
**voice** [7] - 44:5, 60:20, 61:10, 76:24
**voice-pattern** [2] - 60:20, 61:10
**voice-print** [1] - 61:10
**voicing** [1] - 44:8
**volfprius@hotmail. com** [1] - 9:3
**volume** [1] - 128:9
**vs** [1] - 1:4
**vulnerabilities** [1] - 38:14

## W

**wait** [5] - 155:21, 155:25, 156:3, 156:24, 169:13
**wake** [4] - 153:4, 172:9, 173:8
**walk** [1] - 154:5
**walk-through** [1] - 154:5
**walked** [2] - 100:15, 100:16
**Wall** [1] - 1:17
**wallet** [18] - 110:6, 113:7, 114:4, 119:25, 124:5, 124:6, 124:9, 124:10, 124:12, 126:17, 148:9, 148:14, 149:17, 149:18, 152:24, 153:18, 154:5
**Wallet** [15] - 59:18, 152:10, 152:15, 153:15, 153:17, 153:20, 153:21, 154:13, 154:21, 157:13, 157:24, 159:1
**wallets** [1] - 120:2
**wants** [6] - 5:21, 24:24, 52:7, 115:13, 142:18, 156:24
**war** [1] - 100:8
**Wasabi** [16] - 152:10, 152:15, 152:23,

153:1, 153:2, 153:4, 153:7, 153:9, 153:12, 153:15, 153:21, 154:13, 157:12, 157:24, 158:1, 159:1
**Wasabi's** [1] - 153:11
**Washington** [6] - 1:5, 1:12, 1:14, 1:23, 38:20, 185:11
**waste** [2] - 47:18, 48:15
**wasting** [2] - 47:11, 49:20
**Wayback** [2] - 108:24, 109:12
**ways** [11] - 35:19, 71:23, 72:18, 94:10, 98:24, 106:18, 113:3, 113:18, 133:21, 151:12, 173:17
**wealth** [5] - 27:8, 27:17, 172:8, 173:7, 173:8
**Web** [2] - 108:21, 109:16
**web** [3] - 109:15, 109:16, 174:4
**website** [6] - 8:21, 108:12, 108:21, 109:2, 109:4, 109:13
**week** [23] - 4:4, 4:16, 15:12, 21:19, 21:20, 21:22, 22:1, 22:2, 22:6, 22:12, 22:14, 22:19, 22:21, 22:22, 23:22, 23:23, 25:23, 29:3, 68:24, 96:6, 135:13
**weeks** [6] - 13:10, 13:12, 16:7, 21:7, 50:24, 135:13
**weigh** [1] - 109:23
**welcome** [7] - 3:10, 26:12, 55:2, 55:4, 55:8, 61:16, 179:5
**well-established** [1] - 71:10
**well-known** [1] - 157:13
**West** [2] - 178:4, 178:5
**Wharton** [1] - 96:3
**Whirlpool** [2] - 152:23, 154:21
**white** [9] - 10:16, 10:17, 11:22, 12:18, 129:22, 129:25, 130:13, 147:12,

147:15
**whole** [12] - 9:25, 10:2, 10:17, 13:16, 14:2, 15:16, 27:17, 34:5, 49:18, 99:20, 119:9, 176:4
**wide** [1] - 65:23
**Wide** [2] - 108:21, 109:16
**wider** [1] - 61:25
**wife** [3] - 56:18, 58:23, 59:1
**wild** [1] - 139:12
**willing** [3] - 112:23, 112:25, 163:8
**wise** [1] - 128:6
**withdrawal** [1] - 172:14
**withdrawals** [1] - 172:20
**withdrawing** [1] - 172:12
**witness** [34] - 18:15, 18:16, 25:6, 26:17, 30:23, 31:15, 32:19, 43:4, 43:5, 43:6, 44:22, 46:24, 47:6, 47:8, 47:9, 47:10, 47:15, 47:19, 48:16, 49:3, 49:11, 49:14, 49:21, 50:19, 51:17, 52:22, 52:23, 78:13, 91:14, 91:21, 131:2, 177:24, 179:1, 179:3
**Witness** [1] - 92:1
**WITNESS** [61] - 2:2, 40:12, 40:21, 40:24, 44:13, 44:16, 50:25, 51:2, 52:8, 52:10, 53:12, 67:14, 68:21, 69:19, 70:4, 70:16, 80:13, 81:24, 85:3, 90:12, 90:14, 96:11, 97:8, 106:24, 117:12, 120:19, 120:21, 127:23, 128:10, 128:17, 128:22, 131:13, 135:18, 138:6, 142:2, 142:17, 143:7, 143:9, 143:19, 143:21, 145:1, 154:18, 155:15, 157:1, 158:15, 159:21, 160:3, 160:13, 163:6, 164:9, 165:3, 165:16, 166:8, 166:18, 167:1, 167:16, 167:24,

170:23, 175:25, 177:25, 178:2
**witness's** [1] - 51:20
**witnesses** [11] - 6:24, 15:20, 17:12, 23:9, 23:18, 31:2, 78:13, 91:8, 91:12, 91:14
**woman** [1] - 68:8
**wondering** [1] - 29:1
**word** [3] - 36:13, 43:17, 121:22
**words** [2] - 83:1, 84:1
**works** [14] - 10:5, 22:19, 24:5, 24:8, 24:10, 24:14, 30:3, 71:19, 71:22, 97:12, 117:23, 118:24, 125:5, 154:22
**World** [2] - 108:21, 109:16
**world** [7] - 34:6, 39:8, 96:20, 110:10, 118:14, 164:15, 174:12
**worried** [1] - 10:8
**worry** [1] - 100:16
**worth** [7] - 12:8, 90:4, 111:13, 111:22, 154:23, 160:22, 172:6
**wow** [1] - 136:5
**wrap** [2] - 22:3, 130:17
**write** [3] - 12:13, 166:16, 173:4
**writing** [4] - 41:11, 107:18, 136:15, 137:4
**writings** [1] - 136:9
**written** [3] - 18:17, 103:5, 162:7
**wrongful** [7] - 83:4, 83:6, 83:13, 83:15, 83:19, 84:3, 129:20
**wrongfully** [3] - 83:9, 84:7, 116:18
**wrongly** [1] - 83:4
**wrote** [7] - 39:24, 108:12, 108:13, 108:17, 127:16, 141:9

## X

**XYZ** [2] - 5:14, 144:14

## Y

**year** [12] - 10:20, 12:5, 25:17, 49:9, 55:17, 55:23, 56:10, 56:15,

58:17, 115:13, 130:9, 169:2
**years** [8] - 16:9, 56:21, 94:24, 95:4, 124:7, 165:5, 165:21, 167:7
**yesterday** [1] - 34:20
**York** [4] - 1:17, 40:4, 83:2, 176:2
**yourself** [3] - 102:4, 110:1, 141:5
**YouTube** [5] - 129:14, 130:4, 130:11, 153:13, 153:16

## Z

**Zcash** [22] - 137:10, 137:15, 137:17, 137:21, 137:25, 138:3, 138:4, 138:6, 138:7, 138:17, 138:21, 139:2, 139:7, 139:15, 139:24, 139:25, 140:2, 140:3, 140:5, 140:7, 140:8
**zero** [4] - 107:21, 139:7, 139:10, 139:16
**zero-knowledge** [4] - 107:21, 139:7, 139:10, 139:16
**Zoom** [7] - 3:9, 19:12, 32:19, 179:17, 179:18, 179:24
**ZOOM** [1] - 1:10

Appx894

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       ) Criminal Action
                                ) No. 1:21-CR-0399
                 Plaintiff,     )
                                ) **CONTINUED MOTIONS**
vs.                             ) **HEARING**
                                )
ROMAN STERLINGOV,               ) Washington, D.C.
                                ) **July 20, 2023**
                 Defendant.     ) **Time:  10:10 A.M.**

**TRANSCRIPT OF CONTINUED MOTIONS HEARING**
BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For the Plaintiff:      CHRISTOPHER BROWN - VIA ZOOM
                        USAO-DOJ
                        601 D Street, NW
                        Washington, DC 20001

                        ALDEN PELKER
                        U.S. DEPARTMENT OF JUSTICE
                        950 Pennsylvania Avenue, NW
                        Washington, DC 20530

For the Defendant:      TOR EKELAND
                        MICHAEL HASSARD - VIA ZOOM
                        Tor Ekeland Law, PLLC
                        30 Wall Street, 8th Floor
                        New York, NY 10005

Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
                        Official Court Reporter
                        United States Courthouse, Room 6714
                        333 Constitution Avenue, NW
                        Washington, DC  20001
                        202-354-3246

I N D E X

WITNESS                                                    PAGE

J.W. VERRET

    Cross-Examination (Continued)
    By Mr. Brown                                           217

    Redirect Examination
    By Mr. Ekeland                                         227


JEFF FISCHBACH

    Direct Examination
    By Mr. Ekeland                                         254

    Cross-Examination
    By Ms. Pelker                                          275

    Redirect Examination
    By Mr. Ekeland                                         312

(NO EXHIBITS WERE ADMITTED)

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Calling Criminal Case 21-399, United States of America v. Roman Sterlingov.

Would counsel please state their names for the record, starting with government counsel.

MS. PELKER:  Good morning, Your Honor.  Alden Pelker for the United States.

THE COURT:  Good morning.

MS. PELKER:  And I'm joined by Mr. Chris Brown on Zoom.

THE COURT:  Okay.  Thank you.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for defendant, Roman Sterlingov, who is present in court.  And I am joined by Michael Hassard, who is on Zoom.

THE COURT:  Okay.  Thank you all.

Should we go ahead and recall the witness and continue.  Anything else you wanted to say first?

MS. PELKER:  No, Your Honor.  I think we were confused about who would be recalling.  We'd ask Mr. Verret to take the stand, and Mr. Brown will resume the testimony.

THE COURT:  Okay.  Thank you.

MS. PELKER:  Thank you.

THE COURT:  You may continue, Mr. Brown.

MR. BROWN:  Thank you, Your Honor.

CONTINUED CROSS-EXAMINATION OF

J.W. VERRET

BY MR. BROWN:

Q.  Good morning, Mr. Verret.  Can you hear me all right?

A.  I can hear you fine.  Good morning.

Q.  I should say Professor Verret.  Sorry.  Now, Professor --

A.  It's Verret, not Verret, but no need for the professor stuff.

Q.  Very good.  Mr. Verret, yesterday you testified that you did not have access to Chainalysis; is that correct?

A.  That's right.

Q.  Do you have experience with any other blockchain tracing tools, such as CipherTrace or TRM?

A.  I have not used those tools.

Q.  Have you taken any blockchain tracing trainings?

A.  So blockchain tracing is a topic in some of the CFF and CFE trainings.  But I understand you to mean the kind of training that Chainalysis provides; I haven't taken that, training in their tool.

Q.  And you haven't taken training or certification programs that are open to the public from TRM or any other blockchain tracing company?

A.  I wouldn't say that.  I'm currently taking a training program I've almost completed.  I'm waiting for the background check component.  It's offered by McAfee toward their certification as a -- I don't know.  It's another crypto

forensics certification that has a blockchain tracing component to that.

But I have not taken the programs offered by Chainalysis or TRM that you referenced in their own specific tool. And, again, as I mentioned, it's also a component of some CFF and CFE continuing education trainings. Blockchain tracing and using blockchain explorers is a component of those trainings.

Q. Mr. Verret, are you aware of any traditional banks or credit reporting agencies that have been victims of hacks?

A. Sure.

Q. I believe yesterday you mentioned Bank of America. Are there any other financial institutions that you're aware of that have been victims of hacks?

A. So I know that many of them have -- I mentioned Bank of America yesterday in reference to a different item, I believe, a different point.

But in any event, I concede I am aware in the popular news that many banks have been subject to various criminal -- or customers of banks have been subject to issues that involve cryptocurrency and hacks and scams, certainly.

Q. And my question was specifically about hacks. Are you aware of financial institutions, like banks, that have been victims of hacks?

A. Sure.

Q.   Are you aware of a specific example?

A.   Yeah.   I mean, one of the credit rating agencies was subject to a hack.   It was Equifax.

And you read all the time about banks subject to hacking issues.   And I'm aware that -- as you mention banks, I would include in that category the central bank, the Federal Reserve.   And in my capacity as running oversight, the House of Representatives oversight of the Federal Reserve for a couple of years -- as indicated on my resume -- one of the things we investigated was cyber security issues at the Federal Reserve and the number of hacks that the Federal Reserve had been subject to that they didn't tell the public about.

So that's a yes in answer to your question.

Q.   Would it be your testimony that if a bank has been the victim of a hack, then you cannot rely on customer account records for that bank for financial accounting purposes?

A.   It would depend on the nature of the hack.   If, for example, the hack involves an individual's credentials being obtained through phishing, then you could not rely on the bank records as indication of activity by the individual because it might reflect activity by the hacker.   That's one example.

Q.   And does that reflect your personal preference in conducting this work, or is this a generally accepted accounting standard or norm?

A.   It reflects my application of the standards that apply, as

I think it's fair to characterize all the opinions I've expressed. It reflects my application of the standard to -- standards of objectivity and reasonable reliance that apply to CFFs and CFEs in working under the professional standards that we're required to work under that are referenced in my disclosure. And we have to make professional judgments about what records to rely on and for what purpose.

And this tracks back to the Bank of America question and the prior case I had where there was concerns about whether we could rely on -- for a specific purpose, rely on the endorsement practices and -- endorsement compliance practices at Bank of America in the case in which a lot of endorsements seemed to occur that did not comply with their internal processes on endorsements.

For the specific purpose of relying on the accuracy of endorsement at that bank, I couldn't rely because I had reasons to doubt the endorsement compliance procedures of that bank. So the reliance is going to be fit to purpose.

Q. Is it fair to say that your judgment about whether account records can be relied upon or not depends on specific knowledge of the nature of the intrusion and whether that intrusion affected a specific customer's account?

A. It might.

Q. Now, you have no specialized knowledge regarding the Mt. Gox hack, correct?

A. I have knowledge of how that hack has been described by the former operator of that exchange and knowledge of how that's been described in the popular press, knowledge of how that's been described in case filings in which Mt. Gox touches upon issues in cases, including the bankruptcy case itself in Japan. I've seen some of the filings from that case.

So I take my knowledge of it from those -- from those sources and from the tracers in the dark book that's referenced in my disclosure.

Q. So in sum, it's listening to a podcast, reading news articles, and reading a book; is that fair to say?

A. And court filings as well, yes.

Q. And do the court filings for the bankruptcy proceeding in Japan contain details about the nature and specific details of the hack?

A. I don't recall specifically.

Q. Have you reviewed the defense Mt. Gox account records, the account Roso [sic] 987341870?

A. I have reviewed Mt. Gox records. I don't have those in front of me. So I don't recall if -- I don't remember the specific number that you're citing.

Q. Have you reviewed Mt. Gox records that were registered under the name of the defendant, Roman Sterlingov?

A. I don't remember if they had his name at the top, but I assume that they did. I reviewed a number of Mt. Gox records

in the defense -- in the production.

Q.  And do you recall reviewing Mt. Gox customer account records that had KYC information, including Roman Sterlingov's -- an image of his driver's license?

A.  I recall a number of documents where there was a -- there was a -- I'm not sure if it was a driver's license or a passport, but I do recall that.

I don't recall exactly which institutions, but I do recall seeing that a few times.

Q.  So you're not sure if your recollection pertains to the Mt. Gox records or to some other KYC account in the name of Roman Sterlingov?

A.  I reviewed a number of KYC documents that had Mr. Sterlingov's identifying information.  I did see one that appeared to have another person's identifying information, and I wasn't quite sure why that was.  I still have not had a sufficient answer to that particular question.

Q.  And that one account with another person's name and KYC information, that wasn't Mt. Gox, was it?

A.  That wasn't Mt. Gox, that's correct.  I believe it was related to Malta.

Q.  And would it be possible that the reason there's a second customer listed is because that's an account for the defendant's corporate account at Kraken, and the other individual listed is the local Maltese citizen associated with

that corporation?

A. I don't know that that is possible or impossible. I would be glad to look into that further.

Q. Have you reviewed the defendant's plasmadivision.com emails?

A. I reviewed some emails. I don't know that I've reviewed yet that particular email.

Q. Have you reviewed any email transaction confirmations for Roman Sterlingov's Mt. Gox account?

A. I believe I've seen something like that in some of the emails that I reviewed, yes, transaction data confirmations.

Q. Have you reviewed the defendant's Bitstamp account records?

A. Yes. I believe I've -- in understanding the total amount, Bitstamp -- the total amount of bitcoins that he -- are attributed to his possession now by the government, that's a component of that inquiry, yes.

Q. And have you reviewed records of correspondence between the defendant's Bitstamp account administrators?

A. Again, as I sit here, I don't have those in front of me. I don't remember the specific names, but I do remember reviewing -- I remember seeing the email transaction verification emails from various institutions.

Q. Do you recall seeing, in correspondence between the defendant and Bitstamp, that the defendant sent a copy of his Mt. Gox bankruptcy claim form to Bitstamp?

A.  I don't recall that specifically.

Q.  Now, in your expert disclosure, you stated that there is a "distinct possibility that a third-party hacker may have used Sterlingov's Mt. Gox account for the purpose of obfuscating his own unlawful transactions"; correct?

A.  That's correct.

Q.  And that is pure speculation on your part, correct?

A.  You continue to describe things in a way that is misleading and then you ask correct at the end of it.  I want to give a succinct answer, but I don't believe that characterization is accurate.

I believe that it's reasonable to consider the alternative possibility that I've described and that you described in a little bit of a different way than I would describe it.

You know, I -- I continue to believe it's reasonable because, look, I get -- I know I get -- I conduct crypto activity across a number of different venues, and I get email confirmations all the time.  I don't always check them all.  It's absolutely possible for significant confirmations to come through that I don't notice and I don't review until some point later in my own practice until next year's tax filing deadline.

I don't know what someone else's practice is, but it's possible for those to be missed.  I do understand what you're suggesting, that the presence of email confirmations

would raise a flag for a customer.  But I don't think that those obviate the reasonableness of the alternative possibility that someone hacked his account and was conducting activity using his account.

Q.  Have you conducted any study of other Mt. Gox accountholders and whether their accounts were hijacked for illegal purposes?

A.  Not specifically, no.

Q.  Are you aware --

THE COURT:  One at a time, please.

THE WITNESS:  As a result of my training, I do know that that's a frequent pathology -- criminal pathology of hackers.

BY MR. BROWN:

Q.  Are you aware of a single instance that you can speak to today of a Mt. Gox accountholder whose account was hijacked by a third party to conduct the third-party's transactions?

A.  I'm not aware of that, no, specifically.

Q.  So you have no factual basis to speculate that the defendant's Mt. Gox account was hijacked by a third party for illegal purposes?

A.  My basis for considering that alternative hypothesis is my understanding that hacking legitimate accounts to conduct criminal activity is a common fact pattern with hackers.

Q.  Can you cite a single piece of evidence suggesting that

Mr. Sterlingov was the victim of a phishing or credential-stealing attack for his Mt. Gox account credentials?

A. No.

Q. In your review of the defendant's Mt. Gox records, can you point to a single item of evidence that indicates his account was hijacked by a third-party hacker to conduct a third-party hacker's transactions?

A. I have not seen a specific piece of evidence to that effect, no.

But in considering my hypothesis, I also have to consider the possibility that when someone -- when that happens and someone hacks your account in order to engage in illegal activity through your account, they often do their very best to change the settings of your account to limit -- security settings that might be maintained within a specific account. So that's a reasonable hypothetical to consider in considering that alternative hypothesis.

Q. In reviewing the defendant's Mt. Gox account records, can you point to a single piece of evidence indicating that his account security settings were changed or that there's some evidence of deletion logs or other records for his specific account?

A. I have not seen those records, so I cannot point to that specifically. But I would also have the concern of relying on records of those settings changes given the state of the

Mt. Gox data.

MR. BROWN: Your Honor, no further questions for this witness at this time.

THE COURT: All right. Mr. Ekeland?

REDIRECT EXAMINATION OF

J.W. VERRET

BY MR. EKELAND:

Q. Professor Verret, in your review of the discovery, did you come across a complete set of the Mt. Gox database?

A. No.

Q. Do you consider it forensically sound to arrive at conclusions with -- particularly in regard to your hacking hypothesis and everything, without actually having full access to the complete database?

A. If I had access to the full database, I could have a more robust conclusion, fulsome conclusion. It limits my ability to come to a full conclusion, but I still believe it is reasonable to consider the alternative hypothesis of use of -- that, potentially, Roman's account was hacked and used for illicit purposes given that we know it was hacked multiple times.

Q. But if I understand your testimony correctly, to do a fulsome forensic analysis, particularly in the area that you've been brought in, the financial forensic analysis, you'd need access to the complete Mt. Gox database, correct?

A. I think it is accurate that for the -- that to fully

challenge the government's assertions regarding what happened from his Mt. Gox account, that would be necessary, yes.

Q. And as part of your determining -- coming up with, you said, the alternative hypothesis or raising the possibility that Mr. Sterlingov's Mt. Gox information and data had been altered, did you consider Mark Karpeles' conviction in Japan for manipulation of the Mt. Gox data?

A. I did. That's one component, yes.

Q. Did you consider Mr. Mark Karpeles' conviction in 2010 in France for data fraud?

A. I don't have independent knowledge of that, but you mentioned that to me. So that was a part of my consideration, yes.

Q. Now, I just want to turn briefly to -- you've reviewed the government's expert disclosure for Ms. Sarah Glave, who I believe they're bringing in to do the financial reporting on this case?

A. Correct.

Q. Did you see anything in there that demonstrated the bases for her opinions?

A. So far I don't see a basis for a forensic opinion, no.

Q. And did you come across anywhere in the discovery or have you come across any expert report from Ms. Glave as to any of the financial matters in this case?

A. Not yet, no.

Q. And just turning briefly to the government's allegation that Mr. Sterlingov received service fees from his operation of Bitcoin Fog, have you seen any evidence of that at all anywhere in the discovery?

A. I have not, no.

Q. And what would you need to support that hypothesis, if it were to be true? What would you need to see to establish the fact that say, hypothetically, he was receiving service fees?

A. I would need to -- I would need to see his possession of those fees. And the fact that he has bitcoin that's -- that's less than 7 or 8 percent of the total fees one would expect the person running that to receive in bitcoin leads me to understand that -- I cannot assume that the source of that -- I don't want to describe it in the same way because we haven't proven that they're the same bitcoin.

But let's consider Roman's bitcoin -- which is less than 7 percent of the total amount that the person running Mt. Gox would have -- that size differential leads to a reasonable inference to me, related to each other.

What would I need to see? The best evidence would be missing assets that cannot be accounted for. I mean, I have to say -- if you'll indulge a story. I told my son about this case when I first started working on it. And his first question was, does he have a lot of fancy yachts and cars? I said, wow, buddy, that's actually the first question you ask in

forensic accounting. And that's been an element of the government's case is money laundering -- crypto money laundering cases so far, their success so far.

THE COURT: Do you know what sort of car Mr. Sterlingov owned?

THE WITNESS: I haven't seen any evidence that he owned any sort of luxury vehicles or real estate or anything unaccounted for.

THE COURT: Do you consider a Tesla, I think it was a Model S, to be a luxury vehicle?

THE WITNESS: I don't, no. Not in the way --

THE COURT: A $100,000 car is not a luxury vehicle?

THE WITNESS: I mean, it's a $50,000 car. It doesn't --

THE COURT: No. It's the Model S.

THE WITNESS: Okay. Maybe it's a $70,000 car, Your Honor.

To my point, relative to -- at some point valued a billion dollars in missing bitcoin, that doesn't lead me to an inference that he was involved in those assets.

THE COURT: All right.

BY MR. EKELAND:

Q. Outside of this Tesla, have you seen any evidence anywhere of any substantial asset purchases or anything by Mr. Sterlingov anywhere in the discovery?

A.  No.

Q.  And have you seen anything in the evidence, in the discovery that's inconsistent with Mr. Sterlingov simply being an early adopter of Bitcoin who then, essentially, made all his money just from the appreciation when bitcoin rapidly appreciated in the mid- -- around, what is that, 2015, 2016?

A.  No.  And I looked for it.  When I entered this case, like I enter every case, I told you the same initial warning I give every lawyer when I work on a case.  I said, there may come a day when my findings are not consistent with your defense, in which case probably I'll have to resign from this job.  I give that one to every lawyer; I gave it to you.

I looked for the evidence that would suggest otherwise, that he wasn't someone who was just early to Bitcoin who used a privacy tool.  I haven't found that evidence.

MR. EKELAND:  No further questions, Your Honor.

THE COURT:  Okay.  Thank you.  The witness is excused.  Thank you for being here.

Do you want to call the next witness right now?  I have to break at 11:00.

MS. PELKER:  My understanding from Mr. Ekeland is that he won't be available until 1:00 p.m.

MR. EKELAND:  Until 1:00 p.m.  He's on the West Coast.

THE COURT:  I see.  All right.  Do you want to offer

any argument then with respect to the witnesses we've heard over the past day and a half? I'm happy to hear that now as well. It's up to you. I'm just trying to make use of our time.

MR. EKELAND: I was hoping we could do some housekeeping, Your Honor, if that's possible.

THE COURT: That's fine. Sure.

MR. EKELAND: One thing I'd like to address with the Court is we're having significant issues accessing our client at the jail that he's currently in, and that's part of the reasons we're having delays. Like, it's a six-hour drive from New York City; it's two hours outside of D.C.

THE COURT: Where is he being held?

MR. EKELAND: He's being held in the Northern Neck Regional Jail in Warsaw, Virginia. They've restricted our access under the false allegation that we were trying to bring cigarettes in. I think if you just review the video, we put the cigarettes in the locker.

They are not returning our calls. We've had significant issues. We've also heard about other people who were having federal trials that they were restricting access to the attorneys. So we're hoping that either the Court -- we can have him moved to some facility in D.C. where we can access him, or make him readily -- where it's much easier for our experts to get in.

Part of the issue here is, like, Mr. Verret needs to go see him. We need to have our tracing people come talk to him. And even when we try to set up video calls with the jail, they're not returning our calls, they're saying we can only do it at certain times. It's really hampered the defense, and we do not have full and fulsome access that we need to our client to prepare this defense.

So we ask the Court -- I don't know what the solution is, but can we get him to a facility in D.C. or what? Because at this point, as the Court knows, it's game time, and we need full access to him, and we're not getting it.

THE COURT: I can check in with the Marshals Service to see what's going on. There was a time in which -- and it may still be going on -- in which a lot of folks were moved out of the D.C. jail because the conditions were so bad. And the Marshals Service was actually concerned about people being housed under conditions which were not appropriate.

So they moved folks out. And some folks are being held in Pennsylvania, some folks at Northern Neck as a result of that. I can check and see what the current status is. It's, ultimately, not my decision. It's the Marshals Service decision. But I'm happy to follow up with them and figure out what's going on.

More generally, obviously, wherever he's held, the jail needs to provide access to his counsel, and that needs to

occur wherever he's being held.

MR. EKELAND: Your Honor, if there's something that the Court could do on that or if we could have someone get an instruction to the jail to give us full access. We're getting the impression, essentially, that they're just sandbagging us. And it's a big issue.

You know, it's like that sort of soft thing where they don't return your calls or they told us, oh, you can only see him behind plexiglass and we're going to monitor it. It's a big problem.

THE COURT: Well, I will check into what's going on there. If there's anything that I can do, I will. As I said, it is, ultimately, up to the Marshals Service to figure out where someone gets housed.

MR. EKELAND: Thank you, Your Honor.

THE COURT: Any other housekeeping matters you wanted to raise?

THE DEFENDANT: Excuse me.

THE COURT: Yes. Talk to your lawyer first.

MR. EKELAND: Your Honor, he just -- Mr. Sterlingov just wanted to remind the Court something we discussed about before is the sleep issues that he's been having with the transfers. So, essentially, whenever -- in the Northern Neck Regional Jail, when he has to go to a hearing, it's like they're moving him at 2:00 or 3:00 in the night and,

essentially, he's not getting any sleep. I think you can see him. His concern is that that's going to affect his mental state for trial.

THE COURT: Okay.

MR. EKELAND: Then he just asked -- I'd just ask the Court this as well, to reiterate, if there's anything you can do to order the jail to give us full access, we would appreciate it.

THE COURT: On ordering the jail to provide full access, I mean, perhaps that's in my authority at some point. The jail is not even a federal facility. It's a facility that's under contract with the United States Marshals Service. But I'm happy to follow up and make sure that things are handled appropriately.

But what you told me is that they're not returning calls and that he's being held behind plexiglass. Is there anything more than that?

MR. EKELAND: They told us they would now only let us see him, actually, behind the plexiglass on the phone. And before we had access -- well, they're not letting us see him in an attorney room.

THE COURT: Is that because of the cigarette issue?

MR. EKELAND: What they said, essentially, we came in one time and you have to -- you go in a room and you empty out all your pockets. Mr. Hassard had a pack of cigarettes in his

pocket, and he took it out, and then we put them in the locker. And then when we got back, we got a letter from the jail saying, hey, you guys were trying to smuggle in contraband, which was not true, Your Honor. I've been going to jails for a decade; I would never do that.

And then there was a whole back-and-forth between us and them about if we could get access to him, and they said they'd only do it behind plexiglass and --

THE COURT: Because they're concerned that you're going to pass him cigarettes?

MR. EKELAND: Yes, Your Honor.

THE COURT: Well, I will check into the situation.

MR. EKELAND: Thank you, Your Honor.

THE COURT: Any other housekeeping matters you want to raise now?

MS. PELKER: No housekeeping matters, Your Honor. We're happy -- I know we've had a compressed schedule, and we've got 18 minutes. And so if there's any argument that the Court would like to hear, we're happy to make it.

THE COURT: If there's anything you want to add on the bill of particulars, I may be able to this afternoon give you just an oral decision on the bill of particulars. If there's anything you want to add on that, this may be a good time to do that.

MS. PELKER: Yes, Your Honor. I'll actually pass

that to Mr. Brown.

THE COURT: Unless -- maybe since it's Mr. Ekeland's motion, if he wants to go first, that's fine with me, too.

MR. EKELAND: Your Honor, we would like the Court to order a bill of particulars, particularly given -- I understand that the normal response with the bill of particulars is, oh, if you can find from the discovery what you're defending against, you don't need a bill of particulars.

But here we've got a particular problem. It seems like the goalposts keep moving. To date, we don't have any names on the first count of the co-conspirators. There hasn't been a single conspiratorial statement identified by the government. We know no names of the co-conspirators. We've asked.

In terms of the money laundering, initially, the amount was $334 million. In the Bisbee report, it's now gone down to $33 million, 10 of which they're saying is indirectly traced and, I think, like, 22 is directly traced.

The trace in the original criminal complaint does not match the trace in Luke Scholl's report. So we're not clear on -- so what we're having to spend a lot of time on and it's consuming a lot of resources, and Ms. Still is going -- we don't know what we're actually defending against, so we have to burn a lot of resources doing all sorts of traces, spending a lot of money guessing what we're defending.

The government's barebones indictment is not sufficient in a case like this involving very, very complex matters of cryptocurrency tracing and attribution. I mean, that's essentially it. We'd just like to know what we're defending against and not have to guess constantly.

And there's not enough detail in the superseding indictment for us to know what's going on. And then when the expert reports come in, the trace is different. And then, you know, we just don't know what -- if this is going to change at the 11th hour and we're going to have to ask for a continuance and then burn more fuel doing traces that we could have done before if we had just been on notice. I think the Court gets the point.

THE COURT: All right. Thanks. Mr. Brown?

MR. BROWN: Yes, Your Honor. The purpose of the indictment is so that the defendant can understand the charges against him, prepare a defense, and be able to avoid double jeopardy. Between the superseding indictment, the criminal complaint affidavit, the voluminous discovery, and the extremely voluminous pleadings and pretrial witness testimony in this case, I think it's pretty clear that the defense understands the charges, and the defense is mounting a very focused and zealous defense as to the charges against Roman Sterlingov.

The defendant's complaints here really go to certain

specific evidentiary issues about what is the precise amount of money being laundered, you know. The superseding indictment doesn't name darknet vendors and market administrators as unindicted co-conspirators. There's no case law supporting the idea that we need to provide full names of everybody.

In fact, for darknet market administrators, their names may not be known to the grand jury. That doesn't mean the grand jury cannot consider them to be unindicted co-conspirators. I think that --

THE COURT: Just to interrupt, Mr. Brown, even if you didn't know the name, you can still identify who the government contends the co-conspirators are. It was the darknet administrator of X or something like that; even if you didn't know the name, right?

Mr. Brown, can you hear me okay?

MR. BROWN: Yes. Sorry. There's about a one-second delay. I'm trying not to talk over folks on the other side.

To respond to the Court's question, yes, that is true. However, the case law also says that you can look at the full body of materials that have been produced. The superseding indictment refers to darknet market administrators and vendors. The discovery and the other pleadings in this case have referenced, and the expert reports have referenced specific darknet markets, and the trace transactions between those darknet markets and Bitcoin Fog specifically.

So there's no mystery about which darknet markets or illicit markets we're talking about.  There's no mystery about who the unindicted co-conspirators are.  And even if there were, it is very rare for courts to order a bill of particulars simply to name unindicted co-conspirators.

As for the other defense complaints, these are really factual nitty-gritty complaints.  They say they've identified this discrepancy in tracing, which we would dispute, but that's not the basis for a bill of particulars.  The bill of particulars is not a preview of the government's trial presentation.

The bill of particulars is simply to provide notice to the defendant about the charges he needs to prepare a defense to.  And the superseding indictment, complaint and affidavit, search warrant affidavits, discovery, pretrial testimony, expert reports, and other discovery in this case provide a wealth of notice, at the very least, to the defendant sufficient to meet the standard.

THE COURT:  All right.  Thank you.  Anything else, Mr. Brown?

MR. BROWN:  No, Your Honor.

THE COURT:  Mr. Ekeland?

MR. EKELAND:  Just merely on the conspiracy, we really don't have the who, what, where, when, how --

THE COURT:  You've got to go slower for the court

reporter.

MR. EKELAND: On the conspiracy, we don't really have the who, what, when, where, and how. There's no conspiratorial statements or anything identified. It's only stated in the vaguest terms.

And in relation to that, you know, there's a statute of limitations issue here because almost all these darknet markets, if not all of them, went under and ceased practically functioning well outside the statute of limitations. Like Silk Road is going down in 2013; I think Agora goes down in 2014.

You see the government straining with this in the Scholl and the Bisbee reports where they try to identify transactions that they say happened in 2021, well after these markets went down. And nothing there has been defined with any particularity. They're only the vaguest generalizations.

I think that not only goes to the conspiracy issue, but you do have the issue with the double jeopardy. What traces are we concerned with here that the purchase of a domain name registration in 2011, which in and of itself, isn't illegal. That trace is now different in the Scholl report.

So I'm not -- I am conscious of the Court's schedule, so I'm going to leave it at that. Essentially, what we're saying is we would just like a focused statement of the government's case not only to prevent double jeopardy issues, but so that we don't have to burn a ton of resources because

the voluminous discovery is the issue.  That's what's slowing us down.

If we had a bill of particulars, we'd be able to focus more on stuff.  Now we're swimming in three terabytes of data, and that burns a lot of resources that, as the Court is well aware, we don't really have.  Thank you, Your Honor.

THE COURT:  While you're at the podium, you mentioned that the witness is not available until 1:00.  I was planning on starting at 1:30.  Is that okay?

MR. EKELAND:  That's fine, Your Honor.  Yes.

THE COURT:  All right.  So unless there's anything else you want to raise now while we have some time, I can step off the bench, and I'll come back and handle my 11:00.  And then maybe after the 11:00, I can give you my thoughts on the bill of particulars.

MS. PELKER:  Yes, Your Honor.

THE COURT:  I will see you back shortly then.  Thank you.

(Recess taken at 10:50 a.m. until 1:35 p.m., after which the following further proceedings were had:)

THE COURTROOM DEPUTY:  Recalling Criminal Case 21-CR-399, United States of America v. Roman Sterlingov.

THE COURT:  All right.  So I can give you my decision on the bill of particulars, which is the motion at Docket 45. As Rule 7(c)(1) provides, an indictment is sufficient if it

contains "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  If clarification of the indictment is necessary to "ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, to prepare a defense, and perhaps also to protect against retrial on the same charges."  That's *United States v. Butler*, 822 F.2d at 1193.

Then a court "may direct the government to file a bill of particulars."  And that's just a cite to Federal Rule of Criminal Procedure 7(f).

A bill of particulars, though, is not an ordinary tool of discovery or a device to allow the defense to review the government's evidence in the case.  That's *United States v. Brodie* at 326 F.Supp.2d at page 91.  Rather, the purpose of the bill of particulars is to provide clarification where necessary.

It is not a way to force the government to recapitulate information the defendant could ascertain "by reasonable investigation in light of the information contained in the indictment or otherwise furnished by the prosecution."  That's *United States v. Concord Management*, 385 F.Supp.3d at page 74.  And also *Butler* at 822 F.2d at 1193.

At the same time, it's "not sufficient for the government to respond to a motion for a bill of particulars"

by merely "pointing to the voluminous discovery already provided or relying on a government open file policy." And that's *United States v. Bazezew* at 483 F.Supp.2d at page 168.

Here Mr. Sterlingov organizes his motion for a bill of particulars by count in the superseding indictment, so that's the approach that I will follow.

With respect to Count 1, the money laundering conspiracy count, most of what Mr. Sterlingov requests with respect to that count has either already been provided to him or is beyond what the government, in any event, is obligated to disclose in a bill of particulars.

"The general rule in conspiracy cases is that the defendant is not entitled to obtain detailed information about the conspiracy in a bill of particulars."  That's *United States v. Sanford* at 841 F.Supp.2d, page 317.  Courts, therefore, routinely deny requests for information such as which conspirator committed each act alleged in the indictment; the exact time, date, and place where the conspiracy began; the identities of the victims where injury to those victims is not an element of the offense; and the precise details about the times and places the defendant participated in the alleged conspiracy.

And there I'm citing to *Concord, United States v. Martinez* at 764 F.Supp.2d at page 174; *United States v. Palfrey*

at 499 F.2d at page 51; the *Bazezew* case that I just mentioned; and *United States v. Pollack* from the D.C. Circuit at 534 F.2d at page 971. And then, finally, you have *Butler* at 822 F.2d at pages 1193-94.

In addition to the facts alleged in the indictment, the government has provided Mr. Sterlingov with considerable detail about the alleged conspiracy and his role in it and the statement of facts that accompanied the complaint, the warrant, affidavits, and supplemental declarations included with the government's briefing on Mr. Sterlingov's motion of release of funds, to say nothing of the voluminous discovery that's been provided in the case.

I'm going to, therefore, deny the following requests as already provided to Mr. Sterlingov or beyond what he's entitled to in a bill of particulars.

In particular, I'm going to deny the request with respect to the scope of the conspiracy; the precise nature of the conspiratorial agreement; the date of the conspiratorial agreement; the illegal object of the conspiracy; the particular factual predicate for the intent to conceal or disguise the nature, location, source, ownership, or control of property that Mr. Sterlingov believed to be the proceeds of specified unlawful activity; the particular factual predicates for the intent to promote the carrying on of the specified unlawful activity; the particular factual predicate for the intent to

avoid a transaction reporting requirement of state or federal law.

I should note that avoiding a transaction reporting requirement is neither alleged nor is part of the charged offense.

The particular factual predicates for the alleged proceeds of specified unlawful activity; the particular factual predicates for the alleged property that was represented to be the proceeds of or used to conduct specified unlawful activity; the particular factual predicates underlying the date, time, place, and manner of the alleged conspiracy; the particular factual predicates that indicate Mr. Sterlingov had knowledge that Bitcoin Fog was an unlicensed money transmitting business in the United States.

And, again, I note that that knowledge is not necessary for the charged conspiracy offense.

The identity of the particular conspirator and co-conspirators who complete each conspiratorial act alleged in the indictment; and the identities of all persons other than co-conspirators, including victims referenced in the indictment.

Just running through that list, I think, highlights the extent to which the bill of particulars seems more analogous to something that one might see in civil discovery as compared to in a criminal case.

But I am going to grant Mr. Sterlingov's request for the names or identities of the co-conspirators known to the government, although only those known conspirators who the government intends to identify as such at the trial, citing to *Concord Consulting* at 385 F.Supp.3d at 76, and also to *United States v. Ramirez* at 54 F.Supp.2d 25 at 30.

In this district: "The disclosure of the names of alleged co-conspirators is not uncommon in conspiracy cases and particularly in cases alleging nonviolent offenses." That's a quotation from *Palfrey* at 499 F.Supp.2d at 52, and the *Brodie* case and the *Ramirez* case support the same principle.

Such disclosures, particularly here, given the sweeping -- given the broad sweep, duration, and complexity of what is alleged here, I think that Judge Friedrich's opinion in the *Concord Management* case, although not on all fours, is on point in significant respects. In granting the request for the identity of the alleged co-conspirators in that case, Judge Friedrich emphasized that it was not a typical case because the charged conspiracy involved foreign corporate defendants, hundreds of individuals, and conduct carried out on foreign soil. These considerations, among others, make disclosure here appropriate as well.

As -- like the *Concord Management* case, this is not a typical case. I don't question that *Concord Management* was atypical in further respects, but this case does involve an

alleged decade-long conspiracy involving many co-conspirators, a complex and novel money laundering scheme, and acts carried out largely on foreign soil, as was the case in *Concord Management*.

The indictment here is also less detailed than the one in *Concord Management*. It does not contain a detailed account of the overt acts. It lacks the names of any co-conspirators apart from references to "darknet vendors and darknet administrative teams."

To be sure, many of the specifics absent from the indictment can be found in materials the government has provided, including the complaint's statement of fact, and the warrants, as well as the discovery.

But even so, given the complexity and the breadth of the alleged scheme, the Court concludes, as Judge Friedrich did in *Concord Management*, that the disclosure of co-conspirator identities will reduce any potential for unfair surprise at trial, and here also will expedite the process of preparing for trial.

The government resists this conclusion reading *Concord Management* to turn largely on the fact that in that case the defendant's access to much of the discovery was limited for national security reasons. That certainly was a consideration in *Concord Management*, but I don't think it was the predominant one in this respect.

The Court does acknowledge that some courts have taken the view that defendants are generally not entitled to learn the identities of co-conspirators through a bill of particulars.  I don't doubt that that is true.

I should say that my ruling today is one that is intended to be permissive for the defense, but I think in close cases such as this one, it does make sense to err in the -- on the side of the defense with respect to disclosures of this nature.

The out-of-circuit cases that the government cites to don't contain much by way of reasoning in support of that proposition.  To be sure, Judge Howell's opinion in *United States v. Sanford* does include extensive reasoning, but I don't believe it's to the contrary here.  *Sanford* did not set forth a generally applicable rule.  It simply held that disclosing co-conspirators' names was not necessary under the circumstances present there.

Given the sprawling nature of the allegations here, I think that this case is different, and so I'm going to order that the government disclose the names, or if the government doesn't know the names, the other identifying information relating to the co-conspirators that the government is aware of that the government intends to identify as co-conspirators at trial.

I'm going to deny Mr. Sterlingov's request related to

the money laundering count across the board. To start, he appears to believe that the money laundering offense with which he has been charged requires that he laundered actual criminal proceeds. It does not.

He's been charged under 18 U.S.C. Section 1956(a)(3), which prohibits conducting a financial transaction "involving property represented to be the proceeds of specified unlawful activity" with the intent to "conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, or to promote the carrying on of specified unlawful activity."

A representation in this context includes the representation by law enforcement. So there's no requirement that the property issue, in fact, have been the proceeds of ill-gotten gains.

That clarification does resolve several of Mr. Sterlingov's requests relating to this count. The complaint's statement of fact addresses Mr. Sterlingov's other request for detail that otherwise might be provided in a bill of particulars.

The affidavit recounts step-by-step the sting transaction that is the basis of Count 2 and provides Mr. Sterlingov with the information that he's asked for, including the specific unlawful activity alleged, the property involved in the charged transaction, the transaction in which

the charge is based, the unlawful activity, the factual basis for the allegations regarding Mr. Sterlingov's knowledge and intent with respect to the sting transaction, the factual predicate for the allegation that the transaction involved property represented to be the proceeds of specified unlawful activity, and the date, time, place, and manner of the transaction.

Mr. Sterlingov's request related to the conspiracy charge is independent of this charge. Again, just recounting what the actual requests are in the bill of particulars emphasizes the fact that the bill of particulars in this case more closely resembles the type of discovery one would expect in a thoroughly litigated simple litigation as opposed to a criminal case, including, for example, asking for the factual basis for the allegations regarding Mr. Sterlingov's knowledge and intent with respect to the sting transaction, and the factual predicate for the allegations that the transaction involved property represented to be the proceeds of the specified unlawful activity.

With respect to Count 3, operating an unlicensed money laundering -- money transmitting business, Mr. Sterlingov's requests relate to the charge of operating an unlicensed money transmitting business, and those requests fare no better. His assertion that he cannot discern "what he's alleged to have done that constitutes running a money

transmission business" is not at all persuasive to the Court.

The indictment and the information the government has provided impart ample detail regarding the factual predicates of the charge, and that is that the government alleges that Mr. Sterlingov operated Bitcoin Fog, a business that conducted bitcoin transfers on behalf of the public. The complaint's statement of facts also describes the basis for the allegation that this business was unlicensed within the meaning of 18 U.S.C. Section 1960(b).

Mr. Sterlingov's claim that he cannot "determine under what statute the government is attempting to prosecute him for aiding and abetting" is difficult to fathom. The indictment states that Mr. Sterlingov is charged under 18 U.S.C. Section 2, the general aiding and abetting statute.

The factual basis for the charge is also no mystery. The statement of facts describes how an account allegedly associated with Mr. Sterlingov would refer to Bitcoin Fog on the internet forums in terms that suggest that it had ample operators. So the aiding and abetting charge is, presumably, directed at Mr. Sterlingov's conduct that assisted other operators.

And then Count 4 is the money transmission without a license, and much of the same analysis holds true here. Mr. Sterlingov's requests in general terms "the factual predicate to support this count." I'm not sure that, even in a

civil case with extensive discovery, that that would be a sufficiently focused request. But in any event, in a criminal case, it's not.

It doesn't lay on the sufficient -- provide a sufficient basis for providing a bill of particulars. And for all the reasons that I've previously provided, I will deny the request in that regard as well.

So overall then, what I'm going to do is direct that the government, with respect to the conspiracy charge, disclose to Mr. Sterlingov the identity either by providing names or other descriptive matter to Mr. Sterlingov of the alleged co-conspirators who the government intends to identify at trial, and I'm otherwise going to deny the motion for a bill of particulars.

Should we call the next witness?

MR. EKELAND: Just a housekeeping matter. I see Mr. Hassard on the Zoom. I know our witness, Mr. Fischbach, is standing by. So I just think we need to switch or -- I don't see Mr. Fischbach on the Zoom.

THE COURT: There he is.

MR. EKELAND: There he is. May I proceed, Your Honor?

THE COURT: You may.

MR. EKELAND: The defense calls Mr. Jeff Fischbach.

THE COURT: If I could ask the deputy clerk to swear

the witness.

THE COURTROOM DEPUTY:  Yes, your Honor.

Mr. Fischbach, thank you for raising your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION OF

JEFF FISCHBACH

BY MR. EKELAND:

Q.  Mr. Fischbach, could you state for the Court your experience in forensics.

A.  Well, I'll be brief.  In terms of time, I've been working computer forensics for about 26 years at this point, going on 27; mostly with regard to digitally recorded evidence, probably about half of that time, electronically transmitted, wireless, that sort of thing.

But, basically, in a nutshell, if it's saved, if it gets moved, if it's digital, it tends to be somewhat in my general -- obviously, there are certain areas that, I think, require very specialized expertise beyond my --

Q.  Do you --

THE COURT REPORTER:  I'm having trouble hearing the witness.

THE COURT:  It is hard to hear you, Mr. Fischbach.

MR. EKELAND:  Is it possible just to get Mr. Fischbach on this monitor?  I see Mr. Hassard and I see

Mr. Brown and I see Mr. Fischbach.

Is there any way I can just get Mr. Fischbach on this monitor and not --

THE COURTROOM DEPUTY: I don't think so.

MR. EKELAND: Mr. Hassard, do you mind turning your video off for the moment. There we go. Excellent. Thank you very much.

MR. HASSARD: No problem.

BY MR. EKELAND:

Q. Mr. Fischbach, do you -- you own the business SecondWave; is that right?

A. That's correct, yes. SecondWave, Inc.

Q. And what does SecondWave do? What kind of services does SecondWave provide?

A. Primarily forensic consulting, examination of evidence relating to most of the matters, about 5 percent of that. I do training, public speaking. I do attorney conferences and judicial conferences as well, and I work -- I consult with the media in the same capacity.

Q. Have you had any particular training in forensics?

A. Mostly on the job. I wouldn't -- I wouldn't -- I wouldn't inflate my formal training. When I started doing this, there wasn't formal training available.

I've certainly had the advantage of being able to keep up with and have shared with me much of what the

government relies on, as well as other private forensic examiners.  But for the most part, it's 26 years.

Q.  26 years.  And could you just -- you said when I just started doing this.

Could you just add a little more detail and what, in particular, type of forensics that you do mainly.

A.  Mainly would be difficult.  I would say probably the majority of it involves either a hard drive or a cell phone or some combination.

Secondary to that would probably be some form of data transmission, such as cell phone, including using that for the purposes of attempting to locate an individual or multiple individuals.  But because a chip and some form of memory exists in just about everything today, I examine dishwashers and, of course, cars and video game machines, and cable and satellite set boxes and Apple watches; you name it.  Anything that can store data at some point may become part of a crime.

I even probably most recently, most interestingly looked at data from an alarm system that was for the purposes of detecting whether glass broke in order to better isolate the time of a shooting because the hypothesis was that the shooting may have set off the glass-break sensor on the home alarm, which led us to more precisely get a time the shooting occurred than maybe a coroner could.

Q.  Do you have forensic experience with computers and computer

networks, like the internet or network computers in general?

A. Absolutely. My first exposure to the internet would have been in, roughly, 1987. I was very fortunate to have grown up the son of a now-retired college professor whose office was at the top of one of the first buildings that connected to the internet when it was still being tested, which was still before that time. By the time I was on, there was certainly plenty of internet.

My experience with that goes back extensively professionally from the beginning. Internet data has been critical to what I do. I don't think it has -- I don't think there was an early thing that didn't involve the internet. In fact, my very, very first case was a matter of -- first documented case was internet spoofing and identity fraud and extortion.

Q. And as part of that experience with computers and the internet, do you have experience with IP addresses and IP address attribution?

A. Absolutely. From the standpoint of an IP address, you can't have the internet without one, and you can't participate in the internet without one.

But as far as attribution goes, yeah, that's -- attribution of everything. But IP addresses, in particular, when it comes to the internet, this is how the government -- this is the tool the government simply needs to use in order to

try to at least form probable cause.

Q. Just so -- just so everybody -- just to go back to basics, because this is a complex case.

Could you just briefly explain for everybody just exactly what an IP address is.

A. Sure. Simplest terms, I would call it the secret sauce of the internet. It's what makes the internet different from every network that preceded it. It stands for internet protocol; no surprise there.

What it does is it -- I think probably everybody here as a part of this trial, this hearing, probably at least is familiar roughly with how a telephone works where there are switches. Maybe now not so much physically, but virtually connects people because even today telephone networks are run very much as a part of the internet or in similar ways.

But, traditionally, there was -- since it was switched, it electronically connected to computers to each other or to individuals speaking to each other. What the internet did is the internet said let's connect everybody to everybody at the same time, but let's send the payload, whether it's a voice or a picture or a video, whatever it is, let's send it particularly in a virtual envelope like the mail. And so where -- for a Court to serve me a subpoena, they wouldn't necessarily need a dedicated courier who went from D.C. to Los Angeles to my house. They could put that addressed to me,

which would be the internet protocol, in an envelope, and send it through mail that goes to -- goes all over the United States, possibly, before reaching my little neighborhood in Los Angeles.

And then at that point it is properly delivered to my house. And if it comes with a return receipt, you've now completed how an internet protocol works, effectively.

Is that clear enough? Were those good analogies?

Q. If I understand you, you testified that it's a -- sort of like a numerical address for locations on the internet; is that correct?

A. Not exactly. Let me clear that up. There is one big difference between addressing a physical envelope and addressing an internet protocol. And that is the fact that most of us today in the world don't own an IP address, so -- where many people here may own an address; I own an address. And you can always find me at that address. My IP address changes all the time.

And on top of that, as we know from this case, you can also use services that will change your IP address. So it is a little bit at least different in that case. We can't necessarily identify someone by an IP address. Also, keep in mind that they're shared. So anybody that's using the courthouse internet right now is sharing it with everybody else who is using the internet courthouse -- the internet in the

courthouse right now. So you all have the same IP address.

To say that someone here in this courtroom did something would be difficult from that IP address, much as right now there are three other individuals at least using the IP address that I'm on.

Q. Am I correct to understand you that IP addresses are not a reliable form of personal identification?

A. Well, I don't want to be overly inclusive in that statement. They could be under certain circumstances, but not in a general circumstance.

I do, in fact, own some IP addresses. And if I'm using one of those IP addresses, you would certainly want to ask me if I was using it or if I could confirm that somebody else was using it. But that's just not the way most people use it.

The background story on that is we ran out of IP addresses before most people were on the internet. And so this idea of having an IP address that could be shared became essential; otherwise, the internet would have never grown.

Q. Is it possible for thousands of people to share the same IP address?

A. Oh, absolutely.

Q. And what are some of the ways that there are more than one? What ways -- in what ways is that possible?

A. Well, I mean, simplest example, I just came from the

airport a few days ago. And I have no reason to believe -- and I've tested it in the past; I don't believe it's changed. Every user in the airport would have been at that moment on the same IP address.

Once I got into the air, I connected to the airplane's network, and then every single individual on that airplane -- because we were all watching movies and television over the Wi-Fi provided by the airline -- everybody then would have been sharing the same IP address. Conceivably, everybody flying Southwest that day might have been sharing the same IP address, which could have been thousands of people, just on the same day; possibly tens of thousands of people.

Q. And have you had the opportunity in this case to review the government's IP address overlap analysis by Ms. Mazarin?

A. Yes, I have.

Q. And do you have an opinion as to the accuracy or the validity of that analysis?

A. Well, she states in her own disclosure her opinion of the accuracy of her findings. She uses terms like believe and likely.

While I looked at it myself and, frankly, don't have enough evidence or enough data at this point to necessarily replicate what she did, clearly, from her own work, she's going on a bit of a belief and whatever is her measure of likelihood.

Q. And what -- what additional data would you need to assess

her conclusions?

A. Well, I've been made aware for some time now in this case that there are additional records that the government either relied on or, for whatever reason, chose not to rely on that are held by the FBI that, for whatever reason, haven't been released to the defense.

I certainly can't render an opinion about anything until I've looked at the totality of what's available in the case.

Q. Are you referring to the Mt. Gox database that Ms. Mazarin, I believe, is basing her IP address analysis on?

A. That's correct.

Q. And the government, I think, as you may know, has said that they will only provide access to that Mt. Gox data if we send somebody physically to the FBI office down here in Washington, D.C.

In your expert opinion, would you be able to analyze that data properly at the FBI office during the times that they dictate?

A. For a number of reasons, the answer would be no to that, but I want to be clear. It's not as though I have never done that sort of work in a case.

The cases that I've done that work, which is -- quite frequently I'll work at what are known as regional computer forensics laboratories, which are staffed, in part, by FBI

agents.  I've worked in FBI offices, both on the East Coast, the West Coast, and in between.

I've certainly done examinations in the auspices of the government, but they tend to be what I would refer to as two-dimensional examinations.  In other words, typically, so far my experience has been that the only circumstances that require that are either, one, that triggers what's known as the Walsh Act, which involves child pornography, which required that the government keep any investigations within the auspices of the FBI.  And that has been challenged as well in some jurisdictions in some cases.

But, typically, because the sort of work that needs to be done is, oh, gosh, I would say, maybe a 20th or a 30th, or possibly even smaller than that, of what we're looking at in this case, that's a little difficult and still becomes costly and time-consuming.

And I just finished up a case that lasted five years in Alaska because we constantly had to arrange to be able to use government facilities to do it.

Regardless, in this case I don't even see that as feasible because the specific tools and resources that are needed even just to replicate the government's findings, even just an attempt to get what the government -- just to validate what they've done would still be less feasible to be able to do in those circumstances.

And that's not even discussing the vulnerability to privilege and attorney-client privilege, work product; and then as well just the overall budget, which so far I don't have to go through that in this case.

Q.   Just to make sure I understood your testimony correctly on this point before we move on, it's your expert opinion that you need full, unfettered access to the Mt. Gox database in order to properly analyze Ms. Mazarin's IP address overlap conclusions?

A.   Yes, for the purposes of having the resources to be able to competently examine it.  My concern -- sorry if I didn't answer your question.

My concern, specifically, here is that I may or, certainly, other experts will be asked to put their name on opinions under penalty of perjury.  To do so without knowing that we've used the tools, the resources available to us in order to -- and, again, I'm talking about at the least replicate what the government has done, but realistically, having now gotten to know the team over so many months, I believe possibly exceed what the government has done and very likely exceed in terms of the number of hypotheses that are going to be tested.

I just don't see how that could ever occur with that sort of constraint.  I also -- quite honestly, I don't understand why.  I'm not really sure why in this circumstance.

I know why in the Walsh Act, and I have been given access to a SCIF in the past when we've had national security concerns.

But I'm not certain why this case needs to be further complicated beyond where it is other than if I were -- other than simply it's gamesmanship to make it more difficult in order to put up a defense.

Q.  Let me turn to a slightly different topic, Mr. Fischbach.

Do you have any practical experience and forensic experience with websites?

A.  Oh, absolutely, yes.

Q.  Could you just briefly describe your experience with websites.

A.  Well, are you asking -- are you asking about personal, practical experience, or are you talking about forensic experience, or are we talking about both?

Q.  Briefly on the personal and then briefly on the forensics.

A.  Okay.  Well, personally, as I mentioned earlier, I've been a user of the internet, and specifically the World Wide Web, from a time when people, I don't think, had any access to it or even knew that it existed.

Since that time, I've run websites prior to 26 years ago.  But in addition to that, as a result of some of my work and as a result of my wife having her own career, I also consulted with and aided in what, ultimately, became a multimillion-dollar e-commerce website.  I say multimillion

dollar; it was roughly a million a year website.

And then switching to the other hat, forensically, I've lost count of how many of my cases involve the internet, e-commerce, encryption, and websites in particular; clearnet as well as darknet.

Q. Could you explain that distinction for people -- for -- the distinction between the clearnet and the, quote-unquote, darknet, or I prefer the term deep web. But go ahead and use darknet.

A. Yeah. I understand that the term has been reviewed for all sorts of reasons that I don't know what the proper terminology is for it.

But the difference is that there is an internet most of us automatically land on when we open up a web browser, and then there's an internet that requires special tools in order to reach it. Now, let me be clear. They're both using the same internet. They're both on the same physical network, but your ability to see something depends on the piece of software you're using.

So when Your Honor or anyone else here opens up whatever their favorite web browser is, Microsoft Edge or Chrome or Firefox or something else, what you're doing is you are using a tool to be able to see what we call the clearnet. It's just a tool that interprets all that data and turns it into pictures and videos and words and things we can interact

with; Amazon shopping.

There are also tools that allow us to get onto these, what we call it, deep web, dark web, darknet, and it's just a different tool that lets you into a portion of the web that is, I don't know -- I don't know that I would consider it less public. There are certainly other areas of the web that are -- of the internet that are difficult to -- and require other tools as well.

It just tends to be the place that -- I guess they're more encrypted than the traditional internet. In other words, it came built-in with security in mind as a part of the network itself versus the internet, which puts layers of security on top of it. So when one goes to their bank account, they then see if they're paying attention. They see the lock on their browser to show that it's now encrypted.

That's a little different in this other alternative; what we used to call the Altnet before it got all these other names. That was really developed with that in mind from scratch.

Q. Would the Tor browser -- no relation -- be one of the tools that you use to access the deep web?

A. Yes. One of them.

Q. Do you have experience with the Tor browser?

A. I do, yes.

Q. Do you in general -- have you done forensic work involving

the darknet, deep net, or Altnet, whatever we're calling it here?

A.   Yes.   I've had cases that involved sites on that part of the network, yes.

Q.   And are you familiar with the government's allegation that Mr. Sterlingov used a series of layered transactions in 2011 to purchase the DNS registration for the BitcoinFog.com clearnet site?

A.   Yes, I'm familiar with that.

Q.   Could you just briefly explain to the Court exactly what a DNS registration is.

A.   Yes.   Specifically in what I just described as clearnet, there are registered services that have been allowed to provide domain names.   And what those domain names do is they take something that's very native to what I described before, IP, internet protocol.

So everyone has that address; every website has that address.   And even though, as I described, we might be sharing an address, very likely are sharing an address at any given time, those addresses are not easy to memorize.   So if in order to get to Amazon you had to go to 168.1.1 -- which is not an internet address; it's actually a local address.   But if you had to remember an address like that, I don't think the internet would have grown in the way that it did.   It would have been very difficult.

So these DNS registries, what they do -- and originally there was only one, and it has since been decided by the various powers that be -- I don't know if it would be powers, but the people who were influencing the internet at the time, that it was something that should exist in more than one set of hands.

But these groups will sell you something that's sort of akin to a vanity plate. You can choose a domain name, and it has to be entirely unique. And that domain name, what it really is doing is, when someone types it, it's redirecting you to whatever IP address that website can be found at at that moment, which, again, can change.

Q. Is purchasing the DNS registration, is that the same -- sorry. Let me rephrase that.

When you register a domain name or purchase a DNS registration, do you then just get a website that pops up and is running miraculously, or how does that work?

A. No. Although I think if you watch a GoDaddy commercial, you might be convinced that it would work that way. And I like GoDaddy.

No. Purchasing a DNS is just -- in fact, I describe it as being similar to a vanity plate. In fact, you don't get a plate. You really don't get anything other than you have taken that off the market and it belongs to you. If someone wants to use that, they would then have to somehow convince you

to give it or sell it to them, which is something I also have done in the past.

Q. If I'm understanding you correctly, you're just simply registering the name which resolves back to a certain numerical address and nothing more?

A. Actually, when you register the name, it resolves nowhere. Simply registering it won't send it anywhere. At best, you'll get a holding page from whatever company sold you that domain name.

But at that point, you're typically offered some tools to be able to send that domain name; by the way, not necessarily just to one place. Many of us -- I don't know if I would say most of us, because I don't think most of us own domain names. I would say, perhaps, more likely than not if you own a domain name, it is, in fact, funneling different traffic to different places.

While my -- if you type www.SecondWave.com, you'll get a website. If you were to send something to Jeff@SecondWave.com, it actually would go to an entirely different address than my website. It would go to a mail server.

Q. Have you ever registered a domain name?

A. At this point, probably -- conservatively, hundreds. But it's possible that I'm beyond hundreds now. I haven't registered -- well, I register a domain name every time I think

of something that I think is cute or might be useful to somebody or I might have some idea to use at some point.

So my wife will tell you I could be in the middle of watching World Cup and suddenly register a domain name.

Q.  Have you ever registered a domain name for somebody else?

A.  The vast majority of domain names that I've registered have been for other people.

Q.  Why would you do something like that?

A.  Well, for a host of reasons.  Some of my clients work in particularly sensitive fields.  I do have -- well, their clients; my clients' clients.

I do work for people who work for actors and millionaires in film, billionaires, people who themselves have some reasons that they don't want everybody following what they're doing.  So oftentimes, I'll be asked to register a domain name for that purpose.  That's maybe a more recent example.

But in the past I just registered domains because a lot of people didn't understand how to do that or the value of doing it.  There were many clients early on where I registered domain names for them simply because I knew at some point they were going to be happy that I had done it.

Q.  When you register a domain name, do you just generally own that domain name for eternity?

A.  No.  No, no, although that would be nice.  I lost a few

forgetting that I owned them.  It depends on how long you make your purchase for.

But I have never heard of one that you could purchase for eternity; typically, a year or two.  Although, just simply because I'm busy, if it comes into my inbox, I'll typically try to pay for ten.

Q.  So I want to change topic a little bit.  I mean, are you familiar with the fact that the government's experts testified at the *Daubert* hearing that they have no knowledge of the statistical error rates for Chainalysis Reactor, its rate of false positives, and its rate of false negatives?

A.  Yes, I'm aware of that.

Q.  In your opinion, is that the mark of a reliable forensic software?

A.  That isn't the mark of any reliable software.  Even if you're just talking about Microsoft Windows or Word or Apple software, if you use it, even just apps on your phone, they all have at least some form of log that would let you know -- at least let you surmise that it has had a problem with reliability in the past.

I'm not aware of software that hasn't had to be patched or had problems, and I'm sure Chainalysis is no different.  It startles me that they're not internally aware of that.

Q.  And what kinds of data or information would you need to

assess the reliability and the accuracy of software -- of forensic software like Chainalysis Reactor?

A. Well, for me to assess that, I would actually need to have a copy of the software and, more ideally, the code itself. Simply because the software -- a piece of software works well at the time of testing doesn't mean that we've tested it for every vulnerability.

So it's always wise to go over the code itself to see if there are any other vulnerabilities that aren't being tested for.

Q. And when you say the software or the code, is that synonymous or saying the same thing as you would need access to its source code?

A. Correct. I mean, again, need -- it's an ideal. I want to be careful because not in every circumstance is that an option. A lot of software is trusted without having its source code released.

I personally put forensic tools into a very different category, and that is that -- because my area of expertise is just an extension of other scientific methods and those methods typically -- this is what I've been looking at for 26 years. Because, typically, other tools that have been used scientifically in forensics are made available down to the point that you are able to understand exactly how they work and why they work.

To my mind, it only makes sense that everything used in true forensics, especially if we're talking about criminal forensics, ought to be subject to at least that same standard, and I honestly can't come up with a reason why it shouldn't be.

Q. Just real briefly, did you have a chance to or did you see the government's filing, I believe it was the other -- one or two nights ago, a supplemental notice which included a declaration from Elizabeth Bisbee from Chainalysis and a white paper, one of the authors of whom was Sara Meiklejohn?

I think that's M-e-i-k-l-e-j-o-h-n. I may be wrong on that, but I think I'm in the ballpark. Did you review it?

A. I did. Yes. I was provided that, and I did look at it, yes.

Q. Do you have any opinion as to its assertions regarding Chainalysis Reactor and Ms. Bisbee's declarations and as discussed in Ms. Meiklejohn's white paper?

A. Well, I apologize because I'm not in a position of objecting. I think it's a bit of an open-ended question. For the most part, the only way I could really answer that from memory is to say I do recall noticing instances of uncertainty. But if you could ask me a little bit more --

Q. Do you have a general opinion as to the disclosure?

A. Again, just that it appeared to be sort of rife with uncertainty.

MR. EKELAND: No further questions.

THE COURT: Okay. Ms. Pelker?

CROSS-EXAMINATION OF

JEFF FISCHBACH

BY MS. PELKER:

Q. Hello, Mr. Fischbach. How many cases have you worked on in your career as an expert witness or as a consultant?

A. Just before I answer that, is it possible to at least get that camera on so that I can see who I am speaking with, or is that not available?

THE COURT: I think we can do that.

THE WITNESS: Perfect. I apologize for the grammar. With whom I'm speaking. Perfect. Thank you so much.

BY MS. PELKER:

Q. Your screen is directly -- I am looking at you even though it looks like I am not.

A. That's fine. I'll accept the limitations of this -- I don't know -- soul-saving technology that we've all become accustomed to recently.

So the answer to that is somewhat complicated. I have consulted on thousands of cases now over the last 26 years, not just for the defense, but for the government as well. And then, obviously, for plaintiffs and defendants in civil cases, but to a much, much smaller degree.

In terms of how many times I've actually testified, I think there is some -- there's some number I once put together

several years ago that probably needs to be updated, but it's a much smaller number

Q. How many cases, roughly, over the last year have you worked on?

A. Over the last year? If we're talking about actually the last months, I think I'm currently back and forth. I just ended two and started one. I would say this year probably a couple dozen.

Q. Fair to say that you have a busy practice as an expert witness and consultant?

A. I tend to refer to it the other way, as a consultant and expert witness, if that doesn't work.

Q. And is it also fair to say that at least a substantial portion of your work involves defendants accused of possessing child sexual abuse material or violent crime?

A. Yeah. I think a substantial -- I think this is not the majority, but, yes, there's quite a bit of it.

Q. Does much of that work and your work generally involve reviewing seized personal computers and cell phones?

A. Typically, it would be more rare to see the -- to view the actual device. That does happen on occasion. But that's really rather rare.

What I'm typically looking at is some -- I would use the technical term, but there's different ones. But some facsimile of what the government looked at.

Q.   Whether it's an image, a clone, some evidence that has been obtained from personal computers or cell phones; is that right?

A.   Exactly.  Yes, that's correct.

Q.   And do you also often review information or testify or consult regarding cell phone location information?

A.   I do, yes.  That's correct.

Q.   Have you ever testified as an expert relating to blockchain analysis?

A.   So far I have not.  I haven't had the opportunity to testify to that.  The amount of work that I've done relating to it are voluminous.  But I think probably, for the most part, the adoption and then the timing of the pandemic probably slowed down a lot of any sort of trial work.  But there may be other factors as to why I haven't been called to testify about it.

Q.   Could you explain what cases you've worked on where your work involved blockchain analysis?

A.   In terms of the names of the cases, I wouldn't reveal any of that, especially if I haven't testified.  But in terms of the types of cases, yes, a lot of cryptocurrency theft where individuals have had cryptocurrency stolen from them; a number of hacks involving various exchanges; as well as some concerns about software that was meant to protect cryptocurrency wallets.

That's probably a general -- if you ask me a more

specific question, maybe I can give you a more specific answer than that. That's sort of an overview.

Q. Can you explain specifically what you've done on cases involving cryptocurrency theft?

A. So, typically -- and I should -- interestingly, Mr. Ekeland never asked this question. I don't know if it was deliberate or not, but I'll volunteer it to you.

I don't hold myself out as a specific cryptocurrency expert. In fact, when asked if I would do this case, that was the first thing I let Mr. Ekeland know. Although I've enjoyed working with him in the past, I want to be very cautious that there are people I believe have a much more detailed expertise in cryptocurrency.

My work in most cryptocurrency cases -- this one included -- substantially is as a consultant in order to work as what some attorneys have referred to as a digital-to-analog converter. Basically, helping counsel make sure that they understand what resources they need in order to tap into particular knowledge because just within cryptocurrency there are multiple areas of expertise.

Q. In your work on any of these crypto cases, or generally, are you doing the actual on-chain address-to-address bitcoin tracing?

A. Absolutely not. I mean, not -- not that I have not done it or been a party to it, but, again, my feeling is that there are

people who, rightfully, have earned their place as the experts in that area in terms of both the burgeoning science and mastering the tools that do exist.

I'm always very pleased to be exposed to new tools and techniques, but I don't hold myself out as the expert in that.

Q. You may have just rapidly shortened your testimony for the cross-examination.

One quick point of clarification, though. Have you used -- do you have any expertise in using Chainalysis or CipherTrace or any other blockchain tracing tool?

A. Well, I certainly wish with regard to -- specifically with regard to Chainalysis that -- because, again, while my job may not be, nor my expertise, to necessarily generate the work involved with that sort of tool, part of my work is in understanding the reliability of that tool and relating that to the defense, to the Court. And so any ability to work with Chainalysis would be instrumental to this case and very likely to future cases in being able to do that, as I've done with many, many other electronic forensic tools.

Unfortunately, while I asked for that sometime back when I was first contacted in this case, it's my understanding that Chainalysis only makes that available to the government. So I will very honestly tell you I have some very serious issues when it comes to the reliability of forensic tools that

are not independently analyzed and peer-reviewed.

Q. I don't mean this to sound argumentative, but are you aware that, in fact, many private sector experts, consultants do, in fact, have Chainalysis licenses?

A. Well, that sounds interesting, and I'd love to get a list because that might be useful if the -- if they're not simply government consultants. So far, at least in my involvement in the case, we haven't been able to find those that feel comfortable working with the defense to own such licenses.

Q. Have you tried to go on Chainalysis's website and just click free demo or sign up for an account?

A. I have. But that's not -- unfortunately, that's not the totality of what would be needed specifically in this case even if I were able to get a fully unlocked tool, which does not appear to be what they offer. At this point I don't have all of the resources I need even to help another expert duplicate what the government has done.

Q. And have you signed up for any of the free -- the free or trained -- or paid trainings, certifications that Chainalysis or TRM or any of the other companies offer available to the public?

A. No, I haven't. And, again, that would be for the reasons I stated before. That's not my area of expertise.

While I think it would be instructive to understand their training, the more significant aspect of my work is

whether or not the government, in fact, followed that training and what they used in their assertions to perform those assertions; how they configured their hypothesis; and how complete they were in terms of their testing of that hypothesis.

Again, all of this is useful, and I'm happy to have the dialogue about it, but I do want to make sure it's very clear, I'm not the person who was hired specifically to use Chainalysis. In fact, I specifically asked counsel to find better individuals for that purpose.

Q. I'd like to ask you a few questions about the substance of your expert disclosure. Your disclosure states that you will testify to the staffing requirements to run an enterprise like Bitcoin Fog.

Could you explain, what is your opinion of what those staffing requirements are?

A. Well, let's be very clear about my disclosure. My disclosure was written for me by counsel while I was out of the country some of the time; some of the time, certainly out of state for several weeks.

So while I substantially agree that I may testify to the elements there, my expertise specifically within what staffing it does take, I've never run a -- I've never run such an operation. I certainly worked within operations that maybe would be analogous, and so for that reason, I might feel

comfortable rendering an opinion as to, basically, what it takes in terms of the hardware staffing.

So based on the, sort of, turnover, the number of transactions that the government is representing -- and I don't know that those numbers are correct -- but even were I to assume accuracy to the government's number of transactions, yes, that's a -- that is the sort of thing that, typically, from the management standpoint, would not be a single-person operation.

Q. So to be clear, is it your opinion -- are you stating that you do not currently have and have not yet formed an opinion about the staffing requirements, or are you stating that, if asked, you will testify that the staffing requirements for Bitcoin Fog would be more than one person?

A. Well, while the second part is already true just based on what I do know, I want to just make sure I'm very clear, if I didn't articulate it clearly enough.

I don't want to -- I don't want to commit to a specific number at this time because the information that I have from the government, I'm aware, is not complete. Therefore, any number that I give in terms of what a similar operation would require could be vastly inaccurate once I actually saw the rest of the data and had a better idea of what, in fact -- what that operation, in fact, entailed.

But, again, what I know in general is that, based on

the components of that sort of an operation, that kind of a website, that has been, at least in my experience, that's something that's a one-person operation.

Q. Could you explain what additional information you need from the government in order to draw that opinion?

A. Well, that's a difficult question. Since I haven't seen the rest of the information that I understand I have to go to the FBI to see, I don't know. All I know is that there's more than I've seen.

And scientifically speaking, I don't think it's a good idea to render an opinion based on incomplete information even if I was only missing a page, but I understand it's quite voluminous.

Q. So you believe that your opinion about the staffing requirements for Bitcoin Fog is contingent on a review of the Mt. Gox back-end database for transactions that were used to launch some initial funds into Bitcoin Fog?

A. Not in as simple a way as you're presenting it. It's just simply that, until I've seen all of the data the government has used to form its opinions, I don't know how accurate or inaccurate those opinions are.

Q. The disclosure also states that you will testify to what is involved in operating a Tor site and a custodial mixer like Bitcoin Fog.

Could you explain what your opinion is in that

regard.

A. Again, I'll water that down a bit from how counsel presented it, perhaps optimistically. I certainly have wonderful resources now in this group of people that have come together on this case for the defense team. And, collectively, we've been able to come up with a number of opinions that we've all contributed to and come to some agreement.

But I want to -- again, I want to be very careful. But my opinions still, while dependent on seeing everything -- because I don't like to render an opinion until I have the totality of everything the government has available for its case -- it still is very much contingent on other individuals who know very specific areas to greater detail than I do.

And at that point I may or may not decide that that is a valid opinion. But for the purposes of Rule 16, at least it's been my experience -- and this is tightened down even more recently -- it's better to overdisclose than not to disclose. So where you see the words "Mr. Fischbach may," that was my request, because at this point I don't know exactly what it will apply to because I haven't seen everything.

Q. Are you generally aware of the specialized field of cyber incident response?

A. Yes, I would say so.

Q. And are those professionals whose specific job is to respond to hacks and attacks on sometimes vast computer

networks?

A. Sure. I mean, it's a little bit simplified, but I would agree.

Q. Probably a lot of it simplified, but generally speaking.

A. I'm trying to be kind.

Q. Similarly, are there people whose specific job is network defense -- again, very simplified -- but to ensure that computer networks are not breached?

A. Absolutely. I'm very fortunate to work very closely with a number of those individuals.

Q. You work with some of those individuals on occasion. But your specialty is personal device forensics, not incident response or network defense; is that right?

And I may be simplifying personal device forensics, but with a general meaning.

A. I would take that -- I will use that word from the statement. My expertise is not in incident response. That's not what I do.

Sort of like my father-in-law is a retired plumbing contractor, but his expertise is not in emergency repairs. He helped build houses. So while we use him if a pipe bursts and he can do that job, that wasn't his job.

I have been -- my very first case was that case, very first case 26-plus years ago, at a law firm -- actually, right across the street from the FBI building. That case was an

incident response.  That's something I have responded to simply because some people know me, and know me before they know somebody who can handle incident response.

So, theoretically, it's something I could do.  I see that as such a generalized field that I think that there are people that are better at doing that than others.  So much as somebody who works on a ship might not put out a fire because that's what they need to be trained to do working on a ship; and they might be better at putting out a house fire, but they're probably not as good as the fire department.

Q.  When were you hired by the defense in this case?

A.  Hired is a very difficult word.  I was contacted on this case last year.  There were a number of subtle questions that were -- where I didn't specifically know what case Mr. Ekeland would be referring to.  But as a matter of practice, if an attorney -- defense or government, you -- if an attorney calls me and asks me a question or sends me an email and asks me a question, I like to try to answer that question.

So I looked back at my emails sometime this week and it looks as though possibly, if I've gotten this correctly, maybe the first I ever heard of this, assuming Mr. Ekeland's question was about this case, might have been about a year ago. I got more involved near the end of last year and then flew to D.C. in January.

Q.  And when did you start reviewing this discovery?  Perhaps

that's a better question.

A.   That's a good question.  I think that's -- it's subject to change, but I think it might have been late last year.

Q.   What discovery have you reviewed?

A.   To my knowledge, everything.  I don't know that by memory I could list everything, but I'm aware of one document in yesterday's testimony that I haven't seen yet.  I understand it was under seal.

But I have access -- I think limited access -- to the storage -- online storage of every piece of material in this case and have been asked questions about pretty much all of it as far as I know.

Q.   So that includes the images or data from all of the different devices?

A.   That's correct, yes.

Q.   And does it also include emails, financials, the defendant's typed and handwritten notes?

A.   Yes.  I believe I've seen all of that.  One thing I want to clarify that I may confuse is that when I was there in January, some of that was presented to the Court.  So I don't know necessarily that I've -- and every handwritten note is something that I specifically looked at because that may -- may or may not exceed what I needed at any given moment.

But, yeah, I feel like I've -- if I haven't seen everything -- as of yesterday's testimony when I heard there

was a document I hadn't seen yet -- I'm surprised.

Q. How many hours have you spent reviewing the discovery for this case?

A. So -- oh, actually, just reviewing discovery, I don't -- I don't keep things separated like that.

But in terms of reviewing the discovery, I've got probably a couple hundred hours on that. I could check more specifically, but somewhere around there.

Q. And what about just for the case, generally?

A. So for the case, it would add to that -- well, this and the other testimonies that I have been involved in as a consultant and then flying in to D.C., which was probably the largest consumer of time; but all of that, even put together, probably brings it up another 40 hours or so.

Q. Is that ballpark? You said a couple hundred. Now we're at 300, 400 hours?

A. I would -- I would imagine -- I'll explain why I'm not as accurate on this, but I would imagine probably -- probably somewhere in excess of 250 hours, plus -- the trick with the cases -- because my understanding about this case in the beginning was that Mr. Ekeland was asking me for a favor because the funds weren't there.

One of the things I didn't do from the beginning was waste a lot of time documenting hours. I've since attempted at certain points to go back and see if I could get some of that

together.  If that's important to you, I'll make sure I have that before there's a trial.

Q.  No.  I think that that's sufficient, at least for today's testimony.

Are you now being paid for your testimony or have an understanding that you will be paid for your testimony and work?

A.  From counsel, no.  My understanding is that counsel ran out of money before I even made it to D.C.  I paid for D.C. out of pocket and have since received some funds to at least mitigate the out-of-pocket, which is unusual for me.

Again, Mr. Ekeland is someone that I have worked for on other cases.  And when he explained this case, once I was able to see it for myself, it did seem that it had some very long-term precedent that goes well beyond this case.  That's the sort of thing I like to be involved in, sadly, to my family's disappointment, even when that doesn't come with money.

But I do want to be very clear.  When I was there -- I believe it was in January -- Your Honor did make it clear that there would be CJA funds available.  I have worked for CJA funds before.  So my very, very practical understanding of that is that I may be able to collect something at some point.  But I can tell you, after five years on a case that ran out of money two years ago, even when I very accurately billed, I was

only paid for half.

Q. What is your hourly rate that you would normally charge for this or that you are billing and hoping to be paid?

A. Well -- and, again, I'm not billing. As a matter of fact, you've only now just reminded me, I didn't even start a timer before I went on the stand, which would be smart. I'll go back and try to resurrect that.

But allow me to answer your question this way, and you can let me know if it suffices. If Mr. Sterlingov had funds or Mr. Ekeland had funds available to him, my rate on this case -- I think my current rate -- and I apologize. I think you probably get some idea that I don't generally handle a lot of my own money.

But I think my current rate that I'm billed at is a little under 600 an hour.

Q. At this point, aside from trial preparation, is your review of the discovery, absent potential Mt. Gox servers, complete?

A. Well, that's -- that question doesn't work with the stipulation. Nothing is complete absent anything.

Q. Fair enough. What reports have you written, if any, memorializing your work?

A. At this point there are no reports to write. As I have to constantly remind counsels, both attorneys, other people involved in this case, I can't commit anything to writing under my -- that has my signature that I know is missing any sort of

information.  So I don't have any reports.

This is -- by the way, this is the reason specifically that, when asked about it, I told counsel that I would prefer not to -- not to make a formal Rule 16, though I very well understand the most recent iterations of that, it does put me in a very difficult position where the Court does need -- by law, as I understand it -- to have a disclosure. But I also need to be able to be in a position in front of a jury to say, well, those opinions were incomplete at that time.

But I don't want to, in front of a jury with the judge, be blaming the system because I gave incomplete answers. I'm trying as best as I can to preserve any finality until I have a few things.

Q.  So I understand you haven't written a report and may not intend to.

Have you memorialized your work in some other way?

A.  Well, certainly, I have conversed with counsel and the rest of the team.  So to some degree there's some memorialization there.  I very likely -- on phone calls, I tend to take notes. In fact, yesterday, listening to testimony, I took notes.  So there may be something like that.

I am prone to make sure to -- at least jot down my observations with the date at the time that I have them even if I don't consider them report-worthy.

Q.  Turning back to some of the substance of your notice in the

disclosure, the document says that you believe the evidence in this case is tainted because the government mixed evidence from an unrelated case with that of Mr. Sterlingov.

Could you explain what specifically you're referencing.

A. And, again, let me make sure I clarify that. That was counsel's writing based on our conversation. I wouldn't use the word believe, and I don't think it belongs there because that's not a part of what I do. I'm not a preacher. My belief has nothing to do with this.

But I have certainly been exposed to information that has been discussed amongst those individuals who are consulting in this case. Specifically, with regard to the hacks and possibly I do see some -- I can't cite it here at this moment, but I was shown a document that did appear the government may have misattributed some information to another case, which does frequently happen in cases. I understand, like me, you have a lot of work as well.

THE COURT: Mr. -- I'm sorry. I'll let you finish that other question.

THE WITNESS: Yes, Your Honor. That was the substance of that part of that discussion with Mr. Ekeland.

THE COURT: My question for you, Mr. Fischbach, is that you haven't signed your expert disclosure in this case yet.

I guess my question for you is, is that simply because you've been out of the office and haven't had access to it, or is this still something that you need to review and make sure you're comfortable with before you sign it?

THE WITNESS: Well, at the time that I was asked to sign it -- and, thank you, Your Honor. At the time I was asked to sign it, yes, I was barely maintaining a signal.

I went between -- all over Alaska trying to trace a murder to the middle of the ocean; trying to apologize to my wife for working on our anniversary in Alaska, who I did bring with me.

So it was difficult to sign or even feel as though I had competently read it. I thought I was going to get a better signal than I did during that trip.

Since that time, since coming back, and especially since watching yesterday's testimony, I will tell you my opinion, to some degree, has changed in that I now feel even better that I wasn't comfortable signing it without knowing that I had ample time to read through it.

My biggest concern right now is not the specific words in it. While I might alter something like the word believe, my bigger concern is that it's a conclusion with incomplete information, which is something that I brought up to counsel previously.

But, again, I do understand that the Court does need

something.  I just need -- to whatever degree, Your Honor -- since you're asking the question, to whatever degree I can be instructed to provide something that doesn't require me to compromise science, I would be absolutely delighted to do that.

THE COURT:  Of course, I'm not requesting that you compromise science in any way; I don't think your counsel is. I can talk when you're done with your testimony with your counsel -- not your counsel, but the counsel for Mr. Sterlingov about timing on this.

But I do think we need a report from you that indicates, yes, these are my expert opinions, and if there are things in there that you don't feel comfortable opining on, we should know that.

THE WITNESS:  Completely understood.

THE COURT:  Okay.  My apologies for the interruption.

THE WITNESS:  Actually, before I lose your attention, if it makes any difference, Judge Breyer out of San Francisco, Charles Breyer, who is --

THE COURT:  I know him well.

THE WITNESS:  Okay.  So Judge Breyer actually just opined on that in San Francisco, and at least his verbal opinion on that was that in such a circumstance what he was inclined to opine was that a disclosure would necessarily be due before testimony, but not before the government had laid out its entire case.

THE COURT: I'll confer with your -- with Mr. Sterlingov's lawyer about that and the lawyers about that. That's a separate legal question.

But I just want to make sure that I understood, for purposes of having that discussion, what your views are, and I think I understand that now.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you.

BY MS. PELKER:

Q. Mr. Fischbach, I do want to follow up. When you refer to the possibility of mixed evidence from an unrelated case, is it your testimony that that pertains to one of the other experts remarking that, within the discovery produced, there might have been some evidence that wasn't specifically related to Mr. Sterlingov?

A. No, ma'am, not based on a remark. But based on another expert showing me that what they had found at that time prior to remarking on it. But just part of their work.

Q. And the mixing that was referenced is simply that it was produced within the discovery; the voluminous discovery that included lots of information from lots of sources?

A. I think that's a fair statement.

Q. Turning now to some of the IP-related opinions or analysis that you've done, would you agree that one use of VPNs or proxies is to obfuscate someone's location or even their

identity?

A.  Well, I mean, in a manner of speaking, I would say to some degree all uses would be some form of obfuscation.  That's what happens when you connect to your bank and suddenly your connection becomes encrypted; or today every website, although most people probably don't notice if it says HTTPS instead of HTTP, this obfuscation is, in fact, designed into the system.

If your question is to the individual's mindset when they were using it, I don't know that I could necessarily speak to that in this form of a question.  But that's the end effect, and that's why it exists.  It exists to keep us anonymous because, in computer security, there really -- this may not please everybody in the court.  There really is no such thing as a secure computer; it just doesn't exist.  There isn't a secure network; it doesn't exist.

But the greatest form of security that we have is what many of us refer to as security from obscurity, which is if an individual, or attacker in this case, doesn't know who you are or where you're coming from, that's your greatest form of security in terms of keeping a network safe.

Q.  Your expert notice indicates that you will testify to "issues with the government's IP analysis."

Could you explain what specifically you disagree with in Ms. Mazars' IP analysis.

A.  Well, hopefully, it says I may.  Because, again, until I've

looked at everything, I don't know exactly what I'll testify to.

But in terms of her analysis, what I particularly noted, the largest factor to me -- okay. Everyone looks like they were --

Q. You're back with us now. I think we --

THE COURT: I'm sorry, just to pause for a second.

THE WITNESS: Yes. Thank you so much. I believe what I recall of it, said what -- what I know, number one, I just want to make sure -- again, any term, "I believe," "I think," anything like that, or will testify to, if it actually says those words, I'll address that; it should be -- may be testified to. Again, at this point, I don't know that we know because I haven't seen everything.

But my biggest concerns with Ms. Mazars' disclosures -- if that's a proper term for it -- was that it both appears that she relied on a very specific subset and I don't know why other things were not included from the data. But either way, at this time, I don't have the ability to competently compare what she did use to the totality of the data that's available for examination.

So this statement, in particular, is preemptory. I'm disclosing that I may need to testify to that. On the other hand, should the government release the totality of all of that data so that it could be competently reviewed, what I may very

well find out is that she's on track.

Q.  Now, Mr. Fischbach, the last page of the IP overlap analysis document lists off the specific file names of the source information for all of Ms. Mazars' analysis.

It's correct that you have access to all of those individual files from discovery.  You're just asking for additional information; isn't that right?

A.  Boy, I'd love to give you one that I could just agree simply with and keep the testimony short, but I don't know that that would be an accurate thing to give a yes to.

The problem here is not that I don't have what she relied upon, but that an overwhelmingly significant part of my work is to understand why she didn't utilize it, yet why there are other things that she did use.  Absent that information, her -- scientifically, her analysis really doesn't have as much value, if any.  I mean, it lacks any form of certainty.

It would be like -- well, it's sort of -- not to be disrespectful with the Court present, but it is sort of like asking narrow questions.  And to your credit, you haven't done this yet.  And saying just a yes-or-no answer will suffice. There's more to her analysis either in that she looked at other things and chose not to include them, or that she looked at other things and they weren't helpful or they weren't useful.

But I -- because I can't see that for myself, and it wouldn't be sound to simply accept her word for it.  I don't

really have an answer to that at this time.

Q. And at trial I may keep you at yes-or-no answers, but I do think that your explanation for the purpose of the *Daubert* proceeding and understanding the basis of your opinion, that this is helpful.

Are there any specific additional data sets or files, other than maybe some other records from Mt. Gox, that you believe that she should have relied on in conducting this analysis?

A. Well, that's the -- that's the most difficult kind of question you could ever ask. What you're asking me is to tell you what I have seen. Since I haven't seen it, I don't know what it is. I only know that it exists.

THE COURT: Well, let me put the question a little bit differently. You're the expert. You're hired. You say, okay, this is what I would like to see. What is it you want to see that you haven't seen in order to form your expert opinion?

THE WITNESS: Very specifically, Your Honor, what I'd like to see is the totality of everything that the government used to form its opinion and/or those things that they found not useful to forming an opinion. In general, in any case, I want to be able to see everything that the government had available to its case. I understand *Jencks* being what it is in some cases and other things. There are some times when, as my daughter would say, too bad, so sad.

But absent their reason, it would be extremely instructive, especially for a team that Mr. Ekeland has been fortunate to gather, to have everything the government has available to it to us, and then we can be certain about our opinions.

THE COURT:  All right.

BY MS. PELKER:

Q.  We can address this afterwards.  But if you were to be told that the government has provided in discovery the entirety of the basis of Ms. Mazars de Mazarin's opinion or her analysis, would that allow you to complete your analysis absent the Mt. Gox question, or are there still additional things that you would want to see?

A.  Well, I think if that were -- if that were it, that everything that I had, everything that she's seen -- again, I would need to see everything else so that I would know whether or not she was given a compartmentalized task and not given all that information to look at.  I'm unclear, when the government clearly would expect and understand that I would see the totality of everything, I would think the government would expect its own expert to see the totality of everything.

So I don't know why what she has shown -- what she's provided as part of her -- it may be the basis of her opinion, but it should not be the totality of what she had available to her for those opinions.

Q.   Your expert report states that you identified errors in the Mt. Gox data in discovery.  What specifically -- well, I guess it's a question.

Have you identified errors, or are you testifying that you may identify errors?

A.   I'm testifying that there are -- well, there are two things with the Mt. Gox data.  Number one, there are some things that, again, relying on the group mind that's available in this -- miraculously in this case, I am relying on things that other experts have shown to me that have caused me concern.  Those are probably better addressed directly to them because that's their expertise.  But I am relying on their expertise.

Q.   Have you identified any specific errors within the Mt. Gox data?  Mr. Fischbach, I believe you froze again.

(Technical difficulty.)

THE COURT:  Before we get going again, Ms. Pelker, how much more time are you going to need?

MS. PELKER:  In light of this next line, I can definitely finish up within half an hour.  I can expedite that.

THE COURT:  Mr. Ekeland, how about you?

MR. EKELAND:  Probably, I can cut my redirect short. I can do it in 15 minutes.

THE COURT:  All right.  So why don't we take a 15-minute break now, and then we'll come back and finish up. Thank you.

THE COURT: Mr. Fischbach, can you come back in 15 minutes?

THE WITNESS: Absolutely. I will be here.

THE COURT: Thank you.

MR. HASSARD: Thank you, Your Honor.

(Recess taken.)

THE COURT: You can continue.

MS. PELKER: Thank you, your Honor.

BY MS. PELKER:

Q. Mr. Fischbach, before we took a break, we were talking about the review of the Mt. Gox records, and I asked whether you've specifically identified any errors in the Mt. Gox data provided in discovery.

Could you reiterate your answer. I'm not sure we fully got through it.

A. Sure. Again, I'm not the one who identified any of the -- they were identified to me, and there probably are other experts who speak better to their work.

My specific take on it was that, even our identification or another expert's identification of a record from Mt. Gox at this time -- well, a couple possibilities. Number one, it appears to be incomplete based on my understanding that the government has additional information that we haven't reviewed; and, number two, not entirely unexpected given the hacks that Mt. Gox suffered.

Q. Who was the other expert who identified the errors to you?

A. That, at best, I might have in notes. I'd have to go back. It's been some time. It almost appeared to be something that a number of different individuals had seen and brought to counsel's attention, to my attention. To be certain about that, I have to go back and see if I can find anything.

Q. You and Mr. Verret, I think, have both testified that your work and findings are based, in part, on information provided by other experts.

Are you referring to just the experts whose testimony has been noticed for trial, or are there additional experts with whom you've consulted or discussed the work or have discussed their work with you?

A. Well, I'm not sure exactly who has been noticed for trial, so I don't know that I could answer that. I suppose if you read them off, perhaps I could tell you. Yeah, I just don't know. I know there have been other people that all of us have consulted with who are not necessarily going to be a part of the trial.

Q. So the trial notice --

A. Again, that's -- I'm sorry.

Q. The notice trial of experts in addition to you are Ms. Still from CipherTrace, Dr. Cabanas, Mr. Verret, and Dr. Dror.

Are there other experts or individuals who have

provided information to you in your work and analysis?

A. Well, certainly, there are other individuals that have been involved in looking at things in this case. I don't know to what degree I could disclose those names or even to what degree I remember them, but there certainly have been other people involved.

But to be clear, someone else identifying a concern that they have is not an opinion of mine that is necessarily a valid concern. Well, no. Let's be careful. Certainly, a valid concern, but not that it necessarily warrants anything other than a review of an additional hypothesis.

My understanding in this case that the government had a hypothesis and chased that one hypothesis. To date, I haven't seen that the government ever pursued any other hypotheses even though I've seen other individuals listed in the government's work who certainly could have been or may -- or may at this time be co-conspirators or considered co-conspirators.

THE COURT: Let me put the question to you a little bit differently, which is we just need to know what the bases are for your expert opinion and so -- or expert opinions. So if there is a basis for an expert opinion as relying on something that someone else told you, another expert, then I think we need to know who that expert is and what they told you. If you're just saying by way of an aside that you heard

something from somebody else, but it's not forming a basis for any opinion you're going to express, then I don't think -- at least I don't feel like I need to know about that.

THE WITNESS: Thank you for clarifying that, Your Honor. There's a combination of that, especially in the sort of circumstance that the government was referring to where other individuals were noticing those things do, in fact, exist.

My ability to testify as an expert to those things isn't dependent on those individuals or their opinions or anything like that. If I do testify to something, it will be within my expertise and my ability to read it from the evidence itself.

My concern right now, in terms of finalizing that conclusion, is that I still think it's absent any sort of completeness because we still have items that we have yet to see that are with the FBI.

BY MS. PELKER:

Q. So you testified that some other individual -- and you don't recall the name but may be able to find it in your notes -- told you about an error in the Mt. Gox data.

Did you then find the same error that the other individual referred you to?

A. Again, to be clear, the individual didn't tell me specifically about an error, but about a concern over some data

and would I take a look at that data. I took a look at that data.

Again, I don't recall right off, and I'm not looking -- personally, yesterday I had everything out in front of me and ready to go. Today I had to do this sort of commuter testimony. So I don't have everything I had available to me yesterday. It's a site-specific thing.

But I did, in fact, look at those items. They do merit concern. My opinion at that time and my opinion today is that, based on anything we've seen, I don't feel comfortable drawing a conclusion about those things other than that they deserve a full-scope look at everything else so that we have some bigger picture of what we're looking at.

Because sometimes when you see something -- and, again, I may work differently than some of the other experts. But in my line of work, when I see something that appears to be anomalous, that's just a hypothesis at that point. It only becomes something anomalous when you're able to look through the rest of the data and see whether or not it repeats and how many times it exists.

But at this time I don't have that other data to look at.

Q. Mr. Fischbach, you have testified that you have reviewed those items and that when something appears anomalous, I'm trying to understand what are the items and what appeared

anomalous.

When you say you had it in front of you yesterday, what was in front of you yesterday and what were the items that you were looking at that seemed anomalous to you?

A. Well, yesterday what I had in front of me was pretty much the totality of everything that I had put into the folder when I was having the conversation regarding an expert disclosure. So I had all of that at --

THE COURT: Are you in your office now? Is it something where you just need to get up and go find a folder somewhere?

THE WITNESS: Unfortunately, I'm in a home office right now. I'm in a room in my office, but not where I set everything up yesterday. I was actually in a physical office.

BY MS. PELKER:

Q. What -- were they printed documents? Were they files on a computer?

A. Most of what I was looking at I printed out and actually put a Post-it on it so that I'd be able to answer those questions.

Q. Do you remember which files they were that were printed?

A. I believe there was something from Mt. Gox, and then -- I believe specifically on the top was something from Mt. Gox. Whatever subset of data we had that I had looked at. And then from there, the most recent disclosure the government had

provided with the -- with the IP address.

Q. And when you're saying records from Mt. Gox, presumably, it's a spreadsheet that's printed off with Mt. Gox records?

A. That's correct, which I understand is an -- a copy which could also explain what -- not everything appears to be accurate.

Q. When you say not everything appears to be accurate, what are you saying does not appear to be accurate?

A. Again, unfortunately, I'd have to take some time to actually try to get back to whatever I was looking at yesterday. I wasn't just -- I was hoping to be able to get back to that desk, but I just haven't been able to today.

Q. Was it an IP address, a timestamp? Can you reference where, how far along in the document it was?

A. Well, let's also be clear of one other thing. It's not a single thing. What I do know by memory is that nothing that we're referring to is a single object.

It's a compilation of various things, some of which I've spoken to already this morning; such as other individuals being involved, such as other documents appearing to be a part of the file that do look as though they may not have -- they perhaps were not supposed to have been included. Which, again, is why a big part of my work is actually just looking at the totality of the evidence. And more often than not, letting counsel know that, okay, there are no anomalies; I've explained

that.

But at this time I haven't been allowed to see that or had the opportunity to see that.

THE COURT: So just for efficiency's sake here, I think -- I feel like we're spinning our wheels a little bit on this topic, and the witness doesn't have the materials in front of him that he needs to have. And he also hasn't, I think, really fully reviewed his expert report. I think we're probably going to have to ask Mr. Fischbach to come back for our hearing -- our remaining *Daubert* hearings. If there's other stuff you want to cover today, you're welcome to do that.

But he just doesn't have the information in front of him to indicate what the basis is for any opinion regarding the Mt. Gox data. So I don't think there's much point in continuing on that line, and we'll just have to defer that for another time.

MS. PELKER: That's fine, Your Honor. We can go ahead and wrap up.

BY MS. PELKER:

Q. Mr. Fischbach, couple quick questions on tools that you use in your work.

On your CV you describe having expert-level knowledge of a few operating systems, Windows, Mac, iOS, Android; is that accurate.

A. I hope Linux is in there as well. But, sure, all of those.

Q. You've never reviewed the source code for those operating systems, have you, Linux aside?

A. See, that was going to be the one I was going to tell you yes.

Q. That is probably why it was not in my question, now that I think of it.

A. Absolutely. That's -- I've got to be careful. I have been involved in cases that have involved elements of Apple's operating system and Microsoft's operating system. So to the degree that I have had those, yes, I have looked at that code; and, again, reviewed them with other experts.

Q. You haven't done a full review of the entirety of the source code for those operating systems because it's proprietary; is that accurate?

A. I think it would be accurate to say that those companies have never provided me with the totality of their code, nor have I ever asked for the totality of their code.

Q. And according to your CV, you're also proficient in and equipped with multiple forensic tools, including Encase, FTK, Cellebrite and Axiom; is that right?

A. That's correct.

Q. And would you consider those accepted forensic tools?

A. Today, I think they've been very well-demonstrated to be. However, all of those systems have their error rates. Not as published, but studied and reviewed and, in fact, as of earlier

this year -- I'm trying to remember exactly when -- but through the FBI, I was able to identify another error in one of those and submitted that to their company.

So we -- I don't stand for any of those. I do rely on them, much as the government does. Part of why I rely on them is because they do give us some indication of what problems they have and when they have problems.

Q. So you have an expertise, in part, based on your repeated use of the different software and products; is that fair to say?

A. Well, certainly. I mean, the expertise certainly comes from familiarity with them, yes.

Q. Now, each one of those products listed and tools listed is proprietary software; is that right?

A. All of those ones that I listed, yes, those are all proprietary.

Q. And you've never reviewed the source code for Encase, for FTK, for Cellebrite, or for Axiom?

A. I probably could have with FTK because I have worked with one of the original founders of the company. Ultimately, that wasn't necessary for my purposes because what the companies have all done is they've all provided their change logs so that you're aware of some problems. If they wouldn't provide that, if we had no other basis to confirm the accuracy of the software or inaccuracy on occasion, then, yeah, the only way to

do it would be to look at the source code.

Q. But you, to date, have not looked at the source code for any of those tools?

A. No. I haven't needed to.

MS. PELKER: No further questions.

THE COURT: All right. Redirect? Before you turn to your redirect, I'm just looking at Mr. Fischbach's curricula vitae, or resume, and I don't see the education -- his education. Is that not on here?

MR. EKELAND: I'm happy to ask him questions about that, Your Honor.

THE COURT: It would help for me to have that background.

REDIRECT EXAMINATION OF

JEFF FISCHBACH

BY MR. EKELAND:

Q. Mr. Fischbach, I think you've heard the Court asking about your educational background. Could you state what, if any, educational background you have.

A. Absolutely. I dropped out of college just as the internet was taking off. And the opportunities, unfortunately, were so voluminous that -- I don't think I knew I dropped out at the time, but never ended up having time to go back and complete it. That's as far as that got.

Unfortunately, it's a very -- fortunately or

unfortunately, a very common story within this industry. Steve Jobs, Bill Gates, Michael Dell, across the board.

THE COURT: What about just other training, seminars, things like that?

THE WITNESS: So I do -- my seminars have been, for the most part, seminars I've been asked to provide. In terms of attending seminars, occasionally I'm asked to sit in on various seminars, but I haven't received any specific certification or anything like that.

The short answer is, by the time I had done the bulk of my work, the vast majority of the certifications that exist today weren't available. They just hadn't been invented yet.

THE COURT: All right. Thank you.

BY MR. EKELAND:

Q. Just to follow up on that -- on the types of training that you do; do you do any forensic training for law enforcement?

A. Yes, I have done law enforcement forensic training. I'm also, typically, asked by various law enforcement to provide other training to other groups that they address.

And then, also, I specifically do regular judicial trainings for judges, in particular.

Q. And just if you can, name some of the law enforcement agencies that you've done training for and just briefly describe the type of training, if you can disclose that.

A. The very, very first work I ever did in terms of anything

that now looking back on it was training -- I don't know that I knew what I was doing back at that time. But I was asked by an agent, Manny Hurtado, of the LA, what was then called, the Computer Crime Squad that he was just beginning and was asked specifically if I would consult with him pro bono. I didn't even know that term back then. It's a term I know today.

But I was asked if I would help the FBI in trying to designate some of their practices in terms of preservation, that sort of thing. Since that time, I do regular trainings in Oregon. And probably one of the bigger trainings that I've done here in California has been a federal training program that I think combines -- I can't tell you, but it appears to combine possibly federal prosecutors and federal defense; but, in particular, as a matter of fact, I try to stay neutral to that sort of thing anyway. So I wouldn't have gone around and asked everybody. Certainly, individuals that are in law enforcement.

Q. What specifically are you training these agencies and individuals on?

A. That really depends on what the du jour is of that; what's the concern. So going way back early on, I think it would have been just boring by today's standards. It was just understanding how an email can or can't be attributed; a lot of training about how best to utilize IP addresses. Not just how to gather them, but how to -- how to better confirm that you're

using them accurately; a whole lot of evidence preservation and evidence-gathering.

But, you know, if you were to move forward, today I mostly am being asked to speak about issues of artificial intelligence. That's the -- yes.

Q. Would it be just -- fair to say that what people hire you to train them on, generally, is related to computers and computer forensics?

A. That's the -- I mean, that's the nutshell of it.

Q. And that's what your company, SecondWave, does?

A. One of the things that we do.

Q. I want to turn -- I just want to follow up really briefly on a question that Ms. Pelker asked you about whether or not you'd reviewed the source code for Apple, and I can't remember, actually, the other companies that she mentioned.

I took the gist of the question to be, have you ever reviewed, say, like, the source code for any of the big tech companies, like Apple or whatever, and Facebook. Do you need to review their source code to know their error rates or their accuracy of that software?

A. Absolutely not. The only reason we would specifically need to review that source code is because we don't have that information.

Q. And why wouldn't you need to do that in terms of Apple or IBM or whatever?

A.   Well, I suppose, if there were a lawsuit that alleged that Apple or Microsoft or somebody else was lying about that, that would be different.

So if you would take the Volkswagen emissions case, there was no reason to go any further than what Volkswagen published in terms of their emissions until they were caught scamming their emissions.  At that point now you can't trust what comes with them anymore.

My practice has been, if a company has been regularly forthcoming with that sort of information, then there typically isn't a concern.  If there was, then perhaps we would ask.  This certainly isn't the first time we've ever asked.  There's been other software we have asked.

Q.   I think when you were answering Ms. Pelker's question, you mentioned something called a change log.

Could you explain to the Court what a change log is.

A.   Yes.  I mean, in alternate, when we don't have everything, we need to understand error rates and that sort of thing.  We can often extrapolate that from what was repaired in the software.

So FTK, for instance, toolkit; one of the bigger forensics companies, Accurate Data -- these companies produce their change logs.  So as an analyst, if I've done a certain kind of work and I've produced a particular result and in their change log, they've repaired a thing, a component of the

software that I feel would be relevant to the accuracy of my results, then I'll necessarily go back with the new software and test it.

As I found, most people for the government, when they used the same software, I witnessed lots and lots of testimony where, when asked on the stand, why did you reanalyze this case a year later, what was wrong with it the first time, the answer typically is, well, there was an error that was corrected in a future version, the company published that error, and I felt, as a matter of completeness, that I should check my work and make sure that my results are the same with the new piece of software.

So that's, effectively, how we can figure out if there have been errors and that sort of thing.

Q.   And are you aware of any reliable forensic software company that doesn't publish change logs?

A.   From what I -- well, first of all, there aren't many companies I would just go right out and say aren't reliable. There are some products that I think maybe some people use. I'm not aware of using these.

But otherwise, as far as the ones that you see the FBI uses and most large law enforcement, those all produced -- they're all very forthcoming about their software.  I can only imagine how difficult it is to have to repeatedly say, uh-oh, we messed something up; here's what we fixed.  That's just good

practice. Again, not just for forensic software; Microsoft catches their software, I think, weekly and they produce the same information.

Q. Is it fair to say that the -- publishing change logs is a common practice among reputable software companies?

A. That is, in fact, one -- I think contingent upon a company being considered to be reputable.

MR. EKELAND: No further questions, Your Honor.

THE COURT: All right. Thank you.

So, Mr. Fischbach, thank you for participating today. I think what I'm going to need you to do is to look at your disclosure and figure out, sort of, what version of it you're comfortable signing and doing so. I can talk to Mr. Ekeland about timing on doing that.

And then I think we're probably going to want to have you back with that in hand, as well as the materials that you were relying upon, so you can answer some of the questions that you wanted to reference the materials with today, okay?

THE WITNESS: Yes. Your Honor, would it be acceptable to the Court if I were to, effectively, outline within the disclosure anywhere that I felt that those opinions would likely be subject to change if provided additional information or anywhere where it's a hypothetical conclusion that's dependent on further information?

THE COURT: I think you're welcome to say -- I mean,

I think you need to say what your expert opinion is and what your basis is for your expert opinion. If there are areas in which your opinion could change if you had additional information, you're welcome to disclose that as well.

THE WITNESS: Okay. I appreciate that, Your Honor. I'll try to come up with something that, hopefully, the Court will find useful.

THE COURT: I appreciate that. Thank you. You're excused for the day.

THE WITNESS: Thank you so much.

THE COURT: What about timing on that, Mr. Ekeland; when do you want to submit the signed version? Oh, go ahead.

MR. EKELAND: We were discussing it in the break. I think Ms. Still's disclosures are due on -- or report, I'm sorry, Jonelle Still from CipherTrace, are due on August 7th. We were contemplating, if that works for the government, doing the same date.

If I might add, before Ms. Pelker comes up, if the Court wishes -- and I've mentioned this to the government, but I don't know their position on it -- we could also produce an expert report from Mr. Verret on the same date.

THE COURT: An expert report -- was there not an expert report from him?

MR. EKELAND: This was the disclosures. As I took from some of the Court's questioning of Mr. Verret the other

day, there was some concerns about whether or not he should write down some more of his stuff, and we're happy to do that.

In other words, we're happy to provide any more disclosure or reports that the Court wishes in relation to the experts, and we suggest that we just do that on the same deadline as Ms. Still.

THE COURT: I didn't really mean to be expressing questions about the adequacy of his disclosure, although I hadn't really thought about it. What I was really trying to point out for you, I just -- I was at least telegraphing that I was not persuaded that, at least some of what he was testifying to, really qualified as expert opinions, but more arguments of a lawyer and things where you -- the expert can testify and say, here are what the numbers are and there was -- if you look at the value of bitcoin and how it's grown over time had someone invested X dollars in bitcoin in such and such a month, you would expect that over time, if they left it in bitcoin, they would have X dollars -- or Y dollars at a later date, and here are the accounts that show the money that he had.

Then the lawyers can just argue to the jury and say to the jury -- you can argue to the jury and say, well, where's the rest of the money? You would expect to find the money. And the government can say, well, that's what people who are involved in hiding funds do; they hide it. It's not a surprise. And that was all lawyer argument.

There were a bunch of places in his testimony where I think he was slipping a little bit more into his role of being a lawyer and less of being an expert. That was what I was principally commenting on.

MR. EKELAND: Understood, your Honor.

THE COURT: Okay.

MS. PELKER: Your Honor, Ms. Still's late disclosure is really an exceptional situation where she has been recently retained by the defense, and we understand that the defense and she need time to be able to provide and disclose -- to prepare a report.

Mr. Fischbach has been working with the defense since last year, has spent hundreds of hours reviewing the discovery. The testimony today is that he has identified some errors that may be errors that are anomalous, but that he didn't have the spreadsheet printed off so he couldn't point to it.

It should not take him another three weeks to be able to prepare a report.

THE COURT: I agree with that. I think that the problem is that he -- I think that counsel had prepared the report, and maybe he hadn't had an adequate chance to review it. So I don't think it's going to take a lot of time for him to review it and just decide what he feels comfortable opining about and what he doesn't feel comfortable opining about.

Let's see. Today is the 20th of July. Why don't I

give you until the 28th, which is a little bit over a week, to submit the final version of his expert report.

MS. PELKER:  The government would just ask, to the extent that there are specific errors, specific items that he believes are inaccurate, that they be identified in the report.

THE COURT:  I agree with that.  That should be the case.  And all these expert reports, the reports are supposed to not identify just general areas of testimony, but the specific opinions that the expert is going to express and the basis for those opinions.

I don't think it would be, by any means, adequate to say, my view is that there are errors in the Mt. Gox data or there are flaws or difficulties or concerns in it and not say what they are and what the basis is, whether -- that's the whole purpose of this exercise.  So I agree with that.  All right.

MS. PELKER:  Your Honor, the government is just very concerned that we are heading down a timeline in which we get to the end of August and defense is asking for a further continuance here.  We just want to be on the record that this case has been continued many -- has been continued for a lengthy period of time, and we are expecting to go to trial in September.

And whatever we need to do to make that happen, we should strive to do so.

THE COURT: I agree with that. I suspect that Mr. Sterlingov agrees with that. He's been incarcerated, and he, presumably, wants to go to trial as soon as he can.

MR. EKELAND: Well, yes, Your Honor. But one of the defense's concerns -- and we have discussed this before, and Mr. Fischbach touched on this -- is that there's -- we addressed this, I think, the other day, so I'm not going to belabor the point. I just do want to reemphasize it slightly. It's our position that we need full access to the Mt. Gox database.

THE COURT: Just to interrupt, I was going to ask you this. Why don't you outline for me exactly what it is you don't have and that you think you need.

So full access to the Mt. Gox data, correct?

MR. EKELAND: The Chainalysis source code.

THE COURT: Give me a second.

MR. EKELAND: Yes. We're preparing a letter for the government that we intend to send out tomorrow asking this -- listing this as well. I think the key ones are --

THE COURT: The Chainalysis source code.

MR. EKELAND: Chainalysis source code.

THE COURT: Do you have a computer coder? I didn't see any of these experts who were computer coders.

MR. EKELAND: Mr. Fischbach has told me -- represented to me --

THE COURT: He has not a single course in computer science.

MR. EKELAND: Your Honor, every -- I've been working with people involved in the computer field for the last decade. All the super-talented ones, a lot of them are dropouts.

THE COURT: But some training or some substantial experience. I mean, he's not even a coder.

MR. EKELAND: Your Honor, Rule 702 does say experience can be the basis for an expert.

THE COURT: I didn't hear any testimony about his experience as a coder or knowledge as a coder.

MR. EKELAND: Well, we can elicit that next time. I'm quite confident I can find somebody who can read the source code through my connections. I'm not going to argue the point with you here.

I think we have established that we need access to the source code given the fact that Chainalysis does -- has no data on its error rates, period. They haven't produced change logs, period. We're, essentially, just being told trust us; and I thought it was astonishing that Ms. Bisbee said that Chainalysis hadn't even kept internal analysis on the error rates. So I think you get the point.

THE COURT: So the Mt. Gox data, full access to that. I take it there is access to it, but someone has to go to the FBI to have access to it.

MR. EKELAND: That's the issue. We don't -- and that's what Mr. Fischbach was testifying to. He was saying he can't analyze that Mt. Gox data at the FBI office. We're told we have to go during their office hours; we have to get clearance. He's not going to have all his tools.

That will delay the trial further because that's going to involve travel time; it's going to involve expense. It's a whole thing. Like, there's no reason --

THE COURT: Okay. What else then? Anything other than those two items?

MR. EKELAND: I think something that Dr. Dror made relevant is we haven't seen the communications -- actually, what's being told what Chainalysis is being instructed on. We requested a long time ago the communications between the government and Chainalysis in regards to this investigation, and we haven't gotten a single communication that I'm aware of in relation to that.

I think that's highly relevant given that this software, once again, is essentially heuristic assumption-based software and everything is guesses in it.

THE COURT: Okay. Anything else?

MR. EKELAND: Not off the top of my head. I think really the Mt. Gox data, the Chainalysis source code, and the communications between the government and Chainalysis. And also, I think Dr. Dror did make relevant the amount of money

that Chainalysis is being paid for the government to work on this investigation. We've asked for those records.

THE COURT: I think that is part of what expert disclosure is supposed to include, compensation. So everyone should be disclosing that.

MR. EKELAND: Not just the experts. But I'm saying that the amount of money that the United States Government has paid Chainalysis to work on this investigation, I think, is relevant information for the jury should the cognitive bias testimony from Dr. Dror come in. Because Dr. Dror specifically said, you know, financial incentives can create cognitive bias.

And I think it's directly relevant that this is a for-profit forensic vendor because I don't think you would have this problem if this was FBI cyber in-house.

THE COURT: Okay. Let me hear then from Ms. Pelker about those four items.

MS. PELKER: So as far as full access to the Mt. Gox data, the government has offered to make this available to defense counsel and their experts at the Washington Field Office. We picked the Washington Field Office after conversations with the supervisors to ensure that they would have full access during the working hours. Yes, there are working business hours of the office, but they're committed to ensuring that they will have access.

THE COURT: Tell me what the reasons are for not

simply providing a download of it or -- is it so much data that it couldn't be sent out to a California Field Office for someone to access it there? What are the limitations you're facing?

MS. PELKER: It's extremely voluminous, but the real concern is the amount of sensitive third-party financial information and identifying information in that data set.

THE COURT: I see.

MS. PELKER: It has tens of thousands of individuals' sensitive financial details.

We've offered -- and we put this in our filing -- if there is a subset of files that defense counsel wants pertaining to those -- to the servers that don't include the sensitive financial information, we're happy to give it. If they want to come out and do an initial review and say, here are the specific things that we need to do further analysis on and take that back with them, we're happy to do it.

But to just turn over massive amounts of third-party financial --

THE COURT: That was -- you've answered the question; I was wondering why it was that the government was keeping this close hold.

What about the prospect of providing access, for example, in the Los Angeles Field Office, if that's closer to where Mr. Fischbach is and makes it easier for him to access

the data?

MS. PELKER:  We certainly did consider that, and we're happy to discuss the possibility.  The concern there is that hours -- with the Washington Field Office, we have a fair amount of influence in ensuring that there's going to be ample time for defense to be able to do the review.  It is a large data set.

THE COURT:  Right.

MS. PELKER:  And if -- first of all, I'm not clear that Mr. Fischbach has the expertise to do the sort of review that defense counsel is suggesting of -- kind of what an incident responder would do to find evidence of a hack and potential deletion of logs.

THE COURT:  Right.

MS. PELKER:  But, even so, the amount of time that the expert is likely to need with the data set to be able to do that review, our concern is that if we move it out to the Los Angeles Field Office, we're back here next week with defense complaining that they weren't able to get in for five days a week for the full working hours; whereas, in the Washington Field Office, we have commitments from the supervisors here. We can make that happen.

THE COURT:  Well, maybe that's something worth exploring with Mr. Ekeland about whether that is a possible solution.

What about the Chainalysis source code?

MS. PELKER:  The government does not have the Chainalysis source code in our possession.  I think that has been the subject of some of the back-and-forth litigation with Chainalysis.

THE COURT:  I take it -- have you requested that Chainalysis make it available?

MS. PELKER:  I don't know that we've made any specific request to Chainalysis.  I'd have to go back and view. We don't have any ability to direct them.

THE COURT:  I know you don't have the ability to direct them.  It's their proprietary source code.  But, again, just to try and streamline things, you might ask and see if they'd be willing to do it.

MS. PELKER:  I think from their filings, if you -- their motion to quash, in part, addressed this.  They've made their position on that fairly clear.

THE COURT:  Right.  What about the communications between the government and Chainalysis?

MS. PELKER:  So I believe that the defense request initially was very broad of every communication that the government, anyone in the entire U.S. Government has ever had with Chainalysis.  What I'm understanding now is that it's communications between the government and Chainalysis regarding this case.

I mean, I don't believe that's subject to discovery or relevant except to the extent that they're arguing that, if we disclose particular information to Ms. Bisbee and her preparation of the expert report that she may have relied upon, we can go back and see if there's anything that we believe may be covered by that.

THE COURT: I think that would be wise to do that. And I did understand Mr. Ekeland just to be asking about this investigation. And so if there are assumptions, premises, information that was provided, that would be helpful and, quite frankly, it may well be in the government's interest.

If it's not provided, Mr. Ekeland is going to be arguing to the jury that, for all we know there were assumptions, and the government didn't provide that information; therefore, we don't know what the assumptions are. So it might be in everyone's interest if that can be provided.

And then what about the money that's been paid to Chainalysis? I take it, again, it was just relating to this investigation and not over -- for all things?

MS. PELKER: I mean, the money that's been paid to Chainalysis is -- the work that Chainalysis is doing on this case is the expert report.

THE COURT: Did they do anything beforehand, before -- before they were retained to be a testifying expert, as a nontestifying expert to do analysis?

MS. PELKER: No. So what Mr. Ekeland -- part of the defense conspiracy theory is that there was an IRS contractor named Aaron Bice who did work on this case. His contract was post-indictment. Then, basically, his company was acquired by Chainalysis. So he is a contractor.

He is -- my understanding is that IRS has a contract with him for work on lots of different cases, supporting the IRS's work. But that's not a payment by the government to Chainalysis for this case.

THE COURT: Okay.

MS. PELKER: And then the other -- the only other thing would be the government generally pays for Chainalysis licenses, like the license that was used by Mr. Scholl in doing the tracing. But, again, that's not a payment by the government to Chainalysis for work on this case.

THE COURT: What does the license cost?

MS. PELKER: So I don't know the specifics. Because I know it's an enterprise license.

THE COURT: I see.

MS. PELKER: I believe most of the federal contracts are published somewhere, but I just don't know, your Honor.

THE COURT: All right. Well, I think we know the universe of things. I've given you some guidance at least with areas I hope the parties can work together. If you need me on this, let me know.

If the parties prefer to convene a hearing virtually to try and resolve these issues -- Mr. Ekeland, if you're back in New York -- I will be available for that. But I hope that you all can work these things out.

I will say that I understand the government's position that it doesn't possess or own the Chainalysis source code, and they can't require that Chainalysis turn it over. They can make a request, and I think it might be wise to do that.

With respect to the full access to the Mt. Gox data, I understand the government's concerns. And if there is a great deal of sensitive financial information, I understand why the FBI wants to maintain custody of that. Maybe something can be done to increase the access in some way. I think that would be advisable if that can be done.

I think I've just touched on the questions relating to communications with the -- with Chainalysis and also the payments to Chainalysis.

With at least that preliminary guidance from the Court, hopefully, the parties can work something out here, and we can keep moving forward. Mr. Ekeland?

MR. EKELAND: Just a quick procedural question. We will try to work it out with the government. I think what we're planning to do is just send a letter.

THE COURT: You're welcome to send a letter, but I

find that that is -- ends up being less productive.  I mean, you've told the government what it is that you want here.  I think, frankly, conversations in which you can see whether there's some give-and-take can be more productive than just making the record of here, we sent you the letter.

MR. EKELAND:  Understood, Your Honor, yes.  Should we not be able to come to some kind of agreement, we then would just ask the Court for a hearing and not file a motion to compel or something like that?

THE COURT:  I'm all in favor of expediting these things.  I'm not sure how much more I can do on some of these things.  I mean, if the government is providing access to the Mt. Gox data here in D.C., I'm not sure they have a legal obligation to be doing more than that under the circumstances.  I think it might expedite the case and prevent -- minimize the risk that I'll need to grant a continuance if it can be provided in California or in some greater way.

With the Chainalysis source code, again, I'm not sure my -- there's much within my authority to do anything, at least with respect to the government on that.  And I touched on the other issues.

So my authority may be limited other than jawboning on some of these things.  I'm happy to do that if it's helpful.

MR. EKELAND:  You could exclude the Chainalysis Reactor's source code on the basis that it wasn't produced.

That's a separate motion, Your Honor.  Understood.

THE COURT:  Okay.  Anything else before we adjourn?

MS. PELKER:  No, your Honor.

THE COURT:  Okay.  Thank you all.

MR. EKELAND:  Thank you, your Honor.

(The hearing adjourned at 4:25 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 3rd day of August, 2023.

/s/ Tamara M. Sefranek
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C. 20001

**$**

**$100,000** [1] - 230:12
**$33** [1] - 237:17
**$334** [1] - 237:16
**$50,000** [1] - 230:13
**$70,000** [1] - 230:16

**/**

**/s** [1] - 335:9

**1**

**1** [1] - 244:8
**10** [1] - 237:17
**10005** [1] - 214:17
**10:10** [1] - 214:6
**10:50** [1] - 242:19
**1193** [2] - 243:8, 243:23
**1193-94** [1] - 245:4
**11:00** [3] - 231:20, 242:13, 242:14
**11th** [1] - 238:10
**15** [2] - 301:22, 302:1
**15-minute** [1] - 301:24
**16** [2] - 284:15, 291:4
**168** [1] - 244:4
**168.1.1** [1] - 268:21
**174** [1] - 244:25
**18** [4] - 236:18, 250:5, 252:8, 252:14
**1956(a)(3** [1] - 250:5
**1960(b)** [1] - 252:9
**1987** [1] - 257:3
**1:00** [3] - 231:22, 231:23, 242:8
**1:21-CR-0399** [1] - 214:3
**1:30** [1] - 242:9
**1:35** [1] - 242:19

**2**

**2** [2] - 250:22, 252:14
**20** [1] - 214:6
**20001** [3] - 214:12, 214:23, 335:11
**2010** [1] - 228:9
**2011** [2] - 241:19, 268:6
**2013** [1] - 241:10
**2014** [1] - 241:10
**2015** [1] - 231:6
**2016** [1] - 231:6
**202-354-3246** [1] - 214:23
**2021** [1] - 241:13
**2023** [2] - 214:6, 335:7

**20530** [1] - 214:14
**20th** [2] - 263:13, 321:25
**21-399** [1] - 216:2
**21-CR-399** [1] - 242:22
**217** [1] - 215:5
**22** [1] - 237:18
**227** [1] - 215:6
**25** [1] - 247:6
**250** [1] - 288:19
**26** [6] - 254:12, 256:2, 256:3, 265:21, 273:21, 275:20
**26-plus** [1] - 285:24
**27** [1] - 254:13
**28th** [1] - 322:1
**2:00** [1] - 234:25

**3**

**3** [1] - 251:20
**30** [2] - 214:17, 247:6
**300** [1] - 288:16
**30th** [1] - 263:13
**317** [1] - 244:16
**326** [1] - 243:15
**333** [2] - 214:22, 335:11
**385** [2] - 243:22, 247:5
**3:00** [1] - 234:25
**3rd** [1] - 335:7

**4**

**4** [1] - 252:22
**40** [1] - 288:14
**400** [1] - 288:16
**45** [1] - 242:24
**483** [1] - 244:3
**499** [2] - 245:1, 247:10
**4:25** [1] - 334:6

**5**

**5** [1] - 255:16
**51** [1] - 245:1
**52** [1] - 247:10
**534** [1] - 245:2
**54** [1] - 247:6

**6**

**600** [1] - 290:15
**601** [1] - 214:11
**6714** [2] - 214:22, 335:10

**7**

**7** [2] - 229:11, 229:17

**7(c)(1** [1] - 242:25
**7(f)** [1] - 243:11
**702** [1] - 324:8
**74** [1] - 243:23
**76** [1] - 247:5
**764** [1] - 244:25
**7th** [1] - 319:15

**8**

**8** [1] - 229:11
**822** [3] - 243:7, 243:23, 245:3
**841** [1] - 244:16
**8th** [1] - 214:17

**9**

**91** [1] - 243:15
**950** [1] - 214:14
**971** [1] - 245:3
**987341870** [1] - 221:18

**A**

**a.m** [1] - 242:19
**A.M** [1] - 214:6
**Aaron** [1] - 331:3
**abetting** [3] - 252:12, 252:14, 252:19
**ability** [9] - 227:16, 266:18, 279:17, 297:19, 305:9, 305:12, 329:10, 329:11, 335:6
**able** [31] - 236:21, 238:17, 242:3, 255:24, 262:17, 263:18, 263:24, 264:10, 266:23, 270:11, 273:24, 279:19, 280:8, 280:14, 284:6, 289:14, 289:23, 291:8, 299:22, 305:20, 306:18, 307:19, 308:11, 308:12, 311:2, 321:10, 321:17, 328:6, 328:16, 328:19, 333:7
**absent** [7] - 248:10, 290:17, 290:19, 298:14, 300:1, 300:11, 305:15
**absolutely** [12] - 224:20, 257:2, 257:19, 260:22, 265:10, 278:24,

285:9, 294:4, 302:3, 310:7, 312:20, 315:21
**abuse** [1] - 276:15
**accept** [2] - 275:16, 298:25
**acceptable** [1] - 318:20
**accepted** [2] - 219:23, 310:22
**access** [41] - 217:9, 227:13, 227:15, 227:24, 232:16, 232:21, 232:23, 233:6, 233:11, 233:25, 234:4, 235:7, 235:10, 235:20, 236:7, 248:22, 262:14, 264:7, 265:1, 265:19, 267:21, 273:12, 287:9, 293:2, 298:5, 323:9, 323:14, 324:16, 324:23, 324:24, 324:25, 326:17, 326:22, 326:24, 327:3, 327:23, 327:25, 332:10, 332:14, 333:12
**accessing** [1] - 232:9
**accompanied** [1] - 245:8
**according** [1] - 310:18
**account** [33] - 219:15, 220:19, 220:22, 221:17, 221:18, 222:2, 222:11, 222:18, 222:23, 222:24, 223:9, 223:12, 223:18, 224:4, 225:3, 225:4, 225:16, 225:20, 226:2, 226:5, 226:12, 226:13, 226:14, 226:15, 226:18, 226:20, 226:22, 227:19, 228:2, 248:7, 252:16, 267:13, 280:11
**accounted** [1] - 229:21
**accountholder** [1] - 225:16
**accountholders** [1] - 225:6
**accounting** [3] - 219:16, 219:24, 230:1

**accounts** [3] - 225:6, 225:23, 320:19
**accuracy** [8] - 220:15, 261:16, 261:19, 273:1, 282:6, 311:24, 315:20, 317:1
**Accurate** [1] - 316:22
**accurate** [12] - 224:11, 227:25, 283:20, 288:18, 298:10, 308:6, 308:7, 308:8, 309:24, 310:14, 310:15, 335:4
**accurately** [2] - 289:25, 315:1
**accused** [1] - 276:14
**accustomed** [1] - 275:18
**acknowledge** [1] - 249:1
**acquired** [1] - 331:4
**act** [2] - 244:18, 246:18
**Act** [2] - 263:8, 265:1
**Action** [1] - 214:2
**activity** [17] - 219:20, 219:21, 224:18, 225:3, 225:24, 226:13, 245:23, 245:25, 246:7, 246:9, 250:8, 250:10, 250:11, 250:24, 251:1, 251:6, 251:19
**actors** [1] - 271:12
**acts** [2] - 248:2, 248:7
**actual** [4] - 250:3, 251:10, 276:21, 278:22
**add** [5] - 236:20, 236:23, 256:5, 288:10, 319:18
**addition** [3] - 245:5, 265:22, 303:22
**additional** [11] - 261:25, 262:3, 283:4, 298:7, 299:6, 300:12, 302:23, 303:11, 304:11, 318:22, 319:3
**address** [40] - 232:8, 257:18, 257:19, 258:5, 259:10, 259:15, 259:16, 259:17, 259:20, 259:22, 260:1, 260:3, 260:5, 260:18, 260:21, 261:4, 261:9,

261:11, 261:14, 262:11, 264:8, 268:17, 268:18, 268:19, 268:22, 268:23, 269:11, 270:5, 270:20, 278:22, 297:12, 300:8, 308:1, 308:13, 313:19

**address-to-address** [1] - 278:22

**addressed** [4] - 258:25, 301:11, 323:7, 329:16

**addresses** [9] - 250:18, 257:17, 257:23, 260:6, 260:11, 260:12, 260:17, 268:20, 314:24

**addressing** [2] - 259:13, 259:14

**adequacy** [1] - 320:8

**adequate** [2] - 321:21, 322:11

**adjourn** [1] - 334:2

**adjourned** [1] - 334:6

**administrative** [1] - 248:9

**administrator** [1] - 239:13

**administrators** [4] - 223:18, 239:3, 239:6, 239:21

**ADMITTED** [1] - 215:15

**adopter** [1] - 231:4

**adoption** [1] - 277:12

**advantage** [1] - 255:24

**advisable** [1] - 332:15

**affect** [1] - 235:2

**affected** [1] - 220:22

**affidavit** [3] - 238:19, 240:15, 250:21

**affidavits** [2] - 240:15, 245:9

**afternoon** [1] - 236:21

**afterwards** [1] - 300:8

**agencies** [4] - 218:10, 219:2, 313:23, 314:18

**agent** [1] - 314:3

**agents** [1] - 263:1

**ago** [8] - 261:1, 265:22, 274:7, 276:1, 285:24, 286:22, 289:25, 325:14

**Agora** [1] - 241:10

**agree** [8] - 281:21, 285:3, 295:24, 298:8, 321:19, 322:6, 322:15, 323:1

**agreement** [4] - 245:18, 245:19, 284:7, 333:7

**agrees** [1] - 323:2

**ahead** [4] - 216:16, 266:8, 309:18, 319:12

**aided** [1] - 265:24

**aiding** [3] - 252:12, 252:14, 252:19

**air** [1] - 261:5

**airline** [1] - 261:8

**airplane** [1] - 261:7

**airplane's** [1] - 261:6

**airport** [2] - 261:1, 261:3

**akin** [1] - 269:8

**alarm** [2] - 256:19, 256:22

**Alaska** [3] - 263:18, 293:8, 293:10

**Alden** [1] - 216:6

**ALDEN** [1] - 214:13

**allegation** [5] - 229:1, 232:16, 251:4, 252:7, 268:5

**allegations** [4] - 249:18, 251:2, 251:15, 251:17

**alleged** [18] - 244:18, 244:22, 245:5, 245:7, 246:4, 246:6, 246:8, 246:11, 246:18, 247:8, 247:14, 247:17, 248:1, 248:15, 250:24, 251:25, 253:11, 316:1

**allegedly** [1] - 252:16

**alleges** [1] - 252:4

**alleging** [1] - 247:9

**allow** [5] - 243:5, 243:13, 267:2, 290:8, 300:11

**allowed** [2] - 268:13, 309:2

**almost** [3] - 217:23, 241:7, 303:3

**alter** [1] - 293:21

**altered** [1] - 228:6

**alternate** [1] - 316:17

**alternative** [7] - 224:13, 225:2, 225:22, 226:17, 227:18, 228:4, 267:16

**Altnet** [2] - 267:17, 268:1

**Amazon** [2] - 267:1, 268:21

**America** [6] - 216:3, 218:12, 218:16, 220:8, 220:12, 242:22

**AMERICA** [1] - 214:2

**amount** [11] - 223:13, 223:14, 229:17, 237:16, 239:1, 277:10, 325:25, 326:7, 327:6, 328:5, 328:15

**amounts** [1] - 327:18

**ample** [4] - 252:3, 252:18, 293:19, 328:5

**analog** [1] - 278:16

**analogies** [1] - 259:8

**analogous** [2] - 246:24, 281:25

**analysis** [23] - 227:22, 227:23, 252:23, 261:14, 261:17, 262:11, 277:8, 277:17, 295:23, 296:22, 296:24, 297:3, 298:3, 298:4, 298:15, 298:21, 299:9, 300:10, 300:11, 304:1, 324:21, 327:16, 330:25

**analyst** [1] - 316:23

**analyze** [3] - 262:17, 264:8, 325:3

**analyzed** [1] - 280:1

**Android** [1] - 309:23

**Angeles** [4] - 258:25, 259:4, 327:24, 328:18

**anniversary** [1] - 293:10

**anomalies** [1] - 308:25

**anomalous** [6] - 306:17, 306:18, 306:24, 307:1, 307:4, 321:15

**anonymous** [1] - 296:11

**answer** [19] - 219:13, 222:17, 224:10, 262:20, 264:11, 274:19, 275:7, 275:19, 278:1, 286:18, 290:8, 298:20, 299:1,

302:14, 303:15, 307:19, 313:10, 317:7, 318:17

**answered** [1] - 327:20

**answering** [1] - 316:14

**answers** [2] - 291:11, 299:2

**anyway** [1] - 314:15

**apart** [1] - 248:8

**apologies** [1] - 294:15

**apologize** [4] - 274:17, 275:11, 290:11, 293:9

**appear** [3] - 280:15, 292:15, 308:8

**appeared** [4] - 222:15, 274:23, 303:3, 306:25

**appearing** [1] - 308:20

**Apple** [6] - 256:16, 272:16, 315:14, 315:18, 315:24, 316:2

**Apple's** [1] - 310:8

**applicable** [1] - 249:15

**application** [2] - 219:25, 220:2

**apply** [3] - 219:25, 220:3, 284:20

**appreciate** [3] - 235:8, 319:5, 319:8

**appreciated** [1] - 231:6

**appreciation** [1] - 231:5

**approach** [1] - 244:7

**appropriate** [2] - 233:17, 247:22

**appropriately** [1] - 235:14

**apps** [1] - 272:17

**area** [4] - 227:22, 273:19, 279:2, 280:23

**areas** [7] - 254:18, 267:6, 278:20, 284:13, 319:2, 322:8, 331:24

**argue** [3] - 320:20, 320:21, 324:14

**arguing** [2] - 330:2, 330:13

**argument** [3] - 232:1, 236:18, 320:25

**argumentative** [1] - 280:2

**arguments** [1] - 320:12

**arrange** [1] - 263:18

**arrive** [1] - 227:11

**articles** [1] - 221:11

**articulate** [1] - 282:17

**artificial** [1] - 315:4

**ascertain** [1] - 243:19

**aside** [3] - 290:16, 304:25, 310:2

**aspect** [1] - 280:25

**assertion** [1] - 251:24

**assertions** [4] - 228:1, 274:14, 281:2, 281:3

**assess** [3] - 261:25, 273:1, 273:3

**asset** [1] - 230:24

**assets** [2] - 229:21, 230:20

**assisted** [1] - 252:20

**associated** [2] - 222:25, 252:17

**assume** [3] - 221:25, 229:13, 282:6

**assuming** [1] - 286:21

**assumption** [1] - 325:19

**assumption-based** [1] - 325:19

**assumptions** [3] - 330:9, 330:14, 330:15

**astonishing** [1] - 324:20

**attack** [1] - 226:2

**attacker** [1] - 296:18

**attacks** [1] - 284:25

**attempt** [1] - 263:23

**attempted** [1] - 288:24

**attempting** [2] - 252:11, 256:12

**attending** [1] - 313:7

**attention** [4] - 267:14, 294:16, 303:5

**attorney** [5] - 235:21, 255:17, 264:2, 286:16

**attorney-client** [1] - 264:2

**attorneys** [3] - 232:22, 278:16, 290:23

**attributed** [2] - 223:15, 314:23

**attribution** [4] - 238:3, 257:18, 257:22, 257:23

**atypical** [1] - 247:25

**August** [3] - 319:15, 322:19, 335:7

**auspices** [2] - 263:3, 263:9

**authority** [3] - 235:10,

333:19, 333:22
**authors** [1] - 274:9
**automatically** [1] - 266:14
**available** [22] - 231:22, 242:8, 255:23, 262:8, 264:16, 273:23, 275:9, 279:23, 280:20, 284:11, 289:21, 290:10, 297:21, 299:23, 300:4, 300:24, 301:8, 306:6, 313:12, 326:18, 329:7, 332:3
**Avenue** [3] - 214:14, 214:22, 335:11
**avoid** [2] - 238:17, 246:1
**avoiding** [1] - 246:3
**aware** [23] - 218:9, 218:13, 218:18, 218:23, 219:1, 219:5, 225:9, 225:15, 225:18, 242:6, 249:22, 262:2, 272:12, 272:21, 272:23, 280:2, 282:20, 284:21, 287:6, 311:23, 317:15, 317:20, 325:16
**Axiom** [2] - 310:20, 311:18

## B

**back-and-forth** [2] - 236:6, 329:4
**back-end** [1] - 283:16
**background** [5] - 217:23, 260:16, 312:13, 312:18, 312:19
**bad** [2] - 233:15, 299:25
**ballpark** [2] - 274:11, 288:15
**Bank** [4] - 218:12, 218:15, 220:8, 220:12
**bank** [8] - 219:6, 219:14, 219:16, 219:19, 220:16, 220:18, 267:13, 296:4
**bankruptcy** [3] - 221:5, 221:13, 223:25

**banks** [6] - 218:9, 218:19, 218:20, 218:23, 219:4, 219:5
**barebones** [1] - 238:1
**barely** [1] - 293:7
**based** [13] - 251:1, 282:3, 282:15, 282:25, 283:11, 292:7, 295:16, 302:22, 303:8, 306:10, 311:8, 325:19
**bases** [2] - 228:19, 304:20
**basics** [1] - 258:2
**basing** [1] - 262:11
**basis** [22] - 225:19, 225:22, 228:21, 240:9, 250:22, 251:1, 251:15, 252:7, 252:15, 253:5, 299:4, 300:10, 300:23, 304:22, 305:1, 309:13, 311:24, 319:2, 322:10, 322:14, 324:9, 333:25
**Bazezew** [2] - 244:3, 245:1
**became** [2] - 260:18, 265:24
**become** [2] - 256:17, 275:17
**becomes** [3] - 263:15, 296:5, 306:18
**BEFORE** [1] - 214:8
**beforehand** [1] - 330:23
**began** [1] - 244:19
**beginning** [4] - 257:10, 288:21, 288:23, 314:4
**behalf** [1] - 252:6
**behind** [4] - 234:9, 235:16, 235:19, 236:8
**belabor** [1] - 323:8
**belief** [2] - 261:24, 292:9
**believes** [1] - 322:5
**belongs** [2] - 269:24, 292:8
**bench** [1] - 242:13
**best** [7] - 226:13, 229:20, 270:7, 291:12, 303:2, 314:24, 335:6
**better** [13] - 251:24, 256:20, 281:10,

282:23, 284:17, 286:6, 286:9, 287:1, 293:13, 293:18, 301:11, 302:18, 314:25
**between** [13] - 223:17, 223:23, 236:6, 238:18, 239:24, 259:13, 263:2, 266:7, 293:8, 325:14, 325:24, 329:19, 329:24
**beyond** [6] - 244:11, 245:14, 254:19, 265:4, 270:24, 289:15
**bias** [2] - 326:9, 326:11
**Bice** [1] - 331:3
**big** [5] - 234:6, 234:10, 259:12, 308:23, 315:17
**bigger** [4] - 293:22, 306:13, 314:10, 316:21
**biggest** [2] - 293:20, 297:15
**bill** [27] - 236:21, 236:22, 237:5, 237:6, 237:8, 240:4, 240:9, 240:12, 242:3, 242:15, 242:24, 243:10, 243:12, 243:16, 243:25, 244:5, 244:12, 244:15, 245:15, 246:23, 249:3, 250:19, 251:10, 251:11, 253:5, 253:13
**Bill** [1] - 313:2
**billed** [2] - 289:25, 290:14
**billing** [2] - 290:3, 290:4
**billion** [1] - 230:19
**billionaires** [1] - 271:13
**Bisbee** [5] - 237:16, 241:12, 274:8, 324:20, 330:3
**Bisbee's** [1] - 274:15
**bit** [14] - 224:14, 259:21, 261:24, 272:7, 274:18, 274:21, 276:17, 284:2, 285:2, 299:15, 304:20, 309:5, 321:2, 322:1
**Bitcoin** [12] - 229:3,

231:4, 231:14, 239:25, 246:13, 252:5, 252:17, 281:14, 282:14, 283:15, 283:17, 283:24
**bitcoin** [11] - 229:10, 229:12, 229:15, 229:16, 230:19, 231:5, 252:6, 278:22, 320:15, 320:16, 320:17
**BitcoinFog.com** [1] - 268:7
**bitcoins** [1] - 223:14
**Bitstamp** [5] - 223:12, 223:14, 223:18, 223:24, 223:25
**blaming** [1] - 291:11
**blockchain** [10] - 217:11, 217:14, 217:15, 217:20, 218:1, 218:6, 218:7, 277:7, 277:17, 279:11
**board** [2] - 250:1, 313:2
**body** [1] - 239:20
**bono** [1] - 314:5
**book** [2] - 221:8, 221:11
**boring** [1] - 314:22
**boxes** [1] - 256:16
**boy** [1] - 298:8
**breached** [1] - 285:8
**breadth** [1] - 248:14
**break** [5] - 231:20, 256:22, 301:24, 302:10, 319:13
**Breyer** [3] - 294:17, 294:18, 294:20
**brief** [1] - 254:11
**briefing** [1] - 245:10
**briefly** [10] - 228:14, 229:1, 258:4, 265:11, 265:16, 268:10, 274:5, 313:23, 315:12
**bring** [2] - 232:16, 293:10
**bringing** [1] - 228:16
**brings** [1] - 288:14
**broad** [2] - 247:13, 329:21
**Brodie** [2] - 243:15, 247:10
**broke** [1] - 256:20
**brought** [4] - 227:23, 243:4, 293:23, 303:4
**BROWN** [8] - 214:10,

216:24, 217:2, 225:14, 227:2, 238:15, 239:16, 240:21
**Brown** [10] - 215:5, 216:9, 216:20, 216:23, 237:1, 238:14, 239:10, 239:15, 240:20, 255:1
**browser** [5] - 266:14, 266:21, 267:15, 267:20, 267:23
**buddy** [1] - 229:25
**budget** [1] - 264:3
**build** [1] - 285:21
**building** [1] - 285:25
**buildings** [1] - 257:5
**built** [1] - 267:11
**built-in** [1] - 267:11
**bulk** [1] - 313:10
**bunch** [1] - 321:1
**burgeoning** [1] - 279:2
**burn** [3] - 237:24, 238:11, 241:25
**burns** [1] - 242:5
**bursts** [1] - 285:21
**business** [8] - 246:13, 251:21, 251:23, 252:1, 252:5, 252:8, 255:10, 326:23
**busy** [2] - 272:5, 276:9
**Butler** [3] - 243:7, 243:23, 245:3
**BY** [16] - 217:2, 225:14, 227:7, 230:22, 254:8, 255:9, 275:4, 275:13, 295:9, 300:7, 302:9, 305:18, 307:15, 309:19, 312:16, 313:14

## C

**Cabanas** [1] - 303:23
**cable** [1] - 256:15
**California** [3] - 314:11, 327:2, 333:17
**camera** [1] - 275:8
**cannot** [7] - 219:15, 226:23, 229:13, 229:21, 239:8, 251:24, 252:10
**capacity** [2] - 219:7, 255:19
**car** [4] - 230:4, 230:12,

230:13, 230:16
**career** [2] - 265:23, 275:6
**careful** [4] - 273:15, 284:8, 304:9, 310:7
**carried** [2] - 247:20, 248:2
**carrying** [2] - 245:24, 250:11
**cars** [2] - 229:24, 256:15
**Case** [2] - 216:2, 242:22
**case** [101] - 220:9, 220:12, 221:4, 221:5, 221:6, 228:17, 228:24, 229:23, 230:2, 231:7, 231:8, 231:9, 231:11, 238:2, 238:21, 239:4, 239:19, 239:23, 240:16, 241:24, 243:14, 245:1, 245:12, 246:25, 247:11, 247:15, 247:17, 247:18, 247:23, 247:24, 247:25, 248:3, 248:22, 249:19, 251:11, 251:14, 253:1, 253:3, 257:13, 257:14, 258:3, 259:19, 259:21, 261:13, 262:2, 262:9, 262:22, 263:15, 263:17, 263:20, 264:4, 265:3, 278:9, 279:18, 279:22, 280:8, 280:13, 284:5, 284:12, 285:23, 285:24, 285:25, 286:11, 286:13, 286:14, 286:22, 287:11, 288:3, 288:9, 288:10, 288:20, 289:13, 289:15, 289:24, 290:11, 290:24, 292:2, 292:3, 292:13, 292:16, 292:24, 294:25, 295:11, 296:18, 299:21, 299:23, 301:9, 304:3, 304:12, 316:4, 317:6, 322:7, 322:21, 329:25, 330:22, 331:3,

331:9, 331:15, 333:15
**cases** [28] - 221:5, 230:3, 244:13, 247:8, 247:9, 249:7, 249:10, 262:23, 263:11, 266:3, 268:3, 275:5, 275:20, 275:23, 276:3, 277:16, 277:18, 277:20, 278:3, 278:14, 278:21, 279:19, 288:20, 289:13, 292:17, 299:24, 310:8, 331:7
**catches** [1] - 318:2
**category** [2] - 219:6, 273:19
**caught** [1] - 316:6
**caused** [1] - 301:10
**cautious** [1] - 278:11
**ceased** [1] - 241:8
**cell** [5] - 256:8, 256:11, 276:19, 277:2, 277:5
**Cellebrite** [2] - 310:20, 311:18
**central** [1] - 219:6
**certain** [10] - 233:5, 238:25, 254:18, 260:9, 265:3, 270:4, 288:25, 300:4, 303:5, 316:23
**certainly** [24] - 218:21, 248:23, 255:24, 257:7, 260:12, 262:7, 263:3, 264:14, 267:6, 279:12, 281:19, 281:24, 284:3, 291:17, 292:11, 304:2, 304:5, 304:9, 304:16, 311:11, 314:16, 316:12, 328:2
**certainty** [1] - 298:16
**CERTIFICATE** [1] - 335:1
**certification** [4] - 217:19, 217:25, 218:1, 313:9
**certifications** [2] - 280:19, 313:11
**certify** [1] - 335:3
**CFE** [2] - 217:15, 218:6
**CFEs** [1] - 220:4
**CFF** [2] - 217:15, 218:6

**CFFs** [1] - 220:4
**chain** [1] - 278:22
**Chainalysis** [47] - 217:9, 217:17, 218:4, 272:10, 272:22, 273:2, 274:8, 274:15, 279:10, 279:13, 279:18, 279:23, 280:4, 280:19, 281:9, 323:15, 323:20, 323:21, 324:17, 324:21, 325:13, 325:15, 325:23, 325:24, 326:1, 326:8, 329:1, 329:3, 329:5, 329:7, 329:9, 329:19, 329:23, 329:24, 330:18, 330:21, 331:5, 331:9, 331:12, 331:15, 332:6, 332:7, 332:17, 332:18, 333:18, 333:24
**Chainalysis's** [1] - 280:10
**challenge** [1] - 228:1
**challenged** [1] - 263:10
**chance** [2] - 274:5, 321:21
**change** [16] - 226:14, 238:9, 259:20, 269:12, 272:7, 287:3, 311:22, 316:15, 316:16, 316:23, 316:25, 317:16, 318:4, 318:22, 319:3, 324:18
**changed** [3] - 226:20, 261:2, 293:17
**changes** [2] - 226:25, 259:18
**characterization** [1] - 224:10
**characterize** [1] - 220:1
**charge** [9] - 251:1, 251:9, 251:22, 252:4, 252:15, 252:19, 253:9, 290:2
**charged** [8] - 243:2, 246:4, 246:16, 247:19, 250:3, 250:5, 250:25, 252:13
**charges** [7] - 238:16, 238:22, 238:23,

240:13, 243:4, 243:5, 243:7
**Charles** [1] - 294:18
**chased** [1] - 304:13
**check** [8] - 217:24, 224:19, 233:12, 233:20, 234:11, 236:12, 288:7, 317:10
**child** [2] - 263:8, 276:15
**chip** [1] - 256:13
**choose** [1] - 269:8
**chose** [2] - 262:4, 298:22
**Chris** [1] - 216:9
**CHRISTOPHER** [1] - 214:10
**Chrome** [1] - 266:22
**cigarette** [1] - 235:22
**cigarettes** [4] - 232:17, 232:18, 235:25, 236:10
**CipherTrace** [4] - 217:12, 279:11, 303:23, 319:15
**Circuit** [1] - 245:2
**circuit** [1] - 249:10
**circumstance** [5] - 260:10, 264:25, 273:15, 294:22, 305:6
**circumstances** [5] - 249:17, 260:9, 263:6, 263:25, 333:14
**cite** [3] - 225:25, 243:10, 292:14
**cites** [1] - 249:10
**citing** [3] - 221:21, 244:24, 247:4
**citizen** [1] - 222:25
**City** [1] - 232:12
**civil** [3] - 246:24, 253:1, 275:23
**CJA** [2] - 289:21
**claim** [2] - 223:25, 252:10
**clarification** [4] - 243:3, 243:16, 250:16, 279:9
**clarify** [2] - 287:19, 292:6
**clarifying** [1] - 305:4
**clear** [17] - 237:20, 238:21, 259:8, 259:12, 262:21, 266:16, 281:8, 281:17, 282:10, 282:16, 289:19,

289:20, 304:7, 305:24, 308:15, 328:9, 329:17
**clearance** [1] - 325:5
**clearly** [3] - 261:23, 282:17, 300:19
**clearnet** [5] - 266:4, 266:7, 266:23, 268:7, 268:12
**clerk** [1] - 253:25
**click** [1] - 280:11
**client** [3] - 232:9, 233:6, 264:2
**clients** [4] - 271:9, 271:11, 271:20
**clients'** [1] - 271:11
**clone** [1] - 277:1
**close** [2] - 249:6, 327:22
**closely** [2] - 251:12, 285:9
**closer** [1] - 327:24
**co** [22] - 237:11, 237:13, 239:4, 239:9, 239:12, 240:3, 240:5, 246:18, 246:20, 247:2, 247:8, 247:17, 248:1, 248:8, 248:16, 249:3, 249:16, 249:22, 249:23, 253:12, 304:17, 304:18
**co-conspirator** [1] - 248:16
**co-conspirators** [20] - 237:11, 237:13, 239:4, 239:9, 239:12, 240:3, 240:5, 246:18, 246:20, 247:2, 247:8, 247:17, 248:1, 248:8, 249:3, 249:22, 249:23, 253:12, 304:17, 304:18
**co-conspirators'** [1] - 249:16
**Coast** [3] - 231:24, 263:1, 263:2
**code** [29] - 273:4, 273:8, 273:11, 273:13, 273:16, 310:1, 310:10, 310:13, 310:16, 310:17, 311:17, 312:1, 312:2, 315:14, 315:17, 315:19, 315:22,

323:15, 323:20, 323:21, 324:14, 324:17, 325:23, 329:1, 329:3, 329:12, 332:7, 333:18, 333:25

**coder** [4] - 323:22, 324:7, 324:11

**coders** [1] - 323:23

**cognitive** [2] - 326:9, 326:11

**collect** [1] - 289:23

**collectively** [1] - 284:5

**college** [2] - 257:4, 312:20

**COLUMBIA** [1] - 214:1

**combination** [2] - 256:9, 305:5

**combine** [1] - 314:13

**combines** [1] - 314:12

**comfortable** [9] - 280:9, 282:1, 293:4, 293:18, 294:12, 306:10, 318:13, 321:23, 321:24

**coming** [3] - 228:3, 293:15, 296:19

**commenting** [1] - 321:4

**commerce** [2] - 265:25, 266:4

**commercial** [1] - 269:18

**commit** [2] - 282:18, 290:24

**commitments** [1] - 328:21

**committed** [2] - 244:18, 326:23

**common** [3] - 225:24, 313:1, 318:5

**communication** [2] - 325:16, 329:21

**communications** [6] - 325:12, 325:14, 325:24, 329:18, 329:24, 332:17

**commuter** [1] - 306:5

**companies** [9] - 280:20, 310:15, 311:21, 315:15, 315:18, 316:22, 317:18, 318:5

**company** [10] - 217:21, 270:8, 311:3, 311:20, 315:10, 316:9, 317:9, 317:15, 318:6, 331:4

**compare** [1] - 297:20

**compared** [1] - 246:25

**compartmentalized** [1] - 300:17

**compel** [1] - 333:9

**compensation** [1] - 326:4

**competently** [4] - 264:11, 293:13, 297:20, 297:25

**compilation** [1] - 308:18

**complaining** [1] - 328:19

**complaint** [4] - 237:19, 238:19, 240:14, 245:8

**complaint's** [3] - 248:12, 250:18, 252:6

**complaints** [3] - 238:25, 240:6, 240:7

**complete** [11] - 227:9, 227:14, 227:24, 246:18, 281:4, 282:20, 290:17, 290:19, 300:11, 312:23, 335:5

**completed** [2] - 217:23, 259:7

**completely** [1] - 294:14

**completeness** [2] - 305:16, 317:10

**complex** [3] - 238:2, 248:2, 258:3

**complexity** [2] - 247:13, 248:14

**compliance** [2] - 220:11, 220:17

**complicated** [2] - 265:4, 275:19

**comply** [1] - 220:13

**component** [7] - 217:24, 218:1, 218:5, 218:7, 223:16, 228:8, 316:25

**components** [1] - 283:1

**compressed** [1] - 236:17

**compromise** [2] - 294:4, 294:6

**computer** [13] - 254:12, 256:25, 262:24, 284:25, 285:8, 296:12, 296:14, 307:17, 315:8, 323:22, 323:23, 324:1, 324:4

**Computer** [1] - 314:4

**computers** [7] - 256:25, 257:1, 257:16, 258:17, 276:19, 277:2, 315:7

**conceal** [2] - 245:20, 250:8

**concede** [1] - 218:18

**conceivably** [1] - 261:9

**concern** [18] - 226:24, 235:2, 264:11, 264:13, 293:20, 293:22, 301:10, 304:7, 304:9, 304:10, 305:14, 305:25, 306:9, 314:21, 316:11, 327:6, 328:3, 328:17

**concerned** [4] - 233:16, 236:9, 241:18, 322:18

**concerns** [8] - 220:9, 265:2, 277:22, 297:15, 320:1, 322:13, 323:5, 332:11

**concise** [1] - 243:1

**concludes** [1] - 248:15

**conclusion** [8] - 227:16, 227:17, 248:20, 293:22, 305:15, 306:11, 318:23

**conclusions** [3] - 227:12, 262:1, 264:9

**Concord** [11] - 243:22, 244:24, 247:5, 247:15, 247:23, 247:24, 248:3, 248:6, 248:16, 248:21, 248:24

**conditions** [2] - 233:15, 233:17

**conduct** [7] - 224:17, 225:17, 225:23, 226:6, 246:9, 247:20, 252:20

**conducted** [2] - 225:5, 252:5

**conducting** [4] - 219:23, 225:3, 250:6, 299:8

**confer** [1] - 295:1

**conferences** [2] - 255:17, 255:18

**confident** [1] - 324:13

**configured** [1] - 281:3

**confirm** [3] - 260:13, 311:24, 314:25

**confirmations** [5] - 223:8, 223:11, 224:19, 224:20, 224:25

**confuse** [1] - 287:19

**confused** [1] - 216:19

**connect** [2] - 258:19, 296:4

**connected** [3] - 257:5, 258:17, 261:5

**connection** [1] - 296:5

**connections** [1] - 324:14

**connects** [1] - 258:14

**conscious** [1] - 241:21

**conservatively** [1] - 270:23

**consider** [14] - 224:12, 226:11, 226:16, 227:11, 227:18, 228:6, 228:9, 229:16, 230:9, 239:8, 267:5, 291:24, 310:22, 328:2

**considerable** [1] - 245:6

**consideration** [2] - 228:12, 248:24

**considerations** [1] - 247:21

**considered** [2] - 304:17, 318:7

**considering** [3] - 225:22, 226:10, 226:16

**consistent** [1] - 231:10

**conspiracy** [19] - 240:23, 241:2, 241:16, 244:9, 244:13, 244:15, 244:19, 244:23, 245:7, 245:17, 245:19, 246:11, 246:16, 247:8, 247:19, 248:1, 251:8, 253:9, 331:2

**conspirator** [3] - 244:18, 246:17, 248:16

**conspiratorial** [5] - 237:12, 241:3, 245:18, 246:18

**conspirators** [21] - 237:11, 237:13, 239:4, 239:9, 239:12, 240:3,

240:5, 246:18, 246:20, 247:2, 247:3, 247:8, 247:17, 248:1, 248:8, 249:3, 249:22, 249:23, 253:12, 304:17, 304:18

**conspirators'** [1] - 249:16

**constantly** [3] - 238:5, 263:18, 290:23

**constitutes** [2] - 251:25, 335:4

**constituting** [1] - 243:2

**Constitution** [2] - 214:22, 335:11

**constraint** [1] - 264:24

**consult** [3] - 255:18, 277:5, 314:5

**consultant** [5] - 275:6, 276:10, 276:11, 278:15, 288:11

**consultants** [2] - 280:3, 280:7

**consulted** [4] - 265:24, 275:20, 303:12, 303:18

**Consulting** [1] - 247:5

**consulting** [2] - 255:15, 292:12

**consumer** [1] - 288:13

**consuming** [2] - 237:22, 263:16

**contacted** [2] - 279:22, 286:12

**contain** [3] - 221:14, 248:6, 249:11

**contained** [1] - 243:20

**contains** [1] - 243:1

**contemplating** [1] - 319:16

**contends** [1] - 239:12

**context** [1] - 250:12

**contingent** [3] - 283:15, 284:12, 318:6

**continuance** [3] - 238:10, 322:20, 333:16

**continue** [5] - 216:17, 216:23, 224:8, 224:16, 302:7

**CONTINUED** [3] - 214:4, 214:7, 216:25

**Continued** [1] - 215:4

**continued** [2] - 322:21

**continuing** [2] - 218:6, 309:15

contraband [1] - 236:3
contract [3] - 235:12, 331:3, 331:6
contractor [3] - 285:20, 331:2, 331:5
contracts [1] - 331:20
contrary [1] - 249:14
contributed [1] - 284:7
control [2] - 245:21, 250:9
convene [1] - 332:1
conversation [2] - 292:7, 307:7
conversations [2] - 326:21, 333:3
conversed [1] - 291:17
converter [1] - 278:17
conviction [2] - 228:6, 228:9
convince [1] - 269:25
convinced [1] - 269:19
copy [3] - 223:24, 273:4, 308:4
coroner [1] - 256:24
corporate [2] - 222:24, 247:19
corporation [1] - 223:1
correct [22] - 217:9, 220:25, 222:20, 224:5, 224:6, 224:7, 224:9, 227:24, 228:18, 255:12, 259:11, 260:6, 262:12, 273:14, 277:3, 277:6, 282:5, 287:15, 298:5, 308:4, 310:21, 323:14
corrected [1] - 317:8
correctly [4] - 227:21, 264:5, 270:3, 286:20
correspondence [2] - 223:17, 223:23
cost [1] - 331:16
costly [1] - 263:15
counsel [21] - 216:4, 216:5, 233:25, 278:17, 281:9, 281:18, 284:2, 289:8, 291:3, 291:17, 293:24, 294:6, 294:8, 308:25, 321:20, 326:19, 327:12, 328:11

counsel's [2] - 292:7, 303:5
counsels [1] - 290:23
count [8] - 237:11, 244:6, 244:9, 244:10, 250:1, 250:17, 252:25, 266:3
Count [4] - 244:8, 250:22, 251:20, 252:22
country [1] - 281:19
couple [6] - 219:8, 276:8, 288:7, 288:15, 302:21, 309:20
courier [1] - 258:24
course [3] - 256:15, 294:5, 324:1
COURT [110] - 214:1, 216:8, 216:11, 216:15, 216:21, 216:23, 225:10, 227:4, 230:4, 230:9, 230:12, 230:15, 230:21, 231:17, 231:25, 232:7, 232:13, 233:12, 234:11, 234:16, 234:19, 235:4, 235:9, 235:22, 236:9, 236:12, 236:14, 236:20, 237:2, 238:14, 239:10, 240:19, 240:22, 240:25, 242:7, 242:11, 242:17, 242:23, 253:20, 253:23, 253:25, 254:21, 254:23, 275:1, 275:10, 292:19, 292:23, 294:5, 294:15, 294:19, 295:1, 295:8, 297:7, 299:14, 300:6, 301:16, 301:20, 301:23, 302:1, 302:4, 302:7, 304:19, 307:9, 309:4, 312:6, 312:12, 313:3, 313:13, 318:9, 318:25, 319:8, 319:11, 319:22, 320:7, 321:6, 321:19, 322:6, 323:1, 323:11, 323:16, 323:20, 323:22, 324:1,

324:6, 324:10, 324:23, 325:9, 325:21, 326:3, 326:15, 326:25, 327:8, 327:20, 328:8, 328:14, 328:23, 329:6, 329:11, 329:18, 330:7, 330:23, 331:10, 331:16, 331:19, 331:22, 332:25, 333:10, 334:2, 334:4, 335:1
Court [33] - 214:21, 214:21, 232:9, 232:22, 233:8, 233:10, 234:3, 234:21, 235:6, 236:19, 237:4, 238:12, 242:5, 248:15, 249:1, 252:1, 254:9, 258:23, 268:10, 279:17, 287:20, 291:6, 293:25, 298:18, 312:17, 316:16, 318:20, 319:6, 319:19, 320:4, 332:20, 333:8, 335:10
court [6] - 216:13, 221:12, 221:13, 240:25, 243:9, 296:13
Court's [3] - 239:18, 241:21, 319:25
Courthouse [1] - 214:22
courthouse [3] - 259:24, 259:25, 260:1
COURTROOM [5] - 216:2, 242:21, 254:2, 254:5, 255:4
courtroom [1] - 260:2
courts [3] - 240:4, 244:16, 249:1
cover [1] - 309:11
covered [1] - 330:6
CRC [2] - 214:21, 335:9
create [1] - 326:11
credential [1] - 226:2
credential-stealing [1] - 226:2
credentials [2] - 219:18, 226:2
credit [3] - 218:10, 219:2, 298:19
crime [2] - 256:17,

276:15
Crime [1] - 314:4
Criminal [4] - 214:2, 216:2, 242:21, 243:11
criminal [10] - 218:19, 225:12, 225:24, 237:19, 238:18, 246:25, 250:3, 251:14, 253:2, 274:2
critical [1] - 257:11
CROSS [2] - 216:25, 275:2
cross [1] - 279:8
Cross [2] - 215:4, 215:10
CROSS-EXAMINATION [2] - 216:25, 275:2
Cross-Examination [2] - 215:4, 215:10
cross-examination [1] - 279:8
CRR [2] - 214:21, 335:9
crypto [4] - 217:25, 224:17, 230:2, 278:21
cryptocurrency [10] - 218:21, 238:3, 277:20, 277:21, 277:23, 278:4, 278:8, 278:13, 278:14, 278:19
Cup [1] - 271:4
current [3] - 233:20, 290:11, 290:14
curricula [1] - 312:7
custodial [1] - 283:23
custody [1] - 332:13
customer [4] - 219:15, 222:2, 222:23, 225:1
customer's [1] - 220:22
customers [1] - 218:20
cut [1] - 301:21
cute [1] - 271:1
CV [2] - 309:22, 310:18
cyber [3] - 219:10, 284:21, 326:14

**D**

D.C [14] - 214:5, 232:12, 232:23, 233:9, 233:15, 245:2, 258:24, 262:16, 286:24,

288:12, 289:9, 333:13, 335:11
dark [2] - 221:8, 267:3
darknet [15] - 239:3, 239:6, 239:12, 239:21, 239:24, 239:25, 240:1, 241:7, 248:8, 248:9, 266:5, 266:8, 266:9, 267:3, 268:1
data [49] - 223:11, 227:1, 228:5, 228:7, 228:10, 242:5, 256:10, 256:17, 256:19, 257:10, 261:22, 261:25, 262:14, 262:18, 266:24, 272:25, 282:23, 283:19, 287:13, 297:18, 297:21, 297:25, 299:6, 301:2, 301:7, 301:14, 302:12, 305:21, 305:25, 306:1, 306:2, 306:19, 306:21, 307:24, 309:14, 322:12, 323:14, 324:18, 324:23, 325:3, 325:23, 326:18, 327:1, 327:7, 328:1, 328:7, 328:16, 332:10, 333:13
Data [1] - 316:22
database [8] - 227:9, 227:14, 227:15, 227:24, 262:10, 264:7, 283:16, 323:10
date [11] - 237:10, 244:19, 245:18, 246:10, 251:6, 291:23, 304:13, 312:2, 319:17, 319:21, 320:18
Dated [1] - 335:7
Daubert [3] - 272:9, 299:3, 309:10
daughter [1] - 299:25
days [2] - 261:1, 328:19
DC [3] - 214:12, 214:14, 214:23
de [1] - 300:10
deadline [2] - 224:22, 320:6
deal [1] - 332:12
decade [3] - 236:5, 248:1, 324:4

decade-long [1] - 248:1
decide [2] - 284:14, 321:23
decided [1] - 269:2
decision [4] - 233:21, 233:22, 236:22, 242:23
declaration [1] - 274:8
declarations [2] - 245:9, 274:15
dedicated [1] - 258:24
deep [4] - 266:8, 267:3, 267:21, 268:1
DEFENDANT [1] - 234:18
Defendant [2] - 214:6, 214:15
defendant [12] - 216:13, 221:23, 223:24, 238:16, 240:13, 240:17, 243:4, 243:5, 243:19, 244:14, 244:22
defendant's [10] - 222:24, 223:4, 223:12, 223:18, 225:20, 226:4, 226:18, 238:25, 248:22, 287:17
defendants [4] - 247:19, 249:2, 275:22, 276:14
defending [4] - 237:7, 237:23, 237:25, 238:5
defense [38] - 221:17, 222:1, 231:10, 233:5, 233:7, 238:17, 238:21, 238:22, 238:23, 240:6, 240:14, 243:6, 243:13, 249:6, 249:8, 253:24, 262:6, 265:6, 275:21, 279:17, 280:9, 284:5, 285:7, 285:13, 286:11, 286:16, 314:13, 321:9, 321:12, 322:19, 326:19, 327:12, 328:6, 328:11, 328:18, 329:20, 331:2
defense's [1] - 323:5
defer [1] - 309:15
defined [1] - 241:14
definite [1] - 243:1

definitely [1] - 301:19
degree [9] - 275:23, 291:18, 293:17, 294:1, 294:2, 296:3, 304:4, 310:10
delay [2] - 239:17, 325:6
delays [1] - 232:11
deletion [2] - 226:21, 328:13
deliberate [1] - 278:6
delighted [1] - 294:4
delivered [1] - 259:5
Dell [1] - 313:2
demo [1] - 280:11
demonstrated [2] - 228:19, 310:23
deny [6] - 244:17, 245:13, 245:16, 249:25, 253:6, 253:13
DEPARTMENT [1] - 214:13
department [1] - 286:10
dependent [3] - 284:9, 305:10, 318:24
DEPUTY [5] - 216:2, 242:21, 254:2, 254:5, 255:4
deputy [1] - 253:25
describe [7] - 224:8, 224:15, 229:14, 265:11, 269:21, 309:22, 313:24
described [8] - 221:1, 221:3, 221:4, 224:13, 224:14, 268:12, 268:15, 268:18
describes [2] - 252:7, 252:16
descriptive [1] - 253:11
deserve [1] - 306:12
designate [1] - 314:8
designed [1] - 296:7
desk [1] - 308:12
detail [6] - 238:6, 245:7, 250:19, 252:3, 256:5, 284:13
detailed [4] - 244:14, 248:5, 248:6, 278:12
details [4] - 221:14, 244:21, 327:10
detecting [1] - 256:20
determine [1] - 252:10
determining [1] - 228:3
developed [1] -

267:18
device [4] - 243:13, 276:21, 285:12, 285:14
devices [1] - 287:14
dialogue [1] - 281:7
dictate [1] - 262:19
difference [3] - 259:13, 266:13, 294:17
different [23] - 218:16, 218:17, 224:14, 224:18, 238:8, 241:20, 249:19, 258:7, 259:21, 265:7, 267:4, 267:16, 270:15, 270:16, 270:20, 272:23, 273:18, 276:24, 287:14, 303:4, 311:9, 316:3, 331:7
differential [1] - 229:18
differently [3] - 299:15, 304:20, 306:15
difficult [13] - 252:12, 256:7, 260:3, 263:15, 265:5, 267:7, 268:25, 283:6, 286:12, 291:6, 293:12, 299:10, 317:24
difficulties [1] - 322:13
difficulty [1] - 301:15
digital [2] - 254:17, 278:16
digital-to-analog [1] - 278:16
digitally [1] - 254:13
dimensional [1] - 263:5
Direct [1] - 215:9
DIRECT [1] - 254:6
direct [4] - 243:9, 253:8, 329:10, 329:12
directed [1] - 252:20
directly [4] - 237:18, 275:14, 301:11, 326:12
disagree [1] - 296:23
disappointment [1] - 289:17
discern [1] - 251:24
disclose [9] - 244:12, 249:20, 253:9, 284:17, 304:4,

313:24, 319:4, 321:10, 330:3
disclosing [3] - 249:15, 297:23, 326:5
disclosure [26] - 220:6, 221:9, 224:2, 228:15, 247:7, 247:21, 248:16, 261:18, 274:22, 281:12, 281:17, 281:18, 283:22, 291:7, 292:1, 292:24, 294:23, 307:7, 307:25, 318:12, 318:21, 320:4, 320:8, 321:7, 326:4
disclosures [5] - 247:12, 249:8, 297:16, 319:14, 319:24
discovery [34] - 227:8, 228:22, 229:4, 230:25, 231:3, 237:7, 238:19, 239:22, 240:15, 240:16, 242:1, 243:13, 244:1, 245:11, 246:24, 248:13, 248:22, 251:12, 253:1, 286:25, 287:4, 288:2, 288:4, 288:6, 290:17, 295:13, 295:20, 298:6, 300:9, 301:2, 302:13, 321:13, 330:1
discrepancy [1] - 240:8
discuss [1] - 328:3
discussed [6] - 234:21, 274:16, 292:12, 303:12, 303:13, 323:5
discussing [2] - 264:1, 319:13
discussion [2] - 292:22, 295:5
disguise [2] - 245:20, 250:8
dishwashers [1] - 256:14
dispute [1] - 240:8
disrespectful [1] - 298:17
distinct [1] - 224:3
distinction [2] - 266:6, 266:7

district [1] - 247:7
DISTRICT [3] - 214:1, 214:1, 214:8
DNS [6] - 268:7, 268:11, 269:1, 269:13, 269:15, 269:21
Docket [1] - 242:24
document [6] - 287:6, 288:1, 292:1, 292:15, 298:3, 308:14
documented [1] - 257:14
documenting [1] - 288:24
documents [4] - 222:5, 222:13, 307:16, 308:20
DOJ [1] - 214:11
dollar [2] - 265:25, 266:1
dollars [4] - 230:19, 320:16, 320:18
domain [19] - 241:18, 268:14, 269:8, 269:9, 269:15, 270:8, 270:11, 270:14, 270:15, 270:22, 270:25, 271:4, 271:5, 271:6, 271:16, 271:21, 271:23, 271:24
domains [1] - 271:18
done [29] - 238:11, 251:25, 262:21, 262:23, 263:3, 263:13, 263:24, 264:18, 264:20, 267:25, 270:2, 271:22, 277:10, 278:3, 278:24, 279:19, 280:17, 294:7, 295:24, 298:19, 310:12, 311:22, 313:10, 313:17, 313:23, 314:11, 316:23, 332:14, 332:15
double [3] - 238:17, 241:17, 241:24
doubt [2] - 220:17, 249:4
down [13] - 237:17, 241:10, 241:14, 242:2, 262:15, 273:23, 277:13, 284:2, 284:16, 291:22, 320:2, 322:18

download [1] - 327:1
dozen [1] - 276:8
Dr [6] - 303:23, 303:24, 325:11, 325:25, 326:10
draw [1] - 283:5
drawing [1] - 306:11
drive [2] - 232:11, 256:8
driver's [2] - 222:4, 222:6
dropouts [1] - 324:5
dropped [2] - 312:20, 312:22
Dror [5] - 303:24, 325:11, 325:25, 326:10
du [1] - 314:20
due [3] - 294:24, 319:14, 319:15
duplicate [1] - 280:16
duration [1] - 247:13
during [4] - 262:18, 293:14, 325:4, 326:22

# E

e-commerce [2] - 265:25, 266:4
early [5] - 231:4, 231:14, 257:12, 271:20, 314:21
earned [1] - 279:1
easier [2] - 232:24, 327:25
East [1] - 263:1
easy [1] - 268:20
Edge [1] - 266:21
education [3] - 218:6, 312:8, 312:9
educational [2] - 312:18, 312:19
effect [2] - 226:9, 296:10
effectively [3] - 259:7, 317:13, 318:20
efficiency's [1] - 309:4
either [8] - 232:22, 244:10, 253:10, 256:8, 262:3, 263:7, 297:19, 298:21
ekeland [1] - 215:9
EKELAND [53] - 214:15, 216:12, 227:7, 230:22, 231:16, 231:23, 232:5, 232:8, 232:14, 234:2, 234:15, 234:20,

235:5, 235:18, 235:23, 236:11, 236:13, 237:4, 240:23, 241:2, 242:10, 253:16, 253:21, 253:24, 254:8, 254:24, 255:5, 255:9, 274:25, 301:21, 312:10, 312:16, 313:14, 318:8, 319:13, 319:24, 321:5, 323:4, 323:15, 323:17, 323:21, 323:24, 324:3, 324:8, 324:12, 325:1, 325:11, 325:22, 326:6, 332:22, 333:6, 333:24, 334:5
Ekeland [23] - 214:16, 215:6, 216:12, 227:4, 231:21, 240:22, 278:5, 278:10, 286:14, 288:21, 289:12, 290:10, 292:22, 300:2, 301:20, 318:13, 319:11, 328:24, 330:8, 330:12, 331:1, 332:2, 332:21
Ekeland's [2] - 237:2, 286:21
electronic [1] - 279:20
electronically [2] - 254:14, 258:17
element [2] - 230:1, 244:21
elements [2] - 281:22, 310:8
elicit [1] - 324:12
Elizabeth [1] - 274:8
email [7] - 223:7, 223:8, 223:21, 224:18, 224:25, 286:17, 314:23
emails [6] - 223:5, 223:6, 223:11, 223:22, 286:19, 287:16
emergency [1] - 285:20
emissions [3] - 316:4, 316:6, 316:7
emphasized [1] - 247:18
emphasizes [1] - 251:11
empty [1] - 235:24

Encase [2] - 310:19, 311:17
encrypted [3] - 267:10, 267:15, 296:5
encryption [1] - 266:4
end [5] - 224:9, 283:16, 286:23, 296:10, 322:19
ended [3] - 274:18, 276:7, 312:23
endorsement [4] - 220:11, 220:16, 220:17
endorsements [2] - 220:12, 220:14
ends [1] - 333:1
enforcement [7] - 250:13, 313:16, 313:17, 313:18, 313:22, 314:17, 317:22
engage [1] - 226:12
enjoyed [1] - 278:10
ensure [3] - 243:3, 285:7, 326:21
ensuring [2] - 326:24, 328:5
entailed [1] - 282:24
enter [1] - 231:8
entered [1] - 231:7
enterprise [2] - 281:13, 331:18
entire [2] - 294:25, 329:22
entirely [3] - 269:9, 270:19, 302:24
entirety [2] - 300:9, 310:12
entitled [3] - 244:14, 245:15, 249:2
envelope [3] - 258:22, 259:1, 259:13
Equifax [1] - 219:3
equipped [1] - 310:19
err [1] - 249:7
error [12] - 272:10, 305:21, 305:22, 305:25, 310:24, 311:2, 315:19, 316:18, 317:8, 317:9, 324:18, 324:21
errors [11] - 301:1, 301:4, 301:5, 301:13, 302:12, 303:1, 317:14, 321:14, 321:15, 322:4, 322:12
especially [5] - 274:2,

277:19, 293:15, 300:2, 305:5
essential [2] - 243:2, 260:19
essentially [9] - 231:4, 234:5, 234:23, 235:1, 235:23, 238:4, 241:22, 324:19, 325:19
establish [1] - 229:7
established [1] - 324:16
estate [1] - 230:7
eternity [2] - 271:24, 272:4
event [3] - 218:18, 244:11, 253:2
evidence [26] - 225:25, 226:5, 226:8, 226:19, 226:21, 229:3, 229:20, 230:6, 230:23, 231:2, 231:13, 231:15, 243:14, 254:13, 255:15, 261:22, 277:1, 292:1, 292:2, 295:11, 295:14, 305:12, 308:24, 315:1, 315:2, 328:12
evidence-gathering [1] - 315:2
evidentiary [1] - 239:1
exact [1] - 244:19
exactly [11] - 222:8, 258:5, 259:12, 268:10, 273:24, 277:3, 284:19, 297:1, 303:14, 311:1, 323:12
examination [3] - 255:15, 279:8, 297:21
EXAMINATION [5] - 216:25, 227:5, 254:6, 275:2, 312:14
Examination [4] - 215:4, 215:6, 215:9, 215:10
examinations [2] - 263:3, 263:5
examine [2] - 256:14, 264:11
examiners [1] - 256:2
example [7] - 219:1, 219:18, 219:21, 251:14, 260:25, 271:17, 327:24
exceed [3] - 264:20, 264:21, 287:23

excellent [1] - 255:6
except [1] - 330:2
exceptional [1] - 321:8
excess [1] - 288:19
exchange [1] - 221:2
exchanges [1] - 277:22
exclude [1] - 333:24
excuse [1] - 234:18
excused [2] - 231:18, 319:9
exercise [1] - 322:15
EXHIBITS [1] - 215:15
exist [6] - 269:5, 279:3, 296:14, 296:15, 305:8, 313:11
existed [1] - 265:20
exists [5] - 256:13, 296:11, 299:13, 306:20
expect [6] - 229:11, 251:12, 300:19, 300:21, 320:17, 320:22
expecting [1] - 322:22
expedite [3] - 248:18, 301:19, 333:15
expediting [1] - 333:10
expense [1] - 325:7
experience [18] - 217:11, 254:10, 256:25, 257:9, 257:16, 257:17, 263:6, 265:8, 265:9, 265:11, 265:14, 265:15, 267:23, 283:2, 284:16, 324:7, 324:9, 324:11
expert [52] - 224:2, 228:15, 228:23, 238:8, 239:23, 240:16, 262:17, 264:6, 275:6, 276:9, 276:12, 277:7, 278:9, 279:5, 280:16, 281:12, 292:24, 294:11, 295:17, 296:21, 299:15, 299:17, 300:21, 301:1, 303:1, 304:21, 304:22, 304:23, 304:24, 305:9, 307:7, 309:8, 309:22, 319:1, 319:2, 319:21, 319:22, 319:23,

**Appx1024**

320:12, 320:13, 321:3, 322:2, 322:7, 322:9, 324:9, 326:3, 328:16, 330:4, 330:22, 330:24, 330:25

**expert's** [1] - 302:20

**expert-level** [1] - 309:22

**expertise** [16] - 254:19, 273:19, 278:12, 278:20, 279:10, 279:14, 280:23, 281:22, 285:17, 285:20, 301:12, 305:12, 311:8, 311:11, 328:10

**experts** [19] - 232:25, 264:14, 272:8, 279:1, 280:3, 295:12, 301:10, 302:18, 303:9, 303:10, 303:11, 303:22, 303:25, 306:15, 310:11, 320:5, 323:23, 326:6, 326:19

**explain** [13] - 258:4, 266:6, 268:10, 277:16, 278:3, 281:15, 283:4, 283:25, 288:17, 292:4, 296:23, 308:5, 316:16

**explained** [2] - 289:13, 308:25

**explanation** [1] - 299:3

**explorers** [1] - 218:7

**exploring** [1] - 328:24

**exposed** [2] - 279:4, 292:11

**exposure** [1] - 257:2

**express** [2] - 305:2, 322:9

**expressed** [1] - 220:2

**expressing** [1] - 320:7

**extension** [1] - 273:20

**extensive** [2] - 249:13, 253:1

**extensively** [1] - 257:9

**extent** [3] - 246:23, 322:4, 330:2

**extortion** [1] - 257:15

**extrapolate** [1] - 316:19

**extremely** [3] - 238:20, 300:1, 327:5

# F

**F.2d** [5] - 243:7, 243:23, 245:1, 245:2, 245:3

**F.Supp.2d** [6] - 243:15, 244:3, 244:16, 244:25, 247:6, 247:10

**F.Supp.3d** [2] - 243:22, 247:5

**Facebook** [1] - 315:18

**facilities** [1] - 263:19

**facility** [4] - 232:23, 233:9, 235:11

**facing** [1] - 327:4

**facsimile** [1] - 276:25

**fact** [32] - 225:24, 229:8, 229:10, 239:6, 248:12, 248:21, 250:14, 250:18, 251:11, 257:13, 259:14, 260:11, 269:21, 269:22, 270:15, 272:8, 278:9, 280:3, 280:4, 281:1, 281:9, 282:24, 290:4, 291:20, 296:7, 305:7, 306:8, 310:25, 314:14, 318:6, 324:17

**factor** [1] - 297:4

**factors** [1] - 277:14

**facts** [5] - 243:2, 245:5, 245:8, 252:7, 252:16

**factual** [16] - 225:19, 240:7, 245:20, 245:23, 245:25, 246:6, 246:7, 246:10, 246:12, 251:1, 251:3, 251:14, 251:17, 252:3, 252:15, 252:24

**fair** [11] - 220:1, 220:19, 221:11, 276:9, 276:13, 290:20, 295:22, 311:9, 315:6, 318:4, 328:4

**fairly** [1] - 329:17

**false** [3] - 232:16, 272:11

**familiar** [4] - 258:12, 268:5, 268:9, 272:8

**familiarity** [1] - 311:12

**family's** [1] - 289:17

**fancy** [1] - 229:24

**far** [13] - 228:21, 230:3, 257:22, 263:6, 264:3, 277:9, 280:7, 287:12, 308:14, 312:24, 317:21, 326:17

**fare** [1] - 251:23

**father** [1] - 285:19

**father-in-law** [1] - 285:19

**fathom** [1] - 252:12

**favor** [2] - 288:21, 333:10

**favorite** [1] - 266:21

**FBI** [16] - 262:5, 262:15, 262:18, 262:25, 263:1, 263:10, 283:8, 285:25, 305:17, 311:2, 314:7, 317:22, 324:25, 325:3, 326:14, 332:13

**feasible** [2] - 263:21, 263:24

**federal** [7] - 232:21, 235:11, 246:1, 314:11, 314:13, 331:20

**Federal** [5] - 219:6, 219:8, 219:10, 219:11, 243:10

**fees** [4] - 229:2, 229:8, 229:10, 229:11

**felt** [2] - 317:9, 318:21

**few** [6] - 222:9, 261:1, 271:25, 281:11, 291:13, 309:23

**Fi** [1] - 261:8

**field** [3] - 284:21, 286:5, 324:4

**Field** [7] - 326:19, 326:20, 327:2, 327:24, 328:4, 328:18, 328:21

**fields** [1] - 271:10

**figure** [4] - 233:22, 234:13, 317:13, 318:12

**file** [5] - 243:9, 244:2, 298:3, 308:21, 333:8

**files** [5] - 298:6, 299:6, 307:16, 307:21, 327:12

**filing** [3] - 224:22, 274:6, 327:11

**filings** [5] - 221:4, 221:6, 221:12, 221:13, 329:15

**film** [1] - 271:13

**final** [1] - 322:2

**finality** [1] - 291:12

**finalizing** [1] - 305:14

**finally** [1] - 245:3

**financial** [13] - 218:13, 218:23, 219:16, 227:23, 228:16, 228:24, 250:6, 326:11, 327:6, 327:10, 327:14, 327:19, 332:12

**financials** [1] - 287:16

**findings** [4] - 231:10, 261:19, 263:22, 303:8

**fine** [6] - 217:4, 232:7, 237:3, 242:10, 275:16, 309:17

**finish** [3] - 292:19, 301:19, 301:24

**finished** [1] - 263:17

**fire** [3] - 286:7, 286:9, 286:10

**Firefox** [1] - 266:22

**firm** [1] - 285:24

**first** [21] - 216:17, 229:23, 229:25, 234:19, 237:3, 237:11, 257:2, 257:5, 257:13, 278:10, 279:22, 285:23, 285:24, 286:21, 313:25, 316:12, 317:7, 317:17, 328:9

**FISCHBACH** [4] - 215:8, 254:7, 275:3, 312:15

**Fischbach** [30] - 253:17, 253:19, 253:24, 254:3, 254:9, 254:23, 254:25, 255:1, 255:2, 255:10, 265:7, 275:5, 284:18, 292:23, 295:10, 298:2, 301:14, 302:1, 302:10, 306:23, 309:9, 309:20, 312:17, 318:10, 321:12, 323:6, 323:24, 325:2, 327:25, 328:10

**Fischbach's** [1] - 312:7

**fit** [1] - 220:18

**five** [3] - 263:17, 289:24, 328:19

**fixed** [1] - 317:25

**flag** [1] - 225:1

**flaws** [1] - 322:13

**flew** [1] - 286:23

**Floor** [1] - 214:17

**flying** [2] - 261:10, 288:12

**focus** [1] - 242:4

**focused** [3] - 238:23, 241:23, 253:2

**Fog** [10] - 229:3, 239:25, 246:13, 252:5, 252:17, 281:14, 282:14, 283:15, 283:17, 283:24

**folder** [2] - 307:6, 307:10

**folks** [5] - 233:14, 233:18, 233:19, 239:17

**follow** [6] - 233:22, 235:13, 244:7, 295:10, 313:15, 315:12

**followed** [1] - 281:1

**following** [3] - 242:20, 245:13, 271:14

**FOR** [1] - 214:1

**for-profit** [1] - 326:13

**force** [1] - 243:18

**foregoing** [1] - 335:4

**foreign** [3] - 247:19, 247:20, 248:3

**forensic** [22] - 227:22, 227:23, 228:21, 230:1, 255:15, 256:1, 256:25, 265:8, 265:14, 267:25, 272:13, 273:2, 273:18, 279:20, 279:25, 310:19, 310:22, 313:16, 313:17, 317:15, 318:1, 326:13

**forensically** [2] - 227:11, 266:2

**forensics** [14] - 218:1, 254:10, 254:12, 255:20, 256:6, 262:25, 265:16, 273:23, 274:2, 274:3, 285:12, 285:14, 315:8, 316:22

**forgetting** [1] - 272:1

**form** [14] - 223:25, 256:10, 256:13, 258:1, 260:7, 272:18, 283:20,

296:3, 296:10, 296:16, 296:19, 298:16, 299:17, 299:20
**formal** [3] - 255:22, 255:23, 291:4
**formed** [1] - 282:11
**former** [1] - 221:2
**forming** [2] - 299:21, 305:1
**forth** [4] - 236:6, 249:14, 276:6, 329:4
**forthcoming** [2] - 316:10, 317:23
**fortunate** [3] - 257:3, 285:9, 300:3
**fortunately** [1] - 312:25
**forums** [1] - 252:18
**forward** [2] - 315:3, 332:21
**founders** [1] - 311:20
**four** [1] - 326:16
**fours** [1] - 247:15
**France** [1] - 228:10
**Francisco** [2] - 294:17, 294:21
**frankly** [3] - 261:21, 330:11, 333:3
**fraud** [2] - 228:10, 257:14
**free** [3] - 280:11, 280:18
**frequent** [1] - 225:12
**frequently** [2] - 262:24, 292:17
**Friedrich** [2] - 247:18, 248:15
**Friedrich's** [1] - 247:14
**front** [10] - 221:20, 223:19, 291:8, 291:10, 306:4, 307:2, 307:3, 307:5, 309:6, 309:12
**froze** [1] - 301:14
**FTK** [4] - 310:19, 311:18, 311:19, 316:21
**fuel** [1] - 238:11
**full** [21] - 227:13, 227:15, 227:17, 233:6, 233:11, 234:4, 235:7, 235:9, 239:5, 239:20, 264:7, 306:12, 310:12, 323:9, 323:14, 324:23, 326:17, 326:22, 328:20, 332:10,

335:5
**full-scope** [1] - 306:12
**fully** [4] - 227:25, 280:14, 302:15, 309:8
**fulsome** [3] - 227:16, 227:22, 233:6
**functioning** [1] - 241:9
**funds** [9] - 245:11, 283:17, 288:22, 289:10, 289:21, 289:22, 290:10, 320:24
**funneling** [1] - 270:15
**furnished** [1] - 243:21
**future** [2] - 279:19, 317:9

## G

**gains** [1] - 250:15
**game** [2] - 233:10, 256:15
**gamesmanship** [1] - 265:5
**Gates** [1] - 313:2
**gather** [2] - 300:3, 314:25
**gathering** [1] - 315:2
**general** [13] - 244:13, 252:14, 252:24, 254:18, 257:1, 260:10, 267:25, 274:22, 277:25, 282:25, 285:15, 299:21, 322:8
**generalizations** [1] - 241:15
**generalized** [1] - 286:5
**generally** [13] - 219:23, 233:24, 249:2, 249:15, 271:23, 276:18, 278:21, 284:21, 285:4, 288:9, 290:12, 315:7, 331:12
**generate** [1] - 279:14
**gist** [1] - 315:16
**give-and-take** [1] - 333:4
**given** [16] - 226:25, 227:20, 237:5, 247:12, 247:13, 248:14, 249:18, 265:1, 268:19, 287:23, 300:17, 302:25, 324:17,

325:18, 331:23
**glad** [1] - 223:3
**glass** [2] - 256:20, 256:22
**glass-break** [1] - 256:22
**Glave** [2] - 228:15, 228:23
**goalposts** [1] - 237:10
**GoDaddy** [2] - 269:18, 269:20
**gosh** [1] - 263:13
**Government** [2] - 326:7, 329:22
**government** [88] - 216:5, 223:15, 237:13, 239:11, 241:11, 243:9, 243:18, 243:25, 244:2, 244:11, 245:6, 247:3, 247:4, 248:11, 248:20, 249:10, 249:20, 249:22, 249:23, 252:2, 252:4, 252:11, 253:9, 253:12, 256:1, 257:24, 257:25, 262:3, 262:13, 263:4, 263:9, 263:19, 263:23, 264:18, 264:20, 275:21, 276:25, 279:23, 280:7, 280:17, 281:1, 282:4, 282:20, 283:5, 283:19, 284:11, 286:16, 292:2, 292:15, 294:24, 297:24, 299:19, 299:22, 300:3, 300:9, 300:18, 300:20, 302:23, 304:12, 304:14, 305:6, 307:25, 311:5, 317:4, 319:16, 319:19, 320:23, 322:3, 322:17, 323:18, 325:15, 325:24, 326:1, 326:18, 327:21, 329:2, 329:19, 329:22, 329:24, 330:14, 331:8, 331:12, 331:15, 332:23, 333:2, 333:12, 333:20
**government's** [20] - 228:1, 228:15,

229:1, 230:2, 238:1, 240:10, 241:24, 243:14, 245:10, 261:14, 263:22, 268:5, 272:8, 274:6, 282:6, 296:22, 304:16, 330:11, 332:5, 332:11
**Gox** [55] - 220:25, 221:4, 221:17, 221:19, 221:22, 221:25, 222:2, 222:11, 222:19, 222:20, 223:9, 223:25, 224:4, 225:5, 225:16, 225:20, 226:2, 226:4, 226:18, 227:1, 227:9, 227:24, 228:2, 228:5, 228:7, 229:18, 262:10, 262:14, 264:7, 283:16, 290:17, 299:7, 300:12, 301:2, 301:7, 301:13, 302:11, 302:12, 302:21, 302:25, 305:21, 307:22, 307:23, 308:2, 308:3, 309:14, 322:12, 323:9, 323:14, 324:23, 325:3, 325:23, 326:17, 332:10, 333:13
**grammar** [1] - 275:11
**grand** [2] - 239:7, 239:8
**grant** [2] - 247:1, 333:16
**granting** [1] - 247:16
**great** [1] - 332:12
**greater** [2] - 284:13, 333:17
**greatest** [2] - 296:16, 296:19
**gritty** [1] - 240:7
**group** [2] - 284:4, 301:8
**groups** [2] - 269:7, 313:19
**grown** [4] - 257:3, 260:19, 268:24, 320:15
**guess** [4] - 238:5, 267:9, 293:1, 301:2
**guesses** [1] - 325:20
**guessing** [1] - 237:25
**guidance** [2] - 331:23,

332:19
**guys** [1] - 236:3

## H

**hack** [8] - 219:3, 219:15, 219:17, 219:18, 220:25, 221:1, 221:15, 328:12
**hacked** [3] - 225:3, 227:19, 227:20
**hacker** [3] - 219:21, 224:3, 226:6
**hacker's** [1] - 226:7
**hackers** [2] - 225:13, 225:24
**hacking** [3] - 219:5, 225:23, 227:12
**hacks** [11] - 218:10, 218:14, 218:21, 218:22, 218:24, 219:11, 226:12, 277:22, 284:25, 292:13, 302:25
**half** [4] - 232:2, 254:14, 290:1, 301:19
**hampered** [1] - 233:5
**hand** [3] - 254:3, 297:24, 318:16
**handle** [3] - 242:13, 286:3, 290:12
**handled** [1] - 235:14
**hands** [1] - 269:6
**handwritten** [2] - 287:17, 287:21
**happy** [14] - 232:2, 233:22, 235:13, 236:17, 236:19, 271:22, 281:6, 312:10, 320:2, 320:3, 327:14, 327:17, 328:3, 333:23
**hard** [2] - 254:23, 256:8
**hardware** [1] - 282:2
**Hassard** [5] - 216:14, 235:25, 253:17, 254:25, 255:5
**HASSARD** [3] - 214:16, 255:8, 302:5
**hat** [1] - 266:2
**head** [1] - 325:22
**heading** [1] - 322:18
**hear** [8] - 217:3, 217:4, 232:2, 236:19, 239:15, 254:23, 324:10,

326:15

**heard** [7] - 232:1, 232:20, 272:3, 286:21, 287:25, 304:25, 312:17
**hearing** [8] - 234:24, 254:21, 258:11, 272:9, 309:10, 332:1, 333:8, 334:6
**HEARING** [2] - 214:4, 214:7
**hearings** [1] - 309:10
**held** [8] - 232:13, 232:14, 233:19, 233:24, 234:1, 235:16, 249:15, 262:5
**hello** [1] - 275:5
**help** [3] - 280:16, 312:12, 314:7
**helped** [1] - 285:21
**helpful** [4] - 298:23, 299:5, 330:10, 333:23
**helping** [1] - 278:17
**hereby** [1] - 335:3
**heuristic** [1] - 325:19
**hide** [1] - 320:24
**hiding** [1] - 320:24
**highlights** [1] - 246:22
**highly** [1] - 325:18
**hijacked** [4] - 225:6, 225:16, 225:20, 226:6
**hire** [1] - 315:6
**hired** [4] - 281:8, 286:11, 286:12, 299:15
**hold** [3] - 278:8, 279:5, 327:22
**holding** [1] - 270:8
**holds** [1] - 252:23
**home** [2] - 256:22, 307:12
**honestly** [3] - 264:24, 274:4, 279:24
**Honor** [50] - 216:6, 216:12, 216:18, 216:24, 227:2, 230:17, 231:16, 232:6, 234:2, 234:15, 234:20, 236:4, 236:11, 236:13, 236:16, 236:25, 237:4, 238:15, 240:21, 242:6, 242:10, 242:16, 253:22, 254:2, 266:20, 289:20, 292:21,

293:6, 294:1, 295:7, 299:18, 302:5, 302:8, 305:5, 309:17, 312:11, 318:8, 318:19, 319:5, 321:5, 321:7, 322:17, 323:4, 324:3, 324:8, 331:21, 333:6, 334:1, 334:3, 334:5
**HONORABLE** [1] - 214:8
**hope** [3] - 309:25, 331:24, 332:3
**hopefully** [3] - 296:25, 319:6, 332:20
**hoping** [4] - 232:5, 232:22, 290:3, 308:11
**host** [1] - 271:9
**hour** [4] - 232:11, 238:10, 290:15, 301:19
**hourly** [1] - 290:2
**hours** [13] - 232:12, 288:2, 288:7, 288:14, 288:16, 288:19, 288:24, 321:13, 325:4, 326:22, 326:23, 328:4, 328:20
**house** [4] - 258:25, 259:6, 286:9, 326:14
**House** [1] - 219:7
**housed** [2] - 233:17, 234:14
**housekeeping** [5] - 232:6, 234:16, 236:14, 236:16, 253:16
**houses** [1] - 285:21
**Howell's** [1] - 249:12
**HTTP** [1] - 296:7
**HTTPS** [1] - 296:6
**hundred** [2] - 288:7, 288:15
**hundreds** [4] - 247:20, 270:23, 270:24, 321:13
**Hurtado** [1] - 314:3
**hypotheses** [2] - 264:21, 304:15
**hypothesis** [14] - 225:22, 226:10, 226:17, 227:13, 227:18, 228:4, 229:6, 256:21, 281:3, 281:5, 304:11, 304:13, 306:17

**hypothetical** [2] - 226:16, 318:23
**hypothetically** [1] - 229:8

## I

**IBM** [1] - 315:25
**idea** [6] - 239:5, 260:18, 271:2, 282:23, 283:11, 290:12
**ideal** [1] - 273:14
**ideally** [1] - 273:4
**identification** [3] - 260:7, 302:20
**identified** [12] - 237:12, 240:7, 241:4, 301:1, 301:4, 301:13, 302:12, 302:16, 302:17, 303:1, 321:14, 322:5
**identify** [9] - 239:11, 241:12, 247:4, 249:23, 253:12, 259:22, 301:5, 311:2, 322:8
**identifying** [5] - 222:14, 222:15, 249:21, 304:7, 327:7
**identities** [5] - 244:20, 246:19, 247:2, 248:17, 249:3
**identity** [5] - 246:17, 247:17, 253:10, 257:14, 296:1
**ill** [1] - 250:15
**ill-gotten** [1] - 250:15
**illegal** [5] - 225:7, 225:21, 226:12, 241:20, 245:19
**illicit** [2] - 227:19, 240:2
**image** [2] - 222:4, 277:1
**images** [1] - 287:13
**imagine** [3] - 288:17, 288:18, 317:24
**impart** [1] - 252:3
**important** [1] - 289:1
**impossible** [1] - 223:2
**impression** [1] - 234:5
**IN** [1] - 214:1
**in-house** [1] - 326:14
**inaccuracy** [1] - 311:25
**inaccurate** [3] - 282:22, 283:21, 322:5
**inbox** [1] - 272:5

**Inc** [1] - 255:12
**incarcerated** [1] - 323:2
**incentives** [1] - 326:11
**incident** [6] - 284:22, 285:12, 285:17, 286:1, 286:3, 328:12
**inclined** [1] - 294:23
**include** [6] - 219:6, 249:13, 287:16, 298:22, 326:4, 327:13
**included** [6] - 245:9, 274:7, 278:15, 295:21, 297:18, 308:22
**includes** [2] - 250:12, 287:13
**including** [8] - 221:5, 222:3, 246:20, 248:12, 250:24, 251:14, 256:11, 310:19
**inclusive** [1] - 260:8
**incomplete** [5] - 283:11, 291:9, 291:11, 293:23, 302:22
**inconsistent** [1] - 231:3
**increase** [1] - 332:14
**independent** [2] - 228:11, 251:9
**independently** [1] - 280:1
**indicate** [2] - 246:12, 309:13
**indicated** [1] - 219:9
**indicates** [3] - 226:5, 294:11, 296:21
**indicating** [1] - 226:19
**indication** [2] - 219:20, 311:6
**indictment** [20] - 238:1, 238:7, 238:16, 238:18, 239:2, 239:21, 240:14, 242:25, 243:3, 243:21, 244:6, 244:18, 245:5, 246:19, 246:21, 248:5, 248:11, 252:2, 252:13, 331:4
**indirectly** [1] - 237:17
**individual** [9] - 219:20, 222:25, 256:12, 261:6, 296:18, 298:6, 305:19, 305:23,

305:24
**individual's** [2] - 219:18, 296:8
**individuals** [19] - 247:20, 256:13, 258:18, 260:4, 277:21, 281:10, 284:12, 285:10, 285:11, 292:12, 303:4, 303:25, 304:2, 304:15, 305:7, 305:10, 308:19, 314:16, 314:19
**individuals'** [1] - 327:9
**indulge** [1] - 229:22
**industry** [1] - 313:1
**inference** [2] - 229:19, 230:20
**inflate** [1] - 255:22
**influence** [1] - 328:5
**influencing** [1] - 269:4
**information** [46] - 222:3, 222:14, 222:15, 222:19, 228:5, 243:19, 243:20, 244:14, 244:17, 249:21, 250:23, 252:2, 272:25, 277:4, 277:5, 282:19, 283:4, 283:7, 283:11, 291:1, 292:11, 292:16, 293:23, 295:21, 298:4, 298:7, 298:14, 300:18, 302:23, 303:8, 304:1, 309:12, 315:23, 316:10, 318:3, 318:23, 318:24, 319:4, 326:9, 327:7, 327:14, 330:3, 330:10, 330:15, 332:12
**initial** [3] - 231:8, 283:17, 327:15
**injury** [1] - 244:20
**inquiry** [1] - 223:16
**instance** [2] - 225:15, 316:21
**instances** [1] - 274:20
**instead** [1] - 296:6
**institutions** [4] - 218:13, 218:23, 222:8, 223:22
**instructed** [2] - 294:3, 325:13

instruction [1] - 234:4
instructive [2] - 280:24, 300:2
instrumental [1] - 279:18
intelligence [1] - 315:5
intend [2] - 291:15, 323:18
intended [1] - 249:6
intends [3] - 247:4, 249:23, 253:12
intent [6] - 245:20, 245:24, 245:25, 250:8, 251:3, 251:16
interact [1] - 266:25
interest [2] - 330:11, 330:16
interesting [1] - 280:5
interestingly [2] - 256:18, 278:5
internal [2] - 220:13, 324:21
internally [1] - 272:23
internet [40] - 252:18, 257:1, 257:2, 257:6, 257:8, 257:10, 257:12, 257:14, 257:17, 257:20, 257:21, 257:24, 258:7, 258:8, 258:15, 258:19, 259:1, 259:7, 259:10, 259:14, 259:24, 259:25, 260:17, 260:19, 265:18, 266:3, 266:13, 266:15, 266:17, 267:7, 267:10, 267:12, 268:16, 268:22, 268:24, 269:4, 312:20
interprets [1] - 266:24
interrupt [2] - 239:10, 323:11
interruption [1] - 294:15
intrusion [2] - 220:21
invented [1] - 313:12
invested [1] - 320:16
investigated [1] - 219:10
investigation [6] - 243:20, 325:15, 326:2, 326:8, 330:9, 330:19
investigations [1] - 263:9
involve [7] - 218:20,

247:25, 257:12, 266:3, 276:18, 325:7
involved [20] - 230:20, 247:19, 250:25, 251:4, 251:18, 268:3, 277:17, 279:15, 283:23, 286:23, 288:11, 289:16, 290:24, 304:3, 304:6, 308:20, 310:8, 320:24, 324:4
involvement [1] - 280:7
involves [4] - 219:18, 256:8, 263:8, 276:14
involving [6] - 238:2, 248:1, 250:6, 267:25, 277:22, 278:4
iOS [1] - 309:23
IP [33] - 257:17, 257:19, 257:23, 258:5, 259:15, 259:17, 259:20, 259:22, 260:1, 260:3, 260:5, 260:6, 260:11, 260:12, 260:16, 260:18, 260:20, 261:4, 261:9, 261:10, 261:14, 262:11, 264:8, 268:15, 269:11, 295:23, 296:22, 296:24, 298:2, 308:1, 308:13, 314:24
IP-related [1] - 295:23
IRS [2] - 331:2, 331:6
IRS's [1] - 331:8
isolate [1] - 256:20
issue [9] - 233:1, 234:6, 235:22, 241:7, 241:16, 241:17, 242:1, 250:14, 325:1
issues [14] - 218:20, 219:5, 219:10, 221:5, 232:9, 232:20, 234:22, 239:1, 241:24, 279:25, 296:22, 315:4, 332:2, 333:21
item [2] - 218:16, 226:5
items [8] - 305:16, 306:8, 306:24, 306:25, 307:3, 322:4, 325:10, 326:16

iterations [1] - 291:5
itself [6] - 221:5, 241:19, 267:12, 273:4, 273:8, 305:13

**J**

J.W [3] - 215:3, 217:1, 227:6
jail [9] - 232:10, 233:3, 233:15, 233:25, 234:4, 235:7, 235:9, 235:11, 236:2
Jail [2] - 232:15, 234:24
jails [1] - 236:4
January [3] - 286:24, 287:19, 289:20
Japan [3] - 221:5, 221:14, 228:6
jawboning [1] - 333:22
Jeff [1] - 253:24
JEFF [4] - 215:8, 254:7, 275:3, 312:15
Jeff@SecondWave. com [1] - 270:19
Jencks [1] - 299:23
jeopardy [3] - 238:18, 241:17, 241:24
job [7] - 231:11, 255:21, 279:13, 284:24, 285:6, 285:22
Jobs [1] - 313:2
joined [2] - 216:9, 216:14
Jonelle [1] - 319:15
jot [1] - 291:22
jour [1] - 314:20
Judge [6] - 247:14, 247:17, 248:15, 249:12, 294:17, 294:20
judge [1] - 291:11
JUDGE [2] - 214:8, 214:8
judges [1] - 313:21
judgment [1] - 220:19
judgments [1] - 220:6
judicial [2] - 255:18, 313:20
July [2] - 214:6, 321:25
jurisdictions [1] - 263:11
jury [9] - 239:7, 239:8, 291:9, 291:10, 320:20, 320:21, 326:9, 330:13

JUSTICE [1] - 214:13

**K**

Karpeles' [2] - 228:6, 228:9
keep [9] - 237:10, 255:25, 259:22, 263:9, 288:5, 296:11, 298:9, 299:2, 332:21
keeping [2] - 296:20, 327:21
kept [1] - 324:21
key [1] - 323:19
kind [8] - 217:16, 255:13, 283:1, 285:5, 299:10, 316:24, 328:11, 333:7
kinds [1] - 272:25
knowing [2] - 264:15, 293:18
knowledge [16] - 220:20, 220:24, 221:1, 221:2, 221:3, 221:7, 228:11, 246:12, 246:15, 251:2, 251:15, 272:9, 278:19, 287:5, 309:22, 324:11
known [5] - 239:7, 247:2, 247:3, 262:24, 263:7
knows [1] - 233:10
Kraken [1] - 222:24
KYC [4] - 222:3, 222:11, 222:13, 222:18

**L**

LA [1] - 314:3
laboratories [1] - 262:25
lacks [2] - 248:7, 298:16
laid [1] - 294:24
land [1] - 266:14
large [2] - 317:22, 328:6
largely [2] - 248:3, 248:21
largest [2] - 288:12, 297:4
last [10] - 275:20, 276:3, 276:5, 276:6, 286:13, 286:23, 287:3, 298:2,

321:13, 324:4
lasted [1] - 263:17
late [2] - 287:3, 321:7
launch [1] - 283:17
laundered [2] - 239:2, 250:3
laundering [8] - 230:2, 230:3, 237:15, 244:8, 248:2, 250:1, 250:2, 251:21
Law [1] - 214:16
law [13] - 239:4, 239:19, 246:2, 250:13, 285:19, 285:24, 291:7, 313:16, 313:17, 313:18, 313:22, 314:16, 317:22
lawsuit [1] - 316:1
lawyer [7] - 231:9, 231:12, 234:19, 295:2, 320:13, 320:25, 321:3
lawyers [2] - 295:2, 320:20
lay [1] - 253:4
layered [1] - 268:6
layers [1] - 267:12
lead [1] - 230:19
leads [2] - 229:12, 229:18
learn [1] - 249:3
least [24] - 240:17, 258:1, 258:11, 259:21, 260:4, 264:17, 272:18, 272:19, 274:3, 275:7, 276:13, 280:7, 283:2, 284:15, 289:3, 289:10, 291:22, 294:21, 305:3, 320:10, 320:11, 331:23, 332:19, 333:19
leave [1] - 241:22
led [1] - 256:23
left [1] - 320:17
legal [2] - 295:3, 333:13
legitimate [1] - 225:23
lengthy [1] - 322:22
less [7] - 229:11, 229:16, 248:5, 263:24, 267:5, 321:3, 333:1
letter [5] - 236:2, 323:17, 332:24, 332:25, 333:5
letting [2] - 235:20,

308:24
**level** [1] - 309:22
**license** [6] - 222:4, 222:6, 252:23, 331:13, 331:16, 331:18
**licenses** [3] - 280:4, 280:9, 331:13
**light** [2] - 243:20, 301:18
**likelihood** [1] - 261:24
**likely** [8] - 261:20, 264:21, 268:19, 270:14, 279:18, 291:19, 318:22, 328:16
**limit** [1] - 226:14
**limitations** [4] - 241:7, 241:9, 275:16, 327:3
**limited** [3] - 248:23, 287:9, 333:22
**limits** [1] - 227:16
**line** [3] - 301:18, 306:16, 309:15
**Linux** [2] - 309:25, 310:2
**list** [3] - 246:22, 280:5, 287:6
**listed** [6] - 222:23, 222:25, 304:15, 311:13, 311:15
**listening** [2] - 221:10, 291:20
**listing** [1] - 323:19
**lists** [1] - 298:3
**litigated** [1] - 251:13
**litigation** [2] - 251:13, 329:4
**local** [2] - 222:25, 268:22
**locate** [1] - 256:12
**location** [4] - 245:21, 250:9, 277:5, 295:25
**locations** [1] - 259:10
**lock** [1] - 267:14
**locker** [2] - 232:18, 236:1
**log** [4] - 272:18, 316:15, 316:16, 316:25
**logs** [7] - 226:21, 311:22, 316:23, 317:16, 318:4, 324:19, 328:13
**long-term** [1] - 289:15
**look** [15] - 223:3, 224:17, 239:19, 274:12, 300:18, 306:1, 306:8, 306:12, 306:18,

306:21, 308:21, 312:1, 318:11, 320:14
**looked** [14] - 231:7, 231:13, 256:19, 261:21, 262:8, 276:25, 286:19, 287:22, 297:1, 298:21, 298:22, 307:24, 310:10, 312:2
**looking** [13] - 263:14, 273:21, 275:14, 276:23, 304:3, 306:4, 306:13, 307:4, 307:18, 308:10, 308:23, 312:7, 314:1
**looks** [3] - 275:15, 286:20, 297:4
**Los** [4] - 258:25, 259:4, 327:24, 328:17
**lose** [1] - 294:16
**lost** [2] - 266:3, 271:25
**love** [2] - 280:5, 298:8
**Luke** [1] - 237:20
**luxury** [3] - 230:7, 230:10, 230:12
**lying** [1] - 316:2

## M

**M-e-i-k-l-e-j-o-h-n** [1] - 274:10
**ma'am** [1] - 295:16
**Mac** [1] - 309:23
**machines** [1] - 256:15
**mail** [3] - 258:22, 259:2, 270:20
**maintain** [1] - 332:13
**maintained** [1] - 226:15
**maintaining** [1] - 293:7
**majority** [4] - 256:8, 271:6, 276:17, 313:11
**Malta** [1] - 222:21
**Maltese** [1] - 222:25
**Management** [9] - 243:22, 247:15, 247:23, 247:24, 248:4, 248:6, 248:16, 248:21, 248:24
**management** [1] - 282:8
**manipulation** [1] - 228:7

**manner** [3] - 246:11, 251:6, 296:2
**Manny** [1] - 314:3
**Mark** [1] - 228:6
**mark** [3] - 228:9, 272:13, 272:15
**market** [4] - 239:3, 239:6, 239:21, 269:24
**markets** [6] - 239:24, 239:25, 240:1, 240:2, 241:8, 241:14
**Marshals** [5] - 233:12, 233:16, 233:21, 234:13, 235:12
**Martinez** [1] - 244:25
**massive** [1] - 327:18
**mastering** [1] - 279:3
**match** [1] - 237:20
**material** [2] - 276:15, 287:10
**materials** [5] - 239:20, 248:11, 309:6, 318:16, 318:18
**matter** [7] - 253:11, 253:16, 257:13, 286:15, 290:4, 314:14, 317:10
**matters** [6] - 228:24, 234:16, 236:14, 236:16, 238:3, 255:16
**Mazarin** [2] - 261:14, 262:10
**Mazarin's** [2] - 264:8, 300:10
**Mazars** [1] - 300:10
**Mazars'** [3] - 296:24, 297:15, 298:4
**McAfee** [1] - 217:24
**mean** [26] - 217:16, 219:2, 229:21, 230:13, 235:10, 238:3, 239:7, 260:25, 272:7, 273:6, 273:14, 278:24, 280:2, 285:2, 296:2, 298:16, 311:11, 315:9, 316:17, 318:25, 320:7, 324:7, 330:1, 330:20, 333:1, 333:12
**meaning** [2] - 252:8, 285:15
**means** [1] - 322:11
**meant** [1] - 277:23
**measure** [1] - 261:24
**media** [1] - 255:19

**meet** [1] - 240:18
**Meiklejohn** [1] - 274:9
**Meiklejohn's** [1] - 274:16
**memorialization** [1] - 291:18
**memorialized** [1] - 291:16
**memorializing** [1] - 290:21
**memorize** [1] - 268:20
**memory** [4] - 256:13, 274:20, 287:5, 308:16
**mental** [1] - 235:2
**mention** [1] - 219:5
**mentioned** [10] - 218:5, 218:12, 218:15, 228:12, 242:7, 245:1, 265:17, 315:15, 316:15, 319:19
**merely** [2] - 240:23, 244:1
**merit** [1] - 306:9
**messed** [1] - 317:25
**methods** [2] - 273:20
**Michael** [2] - 216:14, 313:2
**MICHAEL** [1] - 214:16
**Microsoft** [4] - 266:21, 272:16, 316:2, 318:1
**Microsoft's** [1] - 310:9
**mid** [1] - 231:6
**middle** [2] - 271:3, 293:9
**might** [24] - 219:21, 220:23, 226:15, 246:24, 250:19, 261:10, 268:18, 269:19, 271:1, 271:2, 280:6, 281:25, 286:7, 286:9, 286:22, 287:3, 293:21, 295:13, 303:2, 319:18, 329:13, 330:16, 332:8, 333:15
**million** [3] - 237:16, 237:17, 266:1
**millionaires** [1] - 271:13
**mind** [6] - 255:5, 259:23, 267:11, 267:18, 274:1, 301:8
**mindset** [1] - 296:8
**mine** [1] - 304:8
**minimize** [1] - 333:15
**minutes** [3] - 236:18,

301:22, 302:2
**miraculously** [2] - 269:17, 301:9
**misattributed** [1] - 292:16
**misleading** [1] - 224:8
**missed** [1] - 224:24
**missing** [4] - 229:21, 230:19, 283:12, 290:25
**mitigate** [1] - 289:10
**mixed** [2] - 292:2, 295:11
**mixer** [1] - 283:23
**mixing** [1] - 295:19
**Model** [2] - 230:10, 230:15
**moment** [5] - 255:6, 261:3, 269:12, 287:23, 292:14
**money** [27] - 230:2, 231:5, 237:15, 237:25, 239:2, 244:8, 246:13, 248:2, 250:1, 250:2, 251:21, 251:23, 251:25, 252:22, 289:9, 289:18, 289:25, 290:13, 320:19, 320:22, 325:25, 326:7, 330:17, 330:20
**monitor** [3] - 234:9, 254:25, 255:3
**month** [1] - 320:16
**months** [2] - 264:19, 276:6
**morning** [6] - 216:6, 216:8, 216:12, 217:3, 217:4, 308:19
**MOSS** [1] - 214:8
**most** [23] - 244:9, 255:16, 256:2, 256:18, 259:15, 260:14, 260:17, 266:13, 270:13, 274:19, 277:11, 278:14, 291:5, 296:6, 299:10, 307:18, 307:25, 313:6, 317:4, 317:22, 331:20
**mostly** [3] - 254:13, 255:21, 315:4
**motion** [9] - 237:3, 242:24, 243:25, 244:5, 245:10, 253:13, 329:16, 333:8, 334:1
**MOTIONS** [2] - 214:4,

214:7
**mounting** [1] - 238:22
**move** [3] - 264:6, 315:3, 328:17
**moved** [4] - 232:23, 233:14, 233:18, 254:17
**movies** [1] - 261:7
**moving** [3] - 234:25, 237:10, 332:21
**MR** [61] - 216:12, 216:24, 217:2, 225:14, 227:2, 227:7, 230:22, 231:16, 231:23, 232:5, 232:8, 232:14, 234:2, 234:15, 234:20, 235:5, 235:18, 235:23, 236:11, 236:13, 237:4, 238:15, 239:16, 240:21, 240:23, 241:2, 242:10, 253:16, 253:21, 253:24, 254:8, 254:24, 255:5, 255:8, 255:9, 274:25, 301:21, 302:5, 312:10, 312:16, 313:14, 318:8, 319:13, 319:24, 321:5, 323:4, 323:15, 323:17, 323:21, 323:24, 324:3, 324:8, 324:12, 325:1, 325:11, 325:22, 326:6, 332:22, 333:6, 333:24, 334:5
**MS** [39] - 216:6, 216:9, 216:18, 216:22, 231:21, 236:16, 236:25, 242:16, 275:4, 275:13, 295:9, 300:7, 301:18, 302:8, 302:9, 305:18, 307:15, 309:17, 309:19, 312:5, 321:7, 322:3, 322:17, 326:17, 327:5, 327:9, 328:2, 328:9, 328:15, 329:2, 329:8, 329:15, 329:20, 330:20, 331:1, 331:11, 331:17, 331:20, 334:3

**Mt** [55] - 220:25, 221:4, 221:17, 221:19, 221:22, 221:25, 222:2, 222:11, 222:19, 222:20, 223:9, 223:25, 224:4, 225:5, 225:16, 225:20, 226:2, 226:4, 226:18, 227:1, 227:9, 227:24, 228:2, 228:5, 228:7, 229:18, 262:10, 262:14, 264:7, 283:16, 290:17, 299:7, 300:12, 301:2, 301:7, 301:13, 302:11, 302:12, 302:21, 302:25, 305:21, 307:22, 307:23, 308:2, 308:3, 309:14, 322:12, 323:9, 323:14, 324:23, 325:3, 325:23, 326:17, 332:10, 333:13
**multimillion** [2] - 265:25
**multimillion-dollar** [1] - 265:25
**multiple** [4] - 227:20, 256:12, 278:20, 310:19
**murder** [1] - 293:9
**mystery** [3] - 240:1, 240:2, 252:15

## N

**N.W** [1] - 335:11
**name** [28] - 221:23, 221:24, 222:11, 222:18, 239:3, 239:11, 239:14, 240:5, 241:19, 256:16, 264:14, 269:8, 269:9, 269:15, 270:4, 270:6, 270:9, 270:11, 270:15, 270:22, 270:25, 271:4, 271:5, 271:16, 271:23, 271:24, 305:20, 313:22
**named** [1] - 331:3
**names** [22] - 216:4, 223:20, 237:11,

237:13, 239:5, 239:7, 247:2, 247:7, 248:7, 249:16, 249:20, 249:21, 253:10, 267:18, 268:14, 270:14, 271:6, 271:21, 277:18, 298:3, 304:4
**narrow** [1] - 298:19
**national** [2] - 248:23, 265:2
**native** [1] - 268:15
**nature** [8] - 219:17, 220:21, 221:14, 245:17, 245:21, 249:9, 249:18, 250:8
**near** [1] - 286:23
**necessarily** [12] - 258:24, 259:22, 261:22, 270:12, 279:14, 287:21, 294:23, 296:9, 303:18, 304:8, 304:10, 317:2
**necessary** [6] - 228:2, 243:3, 243:17, 246:16, 249:16, 311:21
**Neck** [3] - 232:14, 233:19, 234:23
**need** [52] - 217:6, 227:23, 229:6, 229:7, 229:9, 229:20, 233:2, 233:6, 233:10, 237:8, 239:5, 253:18, 258:24, 261:25, 264:7, 272:25, 273:3, 273:12, 273:14, 278:18, 280:16, 283:4, 286:8, 291:7, 291:8, 293:3, 293:25, 294:1, 294:10, 297:23, 300:16, 301:17, 304:20, 304:24, 305:3, 307:10, 315:18, 315:21, 315:24, 316:18, 318:11, 319:1, 321:10, 322:24, 323:9, 323:13, 324:16, 327:16, 328:16, 331:24, 333:16
**needed** [4] - 263:22, 280:13, 287:23, 312:4
**needs** [9] - 233:1,

233:25, 240:13, 257:25, 263:12, 265:3, 276:1, 309:7
**negatives** [1] - 272:11
**neighborhood** [1] - 259:3
**net** [1] - 268:1
**network** [10] - 257:1, 258:8, 261:6, 266:17, 267:11, 268:4, 285:6, 285:13, 296:15, 296:20
**networks** [4] - 257:1, 258:14, 285:1, 285:8
**neutral** [1] - 314:14
**never** [11] - 236:5, 260:19, 262:21, 272:3, 278:6, 281:23, 310:1, 310:16, 311:17, 312:23
**new** [3] - 279:4, 317:2, 317:11
**New** [3] - 214:17, 232:12, 332:3
**news** [2] - 218:19, 221:10
**next** [6] - 224:22, 231:19, 253:15, 301:18, 324:12, 328:18
**nice** [1] - 271:25
**night** [1] - 234:25
**nights** [1] - 274:7
**nitty** [1] - 240:7
**nitty-gritty** [1] - 240:7
**NO** [1] - 215:15
**nontestifying** [1] - 330:25
**nonviolent** [1] - 247:9
**norm** [1] - 219:24
**normal** [1] - 237:6
**normally** [1] - 290:2
**Northern** [3] - 232:14, 233:19, 234:23
**note** [3] - 246:3, 246:15, 287:21
**noted** [1] - 297:4
**notes** [6] - 287:17, 291:19, 291:20, 303:2, 305:21, 335:5
**nothing** [6] - 241:14, 245:11, 270:5, 290:19, 292:10, 308:16
**notice** [10] - 224:21, 238:12, 240:12, 240:17, 274:7, 291:25, 296:6,

296:21, 303:20, 303:22
**noticed** [2] - 303:11, 303:14
**noticing** [2] - 274:20, 305:7
**novel** [1] - 248:2
**now-retired** [1] - 257:4
**nowhere** [1] - 270:6
**number** [23] - 219:11, 221:21, 221:25, 222:5, 222:13, 224:18, 262:20, 264:21, 275:25, 276:2, 277:21, 282:3, 282:6, 282:19, 282:21, 284:6, 285:10, 286:13, 297:9, 301:7, 302:22, 302:24, 303:4
**numbers** [2] - 282:5, 320:14
**numerical** [2] - 259:10, 270:4
**nutshell** [2] - 254:16, 315:9
**NW** [3] - 214:11, 214:14, 214:22
**NY** [1] - 214:17

## O

**obfuscate** [1] - 295:25
**obfuscating** [1] - 224:4
**obfuscation** [2] - 296:3, 296:7
**object** [2] - 245:19, 308:17
**objecting** [1] - 274:18
**objectivity** [1] - 220:3
**obligated** [1] - 244:11
**obligation** [1] - 333:14
**obscurity** [1] - 296:17
**observations** [1] - 291:23
**obtain** [1] - 244:14
**obtained** [2] - 219:19, 277:2
**obviate** [1] - 225:2
**obviously** [3] - 233:24, 254:18, 275:22
**occasion** [3] - 276:21, 285:11, 311:25
**occasionally** [1] - 313:7
**occur** [3] - 220:13,

234:1, 264:23
**occurred** [1] - 256:23
**ocean** [1] - 293:9
**OF** [10] - 214:1, 214:2,
214:7, 214:13,
216:25, 227:5,
254:6, 275:2,
312:14, 335:1
**offense** [5] - 243:2,
244:21, 246:5,
246:16, 250:2
**offenses** [1] - 247:9
**offer** [3] - 231:25,
280:15, 280:20
**offered** [5] - 217:24,
218:3, 270:10,
326:18, 327:11
**office** [11] - 257:4,
262:15, 262:18,
293:2, 307:9,
307:12, 307:13,
307:14, 325:3,
325:4, 326:23
**Office** [7] - 326:20,
327:2, 327:24,
328:4, 328:18,
328:21
**offices** [1] - 263:1
**Official** [2] - 214:21,
335:10
**OFFICIAL** [1] - 335:1
**often** [4] - 226:13,
277:4, 308:24,
316:19
**oftentimes** [1] -
271:15
**on-chain** [1] - 278:22
**once** [5] - 261:5,
275:25, 282:22,
289:13, 325:19
**one** [60] - 219:2,
219:9, 219:21,
222:14, 222:18,
225:10, 228:8,
229:11, 231:12,
232:8, 235:24,
239:16, 246:24,
248:6, 248:25,
249:5, 249:7,
251:12, 257:5,
257:20, 257:21,
259:12, 260:12,
260:23, 263:7,
267:13, 267:20,
267:22, 269:2,
269:5, 270:12,
272:3, 274:6, 274:9,
276:7, 278:14,
279:9, 282:14,
283:3, 287:6,

287:18, 288:23,
295:12, 295:24,
297:9, 298:8, 301:7,
302:16, 302:22,
304:13, 308:15,
310:3, 311:2,
311:13, 311:20,
314:10, 315:11,
316:21, 318:6, 323:4
**one-person** [1] -
283:3
**one-second** [1] -
239:16
**ones** [5] - 276:24,
311:15, 317:21,
323:19, 324:5
**online** [1] - 287:10
**open** [4] - 217:20,
244:2, 266:14,
274:18
**open-ended** [1] -
274:18
**opens** [1] - 266:20
**operated** [1] - 252:5
**operating** [8] - 251:20,
251:22, 283:23,
309:23, 310:1,
310:9, 310:13
**operation** [7] - 229:2,
281:24, 282:9,
282:22, 282:24,
283:1, 283:3
**operations** [1] -
281:24
**operator** [1] - 221:2
**operators** [2] - 252:19,
252:21
**opine** [1] - 294:23
**opined** [1] - 294:21
**opining** [3] - 294:12,
321:23, 321:24
**opinion** [39] - 228:21,
247:14, 249:12,
261:16, 261:18,
262:7, 262:17,
264:6, 272:13,
274:14, 274:22,
281:15, 282:1,
282:10, 282:11,
283:5, 283:11,
283:14, 283:25,
284:10, 284:15,
293:17, 294:22,
299:4, 299:17,
299:20, 299:21,
300:10, 300:23,
304:8, 304:21,
304:22, 305:2,
306:9, 309:13,
319:1, 319:2, 319:3

**opinions** [18] - 220:1,
228:20, 264:15,
283:20, 283:21,
284:6, 284:9, 291:9,
294:11, 295:23,
300:5, 300:25,
304:21, 305:10,
318:21, 320:12,
322:9, 322:10
**opportunities** [1] -
312:21
**opportunity** [3] -
261:13, 277:9, 309:3
**opposed** [1] - 251:13
**optimistically** [1] -
284:3
**option** [1] - 273:15
**oral** [1] - 236:22
**order** [16] - 226:12,
235:7, 237:5, 240:4,
249:19, 256:20,
257:25, 264:7,
264:17, 265:6,
266:15, 268:20,
278:15, 278:18,
283:5, 299:17
**ordering** [1] - 235:9
**ordinary** [1] - 243:12
**Oregon** [1] - 314:10
**organizes** [1] - 244:5
**original** [2] - 237:19,
311:20
**originally** [1] - 269:2
**otherwise** [6] -
231:14, 243:21,
250:19, 253:13,
260:19, 317:21
**ought** [1] - 274:3
**out-of-circuit** [1] -
249:10
**out-of-pocket** [1] -
289:11
**outline** [2] - 318:20,
323:12
**outside** [3] - 230:23,
232:12, 241:9
**overall** [2] - 253:8,
264:3
**overdisclose** [1] -
284:17
**overlap** [3] - 261:14,
264:8, 298:2
**overly** [1] - 260:8
**oversight** [2] - 219:7,
219:8
**overt** [1] - 248:7
**overview** [1] - 278:2
**overwhelmingly** [1] -
298:12
**own** [18] - 218:4,

224:5, 224:22,
255:10, 259:15,
259:16, 260:11,
261:18, 261:23,
265:23, 270:13,
270:15, 271:23,
280:9, 290:13,
300:21, 332:6
**owned** [3] - 230:5,
230:7, 272:1
**ownership** [2] -
245:21, 250:9

## P

**p.m** [4] - 231:22,
231:23, 242:19,
334:6
**pack** [1] - 235:25
**PAGE** [1] - 215:2
**page** [10] - 243:15,
243:23, 244:4,
244:16, 244:25,
245:1, 245:3, 270:8,
283:12, 298:2
**pages** [1] - 245:4
**paid** [10] - 280:19,
289:5, 289:6, 289:9,
290:1, 290:3, 326:1,
326:8, 330:17,
330:20
**Palfrey** [1] - 247:10
**palfrey** [1] - 244:25
**pandemic** [1] - 277:12
**paper** [2] - 274:9,
274:16
**part** [33] - 224:7,
228:3, 228:12,
232:10, 233:1,
246:4, 256:2,
256:17, 257:16,
258:11, 258:15,
262:25, 267:11,
268:3, 274:19,
277:11, 279:15,
282:15, 292:9,
292:22, 295:18,
298:12, 300:23,
303:8, 303:18,
308:20, 308:23,
311:5, 311:8, 313:6,
326:3, 329:16, 331:1
**participate** [1] -
257:20
**participated** [1] -
244:22
**participating** [1] -
318:10
**particular** [22] -
222:17, 223:7,

237:9, 245:16,
245:19, 245:23,
245:25, 246:6,
246:7, 246:10,
246:11, 246:17,
255:20, 256:6,
257:23, 266:4,
278:19, 297:22,
313:21, 314:14,
316:24, 330:3
**particularity** [1] -
241:15
**particularly** [8] -
227:12, 227:22,
237:5, 247:9,
247:12, 258:22,
271:10, 297:3
**particulars** [27] -
236:21, 236:22,
237:5, 237:6, 237:8,
240:4, 240:9,
240:10, 240:12,
242:3, 242:15,
242:24, 243:10,
243:12, 243:16,
243:25, 244:6,
244:12, 244:15,
245:15, 246:23,
249:4, 250:20,
251:10, 251:11,
253:5, 253:14
**parties** [3] - 331:24,
332:1, 332:20
**party** [8] - 224:3,
225:17, 225:20,
226:6, 278:25,
327:6, 327:18
**party's** [1] - 225:17
**pass** [2] - 236:10,
236:25
**passport** [1] - 222:7
**past** [7] - 232:2, 261:2,
265:2, 270:2,
271:18, 272:20,
278:11
**patched** [1] - 272:22
**pathology** [2] - 225:12
**pattern** [1] - 225:24
**pause** [1] - 297:7
**pay** [1] - 272:6
**paying** [1] - 267:14
**payload** [1] - 258:20
**payment** [2] - 331:8,
331:14
**payments** [1] - 332:18
**pays** [1] - 331:12
**peer** [1] - 280:1
**peer-reviewed** [1] -
280:1
**PELKER** [40] - 214:13,

216:6, 216:9, 216:18, 216:22, 231:21, 236:16, 236:25, 242:16, 275:4, 275:13, 295:9, 300:7, 301:18, 302:8, 302:9, 305:18, 307:15, 309:17, 309:19, 312:5, 321:7, 322:3, 322:17, 326:17, 327:5, 327:9, 328:2, 328:9, 328:15, 329:2, 329:8, 329:15, 329:20, 330:20, 331:1, 331:11, 331:17, 331:20, 334:3

**Pelker** [7] - 215:11, 216:6, 275:1, 301:16, 315:13, 319:18, 326:15

**Pelker's** [1] - 316:14

**penalty** [1] - 264:15

**Pennsylvania** [2] - 214:14, 233:19

**people** [32] - 232:20, 233:2, 233:16, 258:14, 259:16, 260:14, 260:17, 260:20, 261:11, 261:12, 265:19, 266:6, 269:4, 271:7, 271:12, 271:13, 271:19, 278:12, 279:1, 284:4, 285:6, 286:2, 286:6, 290:23, 296:6, 303:17, 304:5, 315:6, 317:4, 317:19, 320:23, 324:4

**percent** [3] - 229:11, 229:17, 255:16

**perfect** [2] - 275:11, 275:12

**perform** [1] - 281:2

**perhaps** [8] - 235:10, 243:6, 270:14, 284:3, 286:25, 303:16, 308:22, 316:11

**period** [3] - 322:22, 324:18, 324:19

**perjury** [1] - 264:15

**permissive** [1] - 249:6

**person** [6] - 229:12, 229:17, 281:8, 282:8, 282:14, 283:3

**person's** [2] - 222:15, 222:18

**personal** [8] - 219:22, 260:7, 265:13, 265:16, 276:19, 277:2, 285:12, 285:14

**personally** [3] - 265:17, 273:18, 306:4

**persons** [1] - 246:19

**persuaded** [1] - 320:11

**persuasive** [1] - 252:1

**pertaining** [1] - 327:13

**pertains** [2] - 222:10, 295:12

**phishing** [2] - 219:19, 226:1

**phone** [6] - 235:19, 256:8, 256:11, 272:17, 277:5, 291:19

**phones** [2] - 276:19, 277:2

**physical** [3] - 259:13, 266:17, 307:14

**physically** [2] - 258:13, 262:15

**picked** [1] - 326:20

**picture** [2] - 258:21, 306:13

**pictures** [1] - 266:25

**piece** [7] - 225:25, 226:8, 226:19, 266:18, 273:5, 287:10, 317:11

**pipe** [1] - 285:21

**place** [6] - 244:19, 246:11, 251:6, 267:9, 270:12, 279:1

**places** [3] - 244:22, 270:16, 321:1

**plain** [1] - 243:1

**Plaintiff** [2] - 214:3, 214:10

**plaintiffs** [1] - 275:22

**planning** [2] - 242:8, 332:24

**plasmadivision.com** [1] - 223:4

**plate** [3] - 269:8, 269:22, 269:23

**pleadings** [2] - 238:20, 239:22

**pleased** [1] - 279:4

**plenty** [1] - 257:7

**plexiglass** [4] - 234:9, 235:16, 235:19, 236:8

**PLLC** [1] - 214:16

**plumbing** [1] - 285:19

**plus** [1] - 288:19

**pocket** [3] - 236:1, 289:10, 289:11

**pockets** [1] - 235:25

**podcast** [1] - 221:10

**podium** [1] - 242:7

**point** [37] - 218:17, 224:21, 226:5, 226:19, 226:23, 230:18, 233:10, 235:10, 238:13, 247:16, 254:12, 256:17, 259:5, 261:22, 264:6, 270:10, 270:23, 271:2, 271:21, 273:24, 279:9, 280:15, 284:14, 284:19, 289:23, 290:16, 290:22, 297:13, 306:17, 309:14, 316:7, 320:10, 321:16, 323:8, 324:14, 324:22

**pointing** [1] - 244:1

**points** [1] - 288:25

**policy** [1] - 244:2

**Pollack** [1] - 245:2

**pops** [1] - 269:16

**popular** [2] - 218:18, 221:3

**pornography** [1] - 263:8

**portion** [2] - 267:4, 276:14

**position** [7] - 274:17, 291:6, 291:8, 319:20, 323:9, 329:17, 332:6

**positives** [1] - 272:11

**possess** [1] - 332:6

**possessing** [1] - 276:14

**possession** [3] - 223:15, 229:9, 329:3

**possibilities** [1] - 302:21

**possibility** [7] - 224:3, 224:13, 225:2, 226:11, 228:4, 295:11, 328:3

**possible** [11] - 222:22, 223:2, 224:20, 224:24, 232:6, 254:24, 260:20, 260:24, 270:24, 275:7, 328:24

**possibly** [7] - 259:3, 261:12, 263:14, 264:20, 286:20, 292:14, 314:13

**post** [1] - 331:4

**Post** [1] - 307:19

**post-indictment** [1] - 331:4

**Post-it** [1] - 307:19

**potential** [3] - 248:17, 290:17, 328:13

**potentially** [1] - 227:19

**powers** [2] - 269:3, 269:4

**practical** [3] - 265:8, 265:14, 289:22

**practically** [1] - 241:8

**practice** [7] - 224:22, 224:23, 276:9, 286:15, 316:9, 318:1, 318:5

**practices** [3] - 220:11, 314:8

**preacher** [1] - 292:9

**preceded** [1] - 258:8

**precedent** [1] - 289:15

**precise** [3] - 239:1, 244:21, 245:17

**precisely** [1] - 256:23

**precision** [1] - 243:5

**predicate** [5] - 245:20, 245:25, 251:4, 251:17, 252:25

**predicates** [6] - 245:23, 246:6, 246:8, 246:10, 246:12, 252:3

**predominant** [1] - 248:25

**preemptory** [1] - 297:22

**prefer** [3] - 266:8, 291:4, 332:1

**preference** [1] - 219:22

**preliminary** [1] - 332:19

**premises** [1] - 330:9

**preparation** [2] - 290:16, 330:4

**prepare** [6] - 233:7, 238:17, 240:13, 243:6, 321:10, 321:18

**prepared** [1] - 321:20

**preparing** [2] - 248:18, 323:17

**presence** [1] - 224:25

**present** [3] - 216:13, 249:17, 298:18

**presentation** [1] - 240:11

**presented** [2] - 284:3, 287:20

**presenting** [1] - 283:18

**preservation** [2] - 314:8, 315:1

**preserve** [1] - 291:12

**press** [1] - 221:3

**presumably** [3] - 252:19, 308:2, 323:3

**pretrial** [2] - 238:20, 240:15

**pretty** [3] - 238:21, 287:11, 307:5

**prevent** [2] - 241:24, 333:15

**preview** [1] - 240:10

**previously** [2] - 253:6, 293:24

**primarily** [1] - 255:15

**principally** [1] - 321:4

**principle** [1] - 247:11

**printed** [5] - 307:16, 307:18, 307:21, 308:3, 321:16

**privacy** [1] - 231:15

**private** [2] - 256:1, 280:3

**privilege** [2] - 264:2

**pro** [1] - 314:5

**probable** [1] - 258:1

**problem** [7] - 234:10, 237:9, 255:8, 272:19, 298:11, 321:20, 326:14

**problems** [4] - 272:22, 311:7, 311:23

**procedural** [1] - 332:22

**Procedure** [1] - 243:11

**procedures** [1] - 220:17

**proceed** [1] - 253:21

**proceeding** [2] - 221:13, 299:4

**proceedings** [2] - 242:20, 335:6

**proceeds** [9] - 245:22, 246:7, 246:9, 250:4, 250:7, 250:10, 250:14, 251:5, 251:18

**process** [1] - 248:18

**processes** [1] - 220:14

**produce** [3] - 316:22,

318:2, 319:20
**produced** [7] - 239:20, 295:13, 295:20, 316:24, 317:22, 324:18, 333:25
**product** [1] - 264:2
**production** [1] - 222:1
**productive** [2] - 333:1, 333:4
**products** [3] - 311:9, 311:13, 317:19
**professional** [2] - 220:4, 220:6
**professionally** [1] - 257:10
**professionals** [1] - 284:24
**Professor** [2] - 217:5
**professor** [3] - 217:6, 227:8, 257:4
**proficient** [1] - 310:18
**profit** [1] - 326:13
**program** [2] - 217:23, 314:11
**programs** [2] - 217:19, 218:3
**prohibits** [1] - 250:6
**promote** [2] - 245:24, 250:11
**prone** [1] - 291:22
**proper** [2] - 266:11, 297:16
**properly** [3] - 259:5, 262:18, 264:8
**property** [8] - 245:21, 246:8, 250:7, 250:9, 250:14, 250:24, 251:5, 251:18
**proposition** [1] - 249:12
**proprietary** [4] - 310:14, 311:14, 311:16, 329:12
**prosecute** [1] - 252:11
**prosecution** [1] - 243:21
**prosecutors** [1] - 314:13
**prospect** [1] - 327:23
**protect** [2] - 243:6, 277:23
**protocol** [5] - 258:9, 259:1, 259:7, 259:14, 268:16
**proven** [1] - 229:15
**provide** [17] - 233:25, 235:9, 239:5, 240:12, 240:17, 243:16, 253:4, 255:14, 262:14,

268:13, 294:3, 311:23, 313:6, 313:18, 320:3, 321:10, 330:14
**provided** [24] - 244:2, 244:10, 245:6, 245:12, 245:14, 248:12, 250:19, 252:3, 253:6, 261:8, 274:12, 300:9, 300:23, 302:13, 303:8, 304:1, 308:1, 310:16, 311:22, 318:22, 330:10, 330:12, 330:16, 333:17
**provides** [3] - 217:17, 242:25, 250:22
**providing** [5] - 253:5, 253:10, 327:1, 327:23, 333:12
**proxies** [1] - 295:25
**public** [6] - 217:20, 219:12, 252:6, 255:17, 267:6, 280:21
**publish** [1] - 317:16
**published** [4] - 310:25, 316:6, 317:9, 331:21
**publishing** [1] - 318:4
**purchase** [5] - 241:18, 268:7, 269:15, 272:2, 272:3
**purchases** [1] - 230:24
**purchasing** [2] - 269:13, 269:21
**pure** [1] - 224:7
**purpose** [11] - 220:7, 220:10, 220:15, 220:18, 224:4, 238:15, 243:15, 271:16, 281:10, 299:3, 322:15
**purposes** [10] - 219:16, 225:7, 225:21, 227:20, 256:12, 256:19, 264:10, 284:15, 295:5, 311:21
**pursued** [1] - 304:14
**put** [15] - 232:17, 236:1, 258:25, 264:14, 265:6, 273:18, 275:25, 286:7, 288:13, 291:6, 299:14, 304:19, 307:6, 307:19, 327:11

**puts** [1] - 267:12
**putting** [1] - 286:9

## Q

**qualified** [1] - 320:12
**quash** [1] - 329:16
**questioning** [1] - 319:25
**questions** [15] - 227:2, 231:16, 274:25, 281:11, 286:13, 287:11, 298:19, 307:20, 309:20, 312:5, 312:10, 318:8, 318:17, 320:8, 332:16
**quick** [3] - 279:9, 309:20, 332:22
**quite** [7] - 222:16, 262:23, 264:24, 276:17, 283:12, 324:13, 330:10
**quotation** [1] - 247:10
**quote** [1] - 266:7
**quote-unquote** [1] - 266:7

## R

**raise** [4] - 225:1, 234:17, 236:15, 242:12
**raising** [2] - 228:4, 254:3
**Ramirez** [2] - 247:6, 247:11
**ran** [3] - 260:16, 289:8, 289:24
**RANDOLPH** [1] - 214:8
**rapidly** [2] - 231:5, 279:7
**rare** [3] - 240:4, 276:20, 276:22
**rate** [6] - 272:10, 272:11, 290:2, 290:10, 290:11, 290:14
**rates** [6] - 272:10, 310:24, 315:19, 316:18, 324:18, 324:22
**rather** [2] - 243:15, 276:22
**rating** [1] - 219:2
**reach** [1] - 266:16
**reaching** [1] - 259:3
**Reactor** [3] - 272:10, 273:2, 274:15

**Reactor's** [1] - 333:25
**read** [6] - 219:4, 293:13, 293:19, 303:16, 305:12, 324:13
**readily** [1] - 232:24
**reading** [3] - 221:10, 221:11, 248:20
**ready** [1] - 306:5
**real** [3] - 230:7, 274:5, 327:5
**realistically** [1] - 264:18
**really** [25] - 233:5, 238:25, 240:6, 240:24, 241:2, 242:6, 264:25, 267:18, 269:10, 269:23, 274:19, 276:22, 296:12, 296:13, 298:15, 299:1, 309:8, 314:20, 315:12, 320:7, 320:9, 320:12, 321:8, 325:23
**reanalyze** [1] - 317:6
**reason** [11] - 222:22, 261:1, 262:4, 262:5, 274:4, 281:25, 291:2, 300:1, 315:21, 316:5, 325:8
**reasonable** [7] - 220:3, 224:12, 224:16, 226:16, 227:17, 229:19, 243:20
**reasonableness** [1] - 225:2
**reasoning** [2] - 249:11, 249:13
**reasons** [10] - 220:17, 232:11, 248:23, 253:6, 262:20, 266:11, 271:9, 271:14, 280:22, 326:25
**recalling** [2] - 216:19, 242:21
**recapitulate** [1] - 243:19
**receipt** [1] - 259:6
**receive** [1] - 229:12
**received** [3] - 229:2, 289:10, 313:8
**receiving** [1] - 229:8
**recent** [3] - 271:16, 291:5, 307:25
**recently** [4] - 256:18, 275:18, 284:17,

321:8
**recess** [1] - 302:6
**Recess** [1] - 242:19
**recollection** [1] - 222:10
**record** [4] - 216:5, 302:20, 322:20, 333:5
**recorded** [1] - 254:13
**records** [23] - 219:16, 219:20, 220:7, 220:20, 221:17, 221:19, 221:22, 221:25, 222:3, 222:11, 223:12, 223:17, 226:4, 226:18, 226:21, 226:23, 226:25, 262:3, 299:7, 302:11, 308:2, 308:3, 326:2
**recounting** [1] - 251:9
**recounts** [1] - 250:21
**redirect** [3] - 301:21, 312:6, 312:7
**Redirect** [1] - 215:6
**REDIRECT** [2] - 227:5, 312:14
**redirecting** [1] - 269:10
**reduce** [1] - 248:17
**reemphasize** [1] - 323:8
**refer** [5] - 252:17, 263:4, 276:11, 295:10, 296:17
**reference** [3] - 218:16, 308:13, 318:18
**referenced** [7] - 218:4, 220:5, 221:8, 239:23, 246:20, 295:19
**references** [1] - 248:8
**referencing** [1] - 292:5
**referred** [2] - 278:16, 305:23
**referring** [5] - 262:10, 286:15, 303:10, 305:6, 308:17
**refers** [1] - 239:21
**reflect** [2] - 219:21, 219:22
**reflects** [2] - 219:25, 220:2
**regard** [7] - 227:12, 253:7, 254:13, 279:12, 279:13, 284:1, 292:13
**regarding** [10] - 220:24, 228:1,

251:2, 251:15, 252:3, 274:14, 277:5, 307:7, 309:13, 329:24

**regardless** [1] - 263:20

**regards** [1] - 325:15

**Regional** [2] - 232:15, 234:24

**regional** [1] - 262:24

**register** [6] - 269:15, 270:6, 270:25, 271:4, 271:15, 271:23

**registered** [8] - 221:22, 268:13, 270:22, 270:25, 271:5, 271:6, 271:18, 271:20

**registering** [2] - 270:4, 270:7

**registration** [5] - 241:19, 268:7, 268:11, 269:13, 269:16

**registries** [1] - 269:1

**regular** [2] - 313:20, 314:9

**regularly** [1] - 316:9

**reiterate** [2] - 235:6, 302:14

**relate** [1] - 251:22

**related** [7] - 222:21, 229:19, 249:25, 251:8, 295:14, 295:23, 315:7

**relating** [8] - 249:22, 250:17, 255:16, 277:7, 277:10, 279:16, 330:18, 332:16

**relation** [4] - 241:6, 267:20, 320:4, 325:17

**relative** [1] - 230:18

**release** [2] - 245:10, 297:24

**released** [2] - 262:6, 273:17

**relevant** [7] - 317:1, 325:12, 325:18, 325:25, 326:9, 326:12, 330:2

**reliability** [4] - 272:20, 273:1, 279:16, 279:25

**reliable** [5] - 260:7, 272:13, 272:15, 317:15, 317:18

**reliance** [2] - 220:3,

220:18

**relied** [6] - 220:20, 262:4, 297:17, 298:12, 299:8, 330:4

**relies** [1] - 256:1

**rely** [9] - 219:15, 219:19, 220:7, 220:10, 220:16, 262:4, 311:4, 311:5

**relying** [8] - 220:15, 226:24, 244:2, 301:8, 301:9, 301:12, 304:22, 318:17

**remaining** [1] - 309:10

**remark** [1] - 295:16

**remarking** [2] - 295:13, 295:18

**remember** [10] - 221:20, 221:24, 223:20, 223:21, 268:23, 304:5, 307:21, 311:1, 315:14

**remind** [2] - 234:21, 290:23

**reminded** [1] - 290:5

**render** [3] - 262:7, 283:11, 284:10

**rendering** [1] - 282:1

**repaired** [2] - 316:19, 316:25

**repairs** [1] - 285:20

**repeated** [1] - 311:8

**repeatedly** [1] - 317:24

**repeats** [1] - 306:19

**rephrase** [1] - 269:14

**replicate** [3] - 261:23, 263:22, 264:18

**report** [20] - 228:23, 237:16, 237:20, 241:20, 291:14, 291:24, 294:10, 301:1, 309:8, 319:14, 319:21, 319:22, 319:23, 321:11, 321:18, 321:21, 322:2, 322:5, 330:4, 330:22

**report-worthy** [1] - 291:24

**REPORTER** [2] - 254:21, 335:1

**Reporter** [3] - 214:21, 214:21, 335:10

**reporter** [1] - 241:1

**reporting** [4] - 218:10, 228:16, 246:1, 246:3

**reports** [10] - 238:8,

239:23, 240:16, 241:12, 290:20, 290:22, 291:1, 320:4, 322:7

**representation** [2] - 250:12, 250:13

**Representatives** [1] - 219:8

**represented** [5] - 246:8, 250:7, 251:5, 251:18, 323:25

**representing** [1] - 282:4

**reputable** [2] - 318:5, 318:7

**request** [12] - 245:16, 247:1, 247:16, 249:25, 250:19, 251:8, 253:2, 253:7, 284:19, 329:9, 329:20, 332:8

**requested** [2] - 325:14, 329:6

**requesting** [1] - 294:5

**requests** [8] - 244:9, 244:17, 245:13, 250:17, 251:10, 251:22, 251:23, 252:24

**require** [6] - 254:19, 263:7, 267:7, 282:22, 294:3, 332:7

**required** [2] - 220:5, 263:8

**requirement** [3] - 246:1, 246:4, 250:13

**requirements** [5] - 281:13, 281:16, 282:12, 282:13, 283:15

**requires** [2] - 250:3, 266:15

**resembles** [1] - 251:12

**Reserve** [4] - 219:7, 219:8, 219:10, 219:11

**resign** [1] - 231:11

**resists** [1] - 248:20

**resolve** [2] - 250:16, 332:2

**resolves** [2] - 270:4, 270:6

**resources** [10] - 237:22, 237:24, 241:25, 242:5, 263:21, 264:10, 264:16, 278:18, 280:16, 284:4

**respect** [12] - 232:1,

244:8, 244:10, 245:17, 248:25, 249:8, 251:3, 251:16, 251:20, 253:9, 332:10, 333:20

**respects** [2] - 247:16, 247:25

**respond** [3] - 239:18, 243:25, 284:25

**responded** [1] - 286:1

**responder** [1] - 328:12

**response** [6] - 237:6, 284:22, 285:13, 285:17, 286:1, 286:3

**rest** [5] - 282:23, 283:7, 291:17, 306:19, 320:22

**restricted** [1] - 232:15

**restricting** [1] - 232:21

**result** [5] - 225:11, 233:19, 265:22, 265:23, 316:24

**results** [2] - 317:2, 317:11

**resume** [3] - 216:20, 219:9, 312:8

**resurrect** [1] - 290:7

**retained** [2] - 321:9, 330:24

**retired** [2] - 257:4, 285:19

**retrial** [1] - 243:6

**return** [2] - 234:8, 259:6

**returning** [3] - 232:19, 233:4, 235:15

**reveal** [1] - 277:18

**review** [22] - 224:21, 226:4, 227:8, 232:17, 243:13, 261:13, 274:11, 277:4, 283:15, 290:16, 293:3, 302:11, 304:11, 310:12, 315:19, 315:22, 321:21, 321:23, 327:15, 328:6, 328:10, 328:17

**reviewed** [26] - 221:17, 221:19, 221:22, 221:25, 222:13, 223:4, 223:6, 223:8, 223:11, 223:12, 223:17, 228:14, 266:10, 280:1, 287:4, 297:25, 302:24, 306:23,

309:8, 310:1, 310:11, 310:25, 311:17, 315:14, 315:17

**reviewing** [9] - 222:2, 223:21, 226:18, 276:19, 286:25, 288:2, 288:4, 288:6, 321:13

**rife** [1] - 274:23

**rightfully** [1] - 279:1

**risk** [1] - 333:16

**RMR** [2] - 214:21, 335:9

**Road** [1] - 241:10

**robust** [1] - 227:16

**role** [2] - 245:7, 321:2

**Roman** [8] - 216:3, 216:13, 221:23, 222:3, 222:12, 223:9, 238:24, 242:22

**ROMAN** [1] - 214:5

**Roman's** [2] - 227:19, 229:16

**room** [3] - 235:21, 235:24, 307:13

**Room** [2] - 214:22, 335:10

**Roso** [1] - 221:18

**roughly** [4] - 257:3, 258:12, 266:1, 276:3

**routinely** [1] - 244:17

**Rule** [5] - 242:25, 243:10, 284:15, 291:4, 324:8

**rule** [2] - 244:13, 249:15

**ruling** [1] - 249:5

**run** [5] - 258:14, 265:21, 281:13, 281:23

**running** [6] - 219:7, 229:12, 229:17, 246:22, 251:25, 269:17

## S

**sad** [1] - 299:25

**sadly** [1] - 289:16

**safe** [1] - 296:20

**sake** [1] - 309:4

**San** [2] - 294:17, 294:21

**sandbagging** [1] - 234:5

**Sanford** [3] - 244:16, 249:13, 249:14

**Sara** [1] - 274:9

| | | | | |
|---|---|---|---|---|
| Sarah [1] - 228:15 | 254:25, 255:1, | service [2] - 229:2, | 283:18 | 318:2, 318:5, |
| satellite [1] - 256:15 | 263:20, 264:23, | 229:8 | simplest [2] - 258:6, | 325:19, 325:20 |
| sauce [1] - 258:6 | 266:18, 266:23, | Service [5] - 233:12, | 260:25 | soil [2] - 247:21, 248:3 |
| saved [1] - 254:16 | 267:14, 273:8, | 233:16, 233:21, | simplified [3] - 285:2, | sold [1] - 270:8 |
| saving [1] - 275:17 | 274:5, 275:8, | 234:13, 235:12 | 285:4, 285:7 | solution [2] - 233:8, |
| saw [1] - 282:23 | 276:20, 283:8, | services [3] - 255:13, | simplifying [1] - | 328:25 |
| scamming [1] - 316:7 | 284:18, 286:4, | 259:20, 268:13 | 285:14 | someone [17] - |
| scams [1] - 218:21 | 288:25, 289:14, | set [10] - 227:9, 233:3, | simply [19] - 231:3, | 224:23, 225:3, |
| schedule [2] - 236:17, | 292:14, 298:24, | 249:14, 256:16, | 240:5, 240:12, | 226:11, 226:12, |
| 241:21 | 299:16, 299:17, | 256:22, 269:6, | 249:15, 257:25, | 231:14, 234:3, |
| scheme [2] - 248:2, | 299:19, 299:22, | 307:13, 327:7, | 265:5, 270:3, 270:7, | 234:14, 259:22, |
| 248:15 | 300:13, 300:16, | 328:7, 328:16 | 271:21, 272:4, | 260:2, 269:10, |
| Scholl [3] - 241:12, | 300:19, 300:21, | sets [1] - 299:6 | 273:5, 280:6, | 269:24, 289:12, |
| 241:20, 331:13 | 303:6, 305:17, | settings [4] - 226:14, | 283:19, 286:1, | 304:7, 304:23, |
| Scholl's [1] - 237:20 | 306:14, 306:16, | 226:15, 226:20, | 293:1, 295:19, | 320:16, 324:24, |
| science [4] - 279:2, | 306:19, 309:2, | 226:25 | 298:9, 298:25, 327:1 | 327:3 |
| 294:4, 294:6, 324:2 | 309:3, 310:3, 312:8, | several [3] - 250:16, | single [11] - 225:15, | sometime [2] - |
| scientific [1] - 273:20 | 317:21, 321:25, | 276:1, 281:20 | 225:25, 226:5, | 279:21, 286:19 |
| scientifically [3] - | 323:23, 327:8, | sexual [1] - 276:15 | 226:19, 237:12, | sometimes [2] - |
| 273:23, 283:10, | 329:13, 330:5, | share [1] - 260:20 | 261:6, 282:8, | 284:25, 306:14 |
| 298:15 | 331:19, 333:3 | shared [3] - 255:25, | 308:16, 308:17, | somewhat [2] - |
| SCIF [1] - 265:2 | seeing [4] - 222:9, | 259:23, 260:18 | 324:1, 325:16 | 254:17, 275:19 |
| scope [2] - 245:17, | 223:21, 223:23, | sharing [5] - 259:24, | single-person [1] - | somewhere [4] - |
| 306:12 | 284:9 | 261:9, 261:10, | 282:8 | 288:8, 288:19, |
| scratch [1] - 267:19 | seem [1] - 289:14 | 268:18, 268:19 | sit [2] - 223:19, 313:7 | 307:11, 331:21 |
| screen [1] - 275:14 | Sefranek [3] - 214:21, | ship [2] - 286:7, 286:8 | site [3] - 268:8, | son [2] - 229:22, 257:4 |
| seal [1] - 287:8 | 335:9, 335:9 | shooting [3] - 256:21, | 283:23, 306:7 | soon [1] - 323:3 |
| search [1] - 240:15 | SEFRANEK [1] - | 256:23 | site-specific [1] - | sorry [8] - 217:5, |
| second [5] - 222:22, | 335:3 | shopping [1] - 267:1 | 306:7 | 239:16, 264:11, |
| 239:16, 282:15, | seized [1] - 276:19 | short [3] - 298:9, | sites [1] - 268:3 | 269:14, 292:19, |
| 297:7, 323:16 | sell [2] - 269:7, 270:1 | 301:21, 313:10 | situation [2] - 236:12, | 297:7, 303:21, |
| secondary [1] - | seminars [5] - 313:3, | shortened [1] - 279:7 | 321:8 | 319:15 |
| 256:10 | 313:5, 313:6, 313:7, | shortly [1] - 242:17 | six [1] - 232:11 | sort [31] - 230:4, |
| SecondWave [4] - | 313:8 | show [2] - 267:15, | six-hour [1] - 232:11 | 230:7, 234:7, |
| 255:10, 255:13, | send [10] - 258:20, | 320:19 | size [1] - 229:18 | 254:15, 259:9, |
| 255:14, 315:10 | 258:22, 259:1, | showing [1] - 295:17 | sleep [2] - 234:22, | 262:22, 263:12, |
| secondWave [1] - | 262:14, 270:7, | shown [3] - 292:15, | 235:1 | 264:24, 269:7, |
| 255:12 | 270:11, 270:18, | 300:22, 301:10 | slightly [2] - 265:7, | 274:23, 277:13, |
| secret [1] - 258:6 | 323:18, 332:24, | sic [1] - 221:18 | 323:8 | 278:2, 279:15, |
| Section [3] - 250:5, | 332:25 | side [2] - 239:17, | slipping [1] - 321:2 | 282:3, 282:7, 283:1, |
| 252:9, 252:14 | sends [1] - 286:17 | 249:8 | slowed [1] - 277:13 | 285:19, 289:16, |
| sector [1] - 280:3 | sense [2] - 249:7, | sign [5] - 280:11, | slower [1] - 240:25 | 290:25, 298:17, |
| secure [2] - 296:14, | 274:1 | 293:4, 293:6, 293:7, | slowing [1] - 242:1 | 298:18, 305:5, |
| 296:15 | sensitive [5] - 271:10, | 293:12 | smaller [3] - 263:14, | 305:15, 306:5, |
| security [11] - 219:10, | 327:6, 327:10, | signal [2] - 293:7, | 275:23, 276:2 | 314:9, 314:15, |
| 226:14, 226:20, | 327:14, 332:12 | 293:14 | smart [1] - 290:6 | 316:10, 316:18, |
| 248:23, 265:2, | sensor [1] - 256:22 | signature [1] - 290:25 | smuggle [1] - 236:3 | 317:14, 318:12, |
| 267:11, 267:12, | sent [3] - 223:24, | signed [3] - 280:18, | soft [1] - 234:7 | 328:10 |
| 296:12, 296:16, | 327:2, 333:5 | 292:24, 319:12 | software [30] - 266:18, | sorts [2] - 237:24, |
| 296:17, 296:20 | separate [2] - 295:3, | significant [6] - | 272:14, 272:15, | 266:11 |
| see [64] - 222:14, | 334:1 | 224:20, 232:9, | 272:17, 272:21, | soul [1] - 275:17 |
| 228:19, 228:21, | separated [1] - 288:5 | 232:20, 247:16, | 273:1, 273:2, 273:4, | soul-saving [1] - |
| 229:7, 229:9, | September [1] - | 280:25, 298:12 | 273:5, 273:11, | 275:17 |
| 229:20, 231:25, | 322:23 | signing [2] - 293:18, | 273:16, 277:23, | sound [3] - 227:11, |
| 233:2, 233:13, | series [1] - 268:6 | 318:13 | 311:9, 311:14, | 280:2, 298:25 |
| 233:20, 234:9, | serious [1] - 279:24 | Silk [1] - 241:9 | 311:25, 315:20, | sounds [1] - 280:5 |
| 235:1, 235:19, | serve [1] - 258:23 | similar [3] - 258:15, | 316:13, 316:20, | source [27] - 229:13, |
| 235:20, 241:11, | server [1] - 270:21 | 269:22, 282:21 | 317:1, 317:2, 317:5, | 245:21, 250:9, |
| 242:17, 246:24, | servers [2] - 290:17, | similarly [1] - 285:6 | 317:12, 317:15, | 273:13, 273:16, |
| 253:16, 253:19, | 327:13 | simple [2] - 251:13, | 317:23, 318:1, | 298:4, 310:1, |

310:13, 311:17, 312:1, 312:2, 315:14, 315:17, 315:19, 315:22, 323:15, 323:20, 323:21, 324:13, 324:17, 325:23, 329:1, 329:3, 329:12, 332:6, 333:18, 333:25

**sources** [2] - 221:8, 295:21

**Southwest** [1] - 261:10

**speaking** [7] - 255:17, 258:18, 275:8, 275:12, 283:10, 285:4, 296:2

**special** [1] - 266:15

**specialized** [3] - 220:24, 254:19, 284:21

**specialty** [1] - 285:12

**specific** [36] - 218:4, 219:1, 220:10, 220:15, 220:20, 220:22, 221:14, 221:21, 223:20, 226:8, 226:15, 226:21, 239:1, 239:24, 250:24, 263:21, 278:1, 278:8, 282:19, 284:13, 284:24, 285:6, 293:20, 297:17, 298:3, 299:6, 301:13, 302:19, 306:7, 313:8, 322:4, 322:9, 327:16, 329:9

**specifically** [34] - 218:22, 221:16, 224:1, 225:8, 225:18, 226:24, 239:25, 264:13, 265:18, 268:12, 278:3, 279:12, 280:13, 281:8, 281:9, 281:22, 286:14, 287:22, 288:8, 291:3, 292:4, 292:13, 295:14, 296:23, 299:18, 301:2, 302:12, 305:25, 307:23, 313:20, 314:5, 314:18, 315:21, 326:10

**specifics** [2] - 248:10, 331:17

**specified** [9] - 245:22, 245:24, 246:7, 246:9, 250:7, 250:10, 250:11, 251:5, 251:19

**speculate** [1] - 225:19

**speculation** [1] - 224:7

**spend** [1] - 237:21

**spending** [1] - 237:24

**spent** [2] - 288:2, 321:13

**spinning** [1] - 309:5

**spoken** [1] - 308:19

**spoofing** [1] - 257:14

**sprawling** [1] - 249:18

**spreadsheet** [2] - 308:3, 321:16

**Squad** [1] - 314:4

**staffed** [1] - 262:25

**staffing** [7] - 281:13, 281:16, 281:23, 282:2, 282:12, 282:13, 283:14

**stand** [4] - 216:20, 290:6, 311:4, 317:6

**standard** [4] - 219:24, 220:2, 240:18, 274:3

**standards** [4] - 219:25, 220:3, 220:4, 314:22

**standing** [1] - 253:18

**standpoint** [2] - 257:19, 282:8

**stands** [1] - 258:8

**start** [3] - 250:1, 286:25, 290:5

**started** [4] - 229:23, 255:22, 256:4, 276:7

**starting** [2] - 216:5, 242:9

**startles** [1] - 272:23

**state** [7] - 216:4, 226:25, 235:3, 246:1, 254:9, 281:20, 312:18

**statement** [12] - 237:12, 241:23, 243:1, 245:8, 248:12, 250:18, 252:7, 252:16, 260:9, 285:17, 295:22, 297:22

**statements** [1] - 241:4

**States** [18] - 214:22, 216:3, 216:7, 235:12, 242:22, 243:7, 243:14, 243:22, 244:3, 244:16, 244:24,

244:25, 245:2, 246:14, 247:6, 249:13, 259:3, 326:7

**states** [5] - 252:13, 261:18, 281:12, 283:22, 301:1

**STATES** [3] - 214:1, 214:2, 214:8

**stating** [2] - 282:10, 282:12

**statistical** [1] - 272:10

**status** [1] - 233:20

**statute** [4] - 241:6, 241:9, 252:11, 252:14

**stay** [1] - 314:14

**stealing** [1] - 226:2

**stenographic** [1] - 335:5

**step** [3] - 242:12, 250:21

**step-by-step** [1] - 250:21

**Sterlingov** [30] - 216:3, 216:13, 221:23, 222:12, 226:1, 229:2, 230:5, 230:25, 231:3, 234:20, 238:24, 242:22, 244:5, 244:9, 245:6, 245:14, 245:22, 246:12, 250:23, 252:5, 252:13, 252:17, 253:10, 253:11, 268:6, 290:9, 292:3, 294:8, 295:15, 323:2

**STERLINGOV** [1] - 214:5

**Sterlingov's** [18] - 222:4, 222:14, 223:9, 224:4, 228:5, 245:10, 247:1, 249:25, 250:17, 250:18, 251:2, 251:8, 251:15, 251:22, 252:10, 252:20, 252:24, 295:2

**Steve** [1] - 313:1

**still** [17] - 222:16, 227:17, 233:14, 237:22, 239:11, 257:6, 263:15, 263:24, 284:9, 284:12, 293:3, 300:12, 303:23, 305:15, 305:16, 320:6

**Still** [1] - 319:15

**still's** [2] - 319:14, 321:7

**sting** [3] - 250:21, 251:3, 251:16

**stipulation** [1] - 290:19

**stolen** [1] - 277:21

**storage** [2] - 287:10

**store** [1] - 256:17

**story** [3] - 229:22, 260:16, 313:1

**straining** [1] - 241:11

**streamline** [1] - 329:13

**Street** [2] - 214:11, 214:17

**street** [1] - 285:25

**strive** [1] - 322:25

**studied** [1] - 310:25

**study** [1] - 225:5

**stuff** [4] - 217:7, 242:4, 309:11, 320:2

**subject** [10] - 218:19, 218:20, 219:3, 219:4, 219:12, 274:3, 287:2, 318:22, 329:4, 330:1

**submit** [2] - 319:12, 322:2

**submitted** [1] - 311:3

**subpoena** [1] - 258:23

**subset** [3] - 297:17, 307:24, 327:12

**substance** [3] - 281:11, 291:25, 292:22

**substantial** [4] - 230:24, 276:13, 276:16, 324:6

**substantially** [2] - 278:15, 281:21

**subtle** [1] - 286:13

**success** [1] - 230:3

**succinct** [1] - 224:10

**suddenly** [2] - 271:4, 296:4

**suffered** [1] - 302:25

**suffice** [1] - 298:20

**suffices** [1] - 290:9

**sufficient** [8] - 222:17, 238:2, 240:18, 242:25, 243:24, 253:4, 253:5, 289:3

**sufficiently** [1] - 253:2

**suggest** [3] - 231:13, 252:18, 320:5

**suggesting** [3] - 224:25, 225:25, 328:11

**sum** [1] - 221:10

**super** [1] - 324:5

**super-talented** [1] - 324:5

**superseding** [6] - 238:6, 238:18, 239:2, 239:21, 240:14, 244:6

**supervisors** [2] - 326:21, 328:21

**supplemental** [2] - 245:9, 274:7

**support** [4] - 229:6, 247:11, 249:11, 252:25

**supporting** [2] - 239:4, 331:7

**suppose** [2] - 303:15, 316:1

**supposed** [3] - 308:22, 322:7, 326:4

**surmise** [1] - 272:19

**surprise** [3] - 248:17, 258:9, 320:25

**surprised** [1] - 288:1

**suspect** [1] - 323:1

**swear** [1] - 253:25

**sweep** [1] - 247:13

**sweeping** [1] - 247:13

**swimming** [1] - 242:4

**switch** [1] - 253:18

**switched** [1] - 258:17

**switches** [1] - 258:13

**switching** [1] - 266:2

**sworn** [1] - 254:4

**synonymous** [1] - 273:12

**system** [5] - 256:19, 291:11, 296:7, 310:9

**systems** [4] - 309:23, 310:2, 310:13, 310:24

## T

**tainted** [1] - 292:2

**talented** [1] - 324:5

**TAMARA** [1] - 335:3

**Tamara** [3] - 214:21, 335:9, 335:9

**tap** [1] - 278:18

**task** [1] - 300:17

**tax** [1] - 224:22

**team** [4] - 264:19, 284:5, 291:18, 300:2

**teams** [1] - 248:9

**tech** [1] - 315:17

**Technical** [1] - 301:15

**technical** [1] - 276:24

**techniques** [1] - 279:5

technology [1] - 275:17

telegraphing [1] - 320:10

telephone [2] - 258:12, 258:14

television [1] - 261:7

ten [1] - 272:6

tend [3] - 263:4, 276:11, 291:19

tends [2] - 254:17, 267:9

tens [2] - 261:12, 327:9

terabytes [1] - 242:4

term [8] - 266:8, 266:10, 276:24, 289:15, 297:10, 297:16, 314:6

terminology [1] - 266:11

terms [24] - 237:15, 241:5, 252:18, 252:24, 254:11, 258:6, 261:19, 264:21, 275:24, 277:18, 277:19, 279:2, 281:4, 282:2, 282:21, 288:6, 296:20, 297:3, 305:14, 313:6, 313:25, 314:8, 315:24, 316:6

Tesla [2] - 230:9, 230:23

test [1] - 317:3

tested [5] - 257:6, 261:2, 264:22, 273:6, 273:9

testified [10] - 217:8, 259:9, 272:8, 275:24, 277:7, 277:19, 297:13, 303:7, 305:19, 306:23

testify [14] - 277:4, 277:10, 277:14, 281:13, 281:21, 282:13, 283:22, 296:21, 297:1, 297:11, 297:23, 305:9, 305:11, 320:13

testifying [5] - 301:4, 301:6, 320:11, 325:2, 330:24

testimonies [1] - 288:11

testimony [26] - 216:20, 219:14,

227:21, 238:20, 240:16, 264:5, 279:7, 287:7, 287:25, 289:4, 289:5, 289:6, 291:20, 293:16, 294:7, 294:24, 295:12, 298:9, 303:10, 306:6, 317:5, 321:1, 321:14, 322:8, 324:10, 326:10

testing [2] - 273:6, 281:4

THE [138] - 214:1, 214:1, 214:8, 216:2, 216:8, 216:11, 216:15, 216:21, 216:23, 225:10, 225:11, 227:4, 230:4, 230:6, 230:9, 230:11, 230:12, 230:13, 230:15, 230:16, 230:21, 231:17, 231:25, 232:7, 232:13, 233:12, 234:11, 234:16, 234:18, 234:19, 235:4, 235:9, 235:22, 236:9, 236:12, 236:14, 236:20, 237:2, 238:14, 239:10, 240:19, 240:22, 240:25, 242:7, 242:11, 242:17, 242:21, 242:23, 253:20, 253:23, 253:25, 254:2, 254:5, 254:21, 254:23, 255:4, 275:1, 275:10, 275:11, 292:19, 292:21, 292:23, 293:5, 294:5, 294:14, 294:15, 294:16, 294:19, 294:20, 295:1, 295:7, 295:8, 297:7, 297:8, 299:14, 299:18, 300:6, 301:16, 301:20, 301:23, 302:1, 302:3, 302:4, 302:7, 304:19, 305:4, 307:9, 307:12, 309:4, 312:6, 312:12, 313:3, 313:5, 313:13, 318:9, 318:19, 318:25,

319:5, 319:8, 319:10, 319:11, 319:22, 320:7, 321:6, 321:19, 322:6, 323:1, 323:11, 323:16, 323:20, 323:22, 324:1, 324:6, 324:10, 324:23, 325:9, 325:21, 326:3, 326:15, 326:25, 327:8, 327:20, 328:8, 328:14, 328:23, 329:6, 329:11, 329:18, 330:7, 330:23, 331:10, 331:16, 331:19, 331:22, 332:25, 333:10, 334:2, 334:4

theft [2] - 277:20, 278:4

themselves [1] - 271:13

theoretically [1] - 286:4

theory [1] - 331:2

therefore [4] - 244:17, 245:13, 282:21, 330:15

they've [7] - 232:15, 240:7, 263:24, 310:23, 311:22, 316:25, 329:16

third [8] - 224:3, 225:17, 225:20, 226:6, 327:6, 327:18

third-party [5] - 224:3, 226:6, 327:6, 327:18

third-party's [1] - 225:17

thoroughly [1] - 251:13

thoughts [1] - 242:14

thousands [5] - 260:20, 261:11, 261:12, 275:20, 327:9

three [3] - 242:4, 260:4, 321:17

tightened [1] - 284:16

time-consuming [1] - 263:16

timeline [1] - 322:18

timer [1] - 290:5

timestamp [1] - 308:13

timing [4] - 277:12, 294:9, 318:14, 319:11

today [18] - 225:16, 249:5, 256:14, 258:14, 259:15, 296:5, 306:5, 306:9, 308:12, 309:11, 310:23, 313:12, 314:6, 315:3, 318:10, 318:18, 321:14, 321:25

today's [2] - 289:3, 314:22

together [5] - 275:25, 284:5, 288:13, 289:1, 331:24

tomorrow [1] - 323:18

ton [1] - 241:25

took [6] - 236:1, 291:20, 302:10, 306:1, 315:16, 319:24

tool [12] - 217:18, 218:5, 231:15, 243:13, 257:25, 266:23, 266:24, 267:4, 279:11, 279:15, 279:16, 280:14

toolkit [1] - 316:21

tools [21] - 217:12, 217:13, 263:21, 264:16, 266:15, 267:2, 267:8, 267:20, 270:11, 273:18, 273:22, 279:3, 279:4, 279:20, 279:25, 309:20, 310:19, 310:22, 311:13, 312:3, 325:5

top [6] - 221:24, 257:5, 259:19, 267:13, 307:23, 325:22

topic [4] - 217:15, 265:7, 272:7, 309:6

TOR [1] - 214:15

Tor [5] - 214:16, 216:12, 267:20, 267:23, 283:23

total [4] - 223:13, 223:14, 229:11, 229:17

totality [13] - 262:8, 280:13, 284:11, 297:20, 297:24, 299:19, 300:20, 300:21, 300:24, 307:6, 308:24, 310:16, 310:17

touched [3] - 323:6,

332:16, 333:20

touches [1] - 221:4

toward [1] - 217:24

trace [6] - 237:19, 237:20, 238:8, 239:24, 241:20, 293:8

traced [2] - 237:18

tracers [1] - 221:8

traces [3] - 237:24, 238:11, 241:18

tracing [12] - 217:11, 217:14, 217:15, 217:21, 218:1, 218:7, 233:2, 238:3, 240:8, 278:23, 279:11, 331:14

track [1] - 298:1

tracks [1] - 220:8

traditional [2] - 218:9, 267:10

traditionally [1] - 258:16

traffic [1] - 270:16

train [1] - 315:7

trained [2] - 280:19, 286:8

training [23] - 217:16, 217:17, 217:19, 217:22, 225:11, 255:17, 255:20, 255:22, 255:23, 280:25, 281:1, 313:3, 313:15, 313:16, 313:17, 313:19, 313:23, 313:24, 314:1, 314:11, 314:18, 314:24, 324:6

trainings [8] - 217:14, 217:16, 218:6, 218:8, 280:19, 313:21, 314:9, 314:10

transaction [14] - 223:8, 223:11, 223:21, 246:1, 246:3, 250:6, 250:22, 250:25, 251:3, 251:4, 251:7, 251:16, 251:17

transactions [9] - 224:5, 225:17, 226:7, 239:24, 241:13, 268:6, 282:4, 282:6, 283:16

transcript [2] - 335:4, 335:6

TRANSCRIPT [1] - 214:7

transfers [2] - 234:23, 252:6
transmission [3] - 252:1, 252:22, 256:11
transmitted [1] - 254:14
transmitting [3] - 246:13, 251:21, 251:23
travel [1] - 325:7
trial [20] - 235:3, 240:10, 247:4, 248:18, 248:19, 249:24, 253:13, 258:11, 277:13, 289:2, 290:16, 299:2, 303:11, 303:14, 303:19, 303:20, 303:22, 322:22, 323:3, 325:6
trials [1] - 232:21
trick [1] - 288:19
tried [1] - 280:10
triggers [1] - 263:7
trip [1] - 293:14
TRM [4] - 217:12, 217:20, 218:4, 280:20
trouble [1] - 254:21
true [9] - 229:7, 236:4, 239:19, 249:4, 252:23, 274:2, 282:15, 335:4, 335:5
trust [2] - 316:7, 324:19
trusted [1] - 273:16
try [12] - 233:3, 241:12, 258:1, 272:5, 286:18, 290:7, 308:10, 314:14, 319:6, 329:13, 332:2, 332:23
trying [12] - 232:3, 232:16, 236:3, 239:17, 285:5, 291:12, 293:8, 293:9, 306:25, 311:1, 314:7, 320:9
turn [7] - 228:14, 248:21, 265:7, 312:6, 315:12, 327:18, 332:7
turning [4] - 229:1, 255:5, 291:25, 295:23
turnover [1] - 282:3
turns [1] - 266:24
two [9] - 232:12,

263:5, 272:4, 274:7, 276:7, 289:25, 301:6, 302:24, 325:10
two-dimensional [1] - 263:5
type [4] - 251:12, 256:6, 270:17, 313:24
typed [1] - 287:17
types [3] - 269:10, 277:20, 313:15
typical [2] - 247:18, 247:24
typically [14] - 263:5, 263:12, 270:10, 272:4, 272:5, 273:21, 273:22, 276:20, 276:23, 278:5, 282:7, 313:18, 316:10, 317:8

## U

U.S [2] - 214:13, 329:22
U.S.C [3] - 250:5, 252:9, 252:14
uh-oh [1] - 317:24
ultimately [4] - 233:21, 234:13, 265:24, 311:20
unaccounted [1] - 230:8
uncertainty [2] - 274:20, 274:24
unclear [1] - 300:18
uncommon [1] - 247:8
under [17] - 220:4, 220:5, 221:23, 232:16, 233:17, 235:12, 241:8, 249:16, 250:5, 252:11, 252:13, 260:9, 264:15, 287:8, 290:15, 290:24, 333:14
underlying [1] - 246:10
understood [6] - 264:5, 294:14, 295:4, 321:5, 333:6, 334:1
unexpected [1] - 302:25
unfair [1] - 248:17
unfettered [1] - 264:7
unfortunately [7] - 279:21, 280:12,

307:12, 308:9, 312:21, 312:25, 313:1
unindicted [4] - 239:4, 239:8, 240:3, 240:5
unique [1] - 269:9
United [18] - 214:22, 216:3, 216:7, 235:12, 242:22, 243:7, 243:14, 243:22, 244:3, 244:15, 244:24, 244:25, 245:2, 246:14, 247:5, 249:12, 259:2, 326:7
UNITED [3] - 214:1, 214:2, 214:8
universe [1] - 331:23
unlawful [12] - 224:5, 245:23, 245:24, 246:7, 246:9, 250:7, 250:10, 250:11, 250:24, 251:1, 251:5, 251:19
unless [2] - 237:2, 242:11
unlicensed [4] - 246:13, 251:20, 251:23, 252:8
unlocked [1] - 280:14
unquote [1] - 266:7
unrelated [2] - 292:3, 295:11
unusual [1] - 289:11
up [33] - 228:3, 232:3, 233:3, 233:22, 234:13, 235:13, 255:25, 257:3, 259:12, 263:17, 265:6, 266:14, 266:20, 269:16, 274:4, 280:11, 280:18, 284:6, 288:14, 293:23, 295:10, 301:19, 301:24, 307:10, 307:14, 309:18, 312:23, 313:15, 315:12, 317:25, 319:6, 319:18, 333:1
updated [1] - 276:1
USAO [1] - 214:11
USAO-DOJ [1] - 214:11
useful [6] - 271:1, 280:6, 281:6, 298:23, 299:21, 319:7
user [2] - 261:3, 265:18

uses [3] - 261:19, 296:3, 317:22
utilize [2] - 298:13, 314:24

## V

vaguest [2] - 241:5, 241:15
valid [3] - 284:15, 304:9, 304:10
validate [1] - 263:23
validity [1] - 261:17
value [3] - 271:19, 298:16, 320:15
valued [1] - 230:18
vanity [2] - 269:8, 269:22
various [7] - 218:19, 223:22, 269:3, 277:22, 308:18, 313:8, 313:18
vast [3] - 271:6, 284:25, 313:11
vastly [1] - 282:22
vehicle [2] - 230:10, 230:12
vehicles [1] - 230:7
vendor [1] - 326:13
vendors [3] - 239:3, 239:22, 248:8
venues [1] - 224:18
verbal [1] - 294:21
verification [1] - 223:22
VERRET [3] - 215:3, 217:1, 227:6
Verret [13] - 216:19, 217:3, 217:5, 217:6, 217:8, 218:9, 227:8, 233:1, 303:7, 303:23, 319:21, 319:25
version [4] - 317:9, 318:12, 319:12, 322:2
versus [1] - 267:12
VIA [2] - 214:10, 214:16
victim [2] - 219:15, 226:1
victims [6] - 218:10, 218:14, 218:24, 244:20, 246:20
video [5] - 232:17, 233:3, 255:6, 256:15, 258:21
videos [1] - 266:25
view [4] - 249:2, 276:20, 322:12,

329:9
views [1] - 295:5
violent [1] - 276:15
Virginia [1] - 232:15
virtual [1] - 258:22
virtually [2] - 258:13, 332:1
vitae [1] - 312:8
voice [1] - 258:21
Volkswagen [2] - 316:4, 316:5
voluminous [10] - 238:19, 238:20, 242:1, 244:1, 245:11, 277:11, 283:13, 295:20, 312:22, 327:5
volunteer [1] - 278:7
VPNs [1] - 295:24
vs [1] - 214:4
vulnerabilities [1] - 273:9
vulnerability [2] - 264:1, 273:7

## W

waiting [1] - 217:23
Wall [1] - 214:17
wallets [1] - 277:24
Walsh [2] - 263:8, 265:1
wants [5] - 237:3, 269:25, 323:3, 327:12, 332:13
warning [1] - 231:8
warrant [2] - 240:15, 245:8
warrants [2] - 248:13, 304:10
Warsaw [1] - 232:15
Washington [10] - 214:5, 214:12, 214:14, 214:23, 262:15, 326:19, 326:20, 328:4, 328:20, 335:11
waste [1] - 288:24
watch [1] - 269:18
watches [1] - 256:16
watching [3] - 261:7, 271:4, 293:16
water [1] - 284:2
ways [4] - 258:15, 260:23, 260:24
wealth [1] - 240:17
web [8] - 266:8, 266:14, 266:21, 267:3, 267:4, 267:6, 267:21

**Web** [1] - 265:18
**website** [10] - 265:25, 266:1, 268:17, 269:11, 269:16, 270:18, 270:20, 280:10, 283:2, 296:5
**websites** [4] - 265:9, 265:12, 265:21, 266:4
**week** [4] - 286:19, 322:1, 328:18, 328:20
**weekly** [1] - 318:2
**weeks** [2] - 281:20, 321:17
**welcome** [4] - 309:11, 318:25, 319:4, 332:25
**well-demonstrated** [1] - 310:23
**WERE** [1] - 215:15
**West** [2] - 231:23, 263:2
**wheels** [1] - 309:5
**whereas** [1] - 328:20
**white** [2] - 274:8, 274:16
**whole** [4] - 236:6, 315:1, 322:15, 325:8
**Wi** [1] - 261:8
**Wi-Fi** [1] - 261:8
**Wide** [1] - 265:18
**wife** [3] - 265:23, 271:3, 293:10
**willing** [1] - 329:14
**Windows** [2] - 272:16, 309:23
**wireless** [1] - 254:14
**wise** [3] - 273:8, 330:7, 332:8
**wish** [1] - 279:12
**wishes** [2] - 319:19, 320:4
**WITNESS** [22] - 215:2, 225:11, 230:6, 230:11, 230:13, 230:16, 275:11, 292:21, 293:5, 294:14, 294:16, 294:20, 295:7, 297:8, 299:18, 302:3, 305:4, 307:12, 313:5, 318:19, 319:5, 319:10
**witness** [15] - 216:16, 227:3, 231:17, 231:19, 238:20, 242:8, 253:15, 253:17, 254:1, 254:4, 254:22, 275:6, 276:10, 276:12, 309:6
**witnessed** [1] - 317:5
**witnesses** [1] - 232:1
**wonderful** [1] - 284:4
**wondering** [1] - 327:21
**Word** [1] - 272:16
**word** [5] - 285:16, 286:12, 292:8, 293:21, 298:25
**words** [7] - 263:5, 266:25, 267:10, 284:18, 293:21, 297:12, 320:3
**works** [5] - 258:12, 259:7, 273:5, 286:7, 319:16
**World** [2] - 265:18, 271:4
**world** [1] - 259:15
**worth** [1] - 328:23
**worthy** [1] - 291:24
**wow** [1] - 229:25
**wrap** [1] - 309:18
**write** [2] - 290:22, 320:2
**writing** [2] - 290:24, 292:7
**written** [4] - 243:1, 281:18, 290:20, 291:14
**www.SecondWave. com** [1] - 270:17

## Y

**yachts** [1] - 229:24
**year** [12] - 266:1, 272:4, 276:3, 276:5, 276:7, 286:13, 286:22, 286:23, 287:3, 311:1, 317:7, 321:13
**year's** [1] - 224:22
**years** [12] - 219:9, 254:12, 256:2, 256:3, 263:17, 265:21, 273:21, 275:21, 276:1, 285:24, 289:24, 289:25
**yes-or-no** [2] - 298:20, 299:2
**yesterday** [11] - 217:8, 218:12, 218:16, 291:20, 306:4, 306:7, 307:2, 307:3, 307:5, 307:14, 308:11
**yesterday's** [3] - 287:7, 287:25, 293:16
**York** [3] - 214:17, 232:12, 332:3

## Z

**zealous** [1] - 238:23
**Zoom** [4] - 216:10, 216:14, 253:17, 253:19
**ZOOM** [2] - 214:10, 214:16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          ) Criminal Action
                                   ) No. 1:21-CR-0399
                Plaintiff,         )
                                   ) **MOTIONS HEARING**
vs.                                )
                                   ) Washington, D.C.
ROMAN STERLINGOV,                  ) **August 22, 2023**
                                   ) **Time:  10:05 A.M.**
                Defendant.         )

**TRANSCRIPT OF MOTIONS HEARING**
BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For the Plaintiff:     CHRISTOPHER BROWN
                       USAO-DOJ
                       601 D Street, NW
                       Washington, DC 20001

                       ALDEN PELKER
                       U.S. Department of Justice
                       950 Pennsylvania Avenue, NW
                       Washington, DC 20530

                       JEFFREY PEARLMAN
                       DOJ-CRM
                       U.S. Department of Justice
                       1301 New York Ave. NW
                       Washington, DC 20005

For the Defendant:     TOR EKELAND
                       MICHAEL HASSARD
                       Tor Ekeland Law, PLLC
                       30 Wall Street, 8th Floor
                       New York, NY 10005


Court Reporter:        Tamara M. Sefranek, RMR, CRR, CRC
                       Official Court Reporter
                       United States Courthouse, Room 6714
                       333 Constitution Avenue, NW
                       Washington, DC  20001
                       202-354-3246

I N D E X

| WITNESS | PAGE |
|---|---|

**JONELLE STILL**

Direct Examination
By Mr. Ekeland ..... 34

Cross-Examination
By Ms. Pelker ..... 137

| EXHIBITS ADMITTED | PAGE |
|---|---|

Defense Exhibit A ..... 37

Defense Exhibit B ..... 38

Defense Exhibit C ..... 39

Defense Exhibit D ..... 39

Government Exhibit 11 ..... 150

Government Exhibit 13 ..... 150

Government Exhibit 14 ..... 150

Government Exhibit 15 ..... 158

Government Exhibit 16 ..... 165

Government Exhibit 17 ..... 167

Government Exhibit 18 ..... 187

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Calling Criminal Case No. 21-399, United States of America v. Roman Sterlingov.

Counsel, please approach the podium and state your name for the record, starting with government counsel.

MS. PELKER:  Good morning, Your Honor.  Alden Pelker for the United States.

THE COURT:  Good morning.

MR. BROWN:  Good morning, Your Honor.  AUSA Chris Brown for the government.

THE COURT:  Good morning.

MR. PEARLMAN:  Jeff Pearlman for the government. Good morning, Your Honor.

THE COURT:  Good morning.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for Defendant Roman Sterlingov, who is present in court.

THE COURT:  Good morning.

MR. HASSARD:  Good morning, Your Honor.  Michael Hassard for Defendant Roman Sterlingov.

THE COURT:  Good morning to you as well.

So I have a number of things on my agenda for today in addition to the two witnesses.  First of all, let me just ask Mr. Ekeland whether you've had an opportunity to confer with the Marshals Service with respect to your concerns?

MR. EKELAND:  We had a phone call, Your Honor.  We're

still working things out with the Marshals Service. They asked us to send them an email regarding our attorney visits. So things are progressing. We still do not have full access to our client in terms of being able to visit him in an attorney room. He still does not have access to the discovery, which he had previously at the jail.

So there was a whole hard drive, as well as all his papers. He was not allowed to take them with him. I was informed by the U.S. Marshals that he needs to sign them over to us, and then we need to take them and bring them to him.

So we sent them an email. We're working on it, but as of yet, we still do not have full access to our client.

THE COURT: Okay. Well, let me know if there are difficulties. I know that the marshal is aware of the issue and is focused on making sure that you do have access to your client.

MR. EKELAND: Thank you, Your Honor.

THE COURT: Okay. Why don't we also take up the government's motion with respect to Rule 57.7. I don't know if anyone else -- if the government has anything else they want to add on that, or if the defense would like to be heard on that issue.

MR. BROWN: No, Your Honor. I think the pleadings speak for themselves, and I think that it's clear that -- the Court was very clear in its direction on June 16th as to Rule

57.7(b). And the defense counsel has continued to ignore that direction and continues to violate Rule 57.7(b).

THE COURT: Okay. Let me hear from the defense on that issue.

MR. EKELAND: Your Honor, we'd like to actually file a reply to the government's notice. But I would point out that it's our understanding of the standard in this district for 57(a) [sic] that it's anything that would reasonably interfere with the defendant's ability to get a fair trial.

THE COURT: I don't think it's just focused on the defendant's ability to get a fair trial. I think it's focused on the public's ability to have a fair trial as well.

MR. EKELAND: Absolutely, Your Honor. And we're talking about a Twitter account with about a thousand followers merely retweeting public commentary about this case, and we're not -- first of all, I'm not doing it.

I believe we're talking about Mr. Hassard's account, with Mr. Hassard retweeting public articles and commentary about this case.

THE COURT: And translating them into English in ways that U.S. reporters can read them.

MR. EKELAND: Well, this is a public case, Your Honor, and people are --

THE COURT: You're skating on very thin ice here, I have to say. Let me say this. I thought I was really clear

about this last time.

I don't understand how, frankly, Mr. Hassard can have done what he did in light of what I said last time here. It sort of boggles the mind, frankly. And the concern is not that it's just a thousand followers for a Twitter account.

As we get closer to trial, I have no doubt that there will be press attention on this case, and the press will look at Twitter accounts, and they will look at websites, public websites, and that could end up in the press in ways that could taint the jury pool. And so I think there's a very real risk of prejudice in this case.

The other thing I will say related to this is I don't understand, frankly, what you're doing raising money here because you're CJA counsel. I don't know if you read the CJA rules, but you either have to be CJA or not.

And if you want to -- if Mr. Sterlingov wants to give up his CJA status, that's fine. But you're not allowed to go out and get paid separately without some special approval, and then you get -- then you have to reimburse CJA for any funds that you receive in that process.

So the whole purpose of using this for purposes of raising funds I don't understand as well because I think it's in violation of the CJA rules. And you have to certify when you file your CJA vouchers that you're not receiving funds from other sources.

MR. EKELAND: We have not applied for -- beyond just getting transcripts in this case -- for that very reason, Your Honor, because CJA is incredibly inefficient, and we don't actually anticipate, even if we were to submit things, getting paid before this trial, which is the reason most people don't do CJA. So duly noted, Your Honor, but we're --

THE COURT: I think I need to know that, whether Mr. Sterlingov is proceeding CJA or not. If he wants to withdraw his CJA request, that's fine, but you can't do both. You can't say, well, I'm only seeking reimbursement for transcripts or doing some things and not others, and I'm reserving my right to CJA. He has to decide what he's doing here. You can't do both.

MR. EKELAND: Duly noted, Your Honor.

THE COURT: Okay. You should look at the rules. It says if you're seeking funding from other sources, you have to get Court approval for doing that.

MR. EKELAND: Yes, Your Honor. We were seeking funding before this. But it's duly noted, and I understand the Court's concern, and we will address it.

THE COURT: When can you file your response on the Rule 57 motion?

MR. EKELAND: We were planning on filing that on Friday, which is, basically, a week after they filed theirs.

THE COURT: I see that Mr. Brown is getting up. I'll

give him a chance.

MR. BROWN: If I may be heard, Your Honor. Your Honor, I think, given that a significant part of the government's concern is tainting the jury pool and, frankly, witness intimidation, calling our expert witness rats and parasites, it's --

THE COURT: It's completely unprofessional, in addition to the concerns you raise, I have to say.

MR. BROWN: Yes, Your Honor. I think we're also just concerned about the timeline here. At the June 16th hearing, the Court said I expect this to stop, and if it doesn't, I will enter the motion -- I will enter the proposed order and enforce it by contempt.

I don't think that there's -- I don't think that there's a need to stretch this out with full briefing, for them to file a reply, especially given that the clock is ticking, and the longer that these, frankly, despicable messages are up on Twitter continuing to taint the jury pool, continuing to be amplified by Twitter bots and the crypto press --

THE COURT: Are you asking that they be taken down at this point or just that they cease going forward?

MR. BROWN: Well, Your Honor, as long as they're up there, they're tainting the jury pool.

THE COURT: That wasn't my question. My question was, are you asking that they be taken down or just not posted

in the future?

MR. BROWN: I think it would be prudent for Mr. Hassard to take down those --

THE COURT: You're not asking the Court to order that he do so?

MR. BROWN: I think that Mr. Hassard has a preexisting duty under the local rules not to make those statements or authorize the release of such statements. And, yes, I think that if he doesn't take those down, he is in violation of the local rules, and I think that the Court should stand by its words and enforce the local rules.

THE COURT: Well, I --

MR. BROWN: Your Honor --

THE COURT: I try to stand by my word.

MR. BROWN: Yes, Your Honor. Part of this is the timing. You know, we are -- what? -- three and a half weeks out from trial. If we wait another week for the defense to file a pleading and maybe we want to file a reply and maybe we address this at the pretrial conference, by that point the jury is practically selected. The jury notices have gone out.

THE COURT: I think they're asking for three more days at this point, right? Defense is asking for three more days to file something?

MR. BROWN: Yes, Your Honor. But -- fair enough. The government would ask that the Court rule on the motion, you

know, with alacrity, because this is an ongoing issue of tainting the jury pool and witness intimidation.

THE COURT: What I'm going to do is I'm going to order that nothing else new be posted at this point, and that is an order enforceable by contempt. And you have an obligation to familiarize yourself with Rule 57.7(b) and make sure you're complying with it.

I will point out to you that Rule 57.7(b)(3)(vi) says that, from the time of arrest forward, a lawyer or law firm associated with the prosecution or defense shall not release or authorize the release of any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication relating to that matter and concerning, among other things, any opinion as to the accused guilt or innocence or as to the merits of the case or the evidence in the case.

I think it's pretty clear that rule has been violated here. And so I'm going to order that, going forward, no further material is made public or released or statements are made in a manner that violates Rule 57.7(b).

I will, in addition to pointing to the tweets, also direct that defense counsel look at the law firm website, which I think also contains material that may be in violation of that rule. I will wait to get the response from the defendant to decide whether I continue that order or modify it in some

respect and also to decide whether I direct at that point in time that any material that has already been posted be taken down.

All right. The other thing that I wanted to take up before we turn to the witnesses today is the Rule 17C motion, and I'm happy to be -- to hear from you on that as well. And since it's the defense motion, why don't I hear from the defense first on that.

Is the witness in the room? I don't know whether there's any issue about whether you want the witness excluded or not for this. It's up to you-all.

MR. BROWN: No, Your Honor. I don't think that's necessary.

THE COURT: Okay. That's fine. Mr. Ekeland.

MR. EKELAND: Your Honor, at this point, in terms of Chainalysis Reactor, the government can produce no evidence as to its scientific validity or accuracy. It cannot produce -- and it's clearly stated through Chainalysis's Elizabeth Bisbee herself, who, I believe, is the head of investigations for Chainalysis Global Investigations, that they have no known error rates, they can't tell us the rate of --

THE COURT: No. I've heard that argument from you.

MR. EKELAND: Your Honor --

THE COURT: -- many, many times. What I really want to get to is just the substance of this motion here. And I

understand the background to it, so you don't need to go through that again.

And the question is just what in particular is it that you need and why you need it. As I think both Chainalysis and the government noted in their responses, I did -- and I was pretty clear about the process that I intended to take place, and you didn't seem to follow that, where I said what I need is you to provide me with some statement by a coding expert or other person with the relevant knowledge to identify to me what is it in the code that you need; what is it the code will reveal.

I've reviewed Ms. Still's report, and I understand her concerns with Chainalysis and the government's other witnesses and their expert reports. But what I still haven't seen is, what is it that the source code is going to reveal? Who is going to look at that and be able to tell us something from looking at it?

MR. EKELAND: Your Honor, that's a little bit of a difficult question to answer because it is a black box. So we don't know what we're going to see when we open up the hood, so to speak, and see.

And what we want to see is the algorithms that they're using to implement their heuristics, as well as what data sets they're using and inputting into this software. And there's no way -- perhaps, if they could come to us and tell

us, okay, well, you know, if they had some error rates or some kind of scientific evidence that it worked.  But they've put us in a position where they can't tell us anything about the accuracy of the software.  I think that entitles the defense to take a look under the hood and see what's going on.

THE COURT:  Right.  But you still haven't -- I mean, I get that point.  But you haven't told me who is going to look at it and what they're looking for.

I assume that it's not the entirety of all of the code, but there's some portion of the code that reflects heuristic 2 and that you want to see what assumptions go into heuristic 2, and I get that.

But I guess what I need to understand is, like, what is it that someone is going to go look for and who is that going to be, and is it somebody who can be subject to a protective order where they will agree that, you know, for a period of, I don't know, five years, they will not compete in the relevant field, or something that would provide assurances to Chainalysis that they're not giving up the formula for Coke to a competitor.

MR. EKELAND:  Well, this is a really interesting problem with the government here using private vendors for their investigation running into our client's constitutional right to put on a complete defense.  What we're being told is that IP rights and proprietary rights somehow seem to be

trumping his liberty.

THE COURT: No, no, no. You're not listening to me, Mr. Ekeland. I'm trying to be helpful to you here.

I'm saying give me an expert who can tell me what they want to look at and -- someone who is not their principal competitor, who is an expert in code, who knows and can tell me: I can look at code, and I can read computer code, and I can tell you, based on reading that computer code, what their assumptions were. And this is the portion of the code that I would need to look at in order to do that, and here's the rules that I'd be prepared to live by with respect to a protective order to make sure that the company doesn't sustain significant competitive disadvantage.

MR. EKELAND: Your Honor, if those are the parameters the Court wishes for any expert that we have reviewing them, we will find an expert that will meet those parameters.

There's never been a moment where we thought that this wouldn't be subject to some kind of protective order in terms of the competitive concerns. That's not something I really thought deeply about because I'm thinking about defending my client, but I'm sure that fact could be accommodated.

So if the Court were to order production of the software, then I think maybe what we could do is then the defense would come to the Court with the named expert and what

that -- he or she would be willing to sign.

THE COURT: That's why I suggested last time, many weeks ago -- we're getting very, very close to trial now, but why I suggested many weeks ago that you sit down and have a conversation with the government and Chainalysis -- which, apparently, didn't occur -- and that you tell them, with the assistance of an expert, exactly what it is you need to look at and have a conversation about how to facilitate that. And you just ignored that direction.

MR. EKELAND: I wouldn't characterize us as ignoring it. I would just say, Your Honor, that the defense and the government are at loggerheads here, and I think that --

THE COURT: Well, did the conversation occur? Did you do that?

MR. EKELAND: We have repeatedly asked for the source code.

THE COURT: I know. I know. You've asked me about that. I said, no, you need to do this, and you need to go through this process.

MR. EKELAND: Your Honor, it's the defense's impression that we've, essentially, been told to go pound sand on most of these points and that --

THE COURT: If the government told you that after what I said last time, you should have come back to me and said, Judge, the government won't talk to us instead of just

not talking to the government.

MR. EKELAND: Your Honor, we feel, like you said, because of the current schedule, that it's quicker simply to file the motions for early production under 17(c), which is well within Mr. Sterlingov's rights. If the Court is going to deny that, so be it.

THE COURT: Well, I'm just giving you the procedure, and you're ignoring my procedure. So you're the one who is denying it, not me. And you're not speeding things up; you're slowing things down by ignoring the Court's orders.

MR. EKELAND: Your Honor, we have been asking for the source code since day one on this case.

THE COURT: Yes, on a list of 80-plus items. By the way, I went back and read that. It was not even clear to me you were even asking for the source code on that extremely long list, which I previously characterized as an example of what you're not allowed to do under Rule 17(c), of using it like civil discovery and asking for everything you can possibly imagine.

And maybe, possibly buried in there was a request for source code, although, my recollection is it dealt with source code provided to some other entities. It was unclear to me that you were even asking just for the source code in that original request.

But I'm still -- I guess I still have my question

here, though. I don't want my frustration with the fact that you're not following my directions to interfere with what I think is a legitimate concern that you have. I do think it's fair that you understand what assumptions were applied in the Reactor analysis. I want to find some way for you to get that.

I just -- you need to work with the Court and with government counsel and with Chainalysis in a way that achieves that.

MR. EKELAND: Your Honor, if the Court orders production, early production of the source code, we will name an expert who is willing to sign a protective order governing the discovery.

Again, I mean, given what we've learned so far about this source code, I mean, I think it's arguably exculpatory what's going on in here. There's bigger issues here just beyond 17(c).

And I think this is a major problem when you have private vendors coming in, especially in this new space, where this has never been done before. You say we're asking for these extensive discovery requests, but this is a case unlike almost any other in the history of federal courts.

It's the first time that this kind of blockchain forensics and this kind of stuff has come up before, and these rules, these horse-and-buggy rules about discovery severely hamper the defense in a situation like this. And we don't feel

like we've been given full access to what we need to defend Mr. Sterlingov.

You know, he's been locked in jail based on what appears to the defense to be junk -- junk science with no scientific evidence supporting it; it's well-documented in the case. Now we're asking to see the basis of what that software is doing to put him in jail.

THE COURT: And you're not complying with the Court's direction about how to do that. You're ignoring what I told you weeks ago. I'm sorry. I'm speaking.

If there's anybody who is responsible for the delay here, it's you. You start off by serving discovery requests under Rule 17 that no one who has taken first-year criminal procedure could possibly think were appropriate.

You then, weeks later, come back at the Court's direction and focus more directly on the source code. I tell you what you need to do to do it, and you ignore me.

MR. EKELAND: Your Honor, I respectfully disagree with that characterization.

We have filed a Rule 17(c) subpoena asking for early return of the source code. And, as we said, if the Court orders that early return, we'll find an appropriate expert, and we'll craft an appropriate --

THE COURT: But you're just standing things on their head. I told you to find the expert so the expert can tell me

what the expert needs to see in the source code and then talk to the government about that.  And now you're saying, just give us the code, and we'll go find an expert.  That's just the opposite of what I told you to do.

MR. EKELAND:  No, Your Honor.  Perhaps, before we spend the resources -- what are very limited resources for the defense, that if we --

THE COURT:  They're not limited resources.  There's CJA available.  I know you don't like CJA.  Every other CJA lawyer who appears in front of me, it works just fine.

I just finished a nine-week trial in which I must have approved hundreds of CJA vouchers.  I'm sure there were hundreds of CJA vouchers, including many experts in the process, and it all worked fine.  I don't know what your experience with the process is, but it works fine for everybody else.

MR. EKELAND:  Your Honor, it took about two to three weeks for the CJA from the federal defenders to even return my phone calls.  But I understand, Your Honor.

So the defense seeks early return on the 17(c) subpoena of the source code to Chainalysis.  If the Court orders it before production of that source code, we're happy to produce the name of an expert for review of that source code.

THE COURT:  And what is the expert going to look at?

MR. EKELAND:  He wants to -- he or she will look at

the source code and analyze the algorithms that are being used to implement the heuristics, as well as the data set that Chainalysis Reactor is using to implement its algorithms.

This is not open source. It's not an open-source blockchain explorer like a lot of stuff out there. There's a reason for that. And it's not as simple as just going onto the blockchain and seeing what's going on. And that's because of the heuristics.

And the heuristics, of course, as this Court well knows, is based on assumptions and is making probabilistic assumptions which are fundamental to the government's money laundering charges against Mr. Sterlingov.

I mean, like, this is the -- this case has no corroborating evidence, none whatsoever, outside of this heuristic software, which is a complete black box, and which is shocking that it's been marketed to the government, it's being used by DOJ without anybody ever checking the accuracy of it, ever.

And so what we're asking to do, Your Honor, is look under the hood.

THE COURT: All right. What I'm going to do -- and I think that it's appropriate -- is anyone here from Chainalysis, Counsel?

MS. PELKER: No.

THE COURT: No? Okay. So what I think I need to do

is I'm going to give you the same order I gave you last time. Go find that expert, have that expert write down what it is the expert needs to look for in the source code. Come up with a plan for how you do that, discuss it with Chainalysis, discuss it with the government. I'm not saying you need to reach agreement, but you need to discuss it with them.

We'll come back on Monday or Tuesday; and I'll just ask the deputy clerk to find a time when we can do this on Monday or Tuesday. I will -- if the government can let counsel for Chainalysis know that we're going to be taking up that motion on this date so they can be present, and we will get into this.

As I've said repeatedly, I don't doubt that you're entitled to understand what the assumptions were that applied, but it doesn't simply mean Chainalysis turning over all of its source code without any foundation being laid on the lines of what I've indicated needs to be laid.

So, among other things to discuss, is if this is going to take place, is who is it going to be? Is it someone that Chainalysis would be comfortable being subject to the protective order, what is it, what portion of the source code are they going to need to look at, where are they going to look at it, under what conditions and so forth? Okay?

Tell me what time we can come back to do this. Monday at 11:00?

MS. PELKER: Your Honor, the government can communicate that with counsel for Chainalysis, but if they are not able to make it out in person, would a Zoom appearance by them be appropriate?

THE COURT: If that's what they're comfortable with, that's okay with me. As I've indicated before, I have some questions about the government's standing on this question, although I do think it may affect just the trial process, and maybe the government has a standing to raise the issue as to the extent it could interfere with the smooth administration of the case.

But I do need to hear from Chainalysis on this. I do have some questions for the government as well on this.

MS. PELKER: Yes, Your Honor.

THE COURT: Why not simply provide the defense at least with a license for the Reactor so they can run it? It does seem that it's pretty unfair to put them in a position which they can't even run the same analysis that the government's expert has run.

MS. PELKER: So I think two questions there. Whether they can run the same analysis -- and I think that Ms. Still's report shows that they have run the same analysis and can run the same analysis. The question of whether --

THE COURT: Well, how can they run the same analysis without Reactor? Because Reactor has the heuristics in it that

Ms. Still doesn't have, and I don't think she even knows precisely what the assumptions are or how they're weighted in the analysis.

MS. PELKER: So, again, this is just a misconstruing by defense counsel of what the heuristics do. The heuristics are not for the address-to-address tracing. The heuristics are for building the cluster.

So the heuristics help to inform that this list of 900,000 addresses are Bitcoin Fog. CipherTrace has their own heuristics and, actually, have come up with fairly similar lists of addresses under CipherTrace's heuristics that they also say are Bitcoin Fog.

But we've given them the list of addresses for what are Bitcoin Fog, what is Silk Road, what is Silk Road 2.

THE COURT: You've given a list of addresses that your expert has concluded or associated with those. Defense disagrees, at least, and says there may be some overlap, but we don't agree 100 percent.

In fact, I think Ms. Still said, with respect to the second heuristic, that she disagrees and that that could introduce a 60 percent or so difference in the bottom line.

MS. PELKER: I think that that highlights the defense has been able to use the information that we've provided in discovery, the information about the heuristics for them to take a look at the data set and say, these are the portion of

the addresses that we disagree with; our expert is looking at them, and she is going to take the stand and issue her expert opinion that these addresses are not Bitcoin Fog.

And that's all -- and then the government expert is going to come on and say, we believe that these are Bitcoin Fog.  And we have a classic battle of the experts here, of two experts looking at a large data set and coming to different conclusions.

THE COURT:  Right.  But how do you cross-examine the government's expert if the government's expert says, well, I used -- I ran it through Reactor -- and I'm not a coder, so I don't know exactly what the assumptions were?  I can describe to you in general what they are.  And I understand in general what the heuristics are, but I can't really answer precise questions about exactly how they apply because that's all in the code, and I didn't write the code.

MS. PELKER:  Your Honor, I don't think that this is actually a fair characteristic from defense about the detail that is in Ms. Bisbee's report.  She actually goes through a fairly detailed list of what goes into heuristic 2, which is a behavioral heuristic which is customized for each cluster.

I think that defense counsel can, on cross-examination, ask her about whether there could be misclustering based on heuristic 2.  Ms. Still is going to come in and say that there was potentially misclustering based on

heuristic 2.

But Ms. Bisbee's report puts out in a fair amount of detail all of the different things that go into heuristic 2, and that's not really a source-code discovery issue.

THE COURT: I -- I turned this to the source code. I want to go back, first, to the question of why not just give them a license so they can run it and see if they get the same results?

MS. PELKER: So this is -- we're not stopping defense from getting a Chainalysis Reactor license. It's, frankly, baffling to us that they haven't gotten one.

THE COURT: How much does a license cost?

MS. PELKER: I don't -- I don't know, Your Honor, because ours are in bulk contracts, and we're not part of the contract.

But most -- there are lots of experts offering their services to private entities who have multiple licenses, so that they could have chosen to hire an expert who has experience in Chainalysis, who has a Reactor license.

I don't know what the stand-alone cost is for a Reactor license. The government just doesn't have any greater ability to buy that for defense counsel than defense counsel does for themselves.

But defense counsel can use CJA funds, can use all of their fundraised funds to either get a license just for

themselves or hire an expert who has access to Chainalysis Reactor who knows how to use it.

THE COURT: And what about -- how do I make sure that the defense knows what the assumptions are that goes into the heuristics? I understand that Ms. Bisbee in her report identifies the behavioral heuristic with some level of specificity, but it's still not a level in which there's any sense of how much weighting goes into particular behavioral activity.

There's not an ability to test to see whether it, really, actually is measuring that behavior, how it goes about measuring that behavior, whether it double-counts or triple-counts by mistake; anything that might affect the bottom line.

And I do think it's fair that the defense have some opportunity to test that and to say, not only do we disagree generally with the behavioral heuristics and think that behavioral heuristics are not reliable, but here it's particularly troubling because X, Y, and Z, and we don't know what the X, Y, and Z is unless we know how the behavioral heuristic actually applied in this case.

MS. PELKER: So, again, I would just point back to Ms. Bisbee's report where she lists through all the different parameters that go into the behavioral clustering. Part of behavioral clustering is that it is tailored to the behavior of

each entity. And so Ms. Bisbee explained how they, essentially, fingerprint an entity and look for how that particular entity behaves.

And for Bitcoin Fog, I think that there's a very detailed walk-through in the expert report for both Ms. Bisbee and Mr. Scholl of how they looked at the activity within the Bitcoin Fog cluster and how that's actually behaving.

THE COURT: So I do think that the government has to work with the defense on this and find some way to provide some greater transparency into it and not just take Ms. Bisbee at her word that these are the behavioral heuristics, but also to know that they actually were applied or how they were applied and to be able to test that in some way.

And so I would encourage you, in the same way that I encourage Mr. Ekeland, to confer about this. Because I do think it's fair that the defense, to use Mr. Ekeland's words, be able to look under the hood.

And if the government is going to rely on this as an important part of its case -- and I think perhaps the defense maybe overstates exactly how central it is to the government's case, but it's an important part of the case; may not be the entire case -- I think that there has to be some way for them to be able to look under the hood and -- just to verify that the computer software is doing what Ms. Bisbee indicates it does and that it's doing it in a manner that is accurate, or at

least they have some sense of how it's doing it.

I don't have a firm view on the best way to do it. I'm not adept enough at coding to know whether someone can just pick up lines of code and look at it and know from looking at the lines of code what it is.

Or if the better way to do it is to have somebody who was involved in the coding sit down with somebody from -- an expert who would be subject to a protective order from the defense and say, I can walk you through it. You don't need all our code here; let's spend two hours sitting in front of the computer, and I'll show you what we did here so you can understand it; something along those lines.

MS. PELKER: Understood, Your Honor.

THE COURT: Two hours may be an underestimate. I don't know.

MS. PELKER: We'll definitely take that back. I think the government reiterates its concern that we are just over three weeks out from trial. I think the Court has been very clear, government and Chainalysis have both reiterated that the defense is not coming back with any sort of specificity.

I don't know how they're going to get a coder in the next several days who has the actual expertise to do the review that they need and, given who the defense has hired as experts in the past, I am concerned about who they're going to be

bringing.

THE COURT: Well, that was part of my frustration earlier with Mr. Ekeland in that I thought I was pretty clear about this weeks ago, and I share your concern about how close we are to trial, and I also share your concern about making sure that you have somebody who can do this meaningfully.

If they have somebody who can't do it meaningfully, it's just not going to help them much, and that's their choice.

MS. PELKER: Yes, Your Honor.

THE COURT: Okay. Thank you.

Mr. Ekeland, could you come back up for a second. Do you know how much the license costs for a one-time use?

MR. EKELAND: I've heard anywhere between 50- and $100,000, Your Honor. I haven't gone and actually confirmed that, but that's what I've been told by a number of people.

THE COURT: And what about Ms. Pelker's suggestion of just having an expert who has a license to run it for you?

MR. EKELAND: It's the defense's position that we should be able to choose the experts that we'd like to work with, and we've been extremely limited in terms of funding. We didn't have CJA for a while. It sounds like we now may need to withdraw the CJA and --

THE COURT: That's up to you. I mean, I have no idea how much money you've raised privately.

MR. EKELAND: Well, Your Honor, it's the defense's

position that if the government is going to prosecute somebody using a private proprietary black box software, they should make it available to the defense, and the defense should not -- particularly after the government has seized all the defendant's assets -- have to shell out 50- to $100,000.

THE COURT: You're not shelling a penny out as long as you use CJA. If that's $100,000 and you need to come back to me, and if I conclude it's central to the case, I may conclude that it's appropriate to authorize that payment.

MR. EKELAND: Your Honor, it's basically our experience with CJA so far, with the pace at which it moves, that we do not expect to see any money from CJA, if we even got these applications until after the trial, and that's the --

THE COURT: I just don't think that's true. I have done this hundreds of times in the past where I have authorized CJA payments, and they've been made. It's just -- I have authorized them in many cases for translators, experts, investigators who are paid in real time. It's just not true.

Maybe the counsel ordinarily doesn't get paid until the end of the case unless they file an application for interim payment, but it's just not correct that you can't get paid for your experts as you go. I don't think you've tried, as far as I can tell.

MR. EKELAND: Your Honor, after repeatedly calling the CJA liaison at the federal defender's office and having to

wait sometimes two to three weeks for a return phone call, you can --

THE COURT: Just submit the form. Go online and get the form and submit it to me.

MR. EKELAND: Very well, Your Honor.

Is the Court telling the defense that you would authorize somewhere between 50- and $100,000 for the Chainalysis Reactor license?

THE COURT: Well, I might. I need to know. I would need to see an application for it, and I guess I'd also need to understand whether that is the most cost-effective way to do it; and if there's somebody who you could retain for $20,000 to run the analysis for you, who already has the license, and the person is -- there's no reason to think the person is biased in favor of the government in any way and just someone out there who has a license who can do this, then I would think you ought to take the more cost-effective approach.

But my bottom line is that I think you're entitled to run the analysis and to make sure you get the same result using Reactor, and we'll find a way to do it. But I would direct that it be done in the most cost-effective way possible.

MR. EKELAND: Your Honor, the defense would submit that the most cost-effective way for it to be done is simply for Chainalysis and the government to give us access to the software, which would cost them nothing. They can simply grant

us a license to use it for the limited purposes of this case. I don't see why anybody has to shell out any money.

THE COURT: I don't think I have the authority to order that a private vendor give you something for free. If they license things and sell it, I think we just need to pay them for it. We'll find a way to pay them for it if that's the way it works.

MR. EKELAND: The defense objects to that.

THE COURT: You object to the Court paying --

MR. EKELAND: Your Honor, I think the Court is well aware that we think there's a constitutional issue here with the use of private vendors by the government and the government being, in the defense's opinion, able to avoid its discovery allegations by simply saying, well, it's a private vendor and we can't produce it, but I think we've noted that in our papers.

THE COURT: I think you have my marching orders on this. As I say, as with access to the code, this is very late in the day, and I really, quite frankly, think it is the defense to blame for that fact that we're so late in the day that this is being teed up. I realize that this is central to the case, and I'm going to give you the opportunity.

But I do direct that you follow my instructions promptly and that you find out how much the license is and you contact them and ask them how much a license would be, and you

also see if you can find somebody who has a license who can do this for you and how much they would charge. And then I'll want to know when we come back on Monday what those two costs are. And if I need to authorize a payment at that time, I'll do so.

MR. EKELAND: Duly noted, Your Honor. Thank you.

THE COURT: Also, you need to decide whether you're CJA or not. I can't authorize the payment from the Court if you're not CJA -- or if Mr. Sterlingov is not proceeding pursuant to the CJA.

MR. EKELAND: Understood, Your Honor.

THE COURT: All right. I think we're now ready to hear from Ms. Still, but we probably ought to take a break to give everyone a chance to rest for a moment. Then Ms. Still can take the stand, and we'll see where we go from there. Thank you.

(Recess taken.)

THE COURT: All right. Mr. Ekeland, you can call Ms. Still.

MR. EKELAND: Thank you, Your Honor. The defense calls Jonelle Still of CipherTrace.

THE COURTROOM DEPUTY: Would you please raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Thank you. Please be seated.

THE COURT:  All right.  You may proceed.

DIRECT EXAMINATION OF

JONELLE STILL

BY MR. EKELAND:

Q.  Good morning, Ms. Still.  Do you have the binder up there?

A.  I do not.

MR. EKELAND:  Your Honor, may I approach, please?

THE COURT:  You may.

MR. EKELAND:  May I proceed, Your Honor?

THE COURT:  You may.

BY MR. EKELAND:

Q.  Ms. Still, could you just briefly describe your educational background for the Court.

A.  Yes.  I have a degree in radiologic technology --

Q.  If you could just put the microphone closer.

A.  It really needs to be that close?  Okay.  Excuse me.

I have an associate's degree in radiologic technology, I have a bachelor's degree, and I have two master's degrees; one in international trade and economic diplomacy, and the other in international policy and development with a focus on financial crimes and Arabic.

Q.  And where do you currently work?

A.  I work at CipherTrace by Mastercard.

Q.  And what do you do for CipherTrace?

A.  I am director of investigations and intelligence.

Q. And how long have you been with CipherTrace?

A. March 2020.

Q. And did you start as a director of investigations? How did you start at CipherTrace?

A. I began my career as an unpaid intern at CipherTrace prior to being acquired by Mastercard.

Q. And so you went from being an unpaid intern to being, I believe you said, director of investigations at CipherTrace?

A. Yes, sir.

Q. Could you maybe just talk a little bit about that journey and the experience you gained on that journey.

A. This was the beginning of the lockdowns, COVID. So this was a bit of a career change for me. Prior to that, I was focused on weapons exports and working with the U.S. State Department.

During COVID, I lost that position. I went back to school. We were locked down. And my professor suggested that I take CipherTrace courses. This was the CTCE.

Q. And what does that stand for?

A. Cryptocurrency Tracing Certified Examiner.

Q. And you completed that training?

A. Yes, I did. My current boss, Pamela Clegg, was the teacher.

Q. And then did you do any other training with CipherTrace?

A. Yes, I did. I did a number of other courses and helped

develop courses as well through CipherTrace.  To be clear, I began as an unpaid intern, but I quickly took over organizing as a co-chair the Defenders League, which is the pro bono arm -- or was the pro bono arm of CipherTrace.

Unfortunately, this program was paused, as it was too popular.  We had thousands of cases and reports of theft, fraud, scam, et cetera, to this, and we could no longer -- we did not have the staff to take cases.

Q.  And as part of your role at CipherTrace, do you do blockchain tracing of Bitcoin transactions?

A.  Yes.  And other chains as well.

Q.  And do you train law enforcement organizations?

A.  I train most law enforcement in most countries.

Q.  And can you just name some of those law enforcement organizations that you do training for.

A.  Yes.  Training with Europol, Interpol, CEPOL, LaGuardia Seville, Spanish national police, Greek police.

Q.  And do you do any training for American or United States law enforcement organizations?

A.  And U.S. government agencies as well, like the IRS, Secret Service.

Q.  Any other organization -- American law enforcement agencies?

A.  I work with the FBI, and I'll be training them here in about a week.

Q. And just calling your attention to what's behind Tab A in that binder in front of you, if you could just take a look at that for a second and just look up when you're done looking at it.

And that's your supplemental summary of qualifications as an expert witness; is that correct?

A. Yes, that's what I see.

Q. And that's your signature on the fifth page?

A. Yes.

Q. And this is an accurate statement of your summary of your qualifications?

A. Yes.

MR. EKELAND: Your Honor, we'd just like to move what's been marked for identification as the Defendant's Exhibit A into evidence.

MS. PELKER: No objections, Your Honor.

THE COURT: Exhibit A is admitted.

(Defense Exhibit A was admitted.)

BY MR. EKELAND:

Q. Ms. Still, if you could turn to what's behind Tab B, and just -- when you're done looking at that, just look up.

A. That is my CV.

Q. And is that -- that's an accurate CV for you at this current time?

A. Yes.

MR. EKELAND: Your Honor, at this point in time the defense would like to move what's been marked for identification as Defendant's Exhibit B into evidence.

MS. PELKER: No objection.

THE COURT: Exhibit B is admitted.

MR. EKELAND: Thank you.

(Defense Exhibit B was admitted.)

BY MR. EKELAND:

Q. Ms. Still, you wrote an expert report in relation to this case, correct?

A. Yes.

Q. And directing your attention to what's behind Tab C in your notebook, is that your expert report?

A. Yes.

Q. And that expert report also had a PowerPoint attached to it?

A. Yes.

Q. And if you could look behind Tab D. And is that your PowerPoint?

A. Yes, this is my PowerPoint.

MR. EKELAND: Your Honor, at this point in time the defense would like to move what's been marked for identification as Defendant's Exhibits C and D into evidence.

MS. PELKER: No objection, Your Honor.

THE COURT: Exhibits C and D are admitted into

evidence for purposes of today's hearing.

MR. EKELAND:  Thank you, Your Honor.

(Defense Exhibits C and D were admitted.)

BY MR. EKELAND:

Q.  Ms. Still, do you think it would be helpful to the Court, just as background for you explaining your expert report, if we went through your PowerPoint first?

A.  This would be good for everyone to understand, yes.

Q.  Thank you.

MR. EKELAND:  Your Honor, if we may, I'd like to go through the PowerPoint with Ms. Still.  Mr. Hassard, if you could put up the PowerPoint for us.

THE COURT:  That's fine.

THE COURTROOM DEPUTY:  You've got to give it a minute.

BY MR. EKELAND:

Q.  Ms. Still, can you see the PowerPoint in front of you?

A.  Yes, I can.

Q.  Can you please take us through the PowerPoint and just direct Mr. Hassard when you want to move to the next slide.

A.  Yes, sir.  Next slide, please, Mr. Hassard.

Okay.  So as an investigator, there are really two things that I need to understand.  The source of the data, the way that data is collected; we call that attribution.  And then how that tool actually works and how the clustering algorithms

work as well.

So this is a photo of a black box indicating that black box analytics hinder my ability to do that as an investigator. Next slide, please.

Credible analytics include active, live accounts. This is something CipherTrace does. We will go to the exchanges. All exchanges sign up for accounts. We will pay into those exchanges, we will remove money from those exchanges, and we will be able then to trace out those hot wallets and, essentially, gain attribution through that action.

Dark market, deep web, full chain nodes, we run a couple hundred Bitcoin nodes ourselves. And we also scrape the deep web for information, blockchain addresses, et cetera. Active hunting and targeting; private would be verified user feedback. For example, if I were to gain information via subpoena on a particular address or a set of addresses belonging to a certain entity, then I -- I could then use that as my evidence to submit that to our attribution team, and then that data would be updated.

Other analytics may use unverified databases and open forums. For example, there's a forum called Bitcoin Abuse, and so people will put into this particular website making claims of certain fraud, scams, thefts related to cryptocurrency, and they will oftentimes post addresses. So we do not include data like this.

However, some black box companies do include that data. We don't do it because we can't verify it, and it's critical for us to be able to verify the source of our attribution and have that complete audit trail from the time of collection all the way through for every single point, right?

So any changes that may be made to that attribution. Let's say, for example, we have an exchange address, deposit address for Binance. This happens often with Binance, right? And we think it's Binance. However, Binance comes back after a subpoena and says this isn't our account.

What does that mean? Binance is actually saying that that's a separate entity using them for liquidity. So they're like what we call our message exchange. Some term it parasite exchange, but Binance knows who is actually signing up for their accounts.

So black box, unauthorized customer data, unverified user feedback, and clustering errors and false positive. This increases the errors. I don't know by how much, but this increases errors. So I would not -- I am not comfortable using a black box tool.

Q. What do you mean by unauthorized customer data?

A. For example, if someone were to use an API to input a bunch of addresses utilizing one of the blockchain analytics firms, and they're not aware that that data is being collected, something like this.

Q. So would it be fair to say that that's just collection of user or customer data without the customer's knowledge?

A. Correct.

THE COURT: And when you referred to Binance contacting, was it you or someone else, and indicating that it wasn't their account, is that something you would use or not use?

THE WITNESS: No. So we would have to figure out then -- law enforcement -- essentially, what you do is you back the trace up one step and then resubmit the subpoena, and then they will tell you who it is.

THE COURT: I see. Okay.

THE WITNESS: So then you'll get the correct attribution and then, therefore, we could use that.

THE COURT: Okay.

BY MR. EKELAND:

Q. But did I understand you to say that you have to verify it by some way; you just couldn't rely on it as is?

A. Correct. Next slide, please.

So oftentimes customers of blockchain analytics companies do not understand the type of model that they're using. They may not even be aware that a black box model exists.

What I mean by that is customers are not aware that, within the black box model, decisions may be made on their

behalf, but they are not aware those decisions are being made. For example, if we have any automatic peel chain clustering -- right? -- this is going to heuristic 2 in a bit. This is what I'm talking about.

Model validation, so that's determining how that particular algorithm or model is actually applied and how it works in the tool itself. That can verify the accuracy of the data enrichment. It checks the actual application, the performance of the model itself; is it doing what it's supposed to do.

Okay. So for these companies, it's critical that you have well-documented processes, that your data is fully auditable, that there is an audit trail, and that we can go back using external or independent verification of the data of the models.

Q. And as far as you're aware, is there any model validation for Chainalysis Reactor?

A. No. I believe they actually testified that there was not.

Q. And as far as you are aware, is there any audit trail for Chainalysis Reactor?

A. That's unclear. I have asked for the source of the data. So that would be the source, how do they gain attribution on particular addresses.

And I'm thinking all of -- what was it, like, eight or so dark markets and then we have Bitcoin Fog. It's critical

for me to understand where that source attribution came from, right?

Q.   Why is it critical?

A.   I need to know how it was gained and then, throughout the entire process, that audit trail.  Was that attribution ever changed?  Where did it come from?  Did it come from a third-party vendor?  Did it come from unverified user feedback?  Did it come from a forum?  I don't know.  This could change the way that we view the accuracy of the attribution.

Next slide, please.  All right.  So clustering approaches.  Right?  So we've covered data.  Now I need to understand how these tools cluster.

What I mean by that is right up here on the screen, right?  So left-hand side we have something called separated clusters.  These are truest to the actual transactions that occur on-chain.  That is, if you were to go and use WalletExplorer or any other publicly available tool, you will see addresses co-spending together like this.  So we cluster via co-spend, right?  This is what that means.

So at the top, 1JRE and 32L9 never co-spent together. Their clusters do not touch.  They both belong to the same entity, but they've never intersected on-chain.  So we keep them separate for that accurate representation.  It also makes auditing a lot easier as well.

On your right-hand side, we have something called

single-entity clustering. This combines all of those clusters, as you can see, into one giant cluster. So this gives you a great quick high-level overview. This is great for intelligence gathering.

If you want to understand entity interactions on a high level, this is really good for that. It won't be at the diagnostic level, but you will get an overview of how entities interact with one another.

However, separating out these clusters can be difficult. Perhaps it can be done on the back end, depending on the tool and the company, but to separate them out as an investigator, first the investigator has to know that maybe that's something that they want to do. So it depends on the training and the education that the company provides their users.

This kind of data, when it is all lumped together, sometimes it can lead investigators down the wrong path.

Q. And do you know what type of clustering Chainalysis Reactor utilizes?

A. Reactor uses the right-hand side, single-entity clustering.

Q. Am I right to read that -- you've got down on the bottom right of the slide that with that kind of single-entity clustering, there's a higher probability of false positives and errors?

A. Definitely. And we actually respond to requests from

Chainalysis customers. Sometimes they're shared customers, like law enforcement, regarding Chainalysis tracing.

THE COURT: Can you walk me through this again. I'm not sure I understand what single-entity clustering is. I mean, the separated clustering, I take it, is just based on co-spend, right?

THE WITNESS: Yes, Your Honor.

THE COURT: So you're clustering based on the co-spend, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: Go ahead. So how are you clustering for single-entity clustering then?

THE WITNESS: Single-entity clustering would include all heuristics.

THE COURT: I see. It's co-spend, but it's also then what Chainalysis refers to as heuristic 2 and heuristic 3?

THE WITNESS: And any other sources of data; any other unnamed heuristics will show up on the graphical explorer as one giant cluster. You can see this in some of the IRS traces.

THE COURT: Okay. Thank you.

BY MR. EKELAND:

Q. You mentioned briefly, to the extent that you heard -- you've had Chainalysis customers come to CipherTrace to, I believe, discuss problems that they were having with

Chainalysis. To that extent, without revealing any customer confidence, can you just describe some of the typical things that you're getting told about Chainalysis Reactor?

A. So it's the same type of repeated mistake that I see. And this mistake is not understanding the difference between single-entity clustering and separated clusters. So mistakenly, the investigator will use single-entity clustering not on a diagnostic level, but to determine true interactions between entities and particular unspent transaction outputs, which are termed UTXOs.

Q. What's the consequence of that? Do I understand you correctly that your testimony is that that leads to errors; attribution errors?

A. Not only does it lead to errors, but at one point -- and we'll cover this here in one of the case studies -- it can lead to assumptions that a particular entity engaged in terrorism finance.

Q. Is that -- you're saying that case -- I guess we'll get to the case study.

A. Yes.

THE COURT: I just want to -- before we move to the next slide -- make sure I understand this slide.

What you're referring to as separate clusters and single-entity clusters might be labeled differently as simply saying co-spend clusters and all heuristic clusters?

THE WITNESS: That's a way of saying it.

THE COURT: All right. Thank you.

THE WITNESS: Next slide, please.

So this is an example of how that attribution and the source of that attribution will differ depending on the cluster. So on the left-hand side, we have the DOJ civil complaint, August 13, 2020, related to Al-Qassam Brigades, which is the military name for Hamas.

Down below you can see this address beginning with the 3. That source of attribution for this address comes from the civil complaint. So when we're audited and they say, what's the source of attribution for this, if this address co-spends with other addresses, they will also then be included, and that their source will be via co-spend, but 3LH will be via here, the civil complaint.

So it's important then to understand that the way that clustering works can affect attribution as well. On the right-hand side we have, I think, an advertisement from the Twitter or one of Al-Qassam Brigades Telegram channels for a donation address, donating to the cause, 17QAWG.

Both are Al-Qassam Brigades, but they have different clusters. They've never co-spent together and, therefore, we have separate sources of information for each. We keep them separate. Next slide, please.

This is the same two addresses you saw on the

previous slide. Cluster ID at the top left-hand corner, followed by the owner of those addresses, followed by the type, the country, and the total address count. So do please notice the address counts are different for each of the clusters. This is due to that co-spend heuristic.

The address count for the 3LH address is 156, and on the right-hand side the address count for 17QAWG is 8. In a single-entity clustering, not only would these two be combined in the cluster, you would have all addresses ever attributed to Al-Qassam Brigades by all of the heuristics in that one cluster. That is how it would display itself on the graphical explorer.

So if you are an investigator and you are not aware of these two differences between clustering, you may mistakenly think that single-clustering will give you the level of detail necessary in order to determine which UTXOs spent funds on-chain.

BY MR. EKELAND:

Q. Am I understanding your testimony correctly that the implication of that is -- like a context of this example is that somebody could be falsely accused of financing terrorism who wasn't involved in it at all?

A. In fact, this did happen. Next slide, please.

THE COURT: Can you explain -- unless you're -- if you're moving on to something else, can you explain that to me

a little bit more here.

What happened here, and was one of the addresses that were on one of these two not associated with terrorism and then charged? Can you give me a little more detail here.

THE WITNESS: So Al-Qassam Brigades is sanctioned by OFAC.

THE COURT: Correct. I understand that.

THE WITNESS: So they're definitely both criminal. We have them associated to a criminal entity, and then we have them sanctioned as well in the tool. They just have different sources.

On the right-hand side, that source comes from the actual donation campaign itself.

THE COURT: Right. I thought you just told Mr. Ekeland a moment ago that this led to someone being falsely accused of financing terrorism?

THE WITNESS: Single-entity clustering, an assumption using that tool, led to that, yes.

THE COURT: But do these charts suggest that, or are these charts showing how you would have done it?

THE WITNESS: This will come later on in one of the case studies I can demonstrate.

THE COURT: Okay. But you're going to come back to this particular example involving the Al-Qassam Brigades?

THE WITNESS: These were the Al-Qassam Brigades, yes.

THE COURT: Okay. Thank you.

THE WITNESS: Next slide. Thanks.

Okay. So here's the Al-Qassam Brigades example right here. A certain global exchange was contacted by a blockchain analytics firm who utilized wallet-based tracing. This will be your single-entity clustering.

They were informed that they were related to terrorism finance via about a $4 or so Bitcoin donation to Al-Qassam Brigades.

BY MR. EKELAND:

Q. Are you able to name the firm?

A. I don't have their permission. I guess I could, but it feels a little funny to do that without just making sure they're absolutely okay with it.

Q. That's okay. You don't have to answer that then.

A. If it's okay with you, I can ask and share it.

Q. We can move on. Yeah.

A. So on the left-hand side, you see the global exchange. Now, this is a re-creation of the trace provided to CipherTrace. However -- and this would be like the -- basically, a screenshot of the trace that the exchange gave me. However, I did not use that screenshot.

I rebuilt it in Word using this, but this is what it looked like. Again, if we need the original, I'll ask for permission, and we can provide the original.

Here's our global exchange. We have .1 Bitcoin being sent to a self-custody address. This address, therefore, has no entity in control. It's a user or group of users, persons unknown who have access to those private keys and can spend the funds tied to that address.

Q. So just to touch on that one point, whoever controls the private key just controls the Bitcoin?

A. Yes.

Q. And the identity of the person or entity controlling the private key is not on a blockchain; is that correct?

A. As in PII?

Q. Yes, as in --

A. Not in Bitcoin.

Q. Right. It's off-chain information?

A. That's correct.

The .1 Bitcoin is then spent to Entity 1. And if you notice here, something curious happens. .1 turns into 6.3 Bitcoin. As an investigator, that gets my spidey senses up. That Bitcoin then goes into Entity 2 and then is reduced down to .1 Bitcoin again to a self-custody address, and then, ultimately, deposited into the Al-Qassam Brigades cluster.

Now, as an investigator and someone who is seasoned, I understand what happened by looking at this. The investigator, whoever alerted this particular customer that they had ties to terrorism finance, had improperly utilized the

graphical trace explorer Reactor.

Q. I'm sorry. So is it your testimony that actually what happened here is that there was an improper attribution because someone was using Chainalysis Reactor, which was employing the single-entity clustering, and that led to somebody being falsely accused of terrorism -- of financing terrorism?

A. So the investigator improperly utilized Reactor. Reactor is a great tool for intelligence gathering and looking at large-entity interactions. However, again, on a diagnostic level, specifically UTXOs in Bitcoin, it is critical that we pull out every single address separately and verify they actually spent funds in that particular interaction.

Q. You've used the phrase diagnostic level a few times now. I wonder if you can elaborate just a little bit on what you mean by that as opposed to what I think you said is a sort of the higher-level intelligence gathering that you said Reactor is good at.

A. If you look on this slide, you do not see any Bitcoin addresses. You do not see any transaction hashes. You only see amounts.

Q. And is this what you would typically see on the graphical output from a software like Reactor?

A. From what I have seen from Reactor, there should be something termed a root address; otherwise, there will be no transaction hashes here. Now, it is possible to separate that

stuff out from these clusters, but one must be aware that that's what one should do.

Next slide, please. This is what the trace looks like using a different tool. This is Inspector; CipherTrace's tool here.

So as you can see, those entities are actually very large CoinJoins with an anonymity set of 77. So --

Q. Could you just briefly explain for the Court and everybody here what a CoinJoin is.

A. More than one user chooses to join their coins together via a service, a program, wallet software in order to obfuscate the flow of funds. That is to protect their privacy.

Q. And would that disrupt -- does that disrupt heuristics?

A. Yes.

Q. All heuristics or some heuristics or --

A. This particular trace has two errors. It has a heuristic 1 error and a heuristic 2 error. So part of Reactor's offerings is that it will condense down a peel chain.

This is heuristic 2. I call this the Pac-Man heuristic. It just kind of goes down that peel chain and takes everything up with it.

Q. So that heuristic 2, essentially, gobbles up everything on the chain regardless --

A. Yes. So -- and here's evidence of that right here. Additionally, there's a heuristic multi-input clustering that

was broken at this point in time because we do have a large CoinJoin, and the amount of funds going into that CoinJoin is well within the Wasabi limit.

Wasabi says something like up to one Bitcoin are safe, that is, anonymous, or the most private amount that one can deposit. So you can read that in the Wasabi documentation. And .1 Bitcoin is below that threshold.

Q. What is anonymity set 77; what does anonymity set mean?

A. The number of inputs, possibly the number of users. But there may be multiple of the same users in this particular set.

Q. So it's not -- that 77 isn't necessarily equivalent with the number of users, but it could be?

A. Correct. This is only half of the trace. Next slide, please.

This is a different way of describing the same error that occurred twice in a row. Entity 1 now retraced through a CoinJoin. Now we're tracing through another CoinJoin here.

So two Wasabi rounds were traced through .1 Bitcoin. I cannot provide you the exact statistics on the error rate of this, but this is most highly unlikely; in fact, an error. It is more likely errors were made here to trace through two CoinJoins back-to-back under the threshold amount.

Q. Are there any standards for evaluating these types of traces or anything?

A. I believe you're referring to a type of standard body that

would provide best practices and some oversight in blockchain analytics. No, that body does not yet exist. This is a relatively new field.

Q. Is there any general agreement in the industry about standards?

A. Yes and no. There are a lot of debates going on within the industry even regarding definitions. We do not all agree.

Q. So is it fair to say, because it's such a new industry, that there isn't any general consensus on what the standards should be?

A. I don't know that that conversation has even occurred yet.

Next slide, please, Mr. Hassard. So now you can see Case Study 2. And as we can see at the top, we have a self-custody address, and below we have the source of funds for a theft, which is also a self-custody address.

Again, this is a representation of the actual trace provided to CipherTrace from the client. 9.17 Bitcoin were stolen. They were spent to 1PAaf address within this Wallet 1. Curiously, again, we go up to 472 Bitcoin through Wallet 2, reduced down to 307 and to the client, who is an OTC desk, and received a freeze funds request from law enforcement stating that they had received funds directly from a theft; that is, directly traceable to the theft.

So as you may have guessed, this was inaccurate as well. Next slide, please.

As you can see, this is address 1PAaf.  In its lifetime, it's only spent three times in total what it has received, about .8 Bitcoin, and the total spent is .8 Bitcoin. Final balance, zero Bitcoin.

Q.  Just while we're here real quickly, could you just refresh everybody on what an address is.

A.  Yes.  An address is derived from the public key, which is derived from the private key of a Bitcoin wallet.  So the address is -- essentially, you can think of it, like, as an account number.  This is, essentially, saying that this person has permission to spend the funds contained within this address.  It doesn't exactly work like that.

There's a type of key exchange that occurs -- and this does get more technical.  If you would like a more technical definition, I can provide that, but the basics are the Bitcoin address here, this is someone's account number funds are being sent to.  And in order to send Bitcoin, we must have that account number.

Q.  Is that address account number on the blockchain?

A.  Yes.  That would be recorded on the Bitcoin ledger.

Q.  And is the public key recorded on the blockchain?

A.  The public key is recorded on the Bitcoin ledger within the metadata.

Q.  Is the private key recorded?

A.  The private key is not recorded.  There will be a

mathematical proof called a signature that verifies that the owner who is spending funds is able to spend funds, that it is the true and correct owner.

So going back to this case study, we do not see 9.17 Bitcoin ever going through 1PAaf. So what could have possibly happened? Next slide.

Here's a representation of 1PAaf co-spending funds and then sending those funds to two addresses on the other side. This is displayed in both a publicly available tool like blockchain.com or blockchair.com, and below an actual representation.

I would point you to the amounts here. Again, 9.17 Bitcoin is not contained within this particular transaction or any other 1PAaf transaction.

What happened here is, again, a problem with single-entity clustering and the investigator not understanding that that tool operates in that way and improperly determining that 1PAaf received funds from the theft when, in fact, 1PAaf never received funds from that theft.

Next slide, please. This is what the actual trace of that theft looks like. So as you can see, when you mentioned me mentioning diagnostics, this is at the UTXO level. So if you are to go and take the transaction hash from any one of these gray boxes, including the yellow box --

Q. And what's a transaction hash?

A.   Transaction hash, that's the -- transaction ID is another way of terming it -- for the transaction that occurred on-chain that is recorded in the ledger.

Q.   And that's not the same as the address?

A.   That is different than the address.

Q.   A hash is a unique identifier for the particular transaction?

A.   Yes, it is.  That uses something called a Merkle tree, and I can talk about that as well if we want.

But the way hashes are contained and recorded in the ledger, essentially, you have blocks which are cryptographically connected to one another, and each block contains part of the hash of the block before it.

So what you have is almost like this genealogy of information, and this is why we say the ledger is immutable. We're referring to this type of hashing process.

Now, this is called a Merkle tree.  So -- well, I don't know if we need to go into it.

Q.   I think we're okay at this high a level for the moment.  If it does come up, I think we can go a little deeper.  Back to this slide here.

A.   So we can see the 9 .17 Bitcoin transaction.  Again, that is coming from the theft.  We see immediately we have -- I did not know I could draw on this.  Did it draw on your screens or no?

Q.   I see the little pencil.

A.   Well, now I know.

So we have a co-spend here and another co-spend here on the outside.  So these -- again, the co-spends are the circles all in the one transaction.  So that transaction block, that's -- the actual transaction ID is there.  The circles are the addresses themselves, the UTXOs.

Q.   And the UTXO is the just unspent --

A.   It's the unspent transaction output.  So in this case, if we look at this very first co-spend, we see funds co-spent with one, two, three, four addresses, which were not traced back to the theft.  And only one of those addresses was.  Can you see that?  Okay.

So the very next transaction, the funds are then split into two.  And we continue the trace down to identify where those funds went.  Now, we can't say for certain where those funds went.  That is, the attribution, depending on how we obtained it -- right? -- but we can say within a probability.  Like, it's highly likely; or the funds are directly traceable back to the source, back to the theft.  That is how that report would be written.

So we see a number of outputs here, none of which are the OTC desk who received the subpoena; five exchanges and two services.

Next slide.  I don't know how to delete that on the

screen, so -- thank you for your help. It's okay. It's not in the way. Great. Thank you.

So 19 total hops here. You can see where CipherTrace stopped in the middle. By hop, I mean transaction. So that would be the gray boxes.

And then on the far right-hand side, you can see where the actual VASP or the OTC broker is in the trace. So two things happened. Single-entity clustering confused the investigator. They did not pull apart the cluster to get the correct UTXOs which spent the funds in each of these transactions. And we have a peel chain problem. That is heuristic, too. Again, that Pac-Man heuristic went through these peel chains, collected it all and went through the entities to say to the OTC broker here on the right-hand side. It went too far.

Q. Is it fair to say -- when you refer to heuristic 2 as the Pac-Man heuristic, is that because it's overinclusive of information, and that leads to erroneous results?

A. Yes. There are scientific papers that speak to that.

Q. And that's the heuristic that Chainalysis Reactor uses; is that correct?

A. According to the testimony by Ms. Bisbee, yes.

So we can see it's gone too far. I say Pac-Man because it provides a visual of what actually is occurring. Okay. Next slide.

These are clustering false positives. This is an example, essentially, of a PayJoin or a CoinJoin and how that may break clustering heuristics. That would be heuristic 1, multi-input clustering.

THE COURT: I have a question for you. Are there any studies that quantify the percentage of blockchain transactions involving Bitcoin that use CoinJoin versus not using CoinJoin?

THE WITNESS: I've read some reports about this, but I don't have any way to verify how that actually worked. But I'm extremely curious.

THE COURT: What reports have you read? What have you seen?

THE WITNESS: I can't recall the names.

THE COURT: No, no. I mean, what have the reports indicated?

THE WITNESS: Oh, I don't recall. I don't recall, but I remember thinking that's curious. Because PayJoins -- no one knows when a PayJoin occurs. This would be, like, an example of PayJoin.

THE COURT: Well, someone must have some sense because, among other things, there are services that provide CoinJoin -- that's the service they're selling -- right? -- so as long as you can track or use blockchain analysis to determine how many transactions are coming from the service that provides CoinJoin, you probably have some sense of the

magnitude. I'm just trying to get a sense.

Is this 1 percent of the transactions or 80 percent of the transactions that are currently taking place, or we just have no idea?

THE WITNESS: We cannot know. This is an example of a PayJoin, and this is exactly why we cannot know. There will be no indication on-chain that a Pay-to-Endpoint, PayJoin, has occurred.

And to your point, about knowing which services provide these CoinJoins and other anonymizing enhancing techniques, they would have to have really clear markers; and Ms. Bisbee talks about a fingerprint or a handprint, and specifically Mr. Scholl mentioned Wasabi CoinJoin and Chaumians. He's talking about Wasabi in particular; that one service, that one wallet.

In my testimony -- in my expert report, I talk about the number of CoinJoins and anonymizing services that exist. One of them is Samourai Wallet.

THE COURT: Right.

THE WITNESS: Samourai Wallet not only does CoinJoins, but they structure out their payments in such a way when a user participates or opts into the wallet software, it's called a shotgun. They don't look anything like this right here. In fact, it only comes with one output, and one output per block. So there's really no way for us to tell.

THE COURT: That's the point of the CoinJoin. There's only one output, but there are multiple inputs.

THE WITNESS: So in the previous *Daubert* hearing, Mr. Brown was asking Professor Verret about this very same thing.

THE COURT: Right.

THE WITNESS: And he said something like, it's -- I'm paraphrasing -- something like, is it fair to say that if you have at least five inputs into a CoinJoin, you'll have at least five outputs, and Mr. Verret responded yes, and the answer to that is no, absolutely not.

And in that particular case and with the references over and over to Wasabi, I'm coming to the understanding that perhaps Wasabi CoinJoin is the primary source of understanding for CoinJoins for the prosecution as according to their experts, when this is definitely not the case.

BY MR. EKELAND:

Q. Is it -- Ms. Still, is it your testimony that there's actually more than one type of CoinJoin out there?

A. Yes.

Q. And then did I hear your testimony correctly that there's CoinJoins that don't leave any on-chain information that allow you to determine the statistical currents of these types of CoinJoins?

A. Not yet. There are very smart people working on this

problem.

Q.  But as of today in this courtroom, there's no way to get an accurate statistic on the number of different types of CoinJoins that are being used to initiate transactions?

A.  To Your Honor's point about certain patterns, Wasabi CoinJoin would -- it's a very distinct pattern.  And this is what Mr. Brown is referring to, right?  That actually was in this case study, like four slides back.  You have 77 inputs, 120 outputs, you see structuring, .1, .2, .4, 1.6, 3.2 come out on the other side, plus the change.

That can be counted.  But as far as I'm aware, beyond that, we have no way of knowing, especially when we're talking PayJoins, which is a special case of CoinJoin.

THE COURT:  What is a PayJoin versus a CoinJoin?

THE WITNESS:  Yes.  So CoinJoin, two or more users combine their funds together.  You might see two different outputs, three different outputs, depending on that CoinJoin. It depends on how many users participated.

Within a PayJoin, one person is actually paying the other.  For example, let's say we go out for coffee and our coffees are like $12.  I have $5 in my pocket and you have $10. So we combine our funds together to pay for the coffees; maybe only one of us takes the change.

There's really no way to know unless an actor is watching us and can actually identify the individuals involved.

We can't see that.

THE COURT: All right. Thank you.

THE WITNESS: You're welcome.

BY MR. EKELAND:

Q. You want to take us through the rest.

A. That's the end of the --

Q. Oh, that's the end of the slide show?

A. Yes.

MR. EKELAND: Your Honor, we'd like to go more on the expert report. I wanted to see how the Court is feeling on time right now.

THE COURT: Let me just ask the court reporter how she's doing.

(Discussion off the record.)

THE COURT: Okay. Another 15 minutes.

BY MR. EKELAND:

Q. Ms. Still, did you review the government's expert reports in this case?

A. Yes.

Q. And you also reviewed the discovery as well; is that right?

A. Yes.

Q. And, in general, let me just ask you this. Do you think that it demonstrates that -- in your expert opinion that Roman Sterlingov operated Bitcoin Fog?

THE COURT: I'm sorry. I don't think that's what it

purports to show. I mean, at least if we're talking about the Bisbee report; I don't think that's what that report is about.

I think the report -- if I'm correct, I think that report is intended to show the dark websites that participated in Bitcoin Fog, but not -- there's a separate analysis with respect to Mr. Sterlingov.

MR. EKELAND: Yes, Your Honor. I was asking her for her expert opinion after reviewing all the expert reports in the discovery in this case whether or not it's her expert opinion that Roman Sterlingov operated Bitcoin Fog.

MS. PELKER: Your Honor, I think that's an improper expert opinion as to the defendant's innocence.

THE COURT: Certainly, it's not something I would allow in front of a jury. If he wants to ask the question now, I guess it doesn't cause any harm, but I wouldn't allow it in front of a jury, you're correct.

MR. EKELAND: May I ask the question again, Your Honor?

THE COURT: You may.

MR. EKELAND: Thank you, Your Honor.

BY MR. EKELAND:

Q. So, Ms. Still, after reviewing the discovery and the expert reports in this case, is it your expert opinion that Mr. Sterlingov operated Bitcoin Fog?

A. I do not see evidence on-chain of that type of involvement.

What I do see is that he was a customer of Bitcoin Fog.

Q. And you reviewed Mr. Scholl's report as part of your expert report?

A. Yes.

Q. And what was your opinion of Mr. Scholl's report?

A. So I have a number of thoughts. If it's useful, we can go through the evaluation together, generally speaking. I was struck by two things -- well, three things.

Number one, the table of contents were too short, and it was difficult to follow; a minor detail. But when you're reviewing a lot of discovery and reports, I think it's important to have those kind of links in the table of contents that can take you to the correct sections and have more than four sections identified in a 60-some-page report.

Number 2, it would be the cutting and pasting of the transactional graphs. This is -- this is not forensically appropriate for a report like this. I understand the need to condense down graphs because they do get quite large and, therefore, it is appropriate to include an entire graph of the correct trace and then break that down via PowerPoint or other method; if you prefer an Excel with a different UTXO spending in every single transaction, that is appropriate. It's a little bit more difficult to follow. It's not as easy as a visual. But, still, we can do this, and I've done this for courts before.

Q.  And then just directing your attention to page, I think it's 34 of your report, which is in evidence as Defense Exhibit C; it's behind Tab C.

THE WITNESS:  Mr. Hassard, is this what is up on the screen, 34 of the report?

MR. HASSARD:  Page 34 is on the left of your report.

THE WITNESS:  I see.

MR. EKELAND:  Just to be clear, on the left-hand side of the screen is page 34 of Ms. Still's report.  On the right-hand side of the screen is the corresponding page of Mr. Scholl's report that Ms. Still's report is discussing.

BY MR. EKELAND:

Q.  Ms. Still, can you just please take us through this.

A.  Yes.  So page 10 we have incorrect the dates.  The 2014 date should be 2019.

And on page 34 -- okay.  So we do not have a proper trace here backing up this particular conclusion from blockchain analysis.  It's missing that information.  So there are no lists of transactions, which I would prefer.  In fact, the transaction list is something that was missing from this report.

That's critical when we're identifying -- when we're actually tracing, because just identifying by address can lead to errors.  If we're saying one address or one cluster spent funds but we did not identify the hash, we do not know the

actual sender and the recipient. The hash ties the senders and the recipients. This is also missing.

Q. In your expert opinion, is this -- Mr. Scholl's trace forensically sound?

A. This is not forensically sound, nor is it complete. In addition to this, we're talking specifically about the Mycelium Wallet.

I did ask for the master extended public key, and as I understand, there were hardened derivation paths, so that could not be exported.

What is appropriate then at this time in order for me to confirm that I have all of the complete record of this particular Mycelium Wallet would then be the seed phrase, so then I can rebuild that wallet myself and then verify the true history of the transactions and addresses.

Q. That wasn't in any of the discovery produced by the government that you reviewed?

A. No. I did request it. I did not receive it.

Q. Anything else on page 34 before we move on to your comments on page 45?

A. I'm going to take a moment to look this over, please. Yes. Page 45. We can move on.

THE WITNESS: Mr. Hassard, can you scroll down a little bit. There we go. Thank you.

So I'm going to draw your attention to the actual

Bitcoin Fog section at the bottom of the Bitcoin blockchain on page 45.  This is what this is in regards to.

Page 45, there's no data justifying that this address is under control of Bitcoin Fog.  That is to say, CipherTrace, we do not have this attributed to Bitcoin Fog.  If this is contained within heuristic 2, this would be why.

Mr. Hassard, can you go back up to the top of the page for a second.  This is a different -- okay.  We're good.  Please scroll down on the export -- expert report to page 35.  Yes.  We'll start on page 46 of Mr. Scholl's report.

This page has a number of errors.  You can scroll up a little bit more, just to the top, Example 2 of similar fund movements.  Perfect.  Thank you.  Okay.

So to start with, this particular address, 12MDV, does not send funds to the address identified on Mr. Scholl's trace.  So if we look on the right-hand side, Silk Road address, 12MDV -- thank you -- spends funds to 1C8.

However, if you look this up in a public explorer, this transaction never happened.

Q.   When you say look this up in a public explorer, anybody in this courtroom with an internet access and a web browser could look up this transaction; is that true?

A.   Yes, sir.

Q.   Can you give an example of a public explorer that people could use to do that.

A. Mempool.space.

Q. Mempool.space. And this is just publicly available?

A. M-e-m-pool.

Q. And just taking you back to the -- so it's your testimony that this transaction actually never occurred?

A. This transaction did not occur as it is represented on Mr. Scholl's trace.

MS. PELKER: Your Honor, I apologize. I don't mean to interrupt. I just want to let the Court know, my kid took a cold home from daycare a month ago, and I just have this lingering cough. I noticed the Court putting the mask on. I am definitely not contagious, but I'm also happy to wear a mask.

THE COURT: I take your word. That's fine.

MS. PELKER: I'm sorry to interrupt.

THE COURT: Okay. Continue.

BY MR. EKELAND:

Q. I'm sorry. Just to reiterate your testimony there, the transaction that you just described never occurred?

A. Correct. Additionally, if I may?

Q. Yes.

A. User p-a-s, User ID 25- -- I can't really see that. If you want to zoom in, it's okay. But that user ID was not represented in any of the discovery that I was produced prior to writing this report.

So that user ID for user pas did not match in the Silk Road records that I was provided prior to writing the report.

Q. After you wrote the report, did you receive any new Silk Road records?

A. A few days ago we received another bunch of discovery in the Silk Road records. Unfortunately, the records were combined with other users' user IDs in a way that I was unable to determine actually what was going on.

So if I could get an explanation or a description of each of the columns of what this particular CSV file contains, that would help me understand what is happening here at Silk Road. I would also prefer, though, in addition to the descriptions of the columns and an explanation of the data, access to the true records.

Q. So, essentially, the Silk Road records you got weren't the original records from Silk Road?

A. No.

Q. And what you got were CSV, essentially, spreadsheets of data; did I hear that correctly?

A. Yes.

Q. And is it -- would it be proper to characterize your testimony as saying that data was, essentially, a little bit messy and mixed up?

A. It was jumbled. It was difficult to follow.

Q. Okay. So going back to this user here, though, you said here on page -- what is this? 46 of the Scholl report -- you're saying that when you wrote this report, you had no information about that user; is that correct?

A. I had information on user pas. However, user pas, p-a-s, that user ID did not match user pas. There was a different ID.

Also, I'll draw your attention to the date. If you look above on November 27, 2011, 60.41 Bitcoin was sent to Silk Road, user pas, and then on 10/27, one month earlier -- so this must be a typo -- funds were sent. I assume this is a typo.

Q. Do typos matter when it comes to this type of forensic work?

A. They can.

Q. How can they matter? Why would they matter?

A. If somebody has the wrong address, if they've copied and pasted the incorrect transaction hash, that can change the conclusions made by the investigator and will dramatically change the trace.

Q. Would it be fair to say that if there's a typo in an address, it could lead to a completely different trace?

A. Yes. It will not be the same public address. It's not the same account number, essentially.

Q. Is there anything else you'd like to draw our attention to on this page?

A. So at the top in the Silk Road account, we can see a circle with a Bitcoin -- with a 7.9 Bitcoin amount sending funds to the same account. I can't read the amount. 60 -- is that 60.4?

Q. Looks like 60.41. Is that --

A. This would be the Mt. Gox Account 1 box.

Q. 60.4 is what I see.

THE WITNESS: Thank you, Mr. Hassard.

So this looks like a representation of a co-spend here. However, there is no co-spend within Mt. Gox. I'm not sure exactly what Mr. Scholl is trying to say with these arrows.

I'm curious if this is not a true representation of how funds were spent on-chain because, if you look at the actual transaction here out from Mt. Gox to the address that he labels Bitcoin blockchain, this is an un- -- I don't know that it was -- unhosted address. There is no co-spend identified in the Scholl report right here.

However, if you pull up this address in this particular transaction, you can see that there's another input to this transaction.

BY MR. EKELAND:

Q. Two things. One, you used the word unhosted address. What does that mean?

A. That means self-custody.

Q.  Does that mean -- are you able to identify who has that address if it's unhosted?

A.  No, sir.

Q.  So an unhosted address means you just don't know the identity of whoever has -- controls the private keys to it; is that correct?

A.  That's correct.

Q.  And then did I hear your testimony correct to say that, actually, this trace here is missing an input?

A.  Yes, sir.

Q.  And what's the implication -- what, if anything, is the implication of that?

A.  So to miss another input into this particular transaction is actually to miss an opportunity to gain further information on this particular transaction and ownership.

So as an investigator, what I did was then traced back that input to a source, and I believe I had to go a number of hops, transactional hops backwards, and I came to the exchange Virwox.  There is nothing in discovery with Virwox on it, so that's where my traces stopped.

Q.  Is there anything else you'd like to call our attention to on this page 46 of Mr. Scholl's report?

A.  Tracing demonstration, complete history for cryptocurrency address.  So -- I'm sorry.  Here's the co-spend, is with the 12MDV going back to Virwox, not with the 1PFK.

Q. I'm sorry. Are you referring to your report or where are you --

A. I'm on my report, looking at it. So I just incorrectly stated that the co-spend on 1PFF went to Virwox. It's actually on the Silk Road deposit address, which actually would be critical, I think, if you wanted to determine ownership here or have a sense of who might have sent those funds out of Virwox into Silk Road. That would be user p-a-s. Again, I don't know the exact number of transactions, but you can see this in Reactor.

If you pull up the UTXO view of Reactor, you can look at this in a publicly available tool. You'll actually see that withdrawal come out of Virwox.

Does that make sense? Did I correct myself well enough for everyone to understand?

THE COURT: I think so.

BY MR. EKELAND:

Q. I understood. So is there anything else -- basically, the diagram that's on your report, on what I believe is page 36 of your report, that's what you were referring to with the co-spend and the trace back?

Did you say it went through Virwox and then to Silk Road; is that what you said?

A. So -- yes. So there's a withdrawal from Virwox through a number of hops into this Silk Road deposit address. Do you see

how there's the co-spend, the two addresses here?  And then if we look on the other side, we have the receiving addresses.

And, again, it's too small for me to see, but there are two separate addresses, none of which are on Mr. Scholl's report trace.

Q.  Is there anything else on page 46 showing Mr. Scholl's trace that you want to call our attention to?

A.  Could we please scroll down.  So this is going back to the Silk Road records and the records that I had when I wrote this report.

Some of the transactions, the amounts tied to the transactions, did not match what actually occurred on-chain. It's not clear to me exactly what happened.  But I think, to clear up, like, the confusion around this particular address, the withdrawal, the correct withdrawal address and the correct amount, for me I don't feel comfortable making any further determinations regarding that without access to the actual Silk Road records.

Q.  Did I understand -- I'm sorry.

Did I understand your testimony correctly in that the transaction amounts that are listed on page 46 don't match the transaction amounts in the Silk Road records produced by the government?

A.  So I don't see the actual amount represented here.  But in the Silk Road record, if we were to pull up the hash -- and,

actually, if we could pull them up in discovery, I can show you exactly which one I'm talking about.

Instead of spending funds, 60 Bitcoin or something -- it says 1 Bitcoin. I don't know what occurred there.

Q. Is there anything else you'd like to call our attention to in the transaction on page 46 of Mr. Scholl's report?

A. I think I've covered it.

Q. In your expert opinion, is that trace that Mr. Scholl did on page 46 forensically sound?

A. Well, I don't think this is an actual trace because an actual trace would, again, have hashes and correct identifiers. And, for example, if there was a withdrawal from Silk Road, from that particular user, that correct hash and address should be represented; and I don't see the hash; and I see an address that, when I look on a public explorer, does not match.

THE COURT: Okay. Why don't we go ahead and take our lunch break now. It's a quarter past 12:00. Why don't we come back at 1:45, and we'll continue then.

MR. EKELAND: Thank you, Your Honor.

(Lunch recess from 12:15 p.m. to 1:45 p.m.)

MS. PELKER: Your Honor, while the defendant is being brought out, one quick administrative note. We were able to connect with Chainalysis's counsel over lunch. He, unfortunately, has another matter in district court in Orange County on Monday. He said he can catch a red-eye if there's

any time on Tuesday that would work for the Court.

THE COURT:  All right.  Let me see what we have.  I appreciate your reaching out to him.

THE COURTROOM DEPUTY:  On Tuesday, the 29th, at 9:30 a.m.?

THE COURT:  Okay.  Does that work for everyone?

MS. PELKER:  That works for the government.

THE COURT:  He's going to be coming right from the airport.

MS. PELKER:  Yes.  If there's time later in the day on Tuesday, I'm sure he'd appreciate it.  But he's going to make it work.

THE COURT:  Mr. Ekeland?

MR. EKELAND:  We have something scheduled, but we may be able to reschedule it.

THE COURT:  Did we have anything else on Tuesday, Glenda, or is that the best time?

THE COURTROOM DEPUTY:  We could do 11:30.

THE COURT:  Is that better for you, Mr. Ekeland?

MR. EKELAND:  We're in a forensic training all day, actually, on blockchain that day.

THE COURT:  I see.

MS. PELKER:  Mr. Frentzen said he can do Wednesday as well if that works.  We're concerned about pushing things out too much.

THE COURT: I understand.

MR. EKELAND: The training that we're in is that Tuesday and Wednesday.

THE COURT: I see. Well, why don't we leave it on then for 9:30 and we'll hope to do it quickly. And, Mr. Ekeland, if you want to participate remotely from wherever you're doing the training, just step out to do that, that's okay with me. I'll leave that up to you and to Mr. Sterlingov. I would want to make sure you consult with him and that it's okay with him as well.

MR. EKELAND: Thank you, Your Honor. If we want to do that, should we just reach out to Ms. Walker?

THE COURT: Yes. But make sure you talk to Mr. Sterlingov, because only with his consent.

MR. EKELAND: Yes, Your Honor.

THE COURT: All right. You may proceed.

MR. EKELAND: Thank you.

BY MR. EKELAND:

Q. Ms. Still, just to remind you where we left off, if I remember correctly, we were looking at page 36 of your report, which I believe references page 46 of Mr. Scholl's report. Could you just, to get us back going again, just briefly explain what the -- you've got a diagram on the bottom -- well, actually, what is your page 35 discussing page 46 of Mr. Scholl's report.

If you'd just briefly remind us what's happening with that diagram you've got on the bottom.

A. Yes. So this is a snapshot from Inspector, and this is demonstrating that the address 12MDV, the deposit address at Silk Road, had a co-spend of this other address you see below in that trace.

So there was a co-spend, meaning possibly we can trace this back and identify maybe some connection to the Virwox.

Q. And if I recall your testimony correctly, that co-spend, that transaction you've got down there on the bottom of page 35, that is a transaction that Mr. Scholl did not document in his expert report; is that true?

A. It is not documented in the expert report. That is, it's not accounted for in this trace in Mr. Scholl's report, nor is the output address there, the 1C7 address, representative of who received the funds, and the true transaction, which is on my -- this page -- is it 35 or 36 of my report? -- 35 in this booklet.

Q. And then just directing your attention to the top of page 36 in your report, is that that transaction that you're talking about?

A. Yes. So this would be mempool.space. This is the public explorer that anyone can use, and you can verify that this is the true transaction that occurred between those addresses.

Q.  Can you just take us briefly, where -- the image where it says inputs and outputs from mempool.space, can you just explain what we're looking at there?

A.  Yes.  So on the left-hand side, you can see the address of interest here, the Silk Road deposit address, 12MDV, co-spend with another address in total just over about 60 Bitcoin.

And then the recipients are on the right-hand side. We can see the funds go to address 1DT and then some leftover smaller amount, 1EUJ.

Q.  And that -- again, just to sum up your testimony, if I'm summing up correctly, that's a transaction that Mr. Scholl missed in his report?

A.  This transaction is not accounted for in Mr. Scholl's report, especially on this page where it shows the arrow going from the Silk Road deposit address down to 1C7.  That transaction never occurred.  On the left-hand side, you can verify with CipherTrace Inspector and a publicly available tool, which is a free tool, the true transaction that occurred on-chain.

That is to say, that Mr. Scholl's representation here of this trace is not true to what actually occurred on-chain.

Q.  Is there anything else you'd like to say about Mr. Scholl's representation on -- what is that? -- page 46 of his report?

A.  No.  I mean, I guess I would just maybe offer -- I know he's not present here today, but if this isn't meant to be a

true transactional graph, I think some sort of disclaimer needs to be stated so it's clear to other investigators actually what he's trying to demonstrate because, in my opinion and from my experience, it's in best practice to include the true transactions that have occurred on-chain. And if we're not going to do that, we need to state what we're doing and why.

Q. And, again, it's your testimony that this is not a representation of the true transactions as they occurred on the blockchain?

A. That's correct.

Q. Moving on to page 37 of your report where you're discussing page 49 of Mr. Scholl's report, you've got a diagram there, where it says in the middle, 19 intermediary addresses of unknown control or ownership.

Could you just explain what's going on here.

A. Okay. So on the left-hand side -- and I'm looking at my report -- we see Mr. Sterlingov's Mt. Gox withdrawal. So there was a withdrawal made for -- what was it? -- two Bitcoin. And then we can actually visualize that entire trace as it looks on a UTXO level.

So if we were to rebuild this trace using a publicly available tool, like mempool.space, we would not have a graphical explorer, but you would see all of these addresses participate in each of these transactions as represented here.

THE COURT: Can I ask you a question which will

further demonstrate my lack of sophistication in this area.

But when you're using the UTXO, that's the unspent portion. So those are the coins that are -- money that's left over that doesn't go into purchasing the Bitcoin, correct?

THE WITNESS: Exactly.

THE COURT: Can you explain, why is it what you're tracking is -- what is unspent versus what's spent?

THE WITNESS: Sure. So I'm using the term UTXO to indicate addresses that are about to spend. So we're sort of suspending our understanding of how -- because they're about to spend but they haven't spent yet. And then we're going to trace through.

And those UTXOs, as a fact, are actually destroyed in the process when they're spent. So the address itself may still have funds attached to it, but the actual UTXO -- let's say, it was a $5 bill, and I'm using that to buy coffee, and I have some change left over, that $5 bill is now gone.

THE COURT: Right. I see. It's a temporal issue. It's sort of the moment before the transaction occurs?

THE WITNESS: Correct.

THE COURT: Okay. Thank you.

BY MR. EKELAND:

Q. If you could continue explaining that diagram, the 19 intermediary steps and what that's about.

A. Yes. As I understand it, this was the -- what was termed,

like, the beta transaction in the criminal complaint.  I actually found that term quite confusing.  That's not typically a term I would have used or -- to describe what's happening here.

I think there's been an assumption made that this is somehow a test transaction into Bitcoin Fog.  And if we look at the -- this is in discovery.  It's, like, BCF Beta 2 file, if you want to pull that up.  You can actually see the single-entity clustering and then an arrow kind of pointing to the address 1NEW or 1NEW, something like that, right?  It's kind of like saying this is the -- this is where the test occurred.

So I think the single-entity clustering confused that particular investigator.  I'm not sure if that was the IRS CI agent or who that was.  But that's not actually what occurred on-chain.  There's also no evidence for that.  Secondly, if someone were to test transactions or test out a new service or protocol, they would naturally go to the testnet in order to do that.

Q.  Just briefly, what is the testnet?

A.  It's a place where we can connect to a faucet and have testnet coins of whatever is the native currency on that particular blockchain and then test without actually spending any of our own money.

Q.  So in your expert opinion, what -- does what we're looking

at here, this trace -- which is also, I believe, on -- what is this? -- page 49 of Mr. Scholl's report -- is that a beta transaction where they're testing Bitcoin Fog?

A. As far as any of us can tell. The one thing we can agree on is that this is the first-known deposit into Bitcoin Fog. But that would be 19 addresses or 10 or so hops away from that withdrawal from Mr. Sterlingov's Mt. Gox account into Bitcoin Fog, which were then commingled or co-spent with additional addresses, whose source is Bitcointalk and Instawallet and one mining source.

Q. So what do you think of the -- I believe Mr. Scholl's conclusion and the government's implication that it's Mr. Sterlingov making the first deposit into Bitcoin Fog? Is that, in your expert opinion, an accurate description or attribution?

A. If you were to say a low probability or assign some low probability to this, that would have been better than what he said instead.

The implication, as I'm looking at this in his report, is that somehow he's tying the Mt. Gox account to this, what was termed the beta transaction, and this is -- we cannot do this for a number of reasons; not only distance -- so we have at least ten transactions in between the deposit into Bitcoin Fog -- right? -- with a number of co-spends.

We also have different clusters here, meaning at

least six different clusters that these addresses belong to; could be at least six different private keys, six different owners. I don't have access to those private keys. I don't have access to the master extended public key, which would allow me then to import all of these wallets and all of these clusters to then verify who was actually in control.

I cannot say that these addresses belong to the same wallet, neither can Mr. Scholl, nor anyone else.

Q. So we see on your chart there on page -- I'm sorry, what is this again? -- 37 of your expert report --

THE COURT: I'm sorry. Just to back up for a second here. Is a fair analogy of what you can see here versus the former conclusion that you have a picture of a defendant in a case getting into a 1982 Volkswagen Passat at a particular time and the Passat -- a Passat showing up at the residence where the crime was committed at a time that would be commensurate with how much time it would take to drive that distance, but you also know there are other Passats on the road.

So it's possible it was one of the other Passats, but it's also not an unreasonable inference if there were other evidence that it was his?

THE WITNESS: Well, I think -- so for the Passat, I think you would need to have -- I don't know. I think the analogy might break down here, but I'll try.

THE COURT: I'm not arguing one way or the other.

I'm making sure I understand. That's all.

THE WITNESS: Yes, Your Honor. I understand. So because we have different cluster identifiers and these clusters did not meet, if they had met, they would have the same cluster identifier. You could say maybe from different years or something like that.

THE COURT: Okay.

THE WITNESS: I don't know.

THE COURT: I understand your point. I mean, it's -- the point I was simply trying to get at was not so much that it was a Passat, but just that there is some inferential evidence, but that it is inferential given the fact that there are other possibilities that exist.

THE WITNESS: That's correct.

THE COURT: Okay.

BY MR. EKELAND:

Q. Ms. Still, just going back to the 19 intermediary addresses of unknown control or ownership, is it entirely possible, in your expert opinion, that those could have been controlled by people other than Roman Sterlingov?

A. Yes.

Q. And if I understand your testimony, what you've testified to is that there's actually no way of knowing because we don't have the information to determine ownership or control of those addresses?

A. I do not have that information contained within discovery; again, the master extended public key or the seed phrase that would allow me to import that wallet.

Additionally, what I do have in discovery are lists of addresses attributed to Mr. Sterlingov. He had the Mycelium Wallet, which, again, I cannot fully confirm because I'm lacking the seed phrase. But compared to what I have that was produced by the government, none of these addresses here are in Mr. Sterlingov's Mycelium Wallet or any other wallets attributed to Mr. Sterlingov, nor on the other side of this transaction here in Bitcoin Fog.

Q. So let me break that down a little bit. The first part, if I understand you correctly, what you said is that there are no known addresses that you know to be associated with Mr. Sterlingov as presented in the discovery by the government in this transaction besides that first Mt. Gox address; is that -- am I understanding that correctly?

A. Correct. There are a couple of addresses in this trace that Mr. Scholl references in his report and also in his testimony in his *Daubert* hearing.

Q. But we don't have the information in the discovery presently to confirm whether or not that is related to Mr. Sterlingov?

A. Or anyone else.

Q. Or anybody else. And then you mentioned that on the other

side of this transaction, on the other side of Bitcoin Fog, could you just -- that you saw something else. Can you just explain what you mean by that.

A.   So within this particular address, the 1YZJK, I would not -- I don't exactly know how to present this, but I would not completely disagree that this is some sort of intermediary or internal address to Bitcoin Fog. It does not behave the same as the deposit clusters that we all agree upon -- the IRS, the FBI, Chainalysis, and CipherTrace -- that are the true deposit clusters of Bitcoin Fog. This behaves very differently.

This address only clusters with one other address used one time, and I can actually build this trace out for you in live time if it makes sense. I don't know if it does. But I could show you what I'm talking about here.

So if we pull up the record of the transactional history of this 1YZJKa address, I can see all deposits and I can see all withdrawals. Now, my question is, if this isn't an internal consolidation address -- which, again, we cannot confirm unless we have access to the ledger, the Bitcoin Fog ledger, the servers as we know -- my sense is -- I'm curious if I can trace out on the other side. And I don't totally know.

So what I did do is I looked at those records of deposits and withdrawals to try to match inputs and outputs based upon what I can see being deposited specifically in this

first-known deposit to Bitcoin Fog.

I saw a number of interesting addresses. So I did a search, like Control F search, in the discovery to see if Mr. Scholl or anyone else had identified them. I don't know who it was; someone had already done that work for me. And I have -- those interesting addresses have other data associated with them specifically related to the exchange BTC-e.

And so there are, I think, two or three different BTC-e addresses. We have IP address records, we have records of those API keys controlled or utilized by those users at BTC-e, and we have some email addresses.

So one of the email addresses does trace back to someone. We were able to use open source to identify who possibly owns that particular BTC-e account.

Q. Let me -- I'd like to just unpack that a little bit. You said you attempted to trace through Bitcoin Fog and look on what was on the other side, which, if I understand correctly, what -- who or what was receiving deposits from Bitcoin Fog on the other side of the transaction. Did I understand that correctly?

A. Yes.

THE COURT: Can I just ask you to pause there for a second and explain -- have the witness explain to me, I thought the whole point of Bitcoin Fog was that you couldn't do that and it's a mixer. And so I wouldn't think one would be looking

for the incoming transactions and outgoing transactions. The whole point is you can't do that.

BY MR. EKELAND:

Q. Ms. Still, could you explain that to the Court because, yes, why is it that you potentially are able to trace through on this transaction and, as far as I understand, not on any of the other transactions?

A. I actually don't know that I'm able to do that. What I did is sort of breaking convention here. So what I can do is also look at the deposits into 1YZJK, and I can trace those backwards. They met in the middle, if that makes sense.

So I looked then -- I tried to identify the majority of funds. I also looked for, like, a two -- around a two-Bitcoin or a little less deposit getting pulled out from that --

THE COURT: Is the point here, in part, that if this was the first Bitcoin Fog transaction, that the way Bitcoin Fog works is by having lots and lots of transactions, and if it's the first one, maybe you can see what's going out, but if it's the millionth one, you can't?

THE WITNESS: It's possible. I wish I could confirm this. If we have access to the ledger itself or any of the Bitcoin Fog records, hopefully, that would be contained within that we could verify what's going on here.

There is part of this, though, that I'm -- I haven't

said yet.  So the deposits into this particular first-known deposit -- right? -- or mix cycle, if you will, it's about 43 or so Bitcoin; on the other side it's about 46 or so.  So we're gaining some Bitcoin in there.  So possibly there was already Bitcoin sitting in that account.  I don't know.  I'm kind of guessing at what might have occurred.

But what I can see, I guess -- well, first of all, did that answer your question?

THE COURT:  I think so.  I'll let you continue.

THE WITNESS:  I'm not -- I can't say with certainty what's going on here without access.  I'm guessing at what may have occurred.  I'm also tracing backwards from later deposits, and this is mentioned -- Agent Devon --

BY MR. EKELAND:

Q.  Are you referring to Mr. Devon Beckett?

A.  Mr. Beckett, Agent Beckett, also looks at a later transaction into the same deposit address.

Now, I'm going to back up a little bit here.  This deposit address was only active from this, kind of, date and time until about nine or ten months later.  It only transacted, I think, 33 times.  I can confirm that.  Something like that.

Curiously, it does not behave like the rest of the deposit clusters, which is why it kind of tickled my spidey senses, and I think as well as Mr. Scholl's, to say this doesn't really match what we know about this true deposit

cluster.

So kind of considering, even within CipherTrace:  How did we gain this attribution?  Where did it come from?  Are we sure this is Bitcoin Fog, or is this something else?

As we were looking at the deposits, the very first deposit, you can see all of those addresses -- right? -- like, all co-spending together.  Let's see.  I don't have a clear photo of this, but there's about five addresses that co-spend together and deposit into Bitcoin Fog.

We considered the possibility that this was a CoinJoin.  I don't know.  It's possible.  Later on, in Bitcoin Fog transactions, 2017, 2018, around when SegWit -- segregated witness -- address types come about, around August 1st, 2017, I do see evidence that Bitcoin Fog was actually utilizing CoinJoins.

Now, I think this was -- I'm guessing again, but I'm thinking this was a technique utilized here, not on behalf of their customers necessarily, the later CoinJoin.  I think this was done as just a practicality.  We have this new address type that came out.

So we need to -- we're going to have a different wallet, probably different sets of private keys, and we're going to try to kind of funnel everything to the same place, the same hot wallet for user withdrawals.  So -- I mean, it's squishy here, but this is kind of the business of tracing.

It's a bit squishy.

Q. If I may just take you -- you said when you traced through or attempted to trace through and you got to the other side of Bitcoin Fog, did I hear your testimony correctly that you said you came across a BTC-e account?

A. I came across at least two BTC-e accounts of interest. I then took those deposit addresses, copy and pasted, and did a search and discovery for those addresses to see if I had any information in discovery about them, and the government did have information regarding those two accounts.

Q. And where was that discovery? Do you remember what folder that was in?

A. Can we pull up discovery, and I'll find it for you.

Q. It's okay if you don't remember. First of all, could you explain to the Court what BTC-e is.

A. Yes. This is important for history. So there are a number of very interesting stories in Bitcoin, probably none of them dull, as you know, if you're in this space at all.

BTC is very interesting. I believe it is Alexander Vinnik. Alexander Vinnik was the CEO. He is, I think, under arrest or has been arrested for operating BTC-e as a means of laundering funds from the Mt. Gox hacks that occurred from 2011 through 2014 through its entire history. His two co-founders were recently indicted on suspicion of having organized that theft from Mt. Gox.

And they're on -- I don't know where they are. No one knows. They're not arrested.

Q. So on the other side of Bitcoin Fog, when you said you traced through or attempted to trace through, as you said, you found some BTC-e accounts, and you looked those up in the discovery, were any of those accounts on the other side on your trace-through of Bitcoin Fog attributable to Mr. Sterlingov?

A. No.

Q. Is there anything else you'd like to say or point out about your trace-through through Bitcoin Fog to the BTC-e accounts?

A. I mean, I could spend all day talking about this particular address, I think.

If you have something specific -- it's just a fascinating address to look through these transactions. Nothing really matches everything else we know about Bitcoin Fog, which is perhaps why this is -- this address is different or maybe it isn't Bitcoin Fog. Like, I'm not 100 percent certain here what animal, vegetable, or mineral, what exactly we're looking at here.

As I traced through the remaining transactions, those 33 or so whatever transactions, deposits, and withdrawals -- so 66 -- I see more deposits coming in with connections to Bitcointalk, lots of Instawallet. And from what I can tell, Instawallet didn't -- or said they didn't keep any records.

So I don't know how we can identify who controlled

those particular addresses, any address that is attributed to Instawallet. I did read in discovery that the government had requested that information, and Instawallet said something to the effect of like, we didn't keep logs.

Q. Does Mr. Scholl anywhere in his report -- and I think he discusses this transaction. We've got it up on page -- what is this? -- 49 of his report, does he anywhere describe attempting to trace through and finding these BTC-e addresses?

A. No, he does not.

Q. And do you know what KYC refers to?

A. Know your customer.

Q. Is it your understanding that Mr. Sterlingov's Mt. Gox account here at the beginning of that trace was a KYC account?

A. Yes.

Q. And it looks -- going back to the other side of the Bitcoin Fog transaction, we have a mining source, there's an Instawallet, and there's a Bitcointalk.

To your knowledge, are any of those KYC accounts?

A. No, not KYC accounts. But I think there is some types of identifiers that are present.

For example, on the mining transaction, if you put in that transaction hash in the mempool.space, you can pull out some kind of a code, and that code is going to identify, typically, the miner or the mining group or whoever mined that particular block and were awarded that Coinbase.

Q. And if you -- taking a look at the diagram that Mr. Scholl has of the same transaction -- on page 49 of his report that you've traced on, I believe, page 37 of your report, and if you compare the two, what's your opinion of Mr. Scholl's representation here on page 37 of that trace that you did on page 37 of your report -- I'm sorry -- page 49 of Mr. Scholl's report that you traced on page 37 of yours.

And you should be -- should be on the right-hand side of your screen right now, the Scholl trace.

A. I can't read it very well, so I'm looking in this booklet. Do you know where it --

Q. It's not in the binder. Although we do have it, I think, in --

A. I can speak -- thank you, Mr. Hassard. You just want to scooch it around as I go through the addresses.

So here's about the two Bitcoin withdrawal on this date and time; I was able to confirm that in the Mt. Gox records provided to me. However, those records are jumbled just as much as the Silk Road records. It's difficult to go through them for me.

I would prefer access to the true records, the natives. That just makes sense from a forensic perspective, to have the true records when you're making conclusions regarding any analysis related to on-chain transactions. If it's possible -- I'm in D.C.; I could do it tomorrow -- I would like

access.

Q. Is that because you're saying that the Mt. Gox records, as presented in the discovery, those were on a CSV spreadsheet?

A. Yes.

Q. And did you just say -- well, what's messy about that spreadsheet? Are there errors in it, or what's causing the difficulty, if you can say?

A. So I'm not seeing what I would expect to see with typical production from an exchange. I'll have a list of users, their information will be separate, I'll have their KYC information, IP addresses, log-ins, all logs, any communications. Again, this will be on a per-user basis, so there would be separate CSV files with separate workbooks, separate sheets for each of these users.

I would expect to see deposit addresses attributed to that particular account holder. Those are not there. And the way I received these records were in no particular order. Four different accounts, and they were just mixed; not in any order; not by transaction; not by date and time; not by amount; not by user. They were just kind of all thrown in. I don't know what happened.

But this was -- it's difficult for me to pull all of this apart and make sure I'm not making errors. Honestly, from a forensics perspective, it's just the right, proper way to review the true record.

Q. Taking you back to this trace now, I think you were starting there from the Mt. Gox account.

That's Mt. Gox account number one, which we do attribute to Mr. Sterlingov; is that right?

A. That's correct. If I may, it would almost make sense -- and maybe it doesn't for here -- but for me to go through this and walk through a trace because it's so difficult to see on this expert report, to go through transaction by transaction to show you how this builds out and use that particular tool. I could do it live, if that's possible. So we can compare from the Scholl report to my trace transaction by transaction.

Q. Are you asking if we could do this with -- from the -- I don't know if we have that capability.

MR. EKELAND: But, Your Honor, if we could take a moment and actually discuss this -- if not now, at some point, whether or not we can actually do -- have the expert witnesses do live tracing from the stand. I think this is kind of a unique issue here.

THE COURT: Ms. Pelker?

MS. PELKER: Your Honor, I think that it's a unique issue the defense should have broached and figured out before their witness is on the stand. I'm just very concerned about timing here. The government, obviously, would not be amenable to a -- would likely not be amenable to a live trace at trial where they're presenting things we've never seen before. And I

think it's just outside what we need for a *Daubert* inquiry here.

THE COURT: I think it probably is outside what we need for a *Daubert* inquiry.

With respect to whether you're surprised at trial, maybe the answer to that is just for the defense to make a proffer to you in advance of trial if they intend to do it. It's not a new expert opinion she'd be offering. It's just a further explanation of her expert opinion.

MS. PELKER: That's not -- I think that's just not clear to us, Your Honor, what she's going to show with this live trace.

THE COURT: It's not clear to me either. I suppose, could counsel -- doing it in front of me just to make sure that we all know where it's going, but to the extent she's just using it demonstratively to explain her expert conclusions, it does seem that it's within the scope of her report.

MS. PELKER: I think we'd suggest that she can do a video screen capture of it and walk through it. If she then wants to recreate exactly what she's done live on the stand so that the government isn't surprised by it -- I don't even think that that's necessarily an expert report basis issue.

But so far as -- I don't think it's appropriate for either side to be showing things to the jury that the other side has no idea in advance what's going to be shown until it

is actually in front of the jury, if that makes sense.  There would be no way for the government or anyone to see what it is until it's happening.

THE COURT:  This is probably the first Mr. Ekeland is hearing of this as well.  But you want to respond?

MR. EKELAND:  Yes.  And then I'm happy to move on for the time issues.

Again, I think the Court makes a really good point. We wouldn't be doing any tracing that wasn't already in the expert report.  This would, I think, more function as demonstrative.  I mean, the government has repeatedly said that all this information is on the blockchain.

We could -- we'd just simply be illustrating to the jury clearly, if I'm understanding Ms. Still, what was happening and just making it -- aiding them in understanding what's happening in this tracing, but we're happy to do a proffer and develop this issue outside the context of today.

THE COURT:  So why don't we leave it this way.  I am concerned about time myself and moving things forward today, so let's not do this on the spot today.  If this is something that you conclude you would want to do at trial, make a proffer with the government as to what it would actually be so they can see it in advance.

If I need to have a hearing in the midst of trial to decide whether to allow this or not, we can decide it at that

point in time.  I suppose the question will be whether it goes beyond the scope of the expert report and whether it raises new issues that the government would, in fairness, need time to respond to itself or need to have its own expert do.

MR. EKELAND:  Thank you, Your Honor.

BY MR. EKELAND:

Q.  Ms. Still, just going back real quickly, if you can, to the extent, with our time considerations in mind, if you can take us through Mr. Scholl's representation of -- on page 49 of the Scholl report the best you can.

Just take us through it and compare it to the trace that you did on page 37 of your expert report.

A.  Yes, sir.  So, Mr. Hassard, if you could move the graph over to the left.  Yes.  So we can all see it a little bit easier.  Perfect.  You went a little too far.  Okay.  Can you go back a little bit to where the yellow/orange line begins. That's great.  Right there.  Thank you.

So we can see the funds moving over into the first deposit address.  There is no transaction hash accounted for this.  We do not seek any cluster identifier or any other address identified, just the address itself.  This is not very useful as an investigator, which is why I must rebuild these traces using a publicly available tool or a tool like CipherTrace Inspector where I can view all of the necessary information related to the addresses.

Additionally, there is some metadata contained within each of these transaction hashes. So if we're going to go to a publicly available explorer, like mempool.space, we're going to pop in one of those hashes, and I'm going to have a list of details that I can expand, and then I can see all of the details related to that particular transaction. That's not accounted for on here either.

This will tell me the public key, whether or not the address is compressed or uncompressed, if there was a replace-by-fee -- which there will not be; this is way too early for that -- but those types of identifiers which Ms. Bisbee did put in her expert report on that page with the different address types. And I know we'll get to that later.

So that information is missing from this trace. Going forward, I can see the funds hop through these different addresses. My apologies, I can't completely read them. This looks like the 15- -- 15GL address, where you see three lines going to up there. Yes. Thank you. And then the funds moving around and then kind of arcing around going back -- I don't know -- coming back down and around.

So let's just follow that line. And to the 1NEW address, where those funds are then deposited into the address right beside it, which I cannot read.

So that particular transaction right there is mentioned by Mr. Scholl in his testimony and also in the

report, something about, like, a sweep transaction, what -- I thought that was a curious term to use. Honestly, it confused me. That's not a sweep transaction.

I think of a sweep transaction as funds being deposited into a proper service or a custodial entity and then those funds being moved over from a self-hosted address, unhosted self-custodying, into that service itself. There's no evidence that any of these addresses here are services. In fact, they all very much look like -- and they are -- unhosted addresses. In the CipherTrace tool, we do not have attribution that has any identity or any control or ownership determined for any of these intermediary addresses here.

In Mr. Scholl's report, those addresses are represented by, like, the Bitcoin symbol.

Q. Is there anything else you'd like to say about Mr. Scholl's trace on page 49 of his report?

A. I believe Mr. Scholl is -- I don't want to put words in his mouth, but I think he's trying to demonstrate here in Wallet 2 that possibly this is a deposit cluster into Bitcoin Fog.

We do not have this attributed to Bitcoin Fog. These are still unattributed addresses that co-spent together to make the deposit into the 1YZJKa address.

Q. So just to sum up your testimony in terms of the 19 intermediary addresses, those could be anybody or any kind of entity and not be Mr. Sterlingov?

A.  I don't see evidence that this would be connected to Mr. Sterlingov.  I also don't see any evidence that this is connected to anyone else.  I have no other identities to pull from.

I do not have that seed phrase for each of the individual wallets, et cetera.  Correct.

Q.  Anything else you'd like to say about this trace before we move on?

A.  Let's move on.

Q.  Just going to page 38 of your expert report and where you discuss page 54 of Mr. Scholl's report, it looks like you've got -- there's a quote from his report, it looks like, where it says Tx10, which I take it means transaction 10?

A.  Yes.

Q.  Could you just explain briefly for the Court what -- why you're quoting that and what you're talking about there.

A.  Well, this goes back to, kind of, Mr. Scholl and I agreeing that this address behaves differently, and he's offering up that this could possibly be an internal address at Bitcoin Fog used to consolidate.  That's his quote there.

And I'm saying it is possible; however, we actually do need those records in order to be able to confirm that.  I agree, it doesn't behave like the deposit cluster.

THE COURT:  When you say you need those records, they're not -- no one has them, as far as you know, correct?

These are not records that the government has or anyone else has?

THE WITNESS: As far as I know. I haven't seen any of the Bitcoin Fog ledgers or any of that information. No.

THE COURT: Okay.

BY MR. EKELAND:

Q. And then, briefly, on page 38 of your report -- you discuss you've got an excerpt from page 55 of Mr. Scholl's expert report.

Could you just -- starting, "According to Chainalysis Reactor, 31 out of 33 deposits" --

THE COURT: If you want the court reporter to get that down, you can't read that fast.

BY MR. EKELAND:

Q. Could you just briefly explain for the Court what's -- why you're quoting that and what's going on there.

A. Chainalysis Reactor has attributed those deposit addresses to Bitcoin Fog. He says right here, "31 of the 33 deposits to this" -- what they call -- "Bitcoin Fog cluster, are attributable to Bitcoin Fog and Chainalysis."

He says, "Only the first two deposits, including transaction 10 and one other deposit, 12" -- or deposit -- and I believe that's a reference -- "were from addresses not attributed by Chainalysis to the Bitcoin Fog cluster."

Is that what you wanted me to read?

Q. Yes. Just to -- if I understood you correctly, my understanding is that what Mr. Scholl is engaged in here is speculation because you can't confirm it without the internal ledgers from Bitcoin Fog; is that accurate?

MS. PELKER: Your Honor, I think he's mischaracterizing the witness's testimony. We're allowing some degree of leading to move things along here.

THE COURT: Some degree is an understatement. I was going to actually just say -- Mr. Ekeland, I just want to be completely clear about this. 90 percent of these questions would not be appropriate in front of a jury. I appreciate the desire to move it along, but it is true that you're testifying as much as the witness is today.

MR. EKELAND: I understand, Your Honor. I wouldn't ask these questions in front of a jury. I'm trying to move this along.

BY MR. EKELAND:

Q. Do you -- did I understand your testimony correctly that you said you can't confirm that these are the Bitcoin Fog addresses without the internal ledger to Bitcoin Fog?

A. That's true. I've also probably skipped over an assumption here. I'm realizing, as I read this, I'm assuming that these transactions will all be contained within the ledger.

I actually won't know until I have access to the ledger whether or not I can see all of the correct user

deposits and they kept good records. It's possible they didn't keep good records.

Q. Is there anything else you'd like to say about Mr. Scholl's report before we move on to Ms. Bisbee's report?

A. Well, if we look at page 39 of my expert report, I did want to point out that someone registered the ENS -- ENS name, which is Ethereum Name Service, for Bitcoinfog.eth.

Q. And what, if anything, is the significance of that?

A. I can see the address on-chain who registered this particular ENS, and I can see the date and time when they did that. But this is in reference to the NFT -- NFT, nonfungible token -- on the ERC-721 token type. ERC, Ethereum Request for Comment.

Q. Is that what the -- what you're talking about is the Ethereum Name Service that you're referencing in the middle -- roughly, the middle of page 39 that you're saying was registered on March 31st, 2023?

A. That's correct.

Q. Is there anything else you'd like to comment about Mr. Scholl's report before we move on to Ms. Bisbee's report?

A. No, sir.

MR. EKELAND: Your Honor, just checking on time. May we move on?

THE COURT: You may. I would encourage you to do so.

BY MR. EKELAND:

Q. You reviewed Ms. Bisbee's report?

A. Yes.

Q. And I believe you discussed it -- you start discussing it on page 24 of your expert report?

A. There are references previously to the -- I think there was a supplemental report or declaration provided by Ms. Bisbee. So there are references to other testimony related to Chainalysis citing scientific papers relating to their model and heuristic 2. But, yes, page 24.

Q. Do you see the header there almost at the top of the page saying, "Evaluation of Chainalysis Expert Reports"?

A. Yes.

Q. Could you just briefly take us through your discussion there with -- starting, it looks like, with page 8, Table 2?

A. Yes. Okay. To Ms. Pelker's point about Chainalysis has provided detailed information regarding address types; and so they've already covered kind of their bases in terms of how they applied heuristic 2, I -- if this is a complete table, then they are missing some items.

You can see that there are different address types not accounted for on this. So I have Pay-to-Public-Key, P2PK; P2MS, Pay-to-Multisig; Pay-to-Witness-Script-Hash; Pay-to-Taproot.

Additionally, the compressed and uncompressed key sizes are in the incorrect unit of data. There are eight bits

in a byte. So that should read byte, not bits.

Q. What's the significance of not having a number of the Bitcoin types? What does that do to the accuracy, if anything, of Chainalysis Reactor?

A. Well, it means if that particular heuristic is collecting information and then, what they term the fingerprint, we're missing fingers, or from the handprint, if that makes sense.

So this is not -- to me, this doesn't look like a complete representation of what they're doing, which is why it makes sense for me to understand, and I think for the Court to understand, how was this heuristic applied; how does the algorithm work; what address types are being taken into consideration, if any.

Are the -- did they actually, in their algorithm, use bits instead of bytes? That would make a big deal for compressed and uncompressed keys. Although they will still have the same private key, that seed from the private key, they will not be generated the same, in the same human readable address. So you will see two different addresses for the same key if it's compressed or uncompressed.

So this is something that I can't confirm if they've used all of this information as here applied to their particular heuristic and into their algorithms, but, if so, we're missing some things.

Q. Just directing your attention to the second bullet point

under the subheader page 8, Table 2 where it says, "The table states that the P2SH is a 'SegWit address' that begins with the 3," and then you say that is false.

Can you elaborate on that and explain to the Court what you mean there.

A. So a -- SegWit stands for segregated witness, and this is a way to save block space in transactions. It will also make your transaction fees a little lower. So the idea is to increase the number of transactions that can fit within a block, right? So that a miner is putting within a block. They make things a little cheaper for users.

However, this particular address provided is not a SegWit address. There is no separate witness data. As you can see on any public explorer, you can put that address into mempool.space or Bitaps, and it will say there is no segregated witness or no witness data. That means that data is not there. It's not a SegWit.

Q. And then on the -- is there anything else you'd like to say on that point?

A. I don't think so.

Q. At then at the third bullet point -- I think you mentioned this slightly before -- it says, "The table uses the wrong unit of data when referring to compressed or uncompressed keys."

Could you explain the significance of any of that.

A. Well, like I said, I mean, this is the application of this

information in heuristic 2 and their algorithm that they use. I don't know how this is being applied, if bits instead of bytes is a typo, or if 33 bits were used for compressed keys instead of 33 bytes.

So when we generate a public address -- okay. I will back up two steps. Private keys, very large numbers, randomly generated. It comes from this prime field, and for the standards of efficient cryptography, identifies the specific Elliptic curve used to generate private keys. In this case Bitcoin uses SECP256K1 and R1.

So that's the Elliptic curve where these private keys come from, right? So now, kind of like the formula to create a public key, to derive that from the private key is actually quite simple, although it just involves very large prime numbers.

So you start with P, your public key, equals K, your private key multiplied by some generator point. That generator point is pretty much a standard that's on the curve itself. It is actually a point.

So that means, when you're multiplying this number, this 256-bit number, which that means 2 caret, to the 256, right? That's an exponent. That's like -- that's 77 zeros out. That's an enormous -- I don't even know what that number is called. It's enormous.

So we could say -- let's say this private key is 74

quadrillion or something; an odd -- right? -- prime. So we're going to take that, multiply that by this generator point on the curve, and I actually -- I don't know if it's useful for me to draw this out, but it does help -- a visual, when trying to understand how we generate these addresses.

So -- but anyhow, we're going to multiply, basically, and move that point around depending on what our private key is, 75, 74 quadrillion times around that curve. It's going to bounce around, and we're going to end up at some point. That particular point is an X and Y coordinate. Each of those X and Y coordinates are 32 bits each, and that's on the Elliptic curve itself.

Does that make sense?

Q. I think it does. If you've confused bits and bytes, you would be really off?

A. Again, I don't know. This is compressed and uncompressed. We're not even quite here yet.

So then we have some points for our public key on the Elliptic curve. Now, we need to do a number of things to it. Our wallet software will determine whether or not we want that compressed or uncompressed. Sometimes you can choose. Anymore, I believe it's kind of standard to compress that particular point.

And then from there we're going to encode it. And depending on the address type itself, we can encode a couple of

different ways. And then we'll end up, you know, with our public address that came from that public key that came from that entire process I just described.

MS. PELKER: Your Honor, I don't want to interrupt the witness, and defense counsel can continue down this road. I can represent this was just a typo. Defense can make a big deal about the fact that there was a typo of bits for bytes. He's welcome to continue, but just in the interest of time.

THE COURT: I understand the difference between a bit and a byte, so I think we can move on.

BY MR. EKELAND:

Q. Ms. Still, directing your attention to the second-to-last bullet point on the page under the subheader that says page 12, Section 1.2, you've got a sentence at the end of that bullet point that says, "How can the same addresses be switched from uncompressed to compressed and still output the same human readable address hash?"

This is on page 24 of your report. Can you explain that.

A. That's just to say -- it's the same compression/uncompression issue -- addresses are not -- you're not going to switch between a compressed and uncompressed. I'm not sure exactly what they were trying to describe in this particular -- perhaps they meant that Bitcoin Fog included compressed addresses, but no addresses were changed from

compressed to uncompressed or uncompressed to compressed.

Q. Then in the final bullet point on this page 24 where you're saying the report states that the first known -- on the final bullet point on page 24, you say -- the report states that "The first-known Bitcoin Fog transaction where the change is a P2SH-WPKH SegWit address in block 534129," and then there's a long address. And then you say, "Reviewing this transaction reveals there is no witness data and no addresses participating."

Could you just explain that -- what that means for the Court.

A. Again, this is relating to a wrapped SegWit, which was something that was done to kind of help carry over the awkward time from the time that SegWit was enabled around August 1st, 2017, until other protocols, wallet software, exchanges, services could all update their nodes if they chose to accept SegWit. This was considered a soft fork.

So this was not a rule in terms of every node has to agree or every service has to accept this particular address type. In fact, they did not, and they still have not.

But what this is stating here is that this -- the addresses in this transaction hash -- this is a transaction hash where we're in this particular wrapped SegWit address type; however, there is no witness data, again, on either of those addresses. So this is incorrect.

Q.   Just turning to page 25 -- and you've got some images there -- is that related to what you were just talking about?

A.   Yes.

Q.   And what are we seeing there?

A.   Mempool.space and bitaps.com.  And this is the -- some of that metadata, again, contained within that particular hash.  So this is demonstrating there's no witness data here.

Q.   And then on -- turning your attention to the -- page 26, just starting at the top, you've got a number of points.

Can you just -- starting with page 13, Section 1.2, and then going down, could you just take us briefly through each of your points here about Ms. Bisbee's report.

A.   Sure.  I'll go quickly.  Page 13, 1.2; what is RF.  If RF means RBF; that should say Replace-by-Fee.  So RBF would be part one of those fingers in the handprint, if you will; that -- when we identify transactions by.

And I think that must be a typo.  However, as you can see, I've written here they weren't present until after November 2016.  So there would be no Replace-by-Fee prior to that in Bitcoin Fog.  That first transaction occurred -- what was that? -- November of 2011.

So missing some screenshots, page 15.  I would like screenshots for those onion addresses and those services referenced.  2.2, this is critical in -- regarding the AlphaBay attribution.  This particular address is identified as having,

again, some sort of handprint in a way that allowed, as I understand it, Chainalysis to identify a bunch of AlphaBay attributions.

However, there is -- the address itself is not active during those dates identified in this section, and it only had two transactions ever. So I'm curious if the AlphaBay clustering is inaccurate or how this address played a role in that -- attributing all of AlphaBay, if that makes sense. But to me, this is quite -- this is notable.

Q. If I'm understanding you correctly, it's notable because it calls into question the accuracy of the AlphaBay --

MS. PELKER: Objection, Your Honor.

THE COURT: Sustained. You can just ask her why is it notable.

BY MR. EKELAND:

Q. Why is it notable?

A. So this address is used to sort of create, like, a baseline of behavior. But its behavior was not accurately recorded, at least according to this section here. Anything further from that could be inaccurate in one way or another.

I cannot, again, confirm without understanding the source of attribution for each of the addresses in each of the clusters, any clustering errors that might have occurred, and that entire paragraph that I believe we submitted to the government in requesting that information.

Q. If you could just briefly take us down the rest of the page there. If there's anything you want to add.

A. Missing screenshots.

Q. Again, could you just remind us why the screenshots are so important.

A. They're great because these are V1V2 onion addresses. They're not around anymore. So if someone could just show a screenshot of actually what was captured from these addresses, what the web page actually looked like, what the deposits, the withdrawals, whatever they're describing, it makes sense to include them in a record since that record is no longer accessible.

Q. When you say they're not around anymore, what precisely does that mean?

A. I can't access these websites anymore. So I would like -- I would like to see the screenshots. If they have them and they just didn't include them, I would appreciate it if they could send them over.

Q. And then just -- we're almost to the end here. The -- on page 27, is there anything you would like to call to the attention of the Court?

A. Yes. So this is including their CSV file provided to us regarding how the addresses clustered, whether they were attributed via a co-spend, heuristic 1, or a peel chain behavioral heuristic 2.

So then we compare that against our attribution data, and it appears that of the 925,000-odd Bitcoin Fog data points, that 527,000 or so of them came via heuristic 2, which is that peel chain heuristic; the Pac-Man heuristic.

Q. Is there anything else you want to call to the Court's attention on page 27?

A. Not on 27. On page 28, I'll just note right here, since the Court asked and we were discussing deposit addresses for Bitcoin Fog, that this cluster identifier, 003739a5, was the deposit cluster as we knew. And that that 1YZJKa address that didn't quite fit is not contained within that cluster.

Q. Anything else on page 28 you want to call to the Court's attention?

A. No, sir.

Q. Could you just briefly explain the -- well, the diagram on page 29.

A. This is showing you the deposits into that deposit cluster that the IRS, the FBI, Chainalysis, and CipherTrace identify as the deposit cluster and the change going back into the deposit cluster and then the outputs going to the hot wallet.

Q. Is there anything else you want to say about that diagram?

A. No.

Q. On page 30, you've got -- it says up at the top, "CipherTrace Sentry API Pulls From Clusters." And then it looks like it goes on to page, like, 32.

Could you just briefly explain what that means to the Court.

A.   Yes.  So I'm showing you that -- the difference in clusters here.  So I'm pulling data from the deposit cluster, and I want a record of transactions and where do those funds go after that.  In this case, they go to a different cluster; not the deposit cluster we all identified, not the hot wallet we all agreed upon.  It goes to cluster 0323355a.

And then on the next page, 33 -- well, you can see the different clusters identified by color.  There, CipherTrace has these attributed to Bitcoin Fog, as does Chainalysis.

Q.   And then on page 34, you've got a comparison of the CipherTrace and Chainalysis dark market attributions.  Could you just briefly summarize that for the Court.

A.   So we compared our attribution data, and this would be the discrepancy rate and percentage.  So you can interpret this as CipherTrace is missing 20 percent of that attribution.

We could say, notably, AlphaBay around -- and these are estimates -- around 96 percent.  This is part of the 6 million addresses and 20 million transactions that we were looking at, and we were comparing our attribution data here.

THE COURT:  So when you say AlphaBay 96 percent, does that mean that there was, in your view, 96 percent too many attributions or 96 percent too few attributions in your view?

THE WITNESS:  I don't know exactly what that means,

but it's notable because the number is so high and there's such a high disparity with AlphaBay.

And about four pages ago we did discuss AlphaBay and how that one particular address was used to identify a baseline behavior for AlphaBay, and that address was identified in its behavior incorrectly in that Section 2.2 AlphaBay.

THE COURT: What about Bitcoin Fog, what does the 67 percent mean?

THE WITNESS: That is attributed. That is the difference between heuristic 1 and heuristic 2.

THE COURT: Right. But is it a plus or a minus, or you don't know?

THE WITNESS: That is -- sorry.

THE COURT: Is Chainalysis identifying more transactions than CipherTrace or is CipherTrace identifying more?

THE WITNESS: Yes. So -- yeah, 67 percent more.

THE COURT: So 67 percent where -- another way to think about this is you use heuristic 1, you're using the co-spend, right?

THE WITNESS: Yes.

THE COURT: -- heuristic, and just that?

THE WITNESS: Yes. Well, we'll use direct attribution as well.

THE COURT: Okay. So direct attribution and co-spend

shows 33 percent of the transactions, and the other 67 percent are based on heuristic 2 or 3 or the combination of all three?

THE WITNESS: That's correct.

THE COURT: Okay. It doesn't mean that it's wrong by that percentage point. It just means --

THE WITNESS: No.

THE COURT: -- that there's a difference between your -- you're taking a much more conservative approach?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

BY MR. EKELAND:

Q. Ms. Still, is there anything else you'd like to say about your expert report?

A. No, sir.

MR. EKELAND: Your Honor, I pass the witness.

THE COURT: All right. How much time do you think you'll need, Ms. Pelker?

MS. PELKER: I think we'll go until the end of the day, Your Honor.

THE COURT: Okay. Maybe we should take our break now then. We've been going an hour and 20 minutes. Why don't we come back at 2:15 (sic).

MS. PELKER: Yes, Your Honor. And we have a couple housekeeping matters regarding the witnesses for tomorrow that we just want an opportunity to discuss.

THE COURT: Do you want to raise it now?

MS. PELKER: We can raise it now or when we come back.

THE COURT: Let's hear about the housekeeping matters and then we can take the break.

You will learn for purposes of trial that we're being protective of the court reporter, whose job is extremely challenging. We should all make sure not to talk too quickly and also not to talk at the same time and recognize that she can only go for an hour and a half or so before it becomes hard to keep going.

MS. PELKER: I believe I'm constantly begging the trial reporter's forgiveness, Your Honor, and will continue doing so.

THE COURT: Fair enough.

MS. PELKER: Your Honor, for tomorrow we have Ms. Mazars de Mazarin, who is the government's computer scientist, who we had hoped to put on today; I think likely tomorrow.

THE COURT: Okay.

MS. PELKER: We also have a disagreement with defense counsel as to whether they have sufficiently raised a *Daubert* challenge of Ms. Glave and Mr. Vlahakis, which we wanted to discuss with the Court. We've previewed this previously.

Ms. Glave is a forensic accountant. She is not

giving any sort of opinion testimony. She's just testifying to the financials and summaries of them. And Mr. Vlahakis is a FinCEN fact witness.

These were noticed out of an abundance of caution to the extent that their testimony is on specialized matters. Neither one of them are going to be offering any opinions whatsoever, and we don't think that there's any real question as to their qualifications or methodology.

THE COURT: I'm not sure whether it's opinion testimony or not, but I also understand they're going to be describing some of the equipment that, if I have the witnesses right, Mr. Sterlingov had in his possession and what it's used for.

MS. PELKER: Not for -- so Ms. Mazars de Mazarin, the computer scientist --

THE COURT: No, no, I understand that.

MS. PELKER: Mr. Vlahakis, he's from the Financial Crimes Enforcement Network. He's going to explain what the Financial Crimes Enforcement Network does, what the Department of Treasury obligations are for registration. He is not going to opine as to whether Bitcoin Fog was required to register.

That's an issue that will, ultimately, be before the jury. He's just giving fact testimony.

THE COURT: Okay.

MS. PELKER: And Ms. Glave is just going to testify

to the financials, nothing about the nature of --

THE COURT: Which financials? Give me a little bit more on that.

MS. PELKER: That is the various different accounts. We can pull up a list. But it is, essentially, the --

THE COURT: These are the frozen accounts you're talking about?

MS. PELKER: Excuse me?

THE COURT: The accounts that were frozen?

MS. PELKER: The accounts that were frozen or that were in Mr. Sterlingov's name that were used by him for receiving funds from Bitcoin Fog and other sources.

THE COURT: Okay.

MS. PELKER: So both the cryptocurrency exchange accounts and the Fiat accounts and bank accounts.

THE COURT: Okay. All right. Mr. Ekeland?

MR. EKELAND: Your Honor, the government has noticed both Mr. Vlahakis and Ms. Glave as expert witnesses.

THE COURT: Even if their testimony is expert witnesses, are there any question under *Daubert* as to whether the appropriate -- the testimony would be appropriate, either whether they were qualified or whether they are using accepted or reasonable methodology?

MR. EKELAND: I do have that question both for Mr. Vlahakis and Ms. Glave because this is, basically, a very

novel field, and they both --

THE COURT: It's not a novel field to say this is the money -- this is how much money was in a particular account on a particular date, right?

MR. EKELAND: I believe one of the things that Ms. Glave mentions on page 2 of her expert disclosures, she said she may also rebut defense argument that proceeds were profits where the proceeds -- where the profits of his Bitcoin sales -- which is, again, a matter of opinion. I'm looking -- we just got the summary --

THE COURT: I mean, I thought that was your position itself. I mean, I'm not sure it's even a disputed issue, right? Didn't you -- didn't Mr. Sterlingov testify in front of me at the hearing that that's what they were; they were profits that he earned from his Bitcoin transactions?

MR. EKELAND: Yes. But she's going to offer an opinion that they weren't.

THE COURT: They were not or they were?

MR. EKELAND: That's my understanding; potentially, that she's being noticed to rebut the defense argument that --

THE COURT: I see.

THE EKELAND: -- Mr. Sterlingov's proceeds were the profits of his Bitcoin sales, which are going to be a matter of her opinion and not personal knowledge.

THE COURT: Maybe the bottom line would be -- with

all these witnesses, I worry a little bit about giving the bottom line. But the -- if she's simply saying, if you look at the value of Bitcoin over time and you look at how much money is in the accounts, it just doesn't match up. That's sort of classic, sort of, forensic accounting.

MR. EKELAND: Well, there's some serious questions about her methodologies there. How are you valuing Bitcoin, how are you accounting for --

THE COURT: That's not so complicated, right? Couldn't I do that at any point in time? You go on the internet, you find what the value of the Bitcoin is on a particular day?

MR. EKELAND: No, because early on there's no established exchanges of value. You can go back and look at the historical data, but I don't think the historical value goes back, and I don't think it's like looking up the price of a stock on a given day because the market wasn't necessarily liquid.

And then anything that you're looking at, I think, early on, particularly starting in 2009, 2010, 2011, even maybe into 2012, 2013, is bit anachronistic. I don't think that you can look at the value of Bitcoin early on and definitively say its value, and then you've got its change over time. So it does matter who you're looking at, what --

THE COURT: Can't you just do that -- isn't that just

usual cross-examination, if you want to cross-examine the witness?

What I'm worried about here is that we're turning this into a civil case with a judge sitting in on all of the depositions in the case and that the purpose for a *Daubert* hearing is a fairly narrow purpose. If this isn't discovery -- and I have other ways to spend my time; I'm quite busy. I just don't want to be sitting in on what are really the equivalent of civil depositions.

If it's something where there's no reasonable probability I'm going to exclude her as a witness on the grounds that this means of valuing Bitcoin is so suspect, then it seems to me that this is reasonable ground for cross-examination on your part.

MR. EKELAND: Your Honor, this isn't a civil case because Mr. Sterlingov's liberty is at stake.

THE COURT: No, no. I'm sorry. My point was just the opposite. Discovery is much more limited in a criminal case than in a civil case.

MR. EKELAND: Well, that may be. But the defense submits that we are entitled to cross the noticed -- to *Daubert* the noticed expert witnesses from the government and --

THE COURT: That's not true. It's only true if you can establish some threshold that there's reason for me to doubt or to -- there's some reasonable probability or

possibility that I would exclude the testimony on the grounds that it is so unreliable that it ought not be presented to the jury. If it's not that, then it seems to me that it is discovery.

MR. EKELAND: Well, Your Honor, with Ms. Glave, we'd submit that her valuations in relation to Bitcoin's appreciation over time are going to be speculative, and we're entitled to inquire into her methodologies in determining those values because there isn't any solid, sound way of valuing Bitcoin early on.

So we would argue that we're entitled to delve into that. And as for --

THE COURT: Are you not going to offer any evidence with respect to valuing Bitcoin early on because you think that is sufficiently unreliable and there's no way to do it reliably?

MR. EKELAND: I just didn't hear you.

THE COURT: Are you not going to offer evidence with respect to the valuation of Bitcoin during that period of time?

MR. EKELAND: No. But there --

THE COURT: No, you're going to; or no, you're not going to?

MR. EKELAND: We are going to offer our own valuations. But there is -- the serious caveat here is, where are you turning to for the valuation of -- say, the exchange

rate of Bitcoin on November 20, 2011. Are we going to go to *Yahoo Finance*; are we going to go to *Bloomberg*; are we going to go to the *Wall Street Journal*.

I mean, the market is liquid now, but you're making assumptions that the market was liquid back then. I don't think it's as simple as just doing a Google search. Maybe that gets you initially started, but I think if you're going to make these kinds of representations about the valuation and, particularly, if you're going to be using the expert to make the argument that Mr. Sterlingov somehow is getting service fees from Bitcoin Fog and that the numbers don't add up, I think that's a highly speculative venture.

And I think we're entitled to examine Ms. Glave on the basis of her opinion there and, you know, her methodology.

THE COURT: You're certainly allowed to at trial examine her on that. The question is whether you've made a sufficient showing for *Daubert* purposes that her methodology is unreliable or that I might conclude it's unreliable.

Let me ask Ms. Pelker. What is Ms. Glave going to say? Is she going to go back and look at some past database for identifying the value of Bitcoin going back to 2011 or so?

MS. PELKER: We will have to check back with Ms. Glave as far as which market index or indexes and exchange rates she consulted, but that would be her testimony.

Defense is welcome at trial to cross-examine her on

why she chose the particular indexes or exchanges that she did. Mr. Verret's testimony included his valuation from that time period. So if they want to put forward an alternative one, they're welcome to do so.

THE COURT: What I'll do is I'll just direct that the government disclose to the defense which databases she was using. And if there's some reason to doubt the reliability in a fashion that would permit exclusion or require exclusion under *Daubert*, then I'll allow the defense to -- probably on the day Ms. Glave comes to testify, we'll just do it outside the jury for half an hour and do it that way.

MS. PELKER: That's fine, Your Honor. Thank you.

THE COURT: Anything else?

MS. PELKER: Just clarifying for Mr. Vlahakis -- there's no need for Ms. Glave or Ms. Vlahakis to come tomorrow?

THE COURT: Anything on Mr. Vlahakis that you think would be -- that raises *Daubert* issues?

MR. EKELAND: The defense, without belaboring the point, would like to *Daubert* Mr. Vlahakis, but I think we also have had a -- and this is a separate question -- question as to his -- relevance of his testimony in this case when it seems to be that he's going to be testifying to matters of law, which are the province of the Court.

And to the extent that he's going to be opining on the regulatory environment in relation to Bitcoin Fog, again,

we're in speculative territory because, as far as we're aware, there is no regulatory environment in 2009, 2010, 2011, 2012, 2013. And there's this anachronistic element to this case where there's a projection of the current standards as they're perceived to be back in time.

What our concern is, is that Mr. Vlahakis is going to come in testifying about legal matters and regulatory matters that, A, are not relevant; B, are going to confuse the jury; and C, be far more prejudicial than probative. We just don't see his relevance as a witness, and we object to him being called and we also, again, would like to *Daubert* him.

THE COURT: It doesn't strike me that what you're describing is a *Daubert* issue.

But what about with respect to the other issues, Ms. Pelker.

MS. PELKER: I think, first and foremost, the Court's very correct. That is simply not a *Daubert* issue. Mr. Vlahakis is absolutely not going to be offering an opinion, and he is very clear and FinCEN is very clear that they're not going to invade the province of the jury or the Court as far as his area of testimony.

He is really explaining to the jury what the Department of Treasury is, what the obligations are generally; not speaking directly to Bitcoin Fog. I think defense counsel is grossly misstating the applicability of the law and the

regulations, but that is an argument that the government is going to make to the jury in asking them to find Mr. Sterlingov guilty of the 1960 violation, not something that Mr. Vlahakis is going to be testifying about.

THE COURT: So give me a little bit more about what he's going to testify to.

MS. PELKER: If the Court would like, I can have Mr. Brown, who is handling his testimony, give a proffer.

THE COURT: That's fine. That would be helpful. Thank you.

MR. BROWN: Yes, Your Honor. Mr. Vlahakis is going to be testifying about what the Bank Secrecy Act is, why it matters, what the obligations are for financial institutions in general. And that will provide context to the jury about, well, you know, here's this offense, failure to register with FinCEN, and that that is criminalized in 1960.

And Mr. Vlahakis's testimony will help the jury understand, well, what is the point of registration, why -- you know, how does FinCEN regulate these entities, what are the sorts of reports that regulated entities are required to file, why that's important for preventing illegal activity in the financial system. It's explaining to the jury this, sort of, "so what?" of the 1960(b)(1)(B) count.

THE COURT: Okay. Mr. Ekeland?

MR. EKELAND: Mr. Vlahakis is not a witness with

personal knowledge of anything in this case. The government is now saying that he's not going to be testifying as to any opinions, if I'm understanding the government correctly, and that he's going to be testifying as to questions of law and the regulatory space.

Not only do we submit that this is relevant -- irrelevant, but to the extent that it is relevant, it is far more prejudicial than probative. This Court is quite capable of explaining the law to the jury. Mr. Vlahakis seems to be brought in purely to -- for prejudicial purposes.

And I don't see how his testimony is relevant because he's not a witness -- percipient witness with personal knowledge of anything, and now we're being told that he's not going to testify as to opinion, and he's simply going to tell us the legal and regulatory framework and why it matters and why it's important.

And I would submit to the Court that the importance of the regulatory legal environment is a matter of opinion. So we object to this, Your Honor.

THE COURT: I don't know whether it's opinion or not. I mean, it does seem to me that it involves some expert testimony in that it -- he's testifying based on his specialized experience in a field and describing how that field works.

I don't think that based on what I've heard there's a

basis for a *Daubert* hearing. But, Mr. Ekeland, you preserve any and all objections you have, and you can raise them in light of his testimony as appropriate.

MR. EKELAND: Yes, Your Honor. We do object, and we will object on that basis. Thank you, Your Honor.

THE COURT: That's fine. All right. Let's take our break, but let's not come back at 2:15. We can come back at -- I'm sorry. Yes. That clock is not right. So it's 3:20. Why don't we come back at 3:35.

(Recess taken.)

THE COURT: All right. Ms. Pelker.

MS. PELKER: Thank you, Your Honor. May I have the Court's permission to pass the exhibit binder up to the witness?

THE COURT: You may.

MS. PELKER: Thank you.

CROSS-EXAMINATION OF

JONELLE STILL

BY MS. PELKER:

Q. Good afternoon, Ms. Still. I'd like to direct your attention to the binder in front of you, specifically Tab 10, your expert report which was previously admitted as Defense Exhibit, I believe, B.

Turning to page 41, is that your digital signature on the report?

THE COURT: Page 40.

MS. PELKER: 40. Thank you, Your Honor. I believe it was 41 of the PDF.

THE WITNESS: Yes, ma'am.

BY MS. PELKER:

Q. Ms. Still, did you prepare this report yourself?

A. Yes, ma'am.

Q. Did you write it in its entirety?

A. Yes, ma'am.

Q. And do you still agree with all of the findings as expressed in this report?

A. Yes, ma'am. However, I reserve the right to amend my opinion as this is an ongoing case, and I am still reviewing discovery and any further discovery.

THE COURT: People always say that; I reserve my right. You only reserve whatever right the Court gives you. You're welcome to note that you may want to request leave to amend, but it's not directed at you in particular. I see that all the time. It's subject to whatever the Court permits.

THE WITNESS: What's the correct way to state that then, if I may know?

THE COURT: Well, I think you can say that you're still considering issues or still engaged in analysis, and the Court can then determine whether it's too late.

THE WITNESS: Okay.

BY MS. PELKER:

Q. Ms. Still, when did you learn about this case?

A. When did I learn about this case? July of this year.

Q. And prior to being retained as an expert, had you listened to or read any of the defense's public statements about this case?

A. No.

Q. Have you done so since?

A. A little bit.

Q. And you're aware now that a main focus of the defense appears to be discrediting a CipherTrace competitor, Chainalysis?

A. Say that again.

Q. You're aware that a main focus of the defense appears to be discrediting a CipherTrace competitor, Chainalysis?

A. I think there are a number of points here to unpack. I think stating that Chainalysis is a competitor is true, was true. However, we were acquired by Mastercard, so that's certainly shifted our focus.

As you know, Mastercard is servicing acquirers and other financial institutions internally who are not customers of Chainalysis, and so that would be our customer base as well.

Q. So you don't consider CipherTrace a competitor with Chainalysis?

A. I think to say it as a blanket statement generally

speaking, but I think we have to appreciate that our focus is different. I can't even recall the last time we competed for the same contract, if that makes sense.

And the number of law enforcement are -- they will use our tool, they will use Chainalysis's tools. So we share those customers.

Q. CipherTrace does have an overlapping customer base with competition with Chainalysis for government contracts; isn't that correct?

A. Yes.

Q. And also for private sector clients; isn't that correct?

A. For private sector, I can think of one partner that we share.

Q. One partner that you share. But there are some private companies that choose CipherTrace and some other private sector companies that choose Chainalysis?

A. Probably. I don't know that I can totally confirm that, but probably.

Q. Ms. Still, how many hours did you spend reviewing the discovery before beginning to draft your report?

A. So in total, I've spent over 150 hours looking and working on this case. Prior to drafting the report, I actually -- probably 40 or so. And I worked sort of, kind of, like this. So I would go through one report, like an expert report, and I would work through that report, I would do the traces, and I

would move on to the next expert report and so on.

Q. Have you now reviewed all of the discovery?

A. I think it would be -- if we could pull it up on the screen or a -- a screen, if I could show you exactly what I covered, I can do that file by file. But there were thousands of files.

Q. I guess that's my question.

A. It's possible I didn't touch every single file, but I did touch as much as I could.

Q. And, Ms. Still, you testified that in the Mt. Gox records that you reviewed, the -- it was a single spreadsheet with multiple accounts mixed together; is that right?

A. I didn't say single spreadsheet. There were multiple spreadsheets; however, the account information for each of the users was combined into one. Those were not organized by date or time or user.

Q. So you're aware that the government has produced trial pulls that separate out each of the user's account activity into its own spreadsheets, and you have reviewed those; is that correct?

A. Can you pull those up so I can see, please.

Q. Not here, no. I'm just trying to get a sense of what you've reviewed from the discovery.

But you are aware that there are specific trial pulls from the Mt. Gox records that will be admitted at trial.

A. I guess, can you define what a trial pull is. I'm not

totally clear on what a trial pull is.

Q. Are you aware that there are different versions of the Mt. Gox records in discovery?

A. Different versions? As in -- what does that mean?

Q. Have you reviewed multiple documents relating to Mt. Gox in the discovery?

A. Yes.

Q. And have some of those included spreadsheets recently produced that separate out the activity by account?

A. Recently produced?

Q. In the last several months.

A. I reviewed the Mt. Gox documents that were produced.

Q. Your expert report indicates you've agreed to work on this case pro bono; is that right?

A. Yes.

Q. If Mr. Sterlingov's funds are released at the end of this case, do you expect to be paid?

A. No.

Q. What would your usual rate be for expert witness services?

A. Somewhere between 1,000 and 2,000 an hour.

Q. And how many hours do you expect to spend on this case if it goes to trial?

A. Unclear.

Q. Do you have an estimate, including trial testimony?

A. Our clients often ask for these types of estimates.

However, it's quite difficult to determine how many hours I will spend in court testifying.

We have to include in that estimate the cost of hotels and travel and then any other discovery or any other -- anything else produced by the government that I will need to go over. I can't be sure.

Q. Well, we are now three weeks out from trial. Are you testifying that you don't know how many hours you anticipate spending on this case between now and trial?

A. Yes. I can't say for certain how many hours that I'm going to continue to spend, but I will continue to go through discovery and trace and especially review that one particular address.

Q. Are you doing this work during your normal working hours at CipherTrace?

A. Normal working hours, as CipherTrace works, we can say yes; that kind of includes weekends and evenings.

Q. I guess my question is, are the hours that you are working on this case considered part of hours that you are working for CipherTrace, or is that in addition to hours that you would normally be working at CipherTrace?

A. It's a combination of both.

Q. And you're continuing to be paid your usual salary during this time?

A. Yes.

Q. And so is CipherTrace, essentially, donating your working hours for this case?

A. I guess they -- we could say that. I don't know how they view it.

Q. What percentage of your time over the next month leading into trial do you anticipate dedicating to this case relative to your other CipherTrace responsibilities?

A. So are you looking for -- like, in terms of a percentage, like per day, per week or I guess -- I'm trying to get at what exactly you need from me here. I really can't say, again, how many more hours I'm going to spend on this case.

I can't provide you, necessarily, with an estimate. If there are more supplemental reports, I'll need to review those, and I will. I'll continue to work through the discovery.

Q. Who is paying your expenses in D.C. for this hearing and trial testimony?

A. Both myself and CipherTrace.

Q. And has CipherTrace management officially sanctioned your work on this case?

A. Yes.

Q. And does that include Dave Jevans, Pamela Clegg, and CipherTrace leadership?

A. Yes. Dave Jevans was the CEO. We are now under Mastercard.

Q. Has Dave Jevans and Pamela Clegg reviewed and approved the report that you submitted to the Court?

A. Dave Jevans did not review the report, and he's also no longer CEO of CipherTrace; although perhaps in name only, it would be polite to say we are now Mastercard.

Q. That's because Mastercard has acquired CipherTrace, but it continues to exist under the Mastercard brand?

A. I actually don't know what the legal arrangement is. It's not clear to me. But I am told at some point we will no longer be CipherTrace, and we will be Mastercard.

Q. Ms. Still, in preparing your expert report, have you conferred with the other defense experts on this case?

A. I spoke briefly to them, but nothing of -- nothing really of substance here.

Q. Have you participated in their group chats or email exchanges about the case?

A. I did get a congratulatory email on the report from Professor Verret.

Q. But not engaging in substantive discussion of the case by chat or email?

A. No. Although I did provide a particular IP address that I found really interesting, and I was curious if anyone else found it interesting as well. That IP address is outlined in my report.

Q. Now, Ms. Still, turning to CipherTrace's work, do you agree

that you can use the blockchain to follow funds from one address to the next on the blockchain?

A. Generally speaking, yeah, yes. That's the -- sorry. It's kind of the point of having that immutable record, is you want to be able to say which addresses are in control of the funds and how that changed over time. So you have this -- like I mentioned, this sort of, like, genealogy.

Q. That's something that's done by CipherTrace, by law enforcement, by private sector; is that right?

A. Do you mean with respect to tracing funds?

Q. Tracing funds, generally, on the blockchain.

A. Yes. Even amateur investigators, if you look on Twitter, there are a number; some are great.

Q. CipherTrace employees have, in fact, submitted sworn declarations and testified at trials to precisely that type of tracing; is that right?

A. I believe so.

Q. And does that include CipherTrace's former CEO, Dave Jevans?

A. Dave Jevans, as I'm aware, did testify maybe in one case, but I can't be certain. I'd have to double-check.

Q. Have you ever testified at trial?

A. I've never testified at trial. I have only provided affidavits.

Q. And you have provided sworn affidavits in court?

A. Yes.

Q. Are you familiar with CipherTrace Sentry and CipherTrace Inspector?

A. Yes.

Q. Directing your attention to Government's Exhibit 11, CipherTrace Sentry Fact Sheet, is this a fact sheet about CipherTrace Sentry?

A. Yes, it is.

Q. Could you read the paragraph titled "Entity Identification Through Superior Attribution."

A. Sure. "CipherTrace Sentry exposes relevant data from CipherTrace's immense data lake, which ties crypto addresses to real-world organizations, sanctioned entities and events. This data is derived from extensive open- and closed-source intelligence gathering, which includes active participation in the crypto economy by CipherTrace researchers. CipherTrace's proprietary clustering and other algorithms rapidly aggregate and correlate various indicators to add millions of data points weekly."

Q. Ms. Still, do you agree that that's an accurate description of CipherTrace's clustering and attribution process?

A. Proprietary clustering and other algorithms, I think they're including in here the way the tool works. So I'm a little -- actually, I would like clarity from them on that last, sort of, section there.

Q. So you don't believe that CipherTrace uses proprietary clustering and other algorithms?

A. That's not necessarily what I'm saying.

Q. So they do use proprietary clustering and other algorithms?

A. I think I would have to get with our data scientist to figure out exactly what we're saying is proprietary here. I'm also not an expert in IP either; that being intellectual property.

I don't know exactly what is considered proprietary with respect to this algorithm.

Q. Directing your attention to Government's Exhibit 13, is this a document describing CipherTrace Inspector?

A. Yes.

Q. And could you read the paragraph under "Superior Attribution for a More Accurate Complete Review."

A. "CipherTrace's immense repository of attribution data ties crypto addresses to real-world organizations, sanctioned entities, IP addresses and events. This data is derived from extensive open and closed-source intelligence gathering, which includes active participation in the crypto economy by CipherTrace researchers. CipherTrace's proprietary clustering algorithms rapidly aggregate and correlate various indicators to add millions of data points weekly providing users with actionable data."

Q. Now, turning your attention to Exhibit No. 14, is this

another CipherTrace information sheet?

A. Yes.

Q. Could you turn to the second page and read the paragraph in blue on the top of page 2.

A. "CipherTrace delivers cryptocurrency AML and counterterrorism financing, CTF, blockchain forensics and regulatory monitoring solutions that make crypto assets safe. At the heart of these solutions is globally shared cryptocurrency intelligence and a massive curated pool of high-quality blockchain attribution information covering more than 800 tokens. A team of researchers automates collection of this intelligence, then validates its veracity to add between 10 and 20 million unique pieces of trusted data to the pool every month. Applying proprietary clustering transforms this raw transaction data into intelligence that de-anonymizes Virtual Asset Service Providers, VASPs."

Q. Ms. Still, isn't it true that in CipherTrace's descriptive fact sheets for its various different products, it's describing itself as using proprietary clustering and other algorithms?

A. Yes.

MS. PELKER: Government seeks to admit Government's Exhibits 11, 13, and 14.

THE COURT: Any objection?

MR. EKELAND: No objection, Your Honor.

THE COURT: Exhibits 11, 13, and 14 are admitted.

(Government Exhibits 11, 13, and 14 were admitted.)

BY MS. PELKER:

Q. CipherTrace's blockchain analysis includes clustering; isn't that right?

A. Yes.

Q. And on page 27 of your report, you state, "CipherTrace also uses heuristic 1, multi-input clustering as the primary heuristic for nondirect attribution"; is that correct?

A. Yes.

Q. What other heuristics does CipherTrace use?

A. It depends how we're viewing the word heuristic. And this is sort of what I was getting at at the beginning of my testimony. This is also referenced in Mr. Scholl's report.

The way we're using this terminology depends on who you ask and how we define it, and we don't necessarily all agree. So other heuristics, if we look at Chainalysis and the way they describe direct attribution, they actually include it under heuristic 3; whereas, typically, we would say that is direct attribution, and that's how I would testify to it.

Q. So you're saying that CipherTrace does use heuristic 3; you just call it something different?

A. So, again, we -- I wouldn't say that at all. We just call them -- if you would get intelligent -- let's pull up heuristic 3, and let's read it together in Ms. Bisbee's report.

Q. I'm actually asking the questions here. Let's just -- we

really do need to move things along for time.

A.   Okay.

Q.   So are you saying that CipherTrace does use some intelligence-based information, but they call it direct information rather than heuristic 3?

A.   I think in terms of intelligence gathering, what we're calling direct attribution is referring to us actually going and collecting those addresses ourselves.  Again, that would be like, for example, signing up for exchange accounts and running transactions through those accounts and then, based upon those exchange accounts and those transactions and clustering, we would then pull in all of those deposit clusters and any withdrawal clusters or hot wallets as well.

Q.   And that includes activity that Chainalysis may include under heuristic 3?

A.   As I understand it.

Q.   And does CipherTrace also engage in some clustering, some attribution activities that would be included under Chainalysis heuristic 2?

A.   Not to my knowledge.

Q.   Does CipherTrace use change addresses in making any of its analysis?

A.   We have an algorithm that will identify a change address, and it is wrong, and so we're in the process of -- I'm pushing that we pull that particular change identifier out, as I don't

think it's accurate enough, and I think it can be misleading.

Q. But as it stands currently, CipherTrace does use change address analysis in doing its attribution?

A. Oh, not in its attribution. I'm sorry.

Q. In doing its tracing. It does have an algorithm that relates to change addresses?

A. It will attempt to identify the change address if it is in the same cluster.

Q. And does it also have an algorithm or some sort of process to attempt to identify peel chains?

A. No.

Q. Does it have any other algorithms that attempt to do anything other than co-spending in making assessments about attribution?

A. Not that I'm aware of.

Q. Are you aware of what the error rate is for CipherTrace's clustering heuristics?

A. Yes. So we went through a model validation and data assessment and audit in 2021, and there is a report. I don't know if we need it today, but I can get you those numbers if it's critical for this.

Q. Are you aware of what the error rate numbers were?

A. It was really low, but I can't recall what the P value was and all of that, if that makes sense. I would need to -- I would need to pull that up for you.

Q.  Have CipherTrace's heuristics ever been peer-reviewed in scientific literature?

A.  No.

Q.  Have you ever personally reviewed the CipherTrace source code?

A.  No.

Q.  And are you able to still conduct blockchain analysis using CipherTrace without reading through that underlying source code?

A.  I have been without reading.

Q.  Do you feel it's necessary for the government to review CipherTrace's source code in order to respond to your analysis?

A.  I'm honestly not sure if this would be relevant for you or not.  But if you find it useful, I think that's a conversation we could have, as well as getting you access to Inspector, if you find that useful.

Q.  But you don't feel that it's necessary for the government to review the source code in order to understand your analysis?

A.  I think -- so I'll say this.  I think it would be if the government was relying on CipherTrace data.  This might be an important question for you to ask and for us to provide to you.

However, in this case, the government is not relying on CipherTrace data, so I can't really speak to that.

Q.  And you're able, again, to use CipherTrace's product and conduct reliable blockchain analysis using it without ever

having reviewed the source code?

A. Yes.

Q. Is CipherTrace's clustering, in your opinion, reliable?

A. So multi-input clustering -- that's the clustering that we use -- and reliable in terms of we have to put this in -- within the context of understanding that CoinJoins break that heuristic. PayJoins --

Q. Are you testifying that CipherTrace's clustering, your company's product, is not reliable?

A. That's not what I'm saying, but I'm also not saying we're 100 percent accurate either.

Q. Are you testifying that your product is not sufficiently reliable for presentation in court?

A. No.

Q. Ms. Still, doesn't -- don't you and other members of CipherTrace offer tracing using your products to law enforcement agencies?

A. Yes.

Q. And you're aware that law enforcement uses that tracing in support of criminal cases?

A. In support of what?

Q. In support of criminal cases.

A. Yes.

Q. And do you agree that CipherTrace's customers need reliable tracing and attribution as part of the reason that they have

contracted with CipherTrace in the first place?

A. As most accurate as possible.

Q. And doesn't CipherTrace market its products as accurate and reliable, including to Mastercard during the CipherTrace acquisition?

A. Actually, I don't know how we marketed ourselves to Mastercard. I wasn't part of that negotiation or that process.

Q. You're part of presentations that are given to prospective clients in the form of open trainings; is that right?

A. Sorry. What do you mean by that?

Q. You give presentations to audiences that include prospective clients of CipherTrace?

A. Like a demo?

Q. Yes.

A. Yes.

Q. And in doing so, are you telling those prospective clients, oh, and by the way, actually none of this is sufficiently reliable or accurate?

A. No. But we do definitely counter with -- and I think this is quite ethical and responsible in terms of blockchain tracing. That there are some considerations here in terms of the heuristics, multi-input clustering.

And every time we teach, we make sure to teach that CoinJoins do break that heuristic.

Q. We'll talk about CoinJoins a little bit later on, but in

the conclusion of your report on page 39, I believe -- it may actually be 38 -- you state, "Blockchain forensics should only be used to generate investigatory leads."

Is it your testimony that blockchain analysis, whether by CipherTrace or anyone else, is not sufficiently reliable for court testimony?

A.  No.

Q.  And are you aware that CipherTrace's then-CEO, Dave Jevans, testified as an expert witness back in 2019 in Canada?

A.  That could be correct.  I don't know the dates.

Q.  Directing your attention to Government's Exhibit 15, is this a CipherTrace press release regarding Mr. Jevans' testimony?

A.  Looks like.

Q.  And directing your attention to the beginning of paragraph 4, does this release explain that Mr. Jevans testified that he could trace payments from the darknet markets Agora and Evolution into the defendant's Bitcoin wallet?

A.  Sorry.  Which paragraph is this?

Q.  This would have been in paragraph 14 after the -- sorry, paragraph 4 after the quote.  So the one beginning with, "Mr. Jevans traveled to Ontario."

A.  Okay.  So what was the quote?  Where is the quote that you just said?  Sorry.  I don't see it.

Q.  "Mr. Jevans traveled to Ontario and testified that he was

able to trace multiple transactions from dark web markets Agora and Evolution into Phan's bitcoin addresses."

A.   I'm sorry.  I still don't -- oh, here we go.  I was counting the top paragraph as paragraph 1.

So what was the question?

Q.   Is that what the release says?

A.   Okay.  Yes.

Q.   And Mr. Jevans would have been able to identify the addresses controlled by Agora and Evolution because they were clustered in CipherTrace's product; is that right?

A.   I actually don't -- I would need to look at the report.  I actually don't have the report in front of me.  Do I need to get it?

Q.   No.  But you're aware that he is testifying that he was able to trace funds from darknet markets that have not been previously seized by law enforcement; is that right?

A.   I'm honestly not clear on that.  I really would like to review that report to understand what Mr. Jevans is saying here with respect to this announcement, which may not accurately represent the report.  I'm really not sure.

Q.   So regardless of what's in the report, this is what CipherTrace is putting out and saying that Mr. Jevans testified to -- is that right? -- on CipherTrace's website?

A.   On the CipherTrace website, yes.

Q.   And this would have been sworn testimony, according to this

press release, before a Canadian court, including an assessment of the reliability of that blockchain analysis?

A. Could you rephrase that.

Q. This would have been sworn testimony that Mr. Jevans was presenting to a Canadian court?

A. It looks like he testified, so that sounds like a sworn testimony to me.

MS. PELKER: Government would move to admit Government's Exhibit 15.

THE COURT: Any objection?

MR. EKELAND: No objection, Your Honor.

THE COURT: Exhibit 15 is admitted.

(Government Exhibit 15 was admitted.)

BY MS. PELKER:

Q. Ms. Still, was CipherTrace retained by Holland & Knight to serve as experts in a matter related to the LCX Exchange?

A. Yes.

Q. And did you prepare an affidavit in that matter?

A. I did.

Q. Showing you Exhibit 16, is that a copy of your affidavit?

A. This looks right. This is only one affidavit, though.

Q. Directing your attention to page 3, is that your signature beneath where it states, "I declare under penalty of perjury the foregoing is truth and correct"?

A. Yes.

Q.   And did you tell the truth when you swore to this statement?

A.   Did I tell the truth?

Q.   Yes.

A.   Yes.

Q.   And you mentioned that there's another affidavit.  This was the only one listed in your expert disclosure.

Is there another affidavit that you've prepared?

A.   So I prepared a number of affidavits.  But I would like to point out page 7; if you notice, my email address, my phone number, my LinkedIn are at the top.  So we, through Mastercard lawyers and corporate security, requested Holland & Knight remove this from the internet for my own safety, as I was receiving a number of emails, texts, calls from China, Russia, North Korea, and feeling quite unsafe that it was also possible to trace back where I lived because you can see there on -- was that page 3? -- no, page 4 -- the county in California where this was notarized.

So I -- before we continue, I would, like, politely request if you could remove my personal information from this if we're going to submit this as an exhibit.

MS. PELKER:  Sure.  So when we submit things in as exhibits for the purpose of *Daubert* hearing, they aren't generally made publicly available.  I will say that I simply pulled this down from the New York State court docket, so it

does appear to still be there.

But to the extent we use this at trial, we're, of course, happy to redact it.

A. I understand. We've gone back and forth with Holland & Knight, and currently we are in touch with the court to remove my personal information from the internet.

Q. But there's no substantive difference in a subsequent affidavit that was submitted?

A. Honestly, I can't recall. I'd have to look. I think there were a couple of different affidavits. They had me trace a number of times in this case.

Q. So if there are additional affidavits that were filed on any sort of court case, the government is just going to ask that defense counsel update your expert disclosure to include anything that was -- any affidavits that you also filed.

A. Okay. Is that not accounted for in there?

Q. At the moment the only affidavit we are aware of was the specific docketing of this.

Now, directing your attention to page 11, could you read the second and third paragraphs here under "Methodologies."

A. "CipherTrace utilized the forensic standards of common spend heuristics and change addresses in the unspent transaction output-based cryptocurrency Bitcoin to trace the flow of funds from address to address to determine the ultimate

destinations."

Q. And the next paragraph?

A. "The blockchain stores the details of every cryptocurrency" --

Q. I think you missed a paragraph.

A. Sorry. Yes. "CipherTrace utilized both open source and proprietary attribution data to determine entity ownership of funds received at the ultimate destination address."

Q. And are those, in fact, the methodologies that you used in your analysis for this case?

A. For open source? So this is the Ethereum-based case. This is a bit different. Although there is some RenVM transactions there, which are on the Bitcoin ledger, but this is on the Ethereum network.

So attribution works slightly differently, in that in Ethereum we have something called smart contracts. In those smart contracts, if they belong to a certain entity or controlled by a certain entity, we'll say who the owner is.

Q. What I'm trying to ask is, is this an accurate description of the methodologies that you used in preparing and doing your work for the Holland & Knight retained work?

A. For specifically Holland & Knight?

Q. You have an affidavit that's describing methodology --

A. No, it's --

Q. You have an affidavit describing the methodologies used.

I'm just asking you to confirm whether these were, in fact, the methodologies that you used.

A.   If I can go through and take a moment to read through this page -- it's been a while since I've seen this -- to make sure I've covered everything that I would cover today.

Q.   So it wouldn't be what you would cover today.  I'm just asking about the methodologies that you used in preparing this affidavit for the Holland & Knight case, not in your testimony for the Bitcoin.

A.   I understand.  Could I take a moment to read through this?

Q.   Sure.

A.   Thank you.

Q.   Just in the interest of time, were these the methodologies that you said at the time you used to prepare this report?

A.   You mean, did I write this?

Q.   Did you write this?

A.   Yes.

Q.   And looking at paragraphs 5 and 6 further down that page, do those paragraphs go on to describe the co-spend and change address heuristics for the analysis?

A.   May I have a moment to read these?

Q.   Sure.  Actually, we can skip straight through.  Could you just read aloud paragraphs 5 and 6.

A.   Yes.  That's starting with "Another common," correct?

Q.   Yes.

A.   Okay.  "Another common blockchain analysis technique is to identify address clusters that are under common control.  There are several types of clustering analyses.  When common technique involves identifying transactions with multiple sending addresses funding the same transactions to one receiving address, often called co-spend or consolidating transactions.  Because all cryptocurrency funding the co-spend transaction is transferred through one transaction to the same user, one can, therefore, infer that all sending addresses are controlled by the same user.  The co-spend technique is highly reliable and the most-used metric in commercial blockchain analysis tools."

"Another clustering technique is to identify change addresses.  When cryptocurrency is transferred from a sending to a receiving address, any funds held at the sending address that are not designated for transfer are transferred to a change address, which is also will controlled by the sender.  Thus, by identifying a change address, one may be able to show that the same user controlling the sending address also controls the change address; thus, demonstrating common ownership of the sending address and the change address."

Q.   Turning to the next page, page 12, could you read starting about halfway through the first paragraph.  I can read it aloud.  "CipherTrace Inspector uses co-spend and change address heuristics to cluster addresses together to identify additional

addresses under the same control. And CipherTrace Inspector uses a graph database that displays public blockchain transactions and data with relationships to an anchor transaction. Like other blockchain explorers, the transaction information that CipherTrace Inspector produces is from a public blockchain and can be verified through any other blockchain explorer."

Did you write that?

A. Yes.

MS. PELKER: Government would move to admit Government's Exhibit 16.

THE COURT: Any objection?

MR. EKELAND: Your Honor, as long as we redact --

MS. PELKER: I think Mr. Ekeland is just -- to the extent that any of this would end up being made publicly available, we would just redact.

THE COURT: This is admitted for purposes of the *Daubert* hearing. That's true of all the documents that I've admitted. It's going to sit either on the bench here or in my chambers.

So if you still feel like it needs to be redacted, we're not publishing this on the docket.

MR. EKELAND: With that understanding, then, we don't object. We just ask that if it is going to circulate that the PII be redacted.

THE COURT: Fair enough.

(Government Exhibit 16 was admitted.)

BY MS. PELKER:

Q. Ms. Still, are you familiar with the money laundering steps of placement, layering, and integration?

A. Yes. Those are, generally speaking, the three steps.

Q. And in the cryptocurrency space, do some people use mixers to assist in the layering process?

A. Yes.

Q. And as part of the integration step, do some people then deposit the so-called cleaned funds into exchange accounts?

A. Yes.

Q. And are you aware that criminals hold accounts at virtual currency exchanges?

A. Yes.

Q. And that includes accounts that they may verify with know your customer information?

A. Yes.

Q. And CipherTrace and other companies have whole lines of products to help financial institutions identify potential illicit funds coming onto their platform?

A. Correct.

Q. CipherTrace offers a risk scoring of transactions in its products; is that right?

A. Risk scoring of transactions?

Q. Risk scoring of entities, exposures; some sort of risk scoring method.

A. Of addresses.

Q. What risk scoring does CipherTrace assign to the darknet markets listed in the government's report?

A. Ten.

Q. Ten out of what?

A. Ten.

Q. So they are considered the most risky transactions?

A. Criminal.

Q. Not just risky; they're considered criminal?

A. We'll consider them criminal.

Q. What risk scoring does CipherTrace assign to transactions tied to the addresses it has associated with Bitcoin Fog?

A. Ten.

Q. Ten. So CipherTrace considers those criminal?

A. Yes. I'm sorry, Bitcoin Fog?

Q. Bitcoin Fog.

A. No. That's a mixer, not a dark market.

Q. Right. So what's the risk scoring that CipherTrace would assign to Bitcoin Fog?

A. For a mixer, it depends on the mixer itself. Let me check my attribution to see.

Q. Do you know what the risk scoring would be for Bitcoin Fog, specifically?

A.   I honestly can't recall.

Q.   Directing your attention to Government's Exhibit 17, is this a CipherTrace anti-money laundering report?

A.   Sorry.  Exhibit 17?

Q.   Exhibit 17.

A.   Yes.

Q.   And turning your attention to page 6 -- I believe that's actually page 5.  It's describing a CipherTrace study, and it says just above that chart, "The study defined criminal sources as dark market site, extortion, malware, mixer/tumbler/money laundering site, ransomware, and terrorist financing that CipherTrace has been able to identify and validate as of 9/28/2018."

Is that what CipherTrace included in its AML report?

A.   I haven't read this report from 2018.

Q.   I'm just asking whether that's what's written here.

A.   Yes.

MS. PELKER:  Government would move to admit Government's Exhibit 17.

THE COURT:  Any objection?

MR. EKELAND:  No objection, Your Honor.

THE COURT:  Exhibit 17 is admitted.

(Government Exhibit 17 was admitted.)

BY MS. PELKER:

Q.   Ms. Still, you're aware that law enforcement often issues

subpoenas to exchanges to gather records about exchange customers, aren't you?

A. Yes.

Q. And that information can be used to advance an investigation?

A. Yes.

Q. You are not a sworn law enforcement officer, are you?

A. No.

Q. And you've never worked in law enforcement?

A. No.

Q. You've never actually issued a subpoena?

A. I helped write a subpoena.

Q. You've never been the one actually issuing the subpoena?

A. I've never actually issued.

Q. And before reviewing the discovery in this case, how many times had you actually seen an actual grand jury subpoena in real life?

A. I don't know.

Q. You don't recall ever seeing one?

A. I'm sure I have. I just can't think of one right now. Are those public?

Q. No, they are not public.

A. Then I don't know that I've seen one.

Q. You've never presented a matter to a grand jury?

A. Presented a matter to a grand jury? I've never spoken with

a grand jury.

Q. You've never executed a search warrant?

A. Never executed a search warrant.

Q. Never reviewed the raw search warrant returns?

A. I don't even know what that means.

Q. You've never seized cryptocurrency?

A. I've never seized cryptocurrency.

Q. And prior to joining CipherTrace, did you have any experience in blockchain analysis?

A. No.

Q. You've never used Chainalysis?

A. No.

Q. Have you ever used TRM or Elliptic or any of the other commercial analytics tools?

A. No.

Q. Ms. Still, you distinguish in a presentation that was attached to your expert report between credible analytics -- what you call credible analytics and black box analytics; is that right?

A. Yes.

Q. And those slides have been included in other presentations to customers and prospective customers of CipherTrace; is that right?

A. Yes.

Q. What other companies would you categorize as providing

credible analytics under your standards?

A.   It's possible that Clane and Elliptic may have these, but I cannot confirm without speaking to their teams.

Q.   Sorry.  Not the slides.  But the actual credible analytics as far as what other companies in the space you would categorize as credible.

A.   Yeah.  I'm guessing it would be one of those two.

Q.   So of all of the companies in the blockchain and analytics space, CipherTrace thinks, you think, that Clane and Elliptic are the only other companies that offer credible analytics?

A.   No.  Again, I can't say for sure unless I speak with them about how their tool operates.

Q.   And you don't know how all of the different tools operate because you've only ever used CipherTrace; isn't that right?

A.   I've only used CipherTrace.

THE COURT:  Do you know if CipherTrace has a license for Chainalysis or for --

MS. PELKER:  My understanding is, actually, there's some sort of gentleman's agreement between the four firms that they don't do that.

THE COURT:  Okay.  All right.  Thank you.  I was looking for an easy way out.

MS. PELKER:  I don't have -- I don't know that for sure, but that's my understanding.

THE COURT:  All right.  Thank you.

BY MS. PELKER:

Q. Ms. Still, prior to your work on this case, were you familiar with mixers?

A. Yes.

Q. And isn't it true that criminals use mixers to hide criminal activity?

A. They can.

Q. Prior to being retained for this case, were you familiar with Bitcoin Fog?

A. No.

Q. You've never traced funds for any criminals who used Bitcoin Fog?

A. No.

Q. Are you aware whether your more senior colleagues at CipherTrace have done such tracing?

A. I'm not aware.

Q. And just to recall, you've been doing this since only 2020; is that right?

A. Since 2020.

Q. Do you agree that Bitcoin Fog was a cryptocurrency mixer that operated from 2011 through 2021?

A. By all accounts. Again, I think it's best, though, to confirm via ledger and having access to those servers.

Q. Do you agree that during that time period when it was operating, criminals did use Bitcoin Fog to launder funds?

A.   I can see that there are a number of transactions going in and out of dark markets.  So then I would infer from there that that is possibly what's going on, that they are, in fact, illicit transactions going in and out of Bitcoin Fog.

Q.   And, in fact, isn't it a significant volume of illicit transactions going between Bitcoin Fog and darknet markets?

A.   I actually didn't calculate that, but I did look at the government's numbers.

Q.   And even accounting for the smaller clusters with CipherTrace for Bitcoin Fog and the markets, aren't we looking at millions of dollars' worth of Bitcoin going from the markets to Fog?

A.   Again, I didn't calculate that, and it's not a small difference.  It's 527,000 addresses out of 925,000 or so addresses.

Q.   I'll get to the specific numbers of the addresses in a moment, but are you familiar with the ways criminals on the darknet communicate?

A.   Generally speaking.

Q.   Are you familiar with the use of darknet market forums and the darknet market subreddit?

A.   Yes.

Q.   And are you aware then, through your review of those sources, through the discovery, that darknet market users advocated using Bitcoin Fog to launder darknet proceeds?

A. That is my understanding.

Q. And that extended to both buyers and vendors?

A. I'm actually not sure on that.

Q. Do you agree that Silk Road and Silk Road 2 were darknet markets that facilitated millions of dollars of illicit narcotic sales?

A. Well, I haven't calculated that number either, but yes. The narcotics, yes.

Q. And you're aware that the government did seize both of those sites and has access to records of its users?

A. Right.

Q. And do you agree that the other darknet markets listed in the government's reports, Abraxas, Agora, AlphaBay, BlackBank, Nucleus, Pandora, and Sheep were all also darknet markets trafficking in illicit narcotics?

A. I think we have them in CipherTrace as darknet markets as well. So that would be ten, criminal.

Q. Do you agree that buyers and vendors from those sites were moving their funds, laundering them through Bitcoin Fog?

A. Some of them, yes.

Q. Are you also aware that Welcome to Video was a darknet site trafficking in child sexual abuse material?

A. Yes.

Q. And are you aware that the government seized Welcome to Video and has access to records of its users, including their

Bitcoin deposits to the site?

A.   I did not know they had access to all of the records.

Q.   Have you reviewed records from Welcome to Video users in discovery?

A.   I reviewed the discovery, the addresses in discovery.  I don't recall reviewing that.  If we could pull that up on the screen, I can let you know.

Q.   If you said that you reviewed the addresses, do you agree that some Welcome to Video users sent money from Bitcoin Fog to the site where they would have purchased access to child sexual abuse material?

A.   I actually don't think I looked at that.  I don't recall right now.  I would have to go back through and look at my traces which are saved in my case.

Q.   Well, CipherTrace has the exact same -- has a one percent difference of its Welcome to Video cluster than Chainalysis; is that right?

A.   Let's go back to that page, and I can tell you for sure. What page is that?

Q.   That should be --

A.   Do you have it pulled up?  I just want to confirm that that's the number.

Q.   Understandable.  You do not need to take my word for it.

A.   I see it.  Page 34 of my expert report.

Q.   And that's a one percent difference?

A. Yes.

Q. And so in CipherTrace there are funds going from Bitcoin Fog to Welcome to Video; is that right?

A. I don't think I did those traces. I cannot recall. I would have to pull up my case and take a look to see if I saved those.

Q. Have you reviewed the attachments to Ms. Bisbee's and Mr. Scholl's expert reports?

A. Were those the exhibits?

Q. So the reports themselves had CSV file or Excel spreadsheet attachments with the addresses listed.

A. Yes. Yeah, I reviewed those.

Q. And you're aware that they list out every address that's included in the cluster for Bitcoin Fog and the other reference marketplaces in Chainalysis?

A. Can you say that again. That they included every address from every cluster?

Q. That they included every address listed in Chainalysis for that entity.

A. That's my --

Q. Sorry.

A. That's my understanding.

Q. Directing your attention to Government's Exhibit 18 in the binder in front of you, this is the first page of that attachment. The actual attachment is thousands of pages long.

Did you review that full attachment?

A. If by review you mean run it through a script, yes.

Q. And which addresses in the full list, in your opinion, are definitely not controlled by Bitcoin Fog?

A. So if we're looking -- this is not definitely. So we can't say definitely or indefinitely here. Again, we need to understand what the source of funds are for these dark markets, for Bitcoin Fog in particular.

If you look at the -- on the right-hand side column that says co_spend_root_address, it will say the root address, or it will say unclustered in co-spend.

Q. So this is a different question that I'm asking. I'm asking, you have this list of addresses from Chainalysis. You're saying that there are a whole bunch of addresses in this list that can't be verified, that are wrong.

Have you identified a -- how many specific addresses in that list of over 900,000 have you specifically identified that are not Bitcoin Fog?

A. So you are asking -- if I understand your question correctly, you are asking for a list of addresses that are not attributed via heuristic 1?

Q. No. I'm asking, have you identified specific errors and can you point to them in the list?

A. By error -- sorry. I don't think I understand what you're asking.

Q. Chainalysis has a list of 900,000-plus addresses. CipherTrace has a list of 400,000 that you agree with. There's a question mark about that 500,000. You say that you're reviewing that additional 500,000 in your expert report.

We're now two months, almost, into your review. How many of the addresses in the delta have you found and, in your expert opinion, were mistakenly included by Chainalysis; were an error?

MR. EKELAND: Objection.

THE COURT: Overruled.

THE WITNESS: So, again, if you look at unclustered and co-spend, these are addresses that are clustered via heuristic 2, which is the behavioral cluster.

BY MS. PELKER:

Q. And you're saying that this behavioral cluster produces lots of errors. I am asking you to identify the addresses that you've determined were erroneously included.

A. Well, because of the nature of this particular -- of these co-spends, unclustered in co-spends, this is very difficult to say one way or another exactly which -- where they fall. So CipherTrace does not include these.

Q. So there are addresses that you're saying may or may not be Bitcoin Fog, but you can't point to a single address in this list and say, this is wrong, this is not Bitcoin Fog?

A. It's not clear to me that any of the addresses that state

unclustered and co-spend are actually controlled by Bitcoin Fog.

Q. That's different than saying that they are mistaken or that this is an error.

You're just saying that you can't determine one way or another; isn't that right?

A. The error rate is, as I understand -- and this is coming from Sarah Meiklejohn's paper and others. That error rate is upwards of 60-plus percent.

Q. We're going to get into some mischaracterization about the academic research in a moment. But I'm just asking, you've gone through these addresses.

Is there a single one that you can point to and say, I've done my own analysis. This is definitely not Fog because X, Y, Z?

A. It's difficult to state with exact -- to say 100 percent in this, again, because this is a heuristic. You're asking me to say 100 percent yes or no.

And I can tell you that CipherTrace is not confident in that particular heuristic to attribute to unclustered and co-spend, which is heuristic 2. So we're not going to do it. Whether or not we can say this belongs to Bitcoin Fog or not, we can't really do that in this particular case. What we are comfortable --

THE COURT: Just for the sake of time, if I can ask

you to listen very carefully to Ms. Pelker's question, and just make sure you answer just her question and then we can move on. Listen carefully to her question, answer that question, and then we'll move on to the next topic.

MS. PELKER: Thank you, Your Honor.

BY MS. PELKER:

Q. Is there a single address in this list that you have determined definitively is not Bitcoin Fog?

A. No.

Q. Thank you.

MS. PELKER: Thank you, Your Honor.

BY MS. PELKER:

Q. CipherTrace has its own clusters for each of the entities named in Ms. Bisbee's and Mr. Scholl's reports; isn't that right?

A. Different clusters for? You mean we -- we identify them differently?

Q. Sorry. It has its own list of addresses it clusters associated with each entity; is that right?

A. So we identify our addresses via a cluster ID, and that is determined based on co-spend.

Q. So for any given entity -- we can take Bitcoin Fog as an example. Chainalysis has its list of addresses, CipherTrace also has a list of addresses; is that right?

A. Yes.

Q. And in some instances, CipherTrace's clusters exactly match Chainalysis's; isn't that right?

A. I believe there is one cluster where we are pretty much the same, and I think that was Sheep market.

Q. So let's direct your attention back to your report, the same page that we were just looking at, which I believe is --

THE COURT: Was it 34?

MS. PELKER: Page 34. Thank you, Your Honor.

BY MS. PELKER:

Q. Looking at that list there, you mentioned Sheep is an exact match. That the exact same addresses that Chainalysis has clustered, CipherTrace also has clustered; is that right?

A. I don't know about the clusters themselves, but we have the same attribution, yes.

Q. And for Silk Road 2, you, in fact, have a zero percent discrepancy rate so that you have the exact same addresses; is that right?

A. Yes.

Q. Now, directing your attention back to Exhibit 19 -- that's Mr. Scholl's report -- looking at page 13, could you read the first paragraph starting with "Silk Road 2.0 funds sent to Bitcoin Fog."

A. Sorry. Where are we? We're in 13?

Q. We're in Exhibit 19. This is page 13 under "Silk Road 2.0 funds sent to Bitcoin Fog." If you could just read that aloud.

A. This is the top one, correct?

Q. Yes.

A. "Blockchain analysis identified approximately 13,824 transactions which sent funds directly from Silk Road 2 to Bitcoin Fog. These transactions occurred from on or about 11/13/2013 to on or about 11/6/2014. In total, these transactions transferred approximately 22,864 Bitcoin worth approximately $12,582,929 from Silk Road directly to Bitcoin Fog."

Q. Do you disagree with those numbers there?

A. This is related to Silk Road 2 and 13 transactions. I haven't run these addresses as being deposited into Bitcoin Fog, so I really can't confirm that.

I also can't confirm the dollar value. I would just need to know how that was calculated, and we could probably match that up somehow if I knew what their method was for calculations, the U.S. dollar value.

Q. So you haven't done your own calculation of the funds transferred between the various marketplaces and Bitcoin Fog based on CipherTrace's clustering?

A. No.

Q. So you don't know how different your numbers would be, if at all, than Mr. Scholl's?

A. I haven't calculated this.

Q. Turning your attention back to your report on page 27. So

that's Exhibit 10 in the binder in front of you, page 27. I want to clarify how you counted the Chainalysis addresses in heuristic 1.

So looking at the first line of the chart at the bottom of that page, it says unclustered and co-spend 527731. You counted that number of addresses that were not clustered through co-spend; is that right?

A. This is the last paragraph you're looking at?

Q. This is page 27 of your report, in the actual chart, the first line under the header. It says unclustered and co-spend, Chainalysis address count 527731.

A. On page 27 or on 28?

Q. It appears as 27 in my copy. It's in your report, the top entity, the actual chart.

A. Actual chart.

Q. So there's co-spend root address.

A. Page 28 at the bottom. The total, is that what you mean?

Q. I apologize.

THE COURT: Do you have the same -- I think she's pointing right here on page 27.

BY MS. PELKER:

Q. So on page 27 you have the two green -- two tables with green headers.

A. I see.

Q. Looking at the one on the bottom, the first row there says

unclustered and co-spend.

A.  I got it.  Thank you.  Sorry.

Q.  Now, just above that, the table above it, you have an excerpt of the Chainalysis chart, and you indicate that you got that number by filtering by that right-most column, the co-spend root address column; is that right?

A.  For the 527731, yeah.

Q.  I'd like to direct your attention to the column one to the left.  It's a bit difficult to read on the printout, but it's labeled co-spend flag.

To be clear, you did not include in your calculation the items that had a co_spend_flag but that did not list their root address; is that right?

A.  I don't believe we did.

Q.  Now, did you review the appendix key provided by Chainalysis before conducting your review?

A.  Yeah.  So it says -- let's see.

Q.  Yes, you did review the appendix?

A.  I did.  I did review it.

Q.  Turning your attention to Exhibit 21, is that the appendix key?

A.  Supplemental appendix key.

Q.  Could you read the entries under co_spend_flag and co_spend_root_address down at the bottom?

A.  "0 (zero) has no relation to co-spending transactions.  1

is co-spending" -- "1 is co-spending transaction."

Q.  And then for co_spend_root_address?

A.  "Address for root address within cluster, uncluster in co-spend, due to multiple heuristics."

Q.  So you did not actually include all of Chainalysis's co_spend_flag addresses in your account, did you?

A.  By co_spend_flags, I guess you mean the no relation to co-spending transactions; so accounting for ones and zeros? No, we did not include that.

Q.  So directing your attention back to your report, page 34 -- sorry, 27.

A.  Sorry.  Which section is that again?

Q.  This is Exhibit 10 --

A.  Thank you.

Q.  -- page 27.  Looking at the first two lines --

A.  Wait.  This is where we were before.

Q.  Yes.  We're going right back to where we were before.

The top table, the first two entries, there's a co_spend_flag that's set, of one, indicating that this was detected by a co-spend heuristic.  But on co_spend_root_address, it says unclustered and co-spend, indicating that there are multiple heuristics used.

A.  That is the definition.

Q.  And so I'm asking, isn't it true that you then did not, in fact, count any of the addresses that said unclustered and

co-spend despite having a co_spend_flag set?

A.  So -- I'm sorry.  Can you repeat that so I'm, like, absolutely clear here.

Q.  So there are addresses with a co_spend_flag that are set that say unclustered and co-spend because they were triggered by multiple heuristics.

You did not count those in your calculation of the co-spend addresses; is that right?

A.  I don't think so.

Q.  And are you aware that if you had correctly filtered using the co_spend_flag, the number of co-spend addresses identified through heuristic 1 increases from 398,011 to 573,213?

A.  No.  However, that says addresses attributed by other heuristics.  That's why we didn't count it.  This is not including the co-spend.

Q.  But, in fact, if it's co_spend_flag set, that was detected by co-spend heuristics; it's just that other heuristics were also applied?

A.  As it states there; however, this doesn't match our data.

Q.  It may not match your data.  But as far as what Chainalysis is listing as triggered by co-spend, are you aware that there are, in fact, 573,213 addresses that were detected by heuristic 1?

A.  I don't have that number.

Q.  But --

THE COURT: Could I pause just for a minute. I'd like to take a few-minute break. We're going to leave pretty soon. How much more time do you think you have?

MS. PELKER: I don't see us finishing today, Your Honor.

THE COURT: Okay. Well, let me just take a five-minute break and I want to check with staff on everyone's availability, and we'll see how much later we can go tonight and we'll have to continue tomorrow.

MS. PELKER: Yes, Your Honor. We're happy to stay late. I just know that the Court --

THE COURT: I have staff, too.

MS. PELKER: That's what I figured.

(Recess taken.)

THE COURT: Okay. Unfortunately, I think we can only go for another ten minutes tonight and then let's talk about starting time tomorrow morning to make sure we have time to get through everything we need to get through.

MS. PELKER: Understood, Your Honor.

BY MS. PELKER:

Q. Ms. Still, returning back to the question of the number of addresses that were identified by heuristic 1, you're aware that if you correctly filter by co_spend_flag, there are, in fact, 573,213 addresses identified through heuristic 1 rather than 398,011 per your report?

A.   No.

Q.   No, because you did not, in fact, filter by co_spend_flag; is that right?

A.   I did not filter by flag.

Q.   If you had filtered by the flag, are you aware your analysis would change by 200,000 addresses, or almost 50 percent?

A.   You're telling me this now, but I would need to do this action myself and count.

MS. PELKER:  Government moves to admit Exhibit 21.

THE COURT:  Any objection?

MR. EKELAND:  No objection, Your Honor.

THE COURT:  Exhibit 21 is admitted.

(Government Exhibit 21 was admitted.)

BY MS. PELKER:

Q.   Turning your attention back to your report, I'm looking at that chart spanning pages 27 and 28.

The second line of that chart indicates that Chainalysis connected 244,975 addresses to the root address starting with 17aBK; is that right?

A.   Which line are you on?

Q.   The second -- right underneath the unclustered and co-spend line, the next line, 17aBK.

A.   Ah, okay.  17aBK, and you're asking --

Q.   That the chart indicates Chainalysis connected 244,975

addresses to that root address; is that right?

A.  I don't see the 244 here.  Where are you looking?

Q.  One more column to the right under Chainalysis address count.

A.  Oh, I see it.  Thank you.  Yeah, I can see that.

Q.  Did CipherTrace also have a list of addresses involving that root address?

A.  We wouldn't call that the root address.  But, yes, we have what we call the cluster or the -- what's termed here wallet ID That's the 003739a5.

Q.  And directing your attention to the far right-hand side of that chart, how many addresses did CipherTrace have associated with that wallet?

A.  The same amount.

Q.  The exact same number as Chainalysis?

A.  Yes.

Q.  Did CipherTrace also identify that 244,975 addresses as controlled by Bitcoin Fog?

A.  Yes.

Q.  And what about the next line, 15CLU; how many addresses did Chainalysis connect through that root address?

A.  4 -- 46,532.

Q.  And how many did CipherTrace include in that wallet?

A.  We have the same number.

Q.  And just continuing down the line here, does that hold true

for every single one of these Chainalysis root addresses?

A.   Yes, going down the line.

Q.   And that accounts for almost 400,000 addresses that both Chainalysis and CipherTrace have the exact attribution of Bitcoin Fog?

A.   Yes.

Q.   Does CipherTrace also have additional addresses attributed as Bitcoin Fog that are not on this list?

A.   Yeah.  It's possible.  I think, like, the 1YZJKa address, that certain address that behaves differently.

Q.   At the bottom of the list here, 1YZJKa --

A.   Thank you.

Q.   -- is accounted for.

Are there additional addresses not on this list that CipherTrace has attributed as Bitcoin Fog?

A.   Not to my knowledge.

Q.   Have you looked?

A.   I have looked, but I just can't recall right now.  But not to my knowledge.  I think this is what we have.  However, if you like, I can provide you with a list of addresses.

Q.   And so have you compared the list of addresses from CipherTrace's Bitcoin Fog attribution to Chainalysis's to see if there's additional overlap outside of this 398,011?

A.   I'd have to check on that.

Q.   And in the paragraph below this chart, don't you, in fact,

agree that the cluster of addresses associated with 17aBK are, in fact, Bitcoin Fog deposit addresses?

A.  That is the top line?

Q.  If you look at the paragraph on page 28 underneath the chart.

A.  Yes.  That is the same cluster.  003739a5.

Q.  And you and CipherTrace agree that those are Bitcoin Fog deposit addresses?

A.  We do.

Q.  And you also agree in the next sentence that the cluster of addresses associated with 1Dxmv or CipherTrace cluster 060e8473 is a withdrawal hot wallet?

A.  Yes.

Q.  Directing your attention to Mr. Scholl's report now on page 49 -- actually, we will pivot a bit out of order because I think this next question is going to take a bit more time.

MS. PELKER:  Your Honor, we're doing a hard stop at 5:00?

THE COURT:  Yes.  5:01 if you need it, but right around there.

BY MS. PELKER:

Q.  Pivoting a bit, Ms. Still, when we were talking about nested exchanges in your direct examination, you mentioned hearing about subpoenas to Binance where it would, in turn, respond that the addresses were used by a nested exchange; is

that right?

A. No.

Q. You did testify that there was process to Binance where the nested exchanges would be implicated?

A. I understand what you're asking. Binance does not say whether or not that is a nested exchange. They don't say whether or not it is a different entity, but the way they reject the subpoena indicates to us that there is some company, some entity operating with -- inside that particular deposit address.

Q. Are you referring to Binance coming back and saying that this is a corporate account and you should go to the corporation in order to get records?

A. I don't know that I've actually seen it worded that neatly.

Q. But that is the response from Binance that's requiring the follow-up?

A. It is something along the lines of this is not a customer address.

Q. And then you're aware that nested exchanges operate as what's called exchanges within an exchange; is that sort of a colloquial expression?

A. Yes.

Q. So the addresses are, in fact, ultimately controlled by Binance even if there's a nested exchange as the customer?

A. So this is a bit of nuance here. I think that's a really

good question.  This really demonstrates kind of the issues of control -- right? -- because Binance actually --

Q.  I don't think we actually want to get all the way into control.

I'm just asking, these are, in fact, addresses that are sitting within a Binance wallet even if some other customer may have additional ownership rights in them?

A.  Addresses within another --

Q.  Yes.

A.  -- company within Binance?  As an example; not necessarily as the rule.

Q.  Correct.  But that is what a nested exchange, in fact, is?

A.  Yes.

Q.  So this is not, in fact, an error in clustering regarding the exchange's cluster?

A.  This would be an error if it is improperly attributed.

Q.  But, in fact, the addresses are controlled by Binance, and Binance is the one who controls the addresses, ultimately, even if a subcustomer then has particular accounts for individuals?

A.  I understand what you're asking, but this actually is a question of control.  So I do have to talk about private keys being tied to an entity controlling that particular address and then the account holder themselves.

Q.  This is -- a company may have an account at Binance; is that right?

A. Yes.

Q. And then Binance is the one who is serving that account on behalf of the company?

A. Binance has control of the private keys.

Q. Right. Do you agree with that?

A. Yes.

Q. Okay. And that is a model for a nested exchange?

A. That is one model for a nested exchange.

Q. Okay.

MS. PELKER: I think we are at 5:01.

THE COURT: All right. Well, why don't we break for the day.

I want to talk a little bit about what time tomorrow. How much more time do you think you're going to need?

MS. PELKER: Probably another hour to 90 minutes. It depends a little bit on -- Your Honor, I really don't like cutting off experts in the purposes of a *Daubert* hearing, but I do think it's very difficult to continue moving this forward in a timely manner.

THE COURT: I'm just trying to figure out the plan for the day tomorrow. 90 minutes, best estimate?

MS. PELKER: 90 minutes, Your Honor.

THE COURT: Okay. And, Mr. Ekeland, what about for any reply?

MR. EKELAND: I would say in the same time range.

THE COURT: And then the other expert for tomorrow, how much time? I guess this is the government's expert, right?

MS. PELKER: Yes. I think 30 to 45 minutes. If Your Honor recalls, the specific *Daubert* inquiry forum for Ms. Mazars de Mazarin is for the IP analysis, not the breadth of her entire work on the case.

THE COURT: Okay. Mr. Ekeland, for your cross?

MR. EKELAND: For Ms. Mazarin, I would estimate one to two hours.

THE COURT: Okay. And then reply?

MS. PELKER: Depending on what comes up, probably another 30 to 45.

THE COURT: I'm sorry. How much time did you think you needed for redirect here?

MR. EKELAND: Probably an hour, Your Honor, if that.

THE COURT: All right. Well, I have a hard stop tomorrow at 4:00 p.m., so why don't we start at 9:00 a.m.

MS. PELKER: I believe Ms. Mazarin has a childcare obligation with a hard stop at 3:30. We thought she was going to go today.

THE COURT: Okay. Let's make it a hard stop at 3:30; that's even better. Hard stop at 3:30 tomorrow.

MS. PELKER: We can switch up the order if needed.

THE COURT: Why don't we -- I think it's ideal if you can continue. Why don't we do this. We'll start at 9:00

tomorrow morning, and let's expect to be done with a break by noon with this witness.

We'll then take an early lunch, be back by 1:00, which will give you two and a half hours combined for the next witness, and we ought to be able to get that done.  I mean, these are just *Daubert* hearings.  This is not the examination in front of the jury, okay?

MS. PELKER:  Thank you, Your Honor.

THE COURT:  Anything else before we adjourn?

MS. PELKER:  No.  I don't believe so, Your Honor.

THE COURT:  See you all in the morning.

Given the fact that the witness is in the middle of a cross-examination, I'm going to direct that she not confer with anybody relating to her testimony until at least the cross-examination is done.

MR. EKELAND:  Your Honor, I just didn't hear you.  I know what you said.

THE COURT:  All I said is, since she's in the middle of her cross-examination, don't confer with the witness until she's done with her cross.

MR. EKELAND:  Yes.

MS. PELKER:  Thank you, Your Honor.

THE COURT:  See you all tomorrow.

(The hearing adjourned August 22, 2023, at 5:05 p.m. until 9:00 a.m. August 23, 2023.)

CERTIFICATE OF OFFICIAL COURT REPORTER


I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 28th day of August, 2023.


/s/ Tamara M. Sefranek
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C.  20001

**Appx1235**

**$**

**$10** [1] - 65:21
**$100,000** [4] - 29:14, 30:5, 30:7, 31:7
**$12** [1] - 65:21
**$12,582,929** [1] - 181:8
**$20,000** [1] - 31:12

**'**

**'SegWit** [1] - 113:2

**/**

**/s** [1] - 196:9

**0**

**0** [1] - 183:25
**003739a5** [3] - 121:9, 188:10, 190:6
**0323355a** [1] - 122:8
**060e8473** [1] - 190:11

**1**

**1** [28] - 52:1, 52:16, 52:17, 52:20, 54:16, 55:7, 55:16, 55:18, 56:18, 62:3, 63:2, 65:9, 75:6, 79:4, 120:24, 123:10, 123:19, 150:7, 157:4, 176:21, 182:3, 183:25, 184:1, 185:12, 185:23, 186:22, 186:24
**1,000** [1] - 142:20
**1.2** [3] - 116:14, 118:10, 118:13
**1.6** [1] - 65:9
**10** [8] - 69:14, 87:6, 107:13, 108:22, 137:21, 149:13, 182:1, 184:13
**10/27** [1] - 74:9
**100** [5] - 23:18, 97:17, 154:11, 178:16, 178:18
**10005** [1] - 1:20
**10:05** [1] - 1:6
**11** [6] - 2:15, 147:5, 149:22, 149:25, 150:1, 160:19
**11/13/2013** [1] - 181:6
**11/6/2014** [1] - 181:6
**11:00** [1] - 21:25

**11:30** [1] - 80:18
**12** [3] - 108:22, 116:13, 163:22
**120** [1] - 65:9
**12:00** [1] - 79:17
**12:15** [1] - 79:20
**12MDV** [5] - 71:14, 71:17, 76:25, 82:4, 83:5
**13** [12] - 2:16, 48:7, 118:10, 118:13, 148:11, 149:22, 149:25, 150:1, 180:20, 180:23, 180:24, 181:11
**13,824** [1] - 181:3
**1301** [1] - 1:17
**137** [1] - 2:6
**14** [6] - 2:17, 148:25, 149:22, 149:25, 150:1, 156:20
**15** [8] - 2:18, 66:15, 105:17, 118:22, 156:11, 158:9, 158:12, 158:13
**150** [4] - 2:15, 2:16, 2:17, 140:21
**156** [1] - 49:6
**158** [1] - 2:18
**15CLU** [1] - 188:20
**15GL** [1] - 105:17
**16** [4] - 2:19, 158:20, 164:11, 165:2
**165** [1] - 2:19
**167** [1] - 2:20
**16th** [2] - 4:25, 8:10
**17** [9] - 2:20, 18:13, 59:22, 167:2, 167:4, 167:5, 167:19, 167:22, 167:23
**17(c** [4] - 16:4, 16:17, 18:20, 19:20
**17(c)** [1] - 17:16
**17aBK** [4] - 187:20, 187:23, 187:24, 190:1
**17C** [1] - 11:5
**17QAWG** [2] - 48:20, 49:7
**18** [2] - 2:21, 175:23
**187** [1] - 2:21
**19** [8] - 61:3, 84:13, 85:23, 87:6, 89:17, 106:23, 180:19, 180:24
**1960** [2] - 135:3, 135:16
**1960(b)(1)(B** [1] - 135:23
**1982** [1] - 88:14

**1:00** [1] - 195:3
**1:21-CR-0399** [1] - 1:3
**1:45** [2] - 79:18, 79:20
**1C7** [2] - 82:16, 83:15
**1C8** [1] - 71:17
**1DT** [1] - 83:8
**1Dxmv** [1] - 190:11
**1EUJ** [1] - 83:9
**1JRE** [1] - 44:20
**1NEW** [3] - 86:10, 105:21
**1PAaf** [7] - 56:18, 57:1, 58:5, 58:7, 58:14, 58:18
**1PFF** [1] - 77:4
**1PFK** [1] - 76:25
**1st** [2] - 95:13, 117:14
**1YZJK** [2] - 91:4, 93:10
**1YZJKa** [5] - 91:17, 106:22, 121:10, 189:9, 189:11

**2**

**2** [41] - 13:11, 13:12, 23:14, 24:20, 24:24, 25:1, 25:3, 43:3, 46:16, 52:19, 54:17, 54:19, 54:22, 56:13, 56:19, 61:16, 65:9, 68:15, 71:6, 71:12, 86:7, 106:18, 111:9, 111:14, 111:18, 113:1, 114:1, 114:21, 120:25, 121:3, 123:10, 124:2, 128:6, 149:4, 151:19, 173:4, 177:13, 178:21, 180:15, 181:4, 181:11
**2,000** [1] - 142:20
**2.0** [2] - 180:21, 180:24
**2.2** [2] - 118:24, 123:6
**20** [5] - 122:17, 122:20, 124:21, 132:1, 149:13
**200,000** [1] - 187:6
**20001** [3] - 1:12, 1:24, 196:11
**20005** [1] - 1:17
**2009** [2] - 129:20, 134:2
**2010** [2] - 129:20, 134:2
**2011** [8] - 74:8, 96:22, 118:21, 129:20, 132:1, 132:21,

134:2, 171:21
**2012** [2] - 129:21, 134:2
**2013** [2] - 129:21, 134:3
**2014** [2] - 69:14, 96:23
**2016** [1] - 118:19
**2017** [3] - 95:12, 95:13, 117:15
**2018** [2] - 95:12, 167:15
**2019** [2] - 69:15, 156:9
**202-354-3246** [1] - 1:24
**2020** [4] - 35:2, 48:7, 171:17, 171:19
**2021** [2] - 152:19, 171:21
**2023** [5] - 1:5, 110:17, 195:24, 195:25, 196:7
**20530** [1] - 1:14
**21** [4] - 183:20, 187:10, 187:13, 187:14
**21-399** [1] - 3:3
**22** [2] - 1:5, 195:24
**22,864** [1] - 181:7
**23** [1] - 195:25
**24** [5] - 111:4, 111:9, 116:18, 117:2, 117:4
**244** [1] - 188:2
**244,975** [3] - 187:19, 187:25, 188:17
**25** [2] - 72:22, 118:1
**256** [1] - 114:21
**256-bit** [1] - 114:21
**26** [1] - 118:8
**27** [15] - 74:8, 120:20, 121:6, 121:7, 150:6, 181:25, 182:1, 182:9, 182:12, 182:13, 182:20, 182:22, 184:11, 184:15, 187:17
**28** [6] - 121:7, 121:12, 182:12, 182:17, 187:17, 190:4
**28th** [1] - 196:7
**29** [1] - 121:16
**29th** [1] - 80:4
**2:15** [2] - 124:22, 137:7

**3**

**3** [11] - 46:16, 48:10, 113:3, 124:2, 150:18, 150:20, 150:24, 151:5,

151:15, 158:22, 159:17
**3.2** [1] - 65:9
**30** [4] - 1:20, 121:23, 194:3, 194:12
**307** [1] - 56:20
**31** [2] - 108:11, 108:18
**31st** [1] - 110:17
**32** [2] - 115:11, 121:25
**32L9** [1] - 44:20
**33** [8] - 94:21, 97:21, 108:11, 108:18, 114:3, 114:4, 122:9, 124:1
**333** [2] - 1:23, 196:11
**34** [12] - 2:5, 69:2, 69:5, 69:6, 69:9, 69:16, 70:19, 122:12, 174:24, 180:7, 180:8, 184:10
**35** [5] - 71:9, 81:24, 82:12, 82:18
**36** [4] - 77:19, 81:20, 82:18, 82:21
**37** [8] - 2:10, 84:11, 88:10, 99:3, 99:5, 99:6, 99:7, 104:12
**38** [4] - 2:11, 107:10, 108:7, 156:2
**39** [5] - 2:12, 2:13, 110:5, 110:16, 156:1
**398,011** [3] - 185:12, 186:25, 189:23
**3:20** [1] - 137:8
**3:30** [3] - 194:19, 194:21, 194:22
**3:35** [1] - 137:9
**3LH** [2] - 48:14, 49:6

**4**

**4** [6] - 51:8, 65:9, 156:16, 156:21, 159:17, 188:22
**40** [3] - 138:1, 138:2, 140:23
**400,000** [2] - 177:2, 189:3
**41** [2] - 137:24, 138:3
**43** [1] - 94:2
**45** [6] - 70:20, 70:22, 71:2, 71:3, 194:3, 194:12
**46** [11] - 71:10, 74:2, 76:22, 78:6, 78:21, 79:6, 79:9, 81:21, 81:24, 83:23, 94:3
**46,532** [1] - 188:22
**472** [1] - 56:19
**49** [8] - 84:12, 87:2,

| | | | | |
|---|---|---|---|---|
| 98:7, 99:2, 99:6, 104:9, 106:16, 190:15<br>**4:00** [1] - 194:17 | 55:11, 65:8, 114:22<br><br>**8**<br><br>**8** [5] - 49:7, 57:3, 111:14, 113:1<br>**80** [1] - 63:2<br>**80-plus** [1] - 16:13<br>**800** [1] - 149:11<br>**8th** [1] - 1:20 | **Abuse** [1] - 40:21<br>**abuse** [2] - 173:22, 174:11<br>**academic** [1] - 178:11<br>**accept** [2] - 117:16, 117:19<br>**accepted** [1] - 127:22<br>**access** [27] - 4:3, 4:5, 4:12, 4:15, 18:1, 26:1, 31:24, 32:18, 52:4, 71:21, 73:15, 78:17, 88:3, 88:4, 91:20, 93:22, 94:11, 99:21, 100:1, 109:24, 120:15, 153:15, 171:23, 173:10, 173:25, 174:2, 174:10<br>**accessible** [1] - 120:12<br>**accommodated** [1] - 14:22<br>**According** [1] - 108:10<br>**according** [4] - 61:22, 64:15, 119:19, 157:25<br>**account** [31] - 5:14, 5:17, 6:5, 41:10, 42:6, 57:10, 57:16, 57:18, 57:19, 74:23, 75:1, 75:3, 87:7, 87:20, 92:14, 94:5, 96:5, 98:13, 100:16, 101:2, 101:3, 128:3, 141:13, 141:17, 142:9, 184:6, 191:12, 192:23, 192:24, 193:2<br>**Account** [1] - 75:6<br>**accountant** [1] - 125:25<br>**accounted** [7] - 82:15, 83:13, 104:19, 105:7, 111:21, 160:16, 189:13<br>**accounting** [4] - 129:5, 129:8, 172:9, 184:8<br>**accounts** [30] - 6:8, 40:5, 40:7, 41:15, 96:6, 96:10, 97:5, 97:6, 97:10, 98:18, 98:19, 100:18, 127:4, 127:6, 127:9, 127:10, 127:15, 129:4, 141:11, 151:9, 151:10, 151:11, 165:11, 165:13, 165:16, | 171:22, 189:3, 192:19<br>**accuracy** [7] - 11:17, 13:4, 20:17, 43:7, 44:9, 112:3, 119:11<br>**Accurate** [1] - 148:15<br>**accurate** [15] - 27:25, 37:10, 37:23, 44:23, 65:3, 87:14, 109:4, 147:20, 152:1, 154:11, 155:2, 155:3, 155:18, 161:19, 196:4<br>**accurately** [2] - 119:18, 157:19<br>**accused** [4] - 10:14, 49:21, 50:16, 53:6<br>**achieves** [1] - 17:7<br>**acquired** [3] - 35:6, 139:18, 145:6<br>**acquirers** [7] - 139:20<br>**acquisition** [1] - 155:5<br>**Act** [1] - 135:12<br>**action** [2] - 40:10, 187:9<br>**Action** [1] - 1:2<br>**actionable** [1] - 148:24<br>**active** [6] - 40:5, 40:14, 94:19, 119:4, 147:15, 148:20<br>**activities** [1] - 151:18<br>**activity** [7] - 26:9, 27:6, 135:21, 141:17, 142:9, 151:14, 171:6<br>**actor** [1] - 65:24<br>**actual** [23] - 28:23, 43:8, 44:15, 50:13, 56:16, 58:10, 58:20, 60:6, 61:7, 70:1, 70:25, 75:15, 78:17, 78:24, 79:10, 79:11, 85:15, 168:16, 170:4, 175:25, 182:9, 182:14, 182:15<br>**add** [6] - 4:21, 120:2, 132:11, 147:18, 148:23, 149:12<br>**addition** [6] - 3:22, 8:8, 10:21, 70:6, 73:13, 143:20<br>**additional** [8] - 87:8, 160:12, 163:25, 177:4, 189:7, 189:14, 189:23, 192:7<br>**additionally** [5] - 54:25, 72:20, 90:4, | 105:1, 111:24<br>**address** [165] - 7:20, 9:19, 23:6, 40:16, 41:7, 41:8, 48:9, 48:10, 48:12, 48:20, 49:3, 49:4, 49:6, 49:7, 52:2, 52:5, 52:20, 53:11, 53:24, 56:14, 56:15, 56:18, 57:1, 57:6, 57:7, 57:9, 57:12, 57:16, 57:19, 59:4, 59:5, 69:23, 69:24, 71:3, 71:14, 71:15, 71:17, 74:16, 74:21, 74:22, 75:15, 75:17, 75:19, 75:23, 76:2, 76:4, 76:24, 77:5, 77:25, 78:14, 78:15, 79:13, 79:14, 82:4, 82:5, 82:16, 83:4, 83:5, 83:6, 83:8, 83:15, 85:14, 86:10, 90:16, 91:4, 91:7, 91:12, 91:17, 91:19, 92:9, 94:17, 94:19, 95:13, 95:19, 97:12, 97:14, 97:16, 98:1, 104:19, 104:21, 105:9, 105:13, 105:17, 105:22, 106:6, 106:22, 107:18, 107:19, 110:9, 111:16, 111:20, 112:12, 112:19, 113:12, 113:13, 113:14, 114:5, 115:25, 116:2, 116:17, 117:6, 117:7, 117:19, 117:23, 118:25, 119:4, 119:7, 119:17, 121:10, 123:4, 123:5, 143:13, 145:21, 145:23, 146:2, 151:23, 152:3, 152:7, 159:10, 160:25, 161:8, 162:20, 163:2, 163:6, 163:15, 163:17, 163:18, 163:19, 163:20, 163:21, 163:24, 175:13, 175:16, 175:18, 176:10, 177:23, 179:7, 182:11, 182:16, 183:6, 183:13, 184:3, 187:19, 188:1, 188:3, 188:7, |
| **5** | | | | |
| **5** [6] - 65:21, 85:16, 85:17, 162:18, 162:23, 167:8<br>**50** [4] - 29:13, 30:5, 31:7, 187:7<br>**500,000** [2] - 177:3, 177:4<br>**527,000** [2] - 121:3, 172:14<br>**527731** [3] - 182:5, 182:11, 183:7<br>**534129** [1] - 117:6<br>**54** [1] - 107:11<br>**55** [1] - 108:8<br>**57** [1] - 7:22<br>**57(a** [1] - 5:8<br>**57.7** [1] - 4:19<br>**57.7(b** [1] - 10:6<br>**57.7(b)** [3] - 5:1, 5:2, 10:20<br>**57.7(b)(3)(vi** [1] - 10:8<br>**573,213** [3] - 185:12, 185:22, 186:24<br>**5:00** [1] - 190:18<br>**5:01** [2] - 190:19, 193:10<br>**5:05** [1] - 195:24 | **9**<br><br>**9** [1] - 59:22<br>**9.17** [3] - 56:17, 58:4, 58:12<br>**9/28/2018** [1] - 167:13<br>**90** [4] - 109:10, 193:15, 193:21, 193:22<br>**900,000** [2] - 23:9, 176:17<br>**900,000-plus** [1] - 177:1<br>**925,000** [1] - 172:14<br>**925,000-odd** [1] - 121:2<br>**950** [1] - 1:14<br>**96** [4] - 122:19, 122:22, 122:23, 122:24<br>**9:00** [3] - 194:17, 194:25, 195:25<br>**9:30** [2] - 80:5, 81:5 | | | |

| | | | | |
|---|---|---|---|---|
| **6** | | | | |
| **6** [4] - 122:20, 162:18, 162:23, 167:7<br>**6.3** [1] - 52:18<br>**60** [4] - 23:21, 75:3, 79:3, 83:6<br>**60-plus** [1] - 178:9<br>**60-some-page** [1] - 68:14<br>**60.4** [2] - 75:4, 75:7<br>**60.41** [2] - 74:8, 75:5<br>**601** [1] - 1:11<br>**66** [1] - 97:22<br>**67** [4] - 123:8, 123:17, 123:18, 124:1<br>**6714** [2] - 1:23, 196:10 | **A**<br><br>**A.M** [1] - 1:6<br>**a.m** [3] - 80:5, 194:17, 195:25<br>**ability** [7] - 5:9, 5:11, 5:12, 25:22, 26:10, 40:3, 196:6<br>**able** [30] - 4:4, 12:16, 22:3, 23:23, 27:13, 27:17, 27:23, 29:19, 32:13, 40:9, 41:3, 51:11, 58:2, 76:1, 79:22, 80:15, 92:13, 93:5, 93:8, 99:17, 107:22, 146:5, 153:7, 153:24, 157:1, 157:8, 157:15, 163:18, 167:12, 195:5<br>**Abraxas** [1] - 173:13<br>**absolutely** [5] - 5:13, 51:14, 64:11, 134:18, 185:3<br>**abundance** [1] - 126:4 | | | |
| **7** | | | | |
| **7** [1] - 159:10<br>**7.9** [1] - 75:2<br>**74** [2] - 114:25, 115:8<br>**75** [1] - 115:8<br>**77** [5] - 54:7, 55:8, | | | | |

188:8, 188:21, 189:9, 189:10, 191:10, 191:18, 192:22
**address'** [1] - 113:2
**address-to-address** [1] - 23:6
**addresses** [157] - 23:9, 23:11, 23:13, 23:15, 24:1, 24:3, 40:13, 40:16, 40:24, 41:23, 43:23, 44:18, 48:13, 48:25, 49:2, 49:9, 50:2, 53:19, 58:8, 60:7, 60:11, 60:12, 70:15, 78:1, 78:2, 78:4, 82:25, 84:13, 84:23, 85:9, 87:6, 87:9, 88:1, 88:7, 89:17, 89:25, 90:5, 90:8, 90:14, 90:18, 92:2, 92:6, 92:9, 92:11, 92:12, 95:6, 95:8, 96:7, 96:8, 98:1, 98:8, 99:15, 100:11, 100:15, 104:25, 105:16, 106:8, 106:10, 106:12, 106:13, 106:21, 106:24, 108:17, 108:23, 109:20, 112:19, 115:5, 116:15, 116:21, 116:25, 117:8, 117:22, 117:25, 118:23, 119:22, 120:6, 120:8, 120:23, 121:8, 122:20, 146:5, 147:12, 148:17, 148:18, 151:8, 151:21, 152:6, 157:2, 157:9, 160:23, 163:5, 163:9, 163:14, 163:25, 164:1, 166:3, 166:14, 172:14, 172:15, 172:16, 174:5, 174:8, 175:11, 176:3, 176:13, 176:14, 176:16, 176:20, 177:1, 177:6, 177:12, 177:16, 177:22, 177:25, 178:12, 179:18, 179:20, 179:23, 179:24, 180:11, 180:16, 181:12, 182:2,

182:6, 184:6, 184:25, 185:4, 185:8, 185:11, 185:13, 185:22, 186:22, 186:24, 187:6, 187:19, 188:1, 188:6, 188:12, 188:17, 188:20, 189:1, 189:3, 189:7, 189:14, 189:20, 189:21, 190:1, 190:2, 190:8, 190:11, 190:25, 191:23, 192:5, 192:8, 192:17, 192:18
**adept** [1] - 28:3
**adjourn** [1] - 195:9
**adjourned** [1] - 195:24
**administration** [1] - 22:10
**administrative** [1] - 79:22
**admit** [5] - 149:21, 158:8, 164:10, 167:18, 187:10
**ADMITTED** [1] - 2:9
**admitted** [19] - 37:17, 37:18, 38:5, 38:7, 38:25, 39:3, 137:22, 141:24, 149:25, 150:1, 158:12, 158:13, 164:17, 164:19, 165:2, 167:22, 167:23, 187:13, 187:14
**advance** [4] - 102:7, 102:25, 103:23, 168:4
**advertisement** [1] - 48:18
**advocated** [1] - 172:25
**affect** [3] - 22:8, 26:13, 48:17
**affidavit** [10] - 158:18, 158:20, 158:21, 159:6, 159:8, 160:8, 160:17, 161:23, 161:25, 162:8
**affidavits** [6] - 146:24, 146:25, 159:9, 160:10, 160:12, 160:15
**afternoon** [1] - 137:20
**agencies** [3] - 36:20, 36:23, 154:17
**agenda** [1] - 3:21
**agent** [1] - 86:15

**Agent** [2] - 94:13, 94:16
**aggregate** [2] - 147:17, 148:22
**ago** [8] - 15:3, 15:4, 18:10, 29:4, 50:15, 72:10, 73:6, 123:3
**Agora** [4] - 156:18, 157:1, 157:9, 173:13
**agree** [23] - 13:16, 23:18, 56:7, 87:4, 91:8, 107:23, 117:19, 138:10, 145:25, 147:20, 150:16, 154:24, 171:20, 171:24, 173:4, 173:12, 173:18, 174:8, 177:2, 190:1, 190:7, 190:10, 193:5
**agreed** [2] - 122:8, 142:13
**agreeing** [1] - 107:17
**agreement** [3] - 21:6, 56:4, 170:19
**ahead** [2] - 46:11, 79:16
**aiding** [1] - 103:15
**airport** [1] - 80:9
**AI** [10] - 48:7, 48:19, 48:21, 49:10, 50:5, 50:24, 50:25, 51:3, 51:9, 52:21
**AI-Qassam** [10] - 48:7, 48:19, 48:21, 49:10, 50:5, 50:24, 50:25, 51:3, 51:9, 52:21
**alacrity** [1] - 10:1
**Alden** [1] - 3:6
**ALDEN** [1] - 1:13
**alerted** [1] - 52:24
**Alexander** [2] - 96:19, 96:20
**algorithm** [8] - 43:6, 112:12, 112:14, 114:1, 148:10, 151:23, 152:5, 152:9
**algorithms** [12] - 12:22, 20:1, 20:3, 39:25, 112:23, 147:17, 147:22, 148:2, 148:4, 148:22, 149:19, 152:12
**allegations** [1] - 32:14
**allow** [7] - 64:22, 67:14, 67:15, 88:5, 90:3, 103:25, 133:9
**allowed** [5] - 4:8, 6:17, 16:17, 119:1, 132:15

**allowing** [1] - 109:6
**almost** [8] - 17:21, 59:14, 101:5, 111:10, 120:19, 177:5, 187:6, 189:3
**alone** [1] - 25:20
**aloud** [3] - 162:23, 163:24, 180:25
**AlphaBay** [12] - 118:24, 119:2, 119:6, 119:8, 119:11, 122:18, 122:22, 123:2, 123:3, 123:5, 123:6, 173:13
**alternative** [1] - 133:3
**amateur** [1] - 146:12
**amenable** [2] - 101:23, 101:24
**amend** [2] - 138:12, 138:18
**AMERICA** [1] - 1:2
**America** [1] - 3:3
**American** [2] - 36:18, 36:22
**AML** [2] - 149:5, 167:14
**amount** [11] - 25:2, 55:2, 55:5, 55:22, 75:2, 75:3, 78:16, 78:24, 83:9, 100:19, 188:14
**amounts** [5] - 53:20, 58:12, 78:11, 78:21, 78:22
**amplified** [1] - 8:19
**anachronistic** [2] - 129:21, 134:3
**analogy** [2] - 88:12, 88:24
**analyses** [1] - 163:3
**analysis** [32] - 17:5, 22:18, 22:21, 22:22, 22:23, 22:24, 23:3, 31:13, 31:19, 62:23, 67:5, 69:18, 99:24, 138:23, 150:3, 151:22, 152:3, 153:7, 153:12, 153:18, 153:25, 156:4, 158:2, 161:10, 162:20, 163:1, 163:12, 169:9, 178:14, 181:3, 187:6, 194:5
**analytics** [15] - 40:3, 40:5, 40:20, 41:23, 42:20, 51:5, 56:2, 169:14, 169:17, 169:18, 170:1,

170:4, 170:8, 170:10
**analyze** [1] - 20:1
**anchor** [1] - 164:3
**animal** [1] - 97:18
**announcement** [1] - 157:19
**anonymity** [3] - 54:7, 55:8
**anonymizes** [1] - 149:15
**anonymizing** [2] - 63:10, 63:17
**anonymous** [1] - 55:5
**answer** [8] - 12:19, 24:14, 51:15, 64:10, 94:8, 102:6, 179:2, 179:3
**anti** [1] - 167:3
**anti-money** [1] - 167:3
**anticipate** [3] - 7:4, 143:8, 144:6
**anyhow** [1] - 115:6
**apart** [2] - 61:9, 100:23
**API** [3] - 41:22, 92:10, 121:24
**apologies** [1] - 105:16
**apologize** [2] - 72:8, 182:18
**appear** [1] - 160:1
**appearance** [1] - 22:3
**appendix** [4] - 183:15, 183:18, 183:20, 183:22
**applicability** [1] - 134:25
**application** [4] - 30:20, 31:10, 43:8, 113:25
**applications** [1] - 30:13
**applied** [12] - 7:1, 17:4, 21:14, 26:21, 27:12, 43:6, 111:18, 112:11, 112:22, 114:2, 185:18
**apply** [1] - 24:15
**applying** [1] - 149:14
**appreciate** [5] - 80:3, 80:11, 109:11, 120:17, 140:1
**appreciation** [1] - 131:7
**approach** [4] - 3:4, 31:17, 34:7, 124:8
**approaches** [1] - 44:11
**appropriate** [15] - 18:14, 18:22, 18:23, 20:22, 22:4, 30:9,

68:17, 68:19, 68:22, 70:11, 102:23, 109:11, 127:21, 137:3
**approval** [2] - 6:18, 7:17
**approved** [2] - 19:12, 145:1
**Arabic** [1] - 34:21
**arcing** [1] - 105:19
**area** [2] - 85:1, 134:21
**arguably** [1] - 17:14
**argue** [1] - 131:11
**arguing** [1] - 88:25
**argument** [5] - 11:22, 128:7, 128:20, 132:10, 135:1
**arm** [2] - 36:4
**arrangement** [1] - 145:8
**arrest** [2] - 10:9, 96:21
**arrested** [2] - 96:21, 97:2
**arrow** [2] - 83:14, 86:9
**arrows** [1] - 75:12
**articles** [1] - 5:18
**assessment** [2] - 152:19, 158:1
**assessments** [1] - 152:13
**Asset** [1] - 149:16
**assets** [2] - 30:5, 149:7
**assign** [4] - 87:16, 166:4, 166:13, 166:21
**assist** [1] - 165:8
**assistance** [1] - 15:7
**associate's** [1] - 34:17
**associated** [11] - 10:10, 23:16, 50:3, 50:9, 90:14, 92:6, 166:14, 179:19, 188:12, 190:1, 190:11
**assume** [2] - 13:9, 74:10
**assuming** [1] - 109:22
**assumption** [3] - 50:17, 86:5, 109:21
**assumptions** [11] - 13:11, 14:9, 17:4, 20:10, 20:11, 21:14, 23:2, 24:12, 26:4, 47:16, 132:5
**assurances** [1] - 13:18
**attached** [3] - 38:15, 85:15, 169:17
**attachment** [3] -

175:25, 176:1
**attachments** [2] - 175:7, 175:11
**attempt** [3] - 152:7, 152:10, 152:12
**attempted** [3] - 92:16, 96:3, 97:4
**attempting** [1] - 98:7
**attention** [37] - 6:7, 37:1, 38:12, 69:1, 70:25, 74:7, 74:24, 76:21, 78:7, 79:5, 82:20, 112:25, 116:12, 118:8, 120:21, 121:6, 121:13, 137:21, 147:5, 148:11, 148:25, 156:11, 156:15, 158:22, 160:19, 167:2, 167:7, 175:23, 180:5, 180:19, 181:25, 183:8, 183:20, 184:10, 187:16, 188:11, 190:14
**attorney** [2] - 4:2, 4:4
**attributable** [2] - 97:7, 108:20
**attribute** [2] - 101:3, 178:20
**attributed** [17] - 49:9, 71:5, 90:5, 90:10, 98:1, 100:15, 106:20, 108:17, 108:24, 120:24, 122:11, 123:9, 176:21, 185:13, 189:7, 189:15, 192:16
**attributing** [1] - 119:8
**Attribution** [2] - 147:10, 148:15
**attribution** [47] - 39:24, 40:10, 40:18, 41:4, 41:6, 42:14, 43:22, 44:1, 44:5, 44:9, 47:13, 48:4, 48:5, 48:10, 48:12, 48:17, 53:3, 60:17, 87:15, 95:3, 106:10, 118:25, 119:22, 121:1, 122:15, 122:17, 122:21, 123:24, 123:25, 147:21, 148:16, 149:10, 150:8, 150:17, 150:19, 151:7, 151:18, 152:3, 152:4,

152:14, 154:25, 161:7, 161:15, 166:23, 180:14, 189:4, 189:22
**attributions** [4] - 119:3, 122:13, 122:24
**audiences** [1] - 155:11
**audit** [5] - 41:4, 43:13, 43:19, 44:5, 152:19
**auditable** [1] - 43:13
**audited** [1] - 48:11
**auditing** [1] - 44:24
**August** [7] - 1:5, 48:7, 95:13, 117:14, 195:24, 195:25, 196:7
**AUSA** [1] - 3:9
**authority** [1] - 32:3
**authorize** [6] - 9:8, 10:11, 30:9, 31:7, 33:4, 33:8
**authorized** [2] - 30:15, 30:17
**automates** [1] - 149:11
**automatic** [1] - 43:2
**availability** [1] - 186:8
**available** [12] - 19:9, 30:3, 44:17, 58:9, 72:2, 77:12, 83:17, 84:22, 104:23, 105:3, 159:24, 164:16
**Ave** [1] - 1:17
**Avenue** [3] - 1:14, 1:23, 196:11
**avoid** [1] - 32:13
**awarded** [1] - 98:25
**aware** [39] - 4:14, 32:11, 41:24, 42:22, 42:24, 43:1, 43:16, 43:19, 49:13, 54:1, 65:11, 134:1, 139:10, 139:14, 141:16, 141:23, 142:2, 146:20, 152:15, 152:16, 152:22, 154:19, 156:8, 157:14, 160:17, 165:13, 167:25, 171:14, 171:16, 172:23, 173:9, 173:21, 173:24, 175:13, 185:10, 185:21, 186:22, 187:5, 191:19
**awkward** [1] - 117:13

**B**

**bachelor's** [1] - 34:18
**back-to-back** [1] - 55:22
**background** [3] - 12:1, 34:13, 39:6
**backing** [1] - 69:17
**backwards** [3] - 76:18, 93:11, 94:12
**baffling** [1] - 25:11
**balance** [1] - 57:4
**Bank** [1] - 135:12
**bank** [1] - 127:15
**base** [2] - 139:22, 140:7
**based** [18] - 14:8, 18:3, 20:10, 24:24, 24:25, 46:5, 46:8, 51:5, 91:25, 124:2, 136:22, 136:25, 151:4, 151:10, 160:24, 161:11, 179:21, 181:20
**baseline** [2] - 119:17, 123:4
**bases** [1] - 111:17
**basics** [1] - 57:15
**basis** [6] - 18:6, 100:12, 102:22, 132:14, 137:1, 137:5
**battle** [1] - 24:6
**BCF** [1] - 86:7
**Beckett** [3] - 94:15, 94:16
**becomes** [1] - 125:10
**BEFORE** [1] - 1:8
**began** [2] - 35:5, 36:2
**begging** [1] - 125:12
**beginning** [7] - 35:12, 48:9, 98:13, 140:20, 150:12, 156:15, 156:21
**begins** [2] - 104:16, 113:2
**behalf** [3] - 43:1, 95:17, 193:3
**behave** [3] - 91:7, 94:22, 107:23
**behaves** [4] - 27:3, 91:10, 107:18, 189:10
**behaving** [1] - 27:7
**behavior** [7] - 26:11, 26:12, 26:25, 119:18, 123:5, 123:6
**behavioral** [12] - 24:21, 26:6, 26:8, 26:17, 26:18, 26:20, 26:24, 26:25, 27:11,

120:25, 177:13, 177:15
**behind** [5] - 37:1, 37:20, 38:12, 38:18, 69:3
**belaboring** [1] - 133:18
**belong** [4] - 44:21, 88:1, 88:7, 161:17
**belonging** [1] - 40:17
**belongs** [1] - 178:22
**below** [6] - 48:9, 55:7, 56:14, 58:10, 82:5, 189:25
**bench** [1] - 164:19
**beneath** [1] - 158:23
**beside** [1] - 105:23
**best** [8] - 28:2, 56:1, 80:17, 84:4, 104:10, 171:22, 193:21, 196:6
**beta** [3] - 86:1, 87:2, 87:21
**Beta** [1] - 86:7
**better** [4] - 28:6, 80:19, 87:17, 194:22
**between** [18] - 29:13, 31:7, 47:5, 47:9, 49:14, 82:25, 87:23, 116:9, 116:22, 123:10, 124:7, 142:20, 143:9, 149:12, 169:17, 170:19, 172:6, 181:19
**beyond** [4] - 7:1, 17:16, 65:11, 104:2
**biased** [1] - 31:14
**big** [2] - 112:15, 116:6
**bigger** [1] - 17:15
**bill** [2] - 85:16, 85:17
**Binance** [21] - 41:8, 41:9, 41:11, 41:14, 42:4, 190:24, 191:3, 191:5, 191:11, 191:15, 191:24, 192:2, 192:6, 192:10, 192:17, 192:18, 192:24, 193:2, 193:4
**binder** [7] - 34:5, 37:2, 99:12, 137:13, 137:21, 175:24, 182:1
**Bisbee** [11] - 11:18, 26:5, 27:1, 27:5, 27:10, 27:24, 61:22, 63:12, 67:2, 105:12, 111:6
**Bisbee's** [10] - 24:19,

25:2, 26:23, 110:4, 110:20, 111:1, 118:12, 150:24, 175:7, 179:14

**bit** [31] - 12:18, 35:10, 35:13, 43:3, 50:1, 53:14, 68:23, 70:24, 71:12, 73:23, 90:12, 92:15, 94:18, 96:1, 104:14, 104:16, 116:9, 127:2, 129:1, 129:21, 135:5, 139:9, 155:25, 161:12, 183:9, 190:15, 190:16, 190:22, 191:25, 193:13, 193:16

**Bitaps** [1] - 113:15

**bitaps.com** [1] - 118:5

**bitcoin** [2] - 157:2, 166:18

**Bitcoin** [175] - 23:9, 23:12, 23:14, 24:3, 24:5, 27:4, 27:7, 36:10, 40:12, 40:21, 43:25, 51:8, 52:1, 52:7, 52:13, 52:16, 52:18, 52:19, 52:20, 53:10, 53:18, 55:4, 55:7, 55:18, 56:17, 56:19, 57:3, 57:4, 57:8, 57:16, 57:17, 57:20, 57:22, 58:5, 58:13, 59:22, 62:7, 66:24, 67:5, 67:10, 67:24, 68:1, 71:1, 71:4, 71:5, 74:8, 75:2, 75:16, 79:3, 79:4, 83:6, 84:18, 85:4, 86:6, 87:3, 87:5, 87:7, 87:13, 87:24, 90:11, 91:1, 91:7, 91:10, 91:20, 92:1, 92:16, 92:18, 92:24, 93:14, 93:17, 93:23, 94:3, 94:4, 94:5, 95:4, 95:9, 95:11, 95:14, 96:4, 96:17, 97:3, 97:7, 97:10, 97:15, 97:17, 98:15, 99:16, 106:14, 106:19, 106:20, 107:19, 108:4, 108:18, 108:19, 108:20, 108:24, 109:4, 109:19, 109:20, 112:3, 114:10, 116:24, 117:5, 118:20, 121:2,

121:9, 122:11, 123:7, 126:21, 127:12, 128:8, 128:15, 128:23, 129:3, 129:7, 129:11, 129:22, 130:12, 131:10, 131:14, 131:19, 132:1, 132:11, 132:21, 133:25, 134:24, 156:18, 160:24, 161:13, 162:9, 166:14, 166:17, 166:21, 166:24, 171:9, 171:12, 171:20, 171:25, 172:4, 172:6, 172:10, 172:11, 172:25, 173:19, 174:1, 174:9, 175:2, 175:14, 176:4, 176:8, 176:18, 177:23, 177:24, 178:1, 178:22, 179:8, 179:22, 180:22, 180:25, 181:5, 181:7, 181:8, 181:12, 181:19, 188:18, 189:5, 189:8, 189:15, 189:22, 190:2, 190:7

**Bitcoin's** [1] - 131:6

**Bitcoinfog.eth** [1] - 110:7

**Bitcointalk** [3] - 87:9, 97:23, 98:17

**bits** [8] - 111:25, 112:1, 112:15, 114:2, 114:3, 115:11, 115:14, 116:7

**black** [11] - 12:19, 20:15, 30:2, 40:2, 40:3, 41:1, 41:16, 41:20, 42:22, 42:25, 169:18

**BlackBank** [1] - 173:13

**blame** [1] - 32:20

**blanket** [1] - 139:25

**block** [9] - 59:12, 59:13, 60:5, 63:25, 98:25, 113:7, 113:10, 117:6

**blockchain** [42] - 17:22, 20:5, 20:7, 36:10, 40:13, 41:23, 42:20, 51:4, 52:10, 56:1, 57:19, 57:21,

62:6, 62:23, 69:18, 71:1, 75:16, 80:21, 84:9, 86:23, 103:12, 146:1, 146:2, 146:11, 149:6, 149:10, 150:3, 153:7, 153:25, 155:20, 156:4, 158:2, 161:3, 163:1, 163:11, 164:2, 164:4, 164:6, 164:7, 169:9, 170:8, 181:3

**Blockchain** [1] - 156:2

**blockchain.com** [1] - 58:10

**blockchair.com** [1] - 58:10

**blocks** [1] - 59:11

**Bloomberg** [1] - 132:2

**blue** [1] - 149:4

**body** [2] - 55:25, 56:2

**boggles** [1] - 6:4

**bono** [3] - 36:3, 36:4, 142:14

**booklet** [2] - 82:19, 99:10

**boss** [1] - 35:22

**bots** [1] - 8:19

**bottom** [15] - 23:21, 26:13, 31:18, 45:21, 71:1, 81:23, 82:2, 82:11, 128:25, 129:2, 182:5, 182:17, 182:25, 183:24, 189:11

**bounce** [1] - 115:9

**box** [13] - 12:19, 20:15, 30:2, 40:2, 40:3, 41:1, 41:16, 41:20, 42:22, 42:25, 58:24, 75:6, 169:18

**boxes** [2] - 58:24, 61:5

**brand** [1] - 145:7

**breadth** [1] - 194:5

**break** [15] - 33:13, 62:3, 68:20, 79:17, 88:24, 90:12, 124:20, 125:5, 137:7, 154:6, 155:24, 186:2, 186:7, 193:11, 195:1

**breaking** [1] - 93:9

**briefing** [1] - 8:15

**briefly** [17] - 34:12, 46:23, 54:8, 81:22, 82:1, 83:1, 86:20, 107:15, 108:7, 108:15, 111:13, 118:11, 120:1, 121:15, 122:1,

122:14, 145:13

**Brigades** [10] - 48:7, 48:19, 48:21, 49:10, 50:5, 50:24, 50:25, 51:3, 51:9, 52:21

**bring** [1] - 4:10

**bringing** [1] - 29:1

**broached** [1] - 101:21

**broken** [1] - 55:1

**broker** [2] - 61:7, 61:14

**brought** [2] - 79:22, 136:10

**BROWN** [13] - 1:10, 3:9, 4:23, 8:2, 8:9, 8:22, 9:2, 9:6, 9:13, 9:15, 9:24, 11:12, 135:11

**Brown** [5] - 3:10, 7:25, 64:4, 65:7, 135:8

**browser** [1] - 71:21

**BTC** [12] - 92:7, 92:9, 92:11, 92:14, 96:5, 96:6, 96:15, 96:19, 96:21, 97:5, 97:10, 98:8

**BTC-e** [11] - 92:7, 92:9, 92:11, 92:14, 96:5, 96:6, 96:15, 96:21, 97:5, 97:10, 98:8

**buggy** [1] - 17:24

**build** [1] - 91:13

**building** [1] - 23:7

**builds** [1] - 101:9

**bulk** [1] - 25:14

**bullet** [6] - 112:25, 113:21, 116:13, 116:14, 117:2, 117:4

**bunch** [4] - 41:22, 73:6, 119:2, 176:14

**buried** [1] - 16:20

**business** [1] - 95:25

**busy** [1] - 130:7

**buy** [2] - 25:22, 85:16

**buyers** [2] - 173:2, 173:18

**BY** [47] - 34:4, 34:11, 37:19, 38:8, 39:4, 39:16, 42:16, 46:22, 49:18, 51:10, 64:17, 66:4, 66:16, 67:21, 69:12, 72:17, 75:22, 77:17, 81:18, 85:22, 89:16, 93:3, 94:14, 104:6, 108:6, 108:14, 109:17, 110:25, 116:11, 119:15, 124:11, 137:19, 138:5,

139:1, 150:2, 158:14, 165:3, 167:24, 171:1, 177:14, 179:6, 179:12, 180:9, 182:21, 186:20, 187:15, 190:21

**byte** [3] - 112:1, 116:10

**bytes** [5] - 112:15, 114:3, 114:4, 115:14, 116:7

## C

**calculate** [2] - 172:7, 172:13

**calculated** [3] - 173:7, 181:15, 181:24

**calculation** [3] - 181:18, 183:11, 185:7

**calculations** [1] - 181:17

**California** [1] - 159:17

**campaign** [1] - 50:13

**Canada** [1] - 156:9

**Canadian** [2] - 158:1, 158:5

**cannot** [12] - 11:17, 55:19, 63:5, 63:6, 87:21, 88:7, 90:6, 91:19, 105:23, 119:21, 170:3, 175:4

**capability** [1] - 101:13

**capable** [1] - 136:8

**capture** [1] - 102:19

**captured** [1] - 120:8

**career** [2] - 35:5, 35:13

**carefully** [2] - 179:1, 179:3

**caret** [1] - 114:21

**carry** [1] - 117:13

**case** [78] - 5:15, 5:19, 5:22, 6:7, 6:11, 7:2, 10:15, 10:16, 16:12, 17:20, 18:6, 20:13, 22:11, 26:21, 27:19, 27:21, 27:22, 30:8, 30:20, 32:1, 32:22, 38:10, 47:15, 47:18, 47:19, 50:22, 58:4, 60:9, 64:12, 64:16, 65:8, 65:13, 66:18, 67:9, 67:23, 88:14, 114:9, 122:6, 130:4, 130:5, 130:15, 130:19, 133:21, 134:3, 136:1,

138:13, 139:2, 139:3, 139:6, 140:22, 142:14, 142:17, 142:21, 143:9, 143:19, 144:2, 144:6, 144:11, 144:20, 145:12, 145:16, 145:19, 146:20, 153:22, 160:11, 160:13, 161:10, 161:11, 162:8, 168:15, 171:2, 171:8, 174:14, 175:5, 178:23, 194:6

**Case** [2] - 3:2, 56:13

**cases** [5] - 30:17, 36:6, 36:8, 154:20, 154:22

**catch** [1] - 79:25

**categorize** [2] - 169:25, 170:6

**causing** [1] - 100:6

**caution** [1] - 126:4

**caveat** [1] - 131:24

**cease** [1] - 8:21

**central** [3] - 27:20, 30:8, 32:21

**CEO** [5] - 96:20, 144:24, 145:4, 146:18, 156:8

**CEPOL** [1] - 36:16

**certain** [11] - 40:17, 40:23, 51:4, 60:16, 65:5, 97:18, 143:10, 146:21, 161:17, 161:18, 189:10

**certainly** [3] - 67:13, 132:15, 139:19

**certainty** [1] - 94:10

**CERTIFICATE** [1] - 196:1

**Certified** [1] - 35:20

**certify** [2] - 6:23, 196:3

**cetera** [3] - 36:7, 40:13, 107:6

**chain** [24] - 40:11, 43:2, 44:16, 44:22, 49:17, 52:14, 54:18, 54:20, 54:23, 59:2, 61:11, 63:7, 64:22, 67:25, 75:14, 78:12, 83:19, 83:21, 84:5, 86:16, 99:24, 110:9, 120:24, 121:4

**Chainalysis** [79] - 11:16, 11:20, 12:4, 12:13, 13:19, 15:5, 17:7, 19:21, 20:3, 20:22, 21:4, 21:10, 21:15, 21:20, 22:2, 22:12, 25:10, 25:19, 26:1, 28:19, 31:8, 31:24, 43:17, 43:20, 45:18, 46:1, 46:2, 46:16, 46:24, 47:1, 47:3, 53:4, 61:20, 91:9, 108:10, 108:17, 108:20, 108:24, 111:8, 111:11, 111:15, 112:4, 119:2, 121:18, 122:11, 122:13, 123:14, 139:12, 139:15, 139:17, 139:22, 139:24, 140:8, 140:16, 150:16, 151:14, 151:18, 169:11, 170:17, 174:16, 175:15, 175:18, 176:13, 177:1, 177:7, 179:23, 180:11, 182:2, 182:11, 183:4, 183:16, 185:20, 187:19, 187:25, 188:3, 188:15, 188:21, 189:1, 189:4

**Chainalysis's** [6] - 11:18, 79:23, 140:5, 180:2, 184:5, 189:22

**chains** [3] - 36:11, 61:13, 152:10

**chair** [1] - 36:3

**challenge** [1] - 125:23

**challenging** [1] - 125:8

**chambers** [1] - 164:20

**chance** [2] - 8:1, 33:14

**change** [25] - 35:13, 44:8, 65:10, 65:23, 74:17, 74:19, 85:17, 117:5, 121:19, 129:23, 151:21, 151:23, 151:25, 152:2, 152:6, 152:7, 160:23, 162:19, 163:13, 163:17, 163:18, 163:20, 163:21, 163:24, 187:6

**changed** [3] - 44:6, 116:25, 146:6

**changes** [1] - 41:6

**channels** [1] - 48:19

**characteristic** [1] - 24:18

**characterization** [1] - 18:19

**characterize** [2] - 15:10, 73:22

**characterized** [1] - 16:16

**charge** [1] - 33:2

**charged** [1] - 50:4

**charges** [1] - 20:12

**chart** [13] - 88:9, 167:9, 182:4, 182:9, 182:14, 182:15, 183:4, 187:17, 187:18, 187:25, 188:12, 189:25, 190:5

**charts** [2] - 50:19, 50:20

**chat** [1] - 145:20

**chats** [1] - 145:15

**Chaumians** [1] - 63:14

**cheaper** [1] - 113:11

**check** [5] - 132:22, 146:21, 166:22, 186:7, 189:24

**checking** [2] - 20:17, 110:22

**checks** [1] - 43:8

**child** [2] - 173:22, 174:10

**childcare** [1] - 194:18

**China** [1] - 159:14

**choice** [1] - 29:8

**choose** [4] - 29:19, 115:21, 140:15, 140:16

**chooses** [1] - 54:10

**chose** [2] - 117:16, 133:1

**chosen** [1] - 25:18

**Chris** [1] - 3:9

**CHRISTOPHER** [1] - 1:10

**CI** [1] - 86:14

**CipherTrace** [123] - 23:9, 33:21, 34:23, 34:24, 35:1, 35:4, 35:5, 35:8, 35:18, 35:24, 36:1, 36:4, 36:9, 40:6, 46:24, 51:20, 56:17, 61:3, 71:4, 83:17, 91:9, 95:2, 104:24, 106:10, 121:18, 121:24, 122:10, 122:13, 122:17, 123:15, 139:11, 139:15, 139:23, 140:7, 140:15, 143:15, 143:16, 143:20, 143:21, 144:1, 144:7, 144:18, 144:19, 144:23, 145:4, 145:6, 145:10, 146:8, 146:14, 147:2, 147:6, 147:7, 147:11, 147:16, 148:1, 148:12, 148:21, 149:1, 149:5, 150:6, 150:10, 150:20, 151:3, 151:17, 151:21, 152:2, 153:4, 153:8, 153:20, 153:23, 154:16, 155:1, 155:3, 155:4, 155:12, 156:5, 155:12, 157:22, 157:24, 158:15, 160:22, 161:6, 163:24, 164:1, 164:5, 165:19, 165:23, 166:4, 166:13, 166:16, 166:20, 167:3, 167:8, 167:12, 167:14, 169:8, 169:22, 170:9, 170:14, 170:15, 170:16, 171:15, 172:10, 173:16, 174:15, 175:2, 177:2, 177:21, 178:19, 179:13, 179:23, 180:12, 188:6, 188:12, 188:17, 188:23, 189:4, 189:7, 189:15, 190:7, 190:11

**CipherTrace's** [24] - 23:11, 54:4, 145:25, 146:18, 147:12, 147:16, 147:21, 148:16, 148:21, 149:17, 150:3, 152:16, 153:1, 153:12, 153:24, 154:3, 154:8, 154:24, 156:8, 157:10, 157:23, 180:1, 181:20, 189:22

**circle** [1] - 75:1

**circles** [2] - 60:5, 60:6

**circulate** [1] - 164:24

**citing** [1] - 111:8

**civil** [8] - 16:18, 48:6, 48:11, 48:15, 130:4, 130:9, 130:15, 130:19

**CJA** [29] - 6:14, 6:15, 6:17, 6:19, 6:23, 6:24, 7:3, 7:6, 7:8, 7:9, 7:12, 19:9, 19:12, 19:13, 19:18, 25:24, 29:21, 29:22, 30:7, 30:11, 30:12, 30:16, 30:25, 33:8, 33:9, 33:10

**claims** [1] - 40:22

**Clane** [2] - 170:2, 170:9

**clarify** [1] - 182:2

**clarifying** [1] - 133:14

**clarity** [1] - 147:24

**classic** [2] - 24:6, 129:5

**cleaned** [1] - 165:11

**clear** [26] - 4:24, 4:25, 5:25, 10:17, 12:6, 16:14, 28:19, 29:3, 36:1, 63:11, 69:8, 78:13, 78:14, 84:2, 95:7, 102:11, 102:13, 109:10, 134:19, 142:1, 145:9, 157:17, 177:25, 183:11, 185:3

**clearly** [2] - 11:18, 103:14

**Clegg** [3] - 35:22, 144:22, 145:1

**clerk** [1] - 21:8

**client** [6] - 4:4, 4:12, 4:16, 14:21, 56:17, 56:20

**client's** [1] - 13:23

**clients** [5] - 140:11, 142:25, 155:9, 155:12, 155:16

**clock** [2] - 8:16, 137:8

**close** [3] - 15:3, 29:4, 34:16

**closed** [2] - 147:14, 148:19

**closed-source** [2] - 147:14, 148:19

**closer** [2] - 6:6, 34:15

**cluster** [48] - 23:7, 24:21, 27:7, 44:12, 44:18, 45:2, 46:19, 48:6, 49:1, 49:9, 49:11, 52:21, 61:9, 69:24, 89:3, 89:5, 95:1, 104:20, 106:19, 107:23,

108:19, 108:24, 121:9, 121:10, 121:11, 121:17, 121:19, 121:20, 122:4, 122:6, 122:7, 122:8, 152:8, 163:25, 174:16, 175:14, 175:17, 177:13, 177:15, 179:20, 180:3, 184:3, 188:9, 190:1, 190:6, 190:10, 190:11, 192:15

**clustered** [6] - 120:23, 157:10, 177:12, 180:12, 182:6

**clustering** [57] - 26:24, 26:25, 39:25, 41:17, 43:2, 44:10, 45:1, 45:18, 45:20, 45:23, 46:4, 46:5, 46:8, 46:11, 46:12, 46:13, 47:6, 47:7, 48:17, 49:8, 49:14, 49:15, 50:17, 51:6, 53:5, 54:25, 58:16, 61:8, 62:1, 62:3, 62:4, 86:9, 86:13, 119:7, 119:23, 147:17, 147:21, 147:22, 148:2, 148:4, 148:21, 149:14, 149:19, 150:3, 150:7, 151:11, 151:17, 152:17, 154:3, 154:4, 154:8, 155:22, 163:3, 163:13, 181:20, 192:14

**clusters** [32] - 44:15, 44:21, 45:1, 45:9, 47:6, 47:23, 47:24, 47:25, 48:22, 49:4, 54:1, 87:25, 88:1, 88:6, 89:4, 91:8, 91:10, 91:12, 94:23, 119:23, 122:3, 122:10, 151:12, 151:13, 163:2, 172:9, 179:13, 179:16, 179:18, 180:1, 180:13

**Clusters** [1] - 121:24

**co** [73] - 36:3, 44:18, 44:19, 44:20, 46:6, 46:9, 46:15, 47:25, 48:13, 48:14, 48:22, 49:5, 58:7, 60:3, 60:4, 60:10, 75:9,

75:10, 75:17, 76:24, 77:4, 77:21, 78:1, 82:5, 82:7, 82:10, 83:5, 87:8, 87:24, 95:7, 95:8, 96:23, 106:21, 120:24, 123:20, 123:25, 152:13, 162:19, 163:6, 163:7, 163:10, 163:24, 176:11, 177:12, 177:19, 178:1, 178:21, 179:21, 182:5, 182:7, 182:10, 182:16, 183:1, 183:6, 183:10, 183:25, 184:1, 184:4, 184:8, 184:20, 184:21, 185:1, 185:5, 185:8, 185:11, 185:15, 185:17, 185:21, 187:22

**co-chair** [1] - 36:3

**co-founders** [1] - 96:23

**co-spend** [53] - 44:19, 46:6, 46:9, 46:15, 47:25, 48:14, 49:5, 60:3, 60:10, 75:9, 75:10, 75:17, 76:24, 77:4, 77:21, 78:1, 82:5, 82:7, 82:10, 83:5, 95:8, 120:24, 123:20, 123:25, 162:19, 163:6, 163:7, 163:10, 163:24, 176:11, 177:12, 178:1, 178:21, 179:21, 182:5, 182:7, 182:10, 182:16, 183:1, 183:6, 183:10, 184:4, 184:20, 184:21, 185:1, 185:5, 185:8, 185:11, 185:15, 185:17, 185:21, 187:22

**co-spending** [8] - 44:18, 58:7, 95:7, 152:13, 183:25, 184:1, 184:8

**co-spends** [5] - 48:13, 60:4, 87:24, 177:19

**co-spent** [5] - 44:20, 48:22, 60:10, 87:8, 106:21

**co_spend_flag** [10] - 183:12, 183:23,

184:6, 184:19, 185:1, 185:4, 185:11, 185:16, 186:23, 187:2

**co_spend_flags** [1] - 184:7

**co_spend_root_ address** [4] - 176:10, 183:24, 184:2, 184:21

**code** [44] - 12:10, 12:15, 13:10, 14:6, 14:7, 14:8, 14:9, 15:16, 16:12, 16:15, 16:21, 16:22, 16:23, 17:10, 17:14, 18:16, 18:21, 19:1, 19:3, 19:21, 19:22, 19:23, 20:1, 21:3, 21:16, 21:21, 24:16, 25:4, 25:5, 28:4, 28:5, 28:10, 32:18, 98:23, 153:5, 153:9, 153:12, 153:18, 154:1

**coder** [2] - 24:11, 28:22

**coding** [3] - 12:8, 28:3, 28:7

**coffee** [2] - 65:20, 85:16

**coffees** [2] - 65:21, 65:22

**Coinbase** [1] - 98:25

**CoinJoin** [22] - 54:9, 55:5, 55:17, 62:2, 62:7, 62:22, 62:25, 63:13, 64:1, 64:9, 64:14, 64:19, 65:6, 65:13, 65:14, 65:15, 65:17, 95:11, 95:18

**CoinJoins** [13] - 54:7, 55:22, 63:10, 63:17, 63:21, 64:15, 64:22, 64:24, 65:4, 95:15, 154:6, 155:24, 155:25

**coins** [3] - 54:10, 85:3, 86:22

**Coke** [1] - 13:19

**cold** [1] - 72:10

**colleagues** [1] - 171:14

**collected** [3] - 39:24, 41:24, 61:13

**collecting** [2] - 112:5, 151:8

**collection** [3] - 41:5, 42:1, 149:11

**colloquial** [1] - 191:21

**color** [1] - 122:10

**COLUMBIA** [1] - 1:1

**column** [5] - 176:9, 183:5, 183:6, 183:8, 188:3

**columns** [2] - 73:11, 73:14

**combination** [2] - 124:2, 143:22

**combine** [2] - 65:16, 65:22

**combined** [4] - 49:8, 73:8, 141:14, 195:4

**combines** [1] - 45:1

**comfortable** [5] - 21:20, 22:5, 41:19, 78:16, 178:24

**coming** [12] - 17:18, 24:7, 28:20, 59:23, 62:24, 64:13, 80:8, 97:22, 105:20, 165:21, 178:7, 191:11

**commensurate** [1] - 88:16

**Comment** [1] - 110:13

**comment** [1] - 110:19

**commentary** [2] - 5:15, 5:18

**comments** [1] - 70:19

**commercial** [2] - 163:11, 169:14

**commingled** [1] - 87:8

**committed** [1] - 88:16

**common** [6] - 160:22, 162:24, 163:1, 163:2, 163:3, 163:20

**communicate** [2] - 22:2, 172:18

**communication** [1] - 10:13

**communications** [1] - 100:11

**companies** [10] - 41:1, 42:21, 43:11, 140:15, 140:16, 165:19, 169:25, 170:5, 170:8, 170:10

**company** [7] - 14:12, 45:11, 45:14, 191:8, 192:10, 192:24, 193:3

**company's** [1] - 154:9

**compare** [4] - 99:4, 101:10, 104:11, 121:1

**compared** [3] - 90:7, 122:15, 189:21

**comparing** [1] - 122:21

**comparison** [1] - 122:12

**compete** [1] - 13:17

**competed** [1] - 140:2

**competition** [1] - 140:8

**competitive** [2] - 14:13, 14:19

**competitor** [6] - 13:20, 14:6, 139:11, 139:15, 139:17, 139:23

**complaint** [4] - 48:7, 48:11, 48:15, 86:1

**Complete** [1] - 148:15

**complete** [9] - 13:24, 20:15, 41:4, 70:5, 70:12, 76:23, 111:18, 112:9, 196:5

**completed** [1] - 35:21

**completely** [5] - 8:7, 74:21, 91:6, 105:16, 109:10

**complicated** [1] - 129:9

**complying** [2] - 10:7, 18:8

**compress** [1] - 115:22

**compressed** [13] - 105:9, 111:24, 112:16, 112:20, 113:23, 114:3, 115:16, 115:21, 116:16, 116:22, 116:25, 117:1

**compression/ uncompression** [1] - 116:21

**computer** [6] - 14:7, 14:8, 27:24, 28:11, 125:17, 126:15

**concern** [8] - 6:4, 7:20, 8:4, 17:3, 28:17, 29:4, 29:5, 134:6

**concerned** [5] - 8:10, 28:25, 80:24, 101:22, 103:19

**concerning** [1] - 10:13

**concerns** [4] - 3:24, 8:8, 12:13, 14:19

**conclude** [4] - 30:8, 30:9, 103:21, 132:18

**concluded** [1] - 23:16

**conclusion** [4] - 69:17, 87:12, 88:13, 156:1

**conclusions** [4] - 24:8, 74:18, 99:23, 102:16

condense [2] - 54:18, 68:18
conditions [1] - 21:23
conduct [2] - 153:7, 153:25
conducting [1] - 183:16
confer [4] - 3:23, 27:15, 195:13, 195:19
conference [1] - 9:19
conferred [1] - 145:12
confidence [1] - 47:2
confident [1] - 178:19
confirm [19] - 70:12, 90:6, 90:22, 91:20, 93:21, 94:21, 99:17, 107:22, 109:3, 109:19, 112:21, 119:21, 140:17, 162:1, 170:3, 171:23, 174:21, 181:13, 181:14
confirmed [1] - 29:14
confuse [1] - 134:8
confused [4] - 61:8, 86:13, 106:2, 115:14
confusing [1] - 86:2
confusion [1] - 78:14
congratulatory [1] - 145:17
connect [3] - 79:23, 86:21, 188:21
connected [5] - 59:12, 107:1, 107:3, 187:19, 187:25
connection [1] - 82:8
connections [1] - 97:22
consensus [1] - 56:9
consent [1] - 81:14
consequence [1] - 47:11
conservative [1] - 124:8
consider [2] - 139:23, 166:12
consideration [1] - 112:13
considerations [2] - 104:8, 155:21
considered [6] - 95:10, 117:17, 143:19, 148:9, 166:9, 166:11
considering [2] - 95:2, 138:23
considers [1] - 166:16
consolidate [1] - 107:20

consolidating [1] - 163:6
consolidation [1] - 91:19
constantly [1] - 125:12
constitutes [1] - 196:4
Constitution [2] - 1:23, 196:11
constitutional [2] - 13:23, 32:11
consult [1] - 81:9
consulted [1] - 132:24
contact [1] - 32:25
contacted [1] - 51:4
contacting [1] - 42:5
contagious [1] - 72:12
contained [10] - 57:11, 58:13, 59:10, 71:6, 90:1, 93:23, 105:1, 109:23, 118:6, 121:11
contains [3] - 10:23, 59:13, 73:11
contempt [2] - 8:13, 10:5
contents [2] - 68:9, 68:12
context [4] - 49:20, 103:17, 135:14, 154:6
continue [16] - 10:25, 60:15, 72:16, 79:18, 85:23, 94:9, 116:5, 116:8, 125:13, 143:11, 144:14, 159:19, 186:9, 193:18, 194:25
continued [1] - 5:1
continues [2] - 5:2, 145:7
continuing [4] - 8:18, 143:23, 188:25
contract [2] - 25:15, 140:3
contracted [1] - 155:1
contracts [4] - 25:14, 140:8, 161:16, 161:17
Control [1] - 92:3
control [14] - 52:3, 71:4, 84:14, 88:6, 89:18, 89:24, 106:11, 146:5, 163:2, 164:1, 192:2, 192:4, 192:21, 193:4
controlled [12] - 89:19, 92:10, 97:25, 157:9, 161:18, 163:10, 163:17,

176:4, 178:1, 188:18, 191:23, 192:17
controlling [3] - 52:9, 163:19, 192:22
controls [5] - 52:6, 52:7, 76:5, 163:20, 192:18
convention [1] - 93:9
conversation [5] - 15:5, 15:8, 15:13, 56:11, 153:14
coordinate [1] - 115:10
coordinates [1] - 115:11
copied [1] - 74:16
copy [3] - 96:7, 158:20, 182:13
corner [1] - 49:1
corporate [2] - 159:12, 191:12
corporation [1] - 191:13
correct [51] - 30:21, 37:6, 38:10, 42:3, 42:13, 42:19, 46:9, 50:7, 52:10, 52:15, 55:13, 58:3, 61:10, 61:21, 67:3, 67:16, 68:13, 68:20, 72:20, 74:4, 76:6, 76:7, 76:8, 77:14, 78:15, 79:11, 79:13, 84:10, 85:4, 85:20, 89:14, 90:18, 101:5, 107:6, 107:25, 109:25, 110:18, 124:3, 134:17, 138:20, 140:9, 140:11, 141:19, 150:8, 156:10, 158:24, 162:24, 165:22, 181:1, 192:12
correctly [20] - 47:12, 49:19, 64:21, 73:20, 78:20, 81:20, 82:10, 83:11, 90:13, 90:17, 92:17, 92:20, 96:4, 109:1, 109:18, 119:10, 136:3, 176:20, 185:10, 186:23
correlate [2] - 147:18, 148:22
corresponding [1] - 69:10
corroborating [1] - 20:14
cost [8] - 25:12, 25:20,

31:11, 31:17, 31:21, 31:23, 31:25, 143:3
cost-effective [4] - 31:11, 31:17, 31:21, 31:23
costs [2] - 29:12, 33:3
cough [1] - 72:11
counsel [20] - 3:4, 3:5, 5:1, 6:14, 10:22, 17:7, 21:9, 22:2, 23:5, 24:22, 25:22, 25:24, 30:19, 79:23, 102:14, 116:5, 125:22, 134:24, 160:14
Counsel [1] - 20:23
count [10] - 49:3, 49:6, 49:7, 135:23, 182:11, 184:25, 185:7, 185:14, 187:9, 188:4
counted [3] - 65:11, 182:2, 182:6
counter [1] - 155:19
counterterrorism [1] - 149:6
counting [1] - 157:4
countries [1] - 36:13
country [1] - 49:3
counts [3] - 26:12, 26:13, 49:4
County [1] - 79:25
county [1] - 159:17
couple [5] - 40:12, 90:18, 115:25, 124:23, 160:10
course [2] - 20:9, 160:3
courses [3] - 35:18, 35:25, 36:1
COURT [231] - 1:1, 3:8, 3:11, 3:14, 3:17, 3:20, 4:13, 4:18, 5:3, 5:10, 5:20, 5:24, 7:7, 7:15, 7:21, 7:25, 8:7, 8:20, 8:24, 9:4, 9:12, 9:14, 9:21, 10:3, 11:14, 11:22, 11:24, 13:6, 14:2, 15:2, 15:13, 15:17, 15:23, 16:7, 16:13, 18:8, 18:24, 19:8, 19:24, 20:21, 20:25, 22:5, 22:15, 22:24, 23:15, 24:9, 25:5, 25:12, 26:3, 27:8, 28:14, 29:2, 29:10, 29:16, 29:23, 30:6, 30:14, 31:3, 31:9, 32:3, 32:9, 32:17, 33:7,

33:12, 33:18, 34:1, 34:8, 34:10, 37:17, 38:5, 38:25, 39:13, 42:4, 42:12, 42:15, 46:3, 46:8, 46:11, 46:15, 46:21, 47:21, 48:2, 49:24, 50:7, 50:14, 50:19, 50:23, 51:1, 62:5, 62:11, 62:14, 62:20, 63:19, 64:1, 64:6, 65:14, 66:2, 66:12, 66:15, 66:25, 67:13, 67:19, 72:14, 72:16, 77:16, 79:16, 80:2, 80:6, 80:8, 80:13, 80:16, 80:19, 80:22, 81:1, 81:4, 81:13, 81:16, 84:25, 85:6, 85:18, 85:21, 88:11, 88:25, 89:7, 89:9, 89:15, 92:22, 93:16, 94:9, 101:19, 102:3, 102:13, 103:4, 103:18, 107:24, 108:5, 108:12, 109:8, 110:24, 116:9, 119:13, 122:22, 123:7, 123:11, 123:14, 123:18, 123:22, 123:25, 124:4, 124:7, 124:10, 124:16, 124:20, 125:1, 125:4, 125:15, 125:20, 126:9, 126:16, 126:24, 127:2, 127:6, 127:9, 127:13, 127:16, 127:19, 128:2, 128:11, 128:18, 128:21, 128:25, 129:9, 129:25, 130:17, 130:23, 131:13, 131:18, 131:21, 132:15, 133:5, 133:13, 133:16, 134:12, 135:5, 135:9, 135:24, 136:20, 137:6, 137:11, 137:15, 138:1, 138:15, 138:22, 149:23, 149:25, 158:10, 158:12, 164:12, 164:17, 165:1, 167:20, 167:22, 170:16, 170:21, 170:25, 177:10, 178:25,

180:7, 182:19, 186:1, 186:6, 186:12, 186:15, 187:11, 187:13, 190:19, 193:11, 193:20, 193:23, 194:1, 194:7, 194:10, 194:13, 194:16, 194:21, 194:24, 195:9, 195:11, 195:18, 195:23, 196:1

court [14] - 3:16, 66:12, 79:24, 108:12, 125:7, 143:2, 146:25, 154:13, 156:6, 158:1, 158:5, 159:25, 160:5, 160:13

Court [53] - 1:22, 1:22, 4:25, 7:17, 8:11, 9:4, 9:10, 9:25, 14:15, 14:23, 14:25, 16:5, 17:6, 17:9, 18:21, 19:21, 20:9, 28:18, 31:6, 32:9, 32:10, 33:8, 34:13, 39:5, 54:8, 66:10, 72:9, 72:11, 80:1, 93:4, 96:15, 103:8, 107:15, 108:15, 112:10, 113:4, 117:11, 120:21, 121:8, 122:2, 122:14, 125:24, 133:23, 134:20, 135:7, 136:8, 136:17, 138:16, 138:19, 138:24, 145:2, 186:11, 196:10

Court's [8] - 7:20, 16:10, 18:8, 18:15, 121:5, 121:12, 134:16, 137:13

Courthouse [1] - 1:23

courtroom [2] - 65:2, 71:21

COURTROOM [6] - 3:2, 33:22, 33:25, 39:14, 80:4, 80:18

courts [2] - 17:21, 68:25

cover [3] - 47:15, 162:5, 162:6

covered [5] - 44:11, 79:7, 111:17, 141:4, 162:5

covering [1] - 149:10

COVID [2] - 35:12, 35:16

craft [1] - 18:23

CRC [2] - 1:22, 196:9

create [2] - 114:12, 119:17

creation [1] - 51:19

credible [7] - 40:5, 169:17, 169:18, 170:1, 170:4, 170:6, 170:10

crime [1] - 88:16

Crimes [2] - 126:18, 126:19

crimes [1] - 34:21

criminal [14] - 18:13, 50:8, 50:9, 86:1, 130:18, 154:20, 154:22, 166:10, 166:11, 166:12, 166:16, 167:9, 171:6, 173:17

Criminal [2] - 1:2, 3:2

criminalized [1] - 135:16

criminals [5] - 165:13, 171:5, 171:11, 171:25, 172:17

critical [9] - 41:3, 43:11, 43:25, 44:3, 53:10, 69:22, 77:6, 118:24, 152:21

CRM [1] - 1:16

cross [12] - 24:9, 24:23, 130:1, 130:14, 130:21, 132:25, 194:7, 195:13, 195:15, 195:19, 195:20

CROSS [1] - 137:17

Cross [1] - 2:6

cross-examination [6] - 24:23, 130:1, 130:14, 195:13, 195:15, 195:19

CROSS-EXAMINATION [1] - 137:17

Cross-Examination [1] - 2:6

cross-examine [3] - 24:9, 130:1, 132:25

CRR [2] - 1:22, 196:9

crypto [6] - 8:19, 147:12, 147:16, 148:17, 148:20, 149:7

cryptocurrency [14] - 35:20, 40:23, 76:23, 127:14, 149:5,

149:9, 160:24, 161:4, 163:7, 163:14, 165:7, 169:6, 169:7, 171:20

cryptographically [1] - 59:12

cryptography [1] - 114:8

CSV [6] - 73:11, 73:19, 100:3, 100:13, 120:22, 175:10

CTCE [1] - 35:18

CTF [1] - 149:6

curated [1] - 149:9

curious [8] - 52:17, 62:10, 62:17, 75:13, 91:21, 106:2, 119:6, 145:22

curiously [2] - 56:19, 94:22

currency [2] - 86:22, 165:14

current [4] - 16:3, 35:22, 37:24, 134:4

currents [1] - 64:23

curve [7] - 114:9, 114:11, 114:18, 115:3, 115:8, 115:12, 115:19

custodial [1] - 106:5

custody [5] - 52:2, 52:20, 56:14, 56:15, 75:25

custodying [1] - 106:7

customer [13] - 41:16, 41:21, 42:2, 47:1, 52:24, 68:1, 98:11, 139:22, 140:7, 165:17, 191:17, 191:24, 192:6

customer's [1] - 42:2

customers [12] - 42:20, 42:24, 46:1, 46:24, 95:18, 139:21, 140:6, 154:24, 168:2, 169:22

customized [1] - 24:21

cutting [2] - 68:15, 193:17

CV [2] - 37:22, 37:23

cycle [1] - 94:2

**D**

D.C [4] - 1:5, 99:25, 144:16, 196:11

dark [9] - 40:11, 43:25, 67:4, 122:13,

157:1, 166:19, 167:10, 172:2, 176:7

darknet [14] - 156:17, 157:15, 166:4, 172:6, 172:18, 172:20, 172:21, 172:24, 172:25, 173:4, 173:12, 173:14, 173:16, 173:21

data [57] - 12:24, 20:2, 23:25, 24:7, 39:23, 39:24, 40:19, 40:24, 41:2, 41:16, 41:21, 41:24, 42:2, 43:8, 43:12, 43:14, 43:21, 44:11, 45:16, 46:17, 71:3, 73:14, 73:20, 73:23, 92:6, 111:25, 113:13, 113:16, 113:23, 117:8, 117:24, 118:7, 121:1, 121:2, 122:4, 122:15, 122:21, 129:15, 147:11, 147:12, 147:14, 147:18, 148:5, 148:16, 148:18, 148:23, 148:24, 149:13, 149:15, 152:18, 153:20, 153:23, 161:7, 164:3, 185:19, 185:20

database [2] - 132:20, 164:2

databases [2] - 40:20, 133:6

date [9] - 21:11, 69:15, 74:7, 94:19, 99:17, 100:19, 110:10, 128:4, 141:14

Dated [1] - 196:7

dates [3] - 69:14, 119:5, 156:10

Daubert [21] - 64:3, 90:20, 102:1, 102:4, 125:22, 127:20, 130:5, 130:21, 132:17, 133:9, 133:17, 133:19, 134:11, 134:13, 134:17, 137:1, 159:23, 164:18, 193:17, 194:4, 195:6

Dave [7] - 144:22, 144:24, 145:1, 145:3, 146:18, 146:20, 156:8

daycare [1] - 72:10

days [4] - 9:22, 9:23, 28:23, 73:6

DC [4] - 1:12, 1:14, 1:17, 1:24

de [4] - 125:17, 126:14, 149:15, 194:5

de-anonymizes [1] - 149:15

deal [2] - 112:15, 116:7

dealt [1] - 16:21

debates [1] - 56:6

decide [6] - 7:12, 10:25, 11:1, 33:7, 103:25

decisions [2] - 42:25, 43:1

declaration [1] - 111:6

declarations [1] - 146:15

declare [1] - 158:23

dedicating [1] - 144:6

deep [2] - 40:11, 40:13

deeper [1] - 59:20

deeply [1] - 14:20

defend [1] - 18:1

defendant [3] - 10:24, 79:21, 88:13

Defendant [4] - 1:6, 1:18, 3:16, 3:19

Defendant's [3] - 37:14, 38:3, 38:23

defendant's [5] - 5:9, 5:11, 30:5, 67:12, 156:18

defender's [1] - 30:25

Defenders [1] - 36:3

defenders [1] - 19:18

defending [1] - 14:21

defense [61] - 4:21, 5:1, 5:3, 9:17, 9:22, 10:10, 10:22, 11:7, 11:8, 13:4, 13:24, 14:25, 15:11, 17:25, 18:4, 19:7, 19:20, 22:15, 23:5, 23:16, 23:22, 24:18, 24:22, 25:9, 25:22, 25:24, 26:4, 26:15, 27:9, 27:16, 27:19, 28:9, 28:20, 28:24, 30:3, 31:6, 31:22, 32:8, 32:20, 33:20, 38:2, 38:22, 101:21, 102:6, 116:5, 116:6, 125:21, 128:7, 128:20, 130:20, 132:25, 133:6, 133:9, 133:18,

134:24, 139:10, 139:14, 145:12, 160:14
**Defense** [9] - 2:10, 2:11, 2:12, 2:13, 37:18, 38:7, 39:3, 69:2, 137:22
**defense's** [5] - 15:20, 29:18, 29:25, 32:13, 139:5
**define** [2] - 141:25, 150:15
**defined** [1] - 167:9
**definitely** [10] - 28:16, 45:25, 50:8, 64:16, 72:12, 155:19, 176:4, 176:5, 176:6, 178:14
**definition** [2] - 57:15, 184:23
**definitions** [1] - 56:7
**definitively** [2] - 129:22, 179:8
**degree** [5] - 34:14, 34:17, 34:18, 109:7, 109:8
**degrees** [1] - 34:19
**delay** [1] - 18:11
**delete** [1] - 60:25
**delivers** [1] - 149:5
**delta** [1] - 177:6
**delve** [1] - 131:11
**demo** [1] - 155:13
**demonstrate** [4] - 50:22, 84:3, 85:1, 106:18
**demonstrates** [2] - 66:23, 192:1
**demonstrating** [3] - 82:4, 118:7, 163:20
**demonstration** [1] - 76:23
**demonstrative** [1] - 103:11
**demonstratively** [1] - 102:16
**deny** [1] - 16:6
**denying** [1] - 16:9
**Department** [5] - 1:13, 1:16, 35:15, 126:19, 134:23
**deposit** [42] - 41:7, 55:6, 77:5, 77:25, 82:4, 83:5, 83:15, 87:5, 87:13, 87:23, 91:8, 91:10, 92:1, 93:14, 94:2, 94:17, 94:19, 94:23, 94:25, 95:6, 95:9, 96:7, 100:15, 104:19,

106:19, 106:22, 107:23, 108:17, 108:22, 121:8, 121:10, 121:17, 121:19, 122:4, 122:7, 151:12, 165:11, 190:2, 190:8, 191:9
**deposited** [5] - 52:21, 91:25, 105:22, 106:5, 181:12
**depositions** [2] - 130:5, 130:9
**deposits** [16] - 91:17, 91:24, 92:18, 93:10, 94:1, 94:12, 95:5, 97:21, 97:22, 108:11, 108:18, 108:21, 110:1, 120:9, 121:17, 174:1
**DEPUTY** [6] - 3:2, 33:22, 33:25, 39:14, 80:4, 80:18
**deputy** [1] - 21:8
**derivation** [1] - 70:9
**derive** [1] - 114:13
**derived** [4] - 57:7, 57:8, 147:14, 148:18
**describe** [8] - 24:12, 34:12, 47:2, 86:3, 98:7, 116:23, 150:17, 162:19
**described** [2] - 72:19, 116:3
**describing** [10] - 55:15, 120:10, 126:11, 134:13, 136:23, 148:12, 149:18, 161:23, 161:25, 167:8
**description** [4] - 73:10, 87:14, 147:20, 161:19
**descriptions** [1] - 73:14
**descriptive** [1] - 149:17
**designated** [1] - 163:16
**desire** [1] - 109:12
**desk** [2] - 56:20, 60:23
**despicable** [1] - 8:17
**despite** [1] - 185:1
**destination** [1] - 161:8
**destinations** [1] - 161:1
**destroyed** [1] - 85:13
**detail** [5] - 24:18, 25:3, 49:15, 50:4, 68:10
**detailed** [3] - 24:20,

27:5, 111:16
**details** [3] - 105:5, 105:6, 161:3
**detected** [3] - 184:20, 185:16, 185:22
**determinations** [1] - 78:17
**determine** [13] - 47:8, 49:16, 62:24, 64:23, 73:9, 77:6, 89:24, 115:20, 138:24, 143:1, 160:25, 161:7, 178:5
**determined** [4] - 106:11, 177:17, 179:8, 179:21
**determining** [3] - 43:5, 58:17, 131:8
**develop** [2] - 36:1, 103:17
**development** [1] - 34:20
**Devon** [2] - 94:13, 94:15
**diagnostic** [4] - 45:7, 47:8, 53:9, 53:13
**diagnostics** [1] - 58:22
**diagram** [8] - 77:19, 81:23, 82:2, 84:12, 85:23, 99:1, 121:15, 121:21
**differ** [1] - 48:5
**difference** [10] - 23:21, 47:5, 116:9, 122:3, 123:10, 124:7, 160:7, 172:14, 174:16, 174:25
**differences** [1] - 49:14
**different** [48] - 24:7, 25:3, 26:23, 48:21, 49:4, 50:10, 54:4, 55:15, 59:5, 65:3, 65:16, 65:17, 68:21, 71:8, 74:6, 74:21, 87:25, 88:1, 88:2, 89:3, 89:5, 92:8, 95:21, 95:22, 97:16, 100:18, 105:13, 105:15, 111:20, 112:19, 116:1, 122:6, 122:10, 127:4, 140:2, 142:2, 142:4, 149:18, 150:21, 160:10, 161:12, 170:13, 176:12, 178:3, 179:16, 181:22, 191:7

**differently** [6] - 47:24, 91:11, 107:18, 161:15, 179:17, 189:10
**difficult** [13] - 12:19, 45:10, 68:10, 68:23, 73:25, 99:19, 100:22, 101:7, 143:1, 177:19, 178:16, 183:9, 193:18
**difficulties** [1] - 4:14
**difficulty** [1] - 100:7
**digital** [1] - 137:24
**diplomacy** [1] - 34:19
**direct** [17] - 10:22, 11:1, 31:20, 32:23, 39:20, 123:23, 123:25, 133:5, 137:20, 150:17, 150:19, 151:4, 151:7, 180:5, 183:8, 190:23, 195:13
**Direct** [1] - 2:4
**DIRECT** [1] - 34:2
**directed** [1] - 138:18
**directing** [17] - 38:12, 69:1, 82:20, 112:25, 116:12, 147:5, 148:11, 156:11, 156:15, 158:22, 160:19, 167:2, 175:23, 180:19, 184:10, 188:11, 190:14
**direction** [5] - 4:25, 5:2, 15:9, 18:9, 18:16
**directions** [1] - 17:2
**directly** [7] - 18:16, 56:22, 56:23, 60:20, 134:24, 181:4, 181:8
**director** [3] - 34:25, 35:3, 35:8
**disadvantage** [1] - 14:13
**disagree** [5] - 18:18, 24:1, 26:16, 91:6, 181:10
**disagreement** [1] - 125:21
**disagrees** [2] - 23:17, 23:20
**disclaimer** [1] - 84:1
**disclose** [1] - 133:6
**disclosure** [2] - 159:7, 160:14
**disclosures** [1] - 128:6
**discovery** [49] - 4:5,

16:18, 17:12, 17:20, 17:24, 18:12, 23:24, 25:4, 32:13, 66:20, 67:9, 67:22, 68:11, 70:16, 72:24, 73:6, 76:19, 79:1, 86:7, 90:1, 90:4, 90:15, 90:21, 92:3, 96:8, 96:9, 96:11, 96:13, 97:6, 98:2, 100:3, 130:6, 130:18, 131:4, 138:14, 140:20, 141:2, 141:22, 142:3, 142:6, 143:4, 143:12, 144:15, 168:15, 172:24, 174:4, 174:5
**discrediting** [2] - 139:11, 139:15
**discrepancy** [2] - 122:16, 180:16
**discuss** [11] - 21:4, 21:6, 21:18, 46:25, 101:15, 107:11, 108:7, 123:3, 124:25, 125:24
**discussed** [1] - 111:3
**discusses** [1] - 98:6
**discussing** [5] - 69:11, 81:24, 84:11, 111:3, 121:8
**Discussion** [1] - 66:14
**discussion** [2] - 111:13, 145:19
**disparity** [1] - 123:2
**display** [1] - 49:11
**displayed** [1] - 58:9
**displays** [1] - 164:2
**disputed** [1] - 128:12
**disrupt** [2] - 54:13
**disseminated** [1] - 10:12
**distance** [2] - 87:22, 88:17
**distinct** [1] - 65:6
**distinguish** [1] - 169:16
**DISTRICT** [3] - 1:1, 1:1, 1:8
**district** [2] - 5:7, 79:24
**docket** [2] - 159:25, 164:22
**docketing** [1] - 160:18
**document** [2] - 82:12, 148:12
**documentation** [1] - 55:6
**documented** [3] - 18:5, 43:12, 82:14

**documents** [3] - 142:5, 142:12, 164:18
**DOJ** [4] - 1:11, 1:16, 20:17, 48:6
**DOJ-CRM** [1] - 1:16
**dollar** [2] - 181:14, 181:17
**dollars** [1] - 173:5
**dollars'** [1] - 172:11
**donating** [2] - 48:20, 144:1
**donation** [3] - 48:20, 50:13, 51:8
**done** [23] - 6:3, 17:19, 30:15, 31:21, 31:23, 37:3, 37:21, 45:10, 50:20, 68:24, 92:5, 95:19, 102:20, 117:13, 139:8, 146:8, 171:15, 178:14, 181:18, 195:1, 195:5, 195:15, 195:20
**double** [2] - 26:12, 146:21
**double-check** [1] - 146:21
**double-counts** [1] - 26:12
**doubt** [4] - 6:6, 21:13, 130:25, 133:7
**down** [37] - 8:20, 8:25, 9:3, 9:9, 11:3, 15:4, 16:10, 21:2, 28:7, 35:17, 45:17, 45:21, 48:9, 52:20, 54:18, 54:20, 56:20, 60:15, 68:18, 68:20, 70:23, 71:9, 78:8, 82:11, 83:15, 88:24, 90:12, 105:20, 108:13, 116:5, 118:11, 120:1, 159:25, 162:18, 183:24, 188:25, 189:2
**draft** [1] - 140:20
**drafting** [1] - 140:22
**dramatically** [1] - 74:18
**draw** [6] - 59:24, 70:25, 74:7, 74:24, 115:4
**drive** [2] - 4:7, 88:17
**due** [2] - 49:5, 184:4
**dull** [1] - 96:18
**duly** [4] - 7:6, 7:14, 7:19, 33:6
**during** [7] - 35:16, 119:5, 131:19,

143:14, 143:23, 155:4, 171:24
**duty** [1] - 9:7

**E**

**early** [12] - 16:4, 17:10, 18:20, 18:22, 19:20, 105:11, 129:13, 129:20, 129:22, 131:10, 131:14, 195:3
**earned** [1] - 128:15
**easier** [2] - 44:24, 104:15
**easy** [2] - 68:23, 170:22
**economic** [1] - 34:19
**economy** [2] - 147:16, 148:20
**education** [1] - 45:14
**educational** [1] - 34:12
**effect** [1] - 98:4
**effective** [4] - 31:11, 31:17, 31:21, 31:23
**efficient** [1] - 114:8
**eight** [2] - 43:24, 111:25
**either** [11] - 6:15, 25:25, 102:13, 102:24, 105:7, 117:24, 127:21, 148:7, 154:11, 164:19, 173:7
**EKELAND** [124] - 1:18, 3:15, 3:25, 4:17, 5:5, 5:13, 5:22, 7:1, 7:14, 7:18, 7:23, 11:15, 11:23, 12:18, 13:21, 14:14, 15:10, 15:15, 15:20, 16:2, 16:11, 17:9, 18:18, 19:5, 19:17, 19:25, 29:13, 29:18, 29:25, 30:10, 30:24, 31:5, 31:22, 32:8, 32:10, 33:6, 33:11, 33:20, 34:4, 34:7, 34:9, 34:11, 37:13, 37:19, 38:1, 38:6, 38:8, 38:21, 39:2, 39:4, 39:10, 39:16, 42:16, 46:22, 49:18, 51:10, 64:17, 66:4, 66:9, 66:16, 67:7, 67:17, 67:20, 67:21, 69:8, 69:12, 72:17, 75:22, 77:17, 79:19, 80:14, 80:20, 81:2, 81:11, 81:15,

81:17, 81:18, 85:22, 89:16, 93:3, 94:14, 101:14, 103:6, 104:5, 104:6, 108:6, 108:14, 109:14, 109:17, 110:22, 110:25, 116:11, 119:15, 124:11, 124:15, 127:17, 127:24, 128:5, 128:16, 128:19, 128:22, 129:6, 129:13, 130:15, 130:20, 131:5, 131:17, 131:20, 131:23, 133:18, 135:25, 137:4, 149:24, 158:11, 164:13, 164:23, 167:21, 177:9, 187:12, 193:25, 194:8, 194:15, 195:16, 195:21
**Ekeland** [22] - 1:19, 2:5, 3:15, 3:23, 11:14, 14:3, 27:15, 29:3, 29:11, 33:18, 50:15, 80:13, 80:19, 81:6, 103:4, 109:9, 127:16, 135:24, 137:1, 164:14, 193:23, 194:7
**Ekeland's** [1] - 27:16
**elaborate** [2] - 53:14, 113:4
**element** [1] - 134:3
**Elizabeth** [1] - 11:18
**Elliptic** [7] - 114:9, 114:11, 115:11, 115:19, 169:13, 170:2, 170:9
**email** [8] - 4:2, 4:11, 92:11, 92:12, 145:15, 145:17, 145:20, 159:10
**emails** [1] - 159:14
**employees** [1] - 146:14
**employing** [1] - 53:4
**enabled** [1] - 117:14
**encode** [2] - 115:24, 115:25
**encourage** [3] - 27:14, 27:15, 110:24
**end** [12] - 6:9, 30:20, 45:10, 66:6, 66:7, 115:9, 116:1, 116:14, 120:19, 124:18, 142:16, 164:15

**Endpoint** [1] - 63:7
**enforce** [2] - 8:12, 9:11
**enforceable** [1] - 10:5
**enforcement** [16] - 36:12, 36:13, 36:14, 36:19, 36:22, 42:9, 46:2, 56:21, 140:4, 146:9, 154:17, 154:19, 157:16, 167:25, 168:7, 168:9
**Enforcement** [2] - 126:18, 126:19
**engage** [1] - 151:17
**engaged** [3] - 47:16, 109:2, 138:23
**engaging** [1] - 145:19
**English** [1] - 5:20
**enhancing** [1] - 63:10
**enormous** [2] - 114:23, 114:24
**enrichment** [1] - 43:8
**ENS** [3] - 110:6, 110:10
**enter** [2] - 8:12
**entire** [8] - 27:22, 44:5, 68:19, 84:19, 96:23, 116:3, 119:24, 194:6
**entirely** [1] - 89:18
**entirety** [2] - 13:9, 138:8
**entities** [12] - 16:22, 25:17, 45:7, 47:9, 54:6, 61:14, 135:19, 135:20, 147:13, 148:18, 166:1, 179:13
**entitled** [6] - 21:14, 31:18, 130:21, 131:8, 131:11, 132:13
**entitles** [1] - 13:4
**entity** [42] - 27:1, 27:2, 27:3, 40:17, 41:12, 44:22, 45:1, 45:5, 45:20, 45:22, 46:4, 46:12, 46:13, 47:6, 47:7, 47:16, 47:24, 49:8, 50:9, 50:17, 51:6, 52:3, 52:9, 53:5, 53:9, 55:16, 58:16, 61:8, 86:9, 86:13, 106:5, 106:25, 161:7, 161:17, 161:18, 175:19, 179:19, 179:22, 182:14, 191:7, 191:9, 192:22
**Entity** [3] - 52:16,

52:19, 147:9
**entries** [2] - 183:23, 184:18
**environment** [3] - 133:25, 134:2, 136:18
**equals** [1] - 114:16
**equipment** [1] - 126:11
**equivalent** [2] - 55:11, 130:8
**ERC** [1] - 110:12
**ERC-721** [1] - 110:12
**erroneous** [1] - 61:18
**erroneously** [1] - 177:17
**error** [16] - 11:21, 13:1, 54:17, 55:15, 55:19, 55:20, 152:16, 152:22, 176:24, 177:8, 178:4, 178:7, 178:8, 192:14, 192:16
**errors** [16] - 41:17, 41:18, 41:19, 45:24, 47:12, 47:13, 47:14, 54:16, 55:21, 69:24, 71:11, 100:6, 100:23, 119:23, 176:22, 177:16
**especially** [5] - 8:16, 17:18, 65:12, 83:14, 143:12
**essentially** [15] - 15:21, 27:2, 40:10, 42:9, 54:22, 57:9, 57:10, 59:11, 62:2, 73:16, 73:19, 73:23, 74:23, 127:5, 144:1
**establish** [1] - 130:24
**established** [1] - 129:14
**estimate** [5] - 142:24, 143:3, 144:12, 193:21, 194:8
**estimates** [2] - 122:19, 142:25
**et** [3] - 36:7, 40:13, 107:6
**Ethereum** [6] - 110:7, 110:12, 110:15, 161:11, 161:14, 161:16
**Ethereum-based** [1] - 161:11
**ethical** [1] - 155:20
**Europol** [1] - 36:16
**evaluating** [1] - 55:23
**Evaluation** [1] - 111:11

evaluation [1] - 68:7
evenings [1] - 143:17
events [2] - 147:13, 148:18
evidence [22] - 10:15, 11:16, 13:2, 18:5, 20:14, 37:15, 38:3, 38:23, 39:1, 40:18, 54:24, 67:25, 69:2, 86:16, 88:21, 89:11, 95:14, 106:8, 107:1, 107:2, 131:13, 131:18
Evolution [3] - 156:18, 157:2, 157:9
exact [9] - 55:19, 77:9, 174:15, 178:16, 180:10, 180:11, 180:16, 188:15, 189:4
exactly [21] - 15:7, 24:12, 24:15, 27:20, 57:12, 63:6, 75:11, 78:13, 79:2, 85:5, 91:5, 97:18, 102:20, 116:23, 122:25, 141:4, 144:10, 148:6, 148:9, 177:20, 180:1
Examination [2] - 2:4, 2:6
examination [8] - 24:23, 130:1, 130:14, 190:23, 195:6, 195:13, 195:15, 195:19
EXAMINATION [2] - 34:2, 137:17
examine [5] - 24:9, 130:1, 132:13, 132:16, 132:25
Examiner [1] - 35:20
example [20] - 16:16, 40:15, 40:21, 41:7, 41:22, 43:2, 48:4, 49:20, 50:24, 51:3, 62:2, 62:19, 63:5, 65:20, 71:24, 79:12, 98:21, 151:9, 179:23, 192:10
Example [1] - 71:12
Excel [2] - 68:21, 175:10
excerpt [2] - 108:8, 183:4
exchange [25] - 41:7, 41:13, 41:14, 51:4, 51:18, 51:21, 52:1, 57:13, 76:19, 92:7, 100:9, 127:14,

131:25, 132:23, 151:9, 151:11, 165:11, 168:1, 190:25, 191:6, 191:20, 191:24, 192:12, 193:7, 193:8
Exchange [1] - 158:16
exchange's [1] - 192:15
exchanges [15] - 40:7, 40:8, 40:9, 60:23, 117:15, 129:14, 133:1, 145:16, 165:14, 168:1, 190:23, 191:4, 191:19, 191:20
exclude [2] - 130:11, 131:1
excluded [1] - 11:10
exclusion [2] - 133:8
exculpatory [1] - 17:14
excuse [2] - 34:16, 127:8
executed [2] - 169:2, 169:3
Exhibit [41] - 2:10, 2:11, 2:12, 2:13, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 37:15, 37:17, 37:18, 38:3, 38:5, 38:7, 69:3, 137:23, 147:5, 148:11, 148:25, 156:11, 158:9, 158:12, 158:13, 158:20, 164:11, 165:2, 167:2, 167:19, 167:23, 175:23, 180:19, 180:24, 182:1, 183:20, 184:13, 187:10, 187:13, 187:14
exhibit [5] - 137:13, 159:21, 167:4, 167:5, 167:22
exhibits [3] - 149:25, 159:23, 175:9
EXHIBITS [1] - 2:9
Exhibits [5] - 38:23, 38:25, 39:3, 149:22, 150:1
exist [4] - 56:2, 63:17, 89:13, 145:7
exists [1] - 42:23
expand [1] - 105:5
expect [8] - 8:11, 10:12, 30:12, 100:8, 100:15, 142:17,

142:21, 195:1
expenses [1] - 144:16
experience [7] - 19:15, 25:19, 30:11, 35:11, 84:4, 136:23, 169:9
Expert [1] - 111:11
expert [97] - 8:5, 12:8, 12:14, 14:4, 14:6, 14:15, 14:16, 14:25, 15:7, 17:11, 18:22, 18:25, 19:1, 19:3, 19:23, 19:24, 21:2, 21:3, 22:19, 23:16, 24:1, 24:2, 24:4, 24:10, 25:18, 26:1, 27:5, 28:8, 29:17, 37:6, 38:9, 38:13, 38:15, 39:6, 63:16, 66:10, 66:17, 66:23, 67:8, 67:9, 67:12, 67:22, 67:23, 68:2, 70:3, 71:9, 79:8, 82:13, 82:14, 86:25, 87:14, 88:10, 89:19, 101:8, 101:16, 102:8, 102:9, 102:16, 102:22, 103:10, 104:2, 104:4, 104:12, 105:12, 107:10, 108:8, 110:5, 111:4, 124:13, 127:18, 127:19, 128:6, 130:22, 132:9, 136:21, 137:22, 139:4, 140:24, 141:1, 142:13, 142:19, 145:11, 148:7, 156:9, 159:7, 160:14, 169:17, 174:24, 175:8, 177:4, 177:7, 194:1, 194:2
expertise [1] - 28:23
experts [12] - 19:13, 24:6, 24:7, 25:16, 28:24, 29:19, 30:17, 30:22, 64:16, 145:12, 158:16, 193:17
explain [23] - 49:24, 49:25, 54:8, 81:23, 83:3, 84:15, 85:6, 91:3, 92:23, 93:4, 96:15, 102:16, 107:15, 108:15, 113:4, 113:24, 116:18, 117:10, 121:15, 122:1,

126:18, 156:16
explained [1] - 27:1
explaining [5] - 39:6, 85:23, 134:22, 135:22, 136:9
explanation [3] - 73:10, 73:14, 102:9
explorer [13] - 20:5, 46:18, 49:12, 53:1, 71:18, 71:20, 71:24, 79:15, 82:24, 84:23, 105:3, 113:14, 164:7
explorers [1] - 164:4
exponent [1] - 114:22
export [1] - 71:9
exported [1] - 70:10
exports [1] - 35:14
exposes [1] - 147:11
exposures [1] - 166:1
expressed [1] - 138:11
expression [1] - 191:21
extended [4] - 70:8, 88:4, 90:2, 173:2
extensive [3] - 17:20, 147:14, 148:19
extent [10] - 22:10, 46:23, 47:1, 102:15, 104:8, 126:5, 133:24, 136:7, 160:2, 164:15
external [1] - 43:14
extortion [1] - 167:10
extrajudicial [1] - 10:11
extremely [4] - 16:15, 29:20, 62:10, 125:7
eye [1] - 79:25

## F

facilitate [1] - 15:8
facilitated [1] - 173:5
Fact [1] - 147:6
fact [37] - 14:21, 17:1, 23:19, 32:20, 49:23, 55:20, 58:18, 63:24, 69:19, 85:13, 89:12, 106:9, 116:7, 117:20, 126:3, 126:23, 146:14, 147:6, 149:18, 161:9, 162:1, 172:3, 172:5, 180:15, 184:25, 185:16, 185:22, 186:24, 187:2, 189:25, 190:2, 191:23, 192:5, 192:12,

192:14, 192:17, 195:12
failure [1] - 135:15
fair [17] - 5:9, 5:11, 5:12, 9:24, 17:4, 24:18, 25:2, 26:15, 27:16, 42:1, 56:8, 61:16, 64:8, 74:20, 88:12, 125:15, 165:1
fairly [3] - 23:10, 24:20, 130:6
fairness [1] - 104:3
fall [1] - 177:20
false [4] - 41:17, 45:23, 62:1, 113:3
falsely [3] - 49:21, 50:15, 53:6
familiar [6] - 147:2, 165:4, 171:3, 171:8, 172:17, 172:20
familiarize [1] - 10:6
far [23] - 17:13, 30:11, 30:22, 43:16, 43:19, 61:6, 61:15, 61:23, 65:11, 87:4, 93:6, 102:23, 104:15, 107:25, 108:3, 132:23, 134:1, 134:9, 134:20, 136:7, 170:5, 185:20, 188:11
fascinating [1] - 97:14
fashion [1] - 133:8
fast [1] - 108:13
faucet [1] - 86:21
favor [1] - 31:15
FBI [3] - 36:24, 91:9, 121:18
federal [3] - 17:21, 19:18, 30:25
fee [1] - 105:10
Fee [2] - 118:14, 118:19
feedback [3] - 40:15, 41:17, 44:7
fees [2] - 113:8, 132:11
few [4] - 53:13, 73:6, 122:24, 186:2
few-minute [1] - 186:2
Fiat [1] - 127:15
field [7] - 13:18, 56:3, 114:7, 128:1, 128:2, 136:23
fifth [1] - 37:8
figure [3] - 42:8, 148:6, 193:20
figured [2] - 101:21, 186:13
file [17] - 5:5, 6:24,

7:21, 8:16, 9:18, 9:23, 16:4, 30:20, 73:11, 86:7, 120:22, 135:20, 141:5, 141:7, 175:10

**filed** [4] - 7:24, 18:20, 160:12, 160:15

**files** [2] - 100:13, 141:5

**filing** [1] - 7:23

**filter** [3] - 186:23, 187:2, 187:4

**filtered** [2] - 185:10, 187:5

**filtering** [1] - 183:5

**final** [3] - 57:4, 117:2, 117:3

**finance** [3] - 47:17, 51:8, 52:25

**Finance** [1] - 132:2

**financial** [5] - 34:21, 135:13, 135:22, 139:21, 165:20

**Financial** [2] - 126:17, 126:19

**financials** [3] - 126:2, 127:1, 127:2

**financing** [5] - 49:21, 50:16, 53:6, 149:6, 167:11

**FinCEN** [4] - 126:3, 134:19, 135:16, 135:19

**findings** [1] - 138:10

**fine** [11] - 6:17, 7:9, 11:14, 19:10, 19:14, 19:15, 39:13, 72:14, 133:12, 135:9, 137:6

**fingerprint** [3] - 27:2, 63:12, 112:6

**fingers** [2] - 112:7, 118:15

**finished** [1] - 19:11

**finishing** [1] - 186:4

**firm** [5] - 10:9, 10:22, 28:2, 51:5, 51:11

**firms** [2] - 41:23, 170:19

**first** [36] - 3:22, 5:16, 11:8, 17:22, 18:13, 25:6, 39:7, 45:12, 60:10, 87:5, 87:13, 90:12, 90:16, 92:1, 93:17, 93:19, 94:1, 94:7, 95:5, 96:14, 103:4, 104:18, 108:21, 117:3, 117:5, 118:20, 134:16, 155:1, 163:23, 175:24,

180:21, 182:4, 182:10, 182:25, 184:15, 184:18

**first-known** [4] - 87:5, 92:1, 94:1, 117:5

**first-year** [1] - 18:13

**fit** [2] - 113:9, 121:11

**five** [6] - 13:17, 60:23, 64:9, 64:10, 95:8, 186:7

**five-minute** [1] - 186:7

**flag** [3] - 183:10, 187:4, 187:5

**Floor** [1] - 1:20

**flow** [2] - 54:12, 160:25

**focus** [6] - 18:16, 34:20, 139:10, 139:14, 139:19, 140:1

**focused** [4] - 4:15, 5:10, 5:11, 35:14

**Fog** [109] - 23:9, 23:12, 23:14, 24:3, 24:6, 27:4, 27:7, 43:25, 66:24, 67:5, 67:10, 67:24, 68:1, 71:1, 71:4, 71:5, 86:6, 87:3, 87:5, 87:8, 87:13, 87:24, 90:11, 91:1, 91:7, 91:10, 91:20, 92:1, 92:16, 92:18, 92:24, 93:17, 93:23, 95:4, 95:9, 95:12, 95:14, 96:4, 97:3, 97:7, 97:10, 97:16, 97:17, 98:16, 106:19, 106:20, 107:19, 108:4, 108:18, 108:19, 108:20, 108:24, 109:4, 109:19, 109:20, 116:24, 117:5, 118:20, 121:2, 121:9, 122:11, 123:7, 126:21, 127:12, 132:11, 133:25, 134:24, 166:14, 166:17, 166:18, 166:21, 166:24, 171:9, 171:12, 171:20, 171:25, 172:4, 172:6, 172:10, 172:12, 172:25, 173:19, 174:9, 175:3, 175:14, 176:4, 176:8, 176:18, 177:23,

177:24, 178:2, 178:14, 178:22, 179:8, 179:22, 180:22, 180:25, 181:5, 181:9, 181:13, 181:19, 188:18, 189:5, 189:8, 189:15, 189:22, 190:2, 190:7

**folder** [1] - 96:11

**follow** [8] - 12:7, 32:23, 68:10, 68:23, 73:25, 105:21, 146:1, 191:16

**follow-up** [1] - 191:16

**followed** [2] - 49:2

**followers** [2] - 5:14, 6:5

**following** [1] - 17:2

**FOR** [1] - 1:1

**foregoing** [2] - 158:24, 196:4

**foremost** [1] - 134:16

**forensic** [6] - 74:12, 80:20, 99:22, 125:25, 129:5, 160:22

**forensically** [4] - 68:16, 70:4, 70:5, 79:9

**forensics** [4] - 17:23, 100:24, 149:6, 156:2

**forgiveness** [1] - 125:13

**fork** [1] - 117:17

**form** [3] - 31:3, 31:4, 155:9

**former** [2] - 88:13, 146:18

**formula** [2] - 13:19, 114:12

**forth** [2] - 21:23, 160:4

**forum** [3] - 40:21, 44:8, 194:4

**forums** [2] - 40:21, 172:20

**forward** [7] - 8:21, 10:9, 10:18, 103:19, 105:15, 133:3, 193:18

**foundation** [1] - 21:16

**founders** [1] - 96:23

**four** [6] - 60:11, 65:8, 68:14, 100:17, 123:3, 170:19

**framework** [1] - 136:15

**frankly** [7] - 6:2, 6:4, 6:13, 8:4, 8:17, 25:10, 32:19

**fraud** [2] - 36:7, 40:23

**free** [2] - 32:4, 83:18

**freeze** [1] - 56:21

**frentzen** [1] - 80:23

**Friday** [1] - 7:24

**front** [16] - 19:10, 28:10, 37:2, 39:17, 67:14, 67:16, 102:14, 103:1, 109:11, 109:15, 128:13, 137:21, 157:12, 175:24, 182:1, 195:7

**frozen** [3] - 127:6, 127:9, 127:10

**frustration** [2] - 17:1, 29:2

**full** [8] - 4:3, 4:12, 8:15, 18:1, 40:11, 176:1, 176:3, 196:5

**fully** [2] - 43:12, 90:6

**function** [1] - 103:10

**fund** [1] - 71:12

**fundamental** [1] - 20:11

**funding** [5] - 7:16, 7:19, 29:20, 163:5, 163:7

**fundraised** [1] - 25:25

**funds** [70] - 6:19, 6:22, 6:24, 25:24, 25:25, 49:16, 52:5, 53:12, 54:12, 55:2, 56:14, 56:21, 56:22, 57:11, 57:17, 58:2, 58:7, 58:8, 58:18, 58:19, 60:10, 60:14, 60:16, 60:17, 60:19, 61:10, 65:16, 65:22, 69:25, 71:15, 71:17, 74:10, 75:2, 75:14, 77:7, 79:3, 82:17, 83:8, 85:15, 93:13, 96:22, 104:18, 105:15, 105:18, 105:22, 106:4, 106:6, 122:5, 127:12, 142:16, 146:1, 146:5, 146:10, 146:11, 157:15, 160:25, 161:8, 163:15, 165:11, 165:21, 171:11, 171:25, 173:19, 175:2, 176:7, 180:21, 180:25, 181:4, 181:18

**funnel** [1] - 95:23

**funny** [1] - 51:13

**future** [1] - 9:1

**G**

**gain** [5] - 40:10, 40:15, 43:22, 76:14, 95:3

**gained** [2] - 35:11, 44:4

**gaining** [1] - 94:4

**gather** [1] - 168:1

**gathering** [6] - 45:4, 53:8, 53:16, 147:15, 148:19, 151:6

**genealogy** [2] - 59:14, 146:7

**general** [6] - 24:13, 56:4, 56:9, 66:22, 135:14

**generally** [9] - 26:17, 68:7, 134:23, 139:25, 146:3, 146:11, 159:24, 165:6, 172:19

**generate** [4] - 114:5, 114:9, 115:5, 156:3

**generated** [2] - 112:18, 114:7

**generator** [3] - 114:17, 115:2

**gentleman's** [1] - 170:19

**giant** [2] - 45:2, 46:19

**given** [12] - 8:3, 8:16, 17:13, 18:1, 23:13, 23:15, 28:24, 89:12, 129:17, 155:8, 179:22, 195:12

**Glave** [12] - 125:23, 125:25, 126:25, 127:18, 127:25, 128:6, 131:5, 132:13, 132:19, 132:23, 133:10, 133:15

**Glenda** [1] - 80:17

**Global** [1] - 11:20

**global** [3] - 51:4, 51:18, 52:1

**globally** [1] - 149:8

**gobbles** [1] - 54:22

**Google** [1] - 132:6

**governing** [1] - 17:11

**government** [71] - 3:5, 3:10, 3:12, 4:20, 9:25, 11:16, 12:5, 13:22, 15:5, 15:12, 15:23, 15:25, 16:1, 17:7, 19:2, 20:16, 21:5, 21:9, 22:1, 22:9, 22:13, 24:4, 25:21, 27:8, 27:18, 28:17, 28:19, 30:1,

30:4, 31:15, 31:24, 32:12, 36:20, 70:17, 78:23, 80:7, 90:8, 90:15, 96:9, 98:2, 101:23, 102:21, 103:2, 103:11, 103:22, 104:3, 108:1, 119:25, 127:17, 130:22, 133:6, 135:1, 136:1, 136:3, 140:8, 141:16, 143:5, 149:21, 153:11, 153:17, 153:20, 153:22, 158:8, 160:13, 164:10, 167:18, 173:9, 173:24, 187:10, 187:14

**Government** [11] - 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 150:1, 158:13, 165:2, 167:23

**Government's** [9] - 147:5, 148:11, 149:21, 156:11, 158:9, 164:11, 167:2, 167:19, 175:23

**government's** [17] - 4:19, 5:6, 8:4, 12:13, 20:11, 22:7, 22:19, 24:10, 27:20, 66:17, 87:12, 125:17, 166:5, 172:8, 173:13, 194:2

**Gox** [19] - 75:6, 75:10, 75:15, 84:17, 87:7, 87:20, 90:16, 96:22, 96:25, 98:12, 99:17, 100:2, 101:2, 101:3, 141:9, 141:24, 142:3, 142:5, 142:12

**grand** [4] - 168:16, 168:24, 168:25, 169:1

**grant** [1] - 31:25

**graph** [4] - 68:19, 84:1, 104:13, 164:2

**graphical** [5] - 46:18, 49:11, 53:1, 53:21, 84:23

**graphs** [2] - 68:16, 68:18

**gray** [2] - 58:24, 61:5

**great** [7] - 45:3, 53:8, 61:2, 104:17, 120:6, 146:13

**greater** [2] - 25:21,

27:10

**Greek** [1] - 36:17

**green** [2] - 182:22, 182:23

**grossly** [1] - 134:25

**ground** [1] - 130:13

**grounds** [2] - 130:12, 131:1

**group** [3] - 52:3, 98:24, 145:15

**guess** [15] - 13:13, 16:25, 31:10, 47:18, 51:12, 67:15, 83:24, 94:7, 141:6, 141:25, 143:18, 144:3, 144:9, 184:7, 194:2

**guessed** [1] - 56:24

**guessing** [4] - 94:6, 94:11, 95:16, 170:7

**guilt** [1] - 10:14

**guilty** [1] - 135:3

---

## H

**hacks** [1] - 96:22

**half** [5] - 9:16, 55:13, 125:10, 133:11, 195:4

**halfway** [1] - 163:23

**Hamas** [1] - 48:8

**hamper** [1] - 17:25

**hand** [22] - 33:23, 44:14, 44:25, 45:20, 48:6, 48:18, 49:1, 49:7, 50:12, 51:18, 61:6, 61:14, 69:8, 69:10, 71:16, 83:4, 83:7, 83:16, 84:16, 99:8, 176:9, 188:11

**handling** [1] - 135:8

**handprint** [4] - 63:12, 112:7, 118:15, 119:1

**happy** [7] - 11:6, 19:22, 72:12, 103:6, 103:16, 160:3, 186:10

**hard** [7] - 4:7, 125:10, 190:17, 194:16, 194:19, 194:21, 194:22

**hardened** [1] - 70:9

**harm** [1] - 67:15

**hash** [17] - 58:23, 58:25, 59:1, 59:6, 59:13, 69:25, 70:1, 74:17, 78:25, 79:13, 79:14, 98:22, 104:19, 116:17, 117:22, 117:23, 118:6

**Hash** [1] - 111:22

**hashes** [6] - 53:19, 53:25, 59:10, 79:11, 105:2, 105:4

**hashing** [1] - 59:16

**HASSARD** [3] - 1:19, 3:18, 69:6

**Hassard** [15] - 3:19, 5:18, 6:2, 9:3, 9:6, 39:11, 39:20, 39:21, 56:12, 69:4, 70:23, 71:7, 75:8, 99:14, 104:13

**Hassard's** [1] - 5:17

**head** [2] - 11:19, 18:25

**header** [2] - 111:10, 182:10

**headers** [1] - 182:23

**hear** [12] - 5:3, 11:6, 11:7, 22:12, 33:13, 64:21, 73:20, 76:8, 96:4, 125:4, 131:17, 195:16

**heard** [6] - 4:21, 8:2, 11:22, 29:13, 46:23, 136:25

**HEARING** [2] - 1:4, 1:7

**hearing** [15] - 8:10, 39:1, 64:3, 90:20, 103:5, 103:24, 128:14, 130:6, 137:1, 144:16, 159:23, 164:18, 190:24, 193:17, 195:24

**hearings** [1] - 195:6

**heart** [1] - 149:8

**held** [1] - 163:15

**help** [8] - 23:8, 29:8, 61:1, 73:12, 115:4, 117:13, 135:17, 165:20

**helped** [2] - 35:25, 168:12

**helpful** [3] - 14:3, 39:5, 135:9

**hereby** [1] - 196:3

**herself** [1] - 11:19

**heuristic** [67] - 13:11, 13:12, 20:15, 23:20, 24:20, 24:21, 24:24, 25:1, 25:3, 26:6, 26:21, 43:3, 46:16, 47:25, 49:5, 54:16, 54:17, 54:19, 54:20, 54:22, 54:25, 61:12, 61:16, 61:17, 61:20, 62:3, 71:6, 111:9, 111:18, 112:5,

112:11, 112:23, 114:1, 120:24, 120:25, 121:3, 121:4, 123:10, 123:19, 123:22, 124:2, 150:7, 150:8, 150:11, 150:18, 150:20, 150:24, 151:5, 151:15, 151:19, 154:7, 155:24, 176:21, 177:13, 178:17, 178:20, 178:21, 182:3, 184:20, 185:12, 185:23, 186:22, 186:24

**heuristics** [38] - 12:23, 20:2, 20:8, 20:9, 22:25, 23:5, 23:6, 23:8, 23:10, 23:11, 23:24, 24:14, 26:5, 26:17, 26:18, 27:11, 46:14, 46:18, 49:10, 54:13, 54:15, 62:3, 150:10, 150:16, 152:17, 153:1, 155:22, 160:23, 162:20, 163:25, 184:4, 184:22, 185:6, 185:14, 185:17

**hide** [1] - 171:5

**high** [6] - 45:3, 45:6, 59:19, 123:1, 123:2, 149:10

**high-level** [1] - 45:3

**high-quality** [1] - 149:10

**higher** [2] - 45:23, 53:16

**higher-level** [1] - 53:16

**highlights** [1] - 23:22

**highly** [4] - 55:20, 60:19, 132:12, 163:10

**hinder** [1] - 40:3

**hire** [2] - 25:18, 26:1

**hired** [1] - 28:24

**historical** [2] - 129:15

**history** [6] - 17:21, 70:15, 76:23, 91:17, 96:16, 96:23

**hold** [2] - 165:13, 188:25

**holder** [2] - 100:16, 192:23

**Holland** [6] - 158:15, 159:12, 160:4, 161:21, 161:22,

162:8

**home** [1] - 72:10

**honestly** [6] - 100:23, 106:2, 153:13, 157:17, 160:9, 167:1

**Honor** [120] - 3:6, 3:9, 3:13, 3:15, 3:18, 3:25, 4:17, 4:23, 5:5, 5:13, 5:23, 7:3, 7:6, 7:14, 7:18, 8:2, 8:3, 8:9, 8:22, 9:13, 9:15, 9:24, 11:12, 11:15, 11:23, 12:18, 14:14, 15:11, 15:20, 16:2, 16:11, 17:9, 18:18, 19:5, 19:17, 19:19, 20:19, 22:1, 22:14, 24:17, 25:13, 28:13, 29:9, 29:14, 29:25, 30:10, 30:24, 31:5, 31:22, 32:10, 33:6, 33:11, 33:20, 34:7, 34:9, 37:13, 37:16, 38:1, 38:21, 38:24, 39:2, 39:10, 46:7, 46:10, 66:9, 67:7, 67:11, 67:18, 67:20, 72:8, 79:19, 79:21, 81:11, 81:15, 89:2, 101:14, 101:20, 102:11, 104:5, 109:5, 109:14, 110:22, 116:4, 119:12, 124:9, 124:15, 124:19, 124:23, 125:13, 125:16, 127:17, 130:15, 131:5, 133:12, 135:11, 136:19, 137:4, 137:5, 137:12, 138:2, 149:24, 158:11, 164:13, 167:21, 179:5, 179:11, 180:8, 186:5, 186:10, 186:19, 187:12, 190:17, 193:16, 193:22, 194:4, 194:15, 195:8, 195:10, 195:16, 195:22

**Honor's** [1] - 65:5

**HONORABLE** [1] - 1:8

**hood** [5] - 12:20, 13:5, 20:20, 27:17, 27:23

**hop** [2] - 61:4, 105:15

**hope** [1] - 81:5

**hoped** [1] - 125:18

**hopefully** [1] - 93:23

hops [5] - 61:3, 76:18, 77:25, 87:6
horse [1] - 17:24
horse-and-buggy [1] - 17:24
hosted [1] - 106:6
hot [6] - 40:9, 95:24, 121:20, 122:7, 151:13, 190:12
hotels [1] - 143:4
hour [6] - 124:21, 125:10, 133:11, 142:20, 193:15, 194:15
hours [17] - 28:10, 28:14, 140:19, 140:21, 142:21, 143:1, 143:8, 143:10, 143:14, 143:16, 143:18, 143:19, 143:20, 144:2, 144:11, 194:9, 195:4
housekeeping [2] - 124:24, 125:4
human [2] - 112:18, 116:16
hundred [1] - 40:12
hundreds [3] - 19:12, 19:13, 30:15
hunting [1] - 40:14

I

ice [1] - 5:24
ID [10] - 49:1, 59:1, 60:6, 72:22, 72:23, 73:1, 74:6, 179:20, 188:9
idea [4] - 29:23, 63:4, 102:25, 113:8
ideal [1] - 194:24
Identification [1] - 147:9
identification [3] - 37:14, 38:3, 38:23
identified [17] - 68:14, 71:15, 75:17, 92:4, 104:21, 118:25, 119:5, 122:7, 122:10, 123:5, 176:16, 176:17, 176:22, 181:3, 185:11, 186:22, 186:24
identifier [5] - 59:6, 89:5, 104:20, 121:9, 151:25
identifiers [4] - 79:11, 89:3, 98:20, 105:11

identifies [2] - 26:6, 114:8
identify [27] - 12:9, 60:15, 65:25, 69:25, 76:1, 82:8, 92:13, 93:12, 97:25, 98:23, 118:16, 119:2, 121:18, 123:4, 151:23, 152:7, 152:10, 157:8, 163:2, 163:13, 163:25, 165:20, 167:12, 177:16, 179:16, 179:20, 188:17
identifying [7] - 69:22, 69:23, 123:14, 123:15, 132:21, 163:4, 163:18
identities [1] - 107:3
identity [3] - 52:9, 76:5, 106:11
IDs [1] - 73:8
ignore [2] - 5:1, 18:17
ignored [1] - 15:9
ignoring [4] - 15:10, 16:8, 16:10, 18:9
illegal [1] - 135:21
illicit [5] - 165:21, 172:4, 172:5, 173:5, 173:15
illustrating [1] - 103:13
image [1] - 83:1
images [1] - 118:1
imagine [1] - 16:19
immediately [1] - 59:23
immense [2] - 147:12, 148:16
immutable [2] - 59:15, 146:4
implement [3] - 12:23, 20:2, 20:3
implicated [1] - 191:4
implication [5] - 49:20, 76:11, 76:12, 87:12, 87:19
import [2] - 88:5, 90:3
importance [1] - 136:17
important [9] - 27:19, 27:21, 48:16, 68:12, 96:16, 120:5, 135:21, 136:16, 153:21
impression [1] - 15:21
improper [2] - 53:3, 67:11
improperly [4] - 52:25,

53:7, 58:17, 192:16
IN [1] - 1:1
inaccurate [3] - 56:24, 119:7, 119:20
include [20] - 40:5, 40:24, 41:1, 46:13, 68:19, 84:4, 120:11, 120:17, 143:3, 144:22, 146:18, 150:17, 151:14, 155:11, 160:14, 177:21, 183:11, 184:5, 184:9, 188:23
included [12] - 48:14, 116:24, 133:2, 142:8, 151:18, 167:14, 169:21, 175:14, 175:16, 175:18, 177:7, 177:17
includes [6] - 143:17, 147:15, 148:20, 150:3, 151:14, 165:16
including [10] - 19:13, 58:24, 108:21, 120:22, 142:24, 147:23, 155:4, 158:1, 173:25, 185:15
incoming [1] - 93:1
incorrect [4] - 69:14, 74:17, 111:25, 117:25
incorrectly [2] - 77:3, 123:6
increase [1] - 113:9
increases [3] - 41:18, 41:19, 185:12
incredibly [1] - 7:3
indefinitely [1] - 176:6
independent [1] - 43:14
index [1] - 132:23
indexes [2] - 132:23, 133:1
indicate [2] - 85:9, 183:4
indicated [3] - 21:17, 22:6, 62:15
indicates [5] - 27:24, 142:13, 187:18, 187:25, 191:8
indicating [4] - 40:2, 42:5, 184:19, 184:22
indication [1] - 63:7
indicators [2] - 147:18, 148:22
indicted [1] - 96:24
individual [1] - 107:6

individuals [2] - 65:25, 192:19
industry [3] - 56:4, 56:7, 56:8
inefficient [1] - 7:3
infer [2] - 163:9, 172:2
inference [1] - 88:20
inferential [2] - 89:11, 89:12
inform [1] - 23:8
information [40] - 23:23, 23:24, 40:13, 40:15, 48:23, 52:14, 59:15, 61:18, 64:22, 69:18, 74:4, 74:5, 76:14, 89:24, 90:1, 90:21, 96:9, 96:10, 98:3, 100:10, 103:12, 104:25, 105:14, 108:4, 111:16, 112:6, 112:22, 114:1, 119:25, 141:13, 149:1, 149:10, 151:4, 151:5, 159:20, 160:6, 164:5, 165:17, 168:4
informed [2] - 4:9, 51:7
initiate [1] - 65:4
innocence [2] - 10:15, 67:12
input [10] - 41:22, 54:25, 62:4, 75:20, 76:9, 76:13, 76:17, 150:7, 154:4, 155:22
inputs [6] - 55:9, 64:2, 64:9, 65:8, 83:2, 91:24
inputting [1] - 12:24
inquire [1] - 131:8
inquiry [3] - 102:1, 102:4, 194:4
inside [1] - 191:9
Inspector [10] - 54:4, 82:3, 83:17, 104:24, 147:3, 148:12, 153:15, 163:24, 164:1, 164:5
instances [1] - 180:1
Instawallet [6] - 87:9, 97:23, 97:24, 98:2, 98:3, 98:17
instead [6] - 15:25, 79:3, 87:18, 112:15, 114:2, 114:4
institutions [3] - 135:13, 139:21, 165:20
instructions [1] -

32:23
integration [2] - 165:5, 165:10
intellectual [1] - 148:7
intelligence [11] - 34:25, 45:4, 53:8, 53:16, 147:15, 148:19, 149:9, 149:12, 149:15, 151:4, 151:6
intelligence-based [1] - 151:4
intelligent [1] - 150:23
intend [1] - 102:7
intended [2] - 12:6, 67:4
interact [1] - 45:8
interaction [1] - 53:12
interactions [3] - 45:5, 47:8, 53:9
interest [4] - 83:5, 96:6, 116:8, 162:13
interesting [7] - 13:21, 92:2, 92:6, 96:17, 96:19, 145:22, 145:23
interfere [3] - 5:8, 17:2, 22:10
interim [1] - 30:20
intermediary [6] - 84:13, 85:24, 89:17, 91:6, 106:12, 106:24
intern [3] - 35:5, 35:7, 36:2
internal [5] - 91:7, 91:19, 107:19, 109:3, 109:20
internally [1] - 139:21
international [2] - 34:19, 34:20
internet [4] - 71:21, 129:11, 159:13, 160:6
Interpol [1] - 36:16
interpret [1] - 122:16
interrupt [3] - 72:9, 72:15, 116:4
intersected [1] - 44:22
intimidation [2] - 8:5, 10:2
introduce [1] - 23:21
invade [1] - 134:20
investigation [2] - 13:23, 168:5
investigations [4] - 11:19, 34:25, 35:3, 35:8
Investigations [1] - 11:20
investigator [16] -

39:22, 40:4, 45:12, 47:7, 49:13, 52:18, 52:22, 52:24, 53:7, 58:16, 61:9, 74:18, 76:16, 86:14, 104:22

**investigators** [4] - 30:18, 45:17, 84:2, 146:12

**investigatory** [1] - 156:3

**involved** [3] - 28:7, 49:22, 65:25

**involvement** [1] - 67:25

**involves** [3] - 114:14, 136:21, 163:4

**involving** [3] - 50:24, 62:7, 188:6

**IP** [8] - 13:25, 92:9, 100:11, 145:21, 145:23, 148:7, 148:18, 194:5

**irrelevant** [1] - 136:7

**IRS** [5] - 36:20, 46:19, 86:14, 91:8, 121:18

**issue** [19] - 4:14, 4:22, 5:4, 10:1, 11:10, 22:9, 24:2, 25:4, 32:11, 85:18, 101:18, 101:21, 102:22, 103:17, 116:21, 126:22, 128:12, 134:13, 134:17

**issued** [2] - 168:11, 168:14

**issues** [8] - 17:15, 103:7, 104:3, 133:17, 134:14, 138:23, 167:25, 192:1

**issuing** [1] - 168:13

**items** [3] - 16:13, 111:19, 183:12

**itself** [16] - 43:7, 43:9, 49:11, 50:13, 85:14, 93:22, 104:4, 104:21, 106:7, 114:18, 115:12, 115:25, 119:4, 128:12, 149:19, 166:22

**J**

**jail** [3] - 4:6, 18:3, 18:7

**Jeff** [1] - 3:12

**JEFFREY** [1] - 1:15

**Jevans** [14] - 144:22, 144:24, 145:1,

145:3, 146:19, 146:20, 156:8, 156:16, 156:22, 156:25, 157:8, 157:18, 157:22, 158:4

**Jevans'** [1] - 156:12

**job** [1] - 125:7

**join** [1] - 54:10

**joining** [1] - 169:8

**JONELLE** [3] - 2:3, 34:3, 137:18

**Jonelle** [1] - 33:21

**Journal** [1] - 132:3

**journey** [2] - 35:10, 35:11

**JUDGE** [2] - 1:8, 1:8

**Judge** [1] - 15:25

**judge** [1] - 130:4

**July** [1] - 139:3

**jumbled** [2] - 73:25, 99:18

**June** [2] - 4:25, 8:10

**junk** [2] - 18:4

**jury** [30] - 6:10, 8:4, 8:18, 8:23, 9:19, 9:20, 10:2, 67:14, 67:16, 102:24, 103:1, 103:14, 109:11, 109:15, 126:23, 131:3, 133:11, 134:8, 134:20, 134:22, 135:2, 135:14, 135:17, 135:22, 136:9, 168:16, 168:24, 168:25, 169:1, 195:7

**Justice** [2] - 1:13, 1:16

**justifying** [1] - 71:3

**K**

**keep** [6] - 44:22, 48:23, 97:24, 98:4, 110:2, 125:11

**kept** [1] - 110:1

**key** [28] - 52:7, 52:10, 57:7, 57:8, 57:13, 57:21, 57:22, 57:24, 57:25, 70:8, 88:4, 90:2, 105:8, 111:24, 112:17, 112:20, 114:13, 114:16, 114:17, 114:25, 115:7, 115:18, 116:2, 183:15, 183:21, 183:22

**Key** [1] - 111:21

**keys** [14] - 52:4, 76:5,

88:2, 88:3, 92:10, 95:22, 112:16, 113:23, 114:3, 114:6, 114:9, 114:11, 192:21, 193:4

**kid** [1] - 72:9

**kind** [30] - 13:2, 14:18, 17:22, 17:23, 45:16, 45:22, 54:20, 68:12, 86:9, 86:11, 94:5, 94:19, 94:23, 95:2, 95:23, 95:25, 98:23, 100:20, 101:17, 105:19, 106:24, 107:17, 111:17, 114:12, 115:22, 117:13, 140:23, 143:17, 146:4, 192:1

**kinds** [1] - 132:8

**Knight** [6] - 158:15, 159:12, 160:5, 161:21, 161:22, 162:8

**knowing** [3] - 63:9, 65:12, 89:23

**knowledge** [9] - 12:9, 42:2, 98:18, 128:24, 136:1, 136:13, 151:20, 189:16, 189:19

**known** [7] - 11:20, 87:5, 90:14, 92:1, 94:1, 117:3, 117:5

**knows** [8] - 14:6, 20:10, 23:1, 26:2, 26:4, 41:14, 62:18, 97:2

**Korea** [1] - 159:15

**KYC** [5] - 98:10, 98:13, 98:18, 98:19, 100:10

**L**

**labeled** [2] - 47:24, 183:10

**labels** [1] - 75:16

**lack** [1] - 85:1

**lacking** [1] - 90:7

**LaGuardia** [1] - 36:16

**laid** [2] - 21:16, 21:17

**lake** [1] - 147:12

**large** [7] - 24:7, 53:9, 54:7, 55:1, 68:18, 114:6, 114:14

**large-entity** [1] - 53:9

**last** [10] - 6:1, 6:3, 15:2, 15:24, 21:1, 116:12, 140:2,

142:11, 147:25, 182:8

**late** [4] - 32:18, 32:20, 138:24, 186:11

**launder** [2] - 171:25, 172:25

**laundering** [6] - 20:12, 96:22, 165:4, 167:3, 167:11, 173:19

**Law** [1] - 1:19

**law** [22] - 10:9, 10:22, 36:12, 36:13, 36:14, 36:19, 36:22, 42:9, 46:2, 56:21, 133:22, 134:25, 136:4, 136:9, 140:4, 146:8, 154:16, 154:19, 157:16, 167:25, 168:7, 168:9

**lawyer** [2] - 10:9, 19:10

**lawyers** [1] - 159:12

**layering** [2] - 165:5, 165:8

**LCX** [1] - 158:16

**lead** [5] - 45:17, 47:14, 47:15, 69:23, 74:21

**leadership** [1] - 144:23

**leading** [2] - 109:7, 144:5

**leads** [3] - 47:12, 61:18, 156:3

**League** [1] - 36:3

**learn** [3] - 125:6, 139:2, 139:3

**learned** [1] - 17:13

**least** [12] - 22:16, 23:17, 28:1, 64:9, 67:1, 87:23, 88:1, 88:2, 96:6, 119:19, 195:14

**leave** [6] - 64:22, 81:4, 81:8, 103:18, 138:17, 186:2

**led** [3] - 50:15, 50:18, 53:5

**ledger** [13] - 57:20, 57:22, 59:3, 59:11, 59:15, 91:20, 91:21, 93:22, 109:20, 109:23, 109:25, 161:13, 171:23

**ledgers** [2] - 108:4, 109:4

**left** [14] - 44:14, 48:6, 49:1, 51:18, 69:6, 69:8, 81:19, 83:4, 83:16, 84:16, 85:3, 85:17, 104:14, 183:9

**left-hand** [8] - 44:14, 48:6, 49:1, 51:18, 69:8, 83:4, 83:16, 84:16

**leftover** [1] - 83:8

**legal** [4] - 134:7, 136:15, 136:18, 145:8

**legitimate** [1] - 17:3

**less** [1] - 93:14

**level** [13] - 26:6, 26:7, 45:3, 45:6, 45:7, 47:8, 49:15, 53:10, 53:13, 53:16, 58:22, 59:19, 84:20

**liaison** [1] - 30:25

**liberty** [2] - 14:1, 130:16

**license** [18] - 22:16, 25:7, 25:10, 25:12, 25:19, 25:21, 25:25, 29:12, 29:17, 31:8, 31:13, 31:16, 32:1, 32:5, 32:24, 32:25, 33:1, 170:16

**licenses** [1] - 25:17

**life** [1] - 168:17

**lifetime** [1] - 57:2

**light** [2] - 6:3, 137:3

**likely** [4] - 55:21, 60:19, 101:24, 125:18

**limit** [1] - 55:3

**limited** [5] - 19:6, 19:8, 29:20, 32:1, 130:18

**line** [17] - 23:21, 26:14, 31:18, 104:16, 105:21, 128:25, 129:2, 182:4, 182:10, 187:18, 187:21, 187:23, 188:20, 188:25, 189:2, 190:3

**lines** [8] - 21:16, 28:4, 28:5, 28:12, 105:17, 165:19, 184:15, 191:17

**lingering** [1] - 72:11

**LinkedIn** [1] - 159:11

**links** [1] - 68:12

**liquid** [3] - 129:18, 132:4, 132:5

**liquidity** [1] - 41:12

**list** [32] - 16:13, 16:16, 23:8, 23:13, 23:15, 24:20, 69:20, 100:9, 105:4, 127:5, 175:13, 176:3, 176:13, 176:15,

176:17, 176:20, 176:23, 177:1, 177:2, 177:24, 179:7, 179:18, 179:23, 179:24, 180:10, 183:12, 188:6, 189:8, 189:11, 189:14, 189:20, 189:21

**listed** [6] - 78:21, 159:7, 166:5, 173:12, 175:11, 175:18

**listen** [2] - 179:1, 179:3

**listened** [1] - 139:4

**listening** [1] - 14:2

**listing** [1] - 185:21

**lists** [4] - 23:11, 26:23, 69:19, 90:4

**literature** [1] - 153:2

**live** [8] - 14:11, 40:5, 91:14, 101:10, 101:17, 101:24, 102:12, 102:20

**lived** [1] - 159:16

**local** [3] - 9:7, 9:10, 9:11

**lockdowns** [1] - 35:12

**locked** [2] - 18:3, 35:17

**log** [1] - 100:11

**log-ins** [1] - 100:11

**loggerheads** [1] - 15:12

**logs** [2] - 98:4, 100:11

**look** [63] - 6:7, 6:8, 7:15, 10:22, 12:16, 13:5, 13:7, 13:14, 14:5, 14:7, 14:10, 15:7, 19:24, 19:25, 20:19, 21:3, 21:22, 23:25, 27:2, 27:17, 27:23, 28:4, 37:2, 37:3, 37:21, 38:18, 53:18, 60:10, 63:23, 70:21, 71:16, 71:18, 71:20, 71:22, 74:8, 75:14, 77:11, 78:2, 79:15, 86:6, 92:16, 93:10, 97:14, 99:1, 106:9, 110:5, 112:8, 129:2, 129:3, 129:14, 129:22, 132:20, 146:12, 150:16, 157:11, 160:9, 172:7, 174:13, 175:5, 176:9, 177:11, 190:4

**looked** [10] - 27:6,

51:24, 91:23, 93:12, 93:13, 97:5, 120:9, 174:12, 189:17, 189:18

**looking** [39] - 12:17, 13:8, 24:1, 24:7, 28:4, 37:3, 37:21, 52:23, 53:8, 77:3, 81:20, 83:3, 84:16, 86:25, 87:19, 92:25, 95:5, 97:19, 99:10, 122:21, 128:9, 129:16, 129:19, 129:24, 140:21, 144:8, 162:18, 170:22, 172:10, 176:5, 180:6, 180:10, 180:20, 182:4, 182:8, 182:25, 184:15, 187:16, 188:2

**looks** [15] - 54:3, 58:21, 75:5, 75:9, 84:19, 94:16, 98:15, 105:17, 107:11, 107:12, 111:14, 121:25, 156:14, 158:6, 158:21

**lost** [1] - 35:16

**low** [3] - 87:16, 152:23

**lower** [1] - 113:8

**lumped** [1] - 45:16

**lunch** [4] - 79:17, 79:20, 79:23, 195:3

## M

**M-e-m-pool** [1] - 72:3

**ma'am** [4] - 138:4, 138:7, 138:9, 138:12

**magnitude** [1] - 63:1

**main** [2] - 139:10, 139:14

**major** [1] - 17:17

**majority** [1] - 93:12

**malware** [1] - 167:10

**Man** [5] - 54:19, 61:12, 61:17, 61:23, 121:4

**management** [1] - 144:19

**manner** [3] - 10:20, 27:25, 193:19

**March** [2] - 35:2, 110:17

**marching** [1] - 32:17

**mark** [1] - 177:3

**marked** [3] - 37:14, 38:2, 38:22

**markers** [1] - 63:11

**market** [13] - 40:11,

122:13, 129:17, 132:4, 132:5, 132:23, 155:3, 166:19, 167:10, 172:20, 172:21, 172:24, 180:4

**marketed** [2] - 20:16, 155:6

**marketplaces** [2] - 175:15, 181:19

**markets** [14] - 43:25, 156:17, 157:1, 157:15, 166:5, 172:2, 172:6, 172:10, 172:11, 173:5, 173:12, 173:14, 173:16, 176:7

**marshal** [1] - 4:14

**Marshals** [3] - 3:24, 4:1, 4:9

**mask** [2] - 72:11, 72:13

**massive** [1] - 149:9

**master** [3] - 70:8, 88:4, 90:2

**master's** [1] - 34:18

**Mastercard** [12] - 34:23, 35:6, 139:18, 139:20, 144:25, 145:5, 145:6, 145:7, 145:10, 155:4, 155:7, 159:11

**match** [13] - 73:1, 74:6, 78:12, 78:21, 79:15, 91:24, 94:25, 129:4, 180:1, 180:11, 181:16, 185:19, 185:20

**matches** [1] - 97:15

**material** [5] - 10:19, 10:23, 11:2, 173:22, 174:11

**mathematical** [1] - 58:1

**matter** [13] - 10:13, 74:12, 74:15, 79:24, 128:9, 128:23, 129:24, 136:18, 158:16, 158:18, 168:24, 168:25

**matters** [8] - 124:24, 125:4, 126:5, 133:22, 134:7, 135:13, 136:15

**Mazarin** [5] - 125:17, 126:14, 194:5, 194:8, 194:18

**Mazars** [3] - 125:17, 126:14, 194:5

**mean** [44] - 13:6, 17:13, 17:14, 20:13, 21:15, 29:23, 41:11, 41:21, 42:24, 44:13, 46:5, 53:14, 55:8, 61:4, 62:14, 67:1, 72:8, 75:24, 76:1, 83:24, 89:9, 91:3, 95:24, 97:11, 103:11, 113:5, 113:25, 120:14, 122:23, 123:8, 124:4, 128:11, 128:12, 132:4, 136:21, 142:4, 146:10, 155:10, 162:15, 176:2, 179:16, 182:17, 184:7, 195:5

**meaning** [2] - 82:7, 87:25

**meaningfully** [2] - 29:6, 29:7

**means** [17] - 10:12, 44:19, 75:25, 76:4, 96:21, 107:13, 112:5, 113:16, 114:20, 114:21, 117:10, 118:14, 122:1, 122:25, 124:5, 130:12, 169:5

**meant** [2] - 83:25, 116:24

**measuring** [2] - 26:11, 26:12

**meet** [2] - 14:16, 89:4

**Meiklejohn's** [1] - 178:8

**members** [1] - 154:15

**mempool.space** [9] - 72:1, 72:2, 82:23, 83:2, 84:22, 98:22, 105:3, 113:15, 118:5

**mentioned** [11] - 46:23, 58:21, 63:13, 90:25, 94:13, 105:25, 113:21, 146:7, 159:6, 180:10, 190:23

**mentioning** [1] - 58:22

**mentions** [1] - 128:6

**merely** [1] - 5:15

**merits** [1] - 10:15

**Merkle** [2] - 59:8, 59:17

**message** [1] - 41:13

**messages** [1] - 8:17

**messy** [2] - 73:24, 100:5

**met** [2] - 89:4, 93:11

**metadata** [3] - 57:23, 105:1, 118:6

**method** [3] - 68:21, 166:2, 181:16

**Methodologies** [1] - 160:21

**methodologies** [8] - 129:7, 131:8, 161:9, 161:20, 161:25, 162:2, 162:7, 162:13

**methodology** [5] - 126:8, 127:23, 132:14, 132:17, 161:23

**metric** [1] - 163:11

**MICHAEL** [1] - 1:19

**Michael** [1] - 3:18

**microphone** [1] - 34:15

**middle** [7] - 61:4, 84:13, 93:11, 110:15, 110:16, 195:12, 195:18

**midst** [1] - 103:24

**might** [10] - 26:13, 31:9, 47:24, 65:16, 77:7, 88:24, 94:6, 119:23, 132:18, 153:20

**military** [1] - 48:8

**million** [3] - 122:20, 149:13

**millions** [4] - 147:18, 148:23, 172:11, 173:5

**millionth** [1] - 93:20

**mind** [2] - 6:4, 104:8

**mined** [1] - 98:24

**miner** [2] - 98:24, 113:10

**mineral** [1] - 97:18

**mining** [4] - 87:10, 98:16, 98:21, 98:24

**minor** [1] - 68:10

**minus** [1] - 123:11

**minute** [4] - 39:15, 186:1, 186:2, 186:7

**minutes** [7] - 66:15, 124:21, 186:16, 193:15, 193:21, 193:22, 194:3

**mischaracterization** [1] - 178:10

**mischaracterizing** [1] - 109:6

**misclustering** [2] - 24:24, 24:25

**misconstruing** [1] - 23:4

**misleading** [1] - 152:1

**miss** [2] - 76:13, 76:14
**missed** [2] - 83:12, 161:5
**missing** [11] - 69:18, 69:20, 70:2, 76:9, 105:14, 111:19, 112:7, 112:24, 118:22, 120:3, 122:17
**misstating** [1] - 134:25
**mistake** [3] - 26:13, 47:4, 47:5
**mistaken** [1] - 178:3
**mistakenly** [3] - 47:7, 49:14, 177:7
**mix** [1] - 94:2
**mixed** [3] - 73:24, 100:18, 141:11
**mixer** [5] - 92:25, 166:19, 166:22, 171:20
**mixer/tumbler/ money** [1] - 167:10
**mixers** [3] - 165:7, 171:3, 171:5
**model** [11] - 42:21, 42:22, 42:25, 43:5, 43:6, 43:9, 43:16, 111:8, 152:18, 193:7, 193:8
**models** [1] - 43:15
**modify** [1] - 10:25
**moment** [13] - 14:17, 33:14, 50:15, 59:19, 70:21, 85:19, 101:15, 160:17, 162:3, 162:10, 162:21, 172:17, 178:11
**Monday** [5] - 21:7, 21:9, 21:25, 33:3, 79:25
**money** [14] - 6:13, 20:11, 29:24, 30:12, 32:2, 40:8, 85:3, 86:24, 128:3, 129:3, 165:4, 167:3, 174:9
**monitoring** [1] - 149:7
**month** [4] - 72:10, 74:9, 144:5, 149:14
**months** [3] - 94:20, 142:11, 177:5
**morning** [14] - 3:6, 3:8, 3:9, 3:11, 3:13, 3:14, 3:15, 3:17, 3:18, 3:20, 34:5, 186:17, 195:1, 195:11
**MOSS** [1] - 1:8

**most** [14] - 7:5, 15:22, 25:16, 31:11, 31:21, 31:23, 36:13, 55:5, 55:20, 155:2, 163:11, 166:9, 183:5
**most-used** [1] - 163:11
**motion** [8] - 4:19, 7:22, 8:12, 9:25, 11:5, 11:7, 11:25, 21:11
**motions** [1] - 16:4
**MOTIONS** [2] - 1:4, 1:7
**mouth** [1] - 106:18
**move** [27] - 37:13, 38:2, 38:22, 39:20, 47:21, 51:17, 70:19, 70:22, 103:6, 104:13, 107:8, 107:9, 109:7, 109:12, 109:15, 110:4, 110:20, 110:23, 115:7, 116:10, 141:1, 151:1, 158:8, 164:10, 167:18, 179:2, 179:4
**moved** [1] - 106:6
**movements** [1] - 71:13
**moves** [2] - 30:11, 187:10
**moving** [7] - 49:25, 84:11, 103:19, 104:18, 105:18, 173:19, 193:18
**MR** [137] - 3:9, 3:12, 3:15, 3:18, 3:25, 4:17, 4:23, 5:5, 5:13, 5:22, 7:1, 7:14, 7:18, 7:23, 8:2, 8:9, 8:22, 9:2, 9:6, 9:13, 9:15, 9:24, 11:12, 11:15, 11:23, 12:18, 13:21, 14:14, 15:10, 15:15, 15:20, 16:2, 16:11, 17:9, 18:18, 19:5, 19:17, 19:25, 29:13, 29:18, 29:25, 30:10, 30:24, 31:5, 31:22, 32:8, 32:10, 33:6, 33:11, 33:20, 34:4, 34:7, 34:9, 34:11, 37:13, 37:19, 38:1, 38:6, 38:8, 38:21, 39:2, 39:4, 39:10, 39:16, 42:16, 46:22, 49:18, 51:10, 64:17, 66:4, 66:9, 66:16,

67:7, 67:17, 67:20, 67:21, 69:6, 69:8, 69:12, 72:17, 75:22, 77:17, 79:19, 80:14, 80:20, 81:2, 81:11, 81:15, 81:17, 81:18, 85:22, 89:16, 93:3, 94:14, 101:14, 103:6, 104:5, 104:6, 108:6, 108:14, 109:14, 109:17, 110:22, 110:25, 116:11, 119:15, 124:11, 124:15, 127:17, 127:24, 128:5, 128:16, 128:19, 129:6, 129:13, 130:15, 130:20, 131:5, 131:17, 131:20, 131:23, 133:18, 135:11, 135:25, 137:4, 149:24, 158:11, 164:13, 164:23, 167:21, 177:9, 187:12, 193:25, 194:8, 194:15, 195:16, 195:21
**MS** [94] - 3:6, 20:24, 22:1, 22:14, 22:20, 23:4, 23:22, 24:17, 25:9, 25:13, 26:22, 28:13, 28:16, 29:9, 37:16, 38:4, 38:24, 67:11, 72:8, 72:15, 79:21, 80:7, 80:10, 80:23, 101:20, 102:10, 102:18, 109:5, 116:4, 119:12, 124:18, 124:23, 125:2, 125:12, 125:16, 125:21, 126:14, 126:17, 126:25, 127:4, 127:8, 127:10, 127:14, 132:22, 133:12, 133:14, 134:16, 135:7, 137:12, 137:16, 137:19, 138:2, 138:5, 139:1, 149:21, 150:2, 158:8, 158:14, 159:22, 164:10, 164:14, 165:3, 167:18, 167:24, 170:18, 170:23, 171:1, 177:14, 179:5, 179:6, 179:11, 179:12,

180:8, 180:9, 182:21, 186:4, 186:10, 186:13, 186:19, 186:20, 187:10, 187:15, 190:17, 190:21, 193:10, 193:15, 193:22, 194:3, 194:11, 194:18, 194:23, 195:8, 195:10, 195:22
**Mt** [19] - 75:6, 75:10, 75:15, 84:17, 87:7, 87:20, 90:16, 96:22, 96:25, 98:12, 99:17, 100:2, 101:2, 101:3, 141:9, 141:24, 142:3, 142:5, 142:12
**multi** [5] - 54:25, 62:4, 150:7, 154:4, 155:22
**multi-input** [5] - 54:25, 62:4, 150:7, 154:4, 155:22
**multiple** [11] - 25:17, 55:10, 64:2, 141:11, 141:12, 142:5, 157:1, 163:4, 184:4, 184:22, 185:6
**multiplied** [1] - 114:17
**multiply** [2] - 115:2, 115:6
**multiplying** [1] - 114:20
**Multisig** [1] - 111:22
**must** [7] - 19:11, 54:1, 57:17, 62:20, 74:10, 104:22, 118:17
**Mycelium** [4] - 70:6, 70:13, 90:5, 90:9

**N**

**N.W** [1] - 196:11
**name** [9] - 3:5, 17:10, 19:23, 36:14, 48:8, 51:11, 110:6, 127:11, 145:4
**Name** [2] - 110:7, 110:15
**named** [2] - 14:25, 179:14
**names** [1] - 62:13
**narcotic** [1] - 173:6
**narcotics** [2] - 173:8, 173:15
**narrow** [1] - 130:6
**national** [1] - 36:17
**native** [1] - 86:22
**natives** [1] - 99:22
**naturally** [1] - 86:18

**nature** [2] - 127:1, 177:18
**neatly** [1] - 191:14
**necessarily** [8] - 55:11, 95:18, 102:22, 129:17, 144:12, 148:3, 150:15, 192:10
**necessary** [5] - 11:13, 49:16, 104:24, 153:11, 153:17
**need** [67] - 4:10, 7:7, 8:15, 12:1, 12:4, 12:7, 12:10, 13:13, 14:10, 15:7, 15:18, 17:6, 18:1, 18:17, 20:25, 21:5, 21:6, 21:22, 22:12, 28:9, 28:24, 29:21, 30:7, 31:9, 31:10, 32:5, 33:4, 33:7, 39:23, 44:4, 44:11, 51:24, 59:18, 68:17, 84:6, 88:23, 95:21, 102:1, 102:4, 103:24, 104:3, 104:4, 107:22, 107:24, 115:19, 124:17, 133:15, 143:5, 144:10, 144:13, 151:1, 152:20, 152:24, 152:25, 154:24, 157:11, 157:12, 174:23, 176:6, 181:15, 186:18, 187:8, 190:19, 193:14
**needed** [2] - 194:14, 194:23
**needs** [7] - 4:9, 19:1, 21:3, 21:17, 34:16, 84:1, 164:21
**negotiation** [1] - 155:7
**nested** [9] - 190:23, 190:25, 191:4, 191:6, 191:19, 191:24, 192:12, 193:7, 193:8
**Network** [2] - 126:18, 126:19
**network** [1] - 161:14
**never** [25] - 14:17, 17:19, 44:20, 44:22, 48:22, 58:19, 71:19, 72:5, 72:19, 83:16, 101:25, 146:23, 168:9, 168:11, 168:13, 168:14, 168:24, 168:25, 169:2, 169:3, 169:4,

169:6, 169:7, 169:11, 171:11
**New** [3] - 1:17, 1:20, 159:25
**new** [9] - 10:4, 17:18, 56:3, 56:8, 73:4, 86:17, 95:19, 102:8, 104:2
**next** [31] - 28:23, 39:20, 39:21, 40:4, 42:19, 44:10, 47:22, 48:3, 49:23, 51:2, 54:3, 55:13, 56:12, 56:25, 58:6, 58:20, 60:14, 60:25, 61:25, 122:9, 141:1, 144:5, 146:2, 161:2, 163:22, 179:4, 187:23, 188:20, 190:10, 190:16, 195:4
**Next** [1] - 48:24
**NFT** [2] - 110:11
**nine** [2] - 19:11, 94:20
**nine-week** [1] - 19:11
**node** [1] - 117:18
**nodes** [3] - 40:11, 40:12, 117:16
**nondirect** [1] - 150:8
**none** [6] - 20:14, 60:22, 78:4, 90:8, 96:17, 155:17
**nonfungible** [1] - 110:11
**noon** [1] - 195:2
**normal** [2] - 143:14, 143:16
**normally** [1] - 143:21
**North** [1] - 159:15
**notable** [5] - 119:9, 119:10, 119:14, 119:16, 123:1
**notably** [1] - 122:18
**notarized** [1] - 159:18
**note** [3] - 79:22, 121:7, 138:17
**notebook** [1] - 38:13
**noted** [6] - 7:6, 7:14, 7:19, 12:5, 32:15, 33:6
**notes** [1] - 196:5
**nothing** [7] - 10:4, 31:25, 76:19, 97:15, 127:1, 145:13
**notice** [4] - 5:6, 49:3, 52:17, 159:10
**noticed** [6] - 72:11, 126:4, 127:17, 128:20, 130:21, 130:22

**notices** [1] - 9:20
**novel** [2] - 128:1, 128:2
**November** [4] - 74:8, 118:19, 118:21, 132:1
**nuance** [1] - 191:25
**Nucleus** [1] - 173:14
**Number** [1] - 68:15
**number** [50] - 3:21, 29:15, 35:25, 55:9, 55:12, 57:10, 57:16, 57:18, 57:19, 60:22, 63:17, 65:3, 68:6, 68:9, 71:11, 74:23, 76:17, 77:9, 77:25, 87:22, 87:24, 92:2, 96:16, 101:3, 112:2, 113:9, 114:20, 114:21, 114:23, 115:19, 118:9, 123:1, 139:16, 140:4, 146:13, 159:9, 159:11, 159:14, 160:11, 172:1, 173:7, 174:22, 182:6, 183:5, 185:11, 185:24, 186:21, 188:15, 188:24
**numbers** [9] - 114:6, 114:15, 132:11, 152:20, 152:22, 172:8, 172:16, 181:10, 181:22
**NW** [4] - 1:11, 1:14, 1:17, 1:23
**NY** [1] - 1:20

## O

**obfuscate** [1] - 54:11
**object** [6] - 32:9, 134:10, 136:19, 137:4, 137:5, 164:24
**objection** [13] - 38:4, 38:24, 119:12, 149:23, 149:24, 158:10, 158:11, 164:12, 167:20, 167:21, 177:9, 187:11, 187:12
**objections** [2] - 37:16, 137:2
**objects** [1] - 32:8
**obligation** [2] - 10:6, 194:19
**obligations** [3] - 126:20, 134:23, 135:13

**obtained** [1] - 60:18
**obviously** [1] - 101:23
**occur** [4] - 15:6, 15:13, 44:16, 72:6
**occurred** [22] - 55:16, 56:11, 59:2, 63:8, 72:5, 72:19, 78:12, 79:4, 82:25, 83:16, 83:18, 83:21, 84:5, 84:8, 86:12, 86:15, 94:6, 94:12, 96:22, 118:20, 119:23, 181:5
**occurring** [1] - 61:24
**occurs** [3] - 57:13, 62:18, 85:19
**odd** [1] - 115:1
**OF** [6] - 1:1, 1:2, 1:7, 34:2, 137:17, 196:1
**OFAC** [1] - 50:6
**off-chain** [1] - 52:14
**offense** [1] - 135:15
**offer** [7] - 83:24, 128:16, 131:13, 131:18, 131:23, 154:16, 170:10
**offering** [5] - 25:16, 102:8, 107:18, 126:6, 134:18
**offerings** [1] - 54:17
**offers** [1] - 165:23
**office** [1] - 30:25
**officer** [1] - 168:7
**OFFICIAL** [1] - 196:1
**Official** [2] - 1:22, 196:10
**officially** [1] - 144:19
**often** [4] - 41:8, 142:25, 163:6, 167:25
**oftentimes** [2] - 40:24, 42:20
**on-chain** [15] - 44:16, 44:22, 49:17, 59:2, 63:7, 64:22, 67:25, 75:14, 78:12, 83:19, 83:21, 84:5, 86:16, 99:24, 110:9
**one** [102] - 16:8, 16:12, 18:13, 25:11, 29:12, 34:19, 41:23, 42:10, 45:2, 45:8, 46:19, 47:14, 47:15, 48:19, 49:10, 50:2, 50:3, 50:21, 52:6, 54:1, 54:2, 54:10, 55:4, 55:5, 58:23, 59:12, 60:5, 60:11, 60:12, 62:18, 63:14, 63:15, 63:18, 63:24, 64:2,

64:19, 65:19, 65:23, 68:9, 69:24, 74:9, 75:23, 79:2, 79:22, 87:4, 87:9, 88:19, 88:25, 91:12, 91:13, 92:12, 92:25, 93:19, 93:20, 97:2, 101:3, 105:4, 107:25, 108:22, 118:15, 119:20, 123:4, 126:6, 128:5, 133:3, 140:12, 140:14, 140:24, 141:14, 143:12, 146:1, 146:20, 156:21, 158:21, 159:7, 163:5, 163:8, 163:9, 163:18, 168:13, 168:19, 168:20, 168:23, 170:7, 174:15, 174:25, 177:20, 178:5, 178:13, 180:3, 181:1, 182:25, 183:8, 184:19, 188:3, 189:1, 192:18, 193:2, 193:8, 194:8
**one-time** [1] - 29:12
**ones** [1] - 184:8
**ongoing** [2] - 10:1, 138:13
**onion** [2] - 118:23, 120:6
**online** [1] - 31:3
**Ontario** [2] - 156:22, 156:25
**open** [10] - 12:20, 20:4, 40:20, 92:13, 147:14, 148:19, 155:9, 161:6, 161:11
**open-source** [1] - 20:4
**operate** [2] - 170:13, 191:19
**operated** [4] - 66:24, 67:10, 67:24, 171:21
**operates** [2] - 58:17, 170:12
**operating** [3] - 96:21, 171:25, 191:9
**opine** [1] - 126:21
**opining** [1] - 133:24
**opinion** [32] - 10:14, 24:3, 32:13, 66:23, 67:8, 67:10, 67:12, 67:23, 68:5, 70:3, 79:8, 84:3, 86:25, 87:14, 89:19, 99:4, 102:8, 102:9, 126:1,

126:9, 128:9, 128:17, 128:24, 132:14, 134:18, 136:14, 136:18, 136:20, 138:13, 154:3, 176:3, 177:7
**opinions** [2] - 126:6, 136:3
**opportunity** [5] - 3:23, 26:16, 32:22, 76:14, 124:25
**opposed** [1] - 53:15
**opposite** [2] - 19:4, 130:18
**opts** [1] - 63:22
**Orange** [1] - 79:24
**order** [29] - 8:12, 9:4, 10:4, 10:5, 10:18, 10:25, 13:16, 14:10, 14:12, 14:18, 14:23, 17:11, 21:1, 21:21, 28:8, 32:4, 49:16, 54:11, 57:17, 70:11, 86:18, 100:17, 100:18, 107:22, 153:12, 153:18, 190:15, 191:13, 194:23
**orders** [5] - 16:10, 17:9, 18:22, 19:22, 32:17
**ordinarily** [1] - 30:19
**organization** [1] - 36:22
**organizations** [5] - 36:12, 36:15, 36:19, 147:13, 148:17
**organized** [2] - 96:24, 141:14
**organizing** [1] - 36:2
**original** [4] - 16:24, 51:24, 51:25, 73:17
**OTC** [4] - 56:20, 60:23, 61:7, 61:14
**otherwise** [1] - 53:24
**ought** [4] - 31:16, 33:13, 131:2, 195:5
**ourselves** [3] - 40:12, 151:8, 155:6
**outgoing** [1] - 93:1
**outlined** [1] - 145:23
**output** [8] - 53:22, 60:9, 63:24, 64:2, 82:16, 116:16, 160:24
**output-based** [1] - 160:24
**outputs** [9] - 47:9, 60:22, 64:10, 65:9, 65:17, 83:2, 91:24,

121:20

**outside** [7] - 20:14, 60:4, 102:1, 102:3, 103:17, 133:10, 189:23

**overinclusive** [1] - 61:17

**overlap** [2] - 23:17, 189:23

**overlapping** [1] - 140:7

**overruled** [1] - 177:10

**oversight** [1] - 56:1

**overstates** [1] - 27:20

**overview** [2] - 45:3, 45:7

**own** [10] - 23:9, 86:24, 104:4, 131:23, 141:18, 159:13, 178:14, 179:13, 179:18, 181:18

**owner** [4] - 49:2, 58:2, 58:3, 161:18

**owners** [1] - 88:3

**ownership** [9] - 76:15, 77:6, 84:14, 89:18, 89:24, 106:11, 161:7, 163:21, 192:7

**owns** [1] - 92:14

## P

**p-a-s** [1] - 77:8

**p.m** [4] - 79:20, 194:17, 195:24

**P2MS** [1] - 111:22

**P2PK** [1] - 111:21

**P2SH** [2] - 113:2, 117:6

**P2SH-WPKH** [1] - 117:6

**Pac** [5] - 54:19, 61:12, 61:17, 61:23, 121:4

**Pac-Man** [5] - 54:19, 61:12, 61:17, 61:23, 121:4

**pace** [1] - 30:11

**page** [118] - 37:8, 69:1, 69:6, 69:9, 69:10, 69:14, 69:16, 70:19, 70:20, 70:22, 71:2, 71:3, 71:8, 71:9, 71:10, 71:11, 74:2, 74:25, 76:22, 77:19, 78:6, 78:21, 79:6, 79:9, 81:20, 81:21, 81:24, 82:12, 82:18, 82:20, 83:14, 83:23, 84:11, 84:12, 87:2, 88:9, 98:6, 99:2,

99:3, 99:5, 99:6, 99:7, 104:9, 104:12, 105:12, 106:16, 107:10, 107:11, 108:7, 108:8, 110:5, 110:16, 111:4, 111:9, 111:10, 111:14, 113:1, 116:13, 116:18, 117:2, 117:4, 118:1, 118:8, 118:10, 118:13, 118:22, 120:1, 120:9, 120:20, 121:6, 121:7, 121:12, 121:16, 121:23, 121:25, 122:9, 122:12, 128:6, 137:24, 138:1, 149:3, 149:4, 150:6, 156:1, 158:22, 159:10, 159:17, 160:19, 162:4, 162:18, 163:22, 167:7, 167:8, 174:18, 174:19, 174:24, 175:24, 180:6, 180:8, 180:20, 180:24, 181:25, 182:1, 182:5, 182:9, 182:12, 182:17, 182:20, 182:22, 184:10, 184:15, 190:4, 190:15

**PAGE** [2] - 2:2, 2:9

**pages** [3] - 123:3, 175:25, 187:17

**paid** [7] - 6:18, 7:5, 30:18, 30:19, 30:21, 142:17, 143:23

**Pamela** [3] - 35:22, 144:22, 145:1

**Pandora** [1] - 173:14

**paper** [1] - 178:8

**papers** [4] - 4:8, 32:16, 61:19, 111:8

**paragraph** [17] - 119:24, 147:9, 148:14, 149:3, 156:16, 156:19, 156:20, 156:21, 157:4, 161:2, 161:5, 163:23, 180:21, 182:8, 189:25, 190:4

**paragraphs** [4] - 160:20, 162:18, 162:19, 162:23

**parameters** [3] - 14:14, 14:16, 26:24

**paraphrasing** [1] - 64:8

**parasite** [1] - 41:13

**parasites** [1] - 8:6

**part** [22] - 8:3, 9:15, 25:14, 26:24, 27:19, 27:21, 29:2, 36:9, 54:17, 59:13, 68:2, 90:12, 93:16, 93:25, 118:15, 122:19, 130:14, 143:19, 154:25, 155:7, 155:8, 165:10

**participate** [2] - 81:6, 84:24

**participated** [3] - 65:18, 67:4, 145:15

**participates** [1] - 63:22

**participating** [1] - 117:9

**participation** [2] - 147:15, 148:20

**particular** [68] - 12:3, 26:8, 27:3, 40:16, 40:22, 43:6, 43:23, 47:9, 47:16, 50:24, 52:24, 53:12, 54:16, 55:10, 58:13, 59:6, 63:14, 64:12, 69:17, 70:13, 71:14, 73:11, 75:20, 76:13, 76:15, 78:14, 79:13, 86:14, 86:23, 88:14, 91:4, 92:14, 94:1, 97:11, 98:1, 98:25, 100:16, 100:17, 101:9, 105:6, 105:24, 110:10, 112:5, 112:23, 113:12, 115:10, 115:23, 116:24, 117:19, 117:23, 118:6, 118:25, 123:4, 128:3, 128:4, 129:12, 133:1, 138:18, 143:12, 145:21, 151:25, 176:8, 177:18, 178:20, 178:23, 191:9, 192:19, 192:22

**particularly** [4] - 26:19, 30:4, 129:20, 132:9

**partner** [2] - 140:12, 140:14

**party** [1] - 44:7

**PAS** [2] - 72:22, 74:5

**pas** [5] - 73:1, 74:5,

74:6, 74:9

**pass** [2] - 124:15, 137:13

**Passat** [5] - 88:14, 88:15, 88:22, 89:11

**Passats** [2] - 88:18, 88:19

**past** [4] - 28:25, 30:15, 79:17, 132:20

**pasted** [2] - 74:17, 96:7

**pasting** [1] - 68:15

**path** [1] - 45:17

**paths** [1] - 70:9

**pattern** [1] - 65:6

**patterns** [1] - 65:5

**pause** [2] - 92:22, 186:1

**paused** [1] - 36:5

**pay** [4] - 32:5, 32:6, 40:7, 65:22

**Pay** [5] - 63:7, 111:21, 111:22, 111:23

**Pay-to-Endpoint** [1] - 63:7

**Pay-to-Multisig** [1] - 111:22

**Pay-to-Public-Key** [1] - 111:21

**Pay-to-Taproot** [1] - 111:23

**Pay-to-Witness-Script-Hash** [1] - 111:22

**paying** [3] - 32:9, 65:19, 144:16

**PayJoin** [7] - 62:2, 62:18, 62:19, 63:6, 63:7, 65:14, 65:19

**payJoins** [1] - 154:7

**PayJoins** [2] - 62:17, 65:13

**payment** [4] - 30:9, 30:21, 33:4, 33:8

**payments** [3] - 30:16, 63:21, 156:17

**PDF** [1] - 138:3

**Pearlman** [1] - 3:12

**PEARLMAN** [2] - 1:15, 3:12

**peel** [8] - 43:2, 54:18, 54:20, 61:11, 61:13, 120:24, 121:4, 152:10

**peer** [1] - 153:1

**peer-reviewed** [1] - 153:1

**Pelker** [7] - 2:6, 3:6, 101:19, 124:17, 132:19, 134:15,

137:11

**PELKER** [95] - 1:13, 3:6, 20:24, 22:1, 22:14, 22:20, 23:4, 23:22, 24:17, 25:9, 25:13, 26:22, 28:13, 28:16, 29:9, 37:16, 38:4, 38:24, 67:11, 72:8, 72:15, 79:21, 80:7, 80:10, 80:23, 101:20, 102:10, 102:18, 109:5, 116:4, 119:12, 124:18, 124:23, 125:2, 125:12, 125:16, 125:21, 126:14, 126:17, 126:25, 127:4, 127:8, 127:10, 127:14, 132:22, 133:12, 133:14, 134:16, 135:7, 137:12, 137:16, 137:19, 138:2, 138:5, 139:1, 149:21, 150:2, 158:8, 158:14, 159:22, 164:10, 164:14, 165:3, 167:18, 167:24, 170:18, 170:23, 171:1, 177:14, 179:5, 179:6, 179:11, 179:12, 180:8, 180:9, 182:21, 186:4, 186:10, 186:13, 186:19, 186:20, 187:10, 187:15, 190:17, 190:21, 193:10, 193:15, 193:22, 194:3, 194:11, 194:18, 194:23, 195:8, 195:10, 195:22

**Pelker's** [3] - 29:16, 111:15, 179:1

**penalty** [1] - 158:23

**pencil** [1] - 60:1

**Pennsylvania** [1] - 1:14

**penny** [1] - 30:6

**people** [10] - 5:23, 7:5, 29:15, 40:22, 64:25, 71:24, 89:20, 138:15, 165:7, 165:10

**per** [5] - 63:25, 100:12, 144:9, 186:25

**per-user** [1] - 100:12
**perceived** [1] - 134:5
**percent** [24] - 23:18, 23:21, 63:2, 97:17, 109:10, 122:17, 122:19, 122:22, 122:23, 122:24, 123:8, 123:17, 123:18, 124:1, 154:11, 174:15, 174:25, 178:9, 178:16, 178:18, 180:15, 187:7
**percentage** [5] - 62:6, 122:16, 124:5, 144:5, 144:8
**percipient** [1] - 136:12
**perfect** [2] - 71:13, 104:15
**performance** [1] - 43:9
**perhaps** [8] - 12:25, 19:5, 27:19, 45:10, 64:14, 97:16, 116:24, 145:4
**period** [4] - 13:17, 131:19, 133:3, 171:24
**perjury** [1] - 158:23
**permission** [4] - 51:12, 51:25, 57:11, 137:13
**permit** [1] - 133:8
**permits** [1] - 138:19
**person** [8] - 10:12, 12:9, 22:3, 31:14, 52:9, 57:10, 65:19
**personal** [5] - 128:24, 136:1, 136:12, 159:20, 160:6
**personally** [1] - 153:4
**persons** [1] - 52:3
**perspective** [2] - 99:22, 100:24
**Phan's** [1] - 157:2
**phone** [4] - 3:25, 19:19, 31:1, 159:10
**photo** [2] - 40:2, 95:8
**phrase** [5] - 53:13, 70:13, 90:2, 90:7, 107:5
**pick** [1] - 28:4
**picture** [1] - 88:13
**pieces** [1] - 149:13
**PII** [2] - 52:11, 164:25
**pivot** [1] - 190:15
**pivoting** [1] - 190:22
**place** [6] - 12:6, 21:19, 63:3, 86:21, 95:23, 155:1

**placement** [1] - 165:5
**Plaintiff** [2] - 1:3, 1:10
**plan** [2] - 21:4, 193:20
**planning** [1] - 7:23
**platform** [1] - 165:21
**played** [1] - 119:7
**pleading** [1] - 9:18
**pleadings** [1] - 4:23
**PLLC** [1] - 1:19
**plus** [2] - 65:10, 123:11
**pocket** [1] - 65:21
**podium** [1] - 3:4
**point** [57] - 5:6, 8:21, 9:19, 9:22, 10:4, 10:8, 11:1, 11:15, 13:7, 26:22, 38:1, 38:21, 41:5, 47:14, 52:6, 55:1, 58:12, 63:9, 64:1, 65:5, 89:9, 89:10, 92:24, 93:2, 93:16, 97:9, 101:15, 103:8, 104:1, 110:6, 111:15, 112:25, 113:19, 113:21, 114:17, 114:18, 114:19, 115:2, 115:7, 115:9, 115:10, 115:23, 116:13, 116:15, 117:2, 117:4, 124:5, 129:10, 130:17, 133:19, 135:18, 145:9, 146:4, 159:10, 176:23, 177:23, 178:13
**pointing** [3] - 10:21, 86:9, 182:20
**points** [8] - 15:22, 115:18, 118:9, 118:12, 121:2, 139:16, 147:18, 148:23
**police** [2] - 36:17
**policy** [1] - 34:20
**polite** [1] - 145:5
**politely** [1] - 159:19
**pool** [8] - 6:10, 8:4, 8:18, 8:23, 10:2, 72:3, 149:9, 149:13
**pop** [1] - 105:4
**popular** [1] - 36:6
**portion** [5] - 13:10, 14:9, 21:21, 23:25, 85:3
**position** [6] - 13:3, 22:17, 29:18, 30:1, 35:16, 128:11
**positive** [1] - 41:17

**positives** [2] - 45:23, 62:1
**possession** [1] - 126:12
**possibilities** [1] - 89:13
**possibility** [2] - 95:10, 131:1
**possible** [15] - 31:21, 53:25, 88:19, 89:18, 93:21, 95:11, 99:25, 101:10, 107:21, 110:1, 141:7, 155:2, 159:15, 170:2, 189:9
**possibly** [11] - 16:18, 16:20, 18:14, 55:9, 58:5, 82:7, 92:14, 94:4, 106:19, 107:19, 172:3
**post** [1] - 40:24
**posted** [3] - 8:25, 10:4, 11:2
**potential** [1] - 165:20
**potentially** [3] - 24:25, 93:5, 128:19
**pound** [1] - 15:21
**PowerPoint** [9] - 38:15, 38:19, 38:20, 39:7, 39:11, 39:12, 39:17, 39:19, 68:20
**practicality** [1] - 95:19
**practically** [1] - 9:20
**practice** [1] - 84:4
**practices** [1] - 56:1
**precise** [1] - 24:14
**precisely** [3] - 23:2, 120:13, 146:15
**preexisting** [1] - 9:7
**prefer** [4] - 68:21, 69:19, 73:13, 99:21
**prejudice** [1] - 6:11
**prejudicial** [3] - 134:9, 136:8, 136:10
**prepare** [3] - 138:6, 158:18, 162:14
**prepared** [3] - 14:11, 159:8, 159:9
**preparing** [3] - 145:11, 161:20, 162:7
**present** [6] - 3:16, 21:11, 83:25, 91:5, 98:20, 118:18
**presentation** [2] - 154:13, 169:16
**presentations** [3] - 155:8, 155:11, 169:21
**presented** [5] - 90:15, 100:3, 131:2,

168:24, 168:25
**presenting** [2] - 101:25, 158:5
**presently** [1] - 90:22
**preserve** [1] - 137:1
**press** [6] - 6:7, 6:9, 8:19, 156:12, 158:1
**pretrial** [1] - 9:19
**pretty** [7] - 10:17, 12:6, 22:17, 29:3, 114:18, 180:3, 186:2
**preventing** [1] - 135:21
**previewed** [1] - 125:24
**previous** [2] - 49:1, 64:3
**previously** [6] - 4:6, 16:16, 111:5, 125:24, 137:22, 157:16
**price** [1] - 129:16
**primary** [2] - 64:14, 150:7
**prime** [3] - 114:7, 114:14, 115:1
**principal** [1] - 14:5
**printout** [1] - 183:9
**privacy** [1] - 54:12
**private** [35] - 13:22, 17:18, 25:17, 30:2, 32:4, 32:12, 32:14, 40:14, 52:4, 52:7, 52:10, 55:5, 57:8, 57:24, 57:25, 76:5, 88:2, 88:3, 95:22, 112:17, 114:6, 114:9, 114:11, 114:13, 114:17, 114:25, 115:7, 140:11, 140:12, 140:14, 140:15, 146:9, 192:21, 193:4
**privately** [1] - 29:24
**pro** [3] - 36:3, 36:4, 142:14
**probabilistic** [1] - 20:10
**probability** [6] - 45:23, 60:19, 87:16, 87:17, 130:11, 130:25
**probative** [2] - 134:9, 136:8
**problem** [5] - 13:22, 17:17, 58:15, 61:11, 65:1
**problems** [1] - 46:25
**procedure** [3] - 16:7, 16:8, 18:14
**proceed** [3] - 34:1, 34:9, 81:16

**proceeding** [2] - 7:8, 33:9
**proceedings** [1] - 196:6
**proceeds** [4] - 128:7, 128:8, 128:22, 172:25
**process** [16] - 6:20, 12:6, 15:19, 19:14, 19:15, 22:8, 44:5, 59:16, 85:14, 116:3, 147:21, 151:24, 152:9, 155:7, 165:8, 191:3
**processes** [1] - 43:12
**produce** [4] - 11:16, 11:17, 19:23, 32:15
**produced** [9] - 70:16, 72:24, 78:22, 90:8, 141:16, 142:9, 142:10, 142:12, 143:5
**produces** [2] - 164:5, 177:15
**product** [4] - 153:24, 154:9, 154:12, 157:10
**production** [6] - 14:23, 16:4, 17:10, 19:22, 100:9
**products** [5] - 149:18, 154:16, 155:3, 165:20, 165:24
**Professor** [2] - 64:4, 145:18
**professor** [1] - 35:17
**proffer** [4] - 102:7, 103:17, 103:21, 135:8
**profits** [4] - 128:8, 128:14, 128:23
**program** [2] - 36:5, 54:11
**progressing** [1] - 4:3
**projection** [1] - 134:4
**promptly** [1] - 32:24
**proof** [1] - 58:1
**proper** [4] - 69:16, 73:22, 100:24, 106:5
**property** [1] - 148:8
**proposed** [1] - 8:12
**proprietary** [12] - 13:25, 30:2, 147:17, 147:22, 148:1, 148:4, 148:6, 148:9, 148:21, 149:14, 149:19, 161:7
**prosecute** [1] - 30:1
**prosecution** [2] - 10:10, 64:15

prospective [4] - 155:8, 155:12, 155:16, 169:22
protect [1] - 54:12
protective [7] - 13:16, 14:11, 14:18, 17:11, 21:21, 28:8, 125:7
protocol [1] - 86:18
protocols [1] - 117:15
provide [15] - 12:8, 13:18, 22:15, 27:9, 51:25, 55:19, 56:1, 57:15, 62:21, 63:10, 135:14, 144:12, 145:21, 153:21, 189:20
provided [13] - 16:22, 23:23, 51:19, 56:17, 73:2, 99:18, 111:6, 111:16, 113:12, 120:22, 146:23, 146:25, 183:15
Providers [1] - 149:16
provides [3] - 45:14, 61:24, 62:25
providing [2] - 148:23, 169:25
province [2] - 133:23, 134:20
prudent [1] - 9:2
Public [1] - 111:21
public [31] - 5:15, 5:18, 5:22, 6:8, 10:13, 10:19, 57:7, 57:21, 57:22, 70:8, 71:18, 71:20, 71:24, 74:22, 79:15, 82:23, 88:4, 90:2, 105:8, 113:14, 114:5, 114:13, 114:16, 115:18, 116:2, 139:5, 164:2, 164:6, 168:21, 168:22
public's [1] - 5:12
publicly [10] - 44:17, 58:9, 72:2, 77:12, 83:17, 84:21, 104:23, 105:3, 159:24, 164:15
publishing [1] - 164:22
pull [23] - 53:11, 61:9, 75:19, 77:11, 78:25, 79:1, 86:8, 91:16, 96:13, 98:22, 100:22, 107:3, 127:5, 141:3, 141:20, 141:25, 142:1, 150:23, 151:12, 151:25,

152:25, 174:6, 175:5
pulled [3] - 93:14, 159:25, 174:21
pulling [1] - 122:4
pulls [2] - 141:17, 141:23
Pulls [1] - 121:24
purchased [1] - 174:10
purchasing [1] - 85:4
purely [1] - 136:10
purports [1] - 67:1
purpose [4] - 6:21, 130:5, 130:6, 159:23
purposes [8] - 6:21, 32:1, 39:1, 125:6, 132:17, 136:10, 164:17, 193:17
pursuant [1] - 33:10
pushing [2] - 80:24, 151:24
put [14] - 13:2, 13:24, 18:7, 22:17, 34:15, 39:12, 40:22, 98:21, 105:12, 106:17, 113:14, 125:18, 133:3, 154:5
puts [1] - 25:2
putting [3] - 72:11, 113:10, 157:22

## Q

Qassam [10] - 48:7, 48:19, 48:21, 49:10, 50:5, 50:24, 50:25, 51:3, 51:9, 52:21
quadrillion [2] - 115:1, 115:8
qualifications [3] - 37:5, 37:11, 126:8
qualified [1] - 127:22
quality [1] - 149:10
quantify [1] - 62:6
quarter [1] - 79:17
questions [9] - 22:7, 22:13, 22:20, 24:15, 109:10, 109:15, 129:6, 136:4, 150:25
quick [2] - 45:3, 79:22
quicker [1] - 16:3
quickly [6] - 36:2, 57:5, 81:5, 104:7, 118:13, 125:8
quite [12] - 32:19, 68:18, 86:2, 114:14, 115:17, 119:9, 121:11, 130:7, 136:8, 143:1, 155:20, 159:15

quote [5] - 107:12, 107:20, 156:21, 156:23
quoting [2] - 107:16, 108:16

## R

R1 [1] - 114:10
radiologic [2] - 34:14, 34:17
raise [6] - 8:8, 22:9, 33:22, 125:1, 125:2, 137:2
raised [2] - 29:24, 125:22
raises [2] - 104:2, 133:17
raising [2] - 6:13, 6:22
ran [1] - 24:11
RANDOLPH [1] - 1:8
randomly [1] - 114:6
range [1] - 193:25
ransomware [1] - 167:11
rapidly [2] - 147:17, 148:22
rate [10] - 11:21, 55:19, 122:16, 132:1, 142:19, 152:16, 152:22, 178:7, 178:8, 180:16
rates [3] - 11:21, 13:1, 132:24
rather [2] - 151:5, 186:24
rats [1] - 8:5
raw [2] - 149:15, 169:4
RBF [2] - 118:14
re [1] - 51:19
re-creation [1] - 51:19
reach [2] - 21:5, 81:12
reaching [1] - 80:3
Reactor [31] - 11:16, 17:5, 20:3, 22:16, 22:25, 24:11, 25:10, 25:19, 25:21, 26:2, 31:8, 31:20, 43:17, 43:20, 45:18, 45:20, 47:3, 53:1, 53:4, 53:7, 53:16, 53:22, 53:23, 61:20, 77:10, 77:11, 108:11, 108:17, 112:4
Reactor's [1] - 54:17
read [34] - 5:21, 6:14, 14:7, 16:14, 45:21, 55:6, 62:8, 62:11, 75:3, 98:2, 99:10, 105:16, 105:23,

108:13, 108:25, 109:22, 112:1, 139:5, 147:9, 148:14, 149:3, 150:24, 160:20, 162:3, 162:10, 162:21, 162:23, 163:22, 163:23, 167:15, 180:20, 180:25, 183:9, 183:23
readable [2] - 112:18, 116:17
reading [3] - 14:8, 153:8, 153:10
ready [1] - 33:12
real [8] - 6:10, 30:18, 57:5, 104:7, 126:7, 147:13, 148:17, 168:17
real-world [2] - 147:13, 148:17
realize [1] - 32:21
realizing [1] - 109:22
really [34] - 5:25, 11:24, 13:21, 14:20, 24:14, 25:4, 26:11, 32:19, 34:16, 39:22, 45:6, 63:11, 63:25, 65:24, 72:22, 94:25, 97:15, 103:8, 115:15, 130:8, 134:22, 144:10, 145:13, 145:22, 151:1, 152:23, 153:23, 157:17, 157:20, 178:23, 181:13, 191:25, 192:1, 193:16
reason [7] - 7:2, 7:5, 20:6, 31:14, 130:24, 133:7, 154:25
reasonable [5] - 10:12, 127:23, 130:10, 130:13, 130:25
reasonably [1] - 5:8
reasons [1] - 87:22
rebuild [3] - 70:14, 84:21, 104:22
rebuilt [1] - 51:23
rebut [2] - 128:7, 128:20
receive [3] - 6:20, 70:18, 73:4
received [10] - 56:21, 56:22, 57:3, 58:18, 58:19, 60:23, 73:6, 82:17, 100:17, 161:8
receiving [7] - 6:24,

78:2, 92:18, 127:12, 159:14, 163:6, 163:15
recently [3] - 96:24, 142:8, 142:10
recess [4] - 33:17, 79:20, 137:10, 186:14
recipient [1] - 70:1
recipients [2] - 70:2, 83:7
recognize [1] - 125:9
recollection [1] - 16:21
record [10] - 3:5, 66:14, 70:12, 78:25, 91:16, 100:25, 120:11, 122:5, 146:4
recorded [8] - 57:20, 57:21, 57:22, 57:24, 57:25, 59:3, 59:10, 119:18
records [37] - 73:2, 73:5, 73:7, 73:15, 73:16, 73:17, 78:9, 78:18, 78:22, 91:23, 92:9, 93:23, 97:24, 99:18, 99:19, 99:21, 99:23, 100:2, 100:17, 107:22, 107:24, 108:1, 110:1, 110:2, 141:9, 141:24, 142:3, 168:1, 173:10, 173:25, 174:2, 174:3, 191:13
recreate [1] - 102:20
red [1] - 79:25
red-eye [1] - 79:25
redact [3] - 160:3, 164:13, 164:16
redacted [2] - 164:21, 164:25
redirect [1] - 194:14
reduced [2] - 52:19, 56:20
refer [1] - 61:16
reference [3] - 108:23, 110:11, 175:14
referenced [2] - 118:24, 150:13
references [5] - 64:12, 81:21, 90:19, 111:5, 111:7
referencing [1] - 110:15
referred [1] - 42:4
referring [10] - 47:23, 55:25, 59:16, 65:7, 77:1, 77:20, 94:15,

113:23, 151:7, 191:11
**refers** [2] - 46:16, 98:10
**reflects** [1] - 13:10
**refresh** [1] - 57:5
**regarding** [12] - 4:2, 46:2, 56:7, 78:17, 96:10, 99:23, 111:16, 118:24, 120:23, 124:24, 156:12, 192:14
**regardless** [2] - 54:23, 157:21
**regards** [1] - 71:2
**register** [2] - 126:21, 135:15
**registered** [3] - 110:6, 110:9, 110:17
**registration** [2] - 126:20, 135:18
**regulate** [1] - 135:19
**regulated** [1] - 135:20
**regulations** [1] - 135:1
**regulatory** [7] - 133:25, 134:2, 134:7, 136:5, 136:15, 136:18, 149:7
**reimburse** [1] - 6:19
**reimbursement** [1] - 7:10
**reiterate** [1] - 72:18
**reiterated** [1] - 28:19
**reiterates** [1] - 28:17
**reject** [1] - 191:8
**related** [13] - 6:12, 40:23, 48:7, 51:7, 90:22, 92:7, 99:24, 104:25, 105:6, 111:7, 118:2, 158:16, 181:11
**relates** [1] - 152:6
**relating** [5] - 10:13, 111:8, 117:12, 142:5, 195:14
**relation** [5] - 38:9, 131:6, 133:25, 183:25, 184:7
**relationships** [1] - 164:3
**relative** [1] - 144:6
**relatively** [1] - 56:3
**release** [7] - 9:8, 10:10, 10:11, 156:12, 156:16, 157:6, 158:1
**released** [2] - 10:19, 142:16
**relevance** [2] - 133:21,

134:10
**relevant** [8] - 12:9, 13:18, 134:8, 136:6, 136:7, 136:11, 147:11, 153:13
**reliability** [2] - 133:7, 158:2
**reliable** [11] - 26:18, 153:25, 154:3, 154:5, 154:9, 154:13, 154:24, 155:4, 155:18, 156:6, 163:11
**reliably** [1] - 131:16
**rely** [2] - 27:18, 42:18
**relying** [2] - 153:20, 153:22
**remaining** [1] - 97:20
**remember** [4] - 62:17, 81:20, 96:11, 96:14
**remind** [3] - 81:19, 82:1, 120:4
**remotely** [1] - 81:6
**remove** [4] - 40:8, 159:13, 159:20, 160:5
**RenVM** [1] - 161:12
**repeat** [1] - 185:2
**repeated** [1] - 47:4
**repeatedly** [4] - 15:15, 21:13, 30:24, 103:11
**rephrase** [1] - 158:3
**replace** [1] - 105:10
**Replace** [2] - 118:14, 118:19
**replace-by-fee** [1] - 105:10
**Replace-by-Fee** [2] - 118:14, 118:19
**reply** [5] - 5:6, 8:16, 9:18, 193:24, 194:10
**report** [143] - 12:12, 22:22, 24:19, 25:2, 26:5, 26:23, 27:5, 38:9, 38:13, 38:15, 39:6, 60:21, 63:16, 66:10, 67:2, 67:3, 67:4, 68:2, 68:3, 68:5, 68:14, 68:17, 69:2, 69:5, 69:6, 69:9, 69:11, 69:21, 71:9, 71:10, 72:25, 73:3, 73:4, 74:2, 74:3, 75:18, 76:22, 77:1, 77:3, 77:19, 77:20, 78:5, 78:10, 79:6, 81:20, 81:21, 81:25, 82:13, 82:14, 82:15, 82:18, 82:21, 83:12, 83:14, 83:23,

84:11, 84:12, 84:17, 87:2, 87:20, 88:10, 90:19, 98:5, 98:7, 99:2, 99:3, 99:6, 99:7, 101:8, 101:11, 102:17, 102:22, 103:10, 104:2, 104:10, 104:12, 105:12, 106:1, 106:13, 106:16, 107:10, 107:11, 107:12, 108:7, 108:9, 110:4, 110:5, 110:20, 111:1, 111:4, 111:6, 116:18, 117:3, 117:4, 118:12, 124:13, 137:22, 137:25, 138:6, 138:11, 140:20, 140:22, 140:24, 140:25, 141:1, 142:13, 145:2, 145:3, 145:11, 145:17, 145:24, 150:6, 150:13, 150:24, 152:19, 156:1, 157:11, 157:12, 157:18, 157:20, 157:21, 162:14, 166:5, 167:3, 167:14, 167:15, 169:17, 174:24, 177:4, 180:5, 180:20, 181:25, 182:9, 182:13, 184:10, 186:25, 187:16, 190:14
**reporter** [3] - 66:12, 108:12, 125:7
**REPORTER** [1] - 196:1
**Reporter** [3] - 1:22, 1:22, 196:10
**reporter's** [1] - 125:13
**reporters** [1] - 5:21
**Reports** [1] - 111:11
**reports** [15] - 12:14, 36:6, 62:8, 62:11, 62:14, 66:17, 67:8, 67:23, 68:11, 135:20, 144:13, 173:13, 175:8, 175:10, 179:14
**repository** [1] - 148:16
**represent** [2] - 116:6, 157:20
**representation** [12] - 44:23, 56:16, 58:7,

58:11, 75:9, 75:13, 83:20, 83:23, 84:8, 99:5, 104:9, 112:9
**representations** [1] - 132:8
**representative** [1] - 82:16
**represented** [6] - 72:6, 72:24, 78:24, 79:14, 84:24, 106:14
**Request** [1] - 110:12
**request** [7] - 7:9, 16:20, 16:24, 56:21, 70:18, 138:17, 159:20
**requested** [2] - 98:3, 159:12
**requesting** [1] - 119:25
**requests** [3] - 17:20, 18:12, 45:25
**require** [1] - 133:8
**required** [2] - 126:21, 135:20
**requiring** [1] - 191:15
**reschedule** [1] - 80:15
**research** [1] - 178:11
**researchers** [3] - 147:16, 148:21, 149:11
**reserve** [3] - 138:12, 138:15, 138:16
**reserving** [1] - 7:12
**residence** [1] - 88:15
**resources** [3] - 19:6, 19:8
**respect** [13] - 3:24, 4:19, 11:1, 14:11, 23:19, 67:6, 102:5, 131:14, 131:19, 134:14, 146:10, 148:10, 157:19
**respectfully** [1] - 18:18
**respond** [5] - 45:25, 103:5, 104:4, 153:12, 190:25
**responded** [1] - 64:10
**response** [3] - 7:21, 10:24, 191:15
**responses** [1] - 12:5
**responsibilities** [1] - 144:7
**responsible** [2] - 18:11, 155:20
**rest** [4] - 33:14, 66:5, 94:22, 120:1
**resubmit** [1] - 42:10
**result** [1] - 31:19
**results** [2] - 25:8,

61:18
**retain** [1] - 31:12
**retained** [4] - 139:4, 158:15, 161:21, 171:8
**retraced** [1] - 55:16
**return** [5] - 18:21, 18:22, 19:18, 19:20, 31:1
**returning** [1] - 186:21
**returns** [1] - 169:4
**retweeting** [2] - 5:15, 5:18
**reveal** [2] - 12:11, 12:15
**revealing** [1] - 47:1
**reveals** [1] - 117:8
**review** [18] - 19:23, 28:23, 66:17, 100:25, 143:12, 144:13, 145:3, 153:11, 153:18, 157:18, 172:23, 176:1, 176:2, 177:5, 183:15, 183:16, 183:18, 183:19
**Review** [1] - 148:15
**reviewed** [21] - 12:12, 66:20, 68:2, 70:17, 111:1, 141:2, 141:10, 141:18, 141:22, 142:5, 142:12, 145:1, 153:1, 153:4, 154:1, 169:4, 174:3, 174:5, 174:8, 175:7, 175:12
**Reviewing** [1] - 117:7
**reviewing** [9] - 14:15, 67:8, 67:22, 68:11, 138:13, 140:19, 168:15, 174:6, 177:4
**RF** [2] - 118:13
**right-hand** [13] - 44:25, 45:20, 48:18, 49:7, 50:12, 61:6, 61:14, 69:10, 71:16, 83:7, 99:8, 176:9, 188:11
**right-most** [1] - 183:5
**rights** [4] - 13:25, 16:5, 192:7
**risk** [9] - 6:10, 165:23, 165:25, 166:1, 166:4, 166:13, 166:20, 166:24
**risky** [2] - 166:9, 166:11
**RMR** [2] - 1:22, 196:9
**Road** [32] - 23:14, 71:16, 73:2, 73:5,

73:7, 73:13, 73:16, 73:17, 74:9, 75:1, 77:5, 77:8, 77:23, 77:25, 78:9, 78:18, 78:22, 78:25, 79:12, 82:5, 83:5, 83:15, 99:19, 173:4, 180:15, 180:21, 180:24, 181:4, 181:8, 181:11
**road** [2] - 88:18, 116:5
**role** [2] - 36:9, 119:7
**Roman** [6] - 3:3, 3:16, 3:19, 66:23, 67:10, 89:20
**ROMAN** [1] - 1:5
**Room** [2] - 1:23, 196:10
**room** [2] - 4:5, 11:9
**root** [12] - 53:24, 176:10, 182:16, 183:6, 183:13, 184:3, 187:19, 188:1, 188:7, 188:8, 188:21, 189:1
**roughly** [1] - 110:16
**rounds** [1] - 55:18
**row** [2] - 55:16, 182:25
**rule** [5] - 9:25, 10:17, 10:24, 117:18, 192:11
**Rule** [11] - 4:19, 4:25, 5:2, 7:22, 10:6, 10:8, 10:20, 11:5, 16:17, 18:13, 18:20
**rules** [9] - 6:15, 6:23, 7:15, 9:7, 9:10, 9:11, 14:10, 17:24
**run** [14] - 22:16, 22:18, 22:19, 22:21, 22:22, 22:24, 25:7, 29:17, 31:13, 31:19, 40:11, 176:2, 181:12
**running** [2] - 13:23, 151:9
**Russia** [1] - 159:14

## S

**safe** [2] - 55:5, 149:7
**safety** [1] - 159:13
**sake** [1] - 178:25
**salary** [1] - 143:23
**sales** [3] - 128:9, 128:23, 173:6
**Samourai** [2] - 63:18, 63:20
**sanctioned** [5] - 50:5, 50:10, 144:19, 147:13, 148:17

**sand** [1] - 15:21
**Sarah** [1] - 178:8
**save** [1] - 113:7
**saved** [2] - 174:14, 175:5
**saw** [3] - 48:25, 91:2, 92:2
**scam** [1] - 36:7
**scams** [1] - 40:23
**schedule** [1] - 16:3
**scheduled** [1] - 80:14
**Scholl** [20] - 27:6, 63:13, 74:2, 75:11, 75:18, 79:8, 82:12, 83:11, 88:8, 90:19, 92:4, 98:5, 99:1, 99:9, 101:11, 104:10, 105:25, 106:17, 107:17, 109:2
**Scholl's** [36] - 68:2, 68:5, 69:11, 70:3, 71:10, 71:15, 72:7, 76:22, 78:4, 78:6, 79:6, 81:21, 81:25, 82:15, 83:13, 83:20, 83:22, 84:12, 87:2, 87:11, 94:24, 99:4, 99:6, 104:9, 106:13, 106:15, 107:11, 108:8, 110:3, 110:20, 150:13, 175:8, 179:14, 180:20, 181:23, 190:14
**school** [1] - 35:17
**science** [1] - 18:4
**scientific** [6] - 11:17, 13:2, 18:5, 61:19, 111:8, 153:2
**scientist** [3] - 125:18, 126:15, 148:5
**scooch** [1] - 99:15
**scope** [2] - 102:17, 104:2
**scoring** [8] - 165:23, 165:25, 166:1, 166:2, 166:4, 166:13, 166:20, 166:24
**scrape** [1] - 40:12
**screen** [10] - 44:13, 61:1, 69:5, 69:9, 69:10, 99:9, 102:19, 141:3, 141:4, 174:7
**screens** [1] - 59:24
**screenshot** [3] - 51:21, 51:22, 120:8
**screenshots** [5] - 118:22, 118:23,

120:3, 120:4, 120:16
**script** [1] - 176:2
**Script** [1] - 111:22
**scroll** [4] - 70:23, 71:9, 71:11, 78:8
**search** [7] - 92:3, 96:8, 132:6, 169:2, 169:3, 169:4
**seasoned** [1] - 52:22
**seated** [1] - 33:25
**second** [12] - 23:20, 29:11, 37:3, 71:8, 88:11, 92:23, 112:25, 116:12, 149:3, 160:20, 187:18, 187:22
**second-to-last** [1] - 116:12
**secondly** [1] - 86:16
**SECP256K1** [1] - 114:10
**Secrecy** [1] - 135:12
**Secret** [1] - 36:20
**section** [5] - 71:1, 119:5, 119:19, 147:25, 184:12
**Section** [3] - 116:14, 118:10, 123:6
**sections** [2] - 68:13, 68:14
**sector** [4] - 140:11, 140:12, 140:15, 146:9
**security** [1] - 159:12
**see** [128] - 7:25, 12:20, 12:21, 12:22, 13:5, 13:11, 18:6, 19:1, 25:7, 26:10, 30:12, 31:10, 32:2, 33:1, 33:15, 37:7, 39:17, 42:12, 44:18, 45:2, 46:15, 46:19, 47:4, 48:9, 51:18, 53:18, 53:19, 53:20, 53:21, 54:6, 56:12, 56:13, 57:1, 58:4, 58:21, 59:22, 59:23, 60:1, 60:10, 60:12, 60:22, 61:3, 61:6, 61:23, 65:9, 65:16, 66:1, 66:10, 67:25, 68:1, 69:7, 72:22, 75:1, 75:7, 75:20, 77:9, 77:12, 77:25, 78:3, 78:24, 79:14, 80:2, 80:22, 81:4, 82:5, 83:4, 83:8, 84:17, 84:23, 85:18, 86:8, 88:9, 88:12, 91:17, 91:18, 91:25, 92:3,

93:19, 94:7, 95:6, 95:7, 95:14, 96:8, 97:22, 100:8, 100:15, 101:7, 103:2, 103:22, 104:14, 104:18, 105:5, 105:15, 105:17, 107:1, 107:2, 109:25, 110:9, 110:10, 111:10, 111:20, 112:19, 113:14, 118:18, 120:16, 122:9, 128:21, 134:10, 136:11, 138:18, 141:20, 156:24, 159:16, 166:23, 172:1, 174:24, 175:5, 182:24, 183:17, 186:4, 186:8, 188:2, 188:5, 189:22, 195:11, 195:23
**seed** [5] - 70:13, 90:2, 90:7, 107:5, 112:17
**seeing** [4] - 20:7, 100:8, 118:4, 168:19
**seek** [1] - 104:20
**seeking** [3] - 7:10, 7:16, 7:18
**seeks** [2] - 19:20, 149:21
**seem** [5] - 12:7, 13:25, 22:17, 102:17, 136:21
**SEFRANEK** [1] - 196:3
**Sefranek** [3] - 1:22, 196:9, 196:9
**segregated** [3] - 95:12, 113:6, 113:15
**SegWit** [9] - 95:12, 113:6, 113:13, 113:17, 117:6, 117:12, 117:14, 117:17, 117:23
**seize** [1] - 173:9
**seized** [5] - 30:4, 157:16, 169:6, 169:7, 173:24
**selected** [1] - 9:20
**self** [7] - 52:2, 52:20, 56:14, 56:15, 75:25, 106:6, 106:7
**self-custody** [5] - 52:2, 52:20, 56:14, 56:15, 75:25
**self-custodying** [1] - 106:7
**self-hosted** [1] - 106:6

**sell** [1] - 32:5
**selling** [1] - 62:22
**send** [4] - 4:2, 57:17, 71:15, 120:18
**sender** [2] - 70:1, 163:17
**senders** [1] - 70:1
**sending** [8] - 58:8, 75:2, 163:5, 163:9, 163:14, 163:15, 163:19, 163:21
**senior** [1] - 171:14
**sense** [21] - 26:8, 28:1, 62:20, 62:25, 63:1, 77:7, 77:14, 91:14, 91:21, 93:11, 99:22, 101:5, 103:1, 112:7, 112:10, 115:13, 119:8, 120:10, 140:3, 141:21, 152:24
**senses** [2] - 52:18, 94:24
**sent** [10] - 4:11, 52:2, 57:17, 74:8, 74:10, 77:7, 174:9, 180:21, 180:25, 181:4
**sentence** [2] - 116:14, 190:10
**Sentry** [5] - 121:24, 147:2, 147:6, 147:7, 147:11
**separate** [17] - 41:12, 44:23, 45:11, 47:23, 48:23, 48:24, 53:25, 67:5, 78:4, 100:10, 100:12, 100:13, 113:13, 133:20, 141:17, 142:9
**separated** [3] - 44:14, 46:5, 47:6
**separately** [2] - 6:18, 53:11
**separating** [1] - 45:9
**serious** [2] - 129:6, 131:24
**serve** [1] - 158:16
**servers** [2] - 91:21, 171:23
**service** [9] - 54:11, 62:22, 62:24, 63:15, 86:17, 106:5, 106:7, 117:19, 132:10
**Service** [6] - 3:24, 4:1, 36:21, 110:7, 110:15, 149:16
**services** [9] - 25:17, 60:24, 62:21, 63:9, 63:17, 106:8, 117:16, 118:23,

142:19
**servicing** [1] - 139:20
**serving** [2] - 18:12, 193:2
**set** [12] - 20:2, 23:25, 24:7, 40:16, 54:7, 55:8, 55:10, 184:19, 185:1, 185:4, 185:16
**sets** [2] - 12:24, 95:22
**several** [3] - 28:23, 142:11, 163:3
**severely** [1] - 17:24
**Seville** [1] - 36:17
**sexual** [2] - 173:22, 174:10
**shall** [1] - 10:10
**share** [6] - 29:4, 29:5, 51:16, 140:5, 140:13, 140:14
**shared** [2] - 46:1, 149:8
**Sheep** [3] - 173:14, 180:4, 180:10
**Sheet** [1] - 147:6
**sheet** [2] - 147:6, 149:1
**sheets** [2] - 100:13, 149:18
**shell** [2] - 30:5, 32:2
**shelling** [1] - 30:6
**shifted** [1] - 139:19
**shocking** [1] - 20:16
**short** [1] - 68:9
**shotgun** [1] - 63:23
**show** [12] - 28:11, 46:18, 66:7, 67:1, 67:4, 79:1, 91:15, 101:9, 102:11, 120:7, 141:4, 163:18
**showing** [8] - 50:20, 78:6, 88:15, 102:24, 121:17, 122:3, 132:17, 158:20
**shown** [1] - 102:25
**shows** [3] - 22:22, 83:14, 124:1
**sic** [1] - 5:8
**sic)** [1] - 124:22
**side** [36] - 44:14, 44:25, 45:20, 48:6, 48:18, 49:7, 50:12, 51:18, 58:9, 61:6, 61:14, 65:10, 69:8, 69:10, 71:16, 78:2, 83:4, 83:7, 83:16, 84:16, 90:10, 91:1, 91:22, 92:17, 92:19, 94:3, 96:3, 97:3, 97:6, 98:15, 99:8, 102:24, 102:25,

176:9, 188:11
**sign** [4] - 4:9, 15:1, 17:11, 40:7
**signature** [4] - 37:8, 58:1, 137:24, 158:22
**significance** [3] - 110:8, 112:2, 113:24
**significant** [3] - 8:3, 14:12, 172:5
**signing** [2] - 41:14, 151:9
**Silk** [32] - 23:14, 71:16, 73:2, 73:5, 73:7, 73:13, 73:16, 73:17, 74:9, 75:1, 77:5, 77:8, 77:22, 77:25, 78:9, 78:17, 78:22, 78:25, 79:12, 82:5, 83:5, 83:15, 99:19, 173:4, 180:15, 180:21, 180:24, 181:4, 181:8, 181:11
**similar** [2] - 23:10, 71:12
**simple** [3] - 20:6, 114:14, 132:6
**simply** [13] - 16:3, 21:15, 22:15, 31:23, 31:25, 32:14, 47:24, 89:10, 103:13, 129:2, 134:17, 136:14, 159:24
**single** [28] - 41:5, 45:1, 45:20, 45:22, 46:4, 46:12, 46:13, 47:6, 47:7, 47:24, 49:8, 49:15, 50:17, 51:6, 53:5, 53:11, 58:16, 61:8, 68:22, 86:9, 86:13, 141:7, 141:10, 141:12, 177:23, 178:13, 179:7, 189:1
**single-clustering** [1] - 49:15
**single-entity** [17] - 45:1, 45:20, 45:22, 46:4, 46:12, 46:13, 47:6, 47:7, 47:24, 49:8, 50:17, 51:6, 53:5, 58:16, 61:8, 86:9, 86:13
**sit** [3] - 15:4, 28:7, 164:19
**site** [5] - 167:10, 167:11, 173:21, 174:1, 174:10
**sites** [2] - 173:10, 173:18

**sitting** [5] - 28:10, 94:5, 130:4, 130:8, 192:6
**situation** [1] - 17:25
**six** [3] - 88:1, 88:2
**sizes** [1] - 111:25
**skating** [1] - 5:24
**skip** [1] - 162:22
**skipped** [1] - 109:21
**slide** [24] - 39:20, 39:21, 40:4, 42:19, 44:10, 45:22, 47:22, 48:3, 48:24, 49:1, 49:23, 51:2, 53:18, 54:3, 55:13, 56:12, 56:25, 58:6, 58:20, 59:21, 60:25, 61:25, 66:7
**slides** [3] - 65:8, 169:21, 170:4
**slightly** [2] - 113:22, 161:15
**slowing** [1] - 16:10
**small** [2] - 78:3, 172:13
**smaller** [2] - 83:9, 172:9
**smart** [3] - 64:25, 161:16, 161:17
**smooth** [1] - 22:10
**snapshot** [1] - 82:3
**so-called** [1] - 165:11
**soft** [1] - 117:17
**software** [13] - 12:24, 13:4, 14:24, 18:6, 20:15, 27:24, 30:2, 31:25, 53:22, 54:11, 63:22, 115:20, 117:15
**solid** [1] - 131:9
**solutions** [2] - 149:7, 149:8
**someone** [16] - 13:14, 14:5, 21:19, 28:3, 31:15, 41:22, 42:5, 50:15, 52:22, 53:4, 62:20, 86:17, 92:5, 92:13, 110:6, 120:7
**sometimes** [4] - 31:1, 45:17, 46:1, 115:21
**somewhere** [2] - 31:7, 142:20
**soon** [1] - 186:3
**sophistication** [1] - 85:1
**sorry** [34] - 18:10, 53:2, 66:25, 72:15, 72:18, 76:24, 77:1, 78:19, 88:9, 88:11, 99:6, 123:13,

130:17, 137:8, 146:3, 152:4, 155:10, 156:19, 156:20, 156:24, 157:3, 161:6, 166:17, 167:4, 170:4, 175:21, 176:24, 179:18, 180:23, 183:2, 184:11, 184:12, 185:2, 194:13
**sort** [23] - 6:4, 28:20, 53:15, 84:1, 85:9, 85:19, 91:6, 93:9, 119:1, 119:17, 126:1, 129:4, 129:5, 135:22, 140:23, 146:7, 147:25, 150:12, 152:9, 160:13, 166:1, 170:19, 191:20
**sorts** [1] - 135:20
**sound** [4] - 70:4, 70:5, 79:9, 131:9
**sounds** [2] - 29:21, 158:6
**source** [52] - 12:15, 15:15, 16:12, 16:15, 16:21, 16:23, 17:10, 17:14, 18:16, 18:21, 19:1, 19:21, 19:22, 19:23, 20:1, 20:4, 21:3, 21:16, 21:21, 25:4, 25:5, 39:23, 41:3, 43:21, 43:22, 44:1, 48:5, 48:10, 48:12, 48:14, 50:12, 56:14, 60:20, 64:14, 76:17, 87:9, 87:10, 92:13, 98:16, 119:22, 147:14, 148:19, 153:4, 153:8, 153:12, 153:18, 154:1, 161:6, 161:11, 176:7
**source-code** [1] - 25:4
**sources** [8] - 6:25, 7:16, 46:17, 48:23, 50:11, 127:12, 167:9, 172:24
**space** [7] - 17:18, 96:18, 113:7, 136:5, 165:7, 170:5, 170:9
**Spanish** [1] - 36:17
**spanning** [1] - 187:17
**speaking** [8] - 18:10, 68:7, 134:24, 140:1, 146:3, 165:6, 170:3, 172:19
**special** [2] - 6:18,

65:13
**specialized** [2] - 126:5, 136:23
**specific** [8] - 97:13, 114:8, 141:23, 160:18, 172:16, 176:16, 176:22, 194:4
**specifically** [9] - 53:10, 63:13, 70:6, 91:25, 92:7, 137:21, 161:22, 166:25, 176:17
**specificity** [2] - 26:7, 28:21
**speculation** [1] - 109:3
**speculative** [3] - 131:7, 132:12, 134:1
**speeding** [1] - 16:9
**spend** [68] - 19:6, 28:10, 44:19, 46:6, 46:9, 46:15, 47:25, 48:14, 49:5, 52:4, 57:11, 58:2, 60:3, 60:10, 75:9, 75:10, 75:17, 76:24, 77:4, 77:21, 78:1, 82:5, 82:7, 82:10, 83:5, 85:9, 85:11, 95:8, 97:11, 120:24, 123:20, 123:25, 130:7, 140:19, 142:21, 143:2, 143:11, 144:11, 160:23, 162:19, 163:6, 163:7, 163:10, 163:24, 176:11, 177:12, 178:1, 178:21, 179:21, 182:5, 182:7, 182:10, 182:16, 183:1, 183:6, 183:10, 184:4, 184:20, 184:21, 185:1, 185:5, 185:8, 185:11, 185:15, 185:17, 185:21, 187:22
**spending** [13] - 44:18, 58:2, 58:7, 68:21, 79:3, 86:23, 95:7, 143:9, 152:13, 183:25, 184:1, 184:8
**spends** [6] - 48:13, 60:4, 71:17, 87:24, 177:19
**spent** [18] - 44:20, 48:22, 49:16, 52:16,

53:12, 56:18, 57:2, 57:3, 60:10, 61:10, 69:24, 75:14, 85:7, 85:11, 85:14, 87:8, 106:21, 140:21

**spidey** [2] - 52:18, 94:23

**split** [1] - 60:15

**spoken** [1] - 168:25

**spot** [1] - 103:20

**spreadsheet** [5] - 100:3, 100:6, 141:10, 141:12, 175:10

**spreadsheets** [4] - 73:19, 141:13, 141:18, 142:8

**squishy** [2] - 95:25, 96:1

**staff** [3] - 36:8, 186:7, 186:12

**stake** [1] - 130:16

**stand** [9] - 9:11, 9:14, 24:2, 25:20, 33:15, 35:19, 101:17, 101:22, 102:20

**stand-alone** [1] - 25:20

**standard** [4] - 5:7, 55:25, 114:18, 115:22

**standards** [7] - 55:23, 56:5, 56:9, 114:8, 134:4, 160:22, 170:1

**standing** [3] - 18:24, 22:7, 22:9

**stands** [2] - 113:6, 152:2

**start** [9] - 18:12, 35:3, 35:4, 71:10, 71:14, 111:3, 114:16, 194:17, 194:25

**started** [1] - 132:7

**starting** [12] - 3:5, 101:2, 108:10, 111:14, 118:9, 118:10, 129:20, 162:24, 163:22, 180:21, 186:17, 187:20

**State** [2] - 35:14, 159:25

**state** [7] - 3:4, 84:6, 138:20, 150:6, 156:2, 177:25, 178:16

**statement** [5] - 10:11, 12:8, 37:10, 139:25, 159:2

**statements** [4] - 9:8,

10:19, 139:5

**STATES** [3] - 1:1, 1:2, 1:8

**states** [5] - 113:2, 117:3, 117:4, 158:23, 185:19

**States** [4] - 1:23, 3:3, 3:7, 36:18

**stating** [3] - 56:21, 117:21, 139:17

**statistic** [1] - 65:3

**statistical** [1] - 64:23

**statistics** [1] - 55:19

**status** [1] - 6:17

**stay** [1] - 186:10

**stenographic** [1] - 196:5

**step** [3] - 42:10, 81:7, 165:10

**steps** [4] - 85:24, 114:6, 165:4, 165:6

**STERLINGOV** [1] - 1:5

**Sterlingov** [28] - 3:3, 3:16, 3:19, 6:16, 7:8, 18:2, 20:12, 33:9, 66:24, 67:6, 67:10, 67:24, 81:8, 81:14, 87:13, 89:20, 90:5, 90:10, 90:15, 90:23, 97:7, 101:4, 106:25, 107:2, 126:12, 128:13, 132:10, 135:2

**Sterlingov's** [9] - 16:5, 84:17, 87:7, 90:9, 98:12, 127:11, 128:22, 130:16, 142:16

**STILL** [3] - 2:3, 34:3, 137:18

**Still** [5] - 33:21, 67:22, 89:17, 138:6, 190:22

**still** [60] - 4:1, 4:3, 4:5, 4:12, 12:14, 13:6, 16:25, 23:1, 23:19, 24:24, 26:7, 33:13, 33:14, 33:19, 34:5, 34:12, 37:20, 38:9, 39:5, 39:11, 39:17, 64:18, 66:17, 68:24, 69:13, 81:19, 85:15, 93:4, 103:14, 104:7, 106:21, 112:16, 116:12, 116:16, 117:20, 124:12, 137:20, 138:10, 138:13, 138:23, 139:2, 140:19, 141:9, 145:11, 145:25, 147:20,

149:17, 153:7, 154:15, 157:3, 158:15, 160:1, 164:21, 165:4, 167:25, 169:16, 171:2, 186:21

**still's** [4] - 12:12, 22:21, 69:9, 69:11

**stock** [1] - 129:17

**stolen** [1] - 56:18

**stop** [6] - 8:11, 190:17, 194:16, 194:19, 194:21, 194:22

**stopped** [2] - 61:4, 76:20

**stopping** [1] - 25:9

**stores** [1] - 161:3

**stories** [1] - 96:17

**straight** [1] - 162:22

**Street** [3] - 1:11, 1:20, 132:3

**stretch** [1] - 8:15

**strike** [1] - 134:12

**struck** [1] - 68:8

**structure** [1] - 63:21

**structuring** [1] - 65:9

**studies** [3] - 47:15, 50:22, 62:6

**Study** [1] - 56:13

**study** [5] - 47:19, 58:4, 65:8, 167:8, 167:9

**stuff** [3] - 17:23, 20:5, 54:1

**subcustomer** [1] - 192:19

**subheader** [2] - 113:1, 116:13

**subject** [5] - 13:15, 14:18, 21:20, 28:8, 138:19

**submit** [10] - 7:4, 31:3, 31:4, 31:22, 40:18, 131:6, 136:6, 136:17, 159:21, 159:22

**submits** [1] - 130:21

**submitted** [4] - 119:24, 145:2, 146:14, 160:8

**subpoena** [11] - 18:20, 19:21, 40:16, 41:10, 42:10, 60:23, 168:11, 168:12, 168:13, 168:16, 191:8

**subpoenas** [2] - 168:1, 190:24

**subreddit** [1] - 172:21

**subsequent** [1] -

160:7

**substance** [2] - 11:25, 145:14

**substantive** [2] - 145:19, 160:7

**sufficient** [1] - 132:17

**sufficiently** [5] - 125:22, 131:15, 154:12, 155:17, 156:5

**suggest** [2] - 50:19, 102:18

**suggested** [3] - 15:2, 15:4, 35:17

**suggestion** [1] - 29:16

**sum** [2] - 83:10, 106:23

**summaries** [1] - 126:2

**summarize** [1] - 122:14

**summary** [3] - 37:5, 37:10, 128:10

**summing** [1] - 83:11

**Superior** [2] - 147:10, 148:14

**supplemental** [4] - 37:5, 111:6, 144:13, 183:22

**support** [3] - 154:20, 154:21, 154:22

**supporting** [1] - 18:5

**suppose** [2] - 102:13, 104:1

**supposed** [1] - 43:9

**surprised** [2] - 102:5, 102:21

**suspect** [1] - 130:12

**suspending** [1] - 85:10

**suspicion** [1] - 96:24

**sustain** [1] - 14:12

**sustained** [1] - 119:13

**sweep** [3] - 106:1, 106:3, 106:4

**switch** [2] - 116:22, 194:23

**switched** [1] - 116:15

**swore** [1] - 159:1

**sworn** [7] - 33:24, 146:14, 146:25, 157:25, 158:4, 158:6, 168:7

**symbol** [1] - 106:14

**system** [1] - 135:22

**T**

**Tab** [6] - 37:1, 37:20, 38:12, 38:18, 69:3, 137:21

**Table** [2] - 111:14, 113:1

**table** [7] - 68:9, 68:12, 111:18, 113:1, 113:22, 183:3, 184:18

**tables** [1] - 182:22

**tailored** [1] - 26:25

**taint** [2] - 6:10, 8:18

**tainting** [3] - 8:4, 8:23, 10:2

**talks** [1] - 63:12

**Tamara** [3] - 1:22, 196:9, 196:9

**TAMARA** [1] - 196:3

**Taproot** [1] - 111:23

**targeting** [1] - 40:14

**teach** [2] - 155:23

**teacher** [1] - 35:23

**team** [2] - 40:18, 149:11

**teams** [1] - 170:3

**technical** [2] - 57:14, 57:15

**technique** [5] - 95:17, 163:1, 163:4, 163:10, 163:13

**techniques** [1] - 63:11

**technology** [2] - 34:14, 34:18

**teed** [1] - 32:21

**Telegram** [1] - 48:19

**temporal** [1] - 85:18

**ten** [9] - 87:23, 94:20, 166:6, 166:7, 166:8, 166:15, 166:16, 173:17, 186:16

**term** [6] - 41:13, 85:8, 86:2, 86:3, 106:2, 112:6

**termed** [5] - 47:10, 53:24, 85:25, 87:21, 188:9

**terming** [1] - 59:2

**terminology** [1] - 150:14

**terms** [12] - 4:4, 11:15, 14:19, 29:20, 106:23, 111:17, 117:18, 144:8, 151:6, 154:5, 155:20, 155:21

**territory** [1] - 134:1

**terrorism** [8] - 47:16, 49:21, 50:3, 50:16, 51:8, 52:25, 53:6

**terrorist** [1] - 167:11

**test** [8] - 26:10, 26:16, 27:13, 86:6, 86:11, 86:17, 86:23

testified [11] - 43:18, 89:22, 141:9, 146:15, 146:22, 146:23, 156:9, 156:17, 156:25, 157:22, 158:6
testify [8] - 126:25, 128:13, 133:10, 135:6, 136:14, 146:20, 150:19, 191:3
testifying [14] - 109:12, 126:1, 133:22, 134:7, 135:4, 135:12, 136:2, 136:4, 136:22, 143:2, 143:8, 154:8, 154:12, 157:14
testimony [50] - 47:12, 49:19, 53:2, 61:22, 63:16, 64:18, 64:21, 72:4, 72:18, 73:23, 76:8, 78:20, 82:10, 83:10, 84:7, 89:22, 90:20, 96:4, 105:25, 106:23, 109:6, 109:18, 111:7, 126:1, 126:5, 126:10, 126:23, 127:19, 127:21, 131:1, 132:24, 133:2, 133:21, 134:21, 135:8, 135:17, 136:11, 136:22, 137:3, 142:24, 144:17, 150:13, 156:4, 156:6, 156:13, 157:25, 158:4, 158:7, 162:8, 195:14
testing [1] - 87:3
testnet [3] - 86:18, 86:20, 86:22
texts [1] - 159:14
THE [289] - 1:1, 1:1, 1:8, 3:2, 3:8, 3:11, 3:14, 3:17, 3:20, 4:13, 4:18, 5:3, 5:10, 5:20, 5:24, 7:7, 7:15, 7:21, 7:25, 8:7, 8:20, 8:24, 9:4, 9:12, 9:14, 9:21, 10:3, 11:14, 11:22, 11:24, 13:6, 14:2, 15:2, 15:13, 15:17, 15:23, 16:7, 16:13, 18:8, 18:24, 19:8, 19:24, 20:21, 20:25, 22:5, 22:15, 22:24, 23:15, 24:9,

25:5, 25:12, 26:3, 27:8, 28:14, 29:2, 29:10, 29:16, 29:23, 30:6, 30:14, 31:3, 31:9, 32:3, 32:9, 32:17, 33:7, 33:12, 33:18, 33:22, 33:25, 34:1, 34:8, 34:10, 37:17, 38:5, 38:25, 39:13, 39:14, 42:4, 42:8, 42:12, 42:13, 42:15, 46:3, 46:7, 46:8, 46:10, 46:11, 46:13, 46:15, 46:17, 46:21, 47:21, 48:1, 48:2, 48:3, 49:24, 50:5, 50:7, 50:8, 50:14, 50:17, 50:19, 50:21, 50:23, 50:25, 51:1, 51:2, 62:5, 62:8, 62:11, 62:13, 62:14, 62:16, 62:20, 63:5, 63:19, 63:20, 64:1, 64:3, 64:6, 64:7, 65:14, 65:15, 66:2, 66:3, 66:12, 66:15, 66:25, 67:13, 67:19, 69:4, 69:7, 70:23, 72:14, 72:16, 75:8, 77:16, 79:16, 80:2, 80:4, 80:6, 80:8, 80:13, 80:16, 80:18, 80:19, 80:22, 81:1, 81:4, 81:13, 81:16, 84:25, 85:5, 85:6, 85:8, 85:18, 85:20, 85:21, 88:11, 88:22, 88:25, 89:2, 89:7, 89:8, 89:9, 89:14, 89:15, 92:22, 93:16, 93:21, 94:9, 94:10, 101:19, 102:3, 102:13, 103:4, 103:18, 107:24, 108:3, 108:5, 108:12, 109:8, 110:24, 116:9, 119:13, 122:22, 122:25, 123:7, 123:9, 123:11, 123:13, 123:14, 123:17, 123:18, 123:21, 123:22, 123:23, 123:25, 124:3, 124:4, 124:6, 124:7, 124:9, 124:10, 124:16, 124:20, 125:1, 125:4, 125:15, 125:20, 126:9, 126:16,

126:24, 127:2, 127:6, 127:9, 127:13, 127:16, 127:19, 128:2, 128:11, 128:18, 128:21, 128:22, 128:25, 129:9, 129:25, 130:17, 130:23, 131:13, 131:18, 131:21, 132:15, 133:5, 133:13, 133:16, 134:12, 135:5, 135:9, 135:24, 136:20, 137:6, 137:11, 137:15, 138:1, 138:4, 138:15, 138:20, 138:22, 138:25, 149:23, 149:25, 158:10, 158:12, 164:12, 164:17, 165:1, 167:20, 167:22, 170:16, 170:21, 170:25, 177:10, 177:11, 178:25, 180:7, 182:19, 186:1, 186:6, 186:12, 186:15, 187:11, 187:13, 190:19, 193:11, 193:20, 193:23, 194:1, 194:7, 194:10, 194:13, 194:16, 194:21, 194:24, 195:9, 195:11, 195:18, 195:23
theft [11] - 36:6, 56:15, 56:22, 56:23, 58:18, 58:19, 58:21, 59:23, 60:12, 60:20, 96:25
thefts [1] - 40:23
theirs [1] - 7:24
themselves [7] - 4:24, 25:23, 26:1, 60:7, 175:10, 180:13, 192:23
then-CEO [1] - 156:8
therefore [5] - 42:14, 48:22, 52:2, 68:19, 163:9
they've [7] - 13:2, 30:16, 44:22, 48:22, 74:16, 111:17, 112:21
thin [1] - 5:24
thinking [4] - 14:20, 43:24, 62:17, 95:17
thinks [1] - 170:9

third [3] - 44:7, 113:21, 160:20
third-party [1] - 44:7
thoughts [1] - 68:6
thousand [2] - 5:14, 6:5
thousands [3] - 36:6, 141:5, 175:25
three [15] - 9:16, 9:21, 9:22, 19:17, 28:18, 31:1, 57:2, 60:11, 65:17, 68:8, 92:8, 105:17, 124:2, 143:7, 165:6
threshold [3] - 55:7, 55:22, 130:24
throughout [1] - 44:4
thrown [1] - 100:20
ticking [1] - 8:16
tickled [1] - 94:23
tied [4] - 52:5, 78:11, 166:14, 192:22
ties [4] - 52:25, 70:1, 147:12, 148:16
timeline [1] - 8:10
timely [1] - 193:19
timing [2] - 9:16, 101:23
titled [1] - 147:9
today [14] - 3:21, 11:5, 65:2, 83:25, 103:17, 103:19, 103:20, 109:13, 125:18, 152:20, 162:5, 162:6, 186:4, 194:20
today's [1] - 39:1
together [14] - 44:18, 44:20, 45:16, 48:22, 54:10, 65:16, 65:22, 68:7, 95:7, 95:9, 106:21, 141:11, 150:24, 163:25
token [2] - 110:12
tokens [1] - 149:11
tomorrow [14] - 99:25, 124:24, 125:16, 125:19, 133:15, 186:9, 186:17, 193:13, 193:21, 194:1, 194:17, 194:22, 195:1, 195:23
tonight [2] - 186:8, 186:16
took [4] - 19:17, 36:2, 72:9, 96:7
tool [23] - 39:25, 41:20, 43:7, 44:17, 45:11, 50:10, 50:18, 53:8, 54:4, 54:5,

58:9, 58:17, 77:12, 83:18, 84:22, 101:9, 104:23, 106:10, 140:5, 147:23, 170:12
tools [5] - 44:12, 140:5, 163:12, 169:14, 170:13
top [17] - 44:20, 49:1, 56:13, 71:7, 71:12, 75:1, 82:20, 111:10, 118:9, 121:23, 149:4, 157:4, 159:11, 181:1, 182:13, 184:18, 190:3
topic [1] - 179:4
tor [1] - 3:15
TOR [1] - 1:18
Tor [1] - 1:19
total [8] - 49:3, 57:2, 57:3, 61:3, 83:6, 140:21, 181:6, 182:17
totally [3] - 91:22, 140:17, 142:1
touch [5] - 44:21, 52:6, 141:7, 141:8, 160:5
trace [66] - 40:9, 42:10, 51:19, 51:21, 53:1, 54:3, 54:16, 55:13, 55:21, 56:16, 58:20, 60:15, 61:7, 68:20, 69:17, 70:3, 71:16, 72:7, 74:19, 74:21, 76:9, 77:21, 78:5, 78:7, 79:8, 79:10, 79:11, 82:6, 82:8, 82:15, 83:21, 84:19, 84:21, 85:12, 87:1, 90:18, 91:13, 91:22, 92:12, 92:16, 93:5, 93:10, 96:3, 97:4, 97:7, 97:10, 98:8, 98:13, 99:5, 99:9, 101:1, 101:7, 101:11, 101:24, 102:12, 104:11, 105:14, 106:16, 107:7, 143:12, 156:17, 157:1, 157:15, 159:16, 160:10, 160:24
trace-through [2] - 97:7, 97:10
traceable [2] - 56:23, 60:20
traced [9] - 55:18, 60:11, 76:16, 96:2,

97:4, 97:20, 99:3, 99:7, 171:11
**traces** [7] - 46:20, 55:24, 76:20, 104:23, 140:25, 174:14, 175:4
**Tracing** [1] - 35:20
**tracing** [21] - 23:6, 36:10, 46:2, 51:5, 55:17, 69:23, 76:23, 94:12, 95:25, 101:17, 103:9, 103:16, 146:10, 146:11, 146:16, 152:5, 154:16, 154:19, 154:25, 155:21, 171:15
**track** [1] - 62:23
**tracking** [1] - 85:7
**trade** [1] - 34:19
**trafficking** [2] - 173:15, 173:22
**trail** [4] - 41:4, 43:13, 43:19, 44:5
**train** [2] - 36:12, 36:13
**training** [10] - 35:21, 35:24, 36:15, 36:16, 36:18, 36:24, 45:14, 80:20, 81:2, 81:7
**trainings** [1] - 155:9
**transacted** [1] - 94:20
**transaction** [87] - 47:9, 53:19, 53:25, 58:13, 58:14, 58:23, 58:25, 59:1, 59:2, 59:7, 59:22, 60:5, 60:6, 60:9, 60:14, 61:4, 68:22, 69:20, 71:19, 71:22, 72:5, 72:6, 72:19, 74:17, 75:15, 75:20, 75:21, 76:13, 76:15, 78:21, 78:22, 79:6, 82:11, 82:12, 82:17, 82:21, 82:25, 83:11, 83:13, 83:16, 83:18, 85:19, 86:1, 86:6, 87:3, 87:21, 90:11, 90:16, 91:1, 92:19, 93:6, 93:17, 94:17, 98:6, 98:16, 98:21, 98:22, 99:2, 100:19, 101:8, 101:11, 104:19, 105:2, 105:6, 105:24, 106:1, 106:3, 106:4, 107:13, 108:22, 113:8, 117:5, 117:7, 117:22, 118:20, 149:15, 160:24,

163:8, 164:4, 164:5, 184:1
**transactional** [4] - 68:16, 76:18, 84:1, 91:16
**transactions** [58] - 36:10, 44:15, 61:11, 62:6, 62:24, 63:2, 63:3, 65:4, 69:19, 70:15, 77:9, 78:11, 78:12, 84:5, 84:8, 84:24, 86:17, 87:23, 93:1, 93:7, 93:18, 95:12, 97:14, 97:20, 97:21, 99:24, 109:23, 113:7, 113:9, 118:16, 119:6, 122:5, 122:20, 123:15, 124:1, 128:15, 151:10, 151:11, 157:1, 161:12, 163:4, 163:5, 163:7, 164:3, 165:23, 165:25, 166:9, 166:13, 172:1, 172:4, 172:6, 181:4, 181:5, 181:7, 181:11, 183:25, 184:8
**transcript** [2] - 196:4, 196:6
**TRANSCRIPT** [1] - 1:7
**transcripts** [2] - 7:2, 7:11
**transfer** [1] - 163:16
**transferred** [5] - 163:8, 163:14, 163:16, 181:7, 181:19
**transforms** [1] - 149:14
**translating** [1] - 5:20
**translators** [1] - 30:17
**transparency** [1] - 27:10
**travel** [1] - 143:4
**traveled** [2] - 156:22, 156:25
**Treasury** [2] - 126:20, 134:23
**tree** [2] - 59:8, 59:17
**trial** [35] - 5:9, 5:11, 5:12, 6:6, 7:5, 9:17, 15:3, 19:11, 22:8, 28:18, 29:5, 30:13, 101:24, 102:5, 102:7, 103:21, 103:24, 125:6, 125:13, 132:15,

132:25, 141:16, 141:23, 141:24, 141:25, 142:1, 142:22, 142:24, 143:7, 143:9, 144:6, 144:17, 146:22, 146:23, 160:2
**trials** [1] - 146:15
**tried** [2] - 30:22, 93:12
**triggered** [2] - 185:5, 185:21
**triple** [1] - 26:13
**triple-counts** [1] - 26:13
**TRM** [1] - 169:13
**troubling** [1] - 26:19
**true** [34] - 30:14, 30:18, 47:8, 58:3, 70:14, 71:22, 73:15, 75:13, 82:13, 82:17, 82:25, 83:18, 83:21, 84:1, 84:4, 84:8, 91:9, 94:25, 99:21, 99:23, 100:25, 109:12, 109:21, 130:23, 139:17, 139:18, 149:17, 164:18, 171:5, 184:24, 188:25, 196:4, 196:5
**truest** [1] - 44:15
**trumping** [1] - 14:1
**trusted** [1] - 149:13
**truth** [3] - 158:24, 159:1, 159:3
**try** [4] - 9:14, 88:24, 91:24, 95:23
**trying** [13] - 14:3, 63:1, 75:11, 84:3, 89:10, 106:18, 109:15, 115:4, 116:23, 141:21, 144:9, 161:19, 193:20
**Tuesday** [7] - 21:7, 21:9, 80:1, 80:4, 80:11, 80:16, 81:3
**turn** [4] - 11:5, 37:20, 149:3, 190:24
**turned** [1] - 25:5
**turning** [13] - 21:15, 118:1, 118:8, 130:3, 131:25, 137:24, 145:25, 148:25, 163:22, 167:7, 181:25, 183:20, 187:16
**turns** [1] - 52:17
**tweets** [1] - 10:21
**twice** [1] - 55:16
**Twitter** [7] - 5:14, 6:5,

6:8, 8:18, 8:19, 48:19, 146:12
**two** [49] - 3:22, 19:17, 22:20, 24:6, 28:10, 28:14, 31:1, 33:3, 34:18, 39:22, 48:25, 49:8, 49:14, 50:3, 54:16, 55:18, 55:21, 58:8, 60:11, 60:15, 60:23, 61:8, 65:15, 65:16, 68:8, 75:23, 78:1, 78:4, 84:18, 92:8, 93:13, 93:14, 96:6, 96:10, 96:23, 99:4, 99:16, 108:21, 112:19, 114:6, 119:6, 170:7, 177:5, 182:22, 184:15, 184:18, 194:9, 195:4
**two-Bitcoin** [1] - 93:14
**Tx10** [1] - 107:13
**tying** [1] - 87:20
**type** [16] - 42:21, 45:18, 47:4, 49:2, 55:25, 57:13, 59:16, 64:19, 67:25, 74:12, 95:19, 110:12, 115:25, 117:20, 117:24, 146:15
**types** [13] - 55:23, 64:23, 65:3, 95:13, 98:19, 105:11, 105:13, 111:16, 111:20, 112:3, 112:12, 142:25, 163:3
**typical** [2] - 47:2, 100:8
**typically** [4] - 53:21, 86:2, 98:24, 150:18
**typo** [7] - 74:10, 74:11, 74:20, 114:3, 116:6, 116:7, 118:17
**typos** [1] - 74:12

## U

**U.S** [6] - 1:13, 4:9, 5:21, 35:14, 36:20, 181:17
**u.S** [1] - 1:16
**ultimate** [2] - 160:25, 161:8
**ultimately** [4] - 52:21, 126:22, 191:23, 192:18
**unable** [1] - 73:8
**unattributed** [1] - 106:21

**unauthorized** [2] - 41:16, 41:21
**unclear** [3] - 16:22, 43:21, 142:23
**uncluster** [1] - 184:3
**unclustered** [12] - 176:11, 177:11, 177:19, 178:1, 178:20, 182:5, 182:10, 183:1, 184:21, 184:25, 185:5, 187:22
**uncompressed** [11] - 105:9, 111:24, 112:16, 112:20, 113:23, 115:16, 115:21, 116:16, 116:22, 117:1
**under** [32] - 9:7, 13:5, 16:4, 16:17, 18:13, 20:20, 21:23, 23:11, 27:17, 27:23, 55:22, 71:4, 96:20, 113:1, 116:13, 127:20, 133:9, 144:24, 145:7, 148:14, 150:18, 151:15, 151:18, 158:23, 160:20, 163:2, 164:1, 170:1, 180:24, 182:10, 183:23, 188:3
**underestimate** [1] - 28:14
**underlying** [1] - 153:8
**underneath** [2] - 187:22, 190:4
**understandable** [1] - 174:23
**understatement** [1] - 109:8
**understood** [5] - 28:13, 33:11, 77:18, 109:1, 186:19
**unfair** [1] - 22:17
**unfortunately** [4] - 36:5, 73:7, 79:24, 186:15
**unhosted** [6] - 75:17, 75:23, 76:2, 76:4, 106:7, 106:9
**unique** [4] - 59:6, 101:18, 101:20, 149:13
**unit** [2] - 111:25, 113:22
**UNITED** [3] - 1:1, 1:2, 1:8
**United** [4] - 1:23, 3:3, 3:7, 36:18

**unknown** [3] - 52:4, 84:14, 89:18
**unless** [6] - 26:20, 30:20, 49:24, 65:24, 91:20, 170:11
**unlike** [1] - 17:20
**unlikely** [1] - 55:20
**unnamed** [1] - 46:18
**unpack** [2] - 92:15, 139:16
**unpaid** [3] - 35:5, 35:7, 36:2
**unprofessional** [1] - 8:7
**unreasonable** [1] - 88:20
**unreliable** [4] - 131:2, 131:15, 132:18
**unsafe** [1] - 159:15
**unspent** [6] - 47:9, 60:8, 60:9, 85:2, 85:7, 160:23
**unverified** [3] - 40:20, 41:16, 44:7
**up** [83] - 4:18, 6:9, 6:17, 7:25, 8:17, 8:22, 11:4, 11:11, 12:20, 13:19, 16:9, 17:23, 21:3, 21:10, 23:10, 28:4, 29:11, 29:23, 32:21, 34:5, 37:3, 37:21, 39:12, 40:7, 41:14, 42:10, 44:13, 46:18, 52:19, 54:21, 54:22, 55:4, 56:19, 59:20, 69:4, 69:17, 71:7, 71:11, 71:18, 71:20, 71:22, 73:24, 75:19, 77:11, 78:14, 78:25, 79:1, 81:8, 83:10, 83:11, 86:8, 88:11, 88:15, 91:16, 94:18, 96:13, 97:5, 98:6, 105:18, 106:23, 107:18, 114:6, 115:9, 116:1, 121:23, 127:5, 129:4, 129:16, 132:11, 137:13, 141:3, 141:20, 150:23, 151:9, 152:25, 164:15, 174:6, 174:21, 175:5, 181:16, 191:16, 194:11, 194:23
**update** [2] - 117:16, 160:14
**updated** [1] - 40:19
**upwards** [1] - 178:9

**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**useful** [5] - 68:6, 104:22, 115:3, 153:14, 153:16
**User** [1] - 72:22
**user** [29] - 40:14, 41:17, 42:2, 44:7, 52:3, 54:10, 63:22, 72:22, 72:23, 73:1, 73:8, 74:1, 74:4, 74:5, 74:6, 74:9, 77:8, 79:13, 95:24, 100:12, 100:20, 109:25, 141:15, 163:9, 163:10, 163:19
**user's** [1] - 141:17
**users** [18] - 45:15, 52:3, 55:9, 55:10, 55:12, 65:15, 65:18, 92:10, 100:9, 100:14, 113:11, 141:14, 148:23, 172:24, 173:10, 173:25, 174:3, 174:9
**users'** [1] - 73:8
**uses** [10] - 45:20, 59:8, 61:20, 113:22, 114:10, 148:1, 150:7, 154:19, 163:24, 164:2
**usual** [3] - 130:1, 142:19, 143:23
**utilized** [7] - 51:5, 52:25, 53:7, 92:10, 95:17, 160:22, 161:6
**utilizes** [1] - 45:19
**utilizing** [2] - 41:23, 95:14
**UTXO** [8] - 58:22, 60:8, 68:21, 77:11, 84:20, 85:2, 85:8, 85:15
**UTXOs** [6] - 47:10, 49:16, 53:10, 60:7, 61:10, 85:13

**V**

**V1V2** [1] - 120:6
**validate** [1] - 167:12
**validates** [1] - 149:12
**validation** [3] - 43:5, 43:16, 152:18
**validity** [1] - 11:17
**valuation** [4] - 131:19, 131:25, 132:8, 133:2
**valuations** [2] - 131:6, 131:24

**value** [10] - 129:3, 129:11, 129:14, 129:15, 129:22, 129:23, 132:21, 152:23, 181:14, 181:17
**values** [1] - 131:9
**valuing** [4] - 129:7, 130:12, 131:9, 131:14
**various** [5] - 127:4, 147:18, 148:22, 149:18, 181:19
**VASP** [1] - 61:7
**VASPs** [1] - 149:16
**vegetable** [1] - 97:18
**vendor** [3] - 32:4, 32:14, 44:7
**vendors** [5] - 13:22, 17:18, 32:12, 173:2, 173:18
**venture** [1] - 132:12
**veracity** [1] - 149:12
**verification** [1] - 43:14
**verified** [3] - 40:14, 164:6, 176:15
**verifies** [1] - 58:1
**verify** [13] - 27:23, 41:2, 41:3, 42:17, 43:7, 53:11, 62:9, 70:14, 82:24, 83:17, 88:6, 93:24, 165:16
**Verret** [3] - 64:4, 64:10, 145:18
**Verret's** [1] - 133:2
**versions** [2] - 142:2, 142:4
**versus** [4] - 62:7, 65:14, 85:7, 88:12
**via** [13] - 40:15, 44:19, 48:14, 48:15, 51:8, 54:10, 68:20, 120:24, 121:3, 171:23, 176:21, 177:12, 179:20
**video** [1] - 102:19
**Video** [6] - 173:21, 173:25, 174:3, 174:9, 174:16, 175:3
**view** [7] - 28:2, 44:9, 77:11, 104:24, 122:23, 122:24, 144:4
**viewing** [1] - 150:11
**Vinnik** [2] - 96:20
**violate** [1] - 5:2
**violated** [1] - 10:17
**violates** [1] - 10:20
**violation** [4] - 6:23, 9:10, 10:23, 135:3

**Virtual** [1] - 149:16
**virtual** [1] - 165:13
**Virwox** [9] - 76:19, 76:25, 77:4, 77:7, 77:13, 77:22, 77:24, 82:9
**visit** [1] - 4:4
**visits** [1] - 4:2
**visual** [3] - 61:24, 68:24, 115:4
**visualize** [1] - 84:19
**Vlahakis** [15] - 125:23, 126:2, 126:17, 127:18, 127:25, 133:14, 133:15, 133:16, 133:19, 134:6, 134:18, 135:3, 135:11, 135:25, 136:9
**Vlahakis's** [1] - 135:17
**Volkswagen** [1] - 88:14
**volume** [1] - 172:5
**vouchers** [3] - 6:24, 19:12, 19:13
**vs** [1] - 1:4

**W**

**wait** [4] - 9:17, 10:24, 31:1, 184:16
**walk** [5] - 27:5, 28:9, 46:3, 101:7, 102:19
**walk-through** [1] - 27:5
**walker** [1] - 81:12
**Wall** [2] - 1:20, 132:3
**wallet** [20] - 51:5, 54:11, 57:8, 63:15, 63:22, 70:14, 88:8, 90:3, 95:22, 95:24, 115:20, 117:15, 121:20, 122:7, 156:18, 188:9, 188:13, 188:23, 190:12, 192:6
**Wallet** [9] - 56:18, 56:19, 63:18, 63:20, 70:7, 70:13, 90:6, 90:9, 106:18
**wallet-based** [1] - 51:5
**WalletExplorer** [1] - 44:17
**wallets** [5] - 40:10, 88:5, 90:9, 107:6, 151:13
**wants** [5] - 6:16, 7:8, 19:25, 67:14, 102:20
**warrant** [3] - 169:2,

169:3, 169:4
**Wasabi** [9] - 55:3, 55:4, 55:6, 55:18, 63:13, 63:14, 64:13, 64:14, 65:5
**Washington** [6] - 1:5, 1:12, 1:14, 1:17, 1:24, 196:11
**watching** [1] - 65:25
**ways** [5] - 5:20, 6:9, 116:1, 130:7, 172:17
**weapons** [1] - 35:14
**wear** [1] - 72:12
**web** [5] - 40:11, 40:13, 71:21, 120:9, 157:1
**website** [4] - 10:22, 40:22, 157:23, 157:24
**websites** [4] - 6:8, 6:9, 67:4, 120:15
**Wednesday** [2] - 80:23, 81:3
**week** [5] - 7:24, 9:17, 19:11, 36:25, 144:9
**weekends** [1] - 143:17
**weekly** [2] - 147:19, 148:23
**weeks** [10] - 9:16, 15:3, 15:4, 18:10, 18:15, 19:18, 28:18, 29:4, 31:1, 143:7
**weighted** [1] - 23:2
**weighting** [1] - 26:8
**Welcome** [6] - 173:21, 173:24, 174:3, 174:9, 174:16, 175:3
**welcome** [5] - 66:3, 116:8, 132:25, 133:4, 138:17
**well-documented** [2] - 18:5, 43:12
**whatsoever** [2] - 20:14, 126:7
**whereas** [1] - 150:18
**whole** [6] - 4:7, 6:21, 92:24, 93:2, 165:19, 176:14
**willing** [2] - 15:1, 17:11
**wish** [1] - 93:21
**wishes** [1] - 14:15
**withdraw** [2] - 7:9, 29:22
**withdrawal** [11] - 77:13, 77:24, 78:15, 79:12, 84:17, 84:18, 87:7, 99:16, 151:13, 190:12
**withdrawals** [5] - 91:18, 91:24, 95:24,

97:21, 120:10

**witness** [34] - 8:5, 10:2, 11:9, 11:10, 33:24, 37:6, 92:23, 95:13, 101:22, 109:13, 113:6, 113:13, 113:16, 116:5, 117:8, 117:24, 118:7, 124:15, 126:3, 130:2, 130:11, 134:10, 135:25, 136:12, 137:14, 142:19, 156:9, 195:2, 195:5, 195:12, 195:19

**WITNESS** [51] - 2:2, 42:8, 42:13, 46:7, 46:10, 46:13, 46:17, 48:1, 48:3, 50:5, 50:8, 50:17, 50:21, 50:25, 51:2, 62:8, 62:13, 62:16, 63:5, 63:20, 64:3, 64:7, 65:15, 66:3, 69:4, 69:7, 70:23, 75:8, 85:5, 85:8, 85:20, 88:22, 89:2, 89:8, 89:14, 93:21, 94:10, 108:3, 122:25, 123:9, 123:13, 123:17, 123:21, 123:23, 124:3, 124:6, 124:9, 138:4, 138:20, 138:25, 177:11

**Witness** [1] - 111:22

**witness's** [1] - 109:6

**witnesses** [10] - 3:22, 11:5, 12:14, 101:16, 124:24, 126:11, 127:18, 127:20, 129:1, 130:22

**wonder** [1] - 53:14

**Word** [1] - 51:23

**word** [6] - 9:14, 27:11, 72:14, 75:23, 150:11, 174:23

**worded** [1] - 191:14

**words** [3] - 9:11, 27:16, 106:17

**workbooks** [1] - 100:13

**works** [13] - 19:10, 19:15, 32:7, 39:25, 43:7, 48:17, 80:7, 80:24, 93:18, 136:24, 143:16, 147:23, 161:15

**world** [2] - 147:13,

148:17

**worried** [1] - 130:3

**worry** [1] - 129:1

**worth** [2] - 172:11, 181:7

**WPKH** [1] - 117:6

**wrapped** [2] - 117:12, 117:23

**write** [7] - 21:2, 24:16, 138:8, 162:15, 162:16, 164:8, 168:12

**writing** [2] - 72:25, 73:2

**written** [3] - 60:21, 118:18, 167:16

**wrote** [4] - 38:9, 73:4, 74:3, 78:9

## Y

**Yahoo** [1] - 132:2

**year** [2] - 18:13, 139:3

**years** [2] - 13:17, 89:6

**yellow** [1] - 58:24

**yellow/orange** [1] - 104:16

**York** [3] - 1:17, 1:20, 159:25

**you-all** [1] - 11:11

**yourself** [2] - 10:6, 138:6

## Z

**zero** [3] - 57:4, 180:15, 183:25

**zeros** [2] - 114:22, 184:8

**zoom** [1] - 72:23

**Zoom** [1] - 22:3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,   ) Criminal Action
                            ) No. 1:21-CR-0399
            Plaintiff,      )
                            ) **CONTINUED MOTIONS**
vs.                         ) **HEARING**
                            )
ROMAN STERLINGOV,           ) Washington, D.C.
                            ) **August 23, 2023**
            Defendant.      ) **Time:  10:05 A.M.**

**TRANSCRIPT OF CONTINUED MOTIONS HEARING**
BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For the Plaintiff:      CHRISTOPHER BROWN
                        USAO-DOJ
                        601 D Street, NW
                        Washington, DC 20001

                        ALDEN PELKER
                        U.S. Department of Justice
                        950 Pennsylvania Avenue, NW
                        Washington, DC 20530

                        JEFFREY PEARLMAN
                        DOJ-CRM
                        U.S. Department of Justice
                        1301 New York Ave. NW
                        Washington, DC 20005

For the Defendant:      TOR EKELAND
                        Tor Ekeland Law, PLLC
                        30 Wall Street, 8th Floor
                        New York, NY 10005


Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
                        Official Court Reporter
                        United States Courthouse, Room 6714
                        333 Constitution Avenue, NW
                        Washington, DC  20001
                        202-354-3246

I N D E X

**WITNESS** **PAGE**

**JONELLE STILL (CONTINUED)**

Cross-Examination - Continued
By Ms. Pelker                               230

Redirect Examination
By Mr. Ekeland                              294


**VALERIE MAZARS de MAZARIN**

Direct Examination
By Ms. Pelker                               317

Cross-Examination
By Mr. Ekeland                             345

**EXHIBITS ADMITTED** **PAGE**

Government Exhibit 22                        263

Government Exhibit 23                        263

Government Exhibit 24                        263

Government Exhibit 25                        263

Government Exhibit 26                        263

Government Exhibit 27                        293

Government Exhibit 1                         324

Government Exhibit 2                         342

P R O C E E D I N G S

THE COURTROOM DEPUTY: Criminal Case No. 21-399, United States of America v. Roman Sterlingov.

Would counsel please approach the podium, state their name for the record, starting with government counsel.

MS. PELKER: Good morning, Your Honor. Alden Pelker for the United States.

THE COURT: Good morning.

MR. BROWN: Good morning. Christopher Brown for the United States.

THE COURT: Good morning.

MR. PEARLMAN: And Jeff Pearlman from the United States. Good morning, Your Honor.

THE COURT: Good morning.

MR. EKELAND: Good morning, Your Honor. Tor Ekeland for Defendant Roman Sterlingov, who is present in court.

THE COURT: All right. Good morning to both of you as well.

So let's continue. I did want to mention one thing just for your time management today, which is that I have a 2:00 matter, which shouldn't take terribly long, but I'll need 15 or 20 minutes for another matter at 2:00 today.

All right. The witness can take the stand again. Ms. Pelker, you may continue.

MS. PELKER: Thank you, Your Honor.

CROSS-EXAMINATION CONTINUED OF

JONELLE STILL

BY MS. PELKER:

Q.  Good morning, Ms. Still.

A.  Good morning, Ms. Pelker.

Q.  I'd like to direct your attention to Mr. Scholl's report, which is Exhibit 19 in the binder in front of you.  Can you turn to page 49.

Is that the tracing that you criticized yesterday showing the transfer of funds from Mr. Sterlingov's account into Bitcoin Fog.

A.  May I have one moment.  The binder is kind of coming apart here.

Q.  No problem.  Let us know if you need help with the binder.

A.  Okay.  Page 49?

Q.  Page 49 of Exhibit 19.

A.  We're not able to pull this up on the video at all?

Q.  We don't have it hooked up on the screen.

I'm just asking whether this is the chart that you were talking about yesterday.

A.  This is the deposit into the -- well, the first-known deposit to Bitcoin Fog, yes.

Q.  And on pages 50, 51, 52 of Mr. Scholl's report, in addition to the chart, he includes the details of each transaction with the hash, the input, the output, the amount; is that right?

A.  He does.

Q.  Turning back to page 49, at the bottom right-hand side of the chart -- and I know that this is small here -- does it show a deposit on November 10th of 2011 into what Mr. Scholl labels as a Bitcoin Fog address 1YZJKa?

A.  I think you're referring to Transaction 10.

Q.  Yes, that would be correct.

A.  So I'm going to just flip over here, if you don't mind. Okay.

So the question is, is there a deposit into Bitcoin Fog on -- he doesn't have a date in his.

Q.  But he has a block.

A.  He didn't include the dates in here.  Hang on one second. I think that says November 10, 2011.  Sorry.  It's like -- it's small.

Q.  I understand.  I know that you had the chance to review this on -- in a larger PDF when you did your report, correct?

A.  (Nodding head.)

Q.  Going back to now page 28 of your report -- that's Exhibit 10 -- the last entry in the chart --

A.  Sorry.  Where -- where am I?

Q.  Exhibit 10.

A.  Exhibit 10.

Q.  Page 28.

A.  Yes, I am here.

Q. In the last full line of that chart -- so not the line with total, but the last one with the Bitcoin address in it -- is that showing an address 1YZJKa?

A. Yes.

Q. And is that the same address from the deposit in Mr. Scholl's chart?

A. Yes.

Q. And how does CipherTrace categorize that address, according to your chart in your report?

A. Bitcoin Fog.

Q. You testified yesterday that you agree that the deposit into 1YZJKa is the first-known Bitcoin Fog deposit; is that right?

A. As earliest as I could determine.

Q. Do you agree that Bitcoin Fog did use consolidation addresses to collect and then subsequently commingle user deposits?

A. We would call these -- I believe deposit addresses is the term.

Q. So you would have deposit addresses. Did they then use consolidation addresses to group user deposit --

A. This is a different -- this is different than that. No, ma'am.

Q. I'm not asking about this address specifically. I'm just asking, isn't it true that Bitcoin Fog did use consolidation

addresses as part --

A.  Deposit addresses.

THE COURT REPORTER:  Can you please wait until the question is finished before you respond.  Thank you.

THE WITNESS:  Yeah.  Sorry.

BY MS. PELKER:

Q.  They use deposit addresses.  Didn't they also, in fact, use consolidation addresses?

A.  Can you please define what you mean by consolidation address.

Q.  Well, why don't we turn to the bottom of page 38 of your report.

A.  Here it says, "CipherTrace compiled the following chart showing all received transactions for the likely internal consolidation address for Bitcoin Fog 1YZJKa."

Is that what you wrote in your report?

A.  I believe that was a quote from Mr. Scholl, yes.  Sorry, I don't think that was quoted properly.

But that's referring to Mr. Scholl's report.  In his determination this could be an internal consolidation address, which I don't necessarily disagree with, but I have no way of verifying.

Q.  So you're saying you don't -- it could be a consolidation address, but you haven't made your assessment?

A.  I really need those internal records from Bitcoin Fog in

order to properly determine that.

Q. We would love for the defendant to turn over the ledgers for Bitcoin Fog servers, but the government doesn't have them either.

MR. EKELAND: Objection. Objection.

THE COURT: I think both sides are doing this, frankly. I think the witness is being argumentative about this, and the question was argumentative.

So I think the fault lies on both sides. You're both playing the same game.

MS. PELKER: Withdrawn, Your Honor.

THE COURT: I understand the point, though.

BY MS. PELKER:

Q. Did CipherTrace, in fact, compile a chart showing those transactions as described?

A. If you mean the Inspector trace?

Q. The -- so on the bottom of page 38, it says, "CipherTrace compiled the following chart showing the transactions for the likely internal consolidation address for Bitcoin Fog 1YZJKa."

A. Yes.

Q. Did you create a chart showing those transfers?

A. I exported the chart from Inspector.

Q. And is that somewhere in this report?

A. No.

Q. Has it been provided to the government in discovery?

A.  Have I provided this to you prior?

Q.  In discovery.  Have you provided it -- this is a chart that you created as part of your report.

Is it somewhere else in this report or separately provided to the government?

A.  No.

Q.  Now, you testified yesterday that testing a server can involve testing on testnet; is that right?

A.  Yes.

Q.  And that's, essentially, moving Bitcoin in sort of a simulated environment that's meant to mirror the Bitcoin protocol?

A.  Yes.

Q.  But that's not the same as actually running a test on the live Bitcoin network, is it?

A.  I can't say.

Q.  And have you personally run tests on testnet?

A.  Yes.

Q.  I'd like to direct your attention now to page 35 of your report discussing tracing through Silk Road.

Are you familiar with how custodial services handle user funds?

A.  Generally.

Q.  And are you aware that Silk Road did take custody of user funds?

A.  Yes.

Q.  And for most custodial services -- or at least many -- if a user deposits funds into an account with that service and then withdraws the funds, isn't it true that the withdrawal will come from a different address than the deposit?

A.  That's possible.

Q.  And wasn't that, in fact, the case with Silk Road?

A.  The Silk Road records, I'm not able to confirm that from the -- what I was provided from before.  I'm trying to match the user IDs to the users to the Philadelphia records to the different -- I think they're referencing different FBI records, and different pulls, and this is what I was provided before I wrote this report.

Q.  And -- so I'm asking about Silk Road, generally.  You're familiar with Silk Road, correct?

A.  Yes.

Q.  It was one of the largest and most widely used darknet markets for the rel- -- significant portion of the relevant time period in this case, right?

A.  It's infamous.

Q.  Infamous.  And have you never reviewed records for other Silk Road users?

A.  I don't believe I've ever had access to Silk Road before.

Q.  So in your work doing tracing for darknet market cases, you've never reviewed records for other Silk Road users?

A. I've never reviewed records for other Silk Road users that came from Silk Road.

Q. Have you reviewed the records coming from other darknet markets for any other darknet market user?

A. Directly from the market itself, the actual natives --

Q. Correct.

A. -- or the actual real copies?

Q. Correct.

A. No.

Q. Now, according to your report, don't you, in fact, agree in your report that on November 27th of 2011, there was a transfer of 60.8 Bitcoin from the address 14gbjpk to the address 1C7kW?

A. Yes.

Q. And do you agree that that corresponds to a withdrawal from Silk Road?

A. Yes.

Q. And directing your attention now back to Exhibit 19 and Mr. Scholl's report on page 46, is this the chart showing the transaction through the pas Silk Road account?

A. On the right-hand side.

Q. And you see the blue box with the user pas at the top?

A. Under Silk Road, yes.

Q. Yes. So there's the larger box that says Silk Road; red box, Silk Road; and then within that Silk Road box, there's a blue box that says pas; is that right?

A. Yes.

Q. And that charted deposit from 1Pf address, that shows an arrow directly into the pas account and pointing to the address 1MDVJ [sic]; is that right?

A. Yes.

Q. But for the arrow for the withdrawal from Silk Road, the address -- the arrow starts at the edge of that blue pas box, doesn't it?

A. Yes.

Q. And isn't that because, as you just testified, a withdrawal from a service like Silk Road would not have come -- necessarily come from the deposit address?

A. No.

Q. But Silk Road was, in fact, a custodial service, correct?

A. Yes.

Q. And so if you have a withdrawal -- and Silk Road offered deposit addresses for its customers; is that right?

A. Yes.

Q. And when a Silk Road user would withdraw funds from the service, those withdrawals wouldn't come from the deposit address because it's a withdrawal, not a deposit; isn't that correct?

A. Correct.

Q. And so didn't you, in fact, in this chart see a withdrawal from the pas account into the 1C7k address?

A. No.

Q. But you don't disagree that on that exact date and time, there was a 60.8 Bitcoin withdrawal associated with the pas account going from the Silk Road at controlled addresses to 1C7K?

A. No.

Q. You don't agree that that was the case?

A. No. I wasn't able to confirm in the records I was provided.

Q. But you do agree that it was a withdrawal from Silk Road?

A. I see a withdrawal from Silk Road going back to my report, page 36, November 27th, 2011, from 14gb21C7K.

Q. And you do agree that's a Silk Road withdrawal?

A. Yes.

Q. And you're just saying you don't -- you can't tell which Silk Road user that was a withdrawal from?

A. Correct.

Q. But you did see in the Silk Road pas records that there was a withdrawal of that exact amount at that exact date and time?

A. I did not.

Q. Have you reviewed the Silk Road records?

A. Yes, I have.

Q. Turning your attention to page 35 of your report, now, in Exhibit 10, you're discussing a co-spend with that 1MDV [sic] address; is that right?

A. Sorry. 35 of the Scholl report or my report?

Q. No. Of your report. So this is Exhibit 10.

A. Okay.

Q. Now, you're saying that MDV -- 12MDV received funds one time in a co-spend; is that right?

A. Correct.

Q. But in your chart below here, what you show is actually that it's spending funds in a co-spend; isn't that right?

A. It is spending funds in a co-spend.

Q. So to be clear, the transfer from 1Pfk that we were just talking about into 12MDV is not a co-spend; it's this chart here that's the co-spend?

A. This is the co-spend.

Q. And when 12MDV does transfer the funds, it co-spends with 1MBrU; is that right?

A. Yes.

Q. And 1MBrU, that's the address that you identified as possibly having received funds tied to a Virwox account?

A. Correct.

Q. And you testified yesterday that you had reviewed the attachments to Mr. Scholl's and Ms. Bisbee's reports; isn't that right?

A. Yes.

Q. Are you aware that both 12MDV and 1MBrU are both addresses controlled by Silk Road?

A. No.

Q. Are you aware that the government has included them in the list of addresses controlled by Silk Road?

A. No.

Q. But you did review the attachments?

A. Yes.

Q. Did you look in the attachments for those addresses being listed?

A. Yes.

Q. And, in fact, do you agree that 12MDV is in that list?

A. Which list?

Q. The list of addresses controlled by Silk Road.

A. I will have to look. CipherTrace does not have this attributed to Silk Road. So I will have to confirm. If we could pull that up, I will take a look at it.

Q. So you're saying CipherTrace doesn't. I'm asking you about the attachments to Mr. Scholl's and Ms. Bisbee's report.

A. I can't recall that from memory.

Q. But do you remember looking at, within those attachments, whether 12MDV and 1MBrU were, in fact, both controlled by Silk Road?

A. Yes.

Q. And you're saying that you don't believe that they were controlled by Silk Road?

A. I'm saying I can't recall. And according to CipherTrace

here, they're not controlled by Silk Road.

Q. So CipherTrace doesn't believe that they're controlled by Silk Road, but did you not review records from the Silk Road returns that included 12MDV as a Silk Road deposit address for the pas account?

A. I will need to pull up those records to confirm.

Q. Let's turn to page 18 of your report. Here this says, "CoinJoins break heuristic 1," and we had testimony about that yesterday.

Is that still your testimony?

A. Yes.

Q. Isn't it also true, though, that many CoinJoins are performed through services such as the ones listed in your report?

A. True.

Q. And that many of those services transact with some identifiable patterns?

A. True.

Q. And are you familiar with some of the academic literature on CoinJoin detection?

A. No.

Q. So you're not aware that academic research has found many CoinJoin implementations to be highly reliable?

A. I'm aware, but I've not read the literature myself.

Q. So you are aware that academic researchers looking at

CoinJoin have been able to effectively and reliably detect it from many implementations?

A.   I will have to review that myself.

Q.   You understand that there's a difference between detecting a CoinJoin and tracing through a CoinJoin?

A.   Can you explain what you mean?

Q.   Well, you can -- even if you cannot trace through a CoinJoin, that is, connect an input to an output, you may be able to detect that a CoinJoin is happening; is that right?

A.   Yes.

Q.   And if you can detect a CoinJoin, it may be possible to control for it to avoid misclustering?

A.   Yes.

Q.   And are you aware that blockchain analytics companies use those patterns to control for CoinJoin in order to avoid mistaken clustering?

A.   Yes.

Q.   And, for example, is Wasabi one of now the most common CoinJoin implementations?

A.   Yes.

Q.   And can't most blockchain analytics companies identify transactions that occur through Wasabi?

A.   Yes.

Q.   And they would identify that and not include it in a co-spend cluster?

A. Ideally.

Q. Directing your attention to the graph on page 16 of your report, is this an example of a CoinJoin transaction?

A. Yes.

Q. And is CipherTrace able to detect this as a CoinJoin?

A. We did not.

Q. Are you aware that Chainalysis does flag this as a CoinJoin and, therefore, does not cluster the inputs together?

A. No.

Q. Turning your attention to the following page, is this another example of a CoinJoin transaction?

A. Yes.

Q. And is CipherTrace able to detect this as a CoinJoin?

A. Looks like no.

Q. And so CipherTrace would have mistakenly clustered this using co-spend?

A. Yes.

Q. Are you aware that Chainalysis does identify this as a CoinJoin and does not cluster the inputs together?

A. No.

Q. So given that CipherTrace uses co-spend analysis and that both CipherTrace and Chainalysis attempt to control for CoinJoin, isn't it, in fact, possible for blockchain analytics to detect and control for CoinJoin in many instances?

A. That is difficult for me to say. I've been provided with

two examples.

Q. When you say you've been provided with two examples, who provided the examples to you?

A. You did, ma'am.

Q. Well, these are examples from your report that you had pulled out. Is that what you're saying?

A. Ma'am, you asked if I was aware that companies could control for CoinJoins like these, but you gave me the example that Chainalysis has control for these two CoinJoins.

Q. Oh, I'm talking about CoinJoins writ large. You had testified previously that CipherTrace controls for Wasabi and that other CoinJoin implementations may be detectable.

I'm now asking, isn't it, in fact, true that often blockchain analytics companies detect and control for many CoinJoin implementations?

A. I can't speak to all companies, and I did not testify that CipherTrace controls for these.

Q. Not for these. But they do control for Wasabi; is that right?

A. I will have to check with engineering.

Q. They may, in fact, also control for other co-spends?

A. I do not know.

Q. Now, you considered -- you testified yesterday that you still considered the clusters in CipherTrace to be reliable even though they rely on heuristic 1; is that right?

THE COURT: Can we just back up for a second. I just want to make sure I understand the witness's testimony here.

I understand what the witness has testified is that CoinJoins break co-spend as a useful tool for clustering or as a heuristic, but that you're not aware whether your own company controls for CoinJoins in any way?

THE WITNESS: I've been made aware that there may be some implementation, but I cannot confirm it, and I need to speak with engineering.

MS. PELKER: I can --

THE COURT: I'm just trying to understand -- I mean, as I understand your testimony, if I'm getting it right, you actually don't think that this sort of blockchain analysis is useful because of CoinJoins and that it breaks the one heuristic that your company uses, yet you don't know whether your company actually does anything to control for it. That surprises me about your testimony.

THE WITNESS: Okay.

THE COURT: I mean, I want to make sure I'm understanding that correctly. The one thing you say is the problem that destroys the usefulness of the tool, you don't know whether they control for that one problem?

THE WITNESS: For example, as we spoke yesterday, the case -- the special case of a CoinJoin called a PayJoin, no one can look at, no one can know. It is not detectable. It is

indistinguishable from any other transaction.

Additionally, there are a number of privacy services and options.

THE COURT: Right. I guess my question -- I didn't understand Ms. Pelker's question to be categorically whether they control for every -- whether you control for every CoinJoin, but the question -- at least my question -- I'll leave it for Ms. Pelker to ask her own question.

My question is, to your knowledge, does your company do anything to control for CoinJoins?

THE WITNESS: We can refer back to the PowerPoint presentation I provided yesterday. There is an example of this in there.

THE COURT: What's the answer to my question, though?

THE WITNESS: I'm sorry, Your Honor, but I really do need to confirm with engineering before I actually offer this testimony in court.

THE COURT: Okay. So your testimony today, then, is you just don't know whether they control for CoinJoins?

THE WITNESS: I don't know to what extent, I don't know to which level, I don't know which CoinJoins. I have been informed that we do, but I have not confirmed with engineering. The person who told me does not work for engineering.

THE COURT: Okay. All right. Thank you.

BY MS. PELKER:

Q. As a follow-up, are you aware -- you testified previously that Wasabi is one of the most common current CoinJoin services; is that right?

A. Yes.

Q. And if you're using CipherTrace, doesn't CipherTrace, in fact, identify a large number of addresses that it believes are Wasabi-related addresses?

A. I cannot give you the exact number there.

Q. I'm not asking for the exact number. I'm just asking whether, if you're doing your trace in all of the cases that you're tracing for, if you see funds going to Wasabi Wallet, are you able in CipherTrace to see that CipherTrace knows that that is Wasabi Wallet?

A. Yes.

Q. And so in order to do that, wouldn't they necessarily have to be able to detect when something is a Wasabi Wallet CoinJoin?

A. I do need to confirm with engineering, ma'am.

Q. You do, in fact, have a group of addresses in CipherTrace that are Wasabi Wallet identified, yes?

A. Yes.

Q. In your testimony yesterday -- in your testimony yesterday, you described the peel chain heuristic as sort of a Pac-Man; is that right?

A. Yes.

Q. And are you aware that Chainalysis includes a co-spend requirement within its peel chain heuristic to ensure the cluster remains conservative?

A. Can you describe that again.

Q. Well, directing your attention to Exhibit 20 -- that's Ms. Bisbee's report. This is page 8 where she's describing the peel chain behavior within heuristic 2. And this isn't a blanket peel chain definition.

Instead, it reads, "It does so by identifying long sequences of transactions in which there is no clear indication of which address is change and which is payment. It then finds the end of the chain and finds a co-spend with an address that appeared at the beginning of the chain. This demonstrates that the full peel chain is controlled by the same wallet."

Did I read that correctly?

A. I'm reading now. I see.

Q. Wouldn't that co-spending requirement exclude from this cluster many, what's traditionally thought of as, peel chain instances?

A. I do not know how many peel chains exist.

Q. I'm not asking that question. I'm saying that you have many peel chains that don't have a co-spend from the end to the beginning; is that right?

A. It's possible.

Q. How many cases have you done tracing on?

A. Thousands.

Q. And aren't peel chains a pretty common occurrence?

A. I don't trace all the way through every single peel chain.

Q. That's, again, not my question.

Haven't you, in fact, encountered numerous peel chains in your tracings?

A. Yes.

Q. And do some of them often not include a co-spend between the end of a chain and the beginning?

A. Well, I would have to trace all the way to the end to say for sure. It depends.

Q. So some may; some may not?

A. It's possible, yes.

Q. And this heuristic would only cluster something together if there were a co-spend at the end and the beginning; isn't that correct?

A. That's how I am interpreting this, but it also says that the peel refers to these smaller spending transactions. Is that where you began reading? Sorry. Just for reference.

Q. I started with, "It does so." But the peel begins -- that entire paragraph is the description of the peel chain behavior.

Ms. Still, there are many peel chains throughout the graphs in Mr. Scholl's report that are not shown as a single cluster; isn't that right?

A. I can think of one peel chain that is not shown as a single

cluster, but, instead, is cut and pasted together. But if you have one in mind, please reference that.

Q. So we can turn to Mr. Scholl's report, which is, I believe, on page 19 -- sorry, Exhibit 19. And if you'd turn to page 59.

A. Sorry. Exhibit 19?

Q. Exhibit 19, page 59. These peel chains are described as peel chains, not as single clusters; isn't that right?

A. I see the word peel chain. I disagree.

Q. You may disagree, but there's no representation in the government's chart here that these are single clusters, correct? They're just described as peel chains?

A. They are described as peel chains; however, there are missing transactions in this trace.

Q. That's, again, not what I'm asking. I'm just trying to make the point that these -- in this peel chain, they were not clustered together as single entities; they were continued to be described as peel chains --

A. That is the --

Q. -- is that correct?

A. -- representation here.

Q. That's all I am asking.

Looking back to your report or, actually, Ms. Bisbee's report on Exhibit 20, page 8, is this the chart that you were discussing? I guess it actually starts at the bottom of page 7 going into page 8.

Is this the chart that you were discussing yesterday as missing address types?

A. It starts on page 6 on my --

Q. I believe you've got transaction features starting on page --

A. Oh, I see on page 8, yes.

Q. Are any of the missing address types present in any of the clusters used or introduced by the government in this case?

A. I saw the Pay-to-Public-Key.

Q. I'm saying, are the missing address types?

A. Pay-to-Public-Key. That's P2PK.

Q. And these are, again --

THE COURT: I'm just -- is a P2PK different than a P2PKH?

THE WITNESS: Yes, sir. A Pay-to-Public-Key is, essentially, an exposed public key. It's not hashed.

THE COURT: Okay. Thank you.

BY MS. PELKER:

Q. And those are within the Chainalysis clusters here.

Do you disagree with the description? Again, aside from the bits versus bytes -- otherwise with the description of -- I guess you have a disagreement about SegWit, about Pay-to-Script-Hash -- with the general description of the other addresses?

A. Sorry. I'm still looking at this chart going back to your

previous question.

I believe there are more address types missing from this chart.

Q. But you don't know whether those were address types that were used; in fact, they were not necessarily address types that were used in Chainalysis's clustering; is that correct?

A. As I recall, they actually mentioned one of the address types, and it was one of the wrapped -- what's termed a wrapped SegWit. And, in fact, there was no witness data attached, and they relate this directly to Bitcoin Fog; so that address type is missing.

Q. Well, let's turn to that in just a minute. I guess my point here is that this may, in fact, just be a table describing the address types that were actually fed into -- that were actually used for the behavioral clustering, not a list of -- this may be a chart of the address types used in the behavioral clustering for this case, not a list of every single address type that could potentially exist?

A. I don't know.

Q. You mentioned SegWit. Can we turn your attention to your report that's Exhibit 10, page 24; the last bullet on that page.

This is what you were just discussing, disputing Ms. Bisbee's characterization of a transaction involving a SegWit address; is that right?

A. Which page?

Q. The bottom of page 24.

A. Yes.

THE COURT: Remind me what SegWit stands for.

MS. PELKER: Segregated witness. The witness can answer.

THE WITNESS: I'll answer. Segregated witness address is a more -- I guess, a better way of performing certain transactions on the Bitcoin ledger. It's going to save end fees. It's going to create the smaller block sizes; you can fit more transactions in.

THE COURT: It's coming back now. Thank you.

THE WITNESS: Yes.

BY MS. PELKER:

Q. Now, you looked at this transaction with the hash starting in 9a7e, and you saw that SegWit was not enabled; is that right?

A. Yes.

Q. Isn't it true, though, that an observer would see a Pay-to-Script-Hash address as SegWit-enabled when the address sends funds?

A. Can you repeat that.

Q. Wouldn't an observer looking at a transaction see that it's SegWit-enabled when that address sends the funds as opposed to receives them?

A. Must send the funds.

Q. Must send the funds. And reading Ms. Bisbee's report -- and it's quoted right here -- "The first-known Bitcoin Fog transaction where the change is a SegWit address in block 534129."

Did I read that correctly?

A. Yes.

Q. And so isn't she saying that the SegWit address is the output of that transaction?

A. Yes.

Q. So if you look at the next transaction where that address then spends in a transaction, can't you then see that that is, in fact, a SegWit address?

A. Can I pull that up and trace it?

Q. Not live here on the stand. Did you not do that as part of your report?

A. I need to actually look at the address. But, yes, the way that this is, if you look at the 9a7e transaction hash --

Q. Well, I think that we -- my point here is that you looked at that transaction hash, and the address mentioned by Ms. Bisbee is in the change.

Did you not look at the transaction where that address was actually as an input?

A. I can't recall.

Q. It's not in your report.

A. Which address exactly are you pointing to? There are two outputs here.

Q. I would have to go back and look. But you didn't look at the subsequent tracing of the change addresses from that transaction to see whether they were, in fact, SegWit?

A. I can't recall.

Q. Turning to page 20 of your report -- well, I guess, first, just recalling from yesterday, in your sworn affidavit in the LCX matter, didn't you describe co-spend clustering as "highly reliable"?

A. That is what it says.

Q. And in your testimony yesterday regarding CipherTrace's clustering, which uses co-spend, you testified, I believe, that while you were not sure what the exact P value was, the error rate, when CipherTrace's clustering was assessed, was extremely low; is that right?

A. As I recall.

Q. Now, looking at page 20 of your report and discussing heuristic 2, you acknowledge that the accuracy rate of heuristic 2 may depend on its specific implementation; is that right?

A. Can you point to the paragraph, or you mean just generally speaking?

Q. So if you read the last sentence under the first paragraph of "Evaluation of the Application of Heuristic 2 to

Chainalysis's Model," it reads, "Which subcategories of assumptions that are applied impact the accuracy of heuristic 2?"

A. Subcategories. So this would be those fingerprints.

Q. Correct. So some of them may be accurate, and you're saying that some may be less accurate?

A. I can't say how it's implemented here.

Q. But with proper implementation -- and implementation, you're saying, could be more or less accurate, depending on how it's applied?

A. It's possible.

Q. Your paper -- your report includes a discussion of some of the academic literature in blockchain analysis.

Are you familiar with the academic research in the field?

A. I read this.

Q. You read the reports that were referenced?

A. Yes.

Q. So turning your attention to Exhibit 22, is this the paper by Dr. Meiklejohn and her colleagues that was discussed?

A. Yes.

Q. And you read this in preparation of your report?

A. Yes.

Q. Were you previously familiar with it as well?

A. No.

Q. Does this report also reference a number of other studies that -- does this article also reference a number of other studies listed in your report?

A. Yes.

Q. And did you read those papers as well?

A. Yes.

Q. So turning to Exhibit 23, this is evaluating user privacy in Bitcoin. The lead author is Androulaki.

Is this one of the papers that you read?

A. Yes.

Q. Could you point to where in this paper they profess a 64.19 percent error rate for this heuristic?

A. I'm going to need a Control F.

Q. I'm happy to save you time and represent that there's no error rate listed in -- that that error rate is not listed in this paper.

A. Okay.

Q. Turning your attention now to page 20- -- to Exhibit 24, "A Fistful of Bitcoins: Characterizing Payments Among Men with No Names"; this is Dr. Meiklejohn's earlier paper.

Is this another paper that you reference in your report?

A. As referenced by Ms. Meiklejohn in "How to Peel a Million," yes.

Q. And did you read this paper?

A. Yes.

Q. Could you point to where in this paper they profess a 51.64 percent error rate?

A. Again, I will need that Control F.

Q. Isn't it, in fact, true that -- and you may not know -- that nowhere in this paper do they profess a 51.64 percent error rate?

A. I do not know that.

Q. Turning your attention now to Exhibit 25, "When the Cookie Meets the Blockchain," lead author Goldfeder.

Is this the third paper that you referenced?

A. This was referenced by Ms. Meiklejohn, which I then subsequently referenced.

Q. And did you read this paper?

A. No.

Q. You did not read this paper. So you're not aware that nowhere in this paper do they, in fact, profess a 48.7 percent error rate?

A. I cannot say that.

Q. Because you didn't read it?

A. I did not read this paper.

Q. Pointing your attention now to Exhibit 26, is this the "Automatic Bitcoin Address Clustering" paper with lead author Ermilov?

A. Yes.

Q.  And is this the fourth paper that was referenced?

A.  Where is Ms. Meiklejohn's -- can you point me back to that section so I just can confirm?

Q.  Sure.

A.  The name is familiar, yes, but I just want to confirm.

Q.  So Ms. Meiklejohn's paper is Exhibit 22.

A.  Thank you.

Q.  But the Ermilov paper is cited repeatedly in your report, or referenced repeatedly in your report.

A.  Sorry.  Can you just repeat the question.

Q.  I'm just asking, isn't this, in fact, the Ermilov paper that's cited in your report?

A.  I'm not sure that it is.  I'm -- so I'm doing this secondary source citing directly from Ms. Meiklejohn's "How to Peel a Million."

Q.  So you didn't actually read the source reports for that?

A.  I read some of these reports.

Q.  This is the -- this is the journal article that had the lowest false detection rate according to your report before Dr. Meiklejohn's new paper.

You're testifying that you did not actually read this paper?

A.  This "Automatic Bitcoin Address Clustering"?  I have not read this paper.

THE COURT:  Is there somewhere in the -- what we're

referring to as the Meiklejohn paper -- which I think the first author is, actually, Kappos -- in Exhibit 22, is there somewhere in that paper that lists the error rates that you then rely upon?

THE WITNESS:  That Ms. Meiklejohn is referring to?

THE COURT:  Yes.  Can you take a look at Exhibit 22 and maybe point to me where it is that the error rates are listed in that paper.

MS. PELKER:  And I think we'll get to that shortly, Your Honor.

THE COURT:  Okay.  That's fine.

MR. EKELAND:  I can direct the Court to it.

THE COURT:  I'd rather you not.  But I'll let you continue, Ms. Pelker.

BY MS. PELKER:

Q.  Ms. Still, turning your attention back to your report on -- that's Exhibit 10 on page 22 -- doesn't this list off in bold: Androulaki, et al.; Meiklejohn, et al.; Goldfeder, et al.; and Ermilov, et al.; and that Ermilov quote is the Ermilov "Automatic Bitcoin Address Clustering" article?

A.  I couldn't find the reference, and I'm still flipping through the pages.

Q.  This is your report.  So Exhibit 10 on page 22.

A.  The Ermilov was where?  24, 25?  Or 26, 27?  Where did you have it?

Q. If you could turn to your report that's Exhibit 10, page 22.

A. Page 22?

Q. Yes.

A. Yes.

Q. And these list off a number of different studies, including the Ermilov study; is that correct?

A. Yes.

Q. But your testimony is that you did not actually read the Goldfeder or Ermilov study when preparing your report?

A. Correct.

Q. And so you're not aware that nowhere in the Ermilov paper do they profess the 12.7 percent error rate?

A. The references come from "A Fistful of Bitcoins."

Q. They're not actually in the source documents?

A. I'm referencing a secondary source --

Q. Correct.

A. --- via Ms. Meiklejohn.

Q. So you didn't read the source documents and you don't know that there, in fact, are no calculated error rates within the source documents?

A. I did not read Goldfeder or Ermilov.

MS. PELKER: Government moves to admit Exhibits 22 through 26.

THE COURT: Any objection?

MR. EKELAND: No objection, Your Honor.

THE COURT: Exhibits 22 through 26 are admitted.

(Government Exhibits 22, 23, 24, 25, and 26 were admitted.)

BY MS. PELKER:

Q. Now, Ms. Still, the FDR numbers in your report are based on the subsequent work by Dr. Meiklejohn and her colleagues; is that right?

A. The -- can you repeat that.

Q. The FDR numbers in your report are actually based on the subsequent work by Dr. Meiklejohn and her colleagues?

A. Yes.

Q. And they were conducting their own evaluation of those heuristics; is that right?

A. Yes.

Q. And she -- Dr. Meiklejohn explains the different heuristics used by those prior researchers, correct?

A. Can you point out where she's explaining that? It's been a while since I've read this report.

Q. Well, you just started work on this case in July; is that right?

A. Uh-huh.

Q. Would you consider this a significant academic article relevant to your field?

A. It is important to the field.

Q. Turning your attention back to your report, Exhibit 10, page 22, you said that this was derived from Dr. Meiklejohn's report or study.

Doesn't this, in fact, show the different researchers all applying different parameters and their versions of various heuristics?

A. They are applying their own -- I can't really say exactly how they applied it other than to read directly from each of these.

Q. Right. And I'm not asking that. I'm just asking you to confirm that these different researchers each had their own specific heuristics; is that correct?

A. I'll need to read each of these again.

Q. I'm really just asking that -- you've listed in your report the specific characteristics for each one of these researchers' heuristics; is that right?

A. Yes.

Q. And they are -- in fact, each researcher has their own set of heuristics as set out in your report?

A. That is how it is here. But I need to read that to be able to confirm what you've just said. And as I mentioned, it's been a while.

Q. In your report, that's how you set it out. In your report, you wrote that each one of these researchers had different sets of heuristics; is that correct?

A. Can you point to that paragraph, please.

Q. That would be on page 22 after Androulaki, et al., you list out: Identify the change output in a transaction if one, two; and then you go through for Meiklejohn, if one, two, three, with the specific qualifications; for Goldfeder that -- you have one, two, three for Meiklejohn and then adding another qualification; and then Ermilov, a different set, one, two, three, four, five. Is that right?

A. They are additive.

Q. And at the time that these articles are each written, if you know, are these all, in fact, new proposals for new heuristics being put forward by members of academia?

A. By members of aca- --

Q. Academia.

A. New proposals for new heuristics?

Q. That's what all these papers are -- right? -- new proposals for new heuristics?

A. That is what Ms. Meiklejohn's research is about.

Q. Directing your attention to Ms. Bisbee's report -- that's Government Exhibit 20 -- could you turn now to the bottom of page 19 and read the description of the heuristic 2 parameters for the Agora cluster in Footnote 15.

A. "The change detection will, given a transaction, return the change address. It only allows a single address to be the change, and if multiple addresses are matching the criteria, it

will consider that none of them is the change. The criteria for an address to be the change are: It should be of type Start1.PK.Compressed or Start1.PK.Uncompressed.

"The change value should be like 0.01 BTC. The address should only be involved in two transactions. Transaction fees for both transactions should be the same."

Q. And so you agree that this heuristic includes a requirement for the change value, the transaction fee, and the address type?

A. What about the address did you say?

Q. The address type.

A. The address type and the number of transactions.

Q. But you agree that those are all requirements within the Chainalysis cluster heuristic for this cluster?

A. I'm reading the reference on 15. I do not know how they've applied it.

Q. You're agreeing that in this footnote on page 15 they are explaining that there is a requirement for address type, change value, and transaction fee?

A. Yes.

Q. Turning now back to page 22 of your report -- that's Exhibit 10 -- and directing your attention to the description of the Ermilov heuristic from your report, this is the one with the lowest FDR, 12.7 percent FDR; is that right?

A. That was the run rate, yes.

Q. Does the Ermilov heuristic have any requirements about matching the types of addresses involved?

A. I don't believe so.

Q. Does it place any restrictions on the change value?

A. Yes.

Q. Does it have the same type of -- the same restriction on the change value that the Chainalysis heuristic does?

A. Can you repeat that last one.

Q. Does it have the same restriction on the change value that Chainalysis placed for the Agora cluster?

A. It says the output value is significant. So we're talking sig digs to at least the fourth decimal place.

Q. I believe Chainalysis's is a specific value that is placed rather than a significance; is that correct?

A. That's what I interpret.

Q. So Chainalysis has a different requirement for the change value; is that correct?

A. As compared to these two, it appears so.

Q. And does the Ermilov heuristic have any requirement about the transaction fees?

A. No, not that I see here. But, again, I have not read that paper.

Q. In fact, based on what you wrote in your report and what Ms. Bisbee described in hers about the heuristics used for Agora, doesn't the Chainalysis heuristic have different

requirements than the Ermilov heuristic?

A. Without having read the full paper according to this little section, they do appear different, but --

THE COURT: I'm sorry. One at a time.

BY MS. PELKER:

Q. This is the little section that you chose to put in your report; isn't that correct?

A. Yes.

Q. And when you put it in your report, you believed that it was an accurate description of the heuristics used by Ermilov?

A. Yes.

Q. And, in fact, aren't the Chainalysis heuristics set forth in Ms. Bisbee's report different than the other heuristics set forth by each of the other researchers above?

A. Can we go through them?

Q. You are welcome to take a look. I'm asking, do the Chainalysis heuristics exactly match any of the researchers' heuristics set forth above?

A. I don't see an exact match.

Q. And, in fact, isn't it true that, by design, Chainalysis's behavioral heuristics incorporate the behavior of the particular entity that's being clustered?

A. As I understand.

Q. Would you consider the Bitcoin Fog cluster and the darknet market clusters to be large clusters?

A. It depends. There were, in total, 6 million addresses, 925,000 of which or so belong to Bitcoin Fog. Of those 6 million addresses, 20 million about, transactions.

Q. So in the grand scheme of clusters, some may be bigger, some may be smaller, but this is a relatively large cluster?

A. Possibly.

Q. Directing your attention to back to Exhibit 22, Dr. Meiklejohn's paper, on page 11.

In the bottom of this paragraph below the graph, doesn't Dr. Meiklejohn observe that "Bigger clusters tend to be more predictable in terms of their behavior, which is perhaps not surprising if we consider that the operators of these big clusters use automated scripts in order to form their transactions"?

A. Well, I trust that you read the right area. I'm sorry. I didn't catch where you were.

Q. The paragraph -- if you look on page 11, there's the colored charts. Not the caption, but the paragraph below it, about halfway through toward the end.

Isn't that what Dr. Meiklejohn wrote?

A. Yes.

Q. Your expert report claims that the heuristic that Dr. Meiklejohn and her colleagues propose in this paper fail to validate the government's tracing; is that right?

A. With respect to Bitcoin Fog?

Q. Correct.

A. Yes.

Q. Directing your attention to page 2 of the paper, could you read -- so if you see the paragraph -- you see the bullet pointed list; there's a paragraph above that.

Could you read from -- starting about halfway up, starting with "As compared with previous change heuristics."

A. "As compared with previous change heuristics 2, 10, 14, 31, we demonstrate using our ground truth data set that our change heuristic achieves a false discovery rate of only 0.02 percent. The next best heuristic achieves a false discovery rate of 12.7 percent."

Q. You can keep reading.

A. "We then apply this expansion heuristic to investigate ransomware addresses and to track the funds withdrawn from an exchange account associated with Roman Sterlingov to their deposit into the Bitcoin Fog mixing service. Showing that, our heuristic is able to link these two transactions; whereas, all previous heuristics would be unable to do so."

Q. Directing your attention to page 13 of the paper, under the Bitcoin Fog case study, does this describe the researchers using information from the government's publicly filed complaint affidavit to review the transfer from Mr. Sterlingov's Mt. Gox account into Bitcoin Fog?

A. Ma'am, I'm going to have to ask you to repeat that, as I

was turning the page.

Q. Looking at the -- you did read this paper, correct?

A. Yes.

Q. And the case study that's set out on Bitcoin Fog on page 13, does that describe the researchers using the information from the government's publicly filed complaint affidavit to review the transfer from Mr. Sterlingov's Mt. Gox account into Bitcoin Fog?

A. Did this come from the public filing? I don't know.

Q. If you read in the beginning of paragraph -- the first paragraph under the case study, it says, "According to the affidavit of an IRS special agent," and the cite there for No. 4 is the statement of facts with a cite to *CourtListener*.

A. Sorry. Where is that citation?

Q. Page 13.

A. Yes.

Q. You see the cite 4?

A. I see it.

Q. And then at the end, that's the cite to the public docket, but from -- pulled down on *CourtListener*.

A. Sorry?

Q. But pulled down on *CourtListener*; is that correct?

A. Yes.

Q. And looking at page 14, is this a chart that the researchers put together showing that trace -- showing their

version of that trace?

A. Yes.

Q. I'd like to just direct your attention briefly to Exhibit 19 -- that's Mr. Scholl's report -- on page 49. This is the small chart on the PDF.

Does this show Mr. Scholl -- this chart and the subsequent pages show Mr. Scholl tracing the funds manually from address to address to address?

A. While I cannot confirm he traced manually, I do see the trace represented here.

Q. You see, looking at page 50, 51, 52, that he did trace from address to address to address; is that correct?

A. This is a description of the transactions. It does not say manually tracing or how he accomplished his trace. But --

Q. It does set them out step by step, correct?

A. Yes.

Q. And nowhere in Mr. Scholl's report does he say that he used these -- that these intermediary addresses were somehow all clustered together using Chainalysis's heuristic, does he?

A. No.

Q. Has the government ever said that it was relying on Chainalysis's clustering heuristic for this address-to-address tracing?

A. I can't answer that.

Q. Have you ever seen anywhere in discovery in your review

where the government has said it was relying on Chainalysis's clustering heuristics for this address-to-address tracing?

A.   I can't answer that.

Q.   Do you recall ever seeing that in discovery?

MR. EKELAND:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry.  I can't recall.

THE COURT:  Okay.  That's an answer to the question. That's fine.

BY MS. PELKER:

Q.   That's an answer.  Returning now back to the Meiklejohn paper -- so this is 22 -- isn't it, in fact, true that the researchers' find backwards heuristic would have automatically connected the defendant's Mt. Gox account to the initial Fog deposit?

A.   No.

Q.   So we're talking about the find backwards heuristic; isn't that correct?

A.   I believe that's what you are referencing.

Q.   And that when we are looking at the case study under Bitcoin Fog, don't they, in fact, say that their find backwards heuristic did connect the defendant's Mt. Gox account to the initial Fog deposit?

A.   It says, "While the same analysis was likely done manually by the IRS agent, this would quickly become infeasible if there

were more intermediate hops for" --

Q. I'm, again, not asking that question. I'm just --

MR. EKELAND: Objection, Your Honor.

THE COURT: Overruled.

BY MS. PELKER:

Q. You can read to yourself starting at the beginning of the paragraph.

Didn't the researchers, in fact, trace from the -- using their heuristic find backwards, connect the defendant's Mt. Gox account to that initial Fog deposit?

A. Yes.

Q. Ms. Still, did your review include tracing the funds through the defendant's burner accounts at Liberty Reserve and Mt. Gox?

A. What do you mean by burner accounts?

Q. The Kolbasa account, the Volfprius account, the Nfs9000 account.

A. As far as I'm aware, those did not have PII associated with them. Can you pull them up, please?

Q. They would not have had PII associaters with them. I'm asking whether you did any tracing of funds through those accounts.

A. Ma'am, you referenced them as belonging to Mr. Sterlingov as burner accounts. This is not an --

Q. Did you do any tracing related to those accounts?

A. Yes.

Q. Is that anywhere in your report?

A. No.

Q. Did you produce any sort of work product regarding the tracing on those accounts?

A. To the government?

Q. In general.

A. I've done it, yes.

Q. You've done it. And what did your tracing on those accounts show?

A. I'd have to pull them up in the tool to go through them with you.

Q. You didn't write up any sort of summary on your work on those accounts?

A. I have it, maybe, in my notes file.

Q. Now, in your work at CipherTrace, do you routinely review account records for financial institutions that are not cryptocurrency exchanges?

A. No.

Q. And how many times prior to this case had you reviewed actual records from Mt. Gox?

A. I've never seen actual records from Mt. Gox.

Q. What about Liberty Reserve?

A. No.

Q. BTC-e?

A.  True records?

Q.  True records from BTC-e.

A.  Not that I recall.

Q.  And these are all very significant common services at the time that Mr. -- that Bitcoin Fog was operating; isn't that correct?

A.  What were the two accounts?  Liberty Reserve, BTC-e.  What did you say --

Q.  And Mt. Gox.

A.  And Mt. Gox.  Around 2011, 2012, 2014.  Mt. Gox stops around 2014.

Q.  But my question is, those are common services around that time?

A.  You could say that.

Q.  And prior to this case, you've never reviewed any records from any of those services?

A.  I've reviewed records.  I do not believe that they were the true records or the natives related to those services.

Q.  So you've never reviewed the actual records for a case?

A.  I believe we're saying -- in terms of actual, defining that as the natives provided from the exchange itself?

Q.  So I'm saying that you're aware that the government has the records from the backends of Mt. Gox, from Liberty Reserve, and BTC-e prior to this case.  Have you ever reviewed any of those types of records in that format?

A.  In the -- in the native format, directly from the exchange itself?

Q.  In the way that the government would provide the records as part of a criminal case.

A.  I've never seen these before in any criminal case.

Q.  Do you agree that most of the funds in the defendant's Kraken account can be traced back to Bitcoin Fog?

A.  I would have to check my notes and my traces in the tool.

Q.  Did you do traces from the defendant's Kraken account back to Bitcoin Fog?

A.  I did.

Q.  Is that anywhere in your report?

A.  No.

Q.  Did you do traces from the defendant's LocalBitcoins account back to Bitcoin Fog?

A.  I believe so.  But I really need to get into the tool to review my notes.

Q.  Well, is that anywhere in your report?

A.  No.

Q.  What about traces from the defendant's Binance, Bitfinex, Bitstamp, Poloniex accounts?

A.  I don't recall the defendant having a Binance, but I have to refer to my records and my traces in the tool.

Q.  What about Bitfinex, Bitstamp, and Poloniex?

A.  Bitfinex, Bitstamp; unclear about Poloniex; I will have to

look at it.

Q. And LocalBitcoins?

A. And LocalBitcoins, yes.

Q. Did you do traces from the defendant's accounts back to Bitcoin Fog for those services?

A. Not all of those services. I do have to reference my notes to confirm. Generally speaking, yes, I was able to trace back to Bitcoin Fog.

Q. And is that anywhere in your report?

A. No.

Q. You're aware that the administrator of Bitcoin Fog took numerous steps to avoid being identified by law enforcement; is that correct?

A. I'm not clear on that at all.

Q. You don't believe that the administrator of the Bitcoin Fog darknet mixing service was trying to avoid being identified by law enforcement?

A. It's not been made clear to me, no.

Q. You've reviewed the discovery in this case, correct?

A. Yes.

Q. In your experience looking at criminal cryptocurrency services and transactions, would the administrator of a darknet service try to avoid withdrawals that would stand out as obvious administrator payouts?

A. I've not necessarily seen that to be the case. I can think

of two examples.

Q.   And are those examples that involve very sophisticated operators of Bitcoin mixing services?

A.   I suppose that's true.

Q.   It's true that an administrator would avoid withdrawals that would stand out as obvious payouts?

A.   I don't know.

Q.   Are you aware that administrators of criminal services can try to conceal the withdrawals of their profits by making them look like user withdrawals?

A.   I've read the Larry Harmon interview; Larry Dean Harmon.

Q.   I'm just asking whether you're aware that administrators of criminal services can try to conceal the withdrawals of their profits by making them look like user withdrawals?

A.   I only have that one data point, ma'am; Larry Dean Harmon from his interview, which I read.

Q.   And are you aware that that is, in fact, something that administrators of criminal services can do?

A.   I think there is an assumption here.  We tend to think it's reasonable that if one is running a mixer or some kind of dark web service that one would not want to be identified.  That is an assumption.

         THE COURT:  I think the question asked about criminal services.  I think the question was people who are running criminal services, whether, in your view, they would obscure

their withdrawals or obscure who they are.

THE WITNESS: Well, I guess I have to ask a follow-up question here just to clarify, if that's okay with you.

BY MS. PELKER:

Q. I really am just trying to ask, do administrators of criminal services, can they try to conceal their withdrawals of profits?

Administrators of criminal services, they are earning a profit in many instances, correct?

A. I assume so, yes.

Q. And they at some point want to withdraw their profits from the criminal service; isn't that right?

A. Sometimes.

Q. Sometimes. And when they do that withdrawal, they don't want law enforcement to be able to use that withdrawal to identify them as the administrator; isn't that right?

A. I could agree with that.

Q. And if they're trying to avoid law enforcement flagging this withdrawal, isn't one thing that they could do, to try and mask it as a user withdrawal?

A. It's possible.

Q. On page 9 of your report -- so this is Tab 10, page 9 -- you refer to CipherTrace collecting IP addresses by operating a Bitcoin node; is that accurate?

A. Yes.

Q.   Could you describe the process through which CipherTrace associates particular Bitcoin addresses with the IP address ending in .123.

A.   So, generally -- did you say page 10 on my report?

THE COURT:   I thought it was 9; 9 of Exhibit 10.

BY MS. PELKER:

Q.   Page 9, the second bullet down.

A.   I see, yes.  And the question is?  You want a general -- I think I understand.  You want a general description of how we collect these IP addresses?

Q.   Correct.

A.   So we run our own nodes, and those nodes are set up in such a way to collect IP addresses; that is, if you are to connect to your wallet, let's say, on your phone, for example, and you want to check your balance.

Your wallet software is not running a full node or a half node.  It actually has to communicate with a node running -- a full node or a half node -- right? -- with, like, the full ledger copy.  So it can actually tell you what your balance is and history of transactions and all of that.

If that interaction touches one of our nodes, we are then, therefore, able to collect that IP data.

Q.   Was CipherTrace running these nodes back in 2011?

A.   Unclear.

Q.   Do you know when they started running the nodes?