# 24-3161

## United States Court of Appeals for the District of Columbia

THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
Hon. Randolph D. Moss
United States District Court Case 1-21-cr-00399-RDM-1

## APPENDIX
### Volume IV of XVII (Pages Appx1321 - Appx1760)

TOR EKELAND, ESQ.
TOR EKELAND LAW PLLC
*Attorneys for Defendant-Appellant*
30 Wall Street, 8th Floor
New York, New York 10005
(718) 737-7264
tor@torekeland.com

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
*Attorneys for Defendant-Appellant*
800 Third Avenue, 20th Floor
New York, New York 10022
(212) 446-2346
maf@fernichlaw.com

MAKSIM NEMTSEV, ESQ.
MAKSIM NEMTSEV PC
*Attorneys for Defendant-Appellant*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
max@mnpc.law

AARON DANIEL, ESQ.
ASYMMETRIC LEGAL
*Attorneys for Defendant-Appellant*
11900 Biscayne Blvd, Suite 400
Miami, Florida 33181
(305) 979-9296
aaron@asymmetric.legal

*(See Inside Cover for Additional Counsel)*

3914


ELECTRONIC PARALEGAL

_____

AMY C. COLLINS, ESQ.
THE LAW OFFICE OF
    AMY C. COLLINS
*Attorneys for Defendant-Appellant*
888 17th Street, NW, Suite 1200
Washington DC 20006
(228) 424-0609
amy@amyccollinslaw.com

_____

# TABLE OF CONTENTS

District Court Docket – US v. Sterlingov, 21-CR-00399-RDM .............Appx001

Protective Order of Governing Discovery of Hon. Randolph D. Moss, Dated September 17, 2021 (ECF Doc. No. 18) .......................................Appx074

Preliminary Order of Forfeiture of Hon. Randolph D. Moss, Dated November 4, 2024 (ECF Doc. No. 336) .......................................Appx079

Order of Forfeiture of Hon. Randolph D. Moss, Dated November 14, 2024 (ECF Doc. No. 338) .....................................Appx085

Judgment in a Criminal Case of Hon. Randolph D. Moss, Dated November 13, 2024 (ECF Doc. No. 340) .....................................Appx091

Transcript of Motion Hearing, Dated January 13, 2023 (ECF Doc. No. 114) ..................................................................................Appx099

Transcript of Motion Hearing, Dated January 31, 2023 (ECF Doc. No. 115) ..................................................................................Appx190

Transcript of Motions Hearing, Dated June 16, 2023 (ECF Doc. No. 223) ..................................................................................Appx345

Transcript of Motions Hearing, Dated June 23, 2023 (ECF Doc. No. 224) ..................................................................................Appx501

Transcript of Motions Hearing, Dated July 19, 2023 (ECF Doc. No. 225) ..................................................................................Appx682

Transcript of Continued Motions Hearing, Dated July 20, 2023 (ECF Doc. No. 226) ..................................................................................Appx895

Transcript of Motions Hearing, Dated August 22, 2023 (ECF Doc. No. 228) ..................................................................................Appx1040

Transcript of Continued Motions Hearing, Dated August 23, 2023 (ECF Doc. No. 229) ..................................................................................Appx1266

Transcript of Motions Hearing, Dated August 29, 2023 (ECF Doc. No. 231) ..................................................................................Appx1466

Transcript of Pretrial Conference, Dated September 7, 2023
(ECF Doc. No. 232) .................................................................Appx1524

Transcript of Pretrial Conference, Dated September 8, 2023
(ECF Doc. No. 233) .................................................................Appx1741

Transcript of Pretrial Conference, Dated September 13, 2023
(ECF Doc. No. 234) .................................................................Appx1861

Transcript of Pretrial Conference, Dated September 15, 2023
(ECF Doc. No. 235) .................................................................Appx1999

Transcript of Pretrial Conference, Dated September 18, 2023
(ECF Doc. No. 236) .................................................................Appx2141

Transcript of Pretrial Conference, Dated September 21, 2023
(ECF Doc. No. 237) .................................................................Appx2235

Transcript of Motion Conference, Dated November 13, 2023
(ECF Doc. No. 238) .................................................................Appx2302

Transcript of Jury Trial, Dated February 12, 2024
(ECF Doc. No. 276) .................................................................Appx2350

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) .................................................................Appx2620

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) .................................................................Appx2688

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 278) .................................................................Appx2825

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 327) .................................................................Appx2948

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) .................................................................Appx3074

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) .................................................................Appx3189

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ......................................................................Appx3331

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ......................................................................Appx3446

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 281) ......................................................................Appx3572

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 328) ......................................................................Appx3697

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ......................................................................Appx3858

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ......................................................................Appx3982

Transcript of Jury Trial, Dated February 23, 2024
(ECF Doc. No. 329) ......................................................................Appx4122

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ......................................................................Appx4251

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ......................................................................Appx4394

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 284) ......................................................................Appx4419

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 330) ......................................................................Appx4550

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ......................................................................Appx4581

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ......................................................................Appx4698

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 285) ......................................................................Appx4836

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 286) ...................................................................Appx4955

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 331) ...................................................................Appx5074

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 287) ...................................................................Appx5198

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 332) ...................................................................Appx5344

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...................................................................Appx5359

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...................................................................Appx5496

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 289) ...................................................................Appx5621

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 333) ...................................................................Appx5762

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 290) ...................................................................Appx5900

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 334) ...................................................................Appx6004

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...................................................................Appx6087

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...................................................................Appx6190

Transcript of Jury Trial, Dated March 11, 2024
(ECF Doc. No. 292) ...................................................................Appx6324

Transcript of Jury Trial, Dated March 12, 2024
(ECF Doc. No. 293) ...................................................................Appx6344

Virtual Asset Analysis Expert Report of Luke Scholl,
Dated December 8, 2022................................................................Appx6400

Expert Report #1 of Elizabeth Bisbee (Nov. 2022).....................Appx6465

Expert Report #2 of Elizabeth Bisbee (Dec. 2022) .....................Appx6493

Expert Report #3 of Elizabeth Bisbee (Jul. 2023)......................Appx6522

CS-Mazars Expert Report - Device Review Summary,
Dated May 5, 2023 .......................................................................Appx6529

CS-Mazars Expert Report - IP Overlap Analysis,
Dated November 9, 2022 ..............................................................Appx6532

CS-Mazars Expert Report - IP Graph Data Excel File..............Appx6539

Criminal Complaint, Dated April 26, 2021 (ECF Doc. No. 1) .............Appx6542

Arrest Warrant, Dated April 26, 2021 (ECF Doc. No. 5).....................Appx6556

Indictment, Filed June 14, 2021 (ECF Doc. No. 8) .............................Appx6557

Superseding Indictment, Filed July 18, 2022 (ECF Doc. No. 43) .......Appx6561

Defendant's Supporting Memorandum of Law,
Dated August 1, 2022 (ECF Doc. No. 46) ............................................Appx6567

Attachment to Memorandum of Law -
Proposed Order of Hon. Randolph D. Moss Granting Defendant's
Motion to Dismiss (ECF Doc. No. 46-1) ....................................Appx6585

Attachment to Memorandum of Law -
Defendant's Notice of Motion to Dismiss, Dated August 1, 2022
(ECF Doc. No. 46-2) ....................................................................Appx6586

Government's Opposition to Motion, Filed August 29, 2022
(ECF Doc. No. 52) .................................................................................Appx6589

Defendant's Reply to Government's Opposition to Motion,
Dated September 7, 2022 (ECF Doc. No. 57) ......................................Appx6623

Exhibit A to Defendant's Reply -
Second Declaration of Eric Garland, Dated September 7, 2022
(ECF Doc. No. 57-1) .......................................................................Appx6635

Defendant's Motions in *Limine*, Dated October 24, 2022
(ECF Doc. No. 59) ..........................................................................Appx6644

Exhibit A to Motions in *Limine* -
Letter from Tor Ekeland to Christopher B. Brown and
C. Alden Pelker, Dated September 23, 2022, with Exhibit A
(ECF Doc. No. 59-1) .......................................................................Appx6664

Defendant's Opposition to the Government's Motions in *Limine*,
Dated November 7, 2022 (ECF Doc. No. 68) ......................................Appx6680

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated March 6, 2023 (ECF Doc. No. 116) ..........................................Appx6689

Notice of Bill of Particulars for Forfeiture, Filed May 17, 2023
(ECF Doc. No. 119) .........................................................................Appx6709

Defendant's Notice of Intent to Present Expert Testimony,
Dated July 7, 2023 (ECF Doc. No. 145) ..............................................Appx6711

Exhibit A to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Francisco Cabanas (ECF Doc. No. 145-1) ...........................Appx6716

Exhibit B to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Itiel Dror (ECF Doc. No. 145-2) ........................................Appx6725

Exhibit C to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jeffrey Fischbach (ECF Doc. No. 145-3)...................................Appx6731

Exhibit D to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jonelle Still (ECF Doc. No. 145-4) ...........................................Appx6737

Exhibit E to Notice of Intent -
Summary of Qualifications and Expected Testimony for
J.W. Verret (ECF Doc. No. 145-5)................................................Appx6741

Supplemental Summary of Qualifications and Expected
Testimony for Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 157) ......................................................................Appx6756

Notice of Expert Report for Defense Expert Jonelle Still of
Ciphertrace, Dated August 8, 2023 (ECF Doc. No. 159) .....................Appx6761

Attachment to Notice of Expert Report -
Defense Expert Report of Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 159-1) .................................................................Appx6764

Exhibit A to Notice of Expert Report -
Data Credibility in Cryptocurrency Investigations of Ciphertrace
(ECF Doc. No. 159-2) .................................................................Appx6805

Exhibit B to Notice of Expert Report -
Article Titled "Bitcoin: A Peer-to-Peer Electronic Cash System"
(ECF Doc. No. 159-3) .................................................................Appx6822

Notice of Bill of Particulars, Filed August 28, 2023
(ECF Doc. No. 173) ....................................................................Appx6832

Defense Response to Government's Motion to Admit Certain
Exhibits, Dated September 4, 2023 (ECF Doc. No. 177) .....................Appx6834

Notice of Source Code Expert Bryan Bishop Regarding Independent
Analysis of Chainalysis Reactor Source Code and Request for
Production of Chainalysis Reactor Source Code and Relevant
Related Brady Material, Dated September 5, 2023
(ECF Doc. No. 179) ....................................................................Appx6843

Chainalysis' Notice in Response to the Court's Request Regarding
Protective Order, Dated September 12, 2023
(ECF Doc. No. 195) ....................................................................Appx6860

Exhibit A to Notice in Response -
[Proposed] Heuristic Information Protective Order of
Hon. Randolph D. Moss (ECF Doc. No. 195-1)...........................Appx6862

Exhibit B to Notice in Response -
[Proposed] Heuristic Information Protective Order to Jonelle Still
of Hon. Randolph D. Moss (ECF Doc. No. 195-2).......................Appx6869

Heuristic Information Protective Order to Jonelle Still of Hon.
Randolph D. Moss, Dated September 13, 2023 (ECF Doc. No. 196)...Appx6877

Notice Regarding Court's Proposed Protective Order Governing
Review of Chainalysis' Proprietary Information,
Dated September 20, 2023 (ECF Doc. No. 199) .................................Appx6884

Notice Regarding Ciphertrace Expert Testimony and Review of
Latest Chainalysis Production, Dated September 22, 2023
(ECF Doc. No. 205) .......................................................................Appx6888

Government's Response to September 18, 2023 Minute Order
Regarding Defendant's Access to Sensitive Heuristics Information
Provided by Chainalysis, Filed September 22, 2023
(ECF Doc. No. 206) .......................................................................Appx6892

Defendant's Opposition to Government's Response to
September 18, 2023, Minute Order Regarding Defendant's Access
to Sensitive Heuristics Information Provided by Chainalysis,
Dated September 29, 2023 (ECF Doc. No. 207) .................................Appx6901

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 4, 2023 (ECF Doc. No. 210) ..................................Appx6912

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 30, 2023 (ECF Doc. No. 213) .................................Appx6930

Defendant's  Motion to Exclude any Testimony About Deepweb
Marketplaces, Dated February 8, 2024 (ECF Doc. No. 247)...............Appx6942

Attachment to Motion to Exclude -
[Proposed] Order of Hon. Randolph D. Moss
(ECF Doc. No. 247-2) ...................................................................Appx6950

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated February 29, 2024 (ECF Doc. No. 259)......................................Appx6951

Final Jury Instructions and Charges, Filed March 7, 2024
(ECF Doc. No. 265) ...............................................................................Appx6982

Government's Motion for Preliminary Order of Forfeiture,
Filed June 7, 2024 (ECF Doc. No. 297)................................................Appx7061

       Attachment to Motion for Preliminary Order of Forfeiture -
       Proposed Preliminary Order of Forfeiture Hon.
       Randolph D. Moss (ECF Doc. No. 297-1)...................................Appx7072

Defendant's Opposition to Government's Motion for Preliminary
Order of Forfeiture, Dated June 21, 2021 (ECF Doc. No. 305) ...........Appx7078

       Exhibit A to Defendant's Opposition -
       Article Titled "Chainalysis: Most Mixed Bitcoin Not Used
       For Illicit Purposes", Dated August 26, 2019
       (ECF Doc. No. 305-1) .................................................................Appx7095

       Exhibit B to Defendant's Opposition -
       Blockchain Address Search Result from Blockchain.com
       (ECF Doc. No. 305-2) .................................................................Appx7107

Government's Memorandum in Aid of Sentencing,
Filed August 1, 2024 (ECF Doc. No. 314)............................................Appx7112

Sentencing Memorandum on behalf of Roman Sterlingov,
Dated August 15, 2024 (ECF Doc. No. 321) ........................................Appx7157

Memorandum Opinion of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 337) .....................................Appx7194

Defendant's Notice of Appeal, Dated November 19, 2024
(ECF Doc. No. 343) ...............................................................................Appx7214

Memorandum for All Department Employees from The Deputy
Attorney General, Subjecting "Ending Regulation by Prosecution",
Dated April 7, 2025...............................................................................Appx7217

**Trial Exhibits:**

Trial Exhibit 601 -
Darknet Market Vendor Transaction Summary
(Document in Evidence and to be Produced Upon Request Due
to Volume) ........................................................................................Appx7221

Trial Exhibit 624................................................................................Appx7222

Trial Exhibit 625................................................................................Appx7223

Trial Exhibit 626................................................................................Appx7224

Trial Exhibit 627................................................................................Appx7225

Trial Exhibit 628(A)...........................................................................Appx7226

Trial Exhibit 628(B)...........................................................................Appx7227

Trial Exhibit 629................................................................................Appx7229

Trial Exhibit 630(A)...........................................................................Appx7230

Trial Exhibit 630(B)...........................................................................Appx7244

Trial Exhibit 631................................................................................Appx7247

Trial Exhibit 632................................................................................Appx7248

Trial Exhibit 633................................................................................Appx7252

Defense Exhibit 138 -
The-Message-Game, Written by Ice White .........................................Appx7253

Defense Exhibit 139 -
Extracted Page from The-Message-Game, Written by Ice White ......Appx7413

Government Exhibit 721 and Defense Exhibit 143 -
Boox Chat ..........................................................................................Appx7414

Exhibit B to Fischbach Declaration -
Declaration of Jeffrey M. Fischbach, for Defendant, Dated August 14, 2024,
with Attachment
(ECF Doc. No. 321-2) ...............................................................Appx7415

A.  I would think after they began as a company.

Q.  But you don't have any more specific time frame other than that?

A.  No.  I have to check with the engineers.

Q.  And how many Bitcoin addresses does CipherTrace link to that .123 address?

A.  I will have to go into Inspector to count.  It's about 16 or so.

Q.  And are any of those from that October of 2011 time frame?

A.  I need to go into Inspector to confirm.  My suspicion is probably not.

Q.  Probably not.  So that, in fact, none of these observations may have been around the relevant time period?

A.  There was a nuance here with the way we collect IP addresses.  That is, the dates are not necessarily representative of the date of the touchpoints for each of the individual addresses.

Q.  So does CipherTrace not, actually, necessarily log the date of each touchpoint?

A.  We do log them, but I don't see them represented.

Q.  And as part of your work on this case, when you were putting together this section describing the possibility of other users of this IP, you did consult CipherTrace's tool; is that correct?

A.  Yes.

Q. And you reviewed these different IP addresses -- the different IP addresses that were associated with this .123 address?

A. I reviewed other IP addresses?

Q. Sorry. Other Bitcoin addresses that were associated with the .123.

A. I did.

Q. All different types of addresses.

And you didn't include any further detail on those IP addresses in your report, did you?

A. No.

Q. And you don't recall whether any of them were even from the time period that pertained to the transfers at issue here?

A. Ma'am, are you referring to the Bitcoin addresses and their transaction histories?

Q. I'm referring to the .123 IP address and asking whether you saw any other observations around the October 2011 time frame.

A. Not that I recall.

Q. And has any additional information regarding CipherTrace's attribution on that -- CipherTrace's linking of addresses to that IP address been provided to the government?

A. No.

Q. Now, you claim that none of the Bitcoin addresses associated with IP address 212 -- the IP address ending in .123 ever interacted with a Bitcoin Fog address.

Could you point to where in the government's reports it claims that they did?

A.   No.

Q.   And that's because the government never makes that claim, do we?

A.   I don't know.

Q.   You don't know.  You've reviewed the discovery, you've -- you're not aware or recollecting any time when the government has made that claim?

A.   My review of the discovery is ongoing.

Q.   But based on your review thus far, you're not aware of any time that the government has made that claim?

A.   I cannot recall.

Q.   And, in fact, you testified that you're not sure whether CipherTrace even has collection around the October 2011 time frame; isn't that correct?

A.   No.

Q.   No, you can't recall, or no, it does not?

A.   I need to check with the engineers.

Q.   So as you're testifying today, you cannot recall whether CipherTrace even has collection around that October 2011 time frame?

A.   Yes.  Specific to the IP, I assume, you're mentioning.

Q.   Correct.  And, in fact, what the government has shown is that this IP address was used to log into accounts at Mt. Gox

and Liberty Reserve; isn't that right?

A. Something like that.

Q. None of your data disproves that the IP address was used to log into accounts at Mt. Gox and Liberty Reserve; isn't that right?

A. No.

Q. No. You believe that your data does disprove that that IP address logged into accounts at Mt. Gox and Liberty Reserve?

A. I can't confirm. I have to go back and look in my notes.

Q. So nothing in your report, nothing that you brought to the attention of the government would disprove that the accounts at Mt. Gox and Liberty Reserve that have that IP address in their logs were accessed from that IP address?

A. Can you repeat that.

Q. Nothing in your report would disprove that that IP address logged into the Mt. Gox and Liberty Reserve accounts?

A. Or prove it, I think.

Q. Right. I'm just asking that nothing in your report would disprove that?

A. No.

Q. And are you familiar with CryptoVPN?

A. I think I saw a reference to this in discovery or a different service related to CryptoVPN. I can't recall.

Q. Are you aware then that the government, in its discovery and its report, specifically identifies that .123 address as a

VPN address?

A. Ms. Mazarin does.

Q. Ms. Still, turning your attention to page 10 of your report -- so this is Exhibit 10, page 10 -- regarding the wire fraud charge.

Your report reads, "The superseding indictment does not include a wire fraud charge. Therefore, the fiat sources were not determined to be illicit."

Did I read that correctly?

A. Are we on page 10, or are we on page 11?

Q. On page 10 at the very top; first two sentences, top of the page.

A. Ah, I see. Yes.

Q. Is it your intention to offer an expert opinion that the lack of substantive wire fraud counts in the indictment is some indication that Mr. Sterlingov's purchases are more likely to be legitimate?

A. No.

Q. No. But you are suggesting here that, because the superseding indictment does not include a wire fraud charge, that the fiat sources were not determined to be illicit; isn't that right?

A. I am making a connection to previous indictments that I've read involving cryptocurrency where they typically involve some type of wire fraud charge.

THE COURT:  Can I -- just to speed things along here, I don't think that this witness is qualified to testify about Teslas or Lamborghinis or wire fraud charges or any of that. So I won't allow any of that testimony on any of those topics.

MS. PELKER:  Thank you, Your Honor.  That will help us skip things over a bit.

Does Your Honor have a position already about sanctions and the relevance of whether Bitcoin Fog was or was not sanctioned?  I believe there's a suggestion --

THE COURT:  You want to point to something in the report?

MS. PELKER:  This is page 18 of the report where Ms. Still writes that "It is important to note here that Bitcoin Fog is not and has never been sanctioned."

THE COURT:  You mean -- OFAC sanctions, I can't -- unless you have something else to offer on that.

MR. EKELAND:  What page was that?

THE COURT:  18.  I wouldn't see any basis based on what you've done on the direct or in the report, Mr. Ekeland, to believe that this witness has any expertise on OFAC sanctions or anything along those lines.

It seems to me she's much more of a technical expert rather than that type of expert.

MR. EKELAND:  Your Honor, I think I'm inclined to agree with you.  Could you point me to where --

THE COURT: Page 18.

MS. PELKER: 18. It's in the PayJoin section, the second paragraph.

MR. EKELAND: Oh, okay. On the OFAC. We agree, Your Honor.

THE COURT: All right. So you don't need to get into that.

BY MS. PELKER:

Q. In your testimony yesterday, you discussed funds tied to the terrorist group Al-Qassam Brigades; is that right?

A. Yes.

Q. I'm going to direct your attention now back to the defense binder, Exhibit --

THE COURT: How much more time do you think you're going to need? We've been going for close to an hour and a half, I think. Maybe we started a little after 9:00.

MS. PELKER: Probably maybe 15 -- 10 minutes, Your Honor.

THE COURT: Why don't we finish that up, and then we'll take a break and come back for the redirect.

MS. PELKER: Yes, Your Honor.

BY MS. PELKER:

Q. This is Defense Exhibit D. Turning to page 7, this is a screenshot of the -- I guess there's no page numbers on here, but it's the screenshot of the government's complaint.

A.  Section Bravo or Delta?

Q.  D, Delta.

A.  In the defense?

Q.  This is Exhibit D in the defense binder.  This is the PowerPoint.

A.  Which page are we looking at?

Q.  Page 7, the screenshot of the government's complaint.

A.  Oh, I believe you're referring to the United States District Court for the District of Columbia Civil Forfeiture.

Q.  Yes.  You're aware that that's a civil forfeiture complaint?

A.  Yes.

Q.  You're not disagreeing that the addresses and accounts set out in that complaint are tied to Al-Qassam Brigades, are you?

A.  No.

Q.  And you testified yesterday that CipherTrace and Chainalysis and other blockchain analytics companies offer risk flagging for their exchange customers monitoring funds into and out of the platforms; is that right?

A.  Risk rating?

Q.  Risk flagging; risk alerts, flagging.

A.  Yes.

Q.  Isn't it true that for terrorism financing, sanctioned entities, many exchanges are very risk averse because of the criminal liability that could attach with moving those funds?

A.   Yes.

Q.   And isn't it true that an exchange may want to be alerted to transfers even several steps removed from a sanctioned entity or entity tied to terrorism?

A.   Depends on the exchange.

Q.   But some may?

A.   Some may, yes.

Q.   Now, turning to the next page, page 9, you didn't testify yesterday and you're not suggesting that someone from the Al-Qassam Brigades law enforcement prosecution team looked at this and concluded that a customer was funding -- was sending funds to Al-Qassam Brigades, are you?

A.   No.

Q.   And looking at this chart -- in fact, isn't one of the very first things taught in every basic blockchain tracing course that you don't trace through a service on-chain?

A.   That is what we teach.

Q.   And any trained investigator looking at this would pause at Entity 1 if they could determine that it was a service?

A.   I don't know.

Q.   Wouldn't you teach in your classes that investigators should pause at Entity 1 because you can't trace through a service?

A.   This is not a representation of a custodial or noncustodial service.

Q. Again, not what I'm asking. Wouldn't you -- Entity 1, wouldn't that cause many investigators to pause, in part, because you can't trace through a service?

A. I would hope so.

Q. Now, you criticized Chainalysis yesterday as just showing things as big circles; is that right?

A. I demonstrated that these are circles.

Q. But one of your critiques was that you say that that doesn't provide as much detail as you want to see in a tracing product; is that right?

A. I'm referring to single-entity tracing.

Q. And you've never used Chainalysis, right?

A. Right.

Q. Are you aware, though, that if you click on those big circles or the lines connecting them, then you can see all of the addresses, all of the transactions, all of the transaction hashes?

A. Yes.

Q. You understand, in submitting a sworn declaration to the Court, it's important to accurately characterize the reports you're using, right?

A. Yes.

Q. Now, turning your attention to Exhibit 10 in the government's binders, on page 8 of your report, you write, "Recently, a federal judge dismissed the testimony of a witness

who relied upon data which had not been verified within a two-year time frame, as it violated DOJ guidelines."

Is that reading accurately?

A. You said page 10 or --

THE COURT: I think she said page 8.

MR. EKELAND: It was page 8.

THE COURT: Page 8 of Exhibit 10.

BY MS. PELKER:

Q. It's under lack of data integrity, the second bullet point.

A. Yes.

Q. And you cite to a news article which links to those guidelines; is that right?

A. Courthouse News.

Q. And did you read the article before citing it?

A. Yes.

Q. You're aware that the article is about an antitrust case?

A. Yes.

Q. And directing your attention to Exhibit 27, are those the guidelines cited in the article?

A. This looks familiar, yes.

Q. And are you aware that these are the 1997 horizontal merger guidelines for merger-specific efficiencies modeling in antitrust matters?

A. I can read the date and the front page; horizontal merger guidelines.

Q.  You're aware that this case has nothing to do with market efficiencies modeling for mergers?

A.  No.

MS. PELKER:  Government moves to admit Exhibit 27.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  Exhibit 27 is admitted.

(Government Exhibit 27 was admitted.)

MS. PELKER:  Just a moment, Your Honor.  I think I may be done.

THE COURT:  Okay.

MS. PELKER:  No further questions, Your Honor.

THE COURT:  All right.  Is the other witness available to start before lunch today if we get to that point?  I just want to make sure we have enough time this afternoon since I have that hearing.

MS. PELKER:  I believe so, Your Honor.  We'll confirm.  We had told her around 11:00.

THE COURT:  Okay.  Great.  Why don't we -- let me look at my watch since the clock is incorrect.  It's 10:37.  Why don't we take a break until 10:50; come back and, Mr. Ekeland, you can do your redirect.  And then we'll move on to the next witness.

MS. PELKER:  Thank you, Your Honor.

(Recess taken.)

THE COURT: Mr. Ekeland, you may proceed.

MR. EKELAND: Thank you, Your Honor.

REDIRECT EXAMINATION OF

JONELLE STILL

BY MR. EKELAND:

Q. Ms. Still, do you still have the government's exhibit binder up there with you?

A. Yes.

Q. Do you still have the defense exhibit binder up there with you?

A. Yes.

Q. If I could ask you to turn to what's in evidence as Defense Exhibit C, which is your defense expert report in the defense binder, and just let me know when you've got that.

A. I'm here.

Q. If you could also go to the government's exhibit binder and go to what's in as evidence as, I believe, Government Exhibit 22, which is "How to Peel a Million: Validating and Expanding Bitcoin Clusters."

A. Yes.

Q. And if I could ask you to turn to page 12 of Ms. Meiklejohn's article, and then to page 22 of your expert report.

A. Page 12 of the article and what page?

Q. So page 12 of Ms. Meiklejohn's report; that's Government

Exhibit 22; and then page 22 of your expert report, which is Defense Exhibit C; should be behind Tab C.

THE COURT: If you're answering my question about where the figures were in the report, I found that on my own.

MR. EKELAND: Thank you, Your Honor. In part, I am, but I would like to question the witness about this a little bit.

THE COURT: Okay.

BY MR. EKELAND:

Q. So, Ms. Still, just turning to your expert report on page 22, could you just read on page -- top of 22, those first two paragraphs there.

A. At the top?

Q. Yes, the first -- the one starting Section 7.31 of "How to Peel a Million," if you could just read that paragraph and the following paragraph.

A. Yes. "Section 731 of 'How to Peel a Million' attempts to find a link between a withdrawal from Mt. Gox and a deposit to Bitcoin Fog. Both forward tracing heuristics, find next and find next 2, failed after the first transaction hop. They were able to produce a trace using a backward tracing heuristic, but they say this heuristic produces more errors.

"The academic cited in 'How to Peel a Million' lists a wide range of error rates for various heuristics ranging from 12.7 percent to 64.19 percent. Notably, the heuristics with

the highest claimed accuracy rate, find next and find next 2, were the heuristics that failed to find a link between the Mt. Gox transactions and Bitcoin Fog."

Q. And then just turning your attention to page 12 of Government Exhibit 22, Ms. Meiklejohn's article, Section 7.2 entitled "Evaluating the Heuristic," if you could just take a look at that real quick and just look up when you're done examining it.

Do you see the table on top of page 12, the top header to it says "Heuristic" -- there's a column for heuristic, there's a column for Expsn, which I think means expansion, and then FDR; do you see that?

A. Yes.

Q. Is that where you got the error rates for your expert report?

A. Yes.

Q. And could you just briefly take us through the error rates as listed here and as discussed in your report.

A. Sure. So the error rates find next, find next 2, that would be Sarah Meiklejohn's new research relating to the peel chain identification.

Q. And just to be clear, these are error rates related to heuristics, correct?

A. Correct.

Q. Okay.

A. FDR, false discovery rate, expansion factor; if we look at Androulaki, Meiklejohn, Goldfeder, Ermilov, you can see a number of different false discovery rates, FDR, ranging from 12.7 to about 64.

In addition, we can view the expansion rates ranging from 28.6 to 93.03.

Q. And just -- if you could explain what an expansion rate is.

A. As I understand the expansion rate, as we expand -- as she expands her trace, that is representing higher error. Does that make sense?

THE COURT: Not to me.

BY MR. EKELAND:

Q. If you could maybe explain that to the Court a little more.

A. So we can see the expansion rate; for example, with Ermilov, 28.6, the FDR is 12.7. Now we can compare that to find next and find next 2; the expansion rate 147.43, with the FDR being really low of .62.

THE COURT: I understand what FDR is. That's fairly self-explanatory. But what I don't understand is what the expansion rate is.

THE WITNESS: Like, the accuracy or the risk of ingesting, like, false positives.

THE COURT: Isn't that what a false discovery rate is; that's a false positive?

THE WITNESS: It's more like the more that you

ingest, like, the higher the risk of that particular trace will be, if that makes sense.

So false discovery rate, expansion rate, basically, the larger this thing gets, it depends on which heuristic is used that that rate will adjust to.

THE COURT:  I guess I'm still not understanding what expansion rate is or the expansion factor.

THE WITNESS:  Okay.  So is there -- let me look for the actual explanation, and I'll read it.  I know we don't want to sit here all day; I appreciate that.  But I am looking for this to be able to explain that better.

THE COURT:  That's fine.

THE WITNESS:  Okay.

BY MR. EKELAND:

Q.  Just turning your attention to page 11, Section 7.1, in the first paragraph, last sentence.  Is that where it says, "Our expansion heuristic," is that where they're --

A.  The transaction's transaction expansion and backward transaction transaction expansion.

So, "After defining this heuristic, our goal was to identify its accuracy and effectiveness.  To measure effectiveness, we defined the expansion factor at Expsn as the increase of a cluster's coverage in terms of its transactions (100 multiplied by expansion sub CC, sub tx).  To measure accuracy, we treated as ground truth the set of tags provided

to us in the Chainalysis Reactor tool, which are tags that are gathered internally by Chainalysis and from public websites and documents."

Shall I keep reading?

THE COURT: I think that you're now on to the FDR. If I'm understanding this correctly, the expansion factor doesn't measure the accuracy, but measures the effectiveness, and that is how many transactions are captured.

THE WITNESS: The effectiveness is the correct word.

THE COURT: Okay. So the number of transactions that are captured versus the accuracy.

FDR measures accuracy, and the expansion factor is, at least as defined here, is the effectiveness measured in terms of the number of transactions that are captured. Is that fair?

THE WITNESS: Yes.

THE COURT: Okay. Thank you.

MR. EKELAND: Just for the record, Ms. Still was reading from page 11 of Government Exhibit 22 on the right-hand side, the second full paragraph under Section 7.1, defining the heuristic.

BY MR. EKELAND:

Q. Ms. Still, turning your attention back to the FDR table at the top of page 12 of Ms. Meiklejohn's report, you would -- would you agree that the find next and the find next 2

heuristics are the ones with the lowest FDR rate?

A. Lowest FDR rate, yes.

Q. And is it your understanding that that -- when that heuristic was run on a trace of -- in relation to Mr. Sterlingov and Bitcoin Fog, it did not verify the trace?

A. They ran it forward, find next and find next 2, ran it forward from Mr. Sterlingov's Mt. Gox account, and it did fail on that first transaction.

Q. And just directing your attention to page 13 of Ms. Meiklejohn's, et al.'s paper in Section 7.3.1 with the header "Bitcoin Fog," and directing your attention to the third paragraph in that section starting, "We then followed the funds," could you just read that paragraph for us.

A. Yes. "We then followed the funds from Mt. Gox withdrawal forwards using follow forward to see if we would reach the deposit to Bitcoin Fog. Both find next and find next 2 failed after only one hop.

"However, as the two outputs in transaction 2, TX2, had the same address features and were spent in transactions with the same features, our algorithms were, thus, unable to isolate the change output. These outputs were both, furthermore, fresh, meaning it was their first appearance in the blockchain. So the other change heuristics described in Section 7.2 also would have been unable to follow the transaction forward."

Q. And then I believe you discussed in your expert report how Ms. -- Professor Meiklejohn, et al., traced backwards to attempt to confirm the trace; is that right?

A. Yes.

Q. And I think you also reference in your expert report that the follow backward tracing heuristic is more prone to error than the heuristic, the find next and find next 2 heuristic; is that right?

A. Yes.

Q. So directing your attention down to the last paragraph on the left-hand side under Section 7.3.1, "Bitcoin Fog," where you were just reading, starting with the -- where it says, "While successful in this case," could you just read the first couple sentences there.

A. "While successful in this case, it is important to remember our discussion in Section 5.2; that follow backward is more prone to false positives than follow forward. Indeed, in 2011, all transactions had these same features, as the ones we used were not introduced until years later.

"Meaning, follow backward could continue backwards indefinitely without ever registering a change in the entity performing the transactions."

Q. Do you agree with that?

A. Do I agree with her research?

Q. With what she's saying there.

A.  I understand it.  I haven't applied this follow forward or follow backward myself.

Q.  So why, in your opinion -- if you have one -- is there such a wide range of error rates between these different heuristics?

A.  Well, these -- so you're referring to Table 4 of page 12?

Q.  Yes.

A.  Okay.  These heuristics, in part, are additive.  So we may think of them as perhaps -- and we can flip to confirm.  But for argument's sake, Androulaki, et al., their definition, their heuristic, the characteristics that they are taking into consideration for their peel chains will not be the same as Ms. Meiklejohn's; however, she will add something to that, Goldfeder will add something to that, Ermilov will add something to that.  So they're all organized in that way.

So for these to then -- I mean, this is extremely difficult research; extremely difficult research.  It does need to be peer-reviewed here.

But what they are discovering, essentially, is that as -- the more that Pac-Man -- I'm just -- that heuristic 2 -- right? -- is moving along that chain, the problem here is if we refer back to -- and this is not confirmed here.  But if we refer back to Ms. Bisbee's expert testimony, she talks about the smaller chain, the smaller peel coming off of that chain, and that is defined as the change address; that's not necessarily true.

Q. Why isn't that necessarily true?

A. Peel chains can be bigger or larger depending on however that entity in particular is using them. They're not necessarily the smaller output. They're not necessarily the larger output.

Q. And when it comes to Chainalysis Reactor and its heuristics, are you aware of any statistical analysis of its error rates?

A. No.

Q. Are you aware of any scientific paper assessing its accuracy?

A. No.

Q. And you reviewed Ms. Bisbee's testimony at the *Daubert* hearing, correct?

A. Yes.

Q. And did she testify as to her knowledge of any error rates?

A. She testified, I believe, in her testimony that she was not aware of any error rates.

Q. And just -- now, returning your attention to page 14 of Ms. Meiklejohn, et al.'s, report in Government Exhibit 22, and directing your attention to Section 8 where it says, "Limitations and countermeasures"; do you see that paragraph?

A. Yes.

Q. Could you just read the first full paragraph right there for us.

A. "Both our heuristics and our classifier could be made significantly less effective by a motivated party randomizing the features of their transactions and addresses. Performing this randomization requires a relatively high level of technological sophistication and familiarity with Bitcoin, but does not incur any computational or monetary costs and would be effective in making it either impossible to follow hops in a peel chain because their features would be randomized and, thus, not match the expected behavior, or make the features associated with the cluster so varied that any attempts to follow its transactions would" likely -- "would be likely to result in a false positive.

"Transactions that are private and internal to the ledger of some large entity, like an exchange, would also make it impossible for our heuristics, which rely on public blockchain data, to work. Given this, investigators should not rely on the output of either of our heuristics or our classifier as definitive evidence."

Q. Do you agree with that last sentence?

A. I do.

Q. And can you just explain briefly why you agree with that last sentence.

A. Briefly. For any given transaction, there are a number of indicators of the transaction type, which Ms. Bisbee refers to as a fingerprint in her report. This is what I would term the

metadata or the raw data of the transaction itself. Any one of these can change in every single transaction and oftentimes they do.

This can signal a change in ownership of that particular Bitcoin address. So it is possible, and there are certain wallet softwares and companies out there designing these services specifically to evade these heuristics.

For example, Samourai Wallet. Samourai's actually a company. Samourai has a number of different techniques that they employ, including using the onion router in order to evade any IP detection or any of these heuristics.

I'm sorry. I know you said be brief. I'm doing my best.

One such service they offer is something -- offer is something called shotgun. And you can look that up on your own and read about it, of course. This type of service, you will go through a mixer. It's going to randomize your inputs and outputs, and then it will pay you out in single output transactions, not in the same block, but in different blocks. That is one example.

Q. So would it be fair to say -- am I understanding your testimony correctly, that there are a number of ways to obfuscate your transactions and, sort of, foil the heuristics at play in any of these blockchain forensic analytic tools?

A. In fact, that is the goal.

Q.   That is the goal.  And so I think you mentioned that you train law enforcement.

And when you train law enforcement, do you tell them to rely on the heuristics as definitive evidence?

A.   No.

Q.   Are you aware of how any courts in other countries treat this kind of blockchain forensics at issue in this case?

A.   Yes.  In Canada and in certain courts in Spain -- and I cannot tell you specifically who I've spoken with regarding law enforcement, but you may infer this from this testimony, I suppose -- these courts are requiring that any traces produced to the court be made with publicly available tools.

Q.   And is Chainalysis Reactor a publicly available tool?

A.   No.

Q.   And have you had access to it for purposes of your expert report?

A.   No.

THE COURT:  As I've said, if someone just asks me to authorize funding for a license or finds a way to grant a license, I'm prepared to do that.

MR. EKELAND:  Understood, Your Honor.  But we haven't had it to that point.  That, I think, was the point up until now.  That we've had to ask for it, too, is another issue. Because if this was FBI cyber that was doing this and not a private proprietary company --

THE COURT: Move on.

MR. EKELAND: -- we wouldn't have this issue.

BY MR. EKELAND:

Q. Ms. Still, the government asked you a series of questions about, I believe it was like the Mt. Gox records and the Silk Road records, and they asked you if you had ever examined the true records in any of your cases.

Do you recall that line of questioning?

A. Yes.

Q. In relation to the discovery in this case, anything in the discovery, have you had access to the true records to Mt. Gox?

A. No.

Q. And when I say true, does -- do you understand me to say the records in native form?

A. Yes.

Q. And have you had access anywhere in the discovery to the true records of Silk Road?

THE COURT: I think this was asked and answered, wasn't this? I thought they -- the prosecution asked exactly the same questions.

MR. EKELAND: I don't believe they did, Your Honor, but --

THE COURT: Okay.

MR. EKELAND: -- I could be wrong. I'd have to look.

BY MR. EKELAND:

Q. Essentially, anywhere in the discovery provided by government in relation to any of the darknet marketplaces or any of the exchanges, have you had access to any of the native data?

A. It's not clear to me that I have received the native data.

Q. And you've looked for it?

A. I see indicators that some may be natives. I'm thinking specifically LocalBitcoins. However, I do need to understand, I think, from the government, if they could please confirm which are true and which are natives, I would appreciate that greatly. It would enhance my ability to do my job.

I say LocalBitcoin specifically because I did notice a number of what I believe are missing transactions from that table provided.

Q. Do you recall the government asking you questions about how it might be possible for an administrator of a, quote-unquote, criminal darknet site to disguise their withdrawals as normal user withdrawals?

A. Was your question do I recall?

Q. Do you recall that line of questioning by the government?

A. Yes.

Q. In your expert opinion, if you saw a pattern of transactions that looked like normal user withdrawals without any more evidence, would you conclude that those user withdrawals were evidence of someone being an administrator of

a criminal dark website?

A.   No.

Q.   And are there other reasons for people to use mixers besides money laundering?

A.   Yes.   People would use mixers to preserve their privacy on-chain.

Q.   Two related questions.   First, why would people need to preserve their privacy on-chain when --

MS. PELKER:   Objection, Your Honor.   I think we're getting well outside the scope of the government's cross here.

MR. EKELAND:   Your Honor, they asked multiple questions about mixers and criminal administrators and implied that the only usage for these mixers and these darknet sites was criminal activity.

So what I'm exploring here is an alternative line of questioning related directly to the government's questioning about mixers and their legitimate use.

THE COURT:   My only question at this point is one of timing.   I really think that all of this is going way beyond what I need for purposes of making a *Daubert* determination.   It sounds more like the examinations you actually want to make in front of the jury, which you will have your opportunity to do. How much time do you think you're going to need?

MR. EKELAND:   I can wrap this up in another five, ten minutes, tops.

THE COURT: Okay. That's fine.

BY MR. EKELAND:

Q. So briefly, Ms. Still, could you just explain why somebody would use something like a mixer for privacy purposes when the blockchain itself is supposed to be anonymous?

A. So the blockchain, if you're referring to cryptographic ledgers specifically related to transactional data, people would want to preserve their privacy for any number of reasons. One, they may be privacy-conscious, and they would prefer to remain, quote-unquote, anonymous.

However, I must disagree that the blockchain ledger, if we're referring to the cryptographic ledger that keeps the record of transactions, is not anonymous. It is considered pseudo-anonymous. Therefore, the address, the transaction hash, the amounts, the dates, the times, the types of addresses utilized by the person and the clustering provided by open-source explorers like Wallet Explorer may reveal that person's identity via a chain of transactions.

It is also possible that someone, for example, a high-net-worth individual, may want to preserve their privacy related to their finances, including cryptocurrency, so they may protect themselves from any physical harm, what is termed in the industry a wrench attack.

THE COURT: Maybe I spoke too quickly on this. I am actually not sure this witness is qualified or you've laid a

foundation to say that she's qualified to testify about why people engage in particular behavior.

I understand she has expertise and experience relating to Bitcoin tracing. I don't know that -- I haven't heard testimony that she's gone out and done studies or read studies or has any expertise on the motivations of people who are using mixers, for example.

MR. EKELAND: I could follow up on that.

THE COURT: It's up to you. It's not in the expert report either, I don't think. If it is, maybe you want to point me to it.

I don't see that she's an expert on why people -- didn't come in today and yesterday thinking that she was being offered as an expert on the motivations of people who are using mixers. Is it in the expert report?

MR. EKELAND: In the interest of time, Your Honor, I'm going to reserve that issue. I think she could testify to it. But in the interest of time today, I'm going to move on, on that.

MS. PELKER: The government is going to note its objection for the record to Ms. Still testifying to anything beyond what's been disclosed at this point in her report.

THE COURT: Fair enough. We're three weeks away from trial. I think that's a fair point, and I've also given you several bites at the apple on this.

MR. EKELAND: I believe Mr. Verret is noticed that in his expert testimony, so I don't think this is something to die on, Your Honor.

THE COURT: Okay. That's fine.

BY MR. EKELAND:

Q. Ms. Still, just one final thing. If you could go back to your expert report, which is on Defense Exhibit C, and turn to page 3. And then if you could just look at -- it's the second paragraph up from the bottom. It's just a single sentence. And if you could just read that for us.

A. "Three primary factors which limited this expert report are as follows: The integrity of Chainalysis's data, access to the pertinent data, and time.

Q. And I'm just interested in you discussing that last factor, time, in terms of preparation of report. Did you -- well, why are you saying that there?

MS. PELKER: Objection, Your Honor. This is beyond the scope of the cross. And if defense is trying to use this as a way to shotgun in an argument about a continuance, I don't think this is the appropriate vehicle for it.

MR. EKELAND: That's incorrect, Your Honor. If I may connect --

THE COURT: I'm just not sure that I see what this has to do with whether she's qualified as an expert, but I'll give you another two minutes, and we can wrap it up.

MR. EKELAND: This is directly related to the government's cross.

THE COURT: Okay. Go ahead.

BY MR. EKELAND:

Q. Okay. Ms. Still, can you just discuss why you mentioned that time was a factor here.

A. Yes. I did have two weeks to review thousands of documents produced by the government, millions of transactions and addresses.

Q. And do you recall that the government asked you about certain notes and things that you had that didn't make it into your expert report?

A. Yes.

Q. And would you be willing to produce those to the government if they asked?

A. Definitely.

MR. EKELAND: No further questions, Your Honor.

THE COURT: All right. Thank you. I will say, though, as you know, I've given the defense multiple bites at the apple and extended the expert deadline on multiple times. I do think that three weeks from trial, we're -- absent, really, truly extraordinary circumstances -- done at this point. And we shouldn't be offering any new expert opinions or new bases for expert opinions because the bases have to be disclosed in the reports. And we are, as I said, three weeks

away from trial, and I've given the defense a huge amount of leeway on this already.

MR. EKELAND: Your Honor, we're not -- we're simply saying that what the government was asking for, that they can have on that, that's all. We weren't trying to add anything new to the expert report.

We do note for the record that the government's expert witness, I believe, from Chainalysis produced a supplemental declaration, and I believe one or two other documents related to their expert report.

But understood, Your Honor.

THE COURT: All right. The witness is excused. Thank you for being here.

THE WITNESS: Thank you.

THE COURT: Before we call the next witness, I have one question. I'm not sure whether you'll have the answers to this today, but I think it needs to be on the radar to think about.

This witness and the witness's expert report relies heavily on what I'm calling the Kappos article, but you've been referring to as the Meiklejohn article, "How to Peel a Million."

And I'm not quite sure how we're going to deal with this at trial because there is information in this report and analysis in this report which is inculpatory to Mr. Sterlingov.

I don't know that it's fair to introduce and rely on part of the report which casts doubt on the government's analysis and not rely on other portions of it which say that, actually, the government's analysis is correct with respect to at least the connection of Mr. Sterlingov with the initial deposits into Bitcoin Fog.

I just flag this as an issue to think about at this point in time. I don't know that I have the right answers of how to deal with that, but there is material that's helpful to the defense in this article, and there's also information that is damaging to the defense in the article. And we'll have to figure out how to address that issue.

MS. PELKER: Yes, Your Honor. I am not entirely clear on what the grounds for this actually being admitted into evidence in the defense case --

THE COURT: It may not be admitted as an exhibit in the defense case. But, for example, if Ms. Still is going to testify to the false positives from the three or four studies that were done on the -- using behavioral heuristics, her only knowledge of that comes from this article.

And so even though the article itself may not be introduced as an exhibit, the witness is relying on the article. And maybe you're not -- you wouldn't plan to cross and then say to the witness, didn't the article also say and conclude, rely on their heuristics that Mr. Sterlingov, in

fact, was the person who made the initial deposits into Bitcoin Fog.

If you're not going to ask that question and not object to the defense asking the question about the FDRs in the report, that's fine, and we won't have an issue. But if you object -- either object to the reliance on the FDRs coming in through Ms. Still or you yourself want to cross on this, then I'm going to have to figure out the answers to the questions about what the right balance is.

MS. PELKER: And I think that if Ms. Still is intending to testify to anything regarding her reliance on this report or this report in forming her assessment that the clustering is not accurate, we would want to cross on that.

But, Your Honor, I think we also just heard testimony that the heuristics that are set out in this research are not Chainalysis's heuristics.

THE COURT: I know. Right.

MS. PELKER: I think it's incredibly misleading to put before the jury a study that says there's a 60 percent error rate on something that's a totally different heuristic than anything that's actually being presented in evidence here.

THE COURT: Okay. Fair enough. Yes, Mr. Ekeland?

MR. EKELAND: I would disagree with the characterization that that would be misleading to the jury. I think it would be very informative to the jury to know that

there's a wide range of error rates across all these different heuristics and that Chainalysis, you know -- combine that with the fact that Chainalysis, had they been bothered to do an internal analysis of its error rates, I think that would be highly informative to the jury and very helpful to them in their analysis of what's happening here.

THE COURT: All right. Well, I'm just flagging these as issues that we're going to have to deal with. We'll have to figure out time for argument and analysis on how these -- how and whether these can be used.

All right. So you want to call your next witness?

MS. PELKER: Yes, Your Honor. Government calls Ms. Mazars de Mazarin.

THE COURTROOM DEPUTY: Would you please raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Thank you. Please be seated.

DIRECT EXAMINATION OF

VALERIE MAZARS de MAZARIN

BY MS. PELKER:

Q. Good morning, Ms. Mazars de Mazarin. Could you spell your name for the court reporter.

A. My first name is Valerie, V-a-l-e-r-i-e. And my last name is spelled M-a-z-a-r-s d-e M-a-z-a-r-i-n.

Q. Ms. Mazars de Mazarin, if you'd like, you can move the

microphone, if that's easier for you. Where do you work?

A. I work at the U.S. Department of Health and Human Services in the Office of the Inspector General.

Q. How long have you worked in that office?

A. Since April this year.

Q. Where did you work prior to joining the Office of the Inspector General?

A. At the FBI.

Q. What was your position when you were with the FBI?

A. I was a computer scientist.

Q. While at the FBI, were you assigned to work on the Bitcoin Fog and Roman Sterlingov investigation?

A. Yes.

Q. In your new role with the OIG, are you still working with the FBI?

A. Yes.

Q. What does that work look like?

A. I'm a member of the Washington Field Office Cyber Task Force. HHS-OIG has a memorandum of understanding, which means that I can work freely on any of their cyber cases and provide support, forensics, and analysis.

Q. And has OIG agreed to allow you to continue working on this case through the continued trial date?

A. Yes, they have.

Q. Taking a step back, could you summarize your educational

background.

A.  I have a bachelor of science in computer science from Georgetown University.

Q.  Did you work in the computer science field after graduating from Georgetown?

A.  Yes.

Q.  Where did you first work?

A.  I first worked at Honeywell International -- I worked at Honeywell International, which is an international conglomerate of manufacturing companies, in an IT department for their chemical company.

Q.  What did your work at Honeywell entail?

A.  I was a solutions architect, which involved prototyping and designing IT solutions to fit into their current collection of applications, and doing testing and code review of potential IT solutions.

Q.  Did that also involve things like setting up servers?

A.  Yes.

Q.  Where did you work after your time at Honeywell?

A.  I worked at Booz Allen Hamilton.

Q.  What did your work at Booz Allen involve?

A.  I was an analytical tool developer.  So a JavaScript, dashboard, and analytics programmer, as well as a consultant.

Q.  When did you join the FBI?

A.  In January of 2018.

Q. And what were your job responsibilities at FBI?

A. My job role was a combination of digital forensics, data analysis, online undercover support, network administration, and other analyses of novel technologies.

Q. What did your work specifically in digital forensics involve?

A. It spanned creating forensic images and capturing digital evidence live, making forensically sound copies, and using tools and running custom analyses, scripts to look for artifacts on this digital evidence, and to pull off items of interest and explain them to the case team.

Q. What did your -- what sort of data analysis work did you do?

A. Typically, this would involve analyzing web logs and other data collected via search warrants and subpoenas, IP log-ins, user agent strings, and searching for patterns and key information.

Q. Did you also write and develop tools to help review that type of evidence?

A. Yes.

Q. While at the FBI, was part of your responsibilities also case support?

A. Yes, it was.

Q. And what would that sort of case support entail?

A. That would range from assisting on victim interviews,

operational activities like searches, doing additional research, and explanation of technologies unfamiliar to the case team to try to determine how to analyze them and pull data off of them.

Q. What are some of the types of cases that you worked on?

A. Typically, they would be computer intrusion cases, wire fraud, cyberstalking, and money laundering.

Q. Are you familiar with the term operational security?

A. Yes.

Q. Could you explain in your own words what that is.

A. To me, it's the practice of protecting one's identity, usually online; to create separation between online activities and one's real-world identifiers.

Q. Could you give some examples of things people do for operational security reasons?

A. The classic example to me is buying a second phone that you intend to use for a short period of time to have a new number to sign up for services with and to receive texts from.

Q. Did your work at the FBI involve trying to pierce cyber criminals' operational security or OPSEC?

A. Yes.

Q. Did your work also involve supporting FBI online undercover operations?

A. Yes.

Q. Without getting into anything sensitive, just at a high

level, what did that work entail?

A. It was primarily setting up websites, servers, and profiles in an operationally safe way to provide distance between my identity in real life and the personas online.

Q. Have you completed any relevant professional trainings and certifications?

A. Yes. I completed two SAMS certifications, and I attended the FBI's computer scientist field operations training.

Q. What were the two SAMS certifications?

A. There was the GREM, which was the GIAC Reverse Engineering Malware; and the GSEC, the GIAC Security Essentials.

Q. Related to the GREM, is analyzing malware something that you also have experience in doing?

A. Yes.

Q. Have you received other trainings in digital forensics or related topics?

A. Yes.

Q. What are some of the topics and areas that those trainings have covered?

A. Red teaming, which is penetration testing or hacking; network traffic analysis; scripting; and automating queries and searches against data and mobile forensics, phones.

Q. Are you familiar with any particular computer programming languages?

A. Yes. I've written code in a number of languages, including

CE, C++ --

Q.  Could you list off --

A.  -- Java --

Q.  Could you list off a few of the programming languages that you've used.

A.  Yes.  CE and C++, Java, Python, JavaScript, PHP.

Q.  Are you also trained in conducting forensic analysis of digital evidence?

A.  Yes.

Q.  And are your qualifications and credentials further summarized in your curriculum vitae?

A.  Yes, they are.

Q.  Directing your attention to the binder in front of you to Exhibit No. 1, do you recognize this?  There's two binders. It's the big binder.

A.  It's the other binder.  Yes.

Q.  Is that your CV?

A.  Yes, it is.

Q.  Does this accurately relay and summarize your credentials and experience?

A.  Yes.

          MS. PELKER:  Government moves to admit Exhibit 1.

          THE COURT:  Any objection?

          MR. EKELAND:  No objection, Your Honor.

          THE COURT:  Exhibit 1 is admitted.

(Government Exhibit 1 was admitted.)

BY MS. PELKER:

Q. Ms. Mazars de Mazarin, did you do a few areas of work in the Bitcoin Fog investigation?

A. Yes.

Q. Do you understand your testimony for the *Daubert* hearing today pertains to the IP address analysis that you did?

A. Yes.

Q. And did part of your work in the Bitcoin Fog case involve looking at IP addresses that were used to access different accounts?

A. Yes.

Q. Can you explain what is an IP address.

A. An IP address is an identifier that a computer connected to the internet uses so that the rest of the internet can find it.

Q. And what's the role of the IP address in routing communications over the internet?

A. Typically, communications are directed to a domain name, which then gets translated to an actual IP address, which is a number, much in the way someone might look up a phone number in an address book. And then the relevant traffic that that server accepts is sent onward to that IP address.

Q. And even if you're not running a website or a server, would your computer still be using an IP address to communicate?

A. Yes.

Q. Can a computer access the internet without an IP address?

A. No.

Q. Are IP addresses just randomly generated?

A. No, they're not.

Q. So who controls and assigns the IP addresses?

A. An organization called IANA allocates them out in groups.

Q. And how are they allocated in groups by IANA?

A. Typically, blocks of IP space are reserved for the different Regional Internet Registries.

Q. And is there a Regional Internet Registry that controls the IP addresses for the North America region?

A. Yes.

Q. Which Regional Internet Registry is that?

A. It's ARIN.

Q. If I want to connect to -- my computer in North America to the internet, do I have to go to ARIN to get my IP address?

A. No. Typically, it would come from your internet service provider.

Q. And how do those internet service providers get their IPs from ARIN?

A. They, typically, tell ARIN if they need more space, they have a block of IPs they have to work with, and they'll work with the registry if they need to expand that.

Q. So can you just summarize, walking us through the hierarchy of the IP address allocation starting from IANA.

THE COURT:  Can you spell those out just to make sure the record is clear.

MS. PELKER:  Yes.  I did give a term sheet to the court reporter previously.

THE COURT:  Okay.  Thank you.

MS. PELKER:  IANA is I-A-N-A, the Internet Assigned Numbers Agency; the RIRs, R-I-R-s, are the Regional Internet Registries; and ARIN is A-R-I-N.

THE COURT:  Thank you.

BY MS. PELKER:

Q.  So can you summarize and walk through starting with IANA.

A.  So the greater pool of IP addresses is controlled by IANA, and they are then allocated to the RIRs, who then will suballocate those to internet service providers and organizations, who then have their end users or further customers.

Q.  Does ARIN and the other regional registries keep track of which companies control which sets of IPs at different times?

A.  Yes.

Q.  Is there a way to look up that information?

A.  Typically, that's done using the WhoIs protocol.

Q.  And how do you do lookup using the WhoIs protocol?

A.  There are numerous online tools that let you do it.  You can run the WhoIs command in a -- in terminal or command prompt and those to be pre- -- prestaged to do direct connection to

some of those consolidated databases.  But other providers, like GoDaddy, will also offer those lookup services in a more user-friendly format on their websites.

Q.  Is doing this sort of WhoIs lookup or query something that you and other members of the cybersecurity field often do?

A.  Yes.  It's very standard.

Q.  What sort of information is included in that WhoIs record?

A.  Typically, it's information about the organizations using each IP or block of IPs, including a technical point of contact, an address, email addresses, and phone numbers.

Q.  Is there a way to look at historical WhoIs information to determine what the WhoIs information was for an IP on a past date?

A.  Yes.  Some companies do record and save that information and make it searchable.

Q.  So you're able to do, sort of, a live WhoIs query to give you the real-time information or use a service that's cataloged past queries; is that right?

A.  Yes.  Some of those exist.

Q.  Do some of those services also record what's called Passive DNS information?

A.  Yes.

Q.  What is Passive DNS?

A.  Passive DNS is a historic record of occurrences of when an IP -- when a domain name resolves to an IP address.  And,

typically, it looks like a record storing -- what was the full domain name accessed with subdomain, the IP address that resulted from it, and the date stamp or sometimes time stamp.

Q. And is that sort of Passive DNS information also available for querying and commonly queried by members of the cybersecurity community?

A. Yes. There are some companies that host that and make it searchable.

Q. Are these WhoIs and Passive DNS directories generally used and relied on by members of the cybersecurity community?

A. Yes.

Q. How did you use that information in your analysis in this case?

A. Primarily, I used those sources to get more background information about how the IP addresses I saw in the logs might have been used specifically, if they seemed to appear to be a residential or business connection versus if they appeared to be used as part of an anonymity network.

Q. And what are some of the tools that you used specifically for this case's analysis?

A. Primarily I used DomainTools and Farsight.

Q. And those are some of the standard tools that you referenced, used and relied on by members of the cybersecurity community?

A. Yes.

Q. Why is it valuable to law enforcement to know who controls a particular IP address of interest in their case?

A. For purposes of further pursuing attribution and for looking up other accounts created or other logs generated from the same machine around the same time. It can be useful for pivoting.

Q. And the WhoIs record for a particular IP controlled by an ISP, will that record necessarily show the true identity of the end user?

A. No.

Q. And is that information still helpful to law enforcement insofar as they may be able to send a subpoena for additional follow-up?

A. Yes, exactly.

Q. Is it possible for someone to hide the IP address that they're using on the internet?

A. Yes.

Q. Does law enforcement often connect IP addresses with other information or information-gathering tools that they have available to them?

A. Yes.

Q. Could you explain in your own words what a proxy is.

A. A proxy is a server that acts as an intermediary between the end user and the internet sites they want to visit.

Q. Are there companies that offer proxies as a service?

A. Yes.

Q. How do those companies work?

A. Typically, they're a subscription model where you would pay the company for use -- often monthly, for use of a server as a proxy.

Q. And where are the companies getting all these servers?

A. They -- from all different hosting provider companies. They're often hosted all over the world.

Q. What is a VPN?

A. A virtual private network is a service that hosts a collection of, essentially, proxy servers to provide users privacy by giving them rotating options of which server and, therefore, which IP address they access the internet from.

Q. Can people also hide their true IP address by using Tor?

A. Yes.

Q. Can you explain what is Tor.

A. Tor stands for The Onion Router, and they are a network similar to VPNs of servers that are networked together in order to provide internet privacy by routing the traffic through multiple of these computers and servers before they're accessed to the internet.

Q. And who runs Tor?

A. The Tor Project.

Q. What is the Tor Project, just generally?

A. It's a not-for-profit organization.

Q. And is their main responsibility dedicated to running the Tor network?

A. Yes.

Q. Who controls all of these nodes in the Tor network?

A. They're volunteers. So it ranges from companies to individuals to organizations.

Q. And where are those computers located?

A. They could be located anywhere; almost any country, in a server, or at home, or at a business.

Q. So if I wanted to, could I go home and become a Tor node?

A. Yes.

Q. And if I did that, would lots of different people's internet traffic be routing through my home IP address?

A. Yes.

Q. How does someone use Tor?

A. Someone can use Tor to access regular websites. Typically, they would download the Tor browser and install it; then they would click a button to start the connection to the internet. They would be assigned their Tor exit IP, and then they could -- their traffic would then be encrypted through the Tor network for HTTPS, and their IP would be the exit node IP.

Q. Can you also connect to Tor through the command line?

A. Yes. Typically, you can install a set of tools called proxy chains, and then you can just type Tor -- install some Torsocks tools, and then you can use the Torsocks command to

then do your other website-visiting type commands.

Q. Are there -- is a Tor user's internet traffic routed through just one Tor node, like a proxy?

A. No. It's routed through at least three.

Q. Are there also special hidden sites that you can only access using Tor?

A. Yes.

Q. But you can also use Tor to just access regular websites, like Google.com?

A. Yes.

Q. I'd like to have you walk through a couple of scenarios. First, if someone who is not using any of the services that you just talked about, any sort of anonymizing service, sits down at their home computer and logs in to their Google Gmail account, what IP address would Google see logging in?

A. Their home IP address from their router.

Q. And when I say Google would see it, where would that IP address be collected?

A. Likely in their web logs.

Q. Google's web logs?

A. Yes.

Q. And how -- how could law enforcement go about trying to figure out who is logging into that account?

A. Given the IP address, law enforcement can go back to Google and issue legal process, such as a subpoena or a search

warrant.

Q.  Now, what if the person is using a proxy, how would that person connect from their home computer to the Google servers?

A.  At a high level, they would set up the proxy, often in their browser, so that all their traffic from their home network is routed through that proxy server and then goes onward to Google.

Q.  So what IP address in that case would show up in the Google account logs?

A.  The proxy server's IP.

Q.  And going back to our example, what if the person is using Tor, how would that person connect to the Google account?

A.  Much the same way.  They would often do it through the browser, if not through their command line.  And once they established the Tor circuit, they would visit Google.com, and the traffic would go through the Tor network and out of a Tor exit node.

Q.  What IP address would show up in the -- in Google's logs relating to that account access?

A.  The given Tor exit node.

Q.  If law enforcement were trying to figure out what was going on with this account access, how would they know that this is a Tor exit node?

A.  They would likely check the Tor Project's official holdings, known as ExoneraTor.

Q.   And what is ExoneraTor?

A.   It's a database of all the servers by IP address and names that were used as Tor exit nodes and the dates in which they functioned as such.

Q.   And that's maintained by the Tor Project itself?

A.   Yes.

Q.   Is that a list that's regularly relied on by members of the cybersecurity community?

A.   Yes.

Q.   What's the distinction between a Tor exit node and an otherwise regular Tor node?

A.   Not all of the computers that make up the Tor network are designated to be the outermost node or the last hop.  There are many reasons why users that want to contribute to the Tor Project might not be -- might not want to have their IP exposed to the internet, and so there are other ways to participate in the project, including running a bridge to get onto the network, or a relay node which moves traffic around in the middle, or other types of servers.

Q.   And does ExoneraTor list off all of the nodes or just the exit nodes?

A.   It has a field for if it's a Tor exit node.  So it checks if it's a Tor node, I believe, with the distinction of whether or not it's an exit node as a yes/no value.

Q.   As part of your work on this case, did you review -- even

though a criminal might use Tor or proxies, do you and law enforcement still look at and consider their IP address?

A. Yes.

Q. And why is that?

A. Usually, it's to characterize the way the subject of interest accesses the internet. It provides information about the tools they like to use and the way they go about things, and sometimes I'll still look at them to see if there are any close commonalities between it. But it's just another descriptor of how they use the internet.

Q. As part of your work on this case, did you review account login records for a number of different accounts tied to the defendant and the Bitcoin Fog service?

A. Yes.

Q. Did that include looking at the IP addresses that were used to log in to those accounts?

A. Yes.

Q. Is that sort of analysis of IP logins something that you often do in cases?

A. Yes.

Q. As you were looking at the IPs used to access the various accounts, did you notice any common types of access?

A. Yes.

Q. And what was that?

A. I saw some IPs that were part of the Tor Project, some IPs

that appeared to me from some background research to be possibly VPN IPs or proxy IPs, and very few that appeared possibly residential.

Q. Did you identify any instances in which the same IP address was used to access multiple accounts?

A. Yes.

Q. And, in fact, were there numerous instances where that was the case?

A. Yes.

Q. For your analysis, did you then take steps to filter that larger list or data set?

A. Yes.

Q. How did you set out filtering down the information?

A. I decided to look at this data set within a smaller level of time to perform more of a microanalysis. There were quite a lot of records, and I wanted to reduce the amount of overall data points to look at and focus on the connections that were closest in time and, therefore, most interesting to me to follow up on.

And so I set some time cutoffs that I could apply across the data set to filter it down.

Q. And this was work that you were doing last fall in anticipation of the January trial date; is that right?

A. Yes, that's right.

Q. What were the different types of IPs that you categorized?

A.   It was November.   I think it was still fall.

The different types of IPs defined as possible residential or other otherwise fixed, you know, residential, business, organizational, were its own category.   And then I considered IPs that appeared to be Tor exit nodes, Tor IPs, and VPN services, along with anything I couldn't definitively identify.   And then I made a third category for IPs that appeared as -- to be proxy servers.

Q.   And how are you making your determination of what type of IP address it likely was?

A.   I looked through Passive DNS a lot to see what sorts of domains resolved to these IPs based on -- on or around the period of time I looked at some historic holdings and did some identification tools, but many of them were very old, before services could automatically identify them.

So the majority -- unless I saw them in online holdings or in the case file as known proxy servers, advertised as such, then I primarily looked to see if any domains I knew to be VPN services called back -- resolved to those IPs, and I looked at the nature of how they were worded, if they were named; like virtual private servers were usually named versus if they had something like Comcast in the name.

Q.   In addition to that sort of Passive DNS, did you also look at WhoIs information and the ExoneraTor of lists that you had mentioned?

A.   Yes.

Q.   What did you do specifically to further filter down the IPs after you categorized them?

A.   To filter out the data points that I didn't look at in that analysis to create the final subset, I chose to look at, for all the identified Tor IPs, any accesses between accounts, meaning a login to one account and then a login to a different account.  For those, I focused only on the logins that occurred within five minutes.

For proxy servers, I chose ten minutes.  And for anything that appeared residential, I cut it off after 12 months.

Q.   Starting from the last one first, for a residential IP, why did you choose 12 months?

A.   Those IPs tend to be more fixed.  So I thought there might be relevant data within a wider window of time than when using the tool that's meant to rotate traffic more quickly.

Q.   And, again, this cutoff is for you to do the filtering down of what you're going to focus on for this particular report; is that right?

A.   That's right.

Q.   And for a proxy service, what time window did you focus on?

A.   For the ones that appeared to be proxies, to me, I chose ten minutes.

Q.   Why ten minutes?

A. I modeled this mostly after my own online habits and those of people I know and work with. If I use a proxy server, usually I want a dedicated IP. Usually it's for a specific reason to get onto sites where my IP needs to look more normal and is less known to be from a security tool. So I tend to stay on it a little longer, to have longer browsing sessions.

Q. If someone logs in to their preferred proxy one day and then again a week later, without changing their settings, would there IP address be the same?

A. Yes.

Q. So in setting this ten-minute window, you're not saying that something outside of the ten-minute window is definitely not the same person or definitely excluded?

A. No. This isn't generalized to internet traffic as a whole.

Q. And so is it -- in this particular analysis, did you focus on assessing anything either way outside of the ten-minute window?

A. No.

Q. For a VPN, what time window did you focus on?

A. Five minutes.

Q. Why five minutes?

A. VPN -- as opposed to proxy servers, VPNs are able to cycle more quickly. There tends to be just a button you can press if you wanted to generate a new IP. And sometimes, even within the same online activity website visit I'm doing, if I find an

IP is too slow or the connection is not working, I might change it within the same sitting, so to speak.

And so I wanted to filter down to anything closer co-occurrence for those.

Q. You're talking about, kind of, your experiences, your colleagues' experiences in setting these windows.

Fair to say you're setting these windows based on your experience working in the computer science field but also doing criminal investigations at the FBI?

A. Yes.

Q. For Tor node, what time window did you focus on?

A. Also five minutes.

Q. Why five minutes for the Tor node?

A. For very similar reasons. The network lets you alternate between a variety of exit nodes, and it's just a button press to change them if you want to.

Q. At the same time -- if you're looking at a target who is connecting to Tor and using a particular Tor exit node, at the same time could there also be other people also using that same Tor exit node to access other sites?

A. Yes.

Q. And is that the same for proxies?

A. Yes.

Q. And why were you still comfortable using these particular time cutoffs, five minutes in the instance of Tor, for your

analysis here?

A. Because I wanted to look at a smaller set of data points and then review them individually to see how much time had passed between them. I didn't feel the need to consider anything outside of that window and wanted just a smaller set to focus on.

Q. So was there anything magic about the particular time cutoffs you selected for your analysis?

A. No, not at all.

Q. So you're not saying that if something happened within four minutes, it was definitely the same person, but if it happens six minutes apart, it definitely wasn't?

A. No.

Q. That just wasn't part of your analysis?

A. No. That wasn't what I was saying.

Q. Did you prepare a report in fall of 2022 summarizing this analysis?

A. Yes.

Q. Directing your attention to Exhibit 2, is that the report that you prepared?

A. Yes.

Q. And does that summarize this portion of your work at the time and the conclusions?

A. Yes.

MS. PELKER: Government moves to admit Government's

Exhibit 2.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  Exhibit 2 is admitted for purposes of the *Daubert* hearing.

(Government Exhibit 2 was admitted.)

BY MS. PELKER:

Q.  Ms. Mazars de Mazarin, turning your attention to page 5 and to page 6 -- and there are no numbers here, but it's related to the .123 address.

A.  Yes.  With the table?

Q.  Yes.  Was the IP address ending in .123 one of the IP addresses that came up in your analysis?

A.  Yes.

Q.  Where did that IP appear in the records?

A.  It appeared within the Liberty Reserve returns for the PlasmaDivision email and within the Mt. Gox records for the Volfprius account.

Q.  And several days before and after the accesses pulled out in this report here, was that IP address also used to access the Liberty Reserve Shormint account, the Mt. Gox Nfs9000 account, and the Mt. Gox Kolbasa99 account?

A.  It was used to access those accounts.  I don't remember exactly when.

Q.  And you looked at those in other work on this case but not

for this particular analysis; is that correct?

A. That's correct.

Q. Did you determine who controlled that .123 IP address?

A. Not definitively, but I believe it may have been used by CryptoVPN.com.

Q. And what was that based on?

A. In this case, a Passive DNS result where a CryptoVPN domain resolved to that IP within about a year of these logins.

Q. And what was CryptoVPN?

A. It appeared to be a virtual private network company.

Q. Did you also review common logins from other IP addresses?

A. Yes.

Q. And some of them that were particularly close in time are set out elsewhere in this report?

A. Yes.

Q. To emphasize, does this report list out all of the IP address connections in the records?

A. No.

Q. And based on your micro-level IP analysis for this report, were you able to make some assessment about the likely control over certain accounts?

A. Yes, I did.

Q. Directing your attention to the bottom of page 7 of your report -- that's the last page -- is that your conclusion there?

A. Yes, it is.

Q. And what accounts were you able -- did you conclude were likely accessed by the same user?

A. In my first conclusion, the accounts I grouped together as likely accessed by the same user were the Mt. Gox Volfprius and Roso accounts; Liberty Reserve U7489869 linked to plasma@plasmadivision; Bitstamp 52443 listed under the name Roman Sterlingov; Twitter account Craykilldozer and Bitcointalk account Killdozer.

And in a different group, I believed that the same user who accessed the Mt. Gox Kolbasa account also accessed the PeterNFS Mt. Gox account and the Liberty Reserve account U0845692 tied to shormint@hotmail.com.

Q. And these were the conclusions that were drawn specifically through your micro-level IP analysis; is that right?

A. Right, in this context.

Q. Did that micro-level IP analysis draw conclusions one way or the other about anything outside of the specific windows that you set here?

A. No.

MS. PELKER: No further questions, Your Honor.

THE COURT: All right. Why don't we go ahead and take the lunch break now. It is 12:16. Why don't we come back at 1:30 and continue.

It seems to me we probably won't have any difficulty

completing things. I do -- I am going to have to take a break at 2:00. Maybe we'll be done by 2:00, but if not, I'll take a break for another hearing at 2:00 and then we'll continue. I don't think that will take very long.

All right. So I will see you all back here at 1:30. Thank you.

(Lunch recess from 12:16 p.m. to 1:30 p.m.)

THE COURT: The witness can return to the witness box.

THE COURT: Mr. Ekeland, you may start.

MR. EKELAND: Thank you, Your Honor.

THE WITNESS: Hi.

CROSS-EXAMINATION OF

VALERIE MAZARS de MAZARIN

BY MR. EKELAND:

Q. Hi. Ms. Mazars, you testified, I believe, earlier today about operational security.

A. Yes.

Q. And people abbreviate that OPSEC, correct?

A. Yes.

Q. Do you practice OPSEC?

A. Yes. I always try to.

Q. And what kind of OPSEC do you practice?

A. I use VPNs and Tor and temporary servers, temporary phone numbers.

Q. And when you use a temporary server, do you do that because it gives you a different IP address?

A. Yes.

Q. And why do you use VPN?

A. To protect against types of online tracking, like cookies, and also to protect the IP address.

Q. So, essentially, there's a lot of legitimate reasons to practice OPSEC?

A. Yes.

Q. Okay. You recall testifying about the Tor network, right?

A. Yes.

Q. I think you said that the Tor network is currently administrated by the Tor Project, correct?

A. Well, every node is run by different people, but as a whole, yes.

Q. And are you aware that the -- the Tor browser and the Tor network were created by the United States Navy?

A. Yes.

Q. And the reason that the United States Navy created the Tor network was so that the United States Navy could conceal its signal traffic, correct?

A. I believe so.

Q. You have no reason to doubt that?

A. I have no reason to doubt that.

Q. And the United States Navy is still a user of the Tor

network, correct?

A. I believe so.

THE COURT: I'm not sure what this has to do with the witness's qualifications to testify on the issue that she's indicated in her report.

MR. EKELAND: I'm testing her knowledge of the Tor network, and she --

THE COURT: I'm going to -- I think this is beyond the scope of the *Daubert* hearing.

MR. EKELAND: I will move on, Your Honor.

THE COURT: Okay.

BY MR. EKELAND:

Q. So you testified about IP addresses?

A. Yes.

Q. Which are short for internet protocol addresses, right?

A. Yes.

Q. And there's dynamic IP addresses, correct?

A. I'm sorry. What do you mean? In this analysis?

Q. Do you know the difference between a dynamic and a static IP address?

A. Yes. It depends on how it's allocated by your router.

Q. Yes. Could you please explain to the Court the difference between a dynamic and static IP address.

A. When your computer connects to the internet, depending on how they give a range of IP addresses it has to choose from

that your router would provide -- and this is at a very high level -- you can configure it so that you come out of the same IP every time or that a server called the DHCP can sort of pick it for you from a range.

Q. In essence, would a -- a dynamic IP address can change every time that it's used, correct?

A. Yes.

Q. And a static IP address is one that doesn't change every time that it's used, correct?

A. Right.

Q. And it's possible for residential addresses to have a dynamic or static IP address, correct?

A. Yes.

Q. And are you aware of -- do you know what IP address spoofing is?

A. Yes.

Q. Could you explain to the Court what IP address spoofing is.

A. Well, I'm not sure exactly how it's implemented. Most commonly, it would be the idea that you could create traffic from your computer over the network that would conceal your IP address by making it look like another IP address.

Q. Would it be fair to say that there's a number of ways to conceal an IP address?

A. Yes.

Q. And that it's entirely possible to -- withdrawn.

So you've discussed -- you've testified about proxy servers, correct?

A. Yes.

Q. And a proxy server is one of those ways of masking a user's IP address, correct?

A. Yes.

Q. And would you agree with me that numerous people can share the same IP address through a proxy server?

A. Yes.

Q. And that number could be in the thousands?

A. Yes.

Q. It could be in the hundreds of thousands?

A. Yes.

Q. And depending on the server capacity, it could actually be in the millions?

A. Right. I'd agree. It depends on the server capacity. But, theoretically, yes.

Q. But assuming proper server capacity, millions of people could share the same IP address through a proxy server?

A. For their -- for their respective sites they're visiting, yes.

Q. And, likewise, you're familiar -- you testified about the VPN, I believe, virtual private network?

A. Yes.

Q. And you, I think, just testified that you use a VPN; is

that correct?

A. Yes, I do.

Q. VPN is another way of masking your originating IP address, correct?

A. Yes.

Q. And, likewise, numerous people can share an IP address through a common VPN, correct?

A. Yes.

Q. As a matter of fact, there are a number of ways that people can share a common IP address, whether through a VPN, a proxy server, or just simply logging into, say, the court's Wi-Fi?

A. Yes.

Q. And I believe I heard you testify that an IP address is not a unique personal identifier in terms that it doesn't contain any individual's name?

MS. PELKER: Objection, Your Honor. I don't believe that the witness has testified to that one way or the other.

MR. EKELAND: I was asking her if she had testified to that.

THE COURT: Why don't you just ask her the question.

BY MR. EKELAND:

Q. Do you consider an IP address to be a unique personal identifier?

A. On its own individually, no.

Q. Right. When did you start working on the Roman Sterlingov

investigation?

A. I believe it was 2020 or 2021. It began with some very small asks. It began with one-off questions that, I believe, started around 2020, but I'm not completely sure.

Q. When you started on Mr. Sterlingov -- this case, investigating this case, were you told Roman Sterlingov was the suspect?

MS. PELKER: Objection, Your Honor. This goes well beyond the scope of the IP analysis, which is the subject of this *Daubert* inquiry.

MR. EKELAND: Your Honor, the IP address analysis here is a probability-based analysis. There's words like highly likely and possible. This goes directly to any kind of confirmation bias or cognitive bias going in here.

If this report was stated with a 100 percent certainty, I would perhaps agree with counsel's representation.

THE COURT: I'm not saying that this isn't a relevant question that you could ask at trial, but I don't see how that goes to her competency to testify on whether, as a matter of *Daubert*, she's qualified to offer the expert testimony.

I'm not saying I wouldn't allow that question at trial, depending on what I end up doing with respect to the Dror testimony.

MR. EKELAND: Dr. Dror, yes, sir.

THE COURT: But for present purposes, I don't think

it's necessary to get into this for me to make a determination under *Daubert* as to whether she's qualified to offer testimony.

MR. EKELAND: Understood, Your Honor.

BY MR. EKELAND:

Q. Ms. Mazars -- am I saying that right?

A. Yes.

Q. Okay. Directing -- do you still have the government's defense -- exhibit binder in front of you?

A. Yes.

Q. And could you just please turn to your IP overlap analysis.

A. Yes. I'm there.

Q. And let's just start with page 1. Let me know when you are looking at page 1.

A. I'm on page 1.

Q. Okay. Could you just explain to me -- I'm just not quite clear on what you mean by IP address overlap. So could you just explain to me what -- what you mean by that.

A. By using the phrase IP address overlap, I meant to say within the files reviewed seeing the same IP address appear in the logs from one account to another account.

Q. So when you say logs, are you referring to server logs?

A. Sorry. To be more specific, I'm -- I'm referring to the IRS-provided data, which was mostly legal-process obtained, but it appeared to me that some of the information in it were logins. So I think they came from server logs, but it was

overall legal process returns.

Q. So you didn't actually examine any native server logs for any servers?

A. No, I don't believe so.

Q. Did you examine any traffic logs for any of the servers involved with the IP addresses in this case?

A. No, not for any of these.

Q. And can you tell me -- are you familiar with the phrase in and out points in terms of logging in and logging out to a server?

A. Not as a term, but I think I understand what you mean.

Q. Well, for instance, I notice that you've got login times for certain IP addresses. Do you have the logout times as well?

A. In some cases there may have been logouts, but I treated them all the same; just occurrences of IPs in the logs.

Q. And so when you're -- in your report when you're going through these IP address analyses, you haven't anywhere put when there was a logout from a particular IP address?

A. Correct. It was agnostic of the actual action taken, in and out.

Q. I'm sorry. I spoke over you. You said it was agnostic; is that what you --

A. I didn't consider whether it was a login, a logout, a check transaction. I only considered whether the IP appeared in each

document I looked at.

Q. So your entire IP overlap analysis is purely based on whether or not the IP address appeared in the documents that you were provided by the IRS?

A. Yes.

Q. And then -- so you say here on the data summary -- the last sentence of that paragraph there -- "The data summary contained entries from 29 data sources."

So it's your testimony that none of those 29 data sources were native server logs for any of the servers involved with any of the IP addresses in your IP overlap analysis?

A. I'm not sure whether they were or not.

Q. But you don't recall looking at a native server log for any of the IP addresses?

A. I don't know if they were native or not. But, no, I don't -- I don't specifically remember seeing something I recognized as an Apache log or anything like that.

Q. And then, if you see up at the top, going back to the background section, do you see there's an email there; it's in red. It's shormint@hotmail.com?

A. Yes.

Q. Did you -- are you aware that the government executed a search warrant on -- in relation to that particular email address?

MS. PELKER: Objection, Your Honor. This is going

beyond -- anything related to the search warrant is going beyond the scope of the IP analysis.

MR. EKELAND: Your Honor, I wholeheartedly disagree. First, there's a reason that that email address is at the top of this. They're trying to link it at one point in the criminal complaint to Mr. Sterlingov, and I think it's completely relevant whether or not the expert considered the search warrant returns for this email address because this is the one that they use to claim that Mr. Sterlingov registered the Akemashite Omedetou BitcoinTalk forum post.

It's A-k-e-m-i-s-h-i-t-e [sic] -- I may have spelled that wrong -- and Omedetou is spelled O-m-e-d-e-t-o-u.

And, Your Honor, that is the BitcoinTalk forum account that the government prominently features in their criminal complaint where they tried to tie Mr. Sterlingov to being the administrator of Bitcoin Fog.

THE COURT: So I guess I'm still not quite sure, though, why that's relevant to her expert testimony or whether she's qualified to testify as an expert, presumably, with respect to whether that email account or any Bitcoin Fog administrator-related moniker could then be tied to IP addresses -- in particular, IP addresses.

MR. EKELAND: Your Honor, I'm trying to find out the basis for her opinion and to what extent she actually looked at the information underlying her conclusions about this email

account.

THE COURT: You can ask her if the search warrant return was part of the basis for her conclusion in this report.

MR. EKELAND: Okay.

BY MR. EKELAND:

Q. Ms. Mazars, was the search warrant return for the shormint@hotmail.com email account part of the basis for your opinions in this report?

A. Yes.

Q. And did you review -- so you reviewed the search warrant returns?

A. Yes.

Q. And when you reviewed those search warrant returns, did you see that they led to a backup email that led to somebody named Andrew White?

MS. PELKER: Objection, Your Honor. This is definitely -- first of all, that's mischaracterizing the evidence, but also it is outside the scope of the IP analysis.

THE COURT: Why don't you ask her instead to what extent -- in what way she relied on that search warrant return for purposes of the opinions that she expresses in the IP overlap analysis.

MR. EKELAND: Yes, Your Honor.

BY MR. EKELAND:

Q. Ms. Mazars, did you hear Judge Moss's question?

A.  Yes.  So I didn't use any of the additional registration data to come to these conclusions except in the cases of in 4.3 under background, those associated with Roman Sterlingov.

If there were accounts that were registered in true name to Mr. Sterlingov or to email accounts that were known associated, such as the heavydist moniker, and there were IP occurrences between those accounts, I did not focus on those because that was already known.

That's the extent to which registry -- user registration data figured into this.

Q.  And did I hear your testimony correctly to say that you didn't -- when you looked at the search warrant return for shormint@hotmail.com, you didn't see anything there tying it to Mr. Sterlingov?

MS. PELKER:  Objection.  That's not at all what the witness has testified to or what the question was or that's relevant to this analysis.

MR. EKELAND:  Your Honor --

THE COURT:  I think that's a fair objection.  But I think, for purposes of today, we're just going to try and understand -- or I need to understand what the witness's basis was for her analysis.  And so you're welcome to ask her about anything that she relied upon in her analysis.

MR. EKELAND:  Well, Your Honor, it's my understanding that she did say, if I understood her correctly -- and this is

what I was asking for clarification on. She did say that she did rely on the search warrant return for shormint@hotmail.com. And then, if I understood her correctly, she said that she looked at it to see if there was any real-name attribution with that registration of that account and that that -- there was nothing related to that account that -- named Roman Sterlingov.

THE COURT: I don't think that's what I heard her say either. But why don't we just back up a second, and you can just ask her what -- I think the witness did say that she did make a determination with respect to email addresses that were known Roman Sterlingov email addresses. I think that's all I heard her say.

And that she didn't bother tracing those because she knew already, or they knew already that they were registered in Mr. Sterlingov's name. That's what I had understood her to say.

BY MR. EKELAND:

Q. Ms. Mazars, is that correct, that you made a determination of what email addresses were registered in Mr. Sterlingov's name and weren't?

A. To some degree, yes.

Q. And did you determine that the shormint@hotmail.com email address was registered to Mr. Sterlingov's name?

A. No, that was not something that I determined.

Q. Thank you. Turning your attention to page 2 of your

report, it says here you used a program called Maltego.

Does that -- can you briefly explain what that program does for the Court.

A. Maltego, as an offering, has a few different products. The one I used here was Maltego CaseFile, which is, essentially, a graphing tool where you can read in a CSV file and some sort of Excel file of data, and it will automatically plot the points for you. And from there, you can move the arrows around; you can group the dots together or spread them apart.

Maltego, as a product, has other offerings, but CaseFile was the one I used for this.

Q. Do I understand it correctly that CaseFile is a -- I think you described it as a graphing tool, and that it's not an analytic tool in the sense that it's analyzing the data and arriving at certain conclusions?

A. Right. I didn't use it as any analytic tool. I know Maltego has other offerings that assist with analysis, but that wasn't -- I didn't use any of those features.

Q. So it's fair to say that the graphs or the visual representations in your report are graphs that you, essentially, drew using Maltego?

A. Yes.

Q. Turning to page 3 of your report --

MR. EKELAND: Your Honor, I'm aware that the Court has a 2:00.

THE COURT:  We do, yeah.

MR. EKELAND:  Should we pause?

THE COURT:  You can continue.  It's not 2:00 yet.

MR. EKELAND:  Okay.  Yes, Your Honor.

BY MR. EKELAND:

Q.  Turning to page 3 of your report, we see the header that says "Overlap Analysis"?

A.  Yes.

Q.  Just directing your attention to the last sentence in the first paragraph there where you say, "Time zones were not specified by convention; they were understood to be in UTC" --

A.  Yes.

Q.  -- could you just explain to the Court what UTC is.

THE COURT:  I understand what UTC is.

BY MR. EKELAND:

Q.  For the record, could you just say what UTC is.

A.  UTC is the universal time zone convention and, by default, it's in Greenwich Meantime.

Q.  And am I correct to understand here that none of the data set that you looked at specified what time zones were used to record the IP address login?

A.  I'm not sure that none of them did, but not all of them did.

Q.  And so you have no definitive way of knowing what time zone was recorded -- was being used for a particular login that you

saw?

A. For some of the sources, that's correct.

Q. And can you name the sources where you did know that it was UTC?

A. I don't remember.

Q. Okay. But it's -- I mean, that -- it's entirely possible that if it wasn't UTC, your analysis could be off by hours?

A. Yes.

Q. Okay. Just directing your attention to that -- on about the middle of the page, that 61.19.252.148 IP address --

A. Yes.

Q. -- there you say that is a -- appears not to be a Tor node?

A. Correct.

Q. And you checked that with -- I'm assuming with the Tor Project records, ExoneraTor?

A. Yes.

Q. And that it was owned by Thai provider CAT Telecom?

A. Yes.

Q. And then you say, "According to FBI holdings." Can you explain to me what you mean by -- what FBI holdings? Can you be more particular about that?

A. I searched an FBI database that they don't publicly name and saw an archive post from a criminal forum advertising proxy servers to connect to, and that's where I saw the reference to that IP.

Q. But you're not testifying that CAT Telecom is a criminal enterprise?

A. No, not CAT Telecom.

Q. You're just testifying that you searched the FBI database, and you saw that this particular proxy server was mentioned in the forum?

A. Right, exactly. I'm not asserting anything about the provider; just about how I saw a reference to the IP being used.

Q. And then -- so you, essentially, maintain that this was a proxy server?

A. I believe it could have been a proxy server.

Q. And do you know the traffic volume on that proxy server?

A. No.

Q. Okay. And you say you assigned it a probable overlap of ten minutes; is that right?

A. Yes.

Q. If I recall your testimony on direct correctly, that was just the amount of time that you arbitrarily picked to assign for commercial servers; is that right?

MS. PELKER: Objection. I don't believe the witness testified that it was arbitrarily picked.

MR. EKELAND: I'm asking her --

THE COURT: There's a difference between asking her that and saying she testified to that. Why don't you just ask

the question.

BY MR. EKELAND:

Q.  It states that you got a probable overlap on your IP overlap analysis for IP address 61.19.252.148.

A.  A window of probable overlap of ten minutes was assigned for that.

Q.  And why do you use the word probable?

A.  In choosing the term window of probable overlap, I was intending to create a space for, if overlap between the two IPs that would be meaningful to me occurred, I would most commonly see it in the first ten minutes.

It was not arbitrary, but this isn't a statistical term about -- that anything within ten minutes is overlap.  It was when I expected to see overlap if it existed.

Q.  So when you use the word probable, you're not referring to any statistical probability; did I understand you?

A.  Right.  Not in that sense outside of a professional guess, a professional opinion.

Q.  And then just turning your attention to the last IP address on that page, the 70.90.169.13, that -- and it's your testimony that that's another commercial server by U.S. provider Comcast?

A.  Yes.

Q.  And do you know the traffic volume on that server for the period of time for the logins that you're writing about?

A.  No.

Q. Do you know the logout times for that IP address in relation to what you're writing about there on the bottom of page 3?

A. No, I don't remember if I saw them.

Q. And, again -- and for everything in your report, when you say probable overlap, again, you're not talking about any kind of statistical probability, but just based on your judgment or your guess; is that correct?

A. That's correct.

THE COURT: Can I ask -- I just want to make sure I understand this. When you say that you assigned a window of probable overlap of ten minutes -- I understand this. You're not describing what you actually saw there, but that you're -- you're describing what your assumption is in general given the type of server, whether it's a proxy or a VPN, and that's what you talked about on your direct and that you were just assuming ten minutes, or is that something you observed?

THE WITNESS: What I assigned was a cutoff of IP occurrences that I would stop looking at. So what I assigned -- I wanted to be consistent across every IP I looked at.

THE COURT: Right.

THE WITNESS: So when I calculated the amount of time between connections of some sort between one account and the next, if that amount of time was greater than, in this case,

ten minutes, I excluded it from the whole analysis.

THE COURT: So the first sentence, the sentence -- the first portion where it says you assigned a window of probable overlap is your methodology, and the second sentence is then what you observed, it says two events occurred within ten minutes; is that right?

THE WITNESS: Right. Within ten minutes. I didn't, for brevity in these paragraphs, say exactly the number of seconds. But what I'm saying is for each IP I look at what kind of IP I thought it was, then assigned or decided what the cutoff of time deltas would be for it. So in that case, I assigned it ten minutes.

After ten minutes, I'm not considering it in this analysis. And then from all the points here whose time delta was within ten minutes, I logged them in the table.

THE COURT: That's helpful. Thank you.

BY MR. EKELAND:

Q. In that methodology that you just described to the Court, is that a methodology that you've made up?

A. This is my first time doing that specific methodology.

Q. This is the first time that you've ever done this methodology. Can you -- is that correct? I heard you right there?

THE COURT: That's what I -- I heard it. The clock is running.

MR. EKELAND: Your Honor, I apologize.

THE WITNESS: I put the time deltas before in cases, but doing it this specific way with different ones for different IPs in the same analysis, yes.

BY MR. EKELAND:

Q. Can you cite me any scientific peer-reviewed papers supporting your methodology that you're using here?

A. No. It's not a scientific construct. There wouldn't be any way to -- to study it that way.

Q. Can you cite me any academic white paper supporting your methodology that you used in this IP overlap analysis report?

A. No.

THE COURT: Is this a good breaking point?

MR. EKELAND: Yes, Your Honor.

THE COURT: Well, why don't we break for my other matter now, and we'll let you know as soon as we're done, and you can come back and we'll continue.

(Recess taken at 2:05 p.m. until 2:30 p.m., after which the following further proceedings were had:)

MS. PELKER: Your Honor, I spoke to Mr. Ekeland about this on the break. The witness just had a change in her childcare schedule. Unfortunately, now we need to wrap up by 3:00. We're going to try and wrap up by 3:00, if at all possible.

THE COURT: Good. All right. We'll do our best.

You may proceed.

MR. EKELAND: Thank you, Your Honor.

BY MR. EKELAND:

Q. Ms. Mazars, are you ready?

A. Yes.

Q. I'm just going to jump ahead to page 5 of your expert report. Do you still have that in front of you?

A. Beginning with 95?

Q. On page 5 up at the top there, the IP address that starts with 95.

A. Yes.

Q. You see that? Again, that's -- you've written that it's not a Tor node?

A. Correct.

Q. And that it is a German provider called Leaseweb?

A. Yes.

Q. And you could not figure out whether or not it was a dedicated VPS or a VPN?

A. That's correct.

Q. Did you -- do you know the traffic volume on that server for the times that you've got recorded here?

A. No, I don't.

Q. Okay. And then do you know the traffic volume for any of the servers for any of the IP addresses that you've listed in your expert report?

A.   No.

Q.   Just going down to the IP address at the bottom of the page, the one that starts 212 and it ends in 123.

A.   Yes.

Q.   And that, you say, was likely a VPN?

A.   Yes.

Q.   And that -- if I'm understanding you correctly, that it's possibly from a company known as CryptoVPN.com?

A.   Yes, I believe it could have been a CryptoVPN.com IP.

Q.   And when you say a "Luxembourgish VPS provider, Root S.A.," am I correct to read that, that that's a company in Luxembourg?

A.   The company, yes, from what I could tell.

Q.   Directing your attention to page 6, this is -- what is that? -- the second-to-the-last page in your expert report, and turning your attention to the diagrams down on the bottom.

A.   Yes.

Q.   I was a little unclear.  The top and the bottom image, the bottom image being the one where there's the Shormint email address on the left, and then you've got three IP addresses beside that; are those two separate graphical images, or are they meant --

A.   Yes, they're two separate graphs.

Q.   Am I correct to interpret that, that that's sort of the graphical correlation to what you state in your conclusion in Points 1 and 2?

A. Yes.

Q. So it would be fair to associate the top graphic on page 6 with Bullet Point 1 in your conclusion?

A. Yes.

Q. And it would be fair to associate the second graphical representation on the bottom of page 6 with Point 2 in your conclusion?

A. Yes.

Q. And in Point 1 of your conclusion on page 7, you say that the same user most likely accessed, and then you list the number of the accounts.

But that most likely, that's not a -- you don't have any statistical probability that you could give me for the accuracy of that most likely it is; is that just a guess on your part?

A. It's correct that I don't have -- it was not a statistically computed probably, and I didn't intend it in that way.

Q. Okay. You're also not identifying anywhere there in the conclusion or anywhere in your expert report the identity of the user that you're referring to in Bullet Point 1, are you?

A. That's correct what you said.

Q. And same question for Point Number 2; again, you say likely accessed, and it's fair to say that you're not actually -- you can't assign any kind of statistical probability as to the

accuracy of your statement in Bullet Point Number 2, correct?

A.  That was not something I attempted to compute here.

Q.  And in Bullet Point 2, you're not -- or anywhere else in this expert report -- identifying any particular user?  You're just speculating that the same user most likely accessed the Mt. Gox accounts for Kolbasa and PeterNFS and the Liberty Reserve account; is that correct?

A.  I did not attempt to attribute the user; just provide an observation on the relatedness of the accounts.

MR. EKELAND:  I pass the witness, Your Honor.

THE COURT:  Okay.  Thank you.

MS. PELKER:  Nothing further, Your Honor.

THE COURT:  All right.  You're excused.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Thank you.  We probably should talk about next steps a bit and process here.

MS. PELKER:  Yes, Your Honor.

THE COURT:  We're scheduled for next week to address the Rule 17(c) issues.  I have a big stack of *Daubert* motions in front of me where I've heard quite a bit of testimony, probably more than was necessary from those witnesses.  I also have the motion to dismiss, which, among other things, raises the venue issue.  I can tell you that I'm working on an opinion on that, and I will get that to you as soon as I can.

What I would propose doing with respect to the

*Daubert* motions is I can set aside virtually the entire day that we have for the pretrial conference, and one way to handle this is I can give you some preliminary views today just so you can be moving on with your trial prep. I don't want to interfere with your trial prep. But I'm not going to know for sure until we go through this process.

But what I propose is going witness by witness at the pretrial, and I can give you ten minutes a side, might be convinced to 15 minutes a side, to sum up or make any key points you want to make. And then I can just give you my rulings from the bench with respect to the *Daubert* issues so that you can have that as soon as possible for your final trial prep.

I'm also sometime probably early next week going to post my proposed preliminary jury instructions and my proposed voir dire, and you can review that and then give me any comments on either of those two at the pretrial. I can tell you that my current inclination -- and I haven't heard your argument -- I mean, I've read your briefs and I've heard the witnesses at length, but I haven't heard your argument. I don't want to put anything in stone until I have because, quite frankly, you both made some points worthy of my consideration, and I don't want to foreclose that.

But my inclination is to allow, perhaps with some possible trimming of the sails that we can discuss at the

pretrial, to allow testimony of what I regard to be the principal or the core expert witnesses, and that would mean Bisbee, Scholl, and Still.

And as I was discussing just earlier today, I think, just by way of example, some of Ms. Still's testimony goes beyond her expertise. I don't think that was her proposed testimony, and I don't think that was contested. But I think that those witnesses are at the core of the case, and I can explain in greater detail what my reasoning is at the pretrial with respect to those witnesses.

Just at the most general level, my sense of it is, is that this is a forensic case. It's not terribly different to my mind than a case in which you might have accountants who had spreadsheets on their desks and offered different views of tracing financial transactions on those spreadsheets and came and testified about it.

But since you're dealing with a blockchain and the, at times, probably millions of lines that are in ledgers and the difficulty in -- or just the sheer volume of the tracing, that computers are needed in doing that, and there are assumptions that go into the computer analysis, and there are assumptions that go into the pen-and-paper analysis of any forensic witness who is tracking things. And I think it's fair, as I've indicated before, for both sides to understand what the assumptions are that the other side is applying and to

be able to delve into that and to question that.

But I didn't see anything or hear anything in the testimony that made me think that what they were doing was scientifically unsound. And I use the word scientifically somewhat guardedly here because I do think, as I said before, this is really a forensics case where there are certain assumptions that were applied regarding the forensics, and I think both sides are entitled to explore those forensics.

I can get into greater detail and, as I said, that's not cast in stone because I do want to hear from you more before I give you a final ruling. I also don't want to delay your preparation for trial.

I'm also inclined to allow Ms. Mazars' testimony, but we can also -- that's also just a preliminary view. I'm open to hearing from you.

With respect to some of the other witnesses, I really do want to hear more about Dr. Dror. I think that's a close question in my mind as to whether I allow some testimony, and the question also will be as to the scope of the testimony that I allow from Dr. Dror.

And then with respect to Mr. Verret and Mr. Fischbach, again, just my very preliminary view is that some of their testimony is really not -- is not supported by any particular expertise, but some of it was quite possibly okay. And it's going to be a question of just figuring out

where I draw the lines with respect to their testimony.

And then, again, very preliminarily -- and I do want to hear more argument on this -- I'm skeptical about Mr. Cabanas. I didn't really have a sense that he offered any expertise other than being a smart guy who, as a physicist, knows something about statistics. But I didn't see that he brought any particular expertise here. But I will be open to hearing more from the parties on that end.

I really do want to caution you all that those are very preliminary reviews. I do want to give you all a chance to be heard and, quite frankly, I want to go back -- it's been some time on some of this testimony. I want to go back and look at the testimony again and look at the reports again. I'm probably going to have to, in some of the cases, go line by line or close to line by line for the reports and tell you what I think is permissible and what isn't.

So that will maybe help you a little bit in your preparation. You'll have my preliminary jury instructions and voir dire no later than early next week to look at and then be ready to give me any comments on that for the pretrial.

And as I said, as soon as I can, I will get you an opinion. I know you-all may know that I came to this case coming off of a nine-week terrorism trial that was all-consuming for about four months, five months. And so I apologize for not having that opinion to you yet, but I will

get it to you as soon as I can.

I'm happy to answer any questions you-all have either today or at the pretrial with respect to trial procedures. I guess one question for now is how many weeks you think trial is -- or days you think trial is going to last, which may affect my decision about how many alternates to seat.

I can tell you that in this courtroom, ideally -- if you just look at the jury box, it's ideally two alternates. But we could go beyond that, but it means putting chairs in front of the jury box to do that. I think it's only necessary if we think it's going to be a particularly lengthy trial.

Ms. Pelker, what is your current estimate?

MS. PELKER: Your Honor, we're still waiting to hear back from the defense on stipulations for translations and awaiting pretrial rulings on authentication. Assuming we're able to resolve all of that, we're looking at two full weeks going through September 28th, understanding that the Court may sit on Friday, the 15th, but otherwise will not sit on Fridays. Possibly into early the week of the 2 nd.

THE COURT: Okay. Mr. Ekeland, what's your view on your case at this point? I understand it's hard to say with certainty, but if you can just give me your best estimate.

MR. EKELAND: My best estimate would be one to two weeks, probably closer to two weeks. But that depends on what expert witnesses the Court qualifies and how we resolve the

certification issue with the government in relation to the translations and other stuff.

THE COURT: Okay. Are you going to have things that need to be translated as well; is that what you mean?

MR. EKELAND: I'm sorry. I just didn't hear you.

THE COURT: Are you going to have things that need to be translated as well?

MR. EKELAND: Well, I mean, Mr. Sterlingov speaks Russian, but --

THE COURT: His English was awfully good when he testified in front of me. And I've been operating under the assumption that he's fluent in English.

MR. EKELAND: He is fluent in -- no, no. We don't need a translator at trial. I'm sorry. I thought you were talking in reference of Russian documents.

THE COURT: Oh, yes, I was talking in terms of documents.

MR. EKELAND: I need to look closely at that, because we do have issues with some of the government translations and --

THE COURT: Oh, so you mean in your case -- in your case need to offer rebuttal translations, is that what you're suggesting, or rebuttal testimony about the translations?

MR. EKELAND: Yeah. I don't know, honestly, right now if we're willing to certify the government's translations.

But I don't want to take a position on that before I look really, really closely at it.

THE COURT: If you're unable to work it out amongst yourselves, one way to streamline things might be to see if there was a court-certified translator in Russian -- I don't know if there is -- who can look at it, and you can just agree to abide by whatever the court-certified translator comes up with.

MR. EKELAND: Potentially. I think what's -- one of the issues that we're running into is a certain -- depending on -- there's a lot of ways to translate particular phrases and words, and what words are chosen can have certain nuances and implications, as the Court understands. That's really what it's about.

THE COURT: All right.

MS. PELKER: Your Honor, this is the first time that the government is hearing that the defense has specific issues with the translations. Defense has been telling us since June that he will likely stipulate to it, and he just needs time to review and officially get back to us.

Given that we don't even know what their objections are, I think at this point we just need to plan to have the government put on its translators, the defense will put on its, and we will have translators dispute the -- I'm happy to have a court translator, if that's an option too.

THE COURT: I'm sympathetic to your frustration, but what I say is that we all ought to be careful, particularly as we get closer to trial, everyone's frustration levels go up. I just want to make sure frustration doesn't interfere with the efficient and just proceeding of the trial and -- even if you're frustrated, I get it. As long as you can reach an agreement before trial, that may not spare you and Mr. Ekeland a lot of work going back and forth, but it's going to spare 14 or 16 citizens from the District of Columbia sitting here for an extra couple of days they don't have to sit here for, if you can do it.

MS. PELKER: We certainly have remained very committed to trying to work with defense counsel toward some sort of resolution here.

THE COURT: All right. So how many jurors do you propose that we have?

MS. PELKER: I would defer on the Court's expertise. This is, obviously, not the same as the Trabelsi matter, but how many alternates did you have there?

THE COURT: We had four alternates in that case. We were quite lucky, actually. We ended up, I think, having at least two of those alternates up until the very end of the trial still who were there. So we had some cushion, but every jury is different, so you never know.

MS. PELKER: I think it probably makes sense, Your

Honor, given that this is potentially a month-long trial, to push it to 15, so having three, splitting the difference there.

THE COURT: The only -- it just means one person is sitting there by themselves out in front, but we can do that.

Mr. Ekeland, what's your view?

MR. EKELAND: That's fine with us, Your Honor. We'll defer to the judgment of the Court on that.

THE COURT: All right. I mean, I understand the concern. I think the last thing in the world we want to do is get to week three and a half of a trial and run out of jurors. So let me think about it.

It's probably going to be 15 or 16 that we end up using under the circumstances. I'll let you know that at the pretrial.

And then the other thing, which you're welcome to do now or we can do at the pretrial, is if you each want to give me two numbers chosen at random to be the alternate seats, and we'll keep that secret. I'll direct everyone to keep that secret. When we do the voir dire, you need to make sure you don't inadvertently allow it to slip.

Ms. Pelker, you want to just give me two numbers between 1 and -- well, I guess it's between 1 and what? Let's assume 16.

MS. PELKER: 6 and 11.

THE COURT: Between 1 and 16.

MS. PELKER:  6 and 11.

THE COURT:  Mr. Ekeland?

MR. EKELAND:  Do 3 and 14.

THE COURT:  Okay.  So that, actually, means if we decide to go with 15, we'd be okay still, too.  Those will be the alternate seats.

And just so you know, while we have a little time right now, we might as well use it.  The way I do jury selection is close to how other judges in this court do it, but not identical.

First of all, Glenda, do we know if we have the ceremonial courtroom?

THE COURTROOM DEPUTY:  Nobody else is starting on the day that we are starting because it's on a Thursday.

THE COURT:  Hopefully, we'll have the ceremonial courtroom.  I think we'll be able to get enough prospective jurors in the ceremonial courtroom.  I will read them all the voir dire.  Each of them will have a white note card.  I will tell them to write down the numbers of only my yes -- only where they have a yes answer to my questions.

Inevitably, someone will put down all their answers to all the questions, because it happens every time.  I will say just write down the number of a yes.  We will then bring a group of prospective jurors down here, 20 or so, and we'll just call them one by one in order.

I will ask follow-up questions. We, hopefully, will have the wireless telephones. So if we need to have a bench conference, we can just do that, and you can let me know. I will give you a chance to ask any follow-up questions.

This does raise -- I know there's a -- I can't remember if I ruled on this or not already, but there was a motion for a counsel-directed voir dire.

MR. EKELAND: You did, Your Honor. You denied it.

THE COURT: Well, I knew in my head I had. So that's -- that request is denied. But I will allow you to ask any appropriate follow-up questions.

I just ask that you, in doing so, not use the voir dire as an opportunity to begin your opening statements or to engage in advocacy through the voir dire and not use it as an opportunity to try and build rapport with particular jurors. I've had lawyers who say, I see you went to such-and-such college; that's where I went to college. No. That will get me very upset if you do that. None of that sort of thing.

And then I'll have to do the math. I will tell you the number of jurors that we need to qualify in order for you-all to exercise the strikes that you're entitled to under Rule 24, I think, is the rule; whatever the Federal Rule of Criminal Procedure is. But the number of strikes, that's what we'll do.

I will tell you how many you have to qualify. I

probably will add two or so on to that just to make sure that we don't run into a problem. I will then bring -- I think probably we can get all the qualified jurors into this courtroom here; that won't be a problem.

And we will have a strike sheet which we'll pass back and forth between the two of you. Typically, what happens is that the defense will do two and the government will do one and then the defense will do two and the government will do one just because the defense gets more strikes.

You need to record, to the extent you can perceive, the race and sex or gender of anyone you're striking for *Batson* purposes and so we can make sure we have a record if there is a *Batson* issue that arises.

The one thing, though -- and this is where I differ maybe a little bit from how some other judges do this. You may not during your -- that first back-and-forth when you're doing your first principal strikes, you may not strike anybody in Chair 6, 11, 3, or 14. They just -- they're in another universe. Just pretend that they're not there at the moment when you're doing your initial strikes and do -- we'll do your initial strikes, and then we'll figure out who the principal or the actual serving jurors will be, or the nonalternate jurors will be at that point in time.

Before I actually announce to the jury anything -- because I don't want to, obviously, give away who the

alternates are, but the sheet will get passed up to me, I'll verify that it's all been done correctly. And then at that point you can exercise your strikes for the alternates.

And I think if we have 16, it's maybe two a side. I'll have to look at the rule again, and you'll have to look at the rule on that and go back and forth on that. As to that, you can only strike anybody who is in seat 6, 11, 13 [sic] or 14. And we will fill those seats from the remaining pool, and you can strike into the pool if you want to.

So if it's someone who is next up to be seated, you can strike that person if you want to if you don't want that person to then fill a seat that the other side might -- a vacancy the other side might create through the exercise of a strike. And then we will have our jury.

Hopefully, we can get that done in a day. Usually, I find we can. Although it's a long day, and we have to work hard to get through it. But usually we're able to do that.

Any questions about the jury selection process? Which seats did you say you wanted the alternates to be?

MS. PELKER: 6 and 11. It doesn't matter.

(Off the record discussion between Court and the courtroom deputy.)

THE COURT: 6, 11, and then 3 and 14; correct, Mr. Ekeland?

MR. EKELAND: Yes.

THE COURT: I just want to make sure all our numbers match up.

MR. PEARLMAN: Your Honor, just a couple of questions real quick.

THE COURT: Of course.

MR. PEARLMAN: Can you strike into the panel -- to the voir dire panel during your strikes, and if nobody strikes people in the seats, does that mean that you have concluded that everyone is happy with that initial group, and there will be no more strikes?

THE COURT: You can strike into the panel, I think, as well if you want to during your initial rounds of strikes. And I realize, I guess it's possible that there could be some overlap to that if you're very strategic about it with respect to the alternates. But I think that's okay.

MR. PEARLMAN: Have you -- you are still considering how many strikes to give both sides?

THE COURT: Well, I think -- my inclination is to give you what the rules provide. Why don't I just look at the rule right now.

So the government gets 6 peremptory challenges and the defense gets 10.

MR. PEARLMAN: And that includes alternates?

THE COURT: No. And then for alternates -- so each side will have two alternate strikes as well; two for the

defense and two for the government. That applies regardless of whether I have 15 or 16 jurors. So anything more than 14, each side gets two.

MR. PEARLMAN: Okay. So we'll get first strike of our one and then defense will get their two and then we finish with one strike?

THE COURT: I always have to write this out. If the government gets 6 and the defense has 10 -- if the government goes first, then the defense gets 2, then the government goes, defense 2, government 2. So the government will go first and last --

MR. PEARLMAN: Right.

THE COURT: -- which is what gets you to 6. But then I'll flip the order for the alternates, if you remind me of this. And the defense can go -- will go first for the alternate. And so that will be 1, 1, 1, 1.

MR. PEARLMAN: Okay. Oh, so it's 1, 1, 1, 1; not 2, 2?

THE COURT: Correct.

MR. PEARLMAN: Okay. I think those are my questions.

THE COURT: Okay. At the pretrial, you-all can let me know if there's more on that.

And then I will issue a pretrial order which addresses issues like excluding witnesses. Is the government having a case agent who is going to be at the table?

MS. PELKER: We are still trying to sort that out, Your Honor, since we had multiple -- we had a case agent from IRS and a case agent from FBI. We're still working on sorting that out, who will actually be at counsel's table.

THE COURT: Ideally -- I mean, I don't think it has to be a nonwitness but, ideally, it would be a nonwitness.

MS. PELKER: Understood, Your Honor. If we have someone at counsel table, we may be asking for that -- it would likely be a witness, and we may be asking for permission for that person --

THE COURT: I have in the past allowed the government to have the case agent at the table even when the case agent is the witness. I, obviously, would hear from Mr. Ekeland about that if you had an objection.

MS. PELKER: Understood, Your Honor.

THE COURT: If you want a tutorial on any of the technology in the courtroom, the deputy clerk can help you arrange that with Mr. Cramer, who is a gift to all of us and is wonderful and will be able to explain all the technology to you. I encourage you to do that. I will tell you that when you switch back and forth between different media, it takes more than a few seconds for the system to switch over, and you can let the deputy clerk know. But you're going to find that there's boot-up time when you're switching over between the media that you're using to do that, and you need to let her

know.

You need to make sure that the deputy clerk has your exhibit lists before trial with -- obviously, if there are exhibits that you can't anticipate or don't anticipate in front of -- before trial, there's nothing you can do about that, but she needs to be able to keep track of what's admitted into evidence and what's not. If you don't give her the exhibit list, she can't do that. She needs it.

Oh, the other thing is at the pretrial, I will need a list from each of you -- and I'll order that you actually file it the night before the pretrial conference -- a list of all the witnesses that you anticipate calling, and you can be overly expansive with this. And I'm not trying to use this as a vehicle of discovery.

It's just I need to make sure that none of the prospective jurors know anyone who may be a witness. And the last thing we want is to have a witness take the stand and have a juror raise his or her hand and say, you know, this person lives next door to me; what do we do?

So you can give me lists that are overexpansive, but I need those lists in order to tell the jurors all the names. I will not attribute the witnesses to one side or the other, so you don't need to worry about giving me a name, and then the jury is going to be disappointed if you don't call that person because they're not going to know where that name came from.

I'm just going to say, here are the people who may be witnesses or whose names you might hear in the course of the trial. If they're names that we should ask about, put those on the list as well. I'll include that in the voir dire.

We've done our best -- I don't think we actually got a neutral statement of the case from the parties, so we've done our best to come up with our own neutral statement of the case. If you think it needs to be tweaked, obviously, we can take that up at the pretrial.

It would be helpful for me to have binders of the exhibits just as we go, I can -- particularly, if there's a question with respect to admission, I can have it in front of me as we're proceeding. If those are numbered, it's going to make life so much easier because we'll all know exactly what it is we're talking about as we proceed.

MS. PELKER: Does the Court prefer the standard four copies of the binders for government, defense --

THE COURT: The defense certainly needs a copy and vice versa. Well, let me ask the deputy clerk. Do you want a copy as well?

THE COURTROOM DEPUTY: No, Your Honor.

THE COURT: I need one copy for me and one copy for my clerk and a copy for the defense. And the same for the defense, to have a copy for the government and then a copy for me and a copy for my clerk.

The other thing -- I very much appreciate the fact that Ms. Pelker gave the court reporter a list of unusual names, acronyms and things she maybe heard. You're going to make the court reporter's life much easier and your life much easier if you can give her that in advance. So a good way to earn brownie points is to get that list to the court reporter.

MS. PELKER: Earning brownie points in advance and then losing it when we speak too quickly during trial.

THE COURT: Exactly. You just don't want to hit a deficit.

MS. PELKER: Your Honor, on the exhibit list binders, the government has a number of Excel spreadsheets that are extremely voluminous, and we've been talking about the best way to do that. We can print them. They are -- we're going to have 100,000 pages of printed --

THE COURT: I don't want 100,000 pages. I assume you've turned those over, the 100,000 pages to the defense, and they're probably in electronic format?

MS. PELKER: Yes.

THE COURT: I don't want -- you can put a placeholder in the binder for that. That would be helpful.

MS. PELKER: That sounds great to us as well; I'm sure for our printers and paralegals as well.

THE COURT: All right. Any other questions from the government before I give Mr. Ekeland a chance to ask any

questions?

MS. PELKER: Does Your Honor intend for us to do openings on Friday, the 15th, or Monday, the 18th?

THE COURT: So I think that if we're successful in choosing the jury on the 14th, I would like to start with openings on the 15th, just because I always worry about trials taking longer than you think and then jurors having conflicts, and it becomes a mess.

That also is another issue. What should I tell the jury or prospective jurors in the voir dire about when the presentation of evidence is likely to end? I can just pick a date that's four weeks from the 18th, which gives us -- that gives us a day of cushion. Say, by the 9th of October?

And the balancing trick here is the later out we tell the jury the evidence is going to end, the harder it is going to be to pick a jury. The counterbalance to that is that we don't want to get to the 10th or 11th or 12th or whatever it might be and still be presenting evidence and having jurors get fidgety, but, more importantly, have conflicts and we run the risk of losing jurors.

MR. EKELAND: I just didn't hear. Did you say you anticipated starting the trial and openings on the 18th?

THE COURT: No. I'm hopeful we can start on the 15th, assuming we can pick the jury on the 14th. I was building in a day of cushion. And on the 15th, maybe it's

possible that we'll -- I'll do the preliminary instructions and the openings, maybe even call the first witness that day. I don't know for sure.

I was -- just, as a matter of being conservative, I said let's just assume for telling the jury how many -- counting the number of days to tell the jury, let's start counting ourselves on the 18th. If I counted out four weeks, that would take me to October 9th, but I'm still --

MS. PELKER: I think that might take us, actually, to October 13th, doesn't it?

THE COURT: Let's see. No. It's the 16th. It would take us -- assuming I start counting on the 18th, it would take us to the 16th.

MS. PELKER: Yes. Thank you, Your Honor.

THE COURT: Whenever you're talking about a trial that could be five weeks long by the time they deliberate, it becomes trickier to choose a jury and becomes more burdensome for folks. But I want to be honest with them about how much time it's going to take.

MS. PELKER: Mr. Brown had a point to make about the scheduling for the ancillary forfeiture proceeding as well.

MR. BROWN: I just want to make sure, Your Honor, that the Court is also tracking on the fact that we do have certain specific properties noticed for forfeiture.

Under Rule 32.2, assuming there is one or more

convictions in the case, there may be a post-trial ancillary forfeiture proceeding.

THE COURT: I see.

MR. BROWN: The government -- I mean, we can tell you right now, we will not ask for a jury determination of the forfeiture in this case. It's very often just done on the papers, or we could schedule, you know, some sort of proceeding later on.

The defense, however, under 32.2, does have a right to ask to retain the jury for that ancillary proceeding. It would be helpful, I think, all around if we had a -- maybe not at this moment, but if the defense could tell us and the Court whether they plan to ask the jury to be retained in the event that there is a --

THE COURT: Some of these issues I think we can take up at the pretrial. Mr. Ekeland, if you want to think about that and let me know at the pretrial, that's fine.

By the time we leave the room from the pretrial, I'm going to need to know what to tell the prospective jurors about how long the trial is going to last. As I said, folks should make a realistic estimate, understanding that we're not going to be sitting on Fridays, which helps somewhat, I think, in choosing a jury to the extent that people have obligations that they may need to take care of as jurors, they have a day of the week they can do that as well. Not everyone can sit for four

days a week, but more people can sit four days a week than five days a week.

MS. PELKER: One other point on scheduling, Your Honor. We're certainly fine arguing the specific witness issues on the *Daubert* matter at the pretrial conference. We're also happy to do that next Tuesday to the extent we're all going to be back here for the Chainalysis discussion anyway, or if there's anything else that the Court wants to address on Tuesday, we are happy to handle some of that that day.

THE COURT: Let me see. Unfortunately, my day is fairly packed already. I don't think we're going to have a lot of time for that, that day.

MS. PELKER: That's fine, Your Honor. We just wanted to offer that.

THE COURT: I appreciate that. Anything we can find to be efficient, I'm all in favor of.

MS. PELKER: Thank you, Your Honor.

THE COURT: Mr. Ekeland, any questions you want to ask about trial process?

MR. EKELAND: I've been asked by my client to just raise the issue of his detention. We are working with the U.S. Marshals. But he is wondering if there's any possibility of maybe transferring him to Alexandria or another facility.

Right now he's on lockdown roughly 23 hours a day, give or take, a couple hours. Whenever he's got a day where

he's going to court, he's unable to call me. I don't want to belabor the Court; the Court is well aware of it. We're talking to the U.S. Marshals, but it has been a significant impediment to the defense.

One of the reasons I can't -- I've been unable to get through these Russian translations is that there's a large volume of stuff, and actually finding the time where I can actually sit down with Mr. Sterlingov -- I understand now we're working on getting video conferencing. But if there's anything better in this district that's closer to this court that isn't going to have these kinds of problems that these rent-a-state jails are imposing by, essentially, just imposing these punitive conditions that they're using for their entire population. And then when we come in, we just get sandbagged.

I will keep the Court updated on that. I'm speaking to the U.S. Marshals, but if there's anything --

THE COURT: It is true that -- when I spoke to the marshall about this when you made your original concerns, he said to me, you know, if they had just called me about this, I could have resolved it or addressed these issues weeks ago. I do think the most efficient way is to address it with the marshals. If you reach a dead end with him, I'm happy to do something. I'm also happy when I get off the bench to send an email to the marshal who is responsible for this just to let him know that we're getting close to trial and that, to the

extent that Mr. Sterlingov can be as close as possible, that would be appreciated. I'm happy to do that.

I will tell you that there are substantial restraints on just availability at the Alexandria Jail, and my recollection is, I don't know if -- I think it may still be the case. But the Marshals Service actually concluded that conditions were not up to the Marshals Service's standard at one significant portion of the D.C. Jail, which is the reason that so many individuals who are on pretrial detention are being held outside of the district, is because of the concerns you're raising.

The Marshals Service is being extremely responsible and making sure that the conditions are actually up to the Marshals Service's standards where people are being held.

MR. EKELAND: Understood, Your Honor. I think there's just a bigger problem here where it seems that the district doesn't have, actually, adequate constitutional facilities to hold people pretrial, and then that is --

THE COURT: I will agree with you, with everything there except for the constitutional piece of that. I'm not sure that it violates -- I don't think it violates the Constitution. But I am sympathetic to your concerns, and I wish we had, frankly, our own federal facility here.

There was plans years ago to build one, and it was blocked, and it's too bad. It would be good if we had a

federal facility here. But unless you're very good friends with the appropriators on the Hill and can convince them to appropriate funds to build a jail -- a federal prison in D.C., we are where we are.

MR. EKELAND: Thank you, Your Honor. We'll just keep the Court updated on that.

THE COURT: Okay. That sounds good.

MS. PELKER: Your Honor, just one other point on Friday -- for next Tuesday -- we still have to do a *Missouri v. Frye* inquiry. We may be able -- that should be short, and we can tack that on on Tuesday rather than pushing it to the pretrial conference.

THE COURT: That's fine. That's fine to do that. Anything else before we adjourn for the day?

MS. PELKER: Nothing from the government, Your Honor.

MR. EKELAND: Nothing from the defense, Your Honor.

THE COURT: Well, thank you. This was helpful.

(The hearing adjourned at 3:20 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 29th day of August, 2023.

/s/ Tamara M. Sefranek
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C.  20001

**'**

**'How** [2] - 295:17, 295:23

**/**

**/s** [1] - 397:9

**0**

**0.01** [1] - 266:4
**0.02** [1] - 270:10

**1**

**1** [28] - 228:20, 242:8, 245:25, 290:19, 290:22, 291:1, 323:14, 323:22, 323:25, 324:1, 352:12, 352:13, 352:14, 368:25, 369:3, 369:9, 369:21, 379:22, 379:25, 385:16, 385:17
**10** [28] - 231:6, 231:14, 231:20, 231:22, 231:23, 239:24, 240:2, 253:21, 261:17, 261:23, 262:1, 264:1, 266:22, 270:8, 280:22, 281:4, 281:5, 286:3, 286:4, 286:10, 286:11, 288:17, 291:23, 292:4, 292:7, 384:22, 385:8
**100** [2] - 298:24, 351:15
**100,000** [3] - 389:15, 389:16, 389:17
**10005** [1] - 227:20
**10:05** [1] - 227:6
**10:37** [1] - 293:20
**10:50** [1] - 293:21
**10th** [2] - 231:4, 390:17
**11** [11] - 269:8, 269:17, 286:10, 298:15, 299:19, 379:24, 380:1, 382:18, 383:7, 383:20, 383:23
**11:00** [1] - 293:18
**11th** [1] - 390:17
**12** [9] - 294:21, 294:24, 294:25,

296:4, 296:9, 299:24, 302:5, 338:11, 338:14
**12.7** [6] - 262:13, 266:24, 270:12, 295:25, 297:4, 297:15
**123** [11] - 281:3, 282:6, 283:2, 283:6, 283:16, 283:24, 285:25, 342:10, 342:12, 343:3, 368:3
**12:16** [2] - 344:23, 345:7
**12MDV** [7] - 240:4, 240:11, 240:14, 240:24, 241:10, 241:20, 242:4
**12th** [1] - 390:17
**13** [5] - 270:20, 271:5, 271:15, 300:9, 383:7
**1301** [1] - 227:17
**13th** [1] - 391:10
**14** [9] - 270:8, 271:24, 303:19, 378:8, 380:3, 382:18, 383:8, 383:23, 385:2
**147.43** [1] - 297:16
**14gb21C7K** [1] - 239:12
**14gbjpk** [1] - 237:12
**14th** [2] - 390:5, 390:24
**15** [10] - 229:22, 265:22, 266:15, 266:17, 288:17, 371:9, 379:2, 379:12, 380:5, 385:2
**15th** [5] - 375:18, 390:3, 390:6, 390:24, 390:25
**16** [8] - 244:2, 282:7, 378:9, 379:12, 379:23, 379:25, 383:4, 385:2
**16th** [2] - 391:11, 391:13
**17(c** [1] - 370:19
**18** [5] - 242:7, 287:12, 287:18, 288:1, 288:2
**18th** [5] - 390:3, 390:12, 390:22, 391:7, 391:12
**19** [9] - 230:7, 230:16, 237:17, 251:4, 251:5, 251:6, 265:21, 272:4
**1997** [1] - 292:21
**1:21-CR-0399** [1] - 227:3

**1:30** [3] - 344:24, 345:5, 345:7
**1C7k** [1] - 238:25
**1C7K** [1] - 239:5
**1C7kW** [1] - 237:12
**1MBrU** [4] - 240:15, 240:17, 240:24, 241:20
**1MDV** [1] - 239:24
**1MDVJ** [1] - 238:4
**1Pf** [1] - 238:2
**1Pfk** [1] - 240:10
**1YZJKa** [5] - 231:5, 232:3, 232:12, 233:15, 234:19

**2**

**2** [35] - 228:21, 249:7, 256:19, 256:20, 256:25, 257:3, 265:21, 270:3, 270:8, 295:20, 296:1, 296:19, 297:16, 299:25, 300:6, 300:16, 300:18, 301:7, 302:19, 341:19, 342:1, 342:4, 342:6, 358:25, 368:25, 369:6, 369:23, 370:1, 370:3, 375:19, 385:9, 385:10, 385:17, 385:18
**20** [9] - 229:22, 249:5, 251:23, 256:7, 256:18, 258:18, 265:20, 269:3, 380:24
**20001** [3] - 227:12, 227:23, 397:11
**20005** [1] - 227:17
**2011** [11] - 231:4, 231:14, 237:11, 239:12, 276:10, 281:23, 282:9, 283:17, 284:15, 284:21, 301:17
**2012** [1] - 276:10
**2014** [2] - 276:10, 276:11
**2018** [1] - 319:25
**202-354-3246** [1] - 227:24
**2020** [2] - 351:2, 351:4
**2021** [1] - 351:2
**2022** [1] - 341:16
**2023** [2] - 227:6, 397:7
**20530** [1] - 227:14

**21-399** [1] - 229:2
**212** [2] - 283:24, 368:3
**22** [26] - 228:14, 257:19, 260:6, 261:2, 261:6, 261:17, 261:23, 262:2, 262:3, 262:23, 263:2, 263:3, 264:2, 265:2, 266:21, 269:7, 273:12, 294:18, 294:22, 295:1, 295:11, 296:5, 299:19, 303:20
**23** [5] - 227:6, 228:15, 258:7, 263:3, 393:24
**230** [1] - 228:5
**24** [7] - 228:16, 253:21, 254:2, 258:18, 261:24, 263:3, 381:22
**25** [4] - 228:17, 259:9, 261:24, 263:3
**26** [6] - 228:18, 259:22, 261:24, 262:24, 263:2, 263:3
**263** [5] - 228:14, 228:15, 228:16, 228:17, 228:18
**27** [6] - 228:19, 261:24, 292:18, 293:4, 293:7, 293:8
**27th** [2] - 237:11, 239:12
**28** [2] - 231:19, 231:24
**28.6** [2] - 297:6, 297:15
**28th** [1] - 375:17
**29** [2] - 354:8, 354:9
**293** [1] - 228:19
**294** [1] - 228:6
**29th** [1] - 397:7
**2:00** [7] - 229:21, 229:22, 345:2, 345:3, 359:25, 360:3
**2:05** [1] - 366:18
**2:30** [1] - 366:18

**3**

**3** [7] - 312:8, 359:23, 360:6, 364:3, 380:3, 382:18, 383:23
**30** [1] - 227:19
**31** [1] - 270:8
**317** [1] - 228:9
**32.2** [2] - 391:25, 392:9
**324** [1] - 228:20
**333** [2] - 227:23,

397:11
**342** [1] - 228:21
**345** [1] - 228:11
**35** [3] - 235:19, 239:23, 240:1
**36** [1] - 239:12
**38** [2] - 233:11, 234:17
**3:00** [2] - 366:23
**3:20** [1] - 396:18

**4**

**4** [3] - 271:13, 271:17, 302:5
**4.3** [1] - 357:2
**46** [1] - 237:18
**48.7** [1] - 259:17
**49** [5] - 230:8, 230:15, 230:16, 231:2, 272:4

**5**

**5** [3] - 342:8, 367:6, 367:9
**5.2** [1] - 301:16
**50** [2] - 230:23, 272:11
**51** [2] - 230:23, 272:11
**51.64** [2] - 259:3, 259:6
**52** [2] - 230:23, 272:11
**52443** [1] - 344:7
**534129** [1] - 255:5
**59** [2] - 251:4, 251:6

**6**

**6** [16] - 252:3, 269:1, 269:3, 342:9, 368:13, 369:2, 369:6, 379:24, 380:1, 382:18, 383:7, 383:20, 383:23, 384:21, 385:8, 385:13
**60** [1] - 316:19
**60.8** [2] - 237:12, 239:3
**601** [1] - 227:11
**61.19.252.148** [2] - 361:10, 363:4
**62** [1] - 297:17
**64** [1] - 297:4
**64.19** [2] - 258:12, 295:25
**6714** [2] - 227:22, 397:10

**7**

**7** [5] - 251:25, 288:23,

289:7, 343:23, 369:9

**7.1** [2] - 298:15, 299:20

**7.2** [2] - 296:5, 300:24

**7.3.1** [2] - 300:10, 301:11

**7.31** [1] - 295:14

**70.90.169.13** [1] - 363:20

**731** [1] - 295:17

## 8

**8** [9] - 249:6, 251:23, 251:25, 252:6, 291:24, 292:5, 292:6, 292:7, 303:21

**8th** [1] - 227:19

## 9

**9** [6] - 280:22, 281:5, 281:7, 290:8

**925,000** [1] - 269:2

**93.03** [1] - 297:6

**95** [2] - 367:8, 367:10

**950** [1] - 227:14

**9:00** [1] - 288:16

**9a7e** [2] - 254:16, 255:18

**9th** [2] - 390:13, 391:8

## A

**A-R-I-N** [1] - 326:8

**A.M** [1] - 227:6

**abbreviate** [1] - 345:19

**abide** [1] - 377:7

**ability** [2] - 308:11, 397:6

**able** [28] - 230:17, 236:8, 239:8, 243:1, 243:9, 244:5, 244:13, 248:12, 248:16, 264:20, 270:18, 278:7, 280:15, 281:22, 295:21, 298:11, 327:16, 329:12, 339:22, 343:20, 344:2, 373:1, 375:16, 380:16, 383:17, 386:19, 387:6, 396:10

**absent** [1] - 313:21

**aca** [1] - 265:13

**academia** [2] - 265:12, 265:14

**academic** [8] - 242:19,

242:22, 242:25, 257:13, 257:14, 263:23, 295:23, 366:10

**accepts** [1] - 324:22

**access** [20] - 236:23, 306:15, 307:11, 307:16, 308:3, 312:12, 324:10, 325:1, 330:13, 331:16, 332:6, 332:8, 333:19, 333:22, 335:21, 335:22, 336:5, 340:20, 342:20, 342:23

**accessed** [10] - 285:13, 328:2, 330:20, 344:3, 344:5, 344:11, 369:10, 369:24, 370:5

**accesses** [3] - 335:6, 338:6, 342:19

**accomplished** [1] - 272:14

**According** [2] - 271:11, 361:19

**according** [5] - 232:8, 237:10, 241:25, 260:19, 268:2

**account** [50] - 230:10, 236:3, 237:19, 238:3, 238:25, 239:4, 240:18, 242:5, 270:16, 270:24, 271:8, 273:14, 273:22, 274:10, 274:16, 274:17, 275:17, 277:7, 277:9, 277:15, 300:7, 332:15, 332:23, 333:9, 333:12, 333:19, 333:22, 335:11, 338:7, 338:8, 342:18, 342:21, 342:22, 344:8, 344:9, 344:11, 344:12, 352:20, 355:14, 355:20, 356:1, 356:7, 358:5, 358:6, 364:24, 370:7

**accountants** [1] - 372:13

**accounts** [35] - 274:13, 274:15, 274:22, 274:24, 274:25, 275:5,

275:10, 275:14, 276:7, 277:21, 278:4, 284:25, 285:4, 285:8, 285:11, 285:16, 289:13, 324:11, 329:4, 335:12, 335:16, 335:22, 336:5, 338:6, 342:23, 343:21, 344:2, 344:4, 344:6, 357:4, 357:5, 357:7, 369:11, 370:6, 370:9

**accuracy** [12] - 256:19, 257:2, 296:1, 297:21, 298:21, 298:25, 299:7, 299:11, 299:12, 303:11, 369:14, 370:1

**accurate** [7] - 257:5, 257:6, 257:9, 268:10, 280:24, 316:13, 397:4

**accurately** [3] - 291:20, 292:3, 323:19

**achieves** [2] - 270:10, 270:11

**acknowledge** [1] - 256:19

**acronyms** [1] - 389:3

**action** [1] - 353:20

**Action** [1] - 227:2

**activities** [2] - 321:1, 321:12

**activity** [2] - 309:14, 339:25

**acts** [1] - 329:23

**actual** [10] - 237:5, 237:7, 275:21, 275:22, 276:19, 276:20, 298:9, 324:19, 353:20, 382:22

**add** [5] - 302:12, 302:13, 314:5, 382:1

**adding** [1] - 265:6

**addition** [3] - 230:23, 297:5, 337:23

**additional** [4] - 283:19, 321:1, 329:12, 357:1

**additionally** [1] - 247:2

**additive** [2] - 265:9, 302:7

**Address** [3] - 259:23, 260:23, 261:20

**address** [166] - 231:5,

232:2, 232:3, 232:5, 232:8, 232:24, 233:10, 233:15, 233:20, 233:24, 234:19, 236:5, 237:12, 238:2, 238:3, 238:7, 238:12, 238:21, 238:25, 239:25, 240:17, 242:4, 249:11, 249:12, 252:2, 252:7, 252:10, 253:2, 253:4, 253:5, 253:7, 253:10, 253:14, 253:16, 253:18, 253:25, 254:8, 254:20, 254:24, 255:4, 255:8, 255:11, 255:13, 255:17, 255:20, 255:23, 256:1, 265:24, 266:2, 266:5, 266:8, 266:10, 266:11, 266:12, 266:18, 272:8, 272:12, 272:22, 273:2, 281:2, 282:6, 283:3, 283:16, 283:21, 283:24, 283:25, 284:25, 285:3, 285:8, 285:12, 285:13, 285:15, 285:25, 286:1, 300:19, 302:24, 305:5, 310:14, 315:12, 324:7, 324:13, 324:14, 324:16, 324:19, 324:21, 324:22, 324:24, 325:1, 325:16, 325:25, 327:10, 327:25, 328:2, 329:2, 329:15, 330:13, 330:14, 331:13, 332:15, 332:16, 332:18, 332:24, 333:8, 333:18, 334:2, 335:2, 336:4, 337:10, 339:9, 342:10, 342:12, 342:20, 343:3, 343:17, 346:2, 346:6, 347:20, 347:23, 348:5, 348:8, 348:12, 348:14, 348:17, 348:21, 348:23, 349:5, 349:8,

349:19, 350:3, 350:6, 350:10, 350:13, 350:22, 351:11, 352:16, 352:18, 352:19, 353:18, 353:19, 354:3, 354:24, 355:4, 355:8, 358:23, 360:21, 361:10, 363:4, 363:19, 364:1, 367:9, 368:2, 368:19, 370:18, 393:8, 394:21

**address-to-address** [2] - 272:22, 273:2

**addressed** [1] - 394:20

**addresses** [74] - 232:16, 232:18, 232:20, 232:21, 233:1, 233:2, 233:7, 233:8, 238:17, 239:4, 240:24, 241:3, 241:7, 241:12, 248:6, 248:7, 248:19, 252:24, 256:4, 265:25, 267:2, 269:1, 269:3, 270:15, 272:18, 280:23, 281:2, 281:10, 281:13, 282:5, 282:15, 282:17, 283:1, 283:2, 283:4, 283:5, 283:8, 283:10, 283:14, 283:20, 283:23, 289:13, 291:16, 304:3, 310:15, 313:9, 324:10, 325:3, 325:5, 325:11, 326:12, 327:10, 328:15, 329:18, 335:15, 342:13, 343:11, 347:13, 347:15, 347:17, 347:25, 348:11, 353:6, 353:13, 354:11, 354:14, 355:22, 358:10, 358:11, 358:19, 367:24, 368:19, 385:24

**adequate** [1] - 395:17

**adjourn** [1] - 396:14

**adjourned** [1] - 396:18

**adjust** [1] - 298:5

**administrated** [1] -

346:13
**administration** [1] - 320:3
**administrator** [10] - 278:11, 278:15, 278:22, 278:24, 279:5, 280:16, 308:16, 308:25, 355:16, 355:21
**administrator-related** [1] - 355:21
**administrators** [6] - 279:8, 279:12, 279:18, 280:5, 280:8, 309:12
**admission** [1] - 388:12
**admit** [4] - 262:23, 293:4, 323:22, 341:25
**ADMITTED** [1] - 228:12
**admitted** [11] - 263:2, 263:4, 293:7, 293:8, 315:14, 315:16, 323:25, 324:1, 342:4, 342:6, 387:6
**advance** [2] - 389:5, 389:7
**advertised** [1] - 337:17
**advertising** [1] - 361:23
**advocacy** [1] - 381:14
**affect** [1] - 375:6
**affidavit** [4] - 256:8, 270:23, 271:7, 271:12
**afternoon** [1] - 293:15
**Agency** [1] - 326:7
**agent** [8] - 271:12, 273:25, 320:16, 385:25, 386:2, 386:3, 386:12
**agnostic** [2] - 353:20, 353:22
**ago** [2] - 394:20, 395:24
**Agora** [3] - 265:22, 267:10, 267:25
**agree** [24] - 232:11, 232:15, 237:10, 237:14, 239:7, 239:10, 239:13, 241:10, 266:7, 266:13, 277:6, 280:17, 287:25, 288:4, 299:25, 301:23, 301:24, 304:19, 304:21,

349:7, 349:16, 351:16, 377:6, 395:19
**agreed** [1] - 318:22
**agreeing** [1] - 266:17
**agreement** [1] - 378:7
**ahead** [3] - 313:3, 344:22, 367:6
**Akemashite** [1] - 355:10
**AKEMISHITE** [1] - 355:11
**al** [7] - 261:18, 261:19, 265:2, 301:2, 302:9
**Al** [4] - 288:10, 289:14, 290:10, 290:12
**Al-Qassam** [4] - 288:10, 289:14, 290:10, 290:12
**al.'s** [2] - 300:10, 303:20
**Alden** [1] - 229:6
**ALDEN** [1] - 227:13
**alerted** [1] - 290:2
**alerts** [1] - 289:21
**Alexandria** [2] - 393:23, 395:4
**algorithms** [1] - 300:20
**all-consuming** [1] - 374:24
**Allen** [2] - 319:20, 319:21
**allocated** [3] - 325:7, 326:13, 347:21
**allocates** [1] - 325:6
**allocation** [1] - 325:25
**allow** [10] - 287:4, 318:22, 351:21, 371:24, 372:1, 373:13, 373:18, 373:20, 379:20, 381:10
**allowed** [1] - 386:11
**allows** [1] - 265:24
**almost** [1] - 331:8
**alternate** [5] - 340:14, 379:17, 380:6, 384:25, 385:16
**alternates** [12] - 375:6, 375:8, 378:19, 378:20, 378:22, 383:1, 383:3, 383:19, 384:15, 384:23, 384:24, 385:14
**alternative** [1] - 309:15
**AMERICA** [1] - 227:2
**America** [3] - 229:3,

325:11, 325:15
**amount** [7] - 230:25, 239:19, 314:1, 336:16, 362:19, 364:23, 364:25
**amounts** [1] - 310:15
**analyses** [3] - 320:4, 320:9, 353:18
**Analysis** [1] - 360:7
**analysis** [54] - 244:21, 246:13, 257:13, 273:24, 303:7, 314:25, 315:2, 315:4, 317:4, 317:6, 317:9, 318:21, 320:3, 320:12, 322:21, 323:7, 324:7, 328:12, 328:20, 335:18, 336:10, 338:5, 339:15, 341:1, 341:8, 341:14, 341:17, 342:13, 343:1, 343:19, 344:15, 344:17, 347:18, 351:9, 351:11, 351:12, 352:10, 354:2, 354:11, 355:2, 356:18, 356:22, 357:17, 357:22, 357:23, 359:17, 361:7, 363:4, 365:1, 365:14, 366:4, 366:11, 372:21, 372:22
**analytic** [3] - 305:24, 359:14, 359:16
**analytical** [1] - 319:22
**analytics** [6] - 243:14, 243:21, 244:23, 245:14, 289:17, 319:23
**analyze** [1] - 321:3
**analyzing** [3] - 320:14, 322:12, 359:14
**ancillary** [3] - 391:21, 392:1, 392:10
**Andrew** [1] - 356:15
**Androulaki** [5] - 258:8, 261:18, 265:2, 297:2, 302:9
**announce** [1] - 382:24
**anonymity** [1] - 328:18
**anonymizing** [1] - 332:13
**anonymous** [4] - 310:5, 310:10, 310:13, 310:14

**answer** [9] - 247:14, 254:6, 254:7, 272:24, 273:3, 273:8, 273:11, 375:2, 380:20
**answered** [1] - 307:18
**answering** [1] - 295:3
**answers** [4] - 314:16, 315:8, 316:8, 380:21
**anticipate** [3] - 387:4, 387:12
**anticipated** [1] - 390:22
**anticipation** [1] - 336:23
**antitrust** [2] - 292:16, 292:23
**anyway** [1] - 393:7
**Apache** [1] - 354:17
**apart** [3] - 230:12, 341:12, 359:9
**apologize** [2] - 366:1, 374:25
**appear** [4] - 268:3, 328:16, 342:15, 352:19
**appearance** [1] - 300:22
**appeared** [13] - 249:13, 328:17, 336:1, 336:2, 337:5, 337:8, 338:11, 338:23, 342:16, 343:10, 352:24, 353:25, 354:3
**apple** [2] - 311:25, 313:20
**Application** [1] - 256:25
**applications** [1] - 319:15
**applied** [6] - 257:2, 257:10, 264:8, 266:16, 302:1, 373:7
**applies** [1] - 385:1
**apply** [2] - 270:14, 336:20
**applying** [3] - 264:5, 264:7, 372:25
**appreciate** [4] - 298:10, 308:10, 389:1, 393:15
**appreciated** [1] - 395:2
**approach** [1] - 229:4
**appropriate** [3] - 312:20, 381:11, 396:3
**appropriators** [1] - 396:2

**April** [1] - 318:5
**arbitrarily** [2] - 362:19, 362:22
**arbitrary** [1] - 363:12
**architect** [1] - 319:13
**archive** [1] - 361:23
**area** [1] - 269:15
**areas** [2] - 322:18, 324:3
**arguing** [1] - 393:4
**argument** [5] - 312:19, 317:9, 371:19, 371:20, 374:3
**argument's** [1] - 302:9
**argumentative** [2] - 234:7, 234:8
**ARIN** [6] - 325:14, 325:16, 325:20, 325:21, 326:8, 326:17
**arises** [1] - 382:13
**arrange** [1] - 386:18
**arriving** [1] - 359:15
**arrow** [3] - 238:3, 238:6, 238:7
**arrows** [1] - 359:8
**article** [19] - 258:2, 260:18, 261:20, 263:23, 292:11, 292:14, 292:16, 292:19, 294:22, 294:24, 296:5, 314:20, 314:21, 315:10, 315:11, 315:20, 315:21, 315:23, 315:24
**articles** [1] - 265:10
**artifacts** [1] - 320:10
**aside** [2] - 252:20, 371:1
**asserting** [1] - 362:7
**assessed** [1] - 256:15
**assessing** [2] - 303:10, 339:16
**assessment** [3] - 233:24, 316:12, 343:20
**assign** [2] - 362:19, 369:25
**Assigned** [1] - 326:6
**assigned** [10] - 318:11, 331:19, 362:15, 363:5, 364:11, 364:18, 364:20, 365:3, 365:10, 365:12
**assigns** [1] - 325:5
**assist** [1] - 359:17
**assisting** [1] - 320:25
**associate** [2] - 369:2,

369:5
**associated** [9] - 239:3, 270:16, 274:18, 283:2, 283:5, 283:24, 304:10, 357:3, 357:6
**associaters** [1] - 274:20
**associates** [1] - 281:2
**assume** [5] - 280:10, 284:23, 379:23, 389:16, 391:5
**assuming** [6] - 349:18, 361:14, 364:16, 390:24, 391:12, 391:25
**Assuming** [1] - 375:15
**assumption** [4] - 279:19, 279:22, 364:14, 376:12
**assumptions** [5] - 257:2, 372:21, 372:22, 372:25, 373:7
**attach** [1] - 289:25
**attached** [1] - 253:9
**attachments** [5] - 240:21, 241:5, 241:7, 241:17, 241:19
**attack** [1] - 310:23
**attempt** [3] - 244:22, 301:3, 370:8
**attempted** [1] - 370:2
**attempts** [2] - 295:17, 304:10
**attended** [1] - 322:7
**attention** [43] - 230:6, 235:19, 237:17, 239:23, 244:2, 244:10, 249:5, 253:20, 257:19, 258:18, 259:9, 259:22, 261:16, 264:1, 265:19, 266:22, 269:7, 270:3, 270:20, 272:3, 285:11, 286:3, 288:12, 291:23, 292:18, 296:4, 298:15, 299:23, 300:9, 300:11, 301:10, 303:19, 303:21, 323:13, 341:19, 342:8, 343:23, 358:25, 360:9, 361:9, 363:19, 368:13, 368:15
**attribute** [2] - 370:8,

387:22
**attributed** [1] - 241:14
**attribution** [3] - 283:20, 329:3, 358:4
**August** [2] - 227:6, 397:7
**authentication** [1] - 375:15
**author** [4] - 258:8, 259:10, 259:23, 261:2
**authorize** [1] - 306:19
**automated** [1] - 269:13
**Automatic** [3] - 259:23, 260:23, 261:20
**automatically** [3] - 273:13, 337:15, 359:7
**automating** [1] - 322:21
**availability** [1] - 395:4
**available** [5] - 293:14, 306:12, 306:13, 328:4, 329:20
**Ave** [1] - 227:17
**Avenue** [3] - 227:14, 227:23, 397:11
**averse** [1] - 289:24
**avoid** [7] - 243:12, 243:15, 278:12, 278:16, 278:23, 279:5, 280:18
**awaiting** [1] - 375:15
**aware** [39] - 235:24, 240:24, 241:2, 242:22, 242:24, 242:25, 243:14, 244:7, 244:18, 245:7, 246:5, 246:7, 248:1, 249:1, 259:16, 262:12, 274:18, 276:22, 278:11, 279:8, 279:12, 279:17, 284:8, 284:11, 285:24, 289:10, 291:14, 292:16, 292:21, 293:1, 303:7, 303:10, 303:18, 306:6, 346:16, 348:14, 354:22, 359:24, 394:2
**awfully** [1] - 376:10

## B

**bachelor** [1] - 319:2

**back-and-forth** [1] - 382:16
**backends** [1] - 276:23
**background** [5] - 319:1, 328:14, 336:1, 354:19, 357:3
**backup** [1] - 356:14
**backward** [6] - 295:21, 298:18, 301:6, 301:16, 301:20, 302:2
**backwards** [6] - 273:13, 273:17, 273:21, 274:9, 301:2, 301:20
**bad** [1] - 395:25
**balance** [3] - 281:15, 281:20, 316:9
**balancing** [1] - 390:14
**based** [12] - 263:6, 263:10, 267:23, 284:11, 287:18, 337:12, 340:7, 343:6, 343:19, 351:12, 354:2, 364:7
**bases** [2] - 313:24
**basic** [1] - 290:15
**basis** [5] - 287:18, 355:24, 356:3, 356:7, 357:21
**Batson** [2] - 382:11, 382:13
**become** [2] - 273:25, 331:10
**becomes** [3] - 390:8, 391:17
**BEFORE** [1] - 227:8
**began** [4] - 250:19, 282:1, 351:2, 351:3
**begin** [1] - 381:13
**beginning** [7] - 249:13, 249:23, 250:9, 250:15, 271:10, 274:6, 367:8
**begins** [1] - 250:20
**behavior** [6] - 249:7, 250:21, 268:21, 269:11, 304:9, 311:2
**behavioral** [4] - 253:15, 253:17, 268:21, 315:19
**behind** [1] - 295:2
**belabor** [1] - 394:2
**believes** [1] - 248:6
**belong** [1] - 269:2
**belonging** [1] - 274:23
**below** [3] - 240:7, 269:9, 269:18
**bench** [3] - 371:11, 381:2, 394:23

**beside** [1] - 368:20
**best** [9] - 270:11, 305:13, 366:25, 375:22, 375:23, 388:5, 388:7, 389:13, 397:6
**better** [3] - 254:8, 298:11, 394:10
**between** [27] - 243:4, 250:8, 295:18, 296:2, 302:4, 321:12, 322:3, 329:23, 334:10, 335:9, 338:6, 340:15, 341:4, 347:19, 347:23, 357:7, 362:24, 363:9, 364:24, 379:22, 379:25, 382:6, 383:21, 386:21, 386:24
**beyond** [9] - 309:19, 311:22, 312:17, 347:8, 351:9, 355:1, 355:2, 372:6, 375:9
**bias** [2] - 351:14
**big** [5] - 269:12, 291:6, 291:14, 323:15, 370:19
**bigger** [3] - 269:4, 303:2, 395:16
**Bigger** [1] - 269:10
**Binance** [2] - 277:20, 277:22
**binder** [14] - 230:7, 230:12, 230:14, 288:13, 289:4, 294:7, 294:9, 294:14, 294:16, 323:13, 323:15, 323:16, 352:8, 389:21
**binders** [5] - 291:24, 323:14, 388:10, 388:17, 389:11
**Bisbee** [4] - 255:21, 267:24, 304:24, 372:3
**Bisbee's** [10] - 240:21, 241:17, 249:6, 251:23, 253:24, 255:2, 265:19, 268:13, 302:22, 303:13
**bit** [6] - 287:6, 295:7, 370:16, 370:20, 374:17, 382:15
**Bitcoin** [70] - 230:11, 230:22, 231:5, 231:10, 232:2,

232:10, 232:12, 232:15, 232:25, 233:15, 233:25, 234:3, 234:19, 235:10, 235:11, 235:15, 237:12, 239:3, 253:10, 254:9, 255:3, 258:8, 259:23, 260:23, 261:20, 268:24, 269:2, 269:25, 270:17, 270:21, 270:24, 271:4, 271:8, 273:21, 276:5, 277:7, 277:10, 277:15, 278:5, 278:8, 278:11, 278:15, 279:3, 280:24, 281:2, 282:5, 283:5, 283:14, 283:23, 283:25, 287:8, 287:14, 294:19, 295:19, 296:3, 300:5, 300:11, 300:16, 301:11, 304:5, 305:5, 311:4, 315:6, 316:1, 318:11, 324:4, 324:9, 335:13, 355:16, 355:20
**Bitcoins** [2] - 258:19, 262:14
**Bitcointalk** [3] - 344:8, 355:10, 355:13
**bites** [2] - 311:25, 313:19
**Bitfinex** [3] - 277:20, 277:24, 277:25
**bits** [1] - 252:21
**Bitstamp** [4] - 277:21, 277:24, 277:25, 344:7
**blanket** [1] - 249:8
**block** [6] - 231:12, 254:10, 255:4, 305:19, 325:22, 327:9
**blockchain** [16] - 243:14, 243:21, 244:23, 245:14, 246:13, 257:13, 289:17, 290:15, 300:23, 304:16, 305:24, 306:7, 310:5, 310:6, 310:11, 372:17
**Blockchain** [1] - 259:10
**blocked** [1] - 395:25

blocks [2] - 305:19, 325:8
blue [3] - 237:21, 237:25, 238:7
bold [1] - 261:17
book [1] - 324:21
boot [1] - 386:24
boot-up [1] - 386:24
Booz [2] - 319:20, 319:21
bother [1] - 358:13
bothered [1] - 317:3
bottom [15] - 231:2, 233:11, 234:17, 251:25, 254:2, 265:20, 269:9, 312:9, 343:23, 364:2, 368:2, 368:15, 368:17, 368:18, 369:6
box [9] - 237:21, 237:23, 237:24, 237:25, 238:7, 345:9, 375:8, 375:10
Bravo [1] - 289:1
break [9] - 242:8, 246:4, 288:20, 293:21, 344:23, 345:1, 345:3, 366:15, 366:21
breaking [1] - 366:13
breaks [1] - 246:14
brevity [1] - 365:8
bridge [1] - 334:17
brief [1] - 305:12
briefly [6] - 272:3, 296:17, 304:21, 304:23, 310:3, 359:2
briefs [1] - 371:19
Brigades [4] - 288:10, 289:14, 290:10, 290:12
bring [2] - 380:23, 382:2
brought [2] - 285:10, 374:7
BROWN [4] - 227:10, 229:9, 391:22, 392:4
Brown [2] - 229:9, 391:20
brownie [2] - 389:6, 389:7
browser [4] - 331:17, 333:5, 333:14, 346:16
browsing [1] - 339:6
BTC [5] - 266:4, 275:25, 276:2, 276:7, 276:24
BTC-e [4] - 275:25,

276:2, 276:7, 276:24
build [3] - 381:15, 395:24, 396:3
building [1] - 390:25
Bullet [4] - 369:3, 369:21, 370:1, 370:3
bullet [4] - 253:21, 270:4, 281:7, 292:9
burdensome [1] - 391:17
burner [3] - 274:13, 274:15, 274:24
business [3] - 328:17, 331:9, 337:4
button [3] - 331:18, 339:23, 340:15
buying [1] - 321:16
BY [43] - 230:3, 233:6, 234:13, 247:25, 252:18, 254:14, 261:15, 263:5, 268:5, 273:10, 274:5, 280:4, 281:6, 288:8, 288:22, 292:8, 294:5, 295:9, 297:12, 298:14, 299:22, 307:3, 307:25, 310:2, 312:5, 313:4, 317:20, 324:2, 326:10, 342:7, 345:15, 347:12, 350:21, 352:4, 356:5, 356:24, 358:17, 360:5, 360:15, 363:2, 365:17, 366:5, 367:3
bytes [1] - 252:21

## C

Cabanas [1] - 374:4
calculated [2] - 262:20, 364:23
Canada [1] - 306:8
cannot [8] - 243:7, 246:8, 248:8, 259:19, 272:9, 284:13, 284:20, 306:9
capacity [3] - 349:14, 349:16, 349:18
caption [1] - 269:18
captured [3] - 299:8, 299:11, 299:14
capturing [1] - 320:7
card [1] - 380:18
care [1] - 392:24
careful [1] - 378:2
case [68] - 236:7,

236:19, 239:7, 246:24, 252:8, 253:17, 263:20, 270:21, 271:4, 271:11, 273:20, 275:20, 276:15, 276:19, 276:24, 277:4, 277:5, 278:19, 278:25, 282:21, 292:16, 293:1, 301:13, 301:15, 306:7, 307:10, 315:15, 315:17, 318:23, 320:11, 320:22, 320:24, 321:3, 324:9, 328:13, 329:2, 333:8, 334:25, 335:11, 336:8, 337:17, 342:25, 343:7, 351:5, 351:6, 353:6, 364:25, 365:11, 372:8, 372:12, 372:13, 373:6, 374:22, 375:21, 376:21, 376:22, 378:20, 385:25, 386:2, 386:3, 386:12, 388:6, 388:7, 392:1, 392:6, 395:6
Case [1] - 229:2
case's [1] - 328:20
CaseFile [3] - 359:5, 359:11, 359:12
cases [12] - 236:24, 248:10, 249:25, 307:7, 318:20, 321:5, 321:6, 335:19, 353:15, 357:2, 366:2, 374:14
cast [1] - 373:10
casts [1] - 315:2
CAT [3] - 361:17, 362:1, 362:3
cataloged [1] - 327:17
catch [1] - 269:16
categorically [1] - 247:5
categorize [1] - 232:8
categorized [2] - 336:25, 338:3
category [2] - 337:4, 337:7
caution [1] - 374:9
CC [1] - 298:24
CE [2] - 323:1, 323:6
ceremonial [3] - 380:12, 380:15,

380:17
certain [11] - 254:9, 305:6, 306:8, 313:11, 343:21, 353:13, 359:15, 373:6, 377:10, 377:12, 391:24
certainly [3] - 378:12, 388:18, 393:4
certainty [2] - 351:16, 375:22
CERTIFICATE [1] - 397:1
certification [1] - 376:1
certifications [3] - 322:6, 322:7, 322:9
certified [2] - 377:5, 377:7
certify [2] - 376:25, 397:3
chain [23] - 248:23, 249:2, 249:7, 249:8, 249:12, 249:13, 249:14, 249:18, 250:3, 250:9, 250:21, 250:25, 251:8, 251:15, 290:16, 296:21, 302:20, 302:23, 304:8, 309:6, 309:8, 310:18
Chainalysis [24] - 244:7, 244:18, 244:22, 245:9, 249:1, 252:19, 266:14, 267:7, 267:10, 267:16, 267:25, 268:12, 268:17, 289:17, 291:5, 291:12, 299:1, 299:2, 303:6, 306:13, 314:8, 317:2, 317:3, 393:7
Chainalysis's [9] - 253:6, 257:1, 267:13, 268:20, 272:19, 272:22, 273:1, 312:12, 316:16
chains [13] - 249:20, 249:22, 250:2, 250:6, 250:22, 251:6, 251:7, 251:11, 251:12, 251:17, 302:11, 303:2, 331:24
Chair [1] - 382:18
chairs [1] - 375:9
challenges [1] -

384:21
chance [4] - 231:16, 374:10, 381:4, 389:25
change [31] - 249:11, 255:4, 255:21, 256:4, 265:3, 265:23, 265:24, 265:25, 266:1, 266:2, 266:4, 266:8, 266:18, 267:4, 267:7, 267:9, 267:16, 270:7, 270:8, 270:9, 300:21, 300:23, 301:21, 302:24, 305:2, 305:4, 340:1, 340:16, 348:5, 348:8, 366:21
changing [1] - 339:8
characteristics [2] - 264:15, 302:10
characterization [2] - 253:24, 316:24
characterize [2] - 291:20, 335:5
characterizing [1] - 258:19
charge [4] - 286:5, 286:7, 286:20, 286:25
charges [1] - 287:3
chart [27] - 230:19, 230:24, 231:3, 231:20, 232:1, 232:6, 232:9, 233:13, 234:14, 234:18, 234:21, 234:22, 235:2, 237:18, 238:24, 240:7, 240:11, 251:10, 251:23, 252:1, 252:25, 253:3, 253:16, 271:24, 272:5, 272:6, 290:14
charted [1] - 238:2
charts [1] - 269:18
check [7] - 245:20, 277:8, 281:15, 282:4, 284:19, 333:24, 353:24
checked [1] - 361:14
checks [1] - 334:22
chemical [1] - 319:11
childcare [1] - 366:22
choose [3] - 338:14, 347:25, 391:17
choosing [3] - 363:8, 390:5, 392:23

**chose** [4] - 268:6, 338:5, 338:10, 338:23
**chosen** [2] - 377:12, 379:17
**Christopher** [1] - 229:9
**CHRISTOPHER** [1] - 227:10
**CipherTrace** [30] - 232:8, 233:13, 234:14, 234:17, 241:13, 241:16, 241:25, 242:2, 244:5, 244:13, 244:15, 244:21, 244:22, 245:11, 245:17, 245:24, 248:5, 248:12, 248:19, 275:16, 280:23, 281:1, 281:23, 282:5, 282:18, 284:15, 284:21, 289:16
**CipherTrace's** [5] - 256:12, 256:15, 282:23, 283:19, 283:20
**circles** [3] - 291:6, 291:7, 291:15
**circuit** [1] - 333:15
**circumstances** [2] - 313:22, 379:13
**citation** [1] - 271:14
**cite** [7] - 271:12, 271:13, 271:17, 271:19, 292:11, 366:6, 366:10
**cited** [4] - 260:8, 260:12, 292:19, 295:23
**citing** [2] - 260:14, 292:14
**citizens** [1] - 378:9
**Civil** [1] - 289:9
**civil** [1] - 289:10
**claim** [5] - 283:23, 284:4, 284:9, 284:12, 355:9
**claimed** [1] - 296:1
**claims** [2] - 269:22, 284:2
**clarification** [1] - 358:1
**clarify** [1] - 280:3
**classes** [1] - 290:21
**classic** [1] - 321:16
**classifier** [2] - 304:1, 304:18
**clear** [9] - 240:10,

249:10, 278:14, 278:18, 296:22, 308:5, 315:14, 326:2, 352:16
**clerk** [6] - 386:17, 386:23, 387:2, 388:19, 388:23, 388:25
**click** [2] - 291:14, 331:18
**client** [1] - 393:20
**clock** [2] - 293:20, 365:24
**close** [8] - 288:15, 335:9, 343:13, 373:17, 374:15, 380:9, 394:25, 395:1
**closely** [2] - 376:18, 377:2
**closer** [4] - 340:3, 375:24, 378:3, 394:10
**closest** [1] - 336:18
**cluster** [15] - 243:25, 244:8, 244:19, 249:3, 249:18, 250:14, 250:24, 251:1, 265:22, 266:14, 267:10, 268:24, 269:5, 304:10
**cluster's** [1] - 298:23
**clustered** [4] - 244:15, 251:16, 268:22, 272:19
**clustering** [12] - 243:16, 246:4, 253:6, 253:15, 253:17, 256:9, 256:13, 256:15, 272:22, 273:2, 310:16, 316:13
**Clustering** [3] - 259:23, 260:23, 261:20
**Clusters** [1] - 294:19
**clusters** [10] - 245:24, 251:7, 251:10, 252:8, 252:19, 268:25, 269:4, 269:10, 269:13
**co** [22] - 239:24, 240:5, 240:8, 240:9, 240:11, 240:12, 240:13, 240:14, 243:25, 244:16, 244:21, 245:21, 246:4, 249:1, 249:12, 249:17, 249:22, 250:8,

250:15, 256:9, 256:13, 340:4
**co-occurrence** [1] - 340:4
**co-spend** [18] - 239:24, 240:5, 240:8, 240:9, 240:11, 240:12, 240:13, 243:25, 244:16, 244:21, 246:4, 249:1, 249:12, 249:22, 250:8, 250:15, 256:9, 256:13
**co-spending** [1] - 249:17
**co-spends** [2] - 240:14, 245:21
**code** [2] - 319:15, 322:25
**cognitive** [1] - 351:14
**CoinJoin** [24] - 242:20, 242:23, 243:1, 243:5, 243:8, 243:9, 243:11, 243:15, 243:19, 244:3, 244:5, 244:7, 244:11, 244:13, 244:19, 244:23, 244:24, 245:12, 245:15, 246:24, 247:7, 248:2, 248:17
**CoinJoins** [11] - 242:8, 242:12, 245:8, 245:9, 245:10, 246:4, 246:6, 246:14, 247:10, 247:19, 247:21
**colleagues** [4] - 257:20, 263:7, 263:11, 269:23
**colleagues'** [1] - 340:6
**collect** [5] - 232:16, 281:10, 281:13, 281:22, 282:14
**collected** [2] - 320:15, 332:18
**collecting** [1] - 280:23
**collection** [4] - 284:15, 284:21, 319:14, 330:11
**college** [2] - 381:17
**colored** [1] - 269:18
**Columbia** [2] - 289:9, 378:9
**COLUMBIA** [1] - 227:1
**column** [2] - 296:10, 296:11
**combination** [1] -

320:2
**combine** [1] - 317:2
**Comcast** [2] - 337:22, 363:21
**comfortable** [1] - 340:24
**coming** [6] - 230:12, 237:3, 254:12, 302:23, 316:6, 374:23
**command** [5] - 326:24, 331:22, 331:25, 333:14
**commands** [1] - 332:1
**comments** [2] - 371:17, 374:20
**commercial** [2] - 362:20, 363:21
**commingle** [1] - 232:16
**committed** [1] - 378:13
**common** [9] - 243:18, 248:2, 250:2, 276:4, 276:12, 335:22, 343:11, 350:7, 350:10
**commonalities** [1] - 335:9
**commonly** [3] - 328:5, 348:19, 363:10
**communicate** [2] - 281:17, 324:24
**communications** [2] - 324:17, 324:18
**community** [4] - 328:6, 328:10, 328:24, 334:8
**companies** [16] - 243:14, 243:21, 245:7, 245:14, 245:16, 289:17, 305:6, 319:10, 326:18, 327:14, 328:7, 329:25, 330:2, 330:6, 330:7, 331:5
**company** [13] - 246:5, 246:15, 246:16, 247:9, 282:1, 305:9, 306:25, 319:11, 330:4, 343:10, 368:8, 368:11, 368:12
**compare** [1] - 297:15
**compared** [3] - 267:18, 270:7, 270:8
**competency** [1] - 351:19
**compile** [1] - 234:14

**compiled** [2] - 233:13, 234:18
**complaint** [8] - 270:23, 271:6, 288:25, 289:7, 289:11, 289:14, 355:6, 355:15
**complete** [1] - 397:5
**completed** [2] - 322:5, 322:7
**completely** [2] - 351:4, 355:7
**completing** [1] - 345:1
**computational** [1] - 304:6
**compute** [1] - 370:2
**computed** [1] - 369:17
**computer** [16] - 318:10, 319:2, 319:4, 321:6, 322:8, 322:23, 324:14, 324:24, 325:1, 325:15, 332:14, 333:3, 340:8, 347:24, 348:20, 372:21
**computers** [4] - 330:20, 331:7, 334:12, 372:20
**conceal** [6] - 279:9, 279:13, 280:6, 346:20, 348:20, 348:23
**concern** [1] - 379:9
**concerns** [3] - 394:18, 395:10, 395:22
**conclude** [3] - 308:24, 315:25, 344:2
**concluded** [3] - 290:11, 384:8, 395:6
**conclusion** [8] - 343:24, 344:4, 356:3, 368:24, 369:3, 369:7, 369:9, 369:20
**conclusions** [6] - 341:23, 344:14, 344:17, 355:25, 357:2, 359:15
**conditions** [3] - 394:13, 395:7, 395:13
**conducting** [2] - 263:13, 323:7
**conference** [5] - 371:2, 381:3, 387:11, 393:5, 396:12
**conferencing** [1] - 394:9

configure [1] - 348:2
confirm [19] - 236:8, 239:8, 241:14, 242:6, 246:8, 247:16, 248:18, 260:3, 260:5, 264:11, 264:21, 272:9, 278:7, 282:10, 285:9, 293:18, 301:3, 302:8, 308:9
confirmation [1] - 351:14
confirmed [2] - 247:22, 302:21
conflicts [2] - 390:7, 390:19
conglomerate [1] - 319:9
connect [11] - 243:8, 273:22, 274:9, 281:13, 312:22, 325:15, 329:18, 331:22, 333:3, 333:12, 361:24
connected [2] - 273:14, 324:14
connecting [2] - 291:15, 340:18
connection [6] - 286:23, 315:5, 326:25, 328:17, 331:18, 340:1
connections [3] - 336:17, 343:17, 364:24
connects [1] - 347:24
conscious [1] - 310:9
conservative [2] - 249:3, 391:4
consider [8] - 263:23, 266:1, 268:24, 269:12, 335:2, 341:4, 350:22, 353:24
consideration [2] - 302:11, 371:22
considered [6] - 245:23, 245:24, 310:13, 337:5, 353:25, 355:7
considering [2] - 365:13, 384:16
consistent [1] - 364:20
consolidated [1] - 327:1
consolidation [9] - 232:15, 232:21, 232:25, 233:8,

233:9, 233:15, 233:20, 233:23, 234:19
constitutes [1] - 397:4
Constitution [3] - 227:23, 395:22, 397:11
constitutional [2] - 395:17, 395:20
construct [1] - 366:8
consult [1] - 282:23
consultant [1] - 319:23
consuming [1] - 374:24
contact [1] - 327:10
contain [1] - 350:14
contained [1] - 354:7
contested [1] - 372:7
context [1] - 344:16
continuance [1] - 312:19
continue [9] - 229:19, 229:24, 261:14, 301:20, 318:22, 344:24, 345:3, 360:3, 366:17
continued [2] - 251:16, 318:23
CONTINUED [4] - 227:4, 227:7, 228:3, 230:1
Continued [1] - 228:4
contribute [1] - 334:14
control [17] - 243:12, 243:15, 244:22, 244:24, 245:8, 245:9, 245:14, 245:18, 245:21, 246:16, 246:22, 247:6, 247:10, 247:19, 326:18, 343:20
Control [2] - 258:13, 259:4
controlled [12] - 239:4, 240:25, 241:3, 241:12, 241:20, 241:24, 242:1, 242:2, 249:14, 326:12, 329:7, 343:3
controls [7] - 245:11, 245:17, 246:6, 325:5, 325:10, 329:1, 331:4
convention [2] - 360:11, 360:17
convictions [1] -

392:1
convince [1] - 396:2
convinced [1] - 371:9
Cookie [1] - 259:9
cookies [1] - 346:5
copies [3] - 237:7, 320:8, 388:17
copy [9] - 281:19, 388:18, 388:20, 388:22, 388:23, 388:24, 388:25
core [2] - 372:2, 372:8
correct [77] - 231:7, 231:17, 236:15, 237:6, 237:8, 238:14, 238:22, 238:23, 239:17, 240:6, 240:19, 250:16, 251:11, 251:19, 253:6, 257:5, 262:7, 262:11, 262:17, 263:17, 264:12, 264:25, 267:14, 267:17, 268:7, 270:1, 271:2, 271:22, 272:12, 272:15, 273:18, 276:6, 278:13, 278:19, 280:9, 281:11, 282:24, 284:16, 284:24, 296:23, 296:24, 299:9, 303:14, 315:4, 343:1, 343:2, 345:19, 346:13, 346:21, 347:1, 347:17, 348:6, 348:9, 348:12, 349:2, 349:5, 350:1, 350:4, 350:7, 353:20, 358:18, 360:19, 361:2, 361:13, 364:8, 364:9, 365:22, 367:14, 367:19, 368:11, 368:23, 369:16, 369:22, 370:1, 370:7, 383:23, 385:19
correctly [13] - 246:20, 249:15, 255:6, 286:9, 299:6, 305:22, 357:11, 357:25, 358:3, 359:12, 362:18, 368:7, 383:2
correlation [1] - 368:24
corresponds [1] -

237:14
costs [1] - 304:6
counsel [5] - 229:4, 229:5, 378:13, 381:7, 386:8
counsel's [2] - 351:16, 386:4
counsel-directed [1] - 381:7
count [1] - 282:7
counted [1] - 391:7
counterbalance [1] - 390:16
countermeasures [1] - 303:22
counting [3] - 391:6, 391:7, 391:12
countries [1] - 306:6
country [1] - 331:8
counts [1] - 286:15
couple [5] - 301:14, 332:11, 378:10, 384:3, 393:25
course [4] - 290:15, 305:16, 384:5, 388:2
Court [26] - 227:21, 227:22, 261:12, 289:9, 291:20, 297:13, 347:22, 348:17, 359:3, 359:24, 360:13, 365:18, 375:17, 375:25, 377:13, 379:7, 383:21, 388:16, 391:23, 392:12, 393:8, 394:2, 394:15, 396:6, 397:10
COURT [165] - 227:1, 229:8, 229:11, 229:14, 229:17, 233:3, 234:6, 234:12, 246:1, 246:11, 246:19, 247:4, 247:14, 247:18, 247:24, 252:13, 252:17, 254:4, 254:12, 260:25, 261:6, 261:11, 261:13, 262:25, 263:2, 268:4, 273:6, 273:8, 274:4, 279:23, 281:5, 287:1, 287:10, 287:15, 287:18, 288:1, 288:6, 288:14, 288:19, 292:5, 292:7, 293:5, 293:7, 293:11, 293:13,

293:19, 294:1, 295:3, 295:8, 297:11, 297:18, 297:23, 298:6, 298:12, 299:5, 299:10, 299:17, 306:18, 307:1, 307:18, 307:23, 309:18, 310:1, 310:24, 311:9, 311:23, 312:4, 312:23, 313:3, 313:18, 314:12, 314:15, 315:16, 316:17, 316:22, 317:7, 323:23, 323:25, 326:1, 326:5, 326:9, 342:2, 342:4, 344:22, 345:8, 345:10, 347:3, 347:8, 347:11, 350:20, 351:17, 351:25, 355:17, 356:2, 356:19, 357:19, 358:7, 360:1, 360:3, 360:14, 362:24, 364:10, 364:22, 365:2, 365:16, 365:24, 366:13, 366:15, 366:25, 370:11, 370:13, 370:15, 370:18, 375:20, 376:3, 376:6, 376:10, 376:16, 376:21, 377:3, 377:15, 378:1, 378:15, 378:20, 379:3, 379:8, 379:25, 380:2, 380:4, 380:15, 381:9, 383:23, 384:1, 384:5, 384:11, 384:18, 384:24, 385:7, 385:13, 385:19, 385:21, 386:5, 386:11, 386:16, 388:18, 388:22, 389:9, 389:16, 389:20, 389:24, 390:4, 390:23, 391:11, 391:15, 392:3, 392:15, 393:10, 393:15, 393:18, 394:17, 395:19, 396:7, 396:13, 396:17, 397:1
court [14] - 229:16, 247:17, 306:12,

317:22, 326:4, 377:5, 377:7, 377:25, 380:9, 389:2, 389:4, 389:6, 394:1, 394:10

**court's** [1] - 350:11

**Court's** [1] - 378:17

**court-certified** [2] - 377:5, 377:7

**Courthouse** [1] - 227:22

**courthouse** [1] - 292:13

**CourtListener** [3] - 271:13, 271:20, 271:22

**courtroom** [7] - 375:7, 380:12, 380:16, 380:17, 382:4, 383:22, 386:17

**COURTROOM** [5] - 229:2, 317:14, 317:17, 380:13, 388:21

**courts** [3] - 306:6, 306:8, 306:11

**coverage** [1] - 298:23

**covered** [1] - 322:19

**cramer** [1] - 386:18

**Craykilldozer** [1] - 344:8

**CRC** [2] - 227:21, 397:9

**create** [7] - 234:21, 254:10, 321:12, 338:5, 348:19, 363:9, 383:13

**created** [4] - 235:3, 329:4, 346:17, 346:19

**creating** [1] - 320:7

**credentials** [2] - 323:10, 323:19

**Criminal** [2] - 227:2, 381:23

**criminal** [23] - 229:2, 277:4, 277:5, 278:21, 279:8, 279:13, 279:18, 279:23, 279:25, 280:6, 280:8, 280:12, 289:25, 308:17, 309:1, 309:12, 309:14, 335:1, 340:9, 355:6, 355:15, 361:23, 362:1

**criminals'** [1] - 321:20

**criteria** [2] - 265:25, 266:1

**criticized** [2] - 230:9, 291:5

**critiques** [1] - 291:8

**CRM** [1] - 227:16

**cross** [6] - 309:10, 312:18, 313:2, 315:23, 316:7, 316:13

**CROSS** [2] - 230:1, 345:13

**Cross** [2] - 228:4, 228:10

**CROSS-EXAMINATION** [2] - 230:1, 345:13

**Cross-Examination** [2] - 228:4, 228:10

**CRR** [2] - 227:21, 397:9

**cryptocurrency** [4] - 275:18, 278:21, 286:24, 310:21

**cryptographic** [2] - 310:6, 310:12

**CryptoVPN** [4] - 285:21, 285:23, 343:7, 343:9

**CryptoVPN.com** [3] - 343:5, 368:8, 368:9

**CSV** [1] - 359:6

**current** [4] - 248:2, 319:14, 371:18, 375:12

**curriculum** [1] - 323:11

**cushion** [3] - 378:23, 390:13, 390:25

**custodial** [4] - 235:21, 236:2, 238:14, 290:24

**custody** [1] - 235:24

**custom** [1] - 320:9

**customer** [1] - 290:11

**customers** [3] - 238:17, 289:18, 326:16

**cut** [2] - 251:1, 338:11

**cutoff** [3] - 338:18, 364:18, 365:11

**cutoffs** [3] - 336:20, 340:25, 341:8

**CV** [1] - 323:17

**Cyber** [1] - 318:18

**cyber** [3] - 306:24, 318:20, 321:19

**cybersecurity** [5] - 327:5, 328:6, 328:10, 328:23, 334:8

**cyberstalking** [1] -

321:7

**cycle** [1] - 339:22

**D**

**D.C** [4] - 227:5, 395:8, 396:3, 397:11

**damaging** [1] - 315:11

**dark** [2] - 279:20, 309:1

**darknet** [10] - 236:17, 236:24, 237:3, 237:4, 268:24, 278:16, 278:22, 308:2, 308:17, 309:13

**dashboard** [1] - 319:23

**data** [37] - 253:9, 270:9, 279:15, 281:22, 285:3, 285:7, 292:1, 292:9, 304:16, 305:1, 308:4, 308:5, 310:7, 312:12, 312:13, 320:2, 320:12, 320:15, 321:3, 322:22, 336:11, 336:14, 336:17, 336:21, 338:4, 338:16, 341:2, 352:23, 354:6, 354:7, 354:8, 354:9, 357:2, 357:10, 359:7, 359:14, 360:19

**database** [3] - 334:2, 361:22, 362:4

**databases** [1] - 327:1

**date** [11] - 231:11, 239:2, 239:19, 282:16, 282:18, 292:24, 318:23, 327:13, 328:3, 336:23, 390:12

**Dated** [1] - 397:7

**dates** [4] - 231:13, 282:15, 310:15, 334:3

**Daubert** [12] - 303:13, 309:20, 324:6, 342:5, 347:9, 351:10, 351:20, 352:2, 370:19, 371:1, 371:11, 393:5

**days** [7] - 342:19, 375:5, 378:10, 391:6, 393:1, 393:2

**DC** [4] - 227:12, 227:14, 227:17,

227:23

**de** [8] - 228:8, 317:13, 317:19, 317:21, 317:25, 324:3, 342:8, 345:14

**DE** [1] - 317:24

**dead** [1] - 394:22

**deadline** [1] - 313:20

**deal** [3] - 314:23, 315:9, 317:8

**dealing** [1] - 372:17

**Dean** [2] - 279:11, 279:15

**decide** [1] - 380:5

**decided** [2] - 336:14, 365:10

**decimal** [1] - 267:12

**decision** [1] - 375:6

**declaration** [2] - 291:19, 314:9

**dedicated** [3] - 331:1, 339:3, 367:18

**default** [1] - 360:17

**defendant** [3] - 234:2, 277:22, 335:13

**Defendant** [3] - 227:6, 227:18, 229:16

**defendant's** [9] - 273:14, 273:22, 274:9, 274:13, 277:6, 277:9, 277:14, 277:20, 278:4

**defense** [39] - 288:12, 289:3, 289:4, 294:9, 294:13, 312:18, 313:19, 314:1, 315:10, 315:11, 315:15, 315:17, 316:4, 352:8, 375:14, 377:17, 377:18, 377:23, 378:13, 382:7, 382:8, 382:9, 384:22, 385:1, 385:5, 385:8, 385:9, 385:10, 385:15, 388:17, 388:18, 388:23, 388:24, 389:17, 392:9, 392:12, 394:4, 396:16

**Defense** [4] - 288:23, 294:12, 295:2, 312:7

**defer** [2] - 378:17, 379:7

**deficit** [1] - 389:10

**define** [1] - 233:9

**defined** [4] - 298:22, 299:13, 302:24,

337:2

**defining** [3] - 276:20, 298:20, 299:20

**definitely** [6] - 313:16, 339:12, 339:13, 341:11, 341:12, 356:17

**definition** [2] - 249:8, 302:9

**definitive** [3] - 304:18, 306:4, 360:24

**definitively** [2] - 337:6, 343:4

**degree** [1] - 358:21

**delay** [1] - 373:11

**deliberate** [1] - 391:16

**delta** [1] - 365:14

**Delta** [2] - 289:1, 289:2

**deltas** [2] - 365:11, 366:2

**delve** [1] - 373:1

**demonstrate** [1] - 270:9

**demonstrated** [1] - 291:7

**demonstrates** [1] - 249:13

**denied** [2] - 381:8, 381:10

**department** [1] - 319:10

**Department** [3] - 227:13, 227:16, 318:2

**deposit** [25] - 230:21, 230:22, 231:4, 231:10, 232:5, 232:11, 232:12, 232:18, 232:20, 232:21, 233:2, 233:7, 236:5, 238:2, 238:12, 238:17, 238:20, 238:21, 242:4, 270:17, 273:15, 273:23, 274:10, 295:18, 300:16

**deposits** [4] - 232:17, 236:3, 315:5, 316:1

**DEPUTY** [5] - 229:2, 317:14, 317:17, 380:13, 388:21

**deputy** [5] - 383:22, 386:17, 386:23, 387:2, 388:19

**derived** [1] - 264:2

**describe** [5] - 249:4, 256:9, 270:21, 271:5, 281:1

**described** [10] - 234:15, 248:23, 251:6, 251:11, 251:12, 251:17, 267:24, 300:23, 359:13, 365:18

**describing** [5] - 249:6, 253:14, 282:22, 364:13, 364:14

**description** [9] - 250:21, 252:20, 252:21, 252:23, 265:21, 266:22, 268:10, 272:13, 281:9

**descriptor** [1] - 335:10

**design** [1] - 268:20

**designated** [1] - 334:13

**designing** [2] - 305:6, 319:14

**desks** [1] - 372:14

**destroys** [1] - 246:21

**detail** [4] - 283:9, 291:9, 372:9, 373:9

**details** [1] - 230:24

**detect** [8] - 243:1, 243:9, 243:11, 244:5, 244:13, 244:24, 245:14, 248:16

**detectable** [2] - 245:12, 246:25

**detecting** [1] - 243:4

**detection** [4] - 242:20, 260:19, 265:23, 305:11

**detention** [2] - 393:21, 395:9

**determination** [7] - 233:20, 309:20, 337:9, 352:1, 358:10, 358:18, 392:5

**determine** [7] - 232:14, 234:1, 290:19, 321:3, 327:12, 343:3, 358:22

**determined** [3] - 286:8, 286:21, 358:24

**develop** [1] - 320:18

**developer** [1] - 319:22

**DHCP** [1] - 348:3

**diagrams** [1] - 368:15

**die** [1] - 312:2

**differ** [1] - 382:14

**difference** [5] - 243:4, 347:19, 347:22,

362:24, 379:2

**different** [47] - 232:22, 236:5, 236:11, 236:12, 252:13, 262:6, 263:16, 264:4, 264:5, 264:11, 264:24, 265:7, 267:16, 267:25, 268:3, 268:13, 283:1, 283:2, 283:8, 285:23, 297:3, 302:4, 305:9, 305:19, 316:20, 317:1, 324:10, 325:9, 326:18, 330:7, 331:12, 335:12, 336:25, 337:2, 338:7, 344:10, 346:2, 346:14, 359:4, 366:3, 366:4, 372:12, 372:14, 378:24, 386:21

**difficult** [3] - 244:25, 302:16

**difficulty** [2] - 344:25, 372:19

**digital** [6] - 320:2, 320:5, 320:7, 320:10, 322:15, 323:8

**digs** [1] - 267:12

**dire** [10] - 371:16, 374:19, 379:19, 380:18, 381:7, 381:13, 381:14, 384:7, 388:4, 390:10

**DIRECT** [1] - 317:18

**direct** [10] - 230:6, 235:19, 261:12, 272:3, 287:19, 288:12, 326:25, 362:18, 364:16, 379:18

**Direct** [1] - 228:9

**directed** [2] - 324:18, 381:7

**directing** [20] - 237:17, 244:2, 249:5, 265:19, 266:22, 269:7, 270:3, 270:20, 292:18, 300:9, 300:11, 301:10, 303:21, 323:13, 341:19, 343:23, 352:7, 360:9, 361:9, 368:13

**directly** [9] - 237:5,

238:3, 253:10, 260:14, 264:8, 277:1, 309:16, 313:1, 351:13

**directories** [1] - 328:9

**disagree** [8] - 233:21, 239:2, 251:8, 251:9, 252:20, 310:11, 316:23, 355:3

**disagreeing** [1] - 289:13

**disagreement** [1] - 252:22

**disappointed** [1] - 387:24

**disclosed** [2] - 311:22, 313:25

**discovering** [1] - 302:18

**discovery** [20] - 234:25, 235:2, 270:10, 270:11, 272:25, 273:4, 278:19, 284:7, 284:10, 285:22, 285:24, 297:1, 297:3, 297:23, 298:3, 307:10, 307:11, 307:16, 308:1, 387:14

**discuss** [2] - 313:5, 371:25

**discussed** [5] - 257:20, 288:9, 296:18, 301:1, 349:1

**discussing** [8] - 235:20, 239:24, 251:24, 252:1, 253:23, 256:18, 312:14, 372:4

**discussion** [4] - 257:12, 301:16, 383:21, 393:7

**disguise** [1] - 308:17

**dismiss** [1] - 370:22

**dismissed** [1] - 291:25

**disprove** [4] - 285:7, 285:11, 285:15, 285:19

**disproves** [1] - 285:3

**dispute** [1] - 377:24

**disputing** [1] - 253:23

**distance** [1] - 322:3

**distinction** [2] - 334:10, 334:23

**District** [3] - 289:9, 378:9

**DISTRICT** [3] - 227:1, 227:1, 227:8

**district** [3] - 394:10, 395:10, 395:17

**DNS** [8] - 327:21, 327:23, 327:24, 328:4, 328:9, 337:11, 337:23, 343:7

**docket** [1] - 271:19

**document** [1] - 354:1

**documents** [9] - 262:15, 262:19, 262:21, 299:3, 313:7, 314:10, 354:3, 376:15, 376:17

**DOJ** [3] - 227:11, 227:16, 292:2

**DOJ-CRM** [1] - 227:16

**domain** [4] - 324:18, 327:25, 328:2, 343:7

**domains** [2] - 337:12, 337:18

**DomainTools** [1] - 328:21

**done** [19] - 249:25, 273:24, 275:8, 275:9, 287:19, 293:10, 296:7, 311:5, 313:22, 315:19, 326:21, 345:2, 365:21, 366:16, 383:2, 383:15, 388:5, 388:6, 392:6

**door** [1] - 387:19

**dots** [1] - 359:9

**doubt** [3] - 315:2, 346:23, 346:24

**down** [17] - 271:20, 271:22, 281:7, 301:10, 332:13, 336:13, 336:21, 338:2, 338:18, 340:3, 368:2, 368:15, 380:19, 380:21, 380:23, 380:24, 394:8

**download** [1] - 331:17

**Dr** [14] - 257:20, 258:20, 260:20, 263:7, 263:11, 263:16, 264:2, 269:8, 269:10, 269:20, 269:23, 351:24, 373:17, 373:20

**draw** [2] - 344:17, 374:1

**drawn** [1] - 344:14

**drew** [1] - 359:21

**Dror** [4] - 351:23, 351:24, 373:17, 373:20

**during** [4] - 382:16, 384:7, 384:12, 389:8

**dynamic** [5] - 347:17, 347:19, 347:23, 348:5, 348:12

**E**

**earliest** [1] - 232:14

**early** [3] - 371:14, 374:19, 375:19

**earn** [1] - 389:6

**earning** [2] - 280:8, 389:7

**easier** [4] - 318:1, 388:14, 389:4, 389:5

**edge** [1] - 238:7

**educational** [1] - 318:25

**effective** [2] - 304:2, 304:7

**effectively** [1] - 243:1

**effectiveness** [5] - 298:21, 298:22, 299:7, 299:9, 299:13

**efficiencies** [2] - 292:22, 293:2

**efficient** [3] - 378:5, 393:16, 394:21

**either** [9] - 234:4, 304:7, 304:17, 311:10, 316:6, 339:16, 358:8, 371:17, 375:2

**EKELAND** [91] - 227:18, 229:15, 234:5, 261:12, 263:1, 273:5, 274:3, 287:17, 287:24, 288:4, 292:6, 293:6, 294:2, 294:5, 295:5, 295:9, 297:12, 298:14, 299:18, 299:22, 306:21, 307:2, 307:3, 307:21, 307:24, 307:25, 309:11, 309:24, 310:2, 311:8, 311:16, 312:1, 312:5, 312:21, 313:1, 313:4, 313:17, 314:3, 316:23, 323:24, 342:3, 345:11, 345:15, 347:6, 347:10, 347:12, 350:18,

350:21, 351:11, 351:24, 352:3, 352:4, 355:3, 355:23, 356:4, 356:5, 356:23, 356:24, 357:18, 357:24, 358:17, 359:24, 360:2, 360:4, 360:5, 360:15, 362:23, 363:2, 365:17, 366:1, 366:5, 366:14, 367:2, 367:3, 370:10, 375:23, 376:5, 376:8, 376:13, 376:18, 376:24, 377:9, 379:6, 380:3, 381:8, 383:25, 390:21, 393:20, 395:15, 396:5, 396:16

**Ekeland** [19] - 227:19, 228:6, 228:11, 229:15, 287:19, 293:22, 294:1, 316:22, 345:10, 366:20, 375:20, 378:7, 379:5, 380:2, 383:24, 386:13, 389:25, 392:16, 393:18

**electronic** [1] - 389:18
**elsewhere** [1] - 343:14
**email** [17] - 327:10, 342:17, 354:19, 354:23, 355:4, 355:8, 355:20, 355:25, 356:7, 356:14, 357:5, 358:10, 358:11, 358:19, 358:22, 368:18, 394:24
**emphasize** [1] - 343:16
**employ** [1] - 305:10
**enabled** [3] - 254:16, 254:20, 254:24
**encountered** [1] - 250:5
**encourage** [1] - 386:20
**encrypted** [1] - 331:20
**end** [18] - 249:12, 249:22, 250:9, 250:10, 250:15, 254:10, 269:19, 271:19, 326:15, 329:9, 329:24, 351:22, 374:8,

378:22, 379:12, 390:11, 390:15, 394:22
**ended** [1] - 378:21
**ending** [3] - 281:3, 283:24, 342:12
**ends** [1] - 368:3
**enforcement** [15] - 278:12, 278:17, 280:15, 280:18, 290:10, 306:2, 306:3, 306:10, 329:1, 329:11, 329:18, 332:22, 332:24, 333:21, 335:2
**engage** [2] - 311:2, 381:14
**Engineering** [1] - 322:10
**engineering** [6] - 245:20, 246:9, 247:16, 247:22, 247:23, 248:18
**engineers** [2] - 282:4, 284:19
**English** [2] - 376:10, 376:12
**enhance** [1] - 308:11
**ensure** [1] - 249:2
**entail** [3] - 319:12, 320:24, 322:1
**enterprise** [1] - 362:2
**entire** [4] - 250:21, 354:2, 371:1, 394:13
**entirely** [3] - 315:13, 348:25, 361:6
**entities** [2] - 251:16, 289:24
**entitled** [3] - 296:6, 373:8, 381:21
**Entity** [3] - 290:19, 290:22, 291:1
**entity** [7] - 268:22, 290:4, 291:11, 301:21, 303:3, 304:14
**entries** [1] - 354:8
**entry** [1] - 231:20
**environment** [1] - 235:11
**Ermilov** [20] - 259:24, 260:8, 260:11, 261:19, 261:24, 262:7, 262:10, 262:12, 262:22, 265:7, 266:23, 267:1, 267:19, 268:1, 268:10, 297:2, 297:15,

302:13
**error** [25] - 256:14, 258:12, 258:15, 259:3, 259:7, 259:18, 261:3, 261:7, 262:13, 262:20, 295:24, 296:14, 296:17, 296:19, 296:22, 297:9, 301:6, 302:4, 303:8, 303:16, 303:18, 316:20, 317:1, 317:4
**errors** [1] - 295:22
**essence** [1] - 348:5
**essentially** [10] - 235:10, 252:16, 302:18, 308:1, 330:11, 346:7, 359:5, 359:21, 362:10, 394:12
**Essentials** [1] - 322:11
**established** [1] - 333:15
**estimate** [4] - 375:12, 375:22, 375:23, 392:21
**et** [9] - 261:18, 261:19, 265:2, 300:10, 301:2, 302:9, 303:20
**evade** [2] - 305:7, 305:10
**evaluating** [1] - 258:7
**Evaluating** [1] - 296:6
**evaluation** [1] - 263:13
**Evaluation** [1] - 256:25
**event** [1] - 392:13
**events** [1] - 365:5
**evidence** [17] - 294:12, 294:17, 304:18, 306:4, 308:24, 308:25, 315:15, 316:21, 320:8, 320:10, 320:19, 323:8, 356:18, 387:7, 390:11, 390:15, 390:18
**exact** [7] - 239:2, 239:19, 248:8, 248:9, 256:14, 268:19
**exactly** [11] - 256:1, 264:7, 268:17, 307:19, 329:14, 342:24, 348:18, 362:7, 365:8,

388:14, 389:9
**Examination** [4] - 228:4, 228:6, 228:9, 228:10
**EXAMINATION** [4] - 230:1, 294:3, 317:18, 345:13
**examinations** [1] - 309:21
**examine** [2] - 353:2, 353:5
**examined** [1] - 307:6
**examining** [1] - 296:8
**example** [16] - 243:18, 244:3, 244:11, 245:8, 246:23, 247:12, 281:14, 297:14, 305:8, 305:20, 310:19, 311:7, 315:17, 321:16, 333:11, 372:5
**examples** [7] - 245:1, 245:2, 245:3, 245:5, 279:1, 279:2, 321:14
**Excel** [2] - 359:7, 389:12
**except** [2] - 357:2, 395:20
**exchange** [7] - 270:16, 276:21, 277:1, 289:18, 290:2, 290:5, 304:14
**exchanges** [3] - 275:18, 289:24, 308:3
**exclude** [1] - 249:17
**excluded** [2] - 339:13, 365:1
**excluding** [1] - 385:24
**excused** [2] - 314:12, 370:13
**executed** [1] - 354:22
**exercise** [3] - 381:21, 383:3, 383:13
**exhibit** [12] - 231:22, 231:23, 293:7, 294:6, 294:9, 294:16, 315:16, 315:22, 352:8, 387:3, 387:7, 389:11
**Exhibit** [62] - 228:14, 228:15, 228:16, 228:17, 228:18, 228:19, 228:20, 228:21, 230:7, 230:16, 231:20, 237:17, 239:24, 240:2, 249:5, 251:4, 251:5, 251:6,

251:23, 253:21, 257:19, 258:7, 258:18, 259:9, 259:22, 260:6, 261:2, 261:6, 261:17, 261:23, 262:1, 264:1, 265:20, 266:22, 269:7, 272:4, 281:5, 286:4, 288:13, 288:23, 289:4, 291:23, 292:7, 292:18, 293:4, 293:8, 294:13, 294:18, 295:1, 295:2, 296:5, 299:19, 303:20, 312:7, 323:14, 323:22, 323:25, 324:1, 341:19, 342:1, 342:4, 342:6
**Exhibits** [2] - 262:23, 263:3
**EXHIBITS** [1] - 228:12
**exhibits** [3] - 263:2, 387:4, 388:11
**exist** [3] - 249:20, 253:18, 327:19
**existed** [1] - 363:14
**exit** [14] - 331:19, 331:21, 333:17, 333:20, 333:23, 334:3, 334:10, 334:21, 334:22, 334:24, 337:5, 340:15, 340:18, 340:20
**ExoneraTor** [5] - 333:25, 334:1, 334:20, 337:24, 361:15
**expand** [2] - 297:8, 325:23
**Expanding** [1] - 294:19
**expands** [1] - 297:9
**expansion** [19] - 270:14, 296:12, 297:1, 297:5, 297:7, 297:8, 297:14, 297:16, 297:20, 298:3, 298:7, 298:17, 298:18, 298:19, 298:22, 298:24, 299:6, 299:12
**expansive** [1] - 387:13
**expected** [2] - 304:9, 363:14
**experience** [5] -

Appx1446

278:21, 311:3, 322:13, 323:20, 340:8

**experiences** [2] - 340:5, 340:6

**expert** [41] - 269:22, 286:14, 287:22, 287:23, 294:13, 294:22, 295:1, 295:10, 296:14, 301:1, 301:5, 302:22, 306:15, 308:22, 311:9, 311:12, 311:14, 311:15, 312:2, 312:7, 312:11, 312:24, 313:12, 313:20, 313:23, 313:24, 314:6, 314:8, 314:10, 314:19, 351:20, 355:7, 355:18, 355:19, 367:6, 367:25, 368:14, 369:20, 370:4, 372:2, 375:25

**expertise** [8] - 287:20, 311:3, 311:6, 372:6, 373:24, 374:5, 374:7, 378:17

**explain** [20] - 243:6, 297:7, 297:13, 298:11, 304:21, 310:3, 320:11, 321:10, 324:13, 329:22, 330:16, 347:22, 348:17, 352:15, 352:17, 359:2, 360:13, 361:20, 372:9, 386:19

**explaining** [2] - 263:18, 266:18

**explains** [1] - 263:16

**explanation** [2] - 298:9, 321:2

**explanatory** [1] - 297:19

**explore** [1] - 373:8

**Explorer** [1] - 310:17

**explorers** [1] - 310:17

**exploring** [1] - 309:15

**exported** [1] - 234:22

**exposed** [2] - 252:16, 334:15

**expresses** [1] - 356:21

**Expsn** [2] - 296:11, 298:22

**extended** [1] - 313:20

**extent** [8] - 247:20,

---

355:24, 356:20, 357:9, 382:10, 392:23, 393:6, 395:1

**extra** [1] - 378:10

**extraordinary** [1] - 313:22

**extremely** [5] - 256:15, 302:15, 302:16, 389:13, 395:12

## F

**facilities** [1] - 395:18

**facility** [3] - 393:23, 395:23, 396:1

**fact** [44] - 233:7, 234:14, 236:7, 237:10, 238:14, 238:24, 241:10, 241:20, 244:23, 245:13, 245:21, 248:6, 248:19, 250:5, 253:5, 253:9, 253:13, 255:13, 256:5, 259:5, 259:17, 260:11, 262:20, 264:4, 264:18, 265:11, 267:23, 268:12, 268:20, 273:12, 273:21, 274:8, 279:17, 282:12, 284:14, 284:24, 290:14, 305:25, 316:1, 317:3, 336:7, 350:9, 389:1, 391:23

**factor** [7] - 297:1, 298:7, 298:22, 299:6, 299:12, 312:14, 313:6

**factors** [1] - 312:11

**facts** [1] - 271:13

**fail** [2] - 269:23, 300:7

**failed** [3] - 295:20, 296:2, 300:16

**fair** [14] - 299:15, 305:21, 311:23, 311:24, 315:1, 316:22, 340:7, 348:22, 357:19, 359:19, 369:2, 369:5, 369:24, 372:24

**fairly** [2] - 297:18, 393:11

**fall** [3] - 336:22, 337:1, 341:16

**false** [12] - 260:19, 270:10, 270:11,

---

297:1, 297:3, 297:22, 297:23, 297:24, 298:3, 301:17, 304:12, 315:18

**familiar** [12] - 235:21, 236:15, 242:19, 257:14, 257:24, 260:5, 285:21, 292:20, 321:8, 322:23, 349:22, 353:8

**familiarity** [1] - 304:5

**far** [2] - 274:18, 284:11

**Farsight** [1] - 328:21

**fault** [1] - 234:9

**favor** [1] - 393:16

**FBI** [17] - 236:11, 306:24, 318:8, 318:9, 318:11, 318:15, 319:24, 320:1, 320:21, 321:19, 321:22, 340:9, 361:19, 361:20, 361:22, 362:4, 386:3

**FBI's** [1] - 322:8

**FDR** [15] - 263:6, 263:10, 266:24, 296:12, 297:1, 297:3, 297:15, 297:17, 297:18, 299:5, 299:12, 299:23, 300:1, 300:2

**FDRs** [2] - 316:4, 316:6

**features** [9] - 252:4, 300:19, 300:20, 301:18, 304:3, 304:8, 304:9, 355:14, 359:18

**fed** [1] - 253:14

**Federal** [1] - 381:22

**federal** [4] - 291:25, 395:23, 396:1, 396:3

**fee** [2] - 266:8, 266:19

**fees** [3] - 254:10, 266:6, 267:20

**few** [5] - 323:4, 324:3, 336:2, 359:4, 386:22

**Fi** [1] - 350:11

**fiat** [2] - 286:7, 286:21

**fidgety** [1] - 390:19

**field** [8] - 257:15, 263:24, 263:25, 319:4, 322:8, 327:5, 334:22, 340:8

**Field** [1] - 318:18

**figure** [7] - 315:12, 316:8, 317:9,

---

332:23, 333:21, 367:17, 382:21

**figured** [1] - 357:10

**figures** [1] - 295:4

**figuring** [1] - 373:25

**file** [5] - 275:15, 337:17, 359:6, 359:7, 387:10

**filed** [2] - 270:22, 271:6

**files** [1] - 352:19

**filing** [1] - 271:9

**fill** [2] - 383:8, 383:12

**filter** [5] - 336:10, 336:21, 338:2, 338:4, 340:3

**filtering** [2] - 336:13, 338:18

**final** [4] - 312:6, 338:5, 371:12, 373:11

**finances** [1] - 310:21

**financial** [2] - 275:17, 372:15

**financing** [1] - 289:23

**fine** [12] - 261:11, 273:9, 298:12, 310:1, 312:4, 316:5, 379:6, 392:17, 393:4, 393:13, 396:13

**fingerprint** [1] - 304:25

**fingerprints** [1] - 257:4

**finish** [2] - 288:19, 385:5

**finished** [1] - 233:4

**first** [41] - 230:21, 232:12, 255:3, 256:7, 256:24, 261:1, 271:10, 286:11, 290:15, 295:11, 295:14, 295:20, 298:16, 300:8, 300:22, 301:13, 303:24, 309:7, 317:23, 319:7, 319:8, 332:12, 338:13, 344:4, 355:4, 356:17, 360:10, 363:11, 365:2, 365:3, 365:20, 365:21, 377:16, 380:11, 382:16, 382:17, 385:4, 385:9, 385:10, 385:15, 391:2

**first-known** [3] - 230:21, 232:12,

---

255:3

**Fischbach** [1] - 373:22

**Fistful** [2] - 258:19, 262:14

**fit** [2] - 254:11, 319:14

**five** [11] - 265:8, 309:24, 338:9, 339:20, 339:21, 340:12, 340:13, 340:25, 374:24, 391:16, 393:1

**fixed** [2] - 337:3, 338:15

**flag** [2] - 244:7, 315:7

**flagging** [5] - 280:18, 289:18, 289:21, 317:7

**flip** [3] - 231:8, 302:8, 385:14

**flipping** [1] - 261:21

**Floor** [1] - 227:19

**fluent** [2] - 376:12, 376:13

**focus** [8] - 336:17, 338:19, 338:22, 339:15, 339:19, 340:11, 341:6, 357:7

**focused** [1] - 338:8

**Fog** [51] - 230:11, 230:22, 231:5, 231:11, 232:10, 232:12, 232:15, 232:25, 233:15, 233:25, 234:3, 234:19, 253:10, 255:3, 268:24, 269:2, 269:25, 270:17, 270:21, 270:24, 271:4, 271:8, 273:14, 273:21, 273:23, 274:10, 276:5, 277:7, 277:10, 277:15, 278:5, 278:8, 278:11, 278:15, 283:25, 287:8, 287:14, 295:19, 296:3, 300:5, 300:11, 300:16, 301:11, 315:6, 316:2, 318:12, 324:4, 324:9, 335:13, 355:16, 355:20

**foil** [1] - 305:23

**folks** [2] - 391:18, 392:20

**follow** [18] - 248:1, 280:2, 300:15,

300:24, 301:6, 301:16, 301:17, 301:20, 302:1, 302:2, 304:7, 304:11, 311:8, 329:13, 336:19, 381:1, 381:4, 381:11

**follow-up** [6] - 248:1, 280:2, 329:13, 381:1, 381:4, 381:11

**followed** [2] - 300:12, 300:14

**following** [5] - 233:13, 234:18, 244:10, 295:16, 366:19

**follows** [1] - 312:12

**Footnote** [1] - 265:22

**footnote** [1] - 266:17

**FOR** [1] - 227:1

**Force** [1] - 318:19

**foreclose** [1] - 371:23

**foregoing** [1] - 397:4

**forensic** [5] - 305:24, 320:7, 323:7, 372:12, 372:23

**forensically** [1] - 320:8

**forensics** [9] - 306:7, 318:21, 320:2, 320:5, 322:15, 322:22, 373:6, 373:7, 373:8

**Forfeiture** [1] - 289:9

**forfeiture** [5] - 289:10, 391:21, 391:24, 392:2, 392:6

**form** [2] - 269:13, 307:14

**format** [4] - 276:25, 277:1, 327:3, 389:18

**forming** [1] - 316:12

**forth** [8] - 268:12, 268:14, 268:18, 378:8, 382:6, 382:16, 383:6, 386:21

**forum** [4] - 355:10, 355:13, 361:23, 362:6

**forward** [8] - 265:12, 295:19, 300:6, 300:7, 300:15, 300:25, 301:17, 302:1

**forwards** [1] - 300:15

**foundation** [1] - 311:1

**four** [10] - 265:8, 315:18, 341:10, 374:24, 378:20, 388:16, 390:12,

391:7, 392:25, 393:1

**fourth** [2] - 260:1, 267:12

**frame** [6] - 282:2, 282:9, 283:17, 284:16, 284:22, 292:2

**frankly** [4] - 234:7, 371:22, 374:11, 395:23

**fraud** [7] - 286:5, 286:7, 286:15, 286:20, 286:25, 287:3, 321:7

**freely** [1] - 318:20

**fresh** [1] - 300:22

**Friday** [3] - 375:18, 390:3, 396:9

**Fridays** [2] - 375:18, 392:22

**friendly** [1] - 327:3

**friends** [1] - 396:1

**front** [12] - 230:7, 292:24, 309:22, 323:13, 352:8, 367:7, 370:20, 375:10, 376:11, 379:4, 387:4, 388:12

**frustrated** [1] - 378:6

**frustration** [3] - 378:1, 378:3, 378:4

**Frye** [1] - 396:10

**full** [11] - 232:1, 249:14, 268:2, 281:16, 281:18, 281:19, 299:20, 303:24, 328:1, 375:16, 397:5

**functioned** [1] - 334:4

**funding** [2] - 290:11, 306:19

**funds** [28] - 230:10, 235:22, 235:25, 236:3, 236:4, 238:19, 240:4, 240:8, 240:9, 240:14, 240:18, 248:11, 254:21, 254:24, 255:1, 255:2, 270:15, 272:7, 274:12, 274:21, 277:6, 288:9, 289:18, 289:25, 290:12, 300:13, 300:14, 396:3

**furthermore** [1] - 300:22

### G

**game** [1] - 234:10

**gathered** [1] - 299:2

**gathering** [1] - 329:19

**gender** [1] - 382:11

**General** [2] - 318:3, 318:7

**general** [6] - 252:23, 275:7, 281:8, 281:9, 364:14, 372:11

**generalized** [1] - 339:14

**generally** [7] - 235:23, 236:14, 256:22, 278:7, 281:4, 328:9, 330:24

**generate** [1] - 339:24

**generated** [2] - 325:3, 329:4

**Georgetown** [2] - 319:3, 319:5

**German** [1] - 367:15

**GIAC** [2] - 322:10, 322:11

**gift** [1] - 386:18

**given** [12] - 244:21, 265:23, 304:16, 304:23, 311:24, 313:19, 314:1, 332:24, 333:20, 364:14, 377:21, 379:1

**Glenda** [1] - 380:11

**Gmail** [1] - 332:14

**goal** [3] - 298:20, 305:25, 306:1

**GoDaddy** [1] - 327:2

**Goldfeder** [7] - 259:10, 261:18, 262:10, 262:22, 265:5, 297:2, 302:13

**Google** [8] - 332:14, 332:15, 332:17, 332:24, 333:3, 333:7, 333:8, 333:12

**Google's** [2] - 332:20, 333:18

**Google.com** [2] - 332:9, 333:15

**government** [56] - 229:5, 234:3, 234:25, 235:5, 241:2, 252:8, 262:23, 272:21, 273:1, 275:6, 276:22, 277:3, 283:21, 284:4, 284:8, 284:12, 284:24, 285:11,

285:24, 293:4, 307:4, 308:2, 308:9, 308:15, 308:20, 311:20, 313:8, 313:10, 313:14, 314:4, 317:12, 323:22, 341:25, 354:22, 355:14, 376:1, 376:19, 377:17, 377:23, 382:7, 382:8, 384:21, 385:1, 385:8, 385:9, 385:10, 385:24, 386:11, 388:17, 388:24, 389:12, 389:25, 392:4, 396:15

**Government** [18] - 228:14, 228:15, 228:16, 228:17, 228:18, 228:19, 228:20, 228:21, 263:3, 265:20, 293:8, 294:17, 294:25, 296:5, 299:19, 303:20, 324:1, 342:6

**government's** [18] - 251:10, 269:24, 270:22, 271:6, 284:1, 288:25, 289:7, 291:24, 294:6, 294:16, 309:10, 309:16, 313:2, 314:7, 315:2, 315:4, 352:7, 376:25

**Government's** [1] - 341:25

**Gox** [30] - 270:24, 271:7, 273:14, 273:22, 274:10, 274:14, 275:21, 275:22, 276:9, 276:10, 276:23, 284:25, 285:4, 285:8, 285:12, 285:16, 295:18, 296:3, 300:7, 300:14, 307:5, 307:11, 342:17, 342:21, 342:22, 344:5, 344:11, 344:12, 370:6

**graduating** [1] - 319:4

**grand** [1] - 269:4

**grant** [1] - 306:19

**graph** [2] - 244:2, 269:9

**graphic** [1] - 369:2

**graphical** [3] - 368:20, 368:24, 369:5

**graphing** [2] - 359:6, 359:13

**graphs** [4] - 250:23, 359:19, 359:20, 368:22

**great** [2] - 293:19, 389:22

**greater** [4] - 326:12, 364:25, 372:9, 373:9

**greatly** [1] - 308:11

**Greenwich** [1] - 360:18

**GREM** [2] - 322:10, 322:12

**ground** [2] - 270:9, 298:25

**grounds** [1] - 315:14

**group** [7] - 232:21, 248:19, 288:10, 344:10, 359:9, 380:24, 384:9

**grouped** [1] - 344:4

**groups** [2] - 325:6, 325:7

**GSEC** [1] - 322:11

**guardedly** [1] - 373:5

**guess** [16] - 247:4, 251:24, 252:22, 253:12, 254:8, 256:7, 280:2, 288:24, 298:6, 355:17, 363:17, 364:8, 369:14, 375:4, 379:22, 384:13

**guidelines** [5] - 292:2, 292:12, 292:19, 292:22, 292:25

**guy** [1] - 374:5

### H

**habits** [1] - 339:1

**hacking** [1] - 322:20

**half** [4] - 281:17, 281:18, 288:16, 379:10

**halfway** [2] - 269:19, 270:6

**Hamilton** [1] - 319:20

**hand** [6] - 231:2, 237:20, 299:19, 301:11, 317:15, 387:18

**handle** [3] - 235:21, 371:2, 393:9

**hang** [1] - 231:13

**happy** [9] - 258:14,

**Appx1448**

375:2, 377:24, 384:9, 393:6, 393:9, 394:22, 394:23, 395:2
**hard** [2] - 375:21, 383:17
**harder** [1] - 390:15
**harm** [1] - 310:22
**Harmon** [3] - 279:11, 279:15
**Hash** [2] - 252:23, 254:20
**hash** [5] - 230:25, 254:15, 255:18, 255:20, 310:15
**hashed** [1] - 252:16
**hashes** [1] - 291:17
**head** [2] - 231:18, 381:9
**header** [3] - 296:10, 300:11, 360:6
**Health** [1] - 318:2
**hear** [11] - 356:25, 357:11, 373:2, 373:10, 373:17, 374:3, 375:13, 376:5, 386:13, 388:2, 390:21
**heard** [13] - 311:5, 316:14, 350:13, 358:7, 358:12, 365:22, 365:24, 370:20, 371:18, 371:19, 371:20, 374:11, 389:3
**HEARING** [2] - 227:4, 227:7
**hearing** [10] - 293:16, 303:14, 324:6, 342:5, 345:3, 347:9, 373:15, 374:8, 377:17, 396:18
**heavily** [1] - 314:20
**heavydist** [1] - 357:6
**held** [2] - 395:10, 395:14
**help** [5] - 230:14, 287:5, 320:18, 374:17, 386:17
**helpful** [8] - 315:9, 317:5, 329:11, 365:16, 388:10, 389:21, 392:11, 396:17
**helps** [1] - 392:22
**hereby** [1] - 397:3
**Heuristic** [3] - 256:25, 296:6, 296:10
**heuristic** [46] - 242:8, 245:25, 246:5,

246:15, 248:23, 249:2, 249:7, 250:14, 256:19, 256:20, 257:3, 258:12, 265:21, 266:7, 266:14, 266:23, 267:1, 267:7, 267:19, 267:25, 268:1, 269:22, 270:10, 270:11, 270:14, 270:18, 272:19, 272:22, 273:13, 273:17, 273:22, 274:9, 295:21, 295:22, 296:11, 298:4, 298:17, 298:20, 299:21, 300:4, 301:6, 301:7, 302:10, 302:19, 316:20
**heuristics** [43] - 263:14, 263:16, 264:6, 264:12, 264:16, 264:19, 264:25, 265:12, 265:15, 265:17, 267:24, 268:10, 268:12, 268:13, 268:17, 268:18, 268:21, 270:7, 270:8, 270:19, 273:2, 295:19, 295:24, 295:25, 296:2, 296:23, 300:1, 300:23, 302:4, 302:7, 303:7, 304:1, 304:15, 304:17, 305:7, 305:11, 305:23, 306:4, 315:19, 315:25, 316:15, 316:16, 317:2
**HHS** [1] - 318:19
**HHS-OIG** [1] - 318:19
**hi** [2] - 345:12, 345:16
**hidden** [1] - 332:5
**hide** [2] - 329:15, 330:14
**hierarchy** [1] - 325:24
**high** [5] - 304:4, 310:20, 321:25, 333:4, 348:1
**high-net-worth** [1] - 310:20
**higher** [2] - 297:9, 298:1
**highest** [1] - 296:1
**highly** [4] - 242:23, 256:9, 317:5, 351:13

**Hill** [1] - 396:2
**historic** [2] - 327:24, 337:13
**historical** [1] - 327:11
**histories** [1] - 283:15
**history** [1] - 281:20
**hit** [1] - 389:9
**hold** [1] - 395:18
**holdings** [5] - 333:25, 337:13, 337:17, 361:19, 361:20
**home** [7] - 331:9, 331:10, 331:13, 332:14, 332:16, 333:3, 333:5
**honest** [1] - 391:18
**honestly** [1] - 376:24
**Honeywell** [4] - 319:8, 319:9, 319:12, 319:19
**Honor** [82] - 229:6, 229:13, 229:15, 229:25, 234:11, 247:15, 261:10, 263:1, 274:3, 287:5, 287:7, 287:24, 288:5, 288:18, 288:21, 293:9, 293:12, 293:17, 293:24, 294:2, 295:5, 306:21, 307:21, 309:9, 309:11, 311:16, 312:3, 312:17, 312:21, 313:17, 314:3, 314:11, 315:13, 316:14, 317:12, 323:24, 344:21, 345:11, 347:10, 350:16, 351:8, 351:11, 352:3, 354:25, 355:3, 355:13, 355:23, 356:16, 356:23, 357:18, 357:24, 359:24, 360:4, 366:1, 366:14, 366:20, 367:2, 370:10, 370:12, 370:17, 375:13, 377:16, 379:1, 379:6, 381:8, 384:3, 386:2, 386:7, 386:15, 388:21, 389:11, 390:2, 391:14, 391:22, 393:4, 393:13, 393:17, 395:15, 396:5, 396:8, 396:15, 396:16

**HONORABLE** [1] - 227:8
**hooked** [1] - 230:18
**hop** [3] - 295:20, 300:17, 334:13
**hope** [1] - 291:4
**hopeful** [1] - 390:23
**hopefully** [3] - 380:15, 381:1, 383:15
**hops** [2] - 274:1, 304:7
**horizontal** [2] - 292:21, 292:24
**host** [1] - 328:7
**hosted** [1] - 330:8
**hosting** [1] - 330:7
**hosts** [1] - 330:10
**hour** [1] - 288:15
**hours** [3] - 361:7, 393:24, 393:25
**HTTPS** [1] - 331:21
**huge** [1] - 314:1
**Human** [1] - 318:2
**hundreds** [1] - 349:12

## I

**IANA** [7] - 325:6, 325:7, 325:25, 326:6, 326:11, 326:12
**idea** [1] - 348:19
**ideally** [5] - 244:1, 375:7, 375:8, 386:5, 386:6
**identical** [1] - 380:10
**identifiable** [1] - 242:17
**identification** [2] - 296:21, 337:14
**identified** [6] - 240:17, 248:20, 278:12, 278:16, 279:21, 338:6
**identifier** [3] - 324:14, 350:14, 350:23
**identifiers** [1] - 321:13
**identifies** [1] - 285:25
**identify** [10] - 243:21, 243:24, 244:18, 248:6, 265:3, 280:16, 298:21, 336:4, 337:7, 337:15
**identifying** [3] - 249:9, 369:19, 370:4
**identity** [5] - 310:18, 321:11, 322:4, 329:8, 369:20
**IDs** [1] - 236:10
**illicit** [2] - 286:8,

286:21
**image** [2] - 368:17, 368:18
**images** [2] - 320:7, 368:20
**impact** [1] - 257:2
**impediment** [1] - 394:4
**implementation** [4] - 246:8, 256:20, 257:8
**implementations** [5] - 242:23, 243:2, 243:19, 245:12, 245:15
**implemented** [2] - 257:7, 348:18
**implications** [1] - 377:13
**implied** [1] - 309:12
**important** [4] - 263:25, 287:13, 291:20, 301:15
**importantly** [1] - 390:19
**imposing** [2] - 394:12
**impossible** [2] - 304:7, 304:15
**IN** [1] - 227:1
**inadvertently** [1] - 379:20
**inclination** [3] - 371:18, 371:24, 384:18
**inclined** [2] - 287:24, 373:13
**include** [9] - 231:13, 243:24, 250:8, 274:12, 283:9, 286:7, 286:20, 335:15, 388:4
**included** [3] - 241:2, 242:4, 327:7
**includes** [5] - 230:24, 249:1, 257:12, 266:7, 384:23
**including** [6] - 262:6, 305:10, 310:21, 322:25, 327:9, 334:17
**incorporate** [1] - 268:21
**incorrect** [2] - 293:20, 312:21
**increase** [1] - 298:23
**incredibly** [1] - 316:18
**inculpatory** [1] - 314:25
**incur** [1] - 304:6
**indeed** [1] - 301:17
**indefinitely** [1] -

301:21
**indicated** [2] - 347:5, 372:24
**indication** [2] - 249:10, 286:16
**indicators** [2] - 304:24, 308:7
**indictment** [3] - 286:6, 286:15, 286:20
**indictments** [1] - 286:23
**indistinguishable** [1] - 247:1
**individual** [2] - 282:17, 310:20
**individual's** [1] - 350:15
**individually** [2] - 341:3, 350:24
**individuals** [2] - 331:6, 395:9
**industry** [1] - 310:23
**inevitably** [1] - 380:21
**infamous** [2] - 236:20, 236:21
**infeasible** [1] - 273:25
**infer** [1] - 306:10
**information** [25] - 270:22, 271:6, 283:19, 314:24, 315:10, 320:17, 326:20, 327:7, 327:8, 327:11, 327:12, 327:14, 327:17, 327:21, 328:4, 328:12, 328:15, 329:11, 329:19, 335:6, 336:13, 337:24, 352:24, 355:25
**information-gathering** [1] - 329:19
**informative** [2] - 316:25, 317:5
**informed** [1] - 247:22
**ingest** [1] - 298:1
**ingesting** [1] - 297:22
**initial** [9] - 273:14, 273:23, 274:10, 315:5, 316:1, 382:20, 382:21, 384:9, 384:12
**input** [3] - 230:25, 243:8, 255:23
**inputs** [3] - 244:8, 244:19, 305:17
**inquiry** [2] - 351:10, 396:10
**insofar** [1] - 329:12

**Inspector** [6] - 234:16, 234:22, 282:7, 282:10, 318:3, 318:7
**install** [3] - 331:17, 331:23, 331:24
**instance** [2] - 340:25, 353:12
**instances** [5] - 244:24, 249:19, 280:9, 336:4, 336:7
**instead** [3] - 249:9, 251:1, 356:19
**institutions** [1] - 275:17
**instructions** [3] - 371:15, 374:18, 391:1
**integrity** [2] - 292:9, 312:12
**intend** [3] - 321:17, 369:17, 390:2
**intending** [2] - 316:11, 363:9
**intention** [1] - 286:14
**interacted** [1] - 283:25
**interaction** [1] - 281:21
**interest** [5] - 311:16, 311:18, 320:11, 329:2, 335:6
**interested** [1] - 312:14
**interesting** [1] - 336:18
**interfere** [2] - 371:5, 378:4
**intermediary** [2] - 272:18, 329:23
**intermediate** [1] - 274:1
**internal** [6] - 233:14, 233:20, 233:25, 234:19, 304:13, 317:4
**internally** [1] - 299:2
**International** [2] - 319:8, 319:9
**international** [1] - 319:9
**internet** [22] - 324:15, 324:17, 325:1, 325:16, 325:17, 325:19, 326:14, 329:16, 329:24, 330:13, 330:19, 330:21, 331:13, 331:18, 332:2, 334:16, 335:6, 335:10, 339:14, 347:15, 347:24
**Internet** [5] - 325:9,

325:10, 325:13, 326:6, 326:7
**interpret** [2] - 267:15, 368:23
**interpreting** [1] - 250:17
**interview** [2] - 279:11, 279:16
**interviews** [1] - 320:25
**introduce** [1] - 315:1
**introduced** [3] - 252:8, 301:19, 315:22
**intrusion** [1] - 321:6
**investigate** [1] - 270:14
**investigating** [1] - 351:6
**investigation** [3] - 318:12, 324:4, 351:1
**investigations** [1] - 340:9
**investigator** [1] - 290:18
**investigators** [3] - 290:21, 291:2, 304:16
**involve** [10] - 235:8, 279:2, 286:24, 319:17, 319:21, 320:6, 320:14, 321:19, 321:22, 324:9
**involved** [5] - 266:5, 267:2, 319:13, 353:6, 354:10
**involving** [2] - 253:24, 286:24
**IP** [151] - 280:23, 281:2, 281:10, 281:13, 281:22, 282:14, 282:23, 283:1, 283:2, 283:4, 283:9, 283:16, 283:21, 283:24, 284:23, 284:25, 285:3, 285:7, 285:12, 285:13, 285:15, 305:11, 320:15, 324:7, 324:10, 324:13, 324:14, 324:16, 324:19, 324:22, 324:24, 325:1, 325:3, 325:5, 325:8, 325:11, 325:16, 325:25, 326:12, 327:9, 327:12, 327:25, 328:2, 328:15, 329:2,

329:7, 329:15, 329:18, 330:13, 330:14, 331:13, 331:19, 331:21, 332:15, 332:16, 332:17, 332:24, 333:8, 333:10, 333:18, 334:2, 334:15, 335:2, 335:15, 335:18, 336:4, 337:10, 338:13, 339:3, 339:4, 339:9, 339:24, 340:1, 342:12, 342:15, 342:20, 343:3, 343:8, 343:11, 343:16, 343:19, 344:15, 344:17, 346:2, 346:6, 347:13, 347:17, 347:20, 347:23, 347:25, 348:3, 348:5, 348:8, 348:12, 348:14, 348:17, 348:20, 348:21, 348:23, 349:5, 349:8, 349:19, 350:3, 350:6, 350:10, 350:13, 350:22, 351:9, 351:11, 352:10, 352:16, 352:18, 352:19, 353:6, 353:13, 353:18, 353:19, 353:25, 354:2, 354:3, 354:11, 354:14, 355:2, 355:21, 355:22, 356:18, 356:21, 357:6, 360:21, 361:10, 361:25, 362:8, 363:3, 363:4, 363:19, 364:1, 364:18, 364:20, 365:9, 365:10, 366:11, 367:9, 367:24, 368:2, 368:9, 368:19
**IPs** [22] - 325:19, 325:22, 326:18, 327:9, 335:21, 335:25, 336:2, 336:25, 337:2, 337:5, 337:7, 337:12, 337:19, 338:2, 338:6, 338:15, 353:16, 363:9, 366:4
**IRS** [5] - 271:12,

273:25, 352:23, 354:4, 386:3
**IRS-provided** [1] - 352:23
**isolate** [1] - 300:21
**ISP** [1] - 329:8
**issue** [16] - 283:13, 306:7, 306:23, 307:2, 311:17, 315:7, 315:12, 316:5, 332:25, 347:4, 370:23, 376:1, 382:13, 385:23, 390:9, 393:21
**issues** [10] - 317:8, 370:19, 371:11, 376:19, 377:10, 377:17, 385:24, 392:15, 393:5, 394:20
**IT** [3] - 319:10, 319:14, 319:15
**items** [1] - 320:10
**itself** [7] - 237:5, 276:21, 277:2, 305:1, 310:5, 315:21, 334:5

**J**

**Jail** [2] - 395:4, 395:8
**jail** [1] - 396:3
**jails** [1] - 394:12
**January** [2] - 319:25, 336:23
**Java** [2] - 323:3, 323:6
**JavaScript** [2] - 319:22, 323:6
**Jeff** [1] - 229:12
**JEFFREY** [1] - 227:15
**job** [3] - 308:11, 320:1, 320:2
**join** [1] - 319:24
**joining** [1] - 318:6
**JONELLE** [3] - 228:3, 230:2, 294:4
**journal** [1] - 260:18
**Judge** [1] - 356:25
**judge** [1] - 291:25
**JUDGE** [2] - 227:8, 227:8
**judges** [2] - 380:9, 382:15
**judgment** [2] - 364:7, 379:7
**July** [1] - 263:20
**jump** [1] - 367:6
**June** [1] - 377:18
**juror** [1] - 387:18

jurors [18] - 378:15, 379:10, 380:17, 380:24, 381:15, 381:20, 382:3, 382:22, 385:2, 387:16, 387:21, 390:7, 390:10, 390:18, 390:20, 392:19, 392:24

jury [27] - 309:22, 316:19, 316:24, 316:25, 317:5, 371:15, 374:18, 375:8, 375:10, 378:24, 380:8, 382:24, 383:14, 383:18, 387:24, 390:5, 390:10, 390:15, 390:16, 390:24, 391:5, 391:6, 391:17, 392:5, 392:10, 392:13, 392:23

Justice [2] - 227:13, 227:16

## K

Kappos [2] - 261:2, 314:20

keep [8] - 270:13, 299:4, 326:17, 379:18, 387:6, 394:15, 396:5

keeps [1] - 310:12

Key [3] - 252:9, 252:11, 252:15

key [3] - 252:16, 320:16, 371:9

Killdozer [1] - 344:9

kind [9] - 230:12, 279:20, 306:7, 340:5, 345:23, 351:13, 364:6, 365:10, 369:25

kinds [1] - 394:11

knowing [1] - 360:24

knowledge [4] - 247:9, 303:16, 315:20, 347:6

known [10] - 230:21, 232:12, 255:3, 333:25, 337:17, 339:5, 357:5, 357:8, 358:11, 368:8

knows [2] - 248:12, 374:6

Kolbasa [3] - 274:16, 344:11, 370:6

Kolbasa99 [1] -

342:22

Kraken [2] - 277:7, 277:9

## L

labels [1] - 231:4

lack [2] - 286:15, 292:9

laid [1] - 310:25

Lamborghinis [1] - 287:3

languages [3] - 322:24, 322:25, 323:4

large [6] - 245:10, 248:6, 268:25, 269:5, 304:14, 394:6

larger [6] - 231:17, 237:23, 298:4, 303:2, 303:5, 336:11

largest [1] - 236:17

Larry [3] - 279:11, 279:15

last [25] - 231:20, 232:1, 232:2, 253:21, 256:24, 267:8, 298:16, 301:10, 304:19, 304:22, 312:14, 317:23, 334:13, 336:22, 338:13, 343:24, 354:6, 360:9, 363:19, 368:14, 375:5, 379:9, 385:11, 387:17, 392:20

laundering [2] - 309:4, 321:7

Law [1] - 227:19

law [15] - 278:12, 278:17, 280:15, 280:18, 290:10, 306:2, 306:3, 306:9, 329:1, 329:11, 329:18, 332:22, 332:24, 333:21, 335:1

lawyers [1] - 381:16

LCX [1] - 256:9

lead [3] - 258:8, 259:10, 259:23

Leaseweb [1] - 367:15

least [7] - 236:2, 247:7, 267:12, 299:13, 315:4, 332:4, 378:22

leave [2] - 247:8, 392:18

led [2] - 356:14

ledger [5] - 254:9, 281:19, 304:14, 310:11, 310:12

ledgers [3] - 234:2, 310:7, 372:18

leeway [1] - 314:2

left [2] - 301:11, 368:19

left-hand [1] - 301:11

legal [3] - 332:25, 352:23, 353:1

legal-process [1] - 352:23

legitimate [3] - 286:17, 309:17, 346:7

length [1] - 371:20

lengthy [1] - 375:11

less [4] - 257:6, 257:9, 304:2, 339:5

level [10] - 247:21, 304:4, 322:1, 333:4, 336:14, 343:19, 344:15, 344:17, 348:2, 372:11

levels [1] - 378:3

liability [1] - 289:25

Liberty [14] - 274:13, 275:23, 276:7, 276:23, 285:1, 285:4, 285:8, 285:12, 285:16, 342:16, 342:21, 344:6, 344:12, 370:6

license [2] - 306:19, 306:20

lies [1] - 234:9

life [4] - 322:4, 388:14, 389:4

likely [22] - 233:14, 234:19, 273:24, 286:16, 304:11, 332:19, 333:24, 337:10, 343:20, 344:3, 344:5, 351:13, 368:5, 369:10, 369:12, 369:14, 369:23, 370:5, 377:19, 386:9, 390:11

likewise [2] - 349:22, 350:6

Limitations [1] - 303:22

limited [1] - 312:11

line [11] - 232:1, 307:8, 308:20, 309:15, 331:22, 333:14, 374:14, 374:15

lines [4] - 287:21, 291:15, 372:18, 374:1

link [5] - 270:18, 282:5, 295:18, 296:2, 355:5

linked [1] - 344:6

linking [1] - 283:20

links [1] - 292:11

list [24] - 241:3, 241:10, 241:11, 241:12, 253:16, 253:17, 261:17, 262:6, 265:2, 270:5, 323:2, 323:4, 334:7, 334:20, 336:11, 343:16, 369:10, 387:8, 387:10, 387:11, 388:4, 389:2, 389:6, 389:11

listed [10] - 241:8, 242:13, 258:3, 258:15, 261:8, 264:14, 296:18, 344:7, 367:24

lists [6] - 261:3, 295:23, 337:24, 387:3, 387:20, 387:21

literature [3] - 242:19, 242:24, 257:13

live [4] - 235:15, 255:15, 320:8, 327:16

lives [1] - 387:19

LocalBitcoin [1] - 308:12

LocalBitcoins [4] - 277:14, 278:2, 278:3, 308:8

located [2] - 331:7, 331:8

lockdown [1] - 393:24

log [8] - 282:18, 282:20, 284:25, 285:4, 320:15, 335:16, 354:13, 354:17

log-ins [1] - 320:15

logged [3] - 285:8, 285:16, 365:15

logging [5] - 332:15, 332:23, 350:11, 353:9

login [7] - 335:12, 338:7, 353:12, 353:24, 360:21, 360:25

logins [6] - 335:18, 338:8, 343:8,

343:11, 352:25, 363:24

logout [4] - 353:13, 353:19, 353:24, 364:1

logouts [1] - 353:15

logs [18] - 285:13, 320:14, 328:15, 329:4, 332:14, 332:19, 332:20, 333:9, 333:18, 339:7, 352:20, 352:21, 352:25, 353:2, 353:5, 353:16, 354:10

look [51] - 241:7, 241:13, 241:15, 246:25, 255:11, 255:17, 255:18, 255:22, 256:3, 261:6, 268:16, 269:17, 278:1, 279:10, 279:14, 285:9, 293:20, 296:7, 297:1, 298:8, 305:15, 307:24, 312:8, 318:17, 320:9, 324:20, 326:20, 327:11, 335:2, 335:8, 336:14, 336:17, 337:23, 338:4, 338:5, 339:4, 341:2, 348:21, 365:9, 374:13, 374:19, 375:8, 376:18, 377:1, 377:6, 383:5, 384:19

looked [16] - 254:15, 255:19, 290:10, 308:6, 308:23, 337:11, 337:13, 337:18, 337:20, 342:25, 354:1, 355:24, 357:12, 358:4, 360:20, 364:20

looking [24] - 241:19, 242:25, 251:22, 252:25, 254:23, 256:18, 271:2, 271:24, 272:11, 273:20, 278:21, 289:6, 290:14, 290:18, 298:10, 324:10, 329:4, 335:15, 335:21, 340:17, 352:13, 354:13, 364:19, 375:16

looks [3] - 244:14, 292:20, 328:1
lookup [3] - 326:22, 327:2, 327:4
losing [2] - 389:8, 390:20
love [1] - 234:2
low [2] - 256:16, 297:17
lowest [4] - 260:19, 266:24, 300:1, 300:2
lucky [1] - 378:21
lunch [3] - 293:14, 344:23, 345:7
Luxembourg [1] - 368:11
Luxembourgish [1] - 368:10

## M

M-a-z-a-r-i-n [1] - 317:24
ma'am [8] - 232:23, 245:4, 245:7, 248:18, 270:25, 274:23, 279:15, 283:14
machine [1] - 329:5
magic [1] - 341:7
main [1] - 331:1
maintain [1] - 362:10
maintained [1] - 334:5
majority [1] - 337:16
Maltego [6] - 359:1, 359:4, 359:5, 359:10, 359:17, 359:21
Malware [1] - 322:11
malware [1] - 322:12
Man [2] - 248:23, 302:19
management [1] - 229:20
manually [4] - 272:7, 272:9, 272:14, 273:24
manufacturing [1] - 319:10
market [5] - 236:24, 237:4, 237:5, 268:25, 293:1
marketplaces [1] - 308:2
markets [2] - 236:18, 237:4
marshal [1] - 394:24
marshall [1] - 394:18
Marshals [7] - 393:22, 394:3, 394:16,

395:6, 395:7, 395:12, 395:14
marshals [1] - 394:22
mask [1] - 280:20
masking [2] - 349:4, 350:3
match [5] - 236:9, 268:17, 268:19, 304:9, 384:2
matching [2] - 265:25, 267:2
material [1] - 315:9
math [1] - 381:19
matter [10] - 229:21, 229:22, 256:9, 350:9, 351:19, 366:16, 378:18, 383:20, 391:4, 393:5
matters [1] - 292:23
MAZARIN [3] - 228:8, 317:19, 345:14
Mazarin [6] - 286:2, 317:13, 317:21, 317:25, 324:3, 342:8
Mazars [11] - 317:13, 317:21, 317:25, 324:3, 342:8, 345:16, 352:5, 356:6, 356:25, 358:18, 367:4
MAZARS [4] - 228:8, 317:19, 317:24, 345:14
Mazars' [1] - 373:13
MDV [1] - 240:4
mean [24] - 233:9, 234:16, 243:6, 246:11, 246:19, 256:22, 274:15, 287:15, 302:15, 347:18, 352:16, 352:17, 353:11, 361:6, 361:20, 371:19, 372:2, 376:4, 376:8, 376:21, 379:8, 384:8, 386:5, 392:4
meaning [3] - 300:22, 301:20, 338:7
meaningful [1] - 363:10
means [5] - 296:11, 318:19, 375:9, 379:3, 380:4
meant [4] - 235:11, 338:17, 352:18, 368:21
Meantime [1] - 360:18
measure [3] - 298:21, 298:24, 299:7

measured [1] - 299:13
measures [2] - 299:7, 299:12
media [2] - 386:21, 386:25
Meets [1] - 259:10
Meiklejohn [20] - 257:20, 258:23, 259:12, 261:1, 261:5, 261:18, 262:18, 263:7, 263:11, 263:16, 265:4, 265:6, 269:10, 269:20, 269:23, 273:11, 297:2, 301:2, 303:20, 314:21
Meiklejohn's [15] - 258:20, 260:2, 260:6, 260:14, 260:20, 264:2, 265:18, 269:8, 294:22, 294:25, 296:5, 296:20, 299:24, 300:10, 302:12
member [1] - 318:18
members [7] - 265:12, 265:13, 327:5, 328:5, 328:10, 328:23, 334:7
memorandum [1] - 318:19
memory [1] - 241:18
Men [1] - 258:19
mention [1] - 229:19
mentioned [8] - 253:7, 253:20, 255:20, 264:21, 306:1, 313:5, 337:25, 362:5
mentioning [1] - 284:23
merger [3] - 292:21, 292:22, 292:24
merger-specific [1] - 292:22
mergers [1] - 293:2
mess [1] - 390:8
metadata [1] - 305:1
methodology [7] - 365:4, 365:18, 365:19, 365:20, 365:22, 366:7, 366:11
micro [3] - 343:19, 344:15, 344:17
micro-level [3] - 343:19, 344:15, 344:17
mixer [3] - 279:20, 305:17, 310:4
microanalysis [1] -

336:15
microphone [1] - 318:1
middle [2] - 334:19, 361:10
might [17] - 308:16, 324:20, 328:15, 334:15, 335:1, 338:15, 340:1, 371:8, 372:13, 377:4, 380:8, 383:12, 383:13, 388:2, 390:18, 391:9
Million [5] - 258:23, 260:15, 294:18, 295:15, 314:22
million [3] - 269:1, 269:3
Million' [2] - 295:17, 295:23
millions [4] - 313:8, 349:15, 349:18, 372:18
mind [4] - 231:8, 251:2, 372:13, 373:18
minute [4] - 253:12, 339:11, 339:12, 339:16
minutes [29] - 229:22, 288:17, 309:25, 312:25, 338:9, 338:10, 338:24, 338:25, 339:20, 339:21, 340:12, 340:13, 340:25, 341:11, 341:12, 362:16, 363:5, 363:11, 363:13, 364:12, 364:17, 365:1, 365:6, 365:7, 365:12, 365:13, 365:15, 371:8, 371:9
mirror [1] - 235:11
mischaracterizing [1] - 356:17
misclustering [1] - 243:12
misleading [2] - 316:18, 316:24
missing [7] - 251:13, 252:2, 252:7, 252:10, 253:2, 253:11, 308:13
Missouri [1] - 396:9
mistaken [1] - 243:16
mistakenly [1] - 244:15
mixer [3] - 279:20, 305:17, 310:4

mixers [7] - 309:3, 309:5, 309:12, 309:13, 309:17, 311:7, 311:15
mixing [3] - 270:17, 278:16, 279:3
mobile [1] - 322:22
Model [1] - 257:1
model [1] - 330:3
modeled [1] - 339:1
modeling [2] - 292:22, 293:2
moment [4] - 230:12, 293:9, 382:19, 392:12
Monday [1] - 390:3
monetary [1] - 304:6
money [2] - 309:4, 321:7
moniker [2] - 355:21, 357:6
monitoring [1] - 289:18
month [1] - 379:1
month-long [1] - 379:1
monthly [1] - 330:4
months [4] - 338:12, 338:14, 374:24
morning [11] - 229:6, 229:8, 229:9, 229:11, 229:13, 229:14, 229:15, 229:17, 230:4, 230:5, 317:21
MOSS [1] - 227:8
Moss's [1] - 356:25
most [15] - 236:2, 236:17, 243:18, 243:21, 248:2, 277:6, 336:18, 348:18, 363:10, 369:10, 369:12, 369:14, 370:5, 372:11, 394:21
mostly [2] - 339:1, 352:23
motion [2] - 370:22, 381:7
MOTIONS [2] - 227:4, 227:7
motions [2] - 370:19, 371:1
motivated [1] - 304:2
motivations [2] - 311:6, 311:14
move [6] - 293:22, 307:1, 311:18, 317:25, 347:10, 359:8

moves [5] - 262:23, 293:4, 323:22, 334:18, 341:25
moving [4] - 235:10, 289:25, 302:20, 371:4
MR [102] - 229:9, 229:12, 229:15, 234:5, 261:12, 263:1, 273:5, 274:3, 287:17, 287:24, 288:4, 292:6, 293:6, 294:2, 294:5, 295:5, 295:9, 297:12, 298:14, 299:18, 299:22, 306:21, 307:2, 307:3, 307:21, 307:24, 307:25, 309:11, 309:24, 310:2, 311:8, 311:16, 312:1, 312:5, 312:21, 313:1, 313:4, 313:17, 314:3, 316:23, 323:24, 342:3, 345:11, 345:15, 347:6, 347:10, 347:12, 350:18, 350:21, 351:11, 351:24, 352:3, 352:4, 355:3, 355:23, 356:4, 356:5, 356:23, 356:24, 357:18, 357:24, 358:17, 359:24, 360:2, 360:4, 360:5, 360:15, 362:23, 363:2, 365:17, 366:1, 366:5, 366:14, 367:2, 367:3, 370:10, 375:23, 376:5, 376:8, 376:13, 376:18, 376:24, 377:9, 379:6, 380:3, 381:8, 383:25, 384:3, 384:6, 384:16, 384:23, 385:4, 385:12, 385:17, 385:20, 390:21, 391:22, 392:4, 393:20, 395:15, 396:5, 396:16
MS [83] - 229:6, 229:25, 230:3, 233:6, 234:11, 234:13, 246:10, 247:25, 252:18,

254:5, 254:14, 261:9, 261:15, 262:23, 263:5, 268:5, 273:10, 274:5, 280:4, 281:6, 287:5, 287:12, 288:2, 288:8, 288:17, 288:21, 288:22, 292:8, 293:4, 293:9, 293:12, 293:17, 293:24, 309:9, 311:20, 312:17, 315:13, 316:10, 316:18, 317:12, 317:20, 323:22, 324:2, 326:3, 326:6, 326:10, 341:25, 342:7, 344:21, 350:16, 351:8, 354:25, 356:16, 357:15, 362:21, 366:20, 370:12, 370:17, 375:13, 377:16, 378:12, 378:17, 378:25, 379:24, 380:1, 383:20, 386:1, 386:7, 386:15, 388:16, 389:7, 389:11, 389:19, 389:22, 390:2, 391:9, 391:14, 391:20, 393:3, 393:13, 393:17, 396:8, 396:15
Mt [30] - 270:24, 271:7, 273:14, 273:22, 274:10, 274:14, 275:21, 275:22, 276:9, 276:10, 276:23, 284:25, 285:4, 285:8, 285:12, 285:16, 295:18, 296:3, 300:7, 300:14, 307:5, 307:11, 342:17, 342:21, 342:22, 344:5, 344:11, 344:12, 370:6
multiple [7] - 265:25, 309:11, 313:19, 313:20, 330:20, 336:5, 386:2
multiplied [1] - 298:24
must [3] - 255:1, 255:2, 310:11

## N

N.W [1] - 397:11
name [20] - 229:5, 260:5, 317:22, 317:23, 324:18, 327:25, 328:2, 337:22, 344:7, 350:15, 357:5, 358:4, 358:15, 358:20, 358:23, 361:3, 361:22, 387:23, 387:25
named [4] - 337:21, 356:14, 358:6
Names [1] - 258:20
names [5] - 334:2, 387:21, 388:2, 388:3, 389:3
native [8] - 277:1, 307:14, 308:3, 308:5, 353:2, 354:10, 354:13, 354:15
natives [5] - 237:5, 276:18, 276:21, 308:7, 308:10
nature [1] - 337:20
Navy [4] - 346:17, 346:19, 346:20, 346:25
nd [1] - 375:19
necessarily [12] - 233:21, 238:12, 248:15, 253:5, 278:25, 282:15, 282:18, 302:25, 303:1, 303:4, 329:8
necessary [3] - 352:1, 370:21, 375:10
need [46] - 229:21, 230:14, 233:25, 242:6, 246:8, 247:16, 248:18, 255:17, 258:13, 259:4, 264:13, 264:20, 277:16, 282:10, 284:19, 288:6, 288:15, 302:16, 308:8, 309:7, 309:20, 309:23, 325:21, 325:23, 341:4, 357:21, 366:22, 376:4, 376:6, 376:14, 376:18, 376:22, 377:22, 379:19, 381:2, 381:20, 382:10, 386:25, 387:2,

387:9, 387:15, 387:21, 387:23, 388:22, 392:19, 392:24
needed [1] - 372:20
needs [7] - 314:17, 339:4, 377:19, 387:6, 387:8, 388:8, 388:18
net [1] - 310:20
network [23] - 235:15, 320:3, 322:21, 328:18, 330:10, 330:17, 331:2, 331:4, 331:21, 333:6, 333:16, 334:12, 334:18, 340:14, 343:10, 346:10, 346:12, 346:17, 346:20, 347:1, 347:7, 348:20, 349:23
networked [1] - 330:18
neutral [2] - 388:6, 388:7
never [11] - 236:21, 236:25, 237:1, 275:22, 276:15, 276:19, 277:5, 284:4, 287:14, 291:12, 378:24
new [14] - 260:20, 265:11, 265:15, 265:16, 265:17, 296:20, 313:23, 313:24, 314:6, 318:14, 321:17, 339:24
New [2] - 227:17, 227:20
news [1] - 292:11
News [1] - 292:13
next [31] - 255:11, 270:11, 290:8, 293:23, 295:19, 295:20, 296:1, 296:19, 297:16, 299:25, 300:6, 300:16, 301:7, 314:15, 317:11, 364:25, 370:16, 370:18, 371:14, 374:19, 383:10, 387:19, 393:6, 396:9
Nfs9000 [2] - 274:16, 342:21
night [1] - 387:11
nine [1] - 374:23
nine-week [1] - 374:23

nobody [2] - 380:13, 384:7
node [26] - 280:24, 281:16, 281:17, 281:18, 331:10, 331:21, 332:3, 333:17, 333:20, 333:23, 334:10, 334:11, 334:13, 334:18, 334:22, 334:23, 334:24, 340:11, 340:13, 340:18, 340:20, 346:14, 361:12, 367:13
nodes [11] - 281:12, 281:21, 281:23, 281:25, 331:4, 334:3, 334:20, 334:21, 337:5, 340:15
nonalternate [1] - 382:22
noncustodial [1] - 290:24
none [9] - 266:1, 282:12, 283:23, 285:3, 354:9, 360:19, 360:22, 381:18, 387:15
nonwitness [2] - 386:6
normal [3] - 308:17, 308:23, 339:4
North [2] - 325:11, 325:15
not-for-profit [1] - 330:25
notably [1] - 295:25
note [4] - 287:13, 311:20, 314:7, 380:18
notes [7] - 275:15, 277:8, 277:17, 278:6, 285:9, 313:11, 397:5
nothing [10] - 285:10, 285:15, 285:18, 293:1, 358:6, 370:12, 387:5, 396:15, 396:16
notice [3] - 308:12, 335:22, 353:12
noticed [2] - 312:1, 391:24
novel [1] - 320:4
November [5] - 231:4, 231:14, 237:11, 239:12, 337:1
nowhere [4] - 259:6,

259:17, 262:12, 272:17

**nuance** [1] - 282:14
**nuances** [1] - 377:12
**Number** [2] - 369:23, 370:1
**number** [31] - 247:2, 248:6, 248:8, 248:9, 258:1, 258:2, 262:6, 266:12, 297:3, 299:10, 299:14, 304:23, 305:9, 305:22, 308:13, 310:8, 321:17, 322:25, 324:20, 335:12, 348:22, 349:10, 350:9, 365:8, 369:11, 380:23, 381:20, 381:23, 389:12, 391:6
**numbered** [1] - 388:13
**numbers** [10] - 263:6, 263:10, 288:24, 327:10, 342:9, 345:25, 379:17, 379:21, 380:19, 384:1
**Numbers** [1] - 326:7
**numerous** [6] - 250:5, 278:12, 326:23, 336:7, 349:7, 350:6
**NW** [4] - 227:11, 227:14, 227:17, 227:23
**NY** [1] - 227:20

**O**

**O-m-e-d-e-t-o-u** [1] - 355:12
**obfuscate** [1] - 305:23
**object** [3] - 316:4, 316:6
**objection** [23] - 234:5, 262:25, 263:1, 273:5, 274:3, 293:5, 293:6, 309:9, 311:21, 312:17, 323:23, 323:24, 342:2, 342:3, 350:16, 351:8, 354:25, 356:16, 357:15, 357:19, 362:21, 386:14
**objections** [1] - 377:21
**obligations** [1] - 392:23
**obscure** [2] - 279:25,

280:1
**observation** [1] - 370:9
**observations** [2] - 282:12, 283:17
**observe** [1] - 269:10
**observed** [2] - 364:17, 365:5
**observer** [2] - 254:19, 254:23
**obtained** [1] - 352:23
**obvious** [2] - 278:24, 279:6
**obviously** [5] - 378:18, 382:25, 386:13, 387:3, 388:8
**occur** [1] - 243:22
**occurred** [3] - 338:8, 363:10, 365:5
**occurrence** [2] - 250:2, 340:4
**occurrences** [4] - 327:24, 353:16, 357:7, 364:19
**October** [7] - 282:9, 283:17, 284:15, 284:21, 390:13, 391:8, 391:10
**OF** [8] - 227:1, 227:2, 227:7, 230:1, 294:3, 317:18, 345:13, 397:1
**OFAC** [3] - 287:15, 287:20, 288:4
**offer** [12] - 247:16, 286:14, 287:16, 289:17, 305:14, 327:2, 329:25, 351:20, 352:2, 376:22, 393:14
**offered** [4] - 238:16, 311:14, 372:14, 374:4
**offering** [2] - 313:23, 359:4
**offerings** [2] - 359:10, 359:17
**Office** [3] - 318:3, 318:6, 318:18
**office** [1] - 318:4
**OFFICIAL** [1] - 397:1
**Official** [2] - 227:22, 397:10
**official** [1] - 333:24
**officially** [1] - 377:20
**often** [10] - 245:13, 250:8, 327:5, 329:18, 330:4, 330:8, 333:4, 333:13, 335:19,

392:6
**oftentimes** [1] - 305:2
**OIG** [3] - 318:14, 318:19, 318:22
**old** [1] - 337:14
**Omedetou** [2] - 355:10, 355:12
**on-chain** [3] - 290:16, 309:6, 309:8
**once** [1] - 333:14
**one** [85] - 229:19, 230:12, 231:13, 232:2, 236:17, 240:4, 243:18, 246:14, 246:20, 246:22, 246:24, 246:25, 248:2, 250:25, 251:2, 253:7, 253:8, 258:9, 264:15, 264:24, 265:3, 265:4, 265:6, 265:7, 266:23, 267:8, 268:4, 279:15, 279:20, 279:21, 280:19, 281:21, 290:14, 291:8, 295:14, 300:17, 302:3, 305:1, 305:14, 305:20, 309:18, 310:9, 312:6, 314:9, 314:16, 332:3, 338:7, 338:13, 339:7, 342:12, 344:17, 348:8, 349:4, 350:17, 351:3, 352:20, 355:5, 355:9, 359:5, 359:11, 364:24, 368:3, 368:18, 371:2, 375:4, 375:23, 377:4, 377:9, 379:3, 380:25, 382:7, 382:8, 382:14, 385:5, 385:6, 387:22, 388:22, 391:25, 393:3, 394:5, 395:8, 395:24, 396:8
**one's** [2] - 321:11, 321:13
**one-off** [1] - 351:3
**ones** [5] - 242:13, 300:1, 301:18, 338:23, 366:3
**ongoing** [1] - 284:10
**onion** [1] - 305:10
**Onion** [1] - 330:17
**online** [10] - 320:3,

321:12, 321:22, 322:4, 326:23, 337:16, 339:1, 339:25, 346:5
**onward** [2] - 324:22, 333:7
**open** [3] - 310:17, 373:14, 374:7
**open-source** [1] - 310:17
**opening** [1] - 381:13
**openings** [4] - 390:3, 390:6, 390:22, 391:2
**operating** [3] - 276:5, 280:23, 376:11
**operational** [5] - 321:1, 321:8, 321:15, 321:20, 345:17
**operationally** [1] - 322:3
**operations** [2] - 321:23, 322:8
**operators** [2] - 269:12, 279:3
**opinion** [8] - 286:14, 302:3, 308:22, 355:24, 363:18, 370:23, 374:22, 374:25
**opinions** [4] - 313:23, 313:24, 356:8, 356:21
**opportunity** [3] - 309:22, 381:13, 381:15
**opposed** [2] - 254:24, 339:22
**OPSEC** [5] - 321:20, 345:19, 345:21, 345:23, 346:8
**option** [1] - 377:25
**options** [2] - 247:3, 330:12
**order** [12] - 234:1, 243:15, 248:15, 269:13, 305:10, 330:18, 380:25, 381:20, 385:14, 385:23, 387:10, 387:21
**organization** [2] - 325:6, 330:25
**organizational** [1] - 337:4
**organizations** [3] - 326:15, 327:8, 331:6
**organized** [1] - 302:14
**original** [1] - 394:18
**originating** [1] - 350:3

**otherwise** [4] - 252:21, 334:11, 337:3, 375:18
**ought** [1] - 378:2
**ourselves** [1] - 391:7
**outermost** [1] - 334:13
**output** [10] - 230:25, 243:8, 255:9, 265:3, 267:11, 300:21, 303:4, 303:5, 304:17, 305:18
**outputs** [4] - 256:2, 300:18, 300:21, 305:18
**outside** [8] - 309:10, 339:12, 339:16, 341:5, 344:18, 356:18, 363:17, 395:10
**overall** [2] - 336:16, 353:1
**overexpansive** [1] - 387:20
**Overlap** [1] - 360:7
**overlap** [19] - 352:10, 352:16, 352:18, 354:2, 354:11, 356:22, 362:15, 363:3, 363:4, 363:5, 363:8, 363:9, 363:13, 363:14, 364:6, 364:12, 365:4, 366:11, 384:14
**overly** [1] - 387:13
**overruled** [2] - 273:6, 274:4
**own** [16] - 246:5, 247:8, 263:13, 264:7, 264:11, 264:18, 281:12, 295:4, 305:15, 321:10, 329:22, 337:4, 339:1, 350:24, 388:7, 395:23
**owned** [1] - 361:17
**ownership** [1] - 305:4

**P**

**p.m** [5] - 345:7, 366:18, 396:18
**P2PK** [2] - 252:11, 252:13
**P2PKH** [1] - 252:14
**Pac** [2] - 248:23, 302:19
**Pac-Man** [2] - 248:23, 302:19

packed [1] - 393:11
page [113] - 230:8, 230:15, 230:16, 231:2, 231:19, 231:24, 233:11, 234:17, 235:19, 237:18, 239:12, 239:23, 242:7, 244:2, 244:10, 249:6, 251:4, 251:6, 251:23, 251:25, 252:3, 252:5, 252:6, 253:21, 253:22, 254:1, 254:2, 256:7, 256:18, 258:18, 261:17, 261:23, 262:2, 262:3, 264:2, 265:2, 265:21, 266:17, 266:21, 269:8, 269:17, 270:3, 270:20, 271:1, 271:5, 271:15, 271:24, 272:4, 272:11, 280:22, 281:4, 281:7, 286:3, 286:4, 286:10, 286:11, 286:12, 287:12, 287:17, 288:1, 288:23, 288:24, 289:6, 289:7, 290:8, 291:24, 292:4, 292:5, 292:6, 292:24, 294:21, 294:22, 294:24, 294:25, 295:1, 295:11, 296:4, 296:9, 298:15, 299:19, 299:24, 300:9, 302:5, 303:19, 312:8, 342:8, 342:9, 343:23, 343:24, 352:12, 352:13, 352:14, 358:25, 359:23, 360:6, 361:10, 363:20, 364:3, 367:6, 367:9, 368:3, 368:13, 368:14, 369:2, 369:6, 369:9
PAGE [2] - 228:2, 228:12
Page [1] - 292:7
pages [6] - 230:23, 261:22, 272:7, 389:15, 389:16, 389:17
panel [3] - 384:6, 384:7, 384:11

paper [38] - 257:12, 257:19, 258:11, 258:16, 258:20, 258:21, 258:25, 259:2, 259:6, 259:11, 259:14, 259:16, 259:17, 259:21, 259:23, 260:1, 260:6, 260:8, 260:11, 260:20, 260:22, 260:24, 261:1, 261:3, 261:8, 262:12, 267:22, 268:2, 269:8, 269:23, 270:3, 270:20, 271:2, 273:12, 300:10, 303:10, 366:10, 372:22
papers [5] - 258:5, 258:9, 265:16, 366:6, 392:7
paragraph [25] - 250:21, 256:22, 256:24, 265:1, 269:9, 269:17, 269:18, 270:4, 270:5, 271:10, 271:11, 274:7, 288:3, 295:15, 295:16, 298:16, 299:20, 300:12, 300:13, 301:10, 303:22, 303:24, 312:9, 354:7, 360:10
paragraphs [2] - 295:12, 365:8
paralegals [1] - 389:23
parameters [2] - 264:5, 265:21
part [19] - 233:1, 235:3, 255:15, 277:4, 282:21, 291:2, 295:5, 302:7, 315:1, 320:21, 324:9, 328:18, 334:25, 335:11, 335:25, 341:14, 356:3, 356:7, 369:15
participate [1] - 334:16
particular [26] - 268:22, 281:2, 298:1, 303:3, 305:5, 311:2, 322:23, 329:2, 329:7, 338:19, 339:15, 340:18, 340:24, 341:7, 343:1,

353:19, 354:23, 355:22, 360:25, 361:21, 362:5, 370:4, 373:24, 374:7, 377:11, 381:15
particularly [4] - 343:13, 375:11, 378:2, 388:11
parties [2] - 374:8, 388:6
party [1] - 304:2
pas [9] - 237:19, 237:21, 237:25, 238:3, 238:7, 238:25, 239:3, 239:18, 242:5
pass [2] - 370:10, 382:5
passed [2] - 341:4, 383:1
Passive [7] - 327:20, 327:23, 328:4, 328:9, 337:11, 337:23, 343:7
passive [1] - 327:24
past [3] - 327:12, 327:18, 386:11
pasted [1] - 251:1
pattern [1] - 308:22
patterns [3] - 242:17, 243:15, 320:16
pause [4] - 290:18, 290:22, 291:2, 360:2
pay [2] - 305:18, 330:3
Pay [5] - 252:9, 252:11, 252:15, 252:23, 254:20
Pay-to-Public-Key [3] - 252:9, 252:11, 252:15
Pay-to-Script-Hash [2] - 252:23, 254:20
PayJoin [2] - 246:24, 288:2
payment [1] - 249:11
Payments [1] - 258:19
payouts [2] - 278:24, 279:6
PDF [2] - 231:17, 272:5
Pearlman [1] - 229:12
PEARLMAN [10] - 227:15, 229:12, 384:3, 384:6, 384:16, 384:23, 385:4, 385:12, 385:17, 385:20
Peel [7] - 258:23, 260:15, 294:18,

295:15, 295:17, 295:23, 314:21
peel [28] - 248:23, 249:2, 249:7, 249:8, 249:14, 249:18, 249:20, 249:22, 250:2, 250:3, 250:5, 250:18, 250:20, 250:21, 250:22, 250:25, 251:6, 251:7, 251:8, 251:11, 251:12, 251:15, 251:17, 296:20, 302:11, 302:23, 303:2, 304:8
peer [2] - 302:17, 366:6
peer-reviewed [2] - 302:17, 366:6
PELKER [84] - 227:13, 229:6, 229:25, 230:3, 233:6, 234:11, 234:13, 246:10, 247:25, 252:18, 254:5, 254:14, 261:9, 261:15, 262:23, 263:5, 268:5, 273:10, 274:5, 280:4, 281:6, 287:5, 287:12, 288:2, 288:8, 288:17, 288:21, 288:22, 292:8, 293:4, 293:9, 293:12, 293:17, 293:24, 309:9, 311:20, 312:17, 315:13, 316:10, 316:18, 317:12, 317:20, 323:22, 324:2, 326:3, 326:6, 326:10, 341:25, 342:7, 344:21, 350:16, 351:8, 354:25, 356:16, 357:15, 362:21, 366:20, 370:12, 370:17, 375:13, 377:16, 378:12, 378:17, 378:25, 379:24, 380:1, 383:20, 386:1, 386:7, 386:15, 388:16, 389:7, 389:11, 389:19, 389:22, 390:2, 391:9, 391:14, 391:20, 393:3, 393:13, 393:17, 396:8, 396:15

Pelker [10] - 228:5, 228:9, 229:6, 229:24, 230:5, 247:8, 261:14, 375:12, 379:21, 389:2
Pelker's [1] - 247:5
pen [1] - 372:22
pen-and-paper [1] - 372:22
penetration [1] - 322:20
Pennsylvania [1] - 227:14
people [25] - 279:24, 309:3, 309:5, 309:7, 310:7, 311:2, 311:6, 311:12, 311:14, 321:14, 330:14, 339:2, 340:19, 345:19, 346:14, 349:7, 349:18, 350:6, 350:9, 384:8, 388:1, 392:23, 393:1, 395:14, 395:18
people's [1] - 331:12
perceive [1] - 382:10
percent [12] - 258:12, 259:3, 259:7, 259:17, 262:13, 266:24, 270:10, 270:12, 295:25, 316:19, 351:15
peremptory [1] - 384:21
perform [1] - 336:15
performed [1] - 242:13
performing [3] - 254:8, 301:22, 304:3
perhaps [4] - 269:11, 302:8, 351:16, 371:24
period [6] - 236:19, 282:13, 283:13, 321:17, 337:13, 363:24
permissible [1] - 374:16
permission [1] - 386:9
person [15] - 247:23, 310:16, 316:1, 333:2, 333:3, 333:11, 333:12, 339:13, 341:11, 379:3, 383:11, 383:12, 386:10, 387:18, 387:24
person's [1] - 310:18

personal [2] - 350:14, 350:22
personally [1] - 235:17
personas [1] - 322:4
pertained [1] - 283:13
pertains [1] - 324:7
pertinent [1] - 312:13
PeterNFS [2] - 344:12, 370:6
Philadelphia [1] - 236:10
phone [5] - 281:14, 321:16, 324:20, 327:10, 345:24
phones [1] - 322:22
PHP [1] - 323:6
phrase [2] - 352:18, 353:8
phrases [1] - 377:11
physical [1] - 310:22
physicist [1] - 374:5
pick [4] - 348:3, 390:11, 390:16, 390:24
picked [2] - 362:19, 362:22
piece [1] - 395:20
pierce [1] - 321:19
PII [2] - 274:18, 274:20
pivoting [1] - 329:6
place [2] - 267:4, 267:12
placed [2] - 267:10, 267:13
placeholder [1] - 389:20
Plaintiff [2] - 227:3, 227:10
plan [3] - 315:23, 377:22, 392:13
plans [1] - 395:24
plasma@ plasmadivision [1] - 344:7
PlasmaDivision [1] - 342:17
platforms [1] - 289:19
play [1] - 305:24
playing [1] - 234:10
PLLC [1] - 227:19
plot [1] - 359:7
podium [1] - 229:4
Point [7] - 369:3, 369:6, 369:9, 369:21, 369:23, 370:1, 370:3
point [36] - 234:12, 251:15, 253:13, 255:19, 256:22,

258:11, 259:2, 260:2, 261:7, 263:18, 265:1, 279:15, 280:11, 284:1, 287:10, 287:25, 292:9, 293:14, 306:22, 309:18, 311:11, 311:22, 311:24, 313:23, 315:8, 327:9, 355:5, 366:13, 375:21, 377:22, 382:23, 383:3, 391:20, 393:3, 396:8
pointed [1] - 270:5
pointing [3] - 238:3, 256:1, 259:22
points [10] - 336:17, 338:4, 341:2, 353:9, 359:7, 365:14, 371:10, 371:22, 389:6, 389:7
Points [1] - 368:25
Poloniex [3] - 277:21, 277:24, 277:25
pool [3] - 326:12, 383:8, 383:9
population [1] - 394:14
portion [4] - 236:18, 341:22, 365:3, 395:8
portions [1] - 315:3
position [3] - 287:7, 318:9, 377:1
positive [2] - 297:24, 304:12
positives [3] - 297:22, 301:17, 315:18
possibility [2] - 282:22, 393:22
possible [22] - 236:6, 243:11, 244:23, 249:24, 250:13, 257:11, 280:21, 305:5, 308:16, 310:19, 329:15, 337:2, 348:11, 348:25, 351:13, 361:6, 366:24, 371:12, 371:25, 384:13, 391:1, 395:1
possibly [7] - 240:18, 269:6, 336:2, 336:3, 368:8, 373:24, 375:19
post [4] - 355:10, 361:23, 371:15, 392:1
post-trial [1] - 392:1

potential [1] - 319:15
potentially [3] - 253:18, 377:9, 379:1
PowerPoint [2] - 247:11, 289:5
practice [4] - 321:11, 345:21, 345:23, 346:8
pre [1] - 326:25
predictable [1] - 269:11
prefer [2] - 310:9, 388:16
preferred [1] - 339:7
preliminarily [1] - 374:2
preliminary [7] - 371:3, 371:15, 373:14, 373:22, 374:10, 374:18, 391:1
prep [3] - 371:4, 371:5, 371:13
preparation [4] - 257:22, 312:15, 373:12, 374:18
prepare [1] - 341:16
prepared [2] - 306:20, 341:20
preparing [1] - 262:10
present [3] - 229:16, 252:7, 351:25
presentation [2] - 247:12, 390:11
presented [1] - 316:21
presenting [1] - 390:18
preserve [4] - 309:5, 309:8, 310:8, 310:20
press [2] - 339:23, 340:15
prestaged [1] - 326:25
presumably [1] - 355:19
pretend [1] - 382:19
pretrial [22] - 371:2, 371:8, 371:17, 372:1, 372:9, 374:20, 375:3, 375:15, 379:14, 379:16, 385:21, 385:23, 387:9, 387:11, 388:9, 392:16, 392:17, 392:18, 393:5, 395:9, 395:18, 396:12
pretty [1] - 250:2
previous [5] - 253:1, 270:7, 270:8,

270:19, 286:23
previously [4] - 245:11, 248:1, 257:24, 326:4
primarily [4] - 322:2, 328:14, 328:21, 337:18
primary [1] - 312:11
principal [3] - 372:2, 382:17, 382:21
print [1] - 389:14
printed [1] - 389:15
printers [1] - 389:23
prison [1] - 396:3
privacy [10] - 247:2, 258:7, 309:5, 309:8, 310:4, 310:8, 310:9, 310:20, 330:12, 330:19
privacy-conscious [1] - 310:9
private [6] - 304:13, 306:25, 330:10, 337:21, 343:10, 349:23
probability [5] - 351:12, 363:16, 364:7, 369:13, 369:25
probability-based [1] - 351:12
probable [9] - 362:15, 363:3, 363:5, 363:7, 363:8, 363:15, 364:6, 364:12, 365:4
problem [7] - 230:14, 246:21, 246:22, 302:20, 382:2, 382:4, 395:16
problems [1] - 394:11
Procedure [1] - 381:23
procedures [1] - 375:3
proceed [3] - 294:1, 367:1, 388:15
proceeding [6] - 378:5, 388:13, 391:21, 392:2, 392:7, 392:10
proceedings [2] - 366:19, 397:6
process [8] - 281:1, 332:25, 352:23, 353:1, 370:16, 371:6, 383:18, 393:19
produce [3] - 275:4, 295:21, 313:14
produced [3] - 306:11, 313:8, 314:8

produces [1] - 295:22
product [3] - 275:4, 291:10, 359:10
products [1] - 359:4
profess [5] - 258:11, 259:2, 259:6, 259:17, 262:13
professional [3] - 322:5, 363:17, 363:18
Professor [1] - 301:2
profiles [1] - 322:2
profit [2] - 280:9, 330:25
profits [4] - 279:9, 279:14, 280:7, 280:11
program [2] - 359:1, 359:3
programmer [1] - 319:23
programming [2] - 322:23, 323:4
Project [7] - 330:23, 330:24, 334:5, 334:15, 335:25, 346:13, 361:15
project [1] - 334:17
Project's [1] - 333:24
prominently [1] - 355:14
prompt [1] - 326:24
prone [2] - 301:6, 301:17
proper [2] - 257:8, 349:18
properly [2] - 233:18, 234:1
properties [1] - 391:24
proposals [3] - 265:11, 265:15, 265:16
propose [4] - 269:23, 370:25, 371:7, 378:16
proposed [3] - 371:15, 372:6
proprietary [1] - 306:25
prosecution [2] - 290:10, 307:19
prospective [5] - 380:16, 380:24, 387:16, 390:10, 392:19
protect [3] - 310:22, 346:5, 346:6
protecting [1] - 321:11
protocol [4] - 235:12,

326:21, 326:22, 347:15

**prototyping** [1] - 319:13

**prove** [1] - 285:17

**provide** [9] - 277:3, 291:9, 318:20, 322:3, 330:11, 330:19, 348:1, 370:8, 384:19

**provided** [19] - 234:25, 235:1, 235:2, 235:5, 236:9, 236:12, 239:9, 244:25, 245:2, 245:3, 247:12, 276:21, 283:21, 298:25, 308:1, 308:14, 310:16, 352:23, 354:4

**provider** [7] - 325:18, 330:7, 361:17, 362:8, 363:21, 367:15, 368:10

**providers** [3] - 325:19, 326:14, 327:1

**provides** [1] - 335:6

**proxies** [4] - 329:25, 335:1, 338:23, 340:22

**proxy** [29] - 329:22, 329:23, 330:5, 330:11, 331:24, 332:3, 333:2, 333:4, 333:6, 333:10, 336:2, 337:8, 337:17, 338:10, 338:22, 339:2, 339:7, 339:22, 349:1, 349:4, 349:8, 349:19, 350:10, 361:23, 362:5, 362:11, 362:12, 362:13, 364:15

**pseudo** [1] - 310:14

**pseudo-anonymous** [1] - 310:14

**Public** [3] - 252:9, 252:11, 252:15

**public** [5] - 252:16, 271:9, 271:19, 299:2, 304:15

**publicly** [5] - 270:22, 271:6, 306:12, 306:13, 361:22

**pull** [8] - 230:17, 241:15, 242:6, 255:14, 274:19, 275:11, 320:10, 321:3

**pulled** [4] - 245:6, 271:20, 271:22, 342:19

**pulls** [1] - 236:12

**punitive** [1] - 394:13

**purchases** [1] - 286:16

**purely** [1] - 354:2

**purposes** [9] - 306:15, 309:20, 310:4, 329:3, 342:4, 351:25, 356:21, 357:20, 382:12

**pursuing** [1] - 329:3

**push** [1] - 379:2

**pushing** [1] - 396:11

**put** [13] - 265:12, 268:6, 268:9, 271:25, 316:19, 353:18, 366:2, 371:21, 377:23, 380:21, 388:3, 389:20

**putting** [2] - 282:22, 375:9

**Python** [1] - 323:6

## Q

**Qassam** [4] - 288:10, 289:14, 290:10, 290:12

**qualification** [1] - 265:7

**qualifications** [3] - 265:5, 323:10, 347:4

**qualified** [8] - 287:2, 310:25, 311:1, 312:24, 351:20, 352:2, 355:19, 382:3

**qualifies** [1] - 375:25

**qualify** [2] - 381:20, 381:25

**queried** [1] - 328:5

**queries** [2] - 322:21, 327:18

**query** [2] - 327:4, 327:16

**querying** [1] - 328:5

**questioning** [4] - 307:8, 308:20, 309:16

**questions** [22] - 293:12, 307:4, 307:20, 308:15, 309:7, 309:12, 313:17, 316:8, 344:21, 351:3, 375:2, 380:20, 380:22, 381:1,

381:4, 381:11, 383:18, 384:3, 385:20, 389:24, 390:1, 393:18

**quick** [2] - 296:7, 384:4

**quickly** [5] - 273:25, 310:24, 338:17, 339:23, 389:8

**quite** [9] - 314:23, 336:15, 352:15, 355:17, 370:20, 371:21, 373:24, 374:11, 378:21

**quote** [4] - 233:17, 261:19, 308:16, 310:10

**quote-unquote** [2] - 308:16, 310:10

**quoted** [2] - 233:18, 255:3

## R

**race** [1] - 382:11

**radar** [1] - 314:17

**raise** [4] - 317:14, 381:5, 387:18, 393:21

**raises** [1] - 370:22

**raising** [1] - 395:11

**ran** [2] - 300:6

**RANDOLPH** [1] - 227:8

**random** [1] - 379:17

**randomization** [1] - 304:4

**randomize** [1] - 305:17

**randomized** [1] - 304:8

**randomizing** [1] - 304:2

**randomly** [1] - 325:3

**range** [6] - 295:24, 302:4, 317:1, 320:25, 347:25, 348:4

**ranges** [1] - 331:5

**ranging** [3] - 295:24, 297:3, 297:5

**ransomware** [1] - 270:15

**rapport** [1] - 381:15

**rate** [28] - 256:15, 256:19, 258:12, 258:15, 259:3, 259:7, 259:18, 260:19, 262:13, 266:25, 270:10,

270:11, 296:1, 297:1, 297:7, 297:8, 297:14, 297:16, 297:20, 297:23, 298:3, 298:5, 298:7, 300:1, 300:2, 316:20

**rates** [16] - 261:3, 261:7, 262:20, 295:24, 296:14, 296:17, 296:19, 296:22, 297:3, 297:5, 302:4, 303:8, 303:16, 303:18, 317:1, 317:4

**rather** [4] - 261:13, 267:14, 287:23, 396:11

**rating** [1] - 289:20

**raw** [1] - 305:1

**reach** [3] - 300:15, 378:6, 394:22

**Reactor** [3] - 299:1, 303:6, 306:13

**read** [53] - 242:24, 249:15, 255:6, 256:24, 257:16, 257:17, 257:22, 258:5, 258:9, 258:25, 259:14, 259:16, 259:20, 259:21, 260:16, 260:17, 260:21, 260:24, 262:9, 262:19, 262:22, 263:19, 264:8, 264:13, 264:20, 265:21, 267:21, 268:2, 269:15, 270:4, 270:6, 271:2, 271:10, 274:6, 279:11, 279:16, 286:9, 286:24, 292:14, 292:24, 295:11, 295:15, 298:9, 300:13, 301:13, 303:24, 305:16, 311:5, 312:10, 359:6, 368:11, 371:19, 380:17

**reading** [9] - 249:16, 250:19, 255:2, 266:15, 270:13, 292:3, 299:4, 299:19, 301:12

**reads** [3] - 249:9, 257:1, 286:6

**ready** [2] - 367:4, 374:20

**real** [7] - 237:7, 296:7,

321:13, 322:4, 327:17, 358:4, 384:4

**real-name** [1] - 358:4

**real-time** [1] - 327:17

**real-world** [1] - 321:13

**realistic** [1] - 392:21

**realize** [1] - 384:13

**really** [17] - 233:25, 247:15, 264:7, 264:14, 277:16, 280:5, 297:17, 309:19, 313:22, 373:6, 373:16, 373:23, 374:4, 374:9, 377:2, 377:13

**reason** [6] - 339:4, 346:19, 346:23, 346:24, 355:4, 395:8

**reasonable** [1] - 279:20

**reasoning** [1] - 372:9

**reasons** [7] - 309:3, 310:8, 321:15, 334:14, 340:14, 346:7, 394:5

**rebuttal** [2] - 376:22, 376:23

**recalling** [1] - 256:8

**receive** [1] - 321:18

**received** [5] - 233:14, 240:4, 240:18, 308:5, 322:15

**receives** [1] - 254:25

**Recently** [1] - 291:25

**Recess** [1] - 366:18

**recess** [2] - 293:25, 345:7

**recognize** [1] - 323:14

**recognized** [1] - 354:17

**recollecting** [1] - 284:8

**recollection** [1] - 395:5

**record** [18] - 229:5, 299:18, 310:13, 311:21, 314:7, 326:2, 327:7, 327:14, 327:20, 327:24, 328:1, 329:7, 329:8, 360:16, 360:21, 382:10, 382:12, 383:21

**recorded** [2] - 360:25, 367:21

**records** [38] - 233:25, 236:8, 236:10, 236:11, 236:21, 236:25, 237:1,

237:3, 239:8, 239:18, 239:21, 242:3, 242:6, 275:17, 275:21, 275:22, 276:1, 276:2, 276:15, 276:17, 276:18, 276:19, 276:23, 276:25, 277:3, 277:23, 307:5, 307:6, 307:7, 307:11, 307:14, 307:17, 335:12, 336:16, 342:15, 342:17, 343:17, 361:15

**red** [3] - 237:23, 322:20, 354:20

**redirect** [2] - 288:20, 293:22

**REDIRECT** [1] - 294:3

**Redirect** [1] - 228:6

**reduce** [1] - 336:16

**refer** [5] - 247:11, 277:23, 280:23, 302:21, 302:22

**reference** [13] - 250:19, 251:2, 258:1, 258:2, 258:21, 261:21, 266:15, 278:6, 285:22, 301:5, 361:24, 362:8, 376:15

**referenced** [9] - 257:17, 258:23, 259:11, 259:12, 259:13, 260:1, 260:9, 274:23, 328:23

**references** [1] - 262:14

**referencing** [3] - 236:11, 262:16, 273:19

**referring** [16] - 231:6, 233:19, 261:1, 261:5, 283:14, 283:16, 289:8, 291:11, 302:5, 310:6, 310:12, 314:21, 352:21, 352:22, 363:15, 369:21

**refers** [2] - 250:18, 304:24

**regard** [1] - 372:1

**regarding** [7] - 256:12, 275:4, 283:19, 286:4,

306:9, 316:11, 373:7

**regardless** [1] - 385:1

**region** [1] - 325:11

**regional** [1] - 326:17

**Regional** [4] - 325:9, 325:10, 325:13, 326:7

**registered** [5] - 355:9, 357:4, 358:14, 358:19, 358:23

**registering** [1] - 301:21

**registration** [3] - 357:1, 357:10, 358:5

**registries** [1] - 326:17

**Registries** [2] - 325:9, 326:8

**Registry** [2] - 325:10, 325:13

**registry** [2] - 325:23, 357:9

**regular** [3] - 331:16, 332:8, 334:11

**regularly** [1] - 334:7

**rel** [1] - 236:18

**relate** [1] - 253:10

**related** [17] - 248:7, 274:25, 276:18, 285:23, 296:22, 309:7, 309:16, 310:7, 310:21, 313:1, 314:10, 322:12, 322:16, 342:9, 355:1, 355:21, 358:6

**relatedness** [1] - 370:9

**relating** [3] - 296:20, 311:4, 333:19

**relation** [6] - 300:4, 307:10, 308:2, 354:23, 364:2, 376:1

**relatively** [2] - 269:5, 304:4

**relay** [2] - 323:19, 334:18

**relevance** [1] - 287:8

**relevant** [10] - 236:18, 263:24, 282:13, 322:5, 324:21, 338:16, 351:17, 355:7, 355:18, 357:17

**reliable** [3] - 242:23, 245:24, 256:10

**reliably** [1] - 243:1

**reliance** [2] - 316:6, 316:11

**relied** [6] - 292:1, 328:10, 328:23,

334:7, 356:20, 357:23

**relies** [1] - 314:19

**rely** [9] - 245:25, 261:4, 304:15, 304:17, 306:4, 315:1, 315:3, 315:25, 358:2

**relying** [3] - 272:21, 273:1, 315:22

**remain** [1] - 310:10

**remained** [1] - 378:12

**remaining** [1] - 383:8

**remains** [1] - 249:3

**remember** [7] - 241:19, 301:15, 342:23, 354:16, 361:5, 364:4, 381:6

**remind** [2] - 254:4, 385:14

**removed** [1] - 290:3

**rent** [1] - 394:11

**rent-a-state** [1] - 394:11

**repeat** [6] - 254:22, 260:10, 263:9, 267:8, 270:25, 285:14

**repeatedly** [2] - 260:8, 260:9

**report** [140] - 230:6, 230:23, 231:17, 231:19, 232:9, 233:12, 233:16, 233:19, 234:23, 235:3, 235:4, 235:20, 236:13, 237:10, 237:11, 237:18, 239:11, 239:23, 240:1, 240:2, 241:17, 242:7, 242:14, 244:3, 245:5, 249:6, 250:23, 251:3, 251:22, 251:23, 253:21, 255:2, 255:16, 255:25, 256:7, 256:18, 257:12, 257:22, 258:1, 258:3, 258:22, 260:8, 260:9, 260:12, 260:19, 261:16, 261:23, 262:1, 262:10, 263:6, 263:10, 263:19, 264:1, 264:3, 264:14, 264:19, 264:23, 265:19, 266:21, 266:23,

267:23, 268:7, 268:9, 268:13, 269:22, 272:4, 272:17, 275:2, 277:12, 277:18, 278:9, 280:22, 281:4, 283:10, 285:10, 285:15, 285:18, 285:25, 286:4, 286:6, 287:11, 287:12, 287:19, 291:24, 294:13, 294:23, 294:25, 295:1, 295:4, 295:10, 296:15, 296:18, 299:24, 301:1, 301:5, 303:20, 304:25, 306:16, 311:10, 311:15, 311:22, 312:7, 312:11, 312:15, 313:12, 314:6, 314:10, 314:19, 314:24, 314:25, 315:2, 316:5, 316:12, 338:19, 341:16, 341:19, 342:20, 343:14, 343:16, 343:19, 343:24, 347:5, 351:15, 353:17, 356:3, 356:8, 359:1, 359:20, 359:23, 360:6, 364:5, 366:11, 367:7, 367:25, 368:14, 369:20, 370:4

**reporter** [4] - 317:22, 326:4, 389:2, 389:6

**Reporter** [3] - 227:21, 227:22, 397:10

**REPORTER** [2] - 233:3, 397:1

**reporter's** [1] - 389:4

**reports** [9] - 240:21, 257:17, 260:16, 260:17, 284:1, 291:20, 313:25, 374:13, 374:15

**represent** [1] - 258:14

**representation** [5] - 251:9, 251:20, 290:24, 351:16, 369:6

**representations** [1] - 359:20

**representative** [1] - 282:16

**represented** [2] -

272:10, 282:20

**representing** [1] - 297:9

**request** [1] - 381:10

**requirement** [6] - 249:2, 249:17, 266:7, 266:18, 267:16, 267:19

**requirements** [3] - 266:13, 267:1, 268:1

**requires** [1] - 304:4

**requiring** [1] - 306:11

**research** [10] - 242:22, 257:14, 265:18, 296:20, 301:24, 302:16, 316:15, 321:2, 336:1

**researcher** [1] - 264:18

**researchers** [10] - 242:25, 263:17, 264:4, 264:11, 264:24, 268:14, 270:21, 271:5, 271:25, 274:8

**researchers'** [3] - 264:15, 268:17, 273:13

**reserve** [1] - 311:17

**Reserve** [14] - 274:13, 275:23, 276:7, 276:23, 285:1, 285:4, 285:8, 285:12, 285:16, 342:16, 342:21, 344:6, 344:12, 370:7

**reserved** [1] - 325:8

**residential** [7] - 328:17, 336:3, 337:3, 338:11, 338:13, 348:11

**resolution** [1] - 378:14

**resolve** [2] - 375:16, 375:25

**resolved** [4] - 337:12, 337:19, 343:8, 394:20

**resolves** [1] - 327:25

**respect** [14] - 269:25, 315:4, 351:22, 355:20, 358:10, 370:25, 371:11, 372:10, 373:16, 373:21, 374:1, 375:3, 384:14, 388:12

**respective** [1] - 349:20

**respond** [1] - 233:4

**responsibilities** [2] -

320:1, 320:21
**responsibility** [1] - 331:1
**responsible** [2] - 394:24, 395:12
**rest** [1] - 324:15
**restraints** [1] - 395:3
**restriction** [2] - 267:6, 267:9
**restrictions** [1] - 267:4
**result** [2] - 304:12, 343:7
**resulted** [1] - 328:3
**retain** [1] - 392:10
**retained** [1] - 392:13
**return** [7] - 265:23, 345:8, 356:3, 356:6, 356:20, 357:12, 358:2
**returning** [2] - 273:11, 303:19
**returns** [6] - 242:4, 342:16, 353:1, 355:8, 356:11, 356:13
**reveal** [1] - 310:17
**Reverse** [1] - 322:10
**review** [22] - 231:16, 241:5, 242:3, 243:3, 270:23, 271:7, 272:25, 274:12, 275:16, 277:17, 284:10, 284:11, 313:7, 319:15, 320:18, 334:25, 335:11, 341:3, 343:11, 356:10, 371:16, 377:20
**reviewed** [21] - 236:21, 236:25, 237:1, 237:3, 239:21, 240:20, 275:20, 276:15, 276:17, 276:19, 276:24, 278:19, 283:1, 283:4, 284:7, 302:17, 303:13, 352:19, 356:10, 356:13, 366:6
**reviews** [1] - 374:10
**right-hand** [3] - 231:2, 237:20, 299:19
**RIRs** [2] - 326:7, 326:13
**RIRS** [1] - 326:7
**risk** [8] - 289:17, 289:20, 289:21, 289:24, 297:21, 298:1, 390:20
**RMR** [2] - 227:21,

397:9
**Road** [41] - 235:20, 235:24, 236:7, 236:8, 236:14, 236:15, 236:22, 236:23, 236:25, 237:1, 237:2, 237:15, 237:19, 237:22, 237:23, 237:24, 238:6, 238:11, 238:14, 238:16, 238:19, 239:4, 239:10, 239:11, 239:13, 239:16, 239:18, 239:21, 240:25, 241:3, 241:12, 241:14, 241:21, 241:24, 242:1, 242:3, 242:4, 307:6, 307:17
**role** [3] - 318:14, 320:2, 324:16
**Roman** [10] - 229:3, 229:16, 270:16, 318:12, 344:8, 350:25, 351:6, 357:3, 358:6, 358:11
**ROMAN** [1] - 227:5
**room** [1] - 392:18
**Room** [2] - 227:22, 397:10
**Root** [1] - 368:10
**Roso** [1] - 344:6
**rotate** [1] - 338:17
**rotating** [1] - 330:12
**roughly** [1] - 393:24
**rounds** [1] - 384:12
**routed** [3] - 332:2, 332:4, 333:6
**router** [4] - 305:10, 332:16, 347:21, 348:1
**Router** [1] - 330:17
**routinely** [1] - 275:16
**routing** [3] - 324:16, 330:19, 331:13
**rule** [4] - 381:22, 383:5, 383:6, 384:20
**Rule** [4] - 370:19, 381:22, 391:25
**ruled** [1] - 381:6
**rules** [1] - 384:19
**ruling** [1] - 373:11
**rulings** [2] - 371:11, 375:15
**run** [9] - 235:17, 266:25, 281:12, 300:4, 326:24, 346:14, 379:10,

382:2, 390:19
**running** [13] - 235:14, 279:20, 279:24, 281:16, 281:18, 281:23, 281:25, 320:9, 324:23, 331:1, 334:17, 365:25, 377:10
**runs** [1] - 330:22
**Russian** [4] - 376:9, 376:15, 377:5, 394:6

## S

**S.A** [1] - 368:10
**safe** [1] - 322:3
**sails** [1] - 371:25
**sake** [1] - 302:9
**Samourai** [2] - 305:8, 305:9
**samourai's** [1] - 305:8
**SAMS** [2] - 322:7, 322:9
**sanctioned** [4] - 287:9, 287:14, 289:23, 290:3
**sanctions** [3] - 287:8, 287:15, 287:21
**sandbagged** [1] - 394:14
**Sarah** [1] - 296:20
**save** [3] - 254:9, 258:14, 327:14
**saw** [15] - 252:9, 254:16, 283:17, 285:22, 308:22, 328:15, 335:25, 337:16, 361:1, 361:23, 361:24, 362:5, 362:8, 364:4, 364:13
**scenarios** [1] - 332:11
**schedule** [2] - 366:22, 392:7
**scheduled** [1] - 370:18
**scheduling** [2] - 391:21, 393:3
**scheme** [1] - 269:4
**Scholl** [6] - 231:4, 233:17, 240:1, 272:6, 272:7, 372:3
**Scholl's** [11] - 230:6, 230:23, 232:6, 233:19, 237:18, 240:21, 241:17, 250:23, 251:3, 272:4, 272:17
**science** [4] - 319:2, 319:4, 340:8

**scientific** [3] - 303:10, 366:6, 366:8
**scientifically** [2] - 373:4
**scientist** [2] - 318:10, 322:8
**scope** [7] - 309:10, 312:18, 347:9, 351:9, 355:2, 356:18, 373:19
**screen** [1] - 230:18
**screenshot** [3] - 288:24, 288:25, 289:7
**Script** [2] - 252:23, 254:20
**scripting** [1] - 322:21
**scripts** [2] - 269:13, 320:9
**search** [12] - 320:15, 332:25, 354:23, 355:1, 355:8, 356:2, 356:6, 356:10, 356:13, 356:20, 357:12, 358:2
**searchable** [2] - 327:15, 328:8
**searched** [2] - 361:22, 362:4
**searches** [2] - 321:1, 322:22
**searching** [1] - 320:16
**seat** [3] - 375:6, 383:7, 383:12
**seated** [2] - 317:17, 383:10
**seats** [5] - 379:17, 380:6, 383:8, 383:19, 384:8
**second** [12] - 231:13, 246:1, 281:7, 288:3, 292:9, 299:20, 312:8, 321:16, 358:8, 365:4, 368:14, 369:5
**second-to-the-last** [1] - 368:14
**secondary** [2] - 260:14, 262:16
**seconds** [2] - 365:9, 386:22
**secret** [2] - 379:18, 379:19
**Section** [9] - 295:14, 296:5, 298:15, 299:20, 300:10, 300:24, 301:11, 301:16, 303:21
**section** [9] - 260:3, 268:3, 268:6,

282:22, 288:2, 289:1, 295:17, 300:12, 354:19
**security** [5] - 321:8, 321:15, 321:20, 339:5, 345:17
**Security** [1] - 322:11
**see** [60] - 237:21, 238:24, 239:11, 239:18, 248:11, 248:12, 249:16, 251:8, 252:6, 254:19, 254:23, 255:12, 256:5, 267:21, 268:19, 270:4, 271:17, 271:18, 272:9, 272:11, 281:8, 282:20, 286:13, 287:18, 291:9, 291:15, 296:9, 296:12, 297:2, 297:14, 300:15, 303:22, 308:7, 311:12, 312:23, 332:15, 332:17, 335:8, 337:11, 337:18, 341:3, 345:5, 351:18, 354:18, 354:19, 356:14, 357:13, 358:4, 360:6, 363:11, 363:14, 367:12, 373:2, 374:6, 377:4, 381:16, 391:11, 392:3, 393:10
**seeing** [3] - 273:4, 352:19, 354:16
**Sefranek** [3] - 227:21, 397:9, 397:9
**SEFRANEK** [1] - 397:3
**segregated** [2] - 254:5, 254:7
**SegWit** [12] - 252:22, 253:9, 253:20, 253:25, 254:4, 254:16, 254:20, 254:24, 255:4, 255:8, 255:13, 256:5
**SegWit-enabled** [2] - 254:20, 254:24
**selected** [1] - 341:8
**selection** [2] - 380:9, 383:18
**self** [1] - 297:19
**self-explanatory** [1] - 297:19
**send** [4] - 255:1,

255:2, 329:12, 394:23

**sending** [1] - 290:11

**sends** [2] - 254:21, 254:24

**sense** [7] - 297:10, 298:2, 359:14, 363:17, 372:11, 374:4, 378:25

**sensitive** [1] - 321:25

**sent** [1] - 324:22

**sentence** [10] - 256:24, 298:16, 304:19, 304:22, 312:9, 354:7, 360:9, 365:2, 365:4

**sentences** [2] - 286:11, 301:14

**separate** [2] - 368:20, 368:22

**separately** [1] - 235:4

**separation** [1] - 321:12

**September** [1] - 375:17

**sequences** [1] - 249:10

**series** [1] - 307:4

**server** [32] - 235:7, 324:22, 324:23, 329:23, 330:4, 330:12, 331:9, 333:6, 339:2, 346:1, 348:3, 349:4, 349:8, 349:14, 349:16, 349:18, 349:19, 350:11, 352:21, 352:25, 353:2, 353:10, 354:10, 354:13, 362:5, 362:11, 362:12, 362:13, 363:21, 363:23, 364:15, 367:20

**server's** [1] - 333:10

**servers** [23] - 234:3, 319:17, 322:2, 330:6, 330:11, 330:18, 330:20, 333:3, 334:2, 334:19, 337:8, 337:17, 337:21, 338:10, 339:22, 345:24, 349:2, 353:3, 353:5, 354:10, 361:24, 362:20, 367:24

**Service** [2] - 395:6, 395:12

**service** [26] - 236:3,

238:11, 238:14, 238:20, 270:17, 278:16, 278:23, 279:21, 280:12, 285:23, 290:16, 290:19, 290:23, 290:25, 291:3, 305:14, 305:16, 325:17, 325:19, 326:14, 327:17, 329:25, 330:10, 332:13, 335:13, 338:22

**Service's** [2] - 395:7, 395:14

**Services** [1] - 318:2

**services** [29] - 235:21, 236:2, 242:13, 242:16, 247:2, 248:3, 276:4, 276:12, 276:16, 276:18, 278:5, 278:6, 278:22, 279:3, 279:8, 279:13, 279:18, 279:24, 279:25, 280:6, 280:8, 305:7, 321:18, 327:2, 327:20, 332:12, 337:6, 337:15, 337:19

**serving** [1] - 382:22

**sessions** [1] - 339:6

**set** [27] - 264:18, 264:19, 264:23, 265:7, 268:12, 268:13, 268:18, 270:9, 271:4, 272:15, 281:12, 289:13, 298:25, 316:15, 331:23, 333:4, 336:11, 336:13, 336:14, 336:20, 336:21, 341:2, 341:5, 343:14, 344:19, 360:20, 371:1

**sets** [2] - 264:24, 326:18

**setting** [5] - 319:17, 322:2, 339:11, 340:6, 340:7

**settings** [1] - 339:8

**several** [3] - 290:3, 311:25, 342:19

**sex** [1] - 382:11

**shall** [1] - 299:4

**share** [4] - 349:7, 349:19, 350:6, 350:10

**sheer** [1] - 372:19

**sheet** [3] - 326:3, 382:5, 383:1

**Shormint** [2] - 342:21, 368:18

**shormint@hotmail. com** [6] - 344:13, 354:20, 356:7, 357:13, 358:2, 358:22

**short** [3] - 321:17, 347:15, 396:10

**shortly** [1] - 261:9

**shotgun** [2] - 305:15, 312:19

**show** [9] - 231:3, 240:7, 264:4, 272:6, 272:7, 275:10, 329:8, 333:8, 333:18

**showing** [11] - 230:10, 232:3, 233:14, 234:14, 234:18, 234:21, 237:18, 270:17, 271:25, 291:5

**shown** [3] - 250:23, 250:25, 284:24

**shows** [1] - 238:2

**sic** [4] - 238:4, 239:24, 355:11, 383:7

**side** [13] - 231:2, 237:20, 299:20, 301:11, 371:8, 371:9, 372:25, 383:4, 383:12, 383:13, 384:25, 385:3, 387:22

**sides** [5] - 234:6, 234:9, 372:24, 373:8, 384:17

**sig** [1] - 267:12

**sign** [1] - 321:18

**signal** [2] - 305:4, 346:21

**significance** [1] - 267:14

**significant** [6] - 236:18, 263:23, 267:11, 276:4, 394:3, 395:8

**significantly** [1] - 304:2

**Silk** [41] - 235:20, 235:24, 236:7, 236:8, 236:14, 236:15, 236:22, 236:23, 236:25, 237:1, 237:2, 237:15, 237:19, 237:22, 237:23,

237:24, 238:6, 238:11, 238:14, 238:16, 238:19, 239:4, 239:10, 239:11, 239:13, 239:16, 239:18, 239:21, 240:25, 241:3, 241:12, 241:14, 241:20, 241:24, 242:1, 242:3, 242:4, 307:5, 307:17

**similar** [2] - 330:18, 340:14

**simply** [2] - 314:3, 350:11

**simulated** [1] - 235:11

**single** [12] - 250:3, 250:23, 250:25, 251:7, 251:10, 251:16, 253:17, 265:24, 291:11, 305:2, 305:18, 312:9

**single-entity** [1] - 291:11

**sit** [7] - 298:10, 375:18, 378:10, 392:25, 393:1, 394:8

**site** [1] - 308:17

**sites** [6] - 309:13, 329:24, 332:5, 339:4, 340:20, 349:20

**sits** [1] - 332:13

**sitting** [4] - 340:2, 378:9, 379:4, 392:22

**six** [1] - 341:12

**sizes** [1] - 254:10

**skeptical** [1] - 374:3

**skip** [1] - 287:6

**slip** [1] - 379:20

**slow** [1] - 340:1

**small** [4] - 231:3, 231:15, 272:5, 351:3

**smaller** [9] - 250:18, 254:10, 269:5, 302:23, 303:4, 336:14, 341:2, 341:5

**smart** [1] - 374:5

**software** [1] - 281:16

**softwares** [1] - 305:6

**solutions** [3] - 319:13, 319:14, 319:16

**someone** [13] - 290:9, 306:18, 308:25, 310:19, 324:20, 329:15, 331:15, 331:16, 332:12, 339:7, 380:21, 383:10, 386:8

**sometime** [1] - 371:14

**sometimes** [5] - 280:13, 280:14, 328:3, 335:8, 339:24

**somewhat** [2] - 373:5, 392:22

**somewhere** [4] - 234:23, 235:4, 260:25, 261:3

**soon** [5] - 366:16, 370:24, 371:12, 374:21, 375:1

**sophisticated** [1] - 279:2

**sophistication** [1] - 304:5

**sorry** [23] - 231:14, 231:21, 233:5, 233:17, 240:1, 247:15, 250:19, 251:4, 251:5, 252:25, 260:10, 268:4, 269:15, 271:14, 271:21, 273:7, 283:5, 305:12, 347:18, 352:22, 353:22, 376:5, 376:14

**sort** [23] - 235:10, 246:13, 248:23, 275:4, 275:13, 305:23, 320:12, 320:24, 327:4, 327:7, 327:16, 328:4, 332:13, 335:18, 337:23, 348:3, 359:6, 364:24, 368:23, 378:14, 381:18, 386:1, 392:7

**sorting** [1] - 386:3

**sorts** [1] - 337:11

**sound** [1] - 320:8

**sounds** [3] - 309:21, 389:22, 396:7

**source** [7] - 260:14, 260:16, 262:15, 262:16, 262:19, 262:21, 310:17

**sources** [7] - 286:7, 286:21, 328:14, 354:8, 354:10, 361:2, 361:3

**space** [3] - 325:8, 325:21, 363:9

**Spain** [1] - 306:8

**spanned** [1] - 320:7

**spare** [2] - 378:7, 378:8

**speaking** [3] - 256:23,

278:7, 394:15
**speaks** [1] - 376:8
**special** [3] - 246:24, 271:12, 332:5
**specific** [16] - 256:20, 264:12, 264:15, 265:5, 267:13, 282:2, 284:23, 292:22, 339:3, 344:18, 352:22, 365:20, 366:3, 377:17, 391:24, 393:4
**specifically** [13] - 232:24, 285:25, 305:7, 306:9, 308:8, 308:12, 310:7, 320:5, 328:16, 328:19, 338:2, 344:14, 354:16
**specified** [2] - 360:11, 360:20
**speculating** [1] - 370:5
**speed** [1] - 287:1
**spell** [2] - 317:21, 326:1
**spelled** [3] - 317:24, 355:11, 355:12
**spend** [18] - 239:24, 240:5, 240:8, 240:9, 240:11, 240:12, 240:13, 243:25, 244:16, 244:21, 246:4, 249:1, 249:12, 249:22, 250:8, 250:15, 256:9, 256:13
**spending** [4] - 240:8, 240:9, 249:17, 250:18
**spends** [3] - 240:14, 245:21, 255:12
**spent** [1] - 300:19
**splitting** [1] - 379:2
**spoken** [1] - 306:9
**spoofing** [2] - 348:15, 348:17
**spread** [1] - 359:9
**spreadsheets** [3] - 372:14, 372:15, 389:12
**stack** [1] - 370:19
**stamp** [2] - 328:3
**stand** [5] - 229:23, 255:15, 278:23, 279:6, 387:17
**standard** [4] - 327:6, 328:22, 388:16, 395:7

**standards** [1] - 395:14
**stands** [2] - 254:4, 330:17
**start** [9] - 293:14, 331:18, 345:10, 350:25, 352:12, 390:5, 390:23, 391:6, 391:12
**Start1.PK. Compressed** [1] - 266:3
**Start1.PK. Uncompressed** [1] - 266:3
**started** [6] - 250:20, 263:20, 281:25, 288:16, 351:4, 351:5
**starting** [15] - 229:5, 252:4, 254:15, 270:6, 270:7, 274:6, 295:14, 300:12, 301:12, 325:25, 326:11, 338:13, 380:13, 380:14, 390:22
**starts** [5] - 238:7, 251:24, 252:3, 367:9, 368:3
**state** [3] - 229:4, 368:24, 394:11
**statement** [4] - 271:13, 370:1, 388:6, 388:7
**statements** [1] - 381:13
**States** [10] - 227:22, 229:3, 229:7, 229:10, 229:13, 289:8, 346:17, 346:19, 346:20, 346:25
**STATES** [3] - 227:1, 227:2, 227:8
**states** [1] - 363:3
**static** [4] - 347:19, 347:23, 348:8, 348:12
**statistical** [6] - 303:7, 363:12, 363:16, 364:7, 369:13, 369:25
**statistically** [1] - 369:17
**statistics** [1] - 374:6
**stay** [1] - 339:6
**stenographic** [1] - 397:5
**step** [3] - 272:15, 318:25
**steps** [4] - 278:12,

290:3, 336:10, 370:16
**Sterlingov** [24] - 229:3, 229:16, 270:16, 274:23, 300:5, 314:25, 315:5, 315:25, 318:12, 344:8, 350:25, 351:5, 351:6, 355:6, 355:9, 355:15, 357:3, 357:5, 357:14, 358:6, 358:11, 376:8, 394:8, 395:1
**STERLINGOV** [1] - 227:5
**Sterlingov's** [8] - 230:10, 270:24, 271:7, 286:16, 300:7, 358:15, 358:19, 358:23
**STILL** [3] - 228:3, 230:2, 294:4
**Still** [1] - 372:3
**still** [47] - 230:4, 242:10, 245:24, 250:22, 252:25, 261:16, 261:21, 263:6, 274:12, 286:3, 287:13, 294:6, 294:9, 295:10, 298:6, 299:18, 299:23, 307:4, 310:3, 311:21, 312:6, 313:5, 315:17, 316:7, 316:10, 318:14, 324:24, 329:11, 335:2, 335:8, 337:1, 340:24, 346:25, 352:7, 355:17, 367:7, 375:13, 378:23, 380:5, 384:16, 386:1, 386:3, 390:18, 391:8, 395:5, 396:9
**still's** [1] - 372:5
**stipulate** [1] - 377:19
**stipulations** [1] - 375:14
**stone** [2] - 371:21, 373:10
**stop** [1] - 364:19
**stops** [1] - 276:10
**storing** [1] - 328:1
**strategic** [1] - 384:14
**streamline** [1] - 377:4
**Street** [2] - 227:11, 227:19

**strike** [10] - 382:5, 382:17, 383:7, 383:9, 383:11, 383:14, 384:6, 384:11, 385:4, 385:6
**strikes** [13] - 381:21, 381:23, 382:9, 382:17, 382:20, 382:21, 383:3, 384:7, 384:10, 384:12, 384:17, 384:25
**striking** [1] - 382:11
**strings** [1] - 320:16
**studies** [6] - 258:1, 258:3, 262:6, 311:5, 311:6, 315:18
**study** [9] - 262:7, 262:10, 264:3, 270:21, 271:4, 271:11, 273:20, 316:19, 366:9
**stuff** [2] - 376:2, 394:7
**sub** [2] - 298:24
**suballocate** [1] - 326:14
**subcategories** [2] - 257:1, 257:4
**subdomain** [1] - 328:2
**subject** [2] - 335:5, 351:9
**submitting** [1] - 291:19
**subpoena** [2] - 329:12, 332:25
**subpoenas** [1] - 320:15
**subscription** [1] - 330:3
**subsequent** [4] - 256:4, 263:7, 263:11, 272:7
**subsequently** [2] - 232:16, 259:13
**subset** [1] - 338:5
**substantial** [1] - 395:3
**substantive** [1] - 286:15
**successful** [3] - 301:13, 301:15, 390:4
**such-and-such** [1] - 381:16
**suggesting** [3] - 286:19, 290:9, 376:23
**suggestion** [1] - 287:9
**sum** [1] - 371:9
**summarize** [5] - 318:25, 323:19,

325:24, 326:11, 341:22
**summarized** [1] - 323:11
**summarizing** [1] - 341:16
**summary** [3] - 275:13, 354:6, 354:7
**superseding** [2] - 286:6, 286:20
**supplemental** [1] - 314:9
**support** [4] - 318:21, 320:3, 320:22, 320:24
**supported** [1] - 373:23
**supporting** [3] - 321:22, 366:7, 366:10
**suppose** [2] - 279:4, 306:11
**supposed** [1] - 310:5
**surprises** [1] - 246:17
**surprising** [1] - 269:12
**suspect** [1] - 351:7
**suspicion** [1] - 282:10
**switch** [2] - 386:21, 386:22
**switching** [1] - 386:24
**sworn** [3] - 256:8, 291:19, 317:16
**sympathetic** [2] - 378:1, 395:22
**system** [1] - 386:22

**T**

**Tab** [2] - 280:22, 295:2
**Table** [1] - 302:5
**table** [10] - 253:13, 296:9, 299:23, 308:14, 342:11, 365:15, 385:25, 386:4, 386:8, 386:12
**tack** [1] - 396:11
**tags** [2] - 298:25, 299:1
**talks** [1] - 302:22
**Tamara** [3] - 227:21, 397:9, 397:9
**TAMARA** [1] - 397:3
**target** [1] - 340:17
**Task** [1] - 318:18
**taught** [1] - 290:15
**teach** [2] - 290:17, 290:21
**team** [3] - 290:10, 320:11, 321:3

teaming [1] - 322:20
technical [2] - 287:22, 327:9
techniques [1] - 305:9
technological [1] - 304:5
technologies [2] - 320:4, 321:2
technology [2] - 386:17, 386:19
Telecom [3] - 361:17, 362:1, 362:3
telephones [1] - 381:2
temporary [3] - 345:24, 346:1
ten [20] - 309:24, 338:10, 338:24, 338:25, 339:11, 339:12, 339:16, 362:16, 363:5, 363:11, 363:13, 364:12, 364:17, 365:1, 365:6, 365:7, 365:12, 365:13, 365:15, 371:8
ten-minute [3] - 339:11, 339:12, 339:16
tend [4] - 269:10, 279:19, 338:15, 339:5
tends [1] - 339:23
term [7] - 232:19, 304:25, 321:8, 326:3, 353:11, 363:8, 363:13
termed [2] - 253:8, 310:22
terminal [1] - 326:24
terms [8] - 269:11, 276:20, 298:23, 299:14, 312:15, 350:14, 353:9, 376:16
terribly [2] - 229:21, 372:12
terrorism [3] - 289:23, 290:4, 374:23
terrorist [1] - 288:10
Teslas [1] - 287:3
test [1] - 235:14
testified [24] - 232:11, 235:7, 238:10, 240:20, 245:11, 245:23, 246:3, 248:1, 256:13, 284:14, 289:16, 303:17, 345:16, 347:13, 349:1, 349:22, 349:25,

350:17, 350:18, 357:16, 362:22, 362:25, 372:16, 376:11
testify [12] - 245:16, 287:2, 290:8, 303:16, 311:1, 311:17, 315:18, 316:11, 347:4, 350:13, 351:19, 355:19
testifying [6] - 260:21, 284:20, 311:21, 346:10, 362:1, 362:4
testimony [44] - 242:8, 242:10, 246:2, 246:12, 246:17, 247:17, 247:18, 248:22, 256:12, 262:9, 287:4, 288:9, 291:25, 302:22, 303:13, 303:17, 305:22, 306:10, 311:5, 312:2, 316:14, 324:6, 351:20, 351:23, 352:2, 354:9, 355:18, 357:11, 362:18, 363:20, 370:20, 372:1, 372:5, 372:7, 373:3, 373:13, 373:18, 373:19, 373:23, 374:1, 374:12, 374:13, 376:23
testing [5] - 235:7, 235:8, 319:15, 322:20, 347:6
testnet [2] - 235:8, 235:17
tests [1] - 235:17
texts [1] - 321:18
Thai [1] - 361:17
THE [197] - 227:1, 227:1, 227:8, 229:2, 229:8, 229:11, 229:14, 229:17, 233:3, 233:5, 234:6, 234:12, 246:1, 246:7, 246:11, 246:18, 246:19, 246:23, 247:4, 247:11, 247:14, 247:15, 247:18, 247:20, 247:24, 252:13, 252:15, 252:17, 254:4, 254:7, 254:12, 254:13, 260:25, 261:5, 261:6,

261:11, 261:13, 262:25, 263:2, 268:4, 273:6, 273:7, 273:8, 274:4, 279:23, 280:2, 281:5, 287:1, 287:10, 287:15, 287:18, 288:1, 288:6, 288:14, 288:19, 292:5, 292:7, 293:5, 293:7, 293:11, 293:13, 293:19, 294:1, 295:3, 295:8, 297:11, 297:18, 297:21, 297:23, 297:25, 298:6, 298:8, 298:12, 298:13, 299:5, 299:9, 299:10, 299:16, 299:17, 306:18, 307:1, 307:18, 307:23, 309:18, 310:1, 310:24, 311:9, 311:23, 312:4, 312:23, 313:3, 313:18, 314:12, 314:14, 314:15, 315:16, 316:17, 316:22, 317:7, 317:14, 317:17, 323:23, 323:25, 326:1, 326:5, 326:9, 342:2, 342:4, 344:22, 345:8, 345:10, 345:12, 347:3, 347:8, 347:11, 350:20, 351:17, 351:25, 355:17, 356:2, 356:19, 357:19, 358:7, 360:1, 360:3, 360:14, 362:24, 364:10, 364:18, 364:22, 364:23, 365:2, 365:7, 365:16, 365:24, 366:2, 366:13, 366:15, 366:25, 370:11, 370:13, 370:14, 370:15, 370:18, 375:20, 376:3, 376:6, 376:10, 376:16, 376:21, 377:3, 377:15, 378:1, 378:15, 378:20, 379:3, 379:8, 379:25, 380:2, 380:4, 380:13,

380:15, 381:9, 383:23, 384:1, 384:5, 384:11, 384:18, 384:24, 385:7, 385:13, 385:19, 385:21, 386:5, 386:11, 386:16, 388:18, 388:21, 388:22, 389:9, 389:16, 389:20, 389:24, 390:4, 390:23, 391:11, 391:15, 392:3, 392:15, 393:10, 393:15, 393:18, 394:17, 395:19, 396:7, 396:13, 396:17
themselves [2] - 310:22, 379:4
theoretically [1] - 349:17
therefore [6] - 244:8, 281:22, 286:7, 310:14, 330:13, 336:18
they've [1] - 266:15
thinking [2] - 308:7, 311:13
third [3] - 259:11, 300:11, 337:7
thousands [4] - 250:1, 313:7, 349:10, 349:12
three [12] - 265:4, 265:6, 265:8, 311:23, 312:11, 313:21, 313:25, 315:18, 332:4, 368:19, 379:2, 379:10
throughout [1] - 250:22
Thursday [1] - 380:14
tie [1] - 355:15
tied [7] - 240:18, 288:9, 289:14, 290:4, 335:12, 344:13, 355:21
timing [1] - 309:19
today [14] - 229:20, 229:22, 247:18, 284:20, 293:14, 311:13, 311:18, 314:17, 324:7, 345:16, 357:20, 371:3, 372:4, 375:3
together [11] - 244:8, 244:19, 250:14, 251:1, 251:16,

271:25, 272:19, 282:22, 330:18, 344:4, 359:9
took [1] - 278:11
tool [16] - 246:4, 246:21, 275:11, 277:8, 277:16, 277:23, 282:23, 299:1, 306:13, 319:22, 338:17, 339:5, 359:6, 359:13, 359:14, 359:16
tools [12] - 305:24, 306:12, 320:9, 320:18, 326:23, 328:19, 328:22, 329:19, 331:23, 331:25, 335:7, 337:14
top [13] - 237:21, 286:11, 295:11, 295:13, 296:9, 299:24, 354:18, 355:4, 367:9, 368:17, 369:2
topics [3] - 287:4, 322:16, 322:18
tops [1] - 309:25
Tor [59] - 227:19, 330:14, 330:16, 330:17, 330:22, 330:23, 330:24, 331:2, 331:4, 331:10, 331:15, 331:16, 331:17, 331:19, 331:20, 331:22, 331:24, 332:2, 332:3, 332:6, 332:8, 333:12, 333:15, 333:16, 333:20, 333:23, 333:24, 334:3, 334:5, 334:10, 334:11, 334:12, 334:14, 334:22, 334:23, 335:1, 335:25, 337:5, 338:6, 340:11, 340:13, 340:18, 340:20, 340:25, 345:24, 346:10, 346:12, 346:13, 346:16, 346:19, 346:25, 347:6, 361:12, 361:14, 367:13
TOR [1] - 227:18
tor [1] - 229:15
Torsocks [2] - 331:25

total [2] - 232:2, 269:1
totally [1] - 316:20
touches [1] - 281:21
touchpoint [1] -
282:19
touchpoints [1] -
282:16
toward [2] - 269:19,
378:13
Trabelsi [1] - 378:18
trace [23] - 234:16,
243:7, 248:10,
250:3, 250:10,
251:13, 255:14,
271:25, 272:1,
272:10, 272:11,
272:14, 274:8,
278:7, 290:16,
290:22, 291:3,
295:21, 297:9,
298:1, 300:4, 300:5,
301:3
traced [3] - 272:9,
277:7, 301:2
traces [7] - 277:8,
277:9, 277:14,
277:20, 277:23,
278:4, 306:11
tracing [27] - 230:9,
235:20, 236:24,
243:5, 248:11,
249:25, 256:4,
269:24, 272:7,
272:14, 272:23,
273:2, 274:12,
274:21, 274:25,
275:5, 275:9,
290:15, 291:9,
291:11, 295:19,
295:21, 301:6,
311:4, 358:13,
372:15, 372:19
tracings [1] - 250:6
track [3] - 270:15,
326:17, 387:6
tracking [3] - 346:5,
372:23, 391:23
traditionally [1] -
249:18
traffic [18] - 322:21,
324:21, 330:19,
331:13, 331:20,
332:2, 333:5,
333:16, 334:18,
338:17, 339:14,
346:21, 348:19,
353:5, 362:13,
363:23, 367:20,
367:23
train [2] - 306:2, 306:3

trained [2] - 290:18,
323:7
training [1] - 322:8
trainings [3] - 322:5,
322:15, 322:18
transact [1] - 242:16
transaction [38] -
230:24, 237:19,
244:3, 244:11,
247:1, 252:4,
253:24, 254:15,
254:23, 255:4,
255:9, 255:11,
255:12, 255:18,
255:20, 255:22,
256:5, 265:3,
265:23, 266:6,
266:8, 266:19,
267:20, 283:15,
291:16, 295:20,
298:18, 298:19,
300:8, 300:18,
300:25, 304:23,
304:24, 305:1,
305:2, 310:14,
353:25
Transaction [1] -
231:6
transaction's [1] -
298:18
transactional [1] -
310:7
transactions [38] -
233:14, 234:15,
234:18, 243:22,
249:10, 250:18,
251:13, 254:9,
254:11, 266:5,
266:6, 266:12,
269:3, 269:14,
270:18, 272:13,
278:22, 281:20,
291:16, 296:3,
298:23, 299:8,
299:10, 299:14,
300:19, 301:18,
301:22, 304:3,
304:11, 304:13,
305:19, 305:23,
308:13, 308:23,
310:13, 310:18,
313:8, 372:15
transcript [2] - 397:4,
397:6
TRANSCRIPT [1] -
227:7
transfer [6] - 230:10,
237:11, 240:10,
240:14, 270:23,
271:7

transferring [1] -
393:23
transfers [3] - 234:21,
283:13, 290:3
translate [1] - 377:11
translated [3] -
324:19, 376:4, 376:7
translations [8] -
375:14, 376:2,
376:19, 376:22,
376:23, 376:25,
377:18, 394:6
translator [4] - 376:14,
377:5, 377:7, 377:25
translators [2] -
377:23, 377:24
treat [1] - 306:6
treated [2] - 298:25,
353:15
trial [34] - 311:24,
313:21, 314:1,
314:24, 318:23,
336:23, 351:18,
351:22, 371:4,
371:5, 371:12,
373:12, 374:23,
375:3, 375:4, 375:5,
375:11, 376:14,
378:3, 378:5, 378:7,
378:23, 379:1,
379:10, 387:3,
387:5, 388:3, 389:8,
390:22, 391:15,
392:1, 392:20,
393:19, 394:25
trials [1] - 390:6
trick [1] - 390:14
trickier [1] - 391:17
tried [1] - 355:15
trimming [1] - 371:25
true [30] - 232:25,
236:4, 242:12,
242:15, 242:18,
245:13, 254:19,
259:5, 268:20,
273:12, 276:1,
276:2, 276:18,
279:4, 279:5,
289:23, 290:2,
302:25, 303:1,
307:7, 307:11,
307:13, 307:17,
308:10, 329:8,
330:14, 357:4,
394:17, 397:4, 397:5
truly [1] - 313:22
trust [1] - 269:15
truth [2] - 270:9,
298:25
try [10] - 278:23,

279:9, 279:13,
280:6, 280:19,
321:3, 345:22,
357:20, 366:23,
381:15
trying [16] - 236:9,
246:11, 251:14,
278:16, 280:5,
280:18, 312:18,
314:5, 321:19,
332:22, 333:21,
355:5, 355:23,
378:13, 386:1,
387:13
Tuesday [4] - 393:6,
393:9, 396:9, 396:11
turn [14] - 230:8,
233:11, 234:2,
242:7, 251:3, 251:4,
253:12, 253:20,
262:1, 265:20,
294:12, 294:21,
312:7, 352:10
turned [1] - 389:17
turning [26] - 231:2,
239:23, 244:10,
256:7, 257:19,
258:7, 258:18,
259:9, 261:16,
264:1, 266:21,
271:1, 286:3,
288:23, 290:8,
291:23, 295:10,
296:4, 298:15,
299:23, 342:8,
358:25, 359:23,
360:6, 363:19,
368:15
tutorial [1] - 386:16
tweaked [1] - 388:8
Twitter [1] - 344:8
two [46] - 245:1,
245:2, 245:9, 256:1,
265:3, 265:4, 265:6,
265:7, 266:5,
267:18, 270:18,
276:7, 279:1,
286:11, 292:2,
295:12, 300:18,
309:7, 312:25,
313:7, 314:9, 322:7,
322:9, 323:14,
363:9, 365:5,
368:20, 368:22,
371:17, 375:8,
375:16, 375:23,
375:24, 378:22,
379:17, 379:21,
382:1, 382:6, 382:7,
382:8, 383:4,

384:25, 385:1,
385:3, 385:5
two-year [1] - 292:2
tx) [1] - 298:24
TX2 [1] - 300:18
tying [1] - 357:13
type [17] - 253:10,
253:18, 266:2,
266:9, 266:11,
266:12, 266:18,
267:6, 286:25,
287:23, 304:24,
305:16, 320:19,
331:24, 332:1,
337:9, 364:15
types [19] - 252:2,
252:7, 252:10,
253:2, 253:4, 253:5,
253:8, 253:14,
253:16, 267:2,
276:25, 283:8,
310:15, 321:5,
334:19, 335:22,
336:25, 337:2, 346:5
typically [14] - 286:24,
320:14, 321:6,
324:18, 325:8,
325:17, 325:21,
326:21, 327:8,
328:1, 330:3,
331:16, 331:23,
382:6

## U

U.S [6] - 227:13,
318:2, 363:21,
393:21, 394:3,
394:16
u.S [1] - 227:16
U0845692 [1] - 344:13
U7489869 [1] - 344:6
unable [6] - 270:19,
300:20, 300:24,
377:3, 394:1, 394:5
unclear [3] - 277:25,
281:24, 368:17
under [16] - 237:22,
256:24, 270:20,
271:11, 273:20,
292:9, 299:20,
301:11, 344:7,
352:2, 357:3,
376:11, 379:13,
381:21, 391:25,
392:9
undercover [2] -
320:3, 321:22
underlying [1] -
355:25

understood [10] - 306:21, 314:11, 352:3, 357:25, 358:3, 358:15, 360:11, 386:7, 386:15, 395:15
unfamiliar [1] - 321:2
unfortunately [2] - 366:22, 393:10
unique [2] - 350:14, 350:22
UNITED [3] - 227:1, 227:2, 227:8
United [10] - 227:22, 229:3, 229:7, 229:10, 229:12, 289:8, 346:17, 346:19, 346:20, 346:25
universal [1] - 360:17
universe [1] - 382:19
University [1] - 319:3
unless [3] - 287:16, 337:16, 396:1
unquote [2] - 308:16, 310:10
unsound [1] - 373:4
unusual [1] - 389:2
up [62] - 230:17, 230:18, 241:15, 242:6, 246:1, 248:1, 255:14, 270:6, 274:19, 275:11, 275:13, 280:2, 281:12, 288:19, 294:7, 294:9, 296:7, 305:15, 306:22, 309:24, 311:8, 311:9, 312:9, 312:25, 319:17, 321:18, 322:2, 324:20, 326:20, 329:4, 329:13, 333:4, 333:8, 333:18, 334:12, 336:19, 342:13, 351:22, 354:18, 358:8, 365:19, 366:22, 366:23, 367:9, 371:9, 377:7, 378:3, 378:21, 378:22, 379:12, 381:1, 381:4, 381:11, 383:1, 383:10, 384:2, 386:24, 388:7, 388:9, 392:16, 395:7, 395:13
updated [2] - 394:15, 396:6

upset [1] - 381:18
usage [1] - 309:13
USAO [1] - 227:11
USAO-DOJ [1] - 227:11
useful [3] - 246:4, 246:14, 329:5
usefulness [1] - 246:21
user [31] - 232:16, 232:21, 235:22, 235:24, 236:3, 236:10, 237:4, 237:21, 238:19, 239:16, 258:7, 279:10, 279:14, 280:20, 308:18, 308:23, 308:24, 320:16, 327:3, 329:9, 329:24, 344:3, 344:5, 344:11, 346:25, 357:9, 369:10, 369:21, 370:4, 370:5, 370:8
user's [2] - 332:2, 349:4
user-friendly [1] - 327:3
users [8] - 236:10, 236:22, 236:25, 237:1, 282:23, 326:15, 330:11, 334:14
uses [4] - 244:21, 246:15, 256:13, 324:15
UTC [7] - 360:11, 360:13, 360:14, 360:16, 360:17, 361:4, 361:7
utilized [1] - 310:16

# V

V-a-l-e-r-i-e [1] - 317:23
vacancy [1] - 383:13
VALERIE [3] - 228:8, 317:19, 345:14
Valerie [1] - 317:23
validate [1] - 269:24
validating [1] - 294:18
valuable [1] - 329:1
value [11] - 256:14, 266:4, 266:8, 266:19, 267:4, 267:7, 267:9, 267:11, 267:13, 267:17, 334:24

varied [1] - 304:10
variety [1] - 340:15
various [3] - 264:5, 295:24, 335:21
vehicle [2] - 312:20, 387:14
venue [1] - 370:23
verified [1] - 292:1
verify [2] - 300:5, 383:2
verifying [1] - 233:22
Verret [2] - 312:1, 373:21
versa [1] - 388:19
version [1] - 272:1
versions [1] - 264:5
versus [4] - 252:21, 299:11, 328:17, 337:21
via [3] - 262:18, 310:18, 320:15
vice [1] - 388:19
victim [1] - 320:25
video [2] - 230:17, 394:9
view [6] - 279:25, 297:5, 373:14, 373:22, 375:20, 379:5
views [2] - 371:3, 372:14
violated [1] - 292:2
violates [2] - 395:21
virtual [4] - 330:10, 337:21, 343:10, 349:23
virtually [1] - 371:1
Virwox [1] - 240:18
visit [3] - 329:24, 333:15, 339:25
visiting [2] - 332:1, 349:20
visual [1] - 359:19
vitae [1] - 323:11
voir [10] - 371:16, 374:19, 379:19, 380:18, 381:7, 381:13, 381:14, 384:7, 388:4, 390:10
Volfprius [3] - 274:16, 342:18, 344:5
volume [6] - 362:13, 363:23, 367:20, 367:23, 372:19, 394:7
voluminous [1] - 389:13
volunteers [1] - 331:5
VPN [16] - 286:1, 330:9, 336:2, 337:6,

337:19, 339:19, 339:22, 346:4, 349:23, 349:25, 350:3, 350:7, 350:10, 364:15, 367:18, 368:5
VPNs [3] - 330:18, 339:22, 345:24
VPS [2] - 367:18, 368:10
vs [1] - 227:4

# W

wait [1] - 233:3
waiting [1] - 375:13
walk [2] - 326:11, 332:11
walking [1] - 325:24
Wall [1] - 227:19
Wallet [6] - 248:11, 248:13, 248:16, 248:20, 305:8, 310:17
wallet [4] - 249:14, 281:14, 281:16, 305:6
wants [1] - 393:8
warrant [11] - 333:1, 354:23, 355:1, 355:8, 356:2, 356:6, 356:10, 356:13, 356:20, 357:12, 358:2
warrants [1] - 320:15
Wasabi [10] - 243:18, 243:22, 245:11, 245:18, 248:2, 248:7, 248:11, 248:13, 248:16, 248:20
Wasabi-related [1] - 248:7
Washington [7] - 227:5, 227:12, 227:14, 227:17, 227:23, 318:18, 397:11
watch [1] - 293:20
ways [6] - 305:22, 334:16, 348:22, 349:4, 350:9, 377:11
web [4] - 279:21, 320:14, 332:19, 332:20
website [4] - 309:1, 324:23, 332:1, 339:25
website-visiting [1] - 332:1

websites [5] - 299:2, 322:2, 327:3, 331:16, 332:8
week [11] - 339:8, 370:18, 371:14, 374:19, 374:23, 375:19, 379:10, 392:25, 393:1, 393:2
weeks [12] - 311:23, 313:7, 313:21, 313:25, 375:4, 375:16, 375:24, 390:12, 391:7, 391:16, 394:20
welcome [3] - 268:16, 357:22, 379:15
whereas [1] - 270:18
white [2] - 366:10, 380:18
White [1] - 356:15
Whols [11] - 326:21, 326:22, 326:24, 327:4, 327:7, 327:11, 327:12, 327:16, 328:9, 329:7, 337:24
whole [3] - 339:14, 346:15, 365:1
wholeheartedly [1] - 355:3
Wi [1] - 350:11
Wi-Fi [1] - 350:11
wide [3] - 295:24, 302:4, 317:1
widely [1] - 236:17
wider [1] - 338:16
willing [2] - 313:14, 376:25
window [12] - 338:16, 338:22, 339:11, 339:12, 339:17, 339:19, 340:11, 341:5, 363:5, 363:8, 364:11, 365:3
windows [3] - 340:6, 340:7, 344:18
wire [7] - 286:4, 286:7, 286:15, 286:20, 286:25, 287:3, 321:6
wireless [1] - 381:2
wish [1] - 395:23
withdraw [2] - 238:19, 280:11
withdrawal [19] - 236:4, 237:14, 238:6, 238:10, 238:16, 238:21, 238:24, 239:3, 239:10, 239:11, 239:13, 239:16,

239:19, 280:14, 280:15, 280:19, 280:20, 295:18, 300:14

**withdrawals** [13] - 238:20, 278:23, 279:5, 279:9, 279:10, 279:13, 279:14, 280:1, 280:6, 308:17, 308:18, 308:23, 308:25

**withdrawn** [3] - 234:11, 270:15, 348:25

**withdraws** [1] - 236:4

**witness** [39] - 229:23, 234:7, 246:3, 253:9, 254:5, 254:7, 287:2, 287:20, 291:25, 293:13, 293:23, 295:6, 310:25, 314:8, 314:12, 314:15, 314:19, 315:22, 315:24, 317:11, 317:16, 345:8, 350:17, 357:16, 358:9, 362:21, 366:21, 370:10, 371:7, 372:23, 386:9, 386:13, 387:16, 387:17, 391:2, 393:4

**WITNESS** [27] - 228:2, 233:5, 246:7, 246:18, 246:23, 247:11, 247:15, 247:20, 252:15, 254:7, 254:13, 261:5, 273:7, 280:2, 297:21, 297:25, 298:8, 298:13, 299:9, 299:16, 314:14, 345:12, 364:18, 364:23, 365:7, 366:2, 370:14

**witness's** [4] - 246:2, 314:19, 347:4, 357:21

**witnesses** [11] - 370:21, 371:20, 372:2, 372:8, 372:10, 373:16, 375:25, 385:24, 387:12, 387:22, 388:2

**wonderful** [1] - 386:19

**wondering** [1] - 393:22

**word** [5] - 251:8, 299:9, 363:7, 363:15, 373:4

**worded** [1] - 337:20

**words** [5] - 321:10, 329:22, 351:12, 377:12

**world** [3] - 321:13, 330:8, 379:9

**worry** [2] - 387:23, 390:6

**worth** [1] - 310:20

**worthy** [1] - 371:22

**wrap** [4] - 309:24, 312:25, 366:22, 366:23

**wrapped** [2] - 253:8

**wrench** [1] - 310:23

**writ** [1] - 245:10

**write** [6] - 275:13, 291:24, 320:18, 380:19, 380:23, 385:7

**writes** [1] - 287:13

**writing** [2] - 363:24, 364:2

**written** [3] - 265:10, 322:25, 367:12

**wrote** [5] - 233:16, 236:13, 264:24, 267:23, 269:20

## Y

**year** [3] - 292:2, 318:5, 343:8

**years** [2] - 301:19, 395:24

**yes/no** [1] - 334:24

**yesterday** [19] - 230:9, 230:20, 232:11, 235:7, 240:20, 242:9, 245:23, 246:23, 247:12, 248:22, 252:1, 256:8, 256:12, 288:9, 289:16, 290:9, 291:5, 311:13

**York** [2] - 227:17, 227:20

**you-all** [4] - 374:22, 375:2, 381:21, 385:21

**yourself** [2] - 274:6, 316:7

**yourselves** [1] - 377:4

## Z

**zone** [2] - 360:17, 360:24

**zones** [2] - 360:10, 360:20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          ) Criminal Action
                                   ) No. 1:21-CR-0399
                     Plaintiff,    )
                                   ) **MOTIONS HEARING**
vs.                                )
                                   ) Washington, D.C.
ROMAN STERLINGOV,                  ) **August 29, 2023**
                                   ) **Time:  1:17 P.M.**
                     Defendant.    )


**TRANSCRIPT OF MOTIONS HEARING**
BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE


**A P P E A R A N C E S**


For the Plaintiff:       CHRISTOPHER BROWN
                         USAO-DOJ
                         601 D Street, NW
                         Washington, DC 20001

                         ALDEN PELKER
                         U.S. DEPARTMENT OF JUSTICE
                         950 Pennsylvania Avenue, NW
                         Washington, DC 20530

                         JEFFREY PEARLMAN
                         DOJ-CRM
                         U.S. Department of Justice
                         1301 New York Ave. NW
                         Washington, DC 20005

For the Defendant:       TOR EKELAND - Via Zoom
                         MICHAEL HASSARD - Via Zoom
                         Tor Ekeland Law, PLLC
                         30 Wall Street, 8th Floor
                         New York, NY 10005

                         Defendant Roman Sterlingov - Via Zoom

A P P E A R A N C E S (Cont'd.)

For Chainalysis:            WILLIAM FRENTZEN
                            MORRISON & FOERSTER, LLP
                            425 Market Street
                            San Francisco, CA 94105

Court Reporter:             Tamara M. Sefranek, RMR, CRR, CRC
                            Official Court Reporter
                            United States Courthouse, Room 6714
                            333 Constitution Avenue, NW
                            Washington, DC  20001
                            202-354-3246

PROCEEDINGS

THE COURTROOM DEPUTY:  Criminal Case 21-399, United States of America v. Roman Sterlingov.

Would counsel please state their name for the record, starting with government counsel.

MS. PELKER:  Good afternoon, Your Honor.  Alden Pelker for the United States.

THE COURT:  Good afternoon.

MR. BROWN:  Good afternoon.  AUSA Chris Brown for the United States.

THE COURT:  Good afternoon.

MR. PEARLMAN:  Jeff Pearlman for the government. Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. EKELAND:  Good afternoon, Your Honor.  Tor Ekeland for Defendant Roman Sterlingov, who is present via video link.

MR. HASSARD:  Good afternoon, Your Honor.  Michael Hassard for the defendant, Roman Sterlingov, who is present via video link.

THE COURT:  Good afternoon to you as well.  Let me start off by asking Mr. Sterlingov if he consents to our proceeding today with his counsel appearing by video link and with him appearing by video link.  Mr. Sterlingov?

THE DEFENDANT:  Yes, Your Honor.

THE COURT: Okay. Thank you. All right. So we have a lot to cover and, unfortunately, only about 40 minutes at this point. So we'll just do our best to move as quickly as we can.

Anything else that anyone wants to offer with respect to the government's request that the Court enter an order pursuant to Rule 57.7 ordering the parties to comply with that rule?

MR. BROWN: Not for the government, Your Honor.

MR. EKELAND: Nothing from the defense, Your Honor.

THE COURT: So I am going to enter an order directing the parties act in compliance with Rule 57.7. I do understand that the defense has taken some steps to bring their conduct into conformance with that rule, and I appreciate that.

Let's take up the Rule 17(c) issue. And this is the question, principally, I think at this point of whether Chainalysis should be required to make available for inspection at least a portion of the source code for the program that was used for purposes of doing the analysis in this case and that would form the basis of some of the expert testimony in this case.

I know yesterday evening I received a copy of a curriculum vitae of an individual that the defense has identified as somebody who could look at the source code for them. I suppose my first question is whether the parties have

discussed that and they've discussed what it is that Ms. Salah would be looking at and also a suitable protective order.

MR. EKELAND: Your Honor, thank you. So we had a call yesterday, and the parties are in substantial disagreement, and we couldn't reach any kind of agreement on this point at all.

And I think one of the main reasons for that disagreement is that when we spoke with Mr. Laurent Salah, who my understanding is one of the top experts in the world when it comes to blockchain analytic software, we asked him if -- you know, what parts of the source code we should focus on. And what his answer was to us is that he couldn't answer that question without seeing the entire source code.

And so when we presented that to Chainalysis, we were, essentially, told that that was a nonstarter. And we really didn't get asked that in our discussion. So pretty much the parties aren't in agreement.

The defense currently is asking for all the source code so we can identify what we really need to look at, and it's our understanding that Chainalysis is just refusing on that point.

THE COURT: All right. And have you discussed a protective order?

MR. EKELAND: We didn't get to that, Your Honor. We're happy to sign any reasonable protective order. We have

no interest in distributing this IP anywhere. We just simply want to review it for purposes of Mr. Sterlingov's defense.

THE COURT: Have you discussed the protective order with Mr. Salah? I think that's probably the principal question, about whether he would agree not only to not use the source code, but not to engage in any competitive practices for some period of time in which he might even subconsciously be relying on what he learned from the source code from a potential competitor.

MR. EKELAND: He has signed the protective order that's governing this case. And while I haven't explicitly discussed with him sort of a noncompete, I don't anticipate that being a problem. I can't speak for him, but the defense has no problem presenting it to him and asking him. I wouldn't expect a problem on that front, Your Honor.

THE COURT: All right. Let me hear from Mr. Frentzen then, please.

MR. FRENTZEN: Thank you, Your Honor. I appreciate the opportunity to address the Court.

So let me address the issue as follows. And I was here once upon a time when the Court gave some pretty explicit instructions about how to proceed down this road --

THE COURT: We don't have a lot of time today. I can tell you that I'm aware of the procedural issues and they should have done it earlier. The truth of the matter is, if I

conclude that this is something that is substantially important to the defense in the case, I'm not going to simply say, well, I told you by X date to do this and you didn't do it; therefore, you lose a substantial portion of your defense. I really want to get to the merits of this.

MR. FRENTZEN: That's what I'm getting to, Your Honor. Where I'm going is that, in part, what the Court said was find an expert who would be an appropriate expert, not a competitor and somebody who, you know, could be relied upon. Put something in writing that specifies what needs to be looked at and why with some specificity.

Have the individual able to follow a protective order -- and I will raise for the Court that a protective order be effective in the first place. I will address that a little bit as well in terms of concerns about that.

What we got in the phone call yesterday, and we got the same CV the night before, and so we've done some digging into the proposed expert. But, effectively, the phone call, I will tell the Court, went this way. As you've heard, we need to see everything, and we -- once we get in there and look around, then we'll know what we want to look for.

THE COURT: Isn't that not an unreasonable response where you don't know what you're going to find? And so if I said to you, you're welcome to select a book off the shelf in my chambers, you say, well, thanks very much, Judge, but I have

no idea what books you have on your chambers.  So I wouldn't even know where to begin to know what to ask for.

MR. FRENTZEN:  But this is not that situation, Your Honor.  They know and have an understanding of how this type of software operates.  They know and understand and have conferred with countless experts trying to poke holes in the analysis that was done in this case.

And what the Court has said repeatedly and what we discussed was, say something about what it is you need to see; what aspect of this that it is you don't get.  Because, recall, this is all -- in terms of the actual analysis and in terms of what is occurring there, these are observable and verifiable activities and analysis with a conclusion.

Now, they may have a different expert say we disagree with your conclusion.  But the point is, have some expert say why the source code in particular -- right? -- is proprietary source code, is necessary to be examined and what it is about it.

And recall -- I know there's the rant, you know, my guy is being held for this and et cetera, et cetera, and Chainalysis is accusing him, which is totally false.

But what we're talking about here in terms of the software is not, you know -- you put in a bunch of things and out pops Mr. Sterlingov.  What we're dealing with here is an analysis on Bitcoin Fog -- Bitcoin Fog and other, if you will,

dark markets or exchanges and whether or not Bitcoin Fog was, in large part, handling or dealing with dirty money.

My point is, tell us what -- have your expert tell us what it is you need to understand. We may be able to -- I'm sorry, Your Honor, but if I could just --

THE COURT: Sure. Go ahead.

MR. FRENTZEN: We may be able to explain that to you. We may be able to then say, we understand what the issue is here, and we will try to clarify it for you.

THE COURT: I can answer that question for you, I think. Maybe -- I don't know whether you need the answer from the defense or from me. I can tell you what I think they need to understand.

And you can tell me, since you're the one who -- your client is the one who has access to the source code, where they would need to look to find this. I think what they're entitled to understand is what heuristics applied in this case and any assumptions that applied. And not simply at 30,000 feet where we simply say there were behavioral heuristics, but where somebody can actually do something with the analysis.

Here is a particular behavior, and that behavior received 7 points on a 100-point scale for purposes of determining X, Y, or Z, or however it's weighted in the process. Someone can look at it and say: What's the formula? What is the algorithm that spits out the result that X

percentage of the activity on Bitcoin Fog was tied to the darknet; in particular, darknet sites?

And how do you -- what is the -- what's the formula or algorithms and what are the assumptions so someone can look at it and not just simply say at a general-level behavioral heuristics, but here's a particular behavior and this is how we measured for that behavior in the analysis.

MR. FRENTZEN: Your Honor, first of all, had I had this -- it's a conversation that I can have, and I think there may be a way to respond to what the Court's concern is. It's not just give us all of the source code and let us examine all of it.

And let me get into this because this particular expert, Your Honor, is highly problematic. I will tell you at least a couple of reasons why, having had only a limited amount of time to take a look at this.

But this particular expert, Your Honor, is an individual who actually runs a competitor site. It is called OXT. I think the site can be reached at OXT.ME. It is a blockchain Bitcoin analytics operation that generates links and connections much like other blockchain analytics function.

It is actually a competitor, but not just a competitor. It is a competitor whose mission is effectively to try to put other blockchain analytics programs out of business or to assist people in evading the detection. So this is not

just a competitor, but actually sort of someone who sees themselves as an individual who wants to put, not just Chainalysis, as far as I can tell, but other blockchain analytics software out of business.

And if the Court wants to take a look, I can go through some of the tweets.  There are endless tweets.  The individual's Twitter handle or X, whatever they're going by now, is @-L-a-u-r-e-n-t-M-T.

It is full of negative screeds about Chainalysis, negative screeds about blockchain analytics, negative screeds about the DOJ, Department of Treasury.  It accuses DOJ of manufacturing evidence.  It accuses Chainalysis of all sorts of things; a lot of it straight out of -- straight from defense counsel.

It also is chock full of this particular case in which the individual has prejudged this case and is an opponent of this particular case.  Not that, you know, somebody can't be out there commentating, but what I'm telling the Court is this is not an unbiased expert who is -- this is a competitor.

THE COURT:  I'm less concerned with whether the individual is biased or not because that's an issue that the jury can sort out or not.  I am more concerned with the question about whether the individual is a competitor and actually can abide by a protective order.  That is a more serious issue in my mind.

MR. FRENTZEN: He is a current active competitor through an open-source code site, which so far as I understand, that stuff can't really be effectively shut down. So I don't think it's possible for him to be in a noncompete.

But more troubling, Your Honor -- let me just add -- this is an individual who, among his terms of service, so the Court gets the flavor for it -- and part of the reason why I'm getting into this is that this is, frankly, an individual who has no interest in abiding by a protective order from this Court.

In the terms and conditions there is all kinds of limitations of warranties, and basically you can't rely on this. In addition, a restriction of usage, OXT and the proprietary data, blah-blah-blah, is available to all users without restriction with the exception of officers, contractors, subcontractors, or staff acting on behalf of any government or law enforcement agency; officers, contractors, et cetera, et cetera, associated with the investigation of any active criminal proceedings; officers, contracts, et cetera, et cetera, of blockchain analysis entities acting in an official and/or commercial capacity or being contracted by any government or law enforcement agency; or any entity investigating money laundering or unexplained wealth; any user, entity or company corresponding in the above description that uses OXT will be --

THE COURT REPORTER: Can you slow down, please.

MR. FRENTZEN: I'm sorry. I'm coming in for a landing. I apologize.

-- will be deemed in breach of these terms and conditions.

What I'm explaining to the Court here is this is not an individual who has an interest in complying with the law, complying with a protective order. This is somebody whose active purpose is to evade and try to put out a business, blockchain analytics, by other entities to include Chainalysis.

And so this is an incredibly risky proposition. This is not an appropriate expert. He is in the business of not only competing, but trying to defeat Chainalysis. Handing him the source code is handing him a golden ticket for improper usage.

And let me also point out, so far as I can tell, Your Honor, the individual is French. I have nothing against the French -- lovely people; it's a lovely country -- but I have worked cases when I was still a prosecutor with the French government, and one thing I know and understand deeply is he's not going to be subject to the Court's protective order.

And even if his conduct rose to the level of criminality in the terms of contempt of court and we were able to show it was him who leaked it -- and I think the Court knows, there are a million ways for somebody who knows what

they're doing to leak something and have it not be tied back to them. But let's say that the government were able to figure that out and prove it, he's French. The French don't extradite their own for anything.

So what I'm saying to the Court is, this is not even somebody who is subject to a protective order even if he were inclined to obey, which clearly his entire -- I mean, if the Court spends some time -- and I apologize, because I wouldn't subject you to it otherwise, but if the Court or staff spends some time with his Twitter, I think you'll get a sense of what I'm talking about.

And so the whole purpose here, again, is not -- the source code is not the issue here, Your Honor. That's why they haven't done what you've asked them to do. An expert is not really going to say, this is going to be useful in terms of doing what the Court has talked about.

THE COURT: Let me pause you here. I really am short on time today.

MR. FRENTZEN: I understand. It's a --

THE COURT: You said that there are other alternatives. What are the other alternatives?

MR. FRENTZEN: Your Honor, what I think I could propose that we do and what could be done in relatively short order is a further specification along the lines of what the Court has discussed.

In other words, that the heuristics which Ms. Bisbee -- which Reactor utilized in the analysis that clusters Bitcoin Fog and the other, I think, nine dark markets, for lack of a better phrase, that those -- that those addresses, those transactions could be further specified in terms of which of the behavioral heuristics were utilized.

In other words, within the category of behavioral heuristics, which of the transactions -- what were the behavioral heuristics that triggered the clustering in that particular instance, and I think that's something that we could do. We could provide to the government and that the government could provide, pursuant to Rule 16, which would address the Court's basic concern, which is can we get a more granular definition of what heuristics are being utilized here.

THE COURT: All right. I want -- I'll come back to you in a minute.

MR. FRENTZEN: Thank you, Your Honor.

THE COURT: I want to ask Mr. Ekeland about the concerns that are raised with respect to this particular expert and whether he really is somebody who meaningfully could be subject to a protective order or whether he is such a substantial competitor that it just would not be possible to meaningfully protect the information.

In particular, what I really had in mind was somebody who was not a competitor and also somebody -- I think I

mentioned this last time -- somebody who could, for example, sign a protective order saying for five years that they would not operate in the same field.

MR. EKELAND: Well, first, Your Honor, OXT, I believe, is a free, open-source platform to contrast that with Chainalysis, which is a closed-source proprietary platform. If Chainalysis was open-source, we wouldn't be having this discussion because an open-source software --

THE COURT: I'm really short on time here today. I really want to get to the --

MR. EKELAND: So, first of all, we disagree that he's a competitor. That's not clear to us at all. According to his resume, which we submitted to the Court and the government and Mr. Frentzen, he's a founder of OXT, but he is now a subcontractor that works for them. And in the interest of --

THE COURT: Would he be willing not to work for them for five years?

MR. EKELAND: That, I'd have to ask him. I can't speak for him, but we're happy to ask him. Yeah, I'll ask him that.

THE COURT: What do I do about enforcement? So if stuff starts appearing in tweets and saying, you're not going to believe how terrible Chainalysis is here, and here are the five things I know as to how terrible it is; they're all proprietary in nature. How do I enforce that? What do I do?

MR. EKELAND: Well, the standard enforcement mechanisms, my understanding, is contempt of court --

THE COURT: But if he's a French citizen living in France, what good is that?

MR. EKELAND: Well, I'm sure he wants to travel to the United States. I am not an expert in extradition law or treaties with France, but France is an old ally of the United States. I'm sure there would be repercussions.

I mean, Your Honor, I'm happy to look into enforcement mechanisms further. But one of the issues in this space is that anybody who is good in this space is going to have some kind of conflict with Chainalysis because Chainalysis is competing with everybody. And this is such a new space, and he is one of the top people in the world in this space.

THE COURT: Right. But I suppose, though, there's a difference, though, between somebody who is just an expert who can read the source code and can say from the source code, here are the assumptions, and we can work out some way in which they may be able to then disclose that as assumptions to others for purposes of the case.

But I'm not sure that you need somebody who is writing the competitor's source code or running the competitor or is seeking to undermine Chainalysis in the marketplace either for financial purposes or other purposes; but find somebody who can look at it and say, I'm an expert in reading

source code, and these are the assumptions.

I think Chainalysis has said that they can tell us with greater specificity what the assumptions or heuristics are. But maybe you want someone who can confirm that. Are they telling the truth when they say that? It doesn't have to be a blockchain expert.

It just has to be somebody who can say, yes, I looked at the source code and that is correct. That is, in fact, what the heuristic provides; that the source code does, in fact, say that if X behavior, then Y result.

MR. EKELAND: Your Honor, first of all, we're not agreeing with Mr. Frentzen's characterization of Mr. Salah as a competitor. So I just want to --

THE COURT: I take your point. But I think, regardless of whether he's a financial competitor or not, the point is the same. If he is somebody whose work and activity in life is attempting to undermine Chainalysis and to promote what he's doing in place of what Chainalysis is doing, it may not be a financial competition, but the same point applies.

MR. EKELAND: Yes, Your Honor. I think there's two separate issues here. One is the enforceability of any protective order; and, B, the credibility of any testimony he may put forward.

On that latter point, the government is welcome to challenge him. And on the former point, I think we can easily

craft some kind of protective order that's going to prevent the issues here.

THE COURT: I don't know whether this is possible or ethical, but could I require that you post a $500,000 bond and that you forfeit the bond if he leaks something? I mean, is there some way that I can actually provide enforcement in the United States?

MR. EKELAND: You know, the defense is open to that.

THE COURT: I don't know whether that's ethical or not to do it that way, but I need some way to enforce a protective order. Having somebody living in France is not going to do it.

MR. EKELAND: We're open to exploring that, Your Honor, assuming we can honor the requisite -- whatever the ethical rules apply. We're open. Because A, I don't anticipate any kind of violation of it.

And, Your Honor, if the government and Chainalysis aren't going to produce the source code, given the fact that there's no scientific papers or anything attesting to the accuracy, Chainalysis doesn't have any internal data on its error rates at all, the defense thinks they should be excluded entirely, anything from Chainalysis Reactor, because we didn't create this situation.

The government is the entity that came in and decided to use proprietary closed-source software as the foundation of

their case. And if the government is unwilling to provide the defendant in a federal criminal case access to the source code by using something like OXT, which is an open-source platform, then it should be excluded, particularly in this case where there's no -- no reliable evidence as to its accuracy.

That's why we're asking for the source code in the first place.

THE COURT: Mr. Ekeland, you're pushing on an open door on this point. I've already indicated that I think you're entitled to look under the hood here.

My concern, though, is that I have for weeks and weeks been trying to encourage you to do this in a way that makes sense and, you know, we're on the eve of trial now, and I still am concerned that I don't have a proposal in front of me that is a workable proposal for how you do to.

It's not that it's not possible. It is possible to find somebody who is just an expert in reading source code. We've been told that Chainalysis will give us a list of the specific heuristics that were applied and that somebody can look at the source code and say, does that do that or not.

MR. EKELAND: Your Honor --

THE COURT: Who is not someone who is trying to undermine Chainalysis and where there's concerns that, even if they promise not to use it, it may be very hard for someone who spends a portion of their life criticizing Chainalysis to

exclude from that portion of their brain the fact that they've learned that they think they see some flaw in what Chainalysis does.

MR. EKELAND: That's a big assumption about Mr. Salah. You know, perhaps maybe we should have him in so that the Court and the government can cross him on these issues.

But we're confident that he can evaluate the source code and not violate any protective order or bond or whatever the Court chooses to put in place.

THE COURT: I'd be happy to hear from him if you wanted to schedule something. I would be happy to hear from him.

MR. EKELAND: Okay. We'll reach out to him and, I guess, reach out to the Court.

THE COURT: But what I will do is I will encourage you, just given the shortness of time here, to be following other paths as well. And see if, assuming -- operate under the assumption that I'm going to conclude that this expert is just too adverse in a business sense to Chainalysis to have access to their crown jewels and that you need somebody else.

So keep looking for that other person, somebody who is just not in the blockchain tracing world who can at least look at the source code and just verify whether it does or doesn't do what Chainalysis says it does or will say it

does. And then if it turns out that it doesn't do it or that you have an expert who says it doesn't do that, you can put that person on the stand to say, here's the assumption, and I looked at the source code and the source code doesn't do that; or we can consider whether there are further steps that need to be taken at that time.

MR. EKELAND: Understood, Your Honor. Just for the record, the defense would just like to put an objection on the record as to the government using this type of closed-source proprietary black box -- blockchain explorers to prosecute a defendant. We think it's unconstitutional.

THE COURT: You put that one on the record, I think, about a dozen times so far, so I think you're safe on that.

MR. EKELAND: Thank you.

THE COURT: All right. Mr. Brown?

MR. BROWN: Your Honor, I know time is short; extremely short. I just want to be heard.

THE COURT: Yes.

MR. BROWN: May I pass this up?

THE COURT: Thank you.

MR. BROWN: Your Honor, just -- we sent the defense an electronic copy of these tweets. These are the tweets; just a selection of highlights from their proposed expert.

Just two very quick points. Mr. Laurent [sic] has, I mean, really borderline violent rhetoric directed towards

Chainalysis and their testimony in this case. This hashtag headshot, as in shooting somebody in the head. Mr. Laurent [sic] retweeted, "If you're so F-ing sure of your work, show me your F-ing source code, punk," which is actually a quote from Mr. Ekeland.

This is not an appropriate witness in any sense; certainly, not an appropriate witness to trust with intellectual property from our expert witness. This is part of their campaign of harassment directed at Chainalysis. That's point number one.

Point number two is the defense is not taking yes for an answer. I heard counsel for Chainalysis talk about a compromise where they disclose the underlying algorithms and formulas for the relevant heuristics that went into the expert report. That is -- that would, actually, be more directly tailored to the legitimate defense to the extent that the defense has any sort of legitimate interest in understanding --

THE COURT: All right. So let me order that that occur. And that Chainalysis disclose to the government and the government can disclose to the defense the underlying algorithms and heuristics that went into the report.

MR. BROWN: Yes, Your Honor.

THE COURT: I take your point. I still think -- I think that's an important step, and I appreciate it.

I still -- you're welcome to come back up,

Mr. Frentzen. I still think that, if it's possible, I would like to provide some opportunity for a defense expert to be able to look at the source code just to verify that it does what is represented that it does. As I said, I don't think that needs to be a blockchain expert, and we're running out of time on doing this. I've provided this advice to the defense numerous times already.

Mr. Frentzen?

MR. FRENTZEN: Your Honor, we continue to object to the source code. And the reason why you haven't gotten an expert to say that is because the experts don't need to see the source code. That's not really what's at issue here.

Just to clarify what just occurred, we are providing -- we are willing to provide, in the hopes that it brings this to a conclusion -- not because we want to keep giving things when nobody tells us any intelligible -- what it is they are looking for, but the heuristics utilized in this particular analysis as it relates to the behavioral heuristics, breaking it down within that as to what were the bases or reasons therefor, not a particular algorithm. I just want to make that clear.

THE COURT: Okay. Let me ask Mr. Ekeland. Taking that offer, is there any additional clarification or specification or specificity that you would seek with respect to that?

What we're hearing is the specific behavioral heuristics and assumptions that went into the report as relevant to this case.

MR. EKELAND:  Your Honor, we would --

THE COURT:  Go ahead.

MR. EKELAND:  First, we would like to -- in relation to heuristic No. 1, which is the co-spend heuristic, Ms. Bisbee testified that Chainalysis has particular algorithms to detect CoinJoins.  So we would like to see the source code and any information related to heuristic No. 1.

THE COURT:  Right.  Let me ask you to pause there for a second.  Let me ask Mr. Frentzen.

Again, putting aside the source code, can you provide further detail or explanation of what was done with respect to CoinJoins?

MR. FRENTZEN:  Your Honor, respectfully, their expert agreed with regard to heuristic 1, as far as I can tell, 100 percent with our -- with our conclusions.  So I'm not sure what we're fighting about there.

In other words, I'm not sure why we would turn over, sort of, that type of information when there's not really a live dispute as to that particular issue.

THE COURT:  Mr. Ekeland?

MR. EKELAND:  I think Mr. Frentzen mischaracterizes Ms. Still's testimony and our position on that.

What Ms. Bisbee's testimony was, was that Chainalysis deploys particular proprietary algorithms, I believe, that detect CoinJoins and eliminate any risk of error. We would like to see that, as well as information on heuristic 1; heuristic 2, of course, which Ms. Still called the Pac-Man overinclusive behavioral heuristic.

And, more interestingly, something that was raised by Mr. Salah, with heuristic No. 3 -- which is their intelligence heuristic -- what we're unclear on here is whether or not heuristic No. 3 and -- in relation to their claims that their software is deterministic -- involves actually manual modification and corrections to the result from the software. This is something that's at least documented, I think, once in Ms. Still's expert report where she refers to, I think, Mr. -- IRS CI Beckett that Chainalysis could get back with a fix.

This raises the problem in relation to Chainalysis Reactor, in general, as to hearsay. Because maybe there's an argument that the source code and sort of what they're claiming to be deterministic -- which we don't think is deterministic -- is not hearsay.

If you've got manual manipulation, as appears to be occurring here, at least implied by the IRS CI Beckett, you have a hearsay objection to this code. So what we're asking for is information and source code related to heuristic 1, heuristic 2, and heuristic number 3; in particular, any kind of

manual manipulation or corrections or fixes.

And that's why we're also not just asking for the source code, but the change log as well, which will document changes in the software over the course of time.

THE COURT: All right. Mr. Frentzen?

MR. FRENTZEN: Your Honor, this laundry list is not something that any expert has presented to us. It's what the Court said we could actually try to work through.

And so I'm standing here after however much time where they haven't done anything -- right? -- I had a phone call yesterday. We want everything. Why? We have to look under the hood and look at everything, which is the very definition of a fishing expedition under Rule 17, right?

So no expert has said, here's what we have to say, so that we can say, here's why you don't need to see this, or here's how we can address this problem. We still don't have what the Court has said now, probably months ago when I was here last, exactly how they could do this. They came here again; you said how they could do this. They still haven't done it. They've proposed possibly the worst expert in the world for this project.

THE COURT: Right. Put that aside for a second. That's another issue. I just want to stay focused here.

You're right. They haven't done what I've asked with respect to providing the specificity. I'm going to take

Mr. Ekeland at his word now, and I'm going to hold him to this and his list at this point in time, and the list that he's provided to you. You can shake your head, and I can just enter an order and tell you to turn over your source code, if that's what you prefer.

MR. FRENTZEN: No, Your Honor. I'd prefer that we handle this in a way that we get an expert to say these things, not Mr. Ekeland to just rattle off a wish list. He's done that before. That's what all of his requests are. That's what his subpoenas have been.

THE COURT: I'm trying to give you the specificity now by telling you exactly as of today what it is, period. That's the end of the matter. And I'm going to hold him to it.

MR. FRENTZEN: I understand that. We just want an opportunity to respond, Your Honor, rather than here's an order, because we're just standing here now and they haven't done what they said they were going to do. That's what I'm saying.

THE COURT: I will allow you to seek to file a motion to revise this or to change it if you think that it's mistaken in some reason. But I am going to take you up on your offer with respect to providing the specifics on the heuristics and assumptions that went into heuristic 2.

With respect to heuristic 1, I'm going to ask that you do the same thing with respect to CoinJoins. You can tell

the government what the procedures were or process was for CoinJoins.

And then with respect to heuristic 3, if there were manual corrections that were made, I'm going to request that you just identify the types of manual corrections that were made for the government so that the government can disclose that as well.

And that's the list that I've gotten from Mr. Ekeland. He's had his opportunity. That's it.

MR. FRENTZEN: So this is the end of the matter, Your Honor?

THE COURT: Well, I still need to figure out, once you do this, as to whether there's any need and whether there's someone who is -- an appropriate person, if they want, to be able to look at the source code and just confirm that it does what you say it does. You're going to tell him what it does here.

I agree with you and I have concerns about Mr. Laurent [sic], and I've provided warnings to the defense on numerous occasions on the type of expert, a person they should provide. From what I've seen today, he doesn't seem to satisfy that.

But if they can go to the University of Maryland computer science program and just find somebody who is an expert in computer code in whatever language the problem is

written in who can look at the computer code and say either it does or it doesn't do what you say, I would be open to that still. But I'm not going to order that yet because I'm not convinced that Mr. Laurent is the person to do that, and time is running out for the defense. They have not yet convinced me that they have somebody who is an appropriate expert to do that type of analysis.

MR. FRENTZEN: So the first thing I came here prepared to discuss and to offer to the Court, and so we will make that --

THE COURT: I appreciate that.

MR. FRENTZEN: The others, Your Honor, I would like an opportunity -- because I'm just standing here --

THE COURT: I understand. You have to talk to your client.

MR. FRENTZEN: I want to be able to confer with the client --

THE COURT: I understand.

MR. FRENTZEN: -- talk about what possible issues there are and be able to return to the Court about those --

THE COURT: That's fair.

MR. FRENTZEN: -- in the hope that this will conclude this entire foray.

THE COURT: That's fair under the circumstances. If it turns out that for some reason what I've ordered is

problematic, I'll just direct that you tell me -- when? -- Monday, Tuesday to file a report with the Court letting me know?

MR. FRENTZEN: I think -- sorry, Your Honor. What day is today? I think Tuesday would be great if we can have --

THE COURT: By Tuesday, you'll file a report letting me know if there's a problem with that.

MR. FRENTZEN: Thank you, Your Honor.

THE COURT: Okay. I appreciate this. I realize you're a third party here. But it is -- you're a third party where you're not quite the core of the case, as Mr. Ekeland has suggested, but it's a significant part of the case.

I do think it's fair that the defense have the opportunity to test the assumptions and make sure they understand the assumptions that have gone into the analysis.

MR. FRENTZEN: We will take a look at the additional requests, and we'll report back to the Court. Thank you, Your Honor.

THE COURT: Thank you. Let me be clear. I mean -- well, I guess they are -- I guess there are requests in the sense that it's not discovery that I can direct that you produce.

But it's more than, I think, just a request because I think if we're not able to work something out like this, then I may be in a position where I just have to direct that all the

source code get turned over, just so you can convey that to your client. I need to get some resolution here so that the --

MR. FRENTZEN: I understand that, Your Honor. But I think putting the onus on the folks that have been doing what they're supposed to do rather than the ones who haven't is a fundamental problem here, Your Honor. It's created a situation where we are doing this like this rather than having some expert say, here's why we need to see the following portions of the source code, which is all the Court said, from somebody who has not got a dog in the fight. And we don't have that.

So, instead, we're here with the Court saying we may be forced to just turn it all over if we don't capitulate to a last-minute -- you know, throw up a bunch of issues by counsel. I'm sorry, Your Honor, but it's just not --

THE COURT: I'm sorry to say this to you. I think your attitude towards this is not sufficiently deferential to the due process concerns in this case. If we're going to go to the cost of trying this case and the government is going to the cost and we're going to have a jury who is going to sit here, I'm going to try this case in a way in which -- is not only consistent with due process and the rights of the defendant to a fair trial, but also in a way in which, if there is a conviction, the conviction is going to hold up.

None of us have an interest in trying a case and having the Court of Appeals saying what I'm saying right now,

which is that the defense has some right to look under the hood to understand the assumptions that are going to a key piece of evidence that's being used against them.

MR. FRENTZEN:  I hear everything the Court is saying.  I'm trying to be properly deferential to the Court.  I hope the Court sees that.

THE COURT:  I don't, frankly.  You seem diffident.

MR. FRENTZEN:  I apologize then, Your Honor.  My issue is with a process being laid out and then not being followed and, thus, putting everybody else at this point.  It's not with the Court.  It's with that particular -- that's where that issue comes from.  Let me say that, first of all.

Then just, if I may, I think part of the problem is that no expert -- right? -- no person who knows and understands will put on paper, here's why the source code needs to be seen.  And, fundamentally, that's because it's not really an issue, Your Honor.  And it's not something that under Rule 16 or under Rule 17(c) is something that needs to be seen.

In other words, there's not an expert who has put pen to paper, as the Court has said repeatedly should happen.  And that's because an expert -- it's not the issue.  The issue is not in the source code, Your Honor.  This is independently verifiable.

THE COURT:  Well, the issue may not be in the source code.  When you say it's independently verifiable, how is it

independently verifiable?

MR. FRENTZEN: I'm saying that the functional -- that the activity is all viewable on the blockchain. It is all independently verifiable. That's my point, Your Honor. It's -- and I'm sorry. I know the Court has short time.

But, look, fingerprint analysis, we all agree, is -- it's admitted in hundreds of courts every day. Firearm tool mark examinations, even DNA, if it's not an exact match, but you have a mixture, for example, admitted every day, everywhere.

And you have situations in which there are verifiable portions of that but then there are conclusions that are made from the verifiable information, and all the information here is verifiable and knowable and testable, and somebody else could reach a different conclusion. That's what I'm saying, Your Honor.

THE COURT: Okay. All right. You know where I stand on this issue now. And, hopefully, we'll be able to reach closure on this sooner rather than later.

And I will say to Mr. Ekeland that, although I'm pushing hard on Chainalysis here, I do agree with Mr. Frentzen that a large portion of the problem and the fact that we're dealing with this at the last minute is the fact that the defense has not complied with the Court's orders about how to proceed here.

If at the end of the day you don't get everything you're looking for, it's not going to be because I haven't tried to get it to you. It's going to be because you haven't taken me up on the offer of how to do it properly. But we'll see where we go with this. I hope we're able to reach some resolution. Thank you.

MR. FRENTZEN: Thank you, Your Honor.

THE COURT: So I have a number of other issues on my plate and, unfortunately, I'm already slightly late on my next matter. But let me just tell you the issue, I think, that is probably highest on my list.

I think, with respect to the *Frye* issue, we can just handle that at the pretrial conference. In fact, I think it's better to do it with Mr. Sterlingov in the courtroom.

On venue, I have been working on this. I will tell you, just for purposes of your trial preparation, that I think it is very likely that the Court will conclude that I do have -- there is venue in this District with respect to -- I'm just looking for the indictment. I think it's the first three counts -- all of the federal law counts of the indictment. I do, though, have questions. And I'm -- thank you.

So it's Counts 1, 2, and 3. And I'll get you a written opinion on this. I've been spending a lot of time thinking about it, and I'm pretty confident that there is venue with respect to those three counts.

With respect to Count 4 and one of the theories for Count 3, because, as you may recall off the top of your head, one of the theories for why there was failure to obtain a license for purposes of Count 3 is that there was a state law licensing requirement.

And I am, frankly, a little puzzled about whether there really is a requirement under D.C. law for somebody who conducts -- who physically is outside the District of Columbia, has no offices within the District of Columbia and who only touches the District of Columbia in the sense that someone engages in an internet transaction while sitting in the District of Columbia, and perhaps only does so on two or three or four occasions, but only just a handful of occasions that we know of from the District of Columbia and where it wouldn't even be clear to the, potentially, regulated party that those transactions were coming from the District of Columbia. They're just coming from an IP address somewhere. Is there really, as a matter of D.C. law, a registration requirement? And I, actually, went on to the website, which is cited in -- I think in Judge Howell's opinion, in the *Harmon* case, and there were a handful of businesses, arguably, that were registered under circumstances like that.

We're talking about maybe 10 or 15 companies in the world registered under those circumstances. And when I read the statute, it's not at all clear to me from the statute that

it applies under these circumstances. I'll get my copy of the statute here.

I don't think it's a venue question, but I do -- I really do instruct the jury on the law. And as a matter of law, I just wasn't sure that, even excepting the government's allegations in the case that Mr. Sterlingov was a person who was engaged in the business of money transmission without a license, and that if you then look at the various statutes that require a license under D.C. -- and I may have left some of these on my desk -- but, you know, they're written very much in brick-and-mortar-type terms. And that the disclosure has to say where in the District of Columbia, what's the address that your business is located at, things like that.

And it does seem that it would be capturing enormous breadth under those circumstances because I assume that a similar analysis wouldn't only apply to money transacting businesses, but I suspect there are similar D.C. statutes that deal with regulating businesses and licensing your business in general.

And does that mean that, if I'm sitting in D.C. and I engage in an online transaction with a company that is located in Switzerland and I'm the only person who has ever engaged in that transaction, it's a Swiss company with Swiss offices, but they're selling something online, and they're not registered to do business in D.C., have they violated those statutes?

There's just no analysis at all of this anywhere. If that doesn't apply, then the subsection (a) provision for purposes of 1960 wouldn't apply. You would still have 1960(b)(1)(B) and (b)(1)(C). But even as to (b)(1)(B), I started tracing that back as well. And that's a complicated question about when you're required to register under the treasury regulations or the statute, and the statute directs -- 1960 directs you to Title 31, 5330.

And then 5330 defines a money transmitting business to mean any business that quite broadly involves -- it involves the informal money transfer -- informal money transfer system or network of people who engage as a business in facilitating the transfer of money domestically or internationally. So that seems quite sweeping.

But it's conjunctive, and it says, "And is required to file reports under 5313." And then if you go to 5313, 5313 talks about domestic financial institutions.

And domestic financial institutions are then defined in 5312. And, again, a financial institution is defined quite broadly to include a licensed -- somewhat circularly, a licensed sender of money or any other person who engages as a business in the transmission of funds. So that seems quite broad.

But then it's unclear to me what the difference is between a domestic financial institution and a foreign

financial institution, and I didn't see a definition of that. There's a definition of domestic financial agency and foreign financial agency.

And then, of course, there are all of the governing regulations, the Department of Treasury regulations, which I glanced at but did not dive into.

And this is not all for purposes, Mr. Brown, of putting you to the test on the spot here, but I did want to flag this issue for both parties. I think I probably need a brief from both parties on the question of, as a matter of D.C. law, whether licensing really does apply under these circumstances.

When I looked at the statutes, as I said, they may be older, but they're written in very brick-and-mortar-type terms. And I do worry that if you construed the statute to mean that anyone who engages in a transfer of funds on the internet where somebody in D.C. participates in that or, even if their IP address isn't necessarily readily discernible as D.C., whether it means that there are potentially thousands of companies out there that are engaged in criminal activity that are unaware of that.

When I went to look at the registrations that I found online, it looked like, at least in some of the cases, there were cases that actually had local offices. Virtually, I think all of them, they actually had at least registered agents in

D.C. Maybe that's a requirement, that you have the registered agent in order to license in the first place.

But I don't know whether you-all have even reached out to the D.C. regulatory folks to ask them whether they think it applies under these circumstances, but it struck me as a little bit ambitious.

MR. BROWN: Your Honor, that last comment raises some other issues that Judge Howell actually addressed in some of her other opinions in the *Harmon* case about whether federal courts determine federal law or whether administrative agencies are entitled to --

THE COURT: That is an issue that I probably, hopefully, will not need to get into here. I really meant that more as a sanity check of, is that their understanding of the law or not? Are they applying the law that way or not?

MR. BROWN: And, Your Honor, I would say we did look in the course of the *Harmon* litigation at the kinds of, in particular, virtual currency companies that were registered as money transmitting businesses in D.C., and there were multiple companies that I'm 99 percent positive do not have a brick-and-mortar presence here.

THE COURT: As I said, I saw -- there might have been maybe as many as two dozen, but there were not a ton of them. Given the number of companies out there that engage in money transactions, you would expect, if people were really doing it,

perhaps thousands.

MR. BROWN: Your Honor, I mean, bear in mind, this applies to money transmitting businesses, so not just anybody who happens to be transmitting money. It's not at all unusual for -- like any major money transmitting business will get licensed in all 50 states or they will affiliate with agents who have licenses. That's a pretty typical practice, as is screening for IP addresses.

There are cryptocurrency exchanges that claim not to do business with U.S. customers, and so they screen for U.S. IP addresses. Bitcoin Fog did not do any of those things, and it was available in the District of Columbia.

I'd also direct the Court -- I mean, we're happy to provide briefing, but I'd also direct the Court's attention specifically to Judge Collyer's opinions in the *E-Gold* litigation, which I think is relevant both for -- although she didn't necessarily rule on the D.C. Money Transmitters Act, she did address quite -- in quite specific detail the applicability of the Bank Secrecy Act, statutory and regulatory definitions as applied to a virtual currency company, E-Gold, that had no brick-and-mortar presence in the United States and found that they did, indeed, apply.

THE COURT: And as I said, I want to walk through the analysis under Section 1960(b)(1)(B) and just make sure I understand it. And I believe that there may be Treasury

Department regulations that actually deal with --

MR. BROWN: Yes, Your Honor.

THE COURT: -- money transacting companies and virtual money transacting companies and Bitcoin-type entities. But I just need to make sure I understand that and that I'm walked through that.

As to that one, I really just am agnostic in the sense that I haven't been able to connect all the dots yet in my own mind.

With respect to the D.C. one, though, I'm just -- you may be right in the end. I'm just a little bit more skeptical there because it does seem to have enormous reach, and I guess the question is whether, as a matter of D.C. law, one is engaged in the business of money transacting if one enters into a transaction with somebody, of the millions of transactions that you may engage in, one or two of them happen to be with somebody who is sitting in D.C.

It's one of these challenging questions of the internet age.

MR. BROWN: Yes, Your Honor. I think -- think about PayPal. I'm sure PayPal does not have a brick-and-mortar office building in D.C.

THE COURT: But PayPal probably engages in many thousands of transactions in D.C. every year versus where, I don't know -- there may be thousands in this case -- we don't

know, but we know there are at least a couple.

MR. BROWN: The statute doesn't speak in terms of quantum of transactions.

THE COURT: No. But the word business may --

MR. BROWN: To be sure, yeah. Business is defined generally not in terms of the quantum of transactions, but in terms of, are you doing this -- are you open to the public for arm's length transactions, are you doing this to make money. That distinguishes a business from an individual engaged in --

THE COURT: So for present purposes, why don't we just come up with a date for briefing on this topic. I know you-all have a lot on your plates now as we're getting ready for trial. Why don't you tell me what is workable from your perspective.

I think it probably makes sense for the government to go first and then for the defense to have an opportunity to respond since it's your theory.

MR. BROWN: Your Honor, is it your intention to address this at the pretrial conference in terms of jury instructions?

THE COURT: That probably does -- we certainly need to resolve this before I instruct the jury or even -- I have had cases in which, by the time you get to the final jury instructions, that they depart from the preliminary. But it would be ideal to resolve it, if I can, before I get the

preliminary instructions.

MR. BROWN: Yes, Your Honor. We would certainly want to be able to tell the jury in opening statements which counts we're proceeding on.

THE COURT: Exactly.

MR. BROWN: If that's the case, if we could have until Monday. I know Monday is a holiday.

THE COURT: That's fine with me. I'll direct that the government file its brief with respect to the applicability of 1960(a) -- I'm sorry -- (b)(1)(B) and the D.C. statute, and that you do so on or before the 4th of September. And that the defense respond on or before the 6th.

MR. BROWN: Yes, Your Honor.

THE COURT: Obviously, Mr. Ekeland, in the meantime, even though that's a short turnaround, you can be doing your research on this topic, and if -- but it will give you a chance to at least see what the government says before you have to file your brief. All right?

MR. EKELAND: Understood.

THE COURT: I've already run substantially over today. But the other issue I wanted to touch on was to find out where the parties are with respect to the question of authentication of documents and whether the parties are able to narrow the universe or whether you need me to rule on all, I don't know, 100 different documents we're talking about.

MS. PELKER:  Your Honor, at this point the government is still waiting to hear back from the defense on all of the authentications.  If we haven't heard one way or another, we'll be asking the Court to rule on the admissibility based on the 902 certifications at the pretrial conference.

THE COURT:  All right.  Mr. Ekeland, when can you respond?  Because your response at this point has been three pages of not substantive.  It borders on conceded, I think.  The only thing that you've said more substantively was not even in the briefing on the authentication issue but was in briefing on another issues where, in passing, you indicated that the Mt. Gox documents were not authentic.

But I should say, just so -- to help guide you -- because I know everyone has a lot of work to do between now and trial -- I do think that the defense is mistaken or is conflating authentication with accuracy.  And you're free to argue that the records are inaccurate in some way and they've been hacked, that someone tampered with them in some way.

But authentication is just whether the records are what they purport to be, which that is, are these the records that are maintained or were maintained on a particular date by Mt. Gox or the trustee as of that date.  And they -- records may or may not be accurate, but they either are or are not the records that were maintained by Mt. Gox on that date.

With that said, Mr. Ekeland, when can you file any --

if you have any more specific -- well, first of all, ideally, you would get back to the government and tell the government, yes, you agree or stipulate as to authentication as to some subgroup of the documents.

But if there are others where you're not prepared to stipulate as to authentication, I need a specific legal analysis as to why they're not authentic with particular reasons, and I need it soon because, again, we're running out of time.

MR. EKELAND: Well, why don't we provide that on Monday when the government provides us their brief on the money transmission issue?

THE COURT: Okay. So you'll file with the Court then any specific objections you have?

MR. EKELAND: Yes. What is that, September 4th?

THE COURT: Yes.

MR. EKELAND: Yes, Your Honor.

THE COURT: Okay. I would encourage you beforehand just as a -- frankly, as a service to our jury that we're going to have sitting here through trial and for the Court that if there are things where you can stipulate, I would encourage you to do so just because it doesn't serve the interests of judicial economy to have to bring in an expert to take the stand and say, yes, these are the records we maintained, any cross-examination, no, no cross-examination, thank you. You

can leave. Okay?

MS. PELKER: Thank you, Your Honor.

MR. EKELAND: Understood, Your Honor. Just to flag --

THE COURT: Go ahead.

MR. EKELAND: Just to flag one thing. I'll revisit this, this week, but we do expect there to be an issue with the matter of the Russian translations, and I believe the last time we were in court, the Court mentioned that the Court might be able to provide a neutral translator. That's the most substantial thing that I can think of right now.

THE COURT: All right. So the parties are not in agreement about the translations? I suppose you can offer your competing translations, but if the parties agree to have a court-certified translator look at them and translate them, that's okay with the Court as well. But both parties, I guess, would have to agree to that.

MS. PELKER: The government still hasn't heard what defense's issues or concerns with the translations are, which language it is, what documents they're in. We're happy to discuss any of it.

If it's a small wording choice, it may not be a big deal. I suspect if defense is raising it, then --

THE COURT: I will then direct that the defense identify on or before Tuesday to the government any specific

objections it has with respect to the government's translations.  And then, hopefully, you can resolve any of those differences.  And if you can't, then we'll figure out at the pretrial conference what to do about it.

MS. PELKER:  Thank you, Your Honor.

THE COURT:  Anything else before we adjourn today?  I know you've got a lot of work to do.  I'm trying to at least give you some guidance to make it more efficient.

MS. PELKER:  We appreciate that, Your Honor.  Nothing else from the government.

THE COURT:  Okay.  Thank you.  Mr. Ekeland?

MR. EKELAND:  Nothing from the defense.

THE COURT:  Thank you all.

(The hearing adjourned at 2:25 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 5th day of September, 2023.

/s/ Tamara M. Sefranek
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C.  20001

## $

**$500,000** [1] - 19:4

## /

**/s** [1] - 49:9

## 1

**1** [7] - 25:7, 25:10, 25:17, 26:4, 26:24, 28:24, 35:22
**10** [1] - 36:23
**100** [2] - 25:18, 44:25
**100-point** [1] - 9:22
**10005** [1] - 1:22
**1301** [1] - 1:18
**15** [1] - 36:23
**16** [2] - 15:12, 33:17
**17** [1] - 27:13
**17(c** [2] - 4:15, 33:18
**1960** [2] - 38:3, 38:8
**1960(a** [1] - 44:10
**1960(b)(1)(B** [2] - 38:4, 41:24
**1:17** [1] - 1:6
**1:21-CR-0399** [1] - 1:3

## 2

**2** [4] - 26:5, 26:25, 28:23, 35:22
**20001** [3] - 1:13, 2:23, 49:11
**20005** [1] - 1:19
**202-354-3246** [1] - 2:23
**2023** [2] - 1:5, 49:7
**20530** [1] - 1:16
**21-399** [1] - 3:2
**29** [1] - 1:5
**2:25** [1] - 48:14

## 3

**3** [7] - 26:8, 26:10, 26:25, 29:3, 35:22, 36:2, 36:4
**30** [1] - 1:21
**30,000** [1] - 9:18
**31** [1] - 38:8
**333** [2] - 2:22, 49:11

## 4

**4** [1] - 36:1
**40** [1] - 4:2
**425** [1] - 2:3
**4th** [2] - 44:11, 46:15

## 5

**50** [1] - 41:6
**5312** [1] - 38:19
**5313** [3] - 38:16
**5330** [2] - 38:8, 38:9
**57.7** [2] - 4:7, 4:12
**5th** [1] - 49:7

## 6

**601** [1] - 1:13
**6714** [2] - 2:22, 49:10
**6th** [1] - 44:12

## 7

**7** [1] - 9:22

## 8

**8th** [1] - 1:21

## 9

**902** [1] - 45:5
**94105** [1] - 2:4
**950** [1] - 1:15
**99** [1] - 40:20

## A

**abide** [1] - 11:24
**abiding** [1] - 12:9
**ability** [1] - 49:6
**able** [18] - 7:12, 9:4, 9:7, 9:8, 13:23, 14:2, 17:19, 24:3, 29:15, 30:16, 30:20, 31:24, 34:18, 35:5, 42:8, 44:3, 44:23, 47:10
**access** [3] - 9:15, 20:2, 21:20
**according** [1] - 16:12
**accuracy** [3] - 19:20, 20:5, 45:16
**accurate** [2] - 45:23, 49:4
**accuses** [2] - 11:11, 11:12
**accusing** [1] - 8:21
**Act** [2] - 41:17, 41:19
**act** [1] - 4:12
**acting** [2] - 12:16, 12:20
**Action** [1] - 1:2
**active** [3] - 12:1, 12:19, 13:9
**activities** [1] - 8:13
**activity** [4] - 10:1,

18:16, 34:3, 39:20
**actual** [1] - 8:11
**add** [1] - 12:5
**addition** [1] - 12:13
**additional** [2] - 24:23, 31:16
**address** [10] - 6:19, 6:20, 7:14, 15:12, 27:16, 36:17, 37:12, 39:18, 41:18, 43:19
**addressed** [1] - 40:8
**addresses** [3] - 15:5, 41:8, 41:11
**adjourn** [1] - 48:6
**adjourned** [1] - 48:14
**administrative** [1] - 40:10
**admissibility** [1] - 45:4
**admitted** [2] - 34:7, 34:9
**adverse** [1] - 21:20
**advice** [1] - 24:6
**affiliate** [1] - 41:6
**afternoon** [9] - 3:6, 3:8, 3:9, 3:11, 3:13, 3:14, 3:15, 3:18, 3:21
**age** [1] - 42:19
**agencies** [1] - 40:10
**agency** [4] - 12:17, 12:22, 39:2, 39:3
**agent** [1] - 40:2
**agents** [2] - 39:25, 41:6
**agnostic** [1] - 42:7
**ago** [1] - 27:17
**agree** [7] - 6:5, 29:18, 34:6, 34:21, 46:3, 47:14, 47:17
**agreed** [1] - 25:17
**agreeing** [1] - 18:12
**agreement** [3] - 5:5, 5:17, 47:13
**ahead** [3] - 9:6, 25:5, 47:5
**ALDEN** [1] - 1:14
**Alden** [1] - 3:6
**algorithm** [2] - 9:25, 24:20
**algorithms** [5] - 10:4, 23:13, 23:21, 25:8, 26:2
**allegations** [1] - 37:6
**allow** [1] - 28:19
**ally** [1] - 17:7
**alternatives** [2] - 14:21
**ambitious** [1] - 40:6
**America** [1] - 3:3

**AMERICA** [1] - 1:2
**amount** [1] - 10:15
**analysis** [17] - 4:19, 8:6, 8:11, 8:13, 8:25, 9:20, 10:7, 12:20, 15:2, 24:18, 30:7, 31:15, 34:6, 37:16, 38:1, 41:24, 46:7
**analytic** [1] - 5:10
**analytics** [6] - 10:20, 10:21, 10:24, 11:4, 11:10, 13:10
**answer** [5] - 5:12, 9:10, 9:11, 23:12
**anticipate** [2] - 6:12, 19:16
**apologize** [3] - 13:3, 14:8, 33:8
**Appeals** [1] - 32:25
**appearing** [3] - 3:23, 3:24, 16:22
**applicability** [2] - 41:18, 44:9
**applied** [4] - 9:17, 9:18, 20:19, 41:20
**applies** [4] - 18:19, 37:1, 40:5, 41:3
**apply** [6] - 19:15, 37:16, 38:2, 38:3, 39:11, 41:22
**applying** [1] - 40:15
**appreciate** [6] - 4:14, 6:18, 23:24, 30:11, 31:9, 48:9
**appropriate** [6] - 7:8, 13:12, 23:6, 23:7, 29:14, 30:6
**arguably** [1] - 36:21
**argue** [1] - 45:17
**argument** [1] - 26:18
**arm's** [1] - 43:8
**aside** [2] - 25:13, 27:22
**aspect** [1] - 8:10
**assist** [1] - 10:25
**associated** [1] - 12:18
**assume** [1] - 37:15
**assuming** [2] - 19:14, 21:18
**assumption** [3] - 21:4, 21:19, 22:3
**assumptions** [11] - 9:18, 10:4, 17:18, 17:19, 18:1, 18:3, 25:2, 28:23, 31:14, 31:15, 33:2
**attempting** [1] - 18:17
**attention** [1] - 41:14
**attesting** [1] - 19:19
**attitude** [1] - 32:16

**August** [1] - 1:5
**AUSA** [1] - 3:9
**authentic** [2] - 45:12, 46:7
**authentication** [6] - 44:23, 45:10, 45:16, 45:19, 46:3, 46:6
**authentications** [1] - 45:3
**available** [3] - 4:17, 12:14, 41:12
**Ave** [1] - 1:18
**Avenue** [3] - 1:15, 2:22, 49:11
**aware** [1] - 6:24

## B

**b)(1)(B** [2] - 38:4, 44:10
**b)(1)(C)** [1] - 38:4
**Bank** [1] - 41:19
**based** [1] - 45:4
**bases** [1] - 24:19
**basic** [1] - 15:13
**basis** [1] - 4:20
**bear** [1] - 41:2
**Beckett** [2] - 26:15, 26:22
**BEFORE** [1] - 1:8
**beforehand** [1] - 46:18
**begin** [1] - 8:2
**behalf** [1] - 12:16
**behavior** [5] - 9:21, 10:6, 10:7, 18:10
**behavioral** [8] - 9:19, 10:5, 15:6, 15:7, 15:9, 24:18, 25:1, 26:6
**best** [2] - 4:3, 49:6
**better** [2] - 15:4, 35:14
**between** [3] - 17:16, 38:25, 45:14
**biased** [1] - 11:21
**big** [2] - 21:4, 47:22
**Bisbee** [2] - 15:2, 25:7
**Bisbee's** [1] - 26:1
**bit** [3] - 7:15, 40:6, 42:11
**Bitcoin** [8] - 8:25, 9:1, 10:1, 10:20, 15:3, 41:11, 42:4
**Bitcoin-type** [1] - 42:4
**black** [1] - 22:10
**blah** [3] - 12:14
**blah-blah-blah** [1] - 12:14
**blockchain** [13] - 5:10, 10:20, 10:21, 10:24,

11:3, 11:10, 12:20, 13:10, 18:6, 21:23, 22:10, 24:5, 34:3
**bond** [3] - 19:4, 19:5, 21:9
**book** [1] - 7:24
**books** [1] - 8:1
**borderline** [1] - 22:25
**borders** [1] - 45:8
**box** [1] - 22:10
**brain** [1] - 21:1
**breach** [1] - 13:4
**breadth** [1] - 37:15
**breaking** [1] - 24:19
**brick** [5] - 37:11, 39:14, 40:21, 41:21, 42:21
**brick-and-mortar** [3] - 40:21, 41:21, 42:21
**brick-and-mortar-type** [2] - 37:11, 39:14
**brief** [4] - 39:10, 44:9, 44:18, 46:11
**briefing** [4] - 41:14, 43:11, 45:10
**bring** [2] - 4:13, 46:23
**brings** [1] - 24:15
**broad** [1] - 38:23
**broadly** [2] - 38:10, 38:20
**Brown** [3] - 3:9, 22:15, 39:7
**BROWN** [18] - 1:12, 3:9, 4:9, 22:16, 22:19, 22:21, 23:22, 40:7, 40:16, 41:2, 42:2, 42:20, 43:2, 43:5, 43:18, 44:2, 44:6, 44:13
**building** [1] - 42:22
**bunch** [2] - 8:23, 32:13
**business** [19] - 10:24, 11:4, 13:9, 13:12, 21:20, 37:7, 37:13, 37:18, 37:25, 38:9, 38:10, 38:12, 38:22, 41:5, 41:10, 42:14, 43:4, 43:5, 43:9
**businesses** [5] - 36:21, 37:17, 37:18, 40:19, 41:3

### C

**CA** [1] - 2:4
**campaign** [1] - 23:9
**capacity** [1] - 12:21
**capitulate** [1] - 32:12

**capturing** [1] - 37:14
**Case** [1] - 3:2
**case** [26] - 4:19, 4:21, 6:11, 7:2, 8:7, 9:17, 11:15, 11:16, 11:17, 17:20, 20:1, 20:2, 20:4, 23:1, 25:3, 31:11, 31:12, 32:17, 32:18, 32:20, 32:24, 36:20, 37:6, 40:9, 42:25, 44:6
**cases** [4] - 13:19, 39:23, 39:24, 43:23
**category** [1] - 15:7
**certainly** [3] - 23:7, 43:21, 44:2
**CERTIFICATE** [1] - 49:1
**certifications** [1] - 45:5
**certified** [1] - 47:15
**certify** [1] - 49:3
**cetera** [6] - 8:20, 12:18, 12:19, 12:20
**Chainalysis** [37] - 2:2, 4:17, 5:14, 5:20, 8:21, 11:3, 11:9, 11:12, 13:10, 13:13, 16:6, 16:7, 16:23, 17:12, 17:23, 18:2, 18:17, 18:18, 19:17, 19:20, 19:22, 20:18, 20:23, 20:25, 21:2, 21:20, 21:25, 23:1, 23:9, 23:12, 23:19, 25:8, 26:1, 26:15, 26:16, 34:21
**challenge** [1] - 18:25
**challenging** [1] - 42:18
**chambers** [2] - 7:25, 8:1
**chance** [1] - 44:17
**change** [2] - 27:3, 28:20
**changes** [1] - 27:4
**characterization** [1] - 18:12
**check** [1] - 40:14
**chock** [1] - 11:15
**choice** [1] - 47:22
**chooses** [1] - 21:10
**Chris** [1] - 3:9
**CHRISTOPHER** [1] - 1:12
**CI** [2] - 26:15, 26:22
**circularly** [1] - 38:20
**circumstances** [7] - 30:24, 36:22, 36:24, 37:1, 37:15, 39:12,

40:5
**cited** [1] - 36:19
**citizen** [1] - 17:3
**claim** [1] - 41:9
**claiming** [1] - 26:18
**claims** [1] - 26:10
**clarification** [1] - 24:23
**clarify** [2] - 9:9, 24:13
**clear** [5] - 16:12, 24:21, 31:19, 36:15, 36:25
**clearly** [1] - 14:7
**client** [4] - 9:15, 30:15, 30:17, 32:2
**closed** [3] - 16:6, 19:25, 22:9
**closed-source** [3] - 16:6, 19:25, 22:9
**closure** [1] - 34:19
**clustering** [1] - 15:9
**clusters** [1] - 15:3
**co** [1] - 25:7
**co-spend** [1] - 25:7
**code** [48] - 4:18, 4:24, 5:11, 5:13, 5:19, 6:6, 6:8, 8:16, 8:17, 9:15, 10:11, 12:2, 13:14, 14:13, 17:17, 17:22, 18:1, 18:8, 18:9, 19:18, 20:2, 20:6, 20:17, 20:20, 21:9, 21:24, 22:4, 23:4, 24:3, 24:10, 24:12, 25:9, 25:13, 26:18, 26:23, 26:24, 27:3, 28:4, 29:15, 29:25, 30:1, 32:1, 32:9, 33:15, 33:22, 33:25
**CoinJoins** [5] - 25:9, 25:15, 26:3, 28:25, 29:2
**Collyer's** [1] - 41:15
**Columbia** [8] - 36:8, 36:9, 36:10, 36:12, 36:14, 36:16, 37:12, 41:12
**COLUMBIA** [1] - 1:1
**coming** [3] - 13:2, 36:16, 36:17
**comment** [1] - 40:7
**commentating** [1] - 11:18
**commercial** [1] - 12:21
**companies** [7] - 36:23, 39:19, 40:18, 40:20, 40:24, 42:3, 42:4
**company** [4] - 12:24,

37:21, 37:23, 41:20
**competing** [3] - 13:13, 17:13, 47:14
**competition** [1] - 18:19
**competitive** [1] - 6:6
**competitor** [16] - 6:9, 7:9, 10:18, 10:22, 10:23, 11:1, 11:19, 11:23, 12:1, 15:22, 15:25, 16:12, 17:22, 18:13, 18:15
**competitor's** [1] - 17:22
**complete** [1] - 49:5
**compliance** [1] - 4:12
**complicated** [1] - 38:5
**complied** [1] - 34:24
**comply** [1] - 4:7
**complying** [2] - 13:7, 13:8
**compromise** [1] - 23:13
**computer** [3] - 29:24, 29:25, 30:1
**conceded** [1] - 45:8
**concern** [3] - 10:10, 15:13, 20:11
**concerned** [3] - 11:20, 11:22, 20:14
**concerns** [6] - 7:15, 15:19, 20:23, 29:18, 32:17, 47:19
**conclude** [4] - 7:1, 21:19, 30:22, 35:17
**conclusion** [4] - 8:13, 8:15, 24:15, 34:15
**conclusions** [2] - 25:18, 34:12
**conditions** [2] - 12:11, 13:5
**conduct** [2] - 4:13, 13:22
**conducts** [1] - 36:8
**confer** [1] - 30:16
**conference** [4] - 35:13, 43:19, 45:5, 48:4
**conferred** [1] - 8:5
**confident** [2] - 21:8, 35:24
**confirm** [2] - 18:4, 29:15
**conflating** [1] - 45:16
**conflict** [1] - 17:12
**conformance** [1] - 4:14
**conjunctive** [1] - 38:15
**connect** [1] - 42:8

**connections** [1] - 10:21
**consents** [1] - 3:22
**consider** [1] - 22:5
**consistent** [1] - 32:21
**constitutes** [1] - 49:4
**Constitution** [2] - 2:22, 49:11
**construed** [1] - 39:15
**Cont'd** [1] - 2:1
**contempt** [2] - 13:23, 17:2
**continue** [1] - 24:9
**contracted** [1] - 12:21
**contractors** [2] - 12:16, 12:17
**contracts** [1] - 12:19
**contrast** [1] - 16:5
**conversation** [1] - 10:9
**convey** [1] - 32:1
**conviction** [2] - 32:23
**convinced** [2] - 30:4, 30:5
**copy** [3] - 4:22, 22:22, 37:1
**core** [1] - 31:11
**correct** [1] - 18:8
**corrections** [4] - 26:12, 27:1, 29:4, 29:5
**corresponding** [1] - 12:24
**cost** [2] - 32:18, 32:19
**counsel** [6] - 3:4, 3:5, 3:23, 11:14, 23:12, 32:13
**Count** [3] - 36:1, 36:2, 36:4
**countless** [1] - 8:6
**country** [1] - 13:18
**counts** [4] - 35:20, 35:25, 44:3
**Counts** [1] - 35:22
**couple** [2] - 10:15, 43:1
**course** [4] - 26:5, 27:4, 39:4, 40:17
**Court** [48] - 2:21, 2:21, 4:6, 6:19, 6:21, 7:7, 7:13, 7:19, 8:8, 11:5, 11:18, 12:7, 12:10, 13:6, 13:24, 14:5, 14:8, 14:9, 14:16, 14:25, 16:13, 21:6, 21:10, 21:15, 27:8, 27:17, 30:9, 30:20, 31:2, 31:17, 32:9, 32:11, 32:25, 33:4, 33:5, 33:6, 33:11,

33:20, 34:5, 35:17, 41:13, 45:4, 46:13, 46:20, 47:9, 47:16, 49:10
**court** [4] - 13:23, 17:2, 47:9, 47:15
**COURT** [83] - 1:1, 3:8, 3:11, 3:14, 3:21, 4:1, 4:11, 5:22, 6:3, 6:16, 6:23, 7:22, 9:6, 9:10, 11:20, 13:1, 14:17, 14:20, 15:15, 15:18, 16:9, 16:16, 16:21, 17:3, 17:15, 18:14, 19:3, 19:9, 20:8, 20:22, 21:11, 21:16, 22:12, 22:15, 22:18, 22:20, 23:18, 23:23, 24:22, 25:5, 25:11, 25:23, 27:5, 27:22, 28:11, 28:19, 29:12, 30:11, 30:14, 30:18, 30:21, 30:24, 31:6, 31:9, 31:19, 32:15, 33:7, 33:24, 34:17, 35:8, 40:12, 40:22, 41:23, 42:3, 42:23, 43:4, 43:10, 43:21, 44:5, 44:8, 44:14, 44:20, 45:6, 46:13, 46:16, 46:18, 47:5, 47:12, 47:24, 48:6, 48:11, 48:13, 49:1
**Court's** [5] - 10:10, 13:21, 15:13, 34:24, 41:14
**court-certified** [1] - 47:15
**Courthouse** [1] - 2:22
**courtroom** [1] - 35:14
**COURTROOM** [1] - 3:2
**courts** [2] - 34:7, 40:10
**cover** [1] - 4:2
**craft** [1] - 19:1
**CRC** [2] - 2:21, 49:9
**create** [1] - 19:23
**created** [1] - 32:6
**credibility** [1] - 18:22
**Criminal** [1] - 1:2
**criminal** [4] - 3:2, 12:19, 20:2, 39:20
**criminality** [1] - 13:23
**criticizing** [1] - 20:25
**CRM** [1] - 1:17
**cross** [3] - 21:6, 46:25
**cross-examination** [2] - 46:25
**crown** [1] - 21:21

**CRR** [2] - 2:21, 49:9
**cryptocurrency** [1] - 41:9
**currency** [2] - 40:18, 41:20
**current** [1] - 12:1
**curriculum** [1] - 4:23
**customers** [1] - 41:10
**CV** [1] - 7:17

## D

**D.C** [21] - 1:5, 36:7, 36:18, 37:9, 37:17, 37:20, 37:25, 39:10, 39:17, 39:18, 40:1, 40:4, 40:19, 41:17, 42:10, 42:13, 42:17, 42:22, 42:24, 44:10, 49:11
**dark** [2] - 9:1, 15:3
**darknet** [2] - 10:2
**data** [2] - 12:14, 19:20
**date** [5] - 7:3, 43:11, 45:21, 45:22, 45:24
**Dated** [1] - 49:7
**DC** [4] - 1:13, 1:16, 1:19, 2:23
**deal** [3] - 37:18, 42:1, 47:23
**dealing** [3] - 8:24, 9:2, 34:23
**decided** [1] - 19:24
**deemed** [1] - 13:4
**deeply** [1] - 13:20
**defeat** [1] - 13:13
**Defendant** [4] - 1:6, 1:20, 1:23, 3:16
**defendant** [4] - 3:19, 20:2, 22:11, 32:21
**DEFENDANT** [1] - 3:25
**defense** [32] - 4:10, 4:13, 4:23, 5:18, 6:2, 6:13, 7:2, 7:4, 9:12, 11:13, 19:8, 19:21, 22:8, 22:21, 23:11, 23:16, 23:17, 23:20, 24:2, 24:6, 29:19, 30:5, 31:13, 33:1, 34:24, 43:16, 44:12, 45:2, 45:15, 47:23, 47:24, 48:12
**defense's** [1] - 47:19
**deferential** [2] - 32:16, 33:5
**defined** [3] - 38:18, 38:19, 43:5
**defines** [1] - 38:9
**definition** [4] - 15:14,

27:13, 39:1, 39:2
**definitions** [1] - 41:19
**depart** [1] - 43:24
**DEPARTMENT** [1] - 1:15
**Department** [4] - 1:18, 11:11, 39:5, 42:1
**deploys** [1] - 26:2
**DEPUTY** [1] - 3:2
**description** [1] - 12:24
**desk** [1] - 37:10
**detail** [2] - 25:14, 41:18
**detect** [2] - 25:8, 26:3
**detection** [1] - 10:25
**determine** [1] - 40:10
**determining** [1] - 9:23
**deterministic** [3] - 26:11, 26:19
**difference** [2] - 17:16, 38:24
**differences** [1] - 48:3
**different** [3] - 8:14, 34:15, 44:25
**diffident** [1] - 33:7
**digging** [1] - 7:17
**direct** [7] - 31:1, 31:21, 31:25, 41:13, 41:14, 44:8, 47:24
**directed** [2] - 22:25, 23:9
**directing** [1] - 4:11
**directly** [1] - 23:15
**directs** [2] - 38:7, 38:8
**dirty** [1] - 9:2
**disagree** [2] - 8:14, 16:11
**disagreement** [2] - 5:5, 5:8
**discernible** [1] - 39:18
**disclose** [5] - 17:19, 23:13, 23:19, 23:20, 29:6
**disclosure** [1] - 37:11
**discovery** [1] - 31:21
**discuss** [2] - 30:9, 47:21
**discussed** [7] - 5:1, 5:22, 6:3, 6:12, 8:9, 14:25
**discussion** [2] - 5:16, 16:8
**dispute** [1] - 25:22
**distinguishes** [1] - 43:9
**distributing** [1] - 6:1
**DISTRICT** [3] - 1:1, 1:1, 1:9
**District** [9] - 35:18, 36:8, 36:9, 36:10,

36:12, 36:14, 36:16, 37:12, 41:12
**dive** [1] - 39:6
**DNA** [1] - 34:8
**document** [1] - 27:3
**documented** [1] - 26:13
**documents** [5] - 44:23, 44:25, 45:12, 46:4, 47:20
**dog** [1] - 32:10
**DOJ** [4] - 1:12, 1:17, 11:11
**DOJ-CRM** [1] - 1:17
**domestic** [4] - 38:17, 38:18, 38:25, 39:2
**domestically** [1] - 38:13
**done** [11] - 6:25, 7:17, 8:7, 14:14, 14:23, 25:14, 27:10, 27:20, 27:24, 28:8, 28:17
**door** [1] - 20:9
**dots** [1] - 42:8
**down** [4] - 6:22, 12:3, 13:1, 24:19
**dozen** [2] - 22:13, 40:23
**due** [2] - 32:17, 32:21

## E

**E-Gold** [2] - 41:15, 41:20
**easily** [1] - 18:25
**economy** [1] - 46:23
**effective** [1] - 7:14
**effectively** [3] - 7:18, 10:23, 12:3
**efficient** [1] - 48:8
**either** [3] - 17:24, 30:1, 45:23
**EKELAND** [30] - 1:20, 3:15, 4:10, 5:3, 5:24, 6:10, 16:4, 16:11, 16:18, 17:1, 17:5, 18:11, 18:20, 19:8, 19:13, 20:21, 21:4, 21:14, 22:7, 22:14, 25:4, 25:6, 25:24, 44:19, 46:10, 46:15, 46:17, 47:3, 47:6, 48:12
**Ekeland** [16] - 1:21, 3:16, 15:18, 20:8, 23:5, 24:22, 25:23, 28:1, 28:8, 29:9, 31:11, 34:20, 44:14, 45:6, 45:25, 48:11
**electronic** [1] - 22:22

**eliminate** [1] - 26:3
**encourage** [4] - 20:12, 21:16, 46:18, 46:21
**end** [4] - 28:13, 29:10, 35:1, 42:11
**endless** [1] - 11:6
**enforce** [2] - 16:25, 19:10
**enforceability** [1] - 18:21
**enforcement** [6] - 12:17, 12:22, 16:21, 17:1, 17:10, 19:6
**engage** [5] - 6:6, 37:21, 38:12, 40:24, 42:16
**engaged** [5] - 37:7, 37:22, 39:20, 42:14, 43:9
**engages** [4] - 36:11, 38:21, 39:16, 42:23
**enormous** [2] - 37:14, 42:12
**enter** [3] - 4:6, 4:11, 28:3
**enters** [1] - 42:14
**entire** [3] - 5:13, 14:7, 30:23
**entirely** [1] - 19:22
**entities** [3] - 12:20, 13:10, 42:4
**entitled** [3] - 9:16, 20:10, 40:11
**entity** [3] - 12:22, 12:24, 19:24
**error** [2] - 19:21, 26:3
**essentially** [1] - 5:15
**et** [6] - 8:20, 12:18, 12:19, 12:20
**ethical** [3] - 19:4, 19:9, 19:15
**evade** [1] - 13:9
**evading** [1] - 10:25
**evaluate** [1] - 21:8
**eve** [1] - 20:13
**evening** [1] - 4:22
**everywhere** [1] - 34:10
**evidence** [3] - 11:12, 20:5, 33:3
**exact** [1] - 34:8
**exactly** [3] - 27:18, 28:12, 44:5
**examination** [2] - 46:25
**examinations** [1] - 34:8
**examine** [1] - 10:11
**examined** [1] - 8:17
**example** [2] - 16:1,

34:9
**excepting** [1] - 37:5
**exception** [1] - 12:15
**exchanges** [2] - 9:1, 41:9
**exclude** [1] - 21:1
**excluded** [2] - 19:21, 20:4
**expect** [3] - 6:15, 40:25, 47:7
**expedition** [1] - 27:13
**expert** [40] - 4:20, 7:8, 7:18, 8:14, 8:15, 9:3, 10:14, 10:17, 11:19, 13:12, 14:14, 15:19, 17:6, 17:16, 17:25, 18:6, 20:17, 21:19, 22:2, 22:23, 23:8, 23:14, 24:2, 24:5, 24:11, 25:16, 26:14, 27:7, 27:14, 27:20, 28:7, 29:20, 29:25, 30:6, 32:8, 33:14, 33:19, 33:21, 46:23
**experts** [3] - 5:9, 8:6, 24:11
**explain** [1] - 9:7
**explaining** [1] - 13:6
**explanation** [1] - 25:14
**explicit** [1] - 6:21
**explicitly** [1] - 6:11
**explorers** [1] - 22:10
**exploring** [1] - 19:13
**extent** [1] - 23:16
**extradite** [1] - 14:3
**extradition** [1] - 17:6
**extremely** [1] - 22:17

---

**F**

**F-ing** [2] - 23:3, 23:4
**facilitating** [1] - 38:12
**fact** [7] - 18:8, 18:9, 19:18, 21:1, 34:22, 34:23, 35:13
**failure** [1] - 36:3
**fair** [4] - 30:21, 30:24, 31:13, 32:22
**false** [1] - 8:21
**far** [5] - 11:3, 12:2, 13:16, 22:13, 25:17
**federal** [4] - 20:2, 35:20, 40:9, 40:10
**feet** [1] - 9:18
**field** [1] - 16:3
**fight** [1] - 32:10
**fighting** [1] - 25:19
**figure** [3] - 14:2, 29:12, 48:3

---

**file** [8] - 28:19, 31:2, 31:6, 38:16, 44:9, 44:18, 45:25, 46:13
**final** [1] - 43:23
**financial** [10] - 17:24, 18:15, 18:19, 38:17, 38:18, 38:19, 38:25, 39:1, 39:2, 39:3
**fine** [1] - 44:8
**fingerprint** [1] - 34:6
**firearm** [1] - 34:7
**first** [14] - 4:25, 7:14, 10:8, 16:4, 16:11, 18:11, 20:7, 25:6, 30:8, 33:12, 35:19, 40:2, 43:16, 46:1
**fishing** [1] - 27:13
**five** [3] - 16:2, 16:17, 16:24
**fix** [1] - 26:15
**fixes** [1] - 27:1
**flag** [3] - 39:9, 47:4, 47:6
**flavor** [1] - 12:7
**flaw** [1] - 21:2
**Floor** [1] - 1:21
**focus** [1] - 5:11
**focused** [1] - 27:23
**FOERSTER** [1] - 2:3
**Fog** [6] - 8:25, 9:1, 10:1, 15:3, 41:11
**folks** [2] - 32:4, 40:4
**follow** [1] - 7:12
**followed** [1] - 33:10
**following** [2] - 21:17, 32:8
**follows** [1] - 6:20
**FOR** [1] - 1:1
**foray** [1] - 30:23
**forced** [1] - 32:12
**foregoing** [1] - 49:4
**foreign** [2] - 38:25, 39:2
**forfeit** [1] - 19:5
**form** [1] - 4:20
**former** [1] - 18:25
**formula** [2] - 9:24, 10:3
**formulas** [1] - 23:14
**forward** [1] - 18:23
**foundation** [1] - 19:25
**founder** [1] - 16:14
**four** [1] - 36:13
**France** [4] - 17:4, 17:7, 19:11
**Francisco** [1] - 2:4
**frankly** [4] - 12:8, 33:7, 36:6, 46:19
**free** [2] - 16:5, 45:16

---

**French** [6] - 13:17, 13:18, 13:19, 14:3, 17:3
**Frentzen** [8] - 6:16, 16:14, 24:1, 24:8, 25:12, 25:24, 27:5, 34:21
**FRENTZEN** [30] - 2:2, 6:18, 7:6, 8:3, 9:7, 10:8, 12:1, 13:2, 14:19, 14:22, 15:17, 24:9, 25:16, 27:6, 28:6, 28:14, 29:10, 30:8, 30:12, 30:16, 30:19, 30:22, 31:4, 31:8, 31:16, 32:3, 33:4, 33:8, 34:2, 35:7
**Frentzen's** [1] - 18:12
**front** [2] - 6:15, 20:14
**Frye** [1] - 35:12
**full** [3] - 11:9, 11:15, 49:5
**function** [1] - 10:21
**functional** [1] - 34:2
**fundamental** [1] - 32:6
**fundamentally** [1] - 33:16
**funds** [2] - 38:22, 39:16

---

**G**

**general** [3] - 10:5, 26:17, 37:19
**general-level** [1] - 10:5
**generally** [1] - 43:6
**generates** [1] - 10:20
**given** [3] - 19:18, 21:17, 40:24
**glanced** [1] - 39:6
**Gold** [2] - 41:15, 41:20
**golden** [1] - 13:14
**governing** [2] - 6:11, 39:4
**government** [32] - 3:5, 3:12, 4:9, 12:17, 12:22, 13:20, 14:2, 15:11, 16:13, 18:24, 19:17, 19:24, 20:1, 21:6, 22:9, 23:19, 23:20, 29:1, 29:6, 32:18, 43:15, 44:9, 44:17, 45:1, 46:2, 46:11, 47:18, 47:25, 48:10
**government's** [3] - 4:6, 37:5, 48:1
**Gox** [3] - 45:12, 45:22,

---

45:24
**granular** [1] - 15:13
**great** [1] - 31:5
**greater** [1] - 18:3
**guess** [5] - 21:15, 31:20, 42:12, 47:16
**guidance** [1] - 48:8
**guide** [1] - 45:13
**guy** [1] - 8:20

---

**H**

**hacked** [1] - 45:18
**handful** [2] - 36:13, 36:21
**handing** [2] - 13:13, 13:14
**handle** [3] - 11:7, 28:7, 35:13
**handling** [1] - 9:2
**happy** [7] - 5:25, 16:19, 17:9, 21:11, 21:12, 41:13, 47:20
**harassment** [1] - 23:9
**hard** [2] - 20:24, 34:21
**Harmon** [3] - 36:20, 40:9, 40:17
**hashtag** [1] - 23:1
**Hassard** [1] - 3:19
**HASSARD** [2] - 1:20, 3:18
**head** [3] - 23:2, 28:3, 36:2
**headshot** [1] - 23:2
**hear** [5] - 6:16, 21:11, 21:12, 33:4, 45:2
**heard** [5] - 7:19, 22:17, 23:12, 45:3, 47:18
**hearing** [2] - 25:1, 48:14
**HEARING** [2] - 1:4, 1:8
**hearsay** [3] - 26:17, 26:20, 26:23
**held** [1] - 8:20
**help** [1] - 45:13
**hereby** [1] - 49:3
**heuristic** [17] - 18:9, 25:7, 25:10, 25:17, 26:4, 26:5, 26:6, 26:8, 26:9, 26:10, 26:24, 26:25, 28:23, 28:24, 29:3
**heuristics** [16] - 9:17, 9:19, 10:6, 15:1, 15:6, 15:8, 15:9, 15:14, 18:3, 20:19, 23:14, 23:21, 24:17, 24:18, 25:2, 28:22

---

45:24
**highest** [1] - 35:11
**highlights** [1] - 22:23
**highly** [1] - 10:14
**hold** [3] - 28:1, 28:13, 32:23
**holes** [1] - 8:6
**holiday** [1] - 44:7
**honor** [1] - 19:14
**Honor** [67] - 3:6, 3:13, 3:15, 3:18, 3:25, 4:9, 4:10, 5:3, 5:24, 6:15, 6:18, 7:7, 8:4, 9:5, 10:8, 10:14, 10:17, 12:5, 13:17, 14:13, 14:22, 15:17, 16:4, 17:9, 18:11, 18:20, 19:14, 19:17, 20:21, 22:7, 22:16, 22:21, 23:22, 24:9, 25:4, 25:16, 27:6, 28:6, 28:15, 29:11, 30:12, 31:4, 31:8, 31:18, 32:3, 32:6, 32:14, 33:8, 33:17, 33:22, 34:4, 34:16, 35:7, 40:7, 40:16, 41:2, 42:2, 42:20, 43:18, 44:2, 44:13, 45:1, 46:17, 47:2, 47:3, 48:5, 48:9
**HONORABLE** [1] - 1:8
**hood** [3] - 20:10, 27:12, 33:1
**hope** [3] - 30:22, 33:5, 35:5
**hopefully** [3] - 34:18, 40:13, 48:2
**hopes** [1] - 24:14
**Howell** [1] - 40:8
**Howell's** [1] - 36:20
**hundreds** [1] - 34:7

---

**I**

**idea** [1] - 8:1
**ideal** [1] - 43:25
**ideally** [1] - 46:1
**identified** [1] - 4:24
**identify** [3] - 5:19, 29:5, 47:25
**implied** [1] - 26:22
**important** [2] - 7:1, 23:24
**improper** [1] - 13:14
**IN** [1] - 1:1
**inaccurate** [1] - 45:17
**inclined** [1] - 14:7
**include** [2] - 13:10, 38:20
**incredibly** [1] - 13:11

indeed [1] - 41:22
independently [4] - 33:22, 33:25, 34:1, 34:4
indicated [2] - 20:9, 45:11
indictment [2] - 35:19, 35:20
individual [12] - 4:23, 7:12, 10:18, 11:2, 11:16, 11:21, 11:23, 12:6, 12:8, 13:7, 13:17, 43:9
individual's [1] - 11:7
informal [2] - 38:11
information [7] - 15:23, 25:10, 25:21, 26:4, 26:24, 34:13
ing [2] - 23:3, 23:4
inspection [1] - 4:17
instance [1] - 15:10
instead [1] - 32:11
institution [3] - 38:19, 38:25, 39:1
institutions [2] - 38:17, 38:18
instruct [2] - 37:4, 43:22
instructions [4] - 6:22, 43:20, 43:24, 44:1
intellectual [1] - 23:8
intelligence [1] - 26:8
intelligible [1] - 24:16
intention [1] - 43:18
interest [6] - 6:1, 12:9, 13:7, 16:15, 23:17, 32:24
interestingly [1] - 26:7
interests [1] - 46:22
internal [1] - 19:20
internationally [1] - 38:13
internet [3] - 36:11, 39:16, 42:19
investigating [1] - 12:23
investigation [1] - 12:18
involves [3] - 26:11, 38:10
IP [5] - 6:1, 36:17, 39:17, 41:8, 41:10
IRS [2] - 26:15, 26:22
issue [24] - 4:15, 6:20, 9:8, 11:21, 11:25, 14:13, 24:12, 25:22, 27:23, 33:9, 33:12, 33:16, 33:21, 33:24, 34:18, 35:10, 35:12,

39:9, 40:12, 44:21, 45:10, 46:12, 47:7
issues [11] - 6:24, 17:10, 18:21, 19:2, 21:7, 30:19, 32:13, 35:8, 40:8, 45:11, 47:19

**J**

Jeff [1] - 3:12
JEFFREY [1] - 1:17
jewels [1] - 21:21
Judge [4] - 7:25, 36:20, 40:8, 41:15
JUDGE [2] - 1:8, 1:9
judicial [1] - 46:23
jury [8] - 11:22, 32:19, 37:4, 43:19, 43:22, 43:23, 44:3, 46:19
JUSTICE [1] - 1:15
Justice [1] - 1:18

**K**

keep [2] - 21:22, 24:15
key [1] - 33:2
kind [5] - 5:5, 17:12, 19:1, 19:16, 26:25
kinds [2] - 12:11, 40:17
knowable [1] - 34:14
knows [3] - 13:25, 33:14

**L**

L-a-u-r-e-n-t-M-T [1] - 11:8
lack [1] - 15:4
laid [1] - 33:9
landing [1] - 13:3
language [2] - 29:25, 47:20
large [2] - 9:2, 34:22
last [6] - 16:1, 27:18, 32:13, 34:23, 40:7, 47:8
last-minute [1] - 32:13
late [1] - 35:9
latter [1] - 18:24
laundering [1] - 12:23
laundry [1] - 27:6
Laurent [5] - 5:8, 22:24, 23:2, 29:19, 30:4
Law [1] - 1:21
law [15] - 12:17, 12:22, 13:7, 17:6, 35:20, 36:4, 36:7, 36:18,

37:4, 37:5, 39:11, 40:10, 40:15, 42:13
leak [1] - 14:1
leaked [1] - 13:24
leaks [1] - 19:5
learned [2] - 6:8, 21:2
least [10] - 4:18, 10:15, 21:24, 26:13, 26:22, 39:23, 39:25, 43:1, 44:17, 48:7
leave [1] - 47:1
left [1] - 37:9
legal [1] - 46:6
legitimate [2] - 23:16, 23:17
length [1] - 43:8
less [1] - 11:20
letting [2] - 31:2, 31:6
level [2] - 10:5, 13:22
license [4] - 36:4, 37:8, 37:9, 40:2
licensed [3] - 38:20, 38:21, 41:6
licenses [1] - 41:7
licensing [3] - 36:5, 37:18, 39:11
life [2] - 18:17, 20:25
likely [1] - 35:17
limitations [1] - 12:12
limited [1] - 10:15
lines [1] - 14:24
link [4] - 3:17, 3:20, 3:23, 3:24
links [1] - 10:20
list [7] - 20:18, 27:6, 28:2, 28:8, 29:8, 35:11
litigation [2] - 40:17, 41:16
live [1] - 25:22
living [2] - 17:3, 19:11
LLP [1] - 2:3
local [1] - 39:24
located [2] - 37:13, 37:21
log [1] - 27:3
look [26] - 4:24, 5:19, 7:20, 7:21, 9:16, 9:24, 10:4, 10:16, 11:5, 17:9, 17:25, 20:10, 20:20, 21:24, 24:3, 27:11, 27:12, 29:15, 30:1, 31:16, 33:1, 34:6, 37:8, 39:22, 40:16, 47:15
looked [5] - 7:10, 18:7, 22:4, 39:13, 39:23
looking [5] - 5:2, 21:22, 24:17, 35:2,

35:19
lose [1] - 7:4
lovely [2] - 13:18

**M**

main [1] - 5:7
maintained [4] - 45:21, 45:24, 46:24
major [1] - 41:5
Man [1] - 26:5
manipulation [2] - 26:21, 27:1
manual [5] - 26:11, 26:21, 27:1, 29:4, 29:5
manufacturing [1] - 11:12
mark [1] - 34:8
Market [1] - 2:3
marketplace [1] - 17:23
markets [2] - 9:1, 15:3
Maryland [1] - 29:23
match [1] - 34:8
matter [9] - 6:25, 28:13, 29:10, 35:10, 36:18, 37:4, 39:10, 42:13, 47:8
mean [10] - 14:7, 17:9, 19:5, 22:25, 31:19, 37:20, 38:10, 39:15, 41:2, 41:13
meaningfully [2] - 15:20, 15:23
means [1] - 39:19
meant [1] - 40:13
meantime [1] - 44:14
measured [1] - 10:7
mechanisms [2] - 17:2, 17:10
mentioned [2] - 16:1, 47:9
merits [1] - 7:5
MICHAEL [1] - 1:20
Michael [1] - 3:18
might [3] - 6:7, 40:22, 47:9
million [1] - 13:25
millions [1] - 42:15
mind [4] - 11:25, 15:24, 41:2, 42:9
minute [3] - 15:16, 32:13, 34:23
minutes [1] - 4:2
mischaracterizes [1] - 25:24
mission [1] - 10:23
mistaken [2] - 28:20, 45:15

mixture [1] - 34:9
modification [1] - 26:12
Monday [4] - 31:2, 44:7, 46:11
Money [1] - 41:17
money [19] - 9:2, 12:23, 37:7, 37:16, 38:9, 38:11, 38:13, 38:21, 40:19, 40:24, 41:3, 41:4, 41:5, 42:3, 42:4, 42:14, 43:8, 46:11
months [1] - 27:17
MORRISON [1] - 2:3
mortar [5] - 37:11, 39:14, 40:21, 41:21, 42:21
MOSS [1] - 1:8
most [1] - 47:10
motion [1] - 28:19
MOTIONS [2] - 1:4, 1:8
move [1] - 4:3
MR [77] - 3:9, 3:12, 3:15, 3:18, 4:9, 4:10, 5:3, 5:24, 6:10, 6:18, 7:6, 8:3, 9:7, 10:8, 12:1, 13:2, 14:19, 14:22, 15:17, 16:4, 16:11, 16:18, 17:1, 17:5, 18:11, 18:20, 19:8, 19:13, 20:21, 21:4, 21:14, 22:7, 22:14, 22:16, 22:19, 22:21, 23:22, 24:9, 25:4, 25:6, 25:16, 25:24, 27:6, 28:6, 28:14, 29:10, 30:8, 30:12, 30:16, 30:19, 30:22, 31:4, 31:8, 31:16, 32:3, 33:4, 33:8, 34:2, 35:7, 40:7, 40:16, 41:2, 42:2, 42:20, 43:2, 43:5, 43:18, 44:2, 44:6, 44:13, 44:19, 46:10, 46:15, 46:17, 47:3, 47:6, 48:12
MS [6] - 3:6, 45:1, 47:2, 47:18, 48:5, 48:9
Mt [3] - 45:12, 45:22, 45:24
multiple [1] - 40:19

**N**

N.W [1] - 49:11
name [1] - 3:4

narrow [1] - 44:24
nature [1] - 16:25
necessarily [2] - 39:18, 41:17
necessary [1] - 8:17
need [24] - 5:19, 7:19, 8:9, 9:4, 9:11, 9:12, 9:16, 17:21, 19:10, 21:21, 22:5, 24:11, 27:15, 29:12, 29:13, 32:2, 32:8, 39:9, 40:13, 42:5, 43:21, 44:24, 46:6, 46:8
needs [4] - 7:10, 24:5, 33:15, 33:18
negative [3] - 11:9, 11:10
network [1] - 38:12
neutral [1] - 47:10
New [2] - 1:18, 1:22
new [1] - 17:13
next [1] - 35:9
night [1] - 7:17
nine [1] - 15:3
nobody [1] - 24:16
noncompete [2] - 6:12, 12:4
none [1] - 32:24
nonstarter [1] - 5:15
notes [1] - 49:5
nothing [4] - 4:10, 13:17, 48:9, 48:12
number [5] - 23:10, 23:11, 26:25, 35:8, 40:24
numerous [2] - 24:7, 29:20
NW [4] - 1:13, 1:15, 1:18, 2:22
NY [1] - 1:22

## O

obey [1] - 14:7
object [1] - 24:9
objection [2] - 22:8, 26:23
objections [2] - 46:14, 48:1
observable [1] - 8:12
obtain [1] - 36:3
obviously [1] - 44:14
occasions [3] - 29:20, 36:13
occur [1] - 23:19
occurred [1] - 24:13
occurring [2] - 8:12, 26:22
OF [5] - 1:1, 1:2, 1:8, 1:15, 49:1

offer [6] - 4:5, 24:23, 28:21, 30:9, 35:4, 47:13
office [1] - 42:22
officers [3] - 12:15, 12:17, 12:19
offices [3] - 36:9, 37:23, 39:24
official [1] - 12:21
Official [2] - 2:21, 49:10
OFFICIAL [1] - 49:1
old [1] - 17:7
older [1] - 39:14
once [4] - 6:21, 7:20, 26:13, 29:12
one [20] - 5:7, 5:9, 9:14, 9:15, 13:20, 17:10, 17:14, 18:21, 22:12, 23:10, 36:1, 36:3, 42:7, 42:10, 42:13, 42:14, 42:16, 42:18, 45:3, 47:6
ones [1] - 32:5
online [3] - 37:21, 37:24, 39:23
onus [1] - 32:4
open [11] - 12:2, 16:5, 16:7, 16:8, 19:8, 19:13, 19:15, 20:3, 20:8, 30:2, 43:7
open-source [5] - 12:2, 16:5, 16:7, 16:8, 20:3
opening [1] - 44:3
operate [2] - 16:3, 21:18
operates [1] - 8:5
operation [1] - 10:20
opinion [2] - 35:23, 36:20
opinions [2] - 40:9, 41:15
opponent [1] - 11:16
opportunity [7] - 6:19, 24:2, 28:15, 29:9, 30:13, 31:14, 43:16
order [26] - 4:6, 4:11, 5:2, 5:23, 5:25, 6:3, 6:10, 7:13, 11:24, 12:9, 13:8, 13:21, 14:6, 14:24, 15:21, 16:2, 18:22, 19:1, 19:11, 21:9, 23:18, 28:4, 28:16, 30:3, 40:2
ordered [1] - 30:25
ordering [1] - 4:7
orders [1] - 34:24
otherwise [1] - 14:9

outside [1] - 36:8
overinclusive [1] - 26:6
own [2] - 14:4, 42:9
OXT [6] - 10:19, 12:13, 12:25, 16:4, 16:14, 20:3
OXT.ME [1] - 10:19

## P

P.M [1] - 1:6
p.m [1] - 48:14
Pac [1] - 26:5
Pac-Man [1] - 26:5
pages [1] - 45:8
paper [2] - 33:15, 33:20
papers [1] - 19:19
part [6] - 7:7, 9:2, 12:7, 23:8, 31:12, 33:13
participates [1] - 39:17
particular [21] - 8:16, 9:21, 10:2, 10:6, 10:13, 10:17, 11:15, 11:17, 15:10, 15:19, 15:24, 24:18, 24:20, 25:8, 25:22, 26:2, 26:25, 33:11, 40:18, 45:21, 46:7
particularly [1] - 20:4
parties [12] - 4:7, 4:12, 4:25, 5:4, 5:17, 39:9, 39:10, 44:22, 44:23, 47:12, 47:14, 47:16
parts [1] - 5:11
party [3] - 31:10, 36:15
pass [1] - 22:19
passing [1] - 45:11
paths [1] - 21:18
pause [2] - 14:17, 25:11
PayPal [3] - 42:21, 42:23
PEARLMAN [2] - 1:17, 3:12
Pearlman [1] - 3:12
Pelker [1] - 3:7
PELKER [7] - 1:14, 3:6, 45:1, 47:2, 47:18, 48:5, 48:9
pen [1] - 33:19
Pennsylvania [1] - 1:15
people [5] - 10:25, 13:18, 17:14, 38:12, 40:25

percent [2] - 25:18, 40:20
percentage [1] - 10:1
perhaps [3] - 21:5, 36:12, 41:1
period [2] - 6:7, 28:12
person [9] - 21:22, 22:3, 29:14, 29:20, 30:4, 33:14, 37:6, 37:22, 38:21
perspective [1] - 43:14
phone [3] - 7:16, 7:18, 27:10
phrase [1] - 15:4
physically [1] - 36:8
piece [1] - 33:2
place [5] - 7:14, 18:18, 20:7, 21:10, 40:2
Plaintiff [2] - 1:3, 1:12
plate [1] - 35:9
plates [1] - 43:12
platform [3] - 16:5, 16:6, 20:3
PLLC [1] - 1:21
point [21] - 4:3, 4:16, 5:6, 5:21, 8:15, 9:3, 13:16, 18:14, 18:16, 18:19, 18:24, 18:25, 20:9, 23:10, 23:11, 23:23, 28:2, 33:10, 34:4, 45:1, 45:7
points [2] - 9:22, 22:24
poke [1] - 8:6
pops [1] - 8:24
portion [5] - 4:18, 7:4, 20:25, 21:1, 34:22
portions [2] - 32:8, 34:12
position [2] - 25:25, 31:25
positive [1] - 40:20
possible [7] - 12:4, 15:22, 19:3, 20:16, 24:1, 30:19
possibly [1] - 27:20
post [1] - 19:4
potential [1] - 6:9
potentially [2] - 36:15, 39:19
practice [1] - 41:7
practices [1] - 6:6
prefer [2] - 28:5, 28:6
prejudged [1] - 11:16
preliminary [2] - 43:24, 44:1
preparation [1] - 35:16
prepared [2] - 30:9,

46:5
presence [2] - 40:21, 41:21
present [3] - 3:16, 3:19, 43:10
presented [2] - 5:14, 27:7
presenting [1] - 6:14
pretrial [4] - 35:13, 43:19, 45:5, 48:4
pretty [4] - 5:16, 6:21, 35:24, 41:7
prevent [1] - 19:1
principal [1] - 6:4
principally [1] - 4:16
problem [10] - 6:13, 6:14, 6:15, 26:16, 27:16, 29:25, 31:7, 32:6, 33:13, 34:22
problematic [2] - 10:14, 31:1
procedural [1] - 6:24
procedures [1] - 29:1
proceed [2] - 6:22, 34:25
proceeding [2] - 3:23, 44:4
proceedings [2] - 12:19, 49:6
process [5] - 9:24, 29:1, 32:17, 32:21, 33:9
produce [2] - 19:18, 31:22
program [2] - 4:18, 29:24
programs [1] - 10:24
project [1] - 27:21
promise [1] - 20:24
promote [1] - 18:17
properly [2] - 33:5, 35:4
property [1] - 23:8
proposal [2] - 20:14, 20:15
propose [1] - 14:23
proposed [3] - 7:18, 22:23, 27:20
proposition [1] - 13:11
proprietary [7] - 8:16, 12:14, 16:6, 16:25, 19:25, 22:10, 26:2
prosecute [1] - 22:10
prosecutor [1] - 13:19
protect [1] - 15:23
protective [18] - 5:2, 5:23, 5:25, 6:3, 6:10, 7:12, 7:13, 11:24, 12:9, 13:8, 13:21,

14:6, 15:21, 16:2, 18:22, 19:1, 19:11, 21:9
**prove** [1] - 14:3
**provide** [11] - 15:11, 15:12, 19:6, 20:1, 24:2, 24:14, 25:13, 29:21, 41:14, 46:10, 47:10
**provided** [3] - 24:6, 28:3, 29:19
**provides** [2] - 18:9, 46:11
**providing** [3] - 24:14, 27:25, 28:22
**provision** [1] - 38:2
**public** [1] - 43:7
**punk** [1] - 23:4
**purport** [1] - 45:20
**purpose** [2] - 13:9, 14:12
**purposes** [11] - 4:19, 6:2, 9:22, 17:20, 17:24, 35:16, 36:4, 38:3, 39:7, 43:10
**pursuant** [2] - 4:7, 15:12
**pushing** [2] - 20:8, 34:21
**put** [13] - 7:10, 8:23, 10:24, 11:2, 13:9, 18:23, 21:10, 22:2, 22:8, 22:12, 27:22, 33:15, 33:19
**putting** [4] - 25:13, 32:4, 33:10, 39:8
**puzzled** [1] - 36:6

## Q

**quantum** [2] - 43:3, 43:6
**questions** [2] - 35:21, 42:18
**quick** [1] - 22:24
**quickly** [1] - 4:3
**quite** [7] - 31:11, 38:10, 38:14, 38:19, 38:22, 41:18
**quote** [1] - 23:4

## R

**raise** [1] - 7:13
**raised** [2] - 15:19, 26:7
**raises** [2] - 26:16, 40:7
**raising** [1] - 47:23
**RANDOLPH** [1] - 1:8
**rant** [1] - 8:19

**rates** [1] - 19:21
**rather** [4] - 28:15, 32:5, 32:7, 34:19
**rattle** [1] - 28:8
**reach** [7] - 5:5, 21:14, 21:15, 34:15, 34:18, 35:5, 42:12
**reached** [2] - 10:19, 40:3
**Reactor** [3] - 15:2, 19:22, 26:17
**read** [2] - 17:17, 36:24
**readily** [1] - 39:18
**reading** [2] - 17:25, 20:17
**ready** [1] - 43:12
**realize** [1] - 31:9
**really** [21] - 5:16, 5:19, 7:5, 12:3, 14:15, 14:17, 15:20, 15:24, 16:9, 16:10, 22:25, 24:12, 25:21, 33:16, 36:7, 36:18, 37:4, 39:11, 40:13, 40:25, 42:7
**reason** [4] - 12:7, 24:10, 28:21, 30:25
**reasonable** [1] - 5:25
**reasons** [4] - 5:7, 10:15, 24:20, 46:8
**received** [2] - 4:22, 9:22
**record** [4] - 3:4, 22:8, 22:9, 22:12
**records** [6] - 45:17, 45:19, 45:20, 45:22, 45:24, 46:24
**refers** [1] - 26:14
**refusing** [1] - 5:20
**regard** [1] - 25:17
**regardless** [1] - 18:15
**register** [1] - 38:6
**registered** [6] - 36:21, 36:24, 37:24, 39:25, 40:1, 40:18
**registration** [1] - 36:18
**registrations** [1] - 39:22
**regulated** [1] - 36:15
**regulating** [1] - 37:18
**regulations** [4] - 38:7, 39:5, 42:1
**regulatory** [2] - 40:4, 41:19
**related** [2] - 25:10, 26:24
**relates** [1] - 24:18
**relation** [3] - 25:6, 26:10, 26:16

**relatively** [1] - 14:23
**relevant** [3] - 23:14, 25:3, 41:16
**reliable** [1] - 20:5
**relied** [1] - 7:9
**rely** [1] - 12:12
**relying** [1] - 6:8
**repeatedly** [2] - 8:8, 33:20
**repercussions** [1] - 17:8
**report** [7] - 23:15, 23:21, 25:2, 26:14, 31:2, 31:6, 31:17
**REPORTER** [2] - 13:1, 49:1
**Reporter** [3] - 2:21, 2:21, 49:10
**reports** [1] - 38:16
**represented** [1] - 24:4
**request** [3] - 4:6, 29:4, 31:23
**requests** [3] - 28:9, 31:17, 31:20
**require** [2] - 19:4, 37:9
**required** [3] - 4:17, 38:6, 38:15
**requirement** [4] - 36:5, 36:7, 36:18, 40:1
**requisite** [1] - 19:14
**research** [1] - 44:16
**resolution** [2] - 32:2, 35:6
**resolve** [3] - 43:22, 43:25, 48:2
**respect** [17] - 4:5, 15:19, 24:24, 25:14, 27:25, 28:22, 28:24, 28:25, 29:3, 35:12, 35:18, 35:25, 36:1, 42:10, 44:9, 44:22, 48:1
**respectfully** [1] - 25:16
**respond** [5] - 10:10, 28:15, 43:17, 44:12, 45:7
**response** [2] - 7:22, 45:7
**restriction** [2] - 12:13, 12:15
**result** [3] - 9:25, 18:10, 26:12
**resume** [1] - 16:13
**return** [1] - 30:20
**retweeted** [1] - 23:3
**review** [1] - 6:2
**revise** [1] - 28:20
**revisit** [1] - 47:6

**rhetoric** [1] - 22:25
**rights** [1] - 32:21
**risk** [1] - 26:3
**risky** [1] - 13:11
**RMR** [2] - 2:21, 49:9
**road** [1] - 6:22
**ROMAN** [1] - 1:5
**Roman** [4] - 1:23, 3:3, 3:16, 3:19
**Room** [2] - 2:22, 49:10
**rose** [1] - 13:22
**Rule** [7] - 4:7, 4:12, 4:15, 15:12, 27:13, 33:17, 33:18
**rule** [5] - 4:8, 4:14, 41:17, 44:24, 45:4
**rules** [1] - 19:15
**run** [1] - 44:20
**running** [4] - 17:22, 24:5, 30:5, 46:8
**runs** [1] - 10:18
**Russian** [1] - 47:8

## S

**safe** [1] - 22:13
**Salah** [6] - 5:1, 5:8, 6:4, 18:12, 21:5, 26:8
**San** [1] - 2:4
**sanity** [1] - 40:14
**satisfy** [1] - 29:21
**saw** [1] - 40:22
**scale** [1] - 9:22
**schedule** [1] - 21:12
**science** [1] - 29:24
**scientific** [1] - 19:19
**screeds** [3] - 11:9, 11:10
**screen** [1] - 41:10
**screening** [1] - 41:8
**second** [2] - 25:12, 27:22
**Secrecy** [1] - 41:19
**Section** [1] - 41:24
**see** [12] - 7:20, 8:9, 21:2, 21:18, 24:11, 25:9, 26:4, 27:15, 32:8, 35:5, 39:1, 44:17
**seeing** [1] - 5:13
**seek** [2] - 24:24, 28:19
**seeking** [1] - 17:23
**seem** [4] - 29:21, 33:7, 37:14, 42:12
**sees** [2] - 11:1, 33:6
**Sefranek** [3] - 2:21, 49:9, 49:9
**SEFRANEK** [1] - 49:3
**select** [1] - 7:24

**selection** [1] - 22:23
**selling** [1] - 37:24
**sender** [1] - 38:21
**sense** [8] - 14:10, 20:13, 21:20, 23:6, 31:21, 36:10, 42:8, 43:15
**sent** [1] - 22:21
**separate** [1] - 18:21
**September** [3] - 44:11, 46:15, 49:7
**serious** [1] - 11:25
**serve** [1] - 46:22
**service** [2] - 12:6, 46:19
**shake** [1] - 28:3
**shelf** [1] - 7:24
**shooting** [1] - 23:2
**short** [7] - 14:17, 14:23, 16:9, 22:16, 22:17, 34:5, 44:15
**shortness** [1] - 21:17
**show** [2] - 13:24, 23:3
**shut** [1] - 12:3
**sic** [3] - 22:24, 23:3, 29:19
**sign** [2] - 5:25, 16:2
**signed** [1] - 6:10
**significant** [1] - 31:12
**similar** [2] - 37:16, 37:17
**simply** [5] - 6:1, 7:2, 9:18, 9:19, 10:5
**sit** [1] - 32:19
**site** [3] - 10:18, 10:19, 12:2
**sites** [1] - 10:2
**sitting** [4] - 36:11, 37:20, 42:17, 46:20
**situation** [3] - 8:3, 19:23, 32:6
**situations** [1] - 34:11
**skeptical** [1] - 42:11
**slightly** [1] - 35:9
**slow** [1] - 13:1
**small** [1] - 47:22
**software** [9] - 5:10, 8:5, 8:23, 11:4, 16:8, 19:25, 26:11, 26:12, 27:4
**someone** [9] - 9:24, 10:4, 11:1, 18:4, 20:22, 20:24, 29:14, 36:10, 45:18
**somewhat** [1] - 38:20
**somewhere** [1] - 36:17
**soon** [1] - 46:8
**sooner** [1] - 34:19
**sorry** [7] - 9:5, 13:2,

| | | | | |
|---|---|---|---|---|
| 31:4, 32:14, 32:15, 34:5, 44:10 | 19:7, 41:21 | **Swiss** [2] - 37:23 | **therefore** [1] - 7:4 | 41:4, 41:5 |
| **sort** [6] - 6:12, 11:1, 11:22, 23:17, 25:21, 26:18 | **statute** [8] - 36:25, 37:2, 38:7, 39:15, 43:2, 44:10 | **Switzerland** [1] - 37:22 | **they've** [4] - 5:1, 21:1, 27:20, 45:17 | **travel** [1] - 17:5 |
| **sorts** [1] - 11:12 | **statutes** [4] - 37:8, 37:17, 37:25, 39:13 | **system** [1] - 38:11 | **thinking** [1] - 35:24 | **Treasury** [3] - 11:11, 39:5, 41:25 |
| **source** [52] - 4:18, 4:24, 5:11, 5:13, 5:18, 6:6, 6:8, 8:16, 8:17, 9:15, 10:11, 12:2, 13:14, 14:13, 16:5, 16:6, 16:7, 16:8, 17:17, 17:22, 18:1, 18:8, 18:9, 19:18, 19:25, 20:2, 20:3, 20:6, 20:17, 20:20, 21:8, 21:24, 22:4, 22:9, 23:4, 24:3, 24:10, 24:12, 25:9, 25:13, 26:18, 26:24, 27:3, 28:4, 29:15, 32:1, 32:9, 33:15, 33:22, 33:24 | **statutory** [1] - 41:19 | | **thinks** [1] - 19:21 | **treasury** [1] - 38:7 |
| | **stay** [1] - 27:23 | **T** | **third** [2] - 31:10 | **treaties** [1] - 17:7 |
| | **stenographic** [1] - 49:5 | | **thousands** [4] - 39:19, 41:1, 42:24, 42:25 | **trial** [6] - 20:13, 32:22, 35:16, 43:13, 45:15, 46:20 |
| | **step** [1] - 23:24 | **tailored** [1] - 23:16 | **three** [4] - 35:19, 35:25, 36:12, 45:7 | **tried** [1] - 35:3 |
| | **steps** [2] - 4:13, 22:5 | **talks** [1] - 38:17 | **throw** [1] - 32:13 | **triggered** [1] - 15:9 |
| | **STERLINGOV** [1] - 1:5 | **Tamara** [3] - 2:21, 49:9, 49:9 | **ticket** [1] - 13:14 | **troubling** [1] - 12:5 |
| | **Sterlingov** [9] - 1:23, 3:3, 3:16, 3:19, 3:22, 3:24, 8:24, 35:14, 37:6 | **TAMARA** [1] - 49:3 | **tied** [2] - 10:1, 14:1 | **true** [2] - 49:4, 49:5 |
| | | **tampered** [1] - 45:18 | **Title** [1] - 38:8 | **trust** [1] - 23:7 |
| | | **terms** [16] - 7:15, 8:11, 8:22, 12:6, 12:11, 13:4, 13:23, 14:15, 15:6, 37:11, 39:14, 43:2, 43:6, 43:7, 43:19 | **today** [9] - 3:23, 6:23, 14:18, 16:9, 28:12, 29:21, 31:5, 44:21, 48:6 | **trustee** [1] - 45:22 |
| | **Sterlingov's** [1] - 6:2 | | | **truth** [2] - 6:25, 18:5 |
| | **still** [13] - 13:19, 20:14, 23:23, 23:25, 24:1, 26:5, 27:16, 27:19, 29:12, 30:3, 38:3, 45:2, 47:18 | | | **try** [5] - 9:9, 10:24, 13:9, 27:8, 32:20 |
| | | **terrible** [2] - 16:23, 16:24 | **ton** [1] - 40:23 | **trying** [9] - 8:6, 13:13, 20:12, 20:22, 28:11, 32:18, 32:24, 33:5, 48:7 |
| | | **test** [2] - 31:14, 39:8 | **tool** [1] - 34:7 | |
| | | **testable** [1] - 34:14 | **top** [3] - 5:9, 17:14, 36:2 | |
| **space** [4] - 17:11, 17:13, 17:14 | **still's** [2] - 25:25, 26:14 | **testified** [1] - 25:8 | **topic** [2] - 43:11, 44:16 | **Tuesday** [4] - 31:2, 31:5, 31:6, 47:25 |
| **specific** [7] - 20:19, 25:1, 41:18, 46:1, 46:6, 46:14, 47:25 | **stipulate** [3] - 46:3, 46:6, 46:21 | **testimony** [5] - 4:20, 18:22, 23:1, 25:25, 26:1 | **TOR** [1] - 1:20 | **turn** [3] - 25:20, 28:4, 32:12 |
| | **straight** [2] - 11:13 | | **Tor** [2] - 1:21, 3:15 | |
| **specifically** [1] - 41:15 | **Street** [3] - 1:13, 1:21, 2:3 | **THE** [86] - 1:1, 1:1, 1:8, 3:2, 3:8, 3:11, 3:14, 3:21, 3:25, 4:1, 4:11, 5:22, 6:3, 6:16, 6:23, 7:22, 9:6, 9:10, 11:20, 13:1, 14:17, 14:20, 15:15, 15:18, 16:9, 16:16, 16:21, 17:3, 17:15, 18:14, 19:3, 19:9, 20:8, 20:22, 21:11, 21:16, 22:12, 22:15, 22:18, 22:20, 23:18, 23:23, 24:22, 25:5, 25:11, 25:23, 27:5, 27:22, 28:11, 28:19, 29:12, 30:11, 30:14, 30:18, 30:21, 30:24, 31:6, 31:9, 31:19, 32:15, 33:7, 33:24, 34:17, 35:8, 40:12, 40:22, 41:23, 42:3, 42:23, 43:4, 43:10, 43:21, 44:5, 44:8, 44:14, 44:20, 45:6, 46:13, 46:16, 46:18, 47:5, 47:12, 47:24, 48:6, 48:11, 48:13 | **totally** [1] - 8:21 | **turnaround** [1] - 44:15 |
| **specification** [2] - 14:24, 24:24 | **struck** [1] - 40:5 | | **touch** [1] - 44:21 | **turned** [1] - 32:1 |
| **specificity** [5] - 7:11, 18:3, 24:24, 27:25, 28:11 | **stuff** [2] - 12:3, 16:22 | | **touches** [1] - 36:10 | **turns** [2] - 22:1, 30:25 |
| | **subconsciously** [1] - 6:7 | | **towards** [2] - 22:25, 32:16 | **tweets** [5] - 11:6, 16:22, 22:22 |
| **specifics** [1] - 28:22 | **subcontractor** [1] - 16:15 | | **tracing** [2] - 21:23, 38:5 | **Twitter** [2] - 11:7, 14:10 |
| **specified** [1] - 15:5 | **subcontractors** [1] - 12:16 | | **transacting** [4] - 37:16, 42:3, 42:4, 42:14 | **two** [6] - 18:20, 22:24, 23:11, 36:12, 40:23, 42:16 |
| **specifies** [1] - 7:10 | **subgroup** [1] - 46:4 | | | |
| **spend** [1] - 25:7 | **subject** [4] - 13:21, 14:6, 14:9, 15:21 | | **transaction** [4] - 36:11, 37:21, 37:23, 42:15 | **type** [8] - 8:4, 22:9, 25:21, 29:20, 30:7, 37:11, 39:14, 42:4 |
| **spending** [1] - 35:23 | | | | |
| **spends** [3] - 14:8, 14:9, 20:25 | **submitted** [1] - 16:13 | | **transactions** [9] - 15:5, 15:8, 36:16, 40:25, 42:15, 42:24, 43:3, 43:6, 43:8 | **types** [1] - 29:5 |
| **spits** [1] - 9:25 | **subpoenas** [1] - 28:10 | | | **typical** [1] - 41:7 |
| **spot** [1] - 39:8 | **subsection** [1] - 38:2 | | | |
| **staff** [2] - 12:16, 14:9 | **substantial** [4] - 5:4, 7:4, 15:22, 47:11 | | **transcript** [2] - 49:4, 49:6 | **U** |
| **stand** [3] - 22:3, 34:17, 46:24 | | | **TRANSCRIPT** [1] - 1:8 | |
| **standard** [1] - 17:1 | **substantially** [2] - 7:1, 44:20 | | **transfer** [4] - 38:11, 38:13, 39:16 | **U.S** [3] - 1:15, 41:10 |
| **standing** [3] - 27:9, 28:16, 30:13 | **substantive** [1] - 45:8 | | **translate** [1] - 47:15 | **u.S** [1] - 1:18 |
| **start** [1] - 3:22 | **substantively** [1] - 45:9 | | **translations** [5] - 47:8, 47:13, 47:14, 47:19, 48:2 | **unaware** [1] - 39:20 |
| **started** [1] - 38:5 | | | | **unbiased** [1] - 11:19 |
| **starting** [1] - 3:5 | **sufficiently** [1] - 32:16 | **themselves** [1] - 11:2 | **translator** [2] - 47:10, 47:15 | **unclear** [2] - 26:9, 38:24 |
| **starts** [1] - 16:22 | **suggested** [1] - 31:12 | **theories** [2] - 36:1, 36:3 | | |
| **state** [2] - 3:4, 36:4 | **suitable** [1] - 5:2 | | **transmission** [3] - 37:7, 38:22, 46:12 | **unconstitutional** [1] - 22:11 |
| **statements** [1] - 44:3 | **suppose** [3] - 4:25, 17:15, 47:13 | **theory** [1] - 43:17 | **Transmitters** [1] - 41:17 | **under** [19] - 20:10, 21:18, 27:12, 27:13, 30:24, 33:1, 33:17, 36:7, 36:22, 36:24, 37:1, 37:9, 37:15, 38:6, 38:16, 39:11, 40:5, 41:24 |
| **STATES** [3] - 1:1, 1:2, 1:9 | | **therefor** [1] - 24:20 | | |
| **states** [1] - 41:6 | **supposed** [1] - 32:5 | | **transmitting** [5] - 38:9, 40:19, 41:3, | |
| **States** [8] - 2:22, 3:3, 3:7, 3:10, 17:6, 17:8, | **suspect** [2] - 37:17, 47:23 | | | **underlying** [2] - 23:13, |
| | **sweeping** [1] - 38:14 | | | |

23:20
**undermine** [3] - 17:23, 18:17, 20:23
**understood** [3] - 22:7, 44:19, 47:3
**unexplained** [1] - 12:23
**unfortunately** [2] - 4:2, 35:9
**United** [8] - 2:22, 3:2, 3:7, 3:10, 17:6, 17:7, 19:7, 41:21
**UNITED** [3] - 1:1, 1:2, 1:9
**universe** [1] - 44:24
**University** [1] - 29:23
**unreasonable** [1] - 7:22
**unusual** [1] - 41:4
**unwilling** [1] - 20:1
**up** [8] - 4:15, 22:19, 23:25, 28:21, 32:13, 32:23, 35:4, 43:11
**usage** [2] - 12:13, 13:15
**USAO** [1] - 1:12
**USAO-DOJ** [1] - 1:12
**useful** [1] - 14:15
**user** [1] - 12:23
**users** [1] - 12:14
**uses** [1] - 12:25
**utilized** [4] - 15:2, 15:6, 15:14, 24:17

## V

**various** [1] - 37:8
**venue** [4] - 35:15, 35:18, 35:24, 37:3
**verifiable** [8] - 8:12, 33:23, 33:25, 34:1, 34:4, 34:11, 34:13, 34:14
**verify** [2] - 21:24, 24:3
**versus** [1] - 42:24
**via** [2] - 3:16, 3:19
**Via** [3] - 1:20, 1:20, 1:23
**video** [4] - 3:17, 3:20, 3:23, 3:24
**viewable** [1] - 34:3
**violate** [1] - 21:9
**violated** [1] - 37:25
**violation** [1] - 19:16
**violent** [1] - 22:25
**virtual** [3] - 40:18, 41:20, 42:4
**virtually** [1] - 39:24
**vitae** [1] - 4:23
**vs** [1] - 1:4

## W

**waiting** [1] - 45:2
**walk** [1] - 41:23
**walked** [1] - 42:6
**Wall** [1] - 1:21
**wants** [4] - 4:5, 11:2, 11:5, 17:5
**warnings** [1] - 29:19
**warranties** [1] - 12:12
**Washington** [6] - 1:5, 1:13, 1:16, 1:19, 2:23, 49:11
**ways** [1] - 13:25
**wealth** [1] - 12:23
**website** [1] - 36:19
**week** [1] - 47:7
**weeks** [2] - 20:11, 20:12
**weighted** [1] - 9:23
**welcome** [3] - 7:24, 18:24, 23:25
**whole** [1] - 14:12
**WILLIAM** [1] - 2:2
**willing** [2] - 16:16, 24:14
**wish** [1] - 28:8
**witness** [3] - 23:6, 23:7, 23:8
**word** [2] - 28:1, 43:4
**wording** [1] - 47:22
**words** [4] - 15:1, 15:7, 25:20, 33:19
**workable** [2] - 20:15, 43:13
**works** [1] - 16:15
**world** [5] - 5:9, 17:14, 21:23, 27:21, 36:24
**worry** [1] - 39:15
**worst** [1] - 27:20
**writing** [2] - 7:10, 17:22
**written** [4] - 30:1, 35:23, 37:10, 39:14

## Y

**year** [1] - 42:24
**years** [2] - 16:2, 16:17
**yesterday** [4] - 4:22, 5:4, 7:16, 27:11
**York** [2] - 1:18, 1:22
**you-all** [2] - 40:3, 43:12

## Z

**Zoom** [3] - 1:20, 1:20, 1:23

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Action |
| | ) | No. 1:21-CR-0399 |
| Plaintiff, | ) | |
| | ) | **PRETRIAL CONFERENCE** |
| vs. | ) | |
| | ) | Washington, D.C. |
| ROMAN STERLINGOV, | ) | **September 7, 2023** |
| | ) | **Time: 10:10 A.M.** |
| Defendant. | ) | |

**TRANSCRIPT OF PRETRIAL CONFERENCE**
BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S**

For the Plaintiff:     CHRISTOPHER BROWN
USAO-DOJ
601 D Street, NW
Washington, DC 20001

ALDEN PELKER
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

JEFFREY PEARLMAN
DOJ-CRM
U.S. Department of Justice
1301 New York Ave. NW
Washington, DC 20005

For the Defendant:     TOR EKELAND
MICHAEL HASSARD
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY 10005

Court Reporter:        Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6714
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3246

P R O C E E D I N G S

THE COURTROOM DEPUTY: Criminal Case No. 21-399, United States of America v. Roman Sterlingov.

Would counsel state their name for the record, starting with government counsel.

MS. PELKER: Good morning, Your Honor. Alden Pelker for the United States.

THE COURT: Good morning.

MR. BROWN: Good morning. AUSA Christopher Brown for the government.

THE COURT: Good morning.

MR. PEARLMAN: Jeff Pearlman for the United States. Good morning, Your Honor.

THE COURT: Good morning.

MR. EKELAND: Good morning, Your Honor, Tor Ekeland for Defendant Roman Sterlingov, who is present in court.

THE COURT: Good morning.

MR. HASSARD: Good morning, Your Honor. Michael Hassard for Defendant Roman Sterlingov, who is present in court.

THE COURT: Good morning to you as well.

All right. So we're here for a pretrial conference, as well as an opportunity for final argument on the various *Daubert* motions that are pending and anything else that we need to address pretrial.

I have gotten to you the draft voir dire. I did not provide you with copies of the proposed preliminary jury instructions because I was waiting to get the defense's memorandum relating to the applicability or inapplicability of the D.C. licensing statute and the relevant rules under the Treasury Department regulations with respect to licensing, which just came in last night. And I've looked at that quickly, but I need to look at that a little bit more carefully. I will, hopefully, this evening -- and if not this evening, early tomorrow -- get you my proposed preliminary jury instructions.

Why don't we go ahead and start with the voir dire, though, and just see if there are any comments or suggestions with respect to the proposed voir dire that I've provided to the parties. Mr. Pearlman?

MR. PEARLMAN: Yes. And good morning again, Your Honor.

THE COURT: Good morning.

MR. PEARLMAN: Generally speaking, we're satisfied with the Court's proposed instructions. I think it balances both what the government and the defense requested.

We remain concerned about the publicity in this case through social media and appreciate the introduction of Question No. 2. We might seek, depending on the particular yes response, to follow up, but we'll do that -- we'll make that

request with the Court for a particular individual.

THE COURT: I will allow the parties to ask follow-up questions, as appropriate, while we're conducting the voir dire. So if somebody says they've heard something about the case, I'll ask some follow-up questions. And if you feel I haven't adequately addressed the topic, you're welcome to do so as well.

MR. PEARLMAN: You included some brackets.

THE COURT: Yes. The brackets were -- I don't know enough about the case to know what No. 4 was about and why you were suggesting No. 4. And also No. 18, I didn't know whether there was -- the government is anticipating, actually, calling a cooperating witness. I just hadn't heard anything about that previously.

MR. PEARLMAN: I wasn't able to pull up the actual -- is No. 4 Larry Harmon --

THE COURT: I can read it to you.

MR. PEARLMAN: -- Helix?

THE COURT: That's No. 5. No. 4 is Bitfinex and Ilya "Dutch" Lichtenstein and Heather Morgan.

MR. PEARLMAN: So the issue there is we may be calling Mr. Lichtenstein as a cooperating witness. Mr. Lichtenstein stole a whole bunch of money from Bitfinex and attempted to launder it and use Bitcoin Fog as part of his laundering process. So he may be called as a cooperating

witness.

While the name Ilya Lichtenstein might not mean anything, it did get some publicity, and so perhaps that might trigger some yes responses.

THE COURT: Okay. I just wanted to make sure. So for both of those, the answer is you may actually have a cooperating witness. And that No. 4 are names that could come up in the course of the trial?

MR. PEARLMAN: Yes. One more thing, Your Honor. I am now with the Department of Justice, not with the U.S. Attorney's Office. I think there was a minor typo there

THE COURT: I didn't realize that you had moved.

MR. PEARLMAN: I just wanted to make sure it was accurate.

THE COURT: No, I appreciate that. So we will change that. Let me just make a notation to that effect.

MR. PEARLMAN: And we have a new paralegal who is Angela De Falco, D-e --

THE COURT: I'm sorry. Give me one more second here.

MR. PEARLMAN: Sure.

THE COURT: Okay. Yes. Go ahead.

MR. PEARLMAN: Angela De Falco is the new paralegal, D-e F-a-l-c-o, two words.

THE COURT: Okay. And is that in place of one of the others?

MR. PEARLMAN: It is. It's in place of the other paralegal.

THE COURT: Well, there are two paralegals in mine, right?

MR. PEARLMAN: Oh, replacing Michon.

THE COURT: Divya will stay on the team?

MR. PEARLMAN: Divya is going to stay on the team.

THE COURT: That is fine. What about your list of witnesses or names that could come up in the course of the trial?

MR. PEARLMAN: We have a list of witnesses.

THE COURT: Have you provided that to the defense? You are doing so now.

MR. PEARLMAN: We are. Can I hand this up?

THE COURT: Thank you. Okay. We'll insert this list of names then. Anything else?

MR. PEARLMAN: Not from the government.

THE COURT: Let me hear then from the defense. Mr. Ekeland.

MR. EKELAND: Your Honor, we're generally fine with the voir dire; just a couple of minor things.

I defer to the Court on this first one. As the Court knows, my name is Tor Ekeland. That's my given name. Both my parents were from Norway. And I've in the past encountered confusion by people who think that somehow I changed my name

just to do that because I work in computer law, and that is a complete coincidence.

THE COURT: Just a coincidence, okay.

MR. EKELAND: I'm happy to show my birth certificate to the Court.

THE COURT: No. I take your word for it.

MR. EKELAND: If we could just maybe inform the panel or the Court could inform the panel that it's my given name so people don't wonder about that or think that I'm trying to be cute in some way.

I've had that come up in a couple of cases. I defer to the Court on that because I, honestly, don't know the best way to deal with that.

We do have some names -- I'm sorry.

THE COURT: I'm thinking through the best way to do that because it just -- many of the prospective jurors may not know the word Tor. So if I just single you out and say yes, that really is his given name, that may strike them as odd.

So I'm just trying to figure out if there's some way where Tor comes up -- I think I may in here, actually -- is there a question where I mention the --

MR. EKELAND: The Tor browser.

THE COURT: -- whether someone is familiar with the Tor browser in here?

MR. EKELAND: Yes. If I recall correctly, there is.

And the Tor browser will be coming up.

THE COURT:  Oh, I know it will.

MR. EKELAND:  The Court understands the issue.

THE COURT:  Let me see if I can find that in here. No. 22.

So No. 22 says, "Have you ever used the Tor browser or any similar technology for your online activities?"

If you want, I can say at that point, "And, by the way, even though Mr. Ekeland's first name is Tor, that's just a coincidence."

MR. EKELAND:  The defense is okay with that if the government is.

THE COURT:  Whatever you want.  This is for your sake.

MR. EKELAND:  That's okay.  If you could also let them know it's my given name and my parents are from Norway.

THE COURT:  So what if I say, "By the way, Mr. Ekeland's given name is Tor, but that is just a coincidence."  Does that do it for you?

MR. EKELAND:  Yes, Your Honor.

THE COURT:  That seems fair.

MR. EKELAND:  We do have some names just to fill in for who will be at counsel table.  We anticipate having a young lawyer who will put in his pro hac vice application to the Court.  I expect him just to -- to just sit at the table.  His

name is Tauseef.  That's spelled T-a-u-s-e-e-f; and his last name is Ahmed, A-h-m-e-d.

THE COURT:  Is he from your firm as well?

MR. EKELAND:  He's of counsel, yes.

THE COURT:  But I can say --

MR. EKELAND:  Yes, you may.  You can say he's with Tor Ekeland Law, PLLC.

THE COURT:  Okay.  So I can just say the attorneys representing the defendant are Tor Ekeland, Michael Hassard, and Tauseef Ahmed of Tor Ekeland?

MR. EKELAND:  Yes, Your Honor.

THE COURT:  Okay.

MR. EKELAND:  And I don't think these legal assistants will be present in court, but they are working on the case.  There's a chance they may show up.

The first one is Courtney, C-o-u-r-t-n-e-y, and her last name is Goliwas.  That's spelled G-o-l-i-w-a-s.

THE COURT:  Okay.

MR. EKELAND:  And then the other legal assistant is Stephanie, S-t-e-p-h-a-n-i-e, and last name Norman, N-o-r-m-a-n.

Then just one line of concern.  This is something, again, I don't know if there's -- the best way to deal with this, if there is any good way to deal with it at all, is that the phrase darknet tends to have what the defense views as some

sort of prejudicial overtones, and we'd prefer the phrase deep web. However, darknet, I think, has become such a colloquialism, it's hard to avoid. I don't know if there's any way --

THE COURT: Do you want to point me to where it is in here.

MR. EKELAND: I don't have the --

MS. PELKER: I believe it's No. 23, Your Honor. We could simply -- I think it is significant.

THE COURT: What if I say, "The darknet or sometimes referred to" --

MR. EKELAND: As the deep web. And maybe ask them if they associate the darknet with criminality.

THE COURT: "Or sometimes referred to as the deep web." Any objection from the government to that?

MS. PELKER: Yes, Your Honor. I think there is a bit of a distinction there --

THE COURT: There is?

MS. PELKER: -- and it may just be easier if you can say, "Have you ever accessed part of the internet called the darknet or the deep web," and then leave it somewhat ambiguous.

THE COURT: Any objection to doing it that way?

MR. EKELAND: No. And maybe we can just ask them if they have any opinions about either the darknet or the deep web.

THE COURT: Do you have any opinions about either; is that -- just add that at the end there?

MS. PELKER: Could it possibly, Your Honor, just be phrased as a parallel with No. 24, which says, "Do you have any strong feelings or opinions about the use of cryptocurrency?"

We could also just say, "Do you have any strong feelings or opinions about the use of the darknet or the deep web?"

THE COURT: Can I just say "or the deep" -- just add it to that sentence, "or the darknet or deep web"?

MS. PELKER: That sounds fine.

THE COURT: Is that okay?

MR. EKELAND: Yes, Your Honor.

THE COURT: Any objection to that from the government?

MS. PELKER: No.

THE COURT: "Do you have any strong feelings or opinions about the use of cryptocurrency or about the darknet or deep web?" Okay. All right.

MR. EKELAND: And, Your Honor, I don't know whether the Court wants to deal with this. We do have housekeeping issues related to this case that we'd like to discuss with the Court at some point.

THE COURT: That's fine. Anything else on the proposed voir dire?

MR. EKELAND: No, Your Honor.

THE COURT: Okay. So I will make those changes as discussed.

What about your list of names that may --

MR. EKELAND: We have our witnesses ready. We can email it to the government and the Court.

On that note, the government made a substantial production last night of discovery to the defense and, obviously, we haven't been able to review it in-depth. Some of that is *Jencks*. Some of it is substantive, like updates to Mr. Scholl's tracing. There's a TRM report in there. And we haven't been able to wade through it fully.

I just want to note that for the Court because it may require us, after we review it over the weekend, to update our witness list or raise some objections based on what we're seeing.

THE COURT: Well, why don't you send me now what you have, and if you need to update it, you can just let me know before jury selection.

MR. EKELAND: Mr. Hassard will email that to the Court and to the government right now.

THE COURT: Perfect. Thank you.

What were the housekeeping matters you wanted to raise?

MR. EKELAND: The first thing is we're having trouble

accessing Mr. Sterlingov in the jail.  We were told this morning that we could not visit him over the weekend, which is -- our understanding is a violation of the jail's contract with the federal government.

We've asked for video access and conferencing from the jail numerous times.  They've made the representation multiple times that they were sending me a temporary password and link to access the video conferencing.

After I hadn't received that multiple times, Ms. Goliwas, our legal assistant, got in contact with them again this morning, and they finally sent us the access link, and so we'll see how that works.

Also, we have contacted the U.S. Marshals now two to three times about getting Mr. Sterlingov access to the hard drive and the laptop and all the discovery that he previously had at the --

THE COURT:  Right.

MR. EKELAND:  -- in Warsaw, Northern Neck Regional Jail.

THE COURT:  Correct.

MR. EKELAND:  As of this morning, we haven't gotten a response back from the U.S. Marshals regarding that.  They know how important it is, but, essentially, Mr. Sterlingov has not been able to review the discovery in this case.

And this is -- part of the reasons that we had to

object to the certification of the Russian translations is we just haven't had full access to our client to prepare for this case. I just want to note that for the record. And if there's anything that the Court can do --

THE COURT: Well, let's just not note it for the record. Let's do something about it.

MR. EKELAND: Yes, Your Honor. If the Court could -- I think if the Court could communicate to the marshals and have the marshals communicate to the jail that we need full access to our client.

THE COURT: So since Mr. Sterlingov has been transferred, he's not had access to the hard drive of the computer?

MR. EKELAND: That's correct. And what they've told us --

THE COURT: Has he had a computer at all?

MR. EKELAND: No, he hasn't, Your Honor.

THE COURT: Okay.

MR. EKELAND: I mean, he had it at the Northern Neck Regional Jail. Then they told us, oh, he has to sign it out. Then we emailed the marshals a couple times about facilitating this.

We haven't heard back, and we just recently sent out another email. But --

THE COURT: I'll call the marshal as soon as we have

a break and ask about that because Mr. Sterlingov needs access to his computer in a case like this.

MR. EKELAND: We also just need weekend access to him.

THE COURT: Have you raised that with the marshal? Any concerns about the jail providing access? All I can do is the same thing you can do, is ask the marshal to contact the jail and say, no, he really needs access.

MR. EKELAND: The denial -- the jail this morning told us that they would not provide weekend access to him. I need to check to see what Ms. Goliwas sent to the U.S. Marshals, but I did instruct her to contact the U.S. Marshals and tell them we're having problems with that.

THE COURT: I will ask about both of those things.

MR. EKELAND: And then I just have a couple other minor things.

THE COURT: Okay. Go ahead.

MR. EKELAND: We, potentially, may be calling as witnesses Mr. Sterlingov's friends from Sweden.

THE COURT: Okay.

MR. EKELAND: We're wondering if that testimony can be done via Zoom from Sweden?

THE COURT: I think that's an issue you should discuss first with the government, if you haven't done so already. And if the parties consent, that's going to be fine

with me.

If there's not consent, then I may need argument or briefing on that question. But if the parties consent, I have no objection to that.

MR. EKELAND: Understood, Your Honor.

And then one other question is, we've been asked by Mr. Sterlingov's family and friends in Sweden whether or not they'll be able to watch this trial via Zoom if it's --

THE COURT: I think the answer to that is -- as much as I'd like to do that, I think it's prohibited by the Federal Rules, which do not allow the broadcasting of criminal proceedings.

MR. EKELAND: Understood, Your Honor.

THE COURT: If there's -- I would very much want to accommodate his family. I'm just not sure how I could do it consistent with that rule.

MR. EKELAND: Understood, Your Honor. And then, I think when we discuss the expert and witnesses, we can discuss the defense -- some of the defense's anticipated objections.

THE COURT: Okay. That's fine. You brought up the translation issues. Maybe we should touch on that briefly now as well.

After getting your filing on this, I had my law clerk reach out to the head of the court interpreters, and the Court can make interpreters available in court, although I think it's

not going to be terribly hard to find a Russian interpreter. It may be a little bit harder to find a Romanian or a Swedish interpreter, but we can do that in court.

The court interpreters told me they don't make court translators available. And if it's a question of just translating the documents, the question is what we do about that.

We have done a little bit of research on the question, and there is a fairly helpful decision from the Fourth Circuit -- I'm sorry, from the First Circuit about how to handle this in a case called *United States v. Morales-Madera* at 352 F.3d 1 from 2003.

And, quite sensibly, what the First Circuit holds is that the first thing the Court ought to do is encourage the parties to try and work things out to the extent there are differences. If, ultimately, there are differences that just cannot be worked out between the parties with respect to translation, I think what both sides need to do is offer expert witnesses on the translation, and I'll let the jury decide if there are differences in opinion with respect to the translation.

And so what I will ask -- and I understand you may need to have some additional access to Mr. Sterlingov to complete this task, but I would ask you to tell me precisely where there are differences of position with respect to

particular words or phrases in the translation, and then we can see if we can work it out. If we can't, then I think both sides are just going to have to call witnesses and let the jury decide the question.

MR. EKELAND: And towards that end, Your Honor, it would be helpful to the defense if we knew specifically what translations the government seeks to admit, and if they could match their translations with the actual Russian -- part of what's slowing us down is there's translations, then there seems to be summaries of the translations, and then there's investigator notes on top of stuff, and it's in different places, and there's a lot of stuff here.

If we knew what the concrete universe was, what the translation was, and it was matched with its actual Russian or Swedish or Romanian counterpart, and then we were able to take that to Mr. Sterlingov to review, that would expedite things because this is -- I don't want to -- I'm not trying to sandbag the proceedings. It's just there's a big universe there, and we might be able to come to agreement on many stuff [sic] if we could just get some specifics about it.

THE COURT: Ms. Pelker or Mr. Pearlman?

MR. PEARLMAN: So if I may, Your Honor, first, we have noticed as experts our translators, not specifically because we didn't have the names at the time of the notice, but we have made that request, and we're prepared to seek to put on

those translations.

With respect to matching particular translations with original source documents, we are happy to sit down with Mr. Ekeland and make sure that the defense team is able to match up specific original source documents with the translations.

When we talk about the summaries, just to be clear, Mr. Sterlingov took copious notes about a lot of different subjects, some germane to this trial, some not relevant, really, at all, but perhaps to identity. But not really relevant and not things that we would be able to substantively want introduced.

So at times the translators do summarize these things because we're sort of wrestling with the rule of completeness as well. So we want there to be some understanding, but we're not seeking to read those portions in court. Again --

THE COURT: I'm not sure what the evidentiary basis would be, in any event, for having a summary by a translator going into evidence versus the actual document. So I understand your point.

MR. PEARLMAN: So, look, we're happy to work with the defense, but we just -- I think we found out two days ago that they have all these substantive objections. Some of it was an argument about words, but they only had one word, putting versus, I think, deposit.

THE COURT: Yes.

MR. PEARLMAN: We're not working with a lot here in terms of feedback from the defense about what they need. Again, happy to sit down with them and go over things and perhaps redact portions from our proposed translations. But absent that, we are just prepared to go forward and seek to admit.

THE COURT: Okay. Well, that is fine. But I will ask that you meet with Mr. Ekeland or Mr. Hassard, indicate which translations the government is going to seek to admit at trial; and then point them towards the corresponding original text so they can then look at it, show it to Mr. Sterlingov, make sure that he agrees with the translation and, if not, they can get back to you with the specifics, and the put-versus-deposit is a good example.

That strikes me as one where I'd be surprised if the parties couldn't reach agreement with respect to that translation issue. And, hopefully, if there are others, they won't be terribly complicated, and the parties can reach agreement.

If you can't, then I think the answer is the parties put on their experts, and the jury can decide who they believe. Okay?

MR. EKELAND: Yes, Your Honor.

THE COURT: What about timing on this, Mr. Pearlman?

When can you sit down with Mr. Ekeland and do what you just suggested?

MR. PEARLMAN: Perhaps tomorrow afternoon?

THE COURT: Mr. Ekeland, are you going to be in town? Can you do that?

MR. EKELAND: Tomorrow afternoon, I'm in a meeting for, like, four hours. But, I mean, we can email back and forth and --

MR. PEARLMAN: We'll find a time in the next few days.

THE COURT: Okay. I mean, it may be that there's a break today where you could at least get started. I have no idea the volume of what we're talking about.

MR. EKELAND: I mean, also -- I mean, this could -- we're happy to talk with the government on this, but we could also probably just email potentially back and forth, and if they just -- again, I think if we get specifics, and then we can show it to Mr. Sterlingov, I think that will solve a lot of this.

THE COURT: Okay.

MR. EKELAND: I mean, part of it, again, goes back to the access issue. And from what Mr. Sterlingov reviewed, he asked us to object on this basis because of just what he saw, but we're -- we haven't been able to sit down with him and fully review this with him.

THE COURT: Hopefully, you can do that during the week if you can't do it on the weekend, but I will raise the question about the weekend as well.

MR. EKELAND: Thank you, Your Honor.

THE COURT: Were there any other preliminary matters that you wanted to raise, Mr. Ekeland?

MR. EKELAND: No. I think the rest have to do with the witnesses and the *Daubert* like we're going to be discussing.

THE COURT: Okay. Do the parties want to say anything further about the question of authentication? As I understand it, the only dispute with respect to authentication at this point relates to the Mt. Gox material?

MR. EKELAND: That's correct, Your Honor.

THE COURT: So why don't we take that one up, and then we can turn to other issues.

MS. PELKER: Yes, Your Honor. I think that we've briefed the issue fairly extensively, pointing to ECF 62, our original motion in limine; our reply in support at ECF 78; our supplemental motion in limine specifically dealing with Mt. Gox at 140; and then our reply in support at 146.

So I'm happy to take any of the Court's questions. But here we have records that came from a virtual currency exchange that was doing business back in 2011 through 2014. It did go into bankruptcy, like many different businesses do. Its

assets, including its data, was transferred to a trustee in Japan. The government submitted an official request to the Japanese government to get copies of those records. They were transferred here. We've retrieved the records from the version that was transmitted to us.

As I understand the defense objection, there's really no question that the records that we have and have produced to the defense and intend to admit at trial are the account records as they existed in the possession of the Mt. Gox trustee. The defense argument is really one about potential manipulation of the underlying data before it ever came into the trustee's possession.

And here we have records that we have certified as self-authenticating under 902, but also have put forward in our filing extensive corroborating evidence under 901, just by being the distinctive characteristics, comparison to other evidence. We've lined up the matches from the Mt. Gox accounts from one to the next, from the Mt. Gox transfers out to the blockchain; from emails within Mr. Sterlingov's account.

I think that we have extensive corroborating evidence of why these are trustworthy. But, ultimately, all of that really is an issue on weight versus admissibility.

THE COURT: Why is it you're not relying on 3505?

MS. PELKER: I believe that we did cite that, in part, Your Honor, but that the 902 -- so we have the 902(13),

which is based on the retrieval from the copy that came over to the U.S. Government, and then I believe that we did cite, in part, to 3505 alongside 902(11) in one of our filings.

Let me point to that, Your Honor. In short, we do believe that there are a host of different potential -- on page 6 of ECF 140, we cite to 902(11) and 18 U.S.C. 3553.

THE COURT: I take it that the government still will need to demonstrate to the jury, even if I admit the evidence, that the documents are what they purport to be. I'm looking at *Khatallah* from the D.C. Circuit where the D.C. Circuit says, "But in deciding the telephone records' admissibility, the question is not whether the government conclusively approved their authenticity; it's only whether the government's showing permitted a reasonable jury to find that the evidence is" -- "its proponents" -- "what its proponent claims."

So you would still have to then show that to the jury as well.

MS. PELKER: Yes, Your Honor. I think that it's very clear from the records when we present testimony, did you review the Mt. Gox records on the Mt. Gox account; yes. Here's the record of the Mt. Gox account -- and we walk through how those transactions line up -- that it's very clear to the jury just looking at the records that these are records from the Mt. Gox exchange.

THE COURT: And is there corroboration that the

records that the government says, are those relating to transactions involving Mr. Sterlingov, is there other corroboration that those records are accurate?

MS. PELKER: That they -- yes. Within his -- within Mr. Sterlingov's email accounts, there are confirmations for the account that is in his true name.

There are also -- because there were a number of different Mt. Gox accounts, we, essentially, have all of these transfers from Account 1 out to the blockchain, back to Account 2, from Account 2 to Account 3, from Account 3 onward; for each one of those.

And as part of the government's testimony, we can match up the withdrawals from the account on a particular date and time and amount. And then C, either in a different Mt. Gox account or on the blockchain or for money going through a different service, the corresponding deposit on the other side. Or, similarly, where we have deposits into the Mt. Gox account, we then can see the withdrawals from additional places.

So we go through this in, I think, a fair amount of detail in our filing at ECF 140. Starting on page 10, we talk about the corroboration through the email records. And then continuing onward, on page 14 we look -- and 15 we look at additional corroboration from the blockchain. And then we also discuss that there's corroboration from account to account.

And Mr. Scholl's testimony at the hearing back in

June discussed that as well, Your Honor. And we do expect there to be significant testimony at trial about those Mt. Gox records in granular detail that will allow the jurors to see how each transaction matches up with the other.

THE COURT: Okay. Let me hear from Mr. Ekeland then. Thank you.

MR. EKELAND: As the government said, this issue has been extensively briefed. But just to sum up our position, we take the position that the records not only are inaccurate, they're inauthentic. And that the Japanese bankruptcy trustee is not in a position to certify them as business records because the trustee has no knowledge of how those records were generated.

There's extensive public record indicating that the primary custodian of that data was convicted in Japan for forging -- for data fraud involving the Mt. Gox data. Its documented in Mr. Green- -- Andy Greenberg's book that when Michael Gronager from Chainalysis received the thumb drive of the data that there were deletions in it.

The Mt. Gox database was hacked multiple times, and it's not clear to me at all that what has been produced to the defense -- which is not the files in their native form. We've simply been given spreadsheets that are the purported search results from a query into the database which we have not been given access to.

The government said we could access it at the FBI office in, I think, Manassas, Virginia, which the defense has rejected because we don't believe that's full access that we actually --

THE COURT: I'd say, I think you ought to get in your car and drive there. If you want to take a break right now to go do this. If you want access to it, just go do it. Manassas is not far away. You can be there in a half an hour. Just go look at it.

MR. EKELAND: Your Honor, our expert, Mr. Fischbach, is in California.

THE COURT: That's your -- hiring an expert in California is your issue. Get him on a plane, get him and go to Manassas and go look at it. You can be there in a half hour outside of D.C., maybe less than that to get to Manassas.

MR. EKELAND: Your Honor, Mr. Fischbach's equipment is in his lab in California. So I'm not going to belabor the point, Your Honor.

THE COURT: You should belabor it. If this is something you're attempting to preserve for appeal, you need to do a heck of a lot more. Just go there and look at it. If there's a problem with him having access to it and actually getting into the building to look at it or bringing equipment into the building, let me know; but he should go there, and he should look at it if he needs to. I mean, it's really not very

far from here.

MR. EKELAND: Understood, Your Honor. So I'm just returning to the point that we don't consider the Japanese bankruptcy trustee to have the requisite knowledge to certify these as business records, as the Japanese bankruptcy trustee was simply not there when these alleged business records were generated.

There's substantial public record that we have briefed showing that Mt. Gox was repeatedly hacked and that --

THE COURT: But isn't that true of every -- virtually, every bank in the United States? And so, I mean, are you saying then that records from virtually any bank in the United States can't be authenticated under 902 because virtually every bank in the United States has been hacked?

MR. EKELAND: No, Your Honor. But Jamie Dimon from Chase Manhattan Bank hasn't been convicted in a court of law and sentenced to four years in prison.

THE COURT: That's a different point.

MR. EKELAND: Well, if it's -- if he was convicted of falsifying the data at the Chase Manhattan Bank, particularly as to its business records, I think there would be a question as to its authenticity.

THE COURT: No, no. My point is it's just a different argument than hacking. If there's an argument that the -- that the bank was falsifying its records, maybe there's

a different issue or a different argument there. That's not the same thing as hacking.

There are numerous federal agencies that have been hacked. Probably most federal agencies have been hacked one way or the other. And we wouldn't say all the records are inauthentic.

MR. EKELAND: Mr. Karpeles himself, according to Mr. Greenberg's book, said that the servers were physically accessed, right?

And, again, we have no record of anyone -- how come no one from Mt. Gox is signing any certification? How come nobody who actually was involved in the generation of the business records is certifying the business records? That's a central question here.

THE COURT: But doesn't a trustee stand in the shoes of the entity? The trustee takes over for the entity when it's in bankruptcy and speaks on behalf of the business when a business goes into bankruptcy. That's what a trustee does. They assume the role of managing the entity itself.

MR. EKELAND: But by the time the Japanese bankruptcy trustee took over, the generation of any alleged business records was over. So the Japanese bankruptcy trustee can attest to the fact that what they received from the business is what they received and stored, but they can't testify as to the authenticity of the generation of the records.

And the rule requires that somebody with knowledge of the actual generation of the business records certify it. And what we're arguing is that the bankruptcy trustee doesn't stand in that position. They can say that this is what we stored at the bankruptcy court and gave to the federal government. But there is nobody here that was involved in the generation of the actual records when they were supposedly generated that is certifying these records.

So that's, essentially, why we say they're inauthentic. We don't even know if those are the actual business records of Mt. Gox. There is nobody being proffered to testify or certify to that. That's why we reject them as inauthentic on top of them being inaccurate.

I mean, there's just too much stuff in the record -- the public record involving, you know, Mr. Mark Karpeles's two convictions for data fraud, Mark Karpeles himself saying that the servers to Mt. Gox were physically accessed. And the fact that when we go through and we are working from the spreadsheets, our experts are finding errors, missing transaction hashes, wrong dates on transactions, and things that just don't add up.

That's what initially led us to question this, not -- this isn't just a fishing expedition. It's the fact that the people I'm working with came back to me and said this stuff is a mess. And I believe Ms. Still even testified to that from

the stand.  I'm not going to belabor the point, Your Honor.
It's the defense's position that the Mt. Gox data is not only
inauthentic, it's inaccurate.

THE COURT:  Okay.  I have a follow-up question for
the government on this.  Go ahead.

MS. PELKER:  Your Honor, we can discuss this more
when we get to the *Daubert* issue.  But the defense continues to
say their experts have found all of these errors and have yet
to identify a single error that -- actual error that their
experts have supposedly found in any of this data.  The time
for noticing that is long past.

THE COURT:  Okay.  I had a question, which is what
about Mr. Ekeland's point about the fact that the individuals
who certified or offered the certifications were not involved
in the business at the time it was operating; and at least for
purposes of 902(13), the rule requires a record generated by an
electronic process or system that produces an accurate result
as shown by certification of a qualified person that complies
with the certification requirements?

So how is the trustee in a position to certify as to
the accuracy of the electronic records?

MS. PELKER:  So -- and this is sort of a chain of
certifications here, Your Honor.  The 902(13) for the system or
process is for the retrieval of the records from -- so we get,
essentially, the full server from Japan.

The system or process that produces the accurate result is the certification from the FBI who accesses that server and pulls off the records that are specific to Mr. Sterlingov and the accounts in question.

The additional certification that we have is the transmission from Japan, and that's complying with Japanese law of how they've acquired this from the trustee; and with the Japanese government saying we went to the trustee, we got these records from them, we transmitted it over through official channels to the U.S. Government.

There's no requirement within the -- within the rules that say that the person who is making a certification has to be the one who made the original records, and I think that there's pretty extensive case law that that is not, in fact, required.

THE COURT: That may be a stronger argument under 902(14) than under (13).

MS. PELKER: So for (13), Your Honor, the (13) certification is specific to the FBI retrieving the records from the server that came over.

THE COURT: And is there a rule that would subject those in Japan who have issued the certifications to perjury or false statements or something of the equivalent?

MS. PELKER: Yes. I believe that that is set out in the certification, but yes, that these are subject to penalty

of perjury under Japanese law, I believe, as set out in the certification.

THE COURT: Okay. Thank you.

MS. PELKER: And for what it's worth, the Japanese take this process very seriously; have a set process in Japan. It is very formal and regimented as far as how they do the certifications on those. This is evidence we're obtaining from overseas. They follow their procedures, but they absolutely followed that to a T.

To Mr. Ekeland's point about the conviction of fraud, again, I think that there's a lot of hearsay and re-reporting of what's been reported in books or articles as opposed to actual records from the trial, which -- again, I wasn't there. As I understand it, it was that Mr. Karpeles tried to make his exchange continue to appear solvent.

There's never, as I'm aware, been any allegation that Mr. Karpeles was going in and manufacturing or creating records in any individual user's account --

THE COURT: Transactions, yeah.

MS. PELKER: -- much less any connection to Mr. Sterlingov and the idea that simply because an executive has been accused or even convicted of fraud means that all of the records from their businesses can't be authenticated.

THE COURT: There are also quite a few banks in this country, unfortunately, where executives have been convicted of

fraud as well.

MS. PELKER: Yes, Your Honor.

THE COURT: Okay. I'll give you a second to respond. Mr. Ekeland, anything else you want to add?

MR. EKELAND: Yes, Your Honor. Mr. Karpeles's conviction is a matter of judicial record in Japan. I believe we cited to that in our papers, as well as his conviction --

THE COURT: What was he convicted --

MR. EKELAND: He admitted to a Japanese court that he manipulated Mt. Gox records and he received a suspended four-year sentence.

THE COURT: What records? There's a difference between -- let me finish -- manipulating your financial statements or financial documents and a way to make it look like you're solvent when you're not versus manipulating individual account transactions or matters, which it's kind of hard to imagine what the incentive would be to do that.

MR. EKELAND: Well, the record is not entirely clear on that. That's the level -- we don't have that level of granularity.

You know, I do think it raises a serious question, particularly in this case where the government maintains that Akemashite Omedetou, which means Happy New Year's in Japanese, is the person who was running Bitcoin Fog and Mt. Gox is located in Japan.

But I think we've made our point there that it's a matter of public judicial record about Japan. And in France, that Mr. Karpeles, who ran Mt. Gox, was convicted of data fraud. The level of granularity on that, we don't know, Your Honor. I'm not going to represent what that particularly was to the Court without knowing.

But to return to the point about whether or not a person who is certifying has to be the original person that was present at the generation of the business records being certified, we don't take that position. But we do take the position that they either have to have been there and have knowledge of how they were originally generated or have some knowledge of how they actually were generated, and that's what I think is missing here from everything that the government is presenting; because the FBI is simply taking it for granted that these are authentic business records.

And everyone is just assuming, but nobody who is certifying here either was there when they were originally generated or has sufficient knowledge of how they were generated.

THE COURT: But I didn't think that was the law. So, for example, I thought that if there was a business that was engaged in some nefarious activity and the FBI goes in and seizes all of their computers and an FBI technician then downloads the records off of those computers and there is other

indicia that those actually are the transaction records of the business, that at least under 902(14) that those can come in as business records.

And that you don't need, for example, the defendant to take the stand in a case in which that defendant's business was seized; just come in and say, oh, yes, this is how we generated these business records. But if you can look at them and there's other indicia that they are what they appear to be, and there's somebody who can testify to that, that that's sufficient. That was my understanding of the law for -- at least for purposes of 902(14).

MR. EKELAND: Yes, Your Honor. That's not clear to me that that's the case here. That indicia seems, at least to the defense, to be absent. And when you have facts that Mr. Karpeles apparently added one million dollars to his account to misrepresent his solvency and factors like that, I think there's serious questions as to the authenticity and the accuracy of the record. And I'm not going to belabor the point.

THE COURT: Okay. That's fair enough. I appreciate that.

So I will, hopefully, later today just issue an order on this. I'll give you something in writing on this one as well.

All right. Anything else that we should take up?

I also, at least, hopefully, before trial will get you an opinion on the venue. But I can tell you, as I've indicated before, I don't really see the issues as ones that really materially relate to venue. I think that there are some arguments with respect to whether each of the statutes at issue applies here. Some of that may be a question for the jury; some of it may be a question for me.

I don't see this as a significant venue issue, but I will get you an opinion on that as well. Just for purposes of your trial prep, I want to let you know my take on it is that it's not venue so much as the applicability of the statutes. I've raised the questions that I have about the D.C. statute in particular and at least the issues under section -- under 1960B that I raised before. I just want to study that a little bit further.

It may be that this is even an issue in which, depending on what happens at trial, there may be a need for some post-trial briefing on the issue because it was not an issue that was really developed or even raised by the defense pretrial. But we can come back to that later.

All right. So on *Daubert*, I told you I'll give you all 10 minutes, 15 if you need it in some cases, per side for each expert. Give me one second, here.

Why don't we go ahead and start with Mr. Scholl now, and then maybe after addressing Mr. Scholl, we'll go ahead and

take a break.

MS. PELKER: Yes, Your Honor. I'm happy to proceed however the Court finds most useful. I do think that the defense critique of Mr. Scholl and Ms. Bisbee somewhat run into one another and that my understanding is really -- maybe I'm misunderstanding, but they don't really object to their qualifications, per se, or even the specific individual findings insofar as -- beyond the fact that they don't believe the blockchain analysis is sufficiently reliable.

THE COURT: The particular blockchain analysis. Although, isn't there a difference between Mr. Scholl and Ms. Bisbee? Because my understanding is that Mr. Scholl is not relying on the Reactor and probably actually was -- you know, if one can say, doing it by hand; was doing it by hand versus using a computer model.

MS. PELKER: That's true for a significant portion of Mr. Scholl's testimony. There is a portion of it that does rely on the Chainalysis clustering that is tied into Ms. Bisbee.

THE COURT: Right.

MS. PELKER: On the portion that doesn't rely on Chainalysis clustering, there, I think that this is simple -- well, complex, but a complex version of traditional financial accounting practices and tracing that simply has been moved into the cryptocurrency sphere.

We have Mr. Scholl discussing and explaining to the jury how financial transactions can be traced. Some of that includes looking at the blockchain and then explaining, as he's looking at these transactions, what he, as an expert, based on all of his work in this field, is able to do as far as tracing from one transaction to another.

He's going to provide some additional insight to the jury explaining these key concepts and terms; the same way that we expect that the defense proposed witness, Ms. Still, is going to do.

THE COURT: So let me just look at his report here. I don't know if you have the report in front of you.

MS. PELKER: I do, Your Honor.

THE COURT: Should I start on page 4 with the specifics of what he's going to testify as to?

MS. PELKER: Yes, Your Honor. So if we start on page 4, he's going to talk through just explaining key terms here. So we talk through examples of how funds are moved on the blockchain from co-spend, confirmation; what exchanges are, what keys are, what peel chains are, generally; transaction structures; and different types of wallets. So 4 through 7 are really background terms and concepts.

THE COURT: Well, let's take these --

MS. PELKER: You want to go through each one?

THE COURT: I do. I'm going to need to rule on each

one.  First, he just explains how the blockchain works.  I get the jury is going to need to hear that from both sides, and they're going to need to be educated on that question.

Then Bitcoin pricing and how prices fluctuate over time?

MS. PELKER:  Oh, I apologize, Your Honor.  I was looking at his actual report.

THE COURT:  I'm happy to do it that way, whichever you prefer.

MS. PELKER:  Whatever is easier for the --

THE COURT:  So why don't we do it with your summary.  So then for -- 1 is terms on how the blockchain works.  2 is pricing?

MS. PELKER:  Yes.  Just a moment, Your Honor.  I had the report with the binders.

Okay.  Yes, 2 is the general pricing; explaining how he calculates Bitcoin pricing including coin market cap, the prices into Chainalysis Reactor, and the exchange rates from different -- different exchanges.

THE COURT:  Okay.  Then 3?  This is just Monero and the other cryptocurrency and, I suppose, how they differ from Bitcoin?

MS. PELKER:  That's right, Your Honor.

THE COURT:  Okay.  4.

MS. PELKER:  For 4, this is him explaining the --

basically, serving as sort of a translator from the defendant's notes and files. He has a lot of different references to cryptocurrency systems. This is, again, essentially, background-type explanatory testimony.

THE COURT: Okay. Common terms of -- I'm on top of page 5.

MS. PELKER: Yes, Your Honor.

THE COURT: Common terms and jargon used in cryptocurrency. That's more of the same. BitcoinTalk?

MS. PELKER: Yes, Your Honor. Simply explaining that BitcoinTalk was a popular Bitcoin forum, which I don't know is really expert witness area so much as simply saying what it is, but we did include that in the notice.

THE COURT: Okay. And then the wallets.

MS. PELKER: Then he'll explain wallets. This is, again, mostly background terms.

THE COURT: And then this is -- this is just not actually doing any blockchain analysis, but just explaining what blockchain analysis is. And the next paragraph?

MS. PELKER: Yes. That's correct, Your Honor. This is at least -- yes. This -- he does, as you've seen, go on in his report to apply these concepts in his analysis, but this is discussing him explaining what they are.

THE COURT: Right. Then he turns to describing the modus operandi in the darknet.

MS. PELKER: Yes. Your Honor, just in that preceding paragraph on the top of the page, that does start to get into how he applied that blockchain analysis to this particular case.

THE COURT: Okay. Does this involve Reactor at this point or this is just at this point his, as I would say, by hand, which is probably not quite by hand.

MS. PELKER: This, in part, involves -- it talks about how he verifies certain information in Reactor. So, for example, it says that the undercover transactions sent to Bitcoin Fog were recorded in the blockchain analysis tools and that Chainalysis had identified the receiving addresses as belonging to the Bitcoin Fog cluster.

THE COURT: Okay.

MS. PELKER: The next paragraph is modus operandi and the use of mixers to conceal activity on the darknet.

THE COURT: Okay.

MS. PELKER: The next gets into his -- the substance of his report, which -- and particularly the attachments, as far as the addresses that are held by Bitcoin Fog and different darknet markets, including the direct and indirect fund flows. That analysis is, in part, based on his use of the Chainalysis Reactor tool.

THE COURT: Okay.

MS. PELKER: The next -- sorry, Your Honor.

THE COURT: Go ahead.

MS. PELKER: The next paragraph about his blockchain analysis performed in support of the investigation, that is his analysis that we have memorialized in his reports and his testimony. That includes a significant amount of tracing by hand and includes the financial analysis, not just from the blockchain itself but looking at account records at a variety of financial institutions.

A portion of this, as Mr. Scholl testified, did involve the use of Chainalysis Reactor.

THE COURT: Okay.

MS. PELKER: And the next paragraph just notes that the details are in his expert report, in his declaration, in the additional discovery provided to the defense. And since this was filed, he also -- he had testified at the *Monsanto* hearing; he also testified at the *Daubert* hearing.

THE COURT: Can you explain to me a little bit more just the breakdown of what Mr. Scholl did by hand versus where he used Reactor?

Because there were the transactions that we went through in some detail and that Ms. Still was critical of. I was under the impression that at least that tracing was what I was referring to him as doing by hand. Is that not correct?

MS. PELKER: So, Your Honor, I believe that -- it might be -- if the Court has Mr. Scholl's report in front of

him --

THE COURT:  I do, yes.  Let's see here.

MS. PELKER:  So I believe that -- so most of those charts are by hand and don't involve Reactor at all.  So we have page 35, which is the chart, and the transactions are detailed in the pages that follow.  But the chart shows activity from Mt. Gox, Account 1 to the blockchain to Account 2 to Account 3 to a room exchange to Liberty Reserve.  That is not based on Chainalysis.

At page 41 --

THE COURT:  Give me a second.  Just one second.

MS. PELKER:  Sorry.  I believe we admitted this at the *Daubert* hearing on June 23rd, and it may also have been possibly an exhibit in Ms. Still's testimony a few weeks ago.

THE COURT:  I'm just looking for the right binder.  Got it.  Okay.  Thanks.  So I have his report in front of me.

MS. PELKER:  Yes, Your Honor.  So maybe starting at the beginning, we have -- so on page 10, there's the summary of the undercover transactions.  This is based on Mr. Scholl's review of the undercover transactions, but that he then viewed it in Chainalysis Reactor to verify the cluster in Reactor to determine that the Chainalysis Reactor was appropriately clustering the Bitcoin Fog deposit addresses.

THE COURT:  So he did it both ways with respect to this?

MS. PELKER: Yes, Your Honor.

THE COURT: Okay.

MS. PELKER: The -- so pages 12 through 17 -- or 12 through 18, this is the darknet market exposure that's the aggregate fund flows between the darknet markets and Bitcoin Fog.

This has significant overlap with Ms. Bisbee. So they are -- they're a bit different insofar as the different work that they did and the purposes for which they're testifying, but this is based on Chainalysis. There also will be testimony from Mr. Scholl about individual -- about individual transactions within the transfers between Bitcoin Fog and Silk Road, Silk Road 2 and Welcome to Video where he will, basically, pull out from his report the individual transactions, and we'll have further testimony about what that user was from the data that was pulled from those sites.

THE COURT: Okay.

MS. PELKER: But the aggregate fund flows are based on Chainalysis.

The Sterlingov accounts, the beginning section there is just discussing the different accounts that he looked at. The fund flows from Fog into the various Sterlingov accounts.

So this is -- it was originally done, I believe, in Chainalysis Reactor. He then recreated it to verify everything

on the -- using public block explorers.  So the charts here are not based on Chainalysis Reactor except that the attribution of the original starting point as Bitcoin Fog was based, in part, on -- that Mr. Scholl, as an expert, consulted Chainalysis; and using what he knows about Chainalysis and how addresses are tagged, determined that that is Bitcoin Fog.

And that was, again, further corroborated by the defendant's own testimony about that source.  And that goes through LocalBitcoins and Kraken.

And as a note -- and we did note this in Mr. Scholl's testimony, but this tracing was done before the government was able to fully access the transaction history for the defendant's Mycelium wallet so that these peel chains where Mr. Scholl said that, based on his experience, he's looking at these and would -- and believes that these peel chains all are contained in the same wallet.

He then, after examining -- getting access to Mr. Sterlingov's Mycelium wallet, was able to confirm that all those peel chains are in the same wallet so that they would -- the tracing would, actually, just be from Bitcoin Fog; all those peel chain addresses in one wallet to the removal.

The other account descriptions are just going through his review of financial analysis.  Same for the transactions --

THE COURT:  Which page are you on?

MS. PELKER:  I've gone through pages 30 and 31 and

now -- up through 33, these relate to transactions from the Bitcoin blockchain. There's -- the way that Chainalysis plays in here is, again, that when we're looking at the sourcing of these transactions, determining that original source of the address it came from is a Bitcoin Fog address.

When we get into the actual payments, page 35, this is the transfer from the defendant's true name Mt. Gox account into the payment for the Bitcoin Fog domain that is not based on Chainalysis; same for -- and that -- the description of that continues through page 40.

THE COURT: Okay.

MS. PELKER: Then page 41, similarly, that is not based on Chainalysis. This is Mr. Scholl reviewing the records on the Bitcoin blockchain without any further clustering applied and the records from these various different financial institutions and the defendant's email account.

THE COURT: Okay.

MS. PELKER: Page 45, similarly, the bulk of this is not based on Chainalysis, that deposit into the -- the final deposit into 1LZvk. The deposit into that address is viewable on the blockchain. Mr. Scholl is using his expert determination in consultation with Chainalysis and looking at the transactions to say that 1LZ is controlled by Bitcoin Fog.

THE COURT: So what do you mean by "in consultation with Chainalysis"? Is it confirming?

MS. PELKER: Just the software -- sorry -- not the -- not any other sort of --

THE COURT: What I mean, though, is he relying on Reactor or is he verifying through Reactor?

MS. PELKER: He'd be relying, in part, on Reactor.

THE COURT: Okay.

MS. PELKER: And that is the same on page 46, where those fund flows through the accounts are not based on anything in Chainalysis. The Silk Road --

THE COURT: I'm sorry. So this is not based on Reactor or is?

MS. PELKER: I had not finished my thought, Your Honor. The fund flows through the accounts are not based on Reactor, but that deposit into the -- in the bottom corner, the 16mT deposit into Bitcoin Fog, that transaction is viewable on the blockchain. The fact that 16 -- yes, 16mT is a Bitcoin Fog address, that is, in part, relying on Chainalysis Reactor.

THE COURT: Okay.

MS. PELKER: And, Your Honor, the defense had referenced additional uploads from the government last night. That is Mr. -- so in Mr. Scholl's report, he referenced also that he had -- I'm trying to find the page. I'll find the page for Your Honor.

He had also cross-referenced significant addresses of interest with TRM, a competing blockchain analysis product, to

confirm whether they also had it clustered as Bitcoin Fog. So we have that -- the report of that list of addresses, that's what was uploaded, as well as the kind of visual --

THE COURT: So he used another tool that's a competitor of Chainalysis or Reactor to verify the results from Reactor?

MS. PELKER: Yes, for the specific addresses that were kind of key in the analysis here.

I will -- apologies, Your Honor. Here it is. On page 11 of the report, he notes TRM Labs' confirmation of the Bitcoin Fog cluster and says the second reputable blockchain analysis tool, TRM Labs, was used to corroborate the Chainalysis Bitcoin Fog cluster to a limited extent, and he discusses 43 transactions within the report. This does say 148 unique sending addresses. That was a typo. It's 144 unique sending addresses.

THE COURT: Okay.

MS. PELKER: I believe that's, actually, the withdrawals from -- that then are fed into the defendant's different accounts.

THE COURT: Okay.

MS. PELKER: Then on page 49 we have another chart that shows a transfer from the defendant's Mt. Gox account into Bitcoin Fog, and that's the 1YZJKa address. He's relying, in part, that Chainalysis says that that is Bitcoin Fog.

It is worth noting, Your Honor, that CipherTrace, actually, the defendant's own expert, also agrees that many of these addresses are Bitcoin Fog.

And Mr. Scholl's analysis here is actually that everything boxed in Wallet 2 -- because of the spending transfers as he's looking at it manually -- that those are, in fact, likely all Bitcoin Fog addresses. So that portion of his analysis and conclusion is not because of anything that Chainalysis Reactor has said other than that the 1YZJKa address is controlled by Bitcoin Fog.

THE COURT: Okay.

MS. PELKER: And then he set out the transactions in detail. This information is just the raw information of records about the transactions, not Chainalysis clustering.

Then again on page 57, talking about Mr. Sterlingov's purchases at Expedia, these -- the transfers themselves are either from the blockchain or, actually, from the business records of Expedia and Coinbase. But the -- that the sending address was a Bitcoin Fog sending address or an address controlled by Bitcoin Fog is based, in part, on the Chainalysis Reactor as one of the sources he consulted as an expert.

THE COURT: Okay.

MS. PELKER: So that's shown again on page 59. And these are also more of those peel chains that can now be consolidated after viewing the defendant's Mycelium wallet

contents.

THE COURT: Confirmed by the wallet?

MS. PELKER: Yes, for the peel chains.

We then have pages 61, 62, 63, through the end, through 65. These are, again, individual transactions. He's looking at them on the blockchain.

Those -- the screenshots -- to the extent it helps the Court, the screenshots here are screenshots from mempool.space. That's a public block explorer that's just showing the information from the blockchain. That's not Chainalysis Reactor.

There is a consultation of Chainalysis Reactor in assessing that the input address for the transactions is -- belongs to particular entities. In particular, on page 63 he talks about, according to Chainalysis Reactor, 1Kfu was contained in the Bitcoin Fog cluster; and for page 62, that the Bitcoin address 1PG belonged to Instawallet.

THE COURT: Okay.

MS. PELKER: And the follow-on tracing provided for, kind of, the additional discrete items follow in similar vein of -- the tracing itself is done based on the publicly available Bitcoin blockchain and Mr. Scholl looking at the way transactions are occurring and, based on his expertise, determining the appropriate way of following the funds. Where there is an attribution to a particular service like Bitcoin

Fog, like one of the darknet markets, that is based, in part, on Chainalysis Reactor.

THE COURT: Okay. Is that it?

MS. PELKER: I believe -- I'm happy to answer any questions for Mr. Scholl here. I think that -- just to emphasize, I think that the case law is very clear that experts do not need to have an in-depth understanding of the proprietary algorithms that may go into technology that they're using and that that's not something new or particularly unique to blockchain analysis.

And that Mr. Scholl testified about how he has used this extensively in many different cases, why he finds it to be reliable, and the government has put in its briefings and also through Mr. Scholl's and Ms. Bisbee's testimony extensive evidence about how the blockchain analysis has been tested in real cases and been found to be reliable.

THE COURT: So I was going to come to that in a second. Let me ask you, though. Do you know where things stand with respect to getting the more detailed information relating to the heuristics to the defense?

MS. PELKER: I spoke with counsel for Chainalysis last night. They assured me that they're working very diligently on it and hope to have something tomorrow. I did speak with them earlier in the week as well about exactly what that would look like, and I do believe, based on what we

discussed on the call, that it is going to really address the question of -- for each address, the defense will be able to look at what they're providing, and for all 930,000 -- for Bitcoin Fog, for example -- go and look and say, okay, how did -- what specific heuristic was used to add this address to the cluster, how exactly did we get there. And they would be able to, with their own expert, take that information and say, okay, let's apply this heuristic in the exact same way and make sure that we get to the same address to test it; or say, we don't think that this is a good heuristic to use, for whatever reason.

THE COURT: Okay. All right. Why don't we go ahead and take a break now. What I would like to do, though, is before I hear from Mr. Ekeland regarding Mr. Scholl, I think it would be helpful for me to just walk through the 702/*Daubert* questions or findings that I need to make with respect to Reactor; and the D.C. Circuit's decision in *United States v. Morgan* is pretty helpful because I find it to be just a fairly analogous circumstance.

But applying *Morgan*, first, is the question of just the qualification of the expert and whether the testimony would be helpful to the trier of fact; second would be whether the testimony was based on sufficient facts or data. And encompassed within that is whether it actually accounted for all of the relevant facts and data or whether it omitted

important facts or data and, more generally, to the soundness of the methodology employed.

Third is whether the analysis was the product of reliable principles and methods.  It doesn't necessarily need to be peer-reviewed under that portion of the analysis, but I do need to be able to determine whether it was a reliable methodology and understanding what measures are in place to check or confirm that the results are reliable is helpful.

I know that Mr. Ekeland has now on many, many occasions brought up the response that I think was evoked from a question the Court asked where Ms. Bisbee indicated that there was no known error rate, for example.  But me understanding what has been done to confirm the accuracy or inaccuracy of results from Reactor would be helpful.

You're right that under the analysis under *Morgan*, the D.C. Circuit says we've never held that Rule 702 requires an expert to have a sophisticated understanding of the software underlying or technological tools, but in a case like this, I think I need to understand whether that software is reliable.

You don't need to understand how well the code works, but you need to know have we gone and checked it, and when we do a comparison by hand, does it come out the same way that it does using Reactor.

And then, fourth, I need to consider whether the witness reliably applied the principles and methods to the

facts in the case. So it would be helpful just to walk through that in more detail so I can make the appropriate findings one way or the other.

Let's go ahead and take a 15-minute break and come back at five minutes before 12:00, and then we'll go to 12:30; maybe finish up -- I'll, hopefully, have enough time to hear from Mr. Ekeland. But if not, I'll let him come back after lunch to continue. Thank you.

MS. PELKER: I apologize, Your Honor. One scheduling point. I know Your Honor has a revocation at 2:00.

THE COURT: Yes.

MS. PELKER: Are we going to come back right after that; just for planning purposes?

THE COURT: Yes.

MS. PELKER: Thank you, Your Honor.

THE COURT: So we'll do that. Also, today if we also want to hear from Mr. Sterlingov with respect to whether any plea offer was conveyed to him and whether he's made a decision of how he wants to proceed with that, we can do that as well.

MS. PELKER: Thank you, Your Honor.

THE COURT: Thank you.

(Recess taken.)

THE COURT: All right. Ms. Pelker?

MS. PELKER: Yes, Your Honor. I am happy to go through one by one the factors that the Court laid out, if

that's what's going to be most helpful, but can take any questions.

THE COURT: Let's walk through them one by one.

MS. PELKER: I believe the first was qualification of the expert and whether the testimony would be helpful to the jury.

Here, for Mr. Scholl, we have his qualifications set out in his curriculum vitae and also described at the *Daubert* hearing and the transcript starting at pages 41. Mr. Scholl is a cryptocurrency and blockchain analysis expert with extensive experience doing tracing in various investigations for the FBI. He is a member of the Virtual Currency Response Team for the FBI, where he's responsible for assisting in investigations involving virtual currency all around the country and was selected for that team because of his expertise.

He's been working virtual currency matters for the FBI since 2015. He has certifications and training in blockchain analysis and additional cryptocurrency-related topics; has delivered those trainings as well; and because of his expertise, also was selected to work on the National Cryptocurrency Enforcement Team for DOJ.

THE COURT: Okay.

MS. PELKER: I think that it's clear that his testimony will help the jury understand the blockchain analysis evidence at issue in this case. It is complex financial

analysis and tracing. It's not going to be in the province or understanding of a lay juror, and they will be significantly aided by Mr. Scholl's testimony.

THE COURT: Okay. 2?

MS. PELKER: That's sufficient facts and data to underlie the analysis. Here we have voluminous data, really extensive, extensive financial records. The government's discovery in this case insofar as just the attachments to Mr. Scholl's report alone, I think, exceed 100,000 pages of Excel spreadsheets of just raw Bitcoin address information. There's massive quantities of transactional information that's being analyzed here.

I think, too, the question of sufficient facts and data gets to just the methodology -- whether there's sufficient data and facts for this case and also for the practice of blockchain analysis generally, and it's helpful to note that this is not an outlier.

That even though blockchain analysis may be a more novel field generally, it has been used extensively by law enforcement in the United States, by law enforcement all around the world, by private sector, by financial institutions, by consulting firms, by incident response firms, by regulators who use this blockchain analysis, and that there's a great amount of information about the tracing and the ability of tracing transactions on the blockchain.

THE COURT: All right. And what about use of Reactor or a similar tool, actually, in a judicial proceeding?

MS. PELKER: So here, Your Honor, I would point the Court to the government's filing at ECF 73. This is our opposition to the defendant's omnibus motion in limine where they first raised a challenge to the blockchain analysis.

And from pages 1 through 25, our discussion focuses on a *Daubert* analysis of blockchain analysis. This includes the use of blockchain analysis to support law enforcement investigations, including courts finding blockchain analysis reliable, starting on page 21.

So the defense is correct that this is -- that blockchain analysis has not been through this sort of rigorous *Daubert* examination previously, but it has been presented in courts numerous times in the form of tracing that goes from one address to another. Courts, including Judge Faruqui in this district, have looked at blockchain analysis, including clustering specifically, in evaluating search warrants and finding it to be extremely reliable.

So this is not something that's necessarily new or novel for the court system to look at blockchain analysis, including clustering.

THE COURT: But am I right from what you say that clustering has never been approved through a *Daubert* process in the past?

MS. PELKER: I'm not aware, no, Your Honor. I just don't think that it -- clustering has definitely been presented at trial insofar as there's been testimony that various darknet market vendors received funds from various darknet marketplaces, and that has been presented at trial.

I don't believe any defense attorney has done what Mr. Ekeland has done, which is what he's entitled to do, if, say, we want to raise a *Daubert* challenge about whether -- how you know that those funds are sourced from this darknet market. But, certainly, there's been testimony that, in part, relies on that for the attribution of the darknet market.

THE COURT: Is that cited in one of the pages that you pointed me to?

MS. PELKER: I don't believe so, Your Honor, insofar as most of that testimony would be just not specifically dealing with clustering.

But we do note that from pages 21 through 23 that there's been -- blockchain analysis has been used in hundreds of successful criminal investigations and prosecutions. We cite to Judge Faruqui's opinion. We also give an example of *United States v. Dove* where there was a *Franks* challenge, in part, based on blockchain analysis. We also note in *Gratkowski*, a fourth amendment challenge to the use of Chainalysis Reactor, described as a powerful and sophisticated software to analyze the Bitcoin blockchain.

That was not a *Daubert*-specific issue but did come up in that case in the appeal up to the Fourth Circuit.

And in Judge Faruqui's opinion, he discusses the extensive corroboration that had been -- had been offered relating to the blockchain analysis software. And then in the footnote at the bottom of page 19, the government also collected a number of cases in which blockchain analysis had been presented at trial in testimony, just as a sample.

THE COURT: Okay. Third?

MS. PELKER: Would be whether the expert applied reliable principles and methods.

Here, we have Mr. Scholl explaining exactly how he did his blockchain analysis. A lot of this, again, is just really, kind of, following funds from one address to the next, looking at the activity on the blockchain and just seeing this address spent funds from one to the next.

There is then the additional assessment as he's looking at these transactions where he's saying, based on my expertise, I -- as I'm following these funds, here's where I know where to go next, or here's why I think that all of these addresses in a peel chain are likely controlled by the same entity, because I know a lot about peel chains, I follow them a lot, I look at the transaction structure, and I believe that they're likely in the same wallet.

And in this case, that was then validated from

multiple peel chains when they were able to get access to the defendant's wallet and say, yes, in fact, all these addresses are here.

THE COURT: But I'm more concerned with whether Reactor is a reliable method. And as I indicated before, Mr. Ekeland has repeatedly noted that Ms. Bisbee conceded that she was unaware of any known error rate, and so I suppose the question is, what can you point me to to validate or verify or confirm the results from Reactor?

MS. PELKER: So, Your Honor, I think that a specific numerical figure for an error rate is certainly one factor that can be significant in a *Daubert* analysis. But as the Court has found in the case of tool-mark identification and others, it's one factor to consider. It is not dispositive. The fact that something doesn't have a single error rate doesn't mean that it shouldn't be considered.

I think that, through Ms. Bisbee's testimony, you can understand how, because Chainalysis, trying to avoid any possibility of false positives, is tailoring its behavioral heuristics to the behavior of any individual cluster, of looking at the different factors that would go into it and really customizing it for each cluster, that it would be very difficult to calculate an error rate.

Again, I'm not a statistician. My understanding is that because of the various variables that go into play and how

they customize it, that's a part of how they -- why there really hasn't been a way to calculate an error rate for the product --

THE COURT: I get that. So there's no known error rate, then the question is okay, how else do I verify that what's going on in the black box actually corresponds to the real world.

MS. PELKER: I would say it's really not a black box, but that what you have is a lot of data and clustering that is repeatedly tested and shown to be reliable in the real world time and time again through the users.

So there are thousands of Chainalysis users around the world, including extensive users in law enforcement, Ms. Bisbee's team, all of the investigations she has been involved in and overseen, all of the investigations that Mr. Scholl has been involved in, including this one; and that what you have is repeated corroboration and verification throughout an investigation.

So that you have -- every time an investigator goes into Chainalysis, traces funds to a virtual currency exchange, they say, I know that this transfer must be controlled by this virtual currency exchange because Chainalysis has clustered it as such, I'm going to send a subpoena to that virtual currency exchange and get the records. And when they do, and the virtual currency exchange says, yep, these are our addresses,

here are the records for this customer, that is a validation that Chainalysis has correctly clustered that address as associated with that exchange.

And that happens every day all around the world based on the users of Chainalysis.

THE COURT: So how many times do you think that's happened?

MS. PELKER: I believe that there was some testimony on this, Your Honor. I can attempt to try to pull it up with the exact site. I apologize, Your Honor. I can pull up the exact site.

THE COURT: You can just give me that after lunch if you want. Has there ever been an occasion in which they used Chainalysis to issue a subpoena and then someone has come back and said, I don't know what you're talking about, this isn't -- in fact, this person has nothing to do with our site?

MS. PELKER: I -- honestly, Your Honor, I'm sure that there has been. We don't have any sort of information or figures on that.

I will say that often, especially in the earlier days, an investigator may identify a particular set of addresses that Chainalysis says are clustered with an exchange. And then when they send the subpoena, the investigator says, and also, do you have information about these addresses because we don't know who controls them. And the exchange may come

back and say we have information about these; we don't have information about this other subset.

So it would be very difficult to just base an assessment on exchanges receiving requests for addresses that aren't held at that particular exchange. But I don't have information --

THE COURT: I guess what I'm getting at is I do need some indicia of reliability. And I'm asking you for the indicia of reliability, and it's not, I guess, probably enough to say every day Chainalysis is used for issuance of subpoenas, and those subpoenas come back with information that confirms what Chainalysis told us; unless you can tell me something about -- and say -- 99 percent of the time they come back and they say we don't know what you're talking about versus .001 percent of the time they come back and tell us they don't know what we're talking about.

MS. PELKER: Your Honor, I don't think that the government needs to have collected statistics on the -- when they come back. But I do think that -- and I will find this in, I believe, Mr. Scholl's testimony where he's talking about sending subpoenas to different exchanges and how that also corroborates the blockchain analysis and that he's done that many times and found it to be reliable.

THE COURT: Okay.

MS. PELKER: And I think that you also have that same

activity in -- when we're looking at different -- clustering for the different darknet marketplaces. So within this case you have, in part, Chainalysis or others saying this is a darknet marketplace address. And then when we go and we see the seized records from, say, Silk Road for the individual customers or Welcome to Video for the individual customers, you can pull out the transaction records and say, yes, Chainalysis said that the transaction on this date into the, for example, the pas account, that that was a transfer into Silk Road.

That wasn't what Mr. Scholl was relying on, but that you can then look at the Silk Road records for pas and see a corresponding transaction record on that date. And that plays out time and time again.

THE COURT: So, again, I just want to be as concrete as I can possibly be about this. First, form of confirmation is subpoenas are issued and, often at least, those subpoenas come back and confirm that the information sought was there.

Two, you've got that Mr. Scholl, in fact, did some of his analysis by hand, and then that corresponded to what Chainalysis came up with as well, right?

MS. PELKER: Yes, Your Honor.

THE COURT: Okay. What else do you have for me for -- just by way of confirmation that it is, in fact, accurate?

MS. PELKER: I think we have the use in thousands of

criminal investigations around the country where what has borne out in the ultimate search and arrest of various defendants has corroborated what is present on the blockchain.

THE COURT:  Is that different from the subpoena point?

MS. PELKER:  Yes, Your Honor.  So the subpoena point is that we go to exchanges and we say, do you have records about this individual.

THE COURT:  Okay.

MS. PELKER:  For the search and execution arrest is that, after we've done this -- these investigations, in part, based upon blockchain analysis, and we say, based on the blockchain analysis and other things, we've identified that this individual is, for example, uploading or downloading child sexual abuse materials.

THE COURT:  Right.

MS. PELKER:  We go and execute a search of that individual's residence; we arrest them; they confess and say, yes, it was me, or they find child sexual abuse materials on the device.

Same for various darknet market users.  And Judge Faruqui discusses one example of a particular child sexual abuse material site and how that was found to be highly reliable because in over 200 different search warrants that they executed, every single one of them then turned up

corroborating evidence confirming what the blockchain analysis had shown about the user doing those --

THE COURT: That's more of the type of thing I'm talking about where you have 200 different searches that are based on the blockchain -- or based on Reactor -- is it based on Reactor or just blockchain analysis?

MS. PELKER: I'm not sure what's publicly in the record there, Your Honor, but it was based on Chainalysis Reactor.

THE COURT: So you've got 200 searches, and every single one of them confirmed what Chainalysis Reactor predicted they would find?

MS. PELKER: That's correct, Your Honor.

THE COURT: Okay.

MS. PELKER: I'd say that was one example from one significant case, and we have the citations for that because Judge Faruqui wrote the opinion, but that that plays out time and time again in law enforcement investigations around the country. And we do have --

THE COURT: Mr. Scholl can testify to that?

MS. PELKER: Yes. And I believe that both he and Ms. Bisbee -- certainly, Mr. Scholl testified -- when he was discussing why he finds Chainalysis Reactor to be reliable, that it is, in part, based on in his work he has been able to successfully use blockchain analysis in the investigation of

criminal cases.

THE COURT: And it's my understanding that Mr. Scholl was able to use more traditional methods, as I was referring to it, by hand, tracing particular transactions. But when it came to identifying particular sites and say, yes, we think that this is Bitcoin Fog or we think that this is Silk Road, that is where you have to rely on clustering and you have to rely on Reactor for that. Is that a fair summary?

MS. PELKER: Yes, Your Honor. With some caveats of Mr. Scholl then did do validation testing, which is another point for looking at undercover transactions, looking at known data points that he can say, I know from a source outside of Chainalysis Reactor that this is an address controlled by Bitcoin Fog, for example, with the undercover transactions. Because we have the records from the undercover, I know these addresses are controlled by Bitcoin Fog. Does Chainalysis have them clustered as Bitcoin Fog? Yes, they do.

THE COURT: I see. So they did that as well as a form of confirmation?

MS. PELKER: Yes. Again, that plays out not just in this case but in undercover transactions that are done by law enforcement around the world every single day, where part of their process is that they do the undercover transaction, and they check it online. And for many law enforcement agencies, that involves checking it in Chainalysis Reactor.

Now, because the clustering is intentionally underinclusive, it may not be that it is always clustered with that entity, but they use that as a significant form of validation, verification, and vetting.

THE COURT: Here, there's some verification or validation that where Bitcoin -- where Chainalysis Reactor said that particular site was Bitcoin Fog, that when it was -- where there was a means of verifying that, for example, of having particular transactions where Mr. Scholl knew it was Bitcoin Fog, he was able to say, yes, it came out the same, and it confirms that it was accurate.

MS. PELKER: Yes. That's right, Your Honor.

THE COURT: What about with Silk Road or some of the other darknet sites?

MS. PELKER: So for many of the sites, that is also possible for --

THE COURT: I guess not so much -- my question isn't whether it's possible, but whether Mr. Scholl or anyone else has done it in this case to verify that Chainalysis Reactor, actually, correctly identified Silk Road or other darknet sites through clustering.

MS. PELKER: So I'd say that we have that information for the specific users that we'll present at trial for Silk Road 1, Silk Road 2, and Welcome to Video. The other sites were not seized by law enforcement so we are not presenting

vendor records.

Mr. Scholl did not rely on for his analysis any sort of additional undercover transactions that were done into those sites by any member of the FBI or other law enforcement. I do know that those undercover transactions are done extensively. These are big marketplaces and that they've been verified, but Mr. Scholl is not relying on any of those -- those aspects for the specific purposes of this case.

He is, however, informed in his analysis by the fact that this is something that FBI does, and he knows that this has been done and validated.

THE COURT: He knows that where Chainalysis Reactor says it's Silk Road and they actually then seize records, that those records confirm that Chainalysis Reactor called it right?

MS. PELKER: Yes. For the seized data sets for the individual users. For the -- for the records where the marketplaces have not been seized, he's looking at the -- well, he's aware that FBI and others do undercover transactions on those sites. Part of doing the undercover transactions is tracing using Chainalysis Reactor.

Also, a big aspect of the proof in many darknet market cases for vendors relates to both at trial and then at sentencing how much money the vendor was getting withdrawing from a darknet marketplace. And so in that aspect, even though it's not generally raised as a clustering challenge, I know

there's been a fair amount of litigation recently in the Eastern District of Virginia about the individual vendor's records. Mr. Brown just passed me up a transcript reference as well.

THE COURT: Okay.

MS. PELKER: But individual vendor's records where the vendor was identified through a number of different methods, including blockchain analysis. Ultimately, at sentencing, there's a dispute about the amounts or volumes used, and that there may be ledger information found on the vendors' devices -- and in many cases there are -- that can be used to kind of match up with information on the blockchain about how much the vendor was receiving.

So there are lots of opportunities -- there have been many different instances of this sort of additional validation and verification from different data sets.

THE COURT: Mr. Scholl will be able to testify about that, or Ms. Bisbee?

MS. PELKER: Yes, Your Honor. I would say that Mr. Scholl's -- his analysis and expertise is informed by his prior work and experience. We are not planning to get into any sensitive details of any of the individual cases Mr. Scholl has worked on.

As he testified, he does a lot of work on ransomware cases, on cases all across the country. While that has

informed his testimony, we aren't planning to really delve into anything, especially for ongoing cases, about his work on those cases beyond --

THE COURT: Well, I understand there can be sensitive law enforcement reasons why you don't want to talk about at least, certainly, ongoing investigations, but the question I really had is whether he'll be able to testify and say -- and I know there was some of this. I'd have to go back and look at the transcripts. I'm not sure how deeply we got into this.

But whether he'd be able to say, I use Chainalysis Reactor on almost a daily basis for tracing; we use it for issuing subpoenas; we use it to issue -- for arrest warrants. I can't say every single time, but in the vast majority, the overwhelming majority of cases, it matches up. And when we seize the wallet or we seize the individual or seize the person's phone, yes, Chainalysis Reactor called it correctly; something along those lines.

MS. PELKER: Yes. I think -- absolutely, Your Honor. I think that he did provide some testimony regarding that in his *Daubert* hearing. We could definitely expand upon that at trial.

THE COURT: Okay.

MS. PELKER: And the citation to the discussion about the subpoenas starts on page 55 of the transcript. And --

THE COURT: From his *Daubert* hearing?

MS. PELKER: Yes, from his *Daubert* hearing. I had asked, "In your work have you also had the occasion to validate the clusters and attribution in Chainalysis?"

And he explains that he does so very frequently. Every time we send a subpoena to an exchange to get back account information, we have the opportunity to check that those Bitcoin addresses that belong to this account at this exchange were properly attributed by Chainalysis.

And we discuss that a bit more, and he explains that this is something that he and his colleagues do every day, and he estimated a thousand times a day throughout the FBI.

THE COURT: And does he say anything about how consistently he gets the results he would expect?

MS. PELKER: I believe -- and it was within the question. I said, "Is it your testimony that the response back from the exchange verifying with records from that address that the exchange does control that address a validation of Chainalysis's clustering?"

And he said, "Yes, ma'am, I believe it is."

THE COURT: All right. And then I guess another category of potential confirmation is -- at least with respect to Heuristic 1 is that Ms. Still and her analysis actually confirms, at least with respect to Heuristic 1, that it is fairly predictive?

MS. PELKER: Yes, Your Honor. And I think that

that's very significant in that it was -- I thought it really very powerful confirmation that Ms. Still, with a completely different product, was running that same heuristic and came up with the exact same set of addresses to the tune of over -- at least over 311,000 different addresses where it was an exact match for every single one. And for many of the other services, they were either exactly the same or very, very close.

And here we also have additional verification from Mr. Scholl checking with the TRM tool, as well as --

THE COURT: I was going to ask you about that as well.

MS. PELKER: -- for key addresses. That is, he was checking key addresses as -- whether TRM had associated them as Bitcoin Fog, which I think is a verification and validation of Chainalysis's clustering for those addresses.

THE COURT: And what happened -- what did he find?

MS. PELKER: That for all of the 144 addresses that he had pulled out as particularly significant from his analysis and tracing, that those addresses TRM also had clustered as Bitcoin Fog. And that we have in this case Mr. Scholl's looking at different activities on the blockchain, and then when he goes and follows up with the records from, say, the defendant's Mycelium wallet, he's able to then say yes, I'm looking at this in my expertise through peel chain, and I

determined that this is, in fact, all controlled by the same wallet.

I think that that, actually, is -- is pertinent to whether this is a reliable method because it cements the idea that Chainalysis is being intentionally underinclusive; that we're looking at this as a peel chain.

Mr. Scholl can look at it and say, based on my experience, I am quite confident that this is a peel chain, but because Chainalysis has heightened requirements for what it would add as a peel chain clustered together, it's not clustered in Chainalysis.

THE COURT: Okay.

MS. PELKER: I believe that then that gets us to whether the witness reliably applied the methods, unless the Court has -- did I miss --

THE COURT: No. That was it. Thank you.

MS. PELKER: I think we discussed this. The witness has gone through extensive trainings, has delivered trainings, has certifications from Chainalysis, TRM, and others, and that he applied those practices here. And that Ms. Still testified to many of the same practices.

THE COURT: Can I ask you to put on paper for me what we just went through with respect to the confirmation with record citations either to testimony or to the expert reports. I think it would be helpful for me to have whatever the

government points to as confirmation that Reactor is, in fact, accurate.

MS. PELKER: Yes, Your Honor.

THE COURT: And what is a realistic time frame? I know you've got a lot of work you're doing.

MS. PELKER: I know we have the other Chainalysis filing due at 5:00 tomorrow.

THE COURT: If you want to wait until -- Monday is okay. If you want to get that to me by Monday at 5:00 p.m.; is that okay?

MS. PELKER: Yes, Your Honor.

THE COURT: That would be helpful to have. Well, I'm not going to start with you, Mr. Ekeland, because I don't want to -- I want to give you plenty of time to respond on this. Why don't we come back after lunch.

Since I have a break at 2:00 for the other matter, maybe rather than -- I assume, Mr. Ekeland -- well, let me ask you, how much time do you think you want on the issues that I've just been discussing with Ms. Pelker, which I think is a combination of Mr. Scholl, as well as the Chainalysis Reactor?

MR. EKELAND: That's tough. Probably 15 to 30 minutes.

THE COURT: Okay. Why don't we come back, then, at 1:30, and if you can get it done before the 2:00, great. If you need some time after the 2:00, we can do that then, too.

I'm not putting pressure on you. I understand this is important. We'll see you-all back at 1:30 then.

MS. PELKER: Thank you, Your Honor.

(Whereupon, a lunch recess was taken, after which the following further proceedings were had:)

THE COURT: All right. Mr. Ekeland, you may proceed.

MR. EKELAND: Yes. Thank you, Your Honor. I think we start with, I think, what seems to me to be the threshold issue here, and that's whether or not Chainalysis Reactor meets the *Daubert* standards.

THE COURT: Before you turn back, can I ask you for purposes of clarification, are you challenging Mr. Scholl's qualifications or the sufficiency of the data, or is it -- is your challenge focused on Reactor?

MR. EKELAND: No, Your Honor. I am -- we will be challenging Mr. Scholl's qualifications as an expert.

THE COURT: Okay. Make sure -- I have not seen any basis for doing that, so make sure before you sit down you tell me why that's the case.

MR. EKELAND: Understood, Your Honor. I was hoping we could start --

THE COURT: No, no. You're welcome to start where you want.

MR. EKELAND: As to Chainalysis Reactor, I was struck when I cross-examined both Ms. Bisbee and Mr. Scholl, and I

just went down the list of the *Daubert* factors, and they answered in the negative when it came to every one.

I asked them whether or not there was any scientific peer-reviewed papers attesting to the accuracy of Chainalysis Reactor. They both answered no. I asked them if they could tell me the rate of false positives for Chainalysis Reactor. They answered no. I asked them if they could tell me the rate of false negatives for Chainalysis Reactor. They answered no. I asked them if they could tell me the statistical error rate for Chainalysis Reactor, and they said no.

Ms. Bisbee testified, additionally, that Chainalysis has no internal data as to the error rates of Chainalysis Reactor, and I think the fact that all those questions were answered in the negative raises a real problem because you can never know the accuracy of this software.

And I'm struck by the use of anecdotal hearsay evidence based on cases that are -- haven't been produced, that aren't -- we don't know whether or not they actually relied on Chainalysis Reactor, and the fact that the only thing that the government can attest to as to the supposed accuracy of Chainalysis Reactor is purely anecdotal hearsay evidence, is extremely problematic.

Because, you know, I can hit a ball -- a baseball a hundred times, but if I strike out 10,000 times, I'm missing most of the time. Or just like that broken clock on the wall

right there tells time accurately twice a day; that does not make it an accurate clock.

The problem is we have no data set, no scientific data set with which we can measure the reliability and the accuracy of this software. Instead, we're being told to trust purely anecdotes from law enforcement, which the defense would submit is a biased viewpoint, and there is no data set because Chainalysis has said they have not bothered to collect it of the times it was wrong.

THE COURT: But don't you, in fact, have that yourself already? You have your own expert. You have the same data out there. You have the results from Chainalysis, and you can compare.

So, for example, with respect to Heuristic 1, there seems to be a fairly close correlation between what your expert said and what Chainalysis said. So at least with respect to that heuristic, there seems to be some validation in your own expert report.

MR. EKELAND: Well, in our own expert report, one of the first things that Ms. Still from CipherTrace says is that this type of heuristic tracing that Chainalysis uses in Chainalysis Reactor is unreliable and should not be used in federal court.

THE COURT: That's not the answer to my question. My question was, don't you have a means of validating one way or

the other? The blockchain is out there. You have the blockchain, and you have your own experts, and they can do their own analysis, and they can agree or disagree with what Chainalysis has done.

So it's either verifiable or unverifiable -- unverifiable or subject to dispute based on the publicly available data and your own experts.

MR. EKELAND: That's not correct. I think we need to make a distinction here between the public blockchain that's accessible from a blockchain explorer and the closed-source proprietary software, like Chainalysis, that utilizes heuristics. And where the heuristics come into play in this case is when it comes to the money laundering charges where they're alleging X amount of dollars are being laundered through Bitcoin Fog.

And I'll give you what I think is a striking example of how problematic this heuristic analysis is. As you look at Ms. Bisbee's report -- which she, by the way, testified she's not attributing anything to Mr. Sterlingov on, so I think there's questions as to its relevancy there.

But in her report she says that the flow of funds, I think, to and from Bitcoin Fog from, quote-unquote, darknet markets is approximately $33 million; I think, roughly, $10 million of it was indirect and 22 direct, something like that. Right? That's using supposedly Chainalysis Reactor.

You compare that number to what Mr. Scholl comes up with in his report, supposedly using Chainalysis Reactor, and his number is somewhere, I think, around $100 million. Then you look at the press release in the initial criminal complaint in this case, I think, where that number is $334 million. If this --

THE COURT: I don't care about a press release. It's not evidence.

MR. EKELAND: It's, I believe, in the criminal complaint as well.

The issue being is now the software is being deployed three times, and we're getting three different numbers as to the inflow and outflow of funds to Bitcoin Fog. That's highly problematic.

These heuristics that they're using and these algorithms, as far as we can tell, they're experimental. They have no known error rates and, yes, sometimes they're bound to be right. But the question is, are they reliable under *Daubert* for a federal criminal proceeding.

And there is no evidence -- there is no scientific evidence whatsoever in anecdotal hearsay from cases where we don't know the facts, we don't know whether or not Chainalysis Reactor was behind the trace, whether the heuristic clustering was, or it was a simple blockchain trace. We don't know.

And what's astonishing to me, the more I think about

it, is how much the software is actually based on hearsay. Heuristic No. 2, the behavioral, quote-unquote, heuristic, that's based on hearsay inputs, judgments about what kind of data should go --

THE COURT: Just for clarification, I think you're using hearsay not in the legal sense. Hearsay is a statement offered in court by a declarant who is not present. I think what you simply mean, if I'm understanding you correctly, is that heuristic is based on input that you can't verify in some way?

MR. EKELAND: Yes, Your Honor.

THE COURT: I'm not sure you actually mean it in hearsay --

MR. EKELAND: Correct. I'm not using -- I'm using hearsay broadly here and not -- essentially, in the sense that we're being told to trust external data that we can't verify. This is why we've been asking for the source code and the data inputs.

And what's astonishing to me is that Chainalysis admitted on the stand that they've never bothered to collect the data on the error rates. So you have no way of evaluating the accuracy of the software based purely on anecdotes about when it was accurate because you don't know if, for every time it was accurate, if it was inaccurate for a million times.

And the problem is that it's too late to collect that

data.  And you can't point to case law to verify the scientific validity of something that is being presented to the jury and is being presented to the courts as, quote-unquote, deterministic.  I was struck by Ms. Bisbee's declarations, well, we don't know the error rate, but it's deterministic.  It's scientific, but I can't cite you any scientific peer-reviewed paper establishing that fact.

Now, what's happening -- and I think this is going to be confusing to the jury, and this is why *Daubert* is so important in its gatekeeping function -- is we are being presented with something that is essentially art, that is primarily based on a number of assumptions and guessing.  We don't know anything as to its accuracy rate, and it's being presented as science.  I think that's highly problematic.

And, yes, this is the first time this has -- I'm astonished that this is the first time that this software that's so heavily marketed and so many people are using, that this is the first time it's facing a *Daubert* challenge and that when -- the first time it faces a *Daubert* challenge, all the *Daubert* factors, when they're asked, they're answered in the negative; every single one.

And that's to say nothing of the fact that there is no -- there are no standards, zero standards when it comes to blockchain forensics right now.  There's no MIS standards, there's no governing body.  And you can see the fact that

there's not even acceptance in the community by the very fact that CipherTrace came in and is disputing everything that Chainalysis Reactor is saying.

Now, again, I want to distinguish between simple blockchain tracing using the explorer -- we're not arguing against that because the public blockchain is accessible through publicly accessible explorers. But what the problem here is, is we're sticking heuristics on top of this.

And then we're using those heuristics to calculate huge sums of money that Mr. Sterlingov is being accused of laundering. Yet, there's not a shred -- not a shred of scientific evidence showing that these heuristics are accurate, and we're being told completely to depend on anecdotes, and that is the antithesis of *Daubert*. I don't know what more to say, you know.

This company makes hundreds of millions of dollars from the United States Government, and nobody ever bothered to check the accuracy of the software? They never bothered to check the internal error rates? They marketed this software and they said, this software is great; we'll be able to trace everything and put you in compliance. Uh, do you have your error rates? Do you know how accurate it is? No, we don't.

Okay. Well, it's too late for that because you can't collect that data set now. You have to somehow -- you can't go back in the past and look up every time it made a mistake.

That's impossible.

So they can cite a hundred cases, but you don't know if there's 100,000 cases where there was an error out there. This is junk science and doesn't belong in federal court. This is the underlying software for the majority -- well, I think for almost all of Ms. Bisbee's report and for a large majority of Mr. Scholl's report.

It has no place in a federal criminal trial because it meets none of the *Daubert* standards; and anecdotes and referring to things where we don't have all the facts, where there's been no control group, there's no scientific statistical analysis. There's been no independent audit of this software. There's been no model validation. Instead, we're given a bunch of jargon. Trust us; it's scientific.

But you can't tell me its error rate, you know. What are we supposed to do with this? I mean, if *Daubert* means anything, I think, Your Honor, it means that this software doesn't come in. I mean, that's the gatekeeping function of *Daubert*. Not a single one of those factors is dispositive, but all of those factors are answered in the negative.

And the only thing being offered as proof of the accuracy is anecdotal evidence when you don't know the false positive rate or the false negative rate or the error rate or anything at all.

And I want to say something, too, about the fact that

Chainalysis Reactor and the government keeps on saying that these heuristics are underinclusive or that they're conservative. We completely disagree with that. That's why Ms. Still testified that Heuristic No. 2 -- she calls it the Pac-Man heuristic because it's just going out and it's just gobbling up all sorts of information and throwing it in there.

You know, it's just -- it doesn't meet any of the *Daubert* factors, and it's fundamental to the government's case. And I just don't -- I don't see how this -- how this comes in under *Daubert*.

THE COURT: All right. Anything else?

MR. EKELAND: I just will note, Your Honor, that people are citing to Judge Faruqui's case law, which is anecdotal as well. I just want to note for the record that he was a prosecutor on this case. And, again, I don't think this type of anecdotal evidence is sufficient to establish the reliability of the software.

I mean, I think I've made my point on Chainalysis Reactor, and I think Ms. Still's CipherTrace report makes it as well, and that's -- and I think the government -- I think Mr. Brown and Ms. Pelker, in an article that they wrote for the DOJ law journal that Mr. Verret cites in his expert disclosure, also said in their article that you should use this for generating leads, but then you need corroborating evidence. And the problem is, that just doesn't exist here.

You know, how do you go from $334 million to $33 million to the $100 million in the Scholl report if this stuff is scientific and it's accurate every time? Why are the traces in the criminal complaint and everything that's being done in the criminal complaint not being disregarded by Mr. Scholl, whose errors are documented in the Still CipherTrace report?

Like, what am I supposed to be looking at here? If it's scientific, it should be working the same way every time. And if you start to look around at this evidence, you start to see, well, actually, no, they're not getting the same results, and people are saying different things, you know.

I think I've made my point on the Chainalysis Reactor, Your Honor. Do you have any questions you want to ask on that?

THE COURT: Did you want to address the other factors; qualification or any of the other 702 issues?

MR. EKELAND: So in relation to Mr. Scholl and his qualifications --

THE COURT: Yes.

MR. EKELAND: -- I think Ms. Still's report starting on -- Mr. Hassard, if you can just bring it up. I think it's on page 34. She documents the errors in his reports.

THE COURT: I don't think it goes to his qualification, though. I mean, that's a separate inquiry.

MR. EKELAND: I think it does because I think it shows -- well, it shows -- actually, more properly it goes to the soundness and reliability of his methodology.

THE COURT: Okay. So you're not challenging the qualification then?

MR. EKELAND: I challenge his qualifications in terms of being able to testify to financial forensics. I think that's very problematic.

If I have heard the government correctly -- and I don't recall seeing this in his expert disclosure, but I haven't reread it this morning -- they said that he was going to testify as to valuations, the market value of Bitcoin, the flow of funds.

I don't think he's qualified as a forensic financial analyst to make those -- that kind of testimony, particularly with the market, like, Bitcoin in 2011, 2010, 2012, which wasn't a liquid market. I think the notion that you can just go look and calculate prices and value in this market that's not really liquid and that I think the valuations are arbitrary, it's not like looking up the price of the U.S. dollar in 2010 where we've got an expansive market and there's lots of buyers and sellers and there's readily available data.

I think the idea -- I think there's a little bit -- one of the problems with this case is that there's a little bit

of anachronistic projection from 2023 into 2010. So we object to his qualifications in terms of any kind of testimony related to financial issues.

I think, in terms of him -- I think in terms of simple blockchain explorer tracing, I don't object; but I do object in terms of the soundness and reliability of his methodologies, which is a separate question.

THE COURT: So getting back to Reactor and your challenge to Reactor, it's fairly common in at least civil litigation to have economists build econometric models that are not peer-reviewed, and it's just an issue that's submitted to the jury as to whether the model is an accurate model or not.

Why is this different than the thousands of cases in which economists have built econometric models and one side or the other can challenge the analysis that the economist is offering?

MR. EKELAND: Well, I think, first, that these models that you're speaking of are designed just for the case. And this Chainalysis Reactor software is being presented as scientific and deterministic, something that works all the time based on anecdote. And we're supposed to trust -- and the evidence that I'm hearing that's being put forward, we're supposed to trust its reliability and accuracy because it's been used before and supposedly been accurate. So I think that's a big difference.

The economist model is being designed just for the case and the jury isn't being told, here's some scientific thing that's being used by the SEC, by the FBI, that's been used in all these cases that, you know, we don't have data sets for or can't examine. I think that's a big difference.

I think the -- I think that's actually a dispositive difference. And this is also a criminal case. It's not a civil case. Someone's liberty is at stake. So it's not just a matter of an economic model determining --

THE COURT: I'm not aware of any case law that says that Rule 702 applies differently in criminal cases than in civil cases. Maybe there are such cases, but no one has cited that to me if there is such a case.

MR. EKELAND: No. I -- I don't doubt that, Your Honor. But I do think that it is at least constitutionally significant that someone's liberty is at stake, and it's not just a simple matter of dollar signs.

And here is something that is being -- is the primary evidence without any corroborating evidence at all that I've seen anywhere, Mr. Sterlingov operating Bitcoin Fog, being used in an attempt to take away his liberty. And I think that constitutionally, whether or not there is case law out there, at least to me, that's constitutionally significant.

And because someone's liberty is at stake -- I believe the saying is life, liberty, and property, not

property, life, and liberty -- then I do think it warrants a higher standard of scrutiny. I think that's what the constitution demands is that in a criminal case a defendant be given, you know, the highest accord.

THE COURT: I think you're probably wrong about that because I think that there are states that don't apply *Daubert* at all, and I don't think the Supreme Court has ever even hinted at a suggestion that that violates due process for a state not to apply *Daubert* and that -- I'm not disagreeing -- I mean, I agree with you that you raise significant questions under *Daubert*, but I think you're probably wrong in suggesting that *Daubert* is constitutionally mandated.

MR. EKELAND: I'm not trying -- Your Honor, I'm not trying to -- well, let me preserve that issue should it go up. I'm not trying to -- that's not the crux of my argument here.

I mean, essentially -- what I'm saying -- whether or not *Daubert* is constitutionally mandated, Chainalysis Reactor doesn't meet any of the *Daubert* factors, not one. And that's not just coming from me. That's coming from Ms. Bisbee, that's coming from Mr. Scholl, and I even believe Mr. Scholl testified that -- you know, I heard some testimony in reference to his testimony about how he checked it with subpoenas. But I also recall when I -- on recross asking him, have you ever bothered to check the accuracy of Chainalysis Reactor before he used it. And if I recall correctly, he said no.

So, you know, that goes directly to the soundness and reliability of his methodology. You know, if you're going to go -- that's like using a radar gun that you haven't calibrated, right? There's a number of ways -- and I think you saw in Bryan Bishop's expert disclosure how complicated this software is. It's not some simple thing.

Like, a blockchain explorer, a publicly available -- and that's pretty -- relatively straightforward. You're looking at the blockchain, you're looking at the information on each block, right?

But that's not what's going on with Reactor. With Reactor, you've got all sorts of data inputs, heuristics. I won't belabor the point because the Court knows, but there's a big difference. And I think there's a danger here I'm seeing when we talk about these issues.

It's very easy to conflate simple blockchain tracing and what's going on with Reactor. I think it's important to remember that with Reactor -- what I take to be the crux with Reactor is the issue with clustering and what they're attributing to Mr. Sterlingov in terms of money laundering.

I don't even know what that number is because I can't tell it because, again, there's three different versions of it so far. Maybe they're going to come out with another one. I think that, in and of itself, shows you the reliability of the software. One person uses it, they get one number; another

person uses it, they get a different number. What's going to happen when we get to trial?

THE COURT: I know you may disagree with this, but I heard your witness -- your own witness say that at least $33 million of it was confirmed by your own witness's model. And laundering $33 million is laundering $33 million. Whether it's 100 million or 33 million may not be materially different for what the jury has to decide.

It might be, if we ever reach the point of sentencing, different for what I would have to decide. But why is that -- why couldn't the government simply say, fine, we'll take the $33 million number?

MR. EKELAND: Because I don't know if that's accurate.

THE COURT: Your witness said so.

MR. EKELAND: I'd have to go back and check that, Your Honor. I'm not doubting you. But, okay. Well, then why is it $300 million less than when he was initially arrested? Why is that, roughly, $70 million different from what Mr. Scholl says? So how do we discriminate?

THE COURT: All I'm saying is -- I'm not saying that the government is necessarily wrong about $100 million. I'm just saying that at least as to $33 million, it seems that the defense concedes that $33 million of the amount attributable to Bitcoin Fog came from the darknet.

MR. EKELAND: No, I'm not conceding that. I'll go back and look at my witness's testimony. But let me ask a question related to that.

THE COURT: Right.

MR. EKELAND: With what reliable criteria do we have that anybody can cite to me how we distinguish between those three numbers? The problem is -- and this goes to the scientific validity and the supposedly deterministic nature of this software. You don't.

So we arbitrarily pick that number. So say CipherTrace did say that. How do we know that that's reliable there? How do you distinguish between them? The problem is, there is no reliable methodology to distinguish. There is no metric because there are no standards in this field. This is a completely newly emerging field without any standards. And these metrics are arbitrary. These heuristics are arbitrary. And now they're being used in an attempt to take a man's liberty away.

It just -- it doesn't meet *Daubert*, Your Honor. I think the defense's position is obvious there.

THE COURT: You've mentioned that. Anything else you wanted to add?

MR. EKELAND: In terms of Mr. Scholl, I question the soundness of his methodology as put forward in his report. I'm not going to reread Ms. Still's report, but starting on page 34

of her report, she documents the errors and assumptions.

THE COURT: By the same rationale, Ms. Still clearly made a substantial error in her report. Do I throw her out? Because she made a very significant error in her report.

MR. EKELAND: What error is that, Your Honor?

THE COURT: That she treated transactions that were based purely on -- that were based on Heuristic 1 as though they were based on Heuristic 2 or 3.

MR. EKELAND: Your Honor, it's my understanding -- and I can't recall exactly what she said about that, but she does have an explanation about that. And that that's not an error. She will come and testify about that.

But then again, even if she did make an error, doesn't that show you how error-prone this space is?

THE COURT: Well, I don't think --

MR. EKELAND: Who -- Your Honor, who is right?

THE COURT: You need to let the Court speak when the Court is speaking.

MR. EKELAND: Sorry.

THE COURT: What I was going to say is I don't think that I've ever seen a case involving complicated forensics in which one side or the other isn't saying the other side made some errors along the way.

In fact -- the fact that you can point them out is some evidence that it's verifiable one way or the other. One

of you is right or wrong about whether these errors were committed or not, and it can be submitted to the jury.

MR. EKELAND: There's, I think, a difference between a field that has standards like, say, DNA evidence -- right? -- or whether there's well-developed science and peer-reviewed papers behind something and a newly emerging forensic field that's lacking all standards.

One thing that strikes me, Your Honor, about this space is that everybody I talked to in this space, on this journey of this case, they have -- they'll give you a different answer, right? I think that's highly problematic. And, again, I think that goes to *Daubert*.

THE COURT: I guess -- I see your point about Reactor. On the other aspects of this, it just seems to me that it's forensics. Someone is right and someone is wrong about it. Either someone made a mistake or someone didn't make a mistake.

You're just tracing the blockchain, and it may be that there's some points in that trace in which there's uncertainty and someone makes an assumption one way or the other, and that is subject to challenge and saying, well, why did you assume that in that CoinJoin that there was a -- that the portion of the CoinJoin that was then traceable to some illegal activity came from one source versus the other source. Perfectly fine cross-examination. But that's just forensics.

I mean, that happens all the time in trials. It doesn't mean that it lacks science. In fact, it means it does have science. It's not terribly different from math. Either you made a mathematical error or you didn't.

MR. EKELAND: First of all, Your Honor, I'm inclined to partially agree with you, with the caveat -- I mean, I understand what the Court is saying.

THE COURT: Right.

MR. EKELAND: I think the point more what I'm trying to get at is this is a standardless field in terms of forensics. And, say, with mathematics, if we used an analogy to mathematics like, whatever, formats theorem or basic addition -- right? -- there are readily appliable rules that the community accepts. And there are standards. And if you try to say two plus two equals five, everybody in the community is going to reject you.

Those standards are lacking here. I think it's important to keep in mind, Your Honor, that when it comes to forensics, there are forensics in well-developed fields that have standards, and then there are newly emerging fields of forensics that lack all standards.

And I think something like 51 percent of wrongful convictions in the United States come from junk science from newly emerging forensic fields. I think that's a real risk.

And so I don't think it's as simple as just saying,

oh, it's forensics and -- because forensics can mean lots of things, Your Honor

THE COURT: Although, I have to say, to my mind, there is a -- one of the differences is -- and this is something that has been addressed where the Department of Justice has had to amend, I think it's the U.S. Attorney's manual and its guidelines like this.

So when someone comes into court and -- they used to come into court and they would say, this DNA proves that that was the person; can't say that anymore. They can say, this DNA shows that there's a one-in-a-trillion likelihood that it's somebody else when it comes to ballistics. They can't come in anymore and say, this proves that that was the gun. They can say, here's the likelihood that it's the gun.

One of the things, to my mind, that makes this case somewhat different is the government isn't submitting and doesn't need to submit and say -- at least as to large portions of this -- here is a certainty that this transaction from -- at Bitcoin was Silk Road. They're dealing with things in a much grosser level. They're saying we think there were tens of thousands of transactions involving Silk Road.

Turns out if they're wrong on 5 percent of those, it's immaterial; the same way that it's not -- in the way it's not immaterial wherein the government in the cases will come in and say, you know, we tested that hair and we can tell you to a

certainty that that is the defendant's hair from this case.

MR. EKELAND: Your Honor, I agree with that. I think one of the issues here is that they can't even tell you how accurate this is. It could be 99 percent accurate or 99 percent inaccurate. And there is no way of knowing, and I think that's what's highly problematic.

Like, with DNA testing -- what astonishes me with DNA testing was to learn that it matters what you tell the DNA forensic analyst about the DNA sample they're getting. That actually affects the output of who they're going to say did it. That astonishes me.

There's, apparently, a great deal of writing on this point; that confirmation bias and cognitive bias affects even DNA analysis. When you've got a software here that is based on heuristics, on algorithms, on assumptions, on behavioral inputs, on hearsay, I think it compounds the issue.

I'm not saying the software is zero percent accurate, but I'm saying we don't know. And for *Daubert* purposes, it's not reliable, it's not scientific, and it doesn't belong in a federal criminal court because the jury is going to get confused, I think, into thinking that this is scientific.

They're going to think it's a computer program that's deterministic, that doesn't involve all this kind of guessing. And, I think, because of the complicated nature of things here, the jury is just going to throw up its hands and say it must be

right, it's a big $8.5 billion company.  They use it all the time, so it must be working.  I think that's what *Daubert* is meant to prevent.

THE COURT:  Okay.  Anything else?

MR. EKELAND:  I think we've made our point on Mr. Scholl and Chainalysis Reactor.

THE COURT:  All right.  I need to handle this other matter, so let me take a break.  We'll get set up with the other matter.  As soon as we're done, we'll come back.

MR. EKELAND:  Thank you, Your Honor.

(Recess taken at 2:10 p.m. until 2:50 p.m. this same date as follows:)

THE COURT:  All right.  I have not yet heard back from the marshal about Mr. Sterlingov's computer and access. I'll let you know if I hear anything before we finish today.

I do have from the court interpreter's office the names of some interpreters/translators for Romanian and Russian and one Swedish.  If you want to check with my clerk for advice about that, she can probably help point you in the right direction or provide you with some assistance in that regard.

I think we do need to pick up our pace a little bit, but I want to give Ms. Pelker an opportunity for a couple of more words with respect to the Chainalysis Reactor in particular.

MS. PELKER:  Yes, Your Honor.  I'm mindful of the

time, but I did want to respond to a few points that the defense brought up.

First, I did not hear the defense ask or the government witnesses respond in the negative to a list of all of the different *Daubert* factors. I heard extensive testimony about why the government experts, in their expertise and their experience and use of Reactor, have found it to be extremely reliable.

It's true that there are no peer-reviewed academic papers or specific error rates that are specifically tailored to these heuristics, but that, again, is one factor, not dispositive. We did hear extensive expert -- a fair amount of testimony, including through Ms. Still, that there is a lot of academic interest and research in this area. That's, we understand, not the same as a peer review of Chainalysis's specific implementation, but it is still significant and we think appropriate to consider.

THE COURT: Can you remind me what the Meiklejohn paper said on this issue.

MS. PELKER: So there are, actually, a couple of even different Meiklejohn papers, but the one that Ms. Still cited to was, essentially, they were proposing a new heuristic that they said would improve upon previous heuristics, and they were actually trying to do a version of a subset of a different implementation of a Heuristic 2 for peel chains and change, and

they came up with this new heuristic, compared it to previous ones and said that it's, essentially, an improvement on these previous ones, here's why.

We applied it to some test approaches that are available in the public record, including what the government had put out in the complaint about this case. They're heuristic on two parts, a follow forward, follow backwards. When they applied follow forward, it didn't pick -- it wasn't able to do the trace, which is the manual trace that Mr. Scholl did. They were, essentially, trying to automate what was done manually. It wasn't a cluster in Chainalysis that preexisted anyway.

But when they did the follow backwards -- and I want to make sure I'm not mixing up the two. But when they did the follow backwards, they were actually able to automate and confirm what Mr. Scholl had done manually and which was not clustered in Chainalysis Reactor.

THE COURT: Wasn't there something about the percentages of different tools and how effective they were?

MS. PELKER: Yes, Your Honor. There was a section where -- not on the tools, but they went through prior research on the topic. And, basically, took Chainalysis data as ground truth and compared that data to what the researchers at the time applying their heuristics to the blockchain would have found.

So they found that, actually, when there was a 60 percent error rate, it's a 60 percent error rate off of Chainalysis ground truth data. So showing that it is different than what is in Chainalysis Reactor is my understanding of the study, understanding I'm not an academic expert in the field. But that's my understanding of what was done.

THE COURT: Okay. So there was a -- was there a 60 percent difference between what they predicted and what Chainalysis predicted?

MS. PELKER: They applied the heuristic, and they said that there would be a -- there's all of these different academic papers that they cite from, 2013 down to a more recent one. I think the one that defense keeps citing is the 60 percent error rate.

THE COURT: Right.

MS. PELKER: What they did was looked at this heuristic and said back in -- if we apply this heuristic that was developed in 2013, it would have a 60 percent false positive rate. But they're calculating that false positive rate, as I understand it, based off of Chainalysis's ground truth.

They're saying that it's 60 percent false positive, because they're saying that what Chainalysis has is accurate.

THE COURT: What that might well show is that Chainalysis is just more conservative than what they're doing

and that they were getting more hits than Chainalysis is getting. Does that seem right?

MS. PELKER: It's possible, Your Honor. I believe that there was also -- I would have to go back and do an in-depth reading and consult with our experts.

It's possible that there was also some evaluation when they were looking at the data as to why they were confident that there wasn't more in the way of false negatives in the Chainalysis data that were getting picked up by the heuristic. I'm just not sure.

THE COURT: I'm going to have to go back and look at that further as well. Okay.

MS. PELKER: We did -- I believe those papers did get admitted into the record.

THE COURT: I think so.

MS. PELKER: As far as the different figures that the defense brought up, the complaint has a figure that is the total amount of money that was moved through Bitcoin Fog. We say that that is property that's certainly the value for the 1960 money transmission and is relevant as the property involved in the money laundering offense.

Within that, there is the subset of funds that Mr. Scholl identified as specifically tied to the particular darknet markets that he did the tracing for; both direct and indirect. And then within that, there's a subset --

THE COURT: Is that 100 million, roughly?

MS. PELKER: I would have to pull up the actual chart, but he has it broken out from direct into indirect. I believe that's what the defense is referring to is the $100 million number. But it's actually split out in a few different ways. But it's specific figures.

And then a subset of that is that Ms. Bisbee looked at direct. And then when she did indirect -- and this is set out in the reports -- she, basically, took a subset of the indirect to only look at the transfers that were restricted to one hop in between.

THE COURT: I see.

MS. PELKER: Basically, a withdrawal from a marketplace to an intermediate address, then to be deposited; whereas, Mr. Scholl -- essentially, the default is to not have that sort of restriction.

The direct spend numbers are the exact same from Mr. Scholl's to Ms. Bisbee's. This is where the difference in numbers comes in. There's no difference in what the software is exporting.

THE COURT: Okay.

MS. PELKER: And it's the same addresses that are exported, et cetera.

A minor point on the article simply because defense keeps bringing it up. Mr. Brown and I wrote an article for the

DOJ journal talking about blockchain admission at trial. We have a section where we talk about how blockchain evidence is commonly used as lead purposes.

We in no way say or meant to suggest that that means that it's not appropriate for trial. In fact, a whole portion of the article goes on to explain how we submit that you would go through the exact exercise that we're going through here. There's no Department of Justice policy or suggestion that blockchain analysis is not appropriate for trial.

I'm happy to take any further questions, but I know we have a lot of other experts to get to.

THE COURT: That's helpful. The only thing I would just say is I do think that the *Daubert* motion, at least with respect to Reactor, is a substantial motion. So I just encourage you, when you give me the evidence that can be used to confirm the accuracy of the tool, make sure that you just are as thorough as you can be in that because I do think that this is a substantial motion.

MS. PELKER: Yes, Your Honor. As far as that, we intend to submit kind of specific examples beyond what we've already done in our prior briefing. But if there's anything else that would be particularly helpful or useful to the Court, understanding that there's already been extensive briefing --

THE COURT: Yes. I guess I'd appreciate it if both of you can cover what's already out there and I've already

heard just so it's all in one place and I can find it easily. And then if there's anything that you want to point out that has not been previously identified for me, I'd appreciate that as well.

MS. PELKER: Understood, Your Honor.

THE COURT: Thank you. Should we move on then to the next witness, which -- I guess what we can do is Ms. Bisbee; and I don't think we need to do -- go through the entire Chainalysis Reactor analysis again, unless there's something more that comes up with respect to her, and I'd be happy to hear that.

So I have her report in front of me. Why don't we just do the same exercise and make sure I understand exactly what it is she's going to be testifying to or you want her to testify to, and then we can run through that.

MS. PELKER: Yes, Your Honor. So for her report, again, it's quite limited of, really, just these are the list of addresses that are associated with each of these different entities. And she explains again, clustering based on Heuristic 1, Heuristic 2. Heuristic 3 is only applicable for AlphaBay and relates to information that was provided by the government following the seizure in that case. But that would also be part of the testimony.

She gives -- if we're looking at pages 3 through 5, she explains background concepts for virtual currency; so

what -- how virtual currency is stored in a wallet, how transactions occur.

Starting on page 5, she then introduces the concepts of clustering and talks about the different aspects that go into co-spend clustering and then the features that Chainalysis looks at for their behavioral clustering for Heuristic 2.

And she talks about here and then also in her testimony about how, essentially, they try and take a handprint of a particular service. Services all act differently on the blockchain, and they're observing that -- patterns of behavior for a particular service to model it.

Then it explains different transaction patterns; so peel chain behavior, service-specific behavior. And then starting on page 9, discusses the specific addresses that are associated with Bitcoin Fog and why Chainalysis has determined that those are appropriate -- those are clustered together and that they're controlled by Bitcoin Fog.

She then does the same for the various other marketplaces that are covered in the government's expert report through page 26. And this is all supplemented by attachments to her report.

THE COURT: Do I have the attachments, or are those too voluminous?

MS. PELKER: I believe you have in the next exhibit in that binder, you see a file structure that is BF receiving,

BF direct, Abraxas market with co-spend.  We, basically, screenshotted the Excel spreadsheets.

We're happy to provide those Excel spreadsheets. Those will be the trial exhibits.  We can send them to the Court.

THE COURT:  How extensive are they?

MS. PELKER:  20,000 pages each.  So it is a list of 900,000 -- 930-some-odd-thousand addresses for Bitcoin Fog; similar large numbers for all of the different darknet markets. You see that for AlphaBay, I believe, possibly in the supplemental, actually, it gets split into two different Excel files because Excel couldn't take more than a million addresses.  And we on the U.S. Attorney's Office side needed to have it in Excel.  So it's voluminous.  We're happy to send it over, though.

THE COURT:  I think I probably can live without that.

MS. PELKER:  And then starting on page 27, there is the explanation of the flow of funds, and that is just the spend from Bitcoin Fog to the different darknet marketplaces and vice versa.

So a flow of funds analysis of just looking at these two different entities, how much money is moving between them. And most of that is included in those attachments, and she lists off the attachments on page 28.

There was then the supplemental report that was filed

that just was responsive to the Court's question, and then an update to the attachments from the filing on ECF 153.

THE COURT: Okay. Anything else then?

MS. PELKER: No, Your Honor.

THE COURT: Mr. Ekeland, anything you want to raise other than the issues that we've been over with respect to Reactor?

MR. EKELAND: No. I do -- if I understand Ms. Bisbee's report correctly, it's entirely dependent on Chainalysis Reactor.

I do want to mention one thing we looked up in the break. That's, actually, when it comes to Heuristic No. 1, CipherTrace -- and this is on page 7 of Ms. Still's report -- found it had a 60 percent discrepancy rate between their use of Heuristic No. 1 and Chainalysis Reactor's use.

THE COURT: But I think that was because of that misunderstanding about it, wasn't it?

MR. EKELAND: I'm going to -- I'm not going to represent what she will come back in here and can testify as to the misunderstanding, and that I think she blanked out a little bit on the stand. I don't want to misrepresent it.

It's my understanding that it wasn't an error on her part, but I can't -- I'm not going to make a misrepresentation to the Court by trying to explain it.

I think, besides the fact that the entire report is

dependent on Chainalysis Reactor, I just do want to point out to the Court that most of these darknet markets ceased operations outside the statute of limitations. These are markets that go down in, like, 2014 -- 2014.

There's some things in the Bisbee report I just don't understand where I can -- I take it to be they're trying to get around the statute of limitation issues by saying, even though the government seized this darknet market outside the statute of limitations, we somehow saw a transaction in whatever -- 2022 or whatever.

And I just -- in terms of the statute of limitations issue, I do want to point that out. And I just --

THE COURT: So with respect to that issue, let me ask you, assuming we get to this at trial and this comes in at trial and that comes up as an issue, if there is an instruction you want me to give the jury, you're welcome to propose that at the relevant time.

It may be that if there is activity that is outside the statute of limitations, it might be relevant to intent, state of mind, modus operandi, whatever it might be, but where the actions itself are not what are charged here, what would be criminal in this case. So it may be that a limiting instruction would be appropriate.

MR. EKELAND: I think -- if I can remember, I think we did ask for a jury instruction. I just wanted to point that

out.

THE COURT: As the evidence comes in, if there's something you want me to offer, you need to remind me at the time and give me language and show it to the government in advance and talk about it and then we can consider that.

MR. EKELAND: Absolutely. One thing on the peel chains, it's my understanding that Chainalysis, in its peel chains, it skips transactions. It hops when it's got a long peel chain.

This is according to what Ms. Still is telling me. It's not looking at each step, so to speak, in a peel chain transaction. It will skip hundreds of transactions. I think that's another issue with the reliability of Chainalysis's peel chain analysis. And also --

THE COURT: I'm sorry. How does it do that?

MR. EKELAND: I don't know the technical aspect of it, and I'm just going by what Ms. Still tells me. She says, essentially -- say you've got a really complicated long peel chain --

THE COURT: Right.

MR. EKELAND: -- apparently, it's my understanding that the algorithm or whatever, the software will skip sections of that peel chain to the point sometimes it will skip hundreds of transaction points on the peel chain.

It's my understanding that that affects the accuracy

of the trace. I mean, Ms. Still can add to that. I can't remember if she actually put that in her report.

And then I think just as a final point -- because I know we're pressed for time -- I will point out that Ms. Bisbee did testify that, if I recall correctly, that CoinJoins -- can disrupt Heuristic No. 1. I do believe she testified that there is some sort of algorithm that Chainalysis Reactor uses, but she couldn't describe it. And also I believe the --

THE COURT: With respect to that, I do think that the law is pretty clear that the witness doesn't have to be the software expert themselves or understand necessarily how a computer program works, but I do think that, consistent with what I've already directed, that if there is something built into the heuristic in a way that accounts for or doesn't account for CoinJoins, you're entitled to know what that is.

MR. EKELAND: Absolutely, Your Honor. I don't dispute your point on that.

I do think on the issue of her qualifications that she didn't have -- whereas, I don't think the expert has to have an in-depth knowledge of the software. I didn't think that she had -- I was surprised by her lack of understanding of the software and being unable to --

THE COURT: Although, my recollection is that Ms. Still couldn't even remember whether her software had a correction for CoinJoin or not; just didn't know one way or the

other on that. She said I'd have to check with the engineer.

MR. EKELAND: That's correct.

THE COURT: So if that's a question of qualification, then Ms. Still would be out on the same theory.

MR. EKELAND: Well, then maybe neither of them come in, right? If that's -- again, you see the problem here with how complicated the software is.

I think there's a -- part of the problem here with the software is it's way more complicated than people think. And, again, I think the issue of jury confusion is acute, you know.

You have somebody like Ms. Bisbee coming up who is, you know, being presented as an authority on the software and she's speaking --

THE COURT: I don't think she's being offered as an authority on the software.

MR. EKELAND: Well, she is testifying as to the attributions -- the darknet attributions made by the software -- and I understand, Your Honor, that we're limited on time.

THE COURT: All my point is, we don't have anyone here who is one of the software engineers who is offering -- testifying for either side in this case.

MR. EKELAND: That is correct, unless maybe Bryan Bishop comes in. Then I'd have to check.

The final point I'd just make about this report, and this is more of a relevancy issue, I think, than a *Daubert* one. She did testify that this report doesn't make a single attribution to Mr. Sterlingov, and the only place that Mr. Sterlingov's name appears in the entire report is on the title page. So I question its relevancy in this proceeding. And even if it is relevant, I think it's far more prejudicial than probative.

THE COURT: All right. Ms. Pelker, anything else you wanted to say? You look like you wanted to say something about the skipping transactions before.

MS. PELKER: I believe that -- I might be misunderstanding Ms. Still's concern, but Chainalysis skips insofar as it will look at the -- it will try to find the end of the peel chain and then look at whether it co-spends with something earlier on to then determine whether it's appropriate to cluster it together.

That's not really skipping the transaction. It's just how it does its clustering analysis.

THE COURT: Okay. All right. Shall we move on then to the next witness, which I have as Matthew St. Jean.

MS. PELKER: Yes, Your Honor. I do not believe there was any *Daubert* challenge to Mr. St. Jean.

THE COURT: Anything to add there, Mr. Ekeland?

MR. EKELAND: We're talking -- well, we crossed, I

believe, Ms. Mazarin -- Mazars de Mazarin, and I think the way that the government noticed these expert witnesses is they noticed them -- you can correct me if I'm wrong -- St. Jean and Ms. Mazars de Mazarin as interchangeable.

I'm assuming that Ms. Mazars is the one who is going to testify at trial, although I noticed that the government noticed St. Jean as a witness.

THE COURT: Let me just confirm that one way or the other. Is Mr. St. Jean a witness or not?

MS. PELKER: We're still making a determination as to his testimony. His testimony would not be for the IP analysis, which, as I understand it, is what defense had challenged with regard to Ms. Mazars.

But if there's anything about -- we're happy to -- if there's any challenge to Mr. St. Jean's qualifications; otherwise, he's just really a forensic fact witness, if needed.

MR. EKELAND: Your Honor, we object to that. I think one of my concerns here is -- looking at the government's witness list is that they're going to be trying to backdoor in expert opinion through what they're presenting as lay fact witnesses.

I'm looking at their witness list and I don't really see a single fact witness. I see a lot of cooperating witnesses; people who are in jail, people who I think they're going to put forth as purported users of Bitcoin Fog. My

concern here is that the government's trying to back door in expert testimony.

If Mr. St. Jean is going to testify, he's been noticed as an expert. I believe the expert disclosure says either/or. Then we're going to want a *Daubert* hearing and know what the subject matter of his testimony is.

THE COURT: Well, you have the subject matter because it's here in the expert report.

MR. EKELAND: I believe, if I heard them correctly, they said he would be testifying to separate things than Ms. Mazars. And then we would like to *Daubert* him on that. And just to remind the Court of --

THE COURT: *Daubert* -- we've run a little bit off the rails on this.

*Daubert* is not a civil court deposition. I mean, you need to identify for me and say, here is something in this report that we have reason to believe could not satisfy the *Daubert* standard. You have his expert report and you have what he's indicated he's going to testify about.

So the question is whether there's something in here where there's reason to believe that it wouldn't satisfy *Daubert*.

MR. EKELAND: Is he testifying to the same things that Ms. Mazars -- I'm just a little confused as to what the nature of his testimony is going to be. Because the expert

disclosure, when we crossed Ms. Mazars, we focused on her report. We were pressed for time.

We don't have an expert report from St. Jean unless he's adopting that IP address overlap. I think I just heard the government say that he wasn't going to speak to the IP address overlap.

As for the rest of the expert disclosure, as I recall it, it's, basically, full of vagaries, saying, oh, we're going to talk about the devices seized; we're going to translate the meaning of -- I don't know if I'm using the right word of stuff. It's not clear at all what that testimony is going to consist of.

I thought it was going to be focused primarily on what was disclosed in the expert report, which, as the Court recalls, Ms. Mazars said this is the first time I've ever written this report, there's no scientific methodology underlying it, and I'm essentially guessing, right?

THE COURT: If she said that, I'll give you a dollar.

MR. EKELAND: She did say that. She said, Your Honor, if I recall correctly, that she had no scientific methodology or papers that she could cite, that it was the first time that she had written this type of report; and I believe, because it struck me when she said it, that when it came to her IP address overlap, she was, essentially, guessing. That really struck me when she said that word. I'm happy to --

maybe I'm wrong.

THE COURT: I'll pay you the dollar.

MR. EKELAND: Well, I'm happy to go look --

THE COURT: It would have struck me if a witness took the stand and said those things.

MR. EKELAND: That's what struck me about her IP address overlap. Essentially, it's an arbitrary methodology, just like she chose the times of ten-minute overlap time, one-month overlap time, and a year.

THE COURT: I'm sorry. I just want to -- given the limits of time -- make sure we stay in order here. We're now talking about a different witness.

Let's talk about Mr. St. Jean, and perhaps Ms. Pelker can clarify for us as to what he's going to testify about, and you can let me know whether you object under *Daubert* and, if so, on what basis.

MS. PELKER: Mr. St. Jean was one of the forensic examiners who didn't do the original imaging, but then looked at what the -- was on the defendant's devices and pulled off the files, in addition to Ms. Mazars.

In light of the defense's decision not to challenge the authenticity of the imaging, we likely are not going to end up needing to call him to testify, but we still have not made that determination. The axiom forensic or magnet exports were what Mr. St. Jean's work product was, and those were all turned

over to the defense.

Mr. St. Jean did not do the additional IP analysis for Ms. Mazars. His testimony would, essentially, be I looked at these devices; here are the files that I found on them; and kind of explain where they were found.

And then, to the extent that we would have him testify about any of Mr. Sterlingov's notes, it's similar to what's described in the expert witness disclosure of, basically, saying this is what a static IP is, reading some of the defendant's notes and being able to explain them to the jury.

THE COURT: All right. Mr. Ekeland, what about those issues?

MR. EKELAND: I think if Mr. St. Jean comes in just as a fact witness to describe what was the forensic imaging, we're okay. I think --

THE COURT: I think the government is perhaps just being a little bit careful so they don't run into an objection that, well, it's actually expert testimony if he's saying I found it on this part of the hard drive; whereas, a layperson might not know what the different portions of the hard drive were, for example.

MR. EKELAND: Yes. I believe that, Your Honor. Where I'm concerned more about is where they're interpreting the notes and the meaning of notes. I think there you can go

either way.

You can go in the direction of, okay, well, here's whatever -- what a VPN means.  If opinion testimony starts to get offered about, oh, this particular configuration means that the defendant was engaged in behavior X, Y, and Z, something that goes beyond the facts, that's what we're concerned with.

I just -- I don't want to belabor the point, but I just want to reserve my ability to object on that point.

THE COURT:  I will allow that.  I will just defer to, if he testifies and those issues come up, you can just raise an objection, as appropriate, at the time.

Otherwise, I'm going to allow Mr. St. Jean's testimony as it was just outlined by Ms. Pelker, but with the understanding that Mr. Ekeland is reserving the right to raise objections to particular questions or answers.

So then does that mean we should turn to Ms. Mazars de Mazarin?

MS. PELKER:  Yes.  I think, similarly, the bulk of her testimony is going to be what we had just described, and then she also will discuss the IP analysis; that is, the IP analysis that she testified to, but also simply that when she reviewed these different records, this particular IP address was present in these different records.  When she looked at what time the IP addresses were accessing the different accounts, she noticed that they were close in time, explaining

the significance of that.

She will explain to the jury how she determined who was controlling a particular -- who likely was controlling a particular IP address at a given time insofar as a company and then giving, as set forth in the disclosure, essentially, background concepts. You know, what is Tor; how does Tor work; what's the clearnet; what are proxies; what are VPNs. And then explaining the meaning of the defendant's notes.

I don't think that it's opinion testimony about what a note -- of the definitions of terms within a defendant's notes. We still -- we do think it's technical expertise that's outside of the province of a lay juror; that it would be helpful to have this testimony. And that's why we included it within our expert notice.

To the extent that Mr. Fischbach is going to get up and say that he read these notes and he thinks that they have some other type of meaning, I think that's best dealt with for cross. It's really not a *Daubert* issue.

THE COURT: All right. Mr. Ekeland?

MR. EKELAND: Couple minor things. One, I think, in terms of -- was it the *Morgan* factors and 702 factor, whether or not a report is based on sufficient facts of data, I do want to point out that she did testify that in terms of her IP address analysis, she did not analyze any native logs.

In other words, she didn't have server logs when she

did her analysis, and I don't think that that is a sufficient basis to do an IP address analysis.

If I recall correctly, she couldn't identify -- she had times for when people logged in, but she didn't have times when people logged out, and she actually didn't examine the original data because the -- she just didn't have access to the server logs.

And we were -- so that's, I think, problematic in terms of her IP address analysis. And also, I think, on a deeper level, you don't have, say, what are known as MAC addresses, which are unique identifiers for computers that often server logs will record when they log in. Which is like a unique -- it's a machine access code; I think that's what it stands for. That's a unique identifier on a computer, and quite often server logs will record that.

We don't have that here. And she did say -- we were just looking at her transcript -- that she was, essentially, making a professional guess in terms of her IP address overlap analysis, and I think that segues into the soundness of her methodology.

If I do recall correctly, she said she had no peer-reviewed papers or any kind of academic papers that she could cite for her methodology, and that this was the first time she had ever written a report like this.

But besides those objections --

THE COURT: Give me just a second. I just want to look at her materials.

MR. EKELAND: Using the phrase "professional guess" is on page 363 from the transcript on August 23rd, 2023.

THE COURT: Okay. Give me just a second. I may have to come back to this in a few minutes. I'm just trying to put my hands on the transcript.

Okay. Anything else with respect to Ms. Mazars?

MR. EKELAND: I have the transcript in front of me, and I can just read to you what I'm talking about.

THE COURT: That's fine.

MR. EKELAND: So it starts off -- this is on page 36- -- it's 368 of the transcript, and beginning in the middle of the page at line 9, it says, question, "In Point 1 of your conclusion" --

THE COURT: I'm sorry. You're going to have to go slower for the court reporter.

MR. EKELAND: I apologize. "And in Point 1 of your conclusion on page 7, you say that the same user most likely accessed, and then you list the number of the accounts. But that" -- this is choppy. "That most likely that's not a -- you don't have any statistical probability that you could give me for the accuracy of that most likely; is that just a guess on your part?"

This is skipping around on me. "It's correct that I

don't have -- it was not a statistically computed probability, and I didn't intend it in that way."

"Okay. You're also not identifying anywhere there in the conclusion or anywhere in your expert report the identity of the user that you're referring to in Bullet Point 1."

THE COURT: I can go look this up if it's easier.

MR. EKELAND: The point is made, Your Honor. I think that her cross-examination shows that she didn't have any scientific basis for her methodology, and this was the first time she had ever wrote the report.

She didn't rely on native server logs, and so that calls into question the sufficiency of the data that she's using, and we think that the entire IP address overlap analysis should be excluded.

THE COURT: Okay. I'll take a look. Ms. Pelker?

MS. PELKER: Your Honor, just to point out that I think that Ms. -- the excerpt from the transcript, as Your Honor will see, is that Mr. Ekeland is crossing Ms. Mazars de Mazarin repeatedly about whether there's any statistical basis for this. She maintained that, no, this is not a statistical assessment. That's not what she was basing her determination of those time windows on.

And then she said that it was a professional guess, a professional opinion. I think it's clear from the transcript that she basically -- she corrected herself to say a

professional opinion. That's what she's intending to convey.

And it's regarding the concept of, is this a statistical analysis where you ran different models to come up with your windows, or were you looking, based on your experience, and came up with these windows which, again, were to narrow down the time focus as one step in her analysis.

THE COURT: I'll go back and take a look at this one as well. If she testifies, I'm confident that we'll hear about this on cross-examination.

MS. PELKER: I am very sure, and I think she knew that as soon as she said it -- or misspoke.

The other thing is just the native server logs. To the extent that it keeps coming up -- to the extent that the native server logs keep coming up, again, the government would love to have the native server logs for the Bitcoin Fog server. We don't -- it simply cannot be the case that in any case where a cybercriminal is successful in hiding his server that any of the government's analysis and work cannot be reliable because we don't have access to those logs.

THE COURT: Okay.

MR. EKELAND: Briefly on the server logs point, Your Honor. We're not talking about the Bitcoin Fog server for the IP address analysis. We're talking about the servers. There was one in Luxembourg. And any number of other servers that the IP addresses are supposedly coming from, and the Court may

recall these were identified, many of them as proxy servers. And Ms. Mazars testified that thousands, if not tens of thousands, of people could all be sharing the same IP address at the same time. We're not talking about the Bitcoin Fog server logs.

THE COURT: All right. Ms. Pelker, anything further?

MS. PELKER: No, Your Honor. Just that, again, if we had the server logs for that proxy server, we would love that because then we could, in fact, match up the inputs to the --

THE COURT: Is there some reason that you couldn't have, I guess, through some international process obtained them from the proxy server?

MS. PELKER: The defendant intentionally chose proxy servers that don't keep logs. So there is no -- there would have -- even if we had been aware of his access at the time that they were occurring back in 2011, they wouldn't have been there by the time we went to get them, which is not -- is not atypical of a variety of different cybercriminal cases.

THE COURT: Okay. Final word on this?

MR. EKELAND: It's an assumption, a conclusory statement that the defendant intentionally chose proxy servers that didn't keep logs.

THE COURT: I understand that's an argument.

MR. EKELAND: It's quite common for proxy servers not to keep logs. It's --

THE COURT: But the point is, if they don't exist, the government can't have them.

MR. EKELAND: If they don't exist, then that goes to the sufficiency of the data. They're just not there.

THE COURT: All right. Anything else with respect to the government's witnesses? Anyone else we should talk about?

MS. PELKER: Nothing from the government, Your Honor.

MR. EKELAND: Nothing further from the defendant, Your Honor.

THE COURT: Let's turn then to the defense experts. Give me a second here. Go ahead.

MR. EKELAND: We mentioned this before. I'll just be brief on this. I think the government noticed Mr. Vlahakis as an expert in FinCEN regulations and money laundering law, and we'd just renew our objection on him testifying on matters of law and regulation at all. We think that's exclusively the province of the Court. Oh, and we also left out Sarah Glave.

THE COURT: Is there something you want to raise with her?

MR. EKELAND: Well, I wanted to make sure that her -- she didn't issue an expert report. We've gotten demonstratives from the government in terms of summaries that we're still looking at. We're concerned that she may offer and express an opinion that is not in her disclosure, something to the effect that there's no way that Mr. Sterlingov could have accumulated

all of this money from Bitcoin appreciation based on his assets. So we just want to make sure that her testimony is limited to what was disclosed.

THE COURT: All right. Ms. Pelker? Mr. Brown?

MR. BROWN: Your Honor, I think the government has no objection to limiting Ms. Glave's testimony to what was in her disclosure. We had discussed Ms. Glave, as well as Mr. Vlahakis, I think, at our last hearing.

THE COURT: Right.

MR. BROWN: There's been no other, I mean, real challenge to her qualifications or anything that she plans to testify about. It's, basically, just she is going to go through the financial analysis of -- and we have produced the summary charts, and just last night we produced her work product --

THE COURT: Right.

MR. BROWN: -- for all of that financial analysis.

THE COURT: Okay. Do you want to address the point about whether it's appropriate for a witness to testify just about what regulatory requirements are, if that's appropriate expert testimony or fact testimony?

MR. BROWN: Your Honor, with respect to Mr. Vlahakis, he is absolutely not going to opine about making a judgment of was Bitcoin Fog, was Roman Sterlingov a money-transmitting business that was required to register as such with FinCEN.

That is not what his testimony is going to be.

He is an expert in banking regulation and the Bank Secrecy Act, and this is important contextual information. It will be helpful to the jury to understand what it means to be a registered money-transmitting business; what are the requirements; why do those regulations exist; how does that play a role in law enforcement's ability to, you know, review reports that are of particular importance to criminal, tax, and regulatory investigations.

This is -- as I said the last time we discussed Mr. Vlahakis, this really goes to the "so what?" of the 1960 offense, which I think would be particularly helpful for the 1960 offense because most jurors are probably not familiar with money-transmitting regulations and just the fact that we have money-transmitting regulations.

But he will not -- there's no part of his testimony that I think will overlap with what we contemplate being the jury instructions or any area of law on which the jury is instructed in order for them to arrive at their verdict.

And, Your Honor, one other point. It provides context for the defendant's own statements. For example, under his killdozer moniker, the defendant posted on BitcoinTalk about how FinCEN regulates Bitcoin, and this was in 2013 or 2012. I don't remember exactly.

THE COURT: Right.

MR. BROWN: But he does reference awareness that -- we have the defendant's statements where he's referencing awareness of the fact that FinCEN regulates and that anti-money laundering regulations exist. And so Mr. Vlahakis's testimony will also be important for that.

THE COURT: Has any -- have you briefed at all -- I can't recall -- or anyone pointed me to any case law on the question of what the rules are with respect to the admissibility of legal or regulatory background or context through offering that through a witness?

MR. BROWN: We have not briefed it because the defense has never filed any challenge to Mr. Vlahakis.

THE COURT: I see. Okay.

MR. BROWN: And there may be case law out there.

THE COURT: I'm sure there is in some sense. I know there is with respect to when expert testimony on the law is permissible or not. It would be helpful if you-all could get me started on the research by pointing me to a case or two.

MR. BROWN: We can certainly add that to our submission --

THE COURT: Okay.

MR. BROWN: -- on Monday.

THE COURT: That would be helpful.

MR. BROWN: I mean, don't expect a whole long brief, but we can certainly find a few case citations.

I would also add that Mr. Vlahakis has testified, as has been disclosed, at numerous trials without objection.  And he's typically testified -- as here, he's noticed out of an abundance of caution as an expert.

The testimony, to my knowledge, has never been challenged on *Daubert* grounds and has never not been accepted.  Again, let me just emphasize -- and Mr. Vlahakis is extremely clear on this -- he will not make an opinion about whether in this particular case Bitcoin Fog was a money-transmitting business.  He will not opine about if Sterlingov was required to register, because that is an ultimate question for the jury.

THE COURT:  Right.

MR. BROWN:  But, generally speaking, there's nothing necessarily wrong with an expert testifying about matters that implicate an ultimate issue for the jury.

I don't think in this case he would actually be invading the province of the Court and instructing the jury about the law.  He's just providing background investigation that these regulations exist.  This is why the regulations exist.  That's not something that the Court would ever instruct the jury about.  So it really does provide contextual information.

THE COURT:  Well, it's certainly my intuition at least that someone can testify, for example, what FinCEN is, what FinCEN does, something to provide some context for the

jury on this.  It would just be helpful to be able to put my hands easily on the case law so I know what the parameters are.

MR. BROWN:  Yes, Your Honor.  Another example just occurred to me.

A few years ago, I tried a case involving bulk cash smuggling.  We brought in an expert from CBP who testified about a specific report -- testified about the fact that there is a regulation on carrying cash across the border, requiring it to file a currency monetary instrument report, a CMIR.  He was accepted as an expert in front of Judge McFadden to testify about this and about why CBP enforces the CMIR regulations.  I think that's fairly analogous to this case.

THE COURT:  Okay.  Thank you.  Mr. Ekeland, anything else on this?  Do you have a case for me?

MR. EKELAND:  I'm happy to look one up.  I just will briefly -- we did, I think, stipulate that Bitcoin Fog didn't register in D.C., so --

THE COURT:  You indicated that you will stipulate or maybe the document you filed uses the words "and we stipulate to this."

It would be helpful, I think, to have those stipulations, actually, in the format of a stipulation so that they actually go to the jury as evidence in the case.  And so anything that the parties have stipulated to, I think you ought to put on -- the caption of the case on it, stipulation,

indicate the parties hereby stipulate that, indicate what it is you stipulate. And then when that comes into evidence, I will turn to the jury, and I will say, the stipulation is an issue in which the parties agree. You should treat this as undisputed evidence, or whatever the usual language is on a stipulation. That way when it comes in, the jury knows what it is, and it can go back to the jury as well.

MR. EKELAND: I'm happy to talk to the government about that.

We just think his testimony is more prejudicial than probative in the sense that it's sort of, I think, a little theatrical, and it's unnecessary, and it's cumulative. The question is whether or not Bitcoin Fog was required to register. We will stipulate to the fact that they didn't register, and it's a simple question of law, I think, that the Court can instruct the jury on. I'm not going to belabor the point, Your Honor.

THE COURT: Okay. Thank you. Why don't we go ahead and, actually, take our break now then.

It's a quarter of 4:00. Let's come back at 4:00, and I'll start with Mr. Fischbach at that time. We can just take this and follow this in that process.

(Recess taken.)

THE COURT: All right. Mr. Ekeland, why don't we start with you. We'll go through the same exercise and start

with Mr. Fischbach.

MR. EKELAND: Yes, Your Honor. I think we've submitted Mr. Fischbach's CV to the Court and his expert disclosure. He also testified briefly. I know we're pressed for time.

I mean, I think we see Mr. Fischbach coming in primarily to testify regarding the IP address analysis by the government; their testimony regarding Mr. Sterlingov's devices seized at the airport and the chain of custody involved there; the Mt. Gox -- the nature of the Mt. Gox data; and, as I believe the government mentioned, the interpretation of Mr. Sterlingov's notes, as they mentioned, I think, Ms. Mazars and Mr. St. Michael [sic] might testify as to the meaning of the notes.

Mr. Fischbach, I think, essentially, functions as sort of our version of Ms. Mazars and Mr. St. Michael [sic], and also just functions as a rebuttal witness on general forensics. He's got 20 years of experience, as documented in his CV. He's qualified as an expert numerous times and, actually, one of the problems I have with him is getting ahold of him because he's always in federal court.

With that being said, I welcome any questions from the Court regarding him.

THE COURT: Well, I just want to make sure we've covered the -- each of the categories that he's going to

testify about.

So I have IP address analysis by the government. Mr. Sterlingov's devices and chain of custody. I'm a little confused about what he would know about chain of custody.

MR. EKELAND: What we've seen in terms of what Ms. Mazars analyzed as her list of devices from Mr. Sterlingov doesn't match exactly the list of devices that were listed when Mr. Sterlingov was arrested at the airport.

So I think there's, potentially, some chain of custody issues there and questions that were raised that I think the jury --

THE COURT: There are more or fewer devices that were analyzed than were seized?

MR. EKELAND: I think there is a hard drive that Ms. Mazars has listed in the devices that they say she analyzed belonged to Mr. Sterlingov that isn't Mr. Sterlingov's. It's a six-terabyte drive that's apparently encrypted by BitLocker, and there is no such device that's listed on the seizure of his assets at the airport. So there's a discrepancy there.

I think Mr. Fischbach did testify that this kind of stuff happens in cases. So one thing he will testify to is any kind of discrepancies between what was seized at the airport and what the government experts are analyzing, as well as what was found on those devices.

THE COURT: Why isn't that just completely within the

capacity of the jury? If three items were seized and the government now says we analyzed four items, and one of the items is not on the list of the seized items, why do you need an expert on that? Why isn't that just entirely within the competence of the jury?

MR. EKELAND: Because Mr. Fischbach can testify as to what type of forensic techniques should have been followed, how that might have compromised the evidence.

THE COURT: You do this to me sometimes, Mr. Ekeland, when you just shift to a different topic from what I'm asking about.

The point you were arguing -- making to me is that he wants to testify that there's a question with respect to chain of custody because there were, hypothetically, three items that were seized or identified as seized at the airport, yet the government claims now to have four items, and one of the items doesn't show up on the list. That's what I'm asking about.

MR. EKELAND: In hypothetical?

THE COURT: No. The only thing that's hypothetical is the number I'm using because I don't know the exact number. I thought you told me that he was going to testify about the devices that were seized and chain of custody. Correct?

MR. EKELAND: Yes. I guess there's really two separate things.

There's -- one, there's the contents of the devices

and what he will say about them; essentially, that there's nothing on there that shows any evidence of Mr. Sterlingov operating Bitcoin Fog. He will also testify in rebuttal, as necessary, to what the government's witnesses, Ms. Mazars and Mr. St. Michael [sic] will testify about those devices.

And then there's the separate issue, the fact that there appears to be a discrepancy in what's listed in the devices that Ms. Mazars said Mr. Sterlingov has -- and what was listed on the devices seized at the airport. And he can help clarify for the jury and help them understand what the standard chain of custody procedures are with the FBI and the government that should have been followed and what the possible indications are of the mixing up of evidence.

Because what we don't know if that is -- what that raises as the possibility. I don't know what happened there. Maybe it's a simple incident or maybe they're mixing up evidence from another case, which would be significant in relation to any evidence being used against Mr. Sterlingov.

THE COURT: Well, maybe I need to hear from, I guess, the government as to what happened with respect to that device, and I'll come back to you, Mr. Ekeland. It may make a difference as to what the government's explanation is.

MS. PELKER: Your Honor, the government is going to follow up on this because part of the issue is that we don't have any expert report from Mr. Fischbach. None of this is set

out in his supplemental filing, which came belatedly.

What I believe has occurred is simply that something -- they didn't know, when it was seized, that it was a six-terabyte encrypted hard drive. It may have been entered differently on the -- how it was noted as the seized device versus what Ms. Mazars analyzed. It should be easy enough for us to go back and check and match the evidence number to the evidence information from the IRS seizure.

This is exactly the purpose of why it's important to have an expert report, because it's clear that what defense has tried to do here is sandbag us with this at trial after our case had closed and when we didn't have an opportunity to explain. That's generally our concern with Mr. Fischbach's report.

THE COURT: Before you -- I cut Mr. Ekeland off, so let me let him go first. I'll come back to you.

MS. PELKER: We may, just in the next five minutes, be able to run this down, Your Honor.

THE COURT: Okay. So, Mr. Ekeland, is there an expert report from Mr. Fischbach? And, if so -- if there's not, why would I consider it -- consider him as an expert at this point?

MR. EKELAND: I'm sorry, Your Honor. I just didn't hear your question.

THE COURT: Do I have an expert report from

Mr. Fischbach?

MR. EKELAND: No, you don't.

THE COURT: How can I possibly consider him as an expert at this point? It's long past the due date for that.

MR. EKELAND: Because we've disclosed his expert disclosure, what he's going to testify to, and he can also serve as a rebuttal expert to rebut the government's testimony in terms of what they're going to say about the interpretation of Mr. Sterlingov's notes, about -- I believe we disclosed that he'll testify about the Mt. Gox data.

And the same question would apply to Sarah Glave and Theodore Vlahakis. We have no expert report from Ms. Glave. We have no expert report from Theodore Vlahakis. So on that basis, if it's the lack of an expert report and he's not coming in as an expert, then the Court should exclude those proffered expert witnesses by the government.

His disclosure is fulsome. He's been -- he's testified in this court, he's made himself available, I think, like two or three times.

THE COURT: Show me then -- I have the expert disclosure in front of me, which is Docket 122. Show me in it where it says in here that he's going to testify about the chain of custody and the fact that there were different items listed.

MS. PELKER: And, Your Honor, just one point. There

was a supplemental disclosure at ECF 166.

THE COURT: I think that may actually be sitting back on my desk.

MR. EKELAND: I just have to get it up in front of me, Your Honor.

THE COURT: Just a second.

MR. EKELAND: It's my understanding the only expert reports we have are from Scholl and Bisbee.

THE COURT: I'm sorry?

MR. EKELAND: The only expert reports that are in the record are from Mr. Scholl, Ms. Bisbee, Ms. Still and Mr. Verret.

THE COURT: Okay.

MR. EKELAND: And Mr. Hassard is looking up the -- Mr. Fischbach's disclosure.

THE COURT: Okay.

MR. EKELAND: That's -- Mt. Gox is Point No. 2.

THE COURT: I'm sorry?

MR. EKELAND: I'm sorry, Your Honor. Withdrawn.

No. 15 is where the defense expects Mr. Fischbach to testify to the use --

THE COURT: You need to slow down.

MR. EKELAND: I'm sorry. Mr. Fischbach will be testifying about the use and application of the hardware Mr. Sterlingov had in his possession at the time of his arrest;

this is Document 166.

THE COURT: That's what my clerk is getting for me. Give me one second.

MR. EKELAND: Paragraph 15. No. 16 covers --

THE COURT: I'm sorry. Give me just a minute. My clerk is getting that off my desk for you.

MR. EKELAND: I'm sorry. I didn't hear you.

THE COURT: Give me a second here. My clerk is getting it off my desk for me.

So No. 15. Okay.

MR. EKELAND: That goes to him testifying about the devices. It doesn't go to his chain of custody.

I think -- not seeing it explicitly in here, I think the catchall for that would be paragraph 24 where the defense expects Mr. Fischbach to testify in rebuttal to the government's expert testimony; in particular, the expert testimony of --

THE COURT: That doesn't fly. I'm sorry. That's not an adequate notice.

I mean, you're aware of what the government's testimony was going to be, and you've had plenty of time on this. I don't think this is really expert testimony anyway because I think the jury can reasonably on its own understand that if there were different devices that were seized that were analyzed later, then that can be argued to the jury.

We're not going to be -- particularly where I've given tremendous leeway about filing late expert reports.  I'm not going to just say there's a catchall in which we can do anything we want.

MR. EKELAND:  No, I'm not saying it's a catchall.  Where he says he'll testify in rebuttal to Ms. Mazars who relies on that and explicitly discloses all the devices as a --

THE COURT:  But that's not -- I mean, Ms. Mazars de Mazarin is not the one who is testifying about what was -- I don't think is testifying about chain of custody and what was seized at the airport.  You're aware of this issue.  You were aware.  You're making this up now or afterward.

MR. EKELAND:  Understood, Your Honor.

THE COURT:  This is not anything that was on your radar when you filed this report, and it's not on the government's radar.  I don't think it's appropriate to get into it now.

Let's walk through these paragraph by paragraph.  I think that's the easiest way to do this.

MR. EKELAND:  Paragraph No. 1 says the defense expects Mr. Fischbach to testify that the government has failed to produce any sound forensics evidence that demonstrates Mr. Sterlingov created or operated the Bitcoin Fog onion Bitcoin mixing site.

That's just based on his review of the evidence.  And

as far as we've seen, we haven't seen anything that shows that. And we expect -- as a matter fact, when looking at the government's witness list, we see a lot of witnesses who appear to be users of Bitcoin Fog, and I think there's going to be issues; we're going to object to their relevance.

But we have yet to see anything anywhere in the discovery on the devices that were seized at the airport or on the, quote-unquote, Romanian servers that show anything involving Mr. Sterlingov operating Bitcoin Fog.

THE COURT: So why isn't this, particularly as characterized here, an ultimate question for the jury of the merits of this case? He's going to testify that he didn't commit a crime here versus -- I mean, versus saying, you know, I reviewed this device, and there's no evidence on this device of Mr. Sterlingov communicating with such and such or -- more specifically, this just seems to be like he's going to testify as to one of the ultimate questions for the jury; did Mr. Sterlingov operate Bitcoin Fog or not.

MR. EKELAND: No. We intend to do that through the context of just like the government is saying. They're going to talk about Mr. Sterlingov's seized devices. He will talk about how on those seized devices that he reviewed, there's nothing on there indicating that Mr. Sterlingov ever operated Bitcoin Fog.

It won't be presented as a question of him arguing

Mr. Sterlingov's ultimate guilt or innocence. But just based on what he's seen and reviewed from the evidence, he just hasn't seen anything.

And one of the things that we're concerned with here is that the government is going to be taking -- because there is no hard evidence, they're going to be trying to take notes and VPN and UDP, and, like they say, interpreting Mr. Sterlingov's handwritten notes in a way that appears sinister or attempts to prejudice the jury into thinking that somehow what is normal computer-user behavior is somehow criminal.

THE COURT: This seems very general to me. I mean, it at one level seems to go to the ultimate question in the case, which I take it that's really what the question for the jury is going to be; did Mr. Sterlingov operate Bitcoin Fog or not.

But also, it doesn't offer any specifics -- and maybe this comes later. But No. 1 doesn't really offer any specifics about what his testimony is going to be that would allow the government to contest that testimony or to challenge it in any way.

MR. EKELAND: Well, they could contest it by coming up with some sound forensic evidence that demonstrates --

THE COURT: That's not responsive to my question.

MR. EKELAND: In a certain sense, you're asking him

145

Appx1668

to prove a negative because he --

THE COURT: I'm sorry. But you know what the evidence is in the case. You know what the evidence is that the government is going to offer.

And if Mr. Fischbach thinks that there's problems with that evidence, his expert report or the expert notice could have said he's going to testify that the government -- where the government has done some tracing that is wrong for the following reasons or something like that, rather than simply, he's going to testify that it wasn't him; it was some other guy.

MR. EKELAND: But that's not what he's testifying to. He's saying that he's reviewed the evidence in the case, and he's seen nothing --

THE COURT: That's the jury. I've reviewed the evidence in the case, and I see nothing that would suggest he's guilty. I mean, that can't possibly be what an expert does.

MR. EKELAND: He can say that he received the forensic images from the government of the hard drive seized at the airport or the Cellebrite extractions from the phone which he has, and nothing on there in his expert opinion is sound forensic evidence of Mr. Sterlingov operating Bitcoin Fog.

I mean, it -- maybe there was a situation where the government presented something and they said here's evidence of Mr. Sterlingov operating Bitcoin Fog; then he could analyze

that and rebut that. But the problem is there's nothing like that in this case.

So we're stuck in this land of speculation where everything we have to rebut is just pure speculation by the government. The fact is, when they seized all his assets at the airport, his computers, his Raspberry Pi, the cell phone that they're trying to make out to be some sinister spyware, there was nothing on there.

That's what he's going to testify to, is that he looked at all of this, and he didn't see a single thing on there. What else are we supposed to say about that? I mean, this is based on his review of the discovery, and in his expert forensic opinion in the --

THE COURT: I'm pretty sure it would not be inadequate expert disclosure in any case for the defense to come in with a witness and to say, the witness has reviewed all the evidence in the case, and there's no evidence that Mr. Jones was a heroin distributor.

MR. EKELAND: But he can go in and say, I looked at the laptop or the imaging of the laptop, and there was nothing on there.

THE COURT: You're getting closer to what an expert disclosure should say. I reviewed the information that is on the laptop, all the files -- I can testify that all the files on the laptop are of this nature. I can indicate that there

were none of the files on the laptop that reflected X, Y, and Z.

But that's just very different from saying, I reviewed all the evidence in the case, and there's nothing that leads me to think that he did it.

MR. EKELAND: Well, then, we can limit his expert testimony to concrete pieces of hardware seized at the airport and other concrete pieces of evidence, and he could state what he's seen on them, or the lack thereof.

THE COURT: Why don't we -- as I said, I'm dubious about 1, but let's go to 2.

MR. EKELAND: 2 just deals with the chain of custody that the Mt. Gox data is unreliable, cannot be authenticated as a business record, and that the public record demonstrates that the Mt. Gox data is corrupt.

THE COURT: Certainly, it's not a question for the jury whether it should be excluded from evidence or not. It might be a question for the jury as to whether it is not what it purports to be. But it's not a question for the jury as to whether I should admit it or not into evidence.

MR. EKELAND: No, it's not, Your Honor. It is a question of whether, in his 20 years of experience as a forensic technologist and somebody who, I believe, trains FBI agents and trains people on forensics, whether it's forensically sound to rely on that data.

THE COURT: Okay. The next one. You agree that it should not be about whether the evidence should be excluded or not?

MR. EKELAND: No. That is the ultimate province of the Court, Your Honor.

THE COURT: Okay.

MR. EKELAND: Then this is the -- Point 3 is related to Point 2. This is regarding Mark Karpeles's conviction for manipulation of the Mt. Gox data, the errors in the data, and the hacks of the data.

THE COURT: Is he going to able to say -- tell us anything more about the conviction than you have here today? If he can't tell you anything more than you've told me today, I don't see how that comes in, because we don't actually know what he was convicted of.

MR. EKELAND: What he was convicted of is, I believe, on the public record and something that the Court can take judicial notice of.

That is a factor in determining whether or not it's forensically sound to rely on the data. And as somebody, again, who is routinely used as a forensic technologist by both law enforcement and the defense, he can testify as to whether in his expert opinion it is forensically sound to use data that was in the custody of somebody who was convicted for data fraud.

I mean, I think that's a relevant consideration for anybody who is analyzing data doing any kind of --

THE COURT: That, again, feels to me more like perhaps an argument to the jury. I'm dubious about this proposition based on just what you've told me here today; that he was convicted for manipulation of the Mt. Gox data.

What you told me today is you, actually, don't know what it was that he was manipulating, whether it was financials or whether it was the data that's at issue in this case or not.

MR. EKELAND: No, that's correct. We don't know the particulars, but we do know that he was in some way convicted in a Japanese court and sentenced to four years in prison for falsifying or engaging in some kind of data fraud involving Mt. Gox data, which could be --

THE COURT: You say data fraud. I mean, was it data fraud, or was it fraud of financials? Do we know?

MR. EKELAND: No, we don't. But if the head of the company is manipulating data, I think that calls into question that all data that the head of the company has his hands on and --

THE COURT: Well, you keep saying he was manipulating data, but do we even know he was manipulating data versus financial statements, for example?

MR. EKELAND: No, I don't know. But what I'm saying is --

THE COURT: If you don't know, someone cannot come into the court and testify to this.

MR. EKELAND: I think it's --

THE COURT: I mean, I will instruct the jury that what he just said is completely without any basis whatsoever if you want me to do that. But you can't possibly put someone on the stand and ask him to testify that it was based on manipulation of data when --

MR. EKELAND: I'm not.

THE COURT: -- you have no basis to -- I'm speaking.

MR. EKELAND: Yes, Your Honor.

THE COURT: And the court reporter can only take down one of us at a time.

You can't come in here and have a witness testify that he was manipulating the Mt. Gox data unless there's some foundation for that. By the data, I take it you're meaning the data that's at issue in this case?

MR. EKELAND: I don't think it -- does it say that -- where is it said? Did we use the word manipulated there?

THE COURT: For manipulation of the Mt. Gox data.

MR. EKELAND: So then -- maybe then we just change -- I think what the point is here, Your Honor, is that it's relevant that the owner of Mt. Gox was convicted for some kind of data fraud in Japan. And that that is a consideration that somebody who is forensically analyzing data should take into

consideration, whether or not the data that they have is forensically sound.

And that's not, Your Honor, a hill I need to die on because that's not the only issue with the Mt. Gox data. The Mt. Gox data servers were hacked multiple times. I think, really, this is becoming a bigger point than it needs to be. It's simply that there are a number of facts in the public record that call into question whether it is forensically sound to use the Mt. Gox data.

THE COURT: Okay. 4?

MR. EKELAND: Here, what this is talking about is the data that's been produced to the government -- I'm sorry, to the defense is derivative, and it's our understanding that there's no original server logs or any original native data that can be independently verified.

Again, this just goes to the reliability of the Mt. Gox data.

THE COURT: Okay.

MR. EKELAND: 5, I think, is the point you already made about the authenticity.

6 is more, I think -- is an important one because it's -- that, essentially, IP addresses aren't a form of personally identifiable information; using IP addresses to identify specific users is forensically unsound. I think there's a misconception. I think this would be helpful to

clarify to the jury that an IP address is not a form of personal identification.

THE COURT: Okay. That seems fair.

MR. EKELAND: No. 7, I think, is also a point that thousands of people can share the same IP address. This is something Ms. Mazars testified to as well. I think, again, this goes to help clarify for the jury that you can't just assume one person is using an IP address.

THE COURT: These things seem closer to expert testimony than some of the other stuff. That seems okay.

MR. EKELAND: No. 8 is on the same point. IP -- similar point, IP address matches are an unreliable means of identifying an individual. And, essentially, this goes directly to Ms. Mazars' IP address overlap.

THE COURT: Isn't this just redundant to what's above?

MR. EKELAND: Yeah. I think it's the same point, Your Honor; just a variation. Essentially, we wanted to bring him in to talk about IP addresses and help the jury understand them and help them understand that it's not a form of personally identifiable information.

THE COURT: Okay.

MR. EKELAND: No. 10 is just him testifying about the forensic methodologies used in this case and how he considers them forensically unsound.

THE COURT: That strikes me as just -- that's not a real disclosure there.

MR. EKELAND: I'm sorry?

THE COURT: That is not a disclosure, simply saying what they did is unsound. You've got to tell them why it's unsound. You can't simply say what they did was unsound.

MR. EKELAND: Yeah. I mean, if that's the standard for the expert disclosure, I would then -- I would ask the Court to go look back at St. Jean's disclosures and Ms. Mazars' because they've got a level of generality at the same level. If we need -- same with Ms. Glave.

So if this kind of generality is something that the Court doesn't want, that's all fine and good. Well, then let's apply it to everybody.

THE COURT: I'm fine with that. But I don't recall them being that general. But you can point me to anything they said that was that general.

MR. EKELAND: I can't tell, when you say you're going to interpret notes, what that means. What's the interpretation of Mr. Sterlingov's notes? What notes are you referring to? What kind of interpretations are you going to use?

THE COURT: The government can clarify. But what I understood them to be saying is that they're going to explain what the terminology means in those notes. And so if it refers -- if the notes say -- there's a reference to the -- in

the notes to iOS, what is iOS, and they can say this is what iOS is. That's what I understood them to be saying.

MR. EKELAND: Then I ask that the Court limit their testimony to those kinds of factual descriptions because the impression that I got and the concern that I have when I read their disclosures, I think, is similar to the concern that the Court is expressing here. That there's a certain level of ambiguity that can give rise to sort of backdoor expert opinions that may not have been disclosed that doesn't give the party an opportunity to fully respond.

THE COURT: That's fair enough. If either side engages in surprise, I'm going to exclude it.

MR. EKELAND: Understood, Your Honor. Yes. So I don't think I need to belabor that point.

There's No. 11. No. 11 is really just him explaining to the jury and helping the jury understand what's involved in operating a Tor network site and, by extension, a custodial mixer like Bitcoin Fog.

THE COURT: Okay.

MR. EKELAND: So I think that's fairly straightforward.

No. 12 is related to No. 11. He'll explain the need for constant maintenance of the site.

THE COURT: What do you mean by that?

MR. EKELAND: It just doesn't -- it doesn't run by

itself.

THE COURT: Right.

MR. EKELAND: I think that's relevant because there's times that -- there's a period of time where Mr. Sterlingov was in Miami for three months.

THE COURT: All right. Does Mr. Fischbach have expertise on running mixers or running sites versus forensics? I didn't realize that was an area of his expertise.

MR. EKELAND: I don't know if he's ever run a mixer, but he does have extensive computer coding experience. He's run a bunch of websites, and he's very experienced when it comes to types of computer coding.

THE COURT: When you say he's run a bunch of websites, I guess I'm not quite sure what that means because there are a lot of websites that do just run themselves. Your law firm has a website, and there's probably not a need for someone to go in there every day to do server maintenance on that versus, I suspect, whoever runs the website for Amazon.com, that there's a team of a thousand people who are doing that. So saying he ran a website doesn't tell me a lot.

MR. EKELAND: Your Honor, I merely submit to you that he's got 20 years of experience with computers, computer forensics, computer coding, and that he has the expertise and knowledge base to testify even if he hasn't run a Tor onion site as to what is required to run the site.

I think it would be helpful to the jury to hear, and the government can rebut anything that they think is incorrect with their witnesses.

THE COURT:  I think the point is a fair point for someone to make.  I'm just not sure whether he's the one with the expertise to make it.

MR. EKELAND:  We disagree with the Court.

THE COURT:  Well, I mean, you can convince me that he actually has the expertise.  There may be a need to, you know, continue to voir dire the witness, but I just don't see and hear -- I mean, I'm looking at his expert disclosures.  I just don't see anything in here that says that he has expertise on running anything like Bitcoin Fog.  Maybe I'm wrong about that.

I'm not sure why knowing how to write code or how you read or review code would mean that you understand what it means to keep the servers operating on a site that is processing thousands of transactions a day; that sort of thing.

MR. EKELAND:  Understood, Your Honor.

THE COURT:  Okay.  13?

MR. EKELAND:  13.  Here, he will explain the high level of information security required for a Tor network site like Bitcoin Fog that is subject to continual hacking attempts.

This is related, I think, to the prior points, and that this is just -- it's not -- it's not a self-running enterprise; and, particularly, a site like Bitcoin Fog that is

mixing funds is constantly going to be under attack by people trying to steal the funds, just like Mt. Gox.

THE COURT: For this one and for the next one, my only question is whether he has relevant expertise.

MR. EKELAND: I would submit he does. I'm not saying that he's run these sites, and I -- if I recall correctly, we never did finish Mr. Fischbach's voir dire just because of all the scheduling problems. And maybe if he does come in, we take some time to finish the voir dire on it.

You know what, even better, maybe we get back to the Court with supplemental briefing on this point rather than engaging in additional voir dire, but we're happy to do either/or.

THE COURT: Okay. 15?

MR. EKELAND: This goes to the point, just testifying to the use and application of the hardware Mr. Sterlingov had in his possession at the time of his arrest.

This is similar to what the government is saying Ms. Mazars de Mazarin and St. Jean will do. Particularly, I think the one thing that's been singled out by the government is they think that Mr. Sterlingov had a particularly exotic cell phone, which he will explain and demystify for the jury. I think what the government is going to attempt to do at trial is somehow portray the computer equipment that Mr. Sterlingov was traveling with is somehow sinister.

THE COURT: Okay.

MR. EKELAND: That goes to Point 16 where he will explain the equipment that Mr. Sterlingov is traveling with is quite common in the computer world and what each piece of hardware is legitimately used for.

17 goes to the same point; identifying the purpose and function of each device Mr. Sterlingov had in his possession at the time of his arrest.

And 18 goes to what we were discussing before. This is, I think, a little more particular. The -- I think it's phrased wrong in terms of the sufficiency of the proof, but I think more properly what should be said is that he will testify to, basically, how he didn't see anything on these devices that involved the operation of Bitcoin Fog.

And then No. 19 is just -- he'll testify about Ms. Mazars de Mazarin's IP overlap analysis, and I think this touches on the, I think, IP address points that we made before; and testify that it's forensically unsound to rely on the Mt. Gox records to make attributions. I think that's a bit redundant with the other Mt. Gox attributions.

He'll testify --

THE COURT: Can I ask you a question? When he says it's forensically unsound, that sounds like he's saying there are industry standards or government standards that this doesn't live up to versus just his opinion, and I'm not sure

which of those two you mean to be suggesting here.

MR. EKELAND: Excellent question. It's my understanding that he has trained law enforcement before, including the FBI, and that he instructs, if I'm recalling correctly, judges and law enforcement and lawyers on forensically sound techniques.

I think what -- to answer your question is that he will testify to -- and what his opinions are -- are the sound forensic standards that should be followed and why in his experience -- his 20 years of experience as a forensic technologist, what he's seeing here in his expert opinion is forensically unsound. As to whether or not there's some --

THE COURT: I have to say, I'm much more comfortable with testimony that says -- expert testimony that says there are difficulties and problems with using IP addresses for purposes of making an attribution because an IP address is not assigned to a person; it's assigned to a router, and there are lots of people who can use a router.

In fact, there also are times in which you can use a proxy in a way in which you're using -- either sharing a router or using someone else's router. It may be that when using a VPN, there may be multiple people who are using the same VPN.

And, therefore, you can't tell with any certainty -- and, in fact, there may be substantial uncertainty as to who is actually using it because in some cases there might be a

thousand people who are using the same proxy server or a thousand people who are using the same VPN; in other cases it may be three people who are doing that.

And without knowing that information, it's very difficult to make any conclusions.

That strikes me as more appropriate than saying it's just -- in my opinion, it's forensically unsound. Unless, he can point to some standard other than the fact that that's not the way I would do it or that's not the way I teach people. It may just be too loaded a phrase. And it suggests that there is some standard that it's not living up to versus here's the reason why it's problematic.

MR. EKELAND: I think that's an excellent point, Your Honor. If I'm understanding the Court correctly, you prefer this to proceed by concrete, particularized -- I don't know if the word examples is right -- reference to the evidence; and we are happy to take that approach and limit it to that rather than -- and, again, of course, this will apply to both sides.

If I understand you correctly, you just want to avoid this kind of ambiguity and this kind of -- these generalized statements, and you want to base it on concrete examples like you said. No disagreement from the defense.

THE COURT: I think the experts on both sides shouldn't be testifying to ultimate conclusions or their opinions except to the extent their opinions are based on

something that it can be measured against where you can look to some industry standard or something where you can actually point to something and say this is what satisfies it here.

MR. EKELAND: A concrete metric.

THE COURT: Just explaining, you know. If there's a reasonable question, you ought to explain to the jury that here's the problem. Here's the problem with using proxy servers or VPNs or IP addresses. It's entirely appropriate.

MR. EKELAND: The defense agrees, Your Honor. And we'll tailor our direct and Mr. Fischbach's testimony should the Court admit him towards those ends and do everything we can to avoid these generalized ambiguities.

THE COURT: Okay.

MR. EKELAND: Going to the VPN, you see there on 19C, again, we've got the ambiguous phrase forensically unsound. Basically, the point is that you shouldn't be making attributions from IP addresses that may be VPNs or proxy servers. And that goes to the IP address, VPN attribution because they're used to mask. And that goes --

THE COURT: I'm sorry. Just to interrupt you for a second. To put it a little bit differently, because when you say you shouldn't be, I think probably the better way to do it is to say, here's the problem. If you use a VPN, there can be ten people, a hundred people, a thousand people using the same VPN. It doesn't tell you who the person is if you know what

the IP address that's associated with the VPN.

MR. EKELAND:  I think that's a really good point.

THE COURT:  Then the parties can argue to the jury what conclusions to draw from that type of evidence.

MR. EKELAND:  Understood, Your Honor.

THE COURT:  Okay.

MR. EKELAND:  Item 20, testifying about the Mazars de Mazarin device report and the related documentation produced by the government.  I think that relates -- again, that relates back to the --

THE COURT:  Is this just what the devices are used for and whether the -- is this just redundant with the point above?

MR. EKELAND:  I think what we're trying to capture is what I was getting at with the six-terabyte drive and the discrepancies between -- then maybe the government has an explanation for.

It's not clear to me when I look at Ms. Mazars' report why -- they list the devices in there that I said -- you know, there's a differentiation -- there's a difference between what's listed in her device report and what was seized at the airport; what she actually is going to testify about in relation to those devices because it's a little, I think, generalized and ambiguous in her disclosure.

So what this is, this is a point, sort of, in

response to what she's going to be saying about those devices. And, again, it goes back to they found some 4G modems, cables, two Raspberry Pi's, a battery pack and things that the government -- they continually refer to as cell phone -- I can't remember the exact word -- exotic or there's something in the discovery where they refer to it as, like, a spy phone. It's actually just quite an innocent device.

This is where Mr. -- one of the spaces where Mr. Fischbach will testify about those particular devices and how they've got perfectly legitimate uses.

THE COURT: Okay. 21?

MR. EKELAND: This is just a point about the DNS registration for the clearnet site, www.bitcoinfog.com, somehow implicating Mr. Sterlingov as the operator of Bitcoin Fog. Mr. Fischbach, I know, has purchased -- like many people in the computer space -- hundreds of domain name registrations for sites that he never ran. It's quite a common thing to do for clients. He's set up a number of websites. This is something he has direct experience on.

And he can just simply testify that the mere fact that you purchase a DNS registration does not mean you're operating the website; you create the website, and it's quite a common thing in the industry to do. And he can also testify about the registration renewal on the DNS websites.

THE COURT: I don't see a problem with him testifying

regarding DNS registrations and how that works; I suppose even if he has a basis what common practice is. Although, again, I wouldn't want him to testify sort of to the ultimate conclusion to say that it's a flawed hypothesis.

I mean, he can testify and say, in my experience this is the way it works with DNS registration, and you can register a -- you can obtain a DNS registration on someone else's behalf, for example. There's not a requirement that you certify that you are the only person who is going to then use that registration, that type of thing. It goes to an actual fact.

You know, based on his experience rather than his opinion as to whether -- the ultimate question of whether Mr. Sterlingov was the one who operated Bitcoin Fog.

MR. EKELAND: Correct. Understood, Your Honor. Testify it's common to do DNS registrations for people.

THE COURT: If that's true and he has a basis and the sufficient expertise to do so, I don't see a problem with it.

MR. EKELAND: Thank you, Your Honor.

THE COURT: This is all subject to my having heard from the government on these things. But I'm giving you at least my preliminary views.

MR. EKELAND: And then No. 24 is just --

THE COURT: You skipped 22 and 23.

MR. EKELAND: My computer is acting up here. I think

we'll just -- we don't need 22 because we have Ms. Still.

THE COURT: Okay.

MR. EKELAND: 23, he does have expertise in DNS registrations, how they work, how they need to be renewed, and how the DNS identified in the criminal complaint was renewed. And that's just a matter of public record, and it can be looked up.

24 is just him testifying in rebuttal to the government's experts.

THE COURT: I would say, with respect to that, if it turns out that the government's experts go off-script, then it's fair game for the defense to go off-script. If you now know what the government experts are going to testify to, there's not -- you should be disclosing what Mr. Fischbach is going to testify to, and you shouldn't simply say rebuttal. I don't think that's an adequate disclosure.

Obviously, if the government goes beyond what's in the expert disclosures, perhaps in light of some cross-examination, then that might open the door.

MR. EKELAND: Understood, Your Honor. That's all of the defense --

THE COURT: So let me hear from the government then with respect to these same items.

MS. PELKER: Yes, Your Honor. Mr. Brown just raised a scheduling question. We're fine to stay late. I know that

we're hitting up against time.

THE COURT: Let's see if we can at least get through Mr. Fischbach, and then we'll see where we are.

MS. PELKER: As far as Item No. 1, this just appears to be sort of a catchall impermissible opinion. It's a blanket opinion about the case.

Items 2 through 5 dealing with Mt. Gox, at this point the defense has had numerous opportunities to identify any specific issues or errors that Mr. Fischbach or anyone else has found with the Mt. Gox data and records, and we do want to make clear for the record here that after the June -- I believe it was the June hearing and then possibly again in July, the government again offered to make the data available at the FBI NVRA, then offered to make it available out at the FBI in Orange County or in L.A. near where Mr. Fischbach lives.

We offered if they wanted to give us specific files that they would like that was a subset that wasn't thousands of people's sensitive financial details, we could give it to the defense. That if Mr. Fischbach wanted to come in and spend a day doing a triage review, explain what it was he wanted to take home with him and take a subset of files that weren't sensitive, that we'd be fine with that as well.

The government's tried to make accommodations for the defense here. I understand that they're trying to preserve their issues on appeal, but at this point there's no -- the

defense has not actually articulated any sort of error or issue that they have with the Mt. Gox records.

We think this whole line of testimony and critique from Mr. Fischbach is just without any basis and has not been appropriately disclosed.

THE COURT: Can you say anything about the hacks? I know the hacks keep coming up. Were they -- I don't know anything about the nature of them, how extensive they were.

As I said, I think virtually every business in the country has been hacked at times, but there may be a difference between that versus some circumstance where someone has gone in and fundamentally rewritten transactions and transaction histories in a way that is designed to just disrupt a business.

MS. PELKER: So, Your Honor, as I understand it, the Southern District of New York in June unsealed their indictment charging two Russians with the -- with the large hack of Mt. Gox; so what everyone thinks of as "the" hack. And that indictment explains how these individuals gained access to Mt. Gox's wallets and funneled the money out of the wallets starting in 2011.

THE COURT: Any evidence that -- in doing so that they actually altered the underlying -- the data or the transaction records that existed other than they created new transactions which they stole the money out of the accounts?

MS. PELKER: Again, I'm not privy to all of the SDNY

case file.  I do have another case that somewhat relates to it, so I want to be very careful on the representations I'm making to the Court.

There are -- certainly, the way that a hack would occur would relate to -- and this type of hack in particular -- would be the access to the Mt. Gox hot wallet that someone would, essentially, drain and not going in and, say, manipulating records to make it look like Mr. Sterlingov controls an account that he doesn't control.

And that, certainly, if the -- if the government had any evidence that Mr. Sterlingov's accounts had been accessed or modified or that that was something that we were aware occurred, we certainly would have disclosed that.

THE COURT:  Okay.

MS. PELKER:  The defense -- again, they've had the opportunity to look at the records for these specific accounts, and they keep coming back and saying that they have missing transaction hashes, that they have missing information, but they have yet to identify any of that.

That's not at all what the government -- Mr. Scholl sees when he is looking at the reports.  Mr. Scholl is not a computer scientist, he's not an incident response professional, but when he's doing the financial tracing, he's able to look at these accounts and say that this is all lining up.

THE COURT:  Okay.

MS. PELKER: Items 6 through 9 on the IP analysis and the use of VPNs seems appropriate here.

THE COURT: I'm going to allow Items 6 through 9 at this point.

MS. PELKER: Item No. 10, Mr. Fischbach has no experience in Chainalysis; he's not an expert in blockchain analysis. There's no basis for him to opine about Chainalysis forensic methodology.

THE COURT: I indicated earlier preliminarily my view was to not allow that. I'm not going to allow 10 for the reasons you've given as well, and I also think that it's too conclusory and doesn't actually -- the disclosure doesn't actually identify the basis for an opinion.

MS. PELKER: Items 11 through 14 regarding setting up -- what it would take to operate a custodial mixer like Bitcoin Fog, this is something that I also probed Mr. Fischbach on, on his hearing testimony starting at page 281 of the transcript.

I think that Mr. Fischbach can explain how Tor works and how the internet works. I don't think that he has sufficient expertise, and he didn't testify that he did, to explain how a Bitcoin mixer operates, and I don't think that he's set out a sufficient basis here.

I think that he at the time described the defense disclosure as optimistic on that point.

THE COURT: Okay. So I will allow -- I'll allow Mr. Fischbach to testify about how Tor works then.

MS. PELKER: I think that's appropriate.

THE COURT: I will reserve judgment at this point about whether he can also testify about how mixers work. I just have to go back and look at the transcript on that.

MS. PELKER: Items 15 and 16 regarding use of the hardware is fine.

THE COURT: I'm sorry. Before you get to those, I expressed some skepticism about need of constant maintenance. I may need to look at the transcript on that.

MS. PELKER: I think that he just doesn't have the expertise to opine about what it takes to run a mixing site like Bitcoin Fog.

THE COURT: Okay. I'll look at those a little bit more carefully. I've expressed my preliminary view, but I'll look at that more carefully. So 15?

MS. PELKER: 15 and 16 are, I think, are appropriate. Item 18 --

THE COURT: What about 17?

MS. PELKER: Oh, that's fine as well. I think we thought that was duplicative.

THE COURT: I'm going to allow 15 through 17 then.

MS. PELKER: Yes, Your Honor. And then Item 18, this is, again, one of lack of any forensic evidence. The

government thinks it's just an impermissible summary, conclusion without explaining a basis.

THE COURT: I mean, as Mr. Ekeland says, his basis is that there's no basis. It's not like he can point to and say here's -- I've looked at this here, and here's the errors. His point is, I've looked at it, and I just don't see any evidence of operating Bitcoin Fog on these devices.

MS. PELKER: He can find that there's no artifacts relating to Bitcoin Fog on whatever the different devices are.

THE COURT: So are you okay with that?

MS. PELKER: Yes. This, to me, I think -- and similar to No. 1 -- just seems quite different; of opining about what is sufficient to prove that Mr. Sterlingov is guilty about forensically sound evidence.

THE COURT: I agree with that. I think Mr. Ekeland was agreeing with me when we were going through this before that he has to -- Mr. Fischbach has to make his evidence or his testimony concrete. And if he wants to testify, I looked at this particular device and there was no signature of Bitcoin Fog on that device based on my review, that's okay.

You're in agreement with that?

MS. PELKER: Yes, Your Honor.

THE COURT: All right.

MS. PELKER: Regarding Item 19, I think part of this is fine. So 19B about why he thinks that the 12-month window

is not appropriate; Item 19C about -- that he would not rely on attributions related to VPNs or proxies.

Item 19A has the same issue that we had previously raised. We would object for the same reasons. And we would just note that it's not clear from this drafting whether the issues are fully intended to be fully set out as A, B, C. But that at this point, the only issues that they've disclosed are A, B, C and now the issue with the hard drive reference that we're going to follow up on.

THE COURT: Okay. So I'll allow B and C, and the A is tied up in the question about is the Mt. Gox data generally -- and I have to say my concern without more here, there's just a 403 problem in that coming in and saying they were hacked and the CEO was a crook strikes me as at least, potentially, more prejudicial than probative unless someone can show me some connection to this case.

And that the hacking could have actually had an effect on the data here rather than someone went into the wallet and stole money from Mt. Gox in a way that would not have had any effect on the data that we're talking about here; or showing me that the CEO, actually, was convicted of a crime relating to the manipulation of the data or data of the type here where a jury could reasonably infer that he actually monkeyed with the data in this case versus that he was trying to keep his company afloat when it was heading towards

bankruptcy and he was, for example, trying to take out loans and was making it look like they were making more money than they were on their financials.

So I have a significant 403 issue with respect to the Mt. Gox data. And also, I think it's sort of revealed from the expert report and our discussion at this point, it's not at all clear to me that Mr. Fischbach knows the answers to the questions I'm asking him, that he has any expertise in a way in which he would know whether the data was monkeyed with anyway.

I do have at least at this point a 403 concern, as well as just a question about whether Mr. Fischbach has expertise with respect to Mt. Gox versus expertise which seems almost fairly obvious and maybe in the domain of the jury anyway. If somebody has monkeyed with the data, the data is not reliable. The key point here is really the former one about whether someone has monkeyed with the data that's relevant in this case. I haven't seen anything to support that at this point.

So at this point, my leaning would be to exclude those arguments under 403, absent some further showing there really is reason to doubt the integrity of the data at issue here. So that takes us to 20.

MS. PELKER: Item 20, again, same, the issues with the device report. The only issue that we are aware of is what they have disclosed today.

Mr. Ekeland suggested that Mr. Fischbach has some qualifications in understanding law enforcement procedures and chain of custody. Mr. Fischbach, as far as I'm aware, while he touts that he gives these trainings to law enforcement and the FBI, I think it was one training back in the early '90s. Mr. Fischbach has been an outspoken defense expert.

To the extent that he says that he works for the government, that is military courts who on the defense side are hiring him as an expert witness. He is not someone who is delivering trainings to law enforcement, and he's not worked in law enforcement.

THE COURT: Again, here, maybe there could be a witness who could explain what, for example, a -- a log of seized items is and how that process works, and maybe there's somebody who is an expert who could testify as to that and what would go onto the log.

To the extent that he's just testifying to saying, look, there are three items here and there are four here, that just strikes me as in the province of the jury.

Okay. So I'm at least tentatively in agreement with you with respect to that as well at this point. 21?

MS. PELKER: 21, so it was not clear to us until -- I'm still not sure it's completely clear as to what this was actually noticing. So there is no Chainalysis hypothesis about the DNS registration. Chainalysis had nothing to do with

attributing a DNS registration to Mr. Sterlingov.

If this is now, as I understand it, going to be Mr. Fischbach testifying that individuals set up websites for other people, I don't think that that is what is noticed in No. 21, but I think that that's --

THE COURT: I'll allow that testimony on that narrow topic.

MS. PELKER: But just to the extent we're going down the list, we would object to 21 as written, if that's not what they actually meant by 21.

THE COURT: Based on Mr. Ekeland's explanation, I do think that he's offering the more narrow testimony, and I will allow that.

MS. PELKER: I believe the defense conceded that item 22 is not going to be covered by Mr. Fischbach.

THE COURT: Yes. So I will not allow that.

MS. PELKER: No. 23 about how DNS registration and renewal works is fine.

THE COURT: I'll allow that.

MS. PELKER: And then the rebuttal testimony -- and we have this concern for all of the defense disclosures -- is just that the defense is trying to shoehorn in the possibility of "and anything else the defense wants to testify to" without providing disclosure.

THE COURT: Right. I'll put everyone on both sides

on notice that I'm going to hold you to what is in your disclosures unless the door is opened in some way.

So if in the government's case you end up going beyond the scope of your reports, perhaps not because that was your plan, but in light of some cross-examination and the witness says, well, actually, I went off and did three other studies and this is what I found, then the defense should be entitled to respond to that.

MS. PELKER:  Understood, Your Honor.

THE COURT:  All right.  I think I've given you at least my tentative rulings and my conclusions with respect to most of this.  I've told you what comes in.  I told you a couple things that I want to go back and look at a little bit more.

And so by way of summary, I don't think 1 is a proper topic.  On 2 through 5 on the Mt. Gox, I do have a significant 403 concern, absent something more to let me know that there's reason to think that any of this evidence relates to whether the data in this case was tampered with or even there's any plausible inference that it was tampered with and whether there's any evidence that Mr. Karpeles was involved in manipulation of the underlying data in the system versus manipulating financials and things of that nature.

And at this point -- I remember from when Mr. Fischbach testified, he didn't seem to have any particular

knowledge of this. He had seen some stories in the press or seen a YouTube video or something that touched on this. So I'm not convinced that he has the relevant expertise to dig down deeper on it.

In any event, as currently presented, I have a 403 concern, so I'm not inclined to allow that. I will leave that open to be convinced -- you can convince me otherwise on that.

No. 10, I've concluded, doesn't -- is not appropriate.

With respect to 11, we've agreed that, to the extent that Mr. Fischbach just wants to talk about how Tor works, that's okay. I'm going to take a further look as to whether he has adequate expertise with respect to how mixers work, and I'll take a further look as to whether he has any expertise on maintaining websites like mixers. I'm doubtful about that, but I'll take a further look at that.

The same goes with 13 and 14 where I'm doubtful about it, but I will look further.

15, 16, and 17 are okay.

18 is okay to the extent it's made concrete with respect to review of particular devices and what was or wasn't on those particular devices, but not to the extent it's testimony as to the ultimate question in the case.

19 we discussed both with Mr. Ekeland and with Ms. Pelker. I'm okay with 19B and 19C, but I do think that all

of this should be made concrete in a way that I discussed with Mr. Ekeland.

And with 20, I guess I still have a question as to exactly what it is that Mr. Fischbach would testify to. I'm not convinced, at least at this point, that he does have sort of expertise on how the FBI usually goes about inventorying material at a time of arrest. And to the extent that he's simply saying that there were three devices that were seized and four that show up all of a sudden, that strikes me as something that is in the core competence of the jury.

With respect to 21 and 23, I think it's permissible for Mr. Fischbach to testify about just how the DNS registration process works and about the fact that you can obtain a DNS registration on behalf of somebody else.

22 is withdrawn. And I've expressed my concerns about 24. And I think it's just -- it doesn't provide sufficient notice, but I do recognize that if the door is opened, that Mr. Fischbach may be entitled to respond to testimony that has not been noticed at this point by the government.

So those are my rulings with respect to Mr. Fischbach.

It is a little after 5:00. I'm available to come back tomorrow if the parties want to or if you're available to continue with this tomorrow, or we can find some other date to

do so.

Glenda, what's the calendar look like tomorrow? Thank you. So I have four proceedings tomorrow, but only one of them -- or two of them are likely to take a chunk of time, but I'm sure I can carve out at least a couple of hours for us tomorrow if we need it.

MR. EKELAND: If possible, we'd prefer another day than tomorrow, but --

THE COURT: I'm just not sure of when that would be. If you want to -- I'm getting some additional filings on Monday, I know. I am still going to have to figure out what to do with respect to the source code.

I'm happy to finish this up tomorrow, or we can look for and see if I have time on Tuesday, but we are getting very close to the beginning of the trial. I guess my preference would be to try and finish this up tomorrow if we can. We may need to schedule some hearings next week as well. I want to make sure we have time to do that.

MS. PELKER: I would agree that if there's a way that we can do this tomorrow, that would be the government's strong preference.

MR. EKELAND: I'm sorry. Can we do it via Zoom?

THE COURT: I think the jail -- Mr. Sterlingov, I believe, can only participate in the afternoon; is that correct?

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: I have to check to see if that can be scheduled. I suppose he could waive his appearance if he wanted to. But I want to make sure he's doing that in an informed way.

I have a 2:00 and a 2:30. My 2:30 will probably run until 3:00.

MS. PELKER: Your Honor, we do still have to do the *Missouri v. Frye*. I'm not sure whether that -- I guess it could be done virtually, but --

THE COURT: With the indulgence of the court staff, maybe we should just do that right now. I don't think it's going to take very long. Is that okay with you both?

MS. PELKER: That's fine.

THE COURT: I know it's late. Why don't we do that now.

Is there an objection to just doing the rest of this virtually from 3:00 until 5:00 tomorrow? I'm not sure the jail goes until 5:00 or not. Glenda, do you know? The jail has a hard stop at 4:00. What we could do is we can do 1:00 to 2:00 and 3:00 to 4:00.

MS. PELKER: That's fine, Your Honor. Could we possibly get our 5:00 p.m. filing deadline extended even until Saturday morning?

THE COURT: That's fine. Is noon on Saturday okay?

MS. PELKER: That would be great, Your Honor.

THE COURT: Since you're going to be here, that's understandable.

Does that work for all of you to do from 1:00 until 2:00 and then 3:00 until 4:00 tomorrow?

MR. EKELAND: Yes, Your Honor.

THE COURT: Mr. Sterlingov, is it okay with you to do this that way, you and your counsel will be appearing virtually?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Mr. Sterlingov, you understand you have a right to be physically present at every stage of your proceeding?

THE DEFENDANT: Yes.

THE COURT: Mr. Sterlingov, in the possibility that things may not work out with the jail -- we'll do our best to get you on the line, but if you're unavailable, would you consent to go forward without your being on the line? We'll do our best, but I haven't communicated with the jail yet, so I don't know for sure if they're able to accommodate.

THE DEFENDANT: Yes, Your Honor.

THE COURT: So we'll do our best to have you here, but if we can't, we can go forward without you on this issue?

THE DEFENDANT: Yes. Thank you for trying.

THE COURT: Yes, we will.

So in that case, Ms. Pelker, do you want to put on the record whatever plea offer, if any, was made; or Mr. Brown?

MR. BROWN:  Yes, Your Honor.  On May 2nd, 2023, the government transmitted a plea offer to defense counsel.  The deadline for that was two weeks later on May 16th, 2023.  The government never received a response to the plea offer.

The terms of the plea were as follows:  The government offered a plea to two counts; one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. Section 371, and one count of operating an unlicensed money transmitting business, in violation of 18 U.S.C. Section 1960A.

The maximum sentencing exposure for those two counts would be no more than ten years.  The adjusted guidelines were calculated to be Offense Level 43, Criminal History Category I.  The guidelines range goes up to life, but that would be limited by the statutory caps to two five-year terms for no more than ten years.

And the defendant would be able to apply, if eligible, for international prisoner transfer program, which would allow him to transfer to Sweden, if eligible.

THE COURT:  Okay.  Mr. Sterlingov, you're welcome to come up to the microphone or just turn the microphone to yourself, whichever you prefer.  You want to just do it from there?

Mr. Sterlingov, I just want to make sure that you understand that plea offer was extended to you?

THE DEFENDANT: Yes.

THE COURT: Did you have an adequate opportunity to discuss it with your lawyers?

THE DEFENDANT: Yes, I believe so.

THE COURT: Are you sure? Did you have enough time to talk with your lawyers about it?

THE DEFENDANT: Yes.

THE COURT: Would you like any further time to discuss it or talk with your lawyers about it?

THE DEFENDANT: I believe the timeline was -- there was a time limit?

THE COURT: Right. I just want to make sure you've had enough time to consider it is the main thing.

THE DEFENDANT: Yes.

THE COURT: I suppose -- I'm not involved in any way in plea negotiations, but if you felt as though you hadn't had enough time, you could convey that to the government and they could, I guess, decide what to do about that.

THE DEFENDANT: Yes. Are you asking if I --

THE COURT: The main question, you expressed a little bit of hesitation as to whether you had had enough time to discuss the plea offer with your lawyers. I just wasn't sure if that was hesitation about it or whether you feel as though

you had adequate time to discuss it with your lawyers and made a decision and you wanted to reject it?

THE DEFENDANT: I feel that I've had enough time to discuss it with my attorneys.

THE COURT: Okay. And after having discussed it with your attorneys, have you made a decision that you would like to reject that offer?

THE DEFENDANT: That's -- that's what happened, yes.

THE COURT: Okay. And so you had enough time to discuss it, you thought about it, and you made a decision to reject the offer; is that a fair summary?

THE DEFENDANT: Yes. Except, as I understand it, the offer also ran out. There was a time limit on the offer.

THE COURT: Right.

THE DEFENDANT: So by virtue of not answering to it, it was rejected.

THE COURT: Okay.

THE DEFENDANT: That's the only clarification.

THE COURT: Fair enough. Did you let that time run out because you wanted to reject it, or did you run it out because you didn't have enough time to talk to your lawyers before the time ran out?

THE DEFENDANT: We've made a decision together.

THE COURT: Okay. You made a decision to reject the offer together?

THE DEFENDANT: Yes.

THE COURT: You understand that's your decision; that's not your lawyers' decision; do you understand that?

THE DEFENDANT: Yes, of course.

THE COURT: Okay. And just for clarity of the record, you understand the offer was made to you, you had enough time to talk with your lawyers about it, and you rejected it by simply not responding; is that correct?

THE DEFENDANT: As I understood, that was a legitimate way of responding.

THE COURT: Yes. I don't mean to criticize you. I don't think that Mr. Brown was criticizing you for that. I want to make sure you really intentionally rejected it rather than just the clock running out on you.

THE DEFENDANT: Yes.

THE COURT: Okay. Anything further that either side thinks I should inquire about?

MR. BROWN: No, Your Honor.

THE COURT: Okay. Mr. Ekeland?

MR. EKELAND: No, Your Honor.

THE COURT: Well, thank you. So I will see some of you in person and the rest of you virtually -- hopefully, Mr. Sterlingov, but if not, I have his waiver on the record -- at 1:00 tomorrow.

Thank you. This was helpful for me. I made some

progress today.

(The hearing adjourned September 7, 2023, at 5:20 p.m. until 1:00 p.m. September 8, 2023.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 11th day of September, 2023.

/s/ Tamara M. Sefranek
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C.  20001

# $

**$10** [1] - 80:24
**$100** [4] - 81:3, 87:2, 93:22, 105:5
**$300** [1] - 93:18
**$33** [8] - 80:23, 87:2, 93:5, 93:6, 93:12, 93:23, 93:24
**$334** [2] - 81:5, 87:1
**$70** [1] - 93:19

# '

**'90s** [1] - 175:5

# /

**/s** [1] - 188:9

# 0

**001** [1] - 64:14

# 1

**1** [23] - 17:12, 25:9, 40:12, 44:7, 58:7, 69:24, 73:22, 73:23, 79:14, 95:7, 107:20, 110:12, 110:15, 113:6, 124:14, 124:18, 125:5, 143:20, 145:18, 148:11, 167:4, 172:12, 177:15
**10** [7] - 25:20, 37:22, 44:18, 153:23, 170:5, 170:10, 178:8
**10,000** [1] - 78:24
**100** [2] - 93:7, 105:1
**100,000** [2] - 57:9, 85:3
**10005** [1] - 1:20
**10:10** [1] - 1:6
**11** [6] - 49:10, 155:15, 155:22, 170:14, 178:10
**11th** [1] - 188:7
**12** [3] - 45:3, 155:22
**12-month** [1] - 172:25
**122** [1] - 140:21
**12:00** [1] - 55:5
**12:30** [1] - 55:5
**13** [5] - 32:18, 157:19, 157:20, 178:17
**13)** [1] - 32:17
**1301** [1] - 1:17
**14** [3] - 25:22, 170:14, 178:17

**140** [3] - 22:21, 24:6, 25:20
**144** [2] - 49:15, 74:18
**146** [1] - 22:21
**148** [1] - 49:14
**15** [12] - 25:22, 37:22, 76:21, 141:20, 142:4, 142:10, 158:14, 171:7, 171:17, 171:18, 171:23, 178:19
**15-minute** [1] - 55:4
**153** [1] - 110:2
**16** [6] - 48:16, 142:4, 159:2, 171:7, 171:18, 178:19
**166** [2] - 141:1, 142:1
**16mT** [2] - 48:15, 48:16
**16th** [1] - 183:5
**17** [5] - 45:3, 159:6, 171:20, 171:23, 178:19
**18** [9] - 4:11, 24:6, 45:4, 159:9, 171:19, 171:24, 178:20, 183:10, 183:11
**19** [4] - 60:6, 159:15, 172:24, 178:24
**1960** [3] - 104:20, 130:11, 130:13
**1960A** [1] - 183:12
**1960B** [1] - 37:13
**19A** [1] - 173:3
**19B** [2] - 172:25, 178:25
**19C** [3] - 162:14, 173:1, 178:25
**1:00** [4] - 181:20, 182:4, 186:24, 187:3
**1:21-CR-0399** [1] - 1:3
**1:30** [2] - 76:24, 77:2
**1Kfu** [1] - 51:15
**1LZ** [1] - 47:23
**1LZvk** [1] - 47:20
**1PG** [1] - 51:17
**1YZJKa** [2] - 49:24, 50:9

# 2

**2** [22] - 3:24, 25:10, 40:12, 40:16, 44:7, 45:13, 50:5, 57:4, 69:24, 82:2, 86:4, 95:8, 101:25, 107:20, 108:6, 141:17, 148:11, 148:12, 149:8, 167:7, 177:16

**20** [8] - 135:18, 148:22, 156:22, 160:10, 163:7, 174:22, 174:23, 179:3
**20,000** [1] - 109:7
**200** [3] - 66:24, 67:4, 67:10
**20001** [3] - 1:12, 1:24, 188:11
**20005** [1] - 1:17
**2003** [1] - 17:12
**2010** [3] - 88:16, 88:21, 89:1
**2011** [4] - 22:24, 88:16, 127:16, 168:20
**2012** [2] - 88:16, 130:24
**2013** [3] - 103:12, 103:18, 130:23
**2014** [3] - 22:24, 111:4
**2015** [1] - 56:17
**202-354-3246** [1] - 1:24
**2022** [1] - 111:10
**2023** [8] - 1:5, 89:1, 124:4, 183:3, 183:5, 187:2, 187:3, 188:7
**20530** [1] - 1:14
**21** [9] - 58:11, 59:17, 164:11, 175:21, 175:22, 176:5, 176:9, 176:10, 179:11
**21-399** [1] - 2:2
**22** [7] - 8:5, 8:6, 80:24, 165:24, 166:1, 176:15, 179:15
**23** [6] - 10:8, 59:17, 165:24, 166:3, 176:17, 179:11
**23rd** [2] - 44:13, 124:4
**24** [5] - 11:4, 142:14, 165:23, 166:8, 179:16
**25** [1] - 58:7
**26** [1] - 108:20
**27** [1] - 109:17
**28** [1] - 109:24
**281** [1] - 170:17
**2:00** [7] - 55:10, 76:16, 76:24, 76:25, 181:6, 181:20, 182:5
**2:10** [1] - 100:11
**2:30** [2] - 181:6
**2:50** [1] - 100:11
**2nd** [1] - 183:3

# 3

**3** [8] - 25:10, 40:20, 44:8, 95:8, 107:20, 107:24, 149:7
**30** [3] - 1:20, 46:25, 76:21
**31** [1] - 46:25
**311,000** [1] - 74:5
**33** [2] - 47:1, 93:7
**333** [2] - 1:23, 188:11
**34** [2] - 87:23, 94:25
**35** [2] - 44:5, 47:6
**3505** [2] - 23:23, 24:3
**352** [1] - 17:12
**3553** [1] - 24:6
**36** [1] - 124:13
**363** [1] - 124:4
**368** [1] - 124:13
**371** [1] - 183:10
**3:00** [4] - 181:7, 181:18, 181:21, 182:5

# 4

**4** [11] - 4:10, 4:11, 4:16, 4:19, 5:7, 39:14, 39:17, 39:21, 40:24, 40:25, 152:10
**40** [1] - 47:10
**403** [6] - 173:13, 174:4, 174:10, 174:20, 177:17, 178:5
**41** [3] - 44:10, 47:12, 56:9
**43** [2] - 49:14, 183:15
**45** [1] - 47:18
**46** [1] - 48:7
**49** [1] - 49:22
**4:00** [5] - 134:20, 181:20, 181:21, 182:5
**4G** [1] - 164:2

# 5

**5** [8] - 4:19, 41:6, 98:22, 107:24, 108:3, 152:19, 167:7, 177:16
**51** [1] - 97:22
**55** [1] - 72:24
**57** [1] - 50:15
**59** [1] - 50:23
**5:00** [6] - 76:7, 76:9, 179:23, 181:18, 181:19, 181:23
**5:20** [1] - 187:2

# 6

**6** [4] - 24:6, 152:21, 170:1, 170:3
**60** [7] - 103:1, 103:2, 103:8, 103:14, 103:18, 103:22, 110:14
**601** [1] - 1:11
**61** [1] - 51:4
**62** [3] - 22:18, 51:4, 51:16
**63** [2] - 51:4, 51:14
**65** [1] - 51:5
**6714** [2] - 1:23, 188:10

# 7

**7** [6] - 1:5, 39:21, 110:13, 124:19, 153:4, 187:2
**702** [4] - 54:16, 87:17, 90:11, 122:21
**702/Daubert** [1] - 53:15
**73** [1] - 58:4
**78** [1] - 22:19

# 8

**8** [2] - 153:11, 187:3
**8.5** [1] - 100:1
**8th** [1] - 1:20

# 9

**9** [4] - 108:14, 124:14, 170:1, 170:3
**900,000** [1] - 109:8
**901** [1] - 23:15
**902** [3] - 23:14, 23:25, 28:13
**902(11** [2] - 24:3, 24:6
**902(13** [3] - 23:25, 31:16, 31:23
**902(14** [2] - 32:17, 36:2
**902(14)** [1] - 36:11
**930,000** [1] - 53:3
**930-some-odd-thousand** [1] - 109:8
**950** [1] - 1:14
**99** [3] - 64:13, 99:4, 99:5

# A

**A-h-m-e-d** [1] - 9:2
**A.M** [1] - 1:6
**ability** [4] - 57:24,

121:8, 130:7, 188:6

**able** [35] - 4:15, 12:9, 12:12, 13:24, 16:8, 18:15, 18:19, 19:4, 19:11, 21:24, 39:5, 46:12, 46:18, 53:2, 53:7, 54:6, 61:1, 67:24, 68:3, 69:10, 71:17, 72:7, 72:10, 74:24, 84:20, 88:7, 102:9, 102:15, 120:10, 133:1, 139:18, 149:11, 169:23, 182:20, 183:19

**Abraxas** [1] - 109:1

**absent** [4] - 20:6, 36:14, 174:20, 177:17

**absolutely** [5] - 33:8, 72:18, 112:6, 113:16, 129:23

**abundance** [1] - 132:4

**abuse** [3] - 66:15, 66:19, 66:23

**academic** [5] - 101:9, 101:14, 103:5, 103:12, 123:22

**acceptance** [1] - 84:1

**accepted** [2] - 132:6, 133:10

**accepts** [1] - 97:14

**access** [29] - 13:5, 13:8, 13:11, 13:14, 14:2, 14:9, 14:12, 15:1, 15:3, 15:6, 15:8, 15:10, 17:23, 21:22, 26:25, 27:1, 27:3, 27:7, 27:22, 46:12, 46:17, 61:1, 100:14, 123:6, 123:13, 126:19, 127:15, 168:18, 169:6

**accessed** [5] - 10:20, 29:9, 30:17, 124:20, 169:11

**accesses** [1] - 32:2

**accessible** [3] - 80:10, 84:6, 84:7

**accessing** [2] - 13:1, 121:24

**accommodate** [2] - 16:15, 182:20

**accommodations** [1] - 167:23

**accord** [1] - 91:4

**according** [3] - 29:7, 51:15, 112:10

**account** [23] - 23:8,

23:19, 24:20, 24:21, 25:6, 25:13, 25:15, 25:17, 25:24, 33:18, 34:16, 36:16, 43:7, 46:22, 47:7, 47:16, 49:23, 65:9, 73:6, 73:7, 113:15, 169:9

**Account** [8] - 25:9, 25:10, 44:7, 44:8

**accounted** [1] - 53:24

**accounting** [1] - 38:24

**accounts** [17] - 23:17, 25:5, 25:8, 32:4, 45:21, 45:22, 45:23, 48:8, 48:13, 49:20, 113:14, 121:25, 124:20, 168:24, 169:11, 169:16, 169:24

**accumulated** [1] - 128:25

**accuracy** [16] - 31:21, 36:18, 54:13, 78:4, 78:15, 78:20, 79:5, 82:22, 83:13, 84:18, 85:22, 89:23, 91:24, 106:16, 112:25, 124:23

**accurate** [21] - 5:14, 25:3, 31:17, 32:1, 65:24, 69:11, 76:2, 79:2, 82:23, 82:24, 84:12, 84:22, 87:3, 89:12, 89:24, 93:14, 99:4, 99:17, 103:23, 188:4

**accurately** [1] - 79:1

**accused** [2] - 33:22, 84:10

**acquired** [1] - 32:7

**act** [1] - 108:9

**Act** [1] - 130:3

**acting** [1] - 165:25

**Action** [1] - 1:2

**actions** [1] - 111:21

**activities** [2] - 8:7, 74:22

**activity** [7] - 35:23, 42:16, 44:7, 60:15, 65:1, 96:24, 111:18

**actual** [13] - 4:15, 18:8, 18:14, 19:19, 30:2, 30:7, 30:10, 31:9, 33:13, 40:7, 47:6, 105:2, 165:10

**acute** [1] - 114:10

**add** [11] - 11:2, 11:9, 30:21, 34:4, 53:5, 75:10, 94:22, 113:1, 115:24, 131:19,

132:1

**added** [1] - 36:15

**addition** [2] - 97:13, 119:20

**additional** [16] - 17:23, 25:18, 25:23, 32:5, 39:7, 43:14, 48:20, 51:20, 56:18, 60:17, 70:3, 71:15, 74:9, 120:2, 158:12, 180:10

**additionally** [1] - 78:11

**address** [52] - 2:25, 47:5, 47:20, 48:17, 49:24, 50:9, 50:19, 51:13, 51:17, 53:1, 53:2, 53:5, 53:9, 57:10, 58:16, 60:14, 60:16, 63:2, 65:4, 68:13, 73:16, 73:17, 87:16, 105:14, 118:4, 118:6, 118:24, 119:7, 121:22, 122:4, 122:24, 123:2, 123:9, 123:18, 125:13, 126:23, 127:3, 129:18, 135:7, 136:2, 153:1, 153:5, 153:8, 153:12, 153:14, 159:17, 160:16, 162:18, 163:1

**addressed** [2] - 4:6, 98:5

**addresses** [41] - 42:12, 42:20, 44:23, 46:5, 46:21, 48:24, 49:2, 49:7, 49:15, 49:16, 50:3, 50:7, 60:21, 61:2, 62:25, 63:22, 63:24, 64:4, 68:16, 73:7, 74:4, 74:5, 74:13, 74:14, 74:16, 74:18, 74:20, 105:22, 107:18, 108:14, 109:8, 109:13, 121:24, 123:11, 126:25, 152:22, 152:23, 153:19, 160:15, 162:8, 162:17

**addressing** [1] - 37:25

**adequate** [5] - 142:19, 166:16, 178:13, 184:4, 185:1

**adequately** [1] - 4:6

**adjourned** [1] - 187:2

**adjusted** [1] - 183:14

**admissibility** [3] - 23:22, 24:11, 131:9

**admission** [1] - 106:1

**admit** [7] - 18:7, 20:7, 20:10, 23:8, 24:8, 148:20, 162:11

**admitted** [4] - 34:9, 44:12, 82:20, 104:14

**adopting** [1] - 118:4

**advance** [1] - 112:5

**advice** [1] - 100:18

**affects** [3] - 99:10, 99:13, 112:25

**afloat** [1] - 173:25

**afternoon** [3] - 21:3, 21:6, 180:24

**agencies** [3] - 29:3, 29:4, 68:24

**agents** [1] - 148:24

**aggregate** [2] - 45:5, 45:19

**ago** [3] - 19:22, 44:14, 133:5

**agree** [8] - 80:3, 91:10, 97:6, 99:2, 134:4, 149:1, 172:15, 180:19

**agreed** [1] - 178:10

**agreeing** [1] - 172:16

**agreement** [5] - 18:19, 20:17, 20:20, 172:21, 175:20

**agrees** [3] - 20:13, 50:2, 162:9

**ahead** [11] - 3:12, 5:21, 15:17, 31:5, 37:24, 37:25, 43:1, 53:12, 55:4, 128:11, 134:18

**Ahmed** [2] - 9:2, 9:10

**ahold** [1] - 135:20

**aided** [1] - 57:3

**airport** [12] - 135:9, 136:8, 136:19, 136:22, 137:15, 138:9, 143:11, 144:7, 146:20, 147:6, 148:7, 163:22

**Akemashite** [1] - 34:23

**Alden** [1] - 2:6

**ALDEN** [1] - 1:13

**algorithm** [2] - 112:22, 113:7

**algorithms** [3] - 52:8, 81:16, 99:15

**allegation** [1] - 33:16

**alleged** [2] - 28:6, 29:21

**alleging** [1] - 80:14

**allow** [19] - 4:2, 16:11, 26:3, 121:9, 121:12, 145:19, 170:3, 170:10, 171:1, 171:23, 173:10, 176:6, 176:13, 176:16, 176:19, 178:6, 183:21

**almost** [3] - 72:11, 85:6, 174:13

**alone** [1] - 57:9

**alongside** [1] - 24:3

**AlphaBay** [2] - 107:21, 109:10

**altered** [1] - 168:22

**Amazon.com** [1] - 156:19

**ambiguities** [1] - 162:12

**ambiguity** [2] - 155:8, 161:20

**ambiguous** [3] - 10:21, 162:15, 163:24

**amend** [1] - 98:6

**amendment** [1] - 59:23

**AMERICA** [1] - 1:2

**America** [1] - 2:3

**amount** [9] - 25:14, 25:19, 43:5, 57:23, 71:1, 80:14, 93:24, 101:12, 104:18

**amounts** [1] - 71:9

**anachronistic** [1] - 89:1

**analogous** [2] - 53:19, 133:12

**analogy** [1] - 97:11

**analysis** [88] - 38:9, 38:10, 41:18, 41:19, 41:22, 42:3, 42:11, 42:22, 43:3, 43:4, 43:6, 46:23, 48:25, 49:8, 49:12, 50:4, 50:8, 52:10, 52:15, 54:3, 54:5, 54:15, 56:10, 56:18, 56:24, 57:1, 57:6, 57:16, 57:18, 57:23, 58:6, 58:8, 58:9, 58:10, 58:13, 58:17, 58:21, 59:18, 59:22, 60:5, 60:7, 60:13, 61:12, 64:22, 65:19, 66:12, 66:13, 67:1, 67:6, 67:25, 70:2, 70:9, 71:8, 71:20, 73:22, 74:19, 80:3, 80:17, 85:12, 89:15, 99:14,

106:9, 107:9, 109:21, 112:14, 115:19, 116:11, 120:2, 121:20, 121:21, 122:24, 123:1, 123:2, 123:9, 123:19, 125:13, 126:3, 126:6, 126:18, 126:23, 129:13, 129:17, 135:7, 136:2, 159:16, 170:1, 170:7

**analyst** [2] - 88:15, 99:9

**analyze** [3] - 59:25, 122:24, 146:25

**analyzed** [7] - 57:12, 136:6, 136:13, 136:15, 137:2, 139:6, 142:25

**analyzing** [3] - 136:23, 150:2, 151:25

**Andy** [1] - 26:17

**anecdotal** [6] - 78:16, 78:21, 81:21, 85:22, 86:14, 86:16

**anecdote** [1] - 89:21

**anecdotes** [4] - 79:6, 82:22, 84:13, 85:9

**Angela** [2] - 5:18, 5:22

**answer** [7] - 5:6, 16:9, 20:21, 52:4, 79:24, 96:11, 160:7

**answered** [7] - 78:2, 78:5, 78:7, 78:8, 78:14, 83:20, 85:20

**answering** [1] - 185:15

**answers** [2] - 121:15, 174:7

**anti** [1] - 131:3

**anti-money** [1] - 131:3

**anticipate** [1] - 8:23

**anticipated** [1] - 16:19

**anticipating** [1] - 4:12

**antithesis** [1] - 84:14

**anyway** [4] - 102:12, 142:22, 174:9, 174:14

**apologies** [1] - 49:9

**apologize** [4] - 40:6, 55:9, 63:10, 124:18

**appeal** [3] - 27:20, 60:2, 167:25

**appear** [3] - 33:15, 36:8, 144:3

**appearance** [1] - 181:3

**appearing** [1] - 182:8

**appliable** [1] - 97:13

**applicability** [2] - 3:4, 37:11

**applicable** [1] - 107:20

**application** [3] - 8:24, 141:24, 158:16

**applied** [9] - 42:3, 47:15, 54:25, 60:10, 75:14, 75:20, 102:4, 102:8, 103:10

**applies** [2] - 37:6, 90:11

**apply** [9] - 41:22, 53:8, 91:6, 91:9, 103:17, 140:11, 154:14, 161:18, 183:19

**applying** [2] - 53:20, 102:24

**appreciate** [5] - 3:23, 5:15, 36:20, 106:24, 107:3

**appreciation** [1] - 129:1

**approach** [1] - 161:17

**approaches** [1] - 102:4

**appropriate** [20] - 4:3, 51:24, 55:2, 101:17, 106:5, 106:9, 108:16, 111:23, 115:16, 121:11, 129:19, 129:20, 143:16, 161:6, 162:8, 170:2, 171:3, 171:18, 173:1, 178:9

**appropriately** [2] - 44:22, 168:5

**approved** [2] - 24:12, 58:24

**arbitrarily** [1] - 94:10

**arbitrary** [4] - 88:20, 94:16, 119:7

**area** [4] - 41:12, 101:14, 130:18, 156:8

**argue** [1] - 163:3

**argued** [1] - 142:25

**arguing** [4] - 30:3, 84:5, 137:12, 144:25

**argument** [11] - 2:23, 16:2, 19:24, 23:10, 28:24, 29:1, 32:16, 91:15, 127:23, 150:4

**arguments** [2] - 37:5, 174:20

**arrest** [8] - 66:2, 66:10, 66:18, 72:12, 141:25, 158:17, 159:8, 179:7

**arrested** [2] - 93:18,

136:8

**arrive** [1] - 130:19

**art** [1] - 83:11

**article** [5] - 86:21, 86:23, 105:24, 105:25, 106:6

**articles** [1] - 33:12

**articulated** [1] - 168:1

**artifacts** [1] - 172:8

**aspect** [3] - 70:21, 70:24, 112:16

**aspects** [3] - 70:7, 96:14, 108:4

**assessing** [1] - 51:13

**assessment** [3] - 60:17, 64:4, 125:21

**assets** [4] - 23:1, 129:2, 136:19, 147:5

**assigned** [2] - 160:17

**assistance** [1] - 100:20

**assistant** [2] - 9:19, 13:10

**assistants** [1] - 9:14

**assisting** [1] - 56:13

**associate** [1] - 10:13

**associated** [5] - 63:3, 74:14, 107:18, 108:15, 163:1

**assume** [4] - 29:19, 76:17, 96:22, 153:8

**assuming** [3] - 35:17, 111:14, 116:5

**assumption** [2] - 96:20, 127:20

**assumptions** [3] - 83:12, 95:1, 99:15

**assured** [1] - 52:22

**astonished** [1] - 83:16

**astonishes** [2] - 99:7, 99:11

**astonishing** [2] - 81:25, 82:19

**attachments** [7] - 42:19, 57:8, 108:20, 108:22, 109:23, 109:24, 110:2

**attack** [1] - 158:1

**attempt** [4] - 63:9, 90:21, 94:17, 158:23

**attempted** [1] - 4:24

**attempting** [1] - 27:20

**attempts** [2] - 145:9, 157:22

**attest** [2] - 29:23, 78:20

**attesting** [1] - 78:4

**attorney** [1] - 59:6

**Attorney's** [3] - 5:11, 98:6, 109:13

**attorneys** [3] - 9:8, 185:4, 185:6

**attributable** [1] - 93:24

**attributed** [1] - 73:8

**attributing** [3] - 80:19, 92:20, 176:1

**attribution** [7] - 46:2, 51:25, 59:11, 73:3, 115:4, 160:16, 162:18

**attributions** [6] - 114:18, 159:19, 159:20, 162:17, 173:2

**atypical** [1] - 127:18

**audit** [1] - 85:12

**August** [1] - 124:4

**AUSA** [1] - 2:9

**authentic** [1] - 35:16

**authenticated** [3] - 28:13, 33:23, 148:13

**authenticating** [1] - 23:14

**authentication** [2] - 22:11, 22:12

**authenticity** [6] - 24:13, 28:22, 29:25, 36:17, 119:22, 152:20

**authority** [2] - 114:13, 114:16

**automate** [2] - 102:10, 102:15

**available** [12] - 16:25, 17:5, 51:22, 80:7, 88:23, 92:7, 102:5, 140:18, 167:13, 167:14, 179:23, 179:24

**Ave** [1] - 1:17

**Avenue** [3] - 1:14, 1:23, 188:11

**avoid** [4] - 10:3, 61:18, 161:19, 162:12

**aware** [11] - 33:16, 59:1, 70:18, 90:10, 127:15, 142:20, 143:11, 143:12, 169:12, 174:24, 175:3

**awareness** [2] - 131:1, 131:3

**axiom** [1] - 119:24

**B**

**backdoor** [2] - 116:19, 155:8

**background** [7] -

39:22, 41:4, 41:16, 107:25, 122:6, 131:9, 132:18

**background-type** [1] - 41:4

**backwards** [3] - 102:7, 102:13, 102:15

**balances** [1] - 3:20

**ball** [1] - 78:23

**ballistics** [1] - 98:12

**bank** [4] - 28:11, 28:12, 28:14, 28:25

**Bank** [3] - 28:16, 28:20, 130:2

**banking** [1] - 130:2

**bankruptcy** [11] - 22:25, 26:10, 28:4, 28:5, 29:17, 29:18, 29:20, 29:22, 30:3, 30:5, 174:1

**banks** [1] - 33:24

**base** [3] - 64:3, 156:24, 161:21

**baseball** [1] - 78:23

**based** [60] - 12:15, 24:1, 39:4, 42:22, 44:9, 44:19, 45:10, 45:19, 46:2, 46:3, 46:14, 47:8, 47:13, 47:19, 48:8, 48:10, 48:13, 50:20, 51:21, 51:23, 52:1, 52:25, 53:23, 59:22, 60:18, 63:4, 66:12, 67:5, 67:8, 67:24, 75:7, 78:17, 80:6, 82:1, 82:3, 82:9, 82:22, 83:12, 89:21, 95:7, 95:8, 99:14, 103:20, 107:19, 122:22, 126:4, 129:1, 143:25, 145:1, 147:12, 150:5, 151:7, 161:25, 165:12, 172:20, 176:11

**basic** [1] - 97:12

**basing** [1] - 125:21

**basis** [20] - 19:17, 21:23, 72:11, 77:18, 119:16, 123:2, 125:9, 125:20, 140:14, 151:5, 151:10, 165:2, 165:17, 168:4, 170:7, 170:13, 170:23, 172:2, 172:3, 172:4

**battery** [1] - 164:3

become [1] - 10:2
becoming [1] - 152:6
BEFORE [1] - 1:8
beginning [4] - 44:18, 45:21, 124:13, 180:15
behalf [3] - 29:17, 165:8, 179:14
behavior [6] - 61:20, 108:10, 108:13, 121:5, 145:10
behavioral [4] - 61:19, 82:2, 99:15, 108:6
behind [2] - 81:23, 96:6
belabor [8] - 27:17, 27:19, 31:1, 36:18, 92:13, 121:7, 134:16, 155:14
belatedly [1] - 139:1
believes [1] - 46:15
belong [3] - 73:7, 85:4, 99:19
belonged [2] - 51:17, 136:16
belonging [1] - 42:13
belongs [1] - 51:14
best [8] - 7:12, 7:15, 9:23, 122:17, 182:16, 182:19, 182:22, 188:6
better [2] - 158:10, 162:22
between [19] - 17:17, 34:13, 38:11, 45:5, 45:12, 79:15, 80:9, 84:4, 94:6, 94:12, 96:3, 103:8, 105:11, 109:22, 110:14, 136:22, 163:16, 163:20, 168:11
beyond [6] - 38:8, 72:3, 106:20, 121:6, 166:17, 177:4
BF [2] - 108:25, 109:1
bias [2] - 99:13
biased [1] - 79:7
big [7] - 18:18, 70:6, 70:21, 89:25, 90:5, 92:14, 100:1
bigger [1] - 152:6
billion [1] - 100:1
binder [2] - 44:15, 108:25
binders [1] - 40:15
birth [1] - 7:4
Bisbee [18] - 38:4, 38:12, 38:19, 45:7, 54:11, 61:6, 67:22, 71:18, 77:25, 78:11,

91:19, 105:7, 107:7, 111:5, 113:4, 114:12, 141:8, 141:11
Bisbee's [8] - 52:14, 61:17, 62:14, 80:18, 83:4, 85:6, 105:18, 110:9
Bishop [1] - 114:25
Bishop's [1] - 92:5
bit [19] - 3:8, 10:16, 17:2, 17:8, 37:14, 43:17, 45:8, 73:9, 88:24, 88:25, 100:21, 110:21, 117:13, 120:18, 159:19, 162:21, 171:15, 177:13, 184:23
Bitcoin [95] - 4:24, 34:24, 40:4, 40:17, 40:22, 41:11, 42:11, 42:13, 42:20, 44:23, 45:6, 45:13, 46:3, 46:6, 46:20, 47:2, 47:5, 47:8, 47:14, 47:23, 48:15, 48:16, 49:1, 49:11, 49:13, 49:24, 49:25, 50:3, 50:7, 50:10, 50:19, 50:20, 51:16, 51:17, 51:22, 51:25, 53:4, 57:10, 59:25, 68:6, 68:14, 68:16, 68:17, 69:6, 69:7, 69:10, 73:7, 74:15, 74:21, 80:15, 80:22, 81:13, 88:12, 88:16, 90:20, 93:25, 98:19, 104:18, 108:15, 108:17, 109:8, 109:19, 116:25, 126:15, 126:22, 127:4, 129:1, 129:24, 130:23, 132:9, 133:16, 134:13, 138:3, 143:23, 143:24, 144:4, 144:9, 144:18, 144:24, 145:15, 146:22, 146:25, 155:18, 157:13, 157:22, 157:25, 159:14, 164:14, 165:14, 170:16, 170:22, 171:14, 172:7, 172:9, 172:20
BitcoinTalk [3] - 41:9, 41:11, 130:22

Bitfinex [2] - 4:19, 4:23
BitLocker [1] - 136:17
black [2] - 62:6, 62:8
blanked [1] - 110:20
blanket [1] - 167:5
block [3] - 46:1, 51:9, 92:10
blockchain [80] - 23:19, 25:9, 25:15, 25:23, 38:9, 38:10, 39:3, 39:19, 40:1, 40:12, 41:18, 41:19, 42:3, 42:11, 43:2, 43:7, 44:7, 47:2, 47:14, 47:21, 48:16, 48:25, 49:11, 50:17, 51:6, 51:10, 51:22, 52:10, 52:15, 56:10, 56:18, 56:24, 57:16, 57:18, 57:23, 57:25, 58:6, 58:8, 58:9, 58:10, 58:13, 58:17, 58:21, 59:18, 59:22, 59:25, 60:5, 60:7, 60:13, 60:15, 64:22, 66:3, 66:12, 66:13, 67:1, 67:5, 67:6, 67:25, 71:8, 71:12, 74:22, 80:1, 80:2, 80:9, 80:10, 81:24, 83:24, 84:5, 84:6, 89:5, 92:7, 92:9, 92:16, 96:18, 102:24, 106:1, 106:2, 106:9, 108:10, 170:6
body [1] - 83:25
book [2] - 26:17, 29:8
books [1] - 33:12
border [1] - 133:8
borne [1] - 66:1
bothered [5] - 79:8, 82:20, 84:17, 84:18, 91:23
bottom [2] - 48:14, 60:6
bound [1] - 81:17
box [2] - 62:6, 62:8
boxed [1] - 50:5
brackets [2] - 4:8, 4:9
break [10] - 15:1, 21:12, 27:6, 38:1, 53:13, 55:4, 76:16, 100:8, 110:12, 134:19
breakdown [1] - 43:18
brief [2] - 128:13, 131:24
briefed [5] - 22:18,

26:8, 28:9, 131:6, 131:11
briefing [5] - 16:3, 37:18, 106:21, 106:23, 158:11
briefings [1] - 52:13
briefly [4] - 16:21, 126:21, 133:16, 135:4
bring [2] - 87:22, 153:18
bringing [2] - 27:23, 105:25
broadcasting [1] - 16:11
broadly [1] - 82:15
broken [2] - 78:25, 105:3
brought [5] - 16:20, 54:10, 101:2, 104:17, 133:6
BROWN [16] - 1:10, 2:9, 129:5, 129:10, 129:17, 129:22, 131:1, 131:11, 131:14, 131:19, 131:22, 131:24, 132:13, 133:3, 183:3, 186:18
Brown [8] - 2:9, 71:3, 86:21, 105:25, 129:4, 166:24, 183:2, 186:12
browser [4] - 7:22, 7:24, 8:1, 8:6
Bryan [2] - 92:5, 114:24
build [1] - 89:10
building [2] - 27:23, 27:24
built [2] - 89:14, 113:13
bulk [3] - 47:18, 121:18, 133:5
Bullet [1] - 125:5
bunch [4] - 4:23, 85:14, 156:11, 156:13
business [29] - 22:24, 26:11, 28:5, 28:6, 28:21, 29:13, 29:17, 29:18, 29:21, 29:23, 30:2, 30:11, 31:15, 35:9, 35:16, 35:22, 36:2, 36:3, 36:5, 36:7, 50:17, 129:25, 130:5, 132:10, 148:14, 168:9, 168:13, 183:11
businesses [2] -

22:25, 33:23
buyers [1] - 88:22

**C**

cables [1] - 164:2
calculate [4] - 61:23, 62:2, 84:9, 88:18
calculated [1] - 183:15
calculates [1] - 40:17
calculating [1] - 103:19
calendar [1] - 180:2
calibrated [1] - 92:4
California [3] - 27:11, 27:13, 27:17
cannot [5] - 17:17, 126:16, 126:18, 148:13, 151:1
cap [1] - 40:17
capacity [1] - 137:1
caps [1] - 183:17
caption [1] - 133:25
capture [1] - 163:14
car [1] - 27:6
care [1] - 81:7
careful [2] - 120:18, 169:2
carefully [3] - 3:9, 171:16, 171:17
carrying [1] - 133:8
carve [1] - 180:5
case [91] - 3:22, 4:5, 4:10, 9:15, 11:22, 13:24, 14:3, 15:2, 17:11, 32:14, 34:22, 36:5, 36:13, 42:4, 52:6, 54:18, 55:1, 56:25, 57:8, 57:15, 60:2, 60:25, 61:13, 65:2, 67:16, 68:21, 69:19, 70:8, 74:21, 77:19, 80:13, 81:5, 83:1, 86:8, 86:13, 86:15, 88:25, 89:18, 90:2, 90:7, 90:8, 90:10, 90:13, 90:22, 91:3, 95:21, 96:10, 98:15, 99:1, 102:6, 107:22, 111:22, 114:23, 126:16, 131:7, 131:14, 131:18, 131:25, 132:9, 132:16, 133:2, 133:5, 133:12, 133:14, 133:23, 133:25, 138:17, 139:12, 144:12, 145:14,

146:3, 146:13, 146:16, 147:2, 147:15, 147:17, 148:4, 150:9, 151:17, 153:24, 167:6, 169:1, 173:16, 173:24, 174:17, 177:3, 177:19, 178:23, 183:1

**Case** [1] - 2:2

**cases** [28] - 7:11, 37:22, 52:12, 52:16, 60:7, 68:1, 70:22, 71:11, 71:22, 71:25, 72:2, 72:3, 72:14, 78:17, 81:21, 85:2, 85:3, 89:13, 90:4, 90:11, 90:12, 98:24, 127:18, 136:21, 160:25, 161:2

**cash** [2] - 133:5, 133:8

**catchall** [4] - 142:14, 143:3, 143:5, 167:5

**categories** [1] - 135:25

**Category** [1] - 183:15

**category** [1] - 73:21

**caution** [1] - 132:4

**caveat** [1] - 97:6

**caveats** [1] - 68:9

**CBP** [2] - 133:6, 133:11

**ceased** [1] - 111:2

**cell** [3] - 147:6, 158:22, 164:4

**Cellebrite** [1] - 146:20

**cements** [1] - 75:4

**central** [1] - 29:14

**CEO** [2] - 173:14, 173:21

**certain** [3] - 42:9, 145:25, 155:7

**certainly** [12] - 59:10, 61:11, 67:22, 72:6, 104:19, 131:19, 131:25, 132:23, 148:16, 169:4, 169:10, 169:13

**certainty** [3] - 98:18, 99:1, 160:23

**CERTIFICATE** [1] - 188:1

**certificate** [1] - 7:4

**certification** [10] - 14:1, 29:11, 31:18, 31:19, 32:2, 32:5, 32:12, 32:19, 32:25, 33:2

**certifications** [6] -

31:14, 31:23, 32:22, 33:7, 56:17, 75:19

**certified** [3] - 23:13, 31:14, 35:10

**certify** [7] - 26:11, 28:4, 30:2, 30:12, 31:20, 165:9, 188:3

**certifying** [4] - 29:13, 30:8, 35:8, 35:18

**cetera** [1] - 105:23

**chain** [27] - 31:22, 46:21, 60:21, 74:25, 75:6, 75:8, 75:10, 108:13, 112:9, 112:11, 112:14, 112:19, 112:23, 112:24, 115:15, 135:9, 136:3, 136:4, 136:9, 137:13, 137:22, 138:11, 140:23, 142:12, 143:10, 148:12, 175:3

**Chainalysis** [123] - 26:18, 38:18, 38:22, 40:18, 42:12, 42:22, 43:10, 44:9, 44:21, 44:22, 45:10, 45:20, 45:25, 46:2, 46:4, 46:5, 47:2, 47:9, 47:13, 47:19, 47:22, 47:25, 48:9, 48:17, 49:5, 49:13, 49:25, 50:9, 50:14, 50:20, 51:11, 51:12, 51:15, 52:2, 52:21, 59:24, 61:18, 62:12, 62:20, 62:22, 63:2, 63:5, 63:14, 63:22, 64:10, 64:12, 65:3, 65:7, 65:20, 67:8, 67:11, 67:23, 68:13, 68:16, 68:25, 69:6, 69:19, 70:12, 70:14, 70:20, 72:10, 72:16, 73:3, 73:8, 75:5, 75:9, 75:11, 75:19, 76:6, 76:20, 77:9, 77:24, 78:4, 78:6, 78:8, 78:10, 78:11, 78:12, 78:19, 78:21, 79:8, 79:12, 79:16, 79:21, 79:22, 80:4, 80:11, 80:25, 81:2, 81:22, 82:19, 84:3, 86:1, 86:18, 87:13, 89:19, 91:17, 91:24, 100:6, 100:23, 102:11, 102:17, 102:22, 103:3, 103:4, 103:9,

103:23, 103:25, 104:1, 104:9, 107:9, 108:5, 108:15, 110:10, 110:15, 111:1, 112:7, 113:7, 115:13, 170:6, 170:7, 175:24, 175:25

**Chainalysis's** [5] - 73:18, 74:16, 101:15, 103:20, 112:13

**chains** [11] - 39:20, 46:13, 46:15, 46:19, 50:24, 51:3, 60:22, 61:1, 101:25, 112:7, 112:8

**challenge** [18] - 58:6, 59:8, 59:21, 59:23, 70:25, 77:14, 83:18, 83:19, 88:6, 89:9, 89:15, 96:21, 115:23, 116:15, 119:21, 129:11, 131:12, 145:20

**challenged** [2] - 116:12, 132:6

**challenging** [3] - 77:12, 77:16, 88:4

**chance** [1] - 9:15

**change** [3] - 5:15, 101:25, 151:21

**changed** [1] - 6:25

**changes** [1] - 12:2

**channels** [1] - 32:10

**characteristics** [1] - 23:16

**characterized** [1] - 144:11

**charged** [1] - 111:21

**charges** [1] - 80:13

**charging** [1] - 168:16

**chart** [4] - 44:5, 44:6, 49:22, 105:3

**charts** [3] - 44:4, 46:1, 129:14

**Chase** [2] - 28:16, 28:20

**check** [13] - 15:11, 54:8, 68:24, 73:6, 84:18, 84:19, 91:24, 93:16, 100:18, 114:1, 114:25, 139:7, 181:2

**checked** [2] - 54:21, 91:22

**checking** [3] - 68:25, 74:10, 74:14

**child** [3] - 66:14, 66:19, 66:22

**choppy** [1] - 124:21

**chose** [3] - 119:8, 127:13, 127:21

**Christopher** [1] - 2:9

**CHRISTOPHER** [1] - 1:10

**chunk** [1] - 180:4

**CipherTrace** [7] - 50:1, 79:20, 84:2, 86:19, 87:7, 94:11, 110:13

**Circuit** [7] - 17:10, 17:13, 24:10, 54:16, 60:2

**Circuit's** [1] - 53:17

**circumstance** [2] - 53:19, 168:11

**citation** [1] - 72:23

**citations** [3] - 67:16, 75:24, 131:25

**cite** [10] - 23:24, 24:2, 24:6, 59:20, 83:6, 85:2, 94:6, 103:12, 118:21, 123:23

**cited** [4] - 34:7, 59:12, 90:12, 101:21

**cites** [1] - 86:22

**citing** [2] - 86:13, 103:13

**civil** [4] - 89:9, 90:8, 90:12, 117:15

**claims** [2] - 24:15, 137:16

**clarification** [3] - 77:12, 82:5, 185:18

**clarify** [5] - 119:14, 138:10, 153:1, 153:7, 154:22

**clarity** [1] - 186:5

**clear** [19] - 19:7, 24:19, 24:22, 26:21, 34:18, 36:12, 52:6, 56:23, 113:10, 118:11, 125:24, 132:8, 139:10, 163:18, 167:11, 173:5, 174:7, 175:22, 175:23

**clearly** [1] - 95:2

**clearnet** [2] - 122:7, 164:13

**clerk** [5] - 16:23, 100:18, 142:2, 142:6, 142:8

**client** [2] - 14:2, 14:10

**clients** [1] - 164:18

**clock** [3] - 78:25, 79:2, 186:14

**close** [4] - 74:8, 79:15, 121:25, 180:15

**closed** [2] - 80:10, 139:12

**closed-source** [1] - 80:10

**closer** [2] - 147:22, 153:9

**cluster** [10] - 42:13, 44:21, 49:11, 49:13, 51:16, 53:6, 61:20, 61:22, 102:11, 115:17

**clustered** [11] - 49:1, 62:22, 63:2, 63:22, 68:17, 69:2, 74:20, 75:10, 75:11, 102:17, 108:16

**clustering** [25] - 38:18, 38:22, 44:23, 47:14, 50:14, 58:18, 58:22, 58:24, 59:2, 59:16, 62:9, 65:1, 68:7, 69:1, 69:21, 70:25, 73:18, 74:16, 81:23, 92:19, 107:19, 108:4, 108:5, 108:6, 115:19

**clusters** [1] - 73:3

**CMIR** [2] - 133:9, 133:11

**co** [4] - 39:19, 108:5, 109:1, 115:15

**co-spend** [3] - 39:19, 108:5, 109:1

**co-spends** [1] - 115:15

**code** [6] - 54:20, 82:17, 123:13, 157:14, 157:15, 180:12

**coding** [3] - 156:10, 156:12, 156:23

**cognitive** [1] - 99:13

**coin** [1] - 40:17

**Coinbase** [1] - 50:18

**coincidence** [4] - 7:2, 7:3, 8:10, 8:19

**CoinJoin** [3] - 96:22, 96:23, 113:25

**CoinJoins** [2] - 113:5, 113:15

**colleagues** [1] - 73:10

**collect** [4] - 79:8, 82:20, 82:25, 84:24

**collected** [2] - 60:7, 64:18

**colloquialism** [1] - 10:3

**COLUMBIA** [1] - 1:1

**combination** [1] - 76:20

comfortable [1] - 160:13
coming [14] - 8:1, 91:19, 91:20, 114:12, 126:13, 126:14, 126:25, 135:6, 140:14, 145:22, 168:7, 169:17, 173:13
comments [1] - 3:13
commit [1] - 144:13
committed [1] - 96:2
common [9] - 41:5, 41:8, 89:9, 127:24, 159:4, 164:17, 164:23, 165:2, 165:16
commonly [1] - 106:3
communicate [2] - 14:8, 14:9
communicated [1] - 182:19
communicating [1] - 144:15
community [3] - 84:1, 97:14, 97:15
company [6] - 84:16, 100:1, 122:4, 150:18, 150:19, 173:25
compare [2] - 79:13, 81:1
compared [2] - 102:1, 102:23
comparison [2] - 23:16, 54:22
competence [2] - 137:5, 179:10
competing [1] - 48:25
competitor [1] - 49:5
complaint [7] - 81:4, 81:10, 87:4, 87:5, 102:6, 104:17, 166:5
complete [3] - 7:2, 17:24, 188:5
completely [7] - 74:2, 84:13, 86:3, 94:15, 136:25, 151:5, 175:23
completeness [1] - 19:14
complex [3] - 38:23, 56:25
compliance [1] - 84:21
complicated [7] - 20:19, 92:5, 95:21, 99:24, 112:18, 114:7, 114:9
complies [1] - 31:18

complying [1] - 32:6
compounds [1] - 99:16
compromised [1] - 137:8
computed [1] - 125:1
computer [19] - 7:1, 14:13, 14:16, 15:2, 38:15, 99:22, 100:14, 113:12, 123:14, 145:10, 156:10, 156:12, 156:22, 156:23, 158:24, 159:4, 164:16, 165:25, 169:22
computer-user [1] - 145:10
computers [5] - 35:24, 35:25, 123:11, 147:6, 156:22
conceal [1] - 42:16
conceded [2] - 61:6, 176:14
concedes [1] - 93:24
conceding [1] - 94:1
concept [1] - 126:2
concepts [6] - 39:8, 39:22, 41:22, 107:25, 108:3, 122:6
concern [11] - 9:22, 115:13, 117:1, 139:13, 155:5, 155:6, 173:12, 174:10, 176:21, 177:17, 178:6
concerned [6] - 3:22, 61:4, 120:24, 121:6, 128:23, 145:4
concerns [3] - 15:6, 116:18, 179:15
concluded [1] - 178:8
conclusion [6] - 50:8, 124:15, 124:19, 125:4, 165:3, 172:2
conclusions [4] - 161:5, 161:24, 163:4, 177:11
conclusively [1] - 24:12
conclusory [2] - 127:20, 170:12
concrete [10] - 18:13, 65:14, 148:7, 148:8, 161:15, 161:21, 162:4, 172:18, 178:20, 179:1
conducting [1] - 4:3
CONFERENCE [2] - 1:4, 1:7

conference [1] - 2:22
conferencing [2] - 13:5, 13:8
confess [1] - 66:18
confident [3] - 75:8, 104:8, 126:8
configuration [1] - 121:4
confirm [10] - 46:18, 49:1, 54:8, 54:13, 61:9, 65:17, 70:14, 102:16, 106:16, 116:8
confirmation [10] - 39:19, 49:10, 65:15, 65:23, 68:19, 73:21, 74:2, 75:23, 76:1, 99:13
confirmations [1] - 25:5
confirmed [3] - 51:2, 67:11, 93:5
confirming [2] - 47:25, 67:1
confirms [3] - 64:11, 69:11, 73:23
conflate [1] - 92:16
confused [3] - 99:21, 117:24, 136:4
confusing [1] - 83:9
confusion [2] - 6:25, 114:10
connection [2] - 33:20, 173:16
consent [4] - 15:25, 16:2, 16:3, 182:18
conservative [2] - 86:3, 103:25
consider [9] - 28:3, 54:24, 61:14, 101:17, 112:5, 139:21, 140:3, 184:15
consideration [3] - 150:1, 151:24, 152:1
considered [1] - 61:16
considers [1] - 153:24
consist [1] - 118:12
consistent [2] - 16:16, 113:12
consistently [1] - 73:13
consolidated [1] - 50:25
conspiracy [1] - 183:9
constant [2] - 155:23, 171:10
constantly [1] - 158:1
constitutes [1] - 188:4
Constitution [2] -

1:23, 188:11
constitution [1] - 91:3
constitutionally [5] - 90:15, 90:22, 90:23, 91:12, 91:17
consult [1] - 104:5
consultation [3] - 47:22, 47:24, 51:12
consulted [2] - 46:4, 50:21
consulting [1] - 57:22
contact [3] - 13:10, 15:7, 15:12
contacted [1] - 13:13
contained [2] - 46:16, 51:16
contemplate [1] - 130:17
contents [2] - 51:1, 137:25
contest [2] - 145:20, 145:22
context [4] - 130:21, 131:9, 132:25, 144:20
contextual [2] - 130:3, 132:21
continual [1] - 157:22
continually [1] - 164:4
continue [4] - 33:15, 55:8, 157:10, 179:25
continues [2] - 31:7, 47:10
continuing [1] - 25:22
contract [1] - 13:3
control [3] - 73:17, 85:11, 169:9
controlled [9] - 47:23, 50:10, 50:20, 60:21, 62:21, 68:13, 68:16, 75:1, 108:17
controlling [2] - 122:3
controls [2] - 63:25, 169:9
convey [2] - 126:1, 184:19
conveyed [1] - 55:18
convicted [14] - 26:15, 28:16, 28:19, 33:22, 33:25, 34:8, 35:3, 149:15, 149:16, 149:24, 150:6, 150:11, 151:23, 173:21
conviction [5] - 33:10, 34:6, 34:7, 149:8, 149:12
convictions [2] - 30:16, 97:23
convince [2] - 157:8,

178:7
convinced [3] - 178:3, 178:7, 179:5
cooperating [5] - 4:13, 4:22, 4:25, 5:7, 116:23
copies [2] - 3:2, 23:3
copious [1] - 19:8
copy [1] - 24:1
core [1] - 179:10
corner [1] - 48:14
correct [18] - 13:20, 14:14, 22:14, 41:20, 43:23, 58:12, 67:13, 80:8, 82:14, 114:2, 114:24, 116:3, 124:25, 137:22, 150:10, 165:15, 180:25, 186:8
corrected [1] - 125:25
correction [1] - 113:25
correctly [17] - 7:25, 63:2, 69:20, 72:16, 82:8, 88:9, 91:25, 110:9, 113:5, 117:9, 118:20, 123:3, 123:21, 158:6, 160:5, 161:14, 161:19
correlation [1] - 79:15
corresponded [1] - 65:19
corresponding [3] - 20:11, 25:16, 65:12
corresponds [1] - 62:6
corroborate [1] - 49:12
corroborated [2] - 46:7, 66:3
corroborates [1] - 64:22
corroborating [5] - 23:15, 23:20, 67:1, 86:24, 90:19
corroboration [7] - 24:25, 25:3, 25:21, 25:23, 25:24, 60:4, 62:17
corrupt [1] - 148:15
counsel [7] - 2:4, 2:5, 8:23, 9:4, 52:21, 182:8, 183:4
count [2] - 183:8, 183:10
counterpart [1] - 18:15
country [6] - 33:25, 56:14, 66:1, 67:19, 71:25, 168:10

counts [2] - 183:8, 183:13
County [1] - 167:15
couple [9] - 6:21, 7:11, 14:21, 15:15, 100:22, 101:20, 122:20, 177:13, 180:5
course [4] - 5:8, 6:9, 161:18, 186:4
Court [60] - 1:22, 1:22, 4:1, 6:22, 7:5, 7:8, 7:12, 8:3, 8:25, 11:21, 11:23, 12:6, 12:13, 12:21, 14:4, 14:7, 14:8, 16:24, 17:14, 35:6, 38:3, 43:25, 51:8, 54:11, 55:25, 58:4, 61:12, 75:15, 91:7, 92:13, 95:17, 95:18, 97:7, 106:22, 109:5, 110:24, 111:2, 117:12, 118:14, 126:25, 128:17, 132:17, 132:20, 134:16, 135:3, 135:23, 140:15, 149:5, 149:17, 154:9, 154:13, 155:3, 155:7, 157:7, 158:11, 161:14, 162:11, 169:3, 188:10
COURT [443] - 1:1, 2:8, 2:11, 2:14, 2:17, 2:21, 3:18, 4:2, 4:9, 4:17, 4:19, 5:5, 5:12, 5:15, 5:19, 5:21, 5:24, 6:3, 6:6, 6:8, 6:12, 6:15, 6:18, 7:3, 7:6, 7:15, 7:23, 8:2, 8:4, 8:13, 8:17, 8:21, 9:3, 9:5, 9:8, 9:12, 9:18, 10:5, 10:10, 10:14, 10:18, 10:22, 11:1, 11:9, 11:12, 11:14, 11:17, 11:24, 12:2, 12:17, 12:22, 13:17, 13:20, 14:5, 14:11, 14:16, 14:18, 14:25, 15:5, 15:14, 15:17, 15:20, 15:23, 16:9, 16:14, 16:20, 18:21, 19:17, 20:1, 20:8, 20:25, 21:4, 21:11, 21:20, 22:1, 22:5, 22:10, 22:15, 23:23, 24:7, 24:25, 26:5, 27:5, 27:12,

27:19, 28:10, 28:18, 28:23, 29:15, 31:4, 31:12, 32:16, 32:21, 33:3, 33:19, 33:24, 34:3, 34:8, 34:12, 35:21, 36:20, 38:10, 38:20, 39:11, 39:14, 39:23, 39:25, 40:8, 40:11, 40:20, 40:24, 41:5, 41:8, 41:14, 41:17, 41:24, 42:5, 42:14, 42:17, 42:24, 43:1, 43:11, 43:17, 44:2, 44:11, 44:15, 44:24, 45:2, 45:18, 46:24, 47:11, 47:17, 47:24, 48:3, 48:6, 48:10, 48:18, 49:4, 49:17, 49:21, 50:11, 50:22, 51:2, 51:18, 52:3, 52:17, 53:12, 55:11, 55:14, 55:16, 55:21, 55:23, 56:3, 56:22, 57:4, 58:1, 58:23, 59:12, 60:9, 61:4, 62:4, 63:6, 63:12, 64:7, 64:24, 65:14, 65:22, 66:4, 66:9, 66:16, 67:3, 67:10, 67:14, 67:20, 68:2, 68:18, 69:5, 69:13, 69:17, 70:12, 71:5, 71:17, 72:4, 72:22, 72:25, 73:12, 73:20, 74:11, 74:17, 75:12, 75:16, 75:22, 76:4, 76:8, 76:12, 76:23, 77:6, 77:11, 77:17, 77:22, 79:10, 79:24, 81:7, 82:5, 82:12, 86:11, 87:16, 87:20, 87:24, 88:4, 89:8, 90:10, 91:5, 93:3, 93:15, 93:21, 94:4, 94:21, 95:2, 95:6, 95:15, 95:17, 95:20, 96:13, 97:8, 98:3, 100:4, 100:7, 100:13, 101:18, 102:18, 103:7, 103:15, 103:24, 104:11, 104:15, 105:1, 105:12, 105:21, 106:12, 106:24, 107:6, 108:22, 109:6, 109:16, 110:3, 110:5, 110:16, 111:13, 112:2, 112:15, 112:20, 113:9, 113:23,

114:3, 114:15, 114:21, 115:9, 115:20, 115:24, 116:8, 117:7, 117:13, 118:18, 119:2, 119:4, 119:10, 120:12, 120:17, 121:9, 122:19, 124:1, 124:5, 124:11, 124:16, 125:6, 125:15, 126:7, 126:20, 127:6, 127:10, 127:19, 127:23, 128:1, 128:5, 128:10, 128:18, 129:4, 129:9, 129:16, 129:18, 130:25, 131:6, 131:13, 131:15, 131:21, 131:23, 132:12, 132:23, 133:13, 133:18, 134:18, 134:24, 135:24, 136:12, 136:25, 137:9, 137:19, 138:19, 139:15, 139:19, 139:25, 140:3, 140:20, 141:2, 141:6, 141:9, 141:13, 141:16, 141:18, 141:22, 142:2, 142:5, 142:8, 142:18, 143:8, 143:14, 144:10, 145:12, 145:24, 146:2, 146:15, 147:14, 147:22, 148:10, 148:16, 149:1, 149:6, 149:11, 150:3, 150:15, 150:21, 151:1, 151:4, 151:10, 151:12, 151:20, 152:10, 152:18, 153:3, 153:9, 153:15, 153:22, 154:1, 154:4, 154:15, 154:22, 155:11, 155:19, 155:24, 156:2, 156:6, 156:13, 157:4, 157:8, 157:19, 158:3, 158:14, 159:1, 159:22, 160:13, 161:23, 162:5, 162:13, 162:20, 163:3, 163:6, 163:11,

164:11, 164:25, 165:17, 165:20, 165:24, 166:2, 166:10, 166:22, 167:2, 168:6, 168:21, 169:14, 169:25, 170:3, 170:9, 171:1, 171:4, 171:9, 171:15, 171:20, 171:23, 172:3, 172:10, 172:15, 172:23, 173:10, 175:12, 176:6, 176:11, 176:16, 176:19, 176:25, 177:10, 180:9, 180:23, 181:2, 181:11, 181:15, 181:25, 182:2, 182:7, 182:11, 182:15, 182:22, 182:25, 183:22, 184:4, 184:7, 184:10, 184:14, 184:17, 184:22, 185:5, 185:9, 185:14, 185:17, 185:19, 185:24, 186:2, 186:5, 186:11, 186:16, 186:19, 186:21, 188:1
court [28] - 2:16, 2:20, 9:14, 16:24, 16:25, 17:3, 17:4, 19:16, 28:16, 30:5, 34:9, 58:21, 79:23, 82:7, 85:4, 98:8, 98:9, 99:20, 100:16, 117:15, 124:17, 135:21, 140:18, 150:12, 151:2, 151:12, 181:11
Court's [3] - 3:20, 22:22, 110:1
Courthouse [1] - 1:23
Courtney [1] - 9:16
COURTNEY [1] - 9:16
COURTROOM [2] - 2:2, 181:1
courts [5] - 58:10, 58:15, 58:16, 83:3, 175:8
cover [1] - 106:25
covered [3] - 108:19, 135:25, 176:15
covers [1] - 142:4
CRC [2] - 1:22, 188:9
create [1] - 164:22
created [2] - 143:23,

168:23
creating [1] - 33:17
crime [2] - 144:13, 173:21
criminal [19] - 2:2, 16:11, 59:19, 66:1, 68:1, 81:4, 81:9, 81:19, 85:8, 87:4, 87:5, 90:7, 90:11, 91:3, 99:20, 111:22, 130:8, 145:11, 166:5
Criminal [2] - 1:2, 183:15
criminality [1] - 10:13
criteria [1] - 94:5
critical [1] - 43:21
criticize [1] - 186:11
criticizing [1] - 186:12
critique [2] - 38:4, 168:3
CRM [1] - 1:16
crook [1] - 173:14
cross [8] - 48:24, 77:25, 96:25, 122:18, 125:8, 126:9, 166:19, 177:5
cross-examination [5] - 96:25, 125:8, 126:9, 166:19, 177:5
cross-examined [1] - 77:25
cross-referenced [1] - 48:24
crossed [2] - 115:25, 118:1
crossing [1] - 125:18
CRR [2] - 1:22, 188:9
crux [2] - 91:15, 92:18
cryptocurrency [8] - 11:5, 11:18, 38:25, 40:21, 41:3, 41:9, 56:10, 56:18
Cryptocurrency [1] - 56:21
cryptocurrency-related [1] - 56:18
cumulative [1] - 134:12
Currency [1] - 56:12
currency [10] - 22:23, 56:14, 56:16, 62:20, 62:22, 62:23, 62:25, 107:25, 108:1, 133:9
curriculum [1] - 56:8
custodial [2] - 155:17, 170:15
custodian [1] - 26:15
custody [13] - 135:9, 136:3, 136:4, 136:10, 137:14,

137:22, 138:11, 140:23, 142:12, 143:10, 148:12, 149:24, 175:3
**customer** [1] - 63:1
**customers** [2] - 65:6
**customize** [1] - 62:1
**customizing** [1] - 61:22
**cut** [1] - 139:15
**cute** [1] - 7:10
**CV** [2] - 135:3, 135:19
**cybercriminal** [2] - 126:17, 127:18

**D**

**D.C** [10] - 1:5, 3:5, 24:10, 27:15, 37:12, 53:17, 54:16, 133:17, 188:11
**daily** [1] - 72:11
**danger** [1] - 92:14
**darknet** [34] - 9:25, 10:2, 10:10, 10:13, 10:21, 10:24, 11:7, 11:10, 11:18, 41:25, 42:16, 42:21, 45:4, 45:5, 52:1, 59:3, 59:4, 59:9, 59:11, 65:2, 65:4, 66:21, 69:14, 69:20, 70:21, 70:24, 80:22, 93:25, 104:24, 109:9, 109:19, 111:2, 111:8, 114:18
**data** [101] - 23:1, 23:11, 26:15, 26:16, 26:19, 28:20, 30:16, 31:2, 31:10, 35:3, 45:16, 53:23, 53:25, 54:1, 57:5, 57:6, 57:14, 57:15, 62:9, 68:12, 70:15, 71:16, 77:13, 78:12, 79:3, 79:4, 79:7, 79:12, 80:7, 82:4, 82:16, 82:17, 82:21, 83:1, 84:24, 88:23, 90:4, 92:12, 102:22, 102:23, 103:3, 104:7, 104:9, 122:22, 123:6, 125:12, 128:4, 135:10, 140:10, 148:13, 148:15, 148:25, 149:9, 149:10, 149:20, 149:23, 149:24, 150:2, 150:6, 150:9,

150:13, 150:14, 150:15, 150:18, 150:19, 150:22, 151:8, 151:15, 151:16, 151:17, 151:20, 151:24, 151:25, 152:1, 152:4, 152:5, 152:9, 152:12, 152:14, 152:17, 167:10, 167:13, 168:22, 173:11, 173:18, 173:20, 173:22, 173:24, 174:5, 174:9, 174:14, 174:16, 174:21, 177:19, 177:22
**database** [2] - 26:20, 26:24
**date** [6] - 25:13, 65:8, 65:12, 100:12, 140:4, 179:25
**Dated** [1] - 188:7
**dates** [1] - 30:20
**Daubert** [52] - 2:24, 22:8, 31:7, 37:21, 43:16, 44:13, 56:8, 58:8, 58:14, 58:24, 59:8, 60:1, 61:12, 72:20, 72:25, 73:1, 77:10, 78:1, 81:18, 83:9, 83:18, 83:19, 83:20, 84:14, 85:9, 85:16, 85:19, 86:8, 86:10, 91:6, 91:9, 91:11, 91:12, 91:17, 91:18, 94:19, 96:12, 99:18, 100:2, 101:5, 106:13, 115:2, 115:23, 117:5, 117:11, 117:13, 117:15, 117:18, 117:22, 119:15, 122:18, 132:6
**Daubert-specific** [1] - 60:1
**days** [3] - 19:22, 21:10, 63:21
**DC** [4] - 1:12, 1:14, 1:17, 1:24
**de** [8] - 116:1, 116:4, 121:17, 125:19, 143:9, 158:19, 159:16, 163:8
**De** [2] - 5:18, 5:22
**DE** [2] - 5:18, 5:23
**deadline** [2] - 181:23, 183:5
**deal** [5] - 7:13, 9:23, 9:24, 11:21, 99:12

**dealing** [4] - 22:20, 59:16, 98:19, 167:7
**deals** [1] - 148:12
**dealt** [1] - 122:17
**decide** [6] - 17:19, 18:4, 20:22, 93:8, 93:10, 184:20
**deciding** [1] - 24:11
**decision** [11] - 17:9, 53:17, 55:18, 119:21, 185:2, 185:6, 185:10, 185:23, 185:24, 186:2, 186:3
**declarant** [1] - 82:7
**declaration** [1] - 43:13
**declarations** [1] - 83:4
**deep** [9] - 10:1, 10:12, 10:14, 10:21, 10:24, 11:7, 11:9, 11:10, 11:19
**deeper** [2] - 123:10, 178:4
**deeply** [1] - 72:9
**default** [1] - 105:15
**DEFENDANT** [20] - 182:10, 182:14, 182:21, 182:24, 184:3, 184:6, 184:9, 184:12, 184:16, 184:21, 185:3, 185:8, 185:12, 185:15, 185:18, 185:23, 186:1, 186:4, 186:9, 186:15
**Defendant** [4] - 1:6, 1:18, 2:16, 2:19
**defendant** [9] - 9:9, 36:4, 91:3, 121:5, 127:13, 127:21, 128:8, 130:22, 183:19
**defendant's** [20] - 36:5, 41:1, 46:8, 46:13, 47:7, 47:16, 49:19, 49:23, 50:2, 50:25, 58:5, 61:2, 74:24, 99:1, 119:19, 120:10, 122:8, 122:10, 130:21, 131:2
**defendants** [1] - 66:2
**defense** [64] - 3:21, 6:12, 6:18, 8:11, 9:25, 12:8, 16:19, 18:6, 19:4, 19:22, 20:3, 23:6, 23:8, 23:10, 26:22, 27:2, 31:7, 36:14, 37:19, 38:4, 39:9, 43:14,

48:19, 52:20, 53:2, 58:12, 59:6, 79:6, 93:24, 101:2, 101:3, 103:13, 104:17, 105:4, 105:24, 116:12, 120:1, 128:10, 131:12, 139:10, 141:20, 142:14, 143:20, 147:15, 149:22, 152:13, 161:22, 162:9, 166:12, 166:21, 167:8, 167:19, 167:24, 168:1, 169:15, 170:24, 175:6, 175:8, 176:14, 176:21, 176:22, 176:23, 177:7, 183:4
**defense's** [5] - 3:3, 16:19, 31:2, 94:20, 119:21
**defer** [3] - 6:22, 7:11, 121:9
**definitely** [2] - 59:2, 72:20
**definitions** [1] - 122:10
**deletions** [1] - 26:19
**delivered** [2] - 56:19, 75:18
**delivering** [1] - 175:10
**delve** [1] - 72:1
**demands** [1] - 91:3
**demonstrate** [1] - 24:8
**demonstrates** [3] - 143:22, 145:23, 148:14
**demonstratives** [1] - 128:21
**demystify** [1] - 158:22
**denial** [1] - 15:9
**Department** [6] - 1:13, 1:16, 3:6, 5:10, 98:5, 106:8
**dependent** [2] - 110:9, 111:1
**deployed** [1] - 81:11
**deposit** [9] - 19:25, 20:15, 25:16, 44:23, 47:19, 47:20, 48:14, 48:15
**deposited** [1] - 105:14
**deposition** [1] - 117:15
**deposits** [1] - 25:17
**depth** [4] - 12:9, 52:7, 104:5, 113:20
**DEPUTY** [2] - 2:2, 181:1

**derivative** [1] - 152:13
**describe** [2] - 113:8, 120:15
**described** [5] - 56:8, 59:24, 120:8, 121:19, 170:24
**describing** [1] - 41:24
**description** [1] - 47:9
**descriptions** [2] - 46:22, 155:4
**designed** [3] - 89:18, 90:1, 168:13
**desk** [3] - 141:3, 142:6, 142:9
**detail** [5] - 25:20, 26:3, 43:21, 50:13, 55:2
**detailed** [2] - 44:6, 52:19
**details** [3] - 43:13, 71:22, 167:18
**determination** [4] - 47:22, 116:10, 119:24, 125:22
**determine** [3] - 44:22, 54:6, 115:16
**determined** [4] - 46:6, 75:1, 108:15, 122:2
**determining** [4] - 47:4, 51:24, 90:9, 149:19
**deterministic** [5] - 83:4, 83:5, 89:20, 94:8, 99:23
**developed** [4] - 37:19, 96:5, 97:19, 103:18
**device** [13] - 66:20, 136:18, 138:20, 139:5, 144:14, 159:7, 163:8, 163:21, 164:7, 172:19, 172:20, 174:24
**devices** [33] - 71:11, 118:9, 119:19, 120:4, 135:8, 136:3, 136:6, 136:7, 136:12, 136:15, 136:24, 137:22, 137:25, 138:5, 138:8, 138:9, 142:12, 142:24, 143:7, 144:7, 144:21, 144:22, 159:13, 163:11, 163:19, 163:23, 164:1, 164:9, 172:7, 172:9, 178:21, 178:22, 179:8
**die** [1] - 152:3
**differ** [1] - 40:21

difference [13] - 34:12, 38:11, 89:25, 90:5, 90:7, 92:14, 96:3, 103:8, 105:18, 105:19, 138:22, 163:20, 168:10

differences [5] - 17:16, 17:20, 17:25, 98:4

different [74] - 18:11, 19:8, 22:25, 24:5, 25:8, 25:14, 25:16, 28:18, 28:24, 29:1, 39:21, 40:19, 41:2, 42:20, 45:8, 45:22, 47:15, 49:20, 52:12, 61:21, 64:21, 65:1, 65:2, 66:4, 66:24, 67:4, 71:7, 71:15, 71:16, 74:3, 74:5, 74:22, 81:12, 87:12, 89:13, 92:22, 93:1, 93:7, 93:10, 93:19, 96:10, 97:3, 98:16, 101:5, 101:21, 101:24, 102:19, 103:3, 103:11, 104:16, 105:6, 107:18, 108:4, 108:12, 109:9, 109:11, 109:19, 109:22, 119:12, 120:21, 121:22, 121:23, 121:24, 126:3, 127:18, 137:10, 140:23, 142:24, 148:3, 172:9, 172:12

differentiation [1] - 163:20

differently [4] - 90:11, 108:9, 139:5, 162:21

difficult [3] - 61:23, 64:3, 161:5

difficulties [1] - 160:15

dig [1] - 178:3

diligently [1] - 52:23

Dimon [1] - 28:15

dire [10] - 3:1, 3:12, 3:14, 4:4, 6:21, 11:25, 157:10, 158:7, 158:9, 158:12

direct [9] - 42:21, 80:24, 104:24, 105:3, 105:8, 105:17, 109:1, 162:10, 164:19

directed [1] - 113:13

direction [2] - 100:20,

121:2

directly [2] - 92:1, 153:14

disagree [4] - 80:3, 86:3, 93:3, 157:7

disagreeing [1] - 91:9

disagreement [1] - 161:22

disclosed [10] - 118:14, 129:3, 132:2, 140:5, 140:9, 155:9, 168:5, 169:13, 173:7, 174:25

discloses [1] - 143:7

disclosing [1] - 166:14

disclosure [26] - 86:22, 88:10, 92:5, 117:4, 118:1, 118:7, 120:8, 122:5, 128:24, 129:7, 135:4, 140:6, 140:17, 140:21, 141:1, 141:15, 147:15, 147:23, 154:2, 154:4, 154:8, 163:24, 166:16, 170:12, 170:25, 176:24

disclosures [6] - 154:9, 155:6, 157:11, 166:18, 176:21, 177:2

discovery [8] - 12:8, 13:15, 13:24, 43:14, 57:8, 144:7, 147:12, 164:6

discrepancies [2] - 136:22, 163:16

discrepancy [3] - 110:14, 136:19, 138:7

discrete [1] - 51:20

discriminate [1] - 93:20

discuss [14] - 11:22, 15:24, 16:18, 25:24, 31:6, 73:9, 121:20, 184:5, 184:11, 184:24, 185:1, 185:4, 185:10

discussed [9] - 12:3, 26:1, 53:1, 75:17, 129:7, 130:10, 178:24, 179:1, 185:5

discusses [4] - 49:14, 60:3, 66:22, 108:14

discussing [7] - 22:9, 39:1, 41:23, 45:22,

67:23, 76:19, 159:9

discussion [3] - 58:7, 72:23, 174:6

dispositive [4] - 61:14, 85:19, 90:6, 101:12

dispute [4] - 22:12, 71:9, 80:6, 113:17

disputing [1] - 84:2

disregarded [1] - 87:5

disrupt [2] - 113:6, 168:13

distinction [2] - 10:17, 80:9

distinctive [1] - 23:16

distinguish [4] - 84:4, 94:6, 94:12, 94:13

distributor [1] - 147:18

District [2] - 71:2, 168:15

DISTRICT [3] - 1:1, 1:1, 1:8

district [1] - 58:17

Divya [2] - 6:6, 6:7

DNA [8] - 96:4, 98:9, 98:10, 99:7, 99:8, 99:9, 99:14

DNS [14] - 164:12, 164:21, 164:24, 165:1, 165:6, 165:7, 165:16, 166:3, 166:5, 175:25, 176:1, 176:17, 179:12, 179:14

Docket [1] - 140:21

document [2] - 19:19, 133:19

Document [1] - 142:1

documentation [1] - 163:8

documented [3] - 26:17, 87:6, 135:18

documents [7] - 17:6, 19:3, 19:5, 24:9, 34:14, 87:23, 95:1

DOJ [5] - 1:11, 1:16, 56:21, 86:22, 106:1

DOJ-CRM [1] - 1:16

dollar [4] - 88:21, 90:17, 118:18, 119:2

dollars [3] - 36:15, 80:14, 84:16

domain [3] - 47:8, 164:16, 174:13

done [26] - 15:22, 15:24, 17:8, 45:24, 46:11, 51:21, 54:13, 59:6, 59:7, 64:22, 66:11, 68:21, 69:19,

70:3, 70:5, 70:11, 76:24, 80:4, 87:5, 100:9, 102:10, 102:16, 103:6, 106:21, 146:8, 181:10

door [4] - 117:1, 166:19, 177:2, 179:17

doubt [2] - 90:14, 174:21

doubtful [2] - 178:15, 178:17

doubting [1] - 93:17

dove [1] - 59:21

down [15] - 18:9, 19:3, 20:4, 21:1, 21:24, 77:18, 78:1, 103:12, 111:4, 126:6, 139:18, 141:22, 151:12, 176:8, 178:3

downloading [1] - 66:14

downloads [1] - 35:25

draft [1] - 3:1

drafting [1] - 173:5

drain [1] - 169:7

draw [1] - 163:4

drive [12] - 13:15, 14:12, 26:18, 27:6, 120:20, 120:21, 136:14, 136:17, 139:4, 146:19, 163:15, 173:8

dubious [2] - 148:10, 150:4

due [3] - 76:7, 91:8, 140:4

duplicative [1] - 171:22

during [1] - 22:1

Dutch [1] - 4:20

## E

early [2] - 3:10, 175:5

easier [3] - 10:19, 40:10, 125:6

easiest [1] - 143:19

easily [2] - 107:1, 133:2

Eastern [1] - 71:2

easy [2] - 92:16, 139:6

ECF [7] - 22:18, 22:19, 24:6, 25:20, 58:4, 110:2, 141:1

econometric [2] - 89:10, 89:14

economic [1] - 90:9

economist [2] - 89:15,

90:1

economists [2] - 89:10, 89:14

educated [1] - 40:3

effect [4] - 5:16, 128:24, 173:18, 173:20

effective [1] - 102:19

either [16] - 10:24, 11:1, 25:14, 35:11, 35:18, 50:17, 74:7, 75:24, 80:5, 96:16, 97:3, 114:23, 121:1, 155:11, 160:20, 186:16

either/or [2] - 117:5, 158:13

Ekeland [40] - 1:19, 2:15, 6:19, 6:23, 9:7, 9:9, 9:10, 19:4, 20:9, 21:1, 21:4, 22:6, 26:5, 34:4, 53:14, 54:9, 55:7, 59:7, 61:6, 76:13, 76:17, 77:6, 110:5, 115:24, 120:12, 121:14, 122:19, 125:18, 133:13, 134:24, 137:9, 138:21, 139:15, 139:19, 172:3, 172:15, 175:1, 178:24, 179:2, 186:19

EKELAND [212] - 1:18, 2:15, 6:20, 7:4, 7:7, 7:22, 7:25, 8:3, 8:11, 8:15, 8:20, 8:22, 9:4, 9:6, 9:11, 9:13, 9:19, 10:7, 10:12, 10:23, 11:13, 11:20, 12:1, 12:5, 12:20, 12:25, 13:18, 13:21, 14:7, 14:14, 14:17, 14:19, 15:3, 15:9, 15:15, 15:18, 15:21, 16:5, 16:13, 16:17, 18:5, 20:24, 21:6, 21:14, 21:21, 22:4, 22:7, 22:14, 26:7, 27:10, 27:16, 28:2, 28:15, 28:19, 29:7, 29:20, 34:5, 34:9, 34:18, 36:12, 76:21, 77:7, 77:15, 77:20, 77:24, 79:19, 80:8, 81:9, 82:11, 82:14, 86:12, 87:18, 87:21, 88:1, 88:6, 89:17, 90:14, 91:13, 93:13, 93:16, 94:1, 94:5, 94:23,

95:5, 95:9, 95:16, 95:19, 96:3, 97:5, 97:9, 99:2, 100:5, 100:10, 110:8, 110:18, 111:24, 112:6, 112:16, 112:21, 113:16, 114:2, 114:5, 114:17, 114:24, 115:25, 116:17, 117:9, 117:23, 118:19, 119:3, 119:6, 120:14, 120:23, 122:20, 124:3, 124:9, 124:12, 124:18, 125:7, 126:21, 127:20, 127:24, 128:3, 128:8, 128:12, 128:20, 133:15, 134:8, 135:2, 136:5, 136:14, 137:6, 137:18, 137:23, 139:23, 140:2, 140:5, 141:4, 141:7, 141:10, 141:14, 141:17, 141:19, 141:23, 142:4, 142:7, 142:11, 143:5, 143:13, 143:20, 144:19, 145:22, 145:25, 146:12, 146:18, 147:19, 148:6, 148:12, 148:21, 149:4, 149:7, 149:16, 150:10, 150:17, 150:24, 151:3, 151:9, 151:11, 151:18, 151:21, 152:11, 152:19, 153:4, 153:11, 153:17, 153:23, 154:3, 154:7, 154:18, 155:3, 155:13, 155:20, 155:25, 156:3, 156:9, 156:21, 157:7, 157:18, 157:20, 158:5, 158:15, 159:2, 160:2, 161:13, 162:4, 162:9, 162:14, 163:2, 163:5, 163:7, 163:14, 164:12, 165:15, 165:19, 165:23, 165:25, 166:3, 166:20, 180:7, 180:22,

182:6, 186:20
**Ekeland's** [5] - 8:9, 8:18, 31:13, 33:10, 176:11
**electronic** [2] - 31:17, 31:21
**eligible** [2] - 183:20, 183:21
**email** [8] - 12:6, 12:20, 14:24, 21:7, 21:16, 25:5, 25:21, 47:16
**emailed** [1] - 14:21
**emails** [1] - 23:19
**emerging** [4] - 94:15, 96:6, 97:20, 97:24
**emphasize** [2] - 52:6, 132:7
**employed** [1] - 54:2
**encompassed** [1] - 53:24
**encountered** [1] - 6:24
**encourage** [2] - 17:14, 106:15
**encrypted** [2] - 136:17, 139:4
**end** [6] - 11:2, 18:5, 51:4, 115:14, 119:22, 177:3
**ends** [1] - 162:11
**enforcement** [18] - 57:20, 58:9, 62:13, 67:18, 68:22, 68:24, 69:25, 70:4, 72:5, 79:6, 149:22, 160:3, 160:5, 175:2, 175:4, 175:10, 175:11
**Enforcement** [1] - 56:21
**enforcement's** [1] - 130:7
**enforces** [1] - 133:11
**engaged** [2] - 35:23, 121:5
**engages** [1] - 155:12
**engaging** [2] - 150:13, 158:12
**engineer** [1] - 114:1
**engineers** [1] - 114:22
**entered** [1] - 139:4
**enterprise** [1] - 157:25
**entire** [4] - 107:8, 110:25, 115:5, 125:13
**entirely** [4] - 34:18, 110:9, 137:4, 162:8
**entities** [3] - 51:14, 107:19, 109:22
**entitled** [4] - 59:7, 113:15, 177:8,

179:18
**entity** [5] - 29:16, 29:19, 60:22, 69:3
**equals** [1] - 97:15
**equipment** [4] - 27:16, 27:23, 158:24, 159:3
**equivalent** [1] - 32:23
**error** [32] - 31:9, 54:12, 61:7, 61:11, 61:15, 61:23, 62:2, 62:4, 78:9, 78:12, 81:17, 82:21, 83:5, 84:19, 84:22, 85:3, 85:15, 85:23, 95:3, 95:4, 95:5, 95:12, 95:13, 95:14, 97:4, 101:10, 103:2, 103:14, 110:22, 168:1
**error-prone** [1] - 95:14
**errors** [10] - 30:19, 31:8, 87:6, 87:23, 95:1, 95:23, 96:1, 149:9, 167:9, 172:5
**especially** [2] - 63:20, 72:2
**essentially** [26] - 13:23, 25:8, 30:9, 31:25, 41:3, 82:15, 83:11, 91:16, 101:22, 102:2, 102:10, 105:15, 108:8, 112:18, 118:17, 118:24, 119:7, 120:3, 122:5, 123:17, 135:15, 138:1, 152:22, 153:13, 153:18, 169:7
**establish** [1] - 86:16
**establishing** [1] - 83:7
**estimated** [1] - 73:11
**et** [1] - 105:23
**evaluating** [2] - 58:18, 82:21
**evaluation** [1] - 104:6
**evening** [2] - 3:9, 3:10
**event** [2] - 19:18, 178:5
**evidence** [68] - 19:19, 23:15, 23:17, 23:20, 24:8, 24:14, 33:7, 52:15, 56:25, 67:1, 78:17, 78:21, 81:8, 81:20, 81:21, 84:12, 85:22, 86:16, 86:24, 87:10, 89:22, 90:19, 95:25, 96:4, 106:2, 106:15, 112:2, 133:23, 134:2,

134:5, 137:8, 138:2, 138:13, 138:17, 138:18, 139:7, 139:8, 143:22, 143:25, 144:14, 145:2, 145:6, 145:23, 146:3, 146:6, 146:13, 146:16, 146:22, 146:24, 147:17, 148:4, 148:8, 148:17, 148:20, 149:2, 161:16, 163:4, 168:21, 169:11, 171:25, 172:6, 172:14, 172:17, 177:18, 177:21
**evidentiary** [1] - 19:17
**evoked** [1] - 54:10
**exact** [9] - 53:8, 63:10, 63:11, 74:4, 74:5, 105:17, 106:7, 137:20, 164:5
**exactly** [10] - 52:24, 53:6, 60:12, 74:7, 95:10, 107:13, 130:24, 136:7, 139:9, 179:4
**examination** [6] - 58:14, 96:25, 125:8, 126:9, 166:19, 177:5
**examine** [2] - 90:5, 123:5
**examined** [1] - 77:25
**examiners** [1] - 119:18
**examining** [1] - 46:17
**example** [23] - 20:15, 35:22, 36:4, 42:10, 53:4, 54:12, 59:20, 65:8, 66:14, 66:22, 67:15, 68:14, 69:8, 79:14, 80:16, 120:22, 130:21, 132:24, 133:3, 150:23, 165:8, 174:1, 175:13
**examples** [4] - 39:18, 106:20, 161:16, 161:21
**exceed** [1] - 57:9
**Excel** [6] - 57:10, 109:2, 109:3, 109:11, 109:12, 109:14
**excellent** [2] - 160:2, 161:13
**except** [3] - 46:2, 161:25, 185:12

**excerpt** [1] - 125:17
**exchange** [17] - 22:24, 24:24, 33:15, 40:18, 44:8, 62:20, 62:22, 62:24, 62:25, 63:3, 63:22, 63:25, 64:5, 73:5, 73:8, 73:16, 73:17
**exchanges** [5] - 39:19, 40:19, 64:4, 64:21, 66:7
**exclude** [3] - 140:15, 155:12, 174:19
**excluded** [3] - 125:14, 148:17, 149:2
**exclusively** [1] - 128:16
**execute** [1] - 66:17
**executed** [1] - 66:25
**execution** [1] - 66:10
**executive** [1] - 33:21
**executives** [1] - 33:25
**exercise** [3] - 106:7, 107:13, 134:25
**exhibit** [2] - 44:14, 108:24
**exhibits** [1] - 109:4
**exist** [7] - 86:25, 128:1, 128:3, 130:6, 131:4, 132:19, 132:20
**existed** [2] - 23:9, 168:23
**exotic** [2] - 158:21, 164:5
**expand** [1] - 72:20
**expansive** [1] - 88:21
**expect** [6] - 8:25, 26:1, 39:9, 73:13, 131:24, 144:2
**expects** [3] - 141:20, 142:15, 143:21
**Expedia** [2] - 50:16, 50:18
**expedite** [1] - 18:16
**expedition** [1] - 30:23
**experience** [16] - 46:14, 56:11, 71:21, 75:8, 101:7, 126:5, 135:18, 148:22, 156:10, 156:22, 160:10, 164:19, 165:5, 165:12, 170:6
**experienced** [1] - 156:11
**experimental** [1] - 81:16
**expert** [100] - 16:18, 17:18, 27:10, 27:12, 37:23, 39:4, 41:12,

43:13, 46:4, 47:21, 50:2, 50:21, 53:7, 53:21, 54:17, 56:5, 56:10, 60:10, 75:24, 77:16, 79:11, 79:15, 79:18, 79:19, 86:22, 88:10, 92:5, 101:12, 103:5, 108:19, 113:11, 113:19, 116:2, 116:20, 117:2, 117:4, 117:8, 117:18, 117:25, 118:3, 118:7, 118:14, 120:8, 120:19, 122:14, 125:4, 128:14, 128:21, 129:21, 130:2, 131:16, 132:4, 132:14, 133:6, 133:10, 135:3, 135:19, 137:4, 138:25, 139:10, 139:20, 139:21, 139:25, 140:4, 140:5, 140:7, 140:12, 140:13, 140:14, 140:15, 140:16, 140:20, 141:7, 141:10, 142:16, 142:22, 143:2, 146:6, 146:17, 146:21, 147:12, 147:15, 147:22, 148:6, 149:23, 153:9, 154:8, 155:8, 157:11, 160:11, 160:14, 166:18, 170:6, 174:6, 175:6, 175:9, 175:15

**expertise** [26] - 51:23, 56:15, 56:20, 60:19, 71:20, 74:25, 101:6, 122:11, 156:7, 156:8, 156:23, 157:6, 157:9, 157:12, 158:4, 165:18, 166:3, 170:21, 171:13, 174:8, 174:12, 178:3, 178:13, 178:14, 179:6

**experts** [17] - 18:23, 20:22, 30:19, 31:8, 31:10, 52:6, 80:2, 80:7, 101:6, 104:5, 106:11, 128:10, 136:23, 161:23, 166:9, 166:11, 166:13

**explain** [18] - 41:15,

43:17, 106:6, 110:24, 120:5, 120:10, 122:2, 139:13, 154:23, 155:22, 157:20, 158:22, 159:3, 162:6, 167:20, 170:19, 170:22, 175:13

**explaining** [15] - 39:1, 39:3, 39:8, 39:17, 40:16, 40:25, 41:10, 41:18, 41:23, 60:12, 121:25, 122:8, 155:15, 162:5, 172:2

**explains** [7] - 40:1, 73:4, 73:9, 107:19, 107:25, 108:12, 168:18

**explanation** [5] - 95:11, 109:18, 138:22, 163:17, 176:11

**explanatory** [1] - 41:4

**explicitly** [2] - 142:13, 143:7

**explorer** [5] - 51:9, 80:10, 84:5, 89:5, 92:7

**explorers** [2] - 46:1, 84:7

**exported** [1] - 105:23

**exporting** [1] - 105:20

**exports** [1] - 119:24

**exposure** [2] - 45:4, 183:13

**express** [1] - 128:23

**expressed** [4] - 171:10, 171:16, 179:15, 184:22

**expressing** [1] - 155:7

**extended** [2] - 181:23, 184:2

**extension** [1] - 155:17

**extensive** [17] - 23:15, 23:20, 26:14, 32:14, 52:14, 56:10, 57:7, 60:4, 62:13, 75:18, 101:5, 101:12, 106:23, 109:6, 156:10, 168:8

**extensively** [5] - 22:18, 26:8, 52:12, 57:19, 70:5

**extent** [15] - 17:15, 49:13, 51:7, 120:6, 122:15, 126:13, 161:25, 175:7, 175:17, 176:8, 178:10, 178:20,

178:22, 179:7

**external** [1] - 82:16

**extractions** [1] - 146:20

**extremely** [4] - 58:19, 78:22, 101:7, 132:7

---

**F**

---

**F.3d** [1] - 17:12

**faces** [1] - 83:19

**facilitating** [1] - 14:21

**facing** [1] - 83:18

**fact** [50] - 29:23, 30:17, 30:23, 31:13, 32:14, 38:8, 48:16, 50:7, 53:22, 61:2, 61:14, 63:16, 65:18, 65:23, 70:9, 75:1, 76:1, 78:13, 78:19, 79:10, 83:7, 83:22, 83:25, 84:1, 85:25, 95:24, 97:2, 106:5, 110:25, 116:16, 116:20, 116:23, 120:15, 127:9, 129:21, 130:14, 131:3, 133:7, 134:14, 138:6, 140:23, 144:2, 147:5, 160:19, 160:24, 161:8, 164:20, 165:11, 179:13

**factor** [5] - 61:11, 61:14, 101:11, 122:21, 149:19

**factors** [12] - 36:16, 55:25, 61:21, 78:1, 83:20, 85:19, 85:20, 86:8, 87:17, 91:18, 101:5, 122:21

**facts** [13] - 36:14, 53:23, 53:25, 54:1, 55:1, 57:5, 57:13, 57:15, 81:22, 85:10, 121:6, 122:22, 152:7

**factual** [1] - 155:4

**failed** [1] - 143:21

**fair** [12] - 8:21, 25:19, 36:20, 68:8, 71:1, 101:12, 153:3, 155:11, 157:4, 166:12, 185:11, 185:19

**fairly** [9] - 17:9, 22:18, 53:18, 73:24, 79:15, 89:9, 133:12, 155:20, 174:13

**filed** [5] - 43:15, 109:25, 131:12, 133:19, 143:15

**files** [10] - 26:22, 41:2,

**FALCO** [1] - 5:23

**false** [10] - 32:23, 61:19, 78:6, 78:8, 85:22, 85:23, 103:18, 103:19, 103:22, 104:8

**falsifying** [3] - 28:20, 28:25, 150:13

**familiar** [2] - 7:23, 130:13

**family** [2] - 16:7, 16:15

**far** [13] - 27:8, 28:1, 33:6, 39:5, 42:20, 81:16, 92:23, 104:16, 106:19, 115:7, 144:1, 167:4, 175:3

**Faruqui** [3] - 58:16, 66:22, 67:17

**Faruqui's** [3] - 59:20, 60:3, 86:13

**FBI** [21] - 27:1, 32:2, 32:19, 35:15, 35:23, 35:24, 56:11, 56:13, 56:17, 70:4, 70:10, 70:18, 73:11, 90:3, 138:11, 148:23, 160:4, 167:13, 167:14, 175:5, 179:6

**features** [1] - 108:5

**fed** [1] - 49:19

**federal** [10] - 13:4, 29:3, 29:4, 30:5, 79:23, 81:19, 85:4, 85:8, 99:20, 135:21

**Federal** [1] - 16:10

**feedback** [1] - 20:3

**feelings** [3] - 11:5, 11:7, 11:17

**felt** [1] - 184:18

**few** [8] - 21:9, 33:24, 44:14, 101:1, 105:5, 124:6, 131:25, 133:5

**fewer** [1] - 136:12

**field** [8] - 39:5, 57:19, 94:14, 94:15, 96:4, 96:6, 97:10, 103:5

**fields** [3] - 97:19, 97:20, 97:24

**figure** [4] - 7:19, 61:11, 104:17, 180:11

**figures** [3] - 63:19, 104:16, 105:6

**file** [3] - 108:25, 133:9, 169:1

109:12, 119:20, 120:4, 147:24, 148:1, 167:16, 167:21

**filing** [9] - 16:23, 23:15, 25:20, 58:4, 76:7, 110:2, 139:1, 143:2, 181:23

**filings** [2] - 24:3, 180:10

**fill** [1] - 8:22

**final** [5] - 2:23, 47:19, 113:3, 115:1, 127:19

**finally** [1] - 13:11

**financial** [19] - 34:13, 34:14, 38:23, 39:2, 43:6, 43:8, 46:23, 47:15, 56:25, 57:7, 57:21, 88:7, 88:14, 89:3, 129:13, 129:17, 150:23, 167:18, 169:23

**financials** [4] - 150:8, 150:16, 174:3, 177:23

**FinCEN** [6] - 128:14, 129:25, 130:23, 131:3, 132:24, 132:25

**findings** [3] - 38:8, 53:16, 55:2

**fine** [21] - 6:8, 6:20, 11:11, 11:24, 15:25, 16:20, 20:8, 93:11, 96:25, 124:11, 154:13, 154:15, 166:25, 167:22, 171:8, 171:21, 172:25, 176:18, 181:14, 181:22, 181:25

**finish** [7] - 34:13, 55:6, 100:15, 158:7, 158:9, 180:13, 180:16

**finished** [1] - 48:12

**firm** [2] - 9:3, 156:16

**firms** [2] - 57:22

**first** [25] - 6:22, 8:9, 9:16, 12:25, 15:24, 17:14, 18:22, 40:1, 53:20, 56:4, 58:6, 65:15, 79:20, 83:15, 83:16, 83:18, 83:19, 89:17, 97:5, 101:3, 118:15, 118:22, 123:23, 125:9, 139:16

**First** [2] - 17:10, 17:13

**Fischbach** [43] -

27:10, 122:15,
134:21, 135:1,
135:6, 135:15,
136:20, 137:6,
138:25, 139:20,
140:1, 141:20,
141:23, 142:15,
143:21, 146:5,
156:6, 164:9,
164:15, 166:14,
167:3, 167:9,
167:15, 167:19,
168:4, 170:5,
170:16, 170:19,
171:2, 172:17,
174:7, 174:11,
175:1, 175:3, 175:6,
176:3, 176:15,
177:25, 178:11,
179:4, 179:12,
179:18, 179:22
**Fischbach's** [6] -
27:16, 135:3,
139:13, 141:15,
158:7, 162:10
**fishing** [1] - 30:23
**five** [4] - 55:5, 97:15,
139:17, 183:17
**five-year** [1] - 183:17
**flawed** [1] - 165:4
**Floor** [1] - 1:20
**flow** [4] - 80:21, 88:13,
109:18, 109:21
**flows** [6] - 42:21, 45:5,
45:19, 45:23, 48:8,
48:13
**fluctuate** [1] - 40:4
**fly** [1] - 142:18
**focus** [1] - 126:6
**focused** [3] - 77:14,
118:1, 118:13
**focuses** [1] - 58:7
**Fog** [77] - 4:24, 34:24,
42:11, 42:13, 42:20,
44:23, 45:6, 45:13,
45:23, 46:3, 46:6,
46:20, 47:5, 47:8,
47:23, 48:15, 48:16,
49:1, 49:11, 49:13,
49:24, 49:25, 50:3,
50:7, 50:10, 50:19,
50:20, 51:16, 52:1,
53:4, 68:6, 68:14,
68:16, 68:17, 69:7,
69:10, 74:15, 74:21,
80:15, 80:22, 81:13,
90:20, 93:25,
104:18, 108:15,
108:17, 109:8,
109:19, 116:25,

126:15, 126:22,
127:4, 129:24,
132:9, 133:16,
134:13, 138:3,
143:23, 144:4,
144:9, 144:18,
144:24, 145:15,
146:22, 146:25,
155:18, 157:13,
157:22, 157:25,
159:14, 164:14,
165:14, 170:16,
171:14, 172:7,
172:9, 172:20
**follow** [17] - 3:25, 4:2,
4:5, 31:4, 33:8, 44:6,
51:19, 51:20, 60:22,
102:7, 102:8,
102:13, 102:15,
134:22, 138:24,
173:9
**follow-on** [1] - 51:19
**follow-up** [3] - 4:2,
4:5, 31:4
**followed** [4] - 33:9,
137:7, 138:12, 160:9
**following** [6] - 51:24,
60:14, 60:19, 77:5,
107:22, 146:9
**follows** [3] - 74:23,
100:12, 183:7
**footnote** [1] - 60:6
**FOR** [1] - 1:1
**foregoing** [1] - 188:4
**forensic** [20] - 88:14,
96:6, 97:24, 99:9,
116:16, 119:17,
119:24, 120:15,
137:7, 145:23,
146:19, 146:22,
147:13, 148:23,
149:21, 153:24,
160:9, 160:10,
170:8, 171:25
**forensically** [15] -
148:25, 149:20,
149:23, 151:25,
152:2, 152:8,
152:24, 153:25,
159:18, 159:23,
160:6, 160:12,
161:7, 162:15,
172:14
**forensics** [16] - 83:24,
88:7, 95:21, 96:15,
96:25, 97:11, 97:19,
97:21, 98:1, 135:18,
143:22, 148:24,
156:7, 156:23
**forging** [1] - 26:16

**form** [8] - 26:22,
58:15, 65:15, 68:19,
69:3, 152:22, 153:1,
153:20
**formal** [1] - 33:6
**format** [1] - 133:22
**formats** [1] - 97:12
**former** [1] - 174:15
**forth** [4] - 21:8, 21:16,
116:25, 122:5
**forum** [1] - 41:11
**forward** [8] - 20:6,
23:14, 89:22, 94:24,
102:7, 102:8,
182:18, 182:23
**foundation** [1] -
151:16
**four** [9] - 21:7, 28:17,
34:11, 137:2,
137:16, 150:12,
175:18, 179:9, 180:3
**four-year** [1] - 34:11
**fourth** [2] - 54:24,
59:23
**Fourth** [2] - 17:10,
60:2
**frame** [1] - 76:4
**France** [1] - 35:2
**Franks** [1] - 59:21
**fraud** [12] - 26:16,
30:16, 33:10, 33:22,
34:1, 35:4, 149:25,
150:13, 150:15,
150:16, 151:24
**frequently** [1] - 73:4
**friends** [2] - 15:19,
16:7
**front** [8] - 39:12,
43:25, 44:16,
107:12, 124:9,
133:10, 140:21,
141:4
**Frye** [1] - 181:9
**full** [6] - 14:2, 14:9,
27:3, 31:25, 118:8,
188:5
**fully** [6] - 12:12, 21:25,
46:12, 155:10, 173:6
**fulsome** [1] - 140:17
**function** [3] - 83:10,
85:18, 159:7
**functions** [2] - 135:15,
135:17
**fund** [6] - 42:21, 45:5,
45:19, 45:23, 48:8,
48:13
**fundamental** [1] - 86:8
**fundamentally** [1] -
168:12
**funds** [16] - 39:18,

51:24, 59:4, 59:9,
60:14, 60:16, 60:19,
62:20, 80:21, 81:13,
88:13, 104:22,
109:18, 109:21,
158:1, 158:2
**funneled** [1] - 168:19

## G

**G-o-l-i-w-a-s** [1] - 9:17
**gained** [1] - 168:18
**game** [1] - 166:12
**gatekeeping** [2] -
83:10, 85:18
**general** [5] - 40:16,
135:17, 145:12,
154:16, 154:17
**generality** [2] -
154:10, 154:12
**generalized** [3] -
161:20, 162:12,
163:24
**generally** [10] - 3:19,
6:20, 39:20, 54:1,
57:16, 57:19, 70:25,
132:13, 139:13,
173:12
**generated** [9] - 26:13,
28:7, 30:7, 31:16,
35:12, 35:13, 35:19,
35:20, 36:7
**generating** [1] - 86:24
**generation** [6] - 29:12,
29:21, 29:25, 30:2,
30:6, 35:9
**germane** [1] - 19:9
**given** [14] - 6:23, 7:8,
7:18, 8:16, 8:18,
26:23, 26:25, 85:14,
91:4, 119:10, 122:4,
143:2, 170:11,
177:10
**Glave** [5] - 128:17,
129:7, 140:11,
140:12, 154:11
**Glave's** [1] - 129:6
**Glenda** [2] - 180:2,
181:19
**gobbling** [1] - 86:6
**Goliwas** [3] - 9:17,
13:10, 15:11
**governing** [1] - 83:25
**Government** [3] -
24:2, 32:10, 84:17
**government** [103] -
2:5, 2:10, 3:21, 4:12,
6:17, 8:12, 10:15,
11:15, 12:6, 12:7,
12:21, 13:4, 15:24,

18:7, 20:10, 21:15,
23:2, 23:3, 24:7,
24:12, 25:1, 26:7,
27:1, 30:5, 31:5,
32:8, 34:22, 35:14,
46:11, 48:20, 52:13,
60:6, 64:18, 76:1,
78:20, 86:1, 86:20,
88:9, 93:11, 93:22,
98:16, 98:24, 101:4,
101:6, 102:5,
107:22, 111:8,
112:4, 116:2, 116:6,
118:5, 120:17,
126:14, 128:2,
128:7, 128:13,
128:22, 129:5,
134:8, 135:8,
135:11, 136:2,
136:23, 137:2,
137:16, 138:11,
138:20, 138:23,
140:16, 143:21,
144:20, 145:5,
145:20, 146:4,
146:7, 146:8,
146:19, 146:24,
147:5, 152:12,
154:22, 157:2,
158:18, 158:20,
158:23, 159:24,
163:9, 163:16,
164:4, 165:21,
166:13, 166:17,
166:22, 167:13,
169:10, 169:20,
172:1, 175:8,
179:20, 183:4,
183:6, 183:8, 184:19
**government's** [22] -
24:13, 25:12, 57:7,
58:4, 86:8, 108:19,
116:18, 117:1,
126:18, 128:6,
138:4, 138:22,
140:7, 142:16,
142:20, 143:16,
144:3, 166:9,
166:11, 167:23,
177:3, 180:20
**Gox** [55] - 22:13,
22:20, 23:9, 23:17,
23:18, 24:20, 24:21,
24:24, 25:8, 25:14,
25:17, 26:2, 26:16,
26:20, 28:9, 29:11,
30:11, 30:17, 31:2,
34:10, 34:24, 35:3,
44:7, 47:7, 49:23,
135:10, 140:10,
141:17, 148:13,

148:15, 149:9, 150:6, 150:14, 151:15, 151:20, 151:23, 152:4, 152:5, 152:9, 152:17, 158:2, 159:19, 159:20, 167:7, 167:10, 168:2, 168:17, 169:6, 173:11, 173:19, 174:5, 174:12, 177:16

**Gox's** [1] - 168:19
**granted** [1] - 35:15
**granular** [1] - 26:3
**granularity** [2] - 34:20, 35:4
**Gratkowski** [1] - 59:23
**great** [5] - 57:23, 76:24, 84:20, 99:12, 182:1
**green** [1] - 26:17
**Greenberg's** [2] - 26:17, 29:8
**Gronager** [1] - 26:18
**grosser** [1] - 98:20
**ground** [3] - 102:22, 103:3, 103:20
**grounds** [1] - 132:6
**group** [1] - 85:11
**guess** [19] - 64:7, 64:9, 69:17, 73:20, 96:13, 106:24, 107:7, 123:18, 124:3, 124:23, 125:23, 127:11, 137:23, 138:19, 156:14, 179:3, 180:15, 181:9, 184:20
**guessing** [4] - 83:12, 99:23, 118:17, 118:24
**guidelines** [3] - 98:7, 183:14, 183:16
**guilt** [1] - 145:1
**guilty** [2] - 146:17, 172:13
**gun** [3] - 92:3, 98:13, 98:14
**guy** [1] - 146:11

## H

**hac** [1] - 8:24
**hack** [4] - 168:16, 168:17, 169:4, 169:5
**hacked** [8] - 26:20, 28:9, 28:14, 29:4, 152:5, 168:10,

173:14
**hacking** [4] - 28:24, 29:2, 157:22, 173:17
**hacks** [3] - 149:10, 168:6, 168:7
**hair** [2] - 98:25, 99:1
**half** [2] - 27:8, 27:14
**hand** [12] - 6:14, 38:14, 42:7, 43:6, 43:18, 43:23, 44:4, 54:22, 65:19, 68:4
**handle** [2] - 17:11, 100:7
**handprint** [1] - 108:8
**hands** [4] - 99:25, 124:7, 133:2, 150:19
**handwritten** [1] - 145:8
**Happy** [1] - 34:23
**happy** [22] - 7:4, 19:3, 19:21, 20:4, 21:15, 22:22, 38:2, 40:8, 52:4, 55:24, 106:10, 107:10, 109:3, 109:14, 116:14, 118:25, 119:3, 133:15, 134:8, 158:12, 161:17, 180:13
**hard** [13] - 10:3, 13:14, 14:12, 17:1, 34:17, 120:20, 120:21, 136:14, 139:4, 145:6, 146:19, 173:8, 181:20
**harder** [1] - 17:2
**hardware** [5] - 141:24, 148:7, 158:16, 159:5, 171:8
**Harmon** [1] - 4:16
**hashes** [2] - 30:20, 169:18
**HASSARD** [2] - 1:19, 2:18
**Hassard** [6] - 2:19, 9:9, 12:20, 20:9, 87:22, 141:14
**head** [3] - 16:24, 150:17, 150:19
**heading** [1] - 173:25
**hear** [17] - 6:18, 26:5, 40:2, 53:14, 55:6, 55:17, 100:15, 101:3, 101:12, 107:11, 126:8, 138:19, 139:24, 142:7, 157:1, 157:11, 166:22
**heard** [12] - 4:4, 4:13, 14:23, 88:9, 91:21,

93:4, 100:13, 101:5, 107:1, 117:9, 118:4, 165:20
**hearing** [14] - 25:25, 43:16, 44:13, 56:9, 72:20, 72:25, 73:1, 89:22, 117:5, 129:8, 167:12, 170:17, 187:2
**hearings** [1] - 180:17
**hearsay** [11] - 33:11, 78:16, 78:21, 81:21, 82:1, 82:3, 82:6, 82:13, 82:15, 99:16
**Heather** [1] - 4:20
**heavily** [1] - 83:17
**heck** [1] - 27:21
**heightened** [1] - 75:9
**held** [3] - 42:20, 54:16, 64:5
**Helix** [1] - 4:18
**help** [7] - 56:24, 100:19, 138:9, 138:10, 153:7, 153:19, 153:20
**helpful** [25] - 17:9, 18:6, 53:15, 53:18, 53:22, 54:8, 54:14, 55:1, 56:1, 56:5, 57:16, 75:25, 76:12, 106:12, 106:22, 122:13, 130:4, 130:12, 131:17, 131:23, 133:1, 133:21, 152:25, 157:1, 186:25
**helping** [1] - 155:16
**helps** [1] - 51:7
**hereby** [2] - 134:1, 188:3
**heroin** [1] - 147:18
**herself** [1] - 125:25
**hesitation** [2] - 184:23, 184:25
**Heuristic** [13] - 73:22, 73:23, 79:14, 86:4, 95:7, 95:8, 101:25, 107:20, 108:6, 110:12, 110:15, 113:6
**heuristic** [21] - 53:5, 53:8, 53:10, 74:3, 79:17, 79:21, 80:17, 81:23, 82:2, 82:9, 86:5, 101:22, 102:1, 102:7, 103:10, 103:17, 104:10, 107:20, 113:14
**heuristics** [15] - 52:20, 61:20, 80:12, 81:15,

84:8, 84:9, 84:12, 86:2, 92:12, 94:16, 99:15, 101:11, 101:23, 102:24
**hiding** [1] - 126:17
**high** [1] - 157:20
**higher** [1] - 91:2
**highest** [1] - 91:4
**highly** [5] - 66:23, 81:13, 83:14, 96:11, 99:6
**hill** [1] - 152:3
**himself** [3] - 29:7, 30:16, 140:18
**hinted** [1] - 91:8
**hiring** [2] - 27:12, 175:9
**histories** [1] - 168:13
**History** [1] - 183:15
**history** [1] - 46:12
**hit** [1] - 78:23
**hits** [1] - 104:1
**hitting** [1] - 167:1
**hold** [1] - 177:1
**holds** [1] - 17:13
**home** [1] - 167:21
**honestly** [2] - 7:12, 63:17
**Honor** [170] - 2:6, 2:13, 2:15, 2:18, 3:17, 5:9, 6:20, 8:20, 9:11, 10:8, 10:16, 11:3, 11:13, 11:20, 12:1, 14:7, 14:17, 16:5, 16:13, 16:17, 18:5, 18:22, 20:24, 22:4, 22:14, 22:17, 23:25, 24:4, 24:18, 26:1, 27:10, 27:16, 27:18, 28:2, 28:15, 31:1, 31:6, 31:23, 32:18, 34:2, 34:5, 35:5, 36:12, 38:2, 39:13, 39:16, 40:6, 40:14, 40:23, 41:7, 41:10, 41:20, 42:1, 42:25, 43:24, 44:17, 45:1, 48:13, 48:19, 48:23, 49:9, 50:1, 55:9, 55:10, 55:15, 55:20, 55:24, 58:3, 59:1, 59:14, 61:10, 63:9, 63:10, 63:17, 64:17, 65:21, 66:6, 67:8, 67:13, 68:9, 69:12, 71:19, 72:18, 73:25, 76:3, 76:11, 77:3, 77:7, 77:15, 77:20, 82:11, 85:17, 86:12, 87:14, 90:15,

91:13, 93:17, 94:19, 95:5, 95:9, 95:16, 96:8, 97:5, 97:18, 98:2, 99:2, 100:10, 100:25, 102:20, 104:3, 106:19, 107:5, 107:16, 110:4, 113:16, 114:19, 115:22, 116:17, 118:20, 120:23, 125:7, 125:16, 125:18, 126:22, 127:7, 128:7, 128:9, 129:5, 129:22, 130:20, 133:3, 134:17, 135:2, 138:23, 139:18, 139:23, 140:25, 141:5, 141:19, 143:13, 148:21, 149:5, 151:11, 151:22, 152:3, 153:18, 155:13, 156:21, 157:18, 161:14, 162:9, 163:5, 165:15, 165:19, 166:20, 166:24, 168:14, 171:24, 172:22, 177:9, 181:1, 181:8, 181:22, 182:1, 182:6, 182:10, 182:21, 183:3, 186:18, 186:20
**HONORABLE** [1] - 1:8
**hop** [1] - 105:11
**hope** [1] - 52:23
**hopefully** [7] - 3:9, 20:18, 22:1, 36:22, 37:1, 55:6, 186:22
**hoping** [1] - 77:20
**hops** [1] - 112:8
**host** [1] - 24:5
**hot** [1] - 169:6
**hour** [2] - 27:8, 27:14
**hours** [2] - 21:7, 180:5
**housekeeping** [2] - 11:21, 12:23
**huge** [1] - 84:10
**hundred** [3] - 78:24, 85:2, 162:24
**hundreds** [5] - 59:18, 84:16, 112:12, 112:23, 164:16
**hypothesis** [2] - 165:4, 175:24
**hypothetical** [2] - 137:18, 137:19
**hypothetically** [1] -

137:14

**I**

idea [4] - 21:13, 33:21, 75:4, 88:24
identifiable [2] - 152:23, 153:21
identification [2] - 61:13, 153:2
identified [9] - 42:12, 66:13, 69:20, 71:7, 104:23, 107:3, 127:1, 137:15, 166:5
identifier [1] - 123:14
identifiers [1] - 123:11
identify [8] - 31:9, 63:21, 117:16, 123:3, 152:24, 167:8, 169:19, 170:13
identifying [4] - 68:5, 125:3, 153:13, 159:6
identity [2] - 19:10, 125:4
illegal [1] - 96:24
Ilya [2] - 4:20, 5:2
images [1] - 146:19
imagine [1] - 34:17
imaging [4] - 119:18, 119:22, 120:15, 147:20
immaterial [2] - 98:23, 98:24
impermissible [2] - 167:5, 172:1
implementation [2] - 101:16, 101:25
implicate [1] - 132:15
implicating [1] - 164:14
importance [1] - 130:8
important [10] - 13:23, 54:1, 77:2, 83:10, 92:17, 97:18, 130:3, 131:5, 139:9, 152:21
impossible [1] - 85:1
impression [2] - 43:22, 155:5
improve [1] - 101:23
improvement [1] - 102:2
IN [1] - 1:1
in-depth [4] - 12:9, 52:7, 104:5, 113:20
inaccuracy [1] - 54:14
inaccurate [5] - 26:9, 30:13, 31:3, 82:24, 99:5
inadequate [1] -

147:15
inapplicability [1] - 3:4
inauthentic [5] - 26:10, 29:6, 30:10, 30:13, 31:3
incentive [1] - 34:17
incident [3] - 57:22, 138:16, 169:22
inclined [2] - 97:5, 178:6
include [1] - 41:13
included [3] - 4:8, 109:23, 122:13
includes [4] - 39:3, 43:5, 43:6, 58:8
including [13] - 23:1, 40:17, 42:21, 58:10, 58:16, 58:17, 58:22, 62:13, 62:16, 71:8, 101:13, 102:5, 160:4
incorrect [1] - 157:2
independent [1] - 85:12
independently [1] - 152:15
indicate [4] - 20:9, 134:1, 147:25
indicated [6] - 37:3, 54:11, 61:5, 117:19, 133:18, 170:9
indicating [2] - 26:14, 144:23
indications [1] - 138:13
indicia [5] - 36:1, 36:8, 36:13, 64:8, 64:9
indictment [2] - 168:15, 168:18
indirect [6] - 42:21, 80:24, 104:25, 105:3, 105:8, 105:10
individual [19] - 4:1, 33:18, 34:16, 38:7, 45:11, 45:12, 45:15, 51:5, 61:20, 65:5, 65:6, 66:8, 66:14, 70:16, 71:2, 71:6, 71:22, 72:15, 153:13
individual's [1] - 66:18
individuals [3] - 31:13, 168:18, 176:3
indulgence [1] - 181:11
industry [3] - 159:24, 162:2, 164:23
infer [1] - 173:23
inference [1] - 177:20
inflow [1] - 81:13

inform [2] - 7:7, 7:8
information [32] - 42:9, 50:13, 51:10, 52:19, 53:7, 57:10, 57:11, 57:24, 63:18, 63:24, 64:1, 64:2, 64:6, 64:11, 65:17, 69:22, 71:10, 71:12, 73:6, 86:6, 92:9, 107:21, 130:3, 132:22, 139:8, 147:23, 152:23, 153:21, 157:21, 161:4, 169:18
informed [4] - 70:9, 71:20, 72:1, 181:5
initial [1] - 81:4
innocence [1] - 145:1
innocent [1] - 164:7
input [2] - 51:13, 82:9
inputs [5] - 82:3, 82:18, 92:12, 99:16, 127:9
inquire [1] - 186:17
inquiry [1] - 87:25
insert [1] - 6:15
insight [1] - 39:7
insofar [7] - 38:8, 45:8, 57:8, 59:3, 59:14, 115:14, 122:4
instances [1] - 71:15
Instawallet [1] - 51:17
instead [2] - 79:5, 85:13
institutions [3] - 43:8, 47:16, 57:21
instruct [4] - 15:12, 132:20, 134:16, 151:4
instructed [1] - 130:19
instructing [1] - 132:17
instruction [3] - 111:15, 111:23, 111:25
instructions [4] - 3:3, 3:11, 3:20, 130:18
instructs [1] - 160:4
instrument [1] - 133:9
instruments [1] - 183:9
integrity [1] - 174:21
intend [4] - 23:8, 106:20, 125:2, 144:19
intended [1] - 173:6
intending [1] - 126:1
intent [1] - 111:19
intentionally [5] - 69:1, 75:5, 127:13,

127:21, 186:13
interchangeable [1] - 116:4
interest [2] - 48:25, 101:14
intermediate [1] - 105:14
internal [2] - 78:12, 84:19
international [2] - 127:11, 183:20
internet [2] - 10:20, 170:20
interpret [1] - 154:19
interpretation [3] - 135:11, 140:8, 154:19
interpretations [1] - 154:21
interpreter [2] - 17:1, 17:3
interpreter's [1] - 100:16
interpreters [3] - 16:24, 16:25, 17:4
interpreters/ translators [1] - 100:17
interpreting [2] - 120:24, 145:7
interrupt [1] - 162:20
introduced [1] - 19:12
introduces [1] - 108:3
introduction [1] - 3:23
intuition [1] - 132:23
invading [1] - 132:17
inventorying [1] - 179:6
investigation [4] - 43:3, 62:18, 67:25, 132:18
investigations [11] - 56:11, 56:13, 58:10, 59:19, 62:14, 62:15, 66:1, 66:11, 67:18, 72:6, 130:9
investigator [4] - 18:11, 62:19, 63:21, 63:23
involve [4] - 42:5, 43:10, 44:4, 99:23
involved [11] - 29:12, 30:6, 31:14, 62:15, 62:16, 104:21, 135:9, 155:16, 159:14, 177:21, 184:17
involves [2] - 42:8, 68:25
involving [9] - 25:2,

26:16, 30:15, 56:14, 95:21, 98:21, 133:5, 144:9, 150:13
iOS [3] - 155:1, 155:2
IP [40] - 116:11, 118:4, 118:5, 118:24, 119:6, 120:2, 120:9, 121:20, 121:22, 121:24, 122:4, 122:23, 123:2, 123:9, 123:18, 125:13, 126:23, 126:25, 127:3, 135:7, 136:2, 152:22, 152:23, 153:1, 153:5, 153:8, 153:11, 153:12, 153:14, 153:19, 159:16, 159:17, 160:15, 160:16, 162:8, 162:17, 162:18, 163:1, 170:1
IRS [1] - 139:8
issuance [1] - 64:10
issue [52] - 4:21, 8:3, 15:23, 20:18, 21:22, 22:18, 23:22, 26:7, 27:13, 29:1, 31:7, 36:22, 37:5, 37:8, 37:16, 37:18, 37:19, 56:25, 60:1, 63:14, 72:12, 77:9, 81:11, 89:11, 91:14, 92:19, 99:16, 101:19, 111:12, 111:13, 111:15, 112:13, 113:18, 114:10, 115:2, 122:18, 128:21, 132:15, 134:3, 138:6, 138:24, 143:11, 150:9, 151:17, 152:4, 168:1, 173:3, 173:8, 174:4, 174:21, 174:24, 182:23
issued [2] - 32:22, 65:16
issues [21] - 11:22, 16:21, 22:16, 37:3, 37:13, 76:18, 87:17, 89:3, 92:15, 99:3, 110:6, 111:7, 120:13, 121:10, 136:10, 144:5, 167:9, 167:25, 173:6, 173:7, 174:23
issuing [1] - 72:12
item [6] - 163:7, 170:5, 171:19, 173:3,

174:23, 176:14
**Item** [4] - 167:4, 171:24, 172:24, 173:1
**Items** [1] - 170:3
**items** [16] - 51:20, 137:1, 137:2, 137:3, 137:14, 137:16, 140:23, 166:23, 167:7, 170:1, 170:14, 171:7, 175:14, 175:18
**itself** [6] - 29:19, 43:7, 51:21, 92:24, 111:21, 156:1

## J

**jail** [12] - 13:1, 13:6, 14:9, 15:6, 15:8, 15:9, 116:24, 180:23, 181:18, 181:19, 182:16, 182:19
**Jail** [2] - 13:19, 14:20
**jail's** [1] - 13:3
**Jamie** [1] - 28:15
**Japan** [10] - 23:2, 26:15, 31:25, 32:6, 32:22, 33:5, 34:6, 34:25, 35:2, 151:24
**Japanese** [13] - 23:3, 26:10, 28:3, 28:5, 29:20, 29:22, 32:6, 32:8, 33:1, 33:4, 34:9, 34:23, 150:12
**jargon** [2] - 41:8, 85:14
**Jean** [1] - 115:21
**jean** [11] - 115:23, 116:3, 116:7, 116:9, 117:3, 118:3, 119:13, 119:17, 120:2, 120:14, 158:19
**jean's** [4] - 116:15, 119:25, 121:12, 154:9
**Jeff** [1] - 2:12
**JEFFREY** [1] - 1:15
**Jencks** [1] - 12:10
**Jones** [1] - 147:18
**journal** [2] - 86:22, 106:1
**journey** [1] - 96:10
**JUDGE** [2] - 1:8, 1:8
**Judge** [7] - 58:16, 59:20, 60:3, 66:22, 67:17, 86:13, 133:10
**judges** [1] - 160:5

**judgment** [2] - 129:23, 171:4
**judgments** [1] - 82:3
**judicial** [4] - 34:6, 35:2, 58:2, 149:18
**July** [1] - 167:12
**June** [5] - 26:1, 44:13, 167:11, 167:12, 168:15
**junk** [2] - 85:4, 97:23
**juror** [2] - 57:2, 122:12
**jurors** [3] - 7:16, 26:3, 130:13
**jury** [71] - 3:2, 3:10, 12:19, 17:19, 18:3, 20:22, 24:8, 24:14, 24:16, 24:22, 37:6, 39:2, 39:8, 40:2, 56:6, 56:24, 83:2, 83:9, 89:12, 90:2, 93:8, 96:2, 99:20, 99:25, 111:16, 111:25, 114:10, 120:11, 122:2, 130:4, 130:18, 132:11, 132:15, 132:17, 132:21, 133:1, 133:23, 134:3, 134:6, 134:7, 134:16, 136:11, 137:1, 137:5, 138:10, 142:23, 142:25, 144:11, 144:17, 145:9, 145:15, 146:15, 148:17, 148:18, 148:19, 150:4, 151:4, 153:1, 153:7, 153:19, 155:16, 157:1, 158:22, 162:6, 163:3, 173:23, 174:13, 175:19, 179:10
**Justice** [5] - 1:13, 1:16, 5:10, 98:6, 106:8

## K

**Karpeles** [7] - 29:7, 30:16, 33:14, 33:17, 35:3, 36:15, 177:21
**Karpeles's** [3] - 30:15, 34:5, 149:8
**keep** [10] - 97:18, 126:14, 127:14, 127:22, 127:25, 150:21, 157:16, 168:7, 169:17, 173:25

**keeps** [4] - 86:1, 103:13, 105:25, 126:13
**key** [6] - 39:8, 39:17, 49:8, 74:13, 74:14, 174:15
**keys** [1] - 39:20
**Khatallah** [1] - 24:10
**killdozer** [1] - 130:22
**kind** [22] - 34:16, 49:3, 49:8, 51:20, 60:14, 71:12, 82:3, 88:15, 89:2, 99:23, 106:20, 120:5, 123:22, 136:20, 136:22, 150:2, 150:13, 151:23, 154:12, 154:21, 161:20
**kinds** [1] - 155:4
**knowing** [4] - 35:6, 99:5, 157:14, 161:4
**knowledge** [10] - 26:12, 28:4, 30:1, 35:12, 35:13, 35:19, 113:20, 132:5, 156:24, 178:1
**known** [6] - 54:12, 61:7, 62:4, 68:11, 81:17, 123:10
**knows** [7] - 6:23, 46:5, 70:10, 70:12, 92:13, 134:6, 174:7
**Kraken** [1] - 46:9

## L

**L.A** [1] - 167:15
**lab** [1] - 27:17
**Labs** [1] - 49:12
**Labs'** [1] - 49:10
**lack** [5] - 97:21, 113:21, 140:14, 148:9, 171:25
**lacking** [2] - 96:7, 97:17
**lacks** [1] - 97:2
**laid** [1] - 55:25
**land** [1] - 147:3
**language** [2] - 112:4, 134:5
**laptop** [6] - 13:15, 147:20, 147:24, 147:25, 148:1
**large** [4] - 85:6, 98:17, 109:9, 168:16
**Larry** [1] - 4:16
**last** [10] - 3:7, 9:1, 9:17, 9:20, 12:8, 48:20, 52:22, 129:8, 129:14, 130:10

**late** [5] - 82:25, 84:23, 143:2, 166:25, 181:15
**launder** [2] - 4:24, 183:9
**laundered** [1] - 80:14
**laundering** [9] - 4:25, 80:13, 84:11, 92:20, 93:6, 104:21, 128:14, 131:4
**Law** [2] - 1:19, 9:7
**law** [44] - 7:1, 16:23, 28:16, 32:6, 32:14, 33:1, 35:21, 36:10, 52:6, 57:19, 57:20, 58:9, 62:13, 67:18, 68:21, 68:24, 69:25, 70:4, 72:5, 79:6, 83:1, 86:13, 86:22, 90:10, 90:22, 113:10, 128:14, 128:16, 130:7, 130:18, 131:7, 131:14, 131:16, 132:18, 133:2, 134:15, 149:22, 156:16, 160:3, 160:5, 175:2, 175:4, 175:10, 175:11
**lawyer** [1] - 8:24
**lawyers** [8] - 160:5, 184:5, 184:8, 184:11, 184:24, 185:1, 185:21, 186:7
**lawyers'** [1] - 186:3
**lay** [3] - 57:2, 116:20, 122:12
**layperson** [1] - 120:20
**lead** [1] - 106:3
**leads** [2] - 86:24, 148:5
**leaning** [1] - 174:19
**learn** [1] - 99:8
**least** [31] - 21:12, 31:15, 36:2, 36:11, 36:13, 37:1, 37:13, 41:21, 43:22, 65:16, 72:6, 73:21, 73:23, 74:5, 79:16, 89:9, 90:15, 90:23, 93:4, 93:23, 98:17, 106:13, 132:24, 165:22, 167:2, 173:14, 174:10, 175:20, 177:11, 179:5, 180:5
**leave** [2] - 10:21, 178:6
**led** [1] - 30:22
**ledger** [1] - 71:10

**leeway** [1] - 143:2
**left** [1] - 128:17
**legal** [5] - 9:13, 9:19, 13:10, 82:6, 131:9
**legitimate** [2] - 164:10, 186:10
**legitimately** [1] - 159:5
**less** [3] - 27:15, 33:20, 93:18
**level** [10] - 34:19, 35:4, 98:20, 123:10, 145:13, 154:10, 155:7, 157:21
**Level** [1] - 183:15
**liberty** [7] - 90:8, 90:16, 90:21, 90:24, 90:25, 91:1, 94:18
**Liberty** [1] - 44:8
**licensing** [2] - 3:5, 3:6
**Lichtenstein** [4] - 4:20, 4:22, 4:23, 5:2
**life** [3] - 90:25, 91:1, 183:16
**light** [3] - 119:21, 166:18, 177:5
**likelihood** [2] - 98:11, 98:14
**likely** [9] - 50:7, 60:21, 60:24, 119:22, 122:3, 124:19, 124:21, 124:23, 180:4
**limine** [3] - 22:19, 22:20, 58:5
**limit** [5] - 148:6, 155:3, 161:17, 184:13, 185:13
**limitation** [1] - 111:7
**limitations** [4] - 111:3, 111:9, 111:11, 111:19
**limited** [5] - 49:13, 107:17, 114:19, 129:3, 183:16
**limiting** [2] - 111:22, 129:6
**limits** [1] - 119:11
**line** [6] - 9:22, 24:22, 124:14, 168:3, 182:17, 182:18
**lined** [1] - 23:17
**lines** [1] - 72:17
**lining** [1] - 169:24
**link** [2] - 13:8, 13:11
**liquid** [2] - 88:17, 88:19
**list** [20] - 6:8, 6:11, 6:15, 12:4, 12:15, 49:2, 78:1, 101:4,

107:17, 109:7, 116:19, 116:22, 124:20, 136:6, 136:7, 137:3, 137:17, 144:3, 163:19, 176:9
**listed** [7] - 136:7, 136:15, 136:18, 138:7, 138:9, 140:24, 163:21
**lists** [1] - 109:24
**litigation** [2] - 71:1, 89:10
**live** [2] - 109:16, 159:25
**lives** [1] - 167:15
**living** [1] - 161:11
**loaded** [1] - 161:10
**loans** [1] - 174:1
**LocalBitcoins** [1] - 46:9
**located** [1] - 34:25
**log** [3] - 123:12, 175:13, 175:16
**logged** [2] - 123:4, 123:5
**logs** [17] - 122:24, 122:25, 123:7, 123:12, 123:15, 125:11, 126:12, 126:14, 126:15, 126:19, 126:21, 127:5, 127:8, 127:14, 127:22, 127:25, 152:14
**look** [57] - 3:8, 19:21, 20:12, 25:22, 27:9, 27:14, 27:21, 27:23, 27:25, 34:14, 36:7, 39:11, 52:25, 53:3, 53:4, 58:21, 60:23, 65:11, 72:8, 75:7, 80:17, 81:4, 84:25, 87:10, 88:18, 94:2, 104:11, 105:10, 115:10, 115:14, 115:15, 119:3, 124:2, 125:6, 125:15, 126:7, 133:15, 154:9, 162:1, 163:18, 169:8, 169:16, 169:23, 171:6, 171:11, 171:15, 171:17, 174:2, 175:18, 177:13, 178:12, 178:14, 178:16, 178:18, 180:2, 180:13
**looked** [15] - 3:7,

45:22, 58:17, 103:16, 105:7, 110:11, 119:18, 120:3, 121:23, 147:10, 147:19, 166:6, 172:5, 172:6, 172:18
**looking** [40] - 24:9, 24:23, 39:3, 39:4, 40:7, 43:7, 44:15, 46:14, 47:3, 47:22, 50:6, 51:6, 51:22, 60:15, 60:18, 61:21, 65:1, 68:11, 70:17, 74:22, 74:25, 75:6, 87:8, 88:20, 92:9, 104:7, 107:24, 109:21, 112:11, 116:18, 116:22, 123:17, 126:4, 128:23, 141:14, 144:2, 157:11, 169:21
**looks** [1] - 108:6
**love** [2] - 126:15, 127:8
**lunch** [4] - 55:8, 63:12, 76:15, 77:4
**Luxembourg** [1] - 126:24

## M

**ma'am** [1] - 73:19
**MAC** [1] - 123:10
**machine** [1] - 123:13
**Madera** [1] - 17:11
**magnet** [1] - 119:24
**main** [2] - 184:15, 184:22
**maintained** [1] - 125:20
**maintaining** [1] - 178:15
**maintains** [1] - 34:22
**maintenance** [3] - 155:23, 156:17, 171:10
**majority** [4] - 72:13, 72:14, 85:5, 85:6
**Man** [1] - 86:5
**man's** [1] - 94:17
**managing** [1] - 29:19
**Manassas** [4] - 27:2, 27:7, 27:14, 27:15
**mandated** [2] - 91:12, 91:17
**Manhattan** [2] - 28:16, 28:20
**manipulated** [2] -

34:10, 151:19
**manipulating** [9] - 34:13, 34:15, 150:8, 150:18, 150:21, 150:22, 151:15, 169:8, 177:23
**manipulation** [7] - 23:11, 149:9, 150:6, 151:8, 151:20, 173:22, 177:22
**manual** [2] - 98:7, 102:9
**manually** [3] - 50:6, 102:11, 102:16
**manufacturing** [1] - 33:17
**mark** [2] - 30:15, 61:13
**Mark** [2] - 30:16, 149:8
**market** [14] - 40:17, 45:4, 59:4, 59:9, 59:11, 66:21, 70:22, 88:12, 88:16, 88:17, 88:18, 88:21, 109:1, 111:8
**marketed** [2] - 83:17, 84:19
**marketplace** [3] - 65:4, 70:24, 105:14
**marketplaces** [6] - 59:5, 65:2, 70:6, 70:17, 108:19, 109:19
**markets** [8] - 42:21, 45:5, 52:1, 80:23, 104:24, 109:9, 111:2, 111:4
**marshal** [4] - 14:25, 15:5, 15:7, 100:14
**Marshals** [4] - 13:13, 13:22, 15:12, 15:13
**marshals** [3] - 14:8, 14:9, 14:21
**mask** [1] - 162:19
**massive** [1] - 57:11
**match** [8] - 18:8, 19:5, 25:13, 71:12, 74:6, 127:9, 136:7, 139:7
**matched** [1] - 18:14
**matches** [4] - 23:17, 26:4, 72:14, 153:12
**matching** [1] - 19:2
**material** [3] - 22:13, 66:23, 179:7
**materially** [2] - 37:4, 93:7
**materials** [3] - 66:15, 66:19, 124:2
**math** [1] - 97:3
**mathematical** [1] - 97:4

**mathematics** [2] - 97:11, 97:12
**matter** [11] - 34:6, 35:2, 76:16, 90:9, 90:17, 100:8, 100:9, 117:6, 117:7, 144:2, 166:6
**matters** [7] - 12:23, 22:5, 34:16, 56:16, 99:8, 128:15, 132:14
**Matthew** [1] - 115:21
**maximum** [1] - 183:13
**Mazarin** [8] - 116:1, 116:4, 121:17, 125:19, 143:9, 158:19, 163:8
**Mazarin's** [1] - 159:16
**Mazars** [26] - 116:1, 116:4, 116:5, 116:13, 117:11, 117:24, 118:15, 119:20, 120:3, 121:16, 124:8, 125:18, 127:2, 135:12, 135:16, 136:6, 136:15, 138:4, 138:8, 139:6, 143:6, 143:8, 153:6, 158:19, 159:16, 163:8
**mazars** [1] - 118:1
**Mazars'** [3] - 153:14, 154:9, 163:18
**McFadden** [1] - 133:10
**mean** [51] - 5:2, 14:19, 21:7, 21:11, 21:14, 21:21, 27:25, 28:11, 30:14, 47:24, 48:3, 61:15, 82:8, 82:12, 85:16, 85:18, 86:18, 87:25, 91:10, 91:16, 97:1, 97:2, 97:6, 98:1, 113:1, 117:15, 121:16, 129:10, 131:24, 135:6, 142:20, 143:8, 144:13, 145:12, 146:17, 146:23, 147:11, 150:1, 150:15, 151:4, 154:7, 155:24, 157:8, 157:11, 157:15, 160:1, 164:21, 165:5, 172:3, 186:11
**meaning** [6] - 118:10, 120:25, 122:8, 122:17, 135:13, 151:16

**means** [16] - 33:22, 34:23, 69:8, 79:25, 85:16, 85:17, 97:2, 106:4, 121:3, 121:4, 130:4, 153:12, 154:19, 154:24, 156:14, 157:16
**meant** [3] - 100:3, 106:4, 176:10
**measure** [1] - 79:4
**measured** [1] - 162:1
**measures** [1] - 54:7
**media** [1] - 3:23
**meet** [4] - 20:9, 86:7, 91:18, 94:19
**meeting** [1] - 21:6
**meets** [2] - 77:9, 85:9
**Meiklejohn** [2] - 101:18, 101:21
**member** [2] - 56:12, 70:4
**memorandum** [1] - 3:4
**memorialized** [1] - 43:4
**mempool.space** [1] - 51:9
**mention** [2] - 7:21, 110:11
**mentioned** [4] - 94:21, 128:12, 135:11, 135:12
**mere** [1] - 164:20
**merely** [1] - 156:21
**merits** [1] - 144:12
**mess** [1] - 30:25
**method** [2] - 61:5, 75:4
**methodologies** [2] - 89:7, 153:24
**methodology** [14] - 54:2, 54:7, 57:14, 88:3, 92:2, 94:13, 94:24, 118:16, 118:21, 119:7, 123:20, 123:23, 125:9, 170:8
**methods** [6] - 54:4, 54:25, 60:11, 68:3, 71:8, 75:14
**metric** [2] - 94:14, 162:4
**metrics** [1] - 94:16
**Miami** [1] - 156:5
**MICHAEL** [1] - 1:19
**Michael** [6] - 2:18, 9:9, 26:18, 135:13, 135:16, 138:5
**Michon** [1] - 6:5
**microphone** [2] -

183:23
**middle** [1] - 124:14
**might** [16] - 3:24, 5:2, 5:3, 18:19, 43:25, 93:9, 103:24, 111:19, 111:20, 115:12, 120:21, 135:13, 137:8, 148:18, 160:25, 166:19
**military** [1] - 175:8
**million** [23] - 36:15, 80:23, 80:24, 81:3, 81:5, 82:24, 87:1, 87:2, 93:5, 93:6, 93:7, 93:12, 93:18, 93:19, 93:22, 93:23, 93:24, 105:1, 105:5, 109:12
**millions** [1] - 84:16
**mind** [4] - 97:18, 98:3, 98:15, 111:20
**mindful** [1] - 100:25
**mine** [1] - 6:3
**minor** [5] - 5:11, 6:21, 15:16, 105:24, 122:20
**minute** [2] - 119:8, 142:5
**minutes** [5] - 37:22, 55:5, 76:22, 124:6, 139:17
**MIS** [1] - 83:24
**misconception** [1] - 152:25
**misrepresent** [2] - 36:16, 110:21
**misrepresentation** [1] - 110:23
**miss** [1] - 75:15
**missing** [5] - 30:19, 35:14, 78:24, 169:17, 169:18
**Missouri** [1] - 181:9
**misspoke** [1] - 126:11
**mistake** [3] - 84:25, 96:16, 96:17
**misunderstanding** [4] - 38:6, 110:17, 110:20, 115:13
**mixer** [4] - 155:18, 156:9, 170:15, 170:22
**mixers** [5] - 42:16, 156:7, 171:5, 178:13, 178:15
**mixing** [6] - 102:14, 138:13, 138:16, 143:24, 158:1, 171:13

**model** [8] - 38:15, 85:13, 89:12, 90:1, 90:9, 93:5, 108:11
**models** [4] - 89:10, 89:14, 89:17, 126:3
**modems** [1] - 164:2
**modified** [1] - 169:12
**modus** [3] - 41:25, 42:15, 111:20
**moment** [1] - 40:14
**Monday** [4] - 76:8, 76:9, 131:22, 180:11
**Monero** [1] - 40:20
**monetary** [2] - 133:9, 183:9
**money** [23] - 4:23, 25:15, 70:23, 80:13, 84:10, 92:20, 104:18, 104:20, 104:21, 109:22, 128:14, 129:1, 129:24, 130:5, 130:14, 130:15, 131:3, 132:9, 168:19, 168:24, 173:19, 174:2, 183:11
**money-transmitting** [5] - 129:24, 130:5, 130:14, 130:15, 132:9
**moniker** [1] - 130:22
**monkeyed** [4] - 173:24, 174:9, 174:14, 174:16
**Monsanto** [1] - 43:15
**month** [1] - 119:9
**months** [1] - 156:5
**Morales** [1] - 17:11
**Morales-Madera** [1] - 17:11
**Morgan** [5] - 4:20, 53:18, 53:20, 54:15, 122:21
**morning** [18] - 2:6, 2:8, 2:9, 2:11, 2:13, 2:14, 2:15, 2:17, 2:18, 2:21, 3:16, 3:18, 13:2, 13:11, 13:21, 15:9, 88:11, 181:24
**MOSS** [1] - 1:8
**most** [13] - 29:4, 38:3, 44:3, 56:1, 59:15, 78:25, 109:23, 111:2, 124:19, 124:21, 124:23, 130:13, 177:12
**mostly** [1] - 41:16
**motion** [6] - 22:19,

22:20, 58:5, 106:13, 106:14, 106:18
**motions** [1] - 2:24
**move** [2] - 107:6, 115:20
**moved** [4] - 5:12, 38:24, 39:18, 104:18
**moving** [1] - 109:22
**MR** [250] - 2:9, 2:12, 2:15, 2:18, 3:16, 3:19, 4:8, 4:15, 4:18, 4:21, 5:9, 5:13, 5:17, 5:20, 5:22, 6:1, 6:5, 6:7, 6:11, 6:14, 6:17, 6:20, 7:4, 7:7, 7:22, 7:25, 8:3, 8:11, 8:15, 8:20, 8:22, 9:4, 9:6, 9:11, 9:13, 9:19, 10:7, 10:12, 10:23, 11:13, 11:20, 12:1, 12:5, 12:20, 12:25, 13:18, 13:21, 14:7, 14:14, 14:17, 14:19, 15:3, 15:9, 15:15, 15:18, 15:21, 16:5, 16:13, 16:17, 18:5, 18:22, 19:21, 20:2, 20:24, 21:3, 21:6, 21:9, 21:14, 21:21, 22:4, 22:7, 22:14, 26:7, 27:10, 27:16, 28:2, 28:15, 28:19, 29:7, 29:20, 34:5, 34:9, 34:18, 36:12, 76:21, 77:7, 77:15, 77:20, 77:24, 79:19, 80:8, 81:9, 82:11, 82:14, 86:12, 87:18, 87:21, 88:1, 88:6, 89:17, 90:14, 91:13, 93:13, 93:16, 94:1, 94:5, 94:23, 95:5, 95:9, 95:16, 95:19, 96:3, 97:5, 97:9, 99:2, 100:5, 100:10, 110:8, 110:18, 111:24, 112:6, 112:16, 112:21, 113:16, 114:2, 114:5, 114:17, 114:24, 115:25, 116:17, 117:9, 117:23, 118:19, 119:3, 119:6, 120:14, 120:23, 122:20, 124:3, 124:9, 124:12, 124:18, 125:7, 126:21, 127:20, 127:24, 128:3,

128:8, 128:12, 128:20, 129:5, 129:10, 129:17, 129:22, 131:1, 131:11, 131:14, 131:19, 131:22, 131:24, 132:13, 133:3, 133:15, 134:8, 135:2, 136:5, 136:14, 137:6, 137:18, 137:23, 139:23, 140:2, 140:5, 141:4, 141:7, 141:10, 141:14, 141:17, 141:19, 141:23, 142:4, 142:7, 142:11, 143:5, 143:13, 143:20, 144:19, 145:22, 145:25, 146:12, 146:18, 147:19, 148:6, 148:12, 148:21, 149:4, 149:7, 149:16, 150:10, 150:17, 150:24, 151:3, 151:9, 151:11, 151:18, 151:21, 152:11, 152:19, 153:4, 153:11, 153:17, 153:23, 154:3, 154:7, 154:18, 155:3, 155:13, 155:20, 155:25, 156:3, 156:9, 156:21, 157:7, 157:18, 157:20, 158:5, 158:15, 159:2, 160:2, 161:13, 162:4, 162:9, 162:14, 163:2, 163:5, 163:7, 163:14, 164:12, 165:15, 165:19, 165:23, 165:25, 166:3, 166:20, 180:7, 180:22, 182:6, 183:3, 186:18, 186:20
**MS** [173] - 2:6, 10:8, 10:16, 10:19, 11:3, 11:11, 11:16, 22:17, 23:24, 24:18, 25:4, 31:6, 31:22, 32:18, 32:24, 33:4, 33:20, 34:2, 38:2, 38:16, 38:21, 39:13, 39:16, 39:24, 40:6, 40:10, 40:14, 40:23, 40:25, 41:7, 41:10, 41:15,

41:20, 42:1, 42:8, 42:15, 42:18, 42:25, 43:2, 43:12, 43:24, 44:3, 44:12, 44:17, 45:1, 45:3, 45:19, 46:25, 47:12, 47:18, 48:1, 48:5, 48:7, 48:12, 48:19, 49:7, 49:18, 49:22, 50:12, 50:23, 51:3, 51:19, 52:4, 52:21, 55:9, 55:12, 55:15, 55:20, 55:24, 56:4, 56:23, 57:5, 58:3, 59:1, 59:14, 60:10, 61:10, 62:8, 63:8, 63:17, 64:17, 64:25, 65:21, 65:25, 66:6, 66:10, 66:17, 67:7, 67:13, 67:15, 67:21, 68:9, 68:20, 69:12, 69:15, 69:22, 70:15, 71:6, 71:19, 72:18, 72:23, 73:1, 73:14, 73:25, 74:13, 74:18, 75:13, 75:17, 76:3, 76:6, 76:11, 77:3, 100:25, 101:20, 102:20, 103:10, 103:16, 104:3, 104:13, 104:16, 105:2, 105:13, 105:22, 106:19, 107:5, 107:16, 108:24, 109:7, 109:17, 110:4, 115:12, 115:22, 116:10, 119:17, 121:18, 125:16, 126:10, 127:7, 127:13, 128:7, 138:23, 139:17, 140:25, 166:24, 167:4, 168:14, 168:25, 169:15, 170:1, 170:5, 170:14, 171:3, 171:7, 171:12, 171:18, 171:21, 171:24, 172:8, 172:11, 172:22, 172:24, 174:23, 175:22, 176:8, 176:14, 176:17, 176:20, 177:9, 180:19, 181:8, 181:14, 181:22, 182:1
**Mt** [56] - 22:13, 22:20, 23:9, 23:17, 23:18, 24:20, 24:21, 24:24, 25:8, 25:14, 25:17,

26:2, 26:16, 26:20, 28:9, 29:11, 30:11, 30:17, 31:2, 34:10, 34:24, 35:3, 44:7, 47:7, 49:23, 135:10, 140:10, 141:17, 148:13, 148:15, 149:9, 150:6, 150:14, 151:15, 151:20, 151:23, 152:4, 152:5, 152:9, 152:17, 158:2, 159:19, 159:20, 167:7, 167:10, 168:2, 168:17, 168:19, 169:6, 173:11, 173:19, 174:5, 174:12, 177:16

**multiple** [6] - 13:7, 13:9, 26:20, 61:1, 152:5, 160:22

**must** [3] - 62:21, 99:25, 100:2

**Mycelium** [4] - 46:13, 46:18, 50:25, 74:24

## N

**N-o-r-m-a-n** [1] - 9:21

**N.W** [1] - 188:11

**name** [18] - 2:4, 5:2, 6:23, 6:25, 7:8, 7:18, 8:9, 8:16, 8:18, 9:1, 9:2, 9:17, 9:20, 25:6, 47:7, 115:5, 164:16

**names** [8] - 5:7, 6:9, 6:16, 7:14, 8:22, 12:4, 18:24, 100:17

**narrow** [3] - 126:6, 176:6, 176:12

**National** [1] - 56:20

**native** [7] - 26:22, 122:24, 125:11, 126:12, 126:14, 126:15, 152:14

**nature** [7] - 94:8, 99:24, 117:25, 135:10, 147:25, 168:8, 177:23

**near** [1] - 167:15

**necessarily** [5] - 54:4, 58:20, 93:22, 113:11, 132:14

**necessary** [1] - 138:4

**Neck** [2] - 13:18, 14:19

**need** [52] - 2:24, 3:8, 12:18, 14:9, 15:3, 15:11, 16:2, 17:18, 17:23, 20:3, 24:8,

27:20, 36:4, 37:17, 37:22, 39:25, 40:2, 40:3, 52:7, 53:16, 54:4, 54:6, 54:19, 54:20, 54:21, 54:24, 64:7, 76:25, 80:8, 86:24, 95:17, 98:17, 100:7, 100:21, 107:8, 112:3, 117:16, 137:3, 138:19, 141:22, 152:3, 154:11, 155:14, 155:22, 156:16, 157:9, 166:1, 166:4, 171:10, 171:11, 180:6, 180:17

**needed** [2] - 109:13, 116:16

**needing** [1] - 119:23

**needs** [5] - 15:1, 15:8, 27:25, 64:18, 152:6

**nefarious** [1] - 35:23

**negative** [7] - 78:2, 78:14, 83:21, 85:20, 85:23, 101:4, 146:1

**negatives** [2] - 78:8, 104:8

**negotiations** [1] - 184:18

**network** [2] - 155:17, 157:21

**never** [12] - 33:16, 54:16, 58:24, 78:15, 82:20, 84:18, 131:12, 132:5, 132:6, 158:7, 164:17, 183:6

**new** [7] - 5:17, 5:22, 52:9, 58:20, 101:22, 102:1, 168:23

**New** [4] - 1:17, 1:20, 34:23, 168:15

**newly** [4] - 94:15, 96:6, 97:20, 97:24

**next** [18] - 21:9, 23:18, 41:19, 42:15, 42:18, 42:25, 43:2, 43:12, 60:14, 60:16, 60:20, 107:7, 108:24, 115:21, 139:17, 149:1, 158:3, 180:17

**night** [5] - 3:7, 12:8, 48:20, 52:22, 129:14

**nobody** [5] - 29:12, 30:6, 30:11, 35:17, 84:17

**none** [3] - 85:9, 138:25, 148:1

**noon** [1] - 181:25

**normal** [1] - 145:10

**Norman** [1] - 9:20

**Northern** [2] - 13:18, 14:19

**Norway** [2] - 6:24, 8:16

**notation** [1] - 5:16

**note** [13] - 12:7, 12:13, 14:3, 14:5, 46:10, 57:16, 59:17, 59:22, 86:12, 86:14, 122:10, 173:5

**noted** [2] - 61:6, 139:5

**notes** [24] - 18:11, 19:8, 41:2, 43:12, 49:10, 120:7, 120:10, 120:25, 122:8, 122:11, 122:16, 135:12, 135:14, 140:9, 145:6, 145:8, 154:19, 154:20, 154:24, 154:25, 155:1, 188:5

**nothing** [15] - 63:16, 83:22, 128:7, 128:8, 132:13, 138:2, 144:23, 146:14, 146:16, 146:21, 147:1, 147:8, 147:20, 148:4, 175:25

**notice** [8] - 18:24, 41:13, 122:14, 142:19, 146:6, 149:18, 177:1, 179:17

**noticed** [11] - 18:23, 116:2, 116:3, 116:6, 116:7, 117:4, 121:25, 128:13, 132:3, 176:4, 179:19

**noticing** [2] - 31:11, 175:24

**noting** [1] - 50:1

**notion** [1] - 88:17

**novel** [2] - 57:19, 58:21

**number** [21] - 25:7, 60:7, 71:7, 81:1, 81:3, 81:5, 83:12, 92:4, 92:21, 92:25, 93:1, 93:12, 94:10, 105:5, 124:20, 126:24, 137:20, 139:7, 152:7, 164:18

**numbers** [5] - 81:12, 94:7, 105:17, 105:19, 109:9

**numerical** [1] - 61:11

**numerous** [6] - 13:6, 29:3, 58:15, 132:2, 135:19, 167:8

**NVRA** [1] - 167:14

**NW** [4] - 1:11, 1:14, 1:17, 1:23

**NY** [1] - 1:20

## O

**object** [12] - 14:1, 21:23, 38:6, 89:1, 89:5, 89:6, 116:17, 119:15, 121:8, 144:5, 173:4, 176:9

**objection** [11] - 10:15, 10:22, 11:14, 16:4, 23:6, 120:18, 121:11, 128:15, 129:6, 132:2, 181:17

**objections** [5] - 12:15, 16:19, 19:23, 121:15, 123:25

**observing** [1] - 108:10

**obtain** [2] - 165:7, 179:14

**obtained** [1] - 127:11

**obtaining** [1] - 33:7

**obvious** [2] - 94:20, 174:13

**obviously** [2] - 12:9, 166:17

**occasion** [2] - 63:13, 73:2

**occasions** [1] - 54:10

**occur** [2] - 108:2, 169:5

**occurred** [3] - 133:4, 139:2, 169:13

**occurring** [2] - 51:23, 127:16

**odd** [1] - 7:18

**OF** [4] - 1:1, 1:2, 1:7, 188:1

**off-script** [2] - 166:11, 166:12

**Offense** [1] - 183:15

**offense** [3] - 104:21, 130:12, 130:13

**offer** [18] - 17:18, 55:18, 112:3, 128:23, 145:17, 145:18, 146:4, 183:2, 183:4, 183:6, 184:2, 184:24, 185:7, 185:11, 185:13, 185:25, 186:6

**offered** [10] - 31:14, 60:4, 82:7, 85:21,

114:15, 121:4, 167:13, 167:14, 167:16, 183:8

**offering** [4] - 89:16, 114:22, 131:10, 176:12

**office** [2] - 27:2, 100:16

**Office** [2] - 5:11, 109:13

**official** [2] - 23:2, 32:9

**Official** [2] - 1:22, 188:10

**OFFICIAL** [1] - 188:1

**often** [4] - 63:20, 65:16, 123:12, 123:15

**Omedetou** [1] - 34:23

**omitted** [1] - 53:25

**omnibus** [1] - 58:5

**one** [120] - 5:9, 5:19, 5:24, 6:22, 9:16, 9:22, 16:6, 19:24, 20:16, 22:15, 23:10, 23:18, 24:3, 25:11, 29:4, 29:11, 32:13, 36:15, 36:23, 37:23, 38:5, 38:14, 39:6, 39:24, 40:1, 44:11, 46:21, 50:21, 52:1, 55:2, 55:9, 55:25, 56:3, 58:15, 59:12, 60:14, 60:16, 61:11, 61:14, 62:16, 66:22, 66:25, 67:11, 67:15, 74:6, 78:2, 79:19, 79:25, 83:21, 85:19, 88:25, 89:14, 90:12, 91:18, 92:23, 92:25, 95:22, 95:25, 96:8, 96:20, 96:24, 98:4, 98:11, 98:15, 99:3, 100:18, 101:11, 101:21, 103:13, 105:11, 107:1, 110:11, 112:6, 113:25, 114:22, 115:2, 116:5, 116:8, 116:18, 119:9, 119:17, 122:20, 126:6, 126:7, 126:24, 130:20, 133:15, 135:20, 136:21, 137:2, 137:16, 137:25, 140:25, 142:3, 143:9, 144:17, 145:4, 145:13, 149:1, 151:13, 152:21, 153:8,

157:5, 158:3, 158:20, 164:8, 165:14, 171:25, 174:15, 175:5, 180:3, 183:8, 183:10
**one-in-a-trillion** [1] - 98:11
**one-month** [1] - 119:9
**ones** [3] - 37:3, 102:2, 102:3
**ongoing** [2] - 72:2, 72:6
**onion** [2] - 143:23, 156:24
**online** [2] - 8:7, 68:24
**onward** [2] - 25:10, 25:22
**open** [2] - 166:19, 178:7
**opened** [2] - 177:2, 179:18
**operandi** [3] - 41:25, 42:15, 111:20
**operate** [3] - 144:18, 145:15, 170:15
**operated** [3] - 143:23, 144:23, 165:14
**operates** [1] - 170:22
**operating** [11] - 31:15, 90:20, 138:3, 144:9, 146:22, 146:25, 155:17, 157:16, 164:22, 172:7, 183:10
**operation** [1] - 159:14
**operations** [1] - 111:3
**operator** [1] - 164:14
**opine** [4] - 129:23, 132:10, 170:7, 171:13
**opining** [1] - 172:12
**opinion** [23] - 17:20, 37:2, 37:9, 59:20, 60:3, 67:17, 116:20, 121:3, 122:9, 125:24, 126:1, 128:24, 132:8, 146:21, 147:13, 149:23, 159:25, 160:11, 161:7, 165:13, 167:5, 167:6, 170:13
**opinions** [9] - 10:24, 11:1, 11:5, 11:7, 11:18, 155:9, 160:8, 161:25
**opportunities** [2] - 71:14, 167:8
**opportunity** [7] - 2:23, 73:6, 100:22,

139:12, 155:10, 169:16, 184:4
**opposed** [1] - 33:12
**opposition** [1] - 58:5
**optimistic** [1] - 170:25
**Orange** [1] - 167:15
**order** [3] - 36:22, 119:11, 130:19
**original** [12] - 19:3, 19:5, 20:11, 22:19, 32:13, 35:8, 46:3, 47:4, 119:18, 123:6, 152:14
**originally** [3] - 35:12, 35:18, 45:24
**otherwise** [3] - 116:16, 121:12, 178:7
**ought** [4] - 17:14, 27:5, 133:24, 162:6
**outflow** [1] - 81:13
**outlier** [1] - 57:17
**outlined** [1] - 121:13
**output** [1] - 99:10
**outside** [6] - 27:15, 68:12, 111:3, 111:8, 111:18, 122:12
**outspoken** [1] - 175:6
**overlap** [12] - 45:7, 118:4, 118:6, 118:24, 119:7, 119:8, 119:9, 123:18, 125:13, 130:17, 153:14, 159:16
**overseas** [1] - 33:8
**overseen** [1] - 62:15
**overtones** [1] - 10:1
**overwhelming** [1] - 72:14
**own** [13] - 46:8, 50:2, 53:7, 79:11, 79:17, 79:19, 80:2, 80:3, 80:7, 93:4, 93:5, 130:21, 142:23
**owner** [1] - 151:23

## P

**p.m** [6] - 76:9, 100:11, 181:23, 187:2, 187:3
**Pac** [1] - 86:5
**Pac-Man** [1] - 86:5
**pace** [1] - 100:21
**pack** [1] - 164:3
**page** [41] - 24:6, 25:20, 25:22, 39:14, 39:17, 41:6, 42:2, 44:5, 44:10, 44:18, 46:24, 47:6, 47:10,

47:12, 47:18, 48:7, 48:22, 49:10, 49:22, 50:15, 50:23, 51:14, 51:16, 58:11, 60:6, 72:24, 87:23, 94:25, 108:3, 108:14, 108:20, 109:17, 109:24, 110:13, 115:6, 124:4, 124:13, 124:14, 124:19, 170:17
**pages** [11] - 44:6, 45:3, 46:25, 51:4, 56:9, 57:9, 58:7, 59:12, 59:17, 107:24, 109:7
**panel** [2] - 7:7, 7:8
**paper** [3] - 75:22, 83:7, 101:19
**papers** [10] - 34:7, 78:4, 96:6, 101:10, 101:21, 103:12, 104:13, 118:21, 123:22
**paragraph** [10] - 41:19, 42:2, 42:15, 43:2, 43:12, 142:4, 142:14, 143:18, 143:20
**paralegal** [3] - 5:17, 5:22, 6:2
**paralegals** [1] - 6:3
**parallel** [1] - 11:4
**parameters** [1] - 133:2
**parents** [2] - 6:24, 8:16
**part** [32] - 4:24, 10:20, 13:25, 18:8, 21:21, 23:25, 24:3, 25:12, 42:8, 42:22, 46:3, 48:5, 48:17, 49:25, 50:20, 52:1, 59:10, 59:22, 62:1, 65:3, 66:11, 67:24, 68:22, 70:19, 107:23, 110:23, 114:8, 120:20, 124:24, 130:16, 138:24, 172:24
**partially** [1] - 97:6
**participate** [1] - 180:24
**particular** [37] - 3:24, 4:1, 18:1, 19:2, 25:13, 37:13, 38:10, 42:3, 51:14, 51:25, 63:21, 64:5, 66:22, 68:4, 68:5, 69:7, 69:9, 100:24, 104:23, 108:9,

108:11, 121:4, 121:15, 121:22, 122:3, 122:4, 130:8, 132:9, 142:16, 159:10, 164:9, 169:5, 172:19, 177:25, 178:21, 178:22
**particularized** [1] - 161:15
**particularly** [14] - 28:20, 34:22, 35:5, 42:19, 52:9, 74:19, 88:15, 106:22, 130:12, 143:1, 144:10, 157:25, 158:19, 158:21
**particulars** [1] - 150:11
**parties** [15] - 3:15, 4:2, 15:25, 16:3, 17:15, 17:17, 20:17, 20:19, 20:21, 22:10, 133:24, 134:1, 134:4, 163:3, 179:24
**parts** [1] - 102:7
**party** [1] - 155:10
**pas** [2] - 65:9, 65:11
**passed** [1] - 71:3
**password** [1] - 13:7
**past** [5] - 6:24, 31:11, 58:25, 84:25, 140:4
**patterns** [2] - 108:10, 108:12
**pay** [1] - 119:2
**payment** [1] - 47:8
**payments** [1] - 47:6
**PEARLMAN** [24] - 1:15, 2:12, 3:16, 3:19, 4:8, 4:15, 4:18, 4:21, 5:9, 5:13, 5:17, 5:20, 5:22, 6:1, 6:5, 6:7, 6:11, 6:14, 6:17, 18:22, 19:21, 20:2, 21:3, 21:9
**Pearlman** [4] - 2:12, 3:15, 18:21, 20:25
**peel** [25] - 39:20, 46:13, 46:15, 46:19, 46:21, 50:24, 51:3, 60:21, 60:22, 61:1, 74:25, 75:6, 75:8, 75:10, 101:25, 108:13, 112:6, 112:7, 112:9, 112:11, 112:13, 112:18, 112:23, 112:24, 115:15
**peer** [8] - 54:5, 78:4, 83:7, 89:11, 96:5,

101:9, 101:15, 123:22
**peer-reviewed** [7] - 54:5, 78:4, 83:7, 89:11, 96:5, 101:9, 123:22
**PELKER** [174] - 1:13, 2:6, 10:8, 10:16, 10:19, 11:3, 11:11, 11:16, 22:17, 23:24, 24:18, 25:4, 31:6, 31:22, 32:18, 32:24, 33:4, 33:20, 34:2, 38:2, 38:16, 38:21, 39:13, 39:16, 39:24, 40:6, 40:10, 40:14, 40:23, 40:25, 41:7, 41:10, 41:15, 41:20, 42:1, 42:8, 42:15, 42:18, 42:25, 43:2, 43:12, 43:24, 44:3, 44:12, 44:17, 45:1, 45:3, 45:19, 46:25, 47:12, 47:18, 48:1, 48:5, 48:7, 48:12, 48:19, 49:7, 49:18, 49:22, 50:12, 50:23, 51:3, 51:19, 52:4, 52:21, 55:9, 55:12, 55:15, 55:20, 55:24, 56:4, 56:23, 57:5, 58:3, 59:1, 59:14, 60:10, 61:10, 62:8, 63:8, 63:17, 64:17, 64:25, 65:21, 65:25, 66:6, 66:10, 66:17, 67:7, 67:13, 67:15, 67:21, 68:9, 68:20, 69:12, 69:15, 69:22, 70:15, 71:6, 71:19, 72:18, 72:23, 73:1, 73:14, 73:25, 74:13, 74:18, 75:13, 75:17, 76:3, 76:6, 76:11, 77:3, 100:25, 101:20, 102:20, 103:10, 103:16, 104:3, 104:13, 104:16, 105:2, 105:13, 105:22, 106:19, 107:5, 107:16, 108:24, 109:7, 109:17, 110:4, 115:12, 115:22, 116:10, 119:17, 121:18, 125:16, 126:10, 127:7, 127:13, 128:7, 138:23, 139:17, 140:25, 166:24, 167:4,

168:14, 168:25, 169:15, 170:1, 170:5, 170:14, 171:3, 171:7, 171:12, 171:18, 171:21, 171:24, 172:8, 172:11, 172:22, 172:24, 174:23, 175:22, 176:8, 176:14, 176:17, 176:20, 177:9, 180:19, 181:8, 181:14, 181:22, 182:1
**Pelker** [14] - 2:6, 18:21, 55:23, 76:19, 86:21, 100:22, 115:9, 119:13, 121:13, 125:15, 127:6, 129:4, 178:25, 183:1
**penalty** [1] - 32:25
**pending** [1] - 2:24
**Pennsylvania** [1] - 1:14
**people** [28] - 6:25, 7:9, 30:24, 83:17, 86:13, 87:12, 114:9, 116:24, 123:4, 123:5, 127:3, 148:24, 153:5, 156:19, 158:1, 160:18, 160:22, 161:1, 161:2, 161:3, 161:9, 162:24, 164:15, 165:16, 176:4
**people's** [1] - 167:18
**per** [2] - 37:22, 38:7
**percent** [14] - 64:13, 64:15, 97:22, 98:22, 99:4, 99:5, 99:17, 103:2, 103:8, 103:14, 103:18, 103:22, 110:14
**percentages** [1] - 102:19
**perfect** [1] - 12:22
**perfectly** [2] - 96:25, 164:10
**performed** [1] - 43:3
**perhaps** [9] - 5:3, 19:10, 20:5, 21:3, 119:13, 120:17, 150:4, 166:18, 177:4
**period** [1] - 156:4
**perjury** [2] - 32:22, 33:1
**permissible** [2] - 131:17, 179:11

**permitted** [1] - 24:14
**person** [14] - 31:18, 32:12, 34:24, 35:8, 63:16, 92:25, 93:1, 98:10, 153:8, 160:17, 162:25, 165:9, 186:22
**person's** [1] - 72:16
**personal** [1] - 153:2
**personally** [2] - 152:23, 153:21
**pertinent** [1] - 75:3
**phone** [6] - 72:16, 146:20, 147:6, 158:22, 164:4, 164:6
**phrase** [5] - 9:25, 10:1, 124:3, 161:10, 162:15
**phrased** [2] - 11:4, 159:11
**phrases** [1] - 18:1
**physically** [3] - 29:8, 30:17, 182:12
**Pi** [1] - 147:6
**Pi's** [1] - 164:3
**pick** [3] - 94:10, 100:21, 102:8
**picked** [1] - 104:9
**piece** [1] - 159:4
**pieces** [2] - 148:7, 148:8
**place** [6] - 5:24, 6:1, 54:7, 85:8, 107:1, 115:4
**places** [2] - 18:12, 25:18
**Plaintiff** [2] - 1:3, 1:10
**plan** [1] - 177:5
**plane** [1] - 27:13
**planning** [3] - 55:13, 71:21, 72:1
**plans** [1] - 129:11
**plausible** [1] - 177:20
**play** [3] - 61:25, 80:12, 130:7
**plays** [4] - 47:2, 65:12, 67:17, 68:20
**plea** [9] - 55:18, 183:2, 183:4, 183:6, 183:7, 183:8, 184:2, 184:18, 184:24
**plenty** [2] - 76:14, 142:21
**PLLC** [2] - 1:19, 9:7
**plus** [1] - 97:15
**Point** [7] - 124:14, 124:18, 125:5, 141:17, 149:7, 149:8, 159:2
**point** [101] - 8:8, 10:5,

11:23, 19:20, 20:11, 22:13, 24:4, 27:18, 28:3, 28:18, 28:23, 31:1, 31:13, 33:10, 35:1, 35:7, 36:19, 42:6, 46:3, 55:10, 58:3, 61:8, 66:5, 66:6, 68:11, 83:1, 86:18, 87:13, 92:13, 93:9, 95:24, 96:13, 97:9, 99:13, 100:5, 100:19, 105:24, 107:2, 111:1, 111:12, 111:25, 112:23, 113:3, 113:4, 113:17, 114:21, 115:1, 121:7, 121:8, 122:23, 125:7, 125:16, 126:21, 128:1, 129:18, 130:20, 134:17, 137:12, 139:22, 140:4, 140:25, 151:22, 152:6, 152:19, 153:4, 153:11, 153:12, 153:17, 154:16, 155:14, 157:4, 158:11, 158:15, 159:6, 161:8, 161:13, 162:3, 162:16, 163:2, 163:12, 163:25, 164:12, 167:7, 167:25, 170:4, 170:25, 171:4, 172:4, 172:6, 173:7, 174:6, 174:10, 174:15, 174:18, 174:19, 175:21, 177:24, 179:5, 179:19
**pointed** [2] - 59:13, 131:7
**pointing** [2] - 22:18, 131:18
**points** [7] - 68:12, 76:1, 96:19, 101:1, 112:24, 157:23, 159:17
**policy** [1] - 106:8
**popular** [1] - 41:11
**portion** [8] - 38:16, 38:17, 38:21, 43:9, 50:7, 54:5, 96:23, 106:5
**portions** [4] - 19:16, 20:5, 98:17, 120:21
**portray** [1] - 158:24

**position** [10] - 17:25, 26:8, 26:9, 26:11, 30:4, 31:2, 31:20, 35:10, 35:11, 94:20
**positive** [4] - 85:23, 103:19, 103:22
**positives** [2] - 61:19, 78:6
**possession** [5] - 23:9, 23:12, 141:25, 158:17, 159:8
**possibility** [4] - 61:19, 138:15, 176:22, 182:15
**possible** [6] - 69:16, 69:18, 104:3, 104:6, 138:12, 180:7
**possibly** [9] - 11:3, 44:14, 65:15, 109:10, 140:3, 146:17, 151:6, 167:12, 181:23
**post** [1] - 37:18
**post-trial** [1] - 37:18
**posted** [1] - 130:22
**potential** [3] - 23:10, 24:5, 73:21
**potentially** [4] - 15:18, 21:16, 136:9, 173:15
**powerful** [2] - 59:24, 74:2
**practice** [2] - 57:15, 165:2
**practices** [3] - 38:24, 75:20, 75:21
**preceding** [1] - 42:1
**precisely** [1] - 17:24
**predicted** [3] - 67:11, 103:8, 103:9
**predictive** [1] - 73:24
**preexisted** [1] - 102:11
**prefer** [5] - 10:1, 40:9, 161:14, 180:7, 183:24
**preference** [2] - 180:15, 180:21
**prejudice** [1] - 145:9
**prejudicial** [4] - 10:1, 115:7, 134:10, 173:15
**preliminarily** [1] - 170:9
**preliminary** [5] - 3:2, 3:10, 22:5, 165:22, 171:16
**prep** [1] - 37:10
**prepare** [1] - 14:2
**prepared** [2] - 18:25, 20:6

**present** [10] - 2:16, 2:19, 9:14, 24:19, 35:9, 66:3, 69:23, 82:7, 121:23, 182:12
**presented** [13] - 58:14, 59:2, 59:5, 60:8, 83:2, 83:3, 83:11, 83:14, 89:19, 114:13, 144:25, 146:24, 178:5
**presenting** [3] - 35:15, 69:25, 116:20
**preserve** [3] - 27:20, 91:14, 167:24
**press** [3] - 81:4, 81:7, 178:1
**pressed** [3] - 113:4, 118:2, 135:4
**pressure** [1] - 77:1
**pretrial** [3] - 2:22, 2:25, 37:20
**PRETRIAL** [2] - 1:4, 1:7
**pretty** [5] - 32:14, 53:18, 92:8, 113:10, 147:14
**prevent** [1] - 100:3
**previous** [3] - 101:23, 102:1, 102:3
**previously** [5] - 4:14, 13:15, 58:14, 107:3, 173:3
**price** [1] - 88:20
**prices** [3] - 40:4, 40:18, 88:18
**pricing** [4] - 40:4, 40:13, 40:16, 40:17
**primarily** [3] - 83:12, 118:13, 135:7
**primary** [2] - 26:15, 90:18
**principles** [3] - 54:4, 54:25, 60:11
**prison** [2] - 28:17, 150:12
**prisoner** [1] - 183:20
**private** [1] - 57:21
**privy** [1] - 168:25
**pro** [1] - 8:24
**probability** [2] - 124:22, 125:1
**probative** [3] - 115:8, 134:11, 173:15
**probed** [1] - 170:16
**problem** [17] - 27:22, 78:14, 79:3, 82:25, 84:7, 86:25, 94:7, 94:12, 114:6, 114:8, 147:1, 162:7, 162:23, 164:25,

165:18, 173:13

**problematic** [9] - 78:22, 80:17, 81:14, 83:14, 88:8, 96:11, 99:6, 123:8, 161:12

**problems** [6] - 15:13, 88:25, 135:20, 146:5, 158:8, 160:15

**procedures** [3] - 33:8, 138:11, 175:2

**proceed** [4] - 38:2, 55:19, 77:6, 161:15

**proceeding** [4] - 58:2, 81:19, 115:6, 182:13

**proceedings** [5] - 16:12, 18:18, 77:5, 180:3, 188:6

**process** [13] - 4:25, 31:17, 31:24, 32:1, 33:5, 58:24, 68:23, 91:8, 127:11, 134:22, 175:14, 179:13

**processing** [1] - 157:17

**produce** [1] - 143:22

**produced** [7] - 23:7, 26:21, 78:17, 129:13, 129:14, 152:12, 163:9

**produces** [2] - 31:17, 32:1

**product** [6] - 48:25, 54:3, 62:3, 74:3, 119:25, 129:15

**production** [1] - 12:8

**professional** [6] - 123:18, 124:3, 125:23, 125:24, 126:1, 169:22

**proffered** [2] - 30:11, 140:15

**program** [3] - 99:22, 113:12, 183:20

**progress** [1] - 187:1

**prohibited** [1] - 16:10

**projection** [1] - 89:1

**prone** [1] - 95:14

**proof** [3] - 70:21, 85:21, 159:11

**proper** [1] - 177:15

**properly** [3] - 73:8, 88:2, 159:12

**property** [4] - 90:25, 91:1, 104:19, 104:20

**proponent** [1] - 24:15

**proponents** [1] - 24:15

**propose** [1] - 111:16

**proposed** [7] - 3:2,

3:10, 3:14, 3:20, 11:25, 20:5, 39:9

**proposing** [1] - 101:22

**proposition** [1] - 150:5

**proprietary** [2] - 52:8, 80:11

**prosecutions** [1] - 59:19

**prosecutor** [1] - 86:15

**prospective** [1] - 7:16

**prove** [2] - 146:1, 172:13

**proves** [2] - 98:9, 98:13

**provide** [9] - 3:2, 15:10, 39:7, 72:19, 100:20, 109:3, 132:21, 132:25, 179:16

**provided** [5] - 3:14, 6:12, 43:14, 51:19, 107:21

**provides** [1] - 130:20

**providing** [4] - 15:6, 53:3, 132:18, 176:24

**province** [6] - 57:1, 122:12, 128:17, 132:17, 149:4, 175:19

**proxies** [2] - 122:7, 173:2

**proxy** [10] - 127:1, 127:8, 127:12, 127:13, 127:21, 127:24, 160:20, 161:1, 162:7, 162:17

**public** [13] - 26:14, 28:8, 30:15, 35:2, 46:1, 51:9, 80:9, 84:6, 102:5, 148:14, 149:17, 152:7, 166:6

**publicity** [2] - 3:22, 5:3

**publicly** [5] - 51:21, 67:7, 80:6, 84:7, 92:7

**pull** [6] - 4:15, 45:14, 63:9, 63:10, 65:7, 105:2

**pulled** [3] - 45:16, 74:19, 119:19

**pulls** [1] - 32:3

**purchase** [1] - 164:21

**purchased** [1] - 164:15

**purchases** [1] - 50:16

**pure** [1] - 147:4

**purely** [4] - 78:21,

79:6, 82:22, 95:7

**purport** [1] - 24:9

**purported** [2] - 26:23, 116:25

**purports** [1] - 148:19

**purpose** [2] - 139:9, 159:6

**purposes** [10] - 31:16, 36:11, 37:9, 45:9, 55:13, 70:8, 77:12, 99:18, 106:3, 160:16

**put** [20] - 8:24, 18:25, 20:15, 20:22, 23:14, 52:13, 75:22, 84:21, 89:22, 94:24, 102:6, 113:2, 116:25, 124:6, 133:1, 133:25, 151:6, 162:21, 176:25, 183:1

**put-versus-deposit** [1] - 20:15

**putting** [2] - 19:24, 77:1

## Q

**qualification** [6] - 53:21, 56:4, 87:17, 87:25, 88:5, 114:3

**qualifications** [11] - 38:7, 56:7, 77:13, 77:16, 87:19, 88:6, 89:2, 113:18, 116:15, 129:11, 175:2

**qualified** [3] - 31:18, 88:14, 135:19

**quantities** [1] - 57:11

**quarter** [1] - 134:20

**query** [1] - 26:24

**questions** [18] - 4:3, 4:5, 22:22, 36:17, 37:12, 52:5, 53:16, 56:2, 78:13, 80:20, 87:14, 91:10, 106:10, 121:15, 135:22, 136:10, 144:17, 174:8

**quickly** [1] - 3:8

**quite** [13] - 17:13, 33:24, 42:7, 75:8, 107:17, 123:15, 127:24, 156:14, 159:4, 164:7, 164:17, 164:22, 172:12

**quote** [4] - 80:22, 82:2, 83:3, 144:8

**quote-unquote** [4] -

80:22, 82:2, 83:3, 144:8

## R

**radar** [3] - 92:3, 143:15, 143:16

**rails** [1] - 117:14

**raise** [10] - 12:15, 12:24, 22:2, 22:6, 59:8, 91:10, 110:5, 121:10, 121:14, 128:18

**raised** [9] - 15:5, 37:12, 37:14, 37:19, 58:6, 70:25, 136:10, 166:24, 173:4

**raises** [3] - 34:21, 78:14, 138:15

**ran** [6] - 35:3, 126:3, 156:20, 164:17, 185:13, 185:22

**RANDOLPH** [1] - 1:8

**range** [1] - 183:16

**ransomware** [1] - 71:24

**Raspberry** [2] - 147:6, 164:3

**rate** [22] - 54:12, 61:7, 61:11, 61:15, 61:23, 62:2, 62:5, 78:6, 78:7, 78:9, 83:5, 83:13, 85:15, 85:23, 103:2, 103:14, 103:19, 103:20, 110:14

**rates** [7] - 40:18, 78:12, 81:17, 82:21, 84:19, 84:22, 101:10

**rather** [7] - 76:17, 146:9, 158:11, 161:17, 165:12, 173:18, 186:13

**rationale** [1] - 95:2

**raw** [2] - 50:13, 57:10

**re** [1] - 33:11

**re-reporting** [1] - 33:11

**reach** [4] - 16:24, 20:17, 20:19, 93:9

**Reactor** [91] - 38:13, 40:18, 42:5, 42:9, 42:23, 43:10, 43:19, 44:4, 44:21, 44:22, 45:25, 46:2, 48:4, 48:5, 48:11, 48:14, 48:17, 49:5, 49:6, 50:9, 50:21, 51:11, 51:12, 51:15, 52:2, 53:17, 54:14, 54:23,

80:22, 82:2, 83:3, 144:8

58:1, 59:24, 61:5, 61:9, 67:5, 67:6, 67:9, 67:11, 67:23, 68:8, 68:13, 68:25, 69:6, 69:19, 70:12, 70:14, 70:20, 72:11, 72:16, 76:1, 76:20, 77:9, 77:14, 77:24, 78:5, 78:6, 78:8, 78:10, 78:13, 78:19, 78:21, 79:22, 80:25, 81:2, 81:23, 84:3, 86:1, 86:19, 87:14, 89:8, 89:9, 89:19, 91:17, 91:24, 92:11, 92:12, 92:17, 92:18, 92:19, 96:14, 100:6, 100:23, 101:7, 102:17, 103:4, 106:14, 107:9, 110:7, 110:10, 111:1, 113:7

**Reactor's** [1] - 110:15

**read** [6] - 4:17, 19:16, 122:16, 124:10, 155:5, 157:15

**readily** [2] - 88:22, 97:13

**reading** [2] - 104:5, 120:9

**ready** [1] - 12:5

**real** [7] - 52:16, 62:7, 62:10, 78:14, 97:24, 129:10, 154:2

**realistic** [1] - 76:4

**realize** [2] - 5:12, 156:8

**really** [44] - 7:18, 15:8, 19:10, 23:6, 23:10, 23:22, 27:25, 37:3, 37:4, 37:19, 38:5, 38:6, 39:22, 41:12, 53:1, 57:6, 60:14, 61:22, 62:2, 62:8, 72:1, 72:7, 74:1, 88:19, 107:17, 112:18, 115:18, 116:16, 116:22, 118:25, 122:18, 130:11, 132:21, 137:23, 142:22, 145:14, 145:18, 152:6, 155:15, 163:2, 174:15, 174:21, 186:13

**reason** [7] - 53:11, 117:17, 117:21, 127:10, 161:12, 174:21, 177:18

**reasonable** [2] -

24:14, 162:6
**reasonably** [2] - 142:23, 173:23
**reasons** [5] - 13:25, 72:5, 146:9, 170:11, 173:4
**rebut** [4] - 140:7, 147:1, 147:4, 157:2
**rebuttal** [8] - 135:17, 138:3, 140:7, 142:15, 143:6, 166:8, 166:15, 176:20
**recalling** [1] - 160:4
**received** [8] - 13:9, 26:18, 29:23, 29:24, 34:10, 59:4, 146:18, 183:6
**receiving** [4] - 42:12, 64:4, 71:13, 108:25
**recent** [1] - 103:12
**recently** [2] - 14:23, 71:1
**recess** [3] - 55:22, 77:4, 134:23
**Recess** [1] - 100:11
**recognize** [1] - 179:17
**recollection** [1] - 113:23
**record** [32] - 2:4, 14:3, 14:6, 24:21, 26:14, 28:8, 29:10, 30:14, 30:15, 31:16, 34:6, 34:18, 35:2, 36:18, 65:12, 67:8, 75:24, 86:14, 102:5, 104:14, 123:12, 123:15, 141:11, 148:14, 149:17, 152:8, 166:6, 167:11, 183:2, 186:6, 186:23
**recorded** [1] - 42:11
**records** [77] - 22:23, 23:3, 23:4, 23:7, 23:9, 23:13, 24:19, 24:20, 24:23, 25:1, 25:3, 25:21, 26:3, 26:9, 26:11, 26:12, 28:5, 28:6, 28:12, 28:21, 28:25, 29:5, 29:13, 29:22, 29:25, 30:2, 30:7, 30:8, 30:11, 31:21, 31:24, 32:3, 32:9, 32:13, 32:19, 33:13, 33:17, 33:23, 34:10, 34:12, 35:9, 35:16, 35:25, 36:1, 36:3, 36:7, 43:7, 47:13, 47:15,

50:14, 50:18, 57:7, 62:24, 63:1, 65:5, 65:7, 65:11, 66:7, 68:15, 70:1, 70:13, 70:14, 70:16, 71:3, 71:6, 73:16, 74:23, 121:22, 121:23, 159:19, 167:10, 168:2, 168:23, 169:8, 169:16
**records'** [1] - 24:11
**recreated** [1] - 45:25
**recross** [1] - 91:23
**redact** [1] - 20:5
**redundant** [3] - 153:15, 159:20, 163:12
**refer** [2] - 164:4, 164:6
**reference** [6] - 71:3, 91:21, 131:1, 154:25, 161:16, 173:8
**referenced** [3] - 48:20, 48:21, 48:24
**references** [1] - 41:2
**referencing** [1] - 131:2
**referred** [2] - 10:11, 10:14
**referring** [6] - 43:23, 68:3, 85:10, 105:4, 125:5, 154:20
**refers** [1] - 154:25
**reflected** [1] - 148:1
**regard** [2] - 100:20, 116:13
**regarding** [12] - 13:22, 53:14, 72:19, 126:2, 135:7, 135:8, 135:23, 149:8, 165:1, 170:14, 171:7, 172:24
**regimented** [1] - 33:6
**Regional** [2] - 13:18, 14:20
**register** [6] - 129:25, 132:11, 133:17, 134:14, 134:15, 165:6
**registered** [1] - 130:5
**registration** [11] - 164:13, 164:21, 164:24, 165:6, 165:7, 165:10, 175:25, 176:1, 176:17, 179:13, 179:14
**registrations** [4] - 164:16, 165:1, 165:16, 166:4
**regulates** [2] - 130:23,

131:3
**regulation** [3] - 128:16, 130:2, 133:8
**regulations** [9] - 3:6, 128:14, 130:6, 130:14, 130:15, 131:4, 132:19, 133:11
**regulators** [1] - 57:22
**regulatory** [3] - 129:20, 130:9, 131:9
**reject** [7] - 30:12, 97:16, 185:2, 185:7, 185:11, 185:20, 185:24
**rejected** [4] - 27:3, 185:16, 186:8, 186:13
**relate** [3] - 37:4, 47:1, 169:5
**related** [9] - 11:22, 56:18, 89:2, 94:3, 149:7, 155:22, 157:23, 163:8, 173:2
**relates** [7] - 22:13, 70:22, 107:21, 163:9, 163:10, 169:1, 177:18
**relating** [6] - 3:4, 25:1, 52:20, 60:5, 172:9, 173:22
**relation** [3] - 87:18, 138:18, 163:23
**relatively** [1] - 92:8
**release** [2] - 81:4, 81:7
**relevance** [1] - 144:5
**relevancy** [3] - 80:20, 115:2, 115:6
**relevant** [14] - 3:5, 19:9, 19:11, 53:25, 104:20, 111:17, 111:19, 115:7, 150:1, 151:23, 156:3, 158:4, 174:17, 178:3
**reliability** [11] - 64:8, 64:9, 79:4, 86:17, 88:3, 89:6, 89:23, 92:2, 92:24, 112:13, 152:16
**reliable** [24] - 38:9, 52:13, 52:16, 54:4, 54:6, 54:8, 54:19, 58:11, 58:19, 60:11, 61:5, 62:10, 64:23, 66:24, 67:23, 75:4, 81:18, 94:5, 94:11, 94:13, 99:19, 101:8, 126:18, 174:15
**reliably** [2] - 54:25,

75:14
**relied** [1] - 78:18
**relies** [2] - 59:10, 143:7
**rely** [10] - 38:18, 38:21, 68:7, 70:2, 125:11, 148:25, 149:20, 159:18, 173:1
**relying** [8] - 23:23, 38:13, 48:3, 48:5, 48:17, 49:24, 65:10, 70:7
**remain** [1] - 3:22
**remember** [7] - 92:18, 111:24, 113:2, 113:24, 130:24, 164:5, 177:24
**remind** [3] - 101:18, 112:3, 117:12
**removal** [1] - 46:21
**renew** [1] - 128:15
**renewal** [2] - 164:24, 176:18
**renewed** [2] - 166:4, 166:5
**repeated** [1] - 62:17
**repeatedly** [4] - 28:9, 61:6, 62:10, 125:19
**replacing** [1] - 6:5
**reply** [2] - 22:19, 22:21
**report** [75] - 12:11, 39:11, 39:12, 40:7, 40:15, 41:22, 42:19, 43:13, 43:25, 44:16, 45:14, 48:21, 49:2, 49:10, 49:14, 57:9, 79:18, 79:19, 80:18, 80:21, 81:2, 85:6, 85:7, 86:19, 87:2, 87:7, 87:21, 94:24, 94:25, 95:1, 95:3, 95:4, 107:12, 107:16, 108:19, 108:21, 109:25, 110:9, 110:13, 110:25, 111:5, 113:2, 115:1, 115:3, 115:5, 117:8, 117:17, 117:18, 118:2, 118:3, 118:14, 118:16, 118:22, 122:22, 123:24, 125:4, 125:10, 128:21, 133:7, 133:9, 138:25, 139:10, 139:14, 139:20, 139:25, 140:12, 140:13, 140:14,

143:15, 146:6, 163:8, 163:19, 163:21, 174:6, 174:24
**reported** [1] - 33:12
**REPORTER** [1] - 188:1
**reporter** [2] - 124:17, 151:12
**Reporter** [3] - 1:22, 1:22, 188:10
**reporting** [1] - 33:11
**reports** [10] - 43:4, 75:24, 87:23, 105:9, 130:8, 141:8, 141:10, 143:2, 169:21, 177:4
**represent** [2] - 35:5, 110:19
**representation** [1] - 13:6
**representations** [1] - 169:2
**representing** [1] - 9:9
**reputable** [1] - 49:11
**request** [3] - 4:1, 18:25, 23:2
**requested** [1] - 3:21
**requests** [1] - 64:4
**require** [1] - 12:14
**required** [6] - 32:15, 129:25, 132:10, 134:13, 156:25, 157:21
**requirement** [2] - 32:11, 165:8
**requirements** [4] - 31:19, 75:9, 129:20, 130:6
**requires** [3] - 30:1, 31:16, 54:16
**requiring** [1] - 133:8
**requisite** [1] - 28:4
**reread** [2] - 88:11, 94:25
**research** [4] - 17:8, 101:14, 102:21, 131:18
**researchers** [1] - 102:23
**Reserve** [1] - 44:8
**reserve** [2] - 121:8, 171:4
**reserving** [1] - 121:14
**residence** [1] - 66:18
**respect** [43] - 3:6, 3:14, 17:17, 17:20, 17:25, 19:2, 20:17, 22:12, 37:5, 44:24, 52:19, 53:16, 55:17,

73:21, 73:23, 75:23, 79:14, 79:16, 100:23, 106:14, 107:10, 110:6, 111:13, 113:9, 124:8, 128:5, 129:22, 131:8, 131:16, 137:13, 138:20, 166:10, 166:23, 174:4, 174:12, 175:21, 177:11, 178:10, 178:13, 178:21, 179:11, 179:21, 180:12

**respond** [7] - 34:3, 76:14, 101:1, 101:4, 155:10, 177:8, 179:18

**responding** [2] - 186:8, 186:10

**response** [8] - 3:25, 13:22, 54:10, 57:22, 73:15, 164:1, 169:22, 183:6

**Response** [1] - 56:12

**responses** [1] - 5:4

**responsible** [1] - 56:13

**responsive** [2] - 110:1, 145:24

**rest** [4] - 22:7, 118:7, 181:17, 186:22

**restricted** [1] - 105:10

**restriction** [1] - 105:16

**result** [2] - 31:17, 32:2

**results** [8] - 26:24, 49:5, 54:8, 54:14, 61:9, 73:13, 79:12, 87:11

**retrieval** [2] - 24:1, 31:24

**retrieved** [1] - 23:4

**retrieving** [1] - 32:19

**return** [1] - 35:7

**returning** [1] - 28:3

**revealed** [1] - 174:5

**review** [16] - 12:9, 12:14, 13:24, 18:16, 21:25, 24:20, 44:20, 46:23, 101:15, 130:7, 143:25, 147:12, 157:15, 167:20, 172:20, 178:21

**reviewed** [17] - 21:22, 54:5, 78:4, 83:7, 89:11, 96:5, 101:9, 121:22, 123:22, 144:14, 144:22,

145:2, 146:13, 146:15, 147:16, 147:23, 148:4

**reviewing** [1] - 47:13

**revocation** [1] - 55:10

**rewritten** [1] - 168:12

**rigorous** [1] - 58:13

**rise** [1] - 155:8

**risk** [1] - 97:24

**RMR** [2] - 1:22, 188:9

**Road** [14] - 45:13, 48:9, 65:5, 65:9, 65:11, 68:6, 69:13, 69:20, 69:24, 70:13, 98:19, 98:21

**role** [2] - 29:19, 130:7

**ROMAN** [1] - 1:5

**Roman** [4] - 2:3, 2:16, 2:19, 129:24

**Romanian** [4] - 17:2, 18:15, 100:17, 144:8

**room** [1] - 44:8

**Room** [2] - 1:23, 188:10

**roughly** [3] - 80:23, 93:19, 105:1

**router** [4] - 160:17, 160:18, 160:20, 160:21

**routinely** [1] - 149:21

**Rule** [2] - 54:16, 90:11

**rule** [6] - 16:16, 19:14, 30:1, 31:16, 32:21, 39:25

**rules** [4] - 3:5, 32:11, 97:13, 131:8

**Rules** [1] - 16:11

**rulings** [2] - 177:11, 179:21

**run** [17] - 38:4, 107:15, 117:13, 120:18, 139:18, 155:25, 156:9, 156:11, 156:13, 156:15, 156:24, 156:25, 158:6, 171:13, 181:6, 185:19, 185:20

**running** [7] - 34:24, 74:3, 156:7, 157:13, 157:24, 186:14

**runs** [1] - 156:18

**Russian** [5] - 14:1, 17:1, 18:8, 18:14, 100:17

**Russians** [1] - 168:16

**S**

**sake** [1] - 8:14

**sample** [2] - 60:8, 99:9

**sandbag** [2] - 18:17, 139:11

**Sarah** [2] - 128:17, 140:11

**satisfied** [1] - 3:19

**satisfies** [1] - 162:3

**satisfy** [2] - 117:17, 117:21

**Saturday** [2] - 181:24, 181:25

**saw** [3] - 21:23, 92:5, 111:9

**schedule** [1] - 180:17

**scheduled** [1] - 181:3

**scheduling** [3] - 55:9, 158:8, 166:25

**Scholl** [54] - 37:24, 37:25, 38:4, 38:11, 38:12, 39:1, 43:9, 43:18, 45:11, 46:4, 46:14, 47:13, 47:21, 51:22, 52:5, 52:11, 53:14, 56:7, 56:9, 60:12, 62:16, 65:10, 65:18, 67:20, 67:22, 68:2, 68:10, 69:9, 69:18, 70:2, 70:7, 71:17, 71:22, 74:10, 75:7, 76:20, 77:25, 81:1, 87:2, 87:6, 87:18, 91:20, 93:20, 94:23, 100:6, 102:9, 102:16, 104:23, 105:15, 141:8, 141:11, 169:20, 169:21

**Scholl's** [18] - 12:11, 25:25, 38:17, 43:25, 44:19, 46:10, 48:21, 50:4, 52:14, 57:3, 57:9, 64:20, 71:20, 74:21, 77:12, 77:16, 85:7, 105:18

**science** [6] - 83:14, 85:4, 96:5, 97:2, 97:3, 97:23

**scientific** [19] - 78:3, 79:3, 81:20, 83:1, 83:6, 84:12, 85:11, 85:14, 87:3, 87:9, 89:20, 90:2, 94:8, 99:19, 99:21, 118:16, 118:20, 125:9

**scientist** [1] - 169:22

**scope** [1] - 177:4

**screenshots** [3] - 51:7, 51:8

**screenshotted** [1] -

109:2

**script** [2] - 166:11, 166:12

**scrutiny** [1] - 91:2

**SDNY** [1] - 168:25

**se** [1] - 38:7

**search** [6] - 26:23, 58:18, 66:2, 66:10, 66:17, 66:24

**searches** [2] - 67:4, 67:10

**SEC** [1] - 90:3

**second** [15] - 5:19, 34:3, 37:23, 44:11, 49:11, 52:18, 53:22, 124:1, 124:5, 128:11, 141:6, 142:3, 142:8, 162:21

**Secrecy** [1] - 130:3

**Section** [2] - 183:10, 183:11

**section** [4] - 37:13, 45:21, 102:20, 106:2

**sections** [1] - 112:22

**sector** [1] - 57:21

**security** [1] - 157:21

**see** [44] - 3:13, 8:4, 13:12, 15:11, 18:2, 25:18, 26:3, 37:3, 37:8, 44:2, 65:4, 65:11, 68:18, 77:2, 83:25, 86:9, 87:11, 96:13, 105:12, 108:25, 109:10, 114:6, 116:23, 125:18, 131:13, 135:6, 144:3, 144:6, 146:16, 147:10, 149:14, 157:10, 157:12, 159:13, 162:14, 164:25, 165:18, 167:2, 167:3, 172:6, 180:14, 181:2, 186:21

**seeing** [6] - 12:16, 60:15, 88:10, 92:14, 142:13, 160:11

**seek** [4] - 3:24, 18:25, 20:6, 20:10

**seeking** [1] - 19:16

**seeks** [1] - 18:7

**seem** [3] - 104:2, 153:9, 177:25

**sees** [1] - 169:21

**Sefranek** [3] - 1:22, 188:9, 188:9

**SEFRANEK** [1] - 188:3

**segues** [1] - 123:19

**seize** [4] - 70:13, 72:15

**seized** [29] - 36:6, 65:5, 69:25, 70:15, 70:17, 111:8, 118:9, 135:9, 136:13, 136:22, 137:1, 137:3, 137:15, 137:22, 138:9, 139:3, 139:5, 142:24, 143:11, 144:7, 144:21, 144:22, 146:19, 147:5, 148:7, 163:21, 175:14, 179:8

**seizes** [1] - 35:24

**seizure** [3] - 107:22, 136:18, 139:8

**selected** [2] - 56:15, 56:20

**selection** [1] - 12:19

**self** [2] - 23:14, 157:24

**self-authenticating** [1] - 23:14

**self-running** [1] - 157:24

**sellers** [1] - 88:22

**send** [6] - 12:17, 62:23, 63:23, 73:5, 109:4, 109:14

**sending** [6] - 13:7, 49:15, 49:16, 50:18, 50:19, 64:21

**sense** [5] - 82:6, 82:15, 131:15, 134:11, 145:25

**sensibly** [1] - 17:13

**sensitive** [4] - 71:22, 72:4, 167:18, 167:22

**sent** [4] - 13:11, 14:23, 15:11, 42:10

**sentence** [2] - 11:10, 34:11

**sentenced** [2] - 28:17, 150:12

**sentencing** [4] - 70:23, 71:9, 93:10, 183:13

**separate** [5] - 87:25, 89:7, 117:10, 137:24, 138:6

**September** [4] - 1:5, 187:2, 187:3, 188:7

**serious** [2] - 34:21, 36:17

**seriously** [1] - 33:5

**serve** [1] - 140:7

**server** [22] - 31:25, 32:3, 32:20, 122:25,

123:7, 123:12, 123:15, 125:11, 126:12, 126:14, 126:15, 126:17, 126:21, 126:22, 127:5, 127:8, 127:12, 152:14, 156:17, 161:1

**servers** [13] - 29:8, 30:17, 126:23, 126:24, 127:1, 127:14, 127:21, 127:24, 144:8, 152:5, 157:16, 162:8, 162:18

**service** [5] - 25:16, 51:25, 108:9, 108:11, 108:13

**service-specific** [1] - 108:13

**services** [2] - 74:7, 108:9

**serving** [1] - 41:1

**set** [19] - 32:24, 33:1, 33:5, 50:12, 56:7, 63:21, 74:4, 79:3, 79:4, 79:7, 84:24, 100:8, 105:8, 122:5, 138:25, 164:18, 170:23, 173:6, 176:3

**sets** [3] - 70:15, 71:16, 90:4

**setting** [1] - 170:14

**sexual** [3] - 66:15, 66:19, 66:23

**shall** [1] - 115:20

**share** [1] - 153:5

**sharing** [2] - 127:3, 160:20

**shift** [1] - 137:10

**shoehorn** [1] - 176:22

**shoes** [1] - 29:15

**short** [1] - 24:4

**show** [14] - 7:4, 9:15, 20:12, 21:18, 24:16, 95:14, 103:24, 112:4, 137:17, 140:20, 140:21, 144:8, 173:16, 179:9

**showing** [7] - 24:13, 28:9, 51:10, 84:12, 103:3, 173:21, 174:20

**shown** [4] - 31:18, 50:23, 62:10, 67:2

**shows** [9] - 44:6, 49:23, 88:2, 92:24, 98:11, 125:8, 138:2, 144:1

**shred** [2] - 84:11

**sic** [4] - 18:19, 135:13, 135:16, 138:5

**side** [10] - 25:16, 37:22, 89:14, 95:22, 109:13, 114:23, 155:11, 175:8, 186:16

**sides** [6] - 17:18, 18:3, 40:2, 161:18, 161:23, 176:25

**sign** [1] - 14:20

**signature** [1] - 172:19

**significance** [1] - 122:1

**significant** [20] - 10:9, 26:2, 37:8, 38:16, 43:5, 45:7, 48:24, 61:12, 67:16, 69:3, 74:1, 74:19, 90:16, 90:23, 91:10, 95:4, 101:16, 138:17, 174:4, 177:16

**significantly** [1] - 57:2

**signing** [1] - 29:11

**signs** [1] - 90:17

**Silk** [14] - 45:13, 48:9, 65:5, 65:9, 65:11, 68:6, 69:13, 69:20, 69:23, 69:24, 70:13, 98:19, 98:21

**similar** [9] - 8:7, 51:20, 58:2, 109:9, 120:7, 153:12, 155:6, 158:18, 172:12

**similarly** [4] - 25:17, 47:12, 47:18, 121:18

**simple** [10] - 38:22, 81:24, 84:4, 89:5, 90:17, 92:6, 92:16, 97:25, 134:15, 138:16

**simply** [22] - 10:9, 26:23, 28:6, 33:21, 35:15, 38:24, 41:10, 41:12, 82:8, 93:11, 105:24, 121:21, 126:16, 139:2, 146:10, 152:7, 154:4, 154:6, 164:20, 166:15, 179:8, 186:8

**single** [13] - 7:17, 31:9, 61:15, 66:25, 67:11, 68:22, 72:13, 74:6, 83:21, 85:19, 115:3, 116:23, 147:10

**singled** [1] - 158:20

**sinister** [3] - 145:9,

147:7, 158:25

**sit** [6] - 8:25, 19:3, 20:4, 21:1, 21:24, 77:18

**site** [15] - 63:10, 63:11, 63:16, 66:23, 69:7, 143:24, 155:17, 155:23, 156:25, 157:16, 157:21, 157:25, 164:13, 171:13

**sites** [11] - 45:17, 68:5, 69:14, 69:15, 69:20, 69:24, 70:4, 70:19, 156:7, 158:6, 164:17

**sitting** [1] - 141:2

**situation** [1] - 146:23

**six** [3] - 136:17, 139:4, 163:15

**six-terabyte** [3] - 136:17, 139:4, 163:15

**skepticism** [1] - 171:10

**skip** [3] - 112:12, 112:22, 112:23

**skipped** [1] - 165:24

**skipping** [3] - 115:11, 115:18, 124:25

**skips** [2] - 112:8, 115:13

**slow** [1] - 141:22

**slower** [1] - 124:17

**slowing** [1] - 18:9

**smuggling** [1] - 133:6

**social** [1] - 3:23

**software** [37] - 48:1, 54:17, 54:19, 59:25, 60:5, 78:15, 79:5, 80:11, 81:11, 82:1, 82:22, 83:16, 84:18, 84:19, 84:20, 85:5, 85:13, 85:17, 86:17, 89:19, 92:6, 92:25, 94:9, 99:14, 99:17, 105:19, 112:22, 113:11, 113:20, 113:22, 113:24, 114:7, 114:9, 114:13, 114:16, 114:19, 114:22

**solve** [1] - 21:18

**solvency** [1] - 36:16

**solvent** [2] - 33:15, 34:15

**someone** [21] - 7:23, 63:14, 96:15, 96:16, 96:20, 98:8, 132:24, 151:1, 151:6,

156:17, 157:5, 160:21, 165:7, 168:11, 169:6, 173:15, 173:18, 174:16, 175:9

**sometimes** [5] - 10:10, 10:14, 81:17, 112:23, 137:9

**somewhat** [4] - 10:21, 38:4, 98:16, 169:1

**somewhere** [1] - 81:3

**soon** [3] - 14:25, 100:9, 126:11

**sophisticated** [2] - 54:17, 59:24

**sorry** [25] - 5:19, 7:14, 17:10, 42:25, 44:12, 48:1, 48:10, 95:19, 112:15, 119:10, 124:16, 139:23, 141:9, 141:18, 141:19, 141:23, 142:5, 142:7, 142:18, 146:2, 152:12, 154:3, 162:20, 171:9, 180:22

**sort** [21] - 10:1, 19:14, 31:22, 41:1, 48:2, 58:13, 63:18, 70:2, 71:15, 105:16, 113:7, 134:11, 135:16, 155:8, 157:17, 163:25, 165:3, 167:5, 168:1, 174:5, 179:5

**sorts** [2] - 86:6, 92:12

**sought** [1] - 65:17

**sound** [11] - 143:22, 145:23, 146:21, 148:25, 149:20, 149:23, 152:2, 152:8, 160:6, 160:8, 172:14

**soundness** [6] - 54:1, 88:3, 89:6, 92:1, 94:24, 123:19

**sounds** [2] - 11:11, 159:23

**source** [10] - 19:3, 19:5, 46:8, 47:4, 68:12, 80:10, 82:17, 96:24, 180:12

**sourced** [1] - 59:9

**sources** [1] - 50:21

**sourcing** [1] - 47:3

**Southern** [1] - 168:15

**space** [4] - 95:14, 96:9, 164:16

**spaces** [1] - 164:8

**speaking** [6] - 3:19, 89:18, 95:18, 114:14, 132:13, 151:10

**speaks** [1] - 29:17

**specific** [21] - 19:5, 32:3, 32:19, 38:7, 49:7, 53:5, 60:1, 61:10, 69:23, 70:8, 101:10, 101:16, 105:6, 106:20, 108:13, 108:14, 133:7, 152:24, 167:9, 167:16, 169:16

**specifically** [8] - 18:6, 18:23, 22:20, 58:18, 59:15, 101:10, 104:23, 144:16

**specifics** [6] - 18:20, 20:14, 21:17, 39:15, 145:17, 145:18

**speculation** [2] - 147:3, 147:4

**spelled** [2] - 9:1, 9:17

**spend** [6] - 39:19, 105:17, 108:5, 109:1, 109:19, 167:19

**spending** [1] - 50:5

**spends** [1] - 115:15

**spent** [1] - 60:16

**sphere** [1] - 38:25

**split** [2] - 105:5, 109:11

**spreadsheets** [5] - 26:23, 30:19, 57:10, 109:2, 109:3

**spy** [1] - 164:6

**spyware** [1] - 147:7

**St** [19] - 115:21, 115:23, 116:3, 116:7, 116:9, 116:15, 117:3, 118:3, 119:13, 119:17, 119:25, 120:2, 120:14, 121:12, 135:13, 135:16, 138:5, 154:9, 158:19

**staff** [1] - 181:11

**stage** [1] - 182:12

**stake** [3] - 90:8, 90:16, 90:24

**stand** [9] - 29:15, 30:3, 31:1, 36:5, 52:19, 82:20, 110:21, 119:5, 151:7

**standard** [7] - 91:2, 117:18, 138:10,

154:7, 161:8, 161:11, 162:2
**standardless** [1] - 97:10
**standards** [16] - 77:10, 83:23, 83:24, 85:9, 94:14, 94:15, 96:4, 96:7, 97:14, 97:17, 97:20, 97:21, 159:24, 160:9
**stands** [1] - 123:14
**start** [14] - 3:12, 37:24, 39:14, 39:16, 42:2, 76:13, 77:8, 77:21, 77:22, 87:10, 134:21, 134:25
**started** [2] - 21:12, 131:18
**starting** [13] - 2:5, 25:20, 44:17, 46:3, 56:9, 58:11, 87:21, 94:25, 108:3, 108:14, 109:17, 168:20, 170:17
**starts** [3] - 72:24, 121:3, 124:12
**state** [4] - 2:4, 91:9, 111:20, 148:8
**statement** [2] - 82:6, 127:21
**statements** [6] - 32:23, 34:14, 130:21, 131:2, 150:23, 161:21
**states** [1] - 91:6
**STATES** [3] - 1:1, 1:2, 1:8
**States** [13] - 1:23, 2:3, 2:7, 2:12, 17:11, 28:11, 28:13, 28:14, 53:17, 57:20, 59:21, 84:17, 97:23
**static** [1] - 120:9
**statistical** [6] - 78:9, 85:12, 124:22, 125:19, 125:21, 126:3
**statistically** [1] - 125:1
**statistician** [1] - 61:24
**statistics** [1] - 64:18
**statute** [7] - 3:5, 37:12, 111:3, 111:7, 111:8, 111:11, 111:19
**statutes** [2] - 37:5, 37:11
**statutory** [1] - 183:17
**stay** [4] - 6:6, 6:7, 119:11, 166:25
**steal** [1] - 158:2

**stenographic** [1] - 188:5
**step** [2] - 112:11, 126:6
**Stephanie** [1] - 9:20
**STEPHANIE** [1] - 9:20
**Sterlingov** [60] - 2:3, 2:16, 2:19, 13:1, 13:14, 13:23, 14:11, 15:1, 17:23, 18:16, 19:8, 20:12, 21:18, 21:22, 25:2, 32:4, 33:21, 45:21, 45:23, 55:17, 80:19, 84:10, 90:20, 92:20, 115:4, 128:25, 129:24, 132:10, 136:6, 136:8, 136:16, 138:2, 138:8, 138:18, 141:25, 143:23, 144:9, 144:15, 144:18, 144:23, 145:15, 146:22, 146:25, 156:4, 158:16, 158:21, 158:24, 159:3, 159:7, 164:14, 165:14, 169:8, 172:13, 176:1, 180:23, 182:7, 182:11, 182:15, 183:22, 186:23
**sterlingov** [1] - 184:1
**STERLINGOV** [1] - 1:5
**Sterlingov's** [19] - 15:19, 16:7, 23:19, 25:5, 46:18, 50:15, 100:14, 115:5, 120:7, 135:8, 135:12, 136:3, 136:16, 140:9, 144:21, 145:1, 145:8, 154:20, 169:11
**sticking** [1] - 84:8
**Still** [1] - 87:6
**still** [29] - 24:7, 24:16, 30:25, 39:9, 43:21, 73:22, 74:2, 75:20, 79:20, 86:4, 95:2, 101:13, 101:16, 101:21, 112:10, 112:17, 113:1, 113:24, 114:4, 116:10, 119:23, 122:11, 128:22, 141:11, 166:1, 175:23, 179:3, 180:11, 181:8

**still's** [6] - 44:14, 86:19, 87:21, 94:25, 110:13, 115:13
**stipulate** [6] - 133:16, 133:18, 133:19, 134:1, 134:2, 134:14
**stipulated** [1] - 133:24
**stipulation** [4] - 133:22, 133:25, 134:3, 134:6
**stipulations** [1] - 133:22
**stole** [3] - 4:23, 168:24, 173:19
**stop** [1] - 181:20
**stored** [3] - 29:24, 30:4, 108:1
**stories** [1] - 178:1
**straightforward** [2] - 92:8, 155:21
**Street** [2] - 1:11, 1:20
**strike** [2] - 7:18, 78:24
**strikes** [7] - 20:16, 96:8, 154:1, 161:6, 173:14, 175:19, 179:9
**striking** [1] - 80:16
**strong** [4] - 11:5, 11:6, 11:17, 180:20
**stronger** [1] - 32:16
**struck** [7] - 77:24, 78:16, 83:4, 118:23, 118:25, 119:4, 119:6
**structure** [2] - 60:23, 108:25
**structures** [1] - 39:21
**stuck** [1] - 147:3
**studies** [1] - 177:7
**study** [2] - 37:14, 103:5
**stuff** [9] - 18:11, 18:12, 18:19, 30:14, 30:24, 87:3, 118:11, 136:21, 153:10
**subject** [8] - 32:21, 32:25, 80:6, 96:21, 117:6, 117:7, 157:22, 165:20
**subjects** [1] - 19:9
**submission** [1] - 131:20
**submit** [6] - 79:7, 98:17, 106:6, 106:20, 156:21, 158:5
**submitted** [4] - 23:2, 89:11, 96:2, 135:3
**submitting** [1] - 98:16
**subpoena** [6] - 62:23, 63:14, 63:23, 66:4,

66:6, 73:5
**subpoenas** [8] - 64:10, 64:11, 64:21, 65:16, 72:12, 72:24, 91:22
**subset** [8] - 64:2, 101:24, 104:22, 104:25, 105:7, 105:9, 167:17, 167:21
**substance** [1] - 42:18
**substantial** [6] - 12:7, 28:8, 95:3, 106:14, 106:18, 160:24
**substantive** [2] - 12:10, 19:23
**substantively** [1] - 19:11
**successful** [2] - 59:19, 126:17
**successfully** [1] - 67:25
**sudden** [1] - 179:9
**sufficiency** [4] - 77:13, 125:12, 128:4, 159:11
**sufficient** [14] - 35:19, 36:10, 53:23, 57:5, 57:13, 57:14, 86:16, 122:22, 123:1, 165:18, 170:21, 170:23, 172:13, 179:17
**sufficiently** [1] - 38:9
**suggest** [2] - 106:4, 146:16
**suggested** [2] - 21:2, 175:1
**suggesting** [3] - 4:11, 91:11, 160:1
**suggestion** [2] - 91:8, 106:8
**suggestions** [1] - 3:13
**suggests** [1] - 161:10
**sum** [1] - 26:8
**summaries** [3] - 18:10, 19:7, 128:22
**summarize** [1] - 19:13
**summary** [8] - 19:18, 40:11, 44:18, 68:8, 129:14, 172:1, 177:15, 185:11
**sums** [1] - 84:10
**supplemental** [6] - 22:20, 109:11, 109:25, 139:1, 141:1, 158:11
**supplemented** [1] - 108:20
**support** [5] - 22:19,

22:21, 43:3, 58:9, 174:17
**suppose** [5] - 40:21, 61:7, 165:1, 181:3, 184:17
**supposed** [6] - 78:20, 85:16, 87:8, 89:21, 89:23, 147:11
**supposedly** [7] - 30:7, 31:10, 80:25, 81:2, 89:24, 94:8, 126:25
**Supreme** [1] - 91:7
**surprise** [1] - 155:12
**surprised** [2] - 20:16, 113:21
**suspect** [1] - 156:18
**suspended** [1] - 34:10
**Sweden** [4] - 15:19, 15:22, 16:7, 183:21
**Swedish** [3] - 17:2, 18:15, 100:18
**system** [5] - 31:17, 31:23, 32:1, 58:21, 177:22
**systems** [1] - 41:3

**T**

**table** [2] - 8:23, 8:25
**tagged** [1] - 46:6
**tailor** [1] - 162:10
**tailored** [1] - 101:10
**tailoring** [1] - 61:19
**talks** [4] - 42:8, 51:15, 108:4, 108:7
**Tamara** [3] - 1:22, 188:9, 188:9
**TAMARA** [1] - 188:3
**tampered** [2] - 177:19, 177:20
**task** [1] - 17:24
**Tauseef** [2] - 9:1, 9:10
**TAUSEEF** [1] - 9:1
**tax** [1] - 130:8
**teach** [1] - 161:9
**Team** [2] - 56:12, 56:21
**team** [6] - 6:6, 6:7, 19:4, 56:15, 62:14, 156:19
**technical** [2] - 112:16, 122:11
**technician** [1] - 35:24
**techniques** [2] - 137:7, 160:6
**technological** [1] - 54:18
**technologist** [3] - 148:23, 149:21, 160:11

technology [2] - 8:7, 52:8
telephone [1] - 24:11
temporary [1] - 13:7
ten [4] - 119:8, 162:24, 183:14, 183:18
ten-minute [1] - 119:8
tends [1] - 9:25
tens [2] - 98:20, 127:2
tentative [1] - 177:11
tentatively [1] - 175:20
terabyte [3] - 136:17, 139:4, 163:15
terminology [1] - 154:24
terms [28] - 20:3, 39:8, 39:17, 39:22, 40:12, 41:5, 41:8, 41:16, 88:6, 89:2, 89:4, 89:6, 92:20, 94:23, 97:10, 111:11, 122:10, 122:21, 122:23, 123:9, 123:18, 128:22, 136:5, 140:8, 159:11, 183:7, 183:17
terribly [3] - 17:1, 20:19, 97:3
test [2] - 53:9, 102:4
tested [3] - 52:15, 62:10, 98:25
testified [23] - 30:25, 43:9, 43:15, 43:16, 52:11, 67:22, 71:24, 75:20, 78:11, 80:18, 86:4, 91:20, 113:6, 121:21, 127:2, 132:1, 132:3, 133:6, 133:7, 135:4, 140:18, 153:6, 177:25
testifies [2] - 121:10, 126:8
testify [75] - 29:24, 30:12, 36:9, 39:15, 67:20, 71:17, 72:7, 88:7, 88:12, 95:12, 107:15, 110:19, 113:5, 115:3, 116:6, 117:3, 117:19, 119:14, 119:23, 120:7, 122:23, 129:12, 129:19, 132:24, 133:10, 135:7, 135:13, 136:1, 136:20, 136:21, 137:6, 137:13, 137:21,

138:3, 138:5, 140:6, 140:10, 140:22, 141:21, 142:15, 143:6, 143:21, 144:12, 144:16, 146:7, 146:10, 147:9, 147:24, 149:22, 151:2, 151:7, 151:14, 156:24, 159:12, 159:15, 159:18, 159:21, 160:8, 163:22, 164:9, 164:20, 164:23, 165:3, 165:5, 165:16, 166:13, 166:15, 170:21, 171:2, 171:5, 172:18, 175:15, 176:23, 179:4, 179:12
testifying [21] - 45:10, 107:14, 114:17, 114:23, 117:10, 117:23, 128:15, 132:14, 141:24, 142:11, 143:9, 143:10, 146:12, 153:23, 158:15, 161:24, 163:7, 164:25, 166:8, 175:17, 176:3
testimony [84] - 15:21, 24:19, 25:12, 25:25, 26:2, 38:17, 41:4, 43:5, 44:14, 45:11, 45:15, 46:8, 46:11, 52:14, 53:21, 53:23, 56:5, 56:24, 57:3, 59:3, 59:10, 59:15, 60:8, 61:17, 63:8, 64:20, 72:1, 72:19, 73:15, 75:24, 88:15, 89:2, 91:21, 91:22, 94:2, 101:5, 101:13, 107:23, 108:8, 116:11, 117:2, 117:6, 117:25, 118:11, 120:3, 120:19, 121:3, 121:13, 121:19, 122:9, 122:13, 129:2, 129:6, 129:21, 130:1, 130:16, 131:4, 131:16, 132:5, 134:10, 135:8, 140:7, 142:16, 142:17, 142:21, 142:22, 145:19, 145:20, 148:7,

153:10, 155:4, 160:14, 162:10, 168:3, 170:17, 172:18, 176:6, 176:12, 176:20, 178:23, 179:19
testing [3] - 68:10, 99:7, 99:8
text [1] - 20:12
THE [466] - 1:1, 1:1, 1:8, 2:2, 2:8, 2:11, 2:14, 2:17, 2:21, 3:18, 4:2, 4:9, 4:17, 4:19, 5:5, 5:12, 5:15, 5:19, 5:21, 5:24, 6:3, 6:6, 6:8, 6:12, 6:15, 6:18, 7:3, 7:6, 7:15, 7:23, 8:2, 8:4, 8:13, 8:17, 8:21, 9:3, 9:5, 9:8, 9:12, 9:18, 10:5, 10:10, 10:14, 10:18, 10:22, 11:1, 11:9, 11:12, 11:14, 11:17, 11:24, 12:2, 12:17, 12:22, 13:17, 13:20, 14:5, 14:11, 14:16, 14:18, 14:25, 15:5, 15:14, 15:17, 15:20, 15:23, 16:9, 16:14, 16:20, 18:21, 19:17, 20:1, 20:8, 20:25, 21:4, 21:11, 21:20, 22:1, 22:5, 22:10, 22:15, 23:23, 24:7, 24:25, 26:5, 27:5, 27:12, 27:19, 28:10, 28:18, 28:23, 29:15, 31:4, 31:12, 32:16, 32:21, 33:3, 33:19, 33:24, 34:3, 34:8, 34:12, 35:21, 36:20, 38:10, 38:20, 39:11, 39:14, 39:23, 39:25, 40:8, 40:11, 40:20, 40:24, 41:5, 41:8, 41:14, 41:17, 41:24, 42:5, 42:14, 42:17, 42:24, 43:1, 43:11, 43:17, 44:2, 44:11, 44:15, 44:24, 45:2, 45:18, 46:24, 47:11, 47:17, 47:24, 48:3, 48:6, 48:10, 48:18, 49:4, 49:17, 49:21, 50:11, 50:22, 51:2, 51:18, 52:3, 52:17, 53:12, 55:11, 55:14, 55:16, 55:21, 55:23, 56:3, 56:22, 57:4, 58:1, 58:23, 59:12, 60:9, 61:4, 62:4,

63:6, 63:12, 64:7, 64:24, 65:14, 65:22, 66:4, 66:9, 66:16, 67:3, 67:10, 67:14, 67:20, 68:2, 68:18, 69:5, 69:13, 69:17, 70:12, 71:5, 71:17, 72:4, 72:22, 72:25, 73:12, 73:20, 74:11, 74:17, 75:12, 75:16, 75:22, 76:4, 76:8, 76:12, 76:23, 77:6, 77:11, 77:17, 77:22, 79:10, 79:24, 81:7, 82:5, 82:12, 86:11, 87:16, 87:20, 87:24, 88:4, 89:8, 90:10, 91:5, 93:3, 93:15, 93:21, 94:4, 94:21, 95:2, 95:6, 95:15, 95:17, 95:20, 96:13, 97:8, 98:3, 100:4, 100:7, 100:13, 101:18, 102:18, 103:7, 103:15, 103:24, 104:11, 104:15, 105:1, 105:12, 105:21, 106:12, 106:24, 107:6, 108:22, 109:6, 109:16, 110:3, 110:5, 110:16, 111:13, 112:2, 112:15, 112:20, 113:9, 113:23, 114:3, 114:15, 114:21, 115:9, 115:20, 115:24, 116:8, 117:7, 117:13, 118:18, 119:2, 119:4, 119:10, 120:12, 120:17, 121:9, 122:19, 124:1, 124:5, 124:11, 124:16, 125:6, 125:15, 126:7, 126:20, 127:6, 127:10, 127:19, 127:23, 128:1, 128:5, 128:10, 128:18, 129:4, 129:9, 129:16, 129:18, 130:25, 131:6, 131:13, 131:15, 131:21, 131:23, 132:12, 132:23, 133:13, 133:18, 134:18, 134:24, 135:24, 136:12,

136:25, 137:9, 137:19, 138:19, 139:15, 139:19, 139:25, 140:3, 140:20, 141:2, 141:6, 141:9, 141:13, 141:16, 141:18, 141:22, 142:2, 142:5, 142:8, 142:18, 143:8, 143:14, 144:10, 145:12, 145:24, 146:2, 146:15, 147:14, 147:22, 148:10, 148:16, 149:1, 149:6, 149:11, 150:3, 150:15, 150:21, 151:1, 151:4, 151:10, 151:12, 151:19, 152:10, 152:18, 153:3, 153:9, 153:15, 153:22, 154:1, 154:4, 154:15, 154:22, 155:11, 155:19, 155:24, 156:2, 156:6, 156:13, 157:4, 157:8, 157:19, 158:3, 158:14, 159:1, 159:22, 160:13, 161:23, 162:5, 162:13, 162:20, 163:3, 163:6, 163:11, 164:11, 164:25, 165:17, 165:20, 165:24, 166:2, 166:10, 166:22, 167:2, 168:6, 168:21, 169:14, 169:25, 170:3, 170:9, 171:1, 171:4, 171:9, 171:15, 171:20, 171:23, 172:3, 172:10, 172:15, 172:23, 173:10, 175:12, 176:6, 176:11, 176:16, 176:19, 176:25, 177:10, 180:9, 180:23, 181:1, 181:2, 181:11, 181:15, 181:25, 182:2, 182:7, 182:10, 182:11, 182:14, 182:15, 182:21, 182:22, 182:24, 182:25, 183:22,

184:3, 184:4, 184:6, 184:7, 184:9, 184:10, 184:12, 184:14, 184:16, 184:17, 184:21, 184:22, 185:3, 185:5, 185:8, 185:9, 185:12, 185:14, 185:15, 185:17, 185:18, 185:19, 185:23, 185:24, 186:1, 186:2, 186:4, 186:5, 186:9, 186:11, 186:15, 186:16, 186:19, 186:21

**theatrical** [1] - 134:12

**themselves** [3] - 50:16, 113:11, 156:15

**Theodore** [2] - 140:12, 140:13

**theorem** [1] - 97:12

**theory** [1] - 114:4

**therefore** [1] - 160:23

**thereof** [1] - 148:9

**they've** [10] - 4:4, 13:6, 14:14, 32:7, 70:6, 82:20, 154:10, 164:10, 169:15, 173:7

**thinking** [3] - 7:15, 99:21, 145:9

**thinks** [6] - 122:16, 146:5, 168:17, 172:1, 172:25, 186:17

**third** [2] - 54:3, 60:9

**thorough** [1] - 106:17

**thousand** [5] - 73:11, 156:19, 161:1, 161:2, 162:24

**thousands** [9] - 62:12, 65:25, 89:13, 98:21, 127:2, 127:3, 153:5, 157:17, 167:17

**three** [13] - 13:14, 81:12, 92:22, 94:7, 137:1, 137:14, 140:19, 156:5, 161:3, 175:18, 177:6, 179:8

**threshold** [1] - 77:8

**throughout** [2] - 62:18, 73:11

**throw** [2] - 95:3, 99:25

**throwing** [1] - 86:6

**thumb** [1] - 26:18

**tied** [3] - 38:18, 104:23, 173:11

**timeline** [1] - 184:12

**timing** [1] - 20:25

**title** [1] - 115:6

**today** [10] - 21:12, 36:22, 55:16, 100:15, 149:12, 149:13, 150:5, 150:7, 174:25, 187:1

**together** [5] - 75:10, 108:16, 115:17, 185:23, 185:25

**tomorrow** [17] - 3:10, 21:3, 21:6, 52:23, 76:7, 179:24, 179:25, 180:2, 180:3, 180:6, 180:8, 180:13, 180:16, 180:20, 181:18, 182:5, 186:24

**took** [5] - 19:8, 29:21, 102:22, 105:9, 119:4

**tool** [7] - 42:23, 49:4, 49:12, 58:2, 61:13, 74:10, 106:16

**tool-mark** [1] - 61:13

**tools** [4] - 42:11, 54:18, 102:19, 102:21

**top** [5] - 18:11, 30:13, 41:5, 42:2, 84:8

**topic** [5] - 4:6, 102:22, 137:10, 176:7, 177:16

**topics** [1] - 56:19

**TOR** [1] - 1:18

**Tor** [22] - 1:19, 2:15, 6:23, 7:17, 7:20, 7:22, 7:24, 8:1, 8:6, 8:9, 8:18, 9:7, 9:9, 9:10, 122:6, 155:17, 156:24, 157:21, 170:19, 171:2, 178:11

**total** [1] - 104:18

**touch** [1] - 16:21

**touched** [1] - 178:2

**touches** [1] - 159:17

**tough** [1] - 76:21

**touts** [1] - 175:4

**towards** [4] - 18:5, 20:11, 162:11, 173:25

**town** [1] - 21:4

**trace** [7] - 81:23, 81:24, 84:20, 96:19, 102:9, 113:1

**traceable** [1] - 96:23

**traced** [1] - 39:2

**traces** [2] - 62:20, 87:4

**tracing** [26] - 12:11,

38:24, 39:5, 43:5, 43:22, 46:11, 46:20, 51:19, 51:21, 56:11, 57:1, 57:24, 58:15, 68:4, 70:20, 72:11, 74:20, 79:21, 84:5, 89:5, 92:16, 96:18, 104:24, 146:8, 169:23

**traditional** [2] - 38:23, 68:3

**trained** [1] - 160:3

**training** [2] - 56:17, 175:5

**trainings** [5] - 56:19, 75:18, 175:4, 175:10

**trains** [2] - 148:23, 148:24

**transaction** [21] - 26:4, 30:20, 36:1, 39:6, 39:20, 46:12, 48:15, 60:23, 65:7, 65:8, 65:12, 68:23, 98:18, 108:12, 111:9, 112:12, 112:24, 115:18, 168:12, 168:23, 169:18

**transactional** [1] - 57:11

**transactions** [44] - 24:22, 25:2, 30:20, 33:19, 34:16, 39:2, 39:4, 42:10, 43:20, 44:5, 44:19, 44:20, 45:12, 45:15, 46:23, 47:1, 47:4, 47:23, 49:14, 50:12, 50:14, 51:5, 51:13, 51:23, 57:25, 60:18, 68:4, 68:11, 68:14, 68:21, 69:9, 70:3, 70:5, 70:18, 70:19, 95:6, 98:21, 108:2, 112:8, 112:12, 115:11, 157:17, 168:12, 168:24

**transcript** [15] - 56:9, 71:3, 72:24, 123:17, 124:4, 124:7, 124:9, 124:13, 125:17, 125:24, 170:18, 171:6, 171:11, 188:4, 188:6

**TRANSCRIPT** [1] - 1:7

**transcripts** [1] - 72:9

**transfer** [6] - 47:7, 49:23, 62:21, 65:9, 183:20, 183:21

**transferred** [3] -

14:12, 23:1, 23:4

**transfers** [6] - 23:18, 25:9, 45:12, 50:6, 50:16, 105:10

**translate** [1] - 118:9

**translating** [1] - 17:6

**translation** [8] - 16:21, 17:18, 17:19, 17:21, 18:1, 18:14, 20:13, 20:18

**translations** [10] - 14:1, 18:7, 18:8, 18:9, 18:10, 19:1, 19:2, 19:6, 20:5, 20:10

**translator** [2] - 19:18, 41:1

**translators** [3] - 17:5, 18:23, 19:13

**transmission** [2] - 32:6, 104:20

**transmitted** [3] - 23:5, 32:9, 183:4

**transmitting** [6] - 129:24, 130:5, 130:14, 130:15, 132:9, 183:11

**traveling** [2] - 158:25, 159:3

**Treasury** [1] - 3:6

**treat** [1] - 134:4

**treated** [1] - 95:6

**tremendous** [1] - 143:2

**triage** [1] - 167:20

**trial** [30] - 5:8, 6:10, 16:8, 19:9, 20:11, 23:8, 26:2, 33:13, 37:1, 37:10, 37:17, 37:18, 59:3, 59:5, 60:8, 69:23, 70:22, 72:21, 85:8, 93:2, 106:1, 106:5, 106:9, 109:4, 111:14, 111:15, 116:6, 139:11, 158:23, 180:15

**trials** [2] - 97:1, 132:2

**tried** [4] - 33:14, 133:5, 139:11, 167:23

**trier** [1] - 53:22

**trigger** [1] - 5:4

**trillion** [1] - 98:11

**TRM** [8] - 12:11, 48:25, 49:10, 49:12, 74:10, 74:14, 74:20, 75:19

**trouble** [1] - 12:25

**true** [8] - 25:6, 28:10,

38:16, 47:7, 101:9, 165:17, 188:4, 188:5

**trust** [5] - 79:5, 82:16, 85:14, 89:21, 89:23

**trustee** [15] - 23:1, 23:10, 26:10, 26:12, 28:4, 28:5, 29:15, 29:16, 29:18, 29:21, 29:22, 30:3, 31:20, 32:7, 32:8

**trustee's** [1] - 23:12

**trustworthy** [1] - 23:21

**truth** [3] - 102:23, 103:3, 103:21

**try** [6] - 17:15, 63:9, 97:15, 108:8, 115:14, 180:16

**trying** [25] - 7:9, 7:19, 18:17, 48:22, 61:18, 91:13, 91:14, 91:15, 97:9, 101:24, 102:10, 110:24, 111:6, 116:19, 117:1, 124:6, 145:6, 147:7, 158:2, 163:14, 167:24, 173:24, 174:1, 176:22, 182:24

**Tuesday** [1] - 180:14

**tune** [1] - 74:4

**turn** [6] - 22:16, 77:11, 121:16, 128:10, 134:3, 183:23

**turned** [2] - 66:25, 119:25

**turns** [3] - 41:24, 98:22, 166:11

**twice** [1] - 79:1

**two** [23] - 5:23, 6:3, 13:13, 19:22, 30:15, 65:18, 97:15, 102:7, 102:14, 109:11, 109:22, 131:18, 137:23, 140:19, 160:1, 164:3, 168:16, 180:4, 183:5, 183:8, 183:13, 183:17

**type** [11] - 41:4, 67:3, 79:21, 86:16, 118:22, 122:17, 137:7, 163:4, 165:10, 169:5, 173:22

**types** [2] - 39:21, 156:12

**typically** [1] - 132:3

**typo** [2] - 5:11, 49:15

# U

**U.S** [11] - 1:13, 5:10, 13:13, 13:22, 15:12, 15:13, 24:2, 32:10, 88:21, 98:6, 109:13
**u.S** [1] - 1:16
**U.S.C** [3] - 24:6, 183:10, 183:11
**UDP** [1] - 145:7
**ultimate** [12] - 66:2, 132:11, 132:15, 144:11, 144:17, 145:1, 145:13, 149:4, 161:24, 165:3, 165:13, 178:23
**ultimately** [3] - 17:16, 23:21, 71:8
**unable** [1] - 113:22
**unavailable** [1] - 182:17
**unaware** [1] - 61:7
**uncertainty** [2] - 96:20, 160:24
**under** [21] - 3:5, 23:14, 23:15, 28:13, 32:16, 32:17, 33:1, 36:2, 37:13, 43:22, 54:5, 54:15, 81:18, 86:10, 91:11, 119:15, 130:21, 158:1, 174:20
**undercover** [12] - 42:10, 44:19, 44:20, 68:11, 68:14, 68:15, 68:21, 68:23, 70:3, 70:5, 70:18, 70:19
**underinclusive** [3] - 69:2, 75:5, 86:2
**underlie** [1] - 57:6
**underlying** [6] - 23:11, 54:18, 85:5, 118:17, 168:22, 177:22
**understandable** [1] - 182:3
**understood** [16] - 16:5, 16:13, 16:17, 28:2, 77:20, 107:5, 143:13, 154:23, 155:2, 155:13, 157:18, 163:5, 165:15, 166:20, 177:9, 186:9
**undisputed** [1] - 134:5
**unfortunately** [1] - 33:25
**unique** [6] - 49:15, 52:9, 123:11, 123:13, 123:14

**UNITED** [3] - 1:1, 1:2, 1:8
**United** [13] - 1:23, 2:3, 2:7, 2:12, 17:11, 28:11, 28:13, 28:14, 53:17, 57:20, 59:21, 84:17, 97:23
**universe** [2] - 18:13, 18:18
**unless** [9] - 64:12, 75:14, 107:9, 114:24, 118:3, 151:15, 161:7, 173:15, 177:2
**unlicensed** [1] - 183:10
**unnecessary** [1] - 134:12
**unquote** [4] - 80:22, 82:2, 83:3, 144:8
**unreliable** [3] - 79:22, 148:13, 153:12
**unsealed** [1] - 168:15
**unsound** [10] - 152:24, 153:25, 154:5, 154:6, 159:18, 159:23, 160:12, 161:7, 162:15
**unverifiable** [2] - 80:5, 80:6
**up** [92] - 3:25, 4:2, 4:5, 4:15, 5:8, 6:9, 6:14, 7:11, 7:20, 8:1, 9:15, 16:20, 19:5, 22:15, 23:17, 24:22, 25:13, 26:4, 26:8, 30:21, 31:4, 36:25, 47:1, 54:10, 55:6, 60:1, 60:2, 63:9, 63:10, 65:20, 66:25, 71:3, 71:12, 72:14, 74:3, 74:23, 81:1, 84:25, 86:6, 87:22, 88:20, 91:14, 99:25, 100:8, 100:21, 101:2, 102:1, 102:14, 104:9, 104:17, 105:2, 105:25, 107:10, 110:11, 111:15, 114:12, 119:23, 121:10, 122:15, 125:6, 126:3, 126:5, 126:13, 126:14, 127:9, 133:15, 137:17, 138:13, 138:16, 138:24, 141:4, 141:14, 143:12, 145:23,

159:25, 161:11, 164:18, 165:25, 166:7, 167:1, 168:7, 169:24, 170:15, 173:9, 173:11, 176:3, 177:3, 179:9, 180:13, 180:16, 183:16, 183:23
**update** [3] - 12:14, 12:18, 110:2
**updates** [1] - 12:10
**uploaded** [1] - 49:3
**uploading** [1] - 66:14
**uploads** [1] - 48:20
**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**useful** [2] - 38:3, 106:22
**user** [5] - 45:16, 67:2, 124:19, 125:5, 145:10
**user's** [1] - 33:18
**users** [10] - 62:11, 62:12, 62:13, 63:5, 66:21, 69:23, 70:16, 116:25, 144:4, 152:24
**uses** [6] - 79:21, 92:25, 93:1, 113:7, 133:19, 164:10
**usual** [1] - 134:5
**utilizes** [1] - 80:11

# V

**vagaries** [1] - 118:8
**validate** [2] - 61:8, 73:2
**validated** [2] - 60:25, 70:11
**validating** [1] - 79:25
**validation** [9] - 63:1, 68:10, 69:4, 69:6, 71:15, 73:17, 74:15, 79:17, 85:13
**validity** [2] - 83:2, 94:8
**valuations** [2] - 88:12, 88:19
**value** [3] - 88:12, 88:18, 104:19
**variables** [1] - 61:25
**variation** [1] - 153:18
**variety** [2] - 43:7, 127:18
**various** [10] - 2:23, 45:23, 47:15, 56:11, 59:3, 59:4, 61:25, 66:2, 66:21, 108:18
**vast** [1] - 72:13
**vein** [1] - 51:20

**vendor** [4] - 70:1, 70:23, 71:7, 71:13
**vendor's** [2] - 71:2, 71:6
**vendors** [2] - 59:4, 70:22
**vendors'** [1] - 71:11
**venue** [4] - 37:2, 37:4, 37:8, 37:11
**verdict** [1] - 130:19
**verifiable** [2] - 80:5, 95:25
**verification** [6] - 62:17, 69:4, 69:5, 71:16, 74:9, 74:15
**verified** [2] - 70:6, 152:15
**verifies** [1] - 42:9
**verify** [9] - 44:21, 45:25, 49:5, 61:8, 62:5, 69:19, 82:9, 82:16, 83:1
**verifying** [3] - 48:4, 69:8, 73:16
**Verret** [2] - 86:22, 141:12
**versa** [1] - 109:20
**version** [4] - 23:4, 38:23, 101:24, 135:16
**versions** [1] - 92:22
**versus** [21] - 19:19, 19:25, 20:15, 23:22, 34:15, 38:14, 43:18, 64:14, 96:24, 139:6, 144:13, 150:22, 156:7, 156:18, 159:25, 161:11, 168:11, 173:24, 174:12, 177:22
**vetting** [1] - 69:4
**via** [3] - 15:22, 16:8, 180:22
**vice** [2] - 8:24, 109:20
**video** [3] - 13:5, 13:8, 178:2
**Video** [3] - 45:13, 65:6, 69:24
**view** [2] - 170:9, 171:16
**viewable** [2] - 47:20, 48:15
**viewed** [1] - 44:20
**viewing** [1] - 50:25
**viewpoint** [1] - 79:7
**views** [2] - 9:25, 165:22
**violates** [1] - 91:8
**violation** [3] - 13:3, 183:9, 183:11

**Virginia** [2] - 27:2, 71:2
**virtual** [9] - 22:23, 56:14, 56:16, 62:20, 62:22, 62:23, 62:25, 107:25, 108:1
**Virtual** [1] - 56:12
**virtually** [8] - 28:11, 28:12, 28:14, 168:9, 181:10, 181:18, 182:9, 186:22
**virtue** [1] - 185:15
**visit** [1] - 13:2
**visual** [1] - 49:3
**vitae** [1] - 56:8
**Vlahakis** [9] - 128:13, 129:8, 129:22, 130:11, 131:12, 132:1, 132:7, 140:12, 140:13
**Vlahakis's** [1] - 131:4
**voir** [10] - 3:1, 3:12, 3:14, 4:3, 6:21, 11:25, 157:10, 158:7, 158:9, 158:12
**volume** [1] - 21:13
**volumes** [1] - 71:9
**voluminous** [3] - 57:6, 108:23, 109:14
**VPN** [10] - 121:3, 145:7, 160:22, 161:2, 162:14, 162:18, 162:23, 162:25, 163:1
**VPNs** [5] - 122:7, 162:8, 162:17, 170:2, 173:2
**vs** [1] - 1:4

# W

**wade** [1] - 12:12
**wait** [1] - 76:8
**waiting** [1] - 3:3
**waive** [1] - 181:3
**waiver** [1] - 186:23
**walk** [5] - 24:21, 53:15, 55:1, 56:3, 143:18
**wall** [1] - 78:25
**Wall** [1] - 1:20
**wallet** [15] - 46:13, 46:16, 46:18, 46:19, 46:21, 50:25, 51:2, 60:24, 61:2, 72:15, 74:24, 75:2, 108:1, 169:6, 173:19
**Wallet** [1] - 50:5
**wallets** [5] - 39:21, 41:14, 41:15, 168:19

**wants** [6] - 11:21, 55:19, 137:13, 172:18, 176:23, 178:11

**warrants** [4] - 58:18, 66:24, 72:12, 91:1

**Warsaw** [1] - 13:18

**Washington** [6] - 1:5, 1:12, 1:14, 1:17, 1:24, 188:11

**watch** [1] - 16:8

**ways** [3] - 44:24, 92:4, 105:6

**web** [8] - 10:2, 10:12, 10:15, 10:21, 10:25, 11:8, 11:10, 11:19

**website** [5] - 156:16, 156:18, 156:20, 164:22

**websites** [7] - 156:11, 156:14, 156:15, 164:18, 164:24, 176:3, 178:15

**week** [3] - 22:2, 52:24, 180:17

**weekend** [6] - 12:14, 13:2, 15:3, 15:10, 22:2, 22:3

**weeks** [2] - 44:14, 183:5

**weight** [1] - 23:22

**welcome** [5] - 4:6, 77:22, 111:16, 135:22, 183:22

**Welcome** [3] - 45:13, 65:6, 69:24

**well-developed** [2] - 96:5, 97:19

**whatsoever** [2] - 81:21, 151:5

**whereas** [3] - 105:15, 113:19, 120:20

**wherein** [1] - 98:24

**whichever** [2] - 40:8, 183:24

**whole** [4] - 4:23, 106:5, 131:24, 168:3

**window** [1] - 172:25

**windows** [3] - 125:22, 126:4, 126:5

**withdrawal** [1] - 105:13

**withdrawals** [3] - 25:13, 25:18, 49:19

**withdrawing** [1] - 70:23

**withdrawn** [2] - 141:19, 179:15

**witness** [37] - 4:13, 4:22, 5:1, 5:7, 12:15,

39:9, 41:12, 54:25, 75:14, 75:17, 93:4, 93:15, 107:7, 113:10, 115:21, 116:7, 116:9, 116:16, 116:19, 116:22, 116:23, 119:4, 119:12, 120:8, 120:15, 129:19, 131:10, 135:17, 144:3, 147:16, 151:14, 157:10, 175:9, 175:13, 177:6

**witness's** [2] - 93:5, 94:2

**witnesses** [17] - 6:9, 6:11, 12:5, 15:19, 16:18, 17:19, 18:3, 22:8, 101:4, 116:2, 116:21, 116:24, 128:6, 138:4, 140:16, 144:3, 157:3

**wonder** [1] - 7:9

**wondering** [1] - 15:21

**word** [9] - 7:6, 7:17, 19:24, 118:10, 118:25, 127:19, 151:19, 161:16, 164:5

**words** [6] - 5:23, 18:1, 19:24, 100:23, 122:25, 133:19

**works** [16] - 13:12, 40:1, 40:12, 54:20, 89:20, 113:12, 165:1, 165:6, 170:19, 170:20, 171:2, 175:7, 175:14, 176:18, 178:11, 179:13

**world** [7] - 57:21, 62:7, 62:10, 62:13, 63:4, 68:22, 159:4

**worth** [2] - 33:4, 50:1

**wrestling** [1] - 19:14

**write** [1] - 157:14

**writing** [2] - 36:23, 99:12

**written** [4] - 118:16, 118:22, 123:24, 176:9

**wrongful** [1] - 97:22

**wrote** [4] - 67:17, 86:21, 105:25, 125:10

**www.bitcoinfog.com** [1] - 164:13

## Y

**year** [3] - 34:11, 119:9, 183:17

**Year's** [1] - 34:23

**years** [9] - 28:17, 133:5, 135:18, 148:22, 150:12, 156:22, 160:10, 183:14, 183:18

**York** [3] - 1:17, 1:20, 168:15

**you-all** [2] - 77:2, 131:17

**young** [1] - 8:23

**yourself** [2] - 79:11, 183:24

**YouTube** [1] - 178:2

## Z

**zero** [2] - 83:23, 99:17

**Zoom** [3] - 15:22, 16:8, 180:22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                ) Criminal Action
                                         ) No. 1:21-CR-0399
                   Plaintiff,            )
                                         ) **PRETRIAL CONFERENCE**
vs.                                      )
                                         ) Washington, D.C.
ROMAN STERLINGOV,                        ) **September 8, 2023**
                                         ) **Time:  1:20 P.M.**
                   Defendant.            )

**TRANSCRIPT OF PRETRIAL CONFERENCE**
BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S**

For the Plaintiff:       CHRISTOPHER BROWN
                         USAO-DOJ
                         601 D Street, NW
                         Washington, DC 20001

                         ALDEN PELKER
                         U.S. Department of Justice
                         950 Pennsylvania Avenue, NW
                         Washington, DC 20530

                         JEFFREY PEARLMAN
                         DOJ-CRM
                         U.S. Department of Justice
                         1301 New York Ave. NW
                         Washington, DC 20005

For the Defendant:       TOR EKELAND - **VIA ZOOM**
                         MICHAEL HASSARD - **VIA ZOOM**
                         Tor Ekeland Law, PLLC
                         30 Wall Street, 8th Floor
                         New York, NY 10005


Court Reporter:          Tamara M. Sefranek, RMR, CRR, CRC
                         Official Court Reporter
                         United States Courthouse, Room 6714
                         333 Constitution Avenue, NW
                         Washington, DC  20001
                         202-354-3246

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Criminal Case No. 21-399, United States of America v. Roman Sterlingov.

Would counsel please state their names for the record, starting with government counsel.

MS. PELKER:  Good afternoon, Your Honor.  Alden Pelker for the United States.

MR. BROWN:  Good afternoon.  AUSA Chris Brown for the United States.

MR. PEARLMAN:  Jeff Pearlman for United States.

THE COURT:  All right.  Good afternoon to all of you.

MR. EKELAND:  Good afternoon, Your Honor.  Tor Ekeland for Defendant Roman Sterlingov, who is present via video link.

MR. HASSARD:  Good afternoon, Your Honor.  Michael Hassard for the defense.

THE COURT:  All right.  Good afternoon to all of you. If you could just confirm for the record, Mr. Ekeland, that Mr. Sterlingov consents to proceeding today with his counsel and himself on video and the government counsel present in the courtroom?

MR. EKELAND:  Yes, he does, Your Honor.

THE COURT:  All right.  We've got a lot to cover, but I did want to let you know, Mr. Ekeland, that I did confer with the United States Marshals Service.  And they are going to be

able to make arrangements to move Mr. Sterlingov to somewhere where he can have access to a hard drive five days a week -- some of that may be on the weekend -- for three hours a day. You will have to get the hard drive to him and drop it off for him to have access to it there, but he will have access to the hard drive, as I said, five days a week there.

MR. EKELAND:  Thank you, Your Honor.  We do have another access issue, and that is that the Rappahannock Regional Jail did not give us access to our client over the weekend.  And given that trial is starting and we're going to be tied up in court all day, we cannot visit him during the weekdays, and we need to visit him on the weekend.

So I'm just hoping maybe the Court -- we've reached out to the marshals and the jail as well on that.  I'm hoping maybe the Court can speak to the marshals about that.

THE COURT:  Well, I did speak to the marshal about that as well.  Actually, there is a period where that jail does allow visitors on, I think, it's on Saturdays.  Hold on a second.  He's going to be moved anyway, but there is Saturday access to counsel at the Rappahannock Jail where he is now.

MR. EKELAND:  Your Honor, it's my understanding -- we had our legal assistants reach out to the jail, and it's my understanding that they were told that we could have no access to Mr. Sterlingov at all over the weekend.  I'll double-check with our legal assistants, but that's not my understanding of

what we were told by the jail.

THE COURT: Well, let's see here. I have here a printout from the jail that says -- the printout from the jail, no weekend visits will be scheduled with the exception of attorneys, who may visit on Saturdays from 8:30 a.m. to 11:20 a.m.

MR. EKELAND: Perhaps there was some confusion in the communication with my legal assistant. I'll go back and check.

THE COURT: I'm not sure it would allow a legal assistant, but it would allow the attorneys to be there.

In any event, I don't know exactly when he's going to be moved, but he is going to be moved.

MR. EKELAND: Thank you, Your Honor.

THE COURT: All right. And then I had a question for the government on the authentication of the Mt. Gox documents.

MS. PELKER: Yes, Your Honor.

THE COURT: The papers are a little bit confusing about whether there was a certification from the trustee because the defense at times says, well, the certification from the trustee isn't good enough. But I didn't see any such certification.

MS. PELKER: It's not the trustee certifying -- signing a business record certification. Our understanding is that under Japanese law, that's not their procedure. It is a certification from the Japanese government that they got these

records from the trustee and the documentation of that transfer back and forth.

THE COURT: But do we need some certification that these are, in fact, the records that were downloaded from the server?

What I have here is the certification from the individual from the prosecutor's office saying I went there and I picked up the hard drive from the trustee. But what I may be missing in the link is something saying, and these are the documents that were downloaded from the server.

MS. PELKER: So I think that we are looking at the full set of circumstances about the server, and that's part of why we included the supplemental information under 901 about why this is authentic; and then if you look at the rules about receiving evidence pursuant to a Mutual Legal Assistance Treaty request that it really goes to, this was an official request from the United States Government to Japan.

I can say that when we followed up about the possibility of having the trustee sign a certification, the Japanese said this is our certification. We are certifying this. This is what you're getting from Japan. These are the records of the trustee, and we are certifying as the Japanese government to you that these are the trustee's records.

THE COURT: And was there an MLAT?

MS. PELKER: Yes, Your Honor.

THE COURT:  So this was produced pursuant to an MLAT?

MS. PELKER:  Yes, Your Honor.

THE COURT:  So you're at least relying, in part, that on 901 versus 902 with respect to, perhaps, that first step in the chain, and that we may have to actually look at the records themselves as they come into evidence to determine whether there is some indicia in the records themselves that they are what they purport to be; is that fair?

MS. PELKER:  I think that they're bolstered from 901. But that we also can rely on the fact that the Japanese -- that they came over as records in response to an MLAT under 3553 as well.

THE COURT:  Okay.

MS. PELKER:  Yes, Your Honor.

THE COURT:  Do I have a copy of the MLAT?  Was that produced to the Court?

MS. PELKER:  No, Your Honor.  That was not an MLAT that was specific to our case.

THE COURT:  I see.

MS. PELKER:  That was an MLAT for another -- sort of an omnibus MLAT that produced the entirety of the records, so that we did not --

THE COURT:  I may want to look at that just because, to the extent you're relying on the Japanese government as the government answered our MLAT with this, I may need to know what

the MLAT said.

MS. PELKER:  Understood, Your Honor.

THE COURT:  Okay.  And then any comments on the preliminary jury instructions?

MS. PELKER:  I'm going to turn that to Mr. Brown.

THE COURT:  Mr. Brown?

MR. BROWN:  No, Your Honor.  I think the government has no objections to the proposed preliminary instructions.

THE COURT:  Okay.  Mr. Ekeland?

MR. EKELAND:  Yes, Your Honor.  We just had a few small requests.

THE COURT:  Okay.

MR. EKELAND:  The main one is that, given that the statute of limitations on all these counts are five years except for the D.C. municipal money laundering statute, which is six years, we think it's important that the jury be told at the outset what the statute of limitations are.

They're going to be seeing evidence primarily from 2011, 2012.  But what's crucial here is whether or not Mr. Sterlingov was operating or administrating Bitcoin Fog during the relative statutory period, and that would be after 2016.  We think it's important that going into this, the jury is thinking about that because, you know, all sorts of stuff can happen.

Even arguendo, saying that Mr. Sterlingov did form

Bitcoin Fog in 2011/2012. He could have sold it or given it to somebody. So we think it's important that the jury is not thinking that they have in mind the relative statutory -- statute of limitations. So we ask that that be added to each preliminary jury instruction.

And I found just a couple more things, but I'll wait if the Court wants to just address that.

THE COURT: Well, let me hear from the government on that.

MR. BROWN: Your Honor, statute of limitations is not an element the government is required to prove. It can be a defense, but I think the danger here is that that -- a statute of limitations defense here is really inextricably intertwined with a withdrawal from a conspiracy defense, which is an affirmative defense on which the defendant bears the burden of proof to show affirmative withdrawal.

And I think just for preliminary instructions, we're going to start going down a rabbit hole that will be extremely confusing for the jury.

THE COURT: All right. Well, Mr. Ekeland, anything else you want to add?

MR. EKELAND: No. I mean, we're not saying Mr. Sterlingov withdrew from any conspiracy because he was never part of any conspiracy. We're just saying that it's important for the jury to know the statute of limitations, and

we'll leave it at that because we've got a lot of stuff to get to today.

THE COURT: Okay. Well, I'm not inclined to give the instruction. Look, you told me -- but I assume as long as the conspiracy continues into the relevant statute that the fact that the conspiracy may have been formed earlier, committed acts earlier, that as long as the conspiracy continued, that there would not be a statute of limitations problem; is that correct?

MR. BROWN: Your Honor, that's my understanding. From the government's side, that's my understanding that conspiracy is considered, really, the classic example of a continuing defense, and the statute of limitations doesn't begin to run until the end of the conspiracy or withdrawal of the particular defendant.

THE COURT: All right. Mr. Ekeland?

MR. EKELAND: Well, conspiracy can -- as the government and the Court characterized, is the ongoing offense, but that still leaves three other counts.

I caution what's left of the conspiracy count, say, if it comes up that the defendant sold the business in 2012, because that pretty much seems like an affirmative act of withdrawal from the conspiracy because it can no longer engage in the object of the conspiracy.

So, again, we just would make that the requisite

knowledge of the statute of limitations is very important for the jury to consider going into this.

THE COURT: I thought you just told me a minute ago that you're not going to argue that Mr. Sterlingov withdrew from the conspiracy because there was no conspiracy?

MR. EKELAND: That's correct. But we're speaking here in the hypothetical that the government just raised, Your Honor. If we're going to, you know, say that conspiracy is an ongoing crime, if the object of the conspiracy disappears outside the statute of limitations, it's hard to argue that the conspiracy is ongoing.

MR. BROWN: Your Honor, I think the issue here is still -- this is an affirmative defense on which the defense bears the burden of proof. And so, again, in preliminary jury instructions, you know, I think it's sufficient just to say these are the elements of the offense that the government needs to prove beyond a reasonable doubt.

Once we start going down the road of, if the defendant, you know, provides argument or evidence about an affirmative defense, then you can consider that to whatever the standard of proof is. That, I think -- number one, I just don't think talking about affirmative defenses at the outset of the case is going to be very effective.

THE COURT: I do worry that it's just -- it's going to be pulling on a thread in which it's going to get more and

more complicated in the preliminary instructions.  As you'll see, I tried to keep the instructions with respect to the elements as simple as possible just for purposes of the preliminary instructions because, as soon as you start going deeper, then -- you know, I could go on for five pages about what a conspiracy is.

And I think that there's a greater risk of just confusing the jury by doing that too much upfront.  Obviously, this is an issue, though, that I will have to address in the final jury instructions.

Mr. Ekeland, what else do you want to raise?

MR. EKELAND:  Yes.  There's -- on page 6, the Court uses the word darknet vendors, darknet administrators.  We'd ask that that just be removed on the same grounds of pretty much what we were talking about yesterday, that we consider it to be a prejudicial word.  It's appealing to people's primordial fear of the dark.

And it occurs to the defense that to just use the word internet because the, quote-unquote, darknet is just part of the internet, and that's a more neutral word that won't be appealing to people's prejudices or fear of the dark.

THE COURT:  Mr. Brown?

MR. BROWN:  Your Honor, the way the indictment is pled refers to darknet vendors and darknet market administrative teams.  That's -- and the Court's preliminary

statement is just verbatim from the indictment.

THE COURT: Right.

MR. BROWN: If we had pled he conspired with Ted Bundy, that might be prejudicial, too, but that is -- that would be what he was indicted for.

So I think this is just -- this is the facts of the case. It's not unduly prejudicial.

THE COURT: So I think the way to deal with this is in the voir dire, I do ask about, I think, the darknet and if they -- I think I used that term in the voir dire. If it comes up in the voir dire that there's an individual who thinks that this word is synonymous with evil, then we can deal with that -- with respect to an individual juror or prospective juror.

And if it turns out that they all say, oh, yes, the darknet, that's the most horrible thing ever, then I might have to change the -- we'll know that before I give the preliminary instructions.

MR. BROWN: Yes, Your Honor. I mean, just one note of caution here.

If the issue is that we have a jury full of people who are inflamed by the mere mention of the word darknet, our whole case -- number one, our whole case will involve invoking the term darknet or dark web.

THE COURT: Right.

MR. BROWN: And, number two, these are not -- we didn't come up with these terms. These are commonly accepted terms to talk about Tor-based hidden services websites selling illicit --

THE COURT: One of the reasons that I don't actually have a problem with this here is that it's clear from this -- from these preliminary instructions that what we're talking about is people who are selling illegal drugs or illegally selling drugs in the portion of the internet that is less accessible to people like me who don't really have any idea how you would access that portion of the web or the internet.

So it's already an element and a requirement here that the transactions -- underlying transactions have to be ones that involve the illegal manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing with a controlled substance.

And so I think, to the extent there's any pejorative implication from using the term darknet, it's clear that what we're talking about here is those who are engaged in clandestine, unlawful activity on the internet. That's already clear, and it's going to be a necessary finding. So I'm okay with leaving this in for now.

Anything else, Mr. Ekeland?

MR. EKELAND: Yes, Your Honor. Just two more things. It should be quick.

On page 9, which is -- of the Court's preliminary jury instructions, which is page 10 of the docket number, ECF docketing, in Count 2 it uses the word represented. I think that's a reference to the government transactions.

We would just like to add representative to him because it's our position that, you know, the representation has to be made to somebody who has actually got mens rea rather than say to the wall or to nothing.

THE COURT: All right. Mr. Brown. It says, "Second, it must prove that the transaction involved property represented to him" -- or "represented by a law enforcement officer to him to be" --

MR. BROWN: Your Honor, two points in response. Number one, what's in the preliminary jury instructions here is faithful to the statutory text, which does not say represented to the defendant or to the person who conducted the transaction. It just says represented to be the proceeds of specified unlawful activity.

And, number two, I think that this does get into case law involving money laundering conspiracies, and I don't have the cases in front of me, but I am familiar with -- there is case law to the effect that in a conspiracy, there is such a thing as imputed knowledge, there's -- you know, there's vicarious liability.

There are a lot of other considerations going on in

terms of -- such that it's not impossible for there to be a conspiracy for the dirty representation to be made to one member of a conspiracy and for that knowledge to be imputed to another member of the conspiracy.

I know Count 2 isn't charged as a conspiracy, but we are -- this is a conspiratorial organization, and so I think that, again, there's no need to introduce, sort of, extra-textual elements into the jury instructions here that are not required by the actual statute.

THE COURT:  Mr. Ekeland?

MR. EKELAND:  Well, Count 2, I agree with the government, is not a conspiracy count, and the defense's position is very simple.  Representation requires a perceiver. It cannot just be made to nobody or a wall or anything, and I think that's implicit in the statute.  And we'll leave it at that.

THE COURT:  I think you're right that it seems unlikely to me that it means that if one simply represents to the Grand Canyon that the proceeds were from an unlawful activity, but, again, these are the preliminary instructions. It sounds like we're going to have to deal with a lot of these issues when we get to the final jury instructions.

But I'll note that the very next sentence says that the government must prove that the government acted with the intent to promote the carrying on of specified unlawful

activity or with the intent to conceal unspecified -- or the specified unlawful activity.

And the first sentence is that the government has to prove the defendant knowingly conducted or tried to conduct a financial transaction. As I've written it here already, the defendant had to know that he was conducting a financial transaction or attempting to do so and has to also have acted with the intent to carry on a -- to carry on a specified unlawful activity or with the intent to conceal that activity.

So I think that largely covers the concerns, Mr. Ekeland, that you raised; although I appreciate you raising this now because it does put us on alert when it comes time for the final jury instructions, we'll have to deal with this. I may need considerably more briefing and analysis on these questions to figure out exactly how to instruct the jury, ultimately.

And it may depend, in part, on how the evidence comes in to figure out how to instruct the jury on this. But for purposes of the preliminary instructions, I don't think this is misleading. It's consistent with the statute, and I think that this preliminary instruction is chock full of language of scienter.

Anything else, Mr. Ekeland?

MR. EKELAND: Just one final thing. And I know the Court has tried to keep the preliminary instructions

straightforward and simple.

We'd just request a little bit more fulsome definition of reasonable doubt.  We suggest the one that we put in our proposed preliminary jury instructions.  And that's it. We just would like a little bit more definition of reasonable doubt for the jury.

THE COURT:  What I'll do is I'm just going to do whatever the Red Book is for preliminary instructions on this. I assume what I've done is the Red Book, but I'll confirm that.

MR. EKELAND:  Thank you, Your Honor.

THE COURT:  All right.  Thank you for that.

I did go back and look further at Mr. Fischbach's testimony following up on, sort of, the preliminary views that I gave you on a couple of things yesterday.  I think I gave you more definitive views on a number of topics, but there were a couple where I indicated that I wanted to go back and look further.

In particular, I wanted to look further at his testimony and the materials that were submitted in support of offering him as an expert witness to see if there was information relating to -- or that would allow him to opine as an expert on the need for the constant maintenance of the site, to explain the high level of information security required for a Tor network site like Bitcoin Fog, and the stacking requirements.

And if you go back and look at his testimony, he testified that he had never run such an operation and that his disclosures, when he was asked about this, he said, well, they were written by defense counsel, perhaps optimistically. He did say he worked on something that maybe was analogous, but he didn't specify what that was.

And he testified that he could only say that it would take more than one person to run a mixer, and he could not commit on a specific number of people that would be required. And let's see here.

So I just didn't see anything in his expert report or testimony or background that would suggest that he is an expert on what was required to run a site like Bitcoin Fog. And, in fact, if anything, he seemed to disavow expertise on that subject.

I realize that he was not terribly prepared at the hearing. And so if you want to come back and offer some further testimony from him that would change my mind on this, you're welcome to do so at an appropriate time. But as I look at what he's offered thus far, I didn't see any basis to conclude that he had any expertise regarding Nos. 12, 13, or 14.

I've already expressed my views with respect to the Mt. Gox documents. And, in particular, if you look at what he testified to with respect to his knowledge regarding the

Mt. Gox data, all he said was that he had heard from other experts in the case, I think, that Mt. Gox had been hacked. Oh, yeah. The other thing is, going back to the staffing requirements, for some reason he indicated that he would have to review the Mt. Gox documents in order to determine what was necessary to staff Bitcoin Fog, which didn't make any sense. And when he was confronted with that, all he said was that he wasn't in any -- not in as simple -- the transcript is a rough -- a way you're presenting it. Simply that, until I've seen all the data the government has used to form its opinions, I don't know how accurate or inaccurate these opinions are.

He says that I'll water down what counsel said. It's perhaps -- it was perhaps optimistic with respect to -- this is the question of his expertise regarding the running of sites like Bitcoin Fog.

And then, with respect to the Mt. Gox, he says, I'm relying on things that other experts have shown to me that have caused me concern. Those are probably better addressed directly to them because that's their expertise. So he's disavowing his own expertise on this with respect to the Mt. Gox documents.

And as I indicated at the time that he testified, it says, he just doesn't have the information in front of him to indicate what the basis is for an opinion regarding the Mt. Gox data. And I'm not convinced that anybody, actually, has that

information; that information which would show that there's any reason to believe that the records that are at issue in this case were monkeyed with in any way or that the CEO of Mt. Gox was involved in tampering with the underlying data versus financials.

And so I am going to stick with what I previously told you with respect to my skepticism with respect to the Mt. Gox data and that I think -- I don't think that Mr. Fischbach has the expertise to testify with respect to that, or the knowledge base in addition to the expertise. And that beyond that, I have the 403 concern that I outlined for you yesterday.

And then the final thing was about whether he could testify as to Point 20, which was with respect to the inventory conducted by the FBI. And having reviewed his testimony and his submission to the Court, there's just not any evidence in front of me that he has any expertise on the topic. So absent something more, I'm not inclined to allow that testimony.

So that's where we stand with respect to Mr. Fischbach. We're, obviously, somewhat tight on time.

I defer to you-all as to whether you would want me to -- I can take up Ms. Still now or Mr. Dror, whichever you prefer, Mr. Ekeland. You're the one who is planning your case.

MR. EKELAND: Ms. Still.

THE COURT: All right. That's fine. With