# 24-3161

## United States Court of Appeals
## for the District of Columbia

THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
Hon. Randolph D. Moss
United States District Court Case 1-21-cr-00399-RDM-1

## APPENDIX
### Volume V of XVII (Pages Appx1761 - Appx2200)

TOR EKELAND, ESQ.
TOR EKELAND LAW PLLC
*Attorneys for Defendant-Appellant*
30 Wall Street, 8th Floor
New York, New York 10005
(718) 737-7264
tor@torekeland.com

MAKSIM NEMTSEV, ESQ.
MAKSIM NEMTSEV PC
*Attorneys for Defendant-Appellant*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
max@mnpc.law

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
*Attorneys for Defendant-Appellant*
800 Third Avenue, 20th Floor
New York, New York 10022
(212) 446-2346
maf@fernichlaw.com

AARON DANIEL, ESQ.
ASYMMETRIC LEGAL
*Attorneys for Defendant-Appellant*
11900 Biscayne Blvd, Suite 400
Miami, Florida 33181
(305) 979-9296
aaron@asymmetric.legal

*(See Inside Cover for Additional Counsel)*

3914



AMY C. COLLINS, ESQ.
THE LAW OFFICE OF
   AMY C. COLLINS
*Attorneys for Defendant-Appellant*
888 17th Street, NW, Suite 1200
Washington DC 20006
(228) 424-0609
amy@amyccollinslaw.com

# TABLE OF CONTENTS

District Court Docket – US v. Sterlingov, 21-CR-00399-RDM .............Appx001

Protective Order of Governing Discovery of Hon. Randolph D. Moss,
Dated September 17, 2021 (ECF Doc. No. 18) ......................................Appx074

Preliminary Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 336) ......................................Appx079

Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 14, 2024 (ECF Doc. No. 338) ....................................Appx085

Judgment in a Criminal Case of Hon. Randolph D. Moss,
Dated November 13, 2024 (ECF Doc. No. 340) ....................................Appx091

Transcript of Motion Hearing, Dated January 13, 2023
(ECF Doc. No. 114) .............................................................................Appx099

Transcript of Motion Hearing, Dated January 31, 2023
(ECF Doc. No. 115) .............................................................................Appx190

Transcript of Motions Hearing, Dated June 16, 2023
(ECF Doc. No. 223) .............................................................................Appx345

Transcript of Motions Hearing, Dated June 23, 2023
(ECF Doc. No. 224) .............................................................................Appx501

Transcript of Motions Hearing, Dated July 19, 2023
(ECF Doc. No. 225) .............................................................................Appx682

Transcript of Continued Motions Hearing, Dated July 20, 2023
(ECF Doc. No. 226) .............................................................................Appx895

Transcript of Motions Hearing, Dated August 22, 2023
(ECF Doc. No. 228) ...........................................................................Appx1040

Transcript of Continued Motions Hearing, Dated August 23, 2023
(ECF Doc. No. 229) ...........................................................................Appx1266

Transcript of Motions Hearing, Dated August 29, 2023
(ECF Doc. No. 231) ...........................................................................Appx1466

Transcript of Pretrial Conference, Dated September 7, 2023
(ECF Doc. No. 232) ......................................................................Appx1524

Transcript of Pretrial Conference, Dated September 8, 2023
(ECF Doc. No. 233) ......................................................................Appx1741

Transcript of Pretrial Conference, Dated September 13, 2023
(ECF Doc. No. 234) ......................................................................Appx1861

Transcript of Pretrial Conference, Dated September 15, 2023
(ECF Doc. No. 235) ......................................................................Appx1999

Transcript of Pretrial Conference, Dated September 18, 2023
(ECF Doc. No. 236) ......................................................................Appx2141

Transcript of Pretrial Conference, Dated September 21, 2023
(ECF Doc. No. 237) ......................................................................Appx2235

Transcript of Motion Conference, Dated November 13, 2023
(ECF Doc. No. 238) ......................................................................Appx2302

Transcript of Jury Trial, Dated February 12, 2024
(ECF Doc. No. 276) ......................................................................Appx2350

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ......................................................................Appx2620

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ......................................................................Appx2688

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 278) ......................................................................Appx2825

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 327) ......................................................................Appx2948

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ......................................................................Appx3074

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ......................................................................Appx3189

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ..............................................................Appx3331

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ..............................................................Appx3446

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 281) ..............................................................Appx3572

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 328) ..............................................................Appx3697

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ..............................................................Appx3858

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ..............................................................Appx3982

Transcript of Jury Trial, Dated February 23, 2024
(ECF Doc. No. 329) ..............................................................Appx4122

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ..............................................................Appx4251

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ..............................................................Appx4394

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 284) ..............................................................Appx4419

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 330) ..............................................................Appx4550

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ..............................................................Appx4581

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ..............................................................Appx4698

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 285) ..............................................................Appx4836

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 286) ...................................................................Appx4955

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 331) ...................................................................Appx5074

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 287) ...................................................................Appx5198

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 332) ...................................................................Appx5344

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...................................................................Appx5359

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...................................................................Appx5496

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 289) ...................................................................Appx5621

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 333) ...................................................................Appx5762

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 290) ...................................................................Appx5900

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 334) ...................................................................Appx6004

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...................................................................Appx6087

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...................................................................Appx6190

Transcript of Jury Trial, Dated March 11, 2024
(ECF Doc. No. 292) ...................................................................Appx6324

Transcript of Jury Trial, Dated March 12, 2024
(ECF Doc. No. 293) ...................................................................Appx6344

Virtual Asset Analysis Expert Report of Luke Scholl,
Dated December 8, 2022......................................................Appx6400

Expert Report #1 of Elizabeth Bisbee (Nov. 2022).....................Appx6465

Expert Report #2 of Elizabeth Bisbee (Dec. 2022) .....................Appx6493

Expert Report #3 of Elizabeth Bisbee (Jul. 2023)......................Appx6522

CS-Mazars Expert Report - Device Review Summary,
Dated May 5, 2023 ...........................................................Appx6529

CS-Mazars Expert Report - IP Overlap Analysis,
Dated November 9, 2022 ....................................................Appx6532

CS-Mazars Expert Report - IP Graph Data Excel File..............Appx6539

Criminal Complaint, Dated April 26, 2021 (ECF Doc. No. 1) .............Appx6542

Arrest Warrant, Dated April 26, 2021 (ECF Doc. No. 5)....................Appx6556

Indictment, Filed June 14, 2021 (ECF Doc. No. 8) ............................Appx6557

Superseding Indictment, Filed July 18, 2022 (ECF Doc. No. 43) .......Appx6561

Defendant's Supporting Memorandum of Law,
Dated August 1, 2022 (ECF Doc. No. 46) ...........................................Appx6567

Attachment to Memorandum of Law -
Proposed Order of Hon. Randolph D. Moss Granting Defendant's
Motion to Dismiss (ECF Doc. No. 46-1) ....................................Appx6585

Attachment to Memorandum of Law -
Defendant's Notice of Motion to Dismiss, Dated August 1, 2022
(ECF Doc. No. 46-2) .......................................................Appx6586

Government's Opposition to Motion, Filed August 29, 2022
(ECF Doc. No. 52) ...........................................................Appx6589

Defendant's Reply to Government's Opposition to Motion,
Dated September 7, 2022 (ECF Doc. No. 57) ......................................Appx6623

Exhibit A to Defendant's Reply -
Second Declaration of Eric Garland, Dated September 7, 2022
(ECF Doc. No. 57-1) ......................................................................Appx6635

Defendant's Motions in *Limine*, Dated October 24, 2022
(ECF Doc. No. 59) ..........................................................................Appx6644

Exhibit A to Motions in *Limine* -
Letter from Tor Ekeland to Christopher B. Brown and
C. Alden Pelker, Dated September 23, 2022, with Exhibit A
(ECF Doc. No. 59-1) ......................................................................Appx6664

Defendant's Opposition to the Government's Motions in *Limine*,
Dated November 7, 2022 (ECF Doc. No. 68) ......................................Appx6680

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated March 6, 2023 (ECF Doc. No. 116) ..........................................Appx6689

Notice of Bill of Particulars for Forfeiture, Filed May 17, 2023
(ECF Doc. No. 119) ........................................................................Appx6709

Defendant's Notice of Intent to Present Expert Testimony,
Dated July 7, 2023 (ECF Doc. No. 145) ..............................................Appx6711

Exhibit A to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Francisco Cabanas (ECF Doc. No. 145-1) ............................Appx6716

Exhibit B to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Itiel Dror (ECF Doc. No. 145-2) ..........................................Appx6725

Exhibit C to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jeffrey Fischbach (ECF Doc. No. 145-3) ....................................Appx6731

Exhibit D to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jonelle Still (ECF Doc. No. 145-4) ..............................................Appx6737

Exhibit E to Notice of Intent -
Summary of Qualifications and Expected Testimony for
J.W. Verret (ECF Doc. No. 145-5) ..............................................Appx6741

Supplemental Summary of Qualifications and Expected
Testimony for Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 157) ...................................................................Appx6756

Notice of Expert Report for Defense Expert Jonelle Still of
Ciphertrace, Dated August 8, 2023 (ECF Doc. No. 159) .....................Appx6761

Attachment to Notice of Expert Report -
Defense Expert Report of Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 159-1) .................................................................Appx6764

Exhibit A to Notice of Expert Report -
Data Credibility in Cryptocurrency Investigations of Ciphertrace
(ECF Doc. No. 159-2) .................................................................Appx6805

Exhibit B to Notice of Expert Report -
Article Titled "Bitcoin: A Peer-to-Peer Electronic Cash System"
(ECF Doc. No. 159-3) .................................................................Appx6822

Notice of Bill of Particulars, Filed August 28, 2023
(ECF Doc. No. 173) ...................................................................Appx6832

Defense Response to Government's Motion to Admit Certain
Exhibits, Dated September 4, 2023 (ECF Doc. No. 177) .....................Appx6834

Notice of Source Code Expert Bryan Bishop Regarding Independent
Analysis of Chainalysis Reactor Source Code and Request for
Production of Chainalysis Reactor Source Code and Relevant
Related Brady Material, Dated September 5, 2023
(ECF Doc. No. 179) ...................................................................Appx6843

Chainalysis' Notice in Response to the Court's Request Regarding
Protective Order, Dated September 12, 2023
(ECF Doc. No. 195) ...................................................................Appx6860

Exhibit A to Notice in Response -
[Proposed] Heuristic Information Protective Order of
Hon. Randolph D. Moss (ECF Doc. No. 195-1)...........................Appx6862

Exhibit B to Notice in Response -
[Proposed] Heuristic Information Protective Order to Jonelle Still
of Hon. Randolph D. Moss (ECF Doc. No. 195-2)........................Appx6869

Heuristic Information Protective Order to Jonelle Still of Hon.
Randolph D. Moss, Dated September 13, 2023 (ECF Doc. No. 196)...Appx6877

Notice Regarding Court's Proposed Protective Order Governing
Review of Chainalysis' Proprietary Information,
Dated September 20, 2023 (ECF Doc. No. 199) ..................................Appx6884

Notice Regarding Ciphertrace Expert Testimony and Review of
Latest Chainalysis Production, Dated September 22, 2023
(ECF Doc. No. 205) ........................................................................Appx6888

Government's Response to September 18, 2023 Minute Order
Regarding Defendant's Access to Sensitive Heuristics Information
Provided by Chainalysis, Filed September 22, 2023
(ECF Doc. No. 206) ........................................................................Appx6892

Defendant's Opposition to Government's Response to
September 18, 2023, Minute Order Regarding Defendant's Access
to Sensitive Heuristics Information Provided by Chainalysis,
Dated September 29, 2023 (ECF Doc. No. 207) ..................................Appx6901

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 4, 2023 (ECF Doc. No. 210) ..................................Appx6912

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 30, 2023 (ECF Doc. No. 213) ..................................Appx6930

Defendant's  Motion to Exclude any Testimony About Deepweb
Marketplaces, Dated February 8, 2024 (ECF Doc. No. 247)...............Appx6942

Attachment to Motion to Exclude -
[Proposed] Order of Hon. Randolph D. Moss
(ECF Doc. No. 247-2) ................................................................Appx6950

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated February 29, 2024 (ECF Doc. No. 259)......................................Appx6951

Final Jury Instructions and Charges, Filed March 7, 2024
(ECF Doc. No. 265) .................................................................................Appx6982

Government's Motion for Preliminary Order of Forfeiture,
Filed June 7, 2024 (ECF Doc. No. 297)..................................................Appx7061

      Attachment to Motion for Preliminary Order of Forfeiture -
      Proposed Preliminary Order of Forfeiture Hon.
      Randolph D. Moss (ECF Doc. No. 297-1)....................................Appx7072

Defendant's Opposition to Government's Motion for Preliminary
Order of Forfeiture, Dated June 21, 2021 (ECF Doc. No. 305) ...........Appx7078

      Exhibit A to Defendant's Opposition -
      Article Titled "Chainalysis: Most Mixed Bitcoin Not Used
      For Illicit Purposes", Dated August 26, 2019
      (ECF Doc. No. 305-1) ..................................................................Appx7095

      Exhibit B to Defendant's Opposition -
      Blockchain Address Search Result from Blockchain.com
      (ECF Doc. No. 305-2) ..................................................................Appx7107

Government's Memorandum in Aid of Sentencing,
Filed August 1, 2024 (ECF Doc. No. 314)..............................................Appx7112

Sentencing Memorandum on behalf of Roman Sterlingov,
Dated August 15, 2024 (ECF Doc. No. 321) ..........................................Appx7157

Memorandum Opinion of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 337) .......................................Appx7194

Defendant's Notice of Appeal, Dated November 19, 2024
(ECF Doc. No. 343) .................................................................................Appx7214

Memorandum for All Department Employees from The Deputy
Attorney General, Subjecting "Ending Regulation by Prosecution",
Dated April 7, 2025.................................................................................Appx7217

**Trial Exhibits:**

Trial Exhibit 601 -
Darknet Market Vendor Transaction Summary
(Document in Evidence and to be Produced Upon Request Due
to Volume) ...................................................................................Appx7221

Trial Exhibit 624...............................................................................Appx7222

Trial Exhibit 625...............................................................................Appx7223

Trial Exhibit 626...............................................................................Appx7224

Trial Exhibit 627...............................................................................Appx7225

Trial Exhibit 628(A)..........................................................................Appx7226

Trial Exhibit 628(B)..........................................................................Appx7227

Trial Exhibit 629...............................................................................Appx7229

Trial Exhibit 630(A)..........................................................................Appx7230

Trial Exhibit 630(B)..........................................................................Appx7244

Trial Exhibit 631...............................................................................Appx7247

Trial Exhibit 632...............................................................................Appx7248

Trial Exhibit 633...............................................................................Appx7252

Defense Exhibit 138 -
The-Message-Game, Written by Ice White .........................................Appx7253

Defense Exhibit 139 -
Extracted Page from The-Message-Game, Written by Ice White ......Appx7413

Government Exhibit 721 and Defense Exhibit 143 -
Boox Chat .........................................................................................Appx7414

Exhibit B to Fischbach Declaration -
Declaration of Jeffrey M. Fischbach, for Defendant, Dated August 14, 2024,
with Attachment
(ECF Doc. No. 321-2) ..............................................................Appx7415

Ms. Still -- as I indicated previously with respect to Ms. Still, my general reaction is that, to the extent that she's providing concrete testimony about methodology and saying I did the same tracing and I found this error here or that error or I reached a different result, that all strikes me as fine and within the -- her expertise. She does strike me that she does have relevant expertise.

There's a lot in her expert report that goes beyond that, and it seems to be either speculative or taking the role of the lawyers or the judge or the jury that is just, kind of, fairly argumentative or conclusory. You know, it would be reckless to do such and such; it would be reckless to rely on that; things of that nature.

She talks about the Mt. Gox hack, but I don't necessarily see any evidence that she actually has expertise with respect to the Mt. Gox hack or with the reliability of the Mt. Gox data. And absent some basis to believe that there was -- that the hack actually affected the records at issue in this case, I think that there is a 403 problem with allowing that testimony.

There's aspects of her report that just strike me as more argument than expert opinion; criticizing the government for not having access to data that there's no way the government could have access to. And the government did everything in its power to gain access to the data, and that it

just was unable to find it or it didn't exist anymore.

And to the extent that she wants to testify in a concrete analytic way to say that, without this additional data, which I understand the government wasn't able to obtain, it's difficult to draw particular conclusions.  I don't see a problem with that.  But I was somewhat concerned just by the tone of her expert report, which contains a lot of argument, and it sounds, as I said, at points more like a lawyer making a closing argument than it does as an independent -- or as an expert who is just providing an objective opinion.

The stuff about Lambos and the meme involving Lambos, I don't see how she has any expertise on whether people who are involved in illegal activity involving Bitcoin drive Lamborghinis versus driving Teslas.  I just don't see any basis for offering an opinion on that.  It doesn't seem that she has studied that issue and done an analysis of what types of cars that people who are engaged in running illegal mixing services drive.

I'm not quite sure the best way to, kind of, provide you with further guidance.  I'm happy to hear from you, Mr. Ekeland, if you want to walk through any things where you want my guidance as to what I think is okay and what's not okay.  I think you have, sort of, my general sense for the types of lines that I think should be drawn.

MR. EKELAND:  I think the Court's fairly clear.  I

don't think we need to go into the minutia.

When it comes to the culture of -- we do -- the defense does submit that she is experienced in that culture. You know, I don't believe 702 requires study. We believe it says it can be by experience.

And I mean, those memes and things are a very, very common part of the culture, and looking at the government's --

THE COURT: I'm sorry to just cut you off here. It seems to me a meme almost by definition is not proper. It's just -- I mean, there are memes out there that so fundamentally mischaracterize the world, and that's oftentimes why they are memes. They're intended to exaggerate something, be funny, make people chuckle, and take a -- something that's happened in some way and exaggerate in a way to a level of absurdity.

I don't think that the fact that there are memes regarding people having Lamborghinis is appropriate testimony to say and -- because Mr. Sterlingov didn't have a Lamborghini, he couldn't have possibly been engaged in illegal activity.

MR. EKELAND: Your Honor, I know -- I'm not going to belabor this point, but we submit that she does have the requisite experience to speak on the Bitcoin culture, and that meme is very much a reflection of a particular aspect of that culture that she's very familiar with just by the fact that she's been working in this field for a few years now and travels all over the world and has spent an extensive amount of

time on the internet working with it. But we'll leave it at that.

THE COURT: Okay. Well, if you want to offer outside the presence of the jury some basis for me to conclude that there, actually, is some analytic basis to believe that is more likely than not or that it tends to prove or disprove a fact as to whether someone drives a Lamborghini or not -- I suppose if someone drives a Lamborghini, maybe it is some evidence or makes it more likely that someone is engaged in illegal activity than someone who doesn't drive a Lamborghini.

But I would be quite shocked if it was the case that the fact you don't drive a Lamborghini means that it is less likely than not that you're engaged in illegal activity. But if she has any study or analysis, any data, anything that would support that.

But I just don't think a meme is appropriate. In fact, I think it's almost the definition of something that is not appropriate under 702.

MR. EKELAND: Well, Your Honor, she's -- she is an -- we are offering her as an expert to testify as to her opinion and not fact.

THE COURT: But it's her opinion as to a fact. I mean, if it's her opinion, I'm happy to instruct the jury: Members of the jury, this is -- I want you to know this is her opinion, it is not fact. Do not take anything she says as fact

because it's not fact. It's just her opinion, and we all have our opinions.

But you don't want me to do that. You want the jury to draw factual inferences from what she says.

MR. EKELAND: We are good on that instruction to the jury. We ask that the same be done for the government.

THE COURT: No. I was being facetious because I think it's absurd to suggest that you don't want the jury to draw factual conclusions from what she's saying.

MR. EKELAND: I want the jury to draw their own factual conclusions based on the expert testimony which --

THE COURT: I think we're wasting our time on this.

MR. EKELAND: Understood, Your Honor.

THE COURT: Unless you can show me some factual basis for the meme, it doesn't come in.

MR. EKELAND: Okay. Just to get -- for clarity's sake, then, in terms of the expert report, is that something then that we can't show to the jury, or how do we work that?

THE COURT: I don't think the expert report should come into evidence itself.

MR. EKELAND: Okay. Is that just for this expert report or is this for any of the other government expert reports as well?

THE COURT: Ms. Pelker?

MS. PELKER: Your Honor, the government is not

intending to submit its full export reports into evidence.  We wouldn't think that was proper.  We do intend to submit the charts within them as summaries, or demonstratives as appropriate.

THE COURT:  I was going to say the same thing for you, Mr. Ekeland.  Obviously, to the extent there are charts or diagrams or things like that, that would be helpful for Ms. Still to offer as part of her testimony that appear in her expert report, you're welcome to offer that, and I will then decide whether to admit it into evidence or at least to permit it to be used as a demonstrative.

Each side reserves its ability to object as those come into evidence or come in as demonstratives.

MR. EKELAND:  Understood, Your Honor.  I just have one more point on Ms. Still, and then I think we can move on.

THE COURT:  Okay.

MR. EKELAND:  I'll keep it brief.  It's on the Mt. Gox issue.  The defense just submits that an expert under 702 is allowed to rely on hearsay.  There is plenty of hearsay in terms of Mt. Gox being hacked multiple times.  And Ms. Still has reviewed what limited Mt. Gox data was produced to the defense in a spreadsheet form and did come across problems with it, as I believe she mentions in her report.

We merely just submit that it would be permissible for her under 702 to testify as to her opinion about the

Mt. Gox data.

THE COURT: If she can identify errors in the Mt. Gox data, she's welcome to do that. That's not a problem at all.

And the -- the principal concern that I've raised with respect to the Mt. Gox data is a 403 concern. As I've said before, if there's a major company in this country that hasn't been hacked, it deserves a gold star.

And I think that it is more prejudicial than probative to get into hacks and even get into illegal fraudulent behavior by the CEO of the company unless there's some basis to believe that it affected the data that is at issue in this case. And so I leave the door open on that.

If you can come in and show a connection between the hacks and the data in this case -- but you're going to need somebody who knows something about that. Every time someone -- I've heard anyone testify about this, they've just said, well, I've heard there were hacks. In fact, even asking you about it, you, who presumably met with each of the experts extensively, have not identified to me any basis to believe that the hacks had anything to do with the data at issue in this case, nor have even you, after having spoken to all the experts in the case, identified to me any basis to believe that any wrongdoing by the CEO had anything to do with the data in this case.

So I think that at least as things currently stand,

raising questions about the integrity of the data based on hacks or the actions of the CEO is more prejudicial than probative. If you can show me some connection, that's a different matter.

You need somebody who has some basis to know that and some knowledge of that and can actually draw those connections. Otherwise, it's just asking for speculation and casting aspersions on the integrity of the data based on things that are seemingly, as far as I can tell at this point, entirely unconnected.

MR. EKELAND: Your Honor, I'd just like to note that in our submissions to the Court, we do quote Andy Greenberg's book *Tracers in the Dark*, which recounts the fact that Mr. Karpeles gave Michael Gronager, who then just started Chainalysis, a thumb drive with the Mt. Gox data on it.

Mr. Gronager reviewed the data, determined that there were deleted files, that it was somehow impure, and then he purportedly asked Mr. Karpeles, do you have a backup data set, and Mr. Karpeles allegedly said, no, this is the only data set, which I think makes this different than every major company in the United States that's been hacked, because every major company in the United States backs up their data.

So Mr. Karpeles allegedly told Mr. Gronager, oh, this is the only set of data that we have. These files were deleted because we were hacked and, moreover, our servers were

physically accessed by the hackers.

So that -- when I read that, that was the basis for looking into the integrity of the Mt. Gox data. And then if you just do a review on the internet, you see that the Mt. Gox data set was leaked, which is evidence of them being hacked. And that there's extensive reporting on this issue.

And then you combine that with, you know, what we've already discussed about Mr. Karpeles's convictions both in France and in Japan for some kind of data fraud manipulation -- I'm going to leave it at that -- but I think it calls the integrity of the Mt. Gox data highly into question.

THE COURT: Well, if you have evidence that you actually want to offer to the Court indicating, as I've said, that the data at issue here itself was changed or altered based on any hacks, I would be all ears to hear that.

But from what I've heard thus far, it sounds more likely that what happened is that someone went in or more than one went in, hacked in and stole money out of accounts, which is different from going in and saying, I'm now going to make it look like there's a transaction involving Mr. Sterlingov when that transaction actually involved Ms. Pelker, and I'm going to go in and change that for some reason.

I can't see a plausible reason why someone would be changing data in that way. There's nothing that's been presented to me to suggest it was being done in that way. What

has been suggested to me is that there was a theft. That's typically what hacks do, go in and steal money.

As I said, if you can show me evidence that there was an alteration of the data that is at issue in this case, I'm all ears.

MR. EKELAND: Understood, Your Honor.

THE COURT: So it is -- it's a little after 2:00 already. I do want to give Ms. Pelker a chance to be heard about Ms. Still and whether any further guidance is necessary on that.

MS. PELKER: Yes, Your Honor. I'll try and be brief. I think that the Court hit the main points. But just noting that there's a lot of areas within Ms. Still's testimony that just fall outside of blockchain tracing that the government would object to.

I think that the opinion that this was a wrongful arrest, anything about FTX, about -- that advertising for privacy is not illegal and the legality of that, anything about wire fraud, data standards, law enforcement best practices; they're just big buckets that are not appropriate for expert testimony.

I think that, as the Court forecast after her testimony, that there's a real issue with her presenting anything from the academic articles that she discussed to the jury insofar as it is, potentially, extremely misleading to the

jury to suggest -- as I think her paper initially -- her report initially did -- that there's this 60 percent error rate for the heuristics that the government is using here.

And when we get into her testimony with just a bit more follow-up, it's clear that these studies are not, in fact, on point with the tracing that the government has done, the heuristics that Chainalysis uses, nor is it clear based on that line of questioning that she sufficiently understands the studies to be able to explain them to the jury or to have -- or that she even, actually, relied on these studies in forming her opinion.

In her testimony she indicated that she had not even read all of the studies that she noted in her report.

And as far as the errors, Your Honor, I think that at this point the government has -- defense has had extensive and ample opportunities to identify with specificity any errors in the Mt. Gox records. When Ms. Still was crossed on that, the only, quote-unquote, error that she could provide was that she did not like that the Mt. Gox user ID information had been exported into a single spreadsheet. That's simply how the trial pulls are done as standard procedure.

And she -- it's not clear whether she was even looking at what the trial pulls were for the case or not. But in any event, at this point the defense, despite ample opportunity, has not identified a single specific error,

specific inconsistency, and it would simply be unfair and a clear violation of Rule 16 for the defense to try and somehow spring that on the government mid-trial.

THE COURT: Okay. Mr. Ekeland?

MR. EKELAND: Just briefly. Ms. Meiklejohn's paper, "How to Peel a Million"; that was commissioned by Chainalysis in reaction to this case specifically to analyze the data. I mean, it mentions our client by name.

You know, we went and we found it. So, you know, I think they want to say that it shouldn't be coming in when they commissioned it particularly to address this case, and then they get a result where it's listing error rates that they don't like. Well, I mean, they paid for it.

And Ms. Still is certainly entitled under 702 to rely on hearsay and look at it. She merely presented an expert summary of what Chainalysis commissioned.

So, you know, I don't think -- and she did read that paper. I think it's a little, you know -- I think that paper is -- she's entirely justified and the defense is entirely justified in relying on the work product of Chainalysis, which I think, effectively, in many ways acts as a government investigator and agent in this case.

You know, I'll leave it at that. And the error rates, you know, I think, are really a prime example of just the wild fluctuation and sort of the random, arbitrary nature

of this whole enterprise, which is not scientific. It's more art than anything.

So I just don't -- I don't see it on Ms. Meiklejohn's paper. As for the --

THE COURT: I'm sorry. Before you move on to another topic on this, your assertions here did remind me -- and I'll issue my pretrial order shortly. But I want to remind counsel very clearly that opening statements are not argument. And saying, for example, the sorts of things you said now would be wholly inappropriate in an opening statement.

You can in your opening statement state what the evidence will show. But it's not your opportunity for argument in the case. I did want to make that clear.

I don't like having to cut counsel off when they're making their opening statements to the jury, but if either side starts engaging in argument instead of, in a professional manner, simply summarizing what they, in good faith, believe the evidence will show, I will cut you off, and I don't want to do it. I'm just giving you that warning now.

But go ahead.

MR. EKELAND: Understood, Your Honor. I'm not planning on arguing in my opening. That, as suggested by the Court, is for closing.

We've made our point about Ms. Meiklejohn's paper. The defense takes the Court's point that it wants concrete

testimony instead of ambiguities or whatnot.

So, Your Honor, unless the Court has anything else from the defense, I'm going to stop on this point.

THE COURT: Ms. Pelker, anything else you want to add on this topic?

MS. PELKER: No, Your Honor. Just that, to the extent that Ms. Still does intend to comment on the paper, as the Court forecasts, there's this potential issue. We certainly would want to be aware of that in advance of our witnesses' testimony so that we can, potentially, either bring up in advance of the defense case or on cross or rebuttal as necessary the --

THE COURT: What I'd like to do is I want to go back and read her testimony again because you've both characterized it in different ways. I don't -- my recollection is not strong enough to remember what her knowledge was and how fluent she was in talking about the paper. So I want to go back and look at that.

But I will let you know before you put your witnesses on the stand whether I'm going to allow that or not so you can plan accordingly.

MS. PELKER: Thank you, Your Honor.

THE COURT: All right. It's ten past 2:00. I have a couple of other matters that I previously indicated that I need to turn to, and then we can turn back to this at 3:00.

Unfortunately, though, Mr. Sterlingov, the jail couldn't accommodate bringing you back on at 3:00. So the question for you is, do you want us to continue just with your lawyers, or would you rather put this off for another day when you can actually be here with us?

THE DEFENDANT: It sounds like there isn't much more for us to do. So I consent for you to continue without me with this for this particular --

THE COURT: By this particular, what I will do is -- my intent then will be to continue in just reviewing which expert reports come in and what guardrails should exist with respect to the expert testimony. Is that acceptable to you?

THE DEFENDANT: Yes.

THE COURT: All right. We'll do that. We'll come back at 3:00 then to continue with that. And then I do think that we've got an awful lot that still needs to get done pending trial. And I do wonder whether we should at least put something on the calendar for either Monday afternoon or Wednesday just to clear up before we actually start any remaining issues that are out there.

MS. PELKER: So, Your Honor, just one thought as a possibility. I know that we have jury selection on Thursday. But that we're not going to get to openings anyway. We could come back on -- be here on Friday, or the 15th. We could come on the 15th --

THE COURT: That's not a bad idea.

MS. PELKER: -- and then just open on Monday, the 18th.

THE COURT: Mr. Ekeland, what do you think of that?

MR. EKELAND: I think that's a good idea. Just so I understand it, jury selection on the 14th, maybe bleeding over into the 15th, and deal with any other outstanding pretrial issues on that Friday, and then we come back and do openings on Monday?

THE COURT: Correct.

MR. EKELAND: Yes, Your Honor. The defense is fine with that.

THE COURT: I think that's what we should do. I'm hopeful that we can actually pick the jury on Thursday. I can tell you that my colleague, Chief Judge Boasberg, would have it done by lunchtime. And I think as long as we apply ourselves and don't go off on too many tangents, we ought to be able to get this done on Thursday.

That sounds good. That way, also, that will give you all a little bit of unfettered time for your trial prep between now and Thursday. I'm going to be getting you some opinions between now and then, and I know there are some things you're waiting to hear from me on. I will do my best. This case has a lot of issues.

I'm doing my best to work through them, and I will

get you opinions as quickly as I can on the open issues.  If there's anything that you really need to hear from me about before you open, make sure that is on my list or that I know it's a priority if it's going to affect how you open in the case.

And so tell me if there's something that's outstanding and you said, this is the one thing or the two things, Judge, that I really need to know about because it's going to affect how I open.

I will tell you on the venue issue and on the issue relating to the D.C. statute, as I've previously indicated to you -- and I'll get you an opinion on this.  It's always possible that when you finish the opinion -- I'm working on it already, but if you finish it, you have something that changes your mind.

But my inclination is to conclude that there is not a venue issue here.  And with respect to whether the D.C. statute applies here or exactly how the treasury regs apply here, I need to work that through.  It has not been -- because it was really -- I raised this sua sponte with the parties and, in fact, the defense hasn't even moved on this ground.  And, in fact, even in their -- in their filing on this, it really continues to talk about venue and doesn't talk about whether the statutes apply or not.

My inclination at this point is to proceed on the

theory that those are in the -- those claims are in the case, but with the understanding that there could still be post-trial briefing if there's a conviction in which, with further briefing and further study on it, I might conclude otherwise.

But given the lateness of the day and the fact that there hasn't been a motion to dismiss those counts, my inclination would be to proceed unless someone disagrees with that. And then, as I said, the defense can file a post-trial motion if they want to.

MS. PELKER: The government thinks that's a sensible way to proceed, Your Honor.

THE COURT: Okay. Mr. Ekeland?

MR. EKELAND: The defense agrees as well, Your Honor.

THE COURT: Okay. Well, thank you all. We'll come back at 3:00, maybe 3:15 at this point, and continue with the experts. Thank you.

MS. PELKER: Thank you, Your Honor.

MR. HASSARD: Thank you, Your Honor.

(Recess taken at 2:17 p.m. until 3:25 p.m., at which time Defendant Roman Sterlingov waived his presence for the following further proceedings:)

THE COURTROOM DEPUTY: Criminal Case No. 21-CR-399, United States of America v. Roman Sterlingov.

Do you want counsel to state their names for the record again, Your Honor?

THE COURT: One counsel for everybody, maybe.

MS. PELKER: Alden Pelker for the United States, along with Christopher Brown and Jeffrey Pearlman.

THE COURT: Thank you.

MR. EKELAND: Tor Ekeland and Michael Hassard for Defendant Roman Sterlingov, who has waived his appearance for this hearing today.

THE COURT: Thank you. The next one I had up was Dr. Dror. I'm happy to hear argument with respect to Dr. Dror.

I will say, the parties don't cite much, if anything, by way of case law on the question of whether testimony of this type is appropriate, and I know -- I think I asked Mr. Ekeland about this during the hearing on Dr. Dror, whether there were cases in which he had previously been qualified as an expert to talk about cognitive bias.

And we've gone to look, and I haven't been able to find any of the cases that you referred us to. So I am curious as to whether anyone can point me to any case in which a witness has either been allowed or not allowed to testify about cognitive biases or any similar type of --

MR. EKELAND: I'm sorry, Your Honor. The connection just froze up.

So the last thing I heard was that the Court couldn't find some of the cases and that you were curious as to -- and then it froze.

THE COURT: I'm curious as to whether there are any cases that the parties are aware of dealing either with Dr. Dror or anyone else being allowed or not allowed to testify about cognitive biases or any similar type of scientific phenomenon.

MR. EKELAND: Your Honor, I would have to go back and look. I mean -- because I just can't recall off the top of my head, and I'm looking at this right now. We're happy to go back and look and submit anything we find to the Court and, of course, ask him.

THE COURT: Well, I will direct that both parties, if anyone has any case law or anything they want me to look at, to file it by Monday. But, Mr. Brown, are you going to point me to something now?

MR. BROWN: Your Honor, I'm afraid I don't have it in front of me either. We're aware -- I remember reading the transcript of Dr. Dror's testimony in a Massachusetts state court, but I don't -- from more than five years ago, so it wouldn't have been in that disclosure. But I don't recall standing here today if that's testimony at trial or testimony in a pretrial *Daubert/Frye*-type hearing. It's also a different system.

In candor, I don't know if this is the same as implicit bias experts. I know that courts, I think, are divided, but sometimes the experts are admitted to talk about

implicit bias.

THE COURT: That strikes me as at least, arguably, analogous. So that might be helpful to the extent that I can be directed towards that case law.

So why don't I go ahead and start with Mr. Ekeland, though, with the understanding that the parties, by Monday at 5:00, will provide me with a notice of any additional cases or materials they want me to review on this question.

MR. EKELAND: Certainly, Your Honor. I believe at the *Daubert* hearing for Dr. Dror, the suggestion was made by him, and if I recall correctly, the Court -- but maybe I'm remembering wrong -- that he could generally testify as to the principle as to what's behind cognitive bias and confirmation bias and let the jury decide just -- essentially, give the jury the tools to decide if that's occurred in this case.

And on Wednesday night at about 10:00 p.m., the government gave us a new production of discovery that contained *Jencks* materials, with a lot of *Jencks* statements from witnesses, investigators in this case that -- on our first review of it, to me, strikes the defense as something that the jury, if given sort of the neutral tools from Dr. Dror, were to look at could find that there's a kind of confirmation bias in this case. Because I think one question that the jury is going to be asking is, essentially, why is this prosecution being brought when, as this Court is well aware, it's the defense's

position that there is no corroborating evidence.

And I think there's that aspect of this case, and there's also the underlying assumptions that are being used in Chainalysis Reactor in terms of the heuristics, which we maintain are subject to confirmation and cognitive bias. And, again, I think it also goes to Ms. Mazars' report where I believe the phrase she used is professional guess.

I think there are a number of places here where the jury would benefit from Dr. Dror's giving them the tools to evaluate whether or not there's cognitive or confirmation bias without necessarily referring to any particular piece of evidence.

THE COURT: So what would he do? Would he just say, generally, let me just tell you about confirmation bias and confirmation bias is a known phenomenon, and sometimes it can have a dramatic effect, sometimes it's less dramatic; and here are some examples of the types of circumstances where you can see confirmation bias?

MR. EKELAND: Yes. I believe in our disclosure for him, that is what -- well, paragraph No. 1, I think, addresses that.

The defense expects Dr. Dror to testify, generally, about cognitive bias in forensic science and particularly the role of confirmation and other biases in digital forensic investigations. And as his CV demonstrates, he has done

extensive research in this area, and he has published extensively in this area. I mean, I think his disclosure speaks for itself on this.

I just think it would be very helpful for the jury to have these tools and the -- you know, the defense thinks it's -- the suggestion that he provides the jury the tools without telling the jury how to use them, in a sense, without necessarily identifying any particular instance.

Although, I will state, based on the *Jencks* material that we received the other night, I would like, if possible, to have a chance to review that. And if we do want him to look at that, maybe submit that by Monday -- I believe you said by 5:00 p.m. -- along with any case law.

THE COURT: Well, I do think -- I mean, I have to say I'm not sure that's going to be helpful because I'm skeptical of the proposition that it would be proper for him to testify about cognitive bias in particular evidence in this case. I mean, that does feel too close to standing in the shoes of the jury. And I also have 403 concerns about that. You're welcome to make the argument, but I'm skeptical about it.

I also am -- putting aside the question about whether this comes in or not -- and I want to look at the case law on that -- I'm particularly skeptical also about some of the stuff that is in the notes, which seems unduly inflammatory and seems to be a 403 issue.

He will explain how miscarriages of justice and misleading evidence highlights human error. You know, I would think it would almost certainly be improper for him to say, you know, let me give you some examples of horrible things that have happened based on cognitive bias, and here's some case in which some poor guy went to jail for 20 years or 50 years based on cognitive bias.

Because, you know, if that comes in, then the government ought to be able to offer evidence of the hundreds of thousands of cases in which people were properly convicted based on forensic evidence. We get way off track doing that. I think that type of thing is almost certainly improper and would be unduly inflammatory.

I guess, to me, the question is just whether it would be proper for him to offer, sort of, very -- just a very neutral summary and saying, you know, cognitive bias is something that exists or confirmation bias is something that exists. I've studied it; this is how it works.

And based on my recollection of his testimony, I'm not sure he's in any position in which he can quantify it, but certainly couldn't quantify it for this case. But that it's something that people need to be sensitive to.

I also am skeptical of the proposition that -- even if I allow it -- it will be proper for him to say, this is what the FBI should do. Because I'm just not sure he has that

expertise and is not in a position, frankly, to know whether that's something that, as a practical matter, the FBI can even reasonably do where, you know, agents who are investigating a crime and they have somebody who they think is a suspect. You say, okay, let's bring in an entirely different team and not tell them who the suspect is and have them do all the analysis.

Based on what I've heard from him, I don't think he had that expertise. He may have provided -- I can't remember, but he may have provided some seminars on his research to law enforcement over the years.

But I think that's different from having the experience about how law enforcement operates that would allow him to be prescriptive and to say, this is what law enforcement should do or this is -- this was a flaw in what was done here versus simply in the way that, you know, I've allowed in the past very brief testimony from an expert witness on false confessions.

They come in and say, sometimes people do falsely confess, and these are the types of things that can lead to false confessions. I'm not saying anything about this case.

And for me, I guess the question here is whether to allow that type of testimony from Dr. Dror saying, you know, there is such a thing as confirmation bias, there is such a thing as cognitive bias, this is how it works. And, you know, I'm not saying one way or the other as to whether it was

present here or not, but this is what it is, and leave it up to the jury to decide what to do with that.

That, to me, is the question as to whether to allow that in. Mr. Ekeland?

MR. EKELAND: I think it would be -- yes, Your Honor. I think it would be entirely appropriate for the Court to allow that type of neutral testimony it just described given the level of assumption or speculation underlying so much of the conclusions in this case.

For instance, if you take a look at that 19-transaction hop that the government, I believe, in Dr. -- not Dr. Scholl -- In Mr. Scholl's report wants to say is Mr. Sterlingov making one of the first, if not the first, deposits into Bitcoin Fog.

You have to make an assumption that at every step in those 19 transactions that Mr. Sterlingov controls the private key; likewise, you have this problem with peel chains. You have this problem, I think, in general with these types of blockchain analytics where you have to make a lot of assumptions, and I think that's where his testimony becomes relevant.

It's relevant in the sense that this case is highly dependent upon speculation, upon guesses, and upon assumptions, and I think that's one of the things that Ms. Mazars de Mazarin was quite honest about. She said I'm making my best

professional guess.

And in that sense, I do think that Dr. Dror, who is, I think, at least academically a well-established expert in this field can be helpful to the jury in evaluating the evidence and coming to the decision as to, well, was that guess right?

THE COURT: Okay. Mr. Brown?

MR. BROWN: Yes, Your Honor. The government takes the position that any testimony from Dr. Dror should be excluded under Rule 702. There's a relevance issue, which I think bleeds into the first prong of 702 about whether this would be helpful to the jury.

I just want to remind the Court that Dr. Dror, during his testimony, looked at that expert disclosure and disowned it in total. He said these are things I might testify -- I might opine about in the future, but I have no opinions about this case.

THE COURT: I think -- I mean, for that reason, as well as the reasons I've given otherwise, I don't think we're talking about him opining about the facts of this case. I think he's stepping into the province of the jury; I think there's a 403 problem with that. I think that there's a failure to disclose that testimony problem with it.

To my mind, as I said before, the only question is whether it would be proper -- what I have in mind is fairly

brief testimony. His direct might be 15 minutes, coming in and simply saying there is such a thing called confirmation bias or cognitive bias.

And when you know the result that you think -- when you're aware of the result that you're looking for, studies show that you're more likely, particularly where there are any subjective steps in the process, to reach that result than if you don't know what it is; something of that nature.

MR. BROWN: Yes, Your Honor. And I think that that actually -- we would have concerns even with that because -- and part of this is there's almost a 403 issue with applying his theories to blockchain analysis the way that Mr. Ekeland just walked through. Because one of the points of his testimony is that to determine whether and how cognitive bias affects a forensic process requires experimental work. It requires field work, observing -- you know, he's done work with fingerprint analysts, with airline pilots, with all sorts of other forensic technicians to understand the kinds of data that they review.

And Dr. Dror admitted during his cross that, depending on the different sort of data, there are more or fewer sources of extraneous contextual information that can lead to cognitive biases. And he has no understanding of blockchain analysis. He has no -- he's spent no time observing any blockchain analysis --

THE COURT: Isn't that a two-edged sword? Wouldn't you be more concerned if he was going to take the stand and say, blockchain analysis is particularly problematic and ought not be relied upon because of all the risks of cognitive bias there because then he really is getting a lot closer to the province of the jury, and it's more prejudicial when he starts talking about the particulars of the evidence in this case?

MR. BROWN: Yes, Your Honor. Although, then at least he would be -- there would be other issues, but he would be speaking more relevantly to the case and not just telling the jury to use their common sense, which is something they already know how to do.

I think just his theories -- the way that his theories work, I think, raises 702 issues on a number of levels. I mean, number one, the presence or absence of cognitive bias. And I think the Court -- the Court asked, how do you quantify or provide a meaningful analytic tool to the jury --

THE COURT: Right.

MR. BROWN: -- about whether there's cognitive bias in this case. This is on page 68 of that transcript. And the answer he gave was, essentially, a nonanswer. I can read it, but --

THE COURT: Okay. Why don't you.

MR. BROWN: It's a word salad. There is no clear,

scientific test for whether cognitive bias exists. He said that he would have to review emails. It's, essentially, a vibes-based determination of, A, whether cognitive bias exists. And then the effect of cognitive bias, he can't say with any scientific certainty what effect that would have on the rightness or wrongness of conclusions.

In fact, he said sometimes they get the wrong conclusion, but sometimes they don't. As to -- oh, you can assign a probability that given test condition A, there is cognitive bias and there's X percent of arriving at an inaccurate result; that was the question. And he agreed with that.

And to the next point about, how do you avoid cognitive bias, he does all these trainings to law enforcement and to other investigators about -- steps to reduce cognitive bias, but he was forthright. He's never tested the efficacy of those.

He said there is no scientific proven data on that. Page 79. No scientific proven data on the efficacy of measures to reduce cognitive bias.

So if he's going to get up in front of the jury -- I think the Court has already indicated in no circumstances he would be able to testify, the agents should have done X, they should have done Y. But if he were to testify that way, he would be testifying about something that he has admitted

himself, for which there is no scientific proven data on that.

I just think that at every step -- he's either just saying something as a truism -- cognitive bias exists everywhere and anywhere -- or it's kind of I know it when I see it. And if it exists, there's no predictive value about whether somebody gets the right answer or the wrong answer.

So I just don't see how this is helpful to the jury. It's certainly not based on any reproducible, reliable scientific techniques. Based on his theories, another cognitive bias expert could look at the same situation and say, there is no cognitive bias. What's the test? There is no test.

The same cognitive bias expert could look at evidence of -- if there is evidence of cognitive bias, is this forensic technician going to get the right answer or the wrong answer? Dr. Dror might say yes; another person would say no. There is no way to test that. There is no scientific basis for that.

THE COURT: I'm in agreement with you with respect to trying to quantify it or to say how it applies here. That was one of the reasons that I indicated that I don't think it should be applied to the facts of this case.

Where I'm still unsure and this is what I want to take a look at the case law about is -- it strikes me as a little bit different, for example, than a memory expert who might take the stand and testify about how memory is not as

certain as you think it is and people forget things all the time.

Because, at least as to some jurors, it seems to me this may be, sort of, outside their usual ken and that most people understand memory fades over time and you forget things. Anyone who has been around me for any period of time knows that memory is not perfect.

And I think that there probably are some sophisticated jurors out there who understand confirmation bias. I'm not sure that everyone in the jury pool would be familiar with that notion and would necessarily understand.

I guess the question to my mind is would it be helpful, for some of the jurors at least, to have that context that, I'm not telling you it happened here, I'm not telling you -- I don't purport to be able to quantify it, but I'm telling you, just general context, that there is a concern that I study, that I'm aware of, and that where people know what the result is that they're looking for, they're more likely to get that result than when they don't know what it is.

MR. BROWN: Yes, Your Honor. I think our concern is that's really -- I mean, that really is just common sense. It's just like a lot of academic statements they're sort of dressing up. A common sense observation that everybody knows, which is people dig in their heels. You know, people don't like to be wrong.

That's a jury argument for a lawyer to make. Our concern is if they put up a Ph.D. with all these degrees and everything, what you're doing is you really are dressing up common sense in the garb of an academic discipline. And that really is a core concern of *Daubert*.

That is the situation where you're concerned about the jury being, sort of, overswayed by the credentials of the person testifying about what is really just a commonsense observation.

THE COURT: All right. Anything else on this, Mr. Ekeland?

MR. EKELAND: Just that the defense agrees with the Court. We think it would -- to the extent that the Court is contemplating this and will agree to this, we think Dr. Dror would -- just some short neutral testimony from him regarding a phenomena would be helpful to the jury.

I do want to note that the standards that Mr. Brown was citing about not being able to quantify things, no scientific basis, quote-unquote, for Dr. Dror's testimony, all those apply to the government's witnesses and Chainalysis Reactor. There is no quantification of the error rate. I'm not going to belabor the point, but it --

THE COURT: Although, there is a difference -- I'm sorry. One difference, though, is that there's verifiability in a different way with respect to the government's case.

And that if -- as Ms. Still will testify, if you think that their tracing was incorrect or you think their analysis was incorrect, you can point to it and say, here's why it was incorrect; here's why that assumption was wrong; here's why CoinJoin changes things; here's why -- we've actually gone out and actually -- they -- they, through Reactor, have assigned a particular address to a particular individual or entity and we've checked them. It's just wrong. We can prove it's wrong.

So there's a different sort of verifiability that applies to what Chainalysis has done versus the more general assertion that people are more likely to reach the result that they want to reach or that they believe to be the correct result than when they're behind the veil of ignorance.

MR. EKELAND: Your Honor, with the caveat that memory is fallible, if I do recall Dr. Dror's testimony, he was rather adamant at some points about how there are scientific principles at play here. And one thing that comes into mind is him saying that it matters what an investigator is told beforehand about somebody. Whether or not they've been told that a person, for instance, has been arrested for a crime or whether they're not told anything, and that there is empirical evidence, and it's some 77 pages long documenting his qualifications in this area.

So I don't think it's just a feel-good thing where --

THE COURT: I'm not suggesting that it is in any way quackery or unscientific. I have no doubt that you can and that you've done studies with particular controls where you say, in this study we told everyone that the subject of the study ate the last cookie in the room as it was passed around.

And in some cases that person did do so and in other cases the person didn't do so. And then you ask everybody going around the table who ate the last cookie. And if you tell them that it was Bob who ate the last cookie and then you say -- ask everybody what's your recollection of who ate the last cookie, there's probably going to be some confirmation bias there, and you're going to go around the room, and it's going to turn out that nine people say he ate the cookie when you told people in advance it was him and only six did under our control.

I don't doubt that there's that type of study. The question is how transferable it is to this context where he hasn't studied this context and where I have concerns supplanting the role of the jury in this context. That's what I have to struggle with, whether sort of the general assertion that it can happen at times is meaningful to the jury as applied in this context or not.

So that's why I'd love to see whether he's been allowed to testify in cases before. I'd like to see any opinions on that. But I'd also like to see any case law

dealing with cognitive bias, confirmation bias, implicit bias, anything else that's analogous that might help guide me on this question because I think it's a close call.

MR. EKELAND: We'll take a look, Your Honor.

THE COURT: Okay. Thanks. Let's do that by Monday at 5:00, if anyone has anything to offer.

All right. Anything else on Mr. Dror -- or Dr. Dror?

MR. BROWN: No, Your Honor.

MR. EKELAND: No, Your Honor.

THE COURT: All right. Should we take up Mr. Verret then?

MR. EKELAND: Yes, Your Honor. I'm just scrolling to his disclosure.

THE COURT: I'm at Docket 122 at pages 24 through 30, which includes a lot of categories and things that he will testify about. I guess I'd like to go one by one through these.

MR. EKELAND: Your Honor, we did a supplemental disclosure for him, which is at Docket 145, and it starts --

THE COURT: I have that. Okay.

MR. EKELAND: And then, additionally, I believe there was a PowerPoint attachment as well that's summarizing his proposed testimony. We're happy to go through this, whatever the Court wants. Docket No. 145-5. I'm looking at page 415 right now where the numbered paragraphs start.

THE COURT: Okay. Why don't we go through that then.

MR. EKELAND: Okay. Paragraph No. 1 says, "Mr. Verret will testify to how the evidence offered by the government is consistent with Sterlingov being early to Bitcoin and using Bitcoin Fog for legitimate personal privacy interests. He will explain why the government's evidence is not consistent with Mr. Sterlingov running the Bitcoin Fog mixer."

THE COURT: So that both strikes me as conclusory in the province of the jury but also just not an adequate disclosure. He's going to testify that the government is wrong. But I don't see, sort of, like what he's going to testify about and why; any of the whys as to any of that.

MR. EKELAND: I believe that comes both later in the disclosure and also in his PowerPoint, if I'm recalling correctly. And what the -- he will testify to -- and, again, Your Honor, the defense takes your points on the concreteness and ambiguity.

But that the government seems to have a theory that the deposits into Mr. Sterlingov's KYC Kraken account are royalty or service fees from Bitcoin Fog.

And Mr. Verret's analysis means to show that, in his expert opinion, those are just entirely consistent with Mr. Sterlingov being an early adopter of Bitcoin, then Bitcoin appreciating, and then him using Bitcoin Fog for privacy

purposes. Because I believe later the concept of wrench attacks -- which are just people coming and physically attacking you to get your wallet based on knowing what -- how much Bitcoin you had, because maybe you did a transaction with them or something.

THE COURT: Let me just pause for a second here. I think as No. 1 is framed, it's just too vague. But to the extent that Mr. Verret wants to testify -- and my recollection is he had not really -- the problem is he hadn't done any of the analysis or he -- I think I asked him if he put anything on paper, and he said he didn't put anything on paper is my recollection.

So I'm just not sure of what his math was or how the government is supposed to evaluate his math. I mean, I think it's appropriate expert testimony to say, here's what the value of Bitcoin was at a particular point, although you've argued you can't do that. But putting that aside, assuming you can value Bitcoin at particular points and show the increase in the value of Bitcoin and say that, had he invested X dollars in Bitcoin at this point, it would have grown to such and such a dollar figure over time. I don't see a problem with that.

Although, my recollection is that, when asked about it, he sort of -- it was kind of hard to believe that he didn't actually put anything on paper to do that type of analysis.

MR. EKELAND: Your Honor, we'd refer to the Court to

his 35-page -- or 35-slide PowerPoint.

THE COURT: I've got that in front of me as well. Why don't you show me where that is in there. Where is the math?

MR. EKELAND: If you look at slides evaluating claim No. 1. That is slide -- let me see here. So there's Slide 1, 2, 3, 4, 5. I think it's the 6th slide in. You'll see a chart where you see the math on the appreciation of Bitcoin at one point; after 12 years it's appreciated some 221 -- 320,000 --

THE COURT: That's okay. That doesn't say anything about, sort of, any individual growth of -- doesn't even tell me what year one is.

MR. EKELAND: Well, year one is the first year that Bitcoin exists.

THE COURT: All right.

MR. EKELAND: Which Satoshi writes his paper in -- what is it? -- 2008 --

THE COURT: Subject to hearing from the government, I don't have a problem with him offering that chart and offering that in as evidence.

That's a little bit different from saying, though, that he's concluded that Mr. Sterlingov's assets are entirely consistent with him having engaged in purely private transactions or not having been an administrator. Showing what the growth of Bitcoin is over time, that strikes me as --

assuming that there's a proper foundation for that, it strikes me as appropriate expert testimony.

MR. EKELAND: Agreed, Your Honor. I would submit to the Court that -- that we think that the level of the disclosures -- Mr. Verret's disclosures are far more fulsome than the government's proposed accountant, Ms. Glave. She really doesn't disclose with any depth or any concreteness the level of her opinions.

I mean, we've gotten her summary slides, which we're reviewing. We're in a position, if she's going to come in and be able to testify as to those slides that -- you know, the slides that we have go to a higher level --

THE COURT: I've told you, subject to my hearing from the government, I'm okay with the slide. What I'm concerned about is just the, sort of, conclusory assertion without any other analysis of saying that the evidence offered by the government is consistent with Mr. Sterlingov having been an early investor in Bitcoin, and this is all for legitimate personal and privacy interests.

Also, I don't mind someone saying that here are the reasons -- you know, based on my experience and expertise, these are the reasons why people might use a mixer. Saying that what Mr. Sterlingov did is consistent with those purposes strikes me as, in essence -- and maybe Mr. Sterlingov is going to take the stand -- I don't know.

But it feels a little bit like him taking the stand through an expert, and I don't think the expert can testify to what Mr. Sterlingov was thinking or what his purpose was. But if he wants to talk in general about here are the various reasons why people do it, and then the government should be able to on cross-examination say one of the other reasons that people do it, of course, is to commit crimes, correct? And if he says no to that question, he's not going to be terribly credible with the jury.

MR. EKELAND: Understood, Your Honor. It might be beneficial if we just keep going down his disclosures. I think, perhaps, the level of detail the Court is looking for is contained there. If not, the Court will let us know.

THE COURT: Okay.

MR. EKELAND: So paragraph 2 says, "Mr. Verret will testify to two key points related to the government's assertion that funds transferred back to Mr. Sterlingov's KYC -- short for know your customer -- Kraken accounts from Bitcoin Fog were fees generated by the operator of Bitcoin Fog.

"First, Mr. Verret will show that the Bitcoin Fog fees were many times larger from the total crypto assets ever attributed to Sterlingov. Second, Mr. Verret will explain that the government has shown no noncrypto assets owned by Mr. Sterlingov whose source is unaccounted for."

THE COURT: All right. Again, I think, to the -- to

the extent he's actually done the math -- and as I said, I recall being very surprised that he said he hadn't actually put anything on paper and done any math. So I'm not sure how he can say some of this.

But I mean, I guess I can say it as well. That it does -- may be in the province of the jury, but yes, a forensic accountant can say that the government asserts that there were transactions of X hundred million dollars by Bitcoin Fog, and the government asserts that the administrator's fee was X percent. And if you do the math, that comes out to X millions of dollars.

You know, I think he's -- the problem is at times he acts more like a lawyer than a witness. I would have real problems if he says, that shows that the government's theory is wrong or that -- where is the money then? Why isn't he driving a Porsche then? That just feels like argument to me; not any expert testimony.

But if he's just doing the math, I don't see a problem with that.

MR. EKELAND: Agreed, Your Honor. Again, I'd refer the Court to his PowerPoint, which, I believe, is tracking his expert disclosures somewhat. And the slide after -- where he does the math on Bitcoin's appreciation, it says the value -- he finds, number one, did Sterlingov receive Bitcoin Fog fees. You know, you see him talking about the historical value of

Bitcoin today.

And you can scroll through the next few slides where he's discussing, for instance, evaluating Claim 1, did Sterlingov receive Bitcoin Fog fees. Sterlingov's financial records do not fit the patterns of money laundering for three reasons. You know, he's got the -- his opinion that the -- Reason No. 2, no explainable -- unexplainable asset holdings, which I believe just looking at the disclosure, of between .6 billion to $1.4 billion in personal wealth of the Bitcoin Fog operator. Which he can testify that he's basing that on, I believe, what's been said about the Bitcoin Fog operator's supposed service fees, I believe, disclosed, if I'm recalling correctly, in the criminal complaint and elsewhere in the government's documentation.

Certainly, as a certified forensic examiner and CPA, you know, he can concretely testify about these things.

THE COURT: Some of this strikes me as fairly unremarkable in which you probably could get, basically, any accountant to testify to. I'm not saying it's improper, but any accountant to say, here's what the government says that the number of transactions were; here's what the percentage was; and it would come to X million dollars, and this is how much money the government has found.

Now, it doesn't prove a whole lot, because I'm sure the government's position is that there are other funds that

are just hidden away that they haven't been able to find at this point. But, I mean, that strikes me as fair game.

As I said before, my concern is more when he starts making arguments and acting more like the lawyer in the case. And I haven't looked carefully at the slides, but my suspicion is that the slides may just include things that cross the line where he's acting more as an advocate or a lawyer than as an expert and he's just making arguments.

We'll just have to -- whether the slides come in or we -- it's an issue for another day, and I'll let you confer with the government about that. It may be that there's some portions that can come in and some can't. To the extent it's just argument or lawyer's argument, you know, I don't think it's proper.

The reason I'm raising this now isn't so much because I'm looking at the slides as we're sitting here now and saying that I see this. But I remember his testimony, and I remember being struck that he just struck me as an advocate and not an expert in many of the things he was saying. And some of the stuff -- I mean, that whole story about his son and his son saying to him, Dad, why isn't he driving some fancy car? And then I said, well, you know, he did have a Tesla. And he said a Tesla wouldn't count. It felt like I was arguing with a lawyer -- having a conversation with a lawyer versus an expert who was actually expressing opinions based on some type of

expertise.

So that's the concern I have with his testimony, just policing that and making sure that he is -- if he's doing forensics and counting numbers and doing math, that's completely fine. But if he's then saying, this, therefore, proves or shows that he didn't do it or where is it then and why hasn't the government found it, that sounds like what your closing argument says, not what an expert witness says.

MR. EKELAND: Understood, Your Honor.

THE COURT: Okay. I'm happy to keep going through these.

MR. EKELAND: I believe we -- we're on No. 3 now, if I recall correctly.

THE COURT: Yes.

MR. EKELAND: "Mr. Verret will testify that the account balance in Mr. Sterlingov's seized accounts show less than 10 percent of the amount that someone running Bitcoin Fog would be expected to have. Mr. Verret will testify that an objective investigator in a case like this would typically use net worth analysis and/or net income analysis to show a large magnitude of assets owned by a suspect that had no known income source net of expenses or known assets net of liabilities to explain them," and then he's got citations.

THE COURT: This does strike me, quite frankly, as -- to the extent my role under *Daubert* is, sort of, policing

misleading the jury with things that seem dressed up in expert terms in ways that really aren't, I mean, I worry a little bit about this.

As I've said a half dozen times already, to the extent he wants to testify and say, I've done the math here and it's $300 million in transactions, and this is what the percentage administrator fee allegedly was, and this is how much money you would expect him to have, fine.

But to then go on and -- I really don't know what the net worth analysis and net income analysis actually adds to that. I don't think that there's a question here about whether we're talking about net worth or income. I don't see how that's particularly relevant or helpful to the jury here.

But my concern is that this suggests -- and there's suggestion of this -- is, look, I'm a forensic scientist here, and I'm telling you that it's X dollars, and this is what -- this is what the math would be. And, look, there's only Y dollars in the account, Q.E.D., he didn't do it; which is just very different from saying that you would expect him to have -- I mean, it's kind of obvious, and I don't have a problem with this.

If, in fact, he was the administrator and he personally was getting paid X percent, $300 million in transactions, you would expect him to have -- plus, with the appreciation of Bitcoin on top of it, you would expect him to

have X millions of dollars. That's fine.

But it starts to get dressed up in sounding like he's saying, based on my expertise he didn't do it because these two accounts don't match up, and I think that's the step that I'm -- that I think is causing me pause. To the extent it's dressed up in financial jargon to make it sound like he has reached some sort of scientific conclusion that it can't have been Mr. Sterlingov, that's problematic.

I think what's obvious here is that if the government's theory is right, either the government is wrong or there are other assets out there, something happened to the other assets. That doesn't strike me as particularly controversial.

But I don't really see how this -- a lot of this jargon and analysis adds anything, and I think it potentially misleads the jury into thinking that you would -- that, as a matter of forensics, you can just look at this and say he didn't do it because it's not in this account.

MR. EKELAND: My understanding of what he's doing here is that he's applying the standards that he was trained in. It's very rigorous training in becoming a certified fraud examiner.

And what he's -- the, quote-unquote, jargon he's using are the standards that he was taught to employ while doing a financial analysis, and I don't read this as him

stating an ultimate conclusion regarding Mr. Sterlingov's guilt or innocence.

But I read this as him saying, this is the type of analysis that you apply, per my training as a CFE, and the government didn't use the standards here in analyzing Mr. Sterlingov's finances and --

THE COURT: There's just no relevance to that, and there's a risk of misleading the jury with that. Because I don't believe the government is arguing otherwise. The government is not saying we've done the math and, in fact, we've accounted for every dollar he would have earned on our theory of the case.

And so to say -- I'm not sure I understand the relevance of saying that the government didn't use the proper CFE tools for purposes of tracing the funds, when the government isn't arguing that it's accounted for all the funds that it says were earned.

The problem is that it's creating a false impression that that's what the government is saying here and, therefore, the government's case is wrong because -- here the government says and suggests that it's found all the money, and that's crazy. And if you apply the net worth analysis instead of using a net income analysis, it's going to show X. It doesn't matter which of those things you do. It's going to come out exactly the same, which is they have not accounted for all the

funds.

MR. EKELAND:  Your Honor, we submit it does matter. We submit it is relevant, and particularly in light of the proposed expert testimony from Ms. Glave and her summary slides.  And we're concerned that she's going to come in and argue a whole bunch of conclusions that weren't disclosed in her expert disclosure.

It's very thin in comparison to Mr. Verret's based on our initial review of her slide deck.  And we think that she may come in and try to opine that there's no way Mr. Sterlingov can have the assets that he had just by being an early investor in Bitcoin.  That's hard for us to tell because there's nothing clear in her disclosure.

Again, we ask if Professor Verret is going to be held to these standards, that those same standards apply to Ms. Glave.

THE COURT:  That's a fair point, Mr. Ekeland.  We have the advantage here that she's going to testify first.  And if there's something that Mr. Verret has to offer to contradict something that she's testified to -- so if she takes the stand and testifies that the amount of funds that were in the Kraken accounts or the other accounts that were seized is more than you would believe that he would have if he was simply relying on the accreted value of Bitcoin over time, I think it's fair that Mr. Verret can respond to that and say, no, actually, it

is consistent with the amount of money that you would expect to find based on the accreted value of the Bitcoin over time. I think that's perfectly fine.

What I'm objecting to is, sort of, the sum notion that there's some equation here and that he's dressing it up in a way that makes it sound like everything the government has seized must be all the assets that were out there and that this is a matter of accounting. You've got your assets and liabilities side and, you know, I've done the math here.

On the one side here is what his assets were, and on the other side here is what he, ultimately, had; and, therefore, it proves that he didn't commit any crime because if -- you would have expected to find additional money in those accounts. By dressing that up in the terms of accounting and so on versus just the commonsense point, which I think the jury can draw on its own.

But I think your point is a fair one, and maybe we just have to wait and see what the government's witnesses say. I think it's fair that Mr. Verret be allowed to respond to that and take issue with what they say.

MR. EKELAND: Understood, Your Honor. Would you like to continue --

THE COURT: Yes.

MR. EKELAND: -- on the disclosure? So I believe we're on paragraph No. 4 now.

"Mr. Verret will testify to the pattern of transfers from what Chainalysis describes as the 'Bitcoin Fog cluster' to accounts owned by Mr. Sterlingov and how they do not show any recognizable pattern that might in some way link Mr. Sterlingov" -- I think there's a word missing here -- "to the operation of Bitcoin Fog. Mr. Verret will rely upon his training as a certified valuation analyst and experience as chief economist and senior counsel for the U.S. House Financial Services Committee to show how the government's attributions appear to be just a random pattern more in line with a regular Bitcoin investor using Bitcoin Fog to obtain some measure of personal privacy."

THE COURT: All right. I'll wait to hear what the government has to say on this one. I think we've already touched on 5.

MR. BROWN: Your Honor, are you asking for me to --

THE COURT: If you want to address it, you're welcome to address 4 now if you like. Given how many there are, this may be easier to do it one at a time.

MR. BROWN: Very good, Your Honor.

On No. 4, first of all, to the extent Mr. Verret is planning to testify about Bitcoin transfers from the Bitcoin Fog cluster, he made it very clear that what he considers blockchain analysis is not actually what Mr. Scholl, Ms. Bisbee, or Ms. Still do. This is totally outside of any

sort of expertise that he has.

The latter part of this -- and recognizable pattern, I don't know what a recognizable pattern is. He certainly didn't testify about it. He certainly doesn't have any basis or knowledge, and it has not been disclosed.

The attributions appear to be just a random pattern more in line with a regular Bitcoin investor using Bitcoin Fog to obtain some measure of personal privacy. This is just -- I mean, again, he's talking about doing some sort of pattern recognition blockchain transactions for which he has no experience, no expertise. And I don't think he has any expertise in what is or is not a regular Bitcoin user versus a Bitcoin -- the operator of a darknet service.

That's something that affects a lot of these other -- these other proposed disclosures.

THE COURT: All right. Mr. Ekeland? What is Mr. Verret's expertise regarding Bitcoin Fog clusters and the sort of tracing of transactions involving Bitcoin?

MR. EKELAND: You know, I mean, his CV references his experience with digital currencies in general.

And as I believe the Court referenced, when it came to Ms. Bisbee, he doesn't -- you don't need an in-depth knowledge of, say, the tracing software or anything, and I think he certainly understands the --

THE COURT: Has he done tracing one way or the other,

even with someone else's software?

MR. EKELAND: That, I would have to -- I won't speak off the top of my head on that. That's entirely possible. It wouldn't surprise me. I think he sits on the Zcash Foundation, if I recall correctly.

And I know he does have extensive experience with cryptocurrencies and teaches it -- you know, classes in relation to cryptocurrency at the law school he teaches at. He's not somebody -- I mean, I think, arguably, he has as much experience as any of the other government witnesses in terms of just general knowledge of cryptocurrency.

I don't think the basic concepts of -- you know, service fees being paid out of the Bitcoin Fog cluster, that concept is, essentially, the same as any kind of royalty payments, and I think, you know -- the Court made the analogy in one of their previous hearings that this is just a little bit like any other financial, kind of, fraud case. I think in this aspect, that's right.

You would -- what he's saying is you would expect what he sees in his expert opinion as a certified fraud examiner doesn't match what he would expect to see from somebody who is getting royalty payments from what the government has, essentially, characterized as a money laundering scheme.

That, I don't think, turns on the nature of the

technology so much as just basic understanding, you know, from a fraud examiner's viewpoint of particular patterns which are recognizable across technology.

THE COURT: Although, I have to say, maybe this just goes to the weight of the evidence. I'll have to think about that.

But it strikes me as, sort of, absurd to suggest that you get somebody who is running an illegal exchange, and they're getting paid a percentage on it. To think that they're going to then have that traceable paycheck at the end of the month -- and here's my paycheck; every month it goes into some other account outside of the mixer.

And the whole point of this is you're dealing -- allegedly dealing with sophisticated people who are hiding transactions. And the notion that -- all this testimony is to say, well, look, if he were doing this -- I know people who get royalties on their textbooks, and my colleagues do, and every month they get a check for $42.30 that shows up in their bank account, and you don't see anything like that here for him.

That just strikes me as so ill-informed as to suggest a lack of expertise, if that's what the testimony is with respect to people who are engaged in illegal -- I mean, if that's all he's saying, I would have expected every month for him to be getting a check or a payment that came out for -- based on his illegal gains.

And maybe -- I don't know if you know what he means by the recognizable pattern, but if that's what he means, it just doesn't seem like there's much of a basis for that assertion.

MR. EKELAND: I don't think that's necessarily what he means. I think what he's testifying to is that this is completely compatible with normal innocent behavior. And one of the issues here that I think is -- that the government is sort of appealing to this -- kind of the darknet and the, sort of, exotic nature of this technology, I think, in the hopes that the jury -- because most people don't understand this technology.

I think the reason that his expert testimony here is so crucial is that what he's saying here is that there's nothing necessarily nefarious about what's going on here, and we would expect if he was getting royalty payments and that these represented the royalty payments, first of all, it doesn't add up right.

Now, if there's some mystery pool of assets that hasn't been discovered, the government has the burden of proof there. Of course, they can argue in closing to the jury that maybe somehow --

THE COURT: I think I've said now more than a dozen times probably that if it's just that math, I'm completely fine with it. And then you can argue to the jury and the government

can argue to the jury what conclusions to draw from that. That is five minutes of testimony.

And I was able to confirm that, in fact, Mr. Verret did testify at the *Daubert* hearing that he's never used any blockchain tracing tool. So to the extent that he's purporting to express opinions with respect to blockchain tracing, I don't see any basis to conclude that he has expertise in the area.

And with respect to recognizable patterns, I guess I'd like to know a little bit from you, Mr. Ekeland, what the -- what that pattern is. What is the pattern that he's using?

MR. EKELAND: If I can just back up to his training, Your Honor. Since he testified, I do know that he's gone through CipherTrace's training, which is a two-day training on blockchain tracing. But in terms of the pattern, we -- the government can cross on that.

I don't know if he's referring to any sort of standard pattern from, like, his CFE training or not. But one thing that --

THE COURT: The answer to my question is you don't know what pattern he's looking at then?

MR. EKELAND: No, I don't.

THE COURT: Okay.

MR. EKELAND: Your Honor, if I may add that the government has noticed Larry Harmon as a witness. And I think

on Friday, you know, there's going to be some issues that the defense is going to have with the government's noticed witnesses in terms of relevance and 403 issues.

One of the things we anticipate them using Mr. Harmon to testify about is to say, well, you know, I disguised my service fees I got from Helix as normal user fees; and, you know, that puts us in the strange position where, you know, it's almost like the defense is being given the burden of proof to show that what looks completely normal and what's, you know, consistent with completely innocent behavior is somehow everywhere and every turn in this case being construed in the negative and nefarious.

That's what I think Mr. Verret is getting at. That this is really -- from his expert opinion as a certified fraud examiner, this is consistent with innocent behavior. You need something more than this kind of speculation. You need some sort of corroborative evidence to go any further.

THE COURT: The point that you've just made now is just argument. I don't think it's expert testimony.

And as I said, I did think that when he was on the stand, he sounded more like a defense lawyer than he did like an expert to me. That was one of the concerns I had.

I do think it's a fair point that he should be entitled to rebut testimony from the government. If the government says -- offers testimony that there are certain

patterns that are nefarious, he, I think, should be allowed to testify and say it's not nefarious if he has a basis for doing so.

And I'm going to have to look at this more carefully to conclude whether he has the expertise with respect to any tracing. As I said, he did testify that he's never used any tracing tool in the past. I'm not sure that a two-day course -- I'd have to look a little bit more carefully to say whether that's sufficient.

MR. BROWN: Your Honor, there's also a disclosure issue. And whatever pattern he claims to have identified has not been disclosed to the government.

Your Honor, setting aside -- let's assume arguendo that he did have -- he was qualified to do blockchain tracing. Like many of these things, the government has no objection to him performing calculations or number crunching. It's taking that next step where -- and a lot of this is, really -- the way that it's framed is kind of a no true Scotsman fallacy where he says no true operator of Bitcoin Fog would do X. That's a back door to make these arguments about the evidence.

The government has no objection to him simply putting up calculations that he's qualified to make and leaving it at that, and then defense counsel can make arguments at closing about what that proves.

THE COURT: All right. Let's move on to 6 then.

MR. EKELAND: Yes, Your Honor. No. 6. I guess we're skipping 5?

THE COURT: 5, I thought, we already addressed.

MR. EKELAND: We did, Your Honor. I agree. I'm sorry.

MR. BROWN: I'm sorry to interrupt, Your Honor. On 5, we have no objection, but I want to point out that defense counsel has raised doubts about whether you can value Bitcoin from 2009. I'm not sure if that's inconsistent with the previous positions taken.

THE COURT: I think I noted that a moment ago myself, but we'll see how that plays out.

MR. BROWN: We don't object to that.

THE COURT: All right. 6?

MR. EKELAND: Yes, Your Honor. "Mr. Verret will explain how the creator of the Bitcoin Fog service displays an expert-level knowledge of blockchain privacy concepts, like anonymity set, transaction history, and post-mix privacy. Mr. Verret will explain these concepts and how he teaches them to students at George Mason University.

"He'll emphasize how someone with the expertise that the creator of Bitcoin Fog has exhibited would not send the proceeds from running a mixer back to their own KYC'd accounts.

"Mr. Verret will testify that a skilled privacy programmer would be significantly likely to send any proceeds

into account logins purchasable on the Tor network sites and then swap them out or transfer them from there. Mr. Verret will also testify that an alternative to that method would be to trade the proceeds peer to peer to effectively obfuscate their source."

THE COURT: So I'll let Mr. Brown address this as well. But my reaction to this is that some of this seems okay. Again, it feels like he's stepping over the line and being an advocate.

So if he wants to testify -- or if you want him to testify and say that here are the various ways in which someone who is seeking to hide their identity in obtaining a login on the Tor network could do so in a way in which no one would be able to trace and know who they are, that strikes me as fine.

If he knows the tools and the ways that people could do it -- and a theory here is that the government argues that Mr. Sterlingov let his guard down in some way and engaged in some transactions in which they know that he originally bought the -- I can't remember what it was -- but the credentials for Bitcoin Fog -- or what is the -- what is it that he purchased?

MR. EKELAND: It's the -- the government is alleging and we're disputing that Mr. Sterlingov in 2011 purchased, basically, the domain name for the clearnet website.

THE COURT: Right. That's what it was. You know, if he wants to say, here are the ways in which someone can

purchase a domain name in which it's not traceable, that's fine.

And then you can argue to the jury and say the government's theory here in this case is that Mr. Sterlingov is the most brilliant fraudster ever to exist, and he's hidden his assets and done X, Y; and yet, you heard Mr. Verret testify that he easily could have done the following things. Why would somebody who is trying to hide their identity -- that's perfectly fine for your argument.

It's not -- the witness ought not be arguing to the jury about those, sort of, inferences and how they play with respect to the ultimate questions in the case. But he can -- certainly, I don't see any problem with him testifying saying, I teach my students that if you want to hide your identity when you're purchasing a domain name, here's how you go about doing it. And the government can cross on that, and that's fine.

Then you can use that as a tool however you like in arguing the case to the jury. I just -- what I'd object to is him putting himself into Mr. Sterlingov's shoes and saying -- you could assume that Mr. Sterlingov didn't -- he's smarter than that; here's all the things he could have done. The government must be wrong about this, because Mr. Sterlingov could have done it; or that he says Bitcoin Fog would not send proceeds -- I don't know how he knows what that person would or wouldn't do.

I mean -- so I think he can testify that all the things you can do to hide your identity, and then you can argue to the jury about whether someone who was allegedly a sophisticated money launderer would commit such a misstep as to allow his identity to be revealed.

MR. EKELAND: Yeah. I think I understand the Court's point in terms of ultimately testifying to ultimate conclusions for the jury. I would just ask for a little nuance explanation, if I may, for my understanding.

So when he's -- in No. 6 he says, for instance, will testify that a skilled privacy programmer would significantly likely send any proceeds into an account, logins, purchasing a Tor network, such and such, is it -- in the Court's eyes, is it permissible to say, well, you know, I teach privacy at George Mason University, I'm an expert in this area, and in my expert opinion it's highly unlikely that somebody who shows the level of sophistication I'm seeing with Bitcoin Fog would put their money in a know your customer Kraken account?

THE COURT: I think if you want --

MR. EKELAND: Expressing it in --

THE COURT: I think that if you want to testify to that, I would require some hard data or studies. And if he can say that, you know, I've looked at 100 cases and in every single one of the hundred cases, this is what they did, I think he can testify to that.

As soon as he starts saying, this is what someone would do, that feels to me more like argument to the jury from counsel versus him saying, I can tell you, based on my experience of looking at a hundred cases, this is how every one of those hundred cases was done. Is that fair?

MR. EKELAND: Understood. Understood, Your Honor.

THE COURT: Okay.

MR. EKELAND: No. 7?

THE COURT: Let me see if Mr. Brown had anything else he wanted to add on this.

MR. BROWN: Your Honor, I think the guardrails that the Court just outlined are totally acceptable to the government. It's just, to the extent it sort of strays into nobody like Mr. Sterlingov or nobody who runs Bitcoin Fog would do X; but if I understand the Court, that's where the boundary line is.

THE COURT: That is correct. I do worry -- and I think, Mr. Ekeland, this is going to be your responsibility to make sure that the witness doesn't stray into this stuff because the last thing I want to be doing in front of the jury is myself being the one to have to restrain the witness and saying -- say to the jury -- saying to the witness, that's not appropriate testimony, I'm going to strike it and direct that the jury disregard anything, perhaps even say that there's not an adequate foundation for that testimony.

So I don't want to be in a position in which he's blurting things out, and then I'm trying to do cleanup afterwards. That's going to be your responsibility to make sure we don't have to do that.

MR. EKELAND: Understood, Your Honor.

THE COURT: All right. 7?

MR. EKELAND: Mr. Verret -- paragraph 7. "Mr. Verret will testify that, because Mt. Gox was repeatedly hacked, there's a distinct possibility that a third-party hacker may have used Sterlingov's Mt. Gox account" -- and I think it's missing a word here -- "the purpose of obfuscating his own unlawful transaction."

THE COURT: I think we've covered this topic with others already. And my view is the same with respect to this. In fact, my recollection is that Mr. Verret, if anything, knew less than others about Mt. Gox. He may have been the one who said he saw a YouTube or something about it at some point, but I don't think he knows anything about what files were hacked, how they were affected.

And I think that it's more prejudicial than probative to say that I heard that there were hacks, and if there were hacks, it's always possible that it affected the data in this case, where there's not a basis for drawing anything beyond, sort of, the most rank form of speculation.

I think that's the case here. So my view is the same

with respect to this one as I've indicated otherwise.

MR. EKELAND: Understood, Your Honor. No. 8. "Mr. Verret will testify that privacy measures are regularly employed by users of cryptocurrency and that efforts to maintain financial privacy are not, as the government repeatedly suggests in their filings, something suspicious or illicit in and of itself."

I think part of this is this disclosure was for the *Daubert* hearings. I don't think he needs to reference government filings at trial. But I think the point being is that he's just going to testify in general. I think this would be helpful for the jury to know that, you know --

THE COURT: I have no objection with him testifying that at times people use cryptocurrency for purposes of maintaining their financial privacy that is unrelated to illicit activity.

As I said, I mean, I think that that will invite, inevitably, the question on cross-examination, which I'm sure you will be prepared for of saying you would concede, wouldn't you, that people do also at times use cryptocurrency to hide illegal activity? You've heard of Silk Road, for example, you've heard of -- and you rattle off the list. And that's all fair game both ways.

But I think that it's a fair point for him to draw that they're not everything; not every use of cryptocurrency is

for purposes of hiding illicit gains or activity.

Okay.  9?

MR. EKELAND:  No. 9.  "Mr. Verret will testify that 'wrench attacks' (assaults and kidnapping) against Bitcoin holders are a real threat to crypto users, in part, because it is easier for a kidnapper or thief to demand that the victim transfer large quantities of money in the low-friction environment of crypto self-custody relative to the higher friction environment of withdrawing large quantities of cash out of a bank.

"See as one example DOJ, U.S. Attorney's Office, Southern District of New York, press release 'Two men charged with a plan to commit house -- home invasion robbery for tens of millions of dollars in Bitcoin.'"

Then there's a hyperlink.  And it says, "Mr. Verret will testify that privacy measures, such as mixing services, are one way that crypto users prevent such attack."

THE COURT:  Mr. Brown?

MR. BROWN:  Your Honor, I'm not sure how much basis there is for this.  Frankly, the government doesn't object to this.

THE COURT:  I mean, that's a little bit of my reaction to it as well.  Again, I think that this is -- just invites cross-examination of, okay -- of the millions of transactions, how many times has this occurred, to your

knowledge?  But if he wants to offer it, that seems okay.

MR. BROWN:  Yes, sir.

THE COURT:  All right.  10?

MR. EKELAND:  Paragraph 10.  "Mr. Verret will testify that totalitarian regimes around the world have used blockchain tracing to abuse human rights protestors."  And I think this is just sort of a subcategory of paragraph 9.

THE COURT:  That doesn't seem right to me.  That strikes to me as -- I don't know.  But this feels a little bit to me like you're suggesting to the jury that Chainalysis and those folks are sort of somehow in cahoots with totalitarian regimes.  It seems like an attack on blockchain analysis.

MR. EKELAND:  That's not the point, Your Honor.  As Chainalysis itself in one of the reports we referenced states, 90 percent of users of mixers do so for legitimate privacy concerns.

And so what the -- I think the defense is getting at here is that, you know, the government wants -- and I'm sure this is -- I expect them to do this in their case.  They want to paint all these privacy tools, like the Tor network and mixers, as some sort of criminality -- for criminal purposes, when the majority of people who use the tools use them for legitimate reasons.  These are concrete examples of their uses; safety, protecting your assets, and -- I mean, the Tor network itself is used all over the world by political

dissidents.

So what this testimony goes to -- and I think it would be helpful for the jury to understand -- is that there's legitimate uses for these privacy tools, and there's a lot of people who use them for those reasons.

THE COURT: Let's back up for a minute. Is that quantifiable in any way? Does he know -- does he have any knowledge one way or the other about whether -- has he interviewed people? What is his basis for saying lots of people use it for this purpose?

MR. EKELAND: Chainalysis has reported that.

THE COURT: I'm not asking you what your basis is. I'm asking what his basis is for it.

MR. EKELAND: I can't say off the top of his [sic] head because I can't speak for him on that point, Your Honor.

THE COURT: And how often has this happened? I mean, at least you gave me an example with No. 9.

Are there examples that you can point me to where totalitarian regimes have used blockchain analysis to abuse human rights protestors?

MR. EKELAND: We're happy to -- well, on there -- we're happy to submit that if we can -- what we can find to the Court by Monday at 5:00 on it.

THE COURT: I mean, the problem is this is supposed to be disclosed in the expert reports. Has he pointed to

anything or identified anything?

It's getting a little late to be, sort of -- I don't want your testimony. I want his testimony on his things. So the question is, is there anything that he's identified?

MR. EKELAND: Not that I'm aware of off the top of my head, Your Honor.

THE COURT: All right. Well, I'm not going to allow it at this point. If you can point me to something that he's actually relied upon or identified, then it's okay.

MR. EKELAND: Understood, Your Honor.

THE COURT: 11?

MR. EKELAND: No. 11. "Mr. Verret will testify that the Bitcoin Fog mixing service was an early tool to address these legitimate privacy concerns and that, according to the government's own estimates" -- I believe here he's referring to the Chainalysis report, which isn't the government -- "most of the activity in the Bitcoin Fog mixer was legitimate."

THE COURT: Well, if he wants to point to the Chainalysis report and he's actually relied on a Chainalysis report that says most of it is legitimate, I don't see a problem with it. Mr. Brown?

MR. BROWN: Your Honor, we don't disagree. I would point out the first part -- well, two additional points.

With defense counsel's clarification that he's referring to Chainalysis estimates, not the government's, I

think that helps --

THE COURT: Right.

MR. BROWN: -- me to understand what that is supposed to be saying.

The first clause of this, it just seems like he's just commenting about the case. You know, we don't object if he wants to bring up a Chainalysis study that says, if it does, most of the activity in Bitcoin Fog was legitimate. I question whether that's an accurate representation of whatever Chainalysis is saying. It might be that it's not known to be illegitimate, which is not the same as saying --

THE COURT: This ought to be tied to whatever Chainalysis said and whatever report he's relying upon. He's allowed to bring that to the jury's attention.

MR. BROWN: Yes.

THE COURT: 12?

MR. EKELAND: No. 12. "Mr. Verret will testify to the findings in multiple public reports, including those done by government contractor Chainalysis, and testify that most transactions sent through mixing services like Bitcoin Fog are done for legitimate privacy concerns and are not illicit. Mr. Verret will describe how comparable analysis of BSA/AML regimes by international financial regulatory bodies demonstrate that a comparable percentage of illicit finance runs through traditional banking institutions and how simply

using Bitcoin Fog would not lead one to automatically suspect that using it was somehow illicit."

And there he cites the Chainalysis report, crypto mixer usage reaches all-time highs in 2022. There's a hyperlink. And then there's an article from the Organization for Economic Development and Cooperation entitled, I believe, "Illicit Financial Flows from Developing Countries Measuring OECD Responses."

And then there's a couple more articles cited. I think that goes just to what we were talking about before.

THE COURT: My answer on this is the same, which is I think commentary and argument concerns me, but to the extent he wants to simply report what are in these studies to the jury, he's entitled to do so. And then you can argue to the jury what inferences to draw from that.

So if he has reliable sources and wants to note that, according to OECD reports, for example, that there is such a -- X volume of money laundering occurs through brick-and-mortar banking institutions around the world, that's fine. If he wants to cite to a Chainalysis report and quote from it as to whatever it says, that's fine.

I would just ask that he stick to whatever those reports say and not twist what's in the reports but rather just simply report what they say.

Any objection to that, Mr. Brown?

MR. BROWN:  No objection, Your Honor.

MR. EKELAND:  Understood, Your Honor.

THE COURT:  Paragraph 13?

MR. EKELAND:  Paragraph 13.  "Mr. Verret will testify that attribution property ownership is a vital element to financial forensic investigations done in compliance with recognized standards.  Mr. Verret will rely upon his CFF and CFE designations, his experience as a fraud examiner, and his review of the DOJ's published best practice that directs employees of federal agencies how to appropriately collect and process material in crypto financial forensics investigations."

And he cites, See Michele R. Korver, C. Alden Pelker, and Elizabeth Poteat -- if I'm saying that right -- and the title in quotations is "Attribution in Cryptocurrency Cases," Department of Justice Journal of Law and Practice, from February 2019 at page 233.  And he gives a hyperlink.

THE COURT:  Can you explain to me a little bit more of what this means.  I'm not sure I follow.

Do you simply mean that you -- if you think somebody is stealing, you want to find the goods?

MR. EKELAND:  I think, if I understand this correctly, Your Honor, is that what he's trying to say is you have to identify -- before you're going to do some sort of forensic financial analysis of somebody like I believe Ms. Glave is going to attempt -- or attempt to testify to, you

need to identify and attribute all the assets you can. And he's merely, I think, referring to the standards that are recognized and are discussed in the DOJ manual as part of financial forensic analysis.

THE COURT: All right. Mr. Brown?

MR. BROWN: Your Honor, just two quick points. Number one, I'm not sure just the relevance of he'll testify about the attribution of property ownership is a vital element, et cetera, et cetera. And also just, to the extent that he's relying on some characterization of DOJ policies, he testified explicitly he's not -- he has no expertise in DOJ policies. "The internal policies of Department of Justice, no, I wouldn't hold myself out as an expert in DOJ policy." That's a direct quote; page 133. It's also not a policy doc.

THE COURT: I'm sorry?

MR. BROWN: It's also not a policy document.

THE COURT: Right. You know, I probably ought to take a look at the document here. I am concerned that it's, frankly, just being used to take a shot at Ms. Pelker, and that it's of borderline relevance. I will take a look at it and see whether I really think it is relevant here or whether it's more the nature of trying to take a shot at Ms. Pelker. So I will look at that.

MR. EKELAND: Your Honor?

THE COURT: Yes.

MR. EKELAND: I think what he's talking about is best established practices in relationship to property attribution, not necessarily DOJ policy; but understood.

THE COURT: Also, I mean, if this really is a recognized practice of all of the documents out there that might support recognized practice, the notion that he would cite to a Department of Justice Journal of Law and Practice article that, apparently, is just published online, at least --

MR. BROWN: Your Honor --

THE COURT: -- it makes my antenna go up to say that this is more about taking a shot at Ms. Pelker than it is at establishing what the recognized practice is.

If this really is a recognized standard, there's got to be something beyond an article that Ms. Pelker's name is on that is published online to support that proposition. If the only source for it is the article that Ms. Pelker has published online, then I'm less convinced that this is some established recognized standard.

MR. EKELAND: I take the "See" in the citation to indicate that it's not an exclusive list of just one article, but he's -- understood, Your Honor.

THE COURT: Okay. I'm doubtful about -- certainly, about citing to the Pelker article on this, and I'm not sure I understand the point. But I will take a look at this one a little more carefully.

MR. EKELAND: Thank you, Your Honor.

THE COURT: Let me just pause for a second here. The court reporter has been going a long time now, and we're only up to 14. She was handling all the other matters that you weren't handling.

So I guess what I'm inclined to do, if it's okay with the court reporter, is do maybe another two of these, and then I think we're going to maybe have to put the rest of it off until Friday.

MR. BROWN: Very well, Your Honor. We do have a few questions and housekeeping items before we break for the day.

THE COURT: Well, maybe we should do that instead. Why don't we pause here and do those matters, and we can come back to this on Friday.

MR. BROWN: So, Your Honor, we had one question in terms of witness sequencing.

THE COURT: Yes.

MR. BROWN: The question has to do with out-of-order witnesses, in particular relating to our translators. For example, we will have translations that we want to introduce into evidence. And given the defense position, we're prepared to offer our translators as witnesses, but we want to get the Court's position about whether the translators need to proceed or whether we can admit translated documents conditionally subject to the translators coming in.

THE COURT: Mr. Ekeland, what's your view on that?

MR. EKELAND: That's a -- can I reserve on that? Otherwise, I'm going to be inclined to say I want the translator to come up first before the document is conditionally offered.

We are hoping -- I'm hoping to talk to Mr. Pearlman over the weekend and early next week via email to try and resolve these translation issues, or at least whittle them down to where there's a clear disagreement. And I'm hoping that access to our client -- which has really, I think, been the hurdle here -- will alleviate this problem.

So if I have to take a position right now, then I'm going to say we want the translator up first to be able to challenge anything before it's offered. But I would rather try and get through the weekend and try to work something out before I would take that position.

MR. BROWN: Your Honor, this is -- setting aside the translation issue substantively, this is more of just a trial management question. And, relatedly, the other sequencing question is to the extent that there are electronic -- there are documents, for example, retrieved from an electronic device, you know, would we have to lay the full groundwork, the chain of custody and the extraction before hearing testimony about those documents?

The issue here, especially for the devices, is we

will have to recall witnesses multiple times just the way --
the nature of the way the evidence has to come in.

THE COURT: Right.

MR. BROWN: We would have to call a witness to talk about the electronic device extraction, call another witness to talk about what was found on it, call that first witness to talk about interpreting the terms or whatever are in the notes that were retrieved from the device that was in the possession of Mr. Sterlingov.

It would be just in terms of trial management; given that this is a very long trial to begin with, it would be just much more efficient to be able to take some evidence out of order in that sense.

THE COURT: Why don't I leave it like this. Why don't you or Mr. Pearlman confer with Mr. Ekeland about this over the weekend. I'm going to direct that the parties file a joint status report on Monday by 5:00 p.m. I know you've got a lot going on.

But particularly with respect to the translation, Mr. Ekeland, it's going to make a difference to me of what the nature of the differences of opinion are. And if it's a difference of opinion about whether a word in French is best translated to mean deposit or put, it's going to be very hard for me to see any prejudice to putting that in front of the jury -- putting it in front of the jury; and then you can, if

need be, put your witness on the stand and the government can put its witness on the stand and you-all can dispute whether the word is put or deposit. And that's all fine, and it's not going to cause any prejudice to take that out of turn that way.

On the other hand, if there's evidence that might, actually, be excluded -- it seems unlikely to me that I'm going to then conclude that the evidence ought to be excluded. It's much more likely that I'm going to say it's up to the jury to decide whether the better translation is the word put or deposit. And I suspect both are legitimate translations or interpretations and that one may fit the context better, and the jury can decide.

On the other hand, if there is evidence which could be highly prejudicial where there's a significant question about whether it should come in or not, and -- hypothetically, there's a note in Russian from Mr. Sterlingov that says, great idea, I'm going to create Bitcoin Fog to launder money -- and there's a chain of custody question about whether that actually was his or somebody else's, I'm not going to say, well, conditionally let's put it in and then I'll decide later whether it's properly admitted or not. It's going to depend on the context.

So I'll let you confer. Tell me what the actual disputes are about, if there are any that remain, and then I can decide. I may have to decide. I know you need some

guidance as to when to have people here, but we can also talk about this a little bit on Thursday and Friday, if need be, if it's a matter of just figuring out when to have folks here.

But, hopefully, the parties can work things out. I think the bottom line is -- and I hope this is the parties' attitude about this as well -- if it makes a difference, I understand why you might want to determine admissibility first. If it doesn't make any difference, let's do what is easiest for the jury and is going to get us through the case as quickly as possible.

MR. BROWN: Very good.

THE COURT: I'm sorry. Mr. Ekeland, was there something you wanted to say?

MR. EKELAND: Mr. Brown can proceed, and then I can say what I was going to say.

MR. BROWN: I didn't want to interrupt. I can't see Mr. Ekeland, so I don't know when he's starting to speak.

We have another matter to raise before we leave, but if Mr. Ekeland wants to respond.

THE COURT: Anything on that issue before we turn to the next matter, Mr. Ekeland?

MR. EKELAND: Just very quickly. It's -- hopefully, the main issue with the translations is just our client being able to review them. He asked us to hold off on certifying them until -- because of what little he was able to review.

Hopefully, this move and getting access to him will take care of that.

And I just want to confirm that the Court's not expecting an answer for that by Monday at 5:00. I don't know if we're, realistically, going to be able to have the kind of contact that we need with our client in order to do that. That's all.

THE COURT: I'm just going to ask that you do your best. If the jail won't let you see your client, there's nothing I can do about that, and I understand. And I don't know when he's moving as well. I can't promise you that's going to happen tonight or tomorrow or sometime next week. I don't know the answer to that question. I think it's one of those things that the Marshals Service prefers not to necessarily share.

MR. BROWN: Your Honor, from the government's side, the sooner we get guidance on this, the better. We do have to make travel arrangements for out-of-town witnesses, and it's -- it's been a challenge to, sort of, play this three-dimensional chess of trying to schedule different witnesses.

THE COURT: Right. If we need to convene sometime next week even before Thursday to discuss some of these issues, we can do so.

MR. BROWN: Yes, Your Honor.

THE COURT: Ms. Pelker?

MS. PELKER: Yes, Your Honor. Just a brief follow-up on Your Honor's concern about the Mt. Gox authentication question.

THE COURT: Yes, thank you.

MS. PELKER: I was able to reach out to our Office of International Affairs who relayed the Court's concern about the lack of certification from the trustee. The Tokyo prosecutor's office was much more interested in the Court's concerns than in anything raised by me.

And so we are -- again, it's, obviously, on a condensed timeline. We are endeavoring to obtain that business record certification from the Mt. Gox trustee. Japan inquired as to whether there -- the standard treaty form which tracks the typical 902(11) business records form language is what the Court is looking for or if there's anything additional that the Court, in particular, wanted in any sort of representation from the trustee.

THE COURT: I think what I was looking for is just someone to tell me that what is on the hard drive is what was downloaded from the system -- from the Mt. Gox system.

MS. PELKER: Understood, Your Honor. Thank you.

THE COURT: I appreciate that. I appreciate the fact that the Japanese government is, actually, responsive to what I think.

MS. PELKER: Again, Your Honor, no promises; they

still have to go through their processes. They did take this very seriously and are endeavoring to --

THE COURT: I appreciate that. Also, if you can get to me as well the MLAT, if there was any response to the MLAT other than simply providing the certifications, that would be helpful to have as well.

MS. PELKER: Yes, Your Honor. We may need to do some additional follow-up on that. The MLAT wasn't issued for our case. It is not part of our discovery.

THE COURT: I see.

MS. PELKER: It's for another case. There may be the -- we'll just have to follow up with that prosecutor in the Office of International Affairs about what we're --

THE COURT: If it's something that needs to be filed under seal, I understand, particularly if it relates to another case.

MS. PELKER: Understood, Your Honor.

THE COURT: All right. Anything else before we adjourn then? It is Friday afternoon at 5:05.

MS. PELKER: Nothing from the government, Your Honor.

THE COURT: Mr. Ekeland, anything else?

MR. EKELAND: Nothing from the defense, Your Honor.

THE COURT: Thank you all and thank you for the court staff for a very full day today. Have a nice weekend everyone.

(The hearing adjourned at 5:08 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 12th day of September, 2023.

/s/ Tamara M. Sefranek
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C.  20001

**$**

$300 [2] - 66:6, 66:23
$42.30 [1] - 74:18

**'**

'Bitcoin [1] - 71:2
'Two [2] - 86:12
'wrench [1] - 86:4

**/**

/s [1] - 103:9

**1**

1 [6] - 42:20, 57:2, 58:7, 59:6, 63:3
1.4 [1] - 63:9
10 [4] - 14:2, 65:17, 87:3, 87:4
100 [1] - 82:23
10005 [1] - 1:20
10:00 [1] - 41:16
11 [2] - 89:11, 89:12
11:20 [1] - 4:6
12 [4] - 18:21, 59:9, 90:16, 90:17
122 [1] - 56:14
12th [1] - 103:7
13 [3] - 18:21, 92:3, 92:4
1301 [1] - 1:17
133 [1] - 93:14
14 [2] - 18:22, 95:4
145 [1] - 56:19
145-5 [1] - 56:24
14th [1] - 36:6
15 [1] - 48:1
15th [3] - 35:24, 35:25, 36:7
16 [1] - 32:2
18th [1] - 36:3
19 [1] - 46:16
19-transaction [1] - 46:11
1:20 [1] - 1:6
1:21-CR-0399 [1] - 1:3

**2**

2 [6] - 14:3, 15:5, 15:11, 59:7, 61:15, 63:7
20 [2] - 20:14, 44:6
20001 [3] - 1:12, 1:24, 103:11
20005 [1] - 1:17
2008 [1] - 59:17

2009 [1] - 79:9
2011 [2] - 7:19, 80:22
2011/2012 [1] - 8:1
2012 [2] - 7:19, 9:21
2016 [1] - 7:22
2019 [3] - 92:16
202-354-3246 [1] - 1:25
2022 [1] - 91:4
2023 [2] - 1:5, 103:7
20530 [1] - 1:14
21-399 [1] - 2:2
21-CR-399 [1] - 38:22
221 [1] - 59:9
233 [1] - 92:16
24 [1] - 56:14
2:00 [2] - 30:7, 34:23
2:17 [1] - 38:19

**3**

3 [2] - 59:7, 65:12
30 [2] - 1:20, 56:14
320,000 [1] - 59:9
333 [2] - 1:24, 103:11
35-page [1] - 59:1
35-slide [1] - 59:1
3553 [1] - 6:11
3:00 [4] - 34:25, 35:2, 35:15, 38:15
3:15 [1] - 38:15
3:25 [1] - 38:19

**4**

4 [4] - 59:7, 70:25, 71:18, 71:21
403 [8] - 20:11, 21:19, 27:5, 43:19, 43:25, 47:22, 48:11, 77:3
415 [1] - 56:24

**5**

5 [5] - 59:7, 71:15, 79:2, 79:3, 79:7
50 [1] - 44:6
5:00 [6] - 41:7, 43:13, 56:6, 88:23, 97:17, 100:4
5:05 [1] - 102:19
5:08 [1] - 102:25

**6**

6 [6] - 11:12, 63:8, 78:25, 79:1, 79:14, 82:10
60 [1] - 31:2
601 [1] - 1:11

6714 [2] - 1:23, 103:10
68 [1] - 49:21
6th [1] - 59:7

**7**

7 [3] - 83:8, 84:6, 84:7
702 [8] - 23:4, 24:18, 26:19, 26:25, 32:14, 47:10, 47:11, 49:14
77 [1] - 54:23
79 [1] - 50:19

**8**

8 [2] - 1:5, 85:2
8:30 [1] - 4:5
8th [1] - 1:20

**9**

9 [5] - 14:1, 86:2, 86:3, 87:7, 88:17
90 [1] - 87:15
901 [3] - 5:13, 6:4, 6:9
902 [1] - 6:4
902(11 [1] - 101:14
950 [1] - 1:14

**A**

a.m [2] - 4:5, 4:6
ability [2] - 26:12, 103:6
able [20] - 3:1, 22:4, 31:9, 36:17, 39:16, 44:9, 50:23, 52:15, 53:18, 60:11, 61:6, 64:1, 76:3, 80:14, 96:13, 97:12, 99:24, 99:25, 100:5, 101:5
absence [1] - 49:15
absent [2] - 20:17, 21:17
absurd [2] - 25:8, 74:7
absurdity [1] - 23:14
abuse [2] - 87:6, 88:19
academic [3] - 30:24, 52:22, 53:4
academically [1] - 47:3
acceptable [2] - 35:12, 83:12
accepted [1] - 13:2
access [13] - 3:2, 3:5, 3:8, 3:9, 3:20, 3:23, 13:11, 21:23, 21:24, 21:25, 96:10, 100:1
accessed [1] - 29:1
accessible [1] - 13:10

accommodate [1] - 35:2
according [2] - 89:14, 91:17
accordingly [1] - 34:21
account [10] - 57:20, 65:16, 66:18, 67:18, 74:12, 74:19, 80:1, 82:12, 82:18, 84:10
accountant [4] - 60:6, 62:7, 63:19, 63:20
accounted [3] - 68:11, 68:16, 68:25
accounting [2] - 70:8, 70:14
accounts [9] - 29:18, 61:18, 65:16, 67:4, 69:22, 70:14, 71:3, 79:23
accreted [2] - 69:24, 70:2
accurate [3] - 19:11, 90:9, 103:4
act [1] - 9:22
acted [2] - 15:24, 16:7
acting [2] - 64:4, 64:7
Action [1] - 1:2
actions [1] - 28:2
activity [16] - 13:20, 14:18, 15:20, 16:1, 16:2, 16:9, 22:13, 23:18, 24:10, 24:13, 85:16, 85:21, 86:1, 89:17, 90:8
acts [3] - 9:7, 32:21, 62:13
actual [2] - 15:9, 98:23
adamant [1] - 54:17
add [6] - 8:21, 14:5, 34:4, 75:18, 76:24, 83:10
added [1] - 8:4
addition [1] - 20:10
additional [6] - 22:3, 41:7, 70:13, 89:23, 101:15, 102:8
additionally [1] - 56:21
address [8] - 8:7, 11:9, 32:11, 54:7, 71:17, 71:18, 80:6, 89:13
addressed [2] - 19:18, 79:3
addresses [1] - 42:20
adds [2] - 66:10, 67:15
adequate [2] - 57:10, 83:25
adjourn [1] - 102:19

adjourned [1] - 102:25
administrating [1] - 7:20
administrative [1] - 11:25
administrator [3] - 59:24, 66:7, 66:22
administrator's [1] - 62:9
administrators [1] - 11:13
admissibility [1] - 99:7
admit [2] - 26:10, 95:24
admitted [4] - 40:25, 48:20, 50:25, 98:21
adopter [1] - 57:24
advance [3] - 34:9, 34:11, 55:14
advantage [1] - 69:18
advertising [1] - 30:17
advocate [3] - 64:7, 64:18, 80:9
Affairs [2] - 101:6, 102:13
affect [2] - 37:4, 37:9
affected [4] - 21:18, 27:11, 84:19, 84:22
affects [2] - 48:15, 72:14
afraid [1] - 40:15
afternoon [8] - 2:6, 2:8, 2:11, 2:12, 2:15, 2:17, 35:18, 102:19
afterwards [1] - 84:3
agencies [1] - 92:10
agent [1] - 32:22
agents [2] - 45:3, 50:23
ago [3] - 10:3, 40:18, 79:11
agree [3] - 15:11, 53:14, 79:4
agreed [3] - 50:11, 60:3, 62:20
agreement [1] - 51:18
agrees [2] - 38:13, 53:12
ahead [2] - 33:20, 41:5
airline [1] - 48:17
ALDEN [1] - 1:13
Alden [3] - 2:6, 39:2, 92:12
alert [1] - 16:12
all-time [1] - 91:4
allegedly [5] - 28:19, 28:23, 66:7, 74:14, 82:3
alleging [1] - 80:21

alleviate [1] - 96:11
allow [13] - 3:18, 4:9, 4:10, 17:21, 20:18, 34:20, 44:24, 45:12, 45:22, 46:3, 46:6, 82:5, 89:7
allowed [10] - 26:19, 39:19, 40:3, 45:15, 55:24, 70:19, 78:1, 90:14
allowing [1] - 21:19
almost [6] - 23:9, 24:17, 44:3, 44:12, 48:11, 77:8
alteration [1] - 30:4
altered [1] - 29:14
alternative [1] - 80:3
ambiguities [1] - 34:1
ambiguity [1] - 57:18
America [2] - 2:3, 38:23
AMERICA [1] - 1:2
amount [4] - 23:25, 65:17, 69:21, 70:1
ample [2] - 31:16, 31:24
analogous [3] - 18:5, 41:3, 56:2
analogy [1] - 73:15
analysis [28] - 16:14, 22:16, 24:14, 45:6, 48:12, 48:24, 48:25, 49:3, 54:3, 57:22, 58:10, 58:24, 60:16, 65:20, 66:10, 67:15, 67:25, 68:4, 68:22, 68:23, 71:24, 87:12, 88:19, 90:22, 92:24, 93:4
analyst [1] - 71:7
analysts [1] - 48:17
analytic [3] - 22:3, 24:5, 49:17
analytics [1] - 46:19
analyze [1] - 32:7
analyzing [1] - 68:5
Andy [1] - 28:12
anonymity [1] - 79:18
answer [9] - 49:22, 51:6, 51:15, 76:20, 91:11, 100:4, 100:13
answered [1] - 6:25
antenna [1] - 94:10
anticipate [1] - 77:4
anyway [2] - 3:19, 35:23
appealing [3] - 11:16, 11:21, 75:9
appear [3] - 26:8, 71:10, 72:6

appearance [1] - 39:6
applied [2] - 51:21, 55:22
applies [3] - 37:18, 51:19, 54:11
apply [7] - 36:16, 37:18, 37:24, 53:20, 68:4, 68:22, 69:15
applying [2] - 48:11, 67:20
appreciate [4] - 16:11, 101:22, 102:3
appreciated [1] - 59:9
appreciating [1] - 57:25
appreciation [3] - 59:8, 62:23, 66:25
appropriate [11] - 18:19, 23:16, 24:16, 24:18, 26:4, 30:20, 39:12, 46:6, 58:15, 60:2, 83:23
appropriately [1] - 92:10
arbitrary [1] - 32:25
area [5] - 43:1, 43:2, 54:24, 76:7, 82:15
areas [1] - 30:13
arguably [2] - 41:2, 73:9
argue [9] - 10:4, 10:10, 69:6, 75:21, 75:25, 76:1, 81:3, 82:2, 91:14
argued [1] - 58:16
arguendo [2] - 7:25, 78:13
argues [1] - 80:16
arguing [6] - 33:22, 64:23, 68:9, 68:16, 81:10, 81:18
argument [18] - 10:19, 21:22, 22:7, 22:9, 33:8, 33:12, 33:16, 39:9, 43:20, 53:1, 62:16, 64:13, 65:8, 77:19, 81:9, 83:2, 91:12
argumentative [1] - 21:11
arguments [4] - 64:4, 64:8, 78:20, 78:23
arrangements [2] - 3:1, 100:18
arrest [1] - 30:17
arrested [1] - 54:21
arriving [1] - 50:10
art [1] - 33:2
article [6] - 91:5, 94:8, 94:14, 94:16, 94:20,

94:23
articles [2] - 30:24, 91:9
aside [4] - 43:21, 58:17, 78:13, 96:17
aspect [3] - 23:22, 42:2, 73:18
aspects [1] - 21:21
aspersions [1] - 28:8
assaults [1] - 86:4
assertion [5] - 54:12, 55:20, 60:15, 61:16, 75:4
assertions [1] - 33:6
asserts [2] - 62:7, 62:9
asset [1] - 63:7
assets [15] - 59:22, 61:21, 61:23, 65:21, 65:22, 67:11, 67:12, 69:11, 70:7, 70:8, 70:10, 75:19, 81:6, 87:24, 93:1
assign [1] - 50:9
assigned [1] - 54:7
Assistance [1] - 5:15
assistant [2] - 4:8, 4:10
assistants [2] - 3:22, 3:25
assume [4] - 9:4, 17:9, 78:13, 81:20
assuming [2] - 58:17, 60:1
assumption [3] - 46:8, 46:15, 54:4
assumptions [3] - 42:3, 46:20, 46:23
ate [5] - 55:5, 55:8, 55:9, 55:10, 55:13
attachment [1] - 56:22
attack [2] - 86:17, 87:12
attacking [1] - 58:3
attacks [1] - 58:2
attacks' [1] - 86:4
attempt [2] - 92:25
attempting [1] - 16:7
attention [1] - 90:14
attitude [1] - 99:6
Attorney's [1] - 86:11
attorneys [2] - 4:5, 4:10
attribute [1] - 93:1
attributed [1] - 61:22
attribution [3] - 92:5, 93:8, 94:2
Attribution [1] - 92:14
attributions [2] - 71:9, 72:6
AUSA [1] - 2:8

authentic [1] - 5:14
authentication [2] - 4:15, 101:2
automatically [1] - 91:1
Ave [1] - 1:17
Avenue [3] - 1:14, 1:24, 103:11
avoid [1] - 50:13
aware [7] - 34:9, 40:2, 40:16, 41:25, 48:5, 52:17, 89:5
awful [1] - 35:16

# B

background [1] - 18:12
backs [1] - 28:22
backup [1] - 28:18
bad [1] - 36:1
balance [1] - 65:16
bank [2] - 74:18, 86:10
banking [2] - 90:25, 91:19
base [1] - 20:10
based [23] - 13:3, 25:11, 28:1, 28:8, 29:14, 31:7, 43:9, 44:5, 44:6, 44:11, 44:19, 45:7, 50:3, 51:8, 51:9, 58:3, 60:21, 64:25, 67:3, 69:8, 70:2, 74:25, 83:3
basic [2] - 73:12, 74:1
basing [1] - 63:10
basis [23] - 18:20, 19:24, 21:17, 22:14, 24:4, 24:5, 25:14, 27:11, 27:19, 27:22, 28:5, 29:2, 51:17, 53:19, 72:4, 75:3, 76:7, 78:2, 84:23, 86:19, 88:9, 88:12, 88:13
bears [2] - 8:15, 10:14
becomes [1] - 46:20
becoming [1] - 67:21
BEFORE [1] - 1:8
beforehand [1] - 54:20
begin [2] - 9:14, 97:11
behavior [4] - 27:10, 75:7, 77:10, 77:15
behind [2] - 41:13, 54:14
belabor [2] - 23:20, 53:22
beneficial [1] - 61:11

benefit [1] - 42:9
best [10] - 22:19, 30:19, 36:23, 36:25, 46:25, 92:9, 94:1, 97:22, 100:9, 103:6
better [4] - 19:18, 98:9, 98:11, 100:17
between [4] - 27:13, 36:20, 36:22, 63:8
beyond [5] - 10:17, 20:11, 21:8, 84:23, 94:14
bias [42] - 39:15, 40:24, 41:1, 41:13, 41:14, 41:22, 42:5, 42:10, 42:14, 42:15, 42:18, 42:23, 43:17, 44:5, 44:7, 44:16, 44:17, 45:23, 45:24, 48:2, 48:3, 48:14, 49:4, 49:16, 49:20, 50:1, 50:3, 50:4, 50:10, 50:14, 50:16, 50:20, 51:3, 51:10, 51:11, 51:13, 51:14, 52:10, 55:12, 56:1
biases [4] - 39:20, 40:4, 42:24, 48:23
big [1] - 30:20
billion [2] - 63:9
Bisbee [2] - 71:25, 72:22
bit [16] - 4:17, 17:2, 17:5, 31:4, 36:20, 51:24, 59:21, 61:1, 66:2, 73:17, 76:9, 78:8, 86:22, 87:9, 92:17, 99:2
Bitcoin [67] - 7:20, 8:1, 17:24, 18:13, 19:6, 19:15, 22:13, 23:21, 46:14, 57:4, 57:5, 57:7, 57:21, 57:24, 57:25, 58:4, 58:16, 58:18, 58:19, 58:20, 59:8, 59:14, 59:25, 60:18, 61:18, 61:19, 61:20, 62:8, 62:24, 63:1, 63:4, 63:9, 63:11, 65:17, 66:25, 69:12, 69:24, 70:2, 71:6, 71:11, 71:22, 72:7, 72:12, 72:13, 72:17, 72:18, 73:13, 78:19, 79:8, 79:16, 79:22, 80:20, 81:23, 82:17, 83:14, 86:4, 86:14, 89:13, 89:17, 90:8, 90:20, 91:1, 98:17

**Bitcoin's** [1] - 62:23
**bleeding** [1] - 36:6
**bleeds** [1] - 47:11
**blockchain** [16] -
30:14, 46:19, 48:12,
48:24, 48:25, 49:3,
71:24, 72:10, 76:5,
76:6, 76:15, 78:14,
79:17, 87:5, 87:12,
88:19
**blurting** [1] - 84:2
**Boasberg** [1] - 36:15
**Bob** [1] - 55:9
**bodies** [1] - 90:23
**bolstered** [1] - 6:9
**book** [1] - 28:13
**Book** [2] - 17:8, 17:9
**borderline** [1] - 93:20
**bottom** [1] - 99:5
**bought** [1] - 80:18
**boundary** [1] - 83:15
**break** [1] - 95:11
**brick** [1] - 91:18
**brick-and-mortar** [1] -
91:18
**brief** [5] - 26:17,
30:11, 45:16, 48:1,
101:1
**briefing** [3] - 16:14,
38:3, 38:4
**briefly** [1] - 32:5
**brilliant** [1] - 81:5
**bring** [4] - 34:10, 45:5,
90:7, 90:14
**bringing** [1] - 35:2
**brought** [1] - 41:25
**BROWN** [43] - 1:10,
2:8, 7:7, 8:10, 9:10,
10:12, 11:23, 12:3,
12:19, 13:1, 14:13,
40:15, 47:8, 48:9,
49:8, 49:20, 49:25,
52:20, 56:8, 71:16,
71:20, 78:10, 79:6,
79:13, 83:11, 86:19,
87:2, 89:22, 90:3,
90:15, 92:1, 93:6,
93:16, 94:9, 95:10,
95:15, 95:18, 96:17,
97:4, 99:11, 99:16,
100:16, 100:24
**Brown** [16] - 2:8, 7:5,
7:6, 11:22, 14:9,
39:3, 40:13, 47:7,
53:17, 80:6, 83:9,
86:18, 89:21, 91:25,
93:5, 99:14
**BSA/AML** [1] - 90:22
**buckets** [1] - 30:20
**bunch** [1] - 69:6

**Bundy** [1] - 12:4
**burden** [4] - 8:15,
10:14, 75:20, 77:8
**business** [4] - 4:23,
9:21, 101:11, 101:14
**buying** [1] - 13:15

## C

**cahoots** [1] - 87:11
**calculations** [2] -
78:16, 78:22
**calendar** [1] - 35:18
**candor** [1] - 40:23
**cannot** [2] - 3:11,
15:14
**Canyon** [1] - 15:19
**car** [1] - 64:21
**care** [1] - 100:1
**carefully** [4] - 64:5,
78:4, 78:8, 94:25
**carry** [2] - 16:8
**carrying** [1] - 15:25
**cars** [1] - 22:16
**Case** [2] - 2:2, 38:22
**case** [69] - 6:18, 10:23,
12:7, 12:23, 14:19,
14:22, 19:2, 20:3,
20:23, 21:19, 24:11,
27:12, 27:14, 27:21,
27:22, 27:24, 30:4,
31:23, 32:7, 32:11,
32:22, 33:13, 34:11,
36:23, 37:5, 38:1,
39:11, 39:18, 40:12,
41:4, 41:15, 41:19,
41:23, 42:2, 43:13,
43:17, 43:22, 44:5,
44:21, 45:20, 46:9,
46:22, 47:17, 47:20,
49:7, 49:10, 49:21,
51:21, 51:23, 53:25,
55:25, 64:4, 65:19,
68:12, 68:20, 73:17,
77:11, 81:4, 81:12,
81:18, 84:23, 84:25,
87:19, 90:6, 99:9,
102:9, 102:11,
102:16
**Cases** [1] - 92:14
**cases** [14] - 14:21,
39:14, 39:17, 39:24,
40:2, 41:7, 44:10,
55:6, 55:7, 55:24,
82:23, 82:24, 83:4,
83:5
**cash** [1] - 86:9
**casting** [1] - 28:7
**categories** [1] - 56:15
**caused** [1] - 19:18

**causing** [1] - 67:5
**caution** [2] - 9:20,
12:20
**caveat** [1] - 54:15
**CEO** [4] - 20:3, 27:10,
27:23, 28:2
**certain** [2] - 52:1,
77:25
**certainly** [13] - 32:14,
34:9, 41:9, 44:3,
44:12, 44:21, 51:8,
63:15, 72:3, 72:4,
72:24, 81:13, 94:22
**certainty** [1] - 50:5
**CERTIFICATE** [1] -
103:1
**certification** [11] -
4:18, 4:19, 4:21,
4:23, 4:25, 5:3, 5:6,
5:19, 5:20, 101:7,
101:12
**certifications** [1] -
102:5
**certified** [5] - 63:15,
67:21, 71:7, 73:20,
77:14
**certify** [1] - 103:3
**certifying** [4] - 4:22,
5:20, 5:22, 99:24
**cetera** [2] - 93:9
**CFE** [4] - 68:4, 68:15,
76:18, 92:8
**CFF** [1] - 92:7
**chain** [3] - 6:5, 96:23,
98:18
**Chainalysis** [22] -
28:15, 31:7, 32:6,
32:16, 32:20, 42:4,
53:20, 54:11, 71:2,
87:10, 87:14, 88:11,
89:16, 89:19, 89:25,
90:7, 90:10, 90:13,
90:19, 91:3, 91:20
**chains** [1] - 46:17
**challenge** [2] - 96:14,
100:19
**chance** [2] - 30:8,
43:11
**change** [3] - 12:17,
18:18, 29:22
**changed** [1] - 29:14
**changes** [2] - 37:14,
54:5
**changing** [1] - 29:24
**characterization** [1] -
93:10
**characterized** [3] -
9:18, 34:14, 73:23
**charged** [2] - 15:5,
86:12

**chart** [2] - 59:7, 59:19
**charts** [2] - 26:3, 26:6
**check** [4] - 3:24, 4:8,
74:18, 74:24
**checked** [1] - 54:8
**chess** [1] - 100:20
**chief** [1] - 71:8
**Chief** [1] - 36:15
**chock** [1] - 16:21
**Chris** [1] - 2:8
**CHRISTOPHER** [1] -
1:10
**Christopher** [1] - 39:3
**chuckle** [1] - 23:13
**CipherTrace's** [1] -
76:14
**circumstances** [3] -
5:12, 42:17, 50:22
**citation** [1] - 94:19
**citations** [1] - 65:23
**cite** [3] - 39:10, 91:20,
94:7
**cited** [1] - 91:9
**cites** [2] - 91:3, 92:12
**citing** [2] - 53:18,
94:23
**claim** [1] - 59:5
**Claim** [1] - 63:3
**claims** [2] - 38:1,
78:11
**clandestine** [1] -
13:20
**clarification** [1] -
89:24
**clarity's** [1] - 25:16
**classes** [1] - 73:7
**classic** [1] - 9:12
**clause** [1] - 90:5
**cleanup** [1] - 84:2
**clear** [14] - 13:6,
13:18, 13:21, 22:25,
31:5, 31:7, 31:22,
32:2, 33:13, 35:19,
49:25, 69:13, 71:23,
96:9
**clearly** [1] - 33:8
**clearnet** [1] - 80:23
**client** [6] - 3:9, 32:8,
96:10, 99:23, 100:6,
100:9
**close** [2] - 43:18, 56:3
**closer** [1] - 49:5
**closing** [5] - 22:9,
33:23, 65:8, 75:21,
78:23
**cluster** [2] - 71:23,
73:13
**cluster'** [1] - 71:2
**clusters** [1] - 72:17

**cognitive** [31] - 39:15,
39:20, 40:4, 41:13,
42:5, 42:10, 42:23,
43:17, 44:5, 44:7,
44:16, 45:24, 48:3,
48:14, 48:23, 49:4,
49:16, 49:20, 50:1,
50:3, 50:4, 50:10,
50:14, 50:15, 50:20,
51:3, 51:10, 51:11,
51:13, 51:14, 56:1
**CoinJoin** [1] - 54:5
**colleague** [1] - 36:15
**colleagues** [1] - 74:17
**collect** [1] - 92:10
**COLUMBIA** [1] - 1:1
**combine** [1] - 29:7
**coming** [5] - 32:10,
47:5, 48:1, 58:2,
95:25
**comment** [1] - 34:7
**commentary** [1] -
91:12
**commenting** [1] - 90:6
**comments** [1] - 7:3
**commissioned** [3] -
32:6, 32:11, 32:16
**commit** [5] - 18:9,
61:7, 70:12, 82:4,
86:13
**committed** [1] - 9:6
**Committee** [1] - 71:9
**common** [5] - 23:7,
49:11, 52:21, 52:23,
53:4
**commonly** [1] - 13:2
**commonsense** [2] -
53:8, 70:15
**communication** [1] -
4:8
**company** [4] - 27:6,
27:10, 28:20, 28:22
**comparable** [2] -
90:22, 90:24
**comparison** [1] - 69:8
**compatible** [1] - 75:7
**complaint** [1] - 63:13
**complete** [1] - 103:5
**completely** [5] - 65:5,
75:7, 75:24, 77:9,
77:10
**compliance** [1] - 92:6
**complicated** [1] - 11:1
**conceal** [2] - 16:1,
16:9
**concealment** [1] -
13:15
**concede** [1] - 85:19
**concept** [2] - 58:1,
73:14

concepts [3] - 73:12, 79:17, 79:19
concern [13] - 19:18, 20:11, 27:4, 27:5, 52:16, 52:20, 53:2, 53:5, 64:3, 65:2, 66:14, 101:2, 101:6
concerned [6] - 22:6, 49:2, 53:6, 60:14, 69:5, 93:18
concerns [10] - 16:10, 43:19, 48:10, 55:18, 77:22, 87:16, 89:14, 90:21, 91:12, 101:8
conclude [7] - 18:21, 24:4, 37:16, 38:4, 76:7, 78:5, 98:7
concluded [1] - 59:22
conclusion [3] - 50:8, 67:7, 68:1
conclusions [8] - 22:5, 25:9, 25:11, 46:9, 50:6, 69:6, 76:1, 82:7
conclusory [3] - 21:11, 57:9, 60:15
concrete [4] - 21:3, 22:3, 33:25, 87:23
concretely [1] - 63:16
concreteness [2] - 57:17, 60:7
condensed [1] - 101:11
condition [1] - 50:9
conditionally [3] - 95:24, 96:5, 98:20
conduct [1] - 16:4
conducted [3] - 14:16, 16:4, 20:15
conducting [1] - 16:6
confer [4] - 2:24, 64:10, 97:15, 98:23
CONFERENCE [2] - 1:4, 1:7
confess [1] - 45:19
confessions [2] - 45:17, 45:20
confirm [4] - 2:18, 17:9, 76:3, 100:3
confirmation [14] - 41:13, 41:22, 42:5, 42:10, 42:14, 42:15, 42:18, 42:24, 44:17, 45:23, 48:2, 52:9, 55:11, 56:1
confronted [1] - 19:7
confusing [3] - 4:17, 8:19, 11:8
confusion [1] - 4:7
connection [3] -

27:13, 28:3, 39:21
connections [1] - 28:6
consent [1] - 35:7
consents [1] - 2:19
consider [3] - 10:2, 10:20, 11:15
considerably [1] - 16:14
considerations [1] - 14:25
considered [1] - 9:12
considers [1] - 71:23
consistent [10] - 16:20, 57:4, 57:7, 57:23, 59:23, 60:17, 60:23, 70:1, 77:10, 77:15
conspiracies [1] - 14:20
conspiracy [24] - 8:14, 8:23, 8:24, 9:5, 9:6, 9:7, 9:12, 9:14, 9:17, 9:20, 9:23, 9:24, 10:5, 10:8, 10:9, 10:11, 11:6, 14:22, 15:2, 15:3, 15:4, 15:5, 15:12
conspiratorial [1] - 15:6
conspired [1] - 12:3
constant [1] - 17:22
constitutes [1] - 103:4
Constitution [2] - 1:24, 103:11
construed [1] - 77:11
contact [1] - 100:6
contained [2] - 41:17, 61:13
contains [1] - 22:7
contemplating [1] - 53:14
context [8] - 52:13, 52:16, 55:17, 55:18, 55:19, 55:22, 98:11, 98:22
contextual [1] - 48:22
continue [6] - 35:3, 35:7, 35:10, 35:15, 38:15, 70:22
continued [1] - 9:7
continues [2] - 9:5, 37:23
continuing [1] - 9:13
contractor [1] - 90:19
contradict [1] - 69:19
control [1] - 55:15
controlled [1] - 13:16
controls [2] - 46:16, 55:3
controversial [1] -

67:13
convene [1] - 100:21
conversation [1] - 64:24
convicted [1] - 44:10
conviction [1] - 38:3
convictions [1] - 29:8
convinced [2] - 19:25, 94:17
cookie [5] - 55:5, 55:8, 55:9, 55:11, 55:13
Cooperation [1] - 91:6
copy [1] - 6:15
core [1] - 53:5
correct [6] - 9:9, 10:6, 36:10, 54:13, 61:7, 83:17
correctly [6] - 41:11, 57:16, 63:13, 65:13, 73:5, 92:22
corroborating [1] - 42:1
corroborative [1] - 77:17
counsel [15] - 2:4, 2:5, 2:19, 2:20, 3:20, 18:4, 19:12, 33:7, 33:14, 38:24, 39:1, 71:8, 78:23, 79:8, 83:3
counsel's [1] - 89:24
count [3] - 9:20, 15:12, 64:23
Count [3] - 14:3, 15:5, 15:11
counting [1] - 65:4
Countries [1] - 91:7
country [1] - 27:6
counts [3] - 7:14, 9:19, 38:6
couple [5] - 8:6, 17:14, 17:16, 34:24, 91:9
course [4] - 40:10, 61:7, 75:21, 78:8
court [5] - 3:11, 40:18, 95:3, 95:7, 102:23
Court [42] - 1:22, 1:23, 3:13, 3:15, 6:16, 8:7, 9:18, 11:12, 16:25, 20:16, 28:12, 29:13, 30:12, 30:22, 33:23, 34:2, 34:8, 39:23, 40:9, 41:11, 41:25, 46:6, 47:13, 49:16, 50:22, 53:13, 56:24, 58:25, 60:4, 61:12, 61:13, 62:21, 72:21, 73:15, 83:12, 83:15, 88:23, 101:15,

101:16, 103:10
COURT [170] - 1:1, 2:11, 2:17, 2:23, 3:16, 4:2, 4:9, 4:14, 4:17, 5:3, 5:24, 6:1, 6:3, 6:13, 6:15, 6:19, 6:23, 7:3, 7:6, 7:9, 7:12, 8:8, 8:20, 9:3, 9:16, 10:3, 10:24, 11:22, 12:2, 12:8, 12:25, 13:5, 14:9, 15:10, 15:17, 17:7, 17:11, 20:25, 23:8, 24:3, 24:22, 25:7, 25:12, 25:14, 25:19, 25:24, 26:5, 26:16, 27:2, 29:12, 30:7, 32:4, 33:5, 34:4, 34:13, 34:23, 35:9, 35:14, 36:1, 36:4, 36:10, 36:13, 38:12, 38:14, 39:1, 39:4, 39:8, 40:1, 40:11, 41:2, 42:13, 43:14, 47:7, 47:18, 49:1, 49:19, 49:24, 51:18, 53:10, 53:23, 55:1, 56:5, 56:10, 56:14, 56:20, 57:1, 57:9, 58:6, 59:2, 59:10, 59:15, 59:18, 60:13, 61:14, 61:25, 63:17, 65:10, 65:14, 65:24, 68:7, 69:17, 70:23, 71:13, 71:17, 72:16, 72:25, 74:4, 75:23, 76:20, 76:23, 77:18, 78:25, 79:3, 79:11, 79:14, 80:6, 80:24, 82:19, 82:21, 83:7, 83:9, 83:17, 84:6, 84:13, 85:13, 86:18, 86:22, 87:3, 87:8, 88:6, 88:12, 88:16, 88:24, 89:7, 89:11, 89:18, 90:2, 90:12, 90:16, 91:11, 92:3, 92:17, 93:5, 93:15, 93:17, 93:25, 94:4, 94:10, 94:22, 95:2, 95:12, 95:17, 96:1, 97:3, 97:14, 99:12, 99:20, 100:8, 100:21, 100:25, 101:4, 101:18, 101:22, 102:3, 102:10, 102:14, 102:18, 102:21, 102:23, 103:1
Court's [10] - 11:25, 14:1, 22:25, 33:25,

82:6, 82:13, 95:23, 100:3, 101:6, 101:8
Courthouse [1] - 1:23
courtroom [1] - 2:21
COURTROOM [2] - 2:2, 38:22
courts [1] - 40:24
cover [1] - 2:23
covered [1] - 84:13
covers [1] - 16:10
CPA [1] - 63:15
crazy [1] - 68:22
CRC [2] - 1:22, 103:9
create [1] - 98:17
creating [1] - 68:18
creator [2] - 79:16, 79:22
credentials [2] - 53:7, 80:19
credible [1] - 61:9
crime [4] - 10:9, 45:4, 54:21, 70:12
crimes [1] - 61:7
criminal [4] - 2:2, 38:22, 63:13, 87:21
Criminal [1] - 1:2
criminality [1] - 87:21
criticizing [1] - 21:22
CRM [1] - 1:16
cross [8] - 34:11, 48:20, 61:6, 64:6, 76:16, 81:16, 85:18, 86:24
cross-examination [3] - 61:6, 85:18, 86:24
crossed [1] - 31:17
CRR [2] - 1:22, 103:9
crucial [2] - 7:19, 75:14
crunching [1] - 78:16
crypto [6] - 61:21, 86:5, 86:8, 86:17, 91:3, 92:11
cryptocurrencies [1] - 73:7
cryptocurrency [6] - 73:8, 73:11, 85:4, 85:14, 85:20, 85:25
Cryptocurrency [1] - 92:14
culture [5] - 23:2, 23:3, 23:7, 23:21, 23:23
curious [3] - 39:17, 39:24, 40:1
currencies [1] - 72:20
custody [3] - 86:8, 96:23, 98:18
customer [2] - 61:18, 82:18

**Appx1847**

cut [3] - 23:8, 33:14, 33:18
CV [2] - 42:25, 72:19

## D

D.C [5] - 1:5, 7:15, 37:11, 37:17, 103:11
Dad [1] - 64:21
danger [1] - 8:12
Dark [1] - 28:13
dark [3] - 11:17, 11:21, 12:24
darknet [12] - 11:13, 11:19, 11:24, 12:9, 12:16, 12:22, 12:24, 13:18, 72:13, 75:9
data [42] - 19:1, 19:10, 19:25, 20:4, 20:8, 21:17, 21:23, 21:25, 22:4, 24:14, 26:21, 27:1, 27:3, 27:5, 27:11, 27:14, 27:20, 27:23, 28:1, 28:8, 28:15, 28:16, 28:18, 28:19, 28:22, 28:24, 29:3, 29:5, 29:9, 29:11, 29:14, 29:24, 30:4, 30:19, 32:7, 48:18, 48:21, 50:18, 50:19, 51:1, 82:22, 84:22
Dated [1] - 103:7
Daubert [5] - 41:10, 53:5, 65:25, 76:4, 85:9
Daubert/Frye [1] - 40:21
Daubert/Frye-type [1] - 40:21
days [2] - 3:2, 3:6
DC [4] - 1:12, 1:14, 1:17, 1:24
de [1] - 46:24
deal [5] - 12:8, 12:12, 15:21, 16:13, 36:7
dealing [5] - 13:15, 40:2, 56:1, 74:13, 74:14
decide [9] - 26:10, 41:14, 41:15, 46:2, 98:9, 98:12, 98:20, 98:25
decision [1] - 47:5
deck [1] - 69:9
deeper [1] - 11:5
DEFENDANT [2] - 35:6, 35:13
defendant [7] - 8:15, 9:15, 9:21, 10:19,

14:16, 16:4, 16:6
Defendant [5] - 1:6, 1:18, 2:13, 38:20, 39:6
defense [40] - 2:16, 4:19, 8:12, 8:13, 8:14, 8:15, 9:13, 10:13, 10:20, 11:18, 18:4, 23:3, 26:18, 26:22, 31:15, 31:24, 32:2, 32:19, 33:25, 34:3, 34:11, 36:11, 37:21, 38:8, 38:13, 41:20, 42:22, 43:5, 53:12, 57:17, 77:2, 77:8, 77:21, 78:23, 79:7, 87:17, 89:24, 95:21, 102:22
defense's [2] - 15:12, 41:25
defenses [1] - 10:22
defer [1] - 20:21
definition [4] - 17:3, 17:5, 23:9, 24:17
definitive [1] - 17:15
degrees [1] - 53:2
deleted [2] - 28:17, 28:24
demand [1] - 86:6
demonstrate [1] - 90:24
demonstrates [1] - 42:25
demonstrative [1] - 26:11
demonstratives [2] - 26:3, 26:13
Department [5] - 1:13, 1:16, 92:15, 93:12, 94:7
dependent [1] - 46:23
deposit [3] - 97:23, 98:3, 98:10
deposits [2] - 46:14, 57:20
depth [2] - 60:7, 72:22
DEPUTY [2] - 2:2, 38:22
describe [1] - 90:22
described [1] - 46:7
describes [1] - 71:2
deserves [1] - 27:7
designations [1] - 92:8
despite [1] - 31:24
detail [1] - 61:12
determination [1] - 50:3
determine [4] - 6:6, 19:5, 48:14, 99:7

determined [1] - 28:16
Developing [1] - 91:7
Development [1] - 91:6
device [3] - 96:22, 97:5, 97:8
devices [1] - 96:25
diagrams [1] - 26:7
difference [6] - 53:23, 53:24, 97:20, 97:22, 99:6, 99:8
differences [1] - 97:21
different [15] - 21:5, 28:4, 28:20, 29:19, 34:15, 40:21, 45:5, 45:11, 48:21, 51:24, 53:25, 54:10, 59:21, 66:19, 100:20
difficult [1] - 22:5
dig [1] - 52:24
digital [2] - 42:24, 72:20
dimensional [1] - 100:19
dire [3] - 12:9, 12:10, 12:11
direct [5] - 40:11, 48:1, 83:23, 93:13, 97:16
directed [1] - 41:4
directly [1] - 19:19
directs [1] - 92:9
dirty [1] - 15:2
disagree [1] - 89:22
disagreement [1] - 96:9
disagrees [1] - 38:7
disappears [1] - 10:9
disavow [1] - 18:14
disavowing [1] - 19:20
discipline [1] - 53:4
disclose [2] - 47:23, 60:7
disclosed [5] - 63:12, 69:6, 72:5, 78:12, 88:25
disclosure [14] - 40:19, 42:19, 43:2, 47:14, 56:13, 56:19, 57:11, 57:15, 63:8, 69:7, 69:13, 70:24, 78:10, 85:8
disclosures [6] - 18:3, 60:5, 61:11, 62:22, 72:15
discovered [1] - 75:20
discovery [2] - 41:17, 102:9
discuss [1] - 100:22

discussed [3] - 29:8, 30:24, 93:3
discussing [1] - 63:3
disguised [1] - 77:5
dismiss [1] - 38:6
disowned [1] - 47:14
displays [1] - 79:16
disprove [1] - 24:6
dispute [1] - 98:2
disputes [1] - 98:24
disputing [1] - 80:22
disregard [1] - 83:24
dissidents [1] - 88:1
distinct [1] - 84:9
DISTRICT [3] - 1:1, 1:1, 1:8
District [1] - 86:12
divided [1] - 40:25
doc [1] - 93:14
docket [2] - 14:2, 56:24
Docket [2] - 56:14, 56:19
docketing [1] - 14:3
document [3] - 93:16, 93:18, 96:4
documentation [2] - 5:1, 63:14
documenting [1] - 54:23
documents [9] - 4:15, 5:10, 18:24, 19:5, 19:21, 94:5, 95:24, 96:21, 96:24
DOJ [8] - 1:11, 1:16, 86:11, 93:3, 93:10, 93:11, 93:13, 94:3
DOJ's [1] - 92:9
DOJ-CRM [1] - 1:16
dollar [2] - 58:21, 68:11
dollars [8] - 58:19, 62:8, 62:11, 63:22, 66:16, 66:18, 67:1, 86:14
domain [3] - 80:23, 81:1, 81:15
done [31] - 17:9, 22:16, 25:6, 29:25, 31:6, 31:21, 35:16, 36:16, 36:18, 42:25, 45:14, 48:16, 50:23, 50:24, 54:11, 55:3, 58:9, 62:1, 62:3, 66:5, 68:10, 70:9, 72:25, 81:6, 81:7, 81:21, 81:23, 83:5, 90:18, 90:21, 92:6
door [2] - 27:12, 78:20
double [1] - 3:24

double-check [1] - 3:24
doubt [5] - 10:17, 17:3, 17:6, 55:2, 55:16
doubtful [1] - 94:22
doubts [1] - 79:8
down [6] - 8:18, 10:18, 19:12, 61:11, 80:17, 96:8
downloaded [3] - 5:4, 5:10, 101:20
dozen [2] - 66:4, 75:23
Dr [21] - 39:9, 39:13, 40:2, 40:17, 41:10, 41:21, 42:9, 42:22, 45:22, 46:11, 46:12, 47:2, 47:9, 47:13, 48:20, 51:16, 53:14, 53:19, 54:16, 56:7
dramatic [2] - 42:16
draw [9] - 22:5, 25:4, 25:9, 25:10, 28:6, 70:16, 76:1, 85:24, 91:15
drawing [1] - 84:23
drawn [1] - 22:24
dressed [3] - 66:1, 67:2, 67:6
dressing [4] - 52:23, 53:3, 70:5, 70:14
drive [10] - 3:2, 3:4, 3:6, 5:8, 22:13, 22:18, 24:10, 24:12, 28:15, 101:19
drives [2] - 24:7, 24:8
driving [3] - 22:14, 62:15, 64:21
drop [1] - 3:4
Dror [17] - 20:22, 39:9, 39:13, 40:3, 41:10, 41:21, 42:22, 45:22, 47:2, 47:9, 47:13, 48:20, 51:16, 53:14, 56:7
Dror's [4] - 40:17, 42:9, 53:19, 54:16
drugs [2] - 13:8, 13:9
during [5] - 3:11, 7:21, 39:13, 47:13, 48:20

## E

early [6] - 57:4, 57:24, 60:18, 69:11, 89:13, 96:7
earned [2] - 68:11, 68:17
ears [2] - 29:15, 30:5
easier [2] - 71:19, 86:6

easiest [1] - 99:8
easily [1] - 81:7
ECF [1] - 14:2
Economic [1] - 91:6
economist [1] - 71:8
edged [1] - 49:1
effect [4] - 14:22, 42:16, 50:4, 50:5
effective [1] - 10:23
effectively [2] - 32:21, 80:4
efficacy [2] - 50:16, 50:19
efficient [1] - 97:12
efforts [1] - 85:4
either [9] - 21:9, 33:15, 34:10, 35:18, 39:19, 40:2, 40:16, 51:2, 67:10
EKELAND [103] - 1:18, 2:12, 2:22, 3:7, 3:21, 4:7, 4:13, 7:10, 7:13, 8:22, 9:17, 10:6, 11:12, 13:24, 15:11, 16:24, 17:10, 20:24, 22:25, 23:19, 24:19, 25:5, 25:10, 25:13, 25:16, 25:21, 26:14, 26:17, 28:11, 30:6, 32:5, 33:21, 36:5, 36:11, 38:13, 39:5, 39:21, 40:6, 41:9, 42:19, 46:5, 53:12, 54:15, 56:4, 56:9, 56:12, 56:18, 56:21, 57:2, 57:14, 58:25, 59:5, 59:13, 59:16, 60:3, 61:10, 61:15, 62:20, 65:9, 65:12, 65:15, 67:19, 69:2, 70:21, 70:24, 72:19, 73:2, 75:5, 76:12, 76:22, 76:24, 79:1, 79:4, 79:15, 80:21, 82:6, 82:20, 83:6, 83:8, 84:5, 84:7, 85:2, 86:3, 87:4, 87:13, 88:11, 88:14, 88:21, 89:5, 89:10, 89:12, 90:17, 92:2, 92:4, 92:21, 93:24, 94:1, 94:19, 95:1, 96:2, 99:14, 99:22, 102:22
Ekeland [36] - 1:19, 2:13, 2:18, 2:24, 7:9, 8:20, 9:16, 11:11, 13:23, 15:10, 16:11, 16:23, 20:23, 22:21, 26:6, 32:4, 36:4,

38:12, 39:5, 39:12, 41:5, 46:4, 48:12, 53:11, 69:17, 72:16, 76:9, 83:18, 96:1, 97:15, 97:20, 99:12, 99:17, 99:19, 99:21, 102:21
electronic [3] - 96:20, 96:21, 97:5
element [4] - 8:11, 13:12, 92:5, 93:8
elements [3] - 10:16, 11:3, 15:8
Elizabeth [1] - 92:13
elsewhere [1] - 63:13
email [1] - 96:7
emails [1] - 50:2
emphasize [1] - 79:21
empirical [1] - 54:22
employ [1] - 67:24
employed [1] - 85:4
employees [1] - 92:10
end [2] - 9:14, 74:10
endeavoring [2] - 101:11, 102:2
enforcement [6] - 14:11, 30:19, 45:10, 45:12, 45:13, 50:14
engage [1] - 9:23
engaged [8] - 13:19, 22:17, 23:18, 24:9, 24:13, 59:23, 74:22, 80:17
engaging [1] - 33:16
enterprise [1] - 33:1
entirely [8] - 28:9, 32:19, 45:5, 46:6, 57:23, 59:22, 73:3
entirety [1] - 6:21
entitled [4] - 32:14, 77:24, 91:6, 91:14
entity [1] - 54:8
environment [2] - 86:8, 86:9
equation [1] - 70:5
error [9] - 21:4, 21:5, 31:2, 31:18, 31:25, 32:12, 32:23, 44:2, 53:21
errors [3] - 27:2, 31:14, 31:16
especially [1] - 96:25
essence [1] - 60:24
essentially [6] - 41:14, 41:24, 49:22, 50:2, 73:14, 73:23
established [3] - 47:3, 94:2, 94:17
establishing [1] - 94:12

estimates [2] - 89:15, 89:25
et [2] - 93:9
evaluate [2] - 42:10, 58:14
evaluating [3] - 47:4, 59:5, 63:3
event [2] - 4:11, 31:24
everywhere [2] - 51:4, 77:11
evidence [41] - 5:15, 6:6, 7:18, 10:19, 16:17, 20:16, 21:15, 24:8, 25:20, 26:1, 26:10, 26:13, 29:5, 29:12, 30:3, 33:12, 33:18, 42:1, 42:12, 43:17, 44:2, 44:9, 44:11, 47:5, 49:7, 51:13, 51:14, 54:23, 57:3, 57:6, 59:20, 60:16, 74:5, 77:17, 78:20, 95:21, 97:2, 97:12, 98:5, 98:7, 98:13
evil [1] - 12:12
exactly [4] - 4:11, 16:15, 37:18, 68:25
exaggerate [2] - 23:12, 23:14
examination [3] - 61:6, 85:18, 86:24
examiner [5] - 63:15, 67:22, 73:21, 77:15, 92:8
examiner's [1] - 74:2
example [10] - 9:12, 32:24, 33:9, 51:24, 85:21, 86:11, 88:17, 91:17, 95:20, 96:21
examples [4] - 42:17, 44:4, 87:23, 88:18
except [1] - 7:15
exception [1] - 4:4
exchange [1] - 74:8
excluded [3] - 47:10, 98:6, 98:7
exclusive [1] - 94:20
exhibited [1] - 79:22
exist [3] - 22:1, 35:11, 81:5
exists [7] - 44:17, 44:18, 50:1, 50:3, 51:3, 51:5, 59:14
exotic [1] - 75:10
expect [9] - 66:8, 66:19, 66:24, 66:25, 70:1, 73:19, 73:21, 75:16, 87:19
expected [3] - 65:18,

70:13, 74:23
expecting [1] - 100:4
expects [1] - 42:22
expenses [1] - 65:22
experience [11] - 23:5, 23:21, 45:12, 60:21, 71:7, 72:11, 72:20, 73:6, 73:10, 83:4, 92:8
experienced [1] - 23:3
experimental [1] - 48:15
expert [51] - 17:20, 17:22, 18:11, 18:12, 21:8, 21:22, 22:7, 22:10, 24:20, 25:11, 25:17, 25:19, 25:21, 25:22, 26:9, 26:18, 30:20, 32:15, 35:11, 35:12, 39:14, 45:16, 47:3, 47:14, 51:10, 51:13, 51:24, 57:23, 58:15, 60:2, 61:2, 62:17, 62:22, 64:8, 64:19, 64:24, 65:8, 66:1, 69:4, 69:7, 73:20, 75:13, 77:14, 77:19, 77:22, 79:17, 82:15, 88:25, 93:13
expert-level [1] - 79:17
expertise [26] - 18:14, 18:21, 19:14, 19:19, 19:20, 20:9, 20:10, 20:17, 21:6, 21:7, 21:15, 22:12, 45:1, 45:8, 60:21, 65:1, 67:3, 72:1, 72:11, 72:12, 72:17, 74:21, 76:7, 78:5, 79:21, 93:11
experts [7] - 19:2, 19:17, 27:18, 27:22, 38:16, 40:24, 40:25
explain [9] - 17:23, 31:9, 44:1, 57:6, 61:22, 65:23, 79:16, 79:19, 92:17
explainable [1] - 63:7
explanation [1] - 82:9
explicitly [1] - 93:11
export [1] - 26:1
exported [1] - 31:20
express [1] - 76:6
expressed [1] - 18:23
expressing [2] - 64:25, 82:20
extensive [5] - 23:25, 29:6, 31:15, 43:1, 73:6

extensively [2] - 27:19, 43:2
extent [20] - 6:24, 13:17, 21:2, 22:2, 26:6, 34:7, 41:3, 53:13, 58:8, 62:1, 64:12, 65:25, 66:5, 67:5, 71:21, 76:5, 83:13, 91:12, 93:9, 96:20
extra [1] - 15:8
extra-textual [1] - 15:8
extraction [2] - 96:23, 97:5
extraneous [1] - 48:22
extremely [2] - 8:18, 30:25
eyes [1] - 82:13

## F

facetious [1] - 25:7
fact [26] - 5:4, 6:10, 9:5, 18:14, 23:15, 23:23, 24:6, 24:12, 24:17, 24:21, 24:22, 24:25, 25:1, 27:17, 28:13, 31:5, 37:21, 37:22, 38:5, 50:7, 66:22, 68:10, 76:3, 84:15, 101:22
facts [3] - 12:6, 47:20, 51:21
factual [4] - 25:4, 25:9, 25:11, 25:14
fades [1] - 52:5
failure [1] - 47:23
fair [10] - 6:8, 64:2, 69:17, 69:24, 70:17, 70:19, 77:23, 83:5, 85:23, 85:24
fairly [4] - 21:11, 22:25, 47:25, 63:17
faith [1] - 33:17
faithful [1] - 14:15
fall [1] - 30:14
fallacy [1] - 78:18
fallible [1] - 54:16
false [3] - 45:16, 45:20, 68:18
falsely [1] - 45:18
familiar [3] - 14:21, 23:23, 52:11
fancy [1] - 64:21
far [5] - 18:20, 28:9, 29:16, 31:14, 60:5
FBI [3] - 20:15, 44:25, 45:2
fear [2] - 11:17, 11:21
February [1] - 92:16

federal [1] - 92:10
fee [2] - 62:9, 66:7
feel-good [1] - 54:25
fees [9] - 57:21, 61:19, 61:21, 62:24, 63:4, 63:12, 73:13, 77:6
felt [1] - 64:23
few [4] - 7:10, 23:24, 63:2, 95:10
fewer [1] - 48:22
field [3] - 23:24, 47:4, 48:16
figure [3] - 16:15, 16:18, 58:21
figuring [1] - 99:3
file [3] - 38:8, 40:13, 97:16
filed [1] - 102:14
files [3] - 28:17, 28:24, 84:18
filing [1] - 37:22
filings [2] - 85:6, 85:10
final [5] - 11:10, 15:22, 16:13, 16:24, 20:13
finance [1] - 90:24
finances [1] - 68:6
financial [13] - 16:5, 16:6, 63:4, 67:6, 67:25, 73:17, 85:5, 85:15, 90:23, 92:6, 92:11, 92:24, 93:4
Financial [2] - 71:8, 91:7
financials [1] - 20:5
findings [1] - 90:18
fine [15] - 20:25, 21:6, 36:11, 65:5, 66:8, 67:1, 70:3, 75:24, 80:14, 81:2, 81:9, 81:16, 91:19, 91:21, 98:3
fingerprint [1] - 48:17
finish [2] - 37:13, 37:14
first [17] - 6:4, 16:3, 41:19, 46:13, 47:11, 59:13, 61:20, 69:18, 71:21, 75:17, 89:23, 90:5, 96:4, 96:13, 97:6, 99:7
Fischbach [2] - 20:9, 20:20
Fischbach's [1] - 17:12
fit [2] - 63:5, 98:11
five [6] - 3:2, 3:6, 7:14, 11:5, 40:18, 76:2
flaw [1] - 45:14
Floor [1] - 1:20

Flows [1] - 91:7
fluctuation [1] - 32:25
fluent [1] - 34:16
Fog [40] - 7:20, 8:1, 17:24, 18:13, 19:6, 19:15, 46:14, 57:5, 57:7, 57:21, 57:25, 61:18, 61:19, 61:20, 62:8, 62:24, 63:4, 63:9, 63:11, 65:17, 71:2, 71:6, 71:11, 71:23, 72:7, 72:17, 73:13, 78:19, 79:16, 79:22, 80:20, 81:23, 82:17, 83:14, 89:13, 89:17, 90:8, 90:20, 91:1, 98:17
folks [2] - 87:11, 99:3
follow [5] - 31:5, 92:18, 101:1, 102:8, 102:12
follow-up [3] - 31:5, 101:1, 102:8
followed [1] - 5:18
following [3] - 17:13, 38:21, 81:7
FOR [1] - 1:1
forecast [1] - 30:22
forecasts [1] - 34:8
foregoing [1] - 103:4
forensic [12] - 42:23, 42:24, 44:11, 48:15, 48:18, 51:14, 62:6, 63:15, 66:15, 92:6, 92:24, 93:4
forensics [3] - 65:4, 67:17, 92:11
forget [2] - 52:1, 52:5
form [6] - 7:25, 19:10, 26:22, 84:24, 101:13, 101:14
formed [1] - 9:6
forming [1] - 31:10
forth [1] - 5:2
forthright [1] - 50:16
Foundation [1] - 73:4
foundation [2] - 60:1, 83:25
framed [2] - 58:7, 78:18
France [1] - 29:9
frankly [4] - 45:1, 65:24, 86:20, 93:19
fraud [8] - 29:9, 30:19, 67:21, 73:17, 73:20, 74:2, 77:14, 92:8
fraudster [1] - 81:5
fraudulent [1] - 27:10
French [1] - 97:22
friction [2] - 86:7, 86:9

Friday [7] - 35:24, 36:8, 77:1, 95:9, 95:14, 99:2, 102:19
front [9] - 14:21, 19:23, 20:17, 40:16, 50:21, 59:2, 83:20, 97:24, 97:25
froze [2] - 39:22, 39:25
FTX [1] - 30:17
full [7] - 5:12, 12:21, 16:21, 26:1, 96:22, 102:24, 103:5
fulsome [2] - 17:2, 60:5
fundamentally [1] - 23:10
funds [6] - 61:17, 63:25, 68:15, 68:16, 69:1, 69:21
funny [1] - 23:12
future [1] - 47:16

## G

gain [1] - 21:25
gains [2] - 74:25, 86:1
game [2] - 64:2, 85:23
garb [1] - 53:4
general [10] - 21:2, 22:23, 46:18, 52:16, 54:11, 55:20, 61:4, 72:20, 73:11, 85:11
generally [3] - 41:12, 42:14, 42:22
generated [1] - 61:19
George [2] - 79:20, 82:14
given [12] - 3:10, 7:13, 8:1, 38:5, 41:21, 46:7, 47:19, 50:9, 71:18, 77:8, 95:21, 97:10
Glave [4] - 60:6, 69:4, 69:16, 92:25
gold [1] - 27:7
goods [1] - 92:20
government [88] - 2:5, 2:20, 4:15, 4:25, 5:23, 6:24, 6:25, 7:7, 8:8, 8:11, 9:18, 10:7, 10:16, 14:4, 15:12, 15:24, 16:3, 19:10, 21:22, 21:24, 22:4, 25:6, 25:22, 25:25, 30:14, 31:3, 31:6, 31:15, 32:3, 32:21, 38:10, 41:17, 44:9, 46:11, 47:8, 57:4, 57:11, 57:19, 58:14,

59:18, 60:14, 60:17, 61:5, 61:23, 62:7, 62:9, 63:20, 63:23, 64:11, 65:7, 67:10, 68:5, 68:9, 68:10, 68:14, 68:16, 68:19, 68:20, 70:6, 71:14, 73:10, 73:23, 75:8, 75:20, 75:25, 76:16, 76:25, 77:24, 77:25, 78:12, 78:15, 78:21, 80:16, 80:21, 81:16, 81:22, 83:13, 85:5, 85:10, 86:20, 87:18, 89:16, 90:19, 98:1, 101:23, 102:20
Government [1] - 5:17
government's [19] - 9:11, 23:7, 53:20, 53:25, 57:6, 60:6, 61:16, 62:14, 63:14, 63:25, 67:10, 68:20, 70:18, 71:9, 77:2, 81:4, 89:15, 89:25, 100:16
Gox [31] - 4:15, 18:24, 19:1, 19:2, 19:5, 19:16, 19:21, 19:24, 20:3, 20:8, 21:14, 21:16, 21:17, 26:18, 26:20, 26:21, 27:1, 27:2, 27:5, 28:15, 29:3, 29:4, 29:11, 31:17, 31:19, 84:8, 84:10, 84:16, 101:2, 101:12, 101:20
Grand [1] - 15:19
great [1] - 98:16
greater [1] - 11:7
Greenberg's [1] - 28:12
Gronager [3] - 28:14, 28:16, 28:23
ground [1] - 37:21
grounds [1] - 11:14
groundwork [1] - 96:22
grown [1] - 58:20
growth [2] - 59:11, 59:25
guard [1] - 80:17
guardrails [2] - 35:11, 83:11
guess [11] - 42:7, 44:14, 45:21, 47:1, 47:5, 52:12, 56:16, 62:5, 76:8, 79:1, 95:6
guesses [1] - 46:23
guidance [5] - 22:20,

22:22, 30:9, 99:1, 100:17
guide [1] - 56:2
guilt [1] - 68:1
guy [1] - 44:6

## H

hack [3] - 21:14, 21:16, 21:18
hacked [9] - 19:2, 26:20, 27:7, 28:21, 28:25, 29:5, 29:18, 84:8, 84:18
hacker [1] - 84:9
hackers [1] - 29:1
hacks [9] - 27:9, 27:14, 27:17, 27:20, 28:2, 29:15, 30:2, 84:21, 84:22
half [1] - 66:4
hand [2] - 98:5, 98:13
handling [2] - 95:4, 95:5
happy [8] - 22:20, 24:23, 39:9, 40:8, 56:23, 65:10, 88:21, 88:22
hard [10] - 3:2, 3:4, 3:6, 5:8, 10:10, 58:23, 69:12, 82:22, 97:23, 101:19
Harmon [2] - 76:25, 77:4
HASSARD [3] - 1:19, 2:15, 38:18
Hassard [2] - 2:16, 39:5
head [4] - 40:8, 73:3, 88:15, 89:6
hear [7] - 8:8, 22:20, 29:15, 36:23, 37:2, 39:9, 71:13
heard [11] - 19:1, 27:16, 27:17, 29:16, 30:8, 39:23, 45:7, 81:6, 84:21, 85:21, 85:22
hearing [10] - 18:17, 39:7, 39:13, 40:21, 41:10, 59:18, 60:13, 76:4, 96:23, 102:25
hearings [2] - 73:16, 85:9
hearsay [3] - 26:19, 32:15
heels [1] - 52:24
held [1] - 69:14
Helix [1] - 77:6
help [1] - 56:2

helpful [13] - 26:7, 41:3, 43:4, 43:15, 47:4, 47:12, 51:7, 52:13, 53:16, 66:13, 85:12, 88:3, 102:6
helps [1] - 90:1
hereby [1] - 103:3
heuristics [3] - 31:3, 31:7, 42:4
hidden [3] - 13:3, 64:1, 81:5
hide [5] - 80:12, 81:8, 81:14, 82:2, 85:20
hiding [2] - 74:14, 86:1
high [1] - 17:23
higher [2] - 60:12, 86:8
highlights [1] - 44:2
highly [4] - 29:11, 46:22, 82:16, 98:14
highs [1] - 91:4
himself [3] - 2:20, 51:1, 81:19
historical [1] - 62:25
history [1] - 79:18
hit [1] - 30:12
hold [3] - 3:18, 93:13, 99:24
holders [1] - 86:5
holdings [1] - 63:7
hole [1] - 8:18
home [1] - 86:13
honest [1] - 46:25
Honor [107] - 2:6, 2:12, 2:15, 2:22, 3:7, 3:21, 4:13, 4:16, 5:25, 6:2, 6:14, 6:17, 7:2, 7:7, 7:10, 8:10, 9:10, 10:8, 10:12, 11:23, 12:19, 13:24, 14:13, 17:10, 23:19, 24:19, 25:13, 25:25, 26:14, 28:11, 30:6, 30:11, 31:14, 33:21, 34:2, 34:6, 34:22, 35:21, 36:11, 38:11, 38:13, 38:17, 38:18, 38:25, 39:21, 40:6, 40:15, 41:9, 46:5, 47:8, 48:9, 49:8, 52:20, 54:15, 56:4, 56:8, 56:9, 56:12, 56:18, 57:17, 58:25, 60:3, 61:10, 62:20, 65:9, 69:2, 70:21, 71:16, 71:20, 76:13, 76:24, 78:10, 78:13, 79:1, 79:4, 79:6, 79:15, 83:6, 83:11,

84:5, 85:2, 86:19, 87:13, 88:15, 89:6, 89:10, 89:22, 92:1, 92:2, 92:22, 93:6, 93:24, 94:9, 94:21, 95:1, 95:10, 95:15, 96:17, 100:16, 100:24, 101:1, 101:21, 101:25, 102:7, 102:17, 102:20, 102:22
Honor's [1] - 101:2
HONORABLE [1] - 1:8
hop [1] - 46:11
hope [1] - 99:5
hopeful [1] - 36:14
hopefully [3] - 99:4, 99:22, 100:1
hopes [1] - 75:10
hoping [5] - 3:13, 3:14, 96:6, 96:9
horrible [2] - 12:16, 44:4
hours [1] - 3:3
House [1] - 71:8
house [1] - 86:13
housekeeping [1] - 95:11
human [3] - 44:2, 87:6, 88:20
hundred [4] - 62:8, 82:24, 83:4, 83:5
hundreds [1] - 44:9
hurdle [1] - 96:11
hyperlink [3] - 86:15, 91:5, 92:16
hypothetical [1] - 10:7
hypothetically [1] - 98:15

## I

ID [1] - 31:19
idea [4] - 13:10, 36:1, 36:5, 98:17
identified [7] - 27:19, 27:22, 31:25, 78:11, 89:1, 89:4, 89:9
identify [4] - 27:2, 31:16, 92:23, 93:1
identifying [1] - 43:8
identity [5] - 80:12, 81:8, 81:14, 82:2, 82:5
ignorance [1] - 54:14
ill [1] - 74:20
ill-informed [1] - 74:20
illegal [13] - 13:8, 13:14, 22:13, 22:17,

23:18, 24:9, 24:13, 27:9, 30:18, 74:8, 74:22, 74:25, 85:21
illegally [1] - 13:8
illegitimate [1] - 90:11
Illicit [1] - 91:7
illicit [7] - 13:4, 85:7, 85:16, 86:1, 90:21, 90:24, 91:2
implication [1] - 13:18
implicit [4] - 15:15, 40:24, 41:1, 56:1
important [5] - 7:16, 7:22, 8:2, 8:25, 10:1
importation [1] - 13:14
impossible [1] - 15:1
impression [1] - 68:18
improper [3] - 44:3, 44:12, 63:19
impure [1] - 28:17
imputed [2] - 14:23, 15:3
IN [1] - 1:1
in-depth [1] - 72:22
inaccurate [2] - 19:11, 50:11
inappropriate [1] - 33:10
inclination [3] - 37:16, 37:25, 38:7
inclined [4] - 9:3, 20:18, 95:6, 96:3
include [1] - 64:6
included [1] - 5:13
includes [1] - 56:15
including [1] - 90:18
income [5] - 65:20, 65:21, 66:10, 66:12, 68:23
inconsistency [1] - 32:1
inconsistent [1] - 79:9
incorrect [3] - 54:2, 54:3, 54:4
increase [1] - 58:18
independent [1] - 22:9
indicate [2] - 19:24, 94:20
indicated [10] - 17:16, 19:4, 19:22, 21:1, 31:12, 34:24, 37:11, 50:22, 51:20, 85:1
indicating [1] - 29:13
indicia [1] - 6:7
indicted [1] - 12:5
indictment [2] - 11:23, 12:1
individual [5] - 5:7, 12:11, 12:13, 54:7,

59:11
inevitably [1] - 85:18
inextricably [1] - 8:13
inferences [3] - 25:4, 81:11, 91:15
inflamed [1] - 12:22
inflammatory [2] - 43:24, 44:13
information [8] - 5:13, 17:21, 17:23, 19:23, 20:1, 31:19, 48:22
informed [1] - 74:20
initial [1] - 69:9
innocence [1] - 68:2
innocent [3] - 75:7, 77:10, 77:15
inquired [1] - 101:12
insofar [1] - 30:25
instance [5] - 43:8, 46:10, 54:21, 63:3, 82:10
instead [4] - 33:16, 34:1, 68:22, 95:12
institutions [2] - 90:25, 91:19
instruct [3] - 16:15, 16:18, 24:23
instruction [4] - 8:5, 9:4, 16:21, 25:5
instructions [20] - 7:4, 7:8, 8:17, 10:15, 11:1, 11:2, 11:4, 11:10, 12:18, 13:7, 14:2, 14:14, 15:8, 15:20, 15:22, 16:13, 16:19, 16:25, 17:4, 17:8
integrity [4] - 28:1, 28:8, 29:3, 29:11
intend [2] - 26:2, 34:7
intended [1] - 23:12
intending [1] - 26:1
intent [5] - 15:25, 16:1, 16:8, 16:9, 35:10
interested [1] - 101:8
interests [2] - 57:6, 60:19
internal [1] - 93:12
international [1] - 90:23
International [2] - 101:6, 102:13
internet [7] - 11:19, 11:20, 13:9, 13:11, 13:20, 24:1, 29:4
interpretations [1] - 98:11
interpreting [1] - 97:7
interrupt [2] - 79:6,

99:16
intertwined [1] - 8:13
interviewed [1] - 88:9
introduce [2] - 15:7, 95:20
invasion [1] - 86:13
inventory [1] - 20:14
invested [1] - 58:19
investigating [1] - 45:3
investigations [3] - 42:25, 92:6, 92:11
investigator [3] - 32:22, 54:19, 65:19
investigators [2] - 41:19, 50:15
investor [4] - 60:18, 69:11, 71:11, 72:7
invite [1] - 85:17
invites [1] - 86:24
invoking [1] - 12:23
involve [2] - 12:23, 13:14
involved [4] - 14:10, 20:4, 22:13, 29:21
involving [5] - 14:20, 22:11, 22:13, 29:20, 72:18
issue [29] - 3:8, 10:12, 11:9, 12:21, 20:2, 21:18, 22:16, 26:18, 27:12, 27:20, 29:6, 29:14, 30:4, 30:23, 33:7, 34:8, 37:10, 37:17, 43:25, 47:10, 48:11, 64:10, 70:20, 78:11, 96:18, 96:25, 99:20, 99:23
issued [1] - 102:8
issues [12] - 15:22, 35:20, 36:8, 36:24, 37:1, 49:9, 49:14, 75:8, 77:1, 77:3, 96:8, 100:22
items [1] - 95:11
itself [6] - 25:20, 29:14, 43:3, 85:7, 87:14, 87:25

## J

Jail [2] - 3:9, 3:20
jail [9] - 3:14, 3:17, 3:22, 4:1, 4:3, 35:1, 44:6, 100:9
Japan [4] - 5:17, 5:21, 29:9, 101:12
Japanese [7] - 4:24, 4:25, 5:20, 5:22, 6:10, 6:24, 101:23

jargon [3] - 67:6, 67:15, 67:23
Jeff [1] - 2:10
JEFFREY [1] - 1:15
Jeffrey [1] - 39:3
Jencks [3] - 41:18, 43:9
joint [1] - 97:17
Journal [2] - 92:15, 94:7
judge [1] - 21:10
Judge [2] - 36:15, 37:8
JUDGE [2] - 1:8, 1:8
juror [2] - 12:13, 12:14
jurors [3] - 52:3, 52:9, 52:13
jury [92] - 7:4, 7:16, 7:22, 8:2, 8:5, 8:19, 8:25, 10:2, 10:14, 11:8, 11:10, 12:21, 14:2, 14:14, 15:8, 15:22, 16:13, 16:15, 16:18, 17:4, 17:6, 21:10, 24:4, 24:23, 24:24, 25:3, 25:6, 25:8, 25:10, 25:18, 30:25, 31:1, 31:9, 33:15, 35:22, 36:6, 36:14, 41:14, 41:21, 41:23, 42:9, 43:4, 43:6, 43:7, 43:19, 46:2, 47:4, 47:12, 47:21, 49:6, 49:11, 49:18, 50:21, 51:7, 52:10, 53:1, 53:7, 53:16, 55:19, 55:21, 57:10, 61:9, 62:6, 66:1, 66:13, 67:16, 68:8, 70:15, 75:11, 75:21, 75:25, 76:1, 81:3, 81:11, 81:18, 82:3, 82:8, 83:2, 83:20, 83:22, 83:24, 85:12, 87:10, 88:3, 91:13, 91:14, 97:25, 98:8, 98:12, 99:9
jury's [1] - 90:14
justice [1] - 44:1
Justice [5] - 1:13, 1:16, 92:15, 93:12, 94:7
justified [2] - 32:19, 32:20

**K**

Karpeles [4] - 28:14, 28:18, 28:19, 28:23
Karpeles's [1] - 29:8

keep [5] - 11:2, 16:25, 26:17, 61:11, 65:10
ken [1] - 52:4
key [2] - 46:17, 61:16
kidnapper [1] - 86:6
kidnapping [1] - 86:4
kind [13] - 21:10, 22:19, 29:9, 41:22, 51:4, 58:23, 66:20, 73:14, 73:17, 75:9, 77:16, 78:18, 100:5
kinds [1] - 48:18
knowing [1] - 58:3
knowingly [1] - 16:4
knowledge [13] - 10:1, 14:23, 15:3, 18:25, 20:10, 28:6, 34:16, 72:5, 72:23, 73:11, 79:17, 87:1, 88:8
known [4] - 42:15, 65:21, 65:22, 90:10
knows [6] - 27:15, 52:6, 52:23, 80:15, 81:24, 84:18
Korver [1] - 92:12
Kraken [4] - 57:20, 61:18, 69:21, 82:18
KYC [2] - 57:20, 61:17
KYC'd [1] - 79:23

**L**

lack [2] - 74:21, 101:7
Lamborghini [5] - 23:17, 24:7, 24:8, 24:10, 24:12
Lamborghinis [2] - 22:14, 23:16
Lambos [2] - 22:11
language [2] - 16:21, 101:14
large [3] - 65:20, 86:7, 86:9
largely [1] - 16:10
larger [1] - 61:21
Larry [1] - 76:25
last [6] - 39:23, 55:5, 55:8, 55:9, 55:11, 83:20
late [1] - 89:2
lateness [1] - 38:5
latter [1] - 72:2
launder [1] - 98:17
launderer [1] - 82:4
laundering [5] - 7:15, 14:20, 63:5, 73:24, 91:18
Law [3] - 1:19, 92:15, 94:7
law [17] - 4:24, 14:11,

14:20, 14:22, 30:19, 39:11, 40:12, 41:4, 43:13, 43:23, 45:9, 45:12, 45:13, 50:14, 51:23, 55:25, 73:8
lawyer [8] - 22:8, 53:1, 62:13, 64:4, 64:7, 64:24, 77:21
lawyer's [1] - 64:13
lawyers [2] - 21:10, 35:4
lay [1] - 96:22
lead [3] - 45:19, 48:23, 91:1
leaked [1] - 29:5
least [12] - 6:3, 26:10, 27:25, 35:17, 41:2, 47:3, 49:8, 52:3, 52:13, 88:17, 94:8, 96:8
leave [9] - 9:1, 15:15, 24:1, 27:12, 29:10, 32:23, 46:1, 97:14, 99:18
leaves [1] - 9:19
leaving [2] - 13:22, 78:22
left [1] - 9:20
legal [4] - 3:22, 3:25, 4:8, 4:9
Legal [1] - 5:15
legality [1] - 30:18
legitimate [11] - 57:5, 60:18, 87:15, 87:23, 88:4, 89:14, 89:17, 89:20, 90:8, 90:21, 98:10
less [6] - 13:9, 24:12, 42:16, 65:16, 84:16, 94:17
level [9] - 17:23, 23:14, 46:8, 60:4, 60:8, 60:12, 61:12, 79:17, 82:16
levels [1] - 49:15
liabilities [2] - 65:22, 70:9
liability [1] - 14:24
light [1] - 69:3
likely [10] - 24:6, 24:9, 24:13, 29:17, 48:6, 52:18, 54:12, 79:25, 82:12, 98:8
likewise [1] - 46:17
limitations [10] - 7:14, 7:17, 8:4, 8:10, 8:13, 8:25, 9:8, 9:13, 10:1, 10:10
limited [1] - 26:21
line [7] - 31:8, 64:6,

71:10, 72:7, 80:8, 83:16, 99:5
lines [1] - 22:24
link [3] - 2:14, 5:9, 71:4
list [3] - 37:3, 85:22, 94:20
listing [1] - 32:12
login [1] - 80:12
logins [2] - 80:1, 82:12
look [36] - 5:14, 6:5, 6:23, 9:4, 17:12, 17:16, 17:18, 18:1, 18:19, 18:24, 29:20, 32:15, 34:17, 39:16, 40:7, 40:9, 40:12, 41:22, 43:11, 43:22, 46:10, 51:10, 51:13, 51:23, 56:4, 59:5, 66:15, 66:17, 67:17, 74:16, 78:4, 78:8, 93:18, 93:20, 93:23, 94:24
looked [3] - 47:14, 64:5, 82:23
looking [15] - 5:11, 23:7, 29:3, 31:23, 40:8, 48:5, 52:18, 56:24, 61:12, 63:8, 64:16, 76:21, 83:4, 101:15, 101:18
looks [1] - 77:9
love [1] - 55:23
low [1] - 86:7
low-friction [1] - 86:7
lunchtime [1] - 36:16

**M**

magnitude [1] - 65:21
main [3] - 7:13, 30:12, 99:23
maintain [2] - 42:5, 85:5
maintaining [1] - 85:15
maintenance [1] - 17:22
major [3] - 27:6, 28:20, 28:21
majority [1] - 87:22
management [2] - 96:19, 97:10
manipulation [1] - 29:9
manner [1] - 33:17
manual [1] - 93:3
manufacture [1] - 13:14

market [1] - 11:24
marshal [1] - 3:16
Marshals [2] - 2:25, 100:14
marshals [2] - 3:14, 3:15
Mason [2] - 79:20, 82:15
Massachusetts [1] - 40:17
match [2] - 67:4, 73:21
material [2] - 43:9, 92:11
materials [3] - 17:19, 41:8, 41:18
math [15] - 58:13, 58:14, 59:4, 59:8, 62:1, 62:3, 62:10, 62:18, 62:23, 65:4, 66:5, 66:17, 68:10, 70:9, 75:24
matter [9] - 28:4, 45:2, 67:17, 68:24, 69:2, 70:8, 99:3, 99:18, 99:21
matters [4] - 34:24, 54:19, 95:4, 95:13
Mazarin [1] - 46:24
Mazars [1] - 46:24
Mazars' [1] - 42:6
mean [34] - 8:22, 12:19, 23:6, 23:10, 24:23, 32:8, 32:13, 40:7, 43:2, 43:14, 43:18, 47:18, 49:15, 52:21, 58:14, 60:9, 62:5, 64:2, 64:20, 66:2, 66:20, 72:9, 72:19, 73:9, 74:22, 82:1, 85:17, 86:22, 87:24, 88:16, 88:24, 92:19, 94:4, 97:23
meaningful [2] - 49:17, 55:21
means [7] - 15:18, 24:12, 57:22, 75:1, 75:2, 75:6, 92:18
measure [2] - 71:11, 72:8
measures [3] - 50:19, 85:3, 86:16
Measuring [1] - 91:7
Meiklejohn's [3] - 32:5, 33:3, 33:24
member [2] - 15:3, 15:4
members [1] - 24:24
meme [5] - 22:11, 23:9, 23:22, 24:16,

25:15

**memes** [4] - 23:6, 23:10, 23:12, 23:15
**memory** [5] - 51:24, 51:25, 52:5, 52:7, 54:15
**men** [1] - 86:12
**mens** [1] - 14:7
**mention** [1] - 12:22
**mentions** [2] - 26:23, 32:8
**mere** [1] - 12:22
**merely** [3] - 26:24, 32:15, 93:2
**met** [1] - 27:18
**method** [1] - 80:3
**methodology** [1] - 21:3
**MICHAEL** [1] - 1:19
**Michael** [3] - 2:15, 28:14, 39:5
**Michele** [1] - 92:12
**mid** [1] - 32:3
**mid-trial** [1] - 32:3
**might** [17] - 12:4, 12:16, 38:4, 41:3, 47:15, 48:1, 51:16, 51:25, 56:2, 60:22, 61:10, 71:4, 90:10, 94:6, 98:5, 99:7
**million** [4] - 62:8, 63:22, 66:6, 66:23
**Million** [1] - 32:6
**millions** [4] - 62:10, 67:1, 86:14, 86:24
**mind** [8] - 8:3, 18:18, 37:15, 47:24, 47:25, 52:12, 54:18, 60:20
**minute** [2] - 10:3, 88:6
**minutes** [2] - 48:1, 76:2
**minutia** [1] - 23:1
**miscarriages** [1] - 44:1
**mischaracterize** [1] - 23:11
**misleading** [5] - 16:20, 30:25, 44:2, 66:1, 68:8
**misleads** [1] - 67:16
**missing** [3] - 5:9, 71:5, 84:11
**misstep** [1] - 82:4
**mix** [1] - 79:18
**mixer** [7] - 18:8, 57:8, 60:22, 74:12, 79:23, 89:17, 91:4
**mixers** [2] - 87:15, 87:21
**mixing** [4] - 22:17,

86:16, 89:13, 90:20
**MLAT** [12] - 5:24, 6:1, 6:11, 6:15, 6:17, 6:20, 6:21, 6:25, 7:1, 102:4, 102:8
**moment** [1] - 79:11
**Monday** [10] - 35:18, 36:2, 36:9, 40:13, 41:6, 43:12, 56:5, 88:23, 97:17, 100:4
**money** [17] - 7:15, 14:20, 29:18, 30:2, 62:15, 63:5, 63:23, 66:8, 68:21, 70:1, 70:13, 73:23, 82:4, 82:18, 86:7, 91:18, 98:17
**monkeyed** [1] - 20:3
**month** [4] - 74:11, 74:18, 74:23
**moreover** [1] - 28:25
**mortar** [1] - 91:18
**MOSS** [1] - 1:8
**most** [9] - 12:16, 52:4, 75:11, 81:5, 84:24, 89:16, 89:20, 90:8, 90:19
**motion** [2] - 38:6, 38:9
**move** [5] - 3:1, 26:15, 33:5, 78:25, 100:1
**moved** [4] - 3:19, 4:12, 37:21
**moving** [1] - 100:11
**MR** [147] - 2:8, 2:10, 2:12, 2:15, 2:22, 3:7, 3:21, 4:7, 4:13, 7:7, 7:10, 7:13, 8:10, 8:22, 9:10, 9:17, 10:6, 10:12, 11:12, 11:23, 12:3, 12:19, 13:1, 13:24, 14:13, 15:11, 16:24, 17:10, 20:24, 22:25, 23:19, 24:19, 25:5, 25:10, 25:13, 25:16, 25:21, 26:14, 26:17, 28:11, 30:6, 32:5, 33:21, 36:5, 36:11, 38:13, 38:18, 39:5, 39:21, 40:6, 40:15, 41:9, 42:19, 46:5, 47:8, 48:9, 49:8, 49:20, 49:25, 52:20, 53:12, 54:15, 56:4, 56:8, 56:9, 56:12, 56:18, 56:21, 57:2, 57:14, 58:25, 59:5, 59:13, 59:16, 60:3, 61:10, 61:15, 62:20, 65:9, 65:12, 65:15, 67:19,

69:2, 70:21, 70:24, 71:16, 71:20, 72:19, 73:2, 75:5, 76:12, 76:22, 76:24, 78:10, 79:1, 79:4, 79:6, 79:13, 79:15, 80:21, 82:6, 82:20, 83:6, 83:8, 83:11, 84:5, 84:7, 85:2, 86:3, 86:19, 87:2, 87:4, 87:13, 88:11, 88:14, 88:21, 89:5, 89:10, 89:12, 89:22, 90:3, 90:15, 90:17, 92:1, 92:2, 92:4, 92:21, 93:6, 93:16, 93:24, 94:1, 94:9, 94:19, 95:1, 95:10, 95:15, 95:18, 96:2, 96:17, 97:4, 99:11, 99:14, 99:16, 99:22, 100:16, 100:24, 102:22
**MS** [29] - 2:6, 4:16, 4:22, 5:11, 5:25, 6:2, 6:9, 6:14, 6:17, 6:20, 7:2, 7:5, 25:25, 30:11, 34:6, 34:22, 35:21, 36:2, 38:10, 38:17, 39:2, 101:1, 101:5, 101:21, 101:25, 102:7, 102:11, 102:17, 102:20
**Mt** [31] - 4:15, 18:24, 19:1, 19:2, 19:5, 19:16, 19:21, 19:24, 20:3, 20:8, 21:14, 21:16, 21:17, 26:18, 26:20, 26:21, 27:1, 27:2, 27:5, 28:15, 29:3, 29:4, 29:11, 31:17, 31:19, 84:8, 84:10, 84:16, 101:2, 101:12, 101:20
**multiple** [3] - 26:20, 90:18, 97:1
**municipal** [1] - 7:15
**must** [4] - 14:10, 15:24, 70:7, 81:22
**Mutual** [1] - 5:15
**mystery** [1] - 75:19

## N

**N.W** [1] - 103:11
**name** [5] - 32:8, 80:23, 81:1, 81:15, 94:14
**names** [2] - 2:4, 38:24
**nature** [8] - 21:13,

32:25, 48:8, 73:25, 75:10, 93:22, 97:2, 97:21
**necessarily** [8] - 21:15, 42:11, 43:8, 52:11, 75:5, 75:15, 94:3, 100:15
**necessary** [4] - 13:21, 19:6, 30:9, 34:12
**need** [25] - 3:12, 5:3, 6:25, 15:7, 16:14, 17:22, 23:1, 27:14, 28:5, 34:24, 37:2, 37:8, 37:19, 44:22, 72:22, 77:15, 77:16, 93:1, 95:23, 98:1, 98:25, 99:2, 100:6, 100:21, 102:7
**needs** [4] - 10:16, 35:16, 85:9, 102:14
**nefarious** [4] - 75:15, 77:12, 78:1, 78:2
**negative** [1] - 77:12
**net** [9] - 65:20, 65:22, 66:10, 66:12, 68:22, 68:23
**network** [6] - 17:24, 80:1, 80:13, 82:13, 87:20, 87:25
**neutral** [5] - 11:20, 41:21, 44:16, 46:7, 53:15
**never** [5] - 8:24, 18:2, 50:16, 76:4, 78:6
**new** [1] - 41:17
**New** [3] - 1:17, 1:20, 86:12
**next** [9] - 15:23, 39:8, 50:13, 63:2, 78:17, 96:7, 99:21, 100:12, 100:22
**nice** [1] - 102:24
**night** [2] - 41:16, 43:10
**nine** [1] - 55:13
**nobody** [3] - 15:14, 83:14
**nonanswer** [1] - 49:22
**noncrypto** [1] - 61:23
**normal** [3] - 75:7, 77:6, 77:9
**Nos** [1] - 18:21
**note** [6] - 12:19, 15:23, 28:11, 53:17, 91:16, 98:16
**noted** [2] - 31:13, 79:11
**notes** [3] - 43:24, 97:7, 103:5
**nothing** [7] - 14:8,

29:24, 69:12, 75:15, 100:10, 102:20, 102:22
**notice** [1] - 41:7
**noticed** [2] - 76:25, 77:2
**noting** [1] - 30:12
**notion** [4] - 52:11, 70:4, 74:15, 94:6
**nuance** [1] - 82:8
**number** [15] - 10:21, 12:23, 13:1, 14:2, 14:14, 14:19, 17:15, 18:9, 42:8, 49:14, 49:15, 62:24, 63:21, 78:16, 93:7
**numbered** [1] - 56:25
**numbers** [1] - 65:4
**NW** [4] - 1:11, 1:14, 1:17, 1:24
**NY** [1] - 1:20

## O

**obfuscate** [1] - 80:4
**obfuscating** [1] - 84:11
**object** [8] - 9:24, 10:9, 26:12, 30:15, 79:13, 81:18, 86:20, 90:6
**objecting** [1] - 70:4
**objection** [6] - 78:15, 78:21, 79:7, 85:13, 91:25, 92:1
**objections** [1] - 7:8
**objective** [2] - 22:10, 65:19
**observation** [2] - 52:23, 53:9
**observing** [2] - 48:16, 48:24
**obtain** [4] - 22:4, 71:11, 72:8, 101:11
**obtaining** [1] - 80:12
**obvious** [2] - 66:20, 67:9
**obviously** [4] - 11:8, 20:20, 26:6, 101:10
**occurred** [2] - 41:15, 86:25
**occurs** [2] - 11:18, 91:18
**OECD** [2] - 91:8, 91:17
**OF** [4] - 1:1, 1:2, 1:7, 103:1
**offense** [2] - 9:18, 10:16
**offer** [11] - 18:17, 24:3, 26:8, 26:9, 29:13, 44:9, 44:15, 56:6,

69:19, 87:1, 95:22
**offered** [5] - 18:20, 57:3, 60:16, 96:5, 96:14
**offering** [5] - 17:20, 22:15, 24:20, 59:19
**offers** [1] - 77:25
**office** [2] - 5:7, 101:8
**Office** [3] - 86:11, 101:5, 102:13
**officer** [1] - 14:12
**OFFICIAL** [1] - 103:1
**Official** [2] - 1:23, 103:10
**official** [1] - 5:16
**often** [1] - 88:16
**oftentimes** [1] - 23:11
**omnibus** [1] - 6:21
**once** [1] - 10:18
**one** [61] - 7:13, 10:21, 12:19, 12:23, 13:5, 14:14, 15:2, 15:18, 16:24, 17:3, 18:8, 20:23, 26:15, 29:18, 35:21, 37:7, 39:1, 39:8, 41:23, 45:25, 46:13, 46:24, 48:13, 49:15, 51:20, 53:24, 54:18, 56:16, 59:8, 59:12, 59:13, 61:6, 62:24, 70:10, 70:17, 71:14, 71:19, 72:25, 73:16, 75:7, 76:18, 77:4, 77:22, 80:13, 82:24, 83:4, 83:21, 84:16, 85:1, 86:11, 86:17, 87:14, 88:8, 91:1, 93:7, 94:20, 94:24, 95:15, 98:11, 100:13
**ones** [1] - 13:14
**ongoing** [3] - 9:18, 10:9, 10:11
**online** [3] - 94:8, 94:15, 94:17
**open** [6] - 27:12, 36:2, 37:1, 37:3, 37:4, 37:9
**opening** [5] - 33:8, 33:10, 33:11, 33:15, 33:22
**openings** [2] - 35:23, 36:8
**operates** [1] - 45:12
**operating** [1] - 7:20
**operation** [2] - 18:2, 71:6
**operator** [4] - 61:19, 63:10, 72:13, 78:19
**operator's** [1] - 63:11

**opine** [3] - 17:21, 47:16, 69:10
**opining** [1] - 47:20
**opinion** [21] - 19:24, 21:22, 22:10, 22:15, 24:20, 24:22, 24:23, 24:25, 25:1, 26:25, 30:16, 31:11, 37:12, 37:13, 57:23, 63:6, 73:20, 77:14, 82:16, 97:21, 97:22
**opinions** [10] - 19:10, 19:11, 25:2, 36:21, 37:1, 47:16, 55:25, 60:8, 64:25, 76:6
**opportunities** [1] - 31:16
**opportunity** [2] - 31:25, 33:12
**optimistic** [1] - 19:13
**optimistically** [1] - 18:4
**order** [5] - 19:5, 33:7, 95:18, 97:13, 100:6
**Organization** [1] - 91:5
**organization** [1] - 15:6
**originally** [1] - 80:18
**otherwise** [7] - 13:15, 28:7, 38:4, 47:19, 68:9, 85:1, 96:3
**ought** [7] - 36:17, 44:9, 49:3, 81:10, 90:12, 93:17, 98:7
**ourselves** [1] - 36:16
**out-of-order** [1] - 95:18
**out-of-town** [1] - 100:18
**outlined** [2] - 20:11, 83:12
**outset** [2] - 7:17, 10:22
**outside** [6] - 10:10, 24:3, 30:14, 52:4, 71:25, 74:12
**outstanding** [2] - 36:7, 37:7
**overswayed** [1] - 53:7
**own** [6] - 19:20, 25:10, 70:16, 79:23, 84:11, 89:15
**owned** [3] - 61:23, 65:21, 71:3
**ownership** [2] - 92:5, 93:8

## P

**P.M** [1] - 1:6

**p.m** [6] - 38:19, 41:16, 43:13, 97:17, 102:25
**page** [8] - 11:12, 14:1, 14:2, 49:21, 50:19, 56:24, 92:16, 93:14
**pages** [3] - 11:5, 54:23, 56:14
**paid** [4] - 32:13, 66:23, 73:13, 74:9
**paint** [1] - 87:20
**paper** [13] - 31:1, 32:5, 32:18, 33:4, 33:24, 34:7, 34:17, 58:11, 58:24, 59:16, 62:3
**papers** [1] - 4:17
**Paragraph** [1] - 92:4
**paragraph** [8] - 42:20, 57:2, 61:15, 70:25, 84:7, 87:4, 87:7, 92:3
**paragraphs** [1] - 56:25
**part** [14] - 5:12, 6:3, 8:24, 11:19, 16:17, 23:7, 26:8, 48:11, 72:2, 85:8, 86:5, 89:23, 93:3, 102:9
**particular** [18] - 9:15, 17:18, 18:24, 22:5, 23:22, 35:8, 35:9, 42:11, 43:8, 43:17, 54:7, 55:3, 58:16, 58:18, 74:2, 95:19, 101:16
**particularly** [10] - 32:11, 42:23, 43:23, 48:6, 49:3, 66:13, 67:12, 69:3, 97:19, 102:15
**particulars** [1] - 49:7
**parties** [7] - 37:20, 39:10, 40:2, 40:11, 41:6, 97:16, 99:4
**parties'** [1] - 99:5
**party** [1] - 84:9
**passed** [1] - 55:5
**past** [3] - 34:23, 45:16, 78:7
**pattern** [14] - 71:1, 71:4, 71:10, 72:2, 72:3, 72:6, 72:9, 75:2, 76:10, 76:15, 76:18, 76:21, 78:11
**patterns** [4] - 63:5, 74:2, 76:8, 78:1
**pause** [4] - 58:6, 67:5, 95:2, 95:13
**paycheck** [2] - 74:10, 74:11
**payment** [1] - 74:24
**payments** [4] - 73:15,

73:22, 75:16, 75:17
**Pearlman** [4] - 2:10, 39:3, 96:6, 97:15
**PEARLMAN** [2] - 1:15, 2:10
**peel** [1] - 46:17
**Peel** [1] - 32:6
**peer** [2] - 80:4
**pejorative** [1] - 13:17
**Pelker** [13] - 2:7, 25:24, 29:21, 30:8, 34:4, 39:2, 92:12, 93:19, 93:22, 94:11, 94:16, 94:23, 100:25
**PELKER** [30] - 1:13, 2:6, 4:16, 4:22, 5:11, 5:25, 6:2, 6:9, 6:14, 6:17, 6:20, 7:2, 7:5, 25:25, 30:11, 34:6, 34:22, 35:21, 36:2, 38:10, 38:17, 39:2, 101:1, 101:5, 101:21, 101:25, 102:7, 102:11, 102:17, 102:20
**Pelker's** [1] - 94:14
**pending** [1] - 35:17
**Pennsylvania** [1] - 1:14
**people** [35] - 12:21, 13:8, 13:10, 18:9, 22:12, 22:17, 23:13, 23:16, 44:10, 44:22, 45:18, 52:1, 52:5, 52:17, 52:24, 54:12, 55:13, 55:14, 58:2, 60:22, 61:5, 61:7, 74:14, 74:16, 74:22, 75:11, 80:15, 85:14, 85:20, 87:22, 88:5, 88:9, 88:10, 99:1
**people's** [2] - 11:16, 11:21
**per** [1] - 68:4
**perceiver** [1] - 15:13
**percent** [6] - 31:2, 50:10, 62:10, 65:17, 66:23, 87:15
**percentage** [4] - 63:21, 66:7, 74:9, 90:24
**perfect** [1] - 52:7
**perfectly** [2] - 70:3, 81:9
**performing** [1] - 78:16
**perhaps** [7] - 4:7, 6:4, 18:4, 19:13, 61:12, 83:24
**period** [3] - 3:17, 7:21, 52:6

**permissible** [2] - 26:24, 82:14
**permit** [1] - 26:10
**person** [8] - 14:16, 18:8, 51:16, 53:8, 54:21, 55:6, 55:7, 81:24
**personal** [5] - 57:5, 60:19, 63:9, 71:12, 72:8
**personally** [1] - 66:23
**Ph.D** [1] - 53:2
**phenomena** [1] - 53:16
**phenomenon** [2] - 40:5, 42:15
**phrase** [1] - 42:7
**physically** [2] - 29:1, 58:2
**pick** [1] - 36:14
**picked** [1] - 5:8
**piece** [1] - 42:11
**pilots** [1] - 48:17
**places** [1] - 42:8
**Plaintiff** [2] - 1:3, 1:10
**plan** [2] - 34:21, 86:13
**planning** [3] - 20:23, 33:22, 71:22
**plausible** [1] - 29:23
**play** [3] - 54:18, 81:11, 100:19
**plays** [1] - 79:12
**pled** [2] - 11:24, 12:3
**plenty** [1] - 26:19
**PLLC** [1] - 1:19
**plus** [1] - 66:24
**Point** [1] - 20:14
**point** [39] - 23:20, 26:15, 28:9, 31:6, 31:15, 31:24, 33:24, 33:25, 34:3, 37:25, 38:15, 39:18, 40:13, 50:13, 53:22, 54:3, 58:16, 58:20, 59:9, 64:2, 69:17, 70:15, 70:17, 74:13, 77:18, 77:23, 79:7, 82:7, 84:17, 85:10, 85:24, 87:13, 88:15, 88:18, 89:8, 89:18, 89:23, 94:24
**pointed** [1] - 88:25
**points** [10] - 14:13, 22:8, 30:12, 48:13, 54:17, 57:17, 58:18, 61:16, 89:23, 93:6
**policies** [3] - 93:10, 93:11, 93:12
**policing** [2] - 65:3, 65:25

**policy** [4] - 93:13, 93:14, 93:16, 94:3
**political** [1] - 87:25
**pool** [2] - 52:10, 75:19
**poor** [1] - 44:6
**Porsche** [1] - 62:16
**portion** [2] - 13:9, 13:11
**portions** [1] - 64:12
**position** [14] - 14:6, 15:13, 42:1, 44:20, 45:1, 47:9, 60:10, 63:25, 77:7, 84:1, 95:21, 95:23, 96:12, 96:16
**positions** [1] - 79:10
**possession** [1] - 97:8
**possibility** [3] - 5:19, 35:22, 84:9
**possible** [6] - 11:3, 37:13, 43:10, 73:3, 84:22, 99:10
**possibly** [1] - 23:18
**post** [3] - 38:2, 38:8, 79:18
**post-mix** [1] - 79:18
**post-trial** [2] - 38:2, 38:8
**Poteat** [1] - 92:13
**potential** [1] - 34:8
**potentially** [3] - 30:25, 34:10, 67:15
**power** [1] - 21:25
**PowerPoint** [4] - 56:22, 57:15, 59:1, 62:21
**practical** [1] - 45:2
**practice** [4] - 92:9, 94:5, 94:6, 94:12
**Practice** [2] - 92:15, 94:7
**practices** [2] - 30:19, 94:2
**predictive** [1] - 51:5
**prefer** [1] - 20:23
**prefers** [1] - 100:14
**prejudice** [2] - 97:24, 98:4
**prejudices** [1] - 11:21
**prejudicial** [8] - 11:16, 12:4, 12:7, 27:8, 28:2, 49:6, 84:20, 98:14
**preliminary** [19] - 7:4, 7:8, 8:5, 8:17, 10:14, 11:1, 11:4, 11:25, 12:17, 13:7, 14:1, 14:14, 15:20, 16:19, 16:21, 16:25, 17:4, 17:8, 17:13

**prep** [1] - 36:20
**prepared** [3] - 18:16, 85:19, 95:21
**prescriptive** [1] - 45:13
**presence** [3] - 24:4, 38:20, 49:15
**present** [3] - 2:13, 2:20, 46:1
**presented** [2] - 29:25, 32:15
**presenting** [2] - 19:9, 30:23
**press** [1] - 86:12
**presumably** [1] - 27:18
**PRETRIAL** [2] - 1:4, 1:7
**pretrial** [3] - 33:7, 36:7, 40:21
**pretty** [2] - 9:22, 11:14
**prevent** [1] - 86:17
**previous** [2] - 73:16, 79:10
**previously** [5] - 20:6, 21:1, 34:24, 37:11, 39:14
**primarily** [1] - 7:18
**prime** [1] - 32:24
**primordial** [1] - 11:17
**principal** [1] - 27:4
**principle** [1] - 41:13
**principles** [1] - 54:18
**printout** [2] - 4:3
**priority** [1] - 37:4
**privacy** [20] - 30:18, 57:5, 57:25, 60:19, 71:12, 72:8, 79:17, 79:18, 79:24, 82:11, 82:14, 85:3, 85:5, 85:15, 86:16, 87:15, 87:20, 88:4, 89:14, 90:21
**private** [2] - 46:16, 59:23
**probability** [1] - 50:9
**probative** [3] - 27:9, 28:3, 84:20
**problem** [20] - 9:8, 13:6, 21:19, 22:6, 27:3, 46:17, 46:18, 47:22, 47:23, 58:9, 58:21, 59:19, 62:12, 62:19, 66:20, 68:18, 81:13, 88:24, 89:21, 96:11
**problematic** [2] - 49:3, 67:8
**problems** [2] - 26:22, 62:14

**procedure** [2] - 4:24, 31:21
**proceed** [5] - 37:25, 38:7, 38:11, 95:23, 99:14
**proceeding** [1] - 2:19
**proceedings** [2] - 38:21, 103:6
**proceeds** [7] - 14:17, 15:19, 79:23, 79:25, 80:4, 81:24, 82:12
**process** [3] - 48:7, 48:15, 92:11
**processes** [1] - 102:1
**produced** [4] - 6:1, 6:16, 6:21, 26:21
**product** [1] - 32:20
**production** [1] - 41:17
**professional** [3] - 33:16, 42:7, 47:1
**Professor** [1] - 69:14
**programmer** [2] - 79:25, 82:11
**promise** [1] - 100:11
**promises** [1] - 101:25
**promote** [1] - 15:25
**prong** [1] - 47:11
**proof** [5] - 8:16, 10:14, 10:21, 75:20, 77:8
**proper** [9] - 23:9, 26:2, 43:16, 44:15, 44:24, 47:25, 60:1, 64:14, 68:14
**properly** [2] - 44:10, 98:21
**property** [4] - 14:10, 92:5, 93:8, 94:2
**proposed** [6] - 7:8, 17:4, 56:23, 60:6, 69:4, 72:15
**proposition** [3] - 43:16, 44:23, 94:15
**prosecution** [1] - 41:24
**prosecutor** [1] - 102:12
**prosecutor's** [2] - 5:7, 101:7
**prospective** [1] - 12:13
**protecting** [1] - 87:24
**protestors** [2] - 87:6, 88:20
**prove** [8] - 8:11, 10:17, 14:10, 15:24, 16:4, 24:6, 54:8, 63:24
**proven** [3] - 50:18, 50:19, 51:1
**proves** [3] - 65:6,

70:12, 78:24
**provide** [4] - 22:19, 31:18, 41:7, 49:17
**provided** [2] - 45:8, 45:9
**provides** [2] - 10:19, 43:6
**providing** [3] - 21:3, 22:10, 102:5
**province** [4] - 47:21, 49:6, 57:10, 62:6
**public** [1] - 90:18
**published** [5] - 43:1, 92:9, 94:8, 94:15, 94:16
**pulling** [1] - 10:25
**pulls** [2] - 31:21, 31:23
**purchasable** [1] - 80:1
**purchase** [1] - 81:1
**purchased** [2] - 80:20, 80:22
**purchasing** [2] - 81:15, 82:12
**purely** [1] - 59:23
**purport** [2] - 6:8, 52:15
**purportedly** [1] - 28:18
**purporting** [1] - 76:5
**purpose** [3] - 61:3, 84:11, 88:10
**purposes** [8] - 11:3, 16:19, 58:1, 60:23, 68:15, 85:14, 86:1, 87:22
**pursuant** [2] - 5:15, 6:1
**put** [18] - 16:12, 17:3, 34:19, 35:4, 35:17, 53:2, 58:10, 58:11, 58:24, 62:2, 82:17, 95:8, 97:23, 98:1, 98:2, 98:3, 98:9, 98:20
**puts** [1] - 77:7
**putting** [6] - 43:21, 58:17, 78:21, 81:19, 97:24, 97:25

## Q

**Q.E.D** [1] - 66:18
**quackery** [1] - 55:2
**qualifications** [1] - 54:24
**qualified** [3] - 39:14, 78:14, 78:22
**quantifiable** [1] - 88:7
**quantification** [1] - 53:21

**quantify** [6] - 44:20, 44:21, 49:17, 51:19, 52:15, 53:18
**quantities** [2] - 86:7, 86:9
**questioning** [1] - 31:8
**questions** [4] - 16:15, 28:1, 81:12, 95:11
**quick** [2] - 13:25, 93:6
**quickly** [3] - 37:1, 99:9, 99:22
**quite** [4] - 22:19, 24:11, 46:25, 65:24
**quotations** [1] - 92:14
**quote** [7] - 11:19, 28:12, 31:18, 53:19, 67:23, 91:20, 93:14
**quote-unquote** [4] - 11:19, 31:18, 53:19, 67:23

## R

**rabbit** [1] - 8:18
**raise** [2] - 11:11, 99:18
**raised** [6] - 10:7, 16:11, 27:4, 37:20, 79:8, 101:9
**raises** [1] - 49:14
**raising** [3] - 16:11, 28:1, 64:15
**RANDOLPH** [1] - 1:8
**random** [3] - 32:25, 71:10, 72:6
**rank** [1] - 84:24
**Rappahannock** [2] - 3:8, 3:20
**rate** [2] - 31:2, 53:21
**rates** [2] - 32:12, 32:24
**rather** [5] - 14:7, 35:4, 54:16, 91:23, 96:14
**rattle** [1] - 85:22
**rea** [1] - 14:7
**reach** [5] - 3:22, 48:7, 54:12, 54:13, 101:5
**reached** [3] - 3:13, 21:5, 67:7
**reaches** [1] - 91:4
**reaction** [4] - 21:2, 32:7, 80:7, 86:23
**Reactor** [3] - 42:4, 53:21, 54:6
**read** [7] - 29:2, 31:13, 32:17, 34:14, 49:22, 67:25, 68:3
**reading** [1] - 40:16
**real** [3] - 30:23, 62:13, 86:5
**realistically** [1] - 100:5
**realize** [1] - 18:16

really [26] - 5:16, 8:13, 9:12, 13:10, 32:24, 37:2, 37:8, 37:20, 37:22, 49:5, 52:21, 53:3, 53:5, 53:8, 58:9, 60:7, 66:2, 66:9, 67:14, 77:14, 78:17, 93:21, 94:4, 94:13, 96:10
reason [7] - 19:4, 20:2, 29:22, 29:23, 47:18, 64:15, 75:13
Reason [1] - 63:7
reasonable [3] - 10:17, 17:3, 17:5
reasonably [1] - 45:3
reasons [10] - 13:5, 47:19, 51:20, 60:21, 60:22, 61:5, 61:6, 63:6, 87:23, 88:5
rebut [1] - 77:24
rebuttal [1] - 34:11
recalling [2] - 57:15, 63:12
receive [2] - 62:24, 63:4
received [1] - 43:10
receiving [2] - 5:15, 13:15
Recess [1] - 38:19
reckless [2] - 21:12
recognition [1] - 72:10
recognizable [6] - 71:4, 72:2, 72:3, 74:3, 75:2, 76:8
recognized [7] - 92:7, 93:3, 94:5, 94:6, 94:12, 94:13, 94:18
recollection [7] - 34:15, 44:19, 55:10, 58:8, 58:12, 58:22, 84:15
record [5] - 2:5, 2:18, 4:23, 38:25, 101:12
records [13] - 5:1, 5:4, 5:22, 5:23, 6:5, 6:7, 6:11, 6:21, 20:2, 21:18, 31:17, 63:5, 101:14
recounts [1] - 28:13
Red [2] - 17:8, 17:9
reduce [2] - 50:15, 50:20
refer [2] - 58:25, 62:20
reference [2] - 14:4, 85:9
referenced [2] - 72:21, 87:14
references [1] - 72:19

referred [1] - 39:17
referring [5] - 42:11, 76:17, 89:15, 89:25, 93:2
refers [1] - 11:24
reflection [1] - 23:22
regarding [8] - 18:21, 18:25, 19:14, 19:24, 23:16, 53:15, 68:1, 72:17
regimes [4] - 87:5, 87:12, 88:19, 90:23
Regional [1] - 3:9
regs [1] - 37:18
regular [3] - 71:10, 72:7, 72:12
regularly [1] - 85:3
regulatory [1] - 90:23
related [1] - 61:16
relatedly [1] - 96:19
relates [1] - 102:15
relating [3] - 17:21, 37:11, 95:19
relation [1] - 73:8
relationship [1] - 94:2
relative [3] - 7:21, 8:3, 86:8
relayed [1] - 101:6
release [1] - 86:12
relevance [6] - 47:10, 68:7, 68:14, 77:3, 93:7, 93:20
relevant [7] - 9:5, 21:7, 46:21, 46:22, 66:13, 69:3, 93:21
relevantly [1] - 49:10
reliability [1] - 21:16
reliable [2] - 51:8, 91:16
relied [4] - 31:10, 49:4, 89:9, 89:19
rely [6] - 6:10, 21:12, 26:19, 32:14, 71:6, 92:7
relying [7] - 6:3, 6:24, 19:17, 32:20, 69:23, 90:13, 93:10
remain [1] - 98:24
remaining [1] - 35:20
remember [6] - 34:16, 40:16, 45:8, 64:17, 80:19
remembering [1] - 41:12
remind [3] - 33:6, 33:7, 47:13
removed [1] - 11:14
repeatedly [2] - 84:8, 85:6
report [22] - 18:11,

21:8, 21:21, 22:7, 25:17, 25:19, 25:22, 26:9, 26:23, 31:1, 31:13, 42:6, 46:12, 89:16, 89:19, 89:20, 90:13, 91:3, 91:13, 91:20, 91:24, 97:17
reported [1] - 88:11
REPORTER [1] - 103:1
Reporter [3] - 1:22, 1:23, 103:10
reporter [2] - 95:3, 95:7
reporting [1] - 29:6
reports [9] - 25:23, 26:1, 35:11, 87:14, 88:25, 90:18, 91:17, 91:23
representation [5] - 14:6, 15:2, 15:13, 90:9, 101:16
representative [1] - 14:5
represented [6] - 14:3, 14:11, 14:15, 14:17, 75:17
represents [1] - 15:18
reproducible [1] - 51:8
request [3] - 5:16, 17:2
requests [1] - 7:11
require [1] - 82:22
required [5] - 8:11, 15:9, 17:23, 18:9, 18:13
requirement [1] - 13:12
requirements [2] - 17:25, 19:4
requires [4] - 15:13, 23:4, 48:15, 48:16
requisite [2] - 9:25, 23:21
research [2] - 43:1, 45:9
reserve [1] - 96:2
reserves [1] - 26:12
resolve [1] - 96:8
respect [29] - 6:4, 11:2, 12:13, 18:23, 18:25, 19:13, 19:16, 19:20, 20:7, 20:9, 20:14, 20:19, 21:1, 21:16, 27:5, 35:12, 37:17, 39:9, 51:18, 53:25, 74:22, 76:6, 76:8, 78:5, 81:12, 84:14, 85:1, 97:19

respond [3] - 69:25, 70:19, 99:19
response [3] - 6:11, 14:13, 102:4
Responses [1] - 91:8
responsibility [2] - 83:18, 84:3
responsive [1] - 101:23
rest [1] - 95:8
restrain [1] - 83:21
result [10] - 21:5, 32:12, 48:4, 48:5, 48:7, 50:11, 52:18, 52:19, 54:12, 54:14
retrieved [2] - 96:21, 97:8
revealed [1] - 82:5
review [11] - 19:5, 29:4, 41:8, 41:20, 43:11, 48:19, 50:2, 69:9, 92:9, 99:24, 99:25
reviewed [3] - 20:15, 26:21, 28:16
reviewing [2] - 35:10, 60:10
rightness [1] - 50:6
rights [2] - 87:6, 88:20
rigorous [1] - 67:21
risk [2] - 11:7, 68:8
risks [1] - 49:4
RMR [2] - 1:22, 103:9
Road [1] - 85:21
road [1] - 10:18
robbery [1] - 86:13
role [4] - 21:9, 42:24, 55:19, 65:25
ROMAN [1] - 1:5
Roman [5] - 2:3, 2:13, 38:20, 38:23, 39:6
room [2] - 55:5, 55:12
Room [2] - 1:23, 103:10
rough [1] - 19:9
royalties [1] - 74:17
royalty [5] - 57:21, 73:14, 73:22, 75:16, 75:17
Rule [2] - 32:2, 47:10
rules [1] - 5:14
run [4] - 9:14, 18:2, 18:8, 18:13
running [6] - 19:14, 22:17, 57:7, 65:17, 74:8, 79:23
runs [2] - 83:14, 90:25
Russian [1] - 98:16

**S**

safety [1] - 87:24
sake [1] - 25:17
salad [1] - 49:25
Satoshi [1] - 59:16
Saturday [1] - 3:19
Saturdays [2] - 3:18, 4:5
saw [1] - 84:17
schedule [1] - 100:20
scheduled [1] - 4:4
scheme [1] - 73:24
scholl [1] - 71:24
Scholl [1] - 46:12
Scholl's [1] - 46:12
school [1] - 73:8
science [1] - 42:23
scienter [1] - 16:22
scientific [12] - 33:1, 40:4, 50:1, 50:5, 50:18, 50:19, 51:1, 51:9, 51:17, 53:19, 54:17, 67:7
scientist [1] - 66:15
Scotsman [1] - 78:18
scroll [1] - 63:2
scrolling [1] - 56:12
seal [1] - 102:15
Second [1] - 14:9
second [4] - 3:19, 58:6, 61:22, 95:2
security [1] - 17:23
See [2] - 92:12, 94:19
see [45] - 4:2, 4:20, 6:19, 11:2, 17:20, 18:10, 18:11, 18:20, 21:15, 22:5, 22:12, 22:14, 29:4, 29:23, 33:3, 42:18, 51:4, 51:7, 55:23, 55:24, 55:25, 57:12, 58:21, 59:6, 59:7, 59:8, 62:18, 62:25, 64:17, 66:12, 67:14, 70:18, 73:21, 74:19, 76:7, 79:12, 81:13, 83:9, 86:11, 89:20, 93:20, 97:24, 99:16, 100:9, 102:10
seeing [2] - 7:18, 82:17
seeking [1] - 80:12
seem [4] - 22:15, 66:1, 75:3, 87:8
seemingly [1] - 28:9
sees [1] - 73:20
Sefranek [3] - 1:22, 103:9, 103:9
SEFRANEK [1] -

103:3
**seized** [3] - 65:16, 69:22, 70:7
**selection** [2] - 35:22, 36:6
**self** [1] - 86:8
**self-custody** [1] - 86:8
**selling** [4] - 13:4, 13:8, 13:9, 13:15
**seminars** [1] - 45:9
**send** [4] - 79:22, 79:25, 81:23, 82:12
**senior** [1] - 71:8
**sense** [10] - 19:6, 22:23, 43:7, 46:22, 47:2, 49:11, 52:21, 52:23, 53:4, 97:13
**sensible** [1] - 38:10
**sensitive** [1] - 44:22
**sent** [1] - 90:20
**sentence** [2] - 15:23, 16:3
**September** [2] - 1:5, 103:7
**sequencing** [2] - 95:16, 96:19
**seriously** [1] - 102:2
**server** [3] - 5:5, 5:10, 5:12
**servers** [1] - 28:25
**Service** [2] - 2:25, 100:14
**service** [7] - 57:21, 63:12, 72:13, 73:13, 77:6, 79:16, 89:13
**services** [4] - 13:3, 22:17, 86:16, 90:20
**Services** [1] - 71:9
**set** [6] - 5:12, 28:18, 28:19, 28:24, 29:5, 79:18
**setting** [2] - 78:13, 96:17
**share** [1] - 100:15
**shocked** [1] - 24:11
**shoes** [2] - 43:18, 81:19
**short** [2] - 53:15, 61:17
**shortly** [1] - 33:7
**shot** [3] - 93:19, 93:22, 94:11
**show** [20] - 8:16, 20:1, 25:14, 25:18, 27:13, 28:3, 30:3, 33:12, 33:18, 48:6, 57:22, 58:18, 59:3, 61:20, 65:16, 65:20, 68:23, 71:3, 71:9, 77:9
**showing** [1] - 59:24

**shown** [2] - 19:17, 61:23
**shows** [4] - 62:14, 65:6, 74:18, 82:16
**sic** [1] - 88:14
**side** [7] - 9:11, 26:12, 33:15, 70:9, 70:10, 70:11, 100:16
**sign** [1] - 5:19
**significant** [1] - 98:14
**significantly** [2] - 79:25, 82:11
**signing** [1] - 4:23
**Silk** [1] - 85:21
**similar** [2] - 39:20, 40:4
**simple** [4] - 11:3, 15:13, 17:1, 19:8
**simply** [14] - 15:18, 19:9, 31:20, 32:1, 33:17, 45:15, 48:2, 69:23, 78:21, 90:25, 91:13, 91:24, 92:19, 102:5
**single** [3] - 31:20, 31:25, 82:24
**site** [3] - 17:22, 17:24, 18:13
**sites** [2] - 19:14, 80:1
**sits** [1] - 73:4
**sitting** [1] - 64:16
**situation** [2] - 51:10, 53:6
**six** [2] - 7:16, 55:14
**skeptical** [4] - 43:15, 43:20, 43:23, 44:23
**skepticism** [1] - 20:7
**skilled** [2] - 79:24, 82:11
**skipping** [1] - 79:2
**slide** [5] - 59:6, 59:7, 60:14, 62:22, 69:9
**Slide** [1] - 59:6
**slides** [10] - 59:5, 60:9, 60:11, 60:12, 63:2, 64:5, 64:6, 64:9, 64:16, 69:5
**small** [1] - 7:11
**smarter** [1] - 81:20
**software** [2] - 72:23, 73:1
**sold** [2] - 8:1, 9:21
**someone** [17] - 24:7, 24:8, 24:9, 24:10, 27:15, 29:17, 29:23, 38:7, 60:20, 65:17, 73:1, 79:21, 80:11, 80:25, 82:3, 83:1, 101:19
**sometime** [2] -

100:12, 100:21
**sometimes** [6] - 40:25, 42:15, 42:16, 45:18, 50:7, 50:8
**somewhat** [3] - 20:20, 22:6, 62:22
**somewhere** [1] - 3:1
**son** [2] - 64:20
**soon** [2] - 11:4, 83:1
**sooner** [1] - 100:17
**sophisticated** [3] - 52:9, 74:14, 82:4
**sophistication** [1] - 82:17
**sorry** [8] - 23:8, 33:5, 39:21, 53:24, 79:5, 79:6, 93:15, 99:12
**sort** [38] - 6:20, 15:7, 17:13, 22:23, 32:25, 41:21, 44:15, 48:21, 52:4, 52:22, 53:7, 54:10, 55:20, 57:12, 58:23, 59:11, 60:15, 65:25, 67:7, 70:4, 72:1, 72:9, 72:18, 74:7, 75:9, 76:17, 77:17, 81:11, 83:13, 84:24, 87:7, 87:11, 87:21, 89:2, 92:23, 100:19, 101:16
**sorts** [3] - 7:23, 33:9, 48:17
**sound** [2] - 67:6, 70:6
**sounded** [1] - 77:21
**sounding** [1] - 67:2
**sounds** [6] - 15:21, 22:8, 29:16, 35:6, 36:19, 65:7
**source** [4] - 61:24, 65:22, 80:5, 94:16
**sources** [2] - 48:22, 91:16
**Southern** [1] - 86:12
**speaking** [2] - 10:6, 49:10
**speaks** [1] - 43:3
**specific** [4] - 6:18, 18:9, 31:25, 32:1
**specifically** [1] - 32:7
**specificity** [1] - 31:16
**specified** [4] - 14:18, 15:25, 16:2, 16:8
**specify** [1] - 18:6
**speculation** [5] - 28:7, 46:8, 46:23, 77:16, 84:24
**speculative** [1] - 21:9
**spent** [2] - 23:25, 48:24
**spoken** [1] - 27:21

**sponte** [1] - 37:20
**spreadsheet** [2] - 26:22, 31:20
**spring** [1] - 32:3
**stacking** [1] - 17:24
**staff** [2] - 19:6, 102:24
**staffing** [1] - 19:3
**stand** [11] - 20:19, 27:25, 34:20, 49:2, 51:25, 60:25, 61:1, 69:20, 77:21, 98:1, 98:2
**standard** [6] - 10:21, 31:21, 76:18, 94:13, 94:18, 101:13
**standards** [9] - 30:19, 53:17, 67:20, 67:24, 68:5, 69:15, 92:7, 93:2
**standing** [2] - 40:20, 43:18
**star** [1] - 27:7
**start** [6] - 8:18, 10:18, 11:4, 35:19, 41:5, 56:25
**started** [1] - 28:14
**starting** [3] - 2:5, 3:10, 99:17
**starts** [6] - 33:16, 49:6, 56:19, 64:3, 67:2, 83:1
**state** [5] - 2:4, 33:11, 38:24, 40:17, 43:9
**statement** [3] - 12:1, 33:10, 33:11
**statements** [4] - 33:8, 33:15, 41:18, 52:22
**STATES** [3] - 1:1, 1:2, 1:8
**states** [1] - 87:14
**States** [11] - 1:23, 2:3, 2:7, 2:9, 2:10, 2:25, 5:17, 28:21, 28:22, 38:23, 39:2
**stating** [1] - 68:1
**status** [1] - 97:17
**statute** [17] - 7:14, 7:15, 7:17, 8:4, 8:10, 8:12, 8:25, 9:5, 9:8, 9:13, 10:1, 10:10, 15:9, 15:15, 16:20, 37:11, 37:17
**statutes** [1] - 37:24
**statutory** [3] - 7:21, 8:3, 14:15
**steal** [1] - 30:2
**stealing** [1] - 92:20
**stenographic** [1] - 103:5
**step** [5] - 6:4, 46:15,

51:2, 67:4, 78:17
**stepping** [2] - 47:21, 80:8
**steps** [2] - 48:7, 50:15
**STERLINGOV** [1] - 1:5
**Sterlingov** [40] - 2:3, 2:13, 2:19, 3:1, 3:24, 7:20, 7:25, 8:23, 10:4, 23:17, 29:20, 35:1, 38:20, 38:23, 39:6, 46:13, 46:16, 57:4, 57:7, 57:24, 60:17, 60:23, 60:24, 61:3, 61:22, 61:24, 62:24, 63:4, 67:8, 69:10, 71:3, 71:5, 80:17, 80:22, 81:4, 81:20, 81:22, 83:14, 97:9, 98:16
**Sterlingov's** [9] - 57:20, 59:22, 61:17, 63:4, 65:16, 68:1, 68:6, 81:19, 84:10
**stick** [2] - 20:6, 91:22
**still** [19] - 9:19, 10:13, 20:22, 20:24, 21:1, 21:2, 26:8, 26:15, 26:20, 30:9, 31:17, 32:14, 34:7, 35:16, 38:2, 51:22, 54:1, 71:25, 102:1
**still's** [1] - 30:13
**stole** [1] - 29:18
**stop** [1] - 34:3
**story** [1] - 64:20
**straightforward** [1] - 17:1
**strange** [1] - 77:7
**stray** [1] - 83:19
**strays** [1] - 83:13
**Street** [2] - 1:11, 1:20
**strike** [5] - 21:6, 21:21, 65:24, 67:12, 83:23
**strikes** [14] - 21:5, 41:2, 41:20, 51:23, 57:9, 59:25, 60:1, 60:24, 63:17, 64:2, 74:7, 74:20, 80:14, 87:9
**strong** [1] - 34:15
**struck** [2] - 64:18
**struggle** [1] - 55:20
**students** [2] - 79:20, 81:14
**studied** [3] - 22:16, 44:18, 55:18
**studies** [8] - 31:5, 31:9, 31:10, 31:13, 48:5, 55:3, 82:22,

91:13
**study** [8] - 23:4, 24:14, 38:4, 52:17, 55:4, 55:5, 55:16, 90:7
**stuff** [6] - 7:23, 9:1, 22:11, 43:24, 64:20, 83:19
**sua** [1] - 37:20
**subcategory** [1] - 87:7
**subject** [6] - 18:15, 42:5, 55:4, 59:18, 60:13, 95:25
**subjective** [1] - 48:7
**submission** [1] - 20:16
**submissions** [1] - 28:12
**submit** [11] - 23:3, 23:20, 26:1, 26:2, 26:24, 40:9, 43:12, 60:3, 69:2, 69:3, 88:22
**submits** [1] - 26:18
**submitted** [1] - 17:19
**substance** [1] - 13:16
**substantively** [1] - 96:18
**sufficient** [2] - 10:15, 78:9
**sufficiently** [1] - 31:8
**suggest** [7] - 17:3, 18:12, 25:8, 29:25, 31:1, 74:7, 74:20
**suggested** [2] - 30:1, 33:22
**suggesting** [2] - 55:1, 87:10
**suggestion** [3] - 41:10, 43:6, 66:15
**suggests** [3] - 66:14, 68:21, 85:6
**sum** [1] - 70:4
**summaries** [1] - 26:3
**summarizing** [2] - 33:17, 56:22
**summary** [4] - 32:16, 44:16, 60:9, 69:4
**supplanting** [1] - 55:19
**supplemental** [2] - 5:13, 56:18
**support** [4] - 17:19, 24:15, 94:6, 94:15
**suppose** [1] - 24:7
**supposed** [4] - 58:14, 63:12, 88:24, 90:3
**surprise** [1] - 73:4
**surprised** [1] - 62:2
**suspect** [5] - 45:4, 45:6, 65:21, 91:1,

98:10
**suspicion** [1] - 64:5
**suspicious** [1] - 85:6
**swap** [1] - 80:2
**sword** [1] - 49:1
**synonymous** [1] - 12:12
**system** [3] - 40:22, 101:20

## T

**table** [1] - 55:8
**talks** [1] - 21:14
**TAMARA** [1] - 103:3
**Tamara** [3] - 1:22, 103:9, 103:9
**tampering** [1] - 20:4
**tangents** [1] - 36:17
**taught** [1] - 67:24
**teach** [2] - 81:14, 82:14
**teaches** [3] - 73:7, 73:8, 79:19
**team** [1] - 45:5
**teams** [1] - 11:25
**technician** [1] - 51:15
**technicians** [1] - 48:18
**techniques** [1] - 51:9
**technology** [4] - 74:1, 74:3, 75:10, 75:12
**Ted** [1] - 12:3
**ten** [1] - 34:23
**tends** [1] - 24:6
**tens** [1] - 86:13
**term** [3] - 12:10, 12:24, 13:18
**terms** [15] - 13:2, 13:3, 15:1, 25:17, 26:20, 42:4, 66:2, 70:14, 73:10, 76:15, 77:3, 82:7, 95:16, 97:7, 97:10
**terribly** [2] - 18:16, 61:8
**Tesla** [2] - 64:22, 64:23
**Teslas** [1] - 22:14
**test** [5] - 50:1, 50:9, 51:11, 51:12, 51:17
**tested** [1] - 50:16
**testified** [7] - 18:2, 18:7, 18:25, 19:22, 69:20, 76:13, 93:10
**testifies** [1] - 69:21
**testify** [61] - 20:9, 20:14, 22:2, 24:20, 26:25, 27:16, 39:19, 40:3, 41:12, 42:22,

43:16, 47:15, 50:23, 50:24, 51:25, 54:1, 55:24, 56:16, 57:3, 57:11, 57:13, 57:16, 58:8, 60:11, 61:2, 61:16, 63:10, 63:16, 63:19, 65:15, 65:18, 66:5, 69:18, 71:1, 71:22, 72:4, 76:4, 77:5, 78:2, 78:6, 79:24, 80:3, 80:10, 80:11, 81:6, 82:1, 82:11, 82:21, 82:25, 84:8, 85:3, 85:11, 86:3, 86:16, 87:4, 89:12, 90:17, 90:19, 92:4, 92:25, 93:7
**testifying** [6] - 50:25, 53:8, 75:6, 81:13, 82:7, 85:13
**testimony** [58] - 17:13, 17:19, 18:1, 18:12, 18:18, 20:15, 20:18, 21:3, 21:20, 23:16, 25:11, 26:8, 30:13, 30:21, 30:23, 31:4, 31:12, 34:1, 34:10, 34:14, 35:12, 39:11, 40:17, 40:20, 44:19, 45:16, 45:22, 46:7, 46:20, 47:9, 47:14, 47:23, 48:1, 48:14, 53:15, 53:19, 54:16, 56:23, 58:15, 60:2, 62:17, 64:17, 65:2, 69:4, 74:15, 74:21, 75:13, 76:2, 77:19, 77:24, 77:25, 83:23, 83:25, 88:2, 89:3, 96:23
**text** [1] - 14:15
**textbooks** [1] - 74:17
**textual** [1] - 15:8
**THE** [175] - 1:1, 1:1, 1:8, 2:2, 2:11, 2:17, 2:23, 3:16, 4:2, 4:9, 4:14, 4:17, 5:3, 5:24, 6:1, 6:3, 6:13, 6:15, 6:19, 6:23, 7:3, 7:6, 7:9, 7:12, 8:8, 8:20, 9:3, 9:16, 10:3, 10:24, 11:22, 12:2, 12:8, 12:25, 13:5, 14:9, 15:10, 15:17, 17:7, 17:11, 20:25, 23:8, 24:3, 24:22, 25:7, 25:12, 25:14, 25:19, 25:24, 26:5, 26:16, 27:2, 29:12, 30:7, 32:4, 33:5,

34:4, 34:13, 34:23, 35:6, 35:9, 35:13, 35:14, 36:1, 36:4, 36:10, 36:13, 38:12, 38:14, 38:22, 39:1, 39:4, 39:8, 40:1, 40:11, 41:2, 42:13, 43:14, 47:7, 47:18, 49:1, 49:19, 49:24, 51:18, 53:10, 53:23, 55:1, 56:5, 56:10, 56:14, 56:20, 57:1, 57:9, 58:6, 59:2, 59:10, 59:15, 59:18, 60:13, 61:14, 61:25, 63:17, 65:10, 65:14, 65:24, 68:7, 69:17, 70:23, 71:13, 71:17, 72:16, 72:25, 74:4, 75:23, 76:20, 76:23, 77:18, 78:25, 79:3, 79:11, 79:14, 80:6, 80:24, 82:19, 82:21, 83:7, 83:9, 83:17, 84:6, 84:13, 85:13, 86:18, 86:22, 87:3, 87:8, 88:6, 88:12, 88:16, 88:24, 89:7, 89:11, 89:18, 90:2, 90:12, 90:16, 91:11, 92:3, 92:17, 93:5, 93:15, 93:17, 93:25, 94:4, 94:10, 94:22, 95:2, 95:12, 95:17, 96:1, 97:3, 97:14, 99:12, 99:20, 100:8, 100:21, 100:25, 101:4, 101:18, 101:22, 102:3, 102:10, 102:14, 102:18, 102:21, 102:23
**theft** [1] - 30:1
**themselves** [2] - 6:6, 6:7
**theories** [4] - 48:12, 49:13, 49:14, 51:9
**theory** [7] - 38:1, 57:19, 62:14, 67:10, 68:12, 80:16, 81:4
**therefore** [3] - 65:5, 68:19, 70:12
**they've** [2] - 27:16, 54:20
**thief** [1] - 86:6
**thin** [1] - 69:8
**thinking** [4] - 7:23, 8:3, 61:3, 67:16
**thinks** [3] - 12:11, 38:10, 43:5

**third** [1] - 84:9
**third-party** [1] - 84:9
**thousands** [1] - 44:10
**thread** [1] - 10:25
**threat** [1] - 86:5
**three** [4] - 3:3, 9:19, 63:5, 100:19
**three-dimensional** [1] - 100:19
**thumb** [1] - 28:15
**Thursday** [6] - 35:22, 36:14, 36:18, 36:21, 99:2, 100:22
**tied** [2] - 3:11, 90:12
**tight** [1] - 20:20
**timeline** [1] - 101:11
**title** [1] - 92:14
**today** [6] - 2:19, 9:2, 39:7, 40:20, 63:1, 102:24
**Tokyo** [1] - 101:7
**tomorrow** [1] - 100:12
**tone** [1] - 22:7
**tonight** [1] - 100:12
**tool** [5] - 49:17, 76:5, 78:7, 81:17, 89:13
**tools** [10] - 41:15, 41:21, 42:9, 43:5, 43:6, 68:15, 80:15, 87:20, 87:22, 88:4
**top** [5] - 40:7, 66:25, 73:3, 88:14, 89:5
**topic** [4] - 20:17, 33:6, 34:5, 84:13
**topics** [1] - 17:15
**Tor** [9] - 1:19, 2:12, 13:3, 17:24, 80:1, 80:13, 82:13, 87:20, 87:25
**tor** [1] - 39:5
**TOR** [1] - 1:18
**Tor-based** [1] - 13:3
**total** [2] - 47:15, 61:21
**totalitarian** [3] - 87:5, 87:11, 88:19
**totally** [2] - 71:25, 83:12
**touched** [1] - 71:15
**towards** [1] - 41:4
**town** [1] - 100:18
**trace** [1] - 80:14
**traceable** [2] - 74:10, 81:1
**Tracers** [1] - 28:13
**tracing** [15] - 21:4, 30:14, 31:6, 54:2, 68:15, 72:18, 72:23, 72:25, 76:5, 76:6, 76:15, 78:6, 78:7, 78:14, 87:6

**Appx1858**

track [1] - 44:11
tracking [1] - 62:21
tracks [1] - 101:13
trade [1] - 80:4
traditional [1] - 90:25
trained [1] - 67:20
training [7] - 67:21, 68:4, 71:7, 76:12, 76:14, 76:18
trainings [1] - 50:14
transaction [9] - 14:10, 14:17, 16:5, 16:7, 29:20, 29:21, 58:4, 79:18, 84:12
transactions [15] - 13:13, 14:4, 46:16, 59:24, 62:8, 63:21, 66:6, 66:24, 72:10, 72:18, 74:15, 80:18, 86:25, 90:20
transcript [5] - 19:8, 40:17, 49:21, 103:4, 103:6
TRANSCRIPT [1] - 1:7
transfer [3] - 5:1, 80:2, 86:7
transferable [1] - 55:17
transferred [1] - 61:17
transfers [2] - 71:1, 71:22
translated [2] - 95:24, 97:23
translation [4] - 96:8, 96:18, 97:19, 98:9
translations [3] - 95:20, 98:10, 99:23
translator [2] - 96:4, 96:13
translators [4] - 95:19, 95:22, 95:23, 95:25
travel [1] - 100:18
travels [1] - 23:25
treasury [1] - 37:18
Treaty [1] - 5:15
treaty [1] - 101:13
trial [13] - 3:10, 31:21, 31:23, 32:3, 35:17, 36:20, 38:2, 38:8, 40:20, 85:10, 96:18, 97:10, 97:11
tried [3] - 11:2, 16:4, 16:25
true [4] - 78:18, 78:19, 103:4, 103:5
truism [1] - 51:3
trustee [10] - 4:18, 4:20, 4:22, 5:1, 5:8, 5:19, 5:22, 101:7, 101:12, 101:17

trustee's [1] - 5:23
try [6] - 30:11, 32:2, 69:10, 96:7, 96:14, 96:15
trying [6] - 51:19, 81:8, 84:2, 92:22, 93:22, 100:20
turn [7] - 7:5, 34:25, 55:13, 77:11, 98:4, 99:20
turns [2] - 12:15, 73:25
twist [1] - 91:23
two [13] - 13:1, 13:24, 14:13, 14:19, 37:7, 49:1, 61:16, 67:3, 76:14, 78:7, 89:23, 93:6, 95:7
two-day [2] - 76:14, 78:7
two-edged [1] - 49:1
type [11] - 39:12, 39:20, 40:4, 40:21, 44:12, 45:22, 46:7, 55:16, 58:24, 64:25, 68:3
types [5] - 22:16, 22:24, 42:17, 45:19, 46:18
typical [1] - 101:14
typically [2] - 30:2, 65:19

## U

U.S [3] - 1:13, 71:8, 86:11
u.S [1] - 1:16
ultimate [3] - 68:1, 81:12, 82:7
ultimately [3] - 16:16, 70:11, 82:7
unable [1] - 22:1
unaccounted [1] - 61:24
unconnected [1] - 28:10
under [11] - 4:24, 5:13, 6:11, 24:18, 26:18, 26:25, 32:14, 47:10, 55:14, 65:25, 102:15
underlying [4] - 13:13, 20:4, 42:3, 46:8
understood [18] - 7:2, 25:13, 26:14, 30:6, 33:21, 61:10, 65:9, 70:21, 83:6, 84:5, 85:2, 89:10, 92:2, 94:3, 94:21, 101:21, 102:17

unduly [3] - 12:7, 43:24, 44:13
unexplainable [1] - 63:7
unfair [1] - 32:1
unfettered [1] - 36:20
unfortunately [1] - 35:1
UNITED [3] - 1:1, 1:2, 1:8
United [11] - 1:23, 2:3, 2:7, 2:9, 2:10, 2:25, 5:17, 28:21, 28:22, 38:23, 39:2
University [2] - 79:20, 82:15
unlawful [7] - 13:20, 14:18, 15:19, 15:25, 16:2, 16:9, 84:12
unless [4] - 25:14, 27:10, 34:2, 38:7
unlikely [3] - 15:18, 82:16, 98:6
unquote [4] - 11:19, 31:18, 53:19, 67:23
unrelated [1] - 85:15
unremarkable [1] - 63:18
unscientific [1] - 55:2
unspecified [1] - 16:1
unsure [1] - 51:22
up [40] - 3:11, 5:8, 5:18, 9:21, 12:11, 13:2, 17:13, 20:22, 28:22, 31:5, 34:11, 35:19, 39:8, 39:22, 46:1, 50:21, 52:23, 53:2, 53:3, 56:10, 66:1, 67:2, 67:4, 67:6, 70:5, 70:14, 74:18, 75:18, 76:12, 78:22, 88:6, 90:7, 94:10, 95:4, 96:4, 96:13, 98:8, 101:1, 102:8, 102:12
upfront [1] - 11:8
usage [1] - 91:4
USAO [1] - 1:11
USAO-DOJ [1] - 1:11
user [3] - 31:19, 72:12, 77:6
users [4] - 85:4, 86:5, 86:17, 87:15
uses [5] - 11:13, 14:3, 31:7, 87:24, 88:4
usual [1] - 52:4

## V

vague [1] - 58:7

valuation [1] - 71:7
value [9] - 51:5, 58:15, 58:18, 58:19, 62:23, 62:25, 69:24, 70:2, 79:8
various [2] - 61:4, 80:11
veil [1] - 54:14
vendors [2] - 11:13, 11:24
venue [3] - 37:10, 37:17, 37:23
verbatim [1] - 12:1
verifiability [2] - 53:24, 54:10
Verret [34] - 56:10, 57:3, 58:8, 61:15, 61:20, 61:22, 65:15, 65:18, 69:14, 69:19, 69:25, 70:19, 71:1, 71:6, 71:21, 76:3, 77:13, 79:15, 79:19, 79:24, 80:2, 81:6, 84:7, 84:15, 85:3, 86:3, 86:15, 87:4, 89:12, 90:17, 90:22, 92:4, 92:7
Verret's [4] - 57:22, 60:5, 69:8, 72:17
versus [9] - 6:4, 20:4, 22:14, 45:15, 54:11, 64:24, 70:15, 72:12, 83:3
VIA [2] - 1:18, 1:19
via [2] - 2:13, 96:7
vibes [1] - 50:3
vibes-based [1] - 50:3
vicarious [1] - 14:24
victim [1] - 86:6
video [2] - 2:14, 2:20
view [3] - 84:14, 84:25, 96:1
viewpoint [1] - 74:2
views [3] - 17:13, 17:15, 18:23
violation [1] - 32:2
visit [3] - 3:11, 3:12, 4:5
visitors [1] - 3:18
visits [1] - 4:4
vital [2] - 92:5, 93:8
voir [3] - 12:9, 12:10, 12:11
volume [1] - 91:18
vs [1] - 1:4

## W

wait [3] - 8:6, 70:18, 71:13

waiting [1] - 36:23
waived [2] - 38:20, 39:6
walk [1] - 22:21
walked [1] - 48:13
Wall [1] - 1:20
wall [2] - 14:8, 15:14
wallet [1] - 58:3
wants [18] - 8:7, 22:2, 33:25, 46:12, 56:24, 58:8, 61:4, 66:5, 80:10, 80:25, 87:1, 87:18, 89:18, 90:7, 91:13, 91:16, 91:20, 99:19
warning [1] - 33:19
Washington [6] - 1:5, 1:12, 1:14, 1:17, 1:24, 103:11
wasting [1] - 25:12
water [1] - 19:12
ways [7] - 32:21, 34:15, 66:2, 80:11, 80:15, 80:25, 85:23
wealth [1] - 63:9
web [2] - 12:24, 13:11
website [1] - 80:23
websites [1] - 13:3
Wednesday [2] - 35:19, 41:16
week [5] - 3:2, 3:6, 96:7, 100:12, 100:22
weekdays [1] - 3:12
weekend [9] - 3:3, 3:10, 3:12, 3:24, 4:4, 96:7, 96:15, 97:16, 102:24
weight [1] - 74:5
welcome [5] - 18:19, 26:9, 27:3, 43:19, 71:17
well-established [1] - 47:3
whatnot [1] - 34:1
whichever [1] - 20:22
whittle [1] - 96:8
whole [7] - 12:23, 33:1, 63:24, 64:20, 69:6, 74:13
wholly [1] - 33:10
whys [1] - 57:13
wild [1] - 32:25
wire [1] - 30:19
withdrawal [4] - 8:14, 8:16, 9:14, 9:23
withdrawing [1] - 86:9
withdrew [2] - 8:23, 10:4
witness [16] - 17:20, 39:19, 45:16, 62:13,

65:8, 76:25, 81:10, 83:19, 83:21, 83:22, 95:16, 97:4, 97:5, 97:6, 98:1, 98:2

**witnesses** [11] - 34:19, 41:19, 53:20, 70:18, 73:10, 77:3, 95:19, 95:22, 97:1, 100:18, 100:20

**witnesses'** [1] - 34:10

**wonder** [1] - 35:17

**word** [13] - 11:13, 11:16, 11:19, 11:20, 12:12, 12:22, 14:3, 49:25, 71:5, 84:11, 97:22, 98:3, 98:9

**works** [2] - 44:18, 45:24

**world** [5] - 23:11, 23:25, 87:5, 87:25, 91:19

**worry** [3] - 10:24, 66:2, 83:17

**worth** [4] - 65:20, 66:10, 66:12, 68:22

**wrench** [1] - 58:1

**writes** [1] - 59:16

**written** [2] - 16:5, 18:4

**wrongdoing** [1] - 27:23

**wrongful** [1] - 30:16

**wrongness** [1] - 50:6

## Y

**year** [3] - 59:12, 59:13

**years** [8] - 7:14, 7:16, 23:24, 40:18, 44:6, 45:10, 59:9

**yesterday** [3] - 11:15, 17:14, 20:12

**York** [3] - 1:17, 1:20, 86:12

**you-all** [2] - 20:21, 98:2

**YouTube** [1] - 84:17

## Z

**Zcash** [1] - 73:4

**ZOOM** [2] - 1:18, 1:19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        ) Criminal Action
                                 ) No. 1:21-CR-0399
                    Plaintiff,   )
                                 ) **PRETRIAL CONFERENCE**
vs.                              )
                                 ) Washington, D.C.
ROMAN STERLINGOV,                )
                                 ) **September 13, 2023**
                    Defendant.   ) **Time:  9:30 A.M.**


**TRANSCRIPT OF PRETRIAL CONFERENCE**
BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE


**A P P E A R A N C E S**


For the Plaintiff:      CHRISTOPHER BROWN
                        USAO-DOJ
                        601 D Street, NW
                        Washington, DC 20001

                        ALDEN PELKER
                        U.S. DEPARTMENT OF JUSTICE
                        950 Pennsylvania Avenue, NW
                        Washington, DC 20530

                        JEFFREY PEARLMAN
                        DOJ-CRM
                        U.S. Department of Justice
                        1301 New York Ave. NW
                        Washington, DC 20005

For the Defendant:      TOR EKELAND
                        MICHAEL HASSARD
                        TAUSEEF AHMED
                        Tor Ekeland Law, PLLC
                        30 Wall Street, 8th Floor
                        New York, NY 10005

**A P P E A R A N C E S (Cont'd.)**

For Chainalysis:              WILLIAM FRENTZEN
MORRISON & FOERSTER, LLP
425 Market Street
San Francisco, CA 94105

Court Reporter:              Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6714
333 Constitution Avenue, NW
Washington, DC  20001
202-354-3246

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Calling Criminal Case 21-399, United States of America v. Roman Sterlingov.

Would counsel please approach the podium and state their names for the record, starting with government counsel.

MS. PELKER:  Good morning, Your Honor.  Alden Pelker, Chris Brown, and Jeff Pearlman for the United States.

THE COURT:  All right.  Good morning to all of you.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland, Michael Hassard, and Tauseef Ahmed -- who will be submitting his pro hac vice application to the Court shortly -- for Defendant Roman Sterlingov, who is present in court.

THE COURT:  Okay.  Thank you.  Good morning to all of you as well.

Does counsel for Chainalysis want to enter your appearance as well?

MR. FRENTZEN:  Sure.  Of course, Your Honor.  I apologize.  William Frentzen of Morrison Foerster for Chainalysis.

THE COURT:  Good morning to you.  Thank you.

All right.  So we're going to have a further pretrial hearing on Friday, in which we can take up a number of the open issues, but there are several that are just more pressing that I wanted to get to today.  I appreciate everyone making time for this in the midst of your trial preparation or, in

Mr. Frentzen's case, I assume flying across the country.

MS. PELKER: Yes, Your Honor. I have -- I apologize for passing to defense now -- an update on the documents that the Court had requested as far as the transmission letter back from the Japanese government, paired with our initial request. They're still working on seeing whether they can obtain an actual signed business record certification from the trustee.

My understanding is that the Japanese government has been in touch with him. There is a process in Japan that they have to go through; they're undertaking it now. We've emphasized the urgency and hope to have an update on Friday.

THE COURT: Okay.

MS. PELKER: But that the government, again, would submit that we've provided sufficient additional information through our supplemental briefings to properly authenticate the records.

THE COURT: All right. Thank you for getting what you've gotten. If you can just keep us updated as things progress. Feel free to share with the Japanese government that the Court does thank them, but also does see some urgency given the approaching trial date.

MS. PELKER: Yes, Your Honor.

THE COURT: All right. Thank you. And then -- I'm

just thinking about the best order to take things up here. Maybe the next thing to take up is just the protective order with respect to the material that Chainalysis has at this point produced to the government.

Quite frankly, it's a little bit hard for us to have the conversation about Rule 17(c) and the subpoena where I take it at this point in time Mr. Ekeland hasn't even reviewed the materials because he declined to agree to the proposed protective order and also declined, as I understand it, even to agree to an interim protective order that would allow disclosure to him and his colleagues at the law firm.

So I guess I'd like to address that to make sure that Mr. Ekeland can actually see what is there because I think it does provide some important context for the Rule 17(c) motion.

MS. PELKER: Yes, Your Honor. The government agrees. We had a call with Chainalysis counsel and Mr. Ekeland and Mr. Hassard yesterday. We are continuing to urge them to consider just agreeing to an interim protective order while they work through their ongoing discussions.

They expressed a concern yesterday that the noncompete could be viewed as applying to counsel. Mr. Frentzen followed up to clarify and provide an updated version of the protective order that I believe he filed with the Court last night that we think would make very clear that there is no restriction on counsel taking another blockchain

analysis client on in the future or another case regarding blockchain analysis.

I think that the proposed protective order, Your Honor, all it does is restrict Ms. Still from taking what she's getting in the discovery and using it for CipherTrace's commercial purposes.

The government would view that as improper under the existing protective order, and so I don't see this as that much more restrictive. And that the small additional terms here are to provide Chainalysis assurances about how that information is going to be handled on -- not on CipherTrace's systems. But we did not view this as a controversial step.

THE COURT: Okay. Well, let me hear from Mr. Ekeland on this, then.

So, Mr. Ekeland, what can I do to get this in your hands as quickly as possible?

MR. EKELAND: To the extent that -- we think that the current protective order, in terms of defense counsel, is adequate. And the issue that I had when I was -- first saw the protective order that we were being asked to sign to view the heuristics -- which I didn't expect that we were going to be asked to sign -- it had a five-year noncompete clause in it, and there was a bunch of vague language that I wouldn't counsel any of my clients ever to sign. It wasn't clear to me the scope of it.

I hesitate -- I think there's a fundamental problem here in that competitive concerns are being brought in in a federal criminal trial to -- and limiting our ability to choose experts and how the experts do their analysis, and we are being prevented or being limited in our use of particular kinds of experts, like we had Laurent Salah. I understand the Court's concerns expressed about enforcing a contempt order.

We're hearing objections to Bryan Bishop. These are top people in the field.

THE COURT: Mr. Ekeland, I apologize for interrupting. You have a little bit of a habit of, when I ask a question on one thing, just going off and talking about something else. In the interest of really getting to the heart of the matter, as we're getting closer to trial, my question is just what do you need in the protective order both with respect to Ms. Still's ability to review the material and your ability -- because I want this to happen in the next 45 minutes. I want you looking at this, and we need to know what it is.

If there's something in there that Ms. Still can't live with -- first of all, you're not Ms. Still's lawyer. I want to know what Ms. Still -- not what you would advise your clients, but what she says she can and can't live with. If she says, I can't live with this, I can't do it, I need to know that. I need to know specifically what it is, and we can, if

necessary, revise the protective order to address those concerns.

MR. EKELAND: Your Honor, she ran it by her, I believe, superiors at CipherTrace. They told her not to sign it. She told me last night that she needs to run the heuristic through CipherTrace's software, that they don't have an interest in what they believe Chainalysis's concern is, which is their database, which I think is the most valuable thing.

The limitations -- what was told to me is that the limitations on how we can review the data won't work for them because they need to take the data and use CipherTrace's systems to evaluate the stuff. I think that gets at what I was getting at before; these competitive limitations here are affecting the defense's ability to actually evaluate the data because we're being told that -- by our adversaries that -- essentially, our adversaries are telling us how we can review the data. And that's very problematic.

We need to be able to take the data and the heuristics and run them through CipherTrace's systems, Your Honor.

THE COURT: So it's a little hard for me to know how you or Ms. Still know that because you haven't seen the data yet. So you actually don't know what it is and whether it's something they can run through their system or whether you need to run it through your system because you haven't seen it yet.

So can we at least figure out something so that you and Ms. Still can at least look at it and tell us -- and I may need to get Ms. Still on the line and under oath to tell me what she can and can't do under the circumstances -- and that would be fine -- to pin this down.

We're picking a jury tomorrow, and time is running out. As I've said before, I think that this is -- the defense is largely to blame for this for not following my directions in a timely manner about how to proceed here, but I'm giving you every break I possibly can.

But you have to not be doing everything you can possibly to get to a no answer. You have to be looking at how to get to the yes answer and find ways to actually make this work rather than -- quite frankly, it feels at times that you're more concerned with just having an appellate issue than actually getting what you need in the case.

Every time I try and accommodate you in some way, you don't accept that; and you don't accept the Court's invitations to do things that will actually get you what you need. So all I'm trying to do right now is get you what you need.

Tell me what you need at least for you and Ms. Still to be able to look at what Chainalysis has provided so you then can figure out if there's any analysis that needs to be run. We can talk about whether that can be done in some way, some segregated portion of a computer system or someone can verify

it's erased afterwards or something along those lines. I need to figure out how to get to yes rather than how to get to no here.

MR. EKELAND: Understood, Your Honor. I think this is why some jurisdictions only allow open-source public blockchain explorers and --

THE COURT: We've talked about this for months now. You have yet to show me a case where a court has said we only allow open source in this jurisdiction.

MR. EKELAND: I'm not saying this jurisdiction, but I believe Ms. Still talked about international jurisdictions. It may have been Spain, it might have been Canada. Regardless, Your Honor, I mean, the government voluntarily used a private --

THE COURT: No, no, no. We're going off on a tangent again. What is it you need so you can look at this and Ms. Still can look at it?

MR. EKELAND: Perhaps we can craft a protective order that's just temporary that doesn't have these stringent noncompete provisions in them, like the five-year noncompete like there was, that allows us --

THE COURT: I don't think the current version that Chainalysis has proposed includes the five-year noncompete. It says that she cannot use this information for any purposes other than this case.

MR. EKELAND:  I believe it has vague language like you can't use your thoughts and impressions based on the information.

THE COURT:  That seems reasonable to me.  If you learn something from this information that could cause competitive damage to Chainalysis, she ought not be able to use that one way or the other.

MR. EKELAND:  Well, I think that gets at the core of the issue.  I think the concern from their side -- and maybe we need to get her in to speak -- is that -- if I'm looking at that for a client and that's getting submitted to them transactionally, I would instantly flag the vagueness of that language in the sense that that's a potential trigger for future litigation.  And that's all from these competitive concerns.

And I'm not trying to flag an appellate issue here inasmuch as I'm trying to avoid future liability.  And also, just to be able to get the experts to agree to look at this and if there's some way that we can address that -- you know, the anti-competitive language and the risk of future litigation from an adversary that allows us to look at it, evaluate it, whether -- and then determine how we need to proceed based on what we can see.

Because I think there's a little bit of a catch-22 here; like we can't tell you exactly what we need to do without

looking at it, but, like, we can't say that we're not -- we don't need to use this stuff and --

THE COURT: So let me do this then. I am entering hereby on the record right now an order saying that you can review this and your colleagues from your law firm can review it as well. I order that you not disclose it to anybody else without any -- without prior authorization from the Court; that you not use it for any purpose other than this litigation without prior authorization from the Court.

And that you -- for present purposes, you can just review it right here in the courtroom. I've got the thumb drive I can give you, and you can just put it on a thumb drive right here and look at it. At least we can have a more informed conversation once you've looked at it.

So on pain of contempt, I'm ordering that you can look at it, that your colleagues from your law firm can look at it; that they may not disclose it or discuss it, the contents of it with anybody else, absent further order of the Court. But we can at least have a little bit more informed discussion after you do that. Does that make sense?

MR. EKELAND: Yes, it does. I just want to get clear because the one concern I have -- and I understand why the Court is making this -- is that we can't discuss it at all, even in general terms, with any of our experts or anything like that?

THE COURT: Let's just take it one step at a time. I think -- my goal is to get to the point which you can do that. I just need to do it one step at a time to get there. You're telling me that it's not useful to you unless your experts can run it through a computer, but you don't even know what the "it" is yet.

MR. EKELAND: Your Honor, so we can be clear, what we're talking about -- because I was initially surprised about the protective order issue with the heuristics, that the information -- we're just talking about the heuristics and we're not -- this is a separate issue from the source code production and -- for Mr. Bishop; is that right?

THE COURT: I can't get to the source code issue until we can have a discussion with respect to whether what you've been provided sufficiently addresses the concerns that you've raised. If you don't know what you've been provided, you don't know whether it sufficiently addresses the concerns you've raised to date.

MR. EKELAND: Of course, we're going to honor the order of the Court, and we will go look at this as soon as possible today and tell you --

THE COURT: I'm going to break and I'm going to hand the drive to counsel, who can share it with you, and you can privately sit here in the courtroom and go through it.

MR. EKELAND: We'll do our best to the extent that

we're able to determine anything from it based on our review. We'll do our best.

THE COURT: Let me ask, Mr. Frentzen. Anything that I should add to my oral order to ensure that the interests of your client are adequately protected at this point just as a preliminary step?

MR. FRENTZEN: No, Your Honor. I appreciate that. My only, I guess, specification would be colleagues from the law firm means the lawyers right here rather than any -- I don't know who else is associated with his law firm, et cetera, et cetera.

THE COURT: That is what I meant.

MR. FRENTZEN: Thank you, Your Honor.

THE COURT: All right. Thank you. So I'm going to provide my copy of the thumb drive. I have to exit out of here. I've brought multiple computers today to address these issues.

I will hand it to my clerk, who can provide it to you. I assume that you have a computer with you, and you can take a look at it here. Okay? Here's the pass code as well. I will give you some time to look at it, and I'll come back out and we'll figure out the next steps. We'll do this one step at a time.

(Recess taken.)

THE COURT: All right. Any developments in light of

the fact that, Mr. Ekeland, you've now had a chance to look at what was provided?

MR. EKELAND: Your Honor, this is a difficult issue. I spoke with Mr. Frentzen.

THE COURT: Yes.

MR. EKELAND: And the defense -- and, obviously, I can't speak for Ms. Still without speaking to her. We're reviewing what we were shown. It looks like to us, like, essentially, more expert reports. It's hard to tell what's proprietary, what's not in it. We would --

THE COURT: I'm sorry. You were speaking fast. I missed what you said.

MR. EKELAND: I'm sorry. It's a little difficult to tell what is proprietary in it, what would constitute a trade secret in it. But putting that aside for the moment, if we could -- we would agree to asking Ms. Still to review it without discussing it or disclosing it or using any of CipherTrace's -- running the data through CipherTrace's systems beyond taking, like, a wallet address to confirm it, like, independently.

THE COURT: Right.

MR. EKELAND: Have her then come to us and say, well, I think I need to use a team to review this or we need to take these steps.

So I think if I -- Mr. Frentzen can speak for

himself. I think Chainalysis and the defense are in agreement on that.

What there is -- I honestly don't have an answer to this next point that I'm raising. The concern with, for lack of a better phrase, the noncompete language, the competitive language, we understand there are concerns, but generally, in my experience with these kinds of clauses in business law and transactional law, the law tends to disfavor them and put a time limit on them.

It's not -- we're not saying, oh, Ms. Still or somebody is going to go out and intentionally use this for competitive advantage. What the concern is -- and it's always the concern with these kinds of clauses -- is that something happens, and there's unintentional litigation, and that's really the main concern.

It's not -- because we're not -- we're here to attempt to get Mr. Sterlingov an acquittal, not to compete with Chainalysis. And so if there's some way of addressing that, even just like putting a time limit on it, like I know New York State disfavors ones over a year. But, honestly, we're open to whatever the Court says.

THE COURT: Although, I think what you're talking about with the law disfavoring noncompetes, what you're talking about is there's law that says if you work for a particular company and the company says, if you want to leave the company,

you can't go work for one of our competitors -- and I know New York disfavors and a lot of jurisdictions disfavor are rules that say you can never go work for one of our competitors because it precludes somebody from changing jobs or being able to just move in the workplace.

I'm not aware of any principle that applies just where information from one company is shared with another company that says that there's that same disfavor. Because what it's really -- what that law that you're citing to is really about is that it allows employers to exert economic coercion with respect to their employees and say, we're not going to pay you what you would earn in the marketplace, for example, because we've got a noncompete here. And if you leave, you can't get another job anyway, so we're going to pay you half of what you would get in the marketplace. I think that's what the concern of that law is about.

MR. EKELAND: Without having briefed it and researched it, my understanding is part of the concern is that employee takes their knowledge of the company --

THE COURT: Correct. And that is right.

MR. EKELAND: I searched for case law in the criminal context for protective orders with noncompete clauses in them, and I couldn't find anything. Maybe I missed something.

Long story short, we're willing to -- assuming Ms. Still agrees to it -- agree to just have her review this

without discussing with anybody, to get back to us and let us know what we can do. I think we've expressed our concern about the noncompetitive language.

THE COURT: Where you ended up is fairly close to what I was going to propose anyway. I'll hear from Mr. Frentzen on this as well.

What I was going to propose is that I enter the protective order, Version B as proposed by Chainalysis, with one change. And the one change I would make is both to the addendum, as well as the document -- the protective order itself.

And I would simply say in the portion that says that Ms. Still can -- Ms. Still may not use any -- or may not use CipherTrace's computer systems and may not download to CipherTrace's computer systems and so forth; just add a clause that says "without prior leave of Court" to that.

And then if she looks at it and says, you know, I do conclude I have to run some programs here to figure out what the effect of this heuristic is, and the only equipment I have to do it on are CipherTrace's computers, then what I would say is talk to Mr. Frentzen about it -- I'm glad that you-all are finally talking more constructively about things like this -- and see what you can come up with, and whether there's some way that he can verify that it's been erased from the system after she runs whatever she needs to run or something along those

lines, if that turns out to be necessary.

But for now, I will enter the protective order with that one proviso and, obviously, the entire protective order is subject to change by the Court at some subsequent date. But in particular, with respect to the use of the Chainalysis [sic] computer systems, come back to me, if that's an issue.

MR. EKELAND: Your Honor, I would just add -- I think this is a simple thing, hopefully. And that, if need be, if she needs her team members, then we come back to the Court and say, can we extend this protective order to them?

THE COURT: Yes. I have to say, one of the things that I find encouraging about the fact that it's Ms. Still here is I actually think that she's not going to face the same challenge that other people might face in segregating in her own head the heuristics that are applied here because, as I understand it, she's not somebody who works at Chainalysis -- I mean, at CipherTrace who is actually designing the structure of the systems in which she's going to be sitting there at her desk one day saying, I have this great idea, but is that -- is it my idea or this an idea that I got from what I read from Chainalysis? Because, as I understand it, that's just not what she does.

If she shares the information with somebody who is a software engineer or somebody who is designing the algorithms, that person may find it harder to segregate in their own head

what it is that they've learned from the source versus their own creative instinct.

MR. EKELAND: Understood. That's my understanding as well, Your Honor.

THE COURT: Okay. So that's what I will do with respect to the protective order.

I don't know how easy it is -- frankly, I can just handwrite in that addition to it and just get one of my clerks maybe to print out without the header Exhibit B, and I can give you the right version here. I'll just sign that to get that done and get that in working order.

I have to say, one question I have for you, Mr. Ekeland, about this -- if you want to come up. And this relates both to this issue and also to the source code issue. We're, obviously, very late in the day with respect to this.

What is it you're proposing to do with this? Is it to prepare Ms. Still for purposes of cross-examination? I am interested in how you are proposing to use the information that you're gaining at this late stage in the process.

MR. EKELAND: Excellent question. Again, to the extent I can answer it without seeing it and knowing it, the -- I believe it was, I want to say, Docket No. 194, where the government submitted a bunch of information, I think mainly anecdotal, about attesting -- alleging -- attesting to the accuracy of the software.

THE COURT: They did that at my request when I was asking them to really collect what was in the record.

MR. EKELAND: Absolutely. There was, I believe, also sealed filing as well. And when I was reviewing it, it occurred -- that was with a -- about a cooperating witness.

THE COURT: I read that, yes.

MR. EKELAND: It occurred to me, well, how can we check this for accuracy and know that this is accurate if that -- and it seems to me I would need to see the -- have an expert look at the source code. I think it would -- yeah. I would -- I think, to the extent we could, where there wasn't protective order concerns about the noncompetes, because I think the source code and the heuristic information are, although related, are two separate things that we talked about.

I think, to that extent, we -- if these accuracy issues come to the fore, we might just see if -- maybe we might have to bring Mr. Bishop in if the Court is open to that and voir dire that. To be honest with you, I don't 100 percent know without seeing it. And it may -- you know, it may be that we -- I just don't know without seeing it. I know --

THE COURT: I mean, the problem is that we're picking a jury tomorrow. What I don't want to do is -- I think it would be -- I want to be fair to everyone here.

The reason we're exploring this is I'm really bending over backwards to make sure that Mr. Sterlingov receives due

process and a fair trial here. By the same token, I think it would be unfair to the government to be in a position in which the government opens, puts on its case, and then all of a sudden there's another expert report that the government has never even seen pretrial that's way out of time from the defense where it's something that could have affected how the government opened or how it put on its case.

I don't want to do that to either side here, and so that was really the reason why I was asking. If it's something you want to use for cross-examination, that's one thing. If you're talking about additional expert reports or an additional expert report -- singular -- here, then I think we need to talk about that and understand if that's what's going on and whether there's a basis for it at this point in the process.

I just don't want to barrel into trial and then find halfway through trial that the case is about something different than everyone thought it was when we started.

MR. EKELAND: Understood. And neither do I. And I think I share everyone's concern in this courtroom at just wanting to focus on the trial. And, again, as the Court has indicated, this is -- it's the source code, it's the primary software that's been used in the investigation against Mr. Sterlingov.

I think to the -- I would -- at this point, honestly, I would probably seek to avoid -- I don't want to waive

anything here but avoid introducing any kind of new expert report or expert testimony and try to limit it to cross.

For instance, maybe -- and I'm engaging in hypotheticals here. Maybe we see the source code and we say, oh, what they said about Heuristic 1 and 2, that can't be accurate because of X, Y, and Z. And I don't know how we would handle that with the Court.

Obviously -- I wouldn't -- certainly wouldn't spring that out of nowhere -- I would have to -- we'd have to come to court in the morning or whatever, well beforehand, and give notice to everybody about that, so I don't -- so much of this is matters of first impression, it's hard to know what -- how to proceed.

THE COURT: Well, I have to say, I'm -- we'll get to the source code in greater detail in a minute. I have to say, I'm not yet persuaded on that, but I can -- we can talk more about that.

But you now have seen the heuristic information. That's significant, important information that tells you what Chainalysis did here.

And I guess my question for you is, with that now -- and I understand you haven't spoken to Ms. Still yet -- what are you proposing to do? Are you proposing just to have that available for cross-examination? I take it, from what you've told me, that you're not asking for a continuance in order --

MR. EKELAND: No. I'm sorry, Your Honor. I spoke over you.

No, we're not asking for a continuance. We'd like to just go forward. We'd like, obviously -- obviously, have Ms. Still read the information and then being able to use it on cross. If she comes and reads it and says, oh, my gosh, X, Y, and Z, we'll come to the Court.

But, honestly, I hope it doesn't come to that. We do want to go to trial and just get to the end of this one way or the other.

THE COURT: I understand that. But I do want to be, sort of, clear with Mr. Sterlingov about this and also make sure you've had a chance to confer with him about this. And just be clear that Mr. Sterlingov has decided he does want to proceed to trial, notwithstanding the fact that we're doing a lot of this at the last minute and that he is not requesting a continuance, wants to get to trial and understands that there could be repercussions, including that I might conclude that it's too late for a further expert -- or expert report at this time.

But if you want to talk to him about that and make sure, because I want to make sure he understands that and that is his decision.

MR. EKELAND: I would love to talk to him about that. Would you like me to do that right now?

THE COURT: If you wouldn't mind.

MR. EKELAND: No, not at all, Your Honor.

THE COURT: Okay. Thanks. While you're doing that, I'm just going to take the moment to amend the protective order so I can get that signed as well. I'll put the husher on.

(Recess taken; Court stayed on the bench.)

THE COURT: So I have an arraignment. I want to give you plenty of time to discuss this, and I have an arraignment. I was going to suggest why don't I do the arraignment, and if you want to talk further with Mr. Sterlingov while I'm doing the arraignment, that's fine with me.

MR. EKELAND: I think we actually came -- when you turned the husher off, he came --

THE COURT: Why don't you come up and let us know.

MR. EKELAND: I think, obviously, the Court should talk to Mr. Sterlingov, too. The way I understand it is he's okay with going forward with the trial.

What he would like to keep open, if there is a verdict, that we could say we didn't feel like we had all the time we needed with the source code in relation to the attributions or the clustering --

THE COURT: So that's the reason I was asking the question, was to avoid that issue. I think that Mr. Sterlingov -- and you're welcome while I do the arraignment -- he needs to make that decision himself about

whether he wants to ask me to put the trial off now, in which case I'll hear from the government and decide what to do about that; or whether it's his preference, notwithstanding the fact that some of this information is coming late and I still haven't decided the source code question, that he wants to go forward. And that's his decision to make. But I don't think he can have it both ways.

He has to either decide to go forward and give up the issue of any unfairness in getting information late, or he has to say, no, it's not fair that I'm getting this late, and I want to put the trial off.

MR. EKELAND: His concern -- understood, Your Honor. I think his concern was that if there is a guilty verdict and there's sentencing, he'd want to be able to challenge the -- in terms of the sentencing, the amount of money that's being alleged that he money laundered, which goes to the attributions and the source code. I understand what the Court is saying and --

THE COURT: Right. Well, you know, we're talking in hypotheticals here. I'm happy to hear from the government.

If what you're saying is that at sentencing he wants to be able to argue to me with respect to the guidelines and how they apply in light of the dollar figures, I don't think -- I'm not anticipating, unless someone has a different view of it, the jury would make a finding with respect to the dollar

figure here.

Therefore, that would be a decision for me at -- if we got to that point, if there were a conviction, at sentencing to decide that.  I would decide that by a preponderance of the evidence, and the parties would be free at that time to offer evidence with respect to that issue, if it is an issue.

Frankly, I don't remember off the top of my head what the chart looks like, but there's a top end of the chart.  Some differences don't make a difference because you're at the top end of the chart anyway.  I don't have it in front of me at the moment.

Subject to the government agreeing with what I've just said, that's my take on that issue.  But maybe -- we can see if the government just agrees with me, that the jury is not going to make that finding, I'm going to make the finding if there is a conviction.  And then I'll give you a further chance to chat with Mr. Sterlingov while I take the arraignment, and then you can let us know what he wants to do.

MS. PELKER:  Your Honor, as to the specific amounts in question, the jury -- the defense may or may not ask the jury to make the finding as to the forfeiture, which is a different matter than sentencing, and we would not view the jury making a determination about the specific amounts involved.

That said, the government strongly opposes another

continuance here. I just want to make that very clear.

THE COURT: Yes.

MS. PELKER: I am concerned about some of the hedging in the language from defense counsel about wanting to make arguments about them not having sufficient time to challenge certain things right now. And I just -- I think maybe we break for your hearing and come back and just, if -- the government very much wants to go forward tomorrow. We're prepared to go forward.

But we want it very clear on the record that Mr. Sterlingov understands that if an expert comes in with some grand finding that they spring on the government next week, that it's going to be too late to introduce that at trial.

THE COURT: It is that clarity that I'm searching for now. And I do -- I think it makes sense for the -- Mr. Ekeland to have a chance to confer further with Mr. Sterlingov about this.

I understand the government's desire to go forward. I, frankly, understand Mr. Sterlingov's desire to go forward, and the Court wants to go forward as well. But I want to go forward in a way that is fair to everybody involved and also, quite frankly, it means we're going to do this trial once rather than twice. Whether it's issues coming up on a 2255 or on appeal or whatever it be, I want to make sure we're doing this the right way.

So I understand the desire to go forward. I also want to go forward. But I also want to make sure, if we are going forward, we're doing it the right way. That's why I want Mr. Sterlingov to have a chance to confer with Mr. Ekeland about this and to make a decision about what he wants to do. If he decides that he wants more time, then I'll have to consider that request.

But the one thing is not -- I'm not going to allow is the hedging of saying, well, I do -- I really want to go forward, I want to try the case, but I also want to reserve the ability to argue that I didn't have time to prepare. That doesn't strike me as fair to the government.

MS. PELKER: Yes, Your Honor.

THE COURT: All right. Let's go ahead and take a break in this matter. I'll do the arraignment.

Mr. Ekeland and Mr. Sterlingov, you can talk further, and then I'll come back to this issue after the arraignment.

(Whereupon, a recess was taken at 11:07 a.m., after which the following further proceedings were had at 11:25 a.m.:)

THE COURT: All right. Mr. Ekeland?

MR. EKELAND: Your Honor, we have discussed it with Mr. Sterlingov, and he has asked us to request a short continuance of between two and four weeks, and he said to us that if it's going to be longer than that -- assuming the Court

agrees to any continuance -- that he would like to discuss it with us further.

THE COURT: I'll hear from the government on this as well, but I will tell you that I have another trial that is starting --

MS. PELKER: I believe it's October 16th, Your Honor.

THE COURT: Yes. There's another trial that I have that is starting the 16th of October. And so if we delayed this for two or three weeks, I don't know how -- I mean, we're going to run into that other trial.

MS. PELKER: I believe Your Honor then has a short civil trial, a trial that's set in December that potentially has -- the last item on the docket is a competency issue, and then there's a trial with DOJ fraud, I believe, that they expect to go.

THE COURT: You've done your homework.

MS. PELKER: We've looked, Your Honor.

THE COURT: If it were a matter of a civil trial, if there were a window, I would put off the civil trial to do it. Let's see here.

What is the government's best estimate of how long the trial is going to last here?

MS. PELKER: We're looking at a full month, Your Honor. We do understand from colleagues that there's a possibility, if we want to set a status for Monday, there may

be a matter on Your Honor's calendar that may create a window in that time, but we just -- if we're setting a trial date right now -- and the government would like to be heard on that.

THE COURT: Of course. I'm not making a decision on this. I'm just really answering the question from counsel about what this would mean timing-wise.

MS. PELKER: There's a possibility we could fit it in in December, right up until Christmas, if the Court is not planning to take any Christmas holiday; otherwise, I think we're looking at 2024.

That's based on the government's reading of the Court's calendar. The government doesn't mean to be presumptuous about what the Court's calendar --

THE COURT: No. I appreciate this. I have another criminal trial, it looks like. It looks to me like what's on my calendar here is this trial I reserved time, I think, up until the 11th of October, and then I have a trial starting on the 16th, a long-pending criminal matter, which is -- it's a three-defendant case, which is likely to take a couple of weeks.

Then the last week of October is free, but it's just a week; and then I've got another criminal trial. I don't know if this is one of the ones you're referring to. I have a two-week criminal trial starting on the 6th of November, which lasts two weeks; and then I have some availability the last

couple of weeks of November -- but that is Thanksgiving -- and it's only two weeks. And then I start another criminal trial in a long-pending case on December 4th.

And then counsel is correct -- well, interesting. I've got this hold for a criminal trial, which I'm not sure what the status is on it. Maybe that's one that could move -- maybe that's the one you were thinking of in December that could move, Ms. Pelker?

MS. PELKER: Your Honor, I think colleagues -- there's a chance that there's a window within that time that may end up freeing up --

THE COURT: The only thing -- the only reason I'm asking you that is I see it's twice on my calendar.

MS. PELKER: It is not that case, Your Honor.

THE COURT: Oh, it's not that case. It's on there twice. I think that -- I'm happy to do everything in my power to move things that can be moved without being unfair to other defendants in cases.

But I think before I can tell you with assurance that I have time, it's probably February before I can tell you that I would certainly have time, and I'm happy to move things around. I'm also happy, if need be, to ask one of my colleagues if they can try this case, maybe a senior judge or someone who might have more time on their calendar, if that's what the alternative would be.

But what I can tell you now -- what I can tell you if you say no, we want you as the judge in the case and we want an assurance of when we can go, it would be February. It's possible, as I said, that I might be able to work things out to do it earlier.

MR. EKELAND: I think I understood you. I just want to state it so I make sure I tell my client correctly.

The only one that you could guarantee would be February, with the understanding that you would be willing to go earlier if something cleared off of your calendar.

THE COURT: Cleared off my calendar or if I can move something. As I said, I'm happy to cancel or postpone a civil case. I, obviously, can't do the same thing in a criminal case. I'm also happy to consult with colleagues to see if there's another judge in the court who can try the case to try it earlier as well.

It's not so simple as saying let's push it back two weeks, because then I run at least into another criminal trial that I've had long-scheduled.

MR. EKELAND: Understood, Your Honor. Obviously, I would need to talk to my client.

THE COURT: Okay. Do you want to do that now?

MR. EKELAND: Yes, sir. Thanks.

THE COURT: Okay. To the extent it's helpful, I think there's a pretty good chance that I could try the case --

it's going to require a jury to come back after the holidays, but starting on December 11th and then take a break over the holidays and come back in early January and finish the case, if that's a consideration.

Also, we have two nominees for the court whose nominations are pending who will, hopefully, be confirmed. They're both experienced trial judges from the Superior Court or the D.C. Court of Appeals. And they, presumably, are going to have fairly free dockets and can try the case, if confirmed, as well. I wanted to let you know all the options.

(Recess taken; Court stayed on the bench.)

THE COURT: Mr. Ekeland?

MR. EKELAND: Mr. Sterlingov agrees to the later dates -- the February date with the understanding that we try to get an earlier date.

THE COURT: Okay. Well, let me hear from Ms. Pelker then.

MS. PELKER: Your Honor, I understand that we kind of are where we are. The government does want to be on the record as strongly opposing this continuance, and I do think it's worth making a clear record here that the government was prepared to go forward with trial in January.

THE COURT: I understand.

MS. PELKER: The government asked -- and I know the Court understands, but just to make the record very clear here.

THE COURT: Of course.

MS. PELKER: The defense asked for a continuance for nine months so that they could go out and find these experts. They didn't do what they needed to do. We were back here in June; they continued to not do what they needed to do.

We're now at this eleventh-hour point where defense is asking for a further continuance. I do think that the Court could potentially moot the issue entirely if we could get a clear ruling on the 17(c) with regard to the source code, but I understand --

THE COURT: I'm going to turn to that in a minute. I'll tell you what is motivating me here more than that issue. I actually -- as I hinted earlier, I still think that, despite numerous warnings and cautions and directions from the Court, that the defense hasn't done what I directed with respect to the source code issue. And we'll get to that issue in a moment. I don't want to pre-judge that, but I'm skeptical for the reasons I've previously given.

What is motivating me here, though -- and Mr. Ekeland only made, sort of, glancing reference to this. But he said that -- I think that the heuristic disclosure that was just made today, although with greater cooperation from the defense, it could have certainly been made a few days ago, but is being made very late. He said it's a new expert report.

I don't think it's a new expert report. But I do

wonder whether it is something that should have been disclosed in Ms. Bisbee's report as a basis for her expert opinion, and I do think that, although the defense has, I think, vastly overstated the centrality of the Reactor analysis to this case and suggested that it's the entire case -- and I don't agree with that -- it is, nonetheless, an important piece of evidence in the case.

And if the defense is just learning now what the specific conditions were of the behavioral heuristic, I'm just concerned that they have enough time to do something with that. That was the reason I was asking the questions earlier about what you want to do with it.

And if they want to just use it for cross-examination, that's fine. But my concern is we're going to get into trial and it's going to morph into Ms. Still using it in her testimony in ways in which the government will not have had the benefit of an expert report from the defense relating to what may be key aspects of the methodology that was employed by Chainalysis for purposes of doing what is really the disputed portion of the tracing here.

Because I don't think there's, to my mind, a huge dispute, frankly, about the Heuristic 1 and that the co-spend heuristic is sound to the extent that one can either control for CoinJoin or can read the results with the understanding that there could be some CoinJoin that could have affected it.

So that -- but with respect to Heuristic 2, it's been a little bit more of a black box until now for the defense. And I'm not pointing fingers at anybody with respect to whether the defense certainly could have been a lot more clear and targeted about what they were asking for, and it wasn't really until I pressed Mr. Ekeland -- I think it may have been our last hearing -- and said, tell me specifically what you want, and then Chainalysis delivered that.

So I don't doubt that the defense isn't partly to blame for the fact that that wasn't teed up and that they had these overly expansive requests and never really explained what they were looking for. But on the other hand, to the extent it was part of what Ms. Bisbee was relying on, even if she's not a computer analyst herself or a coder herself, it was a part of it.

I think it's just a close enough question that I would be more comfortable going to trial with the defense having the opportunity to look at that at least before trial and, if need be, to give the government the benefit of an amended or updated expert report on that and giving the government the opportunity to respond to anything that may come up in that regard.

So that's the reason -- if we were just faced with the question of the code on this, I do think the record on that is 100 percent clear to my mind that the defense didn't do what

it needed to do in a prompt enough fashion. I would -- I don't think I would continue in light of that.

It's more the disclosure with respect to the specifics of the heuristics, just to explain my reason for thinking that -- and I understand that this is a burden on the government and that you have witnesses that are ready to go and people who have reserved time on their schedules to do this.

But as I said before, I also want to make sure that we're doing this case once and not twice. I think that's probably another concern and a reason why we ought to give them a little bit more time to do it.

But what I'm inclined to do -- and I want to hear from the parties on this issue -- inclined to direct that -- so we're not back in the same situation again -- to give Ms. Still two weeks or something of that nature to file any update with the understanding that we're done with the ever-evolving out-of-time expert reports.

But if she wants to update it within two weeks, and then I would give the government two weeks to file anything -- any report that is responsive either from a current expert or another expert to say that she's mistaken about whatever she might -- conclusions she might draw.

And then my view, absent compelling argument to the contrary, is we're done at that point. And then it may be that within the next -- it may be before the end of the year we can

find a trial date. If we can't, then we're just going to go in February and get it done.

I, frankly, apologize to the parties. I feel as though, had this come on to my radar sooner, I could have avoided it as well. I hate putting you all in the position in which you're on the eve of trial, but I also want to make sure it's a fair process.

MS. PELKER: Understood, Your Honor. Just one point on the sufficiency of the government's Rule 16 disclosures. I do think it's important to note that Ms. Bisbee did not rely on the information that's in this supplemental production because it didn't exist at the time. This was not something that Chainalysis just pulled off of the shelf to provide. They compiled it --

THE COURT: Right.

MS. PELKER: -- in response to the Court's order. It's honestly, essentially, like an interrogatory to a forensic accountant of you have these lists of addresses or accounts, exactly why do you think each one is here. And Ms. Bisbee did include in her report and testify about peel chains, about the different observed behaviors.

I understand that this is much more specific and granular, but I don't think that a court has ever held -- and there's good case law that you don't have to have an expert who has an in-depth understanding of the proprietary technology

that's being used or of the technology that's being used in order to be qualified as an expert.

The same way that when we put on drive test experts, they don't need to be able to include in their disclosure details of the source code of how the drive test hardware works; or when we put on cell site experts, they don't need to have in their disclosure a detailed breakdown of exactly how that software tech is working.

Again, I understand that this is where we are. But I just want to state for the record the government views its Rule 16 disclosures for its experts very seriously, and we do think that what we provided satisfied --

THE COURT: I appreciate that. I don't mean to be, as I said, pointing the finger as much as doing what I can to manage the case in a way that I think is fair to everyone involved. That's why I'm doing what I'm doing here without casting any aspersions on the government for any failure on your part.

I will say that -- and we'll get to this with respect to the source code issue -- this case is somewhat different than other cases where it does seem that this case is going to be, in large part, a battle of experts, and experts that are relying on methodologies that I just think the jury will benefit from understanding what those methodologies are.

Quite frankly, I don't know how this comes out. It

may actually, in some sense, make the government's case stronger or it could make it weaker. But it may make the government's case stronger to be in a position in which the witnesses can actually explain what the actual specifics were of the assumptions that were applied.

Whether it makes the government's case stronger or the defense's case stronger, we're going to have a jury that -- this is going to be a challenging case for the jury and I think having that additional information -- I will say, one case that neither side has pointed me to at this point, understandably, because it's a state court case, but that I found illuminating in thinking about these issues, was the New Jersey Supreme Court's decision in *State of New Jersey v. Pickett*.

You know what, it's actually the -- it's a decision from the Superior Court. I think it's the intermediate. Yes, the Appellate Division from New Jersey. And it's at 466 N.J. Super. 270.

I thought it was a very thoughtful analysis of a similar type of circumstance dealing with a computer program that was used to make probabilistic genotyping as to DNA, where it was -- as in this case, it was a third-party vendor that was doing it. And there was a *Frye* issue in the case, and the court did grant access there.

The showing that was made in that case was very different from in this case, in which -- much more substantial

in that case. I did think that that was, at least in my own thinking about these issues, helpful.

Any objection to that schedule, Mr. Ekeland?

MR. EKELAND: No, Your Honor.

THE COURT: I have everyone's agreement at this point that, subject to anything that may come up with the source code, but we're done at this point and we're not going to be otherwise amending expert reports or expanding the case. The goal is to get us to trial.

Is that agreeable to everybody?

MS. PELKER: Yes, Your Honor.

MR. EKELAND: Yes, Your Honor, what you just said about Ms. Still's report.

THE COURT: But her amendment ought to be focused just on what's in the disclosure, not on new issues at this point.

MR. EKELAND: Yes.

MS. PELKER: Yes, Your Honor. The government would just ask for the record that we have a very clear colloquy about Mr. Sterlingov not wanting to go to trial tomorrow and asking for the continuance. We also are very concerned about the continued -- any continued pretrial publicity.

Defense counsel continues to -- has made a lot of arguments about how the government is holding Mr. Sterlingov in jail for these extended periods of time pretrial as an aspect

of their fundraising for this case.  We just want to be very clear on the record that this is Mr. Sterlingov's decision to go this way.

THE COURT:  All right.  Let me ask that question. Mr. Sterlingov, do you have the microphone there?  Can you turn that towards you.

Mr. Sterlingov, just for the record, you heard what Mr. Ekeland said.  And did he, in fact, accurately represent your views about how you want to proceed?

THE DEFENDANT:  Your Honor, I know that it's probably, ultimately, my decision.  That's just how the courts work.  But I do have to listen to my attorneys because a lot of these issues, I'm really not an expert on these issues.  I haven't seen these -- I haven't been able to see this report. I don't know how the source code works.  I don't really know exactly what it means for my case, honestly.

But I do have to rely on my attorneys.  And with that information, yes, that's what we came to decide.

THE COURT:  Part of your making a decision yourself is your choice to rely on the advice from your attorneys. There's no problem with your relying on the advice from your attorneys.

I just want to make sure, though, that it is your decision based on the advice you've received from your lawyers?

THE DEFENDANT:  Yes, yes.

THE COURT: You understand that this will result in your continued incarceration pending trial?

THE DEFENDANT: Yes.

THE COURT: But weighing the various concerns, that's a choice that you would like to make, to do that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Mr. Ekeland, if you want to come up -- anything else you want me to ask of Mr. Sterlingov?

MS. PELKER: I believe the defendant just made the comment that he wasn't aware of what this means for his case or he didn't understand what this means for his case, and I just want it to be very clear that he understands the ramifications, but also the potential trade-offs of going forward.

THE COURT: Well, let me ask further. Have you had enough time to confer with your lawyers about the various trade-offs and considerations in making your decision about how you want to proceed?

THE DEFENDANT: I believe I've had enough time to confer with my attorneys.

THE COURT: Okay. Based on the advice that you've received from your attorneys -- I understand you're not a lawyer or an expert on the law -- but do you understand, based on the advice you've received from your attorneys about what the ramifications and the consequences are with respect to your decision of how you want to proceed?

THE DEFENDANT: I understand that I will have to spend more time locked up pretrial.

THE COURT: Right.

THE DEFENDANT: Is that what you're asking?

THE COURT: Well, that's a big part of it. But also, every time you continue a case, there are issues that could arise with respect to availability of witnesses. I don't know who your witnesses might be or what their availability are. There are lots of considerations when you continue a case.

I just want to make sure that you and your lawyers have had enough time to think about that. You don't want to go tomorrow? I'm prepared to start tomorrow, and you're the one who is requesting that we not do that.

I just want to make sure that you have made a considered and knowing decision that that's what you want to do. That's all I'm trying to pin down.

THE DEFENDANT: I think so, Your Honor. I don't know how much time is typically required. But from the conversations we've had, I get the impression that this is how we want to proceed.

THE COURT: It is how you want to proceed?

THE DEFENDANT: And how I want to proceed, yes.

THE COURT: All right. Ms. Pelker?

MS. PELKER: Can we just have the defendant clearly state on the record that he -- the whole "I get the impression

that this is how we want to proceed," again, we just want a clear record here, Your Honor.

THE COURT: All right. I think that's fair. Let me put it just in the form of a question.

Mr. Sterlingov, having had the opportunity -- first of all, I think you've said this already, but have you had enough time to talk with your lawyer about what you want to do?

THE DEFENDANT: Yes.

THE COURT: And you've received advice from your counsel about how to proceed?

THE DEFENDANT: Yes.

THE COURT: Have you considered that advice from your counsel?

THE DEFENDANT: Yes.

THE COURT: Okay. Any other questions you have for your counsel before you make a decision about what you want to do?

THE DEFENDANT: No.

THE COURT: Any other questions you want to ask me before you make a decision about what you want to do?

THE DEFENDANT: No.

THE COURT: What is your decision about whether you want to go to trial tomorrow and pick the jury tomorrow or whether you want to postpone the case, potentially, to as late as February of 2024?

THE DEFENDANT:  I would like to postpone the case.  I would also like to ask you, if you have any opportunity to make sure this happens quicker --

THE COURT:  If I can, consistent with other obligations on my calendar, I will do that.

THE DEFENDANT:  Thank you.

THE COURT:  Ms. Pelker?

MS. PELKER:  Thank you, Your Honor.

THE COURT:  All right.  I did have some follow-up questions for Mr. Ekeland.  This was on the list of things I wanted to ask you about anyway.

I asked you several weeks ago whether you are, in fact, proceeding as appointed counsel under the Criminal Justice Act and being compensated in that fashion or whether you're actually proceeding just as retained counsel who is raising money and is being privately funded.

I do think you have to make a decision one way or the other on that.  I'm somewhat concerned if you're out there still raising funds if you are proceeding as CJA counsel.  If you're not proceeding as CJA counsel, then there's no reason that there can't be some appropriate fundraising effort to pay your bills, but it has to be one or the other, I think.

MR. EKELAND:  I think we should just withdraw as the CJA counsel and stay on this case if we can just as retained counsel, Your Honor.

THE COURT: So you're not proceeding CJA at this point?

MR. EKELAND: Not at this point, Your Honor, no.

THE COURT: Well, I will just caution you with respect to your fundraising that I've already issued my order with respect to publicity and potential tainting of the jury. I would just urge you to be very careful about what you're posting and saying about the case.

MR. EKELAND: Your Honor, we -- I mean, if there's something the Court objects to, let us know. I stripped down our website, and we haven't made any public statements regarding this case since the Court's order.

But we're more than happy -- if the Court has anything they want to point out to us, we're happy to accommodate the Court. We're not addressing this case publicly at all.

THE COURT: Well, Ms. Pelker, if there are particular things that you see you think should be taken down, if you can raise that at least initially with Mr. Ekeland and then if you need to raise it with the Court, you're welcome to do so.

I do worry about if the jury pool were to hear reporting about Mr. Sterlingov being treated almost like a political prisoner, being detained or something like that, that that could be tainting to a jury.

MR. EKELAND: Understood, Your Honor.

THE COURT: Okay. All right. Anything else before we turn to the source code issue?

MR. EKELAND: No, not from the defense, Your Honor.

THE COURT: I'm not sure we'll finish it up in a half an hour. Why don't we go ahead and start. I'm happy to hear from whoever wants to go first.

Why don't I start with Mr. Frentzen, and then I can hear from Mr. Ekeland and the government, if you want to add anything, although I think the government's principal interest in this issue is trial management.

But go ahead, Mr. Frentzen.

MR. FRENTZEN: Thank you, Your Honor. Again, I appreciate the opportunity as a nonparty to come here and address the Court.

THE COURT: Before you get started, I should say that I do very much appreciate what you've provided thus far, and it was obvious to me that there was some substantial effort that went into what was prepared and provided to the Court and to the defense at this point.

I think it was appropriate to provide it, and I think the defense was entitled to it, but I know it was not something that was done easily. So I appreciate that.

MR. FRENTZEN: I appreciate that, Your Honor. The folks who took the laboring oar -- and it was a substantial amount of work that went into putting all that together, so we

appreciate that.

A lot of what I've heard, again, sort of, relates to this notion that -- and we discussed it some the last time I was here, about things not being done. And I think it's more fundamental than that, in our view, Your Honor, to say that what hasn't been done, in our view, is because it's missing the point, and that's because the source code is not an issue here.

And the 17(c) that originally was issued and now, in the course of iterations of pleadings, has been effectively expanded rather than contracted is, again -- I mean, the Court denied the motion originally as, I think, the very definition of a fishing expedition, and I may have gotten that a little wrong, but that was the core of it.

And this somehow has actually gotten worse and more expansive and fundamentally less specified or substantiated in the paperwork to the point where we're not even in a 17(c) realm, if that makes sense. I mean, 17(c) is not an investigatory subpoena. It's not a, "we want to take a look at this and test this." It is an exacting standard which requires relevance, admissibility, and specificity.

And at this point we're so far away from that, but, again, this is not a function of just a failure on somebody's part. This is because they've had months and months and months and a credible expert will not say I need to see this and here's why I need to see this. And it's, in our judgment, Your

Honor, come time to finally close the door.

THE COURT: Can I ask you a question about the 17(c) standard as it applies here?

MR. FRENTZEN: Sure.

THE COURT: Mr. Ekeland has argued in various different manners that this case is different. And his take on it, at least initially -- and maybe this has been his principal take -- is that somehow the government is avoiding its disclosure obligations by having an independent contractor run the analysis or that you really stand in the shoes or your client stands in the shoes of the government and this ought to be treated more like a *Brady* and Rule 16 issue.

I have to say, I'm not persuaded by that formulation of the argument, but I do scratch my head a little bit and am unsure whether the usual 17(c) standards apply somewhat differently in this context where your client has entered into a contract with the government to do analysis on behalf of the government in a criminal case; has agreed to appear as an expert witness in that case and either -- as a matter of either due process or as a matter of reading 17(c) in light of the particular context, it would be appropriate to relax the standards somewhat. I'm not saying that that means that everything that has ever touched a computer at Chainalysis is open game.

But that, on the other hand, if the work of

Chainalysis is going to be offered in the government's affirmative case against the defendant, isn't the fair thing to do is to provide enough information to the defense that the defense can, in essence, confront and cross-examine the witnesses against the defense in a fair and fulsome way?

MR. FRENTZEN: Sure. So, first of all, I think the direct answer to the Court's question is probably no.

I mean, in other words, if the Court's asking me a hypothetical about whether or not Rule 17(c) gets modified by certain other factors, I'm not aware of any law to that effect. And I think, in fact, it would be improper just in the sense that 17(c) is 17(c) and Rule 16 is Rule 16.

THE COURT: Right. Although, the factors that you specified about 17(c) are just the gloss that the Supreme Court in *Nixon* put on 17(c). Those words don't appear in 17(c) itself. And in *Nixon*, it was actually the prosecution that was seeking the tapes.

And there are some courts that have suggested that -- where it's the defense that the standard is perhaps not quite as demanding as *Nixon*. I'm not sure, by any means, that's the majority view, but there's some courts that have hinted at that.

My real point is we're talking about a judicial gloss one way or the other on 17(c) itself, and should that judicial gloss take into consideration the nature of the evidence and

the role of the contractor.

You know, it would be a different thing -- or it might be a different thing if you were representing Bank of America and had nothing whatsoever to do with this case and you got a subpoena -- your client, Bank of America, got a subpoena saying, you know, we want the account balances for the following hundred people because it's possible that one of those people was actually the real administrator of Bitcoin Fog, and we want to show that that person made a lot of money.

There you'd say, well, wait a second, that's a complete fishing expedition. Somewhat different where your client is one of the main witnesses in the case.

MR. FRENTZEN: So, first of all, I think -- again, I think we're sort of arguing about hypotheticals here. But I don't take the *Nixon* decision from the Supreme Court -- which is actually based in *Bowman Dairy*, which is an earlier case --

THE COURT: Right.

MR. FRENTZEN: -- that said the same. And that has fundamentally been repeated and upheld in pretty much every 17(c) case I'm aware of to be less than the controlling law.

THE COURT: Right. But is there any case that you can point me to that has applied 17(c) in the manner it was applied in *Nixon* to a government expert that was offering testimony where the defendant was seeking information relating to the basis for that testimony?

MR. FRENTZEN: I have not looked for that, Your Honor, except to say that I don't -- again, I think this goes back to the Court's original question. I'm not aware of a basis to modify 17(c) on that adjustment when Rule 16 exists for expert disclosures.

In other words -- and 17(c) expressly, according to all of the case law, is also not a tool to be employed in order to, you know, effectuate an end run on Rule 16. That is also part of the pretty rock-solid -- in my humble judgment, just based on having litigated this a lot, these types of subpoenas, both as an issuer and now as a recipient -- that that's sort of also another bedrock of it, is that you don't utilize 17(c) to get around -- and so the relationship of an expert, a testifying expert, if you will, is one that triggers 16(g) and those rules there. And so that puts us in a different category.

But at the end of the day, Your Honor --

THE COURT: Does anyone know -- I apologize for interrupting. But one of the things I've thought about in thinking about this issue is, I assume it comes up in large antitrust cases. I don't know whether the government retains the big economic consulting firms in antitrust cases, including criminal antitrust cases, where you have Economists, Inc., for example, that are doing analyses.

I certainly know what comes up in just civil

litigation between parties, but that's not a good analog here because 17(c) is different. But I was wondering whether there are cases in which the government is using independent experts who are doing things, arguably, analogous to what was done here, where they're running models; and to the extent -- what the disclosure obligations are and the discovery obligations are where you're running those types of models; maybe even in the civil context.

I suppose that it's probably not the case that in every big antitrust case that Economists, Inc., has to turn over all of its source code, although I'm sure that they're disclosing what all the parameters of the models are they're using in those cases.

MR. FRENTZEN: I don't know the specific answer to that, Your Honor. As I'm sitting here trying to think of other instances, I mean, I have been involved in cases in which we used large accounting firms and those large accounting firms testified.

THE COURT: Right.

MR. FRENTZEN: And I don't recall turning over their software on which they performed the accounting functions. And, in fact, I think, much as here, where we have provided the information about what was done, it would be a ludicrous endeavor.

And so I think that, again, this is, at its core, an

effort to try to threaten the business of my client in the form of allegedly getting information which they have. And so, again, what we tried to do, we've come back here again and again and we've been responsive to the Court, and with what we've now provided to the Court and to the defense is sufficient here.

And I know the Court had an opportunity to look at it. We appreciate the Court looking at it. It's a lot of information.

THE COURT: I was going to ask you about it. I had an opportunity to look at it, which I think is the proper phrase to use. I'm not sure that I have the technical capacity to fully grasp the extent to which the disclosure answers all the questions --

MR. FRENTZEN: Sure.

THE COURT: -- that were posed. And that was one of the reasons I brought the second computer on the bench with me here.

There is, obviously, a fair amount of detail in there. I couldn't quite tell the extent to which the spreadsheet -- which is quite large -- captures additional information. For me, it's -- I look at it, and I just see a lot of addresses.

I don't know if you can walk me through that and help me understand exactly what's captured in the spreadsheets and

how that helps understand exactly what it is that your client did.

MR. FRENTZEN: Sorry. I'll walk the Court through in a larger view. If the Court needs to get really granular, it may want to ask Ms. Pelker, with my apologies for volunteering her to pinch-hit for me, since she has a stronger background in the fundamentals of this than I do.

But what's here, first of all, is the response to the question about Heuristic 2, the behavioral heuristic. And so what was done there was to -- and this is part of the reason why we view this as proprietary -- is to take each of the various clusters and to effectively describe -- each of those are behavioral, right?

So they begin with sort of a ground truth, which means there's been some interaction with the exchange so we can identify certain behaviors by the exchange because that conduct has taken place.

THE COURT: To make sure that I understand what that means is, hypothetically, it might mean, for example, that your client might engage in a straw transaction just to see if the site -- or an address is associated with who they think the address is associated with. Once they have that, quote, ground truth, they can then use that ground truth and look at it and say, okay, that is the address that we thought it was based on that straw test or straw transaction.

And we now can go back and look at the chain involving that address in ways in which we can see characteristics, including the way the peel works. And so, for example, it may be that you look at it and every time -- it's good that I'm asking these questions because I'm not giving anything away because it's all made up. I don't actually know what -- precisely what it's doing here. I'm not disclosing anything.

But imagine a world in which the peel in each circumstance is .65 percent of the amount in that wallet, and then it's .65, .65, .65. And you look at that enough, and you say, well, that's sort of a fingerprint. And then you also look at it, and there are other markers that you can look at and say, once you have enough of those markers, you can determine to a pretty high level of certainty that transactions that have those markers came from that address.

Is that a fair summary of what -- the way it's working?

MR. FRENTZEN: That's an example of the type of analysis that is included within the report, without saying too much about what is in the report on the open record, Your Honor. But that's correct.

THE COURT: If I said something you think I shouldn't say -- I don't think I have because I was making it up -- but I'm happy to seal the proceeding.

MR. FRENTZEN: No. I'm simply saying there are varieties of ways in which the -- and those are what's been described.

THE COURT: Right.

MR. FRENTZEN: And so for the different exchanges, if you will, or markets, there are different behavioral characteristics, if you will, and there are parameters, and there are also potential efforts to avoid, if you will, misclustering. And so those are parameters that are described in what's been provided to the Court in one instance.

Within that instance, there is also a response to what was, effectively, the third question that was asked, which was regarding manual alterations.

THE COURT: I was going to ask you about that. Is there something that was provided that addresses the manual alteration?

MR. FRENTZEN: That's correct, Your Honor. The answer is that there was not a manual alteration. But that is within the heuristic for that particular exchange that was asked about. There's a reference to it within the -- that document.

THE COURT: And for purposes of Heuristic 3, to the extent it's based on intelligence -- and maybe this is a question for the government as much as it is for you -- how much has been disclosed to the defense about what information

and the sources of the information that were used for purposes of Heuristic 3?

In other words, if it's -- we know that this is a transaction with Pandora because we had somebody associated with Pandora who told us X, Y, and Z. I'm not asking for the specifics for the disclosure because we're on the public record, but just whether that type of information has been disclosed.

MS. PELKER: Your Honor, I think that that was in the prior report. That is only present here for AlphaBay and relates to information tied to the AlphaBay takedown. There isn't additional detail about --

THE COURT: It's just that one cluster, and at least the nature of the information has been provided to the defense?

MS. PELKER: Yes. Your Honor, just one point of clarification on Mr. Frentzen's comment.

The manual manipulation, there is in the report a note about the information relating to AlphaBay because of how it came in that there were a set of addresses that were manually -- there was a manual processing aspect of it that's set out in the supplement, without getting into more detail.

THE COURT: I understand that. There also was a reference to Heuristic 4, which just came to light. Is this ringing a bell with you?

I guess I'm trying to remember what that heuristic

was, Heuristic 4 was. But it was something, I think you just discovered or your client discovered when they went back and looked at this?

MR. FRENTZEN: That's correct, Your Honor.

THE COURT: Which cluster did that apply to?

MR. FRENTZEN: I forget, as I'm standing here, Your Honor.

MS. PELKER: I can check that for the Court. I believe it may also have just been the cluster that was just referenced with a small number of addresses. It is definitely not the Bitcoin Fog cluster.

THE COURT: Fair enough.

MS. PELKER: And we're going back -- to the extent that Ms. Bisbee's report did not include any reference to that heuristic, it's a small number of additional addresses. We don't think it would impact the finding.

We also recognize that it's too late to -- was too late to amend the expert report, so --

THE COURT: It may be that you should, when you have your opportunity; if there's something that needs to be updated, do that.

I do have to say, I understand, for the reasons that Mr. Sterlingov raised earlier in his question to me through Mr. Ekeland about sentencing, if we ever got to this point or perhaps forfeiture, if we ever got to this point, the precise

dollar figures there, arguably, could matter.

But I do think that this is different from a DNA case, for example, where there's a greater risk that any error where something -- where you're presenting information at an extremely high level of certainty and specificity, and this is different in that even if -- as I've said before, even if there were a one or two or three percent error here and, conceivably, even higher, it's not clear to me that that's material with respect to the government's case.

MR. FRENTZEN: To take it a step further, Your Honor, what the Court now has and what the defense has is -- with regard to the tables, is the ability to take -- and we also provided kind of a workflow, which is a step-by-step sort of -- so to be able to take an input address, to be able to apply the parameters, the heuristics that are identified, to check that -- and it doesn't need to be run on CipherTrace. We're talking about, you know, public records, blockchain records -- and to be able to achieve the same result as was achieved by Ms. Bisbee, was achieved by Reactor.

THE COURT: And so that's what the spreadsheets will allow somebody to do is to recreate and, thus, either verify or contest the results that were generated by Chainalysis Reactor? If you have these addresses in this spreadsheet, you can go, and without the source code you can say -- using the public blockchain and say, we've applied the same heuristic, and it

either leads to that result or it doesn't lead to the result?

MR. FRENTZEN:  Correct, Your Honor.  It's, therefore, entirely independently verifiable.

Some expert may argue about whether or not a particular heuristic should or should not be applied, but there's no reason to go look at software when you can do it yourself.  And so that we now should be past the point, again, in the government's view -- I'm sorry -- in Chainalysis's view of needing to examine any source code.

Again, we think that this -- we were here, we still had gotten no specificity from any qualified expert.  The Court had questions, the defense had questions.  We took those questions.  Those were the questions supposedly needed to be responded to.

And we've now responded to them in a way that is, as we've said, independently verifiable.  And so we should move on from this supposed source code issue.

And so, again, we've laid out in the papers our views on the lack of need, along with the lack of specificity, along with the lack of anything looking like a 17(c) -- an appropriate 17(c) subpoena.  And it's still this, let us see everything so that we can figure out whether or not there is some issue, which is the very definition of a fishing expedition.

We remain concerned with regard to the proposed

experts. We spelled that out in the paperwork. I'm happy to get in the weeds about that. But unless the Court has specific questions on any particular experts, we don't view Mr. Bishop as an appropriate expert either.

I will add one thing. And that is, Your Honor, for the record is, with the benefit of additional time, I want to clarify our argument regarding Mr. Bishop's experience at Custodia Bank.

THE COURT: Okay.

MR. FRENTZEN: We recognized Custodia Bank as a viable and legitimate project with a multitude of interested backers. We do not have reason to doubt its commitment to compliance in AML, and it's now been able to open in several states.

Our point about this, however, you know, and we -- we had to file what we had to file promptly.

THE COURT: I know.

MR. FRENTZEN: I want to be clear with the Court. Our point with regard to Mr. Bishop remains, though, we're not sure from the paperwork we've received exactly what he did while he was there. We understand he's no longer there.

But, more importantly, as having spent time there and as a self-described rent-a-CTO, he's clearly aware of potential benefits of this technology not only to other tracing services, but kind of to a wide variety of different businesses that need

to try to monitor some of the same transactions that Chainalysis's software assists people in trying to monitor.

And so, you know, again, that places Mr. Bishop as a problematic candidate.  I can get into other details about him if the Court wants, but since we don't think any expert needs to review any source code, I don't need to belabor the point, and we filed a relatively lengthy pleading about that.

So, again, if the Court has additional questions, we've tried to answer the questions.  We've provided information that we believe can put this issue finally to rest. I hear what the Court is saying about, you know, something further, but I can only, sort of, respond to what's directly in front of me.

And at this point, that's 17(c).  This is nowhere close, and the actual request was -- effectively, set up another business that's Chainalysis 2 and let us run it for a little while and see if it works out, which was bizarre to say the least.

And if that came from the defense, then it came from the defense.  If it came from Mr. Bishop, it's clearly concerning because it demonstrates, A, no ability to specify why you need to look at anything, but it also -- it's preposterous on its face that they would turn over not only source code but other software and infrastructure and send an advisor over to tell them how to do it.  So, you know, we don't

view any of that as appropriate.

I'm happy to answer other questions about that particular motion or anything else the Court wants. But at the risk of maybe this is my last time up here, I just had a couple of housekeeping things. But I can wait until later for those.

THE COURT: Well, you're welcome to raise them now. I apologize for keeping you here because I know you're from out of town. What I was going to do was take the lunch break and hear from Mr. Ekeland and Ms. Pelker after the lunch break. But if there's something you want to raise now, that's fine, or later.

MR. FRENTZEN: I don't want to keep anybody from lunch, so I'll just say the two things.

THE COURT: Okay.

MR. FRENTZEN: One is there was an outstanding subpoena to Youli Lee. I had heard she didn't perhaps show up on the witness list. I just wanted to make sure it was, in fact, rescinded or dropped, the subpoena to her.

THE COURT: Let me ask Mr. Ekeland to respond.

MR. EKELAND: Your Honor, we mentioned this to the government -- we mentioned this to the government. But we are withdrawing the subpoenas for Michael Gronager, Jonathan Levin, and Youli Lee.

MR. FRENTZEN: I knew about the first two, but not the third, so I appreciate that. Thank you.

THE COURT: Okay. Thank you.

MR. FRENTZEN: The only other thing is I just want to make sure --

THE COURT: I will deny the motion as to, I think it was just Ms. Lee as moot at this point since the subpoena has been withdrawn.

MR. FRENTZEN: Because they had reissued them before and withdrawn them, we also ask that they not be permitted to keep reissuing them, but I'll -- the same subpoenas to the same witnesses, because it had already happened earlier and been quashed. Anyway, I just raise that.

THE COURT: Mr. Ekeland, do you have any interest in reissuing them?

MR. EKELAND: Not at this point, Your Honor. If something changes, I'll come to the Court, but I'm not envisioning reissuing them at this point.

THE COURT: I will grant the motion to quash then in light of that without prejudice. But with the understanding that the defense has represented that they have no interest in reissuing them, and they would have to come in with some substantial showing at this point.

MR. FRENTZEN: I appreciate that, Your Honor.

THE COURT: I should say, based on my review, I didn't see the relevance to this case of any of the witnesses. I believe you represented in all of your papers that none of

them actually had anything to do with the investigation in this case.

MR. FRENTZEN: Thank you, Your Honor. I appreciate that. Finally, just -- we don't need to deal with this now; I'll just raise it. I'd like to get the protective order forms from counsel just so I know that it is just counsel and then the one from Ms. Still, but we can iron that out later.

THE COURT: If you need any assistance from the Court, since you're not in your offices, of just printing out the form here, we can print it for you in the courtroom so you can have it here and get it signed.

MR. FRENTZEN: I think they're supposed to be lodged with the Court, sent to the government and to me. I just want to make sure we know the universe of the people, the lawyers and the one expert.

THE COURT: That's fine. Thank you. One thing I will also mention before we take our lunch break is nothing is going to happen in a manner of time that will affect this case. But the New York City Bar Association has requested that the Criminal Rules Committee consider amending Rule 17 in a manner that would provide for more expansive discovery and actually would supersede the *Nixon* decision.

That's an issue that is pending before the Criminal Rules Committee, and I know how that process works. If they decide to take some action -- and I don't know whether they

will -- if they take some action, it will be many months from now, if not years.

MR. FRENTZEN: That's fortunate for us then, Your Honor.

THE COURT: Okay. Thank you. So let's go ahead and take a lunch break. Does 1:30 work for everyone to come back?

MS. PELKER: Yes, Your Honor.

MR. EKELAND: Yes, Your Honor.

THE COURT: You might think also about, in light of the change in schedule, what our next steps should be, whether we want to come back for a status conference. We can come on Friday, and I'm happy to clean up as much on the docket as possible so we're as set to go -- I really am in a position, if something frees up, I will do my best to accommodate Mr. Sterlingov's request.

And I may only be able to provide you with a week or two of notice and say something freed up and we're ready to go. That's why I want us all to be set and get as much done as possible so we're ready to go.

MS. PELKER: Your Honor, the government would ask that we continue to come back on Friday, try and get as much lined up. We would note that, while we would very much appreciate being able to be fit in, we are also -- we're writting [sic] in individuals and flying them in from various places, so we just need some lead time for witnesses. We will

do our absolute best to make it work, even if we just get short notice.

THE COURT: And I will do my best to provide you with as much notice as I can.

Okay. Let's take a lunch break and we'll come back and finish this up.

(Whereupon, a lunch recess was taken at 12:38 p.m. until 2:00 p.m., after which the following further proceedings were had:)

THE COURT: All right. Mr. Ekeland, your turn.

MR. EKELAND: May I proceed?

THE COURT: You may.

MR. EKELAND: Thank you, Your Honor.

So in *United States v. Nixon*, the technology in question was a reel-to-reel tape recorder. The technology wasn't really in question. The question was whether or not the United States Government could get tape recordings of President Nixon.

Here the technology is in question. In *Nixon*, they're not actually asking, is that really President Nixon's voice on the tape, which would be a possibility in this day and age with deep fakes.

So I think when the Court highlights the issue of the difference between *Nixon* and the issues now, I think there is a very, very big difference. And the reason we're asking for

this source code and the reason we asked for it again was after the *Daubert* hearings where Ms. Bisbee from Chainalysis testified -- and I still think that up until this moment, Chainalysis still says that they do not have any error rates, that they didn't keep any of the internal data on error rates, there's been no independent model validation; there's been no independent audit.

What little I've seen in the few moments that I had to look at what was produced in relation to Heuristic No. 1, 2, 3, and now No. 4 is being presented to this Court as if it's information that allows us to independently verify the attribution -- clustering attributions at issue here.

And I don't think that that's entirely accurate. I suspect it's not. And the reason for that is they made mention of AlphaBay. Now, the way my understanding that the owner, so to speak, of AlphaBay was caught was not because of any kind of heuristics or anything. He was caught because he sent a welcome email that was linked to one of his personal accounts.

And so what -- that raises the issue when you say, oh, well, we validated, you know, our information; AlphaBay. Well, is that because you got what I guess would, essentially, would be Heuristic 3 information, you know, external intelligence on something, and then you went back and you created your clusters from that, or did you create your clusters and then find out that they were valid?

I think that goes to the core of what we need to see in terms of being able to independently validate the clustering attributions in this case. It may be that they had -- I think -- again, I think I saw when I was flipping through the information in Heuristic 1, 2, and 3, or somewhere else in the latest disclosures, that there's still no scientific peer-reviewed validation as to the accuracy of this information.

So the reason we're seeking this source code, and I think for a lot of the reasons expressed in Mr. Bishop's disclosure -- which was at Docket 179 -- is we need to independently verify the assertions of our adversaries.

I think what has been frustrating, as the Court is aware, for the defense is I've never had a case where my adversary has been able to, sort of, dictate the expert that we can use and how we look at the information, not based on whether or not that expert qualifies under Rule 16, but purely on competitive concerns.

And our concern here, and I think this is a matter of first impression, is why the Court is -- when we're looking at things here, we're referring to an intermediate appellate court in New Jersey is -- what you have here is the government can effectively prevent the defense from using the experts of their own choice by simply using a private vendor that may be a competitor.

And what we're seeking to do here by getting the source code and the related information is getting the information so that we can actually independently verify these numerous anecdotal claims that are being made and being put forward to the Court; saying we got this subpoena information, we've got Judge Faruqui saying this. Well, I don't know what the data set is there. Is that scientific? What's the control group? What's -- no one has collected any information, as far as I understand the record, as to the whole universe.

Yes, maybe it was accurate a hundred times, but was it wrong a million times? That information is missing.

So unlike *Nixon*, where the technology wasn't in question -- they were merely asking for recordings of President Nixon's voice -- here we're asking for what we consider to be relevant, admissible, and specific evidence -- the source code and related items -- that Mr. Bishop -- we outlined in his disclosure so that we can go and do that independent verification by Chainalysis -- and the government's own admission has never been done.

It would be a different scenario --

THE COURT: You're not proposing to use the source code to generate an error rate, are you?

MR. EKELAND: I don't know if that's possible. But we certainly know -- need to know how this machine and technology works in understanding -- in order to understand

what kind of tests we would need to do in order to generate the error rate. I don't --

THE COURT: Can't you do it right now with what you have? You have heuristics; you have the spreadsheets, which contain thousands of lines of data; you have the blockchain. Can't you, if you want to, go through and just recreate however you want with your experts tracing, and if you think there are errors, you can bring those to the attention of the jury -- your expert can bring those to the attention of the jury with what you have already.

MR. EKELAND: First of all, I haven't looked closely at what's been produced, but I don't know the honest answer to that.

It's selective data from our adversary. And what we're asking for -- this wouldn't be a problem if this was coming from FBI cyber. The whole reason that this data is being withheld from us is -- my understanding is purely competitive and trade secret concerns.

And that, to us, to the defense, doesn't seem as a matter of due process proper when we feel like we're entitled to see how this technology actually works and so that we can challenge it and without, so to speak, looking under the --

THE COURT: I'm not sure you're right about this. I don't know if it's ever come up, but the FBI has lots of sophisticated computer systems that they use. No one has

brought to my attention, at least, that there are cases that say that the FBI has to turn over its source code without some showing of why there's an issue or question with respect to the source code and just say the FBI has got, you know, lots of sophisticated computers that do various things, and we want to see all the FBI's source code, because we don't really know. There may be something in there that may bear on this case.

MR. EKELAND: Well, we were unable to find a case. Maybe there is. When I looked, I was unable to find a single case in the criminal context where there is a noncompete or competitive concerns are cited in a protective order.

THE COURT: Have you found a case where the FBI or another law enforcement agency has been required to turn over its source code?

MR. EKELAND: I looked for some source code cases. I haven't done a comprehensive search.

THE COURT: That's surprising at this point.

MR. EKELAND: Your Honor, if -- maybe if this technology was established, but it's not.

THE COURT: No. But I'm questioning whether anyone, you or the government or anyone, can bring to my attention any case that deals with or requests -- putting aside a private vendor -- where the government is requested to turn over its source code for some computer program that it's used in an investigation.

MR. EKELAND: I'm not aware of that. I think that highlights the numerous matters of first impression in this case. I think we're in -- I mean, as the government admitted, this is the first time that Chainalysis Reactor has been subject to a *Daubert* challenge, which surprised me.

And it also surprised me -- I mean, it's been no secret what -- how we feel about this technology, that when we went into the *Daubert* hearing, and I just asked the -- you know, I based my cross on the basic *Daubert* factors, and I was surprised to hear that they couldn't name their error rates or the rates of false positives or the rates of false negatives or any kind of scientific peer-reviewed paper.

We're being presented with a lot of stuff from the government that says, look, this stuff works great anecdotally. How are we going to check that without looking at how the software works?

THE COURT: Well, I actually sort of wonder just the opposite. I can see how you can check it with what you've been given recently, which is one of the reasons that I agreed to the defense's request to continue the case.

Quite frankly, I don't see how you're going to be able to check the error rate or peer review or whatever other things you've criticized with respect to Chainalysis with the code, and I've given you multiple occasions to kind of bring that to my attention, and you haven't done so. I understand

what you can do with what you have now and, in fact, even without what you have now, Ms. Still went through and did her own analysis and reached disagreement.

But with what you have now, you can do this based on the individual heuristics that were applied and go back and -- if you want to generate an error rate on it and argue that to the jury, I think you have the information you need to do that, or your experts do at this point.

MR. EKELAND: Your Honor, that is not clear to me. So then -- just because, A, I haven't been able to look closely at it. The Court may be right.

But then, what I would ask is can we reserve the issue so that if we go back and we look at this information on Heuristic 1, 2, 3, and 4, and we come to the opinion that that isn't true, that we can't, that we then come back to the Court and say, here are the reasons why we can't do this without the source code, and here's why we need it.

Because I feel like it's very difficult to say that without knowing, again, what we're looking at, what's under the hood. We're being told, look, this is accurate, you don't need to look under the hood. We've given you information X, Y, and Z. But, of course, this is from my adversary. Maybe that's accurate, but maybe it's not.

And the one thing I think we've all learned during this case is how complicated this is. I think Mr. Bishop's

notice and disclosure goes to that.

So if the Court is of the opinion that we have everything we need to check the accuracy of Chainalysis Reactor, then I also ask, how come Chainalysis has never done that yet?

THE COURT: You're veering off into -- once again into something that's just not what is before me now. I mean, I understand your arguments about the reliability of what Chainalysis has done, and you've made that point to me.

The question just before me now is whether the subpoena is enforceable at this point or not or whether you should be allowed to issue a pretrial Rule 17 subpoena and whether -- the question of why Chainalysis has or hasn't done it, I don't see how that's relevant to that question.

MR. EKELAND: For me, the reason I'm saying that is I just think that if that information was sufficient, then it's likely that they would have done it. But I understand your point, Your Honor. What I guess I'm asking --

THE COURT: They've also had the code, and they could have done it with the code, too.

MR. EKELAND: I'm a little, honestly, baffled by that, why -- I didn't expect that.

THE COURT: I've heard you on that point. I mean, I think quite literally, you've probably made that point 30 or 40 times to me already. I'm not thick. I get it.

MR. EKELAND: Your Honor, we ask then that we be allowed to reserve the issue to examine this heuristic information, which I just scanned this morning very quickly, five to ten minutes at the table there. If that's true, that we can get some sort of accurate assessment and independently verify their data, then we're off and running.

But then we ask that we be able to, if we come to a contrary conclusion, come to the Court and say, well, we looked at this, Your Honor, and for these reasons we don't think it's adequate. I mean, which is, I think, sort of -- one of the points behind having the continuance is to be able -- for us to be able to look at this and analyze it properly, because I just -- I can't say. I can't say after looking at it for five minutes whether I can calculate the error rate from it, and I need to get Ms. Still's expert opinion on that.

THE COURT: All right. Anything else?

MR. EKELAND: Not unless the Court has any questions.

THE COURT: All right. Ms. Pelker?

MS. PELKER: Yes, Your Honor, a few points. So I think that somewhat, understandably, the lines here between *Daubert* and Rule 16 and what qualifies under Rule 17(c) are really getting blurred here. And one does impact, certainly, the relevance assessment under 17(c).

But we really have the assessment of -- the government's put forward two experts who are going to testify

to what their determination is. They have relied on their use of the software, which that information has been disclosed to the defense. The defense is entitled to probe that.

None of our experts have used -- are familiar with the Chainalysis source code; they are not relying on the formulation of their expert, to the extent that they even are opinions, but in their expert determinations, on their expert reports to anything that they've perceived related to this last round of production.

And to the extent that we're now looking at peeling the layers down several layers below, I think that the Court in *Morgan* and really across the board has been clear that experts are not going to be held to a technical understanding of every software that they use. They need to be able to explain how they used it and why, in their determination, it's reliable.

I understand that under 17(c) the defense wants to obtain additional information that they may be able to use on cross-examination for impeachment, but it's not clear to us how they intend to impeach, say, Ms. Bisbee with anything from the Chainalysis source code that is not going to be relevant to her testimony.

If you give her a piece of code and try and cross-examine her on it, the answer is going to be, I didn't code the Chainalysis source code here. And to the extent that they're trying to use it to then develop some additional new

opinion for their own expert, I think it's really clear by the defense repeatedly saying that we don't know what we're going to find, we don't know how we're going to use it, we don't know, we don't know, that this is simply a fishing expedition.

There is a fair amount of case law regarding discovery of sensitive software limited on the source code front, but sensitive law enforcement-developed software in the child sexual abuse material front, so the government cited several of those cases in its original opposition to the defense motions in limine at ECF 73.

The discussion starts at page 32, but on page 34 we cite to what we viewed as kind of two cases that look at the two different positions from two different circuits. That's *U.S. v. Pirosko* from the Sixth Circuit and *U.S. v. Budziak* in the Ninth.

The Ninth in Budziak was really the exception in which the Court did grant a defense request for more extensive discovery relating to a sensitive law enforcement tool, but pointed to the very specific showing there where the defense had actually had an expert come in and give a very specific accounting of exactly what they thought had gone wrong and how, when they looked at evidence on the defendant's computer and their understanding of how the government's software worked, how a very specific thing happened and what specifically they needed to look for relating to the government's software.

When the Court in *Pirosko* looked at that issue, they determined that the defense could not meet that sort of exacting standard that had been set out in *Budziak*. There are a number of district court cases that examine similar issues.

The issue of source code discovery is, actually, fairly rare -- specifically, because in most of those cases the defense says we don't need to see the source code; we just want access to the software to do the testing -- and seems to recognize that they really don't have a way to articulate a need for the software.

And the government -- we had done a fair amount of research back last fall that didn't end up, ultimately, making it into the brief at the district court level. We do think that those two circuit cases sum things up well. But to the extent that the Court is looking for additional case law, most of them discuss the specific tools.

So if you look at -- Roundup, EP2P, and Torrential Downpour are some of the names of the tools, and there's a lot of litigation, including a fair amount by Mr. Fischbach, who often comes in and talks about how he needs access, not necessarily to the source code, but to the software.

And the government recently cited in one of its filings where Mr. Fischbach is on a webinar with defense counsel talking about how they use these discovery demands for a tactical advantage even though they don't know exactly what

they're going to find.

THE COURT: So when you're referring to the software, I take it what you're referring to is just Reactor, and I've already told Mr. Ekeland multiple times that he can obtain a license or find somebody with a license and run the software. And although he withdrew from CJA today, before that I had already told him that I would approve a CJA voucher which he never filed with respect to seeking a license for the Reactor software.

MS. PELKER: Yes, Your Honor. And the government would point out that that would put the defense in the exact same position as the government experts here of using the software.

The government's experts have used the software and determined that it is very reliable for the reasons set out in their reports, in their testimony and then as noted in the government's supplemental finding. The defense experts can run all of their own tests, they can go and run and see how Chainalysis clusters in their software certain entities and try and find examples where an address was misclustered.

Ms. Still tried to do that. And the two examples that she pulled out as thinking that Chainalysis would miscluster, it turns out are not misclustered in Chainalysis. But the defense has the ability to do that.

The source code -- the only thing the source code,

potentially -- having not actually seen the source code or would necessarily be able to do anything with it even if I had, but the source code is just going to say, is this heuristic running the way that's described in this report. They can just look at the spreadsheet and say, you know, here's the starting point, they apply this heuristic as described, it gives us the end point.

And if it turns out that they apply the heuristic as described, it never gets to 50 percent of the end points, 10 percent to any of the end points, they can put their expert on and say that there are issues, they can come back and ask for additional clarification on that point. That's not what they're seeking to do here.

Again, on that point, I think that -- I know that the Court may not have reviewed all of the attachments to the original expert report, but it did -- and then Ms. Bisbee's -- the breakdown from May or June --

THE COURT: I'm not sure I have all the original attachments.

MS. PELKER: There were many, many voluminous attachments. This one absolutely does provide more detail. But the government has, since last December, provided to the defense these long spreadsheets with all of the different addresses.

We heard testimony from Ms. Still that she was able

to verify almost 400,000 -- or determine that almost 400,000 of them she concurred with.  She didn't agree with these others.  She could articulate generally why she did not agree with them.

That's really what the defense is entitled to  and what they've already been able to do with the government's discovery and what they certainly will be able to do even further now.

The government would also point out that this request is massively broad.  For each time we come back here and say that we need to narrow it, we get this request where they're saying no, we don't just need the source code; in fact, we need detailed records of every single log activity by any Chainalysis user, every single graph that any government investigator has ever made for any case, any -- they wanted images of all of the -- all of Chainalysis's computers.  They wanted to set up a mini Chainalysis setup.

And for all the reasons set forth in the government's opposition, we just are so far afield, and it really highlights what a fishing expedition this is; and, frankly, suggests that this is not a good faith effort relating to a true discovery issue.  But, rather, an attempt by the defense to continue harassing and intimidating and not necessarily out of any sort of animus towards Chainalysis but as a defense tactic, to try to dissuade Chainalysis or other blockchain analytics companies from being an expert for the government.

And I think the fact that Ms. Still from CipherTrace is donating, by her account, $100,000 to $200,000 worth of her time from CipherTrace at the same time that CipherTrace has shut down its voluntary response business to help real fraud victims really highlights some of the concerns about what the purpose of these discovery requests are getting at.

THE COURT: All right. Thank you. Mr. Frentzen, anything else you wanted to add?

MR. FRENTZEN: Your Honor, just very briefly, just to add -- well, first, just to tell the Court I took a quick look at *New Jersey v. Pickett*, and while I don't think it's a 17(c) case, obviously -- it's in New Jersey, and it's just sort of -- I would still take a look at that case and say that we're in a very different situation than that situation, and that the factors that that court took under consideration weigh heavily in favor as well of Chainalysis's view that this source code in this particular instance is totally irrelevant.

Number one, they said a rational basis. I'm paraphrasing because I took some notes, but, obviously, it's in the opinion.

That there be a rational basis for disclosure, the extent to which expert testimony supports a claim for disclosure. Here, as the Court has seen repeatedly, repeatedly, there is not -- no expert has provided any justification for it.

Number 2, the specificity of the information sought. Again, we have zero specificity on this record, you know, just couldn't be granted whether it's in *Pickett* or 17(c).

Number 3, the available means of protecting the intellectual property. And here, I'd just address again, we have an absolutely clear record, which we've spelled out, of an intent to harass here and to try to impugn and harm the business for showing up as a witness; including counsel saying we're going to sue the crap out of them, and repeated almost nonstop negative public statements, and being, effectively, outed as feeding news stories.

And so what are the available means of protecting the intellectual property when that's what we're dealing with here.

And then, 4, any other factors. And I would just point out in that regard in terms of any other factors, the *Pickett* case involved, I think it was called TrueAllele, but a DNA mixture which I've spent a lot of time in homicide cases dealing with.

And, you know, the statistical machinations involved in that kind of probabilistic determinations which can, frankly, skyrocket on the basis of particular factors is a far, far cry from, you know, something that is predicated fundamentally on a public source, which is the blockchain.

And so here, in terms of any other factors, I think, again, it weighs heavily -- the *Pickett* case, even if it were

the law -- which, obviously, it's not -- would weigh heavily against disclosure.

And just to Mr. Ekeland's point, I would ask the Court, you know, the time for ruling is now. This has gotten to the point where it's like Whac-A-Mole of perpetually being presented with another expert who has got their own animus, their own inability to be noncompetitive, their own, you know -- let's just say issues, if you will. And, again, three, four times now not any further specificity, but rather going in the other direction.

And, you know, we feel like, obviously, we keep dealing with the exact same issue and the time has come. What we fear -- you know, I know as a trial lawyer, that litigation will expand like gas in a room when you give it time. And my hope is that -- you know, we were here I don't remember how long ago originally, and the Court said, that's a great idea, Mr. Ekeland, why don't you do that.

THE COURT: I think I had the idea. Mr. Ekeland said it was the great idea.

MR. FRENTZEN: There you go. Your memory is better than mine, Your Honor. Exactly. But it's been long enough that I've forgotten the exact sequence, Your Honor.

So the point is, I don't want to be back here in January. I don't want to be back -- no offense. I used to live here; it's great. I don't think that this should continue

to kind of painfully repeat itself.

So with that, Your Honor, I'll sit down.  Thank you.

THE COURT:  Thank you.  Mr. Ekeland, any final words?

MR. FRENTZEN:  Your Honor, I apologize.  One additional point, which is actually just a slightly different thing.

THE COURT:  Sure.

MR. FRENTZEN:  On the Court's modification of the protective order --

THE COURT:  Yes.

MR. FRENTZEN:  -- which, obviously, we didn't object. My only request would be, it says, "unless further order of the Court."  If the Court could just orally -- we would like an opportunity to be heard in the event that there were a petition to modify that protective order.

THE COURT:  I think that's implicit.  If there is a request to modify it, you certainly should be served with that request and have an opportunity to be heard on it.

MR. FRENTZEN:  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

MS. PELKER:  Your Honor, just to the extent it's helpful for the Court, I did find a number of other cites relating to TrueAllele where the local courts determined that they did not warrant disclosure.  I'm happy to give the cites if those are helpful.

THE COURT: After Mr. Ekeland, you can read me the cites. Go ahead, Mr. Ekeland.

MR. EKELAND: In relation to the DNA evidence, DNA is a well-established forensic science. It's been around for, what, almost 60, 70 years since Crick and Watson in the '50s discovered the double helix and got the Nobel prize for it. This technology and question here is nothing like that.

In terms of the source code, I mean, the defense maintains we are specifically asking for the source code. What we want to see is what inputs and outputs it's asking for because the government and Chainalysis have made the claim that this software is deterministic. Well, in order for us to validate that claim, we need to see the source code.

There just isn't any kind of standards for scientific evidence for this technology like there is for DNA. So we would argue that, sort of, comparisons to DNA technologies is inapposite. DNA forensics is a well-established science.

You know, unless -- I think we've made our point there. Unless the Court has further questions, I'm done.

THE COURT: Okay. Thank you. Ms. Pelker?

MS. PELKER: Yes, Your Honor. With the caveat that we had opted not to include this in our prior briefing because they were local and not federal, and so I did --

THE COURT: Those are state court decisions?

MS. PELKER: These are state court decisions. I have

not looked at them since we pulled -- I pulled them out into a local cases file on my computer.

It's very possible that there are other local cases out there, that they're more on point. I just don't --

THE COURT: If they're local cases, I guess I'm less interested. I thought maybe there were some federal cases dealing with access to the source code that underlies various FBI or other law enforcement software programs that are used in litigation.

MS. PELKER: So there's *United States v. Chiaradio*, C-h-i-a-r-a-d-i-o, from the First Circuit. That's 684 F.3d at 278 is the pin cite.

And then it's a number of state cases dealing with TrueAllele specifically, similar to New Jersey, in which the various states determined that the source code for TrueAllele was not material to the defense and that the discovery request relating to discovery of the source code for TrueAllele was rejected on a number of different cases.

THE COURT: Okay. So let me -- I just want to go take a look at least at a couple of these cases that were just cited, and I'll come out and give you my ruling.

(Recess taken.)

THE COURT: All right. Thank you. I've now had the opportunity to review those additional cases that were mentioned, and I'm going to deny the defense's motion for leave

to issue a pretrial Rule 17(c) subpoena for the source code and, I think it was, the change logs. Give me a second here.

So I'm denying the motion at Docket 155, which is the motion to authorize issuance and pretrial return of subpoena duces tecum to Chainalysis, Inc., under Federal Rule of Criminal Procedure 17(c), which seeks leave to file a Rule 17 pretrial subpoena seeking the source code for Reactor and the change logs for Reactor as well.

And the version of the source code that was sought was the version that was used by the government when conducting their investigation. And then they also -- the defense also seeks the change logs for Chainalysis Reactor documenting the changes made to the software during the pendency of this investigation. And that is all that was sought in the motion that is actually in front of me at Docket 155.

I want to provide a fair amount of background and discussion relating to my ruling. In some sense this dispute dates back almost a year ago when the defense, in its omnibus motions in limine, among many other things, sought access from the government to the software source code, object codes, complete input and output databases, relevant native computer logs, and original sources underlying the government's allegations in the case, and the government responds to that motion correctly by observing that the software and source code and object codes are not in the government's possession,

custody, or control. They belong to Chainalysis.

It's been represented to me that the government does not have those materials; in fact, I think has not even reviewed those materials. But in any event, seeking those materials from the government under Rule 16 is the incorrect procedural vehicle because it's the property of -- all of that is the property of Chainalysis.

I think perhaps recognizing that difficulty in November of last year, the defense issued a Rule 17(c) subpoena directly to Chainalysis, along with subpoenas to various Chainalysis employees. The subpoena that was served on Chainalysis, as I have previously observed, was extraordinarily overbroad under Rule 17.

It looked more like the type of document request one might seek -- see in a very hotly contested civil litigation. And the Supreme Court has made clear that 17(c) is not a vehicle for discovery in the same way that it is in a civil case.

The subpoena that was served, in any event, back in November was extremely overbroad and burdensome. Among other things, it sought all documents, records, and communications regarding the purchase of Excygent by Chainalysis, including due diligence documents, the price paid, any memorandum of understanding, sales agreements, negotiations, contracts, and records of payment via cash, equity, options, or any other form

of consideration; sought any documents and records and communications, including individual notes to one's self exchanged between Chainalysis and *Wired* magazine, Andy Greenberg or any other reporter related to blockchain analysis or Andy Greenberg's book, *Tracers in the Dark:  The Global Hunt for the Crime Lords of Cryptocurrency*, released on November 15, 2022.

There were 21 -- or 20 overall requests for documents under the subpoena.  And as I previously held, the request failed to satisfy Rule 17(c) or the *Nixon* standard; and, in fact, was just the type of fishing expedition that may be appropriate, at least at times, in civil litigation, but is not appropriate in a criminal case, at least as the rule is currently drafted.

Most strikingly, is that, as I've previously observed, I don't read the subpoena from last November -- November 30th, I think -- I don't read it to, actually, request the source code.  I guess it's dated November 18, but it was filed with the Court on November 30th.

I don't actually read it to request the source code that was used for purposes of the expert analysis that the government proposes to offer in this case.  And if it does, it does so in the most obscure fashion that has never been explained to the Court or justified to the Court.  And the closest it actually came was saying, any documents, records,

and communications, including individual notes to one's self exchanged between Chainalysis and any researcher from the University College London IC3, the Austrian Institute of Technology, or the Complexity Science Hub Vienna, including, but not limited to George Kappos, Haaroon Yousaf, Rainer Stutz, Sofia Rollet, Bernhard Haslhofer, or Sarah Meiklejohn related to the presentation of the white paper at the USENIX Security Symposium and the investigation that led to the prosecution in this case.

This includes data sets, draft versions of white papers, source code, object code, algorithms, heuristics, methodologies, and Chainalysis research sent to researchers, as well as all software editions with complete code in native file format.

So the Court denied -- agreed to quash that subpoena under the *Nixon* standard. At the time that I denied -- strike that.

At the time that I quashed the subpoena as improper under the *Nixon* standard and Rule 17(c), it was at that hearing that the defense raised with me an interest in obtaining access to the Reactor source code. And I noted at that time "that I was sympathetic to the notion that the defense needed specific information in order to put on its case here."

But what I directed was that if the defense wanted access to the Reactor source code, it would have to identify an

expert for the Court, and that expert would have to prepare a statement for the Court which would specify and explain with some precision what the expert needed and why the expert needed it.

I told Mr. Ekeland, "I understand why you may need this before trial. If you then need the opportunity for someone to do complicated analysis and they need time to do that analysis, I would recommend moving quickly in doing that. But I think you need to get down to that level of specificity" -- which I had previously described -- "in order to satisfy the Rule 17 standard. Does that make sense?"

And Mr. Ekeland responded back in June, "I think that's an excellent idea. We're happy to do that, Your Honor."

I, on several occasions, have made clear to the defense that, in order to satisfy the dictates of Rule 17, the defense has to make some showing to me of a specific need and some showing of relevance. And that the way to do that is to have an expert on source code or on coding explain to me what it is that the expert needs to look for and why the expert needs to look for that, and how it could be relevant to this case.

I advised the parties, "I would just encourage you all to get your heads together quickly relating to this issue and for you to get the specificity you need, Mr. Ekeland, to the government and Chainalysis because I don't want to put you

in the position in which we're back here in another month and a half, and then by the time you actually get what you need, you can't prepare in time for trial."

I added, "If you need to come back or even have a -- if you need to get me on the telephone at some point to try and resolve these issues to move quickly, I'd like to do that because I don't want to be in a position in which we're on the eve of trial and you're telling me, Judge, we just got the code last Thursday and my expert is telling me they need 60 days to review it."

Defense counsel didn't follow through on the Court's instructions that that information be provided, that those discussions occur with Chainalysis and the government, and that some specificity be provided with respect to what was needed to be reviewed and why.

Over a month later, at a *Daubert* hearing that was held over the course of July 19th and 20th, Mr. Ekeland reiterated defense's desire for the source code, and I reminded him again that he needed to comply with my direction to provide a targeted request, and to meet and confer with the government and Chainalysis, and to identify an expert and to have that expert prepare a statement explaining with some precision what the expert would need to review and why the expert would need to do so.

Following that, again, we just didn't hear anything

from the defense with respect to this issue. And it was more than six weeks later, after the June hearing, that the defense filed a motion for leave to issue a Rule 17(c) subpoena. And as I mentioned, that subpoena sought access -- or that motion sought access to the Reactor source code and the change logs and internal Chainalysis study.

The motion ignored the Court's direction that the defense identify an expert and that the expert specify and explain to the Court why the source code was necessary and what the expert would need to review in the source code and how that was, potentially, relevant to the case.

And the motion itself didn't provide any explanation for why the source code was needed for purposes of preparation. For example, with respect to Heuristic 1, the defense simply said, "The heuristic is unreliable because simple obfuscation techniques regularly used throughout the blockchain community, such as CoinJoins, invalidate the assumption that underlies Heuristic 1."

But that's an issue that is addressed by the specifics that the government had previously disclosed to the defense and, certainly, as of today, has now disclosed with respect to how Heuristic 1 operates and how CoinJoins are handled. It says nothing about the source code and how a review of the source code is necessary to make those determinations.

Similarly, with respect to Heuristic 2, the motion simply said, "Heuristic 2 is unreliable because of its indiscriminate automated clustering of peel chains." That critique is not about the source code. It's about the heuristic. And, again, at least as of today, the defense has received additional, quite specific, detail with respect to how the heuristic works.

With respect to Heuristic 3, the motion simply says, "Reliance on open-source data raises significant questions as to the accuracy and verifiability of that data that could only be answered through the analysis of the Reactor source code and the sources used to generate that code." And, again, there's no explanation to me, and no explanation is apparent to me, of why the source code is needed to make those types of determinations.

On August 22nd, after receiving responses from the government and Chainalysis, I heard from the parties on the defendant's pending motion. And at the hearing the Court again instructed defense counsel that they had failed to articulate with any specificity why the defense needed the Reactor source code, and the defense had been directed to file a statement from an expert regarding the need to examine the source code and the scope of any such examination.

I explained, "The question is just what in particular is it that you need and why you need it? As I think about --

as I think both Chainalysis and the government noted in their responses, I was pretty clear about the process that I intended to take place and you didn't seem to follow that. Where I said what I need is for you to provide me with some statement by a coding expert or other person with the relevant knowledge to identify to me what it is in the code that you need to look at and what the code will reveal.

"I reviewed Ms. Still's report, and I understand her concerns with Chainalysis and the government's other witnesses and their expert reports, but what I still haven't seen is what is it that the source code is going to reveal? What is going -- who is going to look at that and be able to tell us something from looking at it?"

Despite the fact that I had provided the defense, with every opportunity, time to comply with the Court's direction and even though the defense failed to do so, the Court again gave the defense tremendous leeway, and I granted another opportunity for the defense to satisfy Rule 17(c) by identifying an expert and having the expert prepare a statement specifying with precision what the expert would need to determine the accuracy of the Reactor software.

I said, "I'm saying give me an expert who can tell me what the expert wants to look at and someone who is not their" -- that is Chainalysis's -- "principal competitor who is an expert in code, who knows and can tell me, I can look at

code and I can read computer code and I can tell you, based on reading the computer code, what the assumptions were and this is the portion of the code I would need to look at in order to do that, and here are the rules that I'm prepared to live by with respect to a protective order to make sure the company doesn't sustain significant competitive disadvantage."

So in response, Mr. Ekeland sought to flip things a little bit and said if I order the production, then the layman expert is willing to sign a protective order, and I said that was not the direction that I had provided.

And I said, "That's why I suggested last time many weeks ago -- we're getting very, very close to trial now, but why I suggested many weeks ago that you sit down and have a conversation with the government and Chainalysis, which apparently didn't occur, and that you tell them, with the assistance of an expert, exactly what it is you need to look at and have a conversation about how to facilitate that, and you just ignored that direction."

On August 27th, 2023, the defense for the first time complied in part, but only in part, with the Court's order. And on that day, the defense counsel sent Mr. Salah's resume to the government and Chainalysis. And it was emailed to the Court on the evening of August 28th.

On August 29th, I heard from the defense, counsel for Chainalysis, and the government on Mr. Salah. And at that

hearing I asked defense counsel what exactly they needed to know and hoped to glean from the source code. And I was quite clear that this was the opportunity for Mr. Ekeland to articulate with specificity exactly what it was that they needed the source code for and what they needed to -- Chainalysis to disclose in order to prepare for the defense.

And in response -- I want to get the actual language in front of me. Mr. Ekeland, given this opportunity said, "First we would like to, in relation to Heuristic 1, which is the co-spend heuristic, Ms. Bisbee testified that Chainalysis has particular algorithms to detect CoinJoins, so we'd like to see the source code and any information that relates to Heuristic 1."

And then he says -- Mr. Ekeland says, "We would like to see, as well as information on Heuristic 1, Heuristic 2, of course, which Ms. Still called the Pac-Man overinclusive behavioral heuristic. And more interestingly, something that was raised by Mr. Salah with Heuristic 3, which is the intelligence heuristic, what we're unclear on here is whether or not Heuristic 3 involves actually manual -- actual manual modification."

And then he goes on and says, "What we're asking for is information and source code related to Heuristic 1, Heuristic 2, and Heuristic 3; in particular, any kind of manual manipulation and corrections."

And then the Court notes that "I just want to stay focused on narrowing things in a way that provides specificity with respect to what the defense is seeking." I say, "I'm trying to give you the specificity now by telling you exactly as of today what it is, period. That's the end of the matter. I'm going to hold him to it." By that I meant I'm going to hold Mr. Ekeland to what he tells us he needs at the end.

He identified these matters. And that is then, as I understand it, what then prompted Chainalysis to agree to provide answers to those materials and information that was answering -- answers to those questions and material that was responsive to those questions that I was very careful about giving Mr. Ekeland the opportunity to be as specific as possible about and made clear that was the end of the matter.

Then the Court on August 30th at -- while Chainalysis was in the process of making the production that it made a few days ago and that was turned over to the defense today, the Court issued an order with respect to Mr. Salah, and I held in my order that the defense had not provided the statement that I required that Mr. Salah to provide that told us why it was he had to look at the source code and what he sought to identify in the source code.

I also concluded that Mr. Salah founded a competing company whose business model was highly antagonistic to Chainalysis's business model, and that he resided outside the

United States, was not a U.S. citizen, and was beyond the contempt power of the Court. And that for those reasons, he was not an appropriate expert.

But before even reaching whether he was an appropriate expert, the defense still had not complied with my requirement and direction that was now weeks and weeks old, that they provide the Court and the government and Chainalysis with a detailed explanation of what it was they were looking for in the source code and why they needed to examine that source code.

On September 5th the defense proposed another expert, Bryan Bishop. And to this day, I still have not received a statement from Mr. Bishop indicating what it is that Mr. Bishop was looking for.

I have a filing by the defense, which goes into far greater detail than any of the prior filings by the defense, but there's nothing that purports to be a statement of Mr. Bishop to the Court or to Chainalysis and the government. It may be that Mr. Bishop spoke to the defense and provided input, but that's not the way it's represented, and it still is not compliant with the Court's direction.

In addition, at the same time, I think, perhaps demonstrating some lack of good faith here in trying to reach a resolution with respect to these issues, the request becomes massively broader. And I think, as Ms. Pelker put it to me, I

think not inaccurately earlier today, literally the request seems to touch on everything that touches on a computer or almost to that extent at Chainalysis. It's extraordinarily broad.

But, again, it provides virtually no explanation of why it is that the defense needs access to the source code in light of all the other disclosures that have been made in this case.

And in the 17-page filing from the defense in which -- what I was just looking for is some expert as -- and the cases that have actually allowed disclosures of this type, some explanation by an expert of here's where I think there's a potential problem, here's what I need to look at to see if it's a problem, and here's why I think it might be a problem in this case. None of that.

And, instead, with respect to the source code request under a section which says "Justification," it says, "source code" refers to the set of human-readable instructions that gets transformed into the machine for a particular software project -- work product. While machine code itself is important to study and examine to see what the machine was told to do at the time the software was executed, source code is itself valuable because it shows high-level extractions, concepts in the intentions of the programmers which can be compared to the machine code. It includes details such as

comments, versions -- version history and human-readable documentation. As to the purpose and different function calls, libraries, and dependencies.

I suspect that that paragraph there could have come out of any textbook definition of what source code is used in any context having no nexus whatsoever to this case.

The filing under justification then goes on and there's one more paragraph that says, "This source code request includes software beyond Chainalysis Reactor because it is possible the Reactor product itself is only a visualization and query interfaced to other Chainalysis systems. And that meaningful computations do not occur within Chainalysis Reactor.

"Without having overview of the Chainalysis system and not having previously reviewed Chainalysis architecture and source code, it is difficult to determine whether Chainalysis Reactor itself will encompass the material sufficient to draw conclusions as to the accuracy of Chainalysis's clustering methods. Software related to data collection, annotation, and other data functions is also requested because data and processing data is the basis of the product's supposed value."

And if you compare this to anything in any other case, it doesn't come close to satisfying the standard in any case in which a court has authorized disclosure, even -- and I'll come to this in a minute -- under Rule 16, much less under

Rule 17(c).

It's largely just a definition of source code, largely just repeating the conclusion that we'd like to look at it, but then adding, and there's a lot of other things we would like to look at, but never responding in any way -- in any way to the Court's request for some statement by an expert explaining why it is the expert needs to look at the source code and what the expert would be looking for in the source code; and how that could be potentially relevant to this case other than just a fishing expedition of extraordinary breadth here of saying we want to just see everything in the Chainalysis computer arsenal so we can determine what Chainalysis may have used here, what it didn't use here, understand the architecture of the systems. And then it's possible we're going to find something that is useful in the case.

But I'm not even clear that the filings rise to that level because the justifications -- in each of the justifications that the defense offers for why it needs to look at the code don't, in fact, involve code. Actually, I think the defense's filings, if anything, undermine a contention that the defense has a need to review the source code because what the defense does at every turn is simply say we need to identify the source code because we think that there are problems with this heuristic and, in particular, that CoinJoin

is a problem; and because the Heuristic 2 is overly expansive, it's the Pac-Man analogy, it gobbles everything up; there's been a lack of peer review; there's no error rate here.

And I asked Mr. Ekeland earlier about the error rate, I said, "How is it that the source code is going to help you determine what the error rate is or not?" And there was no response to that.

So given opportunity after opportunity to explain to me what it is the defense needs to actually review the source code for, if anything, on reviewing those filings, I'm less convinced now than I was before that the defense has some articulable basis to review the source code. Because whenever they are asked to do it, they point to things in which the source code, as far as I understand it, is not the means of discovering what the defense wants to discover.

And with respect to the error rate and understanding how the software operates, for weeks and weeks I have -- and I encouraged the defense to obtain a license to have access to the software, which differs, obviously, from the underlying source code, but it's the software that you can then run and see what results you get with that software and compare it to other software.

And up until today, Mr. Sterlingov was proceeding pursuant to the Criminal Justice Act, and I indicated that the Court would, if necessary, provide the funding for obtaining a

license. Today Mr. Ekeland told me that Mr. Sterlingov no longer wants to proceed under the Criminal Justice Act. I do think at some point I should come back to that, and I just want to make sure that that is, in fact, Mr. Sterlingov's decision and not Mr. Ekeland's decision.

But in any event, the software has been available. The defense has made no gestures to obtain access to that, which I think does provide some support for Chainalysis's argument and the government's argument that either the defense has been looking for an answer of no here and has been constantly shifting its demands and not complying with the Court's order in just the hopes it will be denied access to the source code and can make an issue out of it, or perhaps some lack of good faith with respect to this, because I've given clear directions of what needs to be done. It's been ignored.

Also, the defense -- I've invited the defense to have access to the software, and the defense, as far as I can tell, has done nothing whatsoever about that.

I do think, for the reasons that I've previously provided, that the defense's request fails under Rule 17(c) and the *Nixon* standard which requires a showing of relevancy, admissibility, and specificity, and provides that the search can't be a general fishing expedition. But, nonetheless, the party seeking the information does carry the burden of meeting the exacting standards of each of those prongs.

That's citing to *Cheney v. United States District Court*, 542 U.S. 367, 387 to -- 386 to 87.

I, again, am somewhat sympathetic, as some of my questioning might have suggested, to Mr. Ekeland's view that a case like this may be somewhat different than *Nixon* because here it's the government that is offering the expert testimony. The expert testimony is based, at least in part, on the analysis done by the Reactor program, and that it may be that the *Nixon* standard should be relaxed somewhat in this context.

But even relaxing the *Nixon* standard, I'm still unpersuaded that the defense has made any showing with respect to why it needs the source code. And that's particularly so in light of the disclosure that Chainalysis has now made, which is extremely extensive, and I wouldn't purport to be able to add up the number of lines of data that are provided.

But the explanations are detailed, and there's an enormous amount of information that, as I understand it, would allow, to the extent that the defense wasn't able to do so already based on all the publicly available data on the blockchain, run the particular heuristics at issue here and make determinations as to the defense's view as to the accuracy or not of those heuristics, which is what the challenge has been and the only thing that's ever been identified to me as a basis for needing access to the code itself.

And when you add those -- that disclosure, the reams

and reams of data and information that have been disclosed in this case and the availability which the defense has not availed itself of, of the program itself, I'm left convinced that the defense has failed to carry its burden under Rule 17(c).

As I have previously indicated, I did find the decision from the intermediate court in *New Jersey* and the *United States v. Pirosko* helpful, but that is a case which cuts both ways. It does highlight the need and the importance at times of providing access to the defense of computer code and software to allow the defense to prepare itself.

But it also shows what the defense needs to do in order to obtain that, and it's simply not enough to say this is a criminal case, this is being used against us in this way and, therefore, we need to see everything and anything without any specification by an expert explaining why in particular that information is needed.

And it may be that the showing that was made in *Pirosko* is more than is necessary in a garden-variety case. In there, there was quite a detailed showing that was made. But even if *Pirosko* was a particularly compelling case -- I'm sorry. I was saying *Pirosko*. I had the wrong case in front of me. I meant to be referring to *Pickett*. I apologize. Wrong case name. *Pickett* from the New Jersey intermediate court. I'm getting ahead of myself with *Pirosko*. I was

talking about *Pickett* there.

And it gives you some idea of the type of showing that can be made if someone applies one's self to it and gets an expert and has an expert do what the expert needs to do. That just hasn't been done here.

And the two cases that Ms. Pelker pointed me to a little while ago, I think, are indicative of this. Both of those cases were not even 17(c) cases. They were Rule 16 cases. And in the Ninth Circuit case, *Budziak*, which is at 697 F.3d 1105, the Ninth Circuit did hold that the defendant was entitled to the computer software that was at issue there.

But the Court stressed that in support of his first two motions to compel, *Budziak* presented evidence suggesting that "The FBI may have only downloaded fragments of child pornography files from his "incomplete" folder making it "more likely" that he did not knowingly distribute any complete child pornography files to Agents Lane or Whisman."

And the Court also notes in support of his third motion to compel, *Budziak* submitted evidence suggesting that "The FBI agents could have used the EP2P software to override his share settings."

And then the Court goes on and quotes the Third Circuit as holding "A party seeking to impeach the reliability of computer evidence should have sufficient opportunity to ascertain by pretrial discovery whether both the machine and

those who supply it with data input and information have performed their tasks accurately."

But ultimately concludes that in that case it was required because of the showing that the defendant made through the defendant's experts.

Here I will say that there are numerous means that have been offered to the defense to verify or impeach the reliability of the computer evidence the government seeks to input here. There's a very lengthy and detailed report already from Ms. Still which seeks to do that.

But now there's been another enormous production of information, as well as the fact that the software itself, as I've said numerous times now, was or could have been available to the defense, and what has not been shown to me is why the code itself is even, arguably, necessary for purposes of impeaching the reliability of the computer evidence.

This point, I think, is highlighted by the Sixth Circuit's decision in *United States v. Pirosko* at 787 F.3d 358, where the Third Circuit distinguishes *Budziak* and stresses the fact that in *Budziak* there was evidence that was offered by experts that raised questions about the FBI software, the EP2P software in that case.

And the Third Circuit, in coming out the other way, including that there wasn't sufficient evidence in that case as, tellingly, in *Budziak*, the Ninth Circuit also noted that,

"Although the government argued that the computer logs it provided *Budziak* demonstrated that he would not uncover any helpful information through discovery of the software, the declarations of *Budziak's* computer forensic experts stated otherwise."

And here, that just has never happened. I haven't been provided with that type of evidence despite numerous invitations to the defense to do that.

And so for all of those reasons, the Court will deny the defense motion for leave to issue a Rule 17(c) subpoena at Docket 155.

And just for clarification, I think that the motion fails both procedurally on the grounds that the defense has repeatedly failed to follow the Court's directions, has failed to do so in a timely manner, and even to this date has not complied with the Court's directions with respect to how to support such a motion.

And, two, on the substance, the showing has not been made to me that's necessary to satisfy Rule 17(c).

And I suppose, three, the requests are not getting more targeted but are becoming less targeted and more, again, of a fishing expedition.

And then a final note is Chainalysis and the government have suggested that the requests here are abusive, intended to intimidate, and are ultimately harassing. And I

will note that I do have questions about what the purpose was that's been served by this entire exercise given the fact that the defense has filed numerous filings and has fought hard on this issue but has never done the work of actually finding an expert to explain to the Court why the code is necessary or useful.

But in addition to that, this case strikes me as highly unusual in that in the cover letter to the November 2022 subpoenas, Mr. Ekeland alluded to bringing a malicious prosecution case against Chainalysis, which, as I've previously indicated, I can't imagine what the basis would be for that based on what I've seen.

He and Mr. Hassard have repeatedly referred to Chainalysis as "The Theranos of blockchain analysis." On a podcast, defendant's counsel threatened to "Sue the crap out of Chainalysis after defendant's trial concludes."

And I think that does support somewhat the -- Chainalysis's contention and the government's contention that the requests here are intended to dissuade Chainalysis from participating in this case in particular, but perhaps other cases more generally, and at least, arguably, constitute a form of harassment.

I don't think I need to go that far for purposes of my ruling today other than to say that I think that the statements by defense counsel do provide important context with

respect to the history here and at least the concerns that I think Chainalysis has legitimately raised in light of those threats.

So that's my ruling with respect to 17(c) and, in particular, Docket 155. I don't know if there's anything else you want to take up today or if we should just come back on Friday?

MS. PELKER: I don't think anything else from the government today. Just coming back Friday -- we can also come back tomorrow if that's better for the Court's schedule.

THE COURT: Well, I am free tomorrow. I don't know whether -- can we get Mr. Sterlingov here tomorrow? Is that -- I guess he was going to be here tomorrow anyway.

Do the parties prefer that? I'm happy to do it tomorrow if you prefer. That way maybe you get the weekend. And you're in town already, Mr. Ekeland, so you don't have to travel back and forth. Whatever you prefer.

MR. EKELAND: We would just prefer Friday.

MS. PELKER: Either way is fine with the government. We didn't --

MR. EKELAND: We would just prefer Friday because on the way down Mr. Hassard's car hit something on the I-95 and both his tires blew out, so they got in at, like, 3:30 in the morning last night. So we'd just like to be able to deal with that.

THE COURT: That's scary. I hope everyone was okay?

MR. EKELAND: Yeah, fortunately. It was slow.

THE COURT: A friend of mine within the past two weeks or so, I would say, had the same experience on 95. I think it was in New Jersey. He was driving his car and there was a board across the road; he hit the board and blew out at least two of his tires. I'm not sure if it was two or four. So that's concerning.

MR. EKELAND: It was. It was scary. I'm glad --

THE COURT: That's all beside the point. Friday is fine.

MR. EKELAND: Thank you, Your Honor.

THE COURT: What time? 10:00 a.m.?

MR. EKELAND: 10:00, Your Honor?

THE COURT: Okay. Let's do it at 10:00 a.m. on Friday.

You know what would be helpful to me, though, would be -- I don't care whether you do it in a filing or just in an email that you copy each other on, but if you can let me know what it is that you'd like me to take up on Friday -- maybe just do that by midday tomorrow -- that way at least I have some things on my radar.

But if I don't have the same things on my radar that you do, I'll at least know what you want me to get to.

MR. EKELAND: Certainly.

THE COURT: Okay. Thank you all. Have a good evening.

(The hearing adjourned at 3:50 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 18th day of September, 2023.


/s/ Tamara M. Sefranek
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C.  20001

**$**

**$100,000** [1] - 86:2
**$200,000** [1] - 86:2

**'**

**'50s** [1] - 90:5

**/**

**/s** [1] - 119:9

**1**

**1** [12] - 23:5, 36:22, 71:9, 72:5, 77:14, 98:14, 98:18, 98:22, 102:9, 102:13, 102:15, 102:23
**10** [1] - 84:10
**100** [2] - 21:18, 37:25
**10005** [1] - 1:22
**10:00** [3] - 117:13, 117:14, 117:15
**1105** [1] - 112:10
**11:07** [1] - 29:18
**11:25** [1] - 29:20
**11th** [2] - 31:17, 34:2
**12:38** [1] - 70:7
**13** [1] - 1:6
**1301** [1] - 1:18
**15** [1] - 94:6
**155** [4] - 92:3, 92:15, 114:11, 116:5
**16** [12] - 39:9, 40:11, 51:12, 52:12, 54:4, 54:8, 72:17, 79:21, 93:5, 106:25, 112:8
**16(g** [1] - 54:14
**16th** [3] - 30:6, 30:8, 31:18
**17** [6] - 68:20, 78:12, 92:6, 93:13, 96:11, 96:15
**17(c** [38] - 5:6, 5:14, 35:9, 50:8, 50:16, 50:17, 51:2, 51:15, 51:20, 52:9, 52:12, 52:14, 52:15, 52:24, 53:20, 53:22, 54:4, 54:6, 54:12, 55:2, 63:20, 63:21, 79:21, 80:16, 86:11, 92:1, 92:6, 93:9, 93:16, 94:10, 95:19, 98:3, 100:18, 109:20, 112:8, 114:10, 116:4
**17(c)** [7] - 52:15, 65:14, 79:23, 87:3,

107:1, 111:5, 114:19
**17-page** [1] - 105:9
**179** [1] - 72:11
**18** [1] - 94:18
**18th** [1] - 119:7
**194** [1] - 20:22
**19th** [1] - 97:17
**1:21-CR-0399** [1] - 1:3
**1:30** [1] - 69:6

**2**

**2** [13] - 23:5, 37:1, 57:9, 65:16, 71:9, 72:5, 77:14, 87:1, 99:1, 99:2, 102:15, 102:24, 108:1
**20** [1] - 94:8
**20001** [3] - 1:13, 2:23, 119:11
**20005** [1] - 1:19
**202-354-3246** [1] - 2:23
**2022** [2] - 94:7, 115:8
**2023** [3] - 1:6, 101:19, 119:7
**2024** [2] - 31:10, 46:25
**20530** [1] - 1:16
**20th** [1] - 97:17
**21** [1] - 94:8
**21-399** [1] - 3:2
**2255** [1] - 28:23
**22nd** [1] - 99:16
**270** [1] - 41:17
**278** [1] - 91:12
**27th** [1] - 101:19
**28th** [1] - 101:23
**29th** [1] - 101:24
**2:00** [1] - 70:8

**3**

**3** [11] - 59:22, 60:2, 71:10, 71:22, 72:5, 77:14, 87:4, 99:8, 102:18, 102:20, 102:24
**30** [2] - 1:22, 78:24
**30th** [3] - 94:17, 94:19, 103:15
**32** [1] - 81:11
**333** [2] - 2:22, 119:11
**34** [1] - 81:11
**358** [1] - 113:18
**367** [1] - 110:2
**386** [1] - 110:2
**387** [1] - 110:2
**3:30** [1] - 116:23
**3:50** [1] - 118:3

**4**

**4** [5] - 60:23, 61:1, 71:10, 77:14, 87:14
**40** [1] - 78:24
**400,000** [2] - 85:1
**425** [1] - 2:3
**45** [1] - 7:17
**466** [1] - 41:17
**4th** [1] - 32:3

**5**

**50** [1] - 84:9
**542** [1] - 110:2
**5th** [1] - 104:11

**6**

**60** [2] - 90:5, 97:9
**601** [1] - 1:13
**65** [4] - 58:10, 58:11
**6714** [2] - 2:22, 119:10
**684** [1] - 91:11
**697** [1] - 112:10
**6th** [1] - 31:24

**7**

**70** [1] - 90:5
**73** [1] - 81:10
**787** [1] - 113:18

**8**

**87** [1] - 110:2
**8th** [1] - 1:22

**9**

**94105** [1] - 2:4
**95** [1] - 117:4
**950** [1] - 1:15
**9:30** [1] - 1:6

**A**

**a.m** [4] - 29:18, 29:20, 117:13, 117:15
**A.M** [1] - 1:6
**ability** [9] - 7:3, 7:16, 7:17, 8:14, 29:11, 62:12, 65:21, 83:24, 119:6
**able** [35] - 8:18, 9:22, 11:6, 11:18, 14:1, 17:4, 24:5, 26:14, 26:22, 33:4, 40:4, 43:14, 62:14, 62:18, 64:13, 69:16, 69:23,

72:2, 72:15, 76:22, 77:10, 79:7, 79:11, 79:12, 80:14, 80:17, 84:2, 84:25, 85:5, 85:6, 100:12, 110:14, 110:18, 116:24
**absent** [2] - 12:18, 38:23
**absolute** [1] - 70:1
**absolutely** [3] - 21:3, 84:21, 87:6
**abuse** [1] - 81:8
**abusive** [1] - 114:24
**accept** [2] - 9:18
**access** [16] - 41:23, 82:8, 82:20, 91:7, 92:19, 95:20, 95:25, 98:4, 98:5, 105:6, 108:18, 109:7, 109:12, 109:17, 110:24, 111:10
**accommodate** [3] - 9:17, 48:15, 69:14
**according** [1] - 54:6
**account** [2] - 53:6, 86:2
**accountant** [1] - 39:18
**accounting** [4] - 55:17, 55:21, 81:21
**accounts** [2] - 39:18, 71:18
**accuracy** [9] - 20:25, 21:8, 21:15, 72:7, 78:3, 99:10, 100:21, 106:18, 110:21
**accurate** [8] - 21:8, 23:6, 71:13, 73:10, 77:20, 77:23, 79:5, 119:4
**accurately** [2] - 43:8, 113:2
**achieve** [1] - 62:18
**achieved** [2] - 62:18, 62:19
**acquittal** [1] - 16:17
**Act** [3] - 47:14, 108:24, 109:2
**Action** [1] - 1:2
**action** [2] - 68:25, 69:1
**activity** [1] - 85:12
**actual** [5] - 4:9, 41:4, 65:15, 102:7, 102:20
**add** [9] - 14:4, 18:15, 19:7, 49:8, 64:5, 86:8, 86:10, 110:14, 110:25
**added** [1] - 97:4
**addendum** [1] - 18:10

**adding** [1] - 107:4
**addition** [3] - 20:8, 104:22, 115:7
**additional** [17] - 4:16, 6:9, 22:11, 41:9, 56:21, 60:12, 61:15, 64:6, 65:8, 80:17, 80:25, 82:15, 84:12, 89:5, 91:24, 99:6
**address** [14] - 5:12, 8:1, 11:19, 14:16, 15:19, 49:14, 57:21, 57:22, 57:24, 58:2, 58:16, 62:14, 83:20, 87:5
**addressed** [1] - 98:19
**addresses** [10] - 13:15, 13:17, 39:18, 56:23, 59:15, 60:19, 61:10, 61:15, 62:23, 84:24
**addressing** [2] - 16:18, 48:15
**adequate** [2] - 6:19, 79:10
**adequately** [1] - 14:5
**adjourned** [1] - 118:3
**adjustment** [1] - 54:4
**administrator** [1] - 53:8
**admissibility** [2] - 50:20, 109:22
**admissible** [1] - 73:15
**admission** [1] - 73:19
**admitted** [1] - 76:3
**advantage** [2] - 16:12, 82:25
**adversaries** [3] - 8:15, 8:16, 72:12
**adversary** [4] - 11:21, 72:15, 74:14, 77:22
**advice** [7] - 43:20, 43:21, 43:24, 44:20, 44:23, 46:9, 46:12
**advise** [1] - 7:22
**advised** [1] - 96:22
**advisor** [1] - 65:25
**affect** [1] - 68:18
**affected** [2] - 22:6, 36:25
**affecting** [1] - 8:14
**afield** [1] - 85:18
**afterwards** [1] - 10:1
**age** [1] - 70:22
**agency** [1] - 75:13
**Agents** [1] - 112:17
**agents** [1] - 112:20
**ago** [8] - 35:23, 47:12, 88:16, 92:18, 101:12, 101:13,

103:17, 112:7
**agree** [9] - 5:8, 5:10, 11:18, 15:16, 17:25, 36:5, 85:2, 85:3, 103:9
**agreeable** [1] - 42:10
**agreed** [3] - 51:18, 76:19, 95:15
**agreeing** [2] - 5:18, 27:12
**agreement** [2] - 16:1, 42:5
**agreements** [1] - 93:24
**agrees** [5] - 5:15, 17:25, 27:14, 30:1, 34:13
**ahead** [6] - 29:14, 49:5, 49:11, 69:5, 90:2, 111:25
**Ahmed** [1] - 3:10
**AHMED** [1] - 1:21
**ALDEN** [1] - 1:14
**Alden** [1] - 3:6
**algorithms** [3] - 19:24, 95:11, 102:11
**allegations** [1] - 92:23
**alleged** [1] - 26:16
**allegedly** [1] - 56:2
**alleging** [1] - 20:24
**allow** [7] - 5:10, 10:5, 10:9, 29:8, 62:21, 110:18, 111:11
**allowed** [3] - 78:12, 79:2, 105:11
**allows** [4] - 10:21, 11:21, 17:10, 71:11
**alluded** [1] - 115:9
**almost** [7] - 48:22, 85:1, 87:9, 90:5, 92:18, 105:3
**AlphaBay** [6] - 60:10, 60:11, 60:18, 71:15, 71:16, 71:20
**alteration** [2] - 59:16, 59:18
**alterations** [1] - 59:13
**alternative** [1] - 32:25
**amend** [2] - 25:4, 61:18
**amended** [1] - 37:20
**amending** [2] - 42:8, 68:20
**amendment** [1] - 42:14
**America** [3] - 3:3, 53:4, 53:5
**AMERICA** [1] - 1:2
**AML** [1] - 64:13
**amount** [9] - 26:15,

49:25, 56:19, 58:10, 81:5, 82:11, 82:19, 92:16, 110:17
**amounts** [2] - 27:19, 27:23
**analog** [1] - 55:1
**analogous** [1] - 55:4
**analogy** [1] - 108:2
**analyses** [1] - 54:24
**analysis** [17] - 6:1, 6:2, 7:4, 9:23, 36:4, 41:18, 51:10, 51:17, 58:20, 77:3, 94:4, 94:21, 96:7, 96:8, 99:11, 110:8, 115:14
**analyst** [1] - 37:14
**analytics** [1] - 85:24
**analyze** [1] - 79:12
**Andy** [2] - 94:3, 94:5
**anecdotal** [2] - 20:24, 73:4
**anecdotally** [1] - 76:14
**animus** [2] - 85:23, 88:6
**annotation** [1] - 106:19
**answer** [12] - 9:12, 9:13, 16:3, 20:21, 52:7, 55:14, 59:18, 65:9, 66:2, 74:12, 80:23, 109:10
**answered** [1] - 99:11
**answering** [2] - 31:5, 103:11
**answers** [3] - 56:13, 103:10, 103:11
**antagonistic** [1] - 103:24
**anti** [1] - 11:20
**anti-competitive** [1] - 11:20
**anticipating** [1] - 26:24
**antitrust** [4] - 54:21, 54:22, 54:23, 55:10
**anyway** [6] - 17:14, 18:5, 27:10, 47:11, 67:11, 116:13
**apologies** [1] - 57:5
**apologize** [8] - 3:18, 4:4, 7:10, 39:3, 54:18, 66:7, 89:4, 111:23
**apparent** [1] - 99:13
**appeal** [1] - 28:24
**Appeals** [1] - 34:8
**appear** [2] - 51:18, 52:15
**appearance** [1] - 3:16

**Appellate** [1] - 41:16
**appellate** [3] - 9:15, 11:16, 72:21
**application** [1] - 3:11
**applied** [7] - 19:15, 41:5, 53:22, 53:23, 62:25, 63:5, 77:5
**applies** [3] - 17:6, 51:3, 112:3
**apply** [6] - 26:23, 51:15, 61:5, 62:14, 84:6, 84:8
**applying** [1] - 5:21
**appointed** [1] - 47:13
**appreciate** [14] - 3:24, 14:7, 31:14, 40:13, 49:13, 49:16, 49:22, 49:23, 50:1, 56:8, 66:25, 67:22, 68:3, 69:23
**approach** [1] - 3:4
**approaching** [1] - 4:23
**appropriate** [10] - 47:21, 49:20, 51:21, 63:21, 64:4, 66:1, 94:12, 94:13, 104:3, 104:5
**approve** [1] - 83:7
**architecture** [2] - 106:15, 107:14
**arguably** [4] - 55:4, 62:1, 113:15, 115:21
**argue** [5] - 26:22, 29:11, 63:4, 77:6, 90:16
**argued** [2] - 51:5, 114:1
**arguing** [1] - 53:14
**argument** [5] - 38:23, 51:14, 64:7, 109:9
**arguments** [3] - 28:5, 42:24, 78:8
**arise** [1] - 45:7
**arraignment** [8] - 25:7, 25:8, 25:9, 25:11, 25:25, 27:17, 29:15, 29:17
**arsenal** [1] - 107:12
**articulable** [1] - 108:12
**articulate** [4] - 82:9, 85:3, 99:19, 102:4
**ascertain** [1] - 112:25
**aside** [2] - 15:15, 75:22
**aspect** [2] - 42:25, 60:20
**aspects** [1] - 36:18
**aspersions** [1] - 40:17

**assertions** [1] - 72:12
**assessment** [3] - 79:5, 79:23, 79:24
**assistance** [2] - 68:8, 101:16
**assists** [1] - 65:2
**associated** [4] - 14:10, 57:21, 57:22, 60:4
**Association** [1] - 68:19
**assume** [3] - 4:1, 14:19, 54:20
**assuming** [2] - 17:24, 29:25
**assumption** [1] - 98:17
**assumptions** [2] - 41:5, 101:2
**assurance** [2] - 32:19, 33:3
**assurances** [1] - 6:10
**attachments** [3] - 84:15, 84:19, 84:21
**attempt** [2] - 16:17, 85:21
**attention** [5] - 74:8, 74:9, 75:1, 75:21, 76:25
**attesting** [2] - 20:24
**attorneys** [7] - 43:12, 43:17, 43:20, 43:22, 44:19, 44:21, 44:23
**attribution** [1] - 71:12
**attributions** [4] - 25:21, 26:16, 71:12, 72:3
**audit** [1] - 71:7
**August** [5] - 99:16, 101:19, 101:23, 101:24, 103:15
**Austrian** [1] - 95:3
**authenticate** [1] - 4:17
**authentication** [1] - 4:3
**authorization** [2] - 12:7, 12:9
**authorize** [1] - 92:4
**authorized** [1] - 106:24
**automated** [1] - 99:3
**availability** [4] - 31:25, 45:7, 45:8, 111:2
**available** [6] - 23:24, 87:4, 87:12, 109:6, 110:19, 113:13
**availed** [1] - 111:3
**Ave** [1] - 1:18
**Avenue** [3] - 1:15, 2:22, 119:11

**avoid** [5] - 11:17, 22:25, 23:1, 25:23, 59:8
**avoided** [1] - 39:5
**avoiding** [1] - 51:8
**aware** [8] - 17:6, 44:10, 52:10, 53:20, 54:3, 64:23, 72:14, 76:1

## B

**backers** [1] - 64:12
**background** [2] - 57:6, 92:16
**backwards** [1] - 21:25
**baffled** [1] - 78:21
**balances** [1] - 53:6
**Bank** [4] - 53:3, 53:5, 64:8, 64:10
**Bar** [1] - 68:19
**barrel** [1] - 22:15
**based** [19] - 11:2, 11:22, 14:1, 31:11, 43:24, 44:20, 44:22, 53:16, 54:10, 57:24, 59:23, 67:23, 72:16, 76:9, 77:4, 101:1, 110:7, 110:19, 115:12
**basic** [1] - 76:9
**basis** [11] - 22:14, 36:2, 53:25, 54:4, 86:18, 86:21, 87:21, 106:21, 108:12, 110:24, 115:11
**battle** [1] - 40:22
**bear** [1] - 75:7
**becomes** [1] - 104:24
**becoming** [1] - 114:21
**bedrock** [1] - 54:12
**BEFORE** [1] - 1:8
**beforehand** [1] - 23:10
**begin** [1] - 57:14
**behalf** [1] - 51:17
**behavioral** [5] - 36:9, 57:9, 57:13, 59:6, 102:17
**behaviors** [2] - 39:21, 57:16
**behind** [1] - 79:11
**belabor** [1] - 65:6
**bell** [1] - 60:24
**belong** [1] - 93:1
**below** [1] - 80:11
**bench** [3] - 25:6, 34:11, 56:17
**bending** [1] - 21:24
**benefit** [4] - 36:17,

37:19, 40:24, 64:6
**benefits** [1] - 64:24
**Bernhard** [1] - 95:6
**beside** [1] - 117:10
**best** [8] - 5:1, 13:25, 14:2, 30:21, 69:14, 70:1, 70:3, 119:6
**better** [3] - 16:5, 88:20, 116:10
**between** [6] - 29:24, 55:1, 70:24, 79:20, 94:3, 95:2
**beyond** [3] - 15:19, 104:1, 106:9
**big** [4] - 45:5, 54:22, 55:10, 70:25
**bills** [1] - 47:22
**Bisbee** [7] - 37:13, 39:10, 39:19, 62:19, 71:2, 80:19, 102:10
**Bisbee's** [3] - 36:2, 61:14, 84:16
**Bishop** [13] - 7:8, 13:12, 21:17, 64:3, 64:19, 65:3, 65:20, 73:16, 104:12, 104:13, 104:18, 104:19
**Bishop's** [3] - 64:7, 72:10, 77:25
**bit** [8] - 5:5, 7:11, 11:24, 12:19, 37:2, 38:11, 51:14, 101:8
**Bitcoin** [2] - 53:8, 61:11
**bizarre** [1] - 65:17
**black** [1] - 37:2
**blame** [2] - 9:8, 37:10
**blew** [2] - 116:23, 117:6
**blockchain** [12] - 5:25, 6:2, 10:6, 62:17, 62:25, 74:5, 85:24, 87:23, 94:4, 98:16, 110:20, 115:14
**blurred** [1] - 79:22
**board** [3] - 80:12, 117:6
**book** [1] - 94:5
**Bowman** [1] - 53:16
**box** [1] - 37:2
**Brady** [1] - 51:12
**breadth** [1] - 107:10
**break** [10] - 9:10, 13:22, 28:6, 29:15, 34:2, 66:8, 66:9, 68:17, 69:6, 70:5
**breakdown** [2] - 40:7, 84:17
**brief** [1] - 82:13

**briefed** [1] - 17:17
**briefing** [1] - 90:22
**briefings** [1] - 4:17
**briefly** [1] - 86:9
**bring** [5] - 21:17, 74:8, 74:9, 75:21, 76:24
**bringing** [1] - 115:9
**broad** [2] - 85:9, 105:4
**broader** [1] - 104:25
**brought** [4] - 7:2, 14:16, 56:17, 75:1
**Brown** [1] - 3:7
**BROWN** [1] - 1:12
**Bryan** [2] - 7:8, 104:12
**Budziak** [10] - 81:14, 81:16, 82:3, 112:9, 112:13, 112:19, 113:19, 113:20, 113:25, 114:2
**Budziak's** [1] - 114:4
**bunch** [2] - 6:23, 20:23
**burden** [3] - 38:5, 109:24, 111:4
**burdensome** [1] - 93:20
**business** [8] - 4:9, 16:7, 56:1, 65:16, 86:4, 87:8, 103:24, 103:25
**businesses** [1] - 64:25

## C

**CA** [1] - 2:4
**calculate** [1] - 79:14
**calendar** [9] - 31:1, 31:12, 31:13, 31:16, 32:13, 32:24, 33:10, 33:11, 47:5
**Canada** [1] - 10:12
**cancel** [1] - 33:12
**candidate** [1] - 65:4
**cannot** [1] - 10:24
**capacity** [1] - 56:12
**captured** [1] - 56:25
**captures** [1] - 56:21
**car** [2] - 116:22, 117:5
**care** [1] - 117:18
**careful** [2] - 48:7, 103:12
**carry** [2] - 109:24, 111:4
**case** [120] - 4:1, 6:1, 9:16, 10:8, 10:25, 17:21, 22:3, 22:7, 22:16, 26:2, 29:10, 31:19, 32:3, 32:14, 32:15, 32:23, 33:2,

33:13, 33:14, 33:15, 33:25, 34:3, 34:9, 36:4, 36:5, 36:7, 38:9, 39:24, 40:15, 40:20, 40:21, 41:1, 41:3, 41:6, 41:7, 41:8, 41:9, 41:11, 41:21, 41:22, 41:24, 41:25, 42:1, 42:8, 43:1, 43:16, 44:10, 44:11, 45:6, 45:9, 46:24, 47:1, 47:24, 48:8, 48:12, 48:15, 51:6, 51:18, 51:19, 52:2, 53:4, 53:12, 53:16, 53:20, 53:21, 54:7, 55:9, 55:10, 62:3, 62:9, 67:24, 68:2, 68:18, 72:3, 72:14, 75:7, 75:8, 75:10, 75:12, 75:22, 76:3, 76:20, 77:25, 81:5, 82:15, 85:14, 86:12, 86:13, 87:16, 87:25, 92:23, 93:18, 94:13, 94:22, 95:9, 95:23, 96:21, 98:11, 105:8, 105:15, 106:6, 106:23, 106:24, 107:9, 107:16, 110:5, 111:2, 111:8, 111:14, 111:19, 111:21, 111:22, 111:24, 112:9, 113:3, 113:22, 113:24, 115:7, 115:10, 115:20
**Case** [1] - 3:2
**cases** [30] - 32:18, 40:21, 54:21, 54:22, 54:23, 55:3, 55:13, 55:16, 75:1, 75:15, 81:9, 81:12, 82:4, 82:6, 82:14, 87:17, 91:2, 91:3, 91:5, 91:6, 91:13, 91:18, 91:20, 91:24, 105:11, 112:6, 112:8, 112:9, 115:21
**cash** [1] - 93:25
**casting** [1] - 40:17
**catch-22** [1] - 11:24
**category** [1] - 54:16
**caught** [2] - 71:16, 71:17
**caution** [1] - 48:4
**cautions** [1] - 35:14
**caveat** [1] - 90:21
**cell** [1] - 40:6

**centrality** [1] - 36:4
**certain** [4] - 28:6, 52:10, 57:16, 83:19
**certainly** [11] - 23:8, 32:21, 35:23, 37:4, 54:25, 73:24, 79:22, 85:6, 89:17, 98:21, 117:25
**certainty** [2] - 58:15, 62:5
**CERTIFICATE** [1] - 119:1
**certification** [1] - 4:9
**certify** [1] - 119:3
**cetera** [2] - 14:10, 14:11
**chain** [1] - 58:1
**Chainalysis** [86] - 2:2, 3:15, 3:19, 5:3, 5:16, 6:10, 9:22, 10:23, 11:6, 16:1, 16:18, 18:8, 19:5, 19:16, 19:21, 23:20, 36:19, 37:8, 39:13, 51:23, 52:1, 62:22, 65:16, 71:2, 71:4, 73:18, 76:4, 76:23, 78:3, 78:4, 78:9, 78:13, 80:5, 80:20, 80:24, 83:19, 83:22, 83:23, 85:13, 85:16, 85:23, 85:24, 90:11, 92:5, 92:12, 93:1, 93:7, 93:10, 93:11, 93:12, 93:22, 94:3, 95:2, 95:12, 96:25, 97:13, 97:21, 98:6, 99:17, 100:1, 100:9, 101:14, 101:22, 101:25, 102:6, 102:10, 103:9, 103:15, 104:7, 104:18, 105:3, 106:9, 106:11, 106:12, 106:14, 106:15, 106:16, 107:12, 107:13, 110:13, 114:23, 115:10, 115:14, 115:16, 115:19, 116:2
**Chainalysis's** [10] - 8:7, 63:8, 65:2, 85:15, 86:16, 100:24, 103:25, 106:18, 109:8, 115:18
**chains** [2] - 39:20, 99:3
**challenge** [6] - 19:14,

26:14, 28:5, 74:22, 76:5, 110:22
**challenging** [1] - 41:8
**chance** [7] - 15:1, 24:13, 27:16, 28:16, 29:4, 32:10, 33:25
**change** [8] - 18:9, 19:4, 69:10, 92:2, 92:8, 92:12, 98:5
**changes** [2] - 67:15, 92:13
**changing** [1] - 17:4
**characteristics** [2] - 58:3, 59:7
**chart** [3] - 27:8, 27:10
**chat** [1] - 27:17
**check** [7] - 21:8, 61:8, 62:15, 76:15, 76:18, 76:22, 78:3
**Cheney** [1] - 110:1
**Chiaradio** [1] - 91:10
**CHIARADIO** [1] - 91:11
**child** [3] - 81:8, 112:14, 112:16
**choice** [3] - 43:20, 44:5, 72:24
**choose** [1] - 7:3
**Chris** [1] - 3:7
**Christmas** [2] - 31:8, 31:9
**CHRISTOPHER** [1] - 1:12
**CipherTrace** [6] - 8:4, 19:17, 62:16, 86:1, 86:3
**CipherTrace's** [10] - 6:5, 6:11, 8:6, 8:11, 8:19, 15:18, 18:14, 18:15, 18:20
**Circuit** [8] - 81:14, 91:11, 112:9, 112:10, 112:23, 113:19, 113:23, 113:25
**circuit** [1] - 82:14
**Circuit's** [1] - 113:18
**circuits** [1] - 81:13
**circumstance** [2] - 41:19, 58:10
**circumstances** [1] - 9:4
**cite** [2] - 81:12, 91:12
**cited** [4] - 75:11, 81:8, 82:22, 91:21
**cites** [3] - 89:22, 89:24, 90:2
**citing** [2] - 17:9, 110:1
**citizen** [1] - 104:1
**City** [1] - 68:19

civil [9] - 30:12, 30:18, 30:19, 33:12, 54:25, 55:8, 93:15, 93:17, 94:12

CJA [6] - 47:19, 47:20, 47:24, 48:1, 83:6, 83:7

claim [3] - 86:22, 90:11, 90:13

claims [1] - 73:4

clarification [3] - 60:16, 84:12, 114:12

clarify [2] - 5:22, 64:7

clarity [1] - 28:14

clause [2] - 6:22, 18:15

clauses [3] - 16:7, 16:13, 17:22

clean [1] - 69:12

clear [31] - 5:24, 6:24, 12:21, 13:7, 24:12, 24:14, 28:1, 28:10, 34:21, 34:25, 35:9, 37:4, 37:25, 42:19, 43:2, 44:12, 46:2, 62:8, 64:18, 77:9, 80:12, 80:18, 81:1, 87:6, 93:16, 96:14, 100:2, 102:3, 103:14, 107:17, 109:15

cleared [2] - 33:10, 33:11

clearly [3] - 45:24, 64:23, 65:20

clerk [1] - 14:18

clerks [1] - 20:8

client [13] - 6:1, 11:11, 14:5, 33:7, 33:21, 51:11, 51:16, 53:5, 53:12, 56:1, 57:1, 57:20, 61:2

clients [2] - 6:24, 7:23

close [6] - 18:4, 37:16, 51:1, 65:15, 101:12, 106:23

closely [2] - 74:11, 77:10

closer [1] - 7:14

closest [1] - 94:25

cluster [4] - 60:13, 61:5, 61:9, 61:11

clustering [5] - 25:21, 71:12, 72:2, 99:3, 106:18

clusters [4] - 57:12, 71:24, 71:25, 83:19

co [2] - 36:22, 102:10

co-spend [2] - 36:22, 102:10

code [133] - 13:11, 13:13, 14:20, 20:14, 21:10, 21:13, 22:21, 23:4, 23:15, 25:20, 26:5, 26:17, 35:9, 35:16, 37:24, 40:5, 40:20, 42:7, 43:15, 49:2, 50:7, 55:11, 62:24, 63:9, 63:17, 65:6, 65:24, 71:1, 72:9, 73:2, 73:15, 73:22, 75:2, 75:4, 75:6, 75:14, 75:15, 75:24, 76:24, 77:17, 78:19, 78:20, 80:5, 80:20, 80:22, 80:24, 81:6, 82:5, 82:7, 82:21, 83:25, 84:1, 84:3, 85:11, 86:16, 90:8, 90:9, 90:13, 91:7, 91:15, 91:17, 92:1, 92:7, 92:9, 92:20, 92:24, 94:18, 94:20, 95:11, 95:13, 95:21, 95:25, 96:18, 97:8, 97:18, 98:5, 98:9, 98:10, 98:13, 98:23, 98:24, 99:4, 99:11, 99:12, 99:14, 99:21, 99:22, 100:6, 100:7, 100:11, 100:25, 101:1, 101:2, 101:3, 102:2, 102:5, 102:12, 102:23, 103:21, 103:22, 104:9, 104:10, 105:6, 105:16, 105:18, 105:20, 105:22, 105:25, 106:5, 106:8, 106:16, 107:2, 107:8, 107:9, 107:20, 107:22, 107:24, 108:5, 108:10, 108:12, 108:14, 108:20, 109:13, 110:12, 110:24, 111:10, 113:15, 115:5

coder [1] - 37:14

codes [2] - 92:20, 92:25

coding [2] - 96:18, 100:5

coercion [1] - 17:11

CoinJoin [3] - 36:24, 36:25, 107:25

CoinJoins [3] - 98:17, 98:22, 102:11

colleagues [8] - 5:11, 12:5, 12:16, 14:8, 30:24, 32:9, 32:23, 33:14

collect [1] - 21:2

collected [1] - 73:8

collection [1] - 106:19

College [1] - 95:3

colloquy [1] - 42:19

COLUMBIA [1] - 1:1

comfortable [1] - 37:17

coming [5] - 26:4, 28:23, 74:16, 113:23, 116:9

comment [2] - 44:10, 60:16

comments [1] - 106:1

commercial [1] - 6:6

commitment [1] - 64:12

Committee [2] - 68:20, 68:24

communications [3] - 93:21, 94:2, 95:1

community [1] - 98:16

companies [1] - 85:24

company [8] - 16:25, 17:7, 17:8, 17:19, 101:5, 103:24

compare [2] - 106:22, 108:21

compared [1] - 105:25

comparisons [1] - 90:16

compel [2] - 112:13, 112:19

compelling [2] - 38:23, 111:21

compensated [1] - 47:14

compete [1] - 16:17

competency [1] - 30:13

competing [1] - 103:23

competitive [11] - 7:2, 8:13, 11:6, 11:14, 11:20, 16:5, 16:12, 72:18, 74:18, 75:11, 101:6

competitor [2] - 72:25, 100:24

competitors [2] - 17:1, 17:3

compiled [1] - 39:14

complete [5] - 53:11, 92:21, 95:13, 112:16, 119:5

Complexity [1] - 95:4

compliance [1] -

64:13

compliant [1] - 104:21

complicated [2] - 77:25, 96:7

complied [3] - 101:20, 104:5, 114:16

comply [2] - 97:19, 100:15

complying [1] - 109:11

comprehensive [1] - 75:16

computations [1] - 106:12

computer [26] - 9:25, 13:5, 14:19, 18:14, 18:15, 19:6, 37:14, 41:19, 51:23, 56:17, 74:25, 75:24, 81:22, 91:2, 92:21, 101:1, 101:2, 105:2, 107:12, 111:10, 112:11, 112:24, 113:8, 113:16, 114:1, 114:4

computers [4] - 14:16, 18:20, 75:5, 85:15

conceivably [1] - 62:7

concepts [1] - 105:24

concern [17] - 5:20, 8:7, 11:9, 12:22, 16:4, 16:12, 16:13, 16:15, 17:16, 17:18, 18:2, 22:19, 26:12, 26:13, 36:14, 38:10, 72:19

concerned [6] - 9:15, 28:3, 36:10, 42:21, 47:18, 63:25

concerning [2] - 65:21, 117:8

concerns [15] - 7:2, 7:7, 8:2, 11:15, 13:15, 13:17, 16:6, 21:12, 44:4, 72:18, 74:18, 75:11, 86:5, 100:9, 116:1

conclude [2] - 18:18, 24:18

concluded [1] - 103:23

concludes [2] - 113:3, 115:16

conclusion [2] - 79:8, 107:3

conclusions [2] - 38:22, 106:18

concurred [1] - 85:2

conditions [1] - 36:9

conduct [1] - 57:16

conducting [1] - 92:10

confer [6] - 24:13, 28:16, 29:4, 44:15, 44:19, 97:20

CONFERENCE [2] - 1:4, 1:8

conference [1] - 69:11

confirm [1] - 15:19

confirmed [2] - 34:6, 34:9

confront [1] - 52:4

consequences [1] - 44:24

consider [4] - 5:18, 29:7, 68:20, 73:14

consideration [4] - 34:4, 52:25, 86:15, 94:1

considerations [2] - 44:16, 45:9

considered [2] - 45:15, 46:12

consistent [1] - 47:4

constantly [1] - 109:11

constitute [2] - 15:14, 115:21

constitutes [1] - 119:4

Constitution [2] - 2:22, 119:11

constructively [1] - 18:22

consult [1] - 33:14

consulting [1] - 54:22

Cont'd [1] - 2:1

contain [1] - 74:5

contempt [3] - 7:7, 12:15, 104:2

contention [3] - 107:21, 115:18

contents [1] - 12:17

contest [1] - 62:22

contested [1] - 93:15

context [9] - 5:14, 17:22, 51:16, 51:21, 55:8, 75:10, 106:6, 110:9, 115:25

continuance [11] - 23:25, 24:3, 24:17, 28:1, 29:24, 30:1, 34:20, 35:2, 35:7, 42:21, 79:11

continue [7] - 38:2, 45:6, 45:9, 69:21, 76:20, 85:21, 88:25

continued [4] - 35:5, 42:22, 44:2

continues [1] - 42:23

continuing [1] - 5:17

contract [1] - 51:17

contracted [1] - 50:10
contractor [2] - 51:9, 53:1
contracts [1] - 93:24
contrary [2] - 38:24, 79:8
control [3] - 36:23, 73:7, 93:1
controlling [1] - 53:20
controversial [1] - 6:12
conversation [4] - 5:6, 12:14, 101:14, 101:17
conversations [1] - 45:19
conviction [2] - 27:3, 27:16
convinced [2] - 108:11, 111:3
cooperating [1] - 21:5
cooperation [1] - 35:22
copy [2] - 14:15, 117:19
core [4] - 11:8, 50:13, 55:25, 72:1
correct [6] - 17:20, 32:4, 58:22, 59:17, 61:4, 63:2
corrections [1] - 102:25
correctly [2] - 33:7, 92:24
counsel [33] - 3:4, 3:5, 3:15, 5:16, 5:21, 5:25, 6:18, 6:23, 13:23, 28:4, 31:5, 32:4, 42:23, 46:10, 46:13, 46:16, 47:13, 47:15, 47:19, 47:20, 47:24, 47:25, 68:6, 82:24, 87:8, 97:11, 99:19, 101:21, 101:24, 102:1, 115:15, 115:25
country [1] - 4:1
couple [4] - 31:19, 32:1, 66:4, 91:20
course [8] - 3:17, 13:19, 31:4, 35:1, 50:9, 77:22, 97:17, 102:16
COURT [163] - 1:1, 3:8, 3:13, 3:20, 4:14, 4:19, 4:25, 6:13, 7:10, 8:21, 10:7, 10:15, 10:22, 11:4, 12:3, 13:1, 13:13, 13:22, 14:3, 14:12,

14:14, 14:25, 15:5, 15:11, 15:21, 16:22, 17:20, 18:4, 19:11, 20:5, 21:1, 21:6, 21:21, 23:14, 24:11, 25:1, 25:3, 25:7, 25:14, 25:22, 26:19, 28:2, 28:14, 29:14, 29:21, 30:3, 30:7, 30:16, 30:18, 31:4, 31:14, 32:12, 32:15, 33:11, 33:22, 33:24, 34:12, 34:16, 34:23, 35:1, 35:11, 39:15, 40:13, 42:5, 42:14, 43:4, 43:19, 44:1, 44:4, 44:7, 44:14, 44:20, 45:3, 45:5, 45:21, 45:23, 46:3, 46:9, 46:12, 46:15, 46:19, 46:22, 47:4, 47:7, 47:9, 48:1, 48:4, 48:17, 49:1, 49:4, 49:15, 51:2, 51:5, 52:13, 53:17, 53:21, 54:18, 55:19, 56:10, 56:16, 57:18, 58:23, 59:4, 59:14, 59:22, 60:13, 60:22, 61:5, 61:12, 61:19, 62:20, 64:9, 64:17, 66:6, 66:14, 66:19, 67:1, 67:4, 67:12, 67:17, 67:23, 68:8, 68:16, 69:5, 69:9, 70:3, 70:10, 70:12, 73:21, 74:3, 74:23, 75:12, 75:17, 75:20, 76:17, 78:6, 78:19, 78:23, 79:16, 79:18, 83:2, 84:18, 86:7, 88:18, 89:3, 89:7, 89:10, 89:16, 89:20, 90:1, 90:20, 90:24, 91:5, 91:19, 91:23, 116:11, 117:1, 117:3, 117:10, 117:13, 117:15, 118:1, 119:1
court [17] - 3:12, 10:8, 23:10, 33:15, 34:5, 39:23, 41:11, 41:23, 72:21, 82:4, 82:13, 86:15, 90:24, 90:25, 106:24, 111:7, 111:25
Court [108] - 2:21, 2:21, 3:11, 4:6, 4:22, 5:24, 12:7, 12:9, 12:18, 12:23, 13:20, 16:21, 18:16, 19:4,

19:9, 21:17, 22:20, 23:7, 24:7, 25:6, 25:15, 26:17, 28:20, 29:25, 31:8, 34:7, 34:8, 34:11, 34:25, 35:7, 35:14, 41:15, 48:10, 48:13, 48:15, 48:20, 49:14, 49:18, 50:10, 52:14, 53:15, 56:4, 56:5, 56:7, 56:8, 57:3, 57:4, 59:10, 61:8, 62:11, 63:11, 64:2, 64:18, 65:5, 65:8, 65:11, 66:3, 67:15, 68:9, 68:13, 70:23, 71:10, 72:13, 72:20, 73:5, 77:11, 77:15, 78:2, 79:8, 79:17, 80:11, 81:17, 82:1, 82:15, 84:15, 86:10, 86:23, 88:4, 88:16, 89:13, 89:22, 90:19, 93:16, 94:19, 94:24, 95:15, 96:1, 96:2, 98:9, 99:18, 100:17, 101:23, 103:1, 103:15, 103:18, 104:2, 104:7, 104:18, 108:25, 110:2, 112:12, 112:18, 112:22, 114:9, 115:5, 119:10
Court's [21] - 7:6, 9:18, 31:12, 31:13, 39:16, 41:13, 48:12, 52:7, 52:8, 54:3, 89:8, 97:11, 98:7, 100:15, 101:20, 104:21, 107:6, 109:12, 114:14, 114:16, 116:10
Courthouse [1] - 2:22
courtroom [4] - 12:11, 13:24, 22:19, 68:10
COURTROOM [1] - 3:2
courts [4] - 43:11, 52:18, 52:21, 89:23
cover [1] - 115:8
craft [1] - 10:18
crap [2] - 87:9, 115:15
CRC [2] - 2:21, 119:9
create [2] - 31:1, 71:24
created [1] - 71:24
creative [1] - 20:2
credible [1] - 50:24
Crick [1] - 90:5
Crime [1] - 94:6
Criminal [8] - 1:2, 3:2,

47:13, 68:20, 68:23, 92:6, 108:24, 109:2
criminal [15] - 7:3, 17:21, 31:15, 31:18, 31:22, 31:24, 32:2, 32:5, 33:13, 33:18, 51:18, 54:23, 75:10, 94:13, 111:14
criticized [1] - 76:23
critique [1] - 99:4
CRM [1] - 1:17
cross [10] - 20:17, 22:10, 23:2, 23:24, 24:6, 36:14, 52:4, 76:9, 80:18, 80:23
cross-examination [5] - 20:17, 22:10, 23:24, 36:14, 80:18
cross-examine [2] - 52:4, 80:23
CRR [2] - 2:21, 119:9
cry [1] - 87:22
Cryptocurrency [1] - 94:6
CTO [1] - 64:23
current [3] - 6:18, 10:22, 38:20
Custodia [2] - 64:8, 64:10
custody [1] - 93:1
cuts [1] - 111:8
cyber [1] - 74:16

## D

D.C [3] - 1:5, 34:8, 119:11
Dairy [1] - 53:16
damage [1] - 11:6
Dark [1] - 94:5
data [24] - 8:10, 8:11, 8:14, 8:17, 8:18, 8:22, 15:18, 71:5, 73:7, 74:5, 74:14, 74:16, 79:6, 95:10, 99:9, 99:10, 106:19, 106:20, 106:21, 110:15, 110:19, 111:1, 113:1
database [1] - 8:8
databases [1] - 92:21
date [8] - 4:23, 13:18, 19:4, 31:2, 34:14, 34:15, 39:1, 114:15
dated [1] - 94:18
Dated [1] - 119:7
dates [2] - 34:14, 92:18
Daubert [6] - 71:2, 76:5, 76:8, 76:9,

79:21, 97:16
days [3] - 35:23, 97:9, 103:17
DC [4] - 1:13, 1:16, 1:19, 2:23
deal [2] - 68:4, 116:24
dealing [6] - 41:19, 87:13, 87:18, 88:12, 91:7, 91:13
deals [1] - 75:22
December [6] - 30:12, 31:8, 32:3, 32:7, 34:2, 84:22
decide [6] - 26:2, 26:8, 27:4, 43:18, 68:25
decided [2] - 24:14, 26:5
decides [1] - 29:6
decision [25] - 24:23, 25:25, 26:6, 27:2, 29:5, 31:4, 41:13, 41:14, 43:2, 43:11, 43:19, 43:24, 44:16, 44:25, 45:15, 46:16, 46:20, 46:22, 47:17, 53:15, 68:22, 109:4, 109:5, 111:7, 113:18
decisions [2] - 90:24, 90:25
declarations [1] - 114:4
declined [2] - 5:8, 5:9
deep [1] - 70:22
Defendant [3] - 1:6, 1:20, 3:12
DEFENDANT [16] - 43:10, 43:25, 44:3, 44:6, 44:18, 45:1, 45:4, 45:17, 45:22, 46:8, 46:11, 46:14, 46:18, 46:21, 47:1, 47:6
defendant [7] - 31:19, 44:9, 45:24, 52:2, 53:24, 112:10, 113:4
defendant's [5] - 81:22, 99:18, 113:5, 115:15, 115:16
defendants [1] - 32:18
defense [121] - 4:5, 6:18, 9:7, 15:6, 16:1, 22:6, 27:20, 28:4, 35:2, 35:6, 35:15, 35:22, 36:3, 36:8, 36:17, 37:2, 37:4, 37:9, 37:17, 37:25, 42:23, 49:3, 49:19, 49:21, 52:3, 52:4, 52:5, 52:19, 56:5, 59:25, 60:14, 62:11,

63:12, 65:19, 65:20, 67:19, 72:14, 72:23, 74:19, 80:3, 80:16, 81:2, 81:10, 81:17, 81:19, 82:2, 82:7, 82:23, 83:11, 83:17, 83:24, 84:23, 85:4, 85:21, 85:23, 90:8, 91:16, 92:11, 92:18, 93:9, 95:20, 95:22, 95:24, 96:15, 96:16, 97:11, 98:1, 98:2, 98:8, 98:14, 98:21, 99:5, 99:19, 99:20, 99:21, 100:14, 100:16, 100:17, 100:18, 101:19, 101:21, 101:24, 102:1, 102:6, 103:3, 103:17, 103:19, 104:5, 104:11, 104:15, 104:16, 104:19, 105:6, 105:9, 107:19, 107:22, 107:23, 108:9, 108:11, 108:15, 108:18, 109:7, 109:9, 109:16, 109:17, 110:11, 110:18, 111:2, 111:4, 111:10, 111:11, 111:12, 113:7, 113:14, 114:8, 114:10, 114:13, 115:3, 115:25
**defense's** [8] - 8:14, 41:7, 76:20, 91:25, 97:18, 107:21, 109:20, 110:21
**definitely** [1] - 61:10
**definition** [4] - 50:11, 63:23, 106:5, 107:2
**delayed** [1] - 30:8
**delivered** [1] - 37:8
**demanding** [1] - 52:20
**demands** [2] - 82:24, 109:11
**demonstrated** [1] - 114:2
**demonstrates** [1] - 65:21
**demonstrating** [1] - 104:23
**denied** [4] - 50:11, 95:15, 95:16, 109:12
**deny** [3] - 67:4, 91:25, 114:9
**denying** [1] - 92:3
**DEPARTMENT** [1] -

1:15
**Department** [1] - 1:18
**dependencies** [1] - 106:3
**depth** [1] - 39:25
**DEPUTY** [1] - 3:2
**describe** [1] - 57:12
**described** [7] - 59:3, 59:9, 64:23, 84:4, 84:6, 84:9, 96:10
**designing** [2] - 19:17, 19:24
**desire** [4] - 28:18, 28:19, 29:1, 97:18
**desk** [1] - 19:19
**despite** [3] - 35:13, 100:14, 114:7
**detail** [7] - 23:15, 56:19, 60:12, 60:21, 84:21, 99:6, 104:16
**detailed** [6] - 40:7, 85:12, 104:8, 110:16, 111:20, 113:9
**details** [3] - 40:5, 65:4, 105:25
**detained** [1] - 48:23
**detect** [1] - 102:11
**determination** [3] - 27:23, 80:1, 80:15
**determinations** [5] - 80:7, 87:20, 98:25, 99:15, 110:21
**determine** [8] - 11:22, 14:1, 58:15, 85:1, 100:21, 106:16, 107:12, 108:6
**determined** [4] - 82:2, 83:15, 89:23, 91:15
**deterministic** [1] - 90:12
**develop** [1] - 80:25
**developed** [1] - 81:7
**developments** [1] - 14:25
**dictate** [1] - 72:15
**dictates** [1] - 96:15
**difference** [3] - 27:9, 70:24, 70:25
**differences** [1] - 27:9
**different** [27] - 22:17, 26:24, 27:22, 39:21, 40:20, 41:25, 51:6, 53:2, 53:3, 53:11, 54:15, 55:2, 59:5, 59:6, 62:2, 62:6, 64:25, 73:20, 81:13, 84:23, 86:14, 89:5, 91:18, 106:2, 110:5
**differently** [1] - 51:16

**differs** [1] - 108:19
**difficult** [4] - 15:3, 15:13, 77:18, 106:16
**difficulty** [1] - 93:8
**diligence** [1] - 93:23
**dire** [1] - 21:18
**direct** [2] - 38:13, 52:7
**directed** [3] - 35:15, 95:24, 99:21
**direction** [8] - 88:10, 97:19, 98:7, 100:16, 101:10, 101:18, 104:6, 104:21
**directions** [5] - 9:8, 35:14, 109:15, 114:14, 114:16
**directly** [2] - 65:12, 93:10
**disadvantage** [1] - 101:6
**disagreement** [1] - 77:3
**disclose** [3] - 12:6, 12:17, 102:6
**disclosed** [7] - 36:1, 59:25, 60:8, 80:2, 98:20, 98:21, 111:1
**disclosing** [3] - 15:17, 55:12, 58:8
**disclosure** [20] - 5:11, 35:21, 38:3, 40:4, 40:7, 42:15, 51:9, 55:6, 56:13, 60:6, 72:11, 73:17, 78:1, 86:21, 86:23, 88:2, 89:24, 106:24, 110:13, 110:25
**disclosures** [6] - 39:9, 40:11, 54:5, 72:6, 105:7, 105:11
**discover** [1] - 108:15
**discovered** [3] - 61:2, 90:6
**discovering** [1] - 108:15
**discovery** [15] - 6:5, 55:6, 68:21, 81:6, 81:18, 82:5, 82:24, 85:6, 85:20, 86:6, 91:16, 91:17, 93:17, 112:25, 114:3
**discuss** [5] - 12:17, 12:23, 25:8, 30:1, 82:16
**discussed** [2] - 29:22, 50:3
**discussing** [2] - 15:17, 18:1
**discussion** [4] - 12:19, 13:14, 81:11,

92:17
**discussions** [2] - 5:19, 97:13
**disfavor** [3] - 16:8, 17:2, 17:8
**disfavoring** [1] - 16:23
**disfavors** [2] - 16:20, 17:2
**dispute** [2] - 36:22, 92:17
**disputed** [1] - 36:20
**dissuade** [2] - 85:24, 115:19
**distinguishes** [1] - 113:19
**distribute** [1] - 112:16
**district** [2] - 82:4, 82:13
**DISTRICT** [3] - 1:1, 1:1, 1:9
**District** [1] - 110:1
**Division** [1] - 41:16
**DNA** [8] - 41:20, 62:2, 87:17, 90:3, 90:15, 90:16, 90:17
**docket** [2] - 30:13, 69:12
**Docket** [6] - 20:22, 72:11, 92:3, 92:15, 114:11, 116:5
**dockets** [1] - 34:9
**document** [3] - 18:10, 59:21, 93:14
**documentation** [1] - 106:2
**documenting** [1] - 92:12
**documents** [6] - 4:5, 93:21, 93:23, 94:1, 94:8, 94:25
**DOJ** [3] - 1:12, 1:17, 30:14
**DOJ-CRM** [1] - 1:17
**dollar** [3] - 26:23, 26:25, 62:1
**donating** [1] - 86:2
**done** [30] - 9:24, 20:11, 30:16, 35:15, 38:16, 38:24, 39:2, 42:7, 49:22, 50:4, 50:6, 55:4, 55:23, 57:10, 69:18, 73:19, 75:16, 76:25, 78:4, 78:9, 78:13, 78:17, 78:20, 82:11, 90:19, 109:15, 109:18, 110:8, 112:5, 115:4
**door** [1] - 51:1
**double** [1] - 90:6
**doubt** [2] - 37:9, 64:12

**down** [10] - 9:5, 45:16, 48:10, 48:18, 80:11, 86:4, 89:2, 96:9, 101:13, 116:22
**download** [1] - 18:14
**downloaded** [1] - 112:14
**Downpour** [1] - 82:18
**draft** [1] - 95:10
**drafted** [1] - 94:14
**draw** [2] - 38:22, 106:17
**drive** [6] - 12:12, 13:23, 14:15, 40:3, 40:5
**driving** [1] - 117:5
**dropped** [1] - 66:18
**duces** [1] - 92:5
**due** [4] - 21:25, 51:20, 74:20, 93:23
**during** [2] - 77:24, 92:13

## E

**early** [1] - 34:3
**earn** [1] - 17:12
**easily** [1] - 49:22
**easy** [1] - 20:7
**ECF** [1] - 81:10
**economic** [2] - 17:10, 54:22
**Economists** [2] - 54:23, 55:10
**editions** [1] - 95:13
**effect** [2] - 18:19, 52:10
**effectively** [6] - 50:9, 57:12, 59:12, 65:15, 72:23, 87:10
**effectuate** [1] - 54:8
**effort** [4] - 47:21, 49:17, 56:1, 85:20
**efforts** [1] - 59:8
**either** [11] - 22:8, 26:8, 36:23, 38:20, 51:19, 62:21, 63:1, 64:4, 109:9, 116:19
**EKELAND** [68] - 1:20, 3:9, 6:17, 8:3, 10:4, 10:10, 10:18, 11:1, 11:8, 12:21, 13:7, 13:19, 13:25, 15:3, 15:6, 15:13, 15:22, 17:17, 17:21, 19:7, 20:3, 20:20, 21:3, 21:7, 22:18, 24:1, 24:24, 25:2, 25:12, 25:15, 26:12, 29:22, 33:6, 33:20, 33:23,

34:13, 42:4, 42:12, 42:17, 47:23, 48:3, 48:9, 48:25, 49:3, 66:20, 67:14, 69:8, 70:11, 70:13, 73:23, 74:11, 75:8, 75:15, 75:18, 76:1, 77:9, 78:15, 78:21, 79:1, 79:17, 90:3, 116:18, 116:21, 117:2, 117:9, 117:12, 117:14, 117:25

**Ekeland** [49] - 1:21, 3:9, 5:7, 5:13, 5:16, 6:13, 6:15, 7:10, 15:1, 20:13, 28:15, 29:4, 29:16, 29:21, 34:12, 35:19, 37:6, 42:3, 43:8, 44:7, 47:10, 48:19, 49:8, 51:5, 61:24, 66:9, 66:19, 67:12, 70:10, 83:4, 88:17, 88:18, 89:3, 90:1, 90:2, 96:5, 96:12, 96:24, 97:17, 101:7, 102:3, 102:8, 102:14, 103:7, 103:13, 108:4, 109:1, 115:9, 116:16

**Ekeland's** [3] - 88:3, 109:5, 110:4

**eleventh** [1] - 35:6

**eleventh-hour** [1] - 35:6

**email** [2] - 71:18, 117:19

**emailed** [1] - 101:22

**emphasized** [1] - 4:13

**employed** [2] - 36:19, 54:7

**employee** [1] - 17:19

**employees** [2] - 17:11, 93:11

**employers** [1] - 17:10

**encompass** [1] - 106:17

**encourage** [1] - 96:22

**encouraged** [1] - 108:18

**encouraging** [1] - 19:12

**end** [14] - 24:9, 27:8, 27:10, 32:11, 38:25, 54:8, 54:17, 82:12, 84:7, 84:9, 84:10, 103:5, 103:7, 103:14

**endeavor** [1] - 55:24

**ended** [1] - 18:4

**enforceable** [1] -

78:11

**enforcement** [4] - 75:13, 81:7, 81:18, 91:8

**enforcement-developed** [1] - 81:7

**enforcing** [1] - 7:7

**engage** [1] - 57:20

**engaging** [1] - 23:3

**engineer** [1] - 19:24

**enormous** [2] - 110:17, 113:11

**ensure** [1] - 14:4

**enter** [3] - 3:15, 18:7, 19:2

**entered** [1] - 51:16

**entering** [1] - 12:3

**entire** [3] - 19:3, 36:5, 115:2

**entirely** [3] - 35:8, 63:3, 71:13

**entities** [1] - 83:19

**entitled** [5] - 49:21, 74:20, 80:3, 85:4, 112:11

**envisioning** [1] - 67:16

**EP2P** [3] - 82:17, 112:20, 113:21

**equipment** [1] - 18:19

**equity** [1] - 93:25

**erased** [2] - 10:1, 18:24

**error** [14] - 62:3, 62:7, 71:4, 71:5, 73:22, 74:2, 76:10, 76:22, 77:6, 79:14, 108:3, 108:4, 108:6, 108:16

**errors** [1] - 74:8

**essence** [1] - 52:4

**essentially** [4] - 8:16, 15:9, 39:17, 71:21

**established** [3] - 75:19, 90:4, 90:17

**estimate** [1] - 30:21

**et** [2] - 14:10, 14:11

**evaluate** [3] - 8:12, 8:14, 11:21

**eve** [2] - 39:6, 97:8

**evening** [2] - 101:23, 118:2

**event** [4] - 89:14, 93:4, 93:19, 109:6

**ever-evolving** [1] - 38:16

**evidence** [16] - 27:5, 27:6, 36:6, 52:25, 73:15, 81:22, 90:3, 90:15, 112:13, 112:19, 112:24,

113:8, 113:16, 113:20, 113:24, 114:7

**evolving** [1] - 38:16

**exact** [3] - 83:11, 88:12, 88:22

**exacting** [3] - 50:19, 82:3, 109:25

**exactly** [14] - 11:25, 39:19, 40:7, 43:16, 56:25, 57:1, 64:20, 81:21, 82:25, 88:21, 101:16, 102:1, 102:4, 103:4

**examination** [6] - 20:17, 22:10, 23:24, 36:14, 80:18, 99:23

**examine** [8] - 52:4, 63:9, 79:2, 80:23, 82:4, 99:22, 104:9, 105:21

**example** [7] - 17:13, 54:24, 57:19, 58:4, 58:19, 62:3, 98:14

**examples** [2] - 83:20, 83:21

**excellent** [2] - 20:20, 96:13

**except** [1] - 54:2

**exception** [1] - 81:16

**exchange** [3] - 57:15, 57:16, 59:19

**exchanged** [2] - 94:3, 95:2

**exchanges** [1] - 59:5

**Excygent** [1] - 93:22

**executed** [1] - 105:22

**exercise** [1] - 115:2

**exert** [1] - 17:10

**Exhibit** [1] - 20:9

**exist** [1] - 39:12

**existing** [1] - 6:8

**exists** [1] - 54:4

**exit** [1] - 14:15

**expand** [1] - 88:14

**expanded** [1] - 50:10

**expanding** [1] - 42:8

**expansive** [4] - 37:11, 50:15, 68:21, 108:1

**expect** [3] - 6:21, 30:15, 78:22

**expedition** [9] - 50:12, 53:11, 63:24, 81:4, 85:19, 94:11, 107:10, 109:23, 114:22

**experience** [3] - 16:7, 64:7, 117:4

**experienced** [1] - 34:7

**expert** [92] - 15:9,

21:10, 22:4, 22:11, 22:12, 23:1, 23:2, 24:19, 28:11, 35:24, 35:25, 36:2, 36:17, 37:20, 38:17, 38:20, 38:21, 39:24, 40:2, 42:8, 43:13, 44:22, 50:24, 51:19, 53:23, 54:5, 54:13, 54:14, 61:18, 63:4, 63:11, 64:4, 65:5, 68:15, 72:15, 72:17, 74:9, 79:15, 80:6, 80:7, 81:1, 81:20, 84:10, 84:16, 85:25, 86:22, 86:24, 88:6, 94:21, 96:1, 96:3, 96:18, 96:19, 97:9, 97:21, 97:22, 97:23, 98:8, 98:10, 99:22, 100:5, 100:10, 100:19, 100:20, 100:22, 100:23, 100:25, 101:9, 101:16, 104:3, 104:5, 104:11, 105:10, 105:12, 107:6, 107:7, 107:8, 110:6, 110:7, 111:16, 112:4, 115:5

**experts** [27] - 7:4, 7:6, 11:18, 12:24, 13:4, 35:3, 40:3, 40:6, 40:11, 40:22, 55:3, 64:1, 64:3, 72:23, 74:7, 77:8, 79:25, 80:4, 80:12, 83:12, 83:14, 83:17, 113:5, 113:21, 114:4

**explain** [8] - 38:4, 41:4, 80:14, 96:2, 96:18, 98:9, 108:8, 115:5

**explained** [3] - 37:11, 94:24, 99:24

**explaining** [3] - 97:22, 107:7, 111:16

**explanation** [6] - 98:12, 99:13, 104:8, 105:5, 105:12

**explanations** [1] - 110:16

**explorers** [1] - 10:6

**exploring** [1] - 21:24

**expressed** [4] - 5:20, 7:7, 18:2, 72:10

**expressly** [1] - 54:6

**extend** [1] - 19:10

**extended** [1] - 42:25

**extensive** [2] - 81:17,

110:14

**extent** [21] - 6:17, 13:25, 20:21, 21:11, 21:15, 33:24, 36:23, 37:12, 55:5, 56:13, 56:20, 59:23, 61:13, 80:6, 80:10, 80:24, 82:15, 86:22, 89:21, 105:3, 110:18

**external** [1] - 71:22

**extractions** [1] - 105:23

**extraordinarily** [2] - 93:12, 105:3

**extraordinary** [1] - 107:10

**extremely** [3] - 62:5, 93:20, 110:14

## F

**F.3d** [3] - 91:11, 112:10, 113:18

**face** [3] - 19:13, 19:14, 65:23

**faced** [1] - 37:23

**facilitate** [1] - 101:17

**fact** [21] - 15:1, 19:12, 24:15, 26:3, 37:10, 43:8, 47:13, 52:11, 55:22, 66:18, 77:1, 85:11, 86:1, 93:3, 94:11, 100:14, 107:20, 109:4, 113:12, 113:20, 115:2

**factors** [8] - 52:10, 52:13, 76:9, 86:15, 87:14, 87:15, 87:21, 87:24

**failed** [6] - 94:10, 99:19, 100:16, 111:4, 114:14

**fails** [2] - 109:20, 114:13

**failure** [2] - 40:17, 50:22

**fair** [17] - 21:23, 22:1, 26:10, 28:21, 29:12, 39:7, 40:15, 46:3, 52:2, 52:5, 56:19, 58:17, 61:12, 81:5, 82:11, 82:19, 92:16

**fairly** [3] - 18:4, 34:9, 82:6

**faith** [3] - 85:20, 104:23, 109:14

**fakes** [1] - 70:22

**fall** [1] - 82:12

**false** [2] - 76:11

**familiar** [1] - 80:4
**far** [11] - 4:6, 49:16, 50:21, 73:8, 85:18, 87:21, 87:22, 104:15, 108:14, 109:17, 115:23
**Faruqui** [1] - 73:6
**fashion** [3] - 38:1, 47:14, 94:23
**fast** [1] - 15:11
**favor** [1] - 86:16
**FBI** [9] - 74:16, 74:24, 75:2, 75:4, 75:12, 91:8, 112:14, 112:20, 113:21
**FBI's** [1] - 75:6
**fear** [1] - 88:13
**February** [6] - 32:20, 33:3, 33:9, 34:14, 39:2, 46:25
**Federal** [1] - 92:5
**federal** [3] - 7:3, 90:23, 91:6
**feeding** [1] - 87:11
**few** [4] - 35:23, 71:8, 79:19, 103:16
**field** [1] - 7:9
**figure** [7] - 9:1, 9:23, 10:2, 14:22, 18:18, 27:1, 63:22
**figures** [2] - 26:23, 62:1
**file** [8] - 38:15, 38:19, 64:16, 91:2, 92:6, 95:13, 99:21
**filed** [6] - 5:23, 65:7, 83:8, 94:19, 98:3, 115:3
**files** [2] - 112:15, 112:17
**filing** [5] - 21:4, 104:15, 105:9, 106:7, 117:18
**filings** [6] - 82:23, 104:16, 107:17, 107:21, 108:10, 115:3
**final** [2] - 89:3, 114:23
**finally** [4] - 18:22, 51:1, 65:10, 68:4
**fine** [7] - 9:5, 25:11, 36:14, 66:10, 68:16, 116:19, 117:11
**finger** [1] - 40:14
**fingerprint** [1] - 58:12
**fingers** [1] - 37:3
**finish** [3] - 34:3, 49:4, 70:6
**firm** [5] - 5:11, 12:5, 12:16, 14:9, 14:10

**firms** [3] - 54:22, 55:17
**First** [2] - 91:11, 102:9
**first** [16] - 6:19, 7:21, 23:12, 46:5, 49:6, 52:6, 53:13, 57:8, 66:24, 72:20, 74:11, 76:2, 76:4, 86:10, 101:19, 112:12
**Fischbach** [2] - 82:19, 82:23
**fishing** [9] - 50:12, 53:11, 63:23, 81:4, 85:19, 94:11, 107:10, 109:23, 114:22
**fit** [2] - 31:7, 69:23
**five** [5] - 6:22, 10:20, 10:23, 79:4, 79:13
**five-year** [3] - 6:22, 10:20, 10:23
**flag** [2] - 11:12, 11:16
**flip** [1] - 101:7
**flipping** [1] - 72:4
**Floor** [1] - 1:22
**flying** [2] - 4:1, 69:24
**focus** [1] - 22:20
**focused** [2] - 42:14, 103:2
**FOERSTER** [1] - 2:3
**Foerster** [1] - 3:18
**Fog** [2] - 53:9, 61:11
**folder** [1] - 112:15
**folks** [1] - 49:24
**follow** [4] - 47:9, 97:11, 100:3, 114:14
**follow-up** [1] - 47:9
**followed** [1] - 5:22
**following** [5] - 9:8, 29:19, 53:7, 70:8, 97:25
**FOR** [1] - 1:1
**fore** [1] - 21:16
**foregoing** [1] - 119:4
**forensic** [3] - 39:17, 90:4, 114:4
**forensics** [1] - 90:17
**forfeiture** [2] - 27:21, 61:25
**forget** [1] - 61:6
**forgotten** [1] - 88:22
**form** [5] - 46:4, 56:1, 68:10, 93:25, 115:21
**format** [1] - 95:14
**forms** [1] - 68:5
**formulation** [2] - 51:13, 80:6
**forth** [3] - 18:15, 85:17, 116:17
**fortunate** [1] - 69:3

**fortunately** [1] - 117:2
**forward** [18] - 24:4, 25:17, 26:6, 26:8, 28:8, 28:9, 28:18, 28:19, 28:20, 28:21, 29:1, 29:2, 29:3, 29:10, 34:22, 44:13, 73:5, 79:25
**fought** [1] - 115:3
**founded** [1] - 103:23
**four** [3] - 29:24, 88:9, 117:7
**fragments** [1] - 112:14
**Francisco** [1] - 2:4
**frankly** [12] - 5:5, 9:14, 20:7, 27:7, 28:19, 28:22, 36:22, 39:3, 40:25, 76:21, 85:19, 87:21
**fraud** [2] - 30:14, 86:4
**free** [5] - 4:21, 27:5, 31:21, 34:9, 116:11
**freed** [1] - 69:17
**freeing** [1] - 32:11
**frees** [1] - 69:14
**Frentzen** [10] - 3:18, 5:22, 14:3, 15:4, 15:25, 18:6, 18:21, 49:7, 49:11, 86:7
**FRENTZEN** [40] - 2:2, 3:17, 14:7, 14:13, 49:12, 49:23, 51:4, 52:6, 53:13, 53:18, 54:1, 55:14, 55:20, 56:15, 57:3, 58:19, 59:1, 59:5, 59:17, 61:4, 61:6, 62:10, 63:2, 64:10, 64:18, 66:12, 66:15, 66:24, 67:2, 67:7, 67:22, 68:3, 68:12, 69:3, 86:9, 88:20, 89:4, 89:8, 89:11, 89:19
**Frentzen's** [2] - 4:1, 60:16
**Friday** [11] - 3:22, 4:13, 69:12, 69:21, 116:7, 116:9, 116:18, 116:21, 117:10, 117:16, 117:20
**friend** [1] - 117:3
**front** [7] - 27:10, 65:13, 81:7, 81:8, 92:15, 102:8, 111:22
**frustrating** [1] - 72:13
**Frye** [1] - 41:22
**full** [2] - 30:23, 119:5
**fully** [1] - 56:13
**fulsome** [1] - 52:5

**function** [2] - 50:22, 106:2
**functions** [2] - 55:21, 106:20
**fundamental** [2] - 7:1, 50:5
**fundamentally** [3] - 50:15, 53:19, 87:23
**fundamentals** [1] - 57:7
**funded** [1] - 47:16
**funding** [1] - 108:25
**fundraising** [3] - 43:1, 47:21, 48:5
**funds** [1] - 47:19
**future** [4] - 6:1, 11:14, 11:17, 11:20

### G

**gaining** [1] - 20:19
**game** [1] - 51:24
**garden** [1] - 111:19
**garden-variety** [1] - 111:19
**gas** [1] - 88:14
**general** [2] - 12:24, 109:23
**generally** [3] - 16:6, 85:3, 115:21
**generate** [4] - 73:22, 74:1, 77:6, 99:12
**generated** [1] - 62:22
**genotyping** [1] - 41:20
**George** [1] - 95:5
**gestures** [1] - 109:7
**given** [9] - 4:22, 35:18, 76:19, 76:24, 77:21, 102:8, 108:8, 109:14, 115:2
**glad** [2] - 18:21, 117:9
**glancing** [1] - 35:20
**glean** [1] - 102:2
**Global** [1] - 94:5
**gloss** [3] - 52:14, 52:23, 52:25
**goal** [2] - 13:2, 42:9
**gobbles** [1] - 108:2
**gosh** [1] - 24:6
**Government** [1] - 70:17
**government** [88] - 3:5, 4:7, 4:10, 4:15, 4:21, 5:4, 5:15, 6:7, 10:13, 20:23, 22:2, 22:3, 22:4, 22:7, 26:2, 26:20, 27:12, 27:14, 27:25, 28:7, 28:12, 29:12, 30:3, 31:3, 31:12, 34:19, 34:21,

34:24, 36:16, 37:19, 37:21, 38:6, 38:19, 40:10, 40:17, 42:18, 42:24, 49:8, 51:8, 51:11, 51:17, 51:18, 53:23, 54:21, 55:3, 59:24, 66:21, 68:13, 69:20, 72:22, 75:21, 75:23, 76:3, 76:14, 81:8, 82:11, 82:22, 83:10, 83:12, 84:22, 85:8, 85:13, 85:25, 90:11, 92:10, 92:20, 92:23, 93:2, 93:5, 94:22, 96:25, 97:13, 97:20, 98:20, 99:17, 100:1, 101:14, 101:22, 101:25, 104:7, 104:18, 110:6, 113:8, 114:1, 114:24, 116:9, 116:19
**government's** [24] - 28:18, 30:21, 31:11, 39:9, 41:1, 41:3, 41:6, 49:9, 52:1, 62:9, 63:8, 73:18, 79:25, 81:23, 81:25, 83:14, 83:17, 85:5, 85:17, 92:22, 92:25, 100:9, 109:9, 115:18
**Gox** [1] - 4:2
**grand** [1] - 28:12
**grant** [3] - 41:23, 67:17, 81:17
**granted** [2] - 87:3, 100:17
**granular** [2] - 39:23, 57:4
**graph** [1] - 85:13
**grasp** [1] - 56:13
**great** [5] - 19:19, 76:14, 88:16, 88:19, 88:25
**greater** [4] - 23:15, 35:22, 62:3, 104:16
**Greenberg** [1] - 94:4
**Greenberg's** [1] - 94:5
**Gronager** [1] - 66:22
**ground** [3] - 57:14, 57:22, 57:23
**grounds** [1] - 114:13
**group** [1] - 73:8
**guarantee** [1] - 33:8
**guess** [9] - 5:12, 14:8, 23:21, 60:25, 71:21, 78:18, 91:5, 94:18, 116:13
**guidelines** [1] - 26:22
**guilty** [1] - 26:13

# H

Haaroon [1] - 95:5
habit [1] - 7:11
hac [1] - 3:11
half [3] - 17:15, 49:4, 97:2
halfway [1] - 22:16
hand [4] - 13:22, 14:18, 37:12, 51:25
handle [1] - 23:7
handled [2] - 6:11, 98:23
hands [1] - 6:16
handwrite [1] - 20:8
happy [16] - 26:20, 32:16, 32:21, 32:22, 33:12, 33:14, 48:13, 48:14, 49:5, 58:25, 64:1, 66:2, 69:12, 89:24, 96:13, 116:14
harass [1] - 87:7
harassing [2] - 85:22, 114:25
harassment [1] - 115:22
hard [5] - 5:5, 8:21, 15:9, 23:12, 115:3
harder [1] - 19:25
hardware [1] - 40:5
harm [1] - 87:7
Haslhofer [1] - 95:6
HASSARD [1] - 1:20
Hassard [3] - 3:10, 5:17, 115:13
hassard's [1] - 116:22
hate [1] - 39:5
head [4] - 19:15, 19:25, 27:7, 51:14
header [1] - 20:9
heads [1] - 96:23
hear [14] - 6:13, 18:5, 26:2, 26:20, 30:3, 34:16, 38:12, 48:21, 49:5, 49:8, 65:11, 66:9, 76:10, 97:25
heard [10] - 31:3, 43:7, 50:2, 66:16, 78:23, 84:25, 89:14, 89:18, 99:17, 101:24
hearing [11] - 3:22, 7:8, 28:7, 37:7, 76:8, 95:19, 97:16, 98:2, 99:18, 102:1, 118:3
hearings [1] - 71:2
heart [1] - 7:13
heavily [3] - 86:15, 87:25, 88:1
hedging [2] - 28:3, 29:9

held [5] - 39:23, 80:13, 94:9, 97:17, 103:18
helix [1] - 90:6
help [3] - 56:24, 86:4, 108:5
helpful [7] - 33:24, 42:2, 89:22, 89:25, 111:8, 114:3, 117:17
helps [1] - 57:1
hereby [2] - 12:4, 119:3
herself [2] - 37:14
hesitate [1] - 7:1
Heuristic [28] - 23:5, 36:22, 37:1, 57:9, 59:22, 60:2, 60:23, 61:1, 71:9, 71:22, 72:5, 77:14, 98:14, 98:18, 98:22, 99:1, 99:2, 99:8, 102:9, 102:13, 102:15, 102:18, 102:20, 102:23, 102:24, 108:1
heuristic [24] - 8:5, 18:19, 21:13, 23:18, 35:21, 36:9, 36:23, 57:9, 59:19, 60:25, 61:15, 62:25, 63:5, 79:2, 84:3, 84:6, 84:8, 98:15, 99:5, 99:7, 102:10, 102:17, 102:19, 107:25
heuristics [13] - 6:21, 8:19, 13:9, 13:10, 19:15, 38:4, 62:15, 71:17, 74:4, 77:5, 95:11, 110:20, 110:22
high [3] - 58:15, 62:5, 105:23
high-level [1] - 105:23
higher [1] - 62:8
highlight [1] - 111:9
highlighted [1] - 113:17
highlights [4] - 70:23, 76:2, 85:18, 86:5
highly [2] - 103:24, 115:8
himself [2] - 16:1, 25:25
hinted [2] - 35:13, 52:21
history [2] - 106:1, 116:1
hit [3] - 57:6, 116:22, 117:6
hold [4] - 32:5, 103:6,

103:7, 112:10
holding [2] - 42:24, 112:23
holiday [1] - 31:9
holidays [2] - 34:1, 34:3
homework [1] - 30:16
homicide [1] - 87:17
honest [2] - 21:18, 74:12
honestly [7] - 16:3, 16:20, 22:24, 24:8, 39:17, 43:16, 78:21
Honor [89] - 3:6, 3:9, 3:17, 4:4, 4:24, 5:15, 6:4, 8:3, 8:20, 10:4, 10:13, 13:7, 14:7, 14:13, 15:3, 19:7, 20:4, 24:1, 25:2, 26:12, 27:19, 29:13, 29:22, 30:6, 30:11, 30:17, 30:24, 32:9, 32:14, 33:20, 34:18, 39:8, 42:4, 42:11, 42:12, 42:18, 43:10, 44:6, 45:17, 46:2, 47:8, 47:25, 48:3, 48:9, 48:25, 49:3, 49:12, 49:23, 50:5, 51:1, 54:2, 54:17, 55:15, 58:22, 59:17, 60:9, 60:15, 61:4, 61:7, 62:10, 63:2, 64:5, 66:20, 67:14, 67:22, 68:3, 69:4, 69:7, 69:8, 69:20, 70:13, 75:18, 77:9, 78:18, 79:1, 79:9, 79:19, 83:10, 86:9, 88:21, 88:22, 89:2, 89:4, 89:19, 89:21, 90:21, 96:13, 117:12, 117:14
honor [1] - 13:19
Honor's [1] - 31:1
HONORABLE [1] - 1:8
hood [2] - 77:20, 77:21
hope [4] - 4:13, 24:8, 88:15, 117:1
hoped [1] - 102:2
hopefully [2] - 19:8, 34:6
hopes [1] - 109:12
hotly [1] - 93:15
hour [2] - 35:6, 49:5
housekeeping [1] - 66:5
Hub [1] - 95:4
huge [1] - 36:21

human [2] - 105:18, 106:1
human-readable [2] - 105:18, 106:1
humble [1] - 54:9
hundred [2] - 53:7, 73:10
Hunt [1] - 94:5
husher [2] - 25:5, 25:13
hypothetical [1] - 52:9
hypothetically [1] - 57:19
hypotheticals [3] - 23:4, 26:20, 53:14

# I

I-95 [1] - 116:22
IC3 [1] - 95:3
idea [8] - 19:19, 19:20, 88:16, 88:18, 88:19, 96:13, 112:2
identified [3] - 62:15, 103:8, 110:23
identify [7] - 57:16, 95:25, 97:21, 98:8, 100:6, 103:21, 107:24
identifying [1] - 100:19
ignored [3] - 98:7, 101:18, 109:15
illuminating [1] - 41:11
images [1] - 85:15
imagine [2] - 58:9, 115:11
impact [2] - 61:16, 79:22
impeach [3] - 80:19, 112:23, 113:7
impeaching [1] - 113:16
impeachment [1] - 80:18
implicit [1] - 89:16
importance [1] - 111:9
important [6] - 5:14, 23:19, 36:6, 39:10, 105:21, 115:25
importantly [1] - 64:22
impression [5] - 23:12, 45:19, 45:25, 72:20, 76:2
impressions [1] - 11:2
improper [3] - 6:7, 52:11, 95:18
impugn [1] - 87:7
IN [1] - 1:1

in-depth [1] - 39:25
inability [1] - 88:7
inaccurately [1] - 105:1
inapposite [1] - 90:17
inasmuch [1] - 11:17
Inc [3] - 54:23, 55:10, 92:5
incarceration [1] - 44:2
inclined [2] - 38:12, 38:13
include [4] - 39:20, 40:4, 61:14, 90:22
included [1] - 58:20
includes [4] - 10:23, 95:10, 105:25, 106:9
including [10] - 24:18, 54:22, 58:3, 82:19, 87:8, 93:22, 94:2, 95:1, 95:4, 113:24
incomplete [1] - 112:15
incorrect [1] - 93:5
independent [5] - 51:9, 55:3, 71:6, 71:7, 73:17
independently [8] - 15:20, 63:3, 63:16, 71:11, 72:2, 72:12, 73:3, 79:5
indicated [4] - 22:21, 108:24, 111:6, 115:11
indicating [1] - 104:13
indicative [1] - 112:7
indiscriminate [1] - 99:3
individual [3] - 77:5, 94:2, 95:1
individuals [1] - 69:24
information [65] - 4:16, 6:10, 10:24, 11:3, 11:5, 13:10, 17:7, 19:23, 20:18, 20:23, 21:13, 23:18, 23:19, 24:5, 26:4, 26:9, 39:11, 41:9, 43:18, 52:3, 53:24, 55:23, 56:2, 56:9, 56:22, 59:25, 60:1, 60:7, 60:11, 60:14, 60:18, 62:4, 65:10, 71:11, 71:20, 71:22, 72:5, 72:8, 72:16, 73:2, 73:3, 73:5, 73:8, 73:11, 77:7, 77:13, 77:21, 78:16, 79:3, 80:2, 80:17, 87:1, 95:23, 97:12,

102:12, 102:15, 102:23, 103:10, 109:24, 110:17, 111:1, 111:17, 113:1, 113:12, 114:3
**informed** [2] - 12:14, 12:19
**infrastructure** [1] - 65:24
**initial** [1] - 4:7
**input** [5] - 62:14, 92:21, 104:20, 113:1, 113:9
**inputs** [1] - 90:10
**instance** [4] - 23:3, 59:10, 59:11, 86:17
**instances** [1] - 55:16
**instantly** [1] - 11:12
**instead** [1] - 105:16
**instinct** [1] - 20:2
**Institute** [1] - 95:3
**instructed** [1] - 99:19
**instructions** [2] - 97:12, 105:18
**intellectual** [2] - 87:5, 87:13
**intelligence** [3] - 59:23, 71:23, 102:19
**intend** [1] - 80:19
**intended** [3] - 100:2, 114:25, 115:19
**intent** [1] - 87:7
**intentionally** [1] - 16:11
**intentions** [1] - 105:24
**interaction** [1] - 57:15
**interest** [6] - 7:13, 8:7, 49:9, 67:12, 67:19, 95:20
**interested** [3] - 20:18, 64:11, 91:6
**interesting** [1] - 32:4
**interestingly** [1] - 102:17
**interests** [1] - 14:4
**interfaced** [1] - 106:11
**interim** [2] - 5:10, 5:18
**intermediate** [4] - 41:15, 72:21, 111:7, 111:24
**internal** [2] - 71:5, 98:6
**international** [1] - 10:11
**interrogatory** [1] - 39:17
**interrupting** [2] - 7:11, 54:19
**intimidate** [1] - 114:25
**intimidating** [1] -

85:22
**introduce** [1] - 28:13
**introducing** [1] - 23:1
**invalidate** [1] - 98:17
**investigation** [6] - 22:22, 68:1, 75:25, 92:11, 92:14, 95:8
**investigator** [1] - 85:14
**investigatory** [1] - 50:18
**invitations** [2] - 9:18, 114:8
**invited** [1] - 109:16
**involve** [1] - 107:20
**involved** [6] - 27:24, 28:21, 40:16, 55:16, 87:16, 87:19
**involves** [1] - 102:20
**involving** [1] - 58:2
**iron** [1] - 68:7
**irrelevant** [1] - 86:17
**issuance** [1] - 92:4
**issue** [55] - 6:19, 9:15, 11:9, 11:16, 13:9, 13:11, 13:13, 15:3, 19:6, 20:14, 25:23, 26:9, 27:6, 27:13, 29:17, 30:13, 35:8, 35:12, 35:16, 38:13, 40:20, 41:22, 49:2, 49:10, 50:7, 51:12, 54:20, 63:17, 63:23, 65:10, 68:23, 70:23, 71:12, 71:19, 75:3, 77:13, 78:12, 79:2, 82:1, 82:5, 85:21, 88:12, 92:1, 96:23, 98:1, 98:3, 98:19, 109:13, 110:20, 112:11, 114:10, 115:4
**issued** [4] - 48:5, 50:8, 93:9, 103:18
**issuer** [1] - 54:11
**issues** [16] - 3:23, 14:17, 21:16, 28:23, 41:12, 42:2, 42:15, 43:13, 45:6, 70:24, 82:4, 84:11, 88:8, 97:6, 104:24
**item** [1] - 30:13
**items** [1] - 73:16
**iterations** [1] - 50:9
**itself** [15] - 18:11, 52:16, 52:24, 89:1, 98:12, 105:20, 105:23, 106:10, 106:17, 110:24, 111:3, 111:11,

113:12, 113:15

## J

**jail** [1] - 42:25
**January** [3] - 34:3, 34:22, 88:24
**Japan** [1] - 4:11
**Japanese** [3] - 4:7, 4:10, 4:21
**Jeff** [1] - 3:7
**JEFFREY** [1] - 1:17
**Jersey** [10] - 41:12, 41:13, 41:16, 72:22, 86:11, 86:12, 91:14, 111:7, 111:24, 117:5
**job** [1] - 17:14
**jobs** [1] - 17:4
**Jonathan** [1] - 66:22
**judge** [4] - 32:23, 33:2, 33:15, 35:17
**Judge** [2] - 73:6, 97:8
**JUDGE** [2] - 1:8, 1:9
**judges** [1] - 34:7
**judgment** [2] - 50:25, 54:9
**judicial** [2] - 52:23, 52:24
**July** [1] - 97:17
**June** [4] - 35:5, 84:17, 96:12, 98:2
**jurisdiction** [2] - 10:9, 10:10
**jurisdictions** [3] - 10:5, 10:11, 17:2
**jury** [18] - 9:6, 21:22, 26:25, 27:14, 27:20, 27:21, 27:23, 34:1, 40:23, 41:7, 41:8, 46:23, 48:6, 48:21, 48:24, 74:8, 74:9, 77:7
**JUSTICE** [1] - 1:15
**Justice** [4] - 1:18, 47:14, 108:24, 109:2
**Justification** [1] - 105:17
**justification** [2] - 86:25, 106:7
**justifications** [2] - 107:18, 107:19
**justified** [1] - 94:24

## K

**Kappos** [1] - 95:5
**keep** [6] - 4:20, 25:18, 66:12, 67:9, 71:5, 88:11
**keeping** [1] - 66:7

**key** [1] - 36:18
**kind** [13] - 23:1, 34:18, 62:13, 64:25, 71:16, 74:1, 76:12, 76:24, 81:12, 87:20, 89:1, 90:14, 102:24
**kinds** [3] - 7:5, 16:7, 16:13
**knowing** [3] - 20:21, 45:15, 77:19
**knowingly** [1] - 112:16
**knowledge** [2] - 17:19, 100:5
**knows** [1] - 100:25

## L

**laboring** [1] - 49:24
**lack** [7] - 16:4, 63:19, 63:20, 104:23, 108:3, 109:14
**laid** [1] - 63:18
**Lane** [1] - 112:17
**language** [9] - 6:23, 11:1, 11:13, 11:20, 16:5, 16:6, 18:3, 28:4, 102:7
**large** [5] - 40:22, 54:20, 55:17, 56:21
**largely** [3] - 9:8, 107:2, 107:3
**larger** [1] - 57:4
**last** [18] - 5:24, 8:5, 24:16, 30:13, 30:22, 31:21, 31:25, 37:7, 50:3, 66:4, 80:8, 82:12, 84:22, 93:9, 94:16, 97:9, 101:11, 116:24
**lasts** [1] - 31:25
**late** [11] - 20:15, 20:19, 24:19, 26:4, 26:9, 26:10, 28:13, 35:24, 46:24, 61:17, 61:18
**latest** [1] - 72:6
**laundered** [1] - 26:16
**Laurent** [1] - 7:6
**Law** [1] - 1:21
**law** [25] - 5:11, 12:5, 12:16, 14:9, 14:10, 16:7, 16:8, 16:23, 16:24, 17:9, 17:16, 17:21, 39:24, 44:22, 52:10, 53:20, 54:7, 75:13, 81:5, 81:7, 81:18, 82:15, 88:1, 91:8
**lawyer** [4] - 7:21,

44:22, 46:7, 88:13
**lawyers** [5] - 14:9, 43:24, 44:15, 45:10, 68:14
**layers** [2] - 80:11
**layman** [1] - 101:8
**lead** [2] - 63:1, 69:25
**leads** [1] - 63:1
**learn** [1] - 11:5
**learned** [2] - 20:1, 77:24
**learning** [1] - 36:8
**least** [23] - 9:1, 9:2, 9:21, 12:13, 12:19, 33:18, 37:18, 42:1, 48:19, 51:7, 60:13, 65:18, 75:1, 91:20, 94:12, 94:13, 99:5, 110:7, 115:21, 116:1, 117:7, 117:21, 117:24
**leave** [7] - 16:25, 17:14, 18:16, 91:25, 92:6, 98:3, 114:10
**led** [1] - 95:8
**Lee** [3] - 66:16, 66:23, 67:5
**leeway** [1] - 100:17
**left** [1] - 111:3
**legitimate** [1] - 64:11
**legitimately** [1] - 116:2
**lengthy** [2] - 65:7, 113:9
**less** [6] - 50:15, 53:20, 91:5, 106:25, 108:10, 114:21
**letter** [2] - 4:6, 115:8
**level** [6] - 58:15, 62:5, 82:13, 96:9, 105:23, 107:18
**Levin** [1] - 66:23
**liability** [1] - 11:17
**libraries** [1] - 106:3
**license** [5] - 83:5, 83:8, 108:18, 109:1
**light** [10] - 14:25, 26:23, 38:2, 51:20, 60:23, 67:18, 69:9, 105:7, 110:13, 116:2
**likely** [3] - 31:19, 78:17, 112:16
**limine** [2] - 81:10, 92:19
**limit** [3] - 16:9, 16:19, 23:2
**limitations** [3] - 8:9, 8:10, 8:13
**limited** [3] - 7:5, 81:6, 95:5

**limiting** [1] - 7:3
**line** [1] - 9:3
**lined** [1] - 69:22
**lines** [5] - 10:1, 19:1, 74:5, 79:20, 110:15
**linked** [1] - 71:18
**list** [2] - 47:10, 66:17
**listen** [1] - 43:12
**lists** [1] - 39:18
**literally** [2] - 78:24, 105:1
**litigated** [1] - 54:10
**litigation** [10] - 11:14, 11:20, 12:8, 16:14, 55:1, 82:19, 88:13, 91:9, 93:15, 94:12
**live** [5] - 7:21, 7:23, 7:24, 88:25, 101:4
**LLP** [1] - 2:3
**local** [5] - 89:23, 90:23, 91:2, 91:3, 91:5
**locked** [1] - 45:2
**lodged** [1] - 68:12
**log** [1] - 85:12
**logs** [6] - 92:2, 92:8, 92:12, 92:22, 98:5, 114:1
**London** [1] - 95:3
**long-pending** [2] - 31:18, 32:3
**long-scheduled** [1] - 33:19
**look** [56] - 9:2, 9:22, 10:16, 10:17, 11:18, 11:21, 12:13, 12:16, 13:20, 14:20, 14:21, 15:1, 21:10, 37:18, 50:18, 56:7, 56:11, 56:22, 57:23, 58:1, 58:4, 58:11, 58:13, 63:6, 65:22, 71:9, 72:16, 76:14, 77:10, 77:13, 77:20, 77:21, 79:12, 81:12, 81:25, 82:17, 84:5, 86:10, 86:13, 91:20, 96:19, 96:20, 100:6, 100:12, 100:23, 100:25, 101:3, 101:16, 103:21, 105:13, 107:3, 107:5, 107:7, 107:19
**looked** [12] - 12:14, 30:17, 54:1, 61:3, 74:11, 75:9, 75:15, 79:8, 81:22, 82:1, 91:1, 93:14
**looking** [22] - 7:18, 9:12, 11:10, 12:1,

30:23, 31:10, 37:12, 56:8, 63:20, 72:20, 74:22, 76:15, 77:19, 79:13, 80:10, 82:15, 100:13, 104:8, 104:14, 105:10, 107:8, 109:10
**looks** [5] - 15:8, 18:17, 27:8, 31:15
**Lords** [1] - 94:6
**love** [1] - 24:24
**ludicrous** [1] - 55:23
**lunch** [7] - 66:8, 66:9, 66:13, 68:17, 69:6, 70:5, 70:7

# M

**machinations** [1] - 87:19
**machine** [6] - 73:24, 105:19, 105:20, 105:21, 105:25, 112:25
**magazine** [1] - 94:3
**main** [2] - 16:15, 53:12
**maintains** [1] - 90:9
**majority** [1] - 52:21
**malicious** [1] - 115:9
**Man** [2] - 102:16, 108:2
**manage** [1] - 40:15
**management** [1] - 49:10
**manipulation** [2] - 60:17, 102:25
**manner** [5] - 9:9, 53:22, 68:18, 68:20, 114:15
**manners** [1] - 51:6
**manual** [8] - 59:13, 59:15, 59:18, 60:17, 60:20, 102:20, 102:24
**manually** [1] - 60:20
**markers** [3] - 58:13, 58:14, 58:16
**Market** [1] - 2:3
**marketplace** [2] - 17:12, 17:15
**markets** [1] - 59:6
**massively** [2] - 85:9, 104:25
**material** [7] - 5:3, 7:16, 62:8, 81:8, 91:16, 103:11, 106:17
**materials** [5] - 5:8, 93:3, 93:4, 93:5, 103:10

**matter** [13] - 7:14, 27:22, 29:15, 30:18, 31:1, 31:18, 51:19, 51:20, 62:1, 72:19, 74:20, 103:5, 103:14
**matters** [3] - 23:12, 76:2, 103:8
**mean** [19] - 10:13, 19:17, 21:21, 30:9, 31:6, 31:12, 40:13, 48:9, 50:10, 50:17, 52:8, 55:16, 57:19, 76:3, 76:6, 78:7, 78:23, 79:10, 90:8
**meaningful** [1] - 106:12
**means** [13] - 14:9, 28:22, 43:16, 44:10, 44:11, 51:22, 52:20, 57:15, 57:19, 87:4, 87:12, 108:14, 113:6
**meant** [3] - 14:12, 103:6, 111:23
**meet** [2] - 82:2, 97:20
**meeting** [1] - 109:24
**Meiklejohn** [1] - 95:6
**members** [1] - 19:9
**memorandum** [1] - 93:23
**memory** [1] - 88:20
**mention** [2] - 68:17, 71:14
**mentioned** [4] - 66:20, 66:21, 91:25, 98:4
**merely** [1] - 73:13
**methodologies** [3] - 40:23, 40:24, 95:12
**methodology** [1] - 36:18
**methods** [1] - 106:19
**MICHAEL** [1] - 1:20
**Michael** [2] - 3:10, 66:22
**microphone** [1] - 43:5
**midday** [1] - 117:21
**midst** [1] - 3:25
**might** [17] - 10:12, 19:14, 21:16, 24:18, 32:24, 33:4, 38:22, 45:8, 53:3, 57:19, 57:20, 69:9, 93:15, 105:14, 110:4
**million** [1] - 73:11
**mind** [3] - 25:1, 36:21, 37:25
**mine** [2] - 88:21, 117:3
**mini** [1] - 85:16
**minute** [4] - 23:15, 24:16, 35:11, 106:25
**minutes** [3] - 7:18,

79:4, 79:14
**miscluster** [1] - 83:23
**misclustered** [2] - 83:20, 83:23
**misclustering** [1] - 59:9
**missed** [2] - 15:12, 17:23
**missing** [2] - 50:6, 73:11
**mistaken** [1] - 38:21
**mixture** [1] - 87:17
**model** [3] - 71:6, 103:24, 103:25
**models** [3] - 55:5, 55:7, 55:12
**modification** [2] - 89:8, 102:21
**modified** [1] - 52:9
**modify** [3] - 54:4, 89:15, 89:17
**Mole** [1] - 88:5
**moment** [5] - 15:15, 25:4, 27:11, 35:17, 71:3
**moments** [1] - 71:8
**Monday** [1] - 30:25
**money** [4] - 26:15, 26:16, 47:16, 53:9
**monitor** [2] - 65:1, 65:2
**month** [3] - 30:23, 97:1, 97:16
**months** [6] - 10:7, 35:3, 50:23, 69:1
**moot** [2] - 35:8, 67:5
**Morgan** [1] - 80:12
**morning** [8] - 3:6, 3:8, 3:9, 3:13, 3:20, 23:10, 79:3, 116:24
**morph** [1] - 36:15
**Morrison** [1] - 3:18
**MORRISON** [1] - 2:3
**MOSS** [1] - 1:8
**most** [4] - 8:8, 82:6, 82:15, 94:23
**Most** [1] - 94:15
**motion** [21] - 5:14, 50:11, 66:3, 67:4, 67:17, 91:25, 92:3, 92:4, 92:14, 92:24, 98:3, 98:4, 98:7, 98:12, 99:1, 99:8, 99:18, 112:19, 114:10, 114:12, 114:17
**motions** [3] - 81:10, 92:19, 112:13
**motivating** [2] - 35:12, 35:19

**move** [8] - 17:5, 32:6, 32:8, 32:17, 32:21, 33:11, 63:16, 97:6
**moved** [1] - 32:17
**moving** [1] - 96:8
**MR** [106] - 3:9, 3:17, 6:17, 8:3, 10:4, 10:10, 10:18, 11:1, 11:8, 12:21, 13:7, 13:19, 13:25, 14:7, 14:13, 15:3, 15:6, 15:13, 15:22, 17:17, 17:21, 19:7, 20:3, 20:20, 21:3, 21:7, 22:18, 24:1, 24:24, 25:2, 25:12, 25:15, 26:12, 29:22, 33:6, 33:20, 33:23, 34:13, 42:4, 42:12, 42:17, 47:23, 48:3, 48:9, 48:25, 49:3, 49:12, 49:23, 51:4, 52:6, 53:13, 53:18, 54:1, 55:14, 55:20, 56:15, 57:3, 58:19, 59:1, 59:5, 59:17, 61:4, 61:6, 62:10, 63:2, 64:10, 64:18, 66:12, 66:15, 66:20, 66:24, 67:2, 67:7, 67:14, 67:22, 68:3, 68:12, 69:3, 69:8, 70:11, 70:13, 73:23, 74:11, 75:8, 75:15, 75:18, 76:1, 77:9, 78:15, 78:21, 79:1, 79:17, 86:9, 88:20, 89:4, 89:8, 89:11, 89:19, 90:3, 116:18, 116:21, 117:2, 117:9, 117:12, 117:14, 117:25
**MS** [40] - 3:6, 4:4, 4:15, 4:24, 5:15, 27:19, 28:3, 29:13, 30:6, 30:11, 30:17, 30:23, 31:7, 32:9, 32:14, 34:18, 34:24, 35:2, 39:8, 39:16, 42:11, 42:18, 44:9, 45:24, 47:8, 60:9, 60:15, 61:8, 61:13, 69:7, 69:20, 79:19, 83:10, 84:20, 89:21, 90:21, 90:25, 91:10, 116:8, 116:19
**Mt** [1] - 4:2
**multiple** [3] - 14:16, 76:24, 83:4
**multitude** [1] - 64:11

| N | | | | |
|---|---|---|---|---|
| **N.J** [1] - 41:17<br>**N.W** [1] - 119:11<br>**name** [2] - 76:10,<br>111:24<br>**names** [2] - 3:5, 82:18<br>**narrow** [1] - 85:10<br>**narrowing** [1] - 103:2<br>**native** [2] - 92:21,<br>95:13<br>**nature** [3] - 38:15,<br>52:25, 60:14<br>**necessarily** [3] -<br>82:21, 84:2, 85:22<br>**necessary** [9] - 8:1,<br>19:1, 98:9, 98:24,<br>108:25, 111:19,<br>113:15, 114:19,<br>115:5<br>**need** [83] - 7:15, 7:18,<br>7:24, 7:25, 8:11,<br>8:18, 8:24, 9:3, 9:16,<br>9:19, 9:20, 9:21,<br>10:1, 10:16, 11:10,<br>11:22, 11:25, 12:2,<br>13:3, 15:23, 19:8,<br>21:9, 22:12, 32:22,<br>33:21, 37:19, 40:4,<br>40:6, 48:20, 50:24,<br>50:25, 62:16, 63:19,<br>64:25, 65:6, 65:22,<br>68:4, 68:8, 69:25,<br>72:1, 72:11, 73:24,<br>74:1, 77:7, 77:17,<br>77:20, 78:3, 79:15,<br>80:14, 82:7, 82:10,<br>85:10, 85:11, 90:13,<br>96:5, 96:6, 96:7,<br>96:9, 96:16, 96:24,<br>97:2, 97:4, 97:5,<br>97:9, 97:23, 98:10,<br>99:22, 99:25, 100:4,<br>100:6, 100:20,<br>101:3, 101:16,<br>105:13, 107:22,<br>107:23, 111:9,<br>111:15, 115:23<br>**needed** [19] - 25:20,<br>35:4, 35:5, 38:1,<br>63:13, 81:25, 95:22,<br>96:3, 97:14, 97:19,<br>98:13, 99:14, 99:20,<br>102:1, 102:5, 104:9,<br>111:17<br>**needing** [2] - 63:9,<br>110:24<br>**needs** [20] - 8:5, 9:23,<br>18:25, 19:9, 25:25,<br>57:4, 61:20, 65:5, | 82:20, 96:19, 96:20,<br>103:7, 105:6, 107:7,<br>107:19, 108:9,<br>109:15, 110:12,<br>111:12, 112:4<br>**negative** [1] - 87:10<br>**negatives** [1] - 76:11<br>**negotiations** [1] -<br>93:24<br>**never** [12] - 17:3, 22:5,<br>37:11, 72:14, 73:19,<br>78:4, 83:8, 84:9,<br>94:23, 107:5, 114:6,<br>115:4<br>**new** [5] - 23:1, 35:24,<br>35:25, 42:15, 80:25<br>**New** [15] - 1:18, 1:22,<br>16:19, 17:1, 41:12,<br>41:13, 41:16, 68:19,<br>72:22, 86:11, 86:12,<br>91:14, 111:7,<br>111:24, 117:5<br>**news** [1] - 87:11<br>**next** [7] - 5:2, 7:17,<br>14:22, 16:4, 28:12,<br>38:25, 69:10<br>**nexus** [1] - 106:6<br>**night** [3] - 5:24, 8:5,<br>116:24<br>**nine** [1] - 35:3<br>**Ninth** [5] - 81:15,<br>81:16, 112:9,<br>112:10, 113:25<br>**Nixon** [18] - 52:15,<br>52:16, 52:20, 53:15,<br>53:23, 68:22, 70:14,<br>70:18, 70:19, 70:24,<br>73:12, 94:10, 95:16,<br>95:19, 109:21,<br>110:5, 110:9, 110:10<br>**Nixon's** [2] - 70:20,<br>73:14<br>**Nobel** [1] - 90:6<br>**nominations** [1] - 34:6<br>**nominees** [1] - 34:5<br>**noncompete** [9] -<br>5:21, 6:22, 10:20,<br>10:23, 16:5, 17:13,<br>17:22, 75:10<br>**noncompetes** [2] -<br>16:23, 21:12<br>**noncompetitive** [2] -<br>18:3, 88:7<br>**none** [3] - 67:25, 80:4,<br>105:15<br>**nonetheless** [2] -<br>36:6, 109:23<br>**nonparty** [1] - 49:13<br>**nonstop** [1] - 87:10<br>**note** [5] - 39:10, | 60:18, 69:22,<br>114:23, 115:1<br>**noted** [4] - 83:16,<br>95:21, 100:1, 113:25<br>**notes** [6] - 86:19,<br>94:2, 95:1, 103:1,<br>112:18, 119:5<br>**nothing** [6] - 53:4,<br>68:17, 90:7, 98:23,<br>104:17, 109:18<br>**notice** [5] - 23:11,<br>69:17, 70:2, 70:4,<br>78:1<br>**notion** [2] - 50:3,<br>95:22<br>**notwithstanding** [2] -<br>24:15, 26:3<br>**November** [10] -<br>31:24, 32:1, 93:9,<br>93:20, 94:6, 94:16,<br>94:17, 94:18, 94:19,<br>115:8<br>**nowhere** [2] - 23:9,<br>65:14<br>**number** [9] - 3:22,<br>61:10, 61:15, 82:4,<br>86:18, 89:22, 91:13,<br>91:18, 110:15<br>**Number** [2] - 87:1,<br>87:4<br>**numerous** [7] - 35:14,<br>73:4, 76:2, 113:6,<br>113:13, 114:7, 115:3<br>**NW** [4] - 1:13, 1:15,<br>1:18, 2:22<br>**NY** [1] - 1:22<br><br>**O**<br><br>**oar** [1] - 49:24<br>**oath** [1] - 9:3<br>**obfuscation** [1] -<br>98:15<br>**object** [4] - 89:11,<br>92:20, 92:25, 95:11<br>**objection** [1] - 42:3<br>**objections** [1] - 7:8<br>**objects** [1] - 48:10<br>**obligations** [4] - 47:5,<br>51:9, 55:6<br>**obscure** [1] - 94:23<br>**observed** [3] - 39:21,<br>93:12, 94:16<br>**observing** [1] - 92:24<br>**obtain** [6] - 4:8, 80:17,<br>83:4, 108:18, 109:7,<br>111:13<br>**obtaining** [2] - 95:20,<br>108:25<br>**obvious** [1] - 49:17 | **obviously** [16] - 15:6,<br>19:3, 20:15, 23:8,<br>24:4, 25:15, 33:13,<br>33:20, 56:19, 86:12,<br>86:19, 88:1, 88:11,<br>89:11, 108:19<br>**occasions** [2] - 76:24,<br>96:14<br>**occur** [3] - 97:13,<br>101:15, 106:12<br>**occurred** [2] - 21:5,<br>21:7<br>**October** [4] - 30:6,<br>30:8, 31:17, 31:21<br>**OF** [5] - 1:1, 1:2, 1:8,<br>1:15, 119:1<br>**offense** [1] - 88:24<br>**offer** [2] - 27:5, 94:22<br>**offered** [3] - 52:1,<br>113:7, 113:20<br>**offering** [2] - 53:23,<br>110:6<br>**offers** [1] - 107:19<br>**offices** [1] - 68:9<br>**OFFICIAL** [1] - 119:1<br>**Official** [2] - 2:21,<br>119:10<br>**offs** [2] - 44:13, 44:16<br>**often** [1] - 82:20<br>**old** [1] - 104:6<br>**omnibus** [1] - 92:18<br>**once** [6] - 12:14,<br>28:22, 38:9, 57:22,<br>58:14, 78:6<br>**one** [59] - 7:12, 11:7,<br>12:22, 13:1, 13:3,<br>14:22, 17:1, 17:3,<br>17:7, 18:9, 19:3,<br>19:11, 19:19, 20:8,<br>20:12, 22:10, 24:9,<br>29:8, 31:23, 32:6,<br>32:7, 32:22, 33:8,<br>36:23, 39:8, 39:19,<br>41:9, 45:12, 47:17,<br>47:22, 52:24, 53:7,<br>53:12, 54:14, 54:19,<br>56:16, 59:10, 60:13,<br>60:15, 62:7, 64:5,<br>66:15, 68:7, 68:15,<br>68:16, 71:18, 73:8,<br>74:25, 76:19, 77:24,<br>79:10, 79:22, 82:22,<br>84:21, 86:18, 89:4,<br>93:14, 106:8<br>**one's** [3] - 94:2, 95:1,<br>112:3<br>**ones** [2] - 16:20, 31:23<br>**ongoing** [1] - 5:19<br>**open** [10] - 3:22, 10:5,<br>10:9, 16:20, 21:17, | 25:18, 51:24, 58:21,<br>64:13, 99:9<br>**open-source** [2] -<br>10:5, 99:9<br>**opened** [1] - 22:7<br>**opens** [1] - 22:3<br>**operates** [2] - 98:22,<br>108:17<br>**opinion** [6] - 36:2,<br>77:14, 78:2, 79:15,<br>81:1, 86:20<br>**opinions** [1] - 80:7<br>**opportunity** [20] -<br>37:18, 37:21, 46:5,<br>47:2, 49:13, 56:7,<br>56:11, 61:20, 89:14,<br>89:18, 91:24, 96:6,<br>100:15, 100:18,<br>102:3, 102:8,<br>103:13, 108:8,<br>112:24<br>**opposes** [1] - 27:25<br>**opposing** [1] - 34:20<br>**opposite** [1] - 76:18<br>**opposition** [2] - 81:9,<br>85:18<br>**opted** [1] - 90:22<br>**options** [2] - 34:10,<br>93:25<br>**oral** [1] - 14:4<br>**orally** [1] - 89:13<br>**order** [56] - 5:1, 5:2,<br>5:9, 5:10, 5:18, 5:23,<br>6:3, 6:8, 6:18, 6:20,<br>7:7, 7:15, 8:1, 10:18,<br>12:4, 12:6, 12:18,<br>13:9, 13:20, 14:4,<br>18:8, 18:10, 19:2,<br>19:3, 19:10, 20:6,<br>20:11, 21:12, 23:25,<br>25:4, 39:16, 40:2,<br>48:5, 48:12, 54:7,<br>68:5, 73:25, 74:1,<br>75:11, 89:9, 89:12,<br>89:15, 90:12, 95:23,<br>96:10, 96:15, 101:3,<br>101:5, 101:8, 101:9,<br>101:20, 102:6,<br>103:18, 103:19,<br>109:12, 111:13<br>**ordering** [1] - 12:15<br>**orders** [1] - 17:22<br>**original** [5] - 54:3,<br>81:9, 84:16, 84:18,<br>92:22<br>**originally** [3] - 50:8,<br>50:11, 88:16<br>**otherwise** [3] - 31:9,<br>42:8, 114:5<br>**ought** [4] - 11:6, |

38:10, 42:14, 51:11
**out-of-time** [1] - 38:17
**outed** [1] - 87:11
**outlined** [1] - 73:16
**output** [1] - 92:21
**outputs** [1] - 90:10
**outside** [1] - 103:25
**outstanding** [1] - 66:15
**overall** [1] - 94:8
**overbroad** [2] - 93:13, 93:20
**overinclusive** [1] - 102:16
**overly** [2] - 37:11, 108:1
**override** [1] - 112:20
**overstated** [1] - 36:4
**overview** [1] - 106:14
**own** [12] - 19:15, 19:25, 20:2, 42:1, 72:24, 73:18, 77:3, 81:1, 83:18, 88:6, 88:7
**owner** [1] - 71:15

## P

**p.m** [3] - 70:7, 70:8, 118:3
**Pac** [2] - 102:16, 108:2
**Pac-Man** [2] - 102:16, 108:2
**page** [2] - 81:11
**paid** [1] - 93:23
**pain** [1] - 12:15
**painfully** [1] - 89:1
**paired** [1] - 4:7
**Pandora** [2] - 60:4, 60:5
**paper** [2] - 76:12, 95:7
**papers** [3] - 63:18, 67:25, 95:11
**paperwork** [3] - 50:16, 64:1, 64:20
**paragraph** [2] - 106:4, 106:8
**parameters** [4] - 55:12, 59:7, 59:9, 62:15
**paraphrasing** [1] - 86:19
**part** [13] - 17:18, 37:13, 37:14, 40:18, 40:22, 43:19, 45:5, 50:23, 54:9, 57:10, 101:20, 110:7
**participating** [1] - 115:20
**particular** [20] - 7:5,

16:24, 19:5, 48:17, 51:21, 59:19, 63:5, 64:3, 66:3, 86:17, 87:21, 99:24, 102:11, 102:24, 105:19, 107:25, 110:20, 111:16, 115:20, 116:5
**particularly** [2] - 110:12, 111:21
**parties** [7] - 27:5, 38:13, 39:3, 55:1, 96:22, 99:17, 116:14
**partly** [1] - 37:9
**party** [3] - 41:21, 109:24, 112:23
**pass** [1] - 14:20
**passing** [1] - 4:5
**past** [2] - 63:7, 117:3
**pay** [3] - 17:12, 17:14, 47:21
**payment** [1] - 93:25
**Pearlman** [1] - 3:7
**PEARLMAN** [1] - 1:17
**peel** [4] - 39:20, 58:3, 58:9, 99:3
**peeling** [1] - 80:10
**peer** [4] - 72:7, 76:12, 76:22, 108:3
**peer-reviewed** [2] - 72:7, 76:12
**PELKER** [41] - 1:14, 3:6, 4:4, 4:15, 4:24, 5:15, 27:19, 28:3, 29:13, 30:6, 30:11, 30:17, 30:23, 31:7, 32:9, 32:14, 34:18, 34:24, 35:2, 39:8, 39:16, 42:11, 42:18, 44:9, 45:24, 47:8, 60:9, 60:15, 61:8, 61:13, 69:7, 69:20, 79:19, 83:10, 84:20, 89:21, 90:21, 90:25, 91:10, 116:8, 116:19
**Pelker** [13] - 3:6, 4:2, 32:8, 34:16, 45:23, 47:7, 48:17, 57:5, 66:9, 79:18, 90:20, 104:25, 112:6
**pendency** [1] - 92:13
**pending** [6] - 31:18, 32:3, 34:6, 44:2, 68:23, 99:18
**Pennsylvania** [1] - 1:15
**people** [7] - 7:9, 19:14, 38:7, 53:7, 53:8, 65:2, 68:14
**perceived** [1] - 80:8

**percent** [6] - 21:18, 37:25, 58:10, 62:7, 84:9, 84:10
**performed** [2] - 55:21, 113:2
**perhaps** [8] - 10:18, 52:19, 61:25, 66:16, 93:8, 104:22, 109:13, 115:20
**period** [1] - 103:5
**periods** [1] - 42:25
**permitted** [1] - 67:8
**perpetually** [1] - 88:5
**person** [3] - 19:25, 53:9, 100:5
**personal** [1] - 71:18
**persuaded** [2] - 23:16, 51:13
**petition** [1] - 89:14
**phrase** [2] - 16:5, 56:12
**pick** [1] - 46:23
**Pickett** [8] - 41:13, 86:11, 87:3, 87:16, 87:25, 111:23, 111:24, 112:1
**picking** [2] - 9:6, 21:21
**piece** [2] - 36:6, 80:22
**pin** [3] - 9:5, 45:16, 91:12
**pinch** [1] - 57:6
**pinch-hit** [1] - 57:6
**Pirosko** [8] - 81:14, 82:1, 111:8, 111:19, 111:21, 111:22, 111:25, 113:18
**place** [2] - 57:17, 100:3
**places** [2] - 65:3, 69:25
**Plaintiff** [2] - 1:3, 1:12
**planning** [1] - 31:9
**pleading** [1] - 65:7
**pleadings** [1] - 50:9
**plenty** [1] - 25:8
**PLLC** [1] - 1:21
**podcast** [1] - 115:15
**podium** [1] - 3:4
**point** [61] - 5:3, 5:7, 13:2, 14:5, 16:4, 22:14, 22:24, 27:3, 35:6, 38:24, 39:8, 41:10, 42:5, 42:7, 42:16, 48:2, 48:3, 48:14, 49:19, 50:7, 50:16, 50:21, 52:23, 53:22, 60:15, 61:24, 61:25, 63:7, 64:15, 64:19, 65:6, 65:14,

67:5, 67:14, 67:16, 67:21, 75:17, 77:8, 78:9, 78:11, 78:18, 78:23, 78:24, 83:11, 84:6, 84:7, 84:12, 84:14, 85:8, 87:15, 88:3, 88:5, 88:23, 89:5, 90:18, 91:4, 97:5, 108:13, 109:3, 113:17, 117:10
**pointed** [3] - 41:10, 81:19, 112:6
**pointing** [2] - 37:3, 40:14
**points** [4] - 79:11, 79:19, 84:9, 84:10
**political** [1] - 48:23
**pool** [1] - 48:21
**pornography** [2] - 112:15, 112:17
**portion** [4] - 9:25, 18:12, 36:20, 101:3
**posed** [1] - 56:16
**position** [7] - 22:2, 39:5, 41:3, 69:13, 83:12, 97:1, 97:7
**positions** [1] - 81:13
**positives** [1] - 76:11
**possession** [1] - 92:25
**possibility** [3] - 30:25, 31:7, 70:21
**possible** [11] - 6:16, 13:21, 33:4, 53:7, 69:13, 69:19, 73:23, 91:3, 103:14, 106:10, 107:15
**possibly** [2] - 9:10, 9:12
**posting** [1] - 48:8
**postpone** [3] - 33:12, 46:24, 47:1
**potential** [6] - 11:13, 44:13, 48:6, 59:8, 64:23, 105:13
**potentially** [6] - 30:12, 35:8, 46:24, 84:1, 98:11, 107:9
**power** [2] - 32:16, 104:2
**pre** [1] - 35:17
**pre-judge** [1] - 35:17
**precise** [1] - 61:25
**precisely** [1] - 58:7
**precision** [3] - 96:3, 97:22, 100:20
**precludes** [1] - 17:4
**predicated** [1] - 87:22
**prefer** [5] - 116:14, 116:15, 116:17,

116:18, 116:21
**preference** [1] - 26:3
**prejudice** [1] - 67:18
**preliminary** [1] - 14:6
**preparation** [2] - 3:25, 98:13
**prepare** [8] - 20:17, 29:11, 96:1, 97:3, 97:22, 100:19, 102:6, 111:11
**prepared** [5] - 28:8, 34:22, 45:12, 49:18, 101:4
**preponderance** [1] - 27:4
**preposterous** [1] - 65:23
**present** [3] - 3:12, 12:10, 60:10
**presentation** [1] - 95:7
**presented** [4] - 71:10, 76:13, 88:6, 112:13
**presenting** [1] - 62:4
**President** [3] - 70:17, 70:20, 73:13
**pressed** [1] - 37:6
**pressing** [1] - 3:23
**presumably** [1] - 34:8
**presumptuous** [1] - 31:13
**PRETRIAL** [2] - 1:4, 1:8
**pretrial** [10] - 3:21, 22:5, 42:22, 42:25, 45:2, 78:12, 92:1, 92:4, 92:7, 112:25
**pretty** [5] - 33:25, 53:19, 54:9, 58:15, 100:2
**prevent** [1] - 72:23
**prevented** [1] - 7:5
**previously** [10] - 35:18, 93:12, 94:9, 94:15, 96:10, 98:20, 106:15, 109:19, 111:6, 115:10
**price** [1] - 93:23
**primary** [1] - 22:21
**principal** [3] - 49:9, 51:7, 100:24
**principle** [1] - 17:6
**print** [2] - 20:9, 68:10
**printing** [1] - 68:9
**prisoner** [1] - 48:23
**private** [3] - 10:14, 72:24, 75:22
**privately** [2] - 13:24, 47:16
**prize** [1] - 90:6

**pro** [1] - 3:11
**probabilistic** [2] - 41:20, 87:20
**probe** [1] - 80:3
**problem** [8] - 7:1, 21:21, 43:21, 74:15, 105:13, 105:14, 108:1
**problematic** [2] - 8:17, 65:4
**problems** [1] - 107:25
**procedural** [1] - 93:6
**procedurally** [1] - 114:13
**Procedure** [1] - 92:6
**proceed** [14] - 9:9, 11:22, 23:13, 24:15, 43:9, 44:17, 44:25, 45:20, 45:21, 45:22, 46:1, 46:10, 70:11, 109:2
**proceeding** [7] - 47:13, 47:15, 47:19, 47:20, 48:1, 58:25, 108:23
**proceedings** [3] - 29:19, 70:8, 119:6
**process** [10] - 4:11, 20:19, 22:1, 22:14, 39:7, 51:20, 68:24, 74:20, 100:2, 103:16
**processing** [2] - 60:20, 106:21
**produced** [3] - 5:4, 71:9, 74:12
**product** [2] - 105:20, 106:10
**product's** [1] - 106:21
**production** [6] - 13:12, 39:11, 80:9, 101:8, 103:16, 113:11
**program** [4] - 41:19, 75:24, 110:8, 111:3
**programmers** [1] - 105:24
**programs** [2] - 18:18, 91:8
**progress** [1] - 4:21
**project** [2] - 64:11, 105:20
**prompt** [1] - 38:1
**prompted** [1] - 103:9
**promptly** [1] - 64:16
**prongs** [1] - 109:25
**proper** [2] - 56:11, 74:20
**properly** [2] - 4:17, 79:12
**property** [4] - 87:5,

87:13, 93:6, 93:7
**propose** [2] - 18:5, 18:7
**proposed** [6] - 5:8, 6:3, 10:23, 18:8, 63:25, 104:11
**proposes** [1] - 94:22
**proposing** [5] - 20:16, 20:18, 23:23, 73:21
**proprietary** [4] - 15:10, 15:14, 39:25, 57:11
**prosecution** [3] - 52:16, 95:8, 115:10
**protected** [1] - 14:5
**protecting** [2] - 87:4, 87:12
**protective** [28] - 5:2, 5:9, 5:10, 5:18, 5:23, 6:3, 6:8, 6:18, 6:20, 7:15, 8:1, 10:18, 13:9, 17:22, 18:8, 18:10, 19:2, 19:3, 19:10, 20:6, 21:12, 25:4, 68:5, 75:11, 89:9, 89:15, 101:5, 101:9
**provide** [22] - 5:14, 5:22, 6:10, 14:15, 14:18, 39:13, 49:20, 52:3, 68:21, 69:16, 70:3, 84:21, 92:16, 97:19, 98:12, 100:4, 103:10, 103:20, 104:7, 108:25, 109:8, 115:25
**provided** [27] - 4:16, 9:22, 13:15, 13:16, 15:2, 40:12, 49:16, 49:18, 55:22, 56:5, 59:10, 59:15, 60:14, 62:13, 65:9, 84:22, 86:24, 97:12, 97:14, 100:14, 101:10, 103:19, 104:19, 109:20, 110:15, 114:2, 114:7
**provides** [3] - 103:2, 105:5, 109:22
**providing** [1] - 111:10
**provisions** [1] - 10:20
**proviso** [1] - 19:3
**public** [7] - 10:5, 48:11, 60:6, 62:17, 62:24, 87:10, 87:23
**publicity** [2] - 42:22, 48:6
**publicly** [2] - 48:15, 110:19
**pulled** [4] - 39:13,

83:22, 91:1
**purchase** [1] - 93:22
**purely** [2] - 72:17, 74:17
**purport** [1] - 110:14
**purports** [1] - 104:17
**purpose** [4] - 12:8, 86:6, 106:2, 115:1
**purposes** [11] - 6:6, 10:24, 12:10, 20:17, 36:19, 59:22, 60:1, 94:21, 98:13, 113:15, 115:23
**pursuant** [1] - 108:24
**push** [1] - 33:17
**put** [19] - 12:12, 16:8, 22:7, 25:5, 26:1, 26:11, 30:19, 40:3, 40:6, 46:4, 52:15, 65:10, 73:4, 79:25, 83:11, 84:10, 95:23, 96:25, 104:25
**puts** [2] - 22:3, 54:15
**putting** [5] - 15:15, 16:19, 39:5, 49:25, 75:22

### Q

**qualified** [2] - 40:2, 63:11
**qualifies** [2] - 72:17, 79:21
**quash** [2] - 67:17, 95:15
**quashed** [2] - 67:11, 95:18
**query** [1] - 106:11
**questioning** [2] - 75:20, 110:4
**questions** [21] - 36:11, 46:15, 46:19, 47:10, 56:14, 58:5, 63:12, 63:13, 64:3, 65:8, 65:9, 66:2, 79:17, 90:19, 99:9, 103:11, 103:12, 113:21, 115:1
**quick** [1] - 86:10
**quicker** [1] - 47:3
**quickly** [5] - 6:16, 79:3, 96:8, 96:23, 97:6
**quite** [12] - 5:5, 9:14, 28:22, 40:25, 52:19, 56:20, 56:21, 76:21, 78:24, 99:6, 102:2, 111:20
**quote** [1] - 57:22
**quotes** [1] - 112:22

### R

**radar** [3] - 39:4, 117:22, 117:23
**Rainer** [1] - 95:5
**raise** [6] - 48:19, 48:20, 66:6, 66:10, 67:11, 68:5
**raised** [7] - 13:16, 13:18, 61:23, 95:20, 102:18, 113:21, 116:2
**raises** [2] - 71:19, 99:9
**raising** [3] - 16:4, 47:16, 47:19
**ramifications** [2] - 44:12, 44:24
**ran** [1] - 8:3
**RANDOLPH** [1] - 1:8
**rare** [1] - 82:6
**rate** [9] - 73:22, 74:2, 76:22, 77:6, 79:14, 108:3, 108:4, 108:6, 108:16
**rates** [5] - 71:4, 71:5, 76:10, 76:11
**rather** [7] - 9:14, 10:2, 14:9, 28:23, 50:10, 85:21, 88:9
**rational** [2] - 86:18, 86:21
**reach** [1] - 104:23
**reached** [1] - 77:3
**reaching** [1] - 104:4
**Reactor** [21] - 36:4, 62:19, 62:22, 76:4, 78:4, 83:3, 83:8, 92:7, 92:8, 92:12, 95:21, 95:25, 98:5, 99:11, 99:20, 100:21, 106:9, 106:10, 106:13, 106:17, 110:8
**read** [9] - 19:20, 21:6, 24:5, 36:24, 90:1, 94:16, 94:17, 94:20, 101:1
**readable** [2] - 105:18, 106:1
**reading** [3] - 31:11, 51:20, 101:2
**reads** [1] - 24:6
**ready** [3] - 38:6, 69:17, 69:19
**real** [3] - 52:23, 53:8, 86:4
**really** [29] - 7:13, 16:15, 17:9, 17:10, 21:2, 21:24, 22:9, 29:9, 31:5, 36:19,

37:5, 37:11, 43:13, 43:15, 51:10, 57:4, 69:13, 70:16, 70:20, 75:6, 79:22, 79:24, 80:12, 81:1, 81:16, 82:9, 85:4, 85:18, 86:5
**realm** [1] - 50:17
**reams** [2] - 110:25, 111:1
**reason** [18] - 21:24, 22:9, 25:22, 32:12, 36:11, 37:23, 38:4, 38:10, 47:20, 57:10, 63:6, 64:12, 70:25, 71:1, 71:14, 72:9, 74:16, 78:15
**reasonable** [1] - 11:4
**reasons** [12] - 35:18, 56:17, 61:22, 72:10, 76:19, 77:16, 79:9, 83:15, 85:17, 104:2, 109:19, 114:9
**received** [7] - 43:24, 44:21, 44:23, 46:9, 64:20, 99:6, 104:12
**receives** [1] - 21:25
**receiving** [1] - 99:16
**recently** [2] - 76:19, 82:22
**Recess** [3] - 25:6, 34:11, 91:22
**recess** [3] - 14:24, 29:18, 70:7
**recipient** [1] - 54:11
**recognize** [2] - 61:17, 82:9
**recognized** [1] - 64:10
**recognizing** [1] - 93:8
**recommend** [1] - 96:8
**record** [21] - 3:5, 4:9, 12:4, 21:2, 28:10, 34:19, 34:21, 34:25, 37:24, 40:10, 42:19, 43:2, 43:7, 45:25, 46:2, 58:21, 60:7, 64:6, 73:9, 87:2, 87:6
**recorder** [1] - 70:15
**recordings** [2] - 70:17, 73:13
**records** [9] - 4:2, 4:18, 62:17, 85:12, 93:21, 93:25, 94:1, 94:25
**recreate** [2] - 62:21, 74:6
**reel** [2] - 70:15
**reel-to-reel** [1] - 70:15
**reference** [4] - 35:20, 59:20, 60:23, 61:14

**referenced** [1] - 61:10
**referred** [1] - 115:13
**referring** [5] - 31:23,
  72:21, 83:2, 83:3,
  111:23
**refers** [1] - 105:18
**regard** [6] - 35:9,
  37:22, 62:12, 63:25,
  64:19, 87:15
**regarding** [7] - 6:1,
  48:12, 59:13, 64:7,
  81:5, 93:22, 99:22
**regardless** [1] - 10:12
**regularly** [1] - 98:16
**reissued** [1] - 67:7
**reissuing** [4] - 67:9,
  67:13, 67:16, 67:20
**reiterated** [1] - 97:18
**rejected** [1] - 91:18
**related** [8] - 21:14,
  73:2, 73:16, 80:8,
  94:4, 95:6, 102:23,
  106:19
**relates** [4] - 20:14,
  50:2, 60:11, 102:12
**relating** [10] - 36:18,
  53:24, 60:18, 81:18,
  81:25, 85:20, 89:23,
  91:17, 92:17, 96:23
**relation** [4] - 25:20,
  71:9, 90:3, 102:9
**relationship** [1] -
  54:13
**relatively** [1] - 65:7
**relax** [1] - 51:21
**relaxed** [1] - 110:9
**relaxing** [1] - 110:10
**released** [1] - 94:6
**relevance** [4] - 50:20,
  67:24, 79:23, 96:17
**relevancy** [1] - 109:21
**relevant** [8] - 73:15,
  78:14, 80:20, 92:21,
  96:20, 98:11, 100:5,
  107:9
**reliability** [4] - 78:8,
  112:23, 113:8,
  113:16
**reliable** [2] - 80:15,
  83:15
**Reliance** [1] - 99:9
**relied** [1] - 80:1
**rely** [3] - 39:10, 43:17,
  43:20
**relying** [4] - 37:13,
  40:23, 43:21, 80:5
**remain** [1] - 63:25
**remains** [1] - 64:19
**remember** [3] - 27:7,
  60:25, 88:15

**reminded** [1] - 97:18
**rent** [1] - 64:23
**rent-a-CTO** [1] - 64:23
**repeat** [1] - 89:1
**repeated** [2] - 53:19,
  87:9
**repeatedly** [5] - 81:2,
  86:23, 86:24,
  114:14, 115:13
**repeating** [1] - 107:3
**repercussions** [1] -
  24:18
**report** [23] - 22:4,
  22:12, 23:2, 24:19,
  35:24, 35:25, 36:2,
  36:17, 37:20, 38:20,
  39:20, 42:13, 43:14,
  58:20, 58:21, 60:10,
  60:17, 61:14, 61:18,
  84:4, 84:16, 100:8,
  113:9
**Reporter** [3] - 2:21,
  2:21, 119:10
**reporter** [1] - 94:4
**REPORTER** [1] -
  119:1
**reporting** [1] - 48:22
**reports** [7] - 15:9,
  22:11, 38:17, 42:8,
  80:8, 83:16, 100:10
**represent** [1] - 43:8
**represented** [4] -
  67:19, 67:25, 93:2,
  104:20
**representing** [1] -
  53:3
**request** [25] - 4:7,
  21:1, 29:7, 29:23,
  65:15, 69:15, 76:20,
  81:17, 85:8, 85:10,
  89:12, 89:17, 89:18,
  91:16, 93:14, 94:9,
  94:17, 94:20, 97:20,
  104:24, 105:1,
  105:16, 106:8,
  107:6, 109:20
**requested** [4] - 4:6,
  68:19, 75:23, 106:20
**requesting** [2] - 24:16,
  45:13
**requests** [7] - 37:11,
  75:22, 86:6, 94:8,
  114:20, 114:24,
  115:19
**require** [1] - 34:1
**required** [4] - 45:18,
  75:13, 103:20, 113:4
**requirement** [1] -
  104:6
**requires** [2] - 50:19,

109:21
**rescinded** [1] - 66:18
**research** [2] - 82:12,
  95:12
**researched** [1] - 17:18
**researcher** [1] - 95:2
**researchers** [1] -
  95:12
**reserve** [3] - 29:10,
  77:12, 79:2
**reserved** [2] - 31:16,
  38:7
**resided** [1] - 103:25
**resolution** [1] - 104:24
**resolve** [1] - 97:6
**respect** [41] - 5:3,
  7:15, 13:14, 17:11,
  19:5, 20:6, 20:15,
  26:22, 26:25, 27:6,
  35:15, 37:1, 37:3,
  38:3, 40:19, 44:24,
  45:7, 48:5, 48:6,
  62:9, 75:3, 76:23,
  83:8, 97:14, 98:1,
  98:14, 98:22, 99:1,
  99:6, 99:8, 101:5,
  103:3, 103:18,
  104:24, 105:16,
  108:16, 109:14,
  110:11, 114:16,
  116:1, 116:4
**respond** [3] - 37:21,
  65:12, 66:19
**responded** [3] - 63:14,
  63:15, 96:12
**responding** [1] -
  107:5
**responds** [1] - 92:23
**response** [7] - 39:16,
  57:8, 59:11, 86:4,
  101:7, 102:7, 108:7
**responses** [2] - 99:16,
  100:2
**responsive** [3] -
  38:20, 56:4, 103:12
**rest** [1] - 65:10
**restrict** [1] - 6:4
**restriction** [1] - 5:25
**restrictive** [1] - 6:9
**result** [4] - 44:1,
  62:18, 63:1
**results** [3] - 36:24,
  62:22, 108:21
**resume** [1] - 101:21
**retained** [2] - 47:15,
  47:24
**retains** [1] - 54:21
**return** [1] - 92:4
**reveal** [2] - 100:7,
  100:11

**review** [22] - 7:16,
  8:10, 8:16, 12:5,
  12:11, 14:1, 15:16,
  15:23, 17:25, 65:6,
  67:23, 76:22, 91:24,
  97:10, 97:23, 98:10,
  98:24, 107:22,
  108:3, 108:9, 108:12
**reviewed** [8] - 5:7,
  72:7, 76:12, 84:15,
  93:4, 97:15, 100:8,
  106:15
**reviewing** [3] - 15:8,
  21:4, 108:10
**revise** [1] - 8:1
**ringing** [1] - 60:24
**rise** [1] - 107:17
**risk** [3] - 11:20, 62:3,
  66:4
**RMR** [2] - 2:21, 119:9
**road** [1] - 117:6
**rock** [1] - 54:9
**rock-solid** [1] - 54:9
**role** [1] - 53:1
**Rollet** [1] - 95:6
**ROMAN** [1] - 1:5
**Roman** [2] - 3:3, 3:12
**room** [1] - 88:14
**Room** [2] - 2:22,
  119:10
**round** [1] - 80:9
**Roundup** [1] - 82:17
**rule** [1] - 94:13
**Rule** [34] - 5:6, 5:14,
  39:9, 40:11, 51:12,
  52:9, 52:12, 54:4,
  54:8, 68:20, 72:17,
  78:12, 79:21, 92:1,
  92:5, 92:6, 93:5,
  93:9, 93:13, 94:10,
  95:19, 96:11, 96:15,
  98:3, 100:18,
  106:25, 107:1,
  109:20, 111:5,
  112:8, 114:10,
  114:19
**rules** [3] - 17:2, 54:15,
  101:4
**Rules** [2] - 68:20,
  68:24
**ruling** [6] - 35:9, 88:4,
  91:21, 92:17,
  115:24, 116:4
**run** [19] - 8:5, 8:19,
  8:24, 8:25, 9:23,
  13:5, 18:18, 18:25,
  30:10, 33:18, 51:9,
  54:8, 62:16, 65:16,
  83:5, 83:17, 83:18,
  108:20, 110:20

**running** [6] - 9:6,
  15:18, 55:5, 55:7,
  79:6, 84:4
**runs** [1] - 18:25

## S

**Salah** [6] - 7:6,
  101:25, 102:18,
  103:18, 103:20,
  103:23
**Salah's** [1] - 101:21
**sales** [1] - 93:24
**San** [1] - 2:4
**Sarah** [1] - 95:6
**satisfied** [1] - 40:12
**satisfy** [5] - 94:10,
  96:11, 96:15,
  100:18, 114:19
**satisfying** [1] - 106:23
**saw** [2] - 6:19, 72:4
**scanned** [1] - 79:3
**scary** [2] - 117:1,
  117:9
**scenario** [1] - 73:20
**schedule** [3] - 42:3,
  69:10, 116:10
**scheduled** [1] - 33:19
**schedules** [1] - 38:7
**Science** [1] - 95:4
**science** [2] - 90:4,
  90:17
**scientific** [4] - 72:6,
  73:7, 76:12, 90:14
**scope** [2] - 6:25, 99:23
**scratch** [1] - 51:14
**seal** [1] - 58:25
**sealed** [1] - 21:4
**search** [2] - 75:16,
  109:22
**searched** [1] - 17:21
**searching** [1] - 28:14
**second** [3] - 53:10,
  56:17, 92:2
**secret** [3] - 15:15,
  74:18, 76:7
**section** [1] - 105:17
**Security** [1] - 95:7
**see** [40] - 4:22, 5:13,
  6:8, 11:23, 18:23,
  21:9, 21:16, 23:4,
  27:14, 30:20, 32:13,
  33:14, 43:14, 48:18,
  50:24, 50:25, 56:22,
  57:20, 58:2, 63:21,
  65:17, 67:24, 72:1,
  74:21, 75:6, 76:18,
  76:21, 78:14, 82:7,
  83:18, 90:10, 90:13,
  93:15, 102:12,

102:15, 105:13, 105:21, 107:11, 108:21, 111:15

**seeing** [4] - 4:8, 20:21, 21:19, 21:20

**seek** [2] - 22:25, 93:15

**seeking** [11] - 52:17, 53:24, 72:9, 73:1, 83:8, 84:13, 92:7, 93:4, 103:3, 109:24, 112:23

**seeks** [4] - 92:6, 92:12, 113:8, 113:10

**seem** [3] - 40:21, 74:19, 100:3

**SEFRANEK** [1] - 119:3

**Sefranek** [3] - 2:21, 119:9, 119:9

**segregate** [1] - 19:25

**segregated** [1] - 9:25

**segregating** [1] - 19:14

**selective** [1] - 74:14

**self** [4] - 64:23, 94:2, 95:1, 112:3

**self-described** [1] - 64:23

**send** [1] - 65:24

**senior** [1] - 32:23

**sense** [8] - 11:13, 12:20, 28:15, 41:1, 50:17, 52:11, 92:17, 96:11

**sensitive** [3] - 81:6, 81:7, 81:18

**sent** [4] - 68:13, 71:17, 95:12, 101:21

**sentencing** [6] - 26:14, 26:15, 26:21, 27:3, 27:22, 61:24

**separate** [2] - 13:11, 21:14

**September** [3] - 1:6, 104:11, 119:7

**sequence** [1] - 88:22

**seriously** [1] - 40:11

**served** [4] - 89:17, 93:11, 93:19, 115:2

**services** [1] - 64:24

**set** [13] - 30:12, 30:25, 60:19, 60:21, 65:15, 69:13, 69:18, 73:7, 82:3, 83:15, 85:16, 85:17, 105:18

**sets** [1] - 95:10

**setting** [1] - 31:2

**settings** [1] - 112:21

**setup** [1] - 85:16

**several** [6] - 3:23,

47:12, 64:13, 80:11, 81:9, 96:14

**sexual** [1] - 81:8

**share** [4] - 4:21, 13:23, 22:19, 112:21

**shared** [1] - 17:7

**shares** [1] - 19:23

**shelf** [1] - 39:13

**shifting** [1] - 109:11

**shoes** [2] - 51:10, 51:11

**short** [4] - 17:24, 29:23, 30:11, 70:1

**shortly** [1] - 3:11

**show** [3] - 10:8, 53:9, 66:16

**showing** [14] - 41:24, 67:21, 75:3, 81:19, 87:8, 96:16, 96:17, 109:21, 110:11, 111:18, 111:20, 112:2, 113:4, 114:18

**shown** [2] - 15:8, 113:14

**shows** [2] - 105:23, 111:12

**shut** [1] - 86:4

**sic** [2] - 19:5, 69:24

**side** [3] - 11:9, 22:8, 41:10

**sign** [6] - 6:20, 6:22, 6:24, 8:4, 20:10, 101:9

**signed** [3] - 4:9, 25:5, 68:11

**significant** [3] - 23:19, 99:9, 101:6

**similar** [3] - 41:19, 82:4, 91:14

**similarly** [1] - 99:1

**simple** [3] - 19:8, 33:17, 98:15

**simply** [9] - 18:12, 59:1, 72:24, 81:4, 98:14, 99:2, 99:8, 107:23, 111:13

**single** [3] - 75:9, 85:12, 85:13

**singular** [1] - 22:12

**sit** [3] - 13:24, 89:2, 101:13

**site** [2] - 40:6, 57:21

**sitting** [2] - 19:18, 55:15

**situation** [3] - 38:14, 86:14

**six** [1] - 98:2

**Sixth** [2] - 81:14, 113:17

**skeptical** [1] - 35:17

**skyrocket** [1] - 87:21

**slightly** [1] - 89:5

**slow** [1] - 117:2

**small** [3] - 6:9, 61:10, 61:15

**Sofia** [1] - 95:6

**software** [50] - 8:6, 19:24, 20:25, 22:22, 40:8, 55:21, 63:6, 65:2, 65:24, 76:16, 80:2, 80:14, 81:6, 81:7, 81:23, 81:25, 82:8, 82:10, 82:21, 83:2, 83:5, 83:9, 83:13, 83:14, 83:19, 90:12, 91:8, 92:13, 92:20, 92:24, 95:13, 100:21, 105:19, 105:22, 106:9, 106:19, 108:17, 108:19, 108:20, 108:21, 108:22, 109:6, 109:17, 111:11, 112:11, 112:20, 113:12, 113:21, 113:22, 114:3

**solid** [1] - 54:9

**someone** [6] - 9:25, 26:24, 32:24, 96:7, 100:23, 112:3

**somewhat** [10] - 40:20, 47:18, 51:15, 51:22, 53:11, 79:20, 110:3, 110:5, 110:9, 115:17

**somewhere** [1] - 72:5

**soon** [1] - 13:20

**sooner** [1] - 39:4

**sophisticated** [2] - 74:25, 75:5

**sorry** [6] - 15:11, 15:13, 24:1, 57:3, 63:8, 111:22

**sort** [17] - 24:12, 35:20, 50:2, 53:14, 54:11, 57:14, 58:12, 62:13, 65:12, 72:15, 76:17, 79:5, 79:10, 82:2, 85:22, 86:12, 90:16

**sought** [10] - 87:1, 92:9, 92:14, 92:19, 93:21, 94:1, 98:4, 98:5, 101:7, 103:21

**sound** [1] - 36:23

**source** [112] - 10:5, 10:9, 13:11, 13:13, 20:1, 20:14, 21:10, 21:13, 22:21, 23:4,

23:15, 25:20, 26:5, 26:17, 35:9, 35:16, 40:5, 40:20, 42:6, 43:15, 49:2, 50:7, 55:11, 62:24, 63:9, 63:17, 65:6, 65:24, 71:1, 72:9, 73:2, 73:15, 73:21, 75:2, 75:4, 75:6, 75:14, 75:15, 75:24, 77:17, 80:5, 80:20, 80:24, 81:6, 82:5, 82:7, 82:21, 83:25, 84:1, 84:3, 85:11, 86:16, 87:23, 90:8, 90:9, 90:13, 91:7, 91:15, 91:17, 92:1, 92:7, 92:9, 92:20, 92:24, 94:18, 94:20, 95:11, 95:21, 95:25, 96:18, 97:18, 98:5, 98:9, 98:10, 98:13, 98:23, 98:24, 99:4, 99:9, 99:11, 99:14, 99:20, 99:22, 100:11, 102:2, 102:5, 102:12, 102:23, 103:21, 103:22, 104:9, 104:10, 105:6, 105:16, 105:17, 105:22, 106:5, 106:8, 106:16, 107:2, 107:7, 107:8, 107:22, 107:24, 108:5, 108:9, 108:12, 108:14, 108:20, 109:13, 110:12

**sources** [3] - 60:1, 92:22, 99:12

**Spain** [1] - 10:12

**speaking** [2] - 15:7, 15:11

**specific** [15] - 27:19, 27:23, 36:9, 39:22, 55:14, 64:2, 73:15, 81:19, 81:20, 81:24, 82:16, 95:22, 96:16, 99:6, 103:13

**specifically** [6] - 7:25, 37:7, 81:24, 82:6, 90:9, 91:14

**specification** [2] - 14:8, 111:16

**specificity** [15] - 50:20, 62:5, 63:11, 63:19, 87:1, 87:2, 88:9, 96:10, 96:24, 97:14, 99:20, 102:4,

103:2, 103:4, 109:22

**specifics** [4] - 38:4, 41:4, 60:6, 98:20

**specified** [2] - 50:15, 52:14

**specify** [3] - 65:21, 96:2, 98:8

**specifying** [1] - 100:20

**spelled** [2] - 64:1, 87:6

**spend** [3] - 36:22, 45:2, 102:10

**spent** [2] - 64:22, 87:17

**spoken** [1] - 23:22

**spreadsheet** [3] - 56:21, 62:23, 84:5

**spreadsheets** [4] - 56:25, 62:20, 74:4, 84:23

**spring** [2] - 23:8, 28:12

**stage** [1] - 20:19

**stand** [1] - 51:10

**standard** [12] - 50:19, 51:3, 52:19, 82:3, 94:10, 95:16, 95:19, 96:11, 106:23, 109:21, 110:9, 110:10

**standards** [4] - 51:15, 51:22, 90:14, 109:25

**standing** [1] - 61:6

**stands** [1] - 51:11

**start** [4] - 32:2, 45:12, 49:5, 49:7

**started** [2] - 22:17, 49:15

**starting** [7] - 3:5, 30:5, 30:8, 31:17, 31:24, 34:2, 84:5

**starts** [1] - 81:11

**State** [2] - 16:20, 41:13

**state** [8] - 3:4, 33:7, 40:10, 41:11, 45:25, 90:24, 90:25, 91:13

**statement** [9] - 96:2, 97:22, 99:21, 100:4, 100:19, 103:19, 104:13, 104:17, 107:6

**statements** [3] - 48:11, 87:10, 115:25

**States** [10] - 2:22, 3:3, 3:7, 70:14, 70:17, 91:10, 104:1, 110:1, 111:8, 113:18

**STATES** [3] - 1:1, 1:2, 1:9

states [2] - 64:14, 91:15
statistical [1] - 87:19
status [3] - 30:25, 32:6, 69:11
stay [2] - 47:24, 103:1
stayed [2] - 25:6, 34:11
stenographic [1] - 119:5
step [8] - 6:12, 13:1, 13:3, 14:6, 14:22, 62:10, 62:13
step-by-step [1] - 62:13
steps [3] - 14:22, 15:24, 69:10
Sterlingov [28] - 3:3, 3:12, 16:17, 21:25, 22:23, 24:12, 24:14, 25:10, 25:16, 25:24, 27:17, 28:11, 28:16, 29:4, 29:16, 29:23, 34:13, 42:20, 42:24, 43:5, 43:7, 44:8, 46:5, 48:22, 61:23, 108:23, 109:1, 116:12
STERLINGOV [1] - 1:5
Sterlingov's [4] - 28:19, 43:2, 69:15, 109:4
still [43] - 4:8, 6:4, 7:20, 7:22, 8:22, 9:2, 9:3, 9:21, 10:11, 10:17, 15:7, 15:16, 16:10, 17:25, 18:13, 19:12, 20:17, 23:22, 24:5, 26:4, 35:13, 36:15, 38:14, 47:19, 63:10, 63:21, 68:7, 71:3, 71:4, 72:6, 77:2, 83:21, 84:25, 86:1, 86:13, 100:10, 102:16, 104:5, 104:12, 104:20, 110:10, 113:10
still's [4] - 7:16, 42:13, 79:15, 100:8
Still's [1] - 7:21
stories [1] - 87:11
story [1] - 17:24
straw [3] - 57:20, 57:25
Street [3] - 1:13, 1:22, 2:3
stressed [1] - 112:12
stresses [1] - 113:19
strike [2] - 29:12, 95:16

strikes [1] - 115:7
strikingly [1] - 94:15
stringent [1] - 10:19
stripped [1] - 48:10
stronger [5] - 41:2, 41:3, 41:6, 41:7, 57:6
strongly [2] - 27:25, 34:20
structure [1] - 19:17
study [2] - 98:6, 105:21
stuff [4] - 8:12, 12:2, 76:13, 76:14
Stutz [1] - 95:5
subject [4] - 19:4, 27:12, 42:6, 76:5
submit [1] - 4:16
submitted [3] - 11:11, 20:23, 112:19
submitting [1] - 3:10
subpoena [24] - 5:6, 50:18, 53:5, 63:21, 66:16, 66:18, 67:5, 73:5, 78:11, 78:12, 92:1, 92:4, 92:7, 93:9, 93:11, 93:19, 94:9, 94:16, 95:15, 95:18, 98:3, 98:4, 114:10
subpoenas [5] - 54:10, 66:22, 67:9, 93:10, 115:9
subsequent [1] - 19:4
substance [1] - 114:18
substantial [4] - 41:25, 49:17, 49:24, 67:21
substantiated [1] - 50:15
sudden [1] - 22:4
Sue [1] - 115:15
sue [1] - 87:9
sufficiency [1] - 39:9
sufficient [7] - 4:16, 28:5, 56:6, 78:16, 106:17, 112:24, 113:24
sufficiently [2] - 13:15, 13:17
suggest [1] - 25:9
suggested [6] - 36:5, 52:18, 101:11, 101:13, 110:4, 114:24
suggesting [2] - 112:13, 112:19
suggests [1] - 85:19
sum [1] - 82:14

summary [1] - 58:17
Super [1] - 41:17
Superior [2] - 34:7, 41:15
superiors [1] - 8:4
supersede [1] - 68:22
supplement [1] - 60:21
supplemental [3] - 4:17, 39:11, 83:17
supply [1] - 113:1
support [5] - 109:8, 112:12, 112:18, 114:17, 115:17
supports [1] - 86:22
suppose [2] - 55:9, 114:20
supposed [3] - 63:17, 68:12, 106:21
supposedly [1] - 63:13
Supreme [4] - 41:12, 52:14, 53:15, 93:16
surprised [4] - 13:8, 76:5, 76:6, 76:10
surprising [1] - 75:17
suspect [2] - 71:14, 106:4
sustain [1] - 101:6
sympathetic [2] - 95:22, 110:3
Symposium [1] - 95:8
system [5] - 8:24, 8:25, 9:25, 18:24, 106:14
systems [11] - 6:11, 8:12, 8:19, 15:18, 18:14, 18:15, 19:6, 19:18, 74:25, 106:11, 107:14

## T

table [1] - 79:4
tables [1] - 62:12
tactic [1] - 85:23
tactical [1] - 82:25
tainting [2] - 48:6, 48:24
takedown [1] - 60:11
talks [1] - 82:20
TAMARA [1] - 119:3
Tamara [3] - 2:21, 119:9, 119:9
tangent [1] - 10:15
tape [3] - 70:15, 70:17, 70:21
tapes [1] - 52:17
targeted [4] - 37:5, 97:20, 114:21

tasks [1] - 113:2
TAUSEEF [1] - 1:21
Tauseef [1] - 3:10
team [2] - 15:23, 19:9
tech [1] - 40:8
technical [2] - 56:12, 80:13
techniques [1] - 98:16
technologies [1] - 90:16
technology [13] - 39:25, 40:1, 64:24, 70:14, 70:15, 70:19, 73:12, 73:25, 74:21, 75:19, 76:7, 90:7, 90:15
Technology [1] - 95:4
tecum [1] - 92:5
teed [1] - 37:10
telephone [1] - 97:5
tellingly [1] - 113:25
temporary [1] - 10:19
ten [1] - 79:4
tends [1] - 16:8
terms [8] - 6:9, 6:18, 12:24, 26:15, 72:2, 87:15, 87:24, 90:8
test [4] - 40:3, 40:5, 50:19, 57:25
testified [3] - 55:18, 71:3, 102:10
testify [2] - 39:20, 79:25
testifying [1] - 54:14
testimony [10] - 23:2, 36:16, 53:24, 53:25, 80:21, 83:16, 84:25, 86:22, 110:6, 110:7
testing [1] - 82:8
tests [2] - 74:1, 83:18
textbook [1] - 106:5
Thanksgiving [1] - 32:1
THE [181] - 1:1, 1:1, 1:8, 3:2, 3:8, 3:13, 3:20, 4:14, 4:19, 4:25, 6:13, 7:10, 8:21, 10:7, 10:15, 10:22, 11:4, 12:3, 13:1, 13:13, 13:22, 14:3, 14:12, 14:14, 14:25, 15:5, 15:11, 15:21, 16:22, 17:20, 18:4, 19:11, 20:5, 21:1, 21:6, 21:21, 23:14, 24:11, 25:1, 25:3, 25:7, 25:14, 25:22, 26:19, 28:2, 28:14, 29:14, 29:21, 30:3, 30:7, 30:16,

30:18, 31:4, 31:14, 32:12, 32:15, 33:11, 33:22, 33:24, 34:12, 34:16, 34:23, 35:1, 35:11, 39:15, 40:13, 42:5, 42:14, 43:4, 43:10, 43:19, 43:25, 44:1, 44:3, 44:4, 44:6, 44:7, 44:14, 44:18, 44:20, 45:1, 45:3, 45:4, 45:5, 45:17, 45:21, 45:22, 45:23, 46:3, 46:8, 46:9, 46:11, 46:12, 46:14, 46:15, 46:18, 46:19, 46:21, 46:22, 47:1, 47:4, 47:6, 47:7, 47:9, 48:1, 48:4, 48:17, 49:1, 49:4, 49:15, 51:2, 51:5, 52:13, 53:17, 53:21, 54:18, 55:19, 56:10, 56:16, 57:18, 58:23, 59:4, 59:14, 59:22, 60:13, 60:22, 61:5, 61:12, 61:19, 62:20, 64:9, 64:17, 66:6, 66:14, 66:19, 67:1, 67:4, 67:12, 67:17, 67:23, 68:8, 68:16, 69:5, 69:9, 70:3, 70:10, 70:12, 73:21, 74:3, 74:23, 75:12, 75:17, 75:20, 76:17, 78:6, 78:19, 78:23, 79:16, 79:18, 83:2, 84:18, 86:7, 88:18, 89:3, 89:7, 89:10, 89:16, 89:20, 90:1, 90:20, 90:24, 91:5, 91:19, 91:23, 116:11, 117:1, 117:3, 117:10, 117:13, 117:15, 118:1
Theranos [1] - 115:14
therefore [3] - 27:2, 63:2, 111:15
they've [5] - 20:1, 50:23, 78:19, 80:8, 85:5
thick [1] - 78:25
thinking [7] - 5:1, 32:7, 38:5, 41:12, 42:2, 54:20, 83:22
Third [3] - 112:22, 113:19, 113:23
third [4] - 41:21, 59:12, 66:25, 112:18
third-party [1] - 41:21

**thoughtful** [1] - 41:18
**thoughts** [1] - 11:2
**thousands** [1] - 74:5
**threaten** [1] - 56:1
**threatened** [1] - 115:15
**threats** [1] - 116:3
**three** [5] - 30:9, 31:19, 62:7, 88:8, 114:20
**three-defendant** [1] - 31:19
**throughout** [1] - 98:16
**thumb** [3] - 12:11, 12:12, 14:15
**Thursday** [1] - 97:9
**tied** [1] - 60:11
**timely** [2] - 9:9, 114:15
**timing** [1] - 31:6
**timing-wise** [1] - 31:6
**tires** [2] - 116:23, 117:7
**today** [15] - 3:24, 13:21, 14:16, 35:22, 83:6, 98:21, 99:5, 103:5, 103:17, 105:1, 108:23, 109:1, 115:24, 116:6, 116:9
**together** [2] - 49:25, 96:23
**token** [1] - 22:1
**tomorrow** [14] - 9:6, 21:22, 28:8, 42:20, 45:12, 46:23, 116:10, 116:11, 116:12, 116:13, 116:15, 117:21
**took** [5] - 49:24, 63:12, 86:10, 86:15, 86:19
**tool** [2] - 54:7, 81:18
**tools** [2] - 82:16, 82:18
**top** [4] - 7:9, 27:7, 27:8, 27:9
**TOR** [1] - 1:20
**Tor** [2] - 1:21, 3:9
**Torrential** [1] - 82:17
**totally** [1] - 86:17
**touch** [2] - 4:11, 105:2
**touched** [1] - 51:23
**touches** [1] - 105:2
**towards** [2] - 43:6, 85:23
**town** [2] - 66:8, 116:16
**Tracers** [1] - 94:5
**tracing** [3] - 36:20, 64:24, 74:7
**trade** [4] - 15:14, 44:13, 44:16, 74:18

**trade-offs** [2] - 44:13, 44:16
**transaction** [3] - 57:20, 57:25, 60:4
**transactional** [1] - 16:8
**transactionally** [1] - 11:12
**transactions** [2] - 58:15, 65:1
**transcript** [2] - 119:4, 119:6
**TRANSCRIPT** [1] - 1:8
**transformed** [1] - 105:19
**transmission** [1] - 4:6
**travel** [1] - 116:17
**treated** [2] - 48:22, 51:12
**tremendous** [1] - 100:17
**trial** [52] - 3:25, 4:23, 7:3, 7:14, 22:1, 22:15, 22:16, 22:20, 24:9, 24:15, 24:17, 25:17, 26:1, 26:11, 28:13, 28:22, 30:4, 30:7, 30:10, 30:12, 30:14, 30:18, 30:19, 30:22, 31:2, 31:15, 31:16, 31:17, 31:22, 31:24, 32:2, 32:5, 33:18, 34:7, 34:22, 36:15, 37:17, 37:18, 39:1, 39:6, 42:9, 42:20, 44:2, 46:23, 49:10, 88:13, 96:6, 97:3, 97:8, 101:12, 115:16
**tried** [3] - 56:3, 65:9, 83:21
**trigger** [1] - 11:13
**triggers** [1] - 54:14
**true** [5] - 77:15, 79:4, 85:20, 119:4, 119:5
**TrueAllele** [5] - 87:16, 89:23, 91:14, 91:15, 91:17
**trustee** [1] - 4:9
**truth** [3] - 57:14, 57:23
**try** [17] - 9:17, 23:2, 29:10, 32:23, 33:15, 33:25, 34:9, 34:14, 56:1, 65:1, 69:21, 80:22, 83:19, 85:23, 87:7, 97:5
**trying** [10] - 9:20, 11:16, 11:17, 45:16, 55:15, 60:25, 65:2, 80:25, 103:4, 104:23

**turn** [10] - 35:11, 43:5, 49:2, 55:10, 65:23, 70:10, 75:2, 75:13, 75:23, 107:23
**turned** [2] - 25:13, 103:17
**turning** [1] - 55:20
**turns** [3] - 19:1, 83:23, 84:8
**twice** [4] - 28:23, 32:13, 32:16, 38:9
**two** [27] - 21:14, 29:24, 30:9, 31:24, 31:25, 32:2, 33:17, 34:5, 38:15, 38:18, 38:19, 62:7, 66:13, 66:24, 69:17, 79:25, 81:12, 81:13, 82:14, 83:21, 112:6, 112:13, 114:18, 117:3, 117:7
**two-week** [1] - 31:24
**type** [8] - 41:19, 58:19, 60:7, 93:14, 94:11, 105:11, 112:2, 114:7
**types** [3] - 54:10, 55:7, 99:14
**typically** [1] - 45:18

## U

**U.S** [5] - 1:15, 81:14, 104:1, 110:2
**u.S** [1] - 1:18
**ultimately** [4] - 43:11, 82:12, 113:3, 114:25
**unable** [2] - 75:8, 75:9
**unclear** [1] - 102:19
**uncover** [1] - 114:2
**under** [25] - 6:7, 9:3, 9:4, 47:13, 72:17, 74:22, 77:19, 77:21, 79:21, 79:23, 80:16, 86:15, 92:5, 93:5, 93:13, 94:9, 95:16, 95:19, 105:17, 106:7, 106:25, 109:2, 109:20, 111:4
**underlies** [2] - 91:7, 98:17
**underlying** [2] - 92:22, 108:19
**undermine** [1] - 107:21
**understandably** [2] - 41:10, 79:20
**understood** [8] - 10:4, 20:3, 22:18, 26:12, 33:6, 33:20, 39:8, 48:25

**undertaking** [1] - 4:12
**unfair** [2] - 22:2, 32:17
**unfairness** [1] - 26:9
**unintentional** [1] - 16:14
**United** [10] - 2:22, 3:3, 3:7, 70:14, 70:17, 91:10, 104:1, 110:1, 111:8, 113:18
**UNITED** [3] - 1:1, 1:2, 1:9
**universe** [2] - 68:14, 73:9
**University** [1] - 95:3
**unless** [7] - 13:4, 26:24, 64:2, 79:17, 89:12, 90:18, 90:19
**unlike** [1] - 73:12
**unpersuaded** [1] - 110:11
**unreliable** [2] - 98:15, 99:2
**unsure** [1] - 51:15
**unusual** [1] - 115:8
**up** [44] - 3:22, 5:1, 5:2, 5:22, 18:4, 18:23, 20:13, 25:14, 26:8, 28:23, 31:8, 31:16, 32:11, 37:10, 37:22, 42:6, 44:8, 45:2, 47:9, 49:4, 54:20, 54:25, 58:6, 58:24, 65:15, 66:4, 66:16, 69:12, 69:14, 69:17, 69:22, 70:6, 71:3, 74:24, 82:12, 82:14, 85:16, 87:8, 108:2, 108:23, 110:15, 116:6, 117:20
**update** [5] - 4:2, 4:5, 4:13, 38:15, 38:18
**updated** [4] - 4:20, 5:22, 37:20, 61:21
**upheld** [1] - 53:19
**urge** [2] - 5:17, 48:7
**urgency** [2] - 4:13, 4:22
**USAO** [1] - 1:12
**USAO-DOJ** [1] - 1:12
**useful** [3] - 13:4, 107:15, 115:6
**USENIX** [1] - 95:7
**user** [1] - 85:13
**usual** [1] - 51:15
**utilize** [1] - 54:12

## V

**vague** [2] - 6:23, 11:1
**vagueness** [1] - 11:12

**valid** [1] - 71:25
**validate** [2] - 72:2, 90:13
**validated** [1] - 71:20
**validation** [2] - 71:6, 72:7
**valuable** [2] - 8:8, 105:23
**value** [1] - 106:21
**varieties** [1] - 59:2
**variety** [2] - 64:25, 111:19
**various** [9] - 44:4, 44:15, 51:5, 57:12, 69:24, 75:5, 91:7, 91:15, 93:10
**vastly** [1] - 36:3
**veering** [1] - 78:6
**vehicle** [2] - 93:6, 93:17
**vendor** [3] - 41:21, 72:24, 75:23
**verdict** [2] - 25:19, 26:13
**verifiability** [1] - 99:10
**verifiable** [2] - 63:3, 63:16
**verification** [1] - 73:18
**verify** [9] - 9:25, 18:24, 62:21, 71:11, 72:12, 73:3, 79:6, 85:1, 113:7
**Version** [1] - 18:8
**version** [6] - 5:23, 10:22, 20:10, 92:9, 92:10, 106:1
**versions** [2] - 95:10, 106:1
**versus** [1] - 20:1
**via** [1] - 93:25
**viable** [1] - 64:11
**vice** [1] - 3:11
**victims** [1] - 86:5
**Vienna** [1] - 95:4
**view** [18] - 6:7, 6:12, 6:20, 26:24, 27:22, 38:23, 50:5, 50:6, 52:21, 57:4, 57:11, 63:8, 64:3, 66:1, 86:16, 110:4, 110:21
**viewed** [2] - 5:21, 81:12
**views** [3] - 40:10, 43:9, 63:18
**virtually** [1] - 105:5
**visualization** [1] - 106:10
**voice** [2] - 70:21, 73:14
**voir** [1] - 21:18

**voluminous** [1] - 84:20
**voluntarily** [1] - 10:13
**voluntary** [1] - 86:4
**volunteering** [1] - 57:5
**voucher** [1] - 83:7
**vs** [1] - 1:4

## W

**wait** [2] - 53:10, 66:5
**waive** [1] - 22:25
**walk** [2] - 56:24, 57:3
**Wall** [1] - 1:22
**wallet** [2] - 15:19, 58:10
**wants** [17] - 24:17, 26:1, 26:5, 26:21, 27:18, 28:8, 28:20, 29:5, 29:6, 38:18, 49:6, 65:5, 66:3, 80:16, 100:23, 108:15, 109:2
**warnings** [1] - 35:14
**warrant** [1] - 89:24
**Washington** [6] - 1:5, 1:13, 1:16, 1:19, 2:23, 119:11
**Watson** [1] - 90:5
**ways** [6] - 9:13, 26:7, 36:16, 58:2, 59:2, 111:9
**weaker** [1] - 41:2
**webinar** [1] - 82:23
**website** [1] - 48:11
**weeds** [1] - 64:2
**week** [5] - 28:12, 31:21, 31:22, 31:24, 69:16
**weekend** [1] - 116:15
**weeks** [19] - 29:24, 30:9, 31:20, 31:25, 32:1, 32:2, 33:18, 38:15, 38:18, 38:19, 47:12, 98:2, 101:12, 101:13, 104:6, 108:17, 117:4
**weigh** [2] - 86:15, 88:1
**weighing** [1] - 44:4
**weighs** [1] - 87:25
**welcome** [4] - 25:24, 48:20, 66:6, 71:18
**well-established** [2] - 90:4, 90:17
**Whac** [1] - 88:5
**Whac-A-Mole** [1] - 88:5
**whatsoever** [3] - 53:4, 106:6, 109:18

**Whisman** [1] - 112:17
**white** [2] - 95:7, 95:10
**whole** [3] - 45:25, 73:9, 74:16
**wide** [1] - 64:25
**WILLIAM** [1] - 2:2
**William** [1] - 3:18
**willing** [3] - 17:24, 33:9, 101:9
**window** [3] - 30:19, 31:1, 32:10
**Wired** [1] - 94:3
**wise** [1] - 31:6
**withdraw** [1] - 47:23
**withdrawing** [1] - 66:22
**withdrawn** [2] - 67:6, 67:8
**withdrew** [1] - 83:6
**withheld** [1] - 74:17
**witness** [4] - 21:5, 51:19, 66:17, 87:8
**witnesses** [10] - 38:6, 41:4, 45:7, 45:8, 52:5, 53:12, 67:10, 67:24, 69:25, 100:9
**wonder** [2] - 36:1, 76:17
**wondering** [1] - 55:2
**words** [5] - 52:8, 52:15, 54:6, 60:3, 89:3
**workflow** [1] - 62:13
**workplace** [1] - 17:5
**works** [11] - 19:16, 40:6, 43:15, 58:3, 65:17, 68:24, 73:25, 74:21, 76:14, 76:16, 99:7
**world** [1] - 58:9
**worry** [1] - 48:21
**worse** [1] - 50:14
**worth** [2] - 34:21, 86:2
**writting** [1] - 69:24

## Y

**year** [7] - 6:22, 10:20, 10:23, 16:20, 38:25, 92:18, 93:9
**years** [2] - 69:2, 90:5
**yesterday** [2] - 5:17, 5:20
**York** [5] - 1:18, 1:22, 16:19, 17:2, 68:19
**you-all** [1] - 18:21
**Youli** [2] - 66:16, 66:23
**yourself** [2] - 43:19, 63:7

**Yousaf** [1] - 95:5

## Z

**zero** [1] - 87:2

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 1:21-CR-0399
                    Plaintiff,     )
                                   )  **PRETRIAL CONFERENCE**
vs.                                )
                                   )  Washington, D.C.
ROMAN STERLINGOV,                  )
                                   )  **September 15, 2023**
                    Defendant.     )  **Time:  10:08 A.M.**

**TRANSCRIPT OF PRETRIAL CONFERENCE**
BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S**

For the Plaintiff:      CHRISTOPHER BROWN
                        USAO-DOJ
                        601 D Street, NW
                        Washington, DC 20001

                        ALDEN PELKER
                        U.S. DEPARTMENT OF JUSTICE
                        950 Pennsylvania Avenue, NW
                        Washington, DC 20530

                        JEFFREY PEARLMAN
                        DOJ-CRM
                        U.S. Department of Justice
                        1301 New York Ave. NW
                        Washington, DC 20005

For the Defendant:      TOR EKELAND
                        MICHAEL HASSARD
                        TAUSEEF AHMED
                        Tor Ekeland Law, PLLC
                        30 Wall Street, 8th Floor
                        New York, NY 10005


Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
                        Official Court Reporter
                        United States Courthouse, Room 6714
                        333 Constitution Avenue, NW
                        Washington, DC  20001
                        202-354-3246

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Criminal Case No. 21-399, United States of America v. Roman Sterlingov.

Would counsel please state their name for the record, starting with government counsel.

MS. PELKER:  Good morning, Your Honor. Alden Pelker, Christopher Brown, and Jeffrey Pearlman for the United States.

THE COURT:  Good morning to all of you.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland, Michael Hassard, and Tauseef Ahmed, whose pro hac vice application is pending before this Court for Defendant Roman Sterlingov, who is present in court.

THE COURT:  All right.  Good morning to you.  Why don't I start, actually, with what you just mentioned about the pro hac vice motion.

I looked at the motion, and I noted that there was no sponsor for the motion.  Usually, when I have a pro hac vice motion, there is some sponsor who is a member of the bar of this court who sponsors the person.

MR. EKELAND:  Maybe we made a mistake in the filing, but Jesselyn Radack, I believe, is the sponsor.  And we meant to attach her form and signature, which I thought was on the motion.  And if we didn't, then we made a mistake, and we can resubmit it to the Court.

THE COURT: We can all check on it. That's good. Thank you.

And then, while you're at the podium, the other thing is, I think it is actually now possible that I may be able to try this case in October, if that's what the parties would want to do. It would require shortening slightly the period of time for the expert -- or any supplemental expert disclosures.

But I received a motion late last night in another case seeking a continuance of one of my -- the criminal case that I had scheduled for two to -- I think it was going to last two to three weeks in October. And assuming that I end up granting that motion, it could be that I could actually try this case in October.

It's going to be a little tight, but I think I can provide four weeks for the trial. If we did it this way, we would start on October 10th and run through November 3rd. I can't -- I can't start on October 9th, which is the Monday, because it's a federal holiday.

My plan would be -- I'm not currently planning on sitting on Fridays. I wasn't planning on sitting on Fridays, but if we did run short on time, I could sit on Fridays as well. I'd have to just move all of the status conference matters that I had put on the Fridays that, ordinarily, I would have done during the week.

So I wanted to see what the parties think about that.

And if I did that, I think that -- as I said, I don't think I would have to make a significant change to the deadlines for the supplemental reports, but just modest -- a modest change. Currently, your supplemental expert report would be due on September 28th, and I think if we just moved that up to the 23rd; and the government's is due on October 12th, and I move that up to October 5th; that would mean that you both have an opportunity to review any supplemental expert reports five days before trial would begin.

And if there's anything that you need to argue to the Court with respect to how those reports in any way affect any of the *Daubert* issues, that would give you a few days to do that before trial commenced.

I know that Mr. Sterlingov had expressed an interest in going to trial earlier, and I said I would keep my eyes out for the opportunity. And here is an opportunity.

MR. EKELAND: We are going to be, I think, finally getting full access to him tomorrow. I was hoping maybe we could talk with him tomorrow about this, unless, of course, he has a decision right now. Because he's finally getting settled at the Alexandria state jail.

And then I think what I would prefer -- but I'm going to, obviously, defer to the Court and Mr. Sterlingov -- is that we have an opportunity to talk with him on Saturday and then have an answer for -- to the Court on Monday. And this --

THE COURT: I'm sorry, an answer for the --

MR. EKELAND: I'm sorry. Respond to tell the Court whether or not Mr. Sterlingov wants to go with the earlier October date because there's another issue here with the supplemental expert report, and that is we shared the protective order with Ms. Still, who showed it to CipherTrace and Mastercard, and they have told her that she cannot review the material because what their concern is -- my understanding is that they are concerned that they may already be working on similar methodologies, regardless of what's in the heuristic disclosures, and that if they then read and review the heuristic disclosures, they'll be prevented from doing whatever work they may be doing.

THE COURT: Right. But she's not the one who is doing that. And if she's the one who reviews it, I don't see why that would be a problem.

MR. EKELAND: I understand the Court's position. This is what has been relayed to me, and she was told, as an employee of CipherTrace, that she cannot review the --

THE COURT: Can you arrange for their general counsel to appear in front of me later today. We can do it by Zoom if we need to. I'd like to talk to them about this.

I understand the concerns, but I think the concerns can be easily allayed, and Mr. Sterlingov and the public have a right to a speedy trial. I just want to make sure that people

are not over-lawyering things in ways that they're interfering with Mr. Sterlingov's ability to go to trial; and he wants to go to trial.

MR. EKELAND: Understood, Your Honor. This is not our --

THE COURT: No. I understand. That's why I suggested let's get their general counsel on Zoom, and I'll have them at a hearing, and I'll ask them about it.

MR. EKELAND: We will reach out.

THE COURT: If they need me to make modifications, I can consider that. These things tend to drag out when they're easily resolved. I just would rather -- as we did with the protective order before, rather than letting it fester and delay the trial, let's just get them in here and resolve it right away.

MR. EKELAND: Absolutely, Your Honor. So we're going to reach out right now and do our best to make that happen.

THE COURT: Okay. I appreciate that.

MR. EKELAND: I think that was it on that. We are also looking to see -- reaching out to other experts. We're at a loss of what to do.

THE COURT: I just don't see how this should be a problem with Ms. Still. She's just not -- I heard her testimony. She's not, by any means, the person who is doing the programming or designing the methodology for all these

things.  As long as she's segregated from that, I just don't see why this would be a problem.

MR. EKELAND:  Yes.  I'm merely relaying what I was told.

THE COURT:  I'm not holding you responsible for that. I just think that if we can get them here, we ought to be able to resolve this issue.

MR. EKELAND:  Understood, Your Honor.  We'll reach right out now.

THE COURT:  Also, if you need more time to talk to Mr. Sterlingov about that, I'm willing to accommodate that. But there's things that people are going to need to do to start getting ready for trial if we're going to move it.  I'd like to do it sooner rather than later.

We have the better part of the day reserved here today.  If you need some time to meet privately with Mr. Sterlingov over the lunch break or otherwise, we can accommodate that.  If talking with him for an hour is not sufficient, we'll find some other opportunity for you to talk to him.

MR. EKELAND:  Understood.

THE COURT:  That conversation should be able to begin sooner rather than later.

MR. EKELAND:  Should we just maybe take that time now?

THE COURT: Let me just see if there are any other preliminary matters that I have, and then maybe it does make sense. I didn't get any agenda items from the parties.

The one thing that I had on my agenda that I thought we could talk about that we never got to was Mr. Cabanas. If you wanted to offer any argument with respect to Mr. Cabanas, we can continue with that. I think I was giving you 10 or 15 minutes a side to argue with respect to the experts. So we can do that.

Most everything else I had was really in the nature of a check-in. I can tell you the things I wanted to check in about as well.

You had raised concerns about -- or potential concerns at least, about the translations. I just wanted to see if you had a chance to confer with Mr. Sterlingov about that.

MR. EKELAND: Yes. We've been talking to Mr. Pearlman, and both sides have been working on it. There's a stack of manila folders right there where we've printed out everything that we've gotten from the government that we could match the original translation in. We're just working with the government, because in some of the files there wasn't the original language thing. But we're all working together on that.

We've also now, finally -- we've got a hard drive of

the discovery that we're hoping to be able to give to Mr. Sterlingov today so he can take it back -- my understanding is that, now that he's been transferred, there's sort of a period where he's getting settled in the state jail, and he's been in a holding cell. He still can't call us, but it's my understanding they're getting him a tablet so they can do it, and we'll be able to visit him.

I think one of the things that's been good about this continuance is that now we're really getting access to him that we haven't had before. The translations have been moving forward, and we're working with Mr. Pearlman to just get all those in.

THE COURT: Okay. I appreciate that. The one thing is, you ought to just confirm with the marshal that you can hand the hard drive to Mr. Sterlingov here, and he can be allowed to bring it back with him versus what I've been told is you're supposed to bring the hard drive to the jail. It may be that it's fine. But whoever is doing the transporting, I just don't know what their rules are about bringing things back in themselves versus having you deliver it. It's, obviously, not terribly far if you have to drop it off yourself.

MR. EKELAND: We're planning on visiting him tomorrow morning. We'll just take the hard drive then.

THE COURT: All I'm saying is I would confer with the Marshals Service to figure out what the correct procedure is.

MR. EKELAND: Understood.

THE COURT: Okay. And then the other thing that I had on a list of preliminary matters to discuss is, when we were last together, you indicated when I asked about whether Mr. Sterlingov was proceeding CJA or whether you were retained and receiving private funding, you thought about it and said, let's go with the private funding and not the CJA.

Thinking about it overnight, it occurred to me that it really is Mr. Sterlingov's choice and not yours. So I think I should confer with Mr. Sterlingov and make sure that Mr. Sterlingov is making a choice and -- making the choice about whether he wants to proceed under the Criminal Justice Act in which the judiciary provides the funding both to pay the lawyers on an hourly rate which, admittedly, is well below the hourly rate that they charge their private clients, but also provides funding for things like transcripts, translation services, experts, and all of that.

And if Mr. Sterlingov makes a decision that he doesn't want to proceed as an indigent defendant and receiving funding from the judicial branch in that manner, that's fine, but then he loses all of that. You just can't pick and choose and say, well, I'm retained, and I'm being paid, but he's indigent and, therefore, the Court should be paying for all the transcripts and the experts and the translation services.

I have no dog in this fight. Whatever Mr. Sterlingov

wants to do is completely fine with me. My point is just he has to elect one or the other. If you want to confer with him about that and then I can get his views on the record about what he wants to do rather than it being counsel's choice; because it really is his choice about how he wants to proceed.

MR. EKELAND: Perhaps we can confer with him on that and the CJA matter and then come back.

THE COURT: That's fine. Is there anything else preliminary that either party thinks we should take up or anything other than hearing arguments about Mr. Cabanas that you wanted to address today?

MR. EKELAND: Not from the defense, Your Honor. But I'll let the government speak to their --

THE COURT: All right. Ms. Pelker.

MS. PELKER: Yes, Your Honor. Other than the scheduling -- and the government would very much like to go forward with the October 10th date -- I believe that we didn't actually finish Mr. Verret's -- the review of Mr. Verret's proposed testimony. So we would propose continuing that --

THE COURT: Okay.

MS. PELKER: -- pivoting to Mr. Cabanas.

On the Mt. Gox authentication, if the Court has any further questions following the receipt of that business record certification, we're happy to address that.

THE COURT: Right. I think the only other question I

would have is whether at this point, given the fact that you've provided, I think, at this point a certification with each step in the chain, whether I'm correct in understanding that the defense's objection is not with respect to those certifications, but is the objection that I've really understood the defense principally making all along, which is, in its view, the Mt. Gox document -- or data was tampered with and, therefore, it's inauthentic. That way I just know what I need to focus on, but I'm working on that issue.

It would be helpful for me to pin it down and make sure I am correct in understanding that, given the certifications, that's the only issue that remains at this point.

MS. PELKER: That's the government's understanding.

THE COURT: Is that correct, Mr. Ekeland?

MR. EKELAND: I'm sorry, Your Honor. Can you just restate.

THE COURT: Yes. The question I had is, now that the government has provided what I believe to be the final certification in the process with respect to the Mt. Gox documents, I want to make sure that I'm correct in understanding that the defense's objection is not with respect to those certifications, but, rather, is an objection on the authenticity of the Mt. Gox documents because of the hacking incident or incidents and because of any questions with respect

to the credibility of the CEO of Mt. Gox and questions as to whether he may have tampered with the data.  That's the objection that you're raising.

MR. EKELAND:  I think that's half of it.  The objection on the authentication, I think -- which is in our papers -- and I'm not changing, if I'm remembering it correctly off the cuff here -- is that the people offering the certification don't have the requisite knowledge of the generation of the business records to say that they're authentic.  Does that make sense to the Court?

THE COURT:  Okay.  So those are the two arguments then.  But we now do have the certification from the trustee that these are, in fact, the records that were maintained by Mt. Gox, and it may be that your argument is just, but the trustee wasn't involved in the generation of the materials; is that correct?

MR. EKELAND:  It not only wasn't -- because I think the rule says you cannot be involved in the generation of the materials, but if you've got some sort of sufficient basis to know how they were generated, it's okay.

We're not changing our objection, but that's essentially it.

THE COURT:  Okay.  Fair enough.  Okay.  Thanks.

MS. PELKER:  And then the government does think that it would be helpful for the Court to address the motions in

limine, specifically the ones that would assist us in streamlining trial as well as, potentially, impact openings; the ones that -- in which the government moves to preclude the defense from making impermissible arguments.

So the government's motion is at ECF 65; the defense opposition is at ECF 69; government reply in support at 81. And then the briefing on willful blindness, to a lesser extent, government's motion at 66; defense opposition at 68; government reply in support at 82. That's just depending on how much time we have today.

THE COURT: All right. That sounds fine. Why don't we do this then. Why don't we go ahead and break for a little bit so that, one -- and perhaps most pressing of all -- is that Mr. Ekeland can reach out to CipherTrace and see if we can either get their lawyer or someone who can speak on behalf of the company available, even by Zoom, so we can just talk about this protective order and get any issues resolved on that so that they can -- and, particularly, Ms. Still can -- promptly review the material and that doesn't delay us.

And then, also, you can have the conversation, or at least start the conversation, with Mr. Sterlingov, one, about whether he does want to proceed under the Criminal Justice Act or whether he wants to simply have privately retained counsel and experts.

And two, at least start the conversation about trial

dates and whether he would like to begin the trial on October 10th. Okay?

So I'll just let the clerk let me know when you're all ready for me to come back out.

(Recess taken from 10:30 a.m. until 12:10 p.m.)

THE COURT: All right. Where are we?

MR. EKELAND: So on the low-hanging fruit, we have an answer for you on the CJA. We've spoken to Mr. Sterlingov and, of course, he will speak for himself on the CJA. He's okay with our withdrawal from the CJA and us proceeding as retained counsel, I guess, it would be.

THE COURT: Mr. Sterlingov, that's how you would like to proceed? Can you pull the microphone towards you.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. And you've had enough time to confer with Mr. Ekeland about the consequences of that decision?

THE DEFENDANT: Yes.

THE COURT: Okay. All right. Thank you. That's how we'll proceed then. I'll enter an order indicating that Mr. Sterlingov has withdrawn his request to proceed in forma pauperis and for CJA funding and that he will proceed henceforth with retained counsel. Okay.

MR. EKELAND: And then we've reached out to Ms. Still. We've talked to her. She's been reaching out to

lawyers at Mastercard. Apparently, the general counsel is out. They're trying to find somebody who can speak to this issue.

She said she's going to get back to me. I told her I would check in again shortly; I guess, during the lunch break.

THE COURT: Okay.

MR. EKELAND: Just so the Court knows, the defense is -- we did rent a house down here. We will be in D.C. for the next few weeks. We're available for in-person hearings early next week or whenever, if necessary, on any of this.

THE COURT: Okay. Well, that's good to know. Hopefully, we can resolve this issue today.

MR. EKELAND: I hope so. And then one thing we -- in terms of whether or not to go with the October 10th date, we would ask the Court if we could have the weekend and maybe get back to the Court Sunday night or first thing Monday morning so we can discuss this more with Mr. Sterlingov.

And one issue that came up in relation to the protective order is the defense and the government need clarification from the Court on the scope of it, because this came up when I was talking to the government about us maybe wanting to go review the heuristic information with Mr. Sterlingov, and the government is taking -- and they can speak for themselves, but my understanding of the government's position is that it's, effectively, an attorneys' eyes only protective order, and Mr. Sterlingov cannot review the

heuristic.

In paragraph 6 of the protective order, it does say the defendant, defense counsel, and the expert shouldn't distribute the information in any way. So if it is an attorneys' eyes only protective order in relation to the heuristics, of course -- we haven't shown this to Mr. Sterlingov. We'll respect that -- note our objection in the record that we believe Mr. Sterlingov should see it, but what we just want is clarification so we don't inadvertently violate that protective order.

THE COURT: We probably ought to let Mr. Frentzen weigh in on that as well if he has a view, too.

Ms. Pelker, do you want to address that?

MS. PELKER: Yes, Your Honor. I believe it's the government and Chainalysis's view that it is a protective order that restricts the disclosure of the materials to defense counsel, specifically Mr. Ekeland and Mr. Hassard, and Ms. Still, the named expert.

There's a reference to -- later on in the protective order that's, sort of, blanket no one can disclose the information. But in all of the different subparagraphs, it's very clear about the restriction on the limitations of the disclosure to defense counsel and Ms. Still.

And I think that when we were in court earlier this week and the whole issue came up, defense counsel had

approached the government and asked whether Mr. Sterlingov could review -- because there was a question as they were reviewing it at counsel's table -- and everyone's understanding was that this was not for Mr. Sterlingov's review.

THE COURT: So, in candor, that was my understanding as well. So if you're -- to the extent you're seeking clarification of what I had understood at the time, that is what I understood at the time.

I think there is a fair question, though -- and I'm always reluctant to express a definitive view without looking at the law on this and giving you-all a chance to look at the law on the question, and I understand why there is good reason why the information might not be disclosed to Mr. Sterlingov out of a concern that it is information that he might use to evade detection, assuming that the government's allegations are, at least in part, correct.

On the other hand, in general, it's a good idea and there's good reason for defendant to have access to as much information about the case that involves him as much as possible.

And so, I guess, the way I'd like to leave it on this is my understanding is that, as drafted, it was limited to counsel and Ms. Still, with the ability to come back to me to seek leave to disclose to others. And that I would invite Mr. Ekeland, if he thinks it's appropriate and there's law out

there that supports it, just to file something with the Court seeking a modification to permit disclosure to Mr. Sterlingov.

I'm going to need the parties to point me to what the relevant law is. I do know that I -- it's not infrequent that I sign protective orders that do preclude a defendant from having access to certain information, but I think there are also good reasons to limit that and only do that under extraordinary circumstances.

So for present purposes, it doesn't include Mr. Sterlingov. But, Mr. Ekeland, I do welcome you to file something with me and explain to me why Mr. Sterlingov should have access to it and just point me to the relevant law, and then that will provide an opportunity for Chainalysis's counsel and the government to file a response if and when you file anything that makes that case, Mr. Ekeland.

MR. EKELAND: Understood, Your Honor. Just for clarification, why this came up is we were hoping, and I -- we're totally going to respect the protective order as the Court has so clarified it now, and we've put our objection on the record and will move on, but what --

THE COURT: Don't just put your objection on the record and move on. If there's some reason that Mr. Sterlingov should have access to it and the law supports that, just tell me that and point me to the relevant law. I don't have the law in front of me now, so I can't resolve that question, but I'm

inviting you to raise that with me.

MR. EKELAND: Understood. And we will do that. I don't have the law in front of me either. I don't want to argue from ignorance, so to speak. But what we were hoping to do -- just so the Court understands and to inform the discussion of whether or not he should ask for a continuance -- was to have him give his input on the heuristics so he could weigh in on whether or not -- how important it is to the case or what he thinks. That was just the thinking there.

But I will look at the law, and if I think there is some sufficient basis to argue to the Court, I will.

THE COURT: And I also think that -- I don't think the protective order precludes you from having a discussion with your client about the nature of the heuristics, without disclosing the particulars of it, and much of that is already disclosed in the government's expert reports.

This is just adding a level of greater specificity. And, I mean, I can tell Mr. Sterlingov that that's largely what is there, is just going entity by entity or cluster by cluster and indicating what the specific behavioral heuristics were that were applied as to each of them, and they're not the same as to each; they differ. And it provides just greater specificity with respect to what those heuristics are.

And so to the extent that that's helpful for you in making a decision, Mr. Sterlingov, about how you want to

proceed, I'm happy to have disclosed that. I'm also happy to have the government and Mr. Ekeland talk a little bit about whether it's possible to provide even greater detail without getting into the specifics.

I take it what -- my understanding of what Chainalysis is concerned about is twofold. One is it is, understandably, concerned about revealing the heuristics that it applies because it then just invites those who are trying to avoid detection on the blockchain to engineer around those specific heuristics.

And two, it's proprietary, and it's of great financial value to them. And I think the discussion that we just had about the fact that CipherTrace is considering or planning to develop its own heuristics is evidence of the proprietary value of that specific information.

Because if CipherTrace could simply say, oh, we'll just take this and we'll use it, that would, one, invite another competitor directly offering, essentially, the same product in the market in ways that would cause, presumably, extraordinary financial harm to Chainalysis. It would also allow the competitor to do so without incurring the expense that Chainalysis incurred in developing the heuristics, which would then provide that competitor with even an advantage over Chainalysis. So those are the reasons.

But in light of those reasons, you can also say there

are things that you can disclose that are not going to risk either of those two things in describing the nature of the heuristics. And I was even on the record, when we were talking about this a little bit, giving some sense of the type of information we were talking about. Like peel chain information and, sort of, looking at distinct characteristics of particular peel chains.

MR. EKELAND: I think it's those core concerns that the Court just elucidated that are generating the concern from CipherTrace and Ms. Still.

And one of the comments that was relayed to me -- and I share this with the Court in the hopes that we could try to solve this, I think, difficult problem here; we tried to find a way to address this. And that, essentially, what she said is this is a career killer in the sense that it's the perception of the threat.

Whether or not it's real, being sued or being held in contempt of court because of an action by Chainalysis will stop her from -- eliminate future career prospects from -- for her, because what she's afraid is going to happen is that someone is just going to look at this -- and she says, well, that's really not going to happen, don't worry about it, and they're just going to say, we're not even going to take that risk because it's even probable, and it's sort of a reality versus perception thing.

That's, obviously, not the only thing. But that was one thing that was relayed to me that struck me; is that it's the fear generated by the fact that, as you say, there's IP and proprietary interests at stake.

THE COURT: But, you know, the thing is, if we were in the Northern District of California, 15 minutes wouldn't pass in which this question wouldn't come up in that courthouse. I mean, this comes up all the time in litigation; certainly, in patent litigation or in litigation involving companies with sophisticated IP. And it happens all the time and people sign protective orders all the time. You wall people off. It's just not that unusual.

Since she is not somebody who is involved in writing code or, as I understand it, even designing algorithms or conferring with what should or shouldn't be in the algorithm, I just don't see it as a problem. I think she can be walled off on it.

And I understand that, if you're completely risk-averse, you say to yourself, well, somebody someday might say that because CipherTrace came up with a similar idea, it must have come from her. But that's certainly not going to be enough to file a lawsuit in good faith, and it's not going to be enough to come to me and seek a contempt sanction if all they have is Ms. Still prepared to sign a declaration under the penalty of perjury saying I did not have any discussions with

anybody at CipherTrace about this; I did not disclose it to anyone at CipherTrace; I kept it under lock and key in my office, and I was the only one with a key.

I just don't think that it's a real-world risk under those circumstances. And, quite frankly, there are ways also, if she wants to protect against the risk, that I'm sure would make Chainalysis even happier. I now, I think, understand that Chainalysis and CipherTrace are both located in California; is that right? I know that's where Mr. Frentzen is. I don't know if that's where CipherTrace is.

MS. PELKER: I believe that they're both global companies that are mostly remote.

THE COURT: In any event, what -- that doesn't really matter. What I was going to say is, if she's more comfortable going to a conference room at Chainalysis and looking at it, the material, there and bringing a laptop with her there that can then be wiped afterwards, I'm sure that would make Chainalysis very happy to do it that way, and it would minimize any risk that anyone would ever, even improperly or without foundation, accuse her of any wrongdoing.

MR. EKELAND: I'm not disagreeing with you on the reality that you just described. I think the difference here is there's the reality and there's the perception.

And what is being conveyed to me is that everything you just said could be said to a potential employer, and they

can still just be, like, we're not taking the risk. And that is, I think, the sort of problem that we face with -- like --

THE COURT: Rather than having you and me have this conversation, why don't we wait until we get someone from CipherTrace, because we're just going to have to have the same conversation again with them.

MR. EKELAND: Understood, Your Honor.

MS. PELKER: Can I ask one question for point of clarification?

THE COURT: Okay.

MS. PELKER: It's just not clear to me, listening to defense counsel's articulation of the concerns here, if it's just a concern about the protective order or if CipherTrace's counsel is objecting to Ms. Still viewing these trade secrets in their entirety under the prior existing protective order?

THE COURT: That's a fair question. Or even, frankly, even without a protective order at all in the case, the company still -- if someone thought they had stolen Chainalysis's IP or had appropriated what they had done, they might be subject to suit, I guess, in some hypothetical world anyway. So it's a fair question.

Do you know, Mr. Ekeland?

MR. EKELAND: I don't -- I can't speak for CipherTrace's lawyer. I'm just working with secondhand information. The way I understand it, it's this particular --

the new protective order, which is, presumably, different than the original one, which has heightened concerns that the Court just expressed, the proprietary concern, the IP concerns --

THE COURT: Right.

MR. EKELAND: -- and even though it doesn't have an explicit noncompete clause, it has sort of language about using it for, like, images or impressions or thoughts for competitive purposes.

What everyone is worried about, whether it's rational or not, Your Honor, in the sense, is the word about Chainalysis going after them and they -- and that, I think, anybody who has ever worked in corporate law knows that corporations and companies tend to be very, very risk-averse.

From my understanding -- and I don't want to put words in their mouths -- they're simply looking at this and they're saying, we just don't even want to take the risk.

THE COURT: If that's what their bottom line is -- and I think I can provide them with whatever assurances I can, and we can put in measures to try and minimize that risk; for example, as I said, by having Ms. Still go to Chainalysis and look at it there.

But if there's still the view that they just can't live with that, then we may be in a world in which you need another expert, which, obviously, is a problem timing-wise in the case. And, quite frankly, I would be a little surprised if

you can find somebody who actually understands blockchain tracing in a meaningful way who is not going to face a similar question.

MR. EKELAND: I think that's one of the core issues here with the use of this kind of proprietary software.

THE COURT: It is what it is with that. I mean, I think that we've struck the right balance here with the protective order. And turning information over, I think the defense is entitled to the information.

But it needs to find somebody who is not going to steal Chainalysis's IP in order to -- in doing its analysis. I think the protective order protects from that. I think it's reasonable and, as I said before, we're wasting our time a little bit; this is CipherTrace's issue and not yours.

But in the world of IP, in general, I mean, there are, I'm confident, thousands of protective orders like this in place and thousands of cases and circumstances in which people who are potentially competitors who run those risks receive the IP.

I mean, every significant patent case in the history of this country has raised this issue. People deal with it. You need to actually have somebody in patent cases who are sophisticated and can look at the IP and understand it and testify as experts in the cases, and they're walled off. You find ways to deal with that.

MR. EKELAND: Understood, Your Honor. This is an honest question because I haven't been able to find this in the context of a criminal case.

THE COURT: I pointed you yesterday to the case from New Jersey. One of the criteria from the case from New Jersey was that there be an appropriate protective order in place.

MR. EKELAND: There's nothing in the federal context that we're aware of.

THE COURT: In any event, we are where we are on this. I can tell you that the answer to this is I'm not going to simply dismiss the indictment on the grounds that your expert refuses to look at the information that's provided and it's subject to a protective order.

MR. EKELAND: We weren't asking for that.

THE COURT: I know. But, I mean, that's kind of the import of what your argument is, that we can't get anybody to sign a protective order who is knowledgeable on this. And you have to do that. They just have to be prepared to do it.

I'm happy to accommodate their concerns and come up with ways in which their risk is extremely minimal in doing it, but there just has to be some way in which some knowledgeable person can look at this information in a way that doesn't threaten the core value of Chainalysis.

I think the same thing, quite frankly, comes up -- you say this is all a product of the fact that it's a

third-party vendor here. I'm confident the same issue comes up when the government has sophisticated tools that it's using, as we were talking about yesterday. I know I sign -- I sign protective orders in criminal cases all the time about what can and can't be disclosed.

And it just can't be that, even if the Court concludes that whatever fancy machine the FBI is using, that somebody has to sign a protective order saying, I'm not going to disclose how this machine works and how it tracks criminal activity because it will allow people to evade those actions.

I mean, in all the January 6th cases, people have to sign protective orders saying they're not disclosing all of the camera angles from the Capitol because there are security reasons where we don't want everyone to know where every camera is located at the Capitol Building.

MR. EKELAND: Agreed, Your Honor. There's a distinction, I think -- the defense would submit there's a distinction to be made between the nondisclosure of information and competitive concerns.

But that being said, we will -- hopefully, we can get ahold of CipherTrace's counsel and get some sort of solution to this. We'd just ask the Court, again, that we have the weekend to contemplate this and get back to the Court by, like, late Sunday night or first thing Monday morning, if that's amenable to the Court.

THE COURT: Let me hear from the government on that. What is your best sense of when we're going to hear back from Ms. Still? I would like to do that today.

MR. EKELAND: I told her I would call her during lunch again. The last time I spoke with her, probably about, like, half an hour ago, she said she'd been reaching out and trying to get hold of people and that the general counsel was out, and they were trying to find somebody. I said, okay; I'll check in with you during lunch.

THE COURT: I suppose the other answer here is, if Ms. Still doesn't want to look at this, she doesn't want to look at it, and that's fine too. We can just proceed without her looking at it.

MR. EKELAND: We have started looking for other experts as well, Your Honor. We would just ask, I guess -- with some accommodation, I guess we'd have to to get something early -- to the Court early next week on that.

THE COURT: I mean, I set a deadline for when any supplemental expert report was due. If anything, I was trying to shorten that today so we could actually accommodate Mr. Sterlingov's request to go to trial earlier than February.

MR. EKELAND: Understood.

THE COURT: Let me hear from the government on this. Before you sit down, though, on Mr. Ahmed's pro hac motion, I took a look at it. What's unusual about this, it's usually --

I think this was actually done when you were admitted pro hac in this case.

I get a motion signed by a member of a bar of this court moving someone's admission and then a declaration from the person who is seeking admission saying, here are all the factors that I'm supposed to address, and I've addressed them. Here, the motion seems to be from Mr. Ahmed himself, and it's on a form that I've never seen before with a DocuSign.

At the very bottom of the DocuSign, it simply says, sponsoring attorney, Jesselyn Radack; with an e-signature from Ms. Radack with no indication that Ms. Radack is a member of the bar of this court or that she's actually moving the admission of Mr. Ahmed. So I just --

MR. EKELAND: We are happy --

THE COURT: I don't know who she is or what this is.

MR. EKELAND: We are happy to resubmit it. Mr. Ahmed can address more particulars, but it may just be easier for us to resubmit it --

THE COURT: That's probably the easiest thing to do.

MR. EKELAND: -- in the correct format. No problem, Your Honor.

THE COURT: Okay. That sounds good. Thank you.

MS. PELKER: Your Honor, I'm happy to address any of the substance of Mr. Ekeland's points raised, but I think the most immediate question is just the timing. And the government

would suggest that we just come back here on Monday morning and -- I don't think we're going to get through this afternoon everything that we had hoped over the course of the day. So we can come back Monday morning -- hopefully, first thing Monday morning -- determine whether we're going forward on the 10th, and then either way continue it to address the remaining outstanding pretrial issues.

THE COURT: That is fine with me. Let me ask the deputy clerk about our availability Monday morning. I'm sure we are because we were planning on being on trial. 10:30 Monday morning?

MS. PELKER: Yes, Your Honor.

THE COURT: All right. I guess what I would still like to do is come back this afternoon to see if we can get Ms. Still and/or a general counsel or a lawyer for CipherTrace to work through the issue.

Quite frankly, I would like -- particularly, if we're going to be starting trial in October, I would like Ms. Still to be able to begin her analysis this weekend and get going on any review that she wants to do or any analysis that she wants to do. So I'm happy to come back this afternoon at whatever time the parties think is appropriate, or maybe we should just ask Mr. Ekeland to let us know.

I have a 3:00, but otherwise am available. If you wanted to, we could also go through some of the other stuff

this afternoon. I'm happy to do any of this.

MS. PELKER: Your Honor, the government would suggest, because of the volume of issues that we still have, we can come back this afternoon, we can start with Mr. Verret, go through Mr. Cabanas, wait to hear from Ms. Still.

On the possibility of Ms. Still not actually doing this review and retaining a new expert, the government would just note for the record, the government had previously made a fulsome disclosure that was very detailed spreadsheets with hundreds of thousands of addresses explaining the heuristic basis. Ms. Still looked at those, and the defense has insisted they wanted more, they wanted more.

Chainalysis went to great lengths to assemble more, and now we have defense saying that they're not willing to do that review. They just -- again, we've given them what they asked for. If Ms. Still now is saying that she can't actually review what she testified that she actually needed to do her review, at that point this is really on the defense.

We've had multiple continuances for them to find new experts. They've gone through multiple iterations. Ms. Still went through a whole *Daubert* hearing. We're prepared to go forward with trial. The government would strongly oppose a continuance from October to February where we're looking at an extra four months for the defense to, essentially, go out and find new experts that was the basis of the continuance a year

ago.

THE COURT: I think it's a fair point that where the defense was asking for this information and where I made crystal clear from day one on this that it had to be subject to a protective order, if it was being provided at all, that it is a little surprising to have the defense then dealing with the protective order issues.

I mean, this is information the defense asked for and had to have known that it would be subject to a protective order. And then to ask for the information, go through everything we've gone through, and then say now we can't look at the information that we asked for -- and there's nothing unusual at all about the protective order.

And, in fact, the protective order, I think, is about as unonerous -- if that's a word -- it is less onerous than anything else I think you might expect -- or you wouldn't expect -- it's hard for me to imagine a less onerous protective order under the circumstances like this here.

I think the defense had to have known that was coming. The fact that they're just dealing with this now is troubling.

MS. PELKER: Yes, Your Honor.

THE COURT: Mr. Ekeland.

MR. EKELAND: As we noted before, it's really the anti-competitive language.

THE COURT: I know. But I made clear, I mean, weeks and weeks ago, that that would be a necessary component of what you were seeking.

MR. EKELAND: Yes, Your Honor. What we couldn't predict was our expert's reactions to it and it creating difficulties --

THE COURT: That's why I said you should talk to your experts, get your experts to file statements indicating what they were asking for, and be working with the experts beforehand rather than afterwards saying we, as the lawyers, want this information and then go to the experts and say now we have the information, can you look at it, and them saying, no, we can't look at that.

MR. EKELAND: We could not predict CipherTrace's counsel's reaction to this, and --

THE COURT: You should have. They've been your expert. You were the ones asking for this information, and I made clear it would be subject to a protective order.

MR. EKELAND: And they agreed to the previous protective order.

THE COURT: So that's the answer to Ms. Pelker's question, I think. There was a previous protective order in place. And, quite frankly, I think the current one is just more explicit, but I'm not sure anything is different.

If they come in and say we'll agree to the prior

protective order, that may be a different matter.

MR. EKELAND: Well, if it's not different, why is there a new one?

THE COURT: I think it's more specific. It clarifies. But I think the prior protective order says you can only use the information for the case. Anything disclosed, you can't otherwise disclose it.

MR. EKELAND: Right. And nobody is disclosing it. Again, I think what's additionally new and what we've said before -- and I don't think we need to repeat ourselves on this point -- it's the anti-competitive language and the fear that people are going to get sued by Chainalysis and held in contempt of court inadvertently, or one of the concerns that was expressed to me was that what if CipherTrace is already working on similar or analogous heuristics and methodologies and they don't want to -- my understanding is they don't even want to take the chance of looking at this stuff and then running the risk of litigation or contempt of court because --

THE COURT: I agree. Nobody who is involved in preparing or developing any of that should look at this. I agree completely with that.

But if it's different people and Ms. Still can sign a declaration under the penalty of perjury or sit in the witness box under the penalty of perjury and tell me that she did not disclose it to anybody, did not discuss it with anybody else,

she was the only person at the company who looked at it, she kept it under lock or key or she went to Chainalysis to look at it, I am not going to hold her in contempt or anyone in contempt for that.

MR. EKELAND: That's understood, Your Honor. That's the reality. But the perception is -- I think what the pushback is, they don't want to create the situation, have any kind of possibility that Ms. Still or anybody from the company is ever going to end up in that witness box. That's just --

THE COURT: Just to respond to that, I think that that is sort of an unreasonable demand by your expert, which is your problem and not the government's or Chainalysis's or the Court's problem.

MR. EKELAND: We respectfully disagree, and I think we've made our objection.

In terms of the information that was disclosed, it just wasn't more of the same. There was an entirely new heuristic disclosed in Heuristic No. 4.

THE COURT: But that is like -- that is the flea on the tail of the dog. I mean, that is extremely minor. It's only as to one of the clusters at issue. And, quite frankly, I suspect, if that were really an issue, the government could say even, we'll exclude that from our case, we don't even need that; that is the most minor of issues in the case.

MR. EKELAND: Well, can I say -- I don't know -- I'm

not even sure what I can talk about -- in open court about this heuristic and what that clustering is in relation to because I've heard certain things -- rumors in relation to how that heuristic, that cluster in relation to that market was generated. Essentially, that it wasn't -- that data wasn't -- and that cluster wasn't generated by the heuristic from Chainalysis, but Chainalysis, essentially, exfiltrated the data from the DEA, and that's how they came to that. I don't know if that's true or not, but that's disturbing.

And it goes to, I think, a point in relation to Chainalysis Reactor, which makes the defense actually not want to work with it. They slurp data. And it's my understanding that part of their terms of service is that they can collect your searches, your data, and that's one of the ways that they get their database.

And it's my understanding that, in relation to that darknet market, that the DEA was using Chainalysis Reactor and Chainalysis Reactor slurped the data, and that's how they got the information.

THE COURT: Let me say this. What we're talking about here is the protective order and whether this information can be disclosed to Ms. Still. If this is as ludicrous and out there as you're suggesting, I can't imagine a world in which CipherTrace would be recreating this product in some way and saying, oh, my goodness, we had this idea of working with the

DEA and now we're going to have to throw that out because someone is going to think that we got that idea of working with the DEA and acquiring data from the DEA from Chainalysis.

If your view is that that is completely either unreliable or improper, I can't imagine that your expert would be wanting to do that anyway.

MR. EKELAND: No, Your Honor. What I thought we were addressing -- if I understood the Court correctly in the heuristic disclosures, it's my understanding that the Court was saying that this is just, basically, more of the same information that we asked for and what --

THE COURT: I'm saying it's greater detail.

MR. EKELAND: And it's the defense's position that it looks like new information was disclosed; that some of it, based on information I believe that I've been unable to actually confirm and maybe the government or Chainalysis expert can confirm, it reveals certain things about the data collection process from Chainalysis that I need to look closer at this and research it, but it may reveal inaccuracies in what they disclosed.

I don't think -- I'm just going to put this on the record; that it is just simply a matter of us getting more information with more specificity. I think there's certain things in there that are, at least on initial review, very problematic in relation to representations that have been made;

and I will leave it at that.

THE COURT: That's fine. I mean, I directed that disclosure be made. I thought you were entitled to the disclosure. If there's something there that's useful to Mr. Sterlingov in the case, terrific. That's the way the system is supposed to work.

But I still am just a little baffled by why we have a problem with your expert actually reviewing the information. And if -- as I said, if we do, I think it's something, as Ms. Pelker indicated, that you could have certainly anticipated weeks and weeks ago in this case instead of arguing and putting everyone through the hoops that we went through to obtain that information for you where your own expert is not willing to look at it in ways in which I think does not impose any material risk to your expert.

But that's your expert's decision, and if that's what their decision is, that's their decision. They can choose not to look at, and that's their decision, if that's what they want to do.

But why don't we adjourn now. It's a quarter of 1:00. Should we come back at 2:00? Does that make sense? Hopefully, you can have an update for us about the availability of Ms. Still or somebody from CipherTrace who can address this issue and -- because I do want to get it resolved.

Quite frankly, I want your expert to be able to look

at this and to be able to do any analysis, any supplemental report they want to file and be in a position in which we can go to trial.  That's what my goal is here.  And if they're not willing to do it, then we'll have to figure out what to do about that.

MR. EKELAND:  Thank you, Your Honor.

(Lunch recess from 12:50 p.m. until 2:05 p.m.)

THE COURT:  All right.  Any success in scheduling with Ms. Still or someone from her office?

MR. EKELAND:  No, Your Honor.  I spoke with her about 20 minutes ago, right before I came in.  She said that she had -- nobody from her office has gotten back to her in terms of availability for this afternoon.

THE COURT:  Okay.  Well, let's keep trying.

MR. EKELAND:  I will, Your Honor.

THE COURT:  Okay.  Ms. Pelker.

MS. PELKER:  Your Honor, just to the extent it's helpful, the government was able to just find the contact information for Ms. Jennifer Lorentz from the New York State bar system, and I believe that Ms. Lorentz would be the -- she is of counsel at Mastercard and deals with blockchain-related issues, including CipherTrace.

We're happy to give her phone number over if the Court would like to call or see if defense counsel wants to call her directly; to the extent it's helpful.

THE COURT: Do you know what the -- what the problem is and whether Ms. Still is trying to figure out who the right person is to call or she's just not hearing back from them?

MR. EKELAND: Well, I don't know exactly what's going on, but I know she told me she reached out to the lawyers and that the general counsel wasn't in and that she was waiting to hear back.

I checked in at the top of lunch, and I checked in -- besides the times I checked in this morning, I checked in at the top of lunch, and I checked in right before I came into the building. She said she hadn't heard back from anybody in terms of availability.

THE COURT: All right. Well, can you pass along to her that the Court requests that somebody be available at 3:30 by Zoom. That is my request, and she can pass that along to the lawyers.

Maybe they're trying to figure out what their view is on this, and that's fine. But at least somebody ought to be able to show up just to tell me that.

MR. EKELAND: We can send that --

THE COURT: If you want to send a text to let her know that the Court has requested that somebody be available at 3:30 by Zoom today.

MR. EKELAND: We'll do that immediately.

THE COURT: All right. Anything else, or should we

just turn to picking up where we had been with Mr. Verret?

MS. PELKER: I think the government is prepared to turn to Mr. Verret.

THE COURT: Okay.

MR. EKELAND: Likewise.

THE COURT: I know we were working our way through, but I can't remember who was up.

MR. BROWN: Your Honor, I think we were doing, kind of, seriatim on a point-by-point review of Mr. Verret's disclosure.

THE COURT: Okay. Let me get the correct version in front of me. I'm at Docket 145-5, which is what, I think, we were working off of.

MR. EKELAND: Yes, Your Honor.

THE COURT: It looks to me, by my own notes, we were up to at least 15; is that right?

MR. EKELAND: I think that's right, Your Honor.

THE COURT: Okay. So why don't we start with 15.

MR. EKELAND: Paragraph 15, Document 145-5, Mr. Verret will testify that tracing methods utilized by the government and Chainalysis threaten user privacy because they rely upon probabilistic determinations to attribute cryptocurrency accounts to specific individuals.

THE COURT: Why is that relevant even in a case or just not obvious that tracing methods threaten user privacy?

That's the whole point.  You're trying to trace who it is, and to the extent people are trying to obscure who they are, efforts to figure out -- to break through that obfuscation are -- I don't mean to assign it pejorative one way or the other, but that are at odds with their interest in maintaining their anonymity.

MR. EKELAND:  I think the point Mr. Verret may be getting at is that users have privacy concerns, and I think the general point is that there's legitimate privacy concerns.

So inasmuch as -- I think I understand what the Court is concerned with there about the tracing.  But I think the main point is that he wants to speak, and I think it's elsewhere in the disclosure as well that privacy is a concern for all users of cryptocurrency.

THE COURT:  That's not what this one says.  Maybe it's somewhere else in here.  I have some vague recollection of that as well.  I do, I think, recall talking about this last time; that he wasn't in a position necessarily where he could talk about what people's personal motivations were because he just hadn't studied personal motivations.

But if he wanted to just at a, sort of, very generic level say there are multiple reasons why someone might use cryptocurrency, that that would be okay.  I don't recall anything that would suggest that he's done any study or any analysis of whether 90 percent of the users are trying to hide

criminal activity or 5 percent are trying to hide criminal activity.

I don't think there was anything -- it borders on the sort of thing that is within the competence of the jury. But I guess I don't think I would have a problem -- although I want to hear from the government -- with either him or some other witness simply testifying that in his experience, if he has the relevant experience or based on conversations he's had, if he's had those conversations, that people use cryptocurrencies in the blockchain to maintain privacy for various reasons.

I do remember this because I remember saying in response to this that, of course, then the government can on cross-examination say and isn't it one of the reasons to hide illegal activity.

MR. EKELAND: I think also, just to that point, before we -- I think if I'm recalling correctly, we discussed the Chainalysis report that said 90 percent of users of mixers do it for legitimate privacy reasons. And he's also on the Zcash Foundation, which is a cryptocurrency very much concerned with privacy.

I think the general point is that he does have experience in that realm in relation to privacy concerns with cryptocurrency

THE COURT: To the extent he wants to actually quantify it in any way, though, he would need to have evidence

that would -- and studies that would satisfy a *Daubert*-type analysis, or surveys or something that would provide some indication of the allocation. If Chainalysis has a report that says something, I suppose that he can point to what the Chainalysis report says. If Chainalysis disagrees with that's what the report says, they can say that in their testimony as well --

MR. EKELAND: Yes.

THE COURT: -- Ms. Bisbee. Go ahead.

MR. EKELAND: I believe he does reference the Chainalysis report in this disclosure. I can't remember if we've already --

THE COURT: We went through this last time. I don't want be repeating or second-guessing what I had said about this last time, so for present purposes, I'm going to say no as to 15. I think we did discuss this previously, and 15 is just about a different point. I don't see the relevance of the fact that people don't like the government or Chainalysis to be tracing them.

MR. EKELAND: Understood. No. 16?

THE COURT: Yes.

MR. EKELAND: Mr. Verret will testify that the tracing methodologies utilized by the government and Chainalysis are probabilistic, not determinative, and that they should only be used to generate leads, not to attribute

conduct.

THE COURT: On this one, again, I'd have to go back and refresh my recollection, but I thought what I had already concluded was that Mr. Verret didn't appear to have any expertise in blockchain tracing. You have other experts who can testify with respect to the Chainalysis tracing methods and whether they're probabilistic or determinative.

So I don't really see that Mr. Verret has particular expertise on this question and there are other experts who do.

MR. EKELAND: Assuming that -- I think the Court is referring to Ms. Still on that point. And we're happy to agree with the Court on that. As long as Ms. Still can speak to that point, there's no need for redundancy.

THE COURT: Okay. 17.

MR. EKELAND: Mr. Verret will testify that the tracing methodologies utilized by the government and Chainalysis may be used to commence an investigation and generate leads but should not substitute for empirical confirmation of traces.

As part of this line of testimony, Mr. Verret will rely upon publicly available documents produced by Chainalysis and available at -- and then there's an HTTPS, www.coindesk.com hyperlink. I'm leaving out the rest of it.

THE COURT: Isn't this the same point we just discussed?

MR. EKELAND: I agree with the Court on that. As long as the Court is okay with Ms. Still testifying on this point, which I think the Court just said they were, then yes, we're in agreement with the Court.

THE COURT: Okay.

MR. BROWN: Your Honor, may I be heard?

THE COURT: Yes.

MR. BROWN: On 17, just to remind the Court, I don't think Ms. Still was qualified to testify as to the particular assertion here, which is that blockchain analysis may be used to commence an investigation and generate leads, but should not substitute for empirical confirmation of traces.

I think that's a normative assertion about how law enforcement investigations are supposed to be run. She -- neither Ms. Still, and certainly not Mr. Verret, neither of them have any expertise or basis to render that opinion.

THE COURT: Mr. Ekeland.

MR. EKELAND: I disagree. I can't remember her exact title, but I believe she's a lead investigator or head investigator for CipherTrace. She works with law enforcement agencies, not only in the United States, but globally. Every time I --

THE COURT: That strikes me as a 403 problem, if she's relying on -- she's saying, well, in Germany this is the way they do it and, therefore, that's what we should be doing

here. I think that, to the extent that she's suggesting that the law enforcement here acted in a manner that was at odds with U.S. law enforcement norms or something like that, that's different than saying, well, in Europe this is how they do it.

MR. EKELAND: I think she does reference -- if we're going back to Ms. Still for a moment, I think she does reference in her report that --

THE COURT: Just to cut short here, I mean, it's going to be too challenging for me to go back and forth. I think I've done what I did with Ms. Still, and we've been through that. I don't want to -- I can go back and look at exactly what I said on that.

I hear your point on this, but I don't think it's really a Verret issue. So let's leave that for Ms. Still. If there's an issue that's still unsettled with respect to Ms. Still, we can address that. I don't think we need to address it in the context of Mr. Verret's. Let's keep moving through these because we have a lot of them.

MR. EKELAND: Understood, Your Honor. Number 18?

THE COURT: Yes.

MR. EKELAND: Mr. Verret will testify that the word heuristic is -- there was a typo there -- is synonymous with the words "assumption" or "guess." He will emphasize that the heuristics employed by Chainalysis in this investigation, such as the common ownership heuristic and the peel chain heuristic,

are a novel approach in a nascent area of forensics and that they have not been empirically tested or peer-reviewed.

As part of this line of testimony, Mr. Verret will rely upon literature indicating that heuristics are probabilistic, not determinative, and then he's got a reference to "See Stockinger." That's S-t-o-c-k-i-n-g-e-r.

THE COURT: I've got it in front of me. You don't need to read the whole citation there.

MR. EKELAND: There's a number of papers listed.

THE COURT: 18, 19, 20, 21, 22, and 23, again, it seems to me are all expert testimony with respect to blockchain tracing, where my recollection was that Mr. Verret had no personal experience or training doing that.

I just wonder if he's the wrong expert on the whole series of issues here for the next group.

MR. EKELAND: I think that -- I'm inclined to agree with the Court. I think this is covered by Ms. Still. This may be a product of an earlier time when we didn't know who was qualifying and coming in.

Not to, like you said, to go back to Ms. Still, I'm comfortable that with what the Court has qualified Ms. Still for, that this would be covered on that. I think we can just skip ahead to 24.

THE COURT: Okay.

MR. EKELAND: Just keep -- I think it would be

redundant, I agree with the Court, assuming that Ms. Still --

THE COURT: That is why I brought it in. Let me put it this way.

I don't know exactly what Ms. Still will be able to testify about as to each of these topics, but that if she can't, Mr. Verret certainly can't. If she can, then it's redundant.

MR. EKELAND: I agree. I think 24 gets to, really, the core reason we're bringing in Mr. Verret. 24.

THE COURT: Yeah.

MR. EKELAND: Mr. Verret will testify that it would violate core tenets of forensic accounting and financial forensics principles to use Chainalysis's heuristic assumptions -- and I think it's missing the word to -- to attribute blockchain activity to a specific individual.

He will explain that without something more, like hard evidence on a server with a list of private keys associated with those addresses, there's no way to attribute ownership or activity to a specific individual.

THE COURT: So let me ask before we just go further with this -- I can ask the government.

Is the government actually -- will the government be attempting to be using blockchain analysis to attribute any particular activity to a specific individual? I thought that the blockchain analysis was being used more to attribute

clusters rather than particular individuals.

MR. BROWN: Your Honor, to the extent that there's an instance where it's not necessarily, say, determining the cluster for blockchain analysis, but if you're just tracing funds from Point A to Point Z through certain intermediaries, there is some judgment about attributing that to sort of -- there's a common ownership or control through that chain of transactions, but that's different from, kind of, the Chainalysis heuristics that we've been -- as we've been discussing them in this case.

It's really more -- I mean, this is more like -- it's not even a Chainalysis issue. It's more like a forensic accountant saying drug money was deposited in this bank account, and then there was a wire transfer to an offshore bank account, and then there was a withdrawal of cash, and then the cash was deposited. That's not really a Chainalysis issue, and it's not really a Chainalysis heuristics issue, which is also -- even if it were, that would be outside the ken of Mr. Verret who was quite definitive that he has no understanding of how Chainalysis works, or he hasn't ever used it. It's just somebody a few doors down told him a rumor that it was unreliable, which is not an expert-level basis.

THE COURT: Right. So I guess the question is, do I even need to reach the substance of this? There's not any testimony that this is going to be pertinent to.

MR. BROWN: Your Honor, it is true that the government will be arguing based on blockchain evidence, that you can tell -- that you can trace.

THE COURT: Of course.

MR. BROWN: Kind of a single intelligence moving funds through multiple hops. That is different from, I think, the meat of the defense challenge.

THE COURT: But you're not using Reactor for that?

MR. BROWN: Well, you can. It's not a necessary -- it's not a necessary step in that analysis.

THE COURT: Are you using heuristics for that?

MR. BROWN: Heuristics in the sense of -- and maybe Ms. Pelker can help you. I think when we're distinguishing between, say, there's one input and two outputs, you might make a judgment that one is the change and one is the true spend.

THE COURT: Right.

MR. BROWN: I mean, there are very clear-cut patterns to be able to identify that. That is, I think, something that Chainalysis can help with.

MS. PELKER: Your Honor, to the extent it's helpful to have some concrete examples, I think we went through this in detail with Mr. Scholl's report.

THE COURT: Yes.

MS. PELKER: So that we have, for example, the payment from Sterlingov's Mt. Gox account in his true name

through a series of transactions, including one on the blockchain unrelated to any clustering, unrelated to any heuristics, to pay for the domain; as one example where there's no heuristics coming into play. There's no clustering.

THE COURT: Right.

MS. PELKER: -- and that is traced back to Mr. Sterlingov. The government does intend to argue that, because these are transactions traced from the initial deposit into the Bitcoin Fog cluster back to Mr. Sterlingov's accounts, that that is definitely part of the evidence the government is going to put on in its case.

THE COURT: Remind me. The tracing there, I know that -- my recollection is that Mr. Scholl did principally the tracing -- I was using the shorthand of by hand, but that -- in more traditional forensic senses of it, but then also I guess there was some element of use of Chainalysis. I can't remember if it was to verify some portion of it, but you didn't disavow the use of Chainalysis entirely.

MS. PELKER: Correct. So it really is a question of how does -- and everyone agrees, including the defense expert, that where the funds end up is a Bitcoin Fog-controlled address. That is, in part, based on Chainalysis and

CipherTrace and Mr. Scholl looking at these transactions.

THE COURT: Right.

MS. PELKER: All looking at it and saying, yes, this is a Bitcoin Fog clustered address based on the co-spend heuristic, the pattern of transactions of how that initial address kind of -- it consolidates addresses within the Bitcoin Fog cluster.

I don't think there's actually disagreement between the defense expert, at least, and the government on the fact that these funds do end up in Bitcoin Fog.

THE COURT: Right.

MS. PELKER: But that is, in part, a heuristic in forming this analysis that the ultimate destination is Bitcoin Fog. Defense, potentially, could have found an expert who -- I don't know what their basis would be, but say, nope, this is -- the entire Bitcoin Fog cluster is all wrong. None of these are Bitcoin Fog addresses. They can't be clustered together at all. That's not the defense argument.

THE COURT: No. But my recollection is that Ms. Still did disagree with a portion of Mr. Scholl's tracing.

MS. PELKER: Yes. She disagrees with the -- well, she disagrees that the intermediate transactions between Mr. Sterlingov's Mt. Gox true name account and Bitcoin Fog, basically everyone agrees on the starting point, everyone agrees on the ending point. That is on the blockchain.

THE COURT:  She says there are too many hops that are ignored.

MS. PELKER:  Exactly.  Ms. Still says there are too many hops.  Mr. Scholl testifies that he traced through these hops, and based on his analysis, they would be consistent with a transfer by Mr. Sterlingov.

THE COURT:  And was Reactor used for those hops?

MS. PELKER:  Reactor shows those hops.  But the hops in Mr. Scholl's report were done by hand.

THE COURT:  Okay.

MR. EKELAND:  Your Honor, may I address that?

THE COURT:  Yes, please.

MR. EKELAND:  I think that actual trace goes to exactly the core of what No. 24 is about.  I don't think it's disputed, as the government just said, that the Bitcoin Fog cluster is based on heuristics.  And there is -- I believe, if I recall this trace correctly, there's 19 transactions between what they're identifying as Mr. Sterlingov's account and what the heuristics are identifying as the Bitcoin Fog cluster.  And I believe Ms. Still testified that she traced through the Bitcoin Fog cluster because it's an early transaction to a BTC-e account.

What Mr. Verret is getting at here, as a certified fraud examiner and a forensics accountant -- which he is -- he's saying that it violates standards of forensic accounting

to make attributions, like Mr. Scholl is doing, on each stat there on those transactions because you don't know who has the private key.

So every step of that trace, every hop in that transaction, that could be just somebody else or another entity. So what I take Mr. Verret to be saying here in No. 24 is that it's not forensically sound from a forensic accounting approach under the standards -- and he's certified as a CPA, he's a CFF, he's a CFE. It's not forensically sound from accounting purposes to make those kinds of attributions to say that, oh, over here, here's Mr. Sterlingov's Bitcoin, you've got 19 stacks, and then you've got an Instawallet account going in, you've got a Bitcoin miner going in, and then you're going to the heuristically identified Bitcoin Fog cluster.

And then through it, it's not forensically sound for forensic accounting purposes to make the attribution through that entire chain to Mr. Sterlingov because you can't make it in any deterministic way. You have to make assumptions. You have to assume that ownership of the private keys never changed hands.

That's not on the blockchain. That can be off-chain. And so that's what he's getting at here. It's not forensically sound from an accounting viewpoint to make those kinds of attributions in his expert opinion.

THE COURT: Mr. Brown?

MR. BROWN: Your Honor, Mr. Verret just doesn't have any basis to opine upon the forensic soundness of how Chainalysis works because he has no understanding of how it works or experience how Chainalysis works. He was very clear on that in his testimony.

So to the extent that this is framed as using Chainalysis heuristic assumptions, he just -- that is inconsistent with his testimony saying that he had no insight, he had no understanding, he did not know -- he has no independent knowledge of the reliability of Chainalysis's various measures.

I'd refer the Court to the discussion, for example, on 158, speaking specifically about measures to control for CoinJoins. He says, I don't have any independent knowledge of its reliability, meaning Chainalysis. It is one thing if he just says -- and I'm not sure this is true -- that using the principles of financial accounting, you can never -- without mentioning blockchain analysis.

Maybe he could say, based on my expertise about the principles of financial accounting, you can never definitively prove the ownership of any asset without seeing, like, a deed of title. That's probably wrong. But he may have the expertise to opine on that.

But when he's talking about this sort of assertion and trying to shoehorn it into a criticism of Chainalysis, that

goes far outside his area of expertise.

THE COURT: So is there -- if we had Mr. Verret here, would he be able to pull up his copy of the equivalent of GAAP, or whatever it might be, for financial accounting and point to paragraphs X, Y, Z that will say that it's improper for a forensic accountant to make any attribution of ownership unless, you know, X, Y, or Q?

MR. EKELAND: It's my understanding that the -- I think it's the CFF. I get the two confused. The CFE, which Ms. Glave has. There's one that's a short course, and I think it's the CFF is quite extensive, and that there's a very large set of standards.

And I think what he's getting at here is that a core financial forensic standard is the identification of the asset and being able to attribute it to a particular individual. And what he's taking is, I think, his forensic accounting experience and his extensive certification in that area and applying that principle to a blockchain trace and saying, look, you've got 19 transactions here, and you don't have anything definitive to show who is controlling that transaction. A private key can be handed to somebody else off-chain; you're never going to see that on-chain. It can be a sale of Bitcoin. You've got other inputs into this trace. And I don't think that's complicated.

Then you're getting to this heuristically attributed

cluster at the end. And what he's saying is it's not forensically sound from a forensic accounting viewpoint to say you've got somebody over here, and now you've got 19 transactions ending up in Bitcoin Fog to then say that's Mr. Sterlingov or anybody's money going into Bitcoin Fog.

THE COURT: So the one -- two things here. I don't think that he is qualified to testify about Chainalysis and how Chainalysis works.

Two, I think under 403 and, really, 401, I have problems with him saying it's not forensically sound. Also, I think he's stepping into the role of the jury and saying that -- making some normative judgment.

To the extent that he can make the points that you're making, sort of, intermediate points, I think that's -- having him somewhat make those points is fine and the jury can do with it what they want, and you can argue what you want.

I mean, there's no problem with a proper witness or someone who is qualified saying that, as part of this analysis, you have the public address, but you don't have the private key, and private keys can be transferred, and you don't know who controls the private key. Not a problem with that.

And, therefore -- cross-examining a witness or putting your own witness on; and, therefore, unless you have the private key, you don't know with certainty -- do you? -- who the owner is of that public account? Unless you have some

other verification in some way, all you really know is that it was this account number from this -- from the ledger. It tells you what the public account number is. It doesn't tell you who holds the private key. That seems completely fine to with me.

I worry a little bit that it's either misleading to the jury or stepping into the shoes of the jury to say, look, I'm telling you just, forensically, it is just unsound to do this here; because it really is for the jury to decide for itself whether there is sufficient uncertainty that it calls into question the results, and sort of labeling it as forensically unsound in a case which is not about forensic accounting.

This isn't a case in which there's an allegation that someone violated the CFF standards and, therefore, they're liable for violating the CFF standards, and we need to know what those standards are.

But I think saying to the jury or arguing to the jury, this violates these standards is misleading to the extent that it suggests to the jury that the inferences are wrong simply because it violates that standard -- which I don't even have the standard in front of me, so I don't know whether it violates the standard or not.

I just think -- I think that under 401 and 403, as well as questions just of the witness's own area of expertise, that the question is, where are the areas of uncertainty which

can be brought to the jury's attention, and the jury can decide what inferences to draw from that or what conclusions to draw from that.

MR. EKELAND: Your Honor, just to get some clarification on that.

THE COURT: Sure.

MR. EKELAND: So what I think he would testify to or what -- sort of, proffering here, is that it violates the forensic accounting standards, as in what he was trained on and certified to make asset attributions to an individual without definitive evidence. And, sure, he could go back and find --

THE COURT: But that's the problem I have. That seems to me to be a 403 problem, and it may be a 401 problem. The question for the jury isn't whether it violates the forensic accounting standards and whether a forensic accountant would be subject to sanction from the CFF, or whatever it might be, for saying I know that this is who it is. And I don't think the government here is saying that you know from the public address with 100 percent certainty who it is.

There may be a disagreement on the range of uncertainty, but I don't think there's any disagreement with the notion that there is a difference between the public address and the private key, and the private key can be transferred to somebody else, and you don't know. I think the government's position would be, yes, that's possible, it might

happen rarely, but that's not material here. And your argument will be, no, it is material and it can happen all the time. That's all for the jury to decide.

Other than simply saying to the jury, as a matter of forensic accounting, it's improper, ignore it, you may not draw any conclusions from this because I'm telling you, I'm the expert on this, and it is improper to conclude that this is who it is; versus saying, this is what the evidence is, and here are the uncertainties and you, jury, decide what to do with that.

MR. EKELAND: If I may, just two points on this. This is an interesting question.

My understanding of what they're saying from that, what they're saying is Mr. Sterlingov made one of the first known deposits into Bitcoin Fog.

THE COURT: Right.

MR. EKELAND: What I think Mr. Verret is getting at here is that that is an unsound attribution to make from a forensic accounting viewpoint because you can't -- you have no evidence to verify ownership of the Bitcoin asset across those 19 transactions. That's the first point.

And that is something that it seems like is helpful for the jury to understand.

THE COURT: As I think I've said, I'm not sure whether Mr. Verret is the expert to do this. I don't have a

problem with the second part of what you said. It was just the first part of it.

Saying to the jury that that violates, sort of, fundamental norms -- violates core tenets of forensic accounting and financial forensic principles. Because it -- under 403 and, as I said, also under 401, I think it is suggesting to the jury that it is somehow improper for them to rely on that, and I don't think the question of what the core standards of the CFF are is what's relevant in the case.

The question that's relevant in the case is can you -- did the government properly identify Mr. Sterlingov, and you're entitled to make any, sort of, factual argument with respect to that to reach that conclusion.

I would have the same problem if the government were to do the same thing. If the government would come in and say, as a matter of core tenets of forensic accounting, this is Mr. Sterlingov, or you can draw this conclusion. I don't think that's the question that's in front of the jury.

The question in front of the jury is not what those tenets of forensic accounting say.

MR. EKELAND: So I just want to -- I want a clarification to make sure we're not bogged down in this in trial.

THE COURT: Yes.

MR. EKELAND: So it's not -- it would be improper for

him to say, in my expert opinion, this doesn't follow forensic accounting standards to make this kind of attribution of -- that the Bitcoin on -- saying coming from Mt. Gox account, number one, then going through these 19 transaction hops to the Bitcoin Fog cluster, is Mr. Sterlingov making the first deposit into Bitcoin Fog.

THE COURT: I think it's right. I think what's relevant for the jury is each point of uncertainty in the process, and they may need some expert testimony to understand where there are points of uncertainty and the nature and extent of that uncertainty.

What I don't think is proper is to testify to the jury about whether it violates some professional norm to make an attribution where you, in essence, don't have the deed in hand, to borrow the analogy from Mr. Brown.

For example, if this were a case in which there were multiple witnesses who saw the defendant get in the car, drive up to the bank, rob the bank, drive away. There was also evidence that the -- it was in a green Chevy, and there was evidence that the defendant in the case owned a green Chevy. And the witnesses also saw that the license plate was 1234 but couldn't see the last digit of the license plate.

I think it would be improper to have a witness come in and say, as a matter of sound, sort of, forensic analysis, it is -- it would violate core tenets to assume that that last

digit in the license plate was a 7 if you didn't actually know that it was a 7.  It would violate core tenets of forensic methodology to conclude that that green Chevy with five of the six digits on the license plate was the defendant's unless you had a title showing that it was his car.

That seems to me that those questions are in the realm for the jury to decide based on the evidence whether they think it's sufficient, not whether the CFF thinks it sufficient.

MR. EKELAND:  I'm finding this helpful, Your Honor.  So then, likewise, for the government, they can't come in and say, this is Mr. Sterlingov making the first deposit into Bitcoin Fog.

They have to say, here's this transaction, here's Mr. Sterlingov's -- there's this account over here, here's 19 hops; here's the Bitcoin Fog cluster, because the attribution is a form of opinion.  It's not 100 percent clear to me.

THE COURT:  I think you're raising a different point about what the government can argue.  It's different for the question of, sort of, invoking the name of some society and concluding that under some society norms that are not at issue in the case that something is proper or improper.  That's the concern I'm raising here.

I think that both sides are entitled to argue to the jury that the evidence will show -- and I think the government

is entitled to say, assuming they have the evidence to back it up, the evidence will show that this first deposit was Mr. Sterlingov, and here's what the evidence is.  It's X, Y, Z, Q, and Z.  And the government submits that.

And you're free to argue and say to the jury -- or this is probably better for, frankly, closing arguments than for openings.  You're free to argue and say, it doesn't show that it's Mr. Sterlingov by any means.  In fact, our position is that it's not Mr. Sterlingov.  Here's the evidence that shows it's not Mr. Sterlingov.

But it's always the case when a jury is making a determination that there is -- 90 percent of the cases, there's some uncertainty and the parties argue to the jury about the evidence and they say, I think that it's sufficiently certain that you can conclude that it was, and the government has the burden of proof beyond a reasonable doubt, and they think that the evidence is sufficiently certain, and you think it's not sufficiently certain.  That's what you do as lawyers in the case.

But that's different than having a witness take the stand and say, what the government did here violates the tenets of some organization, where that's just not the question that's before the jury.

MR. EKELAND:  I understand that clearly for a lay witness or a fact witness.

So I guess what I'm just trying to get a little -- and every court I've been in has been different about this, Your Honor, but to some degree, in the ballpark.

That seems to me expert opinion, whether or not something met financial forensic standards as somebody's trained in, in relation to attributing an asset to somebody. That's not a fact question. And the Court --

THE COURT: Just to interrupt, that may be a question of opinion -- expert opinion. I don't disagree with you about that. That's not a question properly before the jury. To the extent that it is, I think it's more prejudicial than probative because if the point is that a forensic accountant will never attribute a transaction to somebody without, in essence, having the private key in hand, I think that's misleading to the jury because I think a reasonable jury could find beyond a reasonable doubt that it was Mr. Sterlingov without knowing whether the private key had traded hands.

So I think that's the -- the question of whether it violates the standards in some cases might be a relevant question in front of a jury. If this was a malpractice case involving a forensic accountant and that was the standard of care, that would be entirely appropriate expert testimony.

But the jury here is not being asked to decide whether what the government did was consistent with or not consistent with the standards -- the CFF standards.

MR. EKELAND: I don't want to belabor this point. I will just submit that we do think it would be helpful to the jury to know that there's forensic accounting standards related to attributing ownership of an asset that in his expert opinion weren't being followed, but I'm happy to --

THE COURT: I think you've heard my ruling on this. If you want to bring me any case law that shows I'm wrong, I'm happy to consider it.

MR. EKELAND: Could I get a clarification on 704? I'm not clear on how the Court reads 704. My understanding of 704 is it abrogates the ultimate conclusion rule with the exception for criminal cases that an expert can't testify to ultimate conclusions about the mental state or condition of a defendant in relation to an element of the crime.

So I just want to make sure I'm understanding that correctly as I read it the other day and that -- and as I believe the committee notes state. My understanding is the rule was changed in order to allow experts to opine to ultimate conclusions with that one exception for a criminal case. I want to make sure I've got that right.

THE COURT: I think -- maybe it's a question of using the language correctly.

I think that the expert can't substitute himself for the jury or step into the role of the jury. So I would be very surprised if the expert was allowed to testify -- and I'd have

Appx2067

to look at this more carefully -- allowed to testify, it is my expert opinion that he is not guilty.

MR. EKELAND: That's why I'm asking you for clarification. I reread the rule, and I hadn't read it in a while. I read the committee notes to it. If I'm recalling it correctly -- I think I read it last night -- the committee notes say that they're abrogating the ultimate conclusion rule, and then there's an exception for criminal cases where you can't offer -- an expert can't offer an ultimate conclusion as to the mental state or condition related to an element of the crime.

But that it's -- actually, 704's meant to be more permissive for experts in what they can state as opinions; because I think, if I recall the committee notes correctly, there was all sorts of stuff that defense attorneys and everybody were doing to twist the wording to get around the rule.

THE COURT: I will take a look at that more carefully. I'm happy to hear from the government on this. I don't think my ruling depends on that, in any event. I think it's a 403 relevance issue, is what I've really been focusing on anyway.

And whether it's an ultimate issue or not is not really central to my conclusion that -- the issue before the jury isn't the professional standards and whether the

professional standards were violated or not and implicating them is more prejudicial than probative.

MR. EKELAND: Okay. We'll move on, Your Honor.

THE COURT: Mr. Brown, did you have anything else on this ultimate issue question you want to clarify for us?

MR. BROWN: Your Honor, the government agrees that it's a 401, 403, and a 702 issue; that it's just not helpful for the jury or relevant what a witness's personal opinion is of the evidence in the case. That's the jury's job; it's not the expert's.

THE COURT: Okay.

MR. BROWN: Just to clarify on No. 24, I want to make sure that the government believes any testimony by Mr. Verret where he's claiming to have walked through blockchain analysis should be excluded because he testified he did not do that.

He said -- I asked him on cross-examination, "Could you identify the blockchain analysis you've done in this case?"

And he said, "So I believe what Mr. Brown is getting at is he wants to say that the only blockchain analysis that counts is tracing done in the way that Chainalysis does tracing. I have not done Chainalysis-level tracing."

He was very unequivocal about that. To the extent the defense wants to put him up and have him walk through, say, a series of hops and then opine about the uncertainties and that, that's a disclosure issue, as well as a lack of expertise

or reliable methods issue.

THE COURT: I actually -- when I was talking about this, I think the way I put it was if there was an appropriate witness, the witness could testify about this. I think it's a fair point.

Mr. Ekeland, is Mr. Verret really the person to be testifying? I would have thought this was Ms. Still.

MR. EKELAND: He's -- the government is sort of presenting Mr. Verret as he's got no experience with cryptocurrencies at all. That's --

THE COURT: No, no. I think he's saying with tracing; blockchain tracing.

MR. EKELAND: The blockchain tracing, in terms -- let's just go back to that example of what they're alleging is the first -- the first-known deposits into Bitcoin Fog.

That's not complicated tracing to do. You can do just the straight-up trace with a public blockchain.

THE COURT: But does Mr. Verret have experience with that or expertise?

MR. EKELAND: I believe he has used public blockchain explorers. He's also done the CipherTrace certification course. He's got a certification from Wharton in cryptocurrency. He sits on the Zcash Foundation.

THE COURT: That's not -- I understand he has certain credentials. I guess my question is, does he have experience

actually doing blockchain tracing?

MR. EKELAND:  I would have to go back and ask him because what level -- I think what Mr. Brown just said is Chainalysis-level, right?  I don't think Mr. Verret said, I have none.  I could be wrong.

Again, just to look at it -- you can look at Mr. Scholl's trace on that piece of paper, and assuming just arguendo that that trace is correct, you can come to conclusions looking at that piece of paper without even looking at the blockchain explorer.  And I think that is where this comes in, in terms of whether or not he considers it forensically sound from an accounting --

THE COURT:  Do you really want Mr. Verret to be the one who is going to be subject to cross-examination on whether he's done the tracing?  It seems to me Ms. Still is much more knowledgeable on this topic.

In addition to my questioning whether he really -- as you sit here now, I think you weren't sure whether he had any tracing experience.  Do you really want to put someone on the stand where you're not sure whether they've had tracing experience, putting aside even the disclosure issues, and let them be subject to cross-examination, which would not be helpful, obviously, to your case?

MR. EKELAND:  I think this is a little bit of a different point.  What he's not opining on is, are those traces

accurate, did you follow the right tracing methodology; that's not what his opinion is being offered for.

What it's being offered for is to say that at any point in this trace, it's forensically unsound to make an attribution of ownership on the asset, and that is something I think he is very much qualified to do because it's a very basic principle.

And then he's taking that notion of the inability to attribute ownership and saying, this doesn't accord in my expert opinion in what I was trained in as a financial fraud examiner; they wouldn't allow it.

THE COURT: Right. I think your description there is helpful for me in crystalizing it. I do think that, to the extent that you are kind of falling back into just forensically unsound, I think I've already expressed my view with respect to that.

To the extent that he wants to say, I don't really -- I didn't do the tracing here, but I heard Ms. Still testify. Ms. Still testified and she explained that at each step in this transaction, you know the public address, but you don't know the private address. And as she explained to you, when you don't know the private address, you don't know for sure who it is. All you know is what the public address is, and you don't know who actually accessed the public address.

And, therefore, it would be improper for you to

conclude that it was Mr. Sterlingov because it could have been anyone else. I think that is actually what the point Mr. Brown was making to me about 702, which I now understand better and I think he's correct about, which is it may not be a question of whether it's ultimately a question for the jury or not. The question is whether it's helpful for the jury or not.

It's not helpful in having the jury understand something they can't otherwise understand to have a witness come in and say, Ms. Still just explained to you that you don't know who these people are, and because you don't know who these people are, then you don't know that it was Mr. Sterlingov.

That's not helpful, in an expert sense, to a jury. You know, what may be helpful would be the testimony that, in fact, from these transactions, you can't tell who the actual owner is. That's my point.

I think that's entirely appropriate and fine, but you need somebody who has some expertise in that. And I'm not sure that Mr. Verret is the right person on that. I think you've indicated you don't even know if he has done any blockchain tracing himself.

And, again, this feels to me like more of a Still question than a Verret question at this point.

MR. EKELAND: Understood, Your Honor. I mean, I don't want to belabor this point. I think we can move on.

I did just get an explanation of why we are having

such a hard time getting ahold of the lawyers at CipherTrace, and that is, it's my understanding, it's Rosh Hashanah. People are, apparently, out on religious holiday. Is that correct?

THE COURT: I'm looking at my calendar.

MR. BROWN: Your Honor, we understand it's the eve of Rosh Hashanah.

THE COURT: That may not explain why they were unavailable earlier today but by 5:00, they may be unavailable. But by 3:30, I'd still hope they would be available. The holiday doesn't start until the sun sets.

MR. EKELAND: I can't speak to that, and I'm not going to speak to it. I'm just repeating what I've been told. Would you like us to continue?

THE COURT: Yes, please.

MR. EKELAND: We're on 25 now. I think this goes back to what the discussion was we just had. Mr. Verret will testify that the heuristics cannot definitively prove ownership of cryptocurrency. Mr. Verret will --

THE COURT: Did Mr. Verret draft this, or did you draft this?

MR. EKELAND: I'm sorry, what?

THE COURT: Did Mr. Verret draft this document or did you?

MR. EKELAND: I think what we did is we would do an initial draft, send it to him, and he, obviously, participated

in the drafting of it and signed off on it. I can't remember how the --

THE COURT: The reason I'm asking is it doesn't sound like the types of things where he has expertise. Earlier stuff, maybe. But this, again, heuristics cannot definitively prove ownership of cryptocurrency; again, Ms. Still or some other person might be the right expert on this.

I didn't believe that Mr. Verret had any particular experience or expertise on those issues.

MR. EKELAND: Is that even a principle that's in dispute? I don't even think that's in --

THE COURT: If it's not in dispute, then we don't need an expert either.

MR. EKELAND: Point taken. Just because the word heuristic is being used doesn't mean that an expert can't use it in their analysis without having some sort of blockchain tracing. I think that's -- just like the Court can theoretically understand stuff and was discussing --

THE COURT: I wouldn't purport to go down the hall to Judge Kelly's courtroom and testify as an expert on this stuff.

MR. EKELAND: The Court is reading the stuff, obviously, on heuristics that was disclosed and understanding at least on a certain theoretical level, right?

I think the notion -- and I'm not saying this is what the Court is asserting, but just to take it to an extreme --

the notion that you have to have had some kind of blockchain training experience to step back and look at things theoretically and understand it and opine about it.

THE COURT: No, no. I completely understand that. I just think, if you want to testify as an expert in a case on a particular topic, you need something more than the type of knowledge that anyone might have if they picked up a primer and read through the primer and then said, okay. I don't get the sense -- maybe I'm wrong about this. I don't get the sense -- and I think Mr. Verret in his testimony -- he doesn't know what the heuristics are that Chainalysis uses. And I think anyone would say that some heuristics are more predictive than others.

Your own expert, Ms. Still, indicated that some heuristics are more predictive than others. If you can control for CoinJoin, for example, co-spend may be extremely predictive.

But I don't get the sense that Mr. Verret has, sort of, that type of expertise other than, perhaps, he understands what the word heuristic means, and he understands that a heuristic is -- I don't think a guess is quite the right word for it, frankly, but that it is a --

MR. EKELAND: Assumption?

THE COURT: Well, I'm not even sure an assumption is the right word. It's a tool that is used, perhaps perfectly, perhaps imperfectly, to identify particular types of

transactions.

There may be a dispute about how perfect that tool is in identifying. I'm not sure you would say it's a guess, for example, if you had a heuristic that said that people standing with -- at the bank teller with a gun pointed at the bank teller are robbing the bank. And you know what? Maybe not always the case; maybe it's Halloween and someone is making a really bad joke. We're going down, I think, an alley that's probably not super helpful here.

The question is whether Mr. Verret has, sort of, relevant expertise. I'm persuaded, as I've indicated before, that Ms. Still does have the expertise on blockchain tracing and heuristics and how they work, but I don't have any sense that he actually has any basis to say heuristics are guesses, for example.

MR. EKELAND: I understand what the Court is driving at. I think the Court understands the defense's position, that he's applying his forensic examiner, forensic fraud experience to what is being presented with these heuristic methodologies.

Maybe I'll just read through the rest of 25 and then -- because he says, Mr. Verret will explain that heuristics are guesses. We just discussed that, guesses. Based in part on the assumption that most Bitcoin transactions take place between public addresses owned by the same --

THE COURT: Slow down for the court reporter.

MR. EKELAND:  On an assumption that most Bitcoin transactions take place between public addresses owned by the same individual.  Definitive assessments of identity-linking non-KYC public keys with individuals based on these heuristics are inconsistent with the standards of the AICPA, and then in parentheses, it says for CPA/CFF designations, and ASCFE, in parentheses, for CFE designation.

And then he says see -- like the word see, like, look at -- AICPA statement on standards for forensic services.  And then he's got a hyperlink and then semicolon, another site, Association of Certified Fraud Examiners, CFE Code of Professional Standards available at, and then he's got the hyperlink.

THE COURT:  Let me ask the government.  The government has its own standards in this regard as well.  I know that sort of grew up out of some of the DNA and fingerprint analysis.  I think it's in the U.S. Attorney's manual with respect to the extent to which the government can argue that the evidence definitively proves something where it's in some sense probabilistic, even if it's probabilistic in the way that DNA is where it's one in a trillion.

So what is the government's view?  I'm not so much asking about Mr. Verret's testimony, but I suppose the question is, is there something for Mr. Verret to be responding to?  If the government is not going to argue that it's definitive using

that word, proof, then this may not be an issue one way or the other.

MR. BROWN: Your Honor, I don't think Mr. Scholl will argue that his analysis definitively proves anything, really, that Mr. Sterlingov is guilty -- I mean, that's not what his testimony is.

He's presenting evidence; and we will certainly argue to the jury that the jury can use their common sense, they can draw reasonable inferences based on that and other items of evidence in front of them.

THE COURT: Right.

MR. BROWN: But by the same token, we certainly will not be arguing, based on the DOJ justice manual, that this evidence is sufficient to prove that Mr. Sterlingov is guilty. We won't be resorting to reliance on any certain standard.

THE COURT: In some sense, I just think this is perhaps a nonissue. This is maybe what is motivating my notion that it's a 403 issue.

You know, it would not surprise me in the slightest that various forensic standards say that where your determination is made on an assumption or even if it's an assumption where there is an extremely high likelihood that that assumption is correct, but if it's based on inference in some way, you ought not conclude definitively, that is, without any doubt whatsoever, that the car in my hypothetical belonged

to the defendant.

But I would also be very surprised if, as a matter of forensics, you couldn't say it is relevant and somebody who is trying to figure out what happened certainly can consider the fact that the defendant did own a green -- or was seen in a green Chevrolet with License No. 12345, we didn't see the sixth digit; and I can't tell you absolutely, positively that it was his car, but I'm also not going to tell you that that's irrelevant to your determination.

If forensics and if Mr. Verret were of the view that that's something that cannot be considered in any way, I would be pretty surprised.

I think maybe we're just -- I think we're arguing about nothing here, and that is my -- is what is driving my 403 concern. To the extent that it is suggesting that, absent absolute definitive proof that someone actually saw Mr. Sterlingov entering the private code into the computer, you can't draw any conclusions. But I don't think that's what Mr. Verret is saying.

I just worry, though, that the way he's putting it in the air and the descriptions of it about these -- violating these various standards would suggest to the jury that that is requiring.

MR. EKELAND: I understand the Court's point on that point. I think the defense's 403 concern is that this

Chainalysis Reactor and these heuristics are being presented as scientific and as deterministic.

I don't think it's disputed that there are no standards in this industry. There is no standard manual, there's nothing like NIST or anything like that. I do think it would be helpful to the jury to be given some kind of standards, not -- I understand the Court's concern with the jury being told, while if you don't absolutely follow this standard, it can't be true. That is heard and understood.

What I think would be useful, though, is in his province in relation to the financial assertions and attributions that are being made is to say, look, there's a set of standards here, and I think at one point the Court said at one of our hearings, this is a little similar, it's not dissimilar from a normal, like, financial fraud case with the tracing.

And that these standards could be useful to you in evaluating and making your own determination, and in my expert opinion, based on what you're seeing here, the fact that you -- whatever, had the private key problem or you don't have -- there's nothing in the blockchain or block that attributes any identity to anybody or any entity; that that from the standards that we use in normal financial cases would be considered forensically unsound; and you can make your own judgment.

The 403 concern is that this is so new, and it's

getting presented like it's science. It's getting deterministic.

THE COURT: I have no doubt, by the time you've finished your cross-examination, that it will not be -- the jury will not have a one-sided view of this as scientific certainty.

MR. EKELAND: I hope so. I think I've made my point.

THE COURT: I think I've made my point on this. If it turns out I'm wrong and there's some case law out there that says that, notwithstanding 403 and 702 and 401, it's appropriate in a criminal case to offer testimony with respect to forensic standards, you can come back to me and point me to that case law.

MR. EKELAND: Thank you, Your Honor. No. 26?

THE COURT: Yes. I think we're going to have to move a little faster than this. We've still got quite a bit to do even on Mr. Verret.

MR. EKELAND: If I could take one second and glance at it. This could be redundant or we may have already covered it.

I think 26 is just a similar point on ownership attribution. 27. May I go ahead on 27?

THE COURT: Yes.

MR. EKELAND: Mr. Verret will testify that there are multiple situations that could have been misinterpreted by the

government and Chainalysis in their investigation into Bitcoin Fog. Mr. Verret will explain that a reasonable explanation for the misattributions in the Bitcoin Fog investigation may be that the defendant transferred Bitcoin to an individual in an exchange, and that individual or another in a chain of individuals was the ultimate purchaser of the Clearnet domain.

Mr. Verret will further explain that another reasonable explanation is that whoever hacked Mt. Gox also hacked the defendant's account and used it to facilitate external transfers.

THE COURT: This all strikes me as so speculative; either arguments that a lawyer can make or just entirely speculative.

We talked about the Mt. Gox hack before. I still haven't seen any evidence or reason to think that Mt. Gox was hacked in any way relevant to the integrity of the data in this case.

Again, if it's out there, you need to bring it to me. Quite frankly, we've passed most of the deadlines long ago in this case. But it's just too speculative to say, it's possible that Mt. Gox was hacked, and it's possible that it was -- that these accounts were hacked, and it's possible that someone went in and changed a transaction involving Mr. Sterlingov or involving somebody else to make it look like it involved Mr. Sterlingov.

That just strikes me as so speculative as to be unhelpful to the jury and also more prejudicial than probative, absent some evidence that, in fact, the Mt. Gox hack had something to do with the type of information or data that we're talking about here.

MR. EKELAND: Removing Mt. Gox from the equation on No. 27, is it appropriate for him to testify that there's perfectly reasonable explanations in terms of these transactions and who they're being attributed to?

Because, again, to -- there is no way beyond where there's some sort of definitive corroborating evidence which the government says they have for, like, the Mt. Gox account, number one, to attribute transactions to Mr. Sterlingov from the blockchain.

Everything, in a certain sense, in relation to that is a form of argument and opinion. We would submit that, from his perspective of a financial forensic examiner and fraud, that part of what you should do is consider reasonable alternatives or explanations to these types of financial transactions and not say, oh, it's definitively this, but it's entirely reasonable, and this is entirely consistent with, say, whatever, private key transfer, off-chain or this.

And that it's helpful to the jury to know, again, that there's perfectly reasonable alternatives to what's being put forth.

THE COURT: Give me just a second here. I need to go attend to something just for a few minutes off the bench, and I will come back.

(Recess taken.)

MR. EKELAND: May I proceed, Your Honor?

THE COURT: You may proceed. Any further word from CipherTrace?

MR. EKELAND: Your Honor, may I look at my phone for one second to check?

THE COURT: Of course.

MR. EKELAND: No, not beyond what I just told you about the Rosh Hashanah, Your Honor.

THE COURT: Are they in California?

MR. EKELAND: Ms. Still is in California. I don't -- I think when I asked her this morning where the lawyers were, she said all over. I'm not sure. I don't know.

MR. BROWN: Mr. Brown?

MR. BROWN: Your Honor, the general counsel whose information we found on the New York Bar website, she is on the board of directors of a Jesuit organization. I don't know her from Adam, but I'm not sure if Rosh Hashanah is the reason for --

THE COURT: I have to say, I'm a little surprised that a company that large can't get somebody to respond to a request from a court to have a lawyer who can show up. I

suspect -- although I don't know, I suspect what's going on is that they're trying to figure out what they want to do or what their position is here. But that's not what I asked.

What I wanted to know is at least, sort of, what their process was and what was going on. I wasn't going to put them in a position in which they had to definitively tell me their answer if they were still thinking about it and debating what to do.

It does feel a little bit like they are not being particularly responsive to the Court here, not to have any lawyer who can show up and just tell us, Judge, we're thinking about it or, Judge, here are the issues. That's what it is.

MR. EKELAND: I agree with you, Your Honor. I don't know what to say.

THE COURT: Let's return to --

MR. EKELAND: No. 28. Mr. Verret will testify that attribution of asset ownership can be a difficult problem in financial forensics, generally. He will explain that forensic techniques are more settled in traditional financial investigations than in the blockchain context.

Mr. Verret will explain that the extensive KYC measures implemented in traditional finance make it easier for investigators to attribute custody and control over assets in ways that are not necessarily applicable in the blockchain context.

Mr. Verret will explain that, despite recent efforts to incorporate KYC protocols in the blockchain space, these developments are not yet complete, and there are many ways users can avoid KYC protocols in blockchain finance.

THE COURT: Mr. Brown, what are your thoughts on this one?

MR. BROWN: Your Honor, I am struggling to understand the relevance of any of this. It just seems very generic. And to the extent that there's some application in this case, it's just a lawyer argument.

THE COURT: I suppose the point which may, again, be conveyed by others or may not be rocket science at this point is that it's harder to track transactions in the blockchain context than in the traditional banking context, which I suppose at some level is more or less true. Again, maybe it's a question of cross-examination.

But in some sense, it's easier because there's actually a public ledger. And in some sense, it's harder because the banks do have strict KYC requirements that are required under the bank secrecy rules and other fairly extensive federal regulations.

So, I mean, I agree with you this is not the core of the case in any respect, Mr. Brown. I guess the question is, is there any objection to Mr. Verret simply testifying that, I'm usually doing pen-and-paper transactions and it's harder to

do it on the blockchain because even if you know what the public addresses are, you don't know what the private addresses are and, therefore, it makes attribution more difficult

MR. BROWN: Yes, Your Honor. I think that's fair.

THE COURT: Is that what he's getting at here?

MR. EKELAND: Yes, Your Honor. I think there's -- it would be helpful for the jury to have some discussion about KYC, which is going to come up in this case. I think the Mt. Gox 1 account was a KYC account; the Kraken account is a KYC account.

I think it would be helpful for them to have some sort of grounding in not only KYC in the traditional financial setting, brick and mortar, so to speak, and then how that's playing out in the digital space. I do think it is, at least to the defense's case, an important issue that Mr. Sterlingov was using KYC accounts, when in this space there are a lot of ways to just not use them.

THE COURT: So the only thing that concerns me about what you just said was that he should be able to speak about how they're playing out in the digital space. I'm a little worried about disclosure issues, and I don't really know what you mean by that.

I think if all you mean is that not everyone on the blockchain is employing KYC protocols, fine.

MR. EKELAND: Yes. I think that's in that sentence

there.  I think it's, like, the last sentence.

Mr. Verret will explain that, despite recent efforts to incorporate KYC protocols in the blockchain space, these developments are not yet complete.

THE COURT:  Okay.  I just -- what you were saying to me sounded more open-ended than that.  If that's what it is, I think that seems okay.

MR. EKELAND:  It was a little more open-ended than that the way it was phrased.  I agree with the Court's concern there, and I don't intend it to be that open-ended.

THE COURT:  Let's go on to 29 then.

MR. EKELAND:  Mr. Verret will testify that there is no way to definitively determine who controls a blockchain asset because the KYC regime lags that of traditional finance. Mr. Verret will explain the challenges associated with determining where a digital asset exists, who possesses custodial control of a digital asset, and even whether a digital asset exists.

THE COURT:  Mr. Brown?  This seems to me to be similar, at least to the extent that there's information there to what we just discussed, and that if Mr. Verret wants to say that there's not universal KYC for the blockchain and it's, at times, difficult on the blockchain to determine who the actual custodian is of the asset, that seems okay.

MR. BROWN:  Yes, Your Honor.  The government doesn't

object to that.  I mean, certain parts of this, the assertion of the online KYC regime lags that of traditional finance, that may not be factually accurate.  But the government doesn't object as a matter of 702.

THE COURT:  All right.  If it's not factually accurate, you can cross on that.

MR. BROWN:  Yes, Your Honor.

MR. EKELAND:  No. 30.  Mr. Verret will testify that the nature of the blockchain has fundamentally altered the notion of property ownership itself, and that the nature of the blockchain makes it difficult to confirm ownership or control over digital assets.

Mr. Verret will explain how he teaches his students that obtaining some physical representation of the seed phrase or private key on a suspect's hard drive is key to establishing an individual's connection to the public keys used to attribute ownership or control over digital assets.

Mr. Verret will further explain that even the DOJ's own criminal practice journal emphasizes the importance of identifying seed phrases or private keys associated with digital assets to attribute custody or control.  Then he cites, see Michael R. Korver.

THE COURT:  You don't need to read that.  Mr. Brown?

MR. BROWN:  Your Honor, this -- first of all, that first sentence, I have no idea what that even is supposed to

mean.

THE COURT:  I don't understand what it means either.

MR. BROWN:  It seems to me some sort of metaphysical point, which --  it's just not, I think, a proper area of testimony in front of a jury in a criminal trial.  This is not helpful to a jury, this sort of metaphysical nature of property and the blockchain space.

And the rest of this --

THE COURT:  I also think it's -- there's no reason to think it's true.  I mean, it's not -- the property is not communal, it's not shared property.  It's just the question of proof of ownership has changed in some respects.

MR. BROWN:  Yes, Your Honor.  We just don't think it's relevant or proper testimony.

THE COURT:  Okay.  And then the remainder?

MR. BROWN:  Well, the same goes for the remainder. How Mr. Verret teaches his students is not particularly helpful to the jury.

And, again, this just doesn't strike us as true; obtaining some physical representation of the seed phrase or private key on a suspect's hard drive is key to establish an individual's connection to the public keys.

This seems like what he's really arguing about is, can the jury make an inference about control over -- about control over Bitcoins that have been transacted in this case,

and there's no basis for that sort of opinion.

THE COURT: It seems to me here -- I agree with you that what he teaches his students is not relevant.

MR. BROWN: Sorry, Your Honor.

THE COURT: What I do think is probably -- it may be captured by what we already discussed above. There's a fair amount of redundancy in these disclosures.

But to the extent he simply wants to testify that there's a difference between the public key and the private key, and the public key isn't definitively tied to someone and that it's only through the private key that you maintain ownership and that private keys can be transferred and knowing who owns the private key is -- if you know someone who has a private key, you can then determine from that, I may be a little bit concerned if you were to go further and say that without that information, you can't know.

That may not be fair and that may be misleading to the jury to put it that strongly. But to make just the factual explanations which might, for lay jurors who don't understand this stuff -- and I will admit that I am closer to that category than the rest of you are, but I'm doing my best to learn it.

But it's helpful to understand the difference between a private and a public key, and that it is the private key that is, sort of, the essential element of ownership.

MR. BROWN: Yes, Your Honor. We don't disagree with that. I think where the Court is drawing the line makes sense, which is he can testify about questions about how you determine ownership. But we don't think that there's a basis or that it's fair for him to testify you can't determine ownership without X, whatever X may be.

THE COURT: All right. And what about the article?

MR. BROWN: The article is -- well, first of all, that's just not what -- I'm not sure if he even read this article. That's just not what the article has to do with.

It has to do with, as I recall, seizing -- how you seize cryptocurrency assets that are subject to seizure and forfeiture. That is a totally separate question. That's a procedural question. It's a totally separate question from attribution of ownership in a criminal sense.

To the extent -- I think the effort with a lot of these citations to articles published by my co-counsel or myself, I think the implication is that they're trying to do some sort of gotcha with a very challenged-level reading comprehension of those articles.

I think that that's -- we should not be talking about what AUSA Chris Brown or Trial Attorney Alden Pelker has written. We should be talking about the evidence in the case.

MR. EKELAND: Your Honor, I think it's relevant to a blockchain prosecution what is -- what the standards being

discussed in one of DOJ's own criminal practice journals says. I don't think that's a game of gotcha.

I think, you know, Mr. Brown and Ms. Pelker are the top prosecutors in this space, and they have written about their practice and what they think about it; and I think it's entirely appropriate for the defense to look at a DOJ criminal practice journal that is discussing things directly on point to this case.

THE COURT: What is the point that the journal establishes?

MR. EKELAND: I think what Mr. Verret is talking about here is that it's important to identify seed phrases and private keys related to digital assets when you're going to attribute custody or control.

THE COURT: Maybe I need to go read the article. But I don't think anyone here doubts that that is important when you can do it, just like you might -- there might be an article by a prosecutor that says, it's important to catch the bank robber red-handed while he has the cash in his hand and is fleeing the bank.

But to suggest to a jury that that's somehow the standard -- unless you do that, you can't charge somebody with bank robbery -- would, obviously, be grossly misleading.

MR. EKELAND: I think what this is getting at is that, in relation to digital assets, there are certain indicia

of ownership, and it would be helpful to the jury to know that.

THE COURT: That's fine. But I don't think you need to use this article here. To the -- again, I think we're talking about stuff that is not controverted. But if you want to explain it to the jury, that's fine. There's a difference between the private key and the public key. It's the private key that is necessary to assert control over the Bitcoin that are in the wallet. That's all fine.

I just -- to the extent, though, that you're suggesting here that there is some standard and that, without that, you cannot make that attribution, I think that is under 403 more prejudicial than probative and misleading. I don't see a need to use the article.

I'll take a look at it. If I have a different view after looking at the article, I'll let you know.

MR. EKELAND: Again, on the 403 point, the defense's concern is, again, just that this -- and I feel like we've been fighting this since the beginning of the case, so to speak, that there's this perception again that this stuff is scientific, that it's -- these heuristics and all this stuff is some kind of magic that definitively makes an attribution. That's why we're emphasizing these points.

THE COURT: I don't think the government is in any way suggesting that through clustering or through the use of Reactor that they're then able to use that to definitively

associate a public key with a particular individual.

MR. EKELAND: What I'm more concerned with here in terms of the 403 thing is really the CSI effect in the sense that the jury is going to come in with these notions that, okay, here's this really fancy expensive software, it's -- there's all these fancy terms around it, it's being said it's scientific, it's deterministic; and that I think it really -- it helps the jury in terms of the defense's 403 concerns to emphasize these points, that there's all these things, and that we're just not making up the standards or what we're talking about here. These are things that the DOJ agrees with.

THE COURT: Again, I'll read it. I would be very surprised if that article said that you cannot make a conclusion without that information, which is the way I think you're trying to suggest what it means. I don't think there's any dispute about the proposition that it's extremely helpful in making that type of association.

MR. EKELAND: I don't believe Mr. Verret is saying that you cannot make that conclusion without the evidence. I think what he says here is -- the DOJ's own criminal practice journal emphasizes the importance of identifying seed phrases or private keys. That's not --

THE COURT: That's just not -- I don't think that's a matter of dispute here. I mean, it may be a dispute about how you characterize it.

But, yes, if you catch the bank robber leaving the bank with the money in his or her hands, that's really good and helpful evidence, but -- so I don't think -- if you have the private key, that's extremely relevant and valuable. But to the extent -- a suggestion that that is an essential or necessary condition, I think, is more misleading than probative.

I don't think that -- I'll look at the article, but I'll be very surprised if that's what Ms. Pelker said in the article.

MR. EKELAND: Your Honor, you can read it and let us know, but I do think it's -- again, not saying that it's definitive, but that it is important.

THE COURT: It is. I don't think the government is going to dispute that.

MR. BROWN: Your Honor, I always highly recommend reading anything that Ms. Pelker writes.

But Mr. Verret did also testify just, unequivocally, the internal policies of Department of Justice, no, I wouldn't hold myself out as an expert in DOJ policy. Page 133.

This may -- you should still read the article, but this may just be outside of his expertise.

THE COURT: Okay. Fair enough. That's actually a ground for keeping it out as well. Let's move on.

MR. EKELAND: Number 31. Mr. Verret will testify

that there's a high risk of misidentification when relying upon heuristics in blockchain forensics. Mr. Verret will explain that the government's characterization of Bitcoin transactions as beta transactions is not reasonable and that it is unlikely the identified transactions were, in fact, beta transactions.

Mr. Verret will explain that the evidence is consistent with these transactions being mundane transactions that any user could have done. Mr. Verret will explain that the pattern of activity identified by the government as beta transactions could have simply been something as simple as a user testing a new wallet or a user onboarding new users to a crypto platform.

Mr. Verret will emphasize that such mundane activity would appear identical to the evidence purported by the government to be beta transactions.

THE COURT: All right. Mr. Brown?

MR. BROWN: Your Honor, three quick points. Number one, Mr. Verret testified that he's not a blockchain expert. Number two --

THE COURT: I'm not sure that this is a blockchain question. I mean, I think, if I'm understanding this correctly, it's very early transactions involving Bitcoin Fog, and the government's position -- that the government ties this to Mr. Sterlingov, and the government's contention is that this early transaction involving Bitcoin Fog is best understood as

him testing the software to make sure it worked, which provides some evidence that he, in fact, was the administrator because, look, here he is testing it.

I think what Mr. Ekeland is saying is, even assuming that that was Mr. Sterlingov, it could have been someone testing it, but it equally could have been him just testing the wallet or him seeing whether he liked Bitcoin Fog and wanted to use Bitcoin Fog. And to conclude that it was a beta test, there's not a foundation for that.

MR. BROWN: Yes, Your Honor. I think that that is, essentially, a closing argument. It's to say these are the facts out there and the defense -- as the government has one interpretation of those facts and the inferences to be drawn from them, the defense has a different interpretation of those facts. That's it. That's a matter of argument. It's not a matter of --

THE COURT: Is the government, when it puts on its case, going to treat this -- or in its opening treat it as a beta transaction or simply put on a witness who is going to testify we were able to track this early transaction to Mr. Sterlingov, and it was very early in the process. How early? It was this early. What were the characteristics of the transaction? And then in closing, you'll say, look, this must have been a beta.

MR. BROWN: Yes, Your Honor. We will have testimony

suggesting that this is consistent with one, sort of, common director of these transactions, and that's consistent with the process of manually mixing and unmixing a transaction.

The other point that I wanted to make is Mr. Verret -- and this may be a proper area of testimony for Ms. Still, perhaps, but Mr. Verret also testified in that other passage that I cited earlier that he has done no transaction -- he calls it Chainalysis-level analysis. But he's done no transaction-level analysis in this case. And if he has, it has not been disclosed to the government.

THE COURT: I guess I'm -- I mean, as was probably evident from my questioning, I think if the government is going to argue and put on expert testimony that there are characteristics of the transaction that are consistent with it being a beta transaction, it's fair game for the defense to put on an expert and testimony that there is evidence that it is consistent with other types of transactions which are not beta transactions.

I do think -- I guess it's not clear to me that Mr. Verret has expertise, and this disclosure here is not terribly detailed. I don't really know exactly -- sort of what indicia he's going to point to or what sort of study he's going to rely upon, what his basis is going to be to say that this transaction is consistent with other types of transactions that someone might have been engaging in early in the use of Bitcoin

Fog.

MR. EKELAND:  I think in 31 there's two examples.  In the second-to-last sentence where he's just saying, it could have simply been something such as a user testing a new wallet or a user onboarding new users to a crypto platform.

THE COURT:  I understand that's what he's saying.  But I guess the question I had is, what are the indicia for; like, knowing one way or the other which it is?  You know, why do the indicia point to the fact that it might be someone just testing a new wallet, and too, and more importantly, is it something that Mr. Verret has studied, and does he have any expertise with respect to how people test new wallets and what the indicia are, where he can look at this transaction and say, I can point to X, Y, and Z here and show you, based on my expertise and experience, that this is exactly what someone would do when they're testing a new wallet?

MR. EKELAND:  I'm fairly confident he has set up his own wallets given his experience with Zcash and my conversations with him.  I think, actually, the point is that -- if I understand this correctly, is that there is no indicia differentiating what the government is going to argue is a beta transaction from somebody setting up a wallet and that's the issue.

THE COURT:  That's the question.

MR. EKELAND:  Yeah.  It's not, is there indicia that

shows you this was definitively a wallet. It's that there is no indicia on what's being argued as a beta transaction that can distinguish it from somebody setting up a wallet.

THE COURT: Correct. That's the question. The question is just whether Mr. Verret has the experience with respect to this particular set of conditions or elements of the transaction in which he could make the -- be engaged in that type of analysis based on his expertise or experience.

MR. EKELAND: I would submit that he does. Just that in my understanding, like, setting up a wallet is not a difficult thing to do. It's -- if I'm recalling my conversations with him correctly, that's something that he has done. It's a very common thing for people to do in the crypto space.

Again, he's certified by Wharton, he teaches cryptocurrency at George Mason University. He's an active user of cryptocurrency. I guess --

THE COURT: Which currency does he use? Does he use Bitcoin?

MR. EKELAND: From my understanding, he uses Bitcoin. He's on the Zcash Foundation board, if I'm remembering correctly. He's somebody who is in the space.

I don't think what we're talking about here is complex in the sense of -- I guess the phrase we're using a lot today is Chainalysis-level tracing. This is a very basic

notion and basic things that I'm confident -- you can maybe voir dire him more, but that he's got the expertise.

THE COURT: Mr. Brown, anything else on this?

MR. BROWN: No, Your Honor. Nothing further.

THE COURT: I'm tentatively going to say this is okay. But if, as Mr. Verret is testifying and in laying out his qualifications it's not clear to me that he's established a foundation on this, then I can revisit the question.

MR. EKELAND: Understood, Your Honor.

THE COURT: So make sure, when you're qualifying him in front of the jury, that you lay a foundation with respect to his expertise or knowledge as to these topics.

MR. EKELAND: Understood, Your Honor.

THE COURT: If that's not done, the government can renew its motion as to him. All right. 32.

MR. EKELAND: 32. Mr. Verret will testify that there is not sufficient evidence in the record to determine the amount of illicit funds flowing from Tor-based --

THE COURT: We already know this one is not -- maybe this wasn't something he drafted, but it already fails the test if he wants to testify there's not sufficient evidence in the record.

MR. EKELAND: I'll change the phrase sufficient evidence. To say that -- I mean, I think -- should I read it?

THE COURT: I'm sorry?

MR. EKELAND: I hear the Court. I'm just going to start from the top with the understanding of what you just said.

Mr. Verret will testify that there is not sufficient evidence in the record to determine the amount of illicit funds flowing from Tor-based marketplaces to what the government purports is the Bitcoin Fog cluster. Mr. Verret will explain that there are legal products offered on the darknet marketplaces and that it would be inaccurate to propose that all the funds flowing from Tor-based marketplaces constitute illicit funds.

Mr. Verret will explain that there are many legal products and services available for purchase on Tor-based marketplaces that would not constitute illegal activity. Mr. Verret will testify that the government has wrongfully categorized all funds originating from Tor-based marketplaces as illicit, and that the government has failed to present a breakdown of which funds are related to illegal products and purposes and which funds are associated with completely illegal activity.

THE COURT: Mr. Brown?

MR. BROWN: Your Honor, the government has no issue with -- I think it's the second and third sentences there. If Mr. Verret just wants to testify based on his knowledge or expertise that there are legal goods and services available on

Tor-based markets, we will certainly cross him as a matter of fact on that.

THE COURT: Right.

MR. BROWN: But we don't dispute that.

THE COURT: Okay.

MR. BROWN: What we have a problem with are the first and last sentences, which seem more like commentary on the sufficiency of the government's evidence, which is just that's not his job as an expert to say there's enough evidence or not enough evidence.

THE COURT: I certainly agree with that as I hinted before Mr. Ekeland even finished reading the first sentence. I don't think he should testify with respect to the sufficiency of the evidence.

I also think that, to the extent that he's testifying with respect to the government's quantification of the portion of the business of Bitcoin Fog that came from, in the government's view, illicit marketplaces, that that is, again, an area that is more in Ms. Still's expertise than it is in Mr. Verret's.

The question is just whether the clustering methodology the government applied is sound or not.

MR. BROWN: Yes, Your Honor.

THE COURT: So I will allow Mr. Verret to testify with respect to, I think, the second and third sentences, and

the remainder of it I will exclude either on the grounds that it is commenting on the sufficiency of the evidence, which is not his role, or that it's an area that is not in his expertise but is more likely in Ms. Still's expertise.

So 33?

MR. EKELAND:  33.  I don't --

THE COURT:  We'll say no to that.

MR. EKELAND:  We'll say no to that.

I would ask, Your Honor -- I don't know if today is the day to do it -- that we -- the government has offered their own financial expert from KPMG, Sarah Glave.  I was hoping to read through her disclosure as well.

I just want to make sure we're all on the same page when it comes to the financial forensics.

THE COURT:  That's fair enough.  We can do that. Although it's 4:00 tonight, so we're reconvening at 10:30 on Monday.  If there are a handful of odds and ends, I'm happy to clear them up tonight, but I don't think we should start with a whole area of expert testimony.

I have Mr. Cabanas with me here.  You know, I don't know if you want to talk a little bit about the motions in limine.  I'm happy to talk about those if that's the most efficient use.

I'd like to finish up by 4:30 since it's a Friday night, and some people actually might be going to temple.

MR. EKELAND: I'm fine knocking off now or I'm fine staying until 4:30, Your Honor.

THE COURT: Can you convey to Ms. Still and/or CipherTrace that the Court urges somebody who can speak on behalf of the company, if they have concerns about the protective order or how to -- whether they can comply with it to be here. And if they're participating from California, they don't necessarily need to be here at 10:30. We can handle other issues.

Maybe what I should say is by 11:30 I expect somebody to either be in my courtroom or to be available on Zoom to discuss those issues.

MR. EKELAND: I will work on that diligently, Your Honor. You have my word.

THE COURT: That gives them the weekend to try and figure out what they want to do. I'm not terribly pleased by their failure to make any efforts, as far as I can tell, to appear today at my request.

MR. EKELAND: Absolutely understood, Your Honor.

THE COURT: Thank you. Any thoughts on whether we should try to take anything else up today or whether we should just let everyone get going on the weekend?

MR. BROWN: Your Honor, we're happy to power through these two motions in limine.

THE COURT: Why don't we take up just the -- why

don't we split the difference and do the motion in limine that addresses the jury nullification issues.

MR. BROWN: Yes, Your Honor. With respect to the jury nullification issues, the government thinks that it would be prudent to address this now, as it may help -- especially if we're looking at a compressed time for trial -- that it would be helpful to get clear guidance from the Court about what is relevant and what is not relevant argument and evidence.

In our motion we outlined several categories. I want to highlight just a few. The references to potential punishment -- and I think some of this in the interim between when we briefed the motions in limine and today, we have additional context in the form of defense counsel's public statements.

Potential punishment is something that they have frequently brought up, including in front of this Court, and actually made some factually inaccurate representations that Mr. Sterlingov is facing 50 to life.

THE COURT: I was puzzled by that. I went back and looked at the statute. I was puzzled.

MR. BROWN: Yes, Your Honor. Should that come up in an opening statement or in argument or testimony, not only would we want that stricken, but we would have to have a corrected instruction to the jury that that is not what Mr. Sterlingov is facing. So that's potential punishment.

Golden rule arguments. This is a Kafkaesque prosecution, et cetera, et cetera, claims of government misconduct, expenditures of government resources, reference to discovery disputes, I think, will be -- I think that may come up, the government's charging decision.

In addition to what is, sort of, listed out in our motion, some additional concerns would include, kind of, policy arguments, which are really jury nullification arguments about, if you accept the government's theory of venue, this would provide universal criminal jurisdiction over anything that happens on the internet. That's a policy issue that's inviting the jury to nullify based on a finding of lack of venue.

The Court is going to instruct the jury on the legal requirements for venue in this case. The defense should not be allowed to argue that those legal requirements should be disregarded.

Allegations of anti-Russian animus. First of all, there's absolutely no basis whatsoever. They should not be allowed to accuse the government -- they can cross-examine witnesses for sure to uncover sources of bias, but they should not be allowed to argue that the prosecution is somehow motivated by ethnic bias or national origin bias.

And, finally, something that came up with the -- in the litigation over the subpoena to my co-counsel. We are very concerned that the defense would make an issue of Ms. Pelker's

prior pre-law career as an FBI analyst, and if they do, that would actually -- that would introduce some of the concerns about the advocate witness rule, that that would create jury confusion about whether Ms. Pelker is acting in her capacity as an advocate, which is 100 percent what is happening in this trial, versus should the jury have some question about whether she has some sort of personal knowledge.

We think that that can be avoided by a clear order that the defense -- I can say, the government will not bring this up. But the defense should also not be allowed to bring up -- it's totally irrelevant any more than it's relevant where I used to work or where any defense counsel used to work.

We should not be talking about the advocates in this case. We should be talking about the evidence.

THE COURT: All right. Mr. Ekeland?

MR. EKELAND: We're not intending to in any way attempt any kind of jury nullification. I don't think we've really got issues with what the government is discussing here.

I will point out for the Court and, actually, I think it would be helpful to have clarification on this, is that the government is bringing in some cooperating witnesses who are facing, I believe, similar -- I need to look and get the details -- deals on similar charges.

And we feel, as is practiced in many courts -- and I don't know what it is in this court -- that it's entirely

appropriate to cross-examine the cooperating witnesses about the punishments that they're facing because it goes directly to their potential bias. And in that sense, the government is opening the door to the jury inferring, oh, okay, corroborating witnesses facing this, facing that, and that's serious. That's my one comment on that.

THE COURT: Let me just pause there for a second. Any disagreement with that, Mr. Brown?

MR. BROWN: Your Honor, we will be -- our intention is to have testimony from cooperating witnesses. As part of that testimony, it is -- we will likely introduce this ourselves.

It is fair game for the defense to elicit testimony about potential sources of bias. It is commonplace for questions to be asked about the potential criminal punishment facing a cooperating defendant. We don't deny that.

THE COURT: Right.

MR. BROWN: Our concern is not -- so we understand that. That's a risk that the government takes in presenting that testimony.

That's different from saying, oh, all bets are off and the jury should be able to base its verdict on potential punishment.

THE COURT: So I think we're in agreement with respect to this topic and that it's fair game for

cross-examination.

The one thing that I will ask, though, Mr. Ekeland -- and, unfortunately, I have actually seen this -- is I don't want you to say to the witness, so you were facing 20 years in jail just like Mr. Sterlingov is. Now, keep it focused on the witness.

MR. EKELAND: Understood. I have no intention of doing that. As the government said, it's a pretty standard --

THE COURT: I think it goes to the veracity of the witness's testimony. That's fine.

MR. EKELAND: I mean, any more than we're holding the government to their public statements, the stuff that -- these old press releases or whatever, I'm not --

THE COURT: You're mumbling a little bit there.

MR. EKELAND: Essentially, we're not -- the stuff about -- we're not intending at all -- certainly not in a federal criminal case, any kind of policy arguments about there will be universal venue or whatever. That's completely inappropriate.

THE COURT: Okay.

MR. EKELAND: I'm trying to -- this has been a -- this case has changed a lot since those initial things.

And I do think the issue, unless something changes and the door gets opened -- and I can't even imagine -- I have a hard time imagining how it would be open after the Court's

ruling on Ms. Pelker's subpoena. We're not interested in raising that issue unless something crazy happens, right?

What is --

THE COURT: I would just ask -- I don't anticipate this happening -- and I would be surprised if it happened -- but I certainly ask that if for some reason you think the door has been opened, you raise it with me outside the presence of the jury before going through that door.

MR. EKELAND: I think that's a definite sidebar. I wouldn't -- it's not where -- it's not -- I think we're done with that, barring some unforeseen circumstances.

THE COURT: I appreciate that.

MR. EKELAND: I think one area where I do have some question is the confirmation bias and cognitive bias area given what we're seeing in -- what we are seeing in the *Jencks*, what -- you know, our view of the heuristics and the assumptions in this case.

And I think that's important in the sense that one of the reasons -- one of the things the jury is going to be asking, and everybody asks when I talk generally about this case, is, well, how did this happen. I do think that -- I think within proper limitations that we want to explore or make that argument evidentiary-wise in terms of -- I want to avoid -- I want to be able to argue in closing confirmation bias. I don't know where the Court is at on Dr. Dror.

THE COURT: Nor do I. I'm still working on that.

MR. EKELAND: Even if, like, we take the approach with Dr. Dror that he just testifies generally about the principles to give the jury the tool, we don't want to before close say -- and I've never taken this approach in a case before, so I'm just talking openly with the Court. Say, putting on evidence from one of the agents who is really, really hot to trot to -- and is, like, laser-focused on Mr. Sterlingov and is 100 percent convinced it's him kind of thing.

Like, I don't want to -- I don't feel like it's a hill to die on, so to speak. But I do think that it is a critical aspect of this case because, from the defense's viewpoint, this is a -- whether accurate or not from the defense's viewpoint, this is a case that is rooted in confirmation bias and that is baked in, in a certain sense, to the very nature of the heuristics. I think that's the most complex issue.

THE COURT: I think -- I'll let Mr. Brown respond on this. It's hard for me to rule on that question in the abstract.

MR. EKELAND: Agreed.

THE COURT: If you want to, in examining Ms. Bisbee about tracing or Mr. Scholl about what he did, say, isn't it true that before you even started that process that you were

working from the premise that it was Mr. Sterlingov; my sense is that seems within bounds to me.

On the other hand, if you want to start saying that the prosecutors in this case are looking to get rich on this or that the investigators brought this case because of some desire to become famous in some way -- maybe the one way to think about drawing the line here -- and I throw this out for consideration rather than being a ruling -- is I'm not sure that the government's motivation in bringing the case is relevant or the motivation of the individuals who are involved in that process is relevant.

But what was in the head of the witnesses at the times that they engaged in particular analyses is relevant. And so, you know, arguing that people who actually aren't even involved in this case anymore initiated the case because they thought it was going to make them famous in some way or because they anticipated that they might get a job from Chainalysis someday -- you know, the grand jury is the one that decides to return the indictment.

Quite frankly, there are never in this jurisdiction, but there are probably are prosecutions out there where prosecutors bring cases because they think they're going to make a name for themselves in bringing the case. I don't think that makes it relevant for the question before the jury. Once there's an indictment, they're charged, and the question is

just whether the allegations in the indictment are true or not.

But if there's some bias in the analysis being put on that you want to bring to the attention of the jury, that strikes me as fair game.

MR. EKELAND: That's helpful. I'm conscious of running over time here. I guess this is where it gets -- as I think about this -- and, again, it's not -- I don't see this as a -- in a sense, like the primary evidence, primary thing in this case.

But going to the instance where, say, I'm looking at something in discovery and I'm thinking of a concrete example -- but I'm not going to name names or anything right now -- where you've got an investigator who, potentially, does have a financial interest in making a decision related to a piece of evidence in a certain way that's being used in the investigation and that's going to get maybe -- I don't know what was put in front of the grand jury, right?

And you see them, actually, being presented with a piece of evidence that could contradict the view that it's Mr. Sterlingov and then they say, oh, no -- okay, no, I'm going to look away from that, right?

Then in this hypothetical, is that potential evidence of their financial interest or later payoffs from, say, a company relevant? And that's where I don't have -- I think it's difficult -- I don't have a clear sense of whether or not

that's -- I mean, I, obviously, think --

THE COURT: I instruct the jury in every case that an indictment is just the way the case is commenced. It's just the allegations that are presented, and the jury should not in any way infer that the defendant is guilty simply because he's been indicted.

I think it's sort of a two-way street. If there's something that tainted the evidence that's being presented to the jury, I think you're entitled to raise that. If there were people who were involved in the investigation where you think that they may have been operating for inappropriate reasons, I'm not sure that's relevant to the question that is in front of the jury unless there's a reason to believe that it actually tainted the evidence that's being presented to the jury.

MR. EKELAND: I think Dr. Dror made a good point on this issue. And, of course, I'm going to respect whatever the Court rules on this. I think you can see I'm struggling with it.

It's not so much that, oh, people are consciously being unethical or blahaha [sic], or it's that -- it's sort of operating in the background. And one thing, at least that strikes me about this case, is the singular focus on Mr. Sterlingov, and from the -- from very early on, from very, very early on.

I think the jury is going to be in some sense

wondering about that or asking or -- when I talk about the general nature of this case to people, they ask, well, why? And that, in a certain sense, is a very, I think, important thing for them to have information on.

And I do, rightly or wrongly, from my viewpoint -- and it's for the jury to decide -- I do think part that of is confirmation bias and cognitive bias by agents doing honest, diligent work but with all these factors affecting them.

THE COURT: I think for present purposes, you need as confirmation bias by the witnesses or those who are offering testimony or those whose analysis or evidence is going to be offered to the jury.

The fact that there's somebody who works in the FBI has nothing to do with this case and thought for sure it must be Mr. Sterlingov. If it's -- if his evidence -- and maybe he wrote some letter or report that they threw in the garbage. If it's not anything that's going to be evidence in the case, I don't see why that's relevant.

But if you can tie it in some way to the evidence in the case and show that the evidence is slanted in some way, then that's fair game. But this is all fairly abstract because you're being abstract with me as well.

What I would ask, though, is just to be cautious about this. And if there's anything that you want to raise with me on the sidebar before going down the road, it's better

to do that because I don't want to be correcting things in front of the jury rather than making sure that the evidence comes in correctly to start with.  When you correct things in front of the jury, nobody is happy when that happens.

MR. EKELAND:  Nobody is happy.

THE COURT:  It's better to raise it in advance.  I don't know if you've seen this yet, but we're going to have telephones in here at counsel table that are wireless.  And the way we'll do the bench conferences is you can just stay at counsel table, and I'll just put on the husher and we can pick up the telephone, and we can all have a conversation.

MR. EKELAND:  Okay.  That's a new one for me.

THE COURT:  It was a COVID innovation, but it's been a good one.

MR. EKELAND:  Okay.

THE COURT:  In light of this, I'm going to grant the government's motion in limine at Docket 65, but with the understanding that -- I think that this was implicit in the motion itself.  The government is not trying to exclude any legitimate cross-examination of witnesses with respect to biases or anything that may have affected their testimony or analysis in the case.

MR. EKELAND:  Understood.

THE COURT:  All right.  Since it's almost 4:30, why don't we adjourn.  We'll reconvene at 10:30 on Monday.

Please do everything you can to make sure that we have an answer from CipherTrace and someone here to tell us what's going on at that point; and convey to them as well that the goal here is not to put them in a gotcha situation. The goal is to make sure that, consistent with the proprietary interests and the law enforcement interests that are at stake in this case, that Ms. Still can review the material and that we put up a wall in a way to make sure there's not any concern for anyone involved.

MR. EKELAND: Understood.

THE COURT: Have a nice weekend and Happy Rosh Hashanah everyone.

(The hearing adjourned at 4:25 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 3rd day of December, 2023.

/s/ Tamara M. Sefranek
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C.  20001

## /

**/s** [1] - 123:9

## 1

**1** [1] - 90:9
**10** [1] - 8:7
**100** [4] - 62:19, 66:17, 112:5, 116:9
**10005** [1] - 1:21
**10:08** [1] - 1:6
**10:30** [5] - 15:5, 32:10, 108:16, 109:8, 121:25
**10th** [5] - 3:16, 11:17, 15:2, 16:13, 32:5
**11:30** [1] - 109:10
**1234** [1] - 65:21
**12345** [1] - 82:6
**12:10** [1] - 15:5
**12:50** [1] - 41:7
**12th** [1] - 4:6
**1301** [1] - 1:17
**133** [1] - 99:20
**145-5** [2] - 43:12, 43:19
**15** [8] - 1:6, 8:7, 23:6, 43:16, 43:18, 43:19, 46:16
**158** [1] - 58:13
**16** [1] - 46:20
**17** [2] - 47:14, 48:8
**18** [2] - 49:19, 50:10
**19** [8] - 50:10, 56:17, 57:12, 59:19, 60:3, 63:21, 65:4, 66:15
**1:00** [1] - 40:21
**1:21-CR-0399** [1] - 1:3

## 2

**20** [3] - 41:11, 50:10, 114:4
**20001** [3] - 1:12, 1:24, 123:11
**20005** [1] - 1:17
**202-354-3246** [1] - 1:25
**2023** [2] - 1:6, 123:7
**20530** [1] - 1:14
**21** [1] - 50:10
**21-399** [1] - 2:2
**22** [1] - 50:10
**23** [1] - 50:10
**23rd** [1] - 4:6
**24** [6] - 50:23, 51:8, 51:9, 56:14, 57:6, 71:12
**25** [2] - 76:15, 79:20

**26** [2] - 84:14, 84:21
**27** [3] - 84:22, 86:7
**28** [1] - 88:16
**28th** [1] - 4:5
**29** [1] - 91:11
**2:00** [1] - 40:21
**2:05** [1] - 41:7

## 3

**30** [2] - 1:20, 92:8
**31** [2] - 99:25, 103:2
**32** [2] - 105:15, 105:16
**33** [2] - 108:5, 108:6
**333** [2] - 1:24, 123:11
**3:00** [1] - 32:24
**3:30** [3] - 42:14, 42:23, 76:9
**3rd** [2] - 3:16, 123:7

## 4

**4** [1] - 37:18
**401** [6] - 60:9, 61:23, 62:13, 64:6, 71:7, 84:10
**403** [16] - 48:23, 60:9, 61:23, 62:13, 64:6, 70:21, 71:7, 81:18, 82:14, 82:25, 83:25, 84:10, 97:12, 97:16, 98:3, 98:8
**4:00** [1] - 108:16
**4:25** [1] - 122:13
**4:30** [3] - 108:24, 109:2, 121:24

## 5

**5** [1] - 45:1
**50** [1] - 110:18
**5:00** [1] - 76:8
**5th** [1] - 4:7

## 6

**6** [1] - 17:2
**601** [1] - 1:11
**65** [2] - 14:5, 121:17
**66** [1] - 14:8
**6714** [2] - 1:23, 123:10
**68** [1] - 14:8
**69** [1] - 14:6
**6th** [1] - 29:11

## 7

**7** [2] - 66:1, 66:2
**702** [4] - 71:7, 75:3, 84:10, 92:4

**704** [3] - 69:9, 69:10, 69:11
**704's** [1] - 70:12

## 8

**81** [1] - 14:6
**82** [1] - 14:9
**8th** [1] - 1:20

## 9

**90** [3] - 44:25, 45:17, 67:12
**950** [1] - 1:14
**9th** [1] - 3:17

## A

**a.m** [1] - 15:5
**A.M** [1] - 1:6
**ability** [3] - 6:2, 18:23, 123:6
**able** [20] - 3:4, 7:6, 7:22, 9:1, 9:7, 28:2, 32:19, 40:25, 41:1, 41:18, 42:19, 51:4, 53:18, 59:3, 59:15, 90:19, 97:25, 101:20, 113:22, 115:24
**abrogates** [1] - 69:11
**abrogating** [1] - 70:7
**absent** [2] - 82:15, 86:3
**absolute** [1] - 82:16
**absolutely** [5] - 6:16, 82:7, 83:8, 109:19, 111:18
**abstract** [3] - 116:21, 120:21, 120:22
**accept** [1] - 111:9
**access** [6] - 4:18, 9:9, 18:18, 19:6, 19:12, 19:23
**accessed** [1] - 74:24
**accommodate** [4] - 7:11, 7:18, 28:19, 30:20
**accommodation** [1] - 30:16
**accord** [1] - 74:9
**account** [18] - 52:14, 52:15, 53:25, 55:23, 56:18, 56:22, 57:12, 60:25, 61:2, 61:3, 65:3, 66:15, 85:9, 86:12, 90:9, 90:10
**accountant** [6] - 52:13, 56:24, 59:6,

62:15, 68:12, 68:21
**accounting** [22] - 51:12, 56:25, 57:7, 57:10, 57:16, 57:23, 58:17, 58:20, 59:4, 59:16, 60:2, 61:12, 62:9, 62:15, 63:5, 63:19, 64:5, 64:16, 64:20, 65:2, 69:3, 73:12
**accounts** [4] - 43:23, 54:12, 85:22, 90:16
**accurate** [5] - 74:1, 92:3, 92:6, 116:14, 123:4
**accuse** [2] - 24:20, 111:19
**acquiring** [1] - 39:3
**Act** [2] - 10:13, 14:22
**acted** [1] - 49:2
**acting** [1] - 112:4
**Action** [1] - 1:2
**action** [1] - 22:18
**actions** [1] - 29:10
**active** [1] - 104:16
**activity** [11] - 29:10, 45:1, 45:2, 45:14, 51:15, 51:19, 51:24, 100:9, 100:13, 106:14, 106:20
**actual** [3] - 56:13, 75:14, 91:23
**Adam** [1] - 87:21
**adding** [1] - 20:17
**addition** [2] - 73:17, 111:6
**additional** [2] - 110:13, 111:7
**additionally** [1] - 36:9
**address** [25] - 11:11, 11:24, 13:25, 17:13, 22:14, 31:6, 31:17, 31:23, 32:6, 40:23, 49:16, 49:17, 54:25, 55:4, 55:6, 56:11, 60:19, 62:19, 62:23, 74:20, 74:21, 74:22, 74:23, 74:24, 110:5
**addressed** [1] - 31:6
**addresses** [9] - 33:10, 51:18, 55:6, 55:17, 79:24, 80:2, 90:2, 110:2
**addressing** [1] - 39:8
**adjourn** [2] - 40:20, 121:25
**adjourned** [1] - 122:13
**administrator** [1] - 101:2
**admission** [3] - 31:4,

31:5, 31:13
**admit** [1] - 94:20
**admitted** [1] - 31:1
**admittedly** [1] - 10:14
**advance** [1] - 121:6
**advantage** [1] - 21:23
**advocate** [2] - 112:3, 112:5
**advocates** [1] - 112:13
**affect** [1] - 4:11
**affected** [1] - 121:21
**affecting** [1] - 120:8
**afraid** [1] - 22:20
**afternoon** [6] - 32:2, 32:14, 32:21, 33:1, 33:4, 41:13
**afterwards** [2] - 24:17, 35:10
**agencies** [1] - 48:21
**agenda** [2] - 8:3, 8:4
**agents** [2] - 116:7, 120:7
**ago** [6] - 30:6, 34:1, 35:2, 40:11, 41:11, 85:19
**agree** [13] - 35:25, 36:19, 36:21, 47:11, 48:1, 50:16, 51:1, 51:8, 88:13, 89:22, 91:9, 94:2, 107:11
**agreed** [3] - 29:16, 35:19, 116:22
**agreement** [2] - 48:4, 113:24
**agrees** [6] - 54:6, 54:23, 55:24, 55:25, 71:6, 98:11
**ahead** [4] - 14:12, 46:9, 50:23, 84:22
**AHMED** [1] - 1:19
**Ahmed** [4] - 2:11, 31:7, 31:13, 31:16
**Ahmed's** [1] - 30:24
**ahold** [2] - 29:21, 76:1
**AICPA** [2] - 80:5, 80:9
**air** [1] - 82:21
**Alden** [2] - 2:7, 95:22
**ALDEN** [1] - 1:13
**Alexandria** [1] - 4:21
**algorithm** [1] - 23:15
**algorithms** [1] - 23:14
**allayed** [1] - 5:24
**allegation** [1] - 61:13
**allegations** [4] - 18:15, 111:17, 118:1, 119:4
**alleging** [1] - 72:14
**alley** [1] - 79:8
**allocation** [1] - 46:3
**allow** [5] - 21:21,

29:10, 69:18, 74:11, 107:24

**allowed** [7] - 9:16, 69:25, 70:1, 111:15, 111:19, 111:21, 112:10

**almost** [1] - 121:24

**altered** [1] - 92:9

**alternatives** [2] - 86:19, 86:24

**amenable** [1] - 29:24

**America** [1] - 2:3

**AMERICA** [1] - 1:2

**amount** [3] - 94:7, 105:18, 106:5

**analogous** [1] - 36:15

**analogy** [1] - 65:15

**analyses** [1] - 117:13

**analysis** [28] - 27:11, 32:19, 32:20, 41:1, 44:25, 46:2, 48:10, 51:23, 51:25, 52:4, 53:10, 55:13, 56:5, 58:18, 60:18, 65:24, 71:14, 71:17, 71:19, 77:16, 80:17, 81:4, 102:8, 102:9, 104:8, 118:2, 120:11, 121:22

**analyst** [1] - 112:1

**angles** [1] - 29:13

**animus** [1] - 111:17

**anonymity** [1] - 44:6

**answer** [8] - 4:25, 5:1, 15:8, 28:10, 30:10, 35:21, 88:7, 122:2

**anti** [3] - 34:25, 36:11, 111:17

**anti-competitive** [2] - 34:25, 36:11

**anti-Russian** [1] - 111:17

**anticipate** [1] - 115:4

**anticipated** [2] - 40:10, 117:17

**anyway** [3] - 25:21, 39:6, 70:22

**appear** [4] - 5:21, 47:4, 100:14, 109:18

**applicable** [1] - 88:24

**application** [2] - 2:12, 89:9

**applied** [2] - 20:21, 107:22

**applies** [1] - 21:8

**applying** [2] - 59:18, 79:18

**appreciate** [3] - 6:18, 9:13, 115:12

**approach** [4] - 50:1,

57:8, 116:2, 116:5

**approached** [1] - 18:1

**appropriate** [10] - 18:25, 28:6, 32:22, 68:22, 72:3, 75:16, 84:11, 86:7, 96:6, 113:1

**appropriated** [1] - 25:19

**area** [11] - 50:1, 59:1, 59:17, 61:24, 93:4, 102:5, 107:19, 108:3, 108:19, 115:13, 115:14

**areas** [1] - 61:25

**argue** [20] - 4:10, 8:8, 20:4, 20:11, 54:10, 60:16, 66:19, 66:24, 67:5, 67:7, 67:13, 80:19, 80:25, 81:4, 81:7, 102:13, 103:21, 111:15, 111:21, 115:24

**argued** [1] - 104:2

**arguendo** [1] - 73:8

**arguing** [7] - 40:11, 53:2, 61:17, 81:13, 82:13, 93:23, 117:14

**argument** [13] - 8:6, 13:14, 28:16, 55:18, 63:1, 64:12, 86:16, 89:10, 101:11, 101:15, 110:8, 110:22, 115:23

**arguments** [9] - 11:10, 13:11, 14:4, 67:6, 85:12, 111:1, 111:8, 114:17

**arrange** [1] - 5:20

**article** [13] - 95:7, 95:8, 95:10, 96:15, 96:17, 97:3, 97:13, 97:15, 98:13, 99:8, 99:10, 99:21

**articles** [2] - 95:17, 95:20

**articulation** [1] - 25:12

**ASCFE** [1] - 80:6

**aside** [1] - 73:21

**aspect** [1] - 116:13

**assemble** [1] - 33:13

**assert** [1] - 97:7

**asserting** [1] - 77:25

**assertion** [4] - 48:10, 48:13, 58:24, 92:1

**assertions** [1] - 83:11

**assessments** [1] - 80:3

**asset** [13] - 58:21, 59:14, 62:10, 63:20,

68:6, 69:4, 74:5, 88:17, 91:14, 91:16, 91:17, 91:18, 91:24

**assets** [7] - 88:23, 92:12, 92:17, 92:21, 95:12, 96:13, 96:25

**assign** [1] - 44:4

**assist** [1] - 14:1

**associate** [1] - 98:1

**associated** [4] - 51:18, 91:15, 92:20, 106:19

**Association** [1] - 80:11

**association** [1] - 98:17

**assume** [2] - 57:19, 65:25

**assuming** [7] - 3:11, 18:15, 47:10, 51:1, 67:1, 73:7, 101:4

**assumption** [8] - 49:23, 78:22, 78:23, 79:23, 80:1, 81:21, 81:22, 81:23

**assumptions** [4] - 51:14, 57:18, 58:7, 115:17

**assurances** [1] - 26:18

**attach** [1] - 2:23

**attempt** [1] - 112:17

**attempting** [1] - 51:23

**attend** [1] - 87:2

**attention** [2] - 62:1, 118:3

**attorney** [1] - 31:10

**Attorney** [1] - 95:22

**Attorney's** [1] - 80:17

**attorneys** [1] - 70:15

**attorneys'** [2] - 16:24, 17:5

**attribute** [14] - 43:22, 46:25, 51:15, 51:18, 51:23, 51:25, 59:15, 68:13, 74:9, 86:13, 88:23, 92:16, 92:21, 96:14

**attributed** [2] - 59:25, 86:9

**attributes** [1] - 83:21

**attributing** [3] - 52:6, 68:6, 69:4

**attribution** [13] - 57:16, 59:6, 63:18, 65:2, 65:14, 66:16, 74:5, 84:22, 88:17, 90:3, 95:15, 97:11, 97:21

**attributions** [5] - 57:1,

57:10, 57:24, 62:10, 83:12

**AUSA** [1] - 95:22

**authentic** [1] - 13:10

**authentication** [2] - 11:22, 13:5

**authenticity** [1] - 12:24

**availability** [4] - 32:9, 40:22, 41:13, 42:12

**available** [12] - 14:16, 16:8, 32:24, 42:14, 42:22, 47:21, 47:22, 76:9, 80:12, 106:13, 106:25, 109:11

**Ave** [1] - 1:17

**Avenue** [3] - 1:14, 1:24, 123:11

**averse** [2] - 23:19, 26:13

**avoid** [3] - 21:9, 89:4, 115:23

**avoided** [1] - 112:8

**aware** [1] - 28:8

## B

**background** [1] - 119:21

**bad** [1] - 79:8

**baffled** [1] - 40:7

**baked** [1] - 116:16

**balance** [1] - 27:7

**ballpark** [1] - 68:3

**bank** [13] - 52:13, 52:14, 65:18, 79:5, 79:6, 89:20, 96:18, 96:20, 96:23, 99:1, 99:2

**banking** [1] - 89:14

**banks** [1] - 89:19

**bar** [4] - 2:19, 31:3, 31:12, 41:20

**Bar** [1] - 87:19

**barring** [1] - 115:11

**base** [1] - 113:22

**based** [25] - 39:15, 45:8, 53:2, 54:25, 55:4, 56:5, 56:16, 58:19, 66:7, 79:23, 80:4, 81:9, 81:13, 81:23, 83:19, 103:14, 104:8, 105:18, 106:6, 106:10, 106:13, 106:16, 106:24, 107:1, 111:12

**basic** [3] - 74:6, 104:25, 105:1

**basis** [13] - 13:19,

20:11, 33:11, 33:25, 48:16, 52:22, 55:15, 58:2, 79:14, 94:1, 95:4, 102:23, 111:18

**become** [1] - 117:6

**BEFORE** [1] - 1:8

**beforehand** [1] - 35:10

**begin** [4] - 4:9, 7:22, 15:1, 32:19

**beginning** [1] - 97:18

**behalf** [2] - 14:15, 109:5

**behavioral** [1] - 20:20

**belabor** [2] - 69:1, 75:24

**believes** [1] - 71:13

**belonged** [1] - 81:25

**below** [1] - 10:14

**bench** [2] - 87:2, 121:9

**best** [5] - 6:17, 30:2, 94:21, 100:25, 123:6

**beta** [11] - 100:4, 100:5, 100:9, 100:15, 101:8, 101:19, 101:24, 102:15, 102:17, 103:22, 104:2

**bets** [1] - 113:21

**better** [5] - 7:15, 67:6, 75:3, 120:25, 121:6

**between** [12] - 29:18, 53:14, 55:8, 55:22, 56:17, 62:22, 79:24, 80:2, 94:9, 94:23, 97:6, 110:11

**beyond** [4] - 67:16, 68:15, 86:10, 87:11

**bias** [13] - 111:20, 111:22, 113:3, 113:14, 115:14, 115:24, 116:16, 118:2, 120:7, 120:10

**biases** [1] - 121:21

**Bisbee** [2] - 46:9, 116:23

**bit** [11] - 14:13, 21:2, 22:4, 27:14, 61:5, 73:24, 84:16, 88:9, 94:15, 108:21, 114:14

**Bitcoin** [43] - 54:7, 54:12, 54:24, 55:4, 55:6, 55:10, 55:13, 55:16, 55:17, 55:23, 56:15, 56:19, 56:21, 57:11, 57:13, 57:14, 59:22, 60:4, 60:5, 63:15, 63:20, 65:3,

65:5, 65:6, 66:13, 66:16, 72:15, 79:23, 80:1, 85:1, 85:3, 85:4, 97:7, 100:3, 100:22, 100:25, 101:7, 101:8, 102:25, 104:19, 104:20, 106:7, 107:17

**Bitcoins** [1] - 93:25
**blahaha** [1] - 119:20
**blanket** [1] - 17:20
**blindness** [1] - 14:7
**block** [1] - 83:21
**blockchain** [50] - 21:9, 27:1, 41:21, 45:10, 47:5, 48:10, 50:11, 51:15, 51:23, 51:25, 52:4, 53:2, 54:2, 55:25, 57:21, 58:18, 59:18, 71:14, 71:17, 71:19, 72:12, 72:13, 72:17, 72:20, 73:1, 73:10, 75:19, 77:16, 78:1, 79:12, 83:21, 86:14, 88:20, 88:24, 89:2, 89:4, 89:13, 90:1, 90:24, 91:3, 91:13, 91:22, 91:23, 92:9, 92:11, 93:7, 95:25, 100:2, 100:18, 100:20
**blockchain-related** [1] - 41:21
**board** [2] - 87:20, 104:21
**bogged** [1] - 64:22
**borders** [1] - 45:3
**borrow** [1] - 65:15
**bottom** [2] - 26:17, 31:9
**bounds** [1] - 117:2
**box** [2] - 36:24, 37:9
**branch** [1] - 10:20
**break** [4] - 7:17, 14:12, 16:4, 44:3
**breakdown** [1] - 106:18
**brick** [1] - 90:13
**briefed** [1] - 110:12
**briefing** [1] - 14:7
**bring** [8] - 9:16, 9:17, 69:7, 85:18, 112:9, 112:10, 117:22, 118:3
**bringing** [6] - 9:19, 24:16, 51:9, 112:21, 117:9, 117:23
**brought** [4] - 51:2, 62:1, 110:16, 117:5

**brown** [1] - 100:16
**BROWN** [43] - 1:10, 43:8, 48:6, 48:8, 52:2, 53:1, 53:5, 53:9, 53:12, 53:17, 58:1, 71:6, 71:12, 76:5, 81:3, 81:12, 87:17, 87:18, 89:7, 90:4, 91:25, 92:7, 92:24, 93:3, 93:13, 93:16, 94:4, 95:1, 95:8, 99:16, 100:17, 101:10, 101:25, 105:4, 106:22, 107:4, 107:6, 107:23, 109:23, 110:3, 110:21, 113:9, 113:18
**Brown** [18] - 2:7, 57:25, 65:15, 71:4, 71:18, 73:3, 75:2, 87:17, 89:5, 89:23, 91:19, 92:23, 95:22, 96:3, 105:3, 106:21, 113:8, 116:19
**BTC** [1] - 56:22
**BTC-e** [1] - 56:22
**Building** [1] - 29:15
**building** [1] - 42:11
**burden** [1] - 67:16
**business** [3] - 11:23, 13:9, 107:17

## C

**Cabanas** [6] - 8:5, 8:6, 11:10, 11:21, 33:5, 108:20
**calendar** [1] - 76:4
**California** [5] - 23:6, 24:8, 87:13, 87:14, 109:7
**camera** [2] - 29:13, 29:14
**candor** [1] - 18:5
**cannot** [10] - 5:7, 5:19, 13:18, 16:25, 76:17, 77:5, 82:11, 97:11, 98:13, 98:19
**capacity** [1] - 112:4
**Capitol** [2] - 29:13, 29:15
**captured** [1] - 94:6
**car** [4] - 65:17, 66:5, 81:25, 82:8
**care** [1] - 68:22
**career** [3] - 22:15, 22:19, 112:1
**carefully** [2] - 70:1, 70:19

**Case** [1] - 2:2
**case** [80] - 3:5, 3:9, 3:13, 18:19, 19:15, 20:8, 25:17, 26:25, 27:20, 28:3, 28:4, 28:5, 31:2, 36:6, 37:23, 37:24, 40:5, 40:11, 43:24, 52:10, 54:14, 61:11, 61:13, 64:9, 64:10, 65:16, 65:20, 66:22, 67:11, 67:19, 68:20, 69:7, 69:19, 71:9, 71:17, 73:23, 78:5, 79:7, 83:15, 84:9, 84:11, 84:13, 85:17, 85:20, 89:9, 89:23, 90:8, 90:15, 93:25, 95:23, 96:8, 97:18, 101:18, 102:9, 111:14, 112:14, 114:17, 114:22, 115:17, 115:21, 116:5, 116:13, 116:15, 117:4, 117:5, 117:9, 117:15, 117:23, 118:9, 119:2, 119:3, 119:22, 120:2, 120:14, 120:17, 120:20, 121:22, 122:7
**cases** [11] - 27:17, 27:22, 27:24, 29:4, 29:11, 67:12, 68:19, 69:12, 70:8, 83:23, 117:22
**cash** [3] - 52:15, 52:16, 96:19
**catch** [2] - 96:18, 99:1
**categories** [1] - 110:9
**categorized** [1] - 106:16
**category** [1] - 94:21
**cautious** [1] - 120:23
**cell** [1] - 9:5
**central** [1] - 70:24
**CEO** [1] - 13:1
**certain** [17] - 19:6, 38:3, 39:17, 39:23, 52:5, 67:14, 67:17, 67:18, 72:24, 77:23, 81:15, 86:15, 92:1, 96:25, 116:16, 118:15, 120:3
**certainly** [12] - 23:9, 23:21, 40:10, 48:15, 51:6, 81:7, 81:12, 82:4, 107:1, 107:11, 114:16, 115:6
**certainty** [3] - 60:24,

62:19, 84:6
**CERTIFICATE** [1] - 123:1
**certification** [8] - 11:24, 12:2, 12:20, 13:8, 13:12, 59:17, 72:21, 72:22
**certifications** [3] - 12:5, 12:12, 12:23
**certified** [4] - 56:23, 57:8, 62:10, 104:15
**Certified** [1] - 80:11
**certify** [1] - 123:3
**cetera** [2] - 111:2
**CFE** [4] - 57:9, 59:9, 80:7, 80:11
**CFF** [9] - 57:9, 59:9, 59:11, 61:14, 61:15, 62:16, 64:9, 66:8, 68:25
**chain** [10] - 12:3, 22:5, 49:25, 52:7, 57:17, 57:21, 59:21, 59:22, 85:5, 86:22
**Chainalysis** [60] - 21:6, 21:20, 21:22, 21:24, 22:18, 24:7, 24:8, 24:15, 24:18, 26:10, 26:20, 28:23, 33:13, 36:12, 37:2, 38:7, 38:11, 38:17, 38:18, 39:3, 39:16, 39:18, 43:21, 45:17, 46:3, 46:5, 46:11, 46:18, 46:24, 47:6, 47:17, 47:21, 49:24, 52:9, 52:12, 52:16, 52:17, 52:20, 53:19, 54:19, 54:21, 54:25, 58:3, 58:4, 58:7, 58:15, 58:25, 60:7, 60:8, 71:20, 71:21, 73:4, 78:11, 83:1, 85:1, 102:8, 104:25, 117:17
**Chainalysis's** [7] - 17:15, 19:13, 25:19, 27:11, 37:12, 51:13, 58:10
**Chainalysis-level** [4] - 71:21, 73:4, 102:8, 104:25
**chains** [1] - 22:7
**challenge** [1] - 53:7
**challenged** [1] - 95:19
**challenged-level** [1] - 95:19
**challenges** [1] - 91:15
**challenging** [1] - 49:9
**chance** [3] - 8:15,

18:11, 36:17
**change** [4] - 4:2, 4:3, 53:15, 105:23
**changed** [5] - 57:19, 69:18, 85:23, 93:12, 114:22
**changes** [1] - 114:23
**changing** [2] - 13:6, 13:21
**characteristics** [3] - 22:6, 101:22, 102:14
**characterization** [1] - 100:3
**characterize** [1] - 98:25
**charge** [2] - 10:15, 96:22
**charged** [1] - 117:25
**charges** [1] - 112:23
**charging** [1] - 111:5
**check** [6] - 3:1, 8:11, 16:4, 30:9, 87:9
**check-in** [1] - 8:11
**checked** [5] - 42:8, 42:9, 42:10
**Chevrolet** [1] - 82:6
**Chevy** [3] - 65:19, 65:20, 66:3
**choice** [5] - 10:9, 10:11, 11:4, 11:5
**choose** [2] - 10:21, 40:17
**Chris** [1] - 95:22
**CHRISTOPHER** [1] - 1:10
**Christopher** [1] - 2:7
**CipherTrace** [24] - 5:6, 5:19, 14:14, 21:13, 21:16, 22:10, 23:20, 24:1, 24:2, 24:8, 24:10, 25:5, 32:15, 36:14, 38:24, 40:23, 41:22, 48:20, 55:1, 72:21, 76:1, 87:7, 109:4, 122:2
**CipherTrace's** [5] - 25:13, 25:24, 27:14, 29:21, 35:14
**circumstances** [5] - 19:8, 24:5, 27:17, 34:18, 115:11
**citation** [1] - 50:8
**citations** [1] - 95:17
**cited** [1] - 102:7
**cites** [1] - 92:21
**CJA** [7] - 10:5, 10:7, 11:7, 15:8, 15:9, 15:10, 15:22
**claiming** [1] - 71:14
**claims** [1] - 111:2

clarification [10] - 16:19, 17:9, 18:7, 19:17, 25:9, 62:5, 64:22, 69:9, 70:4, 112:20
clarified [1] - 19:19
clarifies [1] - 36:5
clarify [2] - 71:5, 71:12
clause [1] - 26:6
clear [15] - 17:22, 25:11, 34:4, 35:1, 35:18, 53:17, 58:4, 66:17, 69:10, 102:19, 105:7, 108:18, 110:7, 112:8, 118:25
clear-cut [1] - 53:17
clearly [1] - 67:24
Clearnet [1] - 85:6
clerk [2] - 15:3, 32:9
client [1] - 20:14
clients [1] - 10:15
close [1] - 116:5
closer [2] - 39:18, 94:20
closing [4] - 67:6, 101:11, 101:23, 115:24
cluster [17] - 20:19, 38:4, 38:6, 52:4, 54:7, 54:12, 55:7, 55:16, 56:16, 56:19, 56:21, 57:14, 60:1, 65:5, 66:16, 106:7
clustered [2] - 55:4, 55:17
clustering [5] - 38:2, 54:2, 54:4, 97:24, 107:21
clusters [2] - 37:21, 52:1
co [4] - 55:4, 78:15, 95:17, 111:24
co-counsel [2] - 95:17, 111:24
co-spend [2] - 55:4, 78:15
Code [1] - 80:11
code [2] - 23:14, 82:17
cognitive [2] - 115:14, 120:7
CoinJoin [1] - 78:15
CoinJoins [1] - 58:14
collect [1] - 38:13
collection [1] - 39:18
COLUMBIA [1] - 1:1
comfortable [2] - 24:14, 50:21
coming [4] - 34:20, 50:19, 54:4, 65:3

commence [2] - 47:17, 48:11
commenced [2] - 4:13, 119:3
comment [1] - 113:6
commentary [1] - 107:7
commenting [1] - 108:2
comments [1] - 22:11
committee [4] - 69:17, 70:5, 70:6, 70:14
common [5] - 49:25, 52:7, 81:8, 102:1, 104:13
commonplace [1] - 113:14
communal [1] - 93:11
companies [3] - 23:10, 24:12, 26:13
company [7] - 14:16, 25:18, 37:1, 37:8, 87:24, 109:5, 118:24
competence [1] - 45:4
competitive [4] - 26:7, 29:19, 34:25, 36:11
competitor [3] - 21:18, 21:21, 21:23
competitors [1] - 27:18
complete [3] - 89:3, 91:4, 123:5
completely [8] - 11:1, 23:18, 36:21, 39:4, 61:4, 78:4, 106:19, 114:18
complex [2] - 104:24, 116:18
complicated [2] - 59:24, 72:16
comply [1] - 109:6
component [1] - 35:2
comprehension [1] - 95:20
compressed [1] - 110:6
computer [1] - 82:17
concern [15] - 5:8, 18:14, 22:9, 25:13, 26:3, 44:13, 66:23, 82:15, 82:25, 83:7, 83:25, 91:9, 97:17, 113:18, 122:8
concerned [8] - 5:9, 21:6, 21:7, 44:11, 45:19, 94:15, 98:2, 111:25
concerns [19] - 5:23, 8:13, 8:14, 22:8, 25:12, 26:2, 26:3,

28:19, 29:19, 36:13, 44:8, 44:9, 45:22, 90:18, 98:8, 109:5, 111:7, 112:2
conclude [6] - 63:7, 66:3, 67:15, 75:1, 81:24, 101:8
concluded [1] - 47:4
concludes [1] - 29:7
concluding [1] - 66:21
conclusion [8] - 64:13, 64:17, 69:11, 70:7, 70:9, 70:24, 98:14, 98:19
conclusions [6] - 62:2, 63:6, 69:13, 69:19, 73:9, 82:18
concrete [2] - 53:21, 118:11
condition [3] - 69:13, 70:10, 99:6
conditions [1] - 104:6
conduct [1] - 47:1
confer [6] - 8:15, 9:24, 10:10, 11:2, 11:6, 15:16
conference [2] - 3:22, 24:15
CONFERENCE [2] - 1:4, 1:7
conferences [1] - 121:9
conferring [1] - 23:15
confident [4] - 27:16, 29:1, 103:17, 105:1
confirm [4] - 9:14, 39:16, 39:17, 92:11
confirmation [7] - 47:19, 48:12, 115:14, 115:24, 116:16, 120:7, 120:10
confused [1] - 59:9
confusion [1] - 112:4
connection [2] - 92:16, 93:22
conscious [1] - 118:5
consciously [1] - 119:19
consequences [1] - 15:16
consider [4] - 6:11, 69:8, 82:4, 86:18
consideration [1] - 117:8
considered [2] - 82:11, 83:23
considering [1] - 21:13
considers [1] - 73:11

consistent [11] - 56:5, 68:24, 68:25, 86:21, 100:7, 102:1, 102:2, 102:14, 102:17, 102:24, 122:5
consolidates [1] - 55:6
constitute [2] - 106:10, 106:14
constitutes [1] - 123:4
Constitution [2] - 1:24, 123:11
contact [1] - 41:18
contemplate [1] - 29:23
contempt [6] - 22:18, 23:23, 36:13, 36:18, 37:3, 37:4
contention [1] - 100:24
context [8] - 28:3, 28:7, 49:17, 88:20, 88:25, 89:14, 110:13
continuance [5] - 3:9, 9:9, 20:6, 33:23, 33:25
continuances [1] - 33:19
continue [3] - 8:7, 32:6, 76:13
continuing [1] - 11:19
contradict [1] - 118:19
control [12] - 52:7, 58:13, 78:14, 88:23, 91:17, 92:11, 92:17, 92:21, 93:24, 93:25, 96:14, 97:7
controlled [1] - 54:24
controlling [1] - 59:20
controls [2] - 60:21, 91:13
controverted [1] - 97:4
conversation [7] - 7:22, 14:20, 14:21, 14:25, 25:4, 25:6, 121:11
conversations [4] - 45:8, 45:9, 103:19, 104:12
convey [2] - 109:3, 122:3
conveyed [2] - 24:24, 89:12
convinced [1] - 116:9
cooperating [4] - 112:21, 113:1, 113:10, 113:16
copy [1] - 59:3
core [13] - 22:8, 27:4,

28:23, 51:9, 51:12, 56:14, 59:13, 64:4, 64:8, 64:16, 65:25, 66:2, 89:22
corporate [1] - 26:12
corporations [1] - 26:12
correct [16] - 9:25, 12:3, 12:11, 12:15, 12:21, 13:16, 18:16, 31:20, 43:11, 54:22, 73:8, 75:4, 76:3, 81:23, 104:4, 121:3
corrected [1] - 110:24
correcting [1] - 121:1
correctly [13] - 13:6, 39:8, 45:16, 56:17, 69:16, 69:22, 70:6, 70:14, 100:22, 103:20, 104:12, 104:22, 121:3
corroborating [2] - 86:11, 113:4
counsel [27] - 2:4, 2:5, 5:20, 6:7, 14:23, 15:11, 15:23, 16:1, 17:3, 17:17, 17:23, 17:25, 18:23, 19:13, 25:14, 29:21, 30:7, 32:15, 41:21, 41:24, 42:6, 87:18, 95:17, 111:24, 112:12, 121:8, 121:10
counsel's [5] - 11:4, 18:3, 25:12, 35:15, 110:13
country [1] - 27:21
counts [1] - 71:20
course [10] - 4:19, 15:9, 17:6, 32:3, 45:12, 53:4, 59:10, 72:22, 87:10, 119:16
court [13] - 2:13, 2:20, 17:24, 22:18, 31:4, 31:12, 36:13, 36:18, 38:1, 68:2, 79:25, 87:25, 112:25
COURT [234] - 1:1, 2:9, 2:14, 3:1, 5:1, 5:14, 5:20, 6:6, 6:10, 6:18, 6:22, 7:5, 7:10, 7:22, 8:1, 9:13, 9:24, 10:2, 11:8, 11:14, 11:20, 11:25, 12:15, 12:18, 13:11, 13:23, 14:11, 15:6, 15:12, 15:15, 15:19, 16:5, 16:10, 17:11, 18:5, 19:21, 20:12, 23:5, 24:13, 25:3, 25:10,

25:16, 26:4, 26:17, 27:6, 28:4, 28:9, 28:15, 30:1, 30:10, 30:18, 30:23, 31:15, 31:19, 31:22, 32:8, 32:13, 34:2, 34:23, 35:1, 35:7, 35:16, 35:21, 36:4, 36:19, 37:10, 37:19, 38:20, 39:12, 40:2, 41:8, 41:14, 41:16, 42:1, 42:13, 42:21, 42:25, 43:4, 43:6, 43:11, 43:15, 43:18, 43:24, 44:15, 45:24, 46:9, 46:13, 46:21, 47:2, 47:14, 47:24, 48:5, 48:7, 48:17, 48:23, 49:8, 49:20, 50:7, 50:10, 50:24, 51:2, 51:10, 51:20, 52:23, 53:4, 53:8, 53:11, 53:16, 53:23, 54:8, 54:15, 55:2, 55:11, 55:19, 56:1, 56:7, 56:10, 56:12, 57:25, 59:2, 60:6, 62:6, 62:12, 63:16, 63:24, 64:24, 65:7, 66:18, 68:8, 69:6, 69:21, 70:18, 71:4, 71:11, 72:2, 72:11, 72:18, 72:24, 73:13, 74:12, 76:4, 76:7, 76:14, 76:19, 76:22, 77:3, 77:12, 77:19, 78:4, 78:23, 79:25, 80:14, 81:11, 81:16, 84:3, 84:8, 84:15, 84:23, 85:11, 87:1, 87:6, 87:10, 87:13, 87:23, 88:15, 89:5, 89:11, 90:5, 90:18, 91:5, 91:11, 91:19, 92:5, 92:23, 93:2, 93:9, 93:15, 94:2, 94:5, 95:7, 96:9, 96:15, 97:2, 97:23, 98:12, 98:23, 99:14, 99:23, 100:16, 100:20, 101:17, 102:11, 103:6, 103:24, 104:4, 104:18, 105:3, 105:5, 105:10, 105:14, 105:19, 105:25, 106:21, 107:3, 107:5, 107:11, 107:24, 108:7, 108:15, 109:3, 109:15, 109:20,

109:25, 110:19, 112:15, 113:7, 113:17, 113:24, 114:9, 114:14, 114:20, 115:4, 115:12, 116:1, 116:19, 116:23, 119:2, 120:9, 121:6, 121:13, 121:16, 121:24, 122:11, 123:1
**Court** [65] - 1:22, 1:23, 2:12, 2:25, 4:11, 4:23, 4:25, 5:2, 10:23, 11:22, 13:10, 13:25, 16:6, 16:14, 16:15, 16:19, 19:1, 19:19, 20:5, 20:11, 22:9, 22:12, 26:2, 29:6, 29:22, 29:23, 29:25, 30:17, 39:8, 39:9, 41:24, 42:14, 42:22, 44:10, 47:10, 47:12, 48:1, 48:2, 48:3, 48:4, 48:8, 50:17, 50:21, 51:1, 58:12, 68:7, 69:10, 77:17, 77:21, 77:25, 79:16, 79:17, 83:13, 88:10, 95:2, 106:1, 109:4, 110:7, 110:16, 111:13, 112:19, 115:25, 116:6, 119:17, 123:10
**Court's** [6] - 5:17, 37:13, 82:24, 83:7, 91:9, 114:25
**Courthouse** [1] - 1:23
**courthouse** [1] - 23:8
**courtroom** [2] - 77:20, 109:11
**COURTROOM** [1] - 2:2
**courts** [1] - 112:24
**covered** [3] - 50:17, 50:22, 84:19
**COVID** [1] - 121:13
**CPA** [1] - 57:8
**CPA/CFF** [1] - 80:6
**crazy** [1] - 115:2
**CRC** [2] - 1:22, 123:9
**create** [2] - 37:7, 112:3
**creating** [1] - 35:5
**credentials** [1] - 72:25
**credibility** [1] - 13:1
**crime** [2] - 69:14, 70:11
**Criminal** [3] - 1:2, 10:12, 14:22

**criminal** [20] - 2:2, 3:9, 28:3, 29:4, 29:9, 45:1, 69:12, 69:19, 70:8, 84:11, 92:19, 93:5, 95:15, 96:1, 96:6, 98:20, 111:10, 113:15, 114:17
**criteria** [1] - 28:5
**critical** [1] - 116:13
**criticism** [1] - 58:25
**CRM** [1] - 1:16
**cross** [13] - 45:13, 60:22, 71:16, 73:14, 73:22, 84:4, 89:16, 92:6, 107:1, 111:19, 113:1, 114:1, 121:20
**cross-examination** [8] - 45:13, 71:16, 73:14, 73:22, 84:4, 89:16, 114:1, 121:20
**cross-examine** [2] - 111:19, 113:1
**cross-examining** [1] - 60:22
**CRR** [2] - 1:22, 123:9
**crypto** [3] - 100:12, 103:5, 104:14
**cryptocurrencies** [2] - 45:9, 72:10
**cryptocurrency** [11] - 43:23, 44:14, 44:23, 45:19, 45:23, 72:23, 76:18, 77:6, 95:12, 104:16, 104:17
**crystal** [1] - 34:4
**crystalizing** [1] - 74:13
**CSI** [1] - 98:3
**cuff** [1] - 13:7
**currency** [1] - 104:18
**current** [1] - 35:23
**custodial** [1] - 91:17
**custodian** [1] - 91:24
**custody** [3] - 88:23, 92:21, 96:14
**cut** [2] - 49:8, 53:17

# D

**D.C** [3] - 1:5, 16:7, 123:11
**darknet** [2] - 38:17, 106:8
**data** [11] - 12:7, 13:2, 38:5, 38:7, 38:12, 38:14, 38:18, 39:3, 39:17, 85:16, 86:4
**database** [1] - 38:15
**date** [3] - 5:4, 11:17, 16:13

**Dated** [1] - 123:7
**dates** [1] - 15:1
**Daubert** [3] - 4:12, 33:21, 46:1
**Daubert-type** [1] - 46:1
**days** [2] - 4:8, 4:12
**DC** [4] - 1:12, 1:14, 1:17, 1:24
**DEA** [5] - 38:8, 38:17, 39:1, 39:3
**deadline** [1] - 30:18
**deadlines** [2] - 4:2, 85:19
**deal** [2] - 27:21, 27:25
**dealing** [2] - 34:6, 34:20
**deals** [2] - 41:21, 112:23
**debating** [1] - 88:7
**December** [1] - 123:7
**decide** [7] - 61:8, 62:1, 63:3, 63:9, 66:7, 68:23, 120:6
**decides** [1] - 117:18
**decision** [10] - 4:20, 10:18, 15:17, 20:25, 40:16, 40:17, 40:18, 111:5, 118:14
**declaration** [3] - 23:24, 31:4, 36:23
**deed** [2] - 58:21, 65:14
**DEFENDANT** [2] - 15:14, 15:18
**Defendant** [3] - 1:6, 1:18, 2:12
**defendant** [12] - 10:19, 17:3, 18:18, 19:5, 65:17, 65:20, 69:14, 82:1, 82:5, 85:4, 113:16, 119:5
**defendant's** [2] - 66:4, 85:9
**defense** [42] - 11:12, 12:6, 14:4, 14:5, 14:8, 16:6, 16:18, 17:3, 17:16, 17:23, 17:25, 25:12, 27:9, 29:17, 33:11, 33:14, 33:18, 33:24, 34:3, 34:6, 34:8, 34:19, 38:11, 41:24, 53:7, 54:23, 55:9, 55:14, 55:18, 70:15, 71:23, 96:6, 101:12, 101:14, 102:15, 110:13, 111:14, 111:25, 112:9, 112:10, 112:12, 113:13

**defense's** [10] - 12:4, 12:22, 39:13, 79:17, 82:25, 90:15, 97:16, 98:8, 116:13, 116:15
**defer** [1] - 4:23
**definite** [1] - 115:9
**definitely** [1] - 54:13
**definitive** [9] - 18:10, 52:19, 59:20, 62:11, 80:3, 80:25, 82:16, 86:11, 99:13
**definitively** [13] - 58:20, 76:17, 77:5, 80:19, 81:4, 81:24, 86:20, 88:6, 91:13, 94:10, 97:21, 97:25, 104:1
**degree** [1] - 68:3
**delay** [2] - 6:14, 14:19
**deliver** [1] - 9:20
**demand** [1] - 37:11
**deny** [1] - 113:16
**DEPARTMENT** [1] - 1:13
**Department** [2] - 1:16, 99:19
**deposit** [5] - 54:7, 54:11, 65:5, 66:12, 67:2
**deposited** [2] - 52:13, 52:16
**deposits** [2] - 63:15, 72:15
**DEPUTY** [1] - 2:2
**deputy** [1] - 32:9
**described** [1] - 24:22
**describing** [1] - 22:2
**description** [1] - 74:12
**descriptions** [1] - 82:21
**designation** [1] - 80:7
**designations** [1] - 80:6
**designing** [2] - 6:25, 23:14
**desire** [1] - 117:5
**despite** [2] - 89:1, 91:2
**destination** [1] - 55:13
**detail** [3] - 21:3, 39:12, 53:22
**detailed** [1] - 33:9, 102:21
**details** [1] - 112:23
**detection** [2] - 18:15, 21:9
**determination** [4] - 67:12, 81:21, 82:9, 83:18
**determinations** [1] -

43:22
**determinative** [3] - 46:24, 47:7, 50:5
**determine** [8] - 32:5, 91:13, 91:23, 94:14, 95:3, 95:5, 105:17, 106:5
**determining** [2] - 52:3, 91:16
**deterministic** [4] - 57:18, 83:2, 84:2, 98:7
**develop** [1] - 21:14
**developing** [2] - 21:22, 36:20
**developments** [2] - 89:3, 91:4
**die** [1] - 116:12
**differ** [1] - 20:22
**difference** [6] - 24:22, 62:22, 94:9, 94:23, 97:5, 110:1
**different** [18] - 17:21, 26:1, 35:24, 36:1, 36:2, 36:22, 46:17, 49:4, 52:8, 53:6, 66:18, 66:19, 67:20, 68:2, 73:25, 97:14, 101:14, 113:21
**differentiating** [1] - 103:21
**difficult** [7] - 22:13, 88:17, 90:3, 91:23, 92:11, 104:11, 118:25
**difficulties** [1] - 35:6
**digit** [3] - 65:22, 66:1, 82:7
**digital** [10] - 90:14, 90:20, 91:16, 91:17, 91:18, 92:12, 92:17, 92:21, 96:13, 96:25
**digits** [1] - 66:4
**diligent** [1] - 120:8
**diligently** [1] - 109:13
**dire** [1] - 105:2
**directed** [1] - 40:2
**directly** [4] - 21:18, 41:25, 96:7, 113:2
**director** [1] - 102:2
**directors** [1] - 87:20
**disagree** [5] - 37:14, 48:18, 55:20, 68:9, 95:1
**disagreeing** [1] - 24:21
**disagreement** [4] - 55:8, 62:20, 62:21, 113:8
**disagrees** [3] - 46:5,

55:21, 55:22
**disavow** [1] - 54:20
**disclose** [7] - 17:20, 18:24, 22:1, 24:1, 29:9, 36:7, 36:25
**disclosed** [12] - 18:13, 20:16, 21:1, 29:5, 36:6, 37:16, 37:18, 38:22, 39:14, 39:20, 77:22, 102:10
**disclosing** [3] - 20:15, 29:12, 36:8
**disclosure** [14] - 17:16, 17:23, 19:2, 33:9, 40:3, 40:4, 43:10, 44:13, 46:11, 71:25, 73:21, 90:21, 102:20, 108:12
**disclosures** [5] - 3:7, 5:11, 5:12, 39:9, 94:7
**discovery** [3] - 9:1, 111:4, 118:11
**discuss** [5] - 10:3, 16:16, 36:25, 46:16, 109:12
**discussed** [6] - 45:16, 47:25, 79:22, 91:21, 94:6, 96:1
**discussing** [4] - 52:10, 77:18, 96:7, 112:18
**discussion** [6] - 20:6, 20:13, 21:12, 58:12, 76:16, 90:7
**discussions** [1] - 23:25
**dismiss** [1] - 28:11
**dispute** [8] - 77:11, 77:12, 79:2, 98:16, 98:24, 99:15, 107:4
**disputed** [2] - 56:15, 83:3
**disputes** [1] - 111:4
**disregarded** [1] - 111:16
**dissimilar** [1] - 83:15
**distinct** [1] - 22:6
**distinction** [2] - 29:17, 29:18
**distinguish** [1] - 104:3
**distinguishing** [1] - 53:13
**distribute** [1] - 17:4
**District** [1] - 23:6
**DISTRICT** [3] - 1:1, 1:1, 1:8
**disturbing** [1] - 38:9
**DNA** [2] - 80:16, 80:21
**Docket** [2] - 43:12,

121:17
**document** [2] - 12:7, 76:22
**Document** [1] - 43:19
**documents** [3] - 12:21, 12:24, 47:21
**DocuSign** [2] - 31:8, 31:9
**dog** [2] - 10:25, 37:20
**DOJ** [6] - 1:11, 1:16, 81:13, 96:6, 98:11, 99:20
**DOJ's** [3] - 92:18, 96:1, 98:20
**DOJ-CRM** [1] - 1:16
**domain** [2] - 54:3, 85:6
**done** [18] - 3:24, 25:19, 31:1, 44:24, 49:10, 56:9, 71:17, 71:20, 71:21, 72:21, 73:15, 75:19, 100:8, 102:7, 102:8, 104:13, 105:14, 115:10
**door** [4] - 113:4, 114:24, 115:6, 115:8
**doors** [1] - 52:21
**doubt** [4] - 67:16, 68:16, 81:25, 84:3
**doubts** [1] - 96:16
**down** [9] - 12:10, 16:7, 30:24, 52:21, 64:22, 77:19, 79:8, 79:25, 120:25
**Dr** [3] - 115:25, 116:3, 119:15
**draft** [4] - 76:19, 76:20, 76:22, 76:25
**drafted** [2] - 18:22, 105:20
**drafting** [1] - 77:1
**drag** [1] - 6:11
**draw** [6] - 62:2, 63:5, 64:17, 81:9, 82:18
**drawing** [2] - 95:2, 117:7
**drawn** [1] - 101:13
**drive** [8] - 8:25, 9:15, 9:17, 9:23, 65:17, 65:18, 92:15, 93:21
**driving** [2] - 79:16, 82:14
**drop** [1] - 9:21
**Dror** [3] - 115:25, 116:3, 119:15
**drug** [1] - 52:13
**due** [3] - 4:4, 4:6, 30:19
**during** [4] - 3:24, 16:4,

30:4, 30:9

## E

**e-signature** [1] - 31:10
**early** [13] - 16:9, 30:17, 56:21, 100:22, 100:25, 101:20, 101:21, 101:22, 102:25, 119:23, 119:24
**easier** [3] - 31:17, 88:22, 89:17
**easiest** [1] - 31:19
**easily** [2] - 5:24, 6:12
**ECF** [2] - 14:5, 14:6
**effect** [1] - 98:3
**effectively** [1] - 16:24
**efficient** [1] - 108:23
**effort** [1] - 95:16
**efforts** [4] - 44:3, 89:1, 91:2, 109:17
**either** [13] - 11:9, 14:15, 20:3, 22:2, 32:6, 39:4, 45:6, 61:5, 77:13, 85:12, 93:2, 108:1, 109:11
**EKELAND** [170] - 1:18, 2:10, 2:21, 4:17, 5:2, 5:17, 6:4, 6:9, 6:16, 6:19, 7:3, 7:8, 7:21, 7:24, 8:17, 9:22, 10:1, 11:6, 11:12, 12:16, 13:4, 13:17, 15:7, 15:24, 16:6, 16:12, 19:16, 20:2, 22:8, 24:21, 25:7, 25:23, 26:5, 27:4, 28:1, 28:7, 28:14, 29:16, 30:4, 30:14, 30:22, 31:14, 31:16, 31:20, 34:24, 35:4, 35:14, 35:19, 36:2, 36:8, 37:5, 37:14, 37:25, 39:7, 39:13, 41:6, 41:10, 41:15, 42:4, 42:20, 42:24, 43:5, 43:14, 43:17, 43:19, 44:7, 45:15, 46:8, 46:10, 46:20, 46:22, 47:10, 47:15, 48:1, 48:18, 49:5, 49:19, 49:21, 50:9, 50:16, 50:25, 51:8, 51:11, 56:11, 56:13, 59:8, 62:4, 62:7, 63:11, 63:17, 64:21, 64:25, 66:10, 67:24, 69:1, 69:9, 70:3, 71:3, 72:8, 72:13,

72:20, 73:2, 73:24, 75:23, 76:11, 76:15, 76:21, 76:24, 77:10, 77:14, 77:21, 78:22, 79:16, 80:1, 82:24, 84:7, 84:14, 84:18, 84:24, 86:6, 87:5, 87:8, 87:11, 87:14, 88:13, 88:16, 90:6, 90:25, 91:8, 91:12, 92:8, 95:24, 96:11, 96:24, 97:16, 98:2, 98:18, 99:11, 99:25, 103:2, 103:17, 103:25, 104:9, 104:20, 105:9, 105:13, 105:16, 105:23, 106:1, 108:6, 108:8, 109:1, 109:13, 109:19, 112:16, 114:7, 114:11, 114:15, 114:21, 115:9, 115:13, 116:2, 116:22, 118:5, 119:15, 121:5, 121:12, 121:15, 121:23, 122:10
**Ekeland** [19] - 1:20, 2:10, 12:15, 14:14, 15:16, 17:17, 18:25, 19:10, 19:15, 21:2, 25:22, 32:23, 34:23, 48:17, 72:6, 101:4, 107:12, 112:15, 114:2
**Ekeland's** [1] - 31:24
**elect** [1] - 11:2
**element** [4] - 54:19, 69:14, 70:10, 94:25
**elements** [1] - 104:6
**elicit** [1] - 113:13
**eliminate** [1] - 22:19
**elsewhere** [1] - 44:13
**elucidated** [1] - 22:9
**emphasize** [3] - 49:23, 98:9, 100:13
**emphasizes** [2] - 92:19, 98:21
**emphasizing** [1] - 97:22
**empirical** [2] - 47:18, 48:12
**empirically** [1] - 50:2
**employed** [1] - 49:24
**employee** [1] - 5:19
**employer** [1] - 24:25
**employing** [1] - 90:24
**end** [5] - 3:11, 37:9, 54:24, 55:10, 60:1

ended [3] - 91:6, 91:8, 91:10
ending [2] - 55:25, 60:4
ends [1] - 108:17
enforcement [5] - 48:14, 48:20, 49:2, 49:3, 122:6
engaged [2] - 104:7, 117:13
engaging [1] - 102:25
engineer [1] - 21:9
enter [1] - 15:20
entering [1] - 82:17
entire [2] - 55:16, 57:17
entirely [9] - 37:17, 54:21, 68:22, 75:16, 85:12, 86:21, 96:6, 112:25
entirety [1] - 25:15
entitled [6] - 27:9, 40:3, 64:12, 66:24, 67:1, 119:9
entity [4] - 20:19, 57:6, 83:22
equally [1] - 101:6
equation [1] - 86:6
equivalent [1] - 59:3
especially [1] - 110:5
essence [2] - 65:14, 68:13
essential [2] - 94:25, 99:5
essentially [8] - 13:22, 21:18, 22:14, 33:24, 38:5, 38:7, 101:11, 114:15
establish [1] - 93:21
established [1] - 105:7
establishes [1] - 96:10
establishing [1] - 92:15
et [2] - 111:2
ethnic [1] - 111:22
Europe [1] - 49:4
evade [2] - 18:15, 29:10
evaluating [1] - 83:18
eve [1] - 76:5
event [3] - 24:13, 28:9, 70:20
evidence [57] - 21:14, 45:25, 51:17, 53:2, 54:13, 62:11, 63:8, 63:20, 65:19, 65:20, 66:7, 66:25, 67:1, 67:2, 67:3, 67:9,

67:14, 67:17, 71:9, 80:19, 81:7, 81:10, 81:14, 85:15, 86:3, 86:11, 95:23, 98:19, 99:3, 100:6, 100:14, 101:2, 102:16, 105:17, 105:21, 105:24, 106:5, 107:8, 107:9, 107:10, 107:14, 108:2, 110:8, 112:14, 116:7, 118:8, 118:15, 118:19, 118:22, 119:8, 119:14, 120:11, 120:15, 120:17, 120:19, 120:20, 121:2
evident [1] - 102:12
evidentiary [1] - 115:23
evidentiary-wise [1] - 115:23
exact [1] - 48:18
exactly [7] - 42:4, 49:12, 51:4, 56:3, 56:14, 102:21, 103:15
examination [8] - 45:13, 71:16, 73:14, 73:22, 84:4, 89:16, 114:1, 121:20
examine [2] - 111:19, 113:1
examiner [4] - 56:24, 74:11, 79:18, 86:17
Examiners [1] - 80:11
examining [2] - 60:22, 116:23
example [10] - 26:20, 53:24, 54:3, 58:12, 65:16, 72:14, 78:15, 79:4, 79:15, 118:12
examples [2] - 53:21, 103:2
exception [3] - 69:12, 69:19, 70:8
exchange [1] - 85:5
exclude [3] - 37:23, 108:1, 121:19
excluded [1] - 71:15
exfiltrated [1] - 38:7
existing [1] - 25:15
exists [2] - 91:16, 91:18
expect [3] - 34:16, 34:17, 109:10
expenditures [1] - 111:3
expense [1] - 21:21

expensive [1] - 98:5
experience [18] - 45:7, 45:8, 45:22, 50:13, 58:4, 59:17, 72:9, 72:18, 72:25, 73:19, 73:21, 77:9, 78:2, 79:18, 103:15, 103:18, 104:5, 104:8
expert [56] - 3:7, 4:4, 4:8, 5:5, 17:3, 17:18, 20:16, 26:24, 28:12, 30:19, 33:7, 35:17, 37:11, 39:5, 39:16, 40:8, 40:13, 40:15, 40:25, 50:11, 50:14, 52:22, 54:23, 55:9, 55:14, 57:24, 63:7, 63:25, 65:1, 65:9, 68:4, 68:9, 68:22, 69:4, 69:12, 69:23, 69:25, 70:2, 70:9, 74:10, 75:12, 77:7, 77:13, 77:15, 77:20, 78:5, 78:13, 83:18, 99:20, 100:19, 102:13, 102:16, 107:9, 108:11, 108:19
expert's [3] - 35:5, 40:16, 71:10
expert-level [1] - 52:22
expertise [26] - 47:5, 47:9, 48:16, 58:19, 58:23, 59:1, 61:24, 71:25, 72:19, 75:17, 77:4, 77:9, 78:18, 79:11, 79:12, 99:22, 102:20, 103:12, 103:15, 104:8, 105:2, 105:12, 106:25, 107:19, 108:3, 108:4
experts [17] - 6:20, 8:8, 10:17, 10:24, 14:24, 27:24, 30:15, 33:20, 33:25, 35:8, 35:9, 35:11, 47:5, 47:9, 69:18, 70:13
explain [19] - 19:11, 51:16, 76:7, 79:21, 85:2, 85:7, 88:18, 88:21, 89:1, 91:2, 91:15, 92:13, 92:18, 97:5, 100:2, 100:6, 100:8, 106:7, 106:12
explained [3] - 74:19, 74:21, 75:9
explaining [1] - 33:10
explanation [3] -

75:25, 85:2, 85:8
explanations [3] - 86:8, 86:19, 94:19
explicit [2] - 26:6, 35:24
explore [1] - 115:22
explorer [1] - 73:10
explorers [1] - 72:21
express [1] - 18:10
expressed [4] - 4:14, 26:3, 36:14, 74:15
extensive [4] - 59:11, 59:17, 88:21, 89:21
extent [27] - 14:7, 18:6, 20:24, 41:17, 41:25, 44:2, 45:24, 49:1, 52:2, 53:20, 58:6, 60:13, 61:18, 65:10, 68:11, 71:22, 74:14, 74:17, 80:18, 82:15, 89:9, 91:20, 94:8, 95:16, 97:9, 99:5, 107:15
external [1] - 85:10
extra [1] - 33:24
extraordinary [2] - 19:8, 21:20
extreme [1] - 77:25
extremely [6] - 28:20, 37:20, 78:15, 81:22, 98:16, 99:4
eyes [3] - 4:15, 16:24, 17:5

## F

face [2] - 25:2, 27:2
facilitate [1] - 85:9
facing [8] - 110:18, 110:25, 112:22, 113:2, 113:5, 113:16, 114:4
fact [21] - 12:1, 13:13, 21:13, 23:3, 28:25, 34:14, 34:20, 46:17, 55:9, 67:8, 67:25, 68:7, 75:14, 82:5, 83:19, 86:3, 100:5, 101:2, 103:9, 107:2, 120:13
factors [2] - 31:6, 120:8
facts [3] - 101:12, 101:13, 101:15
factual [2] - 64:12, 94:18
factually [3] - 92:3, 92:5, 110:17
failed [1] - 106:17
fails [1] - 105:20

failure [1] - 109:17
fair [17] - 13:23, 18:9, 25:16, 25:21, 34:2, 72:5, 90:4, 94:6, 94:17, 95:5, 99:23, 102:15, 108:15, 113:13, 113:25, 118:4, 120:21
fairly [3] - 89:20, 103:17, 120:21
faith [1] - 23:22
falling [1] - 74:14
famous [2] - 117:6, 117:16
fancy [3] - 29:7, 98:5, 98:6
far [3] - 9:21, 59:1, 109:17
faster [1] - 84:16
FBI [3] - 29:7, 112:1, 120:13
fear [2] - 23:3, 36:11
February [2] - 30:21, 33:23
federal [4] - 3:18, 28:7, 89:21, 114:17
fester [1] - 6:13
few [5] - 4:12, 16:8, 52:21, 87:2, 110:10
fight [1] - 10:25
fighting [1] - 97:18
figure [8] - 9:25, 41:4, 42:2, 42:17, 44:3, 82:4, 88:2, 109:16
file [7] - 19:1, 19:10, 19:14, 23:22, 35:8, 41:2
files [1] - 8:22
filing [1] - 2:21
final [1] - 12:19
finally [4] - 4:17, 4:20, 8:25, 111:23
finance [4] - 88:22, 89:4, 91:14, 92:2
financial [22] - 21:12, 21:20, 51:12, 58:17, 58:20, 59:4, 59:14, 64:5, 68:5, 74:10, 83:11, 83:15, 83:23, 86:17, 86:19, 88:18, 88:19, 90:12, 108:11, 108:14, 118:14, 118:23
fine [19] - 9:18, 10:20, 11:1, 11:8, 14:11, 30:12, 32:8, 40:2, 42:18, 60:15, 61:4, 75:16, 90:24, 97:2, 97:5, 97:8, 109:1, 114:10

fingerprint [1] - 80:17
finish [2] - 11:18, 108:24
finished [2] - 84:4, 107:12
first [18] - 16:15, 29:24, 32:4, 54:6, 63:14, 63:21, 64:2, 65:5, 66:12, 67:2, 72:15, 92:24, 92:25, 95:8, 107:6, 107:12, 111:17
first-known [2] - 54:6, 72:15
five [2] - 4:8, 66:3
flea [1] - 37:19
fleeing [1] - 96:20
Floor [1] - 1:20
flowing [3] - 105:18, 106:6, 106:10
focus [2] - 12:9, 119:22
focused [2] - 114:5, 116:8
focusing [1] - 70:21
Fog [31] - 54:7, 54:12, 54:24, 55:4, 55:7, 55:10, 55:14, 55:16, 55:17, 55:23, 56:15, 56:19, 56:21, 57:14, 60:4, 60:5, 63:15, 65:5, 65:6, 66:13, 66:16, 72:15, 85:2, 85:3, 100:22, 100:25, 101:7, 101:8, 103:1, 106:7, 107:17
Fog-controlled [1] - 54:24
folders [1] - 8:19
follow [3] - 65:1, 74:1, 83:8
followed [1] - 69:5
following [1] - 11:23
FOR [1] - 1:1
foregoing [1] - 123:4
forensic [35] - 51:12, 52:12, 54:18, 56:25, 57:7, 57:16, 58:2, 59:6, 59:14, 59:16, 60:2, 61:11, 62:9, 62:15, 63:5, 63:19, 64:4, 64:5, 64:16, 64:20, 65:1, 65:24, 66:2, 68:5, 68:12, 68:21, 69:3, 79:18, 80:9, 81:20, 84:12, 86:17, 88:18
forensically [12] - 57:7, 57:9, 57:15,

57:22, 60:2, 60:10, 61:7, 61:11, 73:12, 74:4, 74:14, 83:24
forensics [8] - 50:1, 51:13, 56:24, 82:3, 82:10, 88:18, 100:2, 108:14
forfeiture [1] - 95:13
form [5] - 2:23, 31:8, 66:17, 86:16, 110:13
forma [1] - 15:21
format [1] - 31:20
forming [1] - 55:13
forth [2] - 49:9, 86:25
forward [4] - 9:11, 11:17, 32:5, 33:22
Foundation [3] - 45:19, 72:23, 104:21
foundation [4] - 24:20, 101:9, 105:8, 105:11
four [2] - 3:15, 33:24
framed [1] - 58:6
frankly [12] - 24:5, 25:17, 26:25, 28:24, 32:17, 35:23, 37:21, 40:25, 67:6, 78:21, 85:19, 117:20
fraud [5] - 56:24, 74:10, 79:18, 83:15, 86:17
Fraud [1] - 80:11
free [2] - 67:5, 67:7
Frentzen [2] - 17:11, 24:9
frequently [1] - 110:16
Friday [1] - 108:24
Fridays [4] - 3:20, 3:21, 3:23
front [17] - 5:21, 19:25, 20:3, 43:12, 50:7, 61:21, 64:18, 64:19, 68:20, 81:10, 93:5, 105:11, 110:16, 118:17, 119:12, 121:2, 121:4
fruit [1] - 15:7
full [2] - 4:18, 123:5
fulsome [1] - 33:9
fundamental [1] - 64:4
fundamentally [1] - 92:9
funding [6] - 10:6, 10:7, 10:13, 10:16, 10:20, 15:22
funds [11] - 52:5, 53:6, 54:24, 55:10, 105:18, 106:5, 106:10, 106:11, 106:16, 106:18,

106:19
future [1] - 22:19

## G

GAAP [1] - 59:3
game [6] - 96:2, 102:15, 113:13, 113:25, 118:4, 120:21
garbage [1] - 120:16
general [12] - 5:20, 6:7, 16:1, 18:17, 27:15, 30:7, 32:15, 42:6, 44:9, 45:21, 87:18, 120:2
generally [3] - 88:18, 115:20, 116:3
generate [3] - 46:25, 47:18, 48:11
generated [4] - 13:20, 23:3, 38:5, 38:6
generating [1] - 22:9
generation [3] - 13:9, 13:15, 13:18
generic [2] - 44:21, 89:8
George [1] - 104:16
Germany [1] - 48:24
given [6] - 12:1, 12:11, 33:15, 83:6, 103:18, 115:14
glance [1] - 84:18
Glave [2] - 59:10, 108:11
global [1] - 24:11
globally [1] - 48:21
goal [3] - 41:3, 122:4, 122:5
golden [1] - 111:1
goodness [1] - 38:25
goods [1] - 106:25
gotcha [3] - 95:19, 96:2, 122:4
government [95] - 2:5, 8:20, 8:22, 11:13, 11:16, 12:19, 13:24, 14:3, 14:6, 14:8, 16:18, 16:20, 16:22, 17:15, 18:1, 19:14, 21:2, 29:2, 30:1, 30:23, 31:25, 33:2, 33:7, 33:8, 33:22, 37:22, 39:16, 41:18, 43:2, 43:21, 45:6, 45:12, 46:18, 46:23, 47:16, 51:21, 51:22, 53:2, 54:10, 54:13, 55:9, 56:15, 62:18, 64:11, 64:14, 64:15,

66:11, 66:19, 66:25, 67:4, 67:15, 67:21, 68:24, 70:19, 71:6, 71:13, 72:8, 80:14, 80:15, 80:18, 80:25, 85:1, 86:12, 91:25, 92:3, 97:23, 99:14, 100:9, 100:15, 100:23, 101:12, 101:17, 102:10, 102:12, 103:21, 105:14, 106:6, 106:15, 106:17, 106:22, 107:22, 108:10, 110:4, 111:2, 111:3, 111:19, 112:9, 112:18, 112:21, 113:3, 113:19, 114:8, 114:12, 121:19
government's [20] - 4:6, 12:14, 14:5, 14:8, 16:23, 18:15, 20:16, 37:12, 62:25, 80:22, 100:3, 100:23, 100:24, 107:8, 107:16, 107:18, 111:5, 111:9, 117:9, 121:17
Gox [17] - 11:22, 12:7, 12:20, 12:24, 13:1, 13:14, 53:25, 55:23, 65:3, 85:8, 85:14, 85:15, 85:21, 86:3, 86:6, 86:12, 90:9
grand [2] - 117:18, 118:17
grant [1] - 121:16
granting [1] - 3:12
great [2] - 21:11, 33:13
greater [4] - 20:17, 20:22, 21:3, 39:12
green [5] - 65:19, 65:20, 66:3, 82:5, 82:6
grew [1] - 80:16
grossly [1] - 96:23
ground [1] - 99:24
grounding [1] - 90:12
grounds [2] - 28:11, 108:1
group [1] - 50:15
guess [22] - 15:11, 16:4, 18:21, 25:20, 30:15, 30:16, 32:13, 45:5, 49:23, 52:23, 54:18, 68:1, 72:25, 78:20, 79:3, 89:23,

102:11, 102:19, 103:7, 104:17, 104:24, 118:6
guesses [3] - 79:14, 79:22
guessing [1] - 46:14
guidance [1] - 110:7
guilty [4] - 70:2, 81:5, 81:14, 119:5
gun [1] - 79:5

## H

hac [5] - 2:11, 2:16, 2:18, 30:24, 31:1
hack [2] - 85:14, 86:3
hacked [5] - 85:8, 85:9, 85:16, 85:21, 85:22
hacking [1] - 12:24
half [2] - 13:4, 30:6
hall [1] - 77:19
Halloween [1] - 79:7
hand [8] - 9:15, 18:17, 54:17, 56:9, 65:15, 68:14, 96:19, 117:3
handed [2] - 59:21, 96:19
handful [1] - 108:17
handle [1] - 109:8
hands [3] - 57:20, 68:17, 99:2
hanging [1] - 15:7
happier [1] - 24:7
Happy [1] - 122:11
happy [20] - 11:24, 21:1, 24:18, 28:19, 31:14, 31:16, 31:23, 32:21, 33:1, 41:23, 47:11, 69:5, 69:8, 70:19, 108:17, 108:22, 109:23, 121:4, 121:5
hard [11] - 8:25, 9:15, 9:17, 9:23, 34:17, 51:17, 76:1, 92:15, 93:21, 114:25, 116:20
harder [3] - 89:13, 89:18, 89:25
harm [1] - 21:20
Hashanah [5] - 76:2, 76:6, 87:12, 87:21, 122:12
HASSARD [1] - 1:19
Hassard [2] - 2:11, 17:17
head [2] - 48:19, 117:12
hear [9] - 30:1, 30:2,

30:23, 33:5, 42:7, 45:6, 49:13, 70:19, 106:1
**heard** [7] - 6:23, 38:3, 42:11, 48:6, 69:6, 74:18, 83:9
**hearing** [5] - 6:8, 11:10, 33:21, 42:3, 122:13
**hearings** [2] - 16:8, 83:14
**heightened** [1] - 26:2
**held** [2] - 22:17, 36:12
**help** [3] - 53:13, 53:19, 110:5
**helpful** [30] - 12:10, 13:25, 20:24, 41:18, 41:25, 53:20, 63:22, 66:10, 69:2, 71:7, 73:23, 74:13, 75:6, 75:7, 75:12, 75:13, 79:9, 83:6, 86:23, 90:7, 90:11, 93:6, 93:17, 94:23, 97:1, 98:16, 99:3, 110:7, 112:20, 118:5
**helps** [1] - 98:8
**henceforth** [1] - 15:23
**hereby** [1] - 123:3
**Heuristic** [1] - 37:18
**heuristic** [22] - 5:10, 5:12, 16:21, 17:1, 33:10, 37:18, 38:2, 38:4, 38:6, 39:9, 49:22, 49:25, 51:13, 55:5, 55:12, 58:7, 77:15, 78:19, 78:20, 79:4, 79:19
**heuristically** [2] - 57:14, 59:25
**heuristics** [36] - 17:6, 20:7, 20:14, 20:20, 20:23, 21:7, 21:10, 21:14, 21:22, 22:3, 36:15, 49:24, 50:4, 52:9, 52:17, 53:11, 53:12, 54:3, 54:4, 56:16, 56:19, 76:17, 77:5, 77:22, 78:11, 78:12, 78:14, 79:13, 79:14, 79:22, 80:4, 83:1, 97:20, 100:2, 115:16, 116:17
**hide** [3] - 44:25, 45:1, 45:13
**high** [2] - 81:22, 100:1
**highlight** [1] - 110:10
**highly** [1] - 99:16
**hill** [1] - 116:12
**himself** [4] - 15:9,

31:7, 69:23, 75:20
**hinted** [1] - 107:11
**history** [1] - 27:20
**hold** [3] - 30:7, 37:3, 99:20
**holding** [3] - 7:5, 9:5, 114:11
**holds** [1] - 61:4
**holiday** [3] - 3:18, 76:3, 76:10
**honest** [2] - 28:2, 120:7
**Honor** [80] - 2:6, 2:10, 6:4, 6:16, 7:8, 11:12, 11:15, 12:16, 15:14, 17:14, 19:16, 25:7, 26:10, 28:1, 29:16, 30:15, 31:21, 31:23, 32:12, 33:2, 34:22, 35:4, 37:5, 39:7, 41:6, 41:10, 41:15, 41:17, 43:8, 43:14, 43:17, 48:6, 49:19, 52:2, 53:1, 53:20, 56:11, 58:1, 62:4, 66:10, 68:3, 71:3, 71:6, 75:23, 76:5, 81:3, 84:14, 87:5, 87:8, 87:12, 87:18, 88:13, 89:7, 90:4, 90:6, 91:25, 92:7, 92:24, 93:13, 94:4, 95:1, 95:24, 99:11, 99:16, 100:17, 101:10, 101:25, 105:4, 105:9, 105:13, 106:22, 107:23, 108:9, 109:2, 109:14, 109:19, 109:23, 110:3, 110:21, 113:9
**HONORABLE** [1] - 1:8
**hoops** [1] - 40:12
**hop** [1] - 57:4
**hope** [3] - 16:12, 76:9, 84:7
**hoped** [1] - 32:3
**hopefully** [4] - 16:11, 29:20, 32:4, 40:22
**hopes** [1] - 22:12
**hoping** [5] - 4:18, 9:1, 19:17, 20:4, 108:11
**hops** [10] - 53:6, 56:1, 56:4, 56:5, 56:7, 56:8, 65:4, 66:16, 71:24
**hot** [1] - 116:8
**hour** [2] - 7:18, 30:6
**hourly** [2] - 10:14, 10:15

**house** [1] - 16:7
**HTTPS** [1] - 47:22
**hundreds** [1] - 33:10
**husher** [1] - 121:10
**hyperlink** [3] - 47:23, 80:10, 80:13
**hypothetical** [3] - 25:20, 81:25, 118:22

## I

**idea** [5] - 18:17, 23:20, 38:25, 39:2, 92:25
**identical** [1] - 100:14
**identification** [1] - 59:14
**identified** [3] - 57:14, 100:5, 100:9
**identify** [5] - 53:18, 64:11, 71:17, 78:25, 96:12
**identifying** [5] - 56:18, 56:19, 79:3, 92:20, 98:21
**identity** [2] - 80:3, 83:22
**identity-linking** [1] - 80:3
**ignorance** [1] - 20:4
**ignore** [1] - 63:5
**ignored** [1] - 56:2
**illegal** [4] - 45:14, 106:14, 106:18, 106:19
**illicit** [5] - 105:18, 106:5, 106:11, 106:17, 107:18
**images** [1] - 26:7
**imagine** [4] - 34:17, 38:23, 39:5, 114:24
**imagining** [1] - 114:25
**immediate** [1] - 31:25
**immediately** [1] - 42:24
**impact** [1] - 14:2
**imperfectly** [1] - 78:25
**impermissible** [1] - 14:4
**implemented** [1] - 88:22
**implicating** [1] - 71:1
**implication** [1] - 95:18
**implicit** [1] - 121:18
**import** [1] - 28:16
**importance** [2] - 92:19, 98:21
**important** [8] - 20:8, 90:15, 96:12, 96:16, 96:18, 99:13, 115:18, 120:3

**importantly** [1] - 103:10
**impose** [1] - 40:14
**impressions** [1] - 26:7
**improper** [9] - 39:5, 59:5, 63:5, 63:7, 64:7, 64:25, 65:23, 66:22, 74:25
**improperly** [1] - 24:19
**IN** [1] - 1:1
**in-person** [1] - 16:8
**inability** [1] - 74:8
**inaccuracies** [1] - 39:19
**inaccurate** [2] - 106:9, 110:17
**inadvertently** [2] - 17:9, 36:13
**inappropriate** [2] - 114:19, 119:11
**inasmuch** [1] - 44:10
**inauthentic** [1] - 12:8
**incident** [1] - 12:25
**incidents** [1] - 12:25
**inclined** [1] - 50:16
**include** [2] - 19:9, 111:7
**including** [4] - 41:22, 54:1, 54:23, 110:16
**inconsistent** [2] - 58:8, 80:5
**incorporate** [2] - 89:2, 91:3
**incurred** [1] - 21:22
**incurring** [1] - 21:21
**independent** [2] - 58:10, 58:14
**indicated** [5] - 10:4, 40:10, 75:19, 78:13, 79:11
**indicating** [4] - 15:20, 20:20, 35:8, 50:4
**indication** [2] - 31:11, 46:3
**indicia** [8] - 96:25, 102:22, 103:7, 103:9, 103:13, 103:21, 103:25, 104:2
**indicted** [1] - 119:6
**indictment** [5] - 28:11, 117:19, 117:25, 118:1, 119:3
**indigent** [2] - 10:19, 10:23
**individual** [9] - 51:15, 51:19, 51:24, 59:15, 62:10, 80:3, 85:4, 85:5, 98:1
**individual's** [2] -

92:16, 93:22
**individuals** [5] - 43:23, 52:1, 80:4, 85:6, 117:10
**industry** [1] - 83:4
**infer** [1] - 119:5
**inference** [2] - 81:23, 93:24
**inferences** [4] - 61:19, 62:2, 81:9, 101:13
**inferring** [1] - 113:4
**inform** [1] - 20:5
**information** [40] - 16:21, 17:4, 17:21, 18:13, 18:14, 18:19, 19:6, 21:15, 22:5, 25:25, 27:8, 27:9, 28:12, 28:22, 29:18, 34:3, 34:8, 34:10, 34:12, 35:11, 35:12, 35:17, 36:6, 37:16, 38:19, 38:21, 39:11, 39:14, 39:15, 39:23, 40:8, 40:13, 41:19, 86:4, 87:19, 91:20, 94:16, 98:14, 120:4
**infrequent** [1] - 19:4
**initial** [5] - 39:24, 54:11, 55:5, 76:25, 114:22
**initiated** [1] - 117:15
**innovation** [1] - 121:13
**input** [2] - 20:7, 53:14
**inputs** [1] - 59:23
**insight** [1] - 58:8
**insisted** [1] - 33:11
**instance** [2] - 52:3, 118:10
**Instawallet** [1] - 57:12
**instead** [1] - 40:11
**instruct** [2] - 111:13, 119:2
**instruction** [1] - 110:24
**integrity** [1] - 85:16
**intelligence** [1] - 53:5
**intend** [2] - 54:10, 91:10
**intending** [2] - 112:16, 114:16
**intention** [2] - 113:9, 114:7
**interest** [4] - 4:14, 44:5, 118:14, 118:23
**interested** [1] - 115:1
**interesting** [1] - 63:12
**interests** [3] - 23:4, 122:6
**interfering** [1] - 6:1

interim [1] - 110:11
intermediaries [1] - 52:5
intermediate [2] - 55:22, 60:14
internal [1] - 99:19
internet [1] - 111:11
interpretation [2] - 101:13, 101:14
interrupt [1] - 68:8
introduce [2] - 112:2, 113:11
investigation [7] - 47:17, 48:11, 49:24, 85:1, 85:3, 118:16, 119:10
investigations [2] - 48:14, 88:20
investigator [3] - 48:19, 48:20, 118:13
investigators [2] - 88:23, 117:5
invite [2] - 18:24, 21:17
invites [1] - 21:8
inviting [2] - 20:1, 111:11
invoking [1] - 66:20
involved [9] - 13:15, 13:18, 23:13, 36:19, 85:24, 117:10, 117:15, 119:10, 122:9
involves [1] - 18:19
involving [6] - 23:9, 68:21, 85:23, 85:24, 100:22, 100:25
IP [8] - 23:3, 23:10, 25:19, 26:3, 27:11, 27:15, 27:19, 27:23
irrelevant [2] - 82:9, 112:11
issue [39] - 5:4, 7:7, 12:9, 12:12, 16:2, 16:11, 16:17, 17:25, 27:14, 27:21, 29:1, 32:16, 37:21, 37:22, 40:24, 49:14, 49:15, 52:12, 52:16, 52:17, 66:21, 70:21, 70:23, 70:24, 71:5, 71:7, 71:25, 72:1, 81:1, 81:18, 90:15, 103:23, 106:22, 111:11, 111:25, 114:23, 115:2, 116:18, 119:16
issues [18] - 4:12, 14:17, 27:4, 32:7, 33:3, 34:7, 37:24,

41:22, 50:15, 73:21, 77:9, 88:12, 90:21, 109:9, 109:12, 110:2, 110:4, 112:18
items [2] - 8:3, 81:9
iterations [1] - 33:20
itself [3] - 61:9, 92:10, 121:19

## J

jail [4] - 4:21, 9:4, 9:17, 114:5
January [1] - 29:11
JEFFREY [1] - 1:15
Jeffrey [1] - 2:7
Jencks [1] - 115:15
Jennifer [1] - 41:19
Jersey [2] - 28:5
Jesselyn [2] - 2:22, 31:10
Jesuit [1] - 87:20
job [3] - 71:9, 107:9, 117:17
joke [1] - 79:8
journal [4] - 92:19, 96:7, 96:9, 98:21
journals [1] - 96:1
JUDGE [2] - 1:8, 1:8
Judge [3] - 77:20, 88:11, 88:12
judgment [4] - 52:6, 53:15, 60:12, 83:24
judicial [1] - 10:20
judiciary [1] - 10:13
jurisdiction [2] - 111:10, 117:20
jurors [1] - 94:19
jury [89] - 45:4, 60:11, 60:15, 61:6, 61:8, 61:17, 61:18, 61:19, 62:1, 62:14, 63:3, 63:4, 63:9, 63:23, 64:3, 64:7, 64:18, 64:19, 65:8, 65:13, 66:7, 66:25, 67:5, 67:11, 67:13, 67:23, 68:10, 68:14, 68:15, 68:20, 68:23, 69:3, 69:24, 70:25, 71:8, 75:5, 75:6, 75:7, 75:12, 81:8, 82:22, 83:6, 83:8, 84:5, 86:2, 86:23, 90:7, 93:5, 93:6, 93:18, 93:24, 94:18, 96:21, 97:1, 97:5, 98:4, 98:8, 105:11, 110:2, 110:4, 110:24, 111:8, 111:12,

111:13, 112:3, 112:6, 112:17, 113:4, 113:22, 115:8, 115:19, 116:4, 117:18, 117:24, 118:3, 118:17, 119:2, 119:4, 119:9, 119:13, 119:14, 119:25, 120:6, 120:12, 121:2, 121:4
jury's [2] - 62:1, 71:9
JUSTICE [1] - 1:13
justice [1] - 81:13
Justice [4] - 1:16, 10:12, 14:22, 99:19

## K

Kafkaesque [1] - 111:1
keep [5] - 4:15, 41:14, 49:17, 50:25, 114:5
keeping [1] - 99:24
Kelly's [1] - 77:20
ken [1] - 52:18
kept [2] - 24:2, 37:2
key [32] - 24:2, 24:3, 37:2, 57:3, 59:21, 60:20, 60:21, 60:24, 61:4, 62:23, 68:14, 68:17, 83:20, 86:22, 92:15, 93:21, 94:9, 94:10, 94:11, 94:13, 94:14, 94:24, 97:6, 97:7, 98:1, 99:4
keys [10] - 51:17, 57:19, 60:20, 80:4, 92:16, 92:20, 93:22, 94:12, 96:13, 98:22
killer [1] - 22:15
kind [15] - 27:5, 28:15, 37:8, 43:8, 52:8, 55:6, 65:2, 74:14, 78:1, 83:6, 97:21, 111:7, 112:17, 114:17, 116:9
Kind [1] - 53:5
kinds [2] - 57:10, 57:23
knocking [1] - 109:1
knowing [3] - 68:16, 94:12, 103:8
knowledge [7] - 13:8, 58:10, 58:14, 78:7, 105:12, 106:24, 112:7
knowledgeable [3] - 28:17, 28:21, 73:16
known [5] - 34:9,

34:19, 54:6, 63:15, 72:15
knows [2] - 16:6, 26:12
Korver [1] - 92:22
KPMG [1] - 108:11
Kraken [1] - 90:9
KYC [15] - 80:4, 88:21, 89:2, 89:4, 89:19, 90:8, 90:9, 90:10, 90:12, 90:16, 90:24, 91:3, 91:14, 91:22, 92:2

## L

labeling [1] - 61:10
lack [2] - 71:25, 111:12
lags [2] - 91:14, 92:2
language [5] - 8:23, 26:6, 34:25, 36:11, 69:22
laptop [1] - 24:16
large [2] - 59:11, 87:24
largely [1] - 20:18
laser [1] - 116:8
laser-focused [1] - 116:8
last [13] - 3:8, 3:10, 10:4, 30:5, 44:17, 46:13, 46:15, 65:22, 65:25, 70:6, 91:1, 103:3, 107:7
late [2] - 3:8, 29:23
Law [1] - 1:20
law [20] - 18:11, 18:12, 18:25, 19:4, 19:12, 19:23, 19:24, 20:3, 20:10, 26:12, 48:13, 48:20, 49:2, 49:3, 69:7, 84:9, 84:13, 112:1, 122:6
lawsuit [1] - 23:22
lawyer [7] - 14:15, 25:24, 32:15, 85:12, 87:25, 88:11, 89:10
lawyering [1] - 6:1
lawyers [8] - 10:14, 16:1, 35:10, 42:5, 42:16, 67:18, 76:1, 87:15
lay [3] - 67:24, 94:19, 105:11
laying [1] - 105:6
lead [1] - 48:19
leads [3] - 46:25, 47:18, 48:11
learn [1] - 94:22

least [13] - 8:14, 14:21, 14:25, 18:16, 39:24, 42:18, 43:16, 55:9, 77:23, 88:4, 90:14, 91:20, 119:21
leave [4] - 18:21, 18:24, 40:1, 49:14
leaving [2] - 47:23, 99:1
ledger [2] - 61:2, 89:18
legal [5] - 106:8, 106:12, 106:25, 111:13, 111:15
legitimate [3] - 44:9, 45:18, 121:20
lengths [1] - 33:13
less [3] - 34:15, 34:17, 89:15
lesser [1] - 14:7
letter [1] - 120:16
letting [1] - 6:13
level [12] - 20:17, 44:22, 52:22, 71:21, 73:3, 73:4, 77:23, 89:15, 95:19, 102:8, 102:9, 104:25
liable [1] - 61:15
license [4] - 65:21, 65:22, 66:1, 66:4
License [1] - 82:6
life [1] - 110:18
light [2] - 21:25, 121:16
likelihood [1] - 81:22
likely [2] - 108:4, 113:11
likewise [2] - 43:5, 66:11
limine [6] - 14:1, 108:22, 109:24, 110:1, 110:12, 121:17
limit [1] - 19:7
limitations [2] - 17:22, 115:22
limited [1] - 18:22
line [5] - 26:17, 47:20, 50:3, 95:2, 117:7
linking [1] - 80:3
list [2] - 10:3, 51:17
listed [2] - 50:9, 111:6
listening [1] - 25:11
literature [1] - 50:4
litigation [5] - 23:8, 23:9, 36:18, 111:24
live [1] - 26:23
located [2] - 24:8, 29:15
lock [2] - 24:2, 37:2

look [39] - 18:11, 20:10, 22:21, 26:21, 27:23, 28:12, 28:22, 30:11, 30:12, 30:25, 34:11, 35:12, 35:13, 36:20, 37:2, 39:18, 40:14, 40:18, 40:25, 49:11, 59:18, 61:6, 70:1, 70:18, 73:6, 78:2, 80:8, 83:12, 85:24, 87:8, 96:6, 97:14, 99:8, 101:3, 101:23, 103:13, 112:22, 118:21

looked [4] - 2:17, 33:11, 37:1, 110:20

looking [18] - 6:20, 18:10, 22:6, 24:15, 26:15, 30:13, 30:14, 33:23, 36:17, 55:1, 55:3, 73:9, 76:4, 97:15, 110:6, 117:4, 118:10

looks [2] - 39:14, 43:15

Lorentz [2] - 41:19, 41:20

loses [1] - 10:21

loss [1] - 6:21

low [1] - 15:7

low-hanging [1] - 15:7

ludicrous [1] - 38:22

lunch [7] - 7:17, 16:4, 30:5, 30:9, 41:7, 42:8, 42:10

## M

machine [2] - 29:7, 29:9

magic [1] - 97:21

main [1] - 44:12

maintain [2] - 45:10, 94:11

maintained [1] - 13:13

maintaining [1] - 44:5

malpractice [1] - 68:20

manila [1] - 8:19

manner [2] - 10:20, 49:2

manual [3] - 80:18, 81:13, 83:4

manually [1] - 102:3

market [3] - 21:19, 38:4, 38:17

marketplaces [6] - 106:6, 106:9, 106:10, 106:14, 106:16, 107:18

markets [1] - 107:1

marshal [1] - 9:14

Marshals [1] - 9:25

Mason [1] - 104:16

Mastercard [3] - 5:7, 16:1, 41:21

match [1] - 8:21

material [7] - 5:8, 14:19, 24:16, 40:15, 63:1, 63:2, 122:7

materials [3] - 13:15, 13:19, 17:16

matter [13] - 11:7, 24:14, 36:1, 39:22, 63:4, 64:16, 65:24, 82:2, 92:4, 98:24, 101:15, 101:16, 107:1

matters [3] - 3:23, 8:2, 10:3

mean [33] - 4:7, 20:18, 23:8, 27:6, 27:15, 27:20, 28:15, 29:11, 30:18, 34:8, 35:1, 37:20, 40:2, 44:4, 49:8, 52:11, 53:17, 60:17, 75:23, 77:15, 81:5, 89:22, 90:22, 90:23, 92:1, 93:1, 93:10, 98:24, 100:21, 102:11, 105:24, 114:11, 119:1

meaning [1] - 58:15

meaningful [1] - 27:2

means [5] - 6:24, 67:8, 78:19, 93:2, 98:15

meant [2] - 2:22, 70:12

measures [4] - 26:19, 58:11, 58:13, 88:22

meat [1] - 53:7

meet [1] - 7:16

member [3] - 2:19, 31:3, 31:11

mental [2] - 69:13, 70:10

mentioned [1] - 2:15

mentioning [1] - 58:18

merely [1] - 7:3

met [1] - 68:5

metaphysical [2] - 93:3, 93:6

methodologies [5] - 5:10, 36:15, 46:23, 47:16, 79:19

methodology [4] - 6:25, 66:3, 74:1, 107:22

methods [4] - 43:20,

43:25, 47:6, 72:1

MICHAEL [1] - 1:19

Michael [2] - 2:11, 92:22

microphone [1] - 15:13

might [20] - 18:13, 18:14, 23:19, 25:20, 34:16, 44:22, 53:14, 59:4, 62:16, 62:25, 68:19, 77:7, 78:7, 94:19, 96:17, 102:25, 103:9, 108:25, 117:17

miner [1] - 57:13

minimal [1] - 28:20

minimize [2] - 24:18, 26:19

minor [2] - 37:20, 37:24

minutes [4] - 8:8, 23:6, 41:11, 87:2

misattributions [1] - 85:3

misconduct [1] - 111:3

misidentification [1] - 100:1

misinterpreted [1] - 84:25

misleading [7] - 61:5, 61:18, 68:14, 94:17, 96:23, 97:12, 99:6

missing [1] - 51:14

mistake [2] - 2:21, 2:24

mixers [1] - 45:17

mixing [1] - 102:3

modest [2] - 4:3

modification [1] - 19:2

modifications [1] - 6:10

moment [1] - 49:6

Monday [11] - 3:17, 4:25, 16:15, 29:24, 32:1, 32:4, 32:9, 32:11, 108:17, 121:25

money [3] - 52:13, 60:5, 99:2

months [1] - 33:24

morning [14] - 2:6, 2:9, 2:10, 2:14, 9:23, 16:15, 29:24, 32:1, 32:4, 32:5, 32:9, 32:11, 42:9, 87:15

mortar [1] - 90:13

MOSS [1] - 1:8

most [9] - 8:10, 14:13, 31:25, 37:24, 79:23,

80:1, 85:19, 108:22, 116:17

mostly [1] - 24:12

motion [18] - 2:16, 2:17, 2:18, 2:19, 2:24, 3:8, 3:12, 14:5, 14:8, 30:24, 31:3, 31:7, 105:15, 110:1, 110:9, 111:7, 121:17, 121:19

motions [4] - 13:25, 108:21, 109:24, 110:12

motivated [1] - 111:22

motivating [1] - 81:17

motivation [2] - 117:9, 117:10

motivations [2] - 44:19, 44:20

mouths [1] - 26:15

move [9] - 3:22, 4:6, 7:13, 19:20, 19:22, 71:3, 75:24, 84:15, 99:24

moved [1] - 4:5

moves [1] - 14:3

moving [5] - 9:10, 31:4, 31:12, 49:17, 53:5

MR [211] - 2:10, 2:21, 4:17, 5:2, 5:17, 6:4, 6:9, 6:16, 6:19, 7:3, 7:8, 7:21, 7:24, 8:17, 9:22, 10:1, 11:6, 11:12, 12:16, 13:4, 13:17, 15:7, 15:24, 16:6, 16:12, 19:16, 20:2, 22:8, 24:21, 25:7, 25:23, 26:5, 27:4, 28:1, 28:7, 28:14, 29:16, 30:4, 30:14, 30:22, 31:14, 31:16, 31:20, 34:24, 35:4, 35:14, 35:19, 36:2, 36:8, 37:5, 37:14, 37:25, 39:7, 39:13, 41:6, 41:10, 41:15, 42:4, 42:20, 42:24, 43:5, 43:8, 43:14, 43:17, 43:19, 44:7, 45:15, 46:8, 46:10, 46:20, 46:22, 47:10, 47:15, 48:1, 48:6, 48:8, 48:18, 49:5, 49:19, 49:21, 50:9, 50:16, 50:25, 51:8, 51:11, 52:2, 53:1, 53:5, 53:9, 53:12, 53:17, 56:11, 56:13, 58:1, 59:8,

62:4, 62:7, 63:11, 63:17, 64:21, 64:25, 66:10, 67:24, 69:1, 69:9, 70:3, 71:3, 71:6, 71:12, 72:8, 72:13, 72:20, 73:2, 73:24, 75:23, 76:5, 76:11, 76:15, 76:21, 76:24, 77:10, 77:14, 77:21, 78:22, 79:16, 80:1, 81:3, 81:12, 82:24, 84:7, 84:14, 84:18, 84:24, 86:6, 87:5, 87:8, 87:11, 87:14, 87:17, 87:18, 88:13, 88:16, 89:7, 90:4, 90:6, 90:25, 91:8, 91:12, 91:25, 92:7, 92:8, 92:24, 93:3, 93:13, 93:16, 94:4, 95:1, 95:8, 95:24, 96:11, 96:24, 97:16, 98:2, 98:18, 99:11, 99:16, 99:25, 100:17, 101:10, 101:25, 103:2, 103:17, 103:25, 104:9, 104:20, 105:4, 105:9, 105:13, 105:16, 105:23, 106:1, 106:22, 107:4, 107:6, 107:23, 108:6, 108:8, 109:1, 109:13, 109:19, 109:23, 110:3, 110:21, 112:16, 113:9, 113:18, 114:7, 114:11, 114:15, 114:21, 115:9, 115:13, 116:2, 116:22, 118:5, 119:15, 121:5, 121:12, 121:15, 121:23, 122:10

MS [24] - 2:6, 11:15, 11:21, 12:14, 13:24, 17:14, 24:11, 25:8, 25:11, 31:23, 32:12, 33:2, 34:22, 41:17, 43:2, 53:20, 53:24, 54:9, 54:22, 55:3, 55:12, 55:21, 56:3, 56:8

Mt [17] - 11:22, 12:7, 12:20, 12:24, 13:1, 13:14, 53:25, 55:23, 65:3, 85:8, 85:14, 85:15, 85:21, 86:3, 86:6, 86:12, 90:9

**multiple** [6] - 33:19, 33:20, 44:22, 53:6, 65:17, 84:25
**mumbling** [1] - 114:14
**mundane** [2] - 100:7, 100:13
**must** [3] - 23:21, 101:24, 120:14

## N

**N.W** [1] - 123:11
**name** [6] - 2:4, 53:25, 55:23, 66:20, 117:23, 118:12
**named** [1] - 17:18
**names** [1] - 118:12
**nascent** [1] - 50:1
**national** [1] - 111:22
**nature** [9] - 8:10, 20:14, 22:2, 65:10, 92:9, 92:10, 93:6, 116:17, 120:2
**necessarily** [4] - 44:18, 52:3, 88:24, 109:8
**necessary** [6] - 16:9, 35:2, 53:9, 53:10, 97:7, 99:6
**need** [33] - 4:10, 5:22, 6:10, 7:10, 7:12, 7:16, 12:9, 16:18, 19:3, 26:23, 27:22, 36:10, 37:23, 39:18, 45:25, 47:13, 49:16, 50:8, 52:24, 61:15, 65:9, 75:17, 77:13, 78:6, 85:18, 87:1, 92:23, 96:15, 97:2, 97:13, 109:8, 112:22, 120:9
**needed** [1] - 33:17
**needs** [1] - 27:10
**never** [9] - 8:5, 31:8, 57:19, 58:17, 58:20, 59:22, 68:12, 116:5, 117:20
**new** [17] - 26:1, 33:7, 33:19, 33:25, 36:3, 36:9, 37:17, 39:14, 83:25, 100:11, 103:4, 103:5, 103:10, 103:12, 103:16, 121:12
**New** [6] - 1:17, 1:21, 28:5, 41:19, 87:19
**next** [4] - 16:8, 16:9, 30:17, 50:15
**nice** [1] - 122:11
**night** [5] - 3:8, 16:15,

29:24, 70:6, 108:25
**NIST** [1] - 83:5
**nobody** [5] - 36:8, 36:19, 41:12, 121:4, 121:5
**non** [1] - 80:4
**non-KYC** [1] - 80:4
**noncompete** [1] - 26:6
**nondisclosure** [1] - 29:18
**none** [2] - 55:16, 73:5
**nonissue** [1] - 81:17
**norm** [1] - 65:13
**normal** [2] - 83:15, 83:23
**normative** [2] - 48:13, 60:12
**norms** [3] - 49:3, 64:4, 66:21
**Northern** [1] - 23:6
**note** [2] - 17:7, 33:8
**noted** [2] - 2:17, 34:24
**notes** [6] - 43:15, 69:17, 70:5, 70:7, 70:14, 123:5
**nothing** [7] - 28:7, 34:12, 82:14, 83:5, 83:21, 105:4, 120:14
**notion** [7] - 62:22, 74:8, 77:24, 78:1, 81:17, 92:10, 105:1
**notions** [1] - 98:4
**notwithstanding** [1] - 84:10
**novel** [1] - 50:1
**November** [1] - 3:16
**nullification** [4] - 110:2, 110:4, 111:8, 112:17
**nullify** [1] - 111:12
**Number** [2] - 49:19, 99:25
**number** [8] - 41:23, 50:9, 61:2, 61:3, 65:4, 86:13, 100:18, 100:19
**NW** [4] - 1:11, 1:14, 1:17, 1:24
**NY** [1] - 1:21

## O

**obfuscation** [1] - 44:3
**object** [2] - 92:1, 92:4
**objecting** [1] - 25:14
**objection** [12] - 12:4, 12:5, 12:22, 12:23, 13:3, 13:5, 13:21, 17:7, 19:19, 19:21, 37:15, 89:24

**obscure** [1] - 44:2
**obtain** [1] - 40:12
**obtaining** [2] - 92:14, 93:20
**obvious** [1] - 43:25
**obviously** [9] - 4:23, 9:20, 23:1, 26:24, 73:23, 76:25, 77:22, 96:23, 119:1
**occurred** [1] - 10:8
**October** [13] - 3:5, 3:11, 3:13, 3:16, 3:17, 4:6, 4:7, 5:4, 11:17, 15:2, 16:13, 32:18, 33:23
**odds** [3] - 44:5, 49:2, 108:17
**OF** [5] - 1:1, 1:2, 1:7, 1:13, 123:1
**off-chain** [3] - 57:21, 59:21, 86:22
**offer** [4] - 8:6, 70:9, 84:11
**offered** [5] - 74:2, 74:3, 106:8, 108:10, 120:12
**offering** [3] - 13:7, 21:18, 120:10
**office** [3] - 24:3, 41:9, 41:12
**OFFICIAL** [1] - 123:1
**Official** [2] - 1:23, 123:10
**offshore** [1] - 52:14
**old** [1] - 114:13
**on-chain** [1] - 59:22
**onboarding** [2] - 100:11, 103:5
**once** [1] - 117:24
**one** [69] - 3:9, 5:14, 5:15, 8:4, 9:8, 9:13, 11:2, 14:13, 14:21, 16:12, 16:17, 17:20, 21:6, 21:17, 22:11, 23:2, 24:3, 25:8, 26:2, 27:4, 28:5, 34:4, 35:23, 36:3, 36:13, 37:21, 38:14, 44:4, 44:15, 45:13, 47:2, 53:14, 53:15, 54:1, 54:3, 58:15, 59:10, 60:6, 63:14, 65:4, 69:19, 73:14, 80:21, 81:1, 83:13, 83:14, 84:5, 84:18, 86:13, 87:9, 89:6, 96:1, 100:18, 101:12, 102:1, 103:8, 105:19, 113:6, 114:2,

115:13, 115:18, 115:19, 116:7, 117:6, 117:18, 119:21, 121:12, 121:14
**one-sided** [1] - 84:5
**onerous** [2] - 34:15, 34:17
**ones** [3] - 14:1, 14:3, 35:17
**online** [1] - 92:2
**open** [5] - 38:1, 91:6, 91:8, 91:10, 114:25
**open-ended** [3] - 91:6, 91:8, 91:10
**opened** [2] - 114:24, 115:7
**opening** [3] - 101:18, 110:22, 113:4
**openings** [2] - 14:2, 67:7
**openly** [1] - 116:6
**operating** [2] - 119:11, 119:21
**opine** [5] - 58:2, 58:23, 69:18, 71:24, 78:3
**opining** [1] - 73:25
**opinion** [15] - 48:16, 57:24, 65:1, 66:17, 68:4, 68:9, 69:4, 70:2, 71:8, 74:2, 74:10, 83:19, 86:16, 94:1
**opinions** [1] - 70:13
**opportunity** [6] - 4:8, 4:16, 4:24, 7:19, 19:13
**oppose** [1] - 33:22
**opposition** [2] - 14:6, 14:8
**order** [39] - 5:6, 6:13, 14:17, 15:20, 16:18, 16:25, 17:2, 17:5, 17:10, 17:15, 17:20, 19:18, 20:13, 25:13, 25:15, 25:17, 26:1, 27:8, 27:11, 27:12, 28:6, 28:13, 28:17, 29:8, 34:5, 34:7, 34:10, 34:13, 34:14, 34:18, 35:18, 35:20, 35:22, 36:1, 36:5, 38:21, 69:18, 109:6, 112:8
**orders** [5] - 19:5, 23:11, 27:16, 29:4, 29:12
**ordinarily** [1] - 3:23
**organization** [2] -

67:22, 87:20
**origin** [1] - 111:22
**original** [3] - 8:21, 8:23, 26:2
**originating** [1] - 106:16
**otherwise** [4] - 7:17, 32:24, 36:7, 75:8
**ought** [5] - 7:6, 9:14, 17:11, 42:18, 81:24
**ourselves** [2] - 36:10, 113:12
**outlined** [1] - 110:9
**outputs** [1] - 53:14
**outside** [4] - 52:18, 59:1, 99:22, 115:7
**outstanding** [1] - 32:7
**over-lawyering** [1] - 6:1
**overnight** [1] - 10:8
**own** [15] - 21:14, 40:13, 43:15, 60:23, 61:24, 78:13, 80:15, 82:5, 83:18, 83:24, 92:19, 96:1, 98:20, 103:18, 108:11
**owned** [3] - 65:20, 79:24, 80:2
**owner** [2] - 60:25, 75:15
**ownership** [24] - 49:25, 51:19, 52:7, 57:19, 58:21, 59:6, 63:20, 69:4, 74:5, 74:9, 76:17, 77:6, 84:21, 88:17, 92:10, 92:11, 92:17, 93:12, 94:12, 94:25, 95:4, 95:5, 95:15, 97:1
**owns** [1] - 94:13

## P

**p.m** [4] - 15:5, 41:7, 122:13
**page** [2] - 99:20, 108:13
**paid** [1] - 10:22
**paper** [3] - 73:7, 73:9, 89:25
**papers** [2] - 13:6, 50:9
**paragraph** [2] - 17:2, 43:19
**paragraphs** [1] - 59:5
**parentheses** [2] - 80:6, 80:7
**part** [15] - 7:15, 18:16, 38:13, 47:20, 50:3, 54:13, 54:25, 55:12, 60:18, 64:1, 64:2,

79:23, 86:18, 113:10, 120:6
**participated** [1] - 76:25
**participating** [1] - 109:7
**particular** [13] - 22:6, 25:25, 47:8, 48:9, 51:24, 52:1, 59:15, 77:8, 78:6, 78:25, 98:1, 104:6, 117:13
**particularly** [4] - 14:18, 32:17, 88:10, 93:17
**particulars** [2] - 20:15, 31:17
**parties** [6] - 3:5, 3:25, 8:3, 19:3, 32:22, 67:13
**parts** [1] - 92:1
**party** [2] - 11:9, 29:1
**pass** [3] - 23:7, 42:13, 42:15
**passage** [1] - 102:7
**passed** [1] - 85:19
**patent** [3] - 23:9, 27:20, 27:22
**pattern** [2] - 55:5, 100:9
**patterns** [1] - 53:17
**pauperis** [1] - 15:22
**pause** [1] - 113:7
**pay** [2] - 10:13, 54:3
**paying** [1] - 10:23
**payment** [1] - 53:25
**payoffs** [1] - 118:23
**PEARLMAN** [1] - 1:15
**Pearlman** [3] - 2:7, 8:18, 9:11
**peel** [3] - 22:5, 22:7, 49:25
**peer** [1] - 50:2
**peer-reviewed** [1] - 50:2
**pejorative** [1] - 44:4
**Pelker** [11] - 2:7, 11:14, 17:13, 40:10, 41:16, 53:13, 95:22, 96:3, 99:9, 99:17, 112:4
**PELKER** [25] - 1:13, 2:6, 11:15, 11:21, 12:14, 13:24, 17:14, 24:11, 25:8, 25:11, 31:23, 32:12, 33:2, 34:22, 41:17, 43:2, 53:20, 53:24, 54:9, 54:22, 55:3, 55:12, 55:21, 56:3, 56:8
**Pelker's** [3] - 35:21,

111:25, 115:1
**pen** [1] - 89:25
**pen-and-paper** [1] - 89:25
**penalty** [3] - 23:25, 36:23, 36:24
**pending** [1] - 2:12
**Pennsylvania** [1] - 1:14
**people** [26] - 5:25, 7:12, 13:7, 23:11, 23:12, 27:17, 27:21, 29:10, 29:11, 30:7, 36:12, 36:22, 44:2, 45:9, 46:18, 75:10, 75:11, 76:2, 79:4, 103:12, 104:13, 108:25, 117:14, 119:10, 119:19, 120:2
**people's** [1] - 44:19
**percent** [8] - 44:25, 45:1, 45:17, 62:19, 66:17, 67:12, 112:5, 116:9
**perception** [5] - 22:15, 22:25, 24:23, 37:6, 97:19
**perfect** [1] - 79:2
**perfectly** [3] - 78:24, 86:8, 86:24
**perhaps** [7] - 11:6, 14:13, 78:18, 78:24, 78:25, 81:17, 102:6
**period** [2] - 3:6, 9:4
**perjury** [3] - 23:25, 36:23, 36:24
**permissive** [1] - 70:13
**permit** [1] - 19:2
**person** [10] - 2:20, 6:24, 16:8, 28:22, 31:5, 37:1, 42:3, 72:6, 75:18, 77:7
**personal** [5] - 44:19, 44:20, 50:13, 71:8, 112:7
**perspective** [1] - 86:17
**persuaded** [1] - 79:11
**pertinent** [1] - 52:25
**phone** [2] - 41:23, 87:8
**phrase** [4] - 92:14, 93:20, 104:24, 105:23
**phrased** [1] - 91:9
**phrases** [3] - 92:20, 96:12, 98:21
**physical** [2] - 92:14, 93:20

**pick** [2] - 10:21, 121:10
**picked** [1] - 78:7
**picking** [1] - 43:1
**piece** [4] - 73:7, 73:9, 118:15, 118:19
**pin** [1] - 12:10
**pivoting** [1] - 11:21
**place** [5] - 27:17, 28:6, 35:23, 79:24, 80:2
**Plaintiff** [2] - 1:3, 1:10
**plan** [1] - 3:19
**planning** [5] - 3:19, 3:20, 9:22, 21:14, 32:10
**plate** [4] - 65:21, 65:22, 66:1, 66:4
**platform** [2] - 100:12, 103:5
**play** [1] - 54:4
**playing** [2] - 90:14, 90:20
**pleased** [1] - 109:16
**PLLC** [1] - 1:20
**podium** [1] - 3:3
**point** [64] - 11:1, 12:1, 12:2, 12:13, 19:3, 19:12, 19:24, 25:8, 33:18, 34:2, 36:11, 38:10, 43:9, 44:1, 44:7, 44:9, 44:12, 45:15, 45:21, 46:4, 46:17, 47:11, 47:13, 47:24, 48:3, 49:13, 55:24, 55:25, 59:4, 63:21, 65:8, 66:18, 68:12, 69:1, 72:5, 73:25, 74:4, 75:2, 75:15, 75:22, 75:24, 77:14, 82:24, 82:25, 83:13, 84:7, 84:8, 84:12, 84:21, 89:11, 89:12, 93:4, 96:7, 96:9, 97:16, 102:4, 102:22, 103:9, 103:14, 103:19, 112:19, 119:15, 122:3
**Point** [2] - 52:5
**point-by-point** [1] - 43:9
**pointed** [2] - 28:4, 79:5
**points** [9] - 31:24, 60:13, 60:14, 60:15, 63:11, 65:10, 97:22, 98:9, 100:17
**policies** [1] - 99:19
**policy** [4] - 99:20, 111:7, 111:11,

114:17
**portion** [3] - 54:20, 55:20, 107:16
**position** [11] - 5:17, 16:24, 39:13, 41:2, 44:18, 62:25, 67:8, 79:17, 88:3, 88:6, 100:23
**positively** [1] - 82:7
**possesses** [1] - 91:16
**possibility** [2] - 33:6, 37:8
**possible** [7] - 3:4, 18:20, 21:3, 62:25, 85:20, 85:21, 85:22
**potential** [10] - 8:13, 24:25, 110:10, 110:15, 110:25, 113:3, 113:14, 113:15, 113:23, 118:22
**potentially** [4] - 14:2, 27:18, 55:14, 118:13
**power** [1] - 109:23
**practice** [5] - 92:19, 96:1, 96:5, 96:7, 98:20
**practiced** [1] - 112:24
**pre** [1] - 112:1
**pre-law** [1] - 112:1
**preclude** [2] - 14:3, 19:5
**precludes** [1] - 20:13
**predict** [2] - 35:5, 35:14
**predictive** [3] - 78:12, 78:14, 78:16
**prefer** [1] - 4:22
**prejudicial** [4] - 68:11, 71:2, 86:2, 97:12
**preliminary** [3] - 8:2, 10:3, 11:9
**premise** [1] - 117:1
**prepared** [4] - 23:24, 28:18, 33:21, 43:2
**preparing** [1] - 36:20
**presence** [1] - 115:7
**present** [5] - 2:13, 19:9, 46:15, 106:17, 120:9
**presented** [7] - 79:19, 83:1, 84:1, 118:18, 119:4, 119:8, 119:14
**presenting** [3] - 72:9, 81:7, 113:19
**press** [1] - 114:13
**pressing** [1] - 14:13
**presumably** [2] - 21:19, 26:1
**pretrial** [1] - 32:7

**PRETRIAL** [2] - 1:4, 1:7
**pretty** [2] - 82:12, 114:8
**prevented** [1] - 5:12
**previous** [2] - 35:19, 35:22
**previously** [2] - 33:8, 46:16
**primary** [2] - 118:8
**primer** [2] - 78:7, 78:8
**principally** [2] - 12:6, 54:16
**principle** [3] - 59:18, 74:7, 77:10
**principles** [5] - 51:13, 58:17, 58:20, 64:5, 116:4
**printed** [1] - 8:19
**privacy** [9] - 43:21, 43:25, 44:8, 44:9, 44:13, 45:10, 45:18, 45:20, 45:22
**private** [37] - 10:6, 10:7, 10:15, 51:17, 57:3, 57:19, 59:21, 60:19, 60:20, 60:21, 60:24, 61:4, 62:23, 68:14, 68:17, 74:21, 74:22, 82:17, 83:20, 86:22, 90:2, 92:15, 92:20, 93:21, 94:9, 94:11, 94:12, 94:13, 94:14, 94:24, 96:13, 97:6, 98:22, 99:4
**privately** [2] - 7:16, 14:23
**pro** [5] - 2:11, 2:16, 2:18, 30:24, 31:1
**probabilistic** [6] - 43:22, 46:24, 47:7, 50:5, 80:20
**probable** [1] - 22:24
**probative** [5] - 68:11, 71:2, 86:2, 97:12, 99:7
**problem** [24] - 5:16, 6:23, 7:2, 22:13, 23:16, 25:2, 26:24, 31:20, 37:12, 37:13, 40:8, 42:1, 45:5, 48:23, 60:17, 60:21, 62:12, 62:13, 64:1, 64:14, 83:20, 88:17, 107:6
**problematic** [1] - 39:25
**problems** [1] - 60:10
**procedural** [1] - 95:14
**procedure** [1] - 9:25

proceed [12] - 10:12, 10:19, 11:5, 14:22, 15:13, 15:20, 15:21, 15:22, 21:1, 30:12, 87:5, 87:6

proceeding [2] - 10:5, 15:10

proceedings [1] - 123:6

process [8] - 12:20, 39:18, 65:9, 88:5, 101:21, 102:3, 116:25, 117:11

produced [1] - 47:21

product [4] - 21:19, 28:25, 38:24, 50:18

products [3] - 106:8, 106:13, 106:18

Professional [1] - 80:12

professional [3] - 65:13, 70:25, 71:1

proffering [1] - 62:8

programming [1] - 6:25

promptly [1] - 14:18

proof [4] - 67:16, 81:1, 82:16, 93:12

proper [7] - 60:17, 65:12, 66:22, 93:4, 93:14, 102:5, 115:22

properly [2] - 64:11, 68:10

property [4] - 92:10, 93:6, 93:10, 93:11

propose [2] - 11:19, 106:9

proposed [1] - 11:19

proposition [1] - 98:16

proprietary [6] - 21:11, 21:15, 23:4, 26:3, 27:5, 122:5

prosecution [3] - 95:25, 111:2, 111:21

prosecutions [1] - 117:21

prosecutor [1] - 96:18

prosecutors [3] - 96:4, 117:4, 117:22

prospects [1] - 22:19

protect [1] - 24:6

protective [40] - 5:6, 6:13, 14:17, 16:18, 16:25, 17:2, 17:5, 17:10, 17:15, 17:19, 19:5, 19:18, 20:13, 23:11, 25:13, 25:15, 25:17, 26:1, 27:8, 27:12, 27:16, 28:6,

28:13, 28:17, 29:4, 29:8, 29:12, 34:5, 34:7, 34:9, 34:13, 34:14, 34:17, 35:18, 35:20, 35:22, 36:1, 36:5, 38:21, 109:6

protects [1] - 27:12

protocols [4] - 89:2, 89:4, 90:24, 91:3

prove [4] - 58:21, 76:17, 77:6, 81:14

proves [2] - 80:19, 81:4

provide [7] - 3:15, 19:13, 21:3, 21:23, 26:18, 46:2, 111:10

provided [4] - 12:2, 12:19, 28:12, 34:5

provides [4] - 10:13, 10:16, 20:22, 101:1

province [1] - 83:11

prudent [1] - 110:5

public [25] - 5:24, 60:19, 60:25, 61:3, 62:19, 62:22, 72:17, 72:20, 74:20, 74:23, 74:24, 79:24, 80:2, 80:4, 89:18, 90:2, 92:16, 93:22, 94:9, 94:10, 94:24, 97:6, 98:1, 110:13, 114:12

publicly [1] - 47:21

published [1] - 95:17

pull [2] - 15:13, 59:3

punishment [5] - 110:11, 110:15, 110:25, 113:15, 113:23

punishments [1] - 113:2

purchase [1] - 106:13

purchaser [1] - 85:6

purport [1] - 77:19

purported [1] - 100:14

purports [1] - 106:7

purposes [7] - 19:9, 26:8, 46:15, 57:10, 57:16, 106:19, 120:9

pushback [1] - 37:7

put [22] - 3:23, 19:19, 19:21, 26:14, 26:19, 39:21, 51:2, 54:14, 71:23, 72:3, 73:19, 86:25, 88:5, 94:18, 101:19, 102:13, 102:15, 118:2, 118:17, 121:10, 122:4, 122:8

puts [1] - 101:17

putting [5] - 40:11,

60:23, 73:21, 82:20, 116:7

puzzled [2] - 110:19, 110:20

**Q**

qualifications [1] - 105:7

qualified [5] - 48:9, 50:21, 60:7, 60:18, 74:6

qualifying [2] - 50:19, 105:10

quantification [1] - 107:16

quantify [1] - 45:25

quarter [1] - 40:20

questioning [2] - 73:17, 102:12

questions [7] - 11:23, 12:25, 13:1, 61:24, 66:6, 95:3, 113:15

quick [1] - 100:17

quite [13] - 24:5, 26:25, 28:24, 32:17, 35:23, 37:21, 40:25, 52:19, 59:11, 78:20, 84:16, 85:19, 117:20

**R**

Radack [4] - 2:22, 31:10, 31:11

raise [5] - 20:1, 115:7, 119:9, 120:24, 121:6

raised [3] - 8:13, 27:21, 31:24

raising [4] - 13:3, 66:18, 66:23, 115:2

RANDOLPH [1] - 1:8

range [1] - 62:20

rarely [1] - 63:1

rate [2] - 10:14, 10:15

rather [11] - 6:12, 6:13, 7:14, 7:23, 11:4, 12:23, 25:3, 35:10, 52:1, 117:8, 121:2

rational [1] - 26:9

reach [6] - 6:9, 6:17, 7:8, 14:14, 52:24, 64:13

reached [2] - 15:24, 42:5

reaching [3] - 6:20, 15:25, 30:6

reaction [1] - 35:15

reactions [1] - 35:5

Reactor [8] - 38:11,

38:17, 38:18, 53:8, 56:7, 56:8, 83:1, 97:25

read [16] - 5:11, 50:8, 69:16, 70:4, 70:5, 70:6, 78:8, 79:20, 92:23, 95:9, 96:15, 98:12, 99:11, 99:21, 105:24, 108:12

reading [4] - 77:21, 95:19, 99:17, 107:12

reads [1] - 69:10

ready [2] - 7:13, 15:4

real [2] - 22:17, 24:4

real-world [1] - 24:4

reality [4] - 22:24, 24:22, 24:23, 37:6

really [40] - 8:10, 9:9, 10:9, 11:5, 12:5, 22:21, 24:13, 33:18, 34:24, 37:22, 47:8, 49:14, 51:8, 52:11, 52:16, 52:17, 54:22, 60:9, 61:1, 61:8, 70:21, 70:24, 72:6, 73:13, 73:17, 73:19, 74:17, 79:8, 81:4, 90:21, 93:23, 98:3, 98:5, 98:7, 99:2, 102:21, 111:8, 112:18, 116:7, 116:8

realm [2] - 45:22, 66:7

reason [10] - 18:12, 18:18, 19:22, 51:9, 77:3, 85:15, 87:21, 93:9, 115:6, 119:13

reasonable [12] - 27:13, 67:16, 68:15, 68:16, 81:9, 85:2, 85:8, 86:8, 86:18, 86:21, 86:24, 100:4

reasons [10] - 19:7, 21:24, 21:25, 29:14, 44:22, 45:10, 45:13, 45:18, 115:19, 119:11

recalling [3] - 45:16, 70:5, 104:11

receipt [1] - 11:23

receive [1] - 27:18

received [1] - 3:8

receiving [2] - 10:6, 10:19

recent [2] - 89:1, 91:2

recess [2] - 41:7, 87:4

Recess [1] - 15:5

recollection [5] - 44:16, 47:3, 50:12, 54:16, 55:19

recommend [1] -

99:16

reconvene [1] - 121:25

reconvening [1] - 108:16

record [12] - 2:4, 11:3, 11:23, 17:8, 19:20, 19:22, 22:3, 33:8, 39:22, 105:17, 105:22, 106:5

records [2] - 13:9, 13:13

recreating [1] - 38:24

red [1] - 96:19

red-handed [1] - 96:19

redundancy [2] - 47:13, 94:7

redundant [3] - 51:1, 51:7, 84:19

refer [1] - 58:12

reference [6] - 17:19, 46:10, 49:5, 49:7, 50:5, 111:3

references [1] - 110:10

referring [1] - 47:11

refresh [1] - 47:3

refuses [1] - 28:12

regard [1] - 80:15

regardless [1] - 5:10

regime [2] - 91:14, 92:2

regulations [1] - 89:21

related [6] - 41:21, 69:3, 70:10, 96:13, 106:18, 118:14

relation [14] - 16:17, 17:5, 38:2, 38:3, 38:4, 38:10, 38:16, 39:25, 45:22, 68:6, 69:14, 83:11, 86:15, 96:25

relayed [3] - 5:18, 22:11, 23:2

relaying [1] - 7:3

releases [1] - 114:13

relevance [3] - 46:17, 70:21, 89:8

relevant [27] - 19:4, 19:12, 19:24, 43:24, 45:8, 64:9, 64:10, 65:8, 68:19, 71:8, 79:11, 82:3, 85:16, 93:14, 94:3, 95:24, 99:4, 110:8, 112:11, 117:10, 117:11, 117:13, 117:24, 118:24, 119:12, 120:18

reliability [2] - 58:10, 58:15
reliable [1] - 72:1
reliance [1] - 81:15
religious [1] - 76:3
reluctant [1] - 18:10
rely [5] - 43:22, 47:21, 50:4, 64:8, 102:23
relying [2] - 48:24, 100:1
remainder [3] - 93:15, 93:16, 108:1
remaining [1] - 32:6
remains [1] - 12:12
remember [7] - 43:7, 45:11, 46:11, 48:18, 54:19, 77:1
remembering [2] - 13:6, 104:21
remind [2] - 48:8, 54:15
remote [1] - 24:12
removing [1] - 86:6
render [1] - 48:16
renew [1] - 105:15
rent [1] - 16:7
repeat [1] - 36:10
repeating [2] - 46:14, 76:12
reply [2] - 14:6, 14:9
report [13] - 4:4, 5:5, 30:19, 41:2, 45:17, 46:3, 46:5, 46:6, 46:11, 49:7, 53:22, 56:9, 120:16
Reporter [3] - 1:22, 1:23, 123:10
reporter [1] - 79:25
REPORTER [1] - 123:1
reports [4] - 4:3, 4:8, 4:11, 20:16
representation [2] - 92:14, 93:20
representations [2] - 39:25, 110:17
request [5] - 15:21, 30:21, 42:15, 87:25, 109:18
requested [1] - 42:22
requests [1] - 42:14
require [1] - 3:6
required [1] - 89:20
requirements [3] - 89:19, 111:14, 111:15
requiring [1] - 82:23
requisite [1] - 13:8
reread [1] - 70:4
research [1] - 39:19

reserved [1] - 7:15
resolve [4] - 6:14, 7:7, 16:11, 19:25
resolved [3] - 6:12, 14:17, 40:24
resorting [1] - 81:15
resources [1] - 111:3
respect [28] - 4:11, 8:6, 8:8, 12:4, 12:20, 12:22, 12:25, 17:7, 19:18, 20:23, 47:6, 49:15, 50:11, 64:13, 74:15, 80:18, 84:11, 89:23, 103:12, 104:6, 105:11, 107:13, 107:16, 107:25, 110:3, 113:25, 119:16, 121:20
respectfully [1] - 37:14
respects [1] - 93:12
respond [4] - 5:2, 37:10, 87:24, 116:19
responding [1] - 80:24
response [2] - 19:14, 45:12
responsible [1] - 7:5
responsive [1] - 88:10
rest [4] - 47:23, 79:20, 93:8, 94:21
restate [1] - 12:17
restriction [1] - 17:22
restricts [1] - 17:16
resubmit [3] - 2:25, 31:16, 31:18
results [1] - 61:10
retained [5] - 10:5, 10:22, 14:23, 15:10, 15:23
retaining [1] - 33:7
return [2] - 88:15, 117:19
reveal [1] - 39:19
revealing [1] - 21:7
reveals [1] - 39:17
review [18] - 4:8, 5:7, 5:11, 5:19, 11:18, 14:19, 16:21, 16:25, 18:2, 18:4, 32:20, 33:7, 33:15, 33:17, 33:18, 39:24, 43:9, 122:7
reviewed [1] - 50:2
reviewing [2] - 18:3, 40:8
reviews [1] - 5:15
revisit [1] - 105:8
rich [1] - 117:4

rightly [1] - 120:5
risk [15] - 22:1, 22:23, 23:19, 24:4, 24:6, 24:19, 25:1, 26:13, 26:16, 26:19, 28:20, 36:18, 40:15, 100:1, 113:19
risk-averse [2] - 23:19, 26:13
risks [1] - 27:18
RMR [2] - 1:22, 123:9
road [1] - 120:25
rob [1] - 65:18
robber [2] - 96:19, 99:1
robbery [1] - 96:23
robbing [1] - 79:6
rocket [1] - 89:12
role [3] - 60:11, 69:24, 108:3
Roman [2] - 2:3, 2:12
ROMAN [1] - 1:5
room [1] - 24:15
Room [2] - 1:23, 123:10
rooted [1] - 116:15
Rosh [5] - 76:2, 76:6, 87:12, 87:21, 122:11
rule [9] - 13:18, 69:11, 69:18, 70:4, 70:7, 70:17, 111:1, 112:3, 116:20
rules [3] - 9:19, 89:20, 119:17
ruling [4] - 69:6, 70:20, 115:1, 117:8
rumor [1] - 52:21
rumors [1] - 38:3
run [4] - 3:16, 3:21, 27:18, 48:14
running [2] - 36:18, 118:6
Russian [1] - 111:17

## S

S-t-o-c-k-i-n-g-e-r [1] - 50:6
sale [1] - 59:22
sanction [2] - 23:23, 62:16
Sarah [1] - 108:11
satisfy [1] - 46:1
Saturday [1] - 4:24
saw [3] - 65:17, 65:21, 82:16
scheduled [1] - 3:10
scheduling [2] - 11:16, 41:8
Scholl [6] - 54:16,

55:1, 56:4, 57:1, 81:3, 116:24
Scholl's [4] - 53:22, 55:20, 56:9, 73:7
science [2] - 84:1, 89:12
scientific [4] - 83:2, 84:5, 97:20, 98:7
scope [1] - 16:19
searches [1] - 38:14
second [9] - 46:14, 64:1, 84:18, 87:1, 87:9, 103:3, 106:23, 107:25, 113:7
second-guessing [1] - 46:14
second-to-last [1] - 103:3
secondhand [1] - 25:24
secrecy [1] - 89:20
secrets [1] - 25:14
security [1] - 29:13
see [25] - 3:25, 5:15, 6:20, 6:22, 7:2, 8:1, 8:15, 14:14, 17:8, 23:16, 32:14, 41:24, 46:17, 47:8, 59:22, 65:22, 80:8, 82:6, 92:22, 97:13, 118:7, 118:18, 119:17, 120:18
See [1] - 50:6
seed [5] - 92:14, 92:20, 93:20, 96:12, 98:21
seeing [5] - 58:21, 83:19, 101:7, 115:15
seek [2] - 18:24, 23:23
seeking [5] - 3:9, 18:6, 19:2, 31:5, 35:3
seem [1] - 107:7
Sefranek [3] - 1:22, 123:9, 123:9
SEFRANEK [1] - 123:3
segregated [1] - 7:1
seize [1] - 95:12
seizing [1] - 95:11
seizure [1] - 95:12
semicolon [1] - 80:10
send [3] - 42:20, 42:21, 76:25
sense [31] - 8:3, 13:10, 22:4, 22:15, 26:10, 30:2, 40:21, 53:12, 75:12, 78:9, 78:17, 79:13, 80:20, 81:8, 81:16, 86:15, 89:17, 89:18, 95:2,

95:15, 98:3, 104:24, 113:3, 115:18, 116:16, 117:1, 118:8, 118:25, 119:25, 120:3
senses [1] - 54:18
sentence [5] - 90:25, 91:1, 92:25, 103:3, 107:12
sentences [3] - 106:23, 107:7, 107:25
separate [2] - 95:13, 95:14
September [2] - 1:6, 4:5
seriatim [1] - 43:9
series [3] - 50:15, 54:1, 71:24
serious [1] - 113:5
server [1] - 51:17
Service [1] - 9:25
service [1] - 38:13
services [5] - 10:17, 10:24, 80:9, 106:13, 106:25
set [5] - 30:18, 59:12, 83:12, 103:17, 104:6
sets [1] - 76:10
setting [4] - 90:13, 103:22, 104:3, 104:10
settled [3] - 4:20, 9:4, 88:19
several [1] - 110:9
share [1] - 22:12
shared [2] - 5:5, 93:11
shoehorn [1] - 58:25
shoes [1] - 61:6
short [3] - 3:21, 49:8, 59:10
shorten [1] - 30:20
shortening [1] - 3:6
shorthand [1] - 54:17
shortly [1] - 16:4
show [9] - 42:19, 59:20, 66:25, 67:2, 67:7, 87:25, 88:11, 103:14, 120:20
showed [1] - 5:6
showing [1] - 66:5
shown [1] - 17:6
shows [4] - 56:8, 67:10, 69:7, 104:1
sic [1] - 119:20
side [1] - 8:8
sidebar [2] - 115:9, 120:25
sided [1] - 84:5
sides [2] - 8:18, 66:24

sign [9] - 19:5, 23:11, 23:24, 28:17, 29:3, 29:8, 29:12, 36:22
signature [2] - 2:23, 31:10
signed [2] - 31:3, 77:1
significant [2] - 4:2, 27:20
similar [9] - 5:10, 23:20, 27:2, 36:15, 83:14, 84:21, 91:20, 112:22, 112:23
simple [1] - 100:10
simply [15] - 14:23, 21:16, 26:15, 28:11, 31:9, 39:22, 45:7, 61:20, 63:4, 89:24, 94:8, 100:10, 101:19, 103:4, 119:5
single [1] - 53:5
singular [1] - 119:22
sit [4] - 3:21, 30:24, 36:23, 73:18
site [1] - 80:10
sits [1] - 72:23
sitting [2] - 3:20
situation [2] - 37:7, 122:4
situations [1] - 84:25
six [1] - 66:4
sixth [1] - 82:6
skip [1] - 50:23
slanted [1] - 120:20
slightest [1] - 81:19
slightly [1] - 3:6
slow [1] - 79:25
slurp [1] - 38:12
slurped [1] - 38:18
society [2] - 66:20, 66:21
software [3] - 27:5, 98:5, 101:1
solution [1] - 29:21
solve [1] - 22:13
someday [2] - 23:19, 117:18
someone [20] - 14:15, 22:20, 25:4, 25:18, 39:2, 41:9, 44:22, 60:18, 61:14, 73:19, 79:7, 82:16, 85:22, 94:10, 94:13, 101:5, 102:25, 103:9, 103:15, 122:2
somewhat [1] - 60:15
somewhere [1] - 44:16
sooner [2] - 7:14, 7:23
sophisticated [3] - 23:10, 27:23, 29:2

sorry [6] - 5:1, 5:2, 12:16, 76:21, 94:4, 105:25
sort [40] - 9:3, 13:19, 17:20, 22:6, 22:24, 25:2, 26:6, 29:21, 37:11, 44:21, 45:4, 52:6, 58:24, 60:14, 61:10, 62:8, 64:3, 64:12, 65:24, 66:20, 72:8, 77:16, 78:17, 79:10, 80:16, 86:11, 88:4, 90:12, 93:3, 93:6, 94:1, 94:25, 95:19, 102:1, 102:21, 102:22, 111:6, 112:7, 119:7, 119:20
sorts [1] - 70:15
sound [10] - 57:7, 57:9, 57:15, 57:23, 60:2, 60:10, 65:24, 73:12, 77:3, 107:22
sounded [1] - 91:6
soundness [1] - 58:2
sounds [2] - 14:11, 31:22
sources [2] - 111:20, 113:14
space [9] - 89:2, 90:14, 90:16, 90:20, 91:3, 93:7, 96:4, 104:14, 104:22
speaking [1] - 58:13
specific [8] - 20:20, 21:10, 21:15, 36:4, 43:23, 51:15, 51:19, 51:24
specifically [3] - 14:1, 17:17, 58:13
specificity [3] - 20:17, 20:23, 39:23
specifics [1] - 21:4
speculative [4] - 85:11, 85:13, 85:20, 86:1
speedy [1] - 5:25
spend [3] - 53:15, 55:4, 78:15
split [1] - 110:1
spoken [1] - 15:8
sponsor [3] - 2:18, 2:19, 2:22
sponsoring [1] - 31:10
sponsors [1] - 2:20
spreadsheets [1] - 33:9
stack [1] - 8:19
stacks [1] - 57:12

stake [2] - 23:4, 122:6
stand [2] - 67:21, 73:20
standard [11] - 59:14, 61:20, 61:21, 61:22, 68:21, 81:15, 83:4, 83:9, 96:22, 97:10, 114:8
Standards [1] - 80:12
standards [31] - 56:25, 57:8, 59:12, 61:14, 61:15, 61:16, 61:18, 62:9, 62:15, 64:9, 65:2, 68:5, 68:19, 68:25, 69:3, 70:25, 71:1, 80:5, 80:9, 80:15, 81:20, 82:22, 83:4, 83:7, 83:13, 83:17, 83:22, 84:12, 95:25, 98:10
standing [1] - 79:4
start [13] - 2:15, 3:16, 3:17, 7:12, 14:21, 14:25, 33:4, 43:18, 76:10, 106:2, 108:18, 117:3, 121:3
started [2] - 30:14, 116:25
starting [3] - 2:5, 32:18, 55:24
stat [1] - 57:1
State [1] - 41:19
state [7] - 2:4, 4:21, 9:4, 69:13, 69:17, 70:10, 70:13
statement [2] - 80:9, 110:22
statements [3] - 35:8, 110:14, 114:12
States [4] - 1:23, 2:3, 2:8, 48:21
STATES [3] - 1:1, 1:2, 1:8
status [1] - 3:22
statute [1] - 110:20
stay [1] - 121:9
staying [1] - 109:2
steal [1] - 27:11
stenographic [1] - 123:5
step [6] - 12:2, 53:10, 57:4, 69:24, 74:19, 78:2
stepping [2] - 60:11, 61:6
Sterlingov [69] - 2:3, 2:13, 4:14, 4:23, 5:3, 5:24, 7:11, 7:17, 8:15, 9:2, 9:15, 10:5, 10:10, 10:11, 10:18,

10:25, 14:21, 15:8, 15:12, 15:21, 16:16, 16:22, 16:25, 17:7, 17:8, 18:1, 18:13, 19:2, 19:10, 19:11, 19:22, 20:18, 20:25, 40:5, 54:5, 54:10, 56:6, 57:17, 60:5, 63:14, 64:11, 64:17, 65:5, 66:12, 67:3, 67:8, 67:9, 67:10, 68:16, 75:1, 75:11, 81:5, 81:14, 82:17, 85:23, 85:25, 86:13, 90:15, 100:24, 101:5, 101:21, 110:18, 110:25, 114:5, 116:9, 117:1, 118:20, 119:23, 120:15
STERLINGOV [1] - 1:5
Sterlingov's [10] - 6:2, 10:9, 18:4, 30:21, 53:25, 54:12, 55:23, 56:18, 57:11, 66:15
Still [1] - 75:21
still [70] - 5:6, 6:23, 9:5, 14:18, 15:25, 17:18, 17:23, 18:23, 22:10, 23:24, 25:1, 25:14, 25:18, 26:20, 26:22, 30:3, 30:11, 32:13, 32:15, 32:18, 33:3, 33:5, 33:6, 33:11, 33:16, 33:20, 36:22, 37:8, 38:22, 40:7, 40:23, 41:9, 42:2, 47:11, 47:12, 48:2, 48:9, 48:15, 49:6, 49:10, 49:14, 49:15, 49:16, 50:17, 50:20, 50:21, 51:1, 51:4, 54:6, 55:20, 56:3, 56:20, 72:7, 73:15, 74:18, 74:19, 75:9, 76:9, 77:6, 78:13, 79:12, 84:16, 85:14, 87:14, 88:7, 99:21, 102:6, 109:3, 116:1, 122:7
still's [2] - 107:19, 108:4
Stockinger [1] - 50:6
stolen [1] - 25:18
stop [1] - 22:18
straight [1] - 72:17
straight-up [1] - 72:17
streamlining [1] - 14:2
street [1] - 119:7
Street [2] - 1:11, 1:20

stricken [1] - 110:23
strict [1] - 89:19
strike [1] - 93:19
strikes [5] - 48:23, 85:11, 86:1, 118:4, 119:22
strongly [2] - 33:22, 94:18
struck [2] - 23:2, 27:7
struggling [2] - 89:7, 119:17
students [3] - 92:13, 93:17, 94:3
studied [2] - 44:20, 103:11
studies [1] - 46:1
study [2] - 44:24, 102:22
stuff [13] - 32:25, 36:17, 70:15, 77:5, 77:18, 77:20, 77:21, 94:20, 97:4, 97:19, 97:20, 114:12, 114:15
subject [9] - 25:20, 28:13, 34:4, 34:9, 35:18, 62:16, 73:14, 73:22, 95:12
submit [4] - 29:17, 69:2, 86:16, 104:9
submits [1] - 67:4
subparagraphs [1] - 17:21
subpoena [2] - 111:24, 115:1
substance [2] - 31:24, 52:24
substitute [3] - 47:18, 48:12, 69:23
success [1] - 41:8
sued [2] - 22:17, 36:12
sufficiency [3] - 107:8, 107:13, 108:2
sufficient [11] - 7:19, 13:19, 20:11, 61:9, 66:8, 66:9, 81:14, 105:17, 105:21, 105:23, 106:4
sufficiently [3] - 67:14, 67:17, 67:18
suggest [6] - 32:1, 33:3, 44:24, 82:22, 96:21, 98:15
suggested [1] - 6:7
suggesting [7] - 38:23, 49:1, 64:7, 82:15, 97:10, 97:24, 102:1
suggestion [1] - 99:5
suggests [1] - 61:19

suit [1] - 25:20
sun [1] - 76:10
Sunday [2] - 16:15,
29:24
super [1] - 79:9
supplemental [7] -
3:7, 4:3, 4:4, 4:8,
5:5, 30:19, 41:1
support [2] - 14:6,
14:9
supports [2] - 19:1,
19:23
suppose [5] - 30:10,
46:4, 80:23, 89:11,
89:15
supposed [5] - 9:17,
31:6, 40:6, 48:14,
92:25
surprise [1] - 81:19
surprised [8] - 26:25,
69:25, 82:2, 82:12,
87:23, 98:13, 99:9,
115:5
surprising [1] - 34:6
surveys [1] - 46:2
suspect [3] - 37:22,
88:1
suspect's [2] - 92:15,
93:21
synonymous [1] -
49:22
system [2] - 40:6,
41:20

**T**

table [3] - 18:3, 121:8,
121:10
tablet [1] - 9:6
tail [1] - 37:20
tainted [2] - 119:8,
119:14
Tamara [3] - 1:22,
123:9, 123:9
TAMARA [1] - 123:3
tampered [2] - 12:7,
13:2
TAUSEEF [1] - 1:19
Tauseef [1] - 2:11
teaches [4] - 92:13,
93:17, 94:3, 104:15
techniques [1] - 88:19
telephone [1] - 121:11
telephones [1] - 121:8
teller [2] - 79:5, 79:6
temple [1] - 108:25
tend [2] - 6:11, 26:13
tenets [7] - 51:12,
64:4, 64:16, 64:20,
65:25, 66:2, 67:21

tentatively [1] - 105:5
terms [12] - 16:13,
37:16, 38:13, 41:12,
42:11, 72:13, 73:11,
86:8, 98:3, 98:6,
98:8, 115:23
terribly [3] - 9:21,
102:21, 109:16
terrific [1] - 40:5
test [3] - 101:8,
103:12, 105:20
tested [1] - 50:2
testified [6] - 33:17,
56:20, 71:15, 74:19,
100:18, 102:6
testifies [2] - 56:4,
116:3
testify [38] - 27:24,
43:20, 46:22, 47:6,
47:15, 48:9, 49:21,
51:5, 51:11, 60:7,
62:7, 65:12, 69:12,
69:25, 70:1, 72:4,
74:18, 76:17, 77:20,
78:5, 84:24, 86:7,
88:16, 91:12, 92:8,
94:8, 95:3, 95:5,
99:18, 99:25,
101:20, 105:16,
105:21, 106:4,
106:15, 106:24,
107:13, 107:24
testifying [6] - 45:7,
48:2, 72:7, 89:24,
105:6, 107:15
testimony [32] - 6:24,
11:19, 46:6, 47:20,
50:3, 50:11, 52:25,
58:5, 58:8, 65:9,
68:22, 71:13, 75:13,
78:10, 80:23, 81:6,
84:11, 93:5, 93:14,
101:25, 102:5,
102:13, 102:16,
108:19, 110:22,
113:10, 113:11,
113:13, 113:20,
114:10, 120:11,
121:21
testing [8] - 100:11,
101:1, 101:3, 101:6,
103:4, 103:10,
103:16
text [1] - 42:21
THE [238] - 1:1, 1:1,
1:8, 2:2, 2:9, 2:14,
3:1, 5:1, 5:14, 5:20,
6:6, 6:10, 6:18, 6:22,
7:5, 7:10, 7:22, 8:1,
9:13, 9:24, 10:2,

11:8, 11:14, 11:20,
11:25, 12:15, 12:18,
13:11, 13:23, 14:11,
15:6, 15:12, 15:14,
15:15, 15:18, 15:19,
16:5, 16:10, 17:11,
18:5, 19:21, 20:12,
23:5, 24:13, 25:3,
25:10, 25:16, 26:4,
26:17, 27:6, 28:4,
28:9, 28:15, 30:1,
30:10, 30:18, 30:23,
31:15, 31:19, 31:22,
32:8, 32:13, 34:2,
34:23, 35:1, 35:7,
35:16, 35:21, 36:4,
36:19, 37:10, 37:19,
38:20, 39:12, 40:2,
41:8, 41:14, 41:16,
42:1, 42:13, 42:21,
42:25, 43:4, 43:6,
43:11, 43:15, 43:18,
43:24, 44:15, 45:24,
46:9, 46:13, 46:21,
47:2, 47:14, 47:24,
48:5, 48:7, 48:17,
48:23, 49:8, 49:20,
50:7, 50:10, 50:24,
51:2, 51:10, 51:20,
52:23, 53:4, 53:8,
53:11, 53:16, 53:23,
54:8, 54:15, 55:2,
55:11, 55:19, 56:1,
56:7, 56:10, 56:12,
57:25, 59:2, 60:6,
62:6, 62:12, 63:16,
63:24, 64:24, 65:7,
66:18, 68:8, 69:6,
69:21, 70:18, 71:4,
71:11, 72:2, 72:11,
72:18, 72:24, 73:13,
74:12, 76:4, 76:7,
76:14, 76:19, 76:22,
77:3, 77:12, 77:19,
78:4, 78:23, 79:25,
80:14, 81:11, 81:16,
84:3, 84:8, 84:15,
84:23, 85:11, 87:1,
87:6, 87:10, 87:13,
87:23, 88:15, 89:5,
89:11, 90:5, 90:18,
91:5, 91:11, 91:19,
92:5, 92:23, 93:2,
93:9, 93:15, 94:2,
94:5, 95:7, 96:9,
96:15, 97:2, 97:23,
98:12, 98:23, 99:14,
99:23, 100:16,
100:20, 101:17,
102:11, 103:6,
103:24, 104:4,

104:18, 105:3,
105:5, 105:10,
105:14, 105:19,
105:25, 106:21,
107:3, 107:5,
107:11, 107:24,
108:7, 108:15,
109:3, 109:15,
109:20, 109:25,
110:19, 112:15,
113:7, 113:17,
113:24, 114:9,
114:14, 114:20,
115:4, 115:12,
116:1, 116:19,
116:23, 119:2,
120:9, 121:6,
121:13, 121:16,
121:24, 122:11
themselves [3] - 9:20,
16:23, 117:23
theoretical [1] - 77:23
theoretically [2] -
77:18, 78:3
theory [1] - 111:9
therefore [8] - 10:23,
12:8, 48:25, 60:22,
60:23, 61:14, 74:25,
90:3
they've [3] - 33:20,
35:16, 73:20
thinking [5] - 10:8,
20:9, 88:7, 88:11,
118:11
thinks [5] - 11:9,
18:25, 20:9, 66:8,
110:4
third [3] - 29:1,
106:23, 107:25
third-party [1] - 29:1
thoughts [3] - 26:7,
89:5, 109:20
thousands [3] - 27:16,
27:17, 33:10
threat [1] - 22:16
threaten [3] - 28:23,
43:21, 43:25
three [2] - 3:11,
100:17
threw [1] - 120:16
throw [2] - 39:1, 117:7
tie [1] - 120:19
tied [1] - 94:10
ties [1] - 100:23
tight [1] - 3:14
timing [2] - 26:24,
31:25
timing-wise [1] -
26:24
title [3] - 48:19, 58:22,

66:5
today [15] - 5:21, 7:16,
9:2, 11:11, 14:10,
16:11, 30:3, 30:20,
42:23, 76:8, 104:25,
108:9, 109:18,
109:21, 110:12
together [3] - 8:23,
10:4, 55:17
token [1] - 81:12
tomorrow [3] - 4:18,
4:19, 9:22
tonight [2] - 108:16,
108:18
took [1] - 30:25
tool [3] - 78:24, 79:2,
116:4
tools [1] - 29:2
top [4] - 42:8, 42:10,
96:4, 106:2
topic [3] - 73:16, 78:6,
113:25
topics [2] - 51:5,
105:12
TOR [1] - 1:18
Tor [8] - 1:20, 2:10,
105:18, 106:6,
106:10, 106:13,
106:16, 107:1
Tor-based [6] -
105:18, 106:6,
106:10, 106:13,
106:16, 107:1
totally [4] - 19:18,
95:13, 95:14, 112:11
towards [1] - 15:13
trace [11] - 44:1, 53:3,
56:13, 56:17, 57:4,
59:18, 59:23, 72:17,
73:7, 73:8, 74:4
traced [4] - 54:9,
54:11, 56:4, 56:20
traces [3] - 47:19,
48:12, 73:25
tracing [33] - 27:2,
43:20, 43:25, 44:11,
46:19, 46:23, 47:5,
47:6, 47:16, 50:12,
52:4, 54:15, 54:17,
55:20, 71:20, 71:21,
72:12, 72:13, 72:16,
73:1, 73:15, 73:19,
73:20, 74:1, 74:18,
75:20, 77:17, 79:12,
83:16, 104:25,
116:24
track [2] - 89:13,
101:20
tracks [1] - 29:9
trade [1] - 25:14

**traded** [1] - 68:17
**traditional** [7] - 54:18, 88:19, 88:22, 89:14, 90:12, 91:14, 92:2
**trained** [3] - 62:9, 68:6, 74:10
**training** [2] - 50:13, 78:2
**transacted** [1] - 93:25
**transaction** [23] - 54:7, 56:21, 57:5, 59:20, 65:4, 66:14, 68:13, 74:20, 85:23, 100:25, 101:19, 101:20, 101:23, 102:3, 102:7, 102:9, 102:14, 102:15, 102:24, 103:13, 103:22, 104:2, 104:7
**transaction-level** [1] - 102:9
**transactions** [34] - 52:8, 54:1, 54:5, 54:11, 55:1, 55:5, 55:22, 56:17, 57:2, 59:19, 60:4, 63:21, 75:14, 79:1, 79:23, 80:2, 86:9, 86:13, 86:20, 89:13, 89:25, 100:3, 100:4, 100:5, 100:7, 100:10, 100:15, 100:22, 102:2, 102:17, 102:18, 102:24
**TRANSCRIPT** [1] - 1:7
**transcript** [2] - 123:4, 123:6
**transcripts** [2] - 10:16, 10:24
**transfer** [3] - 52:14, 56:6, 86:22
**transferred** [5] - 9:3, 60:20, 62:24, 85:4, 94:12
**transfers** [1] - 85:10
**translation** [3] - 8:21, 10:16, 10:24
**translations** [2] - 8:14, 9:10
**transporting** [1] - 9:18
**treat** [2] - 101:18
**trial** [21] - 3:15, 4:9, 4:13, 4:15, 5:25, 6:2, 6:3, 6:14, 7:13, 14:2, 14:25, 15:1, 30:21, 32:10, 32:18, 33:22, 41:3, 64:23, 93:5, 110:6, 112:6
**Trial** [1] - 95:22
**tried** [1] - 22:13

**trillion** [1] - 80:21
**trot** [1] - 116:8
**troubling** [1] - 34:21
**true** [14] - 38:9, 53:1, 53:15, 53:25, 55:23, 58:16, 83:9, 89:15, 93:10, 93:19, 116:25, 118:1, 123:4, 123:5
**trustee** [2] - 13:12, 13:15
**try** [6] - 3:5, 3:12, 22:12, 26:19, 109:15, 109:21
**trying** [20] - 16:2, 21:8, 30:7, 30:8, 30:19, 41:14, 42:2, 42:17, 44:1, 44:2, 44:25, 45:1, 58:25, 68:1, 82:4, 88:2, 95:18, 98:15, 114:21, 121:19
**turn** [2] - 43:1, 43:3
**turning** [1] - 27:8
**turns** [1] - 84:9
**twist** [1] - 70:16
**two** [15] - 3:10, 3:11, 13:11, 14:25, 21:11, 22:2, 53:14, 59:9, 60:6, 60:9, 63:11, 100:19, 103:2, 109:24, 119:7
**two-way** [1] - 119:7
**twofold** [1] - 21:6
**type** [7] - 22:4, 46:1, 78:6, 78:18, 86:4, 98:17, 104:8
**types** [5] - 77:4, 78:25, 86:19, 102:17, 102:24
**typo** [1] - 49:22

**U**

**U.S** [3] - 1:13, 49:3, 80:17
**u.S** [1] - 1:16
**ultimate** [9] - 55:13, 69:11, 69:13, 69:18, 70:7, 70:9, 70:23, 71:5, 85:6
**ultimately** [1] - 75:5
**unable** [1] - 39:15
**unavailable** [2] - 76:8
**uncertainties** [2] - 63:9, 71:24
**uncertainty** [7] - 61:9, 61:25, 62:21, 65:8, 65:10, 65:11, 67:13
**uncover** [1] - 111:20

**under** [19] - 10:12, 14:22, 19:7, 23:24, 24:2, 24:4, 25:15, 34:18, 36:23, 36:24, 37:2, 57:8, 60:9, 61:23, 64:6, 66:21, 89:20, 97:11
**understandably** [1] - 21:7
**Understood** [2] - 46:20, 49:19
**understood** [23] - 6:4, 7:8, 7:21, 10:1, 12:6, 18:7, 18:8, 19:16, 20:2, 25:7, 28:1, 30:22, 37:5, 39:8, 75:23, 83:9, 100:25, 105:9, 105:13, 109:19, 114:7, 121:23, 122:10
**unequivocal** [1] - 71:22
**unequivocally** [1] - 99:18
**unethical** [1] - 119:20
**unforeseen** [1] - 115:11
**unfortunately** [1] - 114:3
**unhelpful** [1] - 86:2
**United** [4] - 1:23, 2:3, 2:8, 48:21
**UNITED** [3] - 1:1, 1:2, 1:8
**universal** [3] - 91:22, 111:10, 114:18
**University** [1] - 104:16
**unless** [9] - 4:19, 59:7, 60:23, 60:25, 66:4, 96:22, 114:23, 115:2, 119:13
**unlikely** [1] - 100:4
**unmixing** [1] - 102:3
**unonerous** [1] - 34:15
**unreasonable** [1] - 37:11
**unrelated** [2] - 54:2
**unreliable** [2] - 39:5, 52:22
**unsettled** [1] - 49:15
**unsound** [6] - 61:7, 61:11, 63:18, 74:4, 74:15, 83:24
**unusual** [3] - 23:12, 30:25, 34:13
**up** [49] - 3:11, 4:5, 4:7, 11:9, 16:17, 16:20, 17:25, 19:17, 23:7, 23:8, 23:20, 28:19, 28:24, 29:1, 37:9,

42:19, 43:1, 43:7, 43:16, 54:24, 55:10, 59:3, 60:4, 65:18, 67:2, 71:23, 72:17, 78:7, 80:16, 87:25, 88:11, 90:8, 98:10, 103:17, 103:22, 104:3, 104:10, 108:18, 108:24, 109:21, 109:25, 110:16, 110:21, 111:5, 111:23, 112:10, 112:11, 121:11, 122:8
**update** [1] - 40:22
**urges** [1] - 109:4
**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**useful** [3] - 40:4, 83:10, 83:17
**user** [8] - 43:21, 43:25, 100:8, 100:11, 103:4, 103:5, 104:16
**users** [7] - 44:8, 44:14, 44:25, 45:17, 89:4, 100:11, 103:5
**uses** [2] - 78:11, 104:20
**utilized** [3] - 43:20, 46:23, 47:16

**V**

**vague** [1] - 44:16
**valuable** [1] - 99:4
**value** [3] - 21:12, 21:15, 28:23
**various** [4] - 45:10, 58:11, 81:20, 82:22
**vendor** [1] - 29:1
**venue** [4] - 111:9, 111:12, 111:14, 114:18
**veracity** [1] - 114:9
**verdict** [1] - 113:22
**verification** [1] - 61:1
**verify** [2] - 54:20, 63:20
**Verret** [83] - 33:4, 43:1, 43:3, 43:20, 44:7, 46:22, 47:4, 47:8, 47:15, 47:20, 48:15, 49:14, 49:21, 50:3, 50:12, 51:6, 51:9, 51:11, 52:19, 56:23, 57:6, 58:1, 59:2, 63:17, 63:25, 71:13, 72:6, 72:9, 72:18, 73:4, 73:13,

75:18, 75:22, 76:16, 76:18, 76:19, 76:22, 77:8, 78:10, 78:17, 79:10, 79:21, 80:24, 82:10, 82:19, 84:17, 84:24, 85:2, 85:7, 88:16, 88:21, 89:1, 89:24, 91:2, 91:12, 91:15, 91:21, 92:8, 92:13, 92:18, 93:17, 96:11, 98:18, 99:18, 99:25, 100:2, 100:6, 100:8, 100:13, 100:18, 102:5, 102:6, 102:20, 103:11, 104:5, 105:6, 105:16, 106:4, 106:7, 106:12, 106:15, 106:24, 107:24
**Verret's** [6] - 11:18, 43:9, 49:17, 80:23, 107:20
**version** [1] - 43:11
**versus** [5] - 9:16, 9:20, 22:24, 63:8, 112:6
**vice** [3] - 2:11, 2:16, 2:18
**view** [15] - 12:7, 17:12, 17:15, 18:10, 26:22, 39:4, 42:17, 74:15, 80:22, 82:10, 84:5, 97:14, 107:18, 115:16, 118:19
**viewing** [1] - 25:14
**viewpoint** [6] - 57:23, 60:2, 63:19, 116:14, 116:15, 120:5
**views** [1] - 11:3
**violate** [4] - 17:10, 51:12, 65:25, 66:2
**violated** [2] - 61:14, 71:1
**violates** [11] - 56:25, 61:18, 61:20, 61:22, 62:8, 62:14, 64:3, 64:4, 65:13, 67:21, 68:19
**violating** [2] - 61:15, 82:21
**visit** [1] - 9:7
**visiting** [1] - 9:22
**voir** [1] - 105:2
**volume** [1] - 33:3
**vs** [1] - 1:4

**W**

**wait** [2] - 25:4, 33:5
**waiting** [1] - 42:6

**walk** [1] - 71:23
**walked** [1] - 71:14
**Wall** [1] - 1:20
**wall** [2] - 23:11, 122:8
**walled** [2] - 23:16, 27:24
**wallet** [10] - 97:8, 100:11, 101:7, 103:4, 103:10, 103:16, 103:22, 104:1, 104:3, 104:10
**wallets** [2] - 103:12, 103:18
**wants** [20] - 5:3, 6:2, 10:12, 11:1, 11:4, 11:5, 14:23, 24:6, 32:20, 41:24, 44:12, 45:24, 71:19, 71:23, 74:17, 91:21, 94:8, 105:21, 106:24
**Washington** [6] - 1:5, 1:12, 1:14, 1:17, 1:24, 123:11
**wasting** [1] - 27:13
**ways** [10] - 6:1, 21:19, 24:5, 27:25, 28:20, 38:14, 40:14, 88:24, 89:3, 90:17
**website** [1] - 87:19
**week** [4] - 3:24, 16:9, 17:25, 30:17
**weekend** [6] - 16:14, 29:22, 32:19, 109:15, 109:22, 122:11
**weeks** [7] - 3:11, 3:15, 16:8, 35:1, 35:2, 40:11
**weigh** [2] - 17:12, 20:8
**welcome** [1] - 19:10
**Wharton** [2] - 72:22, 104:15
**whatsoever** [2] - 81:25, 111:18
**whole** [6] - 17:25, 33:21, 44:1, 50:8, 50:14, 108:19
**willful** [1] - 14:7
**willing** [4] - 7:11, 33:14, 40:13, 41:4
**wiped** [1] - 24:17
**wire** [1] - 52:14
**wireless** [1] - 121:8
**wise** [2] - 26:24, 115:23
**withdrawal** [2] - 15:10, 52:15
**withdrawn** [1] - 15:21
**witness** [17] - 36:23, 37:9, 45:7, 60:17, 60:22, 60:23, 65:23, 67:20, 67:25, 72:4, 75:8, 101:19, 112:3, 114:4, 114:6
**witness's** [3] - 61:24, 71:8, 114:10
**witnesses** [10] - 65:17, 65:21, 111:20, 112:21, 113:1, 113:5, 113:10, 117:12, 120:10, 121:20
**wonder** [1] - 50:14
**wondering** [1] - 120:1
**word** [12] - 26:10, 34:15, 49:21, 51:14, 77:14, 78:19, 78:20, 78:24, 80:8, 81:1, 87:6, 109:14
**wording** [1] - 70:16
**words** [2] - 26:15, 49:23
**works** [8] - 29:9, 48:20, 52:20, 58:3, 58:4, 60:8, 120:13
**world** [5] - 24:4, 25:20, 26:23, 27:15, 38:23
**worried** [2] - 26:9, 90:21
**worry** [3] - 22:22, 61:5, 82:20
**writes** [1] - 99:17
**writing** [1] - 23:13
**written** [2] - 95:23, 96:4
**wrongdoing** [1] - 24:20
**wrongfully** [1] - 106:15
**wrongly** [1] - 120:5
**wrote** [1] - 120:16
**www.coindesk.com** [1] - 47:22

**Y**

**year** [1] - 33:25
**years** [1] - 114:4
**yesterday** [2] - 28:4, 29:3
**York** [4] - 1:17, 1:21, 41:19, 87:19
**you-all** [1] - 18:11
**yourself** [2] - 9:21, 23:19

**Z**

**Zcash** [4] - 45:19, 72:23, 103:18, 104:21
**Zoom** [6] - 5:21, 6:7, 14:16, 42:15, 42:23, 109:11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,

Criminal Action
       Plaintiff,           No. 1: 21-399

    vs.              Washington, DC
                        September 18, 2023
ROMAN STERLINGOV,

                        1:49 p.m.
       Defendant.       AFTERNOON SESSION
_____/


TRANSCRIPT OF PRETRIAL CONFERENCE
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:     CATHERINE PELKER
                      U.S. DEPARTMENT OF JUSTICE
                      950 Pennsylvania Ave NW
                      Washington, DC 20530

                      CHRISTOPHER BRODIE BROWN
                      DOJ-USAO
                      601 D Street, N.W.
                      Suite 5.1527
                      Washington, DC 20530

                      JEFFREY PEARLMAN
                      DOJ-CRM
                      Ccips
                      US Dept of Justice
                      1301 New York Ave. NW
                      Washington, DC 20005


APPEARANCES CONTINUED ON NEXT PAGE

APPEARANCES CONTINUED


For the Defendant:        TOR EKELAND
                          MICHAEL HASSARD
                          TOR EKELAND LAW PLLC
                          30 Wall Street
                          8th Floor
                          Brooklyn, NY 10005


Court Reporter:           SHERRY LINDSAY
                          Official Court Reporter
                          U.S. District & Bankruptcy Courts
                          333 Constitution Avenue, NW
                          Room 6710
                          Washington, DC 20001

P R O C E E D I N G S

THE COURT: All right. Do you want to take up Ms. Glave first?

MR. BROWN: Yes, Your Honor.

Your Honor, with the Court's permission, may I approach? I have copies of the summary charts previously produced to the defense.

THE COURT: Okay.

MR. BROWN: Your Honor, I think that maybe we can short circuit the discussion of Ms. Glave's testimony a little bit. At the bottom of page 2 of her disclosure in looking at ECF 124-5 --

THE COURT: Yep.

MR. BROWN: -- there is the reference to, Ms. Glave may also rebut the defense argument that Mr. Sterlingov's proceeds were the profits of his Bitcoin sales. That paragraph, which continues onto page 3, we don't intend to elicit her making those opinions. She is not going to formulate those opinions that are listed in that paragraph.

THE COURT: Okay.

MR. BROWN: So what we are really talking about is essentially factual testimony about her -- about her financial analysis, which is really described on the preceding paragraph in the middle of page 2.

THE COURT: Okay.

MR. BROWN: And certainly to the extent that the defense opens up this discussion about, you know -- you know, is this consistent with being a dark net market operator versus being consistent with being an early investor. You know, I think that the Court was clear. Well, to the extent the defense does open the door to that discussion in the defense case, we may call her as a rebuttal witness to address consistency or inconsistency with different theories of originating those Bitcoins. But for purposes of her direct testimony is noticed, it is really just her financial analysis.

THE COURT: Okay. All right. Do you want to walk through any of that now?

MR. BROWN: Yes, Your Honor.

So I could read it to the Court, starting middle of paragraph of page 2.

THE COURT: Okay. I have got that in front of me.

MR. BROWN: So Ms. Glave is expected to testify regarding her view of financial records and related communications. Ms. Glave will assist the jury in understanding Mr. Sterlingov's transaction history and will explain the flow of funds into, out of and across Mr. Sterlingov's accounts, including accounts held at various virtual currency exchanges, cryptocurrency wallets and accounts at banks and other traditional financial

institutions.  Ms. Glave will summarize her findings, including how she read and interpreted financial statements. She will walk the jury through Mr. Sterlingov's cryptocurrency deposits, as well as withdrawals and sales, noting the trading price of the cryptocurrency at the time.  Ms. Glave's testimony will note Mr. Sterlingov's purchases, expenditures and spending as compared to his income and cash flow. Ms. Glave's testimony will include the transaction set forth in the relevant account records as well as those detailed in the transaction confirmations and related communications contained in the defendant's emails and/or electronics. Ms. Glave will track and quantify Mr. Sterlingov's financial activity.

THE COURT:  Do you want to walk me through the chart?

MR. BROWN:  I'm sorry, Your Honor?

THE COURT:  Do you want to walk me through the charts as well?

MR. BROWN:  Oh, yes, Your Honor.  So the first page of the charts shows the summary of accounts that Ms. Glave analyzed.  It lists the institution, the financial institution.

THE COURT:  Are these known accounts?  So where it says account owner, Roman Sterlingov, was he actually the registered account or owner of record?

MR. BROWN: Your Honor, in the second column under which is -- where it says account owner, either those are accounts that are opened in his name, Roman Sterlingov, or they are opened with identify -- or accounts that use identifiers that are tied to his attributable personality of Roman Sterlingov. So the unique category of accounts here are the BitPay accounts. And this is just because BitPay in the way I understand it, is BitPay is not like a bank where you would open an account and you use that account for multiple transactions. It is more -- it is a transaction by transaction entry. So certain entries are tied to Mr. Sterlingov's personality through the use of attributable email addresses, either in the "to" or "from" field. And so each of these email addresses is something -- is an email address that Mr. Sterlingov in his true name can be tied to.

THE COURT: Okay. Would there be a foundation laid as to that where some other witness or Ms. Glave will be able to testify that this at Gmail.com for example is registered to Mr. Sterlingov's name or is there some other identifying connection?

MR. BROWN: Yes, Your Honor. That is our intention. I believe all of these account records will be introduced prior to Ms. Glave's testimony. And either in that testimony where the records themselves are introduced or in Ms. Glave's testimony, either that testimony or Ms. Glave will be able to

explain exactly how each of these accounts is attributed to Mr. Sterlingov.

THE COURT: Okay. All right. Next page.

MR. BROWN: The next page is a summary of Bitcoin activity over time in the collection of accounts listed in table 1. And so it shows inflows, it shows outflows and trading activity, positive and negative. The negative is denoted by the parenthesis. And so it shows that essentially the total inflows of Bitcoin into Mr. Sterlingov's variety of accounts and the total outflows over time.

THE COURT: Okay.

MR. BROWN: The next page. This is essentially the same information as presented in the previous page. The previous page was table 2. This is table 3 and chart 1. And this just shows the inflows -- these are just the inflows over time of Bitcoin into various exchanges and this is broken out by individual exchange.

THE COURT: And is the way to think about these are wallets that were maintained by Mr. Sterlingov in these particular exchanges? So the Mt. Gox, for example?

MR. BROWN: You could think of it more like an account. I think wallet might not be exactly the right term.

THE COURT: Okay.

MR. BROWN: So, for instance, yeah, with Mt. Gox Mr. Sterlingov had an account in his true name. And so this

would show the Bitcoin that came into that account, either as a deposit or -- I think as a deposit into that account. And the same thing broken out for other accounts, including his local Bitcoin, Kraken and others.

THE COURT: Okay.

MR. BROWN: The next page, chart 2, this displays the information from the previous two tables, table 1 and -- excuse me -- table 2 and table 3. It shows the incoming Bitcoin into each of those accounts, graphed out both in terms of nominal Bitcoin amounts, in other words denominated in Bitcoin. And also the value of that Bitcoin as it was deposited into those accounts broken out over time. So you can see early on, in 2013, there was a large number of Bitcoin deposited into his accounts. But it wasn't as valuable on a dollar basis as the Bitcoin that was deposited in 2017 and 2018.

THE COURT: Yep.

MR. BROWN: The next page, chart 3, this is Ms. Glave's analysis of Mr. Sterlingov's Bitcoin balance in his accounts. And I should clarify for the Court, the accounts to which we are referring is those accounts listed in table 1. So held in those accounts, is sort of the net balance of Bitcoin that is held in those accounts over time, both as a nominal Bitcoin value and the dollar equivalent value held in those accounts over time.

THE COURT: All right.

MR. BROWN: The next page shows Ms. Glave's analysis to control for Bitcoin that was moved from one of those table 1 accounts to another table 1 account. So in the previous charts Ms. Glave has shown Bitcoin coming into those accounts and the dollar value of those accounts. One issue that arose is there is a significant amount of Bitcoin that was simply transferred from one account to another, simply shuffled in between accounts. So if you are looking at, you know, sort of net inflows of Bitcoin into the system of Mr. Sterlingov's accounts over time, there is a danger of potentially double counting that Bitcoin. And so this chart shows how she adjusted for incoming Bitcoin into, say, account B, that was already counted as incoming from account A and shifted from account A to B. So that is how she would sort of control for that double counting.

If you go back and look at tables 2 and table 3, there is a separate line for adjusted, controlled account transfers in. The bottom of this table 4 addresses how she reconciled certain inconsistencies in the data that would be part of her testimony is she -- there appear to be -- there were a couple of issues. One, I think was local Bitcoins appeared to underestimate some of his sales -- I think it is his sales. There appear to be a missing transaction of the local Bitcoins records, so she adjusted that. And she will be

able to explain how she did that sort of according to the principles of forensic accounting and how she reconciled the other issue. I think it was when BTCE was taken down in 2017, that Bitcoin no longer became available to Mr. Sterlingov. But she will be able to testify to that.

The next page, table 5, is the summary of income and expenditures by Mr. Sterlingov. The income is focused on Mr. Sterlingov's bank accounts. I think that is primarily Nordea Bank, which was a bank account from Sweden. And the inflows -- those are not sort of broken down in great detail. But she will be able to discuss on a -- at a summary level, on year-by-year level net inflows into his bank accounts and as compared with net expenditures. And those expenditures are bank accounts. It is also expenditures from some of his other financial accounts, including PayPal and some of his prepaid debit cards, in particular prepaid financial services where he is spending, you know, over $90,000 worth of prepaid debit cards in two years. And she will be able to show kind of the delta between his known sources of income and his known expenditures.

She will also be able to testify about -- to the extent this is under inclusive that Mr. Sterlingov, as he testified in January, had other bank accounts and other sources of income or sources of expenditures for certain. She will be able to address that. This is her analysis.

THE COURT: What was the basis for sources of bank inflows? Is it just looking at the deposits in that bank account?

MR. BROWN: Yes, Your Honor. So look at his Nordea Bank account inflows.

THE COURT: All right.

MR. BROWN: And then the final page, table 6, details Ms. Glave's analysis of certain invoices that were found on Mr. Sterlingov's computer. That he appeared to have invoices, some of which pertained -- appeared to correlate with incoming Bitcoin payments for unrelated customers, but those unrelated customers were paying Mr. Sterlingov in Bitcoin from the same Bitcoin address, which is unusual for two completely unrelated customers. And the source of the Bitcoin address was Bitcoin Fog, so putting 2 and 2 together, Mr. Sterlingov was paying himself out of Bitcoin Fog using fake invoices.

THE COURT: Okay. Anything else?

MR. BROWN: That is it, Your Honor.

THE COURT: All right. Mr. Ekeland.

MR. EKELAND: Your Honor, the defense takes the position that this doesn't meet the disclosure requirements under Federal Rule of Criminal Procedure 16. There is one paragraph here that Mr. Brown just read to the Court that just vaguely states that Ms. Glave will summarize her findings

including how she read and interpreted financial statements. There is no detail on that interpretation. We are being shown this alleged summary chart where we are not being shown fully what opinion she is going to be testifying to nor fully what the basis of her supposed expert opinions. If it is going to be limited to factual statements and charts, regarding what comes into evidence, then it is just a summary of facts. But I think what is missing here is what she is -- her -- a detailed -- a disclosure on what her interpretation is. And --

THE COURT: Interpretation of what?

MR. EKELAND: It says in the middle on page 2 of 4 of document number 124-5, in her disclosure and roughly in the middle of the -- well, she says she will assist in understanding Mr. Sterlingov's transaction history.

THE COURT: You have got to slow down.

MR. EKELAND: Yes. I'm sorry, Your Honor. Ms. Glave will assist the jury in understanding Mr. Sterlingov's transaction history and will explain the flow of funds into and out of Mr. Sterlingov's accounts, including accounts held at various virtual exchanges, cryptocurrency wallets and accounts at banks and other traditional financial institutions.

If that is just a fact summary, then I don't know how much of an argument we have with that. But then the next

sentence is where we feel that there is a lack of disclosure as to what her expert opinion is. And that is, Ms. Glave will summarize her findings. It is not clear to us, even from this chart, what her findings are -- and including how she read and interpreted financial statements. And it is really -- the question is, well, how did she read them? What was the basis for her reading and what was her interpretation? And that is nowhere clear either in this very short disclosure or in the charts that we're being given where we are being told, you know -- I mean, every one of these pages you can ask the question, what is the interpretation? And what is the basis for it, what financial forensics principles is she using?

THE COURT: I mean, that was why I asked the question about the foundation. And if this is simply taking other evidence that has been introduced earlier in the trial and saying, you know, here is the bank account statement from the bank in Sweden. And if you look on line X of the bank account statement, it shows deposits in this amount. And so I took that amount and I put it into the chart here. That is not really interpretation. That is just --

MR. EKELAND: Agreed, Your Honor. That is not what we are arguing, but I believe if I get this right, the page 1, 2, 3, 4, 5 -- I think it is the 6th page in, for example, on the quote/unquote summary at the top it says, table 4, Bitcoin controlled account transfers. I believe Mr. Brown stated that

she is making adjustments there.  And there is a question of how she is making adjustments, what accounting principles she is using.  You know, what -- what forensic accounting principles are in play, not just here but in the entire chart?  And what our concern is that she is going to take fact evidence that, Your Honor, assuming arguendo, there is a foundation for.

THE COURT:  Right.

MR. EKELAND:  And they get to opine about it in ways that haven't been noticed.  That, I think, is the general concern.  For instance, on the last page, Mr. Brown I think said that there is those two box transactions.  And he said that is unusual for two unrelated customers.  Well, that is an opinion and that is not disclosed in the paragraph we just read.  Why is it unusual?  What is the basis for saying that?  What is the forensic principle for saying that?  And then on the bottom of this chart there appears to be a trace from Bitcoin Fog.  And I don't believe Ms. Glave has been noticed as a Bitcoin tracing expert.

THE COURT:  Right, I agree.

MR. EKELAND:  The same reasons that this Court has I think rejected Mr. Verret's testimony on Bitcoin tracing, I think that should be rejected.  And, again, I look at this and it is a very sparse disclosure.  And she says she is going to be testifying to her interpretations and readings.  But I

don't see any clear statement that puts the defense on notice as to what those readings and interpretations are and what their bases are in any financial forensic principles.

THE COURT: Okay. Fair enough. Let me let Mr. Brown respond on that. I am also not quite sure what the disclosure means when it says that you will summarize your findings, that I understand, but including how she read and interpreted financial statements. I suppose the question for you is, does that simply mean read? And now the words are that appear on the financial statements or are there some inferences that are being made or jumps that are being made in her analysis?

MR. BROWN: Your Honor, I think in terms of how she read and interpreted the financial statements, that is just how do you read a bank statement? How do you read a cryptocurrency account statement? There is no -- it is not that she is, you know, discerning some meaning there that is not there on the page.

I would also add, just for the record, Your Honor, we have produced the summary charts. We have also produced Ms. Glave's pivot tables that the underlying Excel spreadsheets -- that forms the basis of all of these, which is much more than Mr. Verret has ever produced.

THE COURT: When did you produce this?

MR. BROWN: In August, I believe, in our discovery.

THE COURT:  Okay.

MR. BROWN:  In terms of --

THE COURT:  What about the particular questions that Mr. Ekeland raised, the tracing and the opinion as to what is common or not common with respect to joint transactions?

MR. BROWN:  Your Honor, with respect to the tracing, we would be happy to lay a foundation for Ms. Glave's ability. This is not an advanced, sophisticated trace.  This is something that you could click through on a block chain explorer.  It is literally one, two -- two Bitcoin addresses that we can walk through as a matter of fact testimony with her.  The ultimate origin of that being a Bitcoin Fog, that may be separate.  And if Ms. Glave is not able to testify about that, that is fine.  Mr. Scholl can testify to --

THE COURT:  I think she is not an expert on tracing; right?

MR. BROWN:  Your Honor, she does have -- she has tracing expertise -- she has Bitcoin expertise.  It is not broken out with specificity in her disclosure, that is true. But she is trained on Chainalysis, on other block chain analytic tools.  She has experience as a forensic accountant attached to the IRS cybercrimes unit.  This is not the only --

THE COURT:  It does seem to the extent that we are holding everybody to disclosures they have made, there is not disclosure here that she was an expert or was going to opine

on -- what is and what is not Bitcoin Fog or how one can attribute certain funds or transactions to Bitcoin Fog; right?

MR. BROWN:  Yes, Your Honor.

THE COURT:  She can testify -- an expert can delve on testimony from another expert, but I don't think she is qualified -- as far as I can tell, the government hasn't offered her as an expert on that type of tracing.

MR. BROWN:  Yes, Your Honor.  She is not -- she is not being offered as the expert who can testify as to the attribution of that Bitcoin Fog cluster.

THE COURT:  Right.

MR. BROWN:  Just looking at these two hops from the invoice to this address in blue, which is 1EuDR, that is the address that is listed on the invoice.  And just being able to look that up on a block chain explorer and see the incoming transactions that match the time and date that come from this address listed in green.  That is not a sophisticated type of analysis.  This is looking something up on a block chain explorer and making one click.

THE COURT:  The question is whether it is expert or fact testimony.

MR. BROWN:  There, our position would be that is essentially fact testimony.  That is the same as just reading an account where it says there is, you know, a wire transfer from Citibank to Bank of America and matching up Citibank

returns and Bank of America returns. That is really essentially factual, that is not application of expert methodologies and rendering some sort of expert opinion.

THE COURT: What about Mr. Ekeland's point on the final page of the charts that you gave us, that she, Ms. Glave, is not disclosed as an expert on whether it is common or not common to have two transactions like the first two where it occurred here where there were separate individuals in making those transactions.

MR. BROWN: Your Honor, she is disclosed as a forensic accounting expert with experience in investigatory accounting. It is not outside of her realm of experience to say -- take this out of the Bitcoin context. It is within her core area of competence to be able to say, when you are engaging in a forensic accounting exercise, if you see two -- one customer based in Ukraine and one customer supposedly based in Hong Kong and they are both paying separate invoices out of the same bank account, it would be within her expertise as a forensic accountant to say, that is not something that is commonly seen.

THE COURT: So it may be within her competence, but is it disclosed? And I think the main point here is just that we ought to have one set of rules. And if the government is going to criticize the defense for not getting specific about the forensic accounting methods, then what is good for the

goose is good for the gander. I need to make sure we are applying the rules consistently.

MR. BROWN: Yes, Your Honor. I mean, we have disclosed -- this is an actual calculation that she did, which, again, is more than Mr. Verret has ever disclosed, except for the one back-of-the-envelope calculation.

THE COURT: Right.

MR. BROWN: We have disclosed our basis for this and she is qualified to -- and that is not even really an expert opinion, that is just based on her experience, that you don't usually see --

THE COURT: I think though that is one of the definitions of what an expert is is somebody who can testify on training or experience.

MR. BROWN: Yes, Your Honor. It is something within -- it is something within her experience. But it is not the application of sort of expert methodologies, it is just something that is within her training and experience to say, this is not something that you would expect to see. This is not commonly seen.

THE COURT: I also wonder whether this is an issue where she can testify there is one invoice being paid here. And it is being paid from here and it is being paid from here. You know, parties can argue to the jury about what that means and whether it is just a matter of common sense that typically

when you are paying an invoice, they are not two unrelated people from other sides of the world who are paying the invoice absent some explanation for why that is the case.

MR. BROWN: Yes, Your Honor. And she can certainly just testify factually like here. And it is actually not one invoice, you know, it is five invoices from Ukraine and three invoices from Hong Kong that are all being paid out of the same origin.

THE COURT: So I just don't have in front of me at the moment and there is quite a bit of expert testimony and expert reports here, so I can't remember off the top of my head exactly what the defense disclosures look like with respect to forensics. And I think I have made pretty clear, I am okay with what you might call hard forensic analysis on both sides of walking through transactions and looking at transactions. And when I start to have greater concern is, you know, opinion and inference that is drawn independent of what the hard facts show. But I guess for present purposes, my point is just that, you know, at trial, I am going to need to make sure that we are playing by one set of rules. And if I am going to allow the government to offer testimony, which admittedly is not a giant step away from what is disclosed, but is not expressly disclosed, then I will presumably apply the same rule when it comes to the defense. So I need to make sure that it is applied equally. And I am not sure whether it

is necessary. As I said, I don't have the -- I am working on a longer opinion. I don't have in front of me everything that I have already said even with respect to all of the defense experts on this and how much leeway I am giving them. But the bottom line is, I will give you both the same leeway.

MR. BROWN: Yes, Your Honor. We understand that.

THE COURT: All right. Anything else?

MR. BROWN: Not on Ms. Glave.

THE COURT: Okay.

MR. BROWN: At the some point, we would like to be heard a little bit more on the scheduling issue.

THE COURT: Yeah. I plan to come back to that.

So with respect to Ms. Glave, I am going to allow her to testify based on this forensic analysis that she has offered. With respect to the little bit of tracing at the end there, this strikes me as more factual in nature to the extent she is just pointing to two particular addresses and showing that. Any attribution to Bitcoin Fog, I am not going to allow from her. The government is going to have to offer another witness with respect to attribution for Bitcoin Fog. And with respect to the five invoices, what I am going to do is reserve judgment on that. And we'll see how things play out in a manner in which I can just assure that both sides are playing by the same set of rules.

Okay. Do we want to turn to Mr. Cabanas now or -- I

don't know, Mr. Ekeland, if you have any further updates on scheduling, if you have heard anything further from CipherTrace.

MR. EKELAND: Let me check. May I check my email really quick?

THE COURT: Yes.

MR. EKELAND: I called the number we had for Mr. Torres and as well as Ms. Jennifer -- her name escapes me. I left voicemails during lunch.

THE COURT: Ms. Lawrence.

MR. EKELAND: So Ms. Lawrence and Ms. Torres, I called the numbers that were available on the internet. I explained who I was. I explained the Court's concern. I have sent -- I have not heard back. I have sent two emails this morning to Mr. Torres explaining the Court's concerns and I have not heard back.

THE COURT: Do you have any objection to the government reaching out not to discuss anything of substance, but to request that the Mastercard or CipherTrace make some lawyer available, just to talk me to about what is going on.

MR. EKELAND: As long as it is just limited to them reaching out and saying, I think that -- no objection as long as it is just limited to them asking them to reach out and maybe expressing the Court's concern and the importance of this issue.

THE COURT: All right. Mr. Brown, so I think you have heard that.

All right. Well, why don't we go ahead then and turn to Mr. Cabanas. I guess I should say Dr. Cabanas, if he has a PhD.

MR. EKELAND: Your Honor, would you just like me to proceed as we proceeded before by reading from his disclosure which is on docket 145-1?

THE COURT: Yep.

MR. EKELAND: Starting -- would you like me just to go the numbered paragraphs or do you want me to read that -- Dr. Cabanas --

THE COURT: No. There is no reason to -- you can point me to the paragraphs. I have them in front of me.

MR. EKELAND: So this is page 3 of 9 on document 145-1 on the docket. And I am starting at the second paragraph with the numbered paragraphs starting with number 1. This says, "Dr. Cabanas will testify to the critical importance of identifying and quantifying both systemic error bias and random error noise in the government's and Chainalysis investigation into Bitcoin Fog."

THE COURT: I have to say my biggest concern about Dr. Cabanas, which is a fairly big concern, I am just not convinced that he has any expertise, certainly related to tracing or tracing technology, not a great deal of expertise

of any with respect to Bitcoin. In fact, that is not what he currently trades in. He is somebody who years ago traded in Bitcoin. But his training is as a physicist and in mathematics. And he has worked in areas of real estate and other fields. And I think as the government has put it, it does seem as though he is largely a hobbyist in the field of cryptocurrency. And, well, particularly with respect to Bitcoin, he may have some knowledge relating to mathematics. And maybe even with respect to the difference between systemic error and random error. I am just not sure what expertise he has in applying that to anything that Chainalysis did in its review. So that covers quite a bit of his testimony. And that is my principle area of concern with him.

MR. EKELAND: Your Honor, Dr. Cabanas I think has been in the crypto space probably longer than I think anybody in this room or that the government is going to put on besides -- anyone in this room besides perhaps Mr. Sterlingov. He is a legendary status user on the Bitcoin Talk forum, which figures prominently in this case, because that is what the government is going to attempt to say is Mr. Sterlingov -- they are trying to link him to the --

THE COURT: Let's come to that separately as to whether he may have some expertise as -- we'll take that as a separate point. I have probably been driving a car longer than anyone else in this room, I am pretty sure as I look

around at everyone's age in the room here. But I am by no means more of an expert on cars or even driving cars than anyone else in this room.

MR. EKELAND: But the Bitcoin Talk forum is the primary forum for discussions about Bitcoin Talk. I believe if I recall correctly, it was set up by Satoshi -- or Nakamoto's circle. It has been fundamental to the discourse in relation to Bitcoin since the beginning. And he has been involved in the space from the beginning.

THE COURT: But you are still not answering the question with respect to what he knows about the difference between system error and random error in the government -- in Chainalysis' investigation of Bitcoin, clustering tracing. And there are experts on tracing that we have, Ms. Still and Ms. Bisbee and others. But, you know, I don't have any reason to think that he has any particular knowledge in those fields or that he has particular experience in either of those fields. I don't think he has done any tracing. I don't think he has studied tracing, so it would just be someone expressing an opinion on something that is no more valuable than anyone else's opinion.

MR. EKELAND: Chainalysis and the government has asserted that their methodology and Chainalysis reactor is both scientific and deterministic. Yet as the Court well knows, they cannot produce any kind of error rate analysis.

Dr. Cabanas has a PhD in physics with a specialty in statistical analysis of error and can help clarify for the jury and help the jury understand the importance of knowing the error rates in scientific endeavor. He can also identify in relation to the Chainalysis claim that their software is somehow scientific and deterministic. He has --

THE COURT: I don't think -- I should look to the government on this. First of all, I don't think that everyone has ever said this is science in the Daubert sense or in the sense of physics. I think the government's view is this is sophisticated forensics. But I mean, you have also said many times that it is their position that it is scientific and deterministic. And I understand that the government believes there are conclusions that can be drawn from this. Maybe I should ask the government, is it the government's view that tracing based on clustering or on more precisely that tracing based on the heuristics is deterministic in the sense that there is absolute certainty with respect to the results that are achieved or found?

MS. PELKER: Your Honor, it is deterministic insofar as you apply the algorithm. And as long as you apply the same algorithm in the same way, it gets the same results. That is what is meant by deterministic here. The government is not suggesting that block chain analysis is a science the same way that physics is. We view it much more analogous to forensic

accounting and these are very much like forensic accounting methodologies, just on a larger scale because of the number of transactions, number of addresses at play.

THE COURT: But I -- it sounds to me like you all may be talking past each other a little bit in the use of the word deterministic. I think Mr. Ekeland is using it in the sense of if you use this algorithm, you can determine -- you can make attribution determinations in the same way that if you use a thermometer, you can tell us with precision how warm it is in the room. And I don't think that -- at least that is not what I just heard you say. I heard you say it is deterministic in the sense that every time you run the program, you get the same result. But there are assumptions or heuristics that go into the program, which I take it the government is not saying lead to the same type of scientific certainty that a Geiger counter might render with respect to the amount of radiation in a room or a thermometer might render with respect to the precise temperature of a material in the room.

MS. PELKER: No. I think that we are on the same page there, Your Honor, yes.

THE COURT: I think we are talking past each other a little bit with the respect to scientific and deterministic.

Go ahead.

MR. EKELAND: Your Honor, so the -- I am using the

word scientific and deterministic, I am getting from Ms. Bisbee's supplemental declarations. And I think there is a real risk of jury confusion. Because they are going to hear those words and they are going to think, oh, it is science, it is 100 percent accurate. And I think the importance of Dr. Cabanas is he is a scientist. He has a PhD in physics and he is an expert in statistical error, which is not -- you know, which is applicable I think across the board and also to cryptocurrencies. And he is experienced in the cryptocurrencies. And I think he would be helpful to the jury in helping them understand this isn't a pure science. There is --

THE COURT: Did Ms. Bisbee use the word science in her report?

MR. EKELAND: I believe off the top of my head that she said that this is -- while there is no peer-reviewed, you know, scientific papers it is scientific. I think she even used the phrase that it is based on -- I hope I am not getting this wrong, hard science, it is scientific and deterministic. And the concern is here and the reason we are bringing in Dr. Cabanas from --

THE COURT: Maybe I should just preclude her from saying that at trial. Her report is not coming into testimony. If there is a concern about jury confusion about her saying that it is scientific and deterministic, maybe I

should just preclude her from using that phrase.

MR. EKELAND: The defense welcomes that.

THE COURT: Ms. Pelker.

MS. PELKER: The government would note that -- I think Ms. Bisbee's report -- and I am working on pulling up what the exact language was in response to defense's cross-examination suggesting that the heuristics themselves are not deterministic and would potentially lead to disparate outcomes depending on whatever is happening inside this black box. So we certainly don't intend to elicit on direct any testimony from Ms. Bisbee that this is a hard science. But on cross-examination by defense counsel, if defense counsel says, Ms. Bisbee, isn't it true this is just totally unscientific, we think Ms. Bisbee should be able to explain what is meant by that and there are different principles and different things they have done in order to inform their work, which is very different than -- I honestly am still not following how Dr. Cabanas as a physicist in science can even be applied here, but either way it is very different than what defense is suggesting.

THE COURT: Right.

MR. EKELAND: Excuse me. The defense maintains it is important for the jury to understand notions like systemic error and how things can go very, very wrong with programs like Chainalysis Reactor, which is subject to the same

scientific principles as everything else in the universe that is being put forward. So the fact that Chainalysis has no internal error rate analysis is, to the defense, something obviously that is important.

THE COURT: Are you going to ask that question on cross, do you think?

MR. EKELAND: I don't -- well, perhaps.

THE COURT: I am kidding, because I will bet that I hear that phrase at least a dozen times out of your mouth throughout trial.

MR. EKELAND: It is important for the jury to understand why that is important as well. And how there is -- you know, there is different types of error, that there is systemic error that you can pervade a whole system. And there is random error. And I think error rates are crucial to the issues in this trial. And Dr. Cabanas is an expert in that not --

THE COURT: What is he an expert in?

MR. EKELAND: He is an expert in physics and mathematical analysis of random and systemic errors. That is on the top paragraph of page 3 of 9 on document 145-1.

THE COURT: But he is -- but you didn't quite read it entirely or quite correctly. He is --

MR. EKELAND: He has over 20 years of experience in the fields of experimental physics, physical chemistry and

radio astronomy where he specialized in mathematical analysis of random errors or noise and systemic errors, bias in statistics. This is a heuristic program that is, I believe, using some form of statistical analysis and algorithms to arrive at --

THE COURT: Is it using statistics?

MR. EKELAND: I'm sorry. What?

THE COURT: Is the program using statistics?

MR. EKELAND: I don't -- well, I haven't seen its source code, so I don't know.

THE COURT: You have seen -- you have seen the detailed heuristics and methodology that has been applied, quite frankly. I think you have seen more than the source code will reveal to you. You have got a detailed description of exactly how the program works. And I didn't see anything about it using statistics. I could be wrong about this, but I didn't see anything about it using statistical analysis.

MR. EKELAND: Well, that may be the problem, that is something he can testify to that Chainalysis has never done any statistical analysis of its error rates. He can testify as to the importance of that. They said they kept no internal data on their error rates. And one of the things he can testify to is the importance of that in order to be able to do a statistical analysis. So, you know, it --

THE COURT: That is not what he is noticed for, I

don't think.

MR. EKELAND: Should we read through this more or --

THE COURT: I mean, I told you that I don't see how he is -- I think you -- the only thing you have even argued to me is that he is an expert in mathematical analysis and random errors and systemic errors in statistics. But that has nothing -- there is no expertise with respect to block chain tracing, with respect to Reactor, with respect to any of the specifics here. So I think the only question, as far as I can tell, is whether he should be allowed to just offer the more abstract testimony. I don't know anything about Chainalysis. I don't know anything about Reactor. I don't know anything about Bitcoin tracing -- excuse me.

I don't know anything about those topics or I am not offering testimony on any of those topics, all I am telling you is that in general, when you do statistics, it is good to know what the error rate is.

MR. EKELAND: Well, he can --

THE COURT: Go ahead.

MR. EKELAND: In paragraph 2 he says Dr. Cabanas will explain that while clustering over a large number of transactions, statistical techniques can mitigate random error clustering over a large number of transactions and using statistical techniques does not mitigate systemic error. What he is going to say is --

THE COURT: I understand the point. So go ahead.

MR. EKELAND: Your Honor, I have handed a quote from Ms. Bisbee's report on page 5 where it says, using deterministic methodology, Chainalysis identifies which addresses are imagined by the same entity and therefore should be grouped together in a cluster. So that I think goes to, you know, sort of what is at issue here is -- I think it is -- Dr. Cabanas's testimony is important to clarify for the jury just that this isn't scientific, the importance of having knowledge of the error rates.

And if the Court is going to preclude the government's witnesses from testifying and saying it is scientific and deterministic, we welcome that. But I think then that becomes very still difficult for them to argue about the effectiveness of Chainalysis Reactor. And we think his testimony will be helpful to the jury to clarify the importance of knowing these error rates and understanding why it is important and why this isn't scientific.

THE COURT: I guess the problem I have is not with the nature of the testimony, it is whether he has any expertise that is in the relevant field.

MR. EKELAND: Your Honor --

THE COURT: And we could probably get Stephen Hawking in here to testify about the differences between systemic error and random error. But even Stephen Hawking is

not going to be able to tell us about Bitcoin tracing.

MR. EKELAND: But, you know, he has been in the crypto space longer than Ms. Bisbee.

THE COURT: That is a clever choice of words to say he has been in that space longer than Ms. Bisbee. Because that space is -- sort an intentionally undefined term. If you mean to say he has been engaged in tracing, I am with you. If you mean to say he was trading and buying and selling Bitcoin, I don't see how that has any bearing on whether he is an expert on tracing.

MR. EKELAND: We are offering him as an expert on statistical analysis of error, systemic bias and random bias in the Bitcoin space. And I do think that is relevant, because I don't think he needs a high level of knowledge of tracing to do an analysis of that. And he is looking at, for instance, the financial action task force paper on error rates and the error rates that were listed and giving an opinion based on that.

THE COURT: So let me ask you about this: He wants to testify based on this report I have in front of me. And as far as I can tell, it shows what the proportion of identified illicit Bitcoin transactions were between 2016 and 2020 on page 27. And his point is to say, well, look, it shows the variation. It doesn't say anything about who was doing the testing or what methodology was applied. So this also strikes

me as sort of unreliable and unhelpful.  If you could show me that one of these was CipherTrace and one of these was Chainalysis and show me there was a big difference and then maybe the jury needs to understand why there is that big difference.  This report isn't terribly helpful because it just doesn't tell me anything.

MR. EKELAND:  Your Honor, I think that is the point is that this is a newly emerging forensic science that is completely standardless.

THE COURT:  No.  No.  You are not listening.  I am saying, it doesn't tell me who is doing this.  We are not talking about whether it is standardless or not.  Who generated the 12.7 applying what methodology or not, how is the government supposed to respond to this unless they know who it is that actually generated 12.7 and who generated the .5 and what methodology they applied in doing that?

MR. EKELAND:  The government is welcome to cross him on that, but that is I believe a government document.

THE COURT:  I am not going to allow this -- him to use this report with so limited knowledge.  I mean, you just found this report and looked at it.  I am looking at it and I can't tell what it is about.  And he certainly didn't indicate he had any idea.  If he knows exactly what these different studies were and what methodologies were applied and has some expertise with respect to the methodologies that is a

different matter. To say I found some report somewhere which shows some variations, but I don't know what was being measured by whom and under what circumstances, then it strikes me under 403, it is certainly more prejudicial than probative.

MR. EKELAND: Your Honor, if you are going to disallow that report, we would note that that report is referenced in Mr. Scholl's expert report. And it should be excluded from all of Mr. Scholl's testimony as well.

MS. PELKER: That is fine. I am not exactly sure where it is referenced in his report. But Mr. Scholl is certainly not planning to testify to anything about it. And his analysis would stand on its own without any sort of reliance on the report.

MR. EKELAND: I refer the Court to paragraph 20 of Dr. Cabanas' disclosure where he says he will explain the scope of elicit asset transfers as documented by the financial action task force study referenced by proffered government expert Luke Scholl in his expert report.

THE COURT: Okay. I think the government said they are not going to rely on that.

MR. EKELAND: Okay. So we will then just to get clear, the government is not going to rely on anything from the financial action task force study, referenced by Mr. Scholl in his expert report and anything that is derived from it in Mr. Scholl's expert report. Am I understanding

that correctly, Your Honor?

THE COURT: Well, if there is something that you have in mind that was derived from that, I don't know what you have in mind from that.

MR. EKELAND: I would have to go look at his report again. That is our objection. That is what we are asking for is that everything that Mr. Scholl -- we are asking if that is going to be excluded, we also ask that anything in Mr. Scholl's report, that is based on that financial action task force report that that testimony be excluded as well.

THE COURT: So I think you have whatever Ms. Pelker's representation was with respect to that. With respect to what I was saying, I wasn't saying that the FATF is unreliable or that every single word that is in this report is something that an expert could not possibly rely on. I don't know. All I am telling you is the chart that Mr. Cabanas was pointing to, I have looked at that chart. And I can't tell from that chart, what methodologies were being applied, what entities were doing the measuring. And I think that for that reason that chart and his reliance on that chart, particularly given the fact he has no independent experience or knowledge or expertise in the field is more prejudicial than probative. So I conclude that he can't rely on that report absent some greater showing to me that he actually has greater understanding of this than I understand that he does.

MR. EKELAND: Your Honor, then we submit that I think that is an issue in general with the whole FATF report. And we then --

THE COURT: You are welcome to reserve any arguments you have. And anyone who wants to rely on anything in that report, make the same argument to me. And my answer will be all the same, if it is the same circumstances, it is the same argument. But I haven't sat here as we are sitting here and read the entire report. I don't know what any other expert has cited to in this report. And it may be that there are portions of this report that are the type of thing that an expert who actually has expertise in the relevant field could rely on. That is all I am saying.

MS. PELKER: Your Honor, to the extent that it is helpful, the FATF report referenced is that Mr. Scholl for his report had a section that is definitions. And he used the definition of, quote, virtual asset, as the definition in the FATF report. We think that is appropriate. But also, Mr. Scholl has an independent basis for defining the term virtual asset as synonymous with what is in the FATF report.

MR. EKELAND: And we reserve our argument as to what the Court said on the FATF.

THE COURT: That is fine.

MR. EKELAND: Another point, Your Honor. Dr. Cabanas sits on the board of the Monero Policy Group. And

Monero in part is a reaction to Chainalysis, so it is -- and Chainalysis reactor and these kind of block chain tracing software that people in the privacy community don't believe in. And so from that aspect, it is not like he doesn't have any experience with Chainalysis or the block chain at all.

THE COURT: My understanding is though that Monero is not on a public block chain ledger in the same way that Bitcoin is, in particular the transaction amounts are not disclosed for Monero. That is -- doesn't have anything to do with tracing, other than the fact that you are taking away the thing that is tracing, but it doesn't show any particular knowledge or skill or expertise related to tracing.

MR. EKELAND: In order for Monero to function, it needs to know how the block chain tracers are working. It is not -- Monero is not going to function if Chainalysis Reactor can see everything that it is doing. So in that sense, I think he does have expertise.

THE COURT: You had him here for a Daubert hearing and had the chance to ask him all of those questions. And I don't recall anything about any, you know, meaningful expertise that he had developed while serving on Monero with respect to block chain tracing and that he participated in a study group by Monero to figure out how Chainalysis or other block chain entities were working. And they studied that for six months, figured that out and engineered around that. I

don't remember anything like that in his testimony.

MR. EKELAND:  I would have to go back and look at his testimony, Your Honor.  We submit he does have, based on his experience, the relevant expertise to testify on these issues in court and particularly about systemic and random error.  And we think that is important for the jury to understand.  And as, you know, documented in his disclosure.

THE COURT:  I want to think a little bit harder about whether he can just offer the abstract testimony and not tying it to Chainalysis and Reactor, which as far as I can tell he has no experience or knowledge of.  If he wants to offer 10 minutes of testimony and say, I have studied statistics and there are two types of error.  There is systemic error and there is random error.  And systemic error is when your model or your procedure has an error in it.  And random error is the error that is introduced in the application in some way.  Having large sample groups helps with random error, but doesn't help with systemic error where there is a problem with the model to start with.  That is something I might be open to.  But as soon as he starts to applying that to Chainalysis, I don't see any reason to think he has any expertise in the field, other than the fact that he has been quoted in the space.

MR. EKELAND:  Understood, Your Honor.  The defense disagrees, but point taken.  And 55, we do offer him as a

rebuttal expert, should the government open the door.

THE COURT: And I will -- I will get back to you all on this question that I am leaving open and I will give you a decision on that. And I will also give the government a chance to be heard on that too. So 55 --

MR. EKELAND: Is just the paragraph where we offer him as a rebuttal expert.

THE COURT: Well, I suppose. I am curious as to what both sides thinks. It seems to me we ought to apply the golden rule here as well to the extent to which we are requiring disclosure of rebuttal witness or not with respect to unanticipated testimony, I think. The whole point of doing the disclosures if you have reason to already anticipate the testimony, you have to disclose it now. If there is something that you didn't anticipate, I suppose the answer is that both sides reserve the rights to call experts to offer rebuttal testimony. But it would have to be something that was in response to testimony that was not disclosed or otherwise foreseeable at a time in which you made your disclosures. Does that seem fair to both sides?

MR. EKELAND: Yes, Your Honor.

MS. PELKER: I think that is consistent with the amendments to the rule as well.

THE COURT: That is good fortune then.

MR. EKELAND: Your Honor, I wanted to get clear, I

heard the Court say that you were going to issue an opinion just on what the scope of the expert testimony is.

THE COURT: I am working on a larger opinion. I have given you the rulings from the bench on a lot of this. But I have not given you decisions from the bench on everything related to the experts. And I am working on an opinion. And what I am saying is, I think I have given you now from the bench my conclusion that Dr. Cabanas is not an expert in block chain chasing or Chainalysis or anything in that field.

But to the extent that you want to offer him as just a high level on statistics and error and to just offer general testimony about the distinction between random error and systemic error, but without tying it to Chainalysis or block chain analysis, that is what I am going to address in the opinion that is forthcoming.

MR. EKELAND: We would like to offer him as an expert in peer-to-peer transactions, which he has done. I believe that is on page 114 of his Daubert transcript, because we do think it would be helpful.

THE COURT: Do you want to point me to where in the disclosure to what you are talking about?

MR. EKELAND: I am getting a note based on his transcript, his Daubert transcript on page 114. I have to go look through the disclosure.

THE COURT: Why don't you take a minute to look at the disclosures because I think that is really what we want to stick to here.

MR. EKELAND: I think that is -- let me finish looking at this, but -- so I think it is touched on in a number of points in his disclosure, particularly if you look at paragraphs 14, 26 through 29, or particularly -- so 14 he will explain the spacial and temporal proximity or the use of the same or similar wallet software is not necessarily indicative of common ownership. I think he is talking about peer-to-peer transfers there. On paragraphs 26 through 29, he will explain how public and private keys work on the block chain. He will explain how it is impossible to know for certain who, if anyone, exercised direct control over the keys. 28, he will explain how digital currency, like Bitcoin, can be transferred off chain. And 29, he will explain the problems that off chain transfers of cryptocurrency calls for block chain tracing forensics. There I take that to mean he is referring to peer to peer transfers. And let me stop on that. And then I have one other thing I want to raise him as an expert on.

THE COURT: Okay. Let me ask the government's view with respect to this.

MS. PELKER: I don't read any of those, Your Honor, as disclosing him as an expert in peer-to-peer transfers. And

I am not sure how defense gets to that. We also don't believe that he is an expert in peer-to-peer transfers. The fact he has done some peer-to-peer transfers doesn't make him an expert in them.

THE COURT: I suppose, frankly, that maybe the better thing to do is just, if you want to call him as a fact witness about what he has done and says, I have engaged in transactions in the following ways on Bitcoin, maybe that is okay.

MR. EKELAND: We are happy to do that, Your Honor, call him as a fact witness.

MS. PELKER: Your Honor, the government is going to have 401 and 403 concerns to the extent that defense is just calling someone who has done some Bitcoin transactions to talk about how Bitcoin transactions can potentially be done without any sort of real grounding to any relevant fact in this case.

THE COURT: Although, if they want to offer -- I mean, I see your point. And that you don't want to, like, give rise to an unfair inference that they are all transactions of that nature. But if someone who has done transactions wants to testify that I had a public and a private key. And, you know, I did this with my public key and I did this with my private key and, you know, I didn't -- when I was doing that transaction, I had no idea who was on the other side of the transaction. All I knew was there was a

public address.

MS. PELKER: I think if it is truly fact testimony about just transactions that he has specifically done, I think our concern is just -- it is clear that defense is trying to lead then into the expert testimony looking at item 29. He will explain the problems that off chain transfers of cryptocurrency calls for block chain tracing forensics.

THE COURT: I already wrote no in the margin next to that in my version. So I share your view on that and I think that is crossing a line that I drew with respect to his area of expertise, so we -- even practical experience.

I also have similar concerns with respect to 14. And, again, if he wants to talk about and testify about his experience and what he has done as somebody who was an early and extensive user of Bitcoin, I suppose that is probably okay. I will let you reserve your ability to object on 403 or 401 grounds at trial if it comes up. But I suppose I don't see a whole lot of harm on it, depending on how it is done. And I can see it being done in a way that is inappropriate and I can see it being done in a way that is appropriate.

MS. PELKER: Yes, Your Honor. I think though that the discussion of spatial and temporal proximity and whether that is indicative of common ownership gets into a question of block chain analysis. And Dr. Cabanas testified and that is a transcript of page 118, that he has not only never used

Chainalysis, but that he does not trace block chain transactions as part of his work or function.

THE COURT: Yeah.

MS. PELKER: So we can testify to what he has done. But anything about a spatial and temporal proximity analysis would really be veering into the realm of expert testimony that he would not be qualified to opine on.

THE COURT: Okay. I agree with that.

What was the other issue you wanted to raise?

MR. EKELAND: This is on paragraph 41.

THE COURT: That is what I thought you were going to say. So let me ask you this about that. Tell me what it is he is going to say? So I can imagine a world where, for example, the government sometimes will call experts on drug gangs. And the expert on the drug gang will say when they say, you know, I want to buy 15 shirts that are 10 percent acrylic, that everyone in the drug world understands that means, 15 kilograms of heroin that is 10 percent pure. And I suppose the defense probably offers witnesses that do the opposite. Is that what you are talking about here? Are people talking in code in some way or what is it he is going to be interpreting with respect to language that the government attributes to Mr. Sterlingov on Bitcoin Talk?

MR. EKELAND: Excuse me. We anticipate of course, that the government is going to attempt to introduce numerous

posts from somebody called Akemashite Omedetou, which they are going to take the position is Mr. Sterlingov. And it is -- so the Bitcoin Talk forum is historically one of the main places where conversations about Bitcoin happen. There is my understanding -- I am not an expert. My understanding there is lots of slang like you are saying, sort of -- I don't know that it is in the gang context. But I think it would be -- he would be helpful for the jury in helping them understand since he's been a user of it.

THE COURT: Give me an example. You have now whatever posts the government intends to rely upon. Give me an example of an assertion which is ambiguous in how it would be translated.

MR. EKELAND: I'd have to go back and look. I can't give you one off the top of my head.

THE COURT: I need that before I can make a determination as to whether that is proper or not.

MR. EKELAND: Understood. But also they -- the government will be putting stuff on. And if we could notice the Court if something is said that is ambiguous, I can't think of something off the top of my head. He could also explain certain features of Bitcoin Talk like that you had to pay for and how it functions and how you posted and what the culture was. I think it is relevant because not only is the government alleging that Mr. Sterlingov is Akemashite

Omedetou, they are also saying he had another account on Bitcoin Talk called Killdozer.

I think it would be helpful to the jury to understand, not only if there is any questions of ambiguity of the language, but the culture. Because I think part of what is difficult here for the defense is that this is a very different culture than maybe what members of the jury are involved in. And so I think he has got that relevant experience to be helpful to the jury.

THE COURT: So what will he say about the culture?

MR. EKELAND: That maybe people share accounts or that there is a --

THE COURT: I thought people didn't share accounts? I thought that was the whole culture is this privacy and you kept it to yourself.

MR. EKELAND: I'm sorry. What?

THE COURT: I thought the whole culture was one of privacy, in which you certainly kept your private keys to yourself. Are you talking about CoinJoin?

MR. EKELAND: No, I'm sorry. This is a chat forum.

THE COURT: I thought you said people shared accounts.

MR. EKELAND: Chat forum accounts, because it is an account you have to pay for.

THE COURT: You don't have to pay for it, I thought

you said.

MR. EKELAND: You have to pay for Bitcoin -- you have -- for Bitcoin Talk, my understanding is you have to pay them in Bitcoin in order to get the account. And then it is a forum for people to discuss Bitcoin. It is not an -- it is not exchange. It is not like Mt. Gox or any of the other exchanges, it is a forum with people.

THE COURT: What does it cost to be able to post to Bitcoin Talk?

MR. EKELAND: I don't know what the rate is, but I know there is a rate.

MS. PELKER: Your Honor, Bitcoin Talk is a free forum. And Dr. Cabanas testified at the Daubert hearing that he absolutely would not share his account credentials with anyone else. So part of me wants to say fine, the defense can put that up if that is their defense. But I don't think that is doing the jury any sort of favors just listening to the defense here. I still have absolutely no idea what Dr. Cabanas is going to say. I don't think defense really does either. And it is clear that the disclosure is not sufficient.

MR. EKELAND: Well, for instance, there is phrases like To the Moon, which is the name of Mr. Sterlingov's VPN business. There is --

THE COURT: What about that phrase and what would

Dr. Cabanas know about the phrase?

MR. EKELAND: To the Moon, that it is a common expression for people in the Bitcoin community for people who think that Bitcoin is going to rapidly appreciate, you know, or hold --

THE COURT: I guess I am not sure why that would help the jury understand the facts of the case. But --

MR. EKELAND: I mean the VPN server in Romania, that is what it is named. That is the name of the business.

THE COURT: No. No. I understand. But the fact somebody names their server or uses an identification of To the Moon, okay, you know that person or that entity thinks that Bitcoin is going to be up in value. I don't know how that helps the jury decide whether it was Mr. Sterlingov or somebody else.

MR. EKELAND: Well, I do think it would be helpful for the jury to understand the culture so they don't think it is some sort of mysterious, you know, criminal culture. Because I think a lot of what is happening in this case is that they are trying to appeal to people's fear of the dark net or how exotic this is. When what is happening in this culture is very routine. And the other thing -- my understanding of Bitcoin Talk is you needed to -- you need to build your account for months before you could even talk to people. So I don't think that it is even that simple of a

straightforward of a forum chat. And I think it just would be -- I don't think this has to be gigantic testimony. I think it would be helpful to give the central role of what we expect the government to be asserting based on the Bitcoin Talk forum, to have somebody who was actually a user of it from early on actually discuss it a little bit and help the jury understand it.

THE COURT: I guess I am still struggling with what it is he is going to say. It is hard to make a determination as to whether it has been adequately disclosed and whether it is appropriate expert testimony. And I also wonder whether what you are really talking about once again is fact testimony rather than expert testimony and whether he has actually studied in some way these terms. Or whether he can simply say as a fact witness, you know, I was on Bitcoin Fog. I'm sorry. I was on Bitcoin Talk for years. And everyone was named To the Moon. You know, it was virtually everyone who was posting, that is what they were calling themselves. That is fact versus expert testimony. If that is the sort of thing he wants to say or --

MR. EKELAND: We are happy to -- I think that can come in as fact testimony. And we are happy to approach it that way without offering opinion, just saying this is my experience of how it operated; this is, you know, what it was like back then and he can --

THE COURT: I guess I feel as though I am going to need more of a proffer on this. I think there is too much of a risk that he is going to take the stand and say things that either really are expert opinions that are beyond his ken or there is no evidence that he studied it in any way or things that were not properly disclosed. So I need more of a proffer from him as to precisely what he wanted to say about the forum.

MR. EKELAND: Understood.

THE COURT: I think it was worth sitting here today. There is disagreement among all of you as to how you got on -- even got onto it. You think you had to pay and Ms. Pelker said you didn't. I don't know whether it is relevant or not. But he didn't testify about any of this at the Daubert hearing.

MR. EKELAND: Okay.

THE COURT: All right. All right. Should we talk about scheduling?

MR. EKELAND: Certainly, Your Honor.

THE COURT: If you don't have anything else to offer, I think the government wants to be heard on this again.

MR. BROWN: Yes, Your Honor. First of all, we did check with the key witnesses that we could get in touch with. The government has no immovable obstacles with either the October trial date or February trial date. So either one we

would be prepared to move forward with. We would urge that we get some lead time, because we -- there is a logistical challenge.

THE COURT: Right.

MR. BROWN: We are very concerned that based on the conversation this morning, not only are we not going to trial in October, but we are not going to trial in February. Because it seems like every time the Court tries to address a certain issue with the experts with disclosure, you know, the defense brings up ten new reasons why they can't possibly go forward. We would just ask that the defense go on record with a specific filing listing the conflicts of -- if they are claiming that their witnesses are not available in October, we would like them to put that in writing -- put the individual witnesses' conflicts in writing and when these plans were made. Because it seems like a lot of these are just very convenient, witnesses saying that they happen to be busy.

As some point, Your Honor, we just have to go forward. We are also concerned with the fact that the defense -- Mr. Ekeland seemed to be referencing that he may have to seek out new experts if Ms. Still somehow doesn't work out. We should be in trial right now. The time for the defense to identify new experts and to make new disclosures has long passed. And the government is just extremely concerned that if we set this out for trial in February, we will have new

expert disclosures from the defense. We will have to have a whole new round of Daubert hearings, arguments and have the Court adjudicate those disputes.

And I think in the last hearing counsel for Chainalysis mentioned that in litigation, if you set out deadlines further out, it sort of expands like air. And we are profoundly concerned that the defense seems to be prepared to raise just an endless parade of new complaints about access to their client, access to discovery, getting this heuristics discovery. Now that they have it, there are all of the reasons why they can't review it. It just seems like there is one thing after another. And we are prepared to move forward with trial. And we believe that there is a public interest in having a speedy trial for the defendant who asked for a speedy trial, who asked for a trial before February.

THE COURT: So I do want to note for the record in light of the fact that you raised this, that I do think the circumstances that we are in today are a product of the defense's failure to comply with its obligations and failure to, quite frankly, to listen to the Court and directions from the Court. And it was all of the way back in June where I said that I was sympathetic to the interest in obtaining the code or further information that could help the defense understand exactly how the program or how Reactor worked. And I said, you need to move fast on this and you need to find an

expert. We need a statement from an expert explaining what it is they need to look at. And I repeated that over the course of the summer. And I made clear over the course of the summer that there was a need -- there would be a need to sign a protective order. Mr. Ekeland himself acknowledged, of course, he wouldn't imagine a world in which he wouldn't have to sign a protective order. I think it was obvious that that was an essential element of this request.

Then when Chainalysis agreed to provide the information that it provided, which I should say I actually think is more helpful to the defense than the source code would have been. Because reading the source code and then trying to work backwards to what it is that Chainalysis provided would have been additional work where, quite frankly, I don't see any evidence that the defense actually had an expert who was capable of doing that type of analysis with the source code and working back to what the heuristics were. But what Chainalysis provided to the defense was something that didn't exist, so there was no disclosure obligation with respect to that. They created something and they created something to address the defense's request for the source code, where all along I have been clear that we need an expert, we need somebody who could explain what it was they were looking for, why they needed it and who would be prepared to enter into an appropriate protective order.

And as a result of that, and it was completely clear all along that when Chainalysis volunteered to do this, to actually I think make things more transparent than it would have been with the source code, to the defense, and to create a new document that didn't exist, in essence to do some of the work for defense in that regard, it was completely clear beyond any doubt there would be a need for a protective order in the case.

I don't know what happened and why CipherTrace didn't raise concerns until after the disclosure was made and we were on the eve of trial in the case. But in any event, either someone had had a change of heart about the case and what they wanted to do in the case or they weren't kept up to speed by the defense as to what the defense had represented to the Court the defense understood would be necessary in the case. And so that is what got us to this point anyway. And I do think that the fault for all of that lies with the defense.

But the reason that I have been perhaps more lenient than I should be and perhaps my leniency is being taken advantage of a little bit, but I do want to ensure that Mr. Sterlingov gets a fair trial and that he is in a position in which he -- his lawyers can put on the best possible defense in this case. And that is the reason I bent over backwards to provide him with additional information and additional time. He then requested just a few week continuance. And it was only

because the Court then said, well, I don't have time because I have trial that I am rolling into. And if we have to do a continuance, it is going to push the case back to February. It was only in light of that that Mr. Sterlingov then took the night to think about it and I think perhaps somewhat unhappily made the choice and said, okay, well, if it is a choice between going now or going in February, I will go in February. That is the choice I make. And I asked him clearly about that. And he said that he had considered it and discussed it with his lawyers and made the choice.

It was clear to me that his preference was still to go in a few weeks. So I thought he was going to be happy when my trial calendar opened up in a way that would allow me to try the case in October. And I really to this day have not received a very good explanation for why the defense wants to push the case back to February. The defense said that none of the experts were available. And then as soon as I asked about that, it turned out that just wasn't, in fact, true. There may be some experts who had some conflicts, but I don't know precisely. It was a misrepresentation to say none of the experts were available. Because as soon as Mr. Ekeland read me the responses they received, it was clear that some of them were and they might have particular days just like anyone would where they couldn't make it. But I think that was an overstatement. And I also, as you know all too well now,

remained puzzled by CipherTrace's response to this and why CipherTrace is taking steps to try and expedite our ability to get to trial to get the information.

So I just put that on the record as to how we got here today. It is not necessarily indicative of what I am going to rule with respect to scheduling. I do think for purposes of the record, it is important to do that. And I do think if I do decide to postpone the case to February, that would be cast in stone. And everyone has to understand that I am not moving the case if we do that, short of the most extraordinary of circumstances. By that I mean is, you know, the essential counsel in the case becoming gravely ill or something like that. But other than that, it is not moving if I move it.

MR. BROWN: Yes, Your Honor. I would just add that CipherTrace has enjoyed a lot of publicity, let's say, from the defense filings that have been covered by a particularly sympathetic crypto press that has sort of presented a one-sided view of the CipherTrace criticism of Chainalysis. So it is particularly rich for CipherTrace now to be unwilling to stand behind its expert and come before the Court and justify why they can no longer participate in this process.

THE COURT: Right. And final thing I will say is that, you know, I have -- I have also -- talking about bending over backwards for the defense have extended and extended the

deadline for expert reports. And Ms. Still only came in as an expert because the Court agreed to extend the deadline because the defense -- his prior expert didn't work out for defense. It is obviously the defense responsibility to properly vet its experts and to make sure they have experts who can testify and can withstand cross-examination and are willing to do what they need to do to testify in a case. But I have repeatedly now provided extensions to the defense. And the deadlines remain what they are at this point in the process. And either side or anyone is free to file a motion with me if they need changes to that. But given the history in this case, I am just cautioning anyone who might want to seek to adjust the deadlines further in this case that they are going to need a particularly compelling reason to do so. Because the Court has already granted extension after extension.

And I do share your concern, Mr. Brown, that, quite frankly, if I continue to say yes at every turn that this case is just not going to go to trial. And it is going to be a never-ending game. And there is going to come a time in which the Court just has to say, I'm sorry, I have given you every break I possibly can and that is the end of it and we are moving forward. I am not saying that I would deny a properly supported motion. But I am saying though it is a tough standard at this point. And I will hold folks to it. I am not going to say fine without making the appropriate showing. And

also convincing me that it will not interfere with our going to trial in February. So if that is what I decide to do here, we are going and there will be no more excuses.

MR. BROWN: Yes, Your Honor.

THE COURT: Mr. Ekeland.

MR. EKELAND: Yes. So I just got an email back from Daniel Torres asking me if I am free to do a call later. I emailed him back saying I was in Court and I would reach out to him as soon as I got out. So I will --

THE COURT: Why don't we go ahead and take a break. Why don't you come back and tell us what he says. And then I will make a decision about the continuance request.

MR. EKELAND: I think he was -- he has another lawyer on and was asking me if I could send a dial in later for a conference call.

THE COURT: Why don't you see if you can set a dial in for 3:30.

MR. EKELAND: Okay. I am happy to ask him. And then I also have -- so on Friday when the Court suggested maybe we needed a continuance to look at the stuff. And then Mr. Sterlingov said, okay, well, you know, reluctantly I want to go for February. And if we can get something earlier. We hadn't had an opportunity to check with all of our experts with the schedule. As the Court instructed over the lunch break, I got details as much as I could on people's schedules.