# 24-3161

# United States Court of Appeals for the District of Columbia

THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
Hon. Randolph D. Moss
United States District Court Case 1-21-cr-00399-RDM-1

## APPENDIX
## Volume XI of XVII (Pages Appx4401 - Appx4840)

TOR EKELAND, ESQ.
TOR EKELAND LAW PLLC
*Attorneys for Defendant-Appellant*
30 Wall Street, 8th Floor
New York, New York 10005
(718) 737-7264
tor@torekeland.com

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
*Attorneys for Defendant-Appellant*
800 Third Avenue, 20th Floor
New York, New York 10022
(212) 446-2346
maf@fernichlaw.com

MAKSIM NEMTSEV, ESQ.
MAKSIM NEMTSEV PC
*Attorneys for Defendant-Appellant*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
max@mnpc.law

AARON DANIEL, ESQ.
ASYMMETRIC LEGAL
*Attorneys for Defendant-Appellant*
11900 Biscayne Blvd, Suite 400
Miami, Florida 33181
(305) 979-9296
aaron@asymmetric.legal

*(See Inside Cover for Additional Counsel)*

3914


**ELECTRONIC PARALEGAL**

AMY C. COLLINS, ESQ.
THE LAW OFFICE OF
   AMY C. COLLINS
*Attorneys for Defendant-Appellant*
888 17th Street, NW, Suite 1200
Washington DC 20006
(228) 424-0609
amy@amyccollinslaw.com

# TABLE OF CONTENTS

District Court Docket – US v. Sterlingov, 21-CR-00399-RDM .............Appx001

Protective Order of Governing Discovery of Hon. Randolph D. Moss,
Dated September 17, 2021 (ECF Doc. No. 18) ......................................Appx074

Preliminary Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 336) ......................................Appx079

Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 14, 2024 (ECF Doc. No. 338) ....................................Appx085

Judgment in a Criminal Case of Hon. Randolph D. Moss,
Dated November 13, 2024 (ECF Doc. No. 340) ....................................Appx091

Transcript of Motion Hearing, Dated January 13, 2023
(ECF Doc. No. 114) .............................................................................Appx099

Transcript of Motion Hearing, Dated January 31, 2023
(ECF Doc. No. 115) .............................................................................Appx190

Transcript of Motions Hearing, Dated June 16, 2023
(ECF Doc. No. 223) .............................................................................Appx345

Transcript of Motions Hearing, Dated June 23, 2023
(ECF Doc. No. 224) .............................................................................Appx501

Transcript of Motions Hearing, Dated July 19, 2023
(ECF Doc. No. 225) .............................................................................Appx682

Transcript of Continued Motions Hearing, Dated July 20, 2023
(ECF Doc. No. 226) .............................................................................Appx895

Transcript of Motions Hearing, Dated August 22, 2023
(ECF Doc. No. 228) ...........................................................................Appx1040

Transcript of Continued Motions Hearing, Dated August 23, 2023
(ECF Doc. No. 229) ...........................................................................Appx1266

Transcript of Motions Hearing, Dated August 29, 2023
(ECF Doc. No. 231) ...........................................................................Appx1466

Transcript of Pretrial Conference, Dated September 7, 2023
(ECF Doc. No. 232) .................................................................Appx1524

Transcript of Pretrial Conference, Dated September 8, 2023
(ECF Doc. No. 233) .................................................................Appx1741

Transcript of Pretrial Conference, Dated September 13, 2023
(ECF Doc. No. 234) .................................................................Appx1861

Transcript of Pretrial Conference, Dated September 15, 2023
(ECF Doc. No. 235) .................................................................Appx1999

Transcript of Pretrial Conference, Dated September 18, 2023
(ECF Doc. No. 236) .................................................................Appx2141

Transcript of Pretrial Conference, Dated September 21, 2023
(ECF Doc. No. 237) .................................................................Appx2235

Transcript of Motion Conference, Dated November 13, 2023
(ECF Doc. No. 238) .................................................................Appx2302

Transcript of Jury Trial, Dated February 12, 2024
(ECF Doc. No. 276) .................................................................Appx2350

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) .................................................................Appx2620

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) .................................................................Appx2688

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 278) .................................................................Appx2825

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 327) .................................................................Appx2948

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) .................................................................Appx3074

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) .................................................................Appx3189

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ...................................................................Appx3331

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ...................................................................Appx3446

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 281) ...................................................................Appx3572

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 328) ...................................................................Appx3697

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ...................................................................Appx3858

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ...................................................................Appx3982

Transcript of Jury Trial, Dated February 23, 2024
(ECF Doc. No. 329) ...................................................................Appx4122

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ...................................................................Appx4251

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ...................................................................Appx4394

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 284) ...................................................................Appx4419

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 330) ...................................................................Appx4550

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ...................................................................Appx4581

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ...................................................................Appx4698

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 285) ...................................................................Appx4836

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 286) ..................................................................Appx4955

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 331) ..................................................................Appx5074

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 287) ..................................................................Appx5198

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 332) ..................................................................Appx5344

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ..................................................................Appx5359

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ..................................................................Appx5496

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 289) ..................................................................Appx5621

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 333) ..................................................................Appx5762

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 290) ..................................................................Appx5900

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 334) ..................................................................Appx6004

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ..................................................................Appx6087

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ..................................................................Appx6190

Transcript of Jury Trial, Dated March 11, 2024
(ECF Doc. No. 292) ..................................................................Appx6324

Transcript of Jury Trial, Dated March 12, 2024
(ECF Doc. No. 293) ..................................................................Appx6344

Virtual Asset Analysis Expert Report of Luke Scholl,
Dated December 8, 2022..............................................................Appx6400

Expert Report #1 of Elizabeth Bisbee (Nov. 2022)......................Appx6465

Expert Report #2 of Elizabeth Bisbee (Dec. 2022) .....................Appx6493

Expert Report #3 of Elizabeth Bisbee (Jul. 2023)......................Appx6522

CS-Mazars Expert Report - Device Review Summary,
Dated May 5, 2023 .....................................................................Appx6529

CS-Mazars Expert Report - IP Overlap Analysis,
Dated November 9, 2022 ............................................................Appx6532

CS-Mazars Expert Report - IP Graph Data Excel File..............Appx6539

Criminal Complaint, Dated April 26, 2021 (ECF Doc. No. 1) .............Appx6542

Arrest Warrant, Dated April 26, 2021 (ECF Doc. No. 5)....................Appx6556

Indictment, Filed June 14, 2021 (ECF Doc. No. 8) ............................Appx6557

Superseding Indictment, Filed July 18, 2022 (ECF Doc. No. 43) .......Appx6561

Defendant's Supporting Memorandum of Law,
Dated August 1, 2022 (ECF Doc. No. 46) ...........................................Appx6567

Attachment to Memorandum of Law -
Proposed Order of Hon. Randolph D. Moss Granting Defendant's
Motion to Dismiss (ECF Doc. No. 46-1) ....................................Appx6585

Attachment to Memorandum of Law -
Defendant's Notice of Motion to Dismiss, Dated August 1, 2022
(ECF Doc. No. 46-2) ...................................................................Appx6586

Government's Opposition to Motion, Filed August 29, 2022
(ECF Doc. No. 52) ..............................................................................Appx6589

Defendant's Reply to Government's Opposition to Motion,
Dated September 7, 2022 (ECF Doc. No. 57) ......................................Appx6623

Exhibit A to Defendant's Reply -
Second Declaration of Eric Garland, Dated September 7, 2022
(ECF Doc. No. 57-1) ....................................................................Appx6635

Defendant's Motions in *Limine*, Dated October 24, 2022
(ECF Doc. No. 59) .......................................................................Appx6644

Exhibit A to Motions in *Limine* -
Letter from Tor Ekeland to Christopher B. Brown and
C. Alden Pelker, Dated September 23, 2022, with Exhibit A
(ECF Doc. No. 59-1) ....................................................................Appx6664

Defendant's Opposition to the Government's Motions in *Limine*,
Dated November 7, 2022 (ECF Doc. No. 68) .......................................Appx6680

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated March 6, 2023 (ECF Doc. No. 116) ..........................................Appx6689

Notice of Bill of Particulars for Forfeiture, Filed May 17, 2023
(ECF Doc. No. 119) .....................................................................Appx6709

Defendant's Notice of Intent to Present Expert Testimony,
Dated July 7, 2023 (ECF Doc. No. 145) .............................................Appx6711

Exhibit A to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Francisco Cabanas (ECF Doc. No. 145-1) ............................Appx6716

Exhibit B to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Itiel Dror (ECF Doc. No. 145-2) .........................................Appx6725

Exhibit C to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jeffrey Fischbach (ECF Doc. No. 145-3) ....................................Appx6731

Exhibit D to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jonelle Still (ECF Doc. No. 145-4) ...........................................Appx6737

Exhibit E to Notice of Intent -
Summary of Qualifications and Expected Testimony for
J.W. Verret (ECF Doc. No. 145-5)................................................Appx6741

Supplemental Summary of Qualifications and Expected
Testimony for Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 157) .......................................................................Appx6756

Notice of Expert Report for Defense Expert Jonelle Still of
Ciphertrace, Dated August 8, 2023 (ECF Doc. No. 159) .....................Appx6761

Attachment to Notice of Expert Report -
Defense Expert Report of Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 159-1) ...............................................................Appx6764

Exhibit A to Notice of Expert Report -
Data Credibility in Cryptocurrency Investigations of Ciphertrace
(ECF Doc. No. 159-2) ...............................................................Appx6805

Exhibit B to Notice of Expert Report -
Article Titled "Bitcoin: A Peer-to-Peer Electronic Cash System"
(ECF Doc. No. 159-3) ...............................................................Appx6822

Notice of Bill of Particulars, Filed August 28, 2023
(ECF Doc. No. 173) .......................................................................Appx6832

Defense Response to Government's Motion to Admit Certain
Exhibits, Dated September 4, 2023 (ECF Doc. No. 177) .....................Appx6834

Notice of Source Code Expert Bryan Bishop Regarding Independent
Analysis of Chainalysis Reactor Source Code and Request for
Production of Chainalysis Reactor Source Code and Relevant
Related Brady Material, Dated September 5, 2023
(ECF Doc. No. 179) .......................................................................Appx6843

Chainalysis' Notice in Response to the Court's Request Regarding
Protective Order, Dated September 12, 2023
(ECF Doc. No. 195) .......................................................................Appx6860

Exhibit A to Notice in Response -
[Proposed] Heuristic Information Protective Order of
Hon. Randolph D. Moss (ECF Doc. No. 195-1)...........................Appx6862

Exhibit B to Notice in Response -
[Proposed] Heuristic Information Protective Order to Jonelle Still
of Hon. Randolph D. Moss (ECF Doc. No. 195-2).......................Appx6869

Heuristic Information Protective Order to Jonelle Still of Hon.
Randolph D. Moss, Dated September 13, 2023 (ECF Doc. No. 196)...Appx6877

Notice Regarding Court's Proposed Protective Order Governing
Review of Chainalysis' Proprietary Information,
Dated September 20, 2023 (ECF Doc. No. 199) .................................Appx6884

Notice Regarding Ciphertrace Expert Testimony and Review of
Latest Chainalysis Production, Dated September 22, 2023
(ECF Doc. No. 205) ...............................................................Appx6888

Government's Response to September 18, 2023 Minute Order
Regarding Defendant's Access to Sensitive Heuristics Information
Provided by Chainalysis, Filed September 22, 2023
(ECF Doc. No. 206) ...............................................................Appx6892

Defendant's Opposition to Government's Response to
September 18, 2023, Minute Order Regarding Defendant's Access
to Sensitive Heuristics Information Provided by Chainalysis,
Dated September 29, 2023 (ECF Doc. No. 207) .................................Appx6901

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 4, 2023 (ECF Doc. No. 210) .................................Appx6912

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 30, 2023 (ECF Doc. No. 213) .................................Appx6930

Defendant's  Motion to Exclude any Testimony About Deepweb
Marketplaces, Dated February 8, 2024 (ECF Doc. No. 247)...............Appx6942

Attachment to Motion to Exclude -
[Proposed] Order of Hon. Randolph D. Moss
(ECF Doc. No. 247-2) ...............................................................Appx6950

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated February 29, 2024 (ECF Doc. No. 259)......................................Appx6951

Final Jury Instructions and Charges, Filed March 7, 2024
(ECF Doc. No. 265) ...............................................................................Appx6982

Government's Motion for Preliminary Order of Forfeiture,
Filed June 7, 2024 (ECF Doc. No. 297)................................................Appx7061

      Attachment to Motion for Preliminary Order of Forfeiture -
      Proposed Preliminary Order of Forfeiture Hon.
      Randolph D. Moss (ECF Doc. No. 297-1)....................................Appx7072

Defendant's Opposition to Government's Motion for Preliminary
Order of Forfeiture, Dated June 21, 2021 (ECF Doc. No. 305) ...........Appx7078

      Exhibit A to Defendant's Opposition -
      Article Titled "Chainalysis: Most Mixed Bitcoin Not Used
      For Illicit Purposes", Dated August 26, 2019
      (ECF Doc. No. 305-1) ..................................................................Appx7095

      Exhibit B to Defendant's Opposition -
      Blockchain Address Search Result from Blockchain.com
      (ECF Doc. No. 305-2) ..................................................................Appx7107

Government's Memorandum in Aid of Sentencing,
Filed August 1, 2024 (ECF Doc. No. 314)............................................Appx7112

Sentencing Memorandum on behalf of Roman Sterlingov,
Dated August 15, 2024 (ECF Doc. No. 321) ........................................Appx7157

Memorandum Opinion of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 337) ....................................Appx7194

Defendant's Notice of Appeal, Dated November 19, 2024
(ECF Doc. No. 343) ...............................................................................Appx7214

Memorandum for All Department Employees from The Deputy
Attorney General, Subjecting "Ending Regulation by Prosecution",
Dated April 7, 2025...............................................................................Appx7217

**Trial Exhibits:**

Trial Exhibit 601 -
Darknet Market Vendor Transaction Summary
(Document in Evidence and to be Produced Upon Request Due
to Volume) ......................................................................................Appx7221

Trial Exhibit 624................................................................................Appx7222

Trial Exhibit 625................................................................................Appx7223

Trial Exhibit 626................................................................................Appx7224

Trial Exhibit 627................................................................................Appx7225

Trial Exhibit 628(A)...........................................................................Appx7226

Trial Exhibit 628(B)...........................................................................Appx7227

Trial Exhibit 629................................................................................Appx7229

Trial Exhibit 630(A)...........................................................................Appx7230

Trial Exhibit 630(B)...........................................................................Appx7244

Trial Exhibit 631................................................................................Appx7247

Trial Exhibit 632................................................................................Appx7248

Trial Exhibit 633................................................................................Appx7252

Defense Exhibit 138 -
The-Message-Game, Written by Ice White .........................................Appx7253

Defense Exhibit 139 -
Extracted Page from The-Message-Game, Written by Ice White ......Appx7413

Government Exhibit 721 and Defense Exhibit 143 -
Boox Chat ..........................................................................................Appx7414

Exhibit B to Fischbach Declaration -
Declaration of Jeffrey M. Fischbach, for Defendant, Dated August 14, 2024,
with Attachment
(ECF Doc. No. 321-2) ...............................................................Appx7415

You know, part of our proof is proving that there was a federal offense that was being promoted or facilitated by Bitcoin Fog. And frankly, I think the jury does deserve to see the kinds of activity that Bitcoin Fog helped to promote and that the defendant helped to promote.

THE COURT: What is in column H, which I believe Mr. Hassard raised as an issue?

MR. BROWN: It's further description.

THE COURT: Further description. I see. Okay. So it is similar.

I suppose there's certainly no reason to have both columns, right?

MR. BROWN: No, Your Honor. One or the other.

THE COURT: All right. Let me hear from Mr. Ekeland, then.

MR. EKELAND: First, Your Honor, as the Court knows, no money from Welcome to Video was deposited into Bitcoin Fog. What we are discussing here is, I believe, a little under $1,000, I think it was, like, 989, somewhere, of funds that users ran through Bitcoin Fog and then sent to Welcome to Video. There's no evidence anywhere that I'm aware of that the administrator of Bitcoin Fog knew what these funds were going to be used for.

Additionally, it's my understanding that this spreadsheet is just a spreadsheet for one particular user.

I've been told you can look at column B, and that this is a spreadsheet for one user of Bitcoin Fog -- not Bitcoin Fog -- of Welcome to Video, and it's not clear to me that there's actually any evidence linking this user to funds that they ran through Bitcoin Fog.

THE COURT: I'm sorry. Back up and explain that to me.

MR. EKELAND: Could we see column B?

This was a note I was handed. Somebody was looking at this. So, it's my understanding that, yes, you can see the user name in column B.

THE COURT: Right. I guess what I'm curious more about is whether the Bitcoin address is associated with output from Bitcoin Fog.

MR. EKELAND: The government is going to have to answer that. I'm not 100 percent positive on that.

THE COURT: Isn't that all that matters for present purposes? Because we don't have user names of Bitcoin Fog.

MR. EKELAND: No, you don't. But I think the main point here is -- I mean, the money laundering statutes matches the word "proceeds" 13 times. It's not proceeds -- there's no evidence there's any proceeds from any crime for the funds that are coming out of Bitcoin Fog.

I think the point number 2 is that this is probative of nothing because it's already in the record, and the jury has

already heard that Welcome to Video is a CSAM site. So to the extent that this evidence is -- is relevant, it's on an issue that the jury has already received evidence on. I don't think anybody is disputing that Welcome to Video is a CSAM site. What the dispute is, do these highly inflammatory and prejudicial titles listed in G and H, and I would even argue column F, do they get, you know, put in front of the jury?

I mean, if -- I don't even want to read these lines into the record because I think they're -- I mean, it's pretty heinous and it proves nothing because it's going to a point that's already been made to the jury.

THE COURT: So what do you say to Mr. Brown's suggestion, then, that there at least be an instruction to the jury, if we do redact this, in which I say that we've redacted the names of the videos because the jury doesn't need to know those, but they do -- everyone agrees that they reflect that these funds were used for purposes of engaging in criminal behavior involving the abuse of children, or whatever the right language is?

MR. EKELAND: I think that's unnecessary because the jury already knows and has been told, and it has -- I don't think it's been disputed that Welcome to Video is a CSAM site, and that goes to the --

THE COURT: But knowing that's maybe a little bit different from knowing that these particular funds that went

from Bitcoin Fog were then used for purposes of committing a violation of the U.S. criminal law.

MR. EKELAND: Well, there's a third point here that Mr. Fischbach has pointed out for me, because he does work CSAM cases, and that's -- my understanding is that in CSAM cases, the -- when it comes to videos and their titles like this, the National Center for Exploited and Missing Children runs, basically -- if I'm understanding this, he can speak better than me to it -- they basically authenticate the titles because a high degree of the time it's not accurate, these titles, because what they're being used for is SEL purposes. And it's my understanding that the National Center For Exploited and Missing Children hasn't verified the accuracy of any of these titles.

So I think -- I don't want to take up too much of the Court's time, but I think our three points, essentially, are: There is no evidence of money laundering, you don't have any evidence of the intent, and all of these funds, the small amount, $989, are going post-mix from Bitcoin Fog into Welcome to Video.

Number two, it's probative of nothing because that's -- it's already in evidence that Welcome to Video is a CSAM site.

And number three --

THE COURT: As I said before, it's not in evidence

that these particular funds were then used for a purpose that violated U.S. criminal law.

MR. EKELAND:  In terms of what --

THE COURT:  Maybe a child abuse site, but there may be videos on that site that don't violate the statute, and you don't know whether the funds are going for that purpose or not, right?  I mean, it could be the site, 99.9 percent of what the site does is a crime and .1 percent is not.

MR. EKELAND:  And that these funds could go and being used for innocent purposes?

THE COURT:  Well, yeah.  Maybe not even innocent, but not something that violates the U.S. criminal law.  If it was, for example, you know, videos of children that don't qualify under the statutory definition, for example.

MR. EKELAND:  I would be a little surprised if that's what the jury -- anybody on the jury would think that the Welcome to --

THE COURT:  But then why not stipulate to the fact that these are titles --

MR. EKELAND:  I'm happy to stipulate that Welcome to Video was a CSAM site.

THE COURT:  But what -- that -- what you've already said is in the record.  But I guess the question I have, though, is what about stipulating to the fact that the funds in these accounts that are listed for -- addresses column A, that

those Bitcoin were then used on the site to purchase videos, you know, involving the sexual abuse of children in a manner that violates U.S. law?

MR. EKELAND: My concern there is that it might be confusing to the jury in that they're going to then take the additional step to saying that the Bitcoin Fog administrator knew that this was going to be the use of funds post-mix, and there's nothing in the record that supports that proposition.

I think -- I mean --

THE COURT: No, I take that point. But, I take it that the government's argument more generally is that -- and I know you disagree with this characterization, but their argument is, is that the site was a money laundering site -- that Bitcoin Fog was a money laundering site, intended to allow people to engage in criminal activity, whatever it might be.

And, you know, it may be that, for example, there were drug transactions involving the purchase of fentanyl that were done with this site. You could make the point that, you know, Mr. Sterlingov had no idea that people were purchasing fentanyl. But the government would be entitled to argue, well, when you set up a site that launders money on the dark web, people know, and you can reasonably infer that it's going to be used for purposes like that.

And that's just sort of your differences in the arguments. Your argument here is this is largely a privacy

Appx4406

site, and the government's argument is that this was a site for laundering funds for illegal purposes. And the government's argument is that Mr. Sterlingov may not have known what each transaction was, but he knew and intended to profit from the fact that people were laundering funds for engaging in conduct of this type, and that it's not a big surprise that people are laundering money through an .onion site for the purposes of purchasing child pornography.

MR. EKELAND: But there's no money coming into Bitcoin Fog from Welcome to Video. This is all --

THE COURT: But there is money coming in from people who are allegedly laundering their money through the site and paying a fee to launder the money through their site and that, allegedly, Mr. Sterlingov is profiting from people who might not be going to those sites to purchase the child porn if they thought they could be traced. But they say, Ah, I can't untrace because I can use Bitcoin Fog and, therefore, I can -- and, therefore, he's thus facilitating, allegedly, the transactions.

MR. EKELAND: I guess I'm just confused under the theory of money laundering here because there's no evidence of any money laundering, of money going through Bitcoin Fog. What you have is post-mix use of the funds, and under this type of legal theory, you're implicating just everyday, you know, brick-and-mortar banks in the criminal acts of people

withdrawing money from the banks and then using it to buy drugs or commit any kind of crime.

I just -- the -- you know, I think what's lacking here is any kind of evidence that there is any kind of money laundering gone on here and that there's any kind of intent. And I don't see how, you know, if you just look at Bitcoin Fog like it was a bank that someone was passing money through and just taking money out of, I don't see how you can attribute the intent to say, whatever, Chase Bank, if somebody takes $40 out and then buys child porn. I think you need something more there.

THE COURT: Right. But the analogy to a bank doesn't quite hold. You know, the analogy might, you know, hold better if, you know, when we're dealing with a money laundering operation, and there were allegedly cartels in Mexico that were then sending money to a money laundering site and some of that money was being then used for financing the continued operations of the cartels, right?

MR. EKELAND: No. I think the issue --

THE COURT: The whole point of a bank is that you can trace what's going on. And the whole point of this is to avoid tracing it, right?

MR. EKELAND: The point being that it's where you attribute the intent and what evidence there is for intent and the use of these funds. And there are legitimate uses for

mixers, as the Court knows, and I think the Court has acknowledged.

THE COURT: Right.

MR. EKELAND: And I don't want to belabor the point, Your Honor, because I think the Court understands it, is that you've got post-mix funds here. You've got no premixed funds. And I think that's one thing that stands out in these charts, is that in all the other markets, you've got some kind of, you know, deposit into Bitcoin Fog. And, you know, here, this is the one market where there are no deposits from it. And I think you have to take a leap to get to the intention of the money laundering.

And I'm going to stop right there.

THE COURT: Leap to get to what?

MR. EKELAND: A leap to get to the intentionality or the intent to money launder upon the operator of Bitcoin Fog.

THE COURT: Right. I guess I'm not persuaded by that argument. But I'm still coming back to the question that I had before, just whether these titles are so inflammatory that there ought to be some way of addressing it. And I don't know if you have anything more you want to add on that point.

MR. EKELAND: I just would submit that if the Court looks at line 26 and in column G and -- just -- I don't want to even read that into the record, but I think --

THE COURT: They're horrible. I agree.

MR. EKELAND: Yeah, it's horrible. So, I mean, I think, you know, the defense's point is made, unless the Court has any other -- I'm happy to answer any other questions.

THE COURT: All right. Let me hear again from Mr. Brown.

MR. BROWN: Your Honor, I have to say I'm a little bit surprised and a little disturbed that Mr. Ekeland seems to be disputing that these videos establish child pornography offenses. I heard that during -- when he brought up that maybe these aren't authenticated by NCMEC, that is factually untrue. But if this is all going to be disputed by the defense, an element of proof on which the government bears the burden, then we are entitled to present relevant and admissible evidence on that element.

If they're willing to stipulate that there is -- and, Your Honor, I would direct you to Exhibit 623, which was introduced into evidence during Mr. Scholl's testimony, he looked at ten different Welcome to Video users and the addresses associated with them. Each of these ten users is a known Welcome to Video user and, also, had funds coming from Bitcoin -- used Bitcoin Fog. If we can stipulate --

THE COURT: Am I correct in my assumption or understanding that the -- there was actually tracing of funds coming out of Bitcoin Fog, and maybe through some intermediate steps, but eventually then going to expenditures on Welcome to

Video?

MR. BROWN: Yes, Your Honor. And to defense counsel's point, there wasn't any money coming out. That's not how Welcome to Video worked. It wasn't like a drug market where you might upload funds and store funds and bring them -- and then, you know, withdraw funds. It was a one-way buy-in sort of server idea, that you paid a nominal amount of Bitcoin to buy into the service.

And I think Mr. Scholl testified this is not big money business, the way that drugs are. It's a different model. And, so, it's not at all surprising that there are no funds coming out of Welcome to Video. And if the argument is that there's some de minimis exception for facilitating child pornography offenses, you know, he can make that argument to the jury, but I don't think that's a legally defensible argument.

Your Honor, the point here is for each of these corresponding users listed in 623, there is a spreadsheet like we were just looking at listing the user's activity on Welcome to Video. And we would just ask -- and, again, like, I don't know why the defense is disputing that this is child pornography, because if that is an issue in dispute, then maybe we need to show that to the jury, and none of us wants to do that. But if they are willing to stipulate that each of these users committed child pornography offenses, that is part of the

element.

Defense counsel is talking about other elements.  The defendant's knowledge, his *mens rea*, those are separate elements that may be in dispute.  We believe we have our evidence for that.  But, solely the evidence that Bitcoin Fog transmitted funds that were known to the defendant -- that may be in dispute -- to have been -- that were, quote, "intended to be used to promote or support unlawful activity," intended to be used to promote or support unlawful activity.  If you are mixing funds to buy into Welcome to Video, you are trying to promote or support unlawful activity.  That's the movement of funds.

THE COURT:  Right.

MR. BROWN:  And so if the defendant knowingly operated an unlicensed money transmitting business that did that activity, that is an element of the offense.  So if they are willing to stipulate that each of these ten users committed child pornography offenses in violation of a specific federal statute, then I think that we can --

THE COURT:  With the funds associated with those addresses.

MR. BROWN:  Yes.  Yes, Your Honor -- then I think that we can go ahead and redact columns G and H.  But, short of that, it sounds like the defense intends to dispute this element, in which case we are entitled to put our proof to the

jury.

THE COURT: I understand.

Anything else, Mr. Ekeland, on this?

MR. EKELAND: I would just note that I'm not aware of any evidence in the record that any of these listed users were ever convicted of child pornography. I think the --

THE COURT: But I think we've argued -- and I hate to go down this road, is that we would actually have to show these videos to the jury so the jury could conclude that the person did violate the statute.

MR. EKELAND: I don't think it's in dispute that the Welcome to Video sold child pornography.

THE COURT: The question is: Were the videos purchased with the funds associated with the addresses listed in the chart? Were those -- did those videos constitute a child pornography offense for purposes of the federal statute? I think that's the question. And --

MR. EKELAND: Again --

THE COURT: -- if that's in dispute, I think it's fair for the government to prove its case up, one way or the other.

MR. EKELAND: And so then what the Court is suggesting is that we simply redact G and H and instruct the jury with -- I just would like to hear the instruction again.

THE COURT: I'm not saying anything in this regard.

I think what Mr. Brown said is that they would be willing to withdraw their reliance on those two columns if the defense were willing to stipulate. And that's not my -- I don't make anyone stipulate one way or the other on something.

And so the question is whether the parties can reach an agreement on this issue. If they can, that's all the better, from my perspective. And if they can't, then I think I have to allow in at least some of this evidence so the government can carry its burden.

MR. EKELAND: And if I understand the Court correctly, the Court is saying you would screen child pornography for the jury?

THE COURT: You know, it happens -- if we had to, if it got to that point, I don't know. If it really is disputed that these sites were actually child porn -- and I think Mr. Brown is right, you did yourself just a second ago say it hasn't been authenticated as child porn, so if that's disputed in the case, then I suppose that's the case. It's horrific, but it happens in cases. And, you know, I feel horrible for the jury to have to put them through that. But if it is a disputed fact, the government is entitled to carry its burden on that.

MR. EKELAND: Then I would suggest that what we simply do is stipulate to the fact that Welcome to Video sold child pornography.

THE COURT: You and I are sort of going around in circles on this because you've said that a couple times, and each time you say it I say that's not what I think is at issue here. What's at issue is whether these particular addresses that are in the chart the government has produced, which the government contends -- I don't know whether it's true or not, but the government contends could be tied back to outputs from Bitcoin Fog, whether those addresses, the funds -- the Bitcoin in those addresses were used for purposes of purchasing child pornography.

MR. EKELAND: We'll stipulate to that --

THE COURT: All right. So --

MR. EKELAND: -- under the assumption that G and H are redacted. And also, I think we would like to see column F redacted as well.

THE COURT: Which is F? Oh, no. F is the one that just says "Child Porn," right?

MR. EKELAND: Uh-huh.

THE COURT: I don't see why that would need to be redacted.

MR. EKELAND: And then, you know, in that, also just -- it's my understanding that these addresses are also just tied back through Chainalysis clustering, and that we would still be able to argue that clustering point.

THE COURT: Of course. Sure.

MR. EKELAND:  I think that's a solution the defense can live with, if that's acceptable.

THE COURT:  I will let the parties sit down and see if they can work something out because, as I said, I don't tell anyone to stipulate to something.  And so if you can work out a stipulation that's acceptable to both parties, that's great as far as I'm concerned.  And if you can't, then we'll just come back to this issue.

MR. EKELAND:  Okay.  Yes, Your Honor.

THE COURT:  Anything else to raise while we have some time without the jury today?

MR. EKELAND:  No.  I think the Court gave us until tomorrow to respond to the government's latest motion in limine.

THE COURT:  Yes.

MR. EKELAND:  And then we're sitting Friday morning, right?

THE COURT:  Correct.

MR. EKELAND:  And then tomorrow is until 1?

THE COURT:  I'm sorry?

MR. EKELAND:  Tomorrow we're stopping at 1 p.m.?

THE COURT:  Correct.

MR. EKELAND:  And then Wednesday and Thursday are full days, and then we sit Friday morning?

THE COURT:  Correct.

MR. EKELAND:  No other questions, Your Honor.

THE COURT:  All right.  Thank you.

Anything else from the government while we're here?

MR. BROWN:  No.  Just that we are concerned about getting through the case, and if there's any way -- I mean, we understand the earlier stop times are necessary.  If there's any way we could start at 8:30 or tell the jury to start at 8:30?

THE COURT:  Well, I can tell the jury to be here by 8:30.  I'm happy to do that, so we can start promptly at 9.  And I can tell you, we have two persistently late jurors, and if at some point if it continues, we could discuss whether those jurors should be dismissed because they're consistently 20 to 30 minutes late every day.

MR. BROWN:  Yes, Your Honor.

THE COURT:  I tried to address that today.  And the deputy clerk has also not singled them out, but has told the jury how important it is that they all arrive on time.

MR. BROWN:  Yes, Your Honor.

THE COURT:  If there's anything else we can do time-wise, I'm all in favor of that.  And I also just ask the parties to do your best to ask questions once, rather than twice, and be as streamlined as you can in your presentations.

Okay.  All right.  Well, thank you.  I will see you all at 9 a.m. tomorrow morning.

*   *   *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 26th day of February, 2024

_____

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C.  20001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

ROMAN STERLINGOV,

        Defendant.
_____/

Criminal Action
No. 1: 21-399

Washington, DC
February 27, 2024

9:19 a.m.

MORNING PROCEEDINGS


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:    CATHERINE PELKER
                    U.S. DEPARTMENT OF JUSTICE
                    950 Pennsylvania Ave NW
                    Washington, DC 20530

                    CHRISTOPHER BRODIE BROWN
                    DOJ-USAO
                    601 D Street, N.W.
                    Suite 5.1527
                    Washington, DC 20530

                    JEFFREY PEARLMAN
                    DOJ-CRM
                    Ccips
                    US Dept of Justice
                    1301 New York Ave NW
                    Washington, DC 20005


APPEARANCES CONTINUED ON NEXT PAGE

APPEARANCES CONTINUED

For the Defendant:　　　TOR EKELAND
　　　　　　　　　　　　MICHAEL HASSARD
　　　　　　　　　　　　TOR EKELAND LAW PLLC
　　　　　　　　　　　　30 Wall Street
　　　　　　　　　　　　8th Floor
　　　　　　　　　　　　Brooklyn, NY 10005


Court Reporter:　　　　SHERRY LINDSAY
　　　　　　　　　　　　Official Court Reporter
　　　　　　　　　　　　U.S. District & Bankruptcy Courts
　　　　　　　　　　　　333 Constitution Avenue, NW
　　　　　　　　　　　　Room 6710
　　　　　　　　　　　　Washington, DC 20001

TABLE OF CONTENTS

WITNESSES

Ilya Lichtenstein

    Direct examination continued by Mr. Pelker    4
    Cross-examination by Mr. Ekeland    23


Sarah Glave

    Direct examination by Mr. Brown    38
    Cross-examination by Mr. Ekeland    76
    Redirect examination by Mr. Brown    89

Valarie Mazars de Mazarin

    Direct examination by Ms. Pelker    94

EXHIBITS

Government Exhibit 305    46
Government Exhibit 719B    65
Government Exhibit 306    68
Government Exhibit 305A    74
Government Exhibit 51    90

P R O C E E D I N G S

THE COURT:  All right.  As you may know, we were waiting for a juror but all of the jurors are here now.

Do you want to get the witness first?

THE COURTROOM DEPUTY:  They are bringing him out now, Judge.

THE COURT:  Okay.

(Jury in at 9:42 a.m.)

THE REPORTER:  Criminal case 21-399, *United States of America versus Roman Sterlingov.*

Would counsel please approach the podium and state your name for the record, starting with government counsel.

MR. PEARLMAN:  Good morning, Your Honor.  Jeff Pearlman and Chris Brown and C. Alden Pelker for the government.

THE COURT:  Good morning.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for defendant, Roman Sterlingov, who is present in court.  And joining me at counsel table is Michael Hassard.

THE COURT:  Good morning.

Mr. Pearlman, you may proceed.

MR. PEARLMAN:  Thank you, Your Honor.

DIRECT EXAMINATION CONTINUED

BY MR. PEARLMAN:

Q.  Mr. Lichtenstein, I want to ask you a little bit about

yourself. Before I do, I want to make one thing clear. Did you run Bitcoin Fog?

A. Did I run it? No.

Q. Okay. Do you know someone named Roman Sterlingov?

A. I never met him, no, no.

Q. I want to take you back to the early 2010s or so. What were you doing at that time?

A. I was an entrepreneur. I started a tech company.

Q. You started a tech company. Did you have a tech background?

A. Yeah. I taught myself to code and IT and things like that.

Q. Were you a computer science major in college?

A. No. I studied psychology in college.

Q. During the time that you started the tech company, did you meet Ms. Morgan who you testified about yesterday?

A. Yes.

Q. At some point, while you were working at this tech company, did you become aware of something called cryptocurrency?

A. Yes.

Q. And how did you become aware of cryptocurrency?

A. So I was living in San Francisco at the time and talking to a lot of people who were in the tech industry. And so someone told me about Bitcoin like at a meet-up or something

like that.

Q. Did you purchase some cryptocurrency?

A. Yeah, I did a little bit.

Q. Did you ever buy drugs with cryptocurrency?

A. Yes, I did.

Q. And what kind of drugs did you buy with cryptocurrency?

A. So I went on darknet markets and several times for personal use, I purchased psychedelic drugs, so primarily mushrooms and LSD.

Q. How were you able to get onto these markets? What browser did you use?

A. I used Tor browser.

Q. Sir, how was your business doing around 2013, 2014?

MR. EKELAND: Objection; relevance.

THE COURT: Overruled.

THE WITNESS: I mean, it was a startup, so it was definitely a struggle for sure. So it had its ups and downs. It was a little bit of a rollercoaster.

BY MR. PEARLMAN:

Q. At some point, did you decide you wanted to hack something?

A. Yes.

Q. Can you briefly explain what it means to hack something?

A. To gain unauthorized access to a computer system and to obtain data from it.

Q.   Do you know what Bitfinex is?

A.   Yes.  It is a cryptocurrency exchange.

Q.   Did you decide to hack Bitfinex?

A.   Yes, I did.

Q.   Why?

A.   I mean, at the time, I think my business was struggling and I was feeling very burned out from it.  And I felt like very selfish.  I felt like I didn't really care about anyone else.  I just wanted to get mine.  I wanted to access the cryptocurrency on it.  I wanted to make some money.

Q.   Were you able to eventually access cryptocurrency on Bitfinex that did not belong to you?

A.   Yes.

Q.   Briefly, how were you able to do that?

A.   It was over a period of a few months.  I was able to access one server that Bitfinex used and then used that to gain access to other servers and to credentials that would allow me to transfer cryptocurrency out of that exchange.

Q.   At some point, did you gain access to other customers of Bitfinex, their wallets on Bitfinex?

A.   I gained access to lot of the wallets on Bitfinex, yes.

Q.   And then what did you do once you got into those wallets?

A.   I created a script to automatically transfer the funds for those wallets into my own wallets that I controlled.

Q.   Script, is that like a program?

A.    A computer program, yes.

Q.    How long were you on Bitfinex inside, able to do that?

A.    Throughout kind of the whole process, I had access to their systems for several months.  But I didn't have access to the credentials for the cryptocurrency for that whole time.

Q.    So how long were you able to have access to those credentials?

A.    Once I started transferring it, I let it run and it was throughout maybe a few hours.

Q.    Were you able to later access Bitfinex customer resources at other exchanges as a result of the hack?

A.    Yes.  So one of the things that I did was modify the code in Bitfinex to save customer passwords and send them to me.  And then I was able to try to use those passwords at other exchanges.

Q.    Were you able to recover money from there as well?

A.    From some of them, yes.

Q.    And the form of the cryptocurrency this all took, was it Bitcoin?

A.    Yes.

Q.    How much Bitcoin were you able to recover as a result of the hack?

A.    It was approximately 120,000 Bitcoin.

Q.    Did you have a sense of how much this 120,000 Bitcoin was worth in August 2016?

A.    In total it was about $70 million.

Q.    And just to be complete, did you also hack some money from an exchange called PayCoin?

A.    Yes.  At an earlier time, for a small amount of money.

Q.    Do you know what op sec is?

A.    Yes, operational security.

Q.    And in the context of hacking, what does operational security mean?

          MR. EKELAND:  Object, Your Honor, relevance and also 702.

          THE COURT:  Overruled.

          THE WITNESS:  Basically it is protecting yourself from being discovered.  So it could mean protecting your identity, protecting your IP address, which identifies your computer from being traced, basically trying to evade whenever you are hacking or law enforcement from tracking you down.

BY MR. PEARLMAN:

Q.    How did you learn to use operational security in the specific -- operational security in your specific case?

          MR. EKELAND:  Objection; relevance.

          THE COURT:  Overruled.

          THE WITNESS:  Just reading.  So there is a lot of online resources.  There is a lot of discussion forums where people discuss particular methods of operational security.

BY MR. PEARLMAN:

Q.    Are you familiar with something called Exploit?

A.    You mean, a website called Exploit?

Q.    Yes.

A.    Yes.  It is a cybercrime forum.

Q.    Was that something that you occasionally looked at?

A.    Yes, at times.

Q.    Was that for the purpose of learning about operational security?

A.    Primarily it was to find vendors who sold services that might be connected to that.  So, for example, selling access to proxy servers that could conceal my location.

Q.    What is a proxy server?

A.    So a proxy server is essentially a way to conceal someone's IP address.  So the way that I kind of think about it is if I am sending a letter in an envelope that has a return address, and the proxy server essentially takes my letter out of the envelope and puts it in another envelope that has another return address, kind of like a remailing service, but online.  So it is a way to not have my IP address be recorded or tracked.

Q.    In running this hack, did you use devices that were inside your house?

A.    Yes.

Q.    Did you use servers that were outside your house?

A.    Yes.

Q.    Are you familiar with DigitalOcean?

A.    Yes.

Q.    Are you familiar with Vulture?

A.    Yes.  Those are all web hosting companies.

Q.    Did you use those as part of your hack?

A.    I used it as part of the laundering.  I don't remember if I used it as part of the hack.

Q.    And we'll talk about the laundering in a second.

A.    Yeah.

Q.    So you have $70 million in Bitcoin, do you go and cash that out?

A.    Well, not -- not right away.  It would be very difficult to do so.

Q.    Why?

A.    Because, obviously, that would raise some red flags, just as if say I went to a bank with $70 million worth of cash, that would raise a lot of red flags.

Q.    Did you have a concern about what the Bitcoin you took, what banks might be able to figure out?

A.    Yeah, absolutely.

Q.    Do you know what blockchain analysis is?

A.    Yes.

Q.    So what were you worried that blockchain analysis was going to do?

          MR. EKELAND:  Objection, leading, Your Honor.

MR. PEARLMAN: What did you --

THE COURT: Sustained.

MR. PEARLMAN: Your Honor, it is a what question.

THE COURT: So I think maybe you need to back up a step and ask if he had any concerns, for example.

BY MR. PEARLMAN:

Q. So did you have concerns about how your Bitcoin might be seen on the blockchain?

A. Yes. So all transactions on the blockchain are public, anyone can see them. And so, of course, I would have concerns about that.

Q. Do you know what blockchain tracing is?

A. Yeah. It is a way to trace transactions on the blockchain.

Q. So what, if any, concern did you have about blockchain tracing specific to your case?

A. So, basically, that when I sold or cashed out that Bitcoin in some way, law enforcement would use blockchain tracing to connect the Bitcoin that I sold to the stolen Bitcoin from the hack.

Q. Were there any particular companies you were concerned about in particular with respect to the tracing in your case?

A. So I was aware that Chainalysis was kind of a well-known company that did a lot of blockchain tracing.

Q. Where was the BTC, the Bitcoin, where was it stored after

you got it?

A.    So the private key -- I mean, the BTC is on the blockchain.  But the private keys or the access credentials to it were stored on my computer in encrypted form.

Q.    So you mentioned money laundering and you testified yesterday that you pled guilty to money laundering.  I take it you did some laundering with respect to the $70 million worth of Bitcoin?

A.    Yes.  So I used a variety of different services and techniques to try to obfuscate or conceal where it came from.

Q.    How did you learn about those different techniques?

A.    Just like the same thing, a lot of research online looking at different forums, looking at just different services that are available, such as exchanges and things like that.

Q.    Did you -- are you aware of a service called Bitcoin Talk?

A.    Yeah.  That is a discussion forum for people to discuss different topics related to Bitcoin.

Q.    Did that topic come up in Bitcoin Talk at all?

A.    You mean of laundering or concealing Bitcoin?

Q.    Yes.

A.    Yeah.  So there were discussions of different mixers and anonymity services that I remember reading about.

Q.    So you mentioned mixers, what, to your understanding, is a mixer?

A.    So it is a way to anonymize your currency in some way by

mixing it with other people's. So the way I thought about it is, say I have some cash from a bank robbery or something that are marked bills. And if I were to put those in a bag along with a bunch of other people that are putting in other bills from elsewhere and then I randomly pull some money out of the bag, I am probably going to get someone else's money that is not connected to any crime and someone else might get my money.

Q. Did you decide to use a mixer as part of your money laundering?

A. Yeah. That was one of the things I wanted to test.

Q. Which ones did you decide to use, if you can recall?

A. I have used a lot of them. So I have used Bitcoin Fog, I have used Helix. I used ChipMixer. I used BitCloak. I have used Bit Blender. That is just the ones that I can recall. I am sure there were more.

Q. What concerns in having all of this Bitcoin would you have about using a mixer --

MR. EKELAND: Objection.

THE COURT: I'm sorry?

BY MR. BROWN:

Q. -- successfully?

MR. EKELAND: I just said, objection, leading.

MR. PEARLMAN: What concerns?

If I may?

THE COURT: Go ahead.

BY MR. PEARLMAN:

Q.   Did you have any concerns about using a mixer?

A.   Well, yeah.  I want to be sure that it works effectively, and that it makes things harder to trace.

Q.   You mentioned in your bag of money example having other people contributing money to that bag.  How did that factor into those concerns, if at all?

A.   So, number 1, obviously, ideally, you wouldn't want to be getting back money that is dirtier than your own.  Because that doesn't really help, say it is connected to another crime.  And then also another concern is kind of how much money is in that bag, so to speak.  So if I am contributing most of the funds to that mixer, then when I am taking money out randomly, there is a good chance that I will just be getting my own money back anyway and if won't really be mixed.

Q.   What concerns, if any, did you have about having money stolen from you?

A.   Well, and the other thing, obviously, is when you make a deposit into that mixer, you don't -- you know you are trusting that service essentially.  You hope that they will send money back to you.  But you are just trusting it.  And so someone who is operating that service could always just take deposits and then not give you anything back.

Q.   Well, how would you know such as for Bitcoin Fog, how would you know whether to trust Bitcoin Fog?

A.    It is all about reputation.  So looking at particularly say on a discussion forum just like with any service.  I would look at the reviews, so comments that other people are leaving saying that, yes, I got my money back and I didn't have any problems taking this money from the mixer to an exchange or whatever, things like that, looking at how long it has been around.  Just kind of the reputation that it has had over time.

Q.    In choosing a mixer, what were some of the features that you were looking for?

A.    So most importantly, obviously, is that it will actually mix your money and not just give back the same money.  So a lot of people are using it.  I also wanted something that could for example, randomize the fees that it charges, which makes it a lot more secure.  I wanted something that didn't look like it might be like a trap or something that is secretly recording transactions.  Yeah, things like that.

Q.    So I want to ask you about the randomization thing.  Can you give us an example of that, how in terms of what you were looking for?

                MR. EKELAND:  Objection, Your Honor, 702.

                THE COURT:  I think the witness can testify about his own experience and his own purposes, so to the extent that is what he is doing, that is fine.

                THE WITNESS:  So basically all transactions on the blockchain are public.  And say there is a mix -- so all of

these mixing services, they charge a fee.  And say there is a mixing service that always charges a 2 percent fee flat, which means that when I put in $100 worth of Bitcoin into that service, there is going to be another transaction coming back to me that is $98.

MR. EKELAND:  Objection.

THE WITNESS:  $100, minus the fee.

MR. EKELAND:  Objection, Your Honor.  Can we talk on the phone for a moment?

(Conference held at the bench.)

MR. EKELAND:  The witness is not giving fact testimony right now.  And I am really concerned that what government is doing here is what we initially objected to is they are bringing in expert opinion testimony on the working of mixers.  If the witness is going to testify to, oh, I deposited X amount and 2 percent was taken out, that is fact testimony.  But what is going on here is that they are using him as an expert for mixers and we object.

THE COURT:  I don't think -- I understand your concern and maybe it is getting close to that.  But as I understand the testimony -- and what I think is fine is for him to testify about why he was attracted to a particular mixer over some other mixer and as a consumer what was attractive to him.  And he has to provide some background to explain what was in his mind and what his mindset was as to why he was attracted

to it.  I agree with you at some point, it could cross over into expert testimony.  But I understand what I have heard thus far was him explaining why it was this was attractive or something that he was looking for as a consumer.

(End of bench conference.)

THE COURT:  Okay.

BY MR. PEARLMAN:

Q.    Did you ever eventually use Bitcoin Fog?

A.    Yes, I did.

Q.    Did it include the randomizer feature that you just testified about?

A.    As best I remember, I think so.  I am not 100 percent sure on that, but I feel like it probably did.

Q.    What about access to a mixer and how you would locate it on the internet?  What attractions did that have for you if any?

MR. EKELAND:  Objection; compound.

MR. PEARLMAN:  It is not compound, Your Honor.  I was just directing him to the subject.

THE COURT:  Give me a second.  I'm sorry.  Why don't you rephrase the question to avoid that issue.

MR. PEARLMAN:  Sure.

BY MR. PEARLMAN:

Q.    You testified earlier about Tor.

A.    Yeah.

Q.    The Tor browser.  How did Tor, the use of Tor, as opposed to like the internet, factor into your decisions if at all about what mixers to use?

A.    Yeah.  So several mixers have what is called a Tor hidden service as well available, which is basically a way to access that mixer through the dark web without kind of going through the normal internet at all.  And, obviously, that was very attractive to me.  Because the main purpose of using the dark web is to conceal your IP address or your location, so if there is a mixing service that takes the time to set up a Tor hidden service on the dark web, that kind of tells me that it can be more trustworthy almost, because I know that they are not going to be able to record any information about myself.  And they are kind of equally committed to remaining hidden basically.

Q.    Do you recall how many times that you used Bitcoin Fog to launder money?

A.    Probably a total of like 5 to 10 times, something like that.

Q.    If you recall, about how much money would you put in during these times?

A.    So usually, each transaction, it would be between -- each use I should say, between 1 to 5 Bitcoin, something like that. I didn't use mixers for the majority of the Bitcoin, just because of the volume.  But I used them kind of on an as-needed basis.

Q. When you say the volume, you mean the amount of money that you had?

A. Yeah, the amount.

Q. Did you eventually stop using Bitcoin Fog?

A. Yeah.

Q. Why?

A. I found other mixers that I could use that suited my purposes better. So one thing that was inconvenient or not as secure about Bitcoin Fog was that I had to make an account and log in. And thus, the mixer itself, would kind of have a record connecting all of my transactions that I have used with it. I found other mixers, such as Helix Light for example, when I didn't have to log in. And then additionally, I became more sophisticated with using cryptocurrency exchanges and kind of sending crypto through that, so I didn't have to rely on mixers.

Q. At some point, did you use Ms. Morgan to help you launder funds?

A. Yes. I sent some funds to her as well.

Q. Then what would she do with them?

A. So I just sent her funds that then she sold on her own accounts on the exchange.

Q. You mentioned that you used crypto exchanges when you became more sophisticated?

A. Yes.

Q. Were you concerned -- do you know what KYC is?

A. Yeah. It means, know your customer.

Q. So what concerns did you have, if any, about using crypto exchanges with respect to know your customer rules and laws?

A. Well, crypto exchanges, number 1, they never operate on the dark web, not as far as I know. So that means they are recording the IP address that you are accessing them from. And then also, usually crypto exchanges at least some of them, will require some kind of personal information, ID, things like that.

Q. But you were saying that you were able to use them?

A. Yes.

Q. How were you able to use them, if you had those other obstacles?

A. For a lot of crypto exchanges, I was able to access various cybercrime forums, where I purchased exchange accounts that were registered in the names of money mules, so in other people's names.

Q. And, in fact, to be clear, while you were conducting your money laundering plan, is it correct that at times you gave false identifications to various financial services?

A. Yes.

Q. And why did you do that?

A. So that the funds to -- so basically what I was doing was changing Bitcoin for other forms of cryptocurrency. And so I

didn't want the Bitcoin that I was depositing into those exchange accounts to be linked to my real name.

Q.   So, sir, from the time of the hack in 2016, until you were arrested in 2022, approximately how much money in US dollars were you able to launder?

A.   It is hard to say, but certainly millions of dollars.

Q.   Did the value of Bitcoin go up during this time?

A.   Yes, quite a bit.

Q.   And at the time that you were arrested, do you know approximately how much that $70 million of Bitcoin minus the money laundering was worth?

A.   I don't know exactly.  But several billion dollars, probably between $4 to $6 billion.

Q.   On the crypto exchange matter, did you eventually -- did you ever use your real name in depositing crypto exchange amounts?

A.   Yes.  So once I had put cryptocurrency through this process where I felt like it was no longer traceable to its source, then I deposited it into crypto exchanges that were registered in my real name and sold it for US dollars.

MR. PEARLMAN:  The Court's indulgence.

I don't have any other questions, Your Honor.

THE COURT:  All right.  Mr. Ekeland.

MR. EKELAND:  May I proceed, Your Honor?

THE COURT:  You may.

MR. EKELAND:  Thank you.

CROSS-EXAMINATION

BY MR. EKELAND:

Q.   Good morning, Mr. Lichtenstein.

A.   Good morning.

Q.   You don't know Mr. Sterlingov?

A.   No.

Q.   You have never talked to him in your life?

A.   Never talked to him.

Q.   You have never interacted with him in any way?

A.   No, sir.

Q.   And you never communicated with the administrator of Bitcoin Fog?

A.   No.  I didn't need to, it was fully self service.

Q.   So you never sent any kind of message to Bitcoin Fog or anything like that?

A.   No.

Q.   And then you said when you hacked Bitfinex, you stole about 120,000 Bitcoin?

A.   Yes, that is correct.

Q.   And is the way you did that, you just gained access to the private keys for all of those addresses; is that correct?

A.    I gained access to API keys that let me control the withdrawal process and initiate withdrawals.

Q.   And eventually you got about 2,000 addresses; is that

correct?

A.    Yes.

Q.    You got the private keys to all of those addresses?

A.    I never got the private keys to those addresses directly. I gained access to API credentials that allowed me to withdraw funds from the exchange.

Q.    But eventually you did when you gained control of all 120,000 or so Bitcoin that you stole from Bitfinex, eventually you controlled private keys that controlled that Bitcoin?

A.    Yeah.  I sent the funds to my own wallets to which I controlled the private keys.

Q.    When you were arrested and the government searched your devices, they found your private keys to that 120,000 Bitcoin?

A.    Yes.

Q.    You had stored the private keys in cloud storage?

A.    Yes.  They found a lot of them, not all of them but a lot of them.

Q.    So are there still private keys that the government doesn't have to the money that you stole?

A.    Not at this point, no.  Because I turned over all of the credentials and I turned over hundreds of millions of dollars to the government they were unable to trace and find.

Q.    And the fact that the government got those private keys, was proof that you had control over the Bitcoin that you had stolen from Bitfinex?

MR. PEARLMAN:  Objection.

THE COURT:  What is the objection?

MR. PEARLMAN:  Calls for a legal conclusion as to proof.

THE COURT:  Overruled.

THE WITNESS:  The fact that I had the private keys was proof that I had control of that Bitcoin, yes.

BY MR. EKELAND:

Q.  And after you hacked Bitfinex, you took steps to cover your tracks?

A.  Yes, that is correct.

Q.  And part of that is you deleted access credentials?

A.  I deleted data from servers at the time, yes.

Q.  Log files, you deleted?

A.  Yes.

Q.  And you worked with your wife, Ms. Morgan, to launder the stolen funds?

A.  She engaged in some laundering activity with me, yes.

Q.  And the government was able to trace through some of your mixing attempts; is that correct?

A.  Yes.  The government traced a lot of the currency to me.

Q.  And the government also seized one of the servers for one of the mixers called Helix?

A.  I don't know.

Q.  And before you hacked Bitfinex, you hacked Coinbase?

A. I hacked several individual accounts that I was able to obtain the access credentials to.

Q. When did you first start hacking?

A. It would have probably been in late 2015 or maybe 2016, with those particular cryptocurrency hacks.

Q. Was that about the same time that you discovered Bitcoin?

A. No. I knew about Bitcoin before.

Q. When did you first learn about Bitcoin?

A. I have heard about it probably in 2011, 2012. I don't remember when I first purchased some, but it would have been before then.

Q. And after you had hacked Bitfinex, you hacked Kraken?

A. So I didn't hack Kraken itself, but I -- what we talked about before, I used some passwords on -- that I recovered from some Bitfinex accounts to access users' accounts on Kraken.

Q. And you were using drugs a lot of the time that you were doing these hacks?

A. Not at the time I was doing the hacks.

Q. You weren't using drugs at the time you accessed Kraken?

A. I mean, I used marijuana, but not at the same time while I was -- you know, I wanted to be sober while I was doing the hacks. I used marijuana, yes.

Q. And you also wrote some notes about how to evade government detection?

A. I took some notes from things I have learned, yes.

Q. And the government found those notes?

A. Some of them, yes.

Q. And you also went on numerous forums, hacker forums like Dark Money, Probive, Dublikat, obnal and AntiChat?

A. Yes, those are hackers and money laundering forums.

Q. And part of what you did there was to study how to launder money?

A. To launder and then to find vendors or services that I did use to do that, yes.

Q. And you engaged in a number of techniques to money launder; correct?

A. Yes.

Q. And that includes using fictitious identities to set up online accounts?

A. Yes. Those would the exchange accounts that we mentioned earlier.

Q. And you also testified that you essentially went on darknet forums and bought other people's KYCed Bitfinex exchange accounts?

A. Yes.

Q. And you also used computer programs to automate your transactions in an attempt to mask the source of funds?

A. Yes. I wrote computer programs to automate transactions.

Q. And you deposited the stolen funds into a variety of darknet markets?

A.    Yes.

Q.    And you also deposited the money in a variety of cryptocurrency exchanges in an attempt to hide it?

A.    Yes.

Q.    And you also converted the Bitcoin into other forms of cryptocurrency in an attempt to hide the source of funds?

A.    Yes.

Q.    And you also used anonymity enhanced cryptocurrency in a practice known as chain hopping?

A.    Yes.  So I converted some of the founds into Monero which is a more anonymous cryptocurrency.

Q.    And then like you said, you used mixers like Bitcoin Fog, Helix and Chip Mixer.  And you said you only used Bitcoin Fog was it about 5 times?

A.    Five to 10 times, probably as best I remember.

Q.    Then if I heard you correctly, you said that eventually you discovered there were better ways to hide the funds than mixing them?

A.    For my purposes, yes.

Q.    Uh-huh.  So you stopped using Bitcoin Fog as a mixer?

A.    Yes.

Q.    And with the funds that you stole from Bitfinex, you got a Wall Street apartment?

A.    I was renting an apartment.

Q.    Uh-huh.  And you also paid for rap videos to be filmed of

your wife, Morgan; is that correct?

A.   I believe there was one video filmed.  I don't know if it was those funds.  That was with her own funds.

Q.   You bought art?

A.   One time.

Q.   Uh-huh.  And you also -- did you become an investor in venture capital enterprises?

A.   I invested in several tech startups, yes.

Q.   Uh-huh.  You also had plans to get fake passports?

A.   No, I don't think so.

Q.   Did you ever get any fake identification?

A.   Not fake physical identification.  So I have used scans of other people's ID documents to set up the exchange accounts, but I wouldn't know how to get a fake passport.

Q.   So when you were arrested, the government discovered an overwhelming amount of evidence that you had committed the crimes?

A.   I mean, I don't know.  I haven't seen all of the evidence.

Q.   But the government found enough evidence to prove every element of the charges against you beyond a reasonable doubt?

A.   Well, I pleaded guilty and I gave the government a lot of evidence through my statements.  Like I -- at the time I pleaded guilty, I did not have a chance to review all of the discovery and all of the evidence that the government had.  So I really couldn't answer that.

Q. But when you pleaded guilty, you pleaded guilty in a court of law?

A. Yes.

Q. And you took an oath in that court to tell the truth, just like you took an oath today?

A. Yes.

Q. And one of the questions that you were asked at your plea was whether or not the government had enough evidence against you to prove their case beyond a reasonable doubt?

A. Well, yes, with my statements to the government, yes.

Q. And you were facing a maximum of a 20-year sentence on the conspiracy to money launder charge that you pled guilty to?

A. Yes, that is correct.

Q. And at your plea you were informed that you did have a constitutional right to a trial by jury, a jury of your peers?

A. Yes.

Q. And that also you had a constitutional right to testify in your own defense?

A. Yes.

Q. And that you also had a constitutional right to confront the government's witnesses against you?

A. Yes.

Q. And because you were guilty, you chose to waive all of those constitutional rights?

A. Yes.

MR. EKELAND:  I pass the witness, Your Honor.

THE COURT:  All right.  Any redirect?

MR. PEARLMAN:  No, Your Honor.

THE COURT:  All right.  The witness is excused.

MR. PEARLMAN:  The Court's indulgence.

THE COURT:  Can I ask counsel to pick up for a second on the phone here.

(Conference held at the bench.)

THE COURT:  I say, I think the last line of questioning was getting pretty close to inappropriate because what you are suggesting was -- is that the jury should infer from whether someone chooses to exercise their constitutional right to take the stand or not take the stand, whether they are guilty or not.  And, you know, your client has not yet made a decision finally, you have to have a colloquy with me about whether to take the stand or not.  And you are suggesting to the jury that someone who chooses to exercise their constitutional right to testify is -- they should assume is innocent.  And someone who chooses not to testify is guilty.  And I think that is not proper, particularly where your client has not even made a decision at least after a colloquy with me about ultimately what he wants to do in the case.  And I know you opened saying he was going to testify.  But I think that was an inappropriate line of questioning.  So I want to note that for the record.

(End of bench conference.)

MR. PEARLMAN: Maybe we could have a stretch break, Your Honor.

THE COURT: Are we waiting for the next witness?

MR. PEARLMAN: Yeah. We are getting him from another floor.

THE COURT: Feel free to stand up and stretch for a minute.

(Pause.)

(Conference held at the bench.)

THE COURT: Go ahead.

MR. EKELAND: Your Honor, we have an outstanding objection to the testimony of the next witness, Theodore Vlahakis, because he is the FinCEN expert that they are coming in. And our objection was essentially that he is -- the Court remembers and I think the Court reserved judgment, so I am renewing the objection.

THE COURT: I didn't realize he was testifying now. But my view on this is that he can be -- he ought not testify sort of as to the law generally. He can testify as to the value, for example, to law enforcement of obtaining KYC information, the value for the law enforcement of registrations and whatever they need and that value it has for law enforcement, but ought not sort of more generally be testifying as to what the law is.

MR. PEARLMAN: Your Honor, just to be clear, it was my understanding that he could testify, generally as to what FinCEN does with respect to its guidelines and that he should be able to testify to that. He has testified to that in other courts. There is case law concerning his ability to testify concerning the law, to be clear, he will not be testifying as to whether the defendant in this particular case was in violation of those laws. But it is a somewhat complicated regulatory regime, which the defendant we allege the defendant himself made statements about with respect to FinCEN. So I think the witness is entitled to say what the law was and what FinCEN publicized what the law was, particularly in 2013 when the defendant was making statements about FinCEN.

THE COURT: Mr. Ekeland.

MR. EKELAND: Your Honor, obviously, this witness is not a fact witness at all. The law is the province of the Court. I think this is -- he is going to confuse the jury. The question is simple, did Mr. Sterlingov register in DC? Is he an unlicensed -- is Bitcoin Fog an unlicensed money transmitter. I don't see any need for this witness' testimony. And it is entirely improper because he is testifying as to matters of law.

MR. PEARLMAN: So again, Your Honor, in document 191, ECF, we briefed this issue and we discussed that courts had permitted expert testimony -- expert testimony about the Bank

Secrecy Act.  We are certainly not seeking to put him on as an expert, but to testify about the scheme.  You just heard from Mr. Lichtenstein, who testified that it is their concern as money launderers about these know your customer laws.  If he can't testify about what the laws are, then I think that the jury is just left in the dark, is this just something that money launderers make up?  And it is not.

So, again, I want to be very clear, he is not testifying as to whether the defendant in this particular case was a money transmitter.  But we do have -- I think he should at least be able to define the terms money transmitter and so forth for purposes of I think it is the third or fourth charge in this case.  He should be able to testify about what money service businesses are.  And he should be able to testify about the general scheme of the BSA.  There is simply no prejudice to him doing this.  And this is something that we have noticed for months at this point.

THE COURT:  You did notice it for months.  But Mr. Ekeland is right, I think this is the one motion in limine that I have not ruled on yet.  And it would have been nice if I knew that he was testifying this morning so we could have done this this morning rather than on the telephone.  Do you have another witness who can testify first and we can come back to him?  Because I have notes on this issue.  And it has been weeks since I have looked at it.  But I did look extensively at

this issue, but I have to go back and look at my notes again.

MR. PEARLMAN:  All right.  Your Honor, maybe we could take a very brief break, get a different witness and then we would like to come back to you and be heard on this witness.

THE COURT:  I need to go back and refresh my memory about looking back on the notes that I took on this.

MR. PEARLMAN:  Thank you, Your Honor.

(End of bench conference.)

MR. PEARLMAN:  So the next witness, Your Honor, is going to be Sarah Glave.  It is going to take about 4 minutes, Your Honor, so I don't know if you want to take a break or not.

THE COURT:  Why don't we go ahead and take our break then.  We are going to go this morning until 12:30, 12:45.  So why don't we take our morning break now and we'll come back at quarter of.  If I can remind you, don't discuss the case among yourselves and don't conduct any type of research.

(Jury out at 10:30 a.m.)

THE COURT:  All right.  Anything before we break?

MR. PEARLMAN:  Not from the Government, Your Honor.

MR. EKELAND:  Nothing from the defense, Your Honor.

THE COURT:  Okay.  Thank you.

How long do you think the next witness will go for?

MR. BROWN:  Your Honor, maybe an hour or 45 minutes to an hour.

THE COURT:  And then do you have another witness

lined up after that or do I have to come back to this issue?

MR. BROWN:  I think we do have to come back to this issue if we get through Ms. Glave.

THE COURT:  All right.  We'll see where we stand.  Thank you.

(Recess taken at 10:31 a.m.)

THE COURT:  Yes.  The government can get its next witness.

THE COURTROOM DEPUTY:  You may be seated.

MR. BROWN:  Before the jury comes in, I noticed that Professor Verret is sitting at counsel table.  I'd like to ask the defense to confirm whether they are presenting Professor Verret in any capacity as a fact witness?

THE COURT:  All right.  Mr. Ekeland?

MR. EKELAND:  Fact?

MR. BROWN:  As opposed to an expert witness, in which case we would seek to exclude him under Rule 615 from the courtroom.

MR. EKELAND:  Your Honor, we have noticed Mr. Verret as an expert witness.  It is not our intent at this time to present him as a fact witness.  He is not a fact witness to anything, as far as I know.

THE COURT:  Okay.  That answers the question.

MR. BROWN:  And, Your Honor, the second issue is we discussed Ms. Glave's testimony on September 18th.  The Court

ruled that because she is not a blockchain clustering expert she, you know, would not be able to testify as to attribution of certain addresses as being within the Bitcoin Fog cluster. We believe that, you know, through this case thus far, we have laid a sufficient foundation that she can rely on the testimony and exhibits admitted through Mr. Scholl to show that 13 blockchain addresses that she found were, in fact, part of the Bitcoin Fog cluster. We wanted to front this with the Court before raising it during her testimony.

THE COURT: I appreciate you doing it. And it seems to me that the dividing line here is she testifying as an expert herself; right?

MR. BROWN: Yes. But as a forensic accounting expert.

THE COURT: I understand. But I think experts are entitled to rely on a finding or an opinion of another expert as the launching basis for some opinion they may express. So I think it is okay, so long as she is not herself verifying it, but is, you heard so and so testify to this and I want to ask you some questions about your analysis as it relates to that. And I think that is acceptable.

MR. EKELAND: Your Honor, the government can correct me -- did the -- I don't believe the government disclosed this as the basis of her testimony in the expert disclosure. Am I correct about that, Mr. Brown?

MR. BROWN:  So, Mr. Ekeland, this was included in the original slide deck that we discussed on September 18th.  And given the Court's direction, we modified that slide deck in what we produced to the defense originally.  We also produced a -- you know, a separate exhibit pending the Court's approval.  I think it is 305A.  Right.  And we fronted that we would seek to introduce this subject to Court's approval.

THE COURT:  All right.  Well, it is -- I appreciate you fronting with me.  It is a little hard for me to answer the question in the abstract.  And Mr. Ekeland can object as it comes in if he thinks it is inappropriate.

MR. BROWN:  We will seek to lay an appropriate foundation.

THE COURT:  All right.  So let's get the jury.

(Jury in at 10:55 a.m.)

THE COURT:  All right.  The government may call its next witness.

MR. BROWN:  The government calls Sarah Glave.

SARAH GLAVE, sworn.

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Thank you.  Please be seated.

THE COURT:  You may proceed.

DIRECT EXAMINATION

BY MR. BROWN:

Q.   Good morning, Ms. Glave.  Could you please introduce

yourself to the jury, spelling your first and last name?

A.    Hello.  My name is Sarah Glave.  That is S-A-R-A-H, G-L-A-V-E.

Q.    And what is your occupation?

A.    I am a forensic accountant.

Q.    Where are you currently employed?

A.    I am currently employed by Deloitte and I am detailed to the IRS-CI.

Q.    What are your responsibilities at IRS-CI?

A.    I conduct financial analysis into third party money laundering investigations from case inception to trial support.

Q.    How long have you been at IRS-CI?

A.    I have been at IRS-CI for just under 2 years.

Q.    How long have you been at Deloitte?

A.    I have been at Deloitte for just under 2 and a half years.

Q.    Were you always detailed to IRS-CI while you have been at Deloitte or were you somewhere else before?

A.    Prior to my work here at IRS-CI, I supported a fraud, waste and abuse engagement where I reviewed rental abuse for anomalous activity.

Q.    What is your educational background?

A.    I have a bachelor's and master's degree in accounting from East Carolina University.

Q.    What drew you to the field of accounting?

A.    I always enjoyed my accounting coursework and I knew

pursuing a path in accounting would allow me to kind of see something different every single day.

Q. And before you came to Deloitte, what other professional experience did you have?

A. I worked at KPMG as a financial statement auditor.

Q. Ms. Glave, do you have any professional certifications?

A. I am a certified public accountant and certified fraud examiner.

Q. And so for a certified public accountant, is that a CPA?

A. Yes.

Q. What are the qualifications to become a CPA?

A. To become a CPA, you have to have a bachelor's degree, as well as 150 semester hours, a certain amount of which must be related to business and accounting related coursework.

Q. Is there any sort of exam requirement for becoming a CPA?

A. Yes. There are four, four-hour exams that you must pass over a variety of topics, such as financial accounting and reporting, tax, audit and business economic concepts.

Q. Do you have any continuing education requirements for your CPA?

A. Yes. There are 40 hours of continuing education requirements every year, as well as a 24-hour ethics course.

Q. And you also mentioned I think a CFE; is that right?

A. Yes.

Q. What is a CFE?

A. A certified fraud examiner is someone who has taken additional education over -- in the fields of identifying, detecting and investigating fraud.

Q. And what are the requirements to become a CFE or have a CFE certification?

A. To become a CFE, you must again pass four exams, as well as have two years of fraud-related experience.

Q. And in your case, what satisfied the two years of fraud-related experience qualification?

A. My prior work at KPMG satisfied this requirement performing fraud risk assessments and fraud risk inquiries.

Q. For the CFE, do you also have any continuing education requirements?

A. Yes. You are required to take 20 continuing education hours each year, 10 of which must be related to fraud.

Q. Are you a member of any professional organizations?

A. Yes. I am member of the American Institute of Certified Public Accountants or AICPA, as well as the Certification of Certified Fraud Examiners or ACFE.

Q. Ms. Glave, do you have any particular training or experience in cryptocurrency investigations?

A. Yes. I have taken a Chainalysis Reactor certification course as well as TRM certified investigator course.

Q. And so taking those one at a time for the Chainalysis course, approximately how many hours of instruction was that?

A.    Approximately 20 hours.

Q.    And was there an exam associated with that?

A.    Yes, there was.

Q.    And what sorts of concepts were covered in the Chainalysis training?

A.    It covered Bitcoin blockchain fundaments as well as how to use the reactor application.

Q.    And you also mentioned TRM.  What is TRM?

A.    TRM is another blockchain analytics company.

Q.    What was the course that you took with TRM?

A.    It was called TRM certified investigator.

Q.    And approximately how many hours of instruction was that?

A.    Approximately 10 hours.

Q.    And what sorts of concepts were covered in that?

A.    It covered various cryptocurrency concepts, as well as open source block explorers and utilizing other publicly available information to take a deeper look into cryptocurrency transactions.

Q.    Have you also received any training through your work at Deloitte?

A.    Yes.

Q.    What sorts of training does that entail?

A.    I have taken more than 40 hours worth of training at Deloitte related to cryptocurrency, primarily relates to tracing cryptocurrency and investigations and, again, how to

use open source block explorers and publically available information.

Q.   And do you have any practical experience in cryptocurrency investigations?

A.   Yes.  I am aligned with the cybercrimes unit, so every case that I have supported has some type of cryptocurrency element.

Q.   Where is the cybercrimes unit located?

A.   It is located in Washington, DC.

Q.   And what agency is that in?

A.   I'm sorry.  It is with IRS-CI.

Q.   And without getting into kind of specific case details, generally speaking what sorts of cryptocurrency-related investigations have you worked on?

A.   I worked on a variety of cryptocurrency investigations from misuse of government funds, sanctions, drug trafficking, cryptocurrency exchanges, to name a few.

Q.   And through your training and experience, do you have a basic understanding of money laundering techniques and typologies?

A.   Yes.

          MR. BROWN:  Your Honor, the government moves to qualify Ms. Glave as a forensic accounting expert.

          THE COURT:  All right.  The Court concludes that she is qualified to testify as a forensic accounting expert.

BY MR. BROWN:

Q.    Ms. Glave, what were you asked to do in this case?

A.    I was asked to summarize Mr. Sterlingov's financial activity, Bitcoin activity and income and expenses.

Q.    What does it mean to summarize that sort of activity?

A.    Summarizing, essentially means consolidating various data sets and distilling that information into different tables and charts.

Q.    Did you prepare written work product for your summary?

A.    Yes.

Q.    And I'd like to show you Government Exhibit 305, which should come up on your screen here.  And it is several pages. Do you recognize this exhibit?

A.    Yes.

Q.    And what does this exhibit contain?

A.    This contains the summary tables and charts representative of the financial accounts that I reviewed.

Q.    And so I'd like to direct your attention to page 2 of this document, which is table 1.  What is shown on table 1?

A.    This shows a summary of Mr. Sterlingov's known accounts, including the institution's account owner, account number, emails and the number of transactions.

Q.    And approximately how many accounts did you look at here?

A.    Approximately 40 accounts.

Q.    And approximately how many transactions does that

represent?

A.    Approximately 8,423 transactions.

Q.    Now, looking at the second column here that is marked account owner, are some of these accounts -- were they in the defendant's name?

A.    Yes.

Q.    Were some of them not in the defendant's name?

A.    Yes.

Q.    For those accounts, is there some other identifier that has been linked to the defendant?

A.    From my understanding, they are identified through email, search warrants, and notes and documents recovered from the individual's devices.

Q.    And under account owner, are there specific email addresses listed?

A.    Yes.

Q.    And what is your understanding of who controls those email addresses based on your review of the record?

A.    My understanding is that they are in control by Mr. Roman Sterlingov.

Q.    Now, Ms. Glave, looking at the entire Exhibit 305, does this exhibit summarize the contents of the voluminous records?

A.    Yes.

Q.    Have you had a chance to review Exhibit 305 to ensure that it accurately -- the charts and the tables are accurate?

A.    Yes.

MR. BROWN:  The government moves to admit and publish Exhibit 305, as a summary exhibit.

THE COURT:  Any objection?

MR. EKELAND:  I am going to object on hearsay grounds and incomplete summary.

THE COURT:  All right.  Exhibit 305 is admitted and may be published to the jury.

(Whereupon, Exhibit No. 305 was admitted.)

BY MR. BROWN:

Q.   So, Ms. Glave, staying on table 1, could you explain what are some of the different kinds of accounts that you looked at in reviewing this financial activity?

A.    Yes.  There are cryptocurrency exchange accounts.  So, for example, Binance and Bitfinex.  There are payment processors such as BitPay.  There are traditional bank accounts such as Nordea.  And there are prepaid card providers such as prepaid financial services.

Q.   And for most of those account types, did you review the actual financial records produced by, you know, the cryptocurrency exchange or other financial institution at issue?

A.    Yes.

Q.   How about for XML Gold were you able to review the original account from XML Gold?

A.    I was not.

Q.    How you were able to summarize Mr. Sterlingov's XML Gold activity?

A.    I reviewed email confirmations that detailed the account transaction details for XML Gold.

Q.    Now, in addition to the account details, did you consult other sources in your financial analysis?

A.    Yes.

Q.    What other sorts of sources did you consult?

A.    I consulted with blockchain expert Luke Scholl.  I consulted with publically available institutions on the institutions listed in this table.  And I also consulted publically available information on exchange rates.

Q.    And why did you have to consult exchange rate information?

A.    Because I converted some of the currencies that were either cryptocurrency or foreign currency such as Euros to US dollars.

Q.    And turning to the next page, what is shown here is table 2.  Could you summarize to the jury what table 2 shows?

A.    Table 2 shows a summary of Bitcoin activity over time related to the table 1 accounts.  This goes from the period of 2011 to 2021 and it breaks down inflows, outflows and trades.

Q.    Just taking those one piece at a time.  What do you mean by inflows?

A.    Inflows are Bitcoin that is deposited into

Mr. Sterlingov's accounts.

Q. And then how about outflows?

A. Outflows are withdrawals from Mr. Sterlingov's accounts.

Q. And I notice that some of these numbers have parenthesis around them. What does that mean?

A. Parenthesis in this column for outflows means there is a reduction of Bitcoin in the accounts.

Q. And then there is another column that is marked trades. What does that show?

A. Trades are showing the net activity for either purchases or sales of Bitcoin.

Q. And I notice that some of the trades have parenthesis and some of the trades don't. Could you explain that to the jury?

A. So if there are parenthesis, this means that there were more sales of Bitcoin than there were purchases.

Q. And so in other words, it is a net negative for the total trades?

MR. EKELAND: Objection; leading.

THE COURT: Overruled.

BY MR. BROWN:

Q. You can answer.

A. Yes.

Q. Now, before we talk more about the substance of the chart, I would like to ask you about two adjustments. First of all, did you make any manual adjustments or reconciliations to the

numbers here?

A.    Yes.

Q.    And could you explain to the jury, what is a manual adjustment?

A.    A manual adjustment is an adjustment that I made to the consolidated transaction detail and was not included in the original return or exchange data.

Q.    And for which specific financial institutions did you make a manual adjustment?

A.    Mt. Gox, BTC-e and LocalBitcoins.

Q.    And just walking through those one at a time.  For Mt. Gox are you aware that Mt. Gox declared bankruptcy in 2014?

A.    Yes.

Q.    What generally happens to a depositor's money if the institution declares bankruptcy?

          MR. EKELAND:  Objection, Your Honor.

          MR. BROWN:  What happens --

          THE COURT:  I think that the objection is --

          Why don't you state what the objection is.

          MR. EKELAND:  She is not an expert in bankruptcy law.

          THE COURT:  All right.  If it is just based on common knowledge, you can answer it.  If it is based on any expertise, you should not.  If it is based on common knowledge, you can answer it.

BY MR. BROWN:

Q.   Maybe I can rephrase.  For Mt. Gox, what happened to the depositor's funds when Mt. Gox went bankrupt?

A.   They lost access to their funds.

Q.   So do you adjust for that somehow in your analysis?

A.   Yes.  I reduced the balance of Mt. Gox in his account.

Q.   And then for BTC-e, are you aware that BTC-e was seized by law enforcement in July 2017?

A.   Yes.

Q.   And what happened to users' ability to access their funds then?

A.   Similarly, they lost the ability to access their funds.

Q.   And how did you adjust for that in your analysis?

A.   I reduced the remaining balance of Bitcoin in the account to zero.

Q.   And then the third institution was LocalBitcoins; right?

A.   Yes.

Q.   And what adjustment did you make to the LocalBitcoin numbers?

A.   I made a manual adjustment for 33 Bitcoin into Mr. Sterlingov's account after reviewing the account detail.  For each of the exchange returns, I reconciled the beginning balance, plus inflows, minus outflows, plus or minus trades to the ending balance.  And the account balance went negative in the early time frame of the return.

Q.   And so kind of boiling that down, if the account balance

went negative, does -- what does that say about inflows?  Were they overstated or understated?

MR. EKELAND:  Objection; leading.

THE COURT:  Overruled.

BY MR. BROWN:

Q.   Were they -- were the inflows overstated or understated in the LocalBitcoin?

A.   They were understated.

Q.   And how did you make that adjustment in your analysis?

A.   I included a manual adjustment for 33 Bitcoin at the time when the account first went negative.

Q.   Now.  I'd like to talk about the -- there is a lower line here that says total excluding adjusted controlled account transfers.  To give the jury a little bit of background, what is an internal account transfer?

A.   An internal account transfer is a transfer from one account to another.  So you can think of it as a transfer from your checking account to your savings account.

Q.   And in calculating inflows and outflows, how do internal account transfers potentially complicate that analysis?

A.   It can potentially double count a certain amount of money or cryptocurrency coming into an account.

Q.   So with your check account example, how would that potentially cause a double counting issue?

A.   So if you get $1,000 deposited into your checking account

and then you transfer 1,000 to your savings account, if you just look at the inflows into each account, it might look like you have $2,000 coming into your account, when actually it is only $1,000.

Q. And so in your analysis, how would you address that potential double counting issue?

A. I matched inflows and outflows from various exchanges and then reduced the total amount of inflows and outflows to remove those -- those internal transfers.

Q. And I would to like skip ahead to page 7, table 4. Does this table show how you controlled for those internal account transfers?

A. Yes.

Q. And is there an example on this table?

A. Yes. There is an example for Mt. Gox.

Q. Could you point out to the jury where that is on the screen?

A. Yes.

Q. I think there is a way to --

A. Well, I was going to try to circle it, but --

Q. Is that --

A. Yes, thank you.

I see.

Q. Ms. Glave, I think if you maybe try to circle it on the screen, it might work.

A.    It is not working on my side.

Q.    All right.  Maybe verbally explain to the jury where to look on the slide?

A.    Yes.  So if you look at the -- the right box on the right, the one on the bottom that says total Bitcoin transferred out, this is 258.51 Bitcoin that is transferred out of Mt. Gox and transferred to the other cryptocurrency exchanges listed above that line.

Q.    And when you prepared this chart, did you circle two entries there in red?

A.    Yes.

Q.    What are those two entries?

A.    For Bitcoin it is 39.9 Bitcoin and for Mt. Gox it is 258.51 Bitcoin.

Q.    So the Bitstamp transfers that you had circled, what does that mean?  What is he doing with his Mt. Gox accounts vis-a-vis Bitstamp?

        MR. EKELAND:  Objection.

        THE COURT:  What is the objection?

        MR. EKELAND:  It calls for personal knowledge from Mr. Sterlingov.

        THE COURT:  Overruled.

        THE WITNESS:  There is 39.9 total Bitcoin that is transferred out of Mt. Gox to Bitstamp.

BY MR. BROWN:

Q. And then is that reflected in the chart on the left-hand side here?

A. Yes. That is the 20 Bitcoin plus the 19.9 Bitcoin.

Q. Is that in the row 4 Bitstamp in the left-hand chart here?

A. Yes.

Q. And then in your analysis, what do you do with that 39.9 Bitcoin that was transferred from Mt. Gox to Bitstamp?

A. That 39.9 Bitcoin would be removed from Bitstamp inflows.

Q. And did you go through this exercise for all of the cryptocurrency accounts that reflected internal account transfers?

A. Yes.

Q. And before we go back to the previous slide, one more question. For each of those cryptocurrency accounts, is there usually a fee charged for any one of these internal transactions?

A. Yes.

Q. Now, returning to table 2 on page 3. So could you explain the difference between the grand total line and then the total, excluding adjusted controlled account transfers?

A. Yes. The grand total is the total inflows, outflows and trades, including the internal account transfers. And the total excluded adjusted controlled accounts transfers excludes those internal account transfers.

Q. And then just looking at the total, the adjusted total

down at the bottom, what is the total amount over this 11-year time period of Bitcoin that came into those table 1 accounts?

A. 2,707.78 Bitcoin.

Q. Relative to that number, how could you characterize the amounts that were either sold or sent out from those accounts?

A. It is approximately 80 percent that was either sold or sent out.

Q. And just looking at -- taking these a few years -- on a year-by-year basis. Looking at 2011, what is the approximate balance between outflows and trades?

A. They are pretty close to netting out.

Q. And what do you mean, pretty close to netting out?

A. Around 1 Bitcoin is remaining. So, for example, here he purchased 99 Bitcoin with fiat and then he sent out 98 Bitcoin.

Q. And then looking at 2012, what is happening in 2012?

A. Inflows are greater than outflows and trades combined.

Q. And then, looking at 2013, what is happening in 2013?

A. Inflows are less than outflows and trades combined.

Q. And in the year 2013, how many Bitcoin does Mr. Sterlingov deposit into those table 1 accounts?

A. He deposits 2,128.10 Bitcoin.

Q. How many Bitcoin does he sell through those accounts?

A. He net sells 1,907.81 Bitcoin.

Q. And then are there additional outflows in 2013?

A. Yes. There are additional outflows of 352.84 Bitcoin.

Q.   And then in 2014, how would you compare the level of activity in 2014 to 2013?

A.   There is a significant decrease.

Q.   Did you create a more detailed summary of these Bitcoin inflows into the accounts?

A.   Yes.

Q.   I'd like turn to the next page, which shows table 3 in chart 1.  What information is shown on these two charts for the table and the chart, I should say?

A.   This shows Bitcoin inflows over time by exchange.

Q.   And is this essentially the same inflow information as in the previous table?

A.   Yes.

Q.   And what is different about this chart and this table?

A.   It details the inflows by exchange.

Q.   And then I would like to turn to the next page, chart 2. Could you explain to the jury what this chart shows?

A.   This chart shows the incoming Bitcoin over time with the value in US dollars overlaid.

Q.   And what is shown on the blue line in this chart?

A.   The blue line is the amount of incoming Bitcoin.

Q.   And does that correspond to the left axis, the information on the left-hand side of the chart?

A.   Yes.

Q.   And so is -- is there a spike in incoming Bitcoin in any

particular year?

A. Yes, in 2013.

Q. And then what is shown with the gray bars?

A. This is the corresponding transaction value of that incoming Bitcoin.

Q. And does that correspond to the information on the right-hand side of that chart or the right axis?

A. Yes.

Q. What sort of values are shown on the right-hand side of the chart?

A. It is showing the value in US dollars.

Q. And during this time period, did the price of Bitcoin -- did it generally stay the same or change?

A. It generally increased.

Q. And was that a straight line or was it not a straight line?

A. It was not a straight line.

Q. How would you characterize the trend of the price of Bitcoin?

A. It increased and it fluctuated over time.

Q. And looking at the year 2013, approximately how much Bitcoin by dollar value did Mr. Sterlingov deposit into his accounts?

A. In 2013?

Q. Yes.

A.   Approximately $260,000.

Q.   And then when is the peak of the volume of -- by dollar value of deposits into Mr. Sterlingov's accounts?

A.   2017.

Q.   And is 2018 also a significant year?

A.   Yes.

Q.   And looking at the whole chart, what is the approximate total value of Bitcoin that was deposited into all of the table 1 accounts during this time period?

A.   Approximately $1.8 million.

Q.   And then turning to the next page, chart 3, what does this chart show?

A.   This chart shows the estimated Bitcoin balance over time and the table 1 cryptocurrency exchange accounts.

Q.   And so is this a -- is it fair to say this is a running balance of Bitcoin in those accounts?

A.   Yes.

Q.   And so what does the blue line show?

A.   The blue area shows the running Bitcoin balance.

Q.   And if the running -- if the blue line is going up, what does that mean about his Bitcoin balance?

A.   It means the Bitcoin balance is increasing.

Q.   The blue line is going down, what does that mean?

A.   The Bitcoin balance is decreasing.

Q.   And if the blue line is staying relatively flat, what does

that mean about the balance of Bitcoin in Mr. Sterlingov's accounts?

A. It generally means that either inflows and outflows are staying relatively the same or they are netting out.

Q. And just looking at 2017, what, if anything, happened in 2017 to account 4, the change in running balance here?

A. In 2017, the drop there is due to BTC-e being seized by the government.

Q. Now, looking at the gray line, what does the gray line show?

A. The gray line shows this Bitcoin balance over time in US dollars.

Q. And are there spikes in the value of the defendant's Bitcoin account balances?

A. Yes.

Q. And are those earlier on or are those later?

A. They start in approximately June 2017.

Q. And then turning to the next page, table -- two more pages. I'm sorry. Page 8, table 5, what is this table called?

A. This is a summary of income and expenses.

Q. And so just looking at the top part of this table labeled income, what is shown in income?

A. Income are the inflows coming into Mr. Sterlingov's Nordea bank accounts.

Q. And what kinds of inflows are accounted for in those bank

accounts?

A. Deposits, transfers, Switch payments, salary and other miscellaneous inflows.

Q. And looking at the -- first of all, is this all denominated in dollars?

A. Yes.

Q. And did you convert it from another currency?

A. Yes.

Q. And what currency was that?

A. The Swedish Krona.

Q. And looking at the dollar values is there -- what is the highest dollar value in any of these years?

A. It is in 2018.

Q. And how much was that?

A. $43,925.07.

Q. And then focusing on the bottom part of the chart labeled expenses, what is shown on that part of the chart?

A. This shows various expenses identified through Mr. Sterlingov's financial accounts.

Q. So at the top row labeled bank outflows, what does that account for?

A. That accounts for the Nordea Bank accounts.

Q. And below that, are these other kind of financial account expenditures?

A. Yes.

Q.    What was Prepaid Financial Services?

A.    Prepaid Financial Services is a prepaid card provider.

Q.    And then do you see a pattern in the defendant's use of these prepaid financial cards?

MR. EKELAND:  Objection; leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.  It begins in 2014 through 2018.

BY MR. BROWN:

Q.    And in the year 2014, how much did the defendant spend using prepaid financial cards?

A.    Approximately 40,285.22.

Q.    And the year 2015, how much did he spend in prepaid financial cards?

A.    Approximately $40,468.27.

Q.    And looking all of the way to the right-hand column, what is the total that he spent using prepaid financial cards?

A.    Approximately $93,226.95.

Q.    And looking at the total, I think it is a 12-year period here, what is the total on the top of this chart.  What is the total bank inflows that you found?

A.    $321,797.86.

Q.    What is the total expenses or expenditures that you found?

A.    $450,884.33.

Q.    When expenses significantly exceed sources of income, is that a sign of something?

A.    It is usually an indicator there is some form of unexplained income.

Q.    Now, during the course of your work on this case, did you review any invoices?

A.    Yes.

Q.    And were those invoices associated with any company?

A.    Yes.  They were associated with Code Reactor.

Q.    And directing your attention to Exhibit 719A, which I believe has already been admitted into evidence.

THE COURTROOM DEPUTY:  Give me one second, 719A.

Yes.

BY MR. BROWN:

Q.    And is this one of the invoices that you examined?

A.    Yes.

Q.    And is this invoice dated?

A.    Yes.  It is dated April 29th, 2016.

Q.    And I think you may be able to use the screen in this view if you try it.  Could you point out where the date is?

Or maybe not.

THE COURTROOM DEPUTY:  It is not working?

BY MR. BROWN:

Q.    I thought maybe it was just a PowerPoint issue.

A.    I see something in the top upper right corner, but it is not letting me click it.

(Pause.)

THE WITNESS:  Thank you.

BY MR. BROWN:

Q.   I see we have green lines here.  Thank you, Ms. Glave. What did you just circle?

A.   I just circled the date and invoice number.

Q.   What is the invoice number here?

A.   1,001.

Q.   And is there a buyer indicated on this invoice?

A.   Yes.  The buyer is Artem Chukanov.

Q.   Where is Artem Chukanov supposed to be located, according to this?

A.   Ukraine.

Q.   Is there a description of services being purchased or invoiced for?

A.   Yes.  Web development services.

Q.   And is there a price or amount in that -- actually, if we could scroll down to the bottom.

Q.   Can you see the total amount of the invoice?

A.   Yes, 660 Euros.

Q.   Ms. Glave, I believe if you click back in the corner, you will be able to clear out the markings you have previously made.

A.   Thank you.

Q.   And is there a part of this invoice that provides payment details?

A.    Yes.  It is located at the bottom of the invoice.

Q.    Could you point out to the jury where you are looking? What is the first method of payment indicated here?

A.    It offers a Swift payment with an international bank account number.

Q.    Is that what IBAN stands for?

A.    Yes.

Q.    Do you have an understanding of what whose international bank account number this is?

A.    This bank account number belongs to Carl Frederik Akerström.

Q.    Does it not belong to the defendant?

A.    No.

Q.    And is there a Bitcoin address indicated here?

A.    Yes.

Q.    Could you just read what it says in front of that Bitcoin address?

A.    It says when paying by Bitcoin, use this address only. And then it provides a Bitcoin address beginning in 1EUDR.

Q.    And could you just point out to the jury where that Bitcoin address is?

A.    (Complying).

Q.    And now I would like to direct your attention to an exhibit that is not yet in evidence, Exhibit 719A.  719B, excuse me.  Ms. Glave, do you recognize Exhibit 719B?

A.   Yes.

Q.   And what do you recognize this to be?

A.   A Code Reactor invoice.

Q.   Is this another invoice that was recovered from the defendant's electronic devices?

A.   Yes.

Q.   And does this exhibit fairly and accurately show the file that was recovered from the electronic device?

A.   Yes.

MR. BROWN:  The government moves to admit and publish Exhibit 719B.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  Exhibit 719B is admitted and may be published to the jury.

(Whereupon, Exhibit No. 719B was admitted.)

BY MR. BROWN:

Q.   So, Ms. Glave, if you could point out on this invoice is there a date associated with this?

A.   Yes.  It is dated May 16th, 2016.

Q.   And, Ms. Glave, I think if you hit the clear button at the bottom of that menu --

A.   I see.

Q.   Okay.  And could you indicate for the jury the date and could you also indicate the invoice number?

A.   Yes.  1,002.

Q.   And so sequentially, how does this invoice relate to the previous invoice we were looking at?

A.   This invoice follows the previous invoice we were looking at.

Q.   And who is the buyer indicated on this invoice?

A.   Jeremy Wong.

Q.   Where is Jeremy Wong located, according to this invoice?

A.   Hong Kong.

Q.   And what is the nature of the services invoiced here?

A.   Server administration.

Q.   If we could scroll down to the bottom of this, is there a price for this invoice?

A.   Yes.  640 Euros.

Q.   And then is there also payment information on this invoice?

A.   Yes.  It offers a Swift payment method with an international bank account number or an option to pay using Bitcoin.

Q.   Is this the same Bitcoin address that was indicated on invoice number 1,001?

A.   Yes.

Q.   Now, returning to invoice 1,001, Exhibit 719A, going down to that same Bitcoin address, were you able to review a blockchain explorer entry for that Bitcoin address, 1EUDR?

A.   Yes.

Q.   And did you locate any transactions involving 1EUDR that appeared to correspond to this invoice?

A.   Yes.

Q.   I'd like to direct your attention to an exhibit that is not in evidence yet, Exhibit 306.  Ms. Glave, do you recognize Exhibit 306?

A.   Yes.

Q.   And did you prepare Exhibit 306?

A.   Yes.

Q.   And what does Exhibit 306 show?

A.   These are screenshots from Blockchair, which is an open source block explorer.

Q.   In your experience, does Blockchair fairly and accurately show information about Bitcoin transactions from the Bitcoin blockchain?

A.   Yes.

MR. BROWN:  The government moves to admit and publish Exhibit 306?

THE COURT:  Any objection?

MR. EKELAND:  Objection; outside the scope of the expert testimony.

MR. BROWN:  Your Honor, this is factual testimony. And I believe it is consistent with the Court's rulings on September 18th, 2023.

THE COURT: I will go ahead and admit 306 and it maybe published to the jury.

(Whereupon, Exhibit No. 306 was admitted.)

BY MR. BROWN:

Q. Now, directing your attention to page 5 of Exhibit 306. And it might be easier if we go into full page mode.

And page 5. So looking at the top of -- the top transaction on the screen here, what -- what is shown in the top snippet of the screen here?

A. This shows the sending addresses and the receiving addresses for a transaction of 1.6751 Bitcoin.

Q. And that is great.

What is the date of this transaction here?

A. The date is April 30th, 2016.

Q. And if it is possible to flip back to 719A. And what is the date of the invoice for Exhibit 719A?

A. April 29th, 2016.

Q. And then going back to Exhibit 306. What is the receiving address for the April 30th, 2016 transaction?

A. It is the Bitcoin address beginning in 1EUDR.

Q. And it looks like there are two receiving addresses. Could you explain why that may be?

A. Yes. The second receiving address 1PLBO is the change address.

Q. And then --

MR. EKELAND:  Objection, Your Honor.

THE COURT:  I think this may be -- I am going to strike that answer.  I think that is getting into expert testimony.

BY MR. BROWN:

Q.  Ms. Glave, what is the sending address in this transaction?

A.  Bitcoin address beginning in 1PLBO.

Q.  What is the approximate dollar value of this transaction?

A.  $758.64.

Q.  Does that dollar value -- is that close in value to the value of Euros indicated in exhibit -- in invoice 1,001?

A.  Yes.  When the Euros are converted to dollars, it is within approximately $5.

Q.  And then directing your attention to the next page of this exhibit, Exhibit 306.  What is the date of this transaction?

A.  May 18th, 2016.

Q.  And does this -- what is the receiving address of this transaction?

A.  The Bitcoin address beginning in 1EUDR.

Q.  And what is the approximate dollar value of that transaction?

A.  $729.01.

Q.  And how does that approximate dollar value compare to the Euro value in invoice 1,002?

A.   When that Euro value is transferred to US dollars, it is approximately within $5.

Q.   And what is the sending address here?

A.   The sending address is the address beginning in 1PLBO.

Q.   And so for this transaction and the previous transaction that we looked at, is the sending address the same or different?

A.   It is the same.

Q.   Now, invoice 1,001, is for Jeremy Wong in Hong Kong, invoice 1,002 is for Artem Chukanov in Ukraine, is there any connection between those customers that you can see from the invoices that you reviewed?

A.   Not that I am aware of.

Q.   Now returning to invoices -- returning to Exhibit 305 and turning to page 9 of that exhibit.  Did you review other Code Reactor invoices?

A.   Yes.

Q.   Approximately how many Code Reactor invoices did you review?

A.   Sixty-three.

Q.   And for those Code Reactor invoices, did you attempt to identify blockchain transactions that appear to correspond with those invoices?

A.   Yes.

Q.   And did you discover any anomaly in those transactions?

MR. EKELAND: Objection; leading.

THE COURT: I'm sorry. What was the objection, leading?

MR. EKELAND: Leading. Did you discover any anomaly.

THE COURT: Overruled.

BY MR. BROWN:

Q. You may answer.

A. I discovered that eight of those invoices corresponded to the date and the amount corresponded to eight deposits into the Bitcoin address 1EUDR.

Q. And so on the chart here, which eight invoices are you referring to?

A. The first two lines here circled in red or outlined in red.

Q. For those first eight invoices, who were the buyers on those -- listed on those invoices?

A. Artem Chukanov and Jeremy Wong.

Q. For each of those eight invoices, were you able to identify a blockchain transaction that appeared to correspond with the payment information on the invoice?

A. Yes.

Q. For each of those eight invoices, were you able to identify the sending address for that blockchain transaction?

A. Yes. The sending address was the Bitcoin address beginning in 1PLBO in green.

Q.    And were you able to then look at 1PLBO and see what address or addresses funded those transactions from Bitcoin address 1PLBO?

A.    Yes.

Q.    And what, if anything, did you find?

A.    These addresses are listed in the gray box on the left-hand side of the screen.

Q.    And are those those 13 addresses?

A.    Yes, 13 addresses.

Q.    Now, are you familiar with the expert testimony by FBI staff operation specialist Luke Scholl?

A.    Yes.

Q.    And are you familiar with Exhibit 326.  Maybe we could pull that up.  Are you familiar with Exhibit 326?

A.    Yes.

Q.    And what is your understanding of what is contained in Exhibit 326?

          MR. EKELAND:  Objection, 702, Your Honor.

          THE COURT:  Overruled.  I will allow this question.

          THE WITNESS:  From my understanding, this is a list of the Bitcoin Fog addresses associated with the Bitcoin Fog cluster.

BY MR. BROWN:

Q.    And then flipping back to your table that you prepared, have you had an opportunity to compare those 13 sending

addresses listed in the gray box here with the Bitcoin Fog cluster addresses listed in Exhibit 326?

A. Yes.

Q. And what, if anything, did you find?

A. All of the sending addresses listed here in the gray box were also included in the addresses listed in the Bitcoin Fog listing.

Q. I'd like to show you another exhibit that has not yet been admitted, which is Exhibit 305A, which has not yet been admitted.

And, Ms. Glave, do you recognize this exhibit?

A. Yes.

Q. Did you prepare this exhibit?

A. Yes.

Q. And what does this exhibit show?

A. This exhibit shows the same slide as the last only, instead of listing out the 13 sending addresses, it states Bitcoin Fog.

Q. Does this exhibit fairly and accurately summarize the voluminous records that you reviewed, including the Code Reactor invoices and Exhibit 326?

A. Yes.

MR. BROWN: The government moves to admit and publish Exhibit 305A?

THE COURT: Any objection?

MR. EKELAND: Hearsay and 702.

THE COURT: Exhibit 305A is admitted and may be published to the jury.

(Whereupon, Exhibit No. 305A was admitted.)

BY MR. BROWN:

Q. And, Ms. Glave, could you just repeat for the jury what this exhibit shows?

A. Yes. This exhibit shows instead of the 13 sending addresses listed, it includes Bitcoin Fog on the left, the transactions flowing into Bitcoin address beginning 1PLBO and then eight transactions to the Bitcoin address beginning in 1EUDR.

Q. And then flipping back to Exhibit 305 on page 13, I wanted to direct your attention to one more page. Now, on the left-hand side of this, what, if anything, is shown?

A. The invoice on the left is an invoice that was identified on Mr. Sterlingov's device.

Q. What customer is indicated on the invoice on the left?

A. Vasilis Ioannis.

Q. What is the amount of the invoice?

A. 450 Euros.

Q. And in the payment information, is there a Bitcoin address indicated?

A. Yes.

Q. And what are the first couple of letters of that payment

address?

A.   1GDFT.

Q.   Now, did you also review records from the defendant's Bitstamp account?

A.   Yes.

Q.   At some point, did the defendant provide Bitstamp with an invoice in response to Bitstamp's anti-money laundering inquiries?

A.   Yes.

Q.   Specifically, what kind of questions was Bitstamp asking that prompted the defendant to produce that invoice?

A.   There were requesting documentation that supported the origin of some of the Bitcoin deposits.

Q.   Now, the invoice on the right-hand side of the page, where does that come from?

A.   This comes from the -- you are asking --

Q.   What set of records does this come from?

A.   Oh, sorry.  This came from the Bitstamp records.

Q.   And in this invoice, who is the customer indicated?

A.   The customer is Anton Beckman.

Q.   What is the monetary amount indicated in this invoice?

A.   440 Euros.

Q.   Is there a Bitcoin address indicated on this invoice?

A.   Yes.  It is Bitcoin address beginning in 1AIE.

Q.   And was there anything anomalous about that Bitcoin

address?

A.   It wasn't a valid Bitcoin address.

Q.   And there appears to be an inset of something else here. Could you explain what that is?

A.   Yes.  This is a screenshot from Bitstamp documentation that includes the deposit address that did correspond to Mr. Sterlingov's account.

Q.   And how does that address differ?

A.   That address begins with a 3 instead of a 1.

Q.   So comparing these two invoices, is there anything else unusual that you noticed about them?

A.   Yes.  They have the same invoice number.

        MR. BROWN:  The government passes the witness.

        THE COURT:  All right.  Mr. Ekeland.

                    CROSS-EXAMINATION

BY MR. EKELAND:

Q.   Good morning.

A.   Good morning.

Q.   Or good afternoon.

        MR. EKELAND:  May I proceed, Your Honor?

        THE COURT:  You may.

        MR. EKELAND:  Thank you.

BY MR. EKELAND:

Q.   Ms. Glave, you testified that you work for Deloitte?

A.   Yes.

Q. And what is your hourly rate at Deloitte?

A. I am actually a salaried employee. And my salary is $111,000.

Q. And does -- and you said you worked as an IRS-CI on contract through Deloitte. Did I understand that correctly?

A. Yes. I am contracted in detail to IRS-CI.

Q. And does how does Deloitte bill the IRS for your work?

A. I am not entirely sure how they bill the IRS for the work.

Q. But you are not the only Deloitte employee working for the IRS-CI department?

A. No, I am not.

Q. Would it be fair to say that Deloitte makes a fair amount of money from the IRS contract, subcontracting IRS-CIs like you to the IRS?

A. I am not entirely sure of the logistics of the contract.

Q. And do you know about how many hours you have worked on this case?

A. Yes. I have probably worked hundreds of hours on this case.

Q. And did you have staff working for you?

A. No.

Q. Oh. And you were hired to work on this matter after Mr. Sterlingov was arrested?

A. I was hired through Deloitte prior to Mr. Sterlingov getting arrested.

Q.    Did you start working on this case before Mr. Sterlingov was arrested?

A.    I did not.

Q.    Can -- do you know the date or approximate date that you started working on this case?

A.    I was reached out to by one of the case agents in July of 2022.  But I did not receive financial records related to the case for almost a year later.

Q.    And when you got those financial records, was it your understanding that Mr. Sterlingov was alleged to have run Bitcoin Fog?

A.    It was my understanding that he had been arrested, yes.

Q.    And were you asked to look at the financial records for any other suspects in this case?

A.    No, I was not.  My role was to summarize the records related to Mr. Sterlingov.

Q.    And you haven't done any -- you haven't been asked to do any sort of independent investigation to establish whether or not Mr. Sterlingov was actually involved in Bitcoin Fog?

A.    No.

Q.    And then briefly on your credentials you, I think, mentioned that you are a member of the American Institute of Certified Public Accountants?

A.    Yes.

Q.    And you are a CPA; correct?

A.   Yes.

Q.   And you are also a certified fraud examiner; is that right?

A.   Yes.

Q.   But you are not certified in financial forensics by the AICPA, do I have that right?

A.   Correct.

Q.   And would you agree with me that part of financial forensic accounting is interviewing people regarding assets and income and the like?

        MR. BROWN:  Objection; calls for speculation.

        MR. EKELAND:  I am asking for her expert opinion understanding and the basis for her opinions.

        THE COURT:  Overruled.

        THE WITNESS:  Can you repeat the question?

BY MR. EKELAND:

Q.   Yes.  Would you agree with me that as part of financial forensic accounting, that interviewing subjects is important?

A.   I think it can be a part of forensic accounting, but it doesn't always need to be a part of it.

Q.   Would you agree with me that if you don't interview a subject, you might have an incomplete picture of their income and assets?

A.   Potentially.

Q.   And you wouldn't really know if you were missing

information, if you hadn't interviewed somebody about their assets and income?

MR. BROWN: Objection. Can we get on the phone?

(Conference held at the bench.)

MR. BROWN: Your Honor, I think where this is going is going to implicate Mr. Sterlingov's Fifth Amendment rights. Because defense counsel seems to be going down a road where he is trying to impugn Ms. Glaves' analysis because she didn't interview the defendant. And we absolutely, I mean -- we cannot do that. And I think this just raises incredibly tricky and dangerous subject areas and it is not relevant.

THE COURT: That is a fair point. If you are suggesting that she was negligent in not interviewing Mr. Sterlingov and she wasn't allowed to because he was represented by counsel, because it would -- how do you reconcile that?

MR. EKELAND: It is a simple question, they never asked. Mr. Sterlingov was never given an opportunity to even deny and exercise his Fifth Amendment rights. And I am simply asking the question -- pointing out that without any interviewing a subject, it is -- because that is the case here. They are missing a lot of information. They never bothered to ask if they could interview Mr. Sterlingov and even give him the option. It wasn't even presented to him.

MR. BROWN: Your Honor, as Mr. Ekeland well knows,

that is false.  We gave Mr. Sterlingov a proffer letter and we gave him an opportunity to speak to the government.  That is misleading and it is false.  And it is a misrepresentation to the Court to say that we never gave Mr. Sterlingov an opportunity to explain himself or be interviewed.

MR. EKELAND:  I disagree with that, Your Honor.  Because what we are talking about here is we are not talking about a proffer letter.  What we are talking about is their forensic analyst asking Mr. Sterlingov if they can talk to him about his income and assets.  And that wasn't the subject matter of the proffer.  What the proffer was, was essentially the government saying, come in and tell us that you ran Bitcoin Fog, even though Mr. Sterlingov claims he doesn't, you know.

MR. BROWN:  That is not true.  The proffer letter was -- if he had anything to tell us, we would sit there and listen.  That is absolutely not true, Mr. Ekeland.

THE COURT:  So I guess the question is whether this line of questioning is opening the door to that coming in and Mr. Sterlingov's refusal to do so.  And I guess that is the question is whether this is opening the door to that.  That is a tricky question.  And I am concerned about, obviously, when we are dealing with someone's Fifth Amendment rights about raising any issue with respect to that.

MR. EKELAND:  Your Honor, I am fine with moving on from this.  It is not a hill I need to die on.

THE COURT:  I was going to say, I think the question was asked and answered already, in any event.  But I do think that this is a concern we might have to come back to, because I think you have raised this issue a couple times now and I just think we need to figure out how to sort it out.

Why don't you go ahead and proceed.

(End of bench conference.)

BY MR. EKELAND:

Q.  As part of your forensic investigation, did you interview any of Mr. Sterlingov's employers in Sweden?

MR. BROWN:  Objection; calls for hearsay.

MR. EKELAND:  I am not asking for any statements from the employers.  I am merely asking if she interviewed any.

THE COURT:  If she -- you can ask whether she personally interviewed anybody in Sweden.  It is certainly beyond the scope, but I will allow you to ask that question.

BY MR. EKELAND:

Q.  Did you interview any of Mr. Sterlingov's employers in Sweden?

A.  No.  That was outside of the scope of what I was asked to do for this.

Q.  And in terms of the scope of what you were asked to do, you didn't do any independent investigation beyond I think what you just testified to, looking on websites for exchange rates and the like; is that correct?

A. That is correct.

Q. And you essentially, outside what you testified to, you just relied on the information that the government gave you?

A. That is correct.

Q. And in that information, you didn't review any of Mr. Sterlingov's information about any of Mr. Sterlingov's paper wallets?

A. No, I did not review any paper wallets.

Q. And do you know what a paper wallet is?

A. A wallet that is on paper.

Q. In relation to crypto, do you know what a crypto paper wallet is?

A. I have not personally worked with paper wallets before.

THE COURT: I think that you are -- you have suggested yourself that this is not an area that she is being offered as a witness on with respect to expertise with respect to cryptocurrency, so I think you should move on.

MR. EKELAND: I am not asking for the expertise, Your Honor. I am trying to get a sense of what assets she actually reviewed.

THE COURT: You can ask what she reviewed, that is fine. I think you asked her whether she understood some cryptocurrency technology.

BY MR. EKELAND:

Q. Ms. Glave, did you review any of Mr. Sterlingov's private

wallets?

A.   No, I did not.

Q.   And I think you showed the slide listing all of Mr. Sterlingov's accounts and whatnot that you reviewed.  And some of those accounts were KYC accounts; is that correct?

A.   That is correct.

Q.   And the earliest account that you had listed was Mr. Sterlingov's KYC Mt. Gox account?

A.   That is correct.

Q.   And that was first opened on, I believe, October 3rd, 2011?

A.   I do not have the date in front of me.

Q.   Well, if we could take a look at that exhibit, which was -- Mr. Hassard, if you could bring that up.  And I believe that chart is on -- I think it was page 2.  What exhibit was that, 352; is that right?  Exhibit 305.  I'm sorry.

        MR. BROWN:  Your Honor, is Mr. Ekeland asking the witness to read from the exhibit or to testify from memory?

        MR. EKELAND:  I'd like to call up the exhibit and review the table with Ms. Glave to look at some of these accounts, Your Honor.

        THE COURT:  This is an exhibit in evidence?

        MR. EKELAND:  It is in evidence.  It is what the government entered into evidence I believe as Government Exhibit 305.

THE COURT:  Okay.

BY MR. EKELAND:

Q.   And if we could go to the page with the list of accounts I think it may have been -- keep going back.  Keep going.  There we go.  Thank you.

And you see there, there is -- I believe this is Mr. Sterlingov's Mt. Gox account and that was -- you see how it was opened on October 3rd, 2011?

A.   This actually means that the first transaction was October 3rd, 2011.

Q.   The first transaction --

MR. BROWN:  Your Honor, can Mr. Ekeland not comment on or repeat the witness' answers, please.

THE COURT:  Please.

BY MR. EKELAND:

Q.   And you are not aware of any other Bitcoin transactions by Mr. Sterlingov before that date?

A.   That is the earliest Bitcoin transaction, yes.

Q.   And are you aware that Mr. Sterlingov was engaged in Bitcoin transactions before he opened this Mt. Gox account?

A.   The scope of what I reviewed are the accounts listed in this table 1.  So anything outside of that, then, no, I am not aware of activity prior to that.

Q.   So everything in this table is the totality of what you reviewed in your forensic analysis?

A. Yes.

Q. Did you do a full net worth, net income analysis?

A. I did a summary of income and expenditures.

Q. And is that the same as a full net worth, net income analysis?

A. It is similar, but there are different variations.

Q. It is similar, but not the same?

MR. BROWN: Objection, Your Honor, asked and answered.

THE COURT: Sustained.

BY MR. EKELAND:

Q. Now, you reviewed Mr. Sterlingov's Code Reactor invoices?

A. Yes.

Q. And you are aware that those Code Reactor invoices were for Mr. Sterlingov's freelance work?

A. Yes.

Q. And those Code Reactor invoices totaled roughly 56,000 Euros over a two- to three-year period. Do I have that right?

A. Can you refresh my memory?

Q. I believe if we go through this chart here, if we scroll through to the -- there is a summary of that on here.

Mr. Hassard, if we could click through to the chart until we get to the page, until we get to the Code Reactor and feel free to yell out when we get there. No, that is not it.

Keep going. Keep going. Is that --

There it is right there.  Do you see right there?

A.    Yes.

Q.    So that is roughly 56,000 Euros in 63 invoices between what is that April 29th, 2016 and April 24th, 2018; is that correct?

A.    Yes.

THE COURT:  Mr. Ekeland, when you have a convenient breaking point, we need a bathroom break.

MR. EKELAND:  Okay.  We can take a break right now.

THE COURT:  So it is a couple minutes of 2:00.  Let's come back -- make it a quick break and come back at 2:10.

THE COURTROOM DEPUTY:  12:10?

THE COURT:  Yeah, short break.

MR. EKELAND:  Thank you.

THE COURT:  12:10, my apologies.

(Jury out at 12:03 p.m.)

THE COURT:  The witness can take a break as well.  I just ask that you not discuss your testimony with anybody until it is completed.

Anything else before we step off for a minute?

MR. EKELAND:  Not from the defense, Your Honor.

MR. BROWN:  No, Your Honor.

A JUROR:  All right.  Thank you.

(Recess taken at 12:03 p.m.)

THE COURT:  The witness can resume the stand.

MR. HASSARD: Your Honor, the --

THE COURT: We, obviously, won't get started without him, your client.

MR. EKELAND: Yes. I was just talking to him so I just assumed he was in here.

THE COURT: He may have -- let's make sure --

Can you make sure that she doesn't bring the jury in?

I think we are okay.

(Jury in at 12:13 p.m.)

THE COURT: And all right. And you may proceed when you are ready.

MR. EKELAND: Thank you, Your Honor.

BY MR. EKELAND:

Q. Ms. Glave, are you ready?

A. I'm sorry. What is that?

Q. I said, are you ready, Ms. Glave?

A. Yes. Thank you.

Q. Just returning briefly to your testimony before we took the break, directing your attention to the screen here, that is right here in the column with the 63. That is the 63 total Code Reactor invoices that you reviewed?

A. Yes.

Q. And those Code Reactor invoices were for a total 56,060 Euros over a period of two years?

A. Yes.

Q. And besides the one Code Reactor invoice that Mr. Sterlingov sent to Bitstamp, are you aware of Mr. Sterlingov sending any invoices to anybody else?

A. Not that I observed throughout my review of the financial records.

Q. And are you aware that Mr. Sterlingov kept the Code Reactor invoices for his own internal accounting purposes?

A. I was not aware of that.

Q. And you mentioned that Mr. Sterlingov used a number of prepaid cards?

A. Yes, that is correct.

Q. And isn't it true that when Mr. Sterlingov used those prepaid cards, they were all in his own name?

A. Yes, that is correct.

MR. EKELAND: No further questions, Your Honor.

THE COURT: All right.

Anything further from the government?

REDIRECT EXAMINATION

BY MR. BROWN:

Q. Ms. Glave, you were asked if you had reviewed any other records in this -- in your analysis during cross-examination; right?

A. Yes.

Q. Now, are you aware that Mr. Sterlingov testified in a pretrial Monsanto hearing?

A.    Yes.

Q.    During that proceeding, he -- or for that proceeding he prepared a, quote, statement of net worth?

A.    Yes.

Q.    I'd like to pull up Government Exhibit 51, which has not yet been admitted.

And, Ms. Glave, do you recognize this document?

A.    Yes.

Q.    And what do you recognize this document to be?

A.    Mr. Sterlingov's statement of net worth.

Q.    Is this a fair and accurate copy of the statement of net worth from the Monsanto proceeding?

A.    Yes.

Q.    And was this statement of net worth something that Mr. Sterlingov adopted during that Monsanto proceeding?

A.    Yes.

MR. BROWN:  The government moves to admit and publish Exhibit 51.

THE COURT:  Any objection?

MR. EKELAND:  I just object, this wasn't part of the direct, Your Honor.

THE COURT:  I think it is within the scope of the cross, so I will admit Exhibit 51.  You may publish to the jury.

(Whereupon, Exhibit No. 51 was admitted.)

BY MR. BROWN:

Q. So scrolling through this briefly, are there -- is there more than one page to this exhibit?

A. Yes.

Q. And are there how many pages?

A. Two pages.

Q. And so looking at the first page, the table here, are there any financial accounts or assets on this first page that were included in your analysis?

A. Yes.

Q. And could you point that out?

A. The Nordea Bank account.

Q. And are there any financial accounts or assets that were not included in your analysis?

A. Yes.

Q. And what are some of those?

A. Tesla, Jeep, gold, money.com, physical gold.

Q. And what does it say about the physical gold?

A. The physical gold says it is in mother's possession.

Q. And how much did Mr. Sterlingov value that physical gold?

A. Approximately $18,000.

Q. Are there any other assets on the first page that were not included in your financial analysis?

A. Yes. The cryptocurrency accounts, Eclair and Mycelium.

Q. And how much did Mr. Sterlingov value his Mycelium wallet

here?

A.    $50,000.

Q.    And looking at the next page, are -- again, are there any financial accounts or assets listed here that were not a part of your analysis?

A.    Yes.

Q.    And what are some of those?

A.    Bleutrade, Jaxx and Monero.

Q.    How much did Mr. Sterlingov value his Jaxx wallet?

A.    Approximately $43,000.

Q.    So is it fair to say that there were other assets or accounts that may not have been included in your analysis of the table 1 accounts?

A.    Yes.

MR. BROWN:  No further questions.

THE COURT:  All right.

The witness is excused.  Thank you.

Can I ask counsel to pick up the phone for a second.

(Conference held at the bench.)

THE COURT:  Just to keep things moving, I know that you may only have one witness who is here.  I wonder if we should at least get started with that witness and if there is a way, Mr. Pearlman, where you could at least go through the person's -- the witness' background and qualifications before we have to cross the bridge about where to draw the line with

respect to any testimony regarding legal issues.

MR. BROWN:  Yes, Your Honor.  We do have another witness.  Valerie Mazars de Mazarin who is available to get started.  We are switching up the order a little bit, but we can do it that way.

THE COURT:  All right.

MR. EKELAND:  Your Honor, we have a discovery issue that has been brought to my attention that I think -- Mr. Sterlingov has asked me to address with the Court.  And I think because it involves evidence that Ms. Mazars de Mazarin was involved in, I think it might be best if we -- in the time that we have left, address that before she starts to testify.

THE COURT:  We have all afternoon for us to address whatever we want.  So as long as her testimony is not going to implicate whatever that is and you can tell the government what it is, let's get started.  We can go for at least 20 or 25 minutes.  Because I remain concerned about making sure this case is moving forward as quickly as we can, because I think we are running up against some deadlines.

MR. EKELAND:  Yes, Your Honor.  It is my understanding that the evidence is directly related to Ms. Mazars' testimony.  I don't know at what point or if it is going to come in, but it related to the server images, the P taps.  It is something that Mr. Fischbach has been going on back and forth about with the government.

MR. BROWN:  Your Honor, we can certainly get started with Ms. Mazars de Mazarin without reaching that issue today.

THE COURT:  Okay.  That is fine.  Let's do that.

Okay.  The government can call its next witness.

MS. PELKER:  The government calls computer scientist, Valerie Mazars de Mazarin.

VALERIE MAZARS DE MAZARIN, sworn

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Thank you.  You may be seated.

THE COURT:  All right.  You may proceed when you are ready.

DIRECT EXAMINATION

BY MS. PELKER:

Q.   Can you please state and spell your name for the record?

A.   My name is Valerie Mazars de Mazarin, V-A-L-E-R-I-E; last name, M-A-Z-A-R-S D-E M-A-Z-A-R-I-N.

Q.   CS Mazars, where do you work?

A.   I work at the US Department of Health and Human Services in the Office of the Inspector General.

Q.   How long have you been in that role?

A.   Since April 2023.

Q.   Where did you work prior to joining HHS?

A.   At the FBI.

Q.   What was your position at the FBI?

A.   Computer scientist.

Q. And while at the FBI as a computer scientist, were you assigned to work on the Bitcoin Fog investigation?

A. Yes.

Q. In your new role with HHS OIG, are you still working with the FBI?

A. Yes, I am.

Q. Can you explain that?

A. I am also a task force officer at the FBI. My agency has a memorandum of understanding with the FBI. So that means that I come sit at FBI task force spaces and work on joint cases and also non-joint cases, I can freely provide analysis and forensic support.

Q. Does your relationship with the FBI include -- your continued relationship with the FBI and work for the FBI include testifying regarding cases that you previously worked on, including your testimony here today?

A. Yes, it does.

Q. Taking a step back, could you summarize your educational background?

A. I have a BS in computer science from Georgetown University.

Q. Have you worked in the computer science field after graduating with your computer science degree?

A. Yes. I had technical jobs since.

Q. And where did you work immediately after graduating

college?

A.    At a company called Honeywell International.

Q.    And what was Honeywell?

A.    It is an international conglomerate of manufacturing companies.  And I worked within their chemical manufacturing company.

Q.    What did your work at Honeywell entail?

A.    I was a solutions architect.  So within IT, that means thinking of possible solutions that haven't been implemented yet to keep the company running better and building prototypes of them and testing them out to recommend what we should invest in next.

Q.    Did your work at Honeywell involve any work with servers?

A.    Yes.  Sometimes in the course of trying out tools and reviewing current tools, I would have to set up servers internally.

Q.    What goes into setting up a server?

A.    It involves assessing what you are trying to do for how much space and power you will need on the server.  And provisioning that, installing operating systems and setting it up to talk to other servers, if needed.

Q.    And did your work at Honeywell also involve code review?

A.    Yes, it did.

Q.    Can you explain what code review is?

A.    Sometimes, when a solution would hit a roadblock, it

didn't seem to be functioning properly, I would be asked to take a look at the code to make sure it looked efficient and correct. So reading it over in typed out form to see if I could identify any issues with it that might be, for example, slowing things down.

Q. Where did you work at after your time at Honeywell?

A. At Booz Allen Hamilton.

Q. What did your work at Booz Allen involve?

A. I was a senior consultant and an analytical tool developer, so I built JavaScript data visualizations and dashboards custom for Army and Navy clients on site.

Q. When did you join the FBI?

A. In January, 2018.

Q. What were your job responsibilities at the FBI?

A. Primarily digital forensics, so acquiring and processing and reviewing of digital evidence items, images of laptops and servers. I also did network traffic analysis and data analysis. In general, I would write custom tools to help process specific types of data that there might not yet be tools for yet. And I also would test out new technologies as needed if like a Raspberry Pi, a Flipper Zero or a skimmer, sometimes I would have a look at things like that to determine the best way to analyze it.

Q. And you just used a few different terms of Raspberry Pi, skimmer zero, are those somewhat newer, novel technologies that

you would have to write tools to analyze?

A.    Some newer than others, but usually technologies that aren't typically looked at that that you don't see every day in the world of forensic examination.

Q.    And in addition to your work in digital forensics and data analysis, did you do casework support at FBI?

A.    Yes, I did.

Q.    Can you explain generally what casework would entail for an FBI computer scientist?

A.    So while some projects I worked on were very job based, I was given something specific to look at and analyze.  For most cases that I worked on, I would collaborate with the agents on my own, for example, if we got data or logs back from a source, some legal process, I will look through it and triage it to try to find some leads and try to find connections in other cases and make recommendations as to which individuals or servers we should look at next to try to keep the case moving.

Q.    What types of cases do you work on?

A.    Primarily criminal network intrusions, but also wire fraud and stolen data type cases, darknet markets.

Q.    Did your work at FBI also involve supporting undercover operations?

A.    Yes, it did.

Q.    Why would an undercover operation need help from a computer scientist?

A. The primary reason would be to preserve operational security when the FBI does operations online, they don't want any of that activity linked back to the FBI or to any of its individual employees. And they also don't want it linked to other cases. So this means that for each operation, they would need a variety of different servers, phones or whatever is needed to keep that activity separate and anonymous.

Q. Without getting into anything sensitive, what was your role in setting up that sort of infrastructure?

A. I would set up websites, determine the only ways to connect to pages they might have online pages. And I would also design which ways agents were to connect to the internet in general, sometimes write scripts or set up installers so they could reliably connect to the internet in an anonymous way.

Q. Did your work also involve sometimes making it look like the undercover was a cybercriminal?

A. Yes. When new pages or accounts were stood up or as they were stood up, I spend a long period of time populating the accounts and making them look real by doing some activity every day on them and generally making them so they will blend in with other online users of these forums.

Q. Why was it important to try to mirror the operational security used by cyber criminals in your setting up of the undercover infrastructure and activity?

A. Apart from protecting the individual users' identities and my own identity, it is important to not do things the same way each time, because then it becomes your signature. If online criminals or cyber actors are using new technologies, they have a few favorite sources, I will jump on and use those too. Because all of that will bolster my reputation and credibility online.

Q. On the investigation side, did your work also involve piercing cyber criminals' op sec?

A. Yes.

Q. Have you completed any relevant professional trainings and certifications?

A. Yes. Relevant to the field of cybersecurity in general, I have my GIAC, reverse engineering malware certificate that I completed, and also the security 401 equivalent, the GSEC, it is called.

Q. What is the organization that offers the GSEC and the reverse engineering malware?

A. It is called the SANS Institute.

Q. What is malware?

A. Malware, you can think of as computer viruses or any code that is designed to steal information, have a destructive effect on your computer and propagate itself further.

Q. Can you give some examples of common malware that the jury might be familiar with?

A.   Ransomware is probably the most well known now.  But you may also have heard of rootkits or credential stealers, such as key loggers.

Q.   What does a credential stealer or a key logger do?

A.   It records the activity of the user while the user is on it, unbeknownst to them.  So if the user types their password into a field, something secretly listening on the computer and now it has that password or maybe a credit card number or something private in cryptocurrency.  And from there, it can send it back to a computer that the attacker controls.

Q.   And at a high level, what does reverse engineering malware mean and what is its purpose?

A.   Reverse engineering malware is determining how it works and what it does.

Q.   Why is it helpful to reverse engineer malware?

A.   By reversing the malware, not only can you find out what other parts of the internet it calls back to, you might find clues about who wrote it and how it works, so you can look for traces of it or other malware it may have contributed to your network.

Q.   What goes into the GREM or the reverse engineering certification that you mentioned?

A.   It mostly teaches you how to reverse engineer compiled executable programs using some tools to partially decompile them.  You run tools to look at metadata, so maybe times it was

changed and names and signatures of what might have gone into it. And it also involved looking for clues on the operating system to help -- to further help take it apart.

Q. And what goes into the actual -- the certification itself of the certification process?

A. It involved taking a week-long intensive class, maybe a week and a day and then taking an in-person exam.

Q. And is analyzing malware something that you also have hands-on work experience doing?

A. Yes.

Q. And have you received other training in digital forensics or related topics?

A. Yes, I have.

Q. What are some of the topics that those trainings have covered?

A. In the FBI's computer scientist field, operations training, I covered a number of topics, including mobile technology, network traffic analysis, Windows operating system forensics and Linux forensics, writing scripts to help automate the forensic process, interviewing, ways to find out more information from victims about how their network was affected and writing comprehensive reports about findings.

Q. Can you explain at a nontechnical level what a computer programming language is?

A. A computer programming language is a more user friendly

for a programmer way to tell the computer what to do.  There are different words and phrases that it understands.  But at a high level, you give the computer commands through this computer code and its language.  And then depending on the language, that gets converted into more and more low level languages until eventually the computer understands it as ones and zeros and can run it.  But it would be very difficult to write a program exactly as the computer understands it.  So programming languages exist so that people can tell it what to do in a reasonable way.

Q.    Is that sometimes also called coding?

A.    Yes, it is.

Q.    And are there different types of computer programming languages?

A.    There are.

Q.    Are you familiar with any computer programming languages?

A.    Yes.

Q.    And can you speak to what those are?

A.    For example, C and C++, Java, Python, JavaScript, Go, Rust, Ruby, are some that you may have heard of.

Q.    And which computer programming languages are you either proficient in or can at least understand code written in?

A.    C and C++, Java, Python, JavaScript, PHP, anything command line, if you count that, so terminal and Bash and PowerShell. I can read Ruby code for sure.  Those are the main ones that

come to mind.

MS. PELKER: Your Honor, the government would move to qualify CS Mazars de Mazarin as an expert in internet routing, network and IP analysis, digital device forensics, operational security used by cyber criminals, particularly tools and techniques used to conceal location and identity online, as well as cyber terms and tools.

THE COURT: Okay. The Court concludes that she is qualified to testify as an expert in those topics.

MS. PELKER: Your Honor, what time are we going until today?

THE COURT: I think probably until a quarter of, just another 5 minutes or so. If you wanted to break now, we could or we can go for another 5 minutes, whichever you prefer.

MS. PELKER: We'll use the time. We'll keep going.

THE COURT: Okay.

BY MS. PELKER:

Q. CS Mazars, did you do a few different areas of work in the Bitcoin Fog investigation?

A. Yes, I did.

Q. Can you speak generally to what those are?

A. Reviewing accesses, IP addresses and dates in logs, doing digital forensic review of Mr. Sterlingov's devices as found at the time of his arrest, and reviewing legal process returns, also some server analysis.

Q. And we'll speak to each of those today and then tomorrow. But to be clear, CS Mazars, did you join this case before or after the defendant was arrested?

A. After.

Q. So your work was not how the defendant initially identified the defendant?

A. No.

Q. But in your work, did you find additional information corroborating the government's case with regard to Mr. Sterlingov?

A. Yes, I did.

Q. Did part of your work on the Bitcoin Fog case involve reviewing records from different accounts tied to Bitcoin Fog and tied to the defendant?

A. Yes.

Q. What were you looking for when you were doing that review?

A. I was looking primarily for accesses, so log-ins, log-outs, anytime a user interacted with that account and looking for patterns and comparisons between that activity in the accounts and the activity in other accounts.

Q. Can you explain what is an IP address?

A. An IP address is an identifier for a computer that is on the internet so that other computers can find it. You could liken it to, if I want to go visit my friend for the first time, she will give me the address to her house or apartment

building and I will know exactly where to go.  It is going to look like either four sets of numbers separated by periods, for IPv4 addresses or for a newer IPv6 format, you will see letters and numbers separated by colons.

Q.    What is the role of an IP address in routing communications over the internet?

A.    The IP address is the destination for the internet traffic.  The traffic is sent between one IP address, so the user's and the other, the server's IP address.

Q.    Can a computer access the internet without an IP address?

A.    No.

Q.    And does that apply to both personal computers and big servers?

A.    Yes, they both have IP addresses.

Q.    And does every server that is hosting a webpage have an IP address?

A.    Yes.

Q.    And are IP address just randomly generated?

A.    No.

Q.    Who controls and assigns IP addresses at the highest level?

A.    IANA.

Q.    What is -- is that the acronym for the Internet Assigned Numbers Agency?

A.    Yes.

Q.    What is IANA?

A.    It is the entity that controls the entire IP address space and allocates blocks of it down.  IP addresses are assigned in a hierarchy.  IANA to regional information registers who then assign it to companies.

Q.    So speak -- so after IANA assigns it down to the regional internet registries --

A.    Internet registries, I'm sorry.

Q.    How are the internet registries distributed?

A.    Geographically.

Q.    So who controls the IP address space for North America as allocated by IANA?

A.    It is called ARIN, A-R-I-N.

Q.    Does that stand for the American Registry for Internet Numbers?

A.    Yes, it does.

Q.    And what does ARIN then do with the big block of IPs that it got from IANA?

A.    As we move down the hierarchy, ARIN then decides which entities have which blocks of its IP space, usually large companies like internet service providers and Comcast or Verizon.

Q.    And how does an individual person here in North America under ARIN get an IP address to use?

A.    They would have to go to the level below ARIN.  So each of

those companies are entities that gets its IP address, the user would have to go get one.  But as an individual, you don't need to manually configure that.  Typically if I am at home, I set up my router and my internet service provider handles which IP address is the one for my home.

Q.   So can you just walk through to summarize the different levels that you just laid out from IANA down to the user?

A.   So IANA IRs including ARIN for North America, the company such as Comcast, and then sometimes there are more resellers or other levels within, but then the user or the user's home or place of entering the internet specifically.

Q.   Do ARIN and the other regional registries keep track of what companies control which IP addresses?

A.   Yes.

Q.   Is there a way to look up that information?

A.   Yes, there is.  They are called Who Is records.

Q.   And we'll discuss this later, but can you also look up Who Is information based on a website domain?

A.   Yes.

MS. PELKER:  Your Honor --

THE COURT:  This is a good time to break?

MS. PELKER:  This is a fine time to break.

THE COURT:  All right.  Let's break for the day.  I remind you don't discuss the case, even amongst yourselves. Don't conduct any type of research.  We are going to get going

tomorrow at 9:00 a.m.  I appreciate everyone working really hard to get here.  I know people are working on that, but make sure you are here.  Try and get here by 8:30, so we can really get going at 9:00.  Tomorrow and Thursday, we'll put in a full day and Friday, we are going to have a half day.  So we are doing our best to keep things moving.

Have a nice afternoon and I will see you tomorrow.

(Jury out at 12:46 p.m.)

THE COURT:  The witness can step down.  And I will just ask that you come back at 9:00 tomorrow and don't discuss your testimony until it is complete.  Okay?

THE WITNESS:  Okay.

THE COURT:  And we have got at least a couple of things to discuss among ourselves.  I know there is the issue that Mr. Ekeland just alluded to, which I don't know what the issue is but I know there is an issue.  And then there is the question of -- with respect to testimony relating to the Bank Secrecy Act and the administration and so forth.

Anything else that we should discuss this afternoon?

MS. PELKER:  I think that is it from the government, Your Honor.

THE COURT:  Anything else, Mr. Ekeland?

MR. EKELAND:  No, Your Honor.

MS. PELKER:  I guess, just scheduling, Your Honor, and maybe talking about the juror situation of who is -- I

think it would be helpful to know both who is late, but who is not going to be available that week of March 10th, because I tink it is -- it is increasingly unlikely that we finish by March 7th.

THE COURT:  I don't know the answer to the question of -- the deputy clerk may know.  I don't know the answer to which of those jurors were not going to be available.  I think there was two or three.  Is that right?

THE COURTROOM DEPUTY:  I don't remember exactly who it is.  I did a sort of a soft poll and asked them to raise their hand.

THE COURT:  Today, the two jurors who have been chronically late, actually were here on time.  And one juror who has been extremely conscientious simply overslept and she felt terrible about it.  And I don't expect that to happen again.

MR. EKELAND:  Your Honor, just a quick question.

THE REPORTER:  Microphone.

MR. EKELAND:  Your Honor, the government just said that they think it is increasingly unlikely we'll finish by March 7th.  I am just wondering if that -- the government is referring to their case or the trial in totality.  I just want to get clear --

THE COURT:  Fair question.

MS. PELKER:  I sincerely hope that we are not still

on the government's case March 7th. As currently scheduled, we expect that the government's case is going to go into next Monday.

THE COURT: Next Monday. Okay.

MS. PELKER: But we are having a hard time estimating how long cross is going to take for some of these witnesses. We are just not sure.

THE COURT: All right. I understand that. We should continue to talk about scheduling as we go forward. The other thing is we can start the conversation with respect to jury instructions as well. And just to preview it for you, the one instruction that I am continuing to puzzle over is the same issue that I highlighted earlier on with respect to the meaning and application of the DC licensing requirement. And in particular, I have been giving thought to what -- I don't think it is a venue issue as much as what is the nexus requirement to DC or potentially, what, if anything is the scienter requirement. And is it a jurisdictional question? I don't think it is a venue question, but is it a jurisdictional question, that is a preponderance standard or is it an element of the offense? And there is some D.C. Circuit precedent I think that says the provision at issue -- not D.C. Circuit, D.C. Court of Appeals precedent that suggests that the provision at issue hereof is a strict liability provision. But there is case law that says that even when you are dealing with

a strict liability rule that simply means you don't have to know the rule or know that you are violating it. But you have to know that you are engaged in the underlying conduct. So does that mean then that the right answer here is that there has to be -- the jury would have to find that the defendant knew that some transactions would originate or end in the District of Columbia? And if that is the case, then what are the standards with respect to knowledge in a world that is inherently cloaked in secrecy and intentionally cloaked in secrecy? And do I need to instruct with respect to willful blindness or natural consequences of one's actions? I don't know the answer to any of these questions, but that is what I am starting to think through.

And that is what I regard as the hardest issue thus far in thinking about the jury instructions, but also you can be thinking about it as well. That is just a preview.

MS. PELKER: Yes, Your Honor.

MR. EKELAND: We are having a jury charge conference, I am assuming?

THE COURT: We certainly will, yes. But I need to figure out enough answers to these questions that I can give you draft jury instructions for you to comment on. And I think we have time still on that. So I would propose we come back this afternoon at 3:00 to take up the couple of issues that we have. Is that acceptable?

MR. EKELAND: Yes. The only thing we would ask, Your Honor. We have an opposition that we need to file I think by 5:00. If we could get a couple extra hours on that. We have drafted it, but if we could get it in this evening.

THE COURT: Yes. You can have until 7:00 on that.

MR. EKELAND: Thank you, Your Honor.

THE COURT: All right. I will see you back at 3:00 then. Thank you.

THE COURTROOM DEPUTY: All rise.

(Recess taken at 12:51 p.m.)

C E R T I F I C A T E

I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.

Dated this 28th day of February, 2024.

_____
Sherry Lindsay, RPR
Official Court Reporter

A JUROR: [1] 87/23
BY MR. BROWN: [20] 14/20 38/24
44/1 46/10 48/20 49/25 51/5 53/25
61/8 62/12 62/21 63/2 65/17 68/4
69/5 71/6 72/23 74/5 89/19 91/1
BY MR. EKELAND: [12] 23/3 25/8
76/16 76/23 79/16 82/8 82/17
83/24 85/2 85/15 86/11 88/13
BY MR. PEARLMAN: [8] 4/24 6/19
9/17 9/25 12/6 15/1 18/7 18/23
BY MS. PELKER: [2] 94/13 104/17
MR. BROWN: [31] 35/23 36/2 36/10
36/16 36/24 37/13 38/1 38/12
38/18 43/22 46/2 49/17 65/10
67/18 67/23 73/23 76/13 79/11
80/3 80/5 80/25 81/14 82/11 84/17
85/12 86/8 87/22 90/17 92/15 93/2
94/1
MR. EKELAND: [61] 4/17 6/14 9/9
9/20 11/25 14/18 14/22 16/20 17/6
17/8 17/11 18/17 22/24 23/1 31/1
32/12 33/15 35/20 36/15 36/19
37/22 46/5 48/18 49/16 49/20 51/3
53/18 53/20 61/5 65/13 67/21 69/1
71/1 71/4 72/18 74/1 76/20 76/22
79/12 80/17 81/6 81/24 82/12
83/18 84/19 84/23 87/9 87/14
87/21 88/4 88/12 89/15 90/20 93/7
93/20 109/23 110/17 110/19 112/18
113/1 113/6
MR. HASSARD: [1] 88/1
MR. PEARLMAN: [20] 4/13 4/22
12/1 12/3 14/23 18/18 18/22 22/21
25/1 25/3 31/3 31/5 32/2 32/5
33/1 33/23 35/2 35/7 35/9 35/19
MS. PELKER: [11] 94/5 104/2
104/10 104/15 108/20 108/22
109/20 109/24 110/25 111/5 112/17
THE COURT: [111] 4/2 4/7 4/16
4/20 6/15 9/11 9/21 12/2 12/4
14/19 14/25 16/21 17/19 18/6
18/20 22/23 22/25 25/2 25/5 31/2
31/4 31/6 31/9 32/4 32/7 32/11
32/18 33/14 34/18 35/5 35/12
35/18 35/21 35/25 36/4 36/7 36/14
36/23 37/10 37/15 38/8 38/14
38/16 38/22 43/24 46/4 46/7 48/19
49/18 49/21 51/4 53/19 53/22 61/6
65/12 65/14 67/20 68/1 69/2 71/2
71/5 72/19 73/25 74/2 76/14 76/21
79/14 80/12 81/17 82/1 82/14
83/14 83/21 84/22 85/1 85/14
86/10 87/7 87/10 87/13 87/15
87/17 87/25 88/2 88/6 88/10 89/16
90/19 90/22 92/16 92/20 93/6
93/13 94/3 94/10 104/8 104/12
104/16 108/21 108/23 109/9 109/13
109/22 110/5 110/12 110/24 111/4
111/8 112/20 113/5 113/7
THE COURTROOM DEPUTY: [9] 4/5
36/9 38/21 62/10 62/20 87/12 94/9
110/9 113/9
THE REPORTER: [2] 4/9 110/18
THE WITNESS: [14] 6/16 9/12 9/22
16/24 17/7 25/6 38/20 53/23 61/7
63/1 72/20 79/15 94/8 109/12

$
$1,000 [2] 51/25 52/4
$1.8 [1] 58/10
$1.8 million [1] 58/10
$100 [2] 17/3 17/7
$111,000 [1] 77/3
$18,000 [1] 91/21
$2,000 [1] 52/3
$260,000 [1] 58/1
$321,797.86 [1] 61/21
$4 [1] 22/13
$40,468.27 [1] 61/14
$43,000 [1] 92/10

$43,925.07 [1] 60/15
$450,884.33 [1] 61/23
$5 [2] 69/14 70/2
$50,000 [1] 92/2
$6 [1] 22/13
$6 billion [1] 22/13
$70 [5] 9/1 11/10 11/16 13/7
22/10
$70 million [4] 9/1 11/10 13/7
22/10
$729.01 [1] 69/23
$758.64 [1] 69/10
$93,226.95 [1] 61/17
$98 [1] 17/5

1
1,000 [1] 52/1
1,001 [5] 63/7 66/21 66/23 69/12
70/9
1,002 [3] 66/1 69/25 70/10
1,907.81 [1] 55/23
1.6751 [1] 68/11
10 [4] 19/17 28/15 41/15 42/13
100 percent [1] 18/12
10005 [1] 2/4
10:30 [1] 35/17
10:31 [1] 36/6
10:55 [1] 38/15
10th [1] 110/2
11-year [1] 55/1
12-year [1] 61/18
120,000 [5] 8/23 8/24 23/19 24/8
24/13
12:03 [2] 87/16 87/24
12:10 [2] 87/12 87/15
12:13 [1] 88/9
12:30 [1] 35/13
12:45 [1] 35/13
12:46 [1] 109/8
12:51 [1] 113/10
13 [7] 37/6 72/8 72/9 72/25 73/17
74/8 74/13
1301 [1] 1/20
150 [1] 40/13
16th [1] 65/20
18th [4] 36/25 38/2 67/25 69/17
19.9 [1] 54/3
191 [1] 33/23
1AIE [1] 75/24
1EUDR [7] 64/19 66/25 67/2 68/20
69/20 71/10 74/12
1GDFT [1] 75/2
1PLBO [7] 68/23 69/8 70/4 71/25
72/1 72/3 74/10

2
2 percent [2] 17/2 17/16
2,000 [1] 23/25
2,128.10 [1] 55/21
2,707.78 [1] 55/3
20 [4] 41/14 42/1 54/3 93/16
20-year [1] 30/11
20001 [1] 2/9
20005 [1] 1/21
2010s [1] 5/6
2011 [6] 26/9 47/22 55/9 84/11
85/8 85/10
2012 [3] 26/9 55/15 55/15
2013 [10] 6/13 33/12 55/17 55/17
55/19 55/24 56/2 57/2 57/21 57/24
2014 [6] 6/13 49/12 56/1 56/2
61/7 61/9
2015 [2] 26/4 61/12
2016 [10] 8/25 22/3 26/4 62/16
65/20 68/14 68/17 68/19 69/17
87/4
2017 [6] 50/7 58/4 59/5 59/6 59/7
59/17
2018 [5] 58/5 60/13 61/7 87/4
97/13
2021 [1] 47/22
2022 [2] 22/4 78/7

2023 [2] 67/25 94/21
2024 [2] 1/5 114/10
20530 [2] 1/14 1/17
21-399 [2] 1/4 4/9
23 [1] 3/4
24-hour [1] 40/22
24th [1] 87/4
25 [1] 93/16
258.51 [2] 53/6 53/14
27 [1] 1/5
28th [1] 114/10
29th [3] 62/16 68/17 87/4
2:00 [1] 87/10
2:10 [1] 87/11

3
30 [1] 2/3
305 [11] 3/14 44/11 45/21 45/24
46/3 46/7 46/9 70/14 74/13 84/16
84/25
305A [6] 3/15 38/6 73/9 73/24
74/2 74/4
306 [11] 3/15 67/6 67/7 67/9
67/11 67/19 68/1 68/3 68/5 68/18
69/16
30th [2] 68/14 68/19
326 [5] 72/13 72/14 72/17 73/2
73/21
33 [2] 50/19 51/10
333 [1] 2/8
352 [1] 84/16
352.84 [1] 55/25
38 [1] 3/7
39.9 [4] 53/13 53/23 54/6 54/8
399 [2] 1/4 4/9
3:00 [2] 112/24 113/7
3rd [3] 84/10 85/8 85/10

4
40 [3] 40/21 42/23 44/24
40,285.22 [1] 61/11
401 [1] 100/15
440 [1] 75/22
45 [1] 35/23
450 [1] 74/21
46 [1] 3/14

5
5.1527 [1] 1/17
51 [5] 3/16 90/5 90/18 90/23
90/25
56,000 [2] 86/17 87/3
56,060 [1] 88/23
5:00 [1] 113/3

6
601 [1] 1/16
615 [1] 36/17
63 [3] 87/3 88/20 88/20
640 [1] 66/14
65 [1] 3/14
660 [1] 63/19
6710 [1] 2/8
68 [1] 3/15

7
702 [4] 9/10 16/20 72/18 74/1
719A [6] 62/8 62/10 64/24 66/23
68/15 68/16
719B [6] 3/14 64/24 64/25 65/11
65/14 65/16
74 [1] 3/15
76 [1] 3/7
7:00 [1] 113/5
7th [3] 110/4 110/21 111/1

8
8,423 [1] 45/2
80 percent [1] 55/6
89 [1] 3/8
8:30 [1] 109/3

8

8th [1] 2/4

9

90 [1] 3/16
94 [1] 3/10
950 [1] 1/14
98 [1] 55/14
99 [1] 55/14
9:00 [1] 109/4
9:00 a.m [1] 109/1
9:00 tomorrow [1] 109/10
9:19 [1] 1/6
9:42 [1] 4/8

A

a.m [6] 1/6 4/8 35/17 36/6 38/15 109/1
ability [3] 33/5 50/9 50/11
able [31] 6/10 7/11 7/14 7/15 8/2 8/6 8/10 8/14 8/16 8/21 11/19 19/13 21/11 21/13 21/15 22/5 25/19 26/1 33/4 34/11 34/13 34/14 37/2 46/24 47/2 62/17 63/21 66/24 71/18 71/22 72/1
about [87] 4/25 5/16 5/25 7/8 9/1 10/7 10/14 11/8 11/18 12/7 12/11 12/15 12/22 13/11 13/22 14/1 14/17 15/2 15/16 16/1 16/17 16/21 17/22 18/11 18/14 18/24 19/3 19/13 19/19 20/9 21/3 23/19 23/25 26/6 26/7 26/8 26/9 26/14 26/23 28/14 31/15 31/22 33/10 33/13 33/25 34/2 34/4 34/5 34/13 34/14 35/6 35/10 37/20 37/25 46/24 48/2 48/23 48/24 51/1 51/12 56/14 58/21 59/1 67/15 75/25 76/11 77/16 80/1 81/7 81/8 81/8 81/10 81/21 81/22 83/6 91/18 92/25 93/17 93/25 101/18 102/21 102/22 109/25 110/15 111/9 112/15 112/16
above [2] 53/7 114/5
above-entitled [1] 114/5
absolutely [3] 11/20 80/9 81/16
abstract [1] 38/10
abuse [2] 39/19 39/19
acceptable [2] 37/21 112/25
access [26] 6/24 7/9 7/11 7/16 7/17 7/19 7/21 8/3 8/4 8/6 8/10 10/10 13/3 18/14 19/5 21/15 23/21 23/23 24/5 25/12 26/2 26/15 50/3 50/9 50/11 106/10
accessed [1] 26/19
accesses [2] 104/22 105/17
accessing [1] 21/7
according [2] 63/10 66/8
account [50] 20/9 44/21 44/21 45/4 45/14 46/19 46/25 47/4 47/6 50/5 50/13 50/20 50/20 50/23 50/25 51/11 51/13 51/15 51/16 51/17 51/18 51/18 51/20 51/22 51/23 51/25 52/1 52/2 52/3 52/11 54/10 54/20 54/22 54/24 59/6 59/14 60/21 60/23 64/5 64/9 64/10 66/18 75/4 76/7 84/7 84/8 85/7 85/20 91/12 105/18
accountant [3] 39/5 40/7 40/9
Accountants [2] 41/18 78/23
accounted [1] 59/25
accounting [13] 37/13 39/22 39/24 39/25 40/1 40/14 40/17 43/23 43/25 79/9 79/18 79/19 89/7
accounts [60] 20/22 21/16 22/2 26/1 26/15 26/15 27/14 27/15 27/19 29/13 44/17 44/20 44/23 44/24 45/4 45/9 46/12 46/14 46/15 47/21 48/1 48/3 48/7 53/16 54/10 54/14 54/23 55/2 55/5 55/20 55/22 56/5 57/23 58/3 58/9 58/14 58/16 59/2 59/24 60/1 60/19 60/22 60/22 84/4 84/5 84/5 84/21 85/3 85/21

91/8 91/13 91/24 92/4 92/12 92/13 99/18 99/20 105/13 105/20 105/20
accurate [2] 45/25 90/11
accurately [4] 45/25 65/7 67/14 73/19
ACFE [1] 41/19
acquiring [1] 97/15
acronym [1] 106/23
Act [2] 34/1 109/18
Action [1] 1/3
actions [1] 112/11
activity [18] 25/18 39/20 44/4 44/4 44/5 46/13 47/3 47/20 48/10 56/2 85/23 99/3 99/7 99/20 99/25 101/5 105/19 105/20
actors [1] 100/4
actual [2] 46/20 102/4
actually [8] 16/10 52/3 63/16 77/2 78/19 83/19 85/9 110/13
addition [2] 47/6 98/5
additional [4] 41/2 55/24 55/25 105/8
additionally [1] 20/13
address [63] 9/14 10/14 10/16 10/18 10/19 19/9 21/7 52/5 64/14 64/17 64/18 64/19 64/21 66/20 66/24 66/25 68/19 68/20 68/23 68/24 69/6 69/8 69/18 69/20 70/3 70/4 70/4 70/6 71/10 71/23 71/24 71/24 72/2 72/3 74/10 74/11 74/22 75/1 75/23 75/24 76/1 76/2 76/6 76/8 76/9 93/9 93/12 93/13 105/21 105/22 105/25 106/5 106/7 106/8 106/9 106/10 106/16 106/18 107/2 107/11 107/24 108/1 108/5
addresses [28] 23/22 23/25 24/3 24/4 37/3 37/7 45/15 45/18 68/10 68/11 68/21 72/2 72/6 72/8 72/9 72/21 73/1 73/2 73/5 73/6 73/17 74/9 104/22 106/3 106/14 106/20 107/3 108/13
adjust [2] 50/4 50/12
adjusted [4] 51/13 54/20 54/23 54/25
adjustment [8] 49/4 49/5 49/5 49/9 50/17 50/19 51/9 51/10
adjustments [2] 48/24 48/25
administration [2] 66/11 109/18
administrator [1] 23/12
admit [7] 46/2 65/10 67/18 68/1 73/23 90/17 90/23
admitted [13] 37/6 46/7 46/9 62/9 65/14 65/16 68/3 73/9 73/10 74/2 74/4 90/6 90/25
adopted [1] 90/15
affected [1] 102/21
after [13] 12/25 25/9 26/12 31/21 36/1 50/20 77/22 95/22 95/25 97/6 105/3 105/4 107/6
afternoon [5] 76/19 93/13 109/7 109/19 112/24
again [7] 33/23 34/8 35/1 41/6 42/25 92/3 110/16
against [4] 29/20 30/8 30/21 93/19
agency [3] 43/10 95/8 106/24
agents [3] 78/6 98/12 99/12
agree [4] 18/1 79/8 79/17 79/21
ahead [6] 14/25 32/11 35/12 52/10 68/1 82/6
AICPA [2] 41/18 79/6
Akerström [1] 64/11
Alden [1] 4/14
aligned [1] 43/5
all [60] 4/2 4/3 8/18 11/4 12/9 13/18 14/16 15/7 16/1 16/24 16/25 19/2 19/7 20/11 22/23 23/22 24/3 24/7 24/16 24/20 29/18 29/23 29/24 30/23 31/2 31/4 33/16 35/2 35/18 36/4 36/14 38/8 38/14 38/16 43/24 46/7 48/24 49/21 53/2 54/9 58/8 60/4 60/4 61/15 73/5 76/14

84/3 87/23 88/10 89/13 89/16 92/16 93/6 93/13 94/10 100/6 108/23 111/8 113/7 113/9
allege [1] 33/9
alleged [1] 78/10
Allen [2] 97/7 97/8
allocated [1] 107/12
allocates [1] 107/3
allow [4] 7/17 40/1 72/19 82/16
allowed [2] 24/5 80/14
alluded [1] 109/15
almost [2] 19/12 78/8
along [1] 14/3
already [2] 62/9 82/2
also [49] 9/2 9/9 15/11 16/12 21/8 25/22 26/23 27/3 27/17 27/21 28/2 28/5 28/8 28/25 29/6 29/9 30/17 30/20 38/4 40/23 41/12 42/8 42/19 47/12 58/5 65/25 66/15 73/6 75/3 79/2 95/8 95/11 96/22 97/17 97/20 98/19 98/21 99/4 99/12 99/16 100/8 100/15 101/2 102/2 102/8 103/11 104/25 108/17 112/15
always [5] 15/22 17/2 39/16 39/25 79/20
am [39] 10/15 14/6 14/15 15/12 15/13 17/12 18/12 32/16 37/24 39/5 39/7 39/7 40/7 41/17 43/5 46/5 69/2 70/13 77/2 77/6 77/8 77/11 77/15 79/12 80/19 81/21 81/24 82/12 82/13 83/18 83/19 85/22 95/6 95/8 108/3 110/21 111/12 112/13 112/19
Amendment [3] 80/6 80/19 81/22
AMERICA [5] 1/3 4/10 107/11 107/23 108/8
American [3] 41/17 78/22 107/14
among [2] 35/15 109/14
amongst [1] 108/24
amount [16] 9/4 17/16 20/1 20/3 29/16 40/3 51/21 52/8 55/1 56/21 63/16 63/18 71/9 74/20 75/21 77/12
amounts [2] 22/16 55/5
analysis [28] 11/21 11/23 37/20 39/10 47/7 50/4 50/12 51/9 51/20 52/5 54/6 80/8 85/25 86/2 86/5 89/21 91/9 91/14 91/23 92/5 92/12 95/11 97/17 97/18 98/6 102/18 104/4 104/25
analyst [1] 81/9
analytical [1] 97/9
analytics [1] 42/9
analyze [3] 97/23 98/1 98/11
analyzing [1] 102/8
anomalous [2] 39/20 75/25
anomaly [2] 70/25 71/4
anonymity [2] 13/22 28/8
anonymize [1] 13/25
anonymous [3] 28/11 99/7 99/14
another [18] 10/17 10/18 15/10 15/11 17/4 32/5 34/23 35/25 37/16 42/9 48/8 51/17 60/7 65/4 73/8 93/2 104/13 104/14
answer [11] 29/25 38/9 48/21 49/22 49/24 69/3 71/7 110/5 110/6 112/4 112/12
answered [2] 82/2 86/9
answers [3] 36/23 85/13 112/21
anti [1] 75/7
anti-money [1] 75/7
AntiChat [1] 27/4
Anton [1] 75/20
any [75] 12/5 12/15 12/21 14/7 15/2 15/16 16/2 16/4 18/16 19/13 21/3 22/22 23/10 23/15 29/11 31/2 33/20 35/16 36/13 40/6 40/15 40/19 41/12 41/16 41/20 42/19 43/3 46/4 48/25 49/22 54/15 56/25 60/12 62/4 62/6 65/12 67/2 67/20 70/10 70/25 71/4 73/25 78/14 78/17 78/18 80/20 81/23 82/2

**A**

**any... [27]** 82/10 82/12 82/13 82/18 82/23 83/5 83/6 83/8 83/25 85/16 89/3 89/20 90/19 91/8 91/13 91/22 92/3 93/1 96/13 97/4 99/3 99/3 100/11 100/21 103/16 108/25 112/12

**anybody [3]** 82/15 87/18 89/3

**anyone [2]** 7/8 12/10

**anything [19]** 15/23 23/16 35/18 36/22 59/5 72/5 73/4 74/15 75/25 76/10 81/15 85/22 87/20 89/17 99/8 103/23 109/19 109/22 111/17

**anytime [1]** 105/18

**anyway [1]** 15/15

**apart [2]** 100/1 102/3

**apartment [3]** 28/23 28/24 105/25

**API [2]** 23/23 24/5

**apologies [1]** 87/15

**Appeals [1]** 111/23

**appear [1]** 70/22

**APPEARANCES [3]** 1/12 1/23 2/1

**appeared [2]** 67/3 71/19

**appears [1]** 76/3

**application [2]** 42/7 111/14

**apply [1]** 106/12

**appreciate [3]** 37/10 38/8 109/1

**approach [1]** 4/11

**appropriate [1]** 38/12

**approval [2]** 38/5 38/7

**approximate [6]** 55/9 58/7 69/9 69/21 69/24 78/4

**approximately [24]** 8/23 22/4 22/10 41/25 42/1 42/12 42/13 44/23 44/24 44/25 45/2 55/6 57/21 58/1 58/10 59/17 61/11 61/14 61/17 69/14 70/2 70/18 91/21 92/10

**April [7]** 62/16 68/14 68/17 68/19 87/4 87/4 94/21

**April 24th [1]** 87/4

**April 29th [3]** 62/16 68/17 87/4

**April 30th [2]** 68/14 68/19

**architect [1]** 96/8

**are [158]**

**area [2]** 58/19 83/15

**areas [2]** 80/11 104/18

**aren't [1]** 98/3

**ARIN [7]** 107/13 107/17 107/19 107/24 107/25 108/8 108/12

**Army [1]** 97/11

**around [4]** 6/13 16/7 48/5 55/13

**arrest [1]** 104/24

**arrested [9]** 22/4 22/9 24/12 29/15 77/23 77/25 78/2 78/12 105/3

**art [1]** 29/4

**Artem [4]** 63/9 63/10 70/10 71/17

**as [115]**

**as-needed [1]** 19/24

**ask [15]** 4/25 12/5 16/17 31/6 36/11 37/19 48/24 80/23 82/14 82/16 83/21 87/18 92/18 109/10 113/1

**asked [15]** 30/7 44/2 44/3 78/13 78/17 80/18 82/2 82/20 82/22 83/22 86/8 89/20 93/9 97/1 110/10

**asking [9]** 75/10 75/16 79/12 80/20 81/9 82/12 82/13 83/18 84/17

**assessing [1]** 96/18

**assessments [1]** 41/11

**assets [10]** 79/9 79/23 80/2 81/10 83/19 91/8 91/13 91/22 92/4 92/11

**assign [1]** 107/5

**assigned [3]** 95/2 106/23 107/3

**assigns [2]** 106/20 107/6

**associated [5]** 42/2 62/6 62/7 65/19 72/21

**assume [1]** 31/18

**assumed [1]** 88/5

**assuming [1]** 112/19

**attacker [1]** 101/10

**attempt [4]** 27/22 28/3 28/6 70/21

**attempts [1]** 25/20

**attention [9]** 44/18 62/8 64/23 67/5 68/5 69/15 74/14 88/19 93/8

**attracted [2]** 17/22 17/25

**attractions [1]** 18/15

**attractive [3]** 17/23 18/3 19/8

**attribution [1]** 37/2

**audit [1]** 40/18

**auditor [1]** 40/5

**August [1]** 8/25

**August 2016 [1]** 8/25

**automate [3]** 27/21 27/23 102/19

**automatically [1]** 7/23

**available [9]** 13/14 19/5 42/17 43/1 47/11 47/13 93/3 110/2 110/7

**Ave [2]** 1/14 1/20

**Avenue [1]** 2/8

**avoid [1]** 18/21

**aware [15]** 5/19 5/22 12/23 13/15 49/12 50/6 70/13 85/16 85/19 85/23 86/14 89/2 89/6 89/8 89/24

**away [1]** 11/12

**axis [2]** 56/22 57/7

**B**

**bachelor's [2]** 39/22 40/12

**back [36]** 5/6 12/4 15/9 15/14 15/21 15/23 16/4 16/11 17/4 34/23 35/1 35/4 35/5 35/6 35/14 36/1 36/2 54/13 63/20 68/15 68/18 72/24 74/13 82/3 85/4 87/11 87/11 93/25 95/18 98/13 99/3 101/10 101/17 109/10 112/23 113/7

**background [6]** 5/10 17/24 39/21 51/14 92/24 95/19

**bag [5]** 14/3 14/6 15/5 15/6 15/12

**balance [16]** 50/5 50/13 50/22 50/23 50/23 50/25 55/10 58/13 58/16 58/19 58/21 58/22 58/24 59/1 59/6 59/11

**balances [1]** 59/14

**bank [15]** 11/16 14/2 33/25 46/16 59/24 59/25 60/20 60/22 61/20 64/4 64/9 64/10 66/18 91/12 109/17

**bankrupt [1]** 50/2

**bankruptcy [4]** 2/7 49/12 49/15 49/20

**banks [1]** 11/19

**bars [1]** 57/3

**based [6]** 45/18 49/21 49/22 49/23 98/10 108/18

**Bash [1]** 103/24

**basic [1]** 43/19

**basically [7]** 9/12 9/15 12/17 16/24 19/5 19/14 21/24

**basis [5]** 19/25 37/17 37/24 55/9 79/13

**bathroom [1]** 87/8

**be [69]** 9/2 10/10 10/19 11/12 11/19 12/7 15/3 15/8 15/14 15/15 16/15 17/4 19/11 19/13 19/21 21/19 22/2 26/21 28/25 32/19 32/24 33/1 33/4 33/6 33/6 34/8 34/11 34/13 34/14 35/4 35/10 36/9 37/2 38/21 40/13 41/15 46/8 54/8 62/17 63/10 63/21 65/2 65/14 68/6 68/22 69/2 74/2 76/3 77/12 79/19 79/20 80/7 81/5 90/9 93/11 94/9 97/1 97/1 97/4 97/19 99/1 100/25 103/7 105/2 110/1 110/2 110/7 112/5 112/16

**became [2]** 20/13 20/24

**because [26]** 11/15 15/9 19/8 19/12 19/24 24/20 30/23 31/10 32/14 33/21 34/24 37/1 47/15 80/7 80/8 80/14 80/15 80/21 81/7 82/3 93/10 93/17 93/18 100/3 100/6 110/2

**Beckman [1]** 75/20

**become [7]** 5/19 5/22 29/6 40/11 40/12 41/4 41/6

**becomes [1]** 100/3

**becoming [1]** 40/15

**been [26]** 16/6 26/4 26/10 34/20 34/24 39/12 39/13 39/14 39/15 39/16 45/10 62/9 73/8 73/9 78/12 78/17 85/4 90/6 92/12 93/8 93/24 94/20 96/9 110/12 110/14 111/15

**before [22]** 1/9 5/1 25/25 26/7 26/11 26/14 35/18 36/10 37/9 39/17 40/3 48/23 54/13 78/1 83/13 85/17 85/20 87/20 88/18 92/24 93/12 105/2

**beginning [10]** 50/21 64/19 68/20 69/8 69/20 70/4 71/25 74/10 74/11 75/24

**begins [2]** 61/7 76/9

**being [6]** 9/13 9/15 37/3 59/7 63/13 83/15

**believe [11]** 29/2 37/4 37/23 62/9 63/20 67/24 84/10 84/14 84/24 85/6 86/20

**belong [2]** 7/12 64/12

**belongs [1]** 64/10

**below [2]** 60/23 107/25

**bench [9]** 17/10 18/5 31/8 32/1 32/10 35/8 80/4 82/7 92/19

**besides [1]** 89/1

**best [5]** 18/12 28/15 93/11 97/23 109/6

**better [3]** 20/8 28/17 96/10

**between [9]** 19/21 19/22 22/13 54/19 55/10 70/11 87/3 105/19 106/8

**beyond [4]** 29/20 30/9 82/16 82/23

**big [2]** 106/12 107/17

**bill [2]** 77/7 77/8

**billion [2]** 22/12 22/13

**bills [2]** 14/3 14/4

**Binance [1]** 46/15

**bit [7]** 4/25 6/3 6/18 14/14 22/8 51/14 93/4

**BitCloak [1]** 14/13

**Bitcoin [142]**

**Bitfinex [20]** 7/1 7/3 7/12 7/16 7/20 7/20 7/21 8/2 8/10 8/13 23/18 24/8 24/25 25/9 25/25 26/12 26/15 27/18 28/22 46/15

**BitPay [1]** 46/16

**Bitstamp [12]** 53/15 53/17 53/24 54/4 54/7 54/8 75/4 75/6 75/10 75/18 76/5 89/2

**Bitstamp's [1]** 75/7

**blend [1]** 99/21

**Blender [1]** 14/14

**Bleutrade [1]** 92/8

**blindness [1]** 112/11

**block [4]** 42/16 43/1 67/13 107/17

**blockchain [21]** 11/21 11/23 12/8 12/9 12/12 12/14 12/15 12/18 12/24 13/3 16/15 37/1 37/7 42/6 42/9 47/10 66/25 67/16 70/22 71/19 71/23

**Blockchair [2]** 67/12 67/14

**blocks [2]** 107/3 107/20

**blue [7]** 56/20 56/21 58/18 58/19 58/20 58/23 58/25

**boiling [1]** 50/25

**bolster [1]** 100/6

**Booz [2]** 97/7 97/8

**both [3]** 106/12 106/14 110/1

**bothered [1]** 80/22

**bottom [7]** 53/5 55/1 60/16 63/17 64/1 65/22 66/12

**bought [2]** 27/18 29/4

**box [4]** 53/4 72/6 73/1 73/5

**break [16]** 32/2 35/3 35/11 35/12 35/14 35/18 87/8 87/9 87/11 87/13 87/17 88/19 104/13 108/21 108/22 108/23

**B**

breaking [1] 87/8
breaks [1] 47/22
bridge [1] 92/25
brief [1] 35/3
briefed [1] 33/24
briefly [5] 6/23 7/14 78/21 88/18
91/2
bring [2] 84/14 88/7
bringing [2] 4/5 17/14
BRODIE [1] 1/15
Brooklyn [1] 2/4
brought [1] 93/8
BROWN [5] 1/15 3/7 3/8 4/14 37/25
browser [3] 6/10 6/12 19/1
BS [1] 95/20
BSA [1] 34/15
BTC [6] 12/25 13/2 49/10 50/6
50/6 59/7
BTC-e [4] 49/10 50/6 50/6 59/7
building [2] 96/10 106/1
built [1] 97/10
bunch [1] 14/4
burned [1] 7/7
business [4] 6/13 7/6 40/14 40/18
businesses [1] 34/14
button [1] 65/21
buy [2] 6/4 6/6
buyer [3] 63/8 63/9 66/6
buyers [1] 71/15

**C**

calculating [1] 51/19
call [3] 38/16 84/19 94/4
called [15] 5/19 9/3 10/1 10/2
13/15 19/4 25/23 42/11 59/19 96/2
100/16 100/19 103/11 107/13
108/16
calls [7] 25/3 38/18 53/20 79/11
82/11 94/5 101/17
came [4] 13/10 40/3 55/2 75/18
can [75] 6/23 12/10 14/11 14/14
16/17 16/21 17/8 19/11 31/6 32/19
32/20 34/23 34/23 35/15 36/7 37/5
37/22 38/10 48/21 49/22 49/23
50/1 51/17 51/21 63/18 70/11 78/4
79/15 79/19 80/3 81/9 82/14 83/21
85/12 86/19 87/9 87/17 87/25 88/7
92/18 93/5 93/15 93/16 93/18 94/1
94/4 94/14 95/7 95/11 96/24 98/8
100/21 100/24 101/9 101/16 101/18
102/23 103/7 103/9 103/18 103/22
103/25 104/14 104/21 105/21
105/23 106/10 108/6 108/17 109/3
109/9 111/10 112/15 112/21 113/5
can't [1] 34/5
cannot [1] 80/10
capacity [1] 36/13
capital [1] 29/7
card [3] 46/17 61/2 101/8
cards [6] 61/4 61/10 61/13 61/16
89/10 89/13
care [1] 7/8
Carl [1] 64/10
Carolina [1] 39/23
case [38] 4/9 9/19 12/16 12/22
30/9 31/22 33/5 33/7 34/9 34/13
35/15 36/17 37/4 39/11 41/8 43/6
43/12 44/2 62/3 77/17 77/19 78/1
78/5 78/6 78/8 78/14 80/21 93/18
98/17 105/2 105/9 105/12 108/24
110/22 111/1 111/2 111/25 112/7
cases [8] 95/10 95/11 95/15 98/12
98/15 98/18 98/20 99/5
casework [2] 98/6 98/8
cash [3] 11/10 11/16 14/2
cashed [1] 12/17
CATHERINE [1] 1/13
cause [1] 51/24
Ccips [1] 1/19
certain [3] 37/3 40/13 51/21

certainly [5] 22/6 34/1 82/15
94/1 112/20
certificate [1] 100/14
certification [6] 41/5 41/18
41/22 101/22 102/4 102/5
certifications [2] 40/6 100/12
certified [11] 40/7 40/7 40/9
41/1 41/17 41/19 41/23 42/11
78/23 79/2 79/5
certify [1] 114/3
CFE [6] 40/23 40/25 41/4 41/5
41/6 41/12
chain [1] 28/9
Chainalysis [4] 12/23 41/22 41/24
42/4
chance [3] 15/14 29/23 45/24
change [3] 57/13 59/6 68/23
changed [1] 102/1
changing [1] 21/25
characterize [2] 55/4 57/18
charge [4] 17/1 30/12 34/12
112/18
charged [1] 54/15
charges [3] 16/13 17/2 29/20
chart [25] 48/23 53/9 54/1 54/4
56/8 56/9 56/14 56/16 56/17 56/18
56/20 56/23 57/7 57/10 58/7 58/11
58/12 58/13 60/16 60/17 61/19
71/11 84/15 86/20 86/22
charts [4] 44/8 44/16 45/25 56/8
check [1] 51/23
checking [2] 51/18 51/25
chemical [1] 96/5
Chip [1] 28/13
ChipMixer [1] 14/13
chooses [3] 31/12 31/17 31/19
choosing [1] 16/8
chose [1] 30/23
Chris [1] 4/14
CHRISTOPHER [1] 1/15
chronically [1] 110/13
Chukanov [4] 63/9 63/10 70/10
71/17
CI [10] 39/8 39/9 39/12 39/13
39/16 39/18 43/11 77/4 77/6 77/10
circle [4] 52/20 52/24 53/9 63/4
circled [3] 53/15 63/5 71/13
Circuit [2] 111/21 111/22
CIs [1] 77/13
claims [1] 81/13
class [1] 102/6
clear [9] 5/1 21/19 33/1 33/6
34/8 63/21 65/21 105/2 110/23
clerk [1] 110/6
click [3] 62/24 63/20 86/22
client [3] 31/14 31/20 88/3
clients [1] 97/11
cloaked [2] 112/9 112/9
close [5] 17/20 31/10 55/11 55/12
69/11
cloud [1] 24/15
clues [2] 101/18 102/2
cluster [4] 37/3 37/8 72/22 73/2
clustering [1] 37/1
code [23] 5/11 8/12 62/7 65/3
70/15 70/18 70/21 73/20 86/12
86/14 86/17 86/23 88/21 88/23
89/1 89/6 96/22 96/24 97/2 100/21
103/4 103/22 103/25
coding [1] 103/11
Coinbase [1] 25/25
collaborate [1] 98/12
college [3] 5/13 5/14 96/1
colloquy [2] 31/15 31/21
colons [1] 106/4
COLUMBIA [2] 1/1 112/7
column [5] 45/3 48/6 48/8 61/15
88/20
combined [2] 55/16 55/18
Comcast [2] 107/21 108/9
come [18] 13/18 34/23 35/4 35/14
36/1 36/2 44/12 75/15 75/17 81/12

82/3 87/11 87/11 93/23 95/10
104/1 109/10 112/23
comes [3] 36/10 38/11 75/16
coming [6] 17/4 32/14 51/22 52/3
59/23 81/18
command [1] 103/23
commands [1] 103/3
comment [2] 85/12 112/22
comments [1] 16/3
committed [2] 19/14 29/16
common [3] 49/21 49/23 100/24
communicated [1] 23/12
communications [1] 106/6
companies [7] 11/4 12/21 96/5
107/5 107/21 108/1 108/13
company [11] 5/8 5/9 5/15 5/19
12/24 42/9 62/6 96/2 96/6 96/10
108/8
compare [3] 56/1 69/24 72/25
comparing [1] 76/10
comparisons [1] 105/19
compiled [1] 101/23
complete [2] 9/2 109/11
completed [3] 87/19 100/11 100/15
complicate [1] 51/20
complicated [1] 33/8
Complying [1] 64/22
compound [2] 18/17 18/18
comprehensive [1] 102/22
computer [32] 5/13 6/24 8/1 9/15
13/4 27/21 27/23 94/5 94/25 95/1
95/20 95/22 95/23 98/9 98/25
100/21 100/23 101/7 101/10 102/16
102/23 102/25 103/1 103/3 103/4
103/6 103/8 103/13 103/16 103/21
105/22 106/10
computers [2] 105/23 106/12
conceal [5] 10/11 10/13 13/10
19/9 104/6
concealing [1] 13/19
concepts [4] 40/18 42/4 42/14
42/15
concern [6] 11/18 12/15 15/11
17/20 34/3 82/3
concerned [5] 12/21 17/12 21/1
81/21 93/17
concerning [2] 33/5 33/6
concerns [9] 12/5 12/7 12/10
14/16 14/23 15/2 15/7 15/16 21/3
concludes [2] 43/24 104/8
conclusion [1] 25/3
conduct [4] 35/16 39/10 108/25
112/3
conducting [1] 21/19
conference [10] 17/10 18/5 31/8
32/1 32/10 35/8 80/4 82/7 92/19
112/18
configure [1] 108/3
confirm [1] 36/12
confirmations [1] 47/4
confront [1] 30/20
confuse [1] 33/17
conglomerate [1] 96/4
connect [4] 12/19 99/11 99/12
99/14
connected [3] 10/10 14/7 15/10
connecting [1] 20/11
connection [1] 70/11
connections [1] 98/15
conscientious [1] 110/14
consequences [1] 112/11
consistent [1] 67/24
consolidated [1] 49/6
consolidating [1] 44/6
conspiracy [1] 30/12
constitutes [1] 114/4
Constitution [1] 2/8
constitutional [6] 30/15 30/17
30/20 30/24 31/12 31/18
consult [3] 47/6 47/9 47/14
consultant [1] 97/9
consulted [3] 47/10 47/11 47/12

**C**

consumer [2]  17/23 18/4
contain [1]  44/15
contained [1]  72/16
contains [1]  44/16
contents [2]  3/1 45/22
context [1]  9/7
continue [1]  111/9
continued [5]  1/23 2/1 3/4 4/23
 95/14
continuing [5]  40/19 40/21 41/12
 41/14 111/12
contract [3]  77/5 77/13 77/15
contracted [1]  77/6
contributed [1]  101/19
contributing [2]  15/6 15/12
control [6]  23/23 24/7 24/24 25/7
 45/19 108/13
controlled [8]  7/24 24/9 24/9
 24/11 51/13 52/11 54/20 54/23
controls [5]  45/17 101/10 106/20
 107/2 107/11
convenient [1]  87/7
conversation [1]  111/10
convert [1]  60/7
converted [5]  28/5 28/10 47/15
 69/13 103/5
copy [1]  90/11
corner [2]  62/23 63/20
correct [24]  21/20 23/20 23/22
 24/1 25/11 25/20 27/11 29/1 30/13
 37/22 37/25 78/25 79/7 82/25 83/1
 83/4 84/5 84/6 84/9 87/5 89/11
 89/14 97/3 114/4
correctly [2]  28/16 77/5
correspond [6]  56/22 57/6 67/3
 70/22 71/19 76/6
corresponded [2]  71/8 71/9
corresponding [1]  57/4
corroborating [1]  105/9
could [46]  9/13 10/11 15/22 16/12
 18/1 20/7 32/2 33/2 34/21 35/2
 38/25 46/11 47/19 48/13 49/3
 52/16 54/18 55/4 56/17 62/18
 63/17 64/2 64/16 64/20 65/18
 65/24 65/25 66/12 68/22 72/13
 74/6 76/4 80/23 84/13 84/14 85/3
 86/22 91/11 92/23 95/18 97/4
 99/14 104/13 105/23 113/3 113/4
couldn't [1]  29/25
counsel [8]  4/11 4/12 4/19 31/6
 36/11 80/7 80/15 92/18
count [2]  51/21 103/24
counting [2]  51/24 52/6
couple [6]  74/25 82/4 87/10
 109/13 112/24 113/3
course [8]  12/10 40/22 41/23
 41/23 41/25 42/10 62/3 96/14
coursework [2]  39/25 40/14
court [18]  1/1 2/6 2/7 4/18 30/1
 30/4 32/15 32/16 33/17 36/25 37/8
 43/24 81/4 93/9 104/8 111/23
 114/3 114/13
Court's [6]  22/21 31/5 38/3 38/5
 38/7 67/24
courtroom [1]  36/18
courts [3]  2/7 33/5 33/24
cover [1]  25/9
covered [6]  42/4 42/6 42/14 42/15
 102/15 102/17
CPA [6]  40/9 40/11 40/12 40/15
 40/20 78/25
create [1]  56/4
created [1]  7/23
credential [2]  101/2 101/4
credentials [9]  7/17 8/5 8/7 13/3
 24/5 24/21 25/12 26/2 78/21
credibility [1]  100/6
credit [1]  101/8
crime [2]  14/7 15/10
crimes [1]  29/17

criminal [3]  1/3 4/9 98/19
criminals [3]  99/24 100/4 104/5
criminals' [1]  100/9
CRM [1]  1/19
cross [9]  3/4 3/7 18/1 23/2 76/15
 89/21 90/23 92/25 111/6
cross-examination [5]  3/4 3/7
 23/2 76/15 89/21
crypto [11]  20/15 20/23 21/3 21/5
 21/8 21/15 22/14 22/15 22/19
 83/11 83/11
cryptocurrency [41]  5/20 5/22 6/2
 6/4 6/6 7/2 7/10 7/11 7/18 8/5
 8/18 20/14 21/25 22/17 26/5 28/3
 28/6 28/8 28/11 41/21 42/15 42/17
 42/24 42/25 43/3 43/6 43/13 43/15
 43/17 46/14 46/21 47/16 51/22
 53/7 54/10 54/14 58/14 83/17
 83/23 91/24 101/9
cryptocurrency-related [1]  43/13
CS [4]  94/17 104/3 104/18 105/2
currencies [1]  47/15
currency [5]  13/25 25/21 47/16
 60/7 60/9
current [1]  96/15
currently [3]  39/6 39/7 111/1
custom [2]  97/11 97/18
customer [8]  8/10 8/13 21/2 21/4
 34/4 74/18 75/19 75/20
customers [2]  7/19 70/11
cyber [5]  99/24 100/4 100/9 104/5
 104/7
cybercrime [2]  10/4 21/16
cybercrimes [2]  43/5 43/8
cybercriminal [1]  99/17
cybersecurity [1]  100/13

**D**

D-E [1]  94/16
D.C [3]  111/21 111/22 111/23
dangerous [1]  80/11
dark [6]  19/6 19/8 19/11 21/6
 27/4 34/6
darknet [4]  6/7 27/18 27/25 98/20
dashboards [1]  97/11
data [10]  6/25 25/13 44/6 49/7
 97/10 97/17 97/19 98/5 98/13
 98/20
date [13]  62/18 63/5 65/19 65/24
 68/13 68/14 68/16 69/16 71/9 78/4
 78/4 84/12 85/17
dated [4]  62/15 62/16 65/20
 114/10
dates [1]  104/22
day [8]  40/2 98/3 99/21 102/7
 108/23 109/5 109/5 114/10
DC [9]  1/5 1/14 1/17 1/21 2/9
 33/18 43/9 111/14 111/17
de [8]  3/9 93/3 93/10 94/2 94/6
 94/7 94/15 104/3
deadlines [1]  93/19
dealing [2]  81/22 111/25
decide [4]  6/20 7/3 14/8 14/11
decides [1]  107/19
decision [2]  31/15 31/21
decisions [1]  19/2
deck [2]  38/2 38/3
declared [1]  49/12
declares [1]  49/15
decompile [1]  101/24
decrease [1]  56/3
decreasing [1]  58/24
deeper [1]  42/17
defendant [19]  1/7 2/2 4/18 33/7
 33/9 33/9 33/13 34/9 45/10 61/9
 64/12 75/6 75/11 80/9 105/3 105/5
 105/6 105/14 112/5
defendant's [6]  45/5 45/7 59/13
 61/3 65/5 75/3
defense [6]  30/18 35/20 36/12
 38/4 80/7 87/21
define [1]  34/11

definitely [1]  6/17
degree [3]  39/22 40/12 95/23
deleted [3]  25/12 25/13 25/14
Deloitte [14]  39/7 39/14 39/15
 39/17 40/3 42/20 42/24 76/24 77/1
 77/5 77/7 77/9 77/12 77/24
denominated [1]  60/5
deny [1]  80/19
department [3]  1/13 77/10 94/18
depending [1]  103/4
deposit [4]  15/19 55/20 57/22
 76/6
deposited [7]  17/15 22/19 27/24
 28/2 47/25 51/25 58/8
depositing [2]  22/1 22/15
depositor's [2]  49/14 50/2
deposits [6]  15/22 55/21 58/3
 60/2 71/9 75/13
Dept [1]  1/20
deputy [1]  110/6
description [1]  63/13
design [1]  99/12
designed [1]  100/22
destination [1]  106/7
destructive [1]  100/22
detail [3]  49/6 50/20 77/6
detailed [4]  39/7 39/16 47/4 56/4
details [5]  43/12 47/5 47/6 56/15
 63/25
detecting [1]  41/3
detection [1]  26/24
determine [2]  97/22 99/10
determining [1]  101/13
developer [1]  97/10
development [1]  63/15
device [3]  65/8 74/17 104/4
devices [5]  10/21 24/13 45/13
 65/5 104/23
did [140]
didn't [15]  7/8 8/4 16/4 16/14
 19/23 20/13 20/15 22/1 23/14
 26/13 32/18 80/8 82/23 83/5 97/1
die [1]  81/25
differ [1]  76/8
difference [1]  54/19
different [20]  13/9 13/11 13/13
 13/13 13/17 13/21 35/3 40/2 44/7
 46/12 56/14 70/7 86/6 97/24 99/6
 103/2 103/13 104/18 105/13 108/6
difficult [2]  11/12 103/7
digital [6]  97/15 97/16 98/5
 102/11 104/4 104/23
DigitalOcean [1]  11/1
direct [11]  3/4 3/7 3/10 4/23
 38/23 44/18 64/23 67/5 74/14
 90/21 94/12
directing [5]  18/19 62/8 68/5
 69/15 88/19
direction [1]  38/3
directly [2]  24/4 93/21
dirtier [1]  15/9
disagree [1]  81/6
disclosed [1]  37/23
disclosure [1]  37/24
discover [2]  70/25 71/4
discovered [5]  9/13 26/6 28/17
 29/15 71/8
discovery [2]  29/24 93/7
discuss [9]  9/24 13/16 35/15
 87/18 108/17 108/24 109/10 109/14
 109/19
discussed [3]  33/24 36/25 38/2
discussion [3]  9/23 13/16 16/2
discussions [1]  13/21
distilling [1]  44/7
distributed [1]  107/9
DISTRICT [5]  1/1 1/1 1/10 2/7
 112/7
dividing [1]  37/11
do [80]  4/4 5/1 5/4 7/1 7/14 7/22
 8/2 9/5 11/10 11/13 11/21 11/24
 12/12 19/15 20/20 21/1 21/23 22/9

**D**

do... [62]  27/9 31/22 34/10 34/22 35/22 35/25 36/1 36/2 40/6 40/19 41/12 41/20 43/3 43/18 44/2 44/13 47/23 50/4 51/19 54/6 54/6 55/12 61/3 64/8 64/25 65/2 67/6 73/11 77/16 78/4 78/17 79/6 80/10 80/15 81/19 82/2 82/21 82/22 82/23 83/9 83/11 84/12 86/2 86/18 87/1 90/7 90/9 93/2 93/5 94/3 94/17 96/18 98/6 98/18 100/2 101/4 103/1 103/10 104/18 107/17 108/12 112/10
document [4]  33/23 44/19 90/7 90/9
documentation [2]  75/12 76/5
documents [2]  29/13 45/12
does [54]  9/7 33/3 42/22 44/5 44/15 44/25 45/21 48/5 48/9 51/1 51/1 52/10 53/15 55/19 55/22 56/22 57/6 58/11 58/18 58/21 58/23 58/25 59/9 60/20 64/12 65/7 66/2 67/11 67/14 69/11 69/18 69/24 73/15 73/19 75/15 75/17 76/8 77/4 77/7 77/7 91/18 95/13 95/17 99/2 101/4 101/11 101/14 106/12 106/15 107/14 107/16 107/17 107/23 112/4
doesn't [5]  15/10 24/19 79/20 81/13 88/7
doing [16]  5/7 6/13 16/23 17/13 21/24 26/17 26/18 26/21 34/16 37/10 53/16 99/20 102/9 104/22 105/16 109/6
DOJ [2]  1/16 1/19
DOJ-CRM [1]  1/19
DOJ-USAO [1]  1/16
dollar [8]  57/22 58/2 60/11 60/12 69/9 69/11 69/21 69/24
dollars [12]  22/4 22/6 22/12 22/20 24/21 47/17 56/19 57/11 59/12 60/5 69/13 70/1
domain [1]  108/18
don't [40]  11/6 15/19 17/19 18/20 22/12 22/22 23/6 25/24 26/9 29/2 29/10 29/18 33/20 35/11 35/12 35/14 35/15 35/16 37/23 48/13 49/19 79/21 82/6 93/22 98/3 99/2 99/4 108/2 108/24 108/25 109/10 109/15 110/5 110/6 110/9 110/15 111/15 111/18 112/1 112/11
done [2]  34/21 78/17
door [2]  81/18 81/20
double [3]  51/21 51/24 52/6
doubt [2]  29/20 30/9
down [15]  9/16 47/22 50/25 55/1 58/23 63/17 66/12 66/23 80/7 97/5 107/3 107/6 107/19 108/7 109/9
downs [1]  6/17
draft [1]  112/22
drafted [1]  113/4
draw [1]  92/25
drew [1]  39/24
drop [1]  59/7
drug [1]  43/16
drugs [5]  6/4 6/6 6/8 26/16 26/19
Dublikat [1]  27/4
due [1]  59/7
during [10]  5/15 19/20 22/7 37/9 57/12 58/9 62/3 89/21 90/2 90/15

**E**

each [12]  19/21 19/21 41/15 50/21 52/2 54/14 71/18 71/22 99/5 100/3 105/1 107/25
earlier [5]  9/4 18/24 27/16 59/16 111/13
earliest [2]  84/7 85/18
early [2]  5/6 50/24
easier [1]  68/6
East [1]  39/23

ECF [1]  33/24
Eclair [1]  91/24
economic [1]  40/18
education [5]  40/19 40/21 41/2 41/12 41/14
educational [2]  39/21 95/18
effect [1]  100/23
effectively [1]  15/3
efficient [1]  97/2
eight [7]  71/8 71/9 71/11 71/15 71/18 71/22 74/11
either [7]  47/16 48/10 55/5 55/6 59/3 103/21 106/2
EKELAND [19]  2/2 2/3 3/4 3/7 4/17 22/23 33/14 34/19 36/14 38/1 38/10 76/14 80/25 81/16 84/17 85/12 87/7 109/15 109/22
electronic [2]  65/5 65/8
element [3]  29/20 43/7 111/20
else [9]  7/9 14/7 39/17 76/3 76/10 87/20 89/3 109/19 109/22
else's [1]  14/6
elsewhere [1]  14/5
email [4]  45/11 45/14 45/17 47/4
emails [1]  44/22
employed [2]  39/6 39/7
employee [2]  77/2 77/9
employees [1]  99/4
employers [3]  82/10 82/13 82/18
encrypted [1]  13/4
end [5]  18/5 32/1 35/8 82/7 112/6
ending [1]  50/23
enforcement [6]  9/16 12/18 32/21 32/22 32/24 50/7
engaged [4]  25/18 27/10 85/19 112/3
engagement [1]  39/19
engineer [2]  101/15 101/23
engineering [5]  100/14 100/18 101/11 101/13 101/21
enhanced [1]  28/8
enjoyed [1]  39/25
enough [3]  29/19 30/8 112/21
ensure [1]  45/24
entail [3]  42/22 96/7 98/8
entered [1]  84/24
entering [1]  108/11
enterprises [1]  29/7
entire [2]  45/21 107/2
entirely [3]  33/21 77/8 77/15
entities [2]  107/20 108/1
entitled [3]  33/11 37/16 114/5
entity [1]  107/2
entrepreneur [1]  5/8
entries [2]  53/10 53/12
entry [1]  66/25
envelope [3]  10/15 10/17 10/17
equally [1]  19/14
equivalent [1]  100/15
essentially [9]  10/13 10/16 15/20 27/17 32/15 44/6 56/11 81/11 83/2
establish [1]  78/18
estimated [1]  58/13
estimating [1]  111/5
ethics [1]  40/22
Euro [2]  69/25 70/1
Euros [10]  47/16 63/19 66/14 69/12 69/13 74/21 75/22 86/18 87/3 88/24
evade [2]  9/15 26/23
even [7]  31/21 80/18 80/23 80/24 81/13 108/24 111/25
evening [1]  113/4
event [1]  82/2
eventually [9]  7/11 18/8 20/4 22/14 23/25 24/7 24/8 28/16 103/6
ever [4]  6/4 18/8 22/15 29/11
every [7]  29/19 40/2 40/22 43/5 98/3 99/20 106/15
everyone [1]  109/1
everything [1]  85/24
evidence [15]  29/16 29/18 29/19

29/22 29/24 30/8 62/9 64/24 67/6 84/22 84/23 84/24 93/10 93/21 97/16
exactly [4]  22/12 103/8 106/1 110/9
exam [3]  40/15 42/2 102/7
examination [14]  3/4 3/4 3/7 3/7 3/8 3/10 4/23 23/2 38/23 76/15 89/18 89/21 94/12 98/4
examined [1]  62/13
examiner [3]  40/8 41/1 79/2
Examiners [1]  41/19
example [15]  10/10 12/5 15/5 16/13 16/18 20/12 32/21 46/15 51/23 52/14 52/15 55/13 97/4 98/13 103/19
examples [1]  100/24
exams [2]  40/16 41/6
exceed [1]  61/24
exchange [23]  7/2 7/18 9/3 16/5 20/22 21/16 22/2 22/14 22/15 24/6 27/15 27/19 29/13 46/14 46/21 47/13 47/14 49/7 50/21 56/10 56/15 58/14 82/24
exchanges [14]  8/11 8/15 13/14 20/14 20/23 21/4 21/5 21/8 21/15 22/19 28/3 43/17 52/7 53/7
exclude [1]  36/17
excluded [1]  54/23
excludes [1]  54/23
excluding [2]  51/13 54/20
excuse [1]  64/25
excused [2]  31/4 92/17
executable [1]  101/24
exercise [4]  31/12 31/17 54/9 80/19
exhibit [70]  3/14 3/14 3/15 3/15 3/16 38/5 44/11 44/13 44/15 45/21 45/22 45/24 46/3 46/3 46/7 46/9 62/8 64/24 64/24 64/25 65/7 65/11 65/14 65/16 66/23 67/5 67/6 67/7 67/9 67/11 67/19 68/3 68/5 68/16 68/18 69/12 69/16 69/16 70/14 70/15 72/13 72/14 72/17 73/2 73/8 73/9 73/11 73/13 73/15 73/16 73/19 73/21 73/24 74/2 74/4 74/7 74/8 74/13 84/13 84/15 84/16 84/18 84/19 84/22 84/25 90/5 90/18 90/23 90/25 91/3
Exhibit 305 [9]  44/11 45/21 45/24 46/3 46/7 70/14 74/13 84/16 84/25
Exhibit 305A [3]  73/9 73/24 74/2
Exhibit 306 [8]  67/6 67/7 67/9 67/11 67/19 68/5 68/18 69/16
Exhibit 326 [5]  72/13 72/14 72/17 73/2 73/21
Exhibit 51 [3]  90/5 90/18 90/23
Exhibit 719A [3]  64/24 66/23 68/16
Exhibit 719B [3]  64/25 65/11 65/14
exhibits [2]  3/12 37/6
exist [1]  103/9
expect [2]  110/15 111/2
expenditures [3]  60/24 61/22 86/3
expenses [6]  44/4 59/20 60/17 60/18 61/22 61/24
experience [9]  16/22 40/4 41/7 41/9 41/21 43/3 43/18 67/14 102/9
expert [24]  17/14 17/18 18/2 32/14 33/25 33/25 34/2 36/16 36/20 37/1 37/12 37/14 37/16 37/24 43/23 43/25 47/10 49/20 67/22 69/3 72/10 79/12 104/3 104/9
expertise [3]  49/22 83/16 83/18
experts [1]  37/15
explain [16]  6/23 17/24 46/11 48/13 49/3 53/2 54/18 56/17 68/22 76/4 81/5 95/7 96/24 98/8 102/23 105/21
explaining [1]  18/3

**E**

Exploit [2]  10/1 10/2
explorer [2]  66/25 67/13
explorers [2]  42/16 43/1
express [1]  37/17
extensively [1]  34/25
extent [1]  16/22
extra [1]  113/3
extremely [1]  110/14

**F**

facing [1]  30/11
fact [11]  17/11 17/16 21/19 24/23
 25/6 33/16 36/13 36/15 36/21
 36/21 37/7
factor [2]  15/6 19/2
factual [1]  67/23
fair [7]  58/15 77/12 77/12 80/12
 90/11 92/11 110/24
fairly [3]  65/7 67/14 73/19
fake [4]  29/9 29/11 29/12 29/14
false [3]  21/21 81/1 81/3
familiar [8]  10/1 11/1 11/3 72/10
 72/13 72/14 100/25 103/16
far [5]  18/3 21/6 36/22 37/4
 112/15
favorite [1]  100/5
FBI [18]  72/10 94/23 94/24 95/1
 95/5 95/8 95/9 95/10 95/13 95/14
 95/14 97/12 97/14 98/6 98/9 98/21
 99/2 99/3
FBI's [1]  102/16
feature [1]  18/10
features [1]  16/8
February [2]  1/5 114/10
fee [4]  17/1 17/2 17/7 54/15
feel [3]  18/13 32/7 86/23
feeling [1]  7/7
fees [1]  16/13
felt [4]  7/7 7/8 22/18 110/15
few [7]  7/15 8/9 43/17 55/8 97/24
 100/5 104/18
fiat [1]  55/14
fictitious [1]  27/13
field [5]  39/24 95/22 100/13
 101/7 102/16
fields [1]  41/2
Fifth [3]  80/6 80/19 81/22
figure [3]  11/19 82/5 112/21
file [2]  65/7 113/2
files [1]  25/14
filmed [2]  28/25 29/2
finally [1]  31/15
financial [31]  21/21 39/10 40/5
 40/17 44/3 44/17 46/13 46/18
 46/20 46/21 47/7 49/8 60/19 60/23
 61/1 61/2 61/4 61/10 61/13 61/16
 78/7 78/9 78/13 79/5 79/8 79/17
 89/4 91/8 91/13 91/23 92/4
FinCEN [5]  32/14 33/3 33/10 33/12
 33/13
find [13]  10/9 24/22 27/8 72/5
 73/4 98/15 98/15 101/16 101/17
 102/20 105/8 105/23 112/5
finding [1]  37/16
findings [1]  102/22
fine [6]  16/23 17/21 81/24 83/22
 94/3 108/22
finish [2]  110/3 110/20
first [20]  4/4 26/3 26/8 26/10
 34/23 39/1 48/24 51/11 60/4 64/3
 71/13 71/15 74/25 84/10 85/9
 85/11 91/7 91/8 91/22 105/24
Fischbach [1]  93/24
Five [1]  28/15
flags [2]  11/15 11/17
flat [2]  17/2 58/25
flip [1]  68/15
Flipper [1]  97/21
flipping [2]  72/24 74/13
floor [2]  2/4 32/6

flowing [1]  74/10
fluctuated [1]  57/20
focusing [1]  60/16
Fog [29]  5/2 14/12 15/24 15/25
 18/8 19/15 20/4 20/9 23/13 23/15
 28/12 28/13 28/20 33/19 37/3 37/8
 72/21 72/21 73/1 73/6 73/18 74/9
 78/11 78/19 81/13 95/2 104/19
 105/12 105/13
follows [1]  66/4
force [2]  95/8 95/10
foregoing [1]  114/4
foreign [1]  47/16
forensic [14]  37/13 39/5 43/23
 43/25 79/9 79/18 79/19 81/9 82/9
 85/25 95/12 98/4 102/20 104/23
forensics [7]  79/5 97/15 98/5
 102/11 102/19 102/19 104/4
form [4]  8/18 13/4 62/1 97/3
format [1]  106/3
forms [2]  21/25 28/5
forth [3]  34/12 93/25 109/18
forum [3]  10/4 13/16 16/2
forums [8]  9/23 13/13 21/16 27/3
 27/3 27/5 27/18 99/22
forward [2]  93/18 111/9
found [10]  20/7 20/12 24/13 24/16
 27/1 29/19 37/7 61/20 61/22
 104/23
foundation [2]  37/5 38/13
founds [1]  28/10
four [4]  40/16 40/16 41/6 106/2
four-hour [1]  40/16
fourth [1]  34/12
frame [1]  50/24
Francisco [1]  5/23
fraud [12]  39/18 40/7 41/1 41/3
 41/7 41/9 41/11 41/11 41/15 41/19
 79/2 98/19
fraud-related [2]  41/7 41/9
Frederik [1]  64/10
free [2]  32/7 86/24
freelance [1]  86/15
freely [1]  95/11
Friday [1]  109/5
friend [1]  105/24
friendly [1]  102/25
front [3]  37/8 64/16 84/12
fronted [1]  38/6
fronting [1]  38/9
full [4]  68/6 86/2 86/4 109/4
fully [1]  23/14
functioning [1]  97/1
fundaments [1]  42/6
funded [1]  72/2
funds [21]  7/23 15/12 20/18 20/19
 20/21 21/24 24/6 24/10 25/17
 27/22 27/24 28/6 28/17 28/22 29/3
 29/3 43/16 50/2 50/3 50/9 50/11
further [5]  89/15 89/17 92/15
 100/23 102/3

**G**

G-L-A-V-E [1]  39/3
gain [3]  6/24 7/16 7/19
gained [5]  7/21 23/21 23/23 24/5
 24/7
gave [6]  21/20 29/21 81/1 81/2
 81/4 83/3
general [5]  34/15 94/19 97/18
 99/13 100/13
generally [11]  32/20 32/24 33/2
 43/13 49/14 57/13 57/14 59/3 98/8
 99/21 104/21
generated [1]  106/18
Geographically [1]  107/10
Georgetown [1]  95/20
get [32]  4/4 6/10 7/9 14/6 14/7
 29/9 29/11 29/14 35/3 36/3 36/7
 38/14 51/25 80/3 83/19 86/23
 86/23 86/24 88/2 92/22 93/3 93/16
 94/1 107/24 108/2 108/25 109/2

 109/3 109/4 110/23 113/3 113/4
gets [2]  103/5 108/1
getting [9]  15/9 15/14 17/20
 31/10 32/5 43/12 69/3 77/25 99/8
GIAC [1]  100/14
give [11]  15/23 16/11 16/18 18/20
 51/14 62/10 80/23 100/24 103/3
 105/25 112/21
given [3]  38/3 80/18 98/11
giving [2]  17/11 111/15
Glave [30]  3/6 35/10 36/3 38/18
 38/19 38/25 39/2 40/6 41/20 43/23
 44/2 45/21 46/11 52/24 63/3 63/20
 64/25 65/18 65/21 67/6 69/6 73/11
 74/6 76/24 83/25 84/20 88/14
 88/16 89/20 90/7
Glave's [1]  36/25
Glaves' [1]  80/8
go [27]  11/10 14/25 22/7 32/11
 35/1 35/5 35/12 35/13 35/22 54/9
 54/13 68/1 68/6 82/6 85/3 85/5
 86/20 92/23 93/16 103/19 104/14
 105/24 106/1 107/25 108/2 111/2
 111/9
goes [4]  47/21 96/17 101/21 102/4
going [41]  11/24 14/6 17/4 17/15
 17/17 19/6 19/12 31/23 33/17
 35/10 35/10 35/13 46/5 52/20
 58/20 58/23 66/23 68/18 69/2 80/5
 80/6 80/7 82/1 85/4 85/4 86/25
 86/25 93/14 93/23 93/24 104/10
 104/15 106/15 108/25 109/4
 109/5 110/2 110/7 111/2 111/6
gold [9]  46/24 46/25 47/2 47/5
 91/17 91/17 91/18 91/19 91/20
gone [1]  102/1
good [12]  4/13 4/16 4/17 4/20
 15/14 23/4 23/5 38/25 76/17 76/18
 76/19 108/21
got [12]  7/22 13/1 16/4 23/25
 24/3 24/4 24/23 28/22 78/9 98/13
 107/18 109/13
government [54]  3/14 3/14 3/15
 3/15 3/16 4/12 4/15 17/13 24/12
 24/18 24/22 24/23 25/19 25/21
 25/22 26/24 27/1 29/15 29/19
 29/21 29/24 30/8 30/10 35/19 36/7
 37/22 37/23 38/16 38/18 43/16
 43/22 44/11 46/2 59/8 65/10 67/18
 73/23 76/13 81/2 81/12 83/3 84/24
 84/24 89/17 90/5 90/17 93/15
 93/25 94/4 94/5 104/2 109/20
 110/19 110/21
government's [4]  30/21 105/9
 111/1 111/2
Gox [15]  49/10 49/11 49/12 50/1
 50/2 50/5 52/15 53/6 53/13 53/16
 53/24 54/7 84/8 85/7 85/20
graduating [2]  95/23 95/25
grand [2]  54/19 54/21
gray [7]  57/3 59/9 59/9 59/11
 72/6 73/1 73/5
great [1]  68/12
greater [1]  55/16
green [2]  63/3 71/25
GREM [1]  101/21
grounds [1]  46/5
GSEC [2]  100/15 100/17
guess [3]  81/17 81/19 109/24
guidelines [1]  33/3
guilty [9]  13/6 29/21 29/23 30/1
 30/1 30/12 30/23 31/14 31/19

**H**

hack [12]  6/20 6/23 7/3 8/11 8/22
 9/2 10/21 11/5 11/7 12/20 22/3
 26/13
hacked [7]  23/18 25/9 25/25 25/25
 26/1 26/12 26/12
hacker [1]  27/3
hackers [1]  27/5
hacking [3]  9/7 9/16 26/3

**H**

**hacks [4]** 26/5 26/17 26/18 26/22
**had [29]** 6/17 8/3 12/5 16/7 20/2 20/9 21/13 22/17 24/15 24/24 24/24 25/6 25/7 26/12 29/9 29/16 29/24 30/8 30/17 30/20 33/24 45/24 53/15 72/25 78/12 81/15 84/7 89/20 95/24
**hadn't [1]** 80/1
**half [2]** 39/15 109/5
**Hamilton [1]** 97/7
**hand [10]** 54/1 54/4 56/23 57/7 57/9 61/15 72/7 74/15 75/14 110/11
**handles [1]** 108/4
**hands [1]** 102/9
**hands-on [1]** 102/9
**happen [1]** 110/15
**happened [3]** 50/1 50/9 59/5
**happening [2]** 55/15 55/17
**happens [2]** 49/14 49/17
**hard [4]** 22/6 38/9 109/2 111/5
**harder [1]** 15/4
**hardest [1]** 112/14
**has [24]** 10/15 10/17 16/6 16/7 17/24 31/14 31/21 32/23 33/4 34/24 41/1 43/6 45/10 62/9 73/8 73/9 90/5 93/8 93/9 93/24 95/8 101/8 110/14 112/5
**HASSARD [4]** 2/2 4/19 84/14 86/22
**have [147]**
**haven't [4]** 29/18 78/17 78/17 96/9
**having [5]** 14/16 15/5 15/16 111/5 112/18
**he [47]** 12/5 16/23 17/22 17/24 17/25 18/4 31/22 31/23 32/14 32/15 32/18 32/19 32/19 32/20 33/2 33/3 33/4 33/6 33/17 33/19 33/21 34/4 34/8 34/10 34/13 34/14 34/21 36/21 38/11 53/16 55/13 55/14 55/21 55/22 55/23 61/12 61/16 78/12 80/7 80/14 81/13 81/15 85/20 88/5 88/6 90/2 90/2
**Health [1]** 94/18
**heard [8]** 18/2 26/9 28/16 34/2 35/4 37/19 101/2 103/20
**hearing [1]** 89/25
**hearsay [3]** 46/5 74/1 82/11
**held [5]** 17/10 31/8 32/10 80/4 92/19
**Helix [4]** 14/13 20/12 25/23 28/13
**Hello [1]** 39/2
**help [7]** 15/10 20/17 97/18 98/24 102/3 102/3 102/19
**helpful [2]** 101/15 110/1
**her [11]** 20/19 20/21 20/21 29/3 37/9 37/24 79/12 79/13 83/22 93/14 105/25
**here [49]** 4/3 17/13 17/17 31/7 37/11 39/18 44/12 44/23 45/3 47/18 49/1 51/13 54/2 54/4 55/13 59/6 61/19 63/3 63/6 64/3 64/14 66/10 68/8 68/9 68/13 70/3 71/11 71/13 73/1 73/5 76/3 80/21 81/7 86/20 86/21 88/5 88/19 88/20 91/7 92/1 92/4 92/21 95/16 107/23 109/2 109/3 109/3 110/13 112/4
**hereof [1]** 111/24
**herself [2]** 37/12 37/18
**HHS [2]** 94/22 95/4
**hidden [3]** 19/4 19/10 19/14
**hide [3]** 28/3 28/6 28/17
**hierarchy [2]** 107/4 107/19
**high [2]** 101/11 103/3
**highest [2]** 60/12 106/20
**highlighted [1]** 111/13
**hill [1]** 81/25
**him [22]** 4/5 5/5 17/17 17/21 17/24 18/3 18/19 23/8 23/9 23/10 32/5 34/1 34/16 34/24 36/17 36/21

80/23 80/24 81/2 81/9 88/3 88/4
**himself [2]** 33/10 81/5
**hired [2]** 77/22 77/24
**his [16]** 16/21 16/22 17/25 17/25 33/5 50/5 53/16 57/22 58/21 80/19 81/10 89/7 89/13 91/25 92/9 104/24
**hit [2]** 65/21 96/25
**home [3]** 108/3 108/5 108/10
**Honeywell [6]** 96/2 96/3 96/7 96/13 96/22 97/6
**Hong [2]** 66/9 70/9
**Honor [64]** 4/13 4/17 4/22 9/9 11/25 12/3 16/20 17/8 18/18 22/22 22/24 31/1 31/3 32/3 32/12 33/1 33/15 33/23 35/2 35/7 35/9 35/11 35/19 35/20 35/23 36/19 36/24 37/22 43/22 49/16 67/23 69/1 72/18 76/20 80/5 80/25 81/6 81/24 83/19 84/17 84/21 85/12 86/8 87/21 87/22 88/1 88/12 89/15 90/21 93/2 93/7 93/20 94/1 104/2 104/10 108/20 109/21 109/23 109/24 110/17 110/19 112/17 113/2 113/6
**HONORABLE [1]** 1/9
**hope [2]** 15/20 110/25
**hopping [1]** 28/9
**hosting [2]** 11/4 106/15
**hour [4]** 35/23 35/24 40/16 40/22
**hourly [1]** 77/1
**hours [12]** 8/9 40/13 40/21 41/15 41/25 42/1 42/12 42/13 42/23 77/16 77/18 113/3
**house [3]** 10/22 10/24 105/25
**how [78]** 5/22 6/10 6/13 7/14 8/2 8/6 8/21 8/24 9/18 12/7 13/11 15/6 15/11 15/24 15/24 16/6 16/18 18/14 19/1 19/15 19/19 21/13 22/4 22/10 26/23 27/6 29/14 35/22 39/12 39/14 41/25 42/6 42/12 42/25 44/23 44/25 46/24 47/2 48/2 50/12 51/9 51/19 51/23 52/5 52/11 55/4 55/19 55/22 56/1 57/18 57/21 60/14 61/9 61/12 66/2 69/24 70/18 76/8 77/7 77/8 77/16 80/15 82/5 85/7 91/5 91/20 91/25 92/9 94/20 96/18 101/13 101/18 101/23 102/21 105/5 107/9 107/23 111/6
**huh [4]** 28/20 28/25 29/6 29/9
**Human [1]** 94/18
**hundreds [2]** 24/21 77/18

**I**

**I'd [9]** 36/11 44/11 44/18 51/12 56/7 67/5 73/8 84/19 90/5
**I'm [8]** 14/19 18/20 43/11 59/19 71/2 84/16 88/15 107/8
**IANA [8]** 106/22 107/1 107/4 107/6 107/12 107/18 108/7 108/8
**IBAN [1]** 64/6
**ID [2]** 21/9 29/13
**ideally [1]** 15/8
**identification [2]** 29/11 29/12
**identifications [1]** 21/21
**identified [4]** 45/11 60/18 74/16 105/6
**identifier [2]** 45/9 105/22
**identifies [1]** 9/14
**identify [4]** 70/22 71/19 71/23 97/4
**identifying [1]** 41/2
**identities [2]** 27/13 100/1
**identity [3]** 9/14 100/2 104/6
**Ilya [1]** 3/3
**images [2]** 93/23 97/16
**immediately [1]** 95/25
**implemented [1]** 96/9
**implicate [2]** 80/6 93/15
**important [3]** 79/18 99/23 100/2
**importantly [1]** 16/10
**improper [1]** 33/21

**impugn [1]** 80/8
**inappropriate [3]** 31/10 31/24 38/11
**inception [1]** 39/11
**include [3]** 18/10 95/13 95/15
**included [8]** 38/1 49/6 51/10 73/6 91/9 91/14 91/23 92/12
**includes [3]** 27/13 74/9 76/6
**including [6]** 44/21 54/22 73/20 95/16 102/17 108/8
**income [14]** 44/4 59/20 59/22 59/22 59/23 61/24 62/2 79/10 79/22 80/2 81/10 86/2 86/3 86/4
**incoming [4]** 56/18 56/21 56/25 57/5
**incomplete [2]** 46/6 79/22
**inconvenient [1]** 20/8
**increased [2]** 57/14 57/20
**increasing [1]** 58/22
**increasingly [2]** 110/3 110/20
**incredibly [1]** 80/10
**independent [2]** 78/18 82/23
**indicate [2]** 65/24 65/25
**indicated [11]** 63/8 64/3 64/14 66/6 66/20 69/12 74/18 74/23 75/19 75/21 75/23
**indicator [1]** 62/1
**individual [5]** 26/1 99/4 100/1 107/23 108/2
**individual's [1]** 45/13
**individuals [1]** 98/16
**indulgence [2]** 22/21 31/5
**industry [1]** 5/24
**infer [1]** 31/11
**inflow [1]** 56/11
**inflows [22]** 47/22 47/24 47/25 50/22 51/1 51/6 51/19 52/2 52/7 52/8 54/8 54/21 55/16 55/18 56/5 56/10 56/15 59/3 59/23 59/25 60/3 61/20
**information [27]** 19/13 21/9 32/22 42/17 43/2 44/7 47/13 47/14 56/8 56/11 56/22 57/6 66/15 67/15 71/20 74/22 80/1 80/22 83/3 83/5 83/6 100/22 102/21 105/8 107/4 108/15 108/18
**informed [1]** 30/14
**infrastructure [2]** 99/9 99/25
**inherently [1]** 112/9
**initially [2]** 17/13 105/5
**initiate [1]** 23/24
**innocent [1]** 31/19
**inquiries [2]** 41/11 75/8
**ins [1]** 105/17
**inset [1]** 76/3
**inside [2]** 8/2 10/21
**Inspector [1]** 94/19
**installers [1]** 99/13
**installing [1]** 96/20
**instead [3]** 73/17 74/8 76/9
**Institute [3]** 41/17 78/22 100/19
**institution [3]** 46/21 49/15 50/15
**institution's [1]** 44/21
**institutions [3]** 47/11 47/12 49/8
**instruct [1]** 112/10
**instruction [3]** 41/25 42/12 111/12
**instructions [3]** 111/11 112/15 112/22
**intensive [1]** 102/6
**intent [1]** 36/20
**intentionally [1]** 112/9
**interacted [2]** 23/10 105/18
**internal [10]** 51/15 51/16 51/19 52/9 52/11 54/10 54/15 54/22 54/24 89/7
**internally [1]** 96/16
**international [5]** 64/4 64/8 66/18 96/2 96/4
**internet [19]** 18/15 19/2 19/7 99/12 99/14 101/17 104/3 105/23 106/6 106/7 106/10 106/23 107/7

**I**

internet... [6]   107/8 107/9 107/14 107/21 108/4 108/11
interview [5]   79/21 80/9 80/23 82/9 82/18
interviewed [4]   80/1 81/5 82/13 82/15
interviewing [5]   79/9 79/18 80/13 80/21 102/20
introduce [2]   38/7 38/25
intrusions [1]   98/19
invest [1]   96/11
invested [1]   29/8
investigating [1]   41/3
investigation [6]   78/18 82/9 82/23 95/2 100/8 104/19
investigations [6]   39/11 41/21 42/25 43/4 43/14 43/15
investigator [2]   41/23 42/11
investor [1]   29/6
invoice [40]   62/15 63/5 63/6 63/8 63/18 63/24 64/1 65/3 65/4 65/18 65/25 66/2 66/3 66/4 66/4 66/6 66/8 66/13 66/16 66/21 66/23 67/3 68/16 69/12 69/25 70/9 70/10 71/20 74/16 74/16 74/18 74/20 75/7 75/11 75/14 75/19 75/21 75/23 76/12 89/1
invoiced [2]   63/14 66/10
invoices [25]   62/4 62/6 62/13 70/12 70/14 70/16 70/18 70/21 70/23 71/8 71/11 71/15 71/16 71/18 71/22 73/21 76/10 86/12 86/14 86/17 87/3 88/21 88/23 89/3 89/7
involve [7]   96/13 96/22 97/8 98/21 99/16 100/8 105/12
involved [4]   78/19 93/11 102/2 102/6
involves [2]   93/10 96/18
involving [1]   67/2
Ioannis [1]   74/19
IP [26]   9/14 10/14 10/19 19/9 21/7 104/4 104/22 105/21 105/22 106/5 106/7 106/8 106/9 106/10 106/14 106/15 106/18 106/20 107/2 107/3 107/11 107/20 107/24 108/1 108/4 108/13
IPs [1]   107/17
IPv4 [1]   106/3
IPv6 [1]   106/3
IRS [16]   39/8 39/9 39/12 39/13 39/16 39/18 43/11 77/4 77/6 77/7 77/8 77/10 77/13 77/13 77/14 108/8
IRS-CI [10]   39/8 39/9 39/12 39/13 39/16 39/18 43/11 77/4 77/6 77/10
IRS-CIs [1]   77/13
is [471]
isn't [1]   89/12
issue [23]   18/21 33/24 34/24 35/1 36/1 36/3 36/24 46/22 51/24 52/6 62/22 81/23 82/4 93/7 94/2 109/14 109/16 109/16 111/13 111/16 111/22 111/24 112/14
issues [3]   93/1 97/4 112/24
it [284]
items [1]   97/16
its [11]   6/17 22/18 33/3 36/7 38/16 94/4 99/3 101/12 103/4 107/20 108/1
itself [4]   20/10 26/13 100/23 102/4

**J**

January [1]   97/13
Java [2]   103/19 103/23
JavaScript [3]   97/10 103/19 103/23
Jaxx [2]   92/8 92/9
Jeep [1]   91/17

Jeff [1]   4/13
JEFFREY [1]   1/18
Jeremy [4]   66/7 66/8 70/9 71/17
job [2]   97/14 98/10
jobs [1]   95/24
join [2]   97/12 105/2
joining [2]   4/19 94/22
joint [2]   95/10 95/11
JUDGE [2]   1/10 4/6
judgment [1]   32/16
July [2]   50/7 78/6
July 2017 [1]   50/7
jump [1]   100/5
June [1]   59/17
June 2017 [1]   59/17
jurisdictional [2]   111/18 111/19
juror [3]   4/3 109/25 110/13
jurors [3]   4/3 110/7 110/12
jury [39]   1/9 4/8 30/15 30/15 31/11 31/17 33/17 34/6 35/17 36/10 38/14 38/15 39/1 46/8 47/19 48/13 49/3 51/14 52/16 53/2 56/17 64/2 64/20 65/15 65/24 68/2 74/3 74/6 87/16 88/7 88/9 90/24 100/24 109/8 111/10 112/5 112/15 112/18 112/22
just [65]   7/9 9/2 9/22 11/15 13/12 13/13 14/14 14/22 15/14 15/21 15/22 16/2 16/7 16/11 18/10 18/19 19/23 20/21 23/21 30/4 33/1 34/2 34/6 34/6 39/13 39/15 47/23 49/11 49/21 52/2 54/25 55/8 59/5 59/21 62/22 63/4 63/5 64/16 64/20 74/6 80/10 82/4 82/24 83/3 87/18 88/4 88/5 88/18 90/20 92/20 97/24 104/12 106/18 108/6 108/7 109/10 109/15 109/24 110/17 110/19 110/21 110/22 111/7 111/11 112/16
JUSTICE [2]   1/13 1/20

**K**

keep [11]   85/4 85/4 86/25 86/25 92/20 96/10 98/17 99/7 104/15 108/12 109/6
kept [1]   89/6
key [3]   13/2 101/3 101/4
keys [12]   13/3 23/22 23/23 24/3 24/4 24/9 24/11 24/13 24/15 24/18 24/23 25/6
kind [20]   6/6 8/3 10/14 10/18 12/23 15/11 16/7 19/6 19/11 19/14 19/24 20/10 20/14 21/9 23/15 40/1 43/12 50/25 60/23 75/10
kinds [2]   46/12 59/25
knew [4]   26/7 34/21 39/25 112/6
know [52]   4/2 5/4 7/1 9/5 11/21 12/12 15/19 15/24 15/25 19/12 21/1 21/2 21/4 21/6 22/9 22/12 23/6 25/24 26/21 29/2 29/14 29/18 31/14 31/22 34/4 35/11 36/22 37/2 37/4 38/5 46/20 77/16 78/4 79/25 81/13 83/9 83/11 92/20 93/22 106/1 109/2 109/14 109/15 109/16 110/1 110/5 110/6 110/6 112/2 112/2 112/3 112/12
knowledge [4]   49/22 49/23 53/20 112/8
known [4]   12/23 28/9 44/20 101/1
knows [1]   80/25
Kong [2]   66/9 70/9
KPMG [2]   40/5 41/10
Kraken [4]   26/12 26/13 26/15 26/19
Krona [1]   60/10
KYC [4]   21/1 32/21 84/5 84/8
KYCed [1]   27/18

**L**

labeled [3]   59/21 60/16 60/20
laid [2]   37/5 108/7
language [4]   102/24 102/25 103/4 103/5

languages [5]   103/6 103/9 103/14 103/16 103/21
laptops [1]   97/16
large [1]   107/20
last [4]   31/9 39/1 73/16 94/15
late [3]   26/4 110/1 110/13
later [4]   8/10 59/16 78/8 108/17
launching [1]   37/17
launder [8]   19/16 20/17 22/5 25/16 27/6 27/8 27/11 30/12
launderers [2]   34/4 34/7
laundering [14]   11/6 11/8 13/5 13/6 13/7 13/19 14/9 21/20 22/11 25/18 27/5 39/11 43/19 75/7
law [18]   2/3 9/16 12/18 30/2 32/20 32/21 32/22 32/23 32/25 33/5 33/6 33/11 33/12 33/16 33/22 49/20 50/7 111/25
laws [4]   21/4 33/8 34/4 34/5
lay [1]   38/12
leading [8]   11/25 14/22 48/18 51/3 61/5 71/1 71/3 71/4
leads [1]   98/15
learn [3]   9/18 13/11 26/8
learned [1]   26/25
learning [1]   10/7
least [8]   21/8 31/21 34/11 92/22 92/23 93/16 103/22 109/13
leaving [1]   16/3
left [11]   34/6 54/1 54/4 56/22 56/23 72/7 74/9 74/15 74/16 74/18 93/12
left-hand [5]   54/1 54/4 56/23 72/7 74/15
legal [4]   25/3 93/1 98/14 104/24
less [1]   55/18
let [2]   8/8 23/23
let's [6]   38/14 87/10 88/6 93/16 94/3 108/23
letter [5]   10/15 10/16 81/1 81/8 81/14
letters [2]   74/25 106/3
letting [1]   62/24
level [7]   56/1 101/11 102/23 103/3 103/5 106/21 107/25
levels [2]   108/7 108/10
liability [2]   111/24 112/1
licensing [1]   111/14
Lichtenstein [4]   3/3 4/25 23/4 34/3
life [1]   23/8
Light [1]   20/12
like [51]   5/11 5/25 6/1 7/7 7/8 7/25 10/18 13/12 13/14 16/2 16/6 16/14 16/15 16/16 18/13 19/2 19/17 19/17 19/22 21/9 22/18 23/16 27/3 28/12 28/12 29/22 30/5 35/4 36/11 44/11 44/18 48/24 51/12 52/2 52/10 56/7 56/16 64/23 67/5 68/21 73/8 77/13 79/10 82/25 84/19 90/5 97/21 97/22 99/16 106/2 107/21
liken [1]   105/24
limine [1]   34/19
LINDSAY [3]   2/6 114/3 114/12
line [21]   31/9 31/24 37/11 51/12 53/8 54/19 56/20 56/21 57/15 57/16 57/17 58/18 58/20 58/23 58/25 59/9 59/9 59/11 81/18 92/25 103/24
lined [1]   36/1
lines [2]   63/3 71/13
linked [3]   22/2 45/10 99/3 99/4
Linux [1]   102/10
list [2]   72/20 85/3
listed [13]   45/15 47/12 53/7 71/16 72/6 73/1 73/2 73/5 73/6 74/9 84/7 85/21 92/4
listen [1]   81/16
listening [1]   101/7
listing [3]   73/7 73/17 84/3
little [6]   4/25 6/3 6/18 38/9

**L**

little... [2]  51/14 93/4
living [1]  5/23
LocalBitcoin [2]  50/17 51/7
LocalBitcoins [2]  49/10 50/15
locate [2]  18/14 67/2
located [5]  43/8 43/9 63/10 64/1 66/8
location [3]  10/11 19/9 104/6
log [5]  20/10 20/13 25/14 105/17 105/18
log-ins [1]  105/17
log-outs [1]  105/18
logger [1]  101/4
loggers [1]  101/3
logistics [1]  77/15
logs [2]  98/13 104/22
long [12]  8/2 8/6 16/6 35/22 37/18 39/12 39/14 93/14 94/20 99/19 102/6 111/6
longer [1]  22/18
look [26]  16/3 16/14 34/25 35/1 42/17 44/23 52/2 52/2 53/3 53/4 72/1 78/13 84/13 84/20 97/2 97/22 98/11 98/14 98/17 99/16 99/20 101/18 101/25 106/2 108/15 108/17
looked [6]  10/5 34/25 46/12 70/6 97/2 98/3
looking [35]  13/12 13/13 16/1 16/6 16/9 16/19 18/4 35/6 45/3 45/21 54/25 55/8 55/9 55/15 55/17 57/21 58/7 59/5 59/9 59/21 60/4 60/11 61/15 61/18 64/2 66/3 66/4 68/7 82/24 91/7 92/3 102/2 105/16 105/17 105/19
looks [1]  68/21
lost [2]  50/3 50/11
lot [17]  5/24 7/21 9/22 9/23 11/17 12/24 13/12 14/12 16/11 16/14 21/15 24/16 24/16 25/21 26/16 29/21 80/22
low [1]  103/5
lower [1]  51/12
LSD [1]  6/9
Luke [2]  47/10 72/11

**M**

M-A-Z-A-R-I-N [1]  94/16
M-A-Z-A-R-S [1]  94/16
made [6]  31/14 31/21 33/10 49/5 50/19 63/22
main [2]  19/8 103/25
major [1]  5/13
majority [1]  19/23
make [15]  5/1 7/10 15/18 20/9 34/7 48/25 49/8 50/17 51/9 87/11 88/6 88/7 97/2 98/16 109/2
makes [3]  15/4 16/13 77/12
making [5]  33/13 93/17 99/16 99/20 99/21
malware [11]  100/14 100/18 100/20 100/21 100/24 101/11 101/13 101/15 101/16 101/19 102/8
manual [6]  48/25 49/3 49/5 49/9 50/19 51/10
manually [1]  108/3
manufacturing [2]  96/4 96/5
many [10]  19/15 41/25 42/12 44/23 44/25 55/19 55/22 70/18 77/16 91/5
March [4]  110/2 110/4 110/21 111/1
March 10th [1]  110/2
March 7th [3]  110/4 110/21 111/1
marijuana [2]  26/20 26/22
marked [3]  14/3 45/3 48/8
markets [4]  6/7 6/10 27/25 98/20
markings [1]  63/21
mask [1]  27/22
master's [1]  39/22
matched [1]  52/7

matter [4]  22/14 77/22 81/11 114/5
matters [1]  33/22
maximum [1]  30/11
may [32]  4/2 4/21 14/24 22/24 22/25 36/9 37/17 38/16 38/22 46/8 62/17 65/14 65/20 68/22 69/2 69/17 71/7 74/2 76/20 76/21 85/4 88/6 88/10 90/23 92/12 92/21 94/9 94/10 101/2 101/19 103/20 110/6
May 16th [1]  65/20
May 18th [1]  69/17
maybe [18]  8/9 12/4 17/20 26/4 32/2 35/2 35/23 50/1 52/24 53/2 62/19 62/22 68/2 72/13 101/8 101/25 102/6 109/25
Mazarin [8]  3/9 93/3 93/10 94/2 94/6 94/7 94/15 104/3
Mazars [11]  3/9 93/3 93/10 94/2 94/6 94/7 94/15 94/17 104/3 104/18 105/2
Mazars' [1]  93/22
me [28]  4/19 5/25 7/17 8/13 17/5 18/20 19/8 19/11 23/23 24/5 25/18 25/21 31/15 31/21 37/11 37/23 38/9 38/9 40/1 62/10 62/24 64/25 79/8 79/17 79/21 84/12 93/9 105/25
mean [21]  6/16 7/6 9/8 9/13 10/2 13/2 13/19 20/1 26/20 29/18 44/5 47/23 48/5 53/16 55/12 58/21 58/23 59/1 80/9 101/12 112/4
meaning [1]  111/13
means [14]  6/23 17/3 21/2 21/6 44/6 48/6 48/14 58/22 59/3 85/9 95/9 96/8 99/5 112/1
meet [2]  5/16 5/25
meet-up [1]  5/25
member [3]  41/16 41/17 78/22
memorandum [1]  95/9
memory [3]  35/5 84/18 86/19
mentioned [10]  13/5 13/23 15/5 20/23 27/15 40/23 42/8 78/22 89/9 101/22
menu [1]  65/22
merely [1]  82/13
message [1]  23/15
met [1]  5/5
metadata [1]  101/25
method [2]  64/3 66/17
methods [1]  9/24
MICHAEL [2]  2/2 4/19
Microphone [1]  110/18
might [17]  10/10 11/19 12/7 14/7 16/15 52/2 52/25 68/6 79/22 82/3 93/11 97/4 97/19 99/11 100/25 101/17 102/1
million [6]  9/1 11/10 11/16 13/7 22/10 58/10
millions [2]  22/6 24/21
mind [2]  17/25 104/1
mindset [1]  17/25
mine [1]  7/9
minus [4]  17/7 22/10 50/22 50/22
minute [2]  32/8 87/20
minutes [6]  35/10 35/23 87/10 93/17 104/13 104/14
mirror [1]  99/23
miscellaneous [1]  60/3
misleading [1]  81/3
misrepresentation [1]  81/3
missing [2]  79/25 80/22
misuse [1]  43/16
mix [2]  16/11 16/25
mixed [1]  15/15
mixer [15]  13/24 14/8 14/17 15/2 15/13 15/19 16/5 16/8 17/22 17/23 18/14 19/6 20/10 28/13 28/20
mixers [12]  13/21 13/23 17/15 17/18 19/3 19/4 19/23 20/7 20/12 20/16 25/23 28/12
mixing [6]  14/1 17/1 17/2 19/10

25/20 28/18
mobile [1]  102/17
mode [1]  68/6
modified [1]  38/3
modify [1]  8/12
moment [1]  17/9
Monday [2]  111/3 111/4
Monero [2]  28/10 92/8
monetary [1]  75/21
money [48]  7/10 8/16 9/2 9/4 13/5 13/6 14/5 14/6 14/7 14/8 15/5 15/6 15/9 15/11 15/13 15/14 15/16 15/20 16/4 16/5 16/11 16/11 19/16 19/19 20/1 21/17 21/20 22/4 22/11 24/19 27/4 27/5 27/7 27/10 28/2 30/12 33/19 34/4 34/7 34/10 34/11 34/13 39/10 43/19 49/14 51/21 75/7 77/13
money.com [1]  91/17
Monsanto [3]  89/25 90/12 90/15
months [4]  7/15 8/4 34/17 34/18
more [20]  14/15 16/14 19/12 20/14 20/24 28/11 32/24 42/23 48/15 48/23 54/13 56/4 59/18 74/14 91/3 102/20 102/25 103/5 103/5 108/9
Morgan [4]  5/16 20/17 25/16 29/1
morning [14]  1/7 4/13 4/16 4/17 4/20 23/4 23/5 34/21 34/22 35/13 35/14 38/25 76/17 76/18
MOSS [1]  1/9
most [5]  15/12 16/10 46/19 98/11 101/1
mostly [1]  101/23
mother's [1]  91/19
motion [1]  34/19
move [3]  83/17 104/2 107/19
moves [6]  43/22 46/2 65/10 67/18 73/23 90/17
moving [5]  81/24 92/20 93/18 98/17 109/6
Mr [10]  3/4 3/4 3/7 3/7 3/8 4/25 23/4 34/3 37/6 89/24
Mr. [79]  4/21 22/23 23/6 33/14 33/18 34/19 36/14 36/19 37/25 38/1 38/10 44/3 44/20 45/19 47/2 48/1 48/3 50/20 53/21 55/19 57/22 58/3 59/1 59/23 60/19 74/17 76/7 76/14 77/23 77/24 78/1 78/10 78/16 78/19 80/6 80/14 80/18 80/23 80/25 81/1 81/4 81/9 81/13 81/16 81/19 82/10 82/18 83/6 83/6 83/25 84/4 84/8 84/14 84/17 85/7 85/12 85/17 85/19 86/12 86/15 86/22 87/7 89/2 89/3 89/6 89/9 89/12 90/10 90/15 91/20 91/25 92/9 92/23 93/9 93/24 104/23 105/10 109/15 109/22
Mr. Brown [1]  37/25
Mr. Ekeland [14]  22/23 33/14 34/19 36/14 38/1 38/10 76/14 80/25 81/16 84/17 85/12 87/7 109/15 109/22
Mr. Fischbach [1]  93/24
Mr. Hassard [2]  84/14 86/22
Mr. Pearlman [2]  4/21 92/23
Mr. Roman [1]  45/19
Mr. Sterlingov [31]  23/6 33/18 53/21 55/19 57/22 77/23 77/24 78/1 78/10 78/16 78/19 80/14 80/18 80/23 81/1 81/4 81/9 81/13 85/17 85/19 89/2 89/3 89/6 89/9 89/12 90/15 91/20 91/25 92/9 93/9 105/10
Mr. Sterlingov's [26]  44/3 44/20 47/2 48/1 48/3 50/20 58/3 59/1 59/23 60/19 74/17 76/7 80/6 81/19 82/10 82/18 83/6 83/6 83/25 84/4 84/8 85/7 86/12 86/15 90/10 104/23
Mr. Verret [1]  36/19
Ms [20]  3/10 45/21 46/11 52/24 63/3 63/20 64/25 65/18 65/21 67/6

**M**

Ms... [10]   69/6 73/11 74/6 76/24 83/25 84/20 88/14 88/16 89/20 90/7
Ms. [14]   5/16 20/17 25/16 36/3 36/25 38/25 40/6 41/20 43/23 44/2 80/8 93/10 93/22 94/2
Ms. Glave [6]   36/3 38/25 40/6 41/20 43/23 44/2
Ms. Glave's [1]   36/25
Ms. Glaves' [1]   80/8
Ms. Mazars [2]   93/10 94/2
Ms. Mazars' [1]   93/22
Ms. Morgan [3]   5/16 20/17 25/16
Mt. [15]   49/10 49/11 49/12 50/1 50/2 50/5 52/15 53/6 53/13 53/16 53/24 54/7 84/8 85/7 85/20
Mt. Gox [15]   49/10 49/11 49/12 50/1 50/2 50/5 52/15 53/6 53/13 53/16 53/24 54/7 84/8 85/7 85/20
much [15]   8/21 8/24 15/11 19/19 22/4 22/10 57/21 60/14 61/9 61/12 91/20 91/25 92/9 96/19 111/16
mules [1]   21/17
mushrooms [1]   6/9
must [4]   40/13 40/16 41/6 41/15
my [47]   7/6 7/24 10/11 10/16 10/19 13/4 14/7 15/14 16/4 20/7 20/11 22/2 22/20 24/10 28/19 29/22 30/10 32/19 33/2 35/1 35/5 39/2 39/18 39/25 41/10 45/11 45/19 53/1 72/20 77/2 78/12 78/15 86/19 87/15 89/4 93/8 93/20 94/15 95/8 98/13 100/2 100/6 100/14 105/24 108/4 108/4 108/5
Mycelium [2]   91/24 91/25
myself [2]   5/11 19/13

**N**

N.W [1]   1/16
name [13]   4/12 22/2 22/15 22/20 39/1 39/2 43/17 45/5 45/7 89/13 94/14 94/15 94/16
named [1]   5/4
names [3]   21/17 21/18 102/1
natural [1]   112/11
nature [1]   66/10
Navy [1]   97/11
need [16]   12/4 23/14 32/23 33/20 35/5 79/20 81/25 82/5 87/8 96/19 98/24 99/6 108/2 112/10 112/20 113/2
needed [4]   19/24 96/21 97/21 99/7
negative [4]   48/16 50/23 51/1 51/11
negligent [1]   80/13
net [11]   48/10 48/16 55/23 86/2 86/2 86/4 86/4 90/3 90/10 90/11 90/14
netting [3]   55/11 55/12 59/4
network [6]   97/17 98/19 101/20 102/18 102/21 104/4
never [12]   5/5 21/5 23/8 23/9 23/10 23/12 23/15 24/4 80/17 80/18 80/22 81/4
new [5]   1/20 95/4 97/20 99/18 100/4
newer [3]   97/25 98/2 106/3
next [19]   1/23 32/4 32/13 35/9 35/22 36/7 38/17 47/18 56/7 56/16 58/11 59/18 69/15 92/3 94/4 96/12 98/17 111/2 111/4
nexus [1]   111/16
nice [2]   34/20 109/7
no [38]   1/4 5/3 5/5 5/5 5/14 22/18 23/7 23/11 23/14 23/17 24/20 26/7 29/10 31/3 34/15 46/9 64/13 65/13 65/16 68/3 74/4 77/11 77/21 78/15 78/20 82/20 83/8 84/2 85/22 86/24 87/22 89/15 90/25 92/15 105/7 106/11 106/19 109/23

non [1]   95/11
non-joint [1]   95/11
nontechnical [1]   102/23
Nordea [4]   46/17 59/23 60/22 91/12
normal [1]   19/7
North [3]   107/11 107/23 108/8
not [105]   7/12 10/19 11/12 11/12 14/7 15/23 16/11 17/11 18/12 18/18 19/12 20/8 21/6 24/16 24/20 26/18 26/20 29/12 29/23 30/8 31/13 31/14 31/14 31/16 31/19 31/20 31/21 32/19 32/24 33/6 33/16 34/1 34/7 34/8 34/20 35/11 35/19 36/20 36/21 37/1 37/2 37/18 45/7 47/1 49/6 49/20 49/23 53/1 57/15 57/17 62/19 62/20 62/24 64/12 64/24 67/6 70/13 73/8 73/9 77/8 77/9 77/11 77/15 78/3 78/7 78/15 78/19 79/5 80/11 80/13 81/7 81/14 81/16 81/25 82/12 83/8 83/13 83/15 83/18 84/2 84/12 85/12 85/16 85/22 86/7 86/24 87/18 87/21 89/4 89/8 90/5 91/14 91/22 92/4 92/12 93/14 97/19 100/2 101/16 105/5 110/2 110/7 110/25 111/7 111/22
note [1]   31/24
notes [7]   26/23 26/25 27/1 34/24 35/1 35/6 45/12
Nothing [1]   35/20
notice [3]   34/18 48/4 48/12
noticed [4]   34/16 36/10 36/19 76/11
novel [1]   97/25
now [29]   4/3 4/5 17/12 32/18 35/14 45/3 45/21 47/6 48/23 51/12 54/18 59/9 62/3 64/23 66/23 68/5 70/9 70/14 72/10 74/14 75/3 75/14 82/4 86/12 87/9 89/24 101/1 101/8 104/13
number [18]   15/8 21/5 27/10 44/21 44/22 55/4 63/5 63/6 64/5 64/9 64/10 65/25 66/18 66/21 76/12 89/9 101/8 102/17
numbers [7]   48/4 49/1 50/18 106/2 106/4 106/24 107/15
numerous [1]   27/3
NW [3]   1/14 1/20 2/8
NY [1]   2/4

**O**

oath [2]   30/4 30/5
obfuscate [1]   13/10
object [5]   9/9 17/18 38/10 46/5 90/20
objected [1]   17/13
objection [37]   6/14 9/20 11/25 14/18 14/22 16/20 17/6 17/8 18/17 25/1 25/2 32/13 32/15 32/17 46/4 48/18 49/16 49/18 49/19 51/3 53/18 53/19 61/5 65/12 65/13 67/20 67/21 69/1 71/1 71/2 72/18 73/25 79/11 80/3 82/11 86/8 90/19
obnal [1]   27/4
observed [1]   89/4
obstacles [1]   21/14
obtain [2]   6/25 26/2
obtaining [1]   32/21
obviously [8]   11/15 15/8 15/18 16/10 19/7 33/15 81/21 88/2
occasionally [1]   10/5
occupation [1]   39/4
October [3]   84/10 85/8 85/10
October 3rd [3]   84/10 85/8 85/10
off [1]   87/20
offense [1]   111/21
offered [1]   83/16
offers [3]   64/4 66/17 100/17
Office [1]   94/19
officer [1]   95/8
Official [3]   2/7 114/3 114/13

oh [3]   17/15 75/18 77/22
OIG [1]   95/4
okay [17]   4/7 5/4 18/6 35/21 36/23 37/18 65/24 85/1 87/9 88/8 94/3 94/4 104/8 104/16 109/11 109/12 111/4
once [3]   7/22 8/8 22/17
one [30]   5/1 7/16 8/12 14/10 20/8 25/22 25/22 29/2 29/5 30/7 34/19 41/24 47/23 49/11 51/16 53/5 54/13 54/15 62/10 62/13 74/14 78/6 89/1 91/3 92/21 106/8 108/2 108/5 110/13 111/11
one's [1]   112/11
ones [4]   14/11 14/14 103/6 103/25
online [10]   9/23 10/19 13/12 27/14 99/2 99/11 99/22 100/3 100/7 104/6
only [9]   28/13 52/4 64/18 73/16 77/9 92/21 99/10 101/16 113/1
op [2]   9/5 100/9
open [3]   42/16 43/1 67/12
opened [4]   31/23 84/10 85/8 85/20
opening [2]   81/18 81/20
operate [1]   21/5
operating [4]   15/22 96/20 102/2 102/18
operation [3]   72/11 98/24 99/5
operational [9]   9/6 9/7 9/18 9/19 9/24 10/7 99/1 99/23 104/4
operations [3]   98/22 99/2 102/16
opinion [4]   17/14 37/16 37/17 79/12
opinions [1]   79/13
opportunity [4]   72/25 80/18 81/2 81/5
opposed [2]   19/1 36/16
opposition [1]   113/2
option [2]   66/18 80/24
order [1]   93/4
organization [1]   100/17
organizations [1]   41/16
origin [1]   75/13
original [3]   38/2 46/25 49/7
originally [1]   38/4
originate [1]   112/6
other [50]   7/17 7/19 8/11 8/14 14/1 14/4 14/4 15/5 15/18 16/3 17/23 20/7 20/12 21/13 21/17 21/25 22/22 27/18 28/5 29/13 33/4 40/3 42/16 45/9 46/21 47/7 47/9 48/16 53/7 60/2 60/23 70/15 78/14 85/16 89/20 91/22 92/11 96/21 98/15 99/5 99/22 101/17 101/19 102/11 105/20 105/23 106/9 108/10 108/12 111/9
others [1]   98/2
ought [2]   32/19 32/24
our [5]   32/15 35/12 35/14 36/20 109/6
ourselves [1]   109/14
out [43]   4/5 7/7 7/18 10/16 11/11 11/19 12/17 14/5 15/13 17/16 35/17 52/16 53/5 53/6 53/24 55/5 55/7 55/11 55/12 55/14 59/4 62/18 63/21 64/2 64/20 65/18 73/17 78/6 80/20 82/5 82/5 86/24 87/16 91/11 96/11 96/14 97/3 97/20 101/16 102/20 108/7 109/8 112/21
outflows [16]   47/22 48/2 48/3 48/6 50/22 51/19 52/7 52/8 54/21 55/10 55/16 55/18 55/24 55/25 59/3 60/20
outlined [1]   71/13
outs [1]   105/18
outside [5]   10/24 67/21 82/20 83/2 85/22
outstanding [1]   32/12
over [21]   7/15 16/7 17/23 18/1 24/20 24/21 24/24 40/17 41/2 47/20 55/1 56/10 56/18 57/20 58/13 59/11 86/18 88/24 97/3

**O**

over... [2]  106/6 111/12
overlaid [1]  56/19
Overruled [11]  6/15 9/11 9/21
 25/5 48/19 51/4 53/22 61/6 71/5
 72/19 79/14
overslept [1]  110/14
overstated [2]  51/2 51/6
overwhelming [1]  29/16
own [13]  7/24 15/9 15/14 16/22
 16/22 20/21 24/10 29/3 30/18 89/7
 89/13 98/13 100/2
owner [3]  44/21 45/4 45/14

**P**

p.m [5]  87/16 87/24 88/9 109/8
 113/10
page [26]  1/23 44/18 47/18 52/10
 54/18 56/7 56/16 58/11 59/18
 59/19 68/5 68/6 68/7 69/15 70/15
 74/13 74/14 75/14 84/15 85/3
 86/23 91/3 91/7 91/8 91/22 92/3
pages [7]  44/12 59/19 91/5 91/6
 99/11 99/11 99/18
paid [1]  28/25
paper [6]  83/7 83/8 83/9 83/10
 83/11 83/13
parenthesis [4]  48/4 48/6 48/12
 48/14
part [19]  11/5 11/6 11/7 14/8
 25/12 27/6 37/7 59/21 60/16 60/17
 63/24 79/8 79/17 79/19 79/20 82/9
 90/20 92/4 105/12
partially [1]  101/24
particular [10]  9/24 12/21 12/22
 17/22 26/5 33/7 34/9 41/20 57/1
 111/15
particularly [4]  16/1 31/20 33/12
 104/5
parts [1]  101/17
party [1]  39/10
pass [3]  31/1 40/16 41/6
passes [1]  76/13
passport [1]  29/14
passports [1]  29/9
password [2]  101/6 101/8
passwords [3]  8/13 8/14 26/14
path [1]  40/1
pattern [1]  61/3
patterns [1]  105/19
Pause [2]  32/9 62/25
pay [1]  66/18
PayCoin [1]  9/3
paying [1]  64/18
payment [9]  46/15 63/24 64/3 64/4
 66/15 66/17 71/20 74/22 74/25
payments [1]  60/2
peak [1]  58/2
PEARLMAN [4]  1/18 4/14 4/21 92/23
peers [1]  30/15
PELKER [4]  1/13 3/4 3/10 4/14
pending [1]  38/5
Pennsylvania [1]  1/14
people [10]  5/24 9/24 13/16 14/4
 15/6 16/3 16/12 79/9 103/9 109/2
people's [4]  14/1 21/18 27/18
 29/13
percent [4]  17/2 17/16 18/12 55/6
performing [1]  41/11
period [9]  7/15 47/21 55/2 57/12
 58/9 61/18 86/18 88/24 99/19
periods [1]  106/2
permitted [1]  33/25
person [2]  102/7 107/23
person's [1]  92/24
personal [4]  6/8 21/9 53/20
 106/12
personally [2]  82/15 83/13
phone [4]  17/9 31/7 80/3 92/18
phones [1]  99/6
PHP [1]  103/23

phrases [1]  103/2
physical [5]  29/12 91/17 91/18
 91/19 91/20
Pi [2]  97/21 97/24
pick [2]  31/6 92/18
picture [1]  79/22
piece [1]  47/23
piercing [1]  100/9
place [1]  108/11
Plaintiff [2]  1/4 1/13
plan [1]  21/20
plans [1]  29/9
plea [2]  30/7 30/14
pleaded [4]  29/21 29/23 30/1 30/1
please [6]  4/11 38/21 38/25 85/13
 85/14 94/14
pled [2]  13/6 30/12
PLLC [1]  2/3
plus [3]  50/22 50/22 54/3
podium [1]  4/11
point [17]  5/18 6/20 7/19 18/1
 20/17 24/20 34/17 52/16 62/18
 64/2 64/20 65/18 75/6 80/12 87/8
 91/11 93/22
pointing [1]  80/20
poll [1]  110/10
populating [1]  99/19
position [1]  94/24
possession [1]  91/19
possible [2]  68/15 96/9
potential [1]  52/6
potentially [5]  51/20 51/21 51/24
 79/24 111/17
power [1]  96/19
PowerPoint [1]  62/22
PowerShell [1]  103/24
practical [1]  43/3
practice [1]  28/9
precedent [2]  111/21 111/23
prefer [1]  104/14
prejudice [1]  34/15
prepaid [11]  46/17 46/17 61/1
 61/2 61/2 61/4 61/10 61/12 61/16
 89/10 89/13
prepare [3]  44/9 67/9 73/13
prepared [3]  53/9 72/24 90/3
preponderance [1]  111/20
present [2]  4/18 36/21
presented [1]  80/24
presenting [1]  36/12
preserve [1]  99/1
pretrial [1]  89/25
pretty [3]  31/10 55/11 55/12
preview [2]  111/11 112/16
previous [5]  54/13 56/12 66/3
 66/4 70/5
previously [2]  63/21 95/15
price [4]  57/12 57/18 63/16 66/13
primarily [6]  6/8 10/9 42/24
 97/15 98/19 105/17
primary [1]  99/1
prior [5]  39/18 41/10 77/24 85/23
 94/22
private [14]  13/2 13/3 23/22 24/3
 24/4 24/9 24/11 24/13 24/15 24/18
 24/23 25/6 83/25 101/9
probably [10]  14/6 18/13 19/17
 22/13 26/4 26/9 28/15 77/18 101/1
 104/12
Probive [1]  27/4
problems [1]  16/5
proceed [7]  4/21 22/24 38/22
 76/20 82/6 88/10 94/10
proceeding [4]  90/2 90/2 90/12
 90/15
proceedings [2]  1/7 114/5
process [8]  8/3 22/18 23/24 97/19
 98/14 102/5 102/20 104/24
processing [1]  97/15
processors [1]  46/15
produce [1]  75/11
produced [3]  38/4 38/4 46/20

product [1]  44/9
professional [4]  40/3 40/6 41/16
 100/11
Professor [2]  36/11 36/12
proffer [5]  81/1 81/8 81/11 81/11
 81/14
proficient [1]  103/22
program [3]  7/25 8/1 103/8
programmer [1]  103/1
programming [6]  102/24 102/25
 103/9 103/13 103/16 103/21
programs [3]  27/21 27/23 101/24
projects [1]  98/10
prompted [1]  75/11
proof [3]  24/24 25/4 25/7
propagate [1]  100/23
proper [1]  31/20
properly [1]  97/1
propose [1]  112/23
protecting [4]  9/12 9/13 9/14
 100/1
prototypes [1]  96/10
prove [2]  29/19 30/9
provide [3]  17/24 75/6 95/11
provider [2]  61/2 108/4
providers [2]  46/17 107/21
provides [2]  63/24 64/19
province [1]  33/16
provision [3]  111/22 111/24
 111/24
provisioning [1]  96/20
proxy [4]  10/11 10/12 10/13 10/16
psychedelic [1]  6/8
psychology [1]  5/14
public [6]  12/9 16/25 40/7 40/9
 41/18 78/23
publically [3]  43/1 47/11 47/13
publicized [1]  33/12
publicly [1]  42/16
publish [6]  46/2 65/10 67/18
 73/23 90/17 90/23
published [4]  46/8 65/15 68/2
 74/3
pull [3]  14/5 72/14 90/5
purchase [1]  6/2
purchased [5]  6/8 21/16 26/10
 55/14 63/13
purchases [2]  48/10 48/15
purpose [3]  10/7 19/8 101/12
purposes [5]  16/22 20/8 28/19
 34/12 89/7
pursuing [1]  40/1
put [6]  14/3 17/3 19/19 22/17
 34/1 109/4
puts [1]  10/17
putting [1]  14/4
puzzle [1]  111/12
Python [2]  103/19 103/23

**Q**

qualification [1]  41/9
qualifications [2]  40/11 92/24
qualified [2]  43/25 104/9
qualify [2]  43/23 104/3
quarter [2]  35/15 104/12
question [22]  12/3 18/21 33/18
 36/23 38/10 54/14 72/19 79/15
 80/17 80/20 81/17 81/20 81/21
 82/1 82/16 109/17 110/5 110/17
 110/24 111/18 111/19 111/20
questioning [3]  31/10 31/24 81/18
questions [8]  22/22 30/7 37/20
 75/10 89/15 92/15 112/12 112/21
quick [2]  87/11 110/17
quickly [1]  93/18
quite [1]  22/8
quote [1]  90/3

**R**

raise [3]  11/15 11/17 110/10
raised [1]  82/4
raises [1]  80/10

**R**

**raising [2]** 37/9 81/23
**ran [1]** 81/12
**RANDOLPH [1]** 1/9
**randomization [1]** 16/17
**randomize [1]** 16/13
**randomize the [1]** 16/13
**randomizer [1]** 18/10
**randomly [3]** 14/5 15/13 106/18
**Ransomware [1]** 101/1
**rap [1]** 28/25
**Raspberry [2]** 97/21 97/24
**rate [2]** 47/14 77/1
**rates [2]** 47/13 82/24
**rather [1]** 34/22
**reached [1]** 78/6
**reaching [1]** 94/2
**reactor [16]** 41/22 42/7 62/7 65/3
  70/16 70/18 70/21 73/21 86/12
  86/14 86/17 86/23 88/21 88/23
  89/1 89/7
**read [3]** 64/16 84/18 103/25
**reading [3]** 9/22 13/22 97/3
**ready [4]** 88/11 88/14 88/16 94/11
**real [4]** 22/2 22/15 22/20 99/20
**realize [1]** 32/18
**really [8]** 7/8 15/10 15/15 17/12
  29/25 79/25 109/1 109/3
**reason [1]** 99/1
**reasonable [3]** 29/20 30/9 103/10
**recall [4]** 14/11 14/14 19/15
  19/19
**receive [1]** 78/7
**received [2]** 42/19 102/11
**receiving [5]** 68/10 68/18 68/21
  68/23 69/18
**Recess [3]** 36/6 87/24 113/10
**recognize [7]** 44/13 64/25 65/2
  67/6 73/11 90/7 90/9
**recommend [1]** 96/11
**recommendations [1]** 98/16
**reconcile [1]** 80/16
**reconciled [1]** 50/21
**reconciliations [1]** 48/25
**record [7]** 4/12 19/13 20/11 31/25
  45/18 94/14 114/5
**recorded [1]** 10/19
**recording [2]** 16/15 21/7
**records [15]** 45/22 46/20 73/20
  75/3 75/17 75/18 78/7 78/9 78/13
  78/15 89/5 89/21 101/5 105/13
  108/16
**recover [2]** 8/16 8/21
**recovered [4]** 26/14 45/12 65/4
  65/8
**red [5]** 11/15 11/17 53/10 71/13
  71/14
**redirect [3]** 3/8 31/2 89/18
**reduced [3]** 50/5 50/13 52/8
**reduction [1]** 48/7
**referring [2]** 71/12 110/22
**reflected [2]** 54/1 54/10
**refresh [2]** 35/5 86/19
**refusal [1]** 81/19
**regard [2]** 105/9 112/14
**regarding [3]** 79/9 93/1 95/15
**regime [1]** 33/9
**regional [3]** 107/4 107/6 108/12
**register [1]** 33/18
**registered [2]** 21/17 22/20
**registers [1]** 107/4
**registrations [1]** 32/22
**registries [4]** 107/7 107/8 107/9
  108/12
**Registry [1]** 107/14
**regulatory [1]** 33/9
**relate [1]** 66/2
**related [14]** 13/17 40/14 40/14
  41/7 41/9 41/15 42/24 43/13 47/21
  78/7 78/16 93/21 93/23 102/12
**relates [2]** 37/20 42/24

**relating [1]** 109/17
**relation [1]** 83/11
**relationship [2]** 95/13 95/14
**Relative [1]** 55/4
**relatively [2]** 58/25 59/4
**relevance [3]** 6/14 9/9 9/20
**relevant [3]** 80/11 100/11 100/13
**reliably [1]** 99/14
**relied [1]** 83/3
**rely [3]** 20/15 37/5 37/16
**remailing [1]** 10/18
**remain [1]** 93/17
**remaining [3]** 19/14 50/13 55/13
**remember [6]** 11/6 13/22 18/12
  26/10 28/15 110/9
**remembers [1]** 32/16
**remind [2]** 35/15 108/24
**remove [1]** 52/8
**removed [1]** 54/8
**renewing [1]** 32/17
**rental [1]** 39/19
**renting [1]** 28/24
**repeat [3]** 74/6 79/15 85/13
**rephrase [2]** 18/21 50/1
**Reporter [4]** 2/6 2/7 114/3 114/13
**reporting [1]** 40/18
**reports [1]** 102/22
**represent [1]** 45/1
**representative [1]** 44/16
**represented [1]** 80/15
**reputation [3]** 16/1 16/7 100/6
**requesting [1]** 75/12
**require [1]** 21/9
**required [1]** 41/14
**requirement [5]** 40/15 41/10
  111/14 111/16 111/18
**requirements [4]** 40/19 40/22 41/4
  41/13
**research [3]** 13/12 35/16 108/25
**resellers [1]** 108/9
**reserved [1]** 32/16
**resources [2]** 8/10 9/23
**respect [14]** 12/22 13/7 21/4 33/3
  33/10 81/23 83/16 83/16 93/1
  109/17 111/10 111/13 112/8 112/10
**response [1]** 75/7
**responsibilities [2]** 39/9 97/14
**result [2]** 8/11 8/21
**resume [1]** 87/25
**return [4]** 10/15 10/18 49/7 50/24
**returning [5]** 54/18 66/23 70/14
  70/14 88/18
**returns [2]** 50/21 104/24
**reverse [7]** 100/14 100/18 101/11
  101/13 101/15 101/21 101/23
**reversing [1]** 101/16
**review [19]** 29/23 45/18 45/24
  46/19 46/24 62/4 66/24 70/15
  70/19 75/3 83/5 83/8 83/25 84/20
  89/4 96/22 96/24 104/23 105/16
**reviewed [13]** 39/19 44/17 47/4
  70/12 73/20 83/20 83/21 84/4
  85/21 85/25 86/12 88/21 89/20
**reviewing [7]** 46/13 50/20 96/15
  97/16 104/22 104/24 105/13
**reviews [1]** 16/3
**right [56]** 4/2 11/12 17/12 22/23
  30/15 30/17 30/20 31/2 31/4 31/13
  31/18 34/19 35/2 35/18 36/4 36/14
  37/12 38/6 38/8 38/14 38/16 40/23
  43/24 46/7 49/21 50/15 53/2 53/4
  53/4 57/7 57/7 57/9 61/15 62/23
  75/14 76/14 79/3 79/6 84/16 86/18
  87/1 87/1 87/9 87/23 88/10 88/20
  89/16 89/22 92/16 93/6 94/10
  108/23 110/8 111/8 112/4 113/7
**right-hand [4]** 57/7 57/9 61/15
  75/14
**rights [4]** 30/24 80/6 80/19 81/22
**rise [1]** 113/9
**risk [2]** 41/11 41/11
**road [1]** 80/7

**roadblock [1]** 96/25
**robbery [1]** 14/2
**role [5]** 78/15 94/20 95/4 99/9
  106/5
**rollercoaster [1]** 6/18
**ROMAN [5]** 1/6 4/10 4/18 5/4 45/19
**Room [1]** 2/8
**rootkits [1]** 101/2
**roughly [2]** 86/17 87/3
**router [1]** 108/4
**routing [2]** 104/3 106/5
**row [2]** 54/4 60/20
**RPR [1]** 114/12
**Ruby [2]** 103/20 103/25
**rule [3]** 36/17 112/1 112/2
**ruled [2]** 34/20 37/1
**rules [1]** 21/4
**rulings [1]** 67/24
**run [6]** 5/2 5/3 8/8 78/10 101/25
  103/7
**running [7]** 10/21 58/15 58/19
  58/20 59/6 93/19 96/10
**Rust [1]** 103/20

**S**

**said [8]** 14/22 23/18 28/12 28/13
  28/16 77/4 88/16 110/19
**salaried [1]** 77/2
**salary [2]** 60/2 77/2
**sales [2]** 48/11 48/15
**same [17]** 13/12 16/11 26/6 26/20
  56/11 57/13 59/4 66/20 66/24 70/6
  70/8 73/16 76/12 86/4 86/7 100/2
  111/12
**San [1]** 5/23
**sanctions [1]** 43/16
**SANS [1]** 100/19
**Sarah [5]** 3/6 35/10 38/18 38/19
  39/2
**satisfied [2]** 41/8 41/10
**save [1]** 8/13
**savings [2]** 51/18 52/1
**say [19]** 11/16 14/2 15/10 16/2
  16/25 17/1 19/22 20/1 22/6 31/9
  33/11 51/1 56/9 58/15 77/12 81/4
  82/1 91/18 92/11
**saying [4]** 16/4 21/11 31/23 81/12
**says [7]** 51/13 53/5 64/16 64/18
  91/19 111/22 111/25
**scans [1]** 29/12
**scheduled [1]** 111/1
**scheduling [2]** 109/24 111/9
**scheme [2]** 34/2 34/15
**Scholl [3]** 37/6 47/10 72/11
**science [4]** 5/13 95/20 95/22
  95/23
**scienter [1]** 111/17
**scientist [6]** 94/5 94/25 95/1
  98/9 98/25 102/16
**scope [6]** 67/21 82/16 82/20 82/22
  85/21 90/22
**screen [8]** 44/12 52/17 52/25
  62/17 68/8 68/9 72/7 88/19
**screenshot [1]** 76/5
**screenshots [1]** 67/12
**script [2]** 7/23 7/25
**scripts [2]** 99/13 102/19
**scroll [3]** 63/17 66/12 86/20
**scrolling [1]** 91/2
**search [1]** 45/12
**searched [1]** 24/12
**seated [3]** 36/9 38/21 94/9
**sec [2]** 9/5 100/9
**second [8]** 11/8 18/20 31/6 36/24
  45/3 62/10 68/23 92/18
**secrecy [4]** 34/1 109/18 112/9
  112/10
**secretly [2]** 16/15 101/7
**secure [2]** 16/14 20/9
**security [10]** 9/6 9/8 9/18 9/19
  9/24 10/8 99/2 99/24 100/15 104/5
**see [20]** 12/10 33/20 36/4 40/1

**S**

see... [16]  52/23 61/3 62/23 63/3 63/18 65/23 70/11 72/1 85/6 85/7 87/1 97/3 98/3 106/3 109/7 113/7
seek [3]  36/17 38/6 38/12
seeking [1]  34/1
seem [1]  97/1
seems [2]  37/10 80/7
seen [2]  12/8 29/18
seized [3]  25/22 50/6 59/7
self [1]  23/14
selfish [1]  7/8
sell [1]  55/22
selling [1]  10/10
sells [1]  55/23
semester [1]  40/13
send [3]  8/13 15/20 101/10
sending [14]  10/15 20/15 68/10 69/6 70/3 70/4 70/6 71/23 71/24 72/25 73/5 73/17 74/8 89/3
senior [1]  97/9
sense [2]  8/24 83/19
sensitive [1]  99/8
sent [9]  20/19 20/21 23/15 24/10 55/5 55/7 55/14 89/2 106/8
sentence [1]  30/11
separate [2]  38/5 99/7
separated [2]  106/2 106/4
September [3]  36/25 38/2 67/25
September 18th [2]  36/25 67/25
sequentially [1]  66/2
server [10]  7/16 10/12 10/13 10/16 66/11 93/23 96/17 96/19 104/25 106/15
server's [1]  106/9
servers [12]  7/17 10/11 10/24 25/13 25/22 96/13 96/15 96/21 97/17 98/16 99/6 106/13
service [14]  10/18 13/15 15/20 15/22 16/2 17/2 17/4 19/5 19/10 19/11 23/14 34/14 107/21 108/4
services [14]  10/9 13/9 13/13 13/22 17/1 21/21 27/8 46/18 61/1 61/2 63/13 63/15 66/10 94/18
set [8]  19/10 27/13 29/13 75/17 96/15 99/10 99/13 108/3
sets [2]  44/7 106/2
setting [4]  96/17 96/20 99/9 99/24
several [7]  6/7 8/4 19/4 22/12 26/1 29/8 44/12
she [26]  20/20 20/21 25/18 37/1 37/2 37/5 37/7 37/11 37/18 43/24 49/20 80/8 80/13 80/14 82/13 82/14 82/14 83/15 83/19 83/21 83/22 88/7 93/12 104/8 105/25 110/14
SHERRY [3]  2/6 114/3 114/12
short [1]  87/13
should [16]  19/22 31/11 31/18 33/3 34/10 34/13 34/14 44/12 49/23 56/9 83/17 92/22 96/11 98/17 109/19 111/8
show [12]  37/6 44/11 48/9 52/11 58/12 58/18 59/10 65/7 67/11 67/15 73/8 73/15
showed [1]  84/3
showing [2]  48/10 57/11
shown [10]  44/19 47/18 56/8 56/20 57/3 57/9 59/22 60/17 68/8 74/15
shows [15]  44/20 47/19 47/20 56/7 56/10 56/17 56/18 58/13 58/19 59/11 60/18 68/10 73/16 74/7 74/8
side [9]  53/1 54/2 56/23 57/7 57/9 72/7 74/15 75/14 100/8
sign [1]  61/25
signature [1]  100/3
signatures [1]  102/1
significant [2]  56/3 58/5
significantly [1]  61/24
similar [2]  86/6 86/7

Similarly [1]  50/11
simple [2]  33/18 80/17
simply [4]  34/15 80/19 110/14 112/1
since [3]  34/25 94/21 95/24
sincerely [1]  110/25
single [1]  40/2
sir [3]  6/13 22/3 23/11
sit [2]  81/15 95/10
site [1]  97/11
sitting [1]  36/11
situation [1]  109/25
Sixty [1]  70/20
Sixty-three [1]  70/20
skimmer [2]  97/21 97/25
skip [1]  52/10
slide [6]  38/2 38/3 53/3 54/13 73/16 84/3
slowing [1]  97/5
small [1]  9/4
snippet [1]  68/9
so [159]
sober [1]  26/21
soft [1]  110/10
sold [7]  10/9 12/17 12/19 20/21 22/20 55/5 55/6
solution [1]  96/25
solutions [2]  96/8 96/9
some [63]  5/18 6/2 6/20 7/10 7/19 8/17 9/2 11/15 12/18 13/7 13/25 14/2 14/5 16/8 17/23 17/24 18/1 20/17 20/19 21/8 21/9 25/18 25/19 26/10 26/14 26/15 26/23 26/25 27/2 28/10 37/17 37/20 43/6 45/4 45/7 45/9 46/12 47/15 48/4 48/12 48/13 62/1 75/6 75/13 83/22 84/5 84/20 91/16 92/7 93/19 98/2 98/10 98/14 98/15 99/20 100/24 101/24 102/14 103/20 104/25 111/6 111/21 112/6
somebody [1]  80/1
somehow [1]  50/4
someone [9]  5/4 5/25 14/6 14/7 15/21 31/12 31/17 31/19 41/1
someone's [2]  10/14 81/22
something [25]  5/19 5/25 6/21 6/23 10/1 10/5 14/2 16/12 16/14 16/15 18/4 19/17 19/22 34/6 34/16 40/2 61/25 62/23 76/3 90/14 93/24 98/11 101/7 101/9 102/8
sometimes [7]  96/14 96/25 97/22 99/13 99/16 103/11 108/9
somewhat [2]  33/8 97/25
somewhere [1]  39/17
sophisticated [2]  20/14 20/24
sorry [9]  14/19 18/20 43/11 59/19 71/2 75/18 84/16 88/15 107/8
sort [9]  32/20 32/24 40/15 44/5 57/9 78/18 82/5 99/9 110/10
sorts [5]  42/4 42/14 42/22 43/13 47/9
source [7]  22/19 27/22 28/6 42/16 43/1 67/13 98/13
sources [4]  47/7 47/9 61/24 100/5
space [4]  96/19 107/2 107/11 107/20
spaces [1]  95/10
speak [6]  15/12 81/2 103/18 104/21 105/1 107/6
speaking [1]  43/13
specialist [1]  72/11
specific [8]  9/19 9/19 12/16 43/12 45/14 49/8 97/19 98/11
specifically [2]  75/10 108/11
speculation [1]  79/11
spell [1]  94/14
spelling [1]  39/1
spend [3]  61/9 61/12 99/19
spent [1]  61/16
spike [1]  56/25
spikes [1]  59/13
staff [2]  72/11 77/20

stand [7]  31/13 31/13 31/16 32/7 36/4 87/25 107/14
standard [1]  111/20
standards [1]  112/8
stands [1]  64/6
start [4]  26/3 59/17 78/1 111/10
started [10]  5/8 5/9 5/15 8/8 78/5 88/2 92/22 93/4 93/16 94/1
starting [2]  4/12 112/13
starts [1]  93/12
startup [1]  6/16
startups [1]  29/8
state [3]  4/11 49/19 94/14
statement [5]  40/5 90/3 90/10 90/11 90/14
statements [5]  29/22 30/10 33/10 33/13 82/12
states [5]  1/1 1/3 1/10 4/9 73/17
stay [1]  57/13
staying [3]  46/11 58/25 59/4
steal [1]  100/22
stealer [1]  101/4
stealers [1]  101/2
step [4]  12/5 87/20 95/18 109/9
steps [1]  25/9
STERLINGOV [37]  1/6 4/10 4/18 5/4 23/6 33/18 45/20 53/21 55/19 57/22 77/23 77/24 78/1 78/10 78/16 78/19 80/14 80/18 80/23 81/1 81/4 81/9 81/13 85/17 85/19 89/2 89/3 89/6 89/9 89/12 89/24 90/15 91/20 91/25 92/9 93/9 105/10
Sterlingov's [26]  44/3 44/20 47/2 48/1 48/3 50/20 58/3 59/1 59/23 60/19 74/17 76/7 80/6 81/19 82/10 82/18 83/6 83/6 83/25 84/4 84/8 85/7 86/12 86/15 90/10 104/23
still [4]  24/18 95/4 110/25 112/23
stole [4]  23/18 24/8 24/19 28/22
stolen [6]  12/19 15/17 24/25 25/17 27/24 98/20
stood [2]  99/18 99/19
stop [1]  20/4
stopped [1]  28/20
storage [1]  24/15
stored [3]  12/25 13/4 24/15
straight [3]  57/15 57/15 57/17
Street [3]  1/16 2/3 28/23
stretch [2]  32/2 32/7
strict [2]  111/24 112/1
strike [1]  69/3
struggle [1]  6/17
struggling [1]  7/6
studied [1]  5/14
study [1]  27/6
subcontracting [1]  77/13
subject [6]  18/19 38/7 79/22 80/11 80/21 81/10
subjects [1]  79/18
substance [1]  48/23
successfully [1]  14/21
such [10]  13/14 15/24 20/12 40/17 46/16 46/16 46/17 47/16 101/2 108/9
sufficient [1]  37/5
suggested [1]  83/15
suggesting [3]  31/11 31/16 80/13
suggests [1]  111/23
Suite [1]  1/17
suited [1]  20/7
summarize [9]  44/3 44/5 45/22 47/2 47/19 73/19 78/15 95/18 108/6
Summarizing [1]  44/6
summary [10]  44/9 44/16 44/20 46/3 46/6 47/20 56/4 59/20 86/3 86/21
support [3]  39/11 95/12 98/6
supported [3]  39/18 43/6 75/12
supporting [1]  98/21

## S

**supposed [1]**  63/10
**sure [14]**  6/17 14/15 15/3 18/12 18/22 77/8 77/15 88/6 88/7 93/17 97/2 103/25 109/3 111/7
**suspects [1]**  78/14
**Sustained [2]**  12/2 86/10
**Sweden [3]**  82/10 82/15 82/19
**Swedish [1]**  60/10
**Swift [2]**  64/4 66/17
**Switch [1]**  60/2
**switching [1]**  93/4
**sworn [2]**  38/19 94/7
**system [3]**  6/24 102/3 102/18
**systems [2]**  8/4 96/20

## T

**table [33]**  2/10 4/19 36/11 44/19 44/19 46/11 47/12 47/18 47/19 47/20 47/21 52/10 52/11 52/14 54/18 55/2 55/20 56/7 56/9 56/12 56/14 58/8 58/14 59/18 59/19 59/19 59/21 72/24 84/20 85/22 85/24 91/7 92/13
**tables [3]**  44/7 44/16 45/25
**take [20]**  5/6 13/6 15/22 31/13 31/13 31/16 35/3 35/10 35/11 35/12 35/14 41/14 42/17 84/13 87/9 87/17 97/2 102/3 111/6 112/24
**taken [7]**  17/16 36/6 41/1 41/22 42/23 87/24 113/10
**takes [2]**  10/16 19/10
**taking [8]**  15/13 16/5 41/24 47/23 55/8 95/18 102/6 102/7
**talk [9]**  11/8 13/15 13/18 17/8 48/23 51/12 81/9 96/21 111/9
**talked [3]**  23/8 23/9 26/13
**talking [6]**  5/23 81/7 81/7 81/8 88/4 109/25
**taps [1]**  93/24
**task [2]**  95/8 95/10
**taught [1]**  5/11
**tax [1]**  40/18
**teaches [1]**  101/23
**tech [7]**  5/8 5/9 5/9 5/15 5/18 5/24 29/8
**technical [1]**  95/24
**techniques [5]**  13/10 13/11 27/10 43/19 104/6
**technologies [4]**  97/20 97/25 98/2 100/4
**technology [2]**  83/23 102/18
**telephone [1]**  34/22
**tell [6]**  30/4 81/12 81/15 93/15 103/1 103/9
**tells [1]**  19/11
**terminal [1]**  103/24
**terms [5]**  16/18 34/11 82/22 97/24 104/7
**terrible [1]**  110/15
**Tesla [1]**  91/17
**test [2]**  14/10 97/20
**testified [11]**  5/16 13/5 18/11 18/24 27/17 33/4 34/3 76/24 82/24 83/2 89/24
**testify [23]**  16/21 17/15 17/22 30/17 31/18 31/19 31/23 32/19 32/20 33/2 33/4 33/5 34/2 34/5 34/13 34/14 34/23 37/2 37/19 43/25 84/18 93/12 104/9
**testifying [8]**  32/18 32/24 33/6 33/21 34/9 34/21 37/11 95/15
**testimony [25]**  17/12 17/14 17/16 17/21 18/2 32/13 33/20 33/25 33/25 36/25 37/5 37/9 37/24 67/22 67/23 69/4 72/10 87/18 88/18 93/1 93/14 93/22 95/16 109/11 109/17
**testing [1]**  96/11
**than [9]**  15/9 28/17 34/22 42/23 48/15 55/16 55/18 91/3 98/2

**thank [20]**  4/22 23/1 35/7 35/21 36/5 38/21 52/22 63/1 63/3 63/23 76/22 85/5 87/14 87/23 88/12 88/17 92/17 94/9 113/6 113/8
**that [543]**
**their [17]**  7/20 8/4 30/9 31/12 31/17 34/3 50/3 50/9 50/11 79/22 80/1 81/8 96/5 101/6 102/21 110/11 110/22
**them [26]**  8/13 8/17 12/10 14/12 19/24 20/20 21/7 21/8 21/11 21/13 24/16 24/16 24/17 27/2 28/18 45/7 48/5 76/11 96/11 96/11 99/20 99/21 99/21 101/6 101/25 110/10
**then [68]**  7/16 7/22 8/14 14/5 15/11 15/13 15/23 20/13 20/20 20/21 21/8 22/19 23/18 26/11 27/8 28/12 28/16 34/5 35/3 35/13 35/25 48/2 48/8 50/6 50/10 50/15 52/1 52/8 54/1 54/6 54/19 54/25 55/14 55/15 55/17 55/24 56/1 56/16 57/3 58/2 58/11 59/18 60/16 61/3 64/19 66/15 68/18 68/25 69/15 72/1 72/24 74/11 74/13 78/21 85/22 100/3 102/7 103/4 105/1 107/4 107/17 107/19 108/9 108/10 109/16 112/4 112/7 113/8
**Theodore [1]**  32/13
**there [98]**  8/16 9/22 9/23 12/21 13/21 14/15 15/13 16/25 17/1 17/4 19/9 24/18 27/6 28/17 29/2 33/5 34/15 40/15 40/16 40/21 42/2 42/3 45/9 45/14 46/14 46/15 46/16 46/17 48/6 48/8 48/14 48/14 48/15 51/12 52/14 52/15 52/19 53/10 53/23 54/14 55/24 55/25 56/3 56/25 59/7 59/13 60/11 62/1 63/8 63/13 63/16 63/24 64/14 65/19 66/12 66/15 68/21 70/10 74/22 75/12 75/23 75/25 76/3 76/10 81/15 85/4 85/6 85/6 86/6 86/21 86/24 87/1 87/1 87/1 91/2 91/2 91/5 91/8 91/13 91/22 92/3 92/11 92/22 97/19 101/9 103/1 103/13 103/15 108/9 108/15 108/16 109/14 109/16 109/16 110/8 111/21 111/25 112/4
**these [22]**  6/10 17/1 19/20 26/17 34/4 45/4 48/4 54/15 55/8 56/4 56/8 60/12 60/23 61/4 67/12 72/6 76/10 84/20 99/22 111/6 112/12 112/21
**they [50]**  4/5 15/20 17/1 17/14 17/17 19/12 19/13 21/5 21/6 24/13 24/16 24/22 31/13 31/18 32/14 32/23 36/12 37/17 45/4 45/11 45/19 50/3 50/11 51/2 51/6 51/8 55/11 59/4 59/17 62/7 76/12 77/8 80/17 80/22 80/22 80/23 81/9 89/13 99/2 99/4 99/5 99/11 99/14 99/18 99/21 100/4 106/14 107/25 108/16 110/20
**thing [7]**  5/1 13/12 15/18 16/17 20/8 111/10 113/1
**things [15]**  5/11 8/12 13/14 14/10 15/4 16/6 16/16 21/9 26/25 92/20 97/5 97/22 100/2 109/6 109/14
**think [67]**  7/6 10/14 12/4 16/21 17/19 17/21 18/12 29/10 31/9 31/20 31/23 32/16 33/11 33/17 34/5 34/10 34/12 34/19 35/22 36/2 37/15 37/18 37/21 38/6 40/23 49/18 51/17 52/19 52/24 61/18 62/17 65/21 69/2 69/3 78/21 79/19 80/5 80/10 82/1 82/2 82/4 82/5 82/23 83/14 83/17 83/22 84/3 84/15 85/4 88/8 90/22 93/8 93/10 93/11 93/18 100/21 104/12 109/20 110/1 110/7 110/20 111/15 111/19 111/22 112/13 112/22 113/2
**thinking [3]**  96/9 112/15 112/16
**thinks [1]**  38/11

**third [3]**  34/12 39/10 50/15
**this [174]**
**those [75]**  7/22 7/24 8/6 8/14 11/4 11/5 13/11 14/3 15/7 21/13 22/1 23/22 24/3 24/4 24/23 26/5 27/1 27/5 27/15 29/3 30/24 33/8 41/24 45/9 45/17 46/19 47/23 49/11 52/9 52/9 52/11 53/12 54/14 54/24 55/2 55/5 55/20 55/22 58/16 59/16 59/16 59/25 62/6 70/11 70/21 70/23 70/25 71/8 71/15 71/16 71/16 71/18 71/22 72/2 72/8 72/8 72/25 78/9 84/5 86/14 86/17 88/23 89/12 91/16 92/7 97/25 100/5 102/14 103/18 103/25 104/9 104/21 105/1 108/1 110/7
**though [1]**  81/13
**thought [3]**  14/1 62/22 111/15
**three [3]**  70/20 86/18 110/8
**three-year [1]**  86/18
**through [28]**  19/6 19/6 20/15 22/17 25/19 29/22 36/3 37/4 37/6 42/19 43/18 45/11 49/11 54/9 55/22 60/18 61/7 77/5 77/24 86/20 86/21 86/22 91/2 92/23 98/14 103/3 108/6 112/13
**throughout [3]**  8/3 8/9 89/4
**Thursday [1]**  109/4
**thus [4]**  18/2 20/10 37/4 112/14
**tied [2]**  105/13 105/14
**time [47]**  5/7 5/15 5/23 7/6 8/5 9/4 16/7 19/10 22/3 22/7 22/9 25/13 26/6 26/16 26/18 26/19 26/20 29/5 29/22 36/20 41/24 47/20 47/23 49/11 50/24 51/10 55/2 56/10 56/18 57/12 57/20 58/9 58/13 59/11 93/11 97/6 99/19 100/3 104/10 104/15 104/24 105/25 108/21 108/22 110/13 111/5 112/23
**times [10]**  6/7 10/6 19/15 19/17 19/20 21/20 28/14 28/15 82/4 101/25
**tink [1]**  110/3
**today [6]**  30/5 94/2 95/16 104/11 105/1 110/12
**told [1]**  5/25
**tomorrow [5]**  105/1 109/1 109/4 109/7 109/10
**too [1]**  100/5
**took [9]**  8/18 11/18 25/9 26/25 30/4 30/5 35/6 42/10 88/18
**tool [1]**  97/9
**tools [9]**  96/14 96/15 97/18 97/20 98/1 101/24 101/25 104/5 104/7
**top [7]**  59/21 60/20 61/19 62/23 68/7 68/7 68/9
**topic [1]**  13/18
**topics [6]**  13/17 40/17 102/12 102/14 102/17 104/9
**TOR [10]**  2/2 2/3 4/17 6/12 18/24 19/1 19/1 19/1 19/4 19/10
**total [24]**  9/1 19/17 48/16 51/13 52/8 53/5 53/23 54/19 54/19 54/21 54/21 54/23 54/25 54/25 55/1 58/8 61/16 61/18 61/19 61/20 61/22 63/18 88/20 88/23
**totaled [1]**  86/17
**totality [2]**  85/24 110/22
**trace [4]**  12/13 15/4 24/22 25/19
**traceable [1]**  22/18
**traced [2]**  9/15 25/21
**traces [1]**  101/19
**tracing [6]**  12/12 12/16 12/18 12/22 12/24 42/25
**track [1]**  108/12
**tracked [1]**  10/20
**tracking [1]**  9/16
**tracks [1]**  25/10
**trades [11]**  47/22 48/8 48/10 48/12 48/13 48/17 50/22 54/22 55/10 55/16 55/18
**traditional [1]**  46/16

**T**

traffic [4]   97/17 102/18 106/8 106/8
trafficking [1]   43/16
training [8]   41/20 42/5 42/19 42/22 42/23 43/18 102/11 102/17
trainings [2]   100/11 102/14
transaction [21]   17/4 19/21 47/5 49/6 57/4 68/8 68/11 68/13 68/19 69/7 69/9 69/16 69/19 69/22 70/5 70/5 71/19 71/23 85/9 85/11 85/18
transactions [22]   12/9 12/13 16/16 16/24 20/11 27/22 27/23 42/18 44/22 44/25 45/2 54/16 67/2 67/15 70/22 70/25 72/2 74/10 74/11 85/16 85/20 112/6
transcript [2]   1/9 114/4
transfer [7]   7/18 7/23 51/15 51/16 51/16 51/17 52/1
transferred [6]   53/5 53/6 53/7 53/24 54/7 70/1
transferring [1]   8/8
transfers [11]   51/14 51/20 52/9 52/12 53/15 54/11 54/20 54/22 54/23 54/24 60/2
transmitter [3]   33/20 34/10 34/11
trap [1]   16/15
trend [1]   57/18
triage [1]   98/14
trial [4]   1/9 30/15 39/11 110/22
tricky [2]   80/10 81/21
TRM [6]   41/23 42/8 42/8 42/9 42/10 42/11
true [4]   81/14 81/16 89/12 114/4
trust [1]   15/25
trusting [2]   15/19 15/21
trustworthy [1]   19/12
truth [1]   30/4
try [10]   8/14 13/10 52/20 52/24 62/18 98/14 98/15 98/17 99/23 109/3
trying [5]   9/15 80/8 83/19 96/14 96/18
turn [2]   56/7 56/16
turned [2]   24/20 24/21
turning [4]   47/18 58/11 59/18 70/15
two [15]   41/7 41/8 48/24 53/9 53/12 56/8 59/18 68/21 71/13 76/10 86/18 88/24 91/6 110/8 110/12
type [4]   35/16 43/6 98/20 108/25
typed [1]   97/3
types [5]   46/19 97/19 98/18 101/6 103/13
typically [2]   98/3 108/3
typologies [1]   43/20

**U**

U.S [2]   1/13 2/7
Uh [4]   28/20 28/25 29/6 29/9
Uh-huh [4]   28/20 28/25 29/6 29/9
Ukraine [2]   63/12 70/10
ultimately [1]   31/22
unable [1]   24/22
unauthorized [1]   6/24
unbeknownst [1]   101/6
under [5]   36/17 39/13 39/15 45/14 107/24
undercover [4]   98/21 98/24 99/17 99/25
underlying [1]   112/3
understand [7]   17/19 17/21 18/2 37/15 77/5 103/22 111/8
understanding [14]   13/23 33/2 43/19 45/11 45/17 45/19 64/8 72/16 72/20 78/10 78/12 79/13 93/21 95/9
understands [3]   103/2 103/6 103/8
understated [3]   51/2 51/6 51/8
understood [1]   83/22

unexplained [1]   62/2
unit [2]   43/5 43/8
UNITED [4]   1/1 1/3 1/10 4/9
University [2]   39/23 95/21
unlicensed [2]   33/19 33/19
unlikely [2]   110/3 110/20
until [10]   22/3 35/13 86/22 86/23 87/18 103/6 104/10 104/12 109/11 113/5
unusual [1]   76/11
up [33]   5/25 12/4 13/18 19/10 22/7 27/13 29/13 31/6 32/7 34/7 36/1 44/12 58/20 72/14 84/14 84/19 90/5 92/18 93/4 93/19 96/15 96/17 96/21 99/9 99/10 99/13 99/18 99/19 99/24 108/4 108/15 108/17 112/24
upper [1]   62/23
ups [1]   6/17
us [13]   1/20 16/18 22/4 22/20 47/16 56/19 57/11 59/11 70/1 81/12 81/15 93/13 94/18
USAO [1]   1/16
use [29]   6/8 6/11 8/14 9/18 10/21 10/24 11/5 12/18 14/8 14/11 18/8 19/1 19/3 19/22 19/23 20/7 20/17 21/11 21/13 22/15 27/9 42/7 43/1 61/3 62/17 64/18 100/5 104/15 107/24
used [30]   6/12 7/16 7/16 11/6 11/7 13/9 14/12 14/12 14/13 14/13 14/13 14/14 19/15 19/24 20/11 20/23 26/14 26/20 26/22 27/21 28/8 28/12 28/13 29/12 89/9 89/12 97/24 99/24 104/5 104/6
user [8]   101/5 101/5 101/6 102/25 105/18 108/1 108/7 108/10
user's [2]   106/9 108/10
users [1]   99/22
users' [3]   26/15 50/9 100/1
using [17]   14/17 15/2 16/12 17/17 19/8 20/4 20/14 21/3 26/16 26/19 27/13 28/20 61/10 61/16 66/18 100/4 101/24
usually [6]   19/21 21/8 54/15 62/1 98/2 107/20
utilizing [1]   42/16

**V**

V-A-L-E-R-I-E [1]   94/15
Valarie [1]   3/9
Valerie [4]   93/3 94/6 94/7 94/15
valid [1]   76/2
value [23]   22/7 32/21 32/22 32/23 56/19 57/4 57/11 57/22 58/3 58/8 59/13 60/12 69/9 69/11 69/11 69/12 69/21 69/24 69/25 70/1 91/20 91/25 92/9
values [2]   57/9 60/11
variations [1]   86/6
variety [6]   13/9 27/24 28/2 40/17 43/15 99/6
various [6]   21/16 21/21 42/15 44/6 52/7 60/18
Vasilis [1]   74/19
vendors [2]   10/9 27/8
venture [1]   29/7
venue [2]   111/16 111/19
verbally [1]   53/2
verifying [1]   37/18
Verizon [1]   107/22
Verret [3]   36/11 36/13 36/19
versus [1]   4/10
very [8]   7/7 7/8 11/12 19/7 34/8 35/3 98/10 103/7
victims [1]   102/21
video [1]   29/2
videos [1]   28/25
view [2]   32/19 62/17
violating [1]   112/2
violation [1]   33/8
viruses [1]   100/21

vis [2]   53/17 53/17
visit [1]   105/24
visualizations [1]   97/10
Vlahakis [1]   32/14
volume [3]   19/24 20/1 58/2
voluminous [2]   45/22 73/20
vs [1]   1/5
Vulture [1]   11/3

**W**

waiting [2]   4/3 32/4
waive [1]   30/23
walk [1]   108/6
walking [1]   49/11
Wall [2]   2/3 28/23
wallet [5]   83/9 83/10 83/12 91/25 92/9
wallets [10]   7/20 7/21 7/22 7/24 7/24 24/10 83/7 83/8 83/13 84/1
want [17]   4/4 4/25 5/1 5/6 15/3 15/8 16/17 22/1 31/24 34/8 35/11 37/19 93/14 99/2 99/4 105/24 110/22
wanted [11]   6/20 7/9 7/9 7/10 14/10 16/12 16/14 26/21 37/8 74/13 104/13
wants [1]   31/22
warrants [1]   45/12
was [159]
Washington [6]   1/5 1/14 1/17 1/21 2/9 43/9
wasn't [5]   76/2 80/14 80/24 81/10 90/20
waste [1]   39/19
way [21]   10/13 10/14 10/19 12/13 12/18 13/25 13/25 14/1 19/5 23/10 23/21 52/19 61/15 92/23 93/5 97/23 99/15 100/2 103/1 103/10 108/15
ways [4]   28/17 99/10 99/12 102/20
we [124]
we'll [9]   11/8 35/14 36/4 104/15 104/15 105/1 108/17 109/4 110/20
web [6]   11/4 19/6 19/9 19/11 21/6 63/15
webpage [1]   106/15
website [2]   10/2 108/18
websites [2]   82/24 99/10
week [3]   102/6 102/7 110/2
week-long [1]   102/6
weeks [1]   34/25
well [27]   8/16 11/12 12/23 15/3 15/18 15/24 19/5 20/19 21/5 29/21 30/10 38/8 40/13 40/22 41/6 41/18 41/23 42/6 42/15 52/20 80/25 84/13 87/17 101/1 104/7 111/11 112/16
well-known [1]   12/23
went [8]   6/7 11/16 27/3 27/17 50/2 50/23 51/1 51/11
were [98]   4/2 5/7 5/13 5/18 5/24 6/10 7/11 7/14 8/2 8/6 8/10 8/16 8/21 10/21 10/24 11/23 12/21 12/21 13/4 13/21 14/3 14/15 16/8 16/9 16/18 21/1 21/11 21/11 21/13 21/17 21/19 22/3 22/5 22/9 22/19 24/12 24/22 26/16 26/16 28/17 29/15 30/7 30/11 30/14 30/23 37/7 39/16 39/17 42/4 42/14 44/2 45/4 45/7 46/24 47/2 47/15 48/14 48/15 51/1 51/6 51/6 51/8 55/5 62/6 62/7 66/3 66/4 66/24 71/15 71/18 71/22 72/1 73/6 75/12 77/22 78/13 79/25 82/22 84/5 86/14 88/23 89/13 89/20 91/9 91/13 91/22 92/4 92/11 95/1 97/14 98/10 99/12 99/18 99/19 105/16 105/16 110/7 110/13
weren't [1]   26/19
what [229]
whatever [5]   16/6 32/23 93/14 93/15 99/6

**W**

**whatnot [1]** 84/4
**when [38]** 12/17 15/13 15/18 17/3 20/1 20/13 20/23 23/18 24/7 24/12 26/3 26/8 26/10 29/15 30/1 33/12 50/2 51/11 52/3 53/9 58/2 61/24 64/18 69/13 70/1 78/9 81/21 86/24 87/7 88/10 89/12 94/10 96/25 97/12 99/2 99/18 105/16 111/25
**whenever [1]** 9/15
**where [28]** 9/23 12/25 12/25 13/10 21/16 22/18 31/20 36/4 39/6 39/19 43/8 52/16 53/2 62/18 63/10 64/2 64/20 66/8 75/14 80/5 80/7 92/23 92/25 94/17 94/22 95/25 97/6 106/1
**Whereupon [5]** 46/9 65/16 68/3 74/4 90/25
**whether [13]** 15/25 30/8 31/12 31/13 31/16 33/7 34/9 36/12 78/18 81/17 81/20 82/14 83/22
**which [31]** 9/14 14/11 16/13 17/2 19/5 24/10 28/10 33/9 36/16 40/13 41/15 44/11 44/19 49/8 56/7 62/8 67/12 71/11 73/9 73/9 84/13 90/5 98/16 99/12 103/21 107/19 107/20 108/4 108/13 109/15 110/7
**whichever [1]** 104/14
**while [8]** 5/18 21/19 26/20 26/21 39/16 95/1 98/10 101/5
**who [28]** 4/18 5/16 5/24 10/9 15/21 31/17 31/19 34/3 34/23 41/1 45/17 66/6 71/15 75/19 92/21 93/3 101/18 106/20 107/4 107/11 108/16 108/17 109/25 110/1 110/1 110/9 110/12 110/14
**whole [3]** 8/3 8/5 58/7
**whose [1]** 64/8
**why [17]** 7/5 11/14 17/22 17/25 18/3 18/20 20/6 21/23 35/12 35/14 47/14 49/19 68/22 82/6 98/24 99/23 101/15
**wife [2]** 25/16 29/1
**will [24]** 15/14 15/20 16/10 21/8 33/6 35/22 38/12 63/21 68/1 72/19 82/16 90/23 96/19 98/14 99/21 100/5 100/6 105/25 106/1 106/3 109/7 109/9 112/20 113/7
**willful [1]** 112/10
**Windows [1]** 102/18
**wire [1]** 98/19
**withdraw [1]** 24/5
**withdrawal [1]** 23/24
**withdrawals [2]** 23/24 48/3
**within [7]** 37/3 69/14 70/2 90/22 96/5 96/8 108/10
**without [7]** 19/6 43/12 80/20 88/2 94/2 99/8 106/10
**witness [35]** 4/4 16/21 17/11 17/15 31/1 31/4 32/4 32/13 33/11 33/15 33/16 34/23 35/3 35/4 35/9 35/22 35/25 36/8 36/13 36/16 36/20 36/21 36/24 38/17 76/13 83/16 84/18 87/17 87/25 92/17 92/21 92/22 93/3 94/4 109/9
**witness' [3]** 33/20 85/13 92/24
**witnesses [3]** 3/2 30/21 111/6
**won't [2]** 15/15 88/2
**wonder [1]** 92/21
**wondering [1]** 110/21
**Wong [4]** 66/7 66/8 70/9 71/17
**words [2]** 48/16 103/2
**work [34]** 39/18 41/10 42/19 44/9 52/25 62/3 76/24 77/7 77/8 77/22 86/15 94/17 94/18 94/22 95/2 95/10 95/14 95/25 96/7 96/13 96/13 96/22 97/6 97/8 98/5 98/18 98/21 99/16 100/8 102/9 104/18 105/5 105/8 105/12
**worked [13]** 25/16 40/5 43/14 43/15 77/4 77/16 77/18 83/13

95/15 95/22 96/5 98/10 98/12
**working [11]** 5/18 17/14 53/1 62/20 77/9 77/20 78/1 78/5 95/4 109/1 109/2
**works [3]** 15/3 101/13 101/18
**world [2]** 98/4 112/8
**worried [1]** 11/23
**worth [12]** 8/25 11/16 13/7 17/3 22/11 42/23 86/2 86/4 90/3 90/10 90/12 90/14
**would [63]** 4/11 7/17 11/12 11/15 11/17 12/10 12/18 14/16 15/24 15/25 16/2 18/14 19/19 19/21 20/10 20/20 26/4 26/10 27/15 34/20 35/4 36/17 37/2 38/6 40/1 48/24 51/23 52/5 52/10 54/8 56/1 56/16 57/18 64/23 77/12 79/8 79/17 79/21 80/15 81/15 96/15 96/25 97/1 97/18 97/20 97/22 98/1 98/8 98/12 98/24 99/1 99/5 99/10 99/11 103/7 104/2 107/25 108/2 110/1 112/5 112/6 112/23 113/1
**wouldn't [3]** 15/8 29/14 79/25
**write [4]** 97/18 98/1 99/13 103/8
**writing [2]** 102/19 102/22
**written [2]** 44/9 103/22
**wrote [3]** 26/23 27/23 101/18

**X**

**XML [4]** 46/24 46/25 47/2 47/5

**Y**

**yeah [18]** 5/11 6/3 11/9 11/20 12/13 13/16 13/21 14/10 15/3 16/16 18/25 19/4 20/3 20/5 21/2 24/10 32/5 87/13
**year [15]** 30/11 40/22 41/15 55/1 55/9 55/9 55/19 57/1 57/21 58/5 61/9 61/12 61/18 78/8 86/18
**years [7]** 39/13 39/15 41/7 41/8 55/8 60/12 88/24
**yell [1]** 86/24
**yes [232]**
**yesterday [2]** 5/16 13/6
**yet [10]** 31/14 34/20 64/24 67/6 73/8 73/9 90/6 96/10 97/19 97/20
**York [1]** 1/20
**you [567]**
**your [184]**
**yourself [4]** 5/1 9/12 39/1 83/15
**yourselves [2]** 35/16 108/24

**Z**

**zero [3]** 50/14 97/21 97/25
**zeros [1]** 103/7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * *   )
UNITED STATES OF AMERICA,       )        Criminal Action
                                )         No. 21-00399
              Plaintiff,        )
                                )
  vs.                           )        **AFTERNOON SESSION**
                                )
ROMAN STERLINGOV,               )        Washington, D.C.
                                )        February 27, 2024
              Defendant.        )        3:00 p.m.
                                )
* * * * * * * * * * * * * * *   )

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

FOR THE PLAINTIFF:        CHRISTOPHER BROWN, ESQ.
                          UNITED STATES ATTORNEY'S OFFICE FOR
                             THE DISTRICT OF COLUMBIA
                          601 D Street, Northwest
                          Suite 5.1527
                          Washington, D.C. 20530

                          CATHERINE PELKER, ESQ.
                          U.S. DEPARTMENT OF JUSTICE
                          950 Pennsylvania Avenue, Northwest
                          Washington, D.C. 20530

                          JEFFREY PEARLMAN, ESQ.
                          U.S. DEPARTMENT OF JUSTICE
                          1301 New York Avenue, Northwest
                          Washington, D.C. 2005


FOR THE DEFENDANT:        TOR EKELAND, ESQ.
                          MICHAEL HASSARD, ESQ.
                          TOR EKELAND LAW, PLLC
                          30 Wall Street
                          Eighth Floor
                          Brooklyn, New York 10005

REPORTED BY:          LISA EDWARDS, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Room 6706
Washington, D.C. 20001
(202) 354-3269

THE COURTROOM DEPUTY:  Criminal Case 21-399, the United States of America versus Roman Sterlingov.

Would counsel please approach the podium and state their name for the record, starting with Government counsel.

MR. PEARLMAN:  For the Government, Jeffrey Pearlman, C. Alden Pelker, and Mr. Brown.  Ms. Pelker just stepped out for a moment.

THE COURT:  Okay.  Good afternoon.

MR. EKELAND:  Good afternoon, your Honor.  Tor Ekeland for Defendant Roman Sterlingov, who is present in court.  And joining me at counsel table is Michael Hassard.

THE COURT:  Good afternoon.

We have a couple of issues to address this afternoon.  The one that I know about is the question regarding the scope of Mr. Vlahakis's testimony.  I have gone back and reread my notes on this as well as the cases.  I'm happy to hear anything else that any other party wants to add on the question, though.

MR. PEARLMAN:  Your Honor?

THE COURT:  Yes.  I'm listening.

MR. PEARLMAN:  Okay.  So after the Court's hearing in September concerning Mr. Vlahakis and FinCEN testimony, we did brief this issue with your Honor, as did the Defendant.

The defense merely cites to three cases saying

that expert testimony on issues of law is inadmissible. And nowhere in those cases does it actually say that a witness who testifies about what the legal rules are should not be permitted to do so. So those citations are not on point at any level.

So the real issue is whether the Government can offer competent testimony by a lay witness who day in and day out works at FinCEN, is familiar with the rules and regulations that FinCEN has, is familiar with the fact that FinCEN publicizes those rules, should be able to testify about what those rules are. And that's all we're seeking to do in a nonexpert capacity, to talk about FinCEN's role with respect to anti-money laundering provisions and Know Your Customer.

THE COURT: Was he noticed as an expert?

MR. PEARLMAN: He was noticed as an expert out of an abundance of caution. We don't wish to have him testify as an expert. We would rather have him testify as a lay witness.

THE COURT: I'm just wondering whether some of this testimony does involve expert testimony, just with respect to what rules are. I mean, what is a currency transaction report? What is a suspicious activity report?

MR. PEARLMAN: Again, these are things that, you know, FinCEN makes it its mission to publicly communicate

these issues to all the money-service businesses and banks and money transmitters and so forth so that the rules are clear so that they don't get broken.

So in fact, I think that this is more akin to testimony from a witness who has some specialized knowledge but is not anything that a juror couldn't understand. In fact, we've had testimony from several nonexperts about the general nature of Know Your Customer laws, for example, or generally what money laundering is.

And so I don't think that the witness needs to be formally qualified as an expert to essentially be reading off what a website might communicate to the general public and which happens to be true at the same time.

THE COURT: All right. I take it from what you're saying you would not be seeking any testimony with respect to applying any legal rules to the facts as they relate to Mr. Sterlingov personally or to Bitcoin Fog?

MR. PEARLMAN: That's correct. We want to stay as far away from that as possible.

Whether or not Mr. Sterlingov was operating a money-transmitter business is not a question; it's: What is a money-transmitter business?

And the jurors as guided by the Court can make that determination for themselves. We're not seeking to go into that realm.

THE COURT: So on -- you actually touched on the one issue where I may have some greater pause, which is, it does strike me as one potential way to draw the line here, is to say no conclusions or applications to Mr. Sterlingov or to Bitcoin Fog; and, two, nothing on which I would in the ordinary course instruct the jury, because it's the province of the Court to tell the jury what the law is.

And if the jury has to make a finding about whether Mr. Sterlingov or the administrator of Bitcoin Fog was running a money-transmitting business, why not with respect to that submit your relevant views on that question of -- or that legal standard to the Court, and then when it comes time to instruct the jury, I say, you know: There are three provisions that apply with respect to money laundering. One of them involves a question of whether someone was operating a money-transmitting business for purposes of the FinCEN regulations and making that determination. Now, here's what the law is and this is what you should apply.

MR. PEARLMAN: Sure.

So what I hear the Court saying is you're drawing the line at defining certain terms that the jury might be required to make a factual determination about whether the Defendant meets those terms; for example, money transmitter.

THE COURT: Yeah. Well, I think that's probably

another way of saying what I was saying, is if it's something I'm going to instruct the jury on, I'm not quite sure why it's necessary or helpful to have an expert witness on that.

But there's also a lot here that I'm not going to instruct the jury on, which I could understand is relevant background. For example, what a currency transaction report is. Why they're filed. How they're used by law enforcement. What is a suspicious activity report? What are the requirements for filing suspicious activity reports? How those are used by law enforcement.

That type of stuff I don't think I would ordinarily be instructing the jury on in this case because there's not an allegation that somebody violated the law here, or at least it's not one of the charges in the case, that somebody failed to file a currency transaction report or that somebody failed to file a suspicious activity report.

And so that seems to me at least notionally to be on the side of things where expert or lay expert testimony could be helpful for the jury in understanding the testimony and the facts in the case.

But where I get more nervous is anything that touches on what Mr. Sterlingov personally did and whether he violated the law in some way or that touches on the province

of what I need to do, which is instruct the jury on the law that the jury should apply in rendering its verdict in the case.

MR. PEARLMAN:  This is very helpful, and the Government appreciates it.

Just to clarify, we would want to offer testimony that if one registers as a money transmitter, this is the steps that they would take; these are the forms that they would fill out, and things that they would tell FinCEN about themselves.  We would still seek to get that in.

THE COURT:  That strikes me as a different question.  And this is all obviously subject to me hearing from Mr. Ekeland.

But that would -- as long as it's -- assuming that someone was required to register, this is how they would go about doing it, and this is the information they would provide, that strikes me as more factual in nature, or at least to the extent it involves legal questions.  There's nothing that I would otherwise instruct the jury on in the case, nor is it, I think, raising a danger of perhaps unduly influencing the jury with respect to the verdict they should reach by expert testimony or testimony from a knowledgeable person in a way that may be seen by the jury as dictating their result on one of the ultimate questions in the case.

And I realize that under 704, it's not a bright

line, but it does strike me that, even being conservative here, that maybe it will be best to stay away from anything that involves expert testimony or testimony by a knowledgeable person with respect to whether Mr. Sterlingov did something here that was unlawful.

And I'm thinking of the D.C. Circuit cases in, like, *Burkhart v. Lamotta*, which came up in a context and it's where you have an expert witness in an ADA case and the expert witness comes in and testifies, Yes, this is an appropriate accommodation in a way that that's the ultimate question the jury is supposed to be deciding. And that's problematic.

But where it's background information that is not otherwise actually, I think, something that every juror would know about, it strikes me as potentially appropriate.

MR. PEARLMAN: Okay. I mean, I think that provides the Government sufficient guidance, and subject obviously to your decision, that is something that --

THE COURT: I do want to hear what Mr. Ekeland has to say about this.

MR. PEARLMAN: Of course.

THE COURT: So, Mr. Ekeland, you have some sense of where I at least notionally think might be a reasonable place to draw the line.

MR. EKELAND: Yes, your Honor.

Just briefly, the Government did notice him as an expert. Mr. Vlahakis is obviously not a fact witness to anything that Mr. Sterlingov did. And I take it that the Court is contemplating having him come in as sort of a -- giving lay opinion or testifying to facts about -- very generally things about the filing --

THE COURT: Well --

MR. EKELAND: -- process.

THE COURT: Just to clarify, I would have thought he actually was an expert, coming in as an expert witness on the Bank Secrecy Act and government regulation relating to the Bank Secrecy Act. And what I'm suggesting is that I think one -- I can explain my view of the law in a moment.

But one, I think, reasonable place to draw the line would be to say background relating to things like the requirement of filing a currency transaction report, the requirement that banks file suspicious activity reports, how the suspicious activity reports are used, what information goes into a suspicious activity report. That strikes me as the type of information that could be helpful for the jury in understanding the testimony that has been offered in this case, and is helpful background, and also I think probably not terribly controversial or subject to dispute, but would help jurors understand.

There's been talk about currency transaction

reports -- about suspicious activity reports. If I were a juror and not trained in the law, I'd want to know what a suspicious activity report is.

And it's not that that's what the ultimate issues in the case are about, but it then explains and helps the jury understand the facts because it helps the jury understand why someone might want to use a service that doesn't file suspicious activity reports, because they don't want the Department of Treasury to know about what they're doing.

And so I don't think it's anything that goes to the ultimate issues in the case or anything that -- any application of the law or the facts the jury has to really make in the case itself even, but is just useful background in understanding the allegations and the testimony that have been raised in the case.

That's where I'm talking about drawing the line, but not anything where I would ordinarily instruct the jury, because that's my province, nor anything that would constitute a legal conclusion with respect to one of the elements or facts in the case itself.

MR. EKELAND: And I think that is -- the Court there is addressing our main concern, that the jury just somehow gets confused or thinks that this expert is standing in place of the Court's jury charges and explication of the

law.  So I think we're in agreement with the Court on that.

In terms of sort of the SARs stuff and all this background stuff, the only thing I would note on that point, just briefly, is I do -- at least from the defense's viewpoint, there's a little bit, A, of a relevance concern because it doesn't really seem to be a central issue in this case.  The question is whether or not -- well, whether or not Mr. Sterlingov is the operator of Bitcoin Fog, and if there was a requirement to, you know, register as -- with the various agencies, you know.

The other issue is I think just like time, you know.  We've told the jurors that they would be out, you know, sometime like March 7, March 10, whatever.  And now I think with the Government saying the case is -- maybe they're going to end their case in chief on Monday, and we might be able to get our case done by the end of the week, depending on how things go and what witnesses we call.

But that's the only other concern.  I'm not going to belabor this with the Court.

THE COURT:  I appreciate that.

And just -- so that is where I'm going to draw the line.  To the extent that there are questions that come up as the testimony is coming in, let me know.

Just by way of explanation for the record, there certainly are cases that in a fairly categorical way say

that legal conclusions are inadmissible, but I think that those are cases in which this type of nuance is just not at issue.

And there are cases like the ones that I described where the testimony at issue really goes to applying the law to the facts in a way that is the province of the jury or describing the law in a way that is the province of the Court.

And I thought that Judge Saylor in the *Adams* decision, which I believe the Government cited to, but in any event is from the District Court in Massachusetts at 215 Westlaw 9412518, did an excellent job of just cataloging and explaining how in fact testimony comes in all the time with respect to the law.

And I've read through the numerous cases, and there are many cases in which courts have allowed expert testimony relating to the Bank Secrecy Act and money laundering. There's *U.S. versus Caro* from the Eleventh Circuit, 2012. There's *U.S. versus $61,900* from the Eastern District of New York, and that's 802 F.Supp.2d 451 at 459 in Note 15. There's *U.S. versus Campbell* from the Fourth Circuit. There's *U.S. versus Nektalov* from the Southern District of New York. There's *U.S. versus Monaco* from the Second Circuit; *U.S. versus Ortiz* from the Second Circuit. And also I thought a helpful opinion in *United States versus*

*Ventura* from the Eastern District of Kentucky.

And as Judge Forster observed in the *Ventura* case, courts have allowed expert testimony to explain the BSA, its obligations on financial institutions to file currency transaction reports and structuring deposits in general, citing to numerous cases; moreover, currency structuring and the many methods criminals employ to accomplish it are beyond the realm of the knowledge -- general knowledge of the average juror. And so the Court concluded that it was permissible under 702 to offer that type of testimony.

And then in *Campbell*, the Second Circuit -- I'm sorry -- the Fourth Circuit in *Campbell* observed that generally expert testimony is admissible if it will assist the trier of fact to understand the evidence to determine the facts in issue. Conversely, such testimony is inadmissible if it does not aid the trier of fact.

And though Rule 704(a) provides for admissibility of expert testimony that reaches the ultimate issue to be decided by the jury, quote, "Testimony that merely states a legal conclusion is less likely to assist the jury in its determination. Such testimony is admissible even if it reaches the ultimate issue to be decided by the trier of fact," citing to Rule 704.

The Court goes on to explain that in that case the Defendant's or appellant's argument hinged on his assertion

that the Government's expert witness testified largely to legal conclusions that were unhelpful to the jury.  However, the Court wrote:  The record reflects the testimony presented by the FBI agent was likely very helpful to the jury.  The agent explained the Bank Secrecy Act and its requirement that a financial institution must submit a currency transaction report whenever an individual made a transaction with more than $2,000 in cash.

Additionally, the agent testified that the Bank Secrecy Act made it a crime to attempt to structure a transaction in order to evade filing the CTR.  The agent gave hypothetical examples of illegal structuring in order for the jury to better understand the types of actions that would be consistent with structuring.

And it goes on from there.  But I won't -- rather than reading it all into the record.

So that's my ruling with respect to the Vlahakis testimony.

What is the other issue that you wanted to raise today?

MR. EKELAND:  Your Honor, this is related to discovery.  And Mr. Fischbach's been discussing this with the Government, and I'm just hoping that we can just address this with the Court because I'm not trying to stop this trial at all, and I don't know how big of an issue this is.

But this relates to some of the server images and whatnot. And Mr. Fischbach, who's been talking to the Government about it, can tell you his side and the Government can tell you their side and hopefully we can find some solution to this quickly.

THE COURT: You know, I guess I'd rather -- I don't mean to put you in the position of being the middleman, but I'm not accustomed to having the nonlawyers argue motions to me.

MR. EKELAND: I understand, Your Honor. Because I've been working on other stuff, he's been emailing with the Government. And essentially what my understanding is is that there's some of the discovery that's involved with Ms. Mazarin and the pcaps, which are packet capture information, images for an image of the server that was in Romania that we can't find in our discovery.

The Government has said that they sent one hard drive, and they gave us an inventory. But on that inventory, if my understanding is correct -- I want to be careful here -- the image for the server is not there.

And I'm told -- my understanding is that what Mr. Fischbach did was ask the Government for it, and then we've been told that it's in storage or somewhere at FBI. And that -- again, I'm repeating the stuff secondhand; I want to be careful here because I'm not making

accusations -- that it is going to take the Government -- it would take the Government 60 days to access it.

We don't totally understand why that would be the case when it's evidence from a witness who's testifying in this case.

And that's my basic understanding of it at the moment.

And what I'm just hoping is to get the result so we can keep rolling with Mazarin tomorrow, is my main purpose.

THE COURT:  Let me hear from Ms. Pelker about this.

MS. PELKER:  I think it would be helpful for Mr. Ekeland to speak with Mr. Hassard and Mr. Fischbach, because I think that there's a game of telephone and some confusion.

The Government produced over the course of this case four hard drives to defense counsel.  There were three hard drives that were provided with the images of the Defendant's devices.  Those were shipped from IRS in April of 2022.  There was a back-and-forth email chain with defense counsel about these drives in which defense had to arrange to ship hard drives to IRS for IRS to then copy the images onto and ship back to defense counsel.

The drives that they sent weren't large enough, so

IRS provided a third drive of their own drive. We emailed back instructions for how to access the different drives.

Those three drives were sent to defense counsel in April of 2022.

And we reminded defense counsel that the Romania server evidence, if they wanted that, they needed to send us another drive.

We had additional email conversations. They then sent that drive to FBI, who had the Romania server evidence, in September -- they sent the drive August of 2022. FBI then provided the images and shipped it back to defense counsel in September of 2022.

We emailed with defense counsel, providing them the tracking information for the drive.

Defense said: Thanks.

Our understanding was Mr. Fischbach has earlier in this case indicated that he may not have seen all of the images from the IRS drives. And we directed him -- he sent screenshots of what he was looking at. We directed him to the discovery log if he was looking at one drive. There were actually three different drives with the log provided.

That seemed to get resolved.

Then there was the issue of where the Romania server evidence was because Mr. Fischbach appeared to be looking on the IRS drives. We explained that, no, it was on

the FBI drive.

Mr. Hassard then indicated that they had located the FBI drive in their evidence storage up in New York but that they asked whether we could make an additional copy available to Mr. Fischbach here.

We explained that the amount of -- with the amount of time it would take for us to get this drive out of evidence storage in FBI, the backlog that CART, C-A-R-T, has, would take to do the imaging, and our witnesses are here for trial, that it would be much faster for defense to simply have someone retrieve their drive from the evidence storage that they represented was in up in New York and ship it down.

And that was the last we heard. And we're not actually clear what the issue is now.

THE COURT: Mr. Hassard, do you have anything to add to that?

MR. HASSARD: I do not.

THE COURT: Okay.

MR. EKELAND: May I for one moment, your Honor?

The only thing I would add to that is my understanding is when we went to go check the inventory list, that we were told by the Government: Okay, here's everything that was sent.

And I haven't looked at this personally, but what

I've been told is that the image of the Romanian server is not on that inventory list.  So it's not on the list that we've been given saying, Here's what you've gotten.

What I've been told is that the Romanian -- the image of the Romanian server is not on that list.  And so --

MS. PELKER:  Just to clarify, it's an inventory list that was sent with the IRS drives that's an inventory of what's on the IRS drives.  Then there was the FBI drive which had the Romanian server evidence.

THE COURT:  Did you hear that, Mr. Ekeland?

MR. EKELAND:  No.  I'm sorry, your Honor, I didn't.

THE COURT:  Ms. Pelker said the inventory list you're referencing is the inventory list for what was sent from the IRS.  It's not the inventory list of what was sent from the FBI, and that's why the drive that was sent from the FBI is not on that list.

MS. PELKER:  If you look at the inventory list, it clearly says what drive it's on.  And it refers to the IRS drive number.  That's why it's 1, 2, 3, and was sent with the IRS drives which predated the FBI drives.

MR. EKELAND:  Is that the 1B15SSDSamsung.E01?

MS. PELKER:  I can --

MR. EKELAND:  That's what I have.

MS. PELKER:  I can pass this.  This was -- if you

look at the screenshot from Mr. Fischbach of what he sent to us when he was looking for the information, this file is pretty clearly visible. He has this file. It's what was provided by the IRS. It's just the list of the different image files --

THE COURT: Right.

MS. PELKER: -- with the IRS drive that is separate from the FBI drive.

THE COURT: All right.

MR. EKELAND: Your Honor, Mr. Fischbach is telling me that we found all of this stuff and this is unrelated to this inventory that I'm looking at, which lists two terabyte Western Digital hard drive provided by Romanian authorities. And that's what we think we haven't received.

And so --

THE COURT: Do you really think you haven't received that, or do you think that just it's not on the inventory list that you're looking at? Because Ms. Pelker has represented that there was back-and-forth about it and other emails confirming its receipt.

MR. EKELAND: We got sent a drive. But normally, I have everything in discovery and my people, you know, either upload it or I get it in some way, shape or form. I'm not going to make a representation to the Court that I know 100 percent one way or the other, because the only way

I would be able to 100 percent confirm that would be just to go to New York, and that's obviously not something that's --

THE COURT: Well, is there anyone in New York who can go retrieve it?

MR. EKELAND: Our entire office is down here right now. And so that's why we were hoping what we could do is just get an image of it, and we're just -- don't understand why that's --

THE COURT: How many people do you have down here? I know who's in the courtroom. Do you have any assistants or paralegals or folks who are not with you?

MR. EKELAND: I do have -- what do I have? I have one legal -- Ms. Wilkins is at the house.

THE COURT: It sounds like maybe that someone has to get in a car and drive to New York or get on the train and go to New York and take a look for this.

MR. EKELAND: It's either in New York City or it's three hours outside of New York City in the Catskills. I mean, usually what happens in all our cases is all the stuff is uploaded and we have it.

So I mean, I don't -- I honestly don't know what happened here, so I don't want to make a representation. But what I'm trying to do is solve this problem because Mr. Sterlingov asked us to look into it.

THE COURT: I understand why he would want to look

into that.

MR. EKELAND: Yeah.

THE COURT: But, you know, based on what I've heard from Ms. Pelker, the Government seems pretty confident that they sent it, and they did provide it.

Now, obviously, the Government's running a risk if it ever turns out that that's a mistake and they're wrong about that. That could provide a basis for a post-trial motion of some type. But that's -- they seem pretty confident that they sent it. And I don't have a basis for saying -- I don't have a basis for ordering them to go retrieve something from their storage which they represent is even more burdensome than your going and retrieving something from your storage.

MR. EKELAND: Well, I mean, perhaps -- I'm just looking for a solution here. Maybe if it -- I'm sorry. Was somebody saying something?

THE COURT: May someone may have just hit a microphone. I don't know.

MR. EKELAND: So maybe that is the solution, because maybe it's a non-issue. Right? Maybe I can get somebody up over the weekend or whatever, because obviously I don't know --

THE COURT: If you get someone over the weekend up there and they find it and there's a need to recall the

witness, we'll recall the witness.

MR. EKELAND:  Okay.  And the other question we had -- I just got this note -- is whether -- and the Government may have already answered this.  Again, I don't know.  There's the packet capture data which is on the pcap on the Romanian server.  I got asked if the Government is able to produce that or not.  I guess Ms. Pelker can speak to that.

MS. PELKER:  That's on the same drive.  We have the same issue.

I mean, I would like to pass up to the Court our email correspondence with defense on this issue, just so it's in the record; and we can provide it to your Honor and defense counsel.

THE COURT:  My clerk will get that from you.

MR. EKELAND:  No.  We're not disputing the emails.

THE COURT:  I'm sorry?

MR. EKELAND:  I'm not disputing the email correspondence.

THE COURT:  Okay.

MS. PELKER:  Well, I do think, though, there is an email chain of back-and-forth with defense counsel about these drives where we're reminding them that if they want the drives, they need to send us a hard drive.  Then they do send us the hard drive.  They follow up on the status of it.

We let them know it's going out.  We send them the FedEx information.

They say thanks.

FedEx's shown that it's received.

This comes up earlier, and Mr. Hassard indicates that it's in storage in New York.

Also, defense -- I'm not questioning anyone's representation here.  But the issue of the Romania drives and what's on it has absolutely been an issue.

So if defense is now actually claiming that they've potentially never seen these drives before and never received it, I don't see how that possibly squares with where we are at this point in the history and trajectory of this case, and that defense is now potentially raising mid-trial that they claim that they didn't receive this hard drive, that there's all this back-and-forth specifically about it; and that has been a clear issue.

I think it's difficult to square.  And there is, to the -- I really have a hard time, one, thinking that there's a realistic way in which this drive did not get to defense, and certainly that they didn't notice it until now.

MR. EKELAND:  Actually, the fact, your Honor -- I'm going to leave it at this -- is that the fact that there is so much email back and forth about it tells me that my office was on top of it, was getting the hard drives,

cataloging the stuff when it came in and uploading it.

So that's why I'm a little -- I mean, I'm surprised that I can't find this. So -- and again, I'm not -- I can't -- I'm not going to say one way or the other without going and checking. But that's what, you know, makes me wonder: Did I get it? I'm not doubting I got the hard drives, but I have to go now -- I just don't know what was on them.

So I don't want to --

THE COURT: I will say that the email does say that the hard drives containing data related to the Romania server were sent on a particular date. And then you respond: Thanks.

MR. EKELAND: But that's not -- I'm sorry.

THE COURT: Well, I would think at that point in time, which was a year and a half ago, that if there wasn't something there -- on there that you thought should have been there, that you had plenty of time to look at it and say: Oh, wait a second; this isn't what you said it was.

MR. EKELAND: I'm assuming it all got uploaded and so -- but the fact that we said thank you doesn't mean that, you know, we got it.

And the other thing I just don't -- I'm a little bit at a loss is why the Government doesn't have a copy of this. I mean, I'm guessing they're not going to use it as

evidence at trial or what. And maybe this is a nonissue.

If it takes them 60 days to retrieve and if all of a sudden we see the pcap come into evidence tomorrow or an image of the Romanian server, then I think we have grounds obviously to object.

What I'm taking from this by the fact that the Government is saying that it takes 60 days to pull this stuff is that we're not going to see any of it at trial.

THE COURT: Ms. Pelker?

MS. PELKER: So Ms. Mazars will testify to her analysis. That's different than providing an imaged copy of the entirety of the server to defense.

MR. EKELAND: So then she won't be testifying based on her view of something that the Government won't be able to produce as evidence in court?

MS. PELKER: We did produce it.

THE COURT: It was given to you. I mean, I just think that, you know, I can say as much to you as to the Government in this regard. And you both have it in storage. And -- at least hopefully you both have it in storage. And I don't know why the Government would have a greater burden to bring it to court than you would if you received it in discovery.

MR. EKELAND: I'm talking about things coming into evidence. But what I've just heard from the Government is

that they're not planning on introducing the server or the pcap stuff that they're representing is 60 days away into evidence, and so I take them at their word on that.

MS. PELKER: Again, I do not have a server that has an evidentiary copy of this on it at hand to give to defense counsel.

MR. EKELAND: Okay.

MS. PELKER: Our expert has reviewed that. She provided her report of that. That's been gone -- that's gone separately in discovery to defense. She will testify to her review of the server.

MR. EKELAND: Based on her expert report.

I think we've made our record on this, your Honor, unless your Honor has any other questions.

THE COURT: No.

But I would say with respect to making a record that if the Government wants to make sure that their emails are part of the record, you can just lodge them on the docket, just so that they're there, if you'd like to.

MS. PELKER: Thank you, your Honor.

THE COURT: Anything else before we adjourn today?

MR. EKELAND: No, your Honor.

We're back at 9:30 tomorrow?

THE COURT: Well, 9:15, I would say. I've told the jury to be here at 9:00. I have a matter which is only

going to take me ten minutes at 9:00 tomorrow morning.  And so by 9:15, we should be fully ready to go.  But I'd like everyone to be here by 9:00 a.m. so we can really get going.

MR. EKELAND:  And we're a full day tomorrow, a full day Thursday, and then Friday morning?

THE COURT:  Yeah.  Thursday, there is a juror who can't start until 10:00 and has to stop at 4:00.

MR. EKELAND:  Oh.

THE COURT:  And I'm all open to -- if anyone at any point thinks that we have to excuse any of these jurors, just let me know.

And then on Friday, we're a half day.

MR. EKELAND:  I think we may be -- the defense may be streamlining its case.  I don't want to --

THE COURT:  I'm sorry?

MR. EKELAND:  I think the defense may be streamlining its case a little bit.  So I think -- I don't want to, you know, nail us down to anything just right now because I want to see what obviously happens with the Government's case in chief.

But I think if the Government can finish on Monday, which of course, you know, there are variables there, we might be able to finish it next week, you know --

THE COURT:  Okay.

MR. EKELAND:  -- give or take the normal trial

variables.

THE COURT: Okay. Well, I appreciate everyone doing the best they can on this.

I will see you all tomorrow morning, then.

MR. EKELAND: Thank you, your Honor.

THE COURTROOM DEPUTY: All rise.

(Proceedings concluded at 3:37 p.m.)

## CERTIFICATE

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 27th day of February, 2024.

/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

     vs.

ROMAN STERLINGOV,

        Defendant.

_____/

Criminal Action
No. 1: 21-399

Washington, DC
February 28, 2024

9:23 a.m.

MORNING PROCEEDINGS

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:    CATHERINE PELKER
                    U.S. DEPARTMENT OF JUSTICE
                    950 Pennsylvania Ave NW
                    Washington, DC 20530

                    CHRISTOPHER BRODIE BROWN
                    DOJ-USAO
                    601 D Street, N.W.
                    Suite 5.1527
                    Washington, DC 20530

                    JEFFREY PEARLMAN
                    DOJ-CRM
                    Ccips
                    US Dept of Justice
                    1301 New York Ave NW
                    Washington, DC 20005

APPEARANCES CONTINUED ON NEXT PAGE

APPEARANCES CONTINUED

For the Defendant:      TOR EKELAND
                    MICHAEL HASSARD
                    TOR EKELAND LAW PLLC
                    30 Wall Street
                    8th Floor
                    Brooklyn, NY 10005

Court Reporter:        SHERRY LINDSAY
                    Official Court Reporter
                    U.S. District & Bankruptcy Courts
                    333 Constitution Avenue, NW
                    Room 6710
                    Washington, DC 20001

3

TABLE OF CONTENTS

WITNESSES

Valerie Mazars de Mazarin

Direct examination by Ms. Pelker                    5


EXHIBITS

Government Exhibit 366                                6
Government Exhibit 361                               16
Government Exhibit 364                               33
Government Exhibits 363, 363A                        34
Government Exhibit 507                               37
Government Exhibit 507B                              38
Government Exhibit 367                               56
Government Exhibit 362                               71
Government Exhibits 504A - 504E                      77
Government Exhibit 503                               78
Government Exhibit 506                               84
Government Exhibit 26                                95
Government Exhibit 9                                 97

PROCEEDINGS

THE COURT: All right. Anything before we get the jury?

MR. BROWN: No, Your Honor.

MR. EKELAND: No, Your Honor.

THE COURT: All right. Let's get the jury and the witness can come back to the stand.

(Jury in at 9:23 a.m.)

THE COURT: All right. Ms. Pelker, you may proceed when you are ready.

MS. PELKER: Your Honor, do we need to call the case?

THE COURT: Yes.

THE COURTROOM DEPUTY: Criminal case 21-399, *United States of America versus Roman Sterlingov.*

Would counsel please state your name for the record starting with government counsel.

MS. PELKER: Good morning, Your Honor. C. Alden Pelker for the United States, joined at counsel table by Chris Brown and Jeffrey Pearlman.

MR. EKELAND: Good morning, Your Honor. Tor Ekeland for defendant Roman Sterlingov who is present in court and joining me at counsel table is Mr. Michael Hassard.

THE COURT: All right. Thank you.

Ms. Pelker, now you can continue.

MS. PELKER: Thank you, Your Honor.

DIRECT EXAMINATION CONTINUED

BY MS. PELKER:

Q. Good morning, CS Mazars.

A. Good morning.

Q. When we left off yesterday, we were discussing Who is lookups. Can you remind the jury, what is a Who is lookup?

A. A Who is lookup is a search of a database of records that -- that record which IPs were controlled by which entities at a certain time. And there are also Who is records for domains with contact information, organizational information and the like for domains.

Q. And what information is included with a Who is lookup for an IP address?

A. It will show the entire net block, so the base of IP that it is in and the organization or entity's name, usually address, phone number, oftentimes there will be business contacts and contacts if it is being misused and that is usually the base of it.

Q. If we could pull up Exhibit 366, which is in evidence.

CS Mazars, what is this in front of you?

A. This is a Who is record.

Q. And does this accurately depict the entry in the Who is records for DOJ, the Department of Justice's IP space?

A. Yes.

Q.    Would it help the jury understand your testimony about Who is records?

A.    Yes.

MS. PELKER:  Government moves to admit and publish Exhibit 366 as a demonstrative.

THE COURT:  Any objection?

MR. EKELAND:  No objection, Your Honor.

THE COURT:  Exhibit 366 is admitted as demonstrative.

(Whereupon, Exhibit No. 366 was admitted.)

BY MS. PELKER:

Q.    CS Mazars, can you explain what is shown here in this Who is record?

A.    So this Who is record looks up IP address 149.101.1.115 --

Q.    And --

A.    -- for a particular date.  These Who is records are captured routinely over time.

Q.    And what is the information -- if we can scroll down a bit -- shown for who is controlling this block of -- the block of IP addresses in which this IP falls?

A.    The US Department of Justice.

Q.    If we could scroll down just a bit.  Can you explain generally what is shown here with the record?

A.    So apart from the date that this record captured as registration and update when changes were made, you can see the

abuse name and handle and that is, as I mentioned before, who one should contact if an IP or a domain is being used for spam or fraud or some other type of legal issue. And there is a phone number and email address for that.

Q. Does ARIN check the name listed on a Who is record is a real person?

A. No.

Q. So is it accurate to say that the Who is record just shows whatever information the company has entered?

A. Yes.

Q. And can Who is information change over time?

A. Yes, it can.

Q. Is there a way to look at historical Who is information to determine what the Who is information for an IP address was for a past date?

A. Yes. Multiple companies record and maintain a database of Who is records which allows you to go back and search them.

Q. Can you name some of the companies and services that compile that information?

A. The main one that comes to mind is DomainTools.

Q. And how do those -- how does DomainTools or similar companies direct the information?

A. My understanding is that they have set up a process to routinely query or search the Who is databases across all of the IP space and all of the domains that it is aware of at a

high level. And as it routinely goes through and checks, it looks at what the response is and just saves it and likely indexes it, meaning pulling out the key words so it is searchable.

Q. Do these companies change the actual substantive information as they are cataloging it?

A. No, they just record it.

Q. And is Who is information widely used by members of the cybersecurity profession?

A. Yes, it is.

Q. Do you frequently look at Who is information in your work?

A. Yes.

Q. Does that include both doing Who is lookups live and searching a historical database like DomainTools?

A. Yes, both of them.

Q. Have you had the opportunity to compare your live Who is lookups to the cataloged information in DomainTools?

A. Yes, some of them.

Q. Have you found the records in DomainTools and similar Who is lookup tools to accurately reflect the Who is records as they existed?

A. Yes.

Q. And do you and other cybersecurity practitioners rely on those compilations?

A. Yes.

Q.    Do some of those services like DomainTools also record what is called passive DNS information?

A.    Yes.

Q.    Can you explain, what is DNS?

A.    The domain name system is like an address book for IP addresses.  As we said, the computers connect to each other using their IP address.  So when you type in a website name, how does it know which IP address goes with that website?  Your computer will consult a DNS server, just like I might see -- not have my friend's phone number memorized or someone I just met, but I can look them up by name and it will give me the number, which is what I actually call.

Q.    What is passive DNS?

A.    So passive DNS, much like Who is, when the current databases are queried and the records are saved, sites that maintain passive DNS have been doing this with DNS requests. So they have computers on the internet that just watch as requests are made and responses come back.  What is the IP for Google, for example, 8.8.8.8.  And when it sees one of those responses, it just archives it is my understanding.  So that way and there are different types of DNS requests, but it can be helpful to search where certain domains resolve to, meaning their IP address at a certain point in time.

Q.    Like the Who is information, are passive DNS directories generally used and relied on by members of the cybersecurity

profession?

A.   Yes.

Q.   And how do you use Who is and passive DNS information in your IP address analysis in this case?

A.    In this case, I used them both to get a sense of what kind of service provider controlled that IP at the time, whether it was online hosting or more residential or business looking internet connection or something else.  But to make sure I wasn't comparing current records to historic events, I made sure to go back in time to when I saw these IPs in the records to look at which companies and what type of companies had them at the time.

Q.   Why is it valuable to law enforcement to know who controls a particular IP address of interest in a case?

MR. EKELAND:  Objection; leading.

THE COURT:  I'm sorry?

Overruled.

MR. EKELAND:  I'm sorry.

THE COURT:  Overruled.

THE WITNESS:  Oftentimes, it becomes the next step for legal process.  For example, a subpoena, because that company might be the next source of information about a server and how it was used, for example.

BY MS. PELKER:

Q.   Is it possible for someone to take steps to try to hide

the IP address that they are using?

A.    Yes.

Q.    And does law enforcement often connect IP address information with other information or information gathering tools that they have?

A.    Yes.

Q.    Can you explain what a proxy is?

A.    A proxy is a server between the user and the rest of the internet.  Sometimes people will set it up automatically in their browser.  For -- to have a reason to come out of the proxy's IP address to be visible on the internet as the proxy and not as one's own home IP address, for example.  Users can use a proxy server to funnel their traffic through.  You can connect to the proxy and then out to the internet.

Q.    And as a very simple example, if you have two -- if someone has two computers, could they set up one of them as a proxy?

A.    Yes, they could.

Q.    And what would that look like as far as the connections?

A.    The two computers would be networked together in one setup.  I could have my computers talk to each other locally on my network, but I could keep one computer more or less private.  And when I send a request, for example, show me Google.com, it would go to the other computer first and then to the internet and to Google and it could come back the same way.

Q.   Are there companies that also offer proxies as a service?

A.   Yes.

Q.   How do those companies work generally?

A.   To simplify things and to be able to handle more traffic, for example, the company will host a server somewhere out on the internet, sort of like in the first setup I described.  If you pay for the service, you get a username and password to the server, so you can set up your computer to always exit through it.

Q.   How do the companies get those servers in the first place?

A.   They lease them from other providers.

Q.   And where are those servers typically located?

A.   They could be anywhere in the world.

Q.   And can multiple people be using the same proxy server on the same day?

A.   Yes.

Q.   What sorts of things can dictate how many people could be using a particular proxy service server around the same time?

A.   In terms of users all connecting at the same time, it can only support so many connections.  One, because you will run out of ports at same point.  If all of the connections are going through the some sort of door to the server on one end, they need to map internally to the routes in.  And at a high level at a certain point, you will run out.  Oftentimes servers won't have enough CPUs or processing power to handle many

different connections at the same time.

And they also need to handle requests for the rest of the internet, like web crawlers attempted sometimes like -- attacks or research attempts, all of that will be hitting the server at the same time.

Q. Does the activity that someone is taking on a proxy server also sometimes impact what bandwidth is available for other users?

A. Yes, it would.

Q. Can you, using Netflix as an example, explain how that could play out?

A. Large video downloads, especially of high quality video, take a lot of bandwidth.

Q. What are the benefits of using a proxy service as opposed to setting up your own home proxy?

A. It would be less expensive in most cases and simpler.

Q. What are some of the downsides?

A. You are trusting a third party with your data. Even if you connect to it encrypted, you don't know what kind of connection records they are keeping of which IP came into it and which IP came out. And so you lose a bit of control over your own internet browsing that way.

Q. What is a virtual private network or VPN?

A. A VPN is a service where the company controls an array of different servers. And you connect, you open the software and,

say, connect through the VPN in this context and it will assign you a server to come out of similar to a proxy.

Q. Can people also hide their true IP address by using Tor?

A. Yes.

Q. What is Tor?

A. Tor stands for The Onion Router. And it is a network of computers and servers that -- most of them only communicate with one another. Some handle the users' requests in and then some of them only pass the traffic out to the internet. And at a high level, it directs the traffic multiple -- to multiple servicers, sometimes called hops through the network and exit out for the stated purpose of anonymity.

Q. Why was Tor originally called The Onion Router?

A. As the traffic moves through the Tor network, it picks up layers of encryption. So that -- to protect the data. So each server adds an additional layer on top so that others servers in the network can't decrypt it or decode it, in a sense, and read all of the traffic. So like the layers of an onion, the encryption gets added and then one by one on the way out, it gets peeled off or decrypted.

Q. Who runs Tor?

A. An organization, not for profit called the Tor Project.

Q. And who controls all of these Tor nodes that are participating in the Tor network?

A. Many different people and organizations. Anyone can set

up a Tor node.

Q. Where are all of these nodes, computer's servers located?

A. All over the world.

Q. So if I wanted to, could I go home and become a Tor node with my home computer?

A. Yes.

Q. And if I did that, whose internet traffic could be routing through my home IP address?

A. Anyone who is using the Tor network.

Q. How does someone use Tor?

A. Most users download the Tor browser and launch it and sort their connection through there. Although there are other command line ways that you can run the Tor service and use it as well.

Q. Did you assist in compiling a series of visuals to help explain Tor and internet routing to the jury?

A. Yes.

Q. Pulling up Exhibit 361, not yet in evidence.

Is this the PowerPoint presentation that you assisted in compiling?

A. Yes.

Q. Will it assist the jury in understanding your testimony?

A. Yes.

MS. PELKER: Government moves to admit and publish as a demonstrative, Exhibit 361.

THE COURT: Any objection?

MR. EKELAND: No objection, Your Honor.

THE COURT: Exhibit 361 is admitted as a demonstrative and may be published to the jury.

(Whereupon, Exhibit No. 361 was admitted.)

BY MS. PELKER:

Q. CS Mazars, what is shown here?

A. This was the home page or landing page that a user would see when they opened up the Tor browser.

Q. And generally speaking, what is a browser?

A. A browser is a computer program that makes it easy to connect to the internet.

Q. And what are some of the browsers the jury might be familiar with?

A. Chrome, Firefox, Internet Explorer and Edge are some common ones.

Q. Where do you get this Tor browser?

A. You go to the Tor Project's website and download it.

Q. Now, do you have to download this browser in order to use Tor?

A. No.

Q. What is the other alternative, if you didn't want to use this browser?

A. You could start Tor as a service, which is essentially what the browser does. So you have Tor's code running on your

computer and it starts the connection, the network connection. And then from there, you can use certain command line programs to take your regular internet connections, but run them through Tor.

Q. Can you explain what a command line is in a nontechnical way?

A. Oftentimes on a computer, if you see a help desk fixing something on your computer or someone technical using it, they will pop up a window and start typing commands, program names, copy, move, things like that. They are sending commands more directly to the computer without all of the visual programs. And they have that on Windows systems but also on Linux systems.

Q. What is Linux?

A. Linux is an operating system, just like some run Mac OS on their laptops and some run Windows. Linux is often free, some versions are a paid operating system, similar to Mac OS that is popular too.

Q. Directing your attention to the slide in front of you, can you explain what is shown here?

A. This is a demonstration of using Linux terminal, which is sort of command line to visit a website or send a command to a website through the Tor network.

Q. Now, can you use Tor to access regular websites like Google.com?

A. Yes.

Q. And are there also special hidden sites that you can only access if you are using Tor?

A. Yes.

Q. Do they have a special name?

A. They are known as Tor hidden services.

Q. What does a Tor hidden services address look like?

A. They tend to be a long string of letters and numbers. They are two different formats you have seen. And they have gotten even longer. And they always end in .onion.

Q. I'd like to have you walk through a couple scenarios to explain internet traffic routing. If someone who is not using any sort of anonymizing service sits down at their home computer and goes to Google, what IP address will Google see accessing the site?

A. Their home IP, the IP coming out of their home router.

Q. And directing your attention to this next slide 4, can you walk through that using this slide as an example?

A. Yes. In this example, the user's home IP or the IP of where they are connecting from is 72.77.50.122. And they are interested in visiting Google.com.

Q. So what happens when their computer wants to connect or retrieve information from Google.com?

A. Their computer makes a web request for Google.com and it is coming from their IP.

Q. Where would that IP address information generally be collected?

A. Generally the servers keep records known as server logs. And the time of the connection and the IP address and some other information would be recorded in the server's log.

Q. Is that what is shown here on the side under Google.com server log?

A. Yes.

Q. What information is then sent back to the user?

A. The web response, in this case the Google homepage.

Q. If you were law enforcement investigating this activity because it was tied to crime, how would you go about figuring out who is responsible for this access of Google.com?

A. I would attempt to get access to Google's server logs and do research on the IP, maybe using the date and time to help center my research. This is where Who is records and passive DNS often come into play as the next step.

Q. So let's say, you send Google a subpoena and you determine -- you get the information about the IP, you determine that the IP was controlled by Comcast, what would you do next?

A. I have to ask Comcast and do a legal -- send them legal process to get to the next step of who is using it in most cases.

Q. Directing your attention to this next slide. Can you walk

us through what this looks like if the person is using a proxy?

A.    In this case, the user might be running a proxy tool, maybe they pop up the software and say connect or maybe they have it preset already in their browser to use.  But then from there, same home IP address, they would use a proxy as the first step to connect to the internet.  They are still searching for Google.com.

Q.    And how would the user start the connection?  What is the first step in the connection shown here?

A.    They would connect to the proxy server.

Q.    And what happens from the proxy server to connect to Google?

A.    The proxy server relays the traffic on to Google.

Q.    And what will Google then see in its server log?

A.    The proxy server's IP address because that is where the traffic last came from.

Q.    So can you point to where the .279 appears in the server log?

A.    Right here.

Q.    And it is a better arrow than I could draw.

So where does -- how does the traffic then get routed back to the user?

A.    Back through the proxy server.

Q.    And so if you were law enforcement investigating this activity, how would you go about figuring out Who is

responsible for this log-in?

A.   Depending on the nature of the company running the proxy server, law enforcement might be able to send more legal process or they might be out of luck.

Q.   Would the first step be tracing back from Google to the proxy service?

A.   Yes.  First you would have to research the IP and determine which service it came from.

Q.   Now, and then would the second step be seeing whether you could send a subpoena to the proxy service?

A.   Yes.

Q.   Do all proxy services respond to subpoenas to identify their customers?

A.   No.

Q.   Do some proxy services advertise themselves as no logs or completely anonymous and claim not to keep records about their customers?

A.   Yes.

Q.   Are there different types of proxy connections?

A.   Yes.

Q.   Is one common type known as a SOCKS proxy?

A.   Yes.

Q.   Can you explain what a SOCKS proxy is at a very basic, nontechnical level?

A.   You can think of it as an encrypted tunnel that goes to

one -- through some specific ports on the server, oftentimes used to protect user names and passwords or the start of a connection.  It is another added level of safety for browsing the internet.

Q.    Can you explain at a very basic level what a port on a server is?

A.    So in the example of visiting my friend's apartment, her home address would be the IP address.  But the apartment door number would be the port.  It is a further instruction of how exactly at a high level the request gets to the server and how it should be handled once it gets there.

Q.    And going back to the PowerPoint slide here, what if the person is using Tor?  How would that person connect to the Google account?

A.    Typically, they would open the Tor browser, click a button to start the connection.  And then in the search bar at the top, just like any other browser, they would type in their website name.

Q.    Can you explain what is shown here on this slide?

A.    This represents the Tor network with its many computers.

Q.    And there are 12 or so nodes in that purple cloud shown here.  Are there actually only 12 nodes in the whole Tor network?

A.    No.

Q.    Are there many more than 12?

A.    Yeah, there are many more than 12.

Q.    And can you walk the jury through this slide here, as I click through of how access to Google.com would work through Tor?

A.    The connections through the Tor network will have multiple stops.  So this slide is showing the -- showing you Google.com request going to the first computer, to the second, to the third, which is one of those special Tor nodes that handles traffic out of the Tor network into the internet and that is the one that will then go to Google.com.

Q.    Is there a special name for the computer that is shown in purple here that is the last hop?

A.    Yes.

Q.    What is that?

A.    The exit node.

Q.    And what is the role of the Tor exit node?

A.    Tor exit nodes, apart from needing to handle a lot of traffic, take on a little bit more risk.  Because it is the exit node's IP address that will be visible to all of the internet sites.

Q.    So in this example, what IP address is now showing up here in Google's server log?

A.    The Tor exit node's IP address beginning in 64.79.

Q.    So what is the benefit of all of this bouncing around in the Tor network from hop to hop rather than using just a single

proxy?

A.    The main benefit is reliable anonymity.

Q.    Can you layer these different steps on top of each other, for example, using a proxy to connect to Tor?

A.    You could, yes.

Q.    And can you explain what is shown here?

A.    This diagram shows an internet user who has a proxy set up.  They first connect to the proxy server and then to the Tor network.

Q.    So can you just talk through these connections here?

A.    So in this case, the connection goes from the user's home IP to the proxy server, then to the first hop of the Tor network, to the second.  And then to the 3rd, which is the exit node and out to Google.com.  The IP address last shown is the Tor exit node IP and, again, that is what appears in the log.

Q.    Are there any downsides to the user when connecting through Tor or a proxy?

A.    It is very slow.  And a lot of websites keep track of which servers are in the Tor network as does the Tor Project itself.  So oftentimes if you try to use Tor to visit regular websites you will have to do endless CAPTCHAs.

Q.    Why do websites add those additional CAPTCHAs or security requirements or even block Tor?

A.    Because they are trying to cut down on abuse activity, so misuse of their site, attacks against their site and other

traffic that they might not want.

Q. How do sites know when a user is coming through Tor?

A. They maintain black lists, essentially like lists of IPs that they keep up to date that come from different networks. And one source of this is the Tor Project who freely publishes the list of exit nodes.

Q. Is there a name for the Tor Project list of exit nodes that they maintain?

A. They call it ExoneraTor.

Q. Could you spell that for the court reporter?

A. E-X-O-N-E-R-A, Capitol T, O-R.

Q. Is that a list that is regularly relied on by members of the cybersecurity profession?

A. Yes.

Q. Are all Tor nodes in the entire network available to be used as exit nodes?

A. No.

Q. Can you explain that distinction?

A. Users can contribute to the Tor Project by running servers as Tor relays for example, which are only the middle hops in the circuit. They might not want to take on, as I mentioned, the additional risk of being an exit node. But it all depends on how they set up or configure their Tor node. But setting it up as an exit node would have different steps.

Q. And are there different settings for someone who wants to

use Tor?

A.    Yes.

Q.    Can you explain what is shown here on this slide?

A.    This was a feature Tor browser used to have called the Vidalia control panel which was A consolidated menu to start and stop Tor.  And to choose what kind of server to come out of geographically.

Q.    Could you circle and read the name of the feature next to the black silhouette?

A.    "Use a new identity."

Q.    And generally speaking, what would that allow someone to do?

A.    If you were browsing Tor or doing -- browsing the internet using Tor, doing one type of activity and then you wanted a fresh start by clicking this button, it ends the connection through the three hops it currently has and starts you a new one, coming out of a completely different server.

Q.    Did you review examples of Akemashite Omedetou encouraging people to use this function?

A.    Yes.

Q.    Directing your attention to Exhibit 1, Bitcoin Talk post number 78.

        THE COURT:  Before you do that, can I suggest we take a minute to all stand up and stretch just for a second?

        MS. PELKER:  Yes, Your Honor.

Thank you, Your Honor.

THE COURT: All right. Continue.

BY MS. PELKER:

Q. And, CS Mazars, could you read this post from August 22nd, 2012 by Akemashite Omedetou?

A. "It should be reachable right now. If it is not, try restarting Tor or press use new identity in the Vidalia control panel."

Q. Now, directing your attention to post number 91. If you could read the middle paragraph of the post by Akemashite Omedetou from April 20th of 2013.

A. If the website is not opening for you, you might want to try use get new identity Tor function, which will relay you through a different node or try the clearnet gate http:\\gate.BitcoinFog.com.

Q. We will talk a bit about the gate later. But what is Akemashite Omedetou telling Bitcoin Fog users about trying to access the .onion site?

A. If it is not working right away, they can refresh the connection, essentially starting a completely new one by going to get new identity.

Q. Now, even though a criminal might use Tor or proxies, does law enforcement still look at the IP addresses?

A. Yes.

Q. Why is that?

A. Using Tor and especially coming out of some IPs for example regionally can all be a way to describe a user's internet browsing habits. Everyone has a favorite combination of tools or programs they have day to day. It is their preferences. And so the more observations law enforcement can make about how a user interacts with the internet and what software they like, the more they can piece together who this is and compare it against other computers that they find.

Q. And as part of your work on this case, did you review account log-in records for numerous accounts?

A. Yes.

Q. And did your work include looking at IP addresses used to log into those accounts?

A. Yes, it did.

Q. Is that sort of analysis of IP log-ins something that you often do in cases?

A. Yes.

Q. And why is that?

A. Just about in every case there will be multiple logs, multiple data sorts from different companies. And it always makes sense -- it almost always makes sense to compare them side by side to see if you can find the same user or the same time of online activity from source to source. It is just a way of putting the pieces together.

Q. As you were looking at the IP used to access the accounts

in this case, did you notice any common types of accesses?

A. Yes.

Q. What was that?

A. Some of the IP types or the access types I saw were from connections that looked residential or business to me. Some I determined to be proxy servers and some were Tor network at various points.

Q. And you spoke a bit to earlier, but to remind the jury how are you able to know when something is a Tor IP address?

A. I check the ExoneraTor list for a certain date and it will say if it was part of the Tor network or not and whether it was an exit node or not.

Q. And how are you able to determine if something was likely a proxy or a VPN IP address?

A. Some of that information comes from the domain resolutions. Some online servers will have a unique name dot the hosting provider company name.com. So I start with the naming conventions. In some cases, I use that and the IP address to look for lists of known proxy servers that were posted online. So in some cases I figured it out that way.

Q. When you review records, do you take note of the time zone?

A. Yes.

Q. If we could return to the PowerPoint and slide 10. Could you explain what the time zone UTC is?

A.   UTC, coordinated universal time is the standard time zone -- it goes right through the middle of the world map.  And other time zones are referenced by how far away from that time zone they are listed as minus how many hours or plus how many hours.

Q.   So is the blue line here showing everything that is in UTC?

A.   Yes.

Q.   And what major world city -- there are several, but major world city does UTC run through?

A.   London.

Q.   And now directing your attention to the box in the lower left-hand corner.  What is shown there?

A.   This is the table of cities and the current time when the table was recorded in each city.

Q.   And can you briefly explain the difference in the time in those cities compared to the UTC and how it is offset?

A.   So the table shows that when it is noon in London, it was this time 7:00 a.m. in DC, 1:00 p.m. in Gothenburg, Sweden and 3:00 p.m. in Moscow, Russia.

Q.   So if a server log has times that say UTC, what time zone is it indicating the records are in?

A.   UTC plus zero, the coordinated universal time zone.

Q.   If the server were indicating a time zone that was 3 hours ahead of UTC, how would that usually be written for a server

log?

A.    UTC plus 3.

Q.    What about 5 hours behind UTC?

A.    UTC minus 5.

Q.    And what is Zulu Time?

A.    Zulu Time is functionally the same as UTC.  It is that centralized time zone, maybe with some specific differences.  And it is indicated when you look at time stamps, like the full date, time spelled out, you know it is in Zulu Time when it ends in a Capitol Z.

Q.    When you review server logs, how do you typically determine what time zone is used?

A.    I first look to see if it is explicitly indicated in the logs.  I look for the plus or minus.  I look for the Z to see if it is Zulu Time.  If neither of them are for some reason, I look at the server's settings to see if a time zone was specifically set.  If there is a line that says, yes, use local time or not.  And if all of that is absent, the convention is to use UTC.  So I treat it as UTC if there is no information at all.

Q.    Turning your attention now to your review of evidence for the Bitcoin Fog case.  Did you identify instances in which the same IP address was used to access multiple accounts of interest in the investigation close in time?

A.    Yes.

Q. And did that include instances where the same IP address was used to access accounts held in the defendant's true name and otherwise anonymous accounts tied to Bitcoin Fog?

A. I found --

MR. EKELAND: Objection.

THE COURT: What is the objection?

MR. EKELAND: It is argumentative and saying that there is accounts tied to Bitcoin Fog and I think that lacks foundation.

THE COURT: All right. Overruled.

THE WITNESS: I found IP of interest in both the data sources for the defendant's true name accounts and I also looked at IP addresses from the accounts linked to Bitcoin Fog meaning the Shormint and the Akemashite Omedetou accounts.

BY MS. PELKER:

Q. Did you compile a spreadsheet that summarized the log-ins of interest that you reviewed?

A. Yes.

Q. If we could pull up Exhibit 364, which is not yet in evidence. CS Mazars, could you describe generally what is shown here?

A. This is an Excel workbook containing the IP address of interest, dates and times and the files or data sources I found them in.

Q. Does this exhibit accurately summarize the IP address

events that you noted in the accounts?

A.    Yes.

MS. PELKER:  Government moves to admit and publish Exhibit 364.

THE COURT:  Any objection?

MR. EKELAND:  Yeah.  One, hearsay; two, best evidence.  It is not a reflection of the actual server logs.  This is an incomplete summary of all of the server traffic.  And it my understanding it is actually not based on the native server logs.

THE COURT:  Is this coming in as summary exhibit or --

MS. PELKER:  Yes.  Going in as a summary.

THE COURT:  Exhibit 364 is admitted and may be published to the jury.

(Whereupon, Exhibit No. 364 was admitted.)

BY MS. PELKER:

Q.    CS Mazars, can you explain the structure of this spreadsheet or worksheet?

A.    The far left column is the file name.  So the specific file that I looked at that --

Q.    Apologies.  The structure of the workbook as a whole, I said spreadsheet, the workbook as a whole.

A.    The workbook contains all of the IP addresses that I compiled in this sheet in the first tab as a summary.  And

then, they are broken out by specific IP address in the following tab.

Q.   Did you also prepare a chart to visually display your findings?

A.   Yes.

Q.   If we could pull up Exhibit 363.  And with Mr. Pearlman's assistance -- the physical print off of 363A.  And, CS Mazars, does the chart that is shown here on your screen accurately summarize your findings?

A.   Yes, in the spreadsheet, it does.

Q.   And is what is shown there held by Mr. Pearlman just a print off of the same information from 363?

A.   Yes, it is.

        MS. PELKER:  Government moves to admit and publish 363 and 363A.

        THE COURT:  Any objection?

        MR. EKELAND:  Objection; hearsay on multiple hearsay levels.

        THE COURT:  Exhibit 363 is admitted and 363A is admitted and may be published to the jury.

        (Whereupon, Exhibit Nos. 363, 363A were admitted.)

BY MS. PELKER:

Q.   If we could zoom in a bit on what is on the screen.

        CS Mazars, can you explain what is shown here on this chart?

A. In this chart, I tracked occurrences of IP addresses, just answering the question, did the IP address appear in a specific file. And so the rows are shortened names of the account files that I looked at. The columns are IP addresses and where an account and an IP meet. If that IP appeared in that account's records, it is green with an X.

Q. And can you go down this list on the left, just so we are clear what accounts we are talking about?

A. The Bitstamp heavy indicates the Bitstamp account held by the heavydist@gmail.com email. BTC heavydist is the heavydist@gmail.com BTC-e account. BT Killdozer is the Bitcoin Talk account for user Killdozer. Local bit GothenCoin is the LocalBitcoins account for the user named GothenCoin.

LR heavydist is the Liberty Reserve account for the heavydist email. Liberty Reserve Plasma is the Liberty Reserve account for the plasma@plasmadivision email. And LR Shormint is the Liberty Reserve for the Shormint@hotmail.com email. MTGOX Kolbasa is the Kolbasa user's Mt. Gox account. And MTGOX Peter NFS is the Mt. Gox account registered by the Peter NFS user.

Q. And the Peter NFS user, is that the same as the NFS9000 account?

A. It is.

Q. One is the username, one is the email?

A. Yes.

Mt. Gox plasma is the Mt. Gox account for the plasma@plasmadivision email.  Mt. Gox Volf.prius is the Mt. Gox linked to the Volf.prius user.  And finally Twitter account, Twitter cray Killdozer, the username is cray Killdozer.

Q.    So what is shown on this chart for the accounts is a mix of the defendant's true name accounts and accounts opened in the name Akemashite Omedetou or other aliases tied to Bitcoin Fog; is that accurate?

A.    Yes.

Q.    Directing your attention to the IPs on the top.  Starting with the first one on the left, the IP address ending in .123, where did this IP address appear in the records?

A.    In the Liberty Reserve accounts for plasma@plasmadivision and Shormint and the Mt. Gox accounts for Kolbasa and Peter NFS and Volf.prius.

Q.    If we could turn now to Exhibit 364 and go to the chart tab for that 123 IP address along the bottom.  CS Mazars, does this summarize the findings for the .123 address?

A.    Yes.

Q.    Now, can you -- were you able to find out who likely controlled that IP address at the time?

A.    Yes.

Q.    Who was that?

A.    I believe it was a company called Crypto VPN.

Q.    What was Crypto VPN?

A. Crypto VPN was a virtual private network service.

Q. If we could pull up Exhibit 507, which is not yet in evidence. CS Mazars, what is shown here?

A. A website page for Crypto VPN.

Q. And if we could scroll up at the top. Was this site captured by archive.org on a particular date?

A. Yes. It was an archive.org capture on, it appears, 2011/10/29.

Q. And is this a fair and accurate copy of the website as retrieved by the Way Back Machine or Archive.org for that date?

A. Yes.

MS. PELKER: Government moves to admit Government Exhibit 507?

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: 507 is admitted and may be published to the jury.

(Whereupon, Exhibit No. 507 was admitted.)

BY MS. PELKER:

Q. Was part of this page -- some of the headlines are in English. But was part of some of the text in Russian?

A. Some of it, yes.

Q. Did you also review a translated copy of this website?

A. Yes.

Q. If we could pull up 507B. I believe this has been

conditionally admitted by the translators. CS Mazars, is this a translated copy of the Crypto VPN page that we were just looking at?

A. Yes.

MS. PELKER: And the government moves to -- to the extent that it was not previously admitted to admit 507B?

THE COURT: Any objection.

MR. EKELAND: No objection?

THE COURT: 507B is admitted and may be published to the jury.

(Whereupon, Exhibit No. 507B was admitted.)

BY MS. PELKER:

Q. CS Mazars, can you explain what is shown here just generally? We can zoom out a bit.

A. The home page or landing page for Crypto VPN.com where it describes its services.

Q. If we could scroll down to the bottom. What is shown in the icons along the bottom here?

Keep scrolling.

Under Crypto VPN, when privacy matters?

A. They are icons for payment methods.

Q. Can you point to the Bitcoin payment icon?

A. (Complying).

Q. And Liberty Reserve?

A. (Complying).

Q.    Returning now to Exhibit 364.  Why did you assess that the .123 address was likely used by Crypto VPN at this time?

MR. EKELAND:  Objection; leading.

MS. PELKER:  She already testified that she made that assessment.  I am asking why.

THE COURT:  Overruled.

THE WITNESS:  Primarily passive DNS records.  I could see -- from what I remember I could see the IP address was resolved to by some domains .CryptoVPN.com around this time period, which would happen if it were a Crypto VPN server.

BY MS. PELKER:

Q.    Did Crypto VPN come up elsewhere in your review of evidence for this case?

A.    Yes.

Q.    Did that include payments from the Shormint Liberty Reserve account?

A.    Yes, I believe so.

Q.    And was it also referenced in the defendant's notes?

A.    Yes.

Q.    Prior to your work on this case, had you heard of Crypto VPN?

A.    No, I hadn't.

Q.    And is Crypto VPN still in business?

A.    Not to my knowledge.

Q. To be clear, since Crypto VPN is a proxy, could multiple people have been using this .123 address in October of 2011?

A. Yes.

Q. Why was it significant to you that these accounts shown on the screen were accessed from the same IP, even though it was a proxy?

MR. EKELAND: Objection; leading.

THE COURT: Overruled.

THE WITNESS: Well, I first noticed this IP because the log-ins between accounts -- the log-in to one account and then to another account of note happened so close together, that I flagged this IP for review and then pulled out all of the times that it co-occurred. So the closeness in time either logging in or just accessing these accounts in general was why it was significant.

BY MS. PELKER:

Q. And can you walk us through these accesses shown here on this screen?

A. Yes. The first one I saw was in the Liberty Reserve Shormint account on 11/20/2011 at 12:14:30. All times I am listing in UTC time zone.

Q. What was the next time you saw the IP after that? You don't have to walk through each of the time stamps, we can go account by account.

A. Account by account? So the last occurrence in that block

in the Liberty Reserve Shormint account was at 12:14:56. And then it appeared again in Mt. Gox Volf.prius account on 11/24/2011 at midnight and 25:12.

Q. Were there several accesses that day from that IP address to the Volf.prius account?

A. Yes.

Q. What was the last access on 11/24/2011 from that IP and the Volf.prius account?

A. It was 11:34 and 26 seconds.

Q. Did the IP -- was the IP -- that same IP then used to access Mr. Sterlingov's true name Liberty Reserve Plasma account?

A. Yes. On the same day at 12:17:51.

Q. So what is approximately the time difference there?

A. Less than an hour.

Q. And were there then multiple accesses to the Liberty Reserve PlasmaDivision account on the 24th?

A. Yes.

Q. What was the last access?

A. At 12:27:15.

Q. Was that IP used to access another account of interest in the case that same day?

A. Yes.

Q. What was that?

A. The Mt. Gox account for Peter NFS.

Q. And when was that?

A. 14:51:21.

Q. And was the account then of that IP address used to access the Shormint account again the next day?

A. Yes, it was.

Q. And what times were those accesses?

A. At 10:55:02, 29 seconds and 54 seconds.

Q. When was the next time that IP came up in your analysis?

A. Three days later on 11/28/2011 at 1:02:52 p.m.

Q. What account was that used -- was at issue there?

A. In the Mt. Gox Peter NFS account again, the same one as before the Shormint account.

Q. And were there multiple accesses of that account or multiple activity on that account from involving that IP address?

A. I counted three occurrences of the IP address.

Q. And what was the time of the last one?

A. 10:55:54. I'm sorry. I read the wrong line, 10:08:57.

Q. And was that IP then used to access another account of interest in this case that same day?

A. Yes.

Q. What was that?

A. The Mt. Gox Kolbasa account later that same day.

Q. What was the first time that that IP appeared on that day for the Kolbasa account?

A.    At 23:58:43.

Q.    Did it then -- were there several other accesses or events in that account from that same IP?

A.    Yes.

Q.    And when did that continue up until?

A.    Up until the next day.  As you can see it was late in the day on 11/28 just wrapping around to the next day 11/29/2011 at 8:39:16.

Q.    Did it then -- was the IP then used again to access the Shormint account?

A.    Yes, it was the next day.

Q.    Why were these series of accesses across these different accounts significant to you?

        MR. EKELAND:  Objection; leading.

        THE COURT:  Overruled.

        THE WITNESS:  Not only did I notice they were very close together in time, I also noticed that the accesses would go into one account.  And in some cases the same account would occur later.  So first account, second account, back to first account.  And noticing that, led me to -- was one of the reasons that led me to group the activity together for review.

BY MS. PELKER:

Q.    And looking at this as a whole, what were you able to assess about the accesses from this IP address across these different accounts?

A. The conclusion in this one or in the other report?

Q. Just look at your assessment here for this IP address.

A. Oh. Yeah, this table I mostly used to keep track of it. But I assessed that likely the same user -- as I explained in more detail in another report -- accessed many of these accounts. I considered most of the activity to be from the same user.

Q. Returning your attention to Exhibit 363, so the summary chart. And if we could look at this next IP of 212.16.7.171. Could you explain what is shown on this chart with respect to that 171 IP of what accounts it was used to access?

A. It shows that IP was present in the logs for the Mt. Gox accounts for users Kolbasa account and Peter NFS.

Q. Turning your attention back to the spreadsheet and going now to the .171 tab, does this tab list the individual occasions where that individual IP address appeared in the records for those individual accounts?

A. Yes, it did.

Q. Can you walk through these accesses here?

A. On 10/25/2011, the Mt. Gox Peter NFS account was accessed. And then in the next minute at 13:40:28 that IP accessed the Mt. Gox Kolbasa account.

Q. What was significant to you about the timing of these accesses?

MR. EKELAND: Objection; leading.

THE COURT: I mean, you can ask was something significant I guess and then what was significant.

BY MS. PELKER:

Q. What, if anything, was something significant about the timing of these accesses?

A. These accesses were extremely close together in time for two different accounts on the same website.

Q. What did that indicate to you?

A. To me, this looked like a user logging into one Mt. Gox account and then logging in or accessing in some way one Mt. Gox account and then checking the other.

Q. Directing your attention back to the large chart at Exhibit 363 and continuing across the top to the third IP. Was IP address 213.66.214.217 another one of the IP addresses that came up in your analysis?

A. Yes.

Q. What accounts were accessed from that IP address?

A. The Bitstamp account for heavydist and the Bitcoin Talk account for Killdozer.

Q. And returning now to the next step in the spreadsheet, Exhibit 364, the 217 tab. Can you explain what is shown here?

A. In this table, I record that the BT Killdozer account, Bitcoin Talk, was accessed on 12/27/2012 at 11:29:08. And then 10/24/2013 the same IP appeared in records for the Bitstamp heavydist account.

Q.   Were you able to determine who likely controlled this IP address at the time?

A.   Yes.

Q.   What was that?

A.   It appeared to be a Swedish internet service provider called Telia.

Q.   And these accesses are further apart than the others we have looked at.  What was your assessment about these accounts, given the type of IP address it was?

        MR. EKELAND:  Objection.  Counsel was testifying about the temporal space between the log-ins and the question is leading.

BY MS. PELKER:

Q.   Were those account accesses further apart than the other ones we just looked at?

A.   Yes, they were.

        MS. PELKER:  We are just trying to move things along.

        THE COURT:  I understand.

BY MS. PELKER:

Q.   Even though they were farther apart, did the type of IP address factor into your analysis?

A.   Yes.

Q.   And could you explain that?

A.   So local home router and business router IP addresses

don't change as often as sometimes IP address of services on the internet. A user of a VPN, for example, might change their address more quickly. Home and business IP addresses do change from time to time. But depending on the country and provider, it tends to be months apart from change to change. It tends to stay more stable.

Q. Returning to Exhibit 363, our chart. And we are now almost at the middle of IP address 61.19.252.148. Was this another IP that came up in your analysis?

A. Yes.

Q. What accounts were accessed from that IP address?

A. The Liberty Reserve Plasma account and the Mt. Gox Volf.prius account.

Q. If we could turn to the next tab in the spreadsheet. Could you walk through the account activity from this .148 IP address?

A. I first saw it in Liberty Reserve account for plasma@plasmadivision on 10/8/2011 at 1:26 and 11 seconds. A few other accesses very shortly after. And then, it appeared in the Mt. Gox Volf.prius account, accessing it the same day at 13:36:16.

Q. Were you able to determine who likely or what company likely controlled this IP address at the time?

A. Yes. The address itself appeared to be owned by a Thai company called CAT Telecom.

Q.   Were you able to assess how it was likely used?

A.   Yes.  I believe it was a proxy server at the time.

Q.   Why were those accesses significant to you, even though it was a proxy server that multiple people could have been using?

        MR. EKELAND:  Objection; leading.

BY MS. PELKER:

Q.   Was this a proxy server that multiple people could have been using?

A.   Yes.  An available public proxy server.  Sometimes they get posted online and people connect to them.

Q.   Why are these accesses nonetheless significant to you?

A.   They were still on the same day, a few hours apart, these accounts that we were reviewing so I included them.

Q.   Going back to the chart of Exhibit 363A.  Was IP address 70.90.169.13 one of the IP addresses that came up in your analysis?

A.   Yes.

Q.   Where did this IP address appear in the records?

A.   Shormint Liberty Reserve account and Kolbasa's Mt. Gox account.

Q.   And going back to your spreadsheet, the .13 tab, can you explain what is shown here?

A.   The first accesses were to the Kolbasa Mt. Gox account on 10/20/2011.  The last one of those I saw was at 7:04:34.  And then about 5 minutes later, the same day, the IP appeared to

access the Liberty Reserve Shormint account.

Q. And were there multiple -- was there just one or multiple occurrences of this IP in the Shormint account on 10/20?

A. Yeah, multiple, there were a bunch.

Q. And were you able to determine how this IP was likely used?

A. I believe this was what is known as a residential proxy, so a proxy server that is being run off of a business or home internet service provider's network, in this case Comcast.

Q. And since it was a proxy, could multiple people have been using it at this time?

A. Yes.

Q. Even though that was the case, why were these accesses significant to you?

A. The change from one account to another 5 minutes apart, both on these virtual payment currency websites, led me to believe this was the same user logging into one and then the other.

Q. Returning to the chart, and we are now at the third from last, was IP address 83.248.132.4 one of the IP addresses that came up in your analysis?

A. Yes.

Q. Where did this IP address appear in the records?

A. The Bitstamp heavydist account, the BTC-e heavydist account, Bitcoin Talk Killdozer, LocalBitcoin for user

GothenCoin, Liberty Reserve account for heavydist and Liberty Reserve for plasma@plasmadivision. Additionally, the Mt. Gox account for plasma and Twitter for cray Killdozer's account.

Q. And so are these many of the defendant's true name accounts?

A. Yes.

Q. Did you find any indication that a particular web domain was hosted at this IP address?

A. Yes.

Q. Do you recall what that web domain was?

A. I believe it was Bloom Editor.

Q. Did Bloom Editor appear elsewhere in your review of the evidence in this case?

A. Yes.

Q. And do you recall who controlled the Bloom Editor domain. What individual started or registered the Bloom Editor domain?

MR. EKELAND: Objection; leading.

THE COURT: Overruled.

THE WITNESS: I don't remember what was in the domain registration record off the top of my head.

BY MS. PELKER:

Q. Could we pull up what was previously admitted as Government Exhibit 521A.

And, CS Mazars, can you note the name on this Namecheap record here?

A.    It says Roman Sterlingov.

Q.    If we could go to page 2 and zoom in on the top entry on this page here.  What domain is noted here as being registered for Mr. Sterlingov's Namecheap account or renewed for Mr. Sterlingov's Namecheap account?

A.    Bloomeditor.com.

Q.    Does that refresh your recollection of what individual?

A.    Yes.  I'm sorry.  Yes, it does.

Q.    So who registered the or renewed and controlled the bloomeditor.com domain?

A.    Roman Sterlingov.

Q.    Now, directing your attention to Exhibit 12, the Bitcoin user records.  If we could scroll to the bottom of page 5 for the defendant's Kellerman account.  And just scroll up so we can see the username and scroll up a bit more.  And, CS Mazars, can you read from Exhibit 12 what account this section relates to?

A.    Killdozer.

Q.    And scrolling down just slightly, what domain is shown in the signature line for the Killdozer account?

A.    Bloomeditor.com.

Q.    Can you underline that or point to it under the signature?

A.    (Complying).

Q.    Returning to Exhibit 364, staying on the tab for the .4 IP tied to the defendant's true name accounts.  Were you able to

determine anything about how this .4 IP address was used?

A. This appeared to be a Swedish residential or a business local IP address for a company called -- local meaning regional, not in the computer sense, for a company called Comhem.

Q. And were you able to determine whether this IP address was ever used as a Tor exit -- as a Tor node?

A. I believe it was a Tor node at some point.

Q. Directing your attention now back to Exhibit 363. Was IP address 23.254.53.11 one of the IP addresses that came up in your analysis?

A. Yes.

Q. Where did this IP address appear in the records?

A. Bitcoin Talk, the Killdozer account, the plasma@plasmadivision.com Liberty Reserve account and the Mt. Gox Plasma account.

Q. Turning now to the spreadsheet, the .11 tab. Does this document the occasion where the IP appeared repeatedly in the records?

A. Yes.

Q. Did you determine what IP controlled this address?

A. Like the previous one, Comhem, the Swedish ISP.

Q. Was this IP address used as a Tor node?

A. Yes, at some points it was.

Q. If we were looking at your Tor PowerPoint slides with that

Tor cloud in the middle, where would that -- this .11 IP address fall within the Tor network routing?

A. In the middle. So not one of the outer exit nodes that accessed the internet, but one of the internal only ones.

Q. And so what was the significance of someone running a Tor node during this time?

MR. EKELAND: Objection; leading.

THE COURT: Overruled.

THE WITNESS: This would indicate that someone using a residential or business network wanted to contribute to the Tor Project by letting Tor traffic pass through their computer, but didn't want it directly exposed to the internet.

BY MS. PELKER:

Q. And so if you are observing traffic that is coming out of this IP at that time is that likely to be Tor traffic exiting Tor?

A. No. Not various users' Tor traffic and even the user of the IP address would come out of a different one than their own based on how Tor works. So looking at this IP's traffic, it would be the regular, everyday traffic typically, not Tor traffic.

Q. Can you explain why that is in relation to being an exit node versus an internal node?

A. The network theoretically could be used for both at the same time. Even someone running a Tor relay, one of these

middle nodes, would still want to access the internet normally. So they -- they would, as they typically would, while a computer or server on the network is running the Tor relay.

Q. Now, going back to Exhibit 363. Was Exhibit -- was IP address 95.168.163.228 one of the IP addresses that came up in your analysis?

A. Yes.

Q. And where did this IP address appear in the records?

A. The Liberty Reserve Shormint account and the Mt. Gox Kolbasa account.

Q. And directing your attention to your spreadsheet. Going to our last tab. Can you explain what is shown here?

A. The access to Mt. Gox Kolbasa, there were a couple of them. The last one I saw was on 10/9/2011 at 15:12:17. Then the IP was used to access the Liberty Reserve Shormint account, the next day, 10/10/2011 at 2:02 p.m. And then again that same day, it was used to access the Mt. Gox Kolbasa account again at 14:04:30.

Q. What, if anything, was significant to you about the sequence and timing here?

A. Similar to a previous example we see some relatively close together log-ins to two of these exchange or currency-type websites. One, the second one, then back to one. And to me, this very much looked like the same user was checking different accounts.

Q.   In addition to your IP overlap analysis, was there another IP of note in the Shormint Liberty Reserve account?

A.   Yes.

Q.   Directing your attention to Exhibit 401 and going to history sheet.  Generally, what is shown here in this history sheet for the Shormint account?

A.   Activity records, which actions were taken from which IP and when.

Q.   Directing your attention to row 4.  Can you read the IP address that is noted in that row?

A.   95.109.103.113.

Q.   And did you review the Who is information for that IP address?

A.   Yes, I did.

Q.   Showing you Exhibit 367, which --

          THE COURT:  I'm sorry.  Is 401 in evidence yet?

          MS. PELKER:  Yes.

          THE COURT:  Okay.  All right.  I wanted to check that.

          MS. PELKER:  But this Exhibit 367 is not.

          THE COURT:  Okay.

          THE COURTROOM DEPUTY:  I'm sorry.  What number?

          MS. PELKER:  367.

BY MS. PELKER:

Q.   CS Mazars, what is shown here?

A.    A Who is record for the IP address 95.109.103.113.

Q.    And does this fairly and accurately depict the Who is information for that IP address?

A.    Yes.

         MS. PELKER:  Government moves to admit and publish Exhibit 367.

         THE COURT:  Any objection?

         MR. EKELAND:  No objection.

         THE COURT:  367 is admitted and may be published to the jury.

         (Whereupon, Exhibit No. 367 was admitted.)

BY MS. PELKER:

Q.    CS Mazars, what entity is listed as controlling this IP address used to access the Shormint Liberty Reserve account? We'll need to scroll down a bit.  And then keep scrolling down and back up for the abuse.

A.    The whole net block or what is being shown.

Q.    Wherever the IP address falls, what entity is the responsible for abuse contact for that IP?

A.    Oh, the entity falls within Riksnet, but the abuse contact was for Telia.

Q.    Could you explain what Telia is?

A.    A Swedish internet service provider similar to Comcast, for example.

Q.    And is there a point of contact given for the Riksnet

information on this Who is record the same way there was for the DOJ example we looked at?

A.   Yes, there is.

Q.   What is the city listed in this information as associated with this IP address?

A.   It says, Goteberg, Sweden.

MS. PELKER:  Your Honor, we are happy to keep going. This would be a fine time to --

THE COURT:  That is fine.  So why don't we take our morning break.  Now it is 10 minutes to 11:00.  And let's come back at 10 minutes after 11:00.  And I will remind you, don't discuss the case amongst yourself, no research of any kind relating to the case and I will see you back in 20 minutes.

(Jury out at 10:49 a.m.)

THE COURT:  All right.  And the witness can take her break as well.

Anything either party wants to raise before the break?

MS. PELKER:  Nothing from the government, Your Honor.

MR. EKELAND:  Nothing for the defense, Your Honor.

THE COURT:  All right.  I will see you back in 20 minutes.

(Recess taken at 10:50 a.m.)

THE COURT:  All right.  Ready to call the jury?

MS. PELKER: Yes, Your Honor.

THE COURT: Okay.

(Jury in at 11:18 a.m.)

THE COURT: All right. Welcome back, members of the jury.

And you may continue, Ms. Pelker.

MS. PELKER: Thank you, Your Honor.

BY MS. PELKER:

Q. CS Mazars, in addition to the IP analysis you just testified to, did your work on the Bitcoin Fog case include reviewing records related to the BitcoinFog.com clearnet site?

A. Yes.

Q. If we could pull up Exhibit 2 which has been previously admitted. This should be the archive post for Bitcoin Fog. Thank you.

CS Mazars, could you explain what this is?

A. This is an archive.org capture of the Bitcoin Fog clearnet portal website.

Q. Can you explain to the jury what is involved in setting up and managing a web page like this?

A. In this case, looking at custom build, you would need to know a little bit about web servers, how to build a webpage graphically with HTML and CSS.

Q. So in order to actually have visitors to be able to see this content when they type in BitcoinFog.com, what does the

administrator have to do first?

A.    Purchase and register a domain, the BitcoinFog.com domain.

Q.    Did you review content from Akemashite Omedetou describing the Bitcoin Fog service setup related to putting up the content tied to Bitcoin Fog?

A.    Yes.

Q.    And if we could go to page 2 here under, Why us.  Can we have you read from this one section at a time and explain to the jury some of the technical terms.

      Can you read the second from the second paragraph under why us, starting one block at a time with the service is run?

A.    "The service is run on a dedicated server manually configured for this very purpose, which does publically connected from the internet, not needed if using Tor."

Q.    Can you explain what that means?

A.    This is saying that the server wasn't automatically provisioned.  It was set up specifically for this site and it only ran this site.  And it is a regular website you could visit, not a .onion Tor service.

Q.    Can you read the next sentence?

A.    "Bitcoin daemon is run on another machine.  And all suspicious activity is monitored and the website shuts down automatically if it even senses it is under attack."

Q.    Could you explain the first part of that sentence, Bitcoin daemon is run on another machine?

A.    So this is saying they have the web server and then a different server, most likely, that are connected to talk to one another.  One is running the Bitcoin service, the daemon.  That handles whatever Bitcoin processing or transactions are happening.  That lives on one machine and that the website is on another machine.  And it alludes to some kind of monitoring whereas if it notices something, maybe too many connections or the wrong type of connections hitting the server, it claims to be able to automatically shut down to protect itself from that.

Q.    Can you read the last sentence in this paragraph?

A.    "It is manually monitored and checked on a daily basis."

Q.    Going now to the next paragraph.  Could you read starting with, for security purposes?

A.    "For security purposes, the service operates through the Tor network only.  You can be sure your data is processed securely and only by our server if you use our .onion address.  On the other hand, this also makes us feel more secure knowing that we will never be found and dealt with by proper authorities.  Even if Tor network would be compromised, we have taken all of the necessary precautions to still stay hidden.  This is better for you as well, while a freenet service may swear on not cooperating with authorities in case they show up at their homes, we can say with high certainty that not only will we not cooperate with any authorities, the authorities will not actually be able to show up at our doorstep because

finding a Tor doorstep has proven difficult."

Q. What is your understanding of what this means?

A. That even though the service could be visited, the -- through the internet, although not -- also through Tor, it is designed with protecting its own security and its own identity in mind. I understand the authorities to mean governments and law enforcement. And this paragraph is meant to make users feel more secure using this site and to reassure them that this site itself, the servers running it, are never going to be found.

Q. Going down now to page 3. Can you read this second paragraph here starting with, And once again?

A. "And once again, running through Tor makes it not likely for us to be shut down under pressure from the authorities. When in doubt about this, consider Silk Road."

Q. Had Silk Road been shut down at the point when this was posted?

A. No, not yet.

Q. So what is Akemashite Omedetou saying here about the benefit of running the site through Tor?

A. Anonymity, specifically Silk Road was the standard at the time for a darknet site where no one knew where it was. And he is comparing Bitcoin Fog to that.

Q. Did you also review Bitcoin Talk posts made by Akemashite Omedetou describing the Bitcoin Fog service?

A.    Yes.

Q.    If we could pull up Exhibit 1, the Bitcoin Talk thread. And go to post number 16.  16 should be the bottom of page 8.

Can you read the second paragraph of this post by Akemashite Omedetou from October 28th, 2011, starting with as for logs?

A.    "As for logs, based on my experience, with similar web applications, any website that says, 'We don't keep logs at all, not even for 1 second' are basically lying.  What if the server crashes in the middle of a transaction?  What if your server was down for hours yesterday and you don't know why? Et cetera, et cetera.  No good web master or programmer will have such a service running without any logs at all.  That is why our policy is to be open about this and make sure everything is deleted after one week by making this automatic. For any reasonable debugging purposes, a week of records will be more than enough.  And if users are very concerned, they could wait for a week before using the money on the new address knowing that now even we don't have any information about them, except what is recorded in the blockchain."

Q.    So what is your understanding of what Akemashite Omedetou is saying here?

A.    Since many anonymity focused services will advertise no logs, no logging, Akemashite Omedetou is pointing out that is not really doable or practical in real life.  He is saying to

keep any website like this running, you need to have the logs because the logs exist for debugging, figuring out what may have happened to your server and what connected to it if something went wrong. So he is essentially saying here, he is not going to lie about there being no logging. There are logs, so that he can keep the site running properly. But that he set them up to auto delete after a week.

Q. Going now to the next paragraph about the -- could you read about the 2 percent fee?

A. "For 2 percent, do you think we should charge more to lessen the blockchain bloating? Right now that value seems enough. As for having it free, we do indeed care for the future of Bitcoins and it feels good to be able to help the community and ourselves. But developing the solution, running the server, making changes, that all takes time and effort, which we think should be rewarded. Plus this makes sure the service will stay operational. No one shuts down a service that is making one money."

Q. What is Akemashite Omedetou saying here about the work required to run the Fog service?

A. That it is expensive. It is not free, it takes time which has value and it actually takes money.

Q. If we could go now to post number 35. Could you read from this post by Akemashite Omedetou in November 11th, 2011, the paragraph under the second quote box started with, this is an

unfortunate scenario?

A. "That is an unfortunate scenario you are describing. And, of course, it is possible. It is also possible that a lightning strikes our servers and all of the backup locations, which will be unfortunate as well. But to this point, we have been going into this with the intention to make the risks as low as possible. And we have outlined both here and on the BitcoinFog.com which steps we have taken."

Q. So what does this post indicate to you about Akemashite Omedetou's claims about the Fog backup servers?

A. That he is claiming that they will be sufficient, that he is not going to have a critical failure that results in everyone's money or Bitcoin being lost because he has some kind of fail over plan. And so he is saying that -- he is not claiming that it is impossible, since anything is possible. But that -- basically to reassure his users that it won't happen.

Q. Going now to page 20. And can we read under the first quote box starting with the Bitcoin D service?

A. "The Bitcoin D service is run on a different machine than the front end. They communicate by the means of a database. The database engine is not run on the same machine as the front end either. The front end does not have access to the private keys."

Q. Can you explain what this tells you about how Akemashite

Omedetou claims these Bitcoin Fog servers are configured?

A.  He claims there are multiple servers working together. One hosts the website that users can see.  One is running the Bitcoin service to handle transactions.  And one of the machines, but not the one that has the website on it, is storing the private keys.  He is also saying that database is separated where all of the information is retrieved from.  But he doesn't say which server it is on.

Q.  Can you read the next paragraph starting with, I might be able to answer?

A.  "I might be able to answer more specific questions, but I will not reveal much more about our exact configuration, because while it might be reassuring to you, it could also aid a hypothetical attacker.  And any attacker would love the owner of a server to describe how it is built and set up" with an emoji.

Q.  What is Akemashite Omedetou saying here?

A.  That it is not really smart for him to describe the entire layout and setup of his computer because -- of his website because it would be easier to attack.

Q.  Can you read the next two paragraphs underneath the quote box?

A.  "It does not actually have a public IP.  This is the reason we are running it through Tor."

Q.  And the next paragraph?

A. "For more information about Tor hidden services, please read up on their website."

Q. What is he emphasizing here about running fog through Tor?

A. He is saying that you only reach Bitcoin Fog at some point through Tor. Even if there is a clearnet way to get to it, all of the traffic goes through the Tor network. It does not have its own IP address that can accept clearnet requests from the internet.

Q. Can you read the next paragraph starting with, now even if?

A. "Now even if the Bitcoin Fog service would run through Tor, we could still be running other publically available services on that machine or even put the whole thing on a shared hosting, if we were douche bags, but luckily we are not" smiley face.

Q. What does he mean by that?

A. He is emphasizing that he is reinforcing the security of the site by having it on a dedicated server, not running any side projects on it.

Q. Can you read the next paragraph of both servers?

A. "Both servers are running secure OSes with proper settings, are updated regularly and are behind a NAT. We also did manual port scans on them even from within the NAT to check the security."

Q. What does Akemashite Omedetou mean by that?

A.   By OS, he means operating system.  He is saying that they are all up to date.  So there shouldn't be any known vulnerabilities, that he does all of the updates.  And that they all -- all of their traffic goes to a central IP using networked address translation.  Port scans is when you scan your server, essentially, for services running to make sure, for example, you didn't misconfigure it.

Q.   Could you now move to post number 107.  And can you read the first paragraph of this post by Akemashite Omedetou from November 23rd of 2013?

A.   "I have had a lot of server issues in the last couple of days, many new users have joined.  And a lot of infrastructure had to be updated.  We should have, of course, done this before the increase in usage not after.  But we are learning from our mistakes and continuing to innovate."

Q.   Can you explain what your understanding is of Akemashite Omedetou's post here?

A.   My understanding is that servers can only support so many users before they need to be upgraded and that his user base grew too quickly, so the server started struggling and needed to be upgraded.

Q.   Going now to post number 111 on the next page.

And could you read the first paragraph from this?  Actually, could you read the post here dated November 26th of 2013?

A. "One of the servers have completely crashed under the pressure today. And we have now finally could move everything to the backup server and are up and running. Since the servers have to be purchased and administered anonymously, this creates a lot of overhead time. We have used the log information to put update the latest full backup to the state just before the crash, so all the financial accounts should be in the consistent state."

Q. Can you explain what is -- what your understanding is of this post?

A. One of the servers went down because it got overloaded by the traffic. The backup data that he saved so that everyone didn't lose their money has gotten restored over. And he is explaining the amount of time it took by saying that registering infrastructure, so servers and domains anonymously takes time, because all of the information isn't real.

Q. If we can now go to the next page, post number 216. And can you read from this post on April 7th of 2014?

A. "The process is now complete. All systems returned to normal operation. Sorry for taking this long, but given the specifics of our service and the dangers we have to face, we have to take all of the necessary precautions and that takes time. Thank you all for your patience."

Q. And could you explain what your understanding is of this post?

A.    I understand the specifics of our service, meaning that it is a Bitcoin mixer.  And the dangers we have to face to mean law enforcement from different countries.  The post as a whole I understand to mean he has to be careful when setting up any part of it to avoid identification.

Q.    CS Mazars, did you review payments made from the Shormint Liberty Reserve account for various services?

A.    Yes.

Q.    If we could pull up Exhibit 401 for the Liberty Reserve and go to the transactions tab.  Can you explain what is shown in row 4 and row 9?

A.    Row 4 seems to record an invoice for highhosting.net and so does row 9.

Q.    And we'll talk about the High Hosting payments later.  But first I'd like to direct your attention to line 5.  What is the service there noted that the Shormint account is paying for?

A.    Account replenishment.

Q.    And what is the account noted in account C that is being paid?

A.    U5271070 Crypto VPN.

Q.    And what is Crypto VPN?

A.    A VPN service.

Q.    Is that the same Crypto VPN that we have -- that you referred to in your previous testimony?

A.    Yes, that is how I understand it.

Q. And directing your attention to line 6, what is the service noted there?

A. Pay to access SSC services, user ID 15025.

Q. And what is the account name that payment is being made to in the C column?

A. Super Socks.

Q. Are you familiar generally with Super Socks?

A. Yes, in general.

Q. What is it?

A. Super Socks, the same as SSC, was a paid proxy server service that was advertised on a number of forums.

Q. As part of your work on the Fog case, did you review additional records regarding the registration and maintenance of the BitcoinFog.com domain?

A. Yes.

Q. If we can take this exhibit down for now.

CS Mazars, can you explain what is a domain name?

A. A domain name is a website name you could type in to get to the website. It is the main part of it, as opposed to anything before the first dot, which might be a subdomain.

Q. So if you are talking about http://www.Google.com, how does that relate to a domain name?

A. Google.com is the domain name.

Q. How do you get a domain name?

A. You need to pay for it and in most cases and register it

through a service that owns large blocks of domains and leases them out. You essentially rent it for a period of time.

Q. What are some examples of companies that offer that sort of domain name registration?

A. Namecheap and GoDaddy.

Q. If we could pull up Exhibit 362, which is not yet in evidence.

CS Mazars, can you describe generally what is shown here in Exhibit 362?

A. This is a screenshot of a checkout cart for a GoDaddy domain purchase.

Q. Would this visual help the jury understand your testimony about domain name registration?

A. Yes.

MS. PELKER: Government moves to publish as a demonstrative Exhibit 362.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: The government may publish 362 as a demonstrative.

(Whereupon, Exhibit No. 362 was admitted.)

BY MS. PELKER:

Q. CS Mazars, can you explain what is shown here?

A. So right here the product is the domain FBI-test-domain-purchase.com. User is looking to lease it for

two years, renewing in September 2025.  It seems to be discounted right now.  It offers the option for full domain protection, essentially having digital security controls on top of it.  And over here is the summary so the user can check out.

Q.   And is this a typical process for someone who is registering a domain?

A.   Yes.

Q.   And from start to finish, on GoDaddy, how long would it take somebody to set up a domain like this?

A.   Maybe five minutes.

Q.   And does GoDaddy and other providers offer a variety of different payment methods?

A.   Yes.

Q.   And once a user registers the domain, how do they actually put up content that will appear when someone visits that website?

A.   Well, the domain name is just the name.  The actual website needs to live on a server or group of servers and then the site builder needs to point the domain name to the IP of where the site lives and they do that via DNS record.

Q.   Can you host the content with a company where you registered the domain like GoDaddy?

A.   Yes.  You can get them both from the same company.

Q.   If you wanted to, could you also host it yourself?

A.   Yes, you could.

Q. And if you wanted to do it that way, how would you go about getting space on a server somewhere?

A. Hosting it yourself as in --

Q. If you wanted to -- if you didn't want to use the company that you registered the domain for, how could you go about hosting it on a server somewhere else?

A. You would go to another company that is advertising online servers for lease and go through their process to rent it and you would again set up the records so that the domain name points to that website, whatever its IP is.

Q. And if you wanted to, could you host it on your computer at your house?

A. Yes, you could.

Q. Is it generally more or less common for someone if they want to have a website to host it on a server somewhere?

A. On a server, for sure.

Q. And where are these servers located?

A. They could be anywhere in the world.

Q. Can you explain to the jury what a server hosting facility or a data center generally would look like?

A. A big one around here is in Ashburn, Virginia where they have a data center that is just for servers for people all over the world.

Q. And is it basically like a big warehouse with lots of server racks and computers inside?

A.    Yeah.  Big warehouse, racks of servers, fans keeping it cool.

Q.    And does someone who is setting up the website have to actually go out to one of those warehouses in person?

A.    No.  They never have to see it in person.

Q.    So how are they able to access the server to set it up and run it?

A.    All online.

Q.    Now, can any company just start selling domain names?

A.    They could if they have a source of domain names.  There are resellers.  But you actually have to, as a company, have access to domain names in order to do that.

Q.    And are you familiar with an organization called ICANN? That is I-C-A-N-N.

A.    Yes, I am familiar with it.

Q.    Generally, what does ICANN do relevant to domain names?

A.    It manages and keeps track of all of the available domains there are and allocates them out.

Q.    Is one of ICANN's functions to accredit registrars that then can sell domain names?

A.    Yes.  That is right.  They need to be accredited.

Q.    And to be an accredited registrar -- first of all, can you explain what a registrar is?

A.    The registrar is the company that holds the domains and leases them out.

Q.   So is GoDaddy one example of an accredited registrar?

A.   Yes.

Q.   To be an accredited registrar, are there certain things a company has to do?

A.   Yes, I believe so.

Q.   Does that include maintaining Who is records for the different domains?

A.   Yes.

Q.   To remind the jury, does the Who is information for a domain necessarily reveal the true name or identity of the person behind the website?

A.   No.

Q.   So what is the purpose then of that Who is information?

A.   So that if any issue or need arises with the domain, it is clear which company or entity controls it so that any issues can be raised with them.

Q.   And do the Who is records accurately reflect whatever the information that the domain holder or the registrar put into the record?

A.   Yes.

Q.   If you know a website web address is there a way to determine where the domain was registered using the Who is process?

A.   Yes.  You can often see it in the Who is record.

Q.   And is this similar to the Who is look up that you

described for IP address?

A.   Yes, it is similar.

Q.   What information is included in a Who is lookup for a domain?

A.   Likewise, there would be addresses, phone numbers, and organization names --

Q.   Did you --

A.   -- and abuse contact.

Q.   Did you review the Who is records for Bitcoin Fog?

A.   For BitcoinFog.com, yes.

Q.   And showing you Exhibits 504A through E.  And, CS Mazars, what are these generally of the whole series?

A.   Who is records.

Q.   Are they Who is records for BitcoinFog.com?

A.   For BitcoinFog.com.

Q.   Are these fair and accurate depictions of the Who is records for Bitcoin Fog at the noted points in time?

A.   Yes.

        MS. PELKER:  Government moves to admit Exhibits 504A through E.

        THE COURT:  Any objection?

        MR. EKELAND:  No objection.

        THE COURT:  Exhibits 504A through E are admitted and may be published to the jury.

        (Whereupon, Exhibit No. 504A - 504E were admitted.)

BY MS. PELKER:

Q. Turning your attention to 504A. Can you explain what is shown here?

A. So in this Who is record, you can see that the domain BitcoinFog.com was registered by someone who input the information as their name being Akemashite Omedetou with shormint@hotmail.com being their provided email address. And they gave a Kyoto, Japan address and a telephone number.

Q. What was the date given when this entry was created?

A. October 25th, 2011.

Q. And scrolling down a bit. Were you also able to determine what company handled this initial registration, not simply from this record, but from your review of other records in the case?

A. Yes, it appears to be High Hosting.

Q. If we could pull up Exhibit 503. CS Mazars, do you recognize what is shown here on the screen?

A. Yes.

Q. What is this?

A. An archive.org capture of the HighHosting.net website.

Q. Is that as of October of 2011?

A. Yes.

Q. Does this fairly and accurately capture the archive.org of the High Hosting website as of that date?

A. Yes.

MS. PELKER: The government moves to admit and

publish 503.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  503 is admitted and may be published to the jury.

(Whereupon, Exhibit No. 503 was admitted.)

BY MS. PELKER:

Q.    Can you explain what is shown here on the screen?

A.    On the screen, you see High Hosting showing the different paid services they offer, including shared servers, dedicated virtual private servers and resellers.

Q.    What is shown in the bottom row of icons here?

A.    Icons of different payment methods.

Q.    Can you read the first there?

A.    Liberty Reserve, Web Money.

Q.    Can you read the last three on that list?

A.    PayPal, Visa, Mastercard.

Q.    And so is it your understanding that High Hosting would accept payment from all of these different payment methods from its service?

A.    Yes.

Q.    Did you review records from High Hosting pertaining to the domain registration of BitcoinFog.com?

A.    Yes.

Q.    Directing your attention to 502A.  Can you explain what is

shown here?

A.    An email from highhosting.net pertaining to an order.

Q.    And what is the date on this order?

A.    October 25th, 2011.

Q.    And what is the customer information given?

A.    Name, Akemashite Omedetou; email, shormint@hotmail.com.

Q.    And is this the registration record for BitcoinFog.com at High Hosting?

A.    Yes, it appears to be.

Q.    Can you explain what is shown under order items?

A.    These would be what the customer actually paid for.  It says, product/service, share hosting, mini hosting for domain BitcoinFog.com.

Q.    How much was that?

A.    Two dollars.

Q.    And how often would that be billed?

A.    Every month.

Q.    Can you explain what -- at a general level, what share hosting, mini hosting is?

A.    This would be the place where the website lived, not dedicated, shared with other customers.

Q.    And on the section below that, with the next block of text, can you walk through what is shown there?

A.    This is the order for actually registering the domain. Once again, the domain is BitcoinFog.com and the customer paid

$12, the domain with yearly payments of $12.

Q. And so what is the total amount for the order with the shared hosting for the month and the registration of BitcoinFog.com for the year?

A. Fourteen dollars.

Q. If you use one particular company to register a domain, is it possible to move it to a different company?

A. Yes, you can transfer them.

Q. Why might someone choose one registrar over another?

A. Price or satisfaction with the customer service.

Q. If we could pull up Exhibit 502H. Can you explain generally what is shown here? What is the subject line of this message?

A. Request for transfer of BitcoinFog.com.

Q. Can you explain what is happening in this record?

A. In this record, High Hosting is responding to or managing a request to transfer BitcoinFog.com to a different company that is a registrar.

Q. If we could pull up Exhibit 1, the Bitcoin Talk post and go to post number 70. Can you read this post from February 16th, 2012 by Akemashite Omedetou?

A. Yes. "After all of this time, we got the news today that the hoster is stopping delivering the kind of hosting we were using. And they tell us this after they have shut down the site without any warnings. Now we are just waiting on them to

gives domain transfer codes so we can get move the site to another company."

Q.   Can you explain what your understanding is of the meaning of Akemashite Omedetou's post here?

A.   The type of VPS, the type of server is no longer offered by the company, found out by the site being shut down. Therefore, it is transferring a domain to what appears to be BitcoinFog.com to a different company.

Q.   Did you review Who is information for the Bitcoin Fog domain from February of 2012?

A.   Yes.

Q.   If we could pull up Exhibit 504B, can you explain what is shown here?

A.   These are two Who is records for BitcoinFog.com taken at different times.

Q.   And can you just note on the screen where one record begins and where the other -- where one record ends and the other begins?

A.   On the left is the first record and on the right is the second record.

Q.   Can you walk the jury through what is shown here on the left-hand side, the entry for February 7th of 2012?

A.   The domain name is BitcoinFog.com.  The registrant is Akemashite Omedetou, shormint@hotmail.com, full address and a telephone number.  Creation date, 25 October 2011, with an

expiration the next year. And the domain services are listed as being highhosting.net servers.

Q. And now directing your attention over to the right, the February 22nd, 2012, did many of the fields stay the same?

A. Yes.

Q. Can you explain what has changed here?

A. In the domain servers listed order section instead of NS1.highhosting.net, we have NS1.mainnameserver.com.

Q. And what does this indicate to you here?

A. BitcoinFog.com used to be handled by highhosting.net named servers, now by mainnameserver.com. Likely, here this would indicate that the server company changed.

Q. Directing your attention back to Exhibit 1, the Bitcoin Talk thread. And going to the next post, the one right after the one we just read, so post 71. Can you read the first paragraph there?

A. "Problems with the freenet website are finally seem to be resolved. The extra time was due to the domain transfer. Also we are now on Bitcoin-hosting.com, which is good the Bitcoin economy" emoji.

Q. What is the date of this post here?

A. February 26, 2012.

Q. Did you review additional Who is records for BitcoinFog.com?

A. Yes.

Q. If we can pull up Exhibit 504D. And what is the date on this domain -- on this Who is record?

A. 10/25/2011.

Q. And can you read the first two lines at the top?

A. "Domain registered by orangewebsite.com, 100 percent anonymous domain registration service."

Q. Can you read the last line down at the bottom?

We have to scroll down.

A. "Register your domain name 100 percent anonymously at www.orangewebsite.com. We accept Bitcoin as payment method."

Q. What is Orange website?

A. It appears to be a domain registrar.

Q. If we could pull up Exhibit 506, which is not yet in evidence.

And, CS Mazars, do you recognize what is shown here?

A. Yes.

Q. What is this?

A. An archive.org capture of Orangewebsite.com in 2011, December 7th.

Q. Does this fairly and accurately reflect the capture of Orange website's site as depicted at the time?

A. Yes.

MS. PELKER: Government moves to admit and publish Government Exhibit 506.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: Exhibit 506 is admitted and may be published to the jury.

(Whereupon, Exhibit No. 506 was admitted.)

BY MS. PELKER:

Q. Can you explain just at a very high level what is shown here?

A. This is the main website for a company that offers, as I now recall, server hosting, different types of server hosting as well as domain names.

Q. And what is shown in the upper right-hand corner?

A. Bitcoin accepted here.

Q. And can we return our attention to Exhibit 504D. And what is now shown here in the registrant information? First can we actually scroll up to reorient.

This is the Who is record for Bitcoin Fog as of May 8th of 2012?

A. Yes.

Q. And what is now shown in the registrant contract information?

A. Fundacion private Who is with a very long or randomized or probably unique address dot private Who is .net and a Panama address.

Q. And are you familiar with domain privacy protection services?

A. Yes.

Q. Can you explain what those are?

A. They fill the domain registration with private anonymized information so that you don't need to put your own personal information in. That way, when you look at the Who is record, all you see is which privacy service registered the domain and not at all who it is.

Q. Did the Bitcoin Fog domain continue to be associated with Orange website for at least some period of time?

A. Yes.

Q. If we could pull up Exhibit 438. And directing your attention to the second and third rows and scrolling slowly to the right. What service is paid for here by shormint@hotmail.com?

A. I'm sorry. Which column? Merchant?

Q. The merchant name -- we can scroll all of the way to the left. And what is the user in column A that is doing the transactions in rows 2 and 3?

A. Shormint@hotmail.com.

Q. And now if we scroll over to the right for the merchant name, what is --

A. Orangewebsite.com Bitcoin hosting.

Q. And can we scroll so we can see the dates in column D. Scroll back to the left. It is very wide columns. What are the dates of these two different transactions?

A. 9/14/2014 and 10/12/2015.

Q. If we could now pull up Exhibits 811 and 814, which are in evidence. Directing your attention first to Exhibit 811. Can you explain what is shown here?

A. An invoice for domain registration renewal.

Q. What is the date on the invoice of the date it was actually paid?

A. Oh, that it was paid?

Q. Could you read the second sentence of the -- after dear customer.

A. Oh. "This is a payment receipt for invoice 30579 sent on 12 October 2015."

Q. And can you, looking at the next line below that, explain what service is being -- is being purchased here?

A. The domain for BitcoinFog.com with features called DNS management and email forwarding.

Q. And what is the date of -- that this domain renewal will be good through?

A. It will be good through 10/24/2021.

Q. Did you review an additional invoice confirmation also from October of 2015?

A. Yes.

Q. Directing your attention to Exhibit 814, is that what is shown here?

A. Yeah.

Q.    Is that a yes?

A.    Yes.  That was a yes.

Q.    Can you note the date of this invoice payment?

A.    12 October 2015.

Q.    So this is around the same time of the prior invoice that we just saw?

A.    Yes.

Q.    But what are the dates covered for this renewal?

A.    10/25/2021 through 10/24/2026, five year renewal.

Q.    So at this point in October of 2015, how long has Akemashite Omedetou renewed the Bitcoin Fog domain registration through?

A.    I'm sorry.  What -- this was in 2015, five years, I believe.  I don't remember the exact start date, but it was somewhere around five years.

Q.    What was -- so looking at the October 2015 renewals and the record in front of you, what is the end date now of the registration for the domain?

A.    In 2026.

Q.    Is that two five year renewals stacked?

A.    Yes, back to back.

Q.    Did you also review the Bitcoin Fog record from March 2020 shortly prior to the defendant's arrest?

A.    Yes.

Q.    If we could pull up 504E.  Is this the Who is record that

is shown here?

A. Yes, it is.

Q. If we could scroll to the top. What is the expiration date noted here?

A. 10/25/2026.

Q. Could you -- thank you.

And what does that expiration date indicate?

A. The date at which the registration needs to be renewed again.

Q. So if nothing else intervened with BitcoinFog.com it continued to stay active until 2026?

A. Yes.

Q. Would there also need to be payments for server hosting in that time for material to actually appear?

A. Yes. Both the website name would need to be paid for and the actual server hosting, the contents would need to be up too.

Q. And you have testified about registering a clearnet domain. Do you register a Tor hidden service the same way?

A. No, not the same way.

Q. And in as basic nontechnical terms as possible, how does someone get a Tor hidden service address?

A. The .onion addresses are mathematically generated in some way to represent exactly where on the Tor network they live.

Q. Is there any particular company that you have to go to to

get that long string of letters and numbers, .onion?

A. I believe the Tor Project.

Q. Do you actually register that address with a company or any other entity?

A. Oh, no.

Q. And can you tell just by looking at an address whether it is a Tor hidden service address rather than a regular website address?

A. Yes. Because it ends in .onion.

Q. How does someone who is managing a Tor hidden service manage the information that shows up when someone visits that .onion address?

A. Well, they also need to have a server running the website. It just is reachable by the .onion address. So you control it by changing what is hosted on the server itself.

Q. Does a visitor to a hidden services site access the page the same way a visitor to a regular website does?

A. It would be through the Tor browser. And you would have to know the URL of the page you are going to. It wouldn't show up -- in most cases, it wouldn't pop up in a search engine or something like that.

Q. If we could pull back up 361 and resume the slide show here. Are these next few slides a series of visual -- is this slide a visual explaining how a user would access a regular clearnet website?

A. Yes.

Q. And can you -- if a user types in a website like BitcoinFog.com, into a regular browser not Tor, does the computer immediately know how to reach the Bitcoin Fog server?

A. No. It needs to do that lookup first.

Q. So how does the user's computer figure out the IP address of whatever website here it is trying to talk to, here BitcoinFog.com?

A. It has to make a connection to a DNS server, a name server. It is also known to find out what the IP address is.

Q. So can you walk us through this slide of -- to explain how that process plays out?

A. Yes. The users in the bottom left with their 50.122 ending IP address, first the user types in BitcoinFog.com and the process that happens, the users don't have to do it manually is that name server is contacted. It already has records of where websites should currently resolve to. And this is at a very high level. And it responds with what the IP address they need is.

Q. And now what is the user able to do with that?

A. Now, the user can make the website request. The user can make the web request to BitcoinFog.com, because it knows where it is going.

Q. Does the user have to actually look at the message from the name server and then type in that IP address in their

browser?

A.    No, none of that is manual.

Q.    And then what happens after the user's request to BitcoinFog.com?

A.    BitcoinFog.com responds back to the user with the website.

Q.    And is this what is happening behind the scenes when I go home and sit down at my computer and go to Google.com?

A.    Yes.

Q.    And what if the website wants to move to a different IP address?

A.    The domain name server record would have to be updated. There would have to be a change in DNS record so that it knows where -- the internet essentially knows where to send it.

Q.    Is this the same way someone accesses a Tor hidden services?

A.    No.

Q.    Can you walk us through how that access will play out?

A.    Yes.  So this diagram shows a somewhat simplified version of how Tor hidden services and users reach each other through the network.  There are a few steps with authentication and some servers in front of the servers.  But generally speaking, this is how your traffic traverses the Tor network to get the hidden services.

Q.    So what is the first step?

A.    It identifies or picks one of the servers in the Tor

network to be what is known as the rendezvous point, which facilitates the overall connection.

Q. And is the rendezvous point as shown in the simplified diagram the server with the green arrow around it here?

A. Yes. It is highlighted in green.

Q. And what happens after that?

A. So after that, the user needs to form what is known as a Tor circuit, those three hops to the rendezvous point. And there is also a circuit between the hidden services site and the rendezvous point.

Q. And is that what is now mapped out in the dashed line in front of you?

A. Yes. This is the Tor determining what route it would take on both ends, the path to the rendezvous point.

Q. What is the purpose of the rendezvous point at a non-technical level?

A. Security essentially, to obscure from one side of the network where the other side is.

Q. And after the Tor network and the user have mapped out the circuit, what happens next?

A. The connection can be made. The user is going to request the hidden services address.

Q. And how is that connection routed?

A. It is going to go through the first circuit to the rendezvous point, which becomes the center point in the path.

And then it keeps moving through the second circuit too after another step or two, the -- in this case the .onion hidden service.

Q. Is the information from the .onion then relayed back to the user through the rendezvous point again?

A. Yes, back through the same connection.

Q. And is that what is shown here?

A. Yes.

Q. Is it possible for one site to use multiple .onion addresses?

Is it possible for one site to operate multiple .onion addresses that then while they are unique .onion addresses can point to the same server?

A. Yes, I believe so, although I have never tried to set it up like that, but I think that is possible.

Q. Can a service, if it wanted to, move to a new .onion address?

A. Yes.

Q. Can you explain what a Tor gate is?

A. In this context, a Tor gate appears to be a clearnet or non-Tor website server that users can visit and -- to view the Tor hidden services without having to go on Tor. So in this case, it is not my, the user's computer, running Tor, it is the server in between that runs it for you. And so what I understand Tor gate to mean is the website that I would have to

visit to get access to the -- basically this portal to the Tor hidden service. And I would just browse it from going through the website.

Q. Using the slide in front of you to explain the concept, can you explain how the traffic would be routed from a user, through the gate, through the Tor network to a .onion site?

A. The user would type gate.BitcoinFog.com into their browser. And then they would go to the -- that website and then from there, they would have the place where they could specify which hidden services by .onion they are trying to go to. And the request would then go through the Tor network through these circuits that were built to the hidden services and back.

Q. And what is the purpose -- what is the benefit of a Tor gate to the user?

A. So the user doesn't have to run Tor themselves.

Q. Does the gate functionality also -- is it easier to remember gate.BitcoinFog.com or foggeddriztrcar.onion?

A. I would say --

Q. The court reporter is not happy with me. I'm sorry.

Is it easier to remember a long string of letters and numbers .onion or gate.BitcoinFog.com?

MR. EKELAND: Objection, Your Honor. She is not an expert in memory or psychology.

THE COURT: I think we can move on.

BY MS. PELKER:

Q. Around December 2012, did Bitcoin Fog announce that it was adding a Tor gate?

A. Yes.

Q. Did you review announcements from December 2012, where Akemashite Omedetou or Bitcoin Fog announced the Tor gate?

A. Yes.

Q. Showing you Exhibit 26 from the Bitcoin Fog Twitter screenshots.

I believe this may not have been admitted.

Is this a fair and accurate reflection of the Bitcoin Fog Twitter tweets that you reviewed in conducting your review of Akemashite Omedetou's posts?

A. Yes.

MS. PELKER: Government moves to admit Exhibit 26, if it is not already in evidence.

THE COURT: Any objection?

MR. EKELAND: Objection; hearsay.

THE COURT: Exhibit 26 is admitted. It may be published to the jury. If there is any particular statement in there that is not subject to my prior rulings, you can let me know.

(Whereupon, Exhibit No. 26 was admitted.)

BY MS. PELKER:

Q. Can you read the third tweet from the bottom from December

2nd of 2012?

A.   "If the DNS is working for you, should soon, test out our new Tor gate at gate.BitcoinFog.com.  Experimental now, so keep your eyes open."

Q.   Now, going back to Exhibit 1, the Bitcoin talk thread on page 50.

Can you read the third paragraph from the bottom of this long post?  We may need to scroll down a little bit.  Starting with, "Now for some good news."

A.   "Now for some good news.  We have launched a Tor gate so the service can be accessed even without Tor. Https:\\gate.BitcoinFog.com."

Q.   Directing your attention now to Exhibit 9, which is not in evidence.  Do you recognize this?

A.   Yes.

Q.   If we could scroll in on the top for archive.org post. Thank you.

Can you explain what this is?

A.   It is an archive.org capture of gate.BitcoinFog.com from 2013/7/25.

Q.   Does this fairly and accurately reflect the information that was displayed on gate.BitcoinFog.com and captured by archive.org?

A.   Yes.

MS. PELKER:  Government moves to admit Exhibit 9.

THE COURT: Any objection?

MR. EKELAND: No objection, Your Honor.

THE COURT: Exhibit 9 is admitted and may be published to the jury.

(Whereupon, Exhibit No. 9 was admitted.)

BY MS. PELKER:

Q. If we can scroll back out. And, CS Mazars, can you explain what is shown here?

A. A log-in page for Bitcoin Fog company, the username and password field.

Q. And can you explain what website a user would have visited to be able to be shown this page?

A. Gate.BitcoinFog.com.

Q. So is this a way for a user to access Bitcoin Fog through BitcoinFog.com rather than going to .onion site?

A. Yes.

Q. Can you explain what is an SSL certificate again, in as basic terms as possible?

A. It is a piece of the method of encryption that lets you know that you are browsing sites safely, because it guarantees the site's authenticity.

Q. What is the benefit of having an SSL certificate?

A. If you have a https website, it will show if the -- you have a valid certificate. Websites really should have it. And users look to see if they are on the real website.

Q. Is there an indicator of a site having an SSL certificate that the jury might be familiar with?

A. Sometimes it is a little lock to the left of the URL.

Q. How if you are operating a website, how do you get an SSL certificate? Again, not on the technical side, just how a user would go about getting one?

A. You pay for one.

Q. Did you review records showing where Bitcoin Fog acquired and paid for the SSL certificate for gate.BitcoinFog.com?

A. Yes.

Q. Directing your attention to Exhibit 517L, from the Microtronix production. Can you explain what is shown here?

MS. PELKER: This should already be in evidence, I believe.

THE COURTROOM DEPUTY: Uh-huh.

THE WITNESS: It is an invoice for --

BY MS. PELKER:

Q. We can scroll down to the bottom to see what the invoice is for.

A. Specifically for an SSL certificate for gate.BitcoinFog.com.

Q. What is the date on the invoice?

A. January 12th, 2012.

Q. And scrolling back up to the top. What is the user account information given for the Microtronix purchase of the

SSL certificate?

A.   Under client information, first name, Akveduk; last name, Papademos; company name, Bitcoin Fog; email address, shormint@hotmail.com.

MS. PELKER:  And, Your Honor, we can either break now or we can go for -- we can go as long as you want.  We can go for another 15 minutes and break then.

THE COURT:  Why don't we go ahead and break now.  It is 12:30.  Let's come back at 1:30 and continue.  Please don't discuss the case, even amongst yourselves.  And don't do any type of research.  And make sure you steer clear of people involved in the case so you don't overhear anything inadvertently in the hallway.  Have a nice lunch.

THE COURTROOM DEPUTY:  What time to be back?

THE COURT:  1:30.

(Jury out at 12:28 p.m.)

THE COURT:  You can have your lunch as well.  Don't discuss the testimony with anybody until it is complete.

Just updating you all on juror availability issues.  There is one juror who has not yet previously cashed in her chit, but who needs to arrive a little bit late tomorrow and leave a little bit early for childcare purposes.  But I think she can be here probably by 9:15 certainly no later than 9:30 and needs to leave no later than 4:30 tomorrow.

More significantly and I guess I need to figure out

more about this is that Juror number 6, who has cashed in some chits and has been late repeatedly, says that on Monday, I think it is --

THE COURTROOM DEPUTY: Yes, Judge.

THE COURT: She needs to be in Baltimore by 4:30 and was suggesting we end the day at lunchtime so she can get to Baltimore. I don't know why she needs to be in Baltimore and what the circumstances are. But that obviously concerns me. There is another juror who has to be somewhere by 5:30. I don't think that is an issue because I think it is local, as far as I know.

Juror number 7, has a medical appointment on the 13th, which hopefully we will be in deliberations by then. I don't know for sure, but hopefully we will be in deliberations by then. I think we should think about it a little bit, because she is checking a little bit more, but it is a medical appointment procedure. And I don't know how long she will be out for it. But it could be an extended issue. And I think before we actually start deliberations, we might want to consider whether we should let her go or not, because it would be a shame halfway through deliberations to have somebody who disappears for it could be a week or something like that. She didn't really know exactly what the procedure was going to require.

And then there is -- I think this is less of an

issue.  There is a juror who has a business trip on the 15th of March.  It is a one-day trip.  And if we were still in deliberations on the 15th of March, I think we could probably take the day off for the business trip, if we had to.

And the deputy clerk reports to me that jurors 6 and 9 do continue to be chronically late, so that is the update. All right.  I will see you all after lunch.

(Recess taken at 12:31 p.m.)

102

C E R T I F I C A T E

I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.

Dated this 29th day of February, 2024.

_____
Sherry Lindsay, RPR
Official Court Reporter

Appx4682

**BY MS. PELKER: [30]** 5/3 6/11 10/24 16/6 27/3 32/15 33/17 34/22 37/19 38/12 39/12 40/16 43/22 45/3 46/13 46/20 48/6 50/21 53/13 55/24 56/12 58/8 71/22 77/1 78/7 84/5 95/1 95/24 97/6 98/17
**MR. BROWN: [1]** 4/4
**MR. EKELAND: [29]** 4/5 4/21 6/7 10/15 10/18 16/2 32/5 32/7 33/6 34/17 37/15 38/8 39/3 40/7 43/14 44/25 46/10 48/5 50/17 53/7 56/8 57/21 71/18 76/22 78/3 84/1 94/23 95/18 97/2
**MS. PELKER: [29]** 4/11 4/18 5/1 6/4 15/24 26/25 33/3 33/13 34/14 37/12 38/5 39/4 46/17 55/17 55/20 55/23 56/5 57/7 57/19 58/1 58/7 71/15 76/19 77/25 83/23 95/15 96/25 98/13 99/5
**THE COURT: [59]** 4/2 4/6 4/9 4/13 4/24 6/6 6/8 10/16 10/19 16/1 16/3 26/23 27/2 32/6 32/10 33/5 33/11 33/14 34/16 34/19 37/14 37/16 38/7 38/9 39/6 40/8 43/15 45/1 46/19 50/18 53/8 55/16 55/18 55/21 56/7 56/9 57/9 57/15 57/22 57/25 58/2 58/4 71/17 71/19 76/21 76/23 78/2 78/4 83/25 84/2 94/25 95/17 95/19 97/1 97/3 99/8 99/15 99/17 100/5
**THE COURTROOM DEPUTY: [5]** 4/14 55/22 98/15 99/14 100/4
**THE WITNESS: [8]** 10/20 32/11 39/7 40/9 43/16 50/19 53/9 98/16

## $

**$12 [2]** 80/1 80/1

## '

**'We [1]** 62/8

## .

**.11 [2]** 52/17 53/1
**.123 [4]** 36/11 36/18 39/2 40/2
**.13 [1]** 48/21
**.148 [1]** 47/15
**.171 [1]** 44/15
**.279 [1]** 20/17
**.4 [2]** 51/24 52/1
**.CryptoVPN.com [1]** 39/9
**.net [1]** 84/22
**.onion [19]** 18/10 27/18 59/19 60/16 88/23 89/1 89/9 89/12 89/14 93/2 93/4 93/9 93/11 93/12 93/16 94/6 94/10 94/22 97/15

## 1

**10 [3]** 29/24 57/10 57/11
**10/10/2011 [1]** 54/16
**10/12/2015 [1]** 86/1
**10/20 [1]** 49/3
**10/20/2011 [1]** 48/24
**10/24/2013 [1]** 45/24
**10/24/2021 [1]** 86/19
**10/24/2026 [1]** 87/9
**10/25/2011 [2]** 44/20 83/3
**10/25/2021 [1]** 87/9
**10/25/2026 [1]** 88/5
**10/8/2011 [1]** 47/18
**10/9/2011 [1]** 54/14
**100 percent [2]** 83/5 83/9
**10005 [1]** 2/4
**107 [1]** 67/8
**10:08:57 [1]** 42/18
**10:49 [1]** 57/14
**10:50 [1]** 57/24
**10:55:02 [1]** 42/7
**10:55:54 [1]** 42/18
**11 [1]** 47/18
**11/20/2011 [1]** 40/20

**11/24/2011 [2]** 41/3 41/7
**11/28 [1]** 43/7
**11/28/2011 [1]** 42/9
**11/29/2011 [1]** 43/7
**111 [1]** 67/22
**11:00 [2]** 57/10 57/11
**11:18 [1]** 58/3
**11:29:08 [1]** 45/23
**11:34 [1]** 41/9
**11th [1]** 63/24
**12 [8]** 22/21 22/22 22/25 23/1 51/12 51/16 86/12 87/4
**12/27/2012 [1]** 45/23
**123 [1]** 36/17
**12:14:30 [1]** 40/20
**12:14:56 [1]** 41/1
**12:17:51 [1]** 41/13
**12:27:15 [1]** 41/20
**12:28 [1]** 99/16
**12:30 [1]** 99/9
**12:31 [1]** 101/8
**12th [1]** 98/23
**1301 [1]** 1/20
**13:36:16 [1]** 47/21
**13:40:28 that [1]** 44/21
**13th [1]** 100/13
**149.101.1.115 [1]** 6/14
**14:04:30 [1]** 54/18
**14:51:21 [1]** 42/2
**15 [1]** 99/7
**15025 [1]** 70/3
**15:12:17 [1]** 54/14
**15th [2]** 101/1 101/3
**16 [3]** 3/8 62/3 62/3
**16th [1]** 80/21
**171 [1]** 44/11
**1:00 [1]** 30/19
**1:02:52 p.m [1]** 42/9
**1:26 [1]** 47/18
**1:30 [2]** 99/9 99/15

## 2

**2 percent [2]** 63/9 63/10
**20 [4]** 49/3 57/13 57/22 64/18
**20001 [1]** 2/9
**20005 [1]** 1/21
**2011 [19]** 40/2 40/20 41/3 41/7 42/9 43/7 44/20 47/18 48/24 54/14 54/16 62/5 63/24 77/10 77/20 79/4 81/25 83/3 83/18
**2011/10/29 [1]** 37/8
**2012 [12]** 27/5 45/23 80/21 81/10 81/22 82/4 82/22 84/17 95/2 95/5 96/1 98/23
**2013 [4]** 27/11 45/24 67/10 67/25
**2013/7/25 [1]** 96/20
**2014 [2]** 68/18 86/1
**2015 [7]** 86/1 86/12 86/21 87/4 87/10 87/13 87/16
**2020 [1]** 87/22
**2021 [2]** 86/19 87/9
**2024 [2]** 1/5 102/10
**2025 [1]** 72/1
**2026 [4]** 87/9 87/19 88/5 88/11
**20530 [2]** 1/14 1/17
**20th [1]** 27/11
**21-399 [2]** 1/4 4/14
**212.16.7.171 [1]** 44/9
**213.66.214.217 [1]** 45/14
**216 [1]** 68/17
**217 [1]** 45/21
**22nd [2]** 27/4 82/4
**23.254.53.11 [1]** 52/10
**23:58:43 [1]** 43/1
**23rd [1]** 67/10
**24th [1]** 41/17
**25 [2]** 81/25 96/20
**25:12 [1]** 41/3
**25th [2]** 77/10 79/4
**26 [7]** 3/13 41/9 82/22 95/8 95/15 95/19 95/23
**26th [1]** 67/24

**28 [2]** 1/5 43/7
**28th [1]** 62/5
**29 [2]** 37/8 42/7
**29th [1]** 102/10
**2:02 p.m [1]** 54/16
**2nd [1]** 96/1

## 3

**30 [1]** 2/3
**30579 [1]** 86/11
**33 [1]** 3/8
**333 [1]** 2/8
**34 [1]** 3/9
**35 [1]** 63/23
**361 [6]** 3/8 15/18 15/25 16/3 16/5 89/22
**362 [6]** 3/11 71/6 71/9 71/16 71/19 71/21
**363 [11]** 3/9 34/6 34/12 34/15 34/19 34/21 44/8 45/13 47/7 52/9 54/4
**363A [6]** 3/9 34/7 34/15 34/19 34/21 48/14
**364 [9]** 3/8 32/19 33/4 33/14 33/16 36/16 39/1 45/21 51/24
**366 [5]** 3/7 5/20 6/5 6/8 6/10
**367 [7]** 3/10 55/15 55/20 55/23 56/6 56/9 56/11
**37 [1]** 3/9
**38 [1]** 3/10
**399 [2]** 1/4 4/14
**3:00 p.m [1]** 30/20
**3rd [1]** 24/13

## 4

**401 [3]** 55/4 55/16 69/9
**438 [1]** 85/11
**4:30 [1]** 99/24
**4:30 and [1]** 100/5

## 5

**5.1527 [1]** 1/17
**50 [1]** 96/6
**50.122 [1]** 90/13
**502A [1]** 78/25
**502H [1]** 80/11
**503 [5]** 3/12 77/15 78/1 78/4 78/6
**504A [6]** 3/11 76/11 76/19 76/23 76/25 77/2
**504B [1]** 81/12
**504D [2]** 83/1 84/13
**504E [3]** 3/11 76/25 87/25
**506 [5]** 3/12 83/13 83/24 84/2 84/4
**507 [5]** 3/9 37/2 37/13 37/16 37/18
**507B [5]** 3/10 37/25 38/6 38/9 38/11
**517L [1]** 98/11
**521A [1]** 50/23
**54 [1]** 42/7
**56 [1]** 3/10
**5:30 [1]** 100/9

## 6

**601 [1]** 1/16
**61.19.252.148 [1]** 47/8
**64.79 [1]** 23/23
**6710 [1]** 2/8

## 7

**70 [1]** 80/20
**70.90.169.13 [1]** 48/15
**71 [2]** 3/11 82/15
**72.77.50.122 [1]** 18/20
**77 [1]** 3/11
**78 [2]** 3/12 26/22
**7:00 a.m [1]** 30/19
**7:04:34 [1]** 48/24
**7th [3]** 68/18 81/22 83/19

**8**

**811 [2]** 86/2 86/3
**814 [2]** 86/2 86/23
**83.248.132.4 [1]** 49/20
**84 [1]** 3/12
**8:39:16 [1]** 43/8
**8th [2]** 2/4 84/16

**9**

**9/14/2014 [1]** 86/1
**91 [1]** 27/9
**95 [1]** 3/13
**95.109.103.113 [2]** 55/11 56/1
**95.168.163.228 [1]** 54/5
**950 [1]** 1/14
**97 [1]** 3/13
**9:15 [1]** 99/23
**9:23 [2]** 1/6 4/8
**9:30 [1]** 99/23

**A**

**a.m [6]** 1/6 4/8 30/19 57/14 57/24
58/3
**able [22]** 12/4 21/3 29/9 29/13
36/20 43/23 46/1 47/22 48/1 49/5
51/25 52/6 58/24 60/9 60/25 63/13
65/10 65/11 74/6 77/11 90/20
97/12
**about [44]** 6/1 10/22 19/12 19/19
20/25 21/16 27/16 27/17 28/6
28/19 31/3 35/8 43/24 44/23 45/4
46/8 46/11 48/25 52/1 54/19 58/22
61/15 61/19 62/14 62/19 63/5 63/8
63/9 63/19 64/9 64/10 64/25 65/12
66/1 66/3 69/14 70/21 71/13 73/2
73/5 88/18 98/6 100/1 100/15
**above [1]** 102/5
**above-entitled [1]** 102/5
**absent [1]** 31/18
**abuse [6]** 7/1 24/24 56/16 56/19
56/20 76/8
**accept [3]** 66/7 78/19 83/10
**accepted [1]** 84/12
**access [33]** 17/24 18/3 19/13
19/14 23/3 27/18 28/25 29/4 31/23
32/2 41/7 41/11 41/19 41/21 42/3
42/19 43/9 44/11 49/1 54/1 54/13
54/15 54/17 56/14 64/23 70/3 74/6
74/12 89/16 89/24 91/17 94/1
97/14
**accessed [9]** 40/5 44/5 44/20
44/21 45/17 45/23 47/11 53/4
96/11
**accesses [22]** 29/1 40/17 41/4
41/16 42/6 42/13 43/2 43/12 43/17
43/24 44/19 44/24 45/5 45/6 46/7
46/14 47/19 48/3 48/11 48/23
49/13 91/14
**accessing [4]** 18/15 40/14 45/10
47/20
**account [96]** 22/14 28/10 35/3
35/5 35/9 35/11 35/12 35/13 35/14
35/16 35/18 35/19 35/22 36/1 36/3
39/17 40/10 40/11 40/20 40/24
40/24 40/25 40/25 41/1 41/2 41/5
41/8 41/12 41/17 41/21 41/25 42/3
42/4 42/10 42/11 42/12 42/13
42/14 42/19 42/23 42/25 43/3
43/10 43/18 43/18 43/19 43/19
43/20 44/13 44/20 44/22 45/10
45/11 45/18 45/19 45/22 45/25
46/14 47/12 47/13 47/15 47/17
47/20 48/19 48/20 48/23 49/1 49/3
49/15 49/24 49/25 50/1 50/3 50/3
51/4 51/5 51/14 51/16 51/20 52/14
52/15 52/16 54/9 54/10 54/15
54/17 55/2 55/6 56/14 69/7 69/16
69/17 69/18 69/18 70/4 98/25
**account's [1]** 35/5
**accounts [35]** 28/10 28/13 28/25
31/23 32/2 32/3 32/8 32/12 32/13

32/14 33/1 35/8 36/5 36/6 36/6
36/13 36/14 40/4 40/10 40/14
43/13 43/25 44/6 44/11 44/13
44/17 45/7 45/17 46/8 47/11 48/13
50/5 51/25 54/25 68/7
**accredit [1]** 74/19
**accredited [4]** 74/21 74/22 75/1
75/3
**accurate [5]** 7/8 36/8 37/9 76/16
95/11
**accurately [9]** 5/23 8/20 32/25
34/8 56/2 75/17 77/22 83/20 96/21
**acquired [1]** 98/8
**across [4]** 7/24 43/12 43/24 45/13
**Action [1]** 1/3
**actions [1]** 55/7
**active [1]** 88/11
**activity [12]** 13/6 19/11 20/25
24/24 26/14 28/23 42/14 43/21
44/6 47/15 55/7 59/22
**actual [4]** 8/5 33/7 72/17 88/16
**actually [19]** 9/12 22/22 33/9
58/24 60/25 63/22 65/23 67/24
72/14 74/4 74/11 79/11 79/24
84/15 86/7 88/14 89/3 90/24
100/19
**add [1]** 24/22
**added [2]** 14/19 22/3
**adding [1]** 95/3
**addition [2]** 55/1 58/9
**additional [6]** 14/16 24/22 25/22
70/13 82/23 86/20
**Additionally [1]** 50/2
**address [115]**
**addresses [20]** 6/20 9/6 27/23
28/12 32/13 33/24 35/1 35/4 45/14
46/25 47/3 48/15 49/20 52/10 54/5
76/5 88/23 93/10 93/12 93/12
**adds [1]** 14/16
**administered [1]** 68/4
**administrator [1]** 59/1
**admit [12]** 6/4 15/24 33/3 34/14
37/12 38/6 56/5 76/19 77/25 83/23
95/15 96/25
**admitted [31]** 6/8 6/10 16/3 16/5
33/14 33/16 34/19 34/20 34/21
37/16 37/18 38/1 38/6 38/9 38/11
50/22 56/9 56/11 58/14 71/21
76/23 76/25 78/4 78/6 84/2 84/4
95/10 95/19 95/23 97/3 97/5
**advertise [2]** 21/15 62/23
**advertised [1]** 70/11
**advertising [1]** 73/7
**after [16]** 40/22 47/19 57/11
62/15 63/7 67/14 80/22 80/24
82/14 86/9 91/3 92/6 92/7 92/19
93/1 101/7
**again [15]** 24/15 41/2 42/4 42/11
43/9 54/16 54/17 61/12 61/13 73/9
79/25 88/9 93/5 97/17 98/5
**against [2]** 24/25 28/8
**ahead [2]** 30/25 99/8
**aid [1]** 65/13
**Akemashite [28]** 26/18 27/5 27/10
27/17 32/14 36/7 59/3 61/19 61/24
62/5 62/21 62/24 63/19 63/24 64/9
64/25 65/17 66/25 67/9 67/16 77/6
79/6 80/21 81/4 81/24 87/11 95/6
95/13
**Akveduk [1]** 99/2
**Alden [1]** 4/18
**aliases [1]** 36/7
**all [63]** 4/2 4/6 4/9 4/24 7/24
7/25 12/19 12/21 13/4 14/18 14/23
15/2 15/3 17/11 21/12 23/19 23/24
25/15 25/22 26/24 27/2 28/2 31/18
31/20 32/10 33/8 33/24 40/12
40/20 55/18 57/15 57/22 57/25
58/4 59/21 60/20 62/9 62/13 63/15
64/4 65/7 66/5 67/2 67/3 67/4
67/4 68/7 68/16 68/19 68/22 68/23
73/22 74/8 74/17 74/22 78/19

80/22 85/6 85/7 85/16 99/19 101/7
101/7
**allocates [1]** 74/18
**allow [1]** 26/11
**allows [1]** 7/17
**alludes [1]** 60/6
**almost [2]** 28/21 47/8
**along [3]** 36/17 38/18 46/18
**already [5]** 20/4 39/4 90/16 95/16
98/13
**also [30]** 5/10 9/1 12/1 13/2 13/7
14/3 17/12 18/2 32/12 34/3 37/23
39/19 43/17 60/17 61/4 61/24 64/3
65/6 65/13 66/22 72/24 77/11
82/18 86/20 87/22 88/13 89/13
90/10 92/9 94/17
**alternative [1]** 16/22
**although [3]** 15/12 61/4 93/14
**always [4]** 12/8 18/10 28/20 28/21
**am [3]** 39/5 40/20 74/15
**AMERICA [2]** 1/3 4/15
**amongst [2]** 57/12 99/10
**amount [2]** 68/14 80/2
**analysis [12]** 10/4 28/15 42/8
45/15 46/22 47/9 48/16 49/21
52/11 54/6 55/1 58/9
**announce [1]** 95/2
**announced [1]** 95/6
**announcements [1]** 95/5
**anonymity [4]** 14/12 24/2 61/21
62/23
**anonymized [1]** 85/3
**anonymizing [1]** 18/13
**anonymous [3]** 21/16 32/3 83/6
**anonymously [3]** 68/4 68/15 83/9
**another [20]** 14/8 22/3 40/11
41/21 42/19 44/5 45/14 47/9 49/15
55/1 59/21 59/25 60/3 60/6 73/7
80/9 81/2 93/2 97/9 100/9
**answer [2]** 65/10 65/11
**answering [1]** 35/2
**any [37]** 6/6 16/1 18/13 22/17
24/16 29/1 33/5 34/16 37/14 38/7
50/7 56/7 57/12 60/24 62/8 62/13
62/16 62/19 63/1 65/14 66/18 67/2
69/4 71/17 74/9 75/14 75/15 76/21
78/2 80/25 83/25 88/25 89/4 95/17
95/20 97/1 99/10
**anybody [1]** 99/18
**Anyone [2]** 14/25 15/9
**anything [8]** 4/2 45/4 52/1 54/19
57/17 64/15 70/20 99/12
**anywhere [2]** 12/13 73/18
**apart [8]** 6/24 23/17 46/7 46/14
46/21 47/5 48/12 49/15
**apartment [2]** 22/7 22/8
**Apologies [1]** 33/22
**appear [9]** 35/2 36/12 48/18 49/23
50/12 52/13 54/8 72/15 88/14
**APPEARANCES [3]** 1/12 1/23 2/1
**appeared [11]** 35/5 41/2 42/24
44/15 44/24 46/5 47/19 47/24
48/25 52/2 52/18
**appears [8]** 20/17 24/15 37/7
77/14 79/9 81/7 83/12 93/20
**applications [1]** 62/8
**appointment [2]** 100/12 100/17
**approximately [1]** 41/14
**April [2]** 27/11 68/18
**April 20th [1]** 27/11
**April 7th [1]** 68/18
**archive [1]** 58/14
**archive.org [10]** 37/6 37/7 37/10
58/17 77/19 77/22 83/18 96/16
96/19 96/23
**archives [1]** 9/20
**are [114]**
**argumentative [1]** 32/7
**ARIN [1]** 7/5
**arises [1]** 75/14
**around [9]** 12/18 23/24 39/9 43/7
73/21 87/5 87/15 92/4 95/2

**A**

array [1]  13/24
arrest [1]  87/23
arrive [1]  99/21
arrow [2]  20/20 92/4
as [103]
Ashburn [1]  73/21
ask [2]  19/22 45/1
asking [1]  39/5
assess [3]  39/1 43/24 48/1
assessed [1]  44/4
assessment [3]  39/5 44/2 46/8
assign [1]  14/1
assist [2]  15/15 15/22
assistance [1]  34/7
assisted [1]  15/19
associated [2]  57/4 85/8
attack [2]  59/23 65/20
attacker [2]  65/14 65/14
attacks [2]  13/3 24/25
attempt [1]  19/14
attempted [1]  13/3
attempts [1]  13/4
attention [28]  17/19 18/17 19/25
  26/21 27/9 30/12 31/21 36/10 44/8
  44/14 45/12 51/12 52/9 54/11 55/4
  55/9 69/15 70/1 77/2 78/25 82/3
  82/13 84/13 85/12 86/3 86/23
  96/13 98/11
August [1]  27/4
August 22nd [1]  27/4
authentication [1]  91/20
authenticity [1]  97/21
authorities [6]  60/19 60/22 60/24
  60/24 61/6 61/14
auto [1]  63/7
automatic [1]  62/15
automatically [4]  11/9 59/16
  59/23 60/9
availability [1]  99/19
available [5]  13/7 25/15 48/9
  66/12 74/17
Ave [2]  1/14 1/20
Avenue [1]  2/8
avoid [1]  69/5
aware [1]  7/25
away [2]  27/19 30/3

**B**

back [38]  4/7 7/17 9/18 10/10
  11/25 19/9 20/21 20/23 21/5 22/12
  37/10 43/19 44/14 45/12 48/14
  48/21 52/9 54/4 54/23 56/16 57/11
  57/13 57/22 58/4 82/13 85/24
  87/21 87/21 89/22 91/5 93/4 93/6
  94/13 96/5 97/7 98/24 99/9 99/14
backup [5]  64/4 64/10 68/3 68/6
  68/12
bags [1]  66/14
Baltimore [3]  100/5 100/7 100/7
bandwidth [2]  13/7 13/13
Bankruptcy [1]  2/7
bar [1]  22/16
base [3]  5/15 5/19 67/19
based [3]  33/9 53/19 62/7
basic [4]  21/23 22/5 88/21 97/18
basically [4]  62/9 64/16 73/24
  94/1
basis [1]  60/11
be [129]
because [21]  10/21 12/20 19/12
  20/15 23/18 24/24 40/9 60/25 63/2
  64/13 65/13 65/19 65/20 68/11
  68/16 89/9 90/22 97/20 100/10
  100/16 100/20
become [1]  15/4
becomes [2]  10/20 92/25
been [11]  9/16 37/25 40/2 48/4
  48/8 49/10 58/13 61/16 64/6 95/10
  100/2
before [12]  1/9 4/2 7/1 26/23

42/12 57/17 62/18 67/13 67/19
  68/6 70/20 100/19
beginning [1]  23/23
begins [2]  81/17 81/18
behind [4]  31/3 66/22 75/11 91/6
being [17]  5/18 7/2 25/22 49/8
  51/3 53/22 56/17 63/5 64/13 69/18
  70/4 77/6 77/7 81/6 82/2 86/14
  86/14
believe [14]  36/24 37/25 39/18
  48/2 49/7 49/17 50/11 52/8 75/5
  87/14 89/2 93/14 95/10 98/14
below [2]  79/22 86/13
benefit [5]  23/24 24/2 61/20
  94/14 97/22
benefits [1]  13/14
best [1]  33/6
better [2]  20/20 60/21
between [5]  11/8 40/10 46/11 92/9
  93/24
big [3]  73/21 73/24 74/1
billed [1]  79/16
bit [18]  6/19 6/22 13/21 23/18
  27/16 29/8 34/23 35/12 38/14
  51/15 56/15 58/22 77/11 96/8
  99/21 99/22 100/15 100/16
Bitcoin [59]  26/21 27/17 31/22
  32/3 32/8 32/13 35/11 36/7 38/22
  45/18 45/23 49/25 51/12 52/14
  58/10 58/14 58/17 59/4 59/5 59/21
  59/24 60/3 60/4 61/23 61/24 61/25
  62/2 64/13 64/14 65/1 65/4 65/4
  66/4 66/11 69/2 76/9 76/17 80/19
  81/9 82/13 82/19 82/19 83/10
  84/12 84/16 85/8 85/22 87/11
  87/22 90/4 95/2 95/6 95/8 95/11
  96/5 97/9 97/14 98/8 99/3
Bitcoin-hosting.com [1]  82/19
BitcoinFog.com [30]  58/11 58/25
  59/2 64/8 70/14 76/14 76/14 76/15
  77/5 78/23 79/7 79/13 79/25 80/4
  80/14 80/17 81/8 81/14 81/23
  82/10 82/24 86/15 88/10 90/3 90/8
  90/14 90/22 91/4 91/5 97/15
Bitcoins [1]  63/13
Bitstamp [5]  35/9 35/9 45/18
  45/24 49/24
black [2]  25/3 26/9
bloating [1]  63/11
block [8]  5/15 6/19 6/19 24/23
  40/25 56/17 59/11 79/22
blockchain [2]  62/20 63/11
blocks [1]  71/1
Bloom [4]  50/11 50/12 50/15 50/16
bloomeditor.com [3]  51/6 51/10
  51/21
blue [1]  30/6
book [1]  9/5
both [12]  8/13 8/15 10/5 32/11
  49/16 53/24 64/7 66/20 66/21
  72/23 88/15 92/14
bottom [11]  36/17 38/17 38/18
  51/13 62/3 78/12 83/7 90/13 95/25
  96/7 98/18
bouncing [1]  23/24
box [4]  30/12 63/25 64/19 65/22
break [6]  57/10 57/16 57/18 99/5
  99/7 99/8
briefly [1]  30/16
BRODIE [1]  1/15
broken [1]  34/1
Brooklyn [1]  2/4
BROWN [2]  1/15 4/20
browse [1]  94/2
browser [17]  11/10 15/11 16/9
  16/10 16/11 16/17 16/19 16/23
  16/25 20/4 22/15 22/17 26/4 89/18
  90/3 91/1 94/8
browsers [1]  16/13
browsing [6]  13/22 22/3 26/13
  26/13 28/3 97/20
BT [2]  35/11 45/22

BTC [3]  35/10 35/11 49/24
BTC-e [2]  35/11 49/24
build [2]  58/21 58/22
builder [1]  72/19
built [2]  65/15 94/12
bunch [1]  49/4
business [11]  5/17 10/7 29/5
  39/24 46/25 47/3 49/8 52/2 53/10
  101/1 101/4
button [2]  22/15 26/15

**C**

call [4]  4/11 9/12 25/9 57/25
called [12]  9/2 14/11 14/13 14/22
  26/4 36/24 46/6 47/25 52/3 52/4
  74/13 86/15
came [11]  13/20 13/21 20/16 21/8
  42/8 45/15 47/9 48/15 49/21 52/10
  54/5
can [175]
can't [1]  14/17
Capitol [2]  25/11 31/10
CAPTCHAs [2]  24/21 24/22
capture [7]  37/7 58/17 77/19
  77/22 83/18 83/20 96/19
captured [4]  6/17 6/24 37/6 96/22
care [1]  63/12
careful [1]  69/4
cart [1]  71/10
case [30]  4/12 4/14 10/4 10/5
  10/14 19/10 20/2 24/11 28/9 28/19
  29/1 31/22 39/14 39/21 41/22
  42/20 49/9 49/13 50/13 57/12
  57/13 58/10 58/21 60/22 70/12
  77/13 93/2 93/23 99/10 99/12
cases [8]  13/16 19/24 28/16 29/18
  29/20 43/18 70/25 89/20
cashed [2]  99/20 100/1
CAT [1]  47/25
cataloged [1]  8/17
cataloging [1]  8/6
CATHERINE [1]  1/13
Ccips [1]  1/19
center [4]  19/16 73/20 73/22
  92/25
central [1]  67/4
centralized [1]  31/7
certain [7]  5/10 9/22 9/23 12/24
  17/2 29/10 75/3
certainly [1]  99/23
certainty [1]  60/23
certificate [8]  97/17 97/22 97/24
  98/1 98/5 98/9 98/20 99/1
certify [1]  102/3
cetera [2]  62/12 62/12
change [9]  7/11 8/5 47/1 47/2
  47/3 47/5 47/5 49/15 91/12
changed [2]  82/6 82/12
changes [2]  6/25 63/15
changing [1]  89/15
charge [1]  63/10
chart [12]  34/3 34/8 34/25 35/1
  36/5 36/16 44/9 44/10 45/12 47/7
  48/14 49/19
check [5]  7/5 29/10 55/18 66/23
  72/4
checked [1]  60/11
checking [3]  45/11 54/24 100/16
checkout [1]  71/10
checks [1]  8/1
childcare [1]  99/22
chit [1]  99/21
chits [1]  100/2
choose [2]  26/6 80/9
Chris [1]  4/19
CHRISTOPHER [1]  1/15
Chrome [1]  16/15
chronically [1]  101/6
circle [1]  26/8
circuit [6]  25/21 92/8 92/9 92/20
  92/24 93/1
circuits [1]  94/12

**C**

circumstances **[1]** 100/8
cities **[2]** 30/14 30/17
city **[4]** 30/9 30/10 30/15 57/4
claim **[1]** 21/16
claiming **[2]** 64/11 64/15
claims **[4]** 60/8 64/10 65/1 65/2
clear **[4]** 35/8 40/1 75/15 99/11
clearnet **[8]** 27/14 58/11 58/17
  66/5 66/7 88/18 89/25 93/20
clerk **[1]** 101/5
click **[2]** 22/15 23/3
clicking **[1]** 26/15
client **[1]** 99/2
close **[5]** 31/24 40/11 43/17 45/6
  54/21
closeness **[1]** 40/13
cloud **[2]** 22/21 53/1
co **[1]** 40/13
co-occurred **[1]** 40/13
code **[1]** 16/25
codes **[1]** 81/1
collected **[1]** 19/2
COLUMBIA **[1]** 1/1
column **[5]** 33/20 70/5 85/15 85/17
  85/23
columns **[2]** 35/4 85/24
combination **[1]** 28/3
Comcast **[4]** 19/20 19/22 49/9
  56/23
come **[12]** 4/7 9/18 11/10 11/25
  14/2 19/17 25/4 26/6 39/13 53/18
  57/10 99/9
comes **[2]** 7/20 29/15
Comhem **[2]** 52/5 52/22
coming **[7]** 18/16 18/25 25/2 26/17
  28/1 33/11 53/14
command **[5]** 15/13 17/2 17/5 17/22
  17/22
commands **[2]** 17/9 17/10
common **[4]** 16/16 21/21 29/1 73/14
communicate **[2]** 14/7 64/21
community **[1]** 63/14
companies **[11]** 7/16 7/18 7/22 8/5
  10/11 10/11 12/1 12/3 12/10 28/20
  71/3
company **[33]** 7/9 10/22 12/5 13/24
  21/2 29/17 36/24 47/22 47/25 52/3
  52/4 72/21 72/23 73/4 73/7 74/9
  74/11 74/24 75/4 75/15 77/12 80/6
  80/7 80/17 81/2 81/6 81/8 82/12
  84/8 88/25 89/3 97/9 99/3
compare **[3]** 8/16 28/8 28/21
compared **[1]** 30/17
comparing **[2]** 10/9 61/23
compilations **[1]** 8/24
compile **[2]** 7/19 32/16
compiled **[1]** 33/25
compiling **[2]** 15/15 15/20
complete **[2]** 68/19 99/18
completely **[4]** 21/16 26/17 27/20
  68/1
Complying **[3]** 38/23 38/25 51/23
compromised **[1]** 60/19
computer **[24]** 9/9 11/22 11/24
  12/8 15/5 16/11 17/1 17/7 17/8
  17/11 18/14 18/22 18/24 23/7
  23/11 52/4 53/12 54/3 65/19 73/11
  90/4 90/6 91/7 93/23
computer's **[1]** 15/2
computers **[9]** 9/6 9/17 11/16
  11/20 11/21 14/7 22/20 28/8 73/25
concept **[1]** 94/4
concerned **[1]** 62/17
concerns **[1]** 100/8
conclusion **[1]** 44/1
conditionally **[1]** 38/1
conducting **[1]** 95/12
configuration **[1]** 65/12
configure **[1]** 25/23
configured **[2]** 59/13 65/1

confirmation **[1]** 86/20
connect **[16]** 9/6 11/3 11/14 13/19
  13/25 14/1 16/12 18/22 20/3 20/6
  20/10 20/11 22/13 24/4 24/8 48/10
connected **[3]** 59/14 60/2 63/3
connecting **[3]** 12/19 18/20 24/16
connection **[18]** 10/8 13/20 15/12
  17/1 17/1 19/4 20/8 20/9 22/3
  22/16 24/11 26/15 27/20 90/9 92/2
  92/21 92/23 93/6
connections **[11]** 11/19 12/20
  12/21 13/1 17/3 21/19 23/5 24/10
  29/5 60/7 60/8
consider **[2]** 61/15 100/20
considered **[1]** 44/6
consistent **[1]** 68/8
consolidated **[1]** 26/5
constitutes **[1]** 102/4
Constitution **[1]** 2/8
consult **[1]** 9/9
contact **[6]** 5/11 7/2 56/19 56/20
  56/25 76/8
contacted **[1]** 90/16
contacts **[2]** 5/18 5/18
containing **[1]** 32/22
contains **[1]** 33/24
content **[5]** 58/25 59/3 59/4 72/15
  72/21
contents **[2]** 3/1 88/16
context **[2]** 14/1 93/20
continue **[7]** 4/25 27/2 43/5 58/6
  85/8 99/9 101/6
continued **[4]** 1/23 2/1 5/2 88/11
continuing **[2]** 45/13 67/15
contract **[1]** 84/19
contribute **[2]** 25/19 53/10
control **[4]** 13/21 26/5 27/7 89/14
controlled **[9]** 5/9 10/6 19/20
  36/21 46/1 47/23 50/15 51/9 52/21
controlling **[2]** 6/19 56/13
controls **[5]** 10/13 13/24 14/23
  72/3 75/15
convention **[1]** 31/18
conventions **[1]** 29/18
cool **[1]** 74/2
cooperate **[1]** 60/24
cooperating **[1]** 60/22
coordinated **[2]** 30/1 30/23
copy **[4]** 17/10 37/9 37/23 38/2
corner **[2]** 30/13 84/11
correct **[1]** 102/4
could **[93]** 5/20 6/22 11/16 11/18
  11/21 11/22 11/25 12/13 12/17
  13/11 15/4 15/7 16/24 20/20 21/10
  24/5 25/10 26/8 27/4 27/10 29/24
  29/24 32/19 32/20 34/6 34/23
  36/16 37/2 37/5 37/25 38/17 39/8
  39/8 40/1 44/9 44/10 46/24 47/14
  47/15 48/4 48/7 49/10 50/22 51/2
  51/13 53/24 56/22 58/13 58/16
  59/7 59/18 59/24 60/12 61/3 62/2
  62/18 63/8 63/23 63/23 65/13
  66/12 67/8 67/23 67/24 68/2 68/24
  69/9 70/18 71/6 72/24 72/25 73/5
  73/11 73/13 73/18 74/10 77/15
  80/11 80/19 81/12 83/13 85/11
  86/2 86/9 87/25 88/3 88/6 89/22
  94/9 96/16 100/18 100/22 101/3
counsel **[5]** 4/16 4/17 4/19 4/23
  46/10
counted **[1]** 42/16
countries **[1]** 69/3
country **[1]** 47/4
couple **[3]** 18/11 54/13 67/11
course **[2]** 64/3 67/13
court **[8]** 1/1 2/6 2/7 4/22 25/10
  94/20 102/3 102/13
Courts **[1]** 2/7
covered **[1]** 87/8
CPUs **[1]** 12/25
crash **[1]** 68/7
crashed **[1]** 68/1

crashes **[1]** 62/10
crawlers **[1]** 13/3
cray **[3]** 36/4 36/4 50/3
created **[1]** 77/9
creates **[1]** 68/4
Creation **[1]** 81/25
crime **[1]** 19/12
criminal **[3]** 1/3 4/14 27/22
critical **[1]** 64/12
CRM **[1]** 1/19
Crypto **[16]** 36/24 36/25 37/1 37/4
  38/2 38/15 38/20 39/2 39/10 39/13
  39/21 39/24 40/1 69/20 69/21
  69/23
CS **[27]** 5/4 5/21 6/12 16/7 27/4
  32/20 33/18 34/7 34/24 36/17 37/3
  38/1 38/13 50/24 51/15 55/25
  56/13 58/9 58/16 69/6 70/17 71/8
  71/23 76/11 77/15 83/15 97/7
CSS **[1]** 58/23
currency **[2]** 49/16 54/22
currency-type **[1]** 54/22
current **[3]** 9/14 10/9 30/14
currently **[2]** 26/16 90/17
custom **[1]** 58/21
customer **[5]** 79/5 79/11 79/25
  80/10 86/10
customers **[3]** 21/13 21/17 79/21
cut **[1]** 24/24
cybersecurity **[4]** 8/9 8/23 9/25
  25/13

**D**

daemon **[3]** 59/21 59/25 60/3
daily **[1]** 60/11
dangers **[2]** 68/21 69/2
darknet **[1]** 61/22
dashed **[1]** 92/11
data **[9]** 13/18 14/15 28/20 32/12
  32/23 60/15 68/12 73/20 73/22
database **[6]** 5/8 7/16 8/14 64/21
  64/22 65/6
databases **[2]** 7/24 9/15
date **[26]** 6/16 6/24 7/15 19/15
  25/4 29/10 31/9 37/6 37/10 67/2
  77/9 77/23 79/3 81/25 82/21 83/1
  86/6 86/6 86/17 87/3 87/14 87/17
  88/4 88/7 88/8 98/22
dated **[2]** 67/24 102/10
dates **[4]** 32/23 85/23 85/25 87/8
day **[23]** 12/15 28/4 28/4 41/4
  41/13 41/22 42/4 42/20 42/23
  42/24 43/6 43/7 43/7 43/11 47/20
  48/12 48/25 54/16 54/17 100/6
  101/2 101/4 102/10
days **[2]** 42/9 67/12
DC **[6]** 1/5 1/14 1/17 1/21 2/9
  30/19
de **[1]** 3/3
dealt **[1]** 60/18
dear **[1]** 86/9
debugging **[2]** 62/16 63/2
December **[4]** 83/19 95/2 95/5
  95/25
December 2012 **[2]** 95/2 95/5
December 7th **[1]** 83/19
decode **[1]** 14/17
decrypt **[1]** 14/17
decrypted **[1]** 14/20
dedicated **[4]** 59/12 66/18 78/10
  79/21
defendant **[3]** 1/7 2/2 4/22
defendant's **[8]** 32/2 32/12 36/6
  39/19 50/4 51/14 51/25 87/23
defense **[1]** 57/21
delete **[1]** 63/7
deleted **[1]** 62/15
deliberations **[5]** 100/13 100/14
  100/19 100/21 101/3
delivering **[1]** 80/23
demonstration **[1]** 17/21
demonstrative **[6]** 6/5 6/9 15/25

**D**

demonstrative... [3]   16/4 71/16
71/20
DEPARTMENT [3]   1/13 5/24 6/21
depending [2]   21/2 47/4
depends [1]   25/22
depict [2]   5/23 56/2
depicted [1]   83/21
depictions [1]   76/16
Dept [1]   1/20
deputy [1]   101/5
describe [5]   28/2 32/20 65/15
65/18 71/8
described [2]   12/6 76/1
describes [1]   38/16
describing [3]   59/3 61/25 64/2
designed [1]   61/5
desk [1]   17/7
detail [1]   44/5
determine [14]   7/14 19/19 19/20
21/8 29/13 31/12 46/1 47/22 49/5
52/1 52/6 52/21 75/22 77/11
determined [1]   29/6
determining [1]   92/13
developing [1]   63/14
diagram [3]   24/7 91/18 92/4
dictate [1]   12/17
did [52]   15/7 15/15 26/18 28/9
28/12 28/14 29/1 31/22 32/1 32/16
34/3 35/2 36/12 37/23 39/1 39/13
39/16 41/10 43/2 43/5 43/9 43/16
44/18 45/8 46/21 48/18 49/23 50/7
50/12 52/13 52/21 54/8 55/12
55/14 58/10 59/3 61/24 66/23 69/6
70/12 76/7 76/9 78/22 81/9 82/4
82/23 85/8 86/20 87/22 95/2 95/5
98/8
didn't [6]   16/22 53/12 67/7 68/13
73/4 100/23
difference [2]   30/16 41/14
differences [1]   31/7
different [33]   9/21 13/1 13/25
14/25 18/9 21/19 24/3 25/4 25/24
25/25 26/17 27/14 28/20 43/12
43/25 45/7 53/18 54/24 60/2 64/20
69/3 72/12 75/7 78/9 78/13 78/19
80/7 80/17 81/8 81/15 84/9 85/25
91/9
difficult [1]   61/1
digital [1]   72/3
direct [4]   3/4 5/2 7/22 69/15
directing [22]   17/19 18/17 19/25
26/21 27/9 30/12 36/10 45/12
51/12 52/9 54/11 55/4 55/9 70/1
78/25 82/3 82/13 85/11 86/3 86/23
96/13 98/11
directly [2]   17/11 53/12
directories [1]   9/24
directs [1]   14/10
disappears [1]   100/22
discounted [1]   72/2
discuss [3]   57/12 99/10 99/18
discussing [1]   5/6
display [1]   34/3
displayed [1]   96/22
distinction [1]   25/18
DISTRICT [4]   1/1 1/1 1/10 2/7
DNS [17]   9/2 9/4 9/9 9/13 9/14
9/16 9/16 9/21 9/24 10/3 19/17
39/7 72/20 86/15 90/9 91/12 96/2
do [50]   4/11 7/21 8/5 8/11 8/23
9/1 10/3 12/3 12/10 16/17 16/19
18/5 19/15 19/21 19/22 21/12
21/15 24/21 24/22 25/2 26/12
26/23 28/16 29/21 31/11 47/3
50/10 50/15 59/1 63/10 63/12
70/24 72/14 72/20 73/1 74/12
74/16 75/4 75/17 77/15 83/15
88/19 89/3 90/5 90/15 90/20 96/14
98/4 99/10 101/6
doable [1]   62/25

document [1]   52/18
does [53]   5/23 7/5 7/21 8/13 9/8
11/3 13/6 15/10 16/25 18/7 20/21
20/21 24/19 27/22 30/10 32/25
34/8 34/10 36/17 44/15 51/7 51/8
52/17 56/2 58/25 59/13 64/9 64/23
65/23 66/6 66/16 66/25 67/3 69/13
70/22 72/11 74/3 74/16 75/6 75/9
77/22 82/9 83/20 88/7 88/21 89/10
89/16 89/17 90/3 90/6 90/24 94/17
96/21
doesn't [2]   65/8 94/16
doing [5]   8/13 9/16 26/13 26/14
85/17
DOJ [4]   1/16 1/19 5/24 57/2
DOJ-CRM [1]   1/19
DOJ-USAO [1]   1/16
dollars [2]   79/15 80/5
domain [74]   7/2 9/5 29/15 50/7
50/10 50/15 50/16 50/20 51/3
51/10 51/19 59/2 59/2 70/14 70/17
70/18 70/22 70/23 70/24 71/4
71/11 71/13 71/24 71/25 72/2 72/6
72/9 72/14 72/17 72/19 72/22 73/5
73/9 74/9 74/10 74/12 74/16 74/20
75/10 75/14 75/18 75/22 76/4 77/4
78/23 79/12 79/24 79/25 80/1 80/6
81/1 81/7 81/10 81/23 82/1 82/7
82/18 83/2 83/5 83/6 83/9 83/12
84/10 84/24 85/3 85/6 85/8 86/5
86/15 86/17 87/11 87/18 88/19
91/11
domains [10]   5/11 5/12 7/25 9/22
39/9 68/15 71/1 74/17 74/24 75/7
DomainTools [6]   7/20 7/21 8/14
8/17 8/19 9/1
don't [21]   13/19 40/23 47/1 50/19
57/9 57/11 62/8 62/11 62/19 85/4
87/14 90/15 99/8 99/9 99/10 99/12
99/17 100/7 100/10 100/14 100/17
done [1]   67/13
door [2]   12/22 22/8
doorstep [2]   60/25 61/1
dot [3]   29/16 70/20 84/22
doubt [1]   61/15
douche [1]   66/14
down [26]   6/18 6/22 18/13 24/24
35/7 38/17 51/19 56/15 56/15
59/22 60/9 61/11 61/14 61/16
62/11 63/17 68/11 70/16 77/11
80/24 81/6 83/7 83/8 91/7 96/8
98/18
download [3]   15/11 16/18 16/19
downloads [1]   13/12
downsides [2]   13/17 24/16
draw [1]   20/20
due [1]   82/18
during [1]   53/6

**E**

E-X-O-N-E-R-A [1]   25/11
each [7]   9/6 11/21 14/15 24/3
30/15 40/23 91/19
earlier [1]   29/8
early [1]   99/22
easier [3]   65/20 94/17 94/21
easy [1]   16/11
economy [1]   82/20
Edge [1]   16/15
Editor [4]   50/11 50/12 50/15
50/16
effort [1]   63/15
either [4]   40/14 57/17 64/23 99/5
EKELAND [3]   2/2 2/3 4/21
else [3]   10/8 73/6 88/10
elsewhere [2]   39/13 50/12
email [12]   7/4 35/10 35/15 35/16
35/17 35/24 36/2 77/7 79/2 79/6
86/16 99/3
emoji [2]   65/16 82/20
emphasizing [2]   66/3 66/17
encouraging [1]   26/18

encrypted [2]   13/19 21/25
encryption [3]   14/15 14/19 97/19
end [7]   12/22 18/10 64/21 64/23
64/23 87/17 100/6
ending [2]   36/11 90/14
endless [1]   24/21
ends [5]   26/15 31/10 81/17 89/9
92/14
enforcement [9]   10/13 11/3 19/11
20/24 21/3 27/23 28/5 61/7 69/3
engine [2]   64/22 89/20
English [1]   37/21
enough [3]   12/25 62/17 63/12
entered [1]   7/9
entire [3]   5/15 25/15 65/18
entities [1]   5/9
entitled [1]   102/5
entity [5]   56/13 56/18 56/20
75/15 89/4
entity's [1]   5/16
entry [4]   5/23 51/2 77/9 81/22
especially [2]   13/12 28/1
essentially [9]   16/24 25/3 27/20
63/4 67/6 71/2 72/3 91/13 92/17
et [2]   62/12 62/12
Et cetera [1]   62/12
even [22]   13/18 18/10 24/23 27/22
40/5 46/21 48/3 49/13 53/17 53/25
59/23 60/19 61/3 62/9 62/19 66/5
66/9 66/11 66/13 66/23 96/11
99/10
events [3]   10/9 33/1 43/2
ever [1]   52/7
every [2]   28/19 79/17
everyday [1]   53/20
everyone [2]   28/3 68/12
everyone's [1]   64/13
everything [3]   30/6 62/15 68/2
evidence [15]   5/20 15/18 31/21
32/20 33/7 37/3 39/14 50/13 55/16
71/7 83/14 86/7 95/16 96/14 98/13
exact [2]   65/12 87/14
exactly [3]   22/10 88/24 100/23
examination [2]   3/4 5/2
example [21]   9/19 10/21 10/23
11/12 11/15 11/23 12/5 13/10
18/18 18/19 22/7 23/21 24/4 25/20
28/2 47/2 54/21 56/24 57/2 67/7
75/1
examples [2]   26/18 71/3
Excel [1]   32/22
except [1]   62/20
exchange [1]   54/22
exhibit [86]   3/7 3/8 3/8 3/9 3/10
3/10 3/11 3/12 3/12 3/13 3/13
5/20 6/5 6/8 6/10 15/18 15/25
16/3 16/5 26/21 32/19 32/25 33/4
33/11 33/14 33/16 34/6 34/19
34/21 36/16 37/2 37/13 37/18
38/11 39/1 44/8 45/13 45/21 47/7
48/14 50/23 51/12 51/16 51/24
52/9 54/4 54/4 55/4 55/15 55/20
56/6 56/11 58/13 62/2 69/9 70/16
71/6 71/9 71/16 71/21 76/25 77/15
78/6 80/11 80/19 81/12 82/13 83/1
83/13 83/24 84/2 84/4 84/13 85/11
86/3 86/23 95/8 95/15 95/19 95/23
96/5 96/13 96/25 97/3 97/5 98/11
Exhibit 12 [2]   51/12 51/16
Exhibit 2 [1]   58/13
Exhibit 26 [3]   95/8 95/15 95/19
Exhibit 361 [3]   15/18 15/25 16/3
Exhibit 362 [3]   71/6 71/9 71/16
Exhibit 363 [7]   34/6 34/19 44/8
45/13 47/7 52/9 54/4
Exhibit 363A [1]   48/14
Exhibit 364 [5]   32/19 33/4 39/1
45/21 51/24
Exhibit 366 [3]   5/20 6/5 6/8
Exhibit 367 [3]   55/15 55/20 56/6
Exhibit 401 [2]   55/4 69/9
Exhibit 438 [1]   85/11

## E

**Exhibit 502H [1]** 80/11
**Exhibit 503 [1]** 77/15
**Exhibit 504B [1]** 81/12
**Exhibit 504D [2]** 83/1 84/13
**Exhibit 506 [2]** 83/13 84/2
**Exhibit 507 [1]** 37/2
**Exhibit 517L [1]** 98/11
**Exhibit 521A [1]** 50/23
**Exhibit 811 [1]** 86/3
**Exhibit 814 [1]** 86/23
**Exhibit 9 [3]** 96/13 96/25 97/3
**EXHIBITS [7]** 3/6 3/9 3/11 76/11
76/19 76/23 86/2
**exist [1]** 63/2
**existed [1]** 8/21
**exit [18]** 12/8 14/11 23/15 23/16
23/17 23/19 23/23 24/13 24/15
25/6 25/7 25/16 25/22 25/24 29/12
52/7 53/3 53/22
**exiting [1]** 53/15
**ExoneraTor [2]** 25/9 29/10
**expensive [2]** 13/16 63/21
**experience [1]** 62/7
**Experimental [1]** 96/3
**expert [1]** 94/24
**expiration [3]** 82/1 88/3 88/7
**explain [64]** 6/12 6/22 9/4 11/7
13/10 15/16 17/5 17/20 18/12
21/23 22/5 22/19 24/6 25/18 26/3
29/25 30/16 33/18 34/24 38/13
44/10 45/21 46/24 48/22 53/22
54/12 56/22 58/16 58/19 59/8
59/15 59/24 64/25 67/16 68/9
68/24 69/10 70/17 71/23 73/19
74/23 77/2 78/8 78/25 79/10 79/18
80/11 80/15 81/3 81/12 82/6 84/6
85/2 86/4 86/13 90/11 93/19 94/4
94/5 96/18 97/8 97/11 97/17 98/12
**explained [1]** 44/4
**explaining [2]** 68/14 89/24
**explicitly [1]** 31/13
**Explorer [1]** 16/15
**exposed [1]** 53/12
**extended [1]** 100/18
**extent [1]** 38/6
**extra [1]** 82/18
**extremely [1]** 45/6
**eyes [1]** 96/4

## F

**face [3]** 66/15 68/21 69/2
**facilitates [1]** 92/2
**facility [1]** 73/19
**factor [1]** 46/22
**fail [1]** 64/14
**failure [1]** 64/12
**fair [3]** 37/9 76/16 95/11
**fairly [4]** 56/2 77/22 83/20 96/21
**fall [1]** 53/2
**falls [3]** 6/20 56/18 56/20
**familiar [6]** 16/14 70/7 74/13
74/15 84/24 98/2
**fans [1]** 74/1
**far [4]** 11/19 30/3 33/20 100/11
**farther [1]** 46/21
**favorite [1]** 28/3
**FBI [1]** 71/25
**FBI-test-domain-purchase.com [1]**
71/25
**feature [2]** 26/4 26/8
**features [1]** 86/15
**February [7]** 1/5 80/21 81/10
81/22 82/4 82/22 102/10
**February 16th [1]** 80/21
**February 22nd [1]** 82/4
**February 26 [1]** 82/22
**February 7th [1]** 81/22
**fee [1]** 63/9
**feel [2]** 60/17 61/8
**feels [1]** 63/13

**few [4]** 47/19 48/12 89/23 91/20
**field [1]** 97/10
**fields [1]** 82/4
**figure [2]** 90/6 99/25
**figured [1]** 29/20
**figuring [3]** 19/12 20/25 63/2
**file [3]** 33/20 33/21 35/3
**files [2]** 32/23 35/3
**fill [1]** 85/3
**finally [3]** 36/3 68/2 82/17
**financial [1]** 68/7
**find [5]** 28/8 28/22 36/20 50/7
90/10
**finding [1]** 61/1
**findings [3]** 34/4 34/9 36/18
**fine [2]** 57/8 57/9
**finish [1]** 72/8
**Firefox [1]** 16/15
**first [39]** 11/24 12/6 12/10 20/6
20/9 21/5 21/7 23/7 24/8 24/12
31/13 33/25 36/11 40/9 40/19
42/24 43/19 43/19 47/17 48/23
59/1 59/24 64/18 67/9 67/23 69/15
70/20 74/22 78/14 81/19 82/15
83/4 84/14 86/3 90/5 90/14 91/24
92/24 99/2
**five [5]** 72/10 87/9 87/13 87/15
87/20
**fixing [1]** 17/7
**flagged [1]** 40/12
**Floor [1]** 2/4
**focused [1]** 62/23
**fog [36]** 27/17 31/22 32/3 32/8
32/13 36/8 58/10 58/14 58/17 59/4
59/5 61/23 61/25 63/20 64/10 65/1
66/3 66/4 66/11 70/12 76/9 76/17
81/9 84/16 85/8 87/11 87/22 90/4
95/2 95/6 95/8 95/11 97/9 97/14
98/8 99/3
**foggeddriztrcar.onion [1]** 94/18
**following [1]** 34/2
**foregoing [1]** 102/4
**form [1]** 92/7
**formats [1]** 18/9
**forums [1]** 70/11
**forwarding [1]** 86/16
**found [7]** 8/19 32/4 32/11 32/23
60/18 61/10 81/6
**foundation [1]** 32/9
**Fourteen [1]** 80/5
**fraud [1]** 7/3
**free [3]** 17/16 63/12 63/21
**freely [1]** 25/5
**freenet [2]** 60/21 82/17
**frequently [1]** 8/11
**fresh [1]** 26/15
**friend's [2]** 9/10 22/7
**front [9]** 5/21 17/19 64/21 64/22
64/23 87/17 91/21 92/12 94/4
**full [4]** 31/8 68/6 72/2 81/24
**function [2]** 26/19 27/13
**functionality [1]** 94/17
**functionally [1]** 31/6
**functions [1]** 74/19
**Fundacion [1]** 84/21
**funnel [1]** 11/13
**further [3]** 22/9 46/7 46/14
**future [1]** 63/13

## G

**gate [12]** 27/14 27/16 93/19 93/20
93/25 94/6 94/15 94/17 95/3 95/6
96/3 96/10
**gate.BitcoinFog.com [9]** 94/7
94/18 94/22 96/3 96/19 96/22
97/13 98/9 98/21
**gathering [1]** 11/4
**gave [1]** 77/8
**general [3]** 40/14 70/8 79/18
**generally [18]** 6/23 9/25 12/3
16/10 19/1 19/3 26/11 32/20 38/14
55/5 70/7 71/8 73/14 73/20 74/16

76/12 80/12 91/21
**generated [1]** 88/23
**geographically [1]** 26/7
**get [24]** 4/2 4/6 10/5 12/7 12/10
16/17 19/14 19/19 19/23 20/21
27/13 27/21 48/10 66/5 70/18
70/24 72/23 81/1 88/22 89/1 91/22
94/1 98/4 100/6
**gets [4]** 14/19 14/20 22/10 22/11
**getting [2]** 73/2 98/6
**give [1]** 9/11
**given [6]** 46/9 56/25 68/20 77/9
79/5 98/25
**gives [1]** 81/1
**gmail.com [2]** 35/10 35/11
**go [38]** 7/17 10/10 11/24 15/4
16/18 19/12 20/25 23/10 35/7
36/16 40/23 43/18 51/2 59/7 62/3
63/23 68/1 69/10 73/1 73/5 73/7
73/8 74/4 80/20 88/25 91/6 91/7
92/24 93/22 94/8 94/10 94/11 98/6
99/6 99/6 99/7 99/8 100/20
**GoDaddy [6]** 71/5 71/10 72/8 72/11
72/22 75/1
**goes [8]** 8/1 9/8 18/14 21/25
24/11 30/2 66/6 67/4
**going [30]** 12/22 22/12 23/7 27/20
33/13 44/14 48/14 48/21 54/4
54/11 55/4 57/7 60/12 61/9 61/11
63/5 63/8 64/6 64/12 64/18 67/22
82/14 89/19 90/23 92/21 92/24
94/2 96/5 97/15 100/23
**good [11]** 4/18 4/21 5/4 5/5 62/12
63/13 82/19 86/18 86/19 96/9
96/10
**Google [11]** 9/19 11/25 18/14
18/14 19/10 19/18 20/12 20/13
20/14 21/5 22/14
**Google's [2]** 19/14 23/22
**Google.com [14]** 11/23 17/25 18/21
18/23 18/24 19/6 19/13 20/7 23/3
23/6 23/10 24/14 70/23 91/7
**got [2]** 68/11 80/22
**Goteberg [1]** 57/6
**Gothenburg [1]** 30/19
**GothenCoin [3]** 35/12 35/13 50/1
**gotten [2]** 18/10 68/13
**government [32]** 3/7 3/8 3/8 3/9
3/9 3/10 3/10 3/11 3/11 3/12 3/12
3/13 3/13 4/17 6/4 15/24 33/3
34/14 37/12 37/12 38/5 50/23 56/5
57/19 71/15 71/19 76/19 77/25
83/23 83/24 95/15 96/25
**governments [1]** 61/6
**Gox [25]** 35/18 35/19 36/1 36/1
36/2 36/2 36/14 41/2 41/25 42/11
42/23 44/12 44/20 44/22 45/9
45/11 47/12 47/20 48/19 48/23
50/2 52/16 54/9 54/13 54/17
**graphically [1]** 58/23
**green [3]** 35/6 92/4 92/5
**grew [1]** 67/20
**group [2]** 43/21 72/18
**guarantees [1]** 97/20
**guess [2]** 45/2 99/25

## H

**habits [1]** 28/3
**had [7]** 8/16 10/11 39/21 61/16
67/11 67/13 101/4
**hadn't [1]** 39/23
**halfway [1]** 100/21
**hallway [1]** 99/13
**hand [4]** 30/13 60/17 81/22 84/11
**handle [7]** 7/1 12/4 12/25 13/2
14/8 23/17 65/4
**handled [3]** 22/11 77/12 82/10
**handles [2]** 23/8 60/4
**happen [2]** 39/10 64/17
**happened [2]** 40/11 63/3
**happening [3]** 60/5 80/15 91/6
**happens [6]** 18/22 20/11 90/15

**H**

happens... [3] 91/3 92/6 92/20
happy [2] 57/7 94/20
has [25] 7/9 11/16 24/7 26/16 28/3 30/21 37/25 58/13 61/1 63/22 64/13 65/5 68/13 69/4 75/4 82/6 87/10 90/9 90/16 99/20 100/1 100/2 100/9 100/12 101/1
HASSARD [2] 2/2 4/23
have [92] 7/23 8/16 8/19 9/10 9/16 9/17 11/5 11/10 11/15 11/21 12/25 16/19 16/25 17/12 18/5 18/9 18/9 18/11 19/22 20/4 21/7 23/5 24/21 25/24 26/4 28/4 29/16 40/2 40/23 46/8 48/4 48/7 49/10 58/24 59/1 59/8 60/1 60/19 62/13 62/19 63/1 63/3 64/5 64/7 64/8 64/12 64/23 65/23 66/6 67/11 67/12 67/13 68/1 68/2 68/4 68/5 68/21 68/22 69/2 69/23 73/15 73/22 74/3 74/5 74/10 74/11 74/11 80/24 82/8 83/8 88/18 88/25 89/13 89/18 90/15 90/24 91/11 91/12 92/19 93/14 93/25 94/9 94/16 95/10 96/10 97/11 97/23 97/24 97/24 99/13 99/17 100/21
having [6] 63/12 66/18 72/3 93/22 97/22 98/1
he [25] 61/22 62/25 63/4 63/4 63/6 63/6 64/11 64/11 64/13 64/14 64/14 65/2 65/6 65/8 66/3 66/4 66/16 66/17 66/17 67/1 67/1 67/3 68/12 68/13 69/4
head [1] 50/20
headlines [1] 37/20
heard [1] 39/21
hearsay [4] 33/6 34/17 34/17 95/18
heavy [1] 35/9
heavydist [10] 35/10 35/10 35/11 35/14 35/15 45/18 45/25 49/24 49/24 50/1
held [3] 32/2 34/11 35/9
help [6] 6/1 15/15 17/7 19/15 63/13 71/12
helpful [1] 9/22
her [4] 22/7 57/15 99/20 100/20
here [82] 6/12 6/23 16/7 17/20 19/6 20/9 20/19 22/12 22/19 22/22 23/2 23/12 23/21 24/6 24/10 26/3 30/6 32/21 34/8 34/24 37/3 38/13 38/18 40/17 44/2 44/19 45/21 48/22 50/25 51/3 51/3 54/12 54/20 55/5 55/25 59/7 61/12 61/19 62/22 63/4 63/19 64/7 65/17 66/3 67/17 67/24 71/8 71/23 71/24 72/4 73/21 77/3 77/16 78/8 78/12 79/1 80/12 81/4 81/13 81/21 82/6 82/9 82/11 82/21 83/15 84/7 84/12 84/14 85/13 86/4 86/14 86/24 88/1 88/4 89/23 90/7 90/7 92/4 93/7 97/8 98/12 99/23
hidden [20] 18/2 18/6 18/7 60/20 66/1 88/19 88/22 89/7 89/10 89/16 91/14 91/19 91/23 92/9 92/22 93/2 93/22 94/2 94/10 94/12
hide [2] 10/25 14/3
high [16] 8/1 12/23 13/12 14/10 22/10 60/23 69/14 77/14 77/23 78/9 78/18 78/22 79/8 80/16 84/6 90/18
highhosting.net [5] 69/12 77/19 79/2 82/2 82/10
highlighted [1] 92/5
him [1] 65/18
his [4] 64/16 65/19 65/19 67/19
historic [1] 10/9
historical [2] 7/13 8/14
history [2] 55/5 55/5
hitting [2] 13/4 60/8
holder [1] 75/18

holds [1] 74/24
home [18] 11/12 13/15 15/4 15/5 15/8 16/8 18/13 18/16 18/16 18/19 20/5 22/8 24/11 38/15 46/25 47/3 49/8 91/7
homepage [1] 19/10
homes [1] 60/23
Honor [18] 4/4 4/5 4/11 4/18 4/21 5/1 6/7 16/2 26/25 27/1 57/7 57/20 57/21 58/1 58/7 94/23 97/2 99/5
HONORABLE [1] 1/9
hop [4] 23/12 23/25 23/25 24/12
hopefully [2] 100/13 100/14
hops [4] 14/11 25/20 26/16 92/8
host [5] 12/5 72/21 72/24 73/11 73/15
hosted [2] 50/8 89/15
hoster [1] 80/23
hosting [25] 10/7 29/17 66/14 69/14 73/3 73/6 73/19 77/14 77/23 78/9 78/18 78/22 79/8 79/12 79/12 79/19 79/19 80/3 80/16 80/23 84/9 84/9 85/22 88/13 88/16
hosting.com [1] 82/19
hosts [1] 65/3
hotmail.com [7] 35/17 77/7 79/6 81/24 85/14 85/19 99/4
hour [1] 41/15
hours [6] 30/4 30/5 30/24 31/3 48/12 62/11
house [1] 73/12
how [62] 7/21 7/21 9/8 10/3 10/23 12/3 12/10 12/17 13/10 15/10 19/12 20/8 20/21 20/25 22/9 22/10 22/13 23/3 25/2 25/23 28/6 29/8 29/13 30/3 30/4 30/4 30/17 30/25 31/11 48/1 49/5 52/1 53/19 58/22 64/25 65/15 69/25 70/21 70/24 72/8 72/14 73/1 73/5 74/6 79/14 79/16 87/10 88/21 89/10 89/24 90/4 90/6 90/11 91/17 91/19 91/22 92/23 94/5 98/4 98/4 98/5 100/17
HTML [1] 58/23
http: [1] 70/21
http://www.Google.com [1] 70/21
http:\\gate.BitcoinFog.com [1] 27/15
https [1] 97/23
Https:\\gate.BitcoinFog.com [1] 96/12
huh [1] 98/15
hypothetical [1] 65/14

**I**

I'd [2] 18/11 69/15
I'm [9] 10/16 10/18 42/18 51/8 55/16 55/22 85/15 87/13 94/20
I-C-A-N-N [1] 74/14
ICANN [2] 74/13 74/16
ICANN's [1] 74/19
icon [1] 38/22
icons [4] 38/18 38/21 78/12 78/13
ID [1] 70/3
identification [1] 69/5
identifies [1] 91/25
identify [2] 21/12 31/22
identity [6] 26/10 27/7 27/13 27/21 61/5 75/10
immediately [1] 90/4
impact [1] 13/7
impossible [1] 64/15
inadvertently [1] 99/13
include [6] 8/13 28/12 32/1 39/1 58/10 75/6
included [3] 5/13 48/13 76/3
including [1] 78/10
incomplete [1] 33/8
increase [1] 67/14
indeed [1] 63/12
indexes [1] 8/3
indicate [6] 45/8 53/9 64/9 82/9

82/12 88/7
indicated [2] 31/8 31/13
indicates [1] 35/9
indicating [2] 30/22 30/24
indication [1] 50/7
indicator [1] 98/1
individual [5] 44/15 44/16 44/17 50/16 51/7
information [54] 5/11 5/11 5/13 6/18 7/9 7/11 7/13 7/14 7/19 7/22 8/6 8/8 8/11 8/17 9/2 9/24 10/3 10/22 11/4 11/4 11/4 18/23 19/1 19/5 19/9 19/19 29/15 31/19 34/12 55/12 56/3 57/1 57/4 62/19 65/7 66/1 68/5 68/16 75/9 75/13 75/18 76/3 77/6 79/5 81/9 84/14 84/20 85/4 85/5 89/11 93/4 96/21 98/25 99/2
infrastructure [2] 67/12 68/15
initial [1] 77/12
innovate [1] 67/15
input [1] 77/5
ins [5] 28/15 32/16 40/10 46/11 54/22
inside [1] 73/25
instances [2] 31/22 32/1
instead [1] 82/7
instruction [1] 22/9
intention [1] 64/6
interacts [1] 28/6
interest [7] 10/14 31/24 32/11 32/17 32/23 41/21 42/20
interested [1] 18/21
internal [2] 53/4 53/23
internally [1] 12/23
internet [35] 9/17 10/8 11/9 11/11 11/14 11/24 12/6 13/3 13/22 14/9 15/7 15/16 16/12 16/15 17/3 18/12 20/6 22/4 23/9 23/20 24/7 26/13 28/3 28/6 46/5 47/2 49/9 53/4 53/12 54/1 56/23 59/14 61/4 66/8 91/13
intervened [1] 88/10
investigating [2] 19/11 20/24
investigation [1] 31/24
invoice [10] 69/12 86/5 86/6 86/11 86/20 87/3 87/5 98/16 98/18 98/22
involved [2] 58/19 99/12
involving [1] 42/14
IP [164]
IP's [1] 53/19
IPs [5] 5/9 10/10 25/3 28/1 36/10
is [547]
isn't [1] 68/16
ISP [1] 52/22
issue [6] 7/3 42/10 75/14 100/10 100/18 101/1
issues [3] 67/11 75/15 99/19
it [291]
items [1] 79/10
its [8] 20/14 22/20 38/16 61/5 61/5 66/7 73/10 78/20
itself [5] 24/20 47/24 60/9 61/9 89/15

**J**

January [1] 98/23
January 12th [1] 98/23
Japan [1] 77/8
JEFFREY [2] 1/18 4/20
joined [2] 4/19 67/12
joining [1] 4/23
JUDGE [2] 1/10 100/4
juror [6] 99/19 99/20 100/1 100/9 100/12 101/1
jurors [1] 101/5
jury [34] 1/9 4/3 4/6 4/8 5/7 6/1 15/16 15/22 16/4 16/13 23/2 29/8 33/15 34/20 37/17 38/10 56/10 57/14 57/25 58/3 58/5 58/11 59/9 71/12 73/19 75/9 76/24 78/5 81/21

**J**

jury... **[5]**   84/3 95/20 97/4 98/2 99/16
just **[43]**   6/22 7/8 8/2 8/7 9/9 9/10 9/17 9/20 17/15 22/17 23/25 24/10 26/24 28/19 28/23 34/11 35/1 35/7 38/2 38/13 40/14 43/7 44/2 46/15 46/17 49/2 51/14 51/19 58/9 68/6 72/17 73/22 74/9 80/25 81/16 82/15 84/6 87/6 89/6 89/14 94/2 98/5 99/19
JUSTICE **[3]**   1/13 1/20 6/21
Justice's **[1]**   5/24

**K**

keep **[13]**   11/22 19/3 21/16 24/18 25/4 38/19 44/3 56/15 57/7 62/8 63/1 63/6 96/3
keeping **[2]**   13/20 74/1
keeps **[2]**   74/17 93/1
Kellerman **[1]**   51/14
key **[1]**   8/3
keys **[2]**   64/24 65/6
Killdozer **[10]**   35/11 35/12 36/4 36/4 45/19 45/22 49/25 51/18 51/20 52/14
Killdozer's **[1]**   50/3
kind **[7]**   10/5 13/19 26/6 57/12 60/6 64/13 80/23
knew **[1]**   61/22
know **[18]**   9/8 10/13 13/19 25/2 29/9 31/9 58/22 62/11 75/21 89/19 90/4 95/22 97/20 100/7 100/11 100/14 100/17 100/23
knowing **[2]**   60/17 62/19
knowledge **[1]**   39/25
known **[9]**   18/6 19/3 21/21 29/19 49/7 67/2 90/10 92/1 92/7
knows **[3]**   90/22 91/12 91/13
Kolbasa **[11]**   35/18 35/18 36/14 42/23 42/25 44/13 44/22 48/23 54/10 54/13 54/17
Kolbasa's **[1]**   48/19
Kyoto **[1]**   77/8

**L**

lacks **[1]**   32/8
landing **[2]**   16/8 38/15
laptops **[1]**   17/16
large **[3]**   13/12 45/12 71/1
last **[16]**   20/16 23/12 24/14 40/25 41/7 41/19 42/17 48/24 49/20 54/12 54/14 60/10 67/11 78/16 83/7 99/2
late **[4]**   43/6 99/21 100/2 101/6
later **[8]**   27/16 42/9 42/23 43/19 48/25 69/14 99/23 99/24
latest **[1]**   68/6
launch **[1]**   15/11
launched **[1]**   96/10
law **[10]**   2/3 10/13 11/3 19/11 20/24 21/3 27/23 28/5 61/7 69/3
layer **[2]**   14/16 24/3
layers **[2]**   14/15 14/18
layout **[1]**   65/19
leading **[9]**   10/15 39/3 40/7 43/14 44/25 46/12 48/5 50/17 53/7
learning **[1]**   67/14
lease **[3]**   12/11 71/25 73/8
leases **[2]**   71/1 74/25
least **[1]**   85/9
leave **[2]**   99/22 99/24
led **[3]**   43/20 43/21 49/16
left **[11]**   5/6 30/13 33/20 35/7 36/11 81/19 81/22 85/17 85/24 90/13 98/3
left-hand **[2]**   30/13 81/22
legal **[5]**   7/3 10/21 19/22 19/22 21/3
less **[5]**   11/22 13/16 41/15 73/14 100/25

lessen **[1]**   63/11
let **[2]**   95/21 100/20
let's **[4]**   4/6 19/18 57/10 99/9
lets **[1]**   97/19
letters **[3]**   18/8 89/1 94/21
letters and **[1]**   94/21
letting **[1]**   53/11
level **[11]**   8/1 12/24 14/10 21/24 22/3 22/5 22/10 79/18 84/6 90/18 92/16
levels **[1]**   34/18
Liberty **[25]**   35/14 35/15 35/15 35/17 36/13 38/24 39/16 40/19 41/1 41/11 41/16 47/12 47/17 48/19 49/1 50/1 50/1 52/15 54/9 54/15 55/2 56/14 69/7 69/9 78/15
lie **[1]**   63/5
life **[1]**   62/25
lightning **[1]**   64/4
like **[36]**   5/12 8/14 9/1 9/5 9/9 9/14 9/24 11/19 12/6 13/3 13/3 14/18 17/10 17/15 17/24 18/7 18/11 20/1 22/17 25/3 28/7 31/8 45/9 52/22 54/24 58/20 63/1 69/15 72/9 72/22 73/20 73/24 89/21 90/2 93/15 100/22
likely **[14]**   8/2 29/13 36/20 39/2 44/4 46/1 47/22 47/23 48/1 49/5 53/15 60/2 61/13 82/11
Likewise **[1]**   76/5
LINDSAY **[3]**   2/6 102/3 102/12
line **[14]**   15/13 17/2 17/5 17/22 30/6 31/17 42/18 51/20 69/15 70/1 80/12 83/7 86/13 92/11
lines **[1]**   83/4
linked **[2]**   32/13 36/3
Linux **[5]**   17/12 17/14 17/15 17/16 17/21
list **[7]**   25/6 25/7 25/12 29/10 35/7 44/15 78/16
listed **[6]**   7/5 30/4 56/13 57/4 82/1 82/7
listing **[1]**   40/21
lists **[3]**   25/3 25/3 29/19
little **[8]**   23/18 58/22 96/8 98/3 99/21 99/22 100/15 100/16
live **[4]**   8/13 8/16 72/18 88/24
lived **[1]**   79/20
lives **[2]**   60/5 72/20
local **[6]**   31/17 35/12 46/25 52/3 52/3 100/10
LocalBitcoin **[1]**   49/25
LocalBitcoins **[1]**   35/13
locally **[1]**   11/21
located **[3]**   12/12 15/2 73/17
locations **[1]**   64/4
lock **[1]**   98/3
log **[19]**   19/5 19/7 20/14 20/18 21/1 23/22 24/15 28/10 28/13 28/15 30/21 31/1 32/16 40/10 40/10 46/11 54/22 68/5 97/9
log-in **[4]**   21/1 28/10 40/10 97/9
log-ins **[5]**   28/15 32/16 40/10 46/11 54/22
logging **[6]**   40/14 45/9 45/10 49/17 62/24 63/5
logs **[17]**   19/3 19/14 21/15 28/19 31/11 31/14 33/7 33/10 44/12 62/6 62/7 62/8 62/13 62/24 63/1 63/2 63/5
London **[2]**   30/11 30/18
long **[10]**   18/8 68/20 72/8 84/21 87/10 89/1 94/21 96/8 99/6 100/17
longer **[2]**   18/10 81/5
look **[20]**   7/13 8/11 9/11 10/11 11/19 18/7 27/23 29/19 31/8 31/13 31/14 31/14 31/16 44/2 44/9 73/20 75/25 85/5 90/24 97/25
looked **[9]**   29/5 32/13 33/21 35/4 45/9 46/8 46/15 54/24 57/2
looking **[12]**   10/7 28/12 28/25 38/3 43/23 52/25 53/19 58/21

71/25 86/13 87/16 89/6
looks **[3]**   6/14 8/2 20/1
lookup **[6]**   5/7 5/8 5/13 8/20 76/3 90/5
lookups **[3]**   5/7 8/13 8/17
lose **[2]**   13/21 68/13
lost **[1]**   64/13
lot **[6]**   13/13 23/17 24/18 67/11 67/12 68/5
lots **[1]**   73/24
love **[1]**   65/14
low **[1]**   64/7
lower **[1]**   30/12
LR **[2]**   35/14 35/16
luck **[1]**   21/4
luckily **[1]**   66/14
lunch **[3]**   99/13 99/17 101/7
lunchtime **[1]**   100/6
lying **[1]**   62/9

**M**

Mac **[2]**   17/15 17/17
machine **[8]**   37/10 59/21 59/25 60/5 60/6 64/20 64/22 66/13
machines **[1]**   65/5
made **[8]**   6/25 9/18 10/9 39/4 61/24 69/6 70/4 92/21
main **[4]**   7/20 24/2 70/19 84/8
mainnameserver.com **[1]**   82/11
maintain **[4]**   7/16 9/16 25/3 25/8
maintaining **[1]**   75/6
maintenance **[1]**   70/13
major **[2]**   30/9 30/9
make **[10]**   10/8 28/6 61/7 62/14 64/6 67/6 90/9 90/21 90/22 99/11
makes **[7]**   16/11 18/24 28/21 28/21 60/17 61/13 63/16
making **[3]**   62/15 63/15 63/18
manage **[1]**   89/11
management **[1]**   86/16
manages **[1]**   74/17
managing **[3]**   58/20 80/16 89/10
manual **[2]**   66/23 91/2
manually **[3]**   59/12 60/11 90/16
many **[16]**   12/17 12/20 12/25 14/25 22/20 22/25 23/1 30/4 30/4 44/5 50/4 60/7 62/23 67/12 67/18 82/4
map **[2]**   12/23 30/2
mapped **[2]**   92/11 92/19
March **[3]**   87/22 101/2 101/3
March 2020 **[1]**   87/22
master **[1]**   62/12
Mastercard **[1]**   78/17
material **[1]**   88/14
mathematically **[1]**   88/23
matter **[1]**   102/5
matters **[1]**   38/20
may **[19]**   4/9 16/4 33/14 34/20 37/16 38/9 56/9 58/6 60/21 63/2 71/19 76/24 78/4 84/2 84/16 95/10 95/19 96/8 97/3
maybe **[6]**   19/15 20/3 20/3 31/7 60/7 72/10
Mazarin **[1]**   3/3
Mazars **[28]**   3/3 5/4 5/21 6/12 16/7 27/4 32/20 33/18 34/7 34/24 36/17 37/3 38/1 38/13 50/24 51/15 55/25 56/13 58/9 58/16 69/6 70/17 71/8 71/23 76/11 77/15 83/15 97/7
me **[13]**   4/23 9/11 11/23 29/5 43/20 43/21 45/9 49/16 54/23 94/20 95/22 100/8 101/5
mean **[7]**   45/1 61/6 66/16 66/25 69/2 69/4 93/25
meaning **[6]**   8/3 9/22 32/14 52/3 69/1 81/3
means **[4]**   59/15 61/2 64/21 67/1
meant **[1]**   61/7
medical **[2]**   100/12 100/16
meet **[1]**   35/5
members **[4]**   8/8 9/25 25/12 58/4
memorized **[1]**   9/10

## M

memory [1]  94/24
mentioned [2]  7/1 25/21
menu [1]  26/5
merchant [3]  85/15 85/16 85/20
message [2]  80/13 90/24
met [1]  9/11
method [2]  83/10 97/19
methods [4]  38/21 72/12 78/13 78/19
MICHAEL [2]  2/2 4/23
Microtronix [2]  98/12 98/25
middle [8]  25/20 27/10 30/2 47/8 53/1 53/3 54/1 62/10
midnight [1]  41/3
might [18]  9/9 10/22 16/13 20/2 21/3 21/4 25/1 25/21 27/12 27/22 47/2 65/9 65/11 65/13 70/20 80/9 98/2 100/19
mind [2]  7/20 61/6
mini [2]  79/12 79/19
minus [3]  30/4 31/4 31/14
minute [2]  26/24 44/21
minutes [8]  48/25 49/15 57/10 57/11 57/13 57/23 72/10 99/7
misconfigure [1]  67/7
mistakes [1]  67/15
misuse [1]  24/25
misused [1]  5/18
mix [1]  36/5
mixer [1]  69/2
Monday [1]  100/2
money [6]  62/18 63/18 63/22 64/13 68/13 78/15
monitored [2]  59/22 60/11
monitoring [1]  60/6
month [2]  79/17 80/3
months [1]  47/5
more [25]  10/7 11/22 12/4 17/10 21/3 22/25 23/1 23/18 28/5 28/7 44/5 47/3 47/6 51/15 60/17 61/8 62/17 63/10 65/11 65/12 66/1 73/14 99/25 100/1 100/16
morning [6]  1/7 4/18 4/21 5/4 5/5 57/10
Moscow [1]  30/20
MOSS [1]  1/9
most [8]  13/16 14/7 15/11 19/23 44/6 60/2 70/25 89/20
mostly [1]  44/3
move [9]  17/10 46/17 67/8 68/2 80/7 81/1 91/9 93/16 94/25
moves [14]  6/4 14/14 15/24 33/3 34/14 37/12 38/5 56/5 71/15 76/19 77/25 83/23 95/15 96/25
moving [1]  93/1
Mr. [6]  4/23 34/6 34/11 41/11 51/4 51/5
Mr. Michael [1]  4/23
Mr. Pearlman [1]  34/11
Mr. Pearlman's [1]  34/6
Mr. Sterlingov's [3]  41/11 51/4 51/5
Ms [1]  3/4
Ms. [3]  4/9 4/25 58/6
Ms. Pelker [3]  4/9 4/25 58/6
Mt. [25]  35/18 35/19 36/1 36/1 36/2 36/2 36/14 41/2 41/25 42/11 42/23 44/12 44/20 44/22 45/9 45/11 47/12 47/20 48/19 48/23 50/2 52/16 54/9 54/13 54/17
Mt. Gox [25]  35/18 35/19 36/1 36/1 36/2 36/2 36/14 41/2 41/25 42/11 42/23 44/12 44/20 44/22 45/9 45/11 47/12 47/20 48/19 48/23 50/2 52/16 54/9 54/13 54/17
MTGOX [2]  35/18 35/18
much [4]  9/14 54/24 65/12 79/14
multiple [22]  7/16 12/14 14/10 14/10 23/5 28/19 28/20 31/23 34/17 40/1 41/16 42/13 42/14 48/4 48/7 49/2 49/2 49/4 49/10 65/2 93/9 93/11
multiple .onion [2]  93/9 93/11
my [17]  7/23 9/10 9/20 11/21 11/22 15/5 15/8 19/16 22/7 33/9 39/25 50/20 62/7 67/18 91/7 93/23 95/21

## N

N.W [1]  1/16
name [51]  4/16 5/16 7/1 7/5 7/18 9/5 9/7 9/11 18/5 22/18 23/11 25/7 26/8 29/16 32/2 32/12 33/20 36/6 36/7 41/11 50/4 50/24 51/25 70/4 70/17 70/18 70/18 70/22 70/23 70/24 71/4 71/13 72/17 72/17 72/19 73/9 75/10 77/6 79/6 81/23 83/9 85/16 85/21 88/15 90/9 90/16 90/25 91/11 99/2 99/2 99/3
name.com [1]  29/17
Namecheap [4]  50/24 51/4 51/5 71/5
named [2]  35/13 82/10
names [10]  17/9 22/2 35/3 74/9 74/10 74/12 74/16 74/20 76/6 84/10
naming [1]  29/18
NAT [2]  66/22 66/23
native [1]  33/9
nature [1]  21/2
necessarily [1]  75/10
necessary [2]  60/20 68/22
need [18]  4/11 12/23 13/2 56/15 58/21 63/1 67/19 70/25 74/21 75/14 85/4 88/13 88/15 88/16 89/13 90/19 96/8 99/25
needed [2]  59/14 67/24
needing [1]  23/17
needs [9]  72/18 72/19 88/8 90/5 92/7 99/21 99/24 100/5 100/7
neither [1]  31/15
net [2]  5/15 56/17
Netflix [1]  13/10
network [38]  11/22 13/23 14/6 14/11 14/14 14/17 14/24 15/9 17/1 17/23 22/20 22/23 23/5 23/9 23/25 24/9 24/13 24/19 25/15 29/6 29/11 37/1 49/9 53/2 53/10 53/24 54/3 60/15 60/19 66/6 88/24 91/20 91/22 92/1 92/18 92/19 94/6 94/11
networked [2]  11/20 67/5
networks [1]  25/4
never [4]  60/18 61/9 74/5 93/14
new [11]  1/20 26/10 26/16 27/7 27/13 27/20 27/21 62/18 67/12 93/16 96/3
new .onion [1]  93/16
news [3]  80/22 96/9 96/10
next [36]  1/23 10/20 10/22 18/17 19/17 19/21 19/23 19/25 26/8 40/22 42/4 42/8 43/6 43/7 43/11 44/9 44/21 45/20 47/14 54/16 59/20 60/12 63/8 65/9 65/21 65/25 66/9 66/20 67/22 68/17 79/22 82/1 82/14 86/13 89/23 92/20
NFS [8]  35/19 35/19 35/21 36/14 41/25 42/11 44/13 44/20
NFS9000 [1]  35/21
nice [1]  99/13
no [53]  1/4 4/4 4/5 6/7 6/10 7/7 8/7 16/2 16/5 16/21 21/14 21/15 22/24 25/17 31/19 33/16 37/15 37/18 38/8 38/11 39/23 53/17 56/8 56/11 57/12 61/18 61/22 62/12 62/23 62/24 63/5 63/17 71/18 71/21 74/5 75/12 76/22 76/25 78/3 78/6 81/5 84/1 84/4 88/20 89/5 90/5 91/2 91/16 95/23 97/2 97/5 99/23 99/24
node [17]  15/1 15/4 23/15 23/16 24/14 24/15 25/22 25/23 25/24 27/14 29/12 52/7 52/8 52/23 53/6 53/23 53/23
node's [2]  23/19 23/23
nodes [12]  14/23 15/2 22/21 22/22 23/8 23/17 25/6 25/7 25/15 25/16 53/3 54/1
non [2]  92/16 93/21
non-technical [1]  92/16
non-Tor [1]  93/21
none [1]  91/2
nonetheless [1]  48/11
nontechnical [3]  17/5 21/24 88/21
noon [1]  30/18
normal [1]  68/20
normally [1]  54/1
Nos [1]  34/21
not [68]  9/10 11/12 14/22 15/18 18/12 21/16 25/1 25/21 27/6 27/12 27/19 29/11 29/12 31/18 32/19 33/7 33/9 37/2 38/6 39/25 43/16 52/4 53/3 53/17 53/20 55/20 59/14 59/19 60/22 60/23 60/24 60/25 61/4 61/13 61/18 62/9 62/25 63/5 63/21 64/12 64/14 64/22 64/23 65/5 65/12 65/18 65/23 66/6 66/14 66/18 67/14 71/6 77/12 79/20 83/13 85/7 88/20 90/3 93/23 94/20 94/23 95/10 95/16 95/21 96/13 98/5 99/20 100/20
note [6]  29/21 40/11 50/24 55/2 81/16 87/3
noted [8]  33/1 51/3 55/10 69/16 69/18 70/2 76/17 88/4
notes [1]  39/19
nothing [3]  57/19 57/21 88/10
notice [2]  29/1 43/16
noticed [2]  40/9 43/17
notices [1]  60/7
noticing [1]  43/20
November [3]  63/24 67/10 67/24
November 23rd [1]  67/10
November 26th [1]  67/24
now [59]  4/25 16/19 17/24 21/9 23/21 27/6 27/9 27/22 30/12 31/21 36/16 36/20 39/1 44/15 45/20 47/7 49/19 51/12 52/9 52/17 54/4 57/10 60/12 61/11 62/19 63/8 63/11 63/23 64/18 66/9 66/11 67/8 67/22 68/2 68/17 68/19 70/16 72/2 74/9 80/25 82/3 82/11 82/19 84/9 84/14 84/19 85/20 86/2 87/17 90/20 90/21 92/11 96/3 96/5 96/9 96/10 96/13 99/6 99/8
NS1.highhosting.net [1]  82/8
NS1.mainnameserver.com [1]  82/8
number [19]  5/17 7/4 9/10 9/12 22/9 26/22 27/9 55/22 62/3 63/23 67/8 67/22 68/17 70/11 77/8 80/20 81/25 100/1 100/12
numbers [3]  18/8 76/5 94/22
numbers, [1]  89/1
numbers, .onion [1]  89/1
numerous [1]  28/10
NW [3]  1/14 1/20 2/8
NY [1]  2/4

## O

O-R [1]  25/11
objection [37]  6/6 6/7 10/15 16/1 16/2 32/5 32/6 33/5 34/16 34/17 37/14 37/15 38/7 38/8 39/3 40/7 43/14 44/25 46/10 48/5 50/17 53/7 56/7 56/8 71/17 71/18 76/21 76/22 78/2 78/3 83/25 84/1 94/23 95/17 95/18 97/1 97/2
obscure [1]  92/17
observations [1]  28/5
observing [1]  53/14
obviously [1]  100/8
occasion [1]  52/18
occasions [1]  44/16
occur [1]  43/19
occurred [1]  40/13

**O**

occurrence [1] 40/25
occurrences [3] 35/1 42/16 49/3
October [11] 40/2 62/5 77/10
77/20 79/4 81/25 86/12 86/21 87/4
87/10 87/16
October 2011 [1] 81/25
October 2015 [3] 86/12 87/4 87/16
October 25th [2] 77/10 79/4
October 28th [1] 62/5
off [7] 5/6 14/20 34/7 34/12 49/8
50/20 101/4
offer [4] 12/1 71/3 72/11 78/10
offered [1] 81/5
offers [2] 72/2 84/8
Official [3] 2/7 102/3 102/13
offset [1] 30/17
often [7] 11/3 17/16 19/17 28/16
47/1 75/24 79/16
oftentimes [6] 5/17 10/20 12/24
17/7 22/1 24/20
Oh [5] 44/3 56/20 86/8 86/11 89/5
Okay [3] 55/18 55/21 58/2
Omedetou [24] 26/18 27/5 27/11
27/17 32/14 36/7 59/3 61/19 61/25
62/5 62/21 62/24 63/19 63/24 65/1
65/17 66/25 67/9 77/6 79/6 80/21
81/24 87/11 95/6
Omedetou's [4] 64/10 67/17 81/4
95/13
once [5] 22/11 61/12 61/13 72/14
79/25
one [83] 7/2 7/20 9/19 11/16
11/20 11/22 12/20 12/22 14/8
14/19 14/19 21/21 22/1 23/8 23/10
25/5 26/14 26/17 27/20 33/6 35/24
35/24 36/11 40/10 40/19 42/11
42/17 43/18 43/20 44/1 45/9 45/10
45/14 48/15 48/24 49/2 49/15
49/17 49/20 52/10 52/22 53/3 53/4
53/18 53/25 54/5 54/14 54/23
54/23 54/23 59/8 59/11 60/3 60/3
60/5 61/22 62/15 63/17 63/18 65/3
65/3 65/4 65/5 68/1 68/11 73/21
74/4 74/19 75/1 80/6 80/9 81/16
81/17 82/14 82/15 91/25 92/17
93/9 93/11 98/6 98/7 99/20 101/2
one's [1] 11/12
one-day [1] 101/2
ones [3] 16/16 46/15 53/4
onion [3] 14/6 14/13 14/18
online [7] 10/7 28/23 29/16 29/20
48/10 73/7 74/8
only [14] 12/20 14/7 14/9 18/2
22/22 25/20 43/16 53/4 59/18
60/15 60/16 60/23 66/4 67/18
open [4] 13/25 22/15 62/14 96/4
opened [2] 16/9 36/6
opening [1] 27/12
operate [1] 93/11
operates [1] 60/14
operating [4] 17/15 17/17 67/1
98/4
operation [1] 68/20
operational [1] 63/17
opportunity [1] 8/16
opposed [2] 13/14 70/19
option [1] 72/2
Orange [3] 83/11 83/21 85/9
orangewebsite.com [3] 83/5 83/18
85/22
order [9] 16/19 58/24 74/12 79/2
79/3 79/10 79/24 80/2 82/7
organization [4] 5/16 14/22 74/13
76/6
organizational [1] 5/11
organizations [1] 14/25
originally [1] 14/13
OS [3] 17/15 17/17 67/1
OSes [1] 66/21
other [33] 7/3 8/23 9/6 11/4
11/21 11/24 12/11 13/7 15/12
16/22 19/5 22/17 24/3 24/25 28/8
30/3 36/7 43/2 44/1 45/11 46/14
47/19 49/18 60/17 66/12 72/11
77/13 79/21 81/17 81/18 89/4
91/19 92/18
others [2] 14/16 46/7
otherwise [1] 32/3
our [14] 47/7 54/12 57/9 60/16
60/16 60/25 62/14 64/4 65/12
67/14 68/21 69/1 84/13 96/2
our .onion [1] 60/16
ourselves [1] 63/14
out [49] 8/3 11/10 11/14 12/5
12/21 12/24 13/11 13/21 14/2 14/9
14/12 14/19 18/16 19/13 20/25
21/4 23/9 24/14 26/6 26/17 28/1
29/20 31/9 34/1 36/20 38/14 40/12
53/14 53/18 57/14 62/24 63/2 71/2
72/4 74/4 74/18 74/25 81/6 90/6
90/10 90/12 91/17 92/11 92/19
96/2 97/7 99/16 99/25 100/18
outer [1] 53/3
outlined [1] 64/7
over [11] 6/17 7/11 13/21 15/3
64/14 68/13 72/4 73/22 80/9 82/3
85/20
overall [1] 92/2
overhead [1] 68/5
overhear [1] 99/12
overlap [1] 55/1
overloaded [1] 68/11
Overruled [8] 10/17 10/19 32/10
39/6 40/8 43/15 50/18 53/8
own [8] 11/12 13/15 13/22 53/18
61/5 61/5 66/7 85/4
owned [1] 47/24
owner [1] 65/14
owns [1] 71/1

**P**

p.m [6] 30/19 30/20 42/9 54/16
99/16 101/8
page [23] 1/23 16/8 16/8 37/4
37/20 38/2 38/15 38/15 51/2 51/3
51/13 58/20 59/7 61/11 62/3 64/18
67/22 68/17 89/16 89/19 96/6 97/9
97/12
paid [11] 17/17 69/19 70/10 78/10
79/11 79/25 85/13 86/7 86/8 88/15
98/9
Panama [1] 84/22
panel [2] 26/5 27/8
Papademos [1] 99/3
paragraph [17] 27/10 59/10 60/10
60/12 61/7 61/12 62/4 63/8 63/25
65/9 65/25 66/9 66/20 67/9 67/23
82/16 96/7
paragraphs [1] 65/21
part [8] 28/9 29/11 37/20 37/21
59/24 69/5 70/12 70/19
participating [1] 14/24
particular [8] 6/16 10/14 12/18
37/6 50/7 80/6 88/25 95/20
party [2] 13/18 57/17
pass [2] 14/9 53/11
passive [8] 9/2 9/13 9/14 9/16
9/24 10/3 19/16 39/7
password [2] 12/7 97/10
passwords [1] 22/2
past [1] 7/15
path [2] 92/14 92/25
patience [1] 68/23
pay [4] 12/7 70/3 70/25 98/7
paying [1] 69/16
payment [11] 38/21 38/22 49/16
70/4 72/12 78/13 78/19 78/19
83/10 86/11 87/3
payments [5] 39/16 69/6 69/14
80/1 88/13
PayPal [1] 78/17
PEARLMAN [3] 1/18 4/20 34/11

Pearlman's [1] 34/6
peeled [1] 14/20
PELKER [6] 1/13 3/4 4/9 4/19 4/25
58/6
Pennsylvania [1] 1/14
people [13] 11/9 12/14 12/17 14/3
14/25 26/19 40/2 48/4 48/7 48/10
49/10 73/22 99/11
percent [4] 63/9 63/10 83/5 83/9
period [3] 39/10 71/2 85/9
person [7] 7/6 20/1 22/13 22/13
74/4 74/5 75/11
personal [1] 85/4
pertaining [2] 78/22 79/2
Peter [8] 35/19 35/19 35/21 36/14
41/25 42/11 44/13 44/20
phone [4] 5/17 7/4 9/10 76/5
physical [1] 34/7
picks [2] 14/14 91/25
piece [2] 28/7 97/19
pieces [1] 28/24
place [3] 12/10 79/20 94/9
Plaintiff [2] 1/4 1/13
plan [1] 64/14
plasma [12] 35/15 35/16 36/1 36/2
36/13 41/11 47/12 47/18 50/2 50/3
52/15 52/16
plasmadivision [6] 35/16 36/2
36/13 41/17 47/18 50/2
plasmadivision.com [1] 52/15
play [3] 13/11 19/17 91/17
plays [1] 90/12
please [3] 4/16 66/1 99/9
PLLC [1] 2/3
plus [5] 30/4 30/23 31/2 31/14
63/16
point [23] 9/23 12/21 12/24 20/17
38/22 51/22 52/8 56/25 61/16 64/5
66/4 72/19 87/10 92/1 92/3 92/8
92/10 92/14 92/15 92/25 92/25
93/5 93/13
pointing [1] 62/24
points [4] 29/7 52/24 73/10 76/17
policy [1] 62/14
pop [3] 17/9 20/3 89/20
popular [1] 17/18
port [4] 22/5 22/9 66/23 67/5
portal [2] 58/18 94/1
ports [2] 12/21 22/1
possible [11] 10/25 64/3 64/3
64/7 64/15 80/7 88/21 93/9 93/11
93/15 97/11
post [29] 26/21 27/4 27/9 27/10
58/14 62/3 62/4 63/23 63/24 64/9
67/8 67/9 67/17 67/22 67/24 68/10
68/17 68/18 68/25 69/3 80/19
80/20 80/20 81/4 82/14 82/15
82/21 96/8 96/16
posted [3] 29/20 48/10 61/17
posts [2] 61/24 95/13
power [1] 12/25
PowerPoint [4] 15/19 22/12 29/24
52/25
practical [1] 62/25
practitioners [1] 8/23
precautions [2] 60/20 68/22
preferences [1] 28/5
prepare [1] 34/3
present [2] 4/22 44/12
presentation [1] 15/19
preset [1] 20/4
press [1] 27/7
pressure [2] 61/14 68/2
previous [3] 52/22 54/21 69/24
previously [4] 38/6 50/22 58/13
99/20
Price [1] 80/10
Primarily [1] 39/7
print [2] 34/7 34/12
prior [4] 39/21 87/5 87/23 95/21
privacy [3] 38/20 84/24 85/6
private [9] 11/22 13/23 37/1

**P**

private... [6] 64/23 65/6 78/11 84/21 84/22 85/3
probably [3] 84/22 99/23 101/3
Problems [1] 82/17
procedure [2] 100/17 100/23
proceed [1] 4/9
proceedings [2] 1/7 102/5
process [10] 7/23 10/21 19/23 21/4 68/19 72/5 73/8 75/23 90/12 90/15
processed [1] 60/15
processing [2] 12/25 60/4
product [2] 71/24 79/12
product/service [1] 79/12
production [1] 98/12
profession [3] 8/9 10/1 25/13
profit [1] 14/22
program [2] 16/11 17/9
programmer [1] 62/12
programs [3] 17/2 17/11 28/4
Project [7] 14/22 24/19 25/5 25/7 25/19 53/11 89/2
Project's [1] 16/18
projects [1] 66/19
proper [2] 60/18 66/21
properly [1] 63/6
protect [3] 14/15 22/2 60/9
protecting [1] 61/5
protection [2] 72/3 84/24
proven [1] 61/1
provided [1] 77/7
provider [5] 10/6 29/17 46/5 47/4 56/23
provider's [1] 49/9
providers [2] 12/11 72/11
provisioned [1] 59/17
proxies [2] 12/1 27/22
proxy [47] 11/7 11/8 11/11 11/13 11/14 11/17 12/14 12/18 13/6 13/14 13/15 14/2 20/1 20/2 20/5 20/10 20/11 20/13 20/15 20/23 21/2 21/6 21/10 21/12 21/15 21/19 21/21 21/23 24/1 24/4 24/7 24/8 24/12 24/17 29/6 29/14 29/19 40/1 40/6 48/2 48/4 48/7 48/9 49/7 49/8 49/10 70/10
proxy's [1] 11/11
psychology [1] 94/24
public [2] 48/9 65/23
publically [2] 59/13 66/12
publish [9] 6/4 15/24 33/3 34/14 56/5 71/15 71/19 78/1 83/23
published [11] 16/4 33/15 34/20 37/16 38/9 56/9 76/24 78/4 84/3 95/20 97/4
publishes [1] 25/5
pull [20] 5/20 32/19 34/6 37/2 37/25 50/22 58/13 62/2 69/9 71/6 77/15 80/11 80/19 81/12 83/1 83/13 85/11 86/2 87/25 89/22
pulled [1] 40/12
pulling [2] 8/3 15/18
purchase [3] 59/2 71/11 98/25
purchase.com [1] 71/25
purchased [2] 68/4 86/14
purple [2] 22/21 23/12
purpose [5] 14/12 59/13 75/13 92/15 94/14
purposes [4] 60/13 60/14 62/16 99/22
put [5] 66/13 68/6 72/15 75/18 85/4
putting [2] 28/24 59/4

**Q**

quality [1] 13/12
queried [1] 9/15
query [1] 7/24
question [2] 35/2 46/11
questions [1] 65/11

quickly [2] 47/3 67/20
quote [3] 63/25 64/19 65/21

**R**

racks [2] 73/25 74/1
raise [1] 57/17
raised [1] 75/16
ran [1] 59/18
RANDOLPH [1] 1/9
randomized [1] 84/21
rather [3] 23/25 89/7 97/15
reach [3] 66/4 90/4 91/19
reachable [2] 27/6 89/14
read [36] 14/18 26/8 27/4 27/10 42/18 51/16 55/9 59/8 59/10 59/20 60/10 60/12 61/11 62/4 63/9 63/23 64/18 65/9 65/21 66/2 66/9 66/20 67/8 67/23 67/24 68/18 78/14 78/16 80/20 82/15 82/15 83/4 83/7 86/9 95/25 96/7
ready [2] 4/10 57/25
real [4] 7/6 62/25 68/16 97/25
really [4] 62/25 65/18 97/24 100/23
reason [3] 11/10 31/15 65/24
reasonable [1] 62/16
reasons [1] 43/21
reassure [2] 61/8 64/16
reassuring [1] 65/13
recall [3] 50/10 50/15 84/9
receipt [1] 86/11
Recess [2] 57/24 101/8
recognize [3] 77/16 83/15 96/14
recollection [1] 51/7
record [39] 4/16 5/9 5/22 6/13 6/14 6/23 6/24 7/5 7/8 7/16 8/7 9/1 45/22 50/20 50/25 56/1 57/1 69/12 72/20 75/19 75/24 77/4 77/13 79/7 80/15 80/16 81/16 81/17 81/19 81/20 83/2 84/16 85/5 87/17 87/22 87/25 91/11 91/12 102/5
recorded [3] 19/5 30/15 62/20
records [46] 5/8 5/10 5/24 6/2 6/16 7/17 8/19 8/20 9/15 10/9 10/10 13/20 19/3 19/16 21/16 28/10 29/21 30/22 35/6 36/12 39/7 44/17 45/24 48/18 49/23 51/13 52/13 52/19 54/8 55/7 58/11 62/16 70/13 73/9 75/6 75/17 76/9 76/13 76/14 76/17 77/13 78/22 81/14 82/23 90/17 98/8
referenced [2] 30/3 39/19
referred [1] 69/24
reflect [4] 8/20 75/17 83/20 96/21
reflection [2] 33/7 95/11
refresh [2] 27/19 51/7
regarding [1] 70/13
regional [1] 52/4
regionally [1] 28/2
register [6] 59/2 70/25 80/6 83/9 88/19 89/3
registered [10] 35/19 50/16 51/3 51/9 72/22 73/5 75/22 77/5 83/5 85/6
registering [4] 68/15 72/6 79/24 88/18
registers [1] 72/14
registrant [3] 81/23 84/14 84/19
registrar [9] 74/22 74/23 74/24 75/1 75/3 75/18 80/9 80/18 83/12
registrars [1] 74/19
registration [15] 6/25 50/20 70/13 71/4 71/13 77/12 78/23 79/7 80/3 83/6 85/3 86/5 87/11 87/18 88/8
regular [9] 17/3 17/24 24/20 53/20 59/18 89/7 89/17 89/24 90/3
regularly [2] 25/12 66/22
reinforcing [1] 66/17
relate [1] 70/22

related [2] 58/11 59/4
relates [1] 51/16
relating [1] 57/13
relation [1] 53/22
relatively [1] 54/21
relay [3] 27/13 53/25 54/3
relayed [1] 93/4
relays [2] 20/13 25/20
relevant [1] 74/16
reliable [1] 24/2
relied [2] 9/25 25/12
rely [1] 8/23
remember [5] 39/8 50/19 87/14 94/18 94/21
remind [4] 5/7 29/8 57/11 75/9
rendezvous [8] 92/1 92/3 92/8 92/10 92/14 92/15 92/25 93/5
renewal [4] 86/5 86/17 87/8 87/9
renewals [2] 87/16 87/20
renewed [4] 51/4 51/9 87/11 88/8
renewing [1] 72/1
rent [2] 71/2 73/8
reorient [1] 84/15
repeatedly [2] 52/18 100/2
replenishment [1] 69/17
report [2] 44/1 44/5
reporter [6] 2/6 2/7 25/10 94/20 102/3 102/13
reports [1] 101/5
represent [1] 88/24
represents [1] 22/20
request [11] 11/23 18/24 22/10 23/7 80/14 80/17 90/21 90/22 91/3 92/21 94/11
requests [6] 9/16 9/18 9/21 13/2 14/8 66/7
require [1] 100/24
required [1] 63/20
requirements [1] 24/23
research [6] 13/4 19/15 19/16 21/7 57/12 99/11
resellers [2] 74/11 78/11
Reserve [25] 35/14 35/15 35/15 35/17 36/13 38/24 39/17 40/19 41/1 41/11 41/17 47/12 47/17 48/19 49/1 50/1 50/2 52/15 54/9 54/15 55/2 56/14 69/7 69/9 78/15
residential [5] 10/7 29/5 49/7 52/2 53/10
resolutions [1] 29/16
resolve [2] 9/22 90/17
resolved [2] 39/9 82/18
respect [1] 44/10
respond [1] 21/12
responding [1] 80/16
responds [2] 90/18 91/5
response [2] 8/2 19/10
responses [2] 9/18 9/20
responsible [3] 19/13 21/1 56/19
rest [2] 11/8 13/2
restarting [1] 27/7
restored [1] 68/13
results [1] 64/12
resume [1] 89/22
retrieve [1] 18/23
retrieved [2] 37/10 65/7
return [2] 29/24 84/13
returned [1] 68/19
returning [6] 39/1 44/8 45/20 47/7 49/19 51/24
reveal [2] 65/12 75/10
review [25] 26/18 28/9 29/21 31/11 31/21 37/23 39/13 40/12 43/21 50/12 55/12 59/3 61/24 69/6 70/12 76/9 77/13 78/22 81/9 82/23 86/20 87/22 95/5 95/12 98/8
reviewed [2] 32/17 95/12
reviewing [2] 48/13 58/11
rewarded [1] 63/16
right [26] 4/2 4/6 4/9 4/24 20/19 27/2 27/6 27/19 30/2 32/10 55/18 57/15 57/22 57/25 58/4 63/11

**R**

right... [10]  71/24 72/2 74/21 81/19 82/3 82/14 84/11 85/13 85/20 101/7
right-hand [1]  84/11
Riksnet [2]  56/20 56/25
risk [2]  23/18 25/22
risks [1]  64/6
Road [3]  61/15 61/16 61/21
role [1]  23/16
ROMAN [5]  1/6 4/15 4/22 51/1 51/11
Room [1]  2/8
route [1]  92/13
routed [3]  20/21 92/23 94/5
router [5]  14/6 14/13 18/16 46/25 46/25
routes [1]  12/23
routinely [3]  6/17 7/24 8/1
routing [4]  15/7 15/16 18/12 53/2
row [7]  55/9 55/10 69/11 69/11 69/12 69/13 78/12
rows [3]  35/3 85/12 85/18
RPR [1]  102/12
rulings [1]  95/21
run [18]  12/20 12/24 15/13 17/3 17/15 17/16 30/10 49/8 59/11 59/12 59/21 59/25 63/20 64/20 64/22 66/11 74/7 94/16
running [25]  16/25 20/2 21/2 25/19 53/5 53/25 54/3 60/3 61/9 61/13 61/20 62/13 63/1 63/6 63/14 65/3 65/24 66/3 66/12 66/18 66/21 67/6 68/3 89/13 93/23
runs [2]  14/21 93/24
Russia [1]  30/20
Russian [1]  37/21

**S**

safely [1]  97/20
safety [1]  22/3
said [2]  9/6 33/23
same [49]  11/25 12/14 12/15 12/18 12/19 12/21 13/1 13/5 20/5 28/22 28/22 31/6 31/23 32/1 34/12 35/21 40/5 41/10 41/13 41/22 42/11 42/20 42/23 43/3 43/18 44/4 44/7 45/7 45/24 47/20 48/12 48/25 49/17 53/25 54/16 54/24 57/1 64/22 69/23 70/10 72/23 82/4 87/5 88/19 88/20 89/17 91/14 93/6 93/13
satisfaction [1]  80/10
saved [2]  9/15 68/12
saves [1]  8/2
saw [8]  10/10 29/4 40/19 40/22 47/17 48/24 54/14 87/6
say [9]  7/8 14/1 19/18 20/3 29/11 30/21 60/23 65/8 94/19
saying [14]  32/7 59/16 60/1 61/19 62/22 62/25 63/4 63/19 64/14 65/6 65/17 66/4 67/1 68/14
says [6]  31/17 51/1 57/6 62/8 79/12 100/2
scan [1]  67/5
scans [2]  66/23 67/5
scenario [2]  64/1 64/2
scenarios [1]  18/11
scenes [1]  91/6
screen [8]  34/8 34/23 40/5 40/18 77/16 78/8 78/9 81/16
screenshot [1]  71/10
screenshots [1]  95/9
scroll [19]  6/18 6/22 37/5 38/17 51/13 51/14 51/15 56/15 83/8 84/15 85/16 85/20 85/23 85/24 88/3 96/8 96/16 97/7 98/18
scrolling [6]  38/19 51/19 56/15 77/11 85/12 98/24
search [6]  5/8 7/17 7/24 9/22 22/16 89/20

searchable [1]  8/4
searching [2]  8/14 20/7
second [15]  21/9 23/7 24/13 26/24 43/19 54/23 59/10 59/10 61/11 62/4 63/25 81/20 85/12 86/9 93/1
second' [1]  62/9
seconds [4]  41/9 42/7 42/7 47/18
section [4]  51/16 59/8 79/22 82/7
secure [3]  60/17 61/8 66/21
securely [1]  60/16
security [8]  24/22 60/13 60/14 61/5 66/17 66/24 72/3 92/17
see [28]  6/25 9/9 16/9 17/7 18/14 20/14 28/22 31/13 31/14 31/16 39/8 39/8 43/6 51/15 54/21 57/13 57/22 58/24 65/3 74/5 75/24 77/4 78/9 85/6 85/23 97/25 98/18 101/7
seeing [1]  21/9
seem [1]  82/17
seems [3]  63/11 69/12 72/1
seen [1]  18/9
sees [1]  9/19
sell [1]  74/20
selling [1]  74/9
send [7]  11/23 17/22 19/18 19/22 21/3 21/10 91/13
sending [1]  17/10
sense [5]  10/5 14/17 28/21 28/21 52/4
senses [1]  59/23
sent [2]  19/9 86/11
sentence [4]  59/20 59/24 60/10 86/9
separated [1]  65/7
September [1]  72/1
September 2025 [1]  72/1
sequence [1]  54/20
series [4]  15/15 43/12 76/12 89/23
server [89]  9/9 10/22 11/8 11/13 12/5 12/8 12/14 12/18 12/22 13/4 13/6 14/2 14/16 19/3 19/7 19/14 20/10 20/11 20/13 20/14 20/17 20/23 21/3 22/1 22/6 22/10 23/22 24/8 24/12 26/6 26/17 30/21 30/24 30/25 31/11 33/7 33/8 33/10 39/11 48/2 48/4 48/7 48/9 49/8 54/3 59/12 59/16 60/1 60/2 60/8 60/16 62/10 62/11 63/3 63/15 65/8 65/15 66/18 67/6 67/11 67/20 68/3 70/10 72/18 73/2 73/6 73/15 73/16 73/19 73/25 74/6 81/5 82/12 84/9 84/9 88/13 88/16 89/13 89/15 90/4 90/9 90/10 90/16 90/25 91/11 92/4 93/13 93/21 93/24
server's [3]  19/5 20/15 31/16
servers [39]  12/10 12/12 12/24 13/25 14/7 14/16 15/2 19/3 24/19 25/19 29/6 29/16 29/19 58/22 61/9 64/4 64/10 65/1 65/2 66/20 66/21 67/18 68/1 68/3 68/11 68/15 72/18 73/8 73/17 73/22 74/1 78/10 78/11 82/2 82/7 82/11 91/21 91/21 91/25
service [55]  10/6 12/1 12/7 12/18 13/14 13/24 15/13 16/24 18/13 21/6 21/8 21/10 37/1 46/5 49/9 56/23 59/4 59/11 59/12 59/19 60/3 60/14 60/21 61/3 61/25 62/13 63/17 63/17 63/20 64/19 64/20 65/4 66/11 68/21 69/1 69/16 69/22 70/2 70/11 71/1 78/20 79/12 80/10 83/6 85/6 85/13 86/14 88/19 88/22 89/7 89/10 93/3 93/16 94/2 96/11
servicers [1]  14/11
services [26]  7/18 9/1 18/6 18/7 21/12 21/15 38/16 47/1 62/23 66/1 66/13 67/6 69/7 70/3 78/10 82/1 84/25 89/16 91/15 91/19 91/23 92/9 92/22 93/22 94/10 94/12
set [15]  7/23 11/9 11/16 12/8 14/25 24/7 25/23 31/17 59/17 63/6 65/15 72/9 73/9 74/6 93/14

setting [5]  13/15 25/23 58/19 69/4 74/3
settings [3]  25/25 31/16 66/22
setup [4]  11/21 12/6 59/4 65/19
several [3]  30/9 41/4 43/2
shame [1]  100/21
share [2]  79/12 79/18
shared [4]  66/14 78/10 79/21 80/3
she [10]  39/4 39/4 94/23 99/23 100/5 100/6 100/7 100/16 100/17 100/22
sheet [3]  33/25 55/5 55/6
SHERRY [3]  2/6 102/3 102/12
shormint [26]  32/14 35/16 35/17 36/14 39/16 40/20 41/1 42/4 42/12 43/10 48/19 49/1 49/3 54/9 54/15 55/2 55/6 56/14 69/6 69/16 77/7 79/6 81/24 85/14 85/19 99/4
shortened [1]  35/3
shortly [2]  47/19 87/23
should [15]  7/2 22/11 27/6 58/14 62/3 63/10 63/16 67/13 68/7 90/17 96/2 97/24 98/13 100/15 100/20
shouldn't [1]  67/2
show [7]  5/15 11/23 60/22 60/25 89/19 89/22 97/23
showing [9]  23/6 23/6 23/21 30/6 55/15 76/11 78/9 95/8 98/8
shown [58]  6/12 6/19 6/23 16/7 17/20 19/6 20/9 22/19 22/21 23/11 24/6 24/14 26/3 30/13 32/21 34/8 34/11 34/24 36/5 37/3 38/13 38/17 40/4 40/17 44/10 45/21 48/22 51/19 54/12 55/5 55/25 56/17 69/10 71/8 71/23 77/3 77/16 78/8 78/12 79/1 79/10 79/23 80/12 81/13 81/21 83/15 84/6 84/11 84/14 84/19 86/4 86/24 88/1 92/3 93/7 97/8 97/12 98/12
shows [6]  7/8 24/7 30/18 44/12 89/11 91/18
shut [5]  60/9 61/14 61/16 80/24 81/6
shuts [2]  59/22 63/17
side [8]  19/6 28/22 28/22 66/19 81/22 92/17 92/18 98/5
signature [2]  51/20 51/22
significance [1]  53/5
significant [11]  40/4 40/15 43/13 44/23 45/2 45/2 45/4 48/3 48/11 49/14 54/19
significantly [1]  99/25
silhouette [1]  26/9
Silk [3]  61/15 61/16 61/21
similar [9]  7/21 8/19 14/2 17/17 54/21 56/23 62/7 75/25 76/2
simple [1]  11/15
simpler [1]  13/16
simplified [2]  91/18 92/3
simplify [1]  12/4
simply [1]  77/12
since [5]  40/1 49/10 62/23 64/15 68/3
single [1]  23/25
sit [1]  91/7
site [27]  18/15 24/25 24/25 27/18 37/5 58/11 59/17 59/18 61/8 61/9 61/20 61/22 63/6 66/18 72/19 72/20 80/25 81/1 81/6 83/21 89/16 92/9 93/9 93/11 94/6 97/15 98/1
site's [1]  97/21
sites [5]  9/15 18/2 23/20 25/2 97/20
sits [1]  18/13
slide [14]  17/19 18/17 18/18 19/25 22/12 22/19 23/2 23/6 26/3 29/24 89/22 89/24 90/11 94/4
slides [2]  52/25 89/23
slightly [1]  51/19
slow [1]  24/18
slowly [1]  85/12
smart [1]  65/18

**S**

smiley [1]   66/15
so [115]
SOCKS [5]   21/21 21/23 70/6 70/7
70/10
software [3]   13/25 20/3 28/7
solution [1]   63/14
some [46]   7/3 7/18 8/18 9/1 12/22
13/17 14/8 14/9 16/13 16/15 17/15
17/16 17/16 19/4 21/15 22/1 28/1
29/4 29/5 29/6 29/15 29/16 29/18
29/20 31/7 31/15 37/20 37/21
37/22 39/9 43/18 45/10 52/8 52/24
54/21 59/9 60/6 64/13 66/4 71/3
85/9 88/23 91/21 96/9 96/10 100/1
somebody [2]   72/9 100/21
someone [22]   9/10 10/25 11/16
13/6 15/10 17/8 18/12 25/25 26/11
53/5 53/9 53/25 72/5 72/15 73/14
74/3 77/5 80/9 88/22 89/10 89/11
91/14
something [11]   10/8 17/8 28/15
29/9 29/13 45/1 45/4 60/7 63/4
89/21 100/22
sometimes [7]   11/9 13/3 13/7
14/11 47/1 48/9 98/3
somewhat [1]   91/18
somewhere [6]   12/5 73/2 73/6
73/15 87/15 100/9
soon [1]   96/2
sorry [10]   10/16 10/18 42/18 51/8
55/16 55/22 68/20 85/15 87/13
94/20
sort [7]   12/6 12/22 15/11 17/22
18/13 28/15 71/3
sorts [2]   12/17 28/20
source [5]   10/22 25/5 28/23 28/23
74/10
sources [2]   32/12 32/23
space [4]   5/24 7/25 46/11 73/2
spam [1]   7/2
speaking [3]   16/10 26/11 91/21
special [4]   18/2 18/5 23/8 23/11
specific [6]   22/1 31/7 33/20 34/1
35/2 65/11
specifically [4]   31/17 59/17
61/21 98/20
specifics [2]   68/21 69/1
specify [1]   94/10
spell [1]   25/10
spelled [1]   31/9
spoke [1]   29/8
spreadsheet [10]   32/16 33/19
33/23 34/10 44/14 45/20 47/14
48/21 52/17 54/11
SSC [2]   70/3 70/10
SSL [7]   97/17 97/22 98/1 98/4
98/9 98/20 99/1
stable [1]   47/6
stacked [1]   87/20
stamps [2]   31/8 40/23
stand [2]   4/7 26/24
standard [2]   30/1 61/21
stands [1]   14/6
start [12]   16/24 17/9 20/8 22/2
22/16 26/5 26/15 29/17 72/8 74/9
87/14 100/19
started [3]   50/16 63/25 67/20
starting [11]   4/17 27/20 36/10
59/11 60/12 61/12 62/5 64/19 65/9
66/9 96/8
starts [2]   17/1 26/16
state [3]   4/16 68/6 68/8
stated [1]   14/12
statement [1]   95/20
STATES [5]   1/1 1/3 1/10 4/15 4/19
stay [5]   47/6 60/20 63/17 82/4
88/11
staying [1]   51/24
steer [1]   99/11
step [10]   10/20 19/17 19/23 20/6

20/9 21/5 21/9 45/20 91/24 93/2
steps [5]   10/25 24/3 25/24 64/8
91/20
STERLINGOV [5]   1/6 4/15 4/22 51/1
51/11
Sterlingov's [3]   41/11 51/4 51/5
still [8]   20/6 27/23 39/24 48/12
54/1 60/20 66/12 101/2
stop [1]   26/6
stopping [1]   80/23
stops [1]   23/6
storing [1]   65/6
Street [2]   1/16 2/3
stretch [1]   26/24
strikes [1]   64/4
string [3]   18/8 89/1 94/21
structure [2]   33/18 33/22
struggling [1]   67/20
subdomain [1]   70/20
subject [2]   80/12 95/21
subpoena [3]   10/21 19/18 21/10
subpoenas [1]   21/12
substantive [1]   8/5
such [1]   62/13
sufficient [1]   64/11
suggest [1]   26/23
suggesting [1]   100/6
Suite [1]   1/17
summarize [3]   32/25 34/9 36/18
summarized [1]   32/16
summary [6]   33/8 33/11 33/13
33/25 44/8 72/4
Super [3]   70/6 70/7 70/10
support [2]   12/20 67/18
sure [9]   10/8 10/10 60/15 62/14
63/16 67/6 73/16 99/11 100/14
suspicious [1]   59/22
swear [1]   60/22
Sweden [2]   30/19 57/6
Swedish [4]   46/5 52/2 52/22 56/23
system [4]   9/5 17/15 17/17 67/1
systems [3]   17/12 17/13 68/19

**T**

tab [12]   33/25 34/2 36/17 44/15
44/15 45/21 47/14 48/21 51/24
52/17 54/12 69/10
table [8]   2/10 4/19 4/23 30/14
30/15 30/18 44/3 45/22
take [14]   10/25 13/13 17/3 23/18
25/21 26/24 29/21 57/9 57/15
68/22 70/16 72/9 92/13 101/4
taken [6]   55/7 57/24 60/20 64/8
81/14 101/8
takes [5]   63/15 63/21 63/22 68/16
68/22
taking [2]   13/6 68/20
talk [17]   11/21 24/10 26/21 27/16
35/12 45/18 45/23 49/25 52/14
60/2 61/24 62/2 69/14 80/19 82/14
90/7 96/5
talking [2]   35/8 70/21
technical [4]   17/8 59/9 92/16
98/5
Telecom [1]   47/25
telephone [2]   77/8 81/25
Telia [3]   46/6 56/21 56/22
tell [2]   80/24 89/6
telling [1]   27/17
tells [1]   64/25
temporal [1]   46/11
tend [1]   18/8
tends [2]   47/5 47/5
terminal [1]   17/21
terms [4]   12/19 59/9 88/21 97/18
test [2]   71/25 96/2
testified [3]   39/4 58/10 88/18
testifying [1]   46/10
testimony [5]   6/1 15/22 69/24
71/12 99/18
text [2]   37/21 79/23
Thai [1]   47/24

than [14]   20/20 22/25 23/1 23/25
41/15 46/7 46/14 53/18 62/17
64/20 89/7 97/15 99/23 99/24
than 12 [1]   22/25
thank [8]   4/24 5/1 27/1 58/7
58/15 68/23 88/6 96/17
that [340]
that .onion [1]   89/12
their [34]   9/7 9/23 11/10 11/13
14/3 15/12 17/16 18/13 18/16
18/16 18/22 18/24 18/25 20/4
21/13 21/16 22/17 24/25 24/25
25/23 28/4 47/2 53/11 53/18 60/23
66/2 67/4 68/13 73/8 77/6 77/7
90/13 90/25 94/7
them [29]   7/17 8/15 8/18 9/11
10/5 10/11 11/16 12/11 14/7 14/9
17/3 19/22 28/21 31/15 32/24
48/10 48/13 54/14 61/8 62/19 63/7
66/23 71/2 72/23 74/18 74/25
75/16 80/8 80/25
themselves [2]   21/15 94/16
then [55]   11/14 11/24 14/8 14/19
17/2 19/9 20/4 20/14 20/21 21/9
22/16 23/10 24/8 24/12 24/13
26/14 34/1 40/11 40/12 41/2 41/10
41/16 42/3 42/19 43/2 43/9 43/9
44/21 45/2 45/10 45/11 45/23
47/19 48/25 49/17 54/14 54/16
54/23 56/15 60/1 72/18 74/20
75/13 90/25 91/3 93/1 93/4 93/12
94/8 94/9 94/11 99/7 100/13
100/15 100/25
theoretically [1]   53/24
there [70]   5/10 5/17 7/3 7/13
9/21 12/1 15/12 15/12 17/2 18/2
20/5 21/19 22/11 22/21 22/22
22/25 23/1 23/11 24/16 25/7 25/25
28/19 30/9 30/13 31/17 31/19 32/8
34/11 41/4 41/14 41/16 42/10
42/13 43/2 49/2 49/2 49/4 54/13
55/1 56/25 57/1 57/3 63/5 63/5
65/2 66/5 67/2 69/16 70/2 74/10
74/18 75/3 75/21 76/5 78/14 79/23
82/16 88/13 88/25 91/12 91/20
92/9 94/9 95/20 95/21 98/1 99/20
100/9 100/25 101/1
Therefore [1]   81/7
these [37]   6/16 8/5 10/10 14/23
15/2 24/3 24/10 40/4 40/14 40/17
43/12 43/12 43/24 44/5 44/19
44/23 45/5 45/6 46/7 46/8 48/11
48/12 49/13 49/16 50/4 53/25
54/22 65/1 73/17 76/12 76/16
78/19 79/11 81/14 85/25 89/23
94/12
they [93]   7/23 8/6 8/7 8/21 9/17
11/1 11/5 11/16 11/18 12/11 12/13
12/23 13/2 13/20 16/9 17/8 17/10
17/12 18/5 18/6 18/8 18/9 18/9
18/10 18/20 18/20 20/3 20/3 20/5
20/6 20/10 21/4 22/15 22/17 24/8
24/24 25/1 25/3 25/4 25/8 25/9
25/21 25/23 27/19 28/4 28/7 28/7
28/8 30/4 34/1 38/21 43/16 46/16
46/21 48/9 48/12 54/2 54/2 54/2
58/25 60/1 60/22 62/17 64/11
64/21 67/1 67/4 67/19 72/14 72/20
73/14 73/18 73/21 74/5 74/6 74/10
74/10 74/21 76/14 77/8 78/10
80/24 80/24 85/3 88/24 89/13
90/19 93/12 94/8 94/9 94/9 94/10
97/25
thing [1]   66/13
things [5]   12/4 12/17 17/10 46/17
75/3
think [15]   21/25 32/8 63/10 63/16
93/15 94/25 99/22 100/3 100/10
100/10 100/15 100/15 100/18
100/25 101/3
third [7]   13/18 23/8 45/13 49/19
85/12 95/25 96/7

**T**

**this [231]**
**those [19]**   7/21 8/24 9/1 9/19
12/3 12/10 12/12 23/8 24/22 28/13
30/17 42/6 44/17 46/14 48/3 48/24
74/4 85/2 92/8
**though [6]**   27/22 40/5 46/21 48/3
49/13 61/3
**thread [3]**   62/2 82/14 96/5
**three [5]**   26/16 42/9 42/16 78/16
92/8
**through [68]**   8/1 11/13 12/8 12/22
14/1 14/11 14/14 15/8 15/12 17/3
17/23 18/11 18/18 20/1 20/23 22/1
23/2 23/3 23/5 24/10 24/17
25/2 26/16 27/14 30/2 30/10 40/17
40/23 44/19 47/15 53/11 60/14
61/4 61/4 61/13 61/20 65/24 66/3
66/5 66/6 66/11 71/1 73/8 76/11
76/20 76/23 79/23 81/21 86/18
86/19 87/9 87/12 89/18 90/11
91/17 91/19 92/24 93/1 93/5 93/6
94/2 94/6 94/6 94/11 94/12 97/14
100/21
**tied [6]**   19/12 32/3 32/8 36/7
51/25 59/5
**time [78]**   5/10 6/17 7/11 9/23
10/6 10/10 10/12 12/18 12/19 13/1
13/5 19/4 19/15 28/23 29/21 29/25
30/1 30/1 30/3 30/14 30/16
30/19 30/21 30/23 30/24 31/5 31/6
31/7 31/8 31/9 31/9 31/12 31/15
31/16 31/18 31/24 36/21 39/2
39/10 40/13 40/21 40/22 40/23
41/14 42/8 42/17 42/24 43/17 45/6
46/2 47/4 47/4 47/23 48/2 49/11
53/6 53/15 53/25 57/8 59/8 59/11
61/22 63/15 63/21 68/5 68/14
68/16 68/23 71/2 76/17 80/22
82/18 83/21 85/9 87/5 88/14 99/14
**times [6]**   30/21 32/23 40/13 40/20
42/6 81/15
**timing [3]**   44/23 45/5 54/20
**today [2]**   68/2 80/22
**together [9]**   11/20 28/7 28/24
40/11 43/17 43/21 45/6 54/22 65/2
**tomorrow [2]**   99/21 99/24
**too [5]**   17/18 60/7 67/20 88/17
93/1
**took [1]**   68/14
**tool [1]**   20/2
**tools [3]**   8/20 11/5 28/4
**top [13]**   14/16 22/17 24/3 36/10
37/5 45/13 50/20 51/2 72/3 83/4
88/3 96/16 98/24
**TOR [133]**
**Tor's [1]**   16/25
**total [1]**   80/2
**tracing [1]**   21/5
**track [3]**   24/18 44/3 74/17
**tracked [1]**   35/1
**traffic [27]**   11/13 12/4 14/9
14/10 14/14 14/18 15/7 18/12
20/13 20/16 20/21 23/9 23/18 25/1
33/8 53/11 53/14 53/15 53/17
53/19 53/20 53/21 66/6 67/4 68/12
91/22 94/5
**transaction [1]**   62/10
**transactions [5]**   60/4 65/4 69/10
85/18 85/25
**transcript [2]**   1/9 102/4
**transfer [5]**   80/8 80/14 80/17
81/1 82/18
**transferring [1]**   81/7
**translated [2]**   37/23 38/2
**translation [1]**   67/5
**translators [1]**   38/1
**traverses [1]**   91/22
**treat [1]**   31/19
**TRIAL [1]**   1/9
**tried [1]**   93/14

**trip [3]**   101/1 101/2 101/4
**true [9]**   14/3 32/2 32/12 36/6
41/11 50/4 51/25 75/10 102/4
**trusting [1]**   13/18
**try [5]**   10/25 24/20 27/6 27/13
27/14
**trying [5]**   24/24 27/17 46/17 90/7
94/10
**tunnel [1]**   21/25
**turn [2]**   36/16 47/14
**Turning [4]**   31/21 44/14 52/17
77/2
**tweet [1]**   95/25
**tweets [1]**   95/12
**Twitter [5]**   36/3 36/4 50/3 95/8
95/12
**two [15]**   11/15 11/16 11/20 18/9
33/6 45/7 54/22 65/21 72/1 79/15
81/14 83/4 85/25 87/20 93/2
**type [17]**   7/3 9/7 10/11 21/21
22/17 26/14 46/9 46/21 54/22
58/25 60/8 70/18 81/5 81/5 90/2
94/7 99/11
**types [8]**   9/21 21/19 29/1 29/4
29/4 84/9 90/2 90/14
**typical [1]**   72/5
**typically [5]**   12/12 22/15 31/11
53/20 54/2
**typing [1]**   17/9

**U**

**U.S [2]**   1/13 2/7
**U5271070 [1]**   69/20
**Uh [1]**   98/15
**Uh-huh [1]**   98/15
**under [12]**   19/6 38/20 51/22 59/7
59/10 59/23 61/14 63/25 64/18
68/1 79/10 99/2
**underline [1]**   51/22
**underneath [1]**   65/21
**understand [8]**   6/1 46/19 61/6
69/1 69/4 69/25 71/12 93/25
**understanding [12]**   7/23 9/20
15/22 33/9 61/2 62/21 67/16 67/18
68/9 68/24 78/18 81/3
**unfortunate [3]**   64/1 64/2 64/5
**unique [3]**   29/16 84/22 93/12
**unique .onion [1]**   93/12
**UNITED [5]**   1/1 1/3 1/10 4/14 4/19
**universal [2]**   30/1 30/23
**until [4]**   43/5 43/6 88/11 99/18
**up [77]**   5/20 6/14 7/23 9/11 11/9
11/16 12/8 13/15 14/14 15/1 15/18
16/9 17/9 20/3 23/21 24/8 25/4
25/23 25/24 26/24 32/19 34/6 37/2
37/5 37/25 39/13 42/8 43/5 43/6
45/15 47/9 48/15 49/21 50/22
51/14 51/15 52/10 54/5 56/16
58/13 58/19 59/4 59/17 60/22
60/25 62/2 63/7 65/15 66/2 67/2
68/3 69/4 69/9 71/6 72/9 72/15
73/9 74/3 74/6 75/25 77/15 80/11
80/19 81/12 83/1 83/13 84/15
85/11 86/2 87/25 88/16 89/11
89/20 89/20 89/22 93/15 98/24
**update [3]**   6/25 68/6 101/6
**updated [3]**   66/22 67/13 91/11
**updates [1]**   67/3
**updating [1]**   99/19
**upgraded [2]**   67/19 67/21
**upper [1]**   84/11
**URL [2]**   89/19 98/3
**us [11]**   1/20 6/21 20/1 40/17 59/7
59/11 60/17 61/14 80/24 90/11
91/17
**usage [1]**   67/14
**USAO [1]**   1/16
**use [24]**   10/3 11/13 15/10 15/13
16/19 16/22 17/2 17/24 20/4 20/5
24/20 26/1 26/10 26/19 27/7 27/13
27/22 29/18 31/17 31/19 60/16
73/4 80/6 93/9

**used [33]**   7/2 8/8 9/25 10/5 10/23
22/2 25/16 26/4 28/12 28/25 31/12
31/23 32/2 39/2 41/10 41/21 42/3
42/10 42/19 43/9 44/3 44/11 48/1
49/6 52/1 52/7 52/23 53/24 54/15
54/17 56/14 68/5 82/10
**user [52]**   11/8 16/8 19/9 20/2
20/8 20/22 22/2 24/7 24/16 25/2
28/6 28/22 35/12 35/13 35/20
35/21 36/3 44/4 44/7 45/9 47/2
49/17 49/25 51/13 53/17 54/24
67/19 70/3 71/25 72/4 72/14 85/17
89/24 90/2 90/14 90/20 90/21
90/21 90/24 91/5 92/7 92/19 92/21
93/5 94/5 94/7 94/15 94/16 97/11
97/14 98/5 98/24
**user's [7]**   18/19 24/11 28/2 35/18
90/6 91/3 93/23
**username [5]**   12/7 35/24 36/4
51/15 97/9
**users [18]**   11/12 12/19 13/8 15/11
25/19 27/17 44/13 61/7 62/17
64/16 65/3 67/12 67/19 90/13
90/15 91/19 93/21 97/25
**users' [2]**   14/8 53/17
**using [33]**   9/7 11/1 12/14 12/18
13/10 13/14 14/3 15/9 17/8 17/21
18/3 18/12 18/18 19/15 19/23 20/1
22/13 23/25 24/4 26/14 28/1 40/2
48/4 48/8 49/11 53/9 59/14 61/8
62/18 67/4 75/22 80/24 94/4
**usually [3]**   5/16 5/19 30/25
**UTC [15]**   29/25 30/1 30/7 30/10
30/17 30/21 30/23 30/25 31/2 31/3
31/4 31/6 31/19 31/19 40/21

**V**

**Valerie [1]**   3/3
**valid [1]**   97/24
**valuable [1]**   10/13
**value [2]**   63/11 63/22
**variety [1]**   72/11
**various [3]**   29/7 53/17 69/7
**version [1]**   91/18
**versions [1]**   17/17
**versus [2]**   4/15 53/23
**very [13]**   11/15 21/23 22/5 24/18
43/16 47/19 54/24 59/13 62/17
84/6 84/21 85/24 90/18
**via [1]**   72/20
**Vidalia [2]**   26/5 27/7
**video [2]**   13/12 13/12
**view [1]**   93/21
**Virginia [1]**   73/21
**virtual [4]**   13/23 37/1 49/16
78/11
**Visa [1]**   78/17
**visible [2]**   11/11 23/19
**visit [5]**   17/22 24/20 59/19 93/21
94/1
**visited [2]**   61/3 97/11
**visiting [2]**   18/21 22/7
**visitor [2]**   89/16 89/17
**visitors [1]**   58/24
**visits [2]**   72/15 89/11
**visual [4]**   17/11 71/12 89/23
89/24
**visually [1]**   34/3
**visuals [1]**   15/15
**Volf.prius [8]**   36/2 36/3 36/15
41/2 41/5 41/8 47/13 47/20
**VPN [21]**   13/23 13/24 14/1 29/14
36/24 36/25 37/1 37/4 38/2 38/20
39/2 39/10 39/13 39/22 39/24 40/1
47/2 69/20 69/21 69/22 69/23
**VPN.com [1]**   38/15
**VPS [1]**   81/5
**vs [1]**   1/5
**vulnerabilities [1]**   67/3

**W**

**wait [1]**   62/18

**W**

waiting [1]   80/25
walk [12]   18/11 18/18 19/25 23/2
40/17 40/23 44/19 47/15 79/23
81/21 90/11 91/17
Wall [1]   2/3
want [10]   16/22 25/1 25/21 27/12
53/12 54/1 73/4 73/15 99/6 100/19
wanted [9]   15/4 26/14 53/10 55/18
72/24 73/1 73/4 73/11 93/16
wants [4]   18/22 25/25 57/17 91/9
warehouse [2]   73/24 74/1
warehouses [1]   74/4
warnings [1]   80/25
was [141]
Washington [5]   1/5 1/14 1/17 1/21
2/9
wasn't [2]   10/9 59/16
watch [1]   9/17
way [23]   7/13 9/21 11/25 13/22
14/19 17/6 28/2 28/24 29/20 37/10
45/10 57/1 66/5 73/1 75/21 85/5
85/16 88/19 88/20 88/24 89/17
91/14 97/14
ways [1]   15/13
we [123]
we'll [2]   56/15 69/14
web [13]   13/3 18/24 19/10 50/7
50/10 58/20 58/22 60/1 62/7 62/12
75/21 78/15 90/22
webpage [1]   58/22
website [55]   9/7 9/8 16/18 17/22
17/23 22/18 27/12 37/4 37/9 37/23
45/7 58/18 59/18 59/22 60/5 62/8
63/1 65/3 65/5 65/19 66/2 70/18
70/19 72/16 72/18 73/10 73/15
74/3 75/11 75/21 77/19 77/23
79/20 82/17 83/11 84/8 85/9 88/15
89/7 89/13 89/17 89/25 90/2 90/7
90/21 91/5 91/9 93/21 93/25 94/3
94/8 97/11 97/23 97/25 98/4
website's [1]   83/21
websites [8]   17/24 24/18 24/21
24/22 49/16 54/23 90/17 97/24
week [5]   62/15 62/16 62/18 63/7
100/22
Welcome [1]   58/4
well [9]   15/14 40/9 57/16 60/21
64/5 72/17 84/10 89/13 99/17
went [2]   63/4 68/11
were [52]   5/6 5/9 6/25 19/11
20/24 26/13 28/25 29/4 29/6 29/19
30/24 34/21 36/20 38/2 39/10 40/5
41/4 41/16 42/6 42/13 43/2 43/12
43/16 43/23 45/6 45/17 46/1 46/14
46/16 46/21 47/11 47/22 48/1 48/3
48/12 48/13 48/23 49/2 49/4 49/5
49/13 51/25 52/6 52/25 54/13 55/7
66/14 76/25 77/11 80/23 94/12
101/2
what [246]
whatever [5]   7/9 60/4 73/10 75/17
90/7
when [34]   4/10 5/6 6/25 9/7 9/14
9/19 10/10 11/23 16/9 18/22 24/16
25/2 29/9 29/21 30/14 30/18 31/8
31/9 31/11 38/20 42/1 42/8 43/5
55/8 58/25 61/15 61/16 67/5 69/4
72/15 77/9 85/5 89/11 91/6
where [43]   9/22 12/12 13/24 15/2
16/17 18/20 19/1 19/16 20/15
20/17 20/21 32/1 35/4 36/12 38/15
44/16 48/18 49/23 52/13 52/18
53/1 54/8 61/22 61/22 65/7 72/20
72/21 73/17 73/21 75/22 79/20
81/16 81/17 81/17 88/24 90/17
90/22 91/13 91/13 92/18 94/9 95/5
98/8
whereas [1]   60/7
Whereupon [13]   6/10 16/5 33/16
34/21 37/18 38/11 56/11 71/21

76/25 78/6 84/4 95/23 97/5
Wherever [1]   56/18
whether [6]   10/6 21/9 29/11 52/6
89/6 100/20
which [47]   5/9 5/9 5/20 6/20 7/17
9/8 9/12 10/11 13/20 13/21 16/24
17/21 21/8 23/8 24/13 24/19 25/20
26/5 27/13 31/22 32/19 37/2 39/10
55/7 55/7 55/15 58/13 59/13 63/16
63/21 64/5 64/8 70/20 71/6
75/15 82/19 83/13 85/6 85/15 86/2
88/8 92/1 92/25 94/10 96/13
100/13
while [4]   54/2 60/21 65/13 93/12
who [86]   4/22 5/6 5/7 5/8 5/10
5/13 5/22 5/23 6/1 6/12 6/14 6/16
6/19 7/1 7/5 7/8 7/11 7/13 7/14
7/17 7/24 8/8 8/11 8/13 8/16 8/19
8/20 9/14 9/24 10/3 10/13 14/21
14/23 15/9 18/12 19/13 19/16
19/23 20/25 24/7 25/5 25/25 28/7
36/20 36/23 46/1 47/22 50/15 51/9
55/12 56/1 56/2 57/1 72/5 74/3
75/6 75/9 75/13 75/17 75/22 75/24
75/25 76/3 76/9 76/13 76/14 76/16
77/4 77/5 81/9 81/14 82/23 83/2
84/16 84/21 84/22 85/5 85/7 87/25
89/10 99/20 99/21 100/1 100/9
100/21 101/1
whole [8]   22/22 33/22 33/23 43/23
56/17 66/13 69/3 76/12
whose [1]   15/7
why [22]   10/13 14/13 24/22 27/25
28/18 39/1 39/5 40/4 40/15 43/12
48/3 48/11 49/13 53/22 57/9 59/7
59/11 62/11 62/14 80/9 99/8 100/7
wide [1]   85/24
widely [1]   8/8
will [45]   5/15 5/17 9/9 9/11 11/9
12/5 12/20 12/24 13/4 14/1 15/22
17/9 18/14 20/14 23/5 23/10 23/19
24/21 27/13 27/16 28/19 29/10
29/16 57/11 57/13 57/22 60/18
60/24 60/25 62/12 62/16 62/23
63/17 64/5 64/11 65/12 72/15
86/17 86/19 91/17 97/23 100/13
100/14 100/17 101/7
window [1]   17/9
Windows [2]   17/12 17/16
within [3]   53/2 56/20 66/23
without [5]   17/11 62/13 80/25
93/22 96/11
witness [2]   4/7 57/15
WITNESSES [1]   3/2
won't [2]   12/25 64/16
words [1]   8/3
work [9]   8/11 12/3 23/3 28/9
28/12 39/21 58/10 63/19 70/12
workbook [4]   32/22 33/22 33/23
33/24
working [3]   27/19 65/2 96/2
works [1]   53/19
worksheet [1]   33/19
world [7]   12/13 15/3 30/2 30/9
30/10 73/18 73/23
would [77]   4/16 6/1 11/19 11/20
11/24 13/9 13/16 16/8 19/1 19/5
19/12 19/14 19/20 20/5 20/8 20/10
20/25 21/5 21/7 21/9 22/8 22/9
22/13 22/15 22/17 23/3 25/24
26/11 30/25 39/10 43/17 43/18
53/1 53/9 53/18 53/20 54/1 54/2
54/2 57/8 58/21 60/19 65/14 65/20
66/11 71/12 72/8 73/1 73/7 73/9
73/20 76/5 78/18 79/11 79/16
79/20 82/11 88/13 88/15 88/16
89/18 89/18 89/24 91/11 91/12
92/13 93/25 94/2 94/5 94/7 94/8
94/9 94/11 94/19 97/11 98/6
100/20
wouldn't [2]   89/19 89/20
wrapping [1]   43/7

written [1]   30/25
wrong [3]   42/18 60/8 63/4
www.Google.com [1]   70/21
www.orangewebsite.com [1]   83/10

**Y**

Yeah [6]   23/1 33/6 44/3 49/4 74/1
86/25
year [4]   80/4 82/1 87/9 87/20
yearly [1]   80/1
years [3]   72/1 87/13 87/15
yes [173]
yesterday [2]   5/6 62/11
yet [8]   15/18 32/19 37/2 55/16
61/18 71/6 83/13 99/20
York [1]   1/20
you [347]
your [108]
yourself [3]   57/12 72/24 73/3
yourselves [1]   99/10

**Z**

zero [1]   30/23
zone [11]   29/22 29/25 30/2 30/4
30/21 30/23 30/24 31/7 31/12
31/16 40/21
zones [1]   30/3
zoom [3]   34/23 38/14 51/2
Zulu [4]   31/5 31/6 31/9 31/15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


United States of America,        ) Criminal Action
                                 ) No. 21-cr-399
                    Plaintiff,   )
                                 ) JURY TRIAL
vs.                              ) Afternoon Session
                                 )
Roman Sterlingov,               ) Washington, DC
                                 ) February 28, 2024
                    Defendant.   ) Time:  1:30 p.m.
_____

TRANSCRIPT OF JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For Plaintiff:      **Christopher Brown**
                    DOJ-USAO
                    601 D Street, NW, Suite 5.1527
                    Washington, DC  20530
                    Email:  Christopher.brown6@usdoj.gov
                    **Catherine Pelker**
                    US DOJ
                    950 Pennsylvania Avenue NW
                    Washington, DC  20530
                    Email:  Catherine.pelker@usdoj.gov
                    **Jeffrey Pearlman**
                    DOJ-CRM
                    1301 New York Avenue NW
                    Washington, DC  20005
                    Email:  Jeffrey.pearlman@usdoj.gov

For Defendant:      **Tor Ekeland**
                    **Michael Hassard**
                    Tor Ekeland Law PLLC
                    30 Wall Street, 8th Floor
                    Brooklyn, NY  10005
                    Email:  Tor@torekeland.com
                    Email:  Michael@torekeland.com


Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
                    Email:  Janice_e_dickman@dcd.uscourts.gov

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURT: Get the jury.

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: And the witness can return to the witness box.

MS. PELKER: Your Honor, there are a couple physical exhibits that, with the Court's permission, we would just have Special Agent Lund carry up when the time comes.

THE COURT: Without objection, that's fine with me.

MS. PELKER: Thank you, Your Honor.

(Whereupon the jurors enter the courtroom.)

THE COURTROOM DEPUTY: Jury is present. Please be seated and come to order.

THE COURT: Ms. Pelker, you can continue when you're ready.

MS. PELKER: Thank you, Your Honor.

DIRECT EXAMINATION (Cont.)

BY MS. PELKER:

Q. CS Mazarin, as part of your work on the Bitcoin Fog investigation, did you also review data from electronic devices?

A. Yes.

Q. What types of electronic devices, generally?

A. Phones, a laptop, some Raspberry Pi data storage SD cards were the main types, but there were a few others.

Q. Can you explain to the jury what a forensic image is?

A. A forensic image is an exact copy of a computer represented as a file, or in some cases, a set of files.

Q. Are there trainings and standards for making a forensic image?

A. Yes.

Q. How does an examiner ensure that the image is an exact copy of the original media?

A. The examiner would verify the image through hashing.

Q. Can you explain generally what a hash is?

A. So, to generate a hash of a file, it's a mathematical formula. You can put as input all of the ones and zeros that are in the file, and the output will be a number that is unique to the file, a string of letters and numbers. There are a few different types you can do, but that represents the computer as the image exactly as it is.

Q. Did you prepare a visual that would assist the jury understanding the concept of hash values?

A. Yes.

Q. Pull up Exhibit 365, which is not yet in evidence.

Is this the visual that we were just referencing?

A. Yes.

Q. And would this assist the jury in understanding your testimony about hash values?

A. Yes.

MS. PELKER: Government moves to publish as a demonstrative Exhibit 365.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: Exhibit 865 is admitted as a demonstrative and may be published to the jury.

BY MS. PELKER:

Q. CS Mazarin, can you explain what's shown here in file 1?

A. File 1 is a text file that just has the text. This is file 1.

Q. And can you circle where file 1 is appearing here on this screen?

A. (Indicating.)

Q. And what did you do with file 1?

A. I made a copy of file 1, which I renamed file 2, and I changed one character, the number 1 to 2, and that's file 2.

Q. And can you just draw a box around what is file 2 here on your screen?

A. Oh, to box both of them --

Q. Just to help the jury see what file is which.

A. (Indicating.)

Q. And did you hash the contents of file 1?

A. Yes, I did.

Q. Can you point to where that's shown here on the screen?

A. (Indicating.) So in this section, the very first command

computes the hash, and what you see below is the output, or the result.

Q.  And, so, is that string starting with 1D7B5 the hash value of file 1?

A.  Yes.  What I did here was run a command, get file hash, on file 1 as a file.  I told it to use -- which specific hashing algorithm to use, in this case it's used SHA256, and gave it the name file 1.  It hashed the file and as a result, it displayed for me the algorithm again, SHA256, and the hash value -- or at least the beginning of it for that file.

Q.  And for file 2, remind the jury what the only change is in file -- between file 1 and file 2.

A.  The number 1 here, 2, 2.

Q.  Did you then calculate the hash for file 2?

A.  Yes.  I ran the exact same command for file 2 to calculate the SHA256 hash.

Q.  Can you point to where that hash value is shown on the screen?

A.  (Indicating.)

Q.  So after just changing one character in the text file, what happened to the hash value?

A.  The value changed.  It's a completely different hash.

Q.  And can you hash entire computer systems, in addition to just individual files?

A.  Yes.

Q. If the computers were identical copies with thousands of files except one character is changed in one small text file, what would happen with the hash value?

A. The hash values would no longer match.

Q. How do hash values help examiners ensure that the images and files they're reviewing are true copies of the original?

A. Since any change to the original would change the hash, having matching hashes before the examiner does work and after is a good verification that the original wasn't changed in the process.

Q. Are there different hashing algorithms in addition to SHA256?

A. Yes, there are.

Q. What are some of the most common ones used currently used in digital forensics?

A. SHA1 and MD5.

Q. We've spoken about imaging. Were there also phones taken into evidence in this case?

A. Yes.

Q. Is the process for retrieving evidence from phones sometimes a bit different from computers?

A. Yes.

Q. Can you explain what an extraction is related to forensic review of phones?

A. So phones don't get exactly imaged because the process of

replicating data that's on a phone is different.  So, instead, it gets referred to as an extraction.  There are different types, depending on how deep into the phone it goes, but basically it's a process of pulling files, the phone's operation information, metadata, as much as possible, off of the phone into, usually, a big zip file.

Q.  Is the information that's retrieved through the extraction process still a reflection of the original data that was contained on the phone?

A.  Yes.

Q.  Now, were you responsible for making the initial images or extractions for the devices in this case?

A.  No.

Q.  Did you review those images and extractions provided by others at FBI and IRS?

A.  Yes.

Q.  Can you explain what it means to process an image?

A.  Processing an image in terms of forensics usually means running it through a forensic tool that can make it, one, more searchable; and, two, can pull out additional files or pieces of information from the image that might not be readily available.  Depending on the tool, it can also do indexing, and it can organize the file types better.  But processing essentially means running it through a tool.

Q.  When you're reviewing a forensic image of a laptop, do you

see the same thing that someone would see if they were sitting down in front of that original lap?

A. No.

Q. Why is that?

A. Because you see the laptop as it would be on disk. Like, as if you open up File Explorer and are clicking through looking at your files, you see lots and lots of folders, that's what it looks like.

Q. What's the benefit to a forensic examiner of looking at files that way?

A. It's easier, in my opinion, to build a timeline because you have a more overhead view of the files. It's easier to see when things were last changed or updated. And there are other types of information that are more -- like file extensions that are more obvious from looking at it as a disk, as the computer's hard drive, rather than having the computer be booted up and interacting with it.

Q. Is the examiner still able to see the different files that were saved on the computer?

A. Yes.

Q. And can you also see information about those files?

A. Yes.

Q. Is that sometimes called metadata?

A. Yes, it is.

Q. Why is metadata important in a forensic review?

A. Again, it contributes to timeline. Sometimes I want to see if a file appeared before another file. It can help in terms of analyzing photos because it might contain information about what camera took the photo.

It's details that help the examiner determine where files came from and when.

Q. When you're viewing files forensically, are you also sometimes able to see files that the user has deleted?

A. Yes.

Q. Why is that?

A. In the process of the file, where the forensic tool scans the disk image looking for data or information, one of those features most all of the tools have is called carving. Essentially, files begin in their data in the same sorts of ways, so carving programs will look through the rest of your disk that does not have the files you see and just look for matches.

Every match to that pattern it pulls out and it gives, then, the examiner a list of possibly carved files to go through, and sometimes those turn out to be documents. It's really because deleting a file doesn't, on your computer, remove its data, it just takes away the reference to it. The data is still sitting there on the disk.

Q. You're referring to disk. Can you explain what's meant by that?

A. Yes. The hard drive of the computer where its information is stored.

Q. Are you familiar with forensically-sound handling practices?

A. Yes.

Q. What does that term mean?

A. For something to be forensically sound, it should not change the item being examined, as much as that's possible -- with hard drives not at all -- and it needs to be replicable by another examiner.

Q. I would like to turn now to your review of images and extractions of particular electronic devices seized when the defendant was arrested. Generally, what sorts of things are you looking for when you review devices?

A. It largely depends on the type of case and the -- the exact charges, but I will look for names, phone numbers, emails, and IP addresses of interest. Sometimes I will go through the sorts of files that are there to determine how a device was being used. Was this a business laptop? What was this extra storage for? I will look for dates and times particularly to have a sense of when it's used. And sometimes I'll look for special types of files, including malware or encrypted files involved.

Q. Showing you what's been marked as Exhibit 701, not yet in evidence.

Now, when you're reviewing devices, do you compile a list of files of interest?

A.  Yes.

Q.  And can you explain what's shown here in Exhibit 701?

A.  This is a spreadsheet that I compiled with files that I noticed and downloaded copies of from the evidence image, and it keeps track of information like which device it came from, its file hash, and where exactly in the file structure I found it.

Q.  And does Exhibit 701 include in one spreadsheet all of the files that you looked at?

A.  It's many of the files I looked at.  There were one-off occasions where I looked at different files on the computer, went back and looked for something.  This spreadsheet is what I made at the time of writing my main report to keep track of any files that I mentioned in the report.

Q.  And does this accurately summarize the information about that subset of the files that you had reviewed at the time?

A.  Yes.

MS. PELKER:  Government moves to admit and publish Exhibit 701.

THE COURT:  Any objection?

MR. EKELAND:  Hearsay and incomplete summary.

THE COURT:  Exhibit 701 -- the objection is overruled.  Exhibit 701 is admitted and may be published to the

jury.

BY MS. PELKER:

Q. Can you walk through the column headers here?

A. The columns I have are File Name, which is self-evident, the Item Number, using the FBI's evidence numbering system, the MD5 hash, then Path.

Q. And is MD5 one of the hashing algorithms you testified to earlier?

A. Yes.

Q. What is shown in Path?

A. Path is where in the folder structure on the computer's hard drive I located a file.

Q. And why organize the file list like this?

A. I find that it makes it simple to go back and find again these files on the forensic images, if need be. And then the hashes are there so that authenticity check or verification can be done.

Q. And this list, was this list created while your review was ongoing? S, there was some additional review done after this list?

A. Yes.

Q. How did you retrieve the files that are noted in this list and in your review generally?

A. I downloaded them from the processed image right there inside the forensic tool.

Q. Did you alter the contents of the files in any way when you copied them?

A. No. Not from downloading them out of the image. They're the same files.

Q. And did you review those files as we were processing them to show to the -- as the government was processing them to show to the jury for trial?

A. Yes.

Q. Now, in some instances, were the originals file types or formats that would not be easy for the jury to review?

A. Yes.

Q. Can you give an example?

A. Some were database files, where they're known as SQL LIKE databases where you need a database viewer to see them. If you opened it and tried to look at the text, it wouldn't be readable. Others were computer programs that just aren't -- couldn't be readable at all.

Q. And does this include files that you could view on your computer that you use for forensic review, but that cannot even be opened on the government or court computers that we use for displaying the exhibits to the jury?

A. Yes, that's correct.

Q. What did you do in that instance, if it was an exhibit that needed to be shown to the jury in some format?

A. In those cases, I'd create either screenshots or Excel-type

exports from my tools.

Q. And when you're doing those screenshots or the exports, is the resulting information you're providing still an accurate reflection of the information contained in the original file?

A. Yes.

Q. And so do the files that are -- we're about to talk about and that we've reviewed fairly and accurately reflect the substantive contents of the files found on the defendant's devices, even if they needed to be extracted in a form to show to the jury?

A. Yes, they are.

Q. In your review, did you locate text files appearing to contain the defendant's notes?

A. To contain what?

Q. The defendant's notes.

A. Yes.

Q. And with the assistance of Mr. Lund, if we could bring up Exhibit 134R and M. 134R, and then we'll do 134M.

MR. EKELAND: Okay.

BY MS. PELKER:

Q. So with Agent Lund's assistance, we're passing you Exhibit 134R first.

Can you just hold that up for the jury to see?

A. (Indicating.)

Q. What is that?

A. This is a USB storage device, like a little thumb drive.

Q. Is there a 1B number associated with this device on that label?

A. Yes. It's 1B9_18.

Q. Can you explain what a 1B number is?

A. 1B is an FBI evidence numbering system. Oftentimes when digital evidence, in particular, is recovered, there will be digital evidence inside of it, like a camera and its storage or a second SIM card in a phone. And so 1B9 is in reference to where this was found, I believe, and then 18 means specifically this item.

Q. And when you're talking about evidence pertaining to your review at FBI, do you often refer to it by the 1B number?

A. Yes.

Q. And in this item, 1B9_18 which we've labeled for this trial as Exhibit 134R, is this where you found many of the notes that we're going to discuss?

A. Yes.

Q. If you could hand that back to Special Agent Lund.

And showing you Exhibit 709 through 715.

MS. PELKER: And I believe that these may have been conditionally admitted, or at least addressed through the translators. And, Your Honor, we're just going to go through a series to complete the authentication of exhibits that have been previously shown.

THE COURT: All right. Just to expedite things, let me just ask the defense whether there's any objection to my just going ahead and admitting 709 through 715, which I believe were conditionally admitted subject to authentication.

MS. PELKER: We're just going to have her testify that she retrieved them from the device.

MR. EKELAND: The originals are fine, Your Honor. No objection to the originals that the --

THE COURT: I don't know if that addresses the issue or not. Do you mean the translations you're objecting to?

MR. EKELAND: No. I mean the original language notes as they were extracted from the USB drive. Am I understanding --

THE COURT: Well, it's 709 through 715, so if you have no objection, I will admit 709 through 715.

MR. EKELAND: Not the translation still, which are separate documents; is that correct?

MS. PELKER: Right. This is just to complete the authentication. We've had testimony about the documents. She's just testifying that these are, in fact, the documents that were retrieved from the device.

THE COURT: So any objection to that?

MR. EKELAND: No objections to that, Your Honor, as long as it's clear we're not talking about the translations.

THE COURT: I think I've previously addressed the

translations. So, then I will go ahead and admit 709 through 715.

BY MS. PELKER:

Q. And, CS Mazarin, generally, did these files also contain text in other languages?

A. Yes.

Q. Did you later review translated copies of some of these notes?

A. Yes.

Q. And in addition to the notes that were retrieved from the defendant's devices, did you also review translated copies of some of the physical papers the defendant was carrying when he was arrested?

A. Yes, I did.

Q. And did those documents include references to various cyber topics that the case team asked you to help explain?

A. Yes.

Q. And on that same thumb drive, Exhibit 134R, did you also locate a folder named Code Reactor?

A. Yes.

Q. And what was in that folder generally?

A. The primary type of document I found in that folder were invoices.

MS. PELKER: And, Your Honor, if defense is willing to stipulate, we're, again, just going to go through the

authentication that the invoices at Exhibit 719A through KKK are copies of invoices from -- retrieved from that thumb drive.

THE COURT: Any objection to that Mr. Ekeland?

MR. EKELAND: No, Your Honor.

THE COURT: Exhibits 719A through KK (sic) are admitted.

MR. EKELAND: Ms. Pelker, those are just the Code Reactor invoices?

MS. PELKER: Yes. 719A through KKK.

THE COURT: KKK. Okay.

BY MS. PELKER:

Q. CS Mazarin, during your review the defendant's devices, did you also encounter file encryption?

A. Yes.

Q. Did the defendant have several encrypted password vaults?

A. Yes.

Q. Can you explain what a password vault is?

A. A password vault is an encrypted sort of container used by password keeper software. They work together, where if you open the password keeper software, it will unlock the vault for you so you can add user names and passwords or see and copy out ones you've already saved. And then when you're not using it, it locks it or encrypts it again.

Q. With Agent Lund's assistance, if we could hand you Exhibit 134M or 1B_13.

A.   1B9_13?

Q.   Yes, 1B9_13.  Thank you.

And can you hold that up for the jury and explain what that is?

A.   This is another USB thumb drive, external storage.

Q.   And was one of the -- did you retrieve one of the password vaults from that thumb drive, 1B9_13?

A.   Yes.

Q.   And were you able to get access to that password vault, even though it was initially encrypted?

A.   Yes.

Q.   Is the native password vault file format one that can be opened on the DOJ and court computers and shown to the jury readily in that format?

A.   No.  I had to download the software to do it.

Q.   Did you export the information from the password vault in a format that would allow the information in it to be displayed?

A.   Yes.

Q.   And did you -- when you did that, was the resulting file then -- what format was it in?

A.   It was a TSV Excel spreadsheet.

Q.   Did you alter the actual contents of the fields of information in any way when you were extracting the information?

A.   No.

Q.  If we could pull up Exhibit 702, the password safe file. And we should just not pull this up for the gallery.  And we can actually just not publish this for the moment.

But, is 702 a fair and accurate reflection of the information you retrieved in your extraction from the password safe file?

A.  Yes.

MS. PELKER:  And government moves to admit or complete its admission of Exhibit 702.

THE COURT:  Any objection?

MR. EKELAND:  This is the same password, one spreadsheet we were doing before?

MS. PELKER:  Just the extraction.

MR. EKELAND:  No objection, Your Honor.

THE COURT:  702 is admitted and may be published to the jury.

BY MS. PELKER:

Q.  And, CS Mazarin, generally, what does this generally show?

A.  User names and passwords to log into various websites.

Q.  Did you also find references in the defendant's notes and command history regarding the use of encryption?

A.  Yes.

Q.  In your review of the defendant's devices, did you locate any Bitcoin wallets?

A.  Yes.

Q. And are you familiar with the defendant's Mycelium wallet?

A. Yes.

Q. Generally, what is a Mycelium wallet?

A. It's a -- it was a mobile app on one of the phones, and it's a cryptocurrency wallet.

Q. Where was the Mycelium wallet located?

A. On one of the phones.

Q. One of the defendant's phones seized at the time of his arrest?

A. Yes, that's correct.

Q. How did you extract information related to the Mycelium wallet from the phone?

A. I went into the extraction that another examiner had made of this phone and identified where the coded files for the app lived on the Samsung there, its APK file, which is sort of like an archive file, and I pulled the entire Mycelium APK off of it to look at the data that would be in that app.

Q. And from there were you able to retrieve a key-value store related to that Mycelium wallet?

A. Yes. That was in one of the app's databases.

Q. Showing you Exhibit 703. I believe this is the same situation of it's been conditionally admitted.

Is this a fair and accurate reflection of the information you retrieved regarding the Mycelium wallet application?

A. Yes.

MS. PELKER: Government moves to complete admission of Exhibit 703, which was addressed in Mr. Scholl's testimony.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: 703 is admitted and may be published to the jury.

BY MS. PELKER:

Q. CS Mazarin, while you were reviewing the records from the Mycelium wallet from the defendant's phone, did you pull out the records that appeared to be accounts and summarize them in a chart?

A. Yes.

Q. I'm showing you Exhibit 704.

Is this a copy of the summary of accounts that you pulled out with the corresponding account information?

A. Yes, it is.

Q. And does this fairly and accurately summarize the information that you extracted from the Mycelium wallet?

A. Yes.

MS. PELKER: Government moves to admit Exhibit 704.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: 704 is admitted and may be published to the jury.

BY MS. PELKER:

Q. Can you just explain generally what's shown here on this chart?

A. To the left appear to be full account numbers, and to the right were notes that were stored somewhere in the app alongside, in a sense, those account numbers.

Q. Did the FBI also match this information to information that was displayed on the phone itself?

A. Yes. It appeared on the phone itself as labels for the accounts.

Q. And did you assist with photographing the Mycelium app on the defendant's phone?

A. Yes, I assisted.

Q. I'm showing you Exhibits 705A through E.

Do you recognize these images?

A. Yes.

Q. Are these fair and accurate depictions of the phone as it appeared at the time?

A. Yes.

MS. PELKER: Move to complete admission of Exhibit 705A through E.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: 705A through E are admitted and may be published to the jury.

BY MS. PELKER:

Q.  Did Mr. Sterlingov's phone also contain a pre-saved transaction history for one of the wallets?

A.  There was a -- an export of account activity that I found in the form of a spreadsheet on the phone, if that's what you're referring to.

Q.  If we could pull up Exhibit 707.

Is this the file that you were referencing?

A.  Yes.

Q.  And is Exhibit 707 a fair and accurate copy of the file that was retrieved from the defendant's phone?

A.  Yes.

MS. PELKER:  Government moves to admit Exhibit 707.

THE COURT:  Any objection?

MR. EKELAND:  It's hearsay.

THE COURT:  Overruled.  Exhibit 707 is admitted and may be published to the jury.

BY MS. PELKER:

Q.  And, CS Mazarin, did you provide files pertaining to the Mycelium wallet to other members of the case team for further review?

A.  Yes.

Q.  And are these some of the files that Mr. Luke Scholl testified to in his review of the Mycelium wallet activity?

A.  Yes.

Q. Did you find evidence of Tor on multiple devices seized by the defendant?

A. Yes.

Q. Did that include the defendant's laptop as well as multiple SD cards or external storage devices?

A. Yes, that's right.

Q. Can you explain to the jury what bash history is?

A. Bash history is a saved command line history where when the command window pops up and user's comfortable with it, type in commands to the computer, those actually get logged in a file. It doesn't have any dates and times, but it's just a list of all the commands that were entered and attempted to be run.

Q. Did you review bash history from the defendant's devices?

A. Yes.

Q. Showing you Exhibit 731, which I believe is not yet in evidence.

Do you recognize this?

A. Yes.

Q. And can you explain, generally, what it is?

A. So, the .bash history file is a Linux command history file. And this is from that device 1B9_18 for the user heavydist.

Q. And is this a fair and accurate copy of the file from that device?

A. Yes.

MS. PELKER: Government moves to admit Exhibit 731.

THE COURT: Any objection?

MR. EKELAND: Relevance and hearsay.

THE COURT: The objection is overruled. And Exhibit 731 is admitted and may be published to the jury.

BY MS. PELKER:

Q. Now, the jury has this on the screen in front of them. Can you generally describe what's shown here in this bash history file?

A. This is that list of commands, one command per line, generally, that the user heavydist at some point typed in the terminal.

Q. So what does this -- these bash history files tell you about the defendant's use of the command terminal?

A. He knew how to use it. He knew a variety of commands to do all sorts of functionality on his devices.

Q. Directing your attention a little bit more than midway down. And just search for .onion.

Can you explain what's shown here with these entries pertaining to .onion?

A. The torsocks command is one of the ways to connect to Tor browser without using the actual browser. Torsocks followed by any command says to run it through the Tor network instead of directly to the internet. So the actual command here is SSH, short for secure shell, which says to make a connection to a server, log into it. The -D flag specifies a port, and the

format here will be the user name at the server name that's being connected to. In this case, root at this .onion site.

Q. What does it mean to access something as root?

A. Root is the term for administrator.

Q. Why was this access as root significant to you?

A. Because this would suggest an attempted administrator login to the server found at KCQ and therest.onion. So that's different than someone visiting the site as a regular user. This would be somebody who manages the site logging in as its -- a privileged user.

Q. What's the information following the D?

A. That's a port number.

Q. And why was it significant that this connection attempt included a port number?

A. It possibly shows some knowledge about the server's configuration.

Q. Did you review a translated copy of the masked file retrieved from the defendant's device?

A. Yes.

Q. Directing your attention to Exhibit 711A.

Is this the translated mast that you reviewed?

A. Yes.

Q. If we could go to page 26. And in the section under Tor, without reading all of it, generally, what is Mr. Sterlingov discussing in the top portion under the Tor subheading?

A.  In the very first two paragraphs?

Q.  Yes.  I'm going to have you read beginning with, "As such, you can sniff the addresses."

But what's he discussing before we get to that point?

A.  Oh, in the whole section.

He's discussing part of how Tor hidden services work, and how there are some Tor nodes that keep track of where all the hidden services are.

Q.  Can you read from the text beginning with, "As such, you can sniff the addresses"?

A.  "As such, you can sniff the addresses of hidden services in three ways:  Register as a directory service with the right flag and get the descriptors themselves, and maybe you can add ID digest rotation so that different services sent their descriptors here, otherwise, they will be the same.  That's probably why they made the 24-hour restriction.  Sniff addresses when hidden service chooses you as an introduction point.  Sniff addresses when a hidden service client chooses you as a rendezvous point.  An update.  It won't fucking work because rendezvous points don't receive services" --

THE COURT:  Slow down just a little bit.  If you can go a little slower.

A.  "They only see rendezvous cookies."

BY MS. PELKER:

Q.  If you could speak into the microphone, as well, for the

court reporter.

What does address sniffing mean in this context?

A. It means attempting to find the IP address.

Q. What is the defendant explaining or writing about here?

MR. EKELAND: Objection.

THE COURT: Why don't you phrase it as what does it say, what does it describe.

BY MS. PELKER:

Q. Can you explain the meaning of the technical terms that's being described here?

A. Hidden services are the .onion sites. Rendezvous points are the Tor nodes in the middle, that center point that serves a few functions when connecting to a hidden service. And the DHT, distributed hash table, is part of how the Tor network knows where -- how to reach the actual hidden services.

And there are multiple Tor nodes that keep track of parts of those lists, and so these are descriptions of different parts of the Tor network as it pertains to hidden services in different points that the traffic or the request has to go through.

Q. Can you explain your understanding of what's being discussed in these paragraphs?

A. In general, I understand it as thinking through what vulnerabilities, or flaws, in the Tor network would allow an attacker to determine the IP addresses of hidden services.

Q. And why, if at all, was this significant to you in your review?

A. It shows a decent amount of knowledge about how the Tor network works. It shows examination of it from a lot of different angles, and that would be important to know for multiple reasons, if you are on the Tor network.

Q. Can you read the next section under Current Status?

A. "Current Status: Change the code only in the file rendmid.c, signaled using the signature what and where exactly changed. This file is stored both on the work computer and on the VPS."

Q. Can you explain your understanding of what's being discussed here?

A. In general, that file is part of the Tor browser code and the Tor service code, and so to make changes of it is to customize Tor on a computer and a VPS, a server, in some way.

Q. And can you now read the next section, starting with, "To compile"?

A. "To compile on the ubuntu, it was necessary to follow the instructions on HTTPS://" --

Q. You don't have to read the --

A. Okay.

Q. Generally, what's the domain, just the main portion of the domain?

A. Oh, yeah. "Torproject.org/docs/debian.HTML.en regarding

uilding from source, everything except the debuild command. Instead, I just went to the folder that got created there, $./configure.  He told me what libraries need to be installed there as well and how.  Everything went smoothly.  $ make.

Q.  And what is at the Tor project address that's noted there?

A.  Documentation on how to build Tor for the Debian Linux -- Debian version of Linux.

Q.  And what's your understanding of what's being discussed in this text here?

A.  Building from source means instead of just downloading it pre-made, there was some element of it that -- that the user would want to change or control themselves.  So they are compiling their version of it with the modifications, maybe, to run it.

Q.  And viewed as a whole for this page under the Tor section overall, what's your understanding of the concern that's being discussed -- of what's being discussed in this discussion under Tor?

MR. EKELAND:  Objection.  Just vague and ambiguous.

THE COURT:  Overruled.

A.  The overall write-up appeared to me to examine the effectiveness of Tor network's anonymity, especially with regards to hidden services and keeping those IPs private.

BY MS. PELKER:

Q.  When you say "keeping the IPs private," you mean the IP

address of the hidden service?

A. Yes, of the hidden service. So that no one knows where it is.

Q. Staying within the mast document and going to page 30. Can you read the second full paragraph under the --

MR. EKELAND: Your Honor, can we talk on the phone for a second?

THE COURT: I'm sorry?

MR. EKELAND: Can we speak on the phone for a second?

(Bench discussion:)

MR. EKELAND: There's still translations in this document which we've -- it's not right now, actually, being published in front of the jury -- and we never, ever agreed to use the whole summary issue. And I don't know why these summaries are still being published to the jury in this document.

MS. PELKER: That was very much inadvertent. But this summary appears to be that there was a section discussing yoga, and the translators just didn't translate verbatim to the yoga summary. We will redact it. We -- this was not the -- intentional, and we don't think that there's any prejudice here. It just says that there's a discussion about yoga.

MR. EKELAND: Your Honor, we don't think it's intentional. If we can just get it -- you know, get the documents -- the summaries redacted from the document, we're

okay. And if we can just try to avoid dislodging the summaries to the jury.

THE COURT: That's fine. Let's move on.

(Open court:)

MS. PELKER: If I can have just one moment to explain that to Ms. de Falco.

(Pause.)

THE COURT: Okay. You can continue.

BY MS. PELKER:

Q. CS Mazarin, can you read the second full -- the paragraph that starts with, "There is a Tor-like one"?

A. "There is a Tor-like one or an add-on built over the Tor in which connections do not always have to go through the same channel such that it was possible for one TCP connection, for its different packets to totally go through different nodes and get assembled in the right place."

Q. Can you read the second line from the bottom of this page?

A. "Go ahead and set up the connection of payment to the Tor already so as to have fucking plenty of nodes all in all."

Q. What's your understanding of what's being described in these paragraphs?

A. Well, the preceding paragraphs give it more context that helped me understand it better.

Q. And this -- my question is really of -- we had you read several paragraphs. Did you also review additional text on

this in this section?

A.  Yes.

Q.  And based on your review of that text and these paragraphs, what's your understanding of what's being described?

A.  What I understand being described here is the idea that a Tor user would have nodes in the Tor network that they control. Since anyone can run one, that there would be a subset of the overall network that was trusted to not have any -- anything listening on it or spying.  And that if there were enough of those, the traffic could go through it, maybe with some connection split, as described in one of the paragraphs, I'm not sure.  But it would be the part of the Tor network, theoretically, a user could connect through to be sure that their connection was fully safe and anonymous.

Q.  Going now to the bottom of page 31.

Can you read the last paragraph, starting with, "The most important thing"?

And if we can scroll down so we can continue on to the top of the next page.

A.  "The most important thing in the project of making payment for Tor nodes operational is making it possible for the payment to be anonymous, so that the payer knew for sure that the payment will be made without problems, such that the recipient of the money would just receive it on some address, to which he himself won't connect in any way."

Q. What would be the benefit of controlling your own set of Tor nodes?

A. In this case, the benefit would be charging for it so that whoever was paying for it would be willing to pay for that extra guarantee.

Q. And if someone were trying to anonymize their activity, what would be the benefit of that control?

A. They could theoretically try to make that protected part of the network the gateway into their site. They're basically trying to avoid sniffing or man-in-the-middle type of attacks anywhere where part of the network is collecting or capturing information it shouldn't.

Q. Going to page 32. Can you read the paragraph about halfway down, starting with, "In general, darn it"?

    Scroll.

A. "In general, darn it, create a system of encrypted file containers after all, in which you can save anything. And making sure that a good plausible deniability was in place."

Q. Can you explain what an encrypted file container is?

A. It's a section of your computer which, at a high level, you could store multiple files in and then encrypt or, you know, mathematically convert to something unreadable the whole set of files. And then you could also decrypt it when you needed that whole set. It's known as a -- the whole set is known as the container.

Q. And what do you understand to be meant by "good plausible deniability"?

A. An alternate explanation for having something or something occurring.

Q. Can you read the next paragraph, starting with, "Make sure that the browser bundle"?

A. "Make sure that the browser bundle does not let the pages understand what fonts are available on the machine."

Q. What's your understanding of what is meant by that?

A. What fonts someone has installed on their computer could be an attribute that's unique to them. If you speak multiple languages, you might need to download fonts specific to those languages. And then in another sense, any custom fonts that might be unusual could also give information about you as the user. And so I understand this to mean that what fonts are available on the machine is information that he wants to make sure that the Tor browser bundle isn't able to access.

Q. Why would that be a concern for the defendant, in particular?

A. For anonymity. For the language reason, possibly, but for anonymity.

Q. And scrolling to the bottom of this page. Can you read the last paragraph?

A. "In general, create a program that will be removing traces from everywhere. Clean all sorts of cookies out there, the

cache of all sorts of additional programs, temp, et cetera. Everything in general."

Q. What's your understanding of what's being described here?

A. This is an awareness of the forensic techniques existing to pull data out of various places, such as leftovers in the browsers and cookies. It's awareness of forensic techniques and information that can be stolen, for example, by malicious code, and is referencing creating a program that will automate going through and deleting all of those traces of leftover information.

Q. I'm now on page 34, into 35. If we could read in the last paragraph that starts "So, in order," and continue on to the next page.

A. "So, in order to properly set up communication with secure servers, one needs to properly make a system that will be sending packets constantly, and not just when the user presses the keys, for example."

Q. Keep reading for that -- the next two paragraphs.

A. "And perhaps one needs to find a way to embed this in open VPN. In any case, it would be fucking awesome to finish I2P, to make sure it all worked there. And the main thing, making sure that a fucking huge amount of unauthorized traffic is already going through there, say for bittorrent, and that it was not clear who was on this network and who just happens to be there."

Q.   Can you read the next paragraph?

A.   "So, the idea is that when a package intended for a hidden service comes to the router, one can simultaneously send such a package somewhere else.  Therefore, just by watching the router, one can't fucking find out whether the service itself is on it or not."

Q.   What's your understanding of what the defendant is describing here?

A.   So these are some suggestions for, from how I read this, keeping traffic intended for a hidden service, from it being obvious to which IP or which router here it's going to.  Aside from the VPN connection, there's a description of running a noisy service, like a torrenting service on it so that lots of requests, not just the ones for that -- that Tor service will be going through it, so it might not be as visible what that router is being used for.  And it describes another configuration where the -- where the request that comes for the site could go to some other point first.  And by the way it's described at the end, this is to obscure where -- that the server is actually behind this router and where it actually is.

Q.   Who would be putting this sort of protection in place for a hidden service?

A.   The person running the hidden service.  But it did say "secure server" in this one, so a hidden service could be one kind of secure server, but --

Q. If law enforcement were monitoring this router, if it were actually set up like this, what would they see?

A. A lot of traffic. Maybe traffic to the hidden service, but maybe not. It would be difficult to determine exactly what traffic was being seen because it would be a mix of a lot of people's traffic for different purposes.

Q. And would a VPN service be the sort of noisy activity that would be consistent with what's described here?

A. More so the bit torrent service, but the VPN would be for additional encryption, I would say.

Q. If we can now pull up Exhibit 715A, Tech Specific Mast.

And is this another -- did you review this translation of a file from the defendant's computer?

A. Yes.

Q. And if we can go to page 2 and read in the fifth bullet point, starting with, "Upgrade."

THE COURT: Has this one been unconditionally admitted at this point?

MS. PELKER: I believe it was admitted.

THE COURTROOM DEPUTY: It was admitted, Your Honor.

THE COURT: Okay. Thank you.

A. "Upgrade our local server. Because now even SSH seems fucked up. It has a lot of problems."

BY MS. PELKER:

Q. And can you read the last sub-bullet in this section,

"Check if Tor-SSH"?

A.   "Check if Tor-SSH endpoint still works, too."

Q.   Can you explain what this -- what your understanding is of these bullet points in nontechnical terms?

A.   That the server was to be set up allowing for secure shell, SSH connections in, but that it's running into problems and the connection is not working right.

Q.   And what is the Tor-SSH -- or, the Tor portion of the -- that bullet point describing?

A.   I don't know for certain.  It suggests that it would be a way to remote into a computer that has something to do with the Tor network, but I don't know what that exact command does.

Q.   And would it be a casual user of the server or an administrator who would be run -- who will be running these checks and configurations?

MR. EKELAND:  Objection, Your Honor.  Vague and ambiguous as to "casual administrator."  And it's also, I think, kind of compound.

THE COURT:  Overruled.

A.   It would be the administrator, someone who needs to work on the site, not someone who is visiting the site.

BY MS. PELKER:

Q.   Turning now to a somewhat different but related topic.

If a user -- if someone is hosting a website, do they usually run the website off of their laptop?

A.  No.

Q.  Why not?

A.  A laptop couldn't support all of the traffic that would come in.  And a website generally needs to be up and running all the time, whereas laptops you'll close and bring with you.

Q.  When cyber criminals are doing work on a criminal project, do they always save the files on the computer that's physically in front of them?

A.  No.

Q.  Why not?

A.  Because sometimes they need more storage or different locations for these files to be staged.  So they will remote into a different computer or server to move files back and forth.

Q.  What are other ways that cyber criminals can store information remotely but still have access to it?

A.  They can connect to another computer and map a share.  You could think of it as on some people's home browsers they'll add some extra storage so that when they connect on their computer, they can see where all the extra videos are.  They can do different types of connections to servers they have, such as RDP connections or VNC.  Those are some of the ways.

Q.  What is RDP?

A.  Windows terminal services.

Q.  And does RDP stand for remote desktop protocol?

A. Yes, remote desktop protocol.

Q. Can you explain in nontechnical terms what remote desktop protocol would allow someone to do?

A. It's usually known as remoting into another computer. The help desk example fits here as well, when the -- it lets a remote user enter the computer and see it as if it's a user who is behind the screen.

Q. Are you generally familiar with X2Go?

A. Yes.

Q. What is X2Go?

A. A remote viewer application.

Q. Can you explain what a remote viewer application is?

A. It's a program that when it's set up between two computers, would let somebody remotely access and view the contents of the other computer as it -- as logged into it.

Q. Did you find X2Go installed on the defendant's laptop?

A. Yes.

Q. Did you find other indications that the defendant was remotely connecting to other computers and servers?

A. Yes.

Q. Did that include repeated references to bunker or bunkerx?

A. Yes.

Q. What is a bunker, generally?

A. An underground fortress.

Q. Showing you exhibits which are not yet in evidence, 720,

722 through 726, 729, 732, and 733.

And as they're being pulled up, are these fair and accurate copies of files that you retrieved from the defendant's devices?

A. Yes.

MS. PELKER: And the government will move to admit those exhibits.

THE COURT: Any objection?

MR. EKELAND: Could I just get the exhibit numbers again?

MS. PELKER: 720, 722 through 726, 729, 732, and 733.

MR. EKELAND: I have no objection.

THE COURT: Exhibit 720, 722 through 726, 729, 732, and 733 are admitted and may be published to the jury.

BY MS. PELKER:

Q. If we could actually pull up 731, which is already in evidence.

Is this the same bash history file that we previously looked at, showing the defendant attempting to connect to a Tor hidden services root?

A. Yes.

Q. Did this bash history also contain numerous references to bunkertunnel?

A. Yes.

Q. And with Ms. de Falco's assistance, if we could click

through the various bunker references.

What is a "tunnel" in computer terms?

A. Usually, it's an encrypted connection between two computers.

Q. What does "bunkertunnel" indicate to you as it appears in the bash history?

A. A tunnel encrypted connection to some machine named bunker.

Q. Did you locate a script on the defendant's device named bunkertunnel?

A. Yes.

Q. And generally, what is a script?

A. A script is a file that contains one or more computer commands so that they run one after the next.

Q. Pulling up Exhibit 725. The bunkertunnel. Can you explain what's shown here?

A. This appears to be a script containing an auto SSH command, ending with the user SSHuser at the server TD1.ignorelist.com.

Q. What was the name of the script?

A. Bunkertunnel. Bunkertunnel.sh, depending on --

Q. I believe what's shown here is a PDF, but there is a -- if we can just open up the --

Was the original file that was retrieved from the defendant's device a PDF, or was the PDF part of the processing so that it would show up for the jury?

A. It was a text file that may have been turned into a PDF.

Q.   And I think we were able to get the actual text file up.

And generally, was the -- is the PDF simply the same exhibit, just a PDF version of the text file of the script that actually was retrieved?

A.   Yes.

Q.   Did you do further research on the domains containing that TD1 subdomain?

A.   Yes.

Q.   And can you just point -- if you can try drawing on your screen of what -- point out that TD1 subdomain here?

A.   (Indicating.)

Q.   And again, in very nontechnical terms, what would this script with auto SSH be directing the computer to do with regard to that subdomain?

A.   Likely to initiate some kind of connection to the server at that subdomain using the user name SSHuser.

Q.   Directing your attention to Exhibit 727, which is not yet in evidence.

What is shown here?

A.   A passive DNS record rendered in a domain tools table.

Q.   You testified earlier about passive DNS.

Is this the same sort of passive DNS record that's relied on by cybersecurity professionals and viewed as accurate?

A.   Yes.

MS. PELKER: Government moves to admit and publish Exhibit 727.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: Exhibit 727 is admitted and may be published to the jury.

BY MS. PELKER:

Q. Can you explain what is shown here?

A. This record is saying that between 12-9-2020 and 4-19-2021, domain tool sources saw TD1.ignorelist.com resolve to IP address 188.149.52.168.

Q. If we could pull up exhibit --

Did you do additional research on that .168 IP address?

A. Yes.

Q. If we could pull up Exhibit 728, which is also not yet in evidence.

Can you explain what's shown here?

A. An additional domain tool screenshot for this specific IP ending in .168.

Q. Does this fairly and accurately reflect the information pertaining to that .168 IP address that you obtained?

A. Yes. This was the screen I saw.

MS. PELKER: Move to admit Exhibit 728.

THE COURT: Any objection?

MR. EKELAND: Just hearsay.

THE COURT: Exhibit 728 is admitted and may be published to the jury.

BY MS. PELKER:

Q. Can you explain what's shown here with regard to who controlled that .168 IP?

A. It appears that the company was called Tele2.

Q. We might need to scroll down a little bit or zoom in, but can you point out to where on the screen that's shown?

A. A few places (indicating).

Q. What's shown -- scrolling back up, what is shown under the passive DNS resolutions?

A. So these are some domains that domain tools observed resolving to that .168 IP address, and there are several listed here. When I say that some domains appear residential or business in nature to me, this is often what I mean. There's some sort of ID number, which you'll notice has the same numbers as the IP .breadband.tele2, so that would be on the networks like we see of tele2.

We also see COMHEM, which it might have been at another time. And TD1.ignorelist.com and TD1.hopto.org I generally recognize as domains coming from a dynamic DNS service.

Q. Is that TD1 the same -- the same domain that was seen in the bunkertunnel script on the defendant's computer?

A. Yeah, the TD1 subdomain was the same as in these examples.

Q.   What do all of these last couple of exhibits that we've seen indicate to you about the defendant's connections using that bunkertunnel script?

A.   That the connections were made to a computer or server that was in Sweden.

Q.   And was the case team able to obtain any of the defendant's computers or servers from Sweden?

A.   No.

Q.   Directing your attention to Exhibit --

THE COURT:  Are you getting ready to move to a different topic?  Because if so, I think we should take at least a bathroom break now or maybe an afternoon break.

MS. PELKER:  A break here is fine, Your Honor.

THE COURT:  So why don't we do that.  It is just about ten minutes to three.  Let's come back at ten after three.

Please don't discuss the case, even amongst yourselves, and don't conduct any type of research relating to the case in any way.

(Whereupon the jurors leave the courtroom.)

THE COURT:  The witness can take a break as well.

One of the jurors signaled they needed to use the bathroom.  I was going to go a little longer, but it's fine to break now.

Anything else before we take a break?

MS. PELKER:  No, Your Honor.

THE COURT:  All right.  See you shortly.

(Recess from 2:53 p.m. to 3:10 p.m.)

(Whereupon the jurors enter the courtroom.)

THE COURTROOM DEPUTY:  You may be seated and come to order.

THE COURT:  All right.  Welcome back, folks.

And you can continue.

MS. PELKER:  Thank you, Your Honor.

BY MS. PELKER:

Q.  If you could pull up Exhibit 732.

And, CS Mazarin, is this another bash history from the Exhibit 134R, 1B9_18?

A.  Yes.

Q.  Why are there two different bash history files for that device?

A.  If you're logged in as different users, each user gets its own command history.  It's the command someone ran from that user name.

Q.  So for the exhibit that's in front of us now of 732, what's the user noted here for this bash history?

A.  It's root, meaning administrator.

Q.  Can we jump down to the first reference to bunker, and look to the following lines here?

Can you explain, generally, what's shown here?

A.   The following lines?

Q.   Just in the section referencing with the bunker-related references.

A.   There appear to be directories, or folders, named bunkerxmedia and bunkerxhome under a heavydist folder, and it looks like these are being mounted and, eventually, I think, unmounted.  But in here, mounted or sort of attached in a viewable way over the local network bunkerxhome and bunkerxmedia.  So those two are being linked, the bunkerxhome under media heavydist bunkerxhome, and the local area called bunkerxhome, they're being linked or synced up.

Q.   If we could keep scrolling down to where it says "Install Tor."

     Can you explain what's shown here?

A.   Apt-get install is one way to install programs and software onto a Linux system to get the packages needed.  So apt-get install Tor would be an attempt to install a set of programs called Tor.

Q.   Are there other install commands that come after that?

A.   Apt-get install Keypass and apt-get install Keypass 2.

Q.   What's Keypass?

A.   It's a password keeper software.

Q.   If you could pull up Exhibit 729.

     Is this the bash history for 1B9_13, or Exhibit 134M?

A.   Yes.

Q. And is that the -- that's the device where the defendant's password vault that you were able to decrypt was recovered from?

A. Yes.

Q. Can we highlight BunkerSSH, just the first reference?

Can you explain what BunkerSSH means here?

A. Having just the name BunkerSSH would mean running it as a program, the file name BunkerSSH, running a script.

Q. And can you remind the jury what SSH indicates?

A. Secure shell, a remote connection.

Q. Pulling up Exhibit 723. Mount bunkerx. Can you explain what's shown here?

A. These are a set of commands to mount the directories bunkerxmedia and bunkerxhome.

Q. What does it mean to "mount a directory"?

A. So, you have, on your local system, two spots, usually they're in a media folder or something, where you would create a folder to access the files from locally, but you don't have access to them yet until you run a mount command, usually to something that you have access to by path. It could be remotely to another computer.

And mounting basically creates a linkage for the time until you unmount it between that second folder and the folder that you're seeing here, so that the files that are over there in this folder, you can now see in your folder, and changes

that are made to them can apply to both until you unmount it and break that connection.

Q.   Directing your attention to Exhibit 724.

Is this a corollary to that, the unmount script?

A.   Yes.

Q.   What would this do?

A.   The unmount command unmounts the other directory from bunkerxmedia and bunkerxhome.

Q.   Pulling up Exhibit 722.

A.   It's not just a folder, though.  You can mount a whole volume.  I'm describing it in a high-level way, but there are different parts of the other computer, like, entire sections of it that you can attach and mount that way.  But just to be clear, when I say "folder," I mean it in a more conceptual way.

Q.   Directing your attention to Exhibit 722, titled bunkerx. What's shown here?

A.   This looks to be a configuration file.

Q.   And could you explain what the IP address next to hostname indicates there?

A.   Well --

Q.   Just in nontechnical terms, not getting into anything in particular detail about the technical details of how this would actually work, but, generally, what's shown next to hostname and what that indicates?

A.   Hostname is an IP address here.

Q. And what would -- again, without getting into the weeds on any technical details, at a very general, simplistic level, what would this -- what would the purpose of this file be?

A. What I'm trying to explain is that it appears to be a configuration file for a tool called Putty, which is another way to make remote connections. So when you set it up, there are places to specify where you are connecting and how. So, within that context, hostname would be a computer or server that you would use Putty to connect to.

Q. And did you look at -- do additional research into that IP address 83.248.64.79?

A. Yes.

Q. And did that also to go a residential IP address in Sweden controlled by tele2?

A. Yes, I believe so.

Q. And so what does this tell you about this connection here?

A. It appears that this connection, also, is to a computer or server on a residential or business Swedish internet provider network. So, Sweden or possibly the surrounding areas.

Q. Did you also find references to bunker in the defendant's notes?

A. Yes.

Q. If we could pull up Exhibit 119C. Going to page 12. I believe this has been admitted.

THE COURTROOM DEPUTY: It's coming up in a minute.

MS. PELKER: Thank you, Ms. Walker.

If we could scroll down to the text in purple. It does not show up very purple on this screen, but if we could -- it's there. It's just, like, a very, very dark purple that is looking fairly black.

BY MS. PELKER:

Q. If you can start reading with, "Fuck. And, also, how can UDP speeder not be working"?

A. "Fuck. And, also, how can UDP speeder not be working? How? Then, shit, this means I simply don't understand something completely about F network. What the fuck am I supposed to do with that? Maybe everything is working. Maybe it's just packet loss going on in Sweden. What is the easiest way to reinstall UPS in bunkerx?

"Switch the address to a local one inside the VPN.

"Launch server on bunkerx.

"Change the address in UDP speeder client.

"Open more new ports in bunkerx."

Q. Can you explain what is UDP speeder again, at a nontechnical, high level?

A. It's some kind of network utility program to improve the performance of a type of connection called UDP -- a type of protocol, rather.

Q. What is packet loss?

A. When information goes back and forth over the internet,

sometimes pieces of it get corrupted or drop out, if there are network issues, or don't come through properly, and that's known as packet loss because the units of the data traveling over are called packets.

Q.   So what's your understanding of what's being described here?

A.   It seems to be troubleshooting notes for a UDP connection to some odd network that, according to the paragraph before the bullets, may be in Sweden.

Q.   And was the case team able to identify exactly where these various Swedish IPs were resolving back to?

A.   Not exactly where, no.

Q.   What's your understanding of the retention period for Swedish IP records, if any?

A.   They keep them, as I understand it, for less than a year. I believe it's six months.  But it's a matter of months.

Q.   And did Swedish law enforcement ever -- was it ever able to locate the defendant's bunker computer or computers?

A.   No.

Q.   Did you ever review this computer or computers or servers?

A.   No.

Q.   Did you find additional evidence on the defendant's devices and notes indicating he was connecting to other computers?

A.   Yes.

Q.   Did that include evidence of use of -- additional evidence

of use of remote desktop tools?

A. Yes.

Q. And did you review an image of the defendant's laptop?

A. Yes, I did.

Q. Did that laptop contained remote desktop software?

A. Yes.

Q. Did it contain virtual machines?

A. Yes.

Q. Can you explain, generally, what a virtual machine is?

A. A virtual machine is like having a computer inside your computer. The virtualization software is a program that lets you create smaller software, I guess you could say, representations of computers. You can tell it how big its hard drive would be and how much processing power it can use. And you can even install whatever operating system you would like on them, and you turn them on and off within your virtualization program.

Q. Did you also find evidence of VPN configurations?

A. Yes.

Q. In the Tor browser?

A. Yes.

Q. And additional encrypted files that the team was not able to access?

A. At least one, yes.

Q. Did you also find evidence on the defendant's devices of

VNC Viewer?

A. Yes.

Q. Could you explain what VNC is?

A. It's a different type of remote connection.

Q. Pull up Exhibit 720.

And can you explain what is shown here?

A. This is a configuration file for the VNC program TigerVNC.

Q. What's the server name noted here?

A. Td1.ignorelist.com.

Q. Is that the same td1 subdomain that we looked at previously?

A. Yes.

Q. And can you explain what this configuration for tiger -- what this TigerVNC configuration file would do?

A. It would set the server that TigerVNC is to use as the computer that could be found at td1.ignorelist.com. It's setting up how the connection would go.

Q. And, so, this would set up a connection between the defendant's computer and the server at td1.ignorelist?

A. Yeah --

MR. EKELAND: Objection. I don't believe it is in evidence that the connection is to a server. I think that's a fact nowhere in evidence.

THE COURT: Well, you can ask the question.

BY MS. PELKER:

Q. Would it set up a connection between what is noted here as

server name td1.ignorelist.com?

A. The server name field would indicate a destination computer, one that should be -- that -- one that this config file would create a connection between.

Q. Pulling up Exhibit 726.

Is this an additional TigerVNC configuration file?

A. Yes.

Q. And could you circle the device that this configuration file is set to connect the defendant's traffic through?

A. I'm sorry. Could you say that again?

Q. Can you note here, circling on your screen, where this is configuring the defendant's device to connect to?

A. (Indicating.)

Q. And would this function similarly of configuring the defendant's device to connect through VNC to the device located at td1.hopto?

A. Yes. It's the same type of configuration file with the same server name field.

Q. And did you also find references to VNC in the defendant's notes?

A. Yes.

Q. Was that just one or two references or many references?

A. There were multiple references.

Q. In the defendant's notes, did you also find examples of him discussing buying VPSs?

A.   Yes.

Q.   And was there discussion of the defendant remotely administering and accessing servers and computers?

A.   Yes, I believe so.

Q.   Did you also find references in the defendant's notes to a physical computer that was located elsewhere?

A.   By name --

Q.   Did you find references in the defendant's notes to a computer that appeared to be located elsewhere, not on the defendant's person?

A.   Yes.

Q.   If we could pull up Exhibit 119C.

     And directing your attention to the bottom of page 26. Should be below -- scroll to below the discussion of the travel plans.  Can you read the last line here?

A.   On page 24?

Q.   Yes.

A.   "Shit.  But what to do about the computer?"

Q.   And scrolling down now to page 27, can you read under, "Shit, but first I need to buy tickets"?

A.   Underneath, you said, or starting with?

Q.   Right underneath.

A.   "Can I fly directly to Moscow?  Well, fuck.  No.  I need to pick up the computer right away in order to work on it.

     "Well, and then -- how will I buy the return ticket?"

Keep reading?

Q.  No.

If we could pull up Exhibit 712 -- actually, apologies -- 712A.

And is 712A a translated version of the packing document that you found on the defendant's micro USB?

A.  Yes.

Q.  And generally, what does this document appear to be?

A.  A to-do list before a trip.

Q.  And directing your attention to the bottom of this packing list, to-do list, under the section Computer.  Can you read the line that starts "Restart the computer"?

A.  "Restart the computer, if I leave it, and mute the sound, turn off the screen."

Q.  Can you read through the next -- the "Verify that remote access"?

A.  "Verify that remote access works as it should."

Q.  What's your understanding of the devices being discussed here and in the prior notes that we just looked at?

A.  That there is a computer that at the time of these notes the defendant has access to, and that while he leaves on a trip of some sort, he intends to leave that computer running and connect to it remotely from his laptop or another device when he's away from it.

Q.  Did you find other examples of references to additional

devices that the FBI or Swedish authorities has not found?

A. Yes.

Q. If we can now pull up Exhibit 710A, Info Settings. Under page 27, if we could turn off the gallery screen, just to the extent that there are some login credentials here.

Thank you, Mr. Pearlman.

If you could go to page 27. Thank you.

CS Mazarin, can you explain what's shown in this section under RamNode?

A. In this section, it appears to show an IP address and a passwords for a RamNode, most likely, server.

Q. What is RamNode?

A. It's a web hosting company.

Q. And can you read the line under SolusVM Control Panel?

A. "You can install and manage your VPS through the SolusVM control panel."

Q. Generally, what is SolusVM?

A. It's software that lets users manage their virtual private servers, so if any work needs to be done on them at a high level, giving them more resources. I've never used it, but it seems to give the users options to run their server in that way.

Q. And did you review records from RamNode for the defendant's account there?

A. Yes.

62

Q.   And were those the records displayed and discussed during Special Agent Rovensky's testimony at the beginning of the government's case?

A.   I'm not sure.

Q.   Do you recall whether Special Agent Rovensky had reviewed or discussed the RamNode records in general?

MR. EKELAND:  Objection.  Asked and answered.

THE COURT:  Overruled.

A.   I believe it came up in general, yes.

BY MS. PELKER:

Q.   And were you or FBI or this case team ever able to review the actual contents of those servers at RamNode?

A.   I don't know.  I don't believe so.

Q.   Were you -- did you ever --

A.   But I'm not sure.  I didn't review them.

Q.   Did you review records of the defendant using servers at SpiderOak?

A.   Using the SpiderOak software?

Q.   Yes.  Did you review records of the defendant using SpiderOak?

A.   Yes.

Q.   And showing you Exhibit 513A.  And this actually may not currently be in evidence.  I believe it's a version of 513B which was admitted.

But showing you 513A.  Is this a fair and accurate copy

of the records obtained from SpiderOak?

A. Yes.

MS. PELKER: Government moves to admit Exhibit 513A.

THE COURT: Any objection?

MR. EKELAND: Hearsay.

THE COURT: 513A is admitted and may be published to the jury.

BY MS. PELKER:

Q. Can you explain what's shown in this subpoena response here, particularly in line 6 -- row 6?

A. Um --

Q. What's the name of the user given?

A. Roman Sterlingov.

Q. And if we can go to the Connection Information tab along the bottom.

Can you explain the -- what's shown in the device names tied to the Roman Sterlingov SpiderOak account?

A. The device names are bunkerx, MAILWOO and btest.

Q. Can you explain, generally, how SpiderOak would function, understanding it had a few different features?

A. It was some sort of data backup software where you could keep -- keep your data automatically backed up so that it had a safe place to be in case you had a hardware failure or got locked out of your computer or something.

Q. What was the dates of the defendant's use of SpiderOak to

back up bunkerx here?

A.  It appears that the last backup may have been on 5-11-2017. But then the last login to the account on 7-30-2017.

Q.  And were you able to review the actual contents of the SpiderOak backups?

A.  No.

Q.  Directing your attention back to Exhibit 710A for Info Settings on page 2.

Again, without reading all of this, can you explain, generally, what's being discussed under these -- in this section?

A.  This section is doubting whether SpiderOak -- the extent to which SpiderOak accesses the data that the users are backing up using SpiderOak and questioning how private it really is and if it's being used in any other way.

Q.  And could you read the first section -- or, the first sentence under the bold text of We Use the Backup Service?

A.  "Which back up service to use?  Stop at Diino or maybe switch to SpiderOak?"

Q.  And then can you read the last sentence on that section, just "In short"?

A.  "In short, who the fuck knows what is better?  My decision is to do SpiderOak.  We'll support a good manufacturer. Perhaps the speeds will be better there as well.  Well, the client for Linux, too."

Q. Now, going to page 7, so farther down in this document. Can you read the last section under Privacy/Infosec? The last paragraph within the Privacy/Infosec section.

A. "Some alternatives to online secure backup solutions, alternatives to SpiderOak, which is now burned."

And then there's a Reddit link.

Q. Did you review that Reddit link post?

A. Yes.

Q. Directing your attention to Exhibit 514, which is not yet in evidence.

Is this a fair and accurate depiction of the content that's displayed at that Reddit link?

A. Yes.

MS. PELKER: Government moves to admit Exhibit 514.

THE COURT: Any objection?

MR. EKELAND: This is hearsay. It's not the defendant's statement at all.

MS. PELKER: This is effect on the listener.

THE COURT: Yes. So, I'm going to admit it for the effect on the listener.

BY MS. PELKER:

Q. CS Mazarin, can you explain what's shown here?

A. It doesn't have the full discussion, but, in general, this is a post from the privacy sub-Reddit discussing what their -- SpiderOak's, I believe, failure to update its warrant canary

meant that something had happened to it.

Q. Can you explain what a warrant canary is?

A. A warrant canary can be, like, a file or value. Sometimes it's, like, the news article of the day. Some piece of information that stays up-to-date on a website. The idea is, if it stops getting updated, maybe the site has been taken down for a few days by law enforcement or government or some entity, and -- but as long as the canary -- as in, in a coal mine -- keeps updating and changing or staying current, that is one guarantee that the site has been running without any interference.

Q. And what is the concern being discussed in this Reddit thread about SpiderOak's -- the implications of SpiderOak's warrant canary?

A. I believe at the time something lapsed or didn't go right with SpiderOak's warrant canary, and there was a lot of -- or, there was some speculation online in this sub-Reddit that maybe it wasn't trustworthy or maybe had been accessed by law enforcement, is what I believe from the context. And the discussion is about finding alternatives to SpiderOak that might be more private.

Q. When you say "it wasn't trustworthy," what do you mean by trustworthy in this context?

MR. EKELAND: Objection, Your Honor.

THE COURT: What's the objection?

MR. EKELAND: It's vague and ambiguous. And, also, I've got relevance questions here as to --

THE COURT: I'm sorry?

MR. EKELAND: Relevance.

THE COURT: Relevance. Overruled.

A. Trusted with user privacy, trusted to keep the user's data and activity just for the user and the company and not provide it to law enforcement or sold to any other entity.

BY MS. PELKER:

Q. And so with a warrant canary, "warrant" refers to a law enforcement warrant?

A. Yes. That's --

MR. EKELAND: Objection. Your Honor, this is also cumulative. We've also visited the warrant canaries before.

THE COURT: Yeah. Overruled.

BY MS. PELKER:

Q. We can return back to Exhibit 710A.

And so in this context, what's your understanding of what the defendant -- of what is meant by saying that "SpiderOak is now burned"?

A. I understand this to mean that the defendant no longer trusts the level of resistance to answering warrants that SpiderOak may have had, possibly believes that it has -- that SpiderOak's servers have been served with a warrant already and wants to find an alternative cloud backup site that has not

been searched by law enforcement.

Q. Directing your attention now to Exhibit 715A, go to page 3.

If we could read the seventh bullet down, starting with "Remove."

A. "Remove any SpiderOak software from any of the computers I have. But download all data from there?"

Q. And can you read the line above that?

A. "Check the blockchain wallet, who the fuck knows which one, from masked well and delete."

Q. Scrolling up to page 2. If we can look at the text-specific to-do section. Could you read the section that comes in starting with "@RAID"?

A. Everything below @RAID?

Q. Yes. Just that subsection.

A. "Zero out old hard drives. Remove the recycle bin from the old hard drives. Go through them again, see if anything is fucked."

Q. And can you read through the next three lines there as well?

A. Beginning with, "Is the machine"? Where your cursor is?

Q. Read the -- after -- just keep reading from "RAID" down through the end of, "Is the machine now compromised?"

A. Oh, okay. "Local machine SSH keys. Local machine SSH settings? Were they moved after the migration?

"Is the machine now compromised that it has been in

the internet with those settings?"

Q. What is a RAID?

A. It's a way to organize the drives of a computer or server to have them work together. There are different types of -- it's a redundant array of independent disks. So, it's an acronym. And there are different types that show different ways of creating redundancy, or repeat, of data across disks, either entirely or in sections. So, they tend to be referenced by number, RAID 0, RAID 1.

And so they're all ways of setting up, typically, servers, but you can do it to a computer or workstation, too.

Q. What does it mean to "zero out a hard drive"?

A. To overwrite everything with zeros so that there isn't any leftover data. That at the ones and zeros level, the disk is just all zeros.

Q. Could you explain the significance, if any, of these conversations and notes about SpiderOak being burned and then deleting files?

A. The notes appear, to me, to show concern about removing any forensic traces of the backup system, desire to not have any passwords, which some of the SSH files might provide, essentially, leftover, and making sure that after the migration, the entire old setup does not have data in it anymore.

Q. Did you find other records where the defendant was

concerned about services being burned?

A. Yes.

Q. Directing your attention to Exhibit 714A.

MS. PELKER: I believe 714A may have only been conditionally admitted. And I -- if this is not one of the files that we previously discussed, is 7 -- if we could pull up 714.

THE COURTROOM DEPUTY: 714 and 714A were conditionally admitted.

BY MS. PELKER:

Q. So if 714 was admitted, is 714A a translation of the -- of what -- the admission that was completed earlier today?

A. Yes.

MS. PELKER: And so the government moves to complete the admission of 714A. I believe 714A was conditionally admitted depending on 714's admissibility. Now we have 714 admitted, so we're moving to admit 714.

THE COURT: Did we admit 714 earlier, or not?

THE COURTROOM DEPUTY: I don't have it that we admitted it earlier, or not.

MS. PELKER: I believe earlier today with the batch of documents with the defendant's device. If we didn't, I can -- we can do it right now.

THE COURT: Let me just go back and look at my notes.

Oh, I think we did. We had 709 through 715 should

have come in.

MS. PELKER: It was a whole series. Yes.

THE COURT: Right? 709 through 715 came in as a group, I believe, earlier today.

MS. PELKER: Yes.

MR. EKELAND: Okay. So that it is in evidence? It's not just conditionally, in terms --

THE COURT: With this witness we're doing it conditionally.

MR. EKELAND: Oh, okay. But with the proviso --

THE COURT: I'm sorry?

MR. EKELAND: With what we discussed over the phone before in relation to the -- should we --

THE COURT: I'm not sure I remember what you're talking about, but whatever it was, it was.

MS. PELKER: This was just the -- this is one of the documents from the device, and we batch admitted all the documents from the devices.

MR. EKELAND: In Russian?

MS. PELKER: Yes. And then this is the translation of it. So 714A was conditionally admitted as a translation based on the admission of 714. We've completed the admission of 714. We now would move to complete the admission of 714A because it was conditioned on conditioned, and now we've met the conditions.

THE COURT: All right. Any objection to that?

MR. EKELAND: I just -- subject to the same discussion that we had over the phone.

THE COURT: All right. Well, that -- the objection you raised was overruled, so 714 and 714 (sic) are both admitted.

BY MS. PELKER:

Q. If we could now go to page 40 within this research document from the defendant's device.

And if we could scroll down, can you read the bold headlines, starting with "VPNs"?

A. "VPNs and other services that have been burned."

Q. And is there a link on that next line?

A. Yes, there is.

Q. Did you view the article at that securitylab.ru link?

A. Yes.

Q. Directing your attention to Exhibit 520, which is not yet in evidence.

Is this a fair and accurate copy of the article at that link?

A. Yes.

MS. PELKER: Government moves to admit Exhibit 520.

THE COURT: All right. Any objection?

MR. EKELAND: Hearsay.

THE COURT: I'll admit it for the effect on the

listener.

BY MS. PELKER:

Q. CS Mazarin, did you -- is this an article that appears to be in Russian?

A. Yes.

Q. Did you also view the translation of this article made by FBI translators?

A. Yes.

Q. Directing your attention to Exhibit 520B. I believe that this was conditionally admitted by the translators.

CS Mazarin, is this a translated version of the article that you reviewed?

A. Yes.

MS. PELKER: Government moves to complete the admission of 520B.

THE COURT: All right. Any objection?

MR. EKELAND: Hearsay.

THE COURT: Objection is overruled. It comes in for the effect on the listener. And 520B is admitted.

BY MS. PELKER:

Q. Can you read the title of this article?

A. A VPN Provider Provided the FBI with Activity Logs to Catch a Cyber Criminal.

Q. Generally, what's described in the article here?

A. I believe it was about a cyberstalking case that the FBI

was investigating and/or the local police where law enforcement obtained logs and IP information from PureVPN.

Q. Returning to Exhibit 714A, the defendant's note file.

In this context, what's your understanding of what's meant when the defendant describes these services as having been burned?

A. That he can't use it because it cooperated with or otherwise turned records over to law enforcement.

Q. Did you see any other uses of "burned" on the defendant's devices?

A. Yes.

Q. Directing your attention to Exhibit 705B.

Is this one of the photographs of the defendant's Mycelium wallet application?

A. Yes.

Q. And can you read the wallet name that starts "Burned"?

A. "Burned do not use 1."

Q. Can you circle that on the screen?

Did you review other places where the defendant expressed concern about the law enforcement disrupting computer infrastructure?

A. Yes.

Q. Could you go to Exhibit 711A, the mast document? And going to page 13.

Can you read from the third block of text here, starting

with "Must fucking check this"?

A. "Must fucking check this.  There is some good information about which domains to use."

And a Reddit.com link to the Bitcoin sub-Reddit in the specific post and comments section.

Q. Did you visit the link noted there?

A. Yes.

Q. Directing your attention to Exhibit 510, not yet in evidence.

Is this a fair and accurate copy of what is shown at that link?

A. Yes.

MS. PELKER:  Government moves to admit Exhibit 510.

THE COURT:  Any objection?

MR. EKELAND:  Yeah.  401, 403, and hearsay.

MS. PELKER:  Effect on listener.

THE COURT:  Yeah.  So, the 401 and 403 objections are overruled.  And with respect to the hearsay objection, Exhibit 510 comes in for the effect on the listener or reader.

BY MS. PELKER:

Q. CS Mazarin, can you read the title of this Reddit thread here?

A. "U.S. Government Just Seized wn-center.com.  PSA repost: For greater protection from a domain seizure, consider choosing .is and/or .to CCTLDs for your Bitcoin related websites."

Q. What is a domain seizure?

A. It's when the government takes over a domain so that users can't access the website anymore. It's a website takedown via the government taking control of the domain.

Q. Are domain seizures one thing that law enforcement does to take down criminal websites?

A. Yes.

Q. Can you read the next line, starting with "Uncle Sam says"?

A. "Uncle Sam says if it ends in .com, it's seizable."

Q. And did you review the link to the *Wired* article shown below?

A. Yes.

Q. And generally, what was shown in that *Wired* article?

MR. EKELAND: Objection. Calls for hearsay.

THE COURT: Is this one of the ones that's referenced back in the text of the chain before this?

MS. PELKER: No. This would be -- it is still effect on the listener of the viewer of this thread would have been met right up front and center with this link and article.

THE COURT: I'll allow the question.

MR. EKELAND: It's assuming that this was listened to. This is just a link. There's --

THE COURT: That's what I was getting ready to say. So, what I'm going to say is I'm going to admit it for the effect on the listener. But it's up to the jury to draw your

own conclusions as to whether you think that it's likely or not that -- what the link was clicked on. Okay.

A. So this one I don't remember as many of the details because it was a while ago. But I believe the article was about how .com domains were -- that the U.S. government could seize those regardless of where the rest of the website was based.

BY MS. PELKER:

Q. Would it refresh your recollection to review the article?

A. Yes.

Q. Could we pull up but not publish Exhibit 510A.

Does reviewing this -- we don't need a detailed recitation of the article, but does this refresh your recollection of what was generally discussed in the article?

A. Sorry. Could you do it a little more slowly? I'm just skimming it again.

(Pause.)

Yes.

THE COURT: So the -- just to clarify, the only question for you is not what the article says, but just whether it refreshes your recollection.

THE WITNESS: Right. I was looking for certain keywords.

THE COURT: That's fine. I just wanted to make sure that you weren't being asked to read from the article, but just whether it refreshed your recollection.

THE WITNESS: Yes.

THE COURT: Okay.

BY MS. PELKER:

Q. We can take that back down.

So, generally, do you recall what that article was discussing?

A. It was something about the U.S. government doing domain seizures by working with VeriSign and attacking the site, in a sense, via the domain route rather than needing to locate and take down the actual server. But, that's most of what I remember. It was a while ago.

Q. Returning to the mast document at Exhibit 711A.

And, so, what is the defendant saying after "must fucking check this" about how he should use this information about the U.S. government's ability to seize domains?

MR. EKELAND: Objection. Your Honor, it calls for personal knowledge. It's vague and ambiguous. And it's a compound question.

THE COURT: Why don't you just rephrase the question in terms of what does it say or how does she understand it.

BY MS. PELKER:

Q. What do you understand this to be saying about how to use the information at the links?

A. I understood it to mean to use the link as a guide for which TLDs are top-level domains, such as .com, not to use to

avoid this kind of outcome.

Q.   If we could go to page 28 within the mast document.   And scrolling down to the Freelance Finance section here.

Can you read this first paragraph?

A.   "Regarding what to do with legal money.   So now I need to copy the website of those idiots for whom I shall kind of set up email.   To do this, I need to buy a semi-anonymous hosting somewhere, because the website must be located somewhere, such that it is unclear that it is with me.   But, straightforwardly, I can register it on any name whatsoever because they won't understand whether it belongs to me or not in any event."

Q.   Can you explain what your understanding is of what "semi-anonymous hosting" means?

A.   Semi-anonymous hosting means that there is still registration info provided.   It's not advertised as don't give us any info, but that information isn't vetted in any way, and it's simple to give whatever name, whatever address.   None of it is verified.   When I describe hosting things semi-anonymously, it's with inauthentic information, but information is still listed.

Q.   Did you find other instances of the defendant researching anonymous or semi-anonymous hosting?

A.   Yes.

Q.   Did you also find comments in the defendant's notes regarding anti-surveillance measures?

A. Yes.

Q. Directing your attention to Exhibit 710A, Info Settings. Directing your attention on page 6. Scrolling down.

Could you read the title of that third section from the bottom?

A. Paint that Shields Against Radio Waves.

Q. Did you review what was present at that link?

A. Yes.

Q. What generally was discussed?

A. It was paint to block waves -- radio waves.

Q. And do you know whether radio wave-blocking paint would actually work?

A. No.

MR. EKELAND: Objection, Your Honor, relevance.

MS. PELKER: I'm making the point that we don't know whether this actually works or not.

THE COURT: Overruled.

A. No, I don't know.

BY MS. PELKER:

Q. If it did work, what would radio wave-blocking paint do or what does it claim to do?

A. To prevent radio waves from getting through to the surface where it's painted, as I understood it.

Q. Why would a cyber criminal want to block radio waves?

A. Law enforcement, especially local police, tend to

communicate a lot through radio, and they also try to intercept radio waves. So there are different stages of a law enforcement operation where disrupting any radio wave connection would -- could hinder the ultimate raid and arrest, both the surveillance before and any communication after, theoretically.

Q. Going now to page 12.

Can you read the first bold section heading, starting with "Is it safe"?

A. "Is it safe to connect to open WiFi networks or even just WPA networks of unknown ownership?"

Q. Generally, what does the defendant discuss in the next few sections?

MR. EKELAND: Objection, Your Honor.

BY MS. PELKER:

Q. What's your understanding of what the defendant is discussing in the next few sections -- next few bullets?

A. Whether it's safe to connect to sites through open WiFi networks without, for example, leaking DNS information or exposing more information than needed for the connection.

Q. Can you read the first full sentence after the bullets? So starting with, "Setting up"?

A. "Setting up a continuous VPN that does not let anything leak, with a kill switch. There seems to be a setting in Android itself to do this, but it requires setting a password

on a lock thing.  And so let's try to find some other solution first, SSH tunnel app?

"Last solution trying proxy.sh safe jumper Android app.  It says it has kill switch."

Q.  Can you explain what a kill switch is?

A.  When you use a VPN with kill switch enabled, it's a setting that says if anything gets interrupted with the VPN connection and it's not working, just block the internet connection.  So if it's not turned on, the kill switch, and the connection gets interrupted, you would still have internet access, just with whatever IP was behind the VPN.  But with this kill switch setting on, your connection would drop and you would know that something went wrong with your VPN.

Q.  What, if anything, was significant to you about this discussion of kill switches?

A.  Browsing the internet with kill switch on is an action you would take when one would want to be absolutely sure to not have the connection behind the VPN going to the internet.  It goes, in my opinion, a little beyond just not wanting to be tracked as much by advertisers or other more casual VPN usages. It's -- turning the kill switch on means you want to be very sure to have continuous VPN protection.

Q.  We spoke a bit earlier about virtual machines.  Can you -- is it possible to set up virtual machines to work in parallel with remote desktops?

A.   Yes, you can remotely connect to virtual machines.

Q.   And can you explain what the purpose is of using a virtual machine?

A.   There are many reasons someone might use a virtual machine, but it's one way of keeping operating systems separate from one another.  Sometimes I will have all of my malware-reversing tools and projects in one virtual machine, and I may have some online research of a different site in another virtual machine. That, to me, protects my main operating system from having a lot of different -- from being exposed to different risks.

Q.   Did you find evidence of multiple virtual machines on the defendant's devices?

A.   Yes.

Q.   And did you also find references in the defendant's notes to virtual machines?

A.   Yes.

Q.   Directing your attention to 714A.  In fact, this is the research document found on the defendant's devices.  If we could go to page 41.

And can we read the last bullet point in this top section, starting with "Virtual box"?

A.   "Virtual box, in windows if there is not enough memory, it doesn't start the next VM, just says so.  In Linux it starts it, the whole computer with mouse and all hangs for ten minutes.  After that old started VMs just die."

Q.   What is your understanding of what's being discussed here as far as the issues with VMs?

A.   Here, what's being discussed is issues with running multiple VMs at the same time and running out of resources on the main computer hosting the VMs, was my read of this.

Q.   And what does this indicate to you about the defendant's use of VMs?

A.   That he was running multiple VMs at the same time.

Q.   You testified previously about proxies and VPNs.

In reviewing the defendant's devices, did you find additional evidence that the defendant was using VPNs and proxies?

A.   Yes.

Q.   And going to Exhibit 710A.  And on page 1, under VPN settings.

Can you explain what the defendant is describing at a high level on this first page?

A.   To me, this looked like troubleshooting notes for trying to use open VPN with a proxy and making sure that the connection moved in the right direction and didn't -- always went through the proxy and didn't connect directly.

Q.   And why would connecting directly be problematic?

A.   You would expose your IP address online or other information.

Q.   And if we can scroll down a bit, to where -- the discussion

of CryptoVPN. And starting with, "For example."

A. "For example, CryptoVPN adds a bunch of ports in its config files. If you connect through the Tor, then they fucking block all the ports. You need to remove from the config file all the connect lines, except for ports 80 and 443, for example."

Q. And why was this reference to CryptoVPN significant in this case?

MR. EKELAND: Objection. Leading.

MS. PELKER: It's a "why" question.

THE COURT: Yeah, overruled.

A. This note, to me, suggests use of CryptoVPN, since he's writing about what's in its config files and what happens if you run it in conjunction with Tor.

BY MS. PELKER:

Q. And could you remind the jury where we previously -- where you previously saw CryptoVPN being purchased and used?

A. In the IPs of Note table with the data sources, they showed up in CryptoVPN, was the company I attributed one of the IP addresses to.

Q. And was there also a payment to CryptoVPN from the Shormint account?

MR. EKELAND: Objection. Leading.

MS. PELKER: Was there. We could also pull up the exhibit.

THE COURT: Yeah. I think it is leading.

MS. PELKER: Can you pull up Exhibit 401?

Going to the all transactions.

BY MS. PELKER:

Q. And on -- can you, CS Mazarin, note what the -- what account the Shormint account is paying to in line 5?

A. The account is labeled CryptoVPN.

Q. Did you review other records of the defendant researching VPN providers?

A. Yes.

Q. Directing your attention to Exhibit 830, which is not yet in evidence.

Is this a fair and accurate copy of a document titled VPN Retreat from the defendant's Google Drive?

A. I'm sorry. Could you zoom out a little bit again? I just want to remember it.

Yes, that's right.

MS. PELKER: Government moves to admit Exhibit 830.

THE COURT: Any objection?

MR. EKELAND: 401 and 803.

MS. PELKER: This was authenticated through business records sought from Google that the defense stipulated to. This is just part of the Google production batch.

MR. EKELAND: I'm not challenging the authenticity. I'm saying it's being offered for the truth of the matter asserted, that there's a list of VPN service providers. And I

just don't see the relevance of this whole line of questioning. I think we've established that the defendant is familiar with VPN.

MS. PELKER: I think we would like -- we are going to introduce the list of VPN providers to show what VPN providers specifically the defendant was looking at.

THE COURT: As I've observed on multiple occasions, I don't know how this is hearsay or why it would matter in the present circumstances. So the objection is overruled. And the exhibit is admitted.

BY MS. PELKER:

Q. CS Mazarin, generally, what is shown in this Google Drive VPN file?

A. If I recall, it was a list of VPN companies, VPN services.

Q. And to be clear, just what's shown here? Is this a --

A. Oh, in the document I'm looking at now?

Q. Yes.

A. It's a link to a website called filesharefreak.com.

Q. And directing your attention to Exhibit 831.

Is this the associated metadata for a Google Drive VPN file?

A. It was information provided by Google.

MS. PELKER: Government moves to admit Exhibit 831.

THE COURT: Any objection?

MR. EKELAND: 401.

THE COURT: Exhibit 831 is admitted and may be published to the jury.

BY MS. PELKER:

Q. CS Mazarin, can you note when this document was created?

A. January 29th, 2011.

Q. Did you review the information available at --

If we could go back to 830.

Did you review the information available at that link as captured by archive.org?

A. Yes, I did. But, like the other one, I remember reviewing it, but it was a while ago. So I would need to see it again for more detailed questions.

Q. If we could pull up Exhibit 509.

And is this the link that was -- is this an archive -- looking at the address that's in that very bottom of the screen, is this an archive.org capture of the link from Mr. Sterlingov's Google Drive?

A. Yes.

Q. And does this fairly and accurately depict what would have been captured by archive.org, as you understand how it scrapes sites, of this page in 2011 -- January, specifically, of 2011?

A. Yes.

MS. PELKER: Government moves to admit Exhibit 509.

THE COURT: Any objection?

MR. EKELAND: Relevance.

THE COURT: Exhibit 509 is admitted and may be published to the jury.

BY MS. PELKER:

Q. And, CS Mazarin, if we could scroll down a bit.

And generally speaking, can you explain what's shown at this link?

A. In general, this is a list of links to VPN provider websites with notes about how much they cost and what anonymity-specific features they offer.

Q. And is CryptoVPN on this list?

And if we could just do a control-F for CryptoVPN.

A. No. From what I can see here.

Q. CS Mazarin, did you --

And we can pull down this exhibit.

CS Mazarin, did you also review servers from -- records pertaining to servers at M247 in Romania?

A. Yes.

Q. Showing you Exhibit 522A.

Can you explain what's shown here, generally?

A. This was a Romanian law enforcement response to information requests regarding some specific IP addresses.

Q. And who is the accountholder noted here for the IP addresses?

A. To the Moon LTD.

Q. And what's the name of the point of contact listed?

A. Roman Sterlingov.

Q. Did you review a drive provided by Romanian law enforcement?

A. Yeah, I remember reviewing images. I don't remember which law enforcement provided me the actual drive. But, I did review images provided by the Romanians originally.

Q. And were those images of -- images that you understand were obtained from M247 in Romania?

A. Yes.

Q. And can you explain what your general approach is for reviewing servers?

A. Well, it largely depends on what kind of case it is, like, a hacking case or not. For just about any server, I will briefly review the network configuration information as a whole, see which users and user names are on there, and try to categorize, generally, what the server was used for and when.

Q. And how many drives were on the -- how many device images were on the drive that you reviewed?

A. Three.

Q. And could you walk through what you found on the first image?

A. Which one?

Q. Was one of the images appear to pertain to Moon VPN?

A. Yes. The -- one of the images seemed to mostly contain code, notes, email server information that largely seemed to

correspond to a service call Moon VPN.

Q. Did that server also have an application called Bisq, B-I-S-Q?

A. Yes, one of them did for sure. Two of the server images I looked at appeared to possibly work together to support different functionalities of the same Moon VPN general site.

Q. Can you explain what Bisq appeared to be, based on your review?

A. It appeared to be a type of cryptocurrency software, maybe wallet software.

Q. And did you find, on a second drive, the Bitcoin Core software?

A. I did find Bitcoin Core software installed.

Q. Can you explain, generally, your understanding of what Bitcoin Core was, from your perspective?

A. It appeared to me that Bitcoin Core was the service that managed or could manage Bitcoin transactions happening through the site.

Q. And did the Bitcoin Core found on the defendant's servers have an extensive history saved in its logs?

MR. EKELAND: Objection. It's vague and ambiguous as to "extensive." What precisely does that mean?

THE COURT: I think the questions are -- you can follow up if there's uncertainty about that.

A. I don't remember.

BY MS. PELKER:

Q. And what was found on the third drive?

MR. EKELAND: Objection. Your Honor, it's leading as to "What was found." It's assuming there was something on there.

MS. PELKER: I think the answer is actually that there was actually nothing on there, so I don't think it's leading.

THE COURT: Yeah. So, what, if anything.

BY MS. PELKER:

Q. What, if anything, was found on the third server?

A. The third image was all zeros, from what I could see.

Q. And was there anything in the recycling bin, or a server -- whatever the server equivalent of a recycling bin would be?

A. No. There just wasn't any real data on it.

Q. And how are you able to confirm that?

A. I opened the image file up in a hex editor and looked through. It's a type of viewer for the file where I could see what all the bytes were, and I scrolled through to check that they were all zeros, and they were.

Q. If we could pull up Exhibit 523A.

Do you recognize this exhibit?

A. Yes.

Q. What is it?

A. This is a screenshot of the space of the third image opened

in -- I believe this is -- X-Ways is built-in text editor, though I can't remember -- yeah, this is X-Ways Forensics built-in hex editor.

Q. And does this fairly and accurately reflect the information shown when you've reviewed that Romanian drive in a hex editor?

A. Yes.

MS. PELKER: Government moves to admit Exhibit 523A.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: Exhibit 523A is admitted and may be published to the jury.

BY MS. PELKER:

Q. And if we could just scroll down so we can see the zeros.

CS Mazarin, could you explain what the significance, if any, is of all of this being completely zeroed out?

A. Having a drive have only zeros and no other information, that's generally something a user has to do to a drive. If you take a hard drive new, out of the box, and look at what all the bytes are, sometimes they do have some data, although not actual files, here and there. To get a drive to look like that, you have to do what's known as zeroing it out, or wiping it. This is, for example, what I do with any drive I'm about to use for forensics. I overwrite it with all zeros.

Q. If we could return back to Exhibit 522A.

If we could scroll up.

CS Mazarin, what's the date on the return here on the top right-hand corner?

A. 7-19-2021.

Q. And did the FBI obtain images of these Romania servers before or after the defendant --

MR. EKELAND: Objection, Your Honor.

THE COURT: What's the objection?

MR. EKELAND: The objection is that there's nothing in evidence that there were multiple servers. We've just been talking about one server and three hard drives on it.

THE COURT: Overruled.

A. I'm sorry. What was the question?

BY MS. PELKER:

Q. Did the FBI obtain the records or the images from Romania before or after the defendant's arrest?

A. I wasn't working on the case at the time of the defendant's arrest, so I'm not sure exactly.

Q. Is July 19th of 2021 before or after April of 2021?

A. Oh, it's after.

Q. Did you also find references in the defendant's notes to M247?

A. Yes.

Q. Direct your attention to Exhibit 119C. And on page 3.

And can you read, "But now I should probably sort out"? Just do those two lines.

A. "But now I should probably sort out M247 and 3A. Shit, but one needs to resolve the problem with M247 in the morning somehow."

Q. Directing your attention now to Exhibit 716A, the temp note.

And is this a translated copy of a file that you retrieved from the defendant's device?

A. Yes.

Q. Directing your attention to page 8.

THE COURTROOM DEPUTY: 716A, is it admitted or just conditionally?

MS. PELKER: I believe it was previously conditionally admitted, and we would now seek to complete the admission.

THE COURT: All right. Any objection?

MR. EKELAND: Just subject to the same thing we discussed over the phone before, Your Honor. Do you want --

THE COURT: If you're just -- okay.

(Bench discussion:)

MR. EKELAND: This was just in reference to the summary -- summary portions that the government's going to redact out. But, otherwise, no objection.

(Open court:)

THE COURT: All right. You may proceed.

BY MS. PELKER:

Q. And what is the date noted here, starting with 2020?

A. 9-24-2020.

Q. Can we scroll down to the fourth block of text?

And just read, "What to do about moving now, in general."

A. "What to do about moving now, in general. I won't fly to Russia now, and another fuck up in M247."

Q. You can pull that exhibit down.

And with Special Agent Lund's assistance, if I can now direct your attention to Exhibit 125.

And --

THE COURT: I'm sorry. Just a second here.

MS. PELKER: This is one of the physical exhibits.

THE COURT: I don't know that I actually -- I just want to make sure that I actually put on the record that I did admit 716A.

MS. PELKER: Thank you, Your Honor.

THE COURT: Okay.

BY MS. PELKER:

Q. And --

A. Can I stand up?

Q. CS Mazarin, can you go ahead and open up that --

You can sit and then open up that box, with Special Agent Lund's assistance.

THE COURT: Would this be a good time for the jurors

to stretch their legs?

MS. PELKER:  Yes.  And, Your Honor, I am very hopeful we finish today.  We're right at the break.

THE COURT:  Okay.  All right.

So feel free to stretch your legs.  And does anyone need to use the restroom?

(Jurors shake heads.)

THE COURT:  Okay.

(Pause.)

THE COURT:  All right.  You may proceed.

MS. PELKER:  Thank you.

BY MS. PELKER:

Q.  CS Mazarin, can you explain -- you can take it out of the box or maneuver it as you need to.  But can you explain what this is?

A.  This is a portable LTE device called LiveLTE -- can you hold that -- to be able to connect to the internet over data.

Q.  Can you hold up the different parts and kind of explain to the jury how this is -- without getting into the real technical details, but explain what the different parts are here?

A.  So, the main computer here, as well as the secondary one, are Raspberry Pi microcomputers.  It's attached to this TP link hub, and these are four modems.  You can add, from the diagram, what appears to be up to four SIM cards from different providers, and it's configured so that it will route your

traffic through them and you can reach the internet over data, essentially.

Q. Is there a visual that would help the jury understand how this router works?

A. Yes.

Q. And showing you Exhibit 368.

Would this visual assist the jury in understanding your testimony about this LiveLTE writer?

A. Yes.

MS. PELKER: Government moves to publish Exhibit 368 as a demonstrative.

THE COURT: Any objection?

MR. EKELAND: No objection, Your Honor.

THE COURT: Exhibit 368 may be published as a demonstrative.

BY MS. PELKER:

Q. Can you walk the jury through how this device would be used for a user trying to connect to the internet?

A. Yes. The Raspberry Pi I held up would function as the mini PC. Here are the four modems, as I showed you. The devices connect through to this mini PC. Sample, here's, you know, my laptop trying to get to the internet, and then the connection to the internet is via LTE provided by the modems. (Indicating.)

Q. And is this configured to operate with just one SIM card or

can it use multiple SIM cards?

A.   Multiple.

Q.   And what would the impact be of having multiple SIM cards rather than just one?

A.   It could move the data over multiple different networks.

Q.   If law enforcement were monitoring a target's internet traffic, but the target was using this device, what would happen?

A.   If law enforcement was, for example, monitoring the traffic coming from the home or business, it goes over data instead, and so none of that would be visible to the law enforcement tap or monitor.

Q.   And if law enforcement were monitoring traffic to a server trying to identify the person who is connecting to it, but that person was using -- connecting using one of these devices, what would law enforcement see?

            MR. EKELAND:  Objection.  Leading.

            THE COURT:  Overruled.

A.   I would see that the IPs would come back to being mobile network IPs from the sources of the SIM cards, and they would see something similar to data coming back to someone using their phone on data out of the house.

BY MS. PELKER:

Q.   And would that then potentially be split across multiple SIM cards, depending on how these multiple SIM cards are

configured with the modems?

A. Yes, it appears so.

Q. Had you ever encountered one of these devices in real life before this case?

A. No, I hadn't.

Q. Did you find references in the defendant's notes to him troubleshooting issues that he was having with this device?

A. Yes.

Q. And we can go ahead and put away the LiveLTE device.

Thank you, Special Agent Lund.

Did you review additional evidence from the defendant's phone, in addition to the Mycelium wallet?

A. Yes.

Q. And directing your attention to Exhibits 734, 734A, 735, 735A, 736, 737A, 737B, 737C, and 738.

Were these files that were retrieved from the defendant's phones?

A. Yes, they were.

MS. PELKER: And government moves to admit Exhibits 734, 734A, 735, 735A, 736, 737A, 737B, 737C, and 738.

THE COURT: Any objection?

MR. EKELAND: 401 and 403.

THE COURT: The objections are overruled. And those exhibits are all admitted and may be published to the jury.

BY MS. PELKER:

Q. If we can just walk through those. So directing your attention to this exhibit here, 735.

Can you explain what's shown here?

A. This is a screenshot of a desktop. Firefox browser is the current window open.

Q. And if we can zoom in on the lower portion with the -- down at the bottom, with the purple onion.

Do you see the Tor browser down at the bottom?

A. Yes.

Q. And can you circle where that is?

A. (Indicating.)

Q. And -- but to be clear, what browser is currently open on the screen?

A. Mozilla Firefox.

Q. And did you also review an extraction of the defendant's tablet?

A. Yes.

Q. In reviewing that extraction, did you assist in retrieving a copy of a message that the defendant had sent?

A. Yes.

Q. Showing you Exhibit 721, which is not yet in evidence.

Does this accurately reflect what was retrieved from the tablet?

A. Yes.

MS. PELKER: Government moves to admit Exhibit 721.

MR. EKELAND: One second, Your Honor.

(Pause.)

THE COURT: Any objection?

MR. EKELAND: Yes. First of all, 401, 403, and 803. These aren't statements of the defendant.

THE COURT: Ms. Pelker?

MS. PELKER: This is a chat message that was retrieved from the defendant's device, I believe in connection to one of his dating profiles, and it's a discussion of money laundering as a random reference.

MR. EKELAND: This is actually a screenshot, Your Honor. It's not -- my understanding, it's not from his texts. It's something else. And, again, I just don't see the relevance of this.

THE COURT: Why don't you lay the foundation with the witness and we can get a better sense of what this is and then we can decide based on that.

BY MS. PELKER:

Q. When you were reviewing the tablet, did you review -- without getting into anything personal, but could you describe, generally, some of the nature of the messages on the defendant's tablet?

A. Well, a lot of these were from -- were images, too, so screenshots, and photos of images, too.

Q. And when you were reviewing this tablet, was there a --

conversations and images that appeared to be going back and forthwith individuals the defendant appeared to be corresponding with?

A. Yes. There were -- this device, in this screenshots and photos that I reviewed, multiple that showed chats over various apps.

Q. Can you describe, generally, the nature of some of those apps?

A. These ones with the blue bubbles were from a dating app.

Q. And did you note a reference of interest that seemed relevant to this case in this particular chat?

A. Yes, I did.

Q. And did you assist with copying that particular -- this particular snippet of the file from the defendant's tablet?

A. Yes.

MS. PELKER: Government moves to admit Exhibit 721.

THE COURT: Can I ask you to pick up the phone?

(Bench discussion:)

THE COURT: I'm just trying to figure out -- I don't know if you can tell from the blue color or from the rest of the context, whether there's reason to believe that Mr. Sterlingov was receiving this text or whether he was the one who sent it.

MS. PELKER: My understanding is that he was the sender of the text. And that's the relevance here, that

somebody on a dating site was asking him some get-to-know-you questions and he gratuitously brought up money laundering.

THE COURT: Can you tell from the dating app whether the other person he's conversing with is a man or a woman? And the reason I ask that question is just because the reference to the beard, which might provide some clarification. If he's communicating with another man who was bearded, then that might be one thing. If he was communicating with a woman, that's less likely.

MS. PELKER: My understanding is that there are extensive conversations with -- or, that there are conversations with women and, also, that the materials on the defendant's phone would indicate that the partners he would have romantic interests in are women.

THE COURT: Okay. Mr. Ekeland?

MR. EKELAND: Yeah, I think Your Honor sees the point. There's nothing here that --

THE COURT: I don't see the point. That's what I'm trying to get at. And that's the reason I asked the question. You know, maybe you can point me to something that suggests that he was conversing with another man, which could have some bearing on my thinking about this.

MR. EKELAND: Your Honor, there is nothing identifying Mr. Sterlingov as the speaker. There's been no foundation laid for that. These are screenshots from dating

apps where other people are speaking to Mr. Sterlingov, and --

THE COURT: How do I know that? And how do I know that's not Mr. Sterlingov? And why isn't it just a question for the jury?

MR. EKELAND: Because there's nothing in here identifying him as Mr. Sterlingov.

MS. PELKER: Your Honor, the government is actually trying not to put overly personal and problematic material before the jury here. We have no interest in airing Mr. Sterlingov's sexual activity to the jury here.

THE COURT: I mean, if the defense wants to lay a little bit more of a foundation by establishing that his romantic communications were with women, which, I think, would satisfy my question about whether there's at least a preponderance of evidence that he was the sender rather than the receiver of the message.

Should we do that, Mr. Ekeland?

MR. EKELAND: I think there's a 403 issue here, and I don't understand really even what the relevance is. I'm still really --

THE COURT: Come on. That is -- that borders on silly. If he's saying that he's engaged in money laundering and you're saying there's no relevance to it, that's not a serious argument.

MR. EKELAND: It's my understanding this is actually

not him, and that there's no foundation for it being him.

THE COURT: That's what I'm asking about. If you want the government to lay more foundation, I'll have them do it. But I think that is going to require getting into some of his romantic relations and establishing that he was engaged in romantic conversations with women, which I think would then satisfy by a preponderance of the evidence that this was him.

I really don't have a strong view on it. I just want to make sure that I'm not unnecessarily putting personal information of him into the record.

MR. EKELAND: May I one moment to consult with my client, Your Honor?

THE COURT: You may.

MR. EKELAND: Thank you.

(Pause.)

MR. EKELAND: We would like them to lay a foundation.

THE COURT: Okay.

(Open court:)

THE COURT: All right. You can lay a foundation.

BY MS. PELKER:

Q. CS Mazarin, in your review of the defendant's devices as a whole, did you have the opportunity to gain some insight into the defendant's romantic or otherwise interests or activities?

A. Yes, I would say so.

Q. And based on that review, do you have an understanding of

the gender of the individuals that the defendant was interested in?

A. Yes. They were all women.

THE COURT: All right. Anything further on this?

MR. EKELAND: Our objection still stands on this. But, that's --

THE COURT: Okay. All right. All right. Anything further?

MR. EKELAND: No, Your Honor. That's lack of foundation.

THE COURT: I will go ahead and admit -- Exhibit 721? Is this what -- I'm sorry. What's the exhibit number?

MS. PELKER: 721.

THE COURT: 721?

MS. PELKER: 721.

THE COURT: 721 is admitted and may be published to the jury.

BY MS. PELKER:

Q. CS Mazarin, in your review, did you also view photos of the defendant at various points in time?

A. Yes.

Q. And does the defendant sometimes have a beard?

A. Yes.

Q. And can you explain what this conversation appears to be -- what your understanding is of what's shown here?

A.  It appears to be a screenshot of chats within a dating app's direct messaging feature.

Q.  And can you read the second message there in the blue bubble?

A.  "You're wondering what I do, in terms of magically having such photos, or in terms of money laundering?"

Q.  Did you review evidence pertaining to the defendant's use of exploit.in?

A.  Yes.

Q.  Directing your attention to Exhibit 898, which is not yet in evidence.

Is this a -- and if we can just scroll up to the top.

Who is the recipient of this message?

A.  Exploit@exploit.in.

Q.  The recipient.  Who is it sent to?

A.  The recipient?

Q.  Yes.

A.  Oh, sorry.  Spam@plasmadivision.com.

Q.  Is this a fair and accurate copy of an email retrieved from the plasmadivision account?

A.  Yes.

MS. PELKER:  Government moves to admit Exhibit 898.

THE COURT:  Any objection?

MR. EKELAND:  Yeah, it's hearsay.  The defendant is not the speaker.  He's the recipient of the message here.

THE COURT: I guess I may need it in English to be able to evaluate that. Do we have an English version of this?

MS. PELKER: We unfortunately do not, Your Honor. We're going to be pointing to the links here. It relates to the timing of the message. We can ask for some additional questions about whether this appears to be an auto-generated email. We're really just pointing to the different links here.

THE COURT: Okay. Why don't you lay a little bit more of a foundation.

BY MS. PELKER:

Q. CS Mazarin, to -- what's the date on this email here?

A. 9-20-2011.

Q. And to whom is the email addressed?

A. To spam@plasmadivision.com.

Q. And then below that, is there a user name that's noted in the email?

A. It appears to be the Two, which is listed at the top.

Q. If we can kind of scroll out to look at the -- zoom out to look at the general context of the email as a whole, and then scrolling down here.

Can you describe the general structure of this email?

MR. EKELAND: Objection. Vague and ambiguous. Leading.

THE COURT: Overruled. Overruled.

A. The email appears to give a link to an exploit.in page with

the code Lost Pass Form, an ID number, and an alphanumeric string.

Q.  And given that long alphanumeric string and the context of this email, does this appear to be an email that an individual person working at exploit.in sat at their computer and typed out or an automatically generated or scripted email?

MR. EKELAND:  Objection.  Leading.  Incompetent question.  And vague and ambiguous.

THE COURT:  Overruled.

A.  I would say automatically generated.

MS. PELKER:  Government moves to admit Exhibit 898.

MR. EKELAND:  This is still hearsay.  It's not a statement by the defendant.  And in terms of effect of any listener, it's going to his SPAM folder.  And also, given that it's entirely in Russian, there's a relevance issue, as well.  There's nothing in here that is going to issues in this case that I'm aware of.

MS. PELKER:  It's not going to a SPAM folder.  It's going to a spam@plasmadivision email account, and the defense has put into issue as to whether the Meth! account is truly the defendant.  And so we need to have the right to play out the sequence of events that led to the creation of the Meth! account.

THE COURT:  All right.  Exhibit -- I'm sorry.  Go ahead.

MR. EKELAND: I'm sorry, Your Honor. I didn't mean to cut you off.

THE COURT: That's okay.

MR. EKELAND: Also, to that extent, to what counsel just said, this is cumulative because that issue has already been testified to.

THE COURT: Exhibit 898 is admitted and may be published to the jury.

BY MS. PELKER:

Q. CS Mazarin, if we can direct --

THE COURT: Can I ask, Ms. Pelker, it's just 5 o'clock now, and I don't know how much time you have left. And I don't know if there are jurors who have --

MS. PELKER: We have five minutes left.

THE COURT: Anyone who needs to go right now?

THE JURORS: (No response.)

THE COURT: You want to keep going?

THE JURORS: (Nod heads.)

THE COURT: Okay. Let's finish up. Go ahead.

BY MS. PELKER:

Q. CS Mazarin, what's your understanding of what the "two" was -- or is there?

A. It could be a user name or friendly name.

Q. And scrolling down a bit, the link there, exploit.in, is that the link to the Expoit forum that's been the subject of

previous testimony?

A.   Yes.

Q.   What's your understanding of what a Lost Pass Form indicates?

A.   Most websites that have logins have an option if someone forgets their password, where they click a link and get next steps for password reset.

Q.   Scrolling up, what's the date on this email?

A.   9-20-2011.

Q.   Directing your attention now to Exhibit 702.

If we could turn off the gallery screen.

Is this the extraction of the defendant's password vault?

A.   Yes.

Q.   Directing your attention to row 33 -- or, apologies -- 133.

Sorry.  Can we search for "meth," M-E-T-H, with the Exploit link?

83, not 33.  Apologies.

Is this the entry for the defendant's Meth! account on exploit.in?

A.   Yes, it appears to be.

Q.   If we could scroll to the right, and note the date that this was created.

A.   If this is the Date Created column, then it would be 9-22-2011.

Q.   And so how soon after the lost password link was sent to the defendant's SPAM account directed to the "two" was this Meth! exploit.in account created?

A.   Could I see the email again?

Two days after.

Q.   Directing your attention to Exhibit 55A.

Is this the exhibit pertaining to the Meth! post on exploit.in?

A.   Yes.

Q.   And under the Meth! avatar on the left, what is noted for the date joined?

A.   9-22-2011.

Q.   And is that the same date that the Meth! entry in the password vault file on the defendant's device was entered?

A.   Yes.

Q.   If you could go now to page 54.  I'm just going to have you read aloud two posts, and then we're wrapping for the day.

Can you read this post aloud?

A.   "It depends on how serious the enemy is.  But in principle, it is quite difficult.  One needs some specialized hardware solutions, which would shut down or reboot the computer.  In the simplest option, one can create a script that will track the newly enabled USB devices.  Or, for example, perhaps one can set up a web cam there, such that it looks at the computer itself and, when a movement is sensed, the compute will reboot?

"The difficulty lies in the fact that physical access to the computer allows attacks against it in many different ways.  In the simplest case, if a regular cop shows up and does not just turn off the computer -- which would be the best option, since disk encryption will be activated -- then, most likely, he will first try to move the mouse/keyboard to see if access is available through the console.  If one creates a script that will respond to the movement of a physical mouse and keyboard, this will already provide a protection, at least from the simplest enemy."

Q.  What is Mr. Sterlingov describing in this post?

MR. EKELAND:  Objection.

BY MS. PELKER:

Q.  What's your understanding of what is being described in this post?

A.  It's describing how to prevent a regular cop or law enforcement from accessing a computer and shutting it down -- encrypting its contents so it can't be accessed that way.

Q.  And in your review of Mr. Sterlingov's devices, did you find any evidence consistent with this sort of a setup?

A.  Particularly the webcam setup, yes.

Q.  Can you describe that at a high level?

A.  On some of the devices were software and records of him testing out motion-triggered webcams.

Q.  Directing your attention to page 36.

And can you read this post here?

A. "Useful, although the usual Google Tor setup hidden service will give about the same thing. Looks like another small typo under Leave Comments on the lines, according to this example, instead of hidden service port 80 127.0.0.1:8, perhaps it should be hidden service port 80 127.0.0.1:80."

Q. What does this post indicate to you regarding the defendant's knowledge about hidden service configurations?

A. Specific lines within the configurations for setting up Tor hidden services.

Q. And is that something that this indicates the defendant was familiar with?

A. Yes, it could.

MS. PELKER: No further questions, Your Honor.

THE COURT: All right. So let's break for the day. We're going to start tomorrow at 9:15, which is, hopefully, as soon as we can do so. I would ask, do your best to be here by 9 so we can really get going at 9:15 tomorrow.

And don't discuss the case with anybody, including your fellow jurors. Don't do any type of research in any way relating to anything in this case. And I will see you back here tomorrow at 9:15. I appreciate that you're all very attentive. I really appreciate that.

(Whereupon the jurors leave the courtroom.)

THE COURT: The witness is excused until 9:15

tomorrow, as well.  I just ask that you not discuss your testimony with anybody until it's complete.  All right.  Thank you.

All right.  I noticed -- or, my law clerk noticed that one of the jurors was pointing to Juror 13 -- which is the juror that there have been complaints about -- sort of muttering about the testimony in ways that were distracting to the other jurors.  I may have mentioned before, there were, I think, four jurors who had complained, and I started watching more carefully after that.  And I think she probably was a little bit more on her toes because she undoubtedly saw that somebody was pointing to her.

Mr. Hassard, I saw you were kind of interested in something going on with the jury.  Did you see something that was going on, as well?  You seemed amused by something, and you were looking at the jurors.

MR. HASSARD:  No, nothing.

THE COURT:  I'm sorry?

MR. HASSARD:  No, nothing in particular.

THE COURT:  All right.  I think we'll just have to continue to monitor that.  I am concerned about that one, though.  If she's ignoring my instruction not to comment, and she's doing it, actually, in front of us, that's obviously problematic.

And one other thing is, is that I would ask that you

all check in with the deputy clerk about the demonstratives. I just want to make sure that she has a clear record of what has come in only as a demonstrative, so it doesn't inadvertently go back to the jury. And, so, just your checks notes against hers to make sure that if something came in only as a demonstrative, that she knows that's how it came in.

Anything else before we adjourn for the night?

MS. PELKER: No, Your Honor.

THE COURT: All right. I will see you in the morning.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 29th day of February, 2024

_____
Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C.  20001

INDEX

WITNESS:

Valerie Mazars de Mazarin
        Direct Examination By Ms. Pelker................... 2


GOVERNMENT EXHIBITS ADMITTED:
    Exhibit 509........................................... 89
    Exhibit 510........................................... 75
    Exhibit 513A.......................................... 63
    Exhibit 514........................................... 65
    Exhibit 520........................................... 72
    Exhibit 520B.......................................... 73

    Exhibit 523A.......................................... 93
    Exhibit 701........................................... 11
    Exhibit 702........................................... 20
    Exhibit 703........................................... 22
    Exhibit 704........................................... 22
    Exhibit 704A through 704E............................. 23

    Exhibit 707........................................... 24
    Exhibits 709 through 715.............................. 17
    Exhibit 714 and 714A.................................. 72
    Exhibit 716A.......................................... 96
    Exhibit 719A through 719KKK........................... 18
    Exhibit 731........................................... 26

    Exhibits 720.......................................... 43
    Exhibit 721...........................................107
    Exhibit 722 through 726............................... 43
    Exhibit 727........................................... 46
    Exhibit 728........................................... 47
    Exhibit 729, 732, 733................................. 43

    Exhibits 734, 734A, 735, 735A, 736, 737A, 737B, 737C....100
    Exhibit 738...........................................100
    Exhibit 830........................................... 87
    Exhibit 831........................................... 88
    Exhibit 865........................................... 4
    Exhibit 898...........................................111

GOVERNMENT DEMONSTRATIVE EXHIBIT
    Exhibit 368........................................... 98

* * *

**/**

**/configure** [1] - 31:3

**0**

**0** [1] - 69:9

**1**

**1** [16] - 4:8, 4:9, 4:10, 4:11, 4:14, 4:15, 4:16, 4:22, 5:4, 5:6, 5:8, 5:12, 5:13, 69:9, 74:17, 84:14
**119C** [3] - 53:23, 59:12, 94:23
**12** [2] - 53:23, 81:7
**12-9-2020** [1] - 46:9
**125** [1] - 96:10
**13** [1] - 74:24
**134M** [3] - 14:18, 18:25, 50:24
**134R** [6] - 14:18, 14:22, 15:16, 17:18, 49:13
**168** [5] - 46:13, 46:19, 46:21, 47:5, 47:13
**18** [1] - 15:10
**188.149.52.168** [1] - 46:11
**19th** [1] - 94:18
**1B** [4] - 15:2, 15:5, 15:6, 15:13
**1B9** [1] - 15:9
**1B9_13** [4] - 19:1, 19:2, 19:7, 50:24
**1B9_18** [4] - 15:4, 15:15, 25:21, 49:13
**1B_13** [1] - 18:25
**1D7B5** [1] - 5:3

**2**

**2** [14] - 4:15, 4:16, 4:17, 5:11, 5:12, 5:13, 5:14, 5:15, 39:15, 50:20, 64:8, 68:10
**2011** [3] - 88:5, 88:21
**2020** [1] - 96:1
**2021** [2] - 94:18
**24** [1] - 59:16
**24-hour** [1] - 28:16
**26** [2] - 27:23, 59:13
**27** [3] - 59:19, 61:4, 61:7
**28** [1] - 79:2
**29th** [1] - 88:5
**2:53** [1] - 49:3

**3**

**3** [2] - 68:2, 94:23
**30** [1] - 32:4
**31** [1] - 34:15
**32** [1] - 35:13
**34** [1] - 37:11
**35** [1] - 37:11
**365** [2] - 3:20, 4:2
**368** [3] - 98:6, 98:10, 98:14
**3:10** [1] - 49:3
**3A** [1] - 95:1

**4**

**4-19-2021** [1] - 46:9
**40** [1] - 72:8
**401** [7] - 75:15, 75:17, 86:1, 86:19, 87:25, 100:22, 102:4
**403** [5] - 75:15, 75:17, 100:22, 102:4, 105:18
**41** [1] - 83:19
**443** [1] - 85:5

**5**

**5** [1] - 86:5
**5-11-2017** [1] - 64:2
**509** [3] - 88:13, 88:23, 89:1
**510** [3] - 75:8, 75:13, 75:19
**510A** [1] - 77:10
**513A** [4] - 62:22, 62:25, 63:3, 63:6
**513B** [1] - 62:23
**514** [2] - 65:9, 65:14
**520** [2] - 72:17, 72:22
**520B** [3] - 73:9, 73:15, 73:19
**522A** [2] - 89:18, 93:24
**523A** [3] - 92:21, 93:7, 93:10

**6**

**6** [3] - 63:10, 80:3

**7**

**7** [2] - 65:1, 70:6
**7-19-2021** [1] - 94:3
**7-30-2017** [1] - 64:3
**701** [6] - 10:24, 11:4, 11:10, 11:21, 11:24, 11:25
**702** [4] - 20:1, 20:4, 20:9, 20:15

**703** [3] - 21:21, 22:3, 22:6
**704** [3] - 22:14, 22:21, 22:24
**705A** [3] - 23:14, 23:21, 23:24
**705B** [1] - 74:12
**707** [4] - 24:7, 24:10, 24:13, 24:16
**709** [7] - 15:20, 16:3, 16:14, 16:15, 17:1, 70:25, 71:3
**710A** [5] - 61:3, 64:7, 67:17, 80:2, 84:14
**711A** [3] - 27:20, 74:23, 78:12
**712** [1] - 60:3
**712A** [2] - 60:4, 60:5
**714** [10] - 70:7, 70:8, 70:11, 70:16, 70:17, 70:18, 71:22, 71:23, 72:5
**714's** [1] - 70:16
**714A** [10] - 70:3, 70:4, 70:8, 70:11, 70:15, 71:21, 71:23, 74:3, 83:17
**715** [7] - 15:20, 16:3, 16:14, 16:15, 17:2, 70:25, 71:3
**715A** [2] - 39:11, 68:2
**716A** [3] - 95:4, 95:10, 96:16
**719A** [3] - 18:1, 18:5, 18:9
**720** [4] - 42:25, 43:11, 43:13, 57:5
**721** [3] - 101:21, 101:25, 103:16
**722** [5] - 43:1, 43:11, 43:13, 52:9, 52:15
**723** [1] - 51:11
**724** [1] - 52:3
**725** [1] - 44:14
**726** [4] - 43:1, 43:11, 43:13, 58:5
**727** [3] - 45:17, 46:2, 46:5
**728** [3] - 46:15, 46:23, 47:1
**729** [4] - 43:1, 43:11, 43:13, 50:23
**731** [4] - 25:15, 25:25, 26:4, 43:16
**732** [5] - 43:1, 43:11, 43:13, 49:11, 49:20
**733** [3] - 43:1, 43:11, 43:14
**734** [2] - 100:14, 100:20

**734A** [2] - 100:14, 100:20
**735** [3] - 100:14, 100:20, 101:2
**735A** [2] - 100:15, 100:20
**736** [2] - 100:15, 100:20
**737A** [2] - 100:15, 100:20
**737B** [2] - 100:15, 100:20
**737C** [2] - 100:15, 100:20
**738** [2] - 100:15, 100:20

**8**

**8** [1] - 95:9
**80** [1] - 85:5
**803** [2] - 86:19, 102:4
**83.248.64.79** [1] - 53:11
**830** [3] - 86:10, 86:17, 88:7
**831** [3] - 87:19, 87:23, 88:1
**865** [1] - 4:5

**9**

**9-24-2020** [1] - 96:2

**A**

**ability** [1] - 78:15
**able** [15] - 8:18, 9:8, 19:9, 21:18, 36:17, 45:1, 48:6, 51:2, 55:10, 55:17, 56:22, 62:11, 64:4, 92:16, 97:17
**absolutely** [1] - 82:17
**access** [15] - 19:9, 27:3, 27:5, 36:17, 41:16, 42:14, 51:18, 51:19, 51:20, 56:23, 60:16, 60:17, 60:21, 76:3, 82:10
**accessed** [1] - 66:18
**accesses** [1] - 64:13
**accessing** [1] - 59:3
**according** [1] - 55:8
**account** [11] - 22:16, 23:4, 23:6, 24:4, 61:24, 63:17, 64:3, 85:21, 86:5, 86:6
**accountholder** [1] - 89:22
**accounts** [3] - 22:11,

22:15, 23:10

**accurate** [13] - 14:3, 20:4, 21:23, 23:17, 24:10, 25:22, 43:3, 45:24, 62:25, 65:11, 72:19, 75:10, 86:12

**accurately** [7] - 11:17, 14:7, 22:18, 46:20, 88:19, 93:4, 101:22

**acronym** [1] - 69:6

**action** [1] - 82:16

**activities** [1] - 106:23

**activity** [6] - 24:4, 24:24, 35:6, 39:7, 67:7, 105:10

**Activity** [1] - 73:22

**actual** [10] - 19:22, 26:21, 26:23, 29:15, 45:1, 62:12, 64:4, 78:10, 90:5, 93:20

**add** [5] - 18:21, 28:13, 33:12, 41:18, 97:23

**add-on** [1] - 33:12

**addition** [4] - 5:23, 6:11, 17:10, 100:12

**additional** [15] - 7:20, 12:19, 33:25, 37:1, 39:10, 46:13, 46:18, 53:10, 55:22, 55:25, 56:22, 58:6, 60:25, 84:11, 100:11

**address** [19] - 29:2, 29:3, 31:5, 32:1, 34:24, 46:11, 46:13, 46:21, 47:13, 52:18, 52:25, 53:11, 53:13, 54:15, 54:17, 61:10, 79:17, 84:23, 88:15

**addressed** [3] - 15:22, 16:25, 22:3

**addresses** [11] - 10:17, 16:9, 28:3, 28:10, 28:11, 28:17, 28:18, 29:25, 85:19, 89:21, 89:23

**adds** [1] - 85:2

**administering** [1] - 59:3

**administrator** [6] - 27:4, 27:6, 40:14, 40:17, 40:20, 49:22

**admissibility** [1] - 70:16

**admission** [10] - 20:9, 22:2, 23:20, 70:12, 70:15, 71:22, 71:23, 73:15, 95:14

**admit** [27] - 11:20, 16:15, 17:1, 20:8, 22:21, 24:13, 25:25,

43:6, 46:1, 46:23, 63:3, 65:14, 65:19, 70:17, 70:18, 72:22, 72:25, 75:13, 76:24, 86:17, 87:23, 88:23, 93:7, 96:16, 100:19, 101:25, 103:16

**admitted** [39] - 4:5, 11:25, 15:22, 16:4, 18:6, 20:15, 21:22, 22:6, 22:24, 23:24, 24:16, 26:4, 39:18, 39:19, 39:20, 43:14, 46:5, 47:1, 53:24, 62:24, 63:6, 70:5, 70:9, 70:11, 70:16, 70:17, 70:20, 71:17, 71:21, 72:6, 73:10, 73:19, 87:10, 88:1, 89:1, 93:10, 95:10, 95:13, 100:24

**admitting** [1] - 16:3

**advertised** [1] - 79:15

**advertisers** [1] - 82:20

**afternoon** [1] - 48:12

**Agent** [9] - 2:8, 14:21, 15:19, 18:24, 62:2, 62:5, 96:9, 96:24, 100:10

**ago** [3] - 77:4, 78:11, 88:11

**agreed** [1] - 32:13

**ahead** [5] - 16:3, 17:1, 33:18, 96:22, 100:9

**airing** [1] - 105:9

**algorithm** [2] - 5:7, 5:9

**algorithms** [2] - 6:11, 12:7

**allow** [4] - 19:17, 29:24, 42:3, 76:20

**allowing** [1] - 40:5

**alongside** [1] - 23:6

**alter** [2] - 13:1, 19:22

**alternate** [1] - 36:3

**alternative** [1] - 67:25

**alternatives** [3] - 65:4, 65:5, 66:20

**ambiguous** [5] - 31:19, 40:17, 67:1, 78:17, 91:21

**amount** [2] - 30:3, 37:22

**analyzing** [1] - 9:3

**Android** [2] - 81:25, 82:3

**angles** [1] - 30:5

**anonymity** [4] - 31:22, 36:20, 36:21, 89:9

**anonymity-specific** [1] - 89:9

**anonymize** [1] - 35:6

**anonymous** [7] - 34:14, 34:22, 79:7, 79:13, 79:14, 79:22

**anonymously** [1] - 79:19

**answer** [1] - 92:6

**answered** [1] - 62:7

**answering** [1] - 67:22

**anti** [1] - 79:25

**anti-surveillance** [1] - 79:25

**APK** [2] - 21:15, 21:16

**apologies** [1] - 60:4

**app** [9] - 21:4, 21:14, 21:17, 23:5, 23:11, 82:2, 82:4, 103:9, 104:3

**app's** [1] - 21:20

**appear** [6] - 23:4, 47:14, 50:4, 60:8, 69:19, 90:23

**appeared** [12] - 9:2, 22:11, 23:9, 23:18, 31:21, 59:9, 91:5, 91:7, 91:9, 91:16, 103:1, 103:2

**appearing** [2] - 4:11, 14:12

**application** [5] - 21:25, 42:11, 42:12, 74:14, 91:2

**apply** [1] - 52:1

**approach** [1] - 90:10

**apps** [3] - 103:6, 103:8, 105:1

**April** [1] - 94:18

**apt** [4] - 50:15, 50:16, 50:20

**apt-get** [4] - 50:15, 50:16, 50:20

**archive** [2] - 21:16, 88:14

**archive.org** [3] - 88:9, 88:16, 88:20

**area** [1] - 50:10

**areas** [1] - 53:19

**argument** [1] - 105:24

**array** [1] - 69:5

**arrest** [4] - 21:9, 81:4, 94:15, 94:17

**arrested** [2] - 10:13, 17:13

**article** [18] - 66:4, 72:15, 72:19, 73:3, 73:6, 73:11, 73:21, 73:24, 76:10, 76:13, 76:19, 77:4, 77:8, 77:12, 77:13, 77:19, 77:24, 78:5

**aside** [1] - 38:11

**assembled** [1] - 33:16

**asserted** [1] - 86:25

**assist** [6] - 3:17, 3:23, 23:11, 98:7, 101:18, 103:13

**assistance** [6] - 14:17, 14:21, 18:24, 43:25, 96:9, 96:24

**assisted** [1] - 23:13

**associated** [2] - 15:2, 87:20

**assuming** [2] - 76:21, 92:4

**attach** [1] - 52:13

**attached** [2] - 50:7, 97:22

**attacker** [1] - 29:25

**attacking** [1] - 78:8

**attacks** [1] - 35:10

**attempt** [2] - 27:13, 50:17

**attempted** [2] - 25:12, 27:6

**attempting** [2] - 29:3, 43:19

**attention** [27] - 26:16, 27:20, 45:17, 48:9, 52:3, 52:15, 59:13, 60:10, 64:7, 65:9, 68:2, 70:3, 72:17, 73:9, 74:12, 75:8, 80:2, 80:3, 83:17, 86:10, 87:19, 94:23, 95:4, 95:9, 96:10, 100:14, 101:2

**attribute** [1] - 36:11

**attributed** [1] - 85:18

**authenticated** [1] - 86:20

**authentication** [4] - 15:24, 16:4, 16:19, 18:1

**authenticity** [2] - 12:16, 86:23

**authorities** [1] - 61:1

**auto** [2] - 44:16, 45:13

**automate** [1] - 37:8

**automatically** [1] - 63:22

**available** [5] - 7:22, 36:8, 36:16, 88:6, 88:8

**avoid** [3] - 33:1, 35:10, 79:1

**awareness** [2] - 37:4, 37:6

**awesome** [1] - 37:20

**B**

**backed** [1] - 63:22

backing [1] - 64:13
backup [5] - 63:21, 64:2, 65:4, 67:25, 69:20
Backup [1] - 64:17
backups [1] - 64:5
based [6] - 34:3, 71:22, 77:6, 91:7, 102:17, 106:25
bash [12] - 25:7, 25:13, 25:20, 26:7, 26:12, 43:18, 43:22, 44:6, 49:12, 49:15, 49:21, 50:24
Bash [1] - 25:8
batch [3] - 70:21, 71:17, 86:22
bathroom [2] - 48:12, 48:23
beard [1] - 104:6
bearded [1] - 104:7
bearing [1] - 104:22
begin [1] - 9:14
beginning [5] - 5:10, 28:2, 28:9, 62:2, 68:20
behind [4] - 38:20, 42:7, 82:11, 82:18
believes [1] - 67:23
belongs [1] - 79:11
below [5] - 5:1, 59:14, 68:13, 76:11
Bench [3] - 32:10, 95:19, 103:18
benefit [4] - 8:9, 35:1, 35:3, 35:7
better [5] - 7:23, 33:23, 64:22, 64:24, 102:16
between [8] - 5:12, 42:13, 44:3, 46:9, 51:23, 57:17, 57:25, 58:4
beyond [1] - 82:19
big [2] - 7:6, 56:13
bin [3] - 68:15, 92:13, 92:14
Bisq [2] - 91:2, 91:7
BISQ [1] - 91:3
bit [10] - 6:21, 26:16, 28:21, 39:9, 47:7, 82:23, 84:25, 86:14, 89:4, 105:12
Bitcoin [10] - 2:19, 20:24, 75:4, 75:25, 91:11, 91:13, 91:15, 91:16, 91:17, 91:19
bittorrent [1] - 37:23
black [1] - 54:5
block [6] - 74:25, 80:10, 80:24, 82:8, 85:3, 96:3
blockchain [1] - 68:8
blocking [2] - 80:11, 80:20
blue [2] - 103:9, 103:20
bold [3] - 64:17, 72:10, 81:8
booted [1] - 8:17
borders [1] - 105:21
bottom [10] - 33:17, 34:15, 36:22, 59:13, 60:10, 63:15, 80:5, 88:15, 101:7, 101:8
box [8] - 2:5, 4:17, 4:19, 83:21, 83:22, 93:18, 96:23, 97:14
breadband.tele2 [1] - 47:17
break [8] - 48:12, 48:13, 48:21, 48:24, 48:25, 52:2, 97:3
briefly [1] - 90:14
bring [2] - 14:17, 41:5
brought [1] - 104:2
browser [10] - 26:21, 30:14, 36:6, 36:7, 36:17, 56:20, 101:4, 101:8, 101:12
browsers [2] - 37:6, 41:18
browsing [1] - 82:16
btest [1] - 63:18
bubbles [1] - 103:9
build [2] - 8:11, 31:6
building [1] - 31:10
built [3] - 33:12, 93:1, 93:3
built-in [2] - 93:1, 93:3
bullet [6] - 39:15, 39:25, 40:4, 40:9, 68:3, 83:20
bullets [3] - 55:9, 81:17, 81:21
bunch [1] - 85:2
bundle [3] - 36:6, 36:7, 36:17
bunker [8] - 42:21, 42:23, 44:1, 44:7, 49:23, 50:2, 53:20, 55:18
bunker-related [1] - 50:2
BunkerSSH [4] - 51:5, 51:6, 51:7, 51:8
bunkertunnel [7] - 43:23, 44:5, 44:9, 44:14, 44:19, 47:24, 48:3
bunkertunnel.sh [1] - 44:19
bunkerx [8] - 42:21, 51:11, 52:15, 54:14, 54:16, 54:18, 63:18, 64:1
bunkerxhome [7] - 50:5, 50:8, 50:9, 50:10, 50:11, 51:14, 52:8
bunkerxmedia [4] - 50:5, 50:9, 51:14, 52:8
Burned [1] - 74:16
burned [8] - 65:5, 67:20, 69:17, 70:1, 72:12, 74:6, 74:9, 74:17
business [5] - 10:19, 47:15, 53:18, 86:20, 99:10
buy [3] - 59:20, 59:25, 79:7
buying [1] - 58:25
BY [56] - 2:18, 4:7, 12:2, 14:20, 17:3, 18:11, 20:17, 22:8, 23:1, 24:1, 24:18, 26:5, 28:24, 29:8, 31:24, 33:9, 39:24, 40:22, 43:15, 46:7, 47:3, 49:10, 54:6, 57:24, 62:10, 63:8, 65:21, 67:9, 67:16, 70:10, 72:7, 73:2, 73:20, 75:20, 77:7, 78:3, 78:21, 80:19, 81:15, 85:14, 86:3, 87:11, 88:3, 89:3, 92:1, 92:10, 93:12, 94:13, 95:25, 96:19, 97:12, 98:16, 99:23, 100:25, 102:18, 106:20
bytes [2] - 92:19, 93:19

**C**

cache [1] - 37:1
calculate [2] - 5:14, 5:15
camera [2] - 9:4, 15:8
canaries [1] - 67:14
canary [7] - 65:25, 66:2, 66:3, 66:8, 66:14, 66:16, 67:10
cannot [1] - 13:19
capture [1] - 88:16
captured [2] - 88:9, 88:20
capturing [1] - 35:11
card [2] - 15:9, 98:25
cards [8] - 2:24, 25:5, 44:19
bunkerx [8] - 42:21, 51:11, 52:15, 54:14, 54:16, 54:18, 63:18, 64:1

97:24, 99:1, 99:3, 99:20, 99:25
carry [1] - 2:8
carrying [1] - 17:12
carved [1] - 9:19
carving [2] - 9:13, 9:15
case [23] - 5:7, 6:18, 7:12, 10:15, 17:16, 24:20, 27:2, 35:3, 37:20, 48:6, 48:17, 48:19, 55:10, 62:3, 62:11, 63:23, 73:25, 85:7, 90:12, 90:13, 94:16, 100:4, 103:11
cases [2] - 3:3, 13:25
casual [3] - 40:13, 40:17, 82:20
Catch [1] - 73:22
categorize [1] - 90:16
CCTLDs [1] - 75:25
center [2] - 29:12, 76:19
center.com [1] - 75:23
certain [2] - 40:10, 77:21
cetera [1] - 37:1
chain [1] - 76:16
challenging [1] - 86:23
change [7] - 5:11, 6:7, 10:8, 30:8, 31:12, 54:17
changed [6] - 4:16, 5:22, 6:2, 6:9, 8:13, 30:10
changes [2] - 30:15, 51:25
changing [2] - 5:20, 66:9
channel [1] - 33:14
character [3] - 4:16, 5:20, 6:2
charges [1] - 10:16
charging [1] - 35:3
chart [2] - 22:12, 23:3
chat [2] - 102:7, 103:11
chats [1] - 103:5
Check [1] - 40:1
check [7] - 12:16, 40:2, 68:8, 75:1, 75:2, 78:14, 92:19
checks [1] - 40:15
chooses [2] - 28:17, 28:18
choosing [1] - 75:24
circle [4] - 4:11, 58:8, 74:18, 101:10
circling [1] - 58:11

circumstances [1] - 87:9
claim [1] - 80:21
clarification [1] - 104:6
clarify [1] - 77:18
clean [1] - 36:25
clear [5] - 16:24, 37:24, 52:14, 87:15, 101:12
click [1] - 43:25
clicked [1] - 77:2
clicking [1] - 8:6
client [4] - 28:18, 54:17, 64:25, 106:12
close [1] - 41:5
cloud [1] - 67:25
coal [1] - 66:8
code [5] - 30:8, 30:14, 30:15, 37:8, 90:25
Code [2] - 17:19, 18:7
coded [1] - 21:14
collecting [1] - 35:11
color [1] - 103:20
column [1] - 12:3
columns [1] - 12:4
com [3] - 76:9, 77:5, 78:25
comfortable [1] - 25:9
COMHEM [1] - 47:19
coming [4] - 47:21, 53:25, 99:10, 99:21
command [19] - 4:25, 5:5, 5:15, 20:21, 25:8, 25:9, 25:20, 26:9, 26:13, 26:20, 26:22, 26:23, 31:1, 40:12, 44:16, 49:18, 51:19, 52:7
commands [7] - 25:10, 25:12, 26:9, 26:14, 44:13, 50:19, 51:13
comments [2] - 75:5, 79:24
common [1] - 6:14
communicate [1] - 81:1
communicating [2] - 104:7, 104:8
communication [2] - 37:14, 81:5
communications [1] - 105:13
companies [1] - 87:14
company [4] - 47:6, 61:13, 67:7, 85:18
compile [3] - 11:1, 30:18, 30:19
compiled [1] - 11:5

compiling [1] - 31:13
complete [9] - 15:24, 16:18, 20:9, 22:2, 23:20, 70:14, 71:23, 73:14, 95:13
completed [2] - 70:12, 71:22
completely [3] - 5:22, 54:11, 93:15
compound [2] - 40:18, 78:18
compromised [2] - 68:22, 68:25
computer [55] - 3:2, 3:15, 5:23, 8:16, 8:19, 9:21, 10:1, 11:13, 13:16, 13:19, 25:10, 30:10, 30:16, 35:20, 36:10, 39:13, 40:11, 41:7, 41:13, 41:17, 41:19, 42:4, 42:6, 42:15, 44:2, 44:12, 45:13, 47:24, 48:4, 51:21, 52:12, 53:8, 53:17, 55:18, 55:20, 56:10, 56:11, 57:15, 57:18, 58:3, 59:6, 59:9, 59:18, 59:24, 60:12, 60:13, 60:20, 60:22, 63:24, 69:3, 69:11, 74:20, 83:24, 84:5, 97:21
Computer [1] - 60:11
computer's [2] - 8:16, 12:11
computers [14] - 6:1, 6:21, 13:20, 19:13, 42:13, 42:19, 44:4, 48:7, 55:18, 55:20, 55:23, 56:13, 59:3, 68:5
computes [1] - 5:1
concept [1] - 3:18
conceptual [1] - 52:14
concern [5] - 31:16, 36:18, 66:12, 69:19, 74:20
concerned [1] - 70:1
conclusions [1] - 77:1
conditionally [12] - 15:22, 16:4, 21:22, 70:5, 70:9, 70:15, 71:7, 71:9, 71:21, 73:10, 95:11, 95:13
conditioned [2] - 71:24
conditions [1] - 71:25
conduct [1] - 48:18
config [4] - 58:3, 85:2, 85:4, 85:12

configuration [11] - 27:16, 38:17, 52:17, 53:5, 57:7, 57:12, 57:13, 58:6, 58:8, 58:17, 90:14
configurations [2] - 40:15, 56:18
configured [3] - 97:25, 98:25, 100:1
configuring [2] - 58:12, 58:14
confirm [1] - 92:16
conjunction [1] - 85:13
connect [20] - 26:20, 34:13, 34:25, 41:17, 41:19, 43:19, 53:9, 58:9, 58:12, 58:15, 60:23, 81:10, 81:18, 83:1, 84:21, 85:3, 85:5, 97:17, 98:18, 98:21
connected [1] - 27:2
connecting [7] - 29:13, 42:19, 53:7, 55:23, 84:22, 99:14, 99:15
Connection [1] - 63:14
connection [33] - 26:24, 27:13, 33:14, 33:18, 34:11, 34:14, 38:12, 40:7, 44:3, 44:7, 45:15, 51:10, 52:2, 53:16, 53:17, 54:22, 55:7, 57:4, 57:16, 57:17, 57:21, 57:25, 58:4, 81:4, 81:20, 82:7, 82:8, 82:9, 82:12, 82:18, 84:19, 98:22, 102:8
connections [7] - 33:13, 40:6, 41:21, 41:22, 48:2, 48:4, 53:6
consider [1] - 75:24
consistent [1] - 39:8
constantly [1] - 37:16
consult [1] - 106:11
Cont [1] - 2:17
contact [1] - 89:25
contain [8] - 9:3, 14:13, 14:14, 17:4, 24:2, 43:22, 56:7, 90:24
contained [3] - 7:9, 14:4, 56:5
container [3] - 18:18, 35:19, 35:25
containers [1] - 35:17
containing [2] - 44:16, 45:6

contains [1] - 44:12
content [1] - 65:11
contents [7] - 4:22, 13:1, 14:8, 19:22, 42:14, 62:12, 64:4
context [8] - 29:2, 33:22, 53:8, 66:19, 66:23, 67:18, 74:4, 103:21
continue [5] - 2:14, 33:8, 34:18, 37:12, 49:8
continuous [2] - 81:23, 82:22
contributes [1] - 9:1
control [6] - 31:12, 34:6, 35:7, 61:16, 76:4, 89:11
Control [1] - 61:14
control-F [1] - 89:11
controlled [2] - 47:5, 53:14
controlling [1] - 35:1
conversations [5] - 69:17, 103:1, 104:11, 104:12, 106:6
conversing [2] - 104:4, 104:21
convert [1] - 35:22
cookies [3] - 28:23, 36:25, 37:6
cooperated [1] - 74:7
copied [1] - 13:2
copies [7] - 6:1, 6:6, 11:6, 17:7, 17:11, 18:2, 43:3
copy [15] - 3:2, 3:7, 4:15, 18:21, 22:15, 24:10, 25:22, 27:17, 62:25, 72:19, 75:10, 79:6, 86:12, 95:6, 101:19
copying [1] - 103:13
Core [5] - 91:11, 91:13, 91:15, 91:16, 91:19
corner [1] - 94:2
corollary [1] - 52:4
correct [3] - 13:22, 16:17, 21:10
correspond [1] - 91:1
corresponding [2] - 22:16, 103:3
corrupted [1] - 55:1
cost [1] - 89:8
couple [2] - 2:6, 48:1
court [6] - 13:20, 19:13, 29:1, 33:4, 95:23, 106:18
COURT [124] - 2:2,

2:4, 2:9, 2:14, 4:3, 4:5, 11:22, 11:24, 16:1, 16:9, 16:14, 16:22, 16:25, 18:3, 18:5, 18:10, 20:10, 20:15, 22:4, 22:6, 22:22, 22:24, 23:22, 23:24, 24:14, 24:16, 26:1, 26:3, 28:21, 29:6, 31:20, 32:8, 33:3, 33:8, 39:17, 39:21, 40:19, 43:8, 43:13, 46:3, 46:5, 46:24, 47:1, 48:10, 48:14, 48:21, 49:2, 49:7, 57:23, 62:8, 63:4, 63:6, 65:15, 65:19, 66:25, 67:3, 67:5, 67:15, 70:18, 70:24, 71:3, 71:8, 71:11, 71:14, 72:1, 72:4, 72:23, 72:25, 73:16, 73:18, 75:14, 75:17, 76:15, 76:20, 76:23, 77:18, 77:23, 78:2, 78:19, 80:17, 85:10, 85:25, 86:18, 87:7, 87:24, 88:1, 88:24, 89:1, 91:23, 92:9, 93:8, 93:10, 94:7, 94:11, 95:15, 95:18, 95:24, 96:12, 96:14, 96:18, 96:25, 97:4, 97:8, 97:10, 98:12, 98:14, 99:18, 100:21, 100:23, 102:3, 102:6, 102:15, 103:17, 103:19, 104:3, 104:15, 104:18, 105:2, 105:11, 105:21, 106:2, 106:13, 106:17, 106:19

**Court's** [1] - 2:7
**COURTROOM** [8] - 2:3, 2:12, 39:20, 49:5, 53:25, 70:8, 70:19, 95:10
**courtroom** [3] - 2:11, 48:20, 49:4
**create** [6] - 13:25, 35:16, 36:24, 51:17, 56:12, 58:4
**created** [3] - 12:18, 31:2, 88:4
**creates** [1] - 51:22
**creating** [2] - 37:8, 69:7
**credentials** [1] - 61:5
**criminal** [3] - 41:6, 76:6, 80:24
**Criminal** [1] - 73:23
**criminals** [2] - 41:6, 41:15

**cryptocurrency** [2] - 21:5, 91:9
**CryptoVPN** [10] - 85:1, 85:2, 85:6, 85:11, 85:16, 85:18, 85:20, 86:6, 89:10, 89:11
**CS** [25] - 2:19, 4:8, 17:4, 18:12, 20:18, 22:9, 24:19, 33:10, 49:12, 61:8, 65:22, 73:3, 73:11, 75:21, 86:4, 87:12, 88:4, 89:4, 89:13, 89:15, 93:14, 94:1, 96:22, 97:13, 106:21
**cumulative** [1] - 67:14
**Current** [1] - 30:7
**current** [3] - 30:8, 66:9, 101:5
**cursor** [1] - 68:20
**custom** [1] - 36:13
**customize** [1] - 30:16
**cyber** [4] - 17:15, 41:6, 41:15, 80:24
**Cyber** [1] - 73:23
**cybersecurity** [1] - 45:23
**cyberstalking** [1] - 73:25

## D

**dark** [1] - 54:4
**darn** [2] - 35:14, 35:16
**data** [28] - 2:20, 2:24, 7:1, 7:8, 9:12, 9:14, 9:22, 9:23, 21:17, 37:5, 55:3, 63:21, 63:22, 64:13, 67:6, 68:6, 69:7, 69:14, 69:23, 85:17, 92:15, 93:19, 97:17, 98:1, 99:5, 99:10, 99:21, 99:22
**database** [2] - 13:13, 13:14
**databases** [2] - 13:14, 21:20
**date** [3] - 66:5, 94:1, 96:1
**dates** [3] - 10:20, 25:11, 63:25
**dating** [5] - 102:9, 103:9, 104:1, 104:3, 104:25
**days** [1] - 66:7
**de** [2] - 33:6, 43:25
**Debian** [2] - 31:6, 31:7
**debuild** [1] - 31:1
**decent** [1] - 30:3
**decide** [1] - 102:17

**decision** [1] - 64:22
**decrypt** [2] - 35:23, 51:2
**deep** [1] - 7:3
**defendant** [31] - 10:13, 17:12, 18:15, 25:2, 29:4, 36:18, 38:7, 42:18, 43:19, 59:2, 60:21, 62:16, 62:19, 67:19, 67:21, 69:25, 74:5, 74:19, 78:13, 79:21, 81:12, 81:16, 84:11, 84:16, 86:7, 87:2, 87:6, 94:5, 101:19, 102:5, 103:2
**defendant's** [70] - 14:8, 14:13, 14:15, 17:11, 18:12, 20:20, 20:23, 21:1, 21:8, 22:10, 23:12, 24:11, 25:4, 25:13, 26:13, 27:18, 39:13, 42:16, 43:4, 44:8, 44:23, 47:24, 48:2, 48:6, 51:1, 53:20, 55:18, 55:22, 56:3, 56:25, 57:18, 58:9, 58:12, 58:15, 58:19, 58:24, 59:5, 59:8, 59:10, 60:6, 61:23, 63:25, 65:17, 70:22, 72:9, 74:3, 74:9, 74:13, 79:24, 83:12, 83:14, 83:18, 84:6, 84:10, 86:13, 91:19, 94:15, 94:16, 94:20, 95:7, 100:6, 100:11, 100:17, 101:15, 102:8, 102:22, 103:14, 104:13, 106:21, 106:23
**defense** [4] - 16:2, 17:24, 86:21, 105:11
**delete** [1] - 68:9
**deleted** [1] - 9:8
**deleting** [3] - 9:21, 37:9, 69:18
**demonstrative** [4] - 4:2, 4:6, 98:11, 98:15
**deniability** [2] - 35:18, 36:2
**depict** [1] - 88:19
**depiction** [1] - 65:11
**depictions** [1] - 23:17
**DEPUTY** [8] - 2:3, 2:12, 39:20, 49:5, 53:25, 70:8, 70:19, 95:10
**describe** [5] - 26:7, 29:7, 79:18, 102:20, 103:7
**described** [10] - 29:10,

33:20, 34:4, 34:5, 34:11, 37:3, 38:19, 39:8, 55:5, 73:24
**describes** [2] - 38:16, 74:5
**describing** [4] - 38:8, 40:9, 52:11, 84:16
**description** [1] - 38:12
**descriptions** [1] - 29:17
**descriptors** [2] - 28:13, 28:15
**desire** [1] - 69:20
**desk** [1] - 42:5
**desktop** [6] - 41:25, 42:1, 42:2, 56:1, 56:5, 101:4
**desktops** [1] - 82:25
**destination** [1] - 58:2
**detail** [1] - 52:22
**detailed** [2] - 77:11, 88:12
**details** [5] - 9:5, 52:22, 53:2, 77:3, 97:20
**determine** [4] - 9:5, 10:18, 29:25, 39:4
**device** [32] - 10:18, 11:7, 15:1, 15:2, 16:6, 16:21, 25:21, 25:23, 27:18, 44:8, 44:23, 49:16, 51:1, 58:8, 58:12, 58:15, 60:23, 63:16, 63:18, 70:22, 71:17, 72:9, 90:17, 95:7, 97:16, 98:17, 99:7, 100:7, 100:9, 102:8, 103:4
**devices** [28] - 2:21, 2:23, 7:12, 10:12, 10:14, 11:1, 14:9, 17:11, 18:12, 20:23, 25:1, 25:5, 25:13, 26:15, 43:4, 55:22, 56:25, 60:18, 61:1, 71:18, 74:10, 83:12, 83:18, 84:10, 98:20, 99:15, 100:3, 106:21
**DHT** [1] - 29:14
**diagram** [1] - 97:23
**die** [1] - 83:25
**different** [38] - 3:15, 5:22, 6:11, 6:21, 7:1, 7:2, 8:18, 11:13, 27:8, 28:14, 29:18, 29:19, 30:5, 33:15, 39:6, 40:23, 41:11, 41:13, 41:21, 48:11, 49:15, 49:17, 52:12, 57:4, 63:20, 69:4, 69:6, 81:2, 83:8, 83:10, 91:6,

97:18, 97:20, 97:24, 99:5

**difficult** [1] - 39:4
**digest** [1] - 28:14
**digital** [3] - 6:15, 15:7, 15:8
**Diino** [1] - 64:18
**DIRECT** [1] - 2:17
**direct** [2] - 94:23, 96:10
**directing** [26] - 26:16, 27:20, 45:13, 45:17, 48:9, 52:3, 52:15, 59:13, 60:10, 64:7, 65:9, 68:2, 70:3, 72:17, 73:9, 74:12, 75:8, 80:2, 80:3, 83:17, 86:10, 87:19, 95:4, 95:9, 100:14, 101:1
**direction** [1] - 84:20
**directly** [4] - 26:23, 59:23, 84:21, 84:22
**directories** [2] - 50:4, 51:13
**directory** [3] - 28:12, 51:15, 52:7
**discuss** [3] - 15:17, 48:17, 81:12
**discussed** [17] - 29:22, 30:13, 31:8, 31:17, 60:18, 62:1, 62:6, 64:10, 66:12, 70:6, 71:12, 77:13, 80:9, 84:1, 84:3, 95:17
**discussing** [8] - 27:25, 28:4, 28:6, 32:18, 58:25, 65:24, 78:6, 81:17
**discussion** [13] - 31:17, 32:10, 32:22, 59:2, 59:14, 65:23, 66:20, 72:3, 82:15, 84:25, 95:19, 102:9, 103:18
**disk** [7] - 8:5, 8:15, 9:12, 9:16, 9:23, 9:24, 69:14
**disks** [2] - 69:5, 69:7
**dislodging** [1] - 33:1
**displayed** [5] - 5:9, 19:17, 23:8, 62:1, 65:12
**displaying** [1] - 13:21
**disrupting** [2] - 74:20, 81:3
**distributed** [1] - 29:14
**DNS** [6] - 45:20, 45:21, 45:22, 47:11, 47:21, 81:19
**document** [16] - 17:22,

32:4, 32:12, 32:16, 32:25, 60:5, 60:8, 65:1, 72:8, 74:23, 78:12, 79:2, 83:18, 86:12, 87:16, 88:4
**documentation** [1] - 31:6
**documents** [9] - 9:20, 16:17, 16:19, 16:20, 17:15, 32:25, 70:22, 71:17, 71:18
**DOJ** [1] - 19:13
**domain** [14] - 30:23, 30:24, 45:20, 46:10, 46:18, 47:12, 47:23, 75:24, 76:1, 76:2, 76:4, 76:5, 78:7, 78:9
**domains** [8] - 45:6, 47:12, 47:14, 47:21, 75:3, 77:5, 78:15, 78:25
**done** [3] - 12:17, 12:19, 61:19
**doubting** [1] - 64:12
**down** [28] - 8:2, 26:17, 28:21, 34:18, 35:14, 47:7, 49:23, 50:12, 54:2, 59:19, 65:1, 66:6, 68:3, 68:21, 72:10, 76:6, 78:4, 78:10, 79:3, 80:3, 84:25, 89:4, 89:14, 93:13, 96:3, 96:8, 101:6, 101:8
**download** [3] - 19:15, 36:12, 68:6
**downloaded** [2] - 11:6, 12:24
**downloading** [2] - 13:3, 31:10
**draw** [2] - 4:17, 76:25
**drawing** [1] - 45:9
**drive** [22] - 8:16, 10:1, 12:12, 15:1, 16:12, 17:18, 18:2, 19:5, 19:7, 56:14, 69:12, 90:2, 90:5, 90:18, 91:11, 92:2, 93:5, 93:16, 93:17, 93:18, 93:20, 93:22
**Drive** [4] - 86:13, 87:12, 87:20, 88:17
**drives** [6] - 10:9, 68:15, 68:16, 69:3, 90:17, 94:10
**drop** [2] - 55:1, 82:12
**during** [2] - 18:12, 62:1
**dynamic** [1] - 47:21

## E

**easier** [2] - 8:11, 8:12
**easiest** [1] - 54:13
**easy** [1] - 13:10
**editor** [4] - 92:17, 93:1, 93:3, 93:5
**effect** [8] - 65:18, 65:20, 72:25, 73:19, 75:16, 75:19, 76:17, 76:25
**effectiveness** [1] - 31:22
**either** [2] - 13:25, 69:8
**Ekeland** [3] - 18:3, 104:15, 105:17
**EKELAND** [75] - 4:4, 11:23, 14:19, 16:7, 16:11, 16:16, 16:23, 18:4, 18:7, 20:11, 20:14, 22:5, 22:23, 23:23, 24:15, 26:2, 29:5, 31:19, 32:6, 32:9, 32:11, 32:23, 40:16, 43:9, 43:12, 46:4, 46:25, 57:20, 62:7, 63:5, 65:16, 66:24, 67:1, 67:4, 67:13, 71:6, 71:10, 71:12, 71:19, 72:2, 72:24, 73:17, 75:15, 76:14, 76:21, 78:16, 80:14, 81:14, 85:8, 85:22, 86:19, 86:23, 87:25, 88:25, 91:21, 92:3, 93:9, 94:6, 94:8, 95:16, 95:20, 98:13, 99:17, 100:22, 102:1, 102:4, 102:11, 104:16, 104:23, 105:5, 105:18, 105:25, 106:11, 106:14, 106:16
**electronic** [3] - 2:20, 2:23, 10:12
**element** [1] - 31:11
**elsewhere** [2] - 59:6, 59:9
**email** [2] - 79:7, 90:25
**emails** [1] - 10:16
**embed** [1] - 37:19
**enabled** [1] - 82:6
**encounter** [1] - 18:13
**encountered** [1] - 100:3
**encrypt** [1] - 35:21
**encrypted** [9] - 10:22, 18:15, 18:18, 19:10, 35:16, 35:19, 44:3, 44:7, 56:22
**encryption** [3] - 18:13, 20:21, 39:10

**encrypts** [1] - 18:23
**end** [2] - 38:19, 68:22
**ending** [2] - 44:17, 46:19
**endpoint** [1] - 40:2
**ends** [1] - 76:9
**enforcement** [21] - 39:1, 55:17, 66:7, 66:19, 67:8, 67:11, 68:1, 74:1, 74:8, 74:20, 76:5, 80:25, 81:3, 89:20, 90:3, 90:5, 99:6, 99:9, 99:11, 99:13, 99:16
**engaged** [2] - 105:22, 106:5
**ensure** [2] - 3:7, 6:5
**enter** [3] - 2:11, 42:6, 49:4
**entered** [1] - 25:12
**entire** [4] - 5:23, 21:16, 52:12, 69:23
**entirely** [1] - 69:8
**entity** [2] - 66:7, 67:8
**entries** [1] - 26:18
**equivalent** [1] - 92:14
**especially** [2] - 31:22, 80:25
**essentially** [4] - 7:24, 9:14, 69:22, 98:2
**established** [1] - 87:2
**establishing** [2] - 105:12, 106:5
**et** [1] - 37:1
**event** [1] - 79:11
**eventually** [1] - 50:6
**everywhere** [1] - 36:25
**evidence** [36] - 3:20, 6:18, 6:20, 10:25, 11:6, 12:5, 15:6, 15:7, 15:8, 15:12, 25:1, 25:16, 42:25, 43:17, 45:18, 46:16, 55:22, 55:25, 56:18, 56:25, 57:21, 57:22, 62:23, 65:10, 71:6, 72:18, 75:9, 83:11, 84:11, 86:11, 94:9, 100:11, 101:21, 105:15, 106:7
**evident** [1] - 12:4
**exact** [5] - 3:2, 3:7, 5:15, 10:15, 40:12
**exactly** [8] - 3:16, 6:25, 11:8, 30:9, 39:4, 55:10, 55:12, 94:17
**EXAMINATION** [1] - 2:17
**examination** [1] - 30:4
**examine** [1] - 31:21
**examined** [1] - 10:8

**examiner** [9] - 3:7, 3:9, 6:8, 8:9, 8:18, 9:5, 9:19, 10:10, 21:13

**examiners** [1] - 6:5

**example** [10] - 13:12, 37:7, 37:17, 42:5, 81:19, 85:1, 85:2, 85:5, 93:22, 99:9

**examples** [3] - 47:25, 58:24, 60:25

**Excel** [2] - 13:25, 19:21

**Excel-type** [1] - 13:25

**except** [3] - 6:2, 31:1, 85:5

**Exhibit** [97] - 3:20, 4:2, 10:24, 11:4, 11:10, 11:21, 11:24, 11:25, 14:18, 14:22, 15:16, 15:20, 17:18, 18:1, 18:24, 20:1, 20:9, 21:21, 22:3, 22:14, 22:21, 23:20, 24:7, 24:10, 24:13, 24:16, 25:15, 25:25, 26:4, 27:20, 39:11, 43:13, 44:14, 45:17, 46:2, 46:5, 46:15, 46:23, 47:1, 48:9, 49:11, 49:13, 50:23, 50:24, 51:11, 52:3, 52:9, 52:15, 53:23, 57:5, 58:5, 59:12, 60:3, 61:3, 62:22, 63:3, 64:7, 65:9, 65:14, 67:17, 68:2, 70:3, 72:17, 72:22, 73:9, 74:3, 74:12, 74:23, 75:8, 75:13, 75:19, 77:10, 78:12, 80:2, 84:14, 86:1, 86:10, 86:17, 87:19, 87:23, 88:1, 88:13, 88:23, 89:1, 89:18, 92:21, 93:7, 93:24, 94:23, 95:4, 96:10, 98:6, 98:10, 98:14, 101:21, 101:25, 103:16

**exhibit** [13] - 4:5, 13:23, 43:9, 45:3, 46:12, 49:20, 85:24, 87:10, 89:14, 92:22, 93:10, 96:8, 101:2

**Exhibits** [3] - 23:14, 100:14, 100:20

**exhibits** [9] - 2:7, 13:21, 15:24, 18:5, 42:25, 43:7, 48:1, 96:13, 100:24

**existing** [1] - 37:4

**expedite** [1] - 16:1

**explain** [61] - 3:1, 3:10, 4:8, 6:23, 7:17, 9:24, 11:4, 15:5, 17:16, 18:17, 19:3, 23:2, 25:7, 25:19, 26:18, 29:9, 29:21, 30:12, 33:5, 35:19, 40:3, 42:2, 42:12, 44:14, 46:8, 46:17, 47:4, 49:25, 50:14, 51:6, 51:11, 52:18, 53:4, 54:19, 56:9, 57:3, 57:6, 57:12, 61:8, 63:9, 63:16, 63:19, 64:9, 65:22, 66:2, 69:16, 79:12, 82:5, 83:2, 84:16, 89:5, 89:19, 90:10, 91:7, 91:14, 93:14, 97:13, 97:14, 97:18, 97:20, 101:3

**explaining** [1] - 29:4

**explanation** [1] - 36:3

**Explorer** [1] - 8:6

**export** [2] - 19:16, 24:4

**exports** [2] - 14:1, 14:2

**expose** [1] - 84:23

**exposed** [1] - 83:10

**exposing** [1] - 81:20

**expressed** [1] - 74:20

**extensions** [1] - 8:14

**extensive** [3] - 91:20, 91:22, 104:11

**extent** [2] - 61:5, 64:12

**external** [2] - 19:5, 25:5

**extra** [4] - 10:19, 35:5, 41:19, 41:20

**extract** [1] - 21:11

**extracted** [3] - 14:9, 16:12, 22:19

**extracting** [1] - 19:23

**extraction** [8] - 6:23, 7:2, 7:7, 20:5, 20:13, 21:13, 101:15, 101:18

**extractions** [3] - 7:12, 7:14, 10:12

---

**F**

---

**fact** [3] - 16:20, 57:22, 83:17

**failure** [2] - 63:23, 65:25

**fair** [11] - 20:4, 21:23, 23:17, 24:10, 25:22, 43:2, 62:25, 65:11, 72:19, 75:10, 86:12

**fairly** [6] - 14:7, 22:18,

46:20, 54:5, 88:19, 93:4

**Falco** [1] - 33:6

**Falco's** [1] - 43:25

**familiar** [4] - 10:3, 21:1, 42:8, 87:2

**far** [1] - 84:2

**FBI** [11] - 7:15, 15:6, 15:13, 23:7, 61:1, 62:11, 73:7, 73:22, 73:25, 94:4, 94:14

**FBI's** [1] - 12:5

**features** [3] - 9:13, 63:20, 89:9

**few** [9] - 2:25, 3:14, 29:13, 47:9, 63:20, 66:7, 81:12, 81:17

**field** [2] - 58:2, 58:18

**fields** [1] - 19:22

**fifth** [1] - 39:15

**figure** [1] - 103:19

**file** [90] - 3:3, 3:11, 3:13, 3:14, 4:8, 4:9, 4:10, 4:11, 4:14, 4:15, 4:16, 4:17, 4:20, 4:22, 5:4, 5:5, 5:6, 5:8, 5:10, 5:11, 5:12, 5:14, 5:15, 5:20, 6:2, 7:6, 7:23, 8:14, 9:2, 9:11, 9:21, 11:8, 12:12, 12:13, 13:9, 14:4, 18:13, 19:12, 19:19, 20:1, 20:6, 21:15, 21:16, 24:8, 24:10, 25:10, 25:20, 25:22, 26:8, 27:17, 30:8, 30:10, 30:14, 35:16, 35:19, 39:13, 43:18, 44:12, 44:22, 44:25, 45:1, 45:3, 51:8, 52:17, 53:3, 53:5, 57:7, 57:13, 58:4, 58:6, 58:9, 58:17, 66:3, 74:3, 85:4, 87:13, 87:21, 92:17, 92:18, 95:6, 103:14

**File** [2] - 8:6, 12:4

**files** [59] - 3:3, 5:24, 6:2, 6:6, 7:4, 7:20, 8:7, 8:10, 8:12, 8:18, 8:21, 9:6, 9:7, 9:8, 9:14, 9:16, 9:19, 10:18, 10:22, 11:2, 11:5, 11:11, 11:12, 11:13, 11:16, 11:18, 12:15, 12:22, 13:1, 13:4, 13:5, 13:13, 13:18, 14:6, 14:8, 14:12, 17:4, 21:14, 24:19, 24:23, 26:12, 35:21, 35:23, 41:7, 41:12, 41:13,

43:3, 49:15, 51:18, 51:24, 56:22, 69:18, 69:21, 70:6, 85:3, 85:12, 93:20, 100:16

**filesharefreak.com** [1] - 87:18

**Finance** [1] - 79:3

**fine** [6] - 2:9, 16:7, 33:3, 48:13, 48:23, 77:23

**finish** [2] - 37:20, 97:3

**Firefox** [2] - 101:4, 101:14

**first** [16] - 4:25, 14:22, 28:1, 38:18, 49:23, 51:5, 59:20, 64:16, 79:4, 81:8, 81:21, 82:2, 84:17, 90:20, 102:4

**fits** [1] - 42:5

**flag** [2] - 26:25, 28:13

**flaws** [1] - 29:24

**fly** [2] - 59:23, 96:6

**Fog** [1] - 2:19

**folder** [14] - 12:11, 17:19, 17:21, 17:22, 31:2, 50:5, 51:17, 51:18, 51:23, 51:25, 52:10, 52:14

**folders** [2] - 8:7, 50:4

**folks** [1] - 49:7

**follow** [2] - 30:19, 91:24

**followed** [1] - 26:21

**following** [3] - 27:11, 49:24, 50:1

**fonts** [5] - 36:8, 36:10, 36:12, 36:13, 36:15

**forensic** [15] - 3:1, 3:2, 3:4, 6:23, 7:19, 7:25, 8:9, 8:25, 9:11, 12:15, 12:25, 13:19, 37:4, 37:6, 69:20

**forensically** [3] - 9:7, 10:3, 10:7

**forensically-sound** [1] - 10:3

**forensics** [3] - 6:15, 7:18, 93:23

**Forensics** [1] - 93:2

**form** [2] - 14:9, 24:5

**format** [6] - 13:24, 19:12, 19:14, 19:17, 19:20, 27:1

**formats** [1] - 13:10

**formula** [1] - 3:12

**forth** [2] - 41:14, 54:25

**forthwith** [1] - 103:2

**fortress** [1] - 42:24

**foundation** [7] - 102:15, 104:25,

105:12, 106:1, 106:3, 106:16, 106:19
**four** [3] - 97:23, 97:24, 98:20
**fourth** [1] - 96:3
**free** [1] - 97:5
**Freelance** [1] - 79:3
**front** [6] - 8:2, 26:6, 32:13, 41:8, 49:20, 76:19
**Fuck** [1] - 54:7
**fuck** [6] - 54:9, 54:11, 59:23, 64:22, 68:8, 96:7
**fucked** [2] - 39:23, 68:17
**fucking** [9] - 28:19, 33:19, 37:20, 37:22, 38:5, 75:1, 75:2, 78:14, 85:3
**full** [5] - 23:4, 32:5, 33:10, 65:23, 81:21
**fully** [1] - 34:14
**function** [3] - 58:14, 63:19, 98:19
**functionalities** [1] - 91:6
**functionality** [1] - 26:15
**functions** [1] - 29:13

## G

**gain** [1] - 106:22
**gallery** [2] - 20:2, 61:4
**gateway** [1] - 35:9
**general** [15] - 29:23, 30:14, 35:14, 35:16, 36:24, 37:2, 53:2, 62:6, 62:9, 65:23, 89:7, 90:10, 91:6, 96:5, 96:6
**generally** [42] - 2:23, 3:10, 10:13, 12:23, 17:4, 17:21, 20:18, 21:3, 23:2, 25:19, 26:7, 26:10, 27:24, 30:23, 41:4, 42:8, 42:23, 44:11, 45:2, 47:21, 49:25, 52:23, 56:9, 60:8, 61:17, 63:19, 64:10, 73:24, 76:13, 77:13, 78:5, 80:9, 81:12, 87:12, 89:5, 89:19, 90:16, 91:14, 93:17, 102:21, 103:7
**generate** [1] - 3:11
**get-to-know-you** [1] - 104:1
**given** [1] - 63:12
**Google** [7] - 86:13,

86:21, 86:22, 87:12, 87:20, 87:22, 88:17
**government** [32] - 4:1, 11:20, 13:6, 13:20, 20:8, 22:2, 22:21, 24:13, 25:25, 43:6, 46:1, 63:3, 65:14, 66:7, 70:14, 72:22, 73:14, 75:13, 76:2, 76:4, 77:5, 78:7, 86:17, 87:23, 88:23, 93:7, 98:10, 100:19, 101:25, 103:16, 105:7, 106:3
**Government** [1] - 75:23
**government's** [3] - 62:3, 78:15, 95:21
**gratuitously** [1] - 104:2
**greater** [1] - 75:24
**group** [1] - 71:4
**guarantee** [2] - 35:5, 66:10
**guess** [1] - 56:12
**guide** [1] - 78:24

## H

**hacking** [1] - 90:13
**halfway** [1] - 35:13
**hand** [3] - 15:19, 18:24, 94:2
**handling** [1] - 10:3
**hangs** [1] - 83:24
**hard** [10] - 8:16, 10:1, 10:9, 12:12, 56:13, 68:15, 68:16, 69:12, 93:18, 94:10
**hardware** [1] - 63:23
**hash** [22] - 3:10, 3:11, 3:18, 3:24, 4:22, 5:1, 5:3, 5:5, 5:9, 5:14, 5:16, 5:17, 5:21, 5:22, 5:23, 6:3, 6:4, 6:5, 6:7, 11:8, 12:6, 29:14
**hashed** [1] - 5:8
**hashes** [2] - 6:8, 12:16
**hashing** [4] - 3:9, 5:6, 6:11, 12:7
**headers** [1] - 12:3
**heading** [1] - 81:8
**headlines** [1] - 72:11
**heads** [1] - 97:7
**hearsay** [12] - 11:23, 24:15, 26:2, 46:25, 63:5, 65:16, 72:24, 73:17, 75:15, 75:18, 76:14, 87:8
**heavydist** [4] - 25:21, 26:10, 50:5, 50:10

**held** [1] - 98:19
**help** [7] - 4:20, 6:5, 9:2, 9:5, 17:16, 42:5, 98:3
**helped** [1] - 33:23
**hex** [3] - 92:17, 93:3, 93:5
**hidden** [20] - 28:6, 28:8, 28:11, 28:17, 28:18, 29:11, 29:13, 29:15, 29:18, 29:25, 31:23, 32:1, 32:2, 38:2, 38:10, 38:22, 38:23, 38:24, 39:3, 43:20
**high** [5] - 35:20, 52:11, 54:20, 61:19, 84:17
**high-level** [1] - 52:11
**highlight** [1] - 51:5
**himself** [1] - 34:25
**hinder** [1] - 81:4
**history** [19] - 20:21, 24:3, 25:7, 25:8, 25:13, 25:20, 26:7, 26:12, 43:18, 43:22, 44:6, 49:12, 49:15, 49:18, 49:21, 50:24, 91:20
**hold** [4] - 14:23, 19:3, 97:17, 97:18
**home** [2] - 41:18, 99:10
**Honor** [34] - 2:3, 2:6, 2:10, 2:16, 15:23, 16:7, 16:23, 17:24, 18:4, 20:14, 32:6, 32:23, 39:20, 40:16, 48:13, 49:1, 49:9, 66:24, 67:13, 78:16, 80:14, 81:14, 92:3, 94:6, 95:17, 96:17, 97:2, 98:13, 102:1, 102:12, 104:16, 104:23, 105:7, 106:12
**hopeful** [1] - 97:2
**hosting** [8] - 40:24, 61:13, 79:7, 79:13, 79:14, 79:18, 79:22, 84:5
**hostname** [4] - 52:18, 52:23, 52:25, 53:8
**house** [1] - 99:22
**HTTPS** [1] - 30:20
**hub** [1] - 97:23
**huge** [1] - 37:22

## I

**I2P** [1] - 37:20
**ID** [2] - 28:14, 47:16
**idea** [3] - 34:5, 38:2, 66:5

**identical** [1] - 6:1
**identified** [1] - 21:14
**identify** [2] - 55:10, 99:14
**identifying** [2] - 104:24, 105:6
**idiots** [1] - 79:6
**image** [19] - 3:1, 3:2, 3:5, 3:7, 3:9, 3:16, 7:17, 7:18, 7:21, 7:25, 9:12, 11:6, 12:24, 13:3, 56:3, 90:21, 92:12, 92:17, 92:25
**imaged** [1] - 6:25
**images** [19] - 6:5, 7:11, 7:14, 10:11, 12:15, 23:15, 90:4, 90:6, 90:7, 90:17, 90:23, 90:24, 91:4, 94:4, 94:14, 102:23, 102:24, 103:1
**imaging** [1] - 6:17
**impact** [1] - 99:3
**implications** [1] - 66:13
**important** [4] - 8:25, 30:5, 34:17, 34:20
**improve** [1] - 54:21
**inadvertent** [1] - 32:17
**inauthentic** [1] - 79:19
**include** [6] - 11:10, 13:18, 17:15, 25:4, 42:21, 55:25
**included** [1] - 27:14
**including** [1] - 10:22
**incomplete** [1] - 11:23
**independent** [1] - 69:5
**indexing** [1] - 7:22
**indicate** [5] - 44:5, 48:2, 58:2, 84:6, 104:13
**indicates** [3] - 51:9, 52:19, 52:24
**Indicating** [7] - 4:13, 4:21, 4:25, 5:19, 14:24, 45:11, 98:24
**indicating** [3] - 55:23, 58:13, 101:11
**indicating)** [1] - 47:9
**indications** [1] - 42:18
**individual** [1] - 5:24
**individuals** [1] - 103:2
**info** [2] - 79:15, 79:16
**Info** [3] - 61:3, 64:7, 80:2
**information** [52] - 7:5, 7:7, 7:21, 8:14, 8:21, 9:3, 9:12, 10:1, 11:7, 11:17, 14:3, 14:4, 19:16, 19:17, 19:23,

19:24, 20:5, 21:11, 21:24, 22:16, 22:19, 23:7, 27:11, 35:12, 36:14, 36:16, 37:7, 37:10, 41:16, 46:20, 54:25, 66:5, 74:2, 75:2, 78:14, 78:23, 79:16, 79:19, 79:20, 81:19, 81:20, 84:24, 87:22, 88:6, 88:8, 89:20, 90:14, 90:25, 93:4, 93:16, 106:10

**Information** [1] - 63:14

**infrastructure** [1] - 74:21

**initial** [1] - 7:11

**initiate** [1] - 45:15

**input** [1] - 3:12

**inside** [4] - 12:25, 15:8, 54:15, 56:10

**insight** [1] - 106:22

**Install** [1] - 50:12

**install** [9] - 50:15, 50:17, 50:19, 50:20, 56:15, 61:15

**installed** [4] - 31:3, 36:10, 42:16, 91:13

**instance** [1] - 13:23

**instances** [2] - 13:9, 79:21

**instead** [5] - 7:1, 26:22, 31:2, 31:10, 99:10

**instructions** [1] - 30:20

**intended** [2] - 38:2, 38:10

**intends** [1] - 60:22

**intentional** [2] - 32:21, 32:24

**interacting** [1] - 8:17

**intercept** [1] - 81:1

**interest** [4] - 10:17, 11:2, 103:10, 105:9

**interests** [2] - 104:14, 106:23

**interference** [1] - 66:11

**internet** [14] - 26:23, 53:18, 54:25, 69:1, 82:8, 82:10, 82:16, 82:18, 97:17, 98:1, 98:18, 98:22, 98:23, 99:6

**interrupted** [2] - 82:7, 82:10

**introduce** [1] - 87:5

**introduction** [1] - 28:17

**investigating** [1] - 74:1

**investigation** [1] - 2:20

**invoices** [4] - 17:23, 18:1, 18:2, 18:8

**involved** [1] - 10:23

**IP** [24] - 10:17, 29:3, 29:25, 31:25, 38:11, 46:10, 46:13, 46:18, 46:21, 47:5, 47:13, 47:17, 52:18, 52:25, 53:10, 53:13, 55:14, 61:10, 74:2, 82:11, 84:23, 85:18, 89:21, 89:22

**IPs** [6] - 31:23, 31:25, 55:11, 85:17, 99:19, 99:20

**IRS** [1] - 7:15

**issue** [3] - 16:9, 32:14, 105:18

**issues** [4] - 55:2, 84:2, 84:3, 100:7

**item** [3] - 10:8, 15:11, 15:15

**Item** [1] - 12:5

**itself** [4] - 23:8, 23:9, 38:5, 81:25

**J**

**January** [2] - 88:5, 88:21

**July** [1] - 94:18

**jump** [1] - 49:23

**jumper** [1] - 82:3

**jurors** [6] - 2:11, 48:20, 48:22, 49:4, 96:25, 97:7

**jury** [47] - 2:2, 2:12, 3:1, 3:17, 3:23, 4:6, 4:20, 5:11, 12:1, 13:7, 13:10, 13:21, 13:24, 14:10, 14:23, 19:3, 19:13, 20:16, 22:7, 22:25, 23:25, 24:17, 25:7, 26:4, 26:6, 32:13, 32:15, 33:2, 43:14, 44:24, 46:6, 47:2, 51:9, 63:7, 76:25, 85:15, 88:2, 89:2, 93:11, 97:19, 98:3, 98:7, 98:17, 100:24, 105:4, 105:9, 105:10

**K**

**KCQ** [1] - 27:7

**keep** [11] - 11:15, 28:7,

29:16, 37:18, 50:12, 55:15, 60:1, 63:22, 67:6, 68:21

**keeper** [3] - 18:19, 18:20, 50:22

**keeping** [4] - 31:23, 31:25, 38:10, 83:5

**keeps** [2] - 11:7, 66:9

**key** [1] - 21:18

**key-value** [1] - 21:18

**Keypass** [3] - 50:20, 50:21

**keys** [2] - 37:17, 68:23

**keywords** [1] - 77:22

**kill** [9] - 81:24, 82:4, 82:5, 82:6, 82:9, 82:11, 82:15, 82:16, 82:21

**kind** [8] - 38:25, 40:18, 45:15, 54:21, 79:1, 79:6, 90:12, 97:18

**KK** [1] - 18:5

**KKK** [3] - 18:1, 18:9, 18:10

**knowledge** [3] - 27:15, 30:3, 78:17

**known** [6] - 13:13, 35:24, 42:4, 55:3, 93:21

**knows** [4] - 29:15, 32:2, 64:22, 68:8

**L**

**label** [1] - 15:3

**labeled** [2] - 15:15, 86:6

**labels** [1] - 23:9

**laid** [1] - 104:25

**language** [2] - 16:11, 36:20

**languages** [3] - 17:5, 36:12, 36:13

**lap** [1] - 8:2

**lapsed** [1] - 66:15

**laptop** [12] - 2:24, 7:25, 8:5, 10:19, 25:4, 40:25, 41:3, 42:16, 56:3, 56:5, 60:23, 98:22

**laptops** [1] - 41:5

**largely** [3] - 10:15, 90:12, 90:25

**last** [14] - 8:13, 34:16, 36:23, 37:11, 39:25, 48:1, 59:15, 64:2, 64:3, 64:20, 65:2, 82:3, 83:20

**launch** [1] - 54:16

**laundering** [3] - 102:10, 104:2, 105:22

**law** [21] - 39:1, 55:17, 66:7, 66:18, 67:8, 67:10, 68:1, 74:1, 74:8, 74:20, 76:5, 80:25, 81:2, 89:20, 90:2, 90:5, 99:6, 99:9, 99:11, 99:13, 99:16

**lay** [5] - 102:15, 105:11, 106:3, 106:16, 106:19

**leading** [6] - 85:8, 85:22, 85:25, 92:3, 92:8, 99:17

**leak** [1] - 81:24

**leaking** [1] - 81:19

**least** [5] - 5:10, 15:22, 48:12, 56:24, 105:14

**leave** [3] - 48:20, 60:13, 60:22

**leaves** [1] - 60:21

**left** [1] - 23:4

**leftover** [3] - 37:9, 69:14, 69:22

**leftovers** [1] - 37:5

**legal** [1] - 79:5

**legs** [2] - 97:1, 97:5

**less** [2] - 55:15, 104:9

**letters** [1] - 3:14

**level** [9] - 35:20, 52:11, 53:2, 54:20, 61:20, 67:22, 69:14, 78:25, 84:17

**libraries** [1] - 31:3

**life** [1] - 100:3

**LIKE** [1] - 13:13

**likely** [4] - 45:15, 61:11, 77:1, 104:9

**line** [12] - 25:8, 26:9, 33:17, 59:15, 60:12, 61:14, 63:10, 68:7, 72:13, 76:8, 86:5, 87:1

**lines** [5] - 49:24, 50:1, 68:18, 85:5, 94:25

**link** [21] - 65:6, 65:7, 65:12, 72:13, 72:15, 72:20, 75:4, 75:6, 75:11, 76:10, 76:19, 76:22, 77:2, 78:24, 80:7, 87:18, 88:8, 88:14, 88:16, 89:6, 97:22

**linkage** [1] - 51:22

**linked** [2] - 50:9, 50:11

**links** [2] - 78:23, 89:7

**Linux** [6] - 25:20, 31:6, 31:7, 50:16, 64:25, 83:23

**list** [17] - 9:19, 11:2, 12:13, 12:18, 12:20, 12:22, 25:11, 26:9,

60:9, 60:11, 86:25, 87:5, 87:14, 89:7, 89:10

**listed** [3] - 47:13, 79:20, 89:25

**listened** [1] - 76:21

**listener** [8] - 65:18, 65:20, 73:1, 73:19, 75:16, 75:19, 76:18, 76:25

**listening** [1] - 34:9

**lists** [1] - 29:17

**lived** [1] - 21:15

**LiveLTE** [3] - 97:16, 98:8, 100:9

**local** [9] - 39:22, 50:8, 50:10, 51:16, 54:15, 68:23, 74:1, 80:25

**locally** [1] - 51:18

**locate** [6] - 14:12, 17:19, 20:23, 44:8, 55:18, 78:9

**located** [6] - 12:12, 21:6, 58:15, 59:6, 59:9, 79:8

**locations** [1] - 41:12

**lock** [1] - 82:1

**locked** [1] - 63:24

**locks** [1] - 18:23

**log** [2] - 20:19, 26:25

**logged** [3] - 25:10, 42:15, 49:17

**logging** [1] - 27:9

**login** [3] - 27:6, 61:5, 64:3

**Logs** [1] - 73:22

**logs** [2] - 74:2, 91:20

**look** [13] - 9:15, 9:16, 10:16, 10:20, 10:21, 13:15, 21:17, 49:23, 53:10, 68:10, 70:24, 93:18, 93:20

**looked** [10] - 11:11, 11:12, 11:13, 11:14, 43:19, 57:10, 60:19, 84:18, 91:5, 92:17

**looking** [10] - 8:7, 8:9, 8:15, 9:12, 10:14, 54:5, 77:21, 87:6, 87:16, 88:15

**looks** [3] - 8:8, 50:6, 52:17

**loss** [3] - 54:13, 54:24, 55:3

**lower** [1] - 101:6

**LTD** [1] - 89:24

**LTE** [2] - 97:16, 98:23

**Luke** [1] - 24:23

**Lund** [4] - 2:8, 14:17, 15:19, 100:10

**Lund's** [4] - 14:21, 18:24, 96:9, 96:24

## M

**M247** [6] - 89:16, 90:8, 94:21, 95:1, 95:2, 96:7

**machine** [14] - 36:8, 36:16, 44:7, 56:9, 56:10, 68:20, 68:22, 68:23, 68:25, 83:3, 83:4, 83:7, 83:8

**machines** [6] - 56:7, 82:23, 82:24, 83:1, 83:11, 83:15

**MAILWOO** [1] - 63:18

**main** [7] - 2:25, 11:15, 30:23, 37:21, 83:9, 84:5, 97:21

**malicious** [1] - 37:7

**malware** [2] - 10:22, 83:6

**malware-reversing** [1] - 83:6

**man** [4] - 35:10, 104:4, 104:7, 104:21

**man-in-the-middle** [1] - 35:10

**manage** [3] - 61:15, 61:18, 91:17

**managed** [1] - 91:17

**manages** [1] - 27:9

**maneuver** [1] - 97:14

**manufacturer** [1] - 64:23

**map** [1] - 41:17

**marked** [1] - 10:24

**masked** [2] - 27:17, 68:9

**Mast** [1] - 39:11

**mast** [5] - 27:21, 32:4, 74:23, 78:12, 79:2

**match** [3] - 6:4, 9:18, 23:7

**matches** [1] - 9:17

**matching** [1] - 6:8

**material** [1] - 105:8

**materials** [1] - 104:12

**mathematical** [1] - 3:11

**mathematically** [1] - 35:22

**matter** [3] - 55:16, 86:24, 87:8

**Mazarin** [25] - 2:19, 4:8, 17:4, 18:12, 20:18, 22:9, 24:19, 33:10, 49:12, 61:8, 65:22, 73:3, 73:11, 75:21, 86:4, 87:12, 88:4, 89:4,

89:13, 89:15, 93:14, 94:1, 96:22, 97:13, 106:21

**MD5** [3] - 6:16, 12:6, 12:7

**mean** [17] - 10:6, 16:10, 16:11, 27:3, 29:2, 31:25, 36:15, 47:15, 51:7, 51:15, 52:14, 66:22, 67:21, 69:12, 78:24, 91:22, 105:11

**meaning** [2] - 29:9, 49:22

**means** [11] - 7:17, 7:18, 7:24, 15:10, 29:3, 31:10, 51:6, 54:10, 79:13, 79:14, 82:21

**meant** [6] - 9:24, 36:1, 36:9, 66:1, 67:19, 74:5

**measures** [1] - 79:25

**media** [3] - 3:8, 50:10, 51:17

**members** [1] - 24:20

**memory** [1] - 83:22

**mentioned** [1] - 11:16

**message** [3] - 101:19, 102:7, 105:16

**messages** [1] - 102:21

**met** [2] - 71:24, 76:19

**metadata** [4] - 7:5, 8:23, 8:25, 87:20

**micro** [1] - 60:6

**microcomputers** [1] - 97:22

**microphone** [1] - 28:25

**middle** [2] - 29:12, 35:10

**midway** [1] - 26:16

**might** [12] - 7:21, 9:3, 36:12, 36:14, 38:15, 47:7, 47:19, 66:21, 69:21, 83:4, 104:6, 104:7

**migration** [2] - 68:24, 69:23

**mine** [1] - 66:8

**mini** [2] - 98:19, 98:21

**minute** [1] - 53:25

**minutes** [2] - 48:15, 83:25

**mix** [1] - 39:5

**mobile** [2] - 21:4, 99:19

**modems** [4] - 97:23, 98:20, 98:23, 100:1

**modifications** [1] - 31:13

**moment** [3] - 20:3,

33:5, 106:11

**money** [5] - 34:24, 79:5, 102:9, 104:2, 105:22

**monitor** [1] - 99:12

**monitoring** [4] - 39:1, 99:6, 99:9, 99:13

**months** [2] - 55:16

**Moon** [4] - 89:24, 90:23, 91:1, 91:6

**morning** [1] - 95:2

**Moscow** [1] - 59:23

**most** [6] - 6:14, 9:13, 34:17, 34:20, 61:11, 78:10

**mostly** [1] - 90:24

**Mount** [1] - 51:11

**mount** [5] - 51:13, 51:15, 51:19, 52:10, 52:13

**mounted** [2] - 50:6, 50:7

**mounting** [1] - 51:22

**mouse** [1] - 83:24

**move** [8] - 23:20, 33:3, 41:13, 43:6, 46:23, 48:10, 71:23, 99:5

**moved** [2] - 68:24, 84:20

**moves** [22] - 4:1, 11:20, 20:8, 22:2, 22:21, 24:13, 25:25, 46:1, 63:3, 65:14, 70:14, 72:22, 73:14, 75:13, 86:17, 87:23, 88:23, 93:7, 98:10, 100:19, 101:25, 103:16

**moving** [3] - 70:17, 96:4, 96:6

**mozilla** [1] - 101:14

**MR** [75] - 4:4, 11:23, 14:19, 16:7, 16:11, 16:16, 16:23, 18:4, 18:7, 20:11, 20:14, 22:5, 22:23, 23:23, 24:15, 26:2, 29:5, 31:19, 32:6, 32:9, 32:11, 32:23, 40:16, 43:9, 43:12, 46:4, 46:25, 57:20, 62:7, 63:5, 65:16, 66:24, 67:1, 67:4, 67:13, 71:6, 71:10, 71:12, 71:19, 72:2, 72:24, 73:17, 75:15, 76:14, 76:21, 78:16, 80:14, 81:14, 85:8, 85:22, 86:19, 86:23, 87:25, 88:25, 91:21, 92:3, 93:9, 94:6, 94:8, 95:16, 95:20,

98:13, 99:17, 100:22, 102:1, 102:4, 102:11, 104:16, 104:23, 105:5, 105:18, 105:25, 106:11, 106:14, 106:16

**MS** [122] - 2:6, 2:10, 2:16, 2:18, 4:1, 4:7, 11:20, 12:2, 14:20, 15:21, 16:5, 16:18, 17:3, 17:24, 18:9, 18:11, 20:8, 20:13, 20:17, 22:2, 22:8, 22:21, 23:1, 23:20, 24:1, 24:13, 24:18, 25:25, 26:5, 28:24, 29:8, 31:24, 32:17, 33:5, 33:9, 39:19, 39:24, 40:22, 43:6, 43:11, 43:15, 46:1, 46:7, 46:23, 47:3, 48:13, 49:1, 49:9, 49:10, 54:1, 54:6, 57:24, 62:10, 63:3, 63:8, 65:14, 65:18, 65:21, 67:9, 67:16, 70:10, 70:14, 70:21, 71:2, 71:5, 71:16, 71:20, 72:7, 72:22, 73:2, 73:14, 73:20, 75:13, 75:16, 75:20, 76:17, 77:7, 78:3, 78:21, 80:15, 80:19, 81:15, 85:9, 85:14, 85:23, 86:1, 86:3, 86:17, 86:20, 87:4, 87:11, 87:23, 88:3, 88:23, 89:3, 92:1, 92:6, 92:10, 93:7, 93:12, 94:13, 95:12, 95:25, 96:13, 96:17, 96:19, 97:2, 97:11, 97:12, 98:10, 98:16, 99:23, 100:19, 100:25, 101:25, 102:7, 102:18, 103:16, 103:24, 104:10, 105:7, 106:20

**multiple** [19] - 25:1, 25:4, 29:16, 30:6, 35:21, 36:11, 58:23, 83:11, 84:4, 84:8, 87:7, 94:9, 99:1, 99:2, 99:3, 99:5, 99:24, 99:25, 103:5

**Must** [1] - 75:1

**must** [3] - 75:2, 78:13, 79:8

**mute** [1] - 60:13

**Mycelium** [14] - 21:1, 21:3, 21:6, 21:11, 21:16, 21:19, 21:24,

22:10, 22:19, 23:11, 24:20, 24:24, 74:14, 100:12

## N

**Name** [1] - 12:4

**name** [18] - 5:8, 27:1, 44:18, 45:16, 49:19, 51:7, 51:8, 57:8, 58:1, 58:2, 58:18, 59:7, 63:12, 74:16, 79:10, 79:17, 89:25

**named** [4] - 17:19, 44:7, 44:8, 50:4

**names** [6] - 10:16, 18:21, 20:19, 63:16, 63:18, 90:15

**native** [1] - 19:12

**nature** [3] - 47:15, 102:21, 103:7

**necessary** [1] - 30:19

**need** [15] - 12:15, 13:14, 31:3, 36:12, 41:11, 47:7, 59:20, 59:23, 77:11, 79:5, 79:7, 85:4, 88:11, 97:6, 97:14

**needed** [6] - 13:24, 14:9, 35:23, 48:22, 50:16, 81:20

**needing** [1] - 78:9

**needs** [7] - 10:9, 37:15, 37:19, 40:20, 41:4, 61:19, 95:2

**network** [21] - 26:22, 29:14, 29:18, 29:24, 30:4, 30:6, 34:6, 34:8, 34:12, 35:9, 35:11, 37:24, 40:12, 50:8, 53:19, 54:11, 54:21, 55:2, 55:8, 90:14, 99:20

**network's** [1] - 31:22

**networks** [5] - 47:18, 81:10, 81:11, 81:19, 99:5

**never** [2] - 32:13, 61:20

**new** [2] - 54:18, 93:18

**news** [1] - 66:4

**next** [18] - 30:7, 30:17, 34:19, 36:5, 37:13, 37:18, 38:1, 44:13, 52:18, 52:23, 60:15, 68:18, 72:13, 76:8, 81:12, 81:17, 83:23

**nodes** [8] - 28:7, 29:12, 29:16, 33:15, 33:19, 34:6, 34:21,

35:2

**noisy** [2] - 38:13, 39:7

**none** [2] - 79:17, 99:11

**nontechnical** [5] - 40:4, 42:2, 45:12, 52:21, 54:20

**note** [7] - 58:11, 74:3, 85:11, 86:4, 88:4, 95:5, 103:10

**Note** [1] - 85:17

**noted** [8] - 12:22, 31:5, 49:21, 57:8, 57:25, 75:6, 89:22, 96:1

**notes** [27] - 14:13, 14:15, 15:16, 16:11, 17:8, 17:10, 20:20, 23:5, 53:21, 55:7, 55:23, 58:20, 58:24, 59:5, 59:8, 60:19, 60:20, 69:17, 69:19, 70:24, 79:24, 83:14, 84:18, 89:8, 90:25, 94:20, 100:6

**nothing** [5] - 92:7, 94:8, 104:17, 104:23, 105:5

**notice** [1] - 47:16

**noticed** [1] - 11:6

**nowhere** [1] - 57:22

**number** [10] - 3:13, 4:16, 5:13, 15:2, 15:5, 15:13, 27:12, 27:14, 47:16, 69:9

**Number** [1] - 12:5

**numbering** [2] - 12:5, 15:6

**numbers** [6] - 3:14, 10:16, 23:4, 23:6, 43:9, 47:17

**numerous** [1] - 43:22

## O

**objecting** [1] - 16:10

**objection** [67] - 2:9, 4:3, 4:4, 11:22, 11:24, 16:2, 16:8, 16:15, 16:22, 18:3, 20:10, 20:14, 22:4, 22:5, 22:22, 22:23, 23:22, 23:23, 24:14, 26:1, 26:3, 29:5, 31:19, 40:16, 43:8, 43:12, 46:3, 46:4, 46:24, 57:20, 62:7, 63:4, 65:15, 66:24, 66:25, 67:13, 72:1, 72:4, 72:23, 73:16, 73:18, 75:14, 75:18, 76:14,

78:16, 80:14, 81:14, 85:8, 85:22, 86:18, 87:9, 87:24, 88:24, 91:21, 92:3, 93:8, 93:9, 94:6, 94:7, 94:8, 95:15, 95:22, 98:12, 98:13, 99:17, 100:21, 102:3

**objections** [3] - 16:23, 75:17, 100:23

**obscure** [1] - 38:19

**observed** [2] - 47:12, 87:7

**obtain** [3] - 48:6, 94:4, 94:14

**obtained** [4] - 46:21, 63:1, 74:2, 90:8

**obvious** [2] - 8:15, 38:11

**occasions** [2] - 11:13, 87:7

**occurring** [1] - 36:4

**odd** [1] - 55:8

**offer** [1] - 89:9

**offered** [1] - 86:24

**often** [2] - 15:13, 47:15

**oftentimes** [1] - 15:6

**old** [4] - 68:15, 68:16, 69:23, 83:25

**one** [74] - 4:16, 5:20, 6:2, 7:19, 9:12, 11:10, 11:12, 12:7, 19:6, 19:12, 20:11, 21:4, 21:7, 21:8, 21:20, 24:3, 26:9, 26:20, 32:2, 33:5, 33:11, 33:12, 33:14, 34:7, 34:11, 37:15, 37:19, 38:3, 38:5, 38:24, 39:17, 44:12, 44:13, 48:22, 50:15, 54:15, 56:24, 58:3, 58:22, 66:9, 68:8, 70:5, 71:16, 74:13, 76:5, 76:15, 77:3, 82:17, 83:5, 83:7, 85:18, 88:10, 90:22, 90:23, 90:24, 91:4, 94:10, 95:2, 96:13, 97:21, 98:25, 99:4, 99:15, 100:3, 102:1, 102:9, 103:23, 104:8, 106:11

**one-off** [1] - 11:12

**ones** [7] - 3:12, 6:14, 18:22, 38:14, 69:14, 76:15, 103:9

**ongoing** [1] - 12:19

**onion** [5] - 26:17, 26:19, 27:2, 29:11, 101:7

**online** [4] - 65:4,

66:17, 83:8, 84:23

**open** [15] - 8:6, 18:20, 33:4, 37:19, 44:21, 54:18, 81:10, 81:18, 84:19, 95:23, 96:22, 96:23, 101:5, 101:12, 106:18

**opened** [5] - 13:15, 13:20, 19:13, 92:17, 92:25

**operate** [1] - 98:25

**operating** [3] - 56:15, 83:5, 83:9

**operation** [2] - 7:5, 81:3

**operational** [1] - 34:21

**opinion** [2] - 8:11, 82:19

**opportunity** [1] - 106:22

**options** [1] - 61:21

**order** [5] - 2:13, 37:12, 37:14, 49:6, 59:24

**organize** [3] - 7:23, 12:13, 69:3

**original** [9] - 3:8, 6:6, 6:7, 6:9, 7:8, 8:2, 14:4, 16:11, 44:22

**originally** [1] - 90:6

**originals** [3] - 13:9, 16:7, 16:8

**otherwise** [4] - 28:15, 74:8, 95:22, 106:23

**outcome** [1] - 79:1

**output** [2] - 3:13, 5:1

**overall** [3] - 31:16, 31:21, 34:8

**overhead** [1] - 8:12

**overly** [1] - 105:8

**overruled** [17] - 11:25, 24:16, 26:3, 31:20, 40:19, 62:8, 67:5, 67:15, 72:5, 73:18, 75:18, 80:17, 85:10, 87:9, 94:11, 99:18, 100:23

**overwrite** [2] - 69:13, 93:23

**own** [3] - 35:1, 49:18, 77:1

**ownership** [1] - 81:11

## P

**p.m** [2] - 49:3

**package** [2] - 38:2, 38:4

**packages** [1] - 50:16

**packet** [3] - 54:13, 54:24, 55:3

**packets** [3] - 33:15, 37:16, 55:4

**packing** [2] - 60:5, 60:10

**page** [32] - 27:23, 31:15, 32:4, 33:17, 34:15, 34:19, 35:13, 36:22, 37:11, 37:13, 39:15, 53:23, 59:13, 59:16, 59:19, 61:4, 61:7, 64:8, 65:1, 68:2, 68:10, 72:8, 74:24, 79:2, 80:3, 81:7, 83:19, 84:14, 84:17, 88:21, 94:23, 95:9

**pages** [1] - 36:7

**paint** [4] - 80:6, 80:10, 80:11, 80:20

**painted** [1] - 80:23

**Panel** [1] - 61:14

**panel** [1] - 61:16

**papers** [1] - 17:12

**paragraph** [11] - 32:5, 33:10, 34:16, 35:13, 36:5, 36:23, 37:12, 38:1, 55:8, 65:3, 79:4

**paragraphs** [8] - 28:1, 29:22, 33:21, 33:22, 33:25, 34:3, 34:11, 37:18

**parallel** [1] - 82:24

**part** [9] - 2:19, 28:6, 29:14, 30:14, 34:12, 35:8, 35:11, 44:23, 86:22

**particular** [7] - 10:12, 15:7, 36:19, 52:22, 103:11, 103:13, 103:14

**particularly** [2] - 10:20, 63:10

**partners** [1] - 104:13

**parts** [5] - 29:17, 29:18, 52:12, 97:18, 97:20

**passing** [1] - 14:21

**passive** [4] - 45:20, 45:21, 45:22, 47:11

**password** [15] - 18:15, 18:17, 18:18, 18:19, 18:20, 19:6, 19:9, 19:12, 19:16, 20:1, 20:5, 20:11, 50:22, 51:2, 81:25

**passwords** [4] - 18:21, 20:19, 61:11, 69:21

**Path** [2] - 12:6, 12:10

**path** [2] - 12:11, 51:20

**pattern** [1] - 9:18

**Pause** [1] - 77:16

**pause** [4] - 33:7, 97:9, 102:2, 106:15

**pay** [1] - 35:4

**payer** [1] - 34:22

**paying** [2] - 35:4, 86:5

**payment** [5] - 33:18, 34:20, 34:21, 34:23, 85:20

**PC** [2] - 98:20, 98:21

**PDF** [6] - 44:20, 44:23, 44:25, 45:2, 45:3

**Pearlman** [1] - 61:6

**PELKER** [123] - 2:6, 2:10, 2:16, 2:18, 4:1, 4:7, 11:20, 12:2, 14:20, 15:21, 16:5, 16:18, 17:3, 17:24, 18:9, 18:11, 20:8, 20:13, 20:17, 22:2, 22:8, 22:21, 23:1, 23:20, 24:1, 24:13, 24:18, 25:25, 26:5, 28:24, 29:8, 31:24, 32:17, 33:5, 33:9, 39:19, 39:24, 40:22, 43:6, 43:11, 43:15, 46:1, 46:7, 46:23, 47:3, 48:13, 49:1, 49:9, 49:10, 54:1, 54:6, 57:24, 62:10, 63:3, 63:8, 65:14, 65:18, 65:21, 67:9, 67:16, 70:4, 70:10, 70:14, 70:21, 71:2, 71:5, 71:16, 71:20, 72:7, 72:22, 73:2, 73:14, 73:20, 75:13, 75:16, 75:20, 76:17, 77:7, 78:3, 78:21, 80:15, 80:19, 81:15, 85:9, 85:14, 85:23, 86:1, 86:3, 86:17, 86:20, 87:4, 87:11, 87:23, 88:3, 88:23, 89:3, 92:1, 92:6, 92:10, 93:7, 93:12, 94:13, 95:12, 95:25, 96:13, 96:17, 96:19, 97:2, 97:11, 97:12, 98:10, 98:16, 99:23, 100:19, 100:25, 101:25, 102:7, 102:18, 103:16, 103:24, 104:10, 105:7, 106:20

**Pelker** [3] - 2:14, 18:7, 102:6

**people** [1] - 105:1

**people's** [2] - 39:6, 41:18

**per** [1] - 26:9

**performance** [1] -

54:22

**perhaps** [2] - 37:19, 64:24

**period** [1] - 55:13

**permission** [1] - 2:7

**person** [5] - 38:23, 59:10, 99:14, 99:15, 104:4

**personal** [4] - 78:17, 102:20, 105:8, 106:9

**perspective** [1] - 91:15

**pertain** [1] - 90:23

**pertaining** [5] - 15:12, 24:19, 26:19, 46:21, 89:16

**pertains** [1] - 29:18

**phone** [25] - 7:1, 7:3, 7:6, 7:9, 10:16, 15:9, 21:12, 21:14, 22:10, 23:8, 23:9, 23:12, 23:17, 24:2, 24:5, 24:11, 32:6, 32:9, 71:12, 72:3, 95:17, 99:22, 100:12, 103:17, 104:13

**phone's** [1] - 7:4

**phones** [9] - 2:24, 6:17, 6:20, 6:24, 6:25, 21:4, 21:7, 21:8, 100:17

**photo** [1] - 9:4

**photographing** [1] - 23:11

**photographs** [1] - 74:13

**photos** [3] - 9:3, 102:24, 103:5

**phrase** [1] - 29:6

**physical** [4] - 2:6, 17:12, 59:6, 96:13

**physically** [1] - 41:7

**Pi** [3] - 2:24, 97:22, 98:19

**pick** [2] - 59:24, 103:17

**piece** [1] - 66:4

**pieces** [2] - 7:20, 55:1

**place** [4] - 33:16, 35:18, 38:21, 63:23

**places** [4] - 37:5, 47:9, 53:7, 74:19

**plans** [1] - 59:15

**plausible** [2] - 35:18, 36:1

**plenty** [1] - 33:19

**point** [20] - 4:24, 5:17, 26:10, 28:4, 28:18, 28:19, 29:12, 38:18, 39:16, 39:18, 40:9,

45:9, 45:10, 47:8, 80:15, 83:20, 89:25, 104:17, 104:18, 104:20
points [4] - 28:20, 29:11, 29:19, 40:4
police [2] - 74:1, 80:25
pops [1] - 25:9
port [3] - 26:25, 27:12, 27:14
portable [1] - 97:16
portion [4] - 27:25, 30:23, 40:8, 101:6
portions [1] - 95:21
ports [4] - 54:18, 85:2, 85:4, 85:5
possible [5] - 7:5, 10:8, 33:14, 34:21, 82:24
possibly [6] - 9:19, 27:15, 36:20, 53:19, 67:23, 91:5
post [3] - 65:7, 65:24, 75:5
potentially [1] - 99:24
power [1] - 56:14
practices [1] - 10:4
pre [2] - 24:2, 31:11
pre-made [1] - 31:11
pre-saved [1] - 24:2
preceding [1] - 33:22
precisely [1] - 91:22
prejudice [1] - 32:21
prepare [1] - 3:17
preponderance [2] - 105:15, 106:7
present [3] - 2:12, 80:7, 87:9
presses [1] - 37:16
prevent [1] - 80:22
previously [9] - 15:25, 16:25, 43:18, 57:10, 70:6, 84:9, 85:15, 85:16, 95:12
primary [1] - 17:22
privacy [2] - 65:24, 67:6
Privacy/Infosec [2] - 65:2, 65:3
private [5] - 31:23, 31:25, 61:18, 64:14, 66:21
privileged [1] - 27:10
problem [1] - 95:2
problematic [2] - 84:22, 105:8
problems [3] - 34:23, 39:23, 40:6
proceed [2] - 95:24, 97:10
process [7] - 6:10,

6:20, 6:25, 7:4, 7:8, 7:17, 9:11
processed [1] - 12:24
processing [6] - 7:18, 7:23, 13:5, 13:6, 44:23, 56:14
production [1] - 86:22
professionals [1] - 45:23
profiles [1] - 102:9
program [8] - 36:24, 37:8, 42:13, 51:8, 54:21, 56:11, 56:17, 57:7
programs [5] - 9:15, 13:16, 37:1, 50:15, 50:17
project [3] - 31:5, 34:20, 41:6
projects [1] - 83:7
properly [3] - 37:14, 37:15, 55:2
protected [1] - 35:8
protection [3] - 38:21, 75:24, 82:22
protects [1] - 83:9
protocol [4] - 41:25, 42:1, 42:3, 54:23
provide [4] - 24:19, 67:7, 69:21, 104:6
Provided [1] - 73:22
provided [7] - 7:14, 79:15, 87:22, 90:2, 90:5, 90:6, 98:23
Provider [1] - 73:22
provider [2] - 53:18, 89:7
providers [5] - 86:8, 86:25, 87:5, 97:25
providing [1] - 14:3
proviso [1] - 71:10
proxies [2] - 84:9, 84:12
proxy [2] - 84:19, 84:21
proxy.sh [1] - 82:3
PSA [1] - 75:23
publish [6] - 4:1, 11:20, 20:3, 46:1, 77:10, 98:10
published [19] - 4:6, 11:25, 20:15, 22:6, 22:24, 23:25, 24:17, 26:4, 32:13, 32:15, 43:14, 46:6, 47:2, 63:6, 88:2, 89:2, 93:11, 98:14, 100:24
pull [26] - 3:20, 7:20, 20:1, 20:2, 22:10, 24:7, 37:5, 39:11, 43:16,

46:12, 46:15, 49:11, 50:23, 53:23, 57:5, 59:12, 60:3, 61:3, 70:6, 77:10, 85:23, 86:1, 88:13, 89:14, 92:21, 96:8
pulled [3] - 21:16, 22:16, 43:2
pulling [5] - 7:4, 44:14, 51:11, 52:9, 58:5
pulls [1] - 9:18
purchased [1] - 85:16
PureVPN [1] - 74:2
purple [4] - 54:2, 54:3, 54:4, 101:7
purpose [2] - 53:3, 83:2
purposes [1] - 39:6
put [4] - 3:12, 96:15, 100:9, 105:8
putting [2] - 38:21, 106:9
Putty [2] - 53:5, 53:9

**Q**

questioning [2] - 64:14, 87:1
questions [4] - 67:2, 88:12, 91:23, 104:2

**R**

Radio [1] - 80:6
radio [8] - 80:10, 80:11, 80:20, 80:22, 80:24, 81:1, 81:2, 81:3
RAID [6] - 68:12, 68:13, 68:21, 69:2, 69:9
raid [1] - 81:4
raised [1] - 72:5
RamNode [6] - 61:9, 61:11, 61:12, 61:23, 62:6, 62:12
ran [2] - 5:15, 49:18
random [1] - 102:10
Raspberry [3] - 2:24, 97:22, 98:19
rather [5] - 8:16, 54:23, 78:9, 99:4, 105:15
RDP [3] - 41:22, 41:23, 41:25
reach [2] - 29:15, 98:1
Reactor [2] - 17:19, 18:8
read [46] - 28:2, 28:9, 30:7, 30:17, 30:21,

32:5, 33:10, 33:17, 33:24, 34:16, 35:13, 36:5, 36:22, 37:11, 38:1, 38:9, 39:15, 39:25, 59:15, 59:19, 60:11, 60:15, 61:14, 64:16, 64:20, 65:2, 68:3, 68:7, 68:11, 68:18, 68:21, 72:10, 73:21, 74:16, 74:25, 75:21, 76:8, 77:24, 79:4, 80:4, 81:8, 81:21, 83:20, 84:5, 94:24, 96:4
readable [2] - 13:16, 13:17
reader [1] - 75:19
readily [2] - 7:21, 19:14
reading [6] - 27:24, 37:18, 54:7, 60:1, 64:9, 68:21
ready [3] - 2:15, 48:10, 76:23
real [3] - 92:15, 97:19, 100:3
really [6] - 9:21, 33:24, 64:14, 105:19, 105:20, 106:8
reason [4] - 36:20, 103:21, 104:5, 104:19
reasons [2] - 30:6, 83:4
receive [2] - 28:20, 34:24
receiver [1] - 105:16
receiving [1] - 103:22
recess [1] - 49:3
recipient [1] - 34:23
recitation [1] - 77:12
recognize [4] - 23:15, 25:17, 47:21, 92:22
recollection [4] - 77:8, 77:13, 77:20, 77:25
record [5] - 45:20, 45:22, 46:9, 96:15, 106:10
records [15] - 22:9, 22:11, 55:14, 61:23, 62:1, 62:6, 62:16, 62:19, 63:1, 69:25, 74:8, 86:7, 86:21, 89:15, 94:14
recovered [2] - 15:7, 51:2
recycle [1] - 68:15
recycling [2] - 92:13, 92:14
redact [2] - 32:20, 95:22

redacted [1] - 32:25
**Reddit** [8] - 65:6, 65:7, 65:12, 65:24, 66:12, 66:17, 75:4, 75:21
**Reddit.com** [1] - 75:4
**redundancy** [1] - 69:7
**redundant** [1] - 69:5
**refer** [1] - 15:13
**reference** [9] - 9:22, 15:9, 49:23, 51:5, 85:6, 95:20, 102:10, 103:10, 104:5
**referenced** [2] - 69:8, 76:15
**references** [17] - 17:15, 20:20, 42:21, 43:22, 44:1, 50:3, 53:20, 58:19, 58:22, 58:23, 59:5, 59:8, 60:25, 83:14, 94:20, 100:6
**referencing** [4] - 3:21, 24:8, 37:8, 50:2
**referred** [1] - 7:2
**referring** [2] - 9:24, 24:6
**refers** [1] - 67:10
**reflect** [4] - 14:7, 46:20, 93:4, 101:22
**reflection** [4] - 7:8, 14:4, 20:4, 21:23
**refresh** [2] - 77:8, 77:12
**refreshed** [1] - 77:25
**refreshes** [1] - 77:20
**regard** [2] - 45:14, 47:4
**regarding** [6] - 20:21, 21:24, 30:25, 79:5, 79:25, 89:21
**regardless** [1] - 77:6
**regards** [1] - 31:23
**register** [2] - 28:12, 79:10
**registration** [1] - 79:15
**regular** [1] - 27:8
**reinstall** [1] - 54:14
**related** [6] - 6:23, 21:11, 21:19, 40:23, 50:2, 75:25
**relating** [1] - 48:18
**relation** [1] - 71:13
**relations** [1] - 106:5
**relevance** [11] - 26:2, 67:2, 67:4, 67:5, 80:14, 87:1, 88:25, 102:14, 103:25, 105:19, 105:23
**relevant** [1] - 103:11
**relied** [1] - 45:23

**remember** [9] - 71:14, 77:3, 78:11, 86:15, 88:10, 90:4, 91:25, 93:2
**remind** [3] - 5:11, 51:9, 85:15
**remote** [16] - 40:11, 41:12, 41:25, 42:1, 42:2, 42:6, 42:11, 42:12, 51:10, 53:6, 56:1, 56:5, 57:4, 60:15, 60:17, 82:25
**remotely** [7] - 41:16, 42:14, 42:19, 51:21, 59:2, 60:23, 83:1
**remoting** [1] - 42:4
**Remove** [1] - 68:4
**remove** [4] - 9:22, 68:5, 68:15, 85:4
**removing** [2] - 36:24, 69:19
**renamed** [1] - 4:15
**rendered** [1] - 45:20
**rendezvous** [4] - 28:19, 28:20, 28:23, 29:11
**rendmid.c** [1] - 30:9
**repeat** [1] - 69:7
**repeated** [1] - 42:21
**rephrase** [1] - 78:19
**replicable** [1] - 10:9
**replicating** [1] - 7:1
**report** [2] - 11:15, 11:16
**reporter** [1] - 29:1
**repost** [1] - 75:23
**representations** [1] - 56:13
**represented** [1] - 3:2
**represents** [1] - 3:15
**request** [2] - 29:19, 38:17
**requests** [2] - 38:14, 89:21
**require** [1] - 106:4
**requires** [1] - 81:25
**research** [7] - 45:6, 46:13, 48:18, 53:10, 72:8, 83:8, 83:18
**researching** [2] - 79:21, 86:7
**residential** [3] - 47:14, 53:13, 53:18
**resistance** [1] - 67:22
**resolutions** [1] - 47:11
**resolve** [2] - 46:10, 95:2
**resolving** [2] - 47:13, 55:11
**resources** [2] - 61:20,

84:4
**respect** [1] - 75:18
**response** [2] - 63:9, 89:20
**responsible** [1] - 7:11
**rest** [3] - 9:15, 77:6, 103:20
**Restart** [1] - 60:12
**restart** [1] - 60:13
**restriction** [1] - 28:16
**restroom** [1] - 97:6
**result** [2] - 5:2, 5:8
**resulting** [2] - 14:3, 19:19
**retention** [1] - 55:13
**Retreat** [1] - 86:13
**retrieve** [3] - 12:22, 19:6, 21:18
**retrieved** [16] - 7:7, 16:6, 16:21, 17:10, 18:2, 20:5, 21:24, 24:11, 27:18, 43:3, 44:22, 45:4, 95:7, 100:16, 101:22, 102:8
**retrieving** [2] - 6:20, 101:18
**return** [5] - 2:4, 59:25, 67:17, 93:24, 94:1
**returning** [2] - 74:3, 78:12
**reversing** [1] - 83:6
**review** [52] - 2:20, 6:24, 7:14, 8:25, 10:11, 10:14, 12:18, 12:19, 12:23, 13:5, 13:10, 13:19, 14:12, 15:13, 17:7, 17:11, 18:12, 20:23, 24:21, 24:24, 25:13, 27:17, 30:2, 33:25, 34:3, 39:12, 55:20, 56:3, 61:23, 62:11, 62:15, 62:16, 62:19, 64:4, 65:7, 74:19, 76:10, 77:8, 80:7, 86:7, 88:6, 88:8, 89:15, 90:2, 90:6, 90:14, 91:8, 100:11, 101:15, 102:19, 106:21, 106:25
**reviewed** [8] - 11:18, 14:7, 27:21, 62:5, 73:12, 90:18, 93:5, 103:5
**reviewing** [12] - 6:6, 7:25, 11:1, 22:9, 77:11, 84:10, 88:10, 90:4, 90:11, 101:18, 102:19, 102:25
**right-hand** [1] - 94:2
**risks** [1] - 83:10

**Roman** [3] - 63:13, 63:17, 90:1
**Romania** [4] - 89:16, 90:8, 94:4, 94:14
**Romanian** [3] - 89:20, 90:2, 93:5
**Romanians** [1] - 90:6
**romantic** [5] - 104:14, 105:13, 106:5, 106:6, 106:23
**root** [6] - 27:2, 27:3, 27:4, 27:5, 43:20, 49:22
**rotation** [1] - 28:14
**route** [2] - 78:9, 97:25
**router** [7] - 38:3, 38:5, 38:11, 38:16, 38:20, 39:1, 98:4
**Rovensky** [1] - 62:5
**Rovensky's** [1] - 62:2
**row** [1] - 63:10
**run** [11] - 5:5, 25:12, 26:22, 31:14, 34:7, 40:14, 40:25, 44:13, 51:19, 61:21, 85:13
**running** [14] - 7:19, 7:24, 38:12, 38:23, 40:6, 40:14, 41:4, 51:7, 51:8, 60:22, 66:10, 84:3, 84:4, 84:8
**Russia** [1] - 96:7
**Russian** [2] - 71:19, 73:4

## S

**safe** [8] - 20:1, 20:6, 34:14, 63:23, 81:9, 81:10, 81:18, 82:3
**Sam** [2] - 76:8, 76:9
**sample** [1] - 98:21
**Samsung** [1] - 21:15
**satisfy** [2] - 105:14, 106:7
**save** [2] - 35:17, 41:7
**saved** [5] - 8:19, 18:22, 24:2, 25:8, 91:20
**saw** [3] - 46:10, 46:22, 85:16
**scans** [1] - 9:11
**Scholl** [1] - 24:23
**Scholl's** [1] - 22:3
**scrapes** [1] - 88:20
**screen** [16] - 4:12, 4:18, 4:24, 5:18, 26:6, 42:7, 45:10, 46:22, 47:8, 54:3, 58:11, 60:14, 61:4, 74:18, 88:16, 101:13

**screenshot** [4] - 46:18, 92:25, 101:4, 102:11

**screenshots** [5] - 13:25, 14:2, 102:24, 103:4, 104:25

**script** [11] - 44:8, 44:11, 44:12, 44:16, 44:18, 45:3, 45:13, 47:24, 48:3, 51:8, 52:4

**scroll** [11] - 34:18, 35:15, 47:7, 54:2, 59:14, 72:10, 84:25, 89:4, 93:13, 93:25, 96:3

**scrolled** [1] - 92:19

**scrolling** [7] - 36:22, 47:10, 50:12, 59:19, 68:10, 79:3, 80:3

**SD** [2] - 2:24, 25:5

**search** [1] - 26:17

**searchable** [1] - 7:20

**searched** [1] - 68:1

**seated** [2] - 2:13, 49:5

**second** [10] - 15:9, 32:5, 32:7, 32:9, 33:10, 33:17, 51:23, 91:11, 96:12, 102:1

**secondary** [1] - 97:21

**section** [27] - 4:25, 27:23, 28:5, 30:7, 30:17, 31:15, 32:18, 34:1, 35:20, 39:25, 50:2, 60:11, 61:8, 61:10, 64:11, 64:12, 64:16, 64:20, 65:2, 65:3, 68:11, 75:5, 79:3, 80:4, 81:8, 83:21

**sections** [4] - 52:12, 69:8, 81:13, 81:17

**secure** [7] - 26:24, 37:14, 38:24, 38:25, 40:5, 51:10, 65:4

**securitylab.ru** [1] - 72:15

**see** [38] - 4:20, 5:1, 8:1, 8:5, 8:7, 8:12, 8:18, 8:21, 9:1, 9:8, 9:16, 13:14, 14:23, 18:21, 28:23, 39:2, 41:20, 42:6, 47:18, 47:19, 49:2, 51:25, 68:16, 74:9, 87:1, 88:11, 89:12, 90:15, 92:12, 92:18, 93:13, 99:16, 99:19, 99:21, 101:8, 102:13, 104:18

**seeing** [1] - 51:24

**seek** [1] - 95:13

**sees** [1] - 104:16

**seizable** [1] - 76:9

**seize** [2] - 77:5, 78:15

**seized** [3] - 10:12, 21:8, 25:1

**Seized** [1] - 75:23

**seizure** [2] - 75:24, 76:1

**seizures** [2] - 76:5, 78:8

**self** [1] - 12:4

**self-evident** [1] - 12:4

**semi** [5] - 79:7, 79:13, 79:14, 79:19, 79:22

**semi-anonymous** [4] - 79:7, 79:13, 79:14, 79:22

**semi-anonymously** [1] - 79:19

**send** [1] - 38:3

**sender** [2] - 103:25, 105:15

**sending** [1] - 37:16

**sense** [5] - 10:21, 23:6, 36:13, 78:9, 102:16

**sent** [3] - 28:14, 101:19, 103:23

**sentence** [3] - 64:17, 64:20, 81:21

**separate** [2] - 16:17, 83:5

**series** [2] - 15:24, 71:2

**serious** [1] - 105:24

**served** [1] - 67:24

**server** [38] - 26:25, 27:1, 27:7, 30:16, 38:20, 38:24, 38:25, 39:22, 40:5, 40:13, 41:13, 44:17, 45:15, 48:4, 53:8, 53:18, 54:16, 57:8, 57:14, 57:18, 57:21, 58:1, 58:2, 58:18, 61:11, 61:21, 69:3, 78:10, 90:13, 90:16, 90:25, 91:2, 91:4, 92:11, 92:13, 92:14, 94:10, 99:13

**server's** [1] - 27:15

**servers** [17] - 37:15, 41:21, 42:19, 48:7, 55:20, 59:3, 61:19, 62:12, 62:16, 67:24, 69:11, 89:15, 89:16, 90:11, 91:19, 94:4, 94:9

**serves** [1] - 29:12

**Service** [1] - 64:17

**service** [24] - 28:12, 28:17, 28:18, 29:13, 30:15, 32:1, 32:2, 38:3, 38:5, 38:10, 38:13, 38:14, 38:22, 38:23, 38:24, 39:3, 39:7, 39:9, 47:22, 64:18, 86:25, 91:1, 91:16

**services** [16] - 28:6, 28:8, 28:11, 28:14, 28:20, 29:11, 29:15, 29:19, 29:25, 31:23, 41:24, 43:20, 70:1, 72:12, 74:5, 87:14

**set** [19] - 3:3, 33:18, 35:1, 35:22, 35:24, 37:14, 39:2, 40:5, 42:13, 50:17, 51:13, 53:6, 57:14, 57:17, 57:25, 58:9, 79:6, 82:24

**Setting** [1] - 81:22

**setting** [7] - 57:16, 69:10, 81:23, 81:24, 81:25, 82:6, 82:12

**settings** [3] - 68:24, 69:1, 84:15

**Settings** [3] - 61:3, 64:8, 80:2

**setup** [1] - 69:23

**seventh** [1] - 68:3

**several** [3] - 18:15, 33:25, 47:13

**sexual** [1] - 105:10

**SHA1** [1] - 6:16

**SHA256** [4] - 5:7, 5:9, 5:16, 6:12

**shake** [1] - 97:7

**shall** [1] - 79:6

**share** [1] - 41:17

**shell** [3] - 26:24, 40:5, 51:10

**Shields** [1] - 80:6

**Shit** [1] - 59:20

**shit** [3] - 54:10, 59:18, 95:1

**Shormint** [2] - 85:20, 86:5

**short** [3] - 26:24, 64:21, 64:22

**shortly** [1] - 49:2

**show** [10] - 13:6, 14:9, 20:18, 44:24, 54:3, 61:10, 69:6, 69:19, 87:5

**showed** [3] - 85:17, 98:20, 103:5

**showing** [13] - 10:24, 15:20, 21:21, 22:14, 23:14, 25:15, 42:25, 43:19, 62:22, 62:25, 89:18, 98:6, 101:21

**shown** [39] - 4:8, 4:24, 5:17, 11:4, 12:10, 13:24, 15:25, 19:13, 23:2, 26:7, 26:18, 44:15, 44:20, 45:19, 46:8, 46:17, 47:4, 47:8, 47:10, 49:25, 50:14, 51:12, 52:16, 52:23, 57:6, 61:8, 63:9, 63:16, 65:22, 75:10, 76:10, 76:13, 87:12, 87:15, 89:5, 89:19, 93:5, 101:3

**shows** [3] - 27:15, 30:3, 30:4

**sic** [2] - 18:5, 72:5

**signaled** [2] - 30:9, 48:22

**signature** [1] - 30:9

**significance** [2] - 69:16, 93:14

**significant** [5] - 27:5, 27:13, 30:1, 82:14, 85:6

**silly** [1] - 105:22

**SIM** [8] - 15:9, 97:24, 98:25, 99:1, 99:3, 99:20, 99:25

**similar** [1] - 99:21

**similarly** [1] - 58:14

**simple** [2] - 12:14, 79:17

**simplistic** [1] - 53:2

**simply** [2] - 45:2, 54:10

**simultaneously** [1] - 38:3

**sit** [1] - 96:23

**site** [15] - 27:2, 27:8, 27:9, 35:9, 38:18, 40:21, 66:6, 66:10, 67:25, 78:8, 83:8, 91:6, 91:18, 104:1

**sites** [3] - 29:11, 81:18, 88:21

**sitting** [2] - 8:1, 9:23

**situation** [1] - 21:22

**six** [1] - 55:16

**skimming** [1] - 77:15

**slow** [1] - 28:21

**slower** [1] - 28:22

**slowly** [1] - 77:14

**small** [1] - 6:2

**smaller** [1] - 56:12

**smoothly** [1] - 31:4

**sniff** [5] - 28:3, 28:10, 28:11, 28:16, 28:18

**sniffing** [2] - 29:2, 35:10

**snippet** [1] - 103:14

**software** [16] - 18:19, 18:20, 19:15, 50:15, 50:22, 56:5, 56:11, 56:12, 61:18, 62:18, 63:21, 68:5, 91:9, 91:10, 91:12, 91:13

**sold** [1] - 67:8

**SolusVM** [3] - 61:14, 61:15, 61:17

**solution** [2] - 82:1, 82:3

**solutions** [1] - 65:4

**someone** [11] - 8:1, 27:8, 35:6, 36:10, 40:20, 40:21, 40:24, 42:3, 49:18, 83:4, 99:21

**sometimes** [12] - 6:21, 8:23, 9:1, 9:8, 9:20, 10:17, 10:21, 41:11, 55:1, 66:3, 83:6, 93:19

**somewhat** [1] - 40:23

**somewhere** [4] - 23:5, 38:4, 79:8

**sorry** [8] - 32:8, 58:10, 67:3, 71:11, 77:14, 86:14, 94:12, 96:12

**sort** [11] - 18:18, 21:15, 38:21, 39:7, 45:22, 47:16, 50:7, 60:22, 63:21, 94:24, 95:1

**sorts** [6] - 9:14, 10:13, 10:18, 26:15, 36:25, 37:1

**sought** [1] - 86:21

**sound** [3] - 10:3, 10:7, 60:13

**source** [2] - 31:1, 31:10

**sources** [3] - 46:10, 85:17, 99:20

**space** [1] - 92:25

**speaker** [1] - 104:24

**speaking** [2] - 89:5, 105:1

**special** [1] - 10:22

**Special** [7] - 2:8, 15:19, 62:2, 62:5, 96:9, 96:23, 100:10

**specific** [7] - 5:6, 36:12, 46:18, 68:11, 75:5, 89:9, 89:21

**Specific** [1] - 39:11

**specifically** [3] - 15:10, 87:6, 88:21

**specifies** [1] - 26:25

**specify** [1] - 53:7

**speculation** [1] - 66:17

**speeder** [4] - 54:8, 54:9, 54:17, 54:19

**speeds** [1] - 64:24

**SpiderOak** [19] - 62:17, 62:18, 62:20, 63:1, 63:17, 63:19, 63:25, 64:5, 64:12, 64:13, 64:14, 64:19, 64:23, 65:5, 66:20, 67:20, 67:23, 68:5, 69:17

**SpiderOak's** [5] - 65:25, 66:13, 66:16, 67:24

**split** [2] - 34:11, 99:24

**spoken** [1] - 6:17

**spots** [1] - 51:16

**spreadsheet** [6] - 11:5, 11:10, 11:14, 19:21, 20:12, 24:5

**spying** [1] - 34:9

**SQL** [1] - 13:13

**SSH** [13] - 26:23, 39:22, 40:1, 40:2, 40:6, 40:8, 44:16, 45:13, 51:9, 68:23, 69:21, 82:2

**SSHuser** [2] - 44:17, 45:16

**staged** [1] - 41:12

**stages** [1] - 81:2

**stand** [2] - 41:25, 96:21

**standards** [1] - 3:4

**start** [2] - 54:7, 83:23

**started** [1] - 83:25

**starting** [17] - 5:3, 30:17, 34:16, 35:14, 36:5, 39:16, 59:21, 68:3, 68:12, 72:11, 74:25, 76:8, 81:8, 81:22, 83:21, 85:1, 96:1

**starts** [5] - 33:11, 37:12, 60:12, 74:16, 83:23

**statement** [1] - 65:17

**statements** [1] - 102:5

**Status** [2] - 30:7, 30:8

**staying** [2] - 32:4, 66:9

**stays** [1] - 66:5

**sterlingov** [2] - 105:1, 105:3

**Sterlingov** [7] - 27:24, 63:13, 63:17, 90:1, 103:22, 104:24, 105:6

**Sterlingov's** [3] - 24:2, 88:17, 105:10

**still** [14] - 7:8, 8:18, 9:23, 14:3, 16:16,

32:11, 32:15, 40:2, 41:16, 76:17, 79:14, 79:20, 82:10, 105:19

**stipulate** [1] - 17:25

**stipulated** [1] - 86:21

**stolen** [1] - 37:7

**stop** [1] - 64:18

**stops** [1] - 66:6

**storage** [8] - 2:24, 10:20, 15:1, 15:8, 19:5, 25:5, 41:11, 41:19

**store** [3] - 21:18, 35:21, 41:15

**stored** [3] - 10:2, 23:5, 30:10

**straightforwardly** [1] - 79:9

**stretch** [2] - 97:1, 97:5

**string** [2] - 3:14, 5:3

**strong** [1] - 106:8

**structure** [2] - 11:8, 12:11

**sub** [4] - 39:25, 65:24, 66:17, 75:4

**sub-bullet** [1] - 39:25

**sub-Reddit** [3] - 65:24, 66:17, 75:4

**subdomain** [6] - 45:7, 45:10, 45:14, 45:16, 47:25, 57:10

**subheading** [1] - 27:25

**subject** [3] - 16:4, 72:2, 95:16

**subpoena** [1] - 63:9

**subsection** [1] - 68:14

**subset** [2] - 11:18, 34:7

**substantive** [1] - 14:8

**suggest** [1] - 27:6

**suggestions** [1] - 38:9

**suggests** [3] - 40:10, 85:11, 104:20

**summaries** [3] - 32:15, 32:25, 33:1

**summarize** [3] - 11:17, 22:11, 22:18

**summary** [7] - 11:23, 22:15, 32:14, 32:18, 32:20, 95:21

**support** [3] - 41:3, 64:23, 91:5

**supposed** [1] - 54:12

**surface** [1] - 80:22

**surrounding** [1] - 53:19

**surveillance** [2] - 79:25, 81:5

**Sweden** [6] - 48:5, 48:7, 53:13, 53:19,

54:13, 55:9

**Swedish** [5] - 53:18, 55:11, 55:14, 55:17, 61:1

**switch** [10] - 54:15, 64:19, 81:24, 82:4, 82:5, 82:6, 82:9, 82:11, 82:16, 82:21

**switches** [1] - 82:15

**synced** [1] - 50:11

**system** [9] - 12:5, 15:6, 35:16, 37:15, 50:16, 51:16, 56:15, 69:20, 83:9

**systems** [2] - 5:23, 83:5

## T

**tab** [1] - 63:14

**table** [3] - 29:14, 45:20, 85:17

**tablet** [6] - 101:16, 101:23, 102:19, 102:22, 102:25, 103:14

**takedown** [1] - 76:3

**tap** [1] - 99:11

**target** [1] - 99:7

**target's** [1] - 99:6

**TCP** [1] - 33:14

**td1** [1] - 57:10

**TD1** [4] - 45:7, 45:10, 47:23, 47:25

**td1.hopto** [1] - 58:16

**TD1.hopto.org** [1] - 47:20

**td1.ignorelist** [1] - 57:18

**TD1.ignorelist.com** [3] - 44:17, 46:10, 47:20

**td1.ignorelist.com** [3] - 57:9, 57:15, 58:1

**team** [6] - 17:16, 24:20, 48:6, 55:10, 56:22, 62:11

**Tech** [1] - 39:11

**technical** [4] - 29:9, 52:22, 53:2, 97:19

**techniques** [2] - 37:4, 37:6

**tele2** [2] - 47:18, 53:14

**Tele2** [1] - 47:6

**temp** [2] - 37:1, 95:4

**ten** [3] - 48:15, 83:24

**tend** [2] - 69:8, 80:25

**term** [2] - 10:6, 27:4

**terminal** [3] - 26:11, 26:13, 41:24

**terms** [10] - 7:18, 9:2, 29:9, 40:4, 42:2, 44:2,

45:12, 52:21, 71:7, 78:20
**testified** [4] - 12:7, 24:24, 45:21, 84:9
**testify** [1] - 16:5
**testifying** [1] - 16:20
**testimony** [5] - 3:24, 16:19, 22:3, 62:2, 98:8
**text** [23] - 4:9, 5:20, 6:2, 13:15, 14:12, 17:5, 28:9, 31:9, 33:25, 34:3, 44:25, 45:1, 45:3, 54:2, 64:17, 68:10, 74:25, 76:16, 93:1, 96:3, 103:22, 103:25
**texts** [1] - 102:12
**THE** [134] - 2:2, 2:3, 2:4, 2:9, 2:12, 2:14, 4:3, 4:5, 11:22, 11:24, 16:1, 16:9, 16:14, 16:22, 16:25, 18:3, 18:5, 18:10, 20:10, 20:15, 22:4, 22:6, 22:22, 22:24, 23:22, 23:24, 24:14, 24:16, 26:1, 26:3, 28:21, 29:6, 31:20, 32:8, 33:3, 33:8, 39:17, 39:20, 39:21, 40:19, 43:8, 43:13, 46:3, 46:5, 46:24, 47:1, 48:10, 48:14, 48:21, 49:2, 49:5, 49:7, 53:25, 57:23, 62:8, 63:4, 63:6, 65:15, 65:19, 66:25, 67:3, 67:5, 67:15, 70:8, 70:18, 70:19, 70:24, 71:3, 71:8, 71:11, 71:14, 72:1, 72:4, 72:23, 72:25, 73:16, 73:18, 75:14, 75:17, 76:15, 76:20, 76:23, 77:18, 77:21, 77:23, 78:1, 78:2, 78:19, 80:17, 85:10, 85:25, 86:18, 87:7, 87:24, 88:1, 88:24, 89:1, 91:23, 92:9, 93:8, 93:10, 94:7, 94:11, 95:10, 95:15, 95:18, 95:24, 96:12, 96:14, 96:18, 96:25, 97:4, 97:8, 97:10, 98:12, 98:14, 99:18, 100:21, 100:23, 102:3, 102:6, 102:15, 103:17, 103:19, 104:3, 104:15, 104:18, 105:2, 105:11, 105:21, 106:2, 106:13, 106:17, 106:19
**themselves** [2] -

28:13, 31:12
**theoretically** [3] - 34:13, 35:8, 81:6
**therefore** [1] - 38:4
**therest.onion** [1] - 27:7
**thinking** [2] - 29:23, 104:22
**third** [6] - 74:25, 80:4, 92:2, 92:11, 92:12, 92:25
**thousands** [1] - 6:1
**thread** [3] - 66:13, 75:21, 76:18
**three** [6] - 28:12, 48:15, 48:16, 68:18, 90:19, 94:10
**thumb** [5] - 15:1, 17:18, 18:2, 19:5, 19:7
**ticket** [1] - 59:25
**tickets** [1] - 59:20
**tied** [1] - 63:17
**tiger** [1] - 57:12
**TigerVNC** [4] - 57:7, 57:13, 57:14, 58:6
**timeline** [2] - 8:11, 9:1
**title** [3] - 73:21, 75:21, 80:4
**titled** [2] - 52:15, 86:12
**TLDs** [1] - 78:25
**to-do** [3] - 60:9, 60:11, 68:11
**today** [4] - 70:12, 70:21, 71:4, 97:3
**together** [3] - 18:19, 69:4, 91:5
**took** [1] - 9:4
**tool** [8] - 7:19, 7:22, 7:24, 9:11, 12:25, 46:10, 46:18, 53:5
**tools** [6] - 9:13, 14:1, 45:20, 47:12, 56:1, 83:7
**top** [5] - 27:25, 34:19, 78:25, 83:20, 94:2
**top-level** [1] - 78:25
**topic** [2] - 40:23, 48:11
**topics** [1] - 17:16
**Tor** [46] - 25:1, 26:20, 26:22, 27:23, 27:25, 28:6, 28:7, 29:12, 29:14, 29:16, 29:18, 29:24, 30:3, 30:6, 30:14, 30:15, 30:16, 31:5, 31:6, 31:15, 31:18, 31:22, 33:11, 33:12, 33:18, 34:6, 34:12, 34:21, 35:2, 36:17, 38:14, 40:1, 40:2, 40:8, 40:12,

43:19, 50:13, 50:17, 50:18, 56:20, 85:3, 85:13, 101:8
**Tor-like** [2] - 33:11, 33:12
**Tor-SSH** [3] - 40:1, 40:2, 40:8
**Torproject.org/docs/ debian.HTML.en** [1] - 30:25
**torrent** [1] - 39:9
**torrenting** [1] - 38:13
**torsocks** [1] - 26:20
**Torsocks** [1] - 26:21
**totally** [1] - 33:15
**TP** [1] - 97:22
**traces** [3] - 36:24, 37:9, 69:20
**track** [4] - 11:7, 11:15, 28:7, 29:16
**tracked** [1] - 82:20
**traffic** [14] - 29:19, 34:10, 37:22, 38:10, 39:3, 39:5, 39:6, 41:3, 58:9, 98:1, 99:7, 99:9, 99:13
**trainings** [1] - 3:4
**transaction** [1] - 24:3
**transactions** [2] - 86:2, 91:17
**translate** [1] - 32:19
**translated** [7] - 17:7, 17:11, 27:17, 27:21, 60:5, 73:11, 95:6
**translation** [6] - 16:16, 39:12, 70:11, 71:20, 71:21, 73:6
**translations** [4] - 16:10, 16:24, 17:1, 32:11
**translators** [4] - 15:23, 32:19, 73:7, 73:10
**travel** [1] - 59:14
**traveling** [1] - 55:3
**trial** [2] - 13:7, 15:15
**tried** [1] - 13:15
**trip** [2] - 60:9, 60:21
**troubleshooting** [3] - 55:7, 84:18, 100:7
**true** [1] - 6:6
**trusted** [3] - 34:8, 67:6
**trusts** [1] - 67:22
**trustworthy** [3] - 66:18, 66:22, 66:23
**truth** [1] - 86:24
**try** [6] - 33:1, 35:8, 45:9, 81:1, 82:1, 90:15
**trying** [11] - 35:6, 35:10, 53:4, 82:3, 84:18, 98:18, 98:22,

99:14, 103:19, 104:19, 105:8
**TSV** [1] - 19:21
**tunnel** [3] - 44:2, 44:7, 82:2
**turn** [5] - 9:20, 10:11, 56:16, 60:14, 61:4
**turned** [3] - 44:25, 74:8, 82:9
**turning** [2] - 40:23, 82:21
**two** [11] - 7:20, 28:1, 37:18, 42:13, 44:3, 49:15, 50:9, 51:16, 58:22, 91:4, 94:25
**type** [12] - 10:15, 13:25, 17:22, 25:9, 35:10, 48:18, 54:22, 57:4, 58:17, 91:9, 92:18
**typed** [1] - 26:10
**types** [11] - 2:23, 2:25, 3:15, 7:3, 7:23, 8:14, 10:22, 13:9, 41:21, 69:4, 69:6
**typically** [1] - 69:10

## U

**U.S** [4] - 75:23, 77:5, 78:7, 78:15
**ubuntu** [1] - 30:19
**UDP** [6] - 54:8, 54:9, 54:17, 54:19, 54:22, 55:7
**uilding** [1] - 31:1
**ultimate** [1] - 81:4
**unauthorized** [1] - 37:22
**uncertainty** [1] - 91:24
**Uncle** [1] - 76:8
**uncle** [1] - 76:9
**unclear** [1] - 79:9
**unconditionally** [1] - 39:17
**under** [18] - 27:23, 27:25, 30:7, 31:15, 31:17, 32:5, 47:10, 50:5, 50:10, 59:19, 60:11, 61:3, 61:9, 61:14, 64:10, 64:17, 65:2, 84:14
**underground** [1] - 42:24
**underneath** [2] - 59:21, 59:22
**understood** [2] - 78:24, 80:23
**unique** [2] - 3:13, 36:11

units [1] - 55:3
unknown [1] - 81:11
unlock [1] - 18:20
unmount [4] - 51:23, 52:1, 52:4, 52:7
unmounted [1] - 50:7
unmounts [1] - 52:7
unnecessarily [1] - 106:9
unreadable [1] - 35:22
unusual [1] - 36:14
up [80] - 2:8, 3:20, 8:6, 8:17, 14:17, 14:23, 19:3, 20:1, 20:2, 24:7, 25:9, 31:21, 33:18, 37:14, 39:2, 39:11, 39:23, 40:5, 41:4, 42:13, 43:2, 43:16, 44:14, 44:21, 44:24, 45:1, 46:12, 46:15, 47:10, 49:11, 50:11, 50:23, 51:11, 52:9, 53:6, 53:23, 53:25, 54:3, 57:5, 57:16, 57:17, 57:25, 58:5, 59:12, 59:24, 60:3, 61:3, 62:9, 63:22, 64:1, 64:13, 64:18, 66:5, 68:10, 69:10, 70:6, 76:19, 76:25, 77:10, 79:7, 81:22, 81:23, 82:24, 85:18, 85:23, 86:1, 88:13, 91:24, 92:17, 92:21, 93:25, 96:7, 96:21, 96:22, 96:23, 97:18, 97:24, 98:19, 103:17, 104:2
up-to-date [1] - 66:5
update [2] - 28:19, 65:25
updated [2] - 8:13, 66:6
updating [1] - 66:9
Upgrade [1] - 39:16
upgrade [1] - 39:22
UPS [1] - 54:14
usages [1] - 82:20
USB [4] - 15:1, 16:12, 19:5, 60:6
user [28] - 9:8, 18:21, 20:19, 25:21, 26:10, 27:1, 27:8, 27:10, 31:11, 34:6, 34:13, 36:15, 37:16, 40:13, 40:24, 42:6, 44:17, 45:16, 49:17, 49:19, 49:21, 63:12, 67:6, 67:7, 90:15, 93:17, 98:18
user's [2] - 25:9, 67:6

users [6] - 49:17, 61:18, 61:21, 64:13, 76:2, 90:15
uses [1] - 74:9
utility [1] - 54:21

## V

vague [5] - 31:19, 40:16, 67:1, 78:17, 91:21
value [8] - 5:3, 5:10, 5:17, 5:21, 5:22, 6:3, 21:18, 66:3
values [4] - 3:18, 3:24, 6:4, 6:5
variety [1] - 26:14
various [6] - 17:15, 20:19, 37:5, 44:1, 55:11, 103:5
vault [7] - 18:17, 18:18, 18:20, 19:9, 19:12, 19:16, 51:2
vaults [2] - 18:15, 19:7
verbatim [1] - 32:19
verification [2] - 6:9, 12:16
verified [1] - 79:18
Verify [1] - 60:15
verify [2] - 3:9, 60:17
VeriSign [1] - 78:8
version [6] - 31:7, 31:13, 45:3, 60:5, 62:23, 73:11
vetted [1] - 79:16
via [3] - 76:3, 78:9, 98:23
videos [1] - 41:20
view [6] - 8:12, 13:18, 42:14, 72:15, 73:6, 106:8
viewable [1] - 50:8
viewed [2] - 31:15, 45:23
viewer [5] - 13:14, 42:11, 42:12, 76:18, 92:18
Viewer [1] - 57:1
viewing [1] - 9:7
Virtual [1] - 83:21
virtual [14] - 56:7, 56:9, 56:10, 61:18, 82:23, 82:24, 83:1, 83:2, 83:4, 83:7, 83:8, 83:11, 83:15, 83:22
virtualization [2] - 56:11, 56:17
visible [2] - 38:15, 99:11
visit [1] - 75:6

visited [1] - 67:14
visiting [2] - 27:8, 40:21
visual [4] - 3:17, 3:21, 98:3, 98:7
VM [1] - 83:23
VMs [6] - 83:25, 84:2, 84:4, 84:5, 84:7, 84:8
VNC [6] - 41:22, 57:1, 57:3, 57:7, 58:15, 58:19
volume [1] - 52:11
VPN [31] - 37:20, 38:12, 39:7, 39:9, 54:15, 56:18, 73:22, 81:23, 82:6, 82:7, 82:11, 82:13, 82:18, 82:20, 82:22, 84:14, 84:19, 86:8, 86:13, 86:25, 87:3, 87:5, 87:13, 87:14, 87:20, 89:7, 90:23, 91:1, 91:6
VPNs [4] - 72:11, 72:12, 84:9, 84:11
VPS [3] - 30:11, 30:16, 61:15
VPSs [1] - 58:25
vulnerabilities [1] - 29:24

## W

walk [4] - 12:3, 90:20, 98:17, 101:1
walker [1] - 54:1
wallet [16] - 21:1, 21:3, 21:5, 21:6, 21:12, 21:19, 21:24, 22:10, 22:19, 24:20, 24:24, 68:8, 74:14, 74:16, 91:10, 100:12
wallets [2] - 20:24, 24:3
wants [3] - 36:16, 67:25, 105:11
warrant [10] - 65:25, 66:2, 66:3, 66:14, 66:16, 67:10, 67:11, 67:14, 67:24
warrants [1] - 67:22
watching [1] - 38:4
wave [3] - 80:11, 80:20, 81:3
wave-blocking [2] - 80:11, 80:20
Waves [1] - 80:6
waves [5] - 80:10, 80:22, 80:24, 81:2
Ways [2] - 93:1, 93:2
ways [7] - 9:15, 26:20,

28:12, 41:15, 41:22, 69:7, 69:10
web [1] - 61:13
website [10] - 40:24, 40:25, 41:4, 66:5, 76:3, 77:6, 79:6, 79:8, 87:18
websites [4] - 20:19, 75:25, 76:6, 89:8
weeds [1] - 53:1
welcome [1] - 49:7
whatsoever [1] - 79:10
whereas [1] - 41:5
whole [12] - 28:5, 31:15, 32:14, 35:22, 35:24, 52:10, 71:2, 83:24, 87:1, 90:15, 106:22
WiFi [2] - 81:10, 81:18
willing [2] - 17:24, 35:4
window [2] - 25:9, 101:5
windows [2] - 41:24, 83:22
wiping [1] - 93:21
Wired [2] - 76:10, 76:13
witness [5] - 2:4, 48:21, 71:8, 102:16
WITNESS [2] - 77:21, 78:1
wn [1] - 75:23
wn-center.com [1] - 75:23
woman [2] - 104:4, 104:8
women [4] - 104:12, 104:14, 105:13, 106:6
works [5] - 30:4, 40:2, 60:17, 80:16, 98:4
workstation [1] - 69:11
WPA [1] - 81:11
write [1] - 31:21
write-up [1] - 31:21
writer [1] - 98:8
writing [3] - 11:15, 29:4, 85:12

## X

X-Ways [2] - 93:1, 93:2
X2Go [3] - 42:8, 42:10, 42:16

## Y

year [1] - 55:15
yoga [3] - 32:19,

32:20, 32:22
**yourselves** [1] - 48:18

## Z

**zero** [2] - 68:15, 69:12
**zeroed** [1] - 93:15
**zeroing** [1] - 93:21
**zeros** [9] - 3:12, 69:13, 69:14, 69:15, 92:12, 92:20, 93:13, 93:16, 93:23
**zip** [1] - 7:6
**zoom** [3] - 47:7, 86:14, 101:6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

ROMAN STERLINGOV,

        Defendant.

_____/

Criminal Action
No. 1: 21-399

Washington, DC
February 29, 2024

9:38 a.m.

MORNING PROCEEDINGS

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:      CATHERINE PELKER
                    U.S. DEPARTMENT OF JUSTICE
                    950 Pennsylvania Ave NW
                    Washington, DC 20530

                    CHRISTOPHER BRODIE BROWN
                    DOJ-USAO
                    601 D Street, N.W.
                    Suite 5.1527
                    Washington, DC 20530

                    JEFFREY PEARLMAN
                    DOJ-CRM
                    Ccips
                    US Dept of Justice
                    1301 New York Ave NW
                    Washington, DC 20005

APPEARANCES CONTINUED ON NEXT PAGE

APPEARANCES CONTINUED

For the Defendant:      TOR EKELAND
MICHAEL HASSARD
TOR EKELAND LAW PLLC
30 Wall Street
8th Floor
Brooklyn, NY 10005


Court Reporter:      SHERRY LINDSAY
Official Court Reporter
U.S. District & Bankruptcy Courts
333 Constitution Avenue, NW
Room 6710
Washington, DC 20001

TABLE OF CONTENTS

WITNESSES

Valerie Mazars de Mazarin

Cross-examination by Mr. Ekeland 5
Redirect examination by Ms. Pelker 54

Theodore Vlahakis

Direct examination by Mr. Pearlman 71
Cross-examination by Mr. Ekeland 81
Redirect examination by Mr. Pearlman 84

Larry Harmon

Direct examination by Mr. Pearlman 85

EXHIBITS

Defense Exhibit 32 27
Government Exhibit 35B 78
Government Exhibit 45C 87
Government Exhibit 45D 89
Government Exhibits 46, 46A 100

P R O C E E D I N G S

THE COURT: All right. Anything before we get the jury?

MS. PELKER: No, Your Honor. Just if we need to call the case and enter our appearance.

THE COURT: We can call the case with the jury here. But, Mr. Ekeland.

MR. EKELAND: Yes, Your Honor. One small thing, yesterday it is my understanding that when Mr. Sterlingov was in court, somebody managed to gain access to his cell, we think by fooling the guard who was controlling the opening and closing of the gate. They stole all of his food. He has documents subject to protective order in this case in that cell. We are not aware if any of them were stolen. But Mr. Sterlingov wasn't able to do a complete review. But we just wanted to put on the record that somebody gained access without authorization to his cell yesterday.

And just to the extent that the Court does have any sway in these matters, if we could get him transferred over to CTF, we would appreciate that.

THE COURT: All right. Let's go ahead and get the jury.

(Jury in at 9:39 a.m.)

THE COURT: All right. Welcome back, members of the jury. And the witness can come back to the witness stand.

Is the government done?

MS. PELKER:  Yes, Your Honor.

THE COURT:  So it is your witness, Mr. Ekeland.

THE COURTROOM DEPUTY:  Criminal case 21-399, *United States versus Roman Sterlingov*.

Would counsel please approach the podium, state their name for the record starting with government counsel.

MS. PELKER:  Good morning, Your Honor.  Alden Pelker for the United States joined at counsel table by Christopher Brown and Jeff Pearlman.

THE COURT:  Okay.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for defendant, Roman Sterlingov, who is present in court.  And joining me at counsel table is Michael Hassard.

THE COURT:  All right.  Good morning.  And you can proceed when you are ready.

MR. EKELAND:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. EKELAND:

Q.   Good morning, Ms. Mazars.

A.   Good morning.

Q.   Are you ready?

A.   Yes.

Q.   When you searched Mr. Sterlingov's devices, you didn't find any of the private keys to the Bitcoin Fog cluster?