# 24-3161

## United States Court of Appeals for the District of Columbia

THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
Hon. Randolph D. Moss
United States District Court Case 1-21-cr-00399-RDM-1

## APPENDIX
### Volume XII of XVII (Pages Appx4841 - Appx5280)

TOR EKELAND, ESQ.
TOR EKELAND LAW PLLC
*Attorneys for Defendant-Appellant*
30 Wall Street, 8th Floor
New York, New York 10005
(718) 737-7264
tor@torekeland.com

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
*Attorneys for Defendant-Appellant*
800 Third Avenue, 20th Floor
New York, New York 10022
(212) 446-2346
maf@fernichlaw.com

MAKSIM NEMTSEV, ESQ.
MAKSIM NEMTSEV PC
*Attorneys for Defendant-Appellant*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
max@mnpc.law

AARON DANIEL, ESQ.
ASYMMETRIC LEGAL
*Attorneys for Defendant-Appellant*
11900 Biscayne Blvd, Suite 400
Miami, Florida 33181
(305) 979-9296
aaron@asymmetric.legal

*(See Inside Cover for Additional Counsel)*

3914



ELECTRONIC PARALEGAL

AMY C. COLLINS, ESQ.
THE LAW OFFICE OF
   AMY C. COLLINS
*Attorneys for Defendant-Appellant*
888 17th Street, NW, Suite 1200
Washington DC 20006
(228) 424-0609
amy@amyccollinslaw.com

# TABLE OF CONTENTS

District Court Docket – US v. Sterlingov, 21-CR-00399-RDM .............Appx001

Protective Order of Governing Discovery of Hon. Randolph D. Moss,
Dated September 17, 2021 (ECF Doc. No. 18) .....................................Appx074

Preliminary Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 336) .....................................Appx079

Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 14, 2024 (ECF Doc. No. 338) ...................................Appx085

Judgment in a Criminal Case of Hon. Randolph D. Moss,
Dated November 13, 2024 (ECF Doc. No. 340) ...................................Appx091

Transcript of Motion Hearing, Dated January 13, 2023
(ECF Doc. No. 114) ............................................................................Appx099

Transcript of Motion Hearing, Dated January 31, 2023
(ECF Doc. No. 115) ............................................................................Appx190

Transcript of Motions Hearing, Dated June 16, 2023
(ECF Doc. No. 223) ............................................................................Appx345

Transcript of Motions Hearing, Dated June 23, 2023
(ECF Doc. No. 224) ............................................................................Appx501

Transcript of Motions Hearing, Dated July 19, 2023
(ECF Doc. No. 225) ............................................................................Appx682

Transcript of Continued Motions Hearing, Dated July 20, 2023
(ECF Doc. No. 226) ............................................................................Appx895

Transcript of Motions Hearing, Dated August 22, 2023
(ECF Doc. No. 228) ..........................................................................Appx1040

Transcript of Continued Motions Hearing, Dated August 23, 2023
(ECF Doc. No. 229) ..........................................................................Appx1266

Transcript of Motions Hearing, Dated August 29, 2023
(ECF Doc. No. 231) ..........................................................................Appx1466

Transcript of Pretrial Conference, Dated September 7, 2023
(ECF Doc. No. 232) ...................................................................Appx1524

Transcript of Pretrial Conference, Dated September 8, 2023
(ECF Doc. No. 233) ...................................................................Appx1741

Transcript of Pretrial Conference, Dated September 13, 2023
(ECF Doc. No. 234) ...................................................................Appx1861

Transcript of Pretrial Conference, Dated September 15, 2023
(ECF Doc. No. 235) ...................................................................Appx1999

Transcript of Pretrial Conference, Dated September 18, 2023
(ECF Doc. No. 236) ...................................................................Appx2141

Transcript of Pretrial Conference, Dated September 21, 2023
(ECF Doc. No. 237) ...................................................................Appx2235

Transcript of Motion Conference, Dated November 13, 2023
(ECF Doc. No. 238) ...................................................................Appx2302

Transcript of Jury Trial, Dated February 12, 2024
(ECF Doc. No. 276) ...................................................................Appx2350

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ...................................................................Appx2620

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ...................................................................Appx2688

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 278) ...................................................................Appx2825

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 327) ...................................................................Appx2948

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ...................................................................Appx3074

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ...................................................................Appx3189

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ........................................................................Appx3331

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ........................................................................Appx3446

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 281) ........................................................................Appx3572

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 328) ........................................................................Appx3697

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ........................................................................Appx3858

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ........................................................................Appx3982

Transcript of Jury Trial, Dated February 23, 2024
(ECF Doc. No. 329) ........................................................................Appx4122

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ........................................................................Appx4251

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ........................................................................Appx4394

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 284) ........................................................................Appx4419

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 330) ........................................................................Appx4550

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ........................................................................Appx4581

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ........................................................................Appx4698

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 285) ........................................................................Appx4836

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 286) ...................................................................Appx4955

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 331) ...................................................................Appx5074

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 287) ...................................................................Appx5198

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 332) ...................................................................Appx5344

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...................................................................Appx5359

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...................................................................Appx5496

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 289) ...................................................................Appx5621

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 333) ...................................................................Appx5762

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 290) ...................................................................Appx5900

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 334) ...................................................................Appx6004

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...................................................................Appx6087

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...................................................................Appx6190

Transcript of Jury Trial, Dated March 11, 2024
(ECF Doc. No. 292) ...................................................................Appx6324

Transcript of Jury Trial, Dated March 12, 2024
(ECF Doc. No. 293) ...................................................................Appx6344

Virtual Asset Analysis Expert Report of Luke Scholl,
Dated December 8, 2022................................................................Appx6400

Expert Report #1 of Elizabeth Bisbee (Nov. 2022).....................Appx6465

Expert Report #2 of Elizabeth Bisbee (Dec. 2022) .....................Appx6493

Expert Report #3 of Elizabeth Bisbee (Jul. 2023)......................Appx6522

CS-Mazars Expert Report - Device Review Summary,
Dated May 5, 2023 .......................................................................Appx6529

CS-Mazars Expert Report - IP Overlap Analysis,
Dated November 9, 2022 ...............................................................Appx6532

CS-Mazars Expert Report - IP Graph Data Excel File..............Appx6539

Criminal Complaint, Dated April 26, 2021 (ECF Doc. No. 1) .............Appx6542

Arrest Warrant, Dated April 26, 2021 (ECF Doc. No. 5)....................Appx6556

Indictment, Filed June 14, 2021 (ECF Doc. No. 8) .............................Appx6557

Superseding Indictment, Filed July 18, 2022 (ECF Doc. No. 43) .......Appx6561

Defendant's Supporting Memorandum of Law,
Dated August 1, 2022 (ECF Doc. No. 46) ............................................Appx6567

Attachment to Memorandum of Law -
Proposed Order of Hon. Randolph D. Moss Granting Defendant's
Motion to Dismiss (ECF Doc. No. 46-1) ....................................Appx6585

Attachment to Memorandum of Law -
Defendant's Notice of Motion to Dismiss, Dated August 1, 2022
(ECF Doc. No. 46-2) ...................................................................Appx6586

Government's Opposition to Motion, Filed August 29, 2022
(ECF Doc. No. 52) ...............................................................................Appx6589

Defendant's Reply to Government's Opposition to Motion,
Dated September 7, 2022 (ECF Doc. No. 57) ......................................Appx6623

Exhibit A to Defendant's Reply -
Second Declaration of Eric Garland, Dated September 7, 2022
(ECF Doc. No. 57-1) ...................................................................Appx6635

Defendant's Motions in *Limine*, Dated October 24, 2022
(ECF Doc. No. 59) .......................................................................Appx6644

Exhibit A to Motions in *Limine* -
Letter from Tor Ekeland to Christopher B. Brown and
C. Alden Pelker, Dated September 23, 2022, with Exhibit A
(ECF Doc. No. 59-1) ...................................................................Appx6664

Defendant's Opposition to the Government's Motions in *Limine*,
Dated November 7, 2022 (ECF Doc. No. 68) ........................Appx6680

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated March 6, 2023 (ECF Doc. No. 116) .............................Appx6689

Notice of Bill of Particulars for Forfeiture, Filed May 17, 2023
(ECF Doc. No. 119) .....................................................................Appx6709

Defendant's Notice of Intent to Present Expert Testimony,
Dated July 7, 2023 (ECF Doc. No. 145) .................................Appx6711

Exhibit A to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Francisco Cabanas (ECF Doc. No. 145-1) ...........................Appx6716

Exhibit B to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Itiel Dror (ECF Doc. No. 145-2) ..........................................Appx6725

Exhibit C to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jeffrey Fischbach (ECF Doc. No. 145-3) ....................................Appx6731

Exhibit D to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jonelle Still (ECF Doc. No. 145-4) .............................................Appx6737

Exhibit E to Notice of Intent -
Summary of Qualifications and Expected Testimony for
J.W. Verret (ECF Doc. No. 145-5)................................................Appx6741

Supplemental Summary of Qualifications and Expected
Testimony for Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 157) ......................................................................Appx6756

Notice of Expert Report for Defense Expert Jonelle Still of
Ciphertrace, Dated August 8, 2023 (ECF Doc. No. 159) .....................Appx6761

Attachment to Notice of Expert Report -
Defense Expert Report of Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 159-1) ...................................................................Appx6764

Exhibit A to Notice of Expert Report -
Data Credibility in Cryptocurrency Investigations of Ciphertrace
(ECF Doc. No. 159-2) ...................................................................Appx6805

Exhibit B to Notice of Expert Report -
Article Titled "Bitcoin: A Peer-to-Peer Electronic Cash System"
(ECF Doc. No. 159-3) ...................................................................Appx6822

Notice of Bill of Particulars, Filed August 28, 2023
(ECF Doc. No. 173) ......................................................................Appx6832

Defense Response to Government's Motion to Admit Certain
Exhibits, Dated September 4, 2023 (ECF Doc. No. 177) .....................Appx6834

Notice of Source Code Expert Bryan Bishop Regarding Independent
Analysis of Chainalysis Reactor Source Code and Request for
Production of Chainalysis Reactor Source Code and Relevant
Related Brady Material, Dated September 5, 2023
(ECF Doc. No. 179) ......................................................................Appx6843

Chainalysis' Notice in Response to the Court's Request Regarding
Protective Order, Dated September 12, 2023
(ECF Doc. No. 195) ......................................................................Appx6860

Exhibit A to Notice in Response -
[Proposed] Heuristic Information Protective Order of
Hon. Randolph D. Moss (ECF Doc. No. 195-1)............................Appx6862

Exhibit B to Notice in Response -
[Proposed] Heuristic Information Protective Order to Jonelle Still
of Hon. Randolph D. Moss (ECF Doc. No. 195-2).......................Appx6869

Heuristic Information Protective Order to Jonelle Still of Hon.
Randolph D. Moss, Dated September 13, 2023 (ECF Doc. No. 196)...Appx6877

Notice Regarding Court's Proposed Protective Order Governing
Review of Chainalysis' Proprietary Information,
Dated September 20, 2023 (ECF Doc. No. 199) ..................................Appx6884

Notice Regarding Ciphertrace Expert Testimony and Review of
Latest Chainalysis Production, Dated September 22, 2023
(ECF Doc. No. 205) ......................................................................Appx6888

Government's Response to September 18, 2023 Minute Order
Regarding Defendant's Access to Sensitive Heuristics Information
Provided by Chainalysis, Filed September 22, 2023
(ECF Doc. No. 206) ......................................................................Appx6892

Defendant's Opposition to Government's Response to
September 18, 2023, Minute Order Regarding Defendant's Access
to Sensitive Heuristics Information Provided by Chainalysis,
Dated September 29, 2023 (ECF Doc. No. 207) ..................................Appx6901

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 4, 2023 (ECF Doc. No. 210) ...................................Appx6912

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 30, 2023 (ECF Doc. No. 213) ..................................Appx6930

Defendant's  Motion to Exclude any Testimony About Deepweb
Marketplaces, Dated February 8, 2024 (ECF Doc. No. 247)...............Appx6942

Attachment to Motion to Exclude -
[Proposed] Order of Hon. Randolph D. Moss
(ECF Doc. No. 247-2) .................................................................Appx6950

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated February 29, 2024 (ECF Doc. No. 259)......................................Appx6951

Final Jury Instructions and Charges, Filed March 7, 2024
(ECF Doc. No. 265) ................................................................................Appx6982

Government's Motion for Preliminary Order of Forfeiture,
Filed June 7, 2024 (ECF Doc. No. 297)................................................Appx7061

      Attachment to Motion for Preliminary Order of Forfeiture -
      Proposed Preliminary Order of Forfeiture Hon.
      Randolph D. Moss (ECF Doc. No. 297-1)....................................Appx7072

Defendant's Opposition to Government's Motion for Preliminary
Order of Forfeiture, Dated June 21, 2021 (ECF Doc. No. 305) ...........Appx7078

      Exhibit A to Defendant's Opposition -
      Article Titled "Chainalysis: Most Mixed Bitcoin Not Used
      For Illicit Purposes", Dated August 26, 2019
      (ECF Doc. No. 305-1) ....................................................................Appx7095

      Exhibit B to Defendant's Opposition -
      Blockchain Address Search Result from Blockchain.com
      (ECF Doc. No. 305-2) ....................................................................Appx7107

Government's Memorandum in Aid of Sentencing,
Filed August 1, 2024 (ECF Doc. No. 314)............................................Appx7112

Sentencing Memorandum on behalf of Roman Sterlingov,
Dated August 15, 2024 (ECF Doc. No. 321) ........................................Appx7157

Memorandum Opinion of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 337) .....................................Appx7194

Defendant's Notice of Appeal, Dated November 19, 2024
(ECF Doc. No. 343) ...............................................................................Appx7214

Memorandum for All Department Employees from The Deputy
Attorney General, Subjecting "Ending Regulation by Prosecution",
Dated April 7, 2025................................................................................Appx7217

**Trial Exhibits:**

Trial Exhibit 601 -
Darknet Market Vendor Transaction Summary
(Document in Evidence and to be Produced Upon Request Due
to Volume) ...................................................................................Appx7221

Trial Exhibit 624................................................................................Appx7222

Trial Exhibit 625................................................................................Appx7223

Trial Exhibit 626................................................................................Appx7224

Trial Exhibit 627................................................................................Appx7225

Trial Exhibit 628(A)...........................................................................Appx7226

Trial Exhibit 628(B)...........................................................................Appx7227

Trial Exhibit 629................................................................................Appx7229

Trial Exhibit 630(A)...........................................................................Appx7230

Trial Exhibit 630(B)...........................................................................Appx7244

Trial Exhibit 631................................................................................Appx7247

Trial Exhibit 632................................................................................Appx7248

Trial Exhibit 633................................................................................Appx7252

Defense Exhibit 138 -
The-Message-Game, Written by Ice White .........................................Appx7253

Defense Exhibit 139 -
Extracted Page from The-Message-Game, Written by Ice White ......Appx7413

Government Exhibit 721 and Defense Exhibit 143 -
Boox Chat ...........................................................................................Appx7414

Exhibit B to Fischbach Declaration -
Declaration of Jeffrey M. Fischbach, for Defendant, Dated August 14, 2024,
with Attachment
(ECF Doc. No. 321-2) ...............................................................Appx7415

A.    No.

Q.    And you didn't find any of those private keys to the Bitcoin Fog cluster in any of Mr. Sterlingov's private notes?

A.    No.

Q.    And you didn't find any administrator passwords to Bitcoin Fog in his decrypted password vault?

A.    Not labeled as such, no.

Q.    And you didn't find any log-in credentials to the Bitcoin Fog servers in any of Mr. Sterlingov's devices?

A.    There were a lot of log-in credentials, but none of them were labeled for Bitcoin Fog.

Q.    And as far as you were aware, none of them were to Bitcoin Fog?

A.    Not that I am aware, no.

Q.    And the phrase Bitcoin Fog doesn't appear anywhere in any of his devices?

A.    Not that I saw, no.

Q.    And the phrase Bitcoin Fog doesn't appear anywhere in his notes?

A.    No, not that I saw.

Q.    And the phrase Bitcoin Fog doesn't appear anywhere in his emails that you searched?

A.    I didn't review all of the emails, but I didn't see it.

Q.    And you are not aware of there being a trace of anything related to Bitcoin Fog on any of his devices?

A. To -- like the website or the money, like specifically by name?

Q. Specifically by name?

A. No.

Q. And in relation to the clearnet website www.BitcoinFog.com, you didn't find a trace of that on any of his devices, did you?

A. No.

Q. And you worked with Mr. Scholl on this investigation?

A. Yes.

Q. And you communicated with him?

A. Yes.

Q. And you listened to his testimony in this court?

A. Yes, some of it.

Q. And you heard him testify that the government doesn't have the Bitcoin Fog servers?

A. Yes.

Q. And he was telling the truth?

A. Yes.

Q. And you heard him testify that the government doesn't have the Bitcoin Fog server logs?

A. Yes.

Q. And he was telling the truth?

A. Yes.

Q. And you heard him testify that the government doesn't have

the Bitcoin Fog ledgers?

MS. PELKER: Objection, Your Honor, to the extent that he is simply asking her to now comment on the truthfulness of --

THE COURT: Yeah. Why don't you ask her the questions yourself rather than asking about his testimony. It is more appropriate.

BY MR. EKELAND:

Q. The government doesn't have the Bitcoin Fog ledgers, do they?

A. No.

Q. And you haven't examined any of the source code to Bitcoin Fog, have you?

A. No, not that I am aware.

Q. And could you explain to the jury what source code is?

A. Source code is the underlying code that makes up the -- probably the website that you see and also the functionality of how the site would work, the mixing, the transfer of Bitcoin, et cetera.

Q. Thank you. And the reason you haven't examined the Bitcoin Fog source code is because the government doesn't have it?

A. Well, the government never found the back end. So even if there were pieces of it, there was nothing I recognized as the back end source code to Bitcoin Fog. So, no, I didn't examine

anything like that.

Q. And you just -- I wanted to make sure I heard you right. You just testified that the government never found anything related to the back end of Bitcoin Fog?

A. Not that I am aware.

Q. And are you aware of what programming language Bitcoin Fog source code is written in?

A. Well, I didn't review it, so not for certain.

Q. And when you searched Mr. Sterlingov's devices, you didn't find a single communication between him and anybody running Bitcoin Fog, did you?

A. Meaning Akemashite Omedetou?

Q. Yes or anybody running Bitcoin Fog?

A. No.

Q. And you didn't find any communication between Mr. Sterlingov and anybody -- well, withdrawn.

You didn't find any notes regarding the running of Bitcoin Fog in any of Mr. Sterlingov's notes?

A. Of Bitcoin Fog specifically, no.

Q. And there is hundreds of pages of notes, aren't there?

A. Yes, it appeared so.

Q. And they are covering all sorts of aspects of Mr. Sterlingov's life in great detail; correct?

A. Yes.

Q. And those notes span years?

A.    I am not sure of the actual dates, but I believe so.

Q.    And you also looked through his dating apps?

A.    No.  I looked from an extraction from a tablet that had screenshots and photos.  And many of the screenshots appeared to be of dating app chats.  But I don't remember if I looked through specific dating apps.  Maybe on other phone extractions, if Axiom had pulled them out in the chat message, I might have seen them.  But I didn't pull out those apps specifically to go through.

Q.    In those screenshots and everything that you just mentioned that you looked through, you didn't see a single communication between Mr. Sterlingov and anybody running Bitcoin Fog?

A.    I mean, nobody else, no.

Q.    Now, I would just like to turn the discussion to your IP address analysis.  Okay?

A.    Yes.

Q.    And that is what we -- you testified about I believe yesterday; correct?

A.    Yes.

Q.    And that was the result of your IP address analysis is what the government put up as that foam exhibit beside you?

A.    Yes, that was the summary of the results.

Q.    And could you just remind the jury again what an IP address is?

A. An IP address is the identifier that a computer uses as its address on the internet or the place that other computer's communications can find it.

Q. And an IP address can be spoofed; correct?

A. Theoretically, yes.

Q. Can you explain to the jury what IP address spoofing is?

A. In some technical contexts there are ways to make IP addresses appear to be other IP addresses. Sometimes in hacking conventions and places where there is public Wi-Fi, you will see people attempt to run programs to disguise their IP addresses as other ones.

Q. And IP addresses aren't a form of personal identification, are they?

A. Not on their own, no.

Q. And thousands of people can share the same IP address at the same time?

A. Thousands, yes, on some servers that would be big enough.

Q. Like say "The New York Times" servers?

A. Coming out of "The New York Times" servers?

Q. Come in, coming out?

A. Thousands of users could access the server, which is a little different from sharing the IP.

Q. But you wouldn't disagree with me that large numbers of people can share the same IP address at the same time?

A. Depending on what type of setup they are coming out of,

no, I wouldn't disagree, there are some servers that could support that.

Q. For instance, the people in this courtroom using the court's Wi-Fi are probably sharing the same IP address; correct?

A. Yes, probably.

Q. We are not the same people because we are sharing the same IP address; correct?

A. Right, not the same people.

Q. And if you were, say, selling Bitcoin to somebody in a McDonald's or a cafe, you might log in to the same IP address to complete that transaction; correct?

A. Connect to McDonald's Wi-Fi to access -- yes, you might.

Q. And in that case, those two people would be sharing the same IP address; correct?

A. Yes, they could be.

Q. At the same time?

A. Yes.

Q. And the same thing could happen with open Wi-Fi in a cafe?

A. Yes.

Q. And do you recall testifying yesterday, I believe you read I think it was from Mr. Sterlingov's notes about connecting to open Wi-Fi in a cafe and whether it was safe?

A. Yes.

Q. Would you ever connect to an open Wi-Fi in a cafe without

VPN?

A.   Sometimes, yes.

Q.   Sometimes.  But in the times that you didn't, why wouldn't you?

A.   Usually, it was because I was doing work and wanted the anonymity.

Q.   Right.  Because if you don't use VPN, when you connect to open Wi-Fi in public, people can sniff your internet traffic; right?

A.   Theoretically, yes, they could.

Q.   And then they could get your credit cards if you were buying stuff on Amazon?

A.   I don't know about that because the traffic would be over https and encrypted.

Q.   If -- well, that is -- if it was encrypted, they wouldn't be able to get it.  But if it was http, they would be able to sniff your information; right?

A.   Yes, they might.

Q.   And you are aware that there are people out there who sniff internet traffic at public sites to collect information like credit cards and personal information about people; correct?

A.   Yes, I am aware of that.

Q.   And that is why people use -- one of the reasons people use VPNs is to protect their information when it is being

transmitted on the internet; correct?

A.    Yes, I would agree with that.

Q.    And there are a large number of companies that offer a variety of VPN services; correct?

A.    Yeah, there are quite a few.

Q.    And you use VPN on a regular basis?

A.    Yes.

Q.    And you use it for security reasons?

A.    I use it for a variety of different reasons.  But, yes, sometimes for security.

Q.    Could you tell the jury some of those reasons?

A.    Oftentimes, I will use it for work if I need to look up a website of interest or work, meaning investigation-related topics, but I am at home.  I don't necessarily want those searches to be coming out of my home and linked over the internet with my IDs and things I am interested in.  So that is probably the most common time I turn my VPN on is when I want to -- my internet browsing to go into work mode.

Q.    And the VPN helps protect your personal privacy, doesn't it?

A.    Yes.

Q.    It helps keep you safe?

A.    Yes, I believe so.

Q.    And do you recall testifying about proxy servers yesterday?

A.    Yes.

Q.    And proxy servers are similar to VPNs in that they protect your privacy?

A.    Yes.  They do give you -- like VPNs, they give you a different IP address to come out of so that it is not your own, so it would conceal your own personal one from the rest of the internet.

Q.    And a lot of businesses use proxy servers?

A.    I am not really sure.

Q.    You have no reason to believe that is not true?

A.    Use them how so?

Q.    I'm sorry?

A.    Because Who is lookups, a lot of times businesses' main IP addresses, as I trace them, do come back the business on the record.  But I don't know what other -- so in those cases they might not be using proxy servers, there could be other uses they have for proxy servers that I am not thinking of.

Q.    There is a lot of businesses that rent proxy servers just like VPNs?

A.    I don't know.

Q.    And could you explain to the jury the difference between a static and a dynamic IP address?

A.    In general, a static IP address stays the same.  And a dynamic IP address will change slightly each time you connect to it.  One way -- for example, at home you could set up your

router if you -- because of the way you have things set up, always want to come out of the same exact IP address each time you set it to be static.  But if you set it to be dynamic, it uses something called DHCP to pick an IP within a range that is available to you.

Q.   And server logs, among other things -- but server logs record IP addresses; correct?

A.   Yes, generally, they do.

Q.   And generally they record the time that the IP address logs into the server?

A.   Yes.

Q.   And usually the server logs tell you what time zone the IP address is logging in from -- I guess the time zone for the server; correct?

A.   I would say connects to instead of logs in, more like accesses.  Sometimes the time zone is specified, but other times I found it to be implied.

Q.   And when you did your IP address analysis you actually didn't have native server logs to do that analysis; correct?

A.   I am not sure which original form they had.  Many of them were provided in the form of what looks like legal process or spreadsheets.  But IRS and FBI in some cases gave me those.

Q.   But you don't know if you actually reviewed the original server logs when you did your IP address analysis?

A.   In their original form, I don't know.  And some of them

looked like they may have been pulled from the company or organization.  So, in some cases, no.

Q.   And the time stamps in the documents that you reviewed to get the log-in information, not all of them told you what time zone the log in was in; correct?

A.   I believe that is correct.

Q.   And you just -- when you didn't know what -- withdrawn.

When the time zone wasn't designated, you just assumed it was UTC?

A.   No, I did a few more steps.  If the time zone wasn't specifically indicated in the time stamp or at the very top, then I'd go back into other documentation that came with the data in the logs, if there was a registration info or something I'd read through those to see if time zone was indicated for the whole set anywhere else.  But in the absence of any time zone information at all or a note saying all times are local, for example, then I went with the convention, which is UTC.

Q.   And that means potentially the times that you are using for your timing analysis could be off by hours?

A.   If the provider of the records had them in a specific time zone and didn't indicate that, then the offset could be a matter of hours.

Q.   Uh-huh.  And you didn't examine any of the traffic logs for the servers involved?

A.   The only traffic I examined were for the Moon VPN servers.

But I don't believe that that data was part of the IP analysis. I don't think so.

Q. And just I think you answered my question. I want to make sure I understood you. So for the IP address analysis, you didn't look at any of the traffic logs for the servers involved with that?

A. Unless they were provided in the set to analyze.

Q. And there were no log-out times recorded in the legal process that you looked at?

A. I'm sorry. Did you say log-out times?

Q. Yes, log out.

A. I think there might have been some log-out times in there. But I didn't consider the specific action that was happening when I looked at the IP access. I treated log in and log outs neutrally. There might have been some log-out lines though.

Q. And when -- just now you were describing your methodology that you used in this IP address overlap. This was the first time that you have ever done this; correct?

A. Comparing different data sources looking for IP addresses that appear in common and how close together, to clarify, is something that I do for almost every case. But the specific way I conducted this analysis, I designed for the data set I was given.

Q. And that was -- this was the first time that you did it this specific way; correct?

MS. PELKER:  Objection; asked and answered.

MR. EKELAND:  She didn't answer the question.

THE COURT:  I think she did answer the question.

BY MR. EKELAND:

Q.  And this methodology, you can't name me one scientific peer-reviewed paper attesting to its accuracy?

A.  It is not a scientific methodology.  It was a research analysis.

Q.  And can you name me one academic white paper, research paper attesting to the accuracy of your methodology?

A.  The methodology in particular, I didn't define in a scientific way, so it couldn't be tested.  It was a review of different data sources and an analysis of the observations in there.  And what that meant to my interpretation of -- so I didn't define like a peer abstract methodology that I could search other papers for.

Q.  So would it be fair to say that it was a nonscientific methodology?

MS. PELKER:  Objection; misstating the witness' testimony.

THE COURT:  My concern is just perhaps some confusion about how you are both using the word scientific.  And so maybe it is better to ask her how she would characterize her methodology.  I think there may be some disconnect between the way you are using the word scientific.

BY MR. EKELAND:

Q.   In terms of your IP address analysis, you actually didn't make any attributions in relation to who -- the identity behind any of the emails that were part of your IP address analysis?

A.   That is correct.  The attributions were made by the case team in general.  But that analysis looked for users in common without specifically naming any users.

Q.   And you don't actually attribute the shormint@hotmail.com email address to Mr. Sterlingov in your analysis, do you?

A.   In that writeup, no.

Q.   And when you -- in that writeup that we are discussing at the end of it, this is your -- if I am understanding your conclusions in your analysis, you have two groups of email addresses at the end of that report that you are talking about?

A.   Yes.

Q.   And the first group of -- you say email addresses that were likely to have been used maybe by the same user in that group you put Mr. Sterlingov's heavydist@gmail.com, his plasma@plasmadivision.com, I think the log in to his Killdozer account on Bitcoin Talk and the cray Killdozer -- his cray Killdozer Twitter account and I think you also put Volf.prius in there.  But you don't put shormint@hotmail.com in that group, do you?

A.   Although I am doing this from memory, I have don't have it in front of me.  I believe Shormint was in the second bullet

point group.

Q.    And the second bullet point group you said likely was the same user, you grouped Shormint@hotmail.com, the NFS9000@hotmail.com account that was associated with Mt. Gox account number 2; and you also put the Kolbasa99.ru account in that group; correct?

A.    I believe so.  That sounds right.

Q.    And the majority, but not all, of your IP address analysis involved these series of traces that Mr. Scholl did in October related to those transactions you heard him testify about in October and November of 2011?

A.    I'm sorry.  Did you ask if the analysis involved them?

Q.    Let me rephrase if my question wasn't clear.

The email -- your IP address analysis was -- the date range for that was between 2011 and 2013?

A.    I don't really remember.

Q.    Do you remember looking at the traces that Mr. Scholl did, such as the trace for the initial DNS registration and the traces involving Mt. Gox account number 2 and Mt. Gox account number 3?

A.    Yes, I think I looked at those traces.

Q.    And those traces were all just in October and November of 2011?

A.    I am not sure.

Q.    Do you recall looking at any other traces besides the

October, November 2011 traces?

A. I could have. But I don't remember them very distinctly, since the money tracing isn't my essential area, so I am not sure. But I could have, for sure.

Q. And none of the IP addresses or anything that you looked at when you did your IP address analysis involved a log-in to the Bitcoin Fog server, did it?

A. No.

Q. You don't know any kind of statistical error rate or anything for your IP address analysis, do you?

A. It wasn't a statistical analysis.

Q. You were essentially guessing?

MS. PELKER: Objection.

THE WITNESS: No.

BY MR. EKELAND:

Q. But you can't tell me with certainty the identification of anyone behind any of those emails?

A. I did not in that writeup attribute any of the emails to any specific person, other than what research the case team had already did.

Q. You recall testifying about the Tor browser?

A. Yes.

Q. And the Tor browser was developed by the United States Navy?

A. Originally, yes, it was.

Q.   And the United States Navy did it to hide its signal traffic; correct?

A.   I believe so.

Q.   And then the United States Navy gave it to the Tor nonprofit?

A.   I think so.

Q.   The Tor browser and Tor is now administered by a nonprofit?

A.   Yes.

Q.   And anybody in this courtroom could can go on the internet and download the Tor browser?

A.   Yes.

Q.   And the Tor browser is a privacy tool?

A.   Yes, sometimes it gets described that way.

Q.   And you would agree with me that political dissidents all over the world use the Tor browser to protect themselves?

        MS. PELKER:  Objection; relevance.  There is no suggestion that Mr. Sterlingov is a political dissident.

        THE COURT:  It may be better to lay a foundation to see if she has any knowledge of which particular groups are using it.

        MR. EKELAND:  I can move on, Your Honor.

        THE COURT:  You are welcome to ask the question, I just think you need a foundation.

        MR. EKELAND:  It is okay.

THE COURT: I remind the jury that the questions are not evidence.

BY MR. EKELAND:

Q. I would like to turn to your device review. Mr. Hassard, if we could get up what is in evidence as Government Exhibit 710A and go to page 6.

And do you see down here where it says, paint that shields against radio waves?

A. Yes.

Q. Do you remember reading that to the jury yesterday in your testimony?

A. Yes.

Q. And when you reviewed Mr. Sterlingov's devices, were any of them painted with radio wave blocking paint?

A. No.

MR. EKELAND: You can take this down, Mr. Hassard.

BY MR. EKELAND:

Q. You testified as to I think file carving yesterday?

A. Yes.

Q. Could you explain to the jury what that is?

A. File carving is a process by which forensic tools usually scan through unallocated space, so the parts of the computer's hard drive that aren't being taken up by files that appear to the user. And it is a process of looking through and attempting to pull out files and parts of files that may have

been left behind by previous uses.

Q. And you performed file carving on Mr. Sterlingov's devices?

A. Yes, I did.

Q. And you testified previously you didn't find anything related to Bitcoin Fog?

A. No.

Q. And do you recall testifying about RAID yesterday?

A. Yes.

Q. And RAID stands for redundant array of inexpensive disks?

A. Independent.

Q. Thank you. And that is just a way, essentially, of just sort of grouping a bunch of hard drives together; correct?

A. Yes. Having them work together to act as one entity.

Q. And as part of that process, the RAID process in setting up all of these hard drives, you have to zero out the hard drives; right?

A. I have set up a RAID before without wiping or zeroing out the hard drives. But it usually involves formatting them, which will overwrite it with the type of structure it needs. But I don't believe I have set one up without doing a full zero out.

Q. But normally -- and it is not unusual to zero out the hard drives and reformat them, as you say, when you are setting up a RAID configuration?

A. Zeroing out and reformatting are slightly different, but, no, it is not uncommon to start from empty drives.

Q. And as part of your forensic review, you create a log or a list of all of the devices that you are reviewing for a case?

A. They weren't all the devices that I ever reviewed. Because in this case, review was very rolling and ongoing. But at one point to get organized, I loaded many of the devices that FBI provided me into one forensic tool list. And I went through and tagged files of interest from there. At the end, I gathered all of the tags and exported those so the devices that they came from would be in that spreadsheet too. Is that the --

Q. But you also created -- maybe it is, but did you also create a list of the devices in this case that you reviewed and --

Mr. Hassard, if you could put up what is not in evidence as Defendant's Exhibit 32.

A. I also did build a markdown table of devices I reviewed with some short notes about what was on them at a high level to assist the case team in remembering generally which one was which.

Q. If you could look at your screen right there. And do you see that. Is that what you were just talking about?

A. Yes, that is the table.

Q. And that says that you are the author of it?

A. Yes, I wrote this.

Q. And you created that in the course of working on this case?

A. Yes, that is right.

Q. And this is an accurate, authentic depiction of the device summary that you created?

Mr. Hassard can scroll through it, if you would like.

A. I thought I had it in a table format, but the contents and the structure all look the same.

MR. EKELAND: Your Honor, at this point in time, the defense would like to offer what has been marked for identification as Defendant's Exhibit 32 into evidence?

THE COURT: Any objection?

MS. PELKER: No objection, Your Honor.

THE COURT: Defense Exhibit 32 is admitted and may be published to the jury.

(Whereupon, Defense Exhibit No. 32 was admitted.)

BY MR. EKELAND:

Q. And, Mr. Hassard, if you could scroll down a little bit to the next page. And right there, can you stop there. Mr. Hassard, can you go down a little bit? I'm sorry. No, keep going.

And if you -- do you see right here where it says a 6 terabyte hard drive BitLocker encrypted?

A. Yes.

Q.    Could not review.  Could you explain to the jury what BitLocker is?

A.    BitLocker is Windows' full disk encryption.

Q.    And who provided you with these items for review?  Did you pick them up from the IRS or how did you end up with them?  I guess is what I am asking.

A.    When I made this list, I was reviewing the evidence items in the form of their images, which had already been put on FBI's network.  So I went to the network where FBI hosts these things and went to the folder for the Bitcoin Fog case.  And all of these images were there in the folder labeled.  And all of the computer ones that were compatible with my tool, I added one at a time and then started to look through them.  I noticed that one of those images was encrypted and the data wasn't showing up.  So I added it to the list because it was one of the files that I ingested, the image files.

But since I didn't remember anything about any of the devices being that big and encrypted, I asked around the case team for it.  And it turned out that what I believe happened, is that someone at FBI had made an image of a staging hard drive that IRS had used and added it it to the same folder, so that that hard drive should have been in like a working copy folder.  But instead at some point, someone made an image of it, which would be encrypted because the hard drives we use are pin protected.  And that image ended up in the same folder.  So

it ended up in the report, because it was part of the analysis I did. But after writing it up this way, I determined that it wasn't one of Mr. Sterlingov's hard drives.

Q. It is a mistake? It shouldn't have been listed as one of his devices?

MS. PELKER: Objection; this isn't a list of his devices.

MR. EKELAND: Can we scroll to the top of this exhibit?

BY MR. EKELAND:

Q. Sterlingov device review summary is what it says at the top; correct?

A. Indicating, yes, they were the devices I reviewed for the Sterlingov case.

Q. Just to be clear, that 6 terabyte BitLocker encrypted device was not seized from Mr. Sterlingov when he was arrested at the airport?

A. After reviewing it, I determined that, yes, it was not one of the seized devices.

Q. Mr. Hassard, if we could go to Government Exhibit 368. And this should be in evidence, I believe.

THE COURTROOM DEPUTY: It is in there, but as a demonstrative.

It is in evidence as a demonstrative.

MR. EKELAND: As a demonstrative. Can we publish

this to the jury?

THE COURT:  You can.

BY MR. EKELAND:

Q.  Ms. Mazars, do you recall testifying about Mr. Sterlingov's phone the other day, the LTE device?

A.  Oh, the LTE device, yes.

Q.  Yes.  And this is essentially -- what is happening here is there is -- this is just essentially a way for somebody to get multiple internet streams and combine them into one stream; is that correct?

A.  I am not sure if they are always combined or if sometimes they are split up and distributed, because I never tested it out.  But there can be multiple SIM cards, because there are four spots here, at least out of the box.

Q.  But you never tested the device?

A.  I never turned it on and tried to make it stream, no. Generally, unless there is a real need to, I don't do that with evidence items.

Q.  Do you recall testifying yesterday about how the phone could be used to avoid law enforcement?

A.  The LTE device?

Q.  Yes.

A.  Yes.

Q.  And do you recall one of the things I think you said was that one of the ways that that could be done is if law

enforcement was just monitoring one stream and another -- law enforcement was monitoring modem number 1 and the activity that was really happening was on number 4, that would be a way to evade law enforcement. Do I have your testimony right on that?

A. That is not what I was trying to say. What I was describing was that maybe the actor would have a home internet connection or internet connection at work that law enforcement would be monitoring. But instead of connecting to that at all, the actor would only connect to the LTE device. I wasn't referring to law enforcement monitoring only one modem. I was referring to the typical process where they might think to monitor the house specifically and its traffic.

Q. So that what you are -- in your hypothetical, the same thing would happen if somebody just used a hotspot on their smartphone?

A. The built in one? Yes.

Q. There is -- essentially, I think if I understand your hypothetical is that, well, law enforcement's monitoring wouldn't work if the suspect just simply used another way to access the internet. Is that what you are saying?

A. It wouldn't be exactly the same as a phone hotspot, because I would say in most cases, when you are not using your hotspot, you connect your phone to your home Wi-Fi. So there would still be some attribution there. I would compare this more to using an external hotspot that you never connected to

your home network.

Q. You are aware that you can buy devices like this on Amazon?

A. I didn't know that it was on Amazon, but I have no reason to doubt that.

Q. And when you examined this device, you didn't find a trace of anything related to Bitcoin Fog, did you?

A. No.

Q. I would like to now talk about Linux and SSH, which you were testifying about yesterday. Do you recall that?

A. Yes.

Q. Could you explain to the jury what Linux is?

A. Linux is an operating system. If you think about Windows or Mac OS being operating systems, so the software that lets you interact with the computer in its own specific way. Linux is another version of those that programmers tend to like. People who like to customize many aspects of their computer experience tend to like Linux. And it has a lot of free add-ons and things like that.

Q. There is roughly 33 million Linux users in the world, aren't there?

A. I am not sure.

Q. Are you a Linux user?

A. Yes, I am.

Q. And Android phones operate on Linux?

A. Yes, a form of Linux.

Q. And then you testified about SSH. Could you just remind the jury what that is?

A. SSH, secure shell is a form of a -- a way to remotely connect to another computer server. It is a command that you type in a terminal or command prompt window. It is SSH, and the username you're logging into that computer as, at sign and a way to access the computer. So that will be an IP address sometimes or other times it will be the domain name, the dot-com.

Q. And SSH is a little bit similar to VPN in that it is a secure way of remotely logging into a computer in that somebody can't sniff your traffic, because it is encrypted; right?

A. It is encrypted.

Q. Right. And you use SHH all of the time?

A. Yes.

Q. And you use Bash all of the time; correct?

A. Yes.

Q. And could you just explain to the jury what Bash is?

A. The command-type window where instead of using the visual elements of the computer, you type in the commands directly line by line or run scripts with them in. That is what Bash is.

Q. And we are talking about all of this and what you were talking about yesterday was all in the context of Linux and

Linux commands; correct?

A.    Yes.

Q.    So you also testified about SSH tunnels yesterday.  Could you just explain to the jury what an SSH tunnel is, if you know?

A.    I don't remember specifically talking about SSH tunnels.  I know I used tunnelings as a metaphor to explain encrypted remote connections, but I don't specifically remember what you are referencing.

Q.    So when you log in with SSH through Bash, which is like the portal that you are logging in from.  You can either use that to log in locally to the computer you are on or you can use it to remotely access a computer thousands of miles away?

A.    Yes.

Q.    And one of the uses of Linux and SSH and Bash is for people to remotely access their home computers; correct?

A.    Yes, they could.

Q.    And do you recall testifying yesterday or reading about a site called ignorelist.com?

A.    Yes.

Q.    And ignore list is a dynamic DNS, isn't it?

A.    I believe so, yes.

Q.    Could you explain to the jury what a dynamic DNS is?

A.    Dynamic DNS is a service that you can sign up for, sometimes pay for and use when you want an IP address to have a

domain that points to it that doesn't change.

I discussed a little bit about how occasionally home IP addresses can change or that addresses to some things on a home network could shift around within a range. So if you have something set up to remotely connect to a network, oftentimes someone's home network and the IP address changes, it would break your connection. So some people prefer to have a name they can remember, a website name that acts as a shorthand way to connect to their network. And if the IP changes or anything changes, they can go into their settings and update it so their domain name still works.

Q. Is it fair to say that it is a convenient way to log in to your home computer remotely through Linux?

A. To log into any computer. I also saw it used when I worked national security cyber in the context of virtual private servers, but it is a -- I would say it is a convenience mechanism.

Q. And ignorelist.com is a free service?

A. I don't remember the exact name of the DNS service, but ignore list and Hop Do I remember from doing cyber research all linked back to -- it might have been No IP, but one of the big dynamic DNS services.

Q. Mr. Hassard, if we could put up what is in evidence as Government Exhibit 720.

And, Ms. Mazars, do you remember testifying about this

yesterday?

A.  Yes.

Q.  And can you just briefly tell the jury what this is?

A.  This is a configuration file, so sort of a settings file for a tool called Tiger VNC, which allows for remote connections, connections to other computers that aren't there on your network or physically there.

Q.  And Tiger VNC is a video application tool?

A.  Is a what?

Q.  It is for video viewing?

A.  I have never used it, so I am not sure.

Q.  You don't know -- you have no reason to think that it is not?

        MS. PELKER:  Objection, Your Honor.

BY MR. EKELAND:

Q.  -- for viewing media files and video?

        THE COURT:  Sustained.  She said she doesn't know.

BY MR. EKELAND:

Q.  Bitcoin Fog wasn't a video site, was it?

A.  Not that I am aware of.

Q.  And in this configuration file you didn't see anything related to configuring Bitcoin Fog?

A.  It is a configuration for the VNC tool, not for any website, including Bitcoin Fog.

Q.  Right.  Thank you.  We can take this down, Mr. Hassard.

If we can put up what is in evidence as Government Exhibit 722.

And do you recognize this from your testimony yesterday?

A.   Yes.

Q.   And do you see where it says Putty.log?

A.   Yes, under log file name.

Q.   Thank you.  Could you explain to the jury what Putty is?

A.   Putty is a tool that allows for remote detections, TTY connections specifically.  It is a client of sorts, meaning a program that you would run to do the TTY connections to other computers or servers.

Q.   And when you look at this, do you see anything in it that is related to Bitcoin Fog?

A.   I don't see Bitcoin Fog referenced in this file.  I don't know exactly what was used on the IP it was to connect to, but nothing that I know to be directly related to Bitcoin Fog.

Q.   And this is entirely consistent with Mr. Sterlingov remotely accessing his home computer?

A.   Yes, that is right.

Q.   And you said yesterday, I think if I heard you correctly, that the government never obtained Mr. Sterlingov's home computer or any of his computers in Sweden?

A.   Yes.

Q.   And the United States government worked with Swedish law enforcement on this case for years; is that correct?

A.    I don't know.

Q.    But the reason the government doesn't have Mr. Sterlingov's Swedish computers has nothing to do with Mr. Sterlingov; correct?

A.    I'm sorry.  I don't understand what you mean.

Q.    Well, Mr. Sterlingov did not in any way prevent the United States government from seizing his computers in Sweden, did he?

A.    I don't know.  There is no way I am aware of.

Q.    Do you know why the United States government --

        MS. PELKER:  Objection.

BY MR. EKELAND:

Q.    -- hasn't obtained Mr. Sterlingov's computers from Sweden?

        THE COURT:  Yeah.  I think it is beyond the scope of the witness' testimony.

        MR. EKELAND:  She testified yesterday that the United States government does not have Mr. Sterlingov's computers from his apartment, so I am following up on that.

        THE COURT:  Why don't you lay a foundation to see if she has any knowledge on this topic, because it doesn't sound like she does.

BY MR. EKELAND:

Q.    Do you know why the United States government does not have Mr. Sterlingov's computers from Sweden?

A.    I have discussed briefly with members of the case team.  I didn't entirely understand the details especially because a lot

of this played out on the administrative side and I think before I was working on it. I understood it to be issues related to communication and timing, the timing of what actions were being taken investigatively on the case until a certain point when it just seemed too late to get them. But I don't understand legally and administratively exactly what went wrong or what happened.

Q. If we could take down this exhibit, Mr. Hassard.

If we could put up Government Exhibit 723.

Do you recall testifying about this exhibit yesterday?

A. Yes.

Q. And could you just briefly explain to the jury what we are looking at?

A. This is essentially attaching and -- so storage remotely meaning a place where files could live, so that you could see the files on a local computer. You see the two folders bunkerX_media and bunkerX media, one of them lives on the computer, the person typing this is using, and the other is in a remote location. And it links the two so that those files could be shared.

Q. This is Linux; correct?

A. I'm sorry?

Q. This is Linux we are looking at; right?

A. Yes.

Q. And in Linux in order to access a hard drive, you have to

mount the hard drive; correct?

A.   Yes.

Q.   And that is not like say your normal PC where you don't have to mount the hard drive to access the information; correct?

A.   On Windows a lot of steps happen more automatically for you, but you could.

Q.   But in Linux, you actually have to give the command to mount the hard drive to access the hard drive?

A.   Yes, in Linux you need to do these things manually.

Q.   And so what we are seeing here is entirely consistent with Mr. Sterlingov remotely accessing his home computer's hard drive via Linux?

A.   If bunkerX is his home computer, yes.

Q.   Do you see how it says bunkerX_home?

A.   But home --

Q.   We can take that down.  I'm sorry?

A.   The home directory is the main user directory in Linux.

Q.   It could also be his home computer?

A.   It could also.

Q.   It is entirely consistent with it being his home computer?

A.   Yes.

Q.   And there is nothing on here that you see that is related to Bitcoin Fog at all?

A.   No.

Q. Okay. If we could move on to Government Exhibit 724. And this is essentially the unmounting of the hard drive, do I have that correct?

A. Yes, the script to unmount both.

Q. Once again, we see bunkerX home at the end here.

You can take that down, Mr. Hassard.

THE COURT: That wasn't a question. You are testifying.

MR. EKELAND: I apologize, Your Honor, you are correct.

BY MR. EKELAND:

Q. Do you see how it says bunkerX home at the end?

A. Yes, it says bunkerX home.

Q. Thank you. You can take that down, Mr. Hassard.

And if we could get up what we just -- can we get Government Exhibit 725 up.

Do you recognize that from your testimony yesterday?

A. Yes.

Q. And do you see how it says ignorelist.com?

A. Yes.

Q. And that was the dynamic DNS that you just testified about?

A. Yes, that was my understanding.

Q. And you don't see anything on here related to Bitcoin Fog at all, do you?

A. No, not in this file.

Q. If we could take that down, Mr. Hassard.

And if we could go to Government Exhibit 726. And do you recall testifying about this yesterday?

A. Yes.

Q. And, Mr. Hassard, if we could scroll down a little bit, I just would like to see the whole thing. This is the VNC --

Could we go back to the top, Mr. Hassard?

This is the Tiger VNC again that was in the first exhibit of the sequence; correct?

A. Yes, the same tool.

Q. And nothing in this is related, that you can tell, to Bitcoin Fog, is it?

A. No.

Q. All right. If we would go to Government Exhibit 729, which is in evidence. And then do you recall testifying about this yesterday?

A. Yes.

Q. And, Mr. Hassard, if we could scroll down all of the way to the bottom. And do you see anything in this exhibit related to Bitcoin Fog?

A. No.

Q. Thank you. If we could go to Government Exhibit 731. And this, again, is Mr. Sterlingov's Bash history that you testified about yesterday?

A.   Yes, I believe this is the one.

Q.   And this is entirely consistent with Mr. Sterlingov logging into his home computer in Sweden?

A.   Yes, that was my impression.

Q.   And nothing on this is related to the operation of Bitcoin Fog at all, is it?

A.   Not in this file on this computer.

Q.   And, Mr. Hassard, if we could switch now to what is in evidence as Government Exhibit 733.  Do you recall testifying about this yesterday?

A.   Yes.

Q.   And, Mr. Hassard, if we could scroll down.  And this is entirely consistent with Mr. Sterlingov logging into his home computer in Sweden?

A.   I'm sorry.  Could you scroll up again, please?

It seemed like a script to start VNC, which does remote connections.  I didn't -- I am not seeing anything specific.

Q.   And VNC --

A.   I am not seeing any -- at first glance, I am not seeing anything here specific to which computer is being connected to.

Q.   Mr. Hassard, if we could scroll to the top again.

Do you see where it says VNC viewers?

A.   Yes.

Q.   Your understanding of that, that the VNC viewer is for video or media files or cameras?

A.    I tend to know VNC as a remote viewer tool as in you view what is on the other computer.  I have not personally used it for video or associate it with video viewing, but it could be.

Q.    For instance, it could be used to control or view security cameras in a person's home; correct?

A.    Yes, it could.

Q.    Mr. Hassard, you could take this down.

          MR. EKELAND:  Your Honor, do you -- I am just --

          THE COURT:  We have been only going for about an hour.

BY MR. EKELAND:

Q.    Okay.  Keep going.  Mr. Hassard, if we could go to what is in evidence as Government Exhibit 710A.

      Is that 710A?

      If we could scroll to the top of that.  All right.  And then if we could go to scroll down a bit to where it says -- I'm sorry.  I'd like 513B.  My apologies.

      What is in evidence as 513B.  My apologies.

          THE COURTROOM DEPUTY:  I'm sorry.  What number?

          MR. EKELAND:  513B, as in boy.

          THE COURTROOM DEPUTY:  Thank you.

BY MR. EKELAND:

Q.    Mr. Hassard, if you could scroll to the top of this?  Is that it?  Is this published to the jury?

      So do you recall testifying about this yesterday?

A.    Yes.

Q.    And this is Mr. Sterlingov's SpiderOak account summary?

A.    Yes.

Q.    And could you just remind the jury what SpiderOak is?

A.    A cloud backup service.

Q.    And SpiderOak encrypts your data?

A.    I believe so, yes.

Q.    Could you just briefly explain to the jury again what data encryption is?

A.    To encrypt data, depending on which encryption algorithm or method is being used, a program will mathematically change all of the values it is seeing to different ones in a way that makes that data garbled and unreadable.  And then to decrypt it, to run another program to mathematically put them back where they were originally, you need a password or pin or some type of value to prove that you are the -- that you have access to it.

Q.    And do you back up your data?

A.    I should.  I generally don't.

Q.    But when you do -- but you do sometimes back up your data?

        MS. PELKER:  Objection; relevance.  He can ask her -- her personal activities are not relevant.

        MR. EKELAND:  They are absolutely relevant, Your Honor.  They have been making it seem like backing up your data and encrypting it --

THE COURT: First of all, don't start arguing your case. I will allow you to ask the question, if you have a follow up. But, obviously, her personal practices are not what is relevant. If you are using it to set up some other question, that is okay.

BY MR. EKELAND:

Q. Do you sometimes --

A. To do one correction, yes, technically Apple automatically backs up a lot of my phone data for me, so I do some regular personal backups.

Q. When Apple does it, it encrypts the data backup; right?

A. Yes.

Q. And the reason Apple does that is so that bad actors can't access your personal data?

A. I think they do it for liability to them, but I am not sure.

Q. Would you agree with me that encrypting your data backup is standard op sec?

A. Yes.

Q. Could you remind the jury what op sec means?

A. Operational security. It is some steps and methods you take to put barriers between your own identity and home and address, things close to you and your activities usually in this context online.

Q. And encryption also helps protect your financial data,

your personal information, sensitive information and stuff you just generally don't want third parties to get, you would agree with that?

A.    Yes, I would agree with that.

Q.    And SpiderOak is a company that provides online encrypted data backup?

A.    Yes.

Q.    And this is merely an account summary for Mr. Sterlingov's SpiderOak data backup account?

A.    Yes, it appears to be.

Q.    And Mr. Sterlingov has this data backup in his own name?

A.    Yes.

Q.    And if we could just scroll down just a little bit.  And do you see where -- scroll up a little bit to active devices, Mr. Hassard.  Stop right there.

Do you see these three active devices here, one bunkerX, Mailwoo and blast?

A.    Is that Btest?

Q.    Btest, yeah.  I'm sorry.  Do you see all of those?

A.    Yes.

Q.    It is not your testimony that any of those are Bitcoin Fog, is it?

A.    No, I don't know what Btest is.  BunkerX, appears to be the -- by name, the same computer that the remote connections were made to.  And Mailwoo might have been the Moon VPN.

Because of that review it was at one time running Mailwoo, but I am really not sure for certain what any of them were backing up.

Q. Is Mailwoo is an email program; is that right?

A. Yes, email server client to help you manage an email server.

Q. You said that To the Moon was running the Mailwoo email server client at at least one point?

A. It had some Mailwoo databases.

Q. And you are not aware of Bitcoin Fog ever running any kind of email server client, are you?

A. I don't remember if it had a mail subdomain at any point. But, no, I have never visited the site, so I am not aware of any email features, but I just don't know.

Q. If we could take this down, Mr. Hassard.

If we could go back now to what is in evidence as Government Exhibit 710A, going to page 2.

Let me clear my screen.

And then is that published? Thank you. And then, Ms. Mazars, do you see the bold header there, "We use the back up service instead of storing them purely on some VPS"?

A. Yes.

Q. Could you just read the whole -- let me clear this out so it is easier to read the whole paragraph there. Starting right -- could you read that paragraph?

A. "In general, SpiderOak specifically sells its services using the argument, which is sort of like, even we do not have access to your data. If there is such a service, which in a mess of all sorts of Googles and Facebooks that constantly hide the fact that they disclose all of the data of users and sell them left and right comes out and says that we will at least do it safely, then it probably makes more sense to also support it rather than just use it. Still no one can be trusted and you just need encrypt all of the data constantly. Vote with a dollar, so to speak. Also pure engineers appear in their videos. It shows that these are stubborn technicians."

Q. Would it be fair to say is it your understanding of this paragraph that Mr. Sterlingov is expressing a concern with having his data sold by companies like Facebook and the like?

A. Yes.

Q. And that is it your understanding that one of the concerns that Mr. Sterlingov is expressing here is a concern over data privacy?

A. Yes.

Q. And you would agree with me that many people use encryption and VPN and the Tor browser out of a concern for data privacy?

A. That -- I am not sure how many people use the Tor browser. In general, is privacy one of the reasons people use these tools? I'd agree, yes.

Q. You use Tor; right?

A. Yes.

Q. And, Mr. Hassard, I want to scroll down and look for the heading that says bunkerX main on this. If you can -- there, stop right there. This is it, right here.

And then if you could just read that paragraph right there.

A. "Should I leave encrypting in a regular bunker X backup? In fact, who are we defending ourselves against? The main backups will kind of already be in ENCFS anyway or perhaps, for example, one could save them in the cloud then, without another ENCFS actually. That duplicity itself encrypts is, of course, helpful against hackers getting on Mailwoo, but it also depends on where one would leave the password."

Q. And is it your understanding that one of the concerns that Mr. Sterlingov is expressing here is having his data accessed by hackers?

A. Yes.

Q. Would you understand the sentence here where he says, "In fact, who are we defending ourselves against?" is sort of expressing some kind of doubt over whether or not he should encrypt his data at all?

A. I am not sure. I thought it was more a philosophical question.

Q. But you don't see him expressing a concern of encrypting

his data to evade law enforcement in that paragraph, do you?

A. Not in this paragraph.

Q. You can take that down, Mr. Hassard. You reviewed records in relation to Mr. Sterlingov's To the Moon server in Romania?

A. Yes.

Q. Did you review the actual physical server itself?

A. Not the physical server, but the server images, yes.

Q. And that in a certain sense limits your review of the full capability of the server knowing what it could do -- actually do?

A. I wouldn't say that reviewing only images limits the capability of understanding it. I always review images and in most cases, never, unless it is a laptop or something, interact with the physical device.

Q. Do you know where the physical device is?

A. Right now, no, I don't know where it is.

Q. Do you know what type of server it was?

A. I don't remember off the top of my head. It might have been Engine X, but I would have to look in my report again.

Q. As part of your review of the materials related to the To the Moon server, you reviewed the traffic report related to that server provided by the Romanian authorities?

A. Yes. I also reviewed the packet capture.

Q. Are you -- am I understanding your testimony correctly that the traffic report and that packet capture are two

separate things?

A.   I don't understand what you mean by traffic report.

Q.   I'm sorry.

A.   The two projects involving that server that I completed were first, reviewing the images of the server on -- which came in the form of three image files.  And at some other point, I got access to the packet capture, the communication in and out from that server or whichever IP was asked for.  And I reviewed that separately.

Q.   And when you reviewed that packet capture, you didn't see anything related to Bitcoin Fog, did you?

A.   I couldn't identify the majority of IP addresses it was communicating with, but nothing that I directly recognized as being Bitcoin Fog.

Q.   And did you check any of those IP addresses against the so-called Bitcoin Fog cluster that Mr. Scholl testified about?

A.   No.

Q.   And in the -- you did keyword searches in relation to the P caps?

A.   Yes, I did at some point, I think.

Q.   One of those words you searched was Shormint?

A.   Yes.

Q.   And you got no results when you searched the P caps for Shormint?

A.   That is right.

BY MR. EKELAND:  No further questions, Your Honor.

THE COURT:  All right.  I don't know how much time, Ms. Pelker, you need, whether we should take the break now or if you can -- if it is quick, we can finish up and do the break.

MS. PELKER:  I don't think it will be long.  But maybe just a short break and then we can go ahead.

THE COURT:  Why don't we take our morning break now.  It 11:00 now.  We will take a break until 11:15.  Please don't discuss the case among yourselves and don't conduct any research about the case and I will see you shortly.

(Jury out at 11:00 a.m.)

THE COURT:  You can take your break as well.  I just ask that you not discuss your testimony until it is complete.

Anything anyone wants to raise before the break?

MS. PELKER:  No, Your Honor.

MR. EKELAND:  No, Your Honor.

THE COURT:  Okay.  See you shortly.

(Recess taken at 11:01 a.m.)

THE COURT:  Who is the government's next -- I'm sorry.  Let's get the defendant.

All right.  Just before you get the jury --

THE COURTROOM DEPUTY:  Okay.

THE COURT:  Who is the government's next witness?

MR. PEARLMAN:  It is the FinCEN witness Ted Vlahakis.

THE COURT:  Okay.  Sounds good.  Let's get the jury.

(Jury in at 11:22 a.m.)

THE COURT:  All right.  And, Ms. Pelker, you may proceed when you are ready.

MS. PELKER:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. PELKER:

Q.  CS Mazars, defense counsel asked you whether there was anything in the devices or notes related to Bitcoin Fog.  To clarify, was there anything that you saw that had the words Bitcoin Fog specifically in them from the defendant's devices or notes?

A.  No.

Q.  But was there information and discussions that would be consistent with someone running a darknet site and a mixer?

MR. EKELAND:  Objection; leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. PELKER:

Q.  So when Mr. Ekeland was asking you about whether there was anything related to Bitcoin Fog, what was your understanding of the question?

A.  My understanding was related to Bitcoin Fog, the site by name or by a known URL, the .onion, anything explicitly linked to the website.

Q.   So you weren't saying that there wasn't evidence that would be relevant to determining whether Mr. Sterlingov's activity was consistent with running Bitcoin Fog?

MR. EKELAND:  Objection; leading.

THE COURT:  Sustained.

You can rephrase the question.

BY MS. PELKER:

Q.   Was there -- in your review, did you see activity that would have been consistent with someone who was running a site like Bitcoin Fog?

MR. EKELAND:  Objection; asked and answered.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. PELKER:

Q.   And in your review of Mr. Sterlingov's devices, did you find evidence -- did you find multiple pieces of evidence regarding him connecting to different computers?

A.   Doing remote connections, yes, or numerous references to that and giving commands as we saw in the commands histories.

Q.   Did we show every single one or even a -- did we show all of those questions and evidence to the jury in your testimony yesterday and today?

A.   I don't believe so, no.

Q.   And regarding bunker, can you tell just from your review of the data that the government does have what was on bunker

for sure?

A.    No.

Q.    And could bunker be a home computer?

A.    Yes, it could.

Q.    Could it also be a server somewhere?

A.    Yes, it could.

Q.    And can you tell what files are on bunker from your review?

A.    No.  Especially since in the command histories, once the connection if it were successful was made to bunker or any other computer or server, the commands that were run next on it, would not appear in that same command history.  It would appear on the remote computer's command history.  So any files that may have been created or listed, would not have been visible to me.

Q.    So when Mr. Ekeland was asking whether you saw references to Bitcoin Fog in those connections, even if it were a connection to Bitcoin Fog servers, would you see that in these logs?

A.    No, not necessarily.

Q.    And based on your review of these -- this evidence of remote connections, what is your understanding of whether there are additional devices and electronics that the defendant controlled that the -- whether the government has actually been able to review all of them?

MR. EKELAND:  Objection; compound, vague and ambiguous.

THE COURT:  Overruled.

THE WITNESS:  I believe there was at least one other device or computer that the team did not review.

BY MS. PELKER:

Q.   And did you see evidence that the defendant was connecting to multiple -- was connecting to remote devices or remote devices at various times?

A.   Yes.  There were multiple connection attempts in the commands that appeared under different profiles and at different points in the file.  I wouldn't be able to tell you exactly when in time without going deeper into the laptop forensics.  But in general, yes.

Q.   If we could pull up Exhibit 723.  And here Mr. Ekeland was asking you about the indication of bunkerX_home.  Does home in this exhibit necessarily mean a home computer?

A.   I didn't understand it that way personally when I read it.  But --

Q.   How would you read this?

A.   As the Linux directory home, because there is Linux directory home, because there is a Linux directory media as well.

Q.   And can you explain what the Linux home directory is?

A.   It is the directory that contains the user profiles.

Q.   Is that on any Linux device, including a device or server?

A.   Yes, generally they would all have home.

Q.   Turning briefly to the Romania server review.  When you -- the defense -- Mr. Ekeland asked you about searching P cap for certain words related to this case, do you recall that line of questioning?

A.   Yes.

Q.   And would you necessarily -- in P cap going through a server's network traffic, would the -- would you necessarily expect to see Shormint or Bitcoin Fog appearing in plain text that you could search?

A.   A lot of network traffic is encrypted, for example, anything going over https or like some of the encrypted connections, TCP connections that were described earlier, it was full content P cap.  But a decent amount I would say of the contents were encrypted.  So the main value would be from the source and destination IPs and the size of the data more so than specific contents.

Q.   And because the data is encrypted, what impact does that have on your ability to do meaningful keyword searches?

A.   The keyword searches would only hit on terms that were there all together within a packet, not encrypted.  So simply, the keyword searches would not be able to read all of the packet's data.

Q.   And defense counsel asked you about, I think, checking IP

addresses against the Bitcoin addresses in the Bitcoin Fog cluster. Do you remember that question?

A. Yes.

Q. Are IP addresses the same as Bitcoin addresses?

A. No.

Q. So would you expect to see an IP address in a list of Bitcoin addresses?

A. Not in a list of Bitcoin addresses.

Q. Mr. Ekeland asked you about the LTE router device. Do you recall that line of questions?

A. Yes.

Q. And he asked whether the LTE router could have been purchased on Amazon. Have you ever seen this device for sale on Amazon?

A. I have not.

Q. I would like to pull up Defendant's Exhibit 32, the device report.

And, Ms. Mazars, can you explain again, what the purpose was of putting together this sort of high level summary?

A. When I pulled the images, which were named mostly by their evidence number, from FBI's network and analyzed them, there were quite a few of them that I ended up adding into my forensic tool. And during case discussions, it started to become more and more cumbersome to refer to specifically which one out of memory, the one that has the Xeoma security camera,

the one that has this.  So for ease of discussion and just to document my work in general, I made this summary to make a simplified clear version of the images I added to the tool at that time.

Q.   So does a summary list all of the relevant files that were found on the device or things that kind of stood out to you to jog your memory about a particular device?

A.   It was to jog memory about a particular device.

Q.   So does what is listed here in the summary section necessarily note all of the files of interest that you discovered on those devices?

A.   No, it doesn't.

Q.   And if we could scroll down to the BitLocker drive that defense asked you about.  CS Mazars, was this a case that FBI and IRS worked together?

A.   Yes.

Q.   Was some evidence initially acquired by IRS and others by FBI?

A.   Yes, I think so.

Q.   And did IRS make some of the initial images of the devices seized from the defendant when he was arrested?

A.   Yes, I believe so.

Q.   And did you then later review images of some of those devices?

A.   Yes.

Q. And is it your understanding that IRS provided those images to the FBI?

A. Yes, IRS did provide some images or copies of images to FBI on hard drives.

Q. And specifically regarding 1B13, is this simply a drive from IRS that contains the images of Mr. Sterlingov's devices?

A. Yes, it was.

Q. And is that why it was included in the 1B numbers for Mr. Sterlingov's case?

A. It was. Because it was in the same -- stored in the same place on the network as the other images. And since I ingested it into my tool at the time of the report, I included it in the summary.

Q. I would like to turn briefly to your IP overlap analysis. And first, CS Mazars, just to be clear do people who are not criminals use Linux and SSH and VPNs and proxies?

A. Yes.

Q. But in your work, is it relevant when you see someone who is suspected of a crime using those services?

A. Yes, it is.

Q. And why is that?

A. Because anonymity is a big feature of any type of cybercrime. And observing which tools and techniques are used can greatly assist the investigators in trying to peel back those layers of anonymity and attribute the activity.

Q. And are these, in fact, tools that criminals use to try to conceal their activity from law enforcement?

A. Yes.

Q. Regarding your IP address analysis, Mr. Ekeland asked you about certain groupings. Do you recall that line of questions?

A. Yes.

Q. As well as attribution?

A. Yes.

Q. Now, was your role in doing the IP address analysis when you were -- you were doing this part of your review to make individual attributions of who was controlling the account?

A. No, it wasn't.

Q. And, in fact, if we could actually scroll over to the first tab here.

Were the accounts that you reviewed for many of them already previously attributed or had some attribution information with them?

A. Yes.

Q. So what was your -- when -- what was your purpose in doing this review?

A. It was to compare the sources and look for commonalties specifically, in IP addresses occurring across multiple sets of logs and, in particular, the ones that occurred close together in time.

Q. And were you ruling out attribution when you were doing

this when you were doing your IP address analysis and looking at the Shormint account, were you saying that it definitely was not associated with any other particular address?

MR. EKELAND:  Objection; leading.

THE COURT:  Sustained.

You can rephrase the question.

BY MS. PELKER:

Q.   If we could go to the tab of 123 underscore chart here.

Now, Mr. Ekeland was asking you about the connections between the Shormint account and some of the other accounts. Do you recall that?

A.   Yes.

Q.   And looking at this tab here, can you walk through what -- just note the different accounts that were accessed by this 123 IP address?

A.   Liberty Reserve Shormint account, the Mt. Gox Volf.prius account, the Liberty Reserve account for plasma@plasmadivision.com, the Mt. Gox account for Peter NFS, and the Mt. Gox account for Kolbasa.

Q.   So does this include both the Liberty Reserve Shormint account and Mr. Sterlingov's true name Liberty Reserve PlasmaDivision account?

A.   Yes, it does.

Q.   And does it also include the Peter NFS Kolbasa and Volf.prius burner or short-term use accounts?

A.    Yes.

Q.    And what was the significance of the timing proximity of all of these accesses for you?

MR. EKELAND:  Objection; leading.

THE COURT:  Overruled.

THE WITNESS:  I noticed that --

BY MR. PEARLMAN:

Q.    We don't have to go through all of the time stamps.

MR. EKELAND:  Objection, Your Honor.

THE WITNESS:  I am trying to summarize.

I noticed that all of the accesses happened in late November of 2011.  And that in terms of time sequence, some accounts that were visited, most notably here, Liberty Reserve Shormint account were visited again after other accounts in order.  So that matter of a few days definitely caught my attention.

The groupings finding that I believe Mr. Ekeland was referring to was from an initial IP overlap writeup I did where I took an extremely conservative approach and focused on what I considered the closest overlaps.  That was a way of filtering a dataset that had so many IPs into this core set of interest.

MR. EKELAND:  Objection, Your Honor.

Could we pick up the phone for a moment?

(Conference held at the bench.)

MR. EKELAND:  Your Honor, I am wondering now if what

I just heard from the witness is that she now has a different expert opinion than what was disclosed in her expert report. She just testified that what she was talking about when I crossed her on was in an initial expert opinion. But there has been no additional expert opinion disclosed to us. And it is my understanding that the time for expert conclusions are well past. And so I am a little bit -- I don't know what to think of what I just heard.

THE COURT: Ms. Pelker.

MS. PELKER: I don't think that is at all what the witness was testifying to. She was explaining her -- Mr. Ekeland was crossing her on this initial report. We provided and presented testimony about this summary spreadsheet that lists out the different IP addresses. She is not offering a new opinion.

MR. EKELAND: Your Honor, to the extent that she is offering or disclosing a new expert opinion that has not been disclosed to the defense, we object.

THE COURT: That is the question though. Ms. Pelker is saying she is not, so you need to explain to me why she is.

MR. EKELAND: Because she just testified this was in an initial report and somehow this chart that she was testifying was somehow different. But if I recall correctly that chart was in the initial report, so I am just very confused. Is the witness testifying that she has reached a new

expert conclusion different than her initial report?  Maybe we should --

THE COURT:  Ms. Pelker, I don't know if you to want ask the question, if it needs to be.  I am looking at the real time and I just don't see this in the real time.  So it is maybe that it is just not accurately captured at this point.  But I don't see this in the real time as I am looking at it now.  I see a reference to an initial IP overlap writeup.  I don't see a difference in different reports.

MS. PELKER:  I think that we may just also be talking a little bit about apples and oranges.  This is just a summary of different log ins and time stamps.  There was a report and an assessment of certain events that were in such close temporal proximity that she could say with near certainty that these were the same individuals.  She is presenting this and saying she is looking at this and these are the different time stamps.  And she is commenting on the temporal proximity.  That is not a different opinion.

THE COURT:  All right.  I guess I don't see any basis for thinking there is a different opinion that hasn't been disclosed here.  So to the extent there is an objection, it is overruled.

(End of bench conference.)

THE COURT:  You may continue.

BY MS. PELKER:

Q.    CS Mazars, were you done with your answer?

A.    No.  I was continuing to try to provide more clarity around the summary spreadsheet and it's -- my process of putting it together.

Q.    Could you go ahead and explain based on what is here in front of you of this summary chart, based on what is here in front of you with this summary chart how you're able to view the different accesses and connections?

A.    I'm sorry.  What do you mean, how can I view them?

Q.    What is your -- can you explain the significance of these accesses and times related to --

           MR. EKELAND:  Objection, Your Honor.

           THE COURT:  What is the objection?

           MR. EKELAND:  There was a pending question.  And then counsel was testifying and not asking a question.

           MS. PELKER:  I am happy to go back to the question. I was trying to be responsive to Mr. Ekeland's concerns.

           Can we actually read back what the question was?

           THE COURT:  I think if you are asking -- I think your question was, "Could you go ahead and explain based on what is here in front of you of this summary chart, the basis on what is here in front of you with the summary chart, how you are able to view the different accesses and connections?"

           MS. PELKER:  That is not artfully --

           THE COURT:  Maybe you want to rephrase the question.

MS. PELKER:  Thank you, Your Honor.

BY MS. PELKER:

Q.    CS Mazars, can you explain how you are able to connect different accounts together or make assessments about them based on this IP analysis?

MR. EKELAND:  Objection; leading.

THE COURT:  Overruled.

THE WITNESS:  So for this IP analysis and to make this table where I took the IPs as -- that as I explained, I first located as being of interest, and then went back in their data sources to pull all of their occurrences, once I did that to make these tables, where I see all of the times that each IP appeared in different files and seeing them all being in late November from a particular source, to me, the equivalent might be if you were investigating a bank robbery and you got information that someone saw a 2012 white Nissan Altima outside of the bank at that time, outside of a house where some of the money was found; and then, in another source, you look at the Home Depot security footage and before the robbery, there was a white, you know, Altima of the same year there.

Many different people can drive that type of car. But whether or not they are connected, you have to consider how it looks depending on in what order the events -- it was spotted and how close together.  And so from analyzing many sets of IPs, I look at this data all together.  And I don't see

this as different people driving the car. This, to me, is one complete story and I believe that it was the same user accessing all of them.

MR. EKELAND: Objection, Your Honor. Can we talk on the phone for a second?

(Conference held at the bench.)

MR. EKELAND: To the extent that the witness just testified that the same user accessed all of these accounts, that is not what was disclosed in her expert report. Her expert report clearly says that she groups two users -- I asked her about this on Daubert. This is not -- I don't understand this testimony.

THE COURT: Ms. Pelker.

MS. PELKER: Your Honor, defense counsel crossed her on the assessments here and how multiple people can be using these different proxy servers. We just asked her to explain how she has put together this chart.

MR. EKELAND: She just testified that the same user is behind all of these accounts and that is not what was disclosed in her expert report.

THE COURT: I do think that Ms. Pelker is right on this. You did open the door on this yourself on your cross-examination by asking her and sort of suggesting to her they were all different and can't be connected. And the government is entitled to come back and rebut the impression

that you left in that regard, so the objection is overruled.

MR. EKELAND: Your Honor, may I be heard?

THE COURT: You have been heard, but you can be heard again, if you would like.

MR. EKELAND: If I recall her testimony correctly, she said that she grouped the users into two groups. And that one -- she testified that one user accessed the emails and in the accounts related to Mr. Sterlingov and Volf.prius and the other account, which was the Shormint related emails were separate and so we object.

THE COURT: I understand.

Go ahead.

MS. PELKER: For the record, that wasn't the Daubert hearing testimony. She was asked very specifically about two distinct groupings that she had done as part of her initial analysis. She explicitly said that this was not saying that these groups -- that those users were not grouped together.

THE COURT: I have ruled on the objection and we can move on.

(End of bench conference.)

THE COURT: The witness is excused. Thank you.

THE WITNESS: Thank you.

MR. PEARLMAN: May I get the next witness, Your Honor?

THE COURT: Yes.

THEODORE VLAHAKIS, sworn.

THE WITNESS: I do.

THE COURTROOM DEPUTY: Thank you.

THE WITNESS: Thank you.

THE COURT: All right. And you may proceed.

DIRECT EXAMINATION

BY MR. PEARLMAN:

Q. Hi, sir. How are you?

A. Good. How are you?

Q. Good. Could you -- I don't know if you introduced yourself before, but can you again introduce yourself to the members of the jury. State your first name and your last name and spell it, please?

A. Hi. Good morning. My name is Theodore Vlahakis. Last name is spelled V, as in Victor, L-A-H-A-K-I-S, as in Sam; first name is Theodore, T-H-E-O-D-O-R-E.

Q. Where do you work?

A. I work at the US Department of Treasury, Financial Crimes Enforcement Network, commonly known as FinCEN.

Q. What is FinCEN?

A. FinCEN is a bureau of the US Department of Treasury tasked with protecting the US financial system against money laundering and similar types of financial crimes.

Q. Can you tell us a little bit about your education and experience insofar as it relates to your present job?

A.    Yes.  I have a BA from Brandeis University.  And I have a JD from University George Mason School of law.  And I am a member of the District of Columbia bar.

Q.    When did you start working for FinCEN?

A.    March of 2009.

Q.    And what was your starting title and responsibilities?

A.    Starting title was Bank Secrecy Act resource center specialist.  And that position involved answering regulatory inquiries about the Bank Secrecy Act, which is the federal anti-money laundering statute.  And these inquiries came from financial institutions, regulators and law enforcement.  And the responses were provided via phone and email.

Q.    So if I, as a regulated body, had questions for FinCEN about how the rules might be applied, I could get in touch with FinCEN?

A.    Correct.

Q.    And by phone or by email?

A.    Yes.  And all responses were provided within at least 24 hours and the responses were not -- it was not a live line, so, you know, the caller had to leave a voicemail, but they were responded to very promptly.

Q.    At some point, did you move to the enforcement division at FinCEN?

A.    Yes.

Q.    What does that division do?

A. That division essentially investigates financial institutions for possible violations of the Bank Secrecy Act, which is, again, the federal anti-money laundering statute and takes necessary action against those institutions.

Q. And did you say your current role was -- what is your current title?

A. My current role is senior compliance officer.

Q. So can you tell the jury a bit about your current responsibilities?

A. Sure. I educate financial institutions about their compliance obligations under the Bank Secrecy Act. I provide training to internal and external stakeholders. So that could be a new hire, it could be an interdivisional training. I also provide training to law enforcement, US Attorney's Offices. And I testify as a fact witness in criminal money laundering trials.

Q. Can you explain what the Bank Secrecy Act is?

A. Yes. So the Bank Secrecy Act is a federal anti-money laundering statute that was enacted in 1970. And it requires financial institutions to keep certain records relating to transactions, to file reports relating to certain transactions, to engage in transaction monitoring to have an anti-money laundering program. And the purpose of this is to help protect the financial system.

Q. How does it help protect the financial system?

A.    Okay.  As I mentioned, the financial institutions need to file certain reports with FinCEN.  I will just use that as an example.  These reports include, currency transaction reports or CTRs.  And those are reports for any transaction in currency exceeding $10,000 by or on behalf of a person or entity during the course of a business day, whether or not they may be suspicious.

Another type of report is a suspicious activity report or SAR.  Those reports are filed by financial institutions if they believe that suspicious activity has possibly occurred, suspicious transactions may have occurred.  And those reports, are -- once we receive them, they are electronically filed.  They are input to a database.  And that database is searchable by law enforcement as they conduct their investigations and FinCEN staff with a need to know.  And that aids in conducting these investigations, and as we say, following the money trail.  Because these reports contain crucial information about the types of transactions, who is involved, all identifying information.  And so it allows law enforcement to put the pieces together when they conduct their investigations.

Q.    And as a general matter, how does FinCEN ensure compliance with the institutions that it regulates in terms of anti-money laundering?

A.    A number of ways.  We -- to ensure compliance, as I mentioned, there is the regulatory helpline.  And that is more

of a passive route.  So if an institution has questions, for example, when should they file one of these reports like a CTR, SAR they can contact this helpline.  So any type of questions related to recordkeeping, anti-money laundering programs, reporting they can call the helpline.  FinCEN also engages in proactive training with regulators and financial institutions.

And FinCEN has an extensive publicly available website with training guides.  And so, for example, if an institution would like to know what to put in their anti-money laundering program, we have guidance or what may constitute a suspicious activity report.  And we have guidance and that guidance always states the contact information on the regulatory helpline if they have questions.

Q.   For the anti-money laundering program, what is the expectation of what these institutions are supposed to be doing to police themselves?

A.   So the overarching purpose of the anti-money laundering program is to -- we want to help ensure the financial institution is not laundering money, wittingly or unwittingly.  So we impose four requirements on the institutions as a part of this anti-money laundering program.

The first one is policies and procedures.  They need to have policies and procedures to ensure compliance with our requirements under the BSA.  They need to have what is called a compliance officer.  So that is just somebody who is in charge

of filing the necessary reports, as I mentioned, keeping records. And basically just ensuring that the institution is not laundering money. They need to have an independent review of this program. So somebody who is, obviously, not the compliance officer, not working at the institution, auditing the program. And they need to have -- excuse me -- education and training of the staff in our requirement, so some type of training program that they hold at regular intervals.

Q. Do you know what know your customer laws are?

A. Yes.

Q. Can you explain that and how that relates to FinCEN?

A. Yes. So know your customer is very similar to the anti-money laundering program that I just described. And know your customer essentially requires financial institutions to have a reasonable belief that they know the identity of the person conducting the transaction. And so how would they do that? Obtaining a government issued ID, for example, or if they can't do that, you know, a reasonable alternative. So that they know if, let's say John Smith wants to send money somewhere or goes to a bank and wants to open an account, they know that this person actually is John Smith. So they need to collect the appropriate ID.

Q. For all of these rules and regulations of FinCEN, does FinCEN offer any online assistance to publicize what those rules are?

A.    Yes.

Q.    And so does it have its own website?

A.    Yes.  The website is www.FinCEN.gov.  And the way the website works is we have tabs like on the upper part of the screen.  And you can -- if you are a certain type of financial institution, for example a bank, you can click on banks and it will list all of the guidance pieces, webinars, administrative rulings, advisories, FAQ documents that you may be looking for.  For example, you mentioned know your customer.  We have guidance pieces on that, webinars.  And also let's say, I don't know where to look on the website.  We have a search bar in the upper right, works very much like Google.  So I can type in know your customer or anti-money laundering program.  And it will pull up a list of all related documents.

So even if you are not a savvy user or experienced user of our website, it is pretty easy to find what you are looking for.

Q.    Has FinCEN provided guidance about virtual currency?

A.    Yes.

Q.    And did FinCEN provide guidance about virtual currency in March of 2013?

A.    Yes.

Q.    Where is the main office of FinCEN?

A.    Washington, DC.

Q.    I want to show you a couple of forms.  Ms. De Falco, if

you could pull up 35B.  Thank you.

This is not in evidence.

THE COURTROOM DEPUTY:  Okay.

BY MR. PEARLMAN:

Q.    Do you recognize what this form is?

A.    Yes.

Q.    What is this form?

A.    This form is FinCEN form 107, registration of money service business or RMSB.

Q.    And is this form something that a money service business would need to fill out to comply with the rules of FinCEN?

A.    Yes.

Q.    And does it --

MR. PEARLMAN:  At this time, we would move to introduce 35B, Your Honor.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  Exhibit 35B is admitted and may be published to the jury.

(Whereupon, Exhibit No. 35B was admitted.)

BY MR. PEARLMAN:

Q.    Okay.  So showing the jury 35B.  This is the registration of money service form.  Is this something that is filed by mail or filed electronically?

A.    Electronically.

Q. And does a person or business need to file this regardless of what state or District of Columbia they are in?

A. Yes. Excuse me. Yes.

Q. And I don't want to go into specifically what a money service business is. But do you need to register if you are a money service business?

A. Yes, within 180 days of establishing your business.

Q. Just going down this form, if we could look at page 2. Do you see where it says registrant information?

A. Yes.

Q. And does that include what is listed as part 3, individual's last name or entity's legal name?

A. Yes.

Q. Does the form also through 7 through 11 give you an opportunity to provide address type information?

A. Yes. Correct.

Q. What is there at number 16 that you can also provide?

A. Field 16, email address.

Q. And just looking at number 18, what does that indicate?

A. Name of compliance contact person for this registered MSB.

Q. If we could go to page 3, number 34. Is this where someone would indicate where they are physically located and/or providing MSB activities?

A. Correct.

Q. And does that include the District of Columbia?

A.   Yes.

Q.   And if you could go to page 4, please.  Do you see at 36, where it indicates money service business activities of the registrant in the US?

A.   Yes.

Q.   With one of those -- would you read what box is at letter F?

A.   F, money transmitter.

Q.   Okay.  We can pull this down.  So does FinCEN regulate the -- how does FinCEN regulations work with state regulations concerning money laundering and these businesses?

A.   Each state may have different requirements.  And so those requirements are left up to the states.  But FinCEN is concerned with the Bank Secrecy Act, which is federal in nature.  And so someone may be in compliance with their state requirement, let's say, but not with FinCEN.  And so we are just concerned with the federal requirements under the BSA.

Q.   Does FinCEN maintain the registrations filed on behalf of the individuals who file these forms?

A.   Yes.

Q.   And do they keep the records?

A.   Yes.

Q.   And are the records preserved in the course of business?

A.   They are, yes.

Q.   Is FinCEN sometimes asked to perform searches of its

databases to determine whether someone is registered with FinCEN as a particular type of business?

A. Yes.

Q. And if I could show 35C. What do you recognize what type of -- just looking at page 1 and 2.

And these are already into evidence.

Do you recognize what this form is?

A. Yes.

Q. Is this an example of a response to a research request?

A. Yes.

MR. PEARLMAN: Okay. We can pull that down. The Court's indulgence.

Pass the witness, Your Honor.

THE COURT: All right. Mr. Ekeland, any questions?

CROSS-EXAMINATION

BY MR. EKELAND:

Q. You testified that FinCEN didn't offer any guidance on virtual currencies until March 2013; is that correct?

A. That was an official guidance piece that we issued in 2013.

Q. And in 2011, had FinCEN issued any guidance whatsoever in relation to cryptocurrencies?

A. 2011, FinCEN issued what is called the MSB or money service business final rule. And that 2013 guidance is actually just explaining the relevant portions of that rule,

that certain entities engaging in cryptocurrency exchange would be required to register.

Q.   And were those -- did that include mixers in 2011?

A.   I'm sorry, sir.  Could you please --

MR. PEARLMAN:  Objection; beyond the scope.

MR. EKELAND:  They have brought him in to testify about money business licensing registration.  And I am asking for clarification on the rule that Mr. Pearlman asked him about the guidance in March of 2013.

THE COURT:  Let's pick up the phone.

(Conference held at the bench.)

MR. PEARLMAN:  Your Honor, we tried to circumscribe this testimony in conformance with your order that we not get into details about which Your Honor might instruct the jury. It seems that Mr. Ekeland is going directly to whether the FinCEN rules apply to the specific facts of this case.  And so we think that this is not only beyond the scope, but it is inappropriate.

MR. EKELAND:  I am not trying to get into that, Your Honor.  And I can maybe clarify my question.  What I was really trying to get to is whether or not FinCEN had offered any guidance on cryptocurrency before 2013.  Because when he testified in response to Mr. Pearlman's question that FinCEN had issued guidance in March 2013 on cryptocurrencies, it wasn't clear to me whether or not there had been prior

guidance. So that is merely what I was asking on.

THE COURT: Although I think he answered that question already by saying there was the prior regulation, which the guidance then explained. And then I think your question that drew the objection was essentially, were mixers covered in 2011, which I think does cross the line that we all agreed upon and is something in which I would be instructing the jury about what the rules were. It wasn't a rule in 2011, that is an issue to take up with me, I think.

If you are asking for clarification with what kind of guidance was, you are entitled to, I suppose, ask about following up on Mr. Pearlman's questions.

MR. EKELAND: I will keep it to that, Your Honor. I wasn't -- I was actually surprised that he mentioned there had been the rule in 2011, so that caught me offguard, honestly.

THE COURT: Mr. Pearlman, does that address your concern?

MR. PEARLMAN: It does, Your Honor. But I guess I'd ask that at the end of his testimony that you just instruct the jury that you will be instructing as to what rules and regulations the jury will have to consider.

THE COURT: Any objection to that?

MR. EKELAND: No objection, Your Honor.

THE COURT: Okay.

(End of bench conference.)

BY THE COURT:  You may proceed.

MR. EKELAND:  Thank you, Your Honor.

BY MR. EKELAND:

Q.  Just for clarity's sake, prior to March 2013 had FinCEN issued any guidance in relation to cryptocurrencies?

A.  Guidance, no; rules relating to it, yes.

BY MR. EKELAND:  No further questions, Your Honor.

THE COURT:  All right.  Any redirect?

REDIRECT EXAMINATION

BY MR. PEARLMAN:

Q.  Without getting into what those rules were, did the guidance change what the rules were concerning cryptocurrency?

A.  No.  Just explained those rules.

MR. PEARLMAN:  No further questions.

THE COURT:  All right.  The witness is excused. Thank you.

THE WITNESS:  Thank you.

THE COURT:  And members of the jury, I will instruct you on the law that you should apply in this case.  And I think that was the reason we were being somewhat careful there is because it is up to me to tell you what the law is that you should apply in this case.  And I will do that at the end of the case.  All right.  Anything else?  Let's see now, who is your next witness?

MR. PEARLMAN:  Larry Harmon, Your Honor.

THE COURT: How long do you think it will take?

I am trying to figure out whether we should take an early lunch break or --

MR. PEARLMAN: We could --

THE COURT: I'm sorry.

MR. PEARLMAN: I interrupted you, Your Honor.

THE COURT: Go ahead.

MR. PEARLMAN: I think it will take about a half an hour on direct at most.

THE COURT: Does the jury have a preference to an early lunch break now or going for another 20 minutes?

Go for another 20? I see some nods.

All right. Lets go for 20 and we'll break at 12:30.

LARRY HARMON, sworn.

THE WITNESS: Yes.

THE COURTROOM DEPUTY: Thank you. Please be seated.

DIRECT EXAMINATION

BY MR. PEARLMAN:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Sir, can you introduce yourself to the members of the jury by clearly stating your first and last name and spelling your first and last name?

A. My name is Larry Harmon, spelled, L-A-R-R-Y, H-A-R-M-O-N.

Q. Mr. Harmon, were you arrested back in February of 2020?

A. Yes.

Q. Were you arrested in connection with the administration of a mixer called Helix and later Helix Light?

A. Yes.

Q. Were you criminally charged and thus arrested for that?

A. Yes.

Q. Was one of the charges that you had that you were charged with conspiracy to launder money?

A. Yes.

Q. In August of 2021, did you eventually plead guilty to one count of money laundering conspiracy, pursuant to the Title 18 U.S.C. 1956(h)?

A. Yes.

Q. Sir, I want to show you what has been marked for identification purposes as 45C.

Sir, while you are taking a look at the document, do you recognize this document?

A. Yes, that is my plea agreement.

Q. And on page 1, does it indicate your attorney, Charles Flood?

A. Yes.

Q. And then looking at the -- is that letter dated August 6, 2021?

A. Yes.

Q. If you could go to the last page or -- yes. Where it says

defendant's acceptance, do you see that?

A.    Yes.

Q.    Is that your signature?

A.    Yes, it is.

Q.    And is that dated -- it appears to be 8/10/21?

A.    Yes.

Q.    Okay.  Did you sign this agreement and understand it?

A.    Yes.

Q.    Did you have a chance to consult with Mr. Flood about this agreement?

A.    Yes.

        MR. PEARLMAN:  At this time, Your Honor, I'd like to introduce Government Exhibit 45C?

        THE COURT:  Any objection.

        MR. EKELAND:  No objection.

        THE COURT:  Government Exhibit 45C is admitted and may be published to the jury.

        (Whereupon, Exhibit No. 45C was admitted.)

BY MR. PEARLMAN:

Q.    Showing you page 1 of the exhibit when you testified it was a letter dated August 6 to Mr. Flood, is that what you were talking about?

A.    Yes.

Q.    And then just going to the last page where it said defendant's acceptance, is that what you were referring to?

A.    Yes.

Q.    And now I would like to show you Government Exhibit 45D, which has not been offered into evidence:  Do you recognize Government Exhibit 45D?

A.    It looks like my statement of offense.

Q.    We can take a minute to look at it.  Let's go to the last page.  Do you see a paragraph labeled defendant's acceptance?

A.    Yes.

Q.    Is that your signature at the bottom?

A.    Yes.

Q.    Is that also dated August 10th, 2021?

A.    Yes.

Q.    Is that the same date that you signed the plea agreement?

A.    Yes.

Q.    Okay.  Just go back up to the top, please, of page 1 where it says statement of the offense and related conduct.  Is this the statement of offense that you signed?

A.    Yes.

        MR. PEARLMAN:  At this time, Your Honor, we would move to introduce Government Exhibit 45D.

        THE COURT:  Any objection?

        MR. EKELAND:  No objection.

        THE COURT:  Exhibit 45D is admitted and may be published to the jury.

        (Whereupon, Exhibit No. 45D was admitted.)

BY MR. PEARLMAN:

Q.   I just want to show the jury when you indicated statement of the offense and related conduct is this page 1 what you were referring to?

A.   Yes.

Q.   And does that say United States versus Larry Dean Harmon?

A.   Yes, it does.

Q.   And let's go to the last page.  When we were speaking about the defendant's acceptance, is that your signature there?

A.   Yes.

Q.   Sir, when you signed these documents, did you have a chance to consult with Mr. Flood, your counsel, about signing these documents?

A.   Yes.

Q.   And did you, in fact, plead guilty to money laundering conspiracy?

A.   Yes.

Q.   If I could ask you to speak up a little bit, sir.

A.   Yes, I did.

Q.   And speak into the microphone.  I appreciate that.

     Did the government dismiss other charges as part of that plea agreement?

A.   Yes, they did.

Q.   If we can go back to 45C.  And if you could go up to the top please, Ms. De Falco.

At the time that you pled guilty, did you have an understanding about what the maximum sentence under the statute was for the money laundering conspiracy?

A.    It was 20 years.

Q.    And by the way, who did you plead in front of?

A.    Judge Beryl Howell.

Q.    Judge Beryl Howell?

A.    Yes.

Q.    Is she the one who will be sentencing you?

A.    Yes.

Q.    And I need to ask you a couple of questions about the United States sentencing guidelines.  Do you have a general understanding of what the United States sentencing guidelines are?

A.    Yes.

Q.    What is your general understanding?

A.    So it is a point system in which your crimes get a point and any mitigating factors get a certain number of points.  And then there is a chart that you add up those points.  And it gives you what is the recommended sentencing that the judge should give.

Q.    Is that usually within a range?

A.    Yes.

Q.    Does the judge have to follow that recommendation?

A.    No, they don't, unless it is a mandatory minimum, then

they have to give the mandatory minimum.

Q.   At least the mandatory minimum?

A.   Right.

Q.   But is that a place where the court is supposed to start and consider?

A.   Yes.

Q.   In your particular case, what is your understanding of the biggest factor in your charge that affects the guidelines?

A.   For my case, it was the amount of money that -- or Bitcoin that went through my service that was the -- had the most points to my sentencing guidelines.

Q.   And if you could go to page 2, Ms. De Falco.  Keep going down, please.

     Okay.  Do you see there for the sentencing guidelines analysis at page 2 of 15?  Do you see that?

A.   Yes.

Q.   And do you see a subparagraph, estimated offense level under the guidelines?

A.   Yes.

Q.   Can you read that first sentence?

A.   "Your client agrees and will acknowledge at the time of the plea of guilty to the offense stated above that pursuant to USSG 1B1.3 your client is criminally responsible for laundering transactions totaling at least 354,468 Bitcoin, the equivalent of approximately $311,145,854 at the time of the transactions,

which quantity represents the total amount involved in your client's relevant criminal conduct. Your client further agrees that" --

Q. You can stop there.

A. Okay.

Q. And this will be available for the jury. So what is your understanding about how much laundering you took responsibility for, was it the full amount of the Bitcoin?

A. Yeah, that amount.

Q. And so in calculating the sentencing guidelines, what was determined to be the guideline range, the anticipated guideline range?

A. With that amount and for me, it was life in prison.

Q. Would that be affected by the statutory maximum?

A. Yes. So for that crime, there was a maximum of 20 years.

Q. So you could do no more than 20 years?

A. Correct.

THE COURT: Can I interrupt just to ask you a question. Is your lawyer here today?

THE WITNESS: No.

THE COURT: Did you consult with your lawyer before coming today?

THE WITNESS: Yeah.

THE COURT: Did you obtain advice about whether you should come here today from your lawyer?

THE WITNESS: Yes.

THE COURT: Are you comfortable being here and testifying today without your lawyer?

THE WITNESS: Yes.

THE COURT: Okay. I just wanted to make sure that he wasn't without counsel.

MR. PEARLMAN: And we have been in touch with his lawyer, Your Honor.

THE COURT: All right. Thank you.

BY MR. PEARLMAN:

Q. As a condition of your plea agreement, did you agree to provide cooperation to the government?

A. Yes.

Q. Ms. De Falco, could you turn to page 6, please.

Do you see in line 9, it says cooperation?

A. Yes.

Q. Could you just read that first sentence under subparagraph A?

A. "Your client shall cooperate fully, truthfully, completely and forthrightly with the office and other federal, state and local law enforcement authorities identified by this office in any and all matters as to which the government deems the cooperation relevant."

Q. And then a few lines down towards the right-hand side it says, "Any refusal." Do you see that?

A. Yes.

Q. Could you read that sentence and it is admittedly a lengthy sentence?

A. "Any refusal by your client to cooperate fully, truthfully, completely and forthrightly as directed by this office and other federal, state and local law enforcement authorities identified by this office in any and all matters in which the government deems your client's assistance relevant will constitute a breach of this agreement by your client and will relieve the government of its obligations under this agreement including but not limited to its obligation to inform this Court and the Departure Guidelines Committee of the US Attorney's Office for the District of Columbia of any assistance your client has provided."

Q. So to try to sum up, what is it you are seeking to get out of this agreement?

A. So I am seeking to get the prosecution to recommend a lighter sentence.

Q. To who should the government offer its recommendation?

A. To the judge.

Q. Does the judge have to follow what the government says?

A. No.

Q. And what is it that the government, to your understanding, expects in turn?

A. That I cooperate in helping them with any investigations

truthfully and to the best of my ability.

Q.    Just the investigation regarding Bitcoin Fog or any other investigation the government asks you about?

A.    Any other one.

Q.    And if you fail to follow the terms of the agreement, what can the government do?

A.    They can take away this agreement and not recommend any lighter sentence, but I will still have pled guilty.

Q.    You still will have pled guilty?

A.    Yes.

Q.    Do you know somebody named Roman Sterlingov?

A.    No.

Q.    Let me ask you a couple questions about yourself.  What area of the United States are you from?

A.    Akron, Ohio.

Q.    Do you have computer programming experience?

A.    Yes.

Q.    Do you have computer programming experience by education and formal training?

        MR. EKELAND:  Objection, Your Honor.  Can we pick up the phone for a moment?

        (Conference held at the bench.)

        MR. EKELAND:  Your Honor, I don't understand the relevance of this witness.  He hasn't been -- and this is an objection we did raise before, but I don't understand.  He

hasn't been noticed as an expert. He doesn't know Mr. Sterlingov. I don't see even how he is a fact witness. And what I am concerned about is where this is going is that it is an attempt by the government to back door in 702 testimony that hasn't been noticed.

I thought maybe that he -- maybe he was being brought in to testify, oh, he somehow, you know, mixed with Bitcoin Fog or there was some kind of factual basis. As I am flipping through the statement of the offense, I don't see that. So I am concerned here on relevance grounds, 702 grounds and frankly also 403, because of what he did was pretty bad.

THE COURT: All right.

MR. PEARLMAN: Well, so the fact that he did something that was, quote, pretty bad, does not establish a 403 violation. He has already testified he is here today to talk about his relationship with Bitcoin Fog. He used the Bitcoin Fog mixer. Mr. Ekeland has been aware for several months that Mr. Harmon was going to testify. And we provided discovery about Mr. Harmon.

THE COURT: Yeah. So it sounds to me like you have answered the question Mr. Ekeland raised. And so we have got another 2 or 3 minutes because I have to break because I have got something I need to do at 12:30, so why don't we continue.

(End of bench conference.)

THE COURT: You may continue.

MR. PEARLMAN: The objection is overruled, Your Honor?

THE COURT: Yes.

BY MR. PEARLMAN:

Q. Sir, did you have formal training in the area of computer science?

A. I had one semester in college.

Q. Did you have other just experiential training with computer programming and computer science?

A. My dad was a programmer. And he got me books on programming. I pretty much learned myself.

Q. Did you attempt to use those skills to use in the business world in the marketplace?

MR. EKELAND: Objection; leading.

THE COURT: Overruled.

THE WITNESS: Yes. I created many websites and made my life basically about programming.

BY MR. PEARLMAN:

Q. About programming?

A. Yeah, I used it to make a living.

Q. At some point, did you become familiar with something called the darknet?

A. Yes.

Q. Did you become familiar with something called Tor browser?

A. Yes.

Q.   Are you familiar with Tor browser?

A.   Yes.

Q.   Have you used Tor browser?

A.   Yes.

Q.   Did you observe anything about Tor browser related to the ability of someone to easily find specific sites on Tor browser?

MR. EKELAND:  Objection; leading.

THE COURT:  Overruled.

THE WITNESS:  So can you rephrase that?

BY MR. PEARLMAN:

Q.   Sure.  Did you see a need within the darknet to be able to search for certain types of things on the darknet and try to satisfy that with your programming skills?

A.   Right.

MR. EKELAND:  Objection; leading and compound.

THE COURT:  Overruled.

THE WITNESS:  So when I was on the dark web, I noticed there was lots of darknet sites, about five or six marketplaces, they are called.  There was about five or six big ones.  And in order to view them, you had to create an account, log in, and then you could see the different items through their search on each separate one.

And I created a way that would make it so that you could search all of them from one website.

BY MR. PEARLMAN:

Q. What did you call that website?

A. Grams.

Q. So was Grams only accessible through the Tor browser or was it accessible on the regular internet?

A. Only through Tor.

Q. So what did you have Grams set out to do?

A. It was supposed to be the darknet search engine, but it only searched the darknet marketplaces and then I added features as time went on.

Q. Let me show you what has been marked for identification purposes as 46 and 46A. Let's start with 46.

Do you recognize what 46 is?

A. Yes. That is the homepage for Grams.

Q. Let me show you what has been marked for identification purposes as 46A. Do you recognize what 46A is?

A. A frequently asked questions for Grams.

Q. Is Grams a site that you controlled?

A. Yes.

Q. Are these fair and accurate versions of what someone might see if they went to Grams?

A. Yes.

MR. PEARLMAN: Okay. Move to introduce Government Exhibit 46 and 46A?

THE COURT: Any objection?

MR. EKELAND:  Hearsay and relevance, in particularly in relation to the it look like frequently asked questions, it looked like there was a lot of hearsay in there and honestly relevance.

THE COURT:  Can you page up for me to the frequently asked questions?

MR. PEARLMAN:  It is not being offered for the truth, Your Honor, only to give examples to the jury of what the pages looked like.

THE COURT:  All right.  So I will go ahead and admit 46 and 46A, but instruct the jury this is not for truth of the matter asserted, but just so you can see what the website looked like.

(Whereupon, Exhibit Nos. 46, 46A were admitted.)

BY MR. PEARLMAN:

Q.    So showing 46, is this an example of the homepage?

A.    Yes.

Q.    And up there in the left-hand corner, is that Grams?

A.    Yes.

Q.    And then, do you see something towards the bottom in the middle called Helix Light?

A.    Yes.

Q.    And then looking at 46A, what is Grams words?

A.    Grams words was a copy of Google ad words where people could bid on keywords to get their ads placed on my search

engine.

Q. So, for example, if -- can you give us an example of that?

A. So if someone created an ad, let's say for cocaine, and they wanted it to be at the top of a search for someone searching for cocaine, they would create the ad through my site and then they could bid on how much they paid per view of that search engine and/or that search keyword to have their ad at the top and other people could bid on the same keyword.

Q. When did you first launch Grams?

A. April 2014.

BY MR. PEARLMAN: Is this a good place to stop?

THE COURT: I think this is probably a good place for our lunch break. It is a little after 12:30. Why don't we come back at 1:30. And I will just remind you, don't discuss the case, even amongst yourself, don't conduct any type of research and steer clear of someone associated with the case so you don't overhear any hallway chatter.

(Jury out at 12:34 p.m.)

THE COURT: All right. And the witness can take his break as well. I ask that you not discuss your testimony with anybody until it is complete and just be back at 1:30.

THE WITNESS: Okay.

THE COURT: I am going to ask my law clerk to bring you all copies of my opinion that I am getting ready to issue today on the Daubert issues relating to Reactor. And I am

going to ask that you treat it all under seal. And what I really want you to do is look at it. I don't think I have included anything in there that needs to be sealed, but I want you all to take -- put eyes on it, just to make sure that you agree with that. And if there is anything that you think I need to redact, I would ask that you let me know by the end of the day so that I can file this on the docket today. But if there is an issue, I want to make sure I don't inadvertently put something up that I shouldn't. All right.

MS. PELKER: One note, Your Honor.

THE COURT: Yes.

MS. PELKER: We do anticipate calling Ms. Bisbee after lunch. Is that still fine with the sequencing for the Daubert?

THE COURT: Yes. The opinion is issued as of when I hand it to you. I just won't put it up on the docket until then. I have already given you my reasons for this before. This is just more providing a more detailed explanation of the reasons that I gave fairly briefly from the bench.

MS. PELKER: Thank you, Your Honor.

THE COURT: Okay. Thank you.

(Recess taken at 12:35 p.m.)

C E R T I F I C A T E


I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.


Dated this 1st day of March, 2024.


_____
Sherry Lindsay, RPR
Official Court Reporter

BY MR. EKELAND: [22] 5/19 8/8 19/4 20/1 22/15 24/3 24/17 27/18 29/10 30/3 36/15 36/18 38/11 38/21 41/11 44/11 44/22 46/6 53/1 81/16 84/3 84/7
BY MR. PEARLMAN: [15] 64/7 71/7 78/4 78/21 84/10 85/18 87/19 89/1 93/10 97/4 97/18 98/11 99/1 100/15 101/11
BY MS. PELKER: [8] 54/7 54/19 55/7 55/14 57/6 63/7 66/25 68/2
BY THE COURT: [1] 84/1
MR. EKELAND: [49] 4/8 5/12 5/17 19/2 23/22 23/25 24/16 27/10 29/8 29/25 38/15 41/9 44/8 44/20 45/23 53/17 54/16 55/4 55/11 57/1 63/4 64/4 64/9 64/22 64/25 65/16 65/21 67/12 67/14 68/6 69/4 69/7 69/18 70/2 70/5 78/17 82/6 82/19 83/13 83/23 84/2 87/15 88/22 95/20 95/23 97/14 98/8 98/16 100/1
MR. PEARLMAN: [19] 53/25 70/23 78/14 81/11 82/5 82/12 83/18 84/14 84/25 85/4 85/6 85/8 87/12 88/19 93/7 96/13 97/1 99/23 100/7
MS. PELKER: [26] 4/4 5/2 5/8 8/2 19/1 19/19 22/13 23/17 27/14 29/6 36/14 38/10 45/21 53/6 53/16 54/5 65/10 66/10 67/16 67/24 68/1 69/14 70/13 102/10 102/12 102/20
THE COURT: [94] 4/2 4/6 4/21 4/24 5/3 5/11 5/15 8/5 19/3 19/21 23/19 23/23 24/1 27/13 27/15 30/2 36/17 38/13 38/18 41/7 44/9 46/1 53/2 53/8 53/13 53/18 53/20 53/24 54/1 54/3 54/17 55/5 55/12 57/3 63/5 64/5 65/9 65/19 66/3 66/19 66/24 67/13 67/19 67/25 68/7 69/13 69/21 70/3 70/11 70/18 70/21 70/25 71/5 78/16 78/18 81/14 82/10 83/2 83/16 83/22 83/24 84/8 84/15 84/18 85/1 85/5 85/7 85/10 87/14 87/16 88/21 88/23 92/18 92/21 92/24 93/2 93/5 93/9 96/12 96/20 96/25 97/3 97/15 98/9 98/17 99/25 100/5 100/10 101/12 101/19 101/23 102/11 102/15 102/21
THE COURTROOM DEPUTY: [8] 5/4 29/22 44/19 44/21 53/23 71/3 78/3 85/16
THE WITNESS: [20] 22/14 54/18 55/13 57/4 64/6 64/10 68/8 70/22 71/2 71/4 84/17 85/15 92/20 92/23 93/1 93/4 97/16 98/10 98/18 101/22

$

$10,000 [1] 74/5
$311,145,854 [1] 91/25

.

.onion [1] 54/24

1

100 [1] 3/15
10005 [1] 2/4
107 [1] 78/8
10th [1] 88/11
11 [1] 79/14
11:00 [1] 53/12
11:00 now [1] 53/9
11:01 [1] 53/19
11:15 [1] 53/9
11:22 [1] 54/2
123 [2] 63/8 63/14
12:30 [3] 85/13 96/23 101/13
12:34 [1] 101/18
12:35 [1] 102/22
1301 [1] 1/20

15 [1] 91/15
16 [2] 79/17 79/18
18 [2] 79/19 86/11
180 [1] 79/7
1956 [1] 86/12
1970 [1] 73/19
1:30 [2] 101/14 101/21
1B [1] 61/8
1B1.3 [1] 91/23
1B13 [1] 61/5
1st [1] 103/10

2

20 [6] 85/11 85/12 85/13 90/4 92/15 92/16
20001 [1] 2/9
20005 [1] 1/21
2009 [1] 72/5
2011 [11] 21/11 21/15 21/23 22/1 64/12 81/21 81/23 82/3 83/6 83/8 83/15
2012 [1] 68/16
2013 [9] 21/15 77/21 81/18 81/20 81/24 82/9 82/22 82/24 84/4
2014 [1] 101/10
2020 [1] 85/25
2021 [3] 86/10 86/23 88/11
2024 [2] 1/5 103/10
20530 [2] 1/14 1/17
21 [1] 87/5
21-399 [2] 1/4 5/4
24 [1] 72/18
27 [1] 3/13
29 [1] 1/5

3

30 [1] 2/3
32 [6] 3/13 26/17 27/12 27/15 27/17 59/16
33 million [1] 32/20
333 [1] 2/8
34 [1] 79/21
354,468 [1] 91/24
35B [6] 3/13 78/1 78/15 78/18 78/20 78/22
35C [1] 81/4
36 [1] 80/2
368 [1] 29/20
399 [2] 1/4 5/4

4

403 [2] 96/11 96/14
45C [6] 3/14 86/15 87/13 87/16 87/18 89/24
45D [6] 3/14 88/2 88/4 88/20 88/23 88/25
46 [8] 3/15 99/12 99/12 99/13 99/24 100/11 100/14 100/16
46A [8] 3/15 99/12 99/16 99/16 99/24 100/11 100/14 100/23

5

5.1527 [1] 1/17
513B [3] 44/17 44/18 44/20
54 [1] 3/4

6

601 [1] 1/16
6710 [1] 2/8

7

702 [2] 96/4 96/10
71 [1] 3/7
710A [4] 24/6 44/13 44/14 48/17
720 [1] 35/24
722 [1] 37/2
723 [2] 39/9 57/15
724 [1] 41/1
725 [1] 41/16
726 [1] 42/3
729 [1] 42/15

731 [1] 42/23
733 [1] 43/9
78 [1] 3/13

8

8/10/21 [1] 87/5
81 [1] 3/7
84 [1] 3/8
85 [1] 3/10
87 [1] 3/14
89 [1] 3/14
8th [1] 2/4

9

950 [1] 1/14
9:38 [1] 1/6
9:39 [1] 4/23

A

a.m [5] 1/6 4/23 53/12 53/19 54/2
ability [3] 58/20 95/1 98/6
able [10] 4/15 13/16 13/16 56/25 57/12 58/23 67/7 67/23 68/3 98/12
about [85] 8/6 10/18 12/22 13/13 13/21 14/24 19/22 20/14 21/10 22/21 25/8 26/19 26/23 28/17 30/4 30/19 32/9 32/10 32/13 33/2 33/24 33/25 34/3 34/6 34/18 35/2 35/25 39/10 41/22 42/4 42/16 42/25 43/10 44/9 44/25 52/16 53/11 54/20 57/16 58/4 58/25 59/9 60/7 60/8 60/14 62/5 63/9 65/3 65/13 66/11 68/4 69/11 70/14 71/24 72/9 72/14 73/8 73/10 74/17 77/18 77/20 82/7 82/8 82/14 83/8 83/11 85/8 87/9 87/22 89/9 89/12 90/2 90/11 92/7 92/24 95/3 95/13 96/3 96/16 96/19 97/17 97/19 98/5 98/19 98/20
above [2] 91/22 103/5
above-entitled [1] 103/5
absence [1] 17/15
absolutely [1] 45/23
abstract [1] 19/15
academic [1] 19/9
acceptance [4] 87/1 87/25 88/7 89/9
access [16] 4/10 4/16 11/21 12/13 18/14 31/20 33/8 34/13 34/16 39/25 40/4 40/9 45/16 46/14 49/3 52/7
accessed [4] 50/16 63/14 69/8 70/7
accesses [6] 16/16 64/3 64/11 67/8 67/11 67/23
accessible [2] 99/4 99/5
accessing [3] 37/18 40/12 69/3
account [24] 20/20 20/21 21/4 21/5 21/5 21/19 21/19 45/2 47/8 47/9 62/11 63/2 63/10 63/16 63/17 63/17 63/18 63/19 63/21 63/22 64/14 70/9 76/20 98/21
accounts [10] 62/15 63/10 63/14 63/25 64/13 64/14 68/4 69/8 69/19 70/8
accuracy [2] 19/6 19/10
accurate [2] 27/5 99/20
accurately [1] 66/6
acknowledge [1] 91/21
acquired [1] 60/17
across [1] 62/22
act [8] 25/14 72/7 72/9 73/2 73/11 73/17 73/18 80/14
action [3] 1/3 18/13 73/4
actions [1] 39/3
active [2] 47/14 47/16
activities [4] 45/22 46/23 79/23 80/3
activity [8] 31/2 55/3 55/8 61/25 62/2 74/8 74/10 75/11
actor [2] 31/6 31/9

**A**

actors [1] 46/13
acts [1] 35/8
actual [2] 10/1 51/6
actually [13] 16/18 16/23 20/2
 20/8 40/8 50/12 51/9 56/24 62/13
 67/18 76/21 81/25 83/14
ad [4] 100/24 101/3 101/5 101/7
add [2] 32/19 90/19
add-ons [1] 32/19
added [5] 28/12 28/15 28/21 60/3
 99/9
adding [1] 59/22
additional [2] 56/23 65/5
address [44] 10/16 10/21 10/25
 11/1 11/2 11/4 11/6 11/15 11/24
 12/4 12/8 12/11 12/15 15/5 15/22
 15/23 15/24 16/2 16/9 16/13 16/18
 16/24 18/4 18/17 20/2 20/4 20/9
 21/8 21/14 22/6 22/10 33/8 34/25
 35/6 46/23 59/6 62/4 62/9 63/1
 63/3 63/15 79/15 79/18 83/16
addresses [22] 11/8 11/8 11/11
 11/12 15/14 16/7 18/19 20/14
 20/16 22/5 35/3 35/3 52/12 52/15
 59/1 59/1 59/4 59/4 59/7 59/8
 62/22 65/14
administered [1] 23/7
administration [1] 86/2
administrative [2] 39/1 77/7
administratively [1] 39/6
administrator [1] 6/5
admit [1] 100/10
admitted [9] 27/15 27/17 78/18
 78/20 87/16 87/18 88/23 88/25
 100/14
admittedly [1] 94/2
ads [1] 100/25
advice [1] 92/24
advisories [1] 77/8
affected [1] 92/14
affects [1] 91/8
after [5] 29/2 29/18 64/14 101/13
 102/13
afternoon [2] 85/19 85/20
again [13] 10/24 41/5 42/9 42/24
 43/15 43/21 45/8 51/19 59/18
 64/14 70/4 71/11 73/3
against [8] 24/8 50/9 50/13 50/20
 52/15 59/1 71/22 73/4
agree [9] 14/2 23/15 46/17 47/2
 47/4 49/20 49/25 93/11 102/5
agreed [1] 83/7
agreement [11] 86/18 87/7 87/10
 88/13 89/22 93/11 94/9 94/11
 94/16 95/5 95/7
agrees [2] 91/21 92/2
ahead [7] 4/21 53/7 67/5 67/20
 70/12 85/7 100/10
aids [1] 74/15
airport [1] 29/17
Akemashite [1] 9/12
Akron [1] 95/15
Alden [1] 5/8
algorithm [1] 45/10
all [85] 4/2 4/12 4/21 4/24 5/15
 6/23 9/22 17/4 17/16 17/16 21/8
 21/22 23/15 25/16 26/4 26/5 26/10
 27/9 28/11 28/11 31/8 33/15 33/17
 33/24 33/25 35/20 40/24 41/25
 42/15 42/19 43/6 44/15 45/12 46/1
 47/19 49/4 49/5 49/9 50/22 53/2
 53/22 54/3 55/20 56/25 58/2 58/22
 58/23 60/5 60/10 64/3 64/8 64/11
 65/10 66/19 68/11 68/12 68/13
 68/25 69/3 69/8 69/19 69/24 71/5
 72/18 74/18 76/23 77/7 77/14
 81/14 83/6 84/8 84/15 84/23 85/13
 93/9 93/22 94/7 96/12 98/25
 100/10 101/19 101/24 102/1 102/4
 102/9

allow [1] 46/2
allows [3] 36/5 37/8 74/19
almost [1] 18/21
already [8] 22/20 28/8 50/10
 62/16 81/6 83/3 96/15 102/17
also [26] 8/17 10/2 20/21 21/5
 26/13 26/13 26/18 34/3 35/14
 40/19 40/20 46/25 49/7 49/10
 50/13 51/23 56/5 63/24 66/10
 73/13 75/5 77/10 79/14 79/17
 88/11 96/11
alternative [1] 76/18
Although [2] 20/24 83/2
Altima [2] 68/16 68/20
always [4] 16/2 30/11 51/12 75/11
am [50] 6/14 8/14 9/5 10/1 13/23
 14/14 14/16 15/9 15/17 16/20
 20/12 20/24 21/24 22/3 28/6 30/11
 32/22 32/24 36/11 36/20 38/8
 38/17 43/17 43/19 43/19 44/8
 46/15 48/2 48/13 49/23 50/23
 51/24 64/10 64/25 65/7 65/24 66/4
 66/7 67/16 72/2 82/7 82/19 85/2
 94/17 96/3 96/8 96/10 101/23
 101/24 101/25
Amazon [5] 13/12 32/3 32/4 59/13
 59/14
ambiguous [1] 57/2
AMERICA [1] 1/3
among [2] 16/6 53/10
amongst [1] 101/15
amount [6] 58/15 91/9 92/1 92/8
 92/9 92/13
analysis [31] 10/16 10/21 16/18
 16/19 16/24 17/19 18/1 18/4 18/22
 19/8 19/13 20/2 20/6 20/9
 20/13 21/8 21/12 21/14 22/6 22/10
 22/11 29/1 61/14 62/4 62/9 63/1
 68/5 68/8 70/16 91/15
analyze [1] 18/7
analyzed [1] 59/21
analyzing [1] 68/24
Android [1] 32/25
anonymity [3] 13/6 61/22 61/25
another [11] 31/1 31/19 32/16
 33/5 45/14 50/11 68/18 74/8 85/11
 85/12 96/22
answer [3] 19/2 19/3 67/1
answered [5] 18/3 19/1 55/11 83/2
 96/21
answering [1] 72/8
anti [12] 72/10 73/3 73/18 73/22
 74/22 75/4 75/9 75/14 75/17 75/21
 76/13 77/13
anti-money [12] 72/10 73/3 73/18
 73/22 74/22 75/4 75/9 75/14 75/17
 75/21 76/13 77/13
anticipate [1] 102/12
anticipated [1] 92/11
any [75] 4/14 4/18 5/25 6/2 6/3
 6/5 6/8 6/9 6/15 6/25 7/6 8/12
 9/15 9/17 9/18 17/15 17/23 18/5
 20/3 20/4 20/7 21/25 22/9 22/17
 22/18 22/19 23/20 24/13 27/13
 28/17 35/14 36/23 37/22 38/6
 38/19 43/19 47/21 48/2 48/10
 48/12 48/14 52/15 53/10 56/10
 56/13 58/1 61/22 63/3 66/19 74/4
 75/3 76/24 78/16 81/14 81/17
 81/21 82/21 83/22 84/5 84/8 87/14
 88/21 90/18 93/22 93/25 94/4 94/7
 94/13 94/25 95/2 95/4 95/7 99/25
 101/15 101/17
anybody [6] 9/10 9/13 9/16 10/12
 23/10 101/21
anyone [2] 22/17 53/15
anything [27] 4/2 6/24 9/1 9/3
 22/5 22/10 25/5 28/17 32/7 35/9
 36/21 37/12 41/24 42/20 43/17
 43/20 52/11 53/15 54/9 54/10
 54/21 54/24 58/13 84/23 98/5
 102/3 102/5

anyway [1] 50/10
anywhere [4] 6/15 6/18 6/21 17/15
apartment [1] 38/17
apologies [2] 44/17 44/18
apologize [1] 41/9
app [1] 10/5
appear [9] 6/15 6/18 6/21 11/8
 18/20 24/23 49/10 56/12 56/13
appearance [1] 4/5
APPEARANCES [3] 1/12 1/23 2/1
appeared [4] 9/21 10/4 57/11
 68/13
appearing [1] 58/10
appears [3] 47/10 47/23 87/5
Apple [3] 46/8 46/11 46/13
apples [1] 66/11
application [1] 36/8
applied [1] 72/14
apply [3] 82/16 84/19 84/22
appreciate [2] 4/20 89/20
approach [2] 5/6 64/19
appropriate [2] 8/7 76/22
approximately [1] 91/25
apps [3] 10/2 10/6 10/8
April [1] 101/10
April 2014 [1] 101/10
are [106]
area [3] 22/3 95/14 97/5
aren't [5] 9/20 11/12 24/23 32/21
 36/6
arguing [1] 46/1
argument [1] 49/2
around [3] 28/18 35/4 67/3
array [1] 25/10
arrested [5] 29/16 60/21 85/25
 86/2 86/5
artfully [1] 67/24
as [79] 6/7 6/12 6/12 8/24 10/22
 11/1 11/11 15/14 21/18 24/5 24/18
 25/14 25/15 25/24 26/3 26/17
 27/12 29/4 29/22 29/24 29/25
 31/21 33/7 34/7 35/8 35/23 37/1
 43/9 44/1 44/1 44/13 44/18 44/20
 48/16 51/20 52/13 53/13 55/19
 57/21 57/22 59/4 61/11 62/7 62/7
 66/7 68/9 68/9 68/10 69/1 70/15
 71/15 71/15 71/19 71/25 72/13
 73/15 74/1 74/2 74/14 74/16 74/21
 74/24 75/20 76/1 79/11 81/2 83/20
 86/15 89/21 93/11 93/22 94/5 96/1
 96/8 99/10 99/12 99/16 101/20
 102/15
ask [18] 8/5 19/23 21/12 23/23
 45/21 46/2 53/14 66/4 83/11 83/19
 89/18 90/11 92/18 95/13 101/20
 101/23 102/1 102/6
asked [19] 19/1 28/18 52/8 54/8
 55/11 58/4 58/25 59/9 59/12 60/14
 62/4 69/10 69/16 70/14 80/25 82/8
 99/17 100/2 100/6
asking [13] 8/3 8/6 28/6 54/20
 56/16 57/16 63/9 67/15 67/19
 69/23 82/7 83/1 83/10
asks [1] 95/3
aspects [2] 9/22 32/17
asserted [1] 100/12
assessment [1] 66/13
assessments [2] 68/4 69/15
assist [2] 26/20 61/24
assistance [3] 76/24 94/8 94/14
associate [1] 44/3
associated [3] 21/4 63/3 101/16
assumed [1] 17/8
attaching [1] 39/14
attempt [3] 11/10 96/4 97/12
attempting [1] 24/25
attempts [1] 57/10
attention [1] 64/16
attesting [2] 19/6 19/10
attorney [1] 86/19
Attorney's [2] 73/14 94/13
attribute [3] 20/8 22/18 61/25

**A**

attributed [1]  62/16
attribution [4]  31/24 62/7 62/16 62/25
attributions [3]  20/3 20/5 62/11
auditing [1]  76/5
August [4]  86/10 86/22 87/21 88/11
August 10th [1]  88/11
August 6 [2]  86/22 87/21
authentic [1]  27/5
author [1]  26/25
authorities [3]  51/22 93/21 94/7
authorization [1]  4/17
automatically [2]  40/6 46/8
available [3]  16/5 75/7 92/6
Ave [2]  1/14 1/20
Avenue [1]  2/8
avoid [1]  30/20
aware [15]  4/14 6/12 6/14 6/24 8/14 9/5 9/6 13/19 13/23 32/2 36/20 38/8 48/10 48/13 96/17
away [2]  34/13 95/7
Axiom [1]  10/7

**B**

BA [1]  72/1
back [25]  4/24 4/25 8/23 8/25 9/4 15/14 17/12 35/21 42/8 45/14 45/18 45/20 48/16 48/20 61/24 67/16 67/18 68/10 69/25 85/25 88/15 89/24 96/4 101/14 101/21
backing [2]  45/24 48/2
backs [1]  46/9
backup [7]  45/5 46/11 46/17 47/6 47/9 47/11 50/8
backups [2]  46/10 50/10
bad [3]  46/13 96/11 96/14
bank [11]  68/15 68/17 72/7 72/9 73/2 73/11 73/17 73/18 76/20 77/6 80/14
Bankruptcy [1]  2/7
banks [1]  77/6
bar [2]  72/3 77/11
barriers [1]  46/22
based [5]  56/21 67/5 67/6 67/20 68/5
Bash [6]  33/17 33/19 33/22 34/10 34/15 42/24
basically [2]  76/2 97/17
basis [4]  14/6 66/19 67/21 96/8
be [87]  10/5 11/4 11/8 11/17 12/14 12/16 13/13 13/16 13/16 14/15 15/16 15/16 16/3 16/3 16/17 17/19 17/21 19/12 19/17 19/24 23/19 26/11 27/15 28/24 29/15 29/21 30/13 30/20 30/25 31/3 31/8 31/21 31/24 33/8 33/9 37/16 39/2 39/20 40/19 44/3 44/4 47/10 47/23 49/8 49/12 50/10 53/6 54/14 55/2 56/3 56/5 57/12 58/16 58/23 61/15 66/4 66/10 67/17 68/15 69/15 69/24 70/2 70/3 72/14 73/13 73/13 74/6 75/15 77/8 78/18 80/15 82/2 83/7 83/20 85/16 87/5 87/17 88/23 90/9 92/6 92/11 92/14 98/12 99/8 101/4 101/21 102/3
because [30]  8/21 12/7 13/5 13/7 13/13 15/13 16/1 26/6 28/15 28/24 29/1 30/12 30/13 31/22 33/13 38/19 38/25 48/1 57/21 57/22 58/19 61/10 61/22 65/21 74/17 82/22 84/21 96/11 96/22 96/22
become [3]  59/24 97/21 97/24
been [34]  17/1 18/12 18/15 20/17 25/1 27/11 28/8 28/22 29/4 35/21 44/9 45/24 47/25 51/19 55/9 56/14 56/14 56/24 59/12 65/5 65/17 66/20 70/3 82/25 83/15 86/14 88/3 93/7 95/24 96/1 96/5 96/17 99/11 99/15

before [12]  1/9 4/2 25/18 39/2 53/15 53/22 68/19 71/11 82/22 92/21 95/25 102/17
behalf [2]  74/5 80/18
behind [4]  20/3 22/17 25/1 69/19
being [16]  6/24 13/25 24/23 28/18 32/14 39/4 40/21 43/20 45/11 52/14 68/10 68/13 84/20 93/2 96/6 100/7
belief [1]  76/15
believe [22]  10/1 10/18 12/21 14/23 15/10 17/6 18/1 20/25 21/7 23/3 25/21 28/19 29/21 34/22 43/1 45/7 55/23 57/4 60/22 64/17 69/2 74/10
bench [9]  64/24 66/23 69/6 70/20 82/11 83/25 95/22 96/24 102/19
Beryl [2]  90/6 90/7
beside [1]  10/22
besides [1]  21/25
best [1]  95/1
better [2]  19/23 23/19
between [8]  9/10 9/15 10/12 15/21 19/24 21/15 46/22 63/10
beyond [3]  38/13 82/5 82/17
bid [3]  100/25 101/6 101/8
big [5]  11/17 28/18 35/21 61/22 98/20
biggest [1]  91/8
Bisbee [1]  102/12
bit [13]  27/19 27/21 33/11 35/2 42/6 44/16 47/13 47/14 65/7 66/11 71/24 73/8 89/18
Bitcoin [68]  5/25 6/3 6/5 6/8 6/11 6/12 6/15 6/18 6/21 6/25 7/16 7/21 8/1 8/9 8/12 8/18 8/21 8/25 9/4 9/6 9/11 9/13 9/17 9/19 10/13 12/10 20/20 22/7 25/6 28/10 32/7 36/19 36/22 36/24 37/13 37/14 37/16 40/24 41/24 42/13 42/21 43/5 47/21 48/10 52/11 52/14 52/16 54/9 54/11 54/21 54/23 55/3 55/10 56/17 56/18 58/10 59/1 59/1 59/4 59/7 59/8 91/9 91/24 92/8 95/2 96/7 96/16 96/16
BitLocker [5]  27/24 28/2 28/3 29/15 60/13
blast [1]  47/17
blocking [1]  24/14
body [1]  72/13
bold [1]  48/20
books [1]  97/10
both [3]  19/22 41/4 63/20
bottom [3]  42/20 88/9 100/20
box [2]  30/14 80/6
boy [1]  44/20
Brandeis [1]  72/1
breach [1]  94/9
break [14]  35/7 53/3 53/5 53/7 53/8 53/9 53/13 53/15 85/3 85/11 85/13 96/22 101/13 101/20
briefly [7]  36/3 38/24 39/12 45/8 58/3 61/14 102/19
bring [1]  101/23
BRODIE [1]  1/15
Brooklyn [1]  2/4
brought [2]  82/6 96/6
BROWN [2]  1/15 5/10
browser [14]  22/21 22/23 23/7 23/11 23/13 23/16 49/21 49/23 97/24 98/1 98/3 98/5 98/7 99/4
browsing [1]  14/18
BSA [2]  75/24 80/17
Btest [3]  47/18 47/19 47/23
build [1]  26/18
built [1]  31/16
bullet [2]  20/25 21/2
bunch [1]  25/13
bunker [6]  50/8 55/24 55/25 56/3 56/7 56/10
bunkerX [11]  39/17 39/17 40/14

40/15 41/5 41/12 41/13 47/16 47/23 50/4 57/16
bureau [1]  71/21
burner [1]  63/25
business [14]  15/14 74/6 78/9 78/10 79/1 79/5 79/6 79/7 80/3 80/23 81/2 81/24 82/7 97/12
businesses [3]  15/8 15/18 80/11
businesses' [1]  15/13
buy [1]  32/2
buying [1]  13/12

**C**

cafe [4]  12/11 12/19 12/23 12/25
calculating [1]  92/10
call [4]  4/4 4/6 75/5 99/2
called [11]  16/4 34/19 36/5 52/16 75/24 81/23 86/3 97/22 97/24 98/20 100/21
caller [1]  72/20
calling [1]  102/12
came [4]  17/12 26/11 52/5 72/10
camera [1]  59/25
cameras [2]  43/25 44/5
can [89]  4/6 4/25 5/15 11/3 11/4 11/6 11/15 11/24 13/8 19/9 23/10 23/22 24/16 27/7 27/20 27/21 29/8 29/25 30/2 30/13 32/2 34/11 34/12 34/24 35/3 35/8 35/10 36/3 36/25 37/1 40/17 41/6 41/14 41/15 42/12 45/21 49/8 50/4 51/3 53/4 53/4 53/7 53/13 55/6 55/24 56/7 57/24 59/18 61/24 63/6 63/13 67/9 67/10 67/18 68/3 68/21 69/4 69/15 70/3 70/18 71/11 71/24 73/8 73/17 75/3 75/5 76/11 77/5 77/6 77/12 79/17 80/9 81/11 82/20 85/21 88/6 89/24 91/20 92/4 92/18 95/6 95/7 95/20 98/10 100/5 100/12 101/2 101/19 102/7
can't [6]  19/5 22/16 33/13 46/13 69/24 76/18
cap [3]  58/4 58/8 58/15
capability [2]  51/9 51/12
caps [2]  52/19 52/23
capture [4]  51/23 51/25 52/7 52/10
captured [1]  66/6
car [2]  68/21 69/1
cards [3]  13/11 13/21 30/13
careful [1]  84/20
carving [3]  24/18 24/21 25/2
case [34]  4/5 4/6 4/13 5/4 12/14 18/21 20/5 22/19 26/4 26/6 26/14 26/20 27/3 28/10 28/18 29/14 37/25 38/24 39/4 46/2 53/10 53/11 58/5 59/23 60/14 61/9 82/16 84/19 84/22 84/23 91/7 91/9 101/15 101/16
cases [5]  15/15 16/22 17/2 31/22 51/13
CATHERINE [1]  1/13
caught [2]  64/15 83/15
Ccips [1]  1/19
cell [3]  4/10 4/14 4/17
center [1]  72/7
certain [14]  9/8 39/4 48/2 51/8 58/5 62/5 66/13 73/20 73/21 74/2 77/5 82/1 90/18 98/13
certainty [2]  22/16 66/14
certify [1]  103/3
cetera [1]  8/19
chance [2]  87/9 89/12
change [5]  15/14 35/1 35/3 45/11 84/12
changes [3]  35/6 35/9 35/10
characterize [1]  19/23
charge [2]  75/25 91/8
charged [2]  86/5 86/7
charges [2]  86/7 89/21
Charles [1]  86/19
chart [9]  63/8 65/22 65/24 67/6

**C**

chart... **[5]** 67/7 67/21 67/22 69/17 90/19
chat **[1]** 10/7
chats **[1]** 10/5
chatter **[1]** 101/17
check **[1]** 52/15
checking **[1]** 58/25
CHRISTOPHER **[2]** 1/15 5/9
circumscribe **[1]** 82/12
clarification **[2]** 82/8 83/10
clarify **[3]** 18/20 54/10 82/20
clarity **[1]** 67/2
clarity's **[1]** 84/4
clear **[8]** 21/13 29/15 48/18 48/23 60/3 61/15 82/25 101/16
clearly **[2]** 69/10 85/22
clearnet **[1]** 7/5
clerk **[1]** 101/23
click **[1]** 77/6
client **[11]** 37/9 48/5 48/8 48/11 91/21 91/23 92/2 93/19 94/4 94/9 94/14
client's **[2]** 92/2 94/8
close **[5]** 18/20 46/23 62/23 66/13 68/24
closest **[1]** 64/20
closing **[1]** 4/12
cloud **[2]** 45/5 50/11
cluster **[4]** 5/25 6/3 52/16 59/2
cocaine **[2]** 101/3 101/5
code **[7]** 8/12 8/15 8/16 8/16 8/21 8/25 9/7
collect **[2]** 13/20 76/22
college **[1]** 97/7
COLUMBIA **[5]** 1/1 72/3 79/2 79/25 94/13
com **[1]** 33/10
combine **[1]** 30/9
combined **[1]** 30/11
come **[8]** 4/25 11/20 15/5 15/14 16/2 69/25 92/25 101/14
comes **[1]** 49/6
comfortable **[1]** 93/2
coming **[5]** 11/19 11/20 11/25 14/15 92/22
command **[7]** 33/5 33/6 33/20 40/8 56/9 56/12 56/13
command-type **[1]** 33/20
commands **[6]** 33/21 34/1 55/19 55/19 56/11 57/11
comment **[1]** 8/3
commenting **[1]** 66/17
Committee **[1]** 94/12
common **[3]** 14/17 18/20 20/6
commonalties **[1]** 62/21
commonly **[1]** 71/19
communicated **[1]** 7/11
communicating **[1]** 52/13
communication **[5]** 9/10 9/15 10/12 39/3 52/7
communications **[1]** 11/3
companies **[2]** 14/3 49/14
company **[2]** 17/1 47/5
compare **[2]** 31/24 62/21
Comparing **[1]** 18/19
compatible **[1]** 28/12
complete **[5]** 4/15 12/12 53/14 69/2 101/21
completed **[1]** 52/4
completely **[2]** 93/19 94/5
compliance **[9]** 73/7 73/11 74/21 74/24 75/23 75/25 76/5 79/20 80/15
comply **[1]** 78/11
compound **[2]** 57/1 98/16
computer **[35]** 11/1 28/12 32/15 32/17 33/5 33/7 33/8 33/12 33/21 34/12 34/13 35/13 35/14 37/18 37/22 39/16 39/18 40/14 40/19 40/21 43/3 43/7 43/14 43/20 44/2

47/24 56/3 56/11 57/5 57/17 95/16 95/18 97/5 97/9 97/9
computer's **[4]** 11/2 24/22 40/12 56/13
computers **[10]** 34/16 36/6 37/11 37/22 38/3 38/7 38/12 38/16 38/23 55/17
conceal **[2]** 15/6 62/2
concern **[6]** 19/21 49/13 49/17 49/21 50/25 83/17
concerned **[4]** 80/14 80/17 96/3 96/10
concerning **[2]** 80/11 84/12
concerns **[3]** 49/16 50/15 67/17
conclusion **[1]** 66/1
conclusions **[2]** 20/13 65/6
condition **[1]** 93/11
conduct **[7]** 53/10 74/14 74/20 88/16 89/3 92/2 101/15
conducted **[1]** 18/22
conducting **[2]** 74/15 76/16
conference **[8]** 64/24 66/23 69/6 70/20 82/11 83/25 95/22 96/24
configuration **[4]** 25/25 36/4 36/21 36/23
configuring **[1]** 36/22
conformance **[1]** 82/13
confused **[1]** 65/25
confusion **[1]** 19/21
connect **[11]** 12/13 12/25 13/7 15/24 31/9 31/23 33/5 35/5 35/9 37/15 68/3
connected **[4]** 31/25 43/20 68/22 69/24
connecting **[5]** 12/22 31/8 55/17 57/7 57/8
connection **[7]** 31/7 31/7 35/7 56/10 56/18 57/10 86/2
connections **[15]** 34/8 36/6 36/6 37/9 37/10 43/17 47/24 55/18 56/17 56/22 58/14 58/14 63/9 67/8 67/23
connects **[1]** 16/15
conservative **[1]** 64/19
consider **[4]** 18/13 68/22 83/21 91/5
considered **[1]** 64/20
consistent **[8]** 37/17 40/11 40/21 43/2 43/13 54/15 55/3 55/9
conspiracy **[4]** 86/8 86/11 89/16 90/3
constantly **[2]** 49/4 49/9
constitute **[2]** 75/10 94/9
constitutes **[1]** 103/4
Constitution **[1]** 2/8
consult **[3]** 87/9 89/12 92/21
contact **[3]** 75/3 75/12 79/20
contain **[1]** 74/17
contains **[2]** 57/25 61/6
content **[1]** 58/15
contents **[4]** 3/1 27/8 58/16 58/18
context **[3]** 33/25 35/15 46/24
contexts **[1]** 11/7
continue **[3]** 66/24 96/23 96/25
CONTINUED **[2]** 1/23 2/1
continuing **[1]** 67/2
control **[1]** 44/4
controlled **[2]** 56/24 99/18
controlling **[2]** 4/11 62/11
convenience **[1]** 35/16
convenient **[1]** 35/12
convention **[1]** 17/17
conventions **[1]** 11/9
cooperate **[3]** 93/19 94/4 94/25
cooperation **[3]** 93/12 93/15 93/23
copies **[2]** 61/3 101/24
copy **[2]** 28/22 100/24
core **[1]** 64/21
corner **[1]** 100/18
correct **[41]** 9/23 10/19 11/4 12/5 12/8 12/12 12/15 13/22 14/1 14/4 16/7 16/14 16/19 17/5 17/6 18/18

18/25 20/5 21/6 23/2 25/13 29/12 30/10 33/17 34/1 34/16 37/25 38/4 39/21 40/1 40/5 41/3 41/10 42/10 44/5 72/16 79/16 79/24 81/18 92/17 103/4
correction **[1]** 46/8
correctly **[4]** 37/20 51/24 65/23 70/5
could **[116]**
could just **[1]** 50/6
couldn't **[2]** 19/12 52/12
counsel **[10]** 5/6 5/7 5/9 5/14 54/8 58/25 67/15 69/14 89/12 93/6
count **[1]** 86/11
couple **[3]** 77/25 90/11 95/13
course **[4]** 27/2 50/12 74/6 80/23
court **[11]** 1/1 2/6 2/7 4/10 4/18 5/13 7/13 91/4 94/12 103/3 103/13
court's **[2]** 12/4 81/12
courtroom **[2]** 12/3 23/10
Courts **[1]** 2/7
covered **[1]** 83/6
covering **[1]** 9/22
cray **[2]** 20/20 20/20
create **[4]** 26/3 26/14 98/21 101/5
created **[7]** 26/13 27/2 27/6 56/14 97/16 98/24 101/3
credentials **[2]** 6/8 6/10
credit **[2]** 13/11 13/21
crime **[2]** 61/19 92/15
crimes **[3]** 71/18 71/23 90/17
criminal **[4]** 1/3 5/4 73/15 92/2
criminally **[2]** 86/5 91/23
criminals **[2]** 61/16 62/1
CRM **[1]** 1/19
cross **[6]** 3/4 3/7 5/18 69/23 81/15 83/6
cross-examination **[5]** 3/4 3/7 5/18 69/23 81/15
crossed **[2]** 65/4 69/14
crossing **[1]** 65/12
crucial **[1]** 74/17
cryptocurrencies **[3]** 81/22 82/24 84/5
cryptocurrency **[3]** 82/1 82/22 84/12
CS **[5]** 54/8 60/14 61/15 67/1 68/3
CTF **[1]** 4/20
CTR **[1]** 75/2
CTRs **[1]** 74/4
cumbersome **[1]** 59/24
currencies **[1]** 81/18
currency **[4]** 74/3 74/4 77/18 77/20
current **[4]** 73/5 73/6 73/7 73/8
customer **[5]** 76/9 76/12 76/14 77/9 77/13
customize **[1]** 32/17
cyber **[2]** 35/15 35/20
cybercrime **[1]** 61/23

**D**

dad **[1]** 97/10
dark **[1]** 98/18
darknet **[7]** 54/15 97/22 98/12 98/13 98/19 99/8 99/9
data **[36]** 17/13 18/1 18/19 18/22 19/13 28/14 45/6 45/8 45/10 45/13 45/18 45/20 45/24 46/9 46/11 46/14 46/17 46/25 47/6 47/9 47/11 49/3 49/5 49/9 49/14 49/17 49/22 50/16 50/22 51/1 55/25 58/17 58/19 58/24 68/11 68/25
database **[2]** 74/13 74/13
databases **[2]** 48/9 81/1
dataset **[1]** 64/21
date **[2]** 21/14 88/13
dated **[5]** 86/22 87/5 87/21 88/11 103/10
dates **[1]** 10/1
dating **[3]** 10/2 10/5 10/6
Daubert **[4]** 69/11 70/13 101/25

**D**

Daubert... **[1]** 102/14
day **[4]** 30/5 74/6 102/7 103/10
days **[2]** 64/15 79/7
DC **[6]** 1/5 1/14 1/17 1/21 2/9 77/24
de **[5]** 3/3 77/25 89/25 91/12 93/14
Dean **[1]** 89/6
decent **[1]** 58/15
decrypt **[1]** 45/13
decrypted **[1]** 6/6
deems **[2]** 93/22 94/8
deeper **[1]** 57/13
defendant **[7]** 1/7 2/2 5/13 53/21 56/23 57/7 60/21
defendant's **[8]** 26/17 27/12 54/11 59/16 87/1 87/25 88/7 89/9
defending **[2]** 50/9 50/20
defense **[10]** 3/13 27/11 27/15 27/17 54/8 58/4 58/25 60/14 65/18 69/14
define **[2]** 19/11 19/15
definitely **[2]** 63/2 64/15
demonstrative **[3]** 29/23 29/24 29/25
DEPARTMENT **[3]** 1/13 71/18 71/21
Departure **[1]** 94/12
depending **[3]** 11/25 45/10 68/23
depends **[1]** 50/13
depiction **[1]** 27/5
Depot **[1]** 68/19
Dept **[1]** 1/20
described **[3]** 23/14 58/14 76/13
describing **[2]** 18/16 31/6
designated **[1]** 17/8
designed **[1]** 18/22
destination **[1]** 58/17
detail **[1]** 9/23
detailed **[1]** 102/18
details **[2]** 38/25 82/14
detections **[1]** 37/8
determine **[1]** 81/1
determined **[3]** 29/2 29/18 92/11
determining **[1]** 55/2
developed **[1]** 22/23
device **[21]** 24/4 27/5 29/11 29/16 30/5 30/6 30/15 30/21 31/9 32/6 51/14 51/15 57/5 58/1 58/1 59/9 59/13 59/16 60/6 60/7 60/8
devices **[32]** 5/24 6/9 6/16 6/25 7/7 9/9 24/13 25/3 26/4 26/5 26/7 26/10 26/14 26/18 28/18 29/5 29/7 29/13 29/19 32/2 47/14 47/16 54/9 54/11 55/15 56/23 57/8 57/9 60/11 60/20 60/24 61/6
DHCP **[1]** 16/4
did **[75]** 7/7 9/11 16/18 16/24 17/10 18/10 18/24 19/3 21/9 21/12 21/17 22/6 22/7 22/18 22/20 23/1 25/4 26/13 26/18 28/4 28/5 29/2 32/7 38/6 38/7 51/6 52/11 52/15 52/18 52/20 55/8 55/15 55/16 55/20 55/20 57/5 57/7 60/20 60/23 61/3 64/18 68/11 69/22 72/4 72/22 73/5 77/20 82/3 84/11 86/10 87/7 87/9 89/11 89/15 89/19 89/21 89/23 90/1 90/5 92/21 92/24 93/11 95/25 96/11 96/13 97/5 97/8 97/12 97/21 97/24 98/5 98/12 99/2 99/7 101/9
didn't **[35]** 5/24 6/2 6/5 6/8 6/23 6/23 7/6 8/25 9/8 9/9 9/15 9/17 10/8 10/11 13/3 16/19 17/7 17/21 17/23 18/5 18/13 19/2 19/11 19/15 20/2 25/5 28/17 32/4 32/6 36/21 38/25 43/17 52/10 57/18 81/17
difference **[2]** 15/21 66/9
different **[30]** 11/22 14/9 15/5 18/19 19/13 26/1 45/12 55/17 57/11 57/12 63/14 65/1 65/14

65/23 66/1 66/9 66/12 66/16 66/18 66/20 67/8 67/23 68/4 68/13 68/21 69/1 69/16 69/24 80/12 98/22
direct **[5]** 3/7 3/10 71/6 85/9 85/17
directed **[1]** 94/5
directly **[4]** 33/21 37/16 52/13 82/15
directory **[7]** 40/18 40/18 57/21 57/22 57/22 57/24 57/25
disagree **[2]** 11/23 12/1
disclose **[1]** 49/5
disclosed **[6]** 65/2 65/5 65/18 66/21 69/9 69/20
disclosing **[1]** 65/17
disconnect **[1]** 19/24
discovered **[1]** 60/11
discovery **[1]** 96/18
discuss **[4]** 53/10 53/14 101/14 101/20
discussed **[2]** 35/2 38/24
discussing **[1]** 20/11
discussion **[2]** 10/15 60/1
discussions **[2]** 54/14 59/23
disguise **[1]** 11/10
disk **[1]** 28/3
disks **[1]** 25/10
dismiss **[1]** 89/21
dissident **[1]** 23/18
dissidents **[1]** 23/15
distinct **[1]** 70/15
distinctly **[1]** 22/2
distributed **[1]** 30/12
DISTRICT **[8]** 1/1 1/1 1/10 2/7 72/3 79/2 79/25 94/13
division **[3]** 72/22 72/25 73/1
DNS **[7]** 21/18 34/21 34/23 34/24 35/19 35/22 41/21
do **[115]**
docket **[2]** 102/7 102/16
document **[3]** 60/2 86/16 86/17
documentation **[1]** 17/12
documents **[6]** 4/13 17/3 77/8 77/14 89/11 89/13
does **[39]** 4/18 38/16 38/20 38/22 43/16 46/11 46/13 55/25 57/16 58/19 60/5 60/9 63/20 63/23 63/24 72/25 73/25 74/21 76/23 77/2 78/13 79/1 79/11 79/14 79/19 79/25 80/9 80/10 80/18 83/6 83/16 83/18 85/10 86/19 89/6 89/7 90/24 94/21 96/14
doesn't **[15]** 6/15 6/18 6/21 7/15 7/20 7/25 8/9 8/21 14/19 35/1 36/17 38/2 38/19 60/12 96/1
doing **[11]** 13/5 20/24 25/21 35/20 55/18 62/9 62/10 62/19 62/25 63/1 75/15
DOJ **[2]** 1/16 1/19
DOJ-CRM **[1]** 1/19
DOJ-USAO **[1]** 1/16
dollar **[1]** 49/10
domain **[3]** 33/9 35/1 35/11
don't **[73]** 8/5 10/5 13/7 13/13 14/14 15/15 15/20 16/23 16/25 18/1 18/2 20/8 20/22 20/24 21/16 22/2 22/9 25/21 30/17 34/6 34/8 35/19 36/12 37/14 37/14 38/1 38/5 38/8 38/18 39/5 40/1 41/24 45/19 46/1 47/2 47/23 48/12 48/14 50/25 51/16 51/18 52/2 53/2 53/6 53/8 53/9 53/10 55/23 64/8 65/7 65/10 66/3 66/5 66/7 66/9 66/19 68/25 69/11 71/10 77/10 79/4 90/25 95/23 95/25 96/2 96/9 96/23 101/13 101/14 101/15 101/17 102/2 102/8
done **[5]** 5/1 18/18 30/25 67/1 70/15
door **[2]** 69/22 96/4
dot **[1]** 33/10
doubt **[2]** 32/5 50/21

down **[25]** 24/7 24/16 27/19 27/21 36/25 39/8 40/17 41/6 41/14 42/2 42/6 42/19 43/12 44/7 44/16 47/13 48/15 50/3 51/3 60/13 79/8 80/9 81/11 91/13 93/24
download **[1]** 23/11
drew **[1]** 83/5
drive **[14]** 24/23 27/24 28/21 28/22 39/25 40/1 40/4 40/9 40/9 40/13 41/2 60/13 61/5 68/21
drives **[9]** 25/13 25/16 25/17 25/19 25/24 26/2 28/24 29/3 61/4
driving **[1]** 69/1
duplicity **[1]** 50/12
during **[2]** 59/23 74/5
dynamic **[8]** 15/22 15/24 16/3 34/21 34/23 34/24 35/22 41/21

**E**

each **[5]** 15/24 16/2 68/12 80/12 98/23
earlier **[1]** 58/14
early **[2]** 85/3 85/11
ease **[1]** 60/1
easier **[1]** 48/24
easily **[1]** 98/6
easy **[1]** 77/16
educate **[1]** 73/10
education **[3]** 71/24 76/6 95/18
either **[1]** 34/11
EKELAND **[20]** 2/2 2/3 3/4 3/7 4/7 5/3 5/12 54/20 56/16 57/15 58/4 59/9 62/4 63/9 64/17 65/12 81/14 82/15 96/17 96/21
Ekeland's **[1]** 67/17
electronically **[3]** 74/12 78/24 78/25
electronics **[1]** 56/23
elements **[1]** 33/21
else **[3]** 10/14 17/15 84/23
email **[13]** 20/9 20/13 20/16 21/14 48/4 48/5 48/5 48/7 48/11 48/14 72/12 72/17 79/18
emails **[7]** 6/22 6/23 20/4 22/17 22/18 70/7 70/9
empty **[1]** 26/2
enacted **[1]** 73/19
ENCFS **[2]** 50/10 50/12
encrypt **[3]** 45/10 49/9 50/22
encrypted **[16]** 13/14 13/15 27/24 28/14 28/18 28/24 29/15 33/13 33/14 34/7 47/5 58/12 58/13 58/16 58/19 58/22
encrypting **[4]** 45/25 46/17 50/8 50/25
encryption **[5]** 28/3 45/9 45/10 46/25 49/21
encrypts **[3]** 45/6 46/11 50/12
end **[16]** 8/23 8/25 9/4 20/12 20/14 26/9 28/5 41/5 41/12 66/23 70/20 83/19 83/25 84/22 96/24 102/6
ended **[3]** 28/25 29/1 59/22
enforcement **[17]** 30/20 31/1 31/2 31/4 31/7 31/10 37/25 51/1 62/2 71/19 72/12 72/22 73/14 74/14 74/19 93/21 94/6
enforcement's **[1]** 31/18
engage **[1]** 73/22
engages **[1]** 75/5
engaging **[1]** 82/1
engine **[4]** 51/19 99/8 101/1 101/7
engineers **[1]** 49/10
enough **[1]** 11/17
ensure **[4]** 74/21 74/24 75/18 75/23
ensuring **[1]** 76/2
enter **[1]** 4/5
entirely **[6]** 37/17 38/25 40/11 40/21 43/2 43/13
entities **[1]** 82/1
entitled **[3]** 69/25 83/11 103/5

**E**

entity [2]   25/14 74/5
entity's [1]   79/12
equivalent [2]   68/14 91/24
error [1]   22/9
especially [2]   38/25 56/9
essential [1]   22/3
essentially [10]   22/12 25/12 30/7 30/8 31/17 39/14 41/2 73/1 76/14 83/5
establish [1]   96/14
establishing [1]   79/7
estimated [1]   91/17
et [1]   8/19
evade [2]   31/4 51/1
even [7]   8/23 49/2 55/20 56/17 77/15 96/2 101/15
events [2]   66/13 68/23
eventually [1]   86/10
ever [5]   12/25 18/18 26/5 48/10 59/13
every [2]   18/21 55/20
everything [1]   10/10
evidence [26]   24/2 24/5 26/16 27/12 28/7 29/21 29/24 30/18 35/23 37/1 42/16 43/9 44/13 44/18 48/16 55/1 55/16 55/16 55/21 56/21 57/7 59/21 60/17 78/2 81/6 88/3
exact [2]   16/2 35/19
exactly [4]   31/21 37/15 39/6 57/13
examination [13]   3/4 3/4 3/7 3/7 3/8 3/10 5/18 54/6 69/23 71/6 81/15 84/9 85/17
examine [2]   8/25 17/23
examined [4]   8/12 8/20 17/25 32/6
example [14]   15/25 17/17 50/11 58/12 74/3 75/2 75/8 76/17 77/6 77/9 81/9 100/16 101/2 101/2
examples [1]   100/8
exceeding [1]   74/5
exchange [1]   82/1
excuse [2]   76/6 79/3
excused [2]   70/21 84/15
exhibit [43]   3/13 3/13 3/14 3/14 10/22 24/6 26/17 27/12 27/15 27/17 29/9 29/20 35/24 37/2 39/8 39/9 39/10 41/1 41/16 42/3 42/9 42/15 42/20 42/23 43/9 44/13 48/17 57/15 57/17 59/16 78/18 78/20 87/13 87/16 87/18 87/20 88/2 88/4 88/20 88/23 88/25 99/24 100/14
Exhibit 368 [1]   29/20
Exhibit 45C [1]   87/13
Exhibit 45D [4]   88/2 88/4 88/20 88/23
Exhibit 46 [1]   99/24
Exhibit 710A [3]   24/6 44/13 48/17
Exhibit 720 [1]   35/24
Exhibit 722 [1]   37/2
Exhibit 723 [2]   39/9 57/15
Exhibit 724 [1]   41/1
Exhibit 725 [1]   41/16
Exhibit 726 [1]   42/3
Exhibit 729 [1]   42/15
Exhibit 731 [1]   42/23
Exhibit 733 [1]   43/9
EXHIBITS [2]   3/12 3/15
expect [2]   58/10 59/6
expectation [1]   75/15
expects [1]   94/24
experience [4]   32/18 71/25 95/16 95/18
experienced [1]   77/15
experiential [1]   97/8
expert [11]   65/2 65/2 65/4 65/5 65/6 65/17 66/1 69/9 69/10 69/20 96/1
explain [23]   8/15 11/6 15/21

24/20 28/1 32/12 33/19 34/4 34/7 34/23 37/7 39/12 45/8 57/24 59/18 65/20 67/5 67/10 67/20 68/3 69/16 73/17 76/11
explained [3]   68/9 83/4 84/13
explaining [2]   65/11 81/25
explanation [1]   102/18
explicitly [2]   54/24 70/16
exported [1]   26/10
expressing [5]   49/13 49/17 50/16 50/21 50/25
extensive [1]   75/7
extent [5]   4/18 8/2 65/16 66/21 69/7
external [2]   31/25 73/12
extraction [1]   10/3
extractions [1]   10/7
extremely [1]   64/19
eyes [1]   102/4

**F**

Facebook [1]   49/14
Facebooks [1]   49/4
fact [9]   49/5 50/9 50/20 62/1 62/13 73/15 89/15 96/2 96/13
factor [1]   91/8
factors [1]   90/18
facts [1]   82/16
factual [1]   96/8
fail [1]   95/5
fair [4]   19/17 35/12 49/12 99/20
fairly [1]   102/19
Falco [4]   77/25 89/25 91/12 93/14
familiar [3]   97/21 97/24 98/1
FAQ [1]   77/8
far [1]   6/12
FBI [8]   16/22 26/8 28/9 28/20 60/14 60/18 61/2 61/4
FBI's [2]   28/9 59/21
feature [1]   61/22
features [2]   48/14 99/10
February [2]   1/5 85/25
federal [7]   72/9 73/3 73/18 80/14 80/17 93/20 94/6
few [5]   14/5 17/10 59/22 64/15 93/24
Fi [8]   11/9 12/4 12/13 12/19 12/23 12/25 13/8 31/23
Field [1]   79/18
figure [1]   85/2
file [17]   24/18 24/21 25/2 36/4 36/4 36/21 37/6 37/14 42/1 43/7 57/12 73/21 74/2 75/2 79/1 80/19 102/7
filed [5]   74/9 74/12 78/23 78/24 80/18
files [17]   24/23 24/25 24/25 26/9 28/16 28/16 36/16 39/15 39/16 39/19 43/25 52/6 56/7 56/13 60/5 60/10 68/13
filing [1]   76/1
fill [1]   78/11
filtering [1]   64/20
final [1]   81/24
financial [16]   46/25 71/18 71/22 71/23 72/11 73/1 73/10 73/20 73/24 73/25 74/1 74/9 75/6 75/18 76/14 77/5
FinCEN [35]   53/25 71/19 71/20 71/21 72/4 72/13 72/15 72/23 74/2 74/15 74/21 75/5 75/7 76/11 76/23 76/24 77/18 77/20 77/23 78/8 78/11 80/9 80/10 80/13 80/16 80/18 80/25 81/2 81/17 81/21 81/23 82/16 82/21 82/23 84/4
find [15]   5/25 6/2 6/5 6/8 7/6 9/10 9/15 9/17 11/3 25/5 32/6 55/16 55/16 77/16 98/6
finding [1]   64/17
fine [1]   102/13
finish [1]   53/4
first [18]   18/17 18/24 20/16 42/9

43/19 46/1 52/5 61/15 62/14 68/10 71/12 71/16 75/22 85/22 85/23 91/20 93/17 101/9
five [2]   98/19 98/20
flipping [1]   96/8
Flood [4]   86/20 87/9 87/21 89/12
Floor [1]   2/4
foam [1]   10/22
focused [1]   64/19
Fog [58]   5/25 6/3 6/6 6/9 6/11 6/13 6/15 6/18 6/21 6/25 7/16 7/21 8/1 8/9 8/13 8/21 8/25 9/4 9/6 9/11 9/13 9/18 9/19 10/13 22/7 25/6 28/10 32/7 36/19 36/22 36/24 37/13 37/14 37/16 40/24 41/24 42/13 42/21 43/6 47/22 48/10 52/11 52/14 52/16 54/9 54/11 54/21 54/23 55/3 55/10 56/17 56/18 58/10 59/1 95/2 96/7 96/16 96/17
folder [5]   28/10 28/11 28/21 28/23 28/25
folders [1]   39/16
follow [4]   46/3 90/24 94/21 95/5
following [3]   38/17 74/16 83/12
food [1]   4/12
fooling [1]   4/11
footage [1]   68/19
foregoing [1]   103/4
forensic [4]   24/21 26/3 26/8 59/23
forensics [1]   57/14
form [17]   11/12 16/20 16/21 16/25 28/8 33/1 33/4 52/6 78/5 78/7 78/8 78/8 78/10 78/23 79/8 79/14 81/7
formal [2]   95/19 97/5
format [1]   27/8
formatting [1]   25/19
forms [2]   77/25 80/19
forthrightly [2]   93/20 94/5
found [5]   8/23 9/3 16/17 60/6 68/18
foundation [3]   23/19 23/24 38/18
four [2]   30/14 75/20
frankly [1]   96/10
free [2]   32/18 35/18
frequently [3]   99/17 100/2 100/5
front [6]   20/25 67/6 67/7 67/21 67/22 90/5
full [5]   25/21 28/3 51/8 58/15 92/8
fully [2]   93/19 94/4
functionality [1]   8/17
further [4]   53/1 84/7 84/14 92/2

**G**

gain [1]   4/10
gained [1]   4/16
garbled [1]   45/13
gate [1]   4/12
gathered [1]   26/10
gave [3]   16/22 23/4 102/19
general [9]   15/23 20/6 49/1 49/24 57/14 60/2 74/21 90/12 90/16
generally [7]   16/8 16/9 26/20 30/17 45/19 47/2 58/2
George [1]   72/2
get [26]   4/2 4/19 4/21 13/11 13/16 17/4 24/5 26/7 30/8 39/5 41/15 41/15 47/2 53/21 53/22 54/1 70/23 72/14 82/13 82/19 82/21 90/17 90/18 94/15 94/17 100/25
gets [1]   23/14
getting [3]   50/13 84/11 101/24
give [8]   15/4 15/4 40/8 79/14 90/21 91/1 100/8 101/2
given [2]   18/23 102/17
gives [1]   90/20
giving [1]   55/19
glance [1]   43/19
gmail.com [1]   20/18

**G**

**go [37]** 4/21 10/9 14/18 17/12 23/10 24/6 27/21 29/20 35/10 42/3 42/8 42/15 42/23 44/12 44/16 48/16 53/7 63/8 64/8 67/5 67/16 67/20 70/12 79/4 79/21 80/2 85/7 85/12 85/13 86/25 88/6 88/15 89/8 89/24 89/24 91/12 100/10
**goes [1]** 76/20
**going [16]** 27/22 44/9 44/12 48/17 57/13 58/8 58/13 79/8 82/15 85/11 87/24 91/12 96/3 96/18 101/23 102/1
**good [13]** 5/8 5/12 5/15 5/20 5/21 54/1 71/9 71/10 71/14 85/19 85/20 101/11 101/12
**Google [2]** 77/12 100/24
**Googles [1]** 49/4
**got [6]** 52/7 52/23 68/15 96/21 96/23 97/10
**government [55]** 3/13 3/14 3/14 3/15 5/1 5/7 7/15 7/20 7/25 8/9 8/21 8/23 9/3 10/22 24/5 29/20 35/24 37/1 37/21 37/24 38/2 38/7 38/9 38/16 38/22 39/9 41/1 41/16 42/3 42/15 42/23 43/9 44/13 48/17 55/25 56/24 69/25 76/17 87/13 87/16 88/2 88/4 88/20 89/21 93/12 93/22 94/8 94/10 94/19 94/21 94/23 95/3 95/6 96/4 99/23
**government's [2]** 53/20 53/24
**Gox [6]** 21/4 21/19 21/19 63/16 63/18 63/19
**Grams [11]** 99/3 99/4 99/7 99/14 99/17 99/18 99/21 100/18 100/23 100/24 101/9
**great [1]** 9/23
**greatly [1]** 61/24
**grounds [2]** 96/10 96/10
**group [6]** 20/16 20/18 20/23 21/1 21/2 21/6
**grouped [3]** 21/3 70/6 70/17
**grouping [1]** 25/13
**groupings [3]** 62/5 64/17 70/15
**groups [5]** 20/13 23/20 69/10 70/6 70/17
**guard [1]** 4/11
**guess [4]** 16/13 28/6 66/19 83/18
**guessing [1]** 22/12
**guidance [20]** 75/10 75/11 75/11 77/7 77/10 77/18 77/20 81/17 81/19 81/21 81/24 82/9 82/22 82/24 83/1 83/4 83/11 84/5 84/6 84/12
**guideline [2]** 92/11 92/11
**guidelines [8]** 90/12 90/13 91/8 91/11 91/14 91/18 92/10 94/12
**guides [1]** 75/8
**guilty [6]** 86/10 89/15 90/1 91/22 95/8 95/9

**H**

**H-A-R-M-O-N [1]** 85/24
**hackers [2]** 50/13 50/17
**hacking [1]** 11/9
**had [27]** 10/3 10/7 16/20 17/20 22/19 27/8 28/8 28/20 28/21 48/9 48/12 54/10 62/16 64/21 70/15 72/13 72/20 81/21 82/21 82/24 82/25 83/14 84/4 86/7 91/10 97/7 98/21
**half [1]** 85/8
**hallway [1]** 101/17
**hand [3]** 93/24 100/18 102/16
**happen [3]** 12/19 31/14 40/6
**happened [3]** 28/19 39/7 64/11
**happening [3]** 18/13 30/7 31/3
**happy [1]** 67/16
**hard [19]** 24/23 25/13 25/16 25/16 25/19 25/23 27/24 28/20 28/22 28/24 29/3 39/25 40/1 40/4 40/9

40/9 40/12 41/2 61/4
**Harmon [8]** 3/9 84/25 85/14 85/24 85/25 89/6 96/18 96/19
**has [26]** 4/12 23/20 27/11 32/18 38/3 38/19 47/11 56/24 59/25 60/1 65/1 65/4 65/17 65/25 69/17 74/10 75/1 75/7 77/18 86/14 88/3 94/14 96/15 96/17 99/11 99/15
**hasn't [5]** 38/12 66/20 95/24 96/1 96/5
**HASSARD [28]** 2/2 5/14 24/4 24/16 26/16 27/7 27/19 27/21 29/20 35/23 36/25 39/8 41/6 41/14 42/2 42/6 42/8 42/19 43/8 43/12 43/21 44/7 44/12 44/23 47/15 48/15 50/3 51/3
**have [111]**
**haven't [2]** 8/12 8/20
**having [3]** 25/14 49/14 50/16
**he [28]** 4/12 7/18 7/23 8/3 29/16 38/7 45/21 50/19 50/21 59/12 60/21 82/22 83/2 83/14 93/5 95/24 95/25 96/1 96/2 96/6 96/6 96/7 96/11 96/13 96/15 96/15 96/16 97/10
**head [1]** 51/18
**header [1]** 48/20
**heading [1]** 50/4
**heard [11]** 7/15 7/20 7/25 9/2 21/10 37/20 65/1 65/8 70/2 70/3 70/3
**hearing [1]** 70/14
**hearsay [2]** 100/1 100/3
**heavydist [1]** 20/18
**held [4]** 64/24 69/6 82/11 95/22
**Helix [3]** 86/3 86/3 100/21
**help [4]** 48/5 73/23 73/25 75/18
**helpful [1]** 50/13
**helping [1]** 94/25
**helpline [4]** 74/25 75/3 75/5 75/12
**helps [3]** 14/19 14/22 46/25
**her [22]** 8/3 8/5 19/23 19/23 45/21 45/22 46/3 65/2 65/4 65/11 65/12 66/1 69/9 69/9 69/11 69/14 69/16 69/20 69/23 69/23 70/5 70/15
**here [32]** 4/6 24/7 27/23 30/7 30/14 40/11 40/23 41/5 41/24 43/20 47/16 49/17 50/5 50/16 50/19 57/15 60/9 62/14 63/8 63/13 64/13 66/21 67/5 67/6 67/21 67/22 69/15 92/19 92/25 93/2 96/10 96/15
**Hi [2]** 71/8 71/14
**hide [2]** 23/1 49/4
**high [2]** 26/19 59/19
**him [11]** 4/19 7/11 7/15 7/20 7/25 9/10 21/10 50/25 55/17 82/6 82/8
**hire [1]** 73/13
**his [36]** 4/10 4/12 4/17 6/6 6/16 6/18 6/21 6/25 7/7 7/13 8/6 10/2 20/18 20/19 20/20 29/5 29/6 37/18 37/22 38/7 38/17 40/12 40/14 40/19 40/21 43/3 43/13 47/11 49/14 50/16 50/22 51/1 83/19 93/7 96/16 101/19
**histories [2]** 55/19 56/9
**history [3]** 42/24 56/12 56/13
**hit [1]** 58/21
**hold [1]** 76/8
**home [36]** 14/14 14/15 15/25 31/6 31/23 32/1 34/16 35/2 35/3 35/6 35/13 37/18 37/21 40/12 40/14 40/15 40/16 40/18 40/19 40/21 41/5 41/12 41/13 43/3 43/13 44/5 46/22 56/3 57/16 57/16 57/17 57/21 57/22 57/24 58/2 68/19
**homepage [2]** 99/14 100/16
**honestly [2]** 83/15 100/3
**Honor [49]** 4/4 4/8 5/2 5/8 5/12 5/17 8/2 23/22 27/10 27/14 36/14

41/9 44/8 45/24 53/1 53/16 53/17 54/5 64/9 64/22 64/25 65/16 67/12 68/1 69/4 69/14 70/2 70/24 78/15 81/13 82/12 82/14 82/20 83/13 83/18 83/23 84/2 84/7 84/25 85/6 87/12 88/19 93/8 95/20 95/23 97/2 100/8 102/10 102/20
**HONORABLE [1]** 1/9
**Hop [1]** 35/20
**hosts [1]** 28/9
**hotmail.com [4]** 20/8 20/22 21/3 21/4
**hotspot [4]** 31/14 31/21 31/23 31/25
**hour [2]** 44/10 85/9
**hours [3]** 17/19 17/22 72/19
**house [2]** 31/12 68/17
**how [34]** 8/18 15/11 18/20 19/22 19/23 28/5 30/19 35/2 40/15 41/12 41/19 49/23 53/2 57/20 67/7 67/9 67/22 68/3 68/22 68/24 69/15 69/17 71/8 71/9 72/14 73/25 74/21 76/11 76/16 80/10 85/1 92/7 96/2 101/6
**Howell [2]** 90/6 90/7
**http [1]** 13/16
**https [2]** 13/14 58/13
**huh [1]** 17/23
**hundreds [1]** 9/20
**hypothetical [2]** 31/13 31/18

**I**

**I'd [6]** 17/12 17/14 44/17 49/25 83/18 87/12
**I'm [16]** 15/12 18/10 21/12 27/21 38/5 39/22 40/17 43/15 44/17 44/19 47/19 52/3 53/2 67/9 82/4 85/5
**ID [2]** 76/17 76/22
**identification [6]** 11/12 22/16 27/12 86/15 99/11 99/15
**identified [2]** 93/21 94/7
**identifier [1]** 11/1
**identify [1]** 52/12
**identifying [1]** 74/18
**identity [3]** 20/3 46/22 76/15
**IDs [1]** 14/16
**ignore [2]** 34/21 35/20
**ignorelist.com [3]** 34/19 35/18 41/19
**image [5]** 28/16 28/20 28/23 28/25 52/6
**images [16]** 28/8 28/11 28/14 51/7 51/11 51/12 52/5 59/20 60/3 60/20 60/23 61/2 61/3 61/6 61/11
**impact [1]** 58/19
**implied [1]** 16/17
**impose [1]** 75/20
**impression [2]** 43/4 69/25
**inadvertently [1]** 102/8
**inappropriate [1]** 82/18
**include [6]** 63/20 63/24 74/3 79/11 79/25 82/3
**included [3]** 61/8 61/12 102/3
**including [3]** 36/24 58/1 94/11
**independent [2]** 25/11 76/3
**indicate [4]** 17/21 79/19 79/22 86/19
**indicated [3]** 17/11 17/14 89/2
**indicates [1]** 80/3
**Indicating [1]** 29/13
**indication [1]** 57/16
**individual [1]** 62/11
**individual's [1]** 79/12
**individuals [2]** 66/15 80/19
**indulgence [1]** 81/12
**inexpensive [1]** 25/10
**info [1]** 17/13
**inform [1]** 94/11
**information [17]** 13/17 13/20 13/21 13/25 17/4 17/16 40/4 47/1 47/1 54/14 62/17 68/16 74/17

**I**

information... [4]  74/19 75/12 79/9 79/15
ingested [2]  28/16 61/11
initial [10]  21/18 60/20 64/18 65/4 65/12 65/22 65/24 66/1 66/8 70/15
initially [1]  60/17
input [1]  74/13
inquiries [2]  72/9 72/10
ins [1]  66/12
insofar [1]  71/25
instance [2]  12/3 44/4
instead [5]  16/15 28/23 31/8 33/20 48/21
institution [6]  75/1 75/8 75/19 76/2 76/5 77/6
institutions [12]  72/11 73/2 73/4 73/10 73/20 74/1 74/9 74/22 75/6 75/15 75/20 76/14
instruct [4]  82/14 83/19 84/18 100/11
instructing [2]  83/7 83/20
interact [2]  32/15 51/13
interdivisional [1]  73/13
interest [5]  14/13 26/9 60/10 64/21 68/10
interested [1]  14/16
internal [1]  73/12
internet [13]  11/2 13/8 13/20 14/1 14/16 14/18 15/7 23/10 30/9 31/6 31/7 31/20 99/5
interpretation [1]  19/14
interrupt [1]  92/18
interrupted [1]  85/6
intervals [1]  76/8
introduce [6]  71/11 78/15 85/21 87/13 88/20 99/23
introduced [1]  71/10
investigates [1]  73/1
investigating [1]  68/15
investigation [4]  7/9 14/13 95/2 95/3
investigation-related [1]  14/13
investigations [4]  74/14 74/16 74/20 94/25
investigatively [1]  39/4
investigators [1]  61/24
involved [8]  17/24 18/5 21/9 21/12 22/6 72/8 74/18 92/1
involves [1]  25/19
involving [2]  21/19 52/4
IP [66]  10/15 10/21 10/24 11/1 11/4 11/6 11/7 11/8 11/10 11/12 11/15 11/22 11/24 12/4 12/8 12/11 12/15 15/5 15/13 15/22 15/23 15/24 16/2 16/4 16/7 16/9 16/12 16/18 16/24 18/1 18/4 18/14 18/17 18/19 20/2 20/4 21/8 21/14 22/5 22/6 22/10 33/8 34/25 35/2 35/6 35/9 35/21 37/15 52/8 52/12 52/15 58/25 59/4 59/6 61/14 62/4 62/9 62/22 63/1 63/15 64/18 65/14 66/8 68/5 68/8 68/12
IPs [4]  58/17 64/21 68/9 68/25
IRS [9]  16/22 28/5 28/21 60/15 60/17 60/20 61/1 61/3 61/6
is [381]
isn't [3]  22/3 29/6 34/21
issue [3]  83/9 101/24 102/8
issued [7]  76/17 81/19 81/21 81/23 82/24 84/5 102/15
issues [2]  39/2 101/25
it [281]
it's [1]  67/3
items [4]  28/4 28/7 30/18 98/22
its [11]  11/2 19/6 23/1 31/12 32/15 49/1 77/2 80/25 94/10 94/11 94/19
itself [2]  50/12 51/6

**J**

JD [1]  72/2
Jeff [1]  5/10
JEFFREY [1]  1/18
job [1]  71/25
jog [2]  60/7 60/8
John [2]  76/19 76/21
joined [1]  5/9
joining [1]  5/14
judge [7]  1/10 90/6 90/7 90/20 90/24 94/20 94/21
jury [52]  1/9 4/3 4/6 4/22 4/23 4/25 8/15 10/24 11/6 14/11 15/21 24/1 24/10 24/20 27/16 28/1 30/1 32/12 33/3 33/19 34/4 34/23 36/3 37/7 39/12 44/24 45/4 45/8 46/20 53/12 53/22 54/1 54/2 55/21 71/12 73/8 78/19 78/22 82/14 83/8 83/20 83/21 84/18 85/10 85/21 87/17 88/24 89/2 92/6 100/8 100/11 101/18
just [89]  4/4 4/16 4/18 9/2 9/3 10/10 10/15 10/24 15/18 17/7 17/8 18/3 18/16 19/21 21/22 23/24 25/12 25/12 26/23 29/15 30/8 31/1 31/14 31/19 33/2 33/19 34/4 36/3 39/5 39/12 41/15 41/21 42/7 44/8 45/4 45/8 47/2 47/13 47/13 48/14 48/23 49/8 49/9 50/6 53/7 53/13 53/22 55/24 60/1 61/15 63/14 65/1 65/3 65/8 65/21 65/24 66/5 66/6 66/10 66/11 69/7 69/16 69/18 74/2 75/25 76/2 76/13 79/8 79/19 80/17 81/5 81/25 83/19 84/4 84/13 87/24 88/15 89/2 92/18 93/5 93/17 95/2 97/8 100/12 101/14 101/21 102/4 102/16 102/18
JUSTICE [2]  1/13 1/20

**K**

keep [7]  14/22 27/22 44/12 73/20 80/21 83/13 91/12
keeping [1]  76/1
keys [2]  5/25 6/2
keyword [6]  52/18 58/20 58/21 58/23 101/7 101/8
keywords [1]  100/25
Killdozer [3]  20/19 20/20 20/21
kind [7]  22/9 48/10 50/10 50/21 60/6 83/10 96/8
know [47]  13/13 15/15 15/20 16/23 16/25 17/7 22/9 32/4 34/5 34/7 36/12 36/17 37/15 37/16 38/1 38/8 38/9 38/22 44/1 47/23 48/14 51/15 51/16 51/17 53/2 65/7 66/3 68/20 71/10 72/20 74/15 75/9 76/9 76/9 76/12 76/13 76/15 76/18 76/19 76/21 77/9 77/11 77/13 95/11 96/1 96/7 102/6
knowing [1]  51/9
knowledge [2]  23/20 38/19
known [2]  54/24 71/19
Kolbasa [2]  63/19 63/24
Kolbasa99.ru [1]  21/5

**L**

L-A-H-A-K-I-S [1]  71/15
L-A-R-R-Y [1]  85/24
labeled [4]  6/7 6/11 28/11 88/7
language [1]  9/6
laptop [2]  51/13 57/13
large [2]  11/23 14/3
Larry [5]  3/9 84/25 85/14 85/24 89/6
last [9]  71/12 71/14 79/12 85/22 85/23 86/25 87/24 88/6 89/8
late [3]  39/5 64/11 68/13
later [2]  60/23 86/3
launch [1]  101/9
launder [1]  86/8
laundering [22]  71/23 72/10 73/3

73/15 73/19 73/23 74/23 75/4 75/9 75/14 75/17 75/19 75/21 76/3 76/13 77/13 80/11 86/11 89/15 90/3 91/23 92/7
law [21]  2/3 30/20 30/25 31/1 31/4 31/7 31/10 31/18 37/24 51/1 62/2 72/2 72/11 73/14 74/14 74/19 84/19 84/21 93/21 94/6 101/23
laws [1]  76/9
lawyer [5]  92/19 92/21 92/25 93/3 93/8
lay [2]  23/19 38/18
layers [1]  61/25
leading [8]  54/16 55/4 63/4 64/4 68/6 97/14 98/8 98/16
learned [1]  97/11
least [7]  30/14 48/8 49/6 57/4 72/18 91/2 91/24
leave [3]  50/8 50/14 72/20
ledgers [2]  8/1 8/9
left [5]  25/1 49/6 70/1 80/13 100/18
left-hand [1]  100/18
legal [3]  16/21 18/8 79/12
legally [1]  39/6
lengthy [1]  94/3
let [7]  21/13 48/18 48/23 95/13 99/11 99/15 102/6
let's [12]  4/21 53/21 54/1 76/19 77/10 80/16 82/10 84/23 88/6 89/8 99/12 101/3
lets [2]  32/14 85/13
letter [3]  80/7 86/22 87/21
letter F [1]  80/7
level [3]  26/19 59/19 91/17
liability [1]  46/15
Liberty [5]  63/16 63/17 63/20 63/21 64/13
licensing [1]  82/7
life [3]  9/23 92/13 97/17
Light [2]  86/3 100/21
lighter [2]  94/18 95/8
like [49]  7/1 7/1 9/1 10/15 11/18 13/21 15/4 15/19 16/15 16/21 17/1 19/15 24/4 27/7 27/11 28/22 32/2 32/9 32/16 32/17 32/18 32/19 34/10 38/20 40/3 42/7 43/16 44/17 45/24 49/2 49/14 49/14 55/10 58/13 59/16 61/14 70/4 75/2 75/9 77/4 77/12 87/12 88/2 88/5 96/20 100/2 100/3 100/9 100/13
likely [2]  20/17 21/2
limited [1]  94/11
limits [2]  51/8 51/11
LINDSAY [3]  2/6 103/3 103/12
line [8]  33/22 33/22 58/5 59/10 62/5 72/19 83/6 93/15
lines [2]  18/15 93/24
linked [3]  14/15 35/21 54/24
links [1]  39/19
Linux [26]  32/9 32/12 32/13 32/15 32/18 32/20 32/23 32/25 33/1 33/25 34/1 34/15 35/13 39/21 39/23 39/25 40/8 40/10 40/13 40/18 57/21 57/21 57/22 57/24 58/1 61/16
list [13]  26/4 26/8 26/14 28/7 28/15 29/6 34/21 35/20 59/6 59/8 60/5 77/7 77/14
listed [4]  29/4 56/14 60/9 79/11
listened [1]  7/13
lists [1]  65/14
little [13]  11/22 27/19 27/21 33/11 35/2 42/6 47/13 47/14 65/7 66/11 71/24 89/18 101/13
live [2]  39/15 72/19
lives [1]  39/17
living [1]  97/20
loaded [1]  26/7
local [4]  17/16 39/16 93/21 94/6
locally [1]  34/12
located [2]  68/10 79/22

**L**

location [1]   39/19
log [22]   6/8 6/10 12/11 17/4 17/5 18/8 18/10 18/11 18/12 18/14 18/14 18/15 20/19 22/6 26/3 34/10 34/12 35/12 35/14 37/6 66/12 98/22
log-in [4]   6/8 6/10 17/4 22/6
log-out [4]   18/8 18/10 18/12 18/15
logging [6]   16/13 33/7 33/12 34/11 43/3 43/13
logs [13]   7/21 16/6 16/6 16/10 16/12 16/15 16/19 16/24 17/13 17/23 18/5 56/19 62/23
long [2]   53/6 85/1
look [17]   14/12 18/5 26/22 27/9 28/13 37/12 50/3 51/19 62/21 68/18 68/25 77/11 79/8 86/16 88/6 100/2 102/2
looked [13]   10/2 10/3 10/5 10/11 17/1 18/9 18/14 20/6 21/21 22/5 100/3 100/9 100/13
looking [17]   18/19 21/17 21/25 24/24 39/13 39/23 63/1 63/13 66/4 66/7 66/16 77/8 77/16 79/19 81/5 86/22 100/23
looks [3]   16/21 68/23 88/5
lookups [1]   15/13
lot [10]   6/10 15/8 15/13 15/18 32/18 38/25 40/6 46/9 58/12 100/3
lots [1]   98/19
LTE [6]   30/5 30/6 30/21 31/9 59/9 59/12
lunch [4]   85/3 85/11 101/13 102/13

**M**

Mac [1]   32/14
made [8]   20/5 28/7 28/20 28/23 47/25 56/10 60/2 97/16
mail [2]   48/12 78/23
Mailwoo [7]   47/17 47/25 48/1 48/4 48/7 48/9 50/13
main [6]   15/13 40/18 50/4 50/9 58/16 77/23
maintain [1]   80/18
majority [2]   21/8 52/12
make [16]   9/2 11/7 18/3 20/3 30/16 60/2 60/20 62/10 68/4 68/8 68/12 93/5 97/20 98/24 102/4 102/8
makes [3]   8/16 45/13 49/7
making [1]   45/24
manage [1]   48/5
managed [1]   4/10
mandatory [3]   90/25 91/1 91/2
manually [1]   40/10
many [11]   10/4 16/20 26/7 32/17 49/20 49/23 62/15 64/21 68/21 68/24 97/16
March [7]   72/5 77/21 81/18 82/9 82/24 84/4 103/10
March 2013 [3]   81/18 82/24 84/4
markdown [1]   26/18
marked [4]   27/11 86/14 99/11 99/15
marketplace [1]   97/13
marketplaces [2]   98/20 99/9
Mason [1]   72/2
materials [1]   51/20
mathematically [2]   45/11 45/14
matter [5]   17/22 64/15 74/21 100/12 103/5
matters [3]   4/19 93/22 94/7
maximum [3]   90/2 92/14 92/15
may [23]   17/1 19/24 23/19 24/25 27/15 54/3 56/14 66/10 66/24 70/2 70/23 71/5 74/6 74/11 75/10 77/8 78/18 80/12 80/15 84/1 87/17 88/23 96/25

maybe [12]   10/6 19/22 20/17 26/13 31/6 53/7 66/1 66/6 67/25 82/20 96/6 96/6
Mazarin [1]   3/3
Mazars [11]   3/3 5/20 30/4 35/25 48/20 54/8 59/18 60/14 61/15 67/1 68/3
McDonald's [2]   12/11 12/13
me [33]   5/14 11/23 16/22 19/5 19/9 20/25 21/13 22/16 23/15 26/8 46/9 46/17 48/18 48/23 49/20 56/15 65/20 68/14 69/1 76/6 79/3 82/25 83/9 83/15 84/21 92/13 95/13 96/20 97/10 99/11 99/15 100/5 102/6
mean [5]   10/14 38/5 52/2 57/17 67/9
meaning [4]   9/12 14/13 37/9 39/15
meaningful [1]   58/20
means [2]   17/18 46/20
meant [1]   19/14
mechanism [1]   35/17
media [5]   36/16 39/17 39/17 43/25 57/22
member [1]   72/3
members [5]   4/24 38/24 71/12 84/18 85/21
memory [4]   20/24 59/25 60/7 60/8
mentioned [6]   10/11 74/1 74/25 76/1 77/9 83/14
merely [2]   47/8 83/1
mess [1]   49/4
message [1]   10/7
metaphor [1]   34/7
method [1]   45/11
methodology [8]   18/16 19/5 19/7 19/10 19/11 19/15 19/18 19/24
methods [1]   46/21
MICHAEL [2]   2/2 5/14
microphone [1]   89/20
middle [1]   100/21
might [15]   10/8 12/11 12/13 13/18 15/16 18/12 18/15 31/11 35/21 47/25 51/18 68/14 72/14 82/14 99/20
miles [1]   34/13
million [1]   32/20
minimum [3]   90/25 91/1 91/2
minute [1]   88/6
minutes [2]   85/11 96/22
misstating [1]   19/19
mistake [1]   29/4
mitigating [1]   90/18
mixed [1]   96/7
mixer [3]   54/15 86/3 96/17
mixers [2]   82/3 83/5
mixing [1]   8/18
mode [1]   14/18
modem [2]   31/2 31/10
moment [2]   64/23 95/21
money [36]   7/1 22/3 68/18 71/22 72/10 73/3 73/15 73/18 73/22 74/16 74/22 75/4 75/9 75/14 75/17 75/19 75/21 76/3 76/13 76/19 77/13 78/8 78/10 78/23 79/4 79/6 80/3 80/8 80/11 81/23 82/7 86/8 86/11 89/15 90/3 91/9
monitor [1]   31/12
monitoring [6]   31/1 31/2 31/8 31/10 31/18 73/22
months [1]   96/17
Moon [5]   17/25 47/25 48/7 51/4 51/21
more [15]   8/7 16/15 17/10 31/25 40/6 49/7 50/23 58/17 59/24 59/24 67/2 74/25 92/16 102/18 102/18
morning [8]   1/7 5/8 5/12 5/15 5/20 5/21 53/8 71/14
MOSS [1]   1/9
most [6]   14/17 31/22 51/13 64/13 85/9 91/10
mostly [1]   59/20

mount [3]   40/1 40/4 40/9
move [7]   23/22 41/1 70/19 72/22 78/14 88/20 99/23
Mr [11]   3/4 3/7 3/7 3/8 3/10 5/3 7/9 21/9 21/17 47/15 52/16
Mr. [95]   4/7 4/9 4/15 5/24 6/3 6/9 9/9 9/16 9/18 9/23 10/12 12/22 20/9 20/18 23/18 24/4 24/13 24/16 25/2 26/16 27/7 27/19 27/21 29/3 29/16 29/20 30/5 35/23 36/25 37/17 37/21 38/3 38/4 38/6 38/12 38/16 38/23 39/8 40/12 41/6 41/14 42/2 42/6 42/8 42/19 42/24 43/2 43/8 43/12 43/13 43/21 44/7 44/12 44/23 45/2 47/8 47/11 48/15 49/13 49/17 50/3 50/16 51/3 51/4 54/20 55/2 55/15 56/16 57/15 58/4 59/9 61/6 61/9 62/4 63/9 63/21 64/17 65/12 67/17 70/8 81/14 82/8 82/15 82/23 83/12 83/16 85/25 87/9 87/17 89/12 96/2 96/17 96/18 96/19 96/21
Mr. Ekeland [14]   4/7 54/20 56/16 57/15 58/4 59/9 62/4 63/9 64/17 65/12 81/14 82/15 96/17 96/21
Mr. Ekeland's [1]   67/17
Mr. Flood [3]   87/9 87/21 89/12
Mr. Harmon [3]   85/25 96/18 96/19
Mr. Hassard [25]   24/4 24/16 26/16 27/7 27/19 27/21 29/20 35/23 36/25 39/8 41/6 41/14 42/2 42/6 42/8 42/19 43/8 43/12 43/21 44/7 44/12 44/23 48/15 50/3 51/3
Mr. Pearlman [2]   82/8 83/16
Mr. Pearlman's [2]   82/23 83/12
Mr. Sterlingov [19]   4/9 4/15 9/16 10/12 20/9 23/18 29/16 37/17 38/4 38/6 40/12 43/2 43/13 47/11 49/13 49/17 50/16 70/8 96/2
Mr. Sterlingov's [26]   5/24 6/3 6/9 9/9 9/18 9/23 12/22 20/18 24/13 25/2 29/3 30/5 37/21 38/3 38/12 38/16 38/23 42/24 45/2 47/8 51/4 55/2 55/15 61/6 61/9 63/21
Ms [1]   3/4
Ms. [17]   5/20 30/4 35/25 48/20 53/3 54/3 59/18 65/9 65/19 66/3 69/13 69/21 77/25 89/25 91/12 93/14 102/12
Ms. Bisbee [1]   102/12
Ms. De [4]   77/25 89/25 91/12 93/14
Ms. Mazars [5]   5/20 30/4 35/25 48/20 59/18
Ms. Pelker [7]   53/3 54/3 65/9 65/19 66/3 69/13 69/21
MSB [3]   79/20 79/23 81/23
Mt. [6]   21/4 21/19 21/19 63/16 63/18 63/19
Mt. Gox [6]   21/4 21/19 21/19 63/16 63/18 63/19
much [5]   53/2 77/12 92/7 97/11 101/6
multiple [7]   30/9 30/13 55/16 57/8 57/10 62/22 69/15
my [43]   4/9 14/15 14/16 14/17 14/18 18/3 19/14 19/21 21/13 22/3 28/12 41/23 43/4 44/17 44/18 46/9 48/18 51/18 51/19 54/23 59/22 60/2 61/12 64/15 65/6 67/3 71/14 73/7 82/20 85/24 86/18 88/5 91/9 91/10 91/11 95/1 97/10 97/17 100/25 101/5 101/23 101/24 102/17
myself [1]   97/11

**N**

N.W [1]   1/16
name [26]   5/7 7/2 7/3 19/5 19/9 33/9 35/7 35/8 35/11 35/19 37/6 47/11 47/24 54/24 63/21 71/12 71/12 71/14 71/15 71/16 79/12 79/12 79/20 85/22 85/23 85/24

**N**

named [2] 59/20 95/11
naming [1] 20/7
national [1] 35/15
native [1] 16/19
nature [1] 80/15
Navy [3] 22/24 23/1 23/4
near [1] 66/14
necessarily [6] 14/14 56/20 57/17
58/8 58/9 60/10
necessary [2] 73/4 76/1
need [23] 4/4 14/12 23/24 30/17
40/10 45/15 49/9 53/3 65/20 74/1
74/15 75/22 75/24 76/3 76/6 76/21
78/11 79/1 79/5 90/11 96/23 98/12
102/6
needs [3] 25/20 66/4 102/3
network [13] 28/9 28/9 32/1 35/4
35/5 35/6 35/9 36/7 58/9 58/12
59/21 61/11 71/19
neutrally [1] 18/15
never [10] 8/23 9/3 30/12 30/15
30/16 31/25 36/11 37/21 48/13
51/13
new [7] 1/20 11/18 11/19 65/15
65/17 65/25 73/13
next [7] 1/23 27/20 53/20 53/24
56/11 70/23 84/24
NFS [2] 63/18 63/24
NFS9000 [1] 21/4
Nissan [1] 68/16
no [78] 1/4 4/4 6/1 6/4 6/7 6/14
6/17 6/20 7/4 7/8 8/11 8/14 8/25
9/14 9/19 10/3 10/14 11/14 12/1
15/10 17/2 17/10 18/8 20/10 22/8
22/14 23/17 24/15 25/7 26/2 27/14
27/17 27/21 30/16 32/4 32/8 35/21
47/23 48/13 49/8 51/16 52/17
52/23 53/1 53/16 53/17 54/13
55/23 56/2 56/9 56/20 59/5 60/12
62/12 65/5 67/2 78/17 78/20 83/23
84/6 84/7 84/13 84/14 87/15 87/18
88/22 88/25 90/25 92/16 92/20
94/22 95/12
nobody [1] 10/14
nods [1] 85/12
none [3] 6/10 6/12 22/5
nonprofit [2] 23/5 23/8
nonscientific [1] 19/17
normal [1] 40/3
normally [1] 25/23
Nos [1] 100/14
not [109]
notably [1] 64/13
note [4] 17/16 60/10 63/14 102/10
notes [10] 6/3 6/19 9/17 9/18
9/20 9/25 12/22 26/19 54/9 54/12
nothing [7] 8/24 37/16 38/3 40/23
42/12 43/5 52/13
noticed [6] 28/13 64/6 64/11 96/1
96/5 98/19
November [5] 21/11 21/22 22/1
64/12 68/14
November 2011 [1] 22/1
now [19] 8/3 10/15 18/16 23/7
32/9 43/8 48/16 51/16 53/3 53/8
53/9 62/9 63/9 64/25 65/1 66/8
84/23 85/11 88/2
number [13] 14/3 21/5 21/19 21/20
31/2 31/3 44/19 59/21 74/24 79/17
79/19 79/21 90/18
numbers [2] 11/23 61/8
numerous [1] 55/18
NW [3] 1/14 1/20 2/8
NY [1] 2/4

**O**

object [2] 65/18 70/10
objection [43] 8/2 19/1 19/19
22/13 23/17 27/13 27/14 29/6
36/14 38/10 45/21 54/16 55/4
55/11 57/1 63/4 64/4 64/9 64/22
66/21 67/12 67/13 68/6 69/4 70/1
70/18 78/16 78/17 82/5 83/5 83/22
83/23 87/14 87/15 88/21 88/22
95/20 95/25 97/1 97/14 98/8 98/16
99/25
obligation [1] 94/11
obligations [2] 73/11 94/10
observations [1] 19/13
observe [1] 98/5
observing [1] 61/23
obtain [1] 92/24
obtained [2] 37/21 38/12
Obtaining [1] 76/17
obviously [2] 46/3 76/4
occasionally [1] 35/2
occurred [3] 62/23 74/10 74/11
occurrences [1] 68/11
occurring [1] 62/22
October [4] 21/9 21/11 21/22 22/1
off [2] 17/19 51/18
offense [7] 88/5 88/16 88/17 89/3
91/17 91/22 96/9
offer [5] 14/3 27/11 76/24 81/17
94/19
offered [3] 82/21 88/3 100/7
offering [2] 65/14 65/17
offguard [1] 83/15
office [6] 77/23 93/20 93/21 94/6
94/7 94/13
officer [3] 73/7 75/25 76/5
Offices [1] 73/14
official [4] 2/7 81/19 103/3
103/13
offset [1] 17/21
oftentimes [2] 14/12 35/5
oh [2] 30/6 96/7
Ohio [1] 95/15
okay [23] 5/11 10/16 23/25 41/1
44/12 46/5 53/18 53/23 54/1 74/1
78/3 78/22 80/9 81/11 83/24 87/7
88/15 91/14 92/5 93/5 99/23
101/22 102/21
Omedetou [1] 9/12
once [4] 41/5 56/9 68/11 74/12
one [57] 4/8 13/24 15/6 15/25
19/5 19/9 25/14 25/21 26/7 26/8
26/20 28/13 28/14 28/15 29/3 29/4
29/18 30/9 30/24 30/25 31/1 31/10
31/16 34/15 35/21 39/17 43/1 46/8
47/16 48/1 48/8 49/8 49/16 49/24
50/11 50/14 50/15 52/21 55/20
57/4 59/25 59/25 60/1 69/1 70/7
70/7 75/2 75/22 80/6 86/7 86/10
90/9 95/4 97/7 98/23 98/25 102/10
ones [5] 11/11 28/12 45/12 62/23
98/21
ongoing [1] 26/6
online [3] 46/24 47/5 76/24
only [11] 17/25 31/9 31/10 44/9
51/11 58/21 82/17 99/4 99/6 99/9
100/8
ons [1] 32/19
op [2] 46/18 46/20
open [6] 12/19 12/23 12/25 13/8
69/22 76/20
opening [1] 4/11
operate [1] 32/25
operating [2] 32/13 32/14
operation [1] 43/5
Operational [1] 46/21
opinion [9] 65/2 65/4 65/5 65/15
65/17 66/18 66/20 101/24 102/15
opportunity [1] 79/15
oranges [1] 66/11
order [6] 4/13 39/25 64/15 68/23
82/13 98/21
organization [1] 17/2
organized [1] 26/7
original [3] 16/20 16/23 16/25
originally [2] 22/25 45/15
OS [1] 32/14
other [34] 10/6 11/2 11/8 11/11
15/15 15/16 16/6 16/16 17/12
19/16 21/25 22/19 30/5 33/9 36/6
37/10 39/18 44/2 46/4 52/6 56/11
57/4 61/11 63/3 63/10 64/14 70/9
89/21 93/20 94/6 95/2 95/4 97/8
101/8
others [1] 60/17
our [6] 4/5 53/8 75/23 76/7 77/16
101/13
ourselves [2] 50/9 50/20
out [38] 10/7 10/8 11/19 11/20
11/25 13/19 14/15 15/5 16/2 18/8
18/10 18/11 18/12 18/15 24/25
25/16 25/18 25/22 25/23 26/1
28/19 30/13 30/14 39/1 48/23 49/6
49/21 52/7 53/12 59/25 60/6 62/25
65/14 78/11 85/2 94/15 99/7
101/18
outs [1] 18/14
outside [2] 68/16 68/17
over [8] 4/19 13/13 14/15 23/16
49/17 50/21 58/13 62/13
overarching [1] 75/17
overhear [1] 101/17
overlap [4] 18/17 61/14 64/18
66/8
overlaps [1] 64/20
overruled [11] 54/17 55/12 57/3
64/5 66/22 68/7 70/1 97/1 97/15
98/9 98/17
overwrite [1] 25/20
own [7] 11/14 15/5 15/6 32/15
46/22 47/11 77/2

**P**

p.m [2] 101/18 102/22
packet [5] 51/23 51/25 52/7 52/10
58/22
packet's [1] 58/24
page [20] 1/23 24/6 27/20 48/17
79/8 79/21 80/2 81/5 86/19 86/25
87/20 87/24 88/7 88/15 89/3 89/8
91/12 91/15 93/14 100/5
pages [2] 9/20 100/8
paid [1] 101/6
paint [2] 24/7 24/14
painted [1] 24/14
paper [3] 19/6 19/9 19/10
papers [1] 19/16
paragraph [7] 48/24 48/25 49/13
50/6 51/1 51/2 88/7
part [12] 18/1 20/4 25/15 26/3
29/1 51/20 62/10 70/15 75/20 77/4
79/11 89/21
particular [9] 19/11 23/20 60/7
60/8 62/23 63/3 68/14 81/2 91/7
particularly [1] 100/1
parties [1] 47/2
parts [2] 24/22 24/25
Pass [1] 81/13
passive [1] 75/1
password [3] 6/6 45/15 50/14
passwords [1] 6/5
past [1] 65/7
pay [1] 34/25
PC [1] 40/3
PEARLMAN [7] 1/18 3/7 3/8 3/10
5/10 82/8 83/16
Pearlman's [2] 82/23 83/12
peel [1] 61/24
peer [2] 19/6 19/15
peer-reviewed [1] 19/6
PELKER [10] 1/13 3/4 5/8 53/3
54/3 65/9 65/19 66/3 69/13 69/21
pending [1] 67/14
Pennsylvania [1] 1/14
people [24] 11/10 11/15 11/24
12/3 12/7 12/9 12/14 13/8 13/19
13/21 13/24 13/24 32/17 34/16
35/7 49/20 49/23 49/24 61/15

**P**

people... [5]  68/21 69/1 69/15 100/24 101/8
per [1]  101/6
perform [1]  80/25
performed [1]  25/2
perhaps [2]  19/21 50/10
person [7]  22/19 39/18 74/5 76/16 76/21 79/1 79/20
person's [1]  44/5
personal [9]  11/12 13/21 14/19 15/6 45/22 46/3 46/10 46/14 47/1
personally [2]  44/2 57/18
Peter [2]  63/18 63/24
philosophical [1]  50/23
phone [12]  10/6 30/5 30/19 31/21 31/23 46/9 64/23 69/5 72/12 72/17 82/10 95/21
phones [1]  32/25
photos [1]  10/4
phrase [3]  6/15 6/18 6/21
physical [4]  51/6 51/7 51/14 51/15
physically [2]  36/7 79/22
pick [5]  16/4 28/5 64/23 82/10 95/20
piece [1]  81/19
pieces [5]  8/24 55/16 74/20 77/7 77/10
pin [2]  28/25 45/15
place [6]  11/2 39/15 61/11 91/4 101/11 101/12
placed [1]  100/25
places [1]  11/9
plain [1]  58/10
Plaintiff [2]  1/4 1/13
plasma [2]  20/19 63/18
PlasmaDivision [1]  63/22
plasmadivision.com [2]  20/19 63/18
played [1]  39/1
plea [5]  86/18 88/13 89/22 91/22 93/11
plead [3]  86/10 89/15 90/5
please [11]  5/6 43/15 53/9 71/13 80/2 82/4 85/16 88/15 89/25 91/13 93/14
pled [3]  90/1 95/8 95/9
PLLC [1]  2/3
podium [1]  5/6
point [15]  21/1 21/2 26/7 27/10 28/23 39/5 48/8 48/12 52/6 52/20 66/6 72/22 90/17 90/17 97/21
points [5]  35/1 57/12 90/18 90/19 91/11
police [1]  75/16
policies [2]  75/22 75/23
political [2]  23/15 23/18
portal [1]  34/11
portions [1]  81/25
position [1]  72/8
possible [1]  73/2
possibly [1]  74/10
potentially [1]  17/18
practices [1]  46/3
prefer [1]  35/7
preference [1]  85/10
present [2]  5/13 71/25
presented [1]  65/13
presenting [1]  66/15
preserved [1]  80/23
pretty [4]  77/16 96/11 96/14 97/11
prevent [1]  38/6
previous [1]  25/1
previously [2]  25/5 62/16
prior [3]  82/25 83/3 84/4
prison [1]  92/13
privacy [6]  14/19 15/3 23/13 49/18 49/22 49/24
private [4]  5/25 6/2 6/3 35/16

proactive [1]  75/6
probably [6]  8/17 12/4 12/6 14/17 49/7 101/12
procedures [2]  75/22 75/23
proceed [4]  5/16 54/4 71/5 84/1
proceedings [2]  1/7 103/5
process [8]  16/21 18/9 24/21 24/24 25/15 25/15 31/11 67/3
profiles [2]  57/11 57/25
program [14]  37/10 45/11 45/14 48/4 73/23 75/10 75/14 75/18 75/21 76/4 76/6 76/8 76/13 77/13
programmer [1]  97/10
programmers [1]  32/16
programming [8]  9/6 95/16 95/18 97/9 97/11 97/17 97/19 98/14
programs [2]  11/10 75/4
projects [1]  52/4
prompt [1]  33/6
promptly [1]  72/21
prosecution [1]  94/17
protect [7]  13/25 14/19 15/2 23/16 46/25 73/23 73/25
protected [1]  28/25
protecting [1]  71/22
protective [1]  4/13
prove [1]  45/16
provide [8]  61/3 67/2 73/11 73/14 77/20 79/15 79/17 93/12
provided [12]  16/21 18/7 26/8 28/4 51/22 61/1 65/13 72/12 72/18 77/18 94/14 96/18
provider [1]  17/20
provides [1]  47/5
providing [2]  79/23 102/18
proxies [1]  61/16
proximity [3]  64/2 66/14 66/17
proxy [7]  14/24 15/2 15/8 15/16 15/17 15/18 69/16
public [3]  11/9 13/8 13/20
publicize [1]  76/24
publicly [1]  75/7
publish [1]  29/25
published [6]  27/16 44/24 48/19 78/19 87/17 88/24
pull [9]  10/8 24/25 57/15 59/16 68/11 77/14 78/1 80/9 81/11
pulled [3]  10/7 17/1 59/20
purchased [1]  59/13
pure [1]  49/10
purely [1]  48/21
purpose [4]  59/18 62/19 73/23 75/17
purposes [3]  86/15 99/12 99/16
pursuant [2]  86/11 91/22
put [19]  4/16 10/22 20/18 20/21 20/22 21/5 26/16 28/8 35/23 37/1 39/9 45/14 46/22 69/17 74/19 75/9 102/4 102/9 102/16
putting [2]  59/19 67/4
Putty [2]  37/7 37/8
Putty.log [1]  37/5

**Q**

quantity [1]  92/1
question [27]  18/3 19/2 19/3 21/13 23/23 41/7 46/2 46/5 50/24 54/22 55/6 59/2 63/6 65/19 66/4 67/14 67/15 67/16 67/18 67/20 67/25 82/20 82/23 83/3 83/5 92/19 96/21
questioning [1]  58/6
questions [19]  8/6 24/1 53/1 55/21 59/10 62/5 72/13 75/1 75/3 75/13 81/14 83/12 84/7 84/14 90/11 95/13 99/17 100/2 100/6
quick [1]  53/4
quite [2]  14/5 59/22
quote [1]  96/14

**R**

radio [2]  24/8 24/14

RAID [5]  25/8 25/10 25/15 25/18 25/25
raise [2]  53/15 95/25
raised [1]  96/21
RANDOLPH [1]  1/9
range [6]  16/4 21/15 35/4 90/22 92/11 92/12
rate [1]  22/9
rather [2]  8/6 49/8
reached [1]  65/25
Reactor [1]  101/25
read [14]  12/21 17/14 48/23 48/24 48/25 50/6 57/18 57/20 58/23 67/18 80/6 91/20 93/17 94/2
reading [2]  24/10 34/18
ready [4]  5/16 5/22 54/4 101/24
real [4]  30/17 66/4 66/5 66/7
really [6]  15/9 21/16 31/3 48/2 82/20 102/2
reason [7]  8/20 15/10 32/4 36/12 38/2 46/13 84/20
reasonable [2]  76/15 76/18
reasons [7]  13/24 14/8 14/9 14/11 49/24 102/17 102/19
rebut [1]  69/25
recall [21]  12/21 14/24 21/25 22/21 25/8 30/4 30/19 30/24 32/10 34/18 39/10 42/4 42/16 43/9 44/25 58/5 59/10 62/5 63/23 65/23 70/5
receive [1]  74/12
Recess [2]  53/19 102/22
recognize [9]  37/3 41/17 78/5 81/4 81/7 86/17 88/3 99/13 99/16
recognize what [1]  81/4
recognized [2]  8/24 52/13
recommend [2]  94/17 95/7
recommendation [2]  90/24 94/19
recommended [1]  90/20
record [7]  4/16 5/7 15/15 16/7 16/9 70/13 103/5
recorded [1]  18/8
recordkeeping [1]  75/4
records [6]  17/20 51/3 73/20 76/2 80/21 80/23
redact [1]  102/6
redirect [5]  3/4 3/8 54/6 84/8 84/9
redundant [1]  25/10
refer [1]  59/24
reference [1]  66/8
referenced [1]  37/14
references [2]  55/18 56/16
referencing [1]  34/9
referring [5]  31/10 31/11 64/18 87/25 89/4
reformat [1]  25/24
reformatting [1]  26/1
refusal [2]  93/25 94/4
regard [1]  70/1
regarding [6]  9/17 55/17 55/24 61/5 62/4 95/2
regardless [1]  79/1
register [2]  79/5 82/2
registered [2]  79/20 81/1
registrant [2]  79/9 80/4
registration [5]  17/13 21/18 78/8 78/22 82/7
registrations [1]  80/18
regular [5]  14/6 46/9 50/8 76/8 99/5
regulate [1]  80/9
regulated [1]  72/13
regulates [1]  74/22
regulation [1]  83/3
regulations [4]  76/23 80/10 80/10 83/21
regulators [2]  72/11 75/6
regulatory [3]  72/8 74/25 75/12
related [30]  6/25 9/4 14/13 21/10 25/6 32/7 36/22 37/13 37/16 39/3 40/23 41/24 42/12 42/20 43/5 51/20 51/21 52/11 54/9 54/21

**R**

**related... [10]**  54/23 58/5 67/11 70/8 70/9 75/4 77/14 88/16 89/3 98/5
**relates [2]**  71/25 76/11
**relating [4]**  73/20 73/21 84/6 101/25
**relation [7]**  7/5 20/3 51/4 52/18 81/22 84/5 100/2
**relationship [1]**  96/16
**relevance [6]**  23/17 45/21 95/24 96/10 100/1 100/4
**relevant [10]**  45/22 45/23 46/4 55/2 60/5 61/18 81/25 92/2 93/23 94/8
**relieve [1]**  94/10
**remember [15]**  10/5 21/16 21/17 22/2 24/10 28/17 34/6 34/8 35/8 35/19 35/20 35/25 48/12 51/18 59/2
**remembering [1]**  26/20
**remind [6]**  10/24 24/1 33/2 45/4 46/20 101/14
**remote [12]**  34/8 36/5 37/8 39/19 43/16 44/1 47/24 55/18 56/13 56/22 57/8 57/8
**remotely [9]**  33/4 33/12 34/13 34/16 35/5 35/13 37/18 39/14 40/12
**rent [1]**  15/18
**rephrase [5]**  21/13 55/6 63/6 67/25 98/10
**report [20]**  20/14 29/1 51/19 51/21 51/25 52/2 59/17 61/12 65/2 65/12 65/22 65/24 66/1 66/12 69/9 69/10 69/20 74/8 74/8 75/11
**Reporter [4]**  2/6 2/7 103/3 103/13
**reporting [1]**  75/5
**reports [11]**  66/9 73/21 74/2 74/3 74/3 74/4 74/9 74/11 74/17 75/2 76/1
**represents [1]**  92/1
**request [1]**  81/9
**required [1]**  82/2
**requirement [2]**  76/7 80/16
**requirements [5]**  75/20 75/24 80/12 80/13 80/17
**requires [2]**  73/19 76/14
**research [7]**  19/7 19/9 22/19 35/20 53/11 81/9 101/16
**Reserve [5]**  63/16 63/17 63/20 63/21 64/13
**resource [1]**  72/7
**responded [1]**  72/21
**response [2]**  81/9 82/23
**responses [3]**  72/12 72/18 72/19
**responsibilities [2]**  72/6 73/9
**responsibility [1]**  92/7
**responsible [1]**  91/23
**responsive [1]**  67/17
**rest [1]**  15/6
**result [1]**  10/21
**results [2]**  10/23 52/23
**review [27]**  4/15 6/23 9/8 19/12 24/4 26/3 26/6 28/1 28/4 29/11 48/1 51/6 51/8 51/12 51/20 55/8 55/15 55/24 56/8 56/21 56/25 57/5 58/3 60/23 62/10 62/20 76/3
**reviewed [14]**  16/23 17/3 19/6 24/13 26/5 26/14 26/18 29/13 51/3 51/21 51/23 52/8 52/10 62/15
**reviewing [5]**  26/4 28/7 29/18 51/11 52/5
**right [54]**  4/2 4/21 4/24 5/15 9/2 12/9 13/7 13/9 13/17 21/7 25/17 26/22 27/4 27/20 27/23 31/4 33/13 33/15 36/25 37/19 39/23 42/15 44/15 46/11 47/15 48/4 48/25 49/6 50/1 50/5 50/5 50/6 51/16 52/25 53/2 53/22 54/3 66/19 69/21 71/5 77/12 81/14 84/8 84/15 84/23

85/13 91/3 93/9 93/24 96/12 98/15 100/10 101/19 102/9
**right-hand [1]**  93/24
**RMSB [1]**  78/9
**robbery [2]**  68/15 68/19
**role [3]**  62/9 73/5 73/7
**rolling [1]**  26/6
**ROMAN [4]**  1/6 5/5 5/13 95/11
**Romania [2]**  51/4 58/3
**Romanian [1]**  51/22
**Room [1]**  2/8
**roughly [1]**  32/20
**route [1]**  75/1
**router [3]**  16/1 59/9 59/12
**RPR [1]**  103/12
**rule [5]**  81/24 81/25 82/8 83/8 83/15
**ruled [1]**  70/18
**rules [11]**  72/14 76/23 76/25 78/11 82/16 83/8 83/20 84/6 84/11 84/12 84/13
**ruling [1]**  62/25
**rulings [1]**  77/8
**run [5]**  11/10 33/22 37/10 45/14 56/11
**running [10]**  9/10 9/13 9/17 10/12 48/1 48/7 48/10 54/15 55/3 55/9

**S**

**safe [2]**  12/23 14/22
**safely [1]**  49/7
**said [8]**  21/2 30/24 36/17 37/20 48/7 70/6 70/16 87/24
**sake [1]**  84/4
**sale [1]**  59/13
**Sam [1]**  71/15
**same [34]**  11/15 11/16 11/24 11/24 12/4 12/7 12/7 12/9 12/11 12/15 12/17 12/19 15/23 16/2 20/17 21/3 27/9 28/21 28/25 31/13 31/21 42/11 47/24 56/12 59/4 61/10 61/10 66/15 68/20 69/2 69/8 69/18 88/13 101/8
**SAR [2]**  74/9 75/3
**satisfy [1]**  98/14
**save [1]**  50/11
**savvy [1]**  77/15
**saw [7]**  6/17 6/20 35/14 54/10 55/19 56/16 68/16
**say [23]**  11/18 12/10 16/15 18/10 19/17 20/16 25/24 31/5 31/22 35/12 35/16 40/3 49/12 51/11 58/15 66/14 73/5 74/16 76/19 77/10 80/16 89/6 101/3
**saying [8]**  17/16 31/20 55/1 63/2 65/20 66/16 70/16 83/3
**says [21]**  24/7 26/25 27/23 29/11 37/5 40/15 41/12 41/13 41/19 43/22 44/16 49/6 50/4 50/19 69/10 79/9 86/25 88/16 93/15 93/25 94/21
**scan [1]**  24/22
**Scholl [4]**  7/9 21/9 21/17 52/16
**School [1]**  72/2
**science [2]**  97/6 97/9
**scientific [5]**  19/5 19/7 19/12 19/22 19/25
**scope [3]**  38/13 82/5 82/17
**screen [3]**  26/22 48/18 77/5
**screenshots [3]**  10/4 10/4 10/10
**script [2]**  41/4 43/16
**scripts [1]**  33/22
**scroll [16]**  27/7 27/19 29/8 42/6 42/19 43/12 43/15 43/21 44/15 44/16 44/23 47/13 47/14 50/3 60/13 62/13
**seal [1]**  102/1
**sealed [1]**  102/3
**search [11]**  19/16 58/11 77/11 98/13 98/23 98/25 99/8 100/25 101/4 101/7 101/7
**searchable [1]**  74/13

**searched [6]**  5/24 6/22 9/9 52/21 52/23 99/9
**searches [6]**  14/15 52/18 58/20 58/21 58/23 80/25
**searching [2]**  58/4 101/5
**seated [1]**  85/16
**sec [2]**  46/18 46/20
**second [3]**  20/25 21/2 69/5
**Secrecy [7]**  72/7 72/9 73/2 73/11 73/17 73/18 80/14
**section [1]**  60/9
**secure [2]**  33/4 33/12
**security [7]**  14/8 14/10 35/15 44/4 46/21 59/25 68/19
**see [64]**  6/23 8/17 10/11 11/10 17/14 23/20 24/7 26/23 27/23 36/21 37/5 37/12 37/14 38/18 39/15 39/16 40/15 40/23 41/5 41/12 41/19 41/24 42/7 42/20 43/22 47/14 47/16 47/19 48/20 50/25 52/10 53/11 53/18 55/8 56/18 57/7 58/10 59/6 61/18 66/5 66/7 66/8 66/9 66/19 68/12 68/25 79/9 80/2 84/23 85/12 87/1 88/7 91/14 91/15 91/17 93/15 93/25 96/2 96/9 98/12 98/22 99/21 100/12 100/20
**seeing [6]**  40/11 43/17 43/19 43/19 45/12 68/13
**seeking [2]**  94/15 94/17
**seem [1]**  45/24
**seemed [2]**  39/5 43/16
**seems [1]**  82/15
**seen [2]**  10/8 59/13
**seized [3]**  29/16 29/19 60/21
**seizing [1]**  38/7
**sell [1]**  49/5
**selling [1]**  12/10
**sells [1]**  49/1
**semester [1]**  97/7
**send [1]**  76/19
**senior [1]**  73/7
**sense [2]**  49/7 51/8
**sensitive [1]**  47/1
**sentence [8]**  50/19 90/2 91/20 93/17 94/2 94/3 94/18 95/8
**sentencing [7]**  90/9 90/12 90/13 90/20 91/11 91/14 92/10
**separate [3]**  52/1 70/10 98/23
**separately [1]**  52/9
**sequence [2]**  42/10 64/12
**sequencing [1]**  102/13
**series [1]**  21/9
**server [30]**  7/21 11/21 16/6 16/6 16/10 16/12 16/14 16/19 16/24 22/7 33/5 48/5 48/6 48/8 48/11 51/4 51/6 51/7 51/7 51/9 51/17 51/21 51/22 52/4 52/5 52/8 56/5 56/11 58/1 58/3
**server's [1]**  58/9
**servers [19]**  6/9 7/16 11/17 11/18 11/19 12/1 14/24 15/2 15/8 15/16 15/17 15/18 17/24 17/25 18/5 35/16 37/11 56/18 69/16
**service [14]**  34/24 35/18 35/19 45/5 48/21 49/3 78/9 78/10 78/23 79/5 79/6 80/3 81/24 91/10
**services [4]**  14/4 35/22 49/1 61/19
**set [13]**  15/25 16/1 16/3 16/3 17/15 18/7 18/22 25/18 25/21 35/5 46/4 64/21 99/7
**sets [2]**  62/22 68/25
**setting [2]**  25/15 25/24
**settings [2]**  35/10 36/4
**setup [1]**  11/25
**several [1]**  96/17
**shall [1]**  93/19
**share [2]**  11/15 11/24
**shared [1]**  39/20
**sharing [4]**  11/22 12/4 12/7 12/14
**she [34]**  19/2 19/3 19/23 23/20

## S

she... **[30]** 36/17 36/17 38/15 38/19 38/20 65/1 65/3 65/3 65/11 65/14 65/16 65/20 65/20 65/21 65/22 65/25 66/14 66/15 66/16 66/17 69/10 69/17 69/18 70/6 70/6 70/7 70/14 70/15 70/16 90/9
shell **[1]** 33/4
SHERRY **[3]** 2/6 103/3 103/12
SHH **[1]** 33/15
shields **[1]** 24/7
shift **[1]** 35/4
shormint **[13]** 20/8 20/22 20/25 21/3 52/21 52/24 58/10 63/2 63/10 63/16 63/20 64/14 70/9
short **[3]** 26/19 53/7 63/25
short-term **[1]** 63/25
shorthand **[1]** 35/8
shortly **[2]** 53/11 53/18
should **[14]** 28/22 29/21 45/19 50/8 50/21 53/3 66/2 75/2 84/19 84/22 85/2 90/21 92/25 94/19
shouldn't **[2]** 29/4 102/9
show **[9]** 55/20 55/20 77/25 81/4 86/14 88/2 89/2 99/11 99/15
showing **[4]** 28/15 78/22 87/20 100/16
shows **[1]** 49/11
side **[2]** 39/1 93/24
sign **[3]** 33/7 34/24 87/7
signal **[1]** 23/1
signature **[3]** 87/3 88/9 89/9
signed **[3]** 88/13 88/17 89/11
significance **[2]** 64/2 67/10
signing **[1]** 89/12
SIM **[1]** 30/13
similar **[4]** 15/2 33/11 71/23 76/12
simplified **[1]** 60/3
simply **[4]** 8/3 31/19 58/22 61/5
since **[4]** 22/3 28/17 56/9 61/11
single **[3]** 9/10 10/11 55/20
sir **[9]** 71/8 82/4 85/19 85/21 86/14 86/16 89/11 89/18 97/5
site **[9]** 8/18 34/19 36/19 48/13 54/15 54/23 55/9 99/18 101/5
sites **[3]** 13/20 98/6 98/19
six **[2]** 98/19 98/20
size **[1]** 58/17
skills **[2]** 97/12 98/14
slightly **[2]** 15/24 26/1
small **[1]** 4/8
smartphone **[1]** 31/15
Smith **[2]** 76/19 76/21
sniff **[4]** 13/8 13/17 13/20 33/13
so **[134]**
so-called **[1]** 52/16
software **[1]** 32/14
sold **[1]** 49/14
some **[40]** 7/14 11/7 11/17 12/1 14/11 16/22 16/25 17/2 18/12 18/15 19/21 19/24 26/19 28/23 31/24 35/3 35/7 45/15 46/4 46/9 46/21 48/9 48/21 50/21 52/6 52/20 58/13 60/17 60/20 60/23 61/3 62/16 63/10 64/12 68/17 72/22 76/7 85/12 96/8 97/21
somebody **[9]** 4/10 4/16 12/10 30/8 31/14 33/12 75/25 76/4 95/11
somehow **[3]** 65/22 65/23 96/7
someone **[14]** 28/20 28/23 54/15 55/9 61/18 68/16 79/22 80/15 81/1 98/6 99/20 101/3 101/4 101/16
someone's **[1]** 35/6
something **[14]** 16/4 17/13 18/21 35/5 51/13 78/10 78/23 83/7 96/14 96/23 97/21 97/24 100/20 102/9
sometimes **[12]** 11/8 13/2 13/3 14/10 16/16 23/14 30/11 33/9 34/25 45/20 46/7 80/25
somewhat **[1]** 84/20

somewhere **[2]** 56/5 76/20
sorry **[16]** 15/12 18/10 21/12 27/21 38/5 39/22 40/17 43/15 44/17 44/19 47/19 52/3 53/21 67/9 82/4 85/5
sort **[6]** 25/13 36/4 49/2 50/20 59/19 69/23
sorts **[3]** 9/22 37/9 49/4
sound **[1]** 38/19
sounds **[3]** 21/7 54/1 96/20
source **[9]** 8/12 8/15 8/16 8/21 8/25 9/7 58/17 68/14 68/18
sources **[4]** 18/19 19/13 62/21 68/11
space **[1]** 24/22
span **[1]** 9/25
speak **[3]** 49/10 89/18 89/20
speaking **[1]** 89/8
specialist **[1]** 72/8
specific **[12]** 10/6 17/20 18/13 18/21 18/25 22/19 32/15 43/17 43/20 58/18 82/16 98/6
specifically **[17]** 7/1 7/3 9/19 10/9 17/11 20/7 31/12 34/6 34/8 37/9 49/1 54/11 59/24 61/5 62/22 70/14 79/4
specified **[1]** 16/16
spell **[1]** 71/13
spelled **[2]** 71/15 85/24
spelling **[1]** 85/22
SpiderOak **[6]** 45/2 45/4 45/6 47/5 47/9 49/1
split **[1]** 30/12
spoofed **[1]** 11/4
spoofing **[1]** 11/6
spots **[1]** 30/14
spotted **[1]** 68/24
spreadsheet **[3]** 26/11 65/13 67/3
spreadsheets **[1]** 16/22
SSH **[11]** 32/9 33/2 33/4 33/6 33/11 34/3 34/4 34/6 34/10 34/15 61/16
staff **[2]** 74/15 76/7
staging **[1]** 28/20
stakeholders **[1]** 73/12
stamp **[1]** 17/11
stamps **[4]** 17/3 64/8 66/12 66/17
stand **[1]** 4/25
standard **[1]** 46/18
stands **[1]** 25/10
start **[6]** 26/2 43/16 46/1 72/4 91/4 99/12
started **[2]** 28/13 59/23
starting **[4]** 5/7 48/24 72/6 72/7
state **[8]** 5/6 71/12 79/2 80/10 80/12 80/15 93/20 94/6
stated **[1]** 91/22
statement **[5]** 88/5 88/16 88/17 89/2 96/9
states **[19]** 1/1 1/3 1/10 5/5 5/9 22/23 23/1 23/4 37/24 38/7 38/9 38/16 38/22 75/12 80/13 89/6 90/12 90/13 95/14
static **[3]** 15/22 15/23 16/3
stating **[1]** 85/22
statistical **[2]** 22/9 22/11
statute **[4]** 72/10 73/3 73/19 90/2
statutory **[1]** 92/14
stays **[1]** 15/23
steer **[1]** 101/16
steps **[3]** 17/10 40/6 46/21
STERLINGOV **[25]** 1/6 4/9 4/15 5/5 5/13 9/16 10/12 20/9 23/18 29/11 29/14 29/16 37/17 38/4 38/6 40/12 43/2 43/13 47/11 49/13 49/17 50/16 70/8 95/11 96/2
Sterlingov's **[26]** 5/24 6/3 6/9 9/9 9/18 9/23 12/22 20/18 24/13 25/2 29/3 30/5 37/21 38/3 38/12 38/16 38/23 42/24 45/2 47/8 51/4 55/2 55/15 61/6 61/9 63/21
still **[6]** 31/24 35/11 49/8 95/8

95/9 102/13
stole **[1]** 4/12
stolen **[1]** 4/14
stood **[1]** 60/6
stop **[5]** 27/20 47/15 50/5 92/4 101/11
storage **[1]** 39/14
stored **[1]** 61/10
storing **[1]** 48/21
story **[1]** 69/2
stream **[3]** 30/9 30/16 31/1
streams **[1]** 30/9
Street **[2]** 1/16 2/3
structure **[2]** 25/20 27/9
stubborn **[1]** 49/11
stuff **[2]** 13/12 47/1
subdomain **[1]** 48/12
subject **[1]** 4/13
subparagraph **[2]** 91/17 93/17
successful **[1]** 56/10
such **[4]** 6/7 21/18 49/3 66/13
suggesting **[1]** 69/23
suggestion **[1]** 23/18
Suite **[1]** 1/17
sum **[1]** 94/15
summarize **[1]** 64/10
summary **[17]** 10/23 27/6 29/11 45/2 47/8 59/19 60/2 60/5 60/9 61/13 65/13 66/11 67/3 67/6 67/7 67/21 67/22
support **[2]** 12/2 49/7
suppose **[1]** 83/11
supposed **[3]** 75/15 91/4 99/8
sure **[21]** 9/2 10/1 15/9 16/20 18/4 21/24 22/4 22/4 30/11 32/22 36/11 46/16 48/2 49/23 50/23 56/1 73/10 93/5 98/12 102/4 102/8
surprised **[1]** 83/14
suspect **[1]** 31/19
suspected **[1]** 61/19
suspicious **[5]** 74/7 74/8 74/10 74/11 75/10
Sustained **[3]** 36/17 55/5 63/5
sway **[1]** 4/19
Sweden **[6]** 37/22 38/7 38/12 38/23 43/3 43/14
Swedish **[2]** 37/24 38/3
switch **[1]** 43/8
sworn **[2]** 71/1 85/14
system **[5]** 32/13 71/22 73/24 73/25 90/17
systems **[1]** 32/14

## T

T-H-E-O-D-O-R-E **[1]** 71/16
tab **[3]** 62/14 63/8 63/13
table **[7]** 2/10 5/9 5/14 26/18 26/24 27/8 68/9
tables **[1]** 68/12
tablet **[1]** 10/3
tabs **[1]** 77/4
tagged **[1]** 26/9
tags **[1]** 26/10
take **[23]** 24/16 36/25 39/8 40/17 41/6 41/14 42/2 44/7 46/22 48/15 51/3 53/3 53/8 53/9 53/13 83/9 85/1 85/2 85/8 88/6 95/7 101/19 102/4
taken **[4]** 24/23 39/4 53/19 102/22
takes **[1]** 73/4
taking **[1]** 86/16
talk **[4]** 20/20 32/9 69/4 96/15
talking **[8]** 20/14 26/23 33/24 33/25 34/6 65/3 66/10 87/22
tasked **[1]** 71/21
TCP **[1]** 58/14
team **[6]** 20/6 22/19 26/20 28/19 38/24 57/5
technical **[1]** 11/7
technically **[1]** 46/8
technicians **[1]** 49/11
techniques **[1]** 61/23

**T**

**Ted [1]** 53/25
**tell [11]** 14/11 16/12 22/16 36/3 42/12 55/24 56/7 57/12 71/24 73/8 84/21
**telling [2]** 7/18 7/23
**temporal [2]** 66/14 66/17
**tend [3]** 32/16 32/18 44/1
**terabyte [2]** 27/24 29/15
**term [1]** 63/25
**terminal [1]** 33/6
**terms [5]** 20/2 58/21 64/12 74/22 95/5
**tested [3]** 19/12 30/12 30/15
**testified [19]** 9/3 10/18 24/18 25/5 33/2 34/3 38/15 41/21 42/25 52/16 65/3 65/21 69/8 69/18 70/7 81/17 82/23 87/20 96/15
**testify [8]** 7/15 7/20 7/25 21/10 73/15 82/6 96/7 96/18
**testifying [20]** 12/21 14/24 22/21 25/8 30/4 30/19 32/10 34/18 35/25 39/10 41/8 42/4 42/16 43/9 44/25 65/11 65/23 65/25 67/15 93/3
**testimony [20]** 7/13 8/6 19/20 24/11 31/4 37/3 38/14 41/17 47/21 51/24 53/14 55/21 65/13 69/12 70/5 70/14 82/13 83/19 96/4 101/20
**text [1]** 58/10
**than [7]** 8/6 22/19 49/8 58/18 65/2 66/1 92/16
**Thank [23]** 5/17 8/20 25/12 36/25 37/7 41/14 42/23 44/21 48/19 54/5 68/1 70/21 70/22 71/3 71/4 78/1 84/2 84/16 84/17 85/16 93/9 102/20 102/21
**that [490]**
**their [25]** 5/6 11/10 11/14 13/25 16/25 28/8 31/14 32/17 34/16 35/9 35/10 35/10 49/10 59/20 62/2 68/10 68/11 73/10 74/14 74/20 75/9 80/15 98/23 100/25 101/7
**them [45]** 4/14 6/10 6/12 10/7 10/8 15/11 15/14 16/20 16/25 17/4 17/20 21/12 22/2 24/14 25/14 25/19 25/24 26/19 28/5 28/5 28/13 30/9 33/22 39/5 39/17 45/14 46/15 48/2 48/21 49/6 50/11 54/11 56/25 59/21 59/22 62/15 62/17 67/9 68/4 68/13 69/3 74/12 94/25 98/21 98/25
**themselves [2]** 23/16 75/16
**then [33]** 13/11 17/12 17/17 17/21 23/4 28/13 33/2 42/16 44/16 45/13 48/19 48/19 49/7 50/6 50/11 53/7 60/23 67/14 68/10 68/18 83/4 83/4 86/22 87/24 90/19 90/25 93/24 98/22 99/9 100/20 100/23 101/6 102/17
**Theodore [4]** 3/6 71/1 71/14 71/16
**Theoretically [2]** 11/5 13/10
**there [90]** 6/10 6/24 8/24 8/24 9/20 9/20 11/7 11/9 12/1 13/19 13/19 14/3 14/5 15/16 15/18 17/13 18/8 18/12 18/12 18/15 19/14 19/24 20/22 23/17 26/9 26/22 27/20 27/20 28/11 29/22 30/8 30/13 30/13 30/17 31/17 31/23 31/24 32/20 32/21 36/6 36/7 38/8 40/23 47/15 48/20 48/24 49/3 50/4 50/5 50/7 54/8 54/10 54/14 54/20 55/1 55/8 56/22 57/4 57/10 57/21 57/22 58/22 59/21 65/4 66/12 66/20 66/21 67/14 68/19 68/20 74/25 79/17 82/25 83/3 83/14 84/20 89/9 90/19 91/14 92/4 92/15 96/8 98/19 98/20 100/3 100/3 100/18 102/3 102/5 102/8
**these [35]** 4/19 21/9 25/16 28/4 28/9 28/11 40/10 47/16 49/11

49/24 56/18 56/21 62/1 64/3 66/15 66/16 67/10 68/12 69/8 69/16 69/19 70/17 72/10 74/3 74/16 74/17 75/2 75/15 76/23 80/11 80/19 81/6 89/11 89/13 99/20
**they [75]** 4/12 8/10 9/22 11/13 11/25 12/16 13/10 13/11 13/15 13/16 13/18 15/2 15/4 15/4 15/15 15/17 16/8 16/9 16/20 17/1 18/7 26/5 26/11 29/13 30/11 30/12 31/11 34/17 35/8 35/10 45/15 45/23 45/24 46/15 49/5 58/2 68/22 69/24 72/20 74/6 74/9 74/12 74/13 74/14 74/20 75/2 75/3 75/5 75/13 75/22 75/24 76/3 76/6 76/8 76/15 76/16 76/18 76/19 76/20 76/21 79/2 79/22 80/21 80/24 82/6 89/23 90/25 91/1 95/7 98/20 99/21 101/4 101/5 101/6 101/6
**thing [4]** 4/8 12/19 31/14 42/7
**things [12]** 14/16 16/1 16/6 28/10 30/24 32/19 35/3 40/10 46/23 52/1 60/6 98/13
**think [43]** 4/10 12/22 18/2 18/3 18/12 19/3 19/24 20/19 20/21 21/21 23/6 23/24 24/18 30/24 31/11 31/17 32/13 36/12 37/20 38/13 39/1 46/15 52/20 53/6 58/25 60/19 65/7 65/10 66/10 67/19 67/19 69/21 82/17 83/2 83/4 83/6 83/9 84/19 85/1 85/8 101/12 102/2 102/5
**thinking [2]** 15/17 66/20
**third [1]** 47/2
**this [176]**
**those [42]** 6/2 9/25 10/8 10/10 12/14 14/11 14/14 15/15 16/22 17/14 21/10 21/21 21/22 22/17 26/10 28/14 32/16 39/19 47/19 47/21 52/15 52/21 55/21 56/17 60/11 60/23 61/1 61/19 61/25 70/17 73/4 74/4 74/9 74/11 76/24 80/6 80/12 82/3 84/11 84/13 90/19 97/12
**though [2]** 18/15 65/19
**thought [3]** 27/8 50/23 96/6
**thousands [4]** 11/15 11/17 11/21 34/13
**three [2]** 47/16 52/6
**through [23]** 10/2 10/6 10/9 10/11 17/14 24/22 24/24 26/9 27/7 28/13 34/10 35/13 58/8 63/13 64/8 79/14 79/14 91/10 96/9 98/22 99/4 99/6 101/5
**thus [1]** 86/5
**Tiger [3]** 36/5 36/8 42/9
**time [46]** 11/16 11/24 12/17 14/17 15/24 16/2 16/9 16/12 16/13 16/16 17/3 17/4 17/8 17/10 17/11 17/14 17/15 17/20 18/18 18/24 27/10 28/13 33/15 33/17 48/1 53/2 57/13 60/4 61/12 62/24 64/8 64/12 65/6 66/5 66/5 66/7 66/12 66/16 68/17 78/14 87/12 88/19 90/1 91/21 91/25 99/10
**times [14]** 11/18 11/19 13/3 15/13 16/17 17/16 17/18 18/8 18/10 18/12 33/9 57/9 67/11 68/12
**timing [4]** 17/19 39/3 39/3 64/2
**title [4]** 72/6 72/7 73/6 86/11
**today [8]** 55/22 92/19 92/22 92/25 93/3 96/15 101/25 102/7
**together [14]** 18/20 25/13 25/14 58/22 59/19 60/15 62/23 67/4 68/4 68/24 68/25 69/17 70/17 74/20
**told [1]** 17/4
**too [2]** 26/11 39/5
**took [3]** 64/19 68/9 92/7
**tool [12]** 23/13 26/8 28/12 36/5 36/8 36/23 37/8 42/11 44/1 59/23 60/3 61/12
**tools [4]** 24/21 49/25 61/23 62/1

**top [12]** 17/11 29/8 29/12 42/8 43/21 44/15 44/23 51/18 88/15 89/25 101/4 101/8
**topic [1]** 38/19
**topics [1]** 14/14
**TOR [21]** 2/2 2/3 5/12 22/21 22/23 23/4 23/7 23/11 23/13 23/16 49/21 49/23 50/1 97/24 98/1 98/3 98/5 98/6 99/4 99/6
**total [1]** 92/1
**totaling [1]** 91/24
**touch [2]** 72/14 93/7
**towards [2]** 93/24 100/20
**trace [5]** 6/24 7/6 15/14 21/18 32/6
**traces [7]** 21/9 21/17 21/19 21/21 21/22 21/25 22/1
**tracing [1]** 22/3
**traffic [14]** 13/8 13/13 13/20 17/23 17/25 18/5 23/2 31/12 33/13 51/21 51/25 52/2 58/9 58/12
**trail [1]** 74/16
**training [10]** 73/12 73/13 73/14 75/6 75/8 76/7 76/8 95/19 97/5 97/8
**transaction [5]** 12/12 73/22 74/3 74/4 76/16
**transactions [7]** 21/10 73/21 73/21 74/11 74/18 91/24 91/25
**transcript [2]** 1/9 103/4
**transfer [1]** 8/18
**transferred [1]** 4/19
**transmitted [1]** 14/1
**transmitter [1]** 80/8
**Treasury [2]** 71/18 71/21
**treat [1]** 102/1
**treated [1]** 18/14
**TRIAL [1]** 1/9
**trials [1]** 73/16
**tried [2]** 30/16 82/12
**true [3]** 15/10 63/21 103/4
**trusted [1]** 49/8
**truth [4]** 7/18 7/23 100/7 100/11
**truthfully [3]** 93/19 94/5 95/1
**truthfulness [1]** 8/3
**try [4]** 62/1 67/2 94/15 98/13
**trying [7]** 31/5 61/24 64/10 67/17 82/19 82/21 85/2
**TTY [2]** 37/8 37/10
**tunnel [1]** 34/4
**tunnelings [1]** 34/7
**tunnels [2]** 34/3 34/6
**turn [6]** 10/15 14/17 24/4 61/14 93/14 94/24
**turned [2]** 28/19 30/16
**Turning [1]** 58/3
**Twitter [1]** 20/21
**two [9]** 12/14 20/13 39/16 39/19 51/25 52/4 69/10 70/6 70/14
**type [18]** 11/25 25/20 33/6 33/20 33/21 45/16 51/17 61/22 68/21 74/8 75/3 76/7 77/5 77/12 79/15 81/2 81/4 101/15
**types [3]** 71/23 74/18 98/13
**typical [1]** 31/11
**typing [1]** 39/18

**U**

**U.S [2]** 1/13 2/7
**U.S.C [1]** 86/12
**Uh [1]** 17/23
**Uh-huh [1]** 17/23
**unallocated [1]** 24/22
**uncommon [1]** 26/2
**under [10]** 37/6 57/11 73/11 75/24 80/17 90/2 91/18 93/17 94/10 102/1
**underlying [1]** 8/16
**underscore [1]** 63/8
**understand [12]** 31/17 38/5 38/25 39/6 50/19 52/2 57/18 69/11 70/11 87/7 95/23 95/25

**U**

**understanding [20]** 4/9 20/12 41/23 43/24 49/12 49/16 50/15 51/12 51/24 54/21 54/23 56/22 61/1 65/6 90/2 90/13 90/16 91/7 92/7 94/23
**understood [2]** 18/4 39/2
**UNITED [17]** 1/1 1/3 1/10 5/4 5/9 22/23 23/1 23/4 37/24 38/6 38/9 38/15 38/22 89/6 90/12 90/13 95/14
**University [2]** 72/1 72/2
**unless [4]** 18/7 30/17 51/13 90/25
**unmount [1]** 41/4
**unmounting [1]** 41/2
**unreadable [1]** 45/13
**until [6]** 39/4 53/9 53/14 81/18 101/21 102/16
**unusual [1]** 25/23
**unwittingly [1]** 75/19
**up [59]** 8/16 10/22 14/12 15/25 16/1 24/5 24/23 25/15 25/18 25/21 25/24 26/16 28/5 28/5 28/15 28/25 29/1 29/2 30/12 34/24 35/5 35/23 37/1 38/17 39/9 41/15 41/16 43/15 45/18 45/20 45/24 46/3 46/4 46/9 47/14 48/3 48/21 53/4 57/15 59/16 59/22 64/23 77/14 78/1 80/13 82/10 83/9 83/12 84/21 88/15 89/18 89/24 90/19 94/15 95/20 100/5 100/18 102/9 102/16
**update [1]** 35/10
**upon [1]** 83/7
**upper [2]** 77/4 77/12
**URL [1]** 54/24
**us [10]** 1/20 65/5 71/18 71/21 71/22 71/24 73/14 80/4 94/12 101/2
**USAO [1]** 1/16
**use [28]** 13/7 13/24 13/25 14/6 14/8 14/9 14/12 15/8 15/11 23/16 28/24 33/15 33/17 34/11 34/13 34/25 48/20 49/8 49/20 49/23 49/24 50/1 61/16 62/1 63/25 74/2 97/12 97/12
**used [17]** 18/17 20/17 28/21 30/20 31/14 31/19 34/7 35/14 36/11 37/15 44/2 44/4 45/11 61/23 96/16 97/20 98/3
**user [12]** 20/17 21/3 24/24 32/23 40/18 57/25 69/2 69/8 69/18 70/7 77/15 77/15
**username [1]** 33/7
**users [8]** 11/21 20/6 20/7 32/20 49/5 69/10 70/6 70/17
**uses [5]** 11/1 15/16 16/4 25/1 34/15
**using [14]** 12/3 15/16 17/18 19/22 19/25 23/21 31/22 31/25 33/20 39/18 46/4 49/2 61/19 69/15
**USSG [1]** 91/23
**usually [6]** 13/5 16/12 24/21 25/19 46/23 90/22
**UTC [2]** 17/9 17/17

**V**

**vague [1]** 57/1
**Valerie [1]** 3/3
**value [2]** 45/16 58/16
**values [1]** 45/12
**variety [2]** 14/4 14/9
**various [1]** 57/9
**vault [1]** 6/6
**version [2]** 32/16 60/3
**versions [1]** 99/20
**versus [2]** 5/5 89/6
**very [8]** 17/11 22/2 26/6 65/24 70/14 72/21 76/12 77/12
**via [2]** 40/13 72/12
**Victor [1]** 71/15
**video [7]** 36/8 36/10 36/16 36/19

43/25 44/3 44/3
**videos [1]** 49/11
**view [7]** 44/1 44/4 67/7 67/9 67/23 98/21 101/6
**viewer [2]** 43/24 44/1
**viewers [1]** 43/22
**viewing [3]** 36/10 36/16 44/3
**violation [1]** 96/15
**violations [1]** 73/2
**virtual [4]** 35/15 77/18 77/20 81/18
**visible [1]** 56/15
**visited [3]** 48/13 64/13 64/14
**visual [1]** 33/20
**Vlahakis [4]** 3/6 53/25 71/1 71/14
**VNC [10]** 36/5 36/8 36/23 42/7 42/9 43/16 43/18 43/22 43/24 44/1
**voicemail [1]** 72/20
**Volf.prius [4]** 20/21 63/16 63/25 70/8
**Vote [1]** 49/9
**VPN [10]** 13/1 13/7 14/4 14/6 14/17 14/19 17/25 33/11 47/25 49/21
**VPNs [5]** 13/25 15/2 15/4 15/19 61/16
**VPS [1]** 48/21
**vs [1]** 1/5

**W**

**walk [1]** 63/13
**Wall [1]** 2/3
**want [17]** 14/14 14/17 16/2 18/3 34/25 47/2 50/3 66/3 67/25 75/18 77/25 79/4 86/14 89/2 102/2 102/3 102/8
**wanted [5]** 4/16 9/2 13/5 93/5 101/4
**wants [3]** 53/15 76/19 76/20
**was [174]**
**Washington [6]** 1/5 1/14 1/17 1/21 2/9 77/24
**wasn't [17]** 4/15 17/8 17/10 21/13 22/11 28/14 29/3 31/9 36/19 41/7 55/1 62/12 70/13 82/25 83/8 83/14 93/6
**wave [1]** 24/14
**waves [1]** 24/8
**way [27]** 15/25 16/1 18/22 18/25 19/12 19/25 23/14 25/12 29/2 30/8 31/3 31/19 32/15 33/4 33/8 33/12 35/8 35/12 38/6 38/8 42/19 45/12 57/18 64/20 77/3 90/5 98/24
**ways [3]** 11/7 30/25 74/24
**we [113]**
**we'll [1]** 85/13
**web [1]** 98/18
**webinars [2]** 77/7 77/10
**website [16]** 7/1 7/5 8/17 14/13 35/8 36/24 54/25 75/7 77/2 77/3 77/4 77/11 77/16 98/25 99/2 100/12
**websites [1]** 97/16
**welcome [2]** 4/24 23/23
**well [12]** 8/23 9/8 9/16 13/15 31/18 38/6 53/13 57/23 62/7 65/6 96/13 101/20
**went [9]** 17/17 26/8 28/9 28/10 39/6 68/10 91/10 99/10 99/21
**were [76]** 4/14 6/10 6/11 6/12 6/12 8/24 12/10 13/11 16/21 17/25 18/7 18/8 18/16 20/4 20/5 20/17 21/22 22/12 24/13 26/23 28/11 28/12 29/13 32/10 33/24 39/4 45/15 47/25 48/2 52/5 56/10 56/11 56/17 57/18 54/18 58/16 58/21 59/20 59/22 60/5 62/10 62/10 62/15 62/25 62/25 63/1 63/2 63/14 64/13 64/14 66/13 66/15 67/1 68/15 69/24 70/9 70/17 72/12 72/18 72/19 72/20 82/3 83/5 83/8 84/11 84/12 84/20 85/25 86/2 86/5

86/7 87/21 87/25 89/3 89/8 100/14
**weren't [2]** 26/5 55/1
**what [157]**
**whatsoever [1]** 81/21
**when [55]** 4/9 5/16 5/24 9/9 13/7 13/25 14/17 16/18 16/24 17/7 17/8 18/14 18/16 20/11 22/6 24/13 25/24 28/7 29/16 31/22 32/6 34/10 34/25 35/14 37/12 39/5 45/20 46/11 52/10 52/23 54/4 54/20 56/16 57/13 57/18 58/3 59/20 60/21 61/18 62/9 62/19 62/25 63/1 65/3 72/4 74/20 75/2 82/22 87/20 89/2 89/8 89/11 98/18 101/9 102/15
**where [34]** 11/9 24/7 27/23 28/9 31/11 33/20 37/5 39/15 40/3 43/22 44/16 45/15 47/14 50/14 50/19 51/15 51/16 64/18 68/9 68/12 68/17 71/17 77/11 77/23 79/9 79/21 79/22 80/3 86/25 87/24 88/15 91/4 96/3 100/24
**Whereupon [5]** 27/17 78/20 87/18 88/25 100/14
**whether [18]** 12/23 50/21 53/3 54/8 54/20 55/2 56/16 56/22 56/24 59/12 68/22 74/6 81/1 82/15 82/21 82/25 85/2 92/24
**which [36]** 11/21 16/20 17/17 23/20 24/21 25/20 26/20 26/21 28/8 28/24 32/9 34/10 36/5 42/16 43/16 43/20 45/10 49/2 49/3 52/5 59/20 59/24 61/23 70/9 72/9 73/3 80/14 82/14 83/4 83/6 83/7 88/3 90/17 92/1 93/22 94/8
**whichever [1]** 52/8
**while [1]** 86/16
**white [3]** 19/9 68/16 68/20
**who [23]** 4/11 5/13 13/19 15/13 20/3 28/4 32/17 50/9 50/20 53/20 53/24 55/9 61/15 61/18 62/11 74/18 75/25 76/4 80/19 84/23 90/5 90/9 94/19
**whole [4]** 17/15 42/7 48/23 48/24
**why [12]** 8/5 13/3 13/24 38/9 38/18 38/22 53/8 61/8 61/21 65/20 96/23 101/13
**Wi [8]** 11/9 12/4 12/13 12/19 12/23 12/25 13/8 31/23
**Wi-Fi [8]** 11/9 12/4 12/13 12/19 12/23 12/25 13/8 31/23
**will [32]** 11/10 14/12 15/24 25/20 33/8 33/9 45/11 46/2 49/6 50/10 53/6 53/9 53/11 74/2 77/7 77/14 83/13 83/20 83/21 84/18 84/22 85/1 85/8 90/9 91/21 92/6 94/9 94/10 95/8 95/9 100/10 101/14
**window [2]** 33/6 33/20
**Windows [2]** 32/13 40/6
**Windows' [1]** 28/3
**wiping [1]** 25/18
**withdrawn [2]** 9/16 17/7
**within [7]** 16/4 35/4 58/22 72/18 79/7 90/22 98/12
**without [10]** 4/17 12/25 20/7 25/18 25/21 50/11 57/13 84/11 93/3 93/6
**witness [18]** 4/25 4/25 5/3 53/24 53/25 65/1 65/11 65/25 69/7 70/21 70/23 73/15 81/13 84/15 84/24 95/24 96/2 101/19
**witness' [2]** 19/19 38/14
**WITNESSES [1]** 3/2
**wittingly [1]** 75/19
**won't [1]** 102/16
**wondering [1]** 64/25
**word [2]** 19/22 19/25
**words [6]** 52/21 54/10 58/5 100/23 100/24 100/24
**work [13]** 8/18 13/5 14/12 14/13 14/18 25/14 31/7 31/19 60/2 61/18 71/17 71/18 80/10

**W**

**worked [4]** 7/9 35/15 37/24 60/15
**working [5]** 27/2 28/22 39/2 72/4
76/5
**works [3]** 35/11 77/4 77/12
**world [3]** 23/16 32/20 97/13
**would [76]** 4/20 5/6 8/18 10/15
11/17 12/14 12/25 13/13 13/16
14/2 15/6 16/15 19/17 19/23 23/15
24/4 26/11 27/7 27/11 28/24 31/3
31/6 31/8 31/9 31/14 31/22 31/24
31/24 32/9 35/6 35/16 37/10 42/7
42/15 46/17 47/2 47/4 49/12 49/20
50/14 50/19 51/19 54/14 55/2 55/9
56/12 56/12 56/14 56/18 57/20
58/2 58/8 58/9 58/9 58/15 58/16
58/21 58/23 59/6 59/16 61/14 70/4
75/9 76/16 78/11 78/14 79/22 80/6
82/1 83/7 88/2 88/19 92/14 98/24
101/5 102/6
**wouldn't [8]** 11/23 12/1 13/3
13/15 31/19 31/21 51/11 57/12
**writeup [5]** 20/10 20/11 22/18
64/18 66/8
**writing [1]** 29/2
**written [1]** 9/7
**wrong [1]** 39/6
**wrote [1]** 27/1
**www.BitcoinFog.com [1]** 7/6
**www.FinCEN.gov [1]** 77/3

**X**

**Xeoma [1]** 59/25

**Y**

**yeah [8]** 8/5 14/5 38/13 47/19
92/9 92/23 96/20 97/20
**year [1]** 68/20
**years [5]** 9/25 37/25 90/4 92/15
92/16
**yes [231]**
**yesterday [25]** 4/9 4/17 10/19
12/21 14/25 24/10 24/18 25/8
30/19 32/10 33/25 34/3 34/18 36/1
37/3 37/20 38/15 39/10 41/17 42/4
42/17 42/25 43/10 44/25 55/22
**York [3]** 1/20 11/18 11/19
**you [573]**
**you sometimes [1]** 46/7
**you're [2]** 33/7 67/7
**your [186]**
**yourself [7]** 8/6 69/22 71/11
71/11 85/21 95/13 101/15
**yourselves [1]** 53/10

**Z**

**zero [3]** 25/16 25/21 25/23
**zeroing [2]** 25/18 26/1
**zone [9]** 16/12 16/13 16/16 17/5
17/8 17/10 17/14 17/16 17/21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

           Plaintiff,

     vs.

ROMAN STERLINGOV,

        Defendant.
_____/

Criminal Action
No. 1: 21-399

Washington, DC
February 29, 2024

9:38 a.m.

MORNING PROCEEDINGS

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:     CATHERINE PELKER
                      U.S. DEPARTMENT OF JUSTICE
                      950 Pennsylvania Ave NW
                      Washington, DC 20530

                      CHRISTOPHER BRODIE BROWN
                      DOJ-USAO
                      601 D Street, N.W.
                      Suite 5.1527
                      Washington, DC 20530

                      JEFFREY PEARLMAN
                      DOJ-CRM
                      Ccips
                      US Dept of Justice
                      1301 New York Ave NW
                      Washington, DC 20005

APPEARANCES CONTINUED ON NEXT PAGE

APPEARANCES CONTINUED

For the Defendant:      TOR EKELAND
                        MICHAEL HASSARD
                        TOR EKELAND LAW PLLC
                        30 Wall Street
                        8th Floor
                        Brooklyn, NY 10005


Court Reporter:         SHERRY LINDSAY
                        Official Court Reporter
                        U.S. District & Bankruptcy Courts
                        333 Constitution Avenue, NW
                        Room 6710
                        Washington, DC 20001

TABLE OF CONTENTS

WITNESSES

Valerie Mazars de Mazarin

Cross-examination by Mr. Ekeland          5
Redirect examination by Ms. Pelker        54

Theodore Vlahakis

Direct examination by Mr. Pearlman        71
Cross-examination by Mr. Ekeland          81
Redirect examination by Mr. Pearlman      84

Larry Harmon

Direct examination by Mr. Pearlman        85

EXHIBITS

Defense Exhibit 32                        27
Government Exhibit 35B                     78
Government Exhibit 45C                     87
Government Exhibit 45D                     89
Government Exhibits 46, 46A               100

Appx4957

P R O C E E D I N G S

THE COURT: All right. Anything before we get the jury?

MS. PELKER: No, Your Honor. Just if we need to call the case and enter our appearance.

THE COURT: We can call the case with the jury here.

But, Mr. Ekeland.

MR. EKELAND: Yes, Your Honor. One small thing, yesterday it is my understanding that when Mr. Sterlingov was in court, somebody managed to gain access to his cell, we think by fooling the guard who was controlling the opening and closing of the gate. They stole all of his food. He has documents subject to protective order in this case in that cell. We are not aware if any of them were stolen. But Mr. Sterlingov wasn't able to do a complete review. But we just wanted to put on the record that somebody gained access without authorization to his cell yesterday.

And just to the extent that the Court does have any sway in these matters, if we could get him transferred over to CTF, we would appreciate that.

THE COURT: All right. Let's go ahead and get the jury.

(Jury in at 9:39 a.m.)

THE COURT: All right. Welcome back, members of the jury. And the witness can come back to the witness stand.

Is the government done?

MS. PELKER: Yes, Your Honor.

THE COURT: So it is your witness, Mr. Ekeland.

THE COURTROOM DEPUTY: Criminal case 21-399, *United States versus Roman Sterlingov.*

Would counsel please approach the podium, state their name for the record starting with government counsel.

MS. PELKER: Good morning, Your Honor. Alden Pelker for the United States joined at counsel table by Christopher Brown and Jeff Pearlman.

THE COURT: Okay.

MR. EKELAND: Good morning, Your Honor. Tor Ekeland for defendant, Roman Sterlingov, who is present in court. And joining me at counsel table is Michael Hassard.

THE COURT: All right. Good morning. And you can proceed when you are ready.

MR. EKELAND: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. EKELAND:

Q. Good morning, Ms. Mazars.

A. Good morning.

Q. Are you ready?

A. Yes.

Q. When you searched Mr. Sterlingov's devices, you didn't find any of the private keys to the Bitcoin Fog cluster?

A.   No.

Q.   And you didn't find any of those private keys to the Bitcoin Fog cluster in any of Mr. Sterlingov's private notes?

A.   No.

Q.   And you didn't find any administrator passwords to Bitcoin Fog in his decrypted password vault?

A.   Not labeled as such, no.

Q.   And you didn't find any log-in credentials to the Bitcoin Fog servers in any of Mr. Sterlingov's devices?

A.   There were a lot of log-in credentials, but none of them were labeled for Bitcoin Fog.

Q.   And as far as you were aware, none of them were to Bitcoin Fog?

A.   Not that I am aware, no.

Q.   And the phrase Bitcoin Fog doesn't appear anywhere in any of his devices?

A.   Not that I saw, no.

Q.   And the phrase Bitcoin Fog doesn't appear anywhere in his notes?

A.   No, not that I saw.

Q.   And the phrase Bitcoin Fog doesn't appear anywhere in his emails that you searched?

A.   I didn't review all of the emails, but I didn't see it.

Q.   And you are not aware of there being a trace of anything related to Bitcoin Fog on any of his devices?

A. To -- like the website or the money, like specifically by name?

Q. Specifically by name?

A. No.

Q. And in relation to the clearnet website www.BitcoinFog.com, you didn't find a trace of that on any of his devices, did you?

A. No.

Q. And you worked with Mr. Scholl on this investigation?

A. Yes.

Q. And you communicated with him?

A. Yes.

Q. And you listened to his testimony in this court?

A. Yes, some of it.

Q. And you heard him testify that the government doesn't have the Bitcoin Fog servers?

A. Yes.

Q. And he was telling the truth?

A. Yes.

Q. And you heard him testify that the government doesn't have the Bitcoin Fog server logs?

A. Yes.

Q. And he was telling the truth?

A. Yes.

Q. And you heard him testify that the government doesn't have

the Bitcoin Fog ledgers?

MS. PELKER:  Objection, Your Honor, to the extent that he is simply asking her to now comment on the truthfulness of --

THE COURT:  Yeah.  Why don't you ask her the questions yourself rather than asking about his testimony.  It is more appropriate.

BY MR. EKELAND:

Q.    The government doesn't have the Bitcoin Fog ledgers, do they?

A.    No.

Q.    And you haven't examined any of the source code to Bitcoin Fog, have you?

A.    No, not that I am aware.

Q.    And could you explain to the jury what source code is?

A.    Source code is the underlying code that makes up the -- probably the website that you see and also the functionality of how the site would work, the mixing, the transfer of Bitcoin, et cetera.

Q.    Thank you.  And the reason you haven't examined the Bitcoin Fog source code is because the government doesn't have it?

A.    Well, the government never found the back end.  So even if there were pieces of it, there was nothing I recognized as the back end source code to Bitcoin Fog.  So, no, I didn't examine

anything like that.

Q.   And you just -- I wanted to make sure I heard you right. You just testified that the government never found anything related to the back end of Bitcoin Fog?

A.   Not that I am aware.

Q.   And are you aware of what programming language Bitcoin Fog source code is written in?

A.   Well, I didn't review it, so not for certain.

Q.   And when you searched Mr. Sterlingov's devices, you didn't find a single communication between him and anybody running Bitcoin Fog, did you?

A.   Meaning Akemashite Omedetou?

Q.   Yes or anybody running Bitcoin Fog?

A.   No.

Q.   And you didn't find any communication between Mr. Sterlingov and anybody -- well, withdrawn.

You didn't find any notes regarding the running of Bitcoin Fog in any of Mr. Sterlingov's notes?

A.   Of Bitcoin Fog specifically, no.

Q.   And there is hundreds of pages of notes, aren't there?

A.   Yes, it appeared so.

Q.   And they are covering all sorts of aspects of Mr. Sterlingov's life in great detail; correct?

A.   Yes.

Q.   And those notes span years?

A. I am not sure of the actual dates, but I believe so.

Q. And you also looked through his dating apps?

A. No. I looked from an extraction from a tablet that had screenshots and photos. And many of the screenshots appeared to be of dating app chats. But I don't remember if I looked through specific dating apps. Maybe on other phone extractions, if Axiom had pulled them out in the chat message, I might have seen them. But I didn't pull out those apps specifically to go through.

Q. In those screenshots and everything that you just mentioned that you looked through, you didn't see a single communication between Mr. Sterlingov and anybody running Bitcoin Fog?

A. I mean, nobody else, no.

Q. Now, I would just like to turn the discussion to your IP address analysis. Okay?

A. Yes.

Q. And that is what we -- you testified about I believe yesterday; correct?

A. Yes.

Q. And that was the result of your IP address analysis is what the government put up as that foam exhibit beside you?

A. Yes, that was the summary of the results.

Q. And could you just remind the jury again what an IP address is?

A.    An IP address is the identifier that a computer uses as its address on the internet or the place that other computer's communications can find it.

Q.    And an IP address can be spoofed; correct?

A.    Theoretically, yes.

Q.    Can you explain to the jury what IP address spoofing is?

A.    In some technical contexts there are ways to make IP addresses appear to be other IP addresses.  Sometimes in hacking conventions and places where there is public Wi-Fi, you will see people attempt to run programs to disguise their IP addresses as other ones.

Q.    And IP addresses aren't a form of personal identification, are they?

A.    Not on their own, no.

Q.    And thousands of people can share the same IP address at the same time?

A.    Thousands, yes, on some servers that would be big enough.

Q.    Like say "The New York Times" servers?

A.    Coming out of "The New York Times" servers?

Q.    Come in, coming out?

A.    Thousands of users could access the server, which is a little different from sharing the IP.

Q.    But you wouldn't disagree with me that large numbers of people can share the same IP address at the same time?

A.    Depending on what type of setup they are coming out of,

no, I wouldn't disagree, there are some servers that could support that.

Q.   For instance, the people in this courtroom using the court's Wi-Fi are probably sharing the same IP address; correct?

A.   Yes, probably.

Q.   We are not the same people because we are sharing the same IP address; correct?

A.   Right, not the same people.

Q.   And if you were, say, selling Bitcoin to somebody in a McDonald's or a cafe, you might log in to the same IP address to complete that transaction; correct?

A.   Connect to McDonald's Wi-Fi to access -- yes, you might.

Q.   And in that case, those two people would be sharing the same IP address; correct?

A.   Yes, they could be.

Q.   At the same time?

A.   Yes.

Q.   And the same thing could happen with open Wi-Fi in a cafe?

A.   Yes.

Q.   And do you recall testifying yesterday, I believe you read I think it was from Mr. Sterlingov's notes about connecting to open Wi-Fi in a cafe and whether it was safe?

A.   Yes.

Q.   Would you ever connect to an open Wi-Fi in a cafe without

VPN?

A.    Sometimes, yes.

Q.    Sometimes.  But in the times that you didn't, why wouldn't you?

A.    Usually, it was because I was doing work and wanted the anonymity.

Q.    Right.  Because if you don't use VPN, when you connect to open Wi-Fi in public, people can sniff your internet traffic; right?

A.    Theoretically, yes, they could.

Q.    And then they could get your credit cards if you were buying stuff on Amazon?

A.    I don't know about that because the traffic would be over https and encrypted.

Q.    If -- well, that is -- if it was encrypted, they wouldn't be able to get it.  But if it was http, they would be able to sniff your information; right?

A.    Yes, they might.

Q.    And you are aware that there are people out there who sniff internet traffic at public sites to collect information like credit cards and personal information about people; correct?

A.    Yes, I am aware of that.

Q.    And that is why people use -- one of the reasons people use VPNs is to protect their information when it is being

transmitted on the internet; correct?

A.    Yes, I would agree with that.

Q.    And there are a large number of companies that offer a variety of VPN services; correct?

A.    Yeah, there are quite a few.

Q.    And you use VPN on a regular basis?

A.    Yes.

Q.    And you use it for security reasons?

A.    I use it for a variety of different reasons.  But, yes, sometimes for security.

Q.    Could you tell the jury some of those reasons?

A.    Oftentimes, I will use it for work if I need to look up a website of interest or work, meaning investigation-related topics, but I am at home.  I don't necessarily want those searches to be coming out of my home and linked over the internet with my IDs and things I am interested in.  So that is probably the most common time I turn my VPN on is when I want to -- my internet browsing to go into work mode.

Q.    And the VPN helps protect your personal privacy, doesn't it?

A.    Yes.

Q.    It helps keep you safe?

A.    Yes, I believe so.

Q.    And do you recall testifying about proxy servers yesterday?

A.   Yes.

Q.   And proxy servers are similar to VPNs in that they protect your privacy?

A.   Yes.  They do give you -- like VPNs, they give you a different IP address to come out of so that it is not your own, so it would conceal your own personal one from the rest of the internet.

Q.   And a lot of businesses use proxy servers?

A.   I am not really sure.

Q.   You have no reason to believe that is not true?

A.   Use them how so?

Q.   I'm sorry?

A.   Because Who is lookups, a lot of times businesses' main IP addresses, as I trace them, do come back the business on the record.  But I don't know what other -- so in those cases they might not be using proxy servers, there could be other uses they have for proxy servers that I am not thinking of.

Q.   There is a lot of businesses that rent proxy servers just like VPNs?

A.   I don't know.

Q.   And could you explain to the jury the difference between a static and a dynamic IP address?

A.   In general, a static IP address stays the same.  And a dynamic IP address will change slightly each time you connect to it.  One way -- for example, at home you could set up your

router if you -- because of the way you have things set up, always want to come out of the same exact IP address each time you set it to be static.  But if you set it to be dynamic, it uses something called DHCP to pick an IP within a range that is available to you.

Q.    And server logs, among other things -- but server logs record IP addresses; correct?

A.    Yes, generally, they do.

Q.    And generally they record the time that the IP address logs into the server?

A.    Yes.

Q.    And usually the server logs tell you what time zone the IP address is logging in from -- I guess the time zone for the server; correct?

A.    I would say connects to instead of logs in, more like accesses.  Sometimes the time zone is specified, but other times I found it to be implied.

Q.    And when you did your IP address analysis you actually didn't have native server logs to do that analysis; correct?

A.    I am not sure which original form they had.  Many of them were provided in the form of what looks like legal process or spreadsheets.  But IRS and FBI in some cases gave me those.

Q.    But you don't know if you actually reviewed the original server logs when you did your IP address analysis?

A.    In their original form, I don't know.  And some of them

looked like they may have been pulled from the company or organization. So, in some cases, no.

Q. And the time stamps in the documents that you reviewed to get the log-in information, not all of them told you what time zone the log in was in; correct?

A. I believe that is correct.

Q. And you just -- when you didn't know what -- withdrawn.

When the time zone wasn't designated, you just assumed it was UTC?

A. No, I did a few more steps. If the time zone wasn't specifically indicated in the time stamp or at the very top, then I'd go back into other documentation that came with the data in the logs, if there was a registration info or something I'd read through those to see if time zone was indicated for the whole set anywhere else. But in the absence of any time zone information at all or a note saying all times are local, for example, then I went with the convention, which is UTC.

Q. And that means potentially the times that you are using for your timing analysis could be off by hours?

A. If the provider of the records had them in a specific time zone and didn't indicate that, then the offset could be a matter of hours.

Q. Uh-huh. And you didn't examine any of the traffic logs for the servers involved?

A. The only traffic I examined were for the Moon VPN servers.

But I don't believe that that data was part of the IP analysis. I don't think so.

Q.   And just I think you answered my question.  I want to make sure I understood you.  So for the IP address analysis, you didn't look at any of the traffic logs for the servers involved with that?

A.   Unless they were provided in the set to analyze.

Q.   And there were no log-out times recorded in the legal process that you looked at?

A.   I'm sorry.  Did you say log-out times?

Q.   Yes, log out.

A.   I think there might have been some log-out times in there. But I didn't consider the specific action that was happening when I looked at the IP access.  I treated log in and log outs neutrally.  There might have been some log-out lines though.

Q.   And when -- just now you were describing your methodology that you used in this IP address overlap.  This was the first time that you have ever done this; correct?

A.   Comparing different data sources looking for IP addresses that appear in common and how close together, to clarify, is something that I do for almost every case.  But the specific way I conducted this analysis, I designed for the data set I was given.

Q.   And that was -- this was the first time that you did it this specific way; correct?

MS. PELKER:  Objection; asked and answered.

MR. EKELAND:  She didn't answer the question.

THE COURT:  I think she did answer the question.

BY MR. EKELAND:

Q.  And this methodology, you can't name me one scientific peer-reviewed paper attesting to its accuracy?

A.  It is not a scientific methodology.  It was a research analysis.

Q.  And can you name me one academic white paper, research paper attesting to the accuracy of your methodology?

A.  The methodology in particular, I didn't define in a scientific way, so it couldn't be tested.  It was a review of different data sources and an analysis of the observations in there.  And what that meant to my interpretation of -- so I didn't define like a peer abstract methodology that I could search other papers for.

Q.  So would it be fair to say that it was a nonscientific methodology?

MS. PELKER:  Objection; misstating the witness' testimony.

THE COURT:  My concern is just perhaps some confusion about how you are both using the word scientific.  And so maybe it is better to ask her how she would characterize her methodology.  I think there may be some disconnect between the way you are using the word scientific.

BY MR. EKELAND:

Q.   In terms of your IP address analysis, you actually didn't make any attributions in relation to who -- the identity behind any of the emails that were part of your IP address analysis?

A.   That is correct.  The attributions were made by the case team in general.  But that analysis looked for users in common without specifically naming any users.

Q.   And you don't actually attribute the shormint@hotmail.com email address to Mr. Sterlingov in your analysis, do you?

A.   In that writeup, no.

Q.   And when you -- in that writeup that we are discussing at the end of it, this is your -- if I am understanding your conclusions in your analysis, you have two groups of email addresses at the end of that report that you are talking about?

A.   Yes.

Q.   And the first group of -- you say email addresses that were likely to have been used maybe by the same user in that group you put Mr. Sterlingov's heavydist@gmail.com, his plasma@plasmadivision.com, I think the log in to his Killdozer account on Bitcoin Talk and the cray Killdozer -- his cray Killdozer Twitter account and I think you also put Volf.prius in there.  But you don't put shormint@hotmail.com in that group, do you?

A.   Although I am doing this from memory, I have don't have it in front of me.  I believe Shormint was in the second bullet

point group.

Q. And the second bullet point group you said likely was the same user, you grouped Shormint@hotmail.com, the NFS9000@hotmail.com account that was associated with Mt. Gox account number 2; and you also put the Kolbasa99.ru account in that group; correct?

A. I believe so. That sounds right.

Q. And the majority, but not all, of your IP address analysis involved these series of traces that Mr. Scholl did in October related to those transactions you heard him testify about in October and November of 2011?

A. I'm sorry. Did you ask if the analysis involved them?

Q. Let me rephrase if my question wasn't clear.

The email -- your IP address analysis was -- the date range for that was between 2011 and 2013?

A. I don't really remember.

Q. Do you remember looking at the traces that Mr. Scholl did, such as the trace for the initial DNS registration and the traces involving Mt. Gox account number 2 and Mt. Gox account number 3?

A. Yes, I think I looked at those traces.

Q. And those traces were all just in October and November of 2011?

A. I am not sure.

Q. Do you recall looking at any other traces besides the

October, November 2011 traces?

A.    I could have.  But I don't remember them very distinctly, since the money tracing isn't my essential area, so I am not sure.  But I could have, for sure.

Q.    And none of the IP addresses or anything that you looked at when you did your IP address analysis involved a log-in to the Bitcoin Fog server, did it?

A.    No.

Q.    You don't know any kind of statistical error rate or anything for your IP address analysis, do you?

A.    It wasn't a statistical analysis.

Q.    You were essentially guessing?

            MS. PELKER:  Objection.

            THE WITNESS:  No.

BY MR. EKELAND:

Q.    But you can't tell me with certainty the identification of anyone behind any of those emails?

A.    I did not in that writeup attribute any of the emails to any specific person, other than what research the case team had already did.

Q.    You recall testifying about the Tor browser?

A.    Yes.

Q.    And the Tor browser was developed by the United States Navy?

A.    Originally, yes, it was.

Q.    And the United States Navy did it to hide its signal traffic; correct?

A.    I believe so.

Q.    And then the United States Navy gave it to the Tor nonprofit?

A.    I think so.

Q.    The Tor browser and Tor is now administered by a nonprofit?

A.    Yes.

Q.    And anybody in this courtroom could can go on the internet and download the Tor browser?

A.    Yes.

Q.    And the Tor browser is a privacy tool?

A.    Yes, sometimes it gets described that way.

Q.    And you would agree with me that political dissidents all over the world use the Tor browser to protect themselves?

        MS. PELKER:  Objection; relevance.  There is no suggestion that Mr. Sterlingov is a political dissident.

        THE COURT:  It may be better to lay a foundation to see if she has any knowledge of which particular groups are using it.

        MR. EKELAND:  I can move on, Your Honor.

        THE COURT:  You are welcome to ask the question, I just think you need a foundation.

        MR. EKELAND:  It is okay.

THE COURT: I remind the jury that the questions are not evidence.

BY MR. EKELAND:

Q. I would like to turn to your device review. Mr. Hassard, if we could get up what is in evidence as Government Exhibit 710A and go to page 6.

And do you see down here where it says, paint that shields against radio waves?

A. Yes.

Q. Do you remember reading that to the jury yesterday in your testimony?

A. Yes.

Q. And when you reviewed Mr. Sterlingov's devices, were any of them painted with radio wave blocking paint?

A. No.

MR. EKELAND: You can take this down, Mr. Hassard.

BY MR. EKELAND:

Q. You testified as to I think file carving yesterday?

A. Yes.

Q. Could you explain to the jury what that is?

A. File carving is a process by which forensic tools usually scan through unallocated space, so the parts of the computer's hard drive that aren't being taken up by files that appear to the user. And it is a process of looking through and attempting to pull out files and parts of files that may have

been left behind by previous uses.

Q.    And you performed file carving on Mr. Sterlingov's devices?

A.    Yes, I did.

Q.    And you testified previously you didn't find anything related to Bitcoin Fog?

A.    No.

Q.    And do you recall testifying about RAID yesterday?

A.    Yes.

Q.    And RAID stands for redundant array of inexpensive disks?

A.    Independent.

Q.    Thank you.  And that is just a way, essentially, of just sort of grouping a bunch of hard drives together; correct?

A.    Yes.  Having them work together to act as one entity.

Q.    And as part of that process, the RAID process in setting up all of these hard drives, you have to zero out the hard drives; right?

A.    I have set up a RAID before without wiping or zeroing out the hard drives.  But it usually involves formatting them, which will overwrite it with the type of structure it needs. But I don't believe I have set one up without doing a full zero out.

Q.    But normally -- and it is not unusual to zero out the hard drives and reformat them, as you say, when you are setting up a RAID configuration?

A.    Zeroing out and reformatting are slightly different, but, no, it is not uncommon to start from empty drives.

Q.    And as part of your forensic review, you create a log or a list of all of the devices that you are reviewing for a case?

A.    They weren't all the devices that I ever reviewed. Because in this case, review was very rolling and ongoing.  But at one point to get organized, I loaded many of the devices that FBI provided me into one forensic tool list.  And I went through and tagged files of interest from there.  At the end, I gathered all of the tags and exported those so the devices that they came from would be in that spreadsheet too.  Is that the --

Q.    But you also created -- maybe it is, but did you also create a list of the devices in this case that you reviewed and --

      Mr. Hassard, if you could put up what is not in evidence as Defendant's Exhibit 32.

A.    I also did build a markdown table of devices I reviewed with some short notes about what was on them at a high level to assist the case team in remembering generally which one was which.

Q.    If you could look at your screen right there.  And do you see that.  Is that what you were just talking about?

A.    Yes, that is the table.

Q.    And that says that you are the author of it?

A.    Yes, I wrote this.

Q.    And you created that in the course of working on this case?

A.    Yes, that is right.

Q.    And this is an accurate, authentic depiction of the device summary that you created?

Mr. Hassard can scroll through it, if you would like.

A.    I thought I had it in a table format, but the contents and the structure all look the same.

MR. EKELAND:  Your Honor, at this point in time, the defense would like to offer what has been marked for identification as Defendant's Exhibit 32 into evidence?

THE COURT:  Any objection?

MS. PELKER:  No objection, Your Honor.

THE COURT:  Defense Exhibit 32 is admitted and may be published to the jury.

(Whereupon, Defense Exhibit No. 32 was admitted.)

BY MR. EKELAND:

Q.    And, Mr. Hassard, if you could scroll down a little bit to the next page.  And right there, can you stop there.
Mr. Hassard, can you go down a little bit?  I'm sorry.  No, keep going.

And if you -- do you see right here where it says a 6 terabyte hard drive BitLocker encrypted?

A.    Yes.

Q.    Could not review.  Could you explain to the jury what BitLocker is?

A.    BitLocker is Windows' full disk encryption.

Q.    And who provided you with these items for review?  Did you pick them up from the IRS or how did you end up with them?  I guess is what I am asking.

A.    When I made this list, I was reviewing the evidence items in the form of their images, which had already been put on FBI's network.  So I went to the network where FBI hosts these things and went to the folder for the Bitcoin Fog case.  And all of these images were there in the folder labeled.  And all of the computer ones that were compatible with my tool, I added one at a time and then started to look through them.  I noticed that one of those images was encrypted and the data wasn't showing up.  So I added it to the list because it was one of the files that I ingested, the image files.

But since I didn't remember anything about any of the devices being that big and encrypted, I asked around the case team for it.  And it turned out that what I believe happened, is that someone at FBI had made an image of a staging hard drive that IRS had used and added it it to the same folder, so that that hard drive should have been in like a working copy folder.  But instead at some point, someone made an image of it, which would be encrypted because the hard drives we use are pin protected.  And that image ended up in the same folder.  So

it ended up in the report, because it was part of the analysis I did. But after writing it up this way, I determined that it wasn't one of Mr. Sterlingov's hard drives.

Q. It is a mistake? It shouldn't have been listed as one of his devices?

MS. PELKER: Objection; this isn't a list of his devices.

MR. EKELAND: Can we scroll to the top of this exhibit?

BY MR. EKELAND:

Q. Sterlingov device review summary is what it says at the top; correct?

A. Indicating, yes, they were the devices I reviewed for the Sterlingov case.

Q. Just to be clear, that 6 terabyte BitLocker encrypted device was not seized from Mr. Sterlingov when he was arrested at the airport?

A. After reviewing it, I determined that, yes, it was not one of the seized devices.

Q. Mr. Hassard, if we could go to Government Exhibit 368. And this should be in evidence, I believe.

THE COURTROOM DEPUTY: It is in there, but as a demonstrative.

It is in evidence as a demonstrative.

MR. EKELAND: As a demonstrative. Can we publish

this to the jury?

THE COURT: You can.

BY MR. EKELAND:

Q. Ms. Mazars, do you recall testifying about Mr. Sterlingov's phone the other day, the LTE device?

A. Oh, the LTE device, yes.

Q. Yes. And this is essentially -- what is happening here is there is -- this is just essentially a way for somebody to get multiple internet streams and combine them into one stream; is that correct?

A. I am not sure if they are always combined or if sometimes they are split up and distributed, because I never tested it out. But there can be multiple SIM cards, because there are four spots here, at least out of the box.

Q. But you never tested the device?

A. I never turned it on and tried to make it stream, no. Generally, unless there is a real need to, I don't do that with evidence items.

Q. Do you recall testifying yesterday about how the phone could be used to avoid law enforcement?

A. The LTE device?

Q. Yes.

A. Yes.

Q. And do you recall one of the things I think you said was that one of the ways that that could be done is if law

enforcement was just monitoring one stream and another -- law enforcement was monitoring modem number 1 and the activity that was really happening was on number 4, that would be a way to evade law enforcement. Do I have your testimony right on that?

A. That is not what I was trying to say. What I was describing was that maybe the actor would have a home internet connection or internet connection at work that law enforcement would be monitoring. But instead of connecting to that at all, the actor would only connect to the LTE device. I wasn't referring to law enforcement monitoring only one modem. I was referring to the typical process where they might think to monitor the house specifically and its traffic.

Q. So that what you are -- in your hypothetical, the same thing would happen if somebody just used a hotspot on their smartphone?

A. The built in one? Yes.

Q. There is -- essentially, I think if I understand your hypothetical is that, well, law enforcement's monitoring wouldn't work if the suspect just simply used another way to access the internet. Is that what you are saying?

A. It wouldn't be exactly the same as a phone hotspot, because I would say in most cases, when you are not using your hotspot, you connect your phone to your home Wi-Fi. So there would still be some attribution there. I would compare this more to using an external hotspot that you never connected to

your home network.

Q.   You are aware that you can buy devices like this on Amazon?

A.   I didn't know that it was on Amazon, but I have no reason to doubt that.

Q.   And when you examined this device, you didn't find a trace of anything related to Bitcoin Fog, did you?

A.   No.

Q.   I would like to now talk about Linux and SSH, which you were testifying about yesterday.  Do you recall that?

A.   Yes.

Q.   Could you explain to the jury what Linux is?

A.   Linux is an operating system.  If you think about Windows or Mac OS being operating systems, so the software that lets you interact with the computer in its own specific way.  Linux is another version of those that programmers tend to like. People who like to customize many aspects of their computer experience tend to like Linux.  And it has a lot of free add-ons and things like that.

Q.   There is roughly 33 million Linux users in the world, aren't there?

A.   I am not sure.

Q.   Are you a Linux user?

A.   Yes, I am.

Q.   And Android phones operate on Linux?

A. Yes, a form of Linux.

Q. And then you testified about SSH. Could you just remind the jury what that is?

A. SSH, secure shell is a form of a -- a way to remotely connect to another computer server. It is a command that you type in a terminal or command prompt window. It is SSH, and the username you're logging into that computer as, at sign and a way to access the computer. So that will be an IP address sometimes or other times it will be the domain name, the dot-com.

Q. And SSH is a little bit similar to VPN in that it is a secure way of remotely logging into a computer in that somebody can't sniff your traffic, because it is encrypted; right?

A. It is encrypted.

Q. Right. And you use SHH all of the time?

A. Yes.

Q. And you use Bash all of the time; correct?

A. Yes.

Q. And could you just explain to the jury what Bash is?

A. The command-type window where instead of using the visual elements of the computer, you type in the commands directly line by line or run scripts with them in. That is what Bash is.

Q. And we are talking about all of this and what you were talking about yesterday was all in the context of Linux and

Linux commands; correct?

A. Yes.

Q. So you also testified about SSH tunnels yesterday. Could you just explain to the jury what an SSH tunnel is, if you know?

A. I don't remember specifically talking about SSH tunnels. I know I used tunnelings as a metaphor to explain encrypted remote connections, but I don't specifically remember what you are referencing.

Q. So when you log in with SSH through Bash, which is like the portal that you are logging in from. You can either use that to log in locally to the computer you are on or you can use it to remotely access a computer thousands of miles away?

A. Yes.

Q. And one of the uses of Linux and SSH and Bash is for people to remotely access their home computers; correct?

A. Yes, they could.

Q. And do you recall testifying yesterday or reading about a site called ignorelist.com?

A. Yes.

Q. And ignore list is a dynamic DNS, isn't it?

A. I believe so, yes.

Q. Could you explain to the jury what a dynamic DNS is?

A. Dynamic DNS is a service that you can sign up for, sometimes pay for and use when you want an IP address to have a

domain that points to it that doesn't change.

I discussed a little bit about how occasionally home IP addresses can change or that addresses to some things on a home network could shift around within a range. So if you have something set up to remotely connect to a network, oftentimes someone's home network and the IP address changes, it would break your connection. So some people prefer to have a name they can remember, a website name that acts as a shorthand way to connect to their network. And if the IP changes or anything changes, they can go into their settings and update it so their domain name still works.

Q. Is it fair to say that it is a convenient way to log in to your home computer remotely through Linux?

A. To log into any computer. I also saw it used when I worked national security cyber in the context of virtual private servers, but it is a -- I would say it is a convenience mechanism.

Q. And ignorelist.com is a free service?

A. I don't remember the exact name of the DNS service, but ignore list and Hop Do I remember from doing cyber research all linked back to -- it might have been No IP, but one of the big dynamic DNS services.

Q. Mr. Hassard, if we could put up what is in evidence as Government Exhibit 720.

And, Ms. Mazars, do you remember testifying about this

yesterday?

A.    Yes.

Q.    And can you just briefly tell the jury what this is?

A.    This is a configuration file, so sort of a settings file for a tool called Tiger VNC, which allows for remote connections, connections to other computers that aren't there on your network or physically there.

Q.    And Tiger VNC is a video application tool?

A.    Is a what?

Q.    It is for video viewing?

A.    I have never used it, so I am not sure.

Q.    You don't know -- you have no reason to think that it is not?

          MS. PELKER:  Objection, Your Honor.

BY MR. EKELAND:

Q.    -- for viewing media files and video?

          THE COURT:  Sustained.  She said she doesn't know.

BY MR. EKELAND:

Q.    Bitcoin Fog wasn't a video site, was it?

A.    Not that I am aware of.

Q.    And in this configuration file you didn't see anything related to configuring Bitcoin Fog?

A.    It is a configuration for the VNC tool, not for any website, including Bitcoin Fog.

Q.    Right.  Thank you.  We can take this down, Mr. Hassard.

If we can put up what is in evidence as Government Exhibit 722.

And do you recognize this from your testimony yesterday?

A. Yes.

Q. And do you see where it says Putty.log?

A. Yes, under log file name.

Q. Thank you. Could you explain to the jury what Putty is?

A. Putty is a tool that allows for remote detections, TTY connections specifically. It is a client of sorts, meaning a program that you would run to do the TTY connections to other computers or servers.

Q. And when you look at this, do you see anything in it that is related to Bitcoin Fog?

A. I don't see Bitcoin Fog referenced in this file. I don't know exactly what was used on the IP it was to connect to, but nothing that I know to be directly related to Bitcoin Fog.

Q. And this is entirely consistent with Mr. Sterlingov remotely accessing his home computer?

A. Yes, that is right.

Q. And you said yesterday, I think if I heard you correctly, that the government never obtained Mr. Sterlingov's home computer or any of his computers in Sweden?

A. Yes.

Q. And the United States government worked with Swedish law enforcement on this case for years; is that correct?

A.   I don't know.

Q.   But the reason the government doesn't have Mr. Sterlingov's Swedish computers has nothing to do with Mr. Sterlingov; correct?

A.   I'm sorry.  I don't understand what you mean.

Q.   Well, Mr. Sterlingov did not in any way prevent the United States government from seizing his computers in Sweden, did he?

A.   I don't know.  There is no way I am aware of.

Q.   Do you know why the United States government --

MS. PELKER:  Objection.

BY MR. EKELAND:

Q.   -- hasn't obtained Mr. Sterlingov's computers from Sweden?

THE COURT:  Yeah.  I think it is beyond the scope of the witness' testimony.

MR. EKELAND:  She testified yesterday that the United States government does not have Mr. Sterlingov's computers from his apartment, so I am following up on that.

THE COURT:  Why don't you lay a foundation to see if she has any knowledge on this topic, because it doesn't sound like she does.

BY MR. EKELAND:

Q.   Do you know why the United States government does not have Mr. Sterlingov's computers from Sweden?

A.   I have discussed briefly with members of the case team.  I didn't entirely understand the details especially because a lot

of this played out on the administrative side and I think

before I was working on it.  I understood it to be issues

related to communication and timing, the timing of what actions

were being taken investigatively on the case until a certain

point when it just seemed too late to get them.  But I don't

understand legally and administratively exactly what went wrong

or what happened.

Q.    If we could take down this exhibit, Mr. Hassard.

If we could put up Government Exhibit 723.

Do you recall testifying about this exhibit yesterday?

A.    Yes.

Q.    And could you just briefly explain to the jury what we are

looking at?

A.    This is essentially attaching and -- so storage remotely

meaning a place where files could live, so that you could see

the files on a local computer.  You see the two folders

bunkerX_media and bunkerX media, one of them lives on the

computer, the person typing this is using, and the other is in

a remote location.  And it links the two so that those files

could be shared.

Q.    This is Linux; correct?

A.    I'm sorry?

Q.    This is Linux we are looking at; right?

A.    Yes.

Q.    And in Linux in order to access a hard drive, you have to

mount the hard drive; correct?

A. Yes.

Q. And that is not like say your normal PC where you don't have to mount the hard drive to access the information; correct?

A. On Windows a lot of steps happen more automatically for you, but you could.

Q. But in Linux, you actually have to give the command to mount the hard drive to access the hard drive?

A. Yes, in Linux you need to do these things manually.

Q. And so what we are seeing here is entirely consistent with Mr. Sterlingov remotely accessing his home computer's hard drive via Linux?

A. If bunkerX is his home computer, yes.

Q. Do you see how it says bunkerX_home?

A. But home --

Q. We can take that down. I'm sorry?

A. The home directory is the main user directory in Linux.

Q. It could also be his home computer?

A. It could also.

Q. It is entirely consistent with it being his home computer?

A. Yes.

Q. And there is nothing on here that you see that is related to Bitcoin Fog at all?

A. No.

Q. Okay. If we could move on to Government Exhibit 724. And this is essentially the unmounting of the hard drive, do I have that correct?

A. Yes, the script to unmount both.

Q. Once again, we see bunkerX home at the end here.

You can take that down, Mr. Hassard.

THE COURT: That wasn't a question. You are testifying.

MR. EKELAND: I apologize, Your Honor, you are correct.

BY MR. EKELAND:

Q. Do you see how it says bunkerX home at the end?

A. Yes, it says bunkerX home.

Q. Thank you. You can take that down, Mr. Hassard.

And if we could get up what we just -- can we get Government Exhibit 725 up.

Do you recognize that from your testimony yesterday?

A. Yes.

Q. And do you see how it says ignorelist.com?

A. Yes.

Q. And that was the dynamic DNS that you just testified about?

A. Yes, that was my understanding.

Q. And you don't see anything on here related to Bitcoin Fog at all, do you?

A. No, not in this file.

Q. If we could take that down, Mr. Hassard.

And if we could go to Government Exhibit 726. And do you recall testifying about this yesterday?

A. Yes.

Q. And, Mr. Hassard, if we could scroll down a little bit, I just would like to see the whole thing. This is the VNC --

Could we go back to the top, Mr. Hassard?

This is the Tiger VNC again that was in the first exhibit of the sequence; correct?

A. Yes, the same tool.

Q. And nothing in this is related, that you can tell, to Bitcoin Fog, is it?

A. No.

Q. All right. If we would go to Government Exhibit 729, which is in evidence. And then do you recall testifying about this yesterday?

A. Yes.

Q. And, Mr. Hassard, if we could scroll down all of the way to the bottom. And do you see anything in this exhibit related to Bitcoin Fog?

A. No.

Q. Thank you. If we could go to Government Exhibit 731. And this, again, is Mr. Sterlingov's Bash history that you testified about yesterday?

A.    Yes, I believe this is the one.

Q.    And this is entirely consistent with Mr. Sterlingov logging into his home computer in Sweden?

A.    Yes, that was my impression.

Q.    And nothing on this is related to the operation of Bitcoin Fog at all, is it?

A.    Not in this file on this computer.

Q.    And, Mr. Hassard, if we could switch now to what is in evidence as Government Exhibit 733.  Do you recall testifying about this yesterday?

A.    Yes.

Q.    And, Mr. Hassard, if we could scroll down.  And this is entirely consistent with Mr. Sterlingov logging into his home computer in Sweden?

A.    I'm sorry.  Could you scroll up again, please?

It seemed like a script to start VNC, which does remote connections.  I didn't -- I am not seeing anything specific.

Q.    And VNC --

A.    I am not seeing any -- at first glance, I am not seeing anything here specific to which computer is being connected to.

Q.    Mr. Hassard, if we could scroll to the top again.

Do you see where it says VNC viewers?

A.    Yes.

Q.    Your understanding of that, that the VNC viewer is for video or media files or cameras?

A.    I tend to know VNC as a remote viewer tool as in you view what is on the other computer.  I have not personally used it for video or associate it with video viewing, but it could be.

Q.    For instance, it could be used to control or view security cameras in a person's home; correct?

A.    Yes, it could.

Q.    Mr. Hassard, you could take this down.

MR. EKELAND:  Your Honor, do you -- I am just --

THE COURT:  We have been only going for about an hour.

BY MR. EKELAND:

Q.    Okay.  Keep going.  Mr. Hassard, if we could go to what is in evidence as Government Exhibit 710A.

Is that 710A?

If we could scroll to the top of that.  All right.  And then if we could go to scroll down a bit to where it says -- I'm sorry.  I'd like 513B.  My apologies.

What is in evidence as 513B.  My apologies.

THE COURTROOM DEPUTY:  I'm sorry.  What number?

MR. EKELAND:  513B, as in boy.

THE COURTROOM DEPUTY:  Thank you.

BY MR. EKELAND:

Q.    Mr. Hassard, if you could scroll to the top of this?  Is that it?  Is this published to the jury?

So do you recall testifying about this yesterday?

A.   Yes.

Q.   And this is Mr. Sterlingov's SpiderOak account summary?

A.   Yes.

Q.   And could you just remind the jury what SpiderOak is?

A.   A cloud backup service.

Q.   And SpiderOak encrypts your data?

A.   I believe so, yes.

Q.   Could you just briefly explain to the jury again what data encryption is?

A.   To encrypt data, depending on which encryption algorithm or method is being used, a program will mathematically change all of the values it is seeing to different ones in a way that makes that data garbled and unreadable.  And then to decrypt it, to run another program to mathematically put them back where they were originally, you need a password or pin or some type of value to prove that you are the -- that you have access to it.

Q.   And do you back up your data?

A.   I should.  I generally don't.

Q.   But when you do -- but you do sometimes back up your data?

MS. PELKER:  Objection; relevance.  He can ask her -- her personal activities are not relevant.

MR. EKELAND:  They are absolutely relevant, Your Honor.  They have been making it seem like backing up your data and encrypting it --

THE COURT: First of all, don't start arguing your case. I will allow you to ask the question, if you have a follow up. But, obviously, her personal practices are not what is relevant. If you are using it to set up some other question, that is okay.

BY MR. EKELAND:

Q. Do you sometimes --

A. To do one correction, yes, technically Apple automatically backs up a lot of my phone data for me, so I do some regular personal backups.

Q. When Apple does it, it encrypts the data backup; right?

A. Yes.

Q. And the reason Apple does that is so that bad actors can't access your personal data?

A. I think they do it for liability to them, but I am not sure.

Q. Would you agree with me that encrypting your data backup is standard op sec?

A. Yes.

Q. Could you remind the jury what op sec means?

A. Operational security. It is some steps and methods you take to put barriers between your own identity and home and address, things close to you and your activities usually in this context online.

Q. And encryption also helps protect your financial data,

your personal information, sensitive information and stuff you just generally don't want third parties to get, you would agree with that?

A. Yes, I would agree with that.

Q. And SpiderOak is a company that provides online encrypted data backup?

A. Yes.

Q. And this is merely an account summary for Mr. Sterlingov's SpiderOak data backup account?

A. Yes, it appears to be.

Q. And Mr. Sterlingov has this data backup in his own name?

A. Yes.

Q. And if we could just scroll down just a little bit. And do you see where -- scroll up a little bit to active devices, Mr. Hassard. Stop right there.

Do you see these three active devices here, one bunkerX, Mailwoo and blast?

A. Is that Btest?

Q. Btest, yeah. I'm sorry. Do you see all of those?

A. Yes.

Q. It is not your testimony that any of those are Bitcoin Fog, is it?

A. No, I don't know what Btest is. BunkerX, appears to be the -- by name, the same computer that the remote connections were made to. And Mailwoo might have been the Moon VPN.

Because of that review it was at one time running Mailwoo, but I am really not sure for certain what any of them were backing up.

Q. Is Mailwoo is an email program; is that right?

A. Yes, email server client to help you manage an email server.

Q. You said that To the Moon was running the Mailwoo email server client at at least one point?

A. It had some Mailwoo databases.

Q. And you are not aware of Bitcoin Fog ever running any kind of email server client, are you?

A. I don't remember if it had a mail subdomain at any point. But, no, I have never visited the site, so I am not aware of any email features, but I just don't know.

Q. If we could take this down, Mr. Hassard.

If we could go back now to what is in evidence as Government Exhibit 710A, going to page 2.

Let me clear my screen.

And then is that published? Thank you. And then, Ms. Mazars, do you see the bold header there, "We use the back up service instead of storing them purely on some VPS"?

A. Yes.

Q. Could you just read the whole -- let me clear this out so it is easier to read the whole paragraph there. Starting right -- could you read that paragraph?

A. "In general, SpiderOak specifically sells its services using the argument, which is sort of like, even we do not have access to your data. If there is such a service, which in a mess of all sorts of Googles and Facebooks that constantly hide the fact that they disclose all of the data of users and sell them left and right comes out and says that we will at least do it safely, then it probably makes more sense to also support it rather than just use it. Still no one can be trusted and you just need encrypt all of the data constantly. Vote with a dollar, so to speak. Also pure engineers appear in their videos. It shows that these are stubborn technicians."

Q. Would it be fair to say is it your understanding of this paragraph that Mr. Sterlingov is expressing a concern with having his data sold by companies like Facebook and the like?

A. Yes.

Q. And that is it your understanding that one of the concerns that Mr. Sterlingov is expressing here is a concern over data privacy?

A. Yes.

Q. And you would agree with me that many people use encryption and VPN and the Tor browser out of a concern for data privacy?

A. That -- I am not sure how many people use the Tor browser. In general, is privacy one of the reasons people use these tools? I'd agree, yes.

Q.    You use Tor; right?

A.    Yes.

Q.    And, Mr. Hassard, I want to scroll down and look for the heading that says bunkerX main on this.  If you can -- there, stop right there.  This is it, right here.

      And then if you could just read that paragraph right there.

A.    "Should I leave encrypting in a regular bunker X backup?  In fact, who are we defending ourselves against?  The main backups will kind of already be in ENCFS anyway or perhaps, for example, one could save them in the cloud then, without another ENCFS actually.  That duplicity itself encrypts is, of course, helpful against hackers getting on Mailwoo, but it also depends on where one would leave the password."

Q.    And is it your understanding that one of the concerns that Mr. Sterlingov is expressing here is having his data accessed by hackers?

A.    Yes.

Q.    Would you understand the sentence here where he says, "In fact, who are we defending ourselves against?" is sort of expressing some kind of doubt over whether or not he should encrypt his data at all?

A.    I am not sure.  I thought it was more a philosophical question.

Q.    But you don't see him expressing a concern of encrypting

his data to evade law enforcement in that paragraph, do you?

A. Not in this paragraph.

Q. You can take that down, Mr. Hassard. You reviewed records in relation to Mr. Sterlingov's To the Moon server in Romania?

A. Yes.

Q. Did you review the actual physical server itself?

A. Not the physical server, but the server images, yes.

Q. And that in a certain sense limits your review of the full capability of the server knowing what it could do -- actually do?

A. I wouldn't say that reviewing only images limits the capability of understanding it. I always review images and in most cases, never, unless it is a laptop or something, interact with the physical device.

Q. Do you know where the physical device is?

A. Right now, no, I don't know where it is.

Q. Do you know what type of server it was?

A. I don't remember off the top of my head. It might have been Engine X, but I would have to look in my report again.

Q. As part of your review of the materials related to the To the Moon server, you reviewed the traffic report related to that server provided by the Romanian authorities?

A. Yes. I also reviewed the packet capture.

Q. Are you -- am I understanding your testimony correctly that the traffic report and that packet capture are two

separate things?

A. I don't understand what you mean by traffic report.

Q. I'm sorry.

A. The two projects involving that server that I completed were first, reviewing the images of the server on -- which came in the form of three image files. And at some other point, I got access to the packet capture, the communication in and out from that server or whichever IP was asked for. And I reviewed that separately.

Q. And when you reviewed that packet capture, you didn't see anything related to Bitcoin Fog, did you?

A. I couldn't identify the majority of IP addresses it was communicating with, but nothing that I directly recognized as being Bitcoin Fog.

Q. And did you check any of those IP addresses against the so-called Bitcoin Fog cluster that Mr. Scholl testified about?

A. No.

Q. And in the -- you did keyword searches in relation to the P caps?

A. Yes, I did at some point, I think.

Q. One of those words you searched was Shormint?

A. Yes.

Q. And you got no results when you searched the P caps for Shormint?

A. That is right.

BY MR. EKELAND:  No further questions, Your Honor.

THE COURT:  All right.  I don't know how much time, Ms. Pelker, you need, whether we should take the break now or if you can -- if it is quick, we can finish up and do the break.

MS. PELKER:  I don't think it will be long.  But maybe just a short break and then we can go ahead.

THE COURT:  Why don't we take our morning break now. It 11:00 now.  We will take a break until 11:15.  Please don't discuss the case among yourselves and don't conduct any research about the case and I will see you shortly.

(Jury out at 11:00 a.m.)

THE COURT:  You can take your break as well.  I just ask that you not discuss your testimony until it is complete.

Anything anyone wants to raise before the break?

MS. PELKER:  No, Your Honor.

MR. EKELAND:  No, Your Honor.

THE COURT:  Okay.  See you shortly.

(Recess taken at 11:01 a.m.)

THE COURT:  Who is the government's next -- I'm sorry.  Let's get the defendant.

All right.  Just before you get the jury --

THE COURTROOM DEPUTY:  Okay.

THE COURT:  Who is the government's next witness?

MR. PEARLMAN:  It is the FinCEN witness Ted Vlahakis.

THE COURT: Okay. Sounds good. Let's get the jury.

(Jury in at 11:22 a.m.)

THE COURT: All right. And, Ms. Pelker, you may proceed when you are ready.

MS. PELKER: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. PELKER:

Q. CS Mazars, defense counsel asked you whether there was anything in the devices or notes related to Bitcoin Fog. To clarify, was there anything that you saw that had the words Bitcoin Fog specifically in them from the defendant's devices or notes?

A. No.

Q. But was there information and discussions that would be consistent with someone running a darknet site and a mixer?

MR. EKELAND: Objection; leading.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MS. PELKER:

Q. So when Mr. Ekeland was asking you about whether there was anything related to Bitcoin Fog, what was your understanding of the question?

A. My understanding was related to Bitcoin Fog, the site by name or by a known URL, the .onion, anything explicitly linked to the website.

Q.   So you weren't saying that there wasn't evidence that would be relevant to determining whether Mr. Sterlingov's activity was consistent with running Bitcoin Fog?

        MR. EKELAND:  Objection; leading.

        THE COURT:  Sustained.

        You can rephrase the question.

BY MS. PELKER:

Q.   Was there -- in your review, did you see activity that would have been consistent with someone who was running a site like Bitcoin Fog?

        MR. EKELAND:  Objection; asked and answered.

        THE COURT:  Overruled.

        THE WITNESS:  Yes.

BY MS. PELKER:

Q.   And in your review of Mr. Sterlingov's devices, did you find evidence -- did you find multiple pieces of evidence regarding him connecting to different computers?

A.   Doing remote connections, yes, or numerous references to that and giving commands as we saw in the commands histories.

Q.   Did we show every single one or even a -- did we show all of those questions and evidence to the jury in your testimony yesterday and today?

A.   I don't believe so, no.

Q.   And regarding bunker, can you tell just from your review of the data that the government does have what was on bunker

for sure?

A.    No.

Q.    And could bunker be a home computer?

A.    Yes, it could.

Q.    Could it also be a server somewhere?

A.    Yes, it could.

Q.    And can you tell what files are on bunker from your review?

A.    No.  Especially since in the command histories, once the connection if it were successful was made to bunker or any other computer or server, the commands that were run next on it, would not appear in that same command history.  It would appear on the remote computer's command history.  So any files that may have been created or listed, would not have been visible to me.

Q.    So when Mr. Ekeland was asking whether you saw references to Bitcoin Fog in those connections, even if it were a connection to Bitcoin Fog servers, would you see that in these logs?

A.    No, not necessarily.

Q.    And based on your review of these -- this evidence of remote connections, what is your understanding of whether there are additional devices and electronics that the defendant controlled that the -- whether the government has actually been able to review all of them?

MR. EKELAND:  Objection; compound, vague and ambiguous.

THE COURT:  Overruled.

THE WITNESS:  I believe there was at least one other device or computer that the team did not review.

BY MS. PELKER:

Q.   And did you see evidence that the defendant was connecting to multiple -- was connecting to remote devices or remote devices at various times?

A.   Yes.  There were multiple connection attempts in the commands that appeared under different profiles and at different points in the file.  I wouldn't be able to tell you exactly when in time without going deeper into the laptop forensics.  But in general, yes.

Q.   If we could pull up Exhibit 723.  And here Mr. Ekeland was asking you about the indication of bunkerX_home.  Does home in this exhibit necessarily mean a home computer?

A.   I didn't understand it that way personally when I read it.  But --

Q.   How would you read this?

A.   As the Linux directory home, because there is Linux directory home, because there is a Linux directory media as well.

Q.   And can you explain what the Linux home directory is?

A.   It is the directory that contains the user profiles.

Q.    Is that on any Linux device, including a device or server?

A.    Yes, generally they would all have home.

Q.    Turning briefly to the Romania server review.  When you -- the defense -- Mr. Ekeland asked you about searching P cap for certain words related to this case, do you recall that line of questioning?

A.    Yes.

Q.    And would you necessarily -- in P cap going through a server's network traffic, would the -- would you necessarily expect to see Shormint or Bitcoin Fog appearing in plain text that you could search?

A.    A lot of network traffic is encrypted, for example, anything going over https or like some of the encrypted connections, TCP connections that were described earlier, it was full content P cap.  But a decent amount I would say of the contents were encrypted.  So the main value would be from the source and destination IPs and the size of the data more so than specific contents.

Q.    And because the data is encrypted, what impact does that have on your ability to do meaningful keyword searches?

A.    The keyword searches would only hit on terms that were there all together within a packet, not encrypted.  So simply, the keyword searches would not be able to read all of the packet's data.

Q.    And defense counsel asked you about, I think, checking IP

addresses against the Bitcoin addresses in the Bitcoin Fog cluster. Do you remember that question?

A. Yes.

Q. Are IP addresses the same as Bitcoin addresses?

A. No.

Q. So would you expect to see an IP address in a list of Bitcoin addresses?

A. Not in a list of Bitcoin addresses.

Q. Mr. Ekeland asked you about the LTE router device. Do you recall that line of questions?

A. Yes.

Q. And he asked whether the LTE router could have been purchased on Amazon. Have you ever seen this device for sale on Amazon?

A. I have not.

Q. I would like to pull up Defendant's Exhibit 32, the device report.

And, Ms. Mazars, can you explain again, what the purpose was of putting together this sort of high level summary?

A. When I pulled the images, which were named mostly by their evidence number, from FBI's network and analyzed them, there were quite a few of them that I ended up adding into my forensic tool. And during case discussions, it started to become more and more cumbersome to refer to specifically which one out of memory, the one that has the Xeoma security camera,

the one that has this.  So for ease of discussion and just to document my work in general, I made this summary to make a simplified clear version of the images I added to the tool at that time.

Q.   So does a summary list all of the relevant files that were found on the device or things that kind of stood out to you to jog your memory about a particular device?

A.   It was to jog memory about a particular device.

Q.   So does what is listed here in the summary section necessarily note all of the files of interest that you discovered on those devices?

A.   No, it doesn't.

Q.   And if we could scroll down to the BitLocker drive that defense asked you about.  CS Mazars, was this a case that FBI and IRS worked together?

A.   Yes.

Q.   Was some evidence initially acquired by IRS and others by FBI?

A.   Yes, I think so.

Q.   And did IRS make some of the initial images of the devices seized from the defendant when he was arrested?

A.   Yes, I believe so.

Q.   And did you then later review images of some of those devices?

A.   Yes.

Q. And is it your understanding that IRS provided those images to the FBI?

A. Yes, IRS did provide some images or copies of images to FBI on hard drives.

Q. And specifically regarding 1B13, is this simply a drive from IRS that contains the images of Mr. Sterlingov's devices?

A. Yes, it was.

Q. And is that why it was included in the 1B numbers for Mr. Sterlingov's case?

A. It was. Because it was in the same -- stored in the same place on the network as the other images. And since I ingested it into my tool at the time of the report, I included it in the summary.

Q. I would like to turn briefly to your IP overlap analysis. And first, CS Mazars, just to be clear do people who are not criminals use Linux and SSH and VPNs and proxies?

A. Yes.

Q. But in your work, is it relevant when you see someone who is suspected of a crime using those services?

A. Yes, it is.

Q. And why is that?

A. Because anonymity is a big feature of any type of cybercrime. And observing which tools and techniques are used can greatly assist the investigators in trying to peel back those layers of anonymity and attribute the activity.

Q. And are these, in fact, tools that criminals use to try to conceal their activity from law enforcement?

A. Yes.

Q. Regarding your IP address analysis, Mr. Ekeland asked you about certain groupings. Do you recall that line of questions?

A. Yes.

Q. As well as attribution?

A. Yes.

Q. Now, was your role in doing the IP address analysis when you were -- you were doing this part of your review to make individual attributions of who was controlling the account?

A. No, it wasn't.

Q. And, in fact, if we could actually scroll over to the first tab here.

Were the accounts that you reviewed for many of them already previously attributed or had some attribution information with them?

A. Yes.

Q. So what was your -- when -- what was your purpose in doing this review?

A. It was to compare the sources and look for commonalties specifically, in IP addresses occurring across multiple sets of logs and, in particular, the ones that occurred close together in time.

Q. And were you ruling out attribution when you were doing

this when you were doing your IP address analysis and looking at the Shormint account, were you saying that it definitely was not associated with any other particular address?

MR. EKELAND:  Objection; leading.

THE COURT:  Sustained.

You can rephrase the question.

BY MS. PELKER:

Q.    If we could go to the tab of 123 underscore chart here.

Now, Mr. Ekeland was asking you about the connections between the Shormint account and some of the other accounts. Do you recall that?

A.    Yes.

Q.    And looking at this tab here, can you walk through what -- just note the different accounts that were accessed by this 123 IP address?

A.    Liberty Reserve Shormint account, the Mt. Gox Volf.prius account, the Liberty Reserve account for plasma@plasmadivision.com, the Mt. Gox account for Peter NFS, and the Mt. Gox account for Kolbasa.

Q.    So does this include both the Liberty Reserve Shormint account and Mr. Sterlingov's true name Liberty Reserve PlasmaDivision account?

A.    Yes, it does.

Q.    And does it also include the Peter NFS Kolbasa and Volf.prius burner or short-term use accounts?

A.   Yes.

Q.   And what was the significance of the timing proximity of all of these accesses for you?

MR. EKELAND:  Objection; leading.

THE COURT:  Overruled.

THE WITNESS:  I noticed that --

BY MR. PEARLMAN:

Q.   We don't have to go through all of the time stamps.

MR. EKELAND:  Objection, Your Honor.

THE WITNESS:  I am trying to summarize.

I noticed that all of the accesses happened in late November of 2011.  And that in terms of time sequence, some accounts that were visited, most notably here, Liberty Reserve Shormint account were visited again after other accounts in order.  So that matter of a few days definitely caught my attention.

The groupings finding that I believe Mr. Ekeland was referring to was from an initial IP overlap writeup I did where I took an extremely conservative approach and focused on what I considered the closest overlaps.  That was a way of filtering a dataset that had so many IPs into this core set of interest.

MR. EKELAND:  Objection, Your Honor.

Could we pick up the phone for a moment?

(Conference held at the bench.)

MR. EKELAND:  Your Honor, I am wondering now if what

I just heard from the witness is that she now has a different expert opinion than what was disclosed in her expert report. She just testified that what she was talking about when I crossed her on was in an initial expert opinion. But there has been no additional expert opinion disclosed to us. And it is my understanding that the time for expert conclusions are well past. And so I am a little bit -- I don't know what to think of what I just heard.

THE COURT: Ms. Pelker.

MS. PELKER: I don't think that is at all what the witness was testifying to. She was explaining her -- Mr. Ekeland was crossing her on this initial report. We provided and presented testimony about this summary spreadsheet that lists out the different IP addresses. She is not offering a new opinion.

MR. EKELAND: Your Honor, to the extent that she is offering or disclosing a new expert opinion that has not been disclosed to the defense, we object.

THE COURT: That is the question though. Ms. Pelker is saying she is not, so you need to explain to me why she is.

MR. EKELAND: Because she just testified this was in an initial report and somehow this chart that she was testifying was somehow different. But if I recall correctly that chart was in the initial report, so I am just very confused. Is the witness testifying that she has reached a new

expert conclusion different than her initial report?  Maybe we should --

THE COURT:  Ms. Pelker, I don't know if you to want ask the question, if it needs to be.  I am looking at the real time and I just don't see this in the real time.  So it is maybe that it is just not accurately captured at this point. But I don't see this in the real time as I am looking at it now.  I see a reference to an initial IP overlap writeup.  I don't see a difference in different reports.

MS. PELKER:  I think that we may just also be talking a little bit about apples and oranges.  This is just a summary of different log ins and time stamps.  There was a report and an assessment of certain events that were in such close temporal proximity that she could say with near certainty that these were the same individuals.  She is presenting this and saying she is looking at this and these are the different time stamps.  And she is commenting on the temporal proximity.  That is not a different opinion.

THE COURT:  All right.  I guess I don't see any basis for thinking there is a different opinion that hasn't been disclosed here.  So to the extent there is an objection, it is overruled.

(End of bench conference.)

THE COURT:  You may continue.

BY MS. PELKER:

Q.    CS Mazars, were you done with your answer?

A.    No.  I was continuing to try to provide more clarity around the summary spreadsheet and it's -- my process of putting it together.

Q.    Could you go ahead and explain based on what is here in front of you of this summary chart, based on what is here in front of you with this summary chart how you're able to view the different accesses and connections?

A.    I'm sorry.  What do you mean, how can I view them?

Q.    What is your -- can you explain the significance of these accesses and times related to --

          MR. EKELAND:  Objection, Your Honor.

          THE COURT:  What is the objection?

          MR. EKELAND:  There was a pending question.  And then counsel was testifying and not asking a question.

          MS. PELKER:  I am happy to go back to the question. I was trying to be responsive to Mr. Ekeland's concerns.

          Can we actually read back what the question was?

          THE COURT:  I think if you are asking -- I think your question was, "Could you go ahead and explain based on what is here in front of you of this summary chart, the basis on what is here in front of you with the summary chart, how you are able to view the different accesses and connections?"

          MS. PELKER:  That is not artfully --

          THE COURT:  Maybe you want to rephrase the question.

MS. PELKER:  Thank you, Your Honor.

BY MS. PELKER:

Q.   CS Mazars, can you explain how you are able to connect different accounts together or make assessments about them based on this IP analysis?

MR. EKELAND:  Objection; leading.

THE COURT:  Overruled.

THE WITNESS:  So for this IP analysis and to make this table where I took the IPs as -- that as I explained, I first located as being of interest, and then went back in their data sources to pull all of their occurrences, once I did that to make these tables, where I see all of the times that each IP appeared in different files and seeing them all being in late November from a particular source, to me, the equivalent might be if you were investigating a bank robbery and you got information that someone saw a 2012 white Nissan Altima outside of the bank at that time, outside of a house where some of the money was found; and then, in another source, you look at the Home Depot security footage and before the robbery, there was a white, you know, Altima of the same year there.

Many different people can drive that type of car. But whether or not they are connected, you have to consider how it looks depending on in what order the events -- it was spotted and how close together.  And so from analyzing many sets of IPs, I look at this data all together.  And I don't see

this as different people driving the car.  This, to me, is one complete story and I believe that it was the same user accessing all of them.

MR. EKELAND:  Objection, Your Honor.  Can we talk on the phone for a second?

(Conference held at the bench.)

MR. EKELAND:  To the extent that the witness just testified that the same user accessed all of these accounts, that is not what was disclosed in her expert report.  Her expert report clearly says that she groups two users -- I asked her about this on Daubert.  This is not -- I don't understand this testimony.

THE COURT:  Ms. Pelker.

MS. PELKER:  Your Honor, defense counsel crossed her on the assessments here and how multiple people can be using these different proxy servers.  We just asked her to explain how she has put together this chart.

MR. EKELAND:  She just testified that the same user is behind all of these accounts and that is not what was disclosed in her expert report.

THE COURT:  I do think that Ms. Pelker is right on this.  You did open the door on this yourself on your cross-examination by asking her and sort of suggesting to her they were all different and can't be connected.  And the government is entitled to come back and rebut the impression

that you left in that regard, so the objection is overruled.

MR. EKELAND: Your Honor, may I be heard?

THE COURT: You have been heard, but you can be heard again, if you would like.

MR. EKELAND: If I recall her testimony correctly, she said that she grouped the users into two groups. And that one -- she testified that one user accessed the emails and in the accounts related to Mr. Sterlingov and Volf.prius and the other account, which was the Shormint related emails were separate and so we object.

THE COURT: I understand.

Go ahead.

MS. PELKER: For the record, that wasn't the Daubert hearing testimony. She was asked very specifically about two distinct groupings that she had done as part of her initial analysis. She explicitly said that this was not saying that these groups -- that those users were not grouped together.

THE COURT: I have ruled on the objection and we can move on.

(End of bench conference.)

THE COURT: The witness is excused. Thank you.

THE WITNESS: Thank you.

MR. PEARLMAN: May I get the next witness, Your Honor?

THE COURT: Yes.

THEODORE VLAHAKIS, sworn.

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

THE WITNESS:  Thank you.

THE COURT:  All right.  And you may proceed.

DIRECT EXAMINATION

BY MR. PEARLMAN:

Q.   Hi, sir.  How are you?

A.   Good.  How are you?

Q.   Good.  Could you -- I don't know if you introduced yourself before, but can you again introduce yourself to the members of the jury.  State your first name and your last name and spell it, please?

A.   Hi.  Good morning.  My name is Theodore Vlahakis.  Last name is spelled V, as in Victor, L-A-H-A-K-I-S, as in Sam; first name is Theodore, T-H-E-O-D-O-R-E.

Q.   Where do you work?

A.   I work at the US Department of Treasury, Financial Crimes Enforcement Network, commonly known as FinCEN.

Q.   What is FinCEN?

A.   FinCEN is a bureau of the US Department of Treasury tasked with protecting the US financial system against money laundering and similar types of financial crimes.

Q.   Can you tell us a little bit about your education and experience insofar as it relates to your present job?

A. Yes. I have a BA from Brandeis University. And I have a JD from University George Mason School of law. And I am a member of the District of Columbia bar.

Q. When did you start working for FinCEN?

A. March of 2009.

Q. And what was your starting title and responsibilities?

A. Starting title was Bank Secrecy Act resource center specialist. And that position involved answering regulatory inquiries about the Bank Secrecy Act, which is the federal anti-money laundering statute. And these inquiries came from financial institutions, regulators and law enforcement. And the responses were provided via phone and email.

Q. So if I, as a regulated body, had questions for FinCEN about how the rules might be applied, I could get in touch with FinCEN?

A. Correct.

Q. And by phone or by email?

A. Yes. And all responses were provided within at least 24 hours and the responses were not -- it was not a live line, so, you know, the caller had to leave a voicemail, but they were responded to very promptly.

Q. At some point, did you move to the enforcement division at FinCEN?

A. Yes.

Q. What does that division do?

A. That division essentially investigates financial institutions for possible violations of the Bank Secrecy Act, which is, again, the federal anti-money laundering statute and takes necessary action against those institutions.

Q. And did you say your current role was -- what is your current title?

A. My current role is senior compliance officer.

Q. So can you tell the jury a bit about your current responsibilities?

A. Sure. I educate financial institutions about their compliance obligations under the Bank Secrecy Act. I provide training to internal and external stakeholders. So that could be a new hire, it could be an interdivisional training. I also provide training to law enforcement, US Attorney's Offices. And I testify as a fact witness in criminal money laundering trials.

Q. Can you explain what the Bank Secrecy Act is?

A. Yes. So the Bank Secrecy Act is a federal anti-money laundering statute that was enacted in 1970. And it requires financial institutions to keep certain records relating to transactions, to file reports relating to certain transactions, to engage in transaction monitoring to have an anti-money laundering program. And the purpose of this is to help protect the financial system.

Q. How does it help protect the financial system?

A.   Okay.  As I mentioned, the financial institutions need to file certain reports with FinCEN.  I will just use that as an example.  These reports include, currency transaction reports or CTRs.  And those are reports for any transaction in currency exceeding $10,000 by or on behalf of a person or entity during the course of a business day, whether or not they may be suspicious.

Another type of report is a suspicious activity report or SAR.  Those reports are filed by financial institutions if they believe that suspicious activity has possibly occurred, suspicious transactions may have occurred.  And those reports, are -- once we receive them, they are electronically filed.  They are input to a database.  And that database is searchable by law enforcement as they conduct their investigations and FinCEN staff with a need to know.  And that aids in conducting these investigations, and as we say, following the money trail.  Because these reports contain crucial information about the types of transactions, who is involved, all identifying information.  And so it allows law enforcement to put the pieces together when they conduct their investigations.

Q.   And as a general matter, how does FinCEN ensure compliance with the institutions that it regulates in terms of anti-money laundering?

A.   A number of ways.  We -- to ensure compliance, as I mentioned, there is the regulatory helpline.  And that is more

of a passive route. So if an institution has questions, for example, when should they file one of these reports like a CTR, SAR they can contact this helpline. So any type of questions related to recordkeeping, anti-money laundering programs, reporting they can call the helpline. FinCEN also engages in proactive training with regulators and financial institutions.

And FinCEN has an extensive publicly available website with training guides. And so, for example, if an institution would like to know what to put in their anti-money laundering program, we have guidance or what may constitute a suspicious activity report. And we have guidance and that guidance always states the contact information on the regulatory helpline if they have questions.

Q. For the anti-money laundering program, what is the expectation of what these institutions are supposed to be doing to police themselves?

A. So the overarching purpose of the anti-money laundering program is to -- we want to help ensure the financial institution is not laundering money, wittingly or unwittingly. So we impose four requirements on the institutions as a part of this anti-money laundering program.

The first one is policies and procedures. They need to have policies and procedures to ensure compliance with our requirements under the BSA. They need to have what is called a compliance officer. So that is just somebody who is in charge

of filing the necessary reports, as I mentioned, keeping records. And basically just ensuring that the institution is not laundering money. They need to have an independent review of this program. So somebody who is, obviously, not the compliance officer, not working at the institution, auditing the program. And they need to have -- excuse me -- education and training of the staff in our requirement, so some type of training program that they hold at regular intervals.

Q. Do you know what know your customer laws are?

A. Yes.

Q. Can you explain that and how that relates to FinCEN?

A. Yes. So know your customer is very similar to the anti-money laundering program that I just described. And know your customer essentially requires financial institutions to have a reasonable belief that they know the identity of the person conducting the transaction. And so how would they do that? Obtaining a government issued ID, for example, or if they can't do that, you know, a reasonable alternative. So that they know if, let's say John Smith wants to send money somewhere or goes to a bank and wants to open an account, they know that this person actually is John Smith. So they need to collect the appropriate ID.

Q. For all of these rules and regulations of FinCEN, does FinCEN offer any online assistance to publicize what those rules are?

A. Yes.

Q. And so does it have its own website?

A. Yes. The website is www.FinCEN.gov. And the way the website works is we have tabs like on the upper part of the screen. And you can -- if you are a certain type of financial institution, for example a bank, you can click on banks and it will list all of the guidance pieces, webinars, administrative rulings, advisories, FAQ documents that you may be looking for. For example, you mentioned know your customer. We have guidance pieces on that, webinars. And also let's say, I don't know where to look on the website. We have a search bar in the upper right, works very much like Google. So I can type in know your customer or anti-money laundering program. And it will pull up a list of all related documents.

So even if you are not a savvy user or experienced user of our website, it is pretty easy to find what you are looking for.

Q. Has FinCEN provided guidance about virtual currency?

A. Yes.

Q. And did FinCEN provide guidance about virtual currency in March of 2013?

A. Yes.

Q. Where is the main office of FinCEN?

A. Washington, DC.

Q. I want to show you a couple of forms. Ms. De Falco, if

you could pull up 35B. Thank you.

This is not in evidence.

THE COURTROOM DEPUTY: Okay.

BY MR. PEARLMAN:

Q. Do you recognize what this form is?

A. Yes.

Q. What is this form?

A. This form is FinCEN form 107, registration of money service business or RMSB.

Q. And is this form something that a money service business would need to fill out to comply with the rules of FinCEN?

A. Yes.

Q. And does it --

MR. PEARLMAN: At this time, we would move to introduce 35B, Your Honor.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: Exhibit 35B is admitted and may be published to the jury.

(Whereupon, Exhibit No. 35B was admitted.)

BY MR. PEARLMAN:

Q. Okay. So showing the jury 35B. This is the registration of money service form. Is this something that is filed by mail or filed electronically?

A. Electronically.

Q. And does a person or business need to file this regardless of what state or District of Columbia they are in?

A. Yes. Excuse me. Yes.

Q. And I don't want to go into specifically what a money service business is. But do you need to register if you are a money service business?

A. Yes, within 180 days of establishing your business.

Q. Just going down this form, if we could look at page 2. Do you see where it says registrant information?

A. Yes.

Q. And does that include what is listed as part 3, individual's last name or entity's legal name?

A. Yes.

Q. Does the form also through 7 through 11 give you an opportunity to provide address type information?

A. Yes. Correct.

Q. What is there at number 16 that you can also provide?

A. Field 16, email address.

Q. And just looking at number 18, what does that indicate?

A. Name of compliance contact person for this registered MSB.

Q. If we could go to page 3, number 34. Is this where someone would indicate where they are physically located and/or providing MSB activities?

A. Correct.

Q. And does that include the District of Columbia?

A. Yes.

Q. And if you could go to page 4, please. Do you see at 36, where it indicates money service business activities of the registrant in the US?

A. Yes.

Q. With one of those -- would you read what box is at letter F?

A. F, money transmitter.

Q. Okay. We can pull this down. So does FinCEN regulate the -- how does FinCEN regulations work with state regulations concerning money laundering and these businesses?

A. Each state may have different requirements. And so those requirements are left up to the states. But FinCEN is concerned with the Bank Secrecy Act, which is federal in nature. And so someone may be in compliance with their state requirement, let's say, but not with FinCEN. And so we are just concerned with the federal requirements under the BSA.

Q. Does FinCEN maintain the registrations filed on behalf of the individuals who file these forms?

A. Yes.

Q. And do they keep the records?

A. Yes.

Q. And are the records preserved in the course of business?

A. They are, yes.

Q. Is FinCEN sometimes asked to perform searches of its

databases to determine whether someone is registered with FinCEN as a particular type of business?

A.   Yes.

Q.   And if I could show 35C.  What do you recognize what type of -- just looking at page 1 and 2.

And these are already into evidence.

Do you recognize what this form is?

A.   Yes.

Q.   Is this an example of a response to a research request?

A.   Yes.

MR. PEARLMAN:  Okay.  We can pull that down.  The Court's indulgence.

Pass the witness, Your Honor.

THE COURT:  All right.  Mr. Ekeland, any questions?

CROSS-EXAMINATION

BY MR. EKELAND:

Q.   You testified that FinCEN didn't offer any guidance on virtual currencies until March 2013; is that correct?

A.   That was an official guidance piece that we issued in 2013.

Q.   And in 2011, had FinCEN issued any guidance whatsoever in relation to cryptocurrencies?

A.   2011, FinCEN issued what is called the MSB or money service business final rule.  And that 2013 guidance is actually just explaining the relevant portions of that rule,

that certain entities engaging in cryptocurrency exchange would be required to register.

Q.    And were those -- did that include mixers in 2011?

A.    I'm sorry, sir.  Could you please --

MR. PEARLMAN:  Objection; beyond the scope.

MR. EKELAND:  They have brought him in to testify about money business licensing registration.  And I am asking for clarification on the rule that Mr. Pearlman asked him about the guidance in March of 2013.

THE COURT:  Let's pick up the phone.

(Conference held at the bench.)

MR. PEARLMAN:  Your Honor, we tried to circumscribe this testimony in conformance with your order that we not get into details about which Your Honor might instruct the jury. It seems that Mr. Ekeland is going directly to whether the FinCEN rules apply to the specific facts of this case.  And so we think that this is not only beyond the scope, but it is inappropriate.

MR. EKELAND:  I am not trying to get into that, Your Honor.  And I can maybe clarify my question.  What I was really trying to get to is whether or not FinCEN had offered any guidance on cryptocurrency before 2013.  Because when he testified in response to Mr. Pearlman's question that FinCEN had issued guidance in March 2013 on cryptocurrencies, it wasn't clear to me whether or not there had been prior

guidance. So that is merely what I was asking on.

THE COURT: Although I think he answered that question already by saying there was the prior regulation, which the guidance then explained. And then I think your question that drew the objection was essentially, were mixers covered in 2011, which I think does cross the line that we all agreed upon and is something in which I would be instructing the jury about what the rules were. It wasn't a rule in 2011, that is an issue to take up with me, I think.

If you are asking for clarification with what kind of guidance was, you are entitled to, I suppose, ask about following up on Mr. Pearlman's questions.

MR. EKELAND: I will keep it to that, Your Honor. I wasn't -- I was actually surprised that he mentioned there had been the rule in 2011, so that caught me offguard, honestly.

THE COURT: Mr. Pearlman, does that address your concern?

MR. PEARLMAN: It does, Your Honor. But I guess I'd ask that at the end of his testimony that you just instruct the jury that you will be instructing as to what rules and regulations the jury will have to consider.

THE COURT: Any objection to that?

MR. EKELAND: No objection, Your Honor.

THE COURT: Okay.

(End of bench conference.)

BY THE COURT: You may proceed.

MR. EKELAND: Thank you, Your Honor.

BY MR. EKELAND:

Q. Just for clarity's sake, prior to March 2013 had FinCEN issued any guidance in relation to cryptocurrencies?

A. Guidance, no; rules relating to it, yes.

BY MR. EKELAND: No further questions, Your Honor.

THE COURT: All right. Any redirect?

REDIRECT EXAMINATION

BY MR. PEARLMAN:

Q. Without getting into what those rules were, did the guidance change what the rules were concerning cryptocurrency?

A. No. Just explained those rules.

MR. PEARLMAN: No further questions.

THE COURT: All right. The witness is excused. Thank you.

THE WITNESS: Thank you.

THE COURT: And members of the jury, I will instruct you on the law that you should apply in this case. And I think that was the reason we were being somewhat careful there is because it is up to me to tell you what the law is that you should apply in this case. And I will do that at the end of the case. All right. Anything else? Let's see now, who is your next witness?

MR. PEARLMAN: Larry Harmon, Your Honor.

THE COURT:  How long do you think it will take?

I am trying to figure out whether we should take an early lunch break or --

MR. PEARLMAN:  We could --

THE COURT:  I'm sorry.

MR. PEARLMAN:  I interrupted you, Your Honor.

THE COURT:  Go ahead.

MR. PEARLMAN:  I think it will take about a half an hour on direct at most.

THE COURT:  Does the jury have a preference to an early lunch break now or going for another 20 minutes?

Go for another 20?  I see some nods.

All right.  Lets go for 20 and we'll break at 12:30.

LARRY HARMON, sworn.

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Thank you.  Please be seated.

DIRECT EXAMINATION

BY MR. PEARLMAN:

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   Sir, can you introduce yourself to the members of the jury by clearly stating your first and last name and spelling your first and last name?

A.   My name is Larry Harmon, spelled, L-A-R-R-Y, H-A-R-M-O-N.

Q.   Mr. Harmon, were you arrested back in February of 2020?

A.   Yes.

Q.   Were you arrested in connection with the administration of a mixer called Helix and later Helix Light?

A.   Yes.

Q.   Were you criminally charged and thus arrested for that?

A.   Yes.

Q.   Was one of the charges that you had that you were charged with conspiracy to launder money?

A.   Yes.

Q.   In August of 2021, did you eventually plead guilty to one count of money laundering conspiracy, pursuant to the Title 18 U.S.C. 1956(h)?

A.   Yes.

Q.   Sir, I want to show you what has been marked for identification purposes as 45C.

Sir, while you are taking a look at the document, do you recognize this document?

A.   Yes, that is my plea agreement.

Q.   And on page 1, does it indicate your attorney, Charles Flood?

A.   Yes.

Q.   And then looking at the -- is that letter dated August 6, 2021?

A.   Yes.

Q.   If you could go to the last page or -- yes.  Where it says

defendant's acceptance, do you see that?

A.   Yes.

Q.   Is that your signature?

A.   Yes, it is.

Q.   And is that dated -- it appears to be 8/10/21?

A.   Yes.

Q.   Okay.  Did you sign this agreement and understand it?

A.   Yes.

Q.   Did you have a chance to consult with Mr. Flood about this agreement?

A.   Yes.

MR. PEARLMAN:  At this time, Your Honor, I'd like to introduce Government Exhibit 45C?

THE COURT:  Any objection.

MR. EKELAND:  No objection.

THE COURT:  Government Exhibit 45C is admitted and may be published to the jury.

(Whereupon, Exhibit No. 45C was admitted.)

BY MR. PEARLMAN:

Q.   Showing you page 1 of the exhibit when you testified it was a letter dated August 6 to Mr. Flood, is that what you were talking about?

A.   Yes.

Q.   And then just going to the last page where it said defendant's acceptance, is that what you were referring to?

A.   Yes.

Q.   And now I would like to show you Government Exhibit 45D, which has not been offered into evidence:  Do you recognize Government Exhibit 45D?

A.   It looks like my statement of offense.

Q.   We can take a minute to look at it.  Let's go to the last page.  Do you see a paragraph labeled defendant's acceptance?

A.   Yes.

Q.   Is that your signature at the bottom?

A.   Yes.

Q.   Is that also dated August 10th, 2021?

A.   Yes.

Q.   Is that the same date that you signed the plea agreement?

A.   Yes.

Q.   Okay.  Just go back up to the top, please, of page 1 where it says statement of the offense and related conduct.  Is this the statement of offense that you signed?

A.   Yes.

MR. PEARLMAN:  At this time, Your Honor, we would move to introduce Government Exhibit 45D.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  Exhibit 45D is admitted and may be published to the jury.

(Whereupon, Exhibit No. 45D was admitted.)

BY MR. PEARLMAN:

Q.    I just want to show the jury when you indicated statement of the offense and related conduct is this page 1 what you were referring to?

A.    Yes.

Q.    And does that say United States versus Larry Dean Harmon?

A.    Yes, it does.

Q.    And let's go to the last page.  When we were speaking about the defendant's acceptance, is that your signature there?

A.    Yes.

Q.    Sir, when you signed these documents, did you have a chance to consult with Mr. Flood, your counsel, about signing these documents?

A.    Yes.

Q.    And did you, in fact, plead guilty to money laundering conspiracy?

A.    Yes.

Q.    If I could ask you to speak up a little bit, sir.

A.    Yes, I did.

Q.    And speak into the microphone.  I appreciate that.

      Did the government dismiss other charges as part of that plea agreement?

A.    Yes, they did.

Q.    If we can go back to 45C.  And if you could go up to the top please, Ms. De Falco.

At the time that you pled guilty, did you have an understanding about what the maximum sentence under the statute was for the money laundering conspiracy?

A. It was 20 years.

Q. And by the way, who did you plead in front of?

A. Judge Beryl Howell.

Q. Judge Beryl Howell?

A. Yes.

Q. Is she the one who will be sentencing you?

A. Yes.

Q. And I need to ask you a couple of questions about the United States sentencing guidelines. Do you have a general understanding of what the United States sentencing guidelines are?

A. Yes.

Q. What is your general understanding?

A. So it is a point system in which your crimes get a point and any mitigating factors get a certain number of points. And then there is a chart that you add up those points. And it gives you what is the recommended sentencing that the judge should give.

Q. Is that usually within a range?

A. Yes.

Q. Does the judge have to follow that recommendation?

A. No, they don't, unless it is a mandatory minimum, then

they have to give the mandatory minimum.

Q. At least the mandatory minimum?

A. Right.

Q. But is that a place where the court is supposed to start and consider?

A. Yes.

Q. In your particular case, what is your understanding of the biggest factor in your charge that affects the guidelines?

A. For my case, it was the amount of money that -- or Bitcoin that went through my service that was the -- had the most points to my sentencing guidelines.

Q. And if you could go to page 2, Ms. De Falco. Keep going down, please.

Okay. Do you see there for the sentencing guidelines analysis at page 2 of 15? Do you see that?

A. Yes.

Q. And do you see a subparagraph, estimated offense level under the guidelines?

A. Yes.

Q. Can you read that first sentence?

A. "Your client agrees and will acknowledge at the time of the plea of guilty to the offense stated above that pursuant to USSG 1B1.3 your client is criminally responsible for laundering transactions totaling at least 354,468 Bitcoin, the equivalent of approximately $311,145,854 at the time of the transactions,

which quantity represents the total amount involved in your client's relevant criminal conduct. Your client further agrees that" --

Q. You can stop there.

A. Okay.

Q. And this will be available for the jury. So what is your understanding about how much laundering you took responsibility for, was it the full amount of the Bitcoin?

A. Yeah, that amount.

Q. And so in calculating the sentencing guidelines, what was determined to be the guideline range, the anticipated guideline range?

A. With that amount and for me, it was life in prison.

Q. Would that be affected by the statutory maximum?

A. Yes. So for that crime, there was a maximum of 20 years.

Q. So you could do no more than 20 years?

A. Correct.

THE COURT: Can I interrupt just to ask you a question. Is your lawyer here today?

THE WITNESS: No.

THE COURT: Did you consult with your lawyer before coming today?

THE WITNESS: Yeah.

THE COURT: Did you obtain advice about whether you should come here today from your lawyer?

THE WITNESS: Yes.

THE COURT: Are you comfortable being here and testifying today without your lawyer?

THE WITNESS: Yes.

THE COURT: Okay. I just wanted to make sure that he wasn't without counsel.

MR. PEARLMAN: And we have been in touch with his lawyer, Your Honor.

THE COURT: All right. Thank you.

BY MR. PEARLMAN:

Q. As a condition of your plea agreement, did you agree to provide cooperation to the government?

A. Yes.

Q. Ms. De Falco, could you turn to page 6, please.

Do you see in line 9, it says cooperation?

A. Yes.

Q. Could you just read that first sentence under subparagraph A?

A. "Your client shall cooperate fully, truthfully, completely and forthrightly with the office and other federal, state and local law enforcement authorities identified by this office in any and all matters as to which the government deems the cooperation relevant."

Q. And then a few lines down towards the right-hand side it says, "Any refusal." Do you see that?

A. Yes.

Q. Could you read that sentence and it is admittedly a lengthy sentence?

A. "Any refusal by your client to cooperate fully, truthfully, completely and forthrightly as directed by this office and other federal, state and local law enforcement authorities identified by this office in any and all matters in which the government deems your client's assistance relevant will constitute a breach of this agreement by your client and will relieve the government of its obligations under this agreement including but not limited to its obligation to inform this Court and the Departure Guidelines Committee of the US Attorney's Office for the District of Columbia of any assistance your client has provided."

Q. So to try to sum up, what is it you are seeking to get out of this agreement?

A. So I am seeking to get the prosecution to recommend a lighter sentence.

Q. To who should the government offer its recommendation?

A. To the judge.

Q. Does the judge have to follow what the government says?

A. No.

Q. And what is it that the government, to your understanding, expects in turn?

A. That I cooperate in helping them with any investigations

truthfully and to the best of my ability.

Q. Just the investigation regarding Bitcoin Fog or any other investigation the government asks you about?

A. Any other one.

Q. And if you fail to follow the terms of the agreement, what can the government do?

A. They can take away this agreement and not recommend any lighter sentence, but I will still have pled guilty.

Q. You still will have pled guilty?

A. Yes.

Q. Do you know somebody named Roman Sterlingov?

A. No.

Q. Let me ask you a couple questions about yourself. What area of the United States are you from?

A. Akron, Ohio.

Q. Do you have computer programming experience?

A. Yes.

Q. Do you have computer programming experience by education and formal training?

MR. EKELAND: Objection, Your Honor. Can we pick up the phone for a moment?

(Conference held at the bench.)

MR. EKELAND: Your Honor, I don't understand the relevance of this witness. He hasn't been -- and this is an objection we did raise before, but I don't understand. He

hasn't been noticed as an expert. He doesn't know Mr. Sterlingov. I don't see even how he is a fact witness. And what I am concerned about is where this is going is that it is an attempt by the government to back door in 702 testimony that hasn't been noticed.

I thought maybe that he -- maybe he was being brought in to testify, oh, he somehow, you know, mixed with Bitcoin Fog or there was some kind of factual basis. As I am flipping through the statement of the offense, I don't see that. So I am concerned here on relevance grounds, 702 grounds and frankly also 403, because of what he did was pretty bad.

THE COURT: All right.

MR. PEARLMAN: Well, so the fact that he did something that was, quote, pretty bad, does not establish a 403 violation. He has already testified he is here today to talk about his relationship with Bitcoin Fog. He used the Bitcoin Fog mixer. Mr. Ekeland has been aware for several months that Mr. Harmon was going to testify. And we provided discovery about Mr. Harmon.

THE COURT: Yeah. So it sounds to me like you have answered the question Mr. Ekeland raised. And so we have got another 2 or 3 minutes because I have to break because I have got something I need to do at 12:30, so why don't we continue.

(End of bench conference.)

THE COURT: You may continue.

MR. PEARLMAN: The objection is overruled, Your Honor?

THE COURT: Yes.

BY MR. PEARLMAN:

Q. Sir, did you have formal training in the area of computer science?

A. I had one semester in college.

Q. Did you have other just experiential training with computer programming and computer science?

A. My dad was a programmer. And he got me books on programming. I pretty much learned myself.

Q. Did you attempt to use those skills to use in the business world in the marketplace?

MR. EKELAND: Objection; leading.

THE COURT: Overruled.

THE WITNESS: Yes. I created many websites and made my life basically about programming.

BY MR. PEARLMAN:

Q. About programming?

A. Yeah, I used it to make a living.

Q. At some point, did you become familiar with something called the darknet?

A. Yes.

Q. Did you become familiar with something called Tor browser?

A. Yes.

Q.   Are you familiar with Tor browser?

A.   Yes.

Q.   Have you used Tor browser?

A.   Yes.

Q.   Did you observe anything about Tor browser related to the ability of someone to easily find specific sites on Tor browser?

          MR. EKELAND:  Objection; leading.

          THE COURT:  Overruled.

          THE WITNESS:  So can you rephrase that?

BY MR. PEARLMAN:

Q.   Sure.  Did you see a need within the darknet to be able to search for certain types of things on the darknet and try to satisfy that with your programming skills?

A.   Right.

          MR. EKELAND:  Objection; leading and compound.

          THE COURT:  Overruled.

          THE WITNESS:  So when I was on the dark web, I noticed there was lots of darknet sites, about five or six marketplaces, they are called.  There was about five or six big ones.  And in order to view them, you had to create an account, log in, and then you could see the different items through their search on each separate one.

          And I created a way that would make it so that you could search all of them from one website.

BY MR. PEARLMAN:

Q.   What did you call that website?

A.   Grams.

Q.   So was Grams only accessible through the Tor browser or was it accessible on the regular internet?

A.   Only through Tor.

Q.   So what did you have Grams set out to do?

A.   It was supposed to be the darknet search engine, but it only searched the darknet marketplaces and then I added features as time went on.

Q.   Let me show you what has been marked for identification purposes as 46 and 46A.  Let's start with 46.

Do you recognize what 46 is?

A.   Yes.  That is the homepage for Grams.

Q.   Let me show you what has been marked for identification purposes as 46A.  Do you recognize what 46A is?

A.   A frequently asked questions for Grams.

Q.   Is Grams a site that you controlled?

A.   Yes.

Q.   Are these fair and accurate versions of what someone might see if they went to Grams?

A.   Yes.

MR. PEARLMAN:  Okay.  Move to introduce Government Exhibit 46 and 46A?

THE COURT:  Any objection?

MR. EKELAND: Hearsay and relevance, in particularly in relation to the it look like frequently asked questions, it looked like there was a lot of hearsay in there and honestly relevance.

THE COURT: Can you page up for me to the frequently asked questions?

MR. PEARLMAN: It is not being offered for the truth, Your Honor, only to give examples to the jury of what the pages looked like.

THE COURT: All right. So I will go ahead and admit 46 and 46A, but instruct the jury this is not for truth of the matter asserted, but just so you can see what the website looked like.

(Whereupon, Exhibit Nos. 46, 46A were admitted.)

BY MR. PEARLMAN:

Q. So showing 46, is this an example of the homepage?

A. Yes.

Q. And up there in the left-hand corner, is that Grams?

A. Yes.

Q. And then, do you see something towards the bottom in the middle called Helix Light?

A. Yes.

Q. And then looking at 46A, what is Grams words?

A. Grams words was a copy of Google ad words where people could bid on keywords to get their ads placed on my search

engine.

Q. So, for example, if -- can you give us an example of that?

A. So if someone created an ad, let's say for cocaine, and they wanted it to be at the top of a search for someone searching for cocaine, they would create the ad through my site and then they could bid on how much they paid per view of that search engine and/or that search keyword to have their ad at the top and other people could bid on the same keyword.

Q. When did you first launch Grams?

A. April 2014.

BY MR. PEARLMAN: Is this a good place to stop?

THE COURT: I think this is probably a good place for our lunch break. It is a little after 12:30. Why don't we come back at 1:30. And I will just remind you, don't discuss the case, even amongst yourself, don't conduct any type of research and steer clear of someone associated with the case so you don't overhear any hallway chatter.

(Jury out at 12:34 p.m.)

THE COURT: All right. And the witness can take his break as well. I ask that you not discuss your testimony with anybody until it is complete and just be back at 1:30.

THE WITNESS: Okay.

THE COURT: I am going to ask my law clerk to bring you all copies of my opinion that I am getting ready to issue today on the Daubert issues relating to Reactor. And I am

going to ask that you treat it all under seal. And what I really want you to do is look at it. I don't think I have included anything in there that needs to be sealed, but I want you all to take -- put eyes on it, just to make sure that you agree with that. And if there is anything that you think I need to redact, I would ask that you let me know by the end of the day so that I can file this on the docket today. But if there is an issue, I want to make sure I don't inadvertently put something up that I shouldn't. All right.

MS. PELKER: One note, Your Honor.

THE COURT: Yes.

MS. PELKER: We do anticipate calling Ms. Bisbee after lunch. Is that still fine with the sequencing for the Daubert?

THE COURT: Yes. The opinion is issued as of when I hand it to you. I just won't put it up on the docket until then. I have already given you my reasons for this before. This is just more providing a more detailed explanation of the reasons that I gave fairly briefly from the bench.

MS. PELKER: Thank you, Your Honor.

THE COURT: Okay. Thank you.

(Recess taken at 12:35 p.m.)

C E R T I F I C A T E

I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.

Dated this 1st day of March, 2024.

_____
Sherry Lindsay, RPR
Official Court Reporter

BY MR. EKELAND: [22]  5/19 8/8
19/4 20/1 22/15 24/3 24/17 27/18
29/10 30/3 36/15 36/18 38/11
38/21 41/11 44/11 44/22 46/6 53/1
81/16 84/3 84/7
BY MR. PEARLMAN: [15]  64/7 71/7
78/4 78/21 84/10 85/18 87/19 89/1
93/10 97/4 97/18 98/11 99/1
100/15 101/11
BY MS. PELKER: [8]  54/7 54/19
55/7 55/14 57/6 63/7 66/25 68/2
BY THE COURT: [1]  84/1
MR. EKELAND: [49]  4/8 5/12 5/17
19/2 23/22 23/25 24/16 27/10 29/8
29/25 38/15 41/9 44/8 44/20 45/23
53/17 54/16 55/4 55/11 57/1 63/4
64/4 64/9 64/22 64/25 65/16 65/21
67/12 67/14 68/6 69/4 69/7 69/18
70/2 70/5 78/17 82/6 82/19 83/13
83/23 84/2 87/15 88/22 95/20
95/23 97/14 98/8 98/16 100/1
MR. PEARLMAN: [19]  53/25 70/23
78/14 81/11 82/5 82/12 83/18
84/14 84/25 85/4 85/6 85/8 87/12
88/19 93/7 96/13 97/1 99/23 100/7
MS. PELKER: [26]  4/4 5/2 5/8 8/2
19/1 19/19 22/13 23/17 27/14 29/6
36/14 38/10 45/21 53/6 53/16 54/5
65/10 66/10 67/16 67/24 68/1
69/14 70/13 102/10 102/12 102/20
THE COURT: [94]  4/2 4/6 4/21
4/24 5/3 5/11 5/15 8/5 19/3 19/21
23/19 23/23 24/1 27/13 27/15 30/2
36/17 38/13 38/18 41/7 44/9 46/1
53/2 53/8 53/13 53/18 53/20 53/24
54/1 54/3 54/17 55/5 55/12 57/3
63/5 64/5 65/9 65/19 66/3 66/19
66/24 67/13 67/19 67/25 68/7
69/13 69/21 70/3 70/11 70/18
70/21 70/25 71/5 78/16 78/18
81/14 82/10 83/2 83/16 83/22
83/24 84/8 84/15 84/18 85/1 85/5
85/7 85/10 87/14 87/16 88/21
88/23 92/18 92/21 92/24 93/2 93/5
93/9 96/12 96/20 96/25 97/3 97/15
98/9 98/17 99/25 100/5 100/10
101/12 101/19 101/23 102/11
102/15 102/21
THE COURTROOM DEPUTY: [8]  5/4
29/22 44/19 44/21 53/23 71/3 78/3
85/16
THE WITNESS: [20]  22/14 54/18
55/13 57/4 64/6 64/10 68/8 70/22
71/2 71/4 84/17 85/15 92/20 92/23
93/1 93/4 97/16 98/10 98/18
101/22

$

$10,000 [1]  74/5
$311,145,854 [1]  91/25

.

.onion [1]  54/24

1

100 [1]  3/15
10005 [1]  2/4
107 [1]  78/8
10th [1]  88/11
11 [1]  79/14
11:00 [1]  53/12
11:00 now [1]  53/9
11:01 [1]  53/19
11:15 [1]  53/9
11:22 [1]  54/2
123 [2]  63/8 63/14
12:30 [3]  85/13 96/23 101/13
12:34 [1]  101/18
12:35 [1]  102/22
1301 [1]  1/20

15 [1]  91/15
16 [2]  79/17 79/18
18 [2]  79/19 86/11
180 [1]  79/7
1956 [1]  86/12
1970 [1]  73/19
1:30 [2]  101/14 101/21
1B [1]  61/8
1B1.3 [1]  91/23
1B13 [1]  61/5
1st [1]  103/10

2

20 [6]  85/11 85/12 85/13 90/4
92/15 92/16
20001 [1]  2/9
20005 [1]  1/21
2009 [1]  72/5
2011 [11]  21/11 21/15 21/23 22/1
64/12 81/21 81/23 82/3 83/6 83/8
83/15
2012 [1]  68/16
2013 [9]  21/15 77/21 81/18 81/20
81/24 82/9 82/22 82/24 84/4
2014 [1]  101/10
2020 [1]  85/25
2021 [3]  86/10 86/23 88/11
2024 [2]  1/5 103/10
20530 [2]  1/14 1/17
21 [1]  87/5
21-399 [2]  1/4 5/4
24 [1]  72/18
27 [1]  3/13
29 [1]  1/5

3

30 [1]  2/3
32 [6]  3/13 26/17 27/12 27/15
27/17 59/16
33 million [1]  32/20
333 [1]  2/8
34 [1]  79/21
354,468 [1]  91/24
35B [6]  3/13 78/1 78/15 78/18
78/20 78/22
35C [1]  81/4
36 [1]  80/2
368 [1]  29/20
399 [2]  1/4 5/4

4

403 [2]  96/11 96/14
45C [6]  3/14 86/15 87/13 87/16
87/18 89/24
45D [6]  3/14 88/2 88/4 88/20
88/23 88/25
46 [8]  3/15 99/12 99/12 99/13
99/24 100/11 100/14 100/16
46A [8]  3/15 99/12 99/16 99/16
99/24 100/11 100/14 100/23

5

5.1527 [1]  1/17
513B [3]  44/17 44/18 44/20
54 [1]  3/4

6

601 [1]  1/16
6710 [1]  2/8

7

702 [2]  96/4 96/10
71 [1]  3/7
710A [4]  24/6 44/13 44/14 48/17
720 [1]  35/24
722 [1]  37/2
723 [2]  39/9 57/15
724 [1]  41/1
725 [1]  41/16
726 [1]  42/3
729 [1]  42/15

731 [1]  42/23
733 [1]  43/9
78 [1]  3/13

8

8/10/21 [1]  87/5
81 [1]  3/7
84 [1]  3/8
85 [1]  3/10
87 [1]  3/14
89 [1]  3/14
8th [1]  2/4

9

950 [1]  1/14
9:38 [1]  1/6
9:39 [1]  4/23

A

a.m [5]  1/6 4/23 53/12 53/19 54/2
ability [3]  58/20 95/1 98/6
able [10]  4/15 13/16 13/16 56/25
57/12 58/23 67/7 67/23 68/3 98/12
about [85]  8/6 10/18 12/22 13/13
13/21 14/24 19/22 20/14 21/10
22/21 25/8 26/19 26/23 28/17 30/4
30/19 32/9 32/10 32/13 33/2 33/24
33/25 34/3 34/6 34/18 35/2 35/25
39/10 41/22 42/4 42/16 42/25
43/10 44/9 44/25 52/16 53/11
54/20 57/16 58/4 58/25 59/9 60/7
60/8 60/14 62/5 63/9 65/3 65/13
66/11 68/4 69/11 70/14 71/24 72/9
72/14 73/8 73/10 74/17 77/18
77/20 82/7 82/8 82/14 83/8 83/11
85/8 87/9 87/22 89/9 89/12 90/2
90/11 92/7 92/14 95/3 95/13 96/3
96/16 96/19 97/17 97/19 98/5
98/19 98/20
above [2]  91/22 103/5
above-entitled [1]  103/5
absence [1]  17/15
absolutely [1]  45/23
abstract [1]  19/15
academic [1]  19/9
acceptance [4]  87/1 87/25 88/7
89/9
access [16]  4/10 4/16 11/21 12/13
18/14 31/20 33/8 34/13 34/16
39/25 40/4 40/9 45/16 46/14 49/3
52/7
accessed [4]  50/16 63/14 69/8
70/7
accesses [6]  16/16 64/3 64/11
67/8 67/11 67/23
accessible [2]  99/4 99/5
accessing [3]  37/18 40/12 69/3
account [24]  20/20 20/21 21/4
21/5 21/5 21/19 21/19 21/19 45/2 47/8
47/9 62/11 63/2 63/10 63/16 63/17
63/17 63/18 63/19 63/21 63/22
64/14 70/9 76/20 98/21
accounts [10]  62/15 63/10 63/14
63/25 64/13 64/14 68/4 69/8 69/19
70/8
accuracy [2]  19/6 19/10
accurate [2]  27/5 99/20
accurately [1]  66/6
acknowledge [1]  91/21
acquired [1]  60/17
across [1]  62/22
act [8]  25/14 72/7 72/9 73/2
73/11 73/17 73/18 80/14
action [3]  1/3 18/13 73/4
actions [1]  39/3
active [2]  47/14 47/16
activities [4]  45/22 46/23 79/23
80/3
activity [8]  31/2 55/3 55/8 61/25
62/2 74/8 74/10 75/11
actor [2]  31/6 31/9

**A**

actors [1]  46/13
acts [1]  35/8
actual [2]  10/1 51/6
actually [13]  16/18 16/23 20/2
 20/8 40/8 50/12 51/9 56/24 62/13
 67/18 76/21 81/25 83/14
ad [4]  100/24 101/3 101/5 101/7
add [2]  32/19 90/19
add-ons [1]  32/19
added [5]  28/12 28/15 28/21 60/3
 99/9
adding [1]  59/22
additional [2]  56/23 65/5
address [44]  10/16 10/21 10/25
 11/1 11/2 11/4 11/6 11/15 11/24
 12/4 12/8 12/11 12/15 15/5 15/22
 15/23 15/24 16/2 16/9 16/13 16/18
 16/24 18/4 18/17 20/2 20/4 20/9
 21/8 21/14 22/6 22/10 33/8 34/25
 35/6 46/23 59/6 62/4 62/9 63/1
 63/3 63/15 79/15 79/18 83/16
addresses [22]  11/8 11/8 11/11
 11/12 15/14 16/7 18/19 20/14
 20/16 22/5 35/3 35/3 52/12 52/15
 59/1 59/1 59/4 59/4 59/7 59/8
 62/22 65/14
administered [1]  23/7
administration [1]  86/2
administrative [2]  39/1 77/7
administratively [1]  39/6
administrator [1]  6/5
admit [1]  100/10
admitted [9]  27/15 27/17 78/18
 78/20 87/16 87/18 88/23 88/25
 100/14
admittedly [1]  94/2
ads [1]  100/25
advice [1]  92/24
advisories [1]  77/8
affected [1]  92/14
affects [1]  91/8
after [5]  29/2 29/18 64/14 101/13
 102/13
afternoon [2]  85/19 85/20
again [13]  10/24 41/5 42/9 42/24
 43/15 43/21 45/8 51/19 59/18
 64/14 70/4 71/11 73/3
against [8]  24/8 50/9 50/13 50/20
 52/15 59/1 71/22 73/4
agree [9]  14/2 23/15 46/17 47/2
 47/4 49/20 49/25 93/11 102/5
agreed [1]  83/7
agreement [11]  86/18 87/7 87/10
 88/13 89/22 93/11 94/9 94/11
 94/16 95/5 95/7
agrees [2]  91/21 92/2
ahead [7]  4/21 53/7 67/5 67/20
 70/12 85/7 100/10
aids [1]  74/15
airport [1]  29/17
Akemashite [1]  9/12
Akron [1]  95/15
Alden [1]  5/8
algorithm [1]  45/10
all [85]  4/2 4/12 4/21 4/24 5/15
 6/23 9/22 17/4 17/16 17/16 21/8
 21/22 23/15 25/16 26/4 26/5 26/10
 27/9 28/11 28/11 31/8 33/15 33/17
 33/24 33/25 35/20 40/24 41/25
 42/15 42/19 43/6 44/15 45/12 46/1
 47/19 49/4 49/5 49/9 50/22 53/2
 53/22 54/3 55/20 56/25 58/2 58/22
 58/23 60/5 60/10 64/3 64/8 64/11
 65/10 66/19 68/11 68/12 68/13
 68/25 69/3 69/8 69/19 69/24 71/5
 72/18 74/18 76/23 77/7 77/14
 81/14 83/6 84/8 84/15 84/23 85/13
 93/9 93/22 94/7 96/12 98/25
 100/10 101/19 101/24 102/1 102/4
 102/9

allow [1]  46/2
allows [3]  36/5 37/8 74/19
almost [1]  18/21
already [8]  22/20 28/8 50/10
 62/16 81/6 83/3 96/15 102/17
also [26]  8/17 10/2 20/21 21/5
 26/13 26/13 26/18 34/3 35/14
 40/19 40/20 46/25 49/7 49/10
 50/13 51/23 56/5 63/24 66/10
 73/13 75/5 77/10 79/14 79/17
 88/11 96/11
alternative [1]  76/18
Although [2]  20/24 83/2
Altima [2]  68/16 68/20
always [4]  16/2 30/11 51/12 75/11
am [50]  6/14 8/14 9/5 10/1 13/23
 14/14 14/16 15/9 15/17 16/20
 20/12 20/24 21/24 22/3 28/6 30/11
 32/22 32/24 36/11 36/20 38/8
 38/17 43/17 43/19 43/19 44/8
 46/15 48/2 48/13 49/23 50/23
 51/24 64/10 64/25 65/7 65/24 66/4
 66/7 67/16 72/2 82/7 82/19 85/2
 94/17 96/3 96/8 96/10 101/23
 101/24 101/25
Amazon [5]  13/12 32/3 32/4 59/13
 59/14
ambiguous [1]  57/2
AMERICA [1]  1/3
among [2]  16/6 53/10
amongst [1]  101/15
amount [6]  58/15 91/9 92/1 92/8
 92/9 92/13
analysis [31]  10/16 10/21 16/18
 16/19 16/24 17/19 18/1 18/4 18/22
 19/8 19/13 20/2 20/6 20/9 20/9
 20/13 21/8 21/12 21/14 22/6 22/10
 22/11 29/1 61/14 62/4 62/9 63/1
 68/5 68/8 70/16 91/15
analyze [1]  18/7
analyzed [1]  59/21
analyzing [1]  68/24
Android [1]  32/25
anonymity [3]  13/6 61/22 61/25
another [11]  31/1 31/19 32/16
 33/5 45/14 50/11 68/18 74/8 85/11
 85/12 96/22
answer [3]  19/2 19/3 67/1
answered [5]  18/3 19/1 55/11 83/2
 96/21
answering [1]  72/8
anti [12]  72/10 73/3 73/18 73/22
 74/22 75/4 75/9 75/14 75/17 75/21
 76/13 77/13
anti-money [12]  72/10 73/3 73/18
 73/22 74/22 75/4 75/9 75/14 75/17
 75/21 76/13 77/13
anticipate [1]  102/12
anticipated [1]  92/11
any [75]  4/14 4/18 5/25 6/2 6/3
 6/5 6/8 6/9 6/15 6/25 7/6 8/12
 9/15 9/17 9/18 17/15 17/23 18/5
 20/3 20/4 20/7 21/25 22/9 22/17
 22/18 22/19 23/20 24/13 27/13
 28/17 35/14 36/23 37/22 38/6
 38/19 43/19 47/21 48/2 48/10
 48/12 48/14 52/15 53/10 56/10
 56/13 58/1 61/22 63/3 66/19 74/4
 75/3 76/24 78/14 81/4 81/17
 81/21 82/21 83/22 84/5 84/8 87/14
 88/21 90/18 93/22 93/25 94/4 94/7
 94/13 94/25 95/2 95/4 95/7 99/25
 101/15 101/17
anybody [6]  9/10 9/13 9/16 10/12
 23/10 101/21
anyone [2]  22/17 53/15
anything [27]  4/2 6/24 9/1 9/3
 22/5 22/10 25/5 28/17 32/7 35/9
 36/21 37/12 41/24 42/20 43/17
 43/20 52/11 53/15 54/9 54/10
 54/21 54/24 58/13 84/23 98/5
 102/3 102/5

anyway [1]  50/10
anywhere [4]  6/15 6/18 6/21 17/15
apartment [1]  38/17
apologies [2]  44/17 44/18
apologize [1]  41/9
app [1]  10/5
appear [9]  6/15 6/18 6/21 11/8
 18/20 24/23 49/10 56/12 56/13
appearance [1]  4/5
APPEARANCES [3]  1/12 1/23 2/1
appeared [4]  9/21 10/4 57/11
 68/13
appearing [1]  58/10
appears [3]  47/10 47/23 87/5
Apple [3]  46/8 46/11 46/13
apples [1]  66/11
application [1]  36/8
applied [1]  72/14
apply [3]  82/16 84/19 84/22
appreciate [2]  4/20 89/20
approach [2]  5/6 64/19
appropriate [2]  8/7 76/22
approximately [1]  91/25
apps [3]  10/2 10/6 10/8
April [1]  101/10
April 2014 [1]  101/10
are [106]
area [3]  22/3 95/14 97/5
aren't [5]  9/20 11/12 24/23 32/21
 36/6
arguing [1]  46/1
argument [1]  49/2
around [3]  28/18 35/4 67/3
array [1]  25/10
arrested [5]  29/16 60/21 85/25
 86/2 86/5
artfully [1]  67/24
as [79]  6/7 6/12 6/12 8/24 10/22
 11/1 11/11 15/14 21/18 24/5 24/18
 25/14 25/15 25/24 26/3 26/17
 27/12 29/4 29/22 29/24 29/25
 31/21 33/7 34/7 35/8 35/23 37/1
 43/9 44/1 44/1 44/13 44/18 44/20
 48/16 51/20 52/13 53/13 55/19
 57/21 57/22 59/4 61/11 62/7 62/7
 66/7 68/9 68/9 68/10 69/1 70/15
 71/15 71/15 71/19 71/25 72/13
 73/15 74/1 74/2 74/14 74/16 74/21
 74/24 75/20 76/1 79/11 81/2 83/20
 86/15 89/21 93/11 93/22 94/5 96/1
 96/8 99/10 99/12 99/16 101/20
 102/15
ask [18]  8/5 19/23 21/12 23/23
 45/21 46/2 53/14 66/4 83/11 83/19
 89/18 90/11 92/18 95/13 101/20
 101/23 102/1 102/6
asked [19]  19/1 28/18 52/8 54/8
 55/11 58/4 58/25 59/9 59/12 60/14
 62/4 69/10 69/16 70/14 80/25 82/8
 99/17 100/2 100/6
asking [13]  8/3 8/6 28/6 54/20
 56/16 57/16 63/9 67/15 67/19
 69/23 82/7 83/1 83/10
asks [1]  95/3
aspects [2]  9/22 32/17
asserted [1]  100/12
assessment [1]  66/13
assessments [2]  68/4 69/15
assist [2]  26/20 61/24
assistance [3]  76/24 94/8 94/14
associate [1]  44/3
associated [3]  21/4 63/3 101/16
assumed [1]  17/8
attaching [1]  39/14
attempt [3]  11/10 96/4 97/12
attempting [1]  24/25
attempts [1]  57/10
attention [1]  64/16
attesting [2]  19/6 19/10
attorney [1]  86/19
Attorney's [2]  73/14 94/13
attribute [3]  20/8 22/18 61/25

**A**

attributed [1]  62/16
attribution [4]  31/24 62/7 62/16
 62/25
attributions [3]  20/3 20/5 62/11
auditing [1]  76/5
August [4]  86/10 86/22 87/21
 88/11
August 10th [1]  88/11
August 6 [2]  86/22 87/21
authentic [1]  27/5
author [1]  26/25
authorities [3]  51/22 93/21 94/7
authorization [1]  4/17
automatically [2]  40/6 46/8
available [3]  16/5 75/7 92/6
Ave [2]  1/14 1/20
Avenue [1]  2/8
avoid [1]  30/20
aware [15]  4/14 6/12 6/14 6/24
 8/14 9/5 9/6 13/19 13/23 32/2
 36/20 38/8 48/10 48/13 96/17
away [2]  34/13 95/7
Axiom [1]  10/7

**B**

BA [1]  72/1
back [25]  4/24 4/25 8/23 8/25 9/4
 15/14 17/12 35/21 42/8 45/14
 45/18 45/20 48/16 48/20 61/24
 67/16 67/18 68/10 69/25 85/25
 88/15 89/24 96/4 101/14 101/21
backing [2]  45/24 48/2
backs [1]  46/9
backup [7]  45/5 46/11 46/17 47/6
 47/9 47/11 50/8
backups [2]  46/10 50/10
bad [3]  46/13 96/11 96/14
bank [11]  68/15 68/17 72/7 72/9
 73/2 73/11 73/17 73/18 76/20 77/6
 80/14
Bankruptcy [1]  2/7
banks [1]  77/6
bar [2]  72/3 77/11
barriers [1]  46/22
based [5]  56/21 67/5 67/6 67/20
 68/5
Bash [6]  33/17 33/19 33/22 34/10
 34/15 42/24
basically [2]  76/2 97/17
basis [4]  14/6 66/19 67/21 96/8
be [87]  10/5 11/4 11/8 11/17
 12/14 12/16 13/13 13/16 13/16
 14/15 15/16 15/16 16/3 16/3 16/17
 17/19 17/21 19/12 19/17 19/24
 23/19 26/11 27/15 28/24 29/15
 29/21 30/13 30/20 30/25 31/3 31/8
 31/21 31/24 33/8 33/9 37/16 39/2
 39/20 40/19 44/3 44/4 47/10 47/23
 49/8 49/12 50/10 53/6 54/14 55/2
 56/3 56/5 57/12 58/16 58/23 61/15
 66/4 66/10 67/17 68/15 69/15
 69/24 70/2 70/3 72/14 73/13 73/13
 74/6 75/15 77/8 78/18 80/15 82/2
 83/7 83/20 85/16 87/5 87/17 88/23
 90/9 92/6 92/11 92/14 98/12 99/8
 101/4 101/21 102/3
because [30]  8/21 12/7 13/5 13/7
 13/13 15/13 16/1 26/6 28/15 28/24
 29/1 30/12 30/13 31/22 33/13
 38/19 38/25 48/1 57/21 57/22
 58/19 61/10 61/22 65/21 74/17
 82/22 84/21 96/11 96/22 96/22
become [3]  59/24 97/21 97/24
been [34]  17/1 18/12 18/15 20/17
 25/1 27/11 28/8 28/22 29/4 35/21
 44/9 45/24 47/25 51/19 55/9 56/14
 56/14 56/24 59/12 65/5 65/17
 66/20 70/3 82/25 83/15 86/14 88/3
 93/7 95/24 96/1 96/5 96/17 99/11
 99/15

**before [12]**  1/9 4/2 25/18 39/2
 53/15 53/22 68/19 71/11 82/22
 92/21 95/25 102/17
behalf [2]  74/5 80/18
behind [4]  20/3 22/17 25/1 69/19
being [16]  6/24 13/25 24/23 28/18
 32/14 39/4 40/21 43/20 45/11
 52/14 68/10 68/13 84/20 93/2 96/6
 100/7
belief [1]  76/15
believe [22]  10/1 10/18 12/21
 14/23 15/10 17/6 18/1 20/25 21/7
 23/3 25/21 28/19 29/21 34/22 43/1
 45/7 55/23 57/4 60/22 64/17 69/2
 74/10
bench [9]  64/24 66/23 69/6 70/20
 82/11 83/25 95/22 96/24 102/19
Beryl [2]  90/6 90/7
beside [1]  10/22
besides [1]  21/25
best [1]  95/1
better [2]  19/23 23/19
between [8]  9/10 9/15 10/12 15/21
 19/24 21/15 46/22 63/10
beyond [3]  38/13 82/5 82/17
bid [3]  100/25 101/6 101/8
big [5]  11/17 28/18 35/21 61/22
 98/20
biggest [1]  91/8
Bisbee [1]  102/12
bit [13]  27/19 27/21 33/11 35/2
 42/6 44/16 47/13 47/14 65/7 66/11
 71/24 73/8 89/18
Bitcoin [68]  5/25 6/3 6/5 6/8
 6/11 6/12 6/15 6/18 6/21 6/25
 7/16 7/21 8/1 8/9 8/12 8/18 8/21
 8/25 9/4 9/6 9/11 9/13 9/17 9/19
 10/13 12/10 20/20 22/7 25/6 28/10
 32/7 36/19 36/22 36/24 37/13
 37/14 37/16 40/24 41/24 42/13
 42/21 43/5 47/21 48/10 52/11
 52/14 52/16 54/9 54/11 54/21
 54/23 55/3 55/10 56/17 56/18
 58/10 59/1 59/1 59/4 59/7 59/8
 91/9 91/24 92/8 95/2 96/7 96/16
 96/16
BitLocker [5]  27/24 28/2 28/3
 29/15 60/13
blast [1]  47/17
blocking [1]  24/14
body [1]  72/13
bold [1]  48/20
books [1]  97/10
both [3]  19/22 41/4 63/20
bottom [3]  42/20 88/9 100/20
box [2]  30/14 80/6
boy [1]  44/20
Brandeis [1]  72/1
breach [1]  94/9
break [14]  35/7 53/3 53/5 53/7
 53/8 53/9 53/13 53/15 85/3 85/11
 85/13 96/22 101/13 101/20
briefly [7]  36/3 38/24 39/12 45/8
 58/3 61/14 102/19
bring [1]  101/23
BRODIE [1]  1/15
Brooklyn [1]  2/4
brought [2]  82/6 96/6
BROWN [2]  1/15 5/10
browser [14]  22/21 22/23 23/7
 23/11 23/13 23/16 49/21 49/23
 97/24 98/1 98/3 98/5 98/7 99/4
browsing [1]  14/18
BSA [2]  75/24 80/17
Btest [3]  47/18 47/19 47/23
build [1]  26/18
built [1]  31/16
bullet [2]  20/25 21/2
bunch [1]  25/13
bunker [6]  50/8 55/24 55/25 56/3
 56/7 56/10
bunkerX [11]  39/17 39/17 40/14

 40/15 41/5 41/12 41/13 47/16
 47/23 50/4 57/16
bureau [1]  71/21
burner [1]  63/25
business [14]  15/14 74/6 78/9
 78/10 79/1 79/5 79/6 79/7 80/3
 80/23 81/2 81/24 82/7 97/12
businesses [3]  15/8 15/18 80/11
businesses' [1]  15/13
buy [1]  32/2
buying [1]  13/12

**C**

cafe [4]  12/11 12/19 12/23 12/25
calculating [1]  92/10
call [4]  4/4 4/6 75/5 99/2
called [11]  16/4 34/19 36/5 52/16
 75/24 81/23 86/3 97/22 97/24
 98/20 100/21
caller [1]  72/20
calling [1]  102/12
came [4]  17/12 26/11 52/5 72/10
camera [1]  59/25
cameras [2]  43/25 44/5
can [89]  4/6 4/25 5/15 11/3 11/4
 11/6 11/15 11/24 13/8 19/9 23/10
 23/22 24/16 27/7 27/20 27/21 29/8
 29/25 30/2 30/13 32/2 34/11 34/12
 34/24 35/3 35/8 35/10 36/3 36/25
 37/1 40/17 41/6 41/14 41/15 42/12
 45/21 49/8 50/4 51/3 53/4 53/4
 53/7 53/13 55/6 55/24 56/7 57/24
 59/18 61/24 63/6 63/13 67/9 67/10
 67/18 68/3 68/21 69/4 69/15 70/3
 70/18 71/11 71/24 73/8 73/17 75/3
 75/5 76/11 77/5 77/6 77/12 79/17
 80/9 81/11 82/20 85/21 88/6 89/24
 91/20 92/4 92/18 95/6 95/7 95/20
 98/10 100/5 100/12 101/2 101/19
 102/7
can't [6]  19/5 22/16 33/13 46/13
 69/24 76/18
cap [3]  58/4 58/8 58/15
capability [2]  51/9 51/12
caps [2]  52/19 52/23
capture [4]  51/23 51/25 52/7
 52/10
captured [1]  66/6
car [2]  68/21 69/1
cards [3]  13/11 13/21 30/13
careful [1]  84/20
carving [3]  24/18 24/21 25/2
case [34]  4/5 4/6 4/13 5/4 12/14
 18/21 20/5 22/19 26/4 26/6 26/14
 26/20 27/3 28/10 28/18 29/14
 37/25 38/24 39/4 46/2 53/10 53/11
 58/5 59/23 60/14 61/9 82/16 84/19
 84/22 84/23 91/7 91/9 101/15
 101/16
cases [5]  15/15 16/22 17/2 31/22
 51/13
CATHERINE [1]  1/13
caught [2]  64/15 83/15
Ccips [1]  1/19
cell [3]  4/10 4/14 4/17
center [1]  72/7
certain [14]  9/8 39/4 48/2 51/8
 58/5 62/5 66/13 73/20 73/21 74/2
 77/5 82/1 90/18 98/13
certainty [2]  22/16 66/14
certify [1]  103/3
cetera [1]  8/19
chance [2]  87/9 89/12
change [5]  15/14 35/1 35/3 45/11
 84/12
changes [3]  35/6 35/9 35/10
characterize [1]  19/23
charge [2]  75/25 91/8
charged [2]  86/5 86/7
charges [2]  86/7 89/21
Charles [1]  86/19
chart [9]  63/8 65/22 65/24 67/6

**C**

chart... [5]   67/7 67/21 67/22 69/17 90/19
chat [1]   10/7
chats [1]   10/5
chatter [1]   101/17
check [1]   52/15
checking [1]   58/25
CHRISTOPHER [2]   1/15 5/9
circumscribe [1]   82/12
clarification [2]   82/8 83/10
clarify [3]   18/20 54/10 82/20
clarity [1]   67/2
clarity's [1]   84/4
clear [8]   21/13 29/15 48/18 48/23 60/3 61/15 82/25 101/16
clearly [2]   69/10 85/22
clearnet [1]   7/5
clerk [1]   101/23
click [1]   77/6
client [11]   37/9 48/5 48/8 48/11 91/21 91/23 92/2 93/19 94/4 94/9 94/14
client's [2]   92/2 94/8
close [5]   18/20 46/23 62/23 66/13 68/24
closest [1]   64/20
closing [1]   4/12
cloud [2]   45/5 50/11
cluster [4]   5/25 6/3 52/16 59/2
cocaine [2]   101/3 101/5
code [7]   8/12 8/15 8/16 8/16 8/21 8/25 9/7
collect [2]   13/20 76/22
college [1]   97/7
COLUMBIA [5]   1/1 72/3 79/2 79/25 94/13
com [1]   33/10
combine [1]   30/9
combined [1]   30/11
come [8]   4/25 11/20 15/5 15/14 16/2 69/25 92/25 101/14
comes [1]   49/6
comfortable [1]   93/2
coming [5]   11/19 11/20 11/25 14/15 92/22
command [7]   33/5 33/6 33/20 40/8 56/9 56/12 56/13
command-type [1]   33/20
commands [6]   33/21 34/1 55/19 55/19 56/11 57/11
comment [1]   8/3
commenting [1]   66/17
Committee [1]   94/12
common [3]   14/17 18/20 20/6
commonalties [1]   62/21
commonly [1]   71/19
communicated [1]   7/11
communicating [1]   52/13
communication [5]   9/10 9/15 10/12 39/3 52/7
communications [1]   11/3
companies [2]   14/3 49/14
company [2]   17/1 47/5
compare [2]   31/24 62/21
Comparing [1]   18/19
compatible [1]   28/12
complete [5]   4/15 12/12 53/14 69/2 101/21
completed [1]   52/4
completely [2]   93/19 94/5
compliance [9]   73/7 73/11 74/21 74/24 75/23 75/25 76/5 79/20 80/15
comply [1]   78/11
compound [2]   57/1 98/16
computer [35]   11/1 28/12 32/15 32/17 33/5 33/7 33/8 33/12 33/21 34/12 34/13 35/13 35/14 37/18 37/22 39/16 39/18 40/14 40/19 40/21 43/3 43/7 43/14 43/20 44/2

47/24 56/3 56/11 57/5 57/17 95/16 95/18 97/5 97/9 97/9
computer's [4]   11/2 24/22 40/12 56/13
computers [10]   34/16 36/6 37/11 37/22 38/3 38/7 38/12 38/16 38/23 55/17
conceal [2]   15/6 62/2
concern [6]   19/21 49/13 49/17 49/21 50/25 83/17
concerned [4]   80/14 80/17 96/3 96/10
concerning [2]   80/11 84/12
concerns [3]   49/16 50/15 67/17
conclusion [1]   66/1
conclusions [2]   20/13 65/6
condition [1]   93/11
conduct [7]   53/10 74/14 74/20 88/16 89/3 92/2 101/15
conducted [1]   18/22
conducting [2]   74/15 76/16
conference [8]   64/24 66/23 69/6 70/20 82/11 83/25 95/22 96/24
configuration [4]   25/25 36/4 36/21 36/23
configuring [1]   36/22
conformance [1]   82/13
confused [1]   65/25
confusion [1]   19/21
connect [11]   12/13 12/25 13/7 15/24 31/9 31/23 33/5 35/5 35/9 37/15 68/3
connected [4]   31/25 43/20 68/22 69/24
connecting [5]   12/22 31/8 55/17 57/7 57/8
connection [7]   31/7 31/7 35/7 56/10 56/18 57/10 86/2
connections [15]   34/8 36/6 36/6 37/9 37/10 43/17 47/24 55/18 56/17 56/22 58/14 58/14 63/9 67/8 67/23
connects [1]   16/15
conservative [1]   64/19
consider [4]   18/13 68/22 83/21 91/5
considered [1]   64/20
consistent [8]   37/17 40/11 40/21 43/2 43/13 54/15 55/3 55/9
conspiracy [4]   86/8 86/11 89/16 90/3
constantly [2]   49/4 49/9
constitute [2]   75/10 94/9
constitutes [1]   103/4
Constitution [1]   2/8
consult [3]   87/9 89/12 92/21
contact [3]   75/3 75/12 79/20
contain [1]   74/17
contains [2]   57/25 61/6
content [1]   58/15
contents [4]   3/1 27/8 58/16 58/18
context [3]   33/25 35/15 46/24
contexts [1]   11/7
continue [3]   66/24 96/23 96/25
CONTINUED [2]   1/23 2/1
continuing [1]   67/2
control [1]   44/4
controlled [2]   56/24 99/18
controlling [2]   4/11 62/11
convenience [1]   35/16
convenient [1]   35/12
convention [1]   17/17
conventions [1]   11/9
cooperate [3]   93/19 94/4 94/25
cooperation [3]   93/12 93/15 93/23
copies [2]   61/3 101/24
copy [2]   28/22 100/24
core [1]   64/21
corner [1]   100/18
correct [41]   9/23 10/19 11/4 12/5 12/8 12/12 12/15 13/22 14/1 14/4 16/7 16/14 16/19 17/5 17/6 18/18

18/25 20/5 21/6 23/2 25/13 29/12 30/10 33/17 34/1 34/16 37/25 38/4 39/21 40/1 40/5 41/3 41/10 42/10 44/5 72/16 79/16 79/24 81/18 92/17 103/4
correction [1]   46/8
correctly [4]   37/20 51/24 65/23 70/5
could [116]
could just [1]   50/6
couldn't [2]   19/12 52/12
counsel [10]   5/6 5/7 5/9 5/14 54/8 58/25 67/15 69/14 89/12 93/6
count [1]   86/11
couple [3]   77/25 90/11 95/13
course [4]   27/2 50/12 74/6 80/23
court [11]   1/1 2/6 2/7 4/10 4/18 5/13 7/13 91/4 94/12 103/3 103/13
court's [2]   12/4 81/12
courtroom [2]   12/3 23/10
Courts [1]   2/7
covered [1]   83/6
covering [1]   9/22
cray [2]   20/20 20/20
create [4]   26/3 26/14 98/21 101/5
created [7]   26/13 27/2 27/6 56/14 97/16 98/24 101/3
credentials [2]   6/8 6/10
credit [2]   13/11 13/21
crime [2]   61/19 92/15
crimes [3]   71/18 71/23 90/17
criminal [4]   1/3 5/4 73/15 92/2
criminally [2]   86/5 91/23
criminals [2]   61/16 62/1
CRM [1]   1/19
cross [6]   3/4 3/7 5/18 69/23 81/15 83/6
cross-examination [5]   3/4 3/7 5/18 69/23 81/15
crossed [2]   65/4 69/14
crossing [1]   65/12
crucial [1]   74/17
cryptocurrencies [3]   81/22 82/24 84/5
cryptocurrency [3]   82/1 82/22 84/12
CS [5]   54/8 60/14 61/15 67/1 68/3
CTF [1]   4/20
CTR [1]   75/2
CTRs [1]   74/4
cumbersome [1]   59/24
currencies [1]   81/18
currency [4]   74/3 74/4 77/18 77/20
current [4]   73/5 73/6 73/7 73/8
customer [5]   76/9 76/12 76/14 77/9 77/13
customize [1]   32/17
cyber [2]   35/15 35/20
cybercrime [1]   61/23

**D**

dad [1]   97/10
dark [1]   98/18
darknet [7]   54/15 97/22 98/12 98/13 98/19 99/8 99/9
data [36]   17/13 18/1 18/19 18/22 19/13 28/14 45/6 45/8 45/10 45/13 45/18 45/20 45/24 46/9 46/11 46/14 46/17 46/25 47/6 47/9 47/11 49/3 49/5 49/9 49/14 49/17 49/22 50/16 50/22 51/1 55/25 58/17 58/19 58/24 68/11 68/25
database [2]   74/13 74/13
databases [2]   48/9 81/1
dataset [1]   64/21
date [2]   21/14 88/13
dated [5]   86/22 87/5 87/21 88/11 103/10
dates [1]   10/1
dating [3]   10/2 10/5 10/6
Daubert [4]   69/11 70/13 101/25

Appx5061

**D**

Daubert... **[1]**  102/14
day **[4]**  30/5 74/6 102/7 103/10
days **[2]**  64/15 79/7
DC **[6]**  1/5 1/14 1/17 1/21 2/9
 77/24
de **[5]**  3/3 77/25 89/25 91/12
 93/14
Dean **[1]**  89/6
decent **[1]**  58/15
decrypt **[1]**  45/13
decrypted **[1]**  6/6
deems **[2]**  93/22 94/8
deeper **[1]**  57/13
defendant **[7]**  1/7 2/2 5/13 53/21
 56/23 57/7 60/21
defendant's **[8]**  26/17 27/12 54/11
 59/16 87/1 87/25 88/7 89/9
defending **[2]**  50/9 50/20
defense **[10]**  3/13 27/11 27/15
 27/17 54/8 58/4 58/25 60/14 65/18
 69/14
define **[2]**  19/11 19/15
definitely **[2]**  63/2 64/15
demonstrative **[3]**  29/23 29/24
 29/25
DEPARTMENT **[3]**  1/13 71/18 71/21
Departure **[1]**  94/12
depending **[3]**  11/25 45/10 68/23
depends **[1]**  50/13
depiction **[1]**  27/5
Depot **[1]**  68/19
Dept **[1]**  1/20
described **[3]**  23/14 58/14 76/13
describing **[2]**  18/16 31/6
designated **[1]**  17/8
designed **[1]**  18/22
destination **[1]**  58/17
detail **[1]**  9/23
detailed **[1]**  102/18
details **[2]**  38/25 82/14
detections **[1]**  37/8
determine **[1]**  81/1
determined **[3]**  29/2 29/18 92/11
determining **[1]**  55/2
developed **[1]**  22/23
device **[21]**  24/4 27/5 29/11 29/16
 30/5 30/6 30/15 30/21 31/9 32/6
 51/14 51/15 57/5 58/1 58/1 59/9
 59/13 59/16 60/6 60/7 60/8
devices **[32]**  5/24 6/9 6/16 6/25
 7/7 9/9 24/13 25/3 26/4 26/5 26/7
 26/10 26/14 26/18 28/18 29/5 29/7
 29/13 29/19 32/2 47/14 47/16 54/9
 54/11 55/15 56/23 57/8 57/9 60/11
 60/20 60/24 61/6
DHCP **[1]**  16/4
did **[75]**  7/7 9/11 16/18 16/24
 17/10 18/10 18/24 19/3 21/9 21/12
 21/17 22/6 22/7 22/18 22/20 23/1
 25/4 26/13 26/18 28/4 28/5 29/2
 32/7 38/6 38/7 51/6 52/11 52/15
 52/18 52/20 55/8 55/15 55/16
 55/20 55/20 57/5 57/7 60/20 60/23
 61/3 64/18 68/11 69/22 72/4 72/22
 73/5 77/20 82/3 84/11 86/10 87/7
 87/9 89/11 89/15 89/19 89/21
 89/23 90/1 90/5 92/21 92/24 93/11
 95/25 96/11 96/13 97/5 97/8 97/12
 97/21 97/24 98/5 98/12 99/2 99/7
 101/9
didn't **[35]**  5/24 6/2 6/5 6/8 6/23
 6/23 7/6 8/25 9/8 9/9 9/15 9/17
 10/8 10/11 13/3 16/19 17/7 17/21
 17/23 18/5 18/13 19/2 19/11 19/15
 20/2 25/5 28/17 32/4 32/6 36/21
 38/25 43/17 52/10 57/18 81/17
difference **[2]**  15/21 66/9
different **[30]**  11/22 14/9 15/5
 18/19 19/13 26/1 45/12 55/17
 57/11 57/12 63/14 65/1 65/14

65/23 66/1 66/9 66/12 66/16 66/18
 66/20 67/8 67/23 68/4 68/13 68/21
 69/1 69/16 69/24 80/12 98/22
direct **[5]**  3/7 3/10 71/6 85/9
 85/17
directed **[1]**  94/5
directly **[4]**  33/21 37/16 52/13
 82/15
directory **[7]**  40/18 40/18 57/21
 57/22 57/22 57/24 57/25
disagree **[2]**  11/23 12/1
disclose **[1]**  49/5
disclosed **[6]**  65/2 65/5 65/18
 66/21 69/9 69/20
disclosing **[1]**  65/17
disconnect **[1]**  19/24
discovered **[1]**  60/11
discovery **[1]**  96/18
discuss **[4]**  53/10 53/14 101/14
 101/20
discussed **[2]**  35/2 38/24
discussing **[1]**  20/11
discussion **[2]**  10/15 60/1
discussions **[2]**  54/14 59/23
disguise **[1]**  11/10
disk **[1]**  28/3
disks **[1]**  25/10
dismiss **[1]**  89/21
dissident **[1]**  23/18
dissidents **[1]**  23/15
distinct **[1]**  70/15
distinctly **[1]**  22/2
distributed **[1]**  30/12
DISTRICT **[8]**  1/1 1/1 1/10 2/7
 72/3 79/2 79/25 94/13
division **[3]**  72/22 72/25 73/1
DNS **[7]**  21/18 34/21 34/23 34/24
 35/19 35/22 41/21
do **[115]**
docket **[2]**  102/7 102/16
document **[3]**  60/2 86/16 86/17
documentation **[1]**  17/12
documents **[6]**  4/13 17/3 77/8
 77/14 89/11 89/13
does **[39]**  4/18 38/16 38/20 38/22
 43/16 46/11 46/13 55/25 57/16
 58/19 60/5 60/9 63/20 63/23 63/24
 72/25 73/25 74/21 76/23 77/2
 78/13 79/1 79/11 79/14 79/19
 79/25 80/9 80/10 80/18 83/6 83/16
 83/18 85/10 86/19 89/6 89/7 90/24
 94/21 96/14
doesn't **[15]**  6/15 6/18 6/21 7/15
 7/20 7/25 8/9 8/21 14/19 35/1
 36/17 38/2 38/19 60/12 96/1
doing **[11]**  13/5 20/24 25/21 35/20
 55/18 62/9 62/10 62/19 62/25 63/1
 75/15
DOJ **[2]**  1/16 1/19
DOJ-CRM **[1]**  1/19
DOJ-USAO **[1]**  1/16
dollar **[1]**  49/10
domain **[3]**  33/9 35/1 35/11
don't **[73]**  8/5 10/5 13/7 13/13
 14/14 15/15 15/20 16/23 16/25
 18/1 18/2 20/8 20/22 20/24 21/16
 22/2 22/9 25/21 30/17 34/6 34/8
 35/19 36/12 37/14 37/14 38/1 38/5
 38/8 38/18 39/5 40/17 44/24 45/19
 46/1 47/2 47/23 48/12 48/14 50/25
 51/16 51/18 52/2 53/2 53/6 53/8
 53/9 53/10 55/23 64/8 65/7 65/10
 66/3 66/5 66/7 66/9 66/19 68/25
 69/11 71/10 77/10 79/4 90/25
 95/23 95/25 96/2 96/9 96/23
 101/13 101/14 101/15 101/17 102/2
 102/8
done **[5]**  5/1 18/18 30/25 67/1
 70/15
door **[2]**  69/22 96/4
dot **[1]**  33/10
doubt **[2]**  32/5 50/21

down **[25]**  24/7 24/16 27/19 27/21
 36/25 39/8 40/17 41/6 41/14 42/2
 42/6 42/19 43/12 44/7 44/16 47/13
 48/15 50/3 51/3 60/13 79/8 80/9
 81/11 91/13 93/24
download **[1]**  23/11
drew **[1]**  83/5
drive **[14]**  24/23 27/24 28/21
 28/22 39/25 40/1 40/4 40/9 40/9
 40/13 41/2 60/13 61/5 68/21
drives **[9]**  25/13 25/16 25/17
 25/19 25/24 26/2 28/24 29/3 61/4
driving **[1]**  69/1
duplicity **[1]**  50/12
during **[2]**  59/23 74/5
dynamic **[8]**  15/22 15/24 16/3
 34/21 34/23 34/24 35/22 41/21

**E**

each **[5]**  15/24 16/2 68/12 80/12
 98/23
earlier **[1]**  58/14
early **[2]**  85/3 85/11
ease **[1]**  60/1
easier **[1]**  48/24
easily **[1]**  98/6
easy **[1]**  77/16
educate **[1]**  73/10
education **[3]**  71/24 76/6 95/18
either **[1]**  34/11
EKELAND **[20]**  2/2 2/3 3/4 3/7 4/7
 5/3 5/12 54/20 56/16 57/15 58/4
 59/9 62/4 63/9 64/17 65/12 81/14
 82/15 96/17 96/21
Ekeland's **[1]**  67/17
electronically **[3]**  74/12 78/24
 78/25
electronics **[1]**  56/23
elements **[1]**  33/21
else **[3]**  10/14 17/15 84/23
email **[13]**  20/9 20/13 20/16 21/14
 48/4 48/5 48/5 48/7 48/11 48/14
 72/12 72/17 79/18
emails **[7]**  6/22 6/23 20/4 22/17
 22/18 70/7 70/9
empty **[1]**  26/2
enacted **[1]**  73/19
ENCFS **[2]**  50/10 50/12
encrypt **[3]**  45/10 49/9 50/22
encrypted **[16]**  13/14 13/15 27/24
 28/14 28/18 28/24 29/15 33/13
 33/14 34/7 47/5 58/12 58/13 58/16
 58/19 58/22
encrypting **[4]**  45/25 46/17 50/8
 50/25
encryption **[5]**  28/3 45/9 45/10
 46/25 49/21
encrypts **[3]**  45/6 46/11 50/12
end **[16]**  8/23 8/25 9/4 20/12
 20/14 26/9 28/5 41/5 41/12 66/23
 70/20 83/19 83/25 84/22 96/24
 102/6
ended **[3]**  28/25 29/1 59/22
enforcement **[17]**  30/20 31/1 31/2
 31/4 31/7 31/10 37/25 51/1 62/2
 71/19 72/11 72/22 73/14 74/14
 74/19 93/14 94/6
enforcement's **[1]**  31/18
engage **[1]**  73/22
engages **[1]**  75/5
engaging **[1]**  82/1
engine **[4]**  51/19 99/8 101/1 101/7
engineers **[1]**  49/10
enough **[1]**  11/17
ensure **[4]**  74/21 74/24 75/18
 75/23
ensuring **[1]**  76/2
enter **[1]**  4/5
entirely **[6]**  37/17 38/25 40/11
 40/21 43/2 43/13
entities **[1]**  82/1
entitled **[3]**  69/25 83/11 103/5

**E**

entity [2]   25/14 74/5
entity's [1]   79/12
equivalent [2]   68/14 91/24
error [1]   22/9
especially [2]   38/25 56/9
essential [1]   22/3
essentially [10]   22/12 25/12 30/7
  30/8 31/17 39/14 41/2 73/1 76/14
  83/5
establish [1]   96/14
establishing [1]   79/7
estimated [1]   91/17
et [1]   8/19
evade [2]   31/4 51/1
even [7]   8/23 49/2 55/20 56/17
  77/15 96/2 101/15
events [2]   66/13 68/23
eventually [1]   86/10
ever [5]   12/25 18/18 26/5 48/10
  59/13
every [2]   18/21 55/20
everything [1]   10/10
evidence [26]   24/2 24/5 26/16
  27/12 28/7 29/21 29/24 30/18
  35/23 37/1 42/16 43/9 44/13 44/18
  48/16 55/1 55/16 55/16 55/21
  56/21 57/7 59/21 60/17 78/2 81/6
  88/3
exact [2]   16/2 35/19
exactly [4]   31/21 37/15 39/6
  57/13
examination [13]   3/4 3/4 3/7 3/7
  3/8 3/10 5/18 54/6 69/23 71/6
  81/15 84/9 85/17
examine [2]   8/25 17/23
examined [4]   8/12 8/20 17/25 32/6
example [14]   15/25 17/17 50/11
  58/12 74/3 75/2 75/8 76/17 77/6
  77/9 81/9 100/16 101/2 101/2
examples [1]   100/8
exceeding [1]   74/5
exchange [1]   82/1
excuse [2]   76/6 79/3
excused [2]   70/21 84/15
exhibit [43]   3/13 3/13 3/14 3/14
  10/22 24/6 26/17 27/12 27/15
  27/17 29/9 29/20 35/24 37/2 39/8
  39/9 39/10 41/1 41/16 42/3 42/9
  42/15 42/20 42/23 43/9 44/13
  48/17 57/15 57/17 59/16 78/18
  78/20 87/13 87/16 87/18 87/20
  88/2 88/4 88/20 88/23 88/25 99/24
  100/14
Exhibit 368 [1]   29/20
Exhibit 45C [1]   87/13
Exhibit 45D [4]   88/2 88/4 88/20
  88/23
Exhibit 46 [1]   99/24
Exhibit 710A [3]   24/6 44/13 48/17
Exhibit 720 [1]   35/24
Exhibit 722 [1]   37/2
Exhibit 723 [2]   39/9 57/15
Exhibit 724 [1]   41/1
Exhibit 725 [1]   41/16
Exhibit 726 [1]   42/3
Exhibit 729 [1]   42/15
Exhibit 731 [1]   42/23
Exhibit 733 [1]   43/9
EXHIBITS [2]   3/12 3/15
expect [2]   58/10 59/6
expectation [1]   75/15
expects [1]   94/24
experience [4]   32/18 71/25 95/16
  95/18
experienced [1]   77/15
experiential [1]   97/8
expert [11]   65/2 65/2 65/4 65/5
  65/6 65/17 66/1 69/9 69/10 69/20
  96/1
explain [23]   8/15 11/6 15/21

24/20 28/1 32/12 33/19 34/4 34/7
  34/23 37/7 39/12 45/8 57/24 59/18
  65/20 67/5 67/10 67/20 68/3 69/16
  73/17 76/11
explained [3]   68/9 83/4 84/13
explaining [2]   65/11 81/25
explanation [1]   102/18
explicitly [2]   54/24 70/16
exported [1]   26/10
expressing [5]   49/13 49/17 50/16
  50/21 50/25
extensive [1]   75/7
extent [5]   4/18 8/2 65/16 66/21
  69/7
external [2]   31/25 73/12
extraction [1]   10/3
extractions [1]   10/7
extremely [1]   64/19
eyes [1]   102/4

**F**

Facebook [1]   49/14
Facebooks [1]   49/4
fact [9]   49/5 50/9 50/20 62/1
  62/13 73/15 89/15 96/2 96/13
factor [1]   91/8
factors [1]   90/18
facts [1]   82/16
factual [1]   96/8
fail [1]   95/5
fair [4]   19/17 35/12 49/12 99/20
fairly [1]   102/19
Falco [4]   77/25 89/25 91/12 93/14
familiar [3]   97/21 97/24 98/1
FAQ [1]   77/8
far [1]   6/12
FBI [8]   16/22 26/8 28/9 28/20
  60/14 60/18 61/2 61/4
FBI's [2]   28/9 59/21
feature [1]   61/22
features [2]   48/14 99/10
February [2]   1/5 85/25
federal [7]   72/9 73/3 73/18 80/14
  80/17 93/20 94/6
few [5]   14/5 17/10 59/22 64/15
  93/24
Fi [8]   11/9 12/4 12/13 12/19
  12/23 12/25 13/8 31/23
Field [1]   79/18
figure [1]   85/2
file [17]   24/18 24/21 25/2 36/4
  36/4 36/21 37/6 37/14 42/1 43/7
  57/12 73/21 74/2 75/2 79/1 80/19
  102/7
filed [5]   74/9 74/12 78/23 78/24
  80/18
files [17]   24/23 24/25 24/25 26/9
  28/16 28/16 36/16 39/15 39/16
  39/19 43/25 52/6 56/7 56/13 60/5
  60/10 68/13
filing [1]   76/1
fill [1]   78/11
filtering [1]   64/20
final [1]   81/24
financial [16]   46/25 71/18 71/22
  71/23 72/11 73/1 73/10 73/20
  73/24 73/25 74/1 74/9 75/6 75/18
  76/14 77/5
FinCEN [35]   53/25 71/19 71/20
  71/21 72/4 72/13 72/15 72/23 74/2
  74/15 74/21 75/5 75/7 76/11 76/23
  76/24 77/18 77/20 77/23 78/8
  78/11 80/9 80/10 80/13 80/16
  80/18 80/25 81/2 81/17 81/21
  81/23 82/16 82/21 82/23 84/4
find [15]   5/25 6/2 6/5 6/8 7/6
  9/10 9/15 9/17 11/3 25/5 32/6
  55/16 55/16 77/16 98/6
finding [1]   64/17
fine [1]   102/13
finish [1]   53/4
first [18]   18/17 18/24 20/16 42/9

43/19 46/1 52/5 61/15 62/14 68/10
  71/12 71/16 75/22 85/22 85/23
  91/20 93/17 101/9
five [2]   98/19 98/20
flipping [1]   96/8
Flood [4]   86/20 87/9 87/21 89/12
Floor [1]   2/4
foam [1]   10/22
focused [1]   64/19
Fog [58]   5/25 6/3 6/6 6/9 6/11
  6/13 6/15 6/18 6/21 6/25 7/16
  7/21 8/1 8/9 8/13 8/21 8/25 9/4
  9/6 9/11 9/13 9/18 9/19 10/13
  22/7 25/6 28/10 32/7 36/19 36/22
  36/24 37/13 37/14 37/16 40/24
  41/24 42/13 42/21 43/6 47/22
  48/10 52/11 52/14 52/16 54/9
  54/11 54/21 54/23 55/3 55/10
  56/17 56/18 58/10 59/1 95/2 96/7
  96/16 96/17
folder [5]   28/10 28/11 28/21
  28/23 28/25
folders [1]   39/16
follow [4]   46/3 90/24 94/21 95/5
following [3]   38/17 74/16 83/12
food [1]   4/12
fooling [1]   4/11
footage [1]   68/19
foregoing [1]   103/4
forensic [4]   24/21 26/3 26/8
  59/23
forensics [1]   57/14
form [17]   11/12 16/20 16/21 16/25
  28/8 33/1 33/4 52/6 78/5 78/7
  78/8 78/8 78/10 78/23 79/8 79/14
  81/7
formal [2]   95/19 97/5
format [1]   27/8
formatting [1]   25/19
forms [2]   77/25 80/19
forthrightly [2]   93/20 94/5
found [5]   8/23 9/3 16/17 60/6
  68/18
foundation [3]   23/19 23/24 38/18
four [2]   30/14 75/20
frankly [1]   96/10
free [2]   32/18 35/18
frequently [3]   99/17 100/2 100/5
front [6]   20/25 67/6 67/7 67/21
  67/22 90/5
full [5]   25/21 28/3 51/8 58/15
  92/8
fully [2]   93/19 94/4
functionality [1]   8/17
further [4]   53/1 84/7 84/14 92/2

**G**

gain [1]   4/10
gained [1]   4/16
garbled [1]   45/13
gate [1]   4/12
gathered [1]   26/10
gave [3]   16/22 23/4 102/19
general [9]   15/23 20/6 49/1 49/24
  57/14 60/2 74/21 90/12 90/16
generally [7]   16/8 16/9 26/20
  30/17 45/19 47/2 58/2
George [1]   72/2
get [26]   4/2 4/19 4/21 13/11
  13/16 17/4 24/5 26/7 30/8 39/5
  41/15 41/15 47/2 53/21 53/22 54/1
  70/23 72/14 82/13 82/19 82/21
  90/17 90/18 94/15 94/17 100/25
gets [1]   23/14
getting [3]   50/13 84/11 101/24
give [8]   15/4 15/4 40/8 79/14
  90/21 91/1 100/8 101/2
given [2]   18/23 102/17
gives [1]   90/20
giving [1]   55/19
glance [1]   43/19
gmail.com [1]   20/18

**G**

**go [37]** 4/21 10/9 14/18 17/12
23/10 24/6 27/21 29/20 35/10 42/3
42/8 42/15 42/23 44/12 44/16
48/16 53/7 63/8 64/8 67/5 67/16
67/20 70/12 79/4 79/21 80/2 85/7
85/12 85/13 86/25 88/6 88/15 89/8
89/24 89/24 91/12 100/10
**goes [1]** 76/20
**going [16]** 27/22 44/9 44/12 48/17
57/13 58/8 58/13 79/8 82/15 85/11
87/24 91/12 96/3 96/18 101/23
102/1
**good [13]** 5/8 5/12 5/15 5/20 5/21
54/1 71/9 71/10 71/14 85/19 85/20
101/11 101/12
**Google [2]** 77/12 100/24
**Googles [1]** 49/4
**got [6]** 52/7 52/23 68/15 96/21
96/23 97/10
**government [55]** 3/13 3/14 3/14
3/15 5/1 5/7 7/15 7/20 7/25 8/9
8/21 8/23 9/3 10/22 24/5 29/20
35/24 37/1 37/21 37/24 38/2 38/7
38/9 38/16 38/22 39/9 41/1 41/16
42/3 42/15 42/23 43/9 44/13 48/17
55/25 56/24 69/25 76/17 87/13
87/16 88/2 88/4 88/20 89/21 93/12
93/22 94/8 94/10 94/19 94/21
94/23 95/3 95/6 96/4 99/23
**government's [2]** 53/20 53/24
**Gox [6]** 21/4 21/19 21/19 63/16
63/18 63/19
**Grams [11]** 99/3 99/4 99/7 99/14
99/17 99/18 99/21 100/18 100/23
100/24 101/9
**great [1]** 9/23
**greatly [1]** 61/24
**grounds [2]** 96/10 96/10
**group [6]** 20/16 20/18 20/23 21/1
21/2 21/6
**grouped [3]** 21/3 70/6 70/17
**grouping [1]** 25/13
**groupings [3]** 62/5 64/17 70/15
**groups [5]** 20/13 23/20 69/10 70/6
70/17
**guard [1]** 4/11
**guess [4]** 16/13 28/6 66/19 83/18
**guessing [1]** 22/12
**guidance [20]** 75/10 75/11 75/11
77/7 77/10 77/18 77/20 81/17
81/19 81/21 81/24 82/9 82/22
82/24 83/1 83/4 83/11 84/5 84/6
84/12
**guideline [2]** 92/11 92/11
**guidelines [8]** 90/12 90/13 91/8
91/11 91/14 91/18 92/10 94/12
**guides [1]** 75/8
**guilty [6]** 86/10 89/15 90/1 91/22
95/8 95/9

**H**

**H-A-R-M-O-N [1]** 85/24
**hackers [2]** 50/13 50/17
**hacking [1]** 11/9
**had [27]** 10/3 10/7 16/20 17/20
22/19 27/8 28/8 28/20 28/21 48/9
48/12 54/10 62/16 64/21 70/15
72/13 72/20 81/21 82/21 82/24
82/25 83/14 84/4 86/7 91/10 97/7
98/21
**half [1]** 85/8
**hallway [1]** 101/17
**hand [3]** 93/24 100/18 102/16
**happen [3]** 12/19 31/14 40/6
**happened [3]** 28/19 39/7 64/11
**happening [3]** 18/13 30/7 31/3
**happy [1]** 67/16
**hard [19]** 24/23 25/13 25/16 25/16
25/19 25/23 27/24 28/20 28/22
28/24 29/3 39/25 40/1 40/4 40/9

40/9 40/12 41/2 61/4
**Harmon [8]** 3/9 84/25 85/14 85/24
85/25 89/6 96/18 96/19
**has [26]** 4/12 23/20 27/11 32/18
38/3 38/19 47/11 56/24 59/25 60/1
65/1 65/4 65/17 65/25 69/17 74/10
75/1 75/7 77/18 86/14 88/3 94/14
96/15 96/17 99/11 99/15
**hasn't [5]** 38/12 66/20 95/24 96/1
96/5
**HASSARD [28]** 2/2 5/14 24/4 24/16
26/16 27/7 27/19 27/21 29/20
35/23 36/25 39/8 41/6 41/14 42/2
42/6 42/8 42/19 43/8 43/12 43/21
44/7 44/12 44/23 47/15 48/15 50/3
51/3
**have [111]**
**haven't [2]** 8/12 8/20
**having [3]** 25/14 49/14 50/16
**he [28]** 4/12 7/18 7/23 8/3 29/16
38/7 45/21 50/19 50/21 59/12
60/21 82/22 83/2 83/14 93/5 95/24
95/25 96/1 96/2 96/6 96/6 96/7
96/11 96/13 96/15 96/15 96/16
97/10
**head [1]** 51/18
**header [1]** 48/20
**heading [1]** 50/4
**heard [11]** 7/15 7/20 7/25 9/2
21/10 37/20 65/1 65/8 70/2 70/3
70/3
**hearing [1]** 70/14
**hearsay [2]** 100/1 100/3
**heavydist [1]** 20/18
**held [4]** 64/24 69/6 82/11 95/22
**Helix [3]** 86/3 86/3 100/21
**help [4]** 48/5 73/23 73/25 75/18
**helpful [1]** 50/13
**helping [1]** 94/25
**helpline [4]** 74/25 75/3 75/5
75/12
**helps [3]** 14/19 14/22 46/25
**her [22]** 8/3 8/5 19/23 19/23
45/21 45/22 46/3 65/2 65/4 65/11
65/12 66/1 69/9 69/9 69/11 69/14
69/16 69/20 69/23 69/23 70/5
70/15
**here [32]** 4/6 24/7 27/23 30/7
30/14 40/11 40/23 41/5 41/24
43/20 47/16 49/17 50/5 50/16
50/19 57/15 60/9 62/14 63/8 63/13
64/13 66/21 67/5 67/6 67/21 67/22
69/15 92/19 92/25 93/2 96/10
96/15
**Hi [2]** 71/8 71/14
**hide [2]** 23/1 49/4
**high [2]** 26/19 59/19
**him [11]** 4/19 7/11 7/15 7/20 7/25
9/10 21/10 50/25 55/17 82/6 82/8
**hire [1]** 73/13
**his [36]** 4/10 4/12 4/17 6/6 6/16
6/18 6/21 6/25 7/7 7/13 8/6 10/2
20/18 20/19 20/20 29/5 29/6 37/18
37/22 38/7 38/17 40/12 40/14
40/19 40/21 43/3 43/13 47/11
49/14 50/16 50/22 51/1 83/19 93/7
96/16 101/19
**histories [2]** 55/19 56/9
**history [3]** 42/24 56/12 56/13
**hit [1]** 58/21
**hold [1]** 76/8
**home [36]** 14/14 14/15 15/25 31/6
31/23 32/1 34/16 35/2 35/3 35/6
35/13 37/18 37/21 40/12 40/14
40/15 40/16 40/18 40/19 40/21
41/5 41/12 41/13 43/3 43/13 44/5
46/22 56/3 57/16 57/16 57/17
57/21 57/22 57/24 58/2 68/19
**homepage [2]** 99/14 100/16
**honestly [2]** 83/15 100/3
**Honor [49]** 4/4 4/8 5/2 5/8 5/12
5/17 8/2 23/22 27/10 27/14 36/14

41/9 44/8 45/24 53/1 53/16 53/17
54/5 64/9 64/22 64/25 65/16 67/12
68/1 69/4 69/14 70/2 70/24 78/15
81/13 82/12 82/14 82/20 83/13
83/18 83/23 84/2 84/7 84/25 85/6
87/12 88/19 93/8 95/20 95/23 97/2
100/8 102/10 102/20
**HONORABLE [1]** 1/9
**Hop [1]** 35/20
**hosts [1]** 28/9
**hotmail.com [4]** 20/8 20/22 21/3
21/4
**hotspot [4]** 31/14 31/21 31/23
31/25
**hour [2]** 44/10 85/9
**hours [3]** 17/19 17/22 72/19
**house [2]** 31/12 68/17
**how [34]** 8/18 15/11 18/20 19/22
19/23 28/5 30/19 35/2 40/15 41/12
41/19 49/23 53/2 57/20 67/7 67/9
67/22 68/3 68/22 68/24 69/15
69/17 71/8 71/9 72/14 73/25 74/21
76/11 76/16 80/10 85/1 92/7 96/2
101/6
**Howell [2]** 90/6 90/7
**http [1]** 13/16
**https [2]** 13/14 58/13
**huh [1]** 17/23
**hundreds [1]** 9/20
**hypothetical [2]** 31/13 31/18

**I**

**I'd [6]** 17/12 17/14 44/17 49/25
83/18 87/12
**I'm [16]** 15/12 18/10 21/12 27/21
38/5 39/22 40/17 43/15 44/17
44/19 47/19 52/3 53/20 67/9 82/4
85/5
**ID [2]** 76/17 76/22
**identification [6]** 11/12 22/16
27/12 86/15 99/11 99/15
**identified [2]** 93/21 94/7
**identifier [1]** 11/1
**identify [1]** 52/12
**identifying [1]** 74/18
**identity [3]** 20/3 46/22 76/15
**IDs [1]** 14/16
**ignore [2]** 34/21 35/20
**ignorelist.com [3]** 34/19 35/18
41/19
**image [5]** 28/16 28/20 28/23 28/25
52/6
**images [16]** 28/8 28/11 28/14 51/7
51/11 51/12 52/5 59/20 60/3 60/20
60/23 61/2 61/3 61/6 61/11
**impact [1]** 58/19
**implied [1]** 16/17
**impose [1]** 75/20
**impression [2]** 43/4 69/25
**inadvertently [1]** 102/8
**inappropriate [1]** 82/18
**include [6]** 63/20 63/24 74/3
79/11 79/25 82/3
**included [3]** 61/8 61/12 102/3
**including [3]** 36/24 58/1 94/11
**independent [2]** 25/11 76/3
**indicate [4]** 17/21 79/19 79/22
86/19
**indicated [3]** 17/11 17/14 89/2
**indicates [1]** 80/3
**Indicating [1]** 29/13
**indication [1]** 57/16
**individual [1]** 62/11
**individual's [1]** 79/12
**individuals [2]** 66/15 80/19
**indulgence [1]** 81/12
**inexpensive [1]** 25/10
**info [1]** 17/13
**inform [1]** 94/11
**information [17]** 13/17 13/20
13/21 13/25 17/4 17/16 40/4 47/1
47/1 54/14 62/17 68/16 74/17

**I**

information... **[4]** 74/19 75/12 79/9 79/15
ingested **[2]** 28/16 61/11
initial **[10]** 21/18 60/20 64/18 65/4 65/12 65/22 65/24 66/1 66/8 70/15
initially **[1]** 60/17
input **[1]** 74/13
inquiries **[2]** 72/9 72/10
ins **[1]** 66/12
insofar **[1]** 71/25
instance **[2]** 12/3 44/4
instead **[5]** 16/15 28/23 31/8 33/20 48/21
institution **[6]** 75/1 75/8 75/19 76/2 76/5 77/6
institutions **[12]** 72/11 73/2 73/4 73/10 73/20 74/1 74/9 74/22 75/6 75/15 75/20 76/14
instruct **[4]** 82/14 83/19 84/18 100/11
instructing **[2]** 83/7 83/20
interact **[2]** 32/15 51/13
interdivisional **[1]** 73/13
interest **[5]** 14/13 26/9 60/10 64/21 68/10
interested **[1]** 14/16
internal **[1]** 73/12
internet **[13]** 11/2 13/8 13/20 14/1 14/16 14/18 15/7 23/10 30/9 31/6 31/7 31/20 99/5
interpretation **[1]** 19/14
interrupt **[1]** 92/18
interrupted **[1]** 85/6
intervals **[1]** 76/8
introduce **[6]** 71/11 78/15 85/21 87/13 88/20 99/23
introduced **[1]** 71/10
investigates **[1]** 73/1
investigating **[1]** 68/15
investigation **[4]** 7/9 14/13 95/2 95/3
investigation-related **[1]** 14/13
investigations **[4]** 74/14 74/16 74/20 94/25
investigatively **[1]** 39/4
investigators **[1]** 61/24
involved **[8]** 17/24 18/5 21/9 21/12 22/6 72/8 74/18 92/1
involves **[1]** 25/19
involving **[2]** 21/19 52/4
IP **[66]** 10/15 10/21 10/24 11/1 11/4 11/6 11/7 11/8 11/10 11/12 11/15 11/22 11/24 12/4 12/8 12/11 12/15 15/5 15/13 15/22 15/23 15/24 16/2 16/4 16/7 16/9 16/12 16/18 16/24 18/1 18/4 18/14 18/17 18/19 20/2 20/4 21/8 21/14 22/5 22/6 22/10 33/8 34/25 35/2 35/6 35/9 35/21 37/15 52/8 52/12 52/15 58/25 59/4 59/6 61/14 62/4 62/9 62/22 63/1 63/15 64/18 65/14 66/8 68/5 68/8 68/12
IPs **[4]** 58/17 64/21 68/9 68/25
IRS **[9]** 16/22 28/5 28/21 60/15 60/17 60/20 61/1 61/3 61/6
is **[381]**
isn't **[3]** 22/3 29/6 34/21
issue **[3]** 83/9 101/24 102/8
issued **[7]** 76/17 81/19 81/21 81/23 82/24 84/5 102/15
issues **[2]** 39/2 101/25
it **[281]**
it's **[1]** 67/3
items **[4]** 28/4 28/7 30/18 98/22
its **[11]** 11/2 19/6 23/1 31/12 32/15 49/1 77/2 80/25 94/10 94/11 94/19
itself **[2]** 50/12 51/6

**J**

JD **[1]** 72/2
Jeff **[1]** 5/10
JEFFREY **[1]** 1/18
job **[1]** 71/25
jog **[2]** 60/7 60/8
John **[2]** 76/19 76/21
joined **[1]** 5/9
joining **[1]** 5/14
judge **[7]** 1/10 90/6 90/7 90/20 90/24 94/20 94/21
jury **[52]** 1/9 4/3 4/6 4/22 4/23 4/25 8/15 10/24 11/6 14/11 15/21 24/1 24/10 24/20 27/16 28/1 30/1 32/12 33/3 33/19 34/4 34/23 36/3 37/7 39/12 44/24 45/4 45/8 46/20 53/12 53/22 54/1 54/2 55/21 71/12 73/8 78/19 78/22 82/14 83/8 83/20 83/21 84/18 85/10 85/21 87/17 88/24 89/2 92/6 100/8 100/11 101/18
just **[89]** 4/4 4/16 4/18 9/2 9/3 10/10 10/15 10/24 15/18 17/7 17/8 18/3 18/16 19/21 21/22 23/24 25/12 25/12 26/23 29/15 30/8 31/1 31/14 31/19 33/2 33/19 34/4 36/3 39/5 39/12 41/15 41/21 42/7 44/8 45/4 45/8 47/2 47/13 47/13 48/14 48/23 49/8 49/9 50/6 53/7 53/13 53/22 55/24 60/1 61/15 63/14 65/1 65/3 65/8 65/21 65/24 66/5 66/6 66/10 66/11 69/7 69/16 69/18 74/2 75/25 76/2 76/13 79/8 79/19 80/17 81/5 81/25 83/19 84/4 84/13 87/24 88/15 89/2 92/18 93/5 93/17 95/2 97/8 100/12 101/14 101/21 102/4 102/16 102/18
JUSTICE **[2]** 1/13 1/20

**K**

keep **[7]** 14/22 27/22 44/12 73/20 80/21 83/13 91/12
keeping **[1]** 76/1
keys **[2]** 5/25 6/2
keyword **[6]** 52/18 58/20 58/21 58/23 101/7 101/8
keywords **[1]** 100/25
Killdozer **[3]** 20/19 20/20 20/21
kind **[7]** 22/9 48/10 50/10 50/21 60/6 83/10 96/8
know **[47]** 13/13 15/15 15/20 16/23 16/25 17/7 22/9 32/4 34/5 34/7 36/12 36/17 37/15 37/16 38/1 38/8 38/9 38/22 44/1 47/23 48/14 51/15 51/16 51/17 53/2 65/7 66/3 68/20 71/10 72/20 74/15 75/9 76/9 76/9 76/12 76/13 76/15 76/18 76/19 76/21 77/9 77/11 77/13 95/11 96/1 96/7 102/6
knowing **[1]** 51/9
knowledge **[2]** 23/20 38/19
known **[2]** 54/24 71/19
Kolbasa **[2]** 63/19 63/24
Kolbasa99.ru **[1]** 21/5

**L**

L-A-H-A-K-I-S **[1]** 71/15
L-A-R-R-Y **[1]** 85/24
labeled **[4]** 6/7 6/11 28/11 88/7
language **[1]** 9/6
laptop **[2]** 51/13 57/13
large **[2]** 11/23 14/3
Larry **[5]** 3/9 84/25 85/14 85/24 89/6
last **[9]** 71/12 71/14 79/12 85/22 85/23 86/25 87/24 88/6 89/8
late **[3]** 39/5 64/11 68/13
later **[2]** 60/23 86/3
launch **[1]** 101/9
launder **[1]** 86/8
laundering **[22]** 71/23 72/10 73/3

73/15 73/19 73/23 74/23 75/4 75/9 75/14 75/17 75/19 75/21 76/3 76/13 77/13 80/11 86/11 89/15 90/3 91/23 92/7
law **[21]** 2/3 30/20 30/25 31/1 31/4 31/7 31/10 31/18 37/24 51/1 62/2 72/2 72/11 73/14 74/14 74/19 84/19 84/21 93/21 94/6 101/23
laws **[1]** 76/9
lawyer **[5]** 92/19 92/21 92/25 93/3 93/8
lay **[2]** 23/19 38/18
layers **[1]** 61/25
leading **[8]** 54/16 55/4 63/4 64/4 68/6 97/14 98/8 98/16
learned **[1]** 97/11
least **[7]** 30/14 48/8 49/6 57/4 72/18 91/2 91/24
leave **[3]** 50/8 50/14 72/20
ledgers **[2]** 8/1 8/9
left **[5]** 25/1 49/6 70/1 80/13 100/18
left-hand **[1]** 100/18
legal **[3]** 16/21 18/8 79/12
legally **[1]** 39/6
lengthy **[1]** 94/3
let **[7]** 21/13 48/18 48/23 95/13 99/11 99/15 102/6
let's **[12]** 4/21 53/21 54/1 76/19 77/10 80/16 82/10 84/23 88/6 89/8 99/12 101/3
lets **[2]** 32/14 85/13
letter **[3]** 80/7 86/22 87/21
letter F **[1]** 80/7
level **[3]** 26/19 59/19 91/17
liability **[1]** 46/15
Liberty **[5]** 63/16 63/17 63/20 63/21 64/13
licensing **[1]** 82/7
life **[3]** 9/23 92/13 97/17
Light **[2]** 86/3 100/21
lighter **[2]** 94/18 95/8
like **[49]** 7/1 7/1 9/1 10/15 11/18 13/21 15/4 15/19 16/15 16/21 17/1 19/15 24/4 27/7 27/11 28/22 32/2 32/9 32/16 32/17 32/18 32/19 34/10 38/20 40/3 42/7 43/16 44/17 45/24 49/2 49/14 49/14 55/10 58/13 59/16 61/14 70/4 75/2 75/9 77/4 77/12 87/12 88/2 88/5 96/20 100/2 100/3 100/9 100/13
likely **[2]** 20/17 21/2
limited **[1]** 94/11
limits **[2]** 51/8 51/11
LINDSAY **[3]** 2/6 103/3 103/12
line **[8]** 33/22 33/22 58/5 59/10 62/5 72/19 83/6 93/15
lines **[2]** 18/15 93/24
linked **[3]** 14/15 35/21 54/24
links **[1]** 39/19
Linux **[26]** 32/9 32/12 32/13 32/15 32/18 32/20 32/23 32/25 33/1 33/25 34/1 34/15 35/13 39/1 39/23 39/25 40/8 40/10 40/13 40/18 57/1 57/21 57/22 57/24 58/1 61/16
list **[13]** 26/4 26/8 26/14 28/7 28/15 29/6 34/21 35/20 59/6 59/8 60/5 77/7 77/14
listed **[4]** 29/4 56/14 60/9 79/11
listened **[1]** 7/13
lists **[1]** 65/14
little **[13]** 11/22 27/19 27/21 33/11 35/2 42/6 47/13 47/14 65/7 66/11 71/24 89/18 101/13
live **[2]** 39/15 72/19
lives **[1]** 39/17
living **[1]** 97/20
loaded **[1]** 26/7
local **[4]** 17/16 39/16 93/21 94/6
locally **[1]** 34/12
located **[2]** 68/10 79/22

**L**

location [1]  39/19
log [22]  6/8 6/10 12/11 17/4 17/5 18/8 18/10 18/11 18/12 18/14 18/14 18/15 20/19 22/6 26/3 34/10 34/12 35/12 35/14 37/6 66/12 98/22
log-in [4]  6/8 6/10 17/4 22/6
log-out [4]  18/8 18/10 18/12 18/15
logging [6]  16/13 33/7 33/12 34/11 43/3 43/13
logs [13]  7/21 16/6 16/6 16/10 16/12 16/15 16/19 16/24 17/13 17/23 18/5 56/19 62/23
long [2]  53/6 85/1
look [17]  14/12 18/5 26/22 27/9 28/13 37/12 50/3 51/19 62/21 68/18 68/25 77/11 79/8 86/16 88/6 100/2 102/2
looked [13]  10/2 10/3 10/5 10/11 17/1 18/9 18/14 20/6 21/21 22/5 100/3 100/9 100/13
looking [17]  18/19 21/17 21/25 24/24 39/13 39/23 63/1 63/13 66/4 66/7 66/16 77/8 77/16 79/19 81/5 86/22 100/23
looks [3]  16/21 68/23 88/5
lookups [1]  15/13
lot [10]  6/10 15/8 15/13 15/18 32/18 38/25 40/6 46/9 58/12 100/3
lots [1]  98/19
LTE [6]  30/5 30/6 30/21 31/9 59/9 59/12
lunch [4]  85/3 85/11 101/13 102/13

**M**

Mac [1]  32/14
made [8]  20/5 28/7 28/20 28/23 47/25 56/10 60/2 97/16
mail [2]  48/12 78/23
Mailwoo [7]  47/17 47/25 48/1 48/4 48/7 48/9 50/13
main [6]  15/13 40/18 50/4 50/9 58/16 77/23
maintain [1]  80/18
majority [2]  21/8 52/12
make [16]  9/2 11/7 18/3 20/3 30/16 60/2 60/20 62/10 68/4 68/8 68/12 93/5 97/20 98/24 102/4 102/8
makes [3]  8/16 45/13 49/7
making [1]  45/24
manage [1]  48/5
managed [1]  4/10
mandatory [3]  90/25 91/1 91/2
manually [1]  40/10
many [11]  10/4 16/20 26/7 32/17 49/20 49/23 62/15 64/21 68/21 68/24 97/16
March [7]  72/5 77/21 81/18 82/9 82/24 84/4 103/10
March 2013 [3]  81/18 82/24 84/4
markdown [1]  26/18
marked [4]  27/11 86/14 99/11 99/15
marketplace [1]  97/13
marketplaces [2]  98/20 99/9
Mason [1]  72/2
materials [1]  51/20
mathematically [2]  45/11 45/14
matter [5]  17/22 64/15 74/21 100/12 103/5
matters [3]  4/19 93/22 94/7
maximum [3]  90/2 92/14 92/15
may [23]  17/1 19/24 23/19 24/25 27/15 54/3 56/14 66/10 66/24 70/2 70/23 71/5 74/6 74/11 75/10 77/8 78/18 80/12 80/15 84/1 87/17 88/23 96/25

maybe [12]  10/6 19/22 20/17 26/13 31/6 53/7 66/1 66/6 67/25 82/20 96/6 96/6
Mazarin [1]  3/3
Mazars [11]  3/3 5/20 30/4 35/25 48/20 54/8 59/18 60/14 61/15 67/1 68/3
McDonald's [2]  12/11 12/13
me [33]  5/14 11/23 16/22 19/5 19/9 20/25 21/13 22/16 23/15 26/8 46/9 46/17 48/18 48/23 49/20 56/15 65/20 68/14 69/1 76/6 79/3 82/25 83/9 83/15 84/21 92/13 95/13 96/20 97/10 99/11 99/15 100/5 102/6
mean [5]  10/14 38/5 52/2 57/17 67/9
meaning [4]  9/12 14/13 37/9 39/15
meaningful [1]  58/20
means [2]  17/18 46/20
meant [1]  19/14
mechanism [1]  35/17
media [5]  36/16 39/17 39/17 43/25 57/22
member [1]  72/3
members [5]  4/24 38/24 71/12 84/18 85/21
memory [4]  20/24 59/25 60/7 60/8
mentioned [6]  10/11 74/1 74/25 76/1 77/9 83/14
merely [2]  47/8 83/1
mess [1]  49/4
message [1]  10/7
metaphor [1]  34/7
method [1]  45/11
methodology [8]  18/16 19/5 19/7 19/10 19/11 19/15 19/18 19/24
methods [1]  46/21
MICHAEL [2]  2/2 5/14
microphone [1]  89/20
middle [1]  100/21
might [15]  10/8 12/11 12/13 13/18 15/16 18/12 18/15 31/11 35/21 47/25 51/18 68/14 72/14 82/14 99/20
miles [1]  34/13
million [1]  32/20
minimum [3]  90/25 91/1 91/2
minute [1]  88/6
minutes [2]  85/11 96/22
misstating [1]  19/19
mistake [1]  29/4
mitigating [1]  90/18
mixed [1]  96/7
mixer [3]  54/15 86/3 96/17
mixers [2]  82/3 83/5
mixing [1]  8/18
mode [1]  14/18
modem [2]  31/2 31/10
moment [2]  64/23 95/21
money [36]  7/1 22/3 68/18 71/22 72/10 73/3 73/15 73/18 73/22 74/16 74/22 75/4 75/9 75/14 75/17 75/19 75/21 76/3 76/13 76/19 77/13 78/8 78/10 78/23 79/4 79/6 80/3 80/8 80/11 81/23 82/7 86/8 86/11 89/15 90/3 91/9
monitor [1]  31/12
monitoring [6]  31/1 31/2 31/8 31/10 31/18 73/22
months [1]  96/17
Moon [5]  17/25 47/25 48/7 51/4 51/21
more [15]  8/7 16/15 17/10 31/25 40/6 49/7 50/23 58/17 59/24 59/24 67/2 74/25 92/16 102/18 102/18
morning [8]  1/7 5/8 5/12 5/15 5/20 5/21 53/8 71/14
MOSS [1]  1/9
most [6]  14/17 31/22 51/13 64/13 85/9 91/10
mostly [1]  59/20

mount [3]  40/1 40/4 40/9
move [7]  23/22 41/1 70/19 72/22 78/14 88/20 99/23
Mr [11]  3/4 3/7 3/7 3/8 3/10 5/3 7/9 21/9 21/17 47/15 52/16
Mr. [95]  4/7 4/9 4/15 5/24 6/3 6/9 9/9 9/16 9/18 9/23 10/12 12/22 20/9 20/18 23/18 24/4 24/13 24/16 25/2 26/16 27/7 27/19 27/21 29/3 29/16 29/20 30/5 35/23 36/25 37/17 37/21 38/3 38/4 38/6 38/12 38/16 38/23 39/8 40/12 41/6 41/14 42/2 42/6 42/8 42/19 42/24 43/2 43/8 43/12 43/13 43/21 44/7 44/12 44/23 45/2 47/8 47/11 48/15 49/13 49/17 50/3 50/16 51/3 51/4 54/20 55/2 55/15 56/16 57/15 58/4 59/9 61/6 61/9 62/4 63/9 63/21 64/17 65/12 67/17 70/8 81/14 82/8 82/15 82/23 83/12 83/16 85/25 87/9 87/17 89/12 96/2 96/17 96/18 96/19 96/21
Mr. Ekeland [14]  4/7 54/20 56/16 57/15 58/4 59/9 62/4 63/9 64/17 65/12 81/14 82/15 96/17 96/21
Mr. Ekeland's [1]  67/17
Mr. Flood [3]  87/9 87/21 89/12
Mr. Harmon [3]  85/25 96/18 96/19
Mr. Hassard [25]  24/4 24/16 26/16 27/7 27/19 27/21 29/20 35/23 36/25 39/8 41/6 41/14 42/2 42/6 42/8 42/19 43/8 43/12 43/21 44/7 44/12 44/23 48/15 50/3 51/3
Mr. Pearlman [2]  82/8 83/16
Mr. Pearlman's [2]  82/23 83/12
Mr. Sterlingov [19]  4/9 4/15 9/16 10/12 20/9 23/18 29/16 37/17 38/4 38/6 40/12 43/2 43/13 47/11 49/13 49/17 50/16 70/8 96/2
Mr. Sterlingov's [26]  5/24 6/3 6/9 9/9 9/18 9/23 12/22 20/18 24/13 25/2 29/3 30/5 37/21 38/3 38/12 38/16 38/23 42/24 45/2 47/8 51/4 55/2 55/15 61/6 61/9 63/21
Ms [1]  3/4
Ms. [17]  5/20 30/4 35/25 48/20 53/3 54/3 59/18 65/9 65/19 66/3 69/13 69/21 77/25 89/25 91/12 93/14 102/12
Ms. Bisbee [1]  102/12
Ms. De [4]  77/25 89/25 91/12 93/14
Ms. Mazars [5]  5/20 30/4 35/25 48/20 59/18
Ms. Pelker [7]  53/3 54/3 65/9 65/19 66/3 69/13 69/21
MSB [3]  79/20 79/23 81/23
Mt. [6]  21/4 21/19 21/19 63/16 63/18 63/19
Mt. Gox [6]  21/4 21/19 21/19 63/16 63/18 63/19
much [5]  53/2 77/12 92/7 97/11 101/6
multiple [7]  30/9 30/13 55/16 57/8 57/10 62/22 69/15
my [43]  4/9 14/15 14/16 14/17 14/18 18/3 19/14 19/21 21/13 22/3 28/12 41/23 43/4 44/17 44/18 46/9 48/18 51/18 51/19 54/23 59/22 60/2 61/12 64/15 65/6 67/3 71/14 73/7 82/20 85/24 86/18 88/5 91/9 91/10 91/11 95/1 97/10 97/17 100/25 101/5 101/23 101/24 102/17
myself [1]  97/11

**N**

N.W [1]  1/16
name [26]  5/7 7/2 7/3 19/5 19/9 33/9 35/7 35/8 35/11 35/19 37/6 47/11 47/24 54/24 63/21 71/12 71/12 71/14 71/15 71/16 79/12 79/12 79/20 85/22 85/23 85/24

**N**

named [2] 59/20 95/11
naming [1] 20/7
national [1] 35/15
native [1] 16/19
nature [1] 80/15
Navy [3] 22/24 23/1 23/4
near [1] 66/14
necessarily [6] 14/14 56/20 57/17
58/8 58/9 60/10
necessary [2] 73/4 76/1
need [23] 4/4 14/12 23/24 30/17
40/10 45/15 49/9 53/3 65/20 74/1
74/15 75/22 75/24 76/3 76/6 76/21
78/11 79/1 79/5 90/11 96/23 98/12
102/6
needs [3] 25/20 66/4 102/3
network [13] 28/9 28/9 32/1 35/4
35/5 35/6 35/9 36/7 58/9 58/12
59/21 61/11 71/19
neutrally [1] 18/15
never [10] 8/23 9/3 30/12 30/15
30/16 31/25 36/11 37/21 48/13
51/13
new [7] 1/20 11/18 11/19 65/15
65/17 65/25 73/13
next [7] 1/23 27/20 53/20 53/24
56/11 70/23 84/24
NFS [2] 63/18 63/24
NFS9000 [1] 21/4
Nissan [1] 68/16
no [78] 1/4 4/4 6/1 6/4 6/7 6/14
6/17 6/20 7/4 7/8 8/11 8/14 8/25
9/14 9/19 10/3 10/14 11/14 12/1
15/10 17/2 17/10 18/8 20/10 22/8
22/14 23/17 24/15 25/7 26/2 27/14
27/17 27/21 30/16 32/4 32/8 35/21
36/12 38/8 40/25 42/1 42/14 42/22
47/23 48/13 49/8 51/16 52/17
52/23 53/1 53/16 53/17 54/13
55/23 56/2 56/9 56/20 59/5 60/12
62/12 65/5 67/2 78/17 78/20 83/23
84/6 84/7 84/13 84/14 87/15 87/18
88/22 88/25 90/25 92/16 92/20
94/22 95/12
nobody [1] 10/14
nods [1] 85/12
none [3] 6/10 6/12 22/5
nonprofit [2] 23/5 23/8
nonscientific [1] 19/17
normal [1] 40/3
normally [1] 25/23
Nos [1] 100/14
not [109]
notably [1] 64/13
note [4] 17/16 60/10 63/14 102/10
notes [10] 6/3 6/19 9/17 9/18
9/20 9/25 12/22 26/19 54/9 54/12
nothing [7] 8/24 37/16 38/3 40/23
42/12 43/5 52/13
noticed [6] 28/13 64/6 64/11 96/1
96/5 98/19
November [5] 21/11 21/22 22/1
64/12 68/14
November 2011 [1] 22/1
now [19] 8/3 10/15 18/16 23/7
32/9 43/8 48/16 51/16 53/3 53/8
53/9 62/9 63/9 64/25 65/1 66/8
84/23 85/11 88/2
number [13] 14/3 21/5 21/19 21/20
31/2 31/3 44/19 59/21 74/24 79/17
79/19 79/21 90/18
numbers [2] 11/23 61/8
numerous [1] 55/18
NW [3] 1/14 1/20 2/8
NY [1] 2/4

**O**

object [2] 65/18 70/10
objection [43] 8/2 19/1 19/19
22/13 23/17 27/13 27/14 29/6

36/14 38/10 45/21 54/16 55/4
55/11 57/1 63/4 64/4 64/9 64/22
66/21 67/12 67/13 68/6 69/4 70/1
70/18 78/16 78/17 82/5 83/5 83/22
83/23 87/14 87/15 88/21 88/22
95/20 95/25 97/1 97/14 98/8 98/16
99/25
obligation [1] 94/11
obligations [2] 73/11 94/10
observations [1] 19/13
observe [1] 98/5
observing [1] 61/23
obtain [1] 92/24
obtained [2] 37/21 38/12
Obtaining [1] 76/17
obviously [2] 46/3 76/4
occasionally [1] 35/2
occurred [3] 62/23 74/10 74/11
occurrences [1] 68/11
occurring [1] 62/22
October [4] 21/9 21/11 21/22 22/1
off [2] 17/19 51/18
offense [7] 88/5 88/16 88/17 89/3
91/17 91/22 96/9
offer [5] 14/3 27/11 76/24 81/17
94/19
offered [3] 82/21 88/3 100/7
offering [2] 65/14 65/17
offguard [1] 83/15
office [6] 77/23 93/20 93/21 94/6
94/7 94/13
officer [3] 73/7 75/25 76/5
Offices [1] 73/14
official [4] 2/7 81/19 103/3
103/13
offset [1] 17/21
oftentimes [2] 14/12 35/5
oh [2] 30/6 96/7
Ohio [1] 95/15
okay [23] 5/11 10/16 23/25 41/1
44/12 46/5 53/18 53/23 54/1 74/1
78/3 78/22 80/9 81/11 83/24 87/7
88/15 91/14 92/5 93/5 99/23
101/22 102/21
Omedetou [1] 9/12
once [4] 41/5 56/9 68/11 74/12
one [57] 4/8 13/24 15/6 15/25
19/5 19/9 25/14 25/21 26/7 26/8
26/20 28/13 28/14 28/15 29/3 29/4
29/18 30/9 30/24 30/25 31/1 31/10
31/16 34/15 35/21 39/17 43/1 46/8
47/16 48/1 48/8 49/8 49/16 49/24
50/11 50/14 50/15 52/21 55/20
57/4 59/25 59/25 60/1 69/1 70/7
70/7 75/2 75/22 80/6 86/7 86/10
90/9 95/4 97/7 98/23 98/25 102/10
ones [5] 11/11 28/12 45/12 62/23
98/21
ongoing [1] 26/6
online [3] 46/24 47/5 76/24
only [11] 17/25 31/9 31/10 44/9
51/11 58/21 82/17 99/4 99/6 99/9
100/8
ons [1] 32/19
op [2] 46/18 46/20
open [6] 12/19 12/23 12/25 13/8
69/22 76/20
opening [1] 4/11
operate [1] 32/25
operating [2] 32/13 32/14
operation [1] 43/5
Operational [1] 46/21
opinion [9] 65/2 65/4 65/5 65/15
65/17 66/18 66/20 101/24 102/15
opportunity [1] 79/15
oranges [1] 66/11
order [6] 4/13 39/25 64/15 68/23
82/13 98/21
organization [1] 17/2
organized [1] 26/7
original [3] 16/20 16/23 16/25
originally [2] 22/25 45/15

OS [1] 32/14
other [34] 10/6 11/2 11/8 11/11
15/15 15/16 16/6 16/16 17/12
19/16 21/25 22/19 30/5 33/9 36/6
37/10 39/18 44/2 46/4 52/6 56/11
57/4 61/11 63/3 63/10 64/14 70/9
89/21 93/20 94/6 95/2 95/4 97/8
101/8
others [1] 60/17
our [6] 4/5 53/8 75/23 76/7 77/16
101/13
ourselves [2] 50/9 50/20
out [38] 10/7 10/8 11/19 11/20
11/25 13/19 14/15 15/5 16/2 18/8
18/10 18/11 18/12 18/15 24/25
25/16 25/18 25/22 25/23 26/1
28/19 30/13 30/14 39/1 48/23 49/6
49/21 52/7 53/12 59/25 60/6 62/25
65/14 78/11 85/2 94/15 99/7
101/18
outs [1] 18/14
outside [2] 68/16 68/17
over [8] 4/19 13/13 14/15 23/16
49/17 50/21 58/13 62/13
overarching [1] 75/17
overhear [1] 101/17
overlap [4] 18/17 61/14 64/18
66/8
overlaps [1] 64/20
overruled [11] 54/17 55/12 57/3
64/5 66/22 68/7 70/1 97/1 97/15
98/9 98/17
overwrite [1] 25/20
own [7] 11/14 15/5 15/6 32/15
46/22 47/11 77/2

**P**

p.m [2] 101/18 102/22
packet [5] 51/23 51/25 52/7 52/10
58/22
packet's [1] 58/24
page [20] 1/23 24/6 27/20 48/17
79/8 79/21 80/2 81/5 86/19 86/25
87/20 87/24 88/7 88/15 89/3 89/8
91/12 91/15 93/14 100/5
pages [2] 9/20 100/8
paid [1] 101/6
paint [2] 24/7 24/14
painted [1] 24/14
paper [3] 19/6 19/9 19/10
papers [1] 19/16
paragraph [7] 48/24 48/25 49/13
50/6 51/1 51/2 88/7
part [12] 18/1 20/4 25/15 26/3
29/1 51/20 62/10 70/15 75/20 77/4
79/11 89/21
particular [9] 19/11 23/20 60/7
60/8 62/23 63/3 68/14 81/2 91/7
particularly [1] 100/1
parties [1] 47/2
parts [2] 24/22 24/25
Pass [1] 81/13
passive [1] 75/1
password [3] 6/6 45/15 50/14
passwords [1] 6/5
past [1] 65/7
pay [1] 34/25
PC [1] 40/3
PEARLMAN [7] 1/18 3/7 3/8 3/10
5/10 82/8 83/16
Pearlman's [2] 82/23 83/12
peel [1] 61/24
peer [2] 19/6 19/15
peer-reviewed [1] 19/6
PELKER [10] 1/13 3/4 5/8 53/3
54/3 65/9 65/19 66/3 69/13 69/21
pending [1] 67/14
Pennsylvania [1] 1/14
people [24] 11/10 11/15 11/24
12/3 12/7 12/9 12/14 13/8 13/19
13/21 13/24 13/24 32/17 34/16
35/7 49/20 49/23 49/24 61/15

**P**

people... [5]   68/21 69/1 69/15 100/24 101/8
per [1]   101/6
perform [1]   80/25
performed [1]   25/2
perhaps [2]   19/21 50/10
person [7]   22/19 39/18 74/5 76/16 76/21 79/1 79/20
person's [1]   44/5
personal [9]   11/12 13/21 14/19 15/6 45/22 46/3 46/10 46/14 47/1
personally [2]   44/2 57/18
Peter [2]   63/18 63/24
philosophical [1]   50/23
phone [12]   10/6 30/5 30/19 31/21 31/23 46/9 64/23 69/5 72/12 72/17 82/10 95/21
phones [1]   32/25
photos [1]   10/4
phrase [3]   6/15 6/18 6/21
physical [4]   51/6 51/7 51/14 51/15
physically [2]   36/7 79/22
pick [5]   16/4 28/5 64/23 82/10 95/20
piece [1]   81/19
pieces [5]   8/24 55/16 74/20 77/7 77/10
pin [2]   28/25 45/15
place [6]   11/2 39/15 61/11 91/4 101/11 101/12
placed [1]   100/25
places [1]   11/9
plain [1]   58/10
Plaintiff [2]   1/4 1/13
plasma [2]   20/19 63/18
PlasmaDivision [1]   63/22
plasmadivision.com [2]   20/19 63/18
played [1]   39/1
plea [5]   86/18 88/13 89/22 91/22 93/11
plead [3]   86/10 89/15 90/5
please [11]   5/6 43/15 53/9 71/13 80/2 82/4 85/16 88/15 89/25 91/13 93/14
pled [3]   90/1 95/8 95/9
PLLC [1]   2/3
podium [1]   5/6
point [15]   21/1 21/2 26/7 27/10 28/23 39/5 48/8 48/12 52/6 52/20 66/6 72/22 90/17 90/17 97/21
points [5]   35/1 57/12 90/18 90/19 91/11
police [1]   75/16
policies [2]   75/22 75/23
political [2]   23/15 23/18
portal [1]   34/11
portions [1]   81/25
position [1]   72/8
possible [1]   73/2
possibly [1]   74/10
potentially [1]   17/18
practices [1]   46/3
prefer [1]   35/7
preference [1]   85/10
present [2]   5/13 71/25
presented [1]   65/13
presenting [1]   66/15
preserved [1]   80/23
pretty [4]   77/16 96/11 96/14 97/11
prevent [1]   38/6
previous [1]   25/1
previously [2]   25/5 62/16
prior [3]   82/25 83/3 84/4
prison [1]   92/13
privacy [6]   14/19 15/3 23/13 49/18 49/22 49/24
private [4]   5/25 6/2 6/3 35/16

proactive [1]   75/6
probably [6]   8/17 12/4 12/6 14/17 49/7 101/12
procedures [2]   75/22 75/23
proceed [4]   5/16 54/4 71/5 84/1
proceedings [2]   1/7 103/5
process [8]   16/21 18/9 24/21 24/24 25/15 25/15 31/11 67/3
profiles [2]   57/11 57/25
program [14]   37/10 45/11 45/14 48/4 73/23 75/10 75/14 75/18 75/21 76/4 76/6 76/8 76/13 77/13
programmer [1]   97/10
programmers [1]   32/16
programming [8]   9/6 95/16 95/18 97/9 97/11 97/17 97/19 98/14
programs [2]   11/10 75/4
projects [1]   52/4
prompt [1]   33/6
promptly [1]   72/21
prosecution [1]   94/17
protect [7]   13/25 14/19 15/2 23/16 46/25 73/23 73/25
protected [1]   28/25
protecting [1]   71/22
protective [1]   4/13
prove [1]   45/16
provide [8]   61/3 67/2 73/11 73/14 77/20 79/15 79/17 93/12
provided [12]   16/21 18/7 26/8 28/4 51/22 61/1 65/13 72/12 72/18 77/18 94/14 96/18
provider [1]   17/20
provides [1]   47/5
providing [2]   79/23 102/18
proxies [1]   61/16
proximity [3]   64/2 66/14 66/17
proxy [7]   14/24 15/2 15/8 15/16 15/17 15/18 69/16
public [3]   11/9 13/8 13/20
publicize [1]   76/24
publicly [1]   75/7
publish [1]   29/25
published [6]   27/16 44/24 48/19 78/19 87/17 88/24
pull [9]   10/8 24/25 57/15 59/16 68/11 77/14 78/1 80/9 81/11
pulled [3]   10/7 17/1 59/20
purchased [1]   59/13
pure [1]   49/10
purely [1]   48/21
purpose [4]   59/18 62/19 73/23 75/17
purposes [3]   86/15 99/12 99/16
pursuant [2]   86/11 91/22
put [19]   4/16 10/22 20/18 20/21 20/22 21/5 26/16 28/8 35/23 37/1 39/9 45/14 46/22 69/17 74/19 75/9 102/4 102/9 102/16
putting [2]   59/19 67/4
Putty [2]   37/7 37/8
Putty.log [1]   37/5

**Q**

quantity [1]   92/1
question [27]   18/3 19/2 19/3 21/13 23/23 41/7 46/2 46/5 50/24 54/22 55/6 59/2 63/6 65/19 66/4 67/14 67/15 67/16 67/18 67/20 67/25 82/20 82/23 83/3 83/5 92/19 96/21
questioning [1]   58/6
questions [19]   8/6 24/1 53/1 55/21 59/10 62/5 72/13 75/1 75/3 75/13 81/14 83/12 84/7 84/14 90/11 95/13 99/17 100/2 100/6
quick [1]   53/4
quite [2]   14/5 59/22
quote [1]   96/14

**R**

radio [2]   24/8 24/14

RAID [5]   25/8 25/10 25/15 25/18 25/25
raise [2]   53/15 95/25
raised [1]   96/21
RANDOLPH [1]   1/9
range [6]   16/4 21/15 35/4 90/22 92/11 92/12
rate [1]   22/9
rather [2]   8/6 49/8
reached [1]   65/25
Reactor [1]   101/25
read [14]   12/21 17/14 48/23 48/24 48/25 50/6 57/18 57/20 58/23 67/18 80/6 91/20 93/17 94/2
reading [2]   24/10 34/18
ready [4]   5/16 5/22 54/4 101/24
real [4]   30/17 66/4 66/5 66/7
really [6]   15/9 21/16 31/3 48/2 82/20 102/2
reason [7]   8/20 15/10 32/4 36/12 38/2 46/13 84/20
reasonable [2]   76/15 76/18
reasons [7]   13/24 14/8 14/9 14/11 49/24 102/17 102/19
rebut [1]   69/25
recall [21]   12/21 14/24 21/25 22/21 25/8 30/4 30/19 30/24 32/10 34/18 39/10 42/4 42/16 43/9 44/25 58/5 59/10 62/5 63/11 65/23 70/5
receive [1]   74/12
Recess [2]   53/19 102/22
recognize [9]   37/3 41/17 78/5 81/4 81/7 86/17 88/3 99/13 99/16
recognize what [1]   81/4
recognized [2]   8/24 52/13
recommend [2]   94/17 95/7
recommendation [2]   90/24 94/19
recommended [1]   90/20
record [7]   4/16 5/7 15/15 16/7 16/9 70/13 103/5
recorded [1]   18/8
recordkeeping [1]   75/4
records [6]   17/20 51/3 73/20 76/2 80/21 80/23
redact [1]   102/6
redirect [5]   3/4 3/8 54/6 84/8 84/9
redundant [1]   25/10
refer [1]   59/24
reference [1]   66/8
referenced [1]   37/14
references [2]   55/18 56/16
referencing [1]   34/9
referring [5]   31/10 31/11 64/18 87/25 89/4
reformat [1]   25/24
reformatting [1]   26/1
refusal [2]   93/25 94/4
regard [1]   70/1
regarding [6]   9/17 55/17 55/24 61/5 62/4 95/2
regardless [1]   79/1
register [2]   79/5 82/2
registered [2]   79/20 81/1
registrant [2]   79/9 80/4
registration [5]   17/13 21/18 78/8 78/22 82/7
registrations [1]   80/18
regular [5]   14/6 46/9 50/8 76/8 99/5
regulate [1]   80/9
regulated [1]   72/13
regulates [1]   74/22
regulation [1]   83/3
regulations [4]   76/23 80/10 80/10 83/21
regulators [2]   72/11 75/6
regulatory [3]   72/8 74/25 75/12
related [30]   6/25 9/4 14/13 21/10 25/6 32/7 36/22 37/13 37/16 39/3 40/23 41/24 42/12 42/20 43/5 51/20 51/21 52/11 54/9 54/21

**R**

**related...** [10]  54/23 58/5 67/11 70/8 70/9 75/4 77/14 88/16 89/3 98/5
**relates** [2]  71/25 76/11
**relating** [4]  73/20 73/21 84/6 101/25
**relation** [7]  7/5 20/3 51/4 52/18 81/22 84/5 100/2
**relationship** [1]  96/16
**relevance** [6]  23/17 45/21 95/24 96/10 100/1 100/4
**relevant** [10]  45/22 45/23 46/4 55/2 60/5 61/18 81/25 92/2 93/23 94/8
**relieve** [1]  94/10
**remember** [15]  10/5 21/16 21/17 22/2 24/10 28/17 34/6 34/8 35/8 35/19 35/20 35/25 48/12 51/18 59/2
**remembering** [1]  26/20
**remind** [6]  10/24 24/1 33/2 45/4 46/20 101/14
**remote** [12]  34/8 36/5 37/8 39/19 43/16 44/1 47/24 55/18 56/13 56/22 57/8 57/8
**remotely** [9]  33/4 33/12 34/13 34/16 35/5 35/13 37/18 39/14 40/12
**rent** [1]  15/18
**rephrase** [5]  21/13 55/6 63/6 67/25 98/10
**report** [20]  20/14 29/1 51/19 51/21 51/25 52/2 59/17 61/12 65/2 65/12 65/22 65/24 66/1 66/12 69/9 69/10 69/20 74/8 74/8 75/11
**Reporter** [4]  2/6 2/7 103/3 103/13
**reporting** [1]  75/5
**reports** [11]  66/9 73/21 74/2 74/3 74/3 74/4 74/9 74/11 74/17 75/2 76/1
**represents** [1]  92/1
**request** [1]  81/9
**required** [1]  82/2
**requirement** [2]  76/7 80/16
**requirements** [5]  75/20 75/24 80/12 80/13 80/17
**requires** [2]  73/19 76/14
**research** [7]  19/7 19/9 22/19 35/20 53/11 81/9 101/16
**Reserve** [5]  63/16 63/17 63/20 63/21 64/13
**resource** [1]  72/7
**responded** [1]  72/21
**response** [2]  81/9 82/23
**responses** [3]  72/12 72/18 72/19
**responsibilities** [2]  72/6 73/9
**responsibility** [1]  92/7
**responsible** [1]  91/23
**responsive** [1]  67/17
**rest** [1]  15/6
**result** [1]  10/21
**results** [2]  10/23 52/23
**review** [27]  4/15 6/23 9/8 19/12 24/4 26/3 26/6 28/1 28/4 29/11 48/1 51/6 51/8 51/12 51/20 55/8 55/15 55/24 56/8 56/21 56/25 57/5 58/3 60/23 62/10 62/20 76/3
**reviewed** [14]  16/23 17/3 19/6 24/13 26/5 26/14 26/18 29/13 51/3 51/21 51/23 52/8 52/10 62/15
**reviewing** [5]  26/4 28/7 29/18 51/11 52/5
**right** [54]  4/2 4/21 4/24 5/15 9/2 12/9 13/7 13/9 13/17 21/7 25/17 26/22 27/4 27/20 27/23 31/4 33/13 33/15 36/25 37/19 39/23 42/15 44/15 46/11 47/15 48/4 48/25 49/6 50/1 50/5 50/5 50/6 51/16 52/25 53/2 53/22 54/3 66/19 69/21 71/5 77/12 81/14 84/8 84/15 84/23

85/13 91/3 93/9 93/24 96/12 98/15 100/10 101/19 102/9
**right-hand** [1]  93/24
**RMSB** [1]  78/9
**robbery** [2]  68/15 68/19
**role** [3]  62/9 73/5 73/7
**rolling** [1]  26/6
**ROMAN** [4]  1/6 5/5 5/13 95/11
**Romania** [2]  51/4 58/3
**Romanian** [1]  51/22
**Room** [1]  2/8
**roughly** [1]  32/20
**route** [1]  75/1
**router** [3]  16/1 59/9 59/12
**RPR** [1]  103/12
**rule** [5]  81/24 81/25 82/8 83/8 83/15
**ruled** [1]  70/18
**rules** [11]  72/14 76/23 76/25 78/11 82/16 83/8 83/20 84/6 84/11 84/12 84/13
**ruling** [1]  62/25
**rulings** [1]  77/8
**run** [5]  11/10 33/22 37/10 45/14 56/11
**running** [10]  9/10 9/13 9/17 10/12 48/1 48/7 48/10 54/15 55/3 55/9

**S**

**safe** [2]  12/23 14/22
**safely** [1]  49/7
**said** [8]  21/2 30/24 36/17 37/20 48/7 70/6 70/16 87/24
**sake** [1]  84/4
**sale** [1]  59/13
**Sam** [1]  71/15
**same** [34]  11/15 11/16 11/24 11/24 12/4 12/7 12/7 12/9 12/11 12/15 12/17 12/19 15/23 16/2 20/17 21/3 27/9 28/21 28/25 31/13 31/21 42/11 47/24 56/12 59/4 61/10 61/10 66/15 68/20 69/2 69/8 69/18 88/13 101/8
**SAR** [2]  74/9 75/3
**satisfy** [1]  98/14
**save** [1]  50/11
**savvy** [1]  77/15
**saw** [7]  6/17 6/20 35/14 54/10 55/19 56/16 68/16
**say** [23]  11/18 12/10 16/15 18/10 19/17 20/16 25/24 31/5 31/22 35/12 35/16 40/3 49/12 51/11 58/15 66/14 73/5 74/16 76/19 77/10 80/16 89/6 101/3
**saying** [8]  17/16 31/20 55/1 63/2 65/20 66/16 70/16 83/3
**says** [21]  24/7 26/25 27/23 29/11 37/5 40/15 41/12 41/13 41/19 43/22 44/16 49/6 50/4 50/19 69/10 79/9 86/25 88/16 93/15 93/25 94/21
**scan** [1]  24/22
**Scholl** [4]  7/9 21/9 21/17 52/16
**School** [1]  72/2
**science** [2]  97/6 97/9
**scientific** [5]  19/5 19/7 19/12 19/22 19/25
**scope** [3]  38/13 82/5 82/17
**screen** [3]  26/22 48/18 77/5
**screenshots** [3]  10/4 10/4 10/10
**script** [2]  41/4 43/16
**scripts** [1]  33/22
**scroll** [16]  27/7 27/19 29/8 42/6 42/19 43/12 43/15 43/21 44/15 44/16 44/23 47/13 47/14 50/3 60/13 62/13
**seal** [1]  102/1
**sealed** [1]  102/3
**search** [11]  19/16 58/11 77/11 98/13 98/23 98/25 99/8 100/25 101/4 101/7 101/7
**searchable** [1]  74/13

**searched** [6]  5/24 6/22 9/9 52/21 52/23 99/9
**searches** [6]  14/15 52/18 58/20 58/21 58/23 80/25
**searching** [2]  58/4 101/5
**seated** [1]  85/16
**sec** [2]  46/18 46/20
**second** [3]  20/25 21/2 69/5
**Secrecy** [7]  72/7 72/9 73/2 73/11 73/17 73/18 80/14
**section** [1]  60/9
**secure** [2]  33/4 33/12
**security** [7]  14/8 14/10 35/15 44/4 46/21 59/25 68/19
**see** [64]  6/23 8/17 10/11 11/10 17/14 23/20 24/7 26/23 27/23 36/21 37/5 37/12 37/14 38/18 39/15 39/16 40/15 40/23 41/5 41/12 41/19 41/24 42/7 42/20 43/22 47/14 47/16 47/19 48/20 50/25 52/10 53/11 53/18 55/8 56/18 57/7 58/10 59/6 61/18 66/5 66/7 66/8 66/9 66/19 68/12 68/25 79/9 80/2 84/23 85/12 87/1 88/7 91/14 91/15 91/17 93/15 93/25 96/2 96/9 98/12 98/22 99/21 100/12 100/20
**seeing** [6]  40/11 43/17 43/19 43/19 45/12 68/13
**seeking** [2]  94/15 94/17
**seem** [1]  45/24
**seemed** [2]  39/5 43/16
**seems** [1]  82/15
**seen** [2]  10/8 59/13
**seized** [3]  29/16 29/19 60/21
**seizing** [1]  38/7
**sell** [1]  49/5
**selling** [1]  12/10
**sells** [1]  49/1
**semester** [1]  97/7
**send** [1]  76/19
**senior** [1]  73/7
**sense** [2]  49/7 51/8
**sensitive** [1]  47/1
**sentence** [8]  50/19 90/2 91/20 93/17 94/2 94/3 94/18 95/8
**sentencing** [7]  90/9 90/12 90/13 90/20 91/11 91/14 92/10
**separate** [3]  52/1 70/10 98/23
**separately** [1]  52/9
**sequence** [2]  42/10 64/12
**sequencing** [1]  102/13
**series** [1]  21/9
**server** [30]  7/21 11/21 16/6 16/6 16/10 16/12 16/14 16/19 16/24 22/7 33/5 48/5 48/6 48/8 48/11 51/4 51/6 51/7 51/7 51/9 51/17 51/21 51/22 52/4 52/5 52/8 56/5 56/11 58/1 58/3
**server's** [1]  58/9
**servers** [19]  6/9 7/16 11/17 11/18 11/19 12/1 14/24 15/2 15/8 15/16 15/17 15/18 17/24 17/25 18/5 35/16 37/11 56/18 69/16
**service** [14]  34/24 35/18 35/19 45/5 48/21 49/3 78/9 78/10 78/23 79/5 79/6 80/3 81/24 91/10
**services** [4]  14/4 35/22 49/1 61/19
**set** [13]  15/25 16/1 16/3 16/3 17/15 18/7 18/22 25/18 25/21 35/5 46/4 64/21 99/7
**sets** [2]  62/22 68/25
**setting** [2]  25/15 25/24
**settings** [2]  35/10 36/4
**setup** [1]  11/25
**several** [1]  96/17
**shall** [1]  93/19
**share** [2]  11/15 11/24
**shared** [1]  39/20
**sharing** [4]  11/22 12/4 12/7 12/14
**she** [34]  19/2 19/3 19/23 23/20

**S**

she... [30]   36/17 36/17 38/15 38/19 38/20 65/1 65/3 65/3 65/11 65/14 65/16 65/20 65/20 65/21 65/22 65/25 66/14 66/15 66/16 66/17 69/10 69/17 69/18 70/6 70/6 70/7 70/14 70/15 70/16 90/9
shell [1]   33/4
SHERRY [3]   2/6 103/3 103/12
SHH [1]   33/15
shields [1]   24/7
shift [1]   35/4
shormint [13]   20/8 20/22 20/25 21/3 52/21 52/24 58/10 63/2 63/10 63/16 63/20 64/14 70/9
short [3]   26/19 53/7 63/25
short-term [1]   63/25
shorthand [1]   35/8
shortly [2]   53/11 53/18
should [14]   28/22 29/21 45/19 50/8 50/21 53/3 66/2 75/2 84/19 84/22 85/2 90/21 92/25 94/19
shouldn't [2]   29/4 102/9
show [9]   55/20 55/20 77/25 81/4 86/14 88/2 89/2 99/11 99/15
showing [4]   28/15 78/22 87/20 100/16
shows [1]   49/11
side [2]   39/1 93/24
sign [3]   33/7 34/24 87/7
signal [1]   23/1
signature [3]   87/3 88/9 89/9
signed [3]   88/13 88/17 89/11
significance [2]   64/2 67/10
signing [1]   89/12
SIM [1]   30/13
similar [4]   15/2 33/11 71/23 76/12
simplified [1]   60/3
simply [4]   8/3 31/19 58/22 61/5
since [4]   22/3 28/17 56/9 61/11
single [3]   9/10 10/11 55/20
sir [9]   71/8 82/4 85/19 85/21 86/14 86/16 89/11 89/18 97/5
site [9]   8/18 34/19 36/19 48/13 54/15 54/23 55/9 99/18 101/5
sites [3]   13/20 98/6 98/19
six [2]   98/19 98/20
size [1]   58/17
skills [2]   97/12 98/14
slightly [2]   15/24 26/1
small [1]   4/8
smartphone [1]   31/15
Smith [2]   76/19 76/21
sniff [4]   13/8 13/17 13/20 33/13
so [134]
so-called [1]   52/16
software [1]   32/14
sold [1]   49/14
some [40]   7/14 11/7 11/17 12/1 14/11 16/22 16/25 17/2 18/12 18/15 19/21 19/24 26/19 28/23 31/24 35/3 35/7 45/15 46/4 46/9 46/21 48/9 48/21 50/21 52/6 52/20 58/13 60/17 60/20 60/23 61/3 62/16 63/10 64/12 68/17 72/22 76/7 85/12 96/8 97/21
somebody [9]   4/10 4/16 12/10 30/8 31/14 33/12 75/25 76/4 95/11
somehow [3]   65/22 65/23 96/7
someone [14]   28/20 28/23 54/15 55/9 61/18 68/16 79/22 80/15 81/1 98/6 99/20 101/3 101/4 101/16
someone's [1]   35/6
something [14]   16/4 17/13 18/21 35/5 51/13 78/10 78/23 83/7 96/14 96/23 97/21 97/24 100/20 102/9
sometimes [12]   11/8 13/2 13/3 14/10 16/16 23/14 30/11 33/9 34/25 45/20 46/7 80/25
somewhat [1]   84/20

somewhere [2]   56/5 76/20
sorry [16]   15/12 18/10 21/12 27/21 38/5 39/22 40/17 43/15 44/17 44/19 47/19 52/3 53/21 67/9 82/4 85/5
sort [6]   25/13 36/4 49/2 50/20 59/19 69/23
sorts [3]   9/22 37/9 49/4
sound [1]   38/19
sounds [3]   21/7 54/1 96/20
source [9]   8/12 8/15 8/16 8/21 8/25 9/7 58/17 68/14 68/18
sources [4]   18/19 19/13 62/21 68/11
space [1]   24/22
span [1]   9/25
speak [3]   49/10 89/18 89/20
speaking [1]   89/8
specialist [1]   72/8
specific [12]   10/6 17/20 18/13 18/21 18/25 22/19 32/15 43/17 43/20 58/18 82/16 98/6
specifically [17]   7/1 7/3 9/19 10/9 17/11 20/7 31/12 34/6 34/8 37/9 49/1 54/11 59/24 61/5 62/22 70/14 79/4
specified [1]   16/16
spell [1]   71/13
spelled [2]   71/15 85/24
spelling [1]   85/22
SpiderOak [6]   45/2 45/4 45/6 47/5 47/9 49/1
split [1]   30/12
spoofed [1]   11/4
spoofing [1]   11/6
spots [1]   30/14
spotted [1]   68/24
spreadsheet [3]   26/11 65/13 67/3
spreadsheets [1]   16/22
SSH [11]   32/9 33/2 33/4 33/6 33/11 34/3 34/4 34/6 34/10 34/15 61/16
staff [2]   74/15 76/7
staging [1]   28/20
stakeholders [1]   73/12
stamp [1]   17/11
stamps [4]   17/3 64/8 66/12 66/17
stand [1]   4/25
standard [1]   46/18
stands [1]   25/10
start [6]   26/2 43/16 46/1 72/4 91/4 99/12
started [2]   28/13 59/23
starting [4]   5/7 48/24 72/6 72/7
state [8]   5/6 71/12 79/2 80/10 80/12 80/15 93/20 94/6
stated [1]   91/22
statement [5]   88/5 88/16 88/17 89/2 96/9
states [19]   1/1 1/3 1/10 5/5 5/9 22/23 23/1 23/4 37/24 38/7 38/9 38/16 38/22 75/12 80/13 89/6 90/12 90/13 95/14
static [3]   15/22 15/23 16/3
stating [1]   85/22
statistical [2]   22/9 22/11
statute [4]   72/10 73/3 73/19 90/2
statutory [1]   92/14
stays [1]   15/23
steer [1]   101/16
steps [3]   17/10 40/6 46/21
STERLINGOV [25]   1/6 4/9 4/15 5/5 5/13 9/16 10/12 20/9 23/18 29/11 29/14 29/16 37/17 38/4 38/6 40/12 43/2 43/13 47/11 49/13 49/17 50/16 70/8 95/11 96/2
Sterlingov's [26]   5/24 6/3 6/9 9/9 9/18 9/23 12/22 20/18 24/13 25/2 29/3 30/5 37/21 38/3 38/12 38/16 38/23 42/24 45/2 47/8 51/4 55/2 55/15 61/6 61/9 63/21
still [6]   31/24 35/11 49/8 95/8

95/9 102/13
stole [1]   4/12
stolen [1]   4/14
stood [1]   60/6
stop [5]   27/20 47/15 50/5 92/4 101/11
storage [1]   39/14
stored [1]   61/10
storing [1]   48/21
story [1]   69/2
stream [3]   30/9 30/16 31/1
streams [1]   30/9
Street [2]   1/16 2/3
structure [2]   25/20 27/9
stubborn [1]   49/11
stuff [2]   13/12 47/1
subdomain [1]   48/12
subject [1]   4/13
subparagraph [2]   91/17 93/17
successful [1]   56/10
such [4]   6/7 21/18 49/3 66/13
suggesting [1]   69/23
suggestion [1]   23/18
Suite [1]   1/17
sum [1]   94/15
summarize [1]   64/10
summary [17]   10/23 27/6 29/11 45/2 47/8 59/19 60/2 60/5 60/9 61/13 65/13 66/11 67/3 67/6 67/7 67/21 67/22
support [2]   12/2 49/7
suppose [1]   83/11
supposed [3]   75/15 91/4 99/8
sure [21]   9/2 10/1 15/9 16/20 18/4 21/24 22/4 22/4 30/11 32/22 36/11 46/16 48/2 49/23 50/23 56/1 73/10 93/5 98/12 102/4 102/8
surprised [1]   83/14
suspect [1]   31/19
suspected [1]   61/19
suspicious [5]   74/7 74/8 74/10 74/11 75/10
Sustained [3]   36/17 55/5 63/5
sway [1]   4/19
Sweden [6]   37/22 38/7 38/12 38/23 43/3 43/14
Swedish [2]   37/24 38/3
switch [1]   43/8
sworn [2]   71/1 85/14
system [5]   32/13 71/22 73/24 73/25 90/17
systems [1]   32/14

**T**

T-H-E-O-D-O-R-E [1]   71/16
tab [3]   62/14 63/8 63/13
table [7]   2/10 5/9 5/14 26/18 26/24 27/8 68/9
tables [1]   68/12
tablet [1]   10/3
tabs [1]   77/4
tagged [1]   26/9
tags [1]   26/10
take [23]   24/16 36/25 39/8 40/17 41/6 41/14 42/2 44/7 46/22 48/15 51/3 53/3 53/8 53/9 53/13 83/9 85/1 85/2 85/8 88/6 95/7 101/19 102/4
taken [4]   24/23 39/4 53/19 102/22
takes [1]   73/4
taking [1]   86/16
talk [4]   20/20 32/9 69/4 96/15
talking [8]   20/14 26/23 33/24 33/25 34/6 65/3 66/10 87/22
tasked [1]   71/21
TCP [1]   58/14
team [6]   20/6 22/19 26/20 28/19 38/24 57/5
technical [1]   11/7
technically [1]   46/8
technicians [1]   49/11
techniques [1]   61/23

**T**

**Ted [1]** 53/25
**tell [11]** 14/11 16/12 22/16 36/3
  42/12 55/24 56/7 57/12 71/24 73/8
  84/21
**telling [2]** 7/18 7/23
**temporal [2]** 66/14 66/17
**tend [3]** 32/16 32/18 44/1
**terabyte [2]** 27/24 29/15
**term [1]** 63/25
**terminal [1]** 33/6
**terms [5]** 20/2 58/21 64/12 74/22
  95/5
**tested [3]** 19/12 30/12 30/15
**testified [19]** 9/3 10/18 24/18
  25/5 33/2 34/3 38/15 41/21 42/25
  52/16 65/3 65/21 69/8 69/18 70/7
  81/17 82/23 87/20 96/15
**testify [8]** 7/15 7/20 7/25 21/10
  73/15 82/6 96/7 96/18
**testifying [20]** 12/21 14/24 22/21
  25/8 30/4 30/19 32/10 34/18 35/25
  39/10 41/8 42/4 42/16 43/9 44/25
  65/11 65/23 65/25 67/15 93/3
**testimony [20]** 7/13 8/6 19/20
  24/11 31/4 37/3 38/14 41/17 47/21
  51/24 53/14 55/21 65/13 69/12
  70/5 70/14 82/13 83/19 96/4
  101/20
**text [1]** 58/10
**than [7]** 8/6 22/19 49/8 58/18
  65/2 66/1 92/16
**Thank [23]** 5/17 8/20 25/12 36/25
  37/7 41/14 42/23 44/21 48/19 54/5
  68/1 70/21 70/22 71/3 71/4 78/1
  84/2 84/16 84/17 85/16 93/9
  102/20 102/21
**that [490]**
**their [25]** 5/6 11/10 11/14 13/25
  16/25 28/8 31/14 32/17 34/16 35/9
  35/10 35/10 49/10 59/20 62/2
  68/10 68/11 73/10 74/14 74/20
  75/9 80/15 98/23 100/25 101/7
**them [45]** 4/14 6/10 6/12 10/7
  10/8 15/11 15/14 16/20 16/25 17/4
  17/20 21/12 22/2 24/14 25/14
  25/19 25/24 26/19 28/5 28/5 28/13
  30/9 33/22 39/5 39/17 45/14 46/15
  48/2 48/21 49/6 50/11 54/11 56/25
  59/21 59/22 62/15 62/17 67/9 68/4
  68/13 69/3 74/12 94/25 98/21
  98/25
**themselves [2]** 23/16 75/16
**then [33]** 13/11 17/12 17/17 17/21
  23/4 28/13 33/2 42/16 44/16 45/13
  48/19 48/19 49/7 50/6 50/11 53/7
  60/23 67/14 68/10 68/18 83/4 83/4
  86/22 87/24 90/19 90/25 93/24
  98/22 99/9 100/20 100/23 101/6
  102/17
**Theodore [4]** 3/6 71/1 71/14 71/16
**Theoretically [2]** 11/5 13/10
**there [90]** 6/10 6/24 8/24 8/24
  9/20 9/20 11/7 11/9 12/1 13/19
  13/19 14/3 14/5 15/16 15/18 17/13
  18/8 18/12 18/12 18/15 19/14
  19/24 20/22 23/17 26/9 26/22
  27/20 27/20 28/11 29/22 30/8
  30/13 30/13 30/17 31/17 31/23
  31/24 32/20 32/21 36/6 36/7 38/8
  40/23 47/15 48/20 48/24 49/3 50/4
  50/5 50/7 54/8 54/10 54/14 54/20
  55/1 55/8 56/22 57/4 57/10 57/21
  57/22 58/22 59/21 65/4 66/12
  66/20 66/21 67/14 68/19 68/20
  74/25 79/17 82/25 83/3 83/14
  84/20 89/9 90/19 91/14 92/4 92/15
  96/8 98/19 98/20 100/3 100/3
  100/18 102/3 102/5 102/8
**these [35]** 4/19 21/9 25/16 28/4
  28/9 28/11 40/10 47/16 49/11

49/24 56/18 56/21 62/1 64/3 66/15
  66/16 67/10 68/12 69/8 69/16
  69/19 70/17 72/10 74/3 74/16
  74/17 75/2 75/15 76/23 80/11
  80/19 81/6 89/11 89/13 99/20
**they [75]** 4/12 8/10 9/22 11/13
  11/25 12/16 13/10 13/11 13/15
  13/16 13/18 15/2 15/4 15/4 15/15
  15/17 16/8 16/9 16/20 17/1 18/7
  26/5 26/11 29/13 30/11 30/12
  31/11 34/17 35/8 35/10 45/15
  45/23 45/24 46/15 49/5 58/2 68/22
  69/24 72/20 74/6 74/9 74/12 74/13
  74/14 74/20 75/2 75/3 75/5 75/13
  75/22 75/24 76/3 76/6 76/8 76/15
  76/16 76/18 76/19 76/20 76/21
  79/2 79/22 80/21 80/24 82/6 89/23
  90/25 91/1 95/7 98/20 99/21 101/4
  101/5 101/6 101/6
**thing [4]** 4/8 12/19 31/14 42/7
**things [12]** 14/16 16/1 16/6 28/10
  30/24 32/19 35/3 40/10 46/23 52/1
  60/6 98/13
**think [43]** 4/10 12/22 18/2 18/3
  18/12 19/3 19/24 20/19 20/21
  21/21 23/6 23/24 24/18 30/24
  31/11 31/17 32/13 36/12 37/20
  38/13 39/1 46/15 52/20 53/6 58/25
  60/19 65/7 65/10 66/10 67/19
  67/19 69/21 82/17 83/2 83/4 83/6
  83/9 84/19 85/1 85/8 101/12 102/2
  102/5
**thinking [2]** 15/17 66/20
**third [1]** 47/2
**this [176]**
**those [42]** 6/2 9/25 10/8 10/10
  12/14 14/11 14/14 15/15 16/22
  17/14 21/10 21/21 21/22 22/17
  26/10 28/14 32/16 39/19 47/19
  47/21 52/15 52/21 55/21 56/17
  60/11 60/23 61/1 61/19 61/25
  70/17 73/4 74/4 74/9 74/11 76/24
  80/6 80/12 82/3 84/11 84/13 90/19
  97/12
**though [2]** 18/15 65/19
**thought [3]** 27/8 50/23 96/6
**thousands [4]** 11/15 11/17 11/21
  34/13
**three [2]** 47/16 52/6
**through [23]** 10/2 10/6 10/9 10/11
  17/14 24/22 24/24 26/9 27/7 28/13
  34/10 35/13 58/8 63/13 64/8 79/14
  79/14 91/10 96/9 98/22 99/4 99/6
  101/5
**thus [1]** 86/5
**Tiger [3]** 36/5 36/8 42/9
**time [46]** 11/16 11/24 12/17 14/17
  15/24 16/2 16/9 16/12 16/13 16/16
  17/3 17/4 17/8 17/10 17/11 17/14
  17/15 17/20 18/18 18/24 27/10
  28/13 33/15 33/17 48/1 53/2 57/13
  60/4 61/12 62/24 64/8 64/12 65/6
  66/5 66/5 66/7 66/12 66/16 68/17
  78/14 87/12 88/19 90/1 91/21
  91/25 99/10
**times [14]** 11/18 11/19 13/3 15/13
  16/17 17/16 17/18 18/8 18/10
  18/12 33/9 57/9 67/11 68/12
**timing [4]** 17/19 39/3 39/3 64/2
**title [4]** 72/6 72/7 73/6 86/11
**today [8]** 55/22 92/19 92/22 92/25
  93/3 96/15 101/25 102/7
**together [14]** 18/20 25/13 25/14
  58/22 59/19 60/15 62/23 67/4 68/4
  68/24 68/25 69/17 70/17 74/20
**told [1]** 17/4
**too [2]** 26/11 39/5
**took [3]** 64/19 68/9 92/7
**tool [12]** 23/13 26/8 28/12 36/5
  36/8 36/23 37/8 42/11 44/1 59/23
  60/3 61/12
**tools [4]** 24/21 49/25 61/23 62/1

**top [12]** 17/11 29/8 29/12 42/8
  43/21 44/15 44/23 51/18 88/15
  89/25 101/4 101/8
**topic [1]** 38/19
**topics [1]** 14/14
**TOR [21]** 2/2 2/3 5/12 22/21 22/23
  23/4 23/7 23/11 23/13 23/16
  49/21 49/23 50/1 97/24 98/1 98/3
  98/5 98/6 99/4 99/6
**total [1]** 92/1
**totaling [1]** 91/24
**touch [2]** 72/14 93/7
**towards [2]** 93/24 100/20
**trace [5]** 6/24 7/6 15/14 21/18
  32/6
**traces [7]** 21/9 21/17 21/19 21/21
  21/22 21/25 22/1
**tracing [1]** 22/3
**traffic [14]** 13/8 13/13 13/20
  17/23 17/25 18/5 23/2 31/12 33/13
  51/21 51/25 52/2 58/9 58/12
**trail [1]** 74/16
**training [10]** 73/12 73/13 73/14
  75/6 75/8 76/7 76/8 95/19 97/5
  97/8
**transaction [5]** 12/12 73/22 74/3
  74/4 76/16
**transactions [7]** 21/10 73/21
  73/21 74/11 74/18 91/24 91/25
**transcript [2]** 1/9 103/4
**transfer [1]** 8/18
**transferred [1]** 4/19
**transmitted [1]** 14/1
**transmitter [1]** 80/8
**Treasury [2]** 71/18 71/21
**treat [1]** 102/1
**treated [1]** 18/14
**TRIAL [1]** 1/9
**trials [1]** 73/16
**tried [2]** 30/16 82/12
**true [3]** 15/10 63/21 103/4
**trusted [1]** 49/8
**truth [4]** 7/18 7/23 100/7 100/11
**truthfully [3]** 93/19 94/5 95/1
**truthfulness [1]** 8/3
**try [4]** 62/1 67/2 94/15 98/13
**trying [7]** 31/5 61/24 64/10 67/17
  82/19 82/21 85/2
**TTY [2]** 37/8 37/10
**tunnel [1]** 34/4
**tunnelings [1]** 34/7
**tunnels [2]** 34/3 34/6
**turn [6]** 10/15 14/17 24/4 61/14
  93/14 94/24
**turned [2]** 28/19 30/16
**Turning [1]** 58/3
**Twitter [1]** 20/21
**two [9]** 12/14 20/13 39/16 39/19
  51/25 52/4 69/10 70/6 70/14
**type [18]** 11/25 25/20 33/6 33/20
  33/21 45/16 51/17 61/22 68/21
  74/8 75/3 76/7 77/5 77/12 79/15
  81/2 81/4 101/15
**types [3]** 71/23 74/18 98/13
**typical [1]** 31/11
**typing [1]** 39/18

**U**

**U.S [2]** 1/13 2/7
**U.S.C [1]** 86/12
**Uh [1]** 17/23
**Uh-huh [1]** 17/23
**unallocated [1]** 24/22
**uncommon [1]** 26/2
**under [10]** 37/6 57/11 73/11 75/24
  80/17 90/2 91/18 93/17 94/10
  102/1
**underlying [1]** 8/16
**underscore [1]** 63/8
**understand [12]** 31/17 38/5 38/25
  39/6 50/19 52/2 57/18 69/11 70/11
  87/7 95/23 95/25

## U

understanding [20]  4/9 20/12 41/23 43/24 49/12 49/16 50/15 51/12 51/24 54/21 54/23 56/22 61/1 65/6 90/2 90/13 90/16 91/7 92/7 94/23
understood [2]  18/4 39/2
UNITED [17]  1/1 1/3 1/10 5/4 5/9 22/23 23/1 23/4 37/24 38/6 38/9 38/15 38/22 89/6 90/12 90/13 95/14
University [2]  72/1 72/2
unless [4]  18/7 30/17 51/13 90/25
unmount [1]  41/4
unmounting [1]  41/2
unreadable [1]  45/13
until [6]  39/4 53/9 53/14 81/18 101/21 102/16
unusual [1]  25/23
unwittingly [1]  75/19
up [59]  8/16 10/22 14/12 15/25 16/1 24/5 24/23 25/16 25/18 25/21 25/24 26/16 28/5 28/5 28/15 28/25 29/1 29/2 30/12 34/24 35/5 35/23 37/1 38/17 39/9 41/15 41/16 43/15 45/18 45/20 45/24 46/3 46/4 46/9 47/14 48/3 48/21 53/4 57/15 59/16 59/22 64/23 77/14 78/1 80/13 82/10 83/9 83/12 84/21 88/15 89/18 89/24 90/19 94/15 95/20 100/5 100/18 102/9 102/16
update [1]  35/10
upon [1]  83/7
upper [2]  77/4 77/12
URL [1]  54/24
us [10]  1/20 65/5 71/18 71/21 71/22 71/24 73/14 80/4 94/12 101/2
USAO [1]  1/16
use [28]  13/7 13/24 13/25 14/6 14/8 14/9 14/12 15/8 15/11 23/16 28/24 33/15 33/17 34/11 34/13 34/25 48/20 49/8 49/20 49/23 49/24 50/1 61/16 62/1 63/25 74/2 97/12 97/12
used [17]  18/17 20/17 28/21 30/20 31/14 31/19 34/7 35/14 36/11 37/15 44/2 44/4 45/11 61/23 96/16 97/20 98/3
user [12]  20/17 21/3 24/24 32/23 40/18 57/25 69/2 69/8 69/18 70/7 77/15 77/15
username [1]  33/7
users [8]  11/21 20/6 20/7 32/20 49/5 69/10 70/6 70/17
uses [5]  11/1 15/16 16/4 25/1 34/15
using [14]  12/3 15/16 17/18 19/22 19/25 23/21 31/22 31/25 33/20 39/18 46/4 49/2 61/19 69/15
USSG [1]  91/23
usually [6]  13/5 16/12 24/21 25/19 46/23 90/22
UTC [2]  17/9 17/17

## V

vague [1]  57/1
Valerie [1]  3/3
value [2]  45/16 58/16
values [1]  45/12
variety [2]  14/4 14/9
various [1]  57/9
vault [1]  6/6
version [2]  32/16 60/3
versions [1]  99/20
versus [2]  5/5 89/6
very [8]  17/11 22/2 26/6 65/24 70/14 72/21 76/12 77/12
via [2]  40/13 72/12
Victor [1]  71/15
video [7]  36/8 36/10 36/16 36/19

43/25 44/3 44/3
videos [1]  49/11
view [7]  44/1 44/4 67/7 67/9 67/23 98/21 101/6
viewer [2]  43/24 44/1
viewers [1]  43/22
viewing [3]  36/10 36/16 44/3
violation [1]  96/15
violations [1]  73/2
virtual [4]  35/15 77/18 77/20 81/18
visible [1]  56/15
visited [3]  48/13 64/13 64/14
visual [1]  33/20
Vlahakis [4]  3/6 53/25 71/1 71/14
VNC [10]  36/5 36/8 36/23 42/7 42/9 43/16 43/18 43/22 43/24 44/1
voicemail [1]  72/20
Volf.prius [4]  20/21 63/16 63/25 70/8
Vote [1]  49/9
VPN [10]  13/1 13/7 14/4 14/6 14/17 14/19 17/25 33/11 47/25 49/21
VPNs [5]  13/25 15/2 15/4 15/19 61/16
VPS [1]  48/21
vs [1]  1/5

## W

walk [1]  63/13
Wall [1]  2/3
want [17]  14/14 14/17 16/2 18/3 34/25 47/2 50/3 66/3 67/25 75/18 77/25 79/4 86/14 89/2 102/2 102/3 102/8
wanted [5]  4/16 9/2 13/5 93/5 101/4
wants [3]  53/15 76/19 76/20
was [174]
Washington [6]  1/5 1/14 1/17 1/21 2/9 77/24
wasn't [17]  4/15 17/8 17/10 21/13 22/11 28/14 29/3 31/9 36/19 41/7 55/1 62/12 70/13 82/25 83/8 83/14 93/6
wave [1]  24/14
waves [1]  24/8
way [27]  15/25 16/1 18/22 18/25 19/12 19/25 23/14 25/12 29/2 30/8 31/3 31/19 32/15 33/4 33/8 33/12 35/8 35/12 38/6 38/8 42/19 45/12 57/18 64/20 77/3 90/5 98/24
ways [3]  11/7 30/25 74/24
we [113]
we'll [1]  85/13
web [1]  98/18
webinars [2]  77/7 77/10
website [16]  7/1 7/5 8/17 14/13 35/8 36/24 54/25 75/7 77/2 77/3 77/4 77/11 77/16 98/25 99/2 100/12
websites [1]  97/16
welcome [2]  4/24 23/23
well [12]  8/23 9/8 9/16 13/15 31/18 38/6 53/13 57/23 62/7 65/6 96/13 101/20
went [9]  17/17 26/8 28/9 28/10 39/6 68/10 91/10 99/10 99/21
were [76]  4/14 6/10 6/11 6/12 6/12 8/24 12/10 13/11 16/21 17/25 18/7 18/8 18/16 20/4 20/5 20/17 21/22 22/12 24/13 26/23 28/11 28/12 29/13 32/10 33/24 39/4 45/15 47/25 48/2 52/5 56/10 56/11 56/17 57/10 58/14 58/16 58/21 59/20 59/22 60/5 62/10 62/10 62/15 62/25 62/25 63/1 63/2 63/14 64/13 64/14 66/13 66/15 67/1 68/15 69/24 70/9 70/17 72/12 72/18 72/19 72/20 82/3 83/5 83/8 84/11 84/12 84/20 85/25 86/2 86/5

86/7 87/21 87/25 89/3 89/8 100/14
weren't [2]  26/5 55/1
what [157]
whatsoever [1]  81/21
when [55]  4/9 5/16 5/24 9/9 13/7 13/25 14/17 16/18 16/24 17/7 17/8 18/14 18/16 20/11 22/6 24/13 25/24 28/7 29/16 31/22 32/6 34/10 34/25 35/14 37/12 39/5 45/20 46/11 52/10 52/23 54/4 54/20 56/16 57/13 57/18 58/3 59/20 60/21 61/18 62/9 62/19 62/25 63/1 65/3 72/4 74/20 75/2 82/22 87/20 89/2 89/8 89/11 98/18 101/9 102/15
where [34]  11/9 24/7 27/23 28/9 31/11 33/20 37/5 39/15 40/3 43/22 44/16 45/15 47/14 50/14 50/19 51/15 51/16 64/18 68/9 68/12 68/17 71/17 77/11 77/23 79/9 79/21 79/22 80/3 86/25 87/24 88/15 91/4 96/3 100/24
Whereupon [5]  27/17 78/20 87/18 88/25 100/14
whether [18]  12/23 50/21 53/3 54/8 54/20 55/2 56/16 56/22 56/24 59/12 68/22 74/6 81/1 82/15 82/21 82/25 85/2 92/24
which [36]  11/21 16/20 17/17 23/20 24/21 25/20 26/20 26/21 28/8 28/24 32/9 34/10 36/5 42/16 43/16 43/20 45/10 49/2 49/3 52/5 59/20 59/24 61/23 70/9 72/9 73/3 80/14 82/14 83/4 83/6 83/7 88/3 90/17 92/1 93/22 94/8
whichever [1]  52/8
while [1]  86/16
white [3]  19/9 68/16 68/20
who [23]  4/11 5/13 13/19 15/13 20/3 28/4 32/17 50/9 50/20 53/20 53/24 55/9 61/15 61/18 62/11 74/18 75/25 76/4 80/19 84/23 90/5 90/9 94/19
whole [4]  17/15 42/7 48/23 48/24
why [12]  8/5 13/3 13/24 38/9 38/18 38/22 53/8 61/8 61/21 65/20 96/23 101/13
Wi [8]  11/9 12/4 12/13 12/19 12/23 12/25 13/8 31/23
Wi-Fi [8]  11/9 12/4 12/13 12/19 12/23 12/25 13/8 31/23
will [32]  11/10 14/12 15/24 25/20 33/8 33/9 45/11 46/2 49/6 50/10 53/6 53/9 53/11 74/2 77/7 77/14 83/13 83/20 83/21 84/18 84/22 85/1 85/8 90/9 91/21 92/6 94/9 94/10 95/8 95/9 100/10 101/14
window [2]  33/6 33/20
Windows [2]  32/13 40/6
Windows' [1]  28/3
wiping [1]  25/18
withdrawn [2]  9/16 17/7
within [7]  16/4 35/4 58/22 72/18 79/7 90/22 98/12
without [10]  4/17 12/25 20/7 25/18 25/21 50/11 57/13 84/11 93/3 93/6
witness [18]  4/25 4/25 5/3 53/24 53/25 65/1 65/11 65/25 69/7 70/21 70/23 73/15 81/13 84/15 84/24 95/24 96/2 101/19
witness' [2]  19/19 38/14
WITNESSES [1]  3/2
wittingly [1]  75/19
won't [1]  102/16
wondering [1]  64/25
word [2]  19/22 19/25
words [6]  52/21 54/10 58/5 100/23 100/24 100/24
work [13]  8/18 13/5 14/12 14/13 14/18 25/14 31/7 31/19 60/2 61/18 71/17 71/18 80/10

**W**

worked [4]   7/9 35/15 37/24 60/15
working [5]   27/2 28/22 39/2 72/4
  76/5
works [3]   35/11 77/4 77/12
world [3]   23/16 32/20 97/13
would [76]   4/20 5/6 8/18 10/15
  11/17 12/14 12/25 13/13 13/16
  14/2 15/6 16/15 19/17 19/23 23/15
  24/4 26/11 27/7 27/11 28/24 31/3
  31/6 31/8 31/9 31/14 31/22 31/24
  31/24 32/9 35/6 35/16 37/10 42/7
  42/15 46/17 47/2 47/4 49/12 49/20
  50/14 50/19 51/19 54/14 55/2 55/9
  56/12 56/12 56/14 56/18 57/20
  58/2 58/8 58/9 58/9 58/15 58/16
  58/21 58/23 59/6 59/16 61/14 70/4
  75/9 76/16 78/11 78/14 79/22 80/6
  82/1 83/7 88/2 88/19 92/14 98/24
  101/5 102/6
wouldn't [8]   11/23 12/1 13/3
  13/15 31/19 31/21 51/11 57/12
writeup [5]   20/10 20/11 22/18
  64/18 66/8
writing [1]   29/2
written [1]   9/7
wrong [1]   39/6
wrote [1]   27/1
www.BitcoinFog.com [1]   7/6
www.FinCEN.gov [1]   77/3

**X**

Xeoma [1]   59/25

**Y**

yeah [8]   8/5 14/5 38/13 47/19
  92/9 92/23 96/20 97/20
year [1]   68/20
years [5]   9/25 37/25 90/4 92/15
  92/16
yes [231]
yesterday [25]   4/9 4/17 10/19
  12/21 14/25 24/10 24/18 25/8
  30/19 32/10 33/25 34/3 34/18 36/1
  37/3 37/20 38/15 39/10 41/17 42/4
  42/17 42/25 43/10 44/25 55/22
York [3]   1/20 11/18 11/19
you [573]
you sometimes [1]   46/7
you're [2]   33/7 67/7
your [186]
yourself [7]   8/6 69/22 71/11
  71/11 85/21 95/13 101/15
yourselves [1]   53/10

**Z**

zero [3]   25/16 25/21 25/23
zeroing [2]   25/18 26/1
zone [9]   16/12 16/13 16/16 17/5
  17/8 17/10 17/14 17/16 17/21

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * *     )
UNITED STATES OF AMERICA,          )     Criminal Action
                                   )       No. 21-00399
              Plaintiff,           )
                                   )
    vs.                            )     **AFTERNOON SESSION**
                                   )
ROMAN STERLINGOV,                  )     Washington, D.C.
                                   )     February 29, 2024
              Defendant.           )     1:39 p.m.
                                   )
* * * * * * * * * * * * * * *     )

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:        CHRISTOPHER BROWN, ESQ.
                          UNITED STATES ATTORNEY'S OFFICE FOR
                            THE DISTRICT OF COLUMBIA
                          601 D Street, Northwest
                          Suite 5.1527
                          Washington, D.C. 20530

                          CATHERINE PELKER, ESQ.
                          U.S. DEPARTMENT OF JUSTICE
                          950 Pennsylvania Avenue, Northwest
                          Washington, D.C. 20530

                          JEFFREY PEARLMAN, ESQ.
                          U.S. DEPARTMENT OF JUSTICE
                          1301 New York Avenue, Northwest
                          Washington, D.C. 2005


FOR THE DEFENDANT:        TOR EKELAND, ESQ.
                          MICHAEL HASSARD, ESQ.
                          TOR EKELAND LAW, PLLC
                          30 Wall Street
                          Eighth Floor
                          Brooklyn, New York 10005

REPORTED BY:           LISA EDWARDS, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Room 6706
Washington, D.C. 20001
(202) 354-3269

Appx5075

<u>INDEX</u>

<u>WITNESS</u>                                                    <u>PAGE</u>

LARRY HARMON

   Cross-Examination By Mr. Ekeland                        40

ELIZABETH BISBEE

   Direct Examination By Ms. Pelker                        40
   Cross-Examination By Mr. Ekeland                        88
   Redirect Examination By Ms. Pelker                      93

E X H I B I T S


<u>Exhibit No.</u>                                              <u>Received</u>

  326 and 326-A                                            61

  353                                                      66

THE COURT: Anything to raise before we call the jury?

MS. PELKER: Just for Ms. Bisbee's testimony, the Court may recall that she has a hearing aid and will be -- I spoke with Mr. Ekeland. We will use a lapel mic. But she also noted that when the white noise goes off and on, it takes her hearing aid just a couple seconds to adjust.

THE COURT: That's good to know.

MS. PELKER: So just to advise the Court.

THE COURT: I appreciate that. Thank you.

Mr. Ekeland?

MR. EKELAND: And just quickly -- we can speak after today -- but I was speaking with the Government, and they're anticipating finishing their case tomorrow. I would just like to speak to the Court maybe a little bit later about the scheduling going forward.

THE COURT: That sounds good.

We also had that one juror with the issue on Monday. But we can come back to that.

Let's get the jury.

And the witness can come back to the stand.

(Mr. Harmon retakes the witness stand.)

THE COURTROOM DEPUTY: All rise.

(Whereupon, the jury entered the courtroom at 1:40 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY: You may be seated and come to order.

THE COURT: Mr. Pearlman, you may continue.

(LARRY HARMON, GOVERNMENT WITNESS, PREVIOUSLY SWORN.)

CONTINUED DIRECT EXAMINATION

BY MR. PEARLMAN:

Q. Mr. Harmon, we were talking before a little bit about the ad words, like the cocaine example that you gave. Was that the only way that you made money off Grams?

A. I also made money selling ad space on the sidebars. And later I created Helix, which is where I made most of the money.

Q. When you made money at Grams and then subsequently at Helix, how did you get paid?

A. In Bitcoin.

Q. And when you were paid in Bitcoin, were you immediately able to sell it or to cash it out?

A. I would usually mix it first before I had my own mixer.

Q. And why would you mix it?

A. Because any Bitcoin that could be traced from the dark web, which is where I got most of my Bitcoin from, would be flagged on any of the sites I used to cash out Bitcoin. So if I tried to cash it out without mixing it, they could flag my account or, you know, tell the authorities that they found someone trying to cash out Bitcoin that came from the

Harmon - DIRECT - By Mr. Pearlman

dark web.

Q. And what kind of sites were giving you Bitcoin for this type of ad space?

MR. EKELAND: Objection. Leading.

THE COURT: Overruled.

THE WITNESS: So it would basically be mostly vendors from the darknet markets that would pay me to put their ads on the side space.

BY MR. PEARLMAN:

Q. Are you referring to drug markets?

A. Yes. Drug markets.

Q. Are you familiar with a service called Bitcoin Fog?

A. Yes.

Q. How did you become familiar with Bitcoin Fog?

A. When I first started looking into the dark web, it was the known Bitcoin mixer on there. It was the one everyone referred to as the one to use and the most trusted. And it was on all the forums about dark webs, including the subreddit dark markets, and that's where I learned about them and that's where I started using them.

Q. Where was the subreddit dark markets located? Was it on Tor or was it on the regular internet?

A. It's on the regular internet. Reddit.com.

MR. EKELAND: Objection.

THE COURT: What was the objection?

Harmon - DIRECT - By Mr. Pearlman

MR. EKELAND:  Leading and there were a couple questions in there, too.  It was compound.

THE COURT:  Why don't I just ask you to reask the question and ask them separately.

BY MR. PEARLMAN:

Q.  Where was the darknet Reddit thread -- where was that located?

A.  It was a subreddit on reddit.com.

Q.  And you testified that you used Bitcoin Fog because it had some recommendations from these sites?

A.  Yes.  When -- I would often read through the different posts every day and a lot -- most of the posts were, you know, how to --

MR. EKELAND:  Objection, your Honor.  Hearsay.

MR. PEARLMAN:  It's not offered for the truth, your Honor.  It's offered for why he went to Bitcoin Fog.

THE COURT:  I'll allow the testimony not for the truth of the matter asserted.  I don't know exactly what the testimony is going to be, but just for the -- well, for explaining how the site works.

I'm not sure -- what are you offering it for?  If it's not for the truth of the matter asserted, what is it being offered for?

MR. PEARLMAN:  For why he went to Bitcoin Fog.

THE COURT:  Right.  Okay.  So the effect on the

Harmon - DIRECT - By Mr. Pearlman

listener.  That's fine.

MR. PEARLMAN:  Yes.

THE WITNESS:  Okay.  So I would view the different subreddits and forums every day just to get more information and more familiar with the dark web before I started my site.  And a lot of the posts were about how to get Bitcoin in and out of the dark markets and a lot of people asking questions about how to use Bitcoin because a lot of people wanted to buy drugs but weren't familiar with how to use it.

And a common -- very common theme was you had to mix your Bitcoin so that they couldn't be traced on the clearnet or through law enforcement.

And often, whenever that topic came up, people would recommend Bitcoin Fog, as it had been around the longest and is the most trusted.

BY MR. PEARLMAN:

Q.  At some point, did you visit Bitcoin Fog?

A.  Yes.

Q.  When you visited it, how did you access it?

A.  I used the Tor Browser.

Q.  So you visited it on Tor?

A.  Yes.

Q.  And what was the user interface like?

A.  In my opinion, it was kind of clunky and not very user friendly.  You had to create an account and then you had to

deposit some Bitcoin. But first you had to create a deposit address and it was often hard to tell when your Bitcoin actually hit the account, when you could withdraw it. It took three confirmations before you could withdraw the Bitcoin.

So a lot of times you'd have to log in, get a deposit address, wait for three confirmations after you deposit the Bitcoin, which could take hours, and then log back in, if you'd left during that time, and then you could withdraw to your Bitcoin address.

You also never knew what the fees were going to be because they were randomized. So I just thought it was kind of clunky and not very user intuitive.

Q. How many times did you use Bitcoin Fog to put your money from Grams or Helix through?

A. Around eight to ten times.

Q. Do you recall approximately how much total number of Bitcoin you put through Bitcoin Fog?

A. Around $10,000 to $20,000 worth of Bitcoin.

Q. 10 to 20,000 at the time did you it?

A. Correct.

Q. What was Helix?

A. So Helix was my version of a mixer. I was trying to improve on Bitcoin Fog. So what I did was I made it so that people could log in and they could deposit their Bitcoin;

Harmon - DIRECT - By Mr. Pearlman

and then, instead of waiting for three confirmations to withdraw it, they could put in a withdrawal address at the same time they deposited. When the three confirmations came in, it would automatically withdraw it for them. So it kind of made it easier so you didn't have to keep logging in to check if the three confirmations had gone through.

Q. And you noted that there was a randomization feature on Bitcoin Fog --

A. Right.

Q. -- that you didn't like. What did you do with Helix with respect to the fee that the users paid?

MR. EKELAND: Objection, your Honor. Relevance, and also I think we're getting into 702 territory here.

MR. PEARLMAN: As to what he did?

THE COURT: Overruled.

THE WITNESS: So I had a 2.5 percent fee, flat fee, on everything. That way people always knew how much money they were going to get back.

BY MR. PEARLMAN:

Q. When you set up Helix, did you eventually modify it and call it something else?

A. Yes. So I --

MR. EKELAND: Objection, your Honor. Relevance and leading.

THE COURT: Overruled.

Harmon - DIRECT - By Mr. Pearlman

THE WITNESS: So I wanted to make it even easier. So I created Helix Light, which was a version where you didn't even need an account to log in. All you had to do was give us a Bitcoin address that you wanted the money to go to. We would give the user a Bitcoin address to send Bitcoin to.

And with a 2 percent fee taken off, any Bitcoin sent to the deposit address would go to the withdrawal address. And that's -- that made it just a lot easier so they didn't have to create an account.

BY MR. PEARLMAN:

Q. When you designed Helix, did you design it by yourself?

A. Yes.

Q. And was there a particular programming language that you used?

A. PHP.

MR. EKELAND: Objection. Relevance.

THE COURT: I'll allow some of this, but at some point you need to tie it back.

BY MR. PEARLMAN:

Q. Why did you use PHP?

A. I was familiar with it and I couldn't use JavaScript for the front end because of the -- on the dark web, JavaScript is a browser scripting language and --

MR. EKELAND: Objection. 702, your Honor.

Harmon - DIRECT - By Mr. Pearlman

THE COURT: I think he's just explaining what he did. So overruled.

THE WITNESS: I can go?

THE COURT: You can continue.

THE WITNESS: So JavaScript is a scripting language that runs on your browser and not on the server. And it can get your IP address that can identify the user.

So anyone using the darknet was told -- and this was on the darknet forums, too -- that if you see JavaScript running on a server, do not use that because your IP could be leaked out to the person using that -- or the site using that JavaScript.

And since JavaScript's on the browser side, you can view the source, right-click "view source" and you can see if JavaScript is running.

BY MR. PEARLMAN:

Q. When you set up Helix, what kind of computer hardware did you use?

A. I --

MR. EKELAND: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: I had a Microsoft Surface that I would use at my house and then I would connect to different servers that I would rent from different companies around the world using fake names and Bitcoin to pay for.

I had a Linux server that was running CentOS and a remote Windows server that was running the Bitcoin wallets.

BY MR. PEARLMAN:

Q.  Did you ever change servers?

A.  Yes.  Quite frequently.  Probably every few months I would change them just to -- so that the server companies couldn't look into it and see what I was doing and then report it to the authorities.

Q.  Did you have a computer that was dedicated to this program?

MR. EKELAND:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.  I had a computer that I only used for this dark web stuff.

BY MR. PEARLMAN:

Q.  Did you have help?

A.  I had -- so eventually, I hired a graphic designer from the dark web.  I never knew his real identity.  And I hired a couple other support people to handle support, just answering emails and stuff.

Q.  And on the emails, did you get interaction with customers?

A.  Yes.  There was a lot of -- most of my days was dealing with emails and customer support because a lot of the users didn't know how Bitcoin worked; they didn't understand what

confirmations were.  And so a lot of them was saying, Well, hey, I haven't received my Bitcoin yet.

And I'd have to tell them, Well, you have to wait for this many confirmations or to that effect, you know, What's going on with my Bitcoin?  Why is there a fee?  All this.

Then as time went on and my site got more popular, there was a lot of scam sites that looked like my site that were the -- people would say, Hey, I sent you Bitcoin.

And I'd say, What URL did you send it to?

When they told me, I would have to say, No, that's not my site.  You got scammed.  It was a scam site.  That was quite popular near the end of my site.

Q.  Did you make money off Helix and Helix Light?

A.  Yes.  That's how I made most of my money.

Q.  And then what would you do -- and was the money that you made, was that ultimately in Bitcoin?

A.  Yes.

Q.  And so how would you cash out or use the Bitcoin in a real-world environment?

MR. EKELAND:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  So I would cash -- I would cash out in local bitcoin.com, which was a peer-to-peer-type, kind of like craigslist for Bitcoin.  So you could sell your Bitcoin

Harmon - DIRECT - By Mr. Pearlman

for cash on there, and eventually I found people that I could sell for wire transfers.

And later on, I found a company that would sell -- that would let me sell to them. A lot of companies, like Coinbase and Circle, who I'd normally sell small amounts to in the beginning, they shut down my accounts because they could tell it was coming from the dark web. And they asked where the Bitcoin came from.

And I said, From a mixer.

And they shut me down.

BY MR. PEARLMAN:

Q. When you said it came from a mixer, did you misrepresent what kind of mixer it came from?

MR. EKELAND: Objection.

THE WITNESS: I never told --

MR. EKELAND: Leading.

THE COURT: Sustained.

BY MR. PEARLMAN:

Q. What type of mixer did you tell them it came from?

A. I told them it came from a clearnet mixer called Coin Ninja.

Q. Was that a true statement?

A. No.

Q. At some point, did you shut down Helix?

A. Yes.

Harmon - DIRECT - By Mr. Pearlman

Q. Why?

A. I knew it was a gray area and there was a lot of laws being implemented at the time about Bitcoin and I was afraid of getting in trouble for it. So I shut it down.

Q. And when you shut it down, what happened to the server that was running it?

A. I deleted all the files on them and deleted all the evidence of ever having ran it.

MR. PEARLMAN: The Court's brief indulgence.

Pass the witness, your Honor.

THE COURT: All right. Mr. Ekeland.

MR. EKELAND: May I proceed, your Honor?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. EKELAND:

Q. You've never met Roman Sterlingov in your life, have you?

A. No.

Q. And you've never communicated with him?

A. No.

Q. I'm sorry. I don't know if the court reporter heard your answer to the question.

You've never met Roman Sterlingov in your life?

A. No. I've never met him.

Q. The first time you're seeing him is today in this

Harmon - CROSS - By Mr. Ekeland

courtroom?

A.   Yes.

Q.   And you testified that you signed a plea deal with the United States Government?

A.   Yes.

Q.   And you pled guilty to one count of conspiracy to money-launder?

A.   Yes.

Q.   And that you face a maximum of 20 years in prison under than count?

A.   Yes.

Q.   Were you indicted before that plea agreement with more than one count?

A.   Yes.

Q.   And what were the charges against you?

A.   Unregistered money changer, I believe, in federal and D.C.

Q.   And any other charges or was it just that one charge?

A.   Well, there was the conspiracy to money-launder, which I pled guilty to, and then two counts of unregistered money, one for federal and one for D.C.

Q.   And do you recall how many years the maximum sentence was on each of those counts?

A.   So it was 20 for the conspiracy and then five each for the other two.

Harmon - CROSS - By Mr. Ekeland

Q.   And then you decided just to take a plea just to the conspiracy to money-launder?

A.   Yes.

Q.   And is the reason that you took the plea because the Government had evidence against you that would prove their case?

A.   Yes.

Q.   And could you just tell the jury what that evidence was?

A.   They had photos of -- that I was the administrator, screenshots of my computer with the administration on it. They had tracked my Bitcoin addresses and knew that I had paid for certain stuff with money that came from Helix.  And they had witnesses, too.

Q.   And when they arrested you, did they find your private keys?

A.   Well, they found my Bitcoin wallet that had keys on it. But -- yeah.

Q.   And they -- you mentioned that they had photos of you as -- working as the administrator to Helix.  Could you just explain that for the jury.

A.   They had a picture of my computer in the background and you can see one of the tabs open said Grams min on it.

Q.   Did they have other photos?

A.   I believe so.

Q.   Did you keep records of your activity on Helix?

Harmon - CROSS - By Mr. Ekeland

A. What do you mean?

Q. Did you keep spreadsheets or any kind of ledger of all the transactions?

A. Oh, not of all the transactions. But I kept spreadsheets of the amount of money I made.

Q. And the Government got those spreadsheets, too?

A. Yes.

Q. And is one of the things you did with the way you laundered the money that you got from Helix is that you used debit cards in other people's names?

A. No.

Q. You didn't. Did you use debit cards to launder your money?

A. No.

Q. And did you fly private with the money that you made?

A. Yes.

Q. And when the Government arrested you, you had roughly $200 million in Bitcoin. Do I have that right?

A. At the time of my arrest, it was 60 million, and then at the time of my plea it was around 200 million.

Q. And that's because Bitcoin's price just went up, so it appreciated quickly?

A. Yes.

Q. And you consented to an asset forfeiture order in this case; is that right?

Harmon - CROSS - By Mr. Ekeland

A. Yes.

Q. And as part of that asset forfeiture, you agreed to forfeit approximately $311 million?

A. Yes.

MR. EKELAND: No further questions.

THE COURT: Any redirect?

MR. PEARLMAN: No, your Honor. Thank you.

THE COURT: The witness is excused. Thank you.

(Witness excused.)

THE COURT: The Government may call its next witness.

MS. PELKER: The Government calls Ms. Elizabeth Bisbee.

THE COURTROOM DEPUTY: Can you hear me, Ms. Bisbee?

THE WITNESS: Yes.

THE COURTROOM DEPUTY: Could you raise your right hand.

ELIZABETH BISBEE, GOVERNMENT WITNESS, SWORN.

THE COURTROOM DEPUTY: Thank you. Please be seated.

DIRECT EXAMINATION

BY MS. PELKER:

Q. Ms. Bisbee, could you please state and spell your name.

A. Yes. Elizabeth Bisbee, E-L-I-Z-A-B-E-T-H B-I-S-B-E-E.

Bisbee - DIRECT - By Ms. Pelker

Q.   Ms. Bisbee, where do you currently work?

A.   Chainalysis Government Solutions.

Q.   Can you briefly explain your educational background?

A.   Yes.  I have a bachelor's in human services.  I have a master's in forensic psychology and a second master's in investigative psychology.

Q.   Ms. Bisbee, when did you begin working in financial investigations?

A.   2014.

Q.   What was the nature of that work?

A.   I was employed with the Drug Enforcement Administration and provided case support for the DEA.

Q.   Can you explain a bit more about your role at DEA?

A.   Sure.  So I was an intelligence research specialist, which is also known as an analyst, and I worked in a section called the document media exploitation section and was assigned to provide financial investigation support for both the domestic and foreign offices for DEA.

Q.   And what did that work entail?

A.   Flow-of-funds analysis through various bank accounts for individuals that were suspected of drug trafficking and money laundering.

Q.   When you first joined DEA, was your focus on cryptocurrency?

A.   It was not, no.

Bisbee - DIRECT - By Ms. Pelker

Q. When did you first encounter cryptocurrency in your work?

A. Towards the end of 2014, I was assigned an investigation from my supervisor who had received a cryptocurrency investigation and asked for support; and I raised my hand.

Q. And what did your work on that first case in 2014 involve generally?

A. So initially, it started with me trying to figure out what cryptocurrency was and what the investigation was. And it was a darknet market vendor who was using cryptocurrency. And so my work entailed on kind of four different areas of research.

The first was to do open-source research on what is cryptocurrency, what is the darknet, to try to figure out what this type of mechanism that was being used for this investigation was.

That then led into additional research in academia. There were articles that were published about the traceability of Bitcoin. I even attended a couple of lectures at George Mason University that were conducting lectures on blockchain and Bitcoin.

And then the third bucket was through my research I had identified that other federal agencies had had success with tracing flow of funds using Bitcoin. And so I reached out to those agencies, which was FBI, IRS and his, to figure

out what were some of the mechanisms that they used in their previous cases.

And then the fourth thing that I did, because of the background that I had doing the financial investigations -- when doing financial investigations, there's contacts that you develop with financial institutions, so the banks. And so I took that knowledge to apply it to where the cash-out mechanisms were for cryptocurrency, which were the exchanges, and contacted the exchanges to understand how they worked with law enforcement, what type of information they could provide, in order to help with the investigation.

And so that was kind of the foundation that I did in order to learn how to trace funds and also worked these types of investigations.

Q. After you worked on that first darknet case back in 2014, what happened?

A. So the case ended up going into 2015. And I did the manual tracing, which is using public block explorers, to be able to follow the funds with the crypto addresses that were identified in the investigation, identified some offramps, so where the individual converts their Bitcoin into fiat or cash.

That was able to identify the individual. Along with other evidence that had been gathered through the

investigative steps, through undercover buys from the darknet markets, we were able to tie and arrest and indict the individual.

Q. After your success in that early case, did you work additional cases at DEA involving cryptocurrency?

A. I did. So from the success of that case, it became kind of word of mouth throughout DEA, where if you had a crypto case or a Bitcoin case, to call Beth. And so I became the point of contact for all cryptocurrency investigations for DEA.

Q. And in the subsequent years, did you have additional responsibilities in developing and building out DEA's cryptocurrency program?

A. I did. So through the -- just being the point of contact for many of the investigations for cryptocurrency, it became very apparent to me that I couldn't be the only one doing the tracing and being the one to support this. And so I started and created a crypto tracing training for analysts and agents within DEA.

And then that kind of grew to where not only was I providing the tracing support, but also was the point of contact to help develop what the undercover operations were within DEA that were using cryptocurrency and created a program for that.

I also became the, quote-unquote, "seizing agent"

Bisbee - DIRECT - By Ms. Pelker

for DEA.  So what that means is if there was a search warrant and there was expected cryptocurrency, I was called out for those search warrants to help seize the cryptocurrency and setting up government-controlled wallets for that.

Also during that time, DEA was working on building their own blockchain analytic tool.  And I was the advisor for the development of that tool.

And then also I helped with developing the policies and best practices for conducting crypto investigations, tracing, training and then also DOJ implementation for seizing best practices.

Q.  Can you speak to what tools you used to trace your transaction -- trace transactions on the blockchain while at DEA?

A.  So the first tool that I used were the block explorers, so the open-source block explorers.  And then as I became more familiar within the space, I was able to get access to many of the commercial tools, which included Chainalysis, Elliptic, Cybertrace, Blockchain Intelligence Group and others.

Q.  And are those different names that you just listed off other commercial tools similar in some way to Chainalysis Reactor?

A.  Yes, they are.

Bisbee - DIRECT - By Ms. Pelker

Q. Did you also conduct your own transactions to view them on the blockchain?

A. I did. So while learning how to trace cryptocurrency and seize cryptocurrency and also understand how the different wallets operate, I used my own funds to be able to create accounts at various exchanges and then transfer the funds so that I could learn how to follow my own money.

I found that if it was my own money, I didn't want to lose it. And so I became very good at being able to trace and understand how wallet software interacted on the blockchain to be able to decipher the various transactions.

Q. And how did you apply that knowledge to your work on tracing for investigations and undercover work at DEA?

A. So by conducting my own transactions, I also learned the various wallet software that is available, the usability for it, so if it had good obfuscation techniques or different applications that could be leveraged for that.

It also helped for when going and conducting the seizures, the familiarity with the wallets so that we'd be able to access the wallets and be able to seize the cryptocurrency.

Q. In your work at DEA, did you also have occasion to use other records and sources of information to enhance your tracing?

A. Yes.

Bisbee - DIRECT - By Ms. Pelker

Q. Could you explain how that would work?

A. Sure. So as I explained, the blockchain tracing was done with block explorers or commercial tools. But there's always on- and offramps; and so again, that's where individuals will take their cash and convert it into cryptocurrency. And that nexus is, like, what we consider the real world to where you can typically tie the individual to accounts.

And so we would get information to include the personal identifying information for the individual for that.

We also would have the ability to collect evidence when doing undercover transactions. So the evidence from that was also the tie to the real world. So we would get residences where drugs were shipped to to then also confirm what we were seeing on some of the accounts that had identified for the on- and offramps.

Q. How were you able to determine that the tracing you were doing was accurate and reliable?

A. So it was corroborated with the information that was gathering. So while conducting the transactions, not only are you looking at the on-chain, but you're looking at the off-chain transactions for that.

And when serving legal process and identifying the individual behind those accounts, also other evidentiary

collection was able to corroborate that the tracing was accurate.

Q. And did you have occasion at DEA to assess the reliability of Chainalysis's software?

A. Yes.

Q. How many cryptocurrency investigations did you work on while at the DEA?

A. More than 400.

Q. And over your years at DEA, did tracing involved in following the funds on the blockchain become more complicated?

A. Yes.

Q. Can you give some examples?

A. Sure. So in the early days of blockchain tracing, it was primarily Bitcoin. Bitcoin then became more diversified, if you will, in the sense of using other blockchains. So there's forks that happened with Bitcoin, and that's just the protocol enhancing and becoming more efficient. And that created a level of just from the protocol a sophistication.

But then also, there's the diversification of assets, so it wasn't just Bitcoin anymore. There are thousands of other cryptocurrencies. And so individuals would try to obscure the flow of funds by what we call chain hopping, which is going from one cryptocurrency blockchain

to another. So that was an obfuscation technique.

And then also, the increased leverage of use of mixers.

Q. How did the commercial tools assist with your ability to trace funds in light of these increased use of obfuscation techniques?

A. So with the commercial use of the software, they were able to provide almost realtime application of what was actually occurring on the blockchain.

So by identifying the mixers, it helped to streamline the analysis that was being conducted so that we could be able to identify illicit transactions that were occurring and also to be able to identify any of the cash-out mechanisms that were leveraged through any of the cross-chain transactions that may have occurred.

Q. How long were you at DEA?

A. Six and a half years.

Q. And by the end of your time at DEA, how much of your work and responsibilities centered on cryptocurrencies?

A. All of it.

Q. When did you move from DEA to Chainalysis?

A. January of 2021.

Q. Can you tell the jury a little bit about Chainalysis and what it does?

A. Sure. So Chainalysis is a blockchain intelligence

Bisbee - DIRECT - By Ms. Pelker

company that provides software for government as well as commercial entities.

Q. Is one of the -- is one software that Chainalysis offers called Reactor?

A. Yes, it is.

Q. Can you explain what Reactor is?

A. Sure. So Reactor is the investigative software that was developed by Chainalysis to be able to provide a way to view the transactions in an easier format and to also provide attribution for tracing the flow of funds.

Q. Does Chainalysis offer training and certification classes in cryptocurrency and blockchain analysis?

A. Yes.

Q. Can you speak to that a bit?

A. Sure. So there are several trainings and certifications that Chainalysis provides. So one is a fundamentals. It's a foundation level, which is an introduction to what cryptocurrency is, what blockchain is.

Then there's a -- it's a Reactor certification, which is a training for certification on how to use the software.

Then there is an Ethereum-centered investigations course which focuses on another blockchain and how to trace on that blockchain.

And then there's a specialized investigator's

course, which is an advanced blockchain analytics course.

Q. Does Chainalysis host conferences and learning sessions regarding blockchain analysis?

A. Yes.

Q. Does Chainalysis also publish reports about issues in the cryptocurrency space?

A. Yes.

Q. What types of customers use Chainalysis?

A. So it ranges from government, both law enforcement, regulatory and then private sector. So financial institution exchanges.

Q. What is your current role at Chainalysis?

A. So I am the director of customer growth and strategy.

Q. What are your responsibilities in that role?

A. So I'm primarily responsible for being able to take what has been done within Chainalysis and be able to translate that to the work that the government does. Chainalysis Government Solutions focuses on U.S. government, public sector. And so with my experience of working in the government, and then also being at Chainalysis, I provide that support, as well as the development of our own expert testimony.

Q. And how long have you held your current role?

A. Since November of 2023.

Q. Prior to November, what was your role?

A.   I was the director of investigation solutions.

Q.   What did you do as director of investigation solutions?

A.   So for the director of investigation solutions position, I oversaw a team of approximately 40 investigators that provided investigative support for the government agencies we supported.

Q.   What type of support would that involve?

A.   So complex investigative support.

Q.   What was the general background of your team members?

A.   So they range from former government, former law enforcement.  Some were in consultancy.  Some are former individuals from exchanges.

Q.   Why would someone hire your team to do a workup rather than do it themselves?

A.   So my team -- so take a step back a little bit.

Within a typical investigation, there's a multitude of aspects to understand within an investigation. And cryptocurrency is a component of that and tracing cryptocurrency is a component of that.

And so the investigations team is typically hired because we focus 100 percent on the blockchain and are considered to be the subject-matter experts for what is occurring on the blockchain, because that's all we do 24/7. And so we're able to see the changes, the emerging technology that transpires on the blockchain.

Q. What sort of volume of cases were you either working on or supervising as director of investigations?

A. Hundreds.

Q. And can you give some examples of the types of cases that you and your team were working on?

A. Sure. So they range from ransomware, intrusion, violent crimes, service financing, darknet markets, mixers, scams and fraud. It ran the gamut.

Q. What are things that you do to keep abreast of developments in this field?

A. So I do a lot of -- I attend a lot of conferences and read a lot of what's happening within the space through various news outlets.

Q. Have you received certifications in cryptocurrency investigations and blockchain analysis?

A. Yes.

Q. Do you also speak at trainings and conferences?

A. Yes.

Q. And is one of your responsibilities at Chainalysis testifying in cases like this one?

A. Yes.

Q. And have you previously testified in courts around the country regarding clustering and blockchain analysis?

A. Yes.

MR. PEARLMAN: The Government moves to qualify

Bisbee - DIRECT - By Ms. Pelker

Ms. Bisbee as an expert on cryptocurrency and blockchain analysis.

THE COURT: Any objection?

MR. EKELAND: Just the same as before. No.

THE COURT: Then the Court concludes that Ms. Bisbee is qualified to testify as an expert on cryptocurrency and blockchain analysis.

BY MS. PELKER:

Q. Ms. Bisbee, did the Government hire Chainalysis to complete an expert report and testify in this trial?

A. Yes.

Q. Is your salary from Chainalysis tied to that contract?

A. No.

Q. Does your salary depend on what you say here today or how many hours you work on this case?

A. No.

Q. Will you get paid any more or less depending on the outcome of this case?

A. No.

Q. We've heard a lot over the past week, few weeks, but can you explain from your perspective what is blockchain analysis?

A. So blockchain analysis is conducting a flow-of-funds analysis on cryptocurrency addresses that transact on the blockchain.

Q.  Did you assist with preparing a series of visuals that would help the jury understand your testimony today about blockchain analysis?

A.  Yes.

MS. PELKER:  If we could pull up Exhibit 352, which is not yet in evidence.

BY MS. PELKER:

Q.  Ms. Bisbee, directing your attention to the screen in front of you, is this the series of slides that you assisted in preparing?

A.  Yes.

MS. PELKER:  The Government moves to publish Exhibit 352 as a demonstrative.

THE COURT:  Any objection?

MR. EKELAND:  No objection if it's just a demonstrative.

THE COURT:  Exhibit 352 may be published as a demonstrative.

BY MS. PELKER:

Q.  And, Ms. Bisbee, does this slide deck include some of the same visuals that Mr. Scholl used in his testimony?

A.  Yes.

Q.  Directing your attention to Slide 1, can you explain what's shown here?

A.  This is a raw transaction.  That is what would be seen

Bisbee - DIRECT - By Ms. Pelker

on the blockchain without a user interface.

Q. Can you walk through what this transaction information in the box now shown on the screen indicates.

A. Sure. So the box indicates an easier user-friendly format on seeing the transaction and what transpired in that transaction.

So the orange here --

Q. You should be able to -- if you click "clear" on the lower left. And you should be able to select the pencil below there, below the clicker, and that will allow you to draw.

A. Thanks. Sorry.

So the orange here is the transaction hash, which is the same as the orange that's here.

And then the colors represented on the slide represent the different components of a transaction. So this is bringing to light the fee that is charged for the transaction, the input address, the amount that the input address is sending, the outputs, which are the receivers, so the addresses that are receiving those funds, and then the timestamp of when the transaction occurred.

Q. You may need to clear off the screen again. But can you walk us through how this compares to the information that you might see on a check?

A. Sure. So just like on components of a check, it is

Bisbee - DIRECT - By Ms. Pelker

authorizing the sending of funds. And there is components on the check that match up to what's actually occurring on a transaction that's occurring on the blockchain.

So on a check you have the account number. The account number is very similar to the input address. This is what is authorizing the sending of the funds and where the funds actually sit.

Then you have who are you actually sending funds to, which is in the "pay to the order." So that's similar to the output address, because you have to be able to indicate who you're sending funds to for them to receive it from your bank account.

Then you have to stipulate the amount, just like you would on a check.

And you have to sign the check in order for the check to be considered valid. Same within blockchain: You use the private key typically. In wallet software, it'll require you to a put a password or a PIN. That PIN authorizes the sending of the funds, which is like the right key.

Then you have the transaction ID, which is similar to the check number. So if I wanted to go to my bank and ask the bank, "I want to recall the transaction that occurred with Check No. 2400," the bank could query that up and pull this exact transaction that happened on the check.

Same with on the blockchain:  There's a transaction ID that will recall that specific transaction.

And then of course there's a date and a timestamp of when the transaction is, just like when you write the check.

Q.  Mr. Scholl previously compared this to a coffee shop transaction.  Can you walk us through that example?  Then we'll build on it.

A.  Sure.  So in a coffee shop, when you go into the coffee shop and you order a cup of coffee, it's going to have a price and you know that you're going to pay a tax.  And so it'll bring the total to what you actually owe.

And so you'll go into your wallet or your purse and you'll pull out a $5 bill.  And then you'll give that to the cashier and then the cashier will in turn give you a cup of coffee, the receipt and any change that you may have within that transaction for the coffee.

Q.  And how would this appear on the blockchain?

A.  So similarly to what was shown with that raw transaction hash, this is an example of what you would see just from the transaction from the coffee shop.  So you would have address 1 that has five Bitcoin.  It then spends four and then receives one as change.

And so the blue boxes are indicative of the address for the five and then the address 2 receiving the

change for that.

Q.  What if you want coffee and a bagel?

A.  So in this scenario, so the bagel costs, in addition to what you paid for the cup of coffee.  And so your total comes to 5.25.

So of course you can't just pay for it with a $5 bill.  So you retrieve another dollar from your wallet or your purse and you spend that and send it to the cashier. The cashier then gives you your bagel and your coffee, along with the receipt and any change that may have been received from that.

Q.  And how would this appear on the blockchain?

A.  So the five and one dollar represent a co-spend.  So you have to spend them together in order to get your bagel and coffee.

So in this example on the blockchain, you have two addresses on the input side that are spending together, which is what we call a co-spend.

And then they pay the address or the cashier for the coffee, which is address 3, and then the 75 cents is address 4 that then goes back to the wallet that it's spent from.

Q.  Mr. Scholl testified previously regarding Chainalysis's clustering of addresses.

Can you explain what clustering is?

Bisbee - DIRECT - By Ms. Pelker

A.   Clustering is a grouping of addresses that are determined to be associated or grouped together.

Q.   Is the concept of clustering something unique to Chainalysis?

A.   No.

Q.   Who else uses clustering?

A.   So clustering can be done manually.  So when I first started doing blockchain analysis, I could cluster manually addresses together.

Other software also uses clustering in order to group and associate addresses together.

Q.   When tracing funds on the blockchain, why are clusters useful?

A.   So it's useful to be able to identify where services may exist.  And those services are important to be able to identify cash-out points or if it's illicit activity, if there's illicit transactions that are occurring.  So having those grouping of addresses streamlines the process of doing it manually and then also provides more of a consensus of what's occurring on the blockchain.

Q.   Can you explain what you mean when you're using the term "service" or "services"?

A.   Sure.  So service, when I refer to it as a service means an entity, a known entity on the blockchain.  And that is either an exchange, darknet market, a mixer or other

Bisbee - DIRECT - By Ms. Pelker

different platforms.

Q. When you were working as an investigator, how would you identify clusters?

A. So sometimes it was from doing my own transactions of -- if I did a transaction from an exchange to my own wallet, I'd be able to identify that those addresses belonged to that exchange.

Others are using public block explorers that have attribution. And then also commercial tools that have clustering and attribution.

Q. What methods does Chainalysis use to determine what addresses should be clustered together?

A. So Chainalysis uses the -- what we call ground truth to be able to identify addresses that have transacted with. And so Chainalysis conducts micro transactions with these services to be able to identify addresses.

Q. Is there another term that might be commonly used for micro transaction?

A. Yeah; also known as test transactions.

Q. And can you walk through how Chainalysis uses a test transaction to identify addresses that are controlled by a particular darknet market?

A. Sure. So before being able to identify the addresses, Chainalysis has to conduct research on the service itself. So the service -- for instance, if it's an exchange or a

Bisbee - DIRECT - By Ms. Pelker

darknet market, they'll research the darknet market to identify what cryptocurrency that darknet market or service actually accepts and then will create an account on that service to be able to establish the validity of the service itself.

And so then with that, it's known that that service is going to have addresses; and so Chainalysis works to then identify the addresses that are associated with that service.

Q. Can you walk us through how that plays out with what's shown on your slide in front of us?

A. Sure. So with the account that Chainalysis has created at the service, they then will do a test transaction with the service. So the first transaction that Chainalysis will do is from their controlled wallet. They'll send a micro transaction to a deposit address, which is also known as a test deposit, to be able to identify the address that is controlled by that service.

And then, after the funds have been deposited, they'll want to conduct a withdrawal. And then they'll withdraw from the service to the Chainalysis-controlled wallet.

Q. And what does Chainalysis then do with this information about the test deposit and withdrawal addresses?

A. So Chainalysis will identify the addresses that they

Bisbee - DIRECT - By Ms. Pelker

deposited to and then the addresses that then withdrew. Chainalysis will then observe the behavior and patterns in transactions that those addresses do with other addresses within the service.

One --

Q. Is that what's shown here on the screen?

A. Yes. So as one address transacts with others, the patterns and behaviors are able to be identified. And then as those addresses start to transact and interact, additional addresses are then identified until a grouping of the addresses have been identified, which is the clustering.

Q. What does observing all this activity among all these addresses allow Chainalysis to do?

A. It allows Chainalysis to be able to identify what we call as a service fingerprint, the behavior that the service actually exhibits on how it conducts its transactions.

Q. Does Chainalysis do many of these sorts of transactions across many different services?

A. Yes.

Q. And so what insight, if any, does this give Chainalysis and its users?

A. It gives insight into, one, identification of services, but then also insight to how the service actually operates in order to further enhance the accuracy of the tracing that's conducted by its users.

Bisbee - DIRECT - By Ms. Pelker

Q. Can you walk us through some examples of how Chainalysis uses the information from those sorts of micro or test transactions to build out clusters?

A. Sure. So as I had indicated, Chainalysis will have created an account on the service. And so whenever the addresses that Chainalysis is interacting with -- the transaction behaviors that occur are what Chainalysis is observing.

So when one address transacts with another, we're able to identify that.

So this goes into being able to identify co-spend, peel chain detection and change address.

Q. Can you walk us through using this slide in front of you how observing the activity can help to reveal co-spending?

A. Sure. In that example, this would be the service sending Chainalysis funds. So this would be known as a withdrawal occurring from the service.

So Chainalysis provides the address that they want to receive funds to their own controlled wallet and then the service will send four and a half Bitcoin to the Chainalysis address.

What this is indicating here is that with the transaction that Chainalysis occurs within this, which is -- what we're looking at is just one transaction, with the deposit that is occurring -- or the withdrawal that's

occurring with the Chainalysis address, we can identify that these addresses that are on the input side are actually controlled by the service, because that's our account that then is transferring funds to the Chainalysis-controlled wallet.

And so that's one of the ways to be able to identify the addresses to then group them together.

As these addresses on the input side that are circled -- as those then start interacting with others, again, additional addresses can be identified and grouped and clustered together.

Q. And pausing here for a moment, can you explain the role of co-spending in the blockchain analysis profession?

A. Yes. So co-spend is one of the most commonly used and known aspects of blockchain analysis. And there's -- there have been scholarly articles that have been written about the accuracy of the co-spend and how that relates to be able to associate addresses together.

Q. And do many of the other forms or bases for clustering that we're about to talk about build on co-spending analysis?

A. Yes, it does.

Q. Now, returning to the slides, are there other types of behaviors that are useful to observe in addition to co-spending when conducting blockchain analysis?

Bisbee - DIRECT - By Ms. Pelker

A.   Yes.

Q.   Can you walk through how -- using the slide in front of you -- how a Chainalysis test transaction could reveal change addresses?

A.   Sure.  So within this example, again, it's a withdrawal that is coming from the service to a Chainalysis wallet.

So in this transaction, one and a half Bitcoin will be sent from the service Chainalysis account to the Chainalysis wallet.

When that occurs, the one Bitcoin that is to Chainalysis's wallet is received; and then there's change that is identified that belongs back to the service.

So with this address that's identified here that sent the one and a half Bitcoin, the service generated a new change address, which is where the .5 then was sent.

And so within this, Chainalysis can identify two addresses that are in control of the service.

Q.   And can you walk the jury through how a test transaction can reveal peel chains?  You may need to clear the screen first.

A.   Yes.  So in this example, again, it's a withdrawal coming from the service and sending funds to the Chainalysis wallet.

So in this example, the service is sending .25 Bitcoin.  So they sent .5 and they generate a new address.

Bisbee - DIRECT - By Ms. Pelker

**Appx5119**

When that new address is generated on the output side, the .25 goes to Chainalysis's wallet and then the .25 goes over to the newly generated address within their wallet.

Q.  And how would this then fall within a peel chain structure?

A.  So this generates a hop, is what we call it, in blockchain analysis, where the funds then send funds to an address like Chainalysis and then hops to another controlled address and creates this -- what we call peel chain through the hops that are occurring on the blockchain.

Q.  And how can this inform your understanding of a service and its activity on the blockchain?

A.  So this can help to identify how the service generates new wallets.  It can help identify how and the behavior that the service uses in order to withdraw funds from their platform.  And it helps to identify the addresses that are then grouped together based off of this type of pattern and behavior.

Q.  Does Chainalysis cluster based on change addresses or peel chains alone?

A.  No.

Q.  Can you explain how change addresses and peel chains do factor into Chainalysis's blockchain analysis?

A.  So all of the behaviors and patterns that were just

described are built upon each other. And so you don't take just one transaction or one look at how an address transacted. You look at the pattern that occurs with a particular address and various transactions that that address has participated in.

By looking at a multitude of those types of behaviors and patterns, can better inform how to actually group the addresses together.

Q. What sorts of things is Chainalysis looking at when it's observing activity on the blockchain in the way you're describing?

A. So like I had indicated, there are certain fingerprints that occur when transactions happen on the blockchain. So because it's a digital software that is interacting on a digital interface, so when a transaction occurs, the software is then providing a digital fingerprint of that transaction.

And so those fingerprints are identified when conducting blockchain analysis. And there's transaction features that occur of how the transaction transpires and then the wallet software generates particular fingerprints specific to the addresses that it creates.

Q. Can you describe generally what's shown here on the screen?

A. Sure. So these are some of the transaction features and

Bisbee - DIRECT - By Ms. Pelker

some of the address features that would be present when conducting analysis on the blockchain.

Q. Can you give an example of how one of these could be used to inform Chainalysis's study of behavior and patterns on the blockchain?

A. Sure. So it will inform on, for instance, the fee. That's a pretty significant component of looking at just how a service services its fees and how it charges its fees.

So that's one of the components that is looked at in the assessment of the transaction and then addresses that are grouped.

Q. Now, what are some of the most common patterns that you look for when you're clustering a service?

A. So the patterns can be what was just described as the co-spend, peel chain, the change address, as well as the change-of-address features over time. And as the -- and the transaction features and their signatures of when they're confirmed on the blockchain.

Q. Can you explain what behavioral clustering is?

A. Sure. So behavioral clustering is what was described as the co-spend -- not co-spend; excuse me -- the change address and the peel chain. And it's how the service actually interacts with the deposits and withdrawals of the transactions occurring with its users to be able to identify the type of behavior that the specific service is utilizing.

Q.   And how does behavioral clustering relate to co-spend clustering?

A.   So with behavioral clustering, it relates to the co-spend because co-spend is the premise of the methodology to be able to group addresses together.

And you can't look at one without looking at the other.

Q.   And what are you in Chainalysis then able to do with this information that you observe about a particular service?

A.   Able to inform again, like, how it's interacting with other services, to then identify the addresses and the overall behavior structure of that service.

Q.   You're speaking to overall behavior structure.  To emphasize, does any one feature that you referenced on its own necessarily give you enough information to build a cluster?

A.   No.

Q.   So can you explain your approach to using this sort of behavioral information in conjunction with co-spend?

A.   Sure.  So it goes off of the basis of blockchain analysis in general.  And with blockchain analysis, you start with address-level tracing, then you go to transaction-level, and then clustering-level.

So you assess the address first.  Then you look at

the parameters of all the transactions and then go into the grouping of the addresses that it's transacted with.

Q. Can you roughly analogize that address level, transaction level and cluster level using the coffee shop example from the earlier slides?

A. Yes. So in this example, you have the address which is in the blue box. So similarly to when you receive a $5 bill, when you receive that $5 bill you know it's a $5 bill because it tells you it's a $5 bill. It has a serial number on it and it also will tell you when it was printed. So there's different features that are on that $5 bill that you can assess from that.

On the blockchain, the same can be done with an address. So in this example, the address begins with a 1. But addresses can begin with a 3 or a BC1. When you look at the address on the blockchain, it will also tell you if there's any funds that are still tied to it, so does it still have value that's tied to it.

It'll also tell you its first transaction, its last transaction and also tell you how many transactions it's actually been a part of. So all of that helps to inform what actually is occurring with that particular address.

Q. What about at the transaction level?

A. So on the transaction level, when you're at the coffee

Bisbee - DIRECT - By Ms. Pelker

shop and you get the receipt, that receipt is representative of one transaction. That receipt is not representative of all the coffee that's sold or all of the bills that end up in the register. It's just one transaction.

So on transaction level, you're looking at how that address actually interacted with others. So in this example, the address in the blue box is on the input. So it's sending funds.

So when assessing how the address is interacting, that would be considered a pretty good indicator of just one component of that.

So in all of the transactions you'd want to see, how did that address actually receive funds? And so you would look at the transaction level that that address actually received the funds for to give you a more holistic idea of what that particular address is doing on the blockchain.

Q. And what about at the cluster level?

A. So on the cluster level, after assessing the address and then the transactions and the associated addresses that it's interacted with, you can start to identify the different groupings and clusters of those addresses.

So this would be considered like the service-level side of things of being able to identify that behavior, similar to the coffee shop.

Bisbee - DIRECT - By Ms. Pelker

So when you go to a coffee shop, there may be more than one cashier.  So when the cashier -- at the end of their shift, they take their register.  That's considered to be just one component of what they're leveraging to be able to put it into the coffee shop account.  And so the coffee shop as a whole will then look to reconcile everything that they did that day to include what's in their drawer as well as how many coffees they've actually sold.

Q.  How does that kind of play out on the blockchain with your analysis?

A.  So being able to identify how an address interacts and how it's funded helps to inform how it transacts on the blockchain to then start identifying, is it indicative of behavior that includes it to be part of a service?  That's to be able to inform, one, where to send legal process if it's a service, to send legal process to, or if it's a service like a darknet market or a mixer, to be able to identify illicit activity.

Q.  So for Chainalysis, what's the goal when you are identifying a services cluster?

A.  The goal is to be able to identify as many addresses to be able to inform the service in the most accurate and reliable method.

Q.  What does Chainalysis do to ensure the accuracy of its clusters?

A. So Chainalysis provides a very conservative approach. So as I had indicated of the different types of heuristics of co-spend, behavioral, which is the change address and peel chain, if it doesn't fit in parameters exactly, then it's disregarded.

So not all addresses that are part of a peel chain or a part of a change address are included in the service clustering, which is a more conservative approach.

Q. And does that mean that services can have addresses that are not included in the cluster?

A. Yes.

Q. Can clusters vary in size?

A. Yes.

Q. And as more addresses transact and a cluster grows larger, what does that mean for the opportunity to observe behavior?

A. As more addresses are added, there's more data points to be able to identify the different transactions that the addresses are transacting with. So the more data points, the more ability to be able to grow the -- or to build the assessment of what the service behavior is.

Q. Now, is Chainalysis the only company that does this sort of clustering?

A. No.

Q. And is it only done for law enforcement purposes?

Bisbee - DIRECT - By Ms. Pelker

A. No.

Q. What are some of the other purposes for this type of clustering?

A. So this also informs the compliance side. So exchanges that are performing due diligence and anti-money laundering compliance, they rely on the clustering in order to inform the safety for their customers.

Q. Why is it important that Chainalysis's clusters are reliable?

A. The government, law enforcement and private industry rely on it in order to protect the ecosystem.

Q. And in your extensive use of Chainalysis, have you found its clusters to be reliable?

A. I have.

MS. PELKER: Your Honor, we can keep going or take a brief break.

THE COURT: If this is a good time for a break, it's fine.

MS. PELKER: That's fine.

THE COURT: Let's take the afternoon break now. It's five minutes of 3:00. Let's come back at 3:15.

I'll remind you, don't discuss the case among yourselves and don't conduct any type of research related to the case.

THE COURTROOM DEPUTY: All rise.

Bisbee - DIRECT - By Ms. Pelker

(Whereupon, the jury exited the courtroom at 2:53 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY:  You may be seated.

THE COURT:  All right.  The witness can take her break as well.

Before the break, anything anybody wants to raise?

MS. PELKER:  No, your Honor.

MR. EKELAND:  I just didn't hear you.

THE COURT:  I asked:  Anything you wanted to raise?

MR. EKELAND:  No, your Honor.

THE COURT:  I will see you after the break.

THE COURTROOM DEPUTY:  All rise.  Court is in recess.

(Thereupon a recess was taken, after which the following proceedings were had:)

THE COURTROOM DEPUTY:  All rise.

(Whereupon, the jury entered the courtroom at 3:18 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY:  You may be seated and come to order.

THE COURT:  Ms. Pelker, you can continue when you're ready.

MS. PELKER:  Thank you, your Honor.

Bisbee - DIRECT - By Ms. Pelker

BY MS. PELKER:

Q. Ms. Bisbee, turning to Bitcoin Fog and this case specifically, what were you asked by the Government to do?

A. I was asked to provide the clustering and attribution that was found in Chainalysis Reactor for Bitcoin Fog and eight darknet market services.

Q. When did you begin work on this case?

A. I believe it was October of 2022.

Q. And did your work involve identifying Roman Sterlingov?

A. No.

Q. Did your work involve reviewing account records from exchanges or banks or other institutions?

A. No.

Q. Have you reviewed the Bitcoin Fog server or its logs?

A. No.

Q. Have you been to Sweden to interview the Defendant's childhood friends?

A. No.

Q. And you were only asked to look at the Bitcoin Fog cluster and the transactions between Bitcoin Fog and various darknet markets?

A. Yes. Eight darknet markets.

Q. Were Bitcoin Fog and the eight darknet markets that you reviewed here familiar to you before you started working on this case?

Bisbee - DIRECT - By Ms. Pelker

A. Yes, they were.

Q. Why was that?

A. So they were services that had already been identified in Chainalysis Reactor, as well as my time doing investigations at DEA as well as when I came to Chainalysis over the investigations program. Those services were identified in those various investigations.

Q. And why were these services that had already been clustered?

A. Because Chainalysis had identified them in their software.

Q. Why would Chainalysis and its customers need these clusters specifically?

A. So again, for investigations, having attribution and appropriate clustering for services helps to be able to identify flow of funds when doing blockchain analysis, as well as identifying illicit activity.

Q. Would the clusters for Bitcoin Fog and these darknet markets be clusters that would frequently come up in tracing done by law enforcement and financial institutions?

A. Yes.

Q. And how is the accuracy, then, of these clusters important?

A. It's important to be able to identify, again, illicit funds that are important for law enforcement investigations

as well as providing due diligence and compliance for exchanges and financial institutions to keep their customers safe.

MS. PELKER: If we could pull up Exhibit 326-A, which is not yet in evidence.

THE COURTROOM DEPUTY: It's taking a minute.

MS. PELKER: No problem.

THE COURTROOM DEPUTY: Could you unplug and plug back in, please.

MS. PELKER: Sure.

BY MS. PELKER:

Q. Ms. Bisbee, do you recognize Exhibit 326-A?

A. Yes.

Q. What is it?

A. So it's a list of addresses that are identified as being Bitcoin Fog.

Q. Identified by who?

A. Chainalysis.

MS. PELKER: If we could scroll down to the bottom.

BY MS. PELKER:

Q. How many addresses are on this list?

A. So there's a row, an index row. So 925,742.

Q. And, Ms. Bisbee, was one of the addresses in Chainalysis's Bitcoin Fog cluster inadvertently truncated

Bisbee - DIRECT - By Ms. Pelker

from this list during the export of this exhibit?

A. Yes.

Q. So are there actually 925,743 addresses in the Chainalysis Bitcoin Fog cluster?

A. Yes.

MS. PELKER: If we could pull up Exhibit 326, which is in evidence. I believe it may have been in evidence conditionally.

THE COURTROOM DEPUTY: Yes. That is correct.

BY MS. PELKER:

Q. Is this the list that Mr. Scholl testified to as the addresses controlled in the Bitcoin Fog cluster?

A. Yes.

MS. PELKER: If we could scroll all the way down to the bottom.

BY MS. PELKER:

Q. How many addresses are on this list?

A. There's one row. So 925,743.

Q. Does Mr. Scholl's list include the address that was inadvertently dropped from the export in Exhibit 326-A?

A. Yes.

Q. Apart from that address, are the addresses in your list at 326-A and Mr. Scholl's list at 326 identical?

A. Yes.

Q. Did the address impact the analysis that you and

Bisbee - DIRECT - By Ms. Pelker

Mr. Scholl testified to?

A. No.

MS. PELKER: The Government moves to admit Exhibit 326-A and complete the admission of Exhibit 326.

THE COURT: Any objection?

MR. EKELAND: Just hearsay.

THE COURT: Exhibit 326-A is admitted and Exhibit 326 is admitted without the condition.

(Whereupon, Government's Exhibit Nos. 326 and 326-A were entered into evidence.)

BY MS. PELKER:

Q. Now, Ms. Bisbee, can you explain how Chainalysis was able to determine that these addresses in Exhibits 326 and 326-A were controlled by Bitcoin Fog?

A. Yes. Through the micro or test transactions that were conducted by Chainalysis as well as the behavior that was identified by Chainalysis.

MS. PELKER: If we could pull the slide show back up for Ms. Bisbee's demonstrative.

BY MS. PELKER:

Q. Directing your attention to what's shown here, can you explain what's shown on the slide in front of you?

A. Yes. So this is a screenshot from the Bitcoin Fog website for the deposit that Chainalysis was conducting with Bitcoin Fog.

Bisbee - DIRECT - By Ms. Pelker

Q.  And can you walk us through with what's shown on the screen how Chainalysis started its test transaction?

A.  Yes.  So Chainalysis had gone to the website and gotten an account to deposit funds.  And this address here at the bottom that's in this box is the address that Bitcoin Fog provided in order for Chainalysis to deposit funds into Bitcoin Fog.

Q.  Did Chainalysis then in fact send funds to that address?

A.  Yes.

MS. PELKER:  If we could clear the screen.

BY MS. PELKER:

Q.  What did that test deposit transaction allow Chainalysis to see?

A.  So this test transaction was able to identify the deposit address for Bitcoin Fog.  So what you see here is the Chainalysis-controlled address, which is on the input side of the transaction, which is here, sent funds to the Bitcoin Fog address, which is on the output.

Q.  Did Chainalysis also conduct a test withdrawal?

A.  Yes.

Q.  Can you walk through or describe what's shown here on the screen as relevant to a test withdrawal?

A.  Yes.  So within Bitcoin Fog on the website, in order to receive funds from the service, Chainalysis had to input the address that they would like to receive funds to; and so on

Bisbee - DIRECT - By Ms. Pelker

the screen here, this address is Chainalysis's controlled address that they're wanting Bitcoin Fog to send funds to.

Q. And what did this then allow Chainalysis to observe on the blockchain?

A. This identified the withdrawal address that is being used by Bitcoin Fog, which is on the input, which sent funds to Chainalysis's controlled address that's on the output side.

Q. How does this test transaction relate to how funds were moved through Bitcoin Fog as a mixer?

A. So just like what's on this screen here, so you have the mixer user, which would be Chainalysis, depositing funds into Bitcoin Fog.

Bitcoin Fog then operates to obfuscate the address -- or the funds that were deposited. And the withdrawal then is made to the mixer user, which in this instance is Chainalysis.

Q. And how did this test transaction inform Chainalysis's clustering of Bitcoin Fog?

A. So by the two addresses that I identified with both the deposit address as well as the address that was used to send funds as a withdrawal, looking at the address from the address level, transaction level and the interactions that those addresses made with other addresses, we're able to expand the associated addresses that can be grouped together

Bisbee - DIRECT - By Ms. Pelker

for Bitcoin Fog.

Q. You've testified that co-spending is the primary foundation of most blockchain analysis.

Can you explain how co-spend applied in Chainalysis's clustering of Bitcoin Fog?

A. Yes. So the way that Bitcoin Fog operated on -- as a service is it would receive funds from its users and then it would transfer funds to a consolidation address. And those consolidation addresses co-spent. And so being able to identify the addresses within those consolidations were predominantly done through co-spend.

Q. Can you explain what a consolidation address is?

A. Sure. So if we go back to the coffee shop example and how I had indicated that there may be multiple registers or multiple cashiers that are operating, when they take their -- the funds out of their register to then count and reconcile for the day, they then will take those funds and then put it into the overall deposit for the day.

And so that overall deposit would be what we would consider a consolidation, so taking all of the different funds that were made from the different cash registers into one account. So that's what was seen in Bitcoin Fog and is what is -- what would be similar to describing what a consolidation address is.

Q. Is this --

Bisbee - DIRECT - By Ms. Pelker

MR. EKELAND: I'm sorry, your Honor. Could we just -- there's a screen being published to the jury right now that I don't believe anything is relevant.

THE COURT: We can take that down. There's no reason not to take it down.

BY MS. PELKER:

Q. Now, is this sort of consolidation a common pattern seen in services on the blockchain?

A. Yes, it is.

Q. How does understanding a service's use of consolidation addresses help you either cluster a service or validate existing clustering?

A. So it helps to be able to identify again what they're doing with their funds. So not only what the user behavior is of interacting with the service, but then what they're using to be able to withdraw the funds within the service.

So it helps to identify the consolidation addresses, but then also where they're hosting most of the funds to be able to further assess the overall behavior that the service is exhibiting.

Q. Did you create a graphic summarizing your identification and review of Bitcoin Fog's consolidation addresses?

A. Yes.

MS. PELKER: If we could pull up Exhibit 353, which is not yet in evidence.

Bisbee - DIRECT - By Ms. Pelker

BY MS. PELKER:

Q. Ms. Bisbee, can you explain what this is?

A. Yes. This is a visual of the consolidation addresses between 2011 and 2021 for Bitcoin Fog.

Q. And does it fairly and accurately summarize your review of Bitcoin Fog's underlying transactions and consolidation addresses?

A. Yes, it does.

MS. PELKER: The Government moves to admit Exhibit 353.

THE COURT: Any objection?

MR. EKELAND: Hearsay.

THE COURT: I will admit Exhibit 353 as a summary document.

(Whereupon, Government's Exhibit No. 353 was entered into evidence.)

BY MS. PELKER:

Q. Ms. Bisbee, can you --

THE COURT: It's a summary exhibit, rather.

MS. PELKER: If we could publish this to the jury.

BY MS. PELKER:

Q. Ms. Bisbee, can you walk the jury through what's shown here?

A. Sure. So on the side where it says "Consolidation addresses used from 2011 to 2014," there's ten of these

Bisbee - DIRECT - By Ms. Pelker

addresses here. These are all considered to be consolidation addresses that were used between 2011 and 2014.

On the other side, you have these addresses that are identified here that were then used in 2014 to 2021.

Q. And there's a circle that says "Bitcoin Fog" in the middle.

Are all of the addresses shown here within the Bitcoin Fog cluster?

A. Yes.

MS. PELKER: I'd like to briefly pull up the chart admitted during Mr. Scholl's testimony as Exhibit 353-A.

BY MS. PELKER:

Q. Ms. Bisbee, do you recall Mr. Scholl's testimony noting the earlier consolidation addresses that he identified?

A. Yes.

MS. PELKER: If there's a way to split the screen so we can look at both at the same time.

BY MS. PELKER:

Q. Ms. Bisbee, how does the -- how does Mr. Scholl's list of Bitcoin Fog consolidation addresses observed between 2011 and 2014 compare to your list of consolidation addresses that you identified on the left-hand side of your chart?

A. They're the same.

Q. And so studying the Bitcoin Fog behavior, did you and

Bisbee - DIRECT - By Ms. Pelker

Mr. Scholl identify the same consolidation addresses for that early time period?

A. Yes, we did.

Q. How did Bitcoin Fog's use of consolidation addresses help you to validate the Bitcoin Fog cluster?

A. It helped to validate the Bitcoin Fog cluster by the way that those consolidation addresses behaved and transacted with other addresses to be able to confirm the behavior that was exhibited by Bitcoin Fog as a service.

Q. Can you explain a bit more about the behavioral heuristic and how it applied to Bitcoin Fog?

A. Yes. So within Bitcoin Fog, not only was there a co-spend, which is how the consolidation address is identified, but then Bitcoin Fog also started leveraging peel chain and change address for the transfer of their funds.

And so the behavioral clustering that was done for that was based off of the analysis for the co-spends that then sent transactions that were identified to be peel chain and then also change address.

Q. Did you notice anything about the particular transaction features and wallet types used by Bitcoin Fog over time?

A. Yes.

Q. And how did that further help you to corroborate the cluster?

Bisbee - DIRECT - By Ms. Pelker

A.   So along the way, the weight of the transactions were being -- transacting, so co-spend, peel chain and change address.  The address features also were a component in identifying those addresses to confirm the reliability of what was Bitcoin Fog as a service.

Q.   Did you also look at the typical transaction structure, including number of inputs and outputs, for Bitcoin Fog transactions?

A.   Yes.

Q.   How did that help you to verify or validate the cluster?

A.   So it used the same pattern of the inputs and outputs over the entirety of Bitcoin Fog's service.

Q.   Did you do similar work to identify and verify the cluster of other darknet markets?

A.   Yes.

Q.   In addition to identifying the clusters of those markets themselves, were you also asked to do a flow-of-funds analysis between those darknet markets and Bitcoin Fog?

A.   Yes.

Q.   Can you explain what a flow-of-funds analysis is in this context?

A.   Sure.  So the flow of funds were -- was to identify the funds that were sent to and from the Bitcoin Fog and the eight darknet market services.

Q.   And how did you do that flow-of-funds analysis in this

case?

A. The flow of funds was an aggregate for all of the transactions that occurred between Bitcoin Fog and those eight darknet market services. And there were direct transactions, so Bitcoin Fog directly sending to the service, as well as an indirect flow of funds.

Q. In the abstract, is a flow-of-funds analysis something that you could do by hand?

A. Yes.

Q. Realistically, for this case, is it something that you would have been able to do by hand?

A. No.

Q. And why not?

A. I would likely still be doing it.

Q. And how does the Chainalysis Reactor software help with this?

A. It helps by providing again the aggregate of the flow of funds between the entities, so between Bitcoin Fog and the darknet markets.

Q. Does that allow you to use the software to tally things rather than having to hand-tally each transaction?

A. Yes.

Q. Did you prepare a chart and slides or .pdfs summarizing your analysis of all of these transactions?

A. Yes.

Bisbee - DIRECT - By Ms. Pelker

Q. Showing you Exhibit 354, which is not yet in evidence, is this the deck that you prepared?

A. Yes.

Q. And generally, how many transactions are we talking about you having summarized in this chart?

A. Hundreds of thousands.

Q. And does this fairly and accurately summarize the information contained in the voluminous underlying records?

A. Yes.

MS. PELKER: The Government moves to admit Exhibit 354 as a summary.

THE COURT: Any objection?

MR. EKELAND: Hearsay.

THE COURT: That objection is overruled and Exhibit 354 is admitted as a summary exhibit.

(Whereupon, Government's Exhibit No. 354 was entered into evidence as a summary exhibit.)

BY MS. PELKER:

Q. Ms. Bisbee, can you explain what's shown here on this first page?

A. Yes. So in this first box here, this is the direct sending exposure, which means the marketplace is sending funds to Bitcoin Fog. And then in the bottom box, it's the darknet markets receiving funds from Bitcoin Fog.

Q. We'll now walk through the markets one by one.

Bisbee - DIRECT - By Ms. Pelker

Going to the next page, are you familiar with the darknet market Abraxas?

A. Yes.

Q. What was Abraxas?

A. Abraxas was a darknet market that was on Tor, an anonymizing browser. And it primarily sold illicit goods and services.

Q. How did people pay for things on Abraxas?

A. With Bitcoin.

Q. How did Abraxas handle customer funds?

A. Through receiving funds through accounts that customers would set up.

Q. And did Abraxas have just one Bitcoin address that it used for all of its activity or multiple addresses?

A. There were multiple addresses.

Q. Is that typical for darknet markets?

A. Yes.

Q. And we talked about test transactions. Did Chainalysis do a test transaction on Abraxas?

A. Yes.

Q. What did that allow Chainalysis to see?

A. To identify again the deposit address and then withdrawal addresses that Abraxas controlled to then identify additional addresses and the service behavior.

Q. And did Chainalysis identify thousands of addresses that

it determined were controlled by Abraxas?

A. Yes.

Q. Is that using similar processes to what you've testified to regarding Bitcoin Fog and clustering generally?

A. Yes.

Q. Using that information, did you determine the flow of funds between Abraxas and Bitcoin Fog?

A. Yes.

Q. Can you explain how you went about doing that?

A. Yes. So leveraging Chainalysis Reactor software pulled up Bitcoin Fog and Abraxas and provided the funds that sent directly between Bitcoin Fog and Abraxas, and that's what this display is here.

And so we're able to identify the total of Bitcoin that were sent to Abraxas from Bitcoin Fog and then the funds that were received from Abraxas market to Bitcoin Fog.

Q. And for the jury, who isn't used to seeing things in Chainalysis, can you explain what the two circles are here and the line between them?

A. Yes. So this is showing the cluster. So in an easier format, rather than the lists of the 925,000 addresses, it groups them together and puts it in a depiction of the circle, which is considered and known as being a cluster.

Then the line in between Abraxas and Bitcoin Fog represents the transactions that are going between the two

Bisbee - DIRECT - By Ms. Pelker

services. And the two arrows show the direction of the funds that are being sent to and from Bitcoin Fog and Abraxas.

Q. And within the Chainalysis software, can you click on the Bitcoin Fog or Abraxas circles and actually see the list of those hundreds of thousands of addresses?

A. Yes.

Q. And similarly, if you click on that arrow, is that showing just one transaction or many transactions?

A. Many.

Q. And if you were to click on the arrow in the software, would you be able to actually see all of those transactions individually if you wanted to?

A. Yes. It would demonstrate the transactions similar to the transaction in the box that shows the inputs and the outputs. It's the same information that's being derived from the blockchain that then is being placed in the individual software.

Q. And does showing it this way just make it easier to see and understand?

A. Yes.

Q. Now, how much money moved directly from Bitcoin Fog -- from a Bitcoin Fog address to an Abraxas address?

A. So for Bitcoin, it's over 2,000 Bitcoin.

Q. What was the U.S. dollar value of that at the time?

A. $516,057.

Q. Can you explain how the -- when are those exchange rates calculated?

A. So they're calculated at the time of the transaction.

Q. And how much money did Bitcoin Fog receive from Abraxas in Bitcoin?

A. 4,116.

Q. What was the U.S. dollar value of that?

A. Over $1 million.

Q. And is this slide showing only the Bitcoin sent directly between Bitcoin Fog and Abraxas with no intermediary address?

A. That's correct.

Q. Did you also look at the indirect fund flows?

A. Yes.

Q. And are those figures shown on a later slide at the end of this presentation?

A. Yes.

Q. But for these slides, we're just talking about direct?

A. That's correct.

        MS. PELKER:  If we can turn now to the next market.

BY MS. PELKER:

Q. Are you familiar with the darknet market of Agora?

A. Yes.

Bisbee - DIRECT - By Ms. Pelker

Q. And what was Agora?

A. Darknet -- Agora was a darknet market that was on Tor, an anonymized browser that sold illicit goods and services.

Q. And did Chainalysis take the steps similar to what you previously testified for Bitcoin Fog and Abraxas to identify the Agora market addresses and build out its cluster?

A. Yes.

Q. Did you then look at the flow of funds between Agora and Bitcoin Fog?

A. Yes.

Q. How much money in Bitcoin was sent from Bitcoin Fog to Agora?

A. 26,398 Bitcoin.

Q. And what was the U.S. dollar value of that?

A. 8 and a half million.

Q. And what about the amount sent from Agora to Bitcoin Fog?

A. For Bitcoin, it was 41,972.

Q. And in U.S. dollars?

A. Over 14 million.

        MS. PELKER: If we could go to the next slide for AlphaBay.

BY MS. PELKER:

Q. And could you explain what AlphaBay was?

A. Yes. AlphaBay was a darknet market that was accessed

Bisbee - DIRECT - By Ms. Pelker

through Tor, and it sold illicit goods and services.

Q. Can you explain what types of illicit goods and services were sold on AlphaBay and these different markets?

A. Yeah. Predominantly drugs.

Q. And did Chainalysis do test transactions and build out the cluster for AlphaBay similar to the methods that you've described for the other markets?

A. Yes.

Q. And did you look at the flow of funds between Bitcoin Fog and AlphaBay?

A. Yes.

Q. How much money did Bitcoin Fog send to AlphaBay?

A. So in Bitcoin, 3,651.

Q. And U.S. dollars?

A. 1.6 million.

Q. And what about how much money Bitcoin Fog received from AlphaBay?

A. In Bitcoin, 5,700.

Q. And in U.S. dollars?

A. Over 3 million.

MS. PELKER: If we could go to the next slide, please.

BY MS. PELKER:

Q. What was Black Bank?

A. Black Bank was a darknet market service that was

Bisbee - DIRECT - By Ms. Pelker

accessed on Tor. And it sold illicit goods and services.

Q. Did Chainalysis also build out the cluster for Black Bank similar to the other markets?

A. Yes.

Q. How much money did you identify going from Bitcoin Fog to Black Bank?

A. In Bitcoin, it was 1,632.

Q. And U.S. dollars?

A. 427,000.

Q. And what about from Black Bank to Bitcoin Fog?

A. 2,918 Bitcoin.

Q. And in U.S. dollars?

A. Over 912,000.

Q. Going to the next market, can you explain what Evolution Market was?

A. Yes. Evolution was a darknet market service, so it was accessed through Tor. And it sold illicit services and goods.

Q. Did Chainalysis do a test transaction on Evolution and build out the cluster similar to how it has -- you've testified to for the other markets and Fog?

A. Yes.

Q. How much money did you find being sent from Bitcoin Fog to Evolution Market directly?

A. Bitcoin, 6,473.

Bisbee - DIRECT - By Ms. Pelker

Q. In U.S. dollars?

A. 1.8 million.

Q. And what about the amount sent from Evolution to Bitcoin Fog?

A. Bitcoin, 11,100.

Q. And in U.S. dollars?

A. 3.1 million.

Q. Going to the next market, are you familiar with Nucleus Market?

A. Yes.

Q. What was Nucleus?

A. Nucleus was a darknet market service that was accessed through Tor that sold illicit goods and services.

Q. And did Chainalysis build out the Nucleus cluster similar to what you've previously testified to?

A. Yes.

Q. Did you look at the flow of funds between Nucleus and Bitcoin Fog?

A. Yes.

Q. And how much money did you find were sent from Bitcoin Fog to Nucleus Market?

A. Bitcoin was 2,829.

Q. What was the U.S. dollar value of that?

A. 802,000.

Q. What about money sent the other way?

Bisbee - DIRECT - By Ms. Pelker

A. From Bitcoin it was 5,240.

Q. And in U.S. dollars?

A. 1.4 million.

Q. And going to the next slide, are you familiar with Pandora?

A. Yes.

Q. And to be clear, is this Pandora the darknet market, not the streaming service?

A. Yes. Darknet market Pandora.

Q. And what type of items were sold on Pandora?

A. So Pandora sold illicit goods and services.

Q. And did Chainalysis build out the cluster for Pandora similar to what you've testified to for the other markets?

A. Yes.

Q. Did you look at the flow of funds between Pandora and Bitcoin Fog?

A. Yes.

Q. And how much money was sent from Bitcoin Fog to Pandora?

A. Bitcoin was 553.

Q. And the U.S. dollar value?

A. 299,000.

Q. And what about from Pandora to Bitcoin Fog?

A. Bitcoin was 2,032.

Q. And the U.S. dollar value?

A. 1.2 million.

Bisbee - DIRECT - By Ms. Pelker

MS. PELKER: If we could now go to Sheep Market.

BY MS. PELKER:

Q. Are you familiar with Sheep Market?

A. Yes.

Q. What was Sheep Market?

A. Sheep Market's a darknet marketplace accessed through Tor that sold illicit goods and services.

Q. And did Chainalysis build out a cluster for Sheep Market?

A. Yes.

Q. How much money did -- were moved from Bitcoin Fog directly to Sheep Market?

A. In Bitcoin, 1,547.

Q. And in U.S. dollars?

A. 361,000.

Q. And what about money sent from Sheep to Bitcoin Fog?

A. In Bitcoin, 7,646.

Q. And what was the U.S. dollar value?

A. 2.7 million.

MS. PELKER: If we could now go -- we're done with the markets -- to the next page in this slide deck.

BY MS. PELKER:

Q. Directing your attention to this direct fund flow summary, can you explain what's shown here on this slide?

A. Yes. So what this is showing is the total of all of the

marketplaces grouped together to show the aggregate flow between Bitcoin Fog and all of those darknet markets that were just described.

Q. And did your calculation for this table include just the eight markets that you previously testified to?

A. Yes.

Q. And so did it include Silk Road, Silk Road 2 or Welcome to Video?

A. No.

Q. In total, how much money was sent from the selected darknet markets that you reviewed directly to Bitcoin Fog?

A. 80,728 Bitcoin.

Q. And how much was that in U.S. dollars?

A. Over 27 million.

Q. And what about how much money was sent from Fog directly to the darknet markets?

A. 45,152 Bitcoin.

Q. And now can you explain generally with a darknet market what users are sending funds into a darknet market?

MR. EKELAND: Objection.

A. Users that are sending --

THE COURT: I'm sorry. There's an objection.

MR. EKELAND: Leading. Also, outside the scope of 702.

MS. PELKER: I don't think it's leading. I'm just

Bisbee - DIRECT - By Ms. Pelker

asking her about the flow of funds into the market and then out of the market.

THE COURT:  Overruled.

THE WITNESS:  Can you repeat the question?

BY MS. PELKER:

Q.  Generally, for a darknet market, what types of users are sending money into a darknet market?

A.  The funds that are going into a darknet market are the buyers.  So people that are going to go and purchase the illicit goods and services.

Q.  And what about the funds that are coming from the -- out of a darknet market?

A.  The funds that are coming out of a darknet market are typically the funds that are used from the vendors.  So what they've received for their goods and services and then cashing their funds out.

Q.  Did you also look at indirect fund flows between these markets and Bitcoin Fog?

A.  Yes.

Q.  Can you explain what an indirect flow is?

A.  Indirect is where there's funds that go to an intermediary and then are sent to the service.  So an example:  Bitcoin Fog sends funds to an intermediary address that then sends to a darknet market.

Q.  Can you give an example of a situation where there would

Bisbee - DIRECT - By Ms. Pelker

be an indirect flow from, say, Agora Market to Bitcoin Fog?

A. Yes. So an example would be a vendor moving their funds into their own wallet that's not on the darknet marketplace and then sending funds from that wallet to Bitcoin Fog.

Q. And what about an example of movement from Bitcoin Fog indirectly to Agora?

A. So it would be a buyer that is receiving their funds from Bitcoin Fog into their own personal wallet, then sending funds to the darknet marketplace.

Q. And are those indirect transactions captured here in the 20 -- just under $28 million sent directly to Bitcoin Fog and 15 million sent directly to darknet markets?

A. What's shown here is direct.

Q. So the indirect would not be included in this?

A. That's correct.

Q. Did you, though, look at indirect flows related to Bitcoin Fog and darknet markets?

A. Yes, I did.

Q. Now, do indirect flows only have one address in between?

A. No.

Q. And is it common to have transfers involving more than one intermediary address?

A. Yes.

Q. Why would that be?

A. So the -- again, the grouping or co-spend of addresses

can occur outside of services. So if an individual controls their own wallet and they spend those addresses together, that would be considered additional addresses that they'd be sending through.

MS. PELKER: If we could move to the next page.

BY MS. PELKER:

Q. Does this slide show your analysis of both direct and indirect transactions?

A. Yes.

Q. And for the analysis here, did you filter down the indirect to specifically only look at transactions with one intermediary hop?

A. Yes.

Q. So can you walk through what's shown here on the slide? You don't need to read all of the figures, but explain to the jury what is shown.

A. Sure. So the top box here is showing the sending. So this is the marketplace sending to Bitcoin Fog.

And on this side here is the direct.

And then this side here is the indirect. So that intermediary, the one hop for that.

Q. And so what's the figure for the direct sending, total?

A. The total? So that's this down here. So for Bitcoin, it's 45,152.

And then for USD, it's 14.5 million.

Bisbee - DIRECT - By Ms. Pelker

Q. And is that similar -- consistent with the numbers we just saw in the previous slide?

A. Yes.

Q. What about the indirect -- how much additional funds had you identified with the indirect sending?

A. So in the additional funds for indirect for Bitcoin, it was 13,940.

And then for USD, it was 4.7 million.

Q. And can you walk through what's shown in the receiving table at the bottom?

A. Yes. So this down here at the bottom is the receiving. So this is the marketplace is receiving from Bitcoin Fog. And again, there's the direct, which is this down here, and then the indirect, which is this here.

Q. And is that direct figure, the 28 million or so U.S. dollars, consistent with what was shown on the prior slide?

A. Yes.

Q. How much additional funds did you identify when looking at the indirect transfers?

A. So on the indirect with Bitcoin, it was 31,792. And then for the U.S. dollars, it was 10.8 million.

Q. And taking a step back, kind of big picture, is this sort of significant fund flow what you would expect to see as far as transfers between major darknet markets and a darknet mixer like Bitcoin Fog?

Bisbee - DIRECT - By Ms. Pelker

A.  Yes.

Q.  Why is that?

A.  This was typical behavior that buyers and vendors would do and which was observed through years of doing investigations.  It's used to be able to help obfuscate where their funds originated from.

Q.  Ms. Bisbee, are there techniques that people use to attempt to defeat clustering?

A.  Yes.

Q.  And can you -- how does Chainalysis handle those techniques?

A.  So Chainalysis has the ability to control for the techniques that may be leveraged in defeating the clustering and grouping of addresses.

Q.  And in your work for this case, did you see any indication that there were those sorts of techniques that were deployed to try to evade Chainalysis's clustering?

A.  There were no techniques that were detected.

Q.  And why is it so important to Chainalysis to have accurate clusters?

A.  To be able to have our software be relied on by law enforcement and compliance on customers.

Q.  And does the information that you've testified to today -- is it also relied on by other users of the Chainalysis software?

Bisbee - DIRECT - By Ms. Pelker

A.   Yes.

Q.   And what steps does Chainalysis and its users take to test or validate the information in the software?

A.   So Chainalysis takes the steps of continuing to observe the behavior that's occurring with the services and then law enforcement and other compliance or financial institutions take steps to corroborate the information by either sending legal process or again protecting its customer users and ensuring that their platform is safe.

Q.   And how are you able to determine that this is reliable information for your work and your investigations?

A.   So from my experience of using Chainalysis software since 2015, this is the same reliability that I knew when I was in government.  And while working on the investigations team and overseeing all those investigations, the reliability of this clustering is dependent on all investigations.

                MS. PELKER:  No further questions, your Honor.

                THE COURT:  All right.  Mr. Ekeland?

                THE WITNESS:  Can you switch the mic?  Thanks.

                        CROSS-EXAMINATION

BY MR. EKELAND:

Q.   Can you hear me okay?

A.   Yes.

Q.   Can you hear me?

Bisbee - CROSS - By Mr. Ekeland

A. Yeah. That's great.

MR. EKELAND: May I proceed, your Honor?

THE COURT: You may.

BY MR. EKELAND:

Q. You don't identify Mr. Sterlingov as the operator of Bitcoin Fog?

A. No.

Q. And Chainalysis was purely hired to do the flow-of-funds analysis that you just testified to?

A. That's correct.

Q. And you testified, if I recall correctly, that your knowledge of the accuracy of Chainalysis Reactor is based on what law enforcement tells you and your own experience?

A. And what compliance officers and exchanges, financial institutions, do. Yes.

Q. So law enforcement, customer information and your own experience?

A. Yes.

Q. But Chainalysis doesn't collect internally any data on your error rates, do you?

A. Not that I'm aware of.

Q. And you can't tell me the statistical error rate for Chainalysis Reactor, can you?

A. I cannot.

Q. And you cannot name me one scientific peer-reviewed

Bisbee - CROSS - By Mr. Ekeland

paper attesting to the accuracy of Chainalysis Reactor?

A. So not necessarily to Chainalysis Reactor. However, the methodologies that are used for the clustering that was described in my testimony are based off of scholarly academic journal articles that have been published and have been circulated within the community.

Q. And you're aware that in those scholarly academic papers, the error rates for heuristic algorithms like the ones used by Chainalysis Reactor vary anywhere from 10 to 90 percent?

A. So I'm aware of what they cite in some of the articles. However, with Chainalysis's clustering with the ability to identify those addresses, it's different than what's identified in the journal articles because Chainalysis looks at services and then identifies the addresses that are done with the services and not in blockchain as a whole, which is what those articles are referring to instead of an isolated service.

Q. So just -- if I understood your testimony correctly, those articles can't be relied on to attest to the accuracy of Chainalysis Reactor?

A. I am saying that the principles that are identified in those articles are principles that are used for the methodology of our clustering.

Q. And there's never been an independent audit of

Chainalysis Reactor and its accuracy, has there?

A. Not to my knowledge.

Q. And in relation to the field of blockchain analysis, there's no governmental body that sets any kind of standards for blockchain analysis?

A. No.

Q. And there's no recognized scientific body that sets any kind of standards for the field of blockchain analysis?

A. Not to my knowledge.

Q. And that's because blockchain analysis is a relatively new field that's emerged in the last decade or so?

A. Yeah.

Q. And in terms of the clustering that you testified to, Chainalysis can't break out clusters in relation to the transactions by geographical region, can it?

A. No.

Q. And it can't do it jurisdictionally either in terms of what legal jurisdiction any of these transactions occurred in?

A. No.

Q. And in terms of -- do you know what source code is?

A. Yes.

Q. Could you tell the jury what source code is?

A. Source code is what is used to be able to develop the software insights.

Bisbee - CROSS - By Mr. Ekeland

Q. And do you know what open source code is?

A. Yes.

Q. Could you tell the jury what open source code is?

A. Open source code is code that is publicly available, so anybody would be able to look at the open source code and replicate it.

Q. And is Chainalysis Reactor an open source code?

A. It is not.

Q. And that prevents people from examining the software to see how it works and testing its accuracy?

A. Yes.

Q. You, I think, testified about Bitcoin Fog using consolidation addresses?

A. Yes.

Q. Didn't Bitcoin Fog switch away from using consolidation addresses at some point?

A. No, it did not.

Q. Did you hear Mr. Scholl's testimony on that point?

A. I did.

MR. EKELAND: No further questions.

THE COURT: Any redirect?

MS. PELKER: Just briefly, your Honor.

THE WITNESS: Sorry. The mic.

THE COURT: We need to switch it out.

THE WITNESS: Sorry.

Bisbee - CROSS - By Mr. Ekeland

THE COURT: This is to make sure the witness can hear the questions.

REDIRECT EXAMINATION

BY MS. PELKER:

Q. Ms. Bisbee, is reviewing the source code the only way to test the accuracy of Chainalysis Reactor?

A. No.

Q. And with -- even without having the Chainalysis Reactor source code, are people still able to use Chainalysis Reactor and test how it works?

A. Yes.

Q. Can you explain how users have been able to do that and verify its accuracy?

A. Yes. Through legal -- like if it's law enforcement or a legal process arm, they can send legal process to the exchanges or platforms to be able to receive the addresses.

Also, if the government seizes the servers of some of the services, those addresses can be then corroborated within the data; as well as when law enforcement conducts search warrants, there's information from the search warrants that have seized devices that can then corroborate that information.

Outside of the government arm, the compliances, they will provide suspicious activity reports. And a lot of that is framed from information that they're deriving to

Bisbee - REDIRECT - By Ms. Pelker

corroborate what they're seeing from their account users as well as what's being observed on the blockchain.

MS. PELKER: If we could pull up Government's Exhibit 353.

BY MS. PELKER:

Q. Ms. Bisbee, Mr. Ekeland was asking you about the change in Bitcoin Fog's use of consolidation addresses around 2014. Was there a change around that time of how Bitcoin Fog was using consolidation addresses?

A. Yes, there was.

Q. Can you explain that?

A. Yes. In 2014, there is a change within Bitcoin Fog to where they started using a different address type. And they also started using a newly generated address for their change when they were shifting from their deposit addresses to their withdrawal addresses, which indicated a change of pattern that was observed as the service grew over time.

That's why on this side of the screen you see additional consolidation addresses that were identified. It's because there was a shift from doing co-spend to then going and leveraging peel chain and change address based off of the enhancement of newly generated addresses that were deployed within Bitcoin Fog as a service.

Q. And is it unusual for a long-running service trying to evade law enforcement to change its activity over time?

Bisbee - REDIRECT - By Ms. Pelker

A. Yes.

Q. Is it unusual?

A. Oh, sorry. No.

Q. And how were you able to still look at this activity within Bitcoin Fog?

A. Can you state the question again?

Q. How were you able to continue observing Bitcoin Fog's activity within its cluster?

A. So the behavior -- so even though all of these addresses are from 2011 to 2014, with the consolidation addresses, the pattern of that consolidation address used was -- continued. And so it was the same type of behavior that was able to be observed through the duration of Bitcoin Fog's operation.

Q. Did it get more difficult to trace -- did Bitcoin Fog's activity appear to you to be designed to increase the difficulty that would be involved in trying to trace transactions through Bitcoin Fog?

A. Yes.

Q. And using Chainalysis Reactor, were you nonetheless able to continue building out the Bitcoin Fog cluster during this time period?

A. Yes.

Q. And Mr. Ekeland asked you about scientific studies and academic papers.

Do you recall that line of testimony?

Bisbee - REDIRECT - By Ms. Pelker

A.  Yes.

Q.  And I want to clarify.  Can you speak to -- are you familiar with academic papers that have attempted to calculate error rates for hypothetical heuristics or algorithms that could be used in clustering?

A.  Yes.

Q.  Are those the actual specifications that Chainalysis uses in its clusters?

A.  Can you state the question again?

Q.  Are the -- what was calculated with those hypothetical error rates, is that what Chainalysis and industry standard uses or are those academics proposing new clustering methods?

A.  So the principles that are in the articles are what are used in the methodology for Chainalysis clustering, but the hypotheticals are not what Chainalysis depends on for building out their -- the clusters.

Q.  And are there a variety of different academic papers here of papers discussing clustering more generally and then other papers that are proposing new types of clustering?

A.  Yes.

Q.  And is it the latter that -- where there are hypothetical error rates calculated?

A.  Yes.

Q.  But is it the former that you're talking about of the

Bisbee - REDIRECT - By Ms. Pelker

fundamentals of clustering that Chainalysis built on?

A. Yes.

MS. PELKER: No further questions, your Honor.

THE COURT: The witness is excused. Thank you.

(Witness excused.)

THE COURT: Is there another Government witness we can get started with this evening?

MS. PELKER: There unfortunately is not, your Honor. We've made very, very good time today.

THE COURT: Okay.

MS. PELKER: We have two witnesses that we expect to finish tomorrow.

THE COURT: Well, I think some of the jurors may appreciate being able to get going a little bit earlier.

So we'll adjourn for the evening, then. And tomorrow we're going to be here just for a half day.

And let's try and start at 9:00 a.m. tomorrow morning. And we'll be done by lunchtime, whenever that might be.

I'll remind you, don't discuss the case even amongst yourselves. Don't conduct any type of research in any way related to anything related to the case. Have a nice evening. And I will see you back here tomorrow.

THE COURTROOM DEPUTY: All rise.

(Whereupon, the jury exited the courtroom at 4:14

p.m. and the following proceedings were had:)

THE COURT: I was just checking with the deputy clerk about the availability of jurors. So there was the one juror who had told us that on Monday she's supposed to be at Baltimore at 4:30. So my deputy clerk is checking about that.

The deputy clerk noticed as well that Juror 13 continued to be commenting in ways that I think some of the other jurors have found distracting. And at my request, she was going to just privately have a conversation with that juror and ask the juror -- make sure the juror is conscious that she's doing it and ask her to avoid that.

Mr. Ekeland, you indicated you wanted to talk about timing or schedule?

MR. EKELAND: Yes.

THE COURT: Okay.

MR. EKELAND: It's my understanding that the Government is going to rest their case tomorrow and that they've only got two short witnesses. What I'm trying to figure out is our schedule. Do I need to have a witness ready tomorrow? Because there's still the outstanding issue we've got on the slide deck for Professor Verret. I know the Government is filing their response tonight at 7:00. And we do -- we are just working out some logistics with the Government and looking at some of the evidence, like the

actual physical evidence, like the hard drive and stuff like that.

So logistically, I'm wondering if the defense could start its case on Monday. We're anticipating -- I'm guessing our case is about three days, you know, depending on the crosses. I fully anticipate us finishing next week and being on schedule. So I'm just trying to get a sense from the Court, because I think we all went a little faster today than we expected.

THE COURT: That's always a good thing.

MR. EKELAND: It is a good thing.

I guess essentially what I'm asking the Court is -- and, of course, the Government as well -- is if we just finish their witnesses tomorrow, then get a decision from the Court and then the defense starts its case on Monday. And I also think with the time we could probably let that juror, you know, go take their trip to Baltimore.

THE COURT: Oh, that's on Monday.

MR. EKELAND: On Monday. Yeah.

THE COURT: So that actually is sort of -- that would mean we would have a very short day on Monday.

MR. EKELAND: What time would they have to leave? Maybe I'm just confused.

THE COURT: She has to be in Baltimore by 4:30.

MR. EKELAND: Oh, by 4:30.

THE COURT: She was talking about leaving at lunchtime. I suspect that probably we might be able to push it back until 2:00 or 2:30 or something like that. But the deputy clerk may have more information on this now.

(Confers with the courtroom deputy privately.)

It's worse than I thought, which is that she has a medical appointment in Baltimore at 3:45. So she has to get to Baltimore by 3:45 on Monday, which does mean probably leaving around lunchtime.

MR. EKELAND: So that would give me -- we would have a morning session and then --

THE COURT: And maybe until 1:00 or something like that.

MR. EKELAND: 1:00. And then we would have --

THE COURT: Assuming that we just don't let that juror go.

Oh, and I should say -- I don't want anything -- no one should say -- breathe a word of this to the juror, but that juror is an alternate.

MR. EKELAND: Okay. Yeah.

THE COURT: I'm not sure we need to resolve that tonight except to the extent that it relates to your request for tomorrow.

I was going to ask Ms. Pelker just when -- how much time she thinks the Government's case is going to take

tomorrow.

MS. PELKER: Maybe two hours, your Honor. We have one witness that's very short and the other -- we are working on a stipulation with defense regarding the CSAM material, names. So probably two hours.

THE COURT: Okay. And then do you have any flexibility, Mr. Ekeland, with respect to who you call as your first witness? Would it be possible even to get started if this is going to be -- I'm sorry -- for Mr. -- "Verret," was it?

MR. EKELAND: Professor Verret, yes. It was our preference to do that.

THE COURT: But is there a way that you could just get started at least with his background, his credentials, qualify him as an expert and do all that --

MR. EKELAND: I could.

THE COURT: -- before you turn to his slide deck?

MR. EKELAND: Yeah. We could just qualify him, do his credentials and then the Court could -- yeah. We could do that. That works.

THE COURT: I have two things going on in my mind about this. One is that I just want to make sure we get done on the schedule we told the jurors.

But, two, I think we need to lead the jury by example. And the more we sort of effectively use the

jurors' time, I think the less likely it is we're going to get more issues with jurors who want to accommodate their schedule because they are going to realize -- they've actually been really good about this, where they -- when I asked them, Should we keep going? They're saying, Yes, let's keep going.

I think they've internalized the notion that they want to move through the case as well. So I just don't want to drag things out because I want to make sure we get done. And, two, I also want to make sure that the jurors share our desire to move forward quickly.

MS. PELKER: And, your Honor, I think that that makes sense. We do still have questions about the scope of what Mr. Verret's going to be qualified as an expert in. But to the extent that Mr. Ekeland wants to go through his background and then we can still reserve argument about the scope of the qualifications...

THE COURT: Right. And my recollection is -- and I've got notes back in my chambers about this -- but that I did rule from the bench with respect to what Mr. Verret could testify about.

And I guess the question is just whether that is -- whether there's a common understanding of what that is and whether there's a request from the Government to reconsider those decisions -- I mean, from the defense,

rather, to reconsider those decisions.

MS. PELKER: I do not think there's a request from the Government.

THE COURT: That I understand, yes.

So I've read through the papers filed thus far on the issue. But it would be helpful for me to hear more and to hear not only from the Government's submission on it, but also to hear from the parties about this.

As I understand the principal issue, at least -- and maybe there's more to it, which is one of the reasons I want to hear from the Government again on this -- but at least after reading the defense position, it sounded to me like the principal issue is that Professor Verret conducted additional interviews of Mr. Sterlingov fairly recently and would like to offer new financial testimony based on those more recent interviews.

But, Ms. Pelker, is that the more -- most important issue from your perspective or is there a lot more there as well?

MS. PELKER: I believe that that is the most important.

THE COURT: Okay.

MS. PELKER: Your Honor, we will file a response when we get back to the office this evening.

THE COURT: Okay. Mr. Ekeland, I guess I'm not

holding the Government to that, but it sounds to me like that's at least the most significant issue we're going to have to deal with.

MR. EKELAND: Yes. I think that's why we just want to see the Court's decision and -- but, I mean --

THE COURT: What's going to help me with that decision is it's not entirely apparent to me from the slides exactly what it is that he intends to talk about. I mean, I know that there's something more than he addressed at the *Daubert* hearing.

But I don't -- to the extent, you know, either tonight or tomorrow you can enlighten us a little bit more about what it is he intends -- it's possible that the Government is going to say, Okay, that's a non-issue as far as we're concerned or they're going to say, No, that's a big issue, because we would have to call and actually get a rebuttal expert on, like, impossible time to respond to that at this point.

MR. EKELAND: Off the top of my head -- and I'm a little tired right now, your Honor -- I don't see Professor Verret, like, substantially deviating from those slides.

THE COURT: But the slides don't really tell me what he's going to say. They're just -- they're fairly conclusory. They say, you know, based on his study, it's not possible that Mr. Sterlingov was running this site or

the amount of money that he got isn't consistent with it.

But I don't really see the analysis that we're talking about here or what new evidence there is --

MR. EKELAND:  I don't --

THE COURT:  -- and what he learned based on the interviews more recently that would inform or change his views on any issues or expand upon his views.

MR. EKELAND:  Honestly, I don't think it's anything major.  I think what he's got is more detail and more nuance.  I don't think there's any -- that's why I don't think anything in the new slide deck really comes as any surprise.  I think what Professor Verret got was just a lot more detail.

THE COURT:  Well, you said a lot more detail.  And that's -- I guess we're going to need to know that.  And I think it might help expedite things on this if you can share with the Government exactly what that detail is just so that we can see whether the Government disagrees, because otherwise I think probably I'm going to need a proffer to resolve the question.

If you can do it informally with the Government, that's fine.  But if need be, then I may just need a proffer of what is new and what is he going to testify about to decide whether it is within the scope of what was previously disclosed.

MR. EKELAND:  Happy to do that.

I think if we, you know -- the Government closes its case tomorrow and we do Professor Verret's, you know, qualifications and then that'll give us time to sort of figure all that stuff out and the stip on the CSAM.

THE COURT:  The other thing I feel like I would need a lot more than I currently have is what's in your papers is very conclusory, where it just says it was difficult for Professor Verret to be able to go out to Rappahannock to see Mr. Sterlingov when he was there and he had difficulty seeing him at the Alexandria jail.

But I don't really know what efforts were engaged in, you know.  This case is a couple years old at this point and we were supposed to be ready to go to trial six months ago.  So it's not clear to me what hurdles existed, and it's all fairly conclusory in the papers that you filed.

MR. EKELAND:  I think if I recall -- I'd have to go back and look at the transcripts -- we did put some of it on the record.

THE COURT:  No, no.  You did mention some things.  And I said, Let me know if there's anything I can do.  And you never came back to me with anything.

MR. EKELAND:  The access to the jails -- the D.C. Jail, we've had much better access.  I'm going to leave it at that for the moment.

THE COURT: You can leave it at that, but that's not going to convince me. The real question is: Was there -- I mean, to the extent -- I don't know whether this is new or not. But to the extent it is new, I think I would need to be persuaded that there were hurdles that could not reasonably be overcome at getting access to Mr. Sterlingov either in person or, frankly, by telephone or some other means over the past two years.

And I guess all I'm saying for present purposes is what's in the papers now I think is not sufficient in that regard. If there's more on that, I think I would need, you know, a much more substantial showing on that issue. But if there's not more than that, it may just be coming back to a question of whether this is really new or not.

MR. EKELAND: I just didn't hear the last part of what you said.

THE COURT: If there's not evidence that there were insurmountable barriers of access previously, then the question just comes back to, is this new or not? We can resolve that.

MR. EKELAND: I think we can resolve it. I think we can resolve this one way or the other.

THE COURT: I would encourage you to confer with the Government, because if there's a way for the parties to work it out, I'm always in favor of that. If not, we'll

talk about this tomorrow after we let the jury go for the day.

MR. EKELAND:  All right.

THE COURT:  Anything else tonight?

MS. PELKER:  No, your Honor.  Just that I think that we'll submit our papers and may want to be heard on this further tomorrow.  But we can address that after --

THE COURT:  I'm not ruling any way at this point.

That's fine.  I will see you all tomorrow, then.

I don't know if the Government had a chance to review the opinion and whether there's anything that should be filed under seal.

MS. PELKER:  No, your Honor.  No redactions needed.

THE COURT:  Okay.  Anything else from -- anything from the defense that needs to be under seal?

MR. EKELAND:  No, your Honor.

THE COURT:  I'll just put it on the public docket.  So thank you.

MS. PELKER:  Thank you, your Honor.

THE COURTROOM DEPUTY:  All rise.

Court is adjourned.

(Proceedings concluded.)

**CERTIFICATE**

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 29th day of February, 2024.

/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269

**$**

$10,000 [1] - 9:19
$20,000 [1] - 9:19
$200 [1] - 19:18
$28 [1] - 84:11
$311 [1] - 20:3
$516,057 [1] - 75:1

**/**

/s [1] - 109:12

**1**

1 [4] - 35:23, 38:22, 51:14, 75:9
1,547 [1] - 81:13
1,632 [1] - 78:7
1.2 [1] - 80:25
1.4 [1] - 80:3
1.6 [1] - 77:15
1.8 [1] - 79:2
10 [2] - 9:20, 90:9
10.8 [1] - 86:21
100 [1] - 32:21
10005 [1] - 1:25
11,100 [1] - 79:5
13 [1] - 98:7
13,940 [1] - 86:7
1301 [1] - 1:21
14 [1] - 76:20
14.5 [1] - 85:25
15 [1] - 84:12
1:00 [2] - 100:12, 100:14
1:39 [1] - 1:7
1:40 [1] - 4:24

**2**

2 [3] - 11:7, 38:25, 82:7
2,000 [1] - 74:24
2,032 [1] - 80:23
2,829 [1] - 79:22
2,918 [1] - 78:11
2.5 [1] - 10:16
2.7 [1] - 81:19
20 [3] - 17:9, 17:24, 84:11
20,000 [1] - 9:20
200 [1] - 19:20
20001 [2] - 2:4, 109:14
2005 [1] - 1:21
2011 [5] - 66:4,

66:25, 67:2, 67:21, 95:10
2014 [11] - 21:9, 22:3, 22:6, 23:17, 66:25, 67:3, 67:5, 67:22, 94:7, 94:12, 95:10
2015 [2] - 23:18, 88:13
202 [2] - 2:4, 109:15
2021 [3] - 29:22, 66:4, 67:5
2022 [1] - 57:8
2023 [1] - 31:24
2024 [2] - 1:7, 109:10
20530 [2] - 1:16, 1:19
21-00399 [1] - 1:4
24/7 [1] - 32:23
2400 [1] - 37:24
25 [3] - 46:24, 47:2
26,398 [1] - 76:13
27 [1] - 82:14
28 [1] - 86:15
29 [1] - 1:7
299,000 [1] - 80:21
29th [1] - 109:10
2:00 [1] - 100:3
2:30 [1] - 100:3
2:53 [1] - 56:1

**3**

3 [3] - 39:20, 51:15, 77:20
3,651 [1] - 77:13
3.1 [1] - 79:7
30 [1] - 1:24
31,792 [1] - 86:20
326 [7] - 3:14, 60:6, 60:23, 61:4, 61:8, 61:9, 61:13
326-A [9] - 3:14, 59:4, 59:12, 60:20, 60:23, 61:4, 61:7, 61:10, 61:14
333 [2] - 2:3, 109:14
352 [3] - 35:5, 35:13, 35:17
353 [6] - 3:15, 65:24, 66:10, 66:13, 66:15, 94:4
353-A [1] - 67:12
354 [4] - 71:1, 71:11, 71:15, 71:16
354-3269 [2] - 2:4, 109:15
361,000 [1] - 81:15
3:00 [1] - 55:21
3:15 [1] - 55:21

3:18 [1] - 56:18
3:45 [2] - 100:7, 100:8

**4**

4 [1] - 39:21
4,116 [1] - 75:7
4.7 [1] - 86:8
40 [3] - 3:5, 3:7, 32:4
400 [1] - 28:8
41,972 [1] - 76:18
427,000 [1] - 78:9
45,152 [2] - 82:17, 85:24
4:14 [1] - 97:25
4:30 [3] - 98:5, 99:24, 99:25

**5**

5 [9] - 38:14, 39:6, 46:15, 46:25, 51:7, 51:8, 51:9, 51:11
5,240 [1] - 80:1
5,700 [1] - 77:18
5.1527 [1] - 1:16
5.25 [1] - 39:5
553 [1] - 80:19

**6**

6,473 [1] - 78:25
60 [1] - 19:19
601 [1] - 1:15
61 [1] - 3:14
66 [1] - 3:15
6706 [1] - 2:3

**7**

7,646 [1] - 81:17
702 [3] - 10:13, 11:25, 82:24
75 [1] - 39:20
7:00 [1] - 98:23

**8**

8 [1] - 76:15
80,728 [1] - 82:12
802,000 [1] - 79:24
88 [1] - 3:8

**9**

90 [1] - 90:9
912,000 [1] - 78:13
925,000 [1] - 73:21
925,742 [1] - 59:23
925,743 [2] - 60:3, 60:18
93 [1] - 3:8
950 [1] - 1:18
9:00 [1] - 97:17

**A**

a.m [1] - 97:17
ability [6] - 27:12, 29:4, 54:20, 87:12, 90:12, 109:7
able [77] - 5:17, 23:20, 23:24, 24:2, 25:18, 26:5, 26:9, 26:11, 26:20, 27:18, 28:1, 29:8, 29:12, 29:13, 30:8, 31:15, 31:16, 32:24, 36:8, 36:9, 37:10, 40:14, 40:15, 41:6, 41:14, 41:16, 41:23, 42:4, 42:17, 43:8, 43:14, 44:10, 44:11, 45:6, 45:17, 49:24, 50:5, 50:8, 50:11, 52:24, 53:4, 53:11, 53:15, 53:17, 53:21, 53:22, 54:18, 54:20, 58:15, 58:24, 61:13, 62:14, 63:24, 64:9, 65:13, 65:16, 65:19, 68:8, 70:11, 73:14, 74:12, 87:5, 87:21, 88:10, 91:24, 92:5, 93:9, 93:12, 93:16, 95:4, 95:7, 95:12, 95:19, 97:14, 100:2, 106:9
Abraxas [21] - 72:2, 72:4, 72:5, 72:8, 72:10, 72:13, 72:19, 72:23, 73:1, 73:7, 73:11, 73:12, 73:15, 73:16, 73:24, 74:3, 74:5, 74:23, 75:5, 75:11, 76:5
abreast [1] - 33:9
abstract [1] - 70:7
academia [1] - 22:18
academic [5] - 90:5, 90:7, 95:24, 96:3, 96:18
academics [1] -

96:12
accepts [1] - 42:3
access [7] - 8:19, 25:18, 26:20, 106:23, 106:24, 107:6, 107:18
accessed [5] - 76:25, 78:1, 78:17, 79:12, 81:6
accommodate [1] - 102:2
account [18] - 5:24, 8:25, 9:3, 11:3, 11:10, 37:4, 37:5, 37:12, 42:3, 42:12, 44:5, 45:3, 46:8, 53:5, 57:11, 62:4, 64:22, 94:1
accounts [7] - 15:6, 21:20, 26:6, 27:8, 27:16, 27:25, 72:11
accuracy [11] - 43:24, 45:17, 53:24, 58:22, 89:12, 90:1, 90:20, 91:1, 92:10, 93:6, 93:13
accurate [5] - 27:19, 28:2, 53:22, 87:20, 109:4
accurately [2] - 66:5, 71:7
Action [1] - 1:3
activity [14] - 18:25, 40:16, 43:12, 44:14, 47:13, 48:10, 53:18, 58:17, 72:14, 93:24, 94:25, 95:4, 95:8, 95:15
actual [2] - 96:7, 99:1
ad [3] - 5:8, 5:10, 6:3
added [1] - 54:17
addition [3] - 39:3, 45:24, 69:16
additional [12] - 22:17, 24:5, 24:11, 43:10, 45:10, 72:24, 85:3, 86:4, 86:6, 86:18, 94:19, 103:14
address [99] - 9:2, 9:7, 9:10, 10:2, 11:4, 11:5, 11:8, 11:9, 12:7, 36:18, 36:19, 37:5, 37:10, 38:21, 38:25, 39:19, 39:20, 39:21, 42:16, 42:17, 43:7, 44:9, 44:12, 44:18, 44:21, 45:1, 46:13, 46:15, 46:25, 47:1, 47:3, 47:9, 47:10, 48:2, 48:4, 48:5, 49:1,

49:15, 49:16, 49:22, 50:23, 50:25, 51:3, 51:6, 51:14, 51:16, 51:23, 52:6, 52:7, 52:9, 52:13, 52:14, 52:16, 52:19, 53:11, 54:3, 54:7, 60:19, 60:22, 60:25, 62:4, 62:5, 62:8, 62:15, 62:16, 62:18, 62:25, 63:1, 63:2, 63:5, 63:7, 63:15, 63:21, 63:22, 63:23, 64:8, 64:12, 64:24, 68:13, 68:15, 68:20, 69:3, 72:13, 72:22, 74:23, 75:12, 83:23, 84:19, 84:22, 94:13, 94:14, 94:21, 95:11, 108:7

**address-level** [1] - 50:23

**addressed** [1] - 104:9

**addresses** [111] - 18:11, 23:20, 34:24, 36:20, 39:17, 39:24, 40:1, 40:9, 40:11, 40:18, 41:6, 41:12, 41:14, 41:16, 41:21, 41:23, 42:7, 42:8, 42:24, 42:25, 43:1, 43:3, 43:9, 43:10, 43:11, 43:13, 44:6, 45:2, 45:7, 45:8, 45:10, 45:18, 46:4, 46:17, 47:17, 47:20, 47:23, 48:8, 48:22, 49:10, 50:5, 50:12, 51:2, 51:15, 52:20, 52:22, 53:21, 54:6, 54:9, 54:14, 54:17, 54:19, 59:15, 59:22, 59:24, 60:3, 60:12, 60:17, 60:22, 61:13, 63:20, 63:24, 63:25, 64:9, 64:10, 65:11, 65:18, 65:22, 66:3, 66:7, 66:25, 67:1, 67:2, 67:4, 67:8, 67:15, 67:21, 67:22, 68:1, 68:4, 68:7, 68:8, 69:4, 72:14, 72:15, 72:23, 72:24, 72:25, 73:21, 74:6, 76:6, 84:25, 85:2, 85:3, 87:14, 90:13, 90:15, 92:13, 92:16, 93:16, 93:18, 94:7, 94:9, 94:15, 94:16, 94:19, 94:22, 95:9, 95:10

**adjourn** [1] - 97:15

**adjourned** [1] - 108:22

**adjust** [1] - 4:7

**administration** [1] - 18:10

**Administration** [1] - 21:11

**administrator** [2] - 18:9, 18:19

**admission** [1] - 61:4

**admit** [4] - 61:3, 66:9, 66:13, 71:10

**admitted** [4] - 61:7, 61:8, 67:12, 71:15

**ads** [1] - 6:8

**advanced** [1] - 31:1

**advise** [1] - 4:9

**advisor** [1] - 25:7

**afraid** [1] - 16:3

**AFTERNOON** [1] - 1:5

**afternoon** [1] - 55:20

**agencies** [3] - 22:23, 22:25, 32:5

**agent** [1] - 24:25

**agents** [1] - 24:19

**aggregate** [3] - 70:2, 70:17, 82:1

**ago** [1] - 106:15

**Agora** [9] - 75:24, 76:1, 76:2, 76:6, 76:8, 76:12, 76:16, 84:1, 84:6

**agreed** [1] - 20:2

**agreement** [1] - 17:12

**aid** [2] - 4:4, 4:7

**Alexandria** [1] - 106:11

**algorithms** [2] - 90:8, 96:5

**allow** [8] - 7:17, 11:18, 36:10, 43:13, 62:12, 63:3, 70:20, 72:21

**allows** [1] - 43:14

**almost** [1] - 29:8

**alone** [1] - 47:21

**AlphaBay** [8] - 76:22, 76:24, 76:25, 77:3, 77:6, 77:10, 77:12, 77:17

**alternate** [1] - 100:19

**AMERICA** [1] - 1:3

**amount** [6] - 19:5, 36:18, 37:13, 76:16, 79:3, 105:1

**amounts** [1] - 15:5

**analogize** [1] - 51:3

**analysis** [41] - 21:20,

29:11, 30:12, 31:3, 33:15, 33:23, 34:2, 34:7, 34:22, 34:23, 34:24, 35:3, 40:8, 45:13, 45:15, 45:21, 45:25, 47:8, 47:24, 48:19, 49:2, 50:22, 53:10, 58:16, 60:25, 64:3, 68:18, 69:18, 69:20, 69:25, 70:7, 70:24, 85:7, 85:10, 89:9, 91:3, 91:5, 91:8, 91:10, 105:2

**analyst** [1] - 21:15

**analysts** [1] - 24:19

**analytic** [1] - 25:7

**analytics** [1] - 31:1

**anonymized** [1] - 76:3

**anonymizing** [1] - 72:6

**answer** [1] - 16:22

**answering** [1] - 13:20

**anti** [1] - 55:5

**anti-money** [1] - 55:5

**anticipate** [1] - 99:6

**anticipating** [2] - 4:14, 99:4

**apart** [1] - 60:22

**apparent** [2] - 24:16, 104:7

**appear** [3] - 38:18, 39:12, 95:15

**aPPEARANCES** [1] - 1:13

**application** [1] - 29:8

**applications** [1] - 26:17

**applied** [2] - 64:4, 68:11

**apply** [2] - 23:8, 26:12

**appointment** [1] - 100:7

**appreciate** [2] - 4:10, 97:14

**appreciated** [1] - 19:22

**approach** [3] - 50:19, 54:1, 54:8

**appropriate** [1] - 58:15

**area** [1] - 16:2

**areas** [1] - 22:11

**argument** [1] - 102:16

**arm** [2] - 93:15, 93:23

**arrest** [2] - 19:19,

24:2

**arrested** [2] - 18:14, 19:17

**arrow** [2] - 74:8, 74:11

**arrows** [1] - 74:1

**articles** [9] - 22:18, 45:16, 90:5, 90:11, 90:14, 90:17, 90:20, 90:23, 96:14

**aspects** [2] - 32:17, 45:15

**asserted** [2] - 7:18, 7:22

**assess** [4] - 28:3, 50:25, 51:12, 65:19

**assessing** [2] - 52:9, 52:19

**assessment** [2] - 49:10, 54:21

**asset** [2] - 19:24, 20:2

**assets** [1] - 28:22

**assigned** [2] - 21:17, 22:3

**assist** [2] - 29:4, 35:1

**assisted** [1] - 35:9

**associate** [2] - 40:11, 45:18

**associated** [4] - 40:2, 42:8, 52:20, 63:25

**assuming** [1] - 100:15

**attempt** [1] - 87:8

**attempted** [1] - 96:3

**attend** [1] - 33:11

**attended** [1] - 22:19

**attention** [4] - 35:8, 35:23, 61:21, 81:23

**attest** [1] - 90:20

**attesting** [1] - 90:1

**ATTORNEY'S** [1] - 1:14

**attribution** [5] - 30:10, 41:9, 41:10, 57:4, 58:14

**audit** [1] - 90:25

**authorities** [2] - 5:24, 13:8

**authorizes** [1] - 37:19

**authorizing** [2] - 37:1, 37:6

**automatically** [1] - 10:4

**availability** [1] - 98:3

**available** [2] - 26:15, 92:4

**Avenue** [4] - 1:18,

1:21, 2:3, 109:14

**avoid** [1] - 98:12

**aware** [3] - 89:21, 90:7, 90:11

### B

**B-I-S-B-E-E** [1] - 20:25

**bachelor's** [1] - 21:4

**background** [6] - 18:21, 21:3, 23:4, 32:9, 101:14, 102:16

**bagel** [4] - 39:2, 39:3, 39:9, 39:14

**Baltimore** [5] - 98:5, 99:17, 99:24, 100:7, 100:8

**Bank** [5] - 77:24, 77:25, 78:3, 78:6, 78:10

**bank** [5] - 21:20, 37:12, 37:22, 37:23, 37:24

**banks** [2] - 23:7, 57:12

**barriers** [1] - 107:18

**based** [9] - 47:18, 47:20, 68:18, 89:12, 90:4, 94:21, 103:15, 104:24, 105:5

**bases** [1] - 45:19

**basis** [1] - 50:21

**BC1** [1] - 51:15

**became** [7] - 24:6, 24:8, 24:16, 24:25, 25:17, 26:9, 28:15

**become** [2] - 6:14, 28:10

**becoming** [1] - 28:18

**BEFORE** [1] - 1:11

**begin** [3] - 21:7, 51:15, 57:7

**beginning** [1] - 15:6

**begins** [1] - 51:14

**behaved** [1] - 68:7

**behavior** [22] - 43:2, 43:15, 47:15, 47:19, 49:4, 49:25, 50:13, 50:14, 52:24, 53:14, 54:16, 54:21, 61:16, 65:14, 65:19, 67:25, 68:8, 72:24, 87:3, 88:5, 95:9, 95:12

**behavioral** [8] - 49:19, 49:20, 50:1, 50:3, 50:20, 54:3, 68:10, 68:17

**behaviors** [5] - 43:8,

44:7, 45:24, 47:25, 48:7

**behind** [1] - 27:25
**belonged** [1] - 41:6
**belongs** [1] - 46:12
**below** [2] - 36:10
**bench** [1] - 102:20
**best** [3] - 25:10, 25:12, 109:7
**Beth** [1] - 24:8
**better** [2] - 48:7, 106:24
**between** [22] - 57:20, 66:4, 67:2, 67:21, 69:18, 70:3, 70:18, 73:7, 73:12, 73:19, 73:24, 73:25, 75:11, 76:8, 77:9, 79:17, 80:15, 82:2, 83:17, 84:19, 86:24
**big** [2] - 86:22, 104:15
**bill** [7] - 38:14, 39:7, 51:8, 51:9, 51:11
**bills** [1] - 52:3
**BISBEE** [2] - 3:6, 20:19
**Bisbee** [24] - 20:13, 20:15, 20:24, 20:25, 21:1, 21:7, 34:1, 34:6, 34:9, 35:8, 35:20, 57:2, 59:12, 59:24, 61:12, 66:2, 66:18, 66:22, 67:14, 67:20, 71:19, 87:7, 93:5, 94:6
**Bisbee's** [2] - 4:3, 61:19
**bit** [9] - 4:15, 5:7, 21:13, 29:23, 30:14, 32:15, 68:10, 97:14, 104:12
**Bitcoin** [202] - 5:15, 5:16, 5:20, 5:21, 5:22, 5:25, 6:2, 6:12, 6:14, 6:16, 7:9, 7:16, 7:24, 8:6, 8:8, 8:11, 8:14, 8:17, 9:1, 9:2, 9:5, 9:8, 9:10, 9:14, 9:18, 9:19, 9:24, 9:25, 10:8, 11:4, 11:5, 11:6, 11:7, 12:25, 13:2, 13:25, 14:2, 14:5, 14:9, 14:17, 14:19, 14:25, 15:8, 16:3, 18:11, 18:16, 19:18, 22:19, 22:21, 22:24, 23:22, 24:8, 28:15, 28:17, 28:22, 38:22, 44:20, 46:7, 46:10, 46:14,

46:25, 57:2, 57:5, 57:14, 57:19, 57:20, 57:23, 58:18, 59:16, 59:25, 60:4, 60:12, 61:14, 61:23, 61:25, 62:5, 62:7, 62:15, 62:18, 62:23, 63:2, 63:6, 63:10, 63:13, 63:14, 63:19, 64:1, 64:5, 64:6, 64:22, 65:22, 66:4, 66:6, 67:6, 67:9, 67:21, 67:25, 68:4, 68:5, 68:6, 68:9, 68:11, 68:12, 68:14, 68:22, 69:5, 69:7, 69:12, 69:18, 69:23, 70:3, 70:5, 70:18, 71:23, 71:24, 72:9, 72:13, 73:4, 73:7, 73:11, 73:12, 73:14, 73:15, 73:16, 73:24, 74:2, 74:5, 74:22, 74:23, 74:24, 75:5, 75:6, 75:10, 75:11, 76:5, 76:9, 76:11, 76:13, 76:16, 76:18, 77:9, 77:12, 77:13, 77:16, 77:18, 78:5, 78:7, 78:10, 78:11, 78:23, 78:25, 79:3, 79:5, 79:18, 79:20, 79:22, 80:1, 80:16, 80:18, 80:19, 80:22, 80:23, 81:11, 81:13, 81:16, 81:17, 82:2, 82:11, 82:12, 82:17, 83:18, 83:23, 84:1, 84:4, 84:5, 84:8, 84:11, 84:17, 85:18, 85:23, 86:6, 86:12, 86:20, 86:25, 89:6, 92:12, 92:15, 94:7, 94:8, 94:12, 94:23, 95:5, 95:7, 95:13, 95:14, 95:17, 95:20
**Bitcoin's** [1] - 19:21
**bitcoin.com** [1] - 14:24
**Black** [5] - 77:24, 77:25, 78:2, 78:6, 78:10
**block** [5] - 23:19, 25:16, 25:17, 27:3, 41:8
**Blockchain** [1] - 25:20
**blockchain** [70] - 22:21, 25:7, 25:14, 26:2, 26:11, 27:2,

28:10, 28:14, 28:25, 29:9, 29:25, 30:12, 30:18, 30:23, 30:24, 31:1, 31:3, 32:21, 32:23, 32:25, 33:15, 33:23, 34:1, 34:7, 34:21, 34:23, 34:25, 35:3, 36:1, 37:3, 37:16, 38:1, 38:18, 39:12, 39:16, 40:8, 40:12, 40:20, 40:24, 45:13, 45:15, 45:25, 47:8, 47:11, 47:13, 47:24, 48:10, 48:13, 48:19, 49:2, 49:5, 49:18, 50:21, 50:22, 51:13, 51:16, 52:17, 53:9, 53:13, 58:16, 63:4, 64:3, 65:8, 74:17, 90:16, 91:3, 91:5, 91:8, 91:10, 94:2
**blockchains** [1] - 28:17
**blue** [3] - 38:24, 51:7, 52:7
**body** [2] - 91:4, 91:7
**bottom** [6] - 59:20, 60:15, 62:5, 71:23, 86:10, 86:11
**box** [9] - 36:3, 36:4, 51:7, 52:7, 62:5, 71:21, 71:23, 74:15, 85:17
**boxes** [1] - 38:24
**break** [7] - 55:16, 55:17, 55:20, 56:5, 56:6, 56:12, 91:14
**breathe** [1] - 100:18
**brief** [2] - 16:9, 55:16
**briefly** [3] - 21:3, 67:11, 92:22
**bring** [1] - 38:12
**bringing** [1] - 36:17
**Brooklyn** [1] - 1:25
**BROWN** [1] - 1:14
**browser** [5] - 11:24, 12:6, 12:13, 72:6, 76:3
**Browser** [1] - 8:20
**bucket** [1] - 22:22
**build** [12] - 38:8, 44:3, 45:20, 50:16, 54:20, 76:6, 77:5, 78:2, 78:20, 79:14, 80:12, 81:8
**building** [4] - 24:12, 25:6, 95:20, 96:17
**built** [2] - 48:1, 97:1
**buy** [1] - 8:9

**buyer** [1] - 84:7
**buyers** [2] - 83:9, 87:3
**buys** [1] - 24:1
**BY** [44] - 2:1, 5:6, 6:9, 7:5, 8:16, 10:19, 11:11, 11:20, 12:16, 13:3, 13:15, 15:11, 15:18, 16:15, 20:23, 34:8, 35:7, 35:19, 57:1, 59:11, 59:21, 60:10, 60:16, 61:11, 61:20, 62:11, 65:6, 66:1, 66:17, 66:21, 67:13, 67:19, 71:18, 75:23, 76:23, 77:23, 81:2, 81:22, 83:5, 85:6, 88:22, 89:4, 93:4, 94:5

## C

**calculate** [1] - 96:4
**calculated** [4] - 75:3, 75:4, 96:10, 96:23
**calculation** [1] - 82:4
**cannot** [2] - 89:24, 89:25
**captured** [1] - 84:10
**cards** [2] - 19:10, 19:12
**case** [31] - 4:14, 18:6, 19:25, 21:12, 22:6, 23:16, 23:18, 24:4, 24:6, 24:8, 34:15, 34:18, 55:22, 55:24, 57:2, 57:7, 57:25, 70:1, 70:10, 87:15, 97:20, 97:22, 98:18, 99:4, 99:5, 99:15, 100:25, 102:8, 106:3, 106:13
**cases** [5] - 23:2, 24:5, 33:1, 33:4, 33:20
**cash** [14] - 5:17, 5:22, 5:23, 5:25, 14:19, 14:23, 15:1, 23:8, 23:23, 27:5, 29:14, 40:16, 64:21
**cash-out** [3] - 23:8, 29:14, 40:16
**cashier** [7] - 38:15, 39:8, 39:9, 39:19, 53:2
**cashiers** [1] - 64:15
**cashing** [1] - 83:16
**CATHERINE** [1] - 1:17

**centered** [2] - 29:19, 30:22
**CentOS** [1] - 13:1
**cents** [1] - 39:20
**certain** [2] - 18:12, 48:12
**CERTIFICATE** [1] - 109:1
**certification** [3] - 30:11, 30:19, 30:20
**certifications** [2] - 30:15, 33:14
**certify** [1] - 109:4
**chain** [15] - 27:22, 27:23, 28:24, 29:15, 44:12, 47:5, 47:10, 49:15, 49:22, 54:4, 54:6, 68:15, 68:19, 69:2, 94:21
**Chainalysis** [126] - 21:2, 25:19, 25:23, 29:21, 29:23, 29:25, 30:3, 30:8, 30:11, 30:16, 31:2, 31:5, 31:8, 31:12, 31:16, 31:17, 31:20, 33:19, 34:9, 34:12, 40:4, 41:11, 41:13, 41:15, 41:20, 41:24, 42:7, 42:12, 42:14, 42:21, 42:23, 42:25, 43:2, 43:13, 43:14, 43:17, 43:20, 44:1, 44:4, 44:6, 44:7, 44:16, 44:18, 44:20, 44:23, 45:1, 45:4, 46:3, 46:6, 46:8, 46:9, 46:16, 46:22, 47:9, 47:20, 48:9, 50:8, 53:19, 53:24, 54:1, 54:22, 55:12, 57:5, 58:4, 58:5, 58:10, 58:12, 59:18, 60:4, 61:12, 61:16, 61:17, 61:24, 62:2, 62:3, 62:6, 62:8, 62:12, 62:16, 62:19, 62:24, 63:3, 63:12, 63:17, 70:15, 72:18, 72:21, 72:25, 73:10, 73:18, 74:4, 76:4, 77:5, 78:2, 78:19, 79:14, 80:12, 81:8, 87:10, 87:12, 87:19, 87:25, 88:2, 88:4, 88:12, 89:8, 89:12, 89:19, 89:23, 90:1, 90:2, 90:9, 90:14, 90:21, 91:1, 91:14, 92:7, 93:6, 93:8, 93:9, 95:19, 96:7, 96:11,

96:15, 96:16, 97:1
**Chainalysis's** [14] - 28:4, 39:23, 46:11, 47:2, 47:24, 49:4, 55:8, 59:25, 63:1, 63:7, 63:18, 64:5, 87:17, 90:12
**Chainalysis-controlled** [3] - 42:21, 45:4, 62:16
**chains** [3] - 46:19, 47:21, 47:23
**chambers** [1] - 102:19
**chance** [1] - 108:10
**change** [28] - 13:4, 13:6, 38:16, 38:23, 39:1, 39:10, 44:12, 46:4, 46:11, 46:15, 47:20, 47:23, 49:15, 49:16, 49:21, 54:3, 54:7, 68:15, 68:20, 69:2, 94:6, 94:8, 94:12, 94:15, 94:16, 94:21, 94:25, 105:6
**change-of-address** [1] - 49:16
**changer** [1] - 17:16
**changes** [1] - 32:24
**charge** [1] - 17:18
**charged** [1] - 36:17
**charges** [3] - 17:15, 17:18, 49:8
**chart** [4] - 67:11, 67:23, 70:23, 71:5
**Check** [1] - 37:24
**check** [11] - 10:6, 36:24, 36:25, 37:2, 37:4, 37:14, 37:15, 37:16, 37:22, 37:25, 38:5
**checking** [2] - 98:2, 98:5
**childhood** [1] - 57:17
**CHRISTOPHER** [1] - 1:14
**circle** [2] - 67:6, 73:23
**Circle** [1] - 15:5
**circled** [1] - 45:9
**circles** [2] - 73:18, 74:5
**circulated** [1] - 90:6
**cite** [1] - 90:11
**clarify** [1] - 96:2
**classes** [1] - 30:12
**clear** [6] - 36:8, 36:22, 46:19, 62:10, 80:7, 106:15
**clearnet** [2] - 8:12,

15:20
**clerk** [4] - 98:3, 98:5, 98:7, 100:4
**click** [5] - 12:14, 36:8, 74:4, 74:8, 74:11
**clicker** [1] - 36:10
**closes** [1] - 106:2
**clunky** [2] - 8:24, 9:13
**cluster** [31] - 40:8, 47:20, 50:17, 51:4, 52:18, 52:19, 53:20, 54:10, 54:14, 57:20, 59:25, 60:4, 60:12, 65:11, 67:9, 68:5, 68:6, 68:25, 69:10, 69:14, 73:20, 73:23, 76:6, 77:6, 78:2, 78:20, 79:14, 80:12, 81:8, 95:8, 95:20
**clustered** [3] - 41:12, 45:11, 58:9
**clustering** [43] - 33:23, 39:24, 39:25, 40:1, 40:3, 40:6, 40:7, 40:10, 41:10, 43:11, 45:19, 49:13, 49:19, 49:20, 50:1, 50:2, 50:3, 50:24, 54:8, 54:23, 55:3, 55:6, 57:4, 58:15, 63:19, 64:5, 65:12, 68:17, 73:4, 87:8, 87:13, 87:17, 88:16, 90:3, 90:12, 90:24, 91:13, 96:5, 96:12, 96:15, 96:19, 96:20, 97:1
**clustering-level** [1] - 50:24
**clusters** [17] - 40:12, 41:3, 44:3, 52:22, 53:25, 54:12, 55:8, 55:13, 58:13, 58:18, 58:19, 58:22, 69:16, 87:20, 91:14, 96:8, 96:17
**co** [26] - 39:13, 39:18, 44:11, 44:14, 45:13, 45:14, 45:17, 45:20, 45:25, 49:15, 49:21, 50:1, 50:4, 50:20, 54:3, 64:2, 64:4, 64:9, 64:11, 68:13, 68:18, 69:2, 84:25, 94:20
**co-spend** [19] - 39:13, 39:18, 44:11, 45:14, 45:17, 49:15, 49:21, 50:1, 50:4,

50:20, 54:3, 64:4, 64:11, 68:13, 69:2, 84:25, 94:20
**co-spending** [5] - 44:14, 45:13, 45:20, 45:25, 64:2
**co-spends** [1] - 68:18
**co-spent** [1] - 64:9
**cocaine** [1] - 5:8
**code** [11] - 91:21, 91:23, 91:24, 92:1, 92:3, 92:4, 92:5, 92:7, 93:5, 93:9
**coffee** [20] - 38:6, 38:9, 38:10, 38:16, 38:17, 38:21, 39:2, 39:4, 39:9, 39:15, 39:20, 51:4, 51:25, 52:3, 52:25, 53:1, 53:5, 64:13
**coffees** [1] - 53:8
**Coin** [1] - 15:20
**Coinbase** [1] - 15:5
**collect** [2] - 27:12, 89:19
**collection** [1] - 28:1
**colors** [1] - 36:15
**COLUMBIA** [2] - 1:1, 1:15
**Columbia** [2] - 2:2, 109:13
**coming** [6] - 15:7, 46:6, 46:22, 83:11, 83:13, 107:13
**commenting** [1] - 98:8
**commercial** [7] - 25:19, 25:23, 27:3, 29:4, 29:7, 30:2, 41:9
**common** [6] - 8:10, 49:12, 65:7, 84:21, 102:23
**commonly** [2] - 41:17, 45:14
**communicated** [1] - 16:19
**community** [1] - 90:6
**companies** [3] - 12:24, 13:6, 15:4
**company** [3] - 15:3, 30:1, 54:22
**compare** [1] - 67:22
**compared** [1] - 38:6
**compares** [1] - 36:23
**complete** [3] - 34:10, 61:4, 109:6
**complex** [1] - 32:8
**compliance** [6] - 55:4, 55:6, 59:1,

87:22, 88:6, 89:14
**compliances** [1] - 93:23
**complicated** [1] - 28:11
**component** [6] - 32:18, 32:19, 49:7, 52:11, 53:4, 69:3
**components** [4] - 36:16, 36:25, 37:1, 49:9
**compound** [1] - 7:2
**computer** [5] - 12:17, 13:9, 13:13, 18:10, 18:21
**concept** [1] - 40:3
**concerned** [1] - 104:15
**concluded** [1] - 108:23
**concludes** [1] - 34:5
**conclusory** [3] - 104:24, 106:8, 106:16
**condition** [1] - 61:8
**conditionally** [1] - 60:8
**conduct** [6] - 26:1, 41:24, 42:20, 55:23, 62:19, 97:21
**conducted** [4] - 29:11, 43:25, 61:16, 103:13
**conducting** [10] - 22:20, 25:10, 26:14, 26:18, 27:21, 34:23, 45:25, 48:19, 49:2, 61:24
**conducts** [3] - 41:15, 43:16, 93:19
**confer** [1] - 107:23
**conferences** [3] - 31:2, 33:11, 33:17
**confers** [1] - 100:5
**confirm** [3] - 27:15, 68:8, 69:4
**confirmations** [7] - 9:4, 9:7, 10:1, 10:3, 10:6, 14:1, 14:4
**confirmed** [1] - 49:18
**confused** [1] - 99:23
**conjunction** [1] - 50:20
**connect** [1] - 12:23
**conscious** [1] - 98:11
**consensus** [1] - 40:19
**consented** [1] - 19:24

**conservative** [2] - 54:1, 54:8
**consider** [2] - 27:6, 64:20
**considered** [8] - 32:22, 37:16, 52:10, 52:23, 53:3, 67:1, 73:23, 85:3
**consistent** [3] - 86:1, 86:16, 105:1
**Consolidation** [1] - 66:24
**consolidation** [26] - 64:8, 64:9, 64:12, 64:20, 64:24, 65:7, 65:10, 65:17, 65:22, 66:3, 66:6, 67:2, 67:15, 67:21, 67:22, 68:1, 68:4, 68:7, 68:13, 92:13, 92:15, 94:7, 94:9, 94:19, 95:10, 95:11
**consolidations** [1] - 64:10
**conspiracy** [4] - 17:6, 17:19, 17:24, 18:2
**constitutes** [1] - 109:4
**Constitution** [2] - 2:3, 109:14
**consultancy** [1] - 32:11
**contact** [3] - 24:9, 24:15, 24:22
**contacted** [1] - 23:9
**contacts** [1] - 23:6
**contained** [1] - 71:8
**context** [1] - 69:21
**continue** [5] - 5:3, 12:4, 56:22, 95:7, 95:20
**continued** [2] - 95:11, 98:8
**CONTINUED** [1] - 5:5
**continuing** [1] - 88:4
**contract** [1] - 34:12
**control** [2] - 46:17, 87:12
**controlled** [16] - 25:4, 41:21, 42:15, 42:18, 42:21, 44:19, 45:3, 45:4, 47:9, 60:12, 61:14, 62:16, 63:1, 63:7, 72:23, 73:1
**controls** [1] - 85:1
**conversation** [1] - 98:10

convert [1] - 27:5
converts [1] - 23:22
convince [1] - 107:2
correct [6] - 9:21,
60:9, 75:13, 75:20,
84:15, 89:10
correctly [2] - 89:11,
90:19
corroborate [5] -
28:1, 68:24, 88:7,
93:21, 94:1
corroborated [2] -
27:20, 93:18
costs [1] - 39:3
count [4] - 17:6,
17:10, 17:13, 64:16
country [1] - 33:23
counts [2] - 17:20,
17:23
couple [5] - 4:7, 7:1,
13:19, 22:19, 106:13
course [6] - 30:23,
31:1, 38:3, 39:6,
99:13
court [2] - 16:21,
56:13
Court [13] - 2:1, 2:2,
4:4, 4:9, 4:15, 34:5,
99:8, 99:12, 99:15,
101:19, 108:22,
109:12, 109:13
COURT [85] - 1:1,
4:1, 4:8, 4:10, 4:17,
5:3, 6:5, 6:25, 7:3,
7:17, 7:25, 10:15,
10:25, 11:18, 12:1,
12:4, 12:21, 13:12,
14:22, 15:17, 16:11,
16:13, 20:6, 20:8,
20:10, 34:3, 34:5,
35:14, 35:17, 55:17,
55:20, 56:4, 56:9,
56:12, 56:22, 61:5,
61:7, 65:4, 66:11,
66:13, 66:19, 71:12,
71:14, 82:22, 83:3,
88:19, 89:3, 92:21,
92:24, 93:1, 97:4,
97:6, 97:10, 97:13,
98:2, 98:16, 99:10,
99:18, 99:20, 99:24,
100:1, 100:12,
100:15, 100:21,
101:6, 101:13,
101:17, 101:21,
102:18, 103:4,
103:22, 103:25,
104:6, 104:22, 105:5,
105:14, 106:6,
106:20, 107:1,

107:17, 107:23,
108:4, 108:8, 108:15,
108:18
Court's [2] - 16:9,
104:5
COURTROOM [15] -
4:23, 5:1, 20:14,
20:17, 20:20, 55:25,
56:3, 56:13, 56:17,
56:20, 59:6, 59:8,
60:9, 97:24, 108:21
courtroom [6] - 4:24,
17:1, 56:1, 56:18,
97:25, 100:5
courts [1] - 33:22
craigslist [1] - 14:25
create [6] - 8:25, 9:1,
11:10, 26:6, 42:3,
65:21
created [7] - 5:11,
11:2, 24:18, 24:23,
28:19, 42:12, 44:5
creates [2] - 47:10,
48:22
credentials [2] -
101:14, 101:19
crimes [1] - 33:7
Criminal [1] - 1:3
cross [1] - 29:15
CROSS [2] - 16:14,
88:21
Cross [2] - 3:5, 3:8
cross-chain [1] -
29:15
CROSS-
EXAMINATION [2] -
16:14, 88:21
Cross-Examination
[2] - 3:5, 3:8
crosses [1] - 99:6
CRR [3] - 2:1, 109:3,
109:12
crypto [4] - 23:20,
24:7, 24:18, 25:10
cryptocurrencies [2]
- 28:23, 29:19
cryptocurrency [30]
- 21:24, 22:1, 22:4,
22:9, 22:10, 22:14,
23:9, 24:5, 24:9,
24:13, 24:15, 24:23,
25:2, 25:4, 26:3, 26:4,
26:21, 27:6, 28:6,
28:25, 30:12, 30:18,
31:6, 32:18, 32:19,
33:14, 34:1, 34:7,
34:24, 42:2
CSAM [2] - 101:4,
106:5
cup [3] - 38:10,

38:15, 39:4
current [2] - 31:12,
31:23
customer [5] - 13:24,
31:13, 72:10, 88:8,
89:16
customers [7] -
13:22, 31:8, 55:7,
58:12, 59:2, 72:11,
87:22
Cybertrace [1] -
25:20

## D

D.C [9] - 1:6, 1:16,
1:19, 1:21, 2:4, 17:17,
17:21, 106:23, 109:14
dark [12] - 5:20, 6:1,
6:15, 6:18, 6:19, 6:21,
8:5, 8:7, 11:23, 13:14,
13:18, 15:7
darknet [56] - 6:7,
7:6, 12:8, 12:9, 22:10,
22:14, 23:16, 24:2,
33:7, 40:25, 41:22,
42:1, 42:2, 53:17,
57:6, 57:21, 57:22,
57:23, 58:18, 69:14,
69:18, 69:24, 70:4,
70:19, 71:24, 72:2,
72:5, 72:16, 75:24,
76:2, 76:25, 77:25,
78:16, 79:12, 80:7,
80:9, 81:6, 82:2,
82:11, 82:16, 82:18,
82:19, 83:6, 83:7,
83:8, 83:12, 83:13,
83:24, 84:3, 84:9,
84:12, 84:17, 86:24,
86:25
data [4] - 54:17,
54:19, 89:19, 93:19
date [1] - 38:3
Dated [1] - 109:10
Daubert [1] - 104:10
days [3] - 13:23,
28:14, 99:5
DEA [21] - 21:12,
21:13, 21:18, 21:23,
24:5, 24:7, 24:10,
24:19, 24:23, 25:1,
25:6, 25:15, 26:13,
26:22, 28:3, 28:7,
28:9, 29:16, 29:18,
29:21, 58:5
DEA's [1] - 24:12
deal [2] - 17:3, 104:3
dealing [1] - 13:23

debit [2] - 19:10,
19:12
decade [1] - 91:11
decide [1] - 105:24
decided [1] - 18:1
decipher [1] - 26:11
decision [3] - 99:14,
104:5, 104:7
decisions [2] -
102:25, 103:1
deck [6] - 35:20,
71:2, 81:21, 98:22,
101:17, 105:11
dedicated [1] - 13:9
defeat [1] - 87:8
defeating [1] - 87:13
Defendant [1] - 1:7
DEFENDANT [1] -
1:23
Defendant's [1] -
57:16
defense [6] - 99:3,
99:15, 101:4, 102:25,
103:12, 108:16
deleted [2] - 16:7
demonstrate [1] -
74:14
demonstrative [4] -
35:13, 35:16, 35:18,
61:19
DEPARTMENT [2] -
1:18, 1:20
dependent [1] -
88:16
depiction [1] - 73:22
deployed [2] - 87:17,
94:23
deposit [20] - 9:1,
9:7, 9:8, 9:25, 11:8,
42:16, 42:17, 42:24,
44:25, 61:24, 62:4,
62:6, 62:12, 62:15,
63:21, 64:18, 64:19,
72:22, 94:15
deposited [4] - 10:3,
42:19, 43:1, 63:15
depositing [1] -
63:12
deposits [1] - 49:23
DEPUTY [15] - 4:23,
5:1, 20:14, 20:17,
20:20, 55:25, 56:3,
56:13, 56:17, 56:20,
59:6, 59:8, 60:9,
97:24, 108:21
deputy [5] - 98:2,
98:5, 98:7, 100:4,
100:5
derived [1] - 74:16
deriving [1] - 93:25

describe [2] - 48:23,
62:21
described [6] - 48:1,
49:14, 49:20, 77:7,
82:3, 90:4
describing [2] -
48:11, 64:23
design [1] - 11:12
designed [2] - 11:12,
95:15
designer [1] - 13:17
desire [1] - 102:11
detail [4] - 105:9,
105:13, 105:14,
105:17
detected [1] - 87:18
detection [1] - 44:12
determine [5] -
27:18, 41:11, 61:13,
73:6, 88:10
determined [2] -
40:2, 73:1
develop [3] - 23:6,
24:22, 91:24
developed [1] - 30:8
developing [2] -
24:12, 25:9
development [2] -
25:8, 31:21
developments [1] -
33:10
deviating [1] -
104:21
devices [1] - 93:21
different [21] - 7:11,
8:3, 12:23, 12:24,
22:11, 25:22, 26:5,
26:16, 36:16, 41:1,
43:18, 51:11, 52:21,
54:2, 54:18, 64:20,
64:21, 77:3, 90:13,
94:13, 96:18
difficult [2] - 95:14,
106:9
difficulty [2] - 95:16,
106:11
digital [3] - 48:14,
48:15, 48:16
diligence [2] - 55:5,
59:1
Direct [1] - 3:7
DIRECT [2] - 5:5,
20:22
direct [10] - 70:4,
71:21, 75:19, 81:23,
84:13, 85:7, 85:19,
85:22, 86:13, 86:15
directing [4] - 35:8,
35:23, 61:21, 81:23
direction [1] - 74:1

**directly** [10] - 70:5, 73:12, 74:22, 75:10, 78:24, 81:12, 82:11, 82:15, 84:11, 84:12
**director** [5] - 31:13, 32:1, 32:2, 32:3, 33:2
**disagrees** [1] - 105:18
**disclosed** [1] - 105:25
**discuss** [2] - 55:22, 97:20
**discussing** [1] - 96:19
**display** [1] - 73:13
**disregarded** [1] - 54:5
**distracting** [1] - 98:9
**DISTRICT** [4] - 1:1, 1:1, 1:11, 1:15
**district** [1] - 109:13
**District** [3] - 2:2, 2:2, 109:13
**diversification** [1] - 28:21
**diversified** [1] - 28:16
**docket** [1] - 108:18
**document** [2] - 21:16, 66:14
**DOJ** [1] - 25:11
**dollar** [9] - 39:7, 39:13, 74:25, 75:8, 76:14, 79:23, 80:20, 80:24, 81:18
**dollars** [12] - 76:19, 77:14, 77:19, 78:8, 78:12, 79:1, 79:6, 80:2, 81:14, 82:13, 86:16, 86:21
**domestic** [1] - 21:18
**done** [13] - 27:3, 31:16, 40:7, 51:13, 54:25, 58:20, 64:11, 68:17, 81:20, 90:15, 97:18, 101:23, 102:9
**down** [13] - 15:6, 15:10, 15:24, 16:4, 16:5, 59:19, 60:14, 65:4, 65:5, 85:10, 85:23, 86:11, 86:13
**drag** [1] - 102:9
**draw** [1] - 36:11
**drawer** [1] - 53:7
**drive** [1] - 99:1
**dropped** [1] - 60:20
**drug** [3] - 6:10, 6:11, 21:21
**Drug** [1] - 21:11
**drugs** [3] - 8:9,

27:15, 77:4
**due** [2] - 55:5, 59:1
**duration** [1] - 95:13
**during** [5] - 9:9, 25:6, 60:1, 67:12, 95:20

**E**

**early** [3] - 24:4, 28:14, 68:2
**easier** [7] - 10:5, 11:1, 11:9, 30:9, 36:4, 73:20, 74:19
**ecosystem** [1] - 55:11
**educational** [1] - 21:3
**EDWARDS** [2] - 2:1, 109:3
**Edwards** [1] - 109:12
**effect** [2] - 7:25, 14:4
**effectively** [1] - 101:25
**efficient** [1] - 28:19
**efforts** [1] - 106:12
**eight** [7] - 9:16, 57:6, 57:22, 57:23, 69:24, 70:4, 82:5
**Eighth** [1] - 1:25
**either** [7] - 33:1, 40:25, 65:11, 88:7, 91:17, 104:11, 107:7
**EKELAND** [56] - 1:23, 1:24, 4:12, 6:4, 6:24, 7:1, 7:14, 10:12, 10:23, 11:17, 11:25, 12:20, 13:11, 14:21, 15:14, 15:16, 16:12, 16:15, 20:5, 34:4, 35:15, 56:8, 56:11, 61:6, 65:1, 66:12, 71:13, 82:20, 82:23, 88:22, 89:2, 89:4, 92:20, 98:15, 98:17, 99:11, 99:19, 99:22, 99:25, 100:10, 100:14, 100:20, 101:11, 101:16, 101:18, 104:4, 104:19, 105:4, 105:8, 106:1, 106:17, 106:23, 107:15, 107:21, 108:3, 108:17
**Ekeland** [12] - 3:5, 3:8, 4:5, 4:11, 16:11, 88:19, 94:6, 95:23, 98:13, 101:7, 102:15, 103:25
**Elizabeth** [2] - 20:12,

20:25
**ELIZABETH** [3] - 3:6, 20:19, 20:25
**Elliptic** [1] - 25:20
**emails** [3] - 13:20, 13:21, 13:24
**emerged** [1] - 91:11
**emerging** [1] - 32:24
**emphasize** [1] - 50:15
**employed** [1] - 21:11
**encounter** [1] - 22:1
**encourage** [1] - 107:23
**end** [7] - 11:23, 14:13, 22:3, 29:18, 52:3, 53:2, 75:16
**ended** [1] - 23:18
**enforcement** [15] - 8:12, 23:11, 31:9, 32:11, 54:25, 55:10, 58:20, 58:25, 87:22, 88:6, 89:13, 89:16, 93:14, 93:19, 94:25
**Enforcement** [1] - 21:11
**engaged** [1] - 106:12
**enhance** [2] - 26:23, 43:24
**enhancement** [1] - 94:22
**enhancing** [1] - 28:18
**enlighten** [1] - 104:12
**ensure** [1] - 53:24
**ensuring** [1] - 88:9
**entail** [1] - 21:19
**entailed** [1] - 22:11
**entered** [5] - 4:24, 56:18, 61:10, 66:16, 71:17
**entirely** [1] - 104:7
**entirety** [1] - 69:12
**entities** [2] - 30:2, 70:18
**entity** [2] - 40:24
**environment** [1] - 14:20
**error** [6] - 89:20, 89:22, 90:8, 96:4, 96:11, 96:23
**ESQ** [5] - 1:14, 1:17, 1:20, 1:23, 1:23
**essentially** [1] - 99:12
**establish** [1] - 42:4
**Ethereum** [1] - 30:22
**Ethereum-centered** [1] - 30:22

**evade** [2] - 87:17, 94:25
**evening** [4] - 97:7, 97:15, 97:23, 103:24
**eventually** [3] - 10:20, 13:17, 15:1
**evidence** [19] - 16:8, 18:5, 18:8, 23:25, 27:12, 27:13, 35:6, 59:5, 60:7, 60:8, 61:10, 65:25, 66:16, 71:1, 71:17, 98:25, 99:1, 105:3, 107:17
**evidentiary** [1] - 27:25
**Evolution** [4] - 78:14, 78:19, 78:24, 79:3
**evolution** [1] - 78:16
**exact** [1] - 37:25
**exactly** [4] - 7:18, 54:4, 104:8, 105:17
**Examination** [4] - 3:5, 3:7, 3:8, 3:8
**EXAMINATION** [5] - 5:5, 16:14, 20:22, 88:21, 93:3
**examining** [1] - 92:9
**example** [19] - 5:8, 38:7, 38:20, 39:16, 44:15, 46:5, 46:21, 46:24, 49:3, 51:5, 51:6, 51:14, 52:7, 64:13, 83:23, 83:25, 84:2, 84:5, 101:25
**examples** [3] - 28:13, 33:4, 44:1
**except** [1] - 100:22
**exchange** [5] - 40:25, 41:5, 41:7, 41:25, 75:2
**exchanges** [10] - 23:9, 23:10, 26:6, 31:11, 32:12, 55:4, 57:12, 59:2, 89:14, 93:16
**excuse** [1] - 49:21
**excused** [4] - 20:8, 20:9, 97:4, 97:5
**exhibit** [4] - 60:1, 66:19, 71:15, 71:17
**Exhibit** [23] - 3:12, 35:5, 35:13, 35:17, 59:4, 59:12, 60:6, 60:20, 61:3, 61:4, 61:7, 61:9, 65:24, 66:9, 66:13, 66:15, 67:12, 71:1, 71:10, 71:15, 71:16, 94:4
**exhibited** [1] - 68:9

**exhibiting** [1] - 65:20
**exhibits** [1] - 43:16
**Exhibits** [1] - 61:13
**exist** [1] - 40:15
**existed** [1] - 106:15
**existing** [1] - 65:12
**exited** [2] - 56:1, 97:25
**expand** [2] - 63:25, 105:7
**expect** [2] - 86:23, 97:11
**expected** [2] - 25:2, 99:9
**expedite** [1] - 105:16
**experience** [4] - 31:19, 88:12, 89:13, 89:17
**expert** [7] - 31:21, 34:1, 34:6, 34:10, 101:15, 102:14, 104:17
**experts** [1] - 32:22
**explain** [33] - 18:20, 21:3, 21:13, 27:1, 30:6, 34:21, 35:23, 39:25, 40:21, 45:12, 47:23, 49:19, 50:19, 61:12, 61:22, 64:4, 64:12, 66:2, 68:10, 69:20, 71:19, 73:9, 73:18, 75:2, 76:24, 77:2, 78:14, 81:24, 82:18, 83:20, 85:15, 93:12, 94:11
**explained** [1] - 27:2
**explaining** [2] - 7:20, 12:1
**exploitation** [1] - 21:16
**explorers** [5] - 23:19, 25:16, 25:17, 27:3, 41:8
**export** [2] - 60:1, 60:20
**exposure** [1] - 71:22
**extensive** [1] - 55:12
**extent** [5] - 100:22, 102:15, 104:11, 107:3, 107:4

**F**

**face** [1] - 17:9
**fact** [1] - 62:8
**factor** [1] - 47:24
**fairly** [5] - 66:5, 71:7, 103:14, 104:23, 106:16

**fake** [1] - 12:25
**fall** [1] - 47:5
**familiar** [13] - 6:12, 6:14, 8:5, 8:9, 11:22, 25:18, 57:24, 72:1, 75:24, 79:8, 80:4, 81:3, 96:3
**familiarity** [1] - 26:19
**far** [3] - 86:24, 103:5, 104:14
**faster** [1] - 99:8
**favor** [1] - 107:25
**FBI** [1] - 22:25
**feature** [2] - 10:7, 50:15
**features** [8] - 48:20, 48:25, 49:1, 49:16, 49:17, 51:11, 68:22, 69:3
**February** [2] - 1:7, 109:10
**federal** [3] - 17:16, 17:21, 22:23
**fee** [7] - 10:11, 10:16, 10:17, 11:7, 14:5, 36:17, 49:6
**fees** [3] - 9:11, 49:8
**few** [2] - 13:5, 34:20
**fiat** [1] - 23:22
**field** [4] - 33:10, 91:3, 91:8, 91:11
**figure** [7] - 22:8, 22:14, 22:25, 85:22, 86:15, 98:20, 106:5
**figures** [2] - 75:16, 85:15
**file** [1] - 103:23
**filed** [3] - 103:5, 106:16, 108:12
**files** [1] - 16:7
**filing** [1] - 98:23
**filter** [1] - 85:10
**financial** [11] - 21:7, 21:17, 23:4, 23:5, 23:6, 31:10, 58:20, 59:2, 88:6, 89:14, 103:15
**financing** [1] - 33:7
**fine** [5] - 8:1, 55:18, 55:19, 105:22, 108:9
**fingerprint** [2] - 43:15, 48:16
**fingerprints** [3] - 48:12, 48:18, 48:21
**finish** [2] - 97:12, 99:14
**finishing** [2] - 4:14, 99:6
**first** [18] - 5:18, 6:15, 9:1, 16:25, 21:23,

22:1, 22:6, 22:13, 23:16, 25:16, 40:7, 42:14, 46:20, 50:25, 51:19, 71:20, 71:21, 101:8
**fit** [1] - 54:4
**five** [5] - 17:24, 38:22, 38:25, 39:13, 55:21
**flag** [1] - 5:23
**flagged** [1] - 5:22
**flat** [1] - 10:16
**flexibility** [1] - 101:7
**Floor** [1] - 1:25
**flow** [26] - 21:20, 22:24, 28:24, 30:10, 34:23, 58:16, 69:17, 69:20, 69:22, 69:25, 70:2, 70:6, 70:7, 70:17, 73:6, 76:8, 77:9, 79:17, 80:15, 81:23, 82:1, 83:1, 83:20, 84:1, 86:23, 89:8
**flow-of-funds** [7] - 21:20, 34:23, 69:17, 69:20, 69:25, 70:7, 89:8
**flows** [4] - 75:14, 83:17, 84:16, 84:19
**fly** [1] - 19:15
**focus** [2] - 21:23, 32:21
**focuses** [2] - 30:23, 31:18
**Fog** [116] - 6:12, 6:14, 7:9, 7:16, 7:24, 8:14, 8:17, 9:14, 9:18, 9:24, 10:8, 57:2, 57:5, 57:14, 57:19, 57:20, 57:23, 58:18, 59:16, 59:25, 60:4, 60:12, 61:14, 61:23, 61:25, 62:5, 62:7, 62:15, 62:18, 62:23, 63:2, 63:6, 63:10, 63:13, 63:14, 63:19, 64:1, 64:5, 64:6, 64:22, 66:4, 67:6, 67:9, 67:21, 67:25, 68:5, 68:6, 68:9, 68:11, 68:12, 68:14, 68:22, 69:5, 69:7, 69:18, 69:23, 70:3, 70:5, 70:18, 71:23, 71:24, 73:4, 73:7, 73:11, 73:12, 73:15, 73:16, 73:24, 74:2, 74:5, 74:22, 74:23, 75:5, 75:11, 76:5, 76:9,

76:11, 76:17, 77:10, 77:12, 77:16, 78:5, 78:10, 78:21, 78:23, 79:4, 79:18, 79:21, 80:16, 80:18, 80:22, 81:11, 81:16, 82:2, 82:11, 82:15, 83:18, 83:23, 84:1, 84:4, 84:5, 84:8, 84:11, 84:17, 85:18, 86:12, 86:25, 89:6, 92:12, 92:15, 94:8, 94:12, 94:23, 95:5, 95:17, 95:20
**Fog's** [8] - 65:22, 66:6, 68:4, 69:12, 94:7, 95:7, 95:13, 95:14
**follow** [2] - 23:20, 26:7
**following** [6] - 4:25, 28:10, 56:2, 56:16, 56:19, 98:1
**FOR** [4] - 1:1, 1:14, 1:14, 1:23
**foregoing** [1] - 109:4
**foreign** [1] - 21:18
**forensic** [1] - 21:5
**forfeit** [1] - 20:3
**forfeiture** [2] - 19:24, 20:2
**forks** [1] - 28:17
**format** [3] - 30:9, 36:5, 73:21
**former** [4] - 32:10, 32:11, 96:25
**forms** [1] - 45:19
**forums** [3] - 6:18, 8:4, 12:9
**forward** [2] - 4:16, 102:11
**foundation** [3] - 23:13, 30:17, 64:3
**four** [3] - 22:11, 38:22, 44:20
**fourth** [1] - 23:3
**framed** [1] - 93:25
**frankly** [1] - 107:7
**fraud** [1] - 33:8
**frequently** [2] - 13:5, 58:19
**friendly** [2] - 8:25, 36:4
**friends** [1] - 57:17
**front** [6] - 11:23, 35:9, 42:11, 44:13, 46:2, 61:22
**full** [1] - 109:5
**fully** [1] - 99:6
**fund** [4] - 75:14,

81:23, 83:17, 86:23
**fundamentals** [2] - 30:16, 97:1
**funded** [1] - 53:12
**funds** [93] - 21:20, 22:24, 23:14, 23:20, 26:5, 26:7, 28:10, 28:24, 29:5, 30:10, 34:23, 36:20, 37:1, 37:6, 37:7, 37:8, 37:11, 37:19, 40:12, 42:19, 44:16, 44:19, 45:4, 46:22, 47:8, 47:16, 51:17, 52:8, 52:13, 52:15, 58:16, 58:25, 62:4, 62:6, 62:8, 62:17, 62:24, 62:25, 63:2, 63:6, 63:9, 63:12, 63:15, 63:22, 64:7, 64:8, 64:16, 64:17, 64:21, 65:14, 65:16, 65:19, 68:16, 69:17, 69:20, 69:22, 69:23, 69:25, 70:2, 70:6, 70:7, 70:18, 71:23, 71:24, 72:10, 72:11, 73:7, 73:11, 73:16, 74:2, 76:8, 77:9, 79:17, 80:15, 82:19, 83:1, 83:8, 83:11, 83:13, 83:14, 83:16, 83:21, 83:23, 84:2, 84:4, 84:7, 84:9, 86:4, 86:6, 86:18, 87:6, 89:8

**G**

**gamut** [1] - 33:8
**gathered** [1] - 23:25
**gathering** [1] - 27:21
**general** [2] - 32:9, 50:22
**generally** [7] - 22:7, 48:23, 71:4, 73:4, 82:18, 83:6, 96:19
**generate** [1] - 46:25
**generated** [5] - 46:14, 47:1, 47:3, 94:14, 94:22
**generates** [3] - 47:7, 47:14, 48:21
**geographical** [1] - 91:15
**George** [1] - 22:20
**goal** [2] - 53:19, 53:21
**goods** [11] - 72:6, 76:3, 77:1, 77:2, 78:1, 78:18, 79:13, 80:11,

81:7, 83:10, 83:15
**Government** [32] - 4:13, 17:4, 18:5, 19:6, 19:17, 20:10, 20:12, 21:2, 31:18, 33:25, 34:9, 35:12, 57:3, 61:3, 66:9, 71:10, 97:6, 98:18, 98:23, 98:25, 99:13, 102:24, 103:3, 103:11, 104:1, 104:14, 105:17, 105:18, 105:21, 106:2, 107:24, 108:10
**government** [12] - 25:4, 30:1, 31:9, 31:17, 31:18, 31:20, 32:5, 32:10, 55:10, 88:14, 93:17, 93:23
**GOVERNMENT** [2] - 5:4, 20:19
**Government's** [6] - 61:9, 66:15, 71:16, 94:3, 100:25, 103:7
**government-controlled** [1] - 25:4
**governmental** [1] - 91:4
**Grams** [4] - 5:9, 5:13, 9:15, 18:22
**graphic** [2] - 13:17, 65:21
**gray** [1] - 16:2
**great** [1] - 89:1
**grew** [2] - 24:20, 94:17
**ground** [1] - 41:13
**Group** [1] - 25:20
**group** [4] - 40:11, 45:7, 48:8, 50:5
**grouped** [6] - 40:2, 45:10, 47:18, 49:11, 63:25, 82:1
**grouping** [6] - 40:1, 40:18, 43:10, 51:2, 84:25, 87:14
**groupings** [1] - 52:22
**groups** [1] - 73:22
**grow** [1] - 54:20
**grows** [1] - 54:14
**growth** [1] - 31:13
**guess** [5] - 99:12, 102:22, 103:25, 105:15, 107:9
**guessing** [1] - 99:5
**guilty** [2] - 17:6, 17:20

# H

**half** [6] - 29:17, 44:20, 46:7, 46:14, 76:15, 97:16
**hand** [6] - 20:18, 22:5, 67:23, 70:8, 70:11, 70:21
**hand-tally** [1] - 70:21
**handle** [3] - 13:19, 72:10, 87:10
**happy** [1] - 106:1
**hard** [2] - 9:2, 99:1
**hardware** [1] - 12:17
**HARMON** [2] - 3:4, 5:4
**Harmon** [2] - 4:22, 5:7
**hash** [2] - 36:13, 38:20
**HASSARD** [1] - 1:23
**head** [1] - 104:19
**hear** [11] - 20:14, 56:8, 88:23, 88:25, 92:18, 93:2, 103:6, 103:7, 103:8, 103:11, 107:15
**heard** [3] - 16:21, 34:20, 108:6
**hearing** [3] - 4:4, 4:7, 104:10
**hearsay** [4] - 7:14, 61:6, 66:12, 71:13
**held** [1] - 31:23
**Helix** [17] - 5:11, 5:14, 9:15, 9:22, 9:23, 10:10, 10:20, 11:2, 11:12, 12:17, 14:14, 15:24, 18:12, 18:19, 18:25, 19:9
**help** [16] - 13:16, 23:12, 24:22, 25:3, 35:2, 44:14, 47:14, 47:15, 65:11, 68:5, 68:24, 69:10, 70:15, 87:5, 104:6, 105:16
**helped** [4] - 25:9, 26:18, 29:10, 68:6
**helpful** [1] - 103:6
**helps** [7] - 47:17, 51:21, 53:12, 58:15, 65:13, 65:17, 70:17
**hereby** [1] - 109:3
**heuristic** [2] - 68:11, 90:8
**heuristics** [2] - 54:2, 96:4
**hire** [2] - 32:13, 34:9
**hired** [4] - 13:17,

13:18, 32:20, 89:8
**hit** [1] - 9:3
**holding** [1] - 104:1
**holistic** [1] - 52:15
**honestly** [1] - 105:8
**Honor** [26] - 7:14, 7:16, 10:12, 10:23, 11:25, 16:10, 16:12, 20:7, 55:15, 56:7, 56:11, 56:24, 65:1, 88:18, 89:2, 92:22, 97:3, 97:9, 101:2, 102:12, 103:23, 104:20, 108:5, 108:13, 108:17, 108:20
**HONORABLE** [1] - 1:11
**hop** [3] - 47:7, 85:12, 85:21
**hopping** [1] - 28:25
**hops** [2] - 47:9, 47:11
**host** [1] - 31:2
**hosting** [1] - 65:18
**hours** [4] - 9:8, 34:15, 101:2, 101:5
**house** [1] - 12:23
**human** [1] - 21:4
**hundreds** [3] - 33:3, 71:6, 74:6
**hurdles** [2] - 106:15, 107:5
**hypothetical** [3] - 96:4, 96:10, 96:23
**hypotheticals** [1] - 96:16

# I

**ID** [2] - 37:21, 38:2
**idea** [1] - 52:16
**identical** [1] - 60:23
**identification** [2] - 43:22, 65:21
**identified** [28] - 22:23, 23:21, 27:17, 43:8, 43:10, 43:11, 45:10, 46:12, 46:13, 48:18, 58:3, 58:7, 58:10, 59:15, 59:17, 61:17, 63:5, 63:20, 67:5, 67:15, 67:23, 68:14, 68:19, 86:5, 90:14, 90:22, 94:19
**identifies** [1] - 90:15
**identify** [51] - 12:7, 23:24, 29:12, 29:13, 40:14, 40:16, 41:3,

41:6, 41:14, 41:16, 41:21, 41:23, 42:2, 42:8, 42:17, 42:25, 43:14, 44:10, 44:11, 45:1, 45:7, 46:16, 47:14, 47:15, 47:17, 49:24, 50:12, 52:21, 52:24, 53:11, 53:18, 53:21, 54:18, 58:16, 58:24, 62:14, 64:10, 65:13, 65:17, 68:1, 69:13, 69:22, 72:22, 72:24, 72:25, 73:14, 76:5, 78:5, 86:18, 89:5, 90:13
**identifying** [9] - 27:10, 27:24, 29:10, 53:13, 53:20, 57:9, 58:17, 69:4, 69:16
**identity** [1] - 13:18
**illicit** [16] - 29:12, 40:16, 40:17, 53:18, 58:17, 58:24, 72:6, 76:3, 77:1, 77:2, 78:1, 78:17, 79:13, 80:11, 81:7, 83:10
**immediately** [1] - 5:16
**impact** [1] - 60:25
**implementation** [1] - 25:12
**implemented** [1] - 16:3
**important** [8] - 40:15, 55:8, 58:23, 58:24, 58:25, 87:19, 103:18, 103:21
**impossible** [1] - 104:17
**improve** [1] - 9:24
**inadvertently** [2] - 59:25, 60:20
**include** [6] - 27:9, 35:20, 53:7, 60:19, 82:4, 82:7
**included** [4] - 25:19, 54:7, 54:10, 84:14
**includes** [1] - 53:14
**including** [2] - 6:18, 69:7
**increase** [1] - 95:15
**increased** [2] - 29:2, 29:5
**independent** [1] - 90:25
**index** [1] - 59:23
**INDEX** [1] - 3:1
**indicate** [1] - 37:11
**indicated** [6] - 44:4, 48:12, 54:2, 64:14,

94:16, 98:13
**indicates** [2] - 36:3, 36:4
**indicating** [1] - 44:22
**indication** [1] - 87:16
**indicative** [2] - 38:24, 53:13
**indicator** [1] - 52:10
**indict** [1] - 24:2
**indicted** [1] - 17:12
**indirect** [19] - 70:6, 75:14, 83:17, 83:20, 83:21, 84:1, 84:10, 84:14, 84:16, 84:19, 85:8, 85:11, 85:20, 86:4, 86:5, 86:6, 86:14, 86:19, 86:20
**indirectly** [1] - 84:6
**individual** [8] - 23:22, 23:24, 24:3, 27:7, 27:10, 27:25, 74:18, 85:1
**individually** [1] - 74:13
**individuals** [4] - 21:21, 27:5, 28:23, 32:12
**indulgence** [1] - 16:9
**industry** [2] - 55:10, 96:11
**inform** [12] - 47:12, 48:7, 49:4, 49:6, 50:11, 51:22, 53:12, 53:15, 53:22, 55:6, 63:18, 105:6
**informally** [1] - 105:21
**information** [25] - 8:4, 23:11, 26:23, 27:9, 27:10, 27:20, 36:2, 36:23, 42:23, 44:2, 50:9, 50:16, 50:20, 71:8, 73:6, 74:16, 87:23, 88:3, 88:7, 88:11, 89:16, 93:20, 93:22, 93:25, 100:4
**informs** [1] - 55:4
**input** [10] - 36:18, 37:5, 39:17, 45:2, 45:8, 52:7, 62:16, 62:24, 63:6
**inputs** [3] - 69:7, 69:11, 74:15
**insight** [3] - 43:20, 43:22, 43:23
**insights** [1] - 91:25
**instance** [3] - 41:25, 49:6, 63:17
**instead** [2] - 10:1,

90:17
**institution** [1] - 31:11
**institutions** [6] - 23:7, 57:12, 58:20, 59:2, 88:6, 89:15
**insurmountable** [1] - 107:18
**intelligence** [2] - 21:14, 29:25
**Intelligence** [1] - 25:20
**intends** [2] - 104:8, 104:13
**interact** [1] - 43:9
**interacted** [3] - 26:10, 52:6, 52:21
**interacting** [6] - 44:6, 45:9, 48:14, 50:11, 52:9, 65:15
**interaction** [1] - 13:21
**interactions** [1] - 63:23
**interacts** [2] - 49:23, 53:11
**interface** [3] - 8:23, 36:1, 48:15
**intermediary** [6] - 75:11, 83:22, 83:23, 84:22, 85:12, 85:21
**internalized** [1] - 102:7
**internally** [1] - 89:19
**internet** [2] - 6:22, 6:23
**interview** [1] - 57:16
**interviews** [3] - 103:14, 103:16, 105:6
**introduction** [1] - 30:17
**intrusion** [1] - 33:6
**intuitive** [1] - 9:13
**investigation** [12] - 21:17, 22:3, 22:5, 22:9, 22:16, 23:12, 23:21, 32:1, 32:2, 32:3, 32:16, 32:17
**investigations** [23] - 21:8, 23:5, 23:15, 24:9, 24:15, 25:11, 26:13, 28:6, 30:22, 32:20, 33:2, 33:15, 58:5, 58:6, 58:7, 58:14, 58:25, 87:5, 88:11, 88:14, 88:15, 88:17
**investigative** [5] - 21:6, 24:1, 30:7, 32:5, 32:8

**investigator** [1] - 41:2
**investigator's** [1] - 30:25
**investigators** [1] - 32:4
**involve** [4] - 22:7, 32:7, 57:9, 57:11
**involved** [2] - 28:9, 95:16
**involving** [2] - 24:5, 84:21
**IP** [2] - 12:7, 12:10
**IRS** [1] - 22:25
**isolated** [1] - 90:17
**issue** [10] - 4:18, 98:21, 103:6, 103:9, 103:13, 103:18, 104:2, 104:14, 104:16, 107:12
**issues** [3] - 31:5, 102:2, 105:7
**it'll** [3] - 37:17, 38:12, 51:19
**items** [1] - 80:10
**itself** [2] - 41:24, 42:5

## J

**jail** [1] - 106:11
**Jail** [1] - 106:24
**jails** [1] - 106:23
**January** [1] - 29:22
**JavaScript** [6] - 11:22, 11:23, 12:5, 12:9, 12:12, 12:15
**JavaScript's** [1] - 12:13
**JEFFREY** [1] - 1:20
**joined** [1] - 21:23
**journal** [2] - 90:5, 90:14
**JUDGE** [1] - 1:11
**jurisdiction** [1] - 91:18
**jurisdictionally** [1] - 91:17
**Juror** [1] - 98:7
**juror** [9] - 4:18, 98:4, 98:11, 99:17, 100:16, 100:18, 100:19
**jurors** [6] - 97:13, 98:3, 98:9, 101:23, 102:2, 102:10
**jurors'** [1] - 102:1
**JURY** [1] - 1:10
**jury** [20] - 4:2, 4:20, 4:24, 18:8, 18:20,

29:23, 35:2, 46:18, 56:1, 56:18, 65:2, 66:20, 66:22, 73:17, 85:16, 91:23, 92:3, 97:25, 101:24, 108:1
**JUSTICE** [2] - 1:18, 1:20

## K

**keep** [8] - 10:5, 18:25, 19:2, 33:9, 55:15, 59:2, 102:5, 102:6
**kept** [1] - 19:4
**key** [2] - 37:17, 37:20
**keys** [2] - 18:15, 18:16
**kind** [16] - 6:2, 8:24, 9:12, 10:4, 12:17, 14:24, 15:13, 19:2, 22:11, 23:13, 24:6, 24:20, 53:9, 86:22, 91:4, 91:8
**knowledge** [5] - 23:7, 26:12, 89:12, 91:2, 91:9
**known** [9] - 6:16, 21:15, 40:24, 41:19, 42:6, 42:16, 44:16, 45:15, 73:23

## L

**language** [3] - 11:14, 11:24, 12:6
**lapel** [1] - 4:5
**larger** [1] - 54:15
**LARRY** [2] - 3:4, 5:4
**last** [3] - 51:20, 91:11, 107:15
**latter** [1] - 96:22
**launder** [4] - 17:7, 17:19, 18:2, 19:12
**laundered** [1] - 19:9
**laundering** [2] - 21:22, 55:5
**LAW** [1] - 1:24
**law** [15] - 8:12, 23:10, 31:9, 32:10, 54:25, 55:10, 58:20, 58:25, 87:21, 88:5, 89:13, 89:16, 93:14, 93:19, 94:25
**laws** [1] - 16:2
**lead** [1] - 101:24
**leading** [6] - 6:4, 7:1, 10:24, 15:16, 82:23, 82:25

**leaked** [1] - 12:11
**learn** [2] - 23:14, 26:7
**learned** [3] - 6:19, 26:14, 105:5
**learning** [2] - 26:3, 31:2
**least** [4] - 101:14, 103:9, 103:12, 104:2
**leave** [3] - 99:22, 106:24, 107:1
**leaving** [2] - 100:1, 100:9
**lectures** [2] - 22:20, 22:21
**led** [1] - 22:17
**ledger** [1] - 19:2
**left** [3] - 9:9, 36:9, 67:23
**left-hand** [1] - 67:23
**legal** [8] - 27:24, 53:15, 53:16, 88:8, 91:18, 93:14, 93:15
**less** [2] - 34:17, 102:1
**level** [17] - 28:19, 30:17, 50:23, 50:24, 51:3, 51:4, 51:24, 51:25, 52:5, 52:14, 52:18, 52:19, 52:23, 63:23
**leverage** [1] - 29:2
**leveraged** [3] - 26:17, 29:14, 87:13
**leveraging** [4] - 53:4, 68:14, 73:10, 94:21
**life** [2] - 16:16, 16:23
**Light** [2] - 11:2, 14:14
**light** [2] - 29:5, 36:17
**likely** [2] - 70:14, 102:1
**line** [3] - 73:19, 73:24, 95:25
**Linux** [1] - 13:1
**LISA** [2] - 2:1, 109:3
**Lisa** [1] - 109:12
**list** [11] - 59:15, 59:22, 60:1, 60:11, 60:17, 60:19, 60:22, 60:23, 67:20, 67:22, 74:5
**listed** [1] - 25:22
**listener** [1] - 8:1
**lists** [1] - 73:21
**local** [1] - 14:24
**located** [2] - 6:21, 7:7
**log** [4] - 9:6, 9:8, 9:25, 11:3

**logging** [1] - 10:5
**logistically** [1] - 99:3
**logistics** [1] - 98:24
**logs** [1] - 57:14
**long-running** [1] - 94:24
**longest** [1] - 8:15
**look** [23] - 13:7, 48:2, 48:3, 49:13, 50:6, 50:25, 51:15, 52:14, 53:6, 57:19, 67:18, 69:6, 75:14, 76:8, 77:9, 79:17, 80:15, 83:17, 84:16, 85:11, 92:5, 95:4, 106:18
**looked** [2] - 14:8, 49:9
**looking** [12] - 6:15, 27:22, 44:24, 48:6, 48:9, 49:7, 50:6, 52:5, 63:22, 86:18, 98:25
**looks** [1] - 90:14
**lose** [1] - 26:9
**lower** [1] - 36:9
**lunchtime** [3] - 97:18, 100:2, 100:9

## M

**major** [2] - 86:24, 105:9
**manual** [1] - 23:19
**manually** [3] - 40:7, 40:8, 40:19
**market** [35] - 22:10, 40:25, 41:22, 42:1, 42:2, 53:17, 57:6, 69:24, 70:4, 72:2, 72:5, 73:16, 75:22, 75:24, 76:2, 76:6, 76:25, 77:25, 78:14, 78:16, 79:8, 79:12, 80:7, 80:9, 82:18, 82:19, 83:1, 83:2, 83:6, 83:7, 83:8, 83:12, 83:13, 83:24
**Market** [10] - 78:15, 78:24, 79:9, 79:21, 81:1, 81:3, 81:5, 81:9, 81:12, 84:1
**Market's** [1] - 81:6
**marketplace** [6] - 71:22, 81:6, 84:3, 84:9, 85:18, 86:12
**marketplaces** [1] - 82:1
**markets** [33] - 6:7, 6:10, 6:11, 6:19, 6:21, 8:7, 24:2, 33:7, 57:21,

57:22, 57:23, 58:19, 69:14, 69:16, 69:18, 70:19, 71:24, 71:25, 72:16, 77:3, 77:7, 78:3, 78:21, 80:13, 81:21, 82:2, 82:5, 82:11, 82:16, 83:18, 84:12, 84:17, 86:24
**Mason** [1] - 22:20
**master's** [2] - 21:5
**match** [1] - 37:2
**material** [1] - 101:5
**matter** [3] - 7:18, 7:22, 32:22
**maximum** [2] - 17:9, 17:22
**mean** [10] - 19:1, 40:21, 54:9, 54:15, 99:21, 100:8, 102:25, 104:5, 104:8, 107:3
**means** [4] - 25:1, 40:23, 71:22, 107:8
**mechanism** [1] - 22:15
**mechanisms** [3] - 23:1, 23:8, 29:14
**media** [1] - 21:16
**medical** [1] - 100:7
**members** [1] - 32:9
**mention** [1] - 106:20
**mentioned** [1] - 18:18
**met** [3] - 16:16, 16:23, 16:24
**method** [1] - 53:23
**methodologies** [1] - 90:3
**methodology** [3] - 50:4, 90:24, 96:15
**methods** [3] - 41:11, 77:6, 96:13
**mic** [3] - 4:5, 88:20, 92:23
**MICHAEL** [1] - 1:23
**micro** [5] - 41:15, 41:18, 42:15, 44:2, 61:15
**Microsoft** [1] - 12:22
**middle** [1] - 67:7
**might** [5] - 36:24, 41:17, 97:19, 100:2, 105:16
**million** [21] - 19:18, 19:19, 19:20, 20:3, 75:9, 76:15, 76:20, 77:15, 77:20, 79:2, 79:7, 80:3, 80:25, 81:19, 82:14, 84:11, 84:12, 85:25, 86:8, 86:15, 86:21

min [1] - 18:22
mind [1] - 101:21
minute [1] - 59:6
minutes [1] - 55:21
misrepresent [1] - 15:12
mix [3] - 5:18, 5:19, 8:11
mixer [14] - 5:18, 6:16, 9:23, 15:9, 15:12, 15:13, 15:19, 15:20, 40:25, 53:17, 63:10, 63:12, 63:16, 86:25
mixers [3] - 29:3, 29:10, 33:7
mixing [1] - 5:23
modify [1] - 10:20
moment [2] - 45:12, 106:25
Monday [8] - 4:19, 98:4, 99:4, 99:16, 99:18, 99:19, 99:21, 100:8
money [40] - 5:9, 5:10, 5:12, 5:13, 9:14, 10:18, 11:4, 14:14, 14:15, 14:16, 17:7, 17:16, 17:19, 17:20, 18:2, 18:12, 19:5, 19:9, 19:13, 19:15, 21:22, 26:7, 26:8, 55:5, 74:22, 75:5, 76:11, 77:12, 77:16, 78:5, 78:23, 79:20, 79:25, 80:18, 81:11, 81:16, 82:10, 82:15, 83:7, 105:1
money-launder [3] - 17:7, 17:19, 18:2
months [2] - 13:5, 106:14
morning [2] - 97:18, 100:11
MOSS [1] - 1:11
most [15] - 5:11, 5:21, 6:17, 7:12, 8:15, 13:23, 14:15, 45:14, 49:12, 53:22, 64:3, 65:18, 103:17, 103:20, 104:2
mostly [1] - 6:6
mouth [1] - 24:7
move [4] - 29:21, 85:5, 102:8, 102:11
moved [3] - 63:10, 74:22, 81:11
movement [1] - 84:5
moves [5] - 33:25, 35:12, 61:3, 66:9,

71:10
moving [1] - 84:2
MR [73] - 4:12, 5:6, 6:4, 6:9, 6:24, 7:1, 7:5, 7:14, 7:15, 7:24, 8:2, 8:16, 10:12, 10:14, 10:19, 10:23, 11:11, 11:17, 11:20, 11:25, 12:16, 12:20, 13:3, 13:11, 13:15, 14:21, 15:11, 15:14, 15:16, 15:18, 16:9, 16:12, 16:15, 20:5, 20:7, 33:25, 34:4, 35:15, 56:8, 56:11, 61:6, 65:1, 66:12, 71:13, 82:20, 82:23, 88:22, 89:2, 89:4, 92:20, 98:15, 98:17, 99:11, 99:19, 99:22, 99:25, 100:10, 100:14, 100:20, 101:11, 101:16, 101:18, 104:4, 104:19, 105:4, 105:8, 106:1, 106:17, 106:23, 107:15, 107:21, 108:3, 108:17
MS [73] - 4:3, 4:9, 20:12, 20:23, 34:8, 35:5, 35:7, 35:12, 35:19, 55:15, 55:19, 56:7, 56:24, 57:1, 59:4, 59:7, 59:10, 59:11, 59:19, 59:21, 60:6, 60:10, 60:14, 60:16, 61:3, 61:11, 61:18, 61:20, 62:10, 62:11, 65:6, 65:24, 66:1, 66:9, 66:17, 66:20, 66:21, 67:11, 67:13, 67:17, 67:19, 71:10, 71:18, 75:21, 75:23, 76:21, 76:23, 77:21, 77:23, 81:1, 81:2, 81:20, 81:22, 82:25, 83:5, 85:5, 85:6, 88:18, 92:22, 93:4, 94:3, 94:5, 97:3, 97:8, 97:11, 101:2, 102:12, 103:2, 103:20, 103:23, 108:5, 108:13, 108:20
multiple [4] - 64:14, 64:15, 72:14, 72:15
multitude [2] - 32:17, 48:6

**N**

name [2] - 20:24, 89:25
names [4] - 12:25, 19:10, 25:22, 101:5
nature [1] - 21:10
near [1] - 14:13
necessarily [2] - 50:16, 90:2
need [17] - 11:3, 11:19, 36:22, 46:19, 58:12, 85:15, 92:24, 98:20, 100:21, 101:24, 105:15, 105:19, 105:22, 106:7, 107:5, 107:11
needed [1] - 108:14
needs [1] - 108:16
never [9] - 9:11, 13:18, 15:15, 16:16, 16:19, 16:23, 16:24, 90:25, 106:22
New [2] - 1:21, 1:25
new [15] - 46:14, 46:25, 47:1, 47:15, 91:11, 96:12, 96:20, 103:15, 105:3, 105:11, 105:23, 107:4, 107:14, 107:19
newly [3] - 47:3, 94:14, 94:22
news [1] - 33:13
next [11] - 20:10, 72:1, 75:21, 76:21, 77:21, 78:14, 79:8, 80:4, 81:21, 85:5, 99:6
nexus [1] - 27:6
nice [1] - 97:23
Ninja [1] - 15:21
noise [1] - 4:6
non [1] - 104:14
non-issue [1] - 104:14
nonetheless [1] - 95:19
normally [1] - 15:5
Northwest [5] - 1:15, 1:18, 1:21, 2:3, 109:14
Nos [1] - 61:9
noted [2] - 4:6, 10:7
notes [2] - 102:19, 109:5
notice [1] - 68:21
noticed [1] - 98:7
noting [1] - 67:14
notion [1] - 102:7

November [2] - 31:24, 31:25
nuance [1] - 105:10
Nucleus [6] - 79:8, 79:11, 79:12, 79:14, 79:17, 79:21
number [6] - 9:17, 37:4, 37:5, 37:22, 51:9, 69:7
numbers [1] - 86:1

**O**

obfuscate [2] - 63:14, 87:5
obfuscation [3] - 26:16, 29:1, 29:5
objection [21] - 6:4, 6:24, 6:25, 7:14, 10:12, 10:23, 11:17, 11:25, 12:20, 13:11, 14:21, 15:14, 34:3, 35:14, 35:15, 61:5, 66:11, 71:12, 71:14, 82:20, 82:22
obscure [1] - 28:24
observe [6] - 43:2, 45:24, 50:9, 54:15, 63:3, 88:4
observed [5] - 67:21, 87:4, 94:2, 94:17, 95:13
observing [5] - 43:12, 44:8, 44:14, 48:10, 95:7
occasion [2] - 26:22, 28:3
occur [4] - 44:7, 48:13, 48:20, 85:1
occurred [5] - 29:15, 36:21, 37:24, 70:3, 91:18
occurring [14] - 29:9, 29:13, 32:23, 37:2, 37:3, 40:17, 40:20, 44:17, 44:25, 45:1, 47:11, 49:24, 51:22, 88:5
occurs [4] - 44:23, 46:10, 48:3, 48:15
October [1] - 57:8
OF [6] - 1:1, 1:3, 1:10, 1:15, 1:18, 1:20
off-chain [1] - 27:23
offer [2] - 30:11, 103:15
offered [3] - 7:15, 7:16, 7:23
offering [1] - 7:21

offers [1] - 30:3
office [1] - 103:24
OFFICE [1] - 1:14
officers [1] - 89:14
offices [1] - 21:18
Official [1] - 2:1
official [1] - 109:12
offramps [3] - 23:21, 27:4, 27:17
often [3] - 7:11, 8:13, 9:2
old [1] - 106:13
on-chain [1] - 27:22
one [60] - 4:18, 6:16, 6:17, 17:6, 17:13, 17:18, 17:21, 18:22, 19:8, 24:17, 28:25, 30:3, 30:16, 33:19, 33:20, 38:23, 39:13, 43:5, 43:7, 43:22, 44:9, 44:24, 45:6, 45:14, 46:7, 46:10, 46:14, 48:2, 49:3, 49:9, 50:6, 50:15, 52:2, 52:4, 52:10, 53:2, 53:4, 53:15, 59:24, 60:18, 64:22, 71:25, 72:13, 74:9, 84:19, 84:22, 85:11, 85:21, 89:25, 98:4, 100:18, 101:3, 101:22, 103:10, 107:22
ones [1] - 90:9
open [8] - 18:22, 22:13, 25:17, 92:1, 92:3, 92:4, 92:5, 92:7
open-source [2] - 22:13, 25:17
operate [1] - 26:5
operated [1] - 64:6
operates [2] - 43:23, 63:14
operating [1] - 64:15
operation [1] - 95:13
operations [1] - 24:22
operator [1] - 89:5
opinion [2] - 8:24, 108:11
opportunity [1] - 54:15
orange [3] - 36:7, 36:13, 36:14
order [16] - 5:2, 19:24, 23:12, 23:14, 37:9, 37:15, 38:10, 39:14, 40:10, 43:24, 47:16, 55:6, 55:11, 56:21, 62:6, 62:23

originated [1] - 87:6
otherwise [1] - 105:19
outcome [1] - 34:18
outlets [1] - 33:13
output [4] - 37:10, 47:1, 62:18, 63:7
outputs [4] - 36:19, 69:7, 69:11, 74:16
outside [3] - 82:23, 85:1, 93:23
outstanding [1] - 98:21
overall [5] - 50:13, 50:14, 64:18, 64:19, 65:19
overcome [1] - 107:6
overruled [9] - 6:5, 10:15, 10:25, 12:2, 12:21, 13:12, 14:22, 71:14, 83:3
oversaw [1] - 32:4
overseeing [1] - 88:15
owe [1] - 38:12
own [17] - 5:18, 25:7, 26:1, 26:5, 26:7, 26:8, 26:14, 31:21, 41:4, 41:5, 44:19, 50:16, 84:3, 84:8, 85:2, 89:13, 89:16

## P

p.m [5] - 1:7, 4:25, 56:2, 56:19, 98:1
PAGE [1] - 3:3
page [4] - 71:20, 72:1, 81:21, 85:5
paid [6] - 5:14, 5:16, 10:11, 18:12, 34:17, 39:4
Pandora [9] - 80:5, 80:7, 80:9, 80:10, 80:11, 80:12, 80:15, 80:18, 80:22
paper [1] - 90:1
papers [11] - 90:8, 95:24, 96:3, 96:18, 96:19, 96:20, 103:5, 106:8, 106:16, 107:10, 108:6
parameters [2] - 51:1, 54:4
part [6] - 20:2, 51:21, 53:14, 54:6, 54:7, 107:15
participated [1] - 48:5

particular [8] - 11:14, 41:22, 48:4, 48:21, 50:9, 51:22, 52:16, 68:21
parties [2] - 103:8, 107:24
pass [1] - 16:10
password [1] - 37:18
past [2] - 34:20, 107:8
pattern [6] - 47:18, 48:3, 65:7, 69:11, 94:17, 95:11
patterns [7] - 43:2, 43:8, 47:25, 48:7, 49:4, 49:12, 49:14
pausing [1] - 45:12
pay [7] - 6:7, 12:25, 37:9, 38:11, 39:6, 39:19, 72:8
pdfs [1] - 70:23
Pearlman [1] - 5:3
PEARLMAN [20] - 1:20, 5:6, 6:9, 7:5, 7:15, 7:24, 8:2, 8:16, 10:14, 10:19, 11:11, 11:20, 12:16, 13:3, 13:15, 15:11, 15:18, 16:9, 20:7, 33:25
peel [14] - 44:12, 46:19, 47:5, 47:10, 47:21, 47:23, 49:15, 49:22, 54:4, 54:6, 68:15, 68:19, 69:2, 94:21
peer [3] - 14:24, 89:25
peer-reviewed [1] - 89:25
peer-to-peer-type [1] - 14:24
PELKER [74] - 1:17, 4:3, 4:9, 20:12, 20:23, 34:8, 35:5, 35:7, 35:12, 35:19, 55:15, 55:19, 56:7, 56:24, 57:1, 59:4, 59:7, 59:10, 59:11, 59:19, 59:21, 60:6, 60:10, 60:14, 60:16, 61:3, 61:11, 61:18, 61:20, 62:10, 62:11, 65:6, 65:24, 66:1, 66:9, 66:17, 66:20, 66:21, 67:11, 67:13, 67:17, 67:19, 71:10, 71:18, 75:21, 75:23, 76:21, 76:23, 77:21, 77:23, 81:1, 81:2, 81:20, 81:22, 82:25, 83:5,

85:5, 85:6, 88:18, 92:22, 93:4, 94:3, 94:5, 97:3, 97:8, 97:11, 101:2, 102:12, 103:2, 103:20, 103:23, 108:5, 108:13, 108:20
Pelker [5] - 3:7, 3:8, 56:22, 100:24, 103:17
pencil [1] - 36:9
Pennsylvania [1] - 1:18
people [13] - 8:7, 8:8, 8:13, 9:25, 10:17, 13:19, 14:9, 15:1, 72:8, 83:9, 87:7, 92:9, 93:9
people's [1] - 19:10
percent [4] - 10:16, 11:7, 32:21, 90:10
performing [1] - 55:5
period [2] - 68:2, 95:21
person [2] - 12:11, 107:7
personal [2] - 27:10, 84:8
perspective [2] - 34:21, 103:18
persuaded [1] - 107:5
photos [3] - 18:9, 18:18, 18:23
PHP [2] - 11:16, 11:21
physical [1] - 99:1
picture [2] - 18:21, 86:22
PIN [2] - 37:18
placed [1] - 74:17
Plaintiff [1] - 1:4
PLAINTIFF [1] - 1:14
platform [2] - 47:17, 88:9
platforms [2] - 41:1, 93:16
play [1] - 53:9
plays [1] - 42:10
plea [5] - 17:3, 17:12, 18:1, 18:4, 19:20
pled [2] - 17:6, 17:20
PLLC [1] - 1:24
plug [1] - 59:8
point [11] - 8:17, 11:19, 15:24, 24:9, 24:14, 24:21, 92:16, 92:18, 104:18, 106:13, 108:8
points [3] - 40:16, 54:17, 54:19

policies [1] - 25:10
popular [2] - 14:7, 14:13
position [2] - 32:3, 103:12
possible [3] - 101:8, 104:13, 104:25
posts [3] - 7:12, 8:6
practices [2] - 25:10, 25:12
predominantly [2] - 64:11, 77:4
preference [1] - 101:12
premise [1] - 50:4
prepare [1] - 70:23
prepared [1] - 71:2
preparing [2] - 35:1, 35:10
present [2] - 49:1, 107:9
presentation [1] - 75:17
pretty [2] - 49:7, 52:10
prevents [1] - 92:9
previous [2] - 23:2, 86:2
previously [8] - 33:22, 38:6, 39:23, 76:5, 79:15, 82:5, 105:24, 107:18
PREVIOUSLY [1] - 5:4
price [2] - 19:21, 38:11
primarily [3] - 28:15, 31:15, 72:6
primary [1] - 64:2
principal [2] - 103:9, 103:13
principles [3] - 90:22, 90:23, 96:14
printed [1] - 51:10
prison [1] - 17:9
private [5] - 18:14, 19:15, 31:10, 37:17, 55:10
privately [2] - 98:10, 100:5
problem [1] - 59:7
proceed [2] - 16:12, 89:2
proceedings [7] - 4:25, 56:2, 56:16, 56:19, 98:1, 108:23, 109:6
process [7] - 27:24, 40:18, 53:15, 53:16, 88:8, 93:15

processes [1] - 73:3
produced [1] - 109:6
profession [1] - 45:13
professor [1] - 101:11
Professor [6] - 98:22, 103:13, 104:20, 105:12, 106:3, 106:9
proffer [2] - 105:19, 105:22
program [4] - 13:10, 24:13, 24:24, 58:6
programming [1] - 11:14
proposing [2] - 96:12, 96:20
protect [1] - 55:11
protecting [1] - 88:8
protocol [2] - 28:18, 28:20
prove [1] - 18:5
provide [8] - 21:17, 23:11, 29:8, 30:8, 30:9, 31:20, 57:4, 93:24
provided [4] - 21:12, 32:5, 62:6, 73:11
provides [5] - 30:1, 30:16, 40:19, 44:18, 54:1
providing [4] - 24:21, 48:16, 59:1, 70:17
psychology [2] - 21:5, 21:6
public [4] - 23:19, 31:18, 41:8, 108:18
publicly [1] - 92:4
publish [3] - 31:5, 35:12, 66:20
published [4] - 22:18, 35:17, 65:2, 90:5
pull [9] - 35:5, 37:25, 38:14, 59:4, 60:6, 61:18, 65:24, 67:11, 94:3
pulled [1] - 73:10
purchase [1] - 83:9
purely [1] - 89:8
purposes [3] - 54:25, 55:2, 107:9
purse [2] - 38:13, 39:8
push [1] - 100:2
put [9] - 6:7, 9:14, 9:18, 10:2, 37:18, 53:5, 64:18, 106:18,

108:18
**puts** [1] - 73:22

## Q

**qualifications** [1] - 106:4
**qualifications..** [1] - 102:17
**qualified** [2] - 34:6, 102:14
**qualify** [3] - 33:25, 101:15, 101:18
**query** [1] - 37:24
**questions** [8] - 7:2, 8:8, 20:5, 88:18, 92:20, 93:2, 97:3, 102:13
**quickly** [3] - 4:12, 19:22, 102:11
**quite** [2] - 13:5, 14:13
**quote** [1] - 24:25
**quote-unquote** [1] - 24:25

## R

**raise** [4] - 4:1, 20:17, 56:6, 56:10
**raised** [1] - 22:5
**ran** [2] - 16:8, 33:8
**RANDOLPH** [1] - 1:11
**randomization** [1] - 10:7
**randomized** [1] - 9:12
**range** [2] - 32:10, 33:6
**ranges** [1] - 31:9
**ransomware** [1] - 33:6
**Rappahannock** [1] - 106:10
**rate** [1] - 89:22
**rates** [6] - 75:2, 89:20, 90:8, 96:4, 96:11, 96:23
**rather** [5] - 32:13, 66:19, 70:21, 73:21, 103:1
**raw** [2] - 35:25, 38:19
**RDR** [3] - 2:1, 109:3, 109:12
**reached** [1] - 22:24
**Reactor** [21] - 25:24, 30:4, 30:6, 30:7, 30:19, 57:5, 58:4,

70:15, 73:10, 89:12, 89:23, 90:1, 90:2, 90:9, 90:21, 91:1, 92:7, 93:6, 93:8, 93:10, 95:19
**read** [4] - 7:11, 33:12, 85:15, 103:5
**reading** [1] - 103:12
**ready** [3] - 56:23, 98:21, 106:14
**real** [5] - 13:18, 14:20, 27:7, 27:14, 107:2
**real-world** [1] - 14:20
**realistically** [1] - 70:10
**realize** [1] - 102:3
**really** [6] - 102:4, 104:22, 105:2, 105:11, 106:12, 107:14
**realtime** [1] - 29:8
**reask** [1] - 7:3
**reason** [2] - 18:4, 65:5
**reasonably** [1] - 107:6
**reasons** [1] - 103:10
**rebuttal** [1] - 104:17
**receipt** [5] - 38:16, 39:10, 52:1, 52:2
**receive** [10] - 37:11, 44:19, 51:7, 51:8, 52:13, 62:24, 62:25, 64:7, 75:5, 93:16
**Received** [1] - 3:12
**received** [9] - 14:2, 22:4, 33:14, 39:10, 46:11, 52:15, 73:16, 77:16, 83:15
**receivers** [1] - 36:19
**receives** [1] - 38:23
**receiving** [8] - 36:20, 38:25, 71:24, 72:11, 84:7, 86:9, 86:11, 86:12
**recent** [1] - 103:16
**recently** [2] - 103:14, 105:6
**recess** [2] - 56:14, 56:15
**recognize** [1] - 59:12
**recognized** [1] - 91:7
**recollection** [1] - 102:18
**recommend** [1] - 8:14
**recommendations** [1] - 7:10
**reconcile** [2] - 53:6,

64:17
**reconsider** [2] - 102:25, 103:1
**record** [1] - 106:19
**records** [4] - 18:25, 26:23, 57:11, 71:8
**redactions** [1] - 108:13
**Reddit** [1] - 7:6
**Reddit.com** [1] - 6:23
**reddit.com** [1] - 7:8
**redirect** [2] - 20:6, 92:21
**REDIRECT** [1] - 93:3
**Redirect** [1] - 3:8
**refer** [1] - 40:23
**referenced** [1] - 50:15
**referred** [1] - 6:17
**referring** [2] - 6:10, 90:17
**regard** [1] - 107:11
**regarding** [5] - 31:3, 33:23, 39:23, 73:4, 101:4
**region** [1] - 91:15
**register** [3] - 52:4, 53:3, 64:16
**registers** [2] - 64:14, 64:21
**regular** [2] - 6:22, 6:23
**regulatory** [1] - 31:10
**relate** [2] - 50:1, 63:9
**related** [4] - 55:23, 84:16, 97:22
**relates** [3] - 45:17, 50:3, 100:22
**relation** [2] - 91:3, 91:14
**relatively** [1] - 91:10
**relevance** [6] - 10:12, 10:23, 11:17, 12:20, 13:11, 14:21
**relevant** [2] - 62:22, 65:3
**reliability** [4] - 28:4, 69:4, 88:13, 88:16
**reliable** [5] - 27:19, 53:23, 55:9, 55:13, 88:10
**relied** [3] - 87:21, 87:24, 90:20
**rely** [2] - 55:6, 55:11
**remind** [2] - 55:22, 97:20
**remote** [1] - 13:2
**rent** [1] - 12:24

**repeat** [1] - 83:4
**replicate** [1] - 92:6
**report** [2] - 13:8, 34:10
**REPORTED** [1] - 2:1
**reporter** [1] - 16:21
**Reporter** [2] - 2:1, 109:12
**reports** [2] - 31:5, 93:24
**represent** [2] - 36:16, 39:13
**representative** [2] - 52:1, 52:2
**represented** [1] - 36:15
**represents** [1] - 73:25
**request** [4] - 98:9, 100:22, 102:24, 103:2
**require** [1] - 37:18
**research** [9] - 21:14, 22:12, 22:13, 22:17, 22:22, 41:24, 42:1, 55:23, 97:21
**reserve** [1] - 102:16
**residences** [1] - 27:15
**resolve** [5] - 100:21, 105:20, 107:20, 107:21, 107:22
**respect** [3] - 10:11, 101:7, 102:20
**respond** [1] - 104:17
**response** [2] - 98:23, 103:23
**responsibilities** [4] - 24:12, 29:19, 31:14, 33:19
**responsible** [1] - 31:15
**rest** [1] - 98:18
**retakes** [1] - 4:22
**retrieve** [1] - 39:7
**returning** [1] - 45:23
**reveal** [3] - 44:14, 46:3, 46:19
**review** [3] - 65:22, 66:5, 108:11
**reviewed** [4] - 57:14, 57:24, 82:11, 89:25
**reviewing** [2] - 57:11, 93:5
**right-click** [1] - 12:14
**rise** [6] - 4:23, 55:25, 56:13, 56:17, 97:24, 108:21
**Road** [2] - 82:7
**role** [6] - 21:13, 31:12, 31:14, 31:23,

31:25, 45:12
**ROMAN** [1] - 1:6
**Roman** [3] - 16:16, 16:23, 57:9
**Room** [1] - 2:3
**roughly** [2] - 19:17, 51:3
**row** [3] - 59:23, 60:18
**rule** [1] - 102:20
**ruling** [1] - 108:8
**running** [7] - 12:10, 12:15, 13:1, 13:2, 16:6, 94:24, 104:25
**runs** [1] - 12:6

## S

**safe** [2] - 59:3, 88:9
**safety** [1] - 55:7
**salary** [2] - 34:12, 34:14
**saw** [1] - 86:2
**scam** [2] - 14:8, 14:12
**scammed** [1] - 14:12
**scams** [1] - 33:7
**scenario** [1] - 39:3
**schedule** [5] - 98:14, 98:20, 99:7, 101:23, 102:3
**scheduling** [1] - 4:16
**scholarly** [3] - 45:16, 90:4, 90:7
**Scholl** [6] - 35:21, 38:6, 39:23, 60:11, 61:1, 68:1
**Scholl's** [6] - 60:19, 60:23, 67:12, 67:14, 67:20, 92:18
**scientific** [3] - 89:25, 91:7, 95:23
**scope** [4] - 82:23, 102:13, 102:17, 105:24
**screen** [14] - 35:8, 36:3, 36:22, 43:6, 46:19, 48:24, 62:2, 62:10, 62:22, 63:1, 63:11, 65:2, 67:17, 94:18
**screenshot** [1] - 61:23
**screenshots** [1] - 18:10
**scripting** [2] - 11:24, 12:5
**scroll** [2] - 59:19, 60:14

seal [2] - 108:12, 108:16
search [4] - 25:1, 25:3, 93:20
seated [4] - 5:1, 20:21, 56:3, 56:20
second [1] - 21:5
seconds [1] - 4:7
section [2] - 21:15, 21:16
sector [2] - 31:10, 31:19
see [26] - 12:9, 12:15, 13:7, 18:22, 32:24, 36:24, 38:20, 52:12, 56:12, 62:13, 62:15, 72:21, 74:5, 74:12, 74:19, 86:23, 87:15, 92:10, 94:18, 97:23, 104:5, 104:20, 105:2, 105:18, 106:10, 108:9
seeing [6] - 16:25, 27:16, 36:5, 73:17, 94:1, 106:11
seize [3] - 25:3, 26:4, 26:20
seized [1] - 93:21
seizes [1] - 93:17
seizing [2] - 24:25, 25:12
seizures [1] - 26:19
select [1] - 36:9
selected [1] - 82:10
sell [6] - 5:17, 14:25, 15:2, 15:3, 15:4, 15:5
selling [1] - 5:10
send [13] - 11:5, 14:10, 39:8, 42:15, 44:20, 47:8, 53:15, 53:16, 62:8, 63:2, 63:21, 77:12, 93:15
sending [24] - 36:19, 37:1, 37:6, 37:8, 37:11, 37:19, 44:16, 46:22, 46:24, 52:8, 70:5, 71:22, 82:19, 82:21, 83:7, 84:4, 84:9, 85:4, 85:17, 85:18, 85:22, 86:5, 88:7
sends [2] - 83:23, 83:24
sense [3] - 28:16, 99:7, 102:13
sent [27] - 11:8, 14:9, 46:8, 46:14, 46:15, 46:25, 62:17, 63:6, 68:19, 69:23, 73:11, 73:15, 74:2, 75:10,

76:11, 76:16, 78:23, 79:3, 79:20, 79:25, 80:18, 81:16, 82:10, 82:15, 83:22, 84:11, 84:12
sentence [1] - 17:22
separately [1] - 7:4
serial [1] - 51:9
series [2] - 35:1, 35:9
server [7] - 12:6, 12:10, 13:1, 13:2, 13:6, 16:5, 57:14
servers [3] - 12:24, 13:4, 93:17
service [68] - 6:12, 33:7, 40:22, 40:23, 41:24, 41:25, 42:2, 42:4, 42:7, 42:9, 42:13, 42:14, 42:18, 42:21, 43:4, 43:15, 43:23, 44:5, 44:15, 44:17, 44:20, 45:3, 46:6, 46:8, 46:12, 46:14, 46:17, 46:22, 46:24, 47:12, 47:14, 47:16, 49:8, 49:13, 49:22, 49:25, 50:10, 50:13, 52:23, 53:14, 53:16, 53:17, 53:22, 54:7, 54:21, 62:24, 64:7, 65:11, 65:15, 65:16, 65:20, 68:9, 69:5, 69:12, 70:6, 72:24, 77:25, 78:16, 79:12, 80:8, 83:22, 90:18, 94:17, 94:23, 94:24
service's [1] - 65:10
service-level [1] - 52:23
services [36] - 21:4, 40:14, 40:15, 40:22, 41:16, 43:18, 43:22, 49:8, 50:12, 53:20, 54:9, 57:6, 58:3, 58:6, 58:8, 58:15, 65:8, 69:24, 70:4, 72:7, 74:1, 76:3, 77:1, 77:2, 78:1, 78:17, 79:13, 80:11, 81:7, 83:10, 83:15, 85:1, 88:5, 90:15, 90:16, 93:18
serving [1] - 27:24
session [1] - 100:11
SESSION [1] - 1:5
sessions [1] - 31:2
set [3] - 10:20, 12:17, 72:12
sets [2] - 91:4, 91:7

setting [1] - 25:4
several [1] - 30:15
share [2] - 102:10, 105:16
Sheep [7] - 81:1, 81:3, 81:5, 81:6, 81:8, 81:12, 81:16
shift [2] - 53:3, 94:20
shifting [1] - 94:15
shipped [1] - 27:15
shop [11] - 38:6, 38:9, 38:10, 38:21, 51:4, 52:1, 52:25, 53:1, 53:5, 53:6, 64:13
short [3] - 98:19, 99:21, 101:3
show [4] - 61:18, 74:1, 82:1, 85:7
showing [8] - 71:1, 73:20, 74:9, 74:19, 75:10, 81:25, 85:17, 107:12
shown [20] - 35:24, 36:3, 38:19, 42:11, 43:6, 48:23, 61:21, 61:22, 62:1, 62:21, 66:22, 67:8, 71:19, 75:16, 81:24, 84:13, 85:14, 85:16, 86:9, 86:16
shows [1] - 74:15
shut [5] - 15:6, 15:10, 15:24, 16:4, 16:5
side [16] - 6:8, 12:13, 39:17, 45:2, 45:8, 47:2, 52:24, 55:4, 62:17, 63:8, 66:24, 67:4, 67:23, 85:19, 85:20, 94:18
sidebars [1] - 5:10
sign [1] - 37:15
signatures [1] - 49:17
signed [1] - 17:3
significant [3] - 49:7, 86:23, 104:2
Silk [2] - 82:7
similar [16] - 25:23, 37:5, 37:9, 37:21, 52:25, 64:23, 69:13, 73:3, 74:14, 76:4, 77:6, 78:3, 78:20, 79:15, 80:13, 86:1
similarly [3] - 38:19, 51:7, 74:8
sit [1] - 37:7
site [9] - 7:20, 8:6, 12:11, 14:7, 14:8,

14:12, 14:13, 104:25
sites [4] - 5:22, 6:2, 7:10, 14:8
situation [1] - 83:25
six [2] - 29:17, 106:14
size [1] - 54:12
slide [21] - 35:20, 36:15, 42:11, 44:13, 46:2, 61:18, 61:22, 75:10, 75:16, 76:21, 77:21, 80:4, 81:21, 81:24, 85:7, 85:14, 86:2, 86:16, 98:22, 101:17, 105:11
Slide [1] - 35:23
slides [8] - 35:9, 45:23, 51:5, 70:23, 75:19, 104:7, 104:21, 104:22
small [1] - 15:5
software [26] - 26:10, 26:15, 28:4, 29:7, 30:1, 30:3, 30:7, 30:21, 37:17, 40:10, 48:14, 48:16, 48:21, 58:11, 70:15, 70:20, 73:10, 74:4, 74:11, 74:18, 87:21, 87:25, 88:3, 88:12, 91:25, 92:9
sold [12] - 52:3, 53:8, 72:6, 76:3, 77:1, 77:3, 78:1, 78:17, 79:13, 80:10, 80:11, 81:7
Solutions [2] - 21:2, 31:18
solutions [3] - 32:1, 32:2, 32:3
someone [2] - 5:25, 32:13
sometimes [1] - 41:4
sophistication [1] - 28:20
sorry [8] - 16:21, 36:12, 65:1, 82:22, 92:23, 92:25, 95:3, 101:9
sort [8] - 33:1, 50:19, 54:22, 65:7, 86:23, 99:20, 101:25, 106:4
sorts [4] - 43:17, 44:2, 48:9, 87:16
sounded [1] - 103:12
sounds [2] - 4:17, 104:1
source [14] - 12:14, 22:13, 25:17, 91:21, 91:23, 91:24, 92:1, 92:3, 92:4, 92:5, 92:7,

93:5, 93:9
sources [1] - 26:23
space [6] - 5:10, 6:3, 6:8, 25:18, 31:6, 33:12
speaking [2] - 4:13, 50:14
specialist [1] - 21:14
specialized [1] - 30:25
specific [3] - 38:2, 48:22, 49:25
specifically [3] - 57:3, 58:13, 85:11
specifications [1] - 96:7
spell [1] - 20:24
spend [22] - 39:8, 39:13, 39:14, 39:18, 44:11, 45:14, 45:17, 49:15, 49:21, 50:1, 50:4, 50:20, 54:3, 64:4, 64:11, 68:13, 69:2, 84:25, 85:2, 94:20
spending [6] - 39:17, 44:14, 45:13, 45:20, 45:25, 64:2
spends [2] - 38:22, 68:18
spent [2] - 39:21, 64:9
split [1] - 67:17
spreadsheets [3] - 19:2, 19:5, 19:6
stand [2] - 4:21, 4:22
standard [1] - 96:11
standards [2] - 91:4, 91:8
start [7] - 43:9, 45:9, 50:23, 52:21, 53:13, 97:17, 99:4
started [14] - 6:15, 6:20, 8:5, 22:8, 24:18, 40:8, 57:24, 62:2, 68:14, 94:13, 94:14, 97:7, 101:9, 101:14
starts [1] - 99:15
state [3] - 20:24, 95:6, 96:9
statement [1] - 15:22
States [3] - 2:2, 17:4, 109:13
STATES [4] - 1:1, 1:3, 1:11, 1:14
statistical [1] - 89:22
stenographic [1] - 109:5
step [2] - 32:15, 86:22

steps [5] - 24:1, 76:4, 88:2, 88:4, 88:7
**STERLINGOV** [1] - 1:6
**Sterlingov** [8] - 16:16, 16:23, 57:9, 89:5, 103:14, 104:25, 106:10, 107:6
still [8] - 51:17, 51:18, 70:14, 93:9, 95:4, 98:21, 102:13, 102:16
stip [1] - 106:5
stipulate [1] - 37:13
stipulation [1] - 101:4
strategy [1] - 31:13
streaming [1] - 80:8
streamline [1] - 29:11
streamlines [1] - 40:18
**Street** [2] - 1:15, 1:24
structure [4] - 47:6, 50:13, 50:14, 69:6
studies [1] - 95:23
study [2] - 49:4, 104:24
studying [1] - 67:25
stuff [5] - 13:14, 13:20, 18:12, 99:1, 106:5
subject [1] - 32:22
subject-matter [1] - 32:22
submission [1] - 103:7
submit [1] - 108:6
subreddit [3] - 6:19, 6:21, 7:8
subreddits [1] - 8:4
subsequent [1] - 24:11
subsequently [1] - 5:13
substantial [1] - 107:12
substantially [1] - 104:21
success [3] - 22:23, 24:4, 24:6
sufficient [1] - 107:10
**Suite** [1] - 1:16
summarize [2] - 66:5, 71:7
summarized [1] - 71:5
summarizing [2] - 65:21, 70:23

summary [6] - 66:13, 66:19, 71:11, 71:15, 71:17, 81:24
supervising [1] - 33:2
supervisor [1] - 22:4
support [12] - 13:19, 13:24, 21:12, 21:17, 22:5, 24:17, 24:21, 31:21, 32:5, 32:7, 32:8
supported [1] - 32:6
supposed [2] - 98:4, 106:14
**Surface** [1] - 12:22
surprise [1] - 105:12
suspect [1] - 100:2
suspected [1] - 21:21
suspicious [1] - 93:24
sustained [1] - 15:17
**Sweden** [1] - 57:16
switch [3] - 88:20, 92:15, 92:24
**SWORN** [2] - 5:4, 20:19

## T

table [2] - 82:4, 86:10
tabs [1] - 18:22
tally [2] - 70:20, 70:21
tax [1] - 38:11
team [7] - 32:4, 32:9, 32:13, 32:15, 32:20, 33:5, 88:15
technique [1] - 29:1
techniques [7] - 26:16, 29:6, 87:7, 87:11, 87:13, 87:16, 87:18
technology [1] - 32:25
telephone [1] - 107:7
ten [2] - 9:16, 66:25
term [2] - 40:21, 41:17
terms [3] - 91:13, 91:17, 91:21
territory [1] - 10:13
test [23] - 41:19, 41:20, 42:13, 42:17, 42:24, 44:2, 46:3, 46:18, 61:15, 62:2, 62:12, 62:14, 62:19, 62:22, 63:9, 63:18,

72:18, 72:19, 77:5, 78:19, 88:3, 93:6, 93:10
testified [18] - 7:9, 17:3, 33:22, 39:23, 60:11, 61:1, 64:2, 73:3, 76:5, 78:21, 79:15, 80:13, 82:5, 87:23, 89:9, 89:11, 91:13, 92:12
testify [4] - 34:6, 34:10, 102:21, 105:23
testifying [1] - 33:20
testimony [13] - 4:3, 7:17, 7:19, 31:22, 35:2, 35:21, 67:12, 67:14, 90:4, 90:19, 92:18, 95:25, 103:15
testing [1] - 92:10
that'll [1] - 106:4
**THE** [119] - 1:1, 1:11, 1:14, 1:15, 1:23, 4:1, 4:8, 4:10, 4:17, 4:23, 5:1, 5:3, 6:5, 6:6, 6:25, 7:3, 7:17, 7:25, 8:3, 10:15, 10:16, 10:25, 11:1, 11:18, 12:1, 12:3, 12:4, 12:5, 12:21, 12:22, 13:12, 13:13, 14:22, 14:23, 15:15, 15:17, 16:11, 16:13, 20:6, 20:8, 20:10, 20:14, 20:16, 20:17, 20:20, 34:3, 34:5, 35:14, 35:17, 55:17, 55:20, 55:25, 56:3, 56:4, 56:9, 56:12, 56:13, 56:17, 56:20, 56:22, 59:6, 59:8, 60:9, 61:5, 61:7, 65:4, 66:11, 66:13, 66:19, 71:12, 71:14, 82:22, 83:3, 83:4, 88:19, 88:20, 89:3, 92:21, 92:23, 92:24, 92:25, 93:1, 97:4, 97:6, 97:10, 97:13, 97:24, 98:2, 98:16, 99:10, 99:18, 99:20, 99:24, 100:1, 100:12, 100:15, 100:21, 101:6, 101:13, 101:17, 101:21, 102:18, 103:4, 103:22, 103:25, 104:6, 104:22, 105:5, 105:14, 106:6, 106:20, 107:1, 107:17, 107:23, 108:4, 108:8, 108:15,

108:18, 108:21
theme [1] - 8:10
themselves [2] - 32:14, 69:17
**Thereupon** [1] - 56:15
they've [5] - 53:8, 83:15, 98:19, 102:3, 102:7
thinks [1] - 100:25
third [1] - 22:22
thousands [4] - 28:23, 71:6, 72:25, 74:6
thread [1] - 7:6
three [6] - 9:4, 9:7, 10:1, 10:3, 10:6, 99:5
throughout [1] - 24:7
tie [4] - 11:19, 24:2, 27:7, 27:14
tied [3] - 34:12, 51:17, 51:18
timestamp [2] - 36:21, 38:3
timing [1] - 98:14
tired [1] - 104:20
today [7] - 4:13, 16:25, 34:14, 35:2, 87:24, 97:9, 99:9
together [16] - 39:14, 39:17, 40:2, 40:9, 40:11, 41:12, 45:7, 45:11, 45:18, 47:18, 48:8, 50:5, 63:25, 73:22, 82:1, 85:2
tomorrow [15] - 4:14, 97:12, 97:16, 97:17, 97:23, 98:18, 98:21, 99:14, 100:23, 101:1, 104:12, 106:3, 108:1, 108:7, 108:9
tonight [4] - 98:23, 100:22, 104:12, 108:4
took [3] - 9:4, 18:4, 23:7
tool [3] - 25:7, 25:8, 25:16
tools [6] - 25:13, 25:19, 25:23, 27:3, 29:4, 41:9
top [2] - 85:17, 104:19
topic [1] - 8:13
**TOR** [2] - 1:23, 1:24
**Tor** [10] - 6:22, 8:20, 8:21, 72:5, 76:2, 77:1, 78:1, 78:17, 79:13, 81:7
total [8] - 9:17, 38:12, 39:4, 73:14,

81:25, 82:10, 85:22, 85:23
towards [1] - 22:3
trace [9] - 23:14, 25:13, 25:14, 26:3, 26:10, 29:5, 30:23, 95:14, 95:16
traceability [1] - 22:19
traced [2] - 5:20, 8:11
tracing [19] - 22:24, 23:19, 24:17, 24:18, 24:21, 25:11, 26:13, 26:24, 27:2, 27:18, 28:1, 28:9, 28:14, 30:10, 32:18, 40:12, 43:24, 50:23, 58:19
tracked [1] - 18:11
trafficking [1] - 21:21
training [4] - 24:18, 25:11, 30:11, 30:20
trainings [2] - 30:15, 33:17
transact [3] - 34:24, 43:9, 54:14
transacted [4] - 41:14, 48:3, 51:2, 68:7
transacting [2] - 54:19, 69:2
transaction [65] - 25:14, 35:25, 36:2, 36:5, 36:6, 36:13, 36:16, 36:18, 36:21, 37:3, 37:21, 37:23, 37:25, 38:2, 38:4, 38:7, 38:17, 38:19, 38:21, 41:5, 41:18, 41:21, 42:13, 42:14, 42:16, 44:7, 44:23, 44:24, 46:3, 46:7, 46:18, 48:2, 48:15, 48:17, 48:19, 48:20, 48:25, 49:10, 49:17, 50:24, 51:4, 51:19, 51:20, 51:24, 51:25, 52:2, 52:4, 52:5, 52:14, 62:2, 62:12, 62:14, 62:17, 63:9, 63:18, 63:23, 68:21, 69:6, 70:21, 72:19, 74:9, 74:15, 75:4, 78:19
transaction-level [1] - 50:24
transactions [50] - 19:3, 19:4, 25:14, 26:1, 26:11, 26:14,

27:13, 27:21, 27:23, 29:12, 29:15, 30:9, 40:17, 41:4, 41:15, 41:19, 43:3, 43:16, 43:17, 44:3, 48:4, 48:13, 49:24, 51:1, 51:20, 52:12, 52:20, 54:18, 57:20, 61:15, 66:6, 68:19, 69:1, 69:8, 70:3, 70:5, 70:24, 71:4, 72:18, 73:25, 74:9, 74:12, 74:14, 77:5, 84:10, 85:8, 85:11, 91:15, 91:18, 95:17

**transacts** [3] - 43:7, 44:9, 53:12

**transcript** [2] - 109:5, 109:6

**TRANSCRIPT** [1] - 1:10

**transcripts** [1] - 106:18

**transfer** [3] - 26:6, 64:8, 68:15

**transferring** [1] - 45:4

**transfers** [4] - 15:2, 84:21, 86:19, 86:24

**translate** [1] - 31:16

**transpired** [1] - 36:5

**transpires** [2] - 32:25, 48:20

**TRIAL** [1] - 1:10

**trial** [2] - 34:10, 106:14

**tried** [1] - 5:23

**trip** [1] - 99:17

**trouble** [1] - 16:4

**true** [3] - 15:22, 109:4, 109:5

**truncated** [1] - 59:25

**trusted** [2] - 6:17, 8:15

**truth** [4] - 7:15, 7:18, 7:22, 41:13

**try** [4] - 22:14, 28:24, 87:17, 97:17

**trying** [7] - 5:25, 9:23, 22:8, 94:24, 95:16, 98:19, 99:7

**turn** [3] - 38:15, 75:21, 101:17

**turning** [1] - 57:2

**two** [16] - 17:20, 17:25, 39:16, 46:16, 63:20, 73:18, 73:25, 74:1, 97:11, 98:19, 101:2, 101:5, 101:21, 101:24, 102:10, 107:8

**type** [14] - 6:3, 14:24, 15:19, 22:15, 23:11, 32:7, 47:18, 49:25, 55:2, 55:23, 80:10, 94:13, 95:12, 97:21

**types** [10] - 23:15, 31:8, 33:4, 45:23, 48:6, 54:2, 68:22, 77:2, 83:6, 96:20

**typical** [4] - 32:16, 69:6, 72:16, 87:3

**typically** [4] - 27:7, 32:20, 37:17, 83:14

# U

**U.S** [22] - 1:18, 1:20, 31:18, 74:25, 75:8, 76:14, 76:19, 77:14, 77:19, 78:8, 78:12, 79:1, 79:6, 79:23, 80:2, 80:20, 80:24, 81:14, 81:18, 82:13, 86:15, 86:21

**ultimately** [1] - 14:17

**under** [4] - 17:9, 84:11, 108:12, 108:16

**undercover** [4] - 24:1, 24:22, 26:13, 27:13

**underlying** [2] - 66:6, 71:8

**understood** [1] - 90:19

**unfortunately** [1] - 97:8

**unique** [1] - 40:3

**united** [1] - 2:2

**United** [2] - 17:4, 109:13

**UNITED** [4] - 1:1, 1:3, 1:11, 1:14

**University** [1] - 22:20

**unplug** [1] - 59:8

**unquote** [1] - 24:25

**unregistered** [2] - 17:16, 17:20

**unusual** [2] - 94:24, 95:2

**up** [19] - 8:13, 10:20, 12:17, 19:21, 23:18, 25:4, 35:5, 37:2, 37:24, 52:3, 58:19, 59:4, 60:6, 61:19, 65:24, 67:11, 72:12, 73:11, 94:3

**URL** [1] - 14:10

**usability** [1] - 26:15

**USD** [2] - 85:25, 86:8

**useful** [3] - 40:13, 40:14, 45:24

**user** [10] - 8:23, 8:24, 9:13, 11:5, 12:7, 36:1, 36:4, 63:12, 63:16, 65:14

**user-friendly** [1] - 36:4

**users** [13] - 10:11, 13:24, 43:21, 43:25, 49:24, 64:7, 82:19, 83:6, 87:24, 88:2, 88:8, 93:12, 94:1

**Users** [1] - 82:21

**uses** [8] - 40:6, 40:10, 41:13, 41:20, 44:2, 47:16, 96:8, 96:12

**utilizing** [1] - 49:25

# V

**valid** [1] - 37:16

**validate** [5] - 65:11, 68:5, 68:6, 69:10, 88:3

**validity** [1] - 42:4

**value** [8] - 51:18, 74:25, 75:8, 76:14, 79:23, 80:20, 80:24, 81:18

**variety** [1] - 96:18

**various** [8] - 21:20, 26:6, 26:11, 26:15, 33:13, 48:4, 57:20, 58:7

**vary** [2] - 54:12, 90:9

**vendor** [2] - 22:10, 84:2

**vendors** [3] - 6:7, 83:14, 87:3

**verify** [3] - 69:10, 69:13, 93:13

**Verret** [8] - 98:22, 101:10, 101:11, 102:20, 103:13, 104:21, 105:12, 106:9

**Verret's** [2] - 102:14, 106:3

**version** [2] - 9:23, 11:2

**Video** [1] - 82:8

**view** [5] - 8:3, 12:14, 26:1, 30:8

**views** [2] - 105:7

**violent** [1] - 33:6

**visit** [1] - 8:17

**visited** [2] - 8:19, 8:21

**visual** [1] - 66:3

**visuals** [2] - 35:1, 35:21

**volume** [1] - 33:1

**voluminous** [1] - 71:8

**vs** [1] - 1:5

# W

**wait** [2] - 9:7, 14:3

**waiting** [1] - 10:1

**walk** [15] - 36:2, 36:23, 38:7, 41:20, 42:10, 44:1, 44:13, 46:2, 46:18, 62:1, 62:21, 66:22, 71:25, 85:14, 86:9

**Wall** [1] - 1:24

**wallet** [24] - 18:16, 26:10, 26:15, 37:17, 38:13, 39:7, 39:21, 41:5, 42:15, 42:22, 44:19, 45:5, 46:6, 46:9, 46:11, 46:23, 47:2, 47:4, 48:21, 68:22, 84:3, 84:4, 84:8, 85:2

**wallets** [6] - 13:2, 25:4, 26:5, 26:19, 26:20, 47:15

**wants** [2] - 56:6, 102:15

**warrant** [1] - 25:2

**warrants** [3] - 25:3, 93:20, 93:21

**Washington** [6] - 1:6, 1:16, 1:19, 1:21, 2:4, 109:14

**ways** [2] - 45:6, 98:8

**web** [8] - 5:21, 6:1, 6:15, 8:5, 11:23, 13:14, 13:18, 15:7

**webs** [1] - 6:18

**website** [3] - 61:24, 62:3, 62:23

**week** [2] - 34:20, 99:6

**weeks** [1] - 34:20

**weight** [1] - 69:1

**Welcome** [1] - 82:7

**white** [1] - 4:6

**whole** [2] - 53:6, 90:16

**Windows** [1] - 13:2

**wire** [1] - 15:2

**withdraw** [8] - 9:3, 9:4, 9:10, 10:2, 10:4, 42:21, 47:16, 65:16

**withdrawal** [15] - 10:2, 11:8, 42:20, 42:24, 44:17, 44:25, 46:5, 46:21, 62:19, 62:22, 63:5, 63:16, 63:22, 72:23, 94:16

**withdrawals** [1] - 49:23

**withdrew** [1] - 43:1

**witness** [14] - 4:21, 4:22, 16:10, 20:8, 20:9, 20:11, 56:4, 93:1, 97:4, 97:5, 97:6, 98:20, 101:3, 101:8

**WITNESS** [18] - 3:3, 5:4, 6:6, 8:3, 10:16, 11:1, 12:3, 12:5, 12:22, 13:13, 14:23, 15:15, 20:16, 20:19, 83:4, 88:20, 92:23, 92:25

**witnesses** [4] - 18:13, 97:11, 98:19, 99:14

**wondering** [1] - 99:3

**word** [2] - 24:7, 100:18

**words** [1] - 5:8

**works** [5] - 7:20, 42:7, 92:10, 93:10, 101:20

**workup** [1] - 32:13

**world** [4] - 12:25, 14:20, 27:7, 27:14

**worse** [1] - 100:6

**worth** [1] - 9:19

**write** [1] - 38:4

**written** [1] - 45:16

# Y

**years** [8] - 17:9, 17:22, 24:11, 28:9, 29:17, 87:4, 106:13, 107:8

**York** [2] - 1:21, 1:25

**yourself** [1] - 11:12

**yourselves** [2] - 55:23, 97:21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

ROMAN STERLINGOV,

        Defendant.

_____/

Criminal Action
No. 1: 21-399

Washington, DC
March 1, 2024

9:38 a.m.

MORNING PROCEEDINGS

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:    CATHERINE PELKER
                    U.S. DEPARTMENT OF JUSTICE
                    950 Pennsylvania Ave NW
                    Washington, DC 20530

                    CHRISTOPHER BRODIE BROWN
                    DOJ-USAO
                    601 D Street, N.W.
                    Suite 5.1527
                    Washington, DC 20530

                    JEFFREY PEARLMAN
                    DOJ-CRM
                    Ccips
                    US Dept of Justice
                    1301 New York Ave NW
                    Washington, DC 20005

APPEARANCES CONTINUED ON NEXT PAGE

APPEARANCES CONTINUED

For the Defendant:     TOR EKELAND
                       MICHAEL HASSARD
                       TOR EKELAND LAW PLLC
                       30 Wall Street
                       8th Floor
                       Brooklyn, NY 10005


Court Reporter:        SHERRY LINDSAY
                       Official Court Reporter
                       U.S. District & Bankruptcy Courts
                       333 Constitution Avenue, NW
                       Room 6710
                       Washington, DC 20001

TABLE OF CONTENTS

WITNESSSES

Alexandra Comelli
        Direct examination by Mr. Pearlman                10

Steven Santell
        Direct examination by Ms. Pelker                  30

EXHIBITS

Government Exhibits 208A, 208B                            13
Government Exhibit 208C                                   13
Government Exhibit 208D                                   14
Government Exhibit 208E                                   15
Government Exhibit 208F                                   16
Government Exhibit 208G                                   18
Government Exhibit 209A                                   20
Government Exhibit 209B                                   21
Government Exhibit 209C                                   22
Government Exhibit 209D                                   23
Government Exhibit 209F                                   23
Government Exhibit 209E                                   25
Government Exhibit 209G                                   25
Government Exhibit 209H                                   26
Government Exhibit 209I                                   27
Government Exhibit 209J                                   27
Government Exhibit 209L                                   28
Government Exhibit 209M                                   29
Government Exhibit 602A                                   34
Government Exhibit 202                                    38
Government Exhibits 603C, E, F, H, N, S and J            41
Government Exhibits 608A through Q                        45
Government Exhibits 609A, B, G, K, L and M              55
Government Exhibits 604A, B, G, K, J and M              59
Government Exhibits 605A, B, C, D, G, I, N, O and P    60
Government Exhibits 606F, I, J and K                      64
Government Exhibits 610A, C, H, L, M and N             72
Government Exhibits 607A, B, H, K and O                 75
Government Exhibits 611A, G, L, N                         77
Government Exhibit 612D                                   79
Government Exhibits 614D, E                               81
Government Exhibits 616C, D and E                         88
Government Exhibit 613C                                   96
Government Exhibits 615C, D, and E                        98
Government Exhibits 617C, E                              104
Government Exhibits 618D, 618E                           108
Government Exhibits 624 - 633                            121

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Criminal case 21-399, *United States of America versus Roman Sterlingov*.

Would counsel please state their names for the record, starting with government counsel.

MS. PELKER:  Good morning, Your Honor.  Alden Pelker for the United States joined at counsel table by Christopher Brown and Jeff Pearlman.

THE COURT:  Good morning.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for Defendant Roman Sterlingov, who is present in court and joining me at counsel table is Michael Hassard.

THE COURT:  All right.  Good morning to you as well.

So we are waiting on two jurors, but my understanding is they are 5 minutes out, so it is not going to be much of a wait.  Just while we are waiting on the jurors, did the parties reach a resolution with respect to the C Sam stuff.

MS. PELKER:  We did, yes, Your Honor.  I believe we passed up to Ms. Walker a proposed stipulation.  And one note, we also passed up -- basically what the government did was we made redacted copies of each.  We added them as additional exhibits on a new exhibit list.  What we actually are going to do is just replace them on the exhibit list, so the Court can disregard the new entries.  They will not be renumbered essentially.  We do have a proposed stipulation on both the

CSAM material and the FinCEN query for Akemashite Omedetou. And we would propose reading these into the records. Either have the government do it or have the Court do it during witness testimony this morning.

THE COURT: And is the defense agreeable to the two stipulations?

MS. PELKER: Yes, Your Honor.

MR. EKELAND: Yes, Your Honor.

THE COURT: Okay. I am happy to do it either way, whichever way the parties want me to do it. You can either read it and I can tell the jury what a stipulation is or I can read it, whichever the parties prefer.

MS. PELKER: Either one is fine with the government, Your Honor.

MR. EKELAND: I think if the Court reads it in, that is fine.

MS. PELKER: That is fine.

THE COURT: Let me know when you think I should do that.

MS. PELKER: I believe we may do the second one first, Your Honor. And that really can be read in at any time regarding FinCEN. And then for the CSAM stip, toward the end of Special Agent Santell's testimony when the Welcome to Video records are introduced to explain the redacted boxes.

THE COURT: Why don't you just tell me as we are

doing that when that should be done and I will do that. And then, there are some gavels on the docket still, most of which I think I have ruled on. But just for purposes of clarity, let me run through some of those while we are waiting. With respect to the motion to dismiss on venue and statute of limitations grounds. And I have ruled on that. And I have denied those motions.

With respect to the motion for discovery under Rule 12(b)(4)(B), the government has -- it is my understanding has complied with those disclosure requirements. And so I will deny that as moot.

With respect to the defense motions that I transfer -- I would order the marshal service to transfer Mr. Sterlingov from the CTF to the CDF, I have spoken on more than one occasion with the Marshal Service about this. They have told me that the concerns are precisely the same at the CDF as they are at the CTF. I have passed along Mr. Sterlingov's preference, but I will deny that motion. Quite frankly, I am not sure I even have the authority to order the marshals service where to hold somebody. I have spoken to them on a number of occasions about that and conveyed Mr. Sterlingov's concerns. And my understanding is to the extent they can be addressed, they have been addressed.

There was docket 247, which was the motion to exclude evidence of darknet evidence as outside the statute of

limitations, irrelevant and more prejudicial than probative under 403. And that is denied for the reasons I have previously stated on the record. I certainly don't believe that it is more prejudicial than probative. And I do think that it is -- that evidence is highly probative in the case. And with respect to the statute of limitations, I have addressed the statute of limitations issue already. And even if there were not continuing violations at issue here, it would -- the evidence would still be relevant as to the knowledge, the state of mind of the defendant as well as modus operandi.

Docket 248 was the objection with respect to the demonstratives, which I have already denied for the reasons stated on the record.

251 was the defense motion in limine, objecting to the late Rule 16 production. And I have addressed that already on the record. That same motion requests that I rule on the Daubert and change of venue motions, which I have done, change of venue or -- I'm sorry -- on the Daubert issues, as well as the motion to dismiss for lack of venue or statute of limitations. I ruled on those motions. So that motion is moot to that extent. That motion also attached updated credentials for Mr. Cabanas and Mr. Verret. I have raised in the past and I said it was unclear to me whether the defense was seeking reconsideration of any of my decisions with respect to their

qualifications. And the defense just hasn't come back to me with respect to that. So I will just deny that as moot. I am not quite sure what that is intended to convey at this point.

Let's see, there is docket 136 and 137, which is the government's motion to keep certain docket materials under seal, which I will address separately. There was the motion for a hearing on the attorney conflict. We have addressed that so that is denied as moot at this point.

There was docket 250, which I have addressed most of, I think, which was the request for the instruction on juror questions, which I -- which I agreed to give.

Explanation on the courtroom phones and sidebars, which I can't remember whether I addressed or not, but I don't think it is necessary at this point.

I have previously addressed the issue with respect to the Mt. Gox hack and testimony about that. There was a request that I preclude improper commenting or questions during voir dire that is, obviously, moot at this point.

There is the question with respect to maintaining the jury for a forfeiture phase, if necessary. I have addressed that. And a request for 24-hour notice for witnesses and that has been addressed as well, so I will deny -- anything that remains of that motion is moot at this point.

Is there anything else that is pending that either party thinks I have not addressed that I need to address?

MS. PELKER:  Nothing from the government.

THE COURT:  Mr. Ekeland?

I understand we still have the issue with respect to Mr. Verret.

MR. EKELAND:  Yeah.

THE COURT:  Other than that, there may be a couple of other things I need to clean up on the docket.  If there is anything else that you think I need to rule on that I haven't ruled on, let me know.  Should we check to see if we have all of the jurors here?

THE COURTROOM DEPUTY:  Yes, Your Honor.  Give me one second.

(Jury in at 9:23 a.m.)

THE COURT:  All right.  Welcome back, members of the jury.  I have a stipulation to read.

A stipulation is an agreement among the parties with respect to certain facts.  And you should treat a stipulation as undisputed evidence for purposes of your consideration.  And the stipulation is as follows:  The Financial Crimes Enforcement Network, FinCEN, which is the federal government agency with primary responsibility for maintaining reports filed pursuant to the Bank Secrecy Act conducted a diligent search for any FinCEN form 107, registration of money services business, under its control that relates to Akemashite Omedetou.  The records search found no such forms filed by or

on behalf of that individual from January 1st, 2011 through April 27th, 2021.

All right.  And the government may call its next witness.

ALEXANDRA COMOLLI, sworn.

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please be seated.

MR. PEARLMAN:  May I, Your Honor?

THE COURT:  You may proceed when you are ready.

DIRECT EXAMINATION

BY MR. PEARLMAN:

Q.   Good morning, ma'am.

A.   Good morning.

Q.   Can you introduce yourself to the ladies and gentlemen of the jury by spelling your name and saying your full name.

A.   Good morning.  My name is Alexandra Comolli, C-O-M-O-L-L-I.

Q.   Where do you work?

A.   I work at the Department of Justice.

Q.   Are you an attorney?

A.   I am an assistant United States Attorney for the Southern District of Florida.

Q.   Is that a prosecutor?

A.   I am, yeah.

Q.   How long have you been doing that?

A. Approximately two and a half years now.

Q. Prior to joining that office, where did you work?

A. I was with the Federal Bureau of Investigation.

Q. What was your role there?

A. I was an analyst.

Q. What type of cases did you work on?

A. I worked on cyber cases to start with. I spent about four and a half years in the cyber division, switched over to the criminal investigative division, where I worked online darknet marketplaces and money laundering.

Q. Did part of that work include undercover work?

A. It did, yes, specifically online though.

Q. So was one of your roles to be an online undercover?

A. That is correct.

Q. What did that entail for you?

A. Yeah. I would be tasked to assist with different investigations in an undercover capacity, meant that I would go online and complete whatever task that I had been assigned. It also involved a training course. I took a week-long training course in order to be certified as an online undercover.

Q. How long did you serve as an undercover?

A. I was certified I believe it was May 2015. And I served in that capacity until I left the Bureau in September 2021.

Q. What type of cases did you serve as an undercover?

A. The same type of cases that I had been assigned to work

to.

Q.   Did you also train others how to be an online undercover?

A.   I did, yeah.

Q.   Generally speaking, in your work with the FBI, did you become familiar with a service called Bitcoin Fog?

A.   I did.

Q.   And were you asked to conduct an undercover transaction on the site?

A.   Yes.

Q.   Did you review -- I want to take you to March 2016.

A.   Okay.

Q.   Did you have a chance to review the Bitcoin Fog site at that time?

A.   I did, yeah.

Q.   I want to show you what has been marked as Government Exhibit 208A.  Do you recognize what that is?

A.   I do.

Q.   What is 208A?

A.   This is the top bit of the Bitcoin Fog website, as I observed it in March 2016.

Q.   Did you have a chance to take pictures or memorialize your view of the site?

A.   Yeah.  I screenshotted everything, although I didn't know how to full page screenshot, so sometimes the page is in half.

Q.   Right.  So let's look at 208B.  What is that?

A.   That is the second half of the landing page of Bitcoin Fog.

MR. PEARLMAN:  Move to introduce Government Exhibit 208A and 208B.

THE COURT:  Any objection?

MR. EKELAND:  No objection, Your Honor.

THE COURT:  208A and 208B are admitted and may be published to the jury.

(Whereupon, Exhibit No. 208A, 208B was admitted.)

BY MR. PEARLMAN:

Q.   So showing the jury 208A and now showing 208B.  Did you have a chance to register on the site?

A.   Yes.  At some point, I created an account.

Q.   Let me show you 208C.  Do you recognize that?

A.   Yeah.  That is the page after you have logged in or after I logged into Bitcoin Fog.

MR. PEARLMAN:  Move to introduce Government Exhibit 208C.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  208C is admitted and may be published to the jury.

(Whereupon, Exhibit No. 208C was admitted.)

BY MR. PEARLMAN:

Q.   Can you read the portion beginning with the standard

procedure?

A. Yep. "The standard procedure to anonymize Bitcoins is to make a deposit at the deposit page and after some time request a withdrawal."

Q. Keep going.

A. "Your Bitcoins are mixed in our internal pool with other users' Bitcoins and then get paid back to your new address or multiple addresses in a number of randomized amounts at randomized times, thus making it highly unlikely to trace the origin of your Bitcoins and definitely making it impossible to prove. We make your Bitcoins truly anonymous. The service currently only takes between 1 percent and 3 percent fee on all deposits. The fee is randomized for each deposit to further obscure linking money going into and out of the Fog."

Q. Let me turn your attention to 208D, which has not been admitted. Do you recognize this page?

A. This is the deposit page for Bitcoin Fog.

Q. Is this something you were able to access after you had already registered?

A. Correct.

BY MR. PEARLMAN: Move to introduce Government Exhibit 208D, as in dog.

THE COURT: Any objection?

MR. EKELAND: No objection, Your Honor.

THE COURT: 208D is admitted and may be published to

the jury.

(Whereupon, Exhibit No. 208D was admitted.)

BY MR. PEARLMAN:

Q.    And I am going to direct your attention about one third of the way down.  Do you see a deposit address that begins with 18EUE1?

A.    Yes, I do.

Q.    What did you understand that to be?

A.    That was the address that was going to be tied to my Bitcoin Fog account.  So if I wanted to send money to Bitcoin Fog to use their service, that would be the deposit address I would use.

Q.    Show you what has not been admitted yet as 208E.  Do you recognize 208E?

A.    Yes, I do.

Q.    What is that?

A.    This is the same deposit page, however I had asked the site for a new deposit address, which is what you see immediately under the original deposit address, which is the address beginning 148D8.

MR. PEARLMAN:  Move to introduce Government Exhibit 208E.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  208E is admitted and may be published to

the jury.

(Whereupon, Exhibit No. 208E was admitted.)

BY MR. PEARLMAN:

Q.   So, again, you had the 18EUE which you testified that deposit address and then you created another deposit address; is that right?

A.   Correct.

Q.   And that you testified was 148D8A?

A.   Correct.  That was the one that -- when I requested the new deposit address that is what was generated for me, yes.

Q.   Let me show you Government Exhibit not yet admitted, 208F. Do you recognize that?

A.   Yeah.  That is the withdrawal page for Bitcoin Fog.

Q.   And do you see where it says list of addresses?

A.   Yes.

MR. PEARLMAN:  I would move to introduce Government Exhibit 208F.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  208F is admitted and may be published to the jury.

(Whereupon, Exhibit No. 208F was admitted.)

BY MR. PEARLMAN:

Q.   So if you can go to the upper right-hand part of the screen, you should be able to use that to draw.

A.    Uh-huh.

Q.    Do you see that button on the upper right-hand part of the screen?

A.    I see it, yeah.

Q.    So can you just draw a circle around the list of addresses to transfer Bitcoins to?

A.    (Complying).

Q.    And do you see an area where it says time span?

A.    Yes.  Right here.

Q.    Can you read what that says?

A.    "Specify how many hours should transactions be spread across, minimum 6 hours, max 96 hours."

Q.    Do you see anywhere where it says delay?

A.    Yes, right below it.

Q.    Could you read that as well, please?

A.    Yeah.  It says, "Number of hours to wait before starting withdrawal.  Using this value will make your withdrawal be created in pending mode and, of course, be canceled afterwards, max 48 hours."

Q.    And then if you could hit that button again and erase the marks.

        THE COURT:  You can approach if you want to show her how to do it.

        THE COURTROOM DEPUTY:  I have to get IT up.  I am not sure why it is not clearing.

MR. PEARLMAN:  I think we can probably keep going.

THE COURT:  Maybe if we turn the screen off and back on.

THE COURTROOM DEPUTY:  I did that, Judge.

THE COURT:  If you turn your system off here, maybe the portion that you attach with may be back on and off.

You should continue, yes.

MR. PEARLMAN:  Okay.

BY MR. PEARLMAN:

Q.   Did you also access what was a support page on Bitcoin Fog?

A.   I did, yeah.

MR. PEARLMAN:  Okay.  Show Government Exhibit 208G, which has not yet been admitted, please.

THE COURTROOM DEPUTY:  I didn't hear you. 208?

MR. PEARLMAN:  208G.

BY MR. PEARLMAN:

Q.   Is this another view of the withdrawal page?

A.   Yeah.

Q.   This is just the bottom half of the withdrawal page.

A.   All right.

Q.   I want to take you to July --

THE COURT:  Did you want to admit that one or not?

MR. PEARLMAN:  Yes, I'm sorry.  Move to admit 208G.

THE COURT:  Any objection?

MR. EKELAND: No objection.

THE COURT: 208G is admitted and may be published to the jury.

(Whereupon, Exhibit No. 208G was admitted.)

BY MR. PEARLMAN:

Q. You see the bottom there, submit withdrawal?

A. Yeah. That is the big blue button I press when I am trying to complete the withdrawal.

Q. Now, in March 2016, to be clear, did you attempt to do a transaction at that time?

A. No.

Q. I want to take you to July 2016. Did you attempt to do a transaction on that day?

A. To July, you said?

Q. I'm sorry, June 2016.

A. June, yes, I did.

Q. I'm sorry. July 26, 2016?

A. July, you said, July 26? Yeah, that was the correct day. Yeah.

Q. And where were you located, what district or state?

A. I was in the District of Columbia.

Q. Let me show you 209A, not yet admitted into evidence. Do you recognize this screen?

A. Yes, I do.

Q. Is this part of what you saw on Bitcoin Fog at that time?

A.    Yes.

MR. PEARLMAN:  Move to admit 209A.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  209A is admitted and may be published to the jury.

(Whereupon, Exhibit No. 209A was admitted.)

BY MR. PEARLMAN:

Q.    Okay.  About a third of the way down, do you see a deposit address?

A.    Yes, I do.

Q.    Can you just read the first five or six characters of that?

A.    Sure.  1Nuf3K1k.

Q.    Now, let me show you marked for identification purposes as 209B, as in boy.  Do you recognize that?

A.    Yeah.  That is the same Bitcoin address we just saw on the Bitcoin Fog website.

Q.    That is over on the left-hand side where it says address?

A.    Yes.  Correct.

Q.    And why did you go to blockchain info?

A.    I wanted a source independent from the website that I was on that showed this address had no transaction history.

MR. PEARLMAN:  Okay.  Move to introduce Government Exhibit 209B.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: Exhibit 209B is admitted and may be published to the jury.

(Whereupon, Exhibit No. 209B was admitted.)

BY MR. PEARLMAN:

Q. And, again, this is the screen with the -- where you went to blockchain.info?

A. Correct.

Q. And the address of 1Nuf3K is on there?

A. Correct.

Q. And is that the same address that was provided to you by Bitcoin Fog in the previous exhibit?

A. Yes, that is right.

Q. Now let me show you Government Exhibit for identification purpose as 209C. Are you familiar with a service called Coinapult?

A. Yes, I am.

Q. What is that?

A. That is just an online wallet service.

Q. Did you establish an account there?

A. I did.

Q. Is this Government Exhibit 209C, is that a reflection of something done to your account with respect to doing a transaction on Bitcoin Fog?

A.    Yes.  So this -- what this shows is my Coinapult wallet that -- where I am sending a payment or sending a transaction.

Q.    So they are not seeing it yet, I'm sorry.

BY MR. PEARLMAN:  Let me move to introduce 209C.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  Exhibit 209C is admitted and may be published to the jury.

(Whereupon, Exhibit No. 209C was admitted.)

BY MR. PEARLMAN:

Q.    Now forgive me.  If you could explain what the jury is looking at.

A.    Sure, of course.  So what I was doing here was sending the contents of my Coinapult wallet to the address that Bitcoin Fog had given me that was assigned to my account there.

Q.    And is that the same 1Nuf3K?

A.    Correct, yes.  So I sent the full balance of this wallet .12628.

Q.    Let me show you 209D, as in dog, for identification purposes.  Is this another Coinapult screen reflecting work on your account?

A.    Yeah.  This is just the transactions page, yep.

MR. PEARLMAN:  Move to introduce Government Exhibit 209D.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  Exhibit 209D is admitted and may be published to the jury.

(Whereupon, Exhibit No. 209D was admitted.)

BY MR. PEARLMAN:

Q.   Could you show the -- explain to the jury what you are looking at now?

A.   Yes.  So this is the transaction history page for my Coinapult wallet.  You can see the outgoing payment on Tuesday, July 26.  And it is going from my Coinapult wallet to the address provided to me that is associated with my account at BitcoinFog.

Q.   And what is the amount?

A.   The amount is .1628.

Q.   Let me show you for identification purposes 209F.  Is 209F another series of screenshots for this transaction?

A.   Yeah.  209F shows -- this is just a page for Bitcoin Fog that shows the deposit had come in.

MR. PEARLMAN:  Move to introduce 209F.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  209F is admitted and may be published to the jury.

(Whereupon, Exhibit No. 209F was admitted.)

BY MR. PEARLMAN:

Q.    So do you see there where it says logged in as?

A.    Yeah.

Q.    So who is it logged in as?

A.    It is logged in as Bobcat 7.

Q.    Who is Bobcat 7?

A.    I am Bobcat 7.

Q.    Is that a name that you gave yourself?

A.    It is the name of the account that I created, yes.

Q.    And what is the amount for the first four digits of the account balance now?

A.    It is .1597.

Q.    What was your understanding as to -- what is your understanding as to whether that is more or less than what you deposited?

A.    That is less than what I had sent to the service.

Q.    Did you have an understanding as to why that was?

A.    Yeah, it was less a fee.

Q.    Did you then seek to conduct another transaction involving Bitcoin Fog?

A.    Yes.  It would be the withdrawal transaction.

Q.    So let me show you for identification purposes 209E.

      Do you recognize 209E?

A.    I do.

Q.    Is that another screenshot concerning this transaction?

A.    Yeah.  This is another wallet that I had, uh-huh.

MR. PEARLMAN: Move to introduce Government Exhibit 209E.

THE COURT: Any objection?

MR. EKELAND: No objection.

THE COURT: 209E is admitted and may be published to the jury.

(Whereupon, Exhibit No. 209E was admitted.)

BY MR. PEARLMAN:

Q. So can you explain to the jury what they are looking at?

A. Yeah. This is another undercover wallet I had created on blockchain.info, which also provided wallet services. And this particular screenshot shows the address beginning 15DB1Q. That address was assigned to my wallet at blockchain.info.

Q. So that is your address?

A. That is my address that is -- well, it is the Bureau's address.

Q. Let me show you 209G for identification. And is this another screenshot concerning this transaction?

A. Yeah. So what I did was, I just copied and pasted the address that -- for that wallet. That is where I wanted the money to go. And I put it right in here.

MR. PEARLMAN: Move to admit 209G.

THE COURT: Any objection?

MR. EKELAND: No objection, Your Honor.

BY THE COURT: 209G is admitted and may be published

to the jury.

BY MR. PEARLMAN:

Q.   Okay.  So halfway down is there another address that is listed for withdrawal?

A.   Yeah.  So that is the address that was in my blockchain.info wallet.  I copied and pasted it right into this text box here, beginning 1DB1Q.

Q.   And --

A.   My apologies.  15DB1Q.

Q.   What is the address of your withdrawal?

A.   The full balance of my account of Bitcoin Fog.

Q.   Let me show you 209H for identification.  Did you -- is this another screenshot in this transaction?

A.   Yeah.

MR. PEARLMAN:  Move to introduce 209H.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  209H is admitted and may be published to the jury.

(Whereupon, Exhibit No. 209H was admitted.)

BY MR. PEARLMAN:

Q.   I just want to know what is the time span there?

A.   The time span is six, that was the minimum, six hours.

Q.   Now, let me show you 209I for identification.  Do you recognize this as another part of the transaction?

A.    I do, yes.

MR. PEARLMAN:  Move to introduce 209I.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  209I is admitted and may be published to the jury.

(Whereupon, Exhibit No. 209I was admitted.)

BY MR. PEARLMAN:

Q.    What are we seeing on this?

A.    Yeah.  So this is just a page to review your withdrawal. So it has got that cat CAPTCHA there where you had to figure out what letters there were.  And then the rest of it above it is just explaining -- these are the details of the transaction. Do you still want to move forward with it?

Q.    Let me show you 209J.  And is this you completing the CAPTCHA?

A.    Yeah.

MR. PEARLMAN:  Move to introduce 209J.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  209J is admitted and may be published to the jury.

(Whereupon, Exhibit No. 209J was admitted.)

BY MR. PEARLMAN:

Q.    Again, is this you completing the CAPTCHA?

A.    Correct.

Q.    Let me show you now 209L for identification purposes.  And is this another part of the transaction?

A.    Yes, it is.

MR. PEARLMAN:  Move to introduce 209L.

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  209L was admitted and may be published to the jury.

(Whereupon, Exhibit No. 209L was admitted.)

BY MR. PEARLMAN:

Q.    Does this reflect whether the withdrawal is going to occur?

A.    Yeah.  I -- on that last page, I hit the submit button, the blue one.  And this shows that the transaction was happening, yes.

Q.    And let me show you finally 209M.  Did you return to blockchain.info?

A.    I did, yeah.

Q.    Is this another reflection of what occurred with the transaction?

A.    Yes.  So this is the blockchain -- this was -- I'm sorry.  This shows my address for my blockchain.info wallet and it shows the transaction history of that wallet, yeah.

MR. PEARLMAN:  Move to introduce 209M.

THE COURT:  209 -- any objection?

MR. EKELAND:  No objection.

THE COURT:  209M is admitted and may be published to the jury.

(Whereupon, Exhibit No. 209M was admitted.)

BY MR. PEARLMAN:

Q.    Okay.  You testified before about the 15DB1 that is your account?

A.    Yes.  Correct.

Q.    Or the FBI's account?

A.    Correct.  Yeah.

Q.    So what does this screen reflect now?

A.    Yeah.  So this shows there are two transactions coming into that address on July 26th, 2016.

Q.    And do those two total the amount that you withdrew?

A.    Yes, they do.

MR. PEARLMAN:  Pass the witness, Your Honor.

THE COURT:  All right.  Any cross?

MR. EKELAND:  No questions, Your Honor.

THE COURT:  All right.  You are excused.  Thank you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  The government may call its next witness.

MS. PELKER:  The government calls Special Agent Steven Santell.

Ms. Walker, if it helps for this witness, if it's

fine with defense counsel, there are a couple cells in spreadsheets that we would select. But we could ask Dr. Ramjee to just click on them rather than circle on the screen so we don't have an issue. Is that --

MR. EKELAND: I didn't hear what you said.

MS. PELKER: Instead of having the witness circle on the screen, which seems to be causing issues, we can click and ask Dr. Ramjee to select them.

THE COURTROOM DEPUTY: Thank you.

THE COURT: Thank you, Ms. Walker.

Ms. Walker has every duty now too. We have to swear the witness.

STEVEN SANTELL, sworn.

THE WITNESS: I do.

THE COURTROOM DEPUTY: Thank you. Please be seated.

DIRECT EXAMINATION

BY MS. PELKER:

Q. Special Agent Santell, could you please state and spell your full name?

A. Steven Santell; S-T-E-V-E-N, S-A-N-T-E-L-L.

Q. Could you just pull the microphone down a bit so that the court reporter can hear you?

A. Is that a little better?

Q. Yes. Thank you, Agent Santell, where do you work?

A. I work at the FBI.

Q. How long have you worked with FBI?

A. Since 2022.

Q. What did you do before joining the FBI?

A. Before I joined the FBI, I was a software developer.

Q. What did your work as a software developer involve?

A. It primarily built out the infrastructure for database systems in the front and back end for companies' internal and external websites.

Q. Can you summarize your educational background?

A. I have a bachelor's of science in computer science.

Q. Have you had additional training in cyber matters since joining the FBI?

A. I have. I completed the FBI's accelerated cyber training program and the certification in Chainalysis Reactor course.

MR. EKELAND: Objection, Your Honor. Could we pick up the phone for one moment?

(Conference held at the bench.)

MS. PELKER: We are -- this is really just quick background. He is not talking about anything. I have got two more background questions and then we just have him reading from spreadsheets.

MR. EKELAND: Okay, Your Honor. That was my concern was a 702 concern. I couldn't tell where it was going. As long as that is -- I have no reason to disbelieve that representation, so withdrawn.

THE COURT:  We'll know whether it is true very soon.

MR. EKELAND:  Yes.

(End of bench conference.)

BY MS. PELKER:

Q.   And what squad are you assigned to at the FBI?

A.   A criminal cyber task force.

Q.   And what types of cases do you work on there?

A.   Primarily, my cases consisted mostly of ransomware cases, forums, marketplaces, and a little bit of business email compromises.

Q.   And have some of your investigations involved cryptocurrency and the darknet?

A.   So far, every single one of my investigations have involved cryptocurrency.

Q.   From your work at the FBI, are you familiar with darknet marketplaces?

A.   Yes.

Q.   Can you explain what a darknet marketplace is?

A.   Sure.  A darknet marketplace is just like any other marketplace, but in order to access them, you can't really go to Google.  You need to access them on like a Tor browser. There is marketplaces that, you know, are typically used for, you know, buying and selling illegal activity.

Q.   And what sorts of things are sold on darknet marketplaces that you --

A.   My experience, I seen drugs be bought and sold on there, even like murder-for-hire contracts.  You can purchase really just any type of illegal thing that you are looking for.

Q.   In the cybercrime context, have you seen hacking tools --

A.   Yeah.

MR. EKELAND:  Objection, Your Honor, relevance.

MS. PELKER:  We are just laying the foundation of what is being sold on the markets that he is about to testify to.

THE COURT:  Overruled.

THE WITNESS:  So we have seen, for instance, like ransomware being sold on darknet market forums, as well as people advertising the ability to intrude into other computers, to just essentially hold the door open to all of the threats after to come in and release ransomware or I am sure everyone has probably been a victim in some way of data compromise.  We seen data being sold on these darknet markets as well.

BY MS. PELKER:

Q.   Does that include stolen identification documents as well as the stolen financial information?

A.   Yeah, it can include that.

Q.   How do people pay for things on darknet markets?

A.   Typically they pay for them in cryptocurrency.

Q.   In your work for this case, did you review records from the marketplace Silk Road?

A.    I did.

Q.    What was Silk Road?

A.    Silk Road was a darknet market.

Q.    And did the FBI ultimately take down Silk Road and seize its servers?

A.    They did.

Q.    And as part of that investigation, did the FBI acquire Silk Road's records that it had been collecting at the time?

A.    They did.

Q.    Did you review records from those select records for Silk Road users in preparation for your testimony today?

A.    I did.

Q.    Showing you what is not yet in evidence as Exhibit 602A. Agent Santell, can you explain what is shown here?

A.    Sure.  So this is the Silk Road.  It is essentially the home page for Silk Road.

Q.    And this is a fair and accurate depiction of the Silk Road home page as it existed when the records were obtained by the FBI?

A.    Yeah.

        MS. PELKER:  Move to admit Exhibit 602A.

        THE COURT:  Any objection?

        MR. EKELAND:  Hearsay and relevance and 403.

        THE COURT:  602A is admitted and may be published to the jury.

(Whereupon, Exhibit No. 602A was admitted.)

BY MS. PELKER:

Q.    Special Agent Santell, can you explain what is shown here, especially kind of front and center with these photographs?

A.    Yeah.  So essentially this is -- what you can see is for sale on there.  You can see that there is pure MDMA and there is a photo of it as well, another photo of like 7 grams of speed, just a quick, you know, when you are looking at some of these examples that are on there.

Q.    And is this what a visitor to Silk Road would have seen when they first accessed the site's home page?

A.    Yes.

Q.    Can you explain what is shown along the left-hand side under shop by category?

A.    Yeah.  So it is your standard categories.  I know, you know, you can see there is drugs, apparel, art, books, collectibles.  It is whatever you are looking for is on there. You can also see like in the drugs area there is broken down into subsections, so not only is it drugs, but it gets more specific, from there, cannabis, dissolvatives, Ecstasy, intoxicants and the list goes on.

Q.    What do the numbers next to those categories indicate?

A.    It stands for -- so for drugs there are 3,802 listed items in drugs.  And then they break it down into subcategories.  So for cannabis there is 2,906 listed items there.

Q. And what is that search bar at the top in the center?

A. Yep. So the search bar, just like if you go to Amazon, you want to type something in, it helps you identify the search instead of you meticulously going through and trying to find something.

Q. What about above that, where it says messages and then reading across to the right?

A. So when you create an account on here, you have the ability to message the users on here as well, whether it is vendors -- typically the vendors themselves. You also have your orders and then you see the account. The account is just how much money you currently have in your account to purchase things.

Q. And it might be difficult to zoom in here. Is that a dollar sign or something else before the zero sign?

A. So in the green text you will see it is B for Bitcoin. Everything on the Silk Road is essentially bought and sold via Bitcoin. And then next to it in like the gray kind of section, it is dollars so it shows the US conversion from that Bitcoin to dollars.

Q. And how would a user load their account to Silk Road with money?

A. Essentially you use different cryptocurrency exchanges to, from there, I guess input whatever typical currency they want. And then from there they would transfer Bitcoin to their

account on Silk Road.

Q.    If we could zoom back out.  Can you explain what is the shopping cart icon on that upper right-hand corner?

A.    Yep.  Shopping cart works just like -- I am going to keep referring to Amazon.  Where if you want to put a different list of your items in there, you put them right in that shopping cart and when you are ready to check out, you click on that and the product can be yours.

Q.    I am going to ask if we can try and speak a little bit slower for the court reporter.

A.    That I can.

Q.    If we could pull up Exhibit 602B, which is not yet in evidence.  What is shown in 602B?

A.    This is one of the items that are for sale on the Silk Road.  We can see that it is a photo listed there.  And it is 1 gram of crystal meth shards.

Q.    Is this a fair and accurate depiction of the listing as it existed on Silk Road at the time?

A.    It is.

        MS. PELKER:  Move to admit Government Exhibit 602B.

        THE COURT:  Can you just clarify what time you are talking about?

BY MS. PELKER:

Q.    As it existed on Silk Road when the records were acquired by the FBI?

A.    That is correct.

THE COURT:  Yeah.  I just wanted -- I wanted to know what time frame that was.

BY MS. PELKER:

Q.    In 2013?

A.    Correct.

THE COURT:  Any objection?

MR. EKELAND:  401, 403, 803, cumulative.

THE COURT:  Overruled.

Exhibit 602 is admitted and may be published to the jury.

(Whereupon, Exhibit No. 602 was admitted.)

BY MS. PELKER:

Q.    Special Agent Santell, can you explain what is shown in this listing here for crystal meth?

A.    In the description, you mean?

Q.    So the jury can now -- they can now see it.  Can you walk them through what you were describing?

A.    So if you look on the screen here, we see that this is one of the items that are listed for sale.  You can see an image of a crystal meth shard and the title of it.  As you can see, it is 1 gram of crystal meth shards.  You can see it is listed for sale for $115.  And you can see the category over on the right-hand column which is meth.

Q.    And can you read the description in the lower portion of

the screen?

A.    Sure.  "Free shipping within US.  Fresh batch of nice clean shards grams 1/8s, ounce zones, zones, custom orders, stealth shipping, down under and around the globe, large qualities are available upon request."

Q.    What is the price listed for this 1 gram of crystal meth?

A.    115 USD.

Q.    And would that have actually been paid in dollars or in Bitcoin?

A.    No, that would have been paid in Bitcoin.

Q.    Where does this indicate -- listing indicate it is shipping from?

A.    So if you look over to the right-hand side under the item info, you can see it ships from the United States of America and ships to the rest of the world.

Q.    So if a Silk Road user wanted to buy the meth that is shown here, what would he or she have to do?

A.    Sure.  So you can add it to your cart and then access your cart and then check out, same kind of process as Amazon.

Q.    Can you -- maybe with Dr. Ramjee's assistance if we can note under the $115 where you would click at?

A.    So if you see where the $115 is in red, right below, there is that add to cart button, once that is selected, you see all of the way to the top right, you will see the little cart icon. It would add another number to that.

Q. Once it was in the cart, what would the buyer do to essentially check out?

A. Yep. So in order to check out, I guess the money would then on the screen be converted into Bitcoin. And I guess that transaction would follow from there once you hit the procedure check out button the transaction then begins.

Q. Did Silk Road keep records of all of the sales conducted on the site?

A. It did.

Q. Did you review records for the defendant's Silk Road account with the username Pas?

A. I did.

Q. If we could direct your attention to what is not in evidence 603C, E, F, H, N, S and J. And I believe C and F are already in evidence, but if we can look at them as a batch here.

And, Special Agent Santell, are these fair and accurate reflections of the activity of the defendant's Pas account on Silk Road as collected by the FBI in 2013?

A. Yes.

MS. PELKER: Government moves to admit C, E, F -- 603C, E, F, H, N, S and J.

THE COURT: All right. Any objection?

MR. EKELAND: 401, 403, 803.

THE COURT: All right. The objection is overruled

and Exhibit 603C, E, F, H, N, S and J are admitted and may be published to the jury.

(Whereupon, Exhibit No. 603C, E, F, H, N, S and J were admitted.)

BY MS. PELKER:

Q.   Special Agent Santell, just to be clear, was the FBI's Bitcoin Fog investigation based on the defendant's personal drug purchases on Silk Road?

A.   No.

Q.   But do those records reveal the defendant used and was familiar with Silk Road?

A.   Correct.

Q.   Directing your attention to 603C, the user's table here. Is this the user record for the defendant's Pas account?

A.   Yes.

Q.   And if we could just select on the screen the Pas username in column C.  And scrolling to the far right in the last two columns here.  Can you note what the date was that the Pas account was created?

A.   Yep.  In column BA, date created was 7/13/2011.

Q.   And what about the last date modified?

A.   The BB, the last date modified was 6/12/2013.

Q.   And on the column AX, the last action date?

A.   Last action date, was 9/15/2023.  I'm sorry.  2013, excuse me.

Q.    Did you review the records of some of the defendant's drug purchases using this Silk Road account?

A.    I did.

Q.    Directing your attention to 603H.  Is this the last recorded purchase in the defendant's Silk Road account?

A.    Yes.

Q.    And column A, could you read the listing title of what the defendant purchased?

A.    Yep.  10 ST LSD.

Q.    And over on column F, what was the date this order was finalized?

A.    6/30/2013.

Q.    Did Silk Road also store older transactions in archive tables?

A.    They did.

Q.    Directing your attention to 603S.  Is this the archive record from the defendant's early Silk Road purchases?

A.    It is.

Q.    And can you read down the descriptions noted in column C?

A.    The categories tab is LSD and crystal powder.

Q.    And in --

THE COURT:  Can I pause for a second here.  I want to make clear for the jury that nothing in this case turns on whether or not Mr. Sterlingov used or purchased any illegal drugs.  And you shouldn't consider this evidence in that regard

or in any way with respect to his character in any way.  This evidence is only coming in to show his -- for the government to attempt to show what his knowledge was with respect to Silk Road.

BY MS. PELKER:

Q.   Directing your attention to column I for this second row. What date was that first order placed?

A.   First order was created and placed on 7/15/2011.

Q.   Did you also review messages that the defendant sent to several vendors using Silk Road?

A.   I did.

Q.   Let's now turn to Silk Road vendors who sent the proceeds to Bitcoin Fog.  If we could pull up what is in evidence as Exhibit 601 --

          MR. EKELAND:  Objection, Your Honor.  I think counsel was testifying there.

          MS. PELKER:  We are just moving to 601A.

          THE COURT:  So the question is -- the objection is sustained.  And the question is stricken.  You can rephrase the question.

BY MS. PELKER:

Q.   If we could direct your attention to 601A.  And Special Agent Santell, is this a listing of vendors who sent their funds to Bitcoin Fog?

A.   It is.

Q.    And did you review records for the various vendors whose user names are shown in column B?

A.    I did.

Q.    Starting with the top, did you review records for a Bitcoin Fog customer who used the Silk Road moniker Symbiosis?

A.    I did.

Q.    Prior to your testimony today, did you review Government Exhibit 608A through Q?

A.    I did.

Q.    If we could pull up 608A, which is not yet in evidence. And did the 608 series fairly and accurately reflect the records of Symbiosis' activity on Silk Road as captured by the FBI when the site was seized?

A.    It does.

        BY MS. PELKER:  Government moves to admit Exhibit 608A through Q.

        THE COURT:  I'm sorry.  A through what?

        MS. PELKER:  A through Q.

        THE COURT:  All right.  Any objection?

        MR. EKELAND:  To begin with, it is cumulative, 401, 403, 803.  I think the point has been made about Silk Road selling drugs.

        THE COURT:  The objections are overruled.

        608N through Q is admitted and may be published to the jury.

MS. PELKER:  Was that A through Q, Your Honor?

THE COURT:  I'm sorry, A through Q.  My apologies.

(Whereupon, Exhibit No. 608A through Q was admitted.)

BY MS. PELKER:

Q.   Special Agent Santell, directing your attention to 608A, can you describe what is shown here?

A.   So this is Symbiosis' vendor page, if you will.

Q.   And can you walk us through the right-hand side under featured listings?

A.   Yeah.  So these are some of the listings that Symbiosis sold as a vendor.  You could see photos as well.  The feature listings are different quantities of high quality uncut cocaine flake.  Can see 1 gram and 7 gram and half a gram.

Q.   Can you read the top portion of the box in the middle until -- up until Symbiosis starts discussing his reviews?

A.   Sure.  "UK vendor now stocking 160 milligrams MDMA, pink square pills, MDMA, mephedrone, racemic ketamine, isomer ketamine, cocaine flakes, LSD, 2CB, 2CI, 2CE, mushrooms, mescaline, and 4AOCDMT.  Currently out of stock of MDMA. Mephedrone, should return any day now.  Racemic ketamine will be back in about a week.  Now using MBB bags for all international orders.  I am an established Silk Road vendor.  I specialize in international stealth shipping, only stock the rare highest quality products and all of the very low prices or at very low prices."

Q.   Could you read the sentence above the all caps text?

A.   "Also could everyone please stop mentioning their country of origin in the feedback.  We do not want those squares at customs ruining everyone's fun."

Q.   Directing your attention to Exhibit 608E.

Can you explain what is shown here?

A.   This is the review section for Symbiosis.

Q.   Can you explain what a review section for a vendor on Silk Road is?

A.   Sure.  It is, once again, similar to like an Amazon product where you would want to go online and review I guess how it all went, how the product was.

Q.   And on the far right, what ratings is Symbiosis receiving on this page?

A.   So these are all 5 out of 5.

Q.   Directing your attention to 608B.

What is shown here?

A.   This is an item list for Symbiosis.

Q.   And would this type of item list appear on each vendor's page?

A.   Yes.

Q.   And where are these items shipping from?

A.   They are shipping from the United Kingdom.

Q.   Where are they shipping to?

A.   Worldwide.

Q.   Pulling up Exhibit 608J.  Can you explain what is shown in the items spreadsheet here?

A.   This is Symbiosis' items spreadsheet.

Q.   And can you walk us through the listings in row 4?

A.   Sure.  So this is a listing for MDMA.

Q.   And can you read through or explain what is in columns -- the first several columns to explain how one of these items listings would appear?

A.   Sure.  So you see the category name is MDMA.  If we can see the date that this item was created, which is 8/13/2012 and any modifications that were done to it.  And this was 8/13/2012 as well.  We can see that the ID for the item is in column G. That ID just helps the database associate what that item is instead of like plain text.  We also see the user ID in column H, that user ID is a one-for-one relationship with Symbiosis. So whenever you see that ID, it means it is Symbiosis.

Q.   And scrolling over a bit, if we can look at the title in column J.

A.   Yep.  And this is the title of that item.  You can see 1 gram MDMA, UK first class.

Q.   And then in the description in column K, can you just read the top portion of this here?

A.   Sure.  1 gram of the finest MDMA available in the world. This MDMA is a dark purple.  I will update the picture in the morning.

Q.    You can keep reading.

A.    "Reagent test straight to black, made from safrole it has the classic anise seed smell and kicks like the pre-drought stuff of 2009."

Q.    Can we scroll down a bit within the listing.  Can you read the beginning, just the first paragraph of the instructions for international customers?

A.    "All international orders will be sent triple vacuum sealed as a completely flat business letter.  Your items will look, feel and smell like normal international business letter, just containing paperwork."

Q.    And scrolling over to column M.  What is the price list of Bitcoin for the 1 gram of MDMA?

A.    Roughly 3.752.

Q.    If we could go down to row 53.  Can you walk us through this listing here?

A.    Yep.  So we see the category is cocaine.  It was listed on 7/21/2013.  And the date that it was last modified is the same day.  We can see that it still has the same matching IDs for column H or row H with Symbiosis.  We can see that it is item listed in G for the ID.  The title of this is 7 grams high quality uncut cocaine flake.

Q.    And if we can expand column K.

A.    So "7 grams of uncut high quality cocaine flake.  This cocaine really is uncut.  The pictures shows about 9 ounces,

which was once the quarter part of a kilo block.  I broke it up open to show how the fish scale shine runs through the whole of it.  It easily crumbles and absolutely stinks."

Q.    If we can go down to row 55.  Can you read the title and description for the beginning of this listing?

A.    Sure.  3 by 4 ACO DMT capsules.

Q.    And the beginning of this description?

A.    Sure.  "This product is a very powerful psychedelic.  Do not order or take this unless you are an experienced psychedelic drug user who has done significant research on this product."

Q.    Now, when you are reviewing Silk Road records, do all of the vendors' older listings from the entire time always show up in the item spreadsheet?

A.    No.

Q.    Were there also archived records that Silk Road stored pertaining to the older listings?

A.    There was.

        MR. EKELAND:  Objection; leading.

        THE COURT:  Overruled.

        THE WITNESS:  Not only are the items table ended eventually, where they have older records in the archived items table.

BY MS. PELKER:

Q.    Did you review the item records for Symbiosis archived

listings as well?

A. I did.

Q. Directing your attention to 608K.

And is that what is shown here?

A. It is.

Q. And did you also review records of Symbiosis' actual sales of the items listed in the items spreadsheet?

A. I did.

Q. Showing you Exhibit 608N. Is that what is shown here?

A. Yes.

Q. And directing your attention to row 2, can you walk us through the sale that is shown in this top row?

A. Yes. So you can see in that it is liquid LSD, 5 drops tablets -- or I'm sorry, 5 drops. You can see that in column C, you have the category, which is blotter. And then you have D, the seller, Symbiosis; you can see E, who the buyer is, in this case it is Fipp.

Q. And the next few columns, if we scroll to the right, show a few different dates. Can you explain the meaning of these different dates, starting with the created date in column I?

A. So you have the transaction, when was it first created, which in this case was 2/16 of 2012. And any modifications, this one happens to be on the same date. Then you can see in column G, when the product was shipped, which was on the 17th. And then we have the finalized column, which essentially means

that the money going to Symbiosis in this case or the vendor is almost like held in escrow to where the vendor won't get the money until the buyer finalizes, says everything is good to go, everything is okay and then it is finalized and they get the money.

Q.   Is that what is reflected as the finalized date in column F?

A.   It is.

Q.   And scrolling over to the right in column R.  What is the amount paid in Bitcoin for this listing?

A.   3.43.

Q.   If we could scroll all of the way down to the bottom.

How many transactions of Symbiosis drug sales are there records of here?

A.   In this table, it is 847.

Q.   Could you look at that number again?

A.   I'm sorry.  8,047.

Q.   Similar to listings, do the older transactions get archived off?

A.   Yes, just like items do.

Q.   And showing you Exhibit 6080.  Is this a record of the archive sales?

A.   It is.

Q.   And now is there some overlap in Silk Road's records between the sales or listings on the live table and those on an

archive table?

A.    They can overlap a little bit, that is correct.

Q.    But scrolling down to the bottom, how many additional sales -- how many sales are listed here?

A.    2,063.

Q.    Did you review Symbiosis' feedback from people who were buying his drugs on Silk Road?

A.    I did.

Q.    Directing your attention to 608H.  Is this a record of the feedback that Symbiosis was receiving for some of the sales?

A.    That is correct.

Q.    If we could direct your attention to the top entry, the second row here, can you generally explain what is shown?  We don't need to walk through each of the tabs.

A.    This is a rating from the buyer that you see in column D. You can see in column Y., it is a 5 out of 5 rating.  And you can see the feedback in this column here.  Very clean and strong product, large, pure crystals, very nice, packaging was the best I have ever seen on Silk Road, worth the money for shipping, when we see how --

    And I have it blocked on my screen.  I apologize.

    When you see how it was packaged, I could feel comfortable buying from Symbiosis again.

Q.    Did Silk Road also allow vendors to communicate with buyers as well as market staff?

MR. EKELAND:  Objection; leading, relevance.

THE COURT:  Overruled.

THE WITNESS:  It does.

BY MS. PELKER:

Q.   And did you review records of some of those communications by Symbiosis?

A.   I did.

Q.   Pulling up Exhibit 608L.  And directing your attention to line 230.  And who is involved in this conversation here?

A.   Symbiosis and Internet Guy.

Q.   And is this a message from Internet Guy to Symbiosis?

A.   Yes.

Q.   If we could read the message and column I or -- I'm sorry, one more over?

And we don't need to read the full thing here, but looking at the second paragraph there, starting at the B toward the end, "Also I will be buying."

A.   "Also I will be buying one of your 7-gram coke listings today when I get my BTC get through the fog, probably just as you guys are waking up, so you could possibly weigh that one a little heavy."

Q.   What is your understanding of what Internet Guy is saying there?

A.   Essentially that he is waiting for his Bitcoin to go through Bitcoin Fog in order for -- then he is going to put the

money from there into the Silk Road to purchase the 7 grams of coke.

Q. Directing your attention to Exhibit 608Q. Are these additional messages involving Symbiosis?

It looks like our screen is frozen.

A. They are.

Q. And if we could go down to line 578. And can you read this message from Silk Road to -- from Symbiosis to Silk Road vendor support in column J?

A. "Hi guys. Earlier today, I withdrew 630 coins to Bitcoin Fog, but it has not shown up on their system. Could you confirm that it was sent to Bitcoin address" and the Bitcoin address listed there. And if you could -- "And if not could you tell me what address it was sent to please, Symbiosis."

Q. And if we move down to the response in the next row from Silk Road vendor support. Can you read that into the record?

A. "We are a little behind. Please give it a few more hours."

Q. And then can you read the response from Symbiosis?

A. "That's absolutely fine. Please take your time. Now I know it hasn't been lost I can stop panicking."

Q. Did you also review records for the Bitcoin Fog customer using the moniker Tyler Durden?

A. I did.

Q. Showing you what is not yet in evidence 609A, B, C, G, K,

L and M.

And Special Agent Santell, prior to your testimony today had you reviewed this 609 series?

A.    I did.

Q.    And are these fair and accurate reflections of the records that were provided by FBI as they existed when the Silk Road site was taken down?

A.    Yes.

BY MS. PELKER:  Government moves to admit 609A, B, C, G, K, L, and M.

THE COURT:  Any objection?

MR. EKELAND:  Cumulative, 401, 403, 803.

THE COURT:  Objection is overruled.

Exhibits 609A, B, G, K, L and M are admitted and may be published to the jury.

(Whereupon, Exhibit No. 609A, B, G, K, L and M were admitted.)

BY MS. PELKER:

Q.    Special Agent Santell, can you explain what is shown here?

A.    This is the vendor page for Tyler Durden.

Q.    If we could move to 609B.  Can you explain what is shown here?

A.    These are the items listed for Tyler Durden.

Q.    And 609C.

A.    These are reviews left by buyers for Tyler Durden.

Q. And 609G?

A. This is the items table for Tyler Durden.

Q. What items is Tyler Durden typically listing?

A. You can see prescription drugs on here. You can see 25CNBOME.

Q. And pulling up Exhibit 609K. What is shown here in the transactions spreadsheet?

A. So this is like Tyler tabs, different product they are selling as well and a description of the items itself.

Q. And we might need to bring in column B a bit to see what else is shown here. But is this a table of the --

A. The transactions, that's correct, for Tyler Durden.

Q. And just going all of the way back over to the left. And scrolling all of the way down, how many sales are recorded on this spreadsheet?

A. 3,564.

Q. And did you also review Tyler Durden's archive record of older sales?

A. I did.

Q. Were there additional sales noted on that exhibit?

A. That is correct.

Q. Did you review records for the Bitcoin customer Budworx?

A. I did.

Q. Showing you Exhibits 604A, B, G, K, J and M.

BY MR. EKELAND: Objection. One second, Your Honor.

I believe again counsel was testifying in her question about the Bitcoin Fog customer, which I don't believe is in evidence. And Bitcoin Fog didn't have customers, they had users.

THE COURT:  All right.  If you want to rephrase the question.

MS. PELKER:  By user I mean --

THE COURT:  That is fine.  You can rephrase the question.

BY MS. PELKER:

Q.   Did you review records for the Bitcoin Fog user Budworx?

A.   I did.

Q.   And showing you the series for Exhibit 604, prior to your testimony today, did you review this 604 series?

A.   I did.

Q.   Are these fair and accurate reflections of Budworx' activity on -- records from Silk Road of Budworx' activity as they existed on the servers as collected by the FBI?

A.   They are.

MS. PELKER:  Government moves to admit Government Exhibits 604A, B, G, K, J and M.

THE COURT:  All right.  Any objection?

MR. EKELAND:  Cumulative, relevance, 403 and hearsay.

THE COURT:  The objections are overruled.  Exhibits 604A, B, G, K, J and M are admitted and may be published to the jury.

(Whereupon, Exhibit No. 604A, B, G, K, J and M were admitted.)

BY MS. PELKER:

Q. And directing your attention to 604A. Can you explain what is shown here?

A. This is the vendor page for Budworx UK.

Q. Can you walk through the featured listings on the far right?

A. Sure. You see cheese kush, 4 grams of it, along with a photo, also high grade speed amphetamine, 200 grams. And below it would be 100 grams as well.

Q. Directing your attention to 604B. What is shown here?

A. This is an items listing for Budworx.

Q. Can you read off the top item noted there?

A. High grade speed amphetamine of 500 grams, listing price is 2,500 pounds and quantity of 6.

Q. Directing your attention to Exhibit 604G. And what is shown here generally?

A. These are the items for Budworx.

Q. And if we could scroll down slowly. Generally, what items is Budworx selling?

A. Weed, MDMA, cocaine, generally just drugs.

Q. And directing your attention to row 17. And in the column J, what is the listing shown here?

A. One gram of uncut cocaine.

Q.    And row 59?

A.    This is 5 grams of amphetamine speed paste.

Q.    Can we read the description one tab over?

A.    "This speed comes highly recommended from an old and well-established source in the Netherlands.  We are happy to introduce this product to our listings.  It is highly cost effective and very consistent in quality."

Q.    Does it then provide some -- generally what is described below?

A.    So you can see ratings -- the potency is 5 of 5, the texture, the smell and the price for strength is listed as well.

Q.    Pulling up Exhibit 604K.  And is this the list of Budworx sales for Silk Road?

A.    That is correct.

Q.    Scrolling down to the bottom.  How many sales are recorded here?

A.    2,011.

Q.    Did you review Silk Road records for Bitcoin Fog user MarijuanaIsMyMuse?

A.    I did.

Q.    And showing you Exhibits 605A, B, C, D, G, I, N, O, and P. Did you review some 605 series in advance of your testimony here today?

A.    I did.

Q.   And are these fair and accurate reflections of the Silk Road records from MarijuanaIsMyMuse as acquired by the FBI in its investigation?

A.   They are.

BY MS. PELKER:  Government moves to admit Government Exhibit 605A, B, C, D, G, I, N, O, P.

THE COURT:  All right.  Any objection?

MR. EKELAND:  Cumulative, relevance, 403, 803.

THE COURT:  Objection is overruled.  Exhibits 605A, B, C, D, G, I, N, O and P are admitted and may be published to the jury.

(Whereupon, Exhibit Nos. 605A, B, C, D, G, I, N, O and P were admitted.)

BY MS. PELKER:

Q.   Directing your attention to 605A.  Can you describe what is shown here?

A.   This is the vendor page for MarijuanaIsMyMuse.

Q.   And can you note what is shown under the feature listings on the right-hand side?

A.   Yep.  You can see Crystal meth ice shards, MDMA crystals as well.

Q.   Can you read the first line of the description of MarijuanaIsMyMuse's vendor page?

A.   "Welcome to MarijuanaIsMyMuse feel free to order our wares with confidence.  We do this the best stealth possible and ship

every order processed."

Q. Showing you Exhibits 605B. Can you describe what is shown here?

A. This is 56 grams of MDMA.

Q. And what is the purchase price listed?

A. 2,400 USD.

Q. And could you note where it is shipping to?

A. It ships to worldwide.

Q. Showing you Exhibit 605C. Can you note what is shown here?

A. Yep. This is more of the product listings.

Q. 605D?

A. And these are the reviews as well.

Q. If we could pull up 605I, the items.

And can you read in row 2, the title of this first item listing?

A. Yep. It is .25 grams crystal meth ice shards.

Q. And looking down to the next few rows, what generally is shown?

A. Generally, crystal meth ice shards.

Q. And are they sold in various different quantities?

A. They are.

Q. If we could go -- and starting in row 17, what is the description there?

A. That is your MDMA crystals and on down. They are sold in

different quantities as well.

Q.   Moving to row 73.  What is the -- what item is being sold indicated in column J?

A.   Pure heroin.

Q.   And down to row 233.

What item is being sold there?

A.   MDMA.

Q.   And in the next row 234?

A.   Liquid LSD drops.

Q.   Going down to 297.  Can you read the title there?

A.   Yep.  It is white ecstasy pills.

Q.   And what go one -- we need to scroll just one column over to the right.  Can you read the first two lines of the description?

A.   This listing is for "White GP ecstasy pills, 160 milligrams.  We are now pressing our own pills of pure MDMA.  No filler, all killer."

Q.   How many listings are in the spreadsheet in total?

A.   300.

Q.   Showing you now Exhibit 605N.  What is shown here in the transactions record for this vendor?

A.   Can you rephrase that question?

Q.   Can you walk us through -- just go with row 2 here.

     MR. EKELAND:  Objection; leading.

     MS. PELKER:  I haven't asked a question.  I was just

directing --

THE COURT:  Overruled.

MR. EKELAND:  Objection to not asking a question.

MS. PELKER:  I am directing your attention to row 2.

THE COURT:  Overruled.

BY MS. PELKER:

Q.   Can you walk us across this transaction shown here?

A.   Yes.  This is a transaction for 1 gram of MDMA crystals.
Use this in the category MDMA.  The buyer is E-N-I-G-M-A-L.
And the seller is MarijuanaIsMyMuse.  As described before, you
can see the ship date, the finalized date and if we were to
scroll over, we can see when the transaction was created.

Q.   And then in column R, do you see the payment information
in Bitcoin?

A.   You can see it was 3.98 Bitcoin.

Q.   Scrolling all of the way down to the bottom.  How many
transactions are reflected here?

A.   4,850.

Q.   And did you also review additional transactions in the
archive spreadsheet record?

A.   That is correct.

Q.   Did you also review records for a Bitcoin Fog user named
peels4u?

A.   I did.

Q.   Pulling up exhibits which are not yet in evidence 606F, I,

J and K.

And prior to your testimony today, did you review the 606 series?

A.    I did.

Q.    And are the records a fair and accurate reflection of the records for peels4u's activity on Silk Road as obtained by the FBI?

A.    They are.

MS. PELKER:  Government moves to admit Exhibits 606, F, I, J and K.

THE COURT:  All right.  Any objection?

MR. EKELAND:  Cumulative, relevance, 403, hearsay.

THE COURT:  Exhibits 606F, I, J and K are admitted and may be published to the jury.

(Whereupon, Exhibit Nos. 606F, I, J and K were admitted.)

BY MS. PELKER:

Q.    If we could direct your attention to Exhibit 606F.  And what is this spreadsheet?

A.    This is the live items table for peels4u, just the items table, if you will.

Q.    And if we can scroll to column P.  Where are peels4u's listings shipping from?

A.    The United States of America.

Q.    Going to line 32, scrolling back over to the left.  What

item is listed here in column J?

A.    You can see it is a fentanyl patch.

Q.    And the line below that?

A.    Xanax.

Q.    And below that?

A.    Colasapan (ph).

Q.    Is that clonazepam?

A.    Clonazepam, yeah, excuse me.

Q.    And the line below that?

A.    Percocet.

Q.    Directing your attention to Exhibit 606I.  And scrolling down to the bottom how many transactions or sales from peels4u are reflected in this spreadsheet?

A.    227.

Q.    And if we could pull up 606J, the transactions archive. And scrolling down to the bottom, how many of peels4u's sales are noted on this spreadsheet?

A.    1,851.

Q.    Did you review records for a Bitcoin Fog user named UK Grow Tek?

          MR. EKELAND:  Objection, Your Honor.

          THE WITNESS:  I did.

          MR. EKELAND:  Counsel is testifying when she is saying Bitcoin Fog user.

          THE COURT:  I thought you were the one --

Well, let's pick up for a second.

(Conference held at the bench.)

THE COURT:  So the last time she said customer and then you said, they are not customers, they are users.  So she was following what you had said.

MR. EKELAND:  Is that fact in evidence?  I honestly can't remember.  I don't -- it is not clear to me that is in evidence.

MS. PELKER:  In Exhibit 601 with the different -- it is the listing of all of the vendors, each one of these vendors is in that spreadsheet.  And Mr. Scholl testified these were vendors who were sending to these -- I'm sorry -- from Bitcoin Fog into these different vendor accounts.  But if we are going --

THE COURT:  So was there an issue there?

MS. PELKER:  The screen was still up, but it is in evidence.

THE COURT:  Yeah.  I don't think I have a question about the -- I have already admitted this already.

MS. PELKER:  Yes.  So this is showing that all of these vendors are withdrawing money from Fog to go to -- I'm sorry.  Withdrawing money to Fog.  So these are all vendors sending money from Silk Road to Bitcoin Fog.  These are the vendors that we had listed in the bill of particulars as well.

THE COURT:  All right.  So I --

MR. EKELAND: Does the testifying witness have knowledge of this? And this also -- I just think this is a little confusing to the jury as to if the money from these transactions is going into Bitcoin Fog or out of Bitcoin Fog or is it pre-mix, is it post-mix. And, you know, have we laid a foundation for the witness to have knowledge of this? I just would prefer that counsel just ask direct fact questions without leading the witness into saying -- you know, because essentially it is a compound question. It is saying, okay, was you know, Symbiosis a user of Bitcoin Fog. And then did they do X? There is -- it is compound on top of everything else.

MS. PELKER: The alternative is -- and we are happy to do this -- between each one of these vendors, pull up the spreadsheet and say did you review the next vendor on Mr. Scholl's spreadsheet that he noted as receiving funds from -- as sending funds to Bitcoin Fog.

MR. EKELAND: If we are going to do this, lay the foundation.

THE COURT: All right.

MS. PELKER: I don't think there is -- the witness isn't the one who is testifying to the tracing, we are just directing his attention to particular references.

THE COURT: I guess, if Mr. Ekeland wants you to go back to the chart -- I am not sure how many we have to go, but it is fine with me to go back to the chart that is in evidence

each time and start from that and go through it.  I will say that one of the reasons, by the way, that I have allowed this line of questioning and have overruled the objections with respect to cumulative and 403 is that Mr. Ekeland, in some of his questioning of earlier witnesses was suggesting, well, how do you know that whatever was going on was illegal in the place in which the transactions were occurring?  I think it is appropriate for the government to be able to establish sort of the breadth of the transactions and nature of the transactions that that were occurring, given that seed that was at least arguably planted with the jury of how do we know that in whatever the transactions were occurring that it was unlawful.  And so I think that requires some broader testimony with respect to the breadth and nature of the transactions to, I think, be able to rebut that.  So that is why I have allowed it.  Okay.  You can proceed.

(End of bench conference.)

THE COURT:  Do we want to take our morning break now or maybe -- I will leave it up to you as to whether now is a good breaking point.

MS. PELKER:  This is a fine time to take a break, Your Honor.

THE COURT:  Okay.  So why don't we take our break now?  It is 10 minutes of 11:00.  Why don't we come back at 10 minutes after 11:00, so take a 20-minute break.  Please don't

discuss the case amongst yourselves, no research relating to the case and I will see you back shortly.

THE COURTROOM DEPUTY:  All rise.

(Jury out at 10:51 a.m.)

THE COURTROOM DEPUTY:  You may be seated.

THE COURT:  You can take your break as well.  Please don't discuss your testimony with anybody until it is complete.

Anything before we break?

MS. PELKER:  Not from the government, Your Honor.

MR. EKELAND:  Not from the defense, Your Honor.

THE COURT:  Okay.  See you shortly.

(Recess taken at 10:52 a.m.)

THE COURT:  Well, while the deputy clerk is getting the jurors, apparently some of the jurors asked what is going on with Mr. Ekeland referring to these numbers.  And assuming that the parties agree, I am inclined to say, I know you raised some question about this.  When a lawyer has an evidentiary objection, they can either state in a short form what the objection is or they can refer to the rule.  But what matters is whether the Court allows the evidence in or not.  And you should not pay attention to the objections themselves.  The question is whether the Court thinks they have merit and allows the evidence in, something along those lines.  Any objection to me clarifying that?

MR. EKELAND:  No, Your Honor.

MS. PELKER:  No, that is fine, Your Honor.

THE COURT:  You can have a seat.

You can have a seat until they start to come in.

Ms. Pelker, how are we doing timing wise?

MS. PELKER:  We are doing well.  I definitely do expect us to finish.  I think it is just a question whether we do start Mr. Verret today.

THE COURT:  Okay.

MS. PELKER:  What time are we going until today?

THE COURT:  About 12:30, I think.

And before the government rests, both sides should confer and make sure they are in agreement with respect to what exhibits are in or not in evidence, just so the government doesn't rest and it turns out there was a dispute about whether something was admitted or not.

MS. PELKER:  We did review the records from Ms. Walker.  And I think that we will confirm.  I believe we are all in --

THE COURT:  Ready?

THE COURTROOM DEPUTY:  Ready.

(Jury in at 11:15 a.m.)

THE COURTROOM DEPUTY:  The jury is present.

THE COURT:  Before we -- I understood there was some question some of you may have had about the fact that Mr. Ekeland was referring to numbers sometimes when he was

raising objections. And just to clarify for you, the numbers are just references to the Rules of Evidence. And a lawyer can either object by referring to Rules of Evidence or by stating in very short form what the objection is. And so, for example, Rule 401 is relevance and so the lawyer can say, objection, relevance or objection, Rule 401. That is all that is going on. But you shouldn't pay any attention to the objections. The objections, like lawyer's questions, they are not evidence in the case. What matters is whether the Court concludes the evidence should come in or not. So if I admit the evidence, the Court has concluded there is no merit to the objection. If I don't admit the evidence then I can have concluded that there is merit to the objection.

But what matters for your sake is whether the evidence comes in for your consideration or not comes in for your consideration and not what the dialogue that I am having with the lawyers about the objections. That is a legal question for me and the facts are for you.

You can continue.

MS. PELKER: Thank you, Your Honor.

BY MS. PELKER:

Q. If we could pull up Exhibit 601A. And directing your attention to row 7 of this spreadsheet. Did you review records for the Silk Road user noted on this spreadsheet UK Grow Tek?

A. My screen is not currently working.

Q. Can you see it now?

A. No, I just have the shield.

THE COURTROOM DEPUTY: Hold on.

THE WITNESS: I have it now. Thank you.

BY MS. PELKER:

Q. Did you review records for UK Grow Tek?

A. I did.

Q. If we could pull up what is not yet in evidence, as Exhibits 610A, C, H, L, M, and N.

MR. EKELAND: What was the last one?

MS. PELKER: N.

BY MS. PELKER:

Q. And prior to testifying today, did you review the 610 series?

A. I did.

Q. Are these fair and accurate reflections of the records for this vendor as noted in the Silk Road records obtained and provided by the FBI?

A. They are.

Q. Government moves to admit Exhibit 610A, C, H, M and N.

THE COURT: All right. Any objection?

MR. EKELAND: Cumulative, 401, 403, 803.

THE COURT: And the Court overrules those objections.

And Exhibits 610A, C, H, L, M and N are admitted and may be published to the jury.

(Whereupon, Exhibit No. 610A, C, H, L, M and N were admitted.)

BY MS. PELKER:

Q.   Turning your attention to 610A in front of you here.  Can you explain what is shown?

A.   This is the homepage for the vendor UK Grow Tek.

Q.   Can you read the text starting with what we sell?

A.   What we sell, high grade kush and other top strains.  High grade coke, 70 percent and up.  Ketamine, wicked MDMA, pills and speed, hash from around the globe, pure washed DMT, Changa.

Q.   Directing your attention to 610C.  What is shown here?

A.   This is a Ketamine crystals, 10 grams.

Q.   And where is this shipping to?

A.   Ships to worldwide.

Q.   Directing your attention to 610H.  Is this a spreadsheet of this vendor's listings?

A.   That is correct.

Q.   Direction your attention to line 16.  Can you read the title of this listing?

A.   "Festival special, festival combo pack, everything you need."

Q.   And moving over one column, can you read the description?

A.   "Special combo price, this includes 10 green piece ecstasy, pills, 1 gram of fish scale cocaine, 1 gram of MDMA and 3.5 grams of Ketamine."

Q. Can we scroll down. Can you read one more line there?

A. "Please note that they are all quality drugs. When mixing them, please know your limits. Don't want you in the festival hospital tent pulling faces."

Q. And pulling up Exhibit 610L. And scrolling down to the bottom here. How many sales are noted on the spreadsheet here?

A. 1,572.

Q. And did you also review a transactions archive spreadsheet for this vendor?

A. I did.

Q. Were there additional sales noted there?

A. There are.

Q. We could go back to 610A. I apologize, 601A. And what is the next vendor on this spreadsheet here?

A. RoxiPal.

Q. Did you review the records for RoxiPal for Silk Road?

A. I did.

Q. If we could pull up what is not yet in evidence Government Exhibit 607A, B, H, K, and O. And prior to your testimony today, did you review the 607 series?

A. I did.

Q. Are these fair and accurate reflections of the records for RoxiPal as reflected on Silk Road and obtained and provided by the FBI?

A. They are.

MS. PELKER: Government moves to admit Government Exhibit 607A, B, H, K and O.

THE COURT: Any objection?

MR. EKELAND: Cumulative, 401, 403, 803.

THE COURT: Objections are overruled. And Exhibits 607A, B, H, K and O are admitted and may be published to the jury.

(Whereupon, Exhibit No. 607A, B, H, K and O were admitted.)

BY MS. PELKER:

Q.   If we can pull up 607A.

Can you read the last paragraph shown here under RoxiPal's vendor description under introduction?

A.   "Welcome.  RoxiPal stives to provide pharmacy medication mostly opiates at the best prices on the Road.  You will also enjoy the fastest delivery times of any vendor.  RoxiPal will never ask you to finalize early.  The escrow system protects both the buyer and the seller.  Please respect the escrow process by confirming receipt, finalizing immediately after delivery."

Q.   Pulling up 607B.  And can you describe what is shown here?

A.   This an items list.

Q.   And can you just read down the categories list?

A.   Cocaine, oxycodone, Norco, Adderall, Oxycontin.

Q.   Now pulling up 607H.  Is this a listing of spreadsheet of

RoxiPal's listings?

A. That is.

Q. If we can scroll over to the right. Where is RoxiPal shipping from?

A. The United States.

Q. And can you read across the first item listing. We'll have to go over to the left for the title and just the beginning of the description?

A. 30 milligrams of oxycodone.

Q. And on column K. Can you read just the beginning?

A. "30 milligrams oxycodone, V48, 12 round blue pills, instant release, pharmacy fresh, made in the USA, shipped fast domestically."

Q. Now, pulling up 607K. If we can scroll down to the bottom. How many sales did RoxiPal complete on Silk Road as indicated in this spreadsheet?

A. 420.

Q. Going back to 601A. And did you review records for the next vendor on this list, West Coast RX?

A. I did.

Q. And what is -- if we could direct your attention to what is not yet in evidence, Exhibits 611, A, G, L, and N. And are these fair and accurate reflections of the records of West Coast RX activity on Silk Road?

A. That is correct.

MS. PELKER:  Government moves to admit Exhibits 611A, B, G, L and N?

THE COURT:  Any objection?

MR. EKELAND:  Cumulative, relevance, more prejudicial than probative and hearsay.

THE COURT:  Those objections are overruled.  Exhibits 611A, G, L and N are admitted and may be published to the jury.

(Whereupon, Exhibit Nos. 611A, G, L, N were admitted.)

BY MS. PELKER:

Q.   If we could direct your attention to 611G.  And what is shown here?

A.   This is the items table for West Coast RX.

Q.   If we could scroll over to the right on column P.  Where is West Coast RX shipping from?

A.   The United States.

Q.   And going back over to the left, in this first listing could you read the title?

A.   It is 1 gram of MDMA.

Q.   And the beginning of the description?

A.   "One gram of imported MDMA available for reship in the USA."

Q.   And if we can scroll down the -- scroll down here.  And then looking at rows 22, 23, 24.  What items are noted there?

A.   Fentanyl.

Q. And did you also review records of buyers actually buying these items from West Coast RX?

A. I did.

Q. If we could pull up Exhibit 611L. And scrolling down to the bottom, how many sales are reflected on this record?

A. 172.

Q. And did you also review the transaction archive spreadsheet for this vendor?

A. I did.

Q. And if we could go on 611L. Directing your attention on line 4. And can you explain what is shown there?

A. This is a transaction between the seller West Coast RX and the buyer Fun Beach Baby 21. You can see it is for 50 mcg of fentanyl.

Q. And scrolling to the right, what is noted in the payment columns?

A. So it was sold or the transaction was for 6.42 Bitcoin.

Q. In your work for this case, did you review records from the marketplace Silk Road 2?

A. I did.

Q. If we could pull back up 601A.

What was Silk Road 2?

A. After Silk Road was taken down, essentially a copycat called Silk Road 2?

Q. What happened to Silk Road 2?

A.   It was taken down and seized by the FBI.

Q.   And when the FBI -- as part of its investigation, did it obtain records related to Silk Road 2?

A.   It did.

Q.   Now, did you review Silk Road 2 records for the user Pas?

A.   I did.

Q.   If we could pull up what is not yet in evidence Exhibit 612D.

THE COURTROOM DEPUTY:   What is it?

MS. PELKER:   Not yet in evidence.

BY MS. PELKER:

Q.   Is this a fair and accurate reflection for the record of the user named Pas on Silk Road 2 as obtained by the FBI?

A.   It is.

BY MS. PELKER:   The government moves to admit 612D.

THE COURT:   Any objection?

MR. EKELAND:   No objection.

THE COURT:   612D may be admitted and published to the jury.

(Whereupon, Exhibit No. 612D was admitted.)

BY MS. PELKER:

Q.   Can you explain what is shown here relating to the username Pas?

A.   Yup.   You can see the username on here is Pas.   And you can see the sign-up date is 3/28/2014.

Q.   And did this -- were there any saved order information for this user?

A.   It says no orders as buyer.

Q.   So this just reflects that Pas had an account on Silk Road 2?

A.   Correct.

Q.   Returning now to 601A.  Did you review Silk Road 2 records for the user Chemical Brothers?

A.   I did.

Q.   Directing your attention to what is not yet in evidence, 614D and E.  Are these fair and accurate reflections of the records for Chemical Brothers obtained by the FBI?

A.   They are.

MS. PELKER:  Government moves to admit Exhibit 614D and E.

THE COURT:  Any objection?

MR. EKELAND:  Cumulative, 401, 403 and hearsay.  It looks like there is some messages in there.

THE COURT:  All right.  Are any of the messages being offered for the truth of the matter?

MS. PELKER:  I can -- we can pick up the phone because I think this may come up for others.

THE COURT:  Okay.

(Conference held at the bench.)

MS. PELKER:  Generally, no, Your Honor, except there

are some messages that he would read in that are specifically discussing -- that are specifically discussing Bitcoin Fog and that would fall under the co-conspirator exception.

THE COURT:  Mr. Ekeland.

MR. EKELAND:  I don't know which co-conspirators they are talking about.

THE COURT:  I think the theory is that any illicit user of Bitcoin Fog -- anyone engaging in an illicit transaction using Bitcoin Fog is doing so to hide their transactions and therefore is a co-conspirator in the money laundering conspiracy.

MR. EKELAND:  I mean, I would have to see the message.  I mean, that -- I guess we just take that as we see it.

THE COURT:  So that is fine.  You can preserve any particular objections as they come up and raise them through if there are any particular hearsay statements that you think are inadmissible.  Okay.

(End of bench conference.)

THE COURT:  You may proceed.

BY MS. PELKER:

Q.   Directing your attention to 6 --

THE COURT:  I guess 614D and E are admitted subject to our discussion.

(Whereupon, Exhibit Nos. 614D and E were admitted.)

BY MS. PELKER:

Q. And Special Agent Santell, is the format of the records from Silk Road 2 a bit different than Silk Road 2?

A. That is correct.

Q. And but did they collect similar types of information?

A. That is correct.

Q. Directing your attention to 614D. Can you explain what is shown here?

A. Yep. You can see the username, which is Chemical Brothers. The sign-up date should be 11/11/2013. You can see that as a vendor, they had 2,531 orders totaling $692,000.

Q. If we could go to the next section, the top items sold.

A. Yep.

Q. Can you read off the first top items in the statistics there?

A. The top items sold would be pseudo speed or crushed rock along with -- in 3.5 grams. And then the next one would be the same pseudo speed crushed rock for 1 gram, along with MDMA would be the following.

Q. If we could pull up Exhibit 614E.

And if we could attempt to go down to the conversation with, What a Delight from March 11th, 2014. Can you read this message from, What a Delight?

A. "From one Aussie to another, knowing the paranoid fear we live in, would you recommend purchasing Bitcoin and then

washing/tumbling it through Bitcoin Fog and then sending it on to your SR wallet to safely spend it or could you recommend a better method?  Trying to get as good an idea as I can get at being anon before I deposit."

Q.    And if we can scroll down --

MR. EKELAND:  Objection, Your Honor.  Can we talk on the phone for one second?

(Conference held at the bench.)

MR. EKELAND:  That first of all -- there is a bunch of messages in there that don't have anything to do with Bitcoin Fog.  That is not somebody saying -- talking with anybody about actually furthering Bitcoin Fog.  They are asking if they should use it or recommend it.  It is not indicative of any kind of use of Bitcoin at all.

MS. PELKER:  It is.  But also when we scroll down, you see crystal delight's -- I'm sorry, Chemical Brother's response here regarding his tips on how to stay anonymous and then including the use of Bitcoin Fog.

MR. EKELAND:  But it is actually not going to the operation of Bitcoin Fog as a money laundering operation.  They are talking about, you know, using it.  So I guess I am a little bit unclear on sort of the conspiracy here and where the agreement element is with these people, because are you just saying that everybody, you know, who uses Bitcoin Fog is engaged in the money laundering activity of Bitcoin Fog?  I