# 24-3161

# United States Court of Appeals for the District of Columbia

THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
Hon. Randolph D. Moss
United States District Court Case 1-21-cr-00399-RDM-1

## APPENDIX
## Volume XIII of XVII (Pages Appx5281 - Appx5720)

TOR EKELAND, ESQ.
TOR EKELAND LAW PLLC
*Attorneys for Defendant-Appellant*
30 Wall Street, 8th Floor
New York, New York 10005
(718) 737-7264
tor@torekeland.com

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
*Attorneys for Defendant-Appellant*
800 Third Avenue, 20th Floor
New York, New York 10022
(212) 446-2346
maf@fernichlaw.com

MAKSIM NEMTSEV, ESQ.
MAKSIM NEMTSEV PC
*Attorneys for Defendant-Appellant*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
max@mnpc.law

AARON DANIEL, ESQ.
ASYMMETRIC LEGAL
*Attorneys for Defendant-Appellant*
11900 Biscayne Blvd, Suite 400
Miami, Florida 33181
(305) 979-9296
aaron@asymmetric.legal

*(See Inside Cover for Additional Counsel)*

3914



ELECTRONIC
PARALEGAL

AMY C. COLLINS, ESQ.
THE LAW OFFICE OF AMY C. COLLINS
*Attorneys for Defendant-Appellant*
888 17th Street, NW, Suite 1200
Washington DC 20006
(228) 424-0609
amy@amyccollinslaw.com

# TABLE OF CONTENTS

District Court Docket – US v. Sterlingov, 21-CR-00399-RDM .............Appx001

Protective Order of Governing Discovery of Hon. Randolph D. Moss,
Dated September 17, 2021 (ECF Doc. No. 18) ......................................Appx074

Preliminary Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 336) ......................................Appx079

Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 14, 2024 (ECF Doc. No. 338) ....................................Appx085

Judgment in a Criminal Case of Hon. Randolph D. Moss,
Dated November 13, 2024 (ECF Doc. No. 340) ....................................Appx091

Transcript of Motion Hearing, Dated January 13, 2023
(ECF Doc. No. 114) ...............................................................................Appx099

Transcript of Motion Hearing, Dated January 31, 2023
(ECF Doc. No. 115) ...............................................................................Appx190

Transcript of Motions Hearing, Dated June 16, 2023
(ECF Doc. No. 223) ...............................................................................Appx345

Transcript of Motions Hearing, Dated June 23, 2023
(ECF Doc. No. 224) ...............................................................................Appx501

Transcript of Motions Hearing, Dated July 19, 2023
(ECF Doc. No. 225) ...............................................................................Appx682

Transcript of Continued Motions Hearing, Dated July 20, 2023
(ECF Doc. No. 226) ...............................................................................Appx895

Transcript of Motions Hearing, Dated August 22, 2023
(ECF Doc. No. 228) .............................................................................Appx1040

Transcript of Continued Motions Hearing, Dated August 23, 2023
(ECF Doc. No. 229) .............................................................................Appx1266

Transcript of Motions Hearing, Dated August 29, 2023
(ECF Doc. No. 231) .............................................................................Appx1466

Transcript of Pretrial Conference, Dated September 7, 2023
(ECF Doc. No. 232) ...................................................................Appx1524

Transcript of Pretrial Conference, Dated September 8, 2023
(ECF Doc. No. 233) ...................................................................Appx1741

Transcript of Pretrial Conference, Dated September 13, 2023
(ECF Doc. No. 234) ...................................................................Appx1861

Transcript of Pretrial Conference, Dated September 15, 2023
(ECF Doc. No. 235) ...................................................................Appx1999

Transcript of Pretrial Conference, Dated September 18, 2023
(ECF Doc. No. 236) ...................................................................Appx2141

Transcript of Pretrial Conference, Dated September 21, 2023
(ECF Doc. No. 237) ...................................................................Appx2235

Transcript of Motion Conference, Dated November 13, 2023
(ECF Doc. No. 238) ...................................................................Appx2302

Transcript of Jury Trial, Dated February 12, 2024
(ECF Doc. No. 276) ...................................................................Appx2350

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ...................................................................Appx2620

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ...................................................................Appx2688

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 278) ...................................................................Appx2825

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 327) ...................................................................Appx2948

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ...................................................................Appx3074

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ...................................................................Appx3189

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ....................................................................Appx3331

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ....................................................................Appx3446

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 281) ....................................................................Appx3572

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 328) ....................................................................Appx3697

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ....................................................................Appx3858

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ....................................................................Appx3982

Transcript of Jury Trial, Dated February 23, 2024
(ECF Doc. No. 329) ....................................................................Appx4122

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ....................................................................Appx4251

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ....................................................................Appx4394

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 284) ....................................................................Appx4419

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 330) ....................................................................Appx4550

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ....................................................................Appx4581

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ....................................................................Appx4698

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 285) ....................................................................Appx4836

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 286) ...............................................................Appx4955

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 331) ...............................................................Appx5074

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 287) ...............................................................Appx5198

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 332) ...............................................................Appx5344

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...............................................................Appx5359

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...............................................................Appx5496

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 289) ...............................................................Appx5621

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 333) ...............................................................Appx5762

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 290) ...............................................................Appx5900

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 334) ...............................................................Appx6004

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...............................................................Appx6087

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...............................................................Appx6190

Transcript of Jury Trial, Dated March 11, 2024
(ECF Doc. No. 292) ...............................................................Appx6324

Transcript of Jury Trial, Dated March 12, 2024
(ECF Doc. No. 293) ...............................................................Appx6344

Virtual Asset Analysis Expert Report of Luke Scholl,
Dated December 8, 2022................................................................Appx6400

Expert Report #1 of Elizabeth Bisbee (Nov. 2022).....................Appx6465

Expert Report #2 of Elizabeth Bisbee (Dec. 2022) .....................Appx6493

Expert Report #3 of Elizabeth Bisbee (Jul. 2023)......................Appx6522

CS-Mazars Expert Report - Device Review Summary,
Dated May 5, 2023 .......................................................................Appx6529

CS-Mazars Expert Report - IP Overlap Analysis,
Dated November 9, 2022 ..............................................................Appx6532

CS-Mazars Expert Report - IP Graph Data Excel File..............Appx6539

Criminal Complaint, Dated April 26, 2021 (ECF Doc. No. 1) .............Appx6542

Arrest Warrant, Dated April 26, 2021 (ECF Doc. No. 5)....................Appx6556

Indictment, Filed June 14, 2021 (ECF Doc. No. 8) ............................Appx6557

Superseding Indictment, Filed July 18, 2022 (ECF Doc. No. 43) .......Appx6561

Defendant's Supporting Memorandum of Law,
Dated August 1, 2022 (ECF Doc. No. 46) ............................................Appx6567

Attachment to Memorandum of Law -
Proposed Order of Hon. Randolph D. Moss Granting Defendant's
Motion to Dismiss (ECF Doc. No. 46-1) ....................................Appx6585

Attachment to Memorandum of Law -
Defendant's Notice of Motion to Dismiss, Dated August 1, 2022
(ECF Doc. No. 46-2) .....................................................................Appx6586

Government's Opposition to Motion, Filed August 29, 2022
(ECF Doc. No. 52) ...............................................................................Appx6589

Defendant's Reply to Government's Opposition to Motion,
Dated September 7, 2022 (ECF Doc. No. 57) ......................................Appx6623

Exhibit A to Defendant's Reply -
Second Declaration of Eric Garland, Dated September 7, 2022
(ECF Doc. No. 57-1) ........................................................................Appx6635

Defendant's Motions in *Limine*, Dated October 24, 2022
(ECF Doc. No. 59) .............................................................................Appx6644

Exhibit A to Motions in *Limine* -
Letter from Tor Ekeland to Christopher B. Brown and
C. Alden Pelker, Dated September 23, 2022, with Exhibit A
(ECF Doc. No. 59-1) ........................................................................Appx6664

Defendant's Opposition to the Government's Motions in *Limine*,
Dated November 7, 2022 (ECF Doc. No. 68) .......................................Appx6680

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated March 6, 2023 (ECF Doc. No. 116) ..........................................Appx6689

Notice of Bill of Particulars for Forfeiture, Filed May 17, 2023
(ECF Doc. No. 119) ..........................................................................Appx6709

Defendant's Notice of Intent to Present Expert Testimony,
Dated July 7, 2023 (ECF Doc. No. 145) ..............................................Appx6711

Exhibit A to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Francisco Cabanas (ECF Doc. No. 145-1) ...........................Appx6716

Exhibit B to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Itiel Dror (ECF Doc. No. 145-2) ..........................................Appx6725

Exhibit C to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jeffrey Fischbach (ECF Doc. No. 145-3) ....................................Appx6731

Exhibit D to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jonelle Still (ECF Doc. No. 145-4) .............................................Appx6737

Exhibit E to Notice of Intent -
Summary of Qualifications and Expected Testimony for
J.W. Verret (ECF Doc. No. 145-5)................................................Appx6741

Supplemental Summary of Qualifications and Expected
Testimony for Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 157) ........................................................................Appx6756

Notice of Expert Report for Defense Expert Jonelle Still of
Ciphertrace, Dated August 8, 2023 (ECF Doc. No. 159) .....................Appx6761

Attachment to Notice of Expert Report -
Defense Expert Report of Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 159-1) .................................................................Appx6764

Exhibit A to Notice of Expert Report -
Data Credibility in Cryptocurrency Investigations of Ciphertrace
(ECF Doc. No. 159-2) .................................................................Appx6805

Exhibit B to Notice of Expert Report -
Article Titled "Bitcoin: A Peer-to-Peer Electronic Cash System"
(ECF Doc. No. 159-3) .................................................................Appx6822

Notice of Bill of Particulars, Filed August 28, 2023
(ECF Doc. No. 173) ........................................................................Appx6832

Defense Response to Government's Motion to Admit Certain
Exhibits, Dated September 4, 2023 (ECF Doc. No. 177) .....................Appx6834

Notice of Source Code Expert Bryan Bishop Regarding Independent
Analysis of Chainalysis Reactor Source Code and Request for
Production of Chainalysis Reactor Source Code and Relevant
Related Brady Material, Dated September 5, 2023
(ECF Doc. No. 179) ........................................................................Appx6843

Chainalysis' Notice in Response to the Court's Request Regarding
Protective Order, Dated September 12, 2023
(ECF Doc. No. 195) ........................................................................Appx6860

Exhibit A to Notice in Response -
[Proposed] Heuristic Information Protective Order of
Hon. Randolph D. Moss (ECF Doc. No. 195-1)............................Appx6862

Exhibit B to Notice in Response -
[Proposed] Heuristic Information Protective Order to Jonelle Still
of Hon. Randolph D. Moss (ECF Doc. No. 195-2).......................Appx6869

Heuristic Information Protective Order to Jonelle Still of Hon.
Randolph D. Moss, Dated September 13, 2023 (ECF Doc. No. 196)...Appx6877

Notice Regarding Court's Proposed Protective Order Governing
Review of Chainalysis' Proprietary Information,
Dated September 20, 2023 (ECF Doc. No. 199) ..................................Appx6884

Notice Regarding Ciphertrace Expert Testimony and Review of
Latest Chainalysis Production, Dated September 22, 2023
(ECF Doc. No. 205) ..............................................................................Appx6888

Government's Response to September 18, 2023 Minute Order
Regarding Defendant's Access to Sensitive Heuristics Information
Provided by Chainalysis, Filed September 22, 2023
(ECF Doc. No. 206) ..............................................................................Appx6892

Defendant's Opposition to Government's Response to
September 18, 2023, Minute Order Regarding Defendant's Access
to Sensitive Heuristics Information Provided by Chainalysis,
Dated September 29, 2023 (ECF Doc. No. 207) .................................Appx6901

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 4, 2023 (ECF Doc. No. 210) ...................................Appx6912

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 30, 2023 (ECF Doc. No. 213) .................................Appx6930

Defendant's Motion to Exclude any Testimony About Deepweb
Marketplaces, Dated February 8, 2024 (ECF Doc. No. 247)..............Appx6942

Attachment to Motion to Exclude -
[Proposed] Order of Hon. Randolph D. Moss
(ECF Doc. No. 247-2) ..................................................................Appx6950

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated February 29, 2024 (ECF Doc. No. 259)......................................Appx6951

Final Jury Instructions and Charges, Filed March 7, 2024
(ECF Doc. No. 265) ..................................................................................Appx6982

Government's Motion for Preliminary Order of Forfeiture,
Filed June 7, 2024 (ECF Doc. No. 297)..................................................Appx7061

      Attachment to Motion for Preliminary Order of Forfeiture -
      Proposed Preliminary Order of Forfeiture Hon.
      Randolph D. Moss (ECF Doc. No. 297-1)...................................Appx7072

Defendant's Opposition to Government's Motion for Preliminary
Order of Forfeiture, Dated June 21, 2021 (ECF Doc. No. 305) ...........Appx7078

      Exhibit A to Defendant's Opposition -
      Article Titled "Chainalysis: Most Mixed Bitcoin Not Used
      For Illicit Purposes", Dated August 26, 2019
      (ECF Doc. No. 305-1) ..................................................................Appx7095

      Exhibit B to Defendant's Opposition -
      Blockchain Address Search Result from Blockchain.com
      (ECF Doc. No. 305-2) ..................................................................Appx7107

Government's Memorandum in Aid of Sentencing,
Filed August 1, 2024 (ECF Doc. No. 314)..............................................Appx7112

Sentencing Memorandum on behalf of Roman Sterlingov,
Dated August 15, 2024 (ECF Doc. No. 321) ..........................................Appx7157

Memorandum Opinion of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 337) .......................................Appx7194

Defendant's Notice of Appeal, Dated November 19, 2024
(ECF Doc. No. 343) ..................................................................................Appx7214

Memorandum for All Department Employees from The Deputy
Attorney General, Subjecting "Ending Regulation by Prosecution",
Dated April 7, 2025..................................................................................Appx7217

**Trial Exhibits:**

Trial Exhibit 601 -
Darknet Market Vendor Transaction Summary
(Document in Evidence and to be Produced Upon Request Due
to Volume) ...................................................................................Appx7221

Trial Exhibit 624...........................................................................Appx7222

Trial Exhibit 625...........................................................................Appx7223

Trial Exhibit 626...........................................................................Appx7224

Trial Exhibit 627...........................................................................Appx7225

Trial Exhibit 628(A).......................................................................Appx7226

Trial Exhibit 628(B).......................................................................Appx7227

Trial Exhibit 629...........................................................................Appx7229

Trial Exhibit 630(A).......................................................................Appx7230

Trial Exhibit 630(B).......................................................................Appx7244

Trial Exhibit 631...........................................................................Appx7247

Trial Exhibit 632...........................................................................Appx7248

Trial Exhibit 633...........................................................................Appx7252

Defense Exhibit 138 -
The-Message-Game, Written by Ice White .........................................Appx7253

Defense Exhibit 139 -
Extracted Page from The-Message-Game, Written by Ice White ......Appx7413

Government Exhibit 721 and Defense Exhibit 143 -
Boox Chat .....................................................................................Appx7414

Exhibit B to Fischbach Declaration -
Declaration of Jeffrey M. Fischbach, for Defendant, Dated August 14, 2024,
with Attachment
(ECF Doc. No. 321-2) ...............................................................Appx7415

mean, it just seems that the scope of the conspiracy here is just anybody who used Bitcoin Fog, if they had drug money or anything -- and I thought the -- my understanding of the conspiracy was to operate a money laundering system called Bitcoin Fog.  This isn't actually going to the operation.  What it is talking about is use.  I am just a little confused here.

MS. PELKER:  So, I mean, I think we have been clear that the conspiracy here -- the defendant is charged with operating Bitcoin Fog.  But Bitcoin Fog and the defendant was in a conspiracy with the illicit users of Bitcoin Fog to launder these proceeds.  And Chemical Brothers was one of the individuals we specifically noted in our bill of particulars.  But beyond that, any communication by a Bitcoin Fog user discussing specifically their use of Bitcoin Fog to launder illicit proceeds would be a co-conspirator statement in that money laundering conspiracy?

THE COURT:  I think that it -- I think that is correct as far as it goes.  I think to the extent you are relying on the co-conspirator -- or the co-conspirator exception to the hearsay rule.  It has to be also in furtherance of the conspiracy.  I think it is okay as long as someone is encouraging others to do it and in order to protect their own marketplace.  So if you have a vendor on the darknet who is telling people to use Bitcoin Fog, that is in furtherance of the conspiracy.  And I suppose there is also

just a question at some point of whether it is just a statement against interest, someone is simply saying they are laundering funds on a public forum.

But I don't know if that is an argument you are making now or not. I guess all I am saying as we go through this, we have to look at them and see whether it is not only referring to Bitcoin Fog by somebody who is using Bitcoin Fog to allegedly launder funds, but whether it is in furtherance of the conspiracy, as well.

MR. EKELAND: Your Honor, there are a whole host of messages just on this exhibit that don't even mention Bitcoin Fog and have nothing to do with -- you know, furthering a conspiracy. There is like a whole host of messages on this exhibit that have nothing to do with furthering the conspiracy.

THE COURT: Can you point me to them?

MR. EKELAND: Can we just scroll through this?

MS. PELKER: I think the screen is currently up in front of the jury.

Mr. Ekeland is correct that this is -- the record is Chemical Brothers' messages. We are just specifically pointing to the messages that pertain to Bitcoin Fog.

THE COURT: So why don't we do this then just to keep things moving. Let the government point to whatever it wants to point to here. If you have objections to the particular things they point to, let me know what they are and I can make

a judgment about whether they are in furtherance of the alleged conspiracy and or the conspiracy. And then I will let you all confer about whether there need to be redactions to any other portions of the document on hearsay grounds before it actually goes to the jury.

MR. EKELAND: Your Honor, in light of what you just said, can we not publish to the jury while they are lining up the message that they want to show and -- just because I am concerned as they scroll it they are going to see a whole bunch of stuff. If they turn off publication to the jury and then the government lines up their message and we take it from there.

MS. PELKER: That is fine with the government if it is fine with Ms. Walker.

THE COURT: All right. Ms. Walker says it is okay. Let's go that way. Thanks.

(End of bench conference.)

THE COURT: All right. You may continue.

BY MS. PELKER:

Q. Agent Santell, can you read Chemical Brothers' response?

A. "Hey, mate."

Q. You can start with the second paragraph.

A. "Your suggestion to tumble your coins sounds good mate, but I would go as far as to do this. If an open Wi-Fi connection through Tor, create a dirty blockchain.info wallet,

log out, save all of the details and log in from no info and see if you can with the info you saved.  I'd suggest PGPing this for -- or this info or storing it on a secure encrypted hard drive.  Click use new identity in Tor and log onto Bitcoin Fog, create a new deposit address.  Save this too.  Click use new identity in Tor.  Log back into your wallet.  Then purchased Bitcoins appear, send to Bitcoin Fog wallets, takes 2 hours to confirm, then log out.  Click use new identity in Tor. And once it's cleared in Bitcoin Fog, transfer it across your SR wallet.  I hope that helps."

Q.    Returning to 601A.

THE COURT:  One last thing -- I'm sorry.  Just pick up for one last second.

(Conference held at the bench.)

THE COURT:  It seems to me one further point to add with respect to this.  To the extent the government has the evidence already that these particular entities were, in fact, engaged -- where the purchases were being made from -- with funds drawn from Bitcoin Fog or they themselves were depositing funds in the Bitcoin Fog.  That is in evidence already.  And it may be that some of this also can potentially come in to state of mind just to show that the person knew that they were doing it -- using Bitcoin Fog or accurately the funds were coming from Bitcoin Fog.  And that is, I guess, a separate question which we'll have to address as it comes up as to whether it is

not coming in necessarily for the truth of the matter asserted, but what the state of the mind was of the individual.

MR. EKELAND:  That would be just in relation to statements that are actually mentioning Bitcoin Fog?

THE COURT:  Correct.

(End of bench conference.)

BY MS. PELKER:

Q.   Directing your attention to row 11.  Did you review the Silk Road records for the Bitcoin Fog user Mario's Gram Shoppe?

A.   I did.

Q.   And directing your attention to exhibits not yet in evidence, 616C, D, and E.  And E are the messages and per discussion on the phone earlier.

Are Exhibits 616C, D and E fair and accurate reflections of the records pertaining to Mario's Gram Shoppe obtained by the FBI and provided from Silk Road 2?

A.   Correct.

MS. PELKER:  Government moves to admit 616C, D and E subject to the discussion.

THE COURT:  Okay.  Mr. Ekeland.

MR. EKELAND:  Cumulative, relevance, more prejudicial than probative, and hearsay.

THE COURT:  So I will admit 616C, D and E subject to our discussion.

(Whereupon, Exhibit No. 616C, D and E were admitted.)

BY MS. PELKER:

Q.   Directing your attention to 616D.  How many orders did Mario's Gram Shoppe ship?

A.   1,436.

Q.   And where were they shipping from?

A.   United States.

Q.   What were the top items sold?

A.   14 grams of HCL and 3.5 grams of uncut cocaine.

Q.   And then could you read the last three listings here too or the last three items sold?

A.   Yep.  3.5 grams of crack cocaine, 28 grams of famous German-made MDMA and 14 grams of our famous German-made MDMA FE only.

Q.   If we could go to -- actually, if we could pull down and then go to Exhibit 616E.  And go to the December 18th, 2013 conversation with Indica 420.

          THE COURTROOM DEPUTY:  Is that it?

          MS. PELKER:  Yes.  With the Court's permission we would publish this message to the jury.

          THE COURT:  Mr. Ekeland?

          I'm sorry?

          MR. EKELAND:  Can we pick up the phone for one second?

          THE COURT:  Okay.

          (Conference held at the bench.)

MR. EKELAND: I'm sorry. This is seeking to admit this under the co-conspirator -- this is post mix; right? Once funds arrive from Bitcoin Fog, it is not -- so I don't see how it is -- how this is in furtherance of the conspiracy. Because there is no -- it is post mix.

THE COURT: Ms. Pelker.

MS. PELKER: I am not sure I understand the legal distinction of pre or post mix here. There is a Bitcoin Fog user who is explaining how they are going to purchase crack cocaine once they are able to clean their funds from Fog, part of the defense's argument, as we understand it, is that Bitcoin Fog was a privacy service. And that money coming from or to exchanges, is quote/unquote clean. We have presented testimony that money coming from an exchange into Bitcoin Fog is not necessarily clean, privacy-related funds. And showing these are buyers who are using Bitcoin Fog to do these transactions goes to the rebutting the defense arguments here.

MR. EKELAND: There is --

THE COURT: Okay.

MR. EKELAND: I was going to say, there is no foundation for saying that this -- that there is any knowledge on the part of the administrator that these funds coming in were going to be used for a drug purchase afterwards. Maybe if the Indica420.SR2 was talking about, oh, after I get paid, I am going to go mix the funds, that would be a statement in

furtherance of the conspiracy. But this on its face is a statement in furtherance without more.

THE COURT: I guess I am wondering whether it is in furtherance of the conspiracy or whether there is some other exception that would apply here or whether it is, in fact, being offered for the truth of the matter asserted. I suppose it is being offered for the truth of the matter asserted. And it is not clear to me how it furthers the conspiracy.

MS. PELKER: I think it furthers the conspiracy that you have a conversation between the drug buyer and the drug seller discussing how they are going to conduct the surreptitious drug purchase and transaction. And they are explaining the role of Bitcoin Fog in cleaning those funds.

MR. EKELAND: But nothing in that, Your Honor, goes to the knowledge of the administrator of Bitcoin Fog in relation to this transaction.

THE COURT: That I don't think matters. But I guess I am still trying to figure out whether it really is in furtherance of the conspiracy.

MS. PELKER: Your Honor, these are buyers who are saying that they can't do their drug buy until the funds clear through Bitcoin Fog, because Bitcoin Fog is such an essential part of their money laundering operation.

THE COURT: Right. But how is saying that furthering the conspiracy?

MS. PELKER: Furthering the conspiracy of cleaning the funds to be able to do drug buys. Here, they are -- this is an agreement between the buyer and the seller and the administrator of Bitcoin Fog to clean these funds and participate in this entire ecosystem here. And so you have two members of the conspiracy having a conversation about the role of Bitcoin Fog in their operation.

MR. EKELAND: Your Honor, there is no foundation for saying the funds were not already clean. What they are saying is that the -- he is waiting for funds to come out of Bitcoin Fog. There is nothing here that establishes that the funds going into Bitcoin Fog were dirty in the first place.

MS. PELKER: I mean, he is using it to buy drugs. They are probably coming from his exchange account. He is using Bitcoin Fog to hide from the exchange that he is buying drugs.

THE COURT: I get what he is doing. I guess the question is -- the only question I am struggling with at all is whether in telling the seller this is in furtherance of the conspiracy. And if he was telling them that because the seller would be more likely to sell it to them, because the funds had been cleaned, I get that. But it is not clear to me whether that is, in fact, what is going on here.

MS. PELKER: So there is a -- after this message occurs, there is then a purchase of 1 gram of crack cocaine.

This is the buyer negotiating with the seller on the purchase of a gram of crack cocaine explaining how they are going to pay for those funds and that they are waiting for the funds to be laundered through Bitcoin Fog.  It is a comment about the action that is being taken in furtherance of the conspiracy mixing the funds.

THE COURT:  Right.  But the statement has to be in furtherance of the conspiracy.  The statement itself has to be in furtherance of the conspiracy.  So the question is whether his saying this furthers the conspiracy in some way or whether there is some other exception that applies.

MS. PELKER:  He is communicating -- it is a buyer communicating with the seller about a drug transaction.  They are negotiating a drug transaction.  Part of the goals of the conspiracy was to clean funds allowing people to do anonymous drug transactions.  And that is exactly what they are discussing here.

MR. EKELAND:  Nothing in the statement furthers the conspiracy, Your Honor.  It is just merely a statement about Indica420 waiting for their funds to arrive.

MS. PELKER:  But it is an explanation of why there is a delay in purchasing -- in remitting the funds over sending the funds through Silk Road to make the purchase.

MR. EKELAND:  And that delay has nothing to do with furthering the conspiracy.  It is a temporal statement about

the current situation.

THE COURT: Anything else on this, Ms. Pelker? I am frankly not sure.

MS. PELKER: No, Your Honor. Just to the extent that the defense is then going to try to argue that the funds coming in to Bitcoin Fog from exchanges and are somehow clean, that this is important evidence in the government's case to be able to rebut that. And we think that discussion about this payment does go to further that aspect of the conspiracy.

MR. EKELAND: I don't quite understand that upstream liability of money theory, because that would, I think, just implicate banks and almost every financial institution that has anybody's --

THE COURT: That argument is not persuasive to me. Because the whole point here is that it is allegedly a money laundering service that is allowing him to purchase drugs in a way that he is not going to get in trouble or thinks he is not going to get in trouble, because he is laundering the funds and people are not going to be able to understand he did that. So that argument is not persuasive to me. Someone wouldn't, in fact, go down to their bank and say -- you know, they wouldn't get down to the local dealer and write a check, say, here is the check, because they wouldn't want someone to be able to trace it back. That is the whole point here.

I am still not sure this actually is in furtherance

of the conspiracy, because saying that I can buy these drugs once the funds are laundered. You know, if there were any reason to think that gave additional security to the seller, I think I would be convinced of that, but I am not sure I see that here. So why don't we move on. I will give this a little bit further thought. But at this point, I am not convinced it is in furtherance of the conspiracy.

MS. PELKER: Yes, Your Honor.

(End of bench conference.)

BY MS. PELKER:

Q. If we could move to Exhibit 616C.

THE COURT: My apologies.

BY MS. PELKER:

Q. And directing your attention down to row 45. And if we could scroll over to the right into column R. What is the item being purchased here?

A. 1 gram of uncut cocaine.

Q. And on column U? What is the price listed there?

A. 809.93.

Q. If we could scroll all of the way down to the bottom. How many entries are in this order record?

A. 1,472.

Q. Did you also review Silk Road 2 records for the user Budworx?

A. I did.

Q.    If we could direct your attention to what is not yet in evidence 613C.  Is 613C a fair and accurate reflection of Budworx' activity on Silk Road 2?

A.    That's correct.

MS. PELKER:  Government moves to admit Exhibit 613C.

THE COURT:  Any objection?

MR. EKELAND:  Cumulative, relevance, more prejudicial than probative and hearsay.

THE COURT:  Can you open the document for me?

MS. PELKER:  This is just the order spreadsheet, Your Honor.

THE COURT:  Overruled.

And Exhibit 613C is admitted.

(Whereupon, Exhibit No. 613C was admitted.)

THE COURT:  If there is any particular hearsay in it, you can draw my attention to it.  That goes in general for all of these exhibits, Mr. Ekeland, where it is not sufficient to just object to a large exhibit on hearsay grounds.  If there is particular hearsay, you should direct me to it.

BY MS. PELKER:

Q.    Agent Santell, can you explain what is shown in row 3?

A.    Sure.  It is an order.  The buyer's name is Ghost.

Q.    If we can scroll over to the right, column R.  Can you note what item is being purchased here?

A.    It is premium uncut cocaine for .5 grams.

Q.   What is over on column T, what is the Bitcoin price?

A.   Roughly .157.

Q.   And row 4, column R, can you read the item title for that order?

A.   Amphetamine, 10 grams.

Q.   Scrolling down to the bottom.  How many orders are shown here on this spreadsheet?

A.   1,725.

Q.   Can you read the listing title for 1,725?

A.   I didn't -- I made a mark.

Q.   I can clear it.  If you click on the triangle on the upper left-hand --

A.   I am trying to click clear.  It is not listening to me. And then it went dark.

THE COURTROOM DEPUTY:  That was me.

THE WITNESS:  All right.  Good.  Perfect.  Thank you.

So for 1725, that row.

BY MS. PELKER:

Q.   Yes.  Could you read what is in column R?

A.   MDMA, crystal, premium uncut, 90 percent, 2 grams.

Q.   Pulling back up 601A.

Did you review the Silk Road 2 records for the Bitcoin Fog user Crystal Buddha?

A.   I did.

Q.   And what is -- if we could pull up what is not yet in

evidence, 616CD and E in which E is the messages.  And we have one message from Crystal Buddha specifically to show.  Are Exhibits 615C, D and E, fair and accurate reflections of the records pertaining to Crystal Buddha on Silk Road 2 as collected by the FBI?

A.   That is correct.

MS. PELKER:  Government moves to admit 615C and D and 615E, the messages, subject to the Court's ruling?

THE COURT:  Mr. Ekeland.

MR. EKELAND:  Cumulative 401, 403, 803.

THE COURT:  So I am going to admit 615C, D and E subject to the defense having the right to object to any particular assertions on hearsay grounds, but you need to draw my attention to them.

(Whereupon, Exhibit No. 615C, D, and E were admitted.)

BY MS. PELKER:

Q.   Directing your attention to 615D.  What are Crystal Buddha's top products?

A.   Top products would be 1 ounce pure meth and then 7 grams of pure meth and then 14 grams of pure meth.

Q.   Where is Crystal Buddha shipping from?

A.   Ships from the United States.

Q.   Where is it shipping to?

A.   The rest of the world.

Q.   Pulling up 615C.  And if we could scroll to the right. What is the item title right there in column R for the first item sold?

A.   One ounce of pure meth.

Q.   Going over to column T.  How much was Crystal Buddha charging for one ounce of meth at the time?

A.   Roughly 2 Bitcoin.

Q.   And scrolling all of the way down to the bottom.  How many sales are noted?

A.   445.

Q.   And could you read the title in column R of the last item listed?

A.   7 grams pure cocaine, domestic listing only.

Q.   What was the price over in column T.  What is the price in Bitcoin?

A.   Roughly 1.165 Bitcoin.

Q.   And going to the right to column V.  What was the pricing in US dollars?

A.   $396.20.

Q.   If we could take down what is being published to the jury and going to 615E.  And if we could go down to the message from Crystal Buddha on September 30th, 2014.

THE COURTROOM DEPUTY:  Let me know when you are ready for me to publish.

MS. PELKER:  If we could try and zoom in so we are

only looking at --

With the Court's permission, we would publish this to the jury. We can scroll down a bit right there just so we can see the Bitcoin address at the top.

(Pause.)

THE COURT: Let's pick up for a second.

(Conference held at the bench.)

THE COURT: So Crystal Buddha is the market, is that --

MS. PELKER: Crystal Buddha is the vendor. Is one of the individuals who is noted on the government's bill of particulars.

THE COURT: Right. And then who is the other participant in the conversation?

MS. PELKER: I Have a Bong is a buyer and they have negotiated a partial refund. And so this is Crystal Buddha --

MR. EKELAND: We just lost you, Your Honor. I can't hear you.

MS. PELKER: Can you hear me?

MR. EKELAND: I can hear you.

THE COURT: Can you hear me?

MR. EKELAND: Yes.

MS. PELKER: Can you hear me?

THE COURT: I can hear you.

MS. PELKER: Crystal Buddha is the vendor. I Have a

Bong was the buyer. They have negotiated a partial refund. And so this is Crystal Buddha discussing with I Have a Bong, the laundering of that refund payment pertaining to their drug transaction. And Crystal Buddha is explaining that he is making that transaction through Bitcoin Fog. He has to wait for it because it is down. This is in furtherance of Crystal Buddha's drug-dealing activities. He has a relationship with I Have a Bong. He wants to continue that by processing this refund. And they are both very interested in ensuring that their identities remain anonymous. This is actually a transaction that they are discussing happening outside of the marketplace but pertaining to their drug transactions.

MR. EKELAND: Your Honor, it is not clear to me they are actually using Bitcoin Fog, because they are just talking about it. But they are not -- the first transaction is saying, I just sent it to you through a mizer, which I am assuming is a mixer. It is not clear to me that is Bitcoin Fog.

MS. PELKER: Defense can argue that. He is saying Bitcoin Fog and says will arrive in 6 hours, which is Bitcoin Fog's standard delay.

THE COURT: All right. So I don't think it is being offered for the truth of the matter about whether Bitcoin Fog was down for maintenance or not.

MS. PELKER: Correct, Your Honor.

THE COURT: And tell me, is Crystal Buddha the

purchaser or the seller?

MS. PELKER:  He is the vendor.  So he is the seller. He is refunding a payment.  So this is --

THE COURT:  I see.

MS. PELKER:  -- him taking the money of the proceeds of this drug deal and partially refunding a buyer using Bitcoin Fog to conceal his identity.

THE COURT:  And he says that he can't do so right now because Bitcoin Fog is down?

MS. PELKER:  Yes.

MR. EKELAND:  Are we sure this -- this is an honest question.  Are we sure this is a drug deal?  Is this all that Crystal Buddha is dealing in?  Because Silk Road deals with a lot of other stuff.

MS. PELKER:  I mean, we can scroll up, if that is going to be the issue here, but --

MR. EKELAND:  You can tell me if the answer is yes, then I will save the time.  I will trust you on that.  That is an honest question.  I just --

THE COURT:  I think --

MR. EKELAND:  You are cutting in and out, Your Honor.

THE COURT:  You are losing me?

MR. EKELAND:  Now I can.

THE COURT:  I wonder if the batteries are starting to go on these things.

MR. EKELAND: That might be it.

THE COURT: Yes. Ms. Pelker.

MS. PELKER: Yes, I do. If we could -- can you scroll up?

But all Crystal Buddha was selling was drugs. I believe this was a -- we can keep scrolling up. This was an issue with a --

THE COURT: You passed it. Pure meth.

MS. PELKER: So this was -- the buyer had purchased meth.

THE COURT: Okay. Does this address your concern?

MR. EKELAND: It does.

THE COURT: All right. Then we can proceed.

Thank you.

(End of bench conference.)

BY THE COURT: All right. You may proceed.

BY MS. PELKER:

Q. And if we can publish just this screen to the jury.

Can you read the message from Crystal Buddha on 30 of September?

A. "Not sure what is going on with SR, can't make withdrawals and Bitcoin Fog is down for maintenance. I made a note of it and will do it later today when Bitcoin Fog is back on."

Q. And can you read the next message from Crystal Buddha two sections down?

A.    "Just sent it to you through the mizer.  It will arrive in 6 hours."

Q.    If we could pull back up 601A.

And Special Agent Santell, did you also review the Silk Road 2 records for the Bitcoin Fog user Shine Cartel?

A.    I did.

Q.    And directing your attention to what is not yet in evidence, 617C and E.  And are these fair and accurate reflections of the records pertaining to Shine Cartel as obtained by the FBI on Silk Road 2?

A.    Yes.

MS. PELKER:  Government moves to admit C and E.  E are the messages and subject to the Court's prior ruling here, we are just going to show one particular message.

THE COURT:  All right.

MR. EKELAND:  Cumulative 401, 403, 803.

THE COURT:  So I will admit 617C and E.  But, again, with the proviso, if there is any particular statement in here that you believe is hearsay, Mr. Ekeland, you need to point me to it.

(Whereupon, Exhibit Nos. 617C, E were admitted.)

BY MS. PELKER:

Q.    If we could pull up 617C and directing your attention to the order in row 3.  Can you read the title of the item -- we'll have to scroll over to column R here?

A.   It is .5 grams of 96.4 percent pure Columbian fish scale cocaine from the Shine Cartel.

Q.   Can you scroll all of the way down to the bottom?

And how many items are listed here?  How many sales are listed here?

A.   1,539.

Q.   And for the row 1,539, can you read the title of that listing?

A.   Yes.  .5 grams of pure Columbian fish scale cocaine from Shine Cartel.

MS. PELKER:  If we could now pull down the jury's screen for a moment and go to 616E.  If we could go to the June 16th message from between Shine Cartel and Scott2687.

And with the Court's permission, we would publish just this transaction or this message to the jury.

THE COURT:  All right.  Any objection to that?

MR. EKELAND:  Can you pick up the phone real quick?

THE COURT:  Okay.

(Conference held at the bench.)

MR. EKELAND:  I just -- maybe there is a quick answer -- is this related -- where is the connection to Bitcoin Fog or the furtherance of the conspiracy in this one?  I see Silk Road mentioned.  Is it just coming later?

MS. PELKER:  If you read Shine Cartel's message, it is talking about if you do use your account to buy coin --

MR. EKELAND: I see it, yeah. Just the standard objection, Your Honor. But it is -- I don't think this is in furtherance of the conspiracy.

THE COURT: Ms. Pelker.

MS. PELKER: So this is the vendor who is talking about how to ensure that he and his customers are cleaning their funds by laundering them through Bitcoin Fog.

THE COURT: Anything further on this, Mr. Ekeland?

MR. EKELAND: No. I just don't think it is in furtherance of the operating of Bitcoin Fog.

THE COURT: It may not be in furtherance of the cooperation of Bitcoin Fog. I think it is in furtherance of the alleged money laundering conspiracy. The other question I had about some of these things, I am not sure we need to get into this is whether some of these things, even though they are illegal businesses, are business records. I don't think we need it for this one.

MS. PELKER: So the defense -- I guess there is a question of whether that is an authenticity or hearsay question. But defense did stipulate to the authenticity of the Silk Road 1 and 2 records that are coming in.

THE COURT: It may be that for other purposes, I don't think -- I do think this is in furtherance of the conspiracy, but it may be with respect to other records, they are, in fact, business records.

MR. EKELAND: These are compiled by the FBI; is that right? So I think what we stiped to was the authenticity of the FBI compilation but they are not actually business records as I know it from Silk Road. But we can save that for another time. I am not trying to get into a big evidentiary fight here.

THE COURT: All right. Thanks.

(End of bench conference.)

MS. PELKER: If we can zoom in. If we could publish this to the jury?

THE COURT: You may.

BY MS. PELKER:

Q. And Special Agent Santell, can you just read the last sentence of Scott 2687's message there?

A. If you -- otherwise if you do use your account to buy Bitcoin --

Q. I'm sorry. Just the end of Scott 2687's message at the top. So starting with, so can you recommend?

A. "If so, can you recommend a good Bitcoin site?"

Q. Can you read Shine Cartel's response?

A. "An O will be 1750 GPD with free delivery. It is best to go through Silk Road and if you Google buy Bitcoins for cash there are a couple of sites which offer peer-to-peer cash exchange services. Otherwise, if you do use your account to buy Bitcoin, it is always advised to run the coin through

Bitcoin Fog before sending it to SR."

Q.    Returning to 601A.  Did you review the Silk Road 2 for the records vendor -- last one on the list, Trevor Philips Enterprises?

A.    I did.

Q.    What is not yet in evidence, if we could direct your attention to 617D and E.  And are 617D and E, where E is the messages, fair and accurate reflections -- 618, thank you.

THE COURTROOM DEPUTY:  I'm sorry.  618?

MS. PELKER:  618D.

THE WITNESS:  Yes.

BY MS. PELKER:

Q.    Are these fair and accurate reflections of the records from Silk Road 2 as obtained by the FBI?

A.    That's correct.

MS. PELKER:  If we could go to 618D and then publish to the jury -- or government moves to admit 618D and 618E, subject to the Court's prior ruling.

THE COURT:  Any objection?

MR. EKELAND:  Cumulative 401, 403, 803.

THE COURT:  So same decision as to this.  I will admit those exhibits, but with the understanding that if there is any particular hearsay in those exhibits, the defense will bring that to my attention and I will reserve ruling on that.

(Whereupon, Exhibit Nos. 618D, 618E were admitted.)

BY MS. PELKER:

Q. And if we could direct your attention on 618D. How many orders has Trevor Philips Enterprises completed?

A. 1,332.

Q. Where was he shipping from?

A. The United States.

Q. What are the top items sold?

A. Very high quality cocaine and just various grams of that.

Q. If we can go to page 16. And if we could read toward the bottom of this page in the description under mission. Can you read that paragraph there?

A. "Trevor Philips Enterprises is a group dedicated to supplying our customers with the best quality product in the world as well as keeping said customers safe and informed. We pride ourselves in the products we supply and we test them for cuts and purity regularly. Our shipping standards will allow it so no" cocaine unit will --

Q. Could you re-read that? So no --

A. Our shipping --

Say again?

Q. Could you re-read that, allow it so no?

A. "Our shipping standards will allow it so no canine unit will ever be able to sniff and hit your parcel. We get the best of the best and we want you to have it. Our customer service is impeccable. And we have been in this business for

quite a while, so rest easy when ordering with us."

Q.   And scrolling down a bit, if we could direct your attention to the section under cocaine.  Could you read the first two sections there for IV use and smoking use?

A.   "For IV use, please do not order this and IV it immediately if you have been used to street quality products.  You need to ease into this cocaine for IV use.  If you take too much in the first shot there might not be a second chance at it.  Our product is safe but a high quantity in a syringe might kill you if you are not used to it.

"Smoking use, you can cook this into free space crack, if you would like or product gives you a 1 to 1 ratio of crack back if you try to make it as pure as possible.  This process makes many a crack smoker unbelievably happy."

Q.   If we could go to 602A, which is in evidence.

Special Agent Santell, do you remember testifying about the categories on the Silk Road home page?

A.   Say that again?

Q.   Do you recall testifying earlier today about the categories on the Silk Road?

A.   Yes.

Q.   And are there categories here other than drugs?

A.   There are.

Q.   Are you generally aware of what sorts of things were sold in those categories?

A.    That's correct.

Q.    What was that?

A.    So we have apparel. And inside of the apparel section, it was like fake Armani suits and fake Rolex watches. For books, typically the books we saw were instructions about how to do various criminal activities such as, you know, how to make meth, you know, how to -- what to do with MDMA. It wasn't like how to raid [sic] a child.

Q.    I want to be clear, you said how to raise a child; right?

A.    Yes.

Q.    You said it was not like how to raise a child?

A.    That's correct. I guess, you know, go on but it -- for the most part, everything on here was used in some fashion to -- for drug purposes.

Q.    If we could pull up Exhibit 608J, which was in evidence. And for the entry in line 3, can you read the title in column J?

A.    MDMA synthesis instruction book.

Q.    And going one column over. Can you read the first paragraph of this description?

A.    "This listing is for an ebook manual that teaches you step-by-step instructions how to synthesize MDMA or ecstasy. It tells you each and every item you will need, examples of where to get it, what items those chemicals are in them, pictures of lab equipment and explained in simple terms how to

do it. Many people have bought it and have been able to follow it and have said it is very helpful and easy to fallow. Many people pair" --

Q. You can stop there.

Going down now to row 19. Can you read the title in column J?

A. "Guide to postal smuggling ebook."

Q. And can you -- staying over in column K, can you read the beginning of the description?

A. "This is an ebook titled, guide to Postal smuggling. It is a book written by multiple people and pulled together from multiple sources. It outlines how the Postal Service, both international and domestically operate. It tells how they inspect mail, how they handle it, how they pick and choose what to inspect. What they look for, how to package your own items safely and how to use a PO Box for contraband covertly and how to detect if there is an order from the Postal inspector to put your PO Box under watch without you knowing."

Q. And can you -- if we scroll down to the paragraph marked good news. Can you read the beginning of this next section with the sequel to this ebook is in the works?

A. "The sequel to this ebook is in the works. It will focus more on tactics for SR shipping, how to tell if a postal worker is flagging your international item at the time you ship. It will outline how USPS has just implemented new measures to

better track email and shippers as well as never before disclosed info on how their servers work to log info."

Q. Are these examples of the books that are sold on Silk Road and darknet markets?

A. They are.

Q. And you can take down this exhibit.

In your work for this case, did you review records for the darknet site Welcome to Video?

A. I did.

Q. What was Welcome to Video?

A. Welcome to Video was a child porn site where people were able to upload and download images and videos of child pornography.

Q. Did Welcome to Video allow anything else other than child sexual abuse material?

A. They did not.

Q. Was the site on the clearnet or on Tor?

A. Clearnet and Tor, I believe.

The site was on clearnet as well as Tor.

Q. Are you sure about that?

MR. EKELAND: Objection. He answered the question, Your Honor.

THE COURT: Yeah. I think it is okay to ask the question again, if you would like.

BY MS. PELKER:

Q.    Special Agent Santell, can you take a moment to recall the Welcome to Video site.  And do you recall -- understanding that you didn't work on the case, do you recall whether it was on clearnet or on Tor?

MR. EKELAND:  Objection, Your Honor.

THE COURT:  Let me just ask the witness, do you have personal knowledge of about whether the Welcome to Video site was on the clearnet or darknet, do you know?

THE WITNESS:  It was on -- I believe it was on clearnet.  Full personal knowledge, I am lagging a little bit.

BY MS. PELKER:

Q.    You didn't work on the Welcome to Video case, to be clear?

A.    That is correct.

Q.    But did you then review records that were obtained from Welcome to Video?

A.    I did.

Q.    And did you review records from Welcome to Video that were obtained when the site was seized by law enforcement?

A.    I did.

Q.    Showing you Exhibit 623, which is previously admitted.  And is this a list of the Welcome to Video users whose account records you reviewed?

A.    That's correct.

MS. PELKER:  And if we could, at this time, Your Honor, have the Court read in the Welcome to Video stipulation?

THE COURT: So here is another stipulation between the parties. And as I told you before, a stipulation are agreed upon facts by the parties. And so you should treat this as uncontested evidence in the case. And the stipulation is as follows: For Exhibits 624, 625, 626, 627, 628A, 628B, 629, 630A, 630B, 631, 632 and 633, the redacted video titles and descriptions in columns F, G and H, establish that the listed user committed a violation of a federal offense, namely obscene visual representation of the sexual abuse of children in violation of 18 United States Code section 1466(a).

For Exhibits 624, 625, 626, 627, 628A, 629, 630A, 631, 632, and 633, the listed user committed those violations using funds associated with the Bitcoin address listed in column A.

None of the listed users or accounts contained in Exhibits 624 through 633 were or belong to the defendant Roman Sterlingov at any time.

All right. Can I ask before we move on to another topic to pick up the phone with one more thing?

(Conference held at the bench.)

THE COURT: Can you hear me okay?

MS. PELKER: Yes, Your Honor.

THE COURT: I am just continuing to think about the hearsay issue and as it relates to the records that have come in this morning. And my understanding is that the alleged

conspiracy was between Mr. Sterlingov and anyone else who was involved in administering or running Bitcoin Fog and the vendors -- darknet vendors or vendors; correct?

MS. PELKER:  Anyone who was using Bitcoin to launder narcotics trafficking proceeds and activities.  So the darknet market administrators, the vendors.  We would say the buyers are also in furtherance of that.

THE COURT:  That is what the question was, whether the buyers were or not.  Because it is not clear to me whether the buyers were.  If the buyers were not, then I wonder whether the statements by the buyers, even where the buyers are saying, you know, I want to use Bitcoin Fog or whatever, were in furtherance of the conspiracy or whether they were alleged co-conspirators for those purposes.  This has, obviously, gotten a little bit confused, because we are dealing with these large data files.  And I can't count the number of times that Mr. Ekeland has categorically objected to all evidence, including evidence that is undoubtedly not even close to hearsay, on hearsay grounds.  It is just for preserving a hearsay objection to everything that is coming in.  And we are dealing with very large Excel spreadsheets.  I don't know everything that is in each and every line.  It would take more time than we have for me to go through those as they are coming in to evidence.

I guess I want to say that if there is anything that

has either been already presented to the jury that falls into that category that I need to consider further, that the defense can point me to that I should strike, the defense should tell me that now or before this witness leaves the stand. And, as the parties go through these exhibits before they go back to the jury, if there are portions where there are references to Bitcoin Fog or other hearsay that don't involve the vendor talking about efforts to use or encouraging others, for example, to use Bitcoin Fog in a way as operational security, then the defense just needs to bring that to my attention before those exhibits go to the jury. And as I said, if there is anything I need to strike today that falls into that category that we have missed thus far, defense should tell me what that is.

And if the government wants me to point to something that explains that the conspiracy is broader than that, it is essentially even drug purchasers, then you need to point me to that. I don't think it was in the bill of particulars, but maybe I missed it.

MS. PELKER: Your Honor, I think that it is essential for this conspiracy to operate that you have money coming in from exchanges and going into Bitcoin Fog. And then from darknet markets to then swap that money. The buyers here are an essential part of that role and conspiracy.

THE COURT: I guess they may be an essential part of

the conspiracy. But the question is whether they are alleged to be co-conspirators who are identified as co-conspirators or not. As I am sitting here on the bench, I can't answer that question with certainty now. If we have to take a break to look at that before this witness leaves the stand, we should make sure we resolve it. I just want to make sure because there have been these categorical hearsay objections to virtually every document that has been coming in in this case, I want to make sure there is not something buried in there where there was never a specific hearsay objection to the particular line item where we didn't get a chance to talk about whether this statement was by somebody who was a co-conspirator. I agree that anyone who was a vendor of illegal goods falls within that category if they were making statements about and encouraging others to use Bitcoin Fog to clean their money, that is fine. But I just want to make sure that we haven't missed anything because of how this has all come in.

MS. PELKER: Understood, Your Honor. There are, as the Court saw, simply, because of the -- in order to authenticate the messages, we had to show them within the record of the messages within that record from Silk Road. But we are happy to just excerpt the particular messages to send back to the jury. We are not trying to shoehorn in additional evidence here. It is just that the relevant information and

messages fall within that document.

THE COURT:  I will let you and defense counsel confer about that.  And if you think that redacting everything except for the message that you were pointing to is the right way to do it, if you agree on, that is okay.  Or if the defense goes through and thinks there are particular statements that are hearsay that shouldn't come in, you are welcome to do that as well.  And if you need to bring any disputes on that to my attention, you can do so.

MS. PELKER:  Understood, Your Honor.

MR. EKELAND:  Your Honor, just in terms of time, moving to strike stuff and in relation to the volume and this witness, I just don't -- I am wondering without -- looking at the clock -- if that is practical.  I do think if we talk and work with the government --

THE COURT:  It is 12:30 now.  So it may be -- I have got a 1:00 in a case that is going to have even more participants than this one.  We are going to have a full courtroom at 1:00.  So it may be -- and you are not -- I don't think you are probably going to get through your cross today, so it may be that the government can't rest until Monday anyway and you can have the weekend to go through things.

The only reason I am flagging this now is if there is something you are particularly concerned about and don't want it to be percolating with the jury over the weekend even, you

should tell me about that.  But if you all want the weekend to go through these things, that is fine with me.

MR. EKELAND:  I would prefer to take the weekend. There is nothing that is like -- yeah, over the weekend.

THE COURT:  Okay.  That is fine.

(End of bench conference.)

THE COURT:  All right.  You can continue.

BY MS. PELKER:

Q.   And if we can pull down what is currently being published to the jury and pull up the redacted copies of Exhibits 624 through 633.  As those are being pulled up, Special Agent Santell, did you review prior to your testimony and pre-redaction the contents of Exhibit 624 through 633?

A.   That's correct.

Q.   Do they fairly and accurately reflect the records for the users that were provided by the Welcome to Video case team?

A.   That is correct.

MS. PELKER:  And if we can pull up and publish to the jury the redacted copy.  Give me just a minute to keep pulling these up.  And the government moves to admit the redacted copies of 624 through 633 and subparts.  So 624, 625, 626, 627, 628A and 628B, 629, 630A, 630B, 631, 632 and 633?

THE COURT:  All right.  Any objection?

MR. EKELAND:  No, assuming they all match our stipulation, which I think they do.  I just haven't personally

looked through them, but I am assuming they are --

THE COURT:  Exhibits 624 through 633 are admitted and may be published to the jury.

(Whereupon, Exhibit Nos. 624 through 633 were admitted.)

How much more time -- I am wondering whether this is a good breaking point or what you want to do about timing.

MS. PELKER:  I will finish after we go through these spreadsheets --

THE COURT:  How long?

MS. PELKER:  Maybe 10 minutes, if that, but --

THE COURT:  I hate to do it.  You know, I think we probably should break for the day and then we'll come back on Monday and finish up.  I do want to talk about scheduling with counsel.  If we could pick up the phone for a moment.

(Conference held at the bench.)

THE COURT:  And the question is what we do about Monday with the one juror who needs to be in Baltimore -- I think the deputy clerk can tell us what time, but it was 3:30 or something like that.  I think it would mean going to lunch or stopping at lunch time if we can keep her.  As I indicated, this -- it is juror number 6 that we are talking about here who is not a regular juror.

MS. PELKER:  Where are we on -- I know I looked at the Court's calendar last night.  It looked like next Friday is

very full. If we don't end on Thursday, will we be able to sit on Friday? And if not, what is juror availability looking like for Monday, Tuesday of that follow week? I am especially concerned about deliberation time.

THE COURT: Deliberations I can be doing other things during --

MS. PELKER: I meant juror availability for deliberations.

THE COURT: So it was not as bad as I thought for deliberations. There was one person who had a medical appointment on the 13th, someone who had a business trip on the 15th. And I think those were the two, at least up until this point. Although I think people sometimes magically come up with things they didn't bring to our attention earlier. I am not saying they make them up, but they forget to tell us so there could be more.

MR. EKELAND: I am guessing three days on the defense case. So we are not calling a lot of witnesses or we are expecting it to go fast. It depends on when -- I think the government rests on Monday. But I think we could -- on Monday we could finish up this witness and get, you know, maybe even finish up Professor Verret on Monday, assuming we figure out the slide issue and all of that.

THE COURT: It depends. So what is your view, Mr. Ekeland, about whether I should just let this juror go now.

We have four alternates. And she is an alternate, so it is not -- we would be delaying ourselves for something that probably isn't going to matter at the end of the day.

MR. EKELAND: Can I consult with my client?

THE COURT: Absolutely.

(End of bench conference.)

THE COURT: We are talking about scheduling before we let you go for the weekend. I want to make sure to let you know.

(Conversation held at the bench.)

MR. EKELAND: We'd like to keep juror number 6.

THE COURT: Okay. I think if either side wants to do that, we should do so. Okay.

So I will tell the jurors that we are going to sit part day on Monday. And I will ask her to do whatever she can to make it as late in the day as possible. Okay.

MR. EKELAND: Thank you, Your Honor.

THE COURT: And Ms. Pelker.

MS. PELKER: No, Your Honor. Understood.

THE COURT: Okay.

(End of bench conference.)

THE COURT: All right. Members of the jury, we are going to break for the week now. On Monday, let's start at 9:00 a.m. We do have one timing issue on Monday. And I think we are -- can't sit a full day on Monday. I want to talk to

one of the jurors and have the deputy clerk to ask one of the jurors to figure out exactly how late in the day we can sit. We will go at least until lunch. We will go as late as we can, but we'll have to just see. But I think we will probably be letting you go a little bit early on Monday. And then continue Tuesday, Wednesday and Thursday, we'll be sitting full days.

So have a nice weekend. Don't discuss the case with anybody at all. Your fellow jurors, anybody at home. If anybody asks you about it, stick to the script. It is just a criminal case. You can't say anything else about it. And don't conduct any type of research in any way relating to the case. And I hope it is a nice weekend and you enjoy yourselves. I do very much appreciate how attentive you have all been. So thank you for that. And I will see you all on Monday.

(Jury out at 12:40 p.m.)

THE COURT: All right. And the witness I will see you back here on Monday as well. I will ask that you not discuss your testimony with anybody until it is complete.

THE WITNESS: Yes, sir.

THE COURT: Anything we want to raise? I mean, I know we do have to talk as well about the issues regarding the scope of the Verret testimony. And I am not quite sure the best time to do that. It may be that what we should do is let the government finish up and, you know, obviously, with your

cross on Monday.  Then take a break after the government rests, talk about that and then start with the defense case.  Does that make sense?

MS. PELKER:  Your Honor, my only concern is that it is literally 10 more minutes of testimony for this witness.  I just don't want us to lose too much time Monday.  Does the Court have any time this afternoon?

THE COURT:  Let me see.  It is pretty bleak, but let's take a look.

MS. PELKER:  We could come in early before the -- I understand that imposes on the court staff and court reporter.

THE COURT:  Right.  I certainly need the deputy clerk for that.

You know, I tell you what, why don't you all come back today to discuss those issues at 3:30.  I do have a -- I have two motions hearings and will move through them as quickly as I can.  But if you can be available by 3:30, I will free up as soon as I can and we can take those issues up then.

MS. PELKER:  Thank you, Your Honor.

MR. EKELAND:  One other thing, Your Honor.

THE COURT:  Yes.

MR. EKELAND:  Mr. Sterlingov and Mr. Fischbach wanted to view the devices.  And so we are just asking that the Court instruct marshals to allow Mr. Sterlingov to review the devices.  Well, he has to be here at 3:30.

THE COURT: I'm sorry?

MR. EKELAND: He has to be here at 3:30. So we just -- the logistical issue is him and Mr. Fischbach want to review the devices from the government. And Mr. Fischbach wants Mr. Sterlingov present. So we don't want to have any issues with the marshals about that.

THE COURT: Why don't I leave this up to the marshals. If there is any questions the marshals have, I will be in chambers or here on the bench. You come in and raise any questions with me.

MR. EKELAND: Thank you, Your Honor.

THE COURT: Thank you.

All right. Thank you all.

(Recess taken at 12:43 p.m.)

C E R T I F I C A T E

I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.

Dated this 2nd day of March, 2024.

_____
Sherry Lindsay, RPR
Official Court Reporter

BY MR. EKELAND: [1]   56/25
BY MR. PEARLMAN: [23]   10/11
13/10 13/24 14/21 15/3 16/3 16/23
18/9 18/17 19/5 20/8 21/6 22/4
22/10 23/5 23/25 25/8 26/2 26/21
27/8 27/24 28/11 29/6
BY MS. PELKER: [49]   30/17 32/4
33/18 35/2 37/23 38/4 38/13 41/5
43/5 43/21 44/15 45/4 49/24 53/4
55/9 55/18 57/9 58/3 60/5 60/14
63/6 64/17 71/21 72/5 72/12 73/3
75/10 77/10 79/11 79/15 79/21
81/21 82/1 86/19 88/7 89/1 95/10
95/13 96/20 97/18 98/17 103/17
104/22 107/12 108/12 109/1 113/25
114/11 120/8
BY THE COURT: [2]   25/25 103/16
MR. EKELAND: [105]   4/10 5/8 5/15
9/5 13/6 13/20 14/24 15/24 16/19
19/1 20/4 21/2 22/6 23/1 23/21
25/4 25/24 26/17 27/4 27/20 28/7
29/2 29/19 30/5 31/15 31/22 32/2
33/6 34/23 38/8 40/24 43/15 44/20
49/19 53/1 55/12 57/22 60/8 62/24
63/3 64/12 65/21 65/23 66/6 67/1
67/17 69/10 69/25 72/10 72/22
75/4 77/4 79/17 80/17 81/5 81/12
83/6 83/9 83/19 85/10 85/16 86/6
88/3 88/21 89/22 90/1 90/18 90/20
91/14 92/8 93/18 93/24 94/10 96/7
98/10 100/17 100/20 100/22 101/13
102/11 102/17 102/21 102/23 103/1
103/12 104/16 105/17 105/20 106/1
106/9 107/1 108/20 113/21 114/5
119/11 120/3 120/24 122/17 123/4
123/11 123/17 125/20 125/22 126/2
126/11
MR. PEARLMAN: [22]   10/8 13/3
13/17 15/21 16/16 18/1 18/8 18/13
18/16 18/24 20/2 20/24 22/23
23/19 25/1 25/22 26/15 27/2 27/18
28/5 28/25 29/17
MS. PELKER: [97]   4/6 4/18 5/7
5/13 5/17 5/20 9/1 29/23 30/6
31/18 33/7 34/21 37/20 40/21
43/17 44/18 45/1 57/6 57/19 62/25
63/4 64/9 66/9 66/16 66/20 67/12
67/20 68/21 69/9 70/1 70/5 70/9
70/16 71/20 72/11 75/1 77/1 79/10
80/14 80/21 80/25 83/15 84/7
85/17 86/13 88/18 89/18 90/7 91/9
91/20 92/1 92/13 92/24 93/12
93/21 94/4 95/8 96/5 96/10 98/7
99/25 100/10 100/15 100/19 100/23
100/25 101/18 101/24 102/2 102/5
102/10 102/15 103/3 103/9 104/12
105/11 105/24 106/5 106/18 107/9
108/10 108/16 114/24 115/22 116/4
117/20 118/19 119/10 120/18 121/8
121/11 121/24 122/7 123/19 125/4
125/10 125/19
THE COURT: [205]
THE COURTROOM DEPUTY: [18]   4/2
9/11 10/7 17/24 18/4 18/15 30/9
30/15 69/3 69/5 70/20 70/22 72/3
79/9 89/17 97/15 99/23 108/9
THE WITNESS: [12]   10/6 29/21
30/14 33/11 49/21 53/3 65/22 72/4
97/16 108/11 114/9 124/20

$

$115 [3]   38/23 39/21 39/22
$396.20 [1]   99/19
$692,000 [1]   82/11

.

.12628 [1]   22/18
.157 [1]   97/2
.1597 [1]   24/11
.1628 [1]   23/14

.25 [1]   61/17
.25 grams [1]   61/17
.5 [3]   96/25 105/1 105/9
.5 grams [3]   96/25 105/1 105/9

1

1 percent [1]   14/12
1,332 [1]   109/4
1,436 [1]   89/4
1,472 [1]   95/22
1,539 [2]   105/6 105/7
1,572 [1]   74/7
1,725 [2]   97/8 97/9
1,851 [1]   65/18
1.165 [1]   99/16
1/8s [1]   39/3
10 [7]   3/3 42/9 68/24 68/24 73/23
121/11 125/5
10 grams [2]   73/12 97/5
100 grams [1]   58/11
10005 [1]   2/4
104 [1]   3/24
107 [1]   9/23
108 [1]   3/24
10:51 [1]   69/4
10:52 [1]   69/12
11 [1]   88/8
11/11/2013 [1]   82/10
115 [1]   39/7
11:00 [2]   68/24 68/25
11:15 [1]   70/21
11th [1]   82/22
12 [2]   6/9 76/11
121 [1]   3/25
12:30 [2]   70/10 119/16
12:40 [1]   124/16
12:43 [1]   126/14
13 [2]   3/7 3/7
1301 [1]   1/20
136 [1]   8/4
137 [1]   8/4
13th [1]   122/11
14 [1]   3/8
14 grams [3]   89/8 89/12 98/21
1466 [1]   115/10
148D8 [1]   15/20
148D8A [1]   16/8
15 [1]   3/8
15DB1 [1]   29/7
15DB1Q [2]   25/12 26/9
15th [1]   122/12
16 [5]   3/9 7/16 50/22 73/18 109/9
160 milligrams [2]   45/16 62/16
16th [1]   105/13
17 [2]   58/23 61/23
172 [1]   78/6
1725 [1]   97/17
1750 [1]   107/21
17th [1]   50/24
18 [2]   3/9 115/10
18EUE [1]   16/4
18EUE1 [1]   15/6
18th [1]   89/15
19 [1]   112/5
1:00 [2]   119/17 119/19
1DB1Q [1]   26/7
1Nuf3K [2]   21/10 22/16
1Nuf3K1k [1]   20/14
1st [1]   10/1

2

2 grams [1]   97/20
2,011 [1]   59/18
2,063 [1]   52/5
2,400 [1]   61/6
2,500 pounds [1]   58/16
2,531 [1]   82/11
2,906 [1]   35/25
2/16 [1]   50/22
20 [1]   3/10
20-minute [1]   68/25
200 grams [1]   58/10

20001 [1]   2/9
20005 [1]   1/21
2009 [1]   48/4
2011 [3]   10/1 41/20 43/8
2012 [3]   47/10 47/11 50/22
2013 [8]   38/5 40/19 41/22 41/24
42/12 48/18 82/10 89/15
2014 [3]   79/25 82/22 99/22
2015 [1]   11/22
2016 [7]   12/10 12/20 19/9 19/12
19/15 19/17 29/14
202 [1]   3/16
2021 [2]   10/2 11/23
2022 [1]   31/2
2023 [1]   41/24
2024 [2]   1/5 127/10
20530 [2]   1/14 1/17
208 [1]   18/15
208A [7]   3/7 12/16 12/18 13/4
13/7 13/9 13/11
208B [6]   3/7 12/25 13/4 13/7 13/9
13/11
208C [5]   3/7 13/14 13/18 13/21
13/23
208D [5]   3/8 14/15 14/22 14/25
15/2
208E [6]   3/8 15/13 15/14 15/22
15/25 16/2
208F [5]   3/9 16/11 16/17 16/20
16/22
208G [6]   3/9 18/13 18/16 18/24
19/2 19/4
209 [1]   29/1
209A [5]   3/10 19/22 20/2 20/5
20/7
209B [5]   3/10 20/16 20/25 21/3
21/5
209C [6]   3/11 21/16 21/23 22/4
22/7 22/9
209D [5]   3/11 22/19 22/24 23/2
23/4
209E [6]   3/12 24/21 24/22 25/2
25/5 25/7
209F [7]   3/12 23/15 23/15 23/17
23/19 23/22 23/24
209G [4]   3/13 25/17 25/22 25/25
209H [5]   3/13 26/12 26/15 26/18
26/20
209I [5]   3/14 26/24 27/2 27/5
27/7
209J [5]   3/14 27/15 27/18 27/21
27/23
209L [5]   3/15 28/2 28/5 28/8
28/10
209M [5]   3/15 28/17 28/25 29/3
29/5
21 [2]   3/10 78/13
21-399 [2]   1/4 4/2
22 [2]   3/11 77/24
227 [1]   65/14
23 [3]   3/11 3/12 77/24
230 [1]   53/9
233 [1]   62/5
234 [1]   62/8
24 [1]   77/24
24-hour [1]   8/21
247 [1]   6/24
248 [1]   7/12
25 [2]   3/12 3/13
250 [1]   8/9
251 [1]   7/15
25CNBOME [1]   56/5
26 [4]   3/13 19/17 19/18 23/10
2687's [2]   107/14 107/17
26th [1]   29/14
27 [2]   3/14 3/14
27th [1]   10/2
28 [1]   3/15
28 grams [1]   89/11
29 [1]   3/15
297 [1]   62/10
2CB [1]   45/18

**2**

**2CE [1]**  45/18
**2CI [1]**  45/18
**2nd [1]**  127/10

**3**

**3 percent [1]**  14/12
**3,564 [1]**  56/16
**3,802 [1]**  35/23
**3.43 [1]**  51/11
**3.5 grams [4]**  73/25 82/17 89/8 89/11
**3.752 [1]**  48/14
**3.98 [1]**  63/15
**3/28/2014 [1]**  79/25
**30 [4]**  2/3 3/5 76/11 103/19
**30 milligrams [1]**  76/9
**300 [1]**  62/19
**30th [1]**  99/22
**32 [1]**  64/25
**333 [1]**  2/8
**34 [1]**  3/16
**38 [1]**  3/16
**399 [2]**  1/4 4/2
**3:30 [5]**  121/19 125/15 125/17 125/25 126/2

**4**

**4 grams [1]**  58/9
**4,850 [1]**  63/18
**401 [12]**  38/8 40/24 44/20 55/12 71/5 71/6 72/22 75/4 80/17 98/10 104/16 108/20
**403 [16]**  7/2 34/23 38/8 40/24 44/21 55/12 57/22 60/8 64/12 68/4 72/22 75/4 80/17 98/10 104/16 108/20
**41 [1]**  3/17
**420 [2]**  76/17 89/16
**445 [1]**  99/10
**45 [2]**  3/17 95/14
**48 [1]**  17/19
**4AOCDMT [1]**  45/19

**5**

**5 grams [1]**  59/2
**5.1527 [1]**  1/17
**50 [1]**  78/13
**500 grams [1]**  58/15
**53 [1]**  48/15
**55 [2]**  3/18 49/4
**56 grams [1]**  61/4
**578 [1]**  54/7
**59 [2]**  3/18 59/1

**6**

**6.42 [1]**  78/17
**6/12/2013 [1]**  41/22
**6/30/2013 [1]**  42/12
**60 [1]**  3/19
**601 [3]**  1/16 43/14 66/9
**601A [11]**  43/17 43/22 71/22 74/13 76/18 78/21 80/7 87/11 97/21 104/3 108/2
**602 [2]**  38/10 38/12
**602A [6]**  3/16 34/13 34/21 34/24 35/1 110/15
**602B [3]**  37/12 37/13 37/20
**603C [6]**  3/17 40/14 40/22 41/1 41/3 41/13
**603H [1]**  42/4
**603S [1]**  42/16
**604 [2]**  57/12 57/13
**604A [6]**  3/18 56/24 57/20 57/24 58/1 58/4
**604B [1]**  58/12
**604G [1]**  58/17
**604K [1]**  59/13
**605 [1]**  59/23
**605A [6]**  3/19 59/22 60/6 60/9 60/12 60/15

**605B [1]**  61/2
**605C [1]**  61/9
**605D [1]**  61/12
**605I [1]**  61/14
**605N [1]**  62/20
**606 [2]**  64/2 64/9
**606F [5]**  3/19 63/25 64/13 64/15 64/18
**606I [1]**  65/11
**606J [1]**  65/15
**607 [1]**  74/20
**607A [6]**  3/20 74/19 75/2 75/6 75/8 75/11
**607B [1]**  75/21
**607H [1]**  75/25
**607K [1]**  76/14
**608 [1]**  44/11
**608A [6]**  3/17 44/8 44/10 44/16 45/3 45/5
**608B [1]**  46/16
**608E [1]**  46/5
**608H [1]**  52/9
**608J [2]**  47/1 111/15
**608K [1]**  50/3
**608L [1]**  53/8
**608N [2]**  44/24 50/9
**608O [1]**  51/21
**608Q [1]**  54/3
**609 [1]**  55/3
**609A [5]**  3/18 54/25 55/9 55/14 55/16
**609B [1]**  55/21
**609C [1]**  55/24
**609G [1]**  56/1
**609K [1]**  56/6
**610 [1]**  72/13
**610A [7]**  3/20 72/9 72/20 72/24 73/1 73/4 74/13
**610C [1]**  73/11
**610H [1]**  73/15
**610L [1]**  74/5
**611 [1]**  76/22
**611A [4]**  3/21 77/1 77/7 77/8
**611G [1]**  77/11
**611L [2]**  78/4 78/10
**612D [5]**  3/21 79/8 79/15 79/18 79/20
**613C [6]**  3/23 96/2 96/2 96/5 96/13 96/14
**614D [6]**  3/22 80/11 80/14 81/23 81/25 82/7
**614E [1]**  82/20
**615C [6]**  3/23 98/3 98/7 98/11 98/15 99/1
**615D [1]**  98/18
**615E [2]**  98/8 99/21
**616C [7]**  3/22 88/12 88/14 88/18 88/23 88/25 95/11
**616CD [1]**  98/1
**616D [1]**  89/2
**616E [2]**  89/15 105/12
**617C [5]**  3/24 104/8 104/17 104/21 104/23
**617D [2]**  108/7 108/7
**618 [2]**  108/8 108/9
**618D [6]**  3/24 108/10 108/16 108/17 108/25 109/2
**618E [3]**  3/24 108/17 108/25
**623 [1]**  114/20
**624 [10]**  3/25 115/5 115/11 115/16 120/10 120/13 120/21 120/21 121/2 121/4
**625 [3]**  115/5 115/11 120/21
**626 [3]**  115/5 115/11 120/21
**627 [3]**  115/5 115/11 120/21
**628A [3]**  115/5 115/11 120/22
**628B [2]**  115/5 120/22
**629 [3]**  115/5 115/11 120/22
**630 [1]**  54/10
**630A [3]**  115/6 115/11 120/22
**630B [2]**  115/6 120/22
**631 [3]**  115/6 115/12 120/22

**632 [3]**  115/6 115/12 120/22
**633 [10]**  3/25 115/6 115/12 115/16 120/11 120/13 120/21 120/22 121/2 121/4
**64 [1]**  3/19
**6710 [1]**  2/8

**7**

**7 grams [6]**  35/7 48/21 48/24 54/1 98/20 99/13
**7-gram [1]**  53/18
**7/13/2011 [1]**  41/20
**7/15/2011 [1]**  43/8
**7/21/2013 [1]**  48/18
**70 percent [1]**  73/9
**702 [1]**  31/23
**72 [1]**  3/20
**73 [1]**  62/2
**75 [1]**  3/20
**77 [1]**  3/21
**79 [1]**  3/21

**8**

**8,047 [1]**  51/17
**8/13/2012 [2]**  47/10 47/11
**803 [10]**  38/8 40/24 44/21 55/12 60/8 72/22 75/4 98/10 104/16 108/20
**809.93 [1]**  95/19
**81 [1]**  3/22
**847 [1]**  51/15
**88 [1]**  3/22
**8s [1]**  39/3
**8th [1]**  2/4

**9**

**9 ounces [1]**  48/25
**9/15/2023 [1]**  41/24
**90 percent [1]**  97/20
**950 [1]**  1/14
**96 [2]**  3/23 17/12
**96.4 [1]**  105/1
**98 [1]**  3/23
**9:00 a.m [1]**  123/24
**9:23 [1]**  9/13
**9:38 [1]**  1/6

**A**

**a.m [6]**  1/6 9/13 69/4 69/12 70/21 123/24
**ability [2]**  33/13 36/9
**able [13]**  14/18 16/25 68/8 68/15 90/10 92/2 94/7 94/19 94/23 109/23 112/1 113/12 122/1
**about [64]**  6/15 6/21 8/16 11/7 15/4 20/9 29/7 31/19 33/8 36/6 37/22 41/21 44/21 45/21 48/25 57/1 66/19 69/17 70/10 70/14 70/24 71/17 81/6 83/12 83/21 84/6 86/1 86/3 90/24 92/6 93/4 93/13 93/19 93/25 94/8 101/15 101/22 105/25 106/6 106/14 110/16 110/19 111/5 113/20 114/7 115/23 117/8 118/11 118/15 119/3 119/24 120/1 121/7 121/14 121/17 121/22 122/4 122/25 123/7 124/9 124/10 124/22 125/2 126/6
**above [4]**  27/12 36/6 46/1 127/5
**above-entitled [1]**  127/5
**absolutely [3]**  49/3 54/20 123/5
**abuse [2]**  113/15 115/9
**accelerated [1]**  31/13
**access [5]**  14/18 18/10 32/20 32/21 39/18
**accessed [1]**  35/11
**account [30]**  13/13 15/10 21/21 21/24 22/15 22/21 23/11 24/8 24/10 26/11 29/8 29/10 36/8 36/11 36/11 36/12 36/21 37/1 40/11 40/18 41/14 41/19 42/2 42/5 80/4 92/14 105/25 107/15 107/24 114/21

**A**

accounts [2]   66/13 115/15
accurate [18]   34/17 37/17 40/17 55/5 57/15 60/1 64/5 72/16 74/22 76/23 79/12 80/11 88/14 96/2 98/3 104/8 108/8 108/13
accurately [3]   44/11 87/23 120/15
ACO [1]   49/6
acquire [1]   34/7
acquired [2]   37/24 60/2
across [5]   17/12 36/7 63/7 76/6 87/9
Act [1]   9/22
action [4]   1/3 41/23 41/24 93/5
activities [3]   101/7 111/6 116/5
activity [9]   32/23 40/18 44/12 57/16 57/16 64/6 76/24 83/25 96/3
actual [1]   50/6
actually [13]   4/22 39/8 78/1 83/12 83/19 84/5 86/4 88/4 89/14 94/25 101/10 101/14 107/3
add [4]   39/18 39/23 39/25 87/15
added [1]   4/21
Adderall [1]   75/24
additional [9]   4/21 31/11 52/3 54/4 56/20 63/19 74/11 95/3 118/24
address [39]   8/6 8/25 14/7 15/5 15/9 15/11 15/18 15/19 15/20 16/5 16/5 16/10 20/10 20/17 20/19 20/23 21/10 21/12 22/14 23/11 25/12 25/13 25/14 25/15 25/16 25/20 26/3 26/5 26/10 28/23 29/14 54/12 54/13 54/14 87/5 87/25 100/4 103/11 115/13
addressed [11]   6/23 6/23 7/7 7/16 8/7 8/9 8/13 8/15 8/20 8/22 8/25
addresses [3]   14/8 16/14 17/5
administering [1]   116/2
administrator [3]   90/22 91/15 92/4
administrators [1]   116/6
admit [30]   18/23 18/24 20/2 25/22 34/21 37/20 40/21 44/15 55/9 57/19 60/5 64/9 71/10 71/12 72/20 75/1 77/1 79/15 80/14 88/18 88/23 90/1 96/5 98/7 98/11 104/12 104/17 108/17 108/22 120/20
admitted [77]   13/7 13/9 13/21 13/23 14/16 14/25 15/2 15/13 15/25 16/2 16/11 16/20 16/22 18/14 19/2 19/4 19/22 20/5 20/7 21/3 21/5 22/7 22/9 23/2 23/4 23/22 23/24 25/5 25/7 25/25 26/18 26/20 27/5 27/7 27/21 27/23 28/8 28/10 29/3 29/5 34/24 35/1 38/10 38/12 41/1 41/4 44/24 45/3 55/14 55/17 57/24 58/2 60/10 60/13 64/13 64/16 66/19 70/15 72/24 73/2 75/6 75/9 77/1 77/9 79/18 79/20 81/23 81/25 88/25 96/13 96/14 98/16 104/21 108/25 114/20 121/2 121/5
advance [1]   59/23
advertising [1]   33/13
advised [1]   107/25
after [12]   13/7 13/15 14/3 14/18 33/15 68/25 75/19 78/23 90/24 92/24 121/8 125/1
afternoon [1]   125/7
afterwards [2]   17/18 90/23
again [12]   16/4 17/20 21/7 27/25 46/10 51/16 52/23 57/1 104/17 109/20 110/18 113/24
against [1]   85/2
agency [1]   9/21
Agent [21]   5/23 29/23 30/18 30/24 34/14 35/3 38/14 40/17 41/6 43/23 45/5 55/2 55/19 82/2 86/20 96/21 104/4 107/13 110/16 114/1 120/11
agree [3]   69/16 118/13 119/5

agreeable [1]   5/5
agreed [2]   8/11 115/3
agreement [4]   9/16 70/12 83/23 92/3
Akemashite [2]   5/1 9/24
Alden [1]   4/6
Alexandra [3]   3/3 10/5 10/16
all [78]   4/13 9/9 9/14 10/3 14/12 18/21 29/18 29/20 33/14 39/23 40/7 40/23 40/25 44/19 45/21 45/24 46/1 46/12 46/15 48/8 49/12 51/12 56/13 56/14 57/4 57/21 60/7 62/17 63/16 64/11 66/10 66/20 66/22 66/25 67/19 69/3 70/18 71/6 72/21 74/2 80/19 83/9 83/14 85/5 86/2 86/15 86/18 87/1 92/18 95/20 96/16 97/16 99/8 101/21 102/12 103/5 103/13 103/16 104/15 105/3 105/16 107/7 115/18 116/17 118/17 120/1 120/7 120/23 120/24 122/23 123/22 124/8 124/14 124/14 124/17 125/14 126/13 126/13
alleged [5]   86/1 106/13 115/25 116/13 118/1
allegedly [2]   85/8 94/15
allow [6]   52/24 109/16 109/21 109/22 113/14 125/24
allowed [2]   68/2 68/15
allowing [2]   93/15 94/16
allows [2]   69/20 69/22
almost [2]   51/2 94/12
along [6]   6/17 35/13 58/9 69/23 82/17 82/18
already [11]   7/7 7/13 7/16 14/19 40/15 66/19 66/19 87/17 87/20 92/9 117/1
also [34]   4/20 7/22 11/19 12/2 18/10 25/11 35/18 36/10 42/13 43/9 46/2 47/14 49/16 50/6 52/24 53/17 53/18 54/22 56/17 58/10 63/19 63/22 67/2 74/8 75/15 78/1 78/7 83/15 84/20 84/25 87/21 95/23 104/4 116/7
alternate [1]   123/1
alternates [1]   123/1
alternative [1]   67/12
although [2]   12/23 122/13
always [2]   49/13 107/25
am [48]   5/9 6/19 8/2 10/21 10/24 15/4 17/24 19/7 21/18 22/2 24/6 33/15 37/4 37/9 45/22 63/4 67/24 69/16 71/16 83/21 84/6 85/5 86/8 90/7 90/24 91/3 91/18 92/18 94/2 94/25 95/4 95/6 97/13 98/11 101/16 106/14 107/5 114/10 115/23 118/3 119/13 119/23 121/1 121/6 122/3 122/14 122/17 124/23
Amazon [4]   36/2 37/5 39/19 46/10
AMERICA [4]   1/3 4/3 39/14 64/24
among [1]   9/16
amongst [1]   69/1
amount [5]   23/13 23/14 24/9 29/15 51/10
amounts [1]   14/8
amphetamine [4]   58/10 58/15 59/2 97/5
analyst [1]   11/5
anise [1]   48/3
anon [1]   83/4
anonymize [1]   14/2
anonymous [4]   14/11 83/17 93/15 101/10
another [20]   16/5 18/18 22/20 23/16 24/18 24/24 24/25 25/10 25/18 26/3 26/13 26/25 28/3 28/20 35/7 39/25 82/24 107/4 115/1 115/18
answer [3]   102/17 105/21 118/3
answered [1]   113/21
any [72]   5/21 7/25 9/23 13/5 13/19 14/23 15/23 16/18 18/25 20/3 21/1 22/5 22/25 23/20 25/3

25/23 26/16 27/3 27/19 28/6 29/1 29/18 32/19 33/3 34/22 38/7 40/23 42/24 43/1 43/1 44/19 45/20 47/11 50/22 55/11 57/21 60/7 64/11 69/23 71/7 72/21 75/3 75/16 77/3 79/16 80/1 80/16 80/19 81/7 81/15 81/17 83/14 84/13 86/3 90/21 95/2 96/6 96/15 98/12 104/18 105/16 108/19 108/23 115/17 119/8 120/23 124/11 124/11 125/7 126/5 126/8 126/9
anybody [7]   69/7 83/12 84/2 124/8 124/8 124/9 124/19
anybody's [1]   94/13
anyone [4]   81/8 116/1 116/4 118/13
anything [15]   8/22 8/24 9/8 31/19 69/8 83/10 84/3 94/2 106/8 113/14 116/25 117/12 118/17 124/10 124/21
anyway [1]   119/21
anywhere [1]   17/13
apologies [3]   26/9 45/2 95/12
apologize [2]   52/21 74/13
apparel [3]   35/16 111/3 111/3
apparently [1]   69/14
appear [3]   46/19 47/8 87/7
APPEARANCES [3]   1/12 1/23 2/1
applies [1]   93/11
apply [1]   91/5
appointment [1]   122/11
appreciate [1]   124/13
approach [1]   17/22
appropriate [1]   68/8
Approximately [1]   11/1
April [1]   10/2
April 27th [1]   10/2
archive [9]   42/13 42/16 51/22 52/1 56/17 63/20 65/15 74/8 78/7
archived [4]   49/16 49/22 49/25 51/19
are [241]
area [2]   17/8 35/18
arguably [1]   68/11
argue [2]   94/5 101/18
argument [4]   85/4 90/11 94/14 94/20
arguments [1]   90/17
Armani [1]   111/4
around [3]   17/5 39/4 73/10
arrive [4]   90/3 93/20 101/19 104/1
art [1]   35/16
as [148]
ask [11]   30/2 30/8 37/9 67/7 75/17 113/23 114/6 115/18 123/15 124/1 124/18
asked [4]   12/7 15/17 62/25 69/14
asking [3]   63/3 83/12 125/23
asks [1]   124/9
aspect [1]   94/9
asserted [3]   88/1 91/6 91/7
assertions [1]   98/13
assigned [5]   11/18 11/25 22/15 25/13 32/5
assist [1]   11/16
assistance [1]   39/20
assistant [1]   10/21
associate [1]   47/13
associated [2]   23/11 115/13
assuming [5]   69/15 101/16 120/24 121/1 122/22
attach [1]   18/6
attached [1]   7/22
attempt [4]   19/9 19/12 43/3 82/21
attention [56]   14/15 15/4 40/13 41/13 42/4 42/16 43/6 43/22 45/5 46/5 46/16 50/3 50/11 52/9 52/12 53/8 54/3 58/4 58/12 58/17 58/23 60/15 63/4 64/18 65/11 67/22 69/21 71/7 71/23 73/4 73/11 73/15 73/18 76/21 77/11 78/10 80/10

**A**

attention... **[19]**   81/22 82/7 88/8 88/11 89/2 95/14 96/1 96/16 98/14 98/18 104/7 104/23 108/7 108/24 109/2 110/3 117/10 119/9 122/14
attentive **[1]**   124/13
attorney **[3]**   8/7 10/20 10/21
Aussie **[1]**   82/24
authenticate **[1]**   118/21
authenticity **[3]**   106/19 106/20 107/2
authority **[1]**   6/19
availability **[2]**   122/2 122/7
available **[4]**   39/5 47/23 77/21 125/17
Ave **[2]**   1/14 1/20
Avenue **[1]**   2/8
aware **[1]**   110/24
AX **[1]**   41/23

**B**

B, **[1]**   55/14
B, G **[1]**   55/14
BA **[1]**   41/20
Baby **[1]**   78/13
bachelor's **[1]**   31/10
back **[29]**   8/1 9/14 14/7 18/2 18/6 31/7 37/2 45/21 56/13 64/25 67/24 67/25 68/24 69/2 74/13 76/18 77/17 78/21 87/6 94/24 97/21 103/23 104/3 110/13 117/5 118/24 121/13 124/18 125/15
background **[3]**   31/9 31/19 31/20
bad **[1]**   122/9
bags **[1]**   45/21
balance **[3]**   22/17 24/10 26/11
Baltimore **[1]**   121/18
bank **[2]**   9/22 94/21
Bankruptcy **[1]**   2/7
banks **[1]**   94/12
bar **[2]**   36/1 36/2
based **[1]**   41/7
basically **[1]**   4/20
batch **[2]**   39/2 40/15
batteries **[1]**   102/24
BB **[1]**   41/22
be **[118]**   4/15 4/24 5/21 6/1 6/23 7/9 9/6 10/7 11/13 11/16 11/20 12/2 13/7 13/21 14/25 15/8 15/9 15/11 15/25 16/20 16/25 17/11 17/17 17/18 18/6 19/2 19/9 20/5 21/3 22/7 23/2 23/22 24/20 25/5 25/25 26/18 27/5 27/21 28/8 29/3 30/7 30/15 33/1 34/24 36/14 37/8 38/10 40/4 41/1 41/6 44/24 45/21 48/8 50/23 53/17 53/18 55/15 57/24 58/11 60/10 64/14 68/8 68/15 69/5 72/25 75/6 77/7 79/18 82/10 82/16 82/17 82/19 84/15 84/20 86/3 87/21 88/3 90/23 90/25 92/2 92/21 93/3 93/7 93/8 94/7 94/19 94/23 95/4 98/20 102/16 103/1 106/11 106/22 106/24 107/21 109/23 110/8 111/9 114/12 117/25 118/2 119/16 119/19 119/21 119/25 121/3 121/18 122/1 122/5 122/16 123/2 124/4 124/6 124/24 125/17 125/25 126/2 126/9
Beach **[1]**   78/13
because **[22]**   67/8 80/22 83/23 86/8 90/4 91/22 92/20 92/21 94/11 94/15 94/18 94/23 95/1 101/6 101/14 102/9 102/13 116/9 116/15 118/6 118/17 118/20
become **[1]**   12/5
been **[24]**   6/23 8/22 10/25 11/18 11/25 12/15 14/15 15/13 18/14 33/16 34/8 39/8 39/10 44/21 54/21 84/7 92/22 109/25 110/6 112/1 117/1 118/7 118/8 124/14
before **[22]**   1/9 17/16 29/7 31/3

31/4 36/15 63/10 69/8 70/11 70/23 83/4 86/4 108/1 113/1 115/2 115/18 117/4 117/5 117/11 118/5 123/7 125/10
begin **[1]**   44/20
beginning **[12]**   13/25 15/20 25/12 26/7 48/6 49/5 49/7 76/8 76/10 77/20 112/9 112/20
begins **[2]**   15/5 40/6
behalf **[1]**   10/1
behind **[1]**   54/17
being **[17]**   33/8 33/12 33/17 62/2 62/6 80/19 83/4 87/18 91/6 91/7 93/5 95/16 96/24 99/20 101/21 120/9 120/11
believe **[12]**   4/18 5/20 7/3 11/22 40/14 57/1 57/2 70/17 103/6 104/19 113/18 114/9
belong **[1]**   115/16
below **[7]**   17/14 39/22 58/10 59/9 65/3 65/5 65/9
bench **[24]**   31/17 32/3 66/2 68/17 80/24 81/19 83/8 86/17 87/14 88/6 89/25 95/9 100/7 103/15 105/19 107/8 115/20 118/3 120/6 121/16 123/6 123/10 123/21 126/9
best **[8]**   52/19 60/25 75/15 107/21 109/13 109/24 109/24 124/24
better **[3]**   30/23 83/3 113/1
between **[9]**   14/12 51/25 67/13 78/12 91/10 92/3 105/13 115/1 116/1
beyond **[1]**   84/13
big **[2]**   19/7 107/5
bill **[4]**   66/24 84/12 100/11 117/18
bit **[16]**   12/19 30/21 32/9 37/9 47/17 48/5 52/2 56/10 82/3 83/22 95/6 100/3 110/2 114/10 116/15 124/5
Bitcoin **[137]**
BitcoinFog **[1]**   23/12
Bitcoins **[8]**   14/2 14/6 14/7 14/10 14/11 17/6 87/7 107/22
black **[1]**   48/2
bleak **[1]**   125/8
block **[1]**   49/1
blockchain **[2]**   20/21 28/22
blockchain.info **[7]**   21/8 25/11 25/13 26/6 28/18 28/23 86/25
blocked **[1]**   52/21
blotter **[1]**   50/15
blue **[3]**   19/7 28/15 76/11
Bobcat **[3]**   24/4 24/5 24/6
Bong **[4]**   100/15 101/1 101/2 101/8
book **[2]**   111/18 112/11
books **[4]**   35/16 111/4 111/5 113/3
both **[5]**   4/25 70/11 75/18 101/9 112/12
bottom **[16]**   18/20 19/6 51/12 52/3 59/16 63/16 65/12 65/16 74/6 76/15 78/5 95/20 97/6 99/8 105/3 109/10
bought **[3]**   33/1 36/17 112/1
box **[4]**   26/7 45/14 112/16 112/18
boxes **[1]**   5/24
boy **[1]**   20/16
breadth **[2]**   68/9 68/14
break **[11]**   35/24 68/18 68/21 68/23 68/25 69/6 69/8 118/4 121/13 123/23 125/1
breaking **[2]**   68/20 121/7
bring **[5]**   56/10 108/24 117/10 119/8 122/14
broader **[2]**   68/13 117/16
BRODIE **[1]**   1/15
broke **[1]**   49/1
broken **[1]**   35/18
Brooklyn **[1]**   2/4
Brother's **[1]**   83/16
Brothers **[4]**   80/8 80/12 82/10 84/11

Brothers' **[2]**   85/20 86/20
BROWN **[2]**   1/15 4/8
browser **[1]**   32/21
BTC **[1]**   53/19
Buddha **[17]**   97/23 98/2 98/4 98/22 99/5 99/22 100/8 100/10 100/16 100/25 101/2 101/4 101/25 102/13 103/5 103/19 103/24
Buddha's **[2]**   98/19 101/7
Budworx **[8]**   56/22 57/10 58/6 58/13 58/19 58/21 59/13 95/24
Budworx' **[3]**   57/15 57/16 96/3
built **[1]**   31/6
bunch **[2]**   83/9 86/9
Bureau **[2]**   11/3 11/23
Bureau's **[1]**   25/15
buried **[1]**   118/9
business **[9]**   9/24 32/9 48/9 48/10 106/16 106/25 107/3 109/25 122/11
businesses **[1]**   106/16
button **[6]**   17/2 17/20 19/7 28/14 39/23 40/6
buy **[8]**   39/16 91/21 92/13 95/1 105/25 107/15 107/22 107/25
buyer **[16]**   40/1 50/16 51/3 52/15 63/9 75/18 78/13 80/3 91/10 92/3 93/1 93/12 100/15 101/1 102/6 103/9
buyer's **[1]**   96/22
buyers **[12]**   52/25 55/25 78/1 90/16 91/20 116/6 116/9 116/10 116/10 116/11 116/11 117/23
buying **[7]**   32/23 52/7 52/23 53/17 53/18 78/1 92/15
buys **[1]**   92/2

**C**

C-O-M-O-L-L-I **[1]**   10/17
Cabanas **[1]**   7/23
calendar **[1]**   121/25
call **[2]**   10/3 29/22
called **[4]**   12/5 21/16 78/24 84/4
calling **[1]**   122/18
calls **[1]**   29/23
can **[236]**
can hear **[1]**   30/22
can't **[12]**   8/13 32/20 66/7 91/21 100/17 102/8 103/21 116/16 118/3 119/21 123/25 124/10
canceled **[1]**   17/18
canine **[1]**   109/22
cannabis **[2]**   35/20 35/25
capacity **[2]**   11/17 11/23
caps **[1]**   46/1
capsules **[1]**   49/6
CAPTCHA **[3]**   27/11 27/16 27/25
captured **[1]**   44/12
cart **[8]**   37/3 37/4 37/7 39/18 39/19 39/23 39/24 40/1
Cartel **[5]**   104/5 104/9 105/2 105/10 105/13
Cartel's **[2]**   105/24 107/20
case **[24]**   4/2 7/5 33/24 42/23 50/17 50/22 51/1 69/1 69/2 71/9 78/14 94/7 113/7 114/3 114/12 115/4 118/8 119/17 120/16 122/18 124/7 124/10 124/12 125/2
cases **[7]**   11/6 11/7 11/24 11/25 32/7 32/8 32/8
cash **[2]**   107/22 107/23
cat **[1]**   27/11
categorical **[1]**   118/7
categorically **[1]**   116/17
categories **[8]**   35/15 35/22 42/20 75/23 110/17 110/20 110/22 110/25
category **[9]**   35/14 38/23 47/9 48/17 50/15 63/9 117/2 117/13 118/14
CATHERINE **[1]**   1/13
causing **[1]**   30/7
Ccips **[1]**   1/19
CDF **[2]**   6/14 6/17

**C**

cells [1]  30/1
center [2]  35/4 36/1
certain [2]  8/5 9/17
certainly [2]  7/3 125/12
certainty [1]  118/4
certification [1]  31/14
certified [2]  11/20 11/22
certify [1]  127/3
Chainalysis [1]  31/14
chambers [1]  126/9
chance [5]  12/12 12/21 13/12
  110/8 118/11
Changa [1]  73/10
change [2]  7/18 7/18
character [1]  43/1
characters [1]  20/12
charged [1]  84/8
charging [1]  99/6
chart [2]  67/24 67/25
check [8]  9/9 37/7 39/19 40/2
  40/3 40/6 94/22 94/23
cheese [1]  58/9
Chemical [7]  80/8 80/12 82/9
  83/16 84/11 85/20 86/20
chemicals [1]  111/24
child [6]  111/8 111/9 111/11
  113/11 113/12 113/14
children [1]  115/9
choose [1]  112/14
CHRISTOPHER [2]  1/15 4/7
circle [3]  17/5 30/3 30/6
clarify [2]  37/21 71/1
clarifying [1]  69/24
clarity [1]  6/3
class [1]  47/20
classic [1]  48/3
clean [11]  9/7 39/3 52/17 90/10
  90/13 90/15 92/4 92/9 93/15 94/6
  118/16
cleaned [1]  92/22
cleaning [3]  91/13 92/1 106/6
clear [15]  19/9 41/6 42/23 66/7
  84/7 91/8 91/21 92/22 97/11 97/13
  101/13 101/17 111/9 114/12 116/9
cleared [1]  87/9
clearing [1]  17/25
clearnet [6]  113/17 113/18 113/19
  114/4 114/8 114/10
clerk [4]  69/13 121/19 124/1
  125/12
click [9]  30/3 30/7 37/7 39/21
  87/4 87/5 87/8 97/11 97/13
client [1]  123/4
clock [1]  119/14
clonazepam [2]  65/7 65/8
close [1]  116/18
co [11]  81/3 81/5 81/10 84/15
  84/19 84/19 90/2 116/14 118/2
  118/2 118/13
co-conspirator [7]  81/3 81/10
  84/15 84/19 84/19 90/2 118/13
co-conspirators [4]  81/5 116/14
  118/2 118/2
Coast [6]  76/19 76/24 77/13 77/15
  78/2 78/12
cocaine [24]  45/12 45/18 48/17
  48/22 48/24 48/25 58/22 58/25
  73/24 75/24 89/8 89/11 90/10
  92/25 93/2 95/17 96/25 99/13
  105/2 105/9 109/8 109/17 110/3
  110/7
Code [1]  115/10
coin [2]  105/25 107/25
Coinapult [6]  21/17 22/1 22/14
  22/20 23/9 23/10
coins [2]  54/10 86/23
coke [3]  53/18 54/2 73/9
Colasapan [1]  65/6
collect [1]  82/5
collected [3]  40/19 57/17 98/5

collectibles [1]  35/17
collecting [1]  34/8
COLUMBIA [2]  1/1 19/21
Columbian [2]  105/1 105/9
column [54]  38/24 41/17 41/20
  41/23 42/7 42/10 42/19 43/6 44/2
  47/12 47/14 47/18 47/21 48/12
  48/20 48/23 50/14 50/20 50/24
  50/25 51/6 51/9 52/15 52/16 52/17
  53/13 54/9 56/10 58/23 62/3 62/12
  63/13 64/22 65/1 73/22 76/10
  77/14 95/15 95/18 96/23 97/1 97/3
  97/19 99/2 99/5 99/11 99/14 99/17
  104/25 111/16 111/19 112/6 112/8
  115/14
columns [6]  41/18 47/6 47/7 50/18
  78/16 115/7
combo [2]  73/20 73/23
come [18]  8/1 23/18 33/15 68/24
  70/3 71/10 80/22 81/16 87/21
  92/10 115/24 118/18 119/7 121/13
  122/13 125/10 125/14 126/9
Comelli [1]  3/3
comes [4]  59/4 71/15 71/15 87/25
comfortable [1]  52/22
coming [15]  29/13 43/2 87/23 88/1
  90/12 90/14 90/22 92/14 94/5
  105/23 106/21 116/20 116/23
  117/21 118/8
comment [1]  93/4
commenting [1]  8/17
committed [2]  115/8 115/12
communicate [1]  52/24
communicating [2]  93/12 93/13
communication [1]  84/13
communications [1]  53/5
COMOLLI [2]  10/5 10/16
companies' [1]  31/7
compilation [1]  107/3
compiled [1]  107/1
complete [5]  11/18 19/8 69/7
  76/15 124/19
completed [2]  31/13 109/3
completely [1]  48/9
completing [2]  27/15 27/25
complied [1]  6/10
Complying [1]  17/7
compound [2]  67/9 67/11
compromise [1]  33/16
compromises [1]  32/10
computer [1]  31/10
computers [1]  33/13
conceal [1]  102/7
concern [4]  31/22 31/23 103/11
  125/4
concerned [3]  86/9 119/24 122/4
concerning [2]  24/24 25/18
concerns [2]  6/16 6/22
concluded [2]  71/11 71/12
concludes [1]  71/9
conduct [4]  12/7 24/18 91/11
  124/11
conducted [2]  9/22 40/7
confer [3]  70/12 86/3 119/2
conference [21]  31/17 32/3 66/2
  68/17 80/24 81/19 83/8 86/17
  87/14 88/6 89/25 95/9 100/7
  103/15 105/19 107/8 115/20 120/6
  121/16 123/6 123/21
confidence [1]  60/25
confirm [3]  54/12 70/17 87/8
confirming [1]  75/19
conflict [1]  8/7
confused [2]  84/6 116/15
confusing [1]  67/3
connection [2]  86/25 105/21
consider [2]  42/25 117/2
consideration [3]  9/18 71/15
  71/16
consisted [1]  32/8
consistent [1]  59/7
conspiracy [44]  81/11 83/22 84/1

84/4 84/8 84/10 84/16 84/21 84/25
85/9 85/13 85/14 86/2 86/2 90/4
91/1 91/4 91/8 91/9 91/19 91/25
92/1 92/6 92/20 93/5 93/8 93/9
93/10 93/15 93/19 93/25 94/9 95/1
95/7 105/22 106/3 106/13 106/24
116/1 116/13 117/16 117/21 117/24
118/1
conspirator [7]  81/3 81/10 84/15
  84/19 84/19 90/2 118/13
conspirators [4]  81/5 116/14
  118/2 118/2
constitutes [1]  127/4
Constitution [1]  2/8
consult [1]  123/4
contained [1]  115/15
containing [1]  48/11
contents [3]  3/1 22/14 120/13
context [1]  33/4
continue [6]  18/7 71/19 86/18
  101/8 120/7 124/5
CONTINUED [2]  1/23 2/1
continuing [2]  7/8 115/23
contraband [1]  112/16
contracts [1]  33/2
control [1]  9/24
conversation [7]  53/9 82/21 89/16
  91/10 92/6 100/14 123/10
conversion [1]  36/19
converted [1]  40/4
convey [1]  8/3
conveyed [1]  6/21
convinced [2]  95/4 95/6
cook [1]  110/11
cooperation [1]  106/12
copied [2]  25/19 26/6
copies [3]  4/21 120/10 120/21
copy [1]  120/19
copycat [1]  78/23
corner [1]  37/3
correct [42]  11/14 14/20 16/7
  16/9 19/18 20/20 21/9 21/11 22/17
  28/1 29/9 29/11 38/1 38/6 41/12
  52/2 52/11 56/12 56/21 59/15
  63/21 73/17 76/25 80/6 82/4 82/6
  84/18 85/19 88/5 88/17 96/4 98/6
  101/24 108/15 111/1 111/12 114/13
  114/23 116/3 120/14 120/17 127/4
cost [1]  59/6
could [89]  17/15 17/20 22/11 23/6
  30/2 30/18 30/21 31/15 37/2 37/12
  40/13 41/16 42/7 43/13 43/22
  44/10 45/11 46/1 46/2 48/15 51/12
  51/16 52/12 52/22 53/13 53/20
  54/7 54/11 54/13 54/13 55/21
  58/20 61/7 61/14 61/23 64/18
  65/15 71/22 72/8 74/13 74/18
  76/21 77/11 77/14 77/18 78/4
  78/10 78/21 79/7 82/12 82/20
  82/21 83/2 89/9 89/14 89/14 95/11
  95/15 95/20 96/1 97/19 97/25 99/1
  99/11 99/20 99/21 99/25 103/3
  104/3 104/23 105/11 105/12 107/9
  108/6 108/16 109/2 109/9 109/18
  109/21 110/2 110/3 110/15 111/15
  114/24 121/15 122/16 122/20
  122/21 125/10
couldn't [1]  31/23
counsel [11]  4/4 4/5 4/7 4/12
  30/1 43/15 57/1 65/23 67/7 119/2
  121/15
count [1]  116/16
country [1]  46/2
couple [3]  9/6 30/1 107/23
course [5]  11/19 11/20 17/18
  22/13 31/14
court [22]  1/1 2/6 2/7 4/11 4/23
  5/3 5/15 30/22 37/10 69/20 69/22
  71/9 71/11 72/23 114/25 118/20
  125/7 125/11 125/11 125/23 127/3
  127/13
Court's [7]  89/18 98/8 100/2

**C**

Court's... [4]  104/13 105/14 108/18 121/25
courtroom [2]  8/12 119/19
Courts [1]  2/7
covertly [1]  112/16
crack [7]  89/11 90/9 92/25 93/2 110/11 110/12 110/14
create [3]  36/8 86/25 87/5
created [12]  13/13 16/5 17/18 24/8 25/10 41/19 41/20 43/8 47/10 50/20 50/21 63/12
credentials [1]  7/22
Crimes [1]  9/19
criminal [6]  1/3 4/2 11/9 32/6 111/6 124/10
CRM [1]  1/19
cross [3]  29/18 119/20 125/1
crumbles [1]  49/3
crushed [2]  82/16 82/18
cryptocurrency [4]  32/12 32/14 33/23 36/23
crystal [30]  37/16 38/15 38/21 38/22 39/6 42/20 60/20 61/17 61/20 83/16 97/20 97/23 98/2 98/4 98/18 98/22 99/5 99/22 100/8 100/10 100/16 100/25 101/2 101/4 101/6 101/25 102/13 103/5 103/19 103/24
crystals [5]  52/18 60/20 61/25 63/8 73/12
CSAM [2]  5/1 5/22
CTF [2]  6/14 6/17
cumulative [16]  38/8 44/20 55/12 57/22 60/8 64/12 68/4 72/22 75/4 77/4 80/17 88/21 96/7 98/10 104/16 108/20
currency [1]  36/24
current [1]  94/1
currently [6]  14/12 36/12 45/19 71/25 85/17 120/9
custom [1]  39/3
customer [6]  44/5 54/22 56/22 57/2 66/3 109/24
customers [6]  48/7 57/3 66/4 106/6 109/13 109/14
customs [1]  46/4
cuts [1]  109/16
cutting [1]  102/21
cyber [5]  11/7 11/8 31/11 31/13 32/6
cybercrime [1]  33/4

**D**

dark [2]  47/24 97/14
darknet [18]  6/25 11/9 32/12 32/15 32/18 32/19 32/24 33/12 33/17 33/22 34/3 84/23 113/4 113/8 114/8 116/3 116/5 117/23
data [3]  33/16 33/17 116/16
database [2]  31/6 47/13
date [17]  41/18 41/20 41/21 41/22 41/23 41/24 42/10 43/7 47/10 48/18 50/20 50/23 51/6 63/11 63/11 79/25 82/10
Dated [1]  127/10
dates [2]  50/19 50/20
Daubert [2]  7/18 7/19
day [11]  19/13 19/18 45/20 48/19 121/13 123/3 123/15 123/16 123/25 124/2 127/10
days [2]  122/17 124/6
DC [5]  1/5 1/14 1/17 1/21 2/9
deal [2]  102/6 102/12
dealer [1]  94/22
dealing [4]  101/7 102/13 116/15 116/21
deals [1]  102/13
December [1]  89/15
December 18th [1]  89/15
decision [1]  108/21

decisions [1]  7/25
dedicated [1]  109/12
defendant [10]  1/7 2/2 4/11 7/10 41/10 42/8 43/9 84/8 84/9 115/16
defendant's [7]  40/10 40/18 41/7 41/14 42/1 42/5 42/17
defense [22]  5/5 6/12 7/15 7/24 8/1 30/1 69/10 90/17 94/5 98/12 101/18 106/18 106/20 108/23 117/2 117/3 117/10 117/13 119/2 119/5 122/17 125/2
defense's [1]  90/11
definitely [2]  14/10 70/5
delay [4]  17/13 93/22 93/24 101/20
delaying [1]  123/2
deliberation [1]  122/4
deliberations [3]  122/5 122/8 122/10
Delight [2]  82/22 82/23
delight's [1]  83/16
delivery [3]  75/16 75/20 107/21
demonstratives [1]  7/13
denied [4]  6/7 7/2 7/13 8/8
deny [4]  6/11 6/18 8/2 8/22
DEPARTMENT [2]  1/13 10/19
depends [2]  122/19 122/24
depiction [2]  34/17 37/17
deposit [16]  14/3 14/3 14/13 14/17 15/5 15/11 15/17 15/18 15/19 16/5 16/5 16/10 20/9 23/18 83/4 87/5
deposited [1]  24/14
depositing [1]  87/19
deposits [1]  14/13
Dept [1]  1/20
deputy [4]  69/13 121/19 124/1 125/12
describe [4]  45/6 60/15 61/2 75/21
described [2]  59/8 63/10
describing [1]  38/18
description [17]  38/16 38/25 47/21 49/5 49/7 56/9 59/3 60/22 61/24 62/14 73/22 75/13 76/8 77/20 109/10 111/20 112/9
descriptions [2]  42/19 115/7
details [2]  27/13 87/1
detect [1]  112/17
developer [2]  31/4 31/5
devices [3]  125/23 125/25 126/4
dialogue [1]  71/16
did [147]
didn't [9]  12/23 18/15 30/5 57/3 97/10 114/3 114/12 118/11 122/14
different [12]  11/16 36/23 37/5 45/12 50/19 50/20 56/8 61/21 62/1 66/9 66/13 82/3
difficult [1]  36/14
digits [1]  24/9
diligent [1]  9/22
dire [1]  8/18
direct [17]  3/3 3/5 10/10 15/4 30/16 40/13 43/22 52/12 64/18 67/7 76/21 77/11 96/1 96/19 108/6 109/2 110/2
directing [35]  41/13 42/4 42/16 43/6 45/5 46/5 46/16 50/3 50/11 52/9 53/8 54/3 58/4 58/12 58/17 58/23 60/15 63/1 63/4 65/11 67/22 71/22 73/11 73/15 78/10 80/10 81/22 82/7 88/8 88/11 89/2 95/14 98/18 104/7 104/23
Direction [1]  73/18
dirty [2]  86/25 92/12
disbelieve [1]  31/24
disclosed [1]  113/2
disclosure [1]  6/10
discovery [1]  6/8
discuss [5]  69/1 69/7 124/7 124/19 125/15
discussing [8]  45/15 81/2 81/2

84/14 91/11 93/17 101/2 101/11
discussion [5]  81/24 88/13 88/19 88/24 94/8
dismiss [2]  6/5 7/20
dispute [1]  70/14
disputes [1]  119/8
disregard [1]  4/24
dissolvatives [1]  35/20
distinction [1]  90/8
district [7]  1/1 1/1 1/10 2/7 10/22 19/20 19/21
division [2]  11/8 11/9
DMT [2]  49/6 73/10
do [112]  4/23 4/25 5/3 5/3 5/9 5/10 5/18 5/20 6/1 7/4 10/6 10/18 12/16 12/17 13/14 14/16 15/5 15/7 15/13 15/15 16/12 16/14 17/2 17/8 17/13 17/23 19/9 19/12 19/22 19/24 20/9 20/11 20/16 24/1 24/22 24/23 26/24 27/1 27/14 29/15 29/16 30/14 30/24 31/3 32/7 33/22 35/22 39/17 40/1 41/10 46/3 49/8 49/12 51/18 51/20 60/25 63/13 67/11 67/13 67/17 68/6 68/11 68/18 70/5 70/7 83/10 84/22 85/12 85/14 85/22 86/24 90/16 91/21 92/2 93/15 93/24 102/8 103/3 103/23 105/25 106/23 107/15 107/24 110/5 110/16 110/19 111/5 111/7 112/1 114/2 114/3 114/6 114/8 119/5 119/7 119/9 119/14 120/15 120/25 121/7 121/12 121/14 121/17 123/12 123/13 123/15 123/24 124/13 124/22 124/24 124/24 125/15
docket [7]  6/2 6/24 7/12 8/4 8/5 8/9 9/7
document [4]  86/4 96/9 118/8 119/1
documents [1]  33/19
does [13]  28/12 29/12 33/19 39/11 44/14 53/3 59/8 67/1 94/9 103/11 103/12 125/2 125/6
doesn't [1]  70/14
dog [2]  14/22 22/19
doing [10]  6/1 10/25 21/24 22/13 70/4 70/5 81/9 87/22 92/17 122/5
DOJ [2]  1/16 1/19
DOJ-CRM [1]  1/19
DOJ-USAO [1]  1/16
dollar [1]  36/15
dollars [4]  36/19 36/20 39/8 99/18
domestic [1]  99/13
domestically [2]  76/13 112/13
don't [43]  5/25 7/3 8/13 30/4 52/14 53/15 57/2 66/7 66/18 67/20 68/23 68/24 68/25 69/7 71/12 74/3 81/5 83/10 85/4 85/11 85/22 90/3 91/17 94/10 95/5 101/21 106/2 106/9 106/16 106/23 116/21 117/7 117/18 119/13 119/19 119/24 122/1 124/7 124/11 125/6 125/14 126/5 126/7
done [5]  6/1 7/18 21/24 47/11 49/10
door [1]  33/14
down [61]  15/5 20/9 26/3 30/21 34/4 35/18 35/24 39/4 42/19 48/5 48/15 49/4 51/12 52/3 54/7 54/15 55/7 56/14 58/20 59/16 61/18 61/25 62/5 62/10 63/16 65/12 65/16 74/1 74/5 75/23 76/14 77/23 77/23 78/4 78/23 79/1 82/21 83/5 83/15 89/14 94/21 94/22 95/14 95/20 97/6 99/8 99/20 99/21 100/3 101/6 101/23 102/9 103/22 103/25 105/3 105/11 110/2 112/5 112/19 113/6 120/9
download [1]  113/12
Dr. [3]  30/2 30/8 39/20
Dr. Ramjee [2]  30/2 30/8

**D**

Dr. Ramjee's [1]   39/20
draw [4]   16/25 17/5 96/16 98/13
drawn [1]   87/19
drive [1]   87/4
drops [3]   50/13 50/14 62/9
drought [1]   48/3
drug [21]   41/8 42/1 49/10 51/13
 84/2 90/23 91/10 91/10 91/12
 91/21 92/2 93/13 93/14 93/16
 101/3 101/7 101/12 102/6 102/12
 111/14 117/17
drug-dealing [1]   101/7
drugs [18]   33/1 35/16 35/18 35/19
 35/23 35/24 42/25 44/22 52/7 56/4
 58/22 74/2 92/13 92/16 94/16 95/1
 103/5 110/22
Durden [7]   54/23 55/20 55/23
 55/25 56/2 56/3 56/12
Durden's [1]   56/17
during [3]   5/3 8/17 122/6
duty [1]   30/11

**E**

each [9]   4/21 14/13 46/19 52/14
 66/10 67/13 68/1 111/23 116/22
earlier [5]   54/10 68/5 88/13
 110/19 122/14
early [4]   42/17 75/17 124/5
 125/10
ease [1]   110/7
easily [1]   49/3
easy [2]   110/1 112/2
ebook [5]   111/21 112/7 112/10
 112/21 112/22
ecosystem [1]   92/5
ecstasy [5]   35/20 62/11 62/15
 73/24 111/22
educational [1]   31/9
effective [1]   59/7
efforts [1]   117/8
either [9]   5/2 5/9 5/10 5/13 8/24
 69/18 71/3 117/1 123/12
EKELAND [18]   2/2 2/3 4/10 9/2
 67/23 68/4 69/15 70/25 81/4 85/19
 88/20 89/20 96/17 98/9 104/19
 106/8 116/17 122/25
element [1]   83/23
else [9]   8/24 9/8 36/15 56/11
 67/11 94/2 113/14 116/1 124/10
email [2]   32/9 113/1
encouraging [3]   84/22 117/8
 118/15
encrypted [1]   87/3
end [17]   5/22 31/7 32/3 53/17
 68/17 81/19 86/17 88/6 95/9
 103/15 107/8 107/17 120/6 122/1
 123/3 123/6 123/21
ended [1]   49/21
enforcement [2]   9/20 114/18
engaged [2]   83/25 87/18
engaging [1]   81/8
enjoy [2]   75/16 124/12
ensure [1]   106/6
ensuring [1]   101/9
entail [1]   11/15
Enterprises [3]   108/4 109/3
 109/12
entire [2]   49/13 92/5
entities [1]   87/17
entitled [1]   127/5
entries [2]   4/24 95/21
entry [2]   52/12 111/16
equipment [1]   111/25
erase [1]   17/20
escrow [3]   51/2 75/17 75/18
especially [2]   35/4 122/3
essential [4]   91/22 117/20 117/24
 117/25
essentially [12]   4/25 33/14 34/15
 35/5 36/17 36/23 40/2 50/25 53/24

 67/9 78/23 117/17
establish [3]   21/21 68/8 115/7
established [2]   45/22 59/5
establishes [1]   92/11
even [11]   6/19 7/7 33/2 85/11
 106/15 116/11 116/18 117/17
 119/17 119/25 122/21
eventually [1]   49/22
ever [2]   52/19 109/23
every [7]   30/11 32/13 61/1 94/12
 111/23 116/22 118/8
everybody [1]   83/24
everyone [2]   33/15 46/2
everyone's [1]   46/4
everything [10]   12/23 36/17 51/3
 51/4 67/11 73/20 111/13 116/20
 116/22 119/3
evidence [52]   6/25 6/25 7/5 7/9
 9/18 19/22 34/13 37/13 40/14
 40/15 42/25 43/2 43/13 44/10
 54/25 57/2 63/25 66/6 66/8 66/17
 67/25 69/20 69/23 70/13 71/2 71/3
 71/8 71/10 71/10 71/12 71/15 72/8
 74/18 76/22 79/7 79/10 80/10
 87/17 87/20 88/12 94/7 96/2 98/1
 104/8 108/6 110/15 111/15 115/4
 116/17 116/18 116/24 118/25
evidentiary [2]   69/17 107/5
exactly [2]   93/16 124/2
examination [4]   3/3 3/5 10/10
 30/16
example [2]   71/4 117/9
examples [3]   35/9 111/23 113/3
Excel [1]   116/21
except [2]   80/25 119/3
exception [4]   81/3 84/20 91/5
 93/11
excerpt [1]   118/23
exchange [4]   90/14 92/14 92/15
 107/24
exchanges [4]   36/23 90/13 94/6
 117/22
exclude [1]   6/24
excuse [2]   41/24 65/8
excused [1]   29/20
exhibit [122]   3/7 3/8 3/8 3/9 3/9
 3/10 3/10 3/11 3/11 3/12 3/12
 3/13 3/13 3/14 3/14 3/15 3/15
 3/16 3/16 3/21 3/23 4/22 4/23
 12/16 13/4 13/9 13/18 13/23 14/22
 15/2 15/22 16/2 16/11 16/17 16/22
 18/13 19/4 20/7 20/25 21/3 21/5
 21/13 21/15 21/23 22/7 22/9 22/24
 23/2 23/4 23/24 25/2 25/7 26/20
 27/7 27/23 28/10 29/5 34/13 34/21
 35/1 37/12 37/20 38/10 38/12 41/1
 41/3 43/14 44/8 44/16 45/3 46/5
 47/1 50/9 51/21 53/8 54/3 55/16
 56/6 56/20 57/12 58/1 58/17 59/13
 60/6 60/12 61/9 62/20 64/15 64/18
 65/11 66/9 71/22 72/20 73/1 74/5
 74/19 75/2 75/8 77/8 78/4 79/8
 79/20 80/14 81/25 82/20 85/11
 85/14 88/25 89/15 95/11 96/5
 96/13 96/14 96/18 98/15 104/21
 108/25 111/15 113/6 114/20 120/13
 121/4
Exhibit 208A [1]   13/4
Exhibit 208C [1]   13/18
Exhibit 208D [1]   14/22
Exhibit 208E [1]   15/22
Exhibit 208F [1]   16/17
Exhibit 208G [1]   18/13
Exhibit 209B [2]   20/25 21/3
Exhibit 209C [2]   21/23 22/7
Exhibit 209D [2]   22/24 23/2
Exhibit 209E [1]   25/2
Exhibit 601 [2]   43/14 66/9
Exhibit 601A [1]   71/22
Exhibit 602 [1]   38/10
Exhibit 602A [2]   34/13 34/21
Exhibit 602B [2]   37/12 37/20

Exhibit 603C [1]   41/1
Exhibit 604 [1]   57/12
Exhibit 604G [1]   58/17
Exhibit 604K [1]   59/13
Exhibit 605C [1]   61/9
Exhibit 605N [1]   62/20
Exhibit 606F [1]   64/18
Exhibit 606I [1]   65/11
Exhibit 607A [2]   74/19 75/2
Exhibit 608A [2]   44/8 44/16
Exhibit 608E [1]   46/5
Exhibit 608J [2]   47/1 111/15
Exhibit 608L [1]   53/8
Exhibit 608N [1]   50/9
Exhibit 608O [1]   51/21
Exhibit 608Q [1]   54/3
Exhibit 609K [1]   56/6
Exhibit 610A [1]   72/20
Exhibit 610L [1]   74/5
Exhibit 611L [1]   78/4
Exhibit 612D [1]   79/8
Exhibit 613C [1]   96/5
Exhibit 614D [1]   80/14
Exhibit 614E [1]   82/20
Exhibit 616C [1]   95/11
Exhibit 616E [1]   89/15
Exhibit 623 [1]   114/20
Exhibit 624 [1]   120/13
Exhibit for [1]   21/15
Exhibit not [1]   16/11
exhibits [48]   3/6 3/7 3/17 3/17
 3/18 3/18 3/19 3/19 3/20 3/20
 3/21 3/22 3/22 3/23 3/24 3/24
 3/25 4/22 55/14 56/24 57/20 57/23
 59/22 60/9 61/2 63/25 64/9 64/13
 70/13 72/9 72/24 75/5 76/22 77/1
 77/6 88/11 88/14 96/17 98/3
 108/22 108/23 115/5 115/11 115/16
 117/5 117/11 120/10 121/2
existed [5]   34/18 37/18 37/24
 55/6 57/17
expand [1]   48/23
expect [1]   70/6
expecting [1]   122/19
experience [1]   33/1
experienced [1]   49/9
explain [25]   5/24 22/11 23/6 25/9
 32/18 34/14 35/3 35/13 37/2 38/14
 46/6 46/8 47/1 47/6 47/7 50/19
 52/13 55/19 55/21 58/4 73/5 78/11
 79/22 82/7 96/21
explained [1]   111/25
explaining [5]   27/13 90/9 91/13
 93/2 101/4
explains [1]   117/16
explanation [2]   8/12 93/21
extent [5]   6/23 7/22 84/18 87/16
 94/4
external [1]   31/8

**F**

face [1]   91/1
faces [1]   74/4
fact [8]   66/6 67/7 70/24 87/17
 91/5 92/23 94/21 106/25
facts [3]   9/17 71/18 115/3
fair [18]   34/17 37/17 40/17 55/5
 57/15 60/1 64/5 72/16 74/22 76/23
 79/12 80/11 88/14 96/2 98/3 104/8
 108/8 108/13
fairly [2]   44/11 120/15
fake [2]   111/4 111/4
fall [2]   81/3 119/1
fallow [1]   112/2
falls [3]   117/1 117/12 118/14
familiar [4]   12/5 21/16 32/15
 41/11
famous [2]   89/11 89/12
far [7]   32/13 41/17 46/13 58/7
 84/18 86/24 117/13
fashion [1]   111/13
fast [2]   76/12 122/19

**F**

fastest [1]  75/16
FBI [30]  12/4 30/25 31/1 31/3
31/4 31/12 32/5 32/15 34/4 34/7
34/19 37/25 40/19 44/13 55/6
57/17 60/2 64/7 72/18 74/24 79/1
79/2 79/13 80/12 88/16 98/5
104/10 107/1 107/3 108/14
FBI's [3]  29/10 31/13 41/6
FE [1]  89/12
fear [1]  82/24
feature [2]  45/11 60/18
featured [2]  45/9 58/7
federal [3]  9/20 11/3 115/8
fee [3]  14/12 14/13 24/17
feedback [4]  46/3 52/6 52/10
52/17
feel [3]  48/10 52/22 60/24
fellow [1]  124/8
fentanyl [3]  65/2 77/25 78/14
festival [3]  73/20 73/20 74/3
few [4]  50/18 50/19 54/17 61/18
Fi [1]  86/24
fight [1]  107/5
figure [4]  27/11 91/18 122/22
124/2
filed [2]  9/22 9/25
files [1]  116/16
filler [1]  62/17
finalize [1]  75/17
finalized [5]  42/11 50/25 51/4
51/6 63/11
finalizes [1]  51/3
finalizing [1]  75/19
finally [1]  28/17
financial [3]  9/19 33/20 94/12
FinCEN [4]  5/1 5/22 9/20 9/23
find [1]  36/4
fine [15]  5/13 5/16 5/17 30/1
54/20 57/7 67/25 68/21 70/1 81/15
86/13 86/14 118/16 120/2 120/5
finest [1]  47/23
finish [6]  70/6 121/8 121/14
122/21 122/22 124/25
Fipp [1]  50/17
first [23]  5/21 20/12 24/9 35/11
43/7 43/8 47/7 47/20 48/6 50/21
60/22 61/15 62/13 76/6 77/17
82/14 83/9 92/12 99/2 101/15
110/4 110/8 111/19
Fischbach [3]  125/22 126/3 126/4
fish [4]  49/2 73/24 105/1 105/9
five [1]  20/12
flagging [2]  112/24 119/23
flake [3]  45/13 48/22 48/24
flakes [1]  45/18
flat [1]  48/9
Floor [1]  2/4
Florida [1]  10/22
focus [1]  112/22
fog [112]  12/5 12/12 12/19 13/2
13/16 14/14 14/17 15/10 15/11
16/13 18/11 19/25 20/18 21/13
21/25 22/14 23/17 24/19 26/11
41/7 43/13 43/24 44/5 53/19 53/25
54/11 54/22 57/2 57/3 57/10 59/19
63/22 65/19 65/24 66/13 66/21
66/22 66/23 67/4 67/4 67/10 67/16
81/2 81/8 81/9 83/1 83/11 83/12
83/18 83/20 83/24 83/25 84/2 84/5
84/9 84/9 84/10 84/13 84/14 84/24
85/7 85/7 85/12 85/21 87/5 87/7
87/9 87/19 87/20 87/23 87/24 88/4
88/9 90/3 90/8 90/10 90/12 90/14
90/16 91/13 91/15 91/22 91/22
92/4 92/7 92/11 92/12 92/15 93/4
94/6 97/22 101/5 101/14 101/17
101/19 101/22 102/7 102/9 103/22
103/23 104/5 105/22 106/7 106/10
106/12 108/1 116/2 116/12 117/7
117/9 117/22 118/15

**G**

Fog's [1]  101/20
follow [3]  40/5 112/1 122/3
following [2]  66/5 82/19
follows [2]  9/19 115/5
force [1]  32/6
foregoing [1]  127/4
forfeiture [1]  8/20
forget [1]  122/15
forgive [1]  22/11
form [3]  9/23 69/18 71/4
format [1]  82/2
forms [1]  9/25
forum [1]  85/3
forums [2]  32/9 33/12
forward [1]  27/14
found [1]  9/25
foundation [5]  33/7 67/6 67/18
90/21 92/8
four [3]  11/7 24/9 123/1
frame [1]  38/3
frankly [2]  6/19 94/3
free [5]  39/2 60/24 107/21 110/11
125/17
fresh [2]  39/2 76/12
Friday [2]  121/25 122/2
front [4]  31/7 35/4 73/4 85/18
frozen [1]  54/5
full [11]  10/15 12/24 22/17 26/11
30/19 53/15 114/10 119/18 122/1
123/25 124/6
fun [2]  46/4 78/13
funds [33]  43/24 67/15 67/16 85/3
85/8 87/19 87/20 87/23 90/3 90/10
90/15 90/22 90/25 91/13 91/21
92/2 92/4 92/9 92/10 92/11 92/21
93/3 93/3 93/6 93/15 93/20 93/22
93/23 94/5 94/18 95/2 106/7
115/13
further [6]  14/13 87/15 94/9 95/6
106/8 117/2
furtherance [24]  84/21 84/25 85/8
86/1 90/4 91/1 91/2 91/4 91/19
92/19 93/5 93/8 93/9 94/25 95/7
101/6 105/22 106/3 106/10 106/11
106/12 106/23 116/7 116/13
furthering [6]  83/12 85/12 85/14
91/24 92/1 93/25
furthers [4]  91/8 91/9 93/10
93/18

**G**

gave [2]  24/7 95/3
gavels [1]  6/2
general [1]  96/16
generally [10]  12/4 52/13 58/18
58/20 58/22 59/8 61/18 61/20
80/25 110/24
generated [1]  16/10
gentlemen [1]  10/14
German [2]  89/12 89/12
German-made [2]  89/12 89/12
get [22]  14/7 17/24 51/2 51/4
51/18 53/19 53/19 83/3 83/3 90/24
92/17 92/22 94/17 94/18 94/22
106/14 107/5 109/23 111/24 118/11
119/20 122/21
gets [1]  35/19
getting [1]  69/13
Ghost [1]  96/22
give [5]  8/11 9/11 54/17 95/5
120/19
given [2]  22/15 68/10
gives [1]  110/12
globe [2]  39/4 73/10
go [56]  11/17 16/24 20/21 25/21
32/20 36/2 46/11 48/15 49/4 51/3
53/24 54/7 61/23 62/12 62/23
66/21 67/23 67/24 67/25 68/1
74/13 76/7 78/10 82/12 82/21 85/5
86/16 86/24 89/14 89/15 89/15
90/25 94/9 94/21 99/21 102/25
105/12 105/12 107/22 108/16 109/9

110/15 111/12 116/23 117/5 117/5
117/11 119/22 120/2 121/8 122/19
122/25 123/8 124/3 124/3 124/5
goals [1]  93/14
goes [7]  35/21 84/18 86/5 90/17
91/14 96/16 119/5
going [59]  4/15 4/22 14/5 14/14
15/4 15/9 18/1 23/10 28/12 31/23
36/4 37/4 37/9 51/1 53/25 56/13
62/10 64/25 66/14 67/4 67/17 68/6
69/14 70/9 71/6 76/18 77/17 83/19
84/5 86/9 90/9 90/20 90/23 90/25
91/11 92/12 92/23 93/2 94/5 94/17
94/18 94/19 98/11 99/5 99/17
99/21 102/16 103/21 104/14 111/19
112/5 117/22 119/17 119/18 119/20
121/20 123/3 123/14 123/23
good [15]  4/6 4/9 4/10 4/13 10/12
10/13 10/16 51/3 68/20 83/3 86/23
97/16 107/19 112/20 121/7
goods [1]  118/14
Google [2]  32/21 107/22
got [3]  27/11 31/19 119/17
gotten [1]  116/15
government [99]  3/7 3/7 3/8 3/8
3/9 3/9 3/10 3/10 3/11 3/11 3/12
3/12 3/13 3/13 3/14 3/14 3/15
3/15 3/16 3/16 3/17 3/17 3/18
3/18 3/19 3/19 3/20 3/20 3/21
3/21 3/22 3/22 3/23 3/23 3/24
3/24 3/25 4/5 4/20 5/3 5/13 6/9
9/1 9/20 10/3 12/15 13/3 13/17
14/21 15/21 16/11 16/16 18/13
20/24 21/15 21/23 22/23 25/1
29/22 29/23 37/20 40/21 43/2 44/7
44/15 55/9 57/19 57/19 60/5 60/5
64/9 68/8 69/9 70/11 70/13 72/20
74/18 75/1 75/1 77/1 79/15 80/14
85/23 86/11 86/13 87/16 88/18
96/5 98/7 104/12 108/17 117/15
119/15 119/21 120/20 122/20
124/25 125/1 126/4
government's [3]  8/5 94/7 100/11
Gox [1]  8/16
GP [1]  62/15
GPD [1]  107/21
grade [4]  58/10 58/15 73/8 73/9
gram [23]  37/16 38/22 39/6 45/13
45/13 45/13 47/20 47/23 48/13
53/18 58/25 63/8 73/24 73/24
77/19 77/21 82/18 88/9 88/15 89/3
92/25 93/2 95/17
grams [29]  35/7 39/3 48/21 48/24
54/1 58/9 58/10 58/11 58/15 59/2
61/4 61/17 73/12 73/25 82/17 89/8
89/8 89/11 89/11 89/12 96/25 97/5
97/20 98/20 98/21 99/13 105/1
105/9 109/8
gray [1]  36/18
green [2]  36/16 73/23
grounds [5]  6/6 86/4 96/18 98/13
116/19
group [1]  109/12
Grow [4]  65/20 71/24 72/6 73/6
guess [17]  36/24 40/3 40/4 46/11
67/23 81/13 81/23 83/21 85/5
87/24 91/3 91/17 92/17 106/18
111/12 116/25 117/25
guessing [1]  122/17
guide [2]  112/7 112/10
Guy [3]  53/10 53/11 53/22
guys [2]  53/20 54/10

**H**

hack [1]  8/16
hacking [1]  33/4
had [28]  11/18 11/25 14/18 15/17
16/4 20/23 22/15 23/18 24/15
24/25 25/10 27/11 31/11 34/8 55/3
57/3 66/5 66/24 70/24 80/4 82/11
84/2 92/21 103/9 106/14 118/21
122/10 122/11

**H**

half [6]  11/1 11/8 12/24 13/1 18/20 45/13
halfway [1]  26/3
hand [10]  16/24 17/2 20/19 35/13 37/3 38/24 39/13 45/8 60/19 97/12
handle [1]  112/14
happened [1]  78/25
happening [2]  28/16 101/11
happens [1]  50/23
happy [5]  5/9 59/5 67/12 110/14 118/23
hard [1]  87/4
has [34]  6/9 6/9 8/22 12/15 14/15 15/13 18/14 27/11 30/11 33/16 44/21 48/2 48/19 49/10 54/11 69/17 71/11 84/20 87/16 93/7 93/8 93/24 94/12 101/5 101/7 109/3 112/25 116/14 116/17 117/1 118/8 118/17 125/25 126/2
hash [1]  73/10
hasn't [2]  8/1 54/21
HASSARD [2]  2/2 4/12
hate [1]  121/12
have [129]
haven't [4]  9/8 62/25 118/17 120/25
having [4]  30/6 71/16 92/6 98/12
HCL [1]  89/8
he [34]  31/19 33/8 39/17 53/24 53/25 67/15 70/25 81/1 92/10 92/13 92/14 92/15 92/17 92/20 93/12 94/17 94/17 94/18 94/19 101/4 101/5 101/7 101/8 101/18 102/2 102/2 102/3 102/8 102/8 106/6 109/5 113/21 125/25 126/2
hear [10]  18/15 30/5 30/22 100/18 100/19 100/20 100/21 100/23 100/24 115/21
hearing [1]  8/7
hearings [1]  125/16
hearsay [25]  34/23 57/22 64/12 77/5 80/17 81/17 84/20 86/4 88/22 96/8 96/15 96/18 96/19 98/13 104/19 106/19 108/23 115/24 116/19 116/19 116/20 117/7 118/7 118/10 119/7
heavy [1]  53/21
held [12]  31/17 51/2 66/2 80/24 83/8 87/14 89/25 100/7 105/19 115/20 121/16 123/10
helpful [1]  112/2
helps [4]  29/25 36/3 47/13 87/10
her [4]  17/22 57/1 121/21 123/15
here [104]  7/8 9/10 17/9 18/5 22/13 25/21 26/7 34/14 35/3 36/8 36/9 36/14 38/15 38/19 39/17 40/16 41/13 41/18 42/22 45/6 46/6 46/17 47/2 47/22 48/16 50/4 50/9 51/14 52/4 52/13 52/17 53/9 53/15 55/19 55/22 56/4 56/6 56/11 58/5 58/12 58/18 58/24 59/17 59/24 60/16 61/3 61/10 62/20 62/23 63/7 63/17 65/1 73/4 73/11 74/6 74/6 74/14 75/12 75/21 77/12 77/23 79/22 79/24 82/8 83/17 83/22 84/1 84/6 84/8 85/24 89/9 90/8 90/17 91/5 92/2 92/5 92/11 92/23 93/17 94/15 94/22 94/24 95/5 95/16 96/24 97/7 102/16 104/13 104/18 104/25 105/4 105/5 107/6 110/22 111/13 115/1 117/23 118/3 118/25 121/22 124/18 125/25 126/2 126/9
heroin [1]  62/4
Hey [1]  86/21
Hi [1]  54/10
hide [2]  81/9 92/15
high [9]  45/12 48/21 48/24 58/10 58/15 73/8 73/8 109/8 110/9
highest [1]  45/24
highly [4]  7/5 14/9 59/4 59/6

him [4]  31/20 94/16 102/5 126/3
hire [1]  33/2
his [13]  43/1 43/2 43/3 45/15 52/7 53/24 67/22 68/5 83/17 92/14 93/10 102/7 106/6
history [3]  20/23 23/8 28/24
hit [4]  17/20 28/14 40/5 109/23
hold [3]  6/20 33/14 72/3
home [5]  34/16 34/18 35/11 110/17 124/8
homepage [1]  73/6
honest [2]  102/11 102/19
honestly [1]  66/6
Honor [58]  4/6 4/10 4/18 5/7 5/8 5/14 5/21 9/11 10/8 13/6 14/24 25/24 29/17 29/19 29/21 31/15 31/22 33/6 43/15 45/1 56/25 65/21 68/22 69/9 69/10 69/25 70/1 71/20 80/25 83/6 85/10 86/6 91/14 91/20 92/8 93/19 94/4 95/8 96/11 100/17 101/13 101/24 102/21 106/2 113/22 114/5 114/25 115/22 117/20 118/19 119/10 119/11 123/17 123/19 125/4 125/19 125/20 126/11
HONORABLE [1]  1/9
hope [2]  87/10 124/12
hospital [1]  74/4
host [2]  85/10 85/13
hour [1]  8/21
hours [10]  17/11 17/12 17/12 17/16 17/19 26/23 54/18 87/8 101/19 104/2
how [72]  10/25 11/21 12/2 12/24 17/11 17/23 31/1 33/22 36/12 36/21 46/12 46/12 47/7 49/2 51/13 52/3 52/4 52/20 52/22 56/14 59/16 62/18 63/16 65/12 65/16 67/24 68/5 68/11 70/4 74/6 76/15 78/5 83/17 89/2 90/3 90/4 90/9 91/8 91/11 91/24 93/2 95/20 97/6 99/5 99/8 105/4 105/4 106/6 109/2 111/5 111/6 111/7 111/8 111/9 111/11 111/22 111/25 112/12 112/13 112/14 112/14 112/15 112/16 112/16 112/23 112/25 113/2 118/17 121/6 121/10 124/2 124/13
however [1]  15/17
huh [2]  17/1 24/25

**I**

I'd [1]  87/2
I'm [21]  7/19 18/24 19/15 19/17 22/3 28/22 41/24 44/17 45/2 50/14 51/17 53/13 66/12 66/21 83/16 87/12 89/21 90/1 107/17 108/9 126/1
ice [3]  60/20 61/17 61/20
icon [2]  37/3 39/24
ID [6]  47/12 47/13 47/14 47/15 47/16 48/21
idea [1]  83/3
identification [10]  20/15 21/15 22/19 23/15 24/21 25/17 26/12 26/24 28/2 33/19
identified [1]  118/2
identify [1]  36/3
identities [1]  101/10
identity [4]  87/4 87/6 87/8 102/7
IDs [1]  48/19
illegal [6]  32/23 33/3 42/24 68/6 106/16 118/14
illicit [4]  81/7 81/8 84/10 84/15
image [1]  38/20
images [1]  113/12
immediately [3]  15/19 75/19 110/6
impeccable [1]  109/25
implemented [1]  112/25
implicate [1]  94/12
important [1]  94/7
imported [1]  77/21
imposes [1]  125/11
impossible [1]  14/10

improper [1]  8/17
inadmissible [1]  81/18
inclined [1]  69/16
include [3]  11/11 33/19 33/21
includes [1]  73/23
including [2]  83/18 116/18
independent [1]  20/22
Indica [1]  89/16
Indica420 [1]  93/20
Indica420.SR2 [1]  90/24
indicate [3]  35/22 39/11 39/11
indicated [3]  62/3 76/16 121/21
indicative [1]  83/13
individual [2]  10/1 88/2
individuals [2]  84/12 100/11
info [7]  20/21 39/14 87/1 87/2 87/3 113/2 113/2
information [5]  33/20 63/13 80/1 82/5 118/25
informed [1]  109/14
infrastructure [1]  31/6
input [1]  36/24
inside [1]  111/3
inspect [2]  112/14 112/15
inspector [1]  112/17
instance [1]  33/11
instant [1]  76/12
instead [3]  30/6 36/4 47/14
institution [1]  94/12
instruct [1]  125/24
instruction [2]  8/10 111/18
instructions [3]  48/6 111/5 111/22
intended [1]  8/3
interest [1]  85/2
interested [1]  101/9
internal [2]  14/6 31/7
international [7]  45/22 45/23 48/7 48/8 48/10 112/13 112/24
Internet [3]  53/10 53/11 53/22
intoxicants [1]  35/21
introduce [17]  10/14 13/3 13/17 14/21 15/21 16/16 20/24 22/4 22/23 23/19 25/1 26/15 27/2 27/18 28/5 28/25 59/6
introduced [1]  5/24
introduction [1]  75/13
intrude [1]  33/13
investigation [5]  11/3 34/7 41/7 60/3 79/2
investigations [3]  11/17 32/11 32/13
investigative [1]  11/9
involve [2]  31/5 117/7
involved [5]  11/19 32/11 32/14 53/9 116/2
involving [2]  24/18 54/4
irrelevant [1]  7/1
is [677]
isn't [3]  67/21 84/5 123/3
isomer [1]  45/17
issue [12]  7/7 7/8 8/15 9/3 30/4 66/15 102/16 103/7 115/24 122/23 123/24 126/3
issues [6]  7/19 30/7 124/22 125/15 125/18 126/6
it [320]
it's [2]  29/25 87/9
item [26]  39/13 46/18 46/19 47/10 47/12 47/13 47/19 48/20 49/14 49/25 58/14 61/15 62/2 62/6 65/1 76/6 95/15 96/24 97/3 99/2 99/3 99/11 104/24 111/23 112/24 118/11
items [38]  35/23 35/25 37/6 37/14 38/20 46/22 47/2 47/3 47/7 48/9 49/21 49/22 50/7 50/7 51/20 55/23 56/2 56/3 56/9 58/13 58/19 58/20 61/14 64/20 64/20 75/22 77/13 77/24 78/2 82/12 82/14 82/16 89/7 89/10 105/4 109/7 111/24 112/15
its [7]  9/24 10/3 29/22 34/5 60/3 79/2 91/1

**I**

itself **[2]**   56/9 93/8
IV **[4]**   110/4 110/5 110/5 110/7

**J**

January **[1]**   10/1
January 1st **[1]**   10/1
Jeff **[1]**   4/8
JEFFREY **[1]**   1/18
joined **[2]**   4/7 31/4
joining **[4]**   4/12 11/2 31/3 31/12
JUDGE **[2]**   1/10 18/4
judgment **[1]**   86/1
July **[8]**   18/22 19/12 19/14 19/17
 19/18 19/18 23/10 29/14
July 2016 **[1]**   19/12
July 26 **[3]**   19/17 19/18 23/10
July 26th **[1]**   29/14
June **[3]**   19/15 19/16 105/13
June 16th **[1]**   105/13
June 2016 **[1]**   19/15
juror **[8]**   8/10 121/18 121/22
 121/23 122/2 122/7 122/25 123/11
jurors **[9]**   4/14 4/16 9/10 69/14
 69/14 123/14 124/1 124/2 124/8
jury **[68]**   1/9 5/11 8/20 9/13 9/15
 10/15 13/8 13/11 13/22 15/1 16/1
 16/21 19/3 20/6 21/4 22/8 22/11
 23/3 23/6 23/23 25/6 25/9 26/1
 26/19 27/6 27/22 28/9 29/4 34/25
 38/11 38/17 41/2 42/23 44/25
 55/15 57/25 60/11 64/14 67/3
 68/11 69/4 70/21 70/22 72/25 75/7
 77/7 79/19 85/18 86/5 86/7 86/10
 89/19 99/20 100/3 103/18 105/15
 107/10 108/17 117/1 117/6 117/11
 118/24 119/25 120/10 120/19 121/3
 123/22 124/16
jury's **[1]**   105/11
just **[115]**   4/16 4/23 5/25 6/3 8/1
 8/2 17/5 18/20 20/12 20/17 21/20
 22/22 23/17 25/19 26/22 27/10
 27/13 30/3 30/21 31/18 31/20
 32/19 33/3 33/7 33/14 35/8 36/2
 36/11 37/4 37/21 38/2 41/6 41/16
 43/17 47/13 47/21 48/6 48/11
 51/20 53/19 56/13 58/22 62/12
 62/23 62/25 64/20 67/2 67/6 67/7
 67/21 70/6 70/13 71/1 71/2 72/2
 75/23 76/7 76/10 80/4 81/13 83/23
 84/1 84/2 84/6 85/1 85/1 85/11
 85/16 85/20 85/22 86/6 86/8 87/12
 87/22 88/3 93/19 94/4 94/11 96/10
 96/18 100/3 100/17 101/14 101/16
 102/19 103/18 104/1 104/14 105/15
 105/20 105/23 106/1 106/9 107/13
 107/17 109/8 112/25 114/6 115/23
 116/19 117/10 118/6 118/16 118/23
 118/25 119/11 119/13 120/19
 120/25 122/25 124/4 124/9 125/6
 125/23 126/3
JUSTICE **[3]**   1/13 1/20 10/19

**K**

keep **[11]**   8/5 14/5 18/1 37/4 40/7
 48/1 85/22 103/6 120/19 121/21
 123/11
keeping **[1]**   109/14
ketamine **[6]**   45/17 45/18 45/20
 73/9 73/12 73/25
kicks **[1]**   48/3
kill **[1]**   110/10
killer **[1]**   62/17
kilo **[1]**   49/1
kind **[4]**   35/4 36/18 39/19 83/14
Kingdom **[1]**   46/23
knew **[1]**   87/22
know **[42]**   5/18 9/9 12/23 26/22
 32/1 32/22 32/23 35/8 35/15 35/16
 38/2 54/21 67/5 67/8 67/10 68/6
 68/11 69/16 74/3 81/5 83/21 83/24

85/4 85/12 85/25 94/21 95/2 99/23
 107/4 111/6 111/7 111/12 114/8
 116/12 116/21 121/12 121/24
 122/21 123/9 124/22 124/25 125/14
knowing **[2]**   82/24 112/18
knowledge **[8]**   7/10 43/3 67/2 67/6
 90/21 91/15 114/7 114/10
kush **[2]**   58/9 73/8

**L**

lab **[1]**   111/25
lack **[1]**   7/20
ladies **[1]**   10/14
lagging **[1]**   114/10
laid **[1]**   67/5
landing **[1]**   13/1
large **[5]**   39/4 52/18 96/18 116/16
 116/21
last **[19]**   28/14 41/17 41/21 41/22
 41/23 41/24 42/4 48/18 66/3 72/10
 75/12 87/12 87/13 89/9 89/10
 99/11 107/13 108/3 121/25
late **[4]**   7/16 123/16 124/2 124/3
later **[2]**   103/23 105/23
launder **[4]**   84/11 84/14 85/8
 116/4
laundered **[2]**   93/4 95/2
laundering **[13]**   11/10 81/11 83/20
 83/25 84/4 84/16 85/2 91/23 94/16
 94/18 101/3 106/7 106/13
law **[2]**   2/3 114/18
lawyer **[3]**   69/17 71/2 71/5
lawyer's **[1]**   71/8
lawyers **[1]**   71/17
lay **[1]**   67/17
laying **[1]**   33/7
leading **[4]**   49/19 53/1 62/24 67/8
least **[3]**   68/10 122/12 124/3
leave **[2]**   68/19 126/7
leaves **[2]**   117/4 118/5
left **[9]**   11/23 20/19 35/13 55/25
 56/13 64/25 76/7 77/17 97/12
left-hand **[3]**   20/19 35/13 97/12
legal **[2]**   71/17 90/7
less **[3]**   24/13 24/15 24/17
let **[30]**   5/18 6/3 9/9 13/14 14/15
 16/11 19/22 20/15 21/15 22/4
 22/19 23/15 24/21 25/17 26/12
 26/24 27/15 28/2 28/17 85/23
 85/25 86/2 99/23 114/6 119/2
 122/25 123/8 123/8 124/24 125/8
let's **[8]**   8/4 12/25 43/12 66/1
 86/16 100/6 123/23 125/9
letter **[2]**   48/9 48/10
letters **[1]**   27/12
letting **[1]**   124/5
liability **[1]**   94/11
light **[1]**   86/6
like **[30]**   32/19 32/21 33/2 33/11
 35/7 35/18 36/2 36/18 37/4 46/10
 47/14 48/3 48/10 51/2 51/20 54/5
 56/8 71/8 80/18 85/13 100/12
 111/4 111/7 111/11 113/24 120/4
 121/20 121/25 122/2 123/11
likely **[1]**   92/21
limine **[1]**   7/15
limitations **[5]**   6/6 7/1 7/6 7/7
 7/21
limits **[1]**   74/3
LINDSAY **[3]**   2/6 127/3 127/12
line **[13]**   53/9 54/7 60/22 64/25
 65/3 65/9 68/3 73/18 74/1 78/11
 111/16 116/22 118/11
lines **[3]**   62/13 69/23 86/11
lining **[1]**   86/7
linking **[1]**   14/14
liquid **[2]**   50/13 62/9
list **[15]**   4/22 4/23 16/14 17/5
 35/21 37/5 46/18 46/19 48/12
 59/13 75/22 75/23 76/19 108/3
 114/21
listed **[25]**   26/4 35/23 35/25

37/15 38/20 38/22 39/6 48/17
 48/21 50/7 52/4 54/13 55/23 59/11
 61/5 65/1 66/24 95/18 99/12 105/4
 105/5 115/7 115/12 115/13 115/15
listening **[1]**   97/13
listing **[25]**   37/17 38/15 39/11
 42/7 43/23 47/5 48/5 48/16 49/5
 51/10 56/3 58/13 58/15 58/24
 61/16 62/15 66/10 73/19 75/25
 76/6 77/17 97/9 99/13 105/8
 111/21
listings **[20]**   45/9 45/10 45/12
 47/4 47/8 49/13 49/17 50/1 51/18
 51/25 53/18 58/7 59/6 60/18 61/11
 62/18 64/23 73/16 76/1 89/9
literally **[1]**   125/5
little **[14]**   30/23 32/9 37/9 39/24
 52/2 53/21 54/17 67/3 83/22 84/6
 95/5 114/10 116/15 124/5
live **[3]**   51/25 64/20 82/25
load **[1]**   36/21
local **[1]**   94/22
located **[1]**   19/20
log **[6]**   87/1 87/1 87/4 87/6 87/8
 113/2
logged **[5]**   13/15 13/16 24/1 24/3
 24/4
logistical **[1]**   126/3
long **[7]**   10/25 11/19 11/21 31/1
 31/24 84/21 121/10
look **[11]**   12/25 38/19 39/13 40/15
 47/17 48/10 51/16 85/6 112/15
 118/5 125/9
looked **[3]**   121/1 121/24 121/25
looking **[12]**   22/12 23/7 25/9 33/3
 35/8 35/17 53/15 61/18 77/24
 100/1 119/13 122/2
looks **[2]**   54/5 80/18
lose **[1]**   125/6
losing **[1]**   102/22
lost **[2]**   54/21 100/17
lot **[2]**   102/14 122/18
low **[2]**   45/24 45/25
lower **[1]**   38/25
LSD **[5]**   42/9 42/20 45/18 50/13
 62/9
lunch **[3]**   121/20 121/21 124/3

**M**

ma'am **[1]**   10/12
made **[9]**   4/21 44/21 48/2 76/12
 87/18 89/12 89/12 97/10 103/22
magically **[1]**   122/13
mail **[1]**   112/14
maintaining **[2]**   8/19 9/21
maintenance **[2]**   101/23 103/22
make **[18]**   14/3 14/11 17/17 42/23
 70/12 85/25 93/23 103/21 110/13
 111/6 118/6 118/6 118/9 118/16
 122/15 123/8 123/16 125/3
makes **[1]**   110/14
making **[5]**   14/9 14/10 85/5 101/5
 118/14
manual **[1]**   111/21
many **[24]**   17/11 51/13 52/3 52/4
 56/14 59/16 62/18 63/16 65/12
 65/16 67/24 74/6 76/15 78/5 89/2
 95/21 97/6 99/8 105/4 105/4 109/2
 110/14 112/1 112/2
March **[6]**   1/5 12/10 12/20 19/9
 82/22 127/10
March 11th **[1]**   82/22
March 2016 **[3]**   12/10 12/20 19/9
MarijuanaIsMyMuse **[5]**   59/20 60/2
 60/17 60/24 63/10
MarijuanaIsMyMuse's **[1]**   60/23
Mario's **[3]**   88/9 88/15 89/3
mark **[1]**   97/10
marked **[3]**   12/15 20/15 112/19
market **[5]**   33/12 34/3 52/25 100/8
 116/6
marketplace **[7]**   32/18 32/19 32/20

**M**

marketplace... [4]   33/25 78/19 84/23 101/12
marketplaces [5]   11/10 32/9 32/16 32/22 32/24
markets [5]   33/8 33/17 33/22 113/4 117/23
marks [1]   17/21
marshal [2]   6/13 6/15
marshals [5]   6/20 125/24 126/6 126/8 126/8
match [1]   120/24
matching [1]   48/19
mate [2]   86/21 86/23
material [2]   5/1 113/15
materials [1]   8/5
matter [7]   80/20 88/1 91/6 91/7 101/22 123/3 127/5
matters [5]   31/11 69/19 71/9 71/14 91/17
max [2]   17/12 17/19
may [55]   5/20 9/6 10/3 10/8 10/9 11/22 13/7 13/21 14/25 15/25 16/20 18/6 19/2 20/5 21/3 22/7 23/2 23/22 25/5 25/25 26/18 27/5 27/21 28/8 29/3 29/22 34/24 38/10 41/1 44/24 55/14 57/24 60/10 64/14 69/5 70/24 72/25 75/6 77/7 79/18 80/22 81/20 86/18 87/21 103/16 106/11 106/22 106/24 107/11 117/25 119/16 119/19 119/21 121/3 124/24
May 2015 [1]   11/22
maybe [9]   18/2 18/5 39/20 68/19 90/23 105/20 117/19 121/11 122/21
MBB [1]   45/21
mcg [1]   78/13
MDMA [29]   35/6 45/16 45/17 45/19 47/5 47/9 47/20 47/23 47/24 48/13 58/22 60/20 61/4 61/25 62/7 62/17 63/8 63/9 73/9 73/24 77/19 77/21 82/18 89/12 89/12 97/20 111/7 111/18 111/22
me [73]   4/12 5/10 5/18 5/25 6/4 6/16 7/24 8/1 9/9 9/11 13/14 14/15 16/10 16/11 19/22 20/15 21/15 22/4 22/11 22/15 22/19 23/11 23/15 24/21 25/17 26/12 26/24 27/15 28/2 28/17 41/25 54/14 65/8 66/7 67/25 69/24 71/18 85/15 85/25 87/15 91/8 92/22 94/14 94/20 96/9 96/19 97/13 97/15 99/23 99/24 100/19 100/21 100/23 101/13 101/17 101/25 102/17 102/22 104/19 114/6 115/21 116/9 116/23 117/3 117/4 117/13 117/15 117/17 120/1 120/2 120/19 125/8 126/10
mean [10]   38/16 57/6 81/12 81/13 84/1 84/7 92/13 102/15 121/20 124/21
meaning [1]   50/19
means [2]   47/16 50/25
meant [2]   11/17 122/7
measures [1]   112/25
medical [1]   122/10
medication [1]   75/14
members [3]   9/14 92/6 123/22
memorialize [1]   12/21
mention [1]   85/11
mentioned [1]   105/23
mentioning [2]   46/2 88/4
mephedrone [2]   45/17 45/20
merely [1]   93/19
merit [3]   69/22 71/11 71/13
mescaline [1]   45/19
message [21]   36/9 53/11 53/13 54/8 81/13 82/23 86/8 86/11 89/19 92/24 98/2 99/21 103/19 103/24 104/14 105/13 105/15 105/24 107/14 107/17 119/4

messages [20]   36/6 43/9 54/4 80/18 80/19 81/1 83/10 85/11 85/13 85/20 85/21 88/12 98/1 98/8 104/13 108/8 118/21 118/22 118/23 119/1
meth [18]   37/16 38/15 38/21 38/22 38/24 39/6 39/16 60/20 61/17 61/20 98/20 98/21 98/21 99/4 99/6 103/8 103/10 111/7
method [1]   83/3
meticulously [1]   36/4
MICHAEL [2]   2/2 4/12
microphone [1]   30/21
middle [1]   45/14
might [5]   36/14 56/10 103/1 110/8 110/9
milligrams [4]   45/16 62/16 76/9 76/11
mind [3]   7/10 87/22 88/2
minimum [2]   17/12 26/23
minute [2]   68/25 120/19
minutes [5]   4/15 68/24 68/25 121/11 125/5
missed [3]   117/13 117/19 118/17
mission [1]   109/10
mix [6]   67/5 67/5 90/2 90/5 90/8 90/25
mixed [1]   14/6
mixer [1]   101/17
mixing [2]   74/2 93/6
mizer [2]   101/16 104/1
mode [1]   17/18
modifications [2]   47/11 50/22
modified [3]   41/21 41/22 48/18
modus [1]   7/10
moment [4]   31/16 105/12 114/1 121/15
Monday [16]   119/21 121/14 121/18 122/3 122/20 122/20 122/22 123/15 123/23 123/24 123/25 124/5 124/15 124/18 125/1 125/6
money [33]   9/23 11/10 14/14 15/10 25/21 36/12 36/22 40/3 51/1 51/3 51/5 52/19 54/1 66/21 66/22 66/23 67/3 81/10 83/20 83/25 84/2 84/4 84/16 90/12 90/14 91/23 94/11 94/15 102/5 106/13 117/21 117/23 118/16
moniker [2]   44/5 54/23
moot [6]   6/11 7/21 8/2 8/8 8/18 8/23
more [22]   6/14 7/1 7/4 24/13 31/20 35/19 53/14 54/17 61/11 74/1 77/4 88/21 91/2 92/21 96/7 112/23 115/19 116/22 119/17 121/6 122/16 125/5
morning [12]   1/7 4/6 4/9 4/10 4/13 5/4 10/12 10/13 10/16 47/25 68/18 115/25
MOSS [1]   1/9
most [3]   6/2 8/9 111/13
mostly [2]   32/8 75/15
motion [12]   6/5 6/8 6/18 6/24 7/15 7/17 7/20 7/21 7/22 8/5 8/6 8/23
motions [5]   6/7 6/12 7/18 7/21 125/16
move [27]   13/3 13/17 14/21 15/21 16/16 18/24 20/2 20/24 22/4 22/23 23/19 25/1 25/22 26/15 27/2 27/14 27/18 28/5 28/25 34/21 37/20 54/15 55/21 95/5 95/11 115/18 125/16
moves [17]   40/21 44/15 55/9 57/19 60/5 64/9 72/20 75/1 77/1 79/15 80/14 88/18 96/5 98/7 104/12 108/17 120/20
moving [5]   43/17 62/2 73/22 85/23 119/12
Mr [3]   3/3 66/11 126/4
Mr. [30]   6/14 6/18 6/22 7/23 7/23 9/2 9/4 42/24 67/15 67/23 68/4

69/15 70/7 70/25 81/4 85/19 88/20 89/20 96/17 98/9 104/19 106/8 116/1 116/17 122/25 125/22 125/22 125/24 126/3 126/5
Mr. Cabanas [1]   7/23
Mr. Ekeland [15]   9/2 67/23 68/4 69/15 70/25 81/4 85/19 88/20 89/20 96/17 98/9 104/19 106/8 116/17 122/25
Mr. Fischbach [2]   125/22 126/3
Mr. Scholl's [1]   67/15
Mr. Sterlingov [6]   6/14 42/24 116/1 125/22 125/24 126/5
Mr. Sterlingov's [2]   6/18 6/22
Mr. Verret [3]   7/23 9/4 70/7
Ms [1]   3/5
Ms. [13]   4/19 29/25 30/10 30/11 70/4 70/17 86/14 86/15 90/6 94/2 103/2 106/4 123/18
Ms. Pelker [6]   70/4 90/6 94/2 103/2 106/4 123/18
Ms. Walker [7]   4/19 29/25 30/10 30/11 70/17 86/14 86/15
Mt. [1]   8/16
Mt. Gox [1]   8/16
much [7]   4/15 36/12 99/5 110/8 121/6 124/13 125/6
multiple [3]   14/8 112/11 112/12
murder [1]   33/2
mushrooms [1]   45/18
my [37]   4/14 6/9 6/22 7/25 10/16 15/9 22/1 22/14 22/15 23/8 23/10 23/11 25/13 25/15 26/5 26/9 26/11 28/23 28/23 31/22 32/8 32/13 33/1 45/2 52/21 53/19 71/25 84/3 95/12 96/16 98/14 108/24 115/25 117/10 119/8 123/4 125/4

**N**

N.W [1]   1/16
name [8]   10/15 10/15 10/16 24/7 24/8 30/19 47/9 96/22
named [3]   63/22 65/19 79/13
namely [1]   115/8
names [2]   4/4 44/2
narcotics [1]   116/5
nature [2]   68/9 68/14
necessarily [2]   88/1 90/15
necessary [2]   8/14 8/20
need [21]   8/25 9/7 9/8 32/21 52/14 53/15 56/10 62/12 73/21 86/3 98/13 104/19 106/14 106/17 110/7 111/23 117/2 117/12 117/17 119/8 125/12
needs [2]   117/10 121/18
negotiated [2]   100/16 101/1
negotiating [2]   93/1 93/14
Netherlands [1]   59/5
Network [1]   9/20
never [3]   75/17 113/1 118/10
new [11]   1/20 4/22 4/24 14/7 15/18 16/10 87/4 87/5 87/6 87/8 112/25
news [1]   112/20
next [17]   1/23 10/3 29/22 35/22 36/18 50/18 54/15 61/18 62/8 67/14 74/14 76/19 82/12 82/17 103/24 112/20 121/25
nice [4]   39/2 52/18 124/7 124/12
night [1]   121/25
no [77]   1/4 9/25 13/6 13/9 13/20 13/23 14/24 15/2 15/24 16/2 16/19 16/22 19/1 19/4 19/11 20/4 20/7 20/23 21/2 21/5 22/6 22/9 23/1 23/4 23/21 23/24 25/4 25/7 25/24 26/17 26/20 27/4 27/7 27/20 27/23 28/7 28/10 29/2 29/5 29/19 31/24 35/1 38/12 39/10 41/3 41/9 45/3 49/15 55/16 58/1 62/17 69/1 69/25 70/1 71/11 72/2 73/1 75/8 79/17 79/20 80/3 80/25 87/1 88/25 90/5 90/20 92/8 94/4 96/14 98/15 106/9

**N**

no... [6]  109/17 109/18 109/21
109/22 120/24 123/19
None [1]  115/15
Norco [1]  75/24
normal [1]  48/10
Nos [7]  60/12 64/15 77/8 81/25
104/21 108/25 121/4
not [110]  4/15 4/24 6/19 7/8 8/3
8/13 8/25 14/15 15/13 16/11 17/24
17/25 18/14 18/23 19/22 22/3
31/19 34/13 35/19 37/12 40/13
42/24 44/10 46/3 49/9 49/21 54/11
54/13 54/25 63/3 63/25 66/4 66/7
67/24 69/9 69/10 69/20 69/21
70/13 70/15 71/8 71/10 71/15
71/16 71/25 72/8 74/18 76/22 79/7
79/10 80/10 83/11 83/13 83/19
85/5 85/6 86/7 88/1 88/11 90/3
90/7 90/14 91/8 92/9 92/22 94/3
94/14 94/17 94/17 94/19 94/20
94/25 95/4 95/6 96/1 96/17 97/13
97/25 101/13 101/15 101/17 101/23
103/21 104/7 106/11 106/14 107/3
107/5 108/6 110/5 110/8 110/10
111/11 113/16 116/9 116/9 116/10
116/18 118/3 118/9 118/24 119/19
121/23 122/2 122/9 122/15 122/18
123/2 124/18 124/23
note [9]  4/19 39/21 41/18 60/18
61/7 61/9 74/2 96/24 103/22
noted [14]  42/19 56/20 58/14
65/17 67/15 71/24 72/17 74/6
74/11 77/24 78/15 84/12 99/9
100/11
nothing [9]  9/1 42/23 85/12 85/14
91/14 92/11 93/18 93/24 120/4
notice [1]  8/21
now [43]  11/1 13/11 19/9 20/15
21/15 22/11 23/7 24/10 26/24 28/2
29/12 30/11 38/17 38/17 43/12
45/16 45/20 45/21 49/12 51/24
54/20 62/16 62/20 68/18 68/19
68/24 72/1 72/4 75/25 76/14 79/5
80/7 85/5 102/8 102/23 105/11
112/5 117/4 118/4 119/16 119/23
122/25 123/23
number [8]  6/21 14/8 17/16 39/25
51/16 116/16 121/22 123/11
numbers [4]  35/22 69/15 70/25
71/1
NW [3]  1/14 1/20 2/8
NY [1]  2/4

**O**

object [3]  71/3 96/18 98/12
objected [1]  116/17
objecting [1]  7/15
objection [82]  7/12 13/5 13/6
13/19 13/20 14/23 14/24 15/23
15/24 16/18 16/19 18/25 19/1 20/3
20/4 21/1 21/2 22/5 22/6 22/25
23/1 23/20 23/21 25/3 25/4 25/23
25/24 26/16 26/17 27/3 27/4 27/19
27/20 28/6 28/7 29/1 29/2 31/15
33/6 34/22 38/7 40/23 40/25 43/15
43/18 44/19 49/19 53/1 55/11
55/13 56/25 57/21 60/7 60/9 62/24
63/3 64/11 65/21 69/18 69/19
69/23 71/4 71/5 71/6 71/11 71/13
72/21 75/3 77/3 79/16 79/17 80/16
83/6 96/6 105/16 106/2 108/19
113/21 114/5 116/20 118/10 120/23
objections [14]  44/23 57/23 68/3
69/21 71/1 71/7 71/8 71/17 72/23
75/5 77/6 81/16 85/24 118/7
obscene [1]  115/8
obscure [1]  14/14
observed [1]  12/20
obtain [1]  79/3
obtained [11]  34/18 64/6 72/17

74/23 79/13 80/12 88/15 104/10
108/14 114/14 114/18
obviously [3]  8/18 116/14 124/25
occasion [1]  6/15
occasions [1]  6/21
occur [1]  28/13
occurred [1]  28/20
occurring [3]  68/7 68/10 68/12
occurs [1]  92/25
off [7]  18/2 18/5 18/6 51/19
58/14 82/14 86/10
offense [1]  115/8
offer [1]  107/23
offered [4]  80/20 91/6 91/7
101/22
office [1]  11/2
Official [3]  2/7 127/3 127/13
oh [1]  90/24
okay [32]  5/9 12/11 18/8 18/13
20/9 20/24 26/3 29/7 31/22 51/4
67/9 68/16 68/23 69/11 70/8 80/23
81/18 84/21 86/15 88/20 89/24
90/19 103/11 105/18 113/23 115/21
119/5 120/5 123/12 123/13 123/16
123/20
old [1]  59/4
older [6]  42/13 49/13 49/17 49/22
51/18 56/18
Omedetou [2]  5/1 9/25
once [9]  39/23 40/1 40/5 46/10
49/1 87/9 90/2 90/10 95/2
one [60]  4/19 5/13 5/20 6/15 9/11
11/13 15/4 16/9 18/23 28/15 31/16
32/13 37/14 38/19 47/7 47/15
47/15 50/23 53/14 53/18 53/20
56/25 58/25 59/3 62/12 62/12
65/25 66/10 67/13 67/21 68/2
72/10 73/22 74/1 77/21 82/17
82/24 83/7 84/11 87/12 87/13
87/15 89/22 98/2 99/4 99/6 100/10
104/14 105/22 106/17 108/3 111/19
115/19 119/18 121/18 122/10
123/24 124/1 124/1 125/20
online [8]  11/9 11/12 11/13 11/18
11/20 12/2 21/20 46/11
only [12]  14/12 35/19 43/2 45/23
49/21 85/6 89/13 92/18 99/13
100/1 119/23 125/4
open [4]  33/14 49/2 86/24 96/9
operandi [1]  7/11
operate [3]  84/4 112/13 117/21
operating [2]  84/9 106/10
operation [5]  83/20 83/20 84/5
91/23 92/7
operational [1]  117/9
opiates [1]  75/15
order [22]  6/13 6/19 11/20 32/20
40/3 42/10 43/7 43/8 49/9 53/25
60/24 61/1 80/1 84/22 95/21 96/10
96/22 97/4 104/24 110/5 112/17
118/20
ordering [1]  110/1
orders [9]  36/11 39/3 45/22 48/8
80/3 82/11 89/2 97/6 109/3
origin [2]  14/10 46/3
original [1]  15/19
other [19]  9/6 9/7 14/6 32/19
33/13 73/8 86/3 91/4 93/11 100/13
102/14 106/13 106/22 106/24
110/22 113/14 117/7 122/5 125/20
others [5]  12/2 80/22 84/22 117/8
118/15
otherwise [2]  107/15 107/24
ounce [4]  39/3 98/20 99/4 99/6
ounces [1]  48/25
our [19]  14/6 54/5 59/6 60/24
62/16 68/18 68/23 81/24 84/12
88/24 89/12 109/13 109/16 109/19
109/22 109/24 110/9 120/24 122/14
ourselves [2]  109/15 123/2
out [24]  4/15 14/14 27/12 31/6
37/2 37/7 39/19 40/2 40/3 40/6

45/19 46/15 52/16 67/4 69/4 70/14
87/1 87/8 91/18 92/10 102/21
122/22 124/2 124/16
outgoing [1]  23/9
outline [1]  112/25
outlines [1]  112/12
outside [2]  6/25 101/11
over [30]  11/8 20/19 38/23 39/13
42/10 47/17 48/12 51/9 53/14
56/13 59/3 62/12 63/12 64/25
73/22 76/3 76/7 77/14 77/17 93/22
95/15 96/23 97/1 99/5 99/14
104/15 111/19 112/8 119/25 120/4
overlap [2]  51/24 52/2
overruled [15]  33/10 38/9 40/25
44/23 49/20 53/2 55/13 57/23 60/9
63/2 63/5 68/3 75/5 77/6 96/12
overrules [1]  72/23
own [3]  62/16 84/23 112/15
oxycodone [3]  75/24 76/9 76/11
Oxycontin [1]  75/24

**P**

p.m [2]  124/16 126/14
pack [1]  73/20
package [1]  112/15
packaged [1]  52/22
packaging [1]  52/18
page [31]  1/23 12/24 12/24 13/1
13/15 14/3 14/16 14/17 15/17
16/13 18/10 18/18 18/20 22/22
23/8 23/17 27/10 28/14 34/16
34/18 35/11 45/7 46/14 46/20
55/20 58/6 60/17 60/23 109/9
109/10 110/17
paid [5]  14/7 39/8 39/10 51/10
90/24
pair [1]  112/3
panicking [1]  54/21
paperwork [1]  48/11
paragraph [7]  48/6 53/16 75/12
86/22 109/11 111/20 112/19
paranoid [1]  82/24
parcel [1]  109/23
part [17]  11/11 16/24 17/2 19/25
26/25 28/3 34/7 49/1 79/2 90/10
90/22 91/23 93/14 111/13 117/24
117/25 123/15
partial [2]  100/16 101/1
partially [1]  102/6
participant [1]  100/14
participants [1]  119/18
participate [1]  92/5
particular [15]  25/12 67/22 81/16
81/17 85/24 87/17 96/15 96/19
98/13 104/14 104/18 108/23 118/11
118/23 119/6
particularly [1]  119/24
particulars [4]  66/24 84/12
100/12 117/18
parties [8]  4/16 5/10 5/12 9/16
69/16 115/2 115/3 117/5
party [1]  8/25
Pas [10]  40/11 40/18 41/14 41/16
41/18 79/5 79/13 79/23 79/24 80/4
Pass [1]  29/17
passed [4]  4/19 4/20 6/17 103/8
past [1]  7/23
paste [1]  59/2
pasted [2]  25/19 26/6
patch [1]  65/2
pause [2]  42/22 100/5
pay [5]  33/22 33/23 69/21 71/7
93/2
payment [7]  22/2 23/9 63/13 78/15
94/8 101/3 102/3
PEARLMAN [3]  1/18 3/3 4/8
peels4u [3]  63/23 64/20 65/12
peels4u's [3]  64/6 64/22 65/16
peer [2]  107/23 107/23
PELKER [9]  1/13 3/5 4/6 70/4 90/6
94/2 103/2 106/4 123/18

**P**

pending [2]  8/24 17/18
Pennsylvania [1]  1/14
people [12]  33/13 33/22 52/6
 83/23 84/24 93/15 94/19 112/1
 112/3 112/11 113/11 122/13
per [1]  88/12
percent [5]  14/12 14/12 73/9
 97/20 105/1
Percocet [1]  65/10
percolating [1]  119/25
Perfect [1]  97/16
permission [3]  89/18 100/2 105/14
person [2]  87/22 122/10
personal [3]  41/7 114/7 114/10
personally [1]  120/25
persuasive [2]  94/14 94/20
pertain [1]  85/21
pertaining [6]  49/17 88/15 98/4
 101/3 101/12 104/9
PGPing [1]  87/2
ph [1]  65/6
pharmacy [2]  75/14 76/12
phase [1]  8/20
Philips [3]  108/3 109/3 109/12
phone [8]  31/16 80/21 83/7 88/13
 89/22 105/17 115/19 121/15
phones [1]  8/12
photo [4]  35/7 35/7 37/15 58/10
photographs [1]  35/4
photos [1]  45/11
pick [10]  31/15 66/1 80/21 87/12
 89/22 100/6 105/17 112/14 115/19
 121/15
picture [1]  47/24
pictures [3]  12/21 48/25 111/25
piece [1]  73/23
pills [7]  45/17 62/11 62/15 62/16
 73/9 73/24 76/11
pink [1]  45/16
place [2]  68/6 92/12
placed [2]  43/7 43/8
plain [1]  47/14
Plaintiff [2]  1/4 1/13
planted [1]  68/11
please [16]  4/4 10/7 17/15 18/14
 30/15 30/18 46/2 54/14 54/17
 54/20 68/25 69/6 74/2 74/3 75/18
 110/5
PLLC [1]  2/3
PO [2]  112/16 112/18
point [23]  8/3 8/8 8/14 8/18 8/23
 13/13 44/21 68/20 85/1 85/15
 85/23 85/24 85/25 87/15 94/15
 94/24 95/6 104/19 117/3 117/15
 117/17 121/7 122/13
pointing [2]  85/20 119/4
pool [1]  14/6
porn [1]  113/11
pornography [1]  113/13
portion [5]  13/25 18/6 38/25
 45/14 47/22
portions [2]  86/4 117/6
possible [3]  60/25 110/13 123/16
possibly [1]  53/20
post [4]  67/5 90/2 90/5 90/8
post-mix [1]  67/5
postal [5]  112/7 112/10 112/12
 112/17 112/23
potency [1]  59/10
potentially [1]  87/21
pounds [1]  58/16
powder [1]  42/20
powerful [1]  49/8
practical [1]  119/14
pre [4]  48/3 67/5 90/8 120/13
pre-drought [1]  48/3
pre-mix [1]  67/5
pre-redaction [1]  120/13
precisely [1]  6/16
preclude [1]  8/17

prefer [3]  5/12 67/7 120/3
preference [1]  6/18
prejudicial [5]  7/1 7/4 77/4
 88/21 96/7
premium [2]  96/25 97/20
preparation [1]  34/11
prescription [1]  56/4
present [3]  4/11 70/22 126/5
presented [2]  90/13 117/1
preserve [1]  81/15
preserving [1]  116/19
press [1]  19/7
pressing [1]  62/16
pretty [1]  125/8
previous [1]  21/13
previously [3]  7/3 8/15 114/20
price [10]  39/6 48/12 58/15 59/11
 61/5 73/23 95/18 97/1 99/14 99/14
prices [3]  45/24 45/25 75/15
pricing [1]  99/17
pride [1]  109/15
primarily [2]  31/6 32/8
primary [1]  9/21
prior [10]  11/2 44/7 55/2 57/12
 64/2 72/13 74/19 104/13 108/18
 120/12
privacy [2]  90/12 90/15
privacy-related [1]  90/15
probably [8]  18/1 33/16 53/19
 92/14 119/20 121/13 123/3 124/4
probative [6]  7/1 7/4 7/5 77/5
 88/22 96/8
procedure [3]  14/1 14/2 40/5
proceed [5]  10/9 68/16 81/20
 103/13 103/16
proceedings [2]  1/7 127/5
proceeds [5]  43/12 84/11 84/15
 102/5 116/5
process [3]  39/19 75/19 110/13
processed [1]  61/1
processing [1]  101/8
product [13]  37/8 46/11 46/12
 49/8 49/11 50/24 52/18 56/8 59/6
 61/11 109/13 110/9 110/12
production [1]  7/16
products [5]  45/24 98/19 98/20
 109/15 110/6
Professor [1]  122/22
program [1]  31/14
propose [1]  5/2
proposed [2]  4/19 4/25
prosecutor [1]  10/23
protect [1]  84/22
protects [1]  75/17
prove [1]  14/11
provide [2]  59/8 75/14
provided [8]  21/12 23/11 25/11
 55/6 72/18 74/23 88/16 120/16
proviso [1]  104/18
pseudo [2]  82/16 82/18
psychedelic [2]  49/8 49/10
public [1]  85/3
publication [1]  86/10
publish [9]  86/7 89/19 99/24
 100/2 103/18 105/14 107/9 108/16
 120/18
published [33]  13/8 13/21 14/25
 15/25 16/20 19/2 20/5 21/4 22/8
 23/3 23/22 25/5 25/25 26/18 27/5
 27/21 28/8 29/3 34/24 38/10 41/2
 44/24 55/15 57/24 60/10 64/14
 72/25 75/6 77/7 79/18 99/20 120/9
 121/3
pull [24]  30/21 37/12 43/13 44/10
 61/14 65/15 67/13 71/22 72/8
 74/18 75/11 78/4 78/21 79/7 82/20
 89/14 97/25 104/3 104/23 105/11
 111/15 120/9 120/10 120/18
pulled [2]  112/11 120/11
pulling [13]  47/1 53/8 56/6 59/13
 63/25 74/4 74/5 75/21 75/25 76/14
 97/21 99/1 120/19

purchase [12]  33/2 36/12 42/5
 54/1 61/5 90/9 90/23 91/12 92/25
 93/1 93/23 94/16
purchased [6]  42/8 42/24 87/7
 95/16 96/24 103/9
purchaser [1]  102/1
purchasers [1]  117/17
purchases [4]  41/8 42/2 42/17
 87/18
purchasing [2]  82/25 93/22
pure [14]  35/6 52/18 62/4 62/16
 73/10 98/20 98/21 98/21 99/4
 99/13 103/8 105/1 105/9 110/13
purity [1]  109/16
purple [1]  47/24
purpose [1]  21/16
purposes [10]  6/3 9/18 20/15
 22/20 23/15 24/21 28/2 106/22
 111/14 116/14
pursuant [1]  9/22
put [5]  25/21 37/5 37/6 53/25
 112/17

**Q**

qualifications [1]  8/1
qualities [1]  39/5
quality [9]  45/12 45/24 48/22
 48/24 59/7 74/2 109/8 109/13
 110/6
quantities [3]  45/12 61/21 62/1
quantity [2]  58/16 110/9
quarter [1]  49/1
query [1]  5/1
question [33]  8/19 43/18 43/19
 43/20 57/1 57/5 57/8 62/22 62/25
 63/3 66/18 67/9 69/17 69/22 70/6
 70/24 71/18 85/1 87/24 92/18
 92/18 93/9 102/12 102/19 106/13
 106/19 106/20 113/21 113/24 116/8
 118/1 118/4 121/17
questioning [2]  68/3 68/5
questions [8]  8/11 8/17 29/19
 31/20 67/7 71/8 126/8 126/10
quick [4]  31/18 35/8 105/17
 105/20
quickly [1]  125/16
quite [5]  6/19 8/3 94/10 110/1
 124/23
quote [1]  90/13
quote/unquote [1]  90/13

**R**

racemic [2]  45/17 45/20
raid [1]  111/8
raise [5]  81/16 111/9 111/11
 124/21 126/9
raised [2]  7/23 69/16
raising [1]  71/1
Ramjee [2]  30/2 30/8
Ramjee's [1]  39/20
RANDOLPH [1]  1/9
randomized [3]  14/8 14/9 14/13
ransomware [3]  32/8 33/12 33/15
rare [1]  45/24
rather [1]  30/3
rating [2]  52/15 52/16
ratings [2]  46/13 59/10
ratio [1]  110/12
re [2]  109/18 109/21
re-read [2]  109/18 109/21
reach [1]  4/17
Reactor [1]  31/14
read [64]  5/11 5/12 5/21 9/15
 13/25 17/10 17/15 20/12 38/25
 42/7 42/19 45/14 46/1 47/6 47/21
 48/5 49/4 53/13 53/15 54/7 54/16
 54/19 58/14 59/3 60/22 61/15
 62/10 62/13 73/7 73/18 73/22 74/1
 75/12 75/23 76/6 76/10 77/18 81/1
 82/14 82/22 86/20 89/9 97/3 97/9
 97/19 99/11 103/19 103/24 104/24
 105/7 105/24 107/13 107/20 109/9

**R**

**read... [10]** 109/11 109/18 109/21 110/3 111/16 111/19 112/5 112/8 112/20 114/25
**reading [4]** 5/2 31/20 36/7 48/1
**reads [1]** 5/15
**ready [5]** 10/9 37/7 70/19 70/20 99/23
**Reagent [1]** 48/2
**real [1]** 105/17
**really [6]** 5/21 31/18 32/20 33/2 48/25 91/18
**reason [3]** 31/24 95/3 119/23
**reasons [3]** 7/2 7/13 68/2
**rebut [2]** 68/15 94/8
**rebutting [1]** 90/17
**recall [4]** 110/19 114/1 114/2 114/3
**receipt [1]** 75/19
**receiving [3]** 46/13 52/10 67/15
**Recess [2]** 69/12 126/14
**recognize [9]** 12/16 13/14 14/16 15/14 16/12 19/23 20/16 24/22 26/25
**recommend [5]** 82/25 83/2 83/13 107/18 107/19
**recommended [1]** 59/4
**reconsideration [1]** 7/25
**record [19]** 4/5 7/3 7/14 7/17 41/14 42/17 51/21 52/9 54/16 56/17 62/21 63/20 78/5 79/12 85/19 95/21 118/22 118/22 127/5
**recorded [3]** 42/5 56/14 59/16
**records [71]** 5/2 5/24 9/25 33/24 34/8 34/10 34/10 34/18 37/24 40/7 40/10 41/10 42/1 44/1 44/4 44/12 49/12 49/16 49/22 49/25 50/6 51/14 51/24 53/5 54/22 55/5 56/22 57/10 57/16 59/19 60/2 63/22 64/5 64/6 65/19 70/16 71/23 72/6 72/16 72/17 74/16 74/22 76/18 76/23 78/1 78/18 79/3 79/5 80/7 80/12 82/2 88/9 88/15 95/23 97/22 98/4 104/5 104/9 106/16 106/21 106/24 106/25 107/3 108/3 108/13 113/7 114/14 114/17 114/22 115/24 120/15
**red [1]** 39/22
**redacted [6]** 4/21 5/24 115/6 120/10 120/19 120/20
**redacting [1]** 119/3
**redaction [1]** 120/13
**redactions [1]** 86/3
**refer [1]** 69/19
**references [3]** 67/22 71/2 117/6
**referring [5]** 37/5 69/15 70/25 71/3 85/7
**reflect [4]** 28/12 29/12 44/11 120/15
**reflected [5]** 51/6 63/17 65/13 74/23 78/5
**reflecting [1]** 22/20
**reflection [5]** 21/23 28/20 64/5 79/12 96/2
**reflections [13]** 40/18 55/5 57/15 60/1 72/16 74/22 76/23 80/11 88/14 98/3 104/9 108/8 108/13
**reflects [1]** 80/4
**refund [4]** 100/16 101/1 101/3 101/9
**refunding [2]** 102/3 102/6
**regard [1]** 42/25
**regarding [3]** 5/22 83/17 124/22
**register [1]** 13/12
**registered [1]** 14/19
**registration [1]** 9/23
**regular [1]** 121/23
**regularly [1]** 109/16
**related [3]** 79/3 90/15 105/21
**relates [2]** 9/24 115/24
**relating [3]** 69/1 79/22 124/11

**relation [3]** 88/3 91/16 119/12
**relationship [2]** 47/15 101/7
**release [2]** 33/15 76/12
**relevance [11]** 33/6 34/23 53/1 57/22 60/8 64/12 71/5 71/6 77/4 88/21 96/7
**relevant [2]** 7/9 118/25
**relying [1]** 84/19
**remain [1]** 101/10
**remains [1]** 8/23
**remember [3]** 8/13 66/7 110/16
**remitting [1]** 93/22
**renumbered [1]** 4/24
**rephrase [4]** 43/19 57/4 57/7 62/22
**replace [1]** 4/23
**reporter [7]** 2/6 2/7 30/22 37/10 125/11 127/3 127/13
**reports [1]** 9/21
**representation [2]** 31/25 115/9
**request [5]** 8/10 8/16 8/21 14/3 39/5
**requested [1]** 16/9
**requests [1]** 7/17
**requirements [1]** 6/10
**requires [1]** 68/13
**research [3]** 49/10 69/1 124/11
**reserve [1]** 108/24
**reship [1]** 77/21
**resolution [1]** 4/17
**resolve [1]** 118/6
**respect [21]** 4/17 6/5 6/8 6/12 7/6 7/12 7/25 8/2 8/15 8/19 9/3 9/17 21/24 43/1 43/3 68/4 68/14 70/12 75/18 87/16 106/24
**response [5]** 54/15 54/19 83/17 86/20 107/20
**responsibility [1]** 9/21
**rest [6]** 27/12 39/15 70/14 98/25 110/1 119/21
**rests [3]** 70/11 122/20 125/1
**return [2]** 28/17 45/20
**Returning [3]** 80/7 87/11 108/2
**reveal [1]** 41/10
**review [54]** 12/10 12/12 27/10 33/24 34/10 40/10 42/1 43/9 44/1 44/4 44/7 46/7 46/8 46/11 49/25 50/6 52/6 53/5 54/22 56/17 56/22 57/10 57/13 59/19 59/23 63/19 63/22 64/2 65/19 67/14 70/16 71/23 72/6 72/13 74/8 74/16 74/20 76/18 78/1 78/7 78/18 79/5 80/7 88/8 95/23 97/22 104/4 108/2 113/7 114/14 114/17 120/12 125/24 126/4
**reviewed [2]** 55/3 114/22
**reviewing [1]** 49/12
**reviews [3]** 45/15 55/25 61/13
**right [75]** 4/13 9/14 10/3 12/25 16/6 16/24 17/2 17/9 17/14 18/21 21/14 25/21 26/6 29/18 29/20 36/7 37/3 37/6 38/24 39/13 39/22 39/24 40/23 40/25 41/17 44/19 45/8 46/13 50/18 51/9 57/4 57/21 58/8 60/7 60/19 62/13 64/11 66/25 67/19 72/21 76/3 77/14 78/15 80/19 86/15 86/18 90/2 91/24 93/7 95/15 96/23 97/16 98/12 99/1 99/2 99/17 100/3 100/13 101/21 102/8 103/13 103/16 104/15 105/16 107/2 107/7 111/9 115/18 119/4 120/7 120/23 123/22 124/17 125/12 126/13
**right-hand [7]** 16/24 17/2 37/3 38/24 39/13 45/8 60/19
**rise [1]** 69/3
**Road [88]** 33/25 34/2 34/3 34/4 34/11 34/15 34/16 34/17 35/10 36/17 36/21 37/1 37/15 37/18 37/24 39/16 40/7 40/10 40/19 41/8 41/11 42/2 42/5 42/13 42/17 43/4 43/10 43/12 44/5 44/12 44/21

45/22 46/9 49/12 49/16 52/7 52/19 52/24 54/1 54/8 54/8 54/16 55/6 57/16 59/14 59/19 60/2 64/6 66/23 71/24 72/17 74/16 74/23 75/15 76/15 76/24 78/19 78/22 78/23 78/24 78/25 79/3 79/5 79/13 80/4 80/7 82/3 82/3 88/9 88/16 93/23 95/23 96/3 97/22 98/4 102/13 104/5 104/10 105/23 106/21 107/4 107/22 108/2 108/14 110/17 110/20 113/3 118/22
**Road's [2]** 34/8 51/24
**rock [2]** 82/16 82/18
**role [4]** 11/4 91/13 92/6 117/24
**roles [1]** 11/13
**Rolex [1]** 111/4
**ROMAN [4]** 1/6 4/3 4/11 115/16
**Room [1]** 2/8
**Roughly [4]** 48/14 97/2 99/7 99/16
**round [1]** 76/11
**row [27]** 43/6 47/4 48/15 48/20 49/4 50/11 50/23 52/13 54/15 58/23 59/1 61/15 61/23 62/2 62/5 62/8 62/23 63/4 71/23 88/8 95/14 96/21 97/3 97/17 104/24 105/7 112/5
**rows [2]** 61/18 77/24
**RoxiPal [7]** 74/15 74/16 74/23 75/14 75/16 76/3 76/15
**RoxiPal's [2]** 75/12 76/1
**RPR [1]** 127/12
**ruining [1]** 46/4
**rule [8]** 6/8 7/16 7/17 9/8 69/19 71/5 71/6 84/20
**ruled [4]** 6/3 6/6 7/21 9/9
**Rules [2]** 71/2 71/3
**ruling [4]** 98/8 104/13 108/18 108/24
**run [2]** 6/4 107/25
**running [1]** 116/2
**runs [1]** 49/2
**RX [6]** 76/19 76/24 77/13 77/15 78/2 78/12

**S**

**S-A-N-T-E-L-L [1]** 30/20
**S-T-E-V-E-N [1]** 30/20
**safe [2]** 109/14 110/9
**safely [2]** 83/2 112/16
**safrole [1]** 48/2
**said [13]** 7/24 19/14 19/18 30/5 66/3 66/4 66/5 86/7 109/14 111/9 111/11 112/2 117/11
**sake [1]** 71/14
**sale [5]** 35/6 37/14 38/20 38/23 50/12
**sales [21]** 40/7 50/6 51/13 51/22 51/25 52/4 52/4 52/10 56/14 56/18 56/20 59/14 59/16 65/12 65/16 74/6 74/11 76/15 78/5 99/9 105/4
**Sam [1]** 4/17
**same [13]** 6/16 7/17 11/25 15/17 20/17 21/12 22/16 39/19 48/18 48/19 50/23 82/18 108/21
**Santell [23]** 3/4 29/24 30/13 30/18 30/20 30/24 34/14 35/3 38/14 40/17 41/6 43/23 45/5 55/2 55/19 82/2 86/20 96/21 104/4 107/13 110/16 114/1 120/12
**Santell's [1]** 5/23
**save [4]** 87/1 87/5 102/18 107/4
**saved [2]** 80/1 87/2
**saw [4]** 19/25 20/17 111/5 118/20
**say [12]** 67/14 68/1 69/16 71/5 90/20 94/21 94/22 109/20 110/18 116/6 116/25 124/10
**saying [20]** 10/15 53/22 65/24 67/8 67/9 83/11 83/24 85/2 85/5 90/21 91/21 91/24 92/9 92/9 93/10 95/1 101/15 101/18 116/11 122/15
**says [13]** 16/14 17/8 17/10 17/13 17/16 20/19 24/1 36/6 51/3 80/3

**S**

says... [3] 86/15 101/19 102/8
scale [4] 49/2 73/24 105/1 105/9
scheduling [2] 121/14 123/7
Scholl [1] 66/11
Scholl's [1] 67/15
science [2] 31/10 31/10
scope [2] 84/1 124/23
Scott [2] 107/14 107/17
Scott2687 [1] 105/13
screen [20] 16/25 17/3 18/2 19/23
 21/7 22/20 29/12 30/3 30/7 38/19
 39/1 40/4 41/16 52/21 54/5 66/16
 71/25 85/17 103/18 105/12
screenshot [5] 12/24 24/24 25/12
 25/18 26/13
screenshots [1] 23/16
screenshotted [1] 12/23
script [1] 124/9
scroll [27] 48/5 50/18 51/12
 58/20 62/12 63/12 64/22 74/1 76/3
 76/14 77/14 77/23 77/23 83/5
 83/15 85/16 86/9 95/15 95/20
 96/23 99/1 100/3 102/15 103/4
 104/25 105/3 112/19
scrolling [18] 41/17 47/17 48/12
 51/9 52/3 56/14 59/16 63/16 64/25
 65/11 65/16 74/5 78/4 78/15 97/6
 99/8 103/6 110/2
seal [1] 8/6
sealed [1] 48/9
search [5] 9/23 9/25 36/1 36/2
 36/3
seat [2] 70/2 70/3
seated [3] 10/7 30/15 69/5
second [15] 5/20 9/12 13/1 42/22
 43/6 52/13 53/16 56/25 66/1 83/7
 86/22 87/13 89/23 100/6 110/8
Secrecy [1] 9/22
section [8] 36/18 46/7 46/8 82/12
 110/3 111/3 112/20 115/10
sections [2] 103/25 110/4
secure [1] 87/3
security [2] 95/3 117/9
see [85] 8/4 9/9 15/5 15/18 16/14
 17/2 17/4 17/8 17/13 19/6 20/9
 23/9 24/1 35/5 35/6 35/16 35/18
 36/11 36/16 37/15 38/17 38/19
 38/20 38/21 38/22 38/23 39/14
 39/22 39/23 39/24 45/11 45/13
 47/9 47/10 47/12 47/14 47/16
 47/19 48/17 48/19 48/20 50/13
 50/14 50/16 50/23 52/15 52/16
 52/17 52/20 52/22 56/4 56/4 56/10
 58/9 59/10 60/20 63/11 63/12
 63/13 63/15 65/2 69/2 69/11 72/1
 78/13 79/24 79/25 81/12 81/13
 82/9 82/10 83/16 85/6 86/9 87/2
 90/3 95/4 100/4 102/4 105/22
 106/1 124/4 124/14 124/17 125/8
seed [2] 48/3 68/10
seeing [2] 22/3 27/9
seek [1] 24/18
seeking [2] 7/24 90/1
seems [3] 30/7 84/1 87/15
seen [6] 33/1 33/4 33/11 33/17
 35/10 52/19
seize [1] 34/4
seized [3] 44/13 79/1 114/18
select [4] 30/2 30/8 34/10 41/16
selected [1] 39/23
sell [3] 73/7 73/8 92/21
seller [13] 50/16 63/10 75/18
 78/12 91/11 92/3 92/19 92/20 93/1
 93/13 95/3 102/1 102/2
selling [5] 32/23 44/22 56/9
 58/21 103/5
send [3] 15/10 87/7 118/23
sending [9] 22/2 22/2 22/13 66/12
 66/23 67/16 83/1 93/22 108/1
sense [1] 125/3

sent [10] 22/17 24/15 43/9 43/12
 43/23 48/8 54/12 54/14 101/16
 104/1
sentence [2] 46/1 107/14
separate [1] 87/24
separately [1] 8/6
September [3] 11/23 99/22 103/20
September 2021 [1] 11/23
September 30th [1] 99/22
sequel [2] 112/21 112/22
series [9] 23/16 44/11 55/3 57/12
 57/13 59/23 64/3 72/14 74/20
serve [2] 11/21 11/24
served [1] 11/22
servers [3] 34/5 57/17 113/2
service [13] 6/13 6/15 6/20 12/5
 14/11 15/11 21/16 21/20 24/15
 90/12 94/16 109/25 112/12
services [3] 9/23 25/11 107/24
several [2] 43/10 47/7
sexual [2] 113/15 115/9
shard [1] 38/21
shards [6] 37/16 38/22 39/3 60/20
 61/17 61/20
she [6] 39/17 65/23 66/3 66/4
 123/1 123/15
SHERRY [3] 2/6 127/3 127/12
shield [1] 72/2
shine [8] 49/2 104/5 104/9 105/2
 105/10 105/13 105/24 107/20
ship [4] 60/25 63/11 89/3 112/24
shipped [2] 50/24 76/12
shippers [1] 113/1
shipping [21] 39/2 39/4 39/12
 45/23 46/22 46/23 46/24 52/20
 61/7 64/23 73/13 76/4 77/15 89/5
 98/22 98/24 109/5 109/16 109/19
 109/22 112/23
ships [5] 39/14 39/15 61/8 73/14
 98/23
shoehorn [1] 118/24
shop [1] 35/14
Shoppe [3] 88/9 88/15 89/3
shopping [3] 37/3 37/4 37/6
short [2] 69/18 71/4
shortly [2] 69/2 69/11
shot [1] 110/8
should [24] 5/18 6/1 9/9 9/17
 16/25 17/11 18/7 45/20 69/21
 70/11 71/10 82/10 83/13 96/19
 115/3 117/3 117/3 117/13 118/5
 120/1 121/13 122/25 123/13 124/24
shouldn't [3] 42/25 71/7 119/7
show [29] 12/15 13/14 15/13 16/11
 17/22 18/13 19/22 20/15 21/15
 22/19 23/6 23/15 24/21 25/17
 26/12 26/24 27/15 28/2 28/17 43/2
 43/3 49/2 49/13 50/18 86/8 87/22
 98/2 104/14 118/21
showed [1] 20/23
showing [15] 13/11 13/11 34/13
 50/9 51/21 54/25 56/24 57/12
 59/22 61/2 61/9 62/20 66/20 90/15
 114/20
shown [41] 34/14 35/3 35/13 37/13
 38/14 39/17 44/2 45/6 46/6 46/17
 47/1 50/4 50/9 50/12 52/13 54/11
 55/19 55/21 56/6 56/11 58/5 58/12
 58/18 58/24 60/16 60/18 61/2 61/9
 61/19 62/20 63/7 73/5 73/11 75/12
 75/21 77/12 78/11 79/22 82/8
 96/21 97/6
shows [10] 22/1 23/17 23/18 25/12
 28/15 28/23 28/24 29/13 36/19
 48/25
sic [1] 111/8
side [6] 20/19 35/13 39/13 45/8
 60/19 123/12
sidebars [1] 8/12
sides [1] 70/11
sign [4] 36/15 36/15 79/25 82/10
sign-up [2] 79/25 82/10

significant [1] 49/10
Silk [89] 33/25 34/2 34/3 34/4
 34/8 34/10 34/15 34/16 34/17
 35/10 36/17 36/21 37/1 37/14
 37/18 37/24 39/16 40/7 40/10
 40/19 41/8 41/11 42/2 42/5 42/13
 42/17 43/3 43/10 43/12 44/5 44/12
 44/21 45/22 46/8 49/12 49/16
 51/24 52/7 52/19 52/24 54/1 54/8
 54/8 54/16 55/6 57/16 59/14 59/19
 60/1 64/6 66/23 71/24 72/17 74/16
 74/23 76/15 76/24 78/19 78/22
 78/23 78/24 78/25 79/3 79/5 79/13
 80/4 80/7 82/3 82/3 88/9 88/16
 93/23 95/23 96/3 97/22 98/4
 102/13 104/4 104/10 105/23 106/21
 107/4 107/22 108/2 108/14 110/17
 110/20 113/3 118/22
similar [3] 46/10 51/18 82/5
simple [1] 111/25
simply [2] 85/2 118/20
since [2] 31/2 31/11
single [1] 32/13
sir [1] 124/20
sit [4] 122/1 123/14 123/25 124/2
site [16] 12/8 12/12 12/22 13/12
 15/18 40/8 44/13 55/7 107/19
 113/8 113/11 113/17 113/19 114/2
 114/7 114/18
site's [1] 35/11
sites [1] 107/23
sitting [2] 118/3 124/6
situation [1] 94/1
six [3] 20/12 26/23 26/23
slide [1] 122/23
slower [1] 37/10
slowly [1] 58/20
smell [3] 48/3 48/10 59/11
smoker [1] 110/14
smoking [2] 110/4 110/11
smuggling [2] 112/7 112/10
sniff [1] 109/23
so [145]
software [2] 31/4 31/5
sold [20] 32/24 33/1 33/8 33/12
 33/17 36/17 45/11 61/21 61/25
 62/2 62/6 78/17 82/12 82/16 89/7
 89/10 99/3 109/7 110/24 113/3
some [30] 6/2 6/4 13/13 14/3
 32/11 33/16 35/8 42/1 45/10 51/24
 52/10 53/5 59/8 59/23 68/4 68/13
 69/14 69/17 70/23 70/24 80/18
 81/1 85/1 87/21 91/4 93/10 93/11
 106/14 106/15 111/13
somebody [4] 6/20 83/11 85/7
 118/12
somehow [1] 94/6
someone [5] 84/22 85/2 94/20
 94/23 122/11
something [12] 14/18 21/24 36/3
 36/5 36/15 69/23 70/15 117/15
 118/9 119/24 121/20 123/2
sometimes [3] 12/24 70/25 122/13
soon [2] 32/1 125/18
sorry [21] 7/19 18/24 19/15 19/17
 22/3 28/22 41/24 44/17 45/2 50/14
 51/17 53/13 66/12 66/22 83/16
 87/12 89/21 90/1 107/17 108/9
 126/1
sort [2] 68/8 83/22
sorts [2] 32/24 110/24
sounds [1] 86/23
source [2] 20/22 59/5
sources [1] 112/12
Southern [1] 10/21
space [1] 110/11
span [3] 17/8 26/22 26/23
speak [1] 37/9
speaking [1] 12/4
special [19] 5/23 29/23 30/18
 35/3 38/14 40/17 41/6 43/22 45/5
 55/2 55/19 73/20 73/23 82/2 104/4

**S**

special... [4]   107/13 110/16 114/1 120/11
specialize [1]   45/23
specific [2]   35/20 118/10
specifically [7]   11/12 81/1 81/2 84/12 84/14 85/20 98/2
Specify [1]   17/11
speed [8]   35/8 58/10 58/15 59/2 59/4 73/10 82/16 82/18
spell [1]   30/18
spelling [1]   10/15
spend [1]   83/2
spent [1]   11/7
spoken [2]   6/14 6/20
spread [1]   17/11
spreadsheet [25]   47/2 47/3 49/14 50/7 56/7 56/15 62/18 63/20 64/19 65/13 65/17 66/11 67/14 67/15 71/23 71/24 73/15 74/6 74/8 74/14 75/25 76/16 78/8 96/10 97/7
spreadsheets [4]   30/2 31/21 116/21 121/9
squad [1]   32/5
square [1]   45/17
squares [1]   46/3
SR [5]   83/2 87/10 103/21 108/1 112/23
ST [1]   42/9
staff [2]   52/25 125/11
stand [2]   117/4 118/5
standard [5]   13/25 14/2 35/15 101/20 106/1
standards [2]   109/16 109/22
stands [1]   35/23
start [7]   11/7 68/1 70/3 70/7 86/22 123/23 125/2
starting [9]   4/5 17/16 44/4 50/20 53/16 61/23 73/7 102/24 107/18
starts [1]   45/15
state [7]   4/4 7/10 19/20 30/18 69/18 87/21 88/2
stated [2]   7/3 7/14
statement [11]   84/15 85/1 90/25 91/2 93/7 93/8 93/18 93/19 93/25 104/18 118/12
statements [5]   81/17 88/4 116/11 118/15 119/6
STATES [14]   1/1 1/3 1/10 4/3 4/7 10/21 39/14 64/24 76/5 77/16 89/6 98/23 109/6 115/10
stating [1]   71/3
statistics [1]   82/14
statute [5]   6/5 6/25 7/6 7/7 7/20
stay [1]   83/17
staying [1]   112/8
stealth [3]   39/4 45/23 60/25
step [2]   111/22 111/22
STERLINGOV [10]   1/6 4/3 4/11 6/14 42/24 115/17 116/1 125/22 125/24 126/5
Sterlingov's [2]   6/18 6/22
Steven [4]   3/4 29/24 30/13 30/20
stick [1]   124/9
still [8]   6/2 7/9 9/3 27/14 48/19 66/16 91/18 94/25
stinks [1]   49/3
stip [1]   5/22
stiped [1]   107/2
stipulate [1]   106/20
stipulation [12]   4/19 4/25 5/11 9/15 9/16 9/17 9/19 114/25 115/1 115/2 115/4 120/25
stipulations [1]   5/6
stives [1]   75/14
stock [2]   45/19 45/23
stocking [1]   45/16
stolen [2]   33/19 33/20
stop [3]   46/2 54/21 112/4
stopping [1]   121/21
store [1]   42/13

stored [1]   49/16
storing [1]   87/3
straight [1]   48/2
strains [1]   73/8
street [3]   1/16 2/3 110/6
strength [1]   59/11
stricken [1]   43/19
strike [3]   117/3 117/12 119/12
strong [1]   52/18
struggling [1]   92/18
stuff [5]   4/17 48/4 86/10 102/14 119/12
subcategories [1]   35/24
subject [7]   81/23 88/19 88/23 98/8 98/12 104/13 108/18
submit [2]   19/6 28/14
subparts [1]   120/21
subsections [1]   35/19
such [3]   9/25 91/22 111/6
sufficient [1]   96/17
suggest [1]   87/2
suggesting [1]   68/5
suggestion [1]   86/23
Suite [1]   1/17
suits [1]   111/4
summarize [1]   31/9
supply [1]   109/15
supplying [1]   109/13
support [3]   18/10 54/9 54/16
suppose [2]   84/25 91/6
sure [36]   6/19 8/3 17/25 20/14 22/13 32/19 33/15 34/15 39/2 39/18 45/16 46/10 47/5 47/9 47/23 49/6 49/8 58/9 67/24 70/12 90/7 94/3 94/25 95/4 96/22 102/11 102/12 103/21 106/14 113/20 118/6 118/6 118/9 118/16 123/8 124/23
surreptitious [1]   91/12
sustained [1]   43/19
swap [1]   117/23
swear [1]   30/11
switched [1]   11/8
sworn [2]   10/5 30/13
Symbiosis [23]   44/5 45/10 45/15 46/7 46/13 46/18 47/15 47/16 48/20 49/25 50/16 51/1 51/13 52/10 52/23 53/6 53/10 53/11 54/4 54/8 54/14 54/19 67/10
Symbiosis' [5]   44/12 45/7 47/3 50/6 52/6
synthesis [1]   111/18
synthesize [1]   111/22
syringe [1]   110/9
system [4]   18/5 54/11 75/17 84/4
systems [1]   31/7

**T**

tab [2]   42/20 59/3
table [14]   2/11 4/7 4/12 41/13 49/21 49/23 51/15 51/25 52/1 56/2 56/11 64/20 64/21 77/13
tables [1]   42/14
tablets [1]   50/14
tabs [2]   52/14 56/8
tactics [1]   112/23
take [24]   12/10 12/21 18/22 19/12 34/4 49/9 54/20 68/18 68/21 68/23 68/25 69/6 81/13 86/11 99/20 110/7 113/6 114/1 116/22 118/4 120/3 125/1 125/9 125/18
taken [6]   55/7 69/12 78/23 79/1 93/5 126/14
takes [2]   14/12 87/7
taking [1]   102/5
talk [7]   83/6 118/11 119/14 121/14 123/25 124/22 125/2
talking [13]   31/19 37/22 81/6 83/11 83/21 84/6 90/24 101/14 105/25 106/5 117/8 121/22 123/7
task [2]   11/18 32/6
tasked [1]   11/16
teaches [1]   111/21

team [1]   120/16
Tek [4]   65/20 71/24 72/6 73/6
tell [14]   5/11 5/25 31/23 54/14 101/25 102/17 112/23 117/3 117/13 120/1 121/19 122/15 123/14 125/14
telling [3]   84/24 92/19 92/20
tells [2]   111/23 112/13
temporal [1]   93/25
tent [1]   74/4
terms [2]   111/25 119/11
test [2]   48/2 109/15
testified [4]   16/4 16/8 29/7 66/11
testify [1]   33/8
testifying [8]   43/16 57/1 65/23 67/1 67/21 72/13 110/16 110/19
testimony [17]   5/4 5/23 8/16 34/11 44/7 55/2 57/13 59/23 64/2 68/13 69/7 74/19 90/13 120/12 124/19 124/23 125/5
text [5]   26/7 36/16 46/1 47/14 73/7
texture [1]   59/11
than [16]   6/15 7/1 7/4 9/6 24/13 24/15 30/3 77/5 82/3 88/22 96/8 110/22 113/14 116/23 117/16 119/18
thank [18]   10/7 29/20 29/21 30/9 30/10 30/15 30/24 71/20 72/4 97/16 103/14 108/8 123/17 124/14 125/19 126/11 126/12 126/13
Thanks [2]   86/16 107/7
that [461]
that's [8]   54/20 56/12 96/4 108/15 111/1 111/12 114/23 120/14
their [24]   4/4 7/25 15/11 36/21 36/25 43/23 46/2 54/11 81/9 84/14 84/23 86/11 90/10 91/21 91/23 92/7 93/20 94/21 101/3 101/10 101/12 106/7 113/2 118/16
them [25]   4/21 4/23 6/21 30/3 30/8 32/20 32/21 33/23 37/6 38/18 40/15 74/3 81/16 85/6 85/15 92/20 92/21 98/14 106/7 109/15 111/24 118/21 121/1 122/15 125/16
themselves [3]   36/10 69/21 87/19
then [61]   5/22 6/2 14/7 16/5 17/20 24/18 27/12 31/20 35/24 36/6 36/11 36/18 36/25 39/18 39/19 40/4 40/6 47/21 50/15 50/23 50/25 51/4 53/25 54/19 59/8 63/13 66/4 67/10 71/12 77/24 82/17 82/25 83/1 83/18 85/22 86/2 86/10 87/6 87/8 89/9 89/15 92/25 94/5 97/14 98/20 98/21 100/13 102/18 103/13 108/16 114/14 116/10 117/10 117/17 117/22 117/23 121/13 124/5 125/1 125/2 125/18
theory [2]   81/7 94/11
there [130]
therefore [1]   81/10
these [57]   5/2 27/13 33/17 35/4 35/9 40/17 45/10 46/15 46/22 47/7 50/19 54/3 55/5 55/23 55/25 57/15 58/19 60/1 61/13 66/10 66/11 66/12 66/13 66/21 66/22 66/23 67/3 67/13 69/15 72/16 74/22 76/23 78/2 80/11 83/23 84/11 87/17 90/15 90/16 90/22 91/20 92/4 95/1 96/17 102/25 104/8 106/14 106/15 107/1 108/13 113/3 116/15 117/5 118/7 120/2 120/20 121/8
they [110]   4/15 4/24 6/15 6/17 6/23 6/23 22/3 25/9 29/16 33/23 34/4 34/9 35/11 35/24 36/24 36/25 38/17 42/15 46/23 46/24 49/22 51/4 52/2 54/6 55/6 56/8 57/3 57/17 57/18 60/4 61/21 61/22 61/25 64/8 66/4 66/4 67/10 69/18 69/19 69/22 70/3 70/12 71/8 72/19 74/2 74/25 80/13 81/5 81/16 82/5

**T**

they... [60]  82/11 83/12 83/13 83/20 84/2 85/2 85/25 85/25 86/1 86/7 86/8 86/9 86/9 86/10 87/19 87/22 89/5 90/9 90/10 91/11 91/12 91/21 92/2 92/9 92/14 93/2 93/3 93/13 93/16 94/21 94/23 100/15 101/1 101/9 101/11 101/13 101/14 101/15 106/15 106/24 107/3 112/13 112/14 112/14 112/15 113/5 113/16 116/13 116/23 117/5 117/25 118/1 118/14 120/15 120/24 120/25 121/1 122/14 122/15 122/15
thing [5]  33/3 53/15 87/12 115/19 125/20
things [14]  9/7 32/24 33/22 36/13 85/23 85/25 102/25 106/14 106/15 110/24 119/22 120/2 122/5 122/14
think [61]  5/15 5/18 6/3 7/4 8/10 8/14 9/8 18/1 43/15 44/21 66/18 67/2 67/20 68/7 68/13 68/15 70/6 70/10 70/17 80/22 81/7 81/17 84/7 84/17 84/17 84/18 84/21 85/17 91/9 91/17 94/8 94/11 95/3 95/4 101/21 102/20 106/2 106/9 106/12 106/16 106/23 106/23 107/2 113/23 115/23 117/18 117/20 119/3 119/14 119/20 120/25 121/12 121/19 121/20 122/12 122/13 122/19 122/20 123/12 123/24 124/4
thinks [4]  8/25 69/22 94/17 119/6
third [2]  15/4 20/9
this [276]
those [28]  6/4 6/7 6/10 7/21 29/15 34/10 35/22 41/10 46/3 51/25 53/5 69/23 72/23 77/6 91/13 93/3 108/22 108/23 110/25 111/24 115/12 116/14 116/23 117/11 120/11 122/12 125/15 125/16
though [2]  11/12 106/15
thought [4]  65/25 84/3 95/6 122/9
threats [1]  33/14
three [3]  89/9 89/10 122/17
through [54]  3/17 6/4 10/1 36/4 38/18 44/8 44/16 44/17 44/18 44/24 45/1 45/2 45/3 45/8 47/4 47/6 48/15 49/2 50/12 52/14 53/19 53/25 58/7 62/23 68/1 81/16 83/1 85/5 85/16 86/25 91/22 93/4 93/23 101/5 101/16 104/1 106/7 107/22 107/25 115/16 116/23 117/5 119/6 119/20 119/22 120/2 120/11 120/13 120/21 121/1 121/2 121/4 121/8 125/16
Thursday [2]  122/1 124/6
thus [2]  14/9 117/13
tied [1]  15/9
time [33]  5/21 12/13 14/3 17/8 19/10 19/25 26/22 26/23 34/8 37/18 37/21 38/3 49/13 54/20 66/3 68/1 68/21 70/9 99/6 102/18 107/5 112/24 114/24 115/17 116/23 119/11 121/6 121/19 121/21 122/4 124/24 125/6 125/7
times [3]  14/9 75/16 116/16
timing [3]  70/4 121/7 123/24
tips [1]  83/17
title [19]  38/21 42/7 47/17 47/19 48/21 49/4 61/15 62/10 73/19 76/7 77/18 97/3 97/9 99/2 99/11 104/24 105/7 111/16 112/5
titled [1]  112/10
titles [1]  115/6
today [17]  34/11 44/7 53/19 54/10 55/2 57/13 59/24 64/2 70/7 70/9 72/13 74/20 103/23 110/19 117/12 119/20 125/15
together [1]  112/11
told [2]  6/16 115/2
too [5]  30/11 87/5 89/9 110/7 125/6

took [1]  11/19
tools [1]  33/4
top [20]  12/19 36/1 39/24 44/4 45/14 47/22 50/12 52/12 58/14 67/11 73/8 82/12 82/14 82/16 89/7 98/19 98/20 100/4 107/18 109/7
topic [1]  115/19
TOR [12]  2/2 2/3 4/10 32/21 86/25 87/4 87/6 87/8 113/17 113/18 113/19 114/4
total [2]  29/15 62/18
totaling [1]  82/11
toward [3]  5/22 53/16 109/9
trace [2]  14/9 94/24
tracing [1]  67/21
track [1]  113/1
trafficking [1]  116/5
train [1]  12/2
training [4]  11/19 11/19 31/11 31/13
transaction [38]  12/7 19/10 19/13 20/23 21/25 22/2 23/8 23/16 24/18 24/20 24/24 25/18 26/13 26/25 27/13 28/3 28/15 28/21 28/24 40/5 40/6 50/21 63/7 63/8 63/12 78/7 78/12 78/17 81/9 91/12 91/16 93/13 93/14 101/4 101/5 101/11 101/15 105/15
transactions [24]  17/11 22/22 29/13 42/13 51/13 51/18 56/7 56/12 62/21 63/17 63/19 65/12 65/15 67/4 68/7 68/9 68/9 68/12 68/14 74/8 81/10 90/16 93/16 101/12
transcript [2]  1/9 127/4
transfer [5]  6/13 6/13 17/6 36/25 87/9
treat [2]  9/17 115/3
Trevor [3]  108/3 109/3 109/12
TRIAL [1]  1/9
triangle [1]  97/11
trip [1]  122/11
triple [1]  48/8
trouble [2]  94/17 94/18
true [2]  32/1 127/4
truly [1]  14/11
trust [1]  102/18
truth [5]  80/20 88/1 91/6 91/7 101/22
try [4]  37/9 94/5 99/25 110/13
trying [7]  19/8 36/4 83/3 91/18 97/13 107/5 118/24
Tuesday [3]  23/9 122/3 124/6
tumble [1]  86/23
tumbling [1]  83/1
turn [5]  14/15 18/2 18/5 43/12 86/10
Turning [1]  73/4
turns [2]  42/23 70/14
two [13]  4/14 5/5 11/1 29/13 29/15 31/19 41/17 62/13 92/5 103/24 110/4 122/12 125/16
Tyler [9]  54/23 55/20 55/23 55/25 56/2 56/3 56/8 56/12 56/17
type [7]  11/6 11/24 11/25 33/3 36/3 46/19 124/11
types [2]  32/7 82/5
typical [1]  36/24
typically [5]  32/22 33/23 36/10 56/3 111/5

**U**

U.S [2]  1/13 2/7
uh [2]  17/1 24/25
uh-huh [2]  17/1 24/25
UK [7]  45/16 47/20 58/6 65/19 71/24 72/6 73/6
ultimately [1]  34/4
unbelievably [1]  110/14
unclear [2]  7/24 83/22
uncontested [1]  115/4
uncut [9]  45/12 48/22 48/24 48/25

58/25 89/8 95/17 96/25 97/20
under [18]  6/8 7/2 8/5 9/24 15/19 35/14 39/4 39/13 39/21 45/8 60/18 75/12 75/13 81/3 90/2 109/10 110/3 112/18
undercover [9]  11/11 11/13 11/17 11/20 11/21 11/24 12/2 12/7 25/10
understand [7]  9/3 15/8 90/7 90/11 94/10 94/19 125/11
understanding [11]  4/14 6/9 6/22 24/12 24/16 24/16 53/22 84/3 108/22 114/2 115/25
understood [4]  70/23 118/19 119/10 123/19
undisputed [1]  9/18
undoubtedly [1]  116/18
unit [2]  109/17 109/22
UNITED [15]  1/1 1/3 1/10 4/2 4/7 10/21 39/14 46/23 64/24 76/5 77/16 89/6 98/23 109/6 115/10
unlawful [1]  68/12
unless [1]  49/9
unlikely [1]  14/9
unquote [1]  90/13
until [12]  11/23 45/15 45/15 51/3 69/7 70/3 70/9 91/21 119/21 122/12 124/3 124/19
up [75]  4/19 4/20 9/7 17/24 31/16 37/12 43/13 44/10 45/15 47/1 49/1 49/13 53/8 53/20 54/11 56/6 59/13 61/14 63/25 65/15 66/1 66/16 67/13 68/19 71/22 72/8 73/9 74/5 74/18 75/11 75/21 75/25 76/14 78/4 78/21 79/7 79/25 80/21 80/22 81/16 82/10 82/20 85/17 86/7 86/11 87/13 87/25 89/22 97/21 97/25 99/1 100/6 102/15 103/4 103/6 104/3 104/23 105/17 111/15 115/19 120/10 120/11 120/18 120/20 121/14 121/15 122/12 122/13 122/15 122/21 122/22 124/25 125/17 125/18 126/7
update [1]  47/24
updated [1]  7/22
upload [1]  113/12
upon [2]  39/5 115/3
upper [4]  16/24 17/2 37/3 97/11
upstream [1]  94/10
us [15]  1/20 36/19 39/2 45/8 47/4 48/15 50/11 62/23 63/7 70/6 99/18 110/1 121/19 122/15 125/6
USA [2]  76/12 77/22
USAO [1]  1/16
USD [2]  39/7 61/6
use [27]  15/11 15/12 16/25 36/23 63/9 83/13 83/14 83/18 84/6 84/14 84/24 87/4 87/5 87/8 105/25 107/15 107/24 110/4 110/4 110/5 110/7 110/11 112/16 116/12 117/8 117/9 118/15
used [9]  32/22 41/10 42/24 44/5 84/2 90/23 110/6 110/10 111/13
user [28]  36/21 39/16 41/14 44/2 47/14 47/15 49/10 57/6 57/10 59/19 63/22 65/19 65/24 67/10 71/24 79/5 79/13 80/2 80/8 81/8 84/13 88/9 90/9 95/23 97/23 104/5 115/8 115/12
user's [1]  41/13
username [5]  40/11 41/16 79/23 79/24 82/9
users [8]  34/11 36/9 57/3 66/4 84/10 114/21 115/15 120/16
users' [1]  14/7
uses [1]  83/24
using [16]  17/17 42/2 43/10 45/21 54/23 81/9 83/21 85/7 87/23 90/16 92/13 92/15 101/14 102/6 115/13 116/4
USPS [1]  112/25

**V**

vacuum [1]  48/8
value [1]  17/17
various [4]  44/1 61/21 109/8 111/6
vendor [33]  45/7 45/11 45/16 45/22 46/8 51/1 51/2 54/9 54/16 55/20 58/6 60/17 60/23 62/21 66/13 67/14 72/17 73/6 74/9 74/14 75/13 75/16 76/19 78/8 82/11 84/23 100/10 100/25 102/2 106/5 108/3 117/7 118/13
vendor's [2]  46/19 73/16
vendors [18]  36/10 36/10 43/10 43/12 43/23 44/1 52/24 66/10 66/10 66/12 66/21 66/22 66/24 67/13 116/3 116/3 116/3 116/6
vendors' [1]  49/13
venue [4]  6/5 7/18 7/19 7/20
Verret [5]  7/23 9/4 70/7 122/22 124/23
versus [1]  4/3
very [14]  32/1 45/24 45/25 49/8 52/17 52/18 59/7 71/4 101/9 109/8 112/2 116/21 122/1 124/13
via [1]  36/17
victim [1]  33/16
video [14]  5/23 113/8 113/10 113/11 113/14 114/2 114/7 114/12 114/15 114/17 114/21 114/25 115/6 120/16
videos [1]  113/12
view [4]  12/22 18/18 122/24 125/23
violation [2]  115/8 115/10
violations [2]  7/8 115/12
virtually [1]  118/8
visitor [1]  35/10
visual [1]  115/9
voir [1]  8/17
volume [1]  119/12
vs [1]  1/5

**W**

wait [3]  4/16 17/16 101/5
waiting [7]  4/14 4/16 6/4 53/24 92/10 93/3 93/20
waking [1]  53/20
walk [9]  38/17 45/8 47/4 48/15 50/11 52/14 58/7 62/23 63/7
Walker [7]  4/19 29/25 30/10 30/11 70/17 86/14 86/15
Wall [1]  2/3
wallet [18]  21/20 22/1 22/14 22/17 23/9 23/10 24/25 25/10 25/11 25/13 25/20 26/6 28/23 28/24 83/2 86/25 87/6 87/10
wallets [1]  87/7
want [37]  5/10 12/10 12/15 17/22 18/22 18/23 19/12 26/22 27/14 36/3 36/24 37/5 42/22 46/3 46/11 57/4 68/18 74/3 86/8 94/23 109/24 111/9 116/12 116/25 118/6 118/9 118/16 119/24 120/1 121/7 121/14 123/8 123/25 124/21 125/6 126/3 126/5
wanted [7]  15/10 20/22 25/20 38/2 38/2 39/16 125/22
wants [6]  67/23 85/23 101/8 117/15 123/12 126/5
wares [1]  60/24
was [174]
washed [1]  73/10
washing [1]  83/1
washing/tumbling [1]  83/1
Washington [5]  1/5 1/14 1/17 1/21 2/9
wasn't [1]  111/7
watch [1]  112/18
watches [1]  111/4
way [22]  5/9 5/10 15/5 20/9 33/16

39/24 43/1 43/1 51/12 56/13 56/14 63/16 68/2 86/16 93/10 94/17 95/20 99/8 105/3 117/9 119/4 124/11
we [256]
We'd [1]  123/11
we'll [7]  32/1 76/6 87/25 104/25 121/13 124/4 124/6
website [3]  12/19 20/18 20/22
websites [1]  31/8
Wednesday [1]  124/6
Weed [1]  58/22
week [4]  11/19 45/21 122/3 123/23
week-long [1]  11/19
weekend [8]  119/22 119/25 120/1 120/3 120/4 123/8 124/7 124/12
weigh [1]  53/20
welcome [17]  5/23 9/14 60/24 75/14 113/8 113/10 113/11 113/14 114/2 114/7 114/12 114/15 114/17 114/21 114/25 119/7 120/16
well [36]  4/13 7/10 7/19 8/22 17/15 25/15 33/12 33/17 33/19 35/7 36/9 45/11 47/12 50/1 52/25 56/9 58/11 59/5 59/12 60/21 61/13 62/1 66/1 66/24 68/5 69/6 69/13 70/5 85/9 109/14 113/1 113/19 119/8 124/18 124/22 125/25
well-established [1]  59/5
went [3]  21/7 46/12 97/14
were [62]  7/8 12/7 14/18 19/20 27/12 34/18 37/24 38/18 41/4 47/11 49/16 52/6 55/6 55/16 56/20 58/1 60/13 63/11 64/15 65/25 66/11 66/12 68/7 68/10 68/12 73/1 74/11 75/8 77/8 80/1 81/25 87/17 87/18 87/19 87/22 87/23 88/25 89/5 89/7 90/23 92/9 92/12 95/2 98/15 104/21 108/25 110/24 111/5 113/11 114/14 114/17 115/16 116/9 116/10 116/10 116/12 116/13 118/14 119/4 120/16 121/4 122/12
West [6]  76/19 76/23 77/13 77/15 78/2 78/12
what [200]
whatever [8]  11/18 35/17 36/24 68/6 68/12 85/23 116/12 123/15
when [32]  5/18 5/23 6/1 10/9 16/9 19/7 34/18 35/8 35/11 36/8 37/7 37/24 44/13 49/12 50/21 50/24 52/20 52/22 53/19 55/6 63/12 65/23 69/17 70/25 74/2 79/2 83/15 99/23 103/23 110/1 114/18 122/19
whenever [1]  47/16
where [47]  6/20 10/18 11/2 11/9 16/14 17/8 17/13 19/20 20/19 21/7 22/2 24/1 25/20 27/11 30/24 31/23 36/6 37/5 39/11 39/21 39/22 46/11 46/22 46/24 49/22 51/2 61/7 64/22 73/13 76/3 77/14 83/22 87/18 89/5 96/17 98/22 98/24 105/21 108/7 109/5 111/24 113/11 116/11 117/6 118/10 118/11 121/24
Whereupon [36]  13/9 13/23 15/2 16/2 16/22 19/4 20/7 21/5 22/9 23/4 23/24 25/7 26/20 27/7 27/23 28/10 29/5 35/1 38/12 41/3 45/3 55/16 58/1 60/12 64/15 73/1 75/8 77/8 79/20 81/25 88/25 96/14 98/15 104/21 108/25 121/4
whether [41]  7/24 8/13 24/13 28/12 32/1 36/9 42/24 68/19 69/20 69/22 70/6 70/14 71/9 71/14 85/1 85/6 85/8 86/1 86/3 87/25 91/3 91/4 91/5 91/18 92/19 92/22 93/9 93/10 101/22 106/15 106/19 114/3 114/7 116/8 116/9 116/10 116/13 118/1 118/12 121/6 122/25
which [42]  6/2 6/24 7/13 7/18 8/4 8/6 8/9 8/10 8/11 8/11 8/13 9/20 14/15 15/18 15/19 16/4 18/14 25/11 30/7 37/12 38/24 44/10

47/10 49/1 50/15 50/22 50/24 50/25 57/2 63/25 68/7 81/5 82/9 87/25 98/1 101/16 101/19 107/23 110/15 111/15 114/20 120/25
whichever [2]  5/10 5/12
while [5]  4/16 6/4 69/13 86/7 110/1
white [2]  62/11 62/15
who [31]  4/11 24/3 24/5 43/12 43/23 44/5 49/10 50/16 52/6 53/9 66/12 67/21 83/24 84/2 84/24 85/7 90/9 90/16 91/20 100/11 100/13 106/5 116/1 116/4 118/2 118/12 118/13 121/18 121/22 122/10 122/11
whole [6]  49/2 85/10 85/13 86/9 94/15 94/24
whose [2]  44/1 114/21
why [12]  5/25 17/25 20/21 24/16 68/15 68/23 68/24 85/22 93/21 95/5 125/14 126/7
Wi [1]  86/24
Wi-Fi [1]  86/24
wicked [1]  73/9
will [58]  4/24 6/1 6/10 6/18 8/2 8/6 8/22 17/17 36/16 39/24 45/7 45/20 47/24 48/8 48/9 53/17 53/18 64/21 68/1 68/19 69/2 70/17 75/15 75/16 86/2 88/23 95/5 101/19 102/18 102/18 103/23 104/1 104/17 107/21 108/21 108/23 108/24 109/16 109/17 109/22 109/23 111/23 112/22 112/25 119/2 121/8 122/1 123/14 123/15 124/3 124/3 124/4 124/14 124/17 124/18 125/16 125/17 126/8
wise [1]  70/4
withdrawal [13]  14/4 16/13 17/17 17/17 18/18 18/20 19/6 19/8 24/20 26/4 26/10 27/10 28/12
withdrawals [1]  103/21
withdrawing [2]  66/21 66/22
withdrawn [1]  31/25
withdrew [2]  29/15 54/10
within [6]  39/2 48/5 118/14 118/21 118/22 119/1
without [4]  67/8 91/2 112/18 119/13
witness [18]  5/4 10/4 29/17 29/22 29/25 30/6 30/12 67/1 67/6 67/8 67/20 114/6 117/4 118/5 119/13 122/21 124/17 125/5
witnesses [3]  8/21 68/5 122/18
WITNESSSES [1]  3/2
won't [1]  51/2
wonder [2]  102/24 116/10
wondering [3]  91/3 119/13 121/6
work [21]  10/18 10/19 11/2 11/6 11/11 11/11 11/25 12/4 22/20 30/24 30/25 31/5 32/7 32/15 33/24 78/18 113/2 113/7 114/3 114/12 119/15
worked [3]  11/7 11/9 31/1
worker [1]  112/23
working [1]  71/25
works [3]  37/4 112/21 112/22
world [4]  39/15 47/23 98/25 109/14
worldwide [3]  46/25 61/8 73/14
worth [1]  52/19
would [54]  4/4 5/2 6/13 7/9 7/9 11/16 11/17 15/11 15/12 16/16 24/20 30/2 35/10 36/21 36/25 39/8 39/10 39/17 39/21 39/25 40/1 40/3 40/5 46/11 46/19 47/8 58/11 67/7 81/1 81/3 81/12 82/16 82/17 82/19 82/25 84/15 86/24 88/3 89/19 90/25 91/5 92/21 94/11 95/4 98/20 100/2 105/14 110/12 113/24 116/6 116/22 120/3 121/20 123/2
wouldn't [3]  94/20 94/21 94/23
write [1]  94/22

**W**

written [1]  112/11

**X**

Xanax [1]  65/4

**Y**

yeah [44]  9/5 10/24 11/16 12/3
 12/14 12/23 13/15 16/13 17/4
 17/16 18/12 18/19 19/7 19/18
 19/19 20/17 22/22 23/17 24/2
 24/17 24/25 25/10 25/19 26/5
 26/14 27/10 27/17 28/14 28/19
 28/24 29/11 29/13 33/5 33/21
 34/20 35/5 35/15 38/2 45/10 65/8
 66/18 106/1 113/23 120/4
years [2]  11/1 11/8
yep [16]  14/2 22/22 36/2 37/4
 40/3 41/20 42/9 47/19 48/17 60/20
 61/11 61/17 62/11 82/9 82/13
 89/11
yes [64]  4/18 5/7 5/8 9/11 11/12
 12/9 13/13 15/7 15/15 16/10 16/15
 17/9 17/14 18/7 18/24 19/16 19/24
 20/1 20/11 20/20 21/14 21/18 22/1
 22/17 23/8 24/8 24/20 27/1 28/4
 28/16 28/22 29/9 29/16 30/24 32/2
 32/17 35/12 40/20 41/15 42/6
 46/21 50/10 50/13 51/20 53/12
 55/8 63/8 66/20 89/18 95/8 97/19
 100/22 102/10 102/17 103/2 103/3
 104/11 105/9 108/11 110/21 111/10
 115/22 124/20 125/21
yet [21]  15/13 16/11 18/14 19/22
 22/3 34/13 37/12 44/10 54/25
 63/25 72/8 74/18 76/22 79/7 79/10
 80/10 88/11 96/1 97/25 104/7
 108/6
York [1]  1/20
you [546]
your [177]
yours [1]  37/8
yourself [2]  10/14 24/7
yourselves [2]  69/1 124/13
Yup [1]  79/24

**Z**

zero [1]  36/15
zones [2]  39/3 39/3
zoom [4]  36/14 37/2 99/25 107/9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    )
UNITED STATES OF AMERICA,             )        Criminal Action
                                      )          No. 21-00399
            Plaintiff,                )
                                      )
    vs.                               )        **AFTERNOON SESSION**
                                      )
ROMAN STERLINGOV,                     )        Washington, D.C.
                                      )        March 1, 2024
            Defendant.                )        4:24 p.m.
                                      )
\* \* \* \* \* \* \* \* \* \* \* \* \* \*     )


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES:</u>

FOR THE PLAINTIFF:        CHRISTOPHER BROWN, ESQ.
                          UNITED STATES ATTORNEY'S OFFICE FOR
                            THE DISTRICT OF COLUMBIA
                          601 D Street, Northwest
                          Suite 5.1527
                          Washington, D.C. 20530

                          CATHERINE PELKER, ESQ.
                          U.S. DEPARTMENT OF JUSTICE
                          950 Pennsylvania Avenue, Northwest
                          Washington, D.C. 20530


FOR THE DEFENDANT:        TOR EKELAND, ESQ.
                          MICHAEL HASSARD, ESQ.
                          TOR EKELAND LAW, PLLC
                          30 Wall Street
                          Eighth Floor
                          Brooklyn, New York 10005

REPORTED BY:           LISA EDWARDS, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Room 6706
Washington, D.C. 20001
(202) 354-3269

THE COURTROOM DEPUTY: Crime Case No. 21-399, the United States of America versus Roman Sterlingov.

Would counsel please approach the podium and state their name for the record, starting with Government counsel.

MR. BROWN: Good afternoon. AUSA Christopher Brown for the Government. With me at counsel table is C. Alden Pelker. Our co-counsel Jeffrey Pearlman had to leave this afternoon.

THE COURT: That's fine. Good afternoon.

MR. EKELAND: Tor Ekeland for Defendant Roman Sterlingov, who is present in court. And joining me at counsel table is Michael Hassard.

THE COURT: Good afternoon.

I have some modestly good news to kick things off. The one juror who we had talked about canceled or postponed her appointment for Monday.

Another juror, however, indicated that he needs to leave by 3:30 because of a family member who has outpatient surgery and needs to pick that person up. We can sit until 3:30 on Monday. So that's helpful, I guess.

And I'm happy to take suggestions on how we should proceed.

I will say that the court reporter that is present has been going the entire day today and I think it would be cruel and unusual punishment to try and make the court

reporter go until 5:00. So I think we probably should at least kick things off. But not only has she been going, but she's been going with people talking at the same time all afternoon.

So any suggestions, Mr. Ekeland?

MR. EKELAND: This is a proposed solution rather than so much an argument.

So what we suggest is -- so there was the supplemental expert disclosure on August 7, 2023, at Docket 158 that attached the proposed slide deck demonstrative summary for Mr. Verret.

And the latest slide deck that I think we produced about a week ago or so to the government via email is mainly a streamlined version of it. If I'm understanding the objections correctly, which I think I am, it's that the new slide deck also includes forensic interviews Professor Verret conducted.

What we propose is just simply removing the slides in the new slide deck, which I have as Slide No. 9, with the title that says Forensic Interviews, which is obviously a specific reference to forensic interviews; and Slide No. 10, which says Assets, which is information that Professor Verret got in those forensic interviews.

And I would just add that I don't think -- the forensic interviews didn't change his opinion. It just

confirmed it. So -- and also, this testimony, should Mr. Sterlingov choose to testify, will just come in through him, and that can't be stopped. It's just a matter of when, assuming Mr. Sterlingov does choose to testify.

THE COURT: All right.

MR. EKELAND: And then there's Slide No. 11, which is entitled Assessing Credibility, because my understanding is that that slide is about assessing the credibility of, you know, the person you forensically are interviewing.

And that -- unless the Government's got something else to point out, say, you know, involving the forensic interviews, I think it embodies the incorporation of the forensic interviews in the deck; and then we limit -- we just keep the forensic interview testimony out from his expert testimony and just proceed on the basis of his opinions before, which it's the defense's contention is the same as what's been disclosed.

That's our proposed solution.

THE COURT: All right. Mr. Brown or Ms. Pelker?

MR. BROWN: Your Honor, I'm afraid I don't think that that will fully address the Government's concerns, because there's sort of two things going on with this supplemental slide deck.

Number one is that -- is this sort of forensic interview issue. First of all, I'm not sure that those

three slides are the full extent of the sort of additional fact testimony that Professor Verret would seek to introduce.

But more to the point, I think that throughout this new slide deck, it reads as if it was written by somebody who has never been familiarized with the Court's *Daubert* rulings on September 8th and 15th. I mean, from the very first slide to the very last slide, there are -- there's slides that appear in some cases just in diametric opposition to points that the Court made.

I mean, the last slide, you know, just for example, "No financial forensic evidence that Mr. Sterlingov operated Bitcoin Fog."

I think the Court was very clear again and again and again that Mr. Verret -- not only was he not competent to testify as to the sufficiency of the evidence in the case, but that this would be a 702 and a 403 problem if you had an expert purporting to instruct the jury about the sufficiency of the evidence.

And I mean, I could walk through slide by slide. But I think our concerns are just it does not appear that Professor Verret was, you know, mindful of the Court's *Daubert* rulings when he prepared these slides.

We have no objection to proceeding under the Court's rulings on September 8th and September 15th. It

just doesn't appear that this is at all consistent with the Court's rulings.

THE COURT: Mr. Ekeland?

I did -- my clerk printed out those two transcripts, which I intend to read over the weekend again. And I need to go back through my notes from the prior *Daubert* hearings.

Mr. Ekeland?

MR. EKELAND: It was our understanding that the rulings from what we read in the transcript -- and Professor Verret did go through the transcript and, you know, I specifically asked him to revise based on your comments. Also, that the Court was going to issue a written ruling on the *Daubert*; and I understand the Court's been very, very busy.

So I --

THE COURT: I think what I said -- I'm not -- perhaps, but I think with respect to Professor Verret in particular, I went through line by line there and said, "Yes, no, yes, no" in a very clear fashion on the record with respect to those. And there was not -- there may have been like one thing possibly in there or two possibly where there was some further consideration. But I was pretty clear, I think, on the record of exactly what my rulings were on that.

MR. EKELAND: And it's -- and he read that.

But like it's -- what we're proposing is very concrete slides. And I'm not getting a specific slide objection from the Government. I have a revised version of what was sent to them in August. It's just less words.

As for the conclusion to the slide deck, it's our understanding that that's -- it's just in accordance with Federal Rule of Evidence 704. If the Court rules otherwise, that's fine. We'll pull it out. But, you know, the 704 does say that experts can opine as to, you know, the ultimate conclusions as long as it doesn't go to the mental state -- you know, elements of the mental state for a criminal defendant.

So, you know, that's my understanding -- our understanding of Federal Rule of Evidence 704, is it abrogates the ultimate conclusion rule.

THE COURT: I think what it does, actually, is it says -- I think it leaves that within the discretion of the Court, as I understand the rule.

MR. EKELAND: And again, if the Court says to take that slide out, we'll take that slide out. You know, we're not so much interested in getting into a war with respect to the slide deck.

What the understanding was is we're trying to streamline it so it wasn't so wordy. We're willing to take

out the reference to the forensic interview and limit the scope. And if there's anything in particular objectionable, let's have that conversation and just get this going so you -- well, you understand, your Honor.

THE COURT: I think that's a fair point.

What I would just say is that, Mr. Brown, if there are particular slides that you can flag that you can raise these concerns, if you can bring that to Mr. Ekeland's attention, it will help expedite things on Monday in this regard.

And I think this is implicit in what Mr. Ekeland is doing in proposing to drop the slides that refer to the forensic interviews.

But that is a thing that was causing me great concern, because -- both because of its untimeliness, but also because you had asked at least one witness and maybe more than one witness whether they had interviewed Mr. Sterlingov. And it does, I think, put the Government in a really unfair position where they haven't been able to interview him and it may be suggesting in some way that your forensic analysis is better than theirs because they interviewed -- Mr. Sterlingov was interviewed. And that is problematic, I think, and misleading to the jury.

MR. EKELAND: Understood, your Honor.

At this moment, I'm looking for a solution so we

can streamline this and move it ahead. And I think what the Court is suggesting is an excellent idea.

THE COURT: Okay. Mr. Brown?

MR. BROWN: Your Honor, I think that this may be a workable solution. Either tonight or early tomorrow, I can send to the defense on a slide-by-slide basis what the specific objections are.

But I think underlying all of this is that we have prepared our case for trial on the basis of the Court's pretrial rulings. And so, you know, to the extent these slides are rather cryptic in what they say, simply because if there's no objection to a particular slide that doesn't mean that we won't be objecting, you know, if the defense elicits certain areas of testimony that we think the Court has already ruled on. And we'll have those cites ready. But for the slides, the demonstratives themselves, I think that we can certainly work with the defense. And if there's any remaining area for disagreement, we can have that teed up for the Court on Monday.

THE COURT: That's fine. I think that's a good way to proceed.

As I said, I'm going to reread over the weekend my actual rulings and I'll have a summary in hand, and I'll also have the piece of paper or the report where it was in front of me as I was ruling where I was writing yes or no in

the margins of it. So I think I will be well-positioned if there are objections that come up as the evidence is coming in.

Mr. Ekeland, anything else?

MR. EKELAND: Only a final comment. We were not trying to be cryptic with the PowerPoint. It's just merely talking points. We weren't trying to write a legal brief for actually some of the reasons that are being raised. So that's all on that.

THE COURT: Yes. I did agree with the Government that maybe this is all coming out as -- I'm not sure whether it was a question of a witness -- an expert witness opining on the final -- the ultimate question for the jury or just that they were very argumentative in nature.

I realize that Professor Verret is a lawyer as well. But it looked more like sort of the slides -- or some of them -- that you might use in giving your closing than what a witness would address. It felt like a lawyer's argument in some of them. That was causing some concern as well.

MR. EKELAND: Understood.

THE COURT: All right. Anything else before we adjourn for the weekend?

MR. EKELAND: No, your Honor.

THE COURT: Did you want to raise the question

about access to the devices?

MR. BROWN: Yes, your Honor.

So we have devices that we are prepared to make available to the defense for inspection.

We tried to do this while we were -- while our case was in recess down in the basement. The marshals informed us when we tried to walk in that they don't allow these electronics in that space. And they said it would have to be, if anywhere, in the holding cell behind the courtroom.

And so we have them here. But -- so we've tried to make that work, your Honor.

THE COURT: Well, it's 20 minutes of 5:00. Are the marshals okay with keeping you here until 5:00? Is that acceptable?

MR. EKELAND: Your Honor, we need Mr. Fischbach for that, and he's not here. Maybe it's possible to do it after we end the day, at 3:30 on Monday.

THE COURT: Monday. Assuming it's okay with the Marshals Service, it's fine with me.

MR. EKELAND: Okay. Is that okay with the Government?

MS. PELKER: I think the only issue is just going to be that if Mr. Fischbach is mid-testimony, it may be difficult for him to participate in the review. But that's

fine with the Government.

MR. EKELAND: Oh, yeah. I think we'll still be -- well, that would mean that we're through with Professor Verret, which would mean we're going at a good clip. And, you know, maybe we just could pause before he goes and testifies. I think we would still be on pace to finish this trial Wednesday or Thursday.

THE COURT: We're also going to need some time for a charging conference, too, where there's going to be some downtime for the jury for the charging conference also. So sometime next week I'm going to need to tell the jury to come in a little later or go home early so we can have a charging conference.

MS. PELKER: We would just like to put on the record -- and we're happy to make the devices available and we understand that different members of the defense team are located in different places. The Government did send viewing letters, that these devices have been available for the defense to review. But we are trying to accommodate Mr. Fischbach's desire to review them now here with the Defendant.

THE COURT: I appreciate that in all respects.

Anything before we adjourn for the weekend?

MR. BROWN: No, your Honor.

MS. PELKER: No, your Honor.

THE COURT:  Well, thank you all.  Have a good weekend.

(Proceedings concluded.)

**<u>CERTIFICATE</u>**

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 1st day of March, 2024.

<u>/s/ Lisa Edwards, RDR, CRR</u>
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

ROMAN STERLINGOV,

        Defendant.

_____/

Criminal Action
No. 1: 21-399

Washington, DC
March 4, 2024

9:38 a.m.

MORNING PROCEEDINGS

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:    CATHERINE PELKER
                    U.S. DEPARTMENT OF JUSTICE
                    950 Pennsylvania Ave NW
                    Washington, DC 20530

                    CHRISTOPHER BRODIE BROWN
                    DOJ-USAO
                    601 D Street, N.W.
                    Suite 5.1527
                    Washington, DC 20530

                    JEFFREY PEARLMAN
                    DOJ-CRM
                    Ccips
                    US Dept of Justice
                    1301 New York Ave NW
                    Washington, DC 20005

APPEARANCES CONTINUED ON NEXT PAGE

APPEARANCES CONTINUED

For the Defendant:      TOR EKELAND
MICHAEL HASSARD
TOR EKELAND LAW PLLC
30 Wall Street
8th Floor
Brooklyn, NY 10005


Court Reporter:      SHERRY LINDSAY
Official Court Reporter
U.S. District & Bankruptcy Courts
333 Constitution Avenue, NW
Room 6710
Washington, DC 20001

TABLE OF CONTENTS

WITNESSES

Steven Santell

Direct examination continued by Ms. Pelker    5
Cross-examination by Mr. Ekeland    11
Redirect examination by Ms. Pelker    27

John Verret

Direct examination by Mr. Ekeland    80

EXHIBITS

Defense Exhibit 130    17
Defense Exhibit 129    88
Defense Exhibit 128    99

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Criminal case 21-399, *United States of America versus Roman Sterlingov.*

Would counsel please approach the podium state and their name for the record, starting with government counsel.

MR. BROWN:  Good morning, Your Honor.  AUSA Chris Brown for the government and with me at counsel table are C. Alden Pelker and Jeffrey Pearlman.

THE COURT:  All right.  Good morning.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for Defendant Roman Sterlingov, who is present in court.  And joining me at counsel table is Michael Hassard.

THE COURT:  Good morning.

Do we have the final juror, do you know?

THE COURTROOM DEPUTY:  We should.

THE COURT:  We were waiting on one last juror.

THE COURTROOM DEPUTY:  Yes, Judge.

THE COURT:  Anything to raise before we get the jury?

MR. BROWN:  No, Your Honor.

THE COURT:  All right.  We can get the witness back in the witness box.

Okay.  And we can get the jury.

(Jury in at 9:27 a.m.)

THE COURT:  All right.  All right.  You may continue.

MS. PELKER:  Thank you.

If we could pull up Exhibit 623.

DIRECT EXAMINATION CONTINUED

BY MS. PELKER:

Q.   And while that is coming up, Special Agent Santell, when we stopped for the weekend on Friday, you were beginning your testimony about Welcome to Video.  Can you remind the jury what Welcome to Video was?

A.   Yes.  Welcome to Video was a child pornography site allowing users to upload and download child pornography images and videos.

Q.   Showing you Exhibit 623, which was previously admitted. Did you review records corresponding to particular users at Welcome to Video who had received funds through Bitcoin Fog?

A.   I did.

Q.   And are the users whose records you reviewed and their corresponding Bitcoin addresses shown here on this table?

A.   They are.

MS. PELKER:  If we could pull up Exhibit 623.  And 623, and the following exhibits I believe we did -- 624, apologies.

And, Your Honor, we had previously admitted an unredacted version of 624 with Mr. Luke Scholl.  And we had cut off the columns.  We would just now move to withdraw that exhibit and replace it with this exhibit, which is the same but reflecting the redactions that had been discussed.

THE COURT: All right. With the parties' agreement Exhibit 624 is substituted for the prior exhibit in the redacted form.

BY MS. PELKER:

Q. Special Agent Santell, can you explain to the jury what is shown here in this record?

A. Yes. This is a record of downloaded videos from the username that you can see in column B.

Q. And if we could scroll over to the left. Is that Bitcoin address in column A the deposit address for the assigned user?

A. Yes.

Q. And without speaking to the specifics of the -- you reviewed an unredacted version of this exhibit?

A. Yes.

Q. And without speaking to the specific contents of the columns F, G and H, generally what was this user's activity on Welcome to Video?

A. For child pornography.

Q. Pulling up Exhibit 625 and scrolling over to the left. And what is shown here?

A. This is the downloads for the username in column B Billy Bob 1337.

Q. Is the Bitcoin address in 1AK19 the Welcome to Video deposit address for Billy Bob 1337?

A. That's correct.

Q. If we could pull up Exhibit 626.

THE COURT: So are we doing the same thing for all of those where I should be substituting all of those exhibits?

MS. PELKER: We only admitted 624 through Mr. Scholl.

THE COURT: I see.

MS. PELKER: And then when we admitted the exhibits -- we did admit all of the exhibits on Friday. When we were going back to rectify the exhibit list, we realized there were two versions of the same exhibit.

THE COURT: All right. Fine. Thank you.

BY MS. PELKER:

Q. And, Special Agent Santell, what is shown in this exhibit?

A. The downloads file for the user in column B, user 2A387.

Q. And what are the first several characters of that Bitcoin address in column A?

A. 17DQYVZ.

Q. Pulling up Exhibit 627. And what is the user whose records are shown here?

A. TUKOGB1.

Q. What are the first several characters of this user's Bitcoin address?

A. 12S7WS.

Q. 628A. And can you explain what is shown here?

A. The downloads for Slammer 88.

Q. What are the first couple of characters of the Bitcoin

address for Slammer 88?

A.    12M2V.

Q.    Can you read the date in the third row?

A.    Yes.  11/11/2017.

Q.    And moving now to Exhibit 628B.  And is this another record for that same user, Slammer 88?

A.    That is correct.

Q.    And what is the difference between this record and the record that we saw in 628A?

A.    So these are the uploads where the one previous was the downloads.

Q.    Can you explain the distinction on Welcome to Video on the uploads and downloads?

A.    Yes.  Uploading means you are taking some type of child pornography and sending it to the site and downloads would be the reverse where you are downloading it from the site.

Q.    Did some Welcome to Video users like Slammer 88 do both?

A.    Correct.

Q.    Pulling up Exhibit 629.  And scrolling to the left.  What user and Bitcoin address are shown sheer?

A.    User in column B, Geegeegee, G-E-E-G-E-E-E-G-E-E.  And the first several of the Bitcoin address would be 12HWC.

Q.    Exhibit 630A.  What is the user shown here?

A.    I-L-B-E-1.

Q.    And the first couple of characters of the Bitcoin address?

A. 1MB2M.

Q. Can we scroll down to the bottom of this spreadsheet?

THE COURTROOM DEPUTY: Ms. Pelker, is 630A already in evidence?

MS. PELKER: Yes. I believe we admitted this whole series of 624 through 633, including the subparts.

THE COURTROOM DEPUTY: Okay. Give me one second.

Yes, I see it. You're right.

BY MS. PELKER:

Q. If we could scroll down to the bottom of Ilbe1's download records. Special Agent Santell, is this a list of all of the different videos that Ilbe1 using the Bitcoin address 1MB2 downloaded from Welcome to Video?

A. Yes.

Q. And can you read the date in row 945?

A. 3/4/2018.

Q. If we could pull up 630B. Are these additional records for Ilbe1?

A. That is correct.

Q. What is shown here?

A. This is the uploads for Ilbe1.

Q. If we could pull up Exhibit 631. What user activity is shown here?

A. Derrickk, D-E-R-R-I-C-K-K.

Q. And are these the downloads for the user Derrickk using

the Bitcoin address 1H8?

A. Correct.

MS. PELKER: Exhibit 632. And, Ms. Walker, if we -- we may have not included 632 and 633 in our prior batch admission. Does the Court have a record either way on that?

THE COURTROOM DEPUTY: I have -- because I have two separate exhibit lists. I have up to 633.

MS. PELKER: Okay. Thank you.

BY MS. PELKER:

Q. So directing your attention to 632, which is published to the jury. Can you explain what is shown here?

A. This is the downloads for user Rabdark, R-A-B-D-A-R-K.

Q. Is that using the Bitcoin address 1FCV?

A. Correct.

Q. Can we scroll down to the bottom of this exhibit?

What is the date that is reflected in row 254 for this download?

A. 2/10/2018.

Q. Now, pulling up the last one, Exhibit 633.

And what is shown here?

A. Those are the downloads for WaltonTarget, W-A-L-T-O-N-T-A-R-G-E-T.

Q. Is that using the Bitcoin address 1BMKM?

A. It is.

Q. If we can return to Exhibit 623.

Does this list of Bitcoin Fog users correspond to the Welcome to Video users whose child sexual abuse material downloads we just reviewed?

A.   Correct.

MS. PELKER:  No further questions, Your Honor.

THE COURT:  All right.  Mr. Ekeland.

CROSS-EXAMINATION

BY MR. EKELAND:

Q.   Good morning, Mr. Santell.

A.   Good morning.

MR. EKELAND:  May I proceed, Your Honor?

THE COURT:  You may.

MR. EKELAND:  Thank you.

BY MR. EKELAND:

Q.   The government shut down Silk Road in 2013?

A.   I believe so, that is correct.

Q.   And that was nine years before you became an FBI agent?

A.   That's correct.

Q.   And that was eight years before Roman Sterlingov was arrested?

A.   I believe so.

Q.   And you didn't work on this case until after Mr. Sterlingov was arrested?

A.   That's correct.

Q.   And you did all of that work from your desk?

A. That is correct.

Q. And you never went to Sweden to investigate this case?

A. No.

Q. And you never interviewed any eyewitnesses?

A. No.

Q. And as a matter of fact, you can't name one eyewitness who has ever said that Mr. Sterlingov operated Bitcoin Fog?

MS. PELKER: Objection. Well beyond the scope of this witness' testimony.

THE COURT: Sustained.

BY MR. EKELAND:

Q. Mr. Sterlingov was in Sweden in 2013?

MS. PELKER: Objection; beyond the scope.

THE COURT: Sustained.

BY MR. EKELAND:

Q. Mr. Sterlingov wasn't the administrator of Silk Road, was he?

A. That correct.

Q. That was Ross Ulbricht?

A. Yes.

Q. Mr. Ulbricht is serving a life sentence in a maximum security prison right now?

MS. PELKER: Objection, Your Honor.

THE COURT: Sustained.

BY MR. EKELAND:

Q.   You got no evidence of Mr. Sterlingov ever communicating with Mr. Ross Ulbricht?

A.   Not to my knowledge.

Q.   And you have no evidence of Mr. Sterlingov ever communicating with any darknet market administrators?

A.   To my knowledge, no.

Q.   And you have no evidence of Mr. Sterlingov administered any darknet marketplaces?

A.   From what I reviewed for this trial in terms of the Silk Road and Silk Road 2 and for Welcome to Video, no.

Q.   Now, Mr. Sterlingov, I think according to your testimony, did buy some LSD and mescaline in 2011 and 2012 from Silk Road; correct?

A.   I believe so, correct.

        MR. EKELAND:  And, Mr. Hassard, if we could put up Government Exhibit 603S, which I believe is in evidence.

        THE COURTROOM DEPUTY:  I'm sorry.  603, what letter?

        MR. EKELAND:  S, as in Sally.

        THE COURTROOM DEPUTY:  Yes.  Yes, it was.

BY MR. EKELAND:

Q.   And, Mr. Hassard, if we could scroll over all of the way to the left, the other way.

        And this is the record of those transactions; is that correct?

A.   Yes.

Q. And the first two transactions those are on July 25th, 2011?

A. Yes. That is the finalized time. It is not when the transaction started.

Q. I see over on the right, are those the July 15th and July 16th, are those the transaction dates?

A. That is when it was created, yeah.

Q. That was before Bitcoin Fog came into existence; correct?

A. I cannot recall the exact date of when Bitcoin Fog came into existence.

Q. And that last one there on May 28th, 2012, that is after Bitcoin Fog came into existence; correct?

A. I cannot recall the date of the exact existence.

Q. And these transactions -- Mr. Hassard, if we could scroll over, I think there is an amount somewhere here. Right there.

These transactions were for, I think, roughly right there, what is that, about 175 US dollars?

A. We could round to that, sure.

Q. Okay. Round about. You can take that down, Mr. Hassard. And if we could put up what is in -- I believe is in evidence as Government Exhibit 603H, as in Harry.

THE COURTROOM DEPUTY: Yes.

BY MR. EKELAND:

Q. And is this a June 13th -- a June 12th, 2013 transaction where Mr. Sterlingov was buying some LSD?

A.    Correct.

Q.    And between this record and the last one that you looked at, those are all of Mr. Sterlingov's drugs purchases on Silk Road?

A.    Of what I reviewed, I believe so, correct.

Q.    And, Mr. Hassard, if we could put up Government Exhibit -- what I believe is in evidence of Government Exhibit 603A?

THE COURTROOM DEPUTY:  I don't have 603A.  Wait a minute.  Hold on.

Yes.  I'm sorry.

MR. EKELAND:  Is it --

THE COURTROOM DEPUTY:  Yes.

MR. EKELAND:  Thank you.

BY MR. EKELAND:

Q.    And, Mr. Santell, you recognize this spreadsheet?

A.    I believe so, yes.

Q.    And this is a list of all of the transactions that Mr. Sterlingov did on Silk Road minus the -- I think two of the drug transactions; correct?

A.    I don't see them side by side, but it seems that is the case.

Q.    Directing your attention to this transaction on November 27th, 2011, do you see that?

A.    Uh-huh.

Q.    Do you see how it says deposit and withdrawal there?

THE COURTROOM DEPUTY: Mr. Ekeland, hold on one second. I don't think 603 is in, 602A, not 603A.

MR. EKELAND: This isn't in evidence?

THE COURTROOM DEPUTY: You're doing 603A?

MR. EKELAND: Yes.

THE COURTROOM DEPUTY: I think 602A is in evidence, not 603.

602A is in evidence, 603 is not.

MR. EKELAND: Well, let me lay a foundation I think and --

THE COURT: I'm sorry.

BY MR. EKELAND:

Q. So, Mr. Santell, you recognize this spreadsheet though; right?

A. I recognize the columns and material of the spreadsheet.

Q. And this spreadsheet is based on the records that the FBI has from Silk Road?

A. I mean, I don't have everything memorized word for word like the reference number or specific amounts, but as far as I can tell the like the data appears to be the same.

Q. And you have no reason to think this is an inaccurate representation of the Silk Road data as produced by the United States government?

A. No.

MR. EKELAND: Your Honor, at this time, the defense

moves to put into evidence what has been marked for identification as Government Exhibit 603A.

THE COURT:  I think it should be Defendant's Exhibit, if you are moving it.

MR. EKELAND:  Defendant's Exhibit -- this is what has been marked for identification as Government Exhibit 603A to move into evidence as what I believe would be Defendant's Exhibit 130.

THE COURT:  130, any objection?

MS. PELKER:  No, Your Honor.  I believe there is a different version of this spreadsheet that was admitted.  And we were just trying to find the reference number, but we have no objection to just moving this one in.

THE COURT:  So Defendant's Exhibit 130 is admitted and may be published to the jury.

(Whereupon, Defendant's Exhibit No. 130 was admitted.)

BY MR. EKELAND:

Q.    And thank you.

Mr. Santell, then just directing your attention down to that November 27th, 2011 transaction.  Do you see that?

A.    Yes.

Q.    Do you see there under the time where it says deposit and withdrawal?

A.    Uh-huh.

Q.    It doesn't indicate that November 27th, 2011, transaction involved any kind of purchase, does it?

A.    It just shows deposit and withdrawal.

Q.    Mr. Hassard, if we could take that down and put up Government Exhibit 316?

THE COURTROOM DEPUTY:  316.

MR. EKELAND:  316.

MS. PELKER:  Your Honor, we are going to object to this line of questioning as beyond the scope of this witness' testimony and expertise.

MR. EKELAND:  Your Honor, this witness was brought in to discuss the Silk Road transactions.  He testified as to Mr. Sterlingov's Silk Road transactions.  And I am merely asking him about his knowledge of Mr. Sterlingov's Silk Road transactions.

THE COURT:  You can do so, but I agree.  I don't see how Exhibit 316 has anything to do with it.  Exhibit 316 is a tracing.

MR. EKELAND:  I will connect it.

THE COURT:  I am not going to let you until you have established to me there is some basis for asking him about this exhibit, which is way beyond his area of expertise.

MR. EKELAND:  Your Honor, the transaction that we last just looked at dated November 27th, 2011 is this transaction right there.

THE COURT:  Slower.

MR. EKELAND:  You see the underlying transaction, that is the same transaction that we were just talking about.

THE COURT:  I think you can ask him about the date. I don't see -- he doesn't know anything about tracing.  It is beyond the scope.  It is not in his area of expertise.

MR. EKELAND:  I am asking him about the transaction.

THE COURT:  You can ask him about the date of the transaction, but I don't think he knows anything about the chart.

MR. EKELAND:  Can I ask him about the chart and see what he knows about it?

THE COURT:  You can ask him about the date.  But I don't think you should go beyond that because he is just not an expert in this field at all.

MR. EKELAND:  Your Honor, it was just my understanding that the tracing isn't expert testimony in relation to what the Court said in relation to Mr. Price and also Mr. Rovensky when they discussed the -- I am not asking him about the tracing, so why don't I just ask my question and then I will move on.

THE COURT:  That is fine.

MR. EKELAND:  Thank you.

BY MR. EKELAND:

Q.   So, Mr. Santell, do you see the box in the square that is

Silk Road -- labeled Silk Road?

A.    Right below the road, yeah.

MS. PELKER:  Your Honor, Mr. Ekeland, I'm sorry.  The jurors are just indicating they can't actually see this on their screen.

MR. EKELAND:  Thank you.

THE COURTROOM DEPUTY:  Okay.

MR. EKELAND:  Can everybody see it?  Thank you.

BY MR. EKELAND:

Q.    So, Mr. Santell, you see the box in the Silk Road there?

A.    Yes, on the right.

Q.    And you see the user it says, Pas, P-A-S?

A.    I see it.

Q.    That was Mr. Sterlingov's Silk Road username?

A.    To my knowledge, yes.

Q.    You see the date right above the box where it says November 27th, 2011?

A.    Yeah.

Q.    That was the same date of the last transaction that we just spoke about?

A.    I believe so, correct.

Q.    That transaction just involved a deposit and a withdrawal?

A.    It showed a deposit and a withdrawal.

Q.    And it didn't reference any purchase?

A.    It just showed a deposit and withdrawal.

MR. EKELAND:  Okay.  You can take this down, Mr. Hassard.

BY MR. EKELAND:

Q.   Do you recall testifying about some Silk Road vendors on Friday?

A.   I do.

Q.   But you don't have any evidence of Mr. Sterlingov ever communicating with Symbiosis?

A.   I didn't review files for those.

Q.   You don't have any evidence of Mr. Sterlingov ever communicating with Tyler Durden?

A.   I didn't review anything for that.

Q.   I'm sorry.  I didn't understand you.

A.   I didn't review any messages between the two.

Q.   You don't have any evidence of Mr. Sterlingov ever communicating with Budworx?

A.   No, I didn't review any messages for those two.

Q.   You don't have any evidence of Mr. Sterlingov ever communicating with UK Grow Tek?

A.   I don't have any evidence for those messages.

Q.   And you don't have any evidence of Mr. Sterlingov ever communicating with, is it RoxiPal?

A.   RoxiPal.  I didn't review any messages.

Q.   And you don't have any evidence of Mr. Sterlingov ever communicating with West Coast RX?

A.    I didn't review any messages.

Q.    And you don't have any evidence of Mr. Sterlingov communicating with MarijuanaIsMyMuse?

A.    I didn't review any messages for those.

Q.    Can you tell me the percentage of Silk Road transactions that occurred in Sweden?

MS. PELKER:  Objection; relevance.

THE WITNESS:  I don't have that data.

MR. EKELAND:  Your Honor, they brought in testimony about the locations of certain transactions and certain dealers, so I am merely asking the witness' knowledge of the transaction flow in Silk Road.

THE COURT:  I don't -- I mean, I don't -- it is beyond the scope.  I don't think this witness has any foundation that he has studied Silk Road's transactions generally across the board.  And I think it is beyond the scope.  And also I don't think he has established any expertise in the topic of the overall Silk Road transactions, so sustained.

MR. EKELAND:  Understood, Your Honor.

BY MR. EKELAND:

Q.    Mr. Santell, Silk Road sold clothing?

A.    It had an apparel section.

Q.    It sold jewelry?

A.    Yes.  It had a jewelry section.

Q.    It sold books?

A.    It did have a book section.

Q.    Just turning briefly to your attention to Welcome to Video which you just testified to.  Do you recall that?

A.    Yes.

Q.    Welcome to Video operated in South Korea?

A.    In South Korea is where the --

Q.    And it started in --

        THE COURT:  You have got to let him finish.

        MR. EKELAND:  I just didn't hear him.

        THE WITNESS:  It was South Korea, that is correct.

BY MR. EKELAND:

Q.    It started in 2015?

A.    I believe so.  I don't have the date.

Q.    And the South Korean government shut it down in 2018?

A.    I believe that is the case.

Q.    No funds ever went from Welcome to Video to Bitcoin Fog, did they?

A.    From what I reviewed for the case was those spreadsheets.

Q.    Only about $989 worth of direct transfers went from Bitcoin Fog to Welcome to Video?

A.    If that is the number.  I did not review that number.

Q.    And you have no evidence that Mr. Sterlingov knew anything about those flows?

A.    I only reviewed what is on the spreadsheets.

Q.   And only about $846 indirectly went to Bitcoin Fog to Welcome to Video?

MS. PELKER:  Objection.

THE COURT:  I'm sorry.  There is an objection.  What is the objection?

MS. PELKER:  The witness has testified this is beyond what he reviewed for this case.  All he did was review the spreadsheets.

MR. EKELAND:  He was testifying about Welcome to Video and its interaction with customers, so I am merely following up on the depth of his knowledge.

THE COURT:  I will just remind the jury that questions from lawyers are not evidence in the case.  And you should disregard the questions.  You should rely on the answers, if there are any.

BY MR. EKELAND:

Q.   You have zero evidence of Mr. Sterlingov ever communicating with the administrator of Welcome to Video; correct?

A.   I only reviewed what is on the spreadsheets.

Q.   There is not a trace of child pornography or anything related to it on any of the devices that Mr. Sterlingov -- that government seized from Mr. Sterlingov?

MS. PELKER:  Objection.

THE COURT:  Sustained.  Beyond the scope.  It is just

not what the witness is testifying about.

BY MR. EKELAND:

Q.   Turning your attention to Silk Road 2.0.  Do you recall testifying about that?

A.   Uh-huh.

Q.   The government shut down Silk Road 2.0 in 2014?

A.   I believe that is correct.

Q.   And I think you testified that Mr. Sterlingov had an account on Silk Road 2.0?

A.   For Pas, correct.

Q.   But that account never conducted a single transaction; correct?

A.   The spreadsheet we showed, showed no transaction.

Q.   And you have zero evidence that Mr. Sterlingov ever communicated with the administrator of Silk Road 2.0?

A.   I didn't review any messages.

Q.   In relation to the Silk Road 2.0 vendors, you have got zero evidence that Mr. Sterlingov ever communicated with Chemical Brothers?

A.   I didn't review any messages.

        THE COURT:  I'm sorry.  Just to pause here for a second -- the phrasing of the questions here when you say you have zero evidence.  I think you can ask what he has reviewed. You shouldn't be asking about sort of the things that may be beyond the scope of his knowledge or his testimony.  You can

ask whether he has reviewed any evidence of it.  I think it is important you clarify.

MR. EKELAND:  Understood, Your Honor.

BY MR. EKELAND:

Q.  Are you aware of any evidence of Mr. Sterlingov communicating with Mario Gram Shoppe?

A.  I didn't review any evidence for that.

Q.  Are you aware of any evidence of Mr. Sterlingov communicating with Crystal Buddha?

A.  I didn't review any evidence for that.

Q.  Are you aware of any evidence of Mr. Sterlingov communicating with Shine Cartel?

A.  I did not review any evidence of that.

Q.  Are you aware of any evidence of Mr. Sterlingov communicating with Budworx?

A.  I did not review any evidence of that.

Q.  Are you aware of any evidence of Mr. Sterlingov communicating with Trevor Phillips?

A.  I did not review any evidence of that.

Q.  Are you aware of any evidence of Mr. Sterlingov communicating with any vendor on Silk Road?

A.  I did not review any evidence of that.

MR. EKELAND:  No further questions, Your Honor.

THE COURT:  All right.  Any redirect?

MS. PELKER:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. PELKER:

Q.   Special Agent Santell, what was it you were asked to review and testify about for your testimony last week and this week?

A.   What I testified to, the spreadsheets.

Q.   And did you work on the underlying cases for Silk Road, Silk Road 2.0 or Welcome to Video?

A.   I did not.

Q.   So was your testimony based on your review of the records that were provided to you by those case teams?

A.   That is correct.

Q.   When Mr. Ekeland was asking you about whether you had seen communications between the defendant and vendors, is your answer based on your review of the particular spreadsheets for your limited testimony here?

A.   That is correct.

Q.   So do you know, one way or another, if those communications do exist just outside of the spreadsheets that you reviewed?

A.   I do not.

        MS. PELKER:  No further questions, Your Honor.

        THE COURT:  All right.  The witness is excused. Thank you.

        THE WITNESS:  Thank you.

MS. PELKER:  Your Honor, the government rests.

THE COURT:  All right.  Thank you.  So that concludes the government's presentation of the evidence in the case and the defense can call its first witness.

MR. EKELAND:  Your Honor, can we get on the phone?

THE COURT:  Yeah.

(Conference held at the bench.)

MR. EKELAND:  Your Honor, one thing at this point in time, Your Honor, the defense moves for a directed verdict on the basis that the government hasn't met its factual burden and no reasonable juror could conclude based on the government's case that Mr. Sterlingov is guilty.

THE COURT:  All right.  Government have a response?

MR. PEARLMAN:  Your Honor, I am not sure how much you want me to respond at length.  But briefly we think that the evidence here is overwhelming.  There was a long-running conspiracy that ran from the time that he implemented Bitcoin Fog.  And the conspiracy essentially paused just as he was arrested.  He essentially incorporated and enabled Bitcoin Fog in October and November 2011.  Bitcoin Fog ran for several years.  It took in hundreds of millions of dollars.  And the administrators of Bitcoin Fog made very clear they were aware where their money were coming from and the defendant himself has statements concerning knowledge of such things as Silk Road and money laundering.  The majority of the money sent to

Bitcoin Fog came from darknet markets. And that this was -- there are posts from Akemashite Omedetou that this was to avoid authorities. He misrepresented the proceeds that he had received from Bitcoin Fog in interacting with such exchanges as Bitstamp and which was consistent with someone's seeking to avoid authorities. And it also shows consciousness of guilt. And there is no record, of course, of anyone registering the Bitcoin Fog site. Even though the thing -- even though he had an obligation to register with DISB and FinCEN. And the omission, we would argue, is sufficient to withstand attack under those two charges.

Does Your Honor want me to continue more into the specific charges?

THE COURT: Let me see if Mr. Ekeland has anything else to add at this point.

MR. EKELAND: Just the government hasn't established beyond a reasonable doubt that Mr. Sterlingov is Akemashite Omedetou. None of their witnesses made any particular identification. They were very vague about it. Ms. Mazars even at the end of her testimony changed the conclusion that she mentioned in her expert report. And she even herself said -- and she is the one witness that the government brought in to do the IP analysis, that she wasn't making any attribution. The government keeps saying, oh, it is the totality of the case. But they can't name one specific

instance where there is any evidence of Mr. Sterlingov ever operating Bitcoin Fog. They themselves have said, oh, well, these traces, they are consistent with a peer-to-peer exchange at Bitcoin, the logging in on the user and the Bash scripts that are on Linux, they are consistent with Mr. Sterlingov logging in with his home computer. And they have the burden of proof. And they have not adduced a single shred of evidence that ever shows Mr. Sterlingov operating Bitcoin Fog. Their entire case is innuendo. There is a 10-year period where they don't have any evidence. Their entire case is based on DNS registration they can't even attribute to Mr. Sterlingov except through a convoluted trace where on the first step in that trace going from Mt. Gox account number 1, they admit they don't have the private keys. And it is entirely consistent with the peer-to-peer or the sale of Bitcoin. This entire case is innuendo. The government hasn't met its factual burden.

THE COURT: All right. I am going to deny the motion and conclude there is sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Mr. Sterlingov was, in fact, the operator of Bitcoin Fog.

MR. EKELAND: And, Your Honor, aside from that issue, is the issue of the slide deck as the first witness is Professor Verret. And it is my understanding the government still has some objections to the slide deck that we were discussing on Friday.

THE COURT:  Okay.  Mr. Brown, is that your issue?

MR. BROWN:  Yes, Your Honor.  And I think our issues are -- I mean, we tried to be very particular in our objections.  So I am happy to walk through it.  I don't know if it would make sense to give the jury a break to allow us to walk through slide by slide.

THE COURT:  I think I better do that.  Okay.  Thank you.

(End of bench conference.)

THE COURT:  All right.  Members of the jury, we are going to take a break.  I have to address some questions with the lawyers.  And rather than making you sit here while I do it, I will let you take a break.  And I will remind you, even though the government has now concluded the presentation of the case, don't discuss the case among yourselves, don't conduct any research in any way relating to the case.

Why don't we take a break until 10:25?  So I will see you back here at 10:25.

(Jury out at 10:04 a.m.)

THE COURT:  All right.  Am I going -- I left back in chambers my copy of the notes from the ruling on the *Daubert* hearing and the copies of the transcripts that I went through over the weekend.  Should I grab those for this or is it more just a question of whether some of the slides need to be removed?

MR. BROWN:  Your Honor, I think it would probably be helpful for the Court to --

THE COURT:  So let me step off the bench and grab that.  I will be right back.

(Recess taken at 10:05 a.m.)

THE COURT:  All right.  You may proceed.

MR. BROWN:  Yes, Your Honor.  So I have a copy of the proffered defense slides in front of me.  Our first objection is to the second slide that is entitled, standard forensic principles.  And our objection here is that the content of the slides seems to be talking about Professor Verret's qualifications.  Our objection is to the reference to the forensic principles.  During the pretrial *Daubert* hearings, the Court expressed concerns that to the extent that Professor Verret is purporting to testify as to whether the case or his analysis of the government's case meets or doesn't meet forensic principles, principles of forensic accounting.  It is not relevant, because that is not the standard against which the jury is judging the conduct here.  And there is a 403 risk of confusing the jury and confusing the issue.  So just the reference to forensic principles is --

THE COURT:  So maybe we should take these one at a time.  Do you want to respond on that, Mr. Ekeland?

MR. EKELAND:  I think -- I don't think that this is a 403 issue.  I think this is just Professor Verret discussing

the standards that are used in forensic accounting. And I think it would be helpful for the jury to understand that he is just not using an arbitrary methodology, that he is following standards that he has been trained in and he has been certified on. I don't see really what the issue is with simply discussing the industry-wide internationally recognized forensic standards when it comes to accounting. And I will note that the government's expert, Sarah Glave, also had I think some forensic accounting credentials that were noticed to the Court. I don't see this as -- I don't really understand.

THE COURT: The question is are you describing his credentials? Because Mr. Brown is correct that at the *Daubert* hearing I did rule on 403 grounds that Professor Verret should not testify that the tracing that was done here is inconsistent with the standards of forensic accounting or standards of fraud examination.

MR. EKELAND: I don't intend to have him testify as to the tracing not being in accordance with the financial forensic standards. I wasn't --

THE COURT: So I guess I am still puzzled.

MR. EKELAND: He is discussing what standard forensic principles are, what his training are in those principles and what principles he is using to arrive at his expert opinion in this case.

THE COURT: But is that just a -- what I am trying to

figure out is that just a roundabout way of saying what I said you couldn't say?  He is not talking about tracing, fair enough.  But I think what I held at the *Daubert* hearing was that -- let's see.  And I have got it all in front of me here.  Was that on the first day of the -- the September 8th day?  Does anyone recall?

Do you recall, Mr. Brown?

MR. BROWN:  Yes, Your Honor, the September 8th, I believe starting at page 65, there is an extended discussion.

THE COURT:  Right.  So I guess what I am trying to figure out is whether what you are describing is sort of a roundabout way of doing what I said you couldn't do, of saying, I am trained in these principles, applying these principles, I conclude that the government's evidence doesn't support what they say it supports because in applying these principles, it doesn't support that, which I think is the same thing that I said you couldn't do.

MR. EKELAND:  I don't see that conclusion anywhere on this slide.  What this is, is an introductory slide discussing his certifications, CPA, his CFS certification, his CFE certification, his CCFI certification and that he is a published professor of banking law.  And --

THE COURT:  That is

MR. EKELAND:  -- he is discussing the forensic principles that he is using to arrive at his conclusions that

he discusses in his testimony.  I don't understand how that is problematic.

THE COURT:  I think it is because we don't really quite know what the testimony is going to be here.  I mean, if he is just at a high level talking about there are standards that we apply, I get your point.  If he is saying and one of those standards is that X, Y and Z and the X, Y and Z is what you intend to argue to the jury is missing in this case, then it is a problem for the reasons that I previously gave.  On the other hand -- just because I don't think this case is about whether the -- whether and how the standards of forensic accounting apply.  It is not an accounting case.  For example, it is not a question of whether Pricewaterhouse complied with the relevant accounting principles when it certified a company's records.  So that was the concern that I had previously expressed.  I am still just not certain from what you are describing here.  I guess we won't know up until he testifies.  But if he is testifying to the particular standards that we were talking about at the *Daubert* hearing and then says that was the basis for his opinion it seems to me you are doing the same thing I said you couldn't do, if he is just talking about his background and this is how I go about things that is another thing.

MR. EKELAND:  He is talking about his background and standards.  But I disagree with the Court how this isn't an

accounting issue, because there is significant issues here, particularly in relationship to Mr. Scholl's testimony and how he calculated the exchange rates coming from the Bitcoin Fog. There is valuation issues related to Sarah Glave's testimony as the Court admitted Ms. Glave's charts and valuations, so I think there are actually significant forensic accounting issues.

THE COURT:  So tell me what they are.  I mean, I said in the past, it is fine for Professor Verret to testify about the numbers and how they add up and how to testify about the value of Bitcoin over time and to testify about, based on his analysis, what he would anticipate the administrator of Bitcoin Fog would have earned.  That is all fine.

MR. EKELAND:  That is the core of his testimony and that is what we are getting at here.  We are not getting -- we went back and read the Court's -- you know, the testimony from the *Daubert* hearing and so what --

THE COURT:  I just tell me -- so the question is, okay.  Professor Verret, tell me about the standards of forensic accounting, what is he going to say?  Is he going to get down to the level of talking about the particular methods that were at issue at the *Daubert* hearing?

MR. EKELAND:  He is going to talk about his CPA and CFS certifications, his qualifications -- his CFE certification is listed here.  His CCFI certification and that he is a

published professor, banking law, forensic accounting, securities and corporate law. And then if you look at slide 3 one of the arguments that the government is making is that Mr. Sterlingov must have been receiving Bitcoin Fog fees, because according to Ms. Glave's calculations, the numbers don't add up and that there is more money coming out than assets that Mr. Sterlingov has. And here Professor Verret is going to be talking about a net worth income and indirect analysis and how you apply those forensic accounting principles in evaluating a case like that and to Ms. Glave's work. He is directly addressing issues not only just in terms of -- this is direct testimony, but rebuttal from the witnesses that the government has put on, not just Ms. Glave. Mr. Scholl testified about --

THE COURT: Let me just -- so given the description that you just gave, Mr. Brown, is there an objection to that testimony?

MR. BROWN: Yes, Your Honor. And I think the other slide is from the 9/15/23 *Daubert* -- continuation of the Daubert hearing starting at page 60 -- this is actually the extended discussion I was thinking of where the Court says that it is either misleading to the jury or stepping into the shoes of jury to say, look, I am telling you just forensically it is unsound to do this here, because it really is for the jury to decide for itself whether there is sufficient uncertainty that

it calls into question the results.

THE COURT:  So I think maybe to sort of try and cut to the chase here on this.  If he wants to testify to his background --

MR. BROWN:  Yes.

THE COURT:  -- that is fine.  Where I was having pause is he wants to testify that the results are forensically unsound because they don't comply with some association's methodologies.  If he wants to just show the jury through logic and analysis why he thinks the results are unsound, I think that is entirely appropriate.  And I have no problem with that.

MR. BROWN:  Your Honor, we agree 100 percent if Professor Verret has a different analysis to tell the jury that has been disclosed pretrial, he is welcome to do that.  Our concern is just if that gets dressed up as an, you know, these are or are not consistent with forensic standards, that is the 403 issue.

THE COURT:  Mr. Ekeland --

MR. BROWN:  We would also --

THE COURT:  All right.  I will let you finish.

MR. BROWN:  We would also just reiterate our concern about undisclosed testimony to the extent Professor Verret intends to testify about something like net worth, income, you know, presence of unexplained assets, money laundering habits, typology, crypto privacy behavior patterns.  None of that was

in his pretrial disclosure.

THE COURT:  Right.  And his pretrial disclosures were extensive.  We went through them extensively at two different hearings, so I agree if they weren't disclosed they should not come in.

But let me ask, Mr. Ekeland, given the clarification that Professor Verret can talk about his background, talk about his training, and he is welcome to walk the jury through the logic of his view on this and explain to them why he thinks the government's numbers don't add up, is that acceptable?

MR. EKELAND:  Included in that, I am assuming it is okay to talk about the forensic methodologies as, you know, promulgated by -- are you saying that he can't testify as to forensic standards that he learned as part of his certification or are you saying that he can't opine that the government's analysis is forensically unsound, in his opinion?

THE COURT:  I don't -- the point that I think I made at the *Daubert* hearing -- and I don't see any reason to depart from that here.  And I think I invited you at that time, I said, if you have any case to the contrary, bring it to my attention and you haven't done so.  And I think it still goes because you haven't brought any contrary authority to my attention is that he ought not be testifying about what the forensic standards require.  He ought to be talking about what the analysis shows.  And he can show it and talk about his

background.  And he can talk about the analysis he did.  It is -- as I said, for 403 purposes, I think it is misleading to the jury -- and certainly I think more prejudicial than probative to suggest that the government's analysis is flawed, because it didn't comply with the standards of an association where that is not what the case is about.  And he is perfectly free to explain and maybe I have to get into it to understand this to see what comes in with the testimony.  But either the numbers add up or they don't add up.  Maybe you can give me an example.  But I am not sure -- if the testimony is that it is improper as a matter of forensics to -- give me an example. What would he want to testify to as being forensically unsound?

MR. EKELAND:  I am going to elicit his testimony.  I don't think it is just as simple as in the Court's characterization -- first of all, I think this is one of the core issues in the case, because it is a primary piece -- it is a primary allegation of the government that one of the allegations is that Mr. Sterlingov must have been operating Bitcoin Fog because the flows of money into his Kraken account, don't match his income.

THE COURT:  Right.

MR. EKELAND:  That there -- and that kind of analysis is a subjective analysis is my understanding that is based on -- there is financial forensic principles involved in making that kind of analysis like when you are making a net worth

income indirect analysis.  And the government's own witness, Sarah Glave, is certified in some of those -- I believe she was a certified forensic examiner, so she should be following those same standards too, so I am a little bit -- I object to the extent that the Court is saying that the forensic standards that the government's own expert, supposedly is certified on and that are standards in the industry, are somehow inapplicable here to the analysis.  And I don't think --

THE COURT:  Can you give me an example of what you are talking about?  I don't really understand.

MR. EKELAND:  Perhaps one thing is Ms. Glave is making an assessment with just making the assumption that the only assets that Mr. Sterlingov has comes from his KYC account. And that is in our opinion forensically unsound.

THE COURT:  But it is -- I mean, I guess my point on this I don't know whether you need point to some forensic standards or not to make that point.  It is just a matter of logic; right?  If I said, I went and I looked at Mr. Ekeland's Citibank account and he had $100, which means the man only has $100 to his name.  That would clearly be unsound, because you may have an account at Bank of America as well and you may own a house and you may own a car.  I think the jury can understand all of that.  I just don't see how the -- bringing in the forensic standards necessarily changes that.  And I don't see any problem with your offering -- Professor Verret offering

that type of testimony, which I think the jury can understand.

My only concern is and as I understood it at the *Daubert* hearing, you want to offer testimony and say things like, because they didn't have the key to -- the private key for the particular addresses. If that is forensically unsound to attribute it to him. And that was the type of thing that was causing me concern, because I just think that is more confusing to the jury than it is helpful. And I think that it is more prejudicial -- significantly more prejudicial than probative. So, I mean, it is a little hard for me to answer this in the abstract.

But to the extent that it is diverting the jury's attention from what is at issue in the case by making this a debate about who is right or wrong with respect to the standards, you know, if this was a GAAP case, did they comply with GAAP paragraph 64.3G2, it is just going to confuse the jury and is not helpful in the case. On the other hand, if it -- the accounting doesn't make any sense here, because if you add the numbers up, they just don't add up that way. Perfectly appropriate.

MR. EKELAND: So can he testify that he was following the standards that he was trained in and he learned and when he did his calculations this is how he got the math?

THE COURT: Just tell me what the standard -- you have yet to sort of identify to me what the standard is he

wants to testify that you think is relevant.

MR. EKELAND:  He is the expert in that.  I am not --

THE COURT:  Come on.  He is your expert.  You know the answer to this question and you are just playing with the Court here.

MR. EKELAND:  I am not playing with the Court.

THE COURT:  You don't really know what the answer is to the question?

MR. EKELAND:  Your Honor --

THE COURT:  Come on.

MR. EKELAND:  Your Honor, I am not playing with the Court.  And I am not -- I honestly with this slide --

THE COURT:  We have been debating this for weeks now, months going back into September about the extent he can rely on these standards.  Are you are telling me you don't know how his standards relate to the testimony and what the standards are that he wants to talk about?

MR. EKELAND:  He wants to talk about the net worth income indirect analysis, the presence of unexplained assets.  I am looking at page 3 of the slides, the correlation pattern analysis, money laundering habits and cryptocurrency privacy patterns.  And I am not -- I am not -- this slide here with the standard forensic principles.  This is an introductory slide where he is talking about his credentials.  I am not looking -- and I don't think we need to say, oh, okay, the government

didn't apply -- didn't follow this standard here, although we will submit that that would -- I do consider that relevant. But for the sake of getting through this and getting to his testimony, we will refrain from that. We will try to stick to the math. The government can make its objections. But I do think that just him sort of laying a baseline would be helpful. But if the Court thinks that is, you know, more prejudicial than probative then we will hold back.

THE COURT: I'm sorry. I just can't answer that question in the abstract. And what came out at the *Daubert* hearing caused me concern because of the types of principles that he wanted to rely on my understanding at that point in time. But unless you can tell me what the principles are that he wants to rely on and how they apply in this case, I mean, first of all, that is what the *Daubert* hearing was about and that should have been disclosed. But also I don't know how I rule on that in the abstract unless you can tell me, Judge, he wants to testify that the following step violated the following principle and that matters for the following reason. I can't in the abstract rule on that question.

MR. EKELAND: Well, he is primarily right now testifying in rebuttal to what the government has put on. And he is using standard accounting principles which arguably were disclosed.

One of the things I think is a little confusing and I

think the Court is going back to, we are not talking about the tracing. We are not going -- we understand the Court's point about saying, you know, with the private key problem, you don't have the private key, so this is -- he is focused on the financials in this case and the patterns of -- rebutting the testimony from Mr. Scholl and Mr. Rovensky about, you know, patterns of behavior being consistent with money laundering. So the focus here in this testimony -- and we did, we went back and we looked at the Court's *Daubert* rulings and just really focused on the numbers. So to the extent that you don't want Professor Verret saying that the government is not in accordance with GAAP paragraph 5.23, that is okay, yes, Your Honor. Right, so what I want to take Professor Verret through is his review of the numbers in this case and rebut the testimony from government witnesses saying that what they saw was consistent with the pattern of money laundering, without making any kind of legal conclusion. That is the purpose and focus of the slide deck. That is why we slimmed it down even further after we sent the deck to the government and after Friday. And so that is the principle here, Your Honor.

THE COURT: That is -- I have said in the past I think is fine. And so the question I just still have though is just -- I am not quite sure what the slide about standard forensic principles is intended to elicit. If he wants to talk about his -- if he wants to talk about and you want to bring

out his experience, background, qualifications, I think that is all fine.

MR. EKELAND: I will limit it to that, Your Honor. That is fine. I honestly wasn't trying -- this was an introductory slide. I am not like -- this was not sort of an attempted end run that -- anything that the Court did.

THE COURT: So what about take off the header then that says standard forensic principles and leaving it as his --

MR. EKELAND: That is fine.

Can we do that, Mr. Hassard?

We can certainly do that.

THE COURT: All right. Let me hear from Mr. Brown on what the next concern is.

MR. BROWN: Yes, Your Honor. And hopefully the rest of these are a little more discrete. So the next slide that we have concerns about is slide 8, which is labeled personal privacy.

MR. EKELAND: Slide 8?

MR. BROWN: Just two very discrete objections here. There is a bullet that says most mixing is for personal privacy. I think this was addressed in the September 15th hearing that Professor Verret has not quantified the amount of mixing that is for personal privacy --

THE COURT: Although I thought my recollection was that he was going to testify to simply about a Chainalysis

report that he reviewed. He is nodding his head yes as I say that.

MR. BROWN: If that is all it is then we can move on.

THE COURT: Okay.

MR. BROWN: The bullet about professional responsibility, we have no idea what that means. And I think that is a pretrial disclosure issue.

MR. EKELAND: In terms of professional responsibility, that is simply a reference to the professional responsibility that we all have in terms of confidentiality to our client, I am not --

THE COURT: That is fine.

MR. EKELAND: Okay.

MR. BROWN: I guess, I don't follow confidentiality. Is Professor Verret -- Your Honor, I'm sorry. I am a little nonplussed. Is Professor Verret going to opine that there are professional responsibilities standards that are related to --

THE COURT: I don't think he was talking about -- Mr. Ekeland can correct me, but I thought he was going to testify that essentially there are lots of reasons why you might use, for example, a VPN, which is anonymizing in some respects. And one of the reasons might be that you are trying to protect your employer's information and you may have a professional responsibility. You know, I know, for example, when I connect remotely to the courthouse or court materials, I

need to use a VPN.  And it is for maintaining the security of -- the work my employer.  Is that it?

MR. EKELAND:  That is precisely, except I think it was going to be in the context of the mixers where you may have a duty to protect the confidentiality of the client's funds.

THE COURT:  Does he have any knowledge of that expertise on that question?  Has he studied the fact -- why people use mixers for professional purposes?

MR. EKELAND:  This is just as his experience as a CPA and as a lawyer.  So, again, this wasn't -- this is not some major point we are trying to make.  So it is just -- it is a reference to your duty of confidentiality to your client and that may be one of the reasons that you want to use something like a mixer or like a VPN just to protect client confidentiality.  This is not a hill to die on, Your Honor.

THE COURT:  Well, I mean, I do wonder whether he has any knowledge basis or expertise on whether people do, in fact, use mixers for maintaining professional confidentiality.  That I just don't know whether he has any expertise.  I don't recall it being disclosed in any way as a basis for his or any opinion he was going to express.

MR. EKELAND:  I don't think in terms of like some sort of empirical statistical analysis, I am not aware of any. I think this is more his opinion as his duty as a CPA and a lawyer and discussing hypothetical --

THE COURT:  Again, I can't say in the practice of law I ever used a mixer to maintain my professional responsibility or to protect my clients in any way.  And it doesn't seem to me that is one of those things that is common knowledge you would know that, even as a CPA.  So I do worry a little bit about the disclosure as to mixers.  As to VPNs, I get it.

MR. EKELAND:  We'll just -- why don't we solve the problem by -- we won't have him testify about that in relation to mixers.

THE COURT:  Okay.  Does that address the concern, Mr. Brown?

MR. BROWN:  Yes, Your Honor.  We can cross him on that.

THE COURT:  All right.

MR. BROWN:  The next slide with an objection is slide number 10, which is labeled number 1, post mix KYC.

THE COURT:  Yep.

MR. BROWN:  And just two issues, operator of Bitcoin Fog is smarter than that.  During the September 8th hearing, I think the Court drew a distinction between if you want -- if Professor Verret wants to testify about, you know, how somebody concerned about privacy in general would behave, that is one thing in terms of how they would move their funds either to or from a mixer, I think the Court did limit that.  What I would object to is -- and then goes on to say that he says Bitcoin

Fog would not send proceeds. I don't know how he knows what that person would or wouldn't do. There is just no basis for opining about the operator of Bitcoin Fog, what they would do or not do.

And the other issue with that slide, just while I am up here, the gift cards and prepaid phone cards, again, we object for lack of pretrial disclosure. I think this gets into Professor Verret's jailhouse interviews. And our concern is that -- you know, the defense is framing this as quote/unquote rebuttal testimony. Under Rule 16, there is really no such thing as rebuttal expert testimony and it doesn't have to be previously disclosed.

THE COURT: I'm sorry. You're right, the rule has been amended in that regard to make it clear. You are right on that question.

MR. BROWN: Yes. And if they have rebuttal evidence and a competent evidence to introduce it, that is one thing. They have made clear that Professor Verret is not a fact witness.

THE COURT: So Mr. Ekeland.

MR. EKELAND: Your Honor, in relation to the gift cards and prepaid phone cards is information that is in discovery.

THE COURT: Can you give me -- I have got in front of me, the disclosures which included 33 different topics. Can

you show me anything in those disclosures that touches on this?

MR. EKELAND: On the gift cards and prepaid funds, I have to pull up the disclosures.

THE COURT: Okay.

(Pause.)

MR. EKELAND: This goes to his, Professor Verret's testimony about money laundering patterns.

THE COURT: Can you point me to the paragraph?

MR. EKELAND: There is one here where -- paragraph 3, at the end of it, talks about money laundering analysis. And I am still going through this, Your Honor.

THE COURT: That one doesn't seem to be on point, because that is talking about what the government did in other cases, which they didn't do here, which I take it this is not what the slide is about.

MR. EKELAND: What the slide is responding to is -- so the government put in testimony from, I think, Larry Harmon and Ilya Lichtenstein. And they both used prepaid cards. And I believe they used gift cards, I think, in Government Exhibit 45A. I think that is the Harmon or Lichtenstein statement of facts. It -- they used those techniques to money launder. And what the point is here is that Mr. Sterlingov used KYC gift cards and prepaid cards in his own name. And the government has known that because that is in the discovery.

And so what Professor Verret is discussing here in

these slides is simply the fact that he doesn't view that kind of behavior as to be indicative of a pattern of money laundering, again, in rebuttal to Mr. Scholl and Mr. Rovensky saying, oh, we see patterns of money laundering.

THE COURT: So I would want to hear from Mr. Brown. I guess, I don't think it is a huge problem for him to testify that there are other ways, even perhaps ways that are more effective to hide transactions, including by gift cards or prepaid phone cards. I think the first bullet point just strikes me, frankly, as argument for your closing argument.

MR. EKELAND: Take it out.

THE COURT: But what I was having more of a pause there was on the patterns of money laundering. And you need to show me where in the pretrial disclosures it was disclosed that the witness was going to testify based -- relating to patterns of money launderers, in particular patterns of those who have withdrawn money from a site intended to launder funds.

MR. EKELAND: This is -- mainly in rebuttal to Larry Harmon's testimony, Ilya Lichtenstein's testimony --

THE COURT: I think the gift cards and prepaid cards, I think that is fine and you can make argument about that if you want. But he hasn't been disclosed as an expert of patterns of money laundering. I think that is outside the scope of his disclosure.

MR. EKELAND: He was disclosed as a professor of

anti-money laundering law.

THE COURT: So give me -- I have got 33 paragraphs of topics. Point me to the one --

MR. EKELAND: Let's go to the front of his disclosure. Mr. Verret is an expert in crypto forensics --

THE COURT: No. No. No.

MR. EKELAND: -- and anti-money laundering.

THE COURT: I understand what that says. You go down the page it says he is going to testify regarding the following.

MR. EKELAND: Also in the August slide deck that we filed with this Court, I believe on August 7th, or 8th, 2023 all of this was disclosed.

THE COURT: It was in that deck?

MR. EKELAND: What you are seeing here, is this deck is an extremely slimmed down. In that deck -- yes, I have it right here. That is -- that is docket 158-1. It is a 40-page slide deck. The government didn't object at the time. And that has extensive disclosure on these issues in far greater depth. And what we did here after the *Daubert* and everything we just stripped this down and just focused on the financial --

THE COURT: Does it have a disclosure in there with respect to patterns of money laundering?

MR. EKELAND: Let me take a look, yeah. I think there is but let me just pull out the exhibit.

THE COURT:  I am not sure there is even a mention of gift cards or prepaid phone cards in that deck.

MR. EKELAND:  Your Honor, it is -- my thing is double sided here so -- there is a lot of slides in illicit funds, but I mean -- I don't -- I don't see the actual slide that specifically says on the top money laundering.  But I do see a lot of slides talking about tracing and the illicit funds that --

THE COURT:  I guess the question is whether he was disclosed as an expert on patterns of money laundering, unless you can point me to something --

MR. EKELAND:  I would -- just that again is part of his certification as a certified fraud examiner, forensic examiner, anti-money laundering, law professor at George Mason.  I think it is in -- I mean, it is part of his training as a certified --

THE COURT:  Right.  I understand.  The whole point of disclosures is to go through this process pretrial and if necessary to have *Daubert* hearings and deal with all of that.  And, you know, we could have somebody with all sorts of training who appears as an expert, but it doesn't mean that person can then because they say, you know, I was an astrophysicist before I was an accountant and here are the five accounting principles I am going to testify about and then show up at trial and say, I indicated I was an astrophysicist and I

want to talk about astrophysics now.

MR. EKELAND: I think if it is implicit in being a professor in anti-money laundering that you would understand as part of that that part of recognizing money laundering is recognizing the patterns. And also this is not something -- the Court itself said when it came to Mr. Scholl and I believe it was Mr. Rovensky, the defense objected to them testifying about patterns of money laundering. I believe the Court specifically said that wasn't expert testimony and that they could testify on that -- on those points just simply as their knowledge as an investigator. So to that extent, we submit that Professor Verret wouldn't be doing anything more than what the Court allowed Mr. Scholl or Mr. Rovensky to do.

THE COURT: Again, I am at a little bit of a disadvantage because I don't know what you mean by patterns of money laundering.

MR. EKELAND: Well --

THE COURT: Go ahead.

MR. EKELAND: I'm sorry. I think this is ineptly phrased. I think if we just use a concrete example of like the gift cards and the prepaid phone cards, I think what Professor Verret is testifying to is having a KYC prepaid phone card or having a prepaid gift card is not the kind of behavior that somebody who is trying to money launder may necessarily do because it readily identifies you.

THE COURT:  Well, I guess the question is whether he has any experience or training or background to know that.  I get the common sense point, of saying, that, you know, had you bought a gift card, it would have been harder to trace you.  Whether he has studied the behavior of money launderers and that was disclosed in a way that would have allowed some sort of evaluation in his qualifications is what is causing me concern.

MR. EKELAND:  Your Honor --

THE COURT:  To the extent that he wants to testify rather than taking money out and putting it in a KYC account, one could have done even more to hide one's identity by doing things like buying gift cards.  That strikes me perhaps as more on the factual side of the marker.  But what I am concerned is whether he actually has studied and has any basis to say this is how money launderers behave and whether that was disclosed.

MR. EKELAND:  I think that was disclosed.  That is all part of his certifications.

THE COURT:  But we are going around in circles on it.  I have got a 33-paragraph disclosure here.  And I am just asking you to point me to where it is there.  And the fact that his background isn't sufficient -- your expert is raising his hand in the background.  If you want to talk to him, you are welcome to.

MR. EKELAND:  Certainly, Your Honor.  May I have a

moment?

THE COURT: I do want to get moving here. We are taking an awful lot of time on this. You can talk to him.

MR. EKELAND: Thank you, Your Honor.

(Pause.)

THE COURT: All right. Mr. Ekeland.

MR. EKELAND: Yes. Professor Verret informed me that actually he was asked about patterns of money laundering at the *Daubert* hearing. And that Mr. Brown asked him about patterns of money laundering involving pizza parlors and whatnot. And then also the publications that were disclosed, as part of -- I think it was one of his supplemental expert disclosures listing publications -- include publications in discussing money laundering and patterns of money laundering.

So to sum up, it is my understanding that, A, this was raised at *Daubert* and discussed. And Mr. Brown did cross Professor Verret on this issue. And then, number two, the publications that were disclosed as part of his expert disclosure cover academic articles that cover --

THE COURT: Can you point me to those articles?

MR. EKELAND: Now I have to go find the supplemental disclosure. I believe --

May I consult with Professor Verret?

THE COURT: But we really do need to get moving.

MR. EKELAND: I understand, Your Honor. If we could

limit it to what you were saying about the gift cards.

In his CV --

THE COURT:  I am really just -- what I am concerned about is in the actual 33 topics that were identified for testimony.

MR. EKELAND:  Well, we -- I am just going to repeat myself on that point.

THE COURT:  And I will just repeat myself.  Where we have 33 specific topics and the Court spends hours going through each of those topics, you can't come in and say, but his CV said that he is experienced in this particular field and that is what we want to offer him on.  If that is the way the system worked, then the whole pretrial process would collapse and the whole *Daubert* process would collapse.  You could then show up at trial and testify on anything that falls within your CV and that is just not the process.

MR. EKELAND:  We submit that this was discussed at the *Daubert* hearing, that he was noticed as an anti-money laundering expert, that it was very clear from the *Daubert* hearings that he was going to be talking about money laundering or Mr. Brown wouldn't have crossed him on that issue.

And, additionally, to the extent that the Court has allowed Mr. Scholl and Mr. Rovensky and other government fact witnesses to testify about patterns of money laundering behavior, we submit that Professor Verret should be allowed to

rebut that testimony because neither Mr. Scholl or Mr. Rovensky were noticed as experts in money laundering. And the Court specifically ruled that was not expert testimony.

THE COURT: All right. Mr. Brown.

MR. BROWN: Your Honor, first of all, Mr. Scholl was first was specifically noticed and qualified as an expert in the modus operandi of cyber criminals and hiding activity on the blockchain. The Court will recall there was a specific colloquy about that during Mr. Scholl's testimony. And he was so qualified.

THE COURT: What about --

MR. BROWN: There is --

THE COURT: -- Mr. Rovensky?

MR. BROWN: I don't think Agent Rovensky testified as to sort of typologies of money laundering in this way. And, Your Honor, I think that there is a broader concern here, which will relate to another slide, which is it is one thing for an FBI analyst or an IRS agent to provide lay testimony about just factually what looks like money laundering or what they encountered in their investigations. The problem here is we have a Harvard-trained law professor who is purporting to instruct the jury about what is or is not money laundering. We have counts. Count 1 is labeled conspiracy to commit money laundering. Count 2 is labeled money laundering. There is a -- I think this is a little bit of an apples to oranges

comparison, because you have a law professor who is going to be opining about what is or is not money laundering. And I think that raises 403 issues in ways -- as well as just disclosure issues in ways that are not --

THE COURT: I don't think what we are talking about is the legal question of what constitutes money laundering or not. I think we are just talking about whether he can testify about particular types of behavior that you would expect to see from a money launderer.

MR. BROWN: If that is his testimony, I question what the basis for it is.

THE COURT: That is what I was raising more, I'm not sure what the basis is for that testimony. And if it would have been disclosed, we could have addressed it at a *Daubert* hearing. But let me ask you, Mr. Ekeland, you indicated that you examined Professor Verret on these topics. What is your response to that?

MR. BROWN: Yes, Your Honor. Asking questions at a *Daubert* hearing is not waiver of, you know, an objection to the idea that expert is qualified to testify on a subject matter.

THE COURT: If it was explored there, it would be harmless to allow him to testify if it was, in fact, explored.

MR. BROWN: I believe what Mr. Ekeland is referring to is when I was questioning Professor Verret about his claim that no money launderer would ever send funds to a KYCed

account.  And I questioned him, you know, you teach money laundering, you are familiar with the theory of placement, layering and integration.  And isn't the classic stage of integration, taking the funds after they have been laundered and then integrating them into a true name account, an attributable account.

THE COURT:  Right.

MR. BROWN:  That is the extent of the questioning. That is not conceding that Professor Verret has any expertise. I think the crux of the question was to expose that he was purporting to opine about things that just are actually contrary to well accepted and standard principles of the theory of money laundering, not the practice, but the academic theory of it.

THE COURT:  Yeah.  So it does come back to mind on this.  So we have to move on, on this.  I am not aware of any study that Professor Verret has relied upon or performed relating to behavior of those engaged in money laundering.  And so I don't see any basis to permit the testimony relating to how people engaged in money laundering generally behave.  But if he wants to testify that one could have hidden one's self by -- even further by using gift cards or prepaid phone cards, I will allow that.  That strikes me as perhaps similar to some of the stuff that I have allowed already.  And it is somewhere in the twilight between something that is expert and fact in

nature. And I will allow him to testify with respect to that.

MR. EKELAND: I'm sorry. I just didn't hear you, Your Honor, when you said what you would allow -- I wanted to make sure I heard it.

THE COURT: Fair enough. I said I would allow him to testify that one could have hidden one's self further by using gift cards or prepaid phone cards or things like that. I don't see any basis for him to testify with respect to how money launderers typically behave, because there has been no disclosure of any study or analysis on that question, which would then be subject to *Daubert* as to what the foundation was for any such study or so forth, nor is there any evidence or indication that Professor Verret has personal experience with money laundering or even -- you know, as an investigator might having seen hundreds of cases that he could draw on.

Okay. What is next?

MR. BROWN: Your Honor, slides 12, 13 and 14, which are labeled number 3, To the Moon, Bit Coast Adventures; number 4, Code Reactor; and number 5, putting money. Our objections to these are -- this all -- this all appears to be, you know, the jailhouse interview, you know, quote/unquote rebuttal testimony. We don't see a pretrial disclosure for any of those three slides.

THE COURT: All right. Mr. Ekeland. Again, I am going to ask you to go back to the 33 disclosures and tell me

which ones you are relying on.

MR. EKELAND:  Let me grab the deck then.

THE COURT:  Take your time.

MR. EKELAND:  Okay.  First, this is rebuttal.  First, this is not -- we removed everything in -- to any of the forensic interviews.  When you are looking at slide number 12 here, To the Moon, failed business, that is just Professor Verret's conclusions based on what he has reviewed in the discovery in what, you know, the government has as well?

THE COURT:  But where is that in the disclosures?

MR. EKELAND:  In his disclosures?

THE COURT:  Yes.

MR. EKELAND:  Well, this is -- you know, the government has asserted in this case that Mr. Sterlingov was using To the Moon as a money laundering front.

THE COURT:  But you have known that all along.

MR. EKELAND:  What?

THE COURT:  You have known that; right?

MR. EKELAND:  Yes.

THE COURT:  Yeah.

MR. EKELAND:  Well, I mean, not specifically like the government's put it forward in terms of like the -- I can't remember what the Code Reactor invoices and not necessarily with the specifics.

THE COURT:  I think on the Code Reactor stuff, that

may well fall within the disclosure and the permissible testimony just with the -- and the accounting where Mr. Sterlingov's money came from. And so if that is all that is, that strikes me as okay, if you are just showing that here are these invoices and they add up to X dollars and they show income that he was earning that should have been included or should be included in any analysis of the flow of funds.

Is that all that is about?

MR. EKELAND: That is my understanding is that his view of all of basically the Code Reactor invoices and the testimony that I think Ms. Glave gave on that. She has some slides on that. And he was going to look at those slides.

THE COURT: I am not sure what the client privacy aspect of that is though.

MR. EKELAND: That is him testifying that -- it is going back the client privacy thing is that what he is seeing in there is consistent with Mr. Sterlingov attempting to just keep his clients' addresses private.

THE COURT: I don't think there is any disclosure on that. And also I think you can argue that to the jury.

MR. EKELAND: So we'll take it out.

THE COURT: But what about the To the Moon and the putting money?

MR. EKELAND: So To the Moon is just, again, based on his analysis of the information that is already in discovery.

His just, you know, CPA, CFF, CFE, view of what he thinks these -- what he sees there. And then how he thinks it is not a front for money laundering. Those are his -- I mean, you are seeing his opinions right there, that it is a failed business with minimal cash flow, it was never functional and it wasn't a front for money laundering. And just for clarity's sake, it is my understanding To the Moon and Bitcoin Ventures are essentially the same thing.

MR. BROWN: Your Honor, I think that -- I mean, just what Mr. Ekeland said right there, that these are the same businesses, number one, that is not in evidence. And so I -- and number 2, there is a disclosure issue here. We are learning for the first time what Professor Verret intends to testify to here. And it is --

THE COURT: So the slides from August 2023 include a slide that says, no indication Sterlingov received Bitcoin Fog fees for seven reasons. This is at 158-1 at 28. And then it says, doesn't fit money laundering pattern, To the Moon LLC wasn't used for integration of laundered funds. Why not? To the Moon appears to instead simply be a failed business venture.

MR. EKELAND: And, again, the slide deck we are looking at right now is just an edited down version, a more concise version of that August slide deck. And also in response to the Court's *Daubert* ruling. So I mean, that is

disclosure.

THE COURT:  Mr. Brown, why isn't that sufficient?

MR. BROWN:  Your Honor, we don't concede that the defendant's August slide deck count as part of their disclosure.  We had Professor Verret testify for two days in July based on his disclosures docketed at 145-5.  This slide deck, number one, it is a slide deck.  It is demonstrative.  Number two, it was submitted after Professor Verret's *Daubert* testimony.  There was no real vetting of the *Daubert* proceedings.  We didn't waive our objections to this.

And, number two, this precedes the Court's September 8 and September 18th review of Professor Verret's permissible scope of testimony in which this was not at all discussed or approved by the Court.

MR. EKELAND:  Your Honor, the government is correct in that they never objected to this.  It is styled.  It does say clearly on the title of document, docket number 158, supplemental expert disclosure for defense expert JW Verret.  And that is what this slide deck was attached to.  This was in August of 2023.  The government never lodged any objection to this slide deck.  The first objection we got to the slide deck was when we refined it, sent it via email to the government here during trial.  And as the Court has pointed out, the slide deck does disclose those opinions.  And it was our understanding that the Court -- this was filed -- the Court was

going to issue a written ruling on the Daubert hearing.  And this was submitted, you know, before that happened and before the *Daubert* was finalized.  We understand the Court has been very busy with its docket.  But this is expert disclosure.  And the government failed to object to it.  And the information is included in the slide deck.

THE COURT:  I am not sure your expectation is going to be a written ruling has anything to do with this.  Because as I said before, I did go through, at least with respect to Professor Verret, give you line by line rulings.  Probably substantially more extensive than you would get in virtually any *Daubert* opinion of going through these things and giving you extensive analysis of it, so I don't see that.

But I do think that there was something that was labeled as a supplemental disclosure, which occurred and which we probably should have taken up previously.  But it seems to me that it would be appropriate for -- I don't see how Professor Verret would have any knowledge or basis for testifying with respect to whether the To the Moon was functional or not, that falls within his expertise or not.  I don't see a basis for him testifying that it wasn't a front for money laundering.  But based on the disclosure, if you want to introduce some cash flow analysis relating to To the Moon and whether it was a successful or unsuccessful business, I will allow that.

MR. EKELAND: So just for clarity's sake, should we take out the, not a front for money laundering on that slide.

THE COURT: I don't know what his basis would be for saying that. It seems to me there is a 403 issue too, because I am not sure there was even a contention that it ever was a front for money laundering. But if you want to talk about the cash flow to To the Moon, I will allow that.

MR. EKELAND: I think I might proffer, the argument is very simple. There is only $56,000 total or 56,000 Euros, I think it was, total going through To the Moon over a two-month period. And that is an insignificant sum in the face of what the operator of Bitcoin Fog should have had. And I think what the opinion is simply is that it is not a front for money laundering, because it is not laundering anywhere near the volume of what you would --

THE COURT: I don't think the government has alleged that it was a front for money laundering. I don't think anyone has suggested it. That is why I think it was a 403 issue.

MR. EKELAND: It is my understanding that is what they are trying to get at with To the Moon.

THE COURT: I can ask Mr. Brown, is that an argument the government is making?

MR. BROWN: Your Honor, I mean, our argument is that all of the defendant's KYC accounts are part of the, you know, his integration of his laundered proceeds.

THE COURT:  Using laundered money for some purpose is one thing.  I think that the concern is a front for money laundering, you know, that brings to my mind is -- you know, the car wash in "Breaking Bad" or something like that.  And you have created something as a purported legitimate business in order to run large quantities of dirty money through it, a business out the other side showing up as profits from the other side in order to launder the funds.  That is how I understand the phrase, not a front for money laundering.

MR. BROWN:  Your Honor, so two points.  Number 1, in fairness, I think the fact that the defendant did have a Kraken account in the name of his VPN business that received the large majority of funds just from Bitcoin Fog.  I think that is -- that does raise some sense of that, but I think --

THE COURT:  I see.

MR. BROWN:  -- more to the point, Your Honor, the government doesn't have any issue with Professor Verret presenting the cash flow analysis if he has done it or, you know, an analysis of these transactions.  But I think what Mr. Ekeland just said is really more attorney argument for them to argue.  You know, Professor Verret should not be the one arguing, you know, this shows he is not money laundering.  This shows he is not -- it is a -- whatever it is.  I think that should be reserved for attorney argument.  Professor Verret should be able to do the math.  He should be able to present

his expert analysis. We have no issue with that. It is just, you know, these attorney arguments.

MR. EKELAND: Your Honor, if I may?

THE COURT: Go ahead.

MR. EKELAND: We removed on number 3, we removed Bitcoast Adventures just to deal with any potential evidentiary issues with Bitcoast Adventures not having been put into evidence by the government. And then remove the last bullet point not -- was not a front for money laundering. And then keep what he talks about here just analysis of the cash flow and that his opinion --

THE COURT: That is acceptable to me, if it is acceptable to you.

MR. BROWN: Yes, Your Honor.

THE COURT: And you, Mr. Ekeland?

MR. EKELAND: That is acceptable, yes, Your Honor. Mr. Hassard, if you would make those changes.

THE COURT: All right. What is next?

MR. EKELAND: We are removing Bitcoast Adventures and then we are taking out the last bullet point where it says not a front for money laundering. And I don't know, because we didn't actually get specific slide objections from the government, so I will leave it to Mr. Brown.

THE COURT: Do we still have the putting money issue, I think?

MR. BROWN: Yes, Your Honor.

THE COURT: What is the issue there?

MR. BROWN: For all three of these, putting money, it is the same issue, just lack of pretrial disclosure. This appears to be some sort of backdoor hearsay from Professor Verret's jailhouse interviews. You know, and best fix for the problem, we are not sure what he even intends to say. This is a disclosure issue and, you know, this was not the scope of his disclosed expert testimony.

THE COURT: All right. Where was this disclosed, Mr. Ekeland?

MR. EKELAND: I think this is just rebuttal to the putting money. And I don't know if this is -- I don't think this is -- I think the first time it came out may have been in the slide. This is just simply rebuttal to the government's testimony that somehow this is exotic or unusual behavior. I think Mr. Scholl and I want to say maybe Rovensky or Price, I am not sure, were discussing this putting money as if it is some sort of money laundering layering technique. And what this is the -- reflects that Professor Verret was very easily able to go on to Bitcoin Talk, which the government has full access to and was able to just find about 10 posts where people were just discussing this and how this was actually not, again, any kind of exotic money laundering technique, but a very common thing at the time.

THE COURT:  Mr. Brown.

MR. BROWN:  Your Honor, if Professor Verret is purporting to speak as an expert on Bitcoin transactional patterns in 2011, that was absolutely not disclosed.  If he is purporting to testify as a fact witness that conflicts with the defense representations in open court when I asked them if Professor Verret was a fact witness.  And as a fact witness, he is not -- he would have to proffer competent admissible evidence to any of this.  And we don't think he is, number one, competent to speak to that.  And we don't think that there is admissible evidence to speak to any of this.

THE COURT:  I'm sorry.  I take it that what you are talking about here, Mr. Ekeland, are conversations on Bitcoin Talk that are not already in the record?

MR. EKELAND:  I am not sure if they are in the record or not, because I don't have off the top of my head a full knowledge of what is in the record from Bitcoin Talk.  They are publicly accessible.  I don't know that for sure.  This is not something that --

THE COURT:  I mean, if they are in the record already, I suppose you could point to them in your closing and just simply show what is in the record already on this.

MR. EKELAND:  I would have to check that.  I can't tell the Court.

THE COURT:  And I do wonder, actually -- I mean, I

was thinking to myself, well, maybe Professor Verret could be a fact witness in the sense, almost like a paralegal, I went and I pulled this down offline and this is what it says. My only concern about that is, is there a hearsay problem with what is in those conversations?

MR. EKELAND: I think it would be effect on listener. It wouldn't be going to show that it wasn't necessarily money laundering, but it would just show that this is what people were doing when they heard about it. They learned about this technique and they went and they did it.

THE COURT: All right. Mr. Brown.

MR. BROWN: Your Honor, with respect to the exhibits that are in the defense exhibits they have disclosed to us, there is no indication whatsoever that Akemashite Omedetou or Mr. Sterlingov ever viewed any of the posts that the defense has proffered as their defense exhibits. So I don't think that there would be a hearsay exemption. I think what the defense is trying to do is try to backdoor incompetent hearsay through a contorted view of Rule 16 by saying, well, experts can rely on inadmissible hearsay and, therefore, they can have an expert who has never been disclosed, who has no expertise on this testify to inadmissible hearsay that should not be admitted because there is no exception for it and it is not relevant to this case because there is no evidence whatsoever that the defendant saw these posts.

THE COURT: Okay. I am not going to allow this slide and the testimony on this topic on the grounds that it is undisclosed expert testimony. And the defense wants to come back to me with some hearsay exception to offer some fact testimony, I would consider that. But I don't think this is appropriate expert testimony because I think you acknowledged yourself, Mr. Ekeland, that it was not previously disclosed and I don't think that it is sufficient to say, well, we are offering this as rebuttal. Because that would mean the defense never has to engage in the disclosures the Rule 16, in fact, require.

And Rule 16 was amended recently to make clear that rebuttal testimony is included. And all of the cases that you have cited about rebuttal were cases involving the government in its rebuttal case, which were not about the defense case. So I don't think it is appropriate for these reasons. And as I said, if there is some hearsay exception and you have someone who just wants to authenticate materials that are on Bitcoin Talk and there is a basis for that coming in under a hearsay exception, I would be open to considering that.

MR. EKELAND: Understood, Your Honor. I just want to put on the record an objection to Rule 16 as applied as just violating a criminal defendant's constitutional rights to put on a complete defense.

THE COURT: Okay.

MR. EKELAND: With that, we can move on to the next slide.

THE COURT: And I will note for the record that there is no reason in the world this could not have been previously disclosed. I take your point that there could be something that comes as a sufficient surprise that the defense just didn't have any basis to anticipate it and it would be a due process problem. But there is nothing about this that suggests this type of surprise, so even if there were an as-applied exception to the Rule 16 disclosure requirements, I conclude it doesn't apply here.

All right. Anything else, Mr. Brown?

MR. BROWN: Your Honor, just the very last slide. We object to the statement, no financial forensic evidence that Mr. Sterlingov operated Bitcoin Fog.

THE COURT: Oh, I'm sorry. Going back to the To the Moon slide, are you taking the never functional off of that?

MR. EKELAND: This is slide number -- we can take that off.

THE COURT: All right. So my apologies on the last slide.

I'm sorry?

MR. EKELAND: And then --

I was talking to Mr. Hassard, Your Honor. I wasn't saying anything to the Court.

THE COURT: All right.

MR. BROWN: Then just the very last slide, no financial forensic evidence that Mr. Sterlingov operated Bitcoin Fog. I think that is exactly what the Court told Mr. Ekeland. Professor Verret cannot testify to, he cannot testify to the sufficiency or insufficiency of the government's evidence, let alone testify so based on forensic financial standards. That is a 403 and a 702 issue. It is just not helpful to the jury. And it will lead to jury confusion and it is undue prejudice that substantially outweighs any probative value. He is just commenting on the sufficiency of the evidence.

THE COURT: Mr. Ekeland.

MR. EKELAND: The defense submits this is permissible under Federal Rule of Evidence 704. And that Professor Verret is -- it is entirely okay for him to testify as to his ultimate conclusion and his opinion as to whether or not Mr. Sterlingov was operating Bitcoin Fog based on the financial evidence that he has examined.

THE COURT: So I think that is going to come out through everything else that is in the slides before this one, to the extent it is appropriate. But I do think you should drop this slide. It is the same thing that I have problems with a lot of your questions on cross-examination, where you put the government witness on there and you cross-examine the

government witness you say, so you have no evidence of that? So there is no evidence that, you have no evidence this, you have no evidence that. And I think that ultimately is a question for the jury. And I think it raises a 703 problem, particularly I think also as Mr. Brown has indicated when you are dealing with somebody who is going to be coming up as a Harvard law graduate, professor and saying, I am opining that there is no evidence in this case. I think the more appropriate thing for him to do is to describe the evidence. And he is entirely welcome to do that. But I don't think you should include the final slide.

MR. EKELAND: All right. We'll take it out.

THE COURT: So are we ready to bring the jury back?

MR. EKELAND: Can we have just a short moment to make sure we get the slide deck together? And I just want to make sure I get everything proper for --

THE COURT: Mr. Brown.

MR. BROWN: Your Honor, it would be helpful for them to do that and then send it to us so we can take a quick look and we can save time in front of the jury.

THE COURT: Let's do this quickly and get the jury back so let's take a 10-minute break.

(Recess taken at 11:25 a.m.)

THE COURT: All right. Just a quick update on jurors before we call the jury -- let me start over. Just a quick

update on jurors before we call the jury in.  I remind you, we are finishing at 3:30 today, because there was a juror who had an appointment.

For the rest of the week, there is a juror that has requested if we can finish by 4:30 tomorrow.  It doesn't strike me as the greatest excuse, just for a dinner.  Someone else -- it is less of a problem on that same day.  On Wednesday, juror number 9, who is the juror who has been late virtually almost every day, has an entirely legitimate medical issue, has a doctor's appointment in the morning and had asked if we could start at 11:00.  It may be -- that is also the juror who at times has been asleep.  And I think it may be worth thinking about whether we should continue with that juror or not.  But I will let you all think about that and let me know what you want me to do.

And on Thursday, we have a request to end by 4:30.

MR. EKELAND:  Your Honor, I just want to remind the Court that Mr. Fischbach needs to look at the devices today with Mr. Sterlingov.  So we were thinking that would happen after Professor Verret's testimony.

THE COURT:  If we are finishing at 3:30 today, that would work well.

MR. EKELAND:  Depending on the government's cross, I think that is totally doable.

THE COURT:  I do think that Mr. Fischbach should be

ready to start today if we finish with Professor Verret before 3:30. Because we want to keep things moving. Over the lunch break, if you want to look at the devices, you are welcome to do that.

MR. EKELAND: We would rather not have to start his testimony and then not be able to talk to him about his review of the devices.

THE COURT: I think we have to keep things moving here. So if we are done, I think we should start. And if he needs some time to look at the devices, you can talk to him.

MR. EKELAND: After Mr. Fischbach, it would just be Mr. Sterlingov, just so the Court knows, hopefully we are on track to finish this week.

THE COURT: All right. Okay. Sounds good. Let's get the jury.

(Jury in at 11:37 a.m.)

THE COURT: All right. Mr. Ekeland, the defense may call its first witness.

MR. EKELAND: The defense calls Professor Verret, JW Verret.

JOHN WALLACE VERRET, sworn.

THE WITNESS: So help me, God.

THE COURTROOM DEPUTY: Thank you. Please be seated.

MR. EKELAND: May I proceed, Your Honor?

THE COURT: You may.

MR. EKELAND:  Thank you.

DIRECT EXAMINATION

BY MR. EKELAND:

Q.   Professor Verret, could you just introduce yourself to the jury, spelling your name?

A.   Sure.  My name is John Wallace Verret; J-O-H-N, W-A-L-L-A-C-E, V-E-R-R-E-T.  And I go by JW.

Q.   And, Professor Verret, could you describe your educational background?

A.   I went to undergrad at LSU, where I got a degree in accounting.  I went to Harvard Law School, where I got a JD, juris doctorate.  I got a master's degree from the Harvard Kennedy School of Government in public policy with a specialization in financial regulation policy.  And I have a certificate in the Economics of Blockchain from the Wharton School of Business.

Q.   And could you describe for the jury, your professional experience?

A.   Sure.  I -- when I graduated from law school, I -- well, while I was in law school, I served as an intern for Judge Martin Feldman in the Eastern District of Louisiana.  After law school, I clerked for the Delaware Court of Chancery for a year, which is a court that specializes in corporate law issues.  I then practiced at a firm in DC called Skadden Arps doing internal investigations and accounting fraud

investigations for companies that had issues with the SEC, the Securities and Exchange Commission, stock market regulator. After that, I took a job as a professor at George Mason Law School at the Antonin Scalia School of Law over in Arlington, Virginia. I have been a professor ever since. I have done a number of other things during that time and I have taken leave from the university a few times and went back to my teacher job after.

The first time I took leave, was in 2011 where I went to teach at Stanford Law School for a semester. So I taught securities banking corporate law over at Stanford and served as a fellow over at the Hoover Institute while I was there. And then I came back to teaching at the same place.

In my teaching at George Mason Law School, I taught cases in forensic and financial accounting in securities law, banking law, corporate law. In 2013, I took some leave again from teaching and went and worked on Capitol Hill, where I worked from 2013 to 2015 for the US House Financial Services Committee. I served as the chief economist and as senior counsel for that committee. My role leading the -- on the House side, congressional oversight of the Federal Reserve, the monetary policy. I worked in some securities law issues, SEC issues there as well. And I also worked on some issues on oversight of the Treasury Department, which included within the subcommittee I worked with, oversight of anti-money laundering

laws, sanctions law, something called the Export Import Bank and a few other things within Treasury, but not the tax issues. I did that from 2013 to 2015.

While I was there, I also led an investigation into wrong doing at the Federal Reserve that ultimate -- leaks of confidential information at the Federal Reserve. Led that investigation. Eventually the FBI got involved. And that led to the resignation of the Federal Reserve Bank of Richmond as part of what eventually happened with all of that.

I went back to teaching in 2015. And I have been a full time professor there teaching the same topics there since then. I got tenure in 2016. I also practice as an attorney defending clients in corporate issues, securities issues. And I have done some crypto work as an attorney. And I wear a few different hats. I also wear a hat as a forensic accountant in litigation support. I have been doing that for a while, working on cases involving the different things that forensic accountants work on.

I also sit on a nonprofit board call the Zcash Foundation. The Zcash Foundation supports a blockchain called the Zcash blockchain. Zcash is also the name of the coin or the token on the Zcash blockchain. Zcash was founded as a fork of the Bitcoin blockchain. Some of the people involved in Bitcoin early on were a little concerned about the fact that Bitcoin can be traced. On the blockchain, transactions can be traced

on the blockchain and that Bitcoin is not fully anonymous. So they created the Zcash blockchain. It takes the Bitcoin blockchain and just adds some more cryptography on top of it to make all of the transfers potentially completely private and anonymous and untraceable, if you want to use the function, though you can also do transparent functions on the Zcash blockchain. Anyway the Zcash foundation was created to support academics innovating in the cryptography that is used in the Zcash blockchain.

THE COURT: I'm sorry to interrupt. You are -- I think we have gotten a little offtrack on the qualifications.

BY MR. EKELAND:

Q. So while you were in Congress, Professor Verret, did you do any work related to Bitcoin while you were at Congress?

A. Yes. So I led the first briefing, to my knowledge, in Congress to members of Congress about Bitcoin in 2013.

Q. And then in terms of your trainings and certification related to accounting what, if any, trainings and certifications have you taken and do you hold?

A. I am a certified public accountant. I also hold a credential called the CFF that is only available to certified public accountants. CFF stands for certified in financial forensics. I hold the CFE credential, that is certified fraud examiner. I hold a credential called the CVA, that is certified valuation analyst. And I hold a credential called

the CCFI, that is certified cryptocurrency forensic investigator.

Q.   And who issues the CPA certification?

A.   The Virginia State Board of Accountancy is what issued it to me.

Q.   And who issues the -- I believe you said the CFF.  What does that stand for again?

A.   The CFF certified in financial forensics is issued by the AICPA, the Association of International CPAs.

Q.   Who issues the CFE?

A.   The Association of Certified Fraud Examiners.

Q.   And then the CVA, who issues that?

A.   That is the Association of Certified Valuation Analysts.

Q.   And the CCFI?

A.   That is issued by the McAfee Institute, an institute associated with McAfee that does the antivirus software.

Q.   And that is a -- the CCFI, what does that stand for again?

A.   Certified cryptocurrency forensic investigator.

Q.   And have you published any publications?

A.   Yes.

Q.   Could you give a brief summary of what you have published?

A.   I don't remember the total offhand, but maybe 15, 16 publications in journals and law reviews about topics in my field.  Securities, corporate.  One article about anti-money laundering.  I have one article coming out about

cryptocurrency, although I haven't published specifically about cryptocurrency in the past. Most of it is about securities law, corporate law and banking law.

Q. And have you published any books?

A. I haven't published any books yet, but I am working on a book now that is in peer review with MIT Press.

Q. And have you ever testified before in court?

A. Not in court, no.

Q. And are you being paid for your testimony today?

A. I am working on a rate of $450 an hour. And I have sent one invoice for that. But I haven't been paid yet. I didn't ask for a retainer in this case, an upfront retainer. And informed counsel that owing to the realities of this case, I won't be seeking to be paid for any work since the September invoice I have done. I have maybe 300 hours of work. And I have told counsel those will all be just pro bono hours.

Q. How much was your last invoice for?

A. It was for $110,000. I also informed counsel that I think it probably unlikely I will be paid on that invoice. I informed counsel I am willing to negotiate that down. I don't want that invoice to stand in the way of something -- someone -- I don't want that invoice to be a hindrance to anyone. I will leave it there. Yeah.

MR. EKELAND: So, Your Honor, at this time, the defense moves to qualify Professor Verret as an expert in

financial forensics, forensic accounting and cryptocurrency.

(Conference held at the bench.)

MR. BROWN: Your Honor, we have no objection to the first -- Your Honor, we have no objection to the first two topics. We do object to qualifying Professor Verret as an expert in cryptocurrency based on the *Daubert* hearings.

MR. EKELAND: Your Honor, we did notice him as an expert in cryptocurrency. He is well versed. He is a member of the Zcash Foundation. He uses cryptocurrency. He is writing a book on cryptocurrency. He has got a cryptocurrency forensic investigator certification from McAfee. I think he has got a solid foundation.

THE COURT: Is he offering any expert testimony on cryptocurrency or are you just going to throw all of this --

MR. EKELAND: I think to the extent that it comes in on the periphery, I think everything he is testifying about we have disclosed and we went through in the slide deck. But to the extent that he does need to opine on, say, the valuation of Bitcoin and the calculation of like --

THE COURT: I don't think you have to be an expert on cryptocurrency. I think his accounting is sufficient for those purposes. Okay.

MR. EKELAND: Okay.

(End of bench conference.)

THE COURT: The Court concludes that Professor Verret

is qualified to testify as an expert on financial forensics and forensic accounting.

MR. EKELAND:  Thank you, Your Honor.

BY MR. EKELAND:

Q.   Professor Verret, did you prepare anything to aid the jury in understanding your testimony here today?

A.   Yes.  I prepared PowerPoint slides.

Q.   Mr. Hassard, could you put up what is not in evidence as Defendant's Exhibit 129.

THE COURTROOM DEPUTY:  I'm sorry.  What is the number?

MR. EKELAND:  129.

THE COURTROOM DEPUTY:  I don't have a 129.  It stopped at 106.  Do you have an updated one?

MR. EKELAND:  I have to give you an updated one. This is 129 and it is not in evidence.

BY MR. EKELAND:

Q.   And can you see that, Professor?

A.   Yes.

Q.   Mr. Hassard, could you just click through it really quick for him.

Do you recognize that?

A.   I do.

Q.   Is that a fair and accurate depiction of the slide deck you prepared for your testimony today?

A.   Yes.

Q.   Do you think that will help the jury in understanding your testimony here today?

A.   Yes.  I hope so, yes.

MR. EKELAND:  Your Honor, at this time the defense would like to move what has been marked for identification as Defendant's Exhibit 129, just to publish to the jury as a demonstrative.

THE COURT:  All right.  Exhibit 129 may be published to the jury as a demonstrative.

(Whereupon, Defense Exhibit No. 129 was admitted.)

BY MR. EKELAND:

Q.   And Mr. Hassard, if we could go to the next slide.

THE COURT:  You can continue.

You can continue.

MR. EKELAND:  May I proceed, Your Honor?

THE COURT:  You may.

BY MR. EKELAND:

Q.   Professor Verret, could you explain what is on this slide keeping in mind what we discussed?

We just lost the connection.

THE COURTROOM DEPUTY:  I'm sorry.  Just give me one second.

THE WITNESS:  Yes.  The first two bullet points just describe the standards that I work under.  And using the CFF

and CFE credentials, they are mostly the same.  And the three significant elements of these are objectivity, integrity, and relying on sufficient and reliable information.

BY MR. EKELAND:

Q.   And these are the standards you were trained in when you got your certifications?

A.   That is correct.

Q.   And what are the last two bullet points?  What are those in reference to?

A.   Those just mention that the CCFI certification has a set of principles that were provided when we were trained in it. There was a treatise that we used to study for it.  And it includes principles similar to the CPA and CFE, but as applied to cryptocurrency investigations.

Q.   And, Mr. Hassard, if we could go to the next slide, please.

     So, Professor Verret, you have reviewed the discovery in this case?

A.   Yes.

Q.   And you have been listening to the testimony in this case?

A.   Yes, I have.

Q.   And you are aware that the government has --

A.   -- just to be exact, I wasn't here for every single testimony, but the ones relevant to my testimony I was here for.

Q.   And you have looked into the issue of whether you think Mr. Sterlingov received fees from Bitcoin Fog?

A.   Yes.

Q.   And what is your opinion of whether or not he received fees from Bitcoin Fog?

A.   I do not believe he received fees from Bitcoin Fog.

Q.   And what is the basis for your opinion?

A.   The basis is the five tools --

MR. BROWN:  Objection, Your Honor.

THE COURT:  Why don't you ask him to walk through his calculations and his analysis.

BY MR. EKELAND:

Q.   Could you take the jury through your calculations and analysis as to why you reached that conclusion?

A.   Yes.

Could we go to the next slide?

This is a calculation of what the operator of Bitcoin Fog would have earned and what is unexplained based on what we know from the evidence, what it appears from the evidence Mr. Sterlingov ever owned.

One of the tools in financial forensics, in fact, I would say the primary tool --

MR. BROWN:  Objection, Your Honor.

THE COURT:  Yeah.  I think we should just walk through the calculations.

THE WITNESS: I will start with what I am most certain about, what is easiest to estimate and what I am most sure about, measuring how much the operator of Bitcoin Fog would have earned measured in Bitcoin. That is the easiest thing to do. It doesn't require much professional judgment to get there.

MR. BROWN: Objection, Your Honor.

Can we pick up the phone, please?

(Conference held at the bench.)

MR. BROWN: Your Honor, the witness -- the witness keeps trying to sneak in references to his professional standards and accounting practices. We have no objection to him testifying to the analysis he did. But we do object vehemently to what we have just been over with the *Daubert* discussion about framing this as a question of his professional certification and his professional methodologies.

MR. EKELAND: Is he -- he is noticed as an expert in financial forensics. I don't think he is intentionally doing it. If the Court wants to instruct him, I certainly haven't instructed him to be doing this. But, I mean, I don't think it is any secret that he is a CPA and holds all of these certifications. And I think he is merely commenting that he is just following his standard practice.

THE COURT: He sat here through this whole thing. He is a Harvard law graduate who practiced law. He knows what is

going on here. I do think that he is trying undermine my ruling on those issues, so I will just remind him that he sat through our discussions and that he should abide by my rulings.

MR. EKELAND: Your Honor -- I mean, Your Honor knows what to say, just to stick to the math and his calculations.

THE COURT: I have done that twice already and it doesn't work so far.

MR. EKELAND: Understood.

(End of bench conference.)

THE COURT: I am going to remind the witness. You were here when I discussed some rulings on some issues and you should abide by my rulings.

THE WITNESS: Okay.

THE COURT: You can continue.

BY MR. EKELAND:

Q. Could you remind -- could you just go through how you calculated your number here on this page?

A. Sure. I start with estimating the earnings of the operator of Bitcoin Fog, measuring them in Bitcoin before measuring them in dollars. The operator of Bitcoin Fog, as I understand, Bitcoin Fog mixed 1.2 million Bitcoin. 1.2 million Bitcoin went through Fog. The fee for Bitcoin Fog was at first 2 percent and then went to a range of 1 to 3 percent. But the average there is still 2 percent. I view a 2 percent estimate as conservative, though it might stretch to 3 percent. The

transactions I have seen in evidence all are above 2 percent. So it could be 2 percent, it may be 3 percent. I think 2 percent is the one where I would focus most. 2 percent times 1.2 million Bitcoin yields 24,000 Bitcoin that the operator of Fog should have earned, but that might be as high as 36,000 Bitcoin.

Q. Could it be also at the 1 percent, if it was all at the 1 percent range, what would those numbers come out to be?

A. Those would be 12,000 Bitcoin. Though I find that unlikely, given that the average is 2 percent and given that the transactions I have seen are all above 2 percent. The next number there is taken from the Glave -- Ms. Glave's exhibit.

Q. Could you remind the jury again just who Ms. Glave was?

A. She was an accountant for the -- on detail to the IRS who provided an exhibit during her testimony.

Q. And she testified here in front of the jury?

A. That is correct.

The number that she offers for the amount of Bitcoin Mr. Sterlingov ever owned was 2,707, a little less than --

MR. BROWN: Objection, misstates the evidence.

THE COURT: Sustained.

So I am going to strike the answer.

BY MR. EKELAND:

Q. Do you see there it says estimate implied under Glave estimate of 2,707 BTC, how did you arrive at that calculation?

A.   I took that number from her exhibit.

Q.   And that was the exhibit that she displayed in Court?

A.   That is correct.

Q.   And that was published to the jury?

A.   That is my understanding.

Q.   And so could you continue and just take us through the rest of the slide?

A.   So the first thing that is apparent in this calculation is the difference between the 24,000 to 36,000 Bitcoin that the operator of Fog would have earned, did earn, versus the 2,707 number that is included in the Glave report from Mr. Sterlingov's Bitcoin holdings over the time period of the report.

     The next thing to consider is what to do for the purposes of the calculation with the amount of Bitcoin that remains in the Bitcoin Fog cluster.  Now, I think the best way to characterize the Bitcoin that is still sitting in the Bitcoin Fog cluster what has alleged to be the Bitcoin Fog cluster described as that 98 percent of it is customer funds and the other 2 percent of it is fees.  But just to be generous in the calculation and as conservative as I can be, you can also subtract that 24,000.  So, in other words, to measure what is missing, take the 24,000 or 36,000, but let's focus on 24.  Take the 24,000 subtract the 2,707 Bitcoin that the Glave estimate puts in Mr. Sterlingov's hands, subtract the full

1,354 in the Bitcoin Fog cluster, even though probably not all of it is fees or most of it is fees, but subtract it anyway to be careful. That comes to proceeds unaccounted for of 19,939 Bitcoin. That amount -- and stopping there, that shows what the Fog operator earned measured in Bitcoin. It shows what Ms. Glave's exhibit puts in Mr. Sterlingov's hands. It draws a contrast between those two things. It gets a calculation for proceeds unaccounted for in Bitcoin. And, therefore, we have not had to do any estimates putting it into dollars yet. Though I did that as well.

One more thing about this slide is just the highest amount in dollars that that 19,000 could be, if measured either at the price just before trial or at the peak in 2021, would be $975 million that is unaccounted for. Or at the peak in 2021, that would be $1.34 billion unaccounted for measured in dollars rather than measured in Bitcoin. That is the ceiling of what that unaccounted for Bitcoin could be valued at in dollars.

Q. When you say it is unaccounted for, could you just explain that -- what you mean by that a little more?

A. In this slide, I defined unaccounted for as what the Fog operator earned, minus what the Glave report identified as Sterlingov Bitcoin minus what is left in the Bitcoin Fog cluster, that yields what the Fog operator -- funds the Fog operator earned that are unaccounted for.

Q. And you -- is it correct to say that you just didn't find

those unaccounted for Bitcoin in any of the records you reviewed related to Mr. Sterlingov's finances?

A. That is correct.

Q. Is there anything else you would like to share with the jury from this slide?

A. No.

Q. Can we move to the next slide, Mr. Hassard? Could you explain this next slide to the jury?

A. This is a slide that shows percentage returns for Bitcoin investments. This is as of the middle of last year. The price has gone up since that time, so all of the prices would be significantly higher. But it demonstrates the scale of wealth that you could earn if you bought Bitcoin in -- in -- at the very bottom of the 14-year mark, the percentage return you could earn if you earned in the very first year of Bitcoin's existence which is here 3.9 billion percent returns.

Q. What was the first year that you could buy Bitcoin?

A. Well, basically 2010.

This shows in a 12-year mark, if you were buying in 2011, the percentage you could earn was 221,320 thousand percent, versus gold that earned 21 percent, versus the S&P 500, the basic stock market index that was 253 percent. So it shows the scale of earnings that are possible, the astronomical earnings that are possible if you were an early buyer of Bitcoin who held on.

Q.    What was the source for the value of Bitcoin that you used for this calculations -- these calculations here?

A.    So for those, I actually prepared my own chart using a source called Messari, that is one of the accepted sources in the industry.

Q.    What is the reference to the website down there on the bottom?

A.    That is another -- this is another chart that I obtained for a website called Casebitcoin.  It was consistent with what I prepared with my own monthly chart.

Q.    And is there anything else you would like to share with the jury in relation to this slide?

A.    No.

Q.    Mr. Hassard, if we could go to the next slide.

      And what is Bitcoin pizza day?

A.    So this is a date that has become an annual tradition for Bitcoiners that remembers an event that happened in the history of Bitcoin, May 22nd, 2020 [sic].  This is the first time in record that someone actually used Bitcoin to pay for something. And they spent 10,000 Bitcoin to buy a couple of pizzas.  I have in the slide those 10,000 Bitcoin that bought two pizzas would be worth 480 million today.  That is the value at the start of trial.  Today that would be more like 620 million.  It has gone through a lot -- it happens to have gone up a lot through the trial.  So the 10,000 Bitcoin that bought a couple

of pizzas in 2010, would be worth 480 million at the start of trial, 620 million today.

This phenomenon demonstrates to me that at the time, 2010, Bitcoin was just like a hobbyist toy.  It wasn't what it is now and people didn't know then what it would be now.  So it was kind of like a trading card or something where tens of thousands of Bitcoin were transferred around as kind of a game.  And so that shows you the scale of what is possible if you were early in Bitcoin.

Q.   And related to that, I want to take a step back and go back to the discussion about the -- well, the appreciation in Bitcoin.  And, Mr. Hassard, if we could put up what is not in evidence as Defendant's Exhibit 128.

And do you recognize that spreadsheet?

A.   I do.

Q.   And what is it?

A.   This is an effort --

Q.   Just briefly, what is it?

A.   Sure.  This is an effort to take the Bitcoin we know the Fog operator --

Q.   Professor Verret, this hasn't been published to the jury yet.  I want to find out, do you recognize that spreadsheet?

A.   I do.

Q.   Are those your calculations of what you considered to be the potential fee earnings of the Bitcoin Fog operator?

MR. BROWN:  Objection; leading.

THE COURT:  It is leading, but I think he is trying expedite things to lay the foundation, so I will allow it.

THE WITNESS:  This is a calculation of the Fog operator's earnings in dollars.

BY MR. EKELAND:

Q.   Based on the information that you -- in discovery in this case?

A.   Based on the information in the discovery in this case including Mr. Scholl's calculations.

Q.   And this is a fair and accurate representation of the spreadsheet that you did these calculations on?

A.   Correct.

MR. EKELAND:  Your Honor, at this time the defense moves to publish what has been marked for identification as Defendant's Exhibit 18 as a demonstrative to the jury.

THE COURT:  Any objection?

MR. BROWN:  No objection.

THE COURT:  Defendant's Exhibit 128 may be published as a demonstrative.

(Whereupon, Defense Exhibit No. 128 was admitted.)

BY MR. EKELAND:

Q.   And I think the jury can see it.  Professor Verret, can you just take the jury through this spreadsheet and explain -- just explain your calculations without reference to any other

standards, just how you did the math?

A. This is an effort to translate the Fog operator's earnings in Bitcoin into dollars. When I saw that Mr. Scholl's estimate makes an assumption that the Fog operator instantly sells the Bitcoin they earn and turns it into dollars -- this yielded, as I recall, an estimate at a 2 percent fee of just under 8 million, 7.7 million, if I remember correctly. That is based on the assumption that the Fog operator sells their Bitcoin that they earn from the 2 percent fee or 3 percent, whatever, instantly into dollars. I have not seen evidence that did occur.

MR. BROWN: Objection.

THE COURT: Sustained. I will strike the answer.

THE WITNESS: I feel that the best way to follow what I have been trained to do --

MR. BROWN: Objection.

THE COURT: If you could just walk through your calculations with regard to your calculations.

THE WITNESS: I created calculations assuming that the Fog operator would not have instantly sold their Bitcoin. But what the totals would have been if they had held on for a year, 2 years, 3 years and 4 years.

That -- this does not include the assumption they held all of the way to the end to the billion dollar number I provided earlier. But that instead they sold a year after they

earned it, 2 years after they earned, 3 years after they earned it, 4 years after they earned. So that is what is at the top of the columns immediate sale versus -- which was Mr. Scholl's numbers -- against those, the columns compare a 1-year holding period, a 2-year holding period, a 3-year holding period, and a 4-year holding period. And for each fee, they give you totals at the bottom. For a 1 percent year, if they held for one year, the Fog operator held for one year since they earned it, they would have gotten 10.4 million. For 2 years, 21.3 million, for 3 years, 40.1 million; for 4 years 57.67 million. That is at the 1 percent fee, which I do not believe is the best fee to use.

At the 2 percent fee, if the Fog operator held for 1 year the Bitcoin they earned, they would have earned $20 million in US dollars; for two years, $42 million; for 3 years, $80 million; and for 4 years, $115 million.

You will see some black lines here just because it is not possible to hold a holding period when we are not that far along yet. And then for the 3 percent fee, there are estimates at 1 year of 31 million; a 2-year holding period of 64 million; at a 4-year [sic] holding period of 120 million; and a 4-year holding period of 173 million at a 3 percent fee.

BY MR. EKELAND:

Q. Based on your review of the evidence and what you have seen and what you know of Mr. Sterlingov's assets, do you know

how much approximately he had in terms of assets?

A.    The number in the Glave exhibit that she testified to, as I recall, was just south of 2 million.  It was about 1.8 million.

Q.    Is there anything else that you would like to share with the jury about this exhibit?

A.    Just that I believe that the 80- to $120 million is the most likely of these possibilities.

Q.    Why is that?

A.    Because I think the 2 percent fee is conservative.  I think the 3-year holding period tends to be the average that Bitcoin holders hold.

          MR. BROWN:  Objection, based on Rule 16.

          THE COURT:  Sustained.  The answer is stricken as well.

          When I am striking an answer, the jury should just ignore the answer.

BY MR. EKELAND:

Q.    Anything else you would like to share with the jury about this chart?

A.    No.

Q.    Mr. Hassard, if we could just go back to the slide deck in Defendant's Exhibit 129.

          And I think we had stopped at Bitcoin pizza day.  Is there anything else you would like to share with the jury about

Bitcoin pizza day?

A.    No.

But I think in response to your last question --

MR. BROWN:  Objection, Your Honor.

THE COURT:  Just wait for a question.

THE WITNESS:  I'm sorry.

BY MR. EKELAND:

Q.    Is there anything you would like to clarify about your response to my last question?

A.    The other thing I did in creating the chart --

MR. BROWN:  Objection.  Is this about Bitcoin pizza day or a different question?

THE COURT:  Do you want to go back to the chart?

BY MR. EKELAND:

Q.    Mr. Hassard, could you please put up what has been published to the jury as Defendant's Exhibit 128.

Is there anything else, Professor Verret, that you would like to say about this chart?

A.    This chart is what is called an income analysis.

MR. BROWN:  Objection, based on Rule 16.

THE COURT:  I will allow that.  But I think that was the only question, was there anything to be clarified?  He has clarified, it was an income chart.

BY MR. EKELAND:

Q.    Yes.  Is there anything else you would like to clarify

about this?

THE COURT: I think it would be better if you could ask more specific questions. Rather than just, you know, basically is there anything you want to say. So if you want to ask more a specific question, that is fine.

BY MR. EKELAND:

Q. I think we can take this down. Can we, Mr. Hassard, go back to the slide deck. And I think the last slide was -- let's move on to the next slide. Go to slide number 7. So can you explain what this slide is about?

A. This slide mentions that Mr. Sterlingov again, 2,707 Bitcoin, are put in his hands by the Glave exhibit. Bitcoin was as low as 40 cents in 2010, 2011 for a sustained period in records. It went even lower at that point. There was a point really early on where it didn't even have a market price. And so Bitcoin purchased as early as that could have been purchased with a couple thousand dollars in cash.

Q. Can we move on to the next slide, Mr. Hassard.

So what is this slide about and why is it -- why are we talking about personal privacy?

A. I would not infer from use of a mixer that use of the mixer is necessarily illegitimate. I am familiar with use of mixers that are about other reasons. One of them just owes to the fact that Bitcoin is traceable on the blockchain. Any time you interact with someone and they have your public key, they

can trace everything associated with that public key. It is like putting your checking account and your bank account out for the world to see. And I am familiar and read indictments of people where --

MR. BROWN: Objection.

THE WITNESS: -- where they were --

MR. BROWN: Object to reference to indictments under Rule 16.

THE COURT: Sustained.

MR. EKELAND: Your Honor, we did have two witnesses testify from the government who were indicted for Bitcoin-related crimes.

THE COURT: That is fine. That is in evidence and the witness was here and heard that, that is fine too.

BY MR. EKELAND:

Q.   So, Professor Verret, did you hear the testimony of I believe it was Larry Dean Harmon?

A.   Yes.

Q.   Did you gain any insights into the operation in terms of fees in relation to operating a mixer from Mr. Harmon's testimony?

A.   I did.

Q.   Could you share those insights with the jury?

A.   I am aware that Mr. Harmon testified that most of his earnings were from running the Helix mixer. I am aware that

Helix operated from 2014 to 2017. I am aware that Helix was a smaller mixer than Bitcoin Fog. I am aware that Mr. Harmon testified that he earned $220 million from running Helix.

MR. BROWN: Objection. That is not in the record.

MR. EKELAND: Your Honor, that is in the record because I specifically asked -- it is in the statement of facts that the government I believe entered into evidence. He also testified about that amount, having to forfeit it.

THE COURT: But perhaps -- this may be okay, but I feel like we have shifted gears here because you were asking about questions about using mixers. And now we have switched to him testifying about -- this stuff before about how much profit you might make from using a mixer.

MR. EKELAND: That is in reference because the indictments were brought up and the government objected to the indictment, so I decided to go and discuss --

THE COURT: All right. I will allow it.

BY MR. EKELAND:

Q. Just before we go back to the slide, wrapping up with what you learned from Mr. Harmon, could you just sum that up briefly for the jury and then we'll go back to the slide?

A. The testimony from Mr. Harmon indicates that the Helix mixer had less volume than Fog and earned for Mr. Harmon $200 million. That is consistent with my own estimates of using a 3-year holding period, what the Fog operator would have

earned in my own chart.

THE COURT:  Is there an objection?

MR. BROWN:  Yes, Your Honor.  I think this does go back to Rule 16 issue.

THE COURT:  It does.  And I am going to strike the last portion of the answer with respect to the 3-year holding period.  So I am going to strike that.  For the three years, I don't think there is a basis for that.  I am going to strike that.

BY MR. EKELAND:

Q.   Turning back to the slide here on personal privacy.  Why are you saying most mixing is for personal privacy?  What is your basis for saying that?

A.   I have reviewed a Chainalysis report that says most mixing is for personal privacy or otherwise not illicit.

Q.   What is -- you have got the word op sec there.  Why is that there?

A.   I understand that one of the reasons to use a mixer is for operational security to prevent hacking, things like of that nature and kidnapping and other worse things.

Q.   And then what -- why did you have a professional responsibility on this slide and just very general --

THE COURT:  Can you pick up here?

(Conference held at the bench.)

THE COURT:  You are talking about mixing now.  And I

thought we had agreed he was only going to talk about professional responsibility with respect to the use of the VPN and he didn't have any analysis or basis for saying that people used mixers for personal -- or responsibility purposes.

MR. EKELAND:  Yeah.  I am not trying to do that.  And I will steer to the VPN.  I will just --

THE COURT:  If you ask him an open-ended question and after him sitting here and hearing me rule on it and he starts talking about mixers again, I am going to admonish him in front of the jury.  You should be aware of that.

MR. EKELAND:  I am just going to --

(End of bench conference.)

BY MR. EKELAND:

Q.   Let's move on to the next slide, Mr. Hassard.

So can you just explain what this slide is about and why you are reaching this conclusion?

A.   I reviewed four different patterns of transactions to see whether those patterns were consistent with trying to hide something.

Q.   And could we go to the next slide, Mr. Hassard?

What do you mean here, number one, by post mix KYC?

A.   Everything I have seen in the evidence shows that Mr. Sterlingov when he used gift cards --

MR. BROWN:  Objection.

THE COURT:  Sustained.

That is not my understanding of what this was about.

MR. EKELAND:  Could we pick up the phone?

(Conference held at the bench.)

MR. EKELAND:  I'm sorry.  Can I get clarification on what goes in?

THE COURT:  The only thing we talked about, you know, extensively earlier today was that he was going to testify generally, not that Mr. Sterlingov, but that generally one could hide one's identity by purchasing a gift card instead of putting money into a KYC account.  That is all we talked about. He sat here through the whole thing.

I have to say that I do think that he is perhaps acting more as a lawyer here, but not in a way that is abiding by my instructions and my rulings.  He sat through the whole thing and all we talked about.  And when you explained what this was for, was for purposes of showing that it could be an extra layer of protection could be taken when withdrawing money from a mixer is by purchasing gift cards with it, not anything about what Mr. Sterlingov did.  There was no discussion of that whatsoever.

MR. EKELAND:  I honestly must have misunderstood.  I will steer him from talking about anything in relation to the evidence of Mr. Sterlingov and just keeping this in general terms if that is what the Court is requiring.

THE COURT:  Well, if you never mentioned this

before -- you are saying, what I am requiring -- we could take a break now and go back to it.  We have had a lengthy discussion about this.  And all we talked about was this being evidence of how someone could take greater precautions in withdrawing money from a mixer.  Your never said a word about Mr. Sterlingov when we went through that.

MR. EKELAND:  I do believe I did mention that the evidence showed that Mr. Sterlingov only used KYC debit cards and prepaid cards.  And that is what, you know, this -- is the basis of his conclusion.  But I will ask him to testify generally without any reference to Mr. Sterlingov on this point and go through this -- the slides that way.  But that -- I think is just a misunderstanding on our part, Your Honor.

THE COURT:  Okay.  All right.

(End of bench conference.)

BY MR. EKELAND:

Q.  Professor Verret, just in general, without reference to your review of the discovery and just in relation to just general behavior that people might engage in, why do you have your number 1 reason here labeled post mix KYC?

A.  In general, it is not a good idea to send post mix Bitcoin that have already been mixed back to something associated with you, like an account where you have KYC and given your license if you are trying to hide from that entity.

Q.  And then why do you reference again, just in general,

terms and general practices, without any -- discussing the discovery at all, why are you referencing gift cards and prepaid phone cards there?

A.    Gift cards could be useful to hide money, if you use an intermediary straw purchaser to go and put the money on the gift card or the debit card or the prepaid card for you in smaller amounts than what you need to move.  But I don't believe it would be helpful to that purpose, if you are using your own name and KYCing your own information and using it for your own personal spending.

Q.    Is there anything else you would like to comment on about your first reason here?

A.    No.

Q.    If we could go to the next slide, Mr. Hassard.  And then what do you mean by here, the mystery of the missing Bitcoin.

A.    The Bitcoin operator had 24,000 to 36,000 Bitcoin.  That shows a lot of Bitcoin that they would need to try to hide measured in dollars, whatever one believes the right measure of dollars is.  I believe that is a lot of dollars to try to hide.  And that would require a pretty sophisticated operation to move funds of that scale.

Q.    Is there anything else that you want to say about this slide?

      If we could go to the next slide, Mr. Hassard.

A.    No.

Q.    And could you just explain why you're referencing To the Moon here?  And, again, just in general terms even though --

A.    To the Moon VPN was as I understand it, a VPN service to be paid for in Bitcoin.  There was a Kraken account associated with To the Moon.  There was some Bitcoin in a Kraken account.

Q.    Was that Kraken account -- do you know if that was a KYC Kraken account?

A.    That is correct.  It was KYCed under Mr. Sterlingov, as I understand.

Q.    And did you review the cash flow flowing to and from To the Moon and out of that Kraken account, in relation to the To the Moon Kraken account?

A.    I reviewed funds initially sent to the Kraken account to see the account.  I did not see any evidence of client cash flows for that business.

Q.    And these two bullet points here, why do you have them there?

A.    I didn't find any evidence of clients.  I didn't find any evidence of an attempt to hide some money along with client bills to hide money underneath bills for a service.

Q.    Is there anything else you would like to say about To the Moon?

A.    No.

Q.    Could we move on to the next slide.  Code Reactor, what is -- can you remind the jury what Code Reactor is?

A.    I understand Code Reactor to be associated -- doing business name for freelance work by Mr. Sterlingov.

Q.    Do you recall Ms. Glave's testimony about the Code Reactor invoice or invoices?

A.    Yes.

Q.    Mr. Hassard, if we could take down this slide and put up what is in evidence I believe as Government Exhibit 305.  And if we could go to -- I think it is page 9.  And do you recognize this, Professor Verret?

A.    I do.

Q.    And could you describe to the jury your understanding of -- well, what is this?

A.    I understand this to be a summary of invoices found on Mr. Sterlingov's computer for Code Reactor.

Q.    And do you know who prepared this summary?

A.    I do.  It was in Ms. Glave's exhibit.

Q.    That was the exhibit that was published to the jury while she was testifying?

A.    That is my understanding.

Q.    And what is your understanding of this invoice or this -- I'm sorry -- this table, Code Reactor invoice summary?

A.    This shows a total of $56,000 for all of the invoices associated with Code Reactor.  This shows that they were dated over a series over three years.  And they showed -- or I guess purport to show transfers from Bitcoin to addresses.  That is

not in the chart. It is below the chart.

Q. And what, if anything, do you conclude from the amount of money that went through Code Reactor?

A. That that amount of money is consistent with a small side business. It is not consistent with an effort to inflate a business and hide money on the scale that I have discussed in the estimates of the Fog operator's earnings.

MR. EKELAND: Pass the witness, Your Honor.

THE COURT: I was going to ask you, if now was a good time for a break. Do you want to pick up, Mr. Ekeland?

(Conference held at the bench.)

THE COURT: So, Mr. Ekeland, if you want to ask -- I didn't want to sort of get into behavioral testimony with respect to what Mr. Sterlingov was doing, because I don't think there was any disclosure with respect to that. But if you wanted to ask the witness whether Mr. Sterlingov bought any prepaid cards or anything like that based on -- if he was here for all of the testimony to hear that, that is okay with me. And then the other thing is that as we discussed before with respect to To the Moon, if you wanted to do the same thing with To the Moon that you just did with respect to the following, with respect to just the money there and whether that revealed extra money that was inconsistent, I would allow that as well in a similar fashion to what you just did, I think is okay.

MR. EKELAND: Okay. Then can I just not pass the

witness and put him on hold for the lunch, while I think about that. I am not sure if I need to do it. But I would like to think about it.

THE COURT: We will take the lunch break then and you can come back and ask any follow-up questions if you have any at that point.

MR. EKELAND: Thank you, Your Honor.

(End of bench conference.)

THE COURT: We are going to take a lunch break now. It is 12:36. Why don't we come back at 1:45. Don't discuss the case even among yourselves. Don't conduct any type of research and steer clear of everyone associated with the case. Have a nice lunch. And I am sure you can repeat my words by now easily.

(Jury out at 12:36 p.m.)

THE COURT: The witness can take your lunch break as well. I ask that you not discuss your testimony until it is complete.

Anything to raise before we break?

MR. BROWN: Your Honor, we suggest that while we are on the lunch break, if the defense wants Mr. Fischbach to examine electronic devices, we have them here. We'd like to get this over with, because we don't want to send the jury home a half day.

THE COURT: Not only that, I think that it is

important because I think I am pressing the jury to be here -- I don't want to suggest that is not important. But also I remain concerned about time, even though we are moving along at a reasonable pace here. Because I don't have any idea how long the jury will deliberate, but also we haven't told the jury and we are not going to tell the jury if they come back with a conviction that they are going to have to sit again for another, perhaps, mini trial and another deliberation with respect to the forfeiture issues, if there were a conviction.

MR. EKELAND: Your Honor, can we pick up the phone? I need to talk about something private.

THE COURT: Okay.

(Conference held at the bench.)

MR. EKELAND: So Mr. Fischbach is a type 1 diabetic and for that reason he needs to eat his lunch. It is important that he eats his lunch.

THE COURT: Of course. I still think there is plenty of time for that. We are taking an hour and ten minute break. There is plenty of time for him to have lunch and he should definitely do so. I don't want him to do anything that is at odds with his health. I think there is still time to review the devices. And if we need a little bit more time before we start after lunch, we can do that as well.

MR. EKELAND: Okay. Your Honor, so he can take his lunch and then come back and start his review?

THE COURT:  Yeah.  We ask him not to linger over it, but yes, he should take his lunch.

MR. EKELAND:  Your Honor, I am assuming the marshals are going to let Mr. Sterlingov be with Mr. Fischbach as they review the devices.

THE COURT:  I will ask that when we get off the phone.

(End of bench conference.)

THE COURT:  If I could ask the marshal if Mr. Fischbach can be with the defendant when he goes through these devices, none of them are dangerous devices.  They are phones and computers and things like that.  He needs to be able to review them with the defendant.  Is that acceptable?  Can you find a way to do that, either in the courtroom or in the back room here?

THE MARSHAL:  We'll have to get approval from a supervisor to take them downstairs.

THE COURT:  You can't bring them downstairs.  We could do it in the courtroom here or just right back here.

THE MARSHAL:  I will still have to get approval from one of the supervisors.

THE COURT:  Let me know if you need my involvement in that.

THE MARSHAL:  Okay.

MR. BROWN:  Your Honor, our FBI agent is -- and we

would like one of the attorneys to be present if the defense is handling these electronic devices. So we just ask that we keep the courtroom unlocked and we allow Special Agent Lund as well as an attorney for the government to be present during the examination of the devices.

THE COURT: That is fine. There may be need to be shuttling back and forth if Mr. Fischbach wants to have some confidential conversation with Mr. Sterlingov, but they can accommodate that, I'm sorry.

MR. BROWN: Yes, Your Honor.

THE COURT: All right. Have a good lunch, everyone.

(Recess taken at 12:40 p.m.)

C E R T I F I C A T E

I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.

Dated this 5th day of March, 2024.

_____
Sherry Lindsay, RPR
Official Court Reporter

BY MR. EKELAND: [41]   11/8 11/14
12/11 12/15 12/25 13/20 14/23
15/14 16/12 17/18 19/24 20/9 21/3
22/21 23/12 24/16 25/2 26/4 80/3
83/12 87/4 87/17 88/12 88/18 89/4
90/12 92/15 93/23 99/6 99/22
101/23 102/18 103/7 103/14 103/24
104/6 105/15 106/18 107/10 108/13
110/16
BY MS. PELKER: [6]   5/3 6/4 7/11
9/9 10/9 27/2
MR. BROWN: [63]   4/6 4/19 31/2
32/1 32/7 34/8 37/18 38/5 38/12
38/19 38/21 46/14 46/19 47/3 47/5
47/14 49/12 49/15 49/18 50/16
59/5 59/12 59/14 60/10 60/18
60/23 61/8 62/17 65/9 66/3 68/23
69/10 69/16 70/14 71/1 71/3 72/2
73/12 75/13 76/2 77/18 86/3 90/9
90/23 91/7 91/10 93/20 99/1 99/18
100/12 100/16 102/13 103/4 103/11
103/20 105/5 105/7 106/4 107/3
108/24 115/20 117/25 118/10
MR. EKELAND: [157]
MR. PEARLMAN: [1]   28/14
MS. PELKER: [21]   4/25 5/18 7/4
7/6 9/5 10/3 10/8 11/5 12/8 12/13
12/23 17/10 18/8 20/3 22/7 24/3
24/6 24/24 26/25 27/22 28/1
THE COURT: [221]
THE COURTROOM DEPUTY: [20]   4/2
4/15 4/17 9/3 9/7 10/6 13/17
13/19 14/22 15/8 15/12 16/1 16/4
16/6 18/6 20/7 79/23 87/10 87/13
88/22
THE MARSHAL: [3]   117/16 117/20
117/24
THE WITNESS: [12]   22/8 23/11
27/25 79/22 88/24 91/1 92/13 99/4
100/14 100/19 103/6 105/6

$

$1.34 [1]   95/15
$1.34 billion [1]   95/15
$100 [2]   41/19 41/20
$110,000 [1]   85/18
$115 [1]   101/16
$115 million [1]   101/16
$120 [1]   102/7
$120 million [1]   102/7
$20 [1]   101/14
$200 [1]   106/24
$200 million [1]   106/24
$220 [1]   106/3
$220 million [1]   106/3
$42 [1]   101/15
$42 million [1]   101/15
$450 [1]   85/10
$56,000 [2]   68/9 113/22
$80 [1]   101/16
$80 million [1]   101/16
$846 [1]   24/1
$975 [1]   95/13
$989 [1]   23/20

1

1 percent [2]   93/7 101/11
1,354 [1]   95/1
1-year [1]   101/4
1.2 million [3]   92/21 92/21 93/4
1.8 million [1]   102/4
10 [2]   49/16 71/22
10,000 [3]   97/20 97/21 97/25
10-minute [1]   77/22
10-year [1]   30/9
10.4 [1]   101/9
100 percent [1]   38/12
10005 [1]   2/4
106 [1]   87/14
10:04 [1]   31/19

10:05 [1]   32/5
10:25 [2]   31/17 31/18
11 [1]   3/4
11/11/2017 [1]   8/4
11:00 [1]   78/11
11:25 [1]   77/23
11:37 [1]   79/16
12 [2]   62/17 63/6
12,000 [1]   93/9
12-year [1]   96/19
120 million [1]   101/21
128 [5]   3/11 98/13 99/19 99/21
103/16
129 [9]   3/10 87/9 87/12 87/13
87/16 88/7 88/9 88/11 102/23
12:36 [2]   115/10 115/15
12:40 [1]   118/12
12HWC [1]   8/22
12M2V [1]   8/2
12S7WS [1]   7/22
12th [1]   14/24
13 [1]   62/17
130 [5]   3/10 17/8 17/9 17/14
17/16
1301 [1]   1/20
1337 [2]   6/22 6/24
13th [1]   14/24
14 [1]   62/17
14-year [1]   96/14
145-5 [1]   66/6
15 [1]   84/22
158 [1]   66/17
158-1 [2]   53/17 65/17
15th [2]   14/5 46/21
16 [11]   50/10 73/19 74/10 74/12
74/22 75/10 84/22 102/13 103/20
105/8 107/4
16th [1]   14/6
17 [1]   3/10
173 million [1]   101/22
175 [1]   14/17
17DQYVZ [1]   7/16
18 [1]   99/16
18th [1]   66/12
19,000 [1]   95/12
19,939 [1]   95/3
1:45 [1]   115/10
1AK19 [1]   6/23
1BMKM [1]   10/23
1FCV [1]   10/13
1H8 [1]   10/1
1MB2 [1]   9/12
1MB2M [1]   9/1

2

2 percent [14]   92/23 92/24 92/24
93/1 93/2 93/3 93/3 93/10 93/11
94/20 100/6 100/9 101/13 102/10
2,707 [5]   93/19 93/25 94/10 94/24
104/11
2-year [2]   101/5 101/20
2.0 [6]   25/3 25/6 25/9 25/15
25/17 27/8
2/10/2018 [1]   10/18
20001 [1]   2/9
20005 [1]   1/21
2010 [4]   96/18 98/1 98/3 104/13
2011 [12]   13/12 14/2 15/23 17/21
18/1 18/24 20/17 28/20 72/4 81/9
96/19 104/13
2012 [2]   13/12 14/11
2013 [7]   11/15 12/12 14/24 81/16
81/18 82/3 83/16
2014 [2]   25/6 106/1
2015 [4]   23/13 81/18 82/3 82/10
2016 [1]   82/12
2017 [2]   8/4 106/1
2018 [3]   9/16 10/18 23/15
2020 [1]   97/18
2021 [2]   95/13 95/14
2023 [3]   53/12 65/15 66/20
2024 [2]   1/5 119/10

20530 [2]   1/14 1/17
21 percent [1]   96/21
21-399 [2]   1/4 4/2
21.3 [1]   101/9
221,320 [1]   96/20
22nd [1]   97/18
23 [1]   37/19
24 [1]   94/23
24,000 [6]   93/4 94/9 94/22 94/23
94/24 111/16
253 percent [1]   96/22
254 [1]   10/16
25th [1]   14/1
27 [1]   3/5
27th [5]   15/23 17/21 18/1 18/24
20/17
28 [1]   65/17
28th [1]   14/11
2A387 [1]   7/13

3

3 percent [4]   92/23 92/25 93/2
100/9
3-year [4]   101/5 102/11 106/25
107/6
3.9 billion percent [1]   96/16
3/4/2018 [1]   9/16
30 [1]   2/3
300 [1]   85/15
305 [1]   113/7
31 [1]   101/20
316 [5]   18/5 18/6 18/7 18/17
18/17
33 [5]   50/25 53/2 58/4 58/9 62/25
33-paragraph [1]   56/20
333 [1]   2/8
36,000 [4]   93/5 94/9 94/23 111/16
399 [2]   1/4 4/2
3:30 [3]   78/2 78/21 79/2

4

4-year [3]   101/6 101/21 101/21
40 [1]   104/13
40-page [1]   53/17
40.1 [1]   101/10
403 [9]   32/19 32/25 33/13 38/17
40/2 60/3 68/4 68/18 76/8
45A [1]   51/20
480 [1]   98/1
480 million [1]   97/22
4:30 [2]   78/5 78/16

5

5.1527 [1]   1/17
5.23 [1]   45/12
500 [1]   96/21
56,000 [1]   68/9
57.67 million [1]   101/10
5th [1]   119/10

6

60 [1]   37/20
601 [1]   1/16
602A [3]   16/2 16/6 16/8
603 [4]   13/17 16/2 16/7 16/8
603A [6]   15/7 15/8 16/2 16/4 17/2
17/6
603H [1]   14/21
603S [1]   13/16
620 million [2]   97/23 98/2
623 [5]   5/1 5/11 5/18 5/19 10/25
624 [5]   5/19 5/22 6/2 7/4 9/6
625 [1]   6/19
626 [1]   7/1
627 [1]   7/17
628A [2]   7/23 8/9
628B [1]   8/5
629 [1]   8/19
630A [2]   8/23 9/3
630B [1]   9/17
631 [1]   9/22

**6**

**632 [3]** 10/3 10/4 10/10
**633 [4]** 9/6 10/4 10/7 10/19
**64 [1]** 101/20
**64.3G2 [1]** 42/16
**65 [1]** 34/9
**6710 [1]** 2/8

**7**

**7.7 million [1]** 100/7
**702 [1]** 76/8
**703 [1]** 77/4
**704 [1]** 76/15
**7th [1]** 53/12

**8**

**80 [2]** 3/7 102/7
**88 [5]** 3/10 7/24 8/1 8/6 8/17
**8th [5]** 2/4 34/5 34/8 49/19 53/12

**9**

**9/15/23 [1]** 37/19
**945 [1]** 9/15
**950 [1]** 1/14
**98 [1]** 94/19
**99 [1]** 3/11
**9:27 [1]** 4/23
**9:38 [1]** 1/6

**A**

**a.m [6]** 1/6 4/23 31/19 32/5 77/23 79/16
**abide [2]** 92/3 92/12
**abiding [1]** 109/13
**able [6]** 69/25 69/25 71/21 71/22 79/6 117/12
**about [168]**
**above [4]** 20/16 93/1 93/11 119/5
**above-entitled [1]** 119/5
**absolutely [1]** 72/4
**abstract [4]** 42/11 44/10 44/17 44/20
**abuse [1]** 11/2
**academic [2]** 57/19 61/13
**academics [1]** 83/8
**acceptable [5]** 39/10 70/12 70/13 70/16 117/13
**accepted [2]** 61/12 97/4
**access [1]** 71/22
**accessible [1]** 72/18
**accommodate [1]** 118/9
**accordance [2]** 33/18 45/12
**according [2]** 13/11 37/5
**account [24]** 25/9 25/11 30/13 40/19 41/13 41/19 41/21 56/11 61/1 61/5 61/6 69/12 105/2 105/2 109/10 110/23 112/4 112/5 112/6 112/7 112/11 112/12 112/13 112/14
**Accountancy [1]** 84/4
**accountant [4]** 54/23 82/15 83/20 93/14
**accountants [2]** 82/18 83/22
**accounting [25]** 32/17 33/1 33/7 33/9 33/15 35/12 35/12 35/14 36/1 36/6 36/20 37/1 37/9 42/18 44/23 54/24 64/2 80/11 80/25 81/15 83/18 86/1 86/21 87/2 91/12
**accounts [1]** 68/24
**accurate [2]** 87/24 99/11
**acknowledged [1]** 74/6
**across [1]** 22/16
**acting [1]** 109/13
**Action [1]** 1/3
**activity [3]** 6/16 9/22 59/7
**actual [2]** 54/5 58/4
**actually [11]** 20/4 36/6 37/20 56/15 57/8 61/11 70/22 71/23 72/25 97/3 97/19
**add [9]** 29/15 36/10 37/6 39/10 40/9 40/9 42/19 42/19 64/5
**additional [1]** 9/17

**additionally [1]** 58/22
**address [16]** 6/10 6/10 6/23 6/24 7/15 7/21 8/1 8/20 8/22 8/25 9/12 10/1 10/13 10/23 31/11 49/10
**addressed [2]** 46/21 60/14
**addresses [4]** 5/16 42/5 64/18 113/25
**addressing [1]** 37/11
**adds [1]** 83/3
**adduced [1]** 30/7
**administered [1]** 13/7
**administrator [4]** 12/16 24/18 25/15 36/12
**administrators [2]** 13/5 28/22
**admissible [2]** 72/8 72/11
**admission [1]** 10/5
**admit [2]** 7/7 30/13
**admitted [12]** 5/11 5/21 7/4 7/6 9/5 17/11 17/14 17/17 36/5 73/22 88/11 99/21
**admonish [1]** 108/9
**Adventures [4]** 62/18 70/6 70/7 70/19
**after [18]** 11/22 14/11 45/19 45/19 53/20 61/4 66/8 78/20 79/11 80/21 81/3 81/8 100/25 101/1 101/1 101/2 108/8 116/23
**again [19]** 48/10 49/1 50/6 52/3 54/12 55/14 62/24 64/24 65/22 71/23 81/16 84/7 84/17 93/13 104/11 108/9 110/25 112/2 116/7
**against [2]** 32/18 101/4
**agent [10]** 5/4 6/5 7/12 9/11 11/17 27/3 59/14 59/18 117/25 118/3
**agree [3]** 18/16 38/12 39/4
**agreed [1]** 108/1
**agreement [1]** 6/1
**ahead [2]** 55/18 70/4
**AICPA [1]** 84/9
**aid [1]** 87/5
**Akemashite [3]** 29/2 29/17 73/14
**Alden [1]** 4/8
**all [86]** 4/9 4/20 4/24 4/24 6/1 7/2 7/3 7/7 7/10 9/11 11/6 11/25 13/21 15/3 15/17 19/15 24/7 26/24 27/23 28/2 28/13 30/17 31/10 31/20 32/6 34/4 36/13 38/20 40/15 41/23 44/15 46/2 46/12 47/3 47/10 49/14 53/13 54/19 54/20 56/18 57/6 59/4 59/5 62/20 62/20 62/24 63/16 64/3 64/8 64/10 66/13 68/24 70/18 71/3 71/10 73/11 74/13 75/12 75/20 76/1 77/12 77/24 78/14 79/14 79/17 82/9 83/4 85/16 86/14 88/9 91/21 93/1 93/7 93/11 95/1 96/11 100/24 106/17 109/10 109/15 110/3 110/14 111/2 113/22 114/18 118/11
**allegation [1]** 40/17
**allegations [1]** 40/17
**alleged [2]** 68/16 94/18
**allow [14]** 31/5 60/22 61/23 62/1 62/3 62/5 67/25 68/7 74/1 99/3 103/21 106/17 114/23 118/3
**allowed [5]** 55/13 56/6 58/23 58/25 61/24
**allowing [1]** 5/9
**almost [2]** 73/2 78/8
**alone [1]** 76/7
**along [4]** 63/16 101/19 112/19 116/3
**already [8]** 9/3 61/24 64/25 72/14 72/21 72/22 92/6 110/22
**also [28]** 19/19 22/17 29/6 33/8 38/19 38/21 44/16 53/11 55/5 57/11 64/20 65/24 77/5 78/11 81/23 82/4 82/12 82/15 82/19 82/21 83/6 83/20 85/18 93/7 94/21 106/7 116/2 116/5
**although [3]** 44/1 46/24 85/1
**am [78]** 18/13 18/20 19/7 19/19

22/11 24/10 28/14 30/17 31/4 31/20 33/20 33/25 34/10 34/13 35/16 37/23 39/11 40/10 40/13 41/4 43/2 43/6 43/11 43/12 43/20 43/22 43/22 43/24 45/23 46/5 47/11 47/15 48/23 50/5 51/11 54/1 54/24 55/14 56/14 56/20 58/3 58/3 58/6 61/16 62/24 64/13 67/7 68/5 71/18 72/15 74/1 77/7 83/20 85/5 85/10 85/20 91/1 91/2 92/10 93/22 102/16 104/22 105/3 105/24 105/25 106/1 106/2 107/5 107/7 107/8 108/5 108/9 108/11 110/1 115/2 115/13 116/1 117/3
**amended [2]** 50/14 74/12
**AMERICA [3]** 1/3 4/3 41/21
**among [2]** 31/15 115/11
**amount [9]** 14/15 46/22 93/18 94/15 95/4 95/11 106/8 114/2 114/4
**amounts [2]** 16/19 111/7
**analysis [33]** 29/23 32/16 36/12 37/9 38/10 38/13 39/16 39/25 40/1 40/4 40/22 40/23 40/25 41/1 41/8 43/19 43/21 48/23 51/10 62/10 64/7 64/25 67/13 67/23 69/18 69/19 70/1 70/10 90/11 90/14 91/13 103/19 108/3
**analyst [2]** 59/18 83/25
**Analysts [1]** 84/13
**annual [1]** 97/16
**anonymizing [1]** 47/21
**anonymous [2]** 83/1 83/5
**another [8]** 8/5 27/18 35/23 59/17 97/8 97/8 116/8 116/8
**answer [11]** 27/15 42/10 43/4 43/7 44/9 93/22 100/13 102/14 102/16 102/17 107/6
**answers [1]** 24/15
**anti [7]** 53/1 53/7 54/14 55/3 58/18 81/25 84/24
**anti-money [7]** 53/1 53/7 54/14 55/3 58/18 81/25 84/24
**anticipate [2]** 36/12 75/7
**antivirus [1]** 84/16
**Antonin [1]** 81/4
**any [109]** 12/4 13/5 13/8 17/9 18/2 20/24 21/7 21/10 21/14 21/15 21/17 21/18 21/20 21/21 21/23 21/24 22/1 22/2 22/4 22/14 22/17 24/15 24/22 25/16 25/20 26/1 26/5 26/7 26/8 26/10 26/11 26/13 26/14 26/16 26/17 26/19 26/20 26/21 26/22 26/24 29/18 29/23 30/1 30/10 31/16 31/16 39/18 39/20 39/22 41/25 42/18 45/17 48/6 48/17 48/19 48/20 48/20 48/23 49/3 56/2 56/15 61/9 61/16 61/19 62/8 62/10 62/12 62/22 63/5 64/7 64/19 66/20 67/12 67/18 69/17 70/6 71/24 72/9 72/11 73/15 75/7 76/10 83/14 83/18 84/19 85/4 85/5 85/14 86/13 91/21 95/9 96/1 99/17 99/25 104/24 105/19 108/3 110/11 111/1 112/14 112/18 112/18 114/15 114/16 115/5 115/5 115/11 116/4
**anyone [4]** 29/7 34/6 68/17 85/23
**anything [35]** 4/18 18/17 19/5 19/9 21/12 23/23 24/21 29/14 46/6 51/1 55/12 58/15 67/8 75/12 75/25 87/5 96/4 97/11 102/5 102/19 102/25 103/8 103/17 103/22 103/25 104/4 109/18 109/22 111/11 111/22 112/21 114/2 114/17 115/19 116/20
**anything to [1]** 103/22
**anyway [2]** 83/7 95/2
**anywhere [2]** 34/18 68/14
**apologies [2]** 5/20 75/20
**apparel [1]** 22/23
**apparent [1]** 94/8
**APPEARANCES [3]** 1/12 1/23 2/1

**A**

**appears [6]** 16/20 54/21 62/20 65/20 71/5 90/19
**apples [1]** 59/25
**applied [3]** 74/22 75/9 89/13
**apply [6]** 35/6 35/12 37/9 44/1 44/14 75/11
**applying [2]** 34/13 34/15
**appointment [2]** 78/3 78/10
**appreciation [1]** 98/11
**approach [1]** 4/4
**appropriate [7]** 38/11 42/20 67/17 74/6 74/16 76/22 77/9
**approval [2]** 117/16 117/20
**approved [1]** 66/14
**approximately [1]** 102/1
**arbitrary [1]** 33/3
**are [154]**
**area [2]** 18/22 19/6
**arguably [1]** 44/23
**argue [4]** 29/10 35/8 64/20 69/21
**arguing [1]** 69/22
**argument [8]** 52/10 52/10 52/21 68/8 68/21 68/23 69/20 69/24
**arguments [2]** 37/3 70/2
**Arlington [1]** 81/4
**around [2]** 56/19 98/7
**Arps [1]** 80/24
**arrested [3]** 11/20 11/23 28/19
**arrive [3]** 33/23 34/25 93/25
**article [2]** 84/24 84/25
**articles [2]** 57/19 57/20
**as [150]**
**as-applied [1]** 75/9
**aside [1]** 30/21
**ask [26]** 19/4 19/8 19/11 19/13 19/20 25/23 26/1 39/6 60/15 62/25 68/21 85/12 90/10 104/3 104/5 108/7 110/10 114/9 114/12 114/16 115/5 115/17 117/1 117/6 117/9 118/2
**asked [6]** 27/3 57/8 57/9 72/6 78/10 106/6
**asking [10]** 18/14 18/21 19/7 19/19 22/11 25/24 27/13 56/21 60/18 106/10
**asleep [1]** 78/12
**aspect [1]** 64/14
**asserted [1]** 63/14
**assessment [1]** 41/12
**assets [6]** 37/7 38/24 41/13 43/19 101/25 102/1
**assigned [1]** 6/10
**associated [7]** 84/16 105/1 110/22 112/4 113/1 113/23 115/12
**association [4]** 40/5 84/9 84/11 84/13
**association's [1]** 38/8
**assuming [3]** 39/11 100/19 117/3
**assumption [4]** 41/12 100/4 100/8 100/23
**astronomical [1]** 96/23
**astrophysicist [2]** 54/23 54/25
**astrophysics [1]** 55/1
**attached [1]** 66/19
**attack [1]** 29/10
**attempt [1]** 112/19
**attempted [1]** 46/6
**attempting [1]** 64/17
**attention [8]** 10/10 15/22 17/20 23/3 25/3 39/21 39/23 42/13
**attorney [6]** 69/20 69/24 70/2 82/12 82/14 118/4
**attorneys [1]** 118/1
**attributable [1]** 61/6
**attribute [2]** 30/11 42/6
**attribution [1]** 29/24
**August [6]** 53/11 53/12 65/15 65/24 66/4 66/20
**August 2023 [1]** 65/15
**August 7th [1]** 53/12

**AUSA [1]** 4/6
**authenticate [1]** 74/18
**authorities [2]** 29/3 29/6
**authority [1]** 39/22
**available [1]** 83/21
**Ave [2]** 1/14 1/20
**Avenue [1]** 2/8
**average [3]** 92/24 93/10 102/11
**avoid [2]** 29/2 29/6
**aware [15]** 26/5 26/8 26/11 26/14 26/17 26/20 28/22 48/23 61/16 89/22 105/24 105/25 106/1 106/2 108/10
**awful [1]** 57/3

**B**

**back [38]** 4/20 7/8 31/18 31/20 32/4 36/16 43/14 44/8 45/1 45/8 61/15 62/25 64/16 74/4 75/16 77/13 77/22 81/7 81/13 82/10 98/10 98/11 102/22 103/13 104/8 106/19 106/21 107/4 107/11 110/2 110/22 115/5 115/10 116/6 116/25 117/15 117/19 118/7
**backdoor [2]** 71/5 73/18
**background [10]** 35/22 35/24 38/4 39/7 40/1 46/1 56/2 56/22 56/23 80/9
**Bad [1]** 69/4
**bank [4]** 41/21 82/1 82/8 105/2
**banking [5]** 34/22 37/1 81/11 81/15 85/3
**Bankruptcy [1]** 2/7
**based [23]** 16/16 27/10 27/15 28/11 30/10 36/11 40/23 52/15 63/8 64/24 66/6 67/22 76/7 76/18 86/6 90/18 99/7 99/9 100/7 101/24 102/13 103/20 114/17
**baseline [1]** 44/6
**Bash [1]** 30/4
**basic [1]** 96/22
**basically [3]** 64/10 96/18 104/4
**basis [22]** 18/21 28/10 35/20 48/17 48/20 50/2 56/15 60/11 60/13 61/19 62/8 67/18 67/21 68/3 74/19 75/7 90/7 90/8 107/8 107/13 108/3 110/10
**batch [1]** 10/4
**be [113]** 7/3 8/15 8/22 16/20 17/3 17/7 17/15 25/24 25/24 31/3 31/24 32/1 32/4 32/11 33/2 35/4 37/8 39/23 39/24 41/3 41/20 44/6 47/22 48/4 48/13 50/11 51/12 52/2 55/12 58/20 58/25 60/1 60/21 62/11 62/20 64/7 65/20 67/8 67/17 68/3 69/21 69/24 69/25 69/25 71/5 73/1 73/6 73/7 73/17 73/22 74/20 75/5 75/7 77/6 77/18 78/11 78/12 78/25 79/6 79/11 79/23 82/25 82/25 85/14 85/14 85/16 85/19 85/22 86/20 88/9 89/23 91/20 93/2 93/2 93/5 93/7 93/8 93/9 94/18 94/20 94/21 95/3 95/12 95/13 95/15 95/17 96/11 97/22 97/23 98/1 98/5 98/24 99/19 102/11 103/22 104/2 106/9 108/10 109/16 109/17 111/4 111/8 112/4 113/1 113/13 116/1 117/4 117/10 117/12 118/1 118/4 118/6 118/6
**became [1]** 11/17
**because [48]** 10/6 19/14 32/18 33/12 34/15 35/3 35/10 36/1 37/5 37/24 38/8 39/22 40/5 40/16 40/19 41/20 42/4 42/7 42/18 44/11 51/13 51/24 54/22 55/15 55/25 59/1 60/1 62/9 67/8 68/4 68/14 70/21 72/16 73/23 73/24 74/6 74/9 78/2 79/2 101/17 102/10 106/6 106/10 106/14 114/14 115/23 116/1 116/4
**become [1]** 97/16
**been [38]** 5/25 17/1 17/6 33/4 33/4 37/4 38/14 40/18 43/13 44/16

50/14 52/22 56/4 60/14 61/4 62/9 64/6 67/3 70/7 71/14 73/21 75/4 78/8 78/12 81/5 82/10 82/16 85/11 88/6 89/20 91/14 98/21 99/15 100/15 100/21 103/15 104/16 110/22
**before [22]** 1/9 4/18 11/17 11/19 14/8 54/23 67/2 67/2 67/9 76/21 77/25 78/1 79/1 85/7 92/19 95/13 106/12 106/19 110/1 114/19 115/19 116/22
**beginning [1]** 5/5
**behave [4]** 49/22 56/16 61/20 62/9
**behavior [10]** 38/25 45/7 52/2 55/23 56/5 58/25 60/8 61/18 71/16 110/19
**behavioral [1]** 114/13
**being [7]** 33/18 40/12 45/7 48/20 55/2 85/9 110/3
**believe [34]** 5/19 9/5 11/16 11/21 13/14 13/16 14/20 15/5 15/7 15/16 17/7 17/10 20/21 23/14 23/16 25/7 34/9 41/2 51/19 53/12 55/6 55/8 57/22 60/23 84/6 90/6 101/11 102/7 105/17 106/7 110/7 111/8 111/19 113/7
**believes [1]** 111/18
**below [2]** 20/2 114/1
**bench [15]** 28/7 31/9 32/3 86/2 86/24 91/9 92/9 107/24 108/12 109/3 110/15 114/11 115/8 116/13 117/8
**best [4]** 71/6 94/16 100/14 101/12
**better [2]** 31/7 104/2
**between [8]** 8/8 15/2 21/14 27/14 49/20 61/25 94/9 95/7
**beyond [13]** 12/8 12/13 18/9 18/22 19/6 19/14 22/14 22/16 24/6 24/25 25/25 29/17 30/19
**billion [3]** 95/15 96/16 100/24
**bills [2]** 112/20 112/20
**Billy [2]** 6/21 6/24
**bit [6]** 41/4 49/5 55/14 59/25 62/18 116/22
**Bitcoast [3]** 70/6 70/7 70/19
**Bitcoin [137]**
**Bitcoin's [1]** 96/15
**Bitcoin-related [1]** 105/12
**Bitcoiners [1]** 97/17
**Bitstamp [1]** 29/5
**black [1]** 101/17
**blockchain [13]** 59/8 80/15 82/20 82/21 82/22 82/23 82/25 83/1 83/2 83/3 83/7 83/9 104/24
**board [3]** 22/16 82/19 84/4
**Bob [2]** 6/22 6/24
**bono [1]** 85/16
**book [3]** 23/2 85/6 86/10
**books [3]** 23/1 85/4 85/5
**both [2]** 8/17 51/18
**bottom [6]** 9/2 9/10 10/15 96/14 97/7 101/7
**bought [5]** 56/4 96/13 97/21 97/25 114/16
**box [4]** 4/21 19/25 20/10 20/16
**break [14]** 31/5 31/11 31/13 31/17 77/22 79/3 110/2 114/10 115/4 115/9 115/16 115/19 115/21 116/18
**Breaking [1]** 69/4
**brief [1]** 84/21
**briefing [1]** 83/15
**briefly [5]** 23/3 26/25 28/15 98/18 106/20
**bring [4]** 39/20 45/25 77/13 117/18
**bringing [1]** 41/23
**brings [1]** 69/3
**broader [1]** 59/16
**BRODIE [1]** 1/15
**Brooklyn [1]** 2/4
**Brothers [1]** 25/19
**brought [5]** 18/11 22/9 29/22

**B**

brought... **[2]**  39/22 106/15
BROWN **[21]**  1/15 4/7 31/1 33/12
  34/7 37/16 46/12 49/11 52/5 57/9
  57/16 58/21 59/4 66/2 68/21 70/23
  72/1 73/11 75/12 77/5 77/17
BTC **[1]**  93/25
Buddha **[1]**  26/9
Budworx **[2]**  21/16 26/15
bullet **[8]**  46/20 47/5 52/9 70/8
  70/20 88/24 89/8 112/16
burden **[3]**  28/10 30/6 30/16
business **[12]**  63/7 65/4 65/20
  67/24 69/5 69/7 69/12 80/16
  112/15 113/2 114/5 114/6
businesses **[1]**  65/11
busy **[1]**  67/4
buy **[3]**  13/12 96/17 97/20
buyer **[1]**  96/24
buying **[3]**  14/25 56/13 96/19

**C**

calculated **[2]**  36/3 92/17
calculation **[8]**  86/19 90/17 93/25
  94/8 94/15 94/21 95/7 99/4
calculations **[15]**  37/5 42/23
  90/11 90/13 90/25 92/5 97/2 97/2
  98/24 99/10 99/12 99/25 100/18
  100/18 100/19
call **[5]**  28/4 77/25 78/1 79/18
  82/19
called **[9]**  80/24 82/1 82/20 83/21
  83/24 83/25 97/4 97/9 103/19
calls **[2]**  38/1 79/19
came **[9]**  14/8 14/9 14/12 29/1
  44/10 55/6 64/3 71/14 81/13
can **[96]**  4/20 4/22 5/6 6/5 6/8
  7/23 8/3 8/12 9/2 9/15 10/11
  10/15 10/25 14/19 16/20 18/16
  19/4 19/8 19/11 19/13 20/8 21/1
  22/5 25/23 25/25 28/4 28/5 39/7
  39/25 40/1 40/9 41/9 41/22 42/1
  42/21 43/14 44/5 44/13 44/17
  46/10 46/11 47/3 47/19 49/12
  50/24 50/25 51/8 52/21 54/11
  54/22 57/3 57/20 60/7 64/20 68/21
  73/19 73/20 75/1 75/18 77/14
  77/19 77/20 78/5 79/10 82/25
  82/25 83/6 87/18 88/14 88/15 91/8
  92/14 94/21 94/21 96/7 99/23
  99/23 104/7 104/7 104/9 104/18
  105/1 107/23 108/15 109/4 112/25
  114/25 115/5 115/13 115/16 116/10
  116/23 116/24 117/10 117/13 118/7
can't **[13]**  12/6 20/4 29/25 30/11
  39/13 39/15 44/9 44/19 49/1 58/10
  63/22 72/23 117/18
cannot **[4]**  14/9 14/13 76/5 76/5
Capitol **[1]**  81/17
car **[2]**  41/22 69/4
card **[8]**  55/22 55/23 56/4 98/6
  109/9 111/6 111/6 111/6
cards **[31]**  50/6 50/6 50/22 50/22
  51/2 51/18 51/19 51/23 51/23 52/8
  52/9 52/20 52/20 54/2 54/2 55/21
  55/21 56/13 58/1 61/22 61/22 62/7
  62/7 108/23 109/18 110/8 110/9
  111/2 111/3 111/4 114/17
careful **[1]**  95/3
Cartel **[1]**  26/12
case **[47]**  4/2 11/22 12/2 15/21
  23/16 23/19 24/7 24/13 27/11 28/3
  28/12 29/25 30/9 30/10 30/15
  31/15 31/15 31/16 32/15 32/16
  33/24 35/8 35/10 35/12 37/10
  39/20 40/6 40/16 42/13 42/15
  42/17 44/14 45/5 45/14 63/14
  73/24 74/15 74/15 77/8 85/12
  85/13 89/18 89/20 99/8 99/9
  115/11 115/12
Casebitcoin **[1]**  97/9

cases **[7]**  27/7 51/14 62/15 74/13
  74/14 81/14 82/17
cash **[8]**  65/5 67/23 68/7 69/18
  70/10 104/17 112/10 112/14
CATHERINE **[1]**  1/13
caused **[1]**  44/11
causing **[2]**  42/7 56/7
CCFI **[6]**  34/21 36/25 84/1 84/14
  84/17 89/10
Ccips **[1]**  1/19
ceiling **[1]**  95/16
cents **[1]**  104/13
certain **[4]**  22/10 22/10 35/16
  91/2
certainly **[4]**  40/3 46/11 56/25
  91/19
certificate **[1]**  80/15
certification **[12]**  34/20 34/21
  34/21 36/24 36/25 39/14 54/13
  83/17 84/3 86/11 89/10 91/16
certifications **[6]**  34/20 36/24
  56/18 83/19 89/6 91/22
certified **[17]**  33/4 35/14 41/2
  41/3 41/6 54/13 54/16 83/20 83/21
  83/22 83/23 83/25 84/1 84/8 84/11
  84/13 84/18
certify **[1]**  119/3
CFE **[7]**  34/20 36/24 65/1 83/23
  84/10 89/1 89/13
CFF **[6]**  65/1 83/21 83/22 84/6
  84/8 88/25
CFS **[2]**  34/20 36/24
Chainalysis **[2]**  46/25 107/14
chambers **[1]**  31/21
Chancery **[1]**  80/22
changed **[1]**  29/20
changes **[2]**  41/24 70/17
characterization **[1]**  40/15
characterize **[1]**  94/17
characters **[4]**  7/14 7/20 7/25
  8/25
charges **[2]**  29/11 29/13
chart **[14]**  19/10 19/11 97/3 97/8
  97/10 102/20 103/10 103/13 103/18
  103/19 103/23 107/1 114/1 114/1
charts **[1]**  36/5
chase **[1]**  38/3
check **[1]**  72/23
checking **[1]**  105/2
Chemical **[1]**  25/19
chief **[1]**  81/19
child **[6]**  5/8 5/9 6/18 8/14 11/2
  24/21
Chris **[1]**  4/6
CHRISTOPHER **[1]**  1/15
circles **[1]**  56/19
cited **[1]**  74/14
Citibank **[1]**  41/19
claim **[1]**  60/24
clarification **[2]**  39/6 109/4
clarified **[2]**  103/22 103/23
clarify **[3]**  26/2 103/8 103/25
clarity's **[2]**  65/6 68/1
classic **[1]**  61/3
clear **[6]**  28/22 50/14 50/18 58/19
  74/12 115/12
clearly **[2]**  41/20 66/17
clerked **[1]**  80/22
click **[1]**  87/20
client **[7]**  47/11 48/12 48/14
  64/13 64/16 112/14 112/19
client's **[1]**  48/5
clients **[3]**  49/3 82/13 112/18
clients' **[1]**  64/18
closing **[2]**  52/10 72/21
clothing **[1]**  22/22
cluster **[5]**  94/16 94/18 94/18
  95/1 95/23
Coast **[2]**  21/25 62/18
Code **[12]**  62/19 63/23 63/25 64/10
  112/24 112/25 113/1 113/3 113/14
  113/21 113/23 114/3

coin **[1]**  82/21
collapse **[2]**  58/13 58/14
colloquy **[1]**  59/9
COLUMBIA **[1]**  1/1
column **[6]**  6/8 6/10 6/21 7/13
  7/15 8/21
columns **[5]**  5/23 6/16 16/15 101/3
  101/4
come **[12]**  39/5 43/3 43/10 58/10
  61/15 74/3 76/20 93/8 115/5
  115/10 116/6 116/25
comes **[6]**  33/7 40/8 41/13 75/6
  86/15 95/3
coming **[7]**  5/4 28/23 36/3 37/6
  74/19 77/6 84/25
comment **[1]**  111/11
commenting **[2]**  76/11 91/22
Commission **[1]**  81/2
commit **[1]**  59/23
committee **[2]**  81/19 81/20
common **[3]**  49/4 56/3 71/25
communicated **[2]**  25/15 25/18
communicating **[16]**  13/1 13/5 21/8
  21/11 21/16 21/19 21/22 21/25
  22/3 24/18 26/6 26/9 26/12 26/15
  26/18 26/21
communications **[2]**  27/14 27/19
companies **[1]**  81/1
company's **[1]**  35/15
compare **[1]**  101/4
comparison **[1]**  60/1
competent **[3]**  50/17 72/8 72/10
complete **[2]**  74/24 115/18
completely **[1]**  83/4
complied **[1]**  35/13
comply **[3]**  38/8 40/5 42/15
computer **[2]**  30/6 113/14
computers **[1]**  117/12
concede **[1]**  66/3
conceding **[1]**  61/9
concern **[13]**  35/15 38/15 38/21
  42/2 42/7 44/11 46/13 49/10 50/8
  56/9 59/16 69/2 73/4
concerned **[5]**  49/22 56/14 58/3
  82/24 116/3
concerning **[1]**  28/24
concerns **[2]**  32/14 46/16
concise **[1]**  65/24
conclude **[6]**  28/11 30/18 30/19
  34/14 75/10 114/2
concluded **[1]**  31/14
concludes **[2]**  28/2 86/25
conclusion **[7]**  29/20 34/18 45/17
  76/17 90/14 108/16 110/10
conclusions **[2]**  34/25 63/8
concrete **[1]**  55/20
conduct **[3]**  31/15 32/19 115/11
conducted **[1]**  25/11
conference **[14]**  28/7 31/9 86/2
  86/24 91/9 92/9 107/24 108/12
  109/3 110/15 114/11 115/8 116/13
  117/8
confidential **[2]**  82/6 118/8
confidentiality **[6]**  47/10 47/14
  48/5 48/12 48/15 48/18
conflicts **[1]**  72/5
confuse **[1]**  42/16
confusing **[4]**  32/20 32/20 42/8
  44/25
confusion **[1]**  76/9
Congress **[4]**  83/13 83/14 83/16
  83/16
congressional **[1]**  81/21
connect **[2]**  18/19 47/25
connection **[1]**  88/21
consciousness **[1]**  29/6
conservative **[3]**  92/25 94/21
  102/10
consider **[3]**  44/2 74/5 94/14
considered **[1]**  98/24
considering **[1]**  74/20
consistent **[13]**  29/5 30/3 30/5

**C**

consistent... [10] 30/14 38/16 45/7 45/16 64/17 97/9 106/24 108/18 114/4 114/5
conspiracy [3] 28/17 28/18 59/23
constitutes [2] 60/6 119/4
Constitution [1] 2/8
constitutional [1] 74/23
consult [1] 57/23
content [1] 32/10
contention [1] 68/5
contents [2] 3/1 6/15
context [1] 48/4
continuation [1] 37/19
continue [7] 4/24 29/12 78/13 88/14 88/15 92/14 94/6
continued [4] 1/23 2/1 3/4 5/2
contorted [1] 73/19
contrary [3] 39/20 39/22 61/12
contrast [1] 95/7
conversation [1] 118/8
conversations [2] 72/13 73/5
conviction [2] 116/7 116/9
convoluted [1] 30/12
copies [1] 31/22
copy [2] 31/21 32/7
core [2] 36/14 40/16
corporate [7] 37/2 80/23 81/11 81/16 82/13 84/24 85/3
correct [39] 6/25 8/7 8/18 9/19 10/2 10/14 11/4 11/16 11/18 11/24 12/1 12/18 13/13 13/14 13/24 14/8 14/12 15/1 15/5 15/19 20/21 23/11 24/19 25/7 25/10 25/12 27/12 27/17 33/12 47/19 66/15 89/7 93/17 94/3 95/25 96/3 99/13 112/8 119/4
correctly [1] 100/7
correlation [1] 43/20
correspond [1] 11/1
corresponding [2] 5/12 5/16
could [80] 5/1 5/18 6/9 7/1 9/10 9/17 9/22 13/15 13/21 14/14 14/18 14/20 15/6 18/4 28/11 54/20 55/10 56/12 57/25 58/14 60/14 61/21 62/6 62/15 72/21 73/1 75/4 75/5 78/10 80/4 80/8 80/17 84/21 87/8 87/20 88/13 88/19 89/15 90/13 90/16 92/16 92/16 93/2 93/7 93/13 94/6 95/12 95/17 95/18 96/7 96/13 96/15 96/17 96/20 97/14 98/12 100/17 102/22 103/15 104/2 104/16 105/23 106/20 108/20 109/2 109/9 109/16 109/17 110/1 110/4 111/4 111/14 111/24 112/1 112/24 113/6 113/8 113/11 117/9 117/19
couldn't [4] 34/2 34/12 34/17 35/21
counsel [9] 4/4 4/5 4/7 4/12 81/20 85/13 85/16 85/18 85/20
count [3] 59/23 59/24 66/4
counts [1] 59/23
couple [5] 7/25 8/25 97/20 97/25 104/17
course [2] 29/7 116/17
court [51] 1/1 1/2 2/7 4/11 10/5 19/18 32/2 32/14 33/10 35/25 36/5 37/21 41/5 43/5 43/6 43/12 44/7 45/1 46/6 47/25 49/20 49/24 53/12 55/6 55/8 55/13 58/9 58/22 59/2 59/8 66/14 66/23 66/25 66/25 67/3 72/6 72/24 75/25 76/4 78/18 79/12 80/22 80/23 85/7 85/8 86/25 91/19 94/2 109/24 119/3 119/13
Court's [6] 36/16 40/14 45/2 45/9 65/25 66/11
courthouse [1] 47/25
courtroom [3] 117/14 117/19 118/3
Courts [1] 2/7
cover [2] 57/19 57/19
CPA [9] 34/20 36/23 48/9 48/24

CPAs [1] 84/9
created [5] 14/7 69/5 83/2 83/7 100/19
creating [1] 103/10
credential [4] 83/21 83/23 83/24 83/25
credentials [4] 33/9 33/12 43/24 89/1
crimes [1] 105/12
criminal [3] 1/3 4/2 74/23
criminals [1] 59/7
CRM [1] 1/19
cross [7] 3/4 11/7 49/12 57/16 76/24 76/25 78/23
cross-examination [3] 3/4 11/7 76/24
cross-examine [1] 76/25
crossed [1] 58/21
crux [1] 61/10
crypto [3] 38/25 53/5 82/14
cryptocurrency [14] 43/21 84/1 84/18 85/1 85/2 86/1 86/6 86/8 86/9 86/10 86/10 86/14 86/21 89/14
cryptography [2] 83/3 83/8
Crystal [1] 26/9
customer [1] 94/19
customers [1] 24/10
cut [2] 5/22 38/2
CV [3] 58/2 58/11 58/16
CVA [2] 83/24 84/12
cyber [1] 59/7

**D**

D-E-R-R-I-C-K-K [1] 9/24
dangerous [1] 117/11
darknet [3] 13/5 13/8 29/1
data [3] 16/20 16/22 22/8
date [12] 8/3 9/15 10/16 14/9 14/13 19/4 19/8 19/13 20/16 20/19 23/14 97/16
dated [3] 18/24 113/23 119/10
dates [1] 14/6
Daubert [32] 31/21 32/13 33/12 34/3 35/19 36/17 36/22 37/19 37/20 39/18 42/3 44/10 44/15 45/9 53/20 54/19 57/9 57/16 58/14 58/18 58/19 60/14 60/19 62/11 65/25 66/8 66/9 67/1 67/3 67/12 86/6 91/14
day [10] 34/5 34/5 78/7 78/9 97/15 102/24 103/1 103/12 115/24 119/10
days [1] 66/5
DC [6] 1/5 1/14 1/17 1/21 2/9 80/24
deal [2] 54/19 70/6
dealers [1] 22/11
dealing [1] 77/6
Dean [1] 105/17
debate [1] 42/14
debating [1] 43/13
debit [2] 110/8 111/6
decide [1] 37/25
decided [1] 106/16
deck [26] 30/22 30/24 45/18 45/19 53/11 53/14 53/15 53/16 53/18 54/2 63/2 65/22 65/24 66/4 66/7 66/7 66/19 66/21 66/21 66/24 67/6 77/15 86/17 87/24 102/22 104/8
defendant [9] 1/7 2/2 4/11 27/14 28/23 69/11 73/25 117/10 117/13
defendant's [15] 17/3 17/5 17/7 17/14 17/16 66/4 68/24 74/23 87/9 88/7 98/13 99/16 99/19 102/23 103/16
defending [1] 82/12
defense [30] 3/10 3/10 3/11 16/25 28/4 28/9 32/8 50/9 55/7 66/18 72/6 73/13 73/15 73/16 73/17 74/3 74/9 74/15 74/24 75/6 76/14 79/17

79/19 85/25 88/5 88/11 99/14 99/21 115/21 118/1
defined [1] 95/20
definitely [1] 116/20
degree [2] 80/10 80/12
Delaware [1] 80/22
deliberate [1] 116/5
deliberation [1] 116/8
demonstrates [2] 96/12 98/3
demonstrative [5] 66/7 88/8 88/10 99/16 99/20
deny [1] 30/17
depart [1] 39/18
DEPARTMENT [2] 1/13 81/24
Depending [1] 78/23
depiction [1] 87/24
deposit [8] 6/10 6/24 15/25 17/23 18/3 20/22 20/23 20/25
Dept [1] 1/20
depth [2] 24/11 53/20
Derrickk [2] 9/24 9/25
describe [5] 77/9 80/8 80/17 88/25 113/11
described [1] 94/19
describing [3] 33/11 34/11 35/17
description [1] 37/15
desk [1] 11/25
detail [1] 93/14
devices [12] 24/22 78/18 79/3 79/7 79/10 115/22 116/22 117/5 117/11 117/11 118/2 118/5
diabetic [1] 116/14
did [54] 5/12 5/14 5/19 7/7 8/17 11/25 13/12 15/18 23/2 23/18 23/22 24/7 26/13 26/16 26/19 26/22 27/7 27/9 33/13 40/1 42/15 42/23 45/8 46/6 49/24 51/13 53/20 57/16 67/9 69/11 73/10 82/3 83/13 86/7 87/5 91/13 93/25 94/10 95/10 99/12 100/1 100/10 103/10 105/10 105/16 105/19 105/22 107/21 109/19 110/7 112/10 112/14 114/21 114/24
didn't [33] 11/22 20/24 21/9 21/12 21/13 21/14 21/17 21/23 22/1 22/4 23/10 25/16 25/20 26/7 26/10 40/5 42/4 44/1 44/1 51/14 53/18 62/2 66/10 70/22 75/7 85/11 95/25 98/5 104/15 108/3 112/18 112/18 114/13
die [1] 48/15
difference [2] 8/8 94/9
different [9] 9/12 17/11 38/13 39/3 50/25 82/15 82/17 103/12 108/17
dinner [1] 78/6
direct [6] 3/4 3/7 5/2 23/20 37/12 80/2
directed [1] 28/9
directing [3] 10/10 15/22 17/20
directly [1] 37/11
dirty [1] 69/6
disadvantage [1] 55/15
disagree [1] 35/25
DISB [1] 29/9
disclose [1] 66/24
disclosed [25] 38/14 39/4 44/16 44/24 48/20 50/12 52/14 52/22 52/25 53/13 54/10 56/6 56/16 56/17 57/11 57/18 60/14 71/9 71/10 72/4 73/13 73/21 74/7 75/5 86/17
disclosure [27] 39/1 47/7 49/6 50/7 52/24 53/5 53/19 53/22 56/20 57/19 57/22 60/3 62/10 62/22 64/1 64/19 65/12 66/1 66/5 66/18 67/4 67/15 67/22 71/4 71/8 75/10 114/15
disclosures [12] 39/2 50/25 51/1 51/3 52/14 54/18 57/12 62/25 63/10 63/11 66/6 74/10
discovery [9] 50/23 51/24 63/9

**D**

discovery... [6]  64/25 89/17 99/7
99/9 110/18 111/2
discrete [2]  46/15 46/19
discuss [5]  18/12 31/15 106/16
115/10 115/17
discussed [9]  5/25 19/19 57/16
58/17 66/14 88/20 92/11 114/6
114/19
discusses [1]  35/1
discussing [12]  30/25 32/25 33/6
33/21 34/19 34/24 48/25 51/25
57/13 71/18 71/23 111/1
discussion [6]  34/9 37/21 91/15
98/11 109/19 110/3
discussions [1]  92/3
displayed [1]  94/2
disregard [1]  24/14
distinction [2]  8/12 49/20
DISTRICT [5]  1/1 1/1 1/10 2/7
80/21
diverting [1]  42/12
DNS [1]  30/10
do [103]  4/14 4/14 8/17 15/23
15/25 17/21 17/23 18/16 18/17
19/25 21/4 21/6 23/4 25/3 27/18
27/19 27/21 29/23 31/7 31/12
32/23 34/7 34/12 34/17 35/21
37/24 38/14 44/2 44/5 46/10 46/11
48/16 48/17 49/5 50/2 50/3 50/4
51/14 54/6 55/13 55/24 57/2 57/24
67/8 67/14 69/25 70/24 72/25
73/18 76/22 77/9 77/10 77/19
77/21 78/15 78/25 79/4 83/6 83/14
83/19 86/5 87/14 87/22 87/23 88/2
90/6 91/5 91/13 92/1 93/24 94/14
95/9 98/14 98/15 98/22 98/23
100/15 101/11 101/25 103/13 108/5
108/21 109/12 110/7 110/19 110/25
111/15 112/6 112/16 113/3 113/8
113/10 113/15 113/16 114/2 114/10
114/20 115/2 116/20 116/20 116/23
117/14 117/19
doable [1]  78/24
docket [3]  53/17 66/17 67/4
docketed [1]  66/6
doctor's [1]  78/10
doctorate [1]  80/12
document [1]  66/17
does [19]  10/5 11/1 18/2 29/12
34/6 48/6 49/10 53/22 61/15 66/16
66/24 69/14 84/7 84/16 84/17
86/18 100/23 107/3 107/5
doesn't [17]  18/1 19/5 32/16
34/14 34/16 42/18 49/3 50/11
51/12 52/1 54/21 65/18 69/17
75/11 78/5 91/5 92/7
doing [14]  7/2 16/4 34/12 35/20
55/12 56/12 73/9 80/25 82/5 82/16
91/18 91/20 113/1 114/14
DOJ [2]  1/16 1/19
DOJ-CRM [1]  1/19
DOJ-USAO [1]  1/16
dollar [1]  100/24
dollars [17]  14/17 28/21 64/5
92/20 95/9 95/12 95/15 95/17 99/5
100/3 100/5 100/10 101/15 104/17
111/18 111/19 111/19
don't [112]  15/8 15/20 16/2 16/18
18/16 19/5 19/9 19/14 19/20 21/7
21/10 21/15 21/18 21/20 21/21
21/24 22/2 22/8 22/13 22/13 22/14
22/17 23/14 30/10 30/14 31/4
31/15 31/15 31/17 32/24 33/5
33/10 33/10 33/17 34/18 35/1 35/3
35/10 37/6 38/8 39/10 39/17 39/18
40/9 40/14 40/20 41/8 41/10 41/16
41/23 41/24 42/19 43/7 43/15
43/25 44/16 45/3 45/10 47/14
47/18 48/19 48/19 48/22 49/7 50/1
52/6 54/5 54/5 55/15 59/14 60/5

61/19 62/7 62/22 64/19 66/3 67/13
67/17 67/21 68/3 68/16 68/17
70/21 71/13 71/13 72/9 72/10
72/16 72/18 73/16 74/5 74/8 74/16
77/10 84/22 85/20 85/22 86/20
87/13 90/10 91/18 91/20 107/8
111/7 114/14 115/10 115/10 115/11
115/23 116/2 116/4 116/20
done [9]  33/14 39/21 56/12 69/18
79/9 81/5 82/14 85/15 92/6
double [1]  54/3
doubt [2]  29/17 30/19
down [21]  9/2 9/10 10/15 11/15
14/19 17/20 18/4 21/1 23/15 25/6
36/21 45/18 53/8 53/16 53/21
65/23 73/3 85/20 97/6 104/7 113/6
download [3]  5/9 9/10 10/17
downloaded [2]  6/7 9/13
downloading [1]  8/16
downloads [10]  6/21 7/13 7/24
8/11 8/13 8/15 9/25 10/12 10/21
11/3
downstairs [2]  117/17 117/18
draw [1]  62/15
draws [1]  95/6
dressed [1]  38/15
drew [1]  49/20
drop [1]  76/23
drug [1]  15/19
drugs [1]  15/3
due [1]  75/7
Durden [1]  21/11
during [7]  32/13 49/19 59/9 66/23
81/6 93/15 118/4
duty [3]  48/5 48/12 48/24

**E**

each [2]  58/10 101/6
earlier [2]  100/25 109/7
early [5]  82/24 96/24 98/9 104/15
104/16
earn [6]  94/10 96/13 96/15 96/20
100/5 100/9
earned [20]  36/13 90/18 91/4 93/5
94/10 95/5 95/21 95/24 96/15
96/21 101/1 101/1 101/1 101/2
101/8 101/14 101/14 106/3 106/23
107/1
earning [1]  64/6
earnings [8]  92/18 96/23 96/23
98/25 99/5 100/2 105/25 114/7
easiest [2]  91/2 91/4
easily [2]  71/20 115/14
Eastern [1]  80/21
eat [1]  116/15
eats [1]  116/16
Economics [1]  80/15
economist [1]  81/19
edited [1]  65/23
educational [1]  80/8
effect [1]  73/6
effective [1]  52/8
effort [4]  98/17 98/19 100/2
114/5
eight [1]  11/19
either [6]  10/5 37/22 40/8 49/23
95/12 117/14
EKELAND [30]  2/2 2/3 3/4 3/7 4/10
11/6 16/1 20/3 27/13 29/14 32/23
38/18 39/6 47/19 50/20 57/6 60/15
60/23 62/24 65/10 69/20 70/15
71/11 72/13 74/7 76/5 76/13 79/17
114/10 114/12
Ekeland's [1]  41/18
electronic [2]  115/22 118/2
elements [1]  89/2
elicit [2]  40/13 45/24
else [14]  29/15 75/12 76/21 78/6
96/4 97/11 102/5 102/19 102/25
103/17 103/25 111/11 111/22
112/21
email [1]  66/22

empirical [1]  48/23
employer [1]  48/2
employer's [1]  47/23
enabled [1]  28/19
encountered [1]  59/20
end [12]  29/20 31/9 46/6 51/10
78/16 86/24 92/9 100/24 108/12
110/15 115/8 117/8
ended [1]  108/7
engage [2]  74/10 110/19
engaged [2]  61/18 61/20
enough [2]  34/3 62/5
entered [1]  106/7
entire [3]  30/9 30/10 30/15
entirely [5]  30/14 38/11 76/16
77/10 78/9
entitled [2]  32/9 119/5
entity [1]  110/24
essentially [4]  28/18 28/19 47/20
65/8
established [3]  18/21 22/17 29/16
estimate [7]  91/2 92/24 93/24
93/25 94/25 100/3 100/6
estimates [4]  95/9 101/19 106/24
114/7
estimating [1]  92/18
Euros [1]  68/9
evaluating [1]  37/10
evaluation [1]  56/7
even [22]  29/8 29/8 29/20 29/21
30/11 31/13 45/18 49/5 52/7 54/1
56/12 61/22 62/14 68/5 71/7 75/9
95/1 104/14 104/15 112/2 115/11
116/3
event [1]  97/17
eventually [2]  82/7 82/9
ever [23]  12/7 13/1 13/4 21/7
21/10 21/15 21/18 21/21 21/24
23/17 24/17 25/14 25/18 30/1 30/8
49/2 60/25 68/5 73/15 81/5 85/7
90/20 93/19
every [2]  78/9 89/23
everybody [1]  20/8
everyone [2]  115/12 118/11
everything [8]  16/18 53/20 63/5
76/21 77/16 86/16 105/1 108/22
evidence [85]  9/4 13/1 13/4 13/7
13/16 14/20 15/7 16/3 16/6 16/8
17/1 17/7 21/7 21/10 21/15 21/18
21/20 21/21 21/24 22/2 23/23
24/13 24/17 25/14 25/18 25/23
26/1 26/5 26/7 26/8 26/10 26/11
26/13 26/14 26/16 26/17 26/19
26/20 26/22 28/3 28/16 30/1 30/7
30/10 30/18 34/14 50/16 50/17
62/12 65/11 70/8 72/9 72/11 73/24
75/14 76/3 76/7 76/12 76/15 76/18
77/1 77/2 77/2 77/3 77/8 77/9
87/8 87/16 90/19 90/19 93/1 93/20
98/13 100/10 101/24 105/13 106/7
108/22 109/23 110/4 110/8 112/14
112/18 112/19 113/7
evidentiary [1]  70/6
exact [3]  14/9 14/13 89/23
exactly [1]  76/4
examination [11]  3/4 3/4 3/5 3/7
5/2 11/7 27/1 33/16 76/24 80/2
118/5
examine [2]  76/25 115/22
examined [2]  60/16 76/19
examiner [4]  41/3 54/13 54/14
83/24
Examiners [1]  84/11
example [7]  35/12 40/10 40/11
41/9 47/21 47/24 55/20
except [2]  30/11 48/3
exception [5]  73/23 74/4 74/17
74/20 75/10
exchange [3]  30/3 36/3 81/2
exchanges [1]  29/4
excuse [1]  78/6
excused [1]  27/23

**E**

exemption [1] 73/17
exhibit [64] 3/10 3/10 3/11 5/1
 5/11 5/18 5/24 5/24 6/2 6/2 6/13
 6/19 7/1 7/8 7/9 7/12 7/17 8/5
 8/19 8/23 9/22 10/3 10/7 10/15
 10/19 10/25 13/16 14/21 15/6 15/7
 17/2 17/3 17/5 17/6 17/8 17/14
 17/16 18/5 18/17 18/17 18/22
 51/20 53/25 87/9 88/7 88/9 88/11
 93/12 93/15 94/1 94/2 95/6 98/13
 99/16 99/19 99/21 102/2 102/6
 102/23 103/16 104/12 113/7 113/16
 113/17
Exhibit 305 [1] 113/7
Exhibit 316 [3] 18/5 18/17 18/17
Exhibit 45A [1] 51/20
Exhibit 603A [3] 15/7 17/2 17/6
Exhibit 603H [1] 14/21
Exhibit 603S [1] 13/16
Exhibit 623 [4] 5/1 5/11 5/18
 10/25
Exhibit 624 [1] 6/2
Exhibit 625 [1] 6/19
Exhibit 626 [1] 7/1
Exhibit 627 [1] 7/17
Exhibit 628B [1] 8/5
Exhibit 629 [1] 8/19
Exhibit 630A [1] 8/23
Exhibit 631 [1] 9/22
Exhibit 632 [1] 10/3
Exhibit 633 [1] 10/19
exhibits [8] 3/9 5/19 7/3 7/7 7/7
 73/12 73/13 73/16
exist [1] 27/19
existence [5] 14/8 14/10 14/12
 14/13 96/16
exotic [2] 71/16 71/24
expect [1] 60/8
expectation [1] 67/7
expedite [1] 99/3
experience [5] 46/1 48/9 56/2
 62/13 80/18
experienced [1] 58/11
expert [38] 19/15 19/17 29/21
 33/8 33/23 41/6 43/2 43/3 50/11
 52/22 53/5 54/10 54/21 55/9 56/22
 57/12 57/18 58/19 59/3 59/6 60/20
 61/25 66/18 66/18 67/4 70/1 71/9
 72/3 73/20 74/3 74/6 85/25 86/6
 86/8 86/13 86/20 87/1 91/17
expertise [10] 18/10 18/22 19/6
 22/17 48/7 48/17 48/19 61/9 67/20
 73/21
experts [2] 59/2 73/19
explain [14] 6/5 7/23 8/12 10/11
 39/9 40/7 88/19 95/18 96/8 99/24
 99/25 104/10 108/15 112/1
explained [1] 109/15
explored [2] 60/21 60/22
Export [1] 82/1
expose [1] 61/10
express [1] 48/21
expressed [2] 32/14 35/16
extended [2] 34/9 37/21
extensive [4] 39/3 53/19 67/11
 67/13
extensively [2] 39/3 109/7
extent [13] 32/14 38/22 41/5
 42/12 43/14 45/10 55/11 56/10
 58/22 61/8 76/22 86/15 86/16
extra [2] 109/17 114/23
extremely [1] 53/16
eyewitness [1] 12/6
eyewitnesses [1] 12/4

**F**

face [1] 68/11
fact [20] 12/6 30/20 48/7 48/17
 50/18 52/1 56/21 58/23 60/22
 61/25 69/11 72/5 72/7 72/7 73/2
 74/4 74/10 82/24 90/21 104/24
facts [2] 51/21 106/6
factual [3] 28/10 30/16 56/14
factually [1] 59/19
failed [4] 63/7 65/4 65/20 67/5
fair [4] 34/2 62/5 87/24 99/11
fairness [1] 69/11
fall [1] 64/1
falls [2] 58/15 67/20
familiar [3] 61/2 104/22 105/3
far [4] 16/19 53/19 92/7 101/18
fashion [1] 114/24
FBI [5] 11/17 16/16 59/18 82/7
 117/25
Federal [5] 76/15 81/21 82/5 82/6
 82/8
fee [11] 92/22 98/25 100/6 100/9
 101/6 101/11 101/12 101/13 101/19
 101/22 102/10
feel [2] 100/14 106/10
fees [9] 37/4 65/17 90/2 90/5
 90/6 94/20 95/2 95/2 105/20
Feldman [1] 80/21
fellow [1] 81/12
few [3] 81/7 82/2 82/14
field [3] 19/15 58/11 84/24
figure [2] 34/1 34/11
file [1] 7/13
filed [2] 53/12 66/25
files [1] 21/9
final [2] 4/14 77/11
finalized [2] 14/3 67/3
finances [1] 96/2
financial [16] 33/18 40/24 53/21
 75/14 76/3 76/7 76/18 80/14 81/15
 81/18 83/22 84/8 86/1 87/1 90/21
 91/18
financials [1] 45/5
FinCEN [1] 29/9
find [9] 17/12 57/21 71/22 93/9
 95/25 98/22 112/18 112/18 117/14
fine [15] 7/10 19/22 36/9 36/13
 38/6 45/22 46/2 46/4 46/9 47/12
 52/21 104/5 105/13 105/14 118/6
finish [5] 23/9 38/20 78/5 79/1
 79/13
finishing [2] 78/2 78/21
firm [1] 80/24
first [33] 7/14 7/20 7/25 8/22
 8/25 14/1 28/4 30/12 30/22 32/8
 34/5 40/15 44/15 52/9 59/5 59/6
 63/4 63/4 65/13 66/21 71/14 79/18
 81/9 83/15 86/4 86/4 88/24 92/22
 94/8 96/15 96/17 97/18 111/12
Fischbach [8] 78/18 78/25 79/11
 115/21 116/14 117/4 117/10 118/7
fit [1] 65/18
five [2] 54/23 90/8
five tools [1] 90/8
fix [1] 71/6
flawed [1] 40/4
Floor [1] 2/4
flow [8] 22/12 64/7 65/5 67/23
 68/7 69/18 70/10 112/10
flowing [1] 112/10
flows [3] 23/24 40/19 112/15
focus [4] 45/8 45/18 93/3 94/23
focused [3] 45/4 45/10 53/21
Fog [66] 5/13 11/1 12/7 14/8 14/9
 14/12 23/17 23/21 24/1 28/18
 28/19 28/20 28/22 29/1 29/4 29/8
 30/2 30/8 30/20 36/3 36/13 37/4
 40/19 49/19 50/1 50/3 65/16 68/12
 69/13 75/15 76/4 76/18 90/2 90/5
 90/6 90/17 91/3 92/19 92/20 92/21
 92/22 92/22 93/5 94/10 94/16
 94/18 94/18 95/1 95/5 95/20 95/22
 95/23 95/23 98/20 98/25 99/4
 100/2 100/4 100/8 100/20 101/8
 101/13 106/2 106/23 106/25 114/7
follow [4] 44/1 47/14 100/14
 115/5

follow-up [1] 115/5
following [11] 5/19 24/11 33/3
 41/3 42/21 44/18 44/18 44/19
 53/10 91/23 114/21
foregoing [1] 119/4
forensic [42] 32/9 32/13 32/17
 32/17 32/21 33/1 33/7 33/9 33/15
 33/19 33/21 34/24 35/11 36/6
 36/20 37/1 37/9 38/16 39/12 39/14
 39/24 40/24 41/3 41/5 41/16 41/24
 43/23 45/24 46/8 54/13 63/6 75/14
 76/3 76/7 81/15 82/15 82/17 84/1
 84/18 86/1 86/11 87/2
forensically [6] 37/23 38/7 39/16
 40/12 41/14 42/5
forensics [8] 40/11 53/5 83/23
 84/8 86/1 87/1 90/21 91/18
forfeit [1] 106/8
forfeiture [1] 116/9
fork [1] 82/22
form [1] 6/3
forth [2] 62/12 118/7
forward [1] 63/22
found [1] 113/13
foundation [9] 16/9 22/15 62/11
 82/19 82/20 83/7 86/9 86/12 99/3
founded [1] 82/22
four [1] 108/17
framing [2] 50/9 91/15
frankly [1] 52/10
fraud [5] 33/15 54/13 80/25 83/23
 84/11
free [1] 40/7
freelance [1] 113/2
Friday [5] 5/5 7/7 21/5 30/25
 45/20
front [19] 32/8 34/4 50/24 53/4
 63/15 65/3 65/6 67/21 68/2 68/6
 68/13 68/17 69/2 69/7 70/9 70/21
 77/20 93/16 108/9
full [4] 71/21 72/16 82/10 94/25
fully [1] 83/1
function [1] 83/5
functional [3] 65/5 67/20 75/17
functions [1] 83/6
funds [18] 5/13 23/17 48/5 49/23
 51/2 52/17 54/4 54/7 60/25 61/4
 64/7 65/19 69/8 69/13 94/19 95/23
 111/21 112/13
further [6] 11/5 26/23 27/22
 45/19 61/22 62/6

**G**

G-E-E-G-E-E-G-E-E [1] 8/21
GAAP [3] 42/15 42/16 45/12
gain [1] 105/19
game [1] 98/7
gave [3] 35/9 37/16 64/11
gears [1] 106/10
Geegeegee [1] 8/21
general [9] 49/22 107/22 109/23
 110/17 110/19 110/21 110/25 111/1
 112/2
generally [6] 6/16 22/16 61/20
 109/8 109/8 110/11
generous [1] 94/20
George [3] 54/14 81/3 81/14
get [25] 4/18 4/20 4/22 28/5 35/6
 36/14 40/7 49/6 56/3 57/2 57/24
 67/11 68/20 70/22 77/15 77/16
 77/21 79/15 91/6 109/4 114/13
 115/23 117/6 117/16 117/20
gets [3] 38/15 50/7 95/7
getting [4] 36/15 36/15 44/3 44/3
gift [21] 50/6 50/21 51/2 51/19
 51/23 52/8 52/20 54/2 55/21 55/23
 56/4 56/13 58/1 61/22 62/7 108/22
 109/9 109/18 111/2 111/4 111/6
give [12] 9/7 31/5 40/9 40/11
 41/9 50/24 53/2 67/10 84/21 87/15
 88/22 101/6
given [5] 37/15 39/6 93/10 93/10

**G**

given... [1]   110/23
giving [1]   67/12
Glave [13]   33/8 37/13 41/2 41/11
  64/11 93/12 93/13 93/24 94/11
  94/24 95/21 102/2 104/12
Glave's [8]   36/4 36/5 37/5 37/10
  93/12 95/6 113/3 113/16
go [33]   19/14 35/22 53/4 53/8
  54/18 55/18 57/21 62/25 67/9 70/4
  71/21 80/7 88/13 89/15 90/16
  92/16 97/14 98/10 102/22 103/13
  104/7 104/9 106/16 106/19 106/21
  107/3 108/20 110/2 110/12 111/5
  111/14 111/24 113/8
God [1]   79/22
goes [5]   39/21 49/25 51/6 109/5
  117/10
going [59]   7/8 18/8 18/20 30/13
  30/17 31/11 31/20 35/4 36/20
  36/20 36/23 37/8 40/13 42/16
  43/14 45/1 45/2 46/25 47/16 47/19
  48/4 48/21 51/11 52/15 53/9 54/24
  56/19 58/6 58/9 58/20 60/1 62/25
  64/12 64/16 67/1 67/7 67/12 68/10
  73/7 74/1 75/16 76/20 77/6 86/14
  92/1 92/10 93/22 107/5 107/7
  107/8 108/1 108/9 108/11 109/7
  114/9 115/9 116/6 116/7 117/4
gold [1]   96/21
gone [3]   96/11 97/24 97/24
good [10]   4/6 4/9 4/10 4/13 11/9
  11/10 79/14 110/21 114/9 118/11
got [18]   13/1 23/9 25/17 34/4
  42/23 50/24 53/2 56/20 66/21
  80/10 80/11 80/12 82/7 82/12
  86/10 86/12 89/6 107/16
gotten [2]   83/11 101/9
government [60]   4/5 4/7 11/15
  13/16 14/21 15/6 15/7 16/23 17/2
  17/6 18/5 23/15 24/23 25/6 28/1
  28/10 28/13 29/16 29/22 29/24
  30/16 30/23 31/14 37/3 37/13
  40/17 43/25 44/5 44/22 45/11
  45/15 45/19 51/13 51/17 51/19
  51/24 53/18 58/23 63/9 63/14
  66/15 66/20 66/22 67/5 68/16
  68/22 69/17 70/8 70/23 71/21
  74/14 76/25 77/1 80/13 89/22
  105/11 106/7 106/15 113/7 118/4
government's [14]   28/3 28/11
  32/16 33/8 34/14 39/10 39/15 40/4
  41/1 41/6 63/22 71/15 76/6 78/23
Gox [1]   30/13
grab [3]   31/23 32/3 63/2
graduate [2]   77/7 91/25
graduated [1]   80/19
Gram [1]   26/6
greater [2]   53/19 110/4
greatest [1]   78/6
grounds [2]   33/13 74/2
Grow [1]   21/19
guess [9]   33/20 34/10 35/17 41/15
  47/14 52/6 54/9 56/1 113/24
guess my [1]   41/15
guilt [1]   29/6
guilty [1]   28/12

**H**

habits [2]   38/24 43/21
hacking [1]   107/19
had [27]   5/13 5/21 5/22 5/25
  22/23 22/25 25/8 27/13 29/3 29/8
  33/8 35/15 41/19 56/3 66/5 68/12
  78/2 78/10 81/1 95/9 100/21 102/1
  102/24 106/23 108/1 110/2 111/16
half [1]   115/24
hand [3]   35/10 42/17 56/23
handling [1]   118/2
hands [3]   94/25 95/6 104/12
happen [1]   78/19

happened [3]   67/2 82/9 97/17
happens [1]   97/24
happy [1]   31/4
hard [1]   42/10
harder [1]   56/4
harmless [1]   60/22
Harmon [8]   51/17 51/20 105/17
  105/24 106/2 106/20 106/22 106/23
Harmon's [2]   52/19 105/20
Harry [1]   14/21
Harvard [5]   59/21 77/7 80/11
  80/12 91/25
Harvard-trained [1]   59/21
has [74]   12/7 16/17 17/1 17/5
  18/17 22/14 22/15 22/17 24/6
  25/23 26/1 28/24 29/14 30/24
  31/14 33/4 33/4 37/7 37/13 38/13
  38/14 41/13 41/19 44/22 46/22
  48/7 48/16 48/19 50/13 51/24
  53/19 56/2 56/5 56/15 56/15 58/22
  61/9 61/17 62/9 62/13 63/8 63/9
  63/14 64/11 66/23 67/3 67/8 68/16
  68/18 69/18 71/21 73/16 73/21
  73/21 74/10 76/19 77/5 78/4 78/8
  78/9 78/9 78/12 86/10 86/12 88/6
  89/10 89/22 94/18 96/11 97/16
  97/24 99/15 103/15 103/22
hasn't [5]   28/10 29/16 30/16
  52/22 98/21
HASSARD [28]   2/2 4/12 13/15 13/21
  14/14 14/19 15/6 18/4 21/2 46/10
  70/17 75/24 87/8 87/20 88/13
  89/15 96/7 97/14 98/12 102/22
  103/15 104/7 104/18 108/14 108/20
  111/14 111/24 113/6
hat [1]   82/15
hats [1]   82/15
have [197]
haven't [7]   39/21 39/22 85/1 85/5
  85/11 91/19 116/5
having [7]   38/6 52/12 55/22 55/23
  62/15 70/7 106/8
he [179]
head [2]   47/1 72/16
header [1]   46/7
health [1]   116/21
hear [6]   23/10 46/12 52/5 62/2
  105/16 114/18
heard [3]   62/4 73/9 105/14
hearing [19]   31/22 33/13 34/3
  35/19 36/17 36/22 37/20 39/18
  42/3 44/11 44/15 46/22 49/19 57/9
  58/18 60/15 60/19 67/1 108/8
hearings [5]   32/13 39/4 54/19
  58/20 86/6
hearsay [9]   71/5 73/4 73/17 73/18
  73/20 73/22 74/4 74/17 74/19
held [14]   28/7 34/3 86/2 91/9
  96/25 100/21 100/24 101/7 101/8
  101/13 107/24 109/3 114/11 116/13
Helix [5]   105/25 106/1 106/1
  106/3 106/22
help [2]   79/22 88/2
helpful [8]   32/2 33/2 42/8 42/17
  44/6 76/9 77/18 111/8
her [4]   29/20 29/21 93/15 94/1
here [93]   5/16 6/6 6/20 7/18 7/23
  8/23 9/20 9/23 10/11 10/20 14/15
  25/21 25/22 27/16 28/16 31/12
  31/18 32/10 32/19 33/14 34/4 35/4
  35/17 36/1 36/15 36/25 37/7 37/24
  38/3 39/19 41/8 42/18 43/5 43/22
  44/1 45/8 45/20 46/19 50/6 51/9
  51/14 51/22 51/25 53/15 53/17
  53/20 54/4 54/23 56/20 57/2 59/16
  59/20 63/7 64/4 65/12 65/14 66/23
  70/10 72/13 75/11 79/9 87/6 88/3
  89/23 89/24 91/24 92/1 92/11
  92/17 93/16 96/16 97/2 101/17
  105/14 106/10 107/11 107/23 108/8
  108/21 109/11 109/13 110/20
  111/12 111/15 112/2 112/16 114/17

115/22 116/1 116/4 117/15 117/19
  117/19
herself [1]   29/21
hidden [2]   61/21 62/6
hide [11]   52/8 56/12 108/18 109/9
  110/24 111/4 111/17 111/19 112/19
  112/20 114/6
hiding [1]   59/7
high [2]   35/5 93/5
higher [1]   96/12
highest [1]   95/11
hill [2]   48/15 81/17
him [49]   18/14 18/21 19/4 19/7
  19/8 19/11 19/13 19/20 23/9 23/10
  33/17 42/6 44/6 49/8 49/12 52/6
  56/23 57/3 57/9 58/12 58/21 60/22
  61/1 62/1 62/5 62/8 64/15 67/21
  76/16 77/9 79/6 79/10 86/7 87/21
  90/10 91/13 91/19 91/20 92/2
  106/12 108/7 108/8 108/9 109/22
  110/10 115/1 116/19 116/20 117/1
himself [1]   28/23
hindrance [1]   85/22
his [106]   18/14 18/22 19/6 24/11
  25/25 25/25 30/6 32/15 33/11
  33/22 33/23 34/20 34/20 34/20
  34/21 34/25 35/1 35/20 35/22
  35/24 36/11 36/14 36/23 36/24
  36/24 36/25 38/3 39/1 39/2 39/7
  39/8 39/9 39/14 39/16 39/25 40/13
  40/19 40/20 41/13 41/20 42/23
  43/16 43/24 44/3 45/14 45/25 46/1
  46/8 47/1 48/9 48/20 48/24 48/24
  51/6 51/23 52/24 53/4 54/13 54/15
  56/7 56/18 56/22 56/22 57/12
  57/18 58/2 58/11 60/10 60/24
  63/11 64/9 64/18 64/25 65/1 65/3
  65/4 66/6 67/20 68/3 68/25 68/25
  69/12 70/1 70/11 71/8 76/16 76/17
  79/5 79/6 86/21 90/10 90/11 91/11
  91/15 91/16 91/23 92/5 104/12
  105/24 110/10 116/15 116/16
  116/21 116/24 116/25 117/2
history [1]   97/17
hobbyist [1]   98/4
hold [11]   15/9 16/1 44/8 83/19
  83/20 83/23 83/24 83/25 101/18
  102/12 115/1
holders [1]   102/12
holding [11]   101/4 101/5 101/5
  101/6 101/18 101/20 101/21 101/22
  102/11 106/25 107/6
holdings [1]   94/12
holds [1]   91/21
home [2]   30/6 115/23
honestly [3]   43/12 46/4 109/21
Honor [99]   4/6 4/10 4/19 5/21
  11/5 11/11 12/23 16/25 17/10 18/8
  18/11 18/23 19/16 20/3 22/9 22/20
  26/3 26/23 26/25 27/22 28/1 28/5
  28/8 28/9 28/14 29/12 30/21 31/2
  32/1 32/7 34/8 37/18 38/12 43/9
  43/11 45/13 45/20 46/3 46/14
  47/15 48/15 49/12 50/21 51/11
  54/3 56/9 56/25 57/4 57/25 59/5
  59/16 60/18 62/3 62/17 65/9 66/3
  66/15 68/23 69/10 69/16 70/3
  70/14 70/16 71/1 72/2 73/12 74/21
  75/13 75/24 77/18 78/17 79/24
  85/24 86/3 86/4 86/7 87/3 88/5
  88/16 90/9 90/23 91/7 91/10 92/4
  92/4 99/14 103/4 105/10 106/5
  107/3 110/13 114/8 115/7 115/20
  116/10 116/24 117/3 117/25 118/10
HONORABLE [1]   1/9
Hoover [1]   81/12
hope [1]   88/4
hopefully [2]   46/14 79/12
hour [2]   85/10 116/18
hours [3]   58/9 85/15 85/16
house [3]   41/22 81/18 81/21
how [35]   15/25 18/17 28/14 35/1

**H**

how... [31]   35/11 35/22 35/25
36/2 36/10 36/10 37/9 41/23 42/23
43/15 44/14 44/16 49/21 49/23
50/1 56/16 61/20 62/8 65/2 67/17
69/8 71/23 85/17 91/3 92/16 93/25
100/1 102/1 106/12 110/4 116/4
huge [1]   52/6
huh [3]   15/24 17/25 25/5
hundreds [2]   28/21 62/15
hypothetical [1]   48/25

**I**

I am [1]   47/11
I'm [23]   13/17 15/10 16/11 20/3
21/13 24/4 25/21 44/9 47/15 50/13
55/19 60/12 62/2 72/12 75/16
75/22 83/10 87/10 88/22 103/6
109/4 113/21 118/9
I-L-B-E-1 [1]   8/24
idea [4]   47/6 60/20 110/21 116/4
identification [5]   17/2 17/6
29/19 88/6 99/15
identified [2]   58/4 95/21
identifies [1]   55/25
identify [1]   42/25
identity [2]   56/12 109/9
ignore [1]   102/17
Ilbe1 [3]   9/12 9/18 9/21
Ilbe1's [1]   9/10
illegitimate [1]   104/22
illicit [3]   54/4 54/7 107/15
Ilya [2]   51/18 52/19
images [1]   5/9
immediate [1]   101/3
implemented [1]   28/17
implicit [1]   55/2
implied [1]   93/24
Import [1]   82/1
important [4]   26/2 116/1 116/2
116/15
improper [1]   40/11
inaccurate [1]   16/21
inadmissible [2]   73/20 73/22
inapplicable [1]   41/8
include [4]   57/13 65/15 77/11
100/23
included [9]   10/4 39/11 50/25
64/6 64/7 67/6 74/13 81/24 94/11
includes [1]   89/13
including [3]   9/6 52/8 99/10
income [8]   37/8 38/23 40/20 41/1
43/19 64/6 103/19 103/23
incompetent [1]   73/18
inconsistent [2]   33/14 114/23
incorporated [1]   28/19
index [1]   96/22
indicate [1]   18/1
indicated [3]   54/25 60/15 77/5
indicates [1]   106/22
indicating [1]   20/4
indication [3]   62/13 65/16 73/14
indicative [1]   52/2
indicted [1]   105/11
indictment [1]   106/16
indictments [3]   105/3 105/7
106/15
indirect [3]   37/8 41/1 43/19
indirectly [1]   24/1
industry [3]   33/6 41/7 97/5
industry-wide [1]   33/6
ineptly [1]   55/19
infer [1]   104/21
inflate [1]   114/5
information [9]   47/23 50/22 64/25
67/5 82/6 89/3 99/7 99/9 111/9
informed [4]   57/7 85/13 85/18
85/20
initially [1]   112/13
innovating [1]   83/8
innuendo [2]   30/9 30/16

insights [2]   105/19 105/23
insignificant [1]   68/11
instance [1]   30/1
instantly [3]   100/4 100/10 100/20
instead [3]   65/20 100/25 109/9
institute [3]   81/12 84/15 84/15
instruct [2]   59/22 91/19
instructed [1]   91/20
instructions [1]   109/14
insufficiency [1]   76/6
integrating [1]   61/5
integration [4]   61/3 61/4 65/19
68/25
integrity [1]   89/2
intend [2]   33/17 35/8
intended [2]   45/24 52/17
intends [3]   38/23 65/13 71/7
intentionally [1]   91/18
interact [1]   104/25
interacting [1]   29/4
interaction [1]   24/10
intermediary [1]   111/5
intern [1]   80/20
internal [1]   80/25
International [1]   84/9
internationally [1]   33/6
interrupt [1]   83/10
interview [1]   62/21
interviewed [1]   12/4
interviews [3]   50/8 63/6 71/6
introduce [3]   50/17 67/23 80/4
introductory [3]   34/19 43/23 46/5
investigate [1]   12/2
investigation [2]   82/4 82/7
investigations [4]   59/20 80/25
81/1 89/14
investigator [5]   55/11 62/14 84/2
84/18 86/11
investments [1]   96/10
invited [1]   39/19
invoice [9]   85/11 85/15 85/17
85/19 85/21 85/22 113/4 113/20
113/21
invoices [6]   63/23 64/5 64/10
113/4 113/13 113/22
involved [5]   18/2 20/22 40/24
82/7 82/23
involvement [1]   117/22
involving [3]   57/10 74/14 82/17
IP [1]   29/23
IRS [2]   59/18 93/14
is [699]
isn't [6]   16/3 19/17 35/25 56/22
61/3 66/2
issue [28]   30/21 30/22 31/1 32/20
32/25 33/5 36/1 36/22 38/17 42/13
47/7 50/5 57/17 58/21 65/12 67/1
68/4 68/18 69/17 70/1 70/24 71/2
71/4 71/8 76/8 78/9 90/1 107/4
issued [3]   84/4 84/8 84/15
issues [26]   31/2 36/1 36/4 36/7
37/11 40/16 49/18 53/19 60/3 60/4
70/7 80/24 81/1 81/22 81/23 81/23
82/2 82/13 82/13 84/3 84/6 84/10
84/12 92/2 92/11 116/9
it [314]
its [8]   24/10 28/4 28/10 30/16
44/5 67/4 74/15 79/18
itself [2]   37/25 55/6

**J**

J-O-H-N [1]   80/6
jailhouse [3]   50/8 62/21 71/6
JD [1]   80/11
JEFFREY [2]   1/18 4/8
jewelry [2]   22/24 22/25
job [2]   81/3 81/7
John [3]   3/6 79/21 80/6
joining [1]   4/12
journals [1]   84/23
JUDGE [4]   1/10 4/17 44/17 80/20
judging [1]   32/19

judgment [1]   91/5
July [4]   14/1 14/5 14/6 66/6
July 15th [1]   14/5
July 16th [1]   14/6
July 25th [1]   14/1
June [2]   14/24 14/24
June 12th [1]   14/24
June 13th [1]   14/24
juris [1]   80/12
juror [9]   4/14 4/16 28/11 78/2
78/4 78/7 78/8 78/11 78/13
jurors [3]   20/4 77/24 78/1
jury [74]   1/9 4/18 4/22 4/23 5/6
6/5 10/11 17/15 24/12 30/18 31/5
31/10 31/19 32/19 32/20 33/2 35/8
37/22 37/23 37/24 38/9 38/13 39/8
40/3 41/22 42/1 42/8 42/17 59/22
64/20 76/9 76/9 77/4 77/13 77/20
77/21 77/25 78/1 79/15 79/16 80/5
80/17 87/5 88/2 88/7 88/10 90/13
93/13 93/16 94/4 96/5 96/8 97/12
98/21 99/16 99/23 99/24 102/6
102/16 102/19 102/25 103/16
105/23 106/21 108/10 112/25
113/11 113/17 115/15 115/23 116/1
116/5 116/5 116/6
jury's [1]   42/12
just [181]
JUSTICE [2]   1/13 1/20
JW [3]   66/18 79/19 80/7

**K**

keep [5]   64/18 70/10 79/2 79/8
118/2
keeping [2]   88/20 109/23
keeps [2]   29/24 91/11
Kennedy [1]   80/13
key [6]   42/4 42/4 45/3 45/4
104/25 105/1
keys [1]   30/14
kidnapping [1]   107/20
kind [9]   18/2 40/22 40/25 45/17
52/1 55/23 71/24 98/6 98/7
knew [1]   23/23
know [65]   4/14 19/5 27/18 31/4
35/4 35/17 36/16 38/15 38/24
39/12 41/16 42/15 43/3 43/7 43/15
44/7 44/16 45/3 45/6 47/24 47/24
48/19 49/5 49/21 50/1 50/9 54/20
54/22 55/15 56/2 56/3 60/19 61/1
62/14 62/20 62/21 63/9 63/13 65/1
67/2 68/3 68/24 69/3 69/3 69/19
69/21 69/22 70/2 70/21 71/6 71/8
71/13 72/18 78/14 90/18 98/5
98/19 101/25 101/25 104/3 109/6
110/9 112/6 113/15 117/22
knowledge [15]   13/3 13/6 18/14
20/15 22/11 24/11 25/25 28/24
48/6 48/17 49/4 55/11 67/18 72/17
83/15
known [3]   51/24 63/16 63/18
knows [6]   19/9 19/12 50/1 79/12
91/25 92/4
Korea [3]   23/6 23/7 23/11
Korean [1]   23/15
Kraken [9]   40/19 69/11 112/4
112/5 112/6 112/7 112/11 112/12
112/13
KYC [12]   41/13 49/16 51/23 55/22
56/11 68/24 108/21 109/10 110/8
110/20 110/23 112/6
KYCed [2]   60/25 112/8
KYCing [1]   111/9

**L**

labeled [8]   20/1 46/16 49/16
59/23 59/24 62/18 67/15 110/20
lack [2]   50/7 71/4
large [2]   69/6 69/12
Larry [3]   51/17 52/18 105/17
last [19]   4/16 10/19 14/11 15/2

**L**

**last... [15]** 18/24 20/19 27/4 70/8 70/20 75/13 75/20 76/2 85/17 89/8 96/10 103/3 103/9 104/8 107/6
**late [1]** 78/8
**launder [4]** 51/22 52/17 55/24 69/8
**laundered [4]** 61/4 65/19 68/25 69/1
**launderer [2]** 60/9 60/25
**launderers [4]** 52/16 56/5 56/16 62/9
**laundering [61]** 28/25 38/24 43/21 45/7 45/16 51/7 51/10 52/3 52/4 52/13 52/23 53/1 53/7 53/23 54/6 54/10 54/14 55/3 55/4 55/8 55/16 57/8 57/10 57/14 57/14 58/19 58/20 58/24 59/2 59/15 59/19 59/22 59/24 59/24 60/2 60/6 61/2 61/13 61/18 61/20 62/14 63/15 65/3 65/6 65/18 67/22 68/2 68/6 68/14 68/14 68/17 69/3 69/9 69/22 70/9 70/21 71/19 71/24 73/8 81/25 84/25
**law [31]** 2/3 34/22 37/1 37/2 49/1 53/1 54/14 59/21 60/1 77/7 80/11 80/19 80/20 80/21 80/23 81/3 81/4 81/10 81/11 81/14 81/15 81/16 81/16 81/22 82/1 84/23 85/3 85/3 85/3 91/25 91/25
**laws [1]** 82/1
**lawyer [3]** 48/10 48/25 109/13
**lawyers [2]** 24/13 31/12
**lay [3]** 16/9 59/18 99/3
**layer [1]** 109/17
**layering [2]** 61/3 71/19
**laying [1]** 44/6
**lead [1]** 76/9
**leading [3]** 81/20 99/1 99/2
**leaks [1]** 82/5
**learned [4]** 39/14 42/22 73/9 106/20
**learning [1]** 65/13
**least [1]** 67/9
**leave [5]** 70/23 81/6 81/9 81/16 85/23
**leaving [1]** 46/8
**led [4]** 82/4 82/6 82/7 83/15
**left [6]** 6/9 6/19 8/19 13/22 31/20 95/22
**legal [2]** 45/17 60/6
**legitimate [2]** 69/5 78/9
**length [1]** 28/15
**lengthy [1]** 110/2
**less [3]** 78/7 93/19 106/23
**let [20]** 16/9 18/20 23/9 29/14 31/13 32/3 37/15 38/20 39/6 46/12 53/24 53/25 60/15 63/2 76/7 77/25 78/14 78/14 117/4 117/22
**let's [8]** 34/4 53/4 77/21 77/22 79/14 94/23 104/9 108/14
**letter [1]** 13/17
**level [2]** 35/5 36/21
**license [1]** 110/23
**Lichtenstein [2]** 51/18 51/20
**Lichtenstein's [1]** 52/19
**life [1]** 12/21
**like [43]** 8/17 16/19 16/20 37/10 38/23 40/25 42/4 46/5 48/14 48/14 48/22 55/20 56/13 59/19 62/7 63/21 63/22 69/4 73/2 86/19 88/6 96/4 97/11 97/23 98/4 98/6 102/5 102/19 102/25 103/8 103/18 103/25 105/2 106/10 107/19 110/23 111/11 112/21 114/17 115/2 115/22 117/12 118/1
**likely [1]** 102/8
**limit [3]** 46/3 49/24 58/1
**limited [1]** 27/16
**LINDSAY [3]** 2/6 119/3 119/12

**line [3]** 18/9 67/10 67/10
**lines [1]** 101/17
**linger [1]** 117/1
**Linux [1]** 30/5
**list [4]** 7/8 9/11 11/1 15/17
**listed [1]** 36/25
**listener [1]** 73/6
**listening [1]** 89/20
**listing [1]** 57/12
**lists [1]** 10/7
**litigation [1]** 82/16
**little [13]** 41/4 42/10 44/25 46/15 47/15 49/5 55/14 59/25 82/24 83/11 93/19 95/19 116/22
**LLC [1]** 65/18
**locations [1]** 22/10
**lodged [1]** 66/20
**logging [2]** 30/4 30/6
**logic [3]** 38/9 39/9 41/18
**long [2]** 28/16 116/4
**long-running [1]** 28/16
**look [8]** 37/2 37/23 53/24 64/12 77/19 78/18 79/3 79/10
**looked [5]** 15/2 18/24 41/18 45/9 90/1
**looking [4]** 43/20 43/24 63/6 65/23
**looks [1]** 59/19
**lost [1]** 88/21
**lot [8]** 54/4 54/7 57/3 76/24 97/24 97/24 111/17 111/19
**lots [1]** 47/20
**Louisiana [1]** 80/21
**low [1]** 104/13
**lower [1]** 104/14
**LSD [2]** 13/12 14/25
**LSU [1]** 80/10
**Luke [1]** 5/22
**lunch [14]** 79/2 115/1 115/4 115/9 115/13 115/16 115/21 116/15 116/16 116/19 116/23 116/25 117/2 118/11
**Lund [1]** 118/3

**M**

**made [4]** 28/22 29/18 39/17 50/18
**mainly [1]** 52/18
**maintain [1]** 49/2
**maintaining [2]** 48/1 48/18
**major [1]** 48/11
**majority [2]** 28/25 69/13
**make [14]** 31/5 41/17 42/18 44/5 48/11 50/14 52/21 62/4 70/17 74/12 77/14 77/15 83/4 106/13
**makes [1]** 100/4
**making [10]** 29/23 31/12 37/3 40/24 40/25 41/12 41/12 42/13 45/17 68/22
**man [1]** 41/19
**March [2]** 1/5 119/10
**MarijuanaIsMyMuse [1]** 22/3
**Mario [1]** 26/6
**mark [2]** 96/14 96/19
**marked [4]** 17/1 17/6 88/6 99/15
**marker [1]** 56/14
**market [4]** 13/5 81/2 96/22 104/15
**marketplaces [1]** 13/8
**markets [1]** 29/1
**marshal [1]** 117/9
**marshals [1]** 117/3
**Martin [1]** 80/21
**Mason [3]** 54/14 81/3 81/14
**master's [1]** 80/12
**match [1]** 40/20
**material [2]** 11/2 16/15
**materials [2]** 47/25 74/18
**math [5]** 42/23 44/5 69/25 92/5 100/1
**matter [5]** 12/6 40/11 41/17 60/20 119/5
**matters [1]** 44/19
**maximum [1]** 12/21

**may [33]** 4/24 10/4 11/11 11/12 14/11 17/15 25/24 32/6 41/21 41/21 41/22 47/23 48/4 48/13 55/24 56/25 57/23 64/1 70/3 71/14 78/11 78/12 79/17 79/24 79/25 88/9 88/16 88/17 93/2 97/18 99/19 106/9 118/6
**maybe [8]** 32/22 38/2 40/7 40/9 71/17 73/1 84/22 85/15
**Mazars [1]** 29/19
**McAfee [3]** 84/15 84/16 86/11
**me [68]** 4/7 4/12 9/7 16/9 18/21 22/5 28/15 29/12 29/14 32/3 32/8 34/4 35/20 36/8 36/18 36/19 37/15 39/6 40/9 40/11 41/9 42/7 42/10 42/24 42/25 43/15 44/11 44/13 44/17 46/12 47/19 49/3 50/24 50/25 51/1 51/8 52/10 52/14 53/2 53/3 53/24 53/25 54/11 56/7 56/13 56/21 57/7 57/20 60/15 61/23 62/25 63/2 64/4 67/17 68/4 70/12 74/4 77/25 78/6 78/14 78/15 79/22 84/5 88/22 98/3 108/8 114/18 117/22
**mean [26]** 16/18 22/13 31/3 35/4 36/8 41/15 42/10 44/14 48/16 54/5 54/15 54/21 55/15 63/21 65/3 65/9 65/25 68/23 72/20 72/25 74/9 91/20 92/4 95/19 108/21 111/15
**means [3]** 8/14 41/19 47/6
**measure [2]** 94/22 111/18
**measured [6]** 91/4 95/5 95/12 95/15 95/16 111/18
**measuring [3]** 91/3 92/19 92/20
**medical [1]** 78/9
**meet [1]** 32/16
**meets [1]** 32/16
**member [1]** 86/8
**members [2]** 31/10 83/16
**memorized [1]** 16/18
**mention [3]** 54/1 89/10 110/7
**mentioned [2]** 29/21 109/25
**mentions [1]** 104/11
**merely [4]** 18/13 22/11 24/10 91/22
**mescaline [1]** 13/12
**messages [8]** 21/14 21/17 21/20 21/23 22/1 22/4 25/16 25/20
**Messari [1]** 97/4
**met [2]** 28/10 30/16
**methodologies [3]** 38/9 39/12 91/16
**methodology [1]** 33/3
**methods [1]** 36/21
**MICHAEL [2]** 2/2 4/12
**middle [1]** 96/10
**might [8]** 47/21 47/22 62/14 68/8 92/25 93/5 106/13 110/19
**million [27]** 92/21 92/21 93/4 95/14 97/22 97/23 98/1 98/2 100/7 100/7 101/9 101/10 101/10 101/10 101/15 101/15 101/16 101/16 101/20 101/20 101/21 101/22 102/3 102/4 102/7 106/3 106/24
**millions [1]** 28/21
**mind [3]** 61/15 69/3 88/20
**mini [1]** 116/8
**minimal [1]** 65/5
**minus [3]** 15/18 95/21 95/22
**minute [3]** 15/9 77/22 116/18
**misleading [2]** 37/22 40/2
**misrepresented [1]** 29/3
**missing [3]** 35/8 94/23 111/15
**misstates [1]** 93/20
**misunderstanding [1]** 110/13
**misunderstood [1]** 109/21
**MIT [1]** 85/6
**mix [4]** 49/16 108/21 110/20 110/21
**mixed [2]** 92/21 110/22
**mixer [13]** 48/14 49/2 49/24 104/21 104/22 105/20 105/25 106/2

**M**

**mixer... [5]** 106/13 106/23 107/18 109/18 110/5
**mixers [9]** 48/4 48/8 48/18 49/6 49/9 104/23 106/11 108/4 108/9
**mixing [5]** 46/20 46/23 107/12 107/14 107/25
**modus [1]** 59/7
**moment [2]** 57/1 77/14
**monetary [1]** 81/22
**money [95]** 28/23 28/25 28/25 37/6 38/24 40/19 43/21 45/7 45/16 51/7 51/10 51/21 52/2 52/4 52/13 52/16 52/17 52/23 53/1 53/7 53/23 54/6 54/10 54/14 55/3 55/4 55/8 55/16 55/24 56/5 56/11 56/16 57/8 57/10 57/13 57/14 58/18 58/20 58/24 59/2 59/15 59/19 59/22 59/23 59/24 60/2 60/6 60/9 60/25 61/1 61/13 61/18 61/20 62/8 62/14 62/19 63/15 64/3 64/23 65/3 65/6 65/18 67/22 68/2 68/6 68/13 68/17 69/1 69/2 69/6 69/9 69/22 70/9 70/21 70/24 71/3 71/13 71/18 71/19 71/24 73/7 81/25 84/24 109/10 109/17 110/5 111/4 111/5 112/19 112/20 114/3 114/4 114/6 114/22 114/23
**month [1]** 68/10
**monthly [1]** 97/10
**months [1]** 43/14
**Moon [22]** 62/18 63/7 63/15 64/22 64/24 65/7 65/18 65/20 67/19 67/23 68/7 68/10 68/20 75/17 112/2 112/3 112/5 112/11 112/12 112/22 114/20 114/21
**more [29]** 29/12 31/23 37/6 40/3 42/7 42/9 42/9 44/7 46/15 48/24 52/7 52/12 55/12 56/12 56/13 60/12 65/23 67/11 69/16 69/20 77/8 83/3 95/11 95/19 97/23 104/3 104/5 109/13 116/22
**morning [8]** 1/7 4/6 4/9 4/10 4/13 11/9 11/10 78/10
**MOSS [1]** 1/9
**most [10]** 46/20 85/2 91/1 91/2 93/3 95/2 102/8 105/24 107/12 107/14
**mostly [1]** 89/1
**motion [1]** 30/17
**move [15]** 5/23 17/7 19/21 47/3 49/23 61/16 75/1 88/6 96/7 104/9 104/18 108/14 111/7 111/20 112/24
**moves [4]** 17/1 28/9 85/25 99/15
**moving [8]** 8/5 17/4 17/13 57/2 57/24 79/2 79/8 116/3
**Mr [22]** 3/4 3/7 7/4 36/2 37/13 45/6 45/6 52/3 53/5 55/6 55/13 58/23 59/1 59/5 59/9 71/17 74/7 76/13 99/10 100/3 101/3 118/8
**Mr. [178]**
**Mr. Brown [19]** 31/1 33/12 34/7 37/16 46/12 49/11 52/5 57/9 57/16 58/21 59/4 66/2 68/21 70/23 72/1 73/11 75/12 77/5 77/17
**Mr. Ekeland [23]** 11/6 16/1 20/3 27/13 29/14 32/23 38/18 39/6 47/19 50/20 57/6 60/15 60/23 62/24 65/10 69/20 70/15 71/11 72/13 76/5 79/17 114/10 114/12
**Mr. Ekeland's [1]** 41/18
**Mr. Fischbach [8]** 78/18 78/25 79/11 115/21 116/14 117/4 117/10 118/7
**Mr. Harmon [5]** 105/24 106/2 106/20 106/22 106/23
**Mr. Harmon's [1]** 105/20
**Mr. Hassard [26]** 13/15 13/21 14/14 14/19 15/6 18/4 21/2 46/10 70/17 75/24 87/8 87/20 88/13 89/15 96/7 97/14 98/12 102/22

103/15 104/7 104/18 108/14 108/20 111/14 111/24 113/6
**Mr. Luke [1]** 5/22
**Mr. Price [1]** 19/18
**Mr. Ross [1]** 13/2
**Mr. Rovensky [7]** 19/19 52/3 55/7 55/13 58/23 59/1 59/13
**Mr. Santell [7]** 11/9 15/15 16/13 17/20 19/25 20/10 22/22
**Mr. Sterlingov [66]** 11/23 12/7 12/12 12/16 13/1 13/4 13/7 13/11 14/25 15/18 21/7 21/10 21/15 21/18 21/21 21/24 22/2 23/23 24/17 24/22 24/23 25/8 25/14 25/18 26/5 26/8 26/11 26/14 26/17 26/20 28/12 29/17 30/1 30/5 30/8 30/11 30/19 37/4 37/7 40/18 41/13 51/22 63/14 64/17 73/15 75/15 76/3 76/17 78/19 79/12 90/2 90/20 93/19 104/11 108/23 109/8 109/19 109/23 110/6 110/8 110/11 112/8 113/2 114/14 114/16 117/4
**Mr. Sterlingov's [11]** 15/3 18/13 18/14 20/14 64/3 94/12 94/25 95/6 96/2 101/25 113/14
**Mr. Ulbricht [1]** 12/21
**Ms [3]** 3/4 3/5 29/19
**Ms. [13]** 9/3 10/3 36/5 37/5 37/10 37/13 41/11 64/11 93/12 93/13 95/6 113/3 113/16
**Ms. Glave [4]** 37/13 41/11 64/11 93/13
**Ms. Glave's [7]** 36/5 37/5 37/10 93/12 95/6 113/3 113/16
**Ms. Pelker [1]** 9/3
**Ms. Walker [1]** 10/3
**Mt. [1]** 30/13
**Mt. Gox [1]** 30/13
**much [6]** 28/14 85/17 91/3 91/5 102/1 106/12
**must [3]** 37/4 40/18 109/21
**my [48]** 13/3 13/6 19/16 19/20 20/15 30/23 31/21 39/20 39/22 40/23 41/15 42/2 44/12 46/24 48/2 49/2 49/3 54/3 57/15 64/9 65/7 68/19 69/3 72/16 73/3 75/20 80/6 81/7 81/14 81/20 83/15 84/23 89/24 92/1 92/3 92/12 94/5 97/3 97/10 103/9 106/24 107/1 109/1 109/14 109/14 113/19 115/13 117/22
**myself [3]** 58/7 58/8 73/1
**mystery [1]** 111/15

**N**

**N.W [1]** 1/16
**name [12]** 4/5 12/6 29/25 41/20 51/23 61/5 69/12 80/5 80/6 82/21 111/9 113/2
**nature [2]** 62/1 107/20
**near [1]** 68/14
**necessarily [5]** 41/24 55/24 63/23 73/7 104/22
**necessary [1]** 54/19
**need [14]** 31/24 41/16 43/25 48/1 52/13 57/24 86/18 111/7 111/17 115/2 116/11 116/22 117/22 118/6
**needs [4]** 78/18 79/10 116/15 117/12
**negotiate [1]** 85/20
**neither [1]** 59/1
**net [4]** 37/8 38/23 40/25 43/18
**never [11]** 12/2 12/4 25/11 65/5 66/16 66/20 73/21 74/10 75/17 109/25 110/5
**New [1]** 1/20
**next [22]** 1/23 46/13 46/15 49/15 62/16 70/18 75/1 88/13 89/15 90/16 93/11 94/14 96/7 96/8 97/14 104/9 104/18 108/14 108/20 111/14 111/24 112/24
**nice [1]** 115/13

**nine [1]** 11/17
**no [62]** 1/4 4/19 11/5 12/3 12/5 13/1 13/4 13/6 13/7 13/10 16/21 16/24 17/10 17/13 17/16 21/17 23/17 23/23 25/13 26/23 27/22 28/11 29/7 38/11 47/6 50/2 50/10 53/6 53/6 53/6 60/25 62/9 65/16 66/9 70/1 73/14 73/21 73/23 73/24 75/4 75/14 76/2 77/1 77/2 77/2 77/3 77/8 85/8 86/3 86/4 88/11 91/12 96/6 97/13 99/18 99/21 102/21 103/2 109/19 111/13 111/25 112/23
**nodding [1]** 47/1
**none [3]** 29/18 38/25 117/11
**nonplussed [1]** 47/16
**nonprofit [1]** 82/19
**not [156]**
**note [2]** 33/8 75/3
**notes [1]** 31/21
**nothing [1]** 75/8
**notice [1]** 86/7
**noticed [5]** 33/9 58/18 59/2 59/6 91/17
**November [6]** 15/23 17/21 18/1 18/24 20/17 28/20
**November 2011 [1]** 28/20
**November 27th [4]** 15/23 17/21 18/1 20/17
**now [21]** 5/23 8/5 10/19 12/22 13/11 31/14 43/13 44/21 55/1 57/21 65/23 85/6 94/16 98/4 98/5 106/11 107/25 110/2 114/9 115/9 115/14
**number [35]** 16/19 17/12 23/22 23/22 30/13 49/16 49/16 57/17 62/18 62/18 62/19 63/6 65/11 65/12 66/7 66/8 66/11 66/17 69/10 70/5 72/9 75/18 78/8 81/6 87/11 92/17 93/12 93/18 94/1 94/11 100/24 102/2 104/9 108/21 110/20
**numbers [9]** 36/10 37/5 39/10 40/9 42/19 45/10 45/14 93/8 101/4
**NW [3]** 1/14 1/20 2/8
**NY [1]** 2/4

**O**

**object [10]** 18/8 41/4 49/25 50/7 53/18 67/5 75/14 86/5 91/13 105/7
**objected [3]** 55/7 66/16 106/15
**objection [39]** 12/8 12/13 12/23 17/9 17/13 22/7 24/3 24/4 24/5 24/24 32/8 32/10 32/12 37/16 49/15 60/19 66/20 66/21 74/22 86/3 86/4 90/9 90/23 91/7 91/12 93/20 99/1 99/17 99/18 100/12 100/16 102/13 103/4 103/11 103/20 105/5 106/4 107/2 108/24
**objections [7]** 30/24 31/4 44/5 46/19 62/19 66/10 70/22
**objectivity [1]** 89/2
**obligation [1]** 29/9
**obtained [1]** 97/8
**occur [1]** 100/11
**occurred [2]** 22/6 67/15
**October [1]** 28/20
**odds [1]** 116/21
**off [7]** 5/23 32/3 46/7 72/16 75/17 75/19 117/6
**offer [3]** 42/3 58/12 74/4
**offering [4]** 41/25 41/25 74/9 86/13
**offers [1]** 93/18
**offhand [1]** 84/22
**Official [3]** 2/7 119/3 119/13
**offline [1]** 73/3
**offtrack [1]** 83/11
**oh [5]** 29/24 30/2 43/25 52/4 75/16
**okay [34]** 4/22 9/7 10/8 14/19 20/7 21/1 31/1 31/7 36/19 39/12 43/25 45/12 47/4 47/13 49/10 51/4

**O**

okay... [18]  62/16 63/4 64/4 74/1
74/25 76/16 79/14 86/22 86/23
92/13 106/9 110/14 114/18 114/24
114/25 116/12 116/24 117/24
Omedetou [3]  29/2 29/18 73/14
omission [1]  29/10
one [58]  4/16 8/10 9/7 10/19 12/6
14/11 15/2 16/1 17/13 27/18 28/8
29/22 29/25 32/22 35/6 37/3 40/15
40/17 41/11 44/25 47/22 48/13
49/4 49/22 50/17 51/9 51/12 53/3
56/12 57/12 59/17 61/21 62/6
65/11 66/7 69/2 69/21 72/9 76/21
84/24 84/25 85/11 87/14 87/15
88/22 90/21 93/3 95/11 97/4 101/7
101/8 104/23 107/18 108/21 109/8
111/18 117/21 118/1
one's [4]  56/12 61/21 62/6 109/9
ones [2]  63/1 89/24
only [17]  7/4 23/20 23/25 24/1
24/20 37/11 41/13 41/19 42/2 68/9
73/3 83/21 103/22 108/1 109/6
110/8 115/25
op [1]  107/16
open [3]  72/6 74/20 108/7
open-ended [1]  108/7
operandi [1]  59/7
operated [5]  12/7 23/6 75/15 76/3
106/1
operating [5]  30/2 30/8 40/18
76/18 105/20
operation [2]  105/19 111/20
operational [1]  107/19
operator [23]  30/20 49/18 50/3
68/12 90/17 91/3 92/19 92/20 93/4
94/10 95/5 95/21 95/23 95/24
98/20 98/25 100/4 100/8 100/20
101/8 101/13 106/25 111/16
operator's [3]  99/5 100/2 114/7
opine [4]  39/15 47/16 61/11 86/18
opining [3]  50/3 60/2 77/7
opinion [12]  33/23 35/20 39/16
41/14 48/20 48/24 67/12 68/13
70/11 76/17 90/4 90/7
opinions [2]  65/4 66/24
oranges [1]  59/25
order [2]  69/6 69/8
other [19]  13/22 35/10 37/18
42/17 50/5 51/13 52/7 58/23 69/7
69/8 81/6 82/2 94/20 94/22 99/25
103/10 104/23 107/20 114/19
otherwise [1]  107/15
ought [2]  39/23 39/24
our [18]  10/4 31/2 31/3 32/8
32/10 32/12 38/14 38/21 41/14
47/11 50/8 62/19 66/10 66/24
68/23 92/3 110/13 117/25
out [23]  31/19 34/1 34/11 37/6
44/10 46/1 52/11 53/25 56/11
64/21 66/23 68/2 69/7 70/20 71/14
76/20 77/12 84/25 93/8 98/22
105/2 112/11 115/15
outside [2]  27/19 52/23
outweighs [1]  76/10
over [19]  6/9 6/19 13/21 14/5
14/15 31/23 36/11 68/10 77/25
79/2 81/4 81/11 81/12 91/14 94/12
113/24 113/24 115/23 117/1
overall [1]  22/18
oversight [3]  81/21 81/24 81/25
overwhelming [1]  28/16
owes [1]  104/23
owing [1]  85/13
own [12]  41/1 41/6 41/21 41/22
51/23 97/3 97/10 106/24 107/1
111/9 111/9 111/10
owned [2]  90/20 93/19

**P**

p.m [2]  115/15 118/12

pace [1]  116/4
page [8]  1/23 34/9 37/20 43/20
53/9 53/17 92/17 113/8
page 60 [1]  37/20
paid [5]  85/9 85/11 85/14 85/19
112/4
paragraph [5]  42/16 45/12 51/8
51/9 56/20
paragraphs [1]  53/2
paralegal [1]  73/2
parlors [1]  57/10
part [12]  39/14 54/12 54/15 55/4
55/4 56/18 57/11 57/18 66/4 68/24
82/9 110/13
particular [10]  5/12 27/15 29/18
31/3 35/18 36/21 42/5 52/16 58/11
60/8
particularly [2]  36/2 77/5
parties' [1]  6/1
Pas [2]  20/12 25/10
pass [2]  114/8 114/25
past [3]  36/9 45/21 85/2
pattern [4]  43/20 45/16 52/2
65/18
patterns [22]  38/25 43/22 45/5
45/7 51/7 52/4 52/13 52/15 52/16
52/23 53/23 54/10 55/5 55/8 55/15
57/8 57/9 57/14 58/24 72/4 108/17
108/18
pause [5]  25/21 38/7 51/5 52/12
57/5
paused [1]  28/18
pay [1]  97/19
peak [2]  95/13 95/14
PEARLMAN [2]  1/18 4/8
peer [5]  30/3 30/3 30/15 30/15
85/6
PELKER [5]  1/13 3/4 3/5 4/8 9/3
Pennsylvania [1]  1/14
people [10]  48/8 48/17 61/20
71/22 73/8 82/23 98/5 105/4 108/3
110/19
percent [30]  38/12 92/23 92/23
92/24 92/24 92/25 93/1 93/2 93/2
93/3 93/3 93/7 93/8 93/10 93/11
94/19 94/20 96/16 96/20 96/21
96/22 100/6 100/9 100/9 101/7
101/11 101/13 101/19 101/22
102/10
percentage [4]  22/5 96/9 96/14
96/20
perfectly [2]  40/6 42/20
performed [1]  61/17
perhaps [7]  41/11 52/7 56/13
61/23 106/9 109/12 116/8
period [15]  30/9 68/11 94/12
101/5 101/5 101/5 101/6 101/18
101/20 101/21 101/22 102/11
104/13 106/25 107/7
periphery [1]  86/16
permissible [3]  64/1 66/13 76/14
permit [1]  61/19
person [2]  50/2 54/22
personal [10]  46/16 46/20 46/23
62/13 104/20 107/11 107/12 107/15
108/4 111/10
phenomenon [1]  98/3
Phillips [1]  26/18
phone [14]  28/5 50/6 50/22 52/9
54/2 55/21 55/22 61/22 62/7 91/8
109/2 111/3 116/10 117/7
phones [1]  117/12
phrase [1]  69/9
phrased [1]  55/20
phrasing [1]  25/22
pick [5]  91/8 107/23 109/2 114/10
116/10
piece [1]  40/16
pizza [5]  57/10 97/15 102/24
103/1 103/11
pizzas [3]  97/20 97/21 98/1
place [1]  81/13

placement [1]  61/2
Plaintiff [2]  1/4 1/13
playing [3]  43/4 43/6 43/11
please [5]  4/4 79/23 89/16 91/8
103/15
plenty [2]  116/17 116/19
PLLC [1]  2/3
podium [1]  4/4
point [30]  28/8 29/15 35/6 39/17
41/15 41/16 41/17 44/12 45/2
48/11 51/8 51/12 51/22 52/9 53/3
54/11 54/17 56/3 56/21 57/20 58/7
69/16 70/9 70/20 72/21 75/5
104/14 104/14 110/11 115/6
pointed [1]  66/23
points [5]  55/10 69/10 88/24 89/8
112/16
policy [3]  80/13 80/14 81/22
pornography [5]  5/8 5/9 6/18 8/15
24/21
portion [1]  107/6
possibilities [1]  102/8
possible [4]  96/23 96/24 98/8
101/18
post [4]  49/16 108/21 110/20
110/21
posts [4]  29/2 71/22 73/15 73/25
potential [2]  70/6 98/25
potentially [1]  83/4
PowerPoint [1]  87/7
practice [4]  49/1 61/13 82/12
91/23
practiced [2]  80/24 91/25
practices [2]  91/12 111/1
precautions [1]  110/4
precedes [1]  66/11
precisely [1]  48/3
prejudice [1]  76/10
prejudicial [4]  40/3 42/9 42/9
44/7
prepaid [17]  50/6 50/22 51/2
51/18 51/23 52/9 52/20 54/2 55/21
55/22 55/23 61/22 62/7 110/9
111/3 111/6 114/17
prepare [1]  87/5
prepared [5]  87/7 87/25 97/3
97/10 113/15
presence [2]  38/24 43/19
present [4]  4/11 69/25 118/1
118/4
presentation [2]  28/3 31/14
presenting [1]  69/18
Press [1]  85/6
pressing [1]  116/1
pretrial [11]  32/13 38/14 39/1
39/2 47/7 50/7 52/14 54/18 58/13
62/22 71/4
pretty [1]  111/20
prevent [1]  107/19
previous [1]  8/10
previously [8]  5/11 5/21 35/9
35/16 50/12 67/16 74/7 75/4
price [5]  19/18 71/17 95/13 96/10
104/15
prices [1]  96/11
Pricewaterhouse [1]  35/13
primarily [1]  44/21
primary [3]  40/16 40/17 90/22
principle [2]  44/19 45/20
principles [25]  32/10 32/13 32/17
32/17 32/21 33/22 33/22 33/23
34/13 34/13 34/15 34/25 35/14
37/9 40/24 43/23 44/11 44/13
44/23 45/24 46/8 54/24 61/12
89/11 89/13
principles is [1]  32/21
prior [2]  6/2 10/4
prison [1]  12/22
privacy [12]  38/25 43/21 46/17
46/21 46/23 49/22 64/13 64/16
104/20 107/11 107/12 107/15
private [7]  30/14 42/4 45/3 45/4

## P

**private... [3]** 64/18 83/4 116/11
**pro [1]** 85/16
**probably [5]** 32/1 67/10 67/16 85/19 95/1
**probative [4]** 40/4 42/10 44/8 76/10
**problem [12]** 35/9 38/11 41/25 45/3 49/8 52/6 59/20 71/7 73/4 75/8 77/4 78/7
**problematic [1]** 35/2
**problems [1]** 76/23
**proceed [4]** 11/11 32/6 79/24 88/16
**proceedings [3]** 1/7 66/10 119/5
**proceeds [5]** 29/3 50/1 68/25 95/3 95/8
**process [5]** 54/18 58/13 58/14 58/16 75/8
**produced [1]** 16/22
**professional [15]** 47/5 47/8 47/9 47/17 47/24 48/8 48/18 49/2 80/17 91/5 91/11 91/15 91/16 107/21 108/2
**professor [80]** 30/23 32/11 32/14 32/25 33/13 34/22 36/9 36/19 37/1 37/7 38/13 38/22 39/7 41/25 45/11 45/13 46/22 47/15 47/16 49/21 50/8 50/18 51/6 51/25 52/25 54/14 55/3 55/12 55/21 57/7 57/17 57/23 58/25 59/21 60/1 60/16 60/24 61/9 61/17 62/13 63/7 65/13 66/5 66/8 66/12 67/10 67/18 69/17 69/21 69/24 71/5 71/20 72/2 72/7 73/1 76/5 76/15 77/7 78/20 79/1 79/19 80/4 80/8 81/3 81/5 82/11 83/13 85/25 86/5 86/25 87/5 87/18 88/19 89/17 98/21 99/23 103/17 105/16 110/17 113/9
**proffer [2]** 68/8 72/8
**proffered [2]** 32/8 73/16
**profit [1]** 106/13
**profits [1]** 69/7
**promulgated [1]** 39/13
**proof [1]** 30/7
**proper [1]** 77/16
**protect [4]** 47/23 48/5 48/14 49/3
**protection [1]** 109/17
**provide [1]** 59/18
**provided [4]** 27/11 89/11 93/15 100/25
**public [5]** 80/13 83/20 83/22 104/25 105/1
**publications [6]** 57/11 57/13 57/13 57/18 84/19 84/23
**publicly [1]** 72/18
**publish [2]** 88/7 99/15
**published [15]** 10/10 17/15 34/22 37/1 84/19 84/21 85/1 85/4 85/5 88/9 94/4 98/21 99/19 103/16 113/17
**pull [7]** 5/1 5/18 7/1 9/17 9/22 51/3 53/25
**pulled [1]** 73/3
**pulling [4]** 6/19 7/17 8/19 10/19
**purchase [2]** 18/2 20/24
**purchased [2]** 104/16 104/16
**purchaser [1]** 111/5
**purchases [1]** 15/3
**purchasing [2]** 109/9 109/18
**purport [1]** 113/25
**purported [1]** 69/5
**purporting [5]** 32/15 59/21 61/11 72/3 72/5
**purpose [3]** 45/17 69/1 111/8
**purposes [6]** 40/2 48/8 86/22 94/14 108/4 109/16
**put [20]** 13/15 14/20 15/6 17/1 18/4 37/13 44/22 51/17 63/22 70/7 74/22 74/23 76/25 87/8 98/12 103/15 104/12 111/5 113/6 115/1

**puts [2]** 94/25 95/6
**putting [10]** 56/11 62/19 64/23 70/24 71/3 71/13 71/18 95/9 105/2 109/10
**puzzled [1]** 33/20

## Q

**qualifications [5]** 32/12 36/24 46/1 56/7 83/11
**qualified [4]** 59/6 59/10 60/20 87/1
**qualify [1]** 85/25
**qualifying [1]** 86/5
**quantified [1]** 46/22
**quantities [1]** 69/6
**question [28]** 19/20 31/24 33/11 35/13 36/18 38/1 43/4 43/8 44/10 44/20 45/22 48/7 50/15 54/9 56/1 60/6 60/10 61/10 62/10 77/4 91/15 103/3 103/5 103/9 103/12 103/22 104/5 108/7
**questioned [1]** 61/1
**questioning [3]** 18/9 60/24 61/8
**questions [12]** 11/5 24/13 24/14 25/22 26/23 27/22 31/11 60/18 76/24 104/3 106/11 115/5
**quick [4]** 77/19 77/24 77/25 87/20
**quickly [1]** 77/21
**quite [2]** 35/4 45/23
**quote [2]** 50/9 62/21
**quote/unquote [2]** 50/9 62/21

## R

**R-A-B-D-A-R-K [1]** 10/12
**Rabdark [1]** 10/12
**raise [3]** 4/18 69/14 115/19
**raised [1]** 57/16
**raises [2]** 60/3 77/4
**raising [2]** 56/22 60/12
**ran [2]** 28/17 28/20
**RANDOLPH [1]** 1/9
**range [2]** 92/23 93/8
**rate [1]** 85/10
**rates [1]** 36/3
**rather [5]** 31/12 56/11 79/5 95/16 104/3
**reached [1]** 90/14
**reaching [1]** 108/16
**Reactor [12]** 62/19 63/23 63/25 64/10 112/24 112/25 113/1 113/3 113/14 113/21 113/23 114/3
**read [4]** 8/3 9/15 36/16 105/3
**readily [1]** 55/25
**ready [2]** 77/13 79/1
**real [1]** 66/9
**realities [1]** 85/13
**realized [1]** 7/8
**really [13]** 33/5 33/10 35/3 37/24 41/10 43/7 45/9 50/10 57/24 58/3 69/20 87/20 104/15
**reason [7]** 16/21 39/18 44/19 75/4 110/20 111/12 116/15
**reasonable [5]** 28/11 29/17 30/18 30/19 116/4
**reasons [8]** 35/9 47/20 47/22 48/13 65/17 74/16 104/23 107/18
**rebut [2]** 45/14 59/1
**rebuttal [15]** 37/12 44/22 50/10 50/11 50/16 52/3 52/18 62/21 63/4 71/12 71/15 74/9 74/13 74/14 74/15
**rebutting [1]** 45/5
**recall [12]** 14/9 14/13 21/4 23/4 25/3 34/6 34/7 48/19 59/8 100/6 102/3 113/3
**received [7]** 5/13 29/4 65/16 69/12 90/2 90/4 90/6
**receiving [1]** 37/4
**recently [1]** 74/12
**Recess [3]** 32/5 77/23 118/12
**recognize [7]** 15/15 16/13 16/15

87/22 98/14 98/22 113/9
**recognized [1]** 33/6
**recognizing [2]** 55/4 55/5
**recollection [1]** 46/24
**record [21]** 4/5 6/6 6/7 8/6 8/8 8/9 10/5 13/23 15/2 29/7 72/14 72/15 72/17 72/20 72/22 74/22 75/3 97/19 106/4 106/5 119/5
**records [10]** 5/12 5/15 7/18 9/11 9/17 16/16 27/10 35/15 96/1 104/14
**rectify [1]** 7/8
**redacted [1]** 6/3
**redactions [1]** 5/25
**redirect [3]** 3/5 26/24 27/1
**reference [15]** 16/19 17/12 20/24 32/12 32/21 47/9 48/12 89/9 97/6 99/25 105/7 106/14 110/11 110/17 110/25
**references [1]** 91/11
**referencing [2]** 111/2 112/1
**referring [1]** 60/23
**refined [1]** 66/22
**reflected [1]** 10/16
**reflecting [1]** 5/25
**reflects [1]** 71/20
**refrain [1]** 44/4
**regard [2]** 50/14 100/18
**regarding [1]** 53/9
**register [1]** 29/9
**registering [1]** 29/7
**registration [1]** 30/11
**regulation [1]** 80/14
**regulator [1]** 81/2
**reiterate [1]** 38/21
**relate [2]** 43/16 59/17
**related [8]** 24/22 36/4 47/17 83/14 83/18 96/2 98/10 105/12
**relating [5]** 31/16 52/15 61/18 61/19 67/23
**relation [10]** 19/18 19/18 25/17 49/8 50/21 97/12 105/20 109/22 110/18 112/11
**relationship [1]** 36/2
**relevance [1]** 22/7
**relevant [6]** 32/18 35/14 43/1 44/2 73/23 89/24
**reliable [1]** 89/3
**relied [1]** 61/17
**rely [5]** 24/14 43/14 44/12 44/14 73/19
**relying [2]** 63/1 89/3
**remain [1]** 116/3
**remains [1]** 94/15
**remember [3]** 63/23 84/22 100/7
**remembers [1]** 97/17
**remind [10]** 5/6 24/12 31/13 78/1 78/17 92/2 92/10 92/16 93/13 112/25
**remotely [1]** 47/25
**remove [1]** 70/8
**removed [4]** 31/25 63/5 70/5 70/5
**removing [1]** 70/19
**repeat [3]** 58/6 58/8 115/13
**replace [1]** 5/24
**report [6]** 29/21 47/1 94/11 94/13 95/21 107/14
**Reporter [4]** 2/6 2/7 119/3 119/13
**representation [2]** 16/22 99/11
**representations [1]** 72/6
**request [1]** 78/16
**requested [1]** 78/5
**require [4]** 39/24 74/11 91/5 111/20
**requirements [1]** 75/10
**requiring [2]** 109/24 110/1
**research [2]** 31/16 115/12
**Reserve [4]** 81/21 82/5 82/6 82/8
**reserved [1]** 69/24
**resignation [1]** 82/8
**respect [15]** 42/14 53/23 62/1 62/8 67/9 67/19 73/12 107/6 108/2

**R**

**respect...** **[6]**  114/14 114/15 114/20 114/21 114/22 116/9
**respects** **[1]**  47/22
**respond** **[2]**  28/15 32/23
**responding** **[1]**  51/16
**response** **[5]**  28/13 60/17 65/25 103/3 103/9
**responsibilities** **[1]**  47/17
**responsibility** **[8]**  47/6 47/9 47/10 47/24 49/2 107/22 108/2 108/4
**rest** **[3]**  46/14 78/4 94/7
**rests** **[1]**  28/1
**results** **[3]**  38/1 38/7 38/10
**retainer** **[2]**  85/12 85/12
**return** **[2]**  10/25 96/14
**returns** **[2]**  96/9 96/16
**revealed** **[1]**  114/22
**reverse** **[1]**  8/16
**review** **[32]**  5/12 21/9 21/12 21/14 21/17 21/23 22/1 22/4 23/22 24/7 25/16 25/20 26/7 26/10 26/13 26/16 26/19 26/22 27/4 27/10 27/15 45/14 66/12 79/6 85/6 101/24 110/18 112/10 116/21 116/25 117/5 117/13
**reviewed** **[19]**  5/15 6/13 11/3 13/9 15/5 23/19 23/25 24/7 24/20 25/23 26/1 27/20 47/1 63/8 89/17 96/2 107/14 108/17 112/13
**reviews** **[1]**  84/23
**Richmond** **[1]**  82/8
**right** **[64]**  4/9 4/20 4/24 4/24 6/1 7/10 9/8 11/6 12/22 14/5 14/15 14/16 16/14 18/25 20/2 20/11 20/16 26/24 27/23 28/2 28/13 30/17 31/10 31/20 32/4 32/6 34/10 38/20 39/2 40/21 41/18 42/14 44/21 45/13 46/12 49/14 50/13 50/14 53/17 54/17 57/6 59/4 61/7 62/24 63/18 65/4 65/10 65/23 70/18 71/10 73/11 75/12 75/20 76/1 77/12 77/24 79/14 79/17 88/9 106/17 110/14 111/18 117/19 118/11
**rights** **[1]**  74/23
**risk** **[1]**  32/19
**road** **[31]**  11/15 12/16 13/10 13/10 13/12 15/4 15/18 16/17 16/22 18/12 18/13 18/14 20/1 20/1 20/2 20/10 20/14 21/4 22/5 22/12 22/18 22/22 25/3 25/6 25/9 25/15 25/17 26/21 27/7 27/8 28/24
**Road's** **[1]**  22/15
**role** **[1]**  81/20
**ROMAN** **[4]**  1/6 4/3 4/11 11/19
**room** **[2]**  2/8 117/15
**Ross** **[2]**  12/19 13/2
**roughly** **[1]**  14/16
**round** **[2]**  14/18 14/19
**roundabout** **[2]**  34/1 34/12
**Rovensky** **[10]**  19/19 45/6 52/3 55/7 55/13 58/23 59/1 59/13 59/14 71/17
**row** **[3]**  8/3 9/15 10/16
**RoxiPal** **[2]**  21/22 21/23
**RPR** **[1]**  119/12
**rule** **[16]**  33/13 44/17 44/20 50/10 50/13 73/19 74/10 74/12 74/22 75/10 76/15 102/13 103/20 105/8 107/4 108/8
**ruled** **[1]**  59/3
**ruling** **[5]**  31/21 65/25 67/1 67/8 92/2
**rulings** **[6]**  45/9 67/10 92/3 92/11 92/12 109/14
**run** **[2]**  46/6 69/6
**running** **[3]**  28/16 105/25 106/3
**RX** **[1]**  21/25

**S**

**said** **[24]**  12/7 19/18 29/22 30/2 34/1 34/12 34/17 35/21 36/8 39/20 40/2 41/18 45/21 55/6 55/9 58/11 62/3 62/5 65/10 67/9 69/20 74/17 84/6 110/5
**sake** **[3]**  44/3 65/6 68/1
**sale** **[2]**  30/15 101/3
**Sally** **[1]**  13/18
**same** **[19]**  5/24 7/2 7/9 8/6 16/20 19/3 20/19 34/16 35/21 41/4 65/8 65/10 71/4 76/23 78/7 81/13 82/11 89/1 114/20
**sanctions** **[1]**  82/1
**Santell** **[13]**  3/3 5/4 6/5 7/12 9/11 11/9 15/15 16/13 17/20 19/25 20/10 22/22 27/3
**Sarah** **[3]**  33/8 36/4 41/2
**sat** **[4]**  91/24 92/2 109/11 109/14
**save** **[1]**  77/20
**saw** **[4]**  8/9 45/15 73/25 100/3
**say** **[29]**  25/22 34/2 34/15 36/20 37/23 42/3 43/25 47/1 49/1 49/25 54/22 54/25 56/15 58/10 66/17 71/7 71/17 74/8 77/1 86/18 90/22 92/5 95/18 95/25 103/18 104/4 109/12 111/22 112/21
**saying** **[21]**  29/24 34/1 34/12 35/6 39/13 39/15 41/5 45/3 45/11 45/15 52/4 56/3 58/1 68/4 73/19 75/25 77/7 107/12 107/13 108/3 110/1
**says** **[18]**  15/25 17/23 20/12 20/16 35/19 37/21 46/8 46/20 49/25 53/8 53/9 54/6 65/16 65/18 70/20 73/3 93/24 107/14
**scale** **[5]**  96/12 96/23 98/8 111/21 114/6
**Scalia** **[1]**  81/4
**Scholl** **[11]**  5/22 7/4 37/13 45/6 52/3 55/6 55/13 58/23 59/1 59/5 71/17
**Scholl's** **[5]**  36/2 59/9 99/10 100/3 101/3
**school** **[10]**  80/11 80/13 80/16 80/19 80/20 80/22 81/4 81/4 81/10 81/14
**scope** **[11]**  12/8 12/13 18/9 19/6 22/14 22/17 24/25 25/25 52/24 66/13 71/8
**screen** **[1]**  20/5
**scripts** **[1]**  30/4
**scroll** **[6]**  6/9 9/2 9/10 10/15 13/21 14/14
**scrolling** **[2]**  6/19 8/19
**seated** **[1]**  79/23
**sec** **[3]**  81/1 81/22 107/16
**second** **[5]**  9/7 16/2 25/22 32/9 88/23
**secret** **[1]**  91/21
**section** **[3]**  22/23 22/25 23/2
**securities** **[8]**  37/2 81/2 81/11 81/15 81/22 82/13 84/24 85/2
**security** **[3]**  12/22 48/1 107/19
**see** **[49]**  6/8 7/5 9/8 14/5 15/20 15/23 15/25 17/21 17/23 18/16 19/2 19/5 19/11 19/25 20/4 20/8 20/10 20/12 20/13 20/16 29/14 31/17 33/5 33/10 34/4 34/18 39/18 40/8 41/23 41/24 52/4 54/5 54/6 60/8 61/19 62/8 62/22 67/13 67/17 67/21 69/15 87/18 93/24 99/23 101/17 105/3 108/17 112/14 112/14
**seeing** **[3]**  53/15 64/16 65/4
**seeking** **[2]**  29/5 85/14
**seem** **[2]**  49/3 51/12
**seems** **[5]**  15/20 32/11 35/20 67/16 68/4
**seen** **[7]**  27/13 62/15 93/1 93/11 100/10 101/25 108/22
**sees** **[1]**  65/2
**seized** **[1]**  24/23

**self** **[2]**  61/21 62/6
**sells** **[2]**  100/4 100/8
**semester** **[1]**  81/10
**send** **[5]**  50/1 60/25 77/19 110/21 115/23
**sending** **[1]**  8/15
**senior** **[1]**  81/19
**sense** **[5]**  31/5 42/18 56/3 69/14 73/2
**sent** **[5]**  28/25 45/19 66/22 85/10 112/13
**sentence** **[1]**  12/21
**separate** **[1]**  10/7
**September** **[8]**  34/5 34/8 43/14 46/21 49/19 66/12 66/12 85/14
**September 15th** **[1]**  46/21
**September 18th** **[1]**  66/12
**September 8** **[1]**  66/12
**September 8th** **[3]**  34/5 34/8 49/19
**series** **[2]**  9/6 113/24
**served** **[3]**  80/20 81/11 81/19
**service** **[2]**  112/3 112/20
**Services** **[1]**  81/18
**serving** **[1]**  12/21
**set** **[1]**  89/10
**seven** **[1]**  65/17
**several** **[4]**  7/14 7/20 8/22 28/20
**sexual** **[1]**  11/2
**share** **[6]**  96/4 97/11 102/5 102/19 102/25 105/23
**she** **[13]**  29/21 29/21 29/22 29/23 41/2 41/3 64/11 93/14 93/16 93/18 94/2 102/2 113/18
**sheer** **[1]**  8/20
**SHERRY** **[3]**  2/6 119/3 119/12
**shifted** **[1]**  106/10
**Shine** **[1]**  26/12
**shoes** **[1]**  37/22
**Shoppe** **[1]**  26/6
**short** **[1]**  77/14
**should** **[36]**  4/15 7/3 17/3 19/14 24/14 24/14 31/23 32/22 33/13 39/4 41/3 44/16 58/25 64/6 64/7 67/16 68/1 68/12 69/21 69/24 69/25 69/25 73/22 76/22 77/11 78/13 78/25 79/9 90/24 92/3 92/12 93/5 102/16 108/10 116/19 117/2
**shouldn't** **[1]**  25/24
**show** **[11]**  38/9 39/25 51/1 52/14 54/24 58/15 64/5 72/22 73/7 73/8 113/25
**showed** **[6]**  20/23 20/25 25/13 25/13 110/8 113/24
**showing** **[4]**  5/11 64/4 69/7 109/16
**shown** **[12]**  5/16 6/6 6/20 7/12 7/18 7/23 8/20 8/23 9/20 9/23 10/11 10/20
**shows** **[16]**  18/3 29/6 30/8 39/25 69/22 69/23 95/4 95/5 96/9 96/19 96/22 98/8 108/22 111/17 113/22 113/23
**shred** **[1]**  30/7
**shut** **[3]**  11/15 23/15 25/6
**shuttling** **[1]**  118/7
**sic** **[2]**  97/18 101/21
**side** **[7]**  15/20 15/20 56/14 69/7 69/8 81/21 114/4
**sided** **[1]**  54/4
**significant** **[3]**  36/1 36/6 89/2
**significantly** **[2]**  42/9 96/12
**Silk** **[31]**  11/15 12/16 13/9 13/10 13/12 15/3 15/18 16/17 16/22 18/12 18/13 18/14 20/1 20/1 20/10 20/14 21/4 22/5 22/12 22/15 22/18 22/22 25/3 25/6 25/9 25/15 25/17 26/21 27/7 27/8 28/24
**similar** **[3]**  61/23 89/13 114/24
**simple** **[2]**  40/14 68/9
**simply** **[9]**  33/5 46/25 47/9 52/1 55/10 65/20 68/13 71/15 72/22
**since** **[5]**  81/5 82/11 85/14 96/11 101/8

**S**

single [3]  25/11 30/7 89/23
sit [3]  31/12 82/19 116/7
site [5]  5/8 8/15 8/16 29/8 52/17
sitting [2]  94/17 108/8
Skadden [1]  80/24
Slammer [4]  7/24 8/1 8/6 8/17
slide [89]  30/22 30/24 31/6 31/6
 32/9 34/19 34/19 37/2 37/19 43/12
 43/22 43/23 45/18 45/23 46/5
 46/15 46/16 46/18 49/15 49/15
 50/5 51/15 51/16 53/11 53/18 54/5
 59/17 63/6 65/16 65/22 65/24 66/4
 66/6 66/7 66/19 66/21 66/21 66/23
 67/6 68/2 70/22 71/15 74/1 75/2
 75/13 75/17 75/18 75/21 76/2
 76/23 77/11 77/15 86/17 87/24
 88/13 88/19 89/15 90/16 94/7
 95/11 95/20 96/5 96/7 96/8 96/9
 97/12 97/14 97/21 102/22 104/8
 104/8 104/9 104/9 104/10 104/11
 104/18 104/19 106/19 106/21
 107/11 107/22 108/14 108/15
 108/20 111/14 111/23 111/24
 112/24 113/6
slides [15]  31/24 32/8 32/11
 43/20 52/1 54/4 54/7 62/17 62/23
 64/12 64/12 65/15 76/21 87/7
 110/12
slimmed [2]  45/18 53/16
Slower [1]  19/1
small [1]  114/4
smaller [2]  106/2 111/7
smarter [1]  49/19
sneak [1]  91/11
so [128]
so what [1]  36/17
software [1]  84/16
sold [5]  22/22 22/24 23/1 100/20
 100/25
solid [1]  86/12
solve [1]  49/7
some [40]  8/14 8/17 13/12 14/25
 18/21 21/4 30/24 31/11 31/24 33/9
 38/8 41/2 41/16 47/21 48/10 48/22
 56/6 61/23 64/11 67/23 69/1 69/14
 71/5 71/19 74/4 74/4 74/17 79/10
 81/16 81/22 81/23 82/14 82/23
 83/3 92/11 92/11 101/17 112/5
 112/19 118/7
somebody [4]  49/21 54/20 55/24
 77/6
somehow [2]  41/7 71/16
someone [6]  74/17 78/6 85/22
 97/19 104/25 110/4
someone's [1]  29/5
something [17]  38/23 48/13 54/11
 55/5 61/25 67/14 69/4 69/5 72/19
 75/5 82/1 85/21 97/19 98/6 108/19
 110/22 116/11
somewhere [2]  14/15 61/24
sophisticated [1]  111/20
sorry [22]  13/17 15/10 16/11 20/3
 21/13 24/4 25/21 44/9 47/15 50/13
 55/19 62/2 72/12 75/16 75/22
 83/10 87/10 88/22 103/6 109/4
 113/21 118/9
sort [12]  25/24 34/11 38/2 42/25
 44/6 46/5 48/23 56/6 59/15 71/5
 71/19 114/13
sorts [1]  54/20
Sounds [1]  79/14
source [2]  97/1 97/4
sources [1]  97/4
south [5]  23/6 23/7 23/11 23/15
 102/3
speak [3]  72/3 72/10 72/11
speaking [2]  6/12 6/15
Special [6]  5/4 6/5 7/12 9/11
 27/3 118/3
specialization [1]  80/14

specializes [1]  80/23
specific [9]  6/15 16/19 29/13
 29/25 58/9 59/8 70/22 104/3 104/5
specifically [7]  54/6 55/9 59/3
 59/6 63/21 85/1 106/6
specifics [2]  6/12 63/24
spelling [1]  80/5
spending [1]  111/10
spends [1]  58/9
spent [1]  97/20
spoke [1]  20/20
spreadsheet [11]  9/2 15/15 16/13
 16/15 16/16 17/11 25/13 98/14
 98/22 99/12 99/24
spreadsheets [7]  23/19 23/25 24/8
 24/20 27/6 27/15 27/19
square [1]  19/25
stage [1]  61/3
stand [3]  84/7 84/17 85/21
standard [12]  32/9 32/18 33/21
 42/24 42/25 43/23 44/1 44/23
 45/23 46/8 61/12 91/23
standards [32]  33/1 33/4 33/7
 33/15 33/15 33/19 35/5 35/7 35/11
 35/18 35/25 36/19 38/16 39/14
 39/24 40/5 41/4 41/5 41/7 41/17
 41/24 42/15 42/22 43/15 43/16
 43/16 47/17 76/8 88/25 89/5 91/12
 100/1
stands [1]  83/22
Stanford [2]  81/10 81/11
start [11]  77/25 78/11 79/1 79/5
 79/9 91/1 92/18 97/23 98/1 116/23
 116/25
started [3]  14/4 23/8 23/13
starting [3]  4/5 34/9 37/20
starts [1]  108/8
state [2]  4/4 84/4
statement [3]  51/21 75/14 106/6
statements [1]  28/24
STATES [5]  1/1 1/3 1/10 4/3 16/23
statistical [1]  48/23
steer [3]  108/6 109/22 115/12
step [4]  30/12 32/3 44/18 98/10
stepping [1]  37/22
STERLINGOV [73]  1/6 4/3 4/11
 11/19 11/23 12/7 12/12 12/16 13/1
 13/4 13/7 13/11 14/25 15/18 21/7
 21/10 21/15 21/18 21/21 21/24
 22/2 23/23 24/17 24/22 24/23 25/8
 25/14 25/18 26/5 26/8 26/11 26/14
 26/17 26/20 28/12 29/17 30/1 30/5
 30/8 30/11 30/19 37/4 37/7 40/18
 41/13 51/22 63/14 64/17 65/16
 73/15 75/15 76/3 76/17 78/19
 79/12 90/2 90/20 93/19 95/22
 104/11 108/23 109/8 109/19 109/23
 110/6 110/8 110/11 112/8 113/2
 114/14 114/16 117/4 118/8
Sterlingov's [11]  15/3 18/13
 18/14 20/14 64/3 94/12 94/25 95/6
 96/2 101/25 113/14
Steven [1]  3/3
stick [2]  44/4 92/5
still [12]  30/24 33/20 35/16
 39/21 45/22 51/11 70/24 92/24
 94/17 116/17 116/21 117/20
stock [2]  81/2 96/22
stopped [3]  5/5 87/14 102/24
stopping [1]  95/4
straw [1]  111/5
Street [2]  1/16 2/3
stretch [1]  92/25
stricken [1]  102/14
strike [6]  78/5 93/22 100/13
 107/5 107/7 107/8
strikes [4]  52/10 56/13 61/23
 64/4
striking [1]  102/16
stripped [1]  53/21
studied [4]  22/15 48/7 56/5 56/15
study [4]  61/17 62/10 62/12 89/12

stuff [3]  61/24 63/25 106/12
styled [1]  66/16
subcommittee [1]  81/25
subject [2]  60/20 62/11
subjective [1]  40/23
submit [4]  44/2 55/11 58/17 58/25
submits [1]  76/14
submitted [2]  66/8 67/2
subparts [1]  9/6
substantially [2]  67/11 76/10
substituted [1]  6/2
substituting [1]  7/3
subtract [4]  94/22 94/24 94/25
 95/2
successful [1]  67/24
such [4]  28/24 29/4 50/10 62/12
sufficiency [2]  76/6 76/11
sufficient [9]  29/10 30/18 37/25
 56/22 66/2 74/8 75/6 86/21 89/3
suggest [3]  40/4 115/20 116/2
suggested [1]  68/18
suggests [1]  75/8
Suite [1]  1/17
sum [3]  57/15 68/11 106/20
summary [4]  84/21 113/13 113/15
 113/21
supervisor [1]  117/17
supervisors [1]  117/21
supplemental [4]  57/12 57/21
 66/18 67/15
support [4]  34/14 34/16 82/16
 83/7
supports [2]  34/15 82/20
suppose [1]  72/21
supposedly [1]  41/6
sure [23]  14/18 28/14 40/10 45/23
 54/1 60/13 62/4 64/13 67/7 68/5
 71/7 71/18 72/15 72/18 77/15
 77/16 80/6 80/19 91/3 92/18 98/19
 115/2 115/13
surprise [2]  75/6 75/9
sustained [11]  12/10 12/14 12/24
 22/19 24/25 93/21 100/13 102/14
 104/13 105/9 108/25
Sweden [3]  12/2 12/12 22/6
switched [1]  106/11
sworn [1]  79/21
Symbiosis [1]  21/8
system [1]  58/13

**T**

table [5]  2/11 4/7 4/12 5/16
 113/21
take [38]  14/19 18/4 21/1 31/11
 31/13 31/17 32/22 45/13 46/7
 51/14 52/11 53/24 63/3 64/21 68/2
 72/12 75/5 75/18 77/12 77/19
 77/22 90/13 94/6 94/23 94/24
 98/10 98/19 99/24 104/7 110/1
 110/4 113/6 115/4 115/9 115/16
 116/24 117/2 117/17
taken [8]  32/5 67/16 77/23 81/6
 83/19 93/12 109/17 118/12
takes [1]  83/2
taking [7]  8/14 56/11 57/3 61/4
 70/20 75/17 116/18
talk [22]  36/23 39/7 39/7 39/12
 39/25 40/1 43/17 43/18 45/24
 45/25 55/11 56/23 57/3 68/6 71/21
 72/14 72/17 74/19 79/6 79/10
 108/1 116/11
talked [4]  109/6 109/10 109/15
 110/3
talking [25]  19/3 32/11 34/2 35/5
 35/19 35/21 35/24 36/21 37/8
 39/24 41/10 43/24 45/1 47/18
 51/13 54/7 58/20 60/5 60/7 72/13
 75/24 104/20 107/25 108/9 109/22
talks [2]  51/10 70/10
taught [2]  81/10 81/14
tax [1]  82/2
teach [2]  61/1 81/10

**T**

teacher [1]  81/7
teaching [5]  81/13 81/14 81/17 82/10 82/11
teams [1]  27/11
technique [3]  71/19 71/24 73/10
techniques [1]  51/21
Tek [1]  21/19
tell [12]  16/20 22/5 36/8 36/18 36/19 38/13 42/24 44/13 44/17 62/25 72/24 116/6
telling [2]  37/23 43/15
ten [1]  116/18
tends [1]  102/11
tens [1]  98/6
tenure [1]  82/12
terms [13]  13/9 37/11 47/8 47/10 48/22 49/23 63/22 83/17 102/1 105/19 109/24 111/1 112/2
testified [13]  18/12 23/4 24/6 25/8 27/6 37/14 59/14 85/7 93/16 102/2 105/24 106/3 106/8
testifies [1]  35/18
testify [46]  27/4 32/15 33/14 33/17 36/9 36/10 36/11 38/3 38/7 38/23 39/13 40/12 42/21 43/1 44/18 46/25 47/20 49/8 49/21 52/6 52/15 53/9 54/24 55/10 56/10 58/15 58/24 60/7 60/20 60/22 61/21 62/1 62/6 62/8 65/14 66/5 72/5 73/22 76/5 76/6 76/7 76/16 87/1 105/11 109/7 110/10
testifying [16]  21/4 24/9 25/1 25/4 35/18 39/23 44/22 55/7 55/22 64/15 67/19 67/21 86/16 91/13 106/12 113/18
testimony [75]  5/6 12/9 13/11 18/10 19/17 22/9 25/25 27/4 27/10 27/16 29/20 35/1 35/4 36/2 36/4 36/14 36/16 37/12 37/17 38/22 40/8 40/10 40/13 42/1 42/3 43/16 44/4 45/6 45/8 45/15 50/10 50/11 51/7 51/17 52/19 52/19 55/9 58/5 59/1 59/3 59/9 59/18 60/10 60/13 61/19 62/22 64/2 64/11 66/9 66/13 71/9 71/16 74/2 74/3 74/5 74/6 74/13 78/20 79/6 85/9 86/13 87/6 87/25 88/3 89/20 89/24 89/24 93/15 105/16 105/21 106/22 113/3 114/13 114/18 115/17
than [16]  31/12 37/6 40/3 42/8 42/9 44/8 49/19 55/12 56/11 67/11 93/19 95/16 104/3 106/2 106/23 111/7
thank [18]  4/25 7/10 10/8 11/13 15/13 17/19 19/23 20/6 20/8 27/24 27/25 28/2 31/7 57/4 79/23 80/1 87/3 115/7
that [774]
That's [3]  6/25 11/18 11/24
their [14]  4/5 5/15 20/5 28/23 29/18 30/8 30/10 49/23 55/10 59/20 66/4 73/16 100/8 100/20
them [18]  15/20 39/3 39/9 55/7 61/5 69/20 72/6 72/21 77/18 92/19 92/20 104/23 112/16 115/22 117/11 117/13 117/17 117/18
themselves [1]  30/2
then [44]  7/6 17/20 19/21 35/8 35/19 37/2 44/8 46/7 47/3 49/25 54/22 54/24 57/11 57/17 58/13 58/14 61/5 62/11 63/2 65/2 65/17 70/8 70/9 70/20 75/23 76/2 77/19 79/6 80/24 81/13 82/11 83/17 84/12 92/23 98/5 101/19 106/21 107/21 110/25 111/14 114/19 114/25 115/4 116/25
theory [3]  61/2 61/12 61/13
there [123]
therefore [2]  73/20 95/8
these [35]  8/10 9/17 9/25 14/14 14/16 30/3 32/22 34/13 34/13 34/15 38/15 43/15 46/15 52/1 53/19 60/16 62/20 64/5 65/2 65/10 67/12 69/19 70/2 71/3 73/25 74/16 89/2 89/5 91/21 97/2 99/12 102/8 112/16 117/11 118/2
they [83]  5/17 19/19 20/4 22/9 23/18 28/22 29/19 29/25 30/2 30/3 30/5 30/6 30/7 30/9 30/11 30/13 30/13 34/15 36/8 36/10 38/8 39/4 39/4 40/9 42/4 42/15 42/19 44/14 45/15 49/23 50/3 50/16 50/18 51/14 51/18 51/19 51/21 54/22 55/9 59/19 61/4 64/5 64/5 66/16 68/20 72/15 72/17 72/20 73/9 73/9 73/10 73/10 73/13 73/20 83/2 89/1 97/20 100/5 100/9 100/21 100/23 100/25 100/25 101/1 101/1 101/2 101/6 101/7 101/8 101/9 101/14 101/14 104/25 104/25 105/6 111/17 113/23 113/24 116/6 116/7 117/4 117/11 118/8
thing [30]  7/2 28/8 29/8 34/16 35/21 35/23 41/11 42/6 49/23 50/11 50/17 54/3 59/17 64/16 65/8 69/2 71/25 76/23 77/9 91/5 91/24 94/8 94/14 95/11 103/10 109/6 109/11 109/15 114/19 114/20
things [20]  25/24 28/24 35/22 42/3 44/25 49/4 56/13 61/11 62/7 67/12 79/2 79/8 81/6 82/2 82/17 95/7 99/3 107/19 107/20 117/12
think [171]
thinking [4]  37/21 73/1 78/12 78/19
thinks [5]  38/10 39/9 44/7 65/1 65/2
third [1]  8/3
this [258]
those [52]  7/3 7/3 10/21 13/23 14/1 14/5 14/6 15/3 21/9 21/17 21/20 22/4 23/19 23/24 27/11 27/18 29/11 31/23 33/22 35/7 37/9 41/2 41/3 49/4 51/1 51/21 52/16 55/10 57/20 58/10 61/18 62/22 64/12 65/3 66/24 70/17 73/5 85/16 86/21 89/8 89/10 92/2 93/8 93/9 95/7 96/1 97/3 97/21 98/24 101/4 105/23 108/18
though [13]  16/13 29/8 29/8 31/14 45/22 64/14 83/6 92/25 93/9 95/1 95/10 112/2 116/3
thought [3]  46/24 47/19 108/1
thousand [2]  96/20 104/17
thousands [1]  98/7
three [5]  62/23 71/3 89/1 107/7 113/24
through [41]  5/13 7/4 9/6 30/12 31/4 31/6 31/22 38/9 39/3 39/8 44/3 45/13 51/11 54/18 58/10 67/9 67/12 68/10 69/6 73/18 76/21 86/17 87/20 90/10 90/13 90/25 91/24 92/3 92/16 92/22 94/6 97/24 97/25 99/24 100/17 109/11 109/14 110/6 110/12 114/3 117/10
throw [1]  86/14
Thursday [1]  78/16
time [34]  14/3 16/25 17/23 28/9 28/17 32/23 36/11 39/19 44/13 53/18 57/3 63/3 65/13 71/14 71/25 77/20 79/10 81/6 81/9 82/11 85/24 88/5 94/12 96/11 97/18 98/3 99/14 104/24 114/10 116/3 116/18 116/19 116/21 116/22
times [3]  78/12 81/7 93/3
title [1]  66/17
today [12]  78/2 78/18 78/21 79/1 85/9 87/6 87/25 88/3 97/22 97/23 98/2 109/7
together [1]  77/15
token [1]  82/21
told [3]  76/4 85/16 116/5

tomorrow [1]  78/5
too [3]  41/4 68/4 105/14
took [5]  28/21 81/3 81/9 81/16 94/1
tool [1]  90/22
tools [2]  90/8 90/21
top [4]  54/6 72/16 83/3 101/2
topic [2]  22/18 74/2
topics [9]  50/25 53/3 58/4 58/9 58/10 60/16 82/11 84/23 86/5
TOR [3]  2/2 2/3 4/10
total [4]  68/9 68/10 84/22 113/22
totality [1]  29/25
totally [1]  78/24
totals [2]  100/21 101/6
touches [1]  51/1
toy [1]  98/4
trace [5]  24/21 30/12 30/13 56/4 105/1
traceable [1]  104/24
traced [2]  82/25 82/25
traces [1]  30/3
tracing [9]  18/18 19/5 19/17 19/20 33/14 33/18 34/2 45/2 54/7
track [1]  79/13
trading [1]  98/6
tradition [1]  97/16
trained [7]  33/4 34/13 42/22 59/21 89/5 89/11 100/15
training [5]  33/22 39/8 54/15 54/21 56/2
trainings [2]  83/17 83/18
transaction [17]  14/4 14/6 14/24 15/22 17/21 18/1 18/23 18/25 19/2 19/3 19/7 19/9 20/19 20/22 22/12 25/11 25/13
transactional [1]  72/3
transactions [19]  13/23 14/1 14/14 14/16 15/17 15/19 18/12 18/13 18/15 22/5 22/10 22/15 22/18 52/8 69/19 82/25 93/1 93/11 108/17
transcript [2]  1/9 119/4
transcripts [1]  31/22
transferred [1]  98/7
transfers [3]  23/20 83/4 113/25
translate [1]  100/2
transparent [1]  83/6
Treasury [2]  81/24 82/2
treatise [1]  89/12
Trevor [1]  26/18
trial [10]  1/9 13/9 54/25 58/15 66/23 95/13 97/23 97/25 98/2 116/8
tried [1]  31/3
true [2]  61/5 119/4
try [5]  38/2 44/4 73/18 111/17 111/19
trying [15]  17/12 33/25 34/10 46/4 47/22 48/11 55/24 68/20 73/18 91/11 92/1 99/2 108/5 108/18 110/24
TUKOGB1 [1]  7/19
turning [3]  23/3 25/3 107/11
turns [1]  100/5
twice [1]  92/6
twilight [1]  61/25
two [24]  7/9 10/6 14/1 15/18 21/14 21/17 29/11 39/19 46/19 49/18 57/17 66/5 66/8 66/11 68/10 69/10 86/4 88/24 89/8 95/7 97/21 101/15 105/10 112/16
two-month [1]  68/10
Tyler [1]  21/11
type [6]  8/14 42/1 42/6 75/9 115/11 116/14
types [2]  44/11 60/8
typically [1]  62/9
typologies [1]  59/15
typology [1]  38/25

**U**

**Uh [3]** 15/24 17/25 25/5
**Uh-huh [3]** 15/24 17/25 25/5
**UK [1]** 21/19
**Ulbricht [3]** 12/19 12/21 13/2
**ultimate [2]** 76/16 82/5
**ultimately [1]** 77/3
**unaccounted [9]** 95/3 95/8 95/14 95/15 95/17 95/18 95/20 95/24 96/1
**uncertainty [1]** 37/25
**under [10]** 17/23 29/11 50/10 74/19 76/15 88/25 93/24 100/6 105/7 112/8
**undergrad [1]** 80/10
**underlying [2]** 19/2 27/7
**undermine [1]** 92/1
**underneath [1]** 112/20
**understand [21]** 21/13 33/2 33/10 35/1 40/7 41/10 41/22 42/1 45/2 53/8 54/17 55/3 57/25 67/3 69/9 92/21 107/18 112/3 112/9 113/1 113/13
**understanding [16]** 19/17 30/23 40/23 44/12 57/15 64/9 65/7 66/25 68/19 87/6 88/2 94/5 109/1 113/11 113/19 113/20
**understood [5]** 22/20 26/3 42/2 74/21 92/8
**undisclosed [2]** 38/22 74/3
**undue [1]** 76/10
**unexplained [3]** 38/24 43/19 90/18
**UNITED [5]** 1/1 1/3 1/10 4/2 16/22
**university [1]** 81/7
**unless [3]** 44/13 44/17 54/10
**unlikely [2]** 85/19 93/10
**unlocked [1]** 118/3
**unquote [2]** 50/9 62/21
**unredacted [2]** 5/22 6/13
**unsound [8]** 37/24 38/8 38/10 39/16 40/12 41/14 41/20 42/5
**unsuccessful [1]** 67/24
**until [5]** 11/22 18/20 31/17 35/17 115/17
**untraceable [1]** 83/5
**unusual [1]** 71/16
**up [49]** 5/1 5/4 5/18 6/19 7/1 7/17 8/19 9/17 9/22 10/7 10/19 13/15 14/20 15/6 18/4 24/11 35/17 36/10 37/6 38/15 39/10 40/9 40/9 42/19 42/19 50/6 51/3 54/25 57/15 58/15 64/5 67/16 69/7 77/6 87/8 91/8 96/11 97/24 98/12 103/15 106/15 106/19 106/20 107/23 109/2 113/6 114/10 115/5 116/10
**update [2]** 77/24 78/1
**updated [2]** 87/14 87/15
**upfront [1]** 85/12
**upload [1]** 5/9
**Uploading [1]** 8/14
**uploads [3]** 8/10 8/13 9/21
**upon [1]** 61/17
**us [8]** 1/20 14/17 31/5 73/13 77/19 81/18 94/6 101/15
**USAO [1]** 1/16
**use [14]** 47/21 48/1 48/8 48/13 48/18 55/20 83/5 101/12 104/21 104/21 104/22 107/18 108/2 111/4
**used [14]** 33/1 49/2 51/18 51/19 51/21 51/23 65/19 83/8 89/12 97/1 97/19 108/4 108/23 110/8
**useful [1]** 111/4
**user [13]** 6/10 7/13 7/13 7/17 8/6 8/20 8/21 8/23 9/22 9/25 10/12 20/12 30/4
**user's [2]** 6/16 7/20
**username [3]** 6/8 6/21 20/14
**users [6]** 5/9 5/12 5/15 8/17 11/1 11/2
**uses [1]** 86/9
**using [19]** 9/12 9/25 10/13 10/23

33/3 33/23 34/25 44/23 61/22 62/6 63/15 69/1 88/25 97/3 106/11 106/13 106/25 111/8 111/9

**V**

**V-E-R-R-E-T [1]** 80/7
**vague [1]** 29/19
**valuation [4]** 36/4 83/25 84/13 86/18
**valuations [1]** 36/5
**value [4]** 36/11 76/11 97/1 97/22
**valued [1]** 95/17
**vehemently [1]** 91/14
**vendor [1]** 26/21
**vendors [3]** 21/4 25/17 27/14
**venture [1]** 65/21
**Ventures [1]** 65/7
**verdict [1]** 28/9
**Verret [66]** 3/6 30/23 32/15 32/25 33/13 36/9 36/19 37/7 38/13 38/22 39/7 41/25 45/11 45/13 46/22 47/15 47/16 49/21 50/18 51/25 53/5 55/12 55/22 57/7 57/17 57/23 58/25 60/16 60/24 61/9 61/17 62/13 65/13 66/5 66/18 67/10 67/18 69/17 69/21 69/24 71/20 72/2 72/7 73/1 76/5 76/15 79/1 79/19 79/20 79/21 80/4 80/6 80/8 83/13 85/25 86/5 86/25 87/5 88/19 89/17 98/21 99/23 103/17 105/16 110/17 113/9
**Verret is [1]** 53/5
**Verret's [8]** 32/11 50/8 51/6 63/8 66/8 66/12 71/6 78/20
**versed [1]** 86/8
**version [5]** 5/22 6/13 17/11 65/23 65/24
**versions [1]** 7/9
**versus [5]** 4/3 94/10 96/21 96/21 101/3
**very [14]** 28/22 29/19 31/3 46/19 58/19 67/4 68/9 71/20 71/24 75/13 76/2 96/14 96/15 107/22
**vetting [1]** 66/9
**via [1]** 66/22
**Video [19]** 5/6 5/7 5/8 5/13 6/17 6/23 8/12 8/17 9/13 11/2 13/10 23/3 23/6 23/17 23/21 24/2 24/10 24/18 27/8
**videos [3]** 5/10 6/7 9/12
**view [6]** 39/9 52/1 64/10 65/1 73/19 92/24
**viewed [1]** 73/15
**violated [1]** 44/18
**violating [1]** 74/23
**Virginia [2]** 81/5 84/4
**virtually [2]** 67/11 78/8
**volume [2]** 68/15 106/23
**VPN [8]** 47/21 48/1 48/14 69/12 108/2 108/6 112/3 112/3
**VPNs [1]** 49/6
**vs [1]** 1/5

**W**

**W-A-L-L-A-C-E [1]** 80/7
**W-A-L-T-O-N-T-A-R-G-E-T [1]** 10/22
**wait [2]** 15/8 103/5
**waiting [1]** 4/16
**waive [1]** 66/10
**waiver [1]** 60/19
**walk [6]** 31/4 31/6 39/8 90/10 90/24 100/17
**Walker [1]** 10/3
**Wall [1]** 2/3
**WALLACE [2]** 79/21 80/6
**WaltonTarget [1]** 10/21
**want [40]** 28/15 29/12 32/23 40/12 42/3 45/10 45/13 45/25 48/13 49/20 52/5 52/22 55/1 56/23 57/2 58/12 67/22 68/6 71/17 74/21 77/15 78/14 78/17 79/2 79/3 83/5

85/21 85/22 98/10 98/22 103/13 104/4 104/4 111/22 114/10 114/12 114/13 115/23 116/2 116/20
**wanted [4]** 44/12 62/3 114/16 114/20
**wants [18]** 38/3 38/7 38/9 43/1 43/17 43/18 44/14 44/18 45/24 45/25 49/21 56/10 61/21 74/3 74/18 91/19 115/21 118/7
**was [194]**
**wash [1]** 69/4
**Washington [5]** 1/5 1/14 1/17 1/21 2/9
**wasn't [13]** 12/16 29/23 33/19 46/4 48/10 55/9 65/5 65/19 67/21 73/7 75/24 89/23 98/4
**way [21]** 10/5 13/21 13/22 18/22 27/18 31/16 34/1 34/12 42/19 48/20 49/3 56/6 58/12 59/15 85/21 94/16 100/14 100/24 109/13 110/12 117/14
**ways [4]** 52/7 52/7 60/3 60/4
**we [234]**
**we get [1]** 28/5
**We'd [1]** 115/22
**we'll [5]** 49/7 64/21 77/12 106/21 117/16
**wealth [1]** 96/12
**wear [2]** 82/14 82/15
**website [2]** 97/6 97/9
**Wednesday [1]** 78/7
**week [4]** 27/4 27/5 78/4 79/13
**weekend [2]** 5/5 31/23
**weeks [1]** 43/13
**welcome [24]** 5/6 5/7 5/8 5/13 6/17 6/23 8/12 8/17 9/13 11/2 13/10 23/3 23/6 23/17 23/21 24/2 24/9 24/18 27/8 38/14 39/8 56/24 77/10 79/3
**well [32]** 12/8 16/9 30/2 41/21 44/21 48/16 55/17 56/1 58/6 60/3 61/12 63/9 63/13 63/21 64/1 73/1 73/19 74/8 78/22 80/19 81/23 86/8 95/10 96/18 98/11 102/15 109/25 113/12 114/23 115/17 116/23 118/3
**went [23]** 12/2 23/17 23/20 24/1 31/22 36/16 39/3 41/18 45/8 73/2 73/10 80/10 80/11 81/7 81/9 81/17 82/10 86/17 92/22 92/23 104/14 110/6 114/3
**were [49]** 4/16 5/5 7/8 7/9 14/16 17/12 19/3 27/3 27/11 28/22 28/23 29/19 30/24 33/9 35/19 36/22 39/2 44/23 57/11 57/18 58/1 58/4 59/2 71/18 72/13 73/9 74/14 74/15 75/9 78/19 82/24 83/13 83/14 89/5 89/11 89/11 92/11 96/19 96/24 98/7 98/8 105/6 105/11 105/25 106/10 106/15 108/18 113/23 116/9
**weren't [1]** 39/4
**West [1]** 21/25
**Wharton [1]** 80/15
**what [229]**
**whatever [3]** 69/23 100/9 111/18
**whatnot [1]** 57/10
**whatsoever [3]** 73/14 73/24 109/20
**when [36]** 5/4 7/6 7/7 14/3 14/7 14/9 19/19 25/22 27/13 33/7 35/14 40/25 42/22 47/25 55/6 60/24 62/3 63/6 66/22 72/6 73/9 77/5 80/19 89/5 89/11 92/11 95/18 100/3 101/18 102/16 108/23 109/15 109/17 110/6 117/6 117/10
**where [36]** 7/3 8/10 8/16 14/25 17/23 20/16 23/7 28/23 30/1 30/9 30/12 37/21 38/6 40/6 43/24 48/4 51/9 52/14 56/21 58/8 63/10 64/2 70/20 71/10 71/22 76/24 80/10 80/11 81/9 81/17 93/3 98/6 104/15 105/4 105/6 110/23
**Whereupon [3]** 17/16 88/11 99/21
**whether [28]** 26/1 27/13 31/24

**W**

**whether... [25]**   32/15 34/11 35/11 35/11 35/13 37/25 41/16 48/16 48/17 48/19 54/9 56/1 56/5 56/15 56/16 60/7 67/19 67/24 76/17 78/13 90/1 90/4 108/18 114/16 114/22

**which [33]**   5/11 5/24 10/10 13/16 18/22 23/4 29/5 32/18 34/16 41/19 42/1 44/23 46/16 47/21 49/16 50/25 51/14 51/14 59/16 59/17 62/10 62/17 63/1 66/13 67/15 67/15 71/21 74/15 80/23 81/24 96/16 101/3 101/11

**while [12]**   5/4 31/12 50/5 80/20 81/12 82/4 82/16 83/13 83/14 113/17 115/1 115/20

**who [27]**   4/11 5/13 12/6 42/14 52/16 54/21 55/24 59/21 60/1 73/21 73/21 74/18 77/6 78/2 78/8 78/8 78/11 84/3 84/6 84/10 84/12 91/25 93/13 93/14 96/24 105/11 113/15

**whole [7]**   9/5 54/17 58/13 58/14 91/24 109/11 109/14

**whose [3]**   5/15 7/17 11/2

**why [26]**   19/20 31/17 38/10 39/9 45/18 47/20 48/7 49/7 65/19 66/2 68/18 90/10 90/14 102/9 104/19 104/19 107/11 107/16 107/21 108/15 110/19 110/25 111/2 112/1 112/16 115/10

**wide [1]**   33/6

**will [44]**   18/19 19/21 24/12 31/13 31/13 31/17 32/4 33/7 38/20 44/2 44/4 44/4 44/8 46/3 58/8 59/8 59/17 61/23 62/1 67/24 68/7 70/23 75/3 76/9 78/14 85/16 85/19 85/23 88/2 91/1 92/2 99/3 100/13 101/17 103/21 106/17 108/6 108/6 109/22 110/10 115/4 116/5 117/6 117/20

**willing [1]**   85/20

**withdraw [1]**   5/23

**withdrawal [6]**   15/25 17/24 18/3 20/22 20/23 20/25

**withdrawing [2]**   109/17 110/5

**withdrawn [1]**   52/17

**within [5]**   58/15 64/1 67/20 81/24 82/2

**without [7]**   6/12 6/15 45/16 99/25 110/11 110/17 111/1

**withstand [1]**   29/10

**witness [28]**   4/20 4/21 18/11 22/14 24/6 25/1 27/23 28/4 29/22 30/22 41/1 50/19 52/15 72/5 72/7 72/7 73/2 76/25 77/1 79/18 91/10 91/10 92/10 105/14 114/8 114/16 115/1 115/16

**witness' [3]**   12/9 18/9 22/11

**witnesses [6]**   3/2 29/18 37/12 45/15 58/24 105/10

**won't [3]**   35/17 49/8 85/14

**wonder [2]**   48/16 72/25

**word [4]**   16/18 16/18 107/16 110/5

**words [2]**   94/22 115/13

**work [14]**   11/22 11/25 27/7 37/10 48/2 78/22 82/14 82/18 83/14 85/14 85/15 88/25 92/7 113/2

**worked [6]**   58/13 81/17 81/17 81/22 81/23 81/25

**working [3]**   82/17 85/5 85/10

**world [2]**   75/4 105/3

**worry [1]**   49/5

**worse [1]**   107/20

**worth [8]**   23/20 37/8 38/23 40/25 43/18 78/12 97/22 98/1

**would [96]**   4/4 5/23 8/15 8/22 17/7 29/10 31/5 32/1 33/2 36/12 36/13 38/19 38/21 40/12 41/20 44/2 44/6 49/4 49/22 49/23 49/24 50/1 50/2 50/3 52/5 54/12 55/3

56/4 56/6 58/13 58/14 60/8 60/13 60/21 60/25 62/3 62/5 62/11 67/11 67/17 67/18 68/3 68/15 70/17 72/8 72/23 73/6 73/8 73/17 74/5 74/9 74/20 75/7 77/18 78/19 78/22 79/5 79/11 88/6 90/18 90/21 91/4 93/3 93/8 93/9 94/10 95/13 95/15 96/4 96/11 97/11 97/22 97/23 98/1 98/5 100/20 100/21 101/9 101/14 102/5 102/19 102/25 103/8 103/17 103/25 104/2 104/21 106/25 111/8 111/11 111/17 111/20 112/21 114/23 115/2 118/1

**wouldn't [4]**   50/2 55/12 58/21 73/7

**wrapping [1]**   106/19

**writing [1]**   86/10

**written [2]**   67/1 67/8

**wrong [2]**   42/14 82/4

**Y**

**yeah [11]**   14/7 20/2 20/18 28/6 53/24 61/15 63/20 85/23 90/24 108/5 117/1

**year [24]**   30/9 80/23 96/10 96/14 96/15 96/17 96/19 100/22 100/25 101/4 101/5 101/5 101/6 101/7 101/8 101/8 101/14 101/20 101/20 101/21 101/21 102/11 106/25 107/6

**years [17]**   11/17 11/19 28/21 100/22 100/22 100/22 101/1 101/1 101/2 101/9 101/10 101/10 101/15 101/15 101/16 107/7 113/24

**Yep [1]**   49/17

**yes [61]**   4/17 5/8 6/7 6/11 6/14 8/4 8/14 9/5 9/8 9/14 12/20 13/19 13/19 13/25 14/3 14/22 15/10 15/12 15/16 16/5 17/22 20/11 20/15 22/25 23/5 31/2 32/7 34/8 37/18 38/5 45/12 46/14 47/1 49/12 50/16 53/16 57/7 60/18 63/12 63/19 70/14 70/16 71/1 83/15 84/20 87/7 87/19 88/1 88/4 88/4 88/24 89/19 89/21 90/3 90/15 103/25 105/18 107/3 113/5 117/2 118/10

**yet [6]**   42/25 85/5 85/11 95/9 98/22 101/19

**yielded [1]**   100/5

**yields [2]**   93/4 95/23

**York [1]**   1/20

**you [431]**

**you reached [1]**   90/14

**you until [1]**   18/20

**you're [4]**   9/8 16/4 50/13 112/1

**your [166]**

**yourself [2]**   74/7 80/4

**yourselves [2]**   31/15 115/11

**Z**

**Zcash [11]**   82/19 82/20 82/20 82/21 82/22 82/22 83/2 83/6 83/7 83/9 86/9

**zero [4]**   24/17 25/14 25/18 25/23

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America,    ) Criminal Action
                           ) No. 21-cr-399
             Plaintiff,  )
                           ) JURY TRIAL
vs.                          )
                           ) Washington, DC
Roman Sterlingov,        ) March 4, 2024
                           ) Time:  1:45 p.m.
             Defendant.  )

---

TRANSCRIPT OF JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

---

A P P E A R A N C E S

For Plaintiff:    **Christopher Brown**
                     DOJ-USAO
                     601 D Street, NW, Suite 5.1527
                     Washington, DC  20530
                     Email:  Christopher.brown6@usdoj.gov
                     **Catherine Pelker**
                     US DOJ
                     950 Pennsylvania Avenue NW
                     Washington, DC  20530
                     Email:  Catherine.pelker@usdoj.gov
                     **Jeffrey Pearlman**
                     DOJ-CRM
                     1301 New York Avenue NW
                     Washington, DC  20005
                     Email:  Jeffrey.pearlman@usdoj.gov

For Defendant:    **Tor Ekeland**
                     **Michael Hassard**
                     Tor Ekeland Law PLLC
                     30 Wall Street, 8th Floor
                     Brooklyn, NY  10005
                     Email:  Tor@torekeland.com
                     Email:  Michael@torekeland.com

Court Reporter:   Janice E. Dickman, RMR, CRR, CRC
                     Email:  Janice_e_dickman@dcd.uscourts.gov

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURT:  Ready to get the jury?

MR. BROWN:  Yes, Your Honor.

THE COURT:  Okay.  Get the jury.

And the witness can come back to the witness box.

THE COURT:  We're just waiting on one juror.

(Whereupon, the jury returns to the courtroom.)

THE COURTROOM DEPUTY:  Jury is present.

You may be seated and come to order.

THE COURT:  Mr. Ekeland, you can continue.

MR. EKELAND:  Thank you, Your Honor.

Mr. Hassard, if we could get up into what is in evidence as Government's Exhibit Number 305.

THE COURTROOM DEPUTY:  Okay.

J.W. VERRET,

DIRECT EXAMINATION (Cont.)

BY MR. EKELAND:

Q.  And, Professor Verret, do you recognize this slide deck?

A.  I do.  This is the same exhibit we've been talking about.

Q.  And I would just like you to -- I'd just like to go through this slide deck with you, and if you could just tell us, as we go through slide by slide, your understanding of Ms. Glave's slide deck.

MR. EKELAND:  So, Mr. Hassard, if we could have the second slide in this deck.

MR. BROWN: Your Honor, could we get on the phone for a second?

(Bench conference:)

MR. BROWN: This is different than what I thought Mr. Ekeland was going to do, which was to cover certain additional material on Mr. Verret's slides. It looks like now he's going to sort of walk slide by slide through the government's accountant's slide deck, and I'm not sure -- I mean, if he's just commenting on this, this seems like undisclosed expert testimony.

The defense has had this for ages. Professor Verret could have prepared a pretrial disclosure rebutting this or addressing this and he hasn't, and Rule 16 is clear.

MR. EKELAND: Your Honor, I think we're perfectly entitled to have Professor Verret go through the slide deck that the government disclosed and simply tell us his understanding of the slide deck. And this just goes to his general conclusions. And we did disclose that he was going to testify in rebuttal and this should come as no surprise to the government.

THE COURT: I guess I'm still a little bit at a loss what he is doing.

Why is his understanding of the evidence relevant?

MR. EKELAND: Because the government objected to, I believe, the 2707 number for bit count and I believe that's in

the deck.  He's going to go through the analysis.  The current related Tor invoices are in this slide deck as well.

THE COURT:  That's fine.

The government's objection, as I understood and the reason I sustained it, was not that it referred to the 2707 figure.  I think the way the witness answered the question is he said that Ms. Glave's could be concluded that it basically was the sum total of Mr. Sterlingov's earnings.

Whereas, I think what it should -- that's not what she testified to and there's a difference between saying this is the total of everything that's out there that was earned versus saying this is what we could -- we were able to trace.

MR. EKELAND:  That's why I think it would be helpful if Professor Verret goes through the slide deck and shares with the jury his understanding of it, so they can understand how he's reaching his conclusion about Ms. Glave's report.

THE COURT:  I'll allow it, but I'll just have to police this as we go.  As I said, I don't think that what is relevant here is how he understands another witness's testimony.

To the extent that he can point to something that he relied upon in his testimony for purposes of forming his opinions, I think that's permissible.  But, you know, I don't think it's really relevant in the case as how he understood another witness -- what the witness -- that's a question for

the jury.

But to the extent that he's just drawing attention to the premises or information that he drew on, I think that's permissible.

MR. EKELAND: Thank you, Your Honor.

THE COURT: All right.

(Open court:)

BY MR. EKELAND:

Q. If you could just take us through the slide deck and just point out to the jury what information that you relied on or you used to arrive at your conclusions?

THE COURT: Is this up for the jury now?

THE JURORS: (Shake heads.)

BY MR. EKELAND:

Q. And if there's nothing on the particular slide, you can ask Mr. Hassard to move on to the next slide.

A. There is a list of accounts.

THE COURT: Is this up for the jury?

I don't see it on my screen.

THE JURORS: (Nod heads.)

THE COURT: It's not on my screen.

All right. It's up. Thank you.

All right.

THE COURTROOM DEPUTY: Jury has it?

THE JURORS: (Nod heads.)

THE COURT: Okay.

THE WITNESS: This is a list of accounts. The first one, Binance, is an exchange, as is Bitnex. BitPay accounts were associated with spending of Bitcoin. BitPay -- I don't know which ones were directly involved with BitPay or sometimes when you buy something with Bitcoin online, on the back end BitPay is associated. Either way, they're associated with spending Bitcoin. BTC-e is an exchange, as is Linux, Coinbase, the MAIN. Most of the funds involve these two Kraken accounts, one for Mr. Sterlingov, one for To the Moon.

Most of the Bitcoin was there -- or, for the early days in Mt. Gox and to some extent BTC-e and Bitstamp. LocalBitcoins was peer-to-peer website that helped to facilitate peer-to-peer transactions for people who wanted to find someone to interact with peer to peer -- who didn't have somebody to interact with peer to peer on their own. You didn't have to use local BitCoins to interact peer to peer.

Nordea was his personal personal bank account. As I understand Optical, PayPal, Prepaid Financial Services, and XMLGold were all prepaid accounts for spending Bitcoin.

BY MR. EKELAND:

Q. And are these all accounts that you reviewed information on the government's discovery?

A. That's correct.

Q. And what, if any, conclusions did you come to based on your

review of Mr. Sterlingov's accounts that are listed here?

A. Number one, that the prepaid or debit cards listed mostly toward the bottom, except for, to some extent, BitPay, the prepaid or debit cards listed here were done under his own name, for his own spending. That was one thing.

We've already talked about my perspective on the To the Moon account with Kracken, but this is my analysis of that account. In addition, I -- with respect to the Kraken accounts that receive funds from Bitcoin Fog, I believe I observed earlier that if you wanted to hide that from Kraken, you would not have sent it straight to Kraken, you would have unloaded that.

If you wanted to hide the post-Fog, transfer from a KYC account connected to you, you would have sent it to a non-KYC exchange or executed peer to peer some other way. You would not have executed on a KYC exchange and violated the rules that were laid out on the front page of the Bitcoin Fog website.

Q. Is there anything else you would like to share with the jury about your conclusions based on your review of the accounts on this slide?

MR. BROWN: Your Honor, this is just not a question, "Is there anything else you would like to share?"

THE COURT: Yeah. Sustained.

MR. EKELAND: Can we move on to the next slide?

THE WITNESS:  Sure.

MR. EKELAND:  Mr. Hassard, if we could go to the next slide.

BY MR. EKELAND:

Q.  Is there anything on this slide that you utilized in your review in coming to your conclusions that you did?

A.  At the bottom of the left, number 2707, is a number -- a number of adjustments that I understand Ms. Glave has used to put the number -- 2707 is the count of Bitcoin Mr. Sterlingov owned, according to her exhibit.

Q.  Is that -- that's the 2707 number that you used in your analysis?

A.  That's correct.

Q.  Is there anything else on this page that you used in coming to your conclusions?

A.  No.

Q.  So we can go to the next slide, if that's okay.

A.  Okay.

Q.  Looking at slide number 4, is there anything on slide number 4 that you utilized in coming to your conclusions?

A.  It showed some timing for activity that Mr. Sterlingov used to transfer from Fog to KYC accounts.  The -- a good deal of the amount here, I know in the Mt. Gox account, was lost in the Mt. Gox hack.

Otherwise, one can observe here, I observed from this

that this pattern of transfers would be consistent with moving Bitcoin to a KYC account to take advantage of the increase in Bitcoin price around 2013, 2014 to sell it.

Q. Is it okay if we move on to slide number 5?

A. Yes. Yes.

Q. And then what, if anything, did you rely on from slide number 5 in coming to your conclusions?

A. This is a slide consistent with the information in the last few slides, just presents it in graphic form.

Q. Can we move on to the next slide?

A. Yes. Slide number 6.

Q. And what, if anything, did you utilize from this slide in coming to your conclusions?

A. Same answer as the last slide.

Q. So can we move on to slide number 7?

A. Yes.

Q. What, if anything, in slide number 7 did you use to come to your conclusions?

A. This was something that supported Ms. Glave's effort to get to the 2707 number that I utilized in my slide.

Q. That 2707 number being the number of Bitcoin she concluded Mr. Sterlingov had?

A. That's correct.

Q. And can we move on to the next slide?

A. Yes.

MR. EKELAND: Could we get slide number 8, Mr. Hassard?

BY MR. EKELAND:

Q. And what, if anything, did you rely on in slide number 8 in reaching your conclusions?

A. There's a line called "Expenses."

Q. Where is that line?

A. On the left. A line naming it right where the cursor is, yes, "Expenses."

Q. Is that it (indicating)?

A. That's correct.

Q. So if you see subtotal on that?

A. That's right. The subtotal adds up either expenses using his bank outflows and his debit card associated with his bank or his Bitcoin spending using these KYC prepaid cards, they get to that subtotal at the bottom.

And when I observed earlier today that -- when I observed that, the Glave exhibit tells me Mr. Sterlingov never spent more than 50, 60,000 in a year. I think that was the word I used. Other than -- I don't know if I observed -- but other than a purchase of a Tesla, that I'm aware that he purchased. But other than that expenditure, when I observed that he didn't spend more than 50 or 60,000 in a year, I was referring to every subtotal there. And you see they go from 9, 44, 25, 59, and 66, 63, 57, 41, and 40 --

THE COURT REPORTER: Would you repeat that?

THE WITNESS: Sorry. I can start over. Nine -- in rough numbers -- the exact numbers are there -- roughly, 2011, 9,000; 2012, roughly 44,000; 2013, roughly 25,000; 2014, roughly 59,000; 2015, roughly 66,000, or rounded up to 67,000; 2016, round up to 63,000; 2017, 57,000, roughly; 2018, round up to 42,000; 2019, roughly 40,000; 2020, roughly 24,000; 2021, round up to 16,000; 2022, round up to 3,000, for a total expenditures tracked during that 12-year period of $450,000.

BY MR. EKELAND:

Q. And did you do your on independent calculations of Mr. Sterlingov's expenses?

A. No.

Q. You relied on this -- these calculations for your conclusions?

A. Correct.

Q. Can we move on to slide number 9?

A. Yes.

Q. And then what, if anything -- I think we looked at slide number 9 again, but can you just give the jury a reminder of what, if anything, you relied on in your analysis that's in slide number 9?

MR. BROWN: Object to the extent that this calls for testimony that's already been given before lunch.

THE COURT: Is there anything that's not repetitive

here?

BY MR. EKELAND:

Q. Professor Verret, is there anything you would like to add to your testimony regarding slide number 9 that you haven't already said?

A. We talked about it quite a bit. I don't remember whether I said this is consistent with the observation -- consistent with the pattern of sending prior client funds through a mixer to a new destination. I may or may not have said that. But in any event, I think we've covered this slide.

Q. So we can move on to slide number 10?

A. Correct.

Q. What, if anything, in slide number 10 did you rely on in your analysis?

A. This compares two invoices. They ended up having the same address. There were errors in the address. I know this was related to some testimony about an error in the invoice number. And I used that and my awareness that people, including myself, make mistakes in invoices to make the determination that I testified to this morning.

MR. BROWN: Objection. This is not at all close to what the testimony about these invoices was.

MR. EKELAND: He's merely making an observation about the errors in the invoices.

THE COURT: Why don't -- well, why don't you just

move on.

MR. EKELAND: I'm sorry, Your Honor. I just didn't hear you.

THE COURT: Why don't you move on.

MR. EKELAND: Moving on to slide number 11.

BY MR. EKELAND:

Q. What, if anything, did you rely on in slide number 11 in conducting your analysis?

A. The same observation as the last side.

Q. Moving on to slide number 12, please, Mr. Hassard.

What, if anything, did you rely on in your analysis in slide number 12?

A. The same as the last slide, and otherwise generally the same thing we talked about.

Q. Moving on to slide number 13. What, if anything, did you rely on in slide number 13 in your analysis?

A. This slide was helpful in my observation earlier that this invoice does not appear to be inflated in any way, such that it's meant to be a cover where legitimate revenue covers illicit funds. There does not appear to be that sort of invoice, to me.

MR. EKELAND: Mr. Hassard, if you could take down Government Exhibit 305, and then put up what is in evidence as Government Exhibit 325.

BY MR. EKELAND:

Q.   Professor Verret, do you recognize Government Exhibit 325?

A.   I do.

Q.   What do you recognize it as?

A.   As an exhibit and chart that Mr. Scholl used in his testimony about Fog operator earnings.

Q.   And did you review this exhibit in coming to your conclusions about the fees that the Bitcoin Fog administrator --

A.   I did and -- I did, as well as the deposits tab which has the underlying data about each transaction.

Q.   And is -- Bitcoin Fog didn't take dollars, did it?

A.   Correct.

         MR. BROWN:  Object to language.

BY MR. EKELAND:

Q.   Do you see the --

         THE COURT:  I've got to rule on the objection.

         MR. BROWN:  And/or calls for speculation.

         THE COURT:  I don't think there's a foundation, so I'll sustain the objection.

         MR. EKELAND:  I'm sorry.  I didn't hear you.

         THE COURT:  I don't think there's a foundation for it.  I'll sustain the objection.

BY MR. EKELAND:

Q.   Professor Verret, turning your attention to the upper left-hand conner where it says, "USD deposits," what's your

understanding of what that means?

A. I understand that to be an estimate of the value of Bitcoin total deposits as of the date of the deposit, the date it was sent to Fog.

Q. And what's your understanding of how that estimate was made?

A. I believe I heard Mr. Scholl testify that he pushed a button in the Chainalysis software that generated this value.

MR. BROWN: Object to mischaracterization of testimony.

THE COURT: The jury's recollection of the testimony will control.

BY MR. EKELAND:

Q. Do you know what times those valuations were made?

A. They were made using the Bitcoin price as of the day they were deposited to Fog, first deposited to Fog.

Q. And if, I believe, as you testified earlier, if somebody didn't exchange the Bitcoin for U.S. dollars as soon as it was received, the price could be -- the valuation could be significantly different?

A. Correct.

Q. Is there anything else on Government Exhibit 325 that you relied on in reaching your conclusions that you want to share with the jury?

A. Can you scroll down?

I'm sorry. Okay.

So as I described, at least most of this -- the last time we discussed it, I took the values of Bitcoin in this raw deposits, the quantity of Bitcoin at each time. Instead of using the price at the date it was deposited, I used the price a year later, two years later, three years later, et cetera. And in using that price, the data came from blockchain.com, which is a block explorer discussed previously, I think, in testimony. And I used the intraday low, just to make sure I wasn't inflating. I didn't use the high or the high of the day. I used the low of that day because it can be variable.

Q. You referred to the chart that you showed to the jury earlier with your calculations.

A. That goes into the hundreds of millions of dollars, that's correct.

MR. EKELAND: I pass the witness, Your Honor.

THE COURT: Okay. All right. Mr. Brown?

CROSS-EXAMINATION

BY MR. BROWN:

Q. Good afternoon, Professor Verret.

A. Good afternoon, Mr. Brown.

Q. Professor, I noticed you've been in the courtroom for several days during this trial, right?

A. Correct.

Q. And sometimes you sat in the gallery?

A. Yes.

Q. And sometimes you sat at the counsel table with the defense attorneys and the defendant, right?

A. Correct.

Q. How many times have you sat at counsel table during this trial?

A. I don't remember exactly. Two or three times.

Q. And are you allowed to do that because you're not testifying as a fact witness, but only as an expert witness?

A. I'm not an expert in the Rules of Evidence.

Q. Are you aware that fact witnesses generally have to be sequestered so they don't hear what other witnesses are saying in their testimony before they testify?

A. I -- again, I'm not an expert in the Rules of Evidence. I've heard you say that in this courtroom, but I'm not an expert in that question.

Q. You are a lawyer, though, aren't you?

A. That's correct.

Q. And remind the jury --

MR. EKELAND: Objection. Argumentative.

THE COURT: Overruled.

BY MR. BROWN:

Q. Remind the jury where you went to law school.

A. Harvard Law School.

Q. Have you ever helped the defense in responding to

government objections or government briefs in this case?

A.   As a consulting expert, I've provided them with information, useful, particularly in issues having to do with me.

Q.   Now, you're employed by an expert witness consulting firm called Veritas Financial Analytics, LLC, correct?

A.   That's the name of my LLC that I do expert witness consulting through.

Q.   And you sell your services as an expert witnesses, right?

A.   That's correct.

Q.   And one of the services you market yourself for is "Cryptocurrency forensics and valuation," is that correct?

A.   Correct.

Q.   And isn't today the first time that you've ever testified in a cryptocurrency case?

A.   It's the first time I've testified in a cryptocurrency case in court, yes.

Q.   And you have a faculty page at George Mason University, correct?

A.   Correct.

Q.   And you recently updated your faculty page, haven't you?

A.   Correct.

Q.   Your faculty bio now says, "Professor Verret was recently deemed a forensic expert in a $300 million federal money laundering case by Judge Moss in *U.S. v. Sterlingov,*" right?

A. That's right.

Q. Now, you serve on the board of the Zcash Foundation?

A. Correct.

Q. And Zcash is an alternative to cryptocurrency that markets itself as a way to allow users to obscure blockchain tracing, isn't that correct?

A. I think the marketing is more emphasis on privacy rather than obscuring from tracing, to maintain the privacy of your transactions. Our slogan is -- well, a different company that works in Zcash has the slogan "Privacy is normal." That is often repeated in the Zcash community.

Q. What is the main difference between Zcash and Bitcoin?

A. Zcash has the option to do shielded transactions on the Zcash auction, as I mentioned this morning, that are not traceable. And it also has the option to do transparent transactions that can be used to comply with exchange requirements, or something like that.

Q. So, does Zcash offer users the ability to obscure their transactions from blockchain analysis?

A. That's one of the effects of using Zcash shielded, yes.

Q. And you're familiar with the term CBDC, or central bank digital currency?

A. Sure.

Q. You have publicly described central bank digital currency as evil, isn't that true?

A.   That sounds like me.

Q.   And you have described financial surveillance as "Institutional evil," is that correct?

A.   Again, that sounds like me.

Q.   It sounds like you, but is that correct?

A.   I think that's probably correct, yes.  I don't remember exactly what you're talking about, but that sounds like me.

Q.   Did you issue a Tweet, maybe in 2002, where you said "Financial surveillance is the modern face of institutional evil"?

A.   Probably, yeah.  You said 2002.

Q.   Sorry.

A.   It would not have been in 2002.  But that's sounds like something I said.

Q.   If I said 2002, I misspoke.  2022, does that sound about right?

A.   It does.

Q.   And you're working on a book where the working title is *Hide Money Using Crypto*, correct?

A.   So, I -- as we've talked about previously at a hearing, I joked about that on a podcast.  You asked about the working title.  The book is in review -- peer review now with MIT Press.  The focus has become a little more academic than it was before.  It's not a retail book.

          The working title, since you asked, is *Crypto*

*Forensics and Privacy.* The book's thesis along with that title is *The Interplay Between Privacy and Forensics,* the challenges and the conflict between those two concepts. But, yes, I did mention that that would be maybe a title at some point in a podcast.

Q. You're aware that the U.S. Department of Justice has charged the creators of a service called Tornado Cash with money laundering, correct?

A. That's correct.

Q. And Tornado Cash is another kind of mixing service, isn't that correct?

A. On a different blockchain in a different way, but, yes.

Q. And you've described that prosecution as "A grave miscarriage of justice," didn't you?

A. Yes. And I've also participated in an amicus brief related to a designation of that service.

Q. Now, you testified on direct that you are charging a fee for your participation in this case?

A. That's -- contractually, yes. But I haven't been paid and I don't believe I'm likely to be paid, so I -- the answer is yes, simply. But that added a little background to the answer.

Q. At the outset of this case, you gave the defense team an engagement letter, correct?

A. Correct.

Q. And what was the hourly rate in that engagement letter?

A. I believe it was 450.

Q. Are you sure it was 450?

A. Yes. It was a discount from my usual rate.

Q. And you testified on direct that you've worked -- or, you've billed approximately 300 hours?

A. No, no. The -- the bill -- the invoice I sent was for about 110,000.

I believe what I said in my testimony was that since that time, that September invoice, I have told the defense team I won't bill for any more hours. And those free hours, the pro bono hours, amount to, I would guess, about 300 hours. But as they're pro bono, I'm not counting anymore.

Q. When you first started in this case, you had an understanding that the defendant had several hundred thousand dollars that been seized and frozen by the government, correct?

A. Correct.

Q. And when you first started this case, you had a conversation with defense counsel in which you conveyed the understanding that if there was an acquittal in this case, then you would get paid, correct?

A. It wasn't contingent on an acquittal, no.

Q. Is it your testimony here today that when you first started this case you had no understanding that you could stand to receive some of the defendant's seized funds?

A. I knew that it was possible, sure.

Q. When you say you knew that it was possible, what you mean was that you told them that if it ends up becoming the case that you don't get that money, then that's fine with you, correct?

A. My understanding has evolved as I've gotten into the case. I don't remember exactly what I said at the beginning.

Q. Would -- would something help refresh your memory?

A. Sure.

Q. If I could ask you -- I'm showing you the transcript of your pretrial *Daubert* testimony at page 134.

If I could have you read lines 13 through 21.

MR. EKELAND: Objection, Your Honor. This is for refreshing recollection.

THE COURT: Yes. Just to himself.

MR. BROWN: Yes. Apology.

BY MR. BROWN:

Q. If I could have you silently review what I've just circled as line 13 through 22.

Look up when you're done, please.

MR. EKELAND: And, Your Honor, does the government have a copy of this for the defense, or is this an exhibit somewhere?

THE COURT: Well, when the witness is done looking at it, if you would like to look at it as well.

MR. EKELAND: I would like to look at it. Thank you.

MR. BROWN: This is Professor Verret's June 19th, 2023, hearing transcript, which you should have.

(Pause.)

THE WITNESS: Okay.

MR. BROWN: (Hands transcript to defense counsel.)

BY MR. BROWN:

Q. Professor Verret, does that refresh your memory of what your original understanding was?

A. Sure.

Q. And what was your original understanding -- as you stand here today, what's your testimony that your original understanding was as to whether you stood to receive payment in this case?

A. That there was substantial uncertainty in whether I would be paid or not, but that after my review of -- the initial review of the evidence and the indictment and other materials, it was pretty obvious to me --

MR. BROWN: Object to the answer.

THE COURT: Yeah.

MR. BROWN: Nonresponsive.

THE COURT: I'll strike that testimony.

Just answer the question that he's putting to you with respect to what your understanding was with respect to whether you're going to be paid or not.

THE WITNESS: There was substantial uncertainty in

whether I would be paid or not.

BY MR. BROWN:

Q. And the source of that substantial uncertainty was whether or not the defendant is acquitted, isn't that correct?

A. No, I don't think that's correct.

Q. It's your testimony that the uncertainty about whether you get paid did not depend in any way on whether the defendant gets acquitted?

MR. EKELAND: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: I wasn't certain about what you're describing. I didn't know, if he was found guilty, whether his funds would be seized or not because I wasn't sure which of the counts he would be found guilty on.

I wasn't certain if the lawyers were going to raise money for the case. I wasn't certain if the lawyers were going to try to get money from BCJ, the court funding mechanism. I wasn't certain whether the frozen assets would be a part of that or not, or it would be part of the court funding mechanism for people with frozen assets, or whether it would be part of the funds that the lawyers were raising in the case that I understand they were trying to raise. I just wasn't sure any way around it. I thought it was a case -- well, I --

BY MR. BROWN:

Q. That's your testimony here today?

A. Yes.

Q. Professor Verret, I would like to ask you to read into the record your prior -- or, let's back up.

You testified on July 19th, 2023, correct?

A. Correct.

Q. And you were asked about whether you were getting paid in the case?

A. Correct. In what I just read, yes.

Q. And you were under oath on July 19th, 2023?

A. Correct.

Q. And you knew that it was important to testify truthfully on July 19th, 2023?

A. Yes, I believe it is.

MR. BROWN: Your Honor, at this time I would request Professor Verret to read into the record his testimony, transcript page 134, lines 13 through 221.

MR. EKELAND: Objection. Improper impeachment.

THE COURT: I am -- I don't have them in front of me.

Do you have a copy -- do you want to put it up on the Elmo so I can look at it?

If you want to pass it up to me, that's fine, too.

MR. BROWN: Your Honor, we're pulling it up.

I would like to ask the witness to read lines 13 through 21 on the screen there.

MR. EKELAND: Objection. Improper impeachment.

THE COURT: Give me a minute to read it, please.

(Pause.)

THE COURT: All right. What's the objection?

MR. EKELAND: Just improper impeachment. I don't understand what the --

THE COURT: Yeah, I think it's appropriate impeachment. And it's under oath, so I think it comes in as substantive evidence as well.

You may ask the witness.

BY MR. BROWN:

Q. Professor Verret, could you please read lines 13 through 21?

A. Sure.

"Secondly, I did not ask for a retainer in this case, although it's pretty unheard of for me to never have a retainer -- to not have a retainer before I began an expert matter. And in discussions with counsel, they've made clear when they described that the defendant's assets were frozen, they said, look, just to be clear, you might not get paid. And I told them very specifically that after reviewing the issues in this case, if this ends up becoming, because of all that, effectively, a pro bono matter, I'm comfortable with it.

"I haven't been paid" -- do you want me to keep going?

Q. No. Thank you.

MR. BROWN: Your Honor, the government -- we can excerpt this. And we move to admit this transcript cite as Government's Exhibit 915.

THE COURTROOM DEPUTY: I'm sorry. I didn't hear you. 9 --

MR. BROWN: 915, a new exhibit.

THE COURT: 915?

MR. BROWN: Yes, Your Honor.

THE COURT: Any other objection?

MR. EKELAND: No.

THE COURT: Exhibit 915 is admitted and may be published to the jury. Or, it's up to you if you want to publish it.

MR. BROWN: Your Honor, we do move to publish. Yes, please.

BY MR. BROWN:

Q. And, Professor Verret, if the defendant -- if the defendant's funds are released, you -- you stand to receive your $110,000 that you've invoiced in this case, isn't that correct?

A. That may be. In that subject there are a few qualifications, if I can --

Q. If you need to explain your answer, please go ahead.

A. First -- and this goes to what's here -- it's my experience if you don't get the money up front, you don't get the money no

matter what happens. That's why I ask for a retainer.

What I remember describing here is that the reason why I couldn't get a retainer up front is because of the frozen assets. I'm not sure that if he's found innocent, I will be paid because, frankly, it would cost me more than $100,000 to collect on a $100,000 invoice. That's just the way it works.

So the frozen assets is the reason why I wasn't able to ask for a retainer. I conveyed here that I moved forward without a retainer because of the things I said here about what I saw and what I understood.

I've also communicated with counsel about the $110,000 invoice. I think I conveyed, in my earlier questions, that I've told them, look, if he's returning to his life, I don't want that money to stand in the way of him getting back to a normal life, so I'm willing to negotiate it down.

Q. And that is a different understanding than what you had when you first started the case, isn't that correct?

A. Some of it changed and evolved, sure.

Q. And isn't it true that a contingent fee arrangement in a criminal case is generally considered unethical?

A. That's correct. And that's not what I did.

Q. Now, Professor Verret, in your work on this case did you prepare any notes?

A. Yes.

Q. And what notes have you prepared?

A.   So I have notes about my direct and notes that describe my -- am I allowed to mention notes of the forensic interviews?

Q.   Excepting what has been excluded from the scope of your testimony, did you prepare notes about the subject matter of your testimony here today?

A.   So excluding the notes of my interviews of the defendant --

Q.   Excuse me.

             MR. BROWN:  Objection, Your Honor.

             THE COURT:  Yeah.  So that answer is stricken.

             THE WITNESS:  Okay.

             Yes is the answer.

BY MR. BROWN:

Q.   The subject matter of your testimony here today, did you create any Excel spreadsheets?

A.   At some point, yes.  Probably in making calculations that went into the slides.

Q.   Sure.

      Did you use scrap paper to do any calculations or make notes about the subject matter of your testimony here today?

A.   I think those are all in the notes about my direct.

Q.   And I saw that you were working on your laptop computer during part of the trial.

      Did you create notes about the subject matter of your testimony here today while you've been sitting in court?

A.   Sure.  I think so, yeah.

Q. And what sort of notes -- what sort of documents did you create?

A. Documents in Google Drive.

Q. Did you trade emails with other experts on the case about the subject matter of your testimony here today?

A. Yes.

MR. BROWN: Your Honor, may we get on the phone, please?

(Bench conference:)

MR. BROWN: I move to strike the witness's testimony under both 26.2 and Rule 16. He's just testified that he created extensive notes, spreadsheets, other documents, emails with other experts about the subject matter of the testimony. None of that has been produced to the government.

MR. EKELAND: We did produce -- we'd do a *Jencks* production, but the government also hasn't moved the Court for *Jencks* production. It's my understanding that the rule requires the government to make a motion for *Jencks* materials before they start their cross, and I don't believe that's been done.

MR. BROWN: Your Honor, we have requested *Jencks* materials repeatedly from the defense, including today, and it is -- number one, it's not just *Jencks* materials. But, number two, it's -- number one, it's not just *Jencks* materials, it's Rule 16.

Number two, we repeatedly had to remind Mr. Ekeland today to produce *Jencks*. And they produced over lunch today a handful of emails, none of which fit the description of what Professor Verret just testified to today.

MR. EKELAND: We went through and reviewed our emails this morning when Mr. Brown mentioned it, and that's what we found. We're happy to go look for more material.

I don't -- you know, I'm not quite sure what Mr. Brown mean when he says there's extensive material, what he's referring to, but we're happy to produce it. And if they want to make Professor Verret subject to recall to cross on it. But I don't think there's anything there that hasn't been disclosed in the expert disclosures, in the slide decks, or anything. I don't think there's any hidden smoking gun here in terms of any kind of math.

And, again, they haven't made the motion to the Court before they started their cross.

MR. BROWN: Your Honor, again, under Rule 16 we have repeatedly asked this witness for -- we've asked the defense -- every one of our discovery letters asks the defense for reciprocal production. We have asked the defense about *Jencks*. We've asked the defense about their Rule 16 materials the witness just created. He created spreadsheets. He created notes. He did all these other things. He worked on his computer. None of this has been disclosed to the government.

MR. EKELAND: That is incorrect. We have disclosed to the government. We gave them disclosure. To the extent that stuff is privileged, we're not obligated to produce to the government. Again, they haven't made a *Jencks* motion before we began the cross-examination.

MR. BROWN: Your Honor, we didn't make a *Jencks* motion because defense represented they had produced *Jencks* to us before we started cross-examination. It wasn't until I had the question to -- questioned Mr. Verret about the scope of his documentary production that we actually discovered that there was additional *Jencks* and Rule 16 material.

MR. EKELAND: The material that Mr. Brown is referring to is -- was not when we went and did a review. It's not what was in, you know, my computers and my emails that I turned up. I'm happy to do more extensive review. And, again, if they want to recall Professor Verret to cross him, if there's something. But I don't think there's anything that's material in there.

MR. BROWN: Your Honor, we can't just sit here and have people testify and then be subject to recall. We're in week four of a four-week trial. Professor Verret is here today. The defense has had ample time. The defense has received our requests again and again and again for these materials, and they have ignored it.

MR. EKELAND: That's not true, Your Honor. And the

government has been less than fulsome in its *Jencks* disclosure and has been disclosing a lot of stuff at the last minute.

THE COURT:  Last minute is different than after the last minute though.

MR. EKELAND:  But there's no pending motion for disclosure of *Jencks*.

THE COURT:  Can you pull up the rule you're relying on that there has to be a motion for -- of *Jencks* after the direct and before the cross?

MR. EKELAND:  I would have to go look at the rule. If you give me a second.

MR. BROWN:  Your Honor --

THE COURT:  Mr. Brown, can you point me to what he's referring to?

MR. BROWN:  I think he's referring to 26.2, but I don't think the rule is actually structured in that way.  And for -- to the extent it matters -- there's no sort of time limit on --

THE COURT:  I'm going to let the jury take a break now, and we'll sort this out.

(Open court:)

THE COURT:  Members of the jury, rather than having to sit here while we sort this out, take a break.  Why don't we come back at 3:25.

Please don't discuss the case among yourselves or

conduct any research. And I'll see you back here at 3:25.

(Whereupon the jurors leave the courtroom.)

THE COURT: The witness needs a break as well. I ask you don't discuss your testimony with anybody until it's complete.

I'm looking at 26.2. It says: After a witness other than the defendant has testified, the Court, on motion of a party who did not call the witness, must order the attorney to produce it.

I do think you're right. I suspect that this is structured in a way that *Jencks* is usually structured. The government is not required to turn over *Jencks* until after the witness has testified. It doesn't mean the government can't turn it over beforehand or there can't be a request beforehand.

What I would suggest that we do is, Mr. Ekeland, as an officer of the court, I'm just going to direct that you, right now, if there's anything that hasn't been disclosed, that you show it to Mr. Brown right at this moment. And I expect it to be a complete disclosure.

And I see the witness is in the room now. Can I ask him to step out for a moment.

(Whereupon the witness leaves the courtroom.)

THE COURT: And, I mean, I expect it to be complete. And I'll allow Mr. Brown to examine the witness further about what notes exist. And if it turns out that it's not complete

at this point and the witness comes back and says there were other notes, the government can make a motion to strike it's testimony at this point.

You do need to speak up.

MR. EKELAND: I'm happy to go through what I have on, you know, my computers and servers. It's not clear to me whether or not I have all of the witness's --

THE COURT: Don't get into any discussion of his testimony, but I will simply allow you to ask the witness to describe to you any and all notes that he has that could be responsive under Rule 16 and Rule 26, but don't go into discussing how he should testify in any way with respect to that. I don't want him to tell you anything.

Only thing I want you to do is to ask him the question and say, you know: Describe for me in total any notes or materials that you have that you created. And you can describe to him what Rule 26 and Rule 16 require, but nothing further.

MR. EKELAND: Could I just have him send them to me and then I send it to the government?

THE COURT: Yeah.

MR. EKELAND: Maybe that's the solution. I get what they have and we'll look through our stuff and produce it, whatever we have.

THE COURT: That should have happened before now, but

that's where we are.

MR. EKELAND: I will go -- I'll go --

THE COURT: I think it's been obvious there's been more because I've been sitting here watching Professor Verret taking notes throughout the proceeding, and so --

MR. EKELAND: But I don't -- well, without knowing what those are, I'm not going to make any representations.

THE COURT: I tend to doubt -- in fact, he asked permission to be able to use his computer during the proceedings so that he could take notes during the proceedings. He's not writing emails to family and friends. He clearly was taking notes about his testimony in this case because that's what he asked permission to do of the Court.

MR. EKELAND: To the extent they're related to the subject matter of his testimony, he'll produce them. I'll go ask him right now.

We're back at 3:25, Your Honor? I'm going to talk to him right now.

THE COURT: You go talk to him and let me know. Why don't I come back in ten minutes, just to get a sense of what the scope of this is.

(Recess.)

THE COURT: All right. Where are we?

MR. BROWN: So, Your Honor, our proposal -- and I think the defense is in alignment with this -- is they are

gathering *Jencks* materials. They will send those to us soon. But in the meantime, the government proposes that we just continue with the cross now. We'll be able to review those *Jencks* materials overnight and, I think, if we can reserve our right to recall Professor Verret for further cross-examination -- we may not need to, but just reserve that right and then -- and deal with it that way.

THE COURT: So that's fine. Let's get the witness.

MR. EKELAND: He's down the hallway.

THE COURT: And get the jury.

(Whereupon the jurors enter the courtroom.)

THE COURTROOM DEPUTY: Jury is present. You may be seated and come to order.

THE COURT: All right.

And, Mr. Brown, you may continue.

BY MR. BROWN:

Q. Professor Verret, do you recall, during your direct testimony you testified that you reviewed a report by Chainalysis about mixing, is that right?

A. Yes.

Q. And I would like to direct your attention -- if we could pull up what has not been admitted into evidence, but Defense Exhibit 18.

THE COURTROOM DEPUTY: Defense Exhibit 18. Okay.

BY MR. BROWN:

Q. Now, Professor Verret, is this the Chainalysis mixer report that you were referencing?

A. I know that multiple ones make up this point or similar points. But this looks like it might have been the one I'm referencing, yes.

Q. Did you review another Chainalysis mixer report?

A. I reviewed their annual report on crypto crime, which has some related observations.

Q. And you testified on direct about -- that it was your contention that Chainalysis characterized most mixing as legitimate, right?

A. It's my understanding that most mixing is legitimate, and I think this is consistent with that idea.

Q. Is that based on this report?

A. In part, yes.

Q. And isn't this report -- this is not the original Chainalysis study, is it?

A. I'm sorry?

Q. Defense Exhibit 18 is not the original Chainalysis study, is it?

A. I --

Q. If we could scroll down.

A. I don't know that for a fact. I'm not familiar.

Q. If we could scroll down. If you could take some time to review this defense exhibit.

Are you familiar with this defense exhibit?

A. Sure.

Q. Is this the basis for your testimony about what Chainalysis says about mixing?

A. In part, yes.

Q. And this is not the study itself, but a *Bitcoin Magazine* write-up of a Chainalysis webinar, correct?

A. Yes.

Q. And have you watched the Chainalysis webinar?

A. I haven't seen the full webinar, no.

Q. And so you've never examined the underlying data for this Chainalysis webinar, have you, that's reported on in the *Bitcoin Magazine* report?

A. Not for that webinar, no.

Q. Nothing in this article talks about --

MR. EKELAND: Objection, Your Honor. This article is not in evidence, and we need to move it into evidence if we're having so much testimony about it.

MR. BROWN: Your Honor, the witness has testified as an expert. Experts can form their opinions on the basis of inadmissible materials. We are not seeking the admission of it, but we're trying to get a basis for his opinion.

THE COURT: That's fine. The objection is overruled.

BY MR. BROWN:

Q. Professor Verret, this article talks about indirect

transfers, correct?

A. I don't believe so, no.

Q. So somebody transfers funds from a darknet market to an intermediate address and then to a KYC account -- or, excuse me -- and then to a mixer, that would -- there's nothing in this article that says that transaction would be picked up as a transaction from -- or, to or from a mixer, correct?

A. No.

Q. And isn't it true -- you heard the testimony of FBI Staff Operations Specialist Luke Scholl, correct?

A. Yes.

Q. And do you recall him testifying about what percentage of funds coming into Bitcoin Fog were from darknet markets?

A. I don't remember the exact percentage he said.

Q. Now, you testified that you examined the Kraken To the Moon account records, is that correct?

A. Right.

Q. Now -- and you testified that you didn't see evidence --
let me see if I got it right.

You testified you didn't see evidence of an attempt to hide or camouflage illicit payments by hiding them with regular customer payments, correct?

A. Right, because I didn't see any corollary evidence of -- or, purported evidence of customer payments, in part.

Q. You didn't see any evidence of customer payments at all in

the Kraken To the Moon account?

A.   By "customers," I mean customers other than Mr. Sterlingov.

Q.   You didn't prepare any written work product on this analysis, did you?

A.   I provided my analysis in testimony.

Q.   But you didn't think you had to show your work to the jury, is that correct?

A.   I didn't think that was required because there were no cash flows from other customers to analyze.

Q.   I would like to pull up Government's Exhibit 418-H, as in hotel, which has previously been admitted.

And if we could expand the fields here.

Professor Verret, do you see Government Exhibit 418-H?

A.   I do.

Q.   And if I could ask this to be published to the jury.  Thank you.

So, Professor Verret, these are the account transaction records for the Kraken To the Moon account, is that correct?

A.   I -- I don't doubt you, but I don't memorize the exact transaction IDs.

I don't have any reason to believe that's not the case.

Q.   I'm curious.  When you look at the deposit transactions in this spreadsheet, how can you tell what kind of deposit that is?

A. They are -- there's nothing here that's consistent with attempting to show customer payments. And this is consistent with putting money into that account to use as an operating account for Kraken -- for To the Moon expenses.

Q. And so I would like to direct your attention to -- let's start out with lines 2 and 3.

Now, to begin with, do these deposits -- do these deposit transactions appear to be doubled up?

MR. EKELAND: Objection. Vague and ambiguous.

THE COURT: If the witness understands.

THE WITNESS: Yes, that's what they appear to be.

BY MR. BROWN:

Q. And so what -- what is the transaction shown in lines 2 and 3?

A. A deposit for .7 Bitcoin.

Q. And what's the date of that transaction?

A. March 10th, 2016.

Q. And then looking at lines 4 and 5, what sort of transaction is occurring here?

A. It looks like a trade.

Q. A trade of what for what?

A. Traded Bitcoin for euros.

Q. So in other words, he's selling his Bitcoin that he just deposited for euros?

A. Correct.

Q. And then looking at line 6 and 7, what sort of transaction is shown here?

A. A withdrawal of those euros.

Q. And isn't it true that if you look through this whole spreadsheet, that's the same pattern that you see again and again of deposit of Bitcoin, conversion to euros, and then just withdrawing those euros?

A. Correct.

Q. Now, you heard testimony from Larry Harmon, didn't you?

A. Yes.

Q. And you heard him testify about running a darknet -- mixer site called Helix, right?

A. I did.

Q. And you haven't done any sort of study of how Mr. Harmon paid himself his fees out of Helix, have you?

A. I have reviewed analysis contained in discovery, including notes taken and the indictment and the other court documents in that case.

Q. So you would agree with me, based on your review, that Mr. Harmon opened accounts at two cryptocurrency exchanges, Coinbase and Circle to help cash out his proceeds, wouldn't you?

A. I understand that he used KYC -- KYC exchange accounts to cash out proceeds, yes.

Q. And you would also agree with me that he testified that he

only sent small amounts to these two exchanges in the beginning. Isn't that correct?

A. I don't remember that exact testimony, but I understand he mentioned he had frictions with KYC exchanges.

Q. Now, you testified about this back-of-the-envelope calculation about the expected fee income for Bitcoin Fog, isn't that correct?

A. In the *Daubert* hearing, that's correct. Yes.

Q. And today, didn't you testify about expected fee income for Bitcoin Fog?

A. I wouldn't describe anything that I've provided today as a back-of-the-envelope calculation.

Q. Well, setting aside that characterization. You testified today about what you would calculate as the expected fee income for Bitcoin Fog?

A. Correct.

Q. And I would like to direct your attention to the Defense Exhibit 128 that you discussed during your direct testimony.

Now, Professor Verret, who created this exhibit?

A. So this exhibit was prepared by someone at a Bitcoin think tank called Laurent at my direction.

Q. So you did not create this exhibit, did you?

A. I did not create it. I spot-checked it for accuracy and it was created according to my direction.

Q. But you did testify on your direct about -- as if you had

created this and as if these were your calculations?

A. I said I didn't create it. I said this is what I relied on. And this is the design that I thought was best to value Bitcoin Fog's operator's earnings.

Q. And Mr. Laurent is a French citizen, correct?

A. I don't know where he's a citizen.

Q. And he's associated with Samourai Wallet, isn't that correct?

A. I understand that he works at a Bitcoin think tank associated with Samourai Wallet. That's correct.

Q. And Samourai Wallet is a service that -- it's a mixer-like service, isn't that correct?

A. It's a CoinJoin, but achieve the same -- a similar result, but without using a central custodian, is my understanding.

Q. Now, you testified about -- we can take this down.

You testified about Bitcoin Pizza Day, isn't that correct?

A. Correct.

Q. So let me ask you: If in the year 2010 you had paid 10,000 Bitcoin to buy two pizzas, how much Bitcoin would you have left today?

A. I'm sorry?

Q. If you -- in the year 2010, you had spent 10,000 Bitcoin to buy two pizzas, how much Bitcoin would you have left today?

A. It depends on how many I had to start with.

Q. Let's say you started out with 10,000 Bitcoin and you spent 10,000 Bitcoin in 2010 to buy two pizzas. How much Bitcoin would you have left?

A. It depends upon how much Bitcoin I bought after that transaction.

Q. But you would agree with me that you would not have any of that 10,000 Bitcoin left that you spent for the two pizzas, correct?

A. Correct.

Q. And how much -- how much pizza would you have left today, in the year 2024?

A. I would have eaten it.

Q. So in your analysis of how much the Bitcoin Fog administrator would have collected in terms of fees, you're assuming that to reach that, you know, north-of-billion-dollar figure, you're assuming that he never sold a single Bitcoin, isn't that correct?

A. To reach the ceiling of 1.5 Bitcoin. But I think I also testified that I don't rely on the ceiling. The ceiling is useful to understand the highest amount it could be. It's under -- it's useful to understand that it's unlikely that he held it for that long, but that's the ceiling.

I stand behind the 80 to 120 million, or potentially higher if you compare to Harmon's earnings of 200 million. I stand by that amount as the best estimate of what the Bitcoin

Fog operator earned.

Q. But the entire spreadsheet in Mr. Laurent's exhibit, Defense Exhibit 128, it spins anything from low end of about $3 million to high end of -- up in the billions, isn't that correct?

A. Well, the $3 million is the low end of Mr. Scholl's analysis. The median of Mr. Scholl's analysis was a little less than 8 million -- 7.7 million, I think -- which it still leaves a mystery, compared to the 1.7 million net worth of Mr. Sterlingov. But those replicate the Scholl analysis. They also offer a number of different options to use, and I picked one based on my best judgement.

Q. But the option that is realistic is not the, you know, north-of-billion-dollar option, correct?

You would agree?

A. I -- I do not believe that the operator of Bitcoin Fog earned 1.5 billion. That's the maximum they could have earned. I believe they sold it before then. But that's also why I don't believe that the operator of Fog would have held -- in other words, would have squirreled it away and it wouldn't be sold somewhere. I don't believe that's likely.

But it -- I'm rambling. Yes, is the answer to your question.

Q. And isn't it true that Mr. Sterlingov kept substantial assets outside of his KYC accounts?

MR. EKELAND: Objection. Your Honor, we're opening the door here, I think, if I understand the government's prior objections. But if -- you know...

MR. BROWN: Your Honor, my intent was not to open the door. My intent was -- Mr. Verret made certain characterizations of Ms. Glave's testimony and her analysis. Ms. Glave, herself, explored the limits of that analysis and I'm trying to explore the same limits with Mr. Verret. I'm not asking for any inadmissible evidence.

THE COURT: So long as it's based on the evidence that's been admitted, that's fine.

BY MR. BROWN:

Q. And Mr. -- and let me ask you this. I withdraw that question.

Mr. Verret, isn't it true that Mr. Sterlingov had a Mycelium wallet app on his phone when he was arrested?

A. Yes.

Q. And in that app he was carrying, at the time of his arrest, Bitcoin valued at more than $500,000 on his phone?

A. That's what I understand, yes.

Q. And wouldn't it be possible that Mr. Sterlingov had other Bitcoin wallets that were not on his phone, that he didn't travel with?

A. Yes.

Q. Wouldn't it be possible that he had a ledger or a Trezor in

cold storage in one of his prior residences?

A.   Yes.

Q.   And if we could pull up Exhibit 51, which has previously been admitted.

Professor Verret, are you familiar with Exhibit 51?

A.   Yes.

Q.   And this is a statement of Mr. Sterlingov's, quote/unquote, net worth that he prepared for a pretrial proceeding in this case, isn't that correct?

A.   Yes.

Q.   And looking at the first page of this here, isn't there an entry for gold in his mother's possession?

A.   There is, yes.

Q.   And then looking a little bit further down the page.

Isn't there an entry for an Eclair wallet, which is a Bitcoin wallet?

A.   Yes.

Q.   And that's not a KYC account, is it?

A.   I don't understand it to be.

Q.   And then there's also an Exhibit 4, Mr. Sterlingov's Mycelium wallet, isn't that correct?

A.   Correct.

Q.   And, in fact, Mr. Sterlingov values it at approximately half of what the actual worth was, which was 10 -- a little bit more than 10 Bitcoin, isn't that true?

A.  I don't know -- I don't know that fact.  I'm not aware of that fact.

Q.  And looking at the next page here, isn't it true that Mr. Sterlingov just had a category of "Various old crypto accounts," isn't that true?

A.  Yes.

Q.  And turning to Exhibit 305, which is Ms. Glave's analysis, Table 2, which is on page 2.

Isn't it true that Ms. Glave only looked at certain accounts that were at financial institutions that were either in Mr. Sterlingov's name or attributable to email addresses that he used?

A.  That's correct.

Q.  And isn't it true that Ms. Glave never said that this was a comprehensive list of all of the Bitcoin that Mr. Sterlingov has ever received?

A.  That's correct.

Q.  So I would like to direct your attention to Exhibit 702, which has been previously admitted into evidence.

MR. BROWN:  And I think we need to pull down the -- sorry, the public gallery because this shows private password information.

THE COURTROOM DEPUTY:  And share it to the jury?

MR. BROWN:  Yes.  Yes, please.

BY MR. BROWN:

Q. And, Mr. Verret -- Professor Verret, excuse me, isn't this a password file that was found on one of Mr. Sterlingov's electronic devices?

A. I know that that happened. I know that it's been said in court that that happened, but I don't know that this document is that.

Q. Professor Verret, scrolling down to line 46, please.

Isn't it true that under column A, line 46 refers to an account at Advcash?

A. I see that here.

Q. And Advcash is an online payment processer?

A. Okay.

Q. And looking down at line 49, isn't it true that this refers to an account that Mr. Sterlingov controlled at ANXBTC?

A. I see that listed here.

Q. Isn't it true that ANXBTC is another cryptocurrency exchange?

A. I'm not sure that he controlled it because I just -- I'm not sure that he controlled it.

Q. I'm sorry?

A. I'm sorry. I'm not sure that he solely controlled it.

Q. Professor Verret, can you see in columns B and C there appear to be -- there appears to be an email address and then a password for the ANXBTC account?

A. I do see that.

Q. Then scrolling down to line 68, isn't it true that under column A there's another account listed here for CentreGold, correct?

A. I see that here.

Q. Then scrolling down to line 88, isn't there an account indicated here for Goldmoney?

A. I see that here.

Q. And then scrolling down to line 120, isn't it true that there's an account here for Perfect Money?

A. I see that here.

Q. And Perfect Money is another online payment service, correct?

A. I'm not familiar with Perfect Money.

Q. So going back to Exhibit 305 on table 1. Isn't it true that the accounts that Ms. Glave examined are not even realistically close to capturing all of Mr. Sterlingov's financial accounts?

A. I find it highly unlikely that someone could have access to this kind of wealth in any of those accounts and not have it touch their personal life over a ten-year period. That would require an incredible amount of discipline. It's fairly limited in what you can actually spend Bitcoin on or gold on. And so I find it highly unlike that, in answer to your question, that a substantial amount of funds was in those accounts.

I don't know that other funds were not in those accounts. I don't know that, I haven't seen it, the evidence of that. But I find it highly unlikely that a substantial amount of funds was in that account.

Q. Professor Verret, if you could listen closely to my question, please. Isn't it true there are potentially a substantial number of other financial institution accounts that Mr. Sterlingov controlled, as exhibited from his password file, that are not included in Ms. Glave's table 1 accounts?

A. It's possible, yes.

Q. And if we could turn to the next page. You referred to the 2707 BTC figure, correct?

A. Correct.

Q. And that's the total inflows into those table 1 accounts of Bitcoin?

A. Correct.

Q. What about the outflows from those accounts? Doesn't this show that there are also -- there have also been substantial trades and other outflows from those accounts that Ms. Glave reviewed?

A. Correct.

Q. And are those trades selling Bitcoin for other assets?

A. Sometimes that occurs in the Kraken accounts and the other accounts.

Q. Well, isn't it true that Ms. Glave's analysis identified

more than 1700 Bitcoin worth of trades, selling Bitcoin for other assets, isn't that true?

A. That's listed here.

MR. BROWN: No further questions, subject to the discussion earlier.

THE COURT: Okay. Mr. Ekeland.

MR. EKELAND: Mr. Hassard, if we could get up what is not in evidence as Defendant's Exhibit Number 18.

And if we could scroll to the top.

Is that Defense Exhibit 18, Mr. Hassard?

And if we could -- are we at the top of it? Can you zoom out a little bit?

That is not it. Excuse us for a moment.

REDIRECT EXAMINATION

BY MR. EKELAND:

Q. And, Professor Verret, do you recall just testifying about this article just now?

A. Correct.

Q. And you reviewed this article in preparation for your testimony?

A. Correct.

Q. And is this the article that led to your belief that most mixers were used for privacy reasons?

A. In part.

Q. And is this an accurate and authentic depiction of that

article?

A. Yes.

MR. EKELAND: Your Honor, at this point in time, the defense would like to move what's been marked for identification as Defense Exhibit 18 into evidence.

MR. BROWN: Objection. Hearsay.

MR. EKELAND: Effect on listener. We're not saying that the statement is necessarily true.

MR. BROWN: Your Honor, I don't think that's what effect on listener means, so that --

MR. EKELAND: It's also a reputable -- it's from *Bitcoin Magazine*. It's a publication. It's what's led to his belief that privacy mixers are fundamentally used for privacy.

THE COURT: He can testify what he relied upon in forming his expert opinions, but otherwise it's hearsay. So -- but he can testify to what he relied upon, if there's portions of it you want to draw his attention to.

MR. BROWN: If it's what he relied upon for purposes of --

MR. EKELAND: Certainly.

BY MR. EKELAND:

Q. Do you see the chart there that Mr. Hassard has up? Did you rely on that in coming to your opinion?

A. Again, in part.

Q. What part of it did you rely on, if you could just explain

to the jury, if you relied on it?

A. You see a couple of things mentioned here. Darknet market is in green for use of mixers. You see stolen funds in brown, other mixing, mining pools, gambling, exchanges, sources of funds. The only ones that I would define as clearly illicit are darknet market, stolen funds. Gambling depends on the jurisdiction and the loss, so it's unclear.

Q. So what's your understanding -- based on this, what's your conclusion as to what rough percentage of funds going through mixers are illicit?

A. You take out darknet market and stolen funds, that's 8, 9, 10 -- 8.8 percent, and then what you're left with is 91.2 percent.

Q. What does that 91.2 percent number represent?

MR. BROWN: Your Honor, the witness is misstating the document here. That is not the correct math.

A. Sorry. Stolen funds, 8.1. I should have taken out my calculator. 10.8 percent is represented to be listed, and so that means 88.2 percent (sic).

MR. BROWN: Your Honor, the objection is he's testifying to hearsay.

THE COURT: I'm sorry. 88 .2 percent is what? I didn't hear the witness.

THE WITNESS: It's not clearly illicit.

THE COURT: It's not clearly illicit. Okay.

MR. EKELAND: Mr. Hassard, could you just scroll down through this article and, Professor Verret, if you see anything else in this article that you relied on in reaching your expert conclusion, could you tell Mr. Hassard to stop?

MR. BROWN: Your Honor, this is not a proper question. Is there anything else?

THE COURT: If you want to direct him to something in particular.

MR. EKELAND: Mr. -- Professor Verret -- well, Mr. Hassard, could you just scroll down a little more?

And if you could scroll back to the top.

And if you could scroll down just a little bit under the Chainalysis there.

BY MR. EKELAND:

Q. Do you see that first sentence there?

A. I do.

Q. Above that, is that -- did you rely on that in reaching your expert conclusion?

A. In part, yes.

THE COURT: I'm sorry. Before you do that, I need to understand -- you can get on the telephone here.

(Bench conference:)

THE COURT: It's not clear to me that this is Chainalysis that's saying that or some other person is writing an article about something they heard from Chainalysis. I'm

not sure what this is or whether it's a sort of statement that that -- a reputable expert would rely upon for purposes of forming an expert opinion.

MR. EKELAND:  As the government pointed out, this is a *Bitcoin Magazine* article, which is an industry standard, reporting on a webinar that Chainalysis did.

THE COURT:  Mr. Brown?

MR. BROWN:  Your Honor, it's my understanding that this magazine reporting, first of all, it's not, quote/unquote, industry reputable.  It is not accurately stating the underlying source data from Chainalysis.  This is essentially an editorial slant that is actually not a factually accurate representation of the underlying Chainalysis webinar, which the witness has testified he hasn't reviewed.

MR. EKELAND:  Well, the article, I believe, and the pie charts is reproducing the charts from the Chainalysis webinar.

THE COURT:  So I allowed that, but the question is, this is sort of commentary about whoever is writing the article.  If someone in the *Washington Post* writes an article saying, you know, I attended a scientific event and this is what they said at the scientific event today, if they were reproducing what's at the scientific event, that's the sort of thing I could imagine an expert would reasonably rely on.  I'm not sure an expert would reasonably rely on someone's report --

that I don't actually know anything about -- but someone's report as a characterization, really, of what they see.

So I think what's relevant here -- and I think you've already done this -- is the underlying data. And I know the Government's response to that is that it only reflects the direct transactions and not indirect transactions, but I think you brought that out already. And I think someone else's characterization of that, strikes me as beyond something that a reasonable expert would rely upon under those circumstance, like a backdoor way of trying to get into evidence some editorial comment by somebody who I have no idea whether they have any expertise or knowledge in this field.

MR. EKELAND: We'll move on, Your Honor.

(Open court:)

THE COURT: Objection is sustained.

BY MR. EKELAND:

Q. Do you recall, on cross just now, Mr. Brown asking you, I think, questions that was about To the Moon?

A. Yes.

Q. And he -- I think you testified that To the Moon had no customers?

A. That's my understanding.

Q. And then do you recall Mr. Brown showing you the spreadsheet with a number of transactions in them?

A. Sure.

Q. What, if any, is your understanding of those transactions and in relation to the To the Moon?

MR. BROWN: Object to the extent that this goes outside the parameters of Professor Verret's testimony as previously discussed.

MR. EKELAND: The cross-examination specifically brought up the spreadsheet, and in relation to To the Moon, and then was singling out certain transactions by line numbers. And I'm merely asking --

THE COURT: Well, I think it's fine. Why don't you focus on that. I think it's fine for you to focus on what was brought out on cross, but I'm not sure that opens the door to just more generally say what conclusions do you draw more generally. So he can focus on what came out on cross.

MR. EKELAND: Certainly, Your Honor.

BY MR. EKELAND:

Q. Professor Verret, do you recall, Mr. Brown asked you very specific questions about the spreadsheet and certain transactions in that spreadsheet?

A. Yes.

Q. What, if any, is your understanding of those specific transactions?

A. That looks very consistent to me, to -- Bitcoin goes into Kraken, sold for euros, euros sold for small expenses to get To the Moon VPN up and running. That's perfectly consistent with

that pattern.

Q. But you don't consider anything about those transactions to be unusual in any way?

A. I --

MR. BROWN: Objection.

THE COURT: I'm sorry. There's an objection.

MR. BROWN: Objection. Calls for speculation. And I think we are --

THE COURT: Yeah. I think it's leading, in any event, so I'll sustain the objection.

BY MR. EKELAND:

Q. And do you recall Mr. Brown asking you questions about Larry Harmon and the way that Larry Harmon used KYC accounts?

A. Yes.

Q. Is it your understanding that Mr. Harmon only used KYC accounts to launder his money?

A. That's not my understanding, no.

Q. What is your understanding of how Mr. Harmon laundered his money?

A. I recall an analysis -- or maybe it was just notes from a federal agent interviewing Mr. Harmon --

MR. BROWN: Objection. This -- this calls for testimony about hearsay and evidence that is not in the record here.

MR. EKELAND: I believe the government did put in the

statement of facts related to Mr. Harmon. I do believe Mr. Harmon --

THE COURT: Yeah. So if it's in the statement of facts, in that case that's fine.

MR. EKELAND: And I also, Your Honor, believe I cross-examined -- maybe I'm confusing Lichtenstein and Harmon right now.

I do believe I cross-examined on this point, but -- so, Professor Verret --

THE COURT: Yeah. I guess the question is -- I don't remember if -- whether he was in the room or not, and it -- whatever his recollection is he can testify about, and the jury can -- should rely on its recollection about what the testimony actually was.

MR. EKELAND: Certainly, Your Honor.

BY MR. EKELAND:

Q. Professor Verret, were you in the room when Mr. Harmon testified?

A. Yes.

Q. And did you review Mr. Harmon's statement of facts related -- statement of the offense that was entered into evidence?

A. Yes.

Q. And limiting yourself to what you remember of Mr. Harmon's testimony and the statement of offense of Mr. Harmon, what do

you recall in relation to Mr. Harmon that he did in order to money launder?

A. I believe -- generally speaking, I remember it was mentioned that he used non-KYC accounts --

THE COURT: I'm sorry. I apologize. Just for a second here. But I think Mr. Hassard has just put up a document which I'm not sure you had actually proposed that he put up. And I don't know if it's in front of the witness or not. So why don't you at least take that down for now.

MR. EKELAND: Yeah. Could you take that down, Mr. Hassard.

Thank you, Your Honor.

THE COURT: You're welcome.

BY MR. EKELAND:

Q. If you remember the question, please continue answering it.

A. I remember him -- I remember it mentioned that he used various schemes and non-KYC accounts to launder his funds.

Q. And did you -- in your review of Mr. -- the discovery related to Mr. Sterlingov, did you see Mr. Sterlingov engaged in the same kinds of activities as Mr. Harmon?

A. No.

Q. The -- you recall testifying about the Mycelium wallet that was found on -- on Mr. Sterlingov's phone?

A. Yes.

Q. Do you know when that valuation of $500,000 worth of

Bitcoin was done, at what date?

A. I'm not sure.

Q. And you can't KYC a Mycelium wallet, can you?

A. I don't --

THE COURT: This seems leading.

BY MR. EKELAND:

Q. Well, I -- what I'm wondering, did you hear Mr. Brown, I think, testifying about Eclair wallet and other accounts that were KYC?

MR. BROWN: Objection. I have not testified.

THE COURT: Yeah. Sustained.

MR. EKELAND: I'm sorry. I didn't hear the --

THE COURT: Yeah. I think -- I think you incorrectly said that Mr. Brown had testified, and he was just asking questions.

MR. EKELAND: That's fair. I apologize.

THE COURT: I think -- I think we should avoid that as well now and just ask questions.

BY MR. EKELAND:

Q. Can you KYC every type of wallet?

A. No.

Q. And you saw -- Mr. Brown asked you questions about Mr. Sterlingov's password list?

A. Correct.

Q. Have you reviewed that password list before?

A. I don't recall whether I've seen it or not, and I -- I don't recall whether it was -- I was permitted to view it.

Q. Do you know -- so you don't -- you wouldn't know what the dates range of all of those accounts are?

A. No.

Q. But to your knowledge, Ms. Glave had full access to that password list?

A. I -- I don't know.

Q. And -- but you -- did you see any of those accounts from that password list that Mr. Brown was asking you about anywhere in Ms. Glave's slide deck or report?

A. No.

Q. And are you aware of anywhere in the discovery that you've reviewed of any of those accounts having any funds?

A. No.

Q. Are you aware of any transaction records related to those accounts?

A. No.

Q. Do you have any reason to believe that Mr. Sterlingov, based on your review, is hiding substantial assets somewhere?

THE COURT: Sorry, the -- better pick up for a second here.

(Bench conference:)

THE COURT: So I don't know if this is getting into the jailhouse forensics issue or not.

MR. EKELAND: Maybe I inartfully phrased that. I'm not trying to go there. I think what I'm trying to get at is in reviewing the discovery, did you see anything that led you to believe that Mr. Sterlingov is hiding assets somewhere.

I'm not trying to get into the -- any kind of interview. That's not the intent I have.

THE COURT: All right. Mr. Brown?

MR. BROWN: Your Honor, this is just -- is such a general question, asking the witness to comment on essentially the sufficiency of the evidence. We think it's outside of the scope of 702 and will not be helpful to the jury.

MR. EKELAND: On cross Mr. Brown made the clear implication that Mr. Sterlingov could be hiding assets all over the place, and so this question is merely a response to that on redirect, asking, you know --

THE COURT: Well, what is -- I guess what I'm puzzling about is, what is the basis for that? And what would -- what would the basis be for the witness's expert testimony that he wasn't hiding assets elsewhere? Because, you know, by definition, if you're hiding something elsewhere, it may not show up. And so I don't -- I'm not quite sure how he would be able to testify in a way that wasn't misleading that there was no evidence that he was hiding assets elsewhere.

MR. EKELAND: Well, it's my understanding -- and maybe I should maybe lay down a little bit of the foundation,

if necessary -- that one of the things that financial forensics investigators do and certified fraud examiners do is they look for evidence of hidden assets.

And so I do think that's actually squarely in the area of his expertise.  And I'm merely, you know, asking -- wanted to ask one or two questions in that area based, you know, on his expertise as a certified, you know, forensic -- I mean, that's what forensic -- financial forensics means, is you're going in and you're examining the financial evidence and you're looking for clues as to what the financial reality is. And it's my understanding one aspect of that is that you're looking for evidence that the individual you're investigating is hiding assets, whatever that may be.

MR. BROWN:  Your Honor, number one, I think we are -- we're bumping back into the -- the *Daubert* issue that we discussed in the beginning of the day and throughout the day.

And, number two, this is just outside the scope of the cross-examination.  We have not objected to the defense going through the list of accounts that were referenced during cross-examination.  To the extent the witness has knowledge and can testify about that, we don't object to that.  But we do object to this sort of blanket calls for a conclusory statement about the sufficiency of the government's evidence, statement which is -- it is outside the scope of his expert testimony, it's beyond the scope of cross, and it's just not relevant and

it won't be helpful for the jury.

THE COURT: So I agree with that, in part at least. I mean, I do think that given the questions that Mr. Brown asked, it's permissible to follow up on those. But I do think that your question, which is the problem that I've had with a lot of your questioning, is there -- is there any evidence in this case that -- I just -- that's problematic because it is -- it is asking the person to step in the shoes of the jury. You've heard all the evidence in this case, you've examined piles and piles of evidence and, you know, what is your conclusion?

But if you want to direct him to particular exhibits and ask him whether it shows evidence of hidden assets or ask the question in a more narrow, focused way, I think that's appropriate.

My concern is just with the open-ended, you know, you're an expert, you're -- you trace forensics, is it your opinion that he has hidden assets? Is was there any evidence in the piles of evidence in the case that he's done so?

So I think as long as you focus it, it's okay. But just not the sort of open-ended, any -- is there any evidence of this.

MR. EKELAND: Yeah. I just want to ask you on the phone, so I don't, like, ask the wrong questions.

THE COURT: Okay.

EKELAND: I mean, can I just ask him if he's seen anything that's led him to believe that Mr. Sterlingov is hiding assets?

MR. BROWN: Your Honor, I think that's -- that's the thing, is the question -- that's the same issue or set of issues as Mr. Ekeland's original question. Like, that is not a specific question about a specific exhibit or financial account or whatnot that would be, you know, within the scope of anything.

THE COURT: Is there a way for you to focus this a little bit more?

MR. EKELAND: Yes, I can try. But I'm realizing one of the jurors just stood up and maybe -- I don't know if we need to stretch, a break.

THE COURT: He stood up, as well, because we're on the telephone.

If you can really -- really focus on it, I'll allow it. I just -- I do think the concern is just, that, you know, you've examined all the evidence in this case and do you see anything with respect to hidden assets? because I don't think that is disclosed, and I think it also runs into this problem that I have just with the notion of someone opining in the abstract that I just don't see any evidence, which puts someone in the shoes -- puts them in the shoes of the jury.

MR. EKELAND: Understood, Your Honor.

THE COURT:  Okay.

(Open court:)

MR. EKELAND:  Could I -- Mr. Hassard, could we get up what is in evidence as Government Exhibit 702.

And if we could go to line 46.

BY MR. EKELAND:

Q.  Professor Verret, do you recall Mr. Brown asking you questions about Advcash.com?

A.  I do.

Q.  Do you know what Advcash.com was?

A.  I'm not familiar with that service particularly, no.

Q.  Did -- in your review of the discovery, did you find any evidence of any substantial funds -- flow of funds through Advcash.com?

A.  No.

Q.  Turning your attention to line number 49.

And do you see the personal.ANXBTC?

A.  I do.

Q.  Do you know what that is?

A.  I'm not -- I didn't see that in the evidence.

Q.  And in your review of the evidence, did you see any substantial flow of funds through ANXBTC?

A.  No.

MR. BROWN:  Objection.

THE COURT:  I think the witness -- he testified that

he didn't see any evidence, I think.

Mr. Brown?

MR. BROWN: Could we get on the phone, please?

(Bench conference:)

MR. BROWN: Your Honor, this is a highly misleading line of cross and I think it will -- or, line of redirect, and I think it will require recross because the reason why the witness is not seeing flows of funds that he can characterize one way or the other in the discovery for these accounts is that these accounts were not in the discovery.

The way defense counsel is posing these questions implies a fact that is not only not in evidence, but it is contrary to the truth and it is highly misleading. It's like a missing witness argument.

And I think that -- we need to be extremely careful about this line of questioning, and I think that we're going to have to have a recross at this point.

THE COURT: Yeah, so -- okay. Mr. Ekeland?

MR. EKELAND: The government has the burden of proof, and here they are pointing to accounts and saying, "Look, there could have been a lot of money going through there." And I think that is highly misleading and that we are totally well within our rights to simply ask our financial forensics expert whether or not he saw anything related to any funds related to these accounts.

I don't think it's misleading. It is merely rebutting the government's assertion that somehow there is missing money, when they're the ones with the burden of proof.

THE COURT: So I think the right way for me to resolve this is to just allow the jury to exercise its judgment. And, Mr. Sterlingov, (sic) I will give you some rope on this. And I'll allow Mr. Brown to redirect for the reasons that he's given.

MR. EKELAND: Recross, Your Honor.

THE COURT: Recross. But the -- you know, and if you want to go back and sort of even re-ask the broader questions, you can. As long as there's going to be a recross, I'm open to that. My concern was if it was going to be misleading to the jury coming up, you know, for the first time on redirect of issues that weren't disclosed in the expert reports, haven't been explored or reported in the case, and just have the subject of a redirect, which I think was -- am I right that it was invited by Mr. Brown, but Mr. Brown's questions were invited by your questions? You were suggesting that Ms. Glave had found all of the assets.

And so I think he -- that opened the door to doing what he did, which then opened the door to what you're doing. And I think the best resolution is let's just let it -- wash it all out in front of the jury. You can ask your questions, and Mr. Brown can come back on recross.

MR. EKELAND: Just to make sure I understood the Court correctly, because I think the Court just said that if -- I can now ask slightly broader questions because there's going to be a recross?

Again, I just -- why I'm asking this on the phone, so I don't like -- so I could basically ask if he's seen evidence of, like, Mr. Sterlingov hiding substantial assets?

THE COURT: Yeah, as long as Mr. Brown can come back on his recross and draw out what the witness can and can't know and then what the basis is for that opinion, I think it's okay.

MR. EKELAND: Thank you, Your Honor.

MR. BROWN: Thank you, Your Honor.

(Open court:)

MR. EKELAND: If -- Mr. Hassard, if we could put up what's in evidence as Government Exhibit 702 again.

And if we could go to line 68.

BY MR. EKELAND:

Q. Do you recall Mr. Brown asking you a question about CentreGold?

A. I do.

Q. Do you know what CentreGold is?

A. I don't, in part because I've already seen one example where something was called "gold" but didn't have anything to do with gold in evidence.

Q. I'm sorry?

A. I don't know what it is because the label "gold" doesn't necessarily mean it is about gold, I know that.

Q. Understood. And are you aware of any -- anything in your review of the discovery that showed a substantial flow of funds going through CentreGold?

A. No.

Q. And in your review of the government's discovery, did anything lead you to the belief that Mr. Sterlingov was hiding substantial assets in some way?

A. No.

MR. EKELAND: I pass the witness, Your Honor.

THE COURT: All right. Mr. Brown.

RECROSS-EXAMINATION

BY MR. BROWN:

Q. Professor Verret, you were asked by defense counsel about Advcash and whether you found any -- anything in Advcash indicating intent to conceal assets. Is that fair to say?

A. Right. Yes.

Q. Isn't -- and you answered that in the negative, correct?

A. Correct.

Q. And the reason why you answered that in the negative is because there is nothing in the government's discovery about Advcash, correct?

A. I didn't see it in the discovery.

Q. And that's because Advcash doesn't respond to U.S. legal

process. It's based overseas, isn't that correct?

A. I don't know. I don't have knowledge of that. I believe it, if you tell me.

Q. And you were also asked about whether you saw anything in the discovery indicating a pattern of intent to conceal assets involving ANXBTC, correct?

A. Correct.

Q. And you answered that in the negative, correct?

A. Correct.

Q. And the reason why you didn't see any such transactional patterns is because there was nothing in the discovery about ANXBTC, correct?

A. I didn't see anything about it, no.

Q. And same question about CentreGold. There was nothing in the discovery about CentreGold, isn't that correct?

A. That's my knowledge, yes.

MR. BROWN: Now, if I could ask -- if we could call up Exhibit 710-A, please, on page 4.

This has been previously admitted.

MR. EKELAND: What Exhibit?

MR. BROWN: Exhibit 710-A, as in alpha.

THE COURTROOM DEPUTY: It's coming.

(Pause.)

THE COURTROOM DEPUTY: Can you unplug and plug back in, please?

BY MR. BROWN:

Q. And, Professor Verret, isn't Exhibit 710-A -- isn't this a reproduction of some of the defendant's notes that were found on his electronic devices?

A. They appear to be.

Q. And under "Apps to back up," do you see the first line beneath that?

A. Yes.

Q. And doesn't it say, "Protectimus" and then, in parentheses, "It's for access to the Advcash, important as F word," correct?

A. I see that.

MR. BROWN: No further questions.

THE COURT: Okay. Witness may be excused.

MR. EKELAND: Your Honor, isn't the witness subject to recall?

THE COURT: Yes, subject to recall. So you should stick around, in case you're needed.

THE WITNESS: Today?

THE COURT: I don't think it will be today.

MR. EKELAND: And also just -- he should be instructed not to talk about his --

THE COURT: Yeah. Don't talk to anyone about your testimony.

THE WITNESS: Return tomorrow at 9:00?

THE COURT: Return tomorrow at 9:00. Don't talk to

anybody.

All right.

(Bench conference:)

MR. EKELAND:  So, the defense requests that we adjourn for the day and then come back tomorrow because of some of the issues that we -- I don't know if "issues" is the right word.  For lack of a better word, some of the issues that we have with the discovery.  We haven't had an opportunity to speak in private with Mr. Fischbach after his review of the devices.

There is a question with one of the pieces of the evidence that the government brought in through Ms. Mazars that they say came from Mr. Sterlingov's leader.  The Court may recall --

THE COURT:  I notice the witness is listening in on all of our conversations.  He's been doing this throughout the trial.  I'm just not sure that's appropriate.

MR. EKELAND:  I'm sorry?

THE COURT:  The witness has been listening in on all of our conversations, as though he were your co-counsel, Mr. Fischbach.

MR. EKELAND:  Well, he's our expert.

THE COURT:  I know.  I understand.  But the experts don't usually participate in sidebars.

MR. EKELAND:  Do you want him to be off the phone?

THE COURT: He is off the phone now.

MR. EKELAND: Okay. Your Honor, I didn't see that. So, do you want us to keep him off the phone?

THE COURT: Yes.

MR. EKELAND: Okay. Not a problem, Your Honor.

So, essentially there's -- the Court may recall the -- what Ms. Mazars testified to as something coming from Mr. Sterlingov's, like, E-reader, with the beard, and he was saying the money laundering thing.

THE COURT: Can I just interrupt for a second here? Because I'm not sure we need to resolve this right now. We have another half an hour or so today. Actually, I think there has been plenty of time, frankly, to confer with them, Mr. Fischbach, about this.

I understood he wanted to get something to eat, and then when you all didn't show up, the deputy clerk is, Where are they? And they had left the building for lunch, rather than grabbing a sandwich downstairs. The break we took was probably about an-hour-and-a-half-or-so break. The time to eat a sandwich is not substantial. And, also, this could have been done well before today.

But I think what we ought to do is get started with the testimony. I suspect you won't need to get to this issue tonight. We can talk about it overnight. And you can talk to the government about it overnight and we can come back to it.

But, then you can at least get started.

MR. EKELAND: Your Honor, if I may explain the issue. The representation made by Ms. Mazars from the stand as to relation to where that piece of evidence came from on the devices we've discovered was incorrect. And we asked the government for that information, I think yesterday, after we discovered that, based on our analysis. We were told the correct location for where that evidence was this morning, and we asked to power up the device in order for us to confirm it.

And this is a substantial, material piece of evidence. This is the one where the government is claiming it's Mr. Sterlingov saying, oh, look, I'm money laundering. And what it looks, like, actually, is it's not him, and it didn't come from the source that Ms. Mazars testified from the stand that it did. And since we are unable to power up the device itself and look, what Mr. Fischbach has done is arranged to take the image from that device and put it up on another device tonight.

I need to review this and talk to him about this and the rest of his review. And if he takes the stand right now, he's going to be sequestered and I'm going to be unable to get the results from him of his forensic investigation, which I think -- well, I will have in the morning. And then I think if we just take the short break now, we can finish up the *Jencks* review. I can, you know, get confidence and talk to him about

the device review. We can take care of this.

I think, potentially major evidentiary issue that potentially involves a misrepresentation from the government's forensic investigator on the stand to a piece of evidence that is claiming -- the government is claiming to be Mr. Sterlingov saying, oh, ha, ha, I'm money laundering --

THE COURT: I understand. What -- I guess my only concern here is about the sequestering. What's the government's view on that?

Your phone is not working.

MS. PELKER: Your Honor, first of all, I think that defense counsel has just completely misstated what Ms. -- what CS Mazars' testimony was about this file, as well as well as where it was found. The defense has known that this was on the Boox tablet. They then asked for the particular file path and we provided that to them. They've had ample time to sort this out on their own. The exhibit was titled Boox Chat. There was no mystery about where this came from and defense has had since last week to be able to pull it up.

All that said, just to keep things moving, we're fine if Mr. -- at this point, if Mr. Fischbach wants to take the stand, start his testimony, and then defense wants to talk to him about this discrete issue after his testimony begins, overnight, that's fine.

THE COURT: Okay. So why don't we just do it that

way.  You can get started, and you can talk to him about this discrete issue overnight.

MR. EKELAND:  I would like to talk to him about this discrete issue and his review of the devices today, if that is okay.

THE COURT:  Ms. Pelker?

MS. PELKER:  That's fine, Your Honor.  We'd just like to move forward.

THE COURT:  Let's get going.  All right.

(Open court:)

THE COURT:  All right.  You can call your next witness.

MR. EKELAND:  The defense calls Jeff Fischbach.

JEFF FISCHBACH,
was called as a witness and, having been first duly sworn, was examined and testified as follows:

THE COURT:  You may proceed.

MR. EKELAND:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. EKELAND:

Q.  Mr. Fischbach, could you -- let me know when you're ready, Mr. Fischbach.

A.  Yeah.  If -- if I may, I prepared something for the court reporter, for any spellings.

THE COURT:  We can deal with that later.  Why don't

you -- why don't you -- I don't think we're going to get into that now, so why don't you just get going and we'll -- we'll deal with that later.

MR. EKELAND:  Certainly, Your Honor.

BY MR. EKELAND:

Q.  Mr. Fischbach, could you just introduce yourself to the jury, spelling your name.

A.  Yeah.  My name is Jeff Fischbach.  It's F-I-S-C-H-B-A-C-H.  Jeff, with a J.

I'm a forensic technologist, and sort of become by way of 28 years a trial consultant.

Q.  And could you explain to the jury what kind of work you do as a forensic technologist?

A.  Yeah.  Well, start off mostly looking at hard drives, and that was the -- that was the beginning, almost three decades ago; now it's everything.  It can be -- certainly lots and lots of cell phones, lots and lots of network devices.

The internet wasn't quite what it is today three decades ago.  But even washing machines now are keeping logs and, of course, video game machines.  And your car has a complete -- basically a black box, similar to an airplane.  Gosh, I even solved a case with a washing machine -- records from a watching machine.

So just about anything you can think of, I try to -- I try to get into and see if I can get information.

Q. Do you have experience with computer networks?

A. I do. Extensive, yes.

Q. Hard drives?

A. Hard drives, yep.

Q. Cell phones?

A. Absolutely.

Q. Social media?

A. Yeah. I'm not as popular as I would like to be, but yes.

Q. Do you have any certifications for your work or is it based on just your experience?

A. It's -- it's my experience. I'm trying to think. I have probably, here and there, gotten some certifications, just simply because they came by way of training. But nothing I've really particularly kept track of.

Q. And how long have you been doing this -- your work as a forensic technologist?

A. This will be my 28th year.

Q. And where are you based out of?

A. Out of Los Angeles.

Q. And did you -- what were you doing before you were a forensic technologist?

A. Let's see. Immediately before I was a forensic technologist, I was -- I was also doing consulting specifically with the internet. I was fortunate to have access to the internet through my father, who was a professor in the computer

science building at what apparently was the third node on the internet. So it had -- he didn't know what to do with it, but I had access to the internet, really, as a child.

So once I was in college, I was asked to help do some consulting for a large accounting firm. And it's a long story, but by way of that I fell into this and ended up in a criminal case helping to -- to solve that case. And the phone hasn't stopped ringing since.

Q. And -- excuse me -- do you have professional experience with domain names?

A. Yeah. Well, I -- my -- my first domain name registration was probably in the early '90s. But the current domain name that I have for my company, secondwave.com, was registered in 1996. So I've -- I've had hundreds and hundreds of domain names over the years.

Q. And you've -- you registered those domain names yourself?

A. Yes, always. I can't think of any reason to ask somebody else. It's a pretty easy process. Although, it wasn't in the early '90s. It was almost like computer programming to get a domain name.

Q. And are you familiar with web servers?

A. Very much so. I maintain three today. Again, probably something somebody else should do, but it's just relatively simple today.

Q. But you know how to set up a server?

A. Yeah. I've set up numerous servers. Early on in my career, before I knew I could actually make a living, that the phone would keep ringing, I did a lot of network consulting, just to make ends meet. So -- so I was doing it when it was actually fairly difficult and I've enjoyed it and done it in my own office since.

Q. And are you familiar with DNS?

A. Absolutely. It's required as a part of domain and -- and hosting.

Q. And could you just remind the jury again what DNS is?

A. Yeah. It's a domain name system, or server, depending on which way you're using it. Your -- your server will be a domain name server.

But basically it's -- it's sort of like -- and I think this would be nice -- it's almost like if you -- instead of memorizing a phone number to call somebody, they could just apply for, like, a really easy word, like their name, and it would just forward to their phone number.

So every website on the internet -- and actually everybody's home right now, and, in fact, my watch and my insulin pump and -- I don't know, I probably have four or five IP addresses live on me right now. Everything, basically, is using one of these, up to 12 digit numbers, with the decimal points for every three digits.

And, you know, while that's fine when the machines

are working with each other, from the standpoint of getting a web page, I think it was just determined very early on that it would be very difficult for anyone to remember a number like that in order to get to a web page. So the domain name system was set up where you could register for a name and then your DNS, your domain name server, is basically the forwarding system. It's how it gets to the IP address.

But in reality, every time you type in www.google.com it's going to a -- to a number resolving.

Q. Is that number, is that the same that you're talking about, that the DNS name goes to? Is that the same as the IP address?

A. That is the IP address, yes.

Q. And so are you familiar with IP addresses?

A. Very much so.

Q. And could you just remind the jury one more time what an IP address is?

A. IP stands for internet protocol.

And when I first got on the internet, there were no domain names. So I had a sheet of paper with the IP address for the MIT library so I could plagiarize reports for elementary school, which pretty much always got me caught.

So back then you just -- you kind of kept your own list and there were only -- gosh, there were just a few dozen websites anyway, so it wasn't a very long list.

Q. And are you familiar with Dynamic DNS?

A.   Yes.

Q.   And could you just briefly explain to the jury what Dynamic DNS is?

A.   So I mentioned that everybody -- everyone here has an IP address.  Everyone that's holding a phone, as long it's a smart phone, has at least one IP address.  If you have a watch, you'll have another one.

But what ends up happening is unless you have a web server, unless you're running something like Amazon or Google or something like that, there really isn't a need to have what's called a static IP address, where there's always an IP address.  But if you look it up, it's fairly easy to look up, you can find out what the IP address is for Google.  It's been the same thing for a very long time.  You could type in that number and you could go to Google.

At home, that's not necessary.  So what ends up happening at home is your internet service provider, which would be the ISP, is basically what they refer to as leasing, and I think it's more appropriate to say loaning you an IP address.

So they can change that address at any time, they can give it to your neighbors.  And you will have a period of time -- in fact, you can look it up on your computer, where it will tell you, roughly, how long you've been loaned that IP address.

The problem with that is if you do want to do something fairly advanced at home, like run a security system, or -- I mean, in my case, I have a remote control for the door to the chicken coop at home and -- yeah, we have a chicken coop -- I can feed the cats and I can watch a video feed and see the cats come to -- to run to get food.

More recently, companies have set up services that will take care of that. You get an app and you pay them every month. But you've been able to do that for a long time by visiting your IP address. But if your IP address changes, how do you know what it is while you're out of town and you want to check in our your cats or, you know, see your surveillance cameras?

So what a Dynamic DNS does is you put a piece of software or hardware on your network -- so it can just be a piece of software you run on your Windows and Mac machine, just something in your home. All Linksys devices actually have a place that you can set a Dynamic DNS in there.

And once you sign up with a Dynamic DNS -- usually free, but I prefer to pay for them because I want to know that it's going to be there when I need it, and it's relatively cheap -- what happens is your network, your computer, your Linksys, or however you use it, is basically pinging that service regularly and letting it know if your IP address has changed.

So it gives you the sense of being able to type in, you know, fischbach.dynamicdns.com and get to my home very easily, without having to call my wife and say, Would you please find out what our IP address is today?

Sorry for the long explanation, but --

Q.  And are you familiar with hosting?

A.  Yes.  Yes.  I -- I host my own site.

Q.  Can you just briefly explain for the jury what hosting is?

A.  Yeah.  Hosting, basically, unless you are a major company where you've got your own servers running, you will -- generally, if you want to make your own -- your own website, you want to start a business or do something like that, you'll go to a company that hosts.  And sometimes it's the same company where you get your domain name, so like GoDaddy -- sorry.  I'll slow down.

So, like GoDaddy will -- will allow you to get a domain name and allow you to pay for monthly hosting with them as well.  And it's basically just -- they've got very large servers that have -- typically you'll rent what's called a virtual server, so you're just sharing the same piece of equipment with everybody else.

In my case, we don't host physically on property anymore.  Once we moved -- prior to the pandemic, I closed up my office and just decided I like working at home.  I don't host out of my home.  I moved my servers into what's called a

co-location facility. So basically you could pay, also, GoDaddy or Amazon or other places just to hold onto your server and keep it running 24/7. That's the part I don't like doing, is making sure my server is running, so I pay somebody for that.

Q. And are you familiar with the Tor browser and the Tor network?

A. I am, yes. I've been using it for years.

Q. And could you just briefly explain to the jury again what that Tor browser and the Tor network is?

A. Yeah. So the -- The Onion Router was originally started by -- if I remember correctly, I think it was the Navy, U.S. Navy, and it's basically a system that -- it does -- well, I think we've heard people talk about hops today.

It is like a hopping system. What happens when you are running a Tor browser and you type in a domain name that you want to go to, even not a Tor domain name, but even if you just type in "Google," before it gets to Google what it will do is it will go to a Tor node, somebody that is volunteering, typically, to just run, pay -- like a repeater. It's kind of like a repeating system and it will do a number of hops before it comes out on the other side.

And it is a -- basically, it's a security mechanism because if you are just using Chrome, for example, and you go to visit my website, I am -- I promise I am not using it for

malicious purposes -- but I am collecting information on your computer. If you visit me through a Tor browser, I -- the only thing I get is the last node that you connected to.

Q. And then, how did you get started as a forensic technologist?

A. Well, it got me started. I was -- as I said -- a good friend of mine that went to -- went to school and became an accountant, he started working at a law -- at an accounting firm that the -- one of the lead partners in the firm, Grobstein, Horwath & Company, if I remember correctly, they -- he decided -- well, 30 years ago -- or, longer then I've been doing this, he decided that they wanted to get into the internet as an accounting firm, which I thought was really weird and made no sense to me.

But his vision was that eventually there would be -- and he didn't call it e-commerce, but eventually people would spend money and trade money and buy things and do things on the internet, which just wasn't even on anybody's radar at the time, and they would need accountants. So he wanted to show the world that -- early on that they were the first ones that understood that and knew that and could be experts. They even leased an entire extra floor of their building to be able to set that up.

Because my friend was the youngest working there at the time, they asked him, Do you know anybody who knows how to

do that? He said, I've got a friend who has been hacking since he was in elementary school, I'm sure he knows something. My name was given. I showed up and started working for them.

And long story short, they called me up one day and told me that one of their clients was being hacked and extorted online and could I go and take care of it? And I said that's not what I do, and they said, Well, you know, we know that you've done some hacking, at least as a -- as a minor. I'm sure you can at least help them out. And I showed up and literally just unplugged the internet and, next thing you know, the FBI is on my doorstep asking how I stopped the hack.

And I had contacted -- because there weren't that many people on the internet, I contacted a friend that I thought might be able to trace the hack, who ended up coming up with a name. And it turns out that it was somebody that had threatened the law firm before and the FBI ended up arresting him. And I am became friends with Agent Manny Hurtado, who was starting the first computer crime squad, as I understood. And I don't think they call it that anymore in Los Angeles. And I felt like I had the most interesting day I would ever have in my life and I would go back to my old job. But the phone never stopped ringing from that day.

Q. And then do you offer your services to both the prosecution and the defense?

A. Oh, yeah, any -- by way of me trying to slow myself down

for the court reporter -- I love this.  This is cool.

So, yeah, anybody who calls, I would be more than happy to advise.  I don't typically charge the government because it's a -- it's just a much bigger deal getting paid.  And I admire when somebody from the government actually calls and wants to make sure that their -- that the work that they're doing is solid.  So there's a number of prosecutors that I take phone calls from all the time.

Q.  Has the government ever asked you to testify?

A.  I've been asked.  I've been put on call.  I've never actually been put on the stand.  I kind of understand it because I think we've got a room full of people here with my qualifications who can testify, who are already paid for by the government.  And I think over the years I've become expensive, so I get it.

Q.  How would you characterize your background?

A.  Lucky.  I'm not sure what you're asking.  I think I just gave it to you.  I mean, I was a very curious kid who took everything apart my parents ever gave you.  They will, to this day, tell you that over and over again.  Which, back then, was basically the definition of a hacker.  And I did get involved with some people who, in fact, even got arrested for hacking.  Kevin Mitnick, who was one of the most notorious hackers, who, coincidentally, lived down the street from me.  And so I'm --

THE COURT:  I was going to suggest maybe just try and

focus on the qualifications for the proceedings here today.

BY MR. EKELAND:

Q. Do you have any special qualifications or certifications?

A. I think asked and answered. But, nothing special.

Q. And then had you belonged to any associations related to your work?

A. Yeah. I mean, I joined lots of associations over the years. The IEEE because -- I'm trying to remember exactly what it stands for -- electronics -- a number of forensic organizations. The -- but at the same time, I've also tried to balance out joining prosecutorial organizations to be able to provide information there, and also defense organizations. So I'm a member of the Black Prosecutors Association last time I checked, and I'm also a member of the National Association of Criminal Defense Lawyers.

Why black prosecutors? Because, honestly, it was the only black -- it was the only -- sorry, it was the only prosecutorial association that wanted me, that accepted my request to join. So, they got me.

Q. And have you qualified to testify as an expert before?

A. Oh, yes. I've lost count.

Q. And what kinds of courts?

A. Federal, state -- military, I've been in a number of military courts. I think I've worked for all but one of the branches. And then I do a lot of mitigation work and that sort

of thing. I'm not the mitigator, but I'm brought in to help with mitigation. And even though I don't like them as much as criminal work, I do have one or two divorce attorneys that I'll help out, but mostly because their divorces are practically criminal, so I find them interesting.

Q. How many states have you qualified as an expert?

A. I think about half of the lower 48 and then also Alaska. I haven't been fortunate enough to get sent to Hawaii, but I'm waiting.

Q. Have you received any special clearances in order to perform a forensic examination?

A. Yes, I have.

Q. What type -- excuse me -- what type of special clearances have you received?

A. I have to be careful. That's one of those if I tell you, I might have to kill you kind of things. But there was a case that involved national security military secrets and I had to go --

THE COURT: I think he was asking you what clearance you hold.

THE WITNESS: Well, I've learned, posthumously, after the fact, it would have been top -- apparently top secret because of the room that I was put in.

BY MR. EKELAND:

Q. And was that a SCIF?

A. Yeah, SCIF, secure compartmentalized information facility. I didn't know what my level of security was, but I was told in a case in Alaska that you can't get into a SCIF by the prosecutor unless you have top-level security. So apparently that's what I had.

Q. Have you ever been hired to work directly for a court?

A. Yeah, as a special master. I've done that a number of times directly with judges.

Q. Have you ever worked on a case like this one?

A. No, not quite like this one. I've been adjacent to it, but I haven't really seen anything quite like this ever before, not in three decades, which was probably why I'm here.

THE COURT: I'm sorry. We're just doing qualifications here. You can -- you can --

MR. EKELAND: Huh?

THE COURT: The witness was sort of going beyond his qualifications. I think we should just keep to his qualifications.

MR. EKELAND: Okay. I've got a few more, and then I'll move on.

THE COURT: That's fine.

BY MR. EKELAND:

Q. Do you have experience with cryptocurrencies?

A. Personal experience with cryptocurrency, and I've done a few cases that have involved cryptocurrency.

Q. Do you have any experience with crypto mining?

A. Yes. I -- I mined what would today be about $160,000 worth of Bitcoin, and threw away my wallet because it was only worth pocket change at the time and I needed the computer for something else. And today I still have what are called helium miners. They're basically wireless -- they're helping to provide 5G service to cell phones. And I just thought it was a pretty interesting project. But it mines cryptocurrency in exchange for providing your rooftop and your internet service to provide 5G service to customers in the area, to fill in the network.

Q. So you're familiar with what a public key is in relation to Bitcoin?

A. Absolutely. Yes, I have several.

Q. You're familiar with what a private key is in relation to Bitcoin?

A. Yes. And now that I don't lose them anymore, I have several of them, as well.

Q. You know what a seed phrase is?

A. Yes.

Q. Outside of forensics, do you do any other kind of specialized work?

A. Yeah, I over -- well, I'm a part of a group that oversees the nation's second largest school districts. A budget of -- it was about $50 billion when I started. We've spent some of

that. So we're -- I'm just part of this group that we basically -- before the district is able to spend that money, because so much of the money disappeared, I was asked if I would help to oversee that money. I'm now on my third term of that, and in part because I helped write the bylaws, I'm now terming myself out. So this will be my last term. And it's been fantastic. And I think we've done a spectacular job.

Q. And -- I'm sorry?

A. Yeah.

Q. When were you asked to work on this case?

A. Gosh, I wrote it down. Gosh, it was about two years ago. I could get the exact date, if I look at my machine.

Q. If I told you it was April 17th, 2022, would you disagree with me?

A. Two days before I got a pretty famous case, yes.

Q. How much have you been paid on this case up through today?

A. Last I checked it was about $20,000. But all of that has gone to expenses entirely, and probably a little bit -- a lot bit in the hole at this point.

Q. What do you normally charge?

A. $700 an hour is my normal fee off of a -- I'm told I should raise this -- but off a $30,000 retainer.

Q. Do you do pro bono work?

A. Yes. That's why I charge $700 an hour. About 50 percent of my work is pro bono.

MR. EKELAND: Your Honor, at this time the defense moves to qualify Mr. Fischbach as an expert on computer forensics.

THE COURT: All right. Any objection?

MS. PELKER: No objection. But based on the Court's -- prior *Daubert* testimony, we may need to discuss some of the scope later this evening.

THE COURT: That's fine. So the Court concludes that Mr. Fischbach is qualified to testify as an expert on forensic technology.

MR. EKELAND: Okay. Your Honor, I think this would be a good --

THE COURT: I should say, computer forensic technology.

MR. EKELAND: Your Honor, I think this would be a good stopping point.

THE COURT: Let's break for the evening. Do we have anything in the morning?

THE COURTROOM DEPUTY: I'm sorry, Judge. Say that again?

THE COURT: What time should we start in the morning? Do we have anything? 9:00 or 9:15?

We'll start at 9 o'clock tomorrow morning. Mind you, even though we're in the defense case now, still don't discuss the case with anybody. Don't conduct any research in any way

relating to anything having to do with this case. And I'll see you back tomorrow.

(Whereupon the jurors leave the courtroom.)

THE COURT: All right. The witness is excused for the evening. I'll just ask that you not talk about your testimony with anybody, with the exception that you can talk to Mr. Ekeland with respect to what you put on the record.

MR. EKELAND: The book issue and the device review.

THE COURT: The book issue?

MR. EKELAND: That's the E-reader. That's what I was talking to the Court about, the exhibit that's -- where we have a difference with the government.

THE COURT: Well, if you haven't had a chance to discuss that with Mr. Ekeland, you may still.

THE WITNESS: Your Honor, if I may, while I got the mic, I don't know if Mr. Ekeland discussed this with you, but I am physically residing in the same building. I can certainly -- I'm a grown up. I can keep to myself and go to my room.

THE COURT: You can talk about what's for dinner, and just don't talk about your testimony, other than those two things.

THE WITNESS: I wanted to make sure that was good.

MR. EKELAND: Thank you, Your Honor.

MS. PELKER: Your Honor, one thing just before the

witness is excused. The government will make a formal motion under 26.2 and *Jencks* for Mr. Fischbach's statements pertaining to his testimony. And so to the extent that -- we have not yet received anything, so to the extent that Mr. Ekeland needs to discuss that with Mr. Fischbach to obtain the materials, that's fine with us as well.

THE COURT: Okay. You can also discuss that as well. You may.

MR. EKELAND: Then we'll just get that out tonight. I don't --

THE COURT: I'd appreciate if you would do it in advance, just so we don't have to take a break in trial between the direct and cross.

MR. EKELAND: This would be the last witness on that front. So after Mr. Fischbach is Mr. Sterlingov.

THE COURT: Okay. All right. Anything else that we need to address tonight?

MR. BROWN: No, Your Honor.

MS. PELKER: Your Honor, we do still have a pending question on the scope of Mr. Fischbach's testimony from the *Daubert*. We can do it tonight. We can do it before the jury comes back tomorrow. I think it will be brief.

THE COURT: Why don't I go ahead and excuse Mr. Fischbach now. And if you want to at least just tell me what the issue is, and then I can get a sense for how much time

we'll need for it. I do have in front of me his supplemental expert disclosures, with my notes on that.

MS. PELKER: And, Your Honor, it should be brief. At the prior -- when the Court was issuing its guidance from the bench, I believe the Court indicated it would reserve judgment about whether Mr. Fischbach could testify as to how mixers worked and what would be required to operate a custodial mixer like Bitcoin Fog.

The government has no concern with Mr. Fischbach testifying to what is involved with setting -- with using Tor or even setting up a Tor site generally. But we think it's clear that the details relating to how one operates a custodial mixer is far outside Mr. Fischbach's area of expertise. And to the extent that Mr. Ekeland was asking Mr. Fischbach questions about private keys, public keys, seed phrases, seems to suggest that there may be inviting testimony that would go beyond the scope of the disclosure.

THE COURT: All right. So before I spend the evening reading through the *Daubert* hearing on this, Mr. Ekeland, is this going to come up?

MR. EKELAND: I don't -- I think -- in relation to particulars about operating a mixer, it's not my intent to elicit testimony from Mr. Fischbach on that.

The setting up a server, DNS registration, things like that, where he's clearly an expert, I am going to elicit

testimony on that. But, honestly, I don't think anybody knows -- is an expert, at least in this room, on -- on how the mixer functions.

So I think the short answer is, I'm not intending on asking about that.

In terms of just the private keys and the seed phrases and whatnot, that's just -- more just basic sort of facts stuff and not meant to --

THE COURT: I -- I could even testify on that.

MR. EKELAND: Precisely.

So in short, we're not intending on eliciting testimony about the specifics of the mixer, beyond the stuff that is already in Government Exhibit 1, with, you know, Akemashite Ometedou talking about, oh, I've got a front end, I've got a back end, I've got multiple servers. That, I think, is just simple fact stuff, not going into, oh, it's running on this kind of node.

THE COURT: If you're just pointing to evidence that's in the record --

MR. EKELAND: Yes.

THE COURT: -- that seems okay to me.

But if he's then going to opine on that and what that means, it may raise an issue.

MR. EKELAND: Okay. So, understood.

THE COURT: Okay. All right. You'll let us know in

advance if he's going to do that, so we have a chance to discuss it, rather than --

MR. EKELAND: Yes. And I'll tell you, it's not -- I don't have -- you know, you -- sometimes you get up on the stand -- you're doing this and all of the sudden you end up there, but it's not my intention to do that at all.

THE COURT: Okay. All right. Well, before you do it, let me know if it comes up.

MR. EKELAND: Understood.

THE COURT: If you have the urge.

All right. Anything else tonight?

MS. PELKER: No, Your Honor.

THE COURT: All right. I will see you all in the morning. Thank you.

                              *   *   *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 5th day of March, 2024

_____

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C.  20001

INDEX

WITNESSES:

J.W. Verret

Direct Examination (Cont.) By Mr. Ekeland......... 2
Cross-Examination By Mr. Brown.................... 16
Redirect Examination By Mr Ekeland............... 55
Recross-Examination By Mr. Brown................. 75

Jeff Fischbach

Direct Examination By Mr. Ekeland................ 82

EXHIBIT ADMITTED:

Government's Exhibit 915............................ 28

\* \* \*

## $

**$100,000** [2] - 29:5, 29:6
**$110,000** [2] - 28:19, 29:12
**$160,000** [1] - 98:2
**$20,000** [1] - 99:17
**$30,000** [1] - 99:22
**$300** [1] - 18:24
**$450,000** [1] - 11:9
**$50** [1] - 98:25
**$500,000** [2] - 49:19, 64:25
**$700** [2] - 99:21, 99:24

## '

**'90s** [2] - 85:12, 85:19

## 1

**1** [4] - 53:14, 54:9, 54:14, 104:13
**1.5** [2] - 47:18, 48:17
**1.7** [1] - 48:9
**10** [5] - 12:11, 12:13, 50:24, 50:25, 57:12
**10,000** [5] - 46:19, 46:23, 47:1, 47:2, 47:7
**10.8** [1] - 57:18
**10th** [1] - 43:17
**11** [2] - 13:5, 13:7
**110,000** [1] - 22:7
**12** [3] - 13:10, 13:12, 86:23
**12-year** [1] - 11:9
**120** [2] - 47:23, 53:8
**128** [2] - 45:18, 48:3
**13** [7] - 13:15, 13:16, 23:11, 23:18, 26:16, 26:23, 27:11
**134** [2] - 23:10, 26:16
**16** [8] - 3:13, 31:11, 31:25, 32:18, 32:22, 33:11, 36:11, 36:17
**16,000** [1] - 11:8
**1700** [1] - 55:1
**17th** [1] - 99:13
**18** [6] - 38:23, 38:24, 39:19, 55:8, 55:10, 56:5
**1996** [1] - 85:14
**19th** [4] - 24:1, 26:4, 26:9, 26:12

## 2

**2** [5] - 43:6, 43:13, 51:8, 57:22

## (column 2)

**200** [1] - 47:24
**20001** [1] - 106:13
**2002** [4] - 20:8, 20:11, 20:13, 20:15
**2010** [3] - 46:19, 46:23, 47:2
**2011** [1] - 11:3
**2012** [1] - 11:4
**2013** [2] - 9:3, 11:4
**2014** [2] - 9:3, 11:4
**2015** [1] - 11:5
**2016** [2] - 11:6, 43:17
**2017** [1] - 11:6
**2018** [1] - 11:6
**2019** [1] - 11:7
**2020** [1] - 11:7
**2021** [1] - 11:7
**2022** [3] - 11:8, 20:15, 99:13
**2023** [4] - 24:2, 26:4, 26:9, 26:12
**2024** [2] - 47:11, 106:7
**21** [3] - 23:11, 26:24, 27:12
**22** [1] - 23:18
**221** [1] - 26:16
**24,000** [1] - 11:7
**24/7** [1] - 91:3
**25** [1] - 10:25
**25,000** [1] - 11:4
**26** [2] - 36:11, 36:17
**26.2** [4] - 31:11, 34:15, 35:6, 102:2
**2707** [8] - 3:25, 4:5, 8:7, 8:9, 8:11, 9:20, 9:21, 54:12
**28** [1] - 83:11
**28th** [1] - 84:17

## 3

**3** [4] - 43:6, 43:14, 48:4, 48:6
**3,000** [1] - 11:8
**30** [1] - 92:11
**300** [2] - 22:5, 22:11
**305** [4] - 2:13, 13:23, 51:7, 53:14
**325** [3] - 13:24, 14:1, 15:22
**333** [1] - 106:12
**3:25** [3] - 34:24, 35:1, 37:17

## 4

**4** [5] - 8:19, 8:20, 43:18, 50:20, 76:18
**40** [1] - 10:25
**40,000** [1] - 11:7

## (column 3)

**41** [1] - 10:25
**418-H** [2] - 42:10, 42:13
**42,000** [1] - 11:7
**44** [1] - 10:25
**44,000** [1] - 11:4
**450** [2] - 22:1, 22:2
**46** [3] - 52:7, 52:8, 71:5
**48** [1] - 96:7
**49** [2] - 52:13, 71:16

## 5

**5** [3] - 9:4, 9:7, 43:18
**50** [3] - 10:19, 10:23, 99:24
**51** [2] - 50:3, 50:5
**57** [1] - 10:25
**57,000** [1] - 11:6
**59** [1] - 10:25
**59,000** [1] - 11:5
**5G** [2] - 98:7, 98:10
**5th** [1] - 106:7

## 6

**6** [2] - 9:11, 44:1
**60,000** [2] - 10:19, 10:23
**63** [1] - 10:25
**63,000** [1] - 11:6
**6523** [1] - 106:12
**66** [1] - 10:25
**66,000** [1] - 11:5
**67,000** [1] - 11:5
**68** [2] - 53:1, 74:16

## 7

**7** [4] - 9:15, 9:17, 43:15, 44:1
**7.7** [1] - 48:8
**702** [4] - 51:18, 67:11, 71:4, 74:15
**710-A** [3] - 76:18, 76:21, 77:2

## 8

**8** [4] - 10:1, 10:4, 48:8, 57:11
**8.1** [1] - 57:17
**8.8** [1] - 57:12
**80** [1] - 47:23
**88** [2] - 53:5, 57:22
**88.2** [1] - 57:19

## 9

**9** [8] - 10:24, 11:17, 11:20, 11:22, 12:4, 28:5, 57:11, 100:23
**9,000** [1] - 11:4
**91.2** [2] - 57:12, 57:14
**915** [4] - 28:3, 28:6, 28:7, 28:11
**9:00** [3] - 77:24, 77:25, 100:22
**9:15** [1] - 100:22

## A

**ability** [2] - 19:18, 106:6
**able** [12] - 4:12, 29:7, 37:9, 38:3, 67:22, 81:19, 89:9, 90:1, 92:22, 93:14, 95:11, 99:2
**absolutely** [3] - 84:6, 86:8, 98:14
**abstract** [1] - 70:23
**academic** [1] - 20:23
**accepted** [1] - 95:18
**access** [5] - 53:18, 66:6, 77:10, 84:24, 85:3
**according** [2] - 8:10, 45:24
**account** [22] - 6:18, 7:7, 7:8, 7:14, 8:23, 9:2, 41:4, 41:16, 42:1, 42:17, 42:18, 43:3, 43:4, 50:18, 52:9, 52:14, 52:24, 53:2, 53:5, 53:9, 54:4, 70:7
**accountant** [1] - 92:8
**accountant's** [1] - 3:8
**accountants** [1] - 92:19
**accounting** [3] - 85:5, 92:8, 92:13
**accounts** [41] - 5:17, 6:2, 6:3, 6:9, 6:20, 6:22, 7:1, 7:8, 7:21, 8:22, 44:20, 44:23, 48:25, 51:5, 51:10, 53:15, 53:17, 53:19, 53:25, 54:2, 54:7, 54:9, 54:14, 54:17, 54:19, 54:23, 54:24, 62:13, 62:16, 64:4, 64:17, 65:8, 66:4, 66:9, 66:14, 66:17, 68:19, 72:9, 72:10, 72:20, 72:25
**accuracy** [1] - 45:23
**accurate** [3] - 55:25,

59:12, 106:4

**accurately** [1] - 59:10
**achieve** [1] - 46:13
**acquittal** [2] - 22:19, 22:21
**acquitted** [2] - 25:4, 25:8
**activities** [1] - 64:20
**activity** [1] - 8:21
**actual** [1] - 50:24
**add** [1] - 12:3
**added** [1] - 21:21
**addition** [1] - 7:8
**additional** [2] - 3:6, 33:11
**address** [22] - 12:16, 41:4, 52:23, 87:7, 87:11, 87:12, 87:16, 87:19, 88:5, 88:6, 88:11, 88:12, 88:13, 88:20, 88:21, 88:25, 89:10, 89:24, 90:4, 102:17
**addresses** [3] - 51:11, 86:22, 87:13
**addressing** [1] - 3:13
**adds** [1] - 10:13
**adjacent** [1] - 97:10
**adjourn** [1] - 78:5
**adjustments** [1] - 8:8
**administrator** [2] - 14:8, 47:14
**admire** [1] - 94:5
**admission** [1] - 40:21
**admit** [1] - 28:2
**admitted** [7] - 28:11, 38:22, 42:11, 49:11, 50:4, 51:19, 76:19
**advance** [2] - 102:12, 105:1
**advanced** [1] - 89:2
**advantage** [1] - 9:2
**Advcash** [7] - 52:9, 52:11, 75:16, 75:23, 75:25, 77:10
**Advcash.com** [3] - 71:8, 71:10, 71:14
**advise** [1] - 94:3
**afternoon** [2] - 16:20, 16:21
**agent** [1] - 62:21
**Agent** [1] - 93:17
**ages** [1] - 3:11
**ago** [4] - 83:16, 83:19, 92:11, 99:11
**agree** [5] - 44:19, 44:25, 47:6, 48:15, 69:2
**ahead** [2] - 28:23, 102:23

**airplane** [1] - 83:21
**Akemashite** [1] - 104:14
**Alaska** [2] - 96:7, 97:3
**alignment** [1] - 37:25
**allow** [9] - 4:17, 19:5, 35:24, 36:9, 70:17, 73:5, 73:7, 90:16, 90:17
**allowed** [3] - 17:8, 30:2, 59:18
**almost** [3] - 83:15, 85:19, 86:15
**alpha** [1] - 76:21
**alternative** [1] - 19:4
**Amazon** [2] - 88:9, 91:2
**ambiguous** [1] - 43:9
**amicus** [1] - 21:15
**amount** [7] - 8:23, 22:11, 47:20, 47:25, 53:21, 53:24, 54:4
**amounts** [1] - 45:1
**ample** [2] - 33:22, 81:16
**an-hour-and-a-half-or-so** [1] - 79:19
**analysis** [22] - 4:1, 7:7, 8:12, 11:21, 12:14, 13:8, 13:11, 13:16, 19:19, 42:4, 42:5, 44:16, 47:13, 48:7, 48:10, 49:6, 49:7, 51:7, 54:25, 62:20, 80:7
**Analytics** [1] - 18:6
**analyze** [1] - 42:9
**Angeles** [2] - 84:19, 93:19
**annual** [1] - 39:7
**answer** [11] - 9:14, 21:20, 21:21, 24:18, 24:22, 28:23, 30:9, 30:11, 48:22, 53:23, 104:4
**answered** [6] - 4:6, 25:9, 75:19, 75:21, 76:8, 95:4
**answering** [1] - 64:15
**ANXBTC** [6] - 52:14, 52:16, 52:24, 71:22, 76:6, 76:12
**anyway** [1] - 87:24
**apart** [1] - 94:19
**apologize** [2] - 64:5, 65:16
**apology** [1] - 23:15
**app** [3] - 49:16, 49:18, 89:8
**appear** [6] - 13:18, 13:20, 43:8, 43:11,

52:23, 77:5

**apply** [1] - 86:17
**appreciate** [1] - 102:11
**appropriate** [4] - 27:6, 69:15, 78:17, 88:19
**Apps** [1] - 77:6
**April** [1] - 99:13
**area** [4] - 68:5, 68:6, 98:10, 103:13
**argument** [1] - 72:14
**argumentative** [1] - 17:20
**arranged** [1] - 80:16
**arrangement** [1] - 29:19
**arrest** [1] - 49:18
**arrested** [2] - 49:16, 94:22
**arresting** [1] - 93:16
**arrive** [1] - 5:11
**article** [15] - 40:15, 40:16, 40:25, 41:6, 55:17, 55:19, 55:22, 56:1, 58:2, 58:3, 58:25, 59:5, 59:15, 59:20
**aside** [1] - 45:13
**aspect** [1] - 68:11
**assertion** [1] - 73:2
**assets** [24] - 25:18, 25:20, 27:18, 29:4, 29:7, 48:25, 54:22, 55:2, 66:20, 67:4, 67:13, 67:19, 67:23, 68:3, 68:13, 69:13, 69:18, 70:3, 70:20, 73:20, 74:7, 75:9, 75:17, 76:5
**associated** [6] - 6:4, 6:7, 10:14, 46:7, 46:10
**Association** [2] - 95:13, 95:14
**association** [1] - 95:18
**associations** [2] - 95:5, 95:7
**assuming** [2] - 47:15, 47:16
**attempt** [1] - 41:20
**attempting** [1] - 43:2
**attended** [1] - 59:21
**attention** [8] - 5:2, 14:24, 38:21, 43:5, 45:17, 51:18, 56:17, 71:16
**attorney** [1] - 35:8
**attorneys** [2] - 17:3, 96:3
**attributable** [1] - 51:11
**auction** [1] - 19:14

**authentic** [1] - 55:25
**Avenue** [1] - 106:12
**avoid** [1] - 65:17
**aware** [7] - 10:21, 17:11, 21:6, 51:1, 66:13, 66:16, 75:3
**awareness** [1] - 12:18

### B

**back-of-the-envelope** [2] - 45:5, 45:12
**backdoor** [1] - 60:10
**background** [2] - 21:21, 94:16
**balance** [1] - 95:11
**bank** [5] - 6:18, 10:14, 19:21, 19:24
**based** [14] - 6:25, 7:20, 39:14, 44:19, 48:12, 49:10, 57:8, 66:20, 68:6, 76:1, 80:7, 84:9, 84:18, 100:5
**basic** [1] - 104:7
**basis** [6] - 40:3, 40:20, 40:22, 67:17, 67:18, 74:10
**BCJ** [1] - 25:17
**beard** [1] - 79:8
**became** [2] - 92:7, 93:17
**become** [3] - 20:23, 83:10, 94:14
**becoming** [2] - 23:2, 27:21
**beforehand** [2] - 35:14
**began** [2] - 27:16, 33:5
**begin** [1] - 43:7
**beginning** [4] - 23:6, 45:2, 68:16, 83:15
**begins** [1] - 81:23
**behind** [1] - 47:23
**belief** [3] - 55:22, 56:13, 75:8
**belonged** [1] - 95:5
**Bench** [1] - 3:3
**bench** [6] - 31:9, 58:22, 66:23, 72:4, 78:3, 103:5
**beneath** [1] - 77:7
**best** [5] - 46:3, 47:25, 48:12, 73:23, 106:6
**better** [2] - 66:21, 78:7
**between** [4] - 4:10, 19:12, 21:3, 102:12
**Between** [1] - 21:2
**beyond** [5] - 60:8, 68:25, 97:16, 103:16, 104:12

**bigger** [1] - 94:4
**bill** [2] - 22:6, 22:10
**billed** [1] - 22:5
**billion** [4] - 47:15, 48:14, 48:17, 98:25
**billions** [1] - 48:4
**Binance** [1] - 6:3
**bio** [1] - 18:23
**bit** [11] - 3:21, 3:25, 12:6, 50:14, 50:24, 55:12, 58:12, 67:25, 70:11, 99:18, 99:19
**Bitcoin** [66] - 6:4, 6:6, 6:8, 6:11, 6:20, 7:9, 7:17, 8:9, 9:2, 9:3, 9:21, 10:15, 14:7, 14:11, 15:2, 15:15, 15:18, 16:3, 16:4, 19:12, 40:6, 40:13, 41:13, 43:15, 43:22, 43:23, 44:6, 45:6, 45:10, 45:15, 45:20, 46:4, 46:9, 46:16, 46:20, 46:23, 46:24, 47:1, 47:2, 47:4, 47:7, 47:13, 47:16, 47:18, 47:25, 48:16, 49:19, 49:22, 50:16, 50:25, 51:15, 53:22, 54:15, 54:22, 55:1, 56:12, 59:5, 61:23, 65:1, 98:3, 98:13, 98:16, 103:8
**BitCoins** [1] - 6:17
**Bitnex** [1] - 6:3
**BitPay** [5] - 6:3, 6:4, 6:5, 6:7, 7:3
**Bitstamp** [1] - 6:12
**Black** [1] - 95:13
**black** [3] - 83:21, 95:16, 95:17
**blanket** [1] - 68:22
**block** [1] - 16:8
**blockchain** [3] - 19:5, 19:19, 21:12
**blockchain.com** [1] - 16:7
**board** [1] - 19:2
**bono** [5] - 22:11, 22:12, 27:22, 99:23, 99:25
**book** [5] - 20:18, 20:22, 20:24, 101:8, 101:9
**book's** [1] - 21:1
**Boox** [2] - 81:15, 81:17
**bottom** [3] - 7:3, 8:7, 10:16
**bought** [1] - 47:4
**box** [2] - 2:5, 83:21

**branches** [1] - 95:25
**break** [9] - 34:19, 34:23, 35:3, 70:14, 79:18, 79:19, 80:24, 100:17, 102:12
**brief** [3] - 21:15, 102:22, 103:3
**briefly** [3] - 88:2, 90:8, 91:9
**briefs** [1] - 18:1
**broader** [2] - 73:11, 74:3
**brought** [5] - 60:7, 61:7, 61:12, 78:12, 96:1
**brown** [29] - 16:17, 16:21, 32:6, 32:9, 33:12, 34:13, 35:18, 35:24, 38:15, 57:3, 59:7, 60:17, 60:23, 61:17, 62:12, 65:7, 65:14, 65:22, 66:10, 67:7, 67:12, 69:3, 71:7, 73:7, 73:18, 73:25, 74:8, 74:18, 75:12
**Brown** [1] - 72:2
**BROWN** [75] - 2:3, 3:1, 3:4, 7:22, 11:23, 12:21, 14:13, 14:17, 15:9, 16:19, 17:22, 23:15, 23:16, 24:1, 24:5, 24:6, 24:18, 24:20, 25:2, 25:24, 26:14, 26:22, 27:10, 28:1, 28:6, 28:8, 28:14, 28:16, 30:8, 30:12, 31:7, 31:10, 31:21, 32:18, 33:6, 33:19, 34:12, 34:15, 37:24, 38:16, 38:25, 40:19, 40:24, 43:12, 49:4, 49:12, 51:20, 51:24, 51:25, 55:4, 56:6, 56:9, 56:18, 57:15, 57:20, 58:5, 59:8, 61:3, 62:5, 62:7, 62:22, 65:10, 67:8, 68:14, 70:4, 71:24, 72:3, 72:5, 74:12, 75:14, 76:17, 76:21, 77:1, 77:12, 102:18
**brown's** [1] - 73:18
**browser** [4] - 91:6, 91:10, 91:16, 92:2
**BTC** [3] - 6:8, 6:12, 54:12
**BTC-e** [2] - 6:8, 6:12
**budget** [1] - 98:24
**building** [4] - 79:17, 85:1, 92:22, 101:17
**bumping** [1] - 68:15

**burden** [2] - 72:19, 73:3
**business** [1] - 90:12
**button** [1] - 15:8
**buy** [5] - 6:6, 46:20, 46:24, 47:2, 92:17
**BY** [47] - 2:17, 5:8, 5:14, 6:21, 8:4, 10:3, 11:10, 12:2, 13:6, 13:25, 14:14, 14:23, 15:13, 16:19, 17:22, 23:16, 24:6, 25:2, 25:24, 27:10, 28:16, 30:12, 38:16, 38:25, 40:24, 43:12, 49:12, 51:25, 55:15, 56:21, 58:14, 60:16, 61:16, 62:11, 63:16, 64:14, 65:6, 65:19, 71:6, 74:17, 75:14, 77:1, 82:20, 83:5, 95:2, 96:24, 97:22
**bylaws** [1] - 99:5

## C

**calculate** [1] - 45:14
**calculation** [2] - 45:6, 45:12
**calculations** [6] - 11:11, 11:14, 16:13, 30:15, 30:18, 46:1
**calculator** [1] - 57:18
**cameras** [1] - 89:13
**camouflage** [1] - 41:21
**capturing** [1] - 53:16
**car** [1] - 83:20
**card** [1] - 10:14
**cards** [3] - 7:2, 7:4, 10:15
**care** [3] - 81:1, 89:8, 93:6
**career** [1] - 86:2
**careful** [2] - 72:15, 96:15
**carrying** [1] - 49:18
**case** [51] - 4:24, 18:1, 18:15, 18:16, 18:25, 21:18, 21:22, 22:13, 22:17, 22:19, 22:23, 23:2, 23:5, 24:13, 25:16, 25:21, 25:23, 26:7, 27:14, 27:21, 28:19, 29:17, 29:20, 29:22, 31:4, 34:25, 37:12, 42:22, 44:18, 50:9, 63:4, 69:7, 69:9, 69:19, 70:19, 73:16, 77:17, 83:22, 85:7,

89:3, 90:22, 96:16, 97:3, 97:9, 99:10, 99:15, 99:16, 100:24, 100:25, 101:1
**cases** [1] - 97:25
**Cash** [2] - 21:7, 21:10
**cash** [3] - 42:8, 44:21, 44:24
**category** [1] - 51:4
**cats** [3] - 89:5, 89:6, 89:12
**caught** [1] - 87:21
**CBDC** [1] - 19:21
**CCR** [1] - 106:11
**ceiling** [4] - 47:18, 47:19, 47:22
**cell** [3] - 83:17, 84:5, 98:7
**central** [3] - 19:21, 19:24, 46:14
**CentreGold** [6] - 53:2, 74:19, 74:21, 75:5, 76:14, 76:15
**certain** [9] - 3:5, 25:11, 25:15, 25:16, 25:18, 49:5, 51:9, 61:8, 61:18
**certainly** [6] - 56:20, 61:15, 63:15, 83:4, 83:16, 101:18
**CERTIFICATE** [1] - 106:1
**certifications** [3] - 84:9, 84:12, 95:3
**certified** [2] - 68:2, 68:7
**certify** [1] - 106:3
**cetera** [1] - 16:6
**Chainalysis** [18] - 15:8, 38:19, 39:1, 39:6, 39:10, 39:17, 39:19, 40:3, 40:7, 40:9, 40:12, 58:13, 58:24, 58:25, 59:6, 59:11, 59:13, 59:16
**challenges** [1] - 21:2
**chance** [2] - 101:13, 105:1
**change** [2] - 88:21, 98:4
**changed** [2] - 29:18, 89:25
**changes** [1] - 89:10
**characterization** [3] - 45:13, 60:2, 60:8
**characterizations** [1] - 49:6
**characterize** [2] - 72:8, 94:16
**characterized** [1] -

39:10

**charge** [3] - 94:3, 99:20, 99:24
**charged** [1] - 21:7
**charging** [1] - 21:17
**chart** [3] - 14:4, 16:12, 56:22
**charts** [2] - 59:16
**Chat** [1] - 81:17
**cheap** [1] - 89:22
**check** [1] - 89:12
**checked** [3] - 45:23, 95:14, 99:17
**chicken** [2] - 89:4
**child** [1] - 85:3
**Chrome** [1] - 91:24
**Circle** [1] - 44:21
**circled** [1] - 23:17
**circumstance** [1] - 60:9
**cite** [1] - 28:2
**citizen** [2] - 46:5, 46:6
**claiming** [3] - 80:11, 81:5
**clear** [7] - 3:13, 27:17, 27:19, 36:6, 58:23, 67:12, 103:12
**clearance** [1] - 96:19
**clearances** [2] - 96:10, 96:13
**clearly** [5] - 37:11, 57:5, 57:24, 57:25, 103:25
**clerk** [1] - 79:16
**client** [1] - 12:8
**clients** [1] - 93:5
**close** [2] - 12:21, 53:16
**closed** [1] - 90:23
**closely** [1] - 54:5
**clues** [1] - 68:10
**CMR** [1] - 106:11
**co** [2] - 78:20, 91:1
**co-counsel** [1] - 78:20
**co-location** [1] - 91:1
**Coinbase** [2] - 6:8, 44:21
**coincidentally** [1] - 94:24
**CoinJoin** [1] - 46:13
**cold** [1] - 50:1
**collect** [1] - 29:6
**collected** [1] - 47:14
**collecting** [1] - 92:1
**college** [1] - 85:4
**column** [2] - 52:8, 53:2
**columns** [1] - 52:22
**comfortable** [1] -

27:22

**coming** [12] - 8:6, 8:14, 8:20, 9:7, 9:13, 14:6, 41:13, 56:23, 73:14, 76:22, 79:7, 93:14
**comment** [2] - 60:11, 67:9
**commentary** [1] - 59:19
**commenting** [1] - 3:9
**commerce** [1] - 92:16
**communicated** [1] - 29:11
**community** [1] - 19:11
**companies** [1] - 89:7
**company** [5] - 19:9, 85:13, 90:9, 90:13, 90:14
**Company** [1] - 92:10
**compare** [1] - 47:24
**compared** [1] - 48:9
**compares** [1] - 12:15
**compartmentalized** [1] - 97:1
**complete** [6] - 35:5, 35:19, 35:23, 35:25, 83:21, 106:5
**completely** [1] - 81:12
**comply** [1] - 19:16
**comprehensive** [1] - 51:15
**computer** [13] - 30:21, 32:25, 37:9, 84:1, 84:25, 85:19, 88:23, 89:22, 92:2, 93:18, 98:4, 100:2, 100:13
**computers** [2] - 33:14, 36:6
**conceal** [2] - 75:17, 76:5
**concepts** [1] - 21:3
**concern** [5] - 69:16, 70:18, 73:13, 81:8, 103:9
**concluded** [2] - 4:7, 9:21
**concludes** [1] - 100:8
**conclusion** [5] - 4:16, 57:9, 58:4, 58:18, 69:11
**conclusions** [15] - 3:18, 5:11, 6:25, 7:20, 8:6, 8:15, 8:20, 9:7, 9:13, 9:18, 10:5, 11:15, 14:7, 15:23, 61:13
**conclusory** [1] - 68:22
**conduct** [2] - 35:1, 100:25
**conducting** [1] - 13:8

**confer** [1] - 79:13
**conference** [6] - 3:3, 31:9, 58:22, 66:23, 72:4, 78:3
**confidence** [1] - 80:25
**confirm** [1] - 80:9
**conflict** [1] - 21:3
**confusing** [1] - 63:6
**connected** [2] - 7:14, 92:3
**conner** [1] - 14:25
**consider** [1] - 62:2
**considered** [1] - 29:20
**consistent** [9] - 9:1, 9:8, 12:7, 39:13, 43:1, 43:2, 61:23, 61:25
**constitutes** [1] - 106:4
**Constitution** [1] - 106:12
**consultant** [1] - 83:11
**consulting** [6] - 18:2, 18:5, 18:8, 84:23, 85:5, 86:3
**Cont** [1] - 2:16
**contacted** [2] - 93:12, 93:13
**contained** [1] - 44:16
**contention** [1] - 39:10
**contingent** [2] - 22:21, 29:19
**continue** [4] - 2:10, 38:3, 38:15, 64:15
**contractually** [1] - 21:19
**contrary** [1] - 72:13
**control** [2] - 15:12, 89:3
**controlled** [5] - 52:14, 52:18, 52:19, 52:21, 54:8
**conversation** [1] - 22:18
**conversations** [2] - 78:16, 78:20
**conversion** [1] - 44:6
**conveyed** [3] - 22:18, 29:8, 29:12
**cool** [1] - 94:1
**coop** [2] - 89:4, 89:5
**copy** [2] - 23:21, 26:19
**corollary** [1] - 41:23
**correct** [95] - 6:24, 8:13, 9:23, 10:11, 11:16, 12:12, 14:12, 15:21, 16:15, 16:24, 17:4, 17:18, 18:6, 18:10, 18:12, 18:13, 18:19, 18:20, 18:22, 19:3, 19:6, 20:3, 20:5, 20:6, 20:19, 21:8, 21:9,

21:11, 21:23, 21:24, 22:15, 22:16, 22:20, 23:4, 25:4, 25:5, 26:4, 26:5, 26:8, 26:10, 28:20, 29:17, 29:21, 40:7, 41:1, 41:7, 41:10, 41:16, 41:22, 42:7, 42:18, 43:25, 44:8, 45:2, 45:7, 45:8, 45:16, 46:5, 46:8, 46:10, 46:12, 46:17, 46:18, 47:8, 47:9, 47:17, 48:5, 48:14, 50:9, 50:21, 50:22, 51:13, 51:17, 53:3, 53:12, 54:12, 54:13, 54:16, 54:21, 55:18, 55:21, 57:16, 65:24, 75:19, 75:20, 75:23, 76:1, 76:6, 76:7, 76:8, 76:9, 76:12, 76:15, 77:10, 80:8
**correctly** [3] - 74:2, 91:12, 92:10
**cost** [1] - 29:5
**counsel** [10] - 17:2, 17:5, 22:18, 24:5, 27:17, 29:11, 72:11, 75:15, 78:20, 81:12
**count** [3] - 3:25, 8:9, 95:21
**counting** [1] - 22:12
**counts** [1] - 25:14
**couple** [1] - 57:2
**course** [1] - 83:20
**Court** [13] - 31:16, 32:16, 35:7, 37:13, 74:2, 78:13, 79:6, 100:8, 101:11, 103:4, 103:5, 106:11
**court** [16] - 5:7, 18:17, 25:17, 25:19, 30:24, 34:21, 35:16, 44:17, 52:5, 60:14, 71:2, 74:13, 82:10, 82:23, 94:1, 97:6
**COURT** [137] - 2:2, 2:4, 2:6, 2:10, 3:21, 4:3, 4:17, 5:6, 5:12, 5:18, 5:21, 6:1, 7:24, 11:1, 11:25, 12:25, 13:4, 14:16, 14:18, 14:21, 15:11, 16:17, 17:21, 23:14, 23:23, 24:19, 24:21, 25:10, 26:18, 27:1, 27:3, 27:6, 28:7, 28:9, 28:11, 30:9, 34:3, 34:7, 34:13, 34:19, 34:22, 35:3, 35:23, 36:8, 36:21, 36:25, 37:3, 37:8,

37:19, 37:23, 38:8, 38:10, 38:14, 40:23, 43:10, 49:10, 55:6, 56:14, 57:22, 57:25, 58:7, 58:20, 58:23, 59:7, 59:18, 60:15, 61:10, 62:6, 62:9, 63:3, 63:10, 64:5, 64:13, 65:5, 65:11, 65:13, 65:17, 66:21, 66:24, 67:7, 67:16, 69:2, 69:25, 70:10, 70:15, 71:1, 71:25, 72:18, 73:4, 73:10, 74:8, 75:12, 77:13, 77:16, 77:19, 77:22, 77:25, 78:15, 78:19, 78:23, 79:1, 79:4, 79:10, 81:7, 81:25, 82:6, 82:9, 82:11, 82:17, 82:25, 94:25, 96:19, 97:13, 97:16, 97:21, 100:4, 100:8, 100:13, 100:17, 100:21, 101:4, 101:9, 101:13, 101:20, 102:7, 102:11, 102:16, 102:23, 103:18, 104:9, 104:18, 104:21, 104:25, 105:7, 105:10, 105:13, 106:1

**Court's** [1] - 100:6

**courtroom** [7] - 2:7, 16:22, 17:15, 35:2, 35:22, 38:11, 101:3

**COURTROOM** [10] - 2:8, 2:14, 5:24, 28:4, 38:12, 38:24, 51:23, 76:22, 76:24, 100:19

**courts** [2] - 95:22, 95:24

**cover** [2] - 3:5, 13:19

**covered** [1] - 12:10

**covers** [1] - 13:19

**create** [6] - 30:14, 30:23, 31:2, 45:22, 45:23, 46:2

**created** [8] - 31:12, 32:23, 36:16, 45:19, 45:24, 46:1

**creators** [1] - 21:7

**crime** [2] - 39:7, 93:18

**Criminal** [1] - 95:15

**criminal** [4] - 29:20, 85:6, 96:3, 96:5

**CROSS** [1] - 16:18

**cross** [21] - 31:19, 32:11, 32:17, 33:5, 33:8, 33:16, 34:9, 38:3, 38:5, 60:17, 61:6, 61:12, 61:14, 63:6,

63:8, 67:12, 68:18, 68:20, 68:25, 72:6, 102:13

**CROSS-EXAMINATION** [1] - 16:18

**cross-examination** [5] - 33:5, 33:8, 61:6, 68:18, 68:20

**cross-examined** [2] - 63:6, 63:8

**CRR** [1] - 106:11

**crypto** [3] - 39:7, 51:4, 98:1

**Crypto** [2] - 20:19, 20:25

**cryptocurrencies** [1] - 97:23

**Cryptocurrency** [1] - 18:12

**cryptocurrency** [8] - 18:15, 18:16, 19:4, 44:20, 52:16, 97:24, 97:25, 98:8

**CS** [1] - 81:13

**curious** [2] - 42:23, 94:18

**currency** [2] - 19:22, 19:24

**current** [2] - 4:1, 85:12

**cursor** [1] - 10:8

**custodial** [2] - 103:7, 103:12

**custodian** [1] - 46:14

**customer** [4] - 41:22, 41:24, 41:25, 43:2

**customers** [5] - 42:2, 42:9, 60:21, 98:10

## D

**D.C** [1] - 106:13

**darknet** [6] - 41:3, 41:13, 44:11, 57:2, 57:6, 57:11

**data** [5] - 14:10, 16:7, 40:11, 59:11, 60:4

**date** [6] - 15:3, 16:5, 43:16, 65:1, 99:12

**Dated** [1] - 106:7

**dates** [1] - 66:4

**Daubert** [6] - 23:10, 45:8, 68:15, 100:6, 102:21, 103:19

**days** [3] - 6:12, 16:23, 99:15

**deal** [5] - 8:22, 38:7, 82:25, 83:3, 94:4

**debit** [3] - 7:2, 7:4, 10:14

**decades** [3] - 83:15, 83:19, 97:12

**decided** [3] - 90:24, 92:11, 92:12

**decimal** [1] - 86:23

**deck** [12] - 2:18, 2:21, 2:23, 2:25, 3:8, 3:15, 3:17, 4:1, 4:2, 4:14, 5:9, 66:11

**decks** [1] - 32:13

**deemed** [1] - 18:24

**defendant** [7] - 17:3, 22:14, 25:4, 25:7, 28:17, 30:6, 35:7

**defendant's** [4] - 22:24, 27:18, 28:18, 77:3

**Defendant's** [1] - 55:8

**Defense** [6] - 38:22, 45:17, 48:3, 55:10, 56:5, 95:15

**defense** [35] - 3:11, 17:2, 17:25, 21:22, 22:9, 22:18, 23:21, 24:5, 31:22, 32:19, 32:20, 32:21, 32:22, 33:7, 33:22, 37:25, 38:24, 39:19, 39:25, 40:1, 56:4, 68:18, 72:11, 75:15, 78:4, 81:12, 81:14, 81:18, 81:22, 82:13, 93:24, 95:12, 100:1, 100:24

**define** [1] - 57:5

**definition** [2] - 67:20, 94:21

**Department** [1] - 21:6

**depiction** [1] - 55:25

**deposit** [6] - 15:3, 42:23, 42:24, 43:8, 43:15, 44:6

**deposited** [4] - 15:16, 16:5, 43:24

**deposits** [5] - 14:9, 14:25, 15:3, 16:4, 43:7

**DEPUTY** [10] - 2:8, 2:14, 5:24, 28:4, 38:12, 38:24, 51:23, 76:22, 76:24, 100:19

**deputy** [1] - 79:16

**describe** [5] - 30:1, 36:10, 36:15, 36:17, 45:11

**described** [5] - 16:2, 19:24, 20:2, 21:13, 27:18

**describing** [2] - 25:12, 29:2

**description** [1] - 32:3

**design** [1] - 46:3

**designation** [1] - 21:16

**destination** [1] - 12:9

**details** [1] - 103:12

**determination** [1] - 12:19

**determined** [1] - 87:2

**device** [6] - 80:9, 80:16, 80:17, 80:18, 81:1, 101:8

**devices** [7] - 52:3, 77:4, 78:10, 80:5, 82:4, 83:17, 89:17

**DICKMAN** [1] - 106:3

**Dickman** [1] - 106:11

**difference** [3] - 4:10, 19:12, 101:12

**different** [8] - 3:4, 15:20, 19:9, 21:12, 29:16, 34:3, 48:11

**difficult** [2] - 86:5, 87:3

**digit** [1] - 86:23

**digital** [2] - 19:22, 19:24

**digits** [1] - 86:24

**dinner** [1] - 101:20

**direct** [18] - 21:17, 22:4, 30:1, 30:20, 34:9, 35:16, 38:17, 38:21, 39:9, 43:5, 45:17, 45:18, 45:25, 51:18, 58:7, 60:6, 69:12, 102:13

**DIRECT** [2] - 2:16, 82:19

**direction** [2] - 45:21, 45:24

**directly** [3] - 6:5, 97:6, 97:8

**disagree** [1] - 99:13

**disappeared** [1] - 99:3

**discipline** [1] - 53:21

**disclose** [1] - 3:18

**disclosed** [7] - 3:16, 32:13, 32:25, 33:1, 35:17, 70:21, 73:15

**disclosing** [1] - 34:2

**disclosure** [6] - 3:12, 33:2, 34:1, 34:6, 35:19, 103:17

**disclosures** [2] - 32:13, 103:2

**discount** [1] - 22:3

**discovered** [3] - 33:10, 80:5, 80:7

**discovery** [17] - 6:23, 32:20, 44:16, 64:18, 66:13, 67:3, 71:12, 72:9, 72:10, 75:4, 75:7,

75:22, 75:24, 76:5, 76:11, 76:15, 78:8

**discrete** [3] - 81:23, 82:2, 82:4

**discuss** [8] - 34:25, 35:4, 100:6, 100:24, 101:14, 102:5, 102:7, 105:2

**discussed** [6] - 16:3, 16:8, 45:18, 61:5, 68:16, 101:16

**discussing** [1] - 36:12

**discussion** [2] - 36:8, 55:5

**discussions** [1] - 27:17

**district** [1] - 99:2

**districts** [1] - 98:24

**divorce** [1] - 96:3

**divorces** [1] - 96:4

**DNS** [10] - 86:7, 86:10, 87:6, 87:11, 87:25, 88:3, 89:14, 89:18, 89:19, 103:24

**document** [3] - 52:5, 57:16, 64:7

**documentary** [1] - 33:10

**documents** [4] - 31:1, 31:3, 31:12, 44:17

**dollar** [2] - 47:15, 48:14

**dollars** [4] - 14:11, 15:18, 16:14, 22:15

**domain** [16] - 85:10, 85:11, 85:12, 85:14, 85:16, 85:20, 86:8, 86:11, 86:13, 87:4, 87:6, 87:19, 90:14, 90:17, 91:16, 91:17

**done** [15] - 7:4, 23:19, 23:23, 31:20, 44:14, 60:4, 65:1, 69:19, 79:21, 80:16, 86:5, 93:8, 97:7, 97:24, 99:7

**door** [6] - 49:2, 49:5, 61:12, 73:21, 73:22, 89:3

**doorstep** [1] - 93:11

**doubled** [1] - 43:8

**doubt** [2] - 37:8, 42:19

**down** [24] - 13:22, 15:25, 29:15, 38:9, 39:22, 39:24, 46:15, 50:14, 51:20, 52:7, 52:13, 53:1, 53:5, 53:8, 58:1, 58:10, 58:12, 64:9, 64:10, 67:25, 90:15, 93:25, 94:24, 99:11

**downstairs** [1] - 79:18

**dozen** [1] - 87:23

**draw** [3] - 56:17, 61:13, 74:9

**drawing** [1] - 5:2

**drew** [1] - 5:3

**Drive** [1] - 31:3

**drives** [3] - 83:14, 84:3, 84:4

**duly** [1] - 82:15

**during** [9] - 11:9, 16:23, 17:5, 30:22, 37:9, 37:10, 38:17, 45:18, 68:19

**Dynamic** [5] - 87:25, 88:2, 89:14, 89:18, 89:19

## E

**e-commerce** [1] - 92:16

**E-reader** [2] - 79:8, 101:10

**early** [6] - 6:11, 85:12, 85:19, 86:1, 87:2, 92:20

**earned** [4] - 4:11, 48:1, 48:17

**earnings** [4] - 4:8, 14:5, 46:4, 47:24

**easily** [1] - 90:3

**easy** [3] - 85:18, 86:17, 88:12

**eat** [2] - 79:15, 79:19

**eaten** [1] - 47:12

**Eclair** [2] - 50:15, 65:8

**editorial** [2] - 59:12, 60:11

**effect** [2] - 56:7, 56:10

**effectively** [1] - 27:22

**effects** [1] - 19:20

**effort** [1] - 9:19

**either** [3] - 6:7, 10:13, 51:10

**Ekeland** [12] - 2:10, 3:5, 32:1, 35:15, 55:6, 72:18, 101:7, 101:14, 101:16, 102:4, 103:14, 103:19

**EKELAND** [133] - 2:11, 2:17, 2:24, 3:14, 3:24, 4:13, 5:5, 5:8, 5:14, 6:21, 7:25, 8:2, 8:4, 10:1, 10:3, 11:10, 12:2, 12:23, 13:2, 13:5, 13:6, 13:22, 13:25, 14:14, 14:20, 14:23, 15:13, 16:16, 17:20, 23:12, 23:20, 23:25, 25:9,

26:17, 26:25, 27:4, 28:10, 31:15, 32:5, 33:1, 33:12, 33:25, 34:5, 34:10, 36:5, 36:19, 36:22, 37:2, 37:6, 37:14, 38:9, 40:16, 43:9, 49:1, 55:7, 55:15, 56:3, 56:7, 56:11, 56:20, 56:21, 58:1, 58:9, 58:14, 59:4, 59:15, 60:13, 60:16, 61:6, 61:15, 61:16, 62:11, 62:25, 63:5, 63:15, 63:16, 64:10, 64:14, 65:6, 65:12, 65:16, 65:19, 67:1, 67:12, 67:24, 69:23, 70:1, 70:12, 70:25, 71:3, 71:6, 72:19, 73:9, 74:1, 74:11, 74:14, 74:17, 75:11, 76:20, 77:14, 77:20, 78:4, 78:18, 78:22, 78:25, 79:2, 79:5, 80:2, 82:3, 82:13, 82:18, 82:20, 83:4, 83:5, 95:2, 96:24, 97:15, 97:19, 97:22, 100:1, 100:11, 100:15, 101:8, 101:10, 101:24, 102:9, 102:14, 103:21, 104:10, 104:20, 104:24, 105:3, 105:9

**Ekeland's** [1] - 70:6

**electronic** [2] - 52:3, 77:4

**electronics** [1] - 95:9

**elementary** [2] - 87:21, 93:2

**elicit** [2] - 103:23, 103:25

**eliciting** [1] - 104:11

**Elmo** [1] - 26:20

**elsewhere** [3] - 67:19, 67:20, 67:23

**email** [2] - 51:11, 52:23

**emails** [6] - 31:4, 31:12, 32:3, 32:5, 33:14, 37:11

**emphasis** [1] - 19:7

**employed** [1] - 18:5

**end** [7] - 6:6, 48:3, 48:4, 48:6, 104:14, 104:15, 105:5

**ended** [6] - 12:15, 69:16, 69:21, 85:6, 93:14, 93:16

**ends** [5] - 23:2, 27:21, 86:4, 88:8, 88:16

**engaged** [1] - 64:19

**engagement** [2] - 21:23, 21:25

**enjoyed** [1] - 86:5

**enter** [1] - 38:11

**entered** [1] - 63:21

**entire** [2] - 48:2, 92:22

**entirely** [1] - 99:18

**entitled** [1] - 3:15

**entry** [2] - 50:12, 50:15

**envelope** [2] - 45:5, 45:12

**equipment** [1] - 90:21

**error** [1] - 12:17

**errors** [2] - 12:16, 12:24

**essentially** [3] - 59:11, 67:9, 79:6

**estimate** [3] - 15:2, 15:5, 47:25

**et** [1] - 16:6

**euros** [7] - 43:22, 43:24, 44:3, 44:6, 44:7, 61:24

**evening** [4] - 100:7, 100:17, 101:5, 103:18

**event** [5] - 12:10, 59:21, 59:22, 59:23, 62:10

**eventually** [2] - 92:15, 92:16

**Evidence** [2] - 17:10, 17:14

**evidence** [52] - 2:13, 3:23, 13:23, 24:16, 27:8, 38:22, 40:17, 41:18, 41:20, 41:23, 41:24, 41:25, 49:9, 49:10, 51:19, 54:2, 55:8, 56:5, 60:10, 62:23, 63:22, 67:10, 67:23, 68:3, 68:9, 68:12, 68:23, 69:6, 69:9, 69:10, 69:13, 69:18, 69:19, 69:21, 70:19, 70:23, 71:4, 71:13, 71:20, 71:21, 72:1, 72:12, 74:6, 74:15, 74:24, 78:12, 80:4, 80:8, 80:11, 81:4, 104:18

**evidentiary** [1] - 81:2

**evil** [3] - 19:25, 20:3, 20:10

**evolved** [2] - 23:5, 29:18

**exact** [5] - 11:3, 41:14, 42:19, 45:3, 99:12

**exactly** [4] - 17:7, 20:7, 23:6, 95:8

**examination** [7] -

33:5, 33:8, 38:6, 61:6, 68:18, 68:20, 96:11

**EXAMINATION**[5] - 2:16, 16:18, 55:14, 75:13, 82:19

**examine**[1] - 35:24

**examined**[8] - 40:11, 41:15, 53:15, 63:6, 63:8, 69:9, 70:19, 82:16

**examiners**[1] - 68:2

**examining**[1] - 68:9

**example**[2] - 74:22, 91:24

**Excel**[1] - 30:14

**except**[1] - 7:3

**excepting**[1] - 30:3

**exception**[1] - 101:6

**excerpt**[1] - 28:2

**exchange**[9] - 6:3, 6:8, 7:15, 7:16, 15:18, 19:16, 44:23, 52:17, 98:9

**exchanges**[4] - 44:20, 45:1, 45:4, 57:4

**excluded**[1] - 30:3

**excluding**[1] - 30:6

**excuse**[7] - 30:7, 41:4, 52:1, 55:13, 85:9, 96:13, 102:23

**excused**[3] - 77:13, 101:4, 102:1

**executed**[2] - 7:15, 7:16

**exercise**[1] - 73:5

**Exhibit**[30] - 2:13, 13:23, 13:24, 14:1, 15:22, 28:3, 28:11, 38:23, 38:24, 39:19, 42:10, 42:13, 45:18, 48:3, 50:3, 50:5, 50:20, 51:7, 51:18, 53:14, 55:8, 55:10, 56:5, 71:4, 74:15, 76:18, 76:20, 76:21, 77:2, 104:13

**exhibit**[16] - 2:19, 8:10, 10:18, 14:4, 14:6, 23:21, 28:6, 39:25, 40:1, 45:19, 45:20, 45:22, 48:2, 70:7, 81:17, 101:11

**exhibited**[1] - 54:8

**exhibits**[1] - 69:12

**exist**[1] - 35:25

**expand**[1] - 42:12

**expect**[2] - 35:18, 35:23

**expected**[3] - 45:6, 45:9, 45:14

**expenditure**[1] -

10:22

**expenditures**[1] - 11:9

**Expenses**[2] - 10:6, 10:9

**expenses**[5] - 10:13, 11:12, 43:4, 61:24, 99:18

**expensive**[1] - 94:14

**experience**[8] - 28:24, 84:1, 84:10, 84:11, 85:9, 97:23, 97:24, 98:1

**expert**[34] - 3:10, 17:9, 17:10, 17:14, 17:16, 18:2, 18:5, 18:7, 18:9, 18:24, 27:16, 32:13, 40:20, 56:15, 58:3, 58:18, 59:2, 59:3, 59:24, 59:25, 60:9, 67:18, 68:24, 69:17, 72:23, 73:15, 78:22, 95:20, 96:6, 100:2, 100:9, 103:2, 103:25, 104:2

**expertise**[4] - 60:12, 68:5, 68:7, 103:13

**experts**[5] - 31:4, 31:13, 40:20, 78:23, 92:21

**explain**[7] - 28:23, 56:25, 80:2, 83:12, 88:2, 90:8, 91:9

**explanation**[1] - 90:5

**explore**[1] - 49:8

**explored**[2] - 49:7, 73:16

**explorer**[1] - 16:8

**extensive**[4] - 31:12, 32:9, 33:15, 84:2

**extent**[13] - 4:21, 5:2, 6:12, 7:3, 11:23, 33:2, 34:17, 37:14, 61:3, 68:20, 102:3, 102:4, 103:14

**extorted**[1] - 93:5

**extra**[1] - 92:22

**extremely**[1] - 72:15

---

## F

**F-I-S-C-H-B-A-C-H**[1] - 83:8

**face**[1] - 20:9

**facilitate**[1] - 6:14

**facility**[2] - 91:1, 97:1

**fact**[13] - 17:9, 17:11, 37:8, 39:23, 50:23, 51:1, 51:2, 72:12, 86:20, 88:23, 94:22,

96:22, 104:16

**facts**[4] - 63:1, 63:4, 63:20, 104:8

**factually**[1] - 59:12

**faculty**[3] - 18:18, 18:21, 18:23

**fair**[2] - 65:16, 75:17

**fairly**[4] - 53:21, 86:5, 88:12, 89:2

**familiar**[14] - 19:21, 39:23, 40:1, 50:5, 53:13, 71:11, 85:21, 86:7, 87:13, 87:25, 90:6, 91:6, 98:12, 98:15

**family**[1] - 37:11

**famous**[1] - 99:15

**fantastic**[1] - 99:7

**far**[1] - 103:13

**father**[1] - 84:25

**FBI**[3] - 41:9, 93:11, 93:16

**federal**[3] - 18:24, 62:21, 95:23

**fee**[6] - 21:17, 29:19, 45:6, 45:9, 45:14, 99:21

**feed**[2] - 89:5

**fees**[3] - 14:7, 44:15, 47:14

**fell**[1] - 85:6

**felt**[1] - 93:20

**few**[5] - 9:9, 28:21, 87:23, 97:19, 97:25

**field**[1] - 60:12

**fields**[1] - 42:12

**figure**[3] - 4:6, 47:16, 54:12

**file**[4] - 52:2, 54:8, 81:13, 81:15

**fill**[1] - 98:10

**financial**[10] - 20:2, 51:10, 53:17, 54:7, 68:1, 68:8, 68:9, 68:10, 70:7, 72:23

**Financial**[3] - 6:19, 18:6, 20:9

**fine**[16] - 4:3, 23:3, 26:21, 38:8, 40:23, 49:11, 61:10, 61:11, 63:4, 81:20, 81:24, 82:7, 86:25, 97:21, 100:8, 102:6

**finish**[1] - 80:24

**firm**[6] - 18:5, 85:5, 92:9, 92:13, 93:16

**first**[20] - 6:2, 15:16, 18:14, 18:16, 22:13, 22:17, 22:22, 28:24, 29:17, 50:11, 58:15,

59:9, 73:14, 77:6, 81:11, 82:15, 85:11, 87:18, 92:20, 93:18

**FISCHBACH**[1] - 82:14

**fischbach**[1] - 100:9

**Fischbach**[18] - 78:9, 78:21, 79:14, 80:16, 81:21, 82:13, 82:21, 82:22, 83:6, 83:8, 100:2, 102:5, 102:15, 102:24, 103:6, 103:9, 103:14, 103:23

**Fischbach's**[3] - 102:2, 102:20, 103:13

**fischbach. dynamicdns.com**[1] - 90:2

**fit**[1] - 32:3

**five**[1] - 86:21

**floor**[1] - 92:22

**flow**[3] - 71:13, 71:22, 75:4

**flows**[2] - 42:9, 72:8

**focus**[8] - 20:23, 61:11, 61:14, 69:20, 70:10, 70:17, 95:1

**focused**[1] - 69:14

**Fog**[19] - 7:9, 7:13, 7:17, 8:22, 14:5, 14:7, 14:11, 15:4, 15:16, 41:13, 45:6, 45:10, 45:15, 47:13, 48:1, 48:16, 48:19, 103:8

**Fog's**[1] - 46:4

**follow**[1] - 69:4

**follows**[1] - 82:16

**food**[1] - 89:6

**foregoing**[1] - 106:4

**forensic**[16] - 18:24, 30:2, 68:7, 68:8, 80:22, 81:4, 83:10, 83:13, 84:16, 84:21, 84:22, 92:4, 95:9, 96:11, 100:9, 100:13

**Forensics**[2] - 21:1, 21:2

**forensics**[8] - 18:12, 66:25, 68:1, 68:8, 69:17, 72:23, 98:21, 100:3

**form**[2] - 9:9, 40:20

**formal**[1] - 102:1

**forming**[3] - 4:22, 56:15, 59:3

**fortunate**[2] - 84:24, 96:8

**forward**[3] - 29:8, 82:8, 86:18

**forwarding**[1] - 87:6

**foundation** [3] - 14:18, 14:21, 67:25
**Foundation** [1] - 19:2
**four** [3] - 33:21, 86:21
**four-week** [1] - 33:21
**frankly** [2] - 29:5, 79:13
**fraud** [1] - 68:2
**free** [2] - 22:10, 89:20
**French** [1] - 46:5
**frictions** [1] - 45:4
**friend** [4] - 92:7, 92:24, 93:1, 93:13
**friends** [2] - 37:11, 93:17
**front** [9] - 7:17, 26:18, 28:25, 29:3, 64:8, 73:24, 102:15, 103:1, 104:14
**frozen** [6] - 22:15, 25:18, 25:20, 27:18, 29:3, 29:7
**full** [4] - 40:10, 66:6, 94:12, 106:5
**fulsome** [1] - 34:1
**functions** [1] - 104:3
**fundamentally** [1] - 56:13
**funding** [2] - 25:17, 25:19
**funds** [27] - 6:9, 7:9, 12:8, 13:20, 22:24, 25:13, 25:21, 28:18, 41:3, 41:13, 53:24, 54:1, 54:4, 57:3, 57:5, 57:6, 57:9, 57:11, 57:17, 64:17, 66:14, 71:13, 71:22, 72:8, 72:24, 75:4

### G

**gallery** [2] - 16:25, 51:21
**gambling** [2] - 57:4, 57:6
**game** [1] - 83:20
**gathering** [1] - 38:1
**general** [2] - 3:18, 67:9
**generally** [8] - 13:13, 17:11, 29:20, 61:13, 61:14, 64:3, 90:11, 103:11
**generated** [1] - 15:8
**George** [1] - 18:18
**given** [4] - 11:24, 69:3, 73:8, 93:3
**Glave** [9] - 8:8, 10:18, 49:7, 51:9, 51:14,

53:15, 54:19, 66:6, 73:19
**Glave's** [9] - 2:22, 4:7, 4:16, 9:19, 49:6, 51:7, 54:9, 54:25, 66:11
**GoDaddy** [3] - 90:14, 90:16, 91:2
**gold** [6] - 50:12, 53:22, 74:23, 74:24, 75:1, 75:2
**Goldmoney** [1] - 53:6
**Google** [6] - 31:3, 88:9, 88:13, 88:15, 91:18
**gosh** [4] - 83:22, 87:23, 99:11
**Government** [8] - 13:23, 13:24, 14:1, 15:22, 42:13, 71:4, 74:15, 104:13
**government** [35] - 3:16, 3:20, 3:24, 18:1, 22:15, 23:20, 28:1, 31:14, 31:16, 31:18, 32:25, 33:2, 33:4, 34:1, 35:12, 35:13, 36:2, 36:20, 38:2, 59:4, 62:25, 72:19, 78:12, 79:25, 80:6, 80:11, 81:5, 94:3, 94:5, 94:9, 94:14, 101:12, 102:1, 103:9
**Government's** [4] - 2:13, 28:3, 42:10, 60:5
**government's** [10] - 3:8, 4:4, 6:23, 49:2, 68:23, 73:2, 75:7, 75:22, 81:3, 81:9
**Gox** [3] - 6:12, 8:23, 8:24
**grabbing** [1] - 79:18
**graphic** [1] - 9:9
**grave** [1] - 21:13
**green** [1] - 57:3
**Grobstein** [1] - 92:10
**group** [2] - 98:23, 99:1
**grown** [1] - 101:18
**guess** [5] - 3:21, 22:11, 63:10, 67:16, 81:7
**guidance** [1] - 103:4
**guilty** [2] - 25:12, 25:14
**gun** [1] - 32:14

### H

**hack** [3] - 8:24, 93:11, 93:14
**hacked** [1] - 93:5

**hacker** [1] - 94:21
**hackers** [1] - 94:23
**hacking** [3] - 93:1, 93:8, 94:22
**half** [4] - 50:24, 79:12, 79:19, 96:7
**hallway** [1] - 38:9
**hand** [1] - 14:25
**handful** [1] - 32:3
**hands** [1] - 24:5
**happy** [5] - 32:7, 32:10, 33:15, 36:5, 94:3
**hard** [3] - 83:14, 84:3, 84:4
**hardware** [1] - 89:15
**Harmon** [15] - 44:9, 44:14, 44:20, 62:13, 62:15, 62:18, 62:21, 63:1, 63:2, 63:6, 63:17, 63:25, 64:1, 64:20
**Harmon's** [3] - 47:24, 63:20, 63:24
**Harvard** [1] - 17:24
**hassard** [1] - 2:12
**Hassard** [16] - 2:24, 5:16, 8:2, 10:2, 13:10, 13:22, 55:7, 55:10, 56:22, 58:1, 58:4, 58:10, 64:6, 64:11, 71:3, 74:14
**Hawaii** [1] - 96:8
**heads** [3] - 5:13, 5:20, 5:25
**hear** [7] - 13:3, 14:20, 17:12, 28:4, 57:23, 65:7, 65:12
**heard** [8] - 15:7, 17:15, 41:9, 44:9, 44:11, 58:25, 69:9, 91:14
**hearing** [4] - 20:20, 24:2, 45:8, 103:19
**hearsay** [4] - 56:6, 56:15, 57:21, 62:23
**held** [2] - 47:22, 48:19
**helium** [1] - 98:5
**Helix** [2] - 44:12, 44:15
**help** [7] - 23:7, 44:21, 85:4, 93:9, 96:1, 96:4, 99:4
**helped** [3] - 6:13, 17:25, 99:5
**helpful** [4] - 4:13, 13:17, 67:11, 69:1
**helping** [2] - 85:7, 98:6
**hereby** [1] - 106:3
**herself** [1] - 49:7
**hidden** [5] - 32:14,

68:3, 69:13, 69:18, 70:20
**Hide** [1] - 20:19
**hide** [3] - 7:10, 7:13, 41:21
**hiding** [11] - 41:21, 66:20, 67:4, 67:13, 67:19, 67:20, 67:23, 68:13, 70:3, 74:7, 75:8
**high** [3] - 16:10, 48:4
**higher** [1] - 47:24
**highest** [1] - 47:20
**highly** [6] - 53:18, 53:23, 54:3, 72:5, 72:13, 72:22
**himself** [2] - 23:14, 44:15
**hired** [1] - 97:6
**hold** [2] - 91:2, 96:20
**holding** [1] - 88:5
**hole** [1] - 99:19
**home** [9] - 86:20, 88:16, 88:17, 89:2, 89:4, 89:17, 90:2, 90:24, 90:25
**honestly** [2] - 95:16, 104:1
**Honor** [67] - 2:3, 2:11, 3:1, 3:14, 5:5, 7:22, 13:2, 16:16, 23:12, 23:20, 26:14, 26:22, 28:1, 28:8, 28:14, 30:8, 31:7, 31:21, 32:18, 33:6, 33:19, 33:25, 34:12, 37:17, 37:24, 40:16, 40:19, 49:1, 49:4, 56:3, 56:9, 57:15, 57:20, 58:5, 59:8, 60:13, 61:15, 63:5, 63:15, 64:12, 67:8, 68:14, 70:4, 70:25, 72:5, 73:9, 74:11, 74:12, 75:11, 77:14, 79:2, 79:5, 80:2, 81:11, 82:7, 82:18, 83:4, 100:1, 100:11, 100:15, 101:15, 101:24, 101:25, 102:18, 102:19, 103:3, 105:12
**hopping** [1] - 91:15
**hops** [2] - 91:14, 91:21
**Horwath** [1] - 92:10
**host** [3] - 90:7, 90:22, 90:25
**hosting** [5] - 86:9, 90:6, 90:8, 90:9, 90:17
**hosts** [1] - 90:13
**hotel** [1] - 42:11
**hour** [4] - 79:12, 79:19, 99:21, 99:24

**hourly** [1] - 21:25
**hours** [5] - 22:5, 22:10, 22:11
**hundred** [1] - 22:14
**hundreds** [3] - 16:14, 85:14
**Hurtado** [1] - 93:17

## I

**idea** [2] - 39:13, 60:11
**identification** [1] - 56:5
**identified** [1] - 54:25
**IDs** [1] - 42:20
**IEEE** [1] - 95:8
**ignored** [1] - 33:24
**illicit** [6] - 13:20, 41:21, 57:5, 57:10, 57:24, 57:25
**image** [1] - 80:17
**imagine** [1] - 59:24
**immediately** [1] - 84:22
**impeachment** [4] - 26:17, 26:25, 27:4, 27:7
**implication** [1] - 67:13
**implies** [1] - 72:12
**important** [2] - 26:11, 77:10
**improper** [3] - 26:17, 26:25, 27:4
**inadmissible** [2] - 40:21, 49:9
**inartfully** [1] - 67:1
**included** [1] - 54:9
**including** [3] - 12:18, 31:22, 44:16
**income** [3] - 45:6, 45:9, 45:14
**incorrect** [2] - 33:1, 80:5
**incorrectly** [1] - 65:13
**increase** [1] - 9:2
**incredible** [1] - 53:21
**independent** [1] - 11:11
**indicated** [2] - 53:6, 103:5
**indicating** [3] - 10:10, 75:17, 76:5
**indictment** [2] - 24:16, 44:17
**indirect** [2] - 40:25, 60:6
**individual** [1] - 68:12
**industry** [2] - 59:5, 59:10
**inflated** [1] - 13:18

**inflating** [1] - 16:10
**inflows** [1] - 54:14
**information** [11] - 5:3, 5:10, 6:22, 9:8, 18:3, 51:22, 80:6, 83:25, 92:1, 95:12, 97:1
**initial** [1] - 24:15
**innocent** [1] - 29:4
**instead** [2] - 16:4, 86:15
**institution** [1] - 54:7
**Institutional** [1] - 20:3
**institutional** [1] - 20:9
**institutions** [1] - 51:10
**instructed** [1] - 77:21
**insulin** [1] - 86:21
**intending** [2] - 104:4, 104:11
**intent** [6] - 49:4, 49:5, 67:6, 75:17, 76:5, 103:22
**intention** [1] - 105:6
**interact** [3] - 6:15, 6:16, 6:17
**interesting** [3] - 93:20, 96:5, 98:8
**intermediate** [1] - 41:4
**internet** [14] - 83:18, 84:24, 84:25, 85:2, 85:3, 86:19, 87:17, 87:18, 88:17, 92:13, 92:18, 93:10, 93:13, 98:9
**Interplay** [1] - 21:2
**interrupt** [1] - 79:10
**interview** [1] - 67:6
**interviewing** [1] - 62:21
**interviews** [2] - 30:2, 30:6
**intraday** [1] - 16:9
**introduce** [1] - 83:6
**investigating** [1] - 68:12
**investigation** [1] - 80:22
**investigator** [1] - 81:4
**investigators** [1] - 68:2
**invited** [2] - 73:18, 73:19
**inviting** [1] - 103:16
**invoice** [7] - 12:17, 13:18, 13:21, 22:6, 22:9, 29:6, 29:12
**invoiced** [1] - 28:19
**invoices** [5] - 4:2, 12:15, 12:19, 12:22, 12:24
**involve** [1] - 6:9

**involved** [5] - 6:5, 94:21, 96:17, 97:25, 103:10
**involves** [1] - 81:3
**involving** [1] - 76:6
**IP** [19] - 86:22, 87:7, 87:11, 87:12, 87:13, 87:15, 87:17, 87:19, 88:4, 88:6, 88:11, 88:13, 88:19, 88:24, 89:10, 89:24, 90:4
**ISP** [1] - 88:18
**issue** [14] - 20:8, 66:25, 68:15, 70:5, 79:23, 80:2, 81:2, 81:23, 82:2, 82:4, 101:8, 101:9, 102:25, 104:23
**issues** [7] - 18:3, 27:20, 70:6, 73:15, 78:6, 78:7
**issuing** [1] - 103:4
**itself** [3] - 19:5, 40:6, 80:16

## J

**J.W** [1] - 2:15
**jailhouse** [1] - 66:25
**JANICE** [1] - 106:3
**Janice** [1] - 106:11
**Jeff** [3] - 82:13, 83:8, 83:9
**JEFF** [1] - 82:14
**Jencks** [21] - 31:15, 31:17, 31:18, 31:21, 31:23, 31:24, 32:2, 32:21, 33:4, 33:6, 33:7, 33:11, 34:1, 34:6, 34:8, 35:11, 35:12, 38:1, 38:4, 80:24, 102:2
**job** [2] - 93:21, 99:7
**join** [1] - 95:19
**joined** [1] - 95:7
**joining** [1] - 95:11
**joked** [1] - 20:21
**Judge** [2] - 18:25, 100:19
**judgement** [1] - 48:12
**judges** [1] - 97:8
**judgment** [2] - 73:6, 103:5
**July** [3] - 26:4, 26:9, 26:12
**June** [1] - 24:1
**jurisdiction** [1] - 57:7
**juror** [1] - 2:6
**jurors** [4] - 35:2, 38:11, 70:13, 101:3
**JURORS** [3] - 5:13,

5:20, 5:25
**jury** [41] - 2:2, 2:4, 2:7, 2:8, 4:15, 5:1, 5:10, 5:12, 5:18, 5:24, 7:20, 11:20, 15:24, 16:12, 17:19, 17:23, 28:12, 34:19, 34:22, 38:10, 38:12, 42:6, 42:15, 51:23, 57:1, 63:12, 67:11, 69:1, 69:8, 70:24, 73:5, 73:14, 73:24, 83:7, 83:12, 86:10, 87:15, 88:2, 90:8, 91:9, 102:21
**jury's** [1] - 15:11
**Justice** [1] - 21:6
**justice** [1] - 21:14

## K

**keep** [7] - 27:23, 79:3, 81:20, 86:3, 91:3, 97:17, 101:18
**keeping** [1] - 83:19
**kept** [3] - 48:24, 84:14, 87:22
**Kevin** [1] - 94:23
**key** [2] - 98:12, 98:15
**keys** [3] - 103:15, 104:6
**kid** [1] - 94:18
**kill** [1] - 96:16
**kind** [12] - 21:10, 32:15, 42:24, 53:19, 67:5, 83:12, 87:22, 91:20, 94:11, 96:16, 98:21, 104:17
**kinds** [2] - 64:20, 95:22
**know..** [1] - 49:3
**knowing** [1] - 37:6
**knowledge** [5] - 60:12, 66:6, 68:20, 76:2, 76:16
**known** [1] - 81:14
**knows** [3] - 92:25, 93:2, 104:2
**Kracken** [1] - 7:7
**Kraken** [10] - 6:9, 7:8, 7:10, 7:11, 41:15, 42:1, 42:18, 43:4, 54:23, 61:24
**KYC** [19] - 7:14, 7:15, 7:16, 8:22, 9:2, 10:15, 41:4, 44:23, 45:4, 48:25, 50:18, 62:13, 62:15, 64:4, 64:17, 65:3, 65:9, 65:20

## L

**label** [1] - 75:1
**lack** [1] - 78:7
**laid** [1] - 7:17
**language** [1] - 14:13
**laptop** [1] - 30:21
**large** [2] - 85:5, 90:18
**largest** [1] - 98:24
**Larry** [3] - 44:9, 62:13
**last** [14] - 9:8, 9:14, 13:9, 13:13, 16:2, 34:2, 34:3, 34:4, 81:19, 92:3, 95:13, 99:6, 99:17, 102:14
**launder** [3] - 62:16, 64:2, 64:17
**laundered** [1] - 62:18
**laundering** [5] - 18:25, 21:8, 79:9, 80:12, 81:6
**Laurent** [2] - 45:21, 46:5
**Laurent's** [1] - 48:2
**law** [3] - 17:23, 92:8, 93:16
**Law** [1] - 17:24
**lawyer** [1] - 17:17
**lawyers** [3] - 25:15, 25:16, 25:21
**Lawyers** [1] - 95:15
**lay** [1] - 67:25
**lead** [2] - 75:8, 92:9
**leader** [1] - 78:13
**leading** [2] - 62:9, 65:5
**learned** [1] - 96:21
**leased** [1] - 92:22
**leasing** [1] - 88:18
**least** [9] - 16:2, 64:9, 69:2, 80:1, 88:6, 93:8, 93:9, 102:24, 104:2
**leave** [2] - 35:2, 101:3
**leaves** [2] - 35:22, 48:9
**led** [4] - 55:22, 56:12, 67:3, 70:2
**ledger** [1] - 49:25
**left** [10] - 8:7, 10:8, 14:25, 46:20, 46:24, 47:3, 47:7, 47:10, 57:12, 79:17
**left-hand** [1] - 14:25
**legal** [1] - 75:25
**legitimate** [3] - 13:19, 39:11, 39:12
**less** [2] - 34:1, 48:8
**letter** [2] - 21:23, 21:25
**letters** [1] - 32:20
**letting** [1] - 89:24

**level** [2] - 97:2, 97:4
**library** [1] - 87:20
**Lichtenstein** [1] - 63:6
**life** [4] - 29:13, 29:15, 53:20, 93:21
**likely** [2] - 21:20, 48:21
**limit** [1] - 34:18
**limited** [1] - 53:22
**limiting** [1] - 63:24
**limits** [2] - 49:7, 49:8
**line** [19] - 10:6, 10:7, 10:8, 23:18, 44:1, 52:7, 52:8, 52:13, 53:1, 53:5, 53:8, 61:8, 71:5, 71:16, 72:6, 72:16, 74:16, 77:6
**lines** [7] - 23:11, 26:16, 26:23, 27:11, 43:6, 43:13, 43:18
**Linksys** [2] - 89:17, 89:23
**Linux** [1] - 6:8
**list** [10] - 5:17, 6:2, 51:15, 65:23, 65:25, 66:7, 66:10, 68:19, 87:23, 87:24
**listed** [7] - 7:1, 7:2, 7:4, 52:15, 53:2, 55:3, 57:18
**listen** [1] - 54:5
**listener** [2] - 56:7, 56:10
**listening** [2] - 78:15, 78:19
**literally** [1] - 93:10
**live** [1] - 86:22
**lived** [1] - 94:24
**living** [1] - 86:2
**LLC** [2] - 18:6, 18:7
**loaned** [1] - 88:24
**loaning** [1] - 88:19
**local** [1] - 6:17
**LocalBitcoins** [1] - 6:13
**location** [2] - 80:8, 91:1
**logs** [1] - 83:19
**Look** [1] - 72:20
**look** [18] - 23:19, 23:24, 23:25, 26:20, 27:19, 29:13, 32:7, 34:10, 36:23, 42:23, 44:4, 68:2, 80:12, 80:16, 88:12, 88:23, 99:12
**looked** [2] - 11:19, 51:9
**looking** [12] - 8:19, 23:23, 35:6, 43:18,

44:1, 50:11, 50:14, 51:3, 52:13, 68:10, 68:12, 83:14
**looks** [5] - 3:6, 39:4, 43:20, 61:23, 80:13
**Los** [2] - 84:19, 93:19
**lose** [1] - 98:17
**loss** [2] - 3:21, 57:7
**lost** [2] - 8:23, 95:21
**love** [1] - 94:1
**low** [4] - 16:9, 16:11, 48:3, 48:6
**lower** [1] - 96:7
**lucky** [1] - 94:17
**Luke** [1] - 41:10
**lunch** [3] - 11:24, 32:2, 79:17

## M

**Mac** [1] - 89:16
**machine** [4] - 83:22, 83:23, 89:16, 99:12
**machines** [3] - 83:19, 83:20, 86:25
**magazine** [1] - 59:9
**Magazine** [4] - 40:6, 40:13, 56:12, 59:5
**main** [1] - 19:12
**MAIN** [1] - 6:9
**maintain** [2] - 19:8, 85:22
**major** [2] - 81:2, 90:9
**malicious** [1] - 92:1
**Manny** [1] - 93:17
**March** [2] - 43:17, 106:7
**marked** [1] - 56:4
**market** [5] - 18:11, 41:3, 57:2, 57:6, 57:11
**marketing** [1] - 19:7
**markets** [2] - 19:4, 41:13
**Mason** [1] - 18:18
**master** [1] - 97:7
**material** [7] - 3:6, 32:7, 32:9, 33:11, 33:12, 33:18, 80:10
**materials** [12] - 24:16, 31:18, 31:22, 31:23, 31:24, 32:22, 33:24, 36:16, 38:1, 38:4, 40:21, 102:5
**math** [2] - 32:15, 57:16
**matter** [10] - 27:17, 27:22, 29:1, 30:4, 30:13, 30:19, 30:23, 31:5, 31:13, 37:15
**matters** [1] - 34:17
**maximum** [1] - 48:17

**Mazars** [4] - 78:12, 79:7, 80:3, 80:14
**Mazars'** [1] - 81:13
**mean** [13] - 3:9, 23:1, 32:9, 35:13, 35:23, 42:2, 68:8, 69:3, 70:1, 75:2, 89:3, 94:18, 95:7
**means** [5] - 15:1, 56:10, 57:19, 68:8, 104:23
**meant** [2] - 13:19, 104:8
**meantime** [1] - 38:2
**mechanism** [3] - 25:17, 25:19, 91:23
**media** [1] - 84:7
**median** [1] - 48:7
**meet** [1] - 86:4
**member** [2] - 95:13, 95:14
**members** [1] - 34:22
**memorize** [1] - 42:19
**memorizing** [1] - 86:16
**memory** [2] - 23:7, 24:7
**mention** [2] - 21:4, 30:2
**mentioned** [7] - 19:14, 32:6, 45:4, 57:2, 64:4, 64:16, 88:4
**merely** [5] - 12:23, 61:9, 67:14, 68:5, 73:1
**mic** [1] - 101:16
**might** [4] - 27:19, 39:4, 93:14, 96:16
**military** [3] - 95:23, 95:24, 96:17
**million** [8] - 18:24, 47:23, 47:24, 48:4, 48:6, 48:8, 48:9
**millions** [1] - 16:14
**mind** [1] - 100:23
**mine** [1] - 92:7
**mined** [1] - 98:2
**miners** [1] - 98:6
**mines** [1] - 98:8
**mining** [2] - 57:4, 98:1
**minor** [1] - 93:8
**minute** [4] - 27:1, 34:2, 34:3, 34:4
**minutes** [1] - 37:20
**miscarriage** [1] - 21:14
**mischaracterization** [1] - 15:9
**misleading** [6] - 67:22, 72:5, 72:13, 72:22, 73:1, 73:13
**misrepresentation** [1]

- 81:3
**missing** [2] - 72:14, 73:3
**misspoke** [1] - 20:15
**misstated** [1] - 81:12
**misstating** [1] - 57:15
**mistakes** [1] - 12:19
**MIT** [2] - 20:22, 87:20
**mitigation** [2] - 95:25, 96:2
**mitigator** [1] - 96:1
**Mitnick** [1] - 94:23
**mixer** [12] - 12:8, 39:1, 39:6, 41:5, 41:7, 44:11, 46:11, 103:7, 103:13, 103:22, 104:3, 104:12
**mixer-like** [1] - 46:11
**mixers** [5] - 55:23, 56:13, 57:3, 57:10, 103:6
**mixing** [6] - 21:10, 38:19, 39:10, 39:12, 40:4, 57:4
**modern** [1] - 20:9
**moment** [3] - 35:18, 35:21, 55:13
**money** [22] - 18:24, 21:8, 23:3, 25:16, 25:17, 28:25, 29:14, 43:3, 62:16, 62:19, 64:2, 72:21, 73:3, 79:9, 80:12, 81:6, 92:17, 99:2, 99:3, 99:4
**Money** [4] - 20:19, 53:9, 53:11, 53:13
**month** [1] - 89:9
**monthly** [1] - 90:17
**Moon** [11] - 6:10, 7:7, 41:15, 42:1, 42:18, 43:4, 60:18, 60:20, 61:2, 61:7, 61:25
**morning** [9] - 12:20, 19:14, 32:6, 80:8, 80:23, 100:18, 100:21, 100:23, 105:14
**Moss** [1] - 18:25
**most** [8] - 6:9, 6:11, 16:2, 39:10, 39:12, 55:22, 93:20, 94:23
**mostly** [3] - 7:2, 83:14, 96:4
**mother's** [1] - 50:12
**motion** [9] - 31:18, 32:16, 33:4, 33:7, 34:5, 34:8, 35:7, 36:2, 102:1
**move** [18] - 5:16, 7:25, 9:4, 9:10, 9:15, 9:24, 11:17, 12:11, 13:1, 13:4, 28:2, 28:14, 31:10, 40:17, 56:4,

60:13, 82:8, 97:20
**moved** [4] - 29:8, 31:16, 90:23, 90:25
**moves** [1] - 100:2
**moving** [5] - 9:1, 13:5, 13:10, 13:15, 81:20
**MR** [207] - 2:3, 2:11, 2:17, 2:24, 3:1, 3:4, 3:14, 3:24, 4:13, 5:5, 5:8, 5:14, 6:21, 7:22, 7:25, 8:2, 8:4, 10:1, 10:3, 11:10, 11:23, 12:2, 12:21, 12:23, 13:2, 13:5, 13:6, 13:22, 13:25, 14:13, 14:14, 14:17, 14:20, 14:23, 15:9, 15:13, 16:16, 16:19, 17:20, 17:22, 23:12, 23:15, 23:16, 23:20, 23:25, 24:1, 24:5, 24:6, 24:18, 24:20, 25:2, 25:9, 25:24, 26:14, 26:17, 26:22, 26:25, 27:4, 27:10, 28:1, 28:6, 28:8, 28:10, 28:14, 28:16, 30:8, 30:12, 31:7, 31:10, 31:15, 31:21, 32:5, 32:18, 33:1, 33:6, 33:12, 33:19, 33:25, 34:5, 34:10, 34:12, 34:15, 36:5, 36:19, 36:22, 37:2, 37:6, 37:14, 37:24, 38:9, 38:16, 38:25, 40:16, 40:19, 40:24, 43:9, 43:12, 49:1, 49:4, 49:12, 51:20, 51:24, 51:25, 55:4, 55:7, 55:15, 56:3, 56:6, 56:7, 56:9, 56:11, 56:18, 56:20, 56:21, 57:15, 57:20, 58:1, 58:5, 58:9, 58:14, 59:4, 59:8, 59:15, 60:13, 60:16, 61:3, 61:6, 61:15, 61:16, 62:5, 62:7, 62:11, 62:22, 62:25, 63:5, 63:15, 63:16, 64:10, 64:14, 65:6, 65:10, 65:12, 65:16, 65:19, 67:1, 67:8, 67:12, 67:24, 68:14, 69:23, 70:4, 70:12, 70:25, 71:3, 71:6, 71:24, 72:3, 72:5, 72:19, 73:9, 74:1, 74:11, 74:12, 74:14, 74:17, 75:11, 75:14, 76:17, 76:20, 76:21, 77:1, 77:12, 77:14,

77:20, 78:4, 78:18, 78:22, 78:25, 79:2, 79:5, 80:2, 82:3, 82:13, 82:18, 82:20, 83:4, 83:5, 95:2, 96:24, 97:15, 97:19, 97:22, 100:1, 100:11, 100:15, 101:8, 101:10, 101:24, 102:9, 102:14, 102:18, 103:21, 104:10, 104:20, 104:24, 105:3, 105:9
**MS** [7] - 81:11, 82:7, 100:5, 101:25, 102:19, 103:3, 105:12
**Mt** [3] - 6:12, 8:23, 8:24
**multiple** [2] - 39:3, 104:15
**must** [1] - 35:8
**Mycelium** [4] - 49:16, 50:21, 64:22, 65:3
**mystery** [2] - 48:9, 81:18

---

## N

**N.W** [1] - 106:12
**name** [21] - 7:5, 18:7, 51:11, 83:7, 83:8, 85:11, 85:12, 85:20, 86:11, 86:13, 86:17, 87:4, 87:5, 87:6, 87:11, 90:14, 90:17, 91:16, 91:17, 93:3, 93:15
**names** [4] - 85:10, 85:15, 85:16, 87:19
**naming** [1] - 10:8
**narrow** [1] - 69:14
**nation's** [1] - 98:24
**National** [1] - 95:14
**national** [1] - 96:17
**Navy** [2] - 91:12, 91:13
**necessarily** [2] - 56:8, 75:2
**necessary** [2] - 68:1, 88:16
**need** [17] - 28:23, 36:4, 38:6, 40:17, 51:20, 58:20, 70:14, 72:15, 79:11, 79:23, 80:19, 88:10, 89:21, 92:19, 100:6, 102:17, 103:1
**needed** [2] - 77:17, 98:4
**needs** [2] - 35:3, 102:4
**negative** [3] - 75:19, 75:21, 76:8
**negotiate** [1] - 29:15

**neighbors** [1] - 88:22
**net** [2] - 48:9, 50:8
**network** [7] - 83:17, 86:3, 89:15, 89:22, 91:7, 91:10, 98:11
**networks** [1] - 84:1
**never** [7] - 10:18, 27:15, 40:11, 47:16, 51:14, 93:21, 94:10
**new** [2] - 12:9, 28:6
**next** [10] - 5:16, 7:25, 8:2, 8:17, 9:10, 9:24, 51:3, 54:11, 82:11, 93:10
**nice** [1] - 86:15
**nine** [1] - 11:2
**node** [4] - 85:1, 91:19, 92:3, 104:17
**non** [3] - 7:15, 64:4, 64:17
**non-KYC** [3] - 7:15, 64:4, 64:17
**none** [3] - 31:14, 32:3, 32:25
**nonresponsive** [1] - 24:20
**Nordea** [1] - 6:18
**normal** [3] - 19:10, 29:15, 99:21
**normally** [1] - 99:20
**north** [2] - 47:15, 48:14
**north-of-billion-dollar** [2] - 47:15, 48:14
**notes** [25] - 29:23, 29:25, 30:1, 30:2, 30:4, 30:6, 30:19, 30:20, 30:23, 31:1, 31:12, 32:24, 35:25, 36:2, 36:10, 36:15, 37:5, 37:10, 37:12, 44:17, 62:20, 77:3, 103:2, 106:5
**nothing** [10] - 5:15, 36:17, 40:15, 41:5, 43:1, 75:22, 76:11, 76:14, 84:13, 95:4
**notice** [1] - 78:15
**noticed** [1] - 16:22
**notion** [1] - 70:22
**notorious** [1] - 94:23
**number** [54] - 3:25, 7:2, 8:7, 8:8, 8:9, 8:11, 8:19, 8:20, 9:4, 9:7, 9:11, 9:15, 9:17, 9:20, 9:21, 10:1, 10:4, 11:17, 11:20, 11:22, 12:4, 12:11, 12:13, 12:17, 13:5, 13:7, 13:10, 13:12, 13:15, 13:16,

31:23, 31:24, 32:1, 48:11, 54:7, 57:14, 60:24, 68:14, 68:17, 71:16, 86:16, 86:18, 87:3, 87:9, 87:10, 88:15, 91:21, 94:7, 95:9, 95:23, 97:7

**Number** [2] - 2:13, 55:8

**numbers** [4] - 11:3, 61:8, 86:23

**numerous** [1] - 86:1

## O

**o'clock** [1] - 100:23
**oath** [2] - 26:9, 27:7
**object** [7] - 11:23, 14:13, 15:9, 24:18, 61:3, 68:21, 68:22
**objected** [2] - 3:24, 68:18
**objection** [29] - 4:4, 12:21, 14:16, 14:19, 14:22, 17:20, 23:12, 25:9, 26:17, 26:25, 27:3, 28:9, 30:8, 40:16, 40:23, 43:9, 49:1, 56:6, 57:20, 60:15, 62:5, 62:6, 62:7, 62:10, 62:22, 65:10, 71:24, 100:4, 100:5
**objections** [2] - 18:1, 49:3
**obligated** [1] - 33:3
**obscure** [2] - 19:5, 19:18
**obscuring** [1] - 19:8
**observation** [4] - 12:7, 12:23, 13:9, 13:17
**observations** [1] - 39:8
**observe** [1] - 8:25
**observed** [6] - 7:9, 8:25, 10:17, 10:18, 10:20, 10:22
**obtain** [1] - 102:5
**obvious** [2] - 24:17, 37:3
**occurring** [1] - 43:19
**occurs** [1] - 54:23
**OF** [1] - 106:1
**offense** [2] - 63:21, 63:25
**offer** [3] - 19:18, 48:11, 93:23
**office** [2] - 86:6, 90:24
**officer** [1] - 35:16
**OFFICIAL** [1] - 106:1
**Official** [1] - 106:11

**often** [1] - 19:11
**old** [2] - 51:4, 93:21
**Ometedou** [1] - 104:14
**once** [3] - 85:4, 89:19, 90:23
**one** [40] - 2:6, 6:3, 6:10, 7:2, 7:5, 8:25, 18:11, 19:20, 31:23, 31:24, 32:20, 39:4, 48:12, 50:1, 52:2, 68:1, 68:6, 68:11, 68:14, 70:12, 72:9, 74:22, 78:11, 80:11, 86:23, 87:15, 88:6, 88:7, 92:9, 93:4, 93:5, 94:23, 95:24, 96:3, 96:15, 97:9, 97:10, 101:25, 103:12
**ones** [5] - 6:5, 39:3, 57:5, 73:3, 92:20
**Onion** [1] - 91:11
**online** [4] - 6:6, 52:11, 53:11, 93:6
**open** [8] - 34:21, 49:4, 60:14, 69:16, 69:21, 73:12, 74:13, 82:10
**Open** [2] - 5:7, 71:2
**open-ended** [2] - 69:16, 69:21
**opened** [3] - 44:20, 73:21, 73:22
**opening** [1] - 49:1
**opens** [1] - 61:12
**operate** [1] - 103:7
**operates** [1] - 103:12
**operating** [2] - 43:3, 103:22
**Operations** [1] - 41:10
**operator** [4] - 14:5, 48:1, 48:16, 48:19
**operator's** [1] - 46:4
**opine** [1] - 104:22
**opining** [1] - 70:22
**opinion** [5] - 40:22, 56:23, 59:3, 69:18, 74:10
**opinions** [3] - 4:23, 40:20, 56:15
**opportunity** [1] - 78:8
**Optical** [1] - 6:19
**option** [4] - 19:13, 19:15, 48:13, 48:14
**options** [1] - 48:11
**order** [7] - 2:9, 35:8, 38:13, 64:1, 80:9, 87:4, 96:10
**organizations** [3] - 95:10, 95:11, 95:12
**original** [6] - 24:8,

24:10, 24:11, 39:16, 39:19, 70:6
**originally** [1] - 91:11
**otherwise** [3] - 8:25, 13:13, 56:15
**ought** [1] - 79:22
**outflows** [3] - 10:14, 54:17, 54:19
**outset** [1] - 21:22
**outside** [7] - 48:25, 61:4, 67:10, 68:17, 68:24, 98:21, 103:13
**overnight** [5] - 38:4, 79:24, 79:25, 81:24, 82:2
**overruled** [3] - 17:21, 25:10, 40:23
**overseas** [1] - 76:1
**oversee** [1] - 99:4
**oversees** [1] - 98:23
**own** [10] - 6:16, 7:4, 7:5, 81:17, 86:6, 87:22, 90:7, 90:10, 90:11
**owned** [1] - 8:10

## P

**page** [14] - 7:17, 8:14, 18:18, 18:21, 23:10, 26:16, 50:11, 50:14, 51:3, 51:8, 54:11, 76:18, 87:2, 87:4
**paid** [16] - 21:19, 21:20, 22:20, 24:15, 24:24, 25:1, 25:7, 26:6, 27:19, 27:23, 29:5, 44:15, 46:19, 94:4, 94:13, 99:16
**pandemic** [1] - 90:23
**paper** [2] - 30:18, 87:19
**parameters** [1] - 61:4
**parentheses** [1] - 77:9
**parents** [1] - 94:19
**part** [18] - 25:18, 25:19, 25:20, 30:22, 39:15, 40:5, 41:24, 55:24, 56:24, 56:25, 58:19, 69:2, 74:22, 86:8, 91:3, 98:23, 99:1, 99:5
**participate** [1] - 78:24
**participated** [1] - 21:15
**participation** [1] - 21:18
**particular** [4] - 5:15, 58:8, 69:12, 81:15
**particularly** [3] - 18:3, 71:11, 84:14

**particulars** [1] - 103:22
**partners** [1] - 92:9
**party** [1] - 35:8
**pass** [3] - 16:16, 26:21, 75:11
**password** [8] - 51:21, 52:2, 52:24, 54:8, 65:23, 65:25, 66:7, 66:10
**path** [1] - 81:15
**pattern** [5] - 9:1, 12:8, 44:5, 62:1, 76:5
**patterns** [1] - 76:11
**pause** [2] - 24:3, 76:23
**Pause** [1] - 27:2
**pay** [6] - 89:8, 89:20, 90:17, 91:1, 91:4, 91:20
**payment** [3] - 24:12, 52:11, 53:11
**payments** [5] - 41:21, 41:22, 41:24, 41:25, 43:2
**PayPal** [1] - 6:19
**peer** [13] - 6:13, 6:14, 6:15, 6:16, 6:17, 7:15, 20:22
**peer-to-peer** [2] - 6:13, 6:14
**Pelker** [1] - 82:6
**PELKER** [7] - 81:11, 82:7, 100:5, 101:25, 102:19, 103:3, 105:12
**pending** [2] - 34:5, 102:19
**people** [9] - 6:14, 12:18, 25:20, 33:20, 91:14, 92:16, 93:13, 94:12, 94:22
**percent** [7] - 57:12, 57:13, 57:14, 57:18, 57:19, 57:22, 99:24
**percentage** [3] - 41:12, 41:14, 57:9
**Perfect** [3] - 53:9, 53:11, 53:13
**perfectly** [2] - 3:14, 61:25
**perform** [1] - 96:11
**period** [3] - 11:9, 53:20, 88:22
**permissible** [3] - 4:23, 5:4, 69:4
**permission** [2] - 37:9, 37:13
**permitted** [1] - 66:2
**person** [2] - 58:24, 69:8
**personal** [4] - 6:18,

53:20, 97:24
**personal.ANXBTC** [1] - 71:17
**perspective** [1] - 7:6
**pertaining** [1] - 102:2
**phone** [21] - 3:1, 31:7, 49:16, 49:19, 49:22, 64:23, 69:24, 72:3, 74:5, 78:25, 79:1, 79:3, 81:10, 85:7, 86:3, 86:16, 86:18, 88:5, 88:6, 93:21, 94:8
**phones** [3] - 83:17, 84:5, 98:7
**phrase** [1] - 98:19
**phrased** [1] - 67:1
**phrases** [2] - 103:15, 104:7
**physically** [2] - 90:22, 101:17
**pick** [1] - 66:21
**picked** [2] - 41:6, 48:11
**pie** [1] - 59:16
**piece** [6] - 80:4, 80:10, 81:4, 89:14, 89:16, 90:20
**pieces** [1] - 78:11
**piles** [3] - 69:10, 69:19
**pinging** [1] - 89:23
**Pizza** [1] - 46:16
**pizza** [1] - 47:10
**pizzas** [4] - 46:20, 46:24, 47:2, 47:7
**place** [2] - 67:14, 89:18
**places** [1] - 91:2
**plagiarize** [1] - 87:20
**plenty** [1] - 79:13
**plug** [1] - 76:24
**pocket** [1] - 98:4
**podcast** [2] - 20:21, 21:5
**point** [14] - 4:21, 5:10, 21:4, 30:15, 34:13, 36:1, 36:3, 39:3, 56:3, 63:8, 72:17, 81:21, 99:19, 100:16
**pointed** [1] - 59:4
**pointing** [2] - 72:20, 104:18
**points** [2] - 39:4, 86:24
**police** [1] - 4:18
**pools** [1] - 57:4
**popular** [1] - 84:8
**portions** [1] - 56:16
**posing** [1] - 72:11
**possession** [1] - 50:12

**possible** [5] - 22:25, 23:1, 49:21, 49:25, 54:10
**Post** [1] - 59:20
**post** [1] - 7:13
**post-Fog** [1] - 7:13
**posthumously** [1] - 96:21
**potentially** [4] - 47:23, 54:6, 81:2, 81:3
**power** [2] - 80:9, 80:15
**practically** [1] - 96:4
**precisely** [1] - 104:10
**prefer** [1] - 89:20
**premises** [1] - 5:3
**Prepaid** [1] - 6:19
**prepaid** [4] - 6:20, 7:2, 7:4, 10:15
**preparation** [1] - 55:19
**prepare** [3] - 29:23, 30:4, 42:3
**prepared** [5] - 3:12, 29:25, 45:20, 50:8, 82:23
**present** [2] - 2:8, 38:12
**presents** [1] - 9:9
**Press** [1] - 20:23
**pretrial** [3] - 3:12, 23:10, 50:8
**pretty** [6] - 24:17, 27:15, 85:18, 87:21, 98:8, 99:15
**previously** [7] - 16:8, 20:20, 42:11, 50:3, 51:19, 61:5, 76:19
**price** [6] - 9:3, 15:15, 15:19, 16:5, 16:7
**privacy** [5] - 19:7, 19:8, 55:23, 56:13
**Privacy** [3] - 19:10, 21:1, 21:2
**private** [5] - 51:21, 78:9, 98:15, 103:15, 104:6
**privileged** [1] - 33:3
**pro** [5] - 22:10, 22:12, 27:22, 99:23, 99:25
**problem** [4] - 69:5, 70:21, 79:5, 89:1
**problematic** [1] - 69:7
**proceed** [1] - 82:17
**proceeding** [2] - 37:5, 50:8
**proceedings** [4] - 37:10, 95:1, 106:6
**proceeds** [2] - 44:21, 44:24
**process** [2] - 76:1,

85:18
**processer** [1] - 52:11
**produce** [7] - 31:15, 32:2, 32:10, 33:3, 35:9, 36:23, 37:15
**produced** [3] - 31:14, 32:2, 33:7
**product** [1] - 42:3
**production** [4] - 31:16, 31:17, 32:21, 33:10
**professional** [1] - 85:9
**Professor** [43] - 2:18, 3:11, 3:15, 4:14, 12:3, 14:1, 14:24, 16:20, 18:23, 24:1, 24:7, 26:2, 26:15, 27:11, 28:17, 29:22, 32:4, 32:11, 33:16, 33:21, 37:4, 38:5, 38:17, 39:1, 40:25, 42:13, 42:17, 45:19, 50:5, 52:1, 52:7, 52:22, 54:5, 55:16, 58:2, 58:9, 61:4, 61:17, 63:9, 63:17, 71:7, 75:15, 77:2
**professor** [2] - 16:22, 84:25
**programming** [1] - 85:19
**project** [1] - 98:8
**promise** [1] - 91:25
**proof** [2] - 72:19, 73:3
**proper** [1] - 58:5
**property** [1] - 90:22
**proposal** [1] - 37:24
**proposed** [1] - 64:7
**proposes** [1] - 38:2
**prosecution** [2] - 21:13, 93:23
**prosecutor** [1] - 97:4
**prosecutorial** [2] - 95:11, 95:18
**prosecutors** [2] - 94:7, 95:16
**Prosecutors** [1] - 95:13
**Protectimus** [1] - 77:9
**protocol** [1] - 87:17
**provide** [3] - 95:12, 98:7, 98:10
**provided** [4] - 18:2, 42:5, 45:11, 81:16
**provider** [1] - 88:17
**providing** [1] - 98:9
**public** [3] - 51:21, 98:12, 103:15
**publication** [1] - 56:12
**publicly** [1] - 19:24
**publish** [2] - 28:13,

28:14
**published** [2] - 28:12, 42:15
**pull** [6] - 34:7, 38:22, 42:10, 50:3, 51:20, 81:19
**pulling** [1] - 26:22
**pump** [1] - 86:21
**purchase** [1] - 10:21
**purchased** [1] - 10:22
**purported** [1] - 41:24
**purposes** [4] - 4:22, 56:18, 59:2, 92:1
**pushed** [1] - 15:7
**put** [13] - 8:9, 13:23, 26:19, 62:25, 64:6, 64:8, 74:14, 80:17, 89:14, 94:10, 94:11, 96:23, 101:7
**puts** [2] - 70:23, 70:24
**putting** [2] - 24:22, 43:3
**puzzling** [1] - 67:17

## Q

**qualifications** [7] - 28:22, 94:13, 95:1, 95:3, 97:14, 97:17, 97:18
**qualified** [3] - 95:20, 96:6, 100:9
**qualify** [1] - 100:2
**quantity** [1] - 16:4
**questioned** [1] - 33:9
**questioning** [2] - 69:6, 72:16
**questions** [20] - 29:12, 55:4, 60:18, 61:18, 62:12, 65:15, 65:18, 65:22, 68:6, 69:3, 69:24, 71:8, 72:11, 73:11, 73:18, 73:19, 73:24, 74:3, 77:12, 103:14
**quite** [6] - 12:6, 32:8, 67:21, 83:18, 97:10, 97:11
**quote/unquote** [2] - 50:7, 59:9

## R

**radar** [1] - 92:18
**raise** [4] - 25:15, 25:22, 99:22, 104:23
**raising** [1] - 25:21
**rambling** [1] - 48:22
**range** [1] - 66:4
**rate** [2] - 21:25, 22:3

rather [4] - 19:7, 34:22, 79:17, 105:2
raw [1] - 16:3
re [1] - 73:11
re-ask [1] - 73:11
reach [2] - 47:15, 47:18
reaching [5] - 4:16, 10:5, 15:23, 58:3, 58:17
read [7] - 23:11, 26:2, 26:8, 26:15, 26:23, 27:1, 27:11
reader [2] - 79:8, 101:10
reading [1] - 103:19
ready [2] - 2:2, 82:21
realistic [1] - 48:13
realistically [1] - 53:16
reality [2] - 68:10, 87:8
realizing [1] - 70:12
really [10] - 4:24, 60:2, 70:17, 84:14, 85:3, 86:17, 88:10, 92:13, 97:11
reason [9] - 4:5, 29:2, 29:7, 42:21, 66:19, 72:7, 75:21, 76:10, 85:17
reasonable [1] - 60:9
reasonably [2] - 59:24, 59:25
reasons [2] - 55:23, 73:7
rebuttal [1] - 3:19
rebutting [2] - 3:12, 73:2
receive [4] - 7:9, 22:24, 24:12, 28:18
received [6] - 15:19, 33:23, 51:16, 96:10, 96:14, 102:4
recently [3] - 18:21, 18:23, 89:7
recess [1] - 37:22
reciprocal [1] - 32:21
recognize [3] - 2:18, 14:1, 14:3
recollection [4] - 15:11, 23:13, 63:12, 63:13
record [5] - 26:3, 26:15, 62:23, 101:7, 104:19
records [4] - 41:16, 42:18, 66:16, 83:22
recross [8] - 72:7, 72:17, 73:9, 73:10, 73:12, 73:25, 74:4, 74:9

RECROSS [1] - 75:13
RECROSS-EXAMINATION [1] - 75:13
redirect [5] - 67:15, 72:6, 73:7, 73:14, 73:17
REDIRECT [1] - 55:14
refer [1] - 88:18
referenced [1] - 68:19
referencing [2] - 39:2, 39:5
referred [3] - 4:5, 16:12, 54:11
referring [5] - 10:24, 32:10, 33:13, 34:14, 34:15
refers [2] - 52:8, 52:13
reflects [1] - 60:5
refresh [2] - 23:7, 24:7
refreshing [1] - 23:13
regarding [1] - 12:4
register [1] - 87:5
registered [2] - 85:13, 85:16
registration [2] - 85:11, 103:24
regular [1] - 41:21
regularly [1] - 89:24
related [12] - 4:2, 12:17, 21:15, 37:14, 39:8, 63:1, 63:21, 64:19, 66:16, 72:24, 95:5
relating [2] - 101:1, 103:12
relation [7] - 61:2, 61:7, 64:1, 80:4, 98:12, 98:15, 103:21
relatively [2] - 85:23, 89:21
released [1] - 28:18
relevant [5] - 3:23, 4:19, 4:24, 60:3, 68:25
relied [11] - 4:22, 5:10, 11:14, 11:21, 15:23, 46:2, 56:14, 56:16, 56:18, 57:1, 58:3
rely [15] - 9:6, 10:4, 12:13, 13:7, 13:11, 13:16, 47:19, 56:23, 56:25, 58:17, 59:2, 59:24, 59:25, 60:9, 63:13
relying [1] - 34:7
remember [17] - 12:6, 17:7, 20:6, 23:6, 29:2, 41:14, 45:3, 63:11, 63:24, 64:3, 64:15, 64:16, 87:3, 91:12,

92:10, 95:8
remind [5] - 17:19, 17:23, 32:1, 86:10, 87:15
reminder [1] - 11:20
remote [1] - 89:3
rent [1] - 90:19
repeat [1] - 11:1
repeated [1] - 19:11
repeatedly [3] - 31:22, 32:1, 32:19
repeater [1] - 91:20
repeating [1] - 91:21
repetitive [1] - 11:25
replicate [1] - 48:10
report [11] - 4:16, 38:18, 39:1, 39:6, 39:7, 39:14, 39:16, 40:13, 59:25, 60:2, 66:11
reported [2] - 40:12, 73:16
REPORTER [2] - 11:1, 106:1
Reporter [1] - 106:11
reporter [2] - 82:24, 94:1
reporting [2] - 59:6, 59:9
reports [2] - 73:15, 87:20
represent [1] - 57:14
representation [2] - 59:13, 80:3
representations [1] - 37:7
represented [2] - 33:7, 57:18
reproducing [2] - 59:16, 59:23
reproduction [1] - 77:3
reputable [3] - 56:11, 59:2, 59:10
request [3] - 26:14, 35:14, 95:19
requested [1] - 31:21
requests [2] - 33:23, 78:4
require [3] - 36:17, 53:21, 72:7
required [4] - 35:12, 42:8, 86:8, 103:7
requirements [1] - 19:17
requires [1] - 31:18
research [2] - 35:1, 100:25
reserve [3] - 38:4, 38:6, 103:5
residences [1] - 50:1

residing [1] - 101:17
resolution [1] - 73:23
resolve [2] - 73:5, 79:11
resolving [1] - 87:9
respect [6] - 7:8, 24:23, 36:12, 70:20, 101:7
respond [1] - 75:25
responding [1] - 17:25
response [2] - 60:5, 67:14
responsive [1] - 36:11
rest [1] - 80:20
result [1] - 46:13
results [1] - 80:22
retail [1] - 20:24
retainer [8] - 27:14, 27:16, 29:1, 29:3, 29:8, 29:9, 99:22
return [2] - 77:24, 77:25
returning [1] - 29:13
returns [1] - 2:7
revenue [1] - 13:19
review [29] - 7:1, 7:20, 8:6, 14:6, 20:22, 23:17, 24:15, 24:16, 33:13, 33:15, 38:3, 39:6, 39:25, 44:19, 63:20, 64:18, 66:20, 71:12, 71:21, 75:4, 75:7, 78:9, 80:19, 80:20, 80:25, 81:1, 82:4, 101:8
reviewed [10] - 6:22, 32:5, 38:18, 39:7, 44:16, 54:20, 55:19, 59:14, 65:25, 66:14
reviewing [2] - 27:20, 67:3
rights [1] - 72:23
ringing [3] - 85:8, 86:3, 93:22
rooftop [1] - 98:9
Room [1] - 106:12
room [7] - 35:20, 63:11, 63:17, 94:12, 96:23, 101:19, 104:2
rope [1] - 73:6
rough [2] - 11:3, 57:9
roughly [9] - 11:3, 11:4, 11:5, 11:6, 11:7, 88:24
round [4] - 11:6, 11:8
rounded [1] - 11:5
Router [1] - 91:11
Rule [10] - 3:13, 31:11, 31:25, 32:18, 32:22, 33:11, 36:11, 36:17
rule [5] - 14:16, 31:17,

34:7, 34:10, 34:16
**rules** [1] - 7:17
**Rules** [2] - 17:10, 17:14
**run** [4] - 89:2, 89:6, 89:16, 91:20
**running** [8] - 44:11, 61:25, 88:9, 90:10, 91:3, 91:4, 91:16, 104:16
**runs** [1] - 70:21

## S

**Samourai** [3] - 46:7, 46:10, 46:11
**sandwich** [2] - 79:18, 79:20
**sat** [3] - 16:25, 17:2, 17:5
**saw** [5] - 29:10, 30:21, 65:22, 72:24, 76:4
**schemes** [1] - 64:17
**Scholl** [4] - 14:4, 15:7, 41:10, 48:10
**Scholl's** [2] - 48:6, 48:7
**school** [5] - 17:23, 87:21, 92:7, 93:2, 98:24
**School** [1] - 17:24
**science** [1] - 85:1
**scientific** [3] - 59:21, 59:22, 59:23
**SCIF** [3] - 96:25, 97:1, 97:3
**scope** [11] - 30:3, 33:9, 37:21, 67:11, 68:17, 68:24, 68:25, 70:8, 100:7, 102:20, 103:17
**scrap** [1] - 30:18
**screen** [3] - 5:19, 5:21, 26:24
**scroll** [8] - 15:25, 39:22, 39:24, 55:9, 58:1, 58:10, 58:11, 58:12
**scrolling** [4] - 52:7, 53:1, 53:5, 53:8
**seated** [2] - 2:9, 38:13
**second** [7] - 2:25, 3:2, 34:11, 64:6, 66:21, 79:10, 98:24
**secondly** [1] - 27:14
**secondwave.com** [1] - 85:13
**secret** [1] - 96:22
**secrets** [1] - 96:17
**secure** [1] - 97:1

**security** [5] - 89:2, 91:23, 96:17, 97:2, 97:4
**see** [47] - 5:19, 10:12, 10:24, 14:15, 35:1, 35:20, 41:18, 41:19, 41:20, 41:23, 41:25, 42:13, 44:5, 52:10, 52:15, 52:22, 52:25, 53:4, 53:7, 53:10, 56:22, 57:2, 57:3, 58:2, 58:15, 60:2, 64:19, 66:9, 67:3, 70:19, 70:23, 71:17, 71:20, 71:21, 72:1, 75:24, 76:10, 76:13, 77:6, 77:11, 79:2, 83:25, 84:22, 89:6, 89:12, 101:1, 105:13
**seed** [3] - 98:19, 103:15, 104:6
**seeing** [1] - 72:8
**seeking** [1] - 40:21
**seized** [3] - 22:15, 22:24, 25:13
**sell** [2] - 9:3, 18:9
**selling** [3] - 43:23, 54:22, 55:1
**send** [3] - 36:19, 36:20, 38:1
**sending** [1] - 12:8
**sense** [4] - 37:20, 90:1, 92:14, 102:25
**sent** [6] - 7:11, 7:14, 15:4, 22:6, 45:1, 96:8
**sentence** [1] - 58:15
**September** [1] - 22:9
**sequestered** [2] - 17:12, 80:21
**sequestering** [1] - 81:8
**serve** [1] - 19:2
**server** [10] - 85:25, 86:11, 86:12, 86:13, 87:6, 88:9, 90:20, 91:2, 91:4, 103:24
**servers** [7] - 36:6, 85:21, 86:1, 90:10, 90:19, 90:25, 104:15
**service** [12] - 21:7, 21:10, 21:16, 46:11, 46:12, 53:11, 71:11, 88:17, 89:24, 98:7, 98:9, 98:10
**services** [4] - 18:9, 18:11, 89:7, 93:23
**Services** [1] - 6:19
**set** [7] - 70:5, 85:25, 86:1, 87:5, 89:7, 89:18, 92:23

**setting** [4] - 45:13, 103:10, 103:11, 103:24
**several** [4] - 16:23, 22:14, 98:14, 98:18
**Shake** [1] - 5:13
**share** [4] - 7:19, 7:23, 15:23, 51:23
**shares** [1] - 4:14
**sharing** [1] - 90:20
**sheet** [1] - 87:19
**shielded** [2] - 19:13, 19:20
**shoes** [3] - 69:8, 70:24
**short** [4] - 80:24, 93:4, 104:4, 104:11
**show** [7] - 35:18, 42:6, 43:2, 54:18, 67:21, 79:16, 92:19
**showed** [5] - 8:21, 16:12, 75:4, 93:3, 93:9
**showing** [2] - 23:9, 60:23
**shown** [2] - 43:13, 44:2
**shows** [2] - 51:21, 69:13
**sic** [1] - 73:6
**sic)** [1] - 57:19
**side** [2] - 13:9, 91:22
**sidebars** [1] - 78:24
**sign** [1] - 89:19
**significantly** [1] - 15:20
**silently** [1] - 23:17
**similar** [3] - 39:3, 46:13, 83:21
**simple** [2] - 85:24, 104:16
**simply** [5] - 3:16, 21:21, 36:9, 72:23, 84:13
**single** [1] - 47:16
**singling** [1] - 61:8
**sit** [2] - 33:19, 34:23
**site** [3] - 44:12, 90:7, 103:11
**sitting** [2] - 30:24, 37:4
**slant** [1] - 59:12
**slide** [53] - 2:18, 2:21, 2:22, 2:23, 2:25, 3:7, 3:8, 3:15, 3:17, 4:2, 4:14, 5:9, 5:15, 5:16, 7:21, 7:25, 8:3, 8:5, 8:17, 8:19, 9:4, 9:6, 9:8, 9:10, 9:11, 9:12, 9:14, 9:15, 9:17, 9:20, 9:24, 10:1, 10:4, 11:17, 11:19, 11:22, 12:4, 12:10, 12:11, 12:13,

13:5, 13:7, 13:10, 13:12, 13:13, 13:15, 13:16, 13:17, 32:13, 66:11
**slides** [3] - 3:6, 9:9, 30:16
**slightly** [1] - 74:3
**slogan** [2] - 19:9, 19:10
**slow** [2] - 90:15, 93:25
**small** [2] - 45:1, 61:24
**smart** [1] - 88:5
**smoking** [1] - 32:14
**social** [1] - 84:7
**software** [3] - 15:8, 89:15, 89:16
**sold** [5] - 47:16, 48:18, 48:21, 61:24
**solely** [1] - 52:21
**solid** [1] - 94:7
**solution** [1] - 36:22
**solve** [1] - 85:7
**solved** [1] - 83:22
**someone** [7] - 6:15, 45:20, 53:18, 59:20, 60:7, 70:22, 70:23
**sometimes** [6] - 6:5, 16:25, 17:2, 54:23, 90:13, 105:4
**somewhere** [4] - 23:22, 48:21, 66:20, 67:4
**soon** [2] - 15:18, 38:1
**Sorry** [1] - 11:2
**sorry** [25] - 13:2, 14:20, 16:1, 20:12, 28:4, 39:18, 46:22, 51:21, 52:20, 52:21, 57:17, 57:22, 58:20, 62:6, 64:5, 65:12, 66:21, 74:25, 78:18, 90:5, 90:15, 95:17, 97:13, 99:8, 100:19
**sort** [22] - 3:7, 13:20, 31:1, 34:17, 34:20, 34:23, 43:18, 44:1, 44:14, 59:1, 59:19, 59:23, 68:22, 69:21, 73:11, 81:16, 83:10, 86:14, 95:25, 97:16, 104:7
**sound** [1] - 20:15
**sounds** [5] - 20:1, 20:4, 20:5, 20:7, 20:13
**source** [3] - 25:3, 59:11, 80:14
**sources** [1] - 57:4
**speaking** [1] - 64:3
**special** [5] - 95:3, 95:4, 96:10, 96:13,

97:7
**Specialist** [1] - 41:10
**specialized** [1] - 98:22
**specific** [4] - 61:18, 61:21, 70:7
**specifically** [3] - 27:20, 61:6, 84:23
**specifics** [1] - 104:12
**spectacular** [1] - 99:7
**speculation** [2] - 14:17, 62:7
**spelling** [1] - 83:7
**spellings** [1] - 82:24
**spend** [5] - 10:23, 53:22, 92:17, 99:2, 103:18
**spending** [5] - 6:4, 6:8, 6:20, 7:5, 10:15
**spent** [5] - 10:19, 46:23, 47:1, 47:7, 98:25
**spins** [1] - 48:3
**spot** [1] - 45:23
**spot-checked** [1] - 45:23
**spreadsheet** [7] - 42:24, 44:5, 48:2, 60:24, 61:7, 61:18, 61:19
**spreadsheets** [3] - 30:14, 31:12, 32:23
**squad** [1] - 93:18
**squarely** [1] - 68:4
**squirreled** [1] - 48:20
**Staff** [1] - 41:9
**stand** [13] - 22:23, 24:10, 28:18, 29:14, 47:23, 47:25, 80:3, 80:15, 80:20, 81:4, 81:22, 94:11, 105:5
**standard** [1] - 59:5
**standpoint** [1] - 87:1
**stands** [2] - 87:17, 95:9
**start** [9] - 11:2, 31:19, 43:6, 46:25, 81:22, 83:14, 90:12, 100:21, 100:23
**started** [16] - 22:13, 22:17, 22:22, 29:17, 32:17, 33:8, 47:1, 79:22, 80:1, 82:1, 91:11, 92:4, 92:6, 92:8, 93:3, 98:25
**starting** [1] - 93:18
**state** [1] - 95:23
**statement** [10] - 50:7, 56:8, 59:1, 63:1, 63:3, 63:20, 63:21, 63:25, 68:22, 68:23

**statements** [1] - 102:2
**states** [1] - 96:6
**static** [1] - 88:11
**stating** [1] - 59:10
**stenographic** [1] - 106:5
**step** [2] - 35:21, 69:8
**Sterlingov** [28] - 6:10, 8:9, 8:21, 9:22, 10:18, 18:25, 42:2, 48:10, 48:24, 49:15, 49:21, 50:23, 51:4, 51:15, 52:14, 54:8, 64:19, 66:19, 67:4, 67:13, 70:2, 73:6, 74:7, 75:8, 80:12, 81:5, 102:15
**Sterlingov's** [12] - 4:8, 7:1, 11:12, 50:7, 50:20, 51:11, 52:2, 53:16, 64:23, 65:23, 78:13, 79:8
**stick** [1] - 77:17
**still** [6] - 3:21, 48:8, 98:5, 100:24, 101:14, 102:19
**stolen** [4] - 57:3, 57:6, 57:11, 57:17
**stood** [3] - 24:12, 70:13, 70:15
**stop** [1] - 58:4
**stopped** [3] - 85:8, 93:11, 93:22
**stopping** [1] - 100:16
**storage** [1] - 50:1
**story** [2] - 85:5, 93:4
**straight** [1] - 7:11
**street** [1] - 94:24
**stretch** [1] - 70:14
**stricken** [1] - 30:9
**strike** [3] - 24:21, 31:10, 36:2
**strikes** [1] - 60:8
**structured** [3] - 34:16, 35:11
**study** [4] - 39:17, 39:19, 40:6, 44:14
**stuff** [6] - 33:3, 34:2, 36:23, 104:8, 104:12, 104:16
**subject** [14] - 28:21, 30:4, 30:13, 30:19, 30:23, 31:5, 31:13, 32:11, 33:20, 37:15, 55:4, 73:17, 77:14, 77:16
**substantial** [16] - 24:14, 24:25, 25:3, 48:24, 53:24, 54:3, 54:7, 54:18, 66:20, 71:13, 71:22, 74:7,

75:4, 75:9, 79:20, 80:10
**substantive** [1] - 27:8
**subtotal** [4] - 10:12, 10:13, 10:16, 10:24
**sudden** [1] - 105:5
**sufficiency** [2] - 67:10, 68:23
**suggest** [3] - 35:15, 94:25, 103:15
**suggesting** [1] - 73:19
**sum** [1] - 4:8
**supplemental** [1] - 103:1
**supported** [1] - 9:19
**surprise** [1] - 3:19
**surveillance** [3] - 20:2, 20:9, 89:12
**suspect** [2] - 35:10, 79:23
**sustain** [3] - 14:19, 14:22, 62:10
**sustained** [4] - 4:5, 7:24, 60:15, 65:11
**sworn** [1] - 82:15
**system** [7] - 86:11, 87:4, 87:7, 89:2, 91:13, 91:15, 91:21

---

### T

**tab** [1] - 14:9
**table** [5] - 17:2, 17:5, 53:14, 54:9, 54:14
**Table** [1] - 51:8
**tablet** [1] - 81:15
**talks** [2] - 40:15, 40:25
**tank** [2] - 45:21, 46:9
**team** [2] - 21:22, 22:9
**technologist** [6] - 83:10, 83:13, 84:16, 84:21, 84:23, 92:5
**technology** [2] - 100:10, 100:14
**telephone** [2] - 58:21, 70:16
**ten** [2] - 37:20, 53:20
**ten-year** [1] - 53:20
**tend** [1] - 37:8
**term** [3] - 19:21, 99:4, 99:6
**terming** [1] - 99:6
**terms** [3] - 32:15, 47:14, 104:6
**Tesla** [1] - 10:21
**testified** [33] - 4:10, 12:20, 15:17, 18:14, 18:16, 21:17, 22:4, 26:4, 31:11, 32:4, 35:7, 35:13, 38:18, 39:9,

40:19, 41:15, 41:18, 41:20, 44:25, 45:5, 45:13, 46:15, 46:16, 47:19, 59:14, 60:20, 63:18, 65:10, 65:14, 71:25, 79:7, 80:14, 82:16
**testify** [20] - 3:19, 15:7, 17:13, 26:11, 33:20, 36:12, 44:11, 45:9, 45:25, 56:14, 56:16, 63:12, 67:22, 68:21, 94:9, 94:13, 95:20, 100:9, 103:6, 104:9
**testifying** [7] - 17:9, 41:12, 55:16, 57:21, 64:22, 65:8, 103:10
**testimony** [63] - 3:10, 4:20, 4:22, 11:24, 12:4, 12:17, 12:22, 14:5, 15:10, 15:11, 16:9, 17:13, 22:8, 22:22, 23:10, 24:11, 24:21, 25:6, 25:25, 26:15, 30:4, 30:5, 30:13, 30:19, 30:24, 31:5, 31:10, 31:13, 35:4, 36:3, 36:9, 37:12, 37:15, 38:18, 40:3, 40:18, 41:9, 42:5, 44:9, 45:3, 45:18, 49:6, 55:20, 61:4, 62:23, 63:13, 63:25, 67:19, 68:24, 77:23, 79:23, 81:13, 81:22, 81:23, 100:6, 101:6, 101:21, 102:3, 102:20, 103:16, 103:23, 104:1, 104:12
**THE** [163] - 2:2, 2:4, 2:6, 2:8, 2:10, 2:14, 3:21, 4:3, 4:17, 5:6, 5:12, 5:13, 5:18, 5:20, 5:21, 5:24, 5:25, 6:1, 6:2, 7:24, 8:1, 11:1, 11:2, 11:25, 12:25, 13:4, 14:16, 14:18, 14:21, 15:11, 16:17, 17:21, 23:14, 23:23, 24:4, 24:19, 24:21, 24:25, 25:10, 25:11, 26:18, 27:1, 27:3, 27:6, 28:4, 28:7, 28:9, 28:11, 30:9, 30:10, 34:3, 34:7, 34:13, 34:19, 34:22, 35:3, 35:23, 36:8, 36:21, 36:25, 37:3, 37:8, 37:19, 37:23, 38:8, 38:10, 38:12, 38:14, 38:24, 40:23, 43:10, 43:11, 49:10,

51:23, 55:6, 56:14, 57:22, 57:24, 57:25, 58:7, 58:20, 58:23, 59:7, 59:18, 60:15, 61:10, 62:6, 62:9, 63:3, 63:10, 64:5, 64:13, 65:5, 65:11, 65:13, 65:17, 66:21, 66:24, 67:7, 67:16, 69:2, 69:25, 70:10, 70:15, 71:1, 71:25, 72:18, 73:4, 73:10, 74:8, 75:12, 76:22, 76:24, 77:13, 77:16, 77:18, 77:19, 77:22, 77:24, 77:25, 78:15, 78:19, 78:23, 79:1, 79:4, 79:10, 81:7, 81:25, 82:6, 82:9, 82:11, 82:17, 82:25, 94:25, 96:19, 96:21, 97:13, 97:16, 97:21, 100:4, 100:8, 100:13, 100:17, 100:19, 100:21, 101:4, 101:9, 101:13, 101:15, 101:20, 101:23, 102:7, 102:11, 102:16, 102:23, 103:18, 104:9, 104:18, 104:21, 104:25, 105:7, 105:10, 105:13

**thesis** [1] - 21:1
**they've** [3] - 27:17, 81:16, 90:18
**third** [2] - 85:1, 99:4
**thousand** [1] - 22:14
**threatened** [1] - 93:16
**three** [7] - 16:6, 17:7, 83:15, 83:18, 85:22, 86:24, 97:12
**threw** [1] - 98:3
**throughout** [3] - 37:5, 68:16, 78:16
**timing** [1] - 8:21
**title** [5] - 20:18, 20:22, 20:25, 21:1, 21:4
**titled** [1] - 81:17
**today** [36] - 10:17, 18:14, 22:22, 24:11, 25:25, 30:5, 30:13, 30:19, 30:24, 31:5, 31:22, 32:2, 32:4, 33:22, 45:9, 45:11, 45:14, 46:21, 46:24, 47:10, 59:22, 77:18, 77:19, 79:12, 79:21, 82:4, 83:18, 85:22, 85:24, 90:4, 91:14, 95:1, 98:2, 98:5, 99:16
**tomorrow** [6] - 77:24,

77:25, 78:5, 100:23, 101:2, 102:22
**tonight** [6] - 79:24, 80:18, 102:9, 102:17, 102:21, 105:11
**took** [3] - 16:3, 79:18, 94:18
**top** [6] - 55:9, 55:11, 58:11, 96:22, 97:4
**top-level** [1] - 97:4
**Tor** [11] - 4:2, 91:6, 91:10, 91:16, 91:17, 91:19, 92:2, 103:10, 103:11
**Tornado** [2] - 21:7, 21:10
**total** [6] - 4:8, 4:11, 11:8, 15:3, 36:15, 54:14
**totally** [1] - 72:22
**touch** [1] - 53:20
**toward** [1] - 7:3
**town** [1] - 89:11
**trace** [3] - 4:12, 69:17, 93:14
**traceable** [1] - 19:15
**tracing** [2] - 19:5, 19:8
**track** [1] - 84:14
**tracked** [1] - 11:9
**trade** [4] - 31:4, 43:20, 43:21, 92:17
**traded** [1] - 43:22
**trades** [3] - 54:19, 54:22, 55:1
**training** [1] - 84:13
**transaction** [11] - 14:10, 41:6, 41:7, 42:17, 42:20, 43:13, 43:16, 43:18, 44:1, 47:5, 66:16
**transactional** [1] - 76:10
**transactions** [15] - 6:14, 19:9, 19:13, 19:16, 19:19, 42:23, 43:8, 60:6, 60:24, 61:1, 61:8, 61:19, 61:22, 62:2
**transcript** [7] - 23:9, 24:2, 24:5, 26:16, 28:2, 106:4, 106:5
**transfer** [2] - 7:13, 8:22
**transfers** [3] - 9:1, 41:1, 41:3
**transparent** [1] - 19:15
**travel** [1] - 49:23
**Trezor** [1] - 49:25
**trial** [7] - 16:23, 17:6, 30:22, 33:21, 78:17,

83:11, 102:12
**tried** [1] - 95:10
**true** [24] - 19:25, 29:19, 33:25, 41:9, 44:4, 48:24, 49:15, 50:25, 51:3, 51:5, 51:9, 51:14, 52:8, 52:13, 52:16, 53:1, 53:8, 53:14, 54:6, 54:25, 55:2, 56:8, 106:4, 106:5
**truth** [1] - 72:13
**truthfully** [1] - 26:11
**try** [5] - 25:17, 70:12, 83:24, 83:25, 94:25
**trying** [10] - 25:22, 40:22, 49:8, 60:10, 67:2, 67:5, 84:11, 93:25, 95:8
**turn** [3] - 35:12, 35:14, 54:11
**turned** [1] - 33:15
**turning** [3] - 14:24, 51:7, 71:16
**turns** [2] - 35:25, 93:15
**Tweet** [1] - 20:8
**two** [19] - 6:9, 12:15, 16:6, 17:7, 21:3, 31:24, 32:1, 44:20, 45:1, 46:20, 46:24, 47:2, 47:7, 68:6, 68:17, 96:3, 99:11, 99:15, 101:21
**type** [8] - 65:20, 87:8, 88:14, 90:1, 91:16, 91:18, 96:13
**typically** [3] - 90:19, 91:20, 94:3

## U

**U.S** [5] - 15:18, 18:25, 21:6, 75:25, 91:12
**unable** [2] - 80:15, 80:21
**uncertainty** [4] - 24:14, 24:25, 25:3, 25:6
**unclear** [1] - 57:7
**under** [13] - 7:4, 26:9, 27:7, 31:11, 32:18, 36:11, 47:21, 52:8, 53:1, 58:12, 60:9, 77:6, 102:2
**underlying** [5] - 14:10, 40:11, 59:11, 59:13, 60:4
**understood** [11] - 4:4, 4:24, 29:10, 70:25, 74:1, 75:3, 79:15,

92:21, 93:18, 104:24, 105:9
**undisclosed** [1] - 3:10
**unethical** [1] - 29:20
**unheard** [1] - 27:15
**University** [1] - 18:18
**unless** [4] - 88:8, 88:9, 90:9, 97:4
**unlike** [1] - 53:23
**unlikely** [3] - 47:21, 53:18, 54:3
**unloaded** [1] - 7:11
**unplug** [1] - 76:24
**unplugged** [1] - 93:10
**unusual** [1] - 62:3
**up** [83] - 2:12, 5:12, 5:18, 5:22, 10:13, 11:5, 11:6, 11:8, 12:15, 13:23, 23:2, 23:19, 26:3, 26:19, 26:21, 26:22, 27:21, 28:12, 28:25, 29:3, 33:15, 34:7, 36:4, 38:22, 39:3, 40:7, 41:6, 42:10, 43:8, 48:4, 50:3, 55:7, 56:22, 61:7, 61:25, 64:6, 64:8, 66:21, 67:21, 69:4, 70:13, 70:15, 71:3, 73:14, 74:14, 76:18, 77:6, 79:16, 80:9, 80:15, 80:17, 80:24, 81:19, 85:6, 85:25, 86:1, 86:23, 87:5, 88:8, 88:12, 88:16, 88:23, 89:7, 89:19, 90:23, 92:23, 93:3, 93:4, 93:9, 93:14, 93:16, 99:16, 101:18, 103:11, 103:20, 103:24, 105:4, 105:5, 105:8
**updated** [1] - 18:21
**upper** [1] - 14:24
**urge** [1] - 105:10
**USD** [1] - 14:25
**useful** [3] - 18:3, 47:20, 47:21
**users** [2] - 19:5, 19:18
**usual** [1] - 22:3
**utilize** [1] - 9:12
**utilized** [3] - 8:5, 8:20, 9:20

## V

**vague** [1] - 43:9
**valuation** [3] - 15:19, 18:12, 64:25
**valuations** [1] - 15:14
**value** [3] - 15:2, 15:8, 46:3

**valued** [1] - 49:19
**values** [2] - 16:3, 50:23
**variable** [1] - 16:11
**various** [1] - 64:17
**Various** [1] - 51:4
**Veritas** [1] - 18:6
**VERRET** [1] - 2:15
**Verret** [46] - 2:18, 3:11, 3:15, 4:14, 12:3, 14:1, 14:24, 16:20, 18:23, 24:7, 26:2, 26:15, 27:11, 28:17, 29:22, 32:4, 32:11, 33:9, 33:16, 33:21, 37:4, 38:5, 38:17, 39:1, 40:25, 42:13, 42:17, 45:19, 49:5, 49:8, 49:15, 50:5, 52:1, 52:7, 52:22, 54:5, 55:16, 58:2, 58:9, 61:17, 63:9, 63:17, 71:7, 75:15, 77:2
**Verret's** [3] - 3:6, 24:1, 61:4
**versus** [1] - 4:12
**video** [2] - 83:20, 89:5
**view** [2] - 66:2, 81:9
**violated** [1] - 7:16
**virtual** [1] - 90:20
**vision** [1] - 92:15
**visit** [2] - 91:25, 92:2
**visiting** [1] - 89:10
**volunteering** [1] - 91:19
**VPN** [1] - 61:25

## W

**waiting** [2] - 2:6, 96:9
**walk** [1] - 3:7
**Wallet** [3] - 46:7, 46:10, 46:11
**wallet** [9] - 49:16, 50:15, 50:16, 50:21, 64:22, 65:3, 65:8, 65:20, 98:3
**wallets** [1] - 49:22
**wants** [3] - 81:21, 81:22, 94:6
**wash** [1] - 73:23
**washing** [2] - 83:19, 83:22
**Washington** [2] - 59:20, 106:13
**watch** [3] - 86:20, 88:6, 89:5
**watched** [1] - 40:9
**watching** [2] - 37:4, 83:23

**wealth** [1] - 53:19
**web** [4] - 85:21, 87:2, 87:4, 88:8
**webinar** [8] - 40:7, 40:9, 40:10, 40:12, 40:14, 59:6, 59:13, 59:17
**website** [5] - 6:13, 7:18, 86:19, 90:11, 91:25
**websites** [1] - 87:24
**week** [3] - 33:21, 81:19
**weird** [1] - 92:14
**welcome** [1] - 64:13
**whatnot** [2] - 70:8, 104:7
**whereas** [1] - 4:9
**whole** [1] - 44:4
**wife** [1] - 90:3
**willing** [1] - 29:15
**Windows** [1] - 89:16
**wireless** [1] - 98:6
**withdraw** [1] - 49:13
**withdrawal** [1] - 44:3
**withdrawing** [1] - 44:7
**witness** [48] - 2:5, 4:6, 4:25, 16:16, 17:9, 18:5, 18:7, 23:23, 26:23, 27:9, 32:19, 32:23, 35:3, 35:6, 35:8, 35:13, 35:20, 35:22, 35:24, 36:1, 36:9, 38:8, 40:19, 43:10, 57:15, 57:23, 59:14, 64:8, 67:9, 68:20, 71:25, 72:8, 72:14, 74:9, 75:11, 77:13, 77:14, 78:15, 78:19, 82:12, 82:15, 97:16, 101:4, 102:1, 102:14
**WITNESS** [14] - 6:2, 8:1, 11:2, 24:4, 24:25, 25:11, 30:10, 43:11, 57:24, 77:18, 77:24, 96:21, 101:15, 101:23
**witness's** [4] - 4:19, 31:10, 36:7, 67:18
**witnesses** [3] - 17:11, 17:12, 18:9
**wondering** [1] - 65:7
**word** [5] - 10:20, 77:10, 78:7, 86:17
**words** [2] - 43:23, 48:20
**works** [3] - 19:10, 29:6, 46:9
**world** [1] - 92:20
**worth** [7] - 48:9, 50:8, 50:24, 55:1, 64:25,

98:2, 98:3
**write** [2] - 40:7, 99:5
**write-up** [1] - 40:7
**writes** [1] - 59:20
**writing** [3] - 37:11, 58:24, 59:19
**written** [1] - 42:3
**wrote** [1] - 99:11
**www.google.com** [1] - 87:8

## X

**XMLGold** [1] - 6:20

## Y

**year** [8] - 10:19, 10:23, 16:6, 46:19, 46:23, 47:11, 53:20, 84:17
**years** [9] - 16:6, 83:11, 85:15, 91:8, 92:11, 94:14, 95:8, 99:11
**yesterday** [1] - 80:6
**youngest** [1] - 92:24
**yourself** [4] - 18:11, 63:24, 83:6, 85:16
**yourselves** [1] - 34:25

## Z

**Zcash** [9] - 19:2, 19:4, 19:10, 19:11, 19:12, 19:13, 19:14, 19:18, 19:20
**zoom** [1] - 55:12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      Plaintiff,

    vs.

ROMAN STERLINGOV,

      Defendant.
_____/

Criminal Action
No. 1: 21-399

Washington, DC
March 5, 2024

9:38 a.m.

MORNING PROCEEDINGS

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:    CATHERINE PELKER
                  U.S. DEPARTMENT OF JUSTICE
                  950 Pennsylvania Ave NW
                  Washington, DC 20530

                  CHRISTOPHER BRODIE BROWN
                  DOJ-USAO
                  601 D Street, N.W.
                  Suite 5.1527
                  Washington, DC 20530

                  JEFFREY PEARLMAN
                  DOJ-CRM
                  Ccips
                  US Dept of Justice
                  1301 New York Ave NW
                  Washington, DC 20005

APPEARANCES CONTINUED ON NEXT PAGE

APPEARANCES CONTINUED

For the Defendant:      TOR EKELAND
MICHAEL HASSARD
TOR EKELAND LAW PLLC
30 Wall Street
8th Floor
Brooklyn, NY 10005


Court Reporter:      SHERRY LINDSAY
Official Court Reporter
U.S. District & Bankruptcy Courts
333 Constitution Avenue, NW
Room 6710
Washington, DC 20001

TABLE OF CONTENTS

WITNESSES

Jeffrey Fischbach

Direct examination continued by Mr. Ekeland     20
Cross-examination by Ms. Pelker     91
Redirect examination by Mr. Ekeland     114

EXHIBITS

Defense Exhibit 126     77
Defense Exhibit 127     83

P R O C E E D I N G S

THE COURTROOM DEPUTY:  This is 21-399, *United States of America versus Roman Sterlingov.*

Would counsel please approach the podium and state your name for the record, starting with the government?

MS. PELKER:  Good morning, Your Honor.  Alden Pelker for the United States, joined at counsel table by Christopher Brown and Jeff Pearlman.

THE COURT:  Good morning.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for Defendant Roman Sterlingov, who is present in court.  And joining me at counsel table is Michael Hassard.

THE COURT:  Good morning to you.

Anything to raise before we get the jury?

MS. PELKER:  One brief point, Your Honor, on the scope of Mr. Fischbach's testimony.  And I understand he is in the room.  I have spoken with Mr. Ekeland.  I think it may just be easier to have him here to avoid any sort of confusion like where we had with Mr. Verret, about what is and isn't permitted.  In the prior *Daubert* hearings, defense had previously included a point in their disclosure regarding evidentiary handling.  And the Court had ruled that Mr. Fischbach should not be permitted to testify regarding that point.  I think it was number 20 of the disclosure.  Given that there is no evidence that Mr. Fischbach has any sort of

training or expertise in FBI evidence handling procedures. We understand that this proposed line of testimony relates to the drive that IRS provided to FBI with the images. And defense wants to make some sort of an argument about whether or not it should have been assigned a separate 1B number. And we just -- we don't think it is relevant, but we certainly don't think that Mr. Fischbach has the expertise to discuss what would or would not have been proper FBI procedures for assigning a 1B number and how they did this review. And I think the Court had already ruled on this issue.

THE COURT: So I am maybe looking at a different version of the disclosures, because my number 20 is different than that. I am looking at docket 166, is the one that I had in front of me when I was ruling.

MS. PELKER: And, Your Honor, I have -- if you look at the transcript from September 7th and September 8th, it was referenced as item number 20.

THE COURT: Let's see.

MS. PELKER: But I believe the quote there from the Court was from September 8. And then the final thing was about whether he could testify as to point 20, which was with respect to inventory conducted by the FBI. "And having reviewed his testimony and the submission to the Court, there is just not any evidence in front of me that he has any expertise on the topic. So absent something more, I am not inclined to allow

that testimony."

THE COURT: I am not sure which one that was meant to refer to. I am looking at the supplemental disclosures, but they are supposed to have everything, I think.

MS. PELKER: It might have been -- looking at 145, which was the unsigned. I believe it is, "He will testify to the issues in Valerie Mazars de Mazarin's device report and related documentation provided by the government." And that it was explained in the hearing that was in reference to the 1B number.

THE COURT: That is 20, but it says, "He will testify to the issues of Valerie Mazars de Mazarin's device report and related documentation provided by the government."

That is about --

MS. PELKER: Our understanding is that is about inventory numbering.

THE COURT: And then can you read to me what I said at the hearing on that?

MS. PELKER: This is the transcript, so there were two references, one on September 7th at 179 and one on September 8th at 120, both saying more or less the same thing. On September 8th you said, "And then the final thing was about whether he could testify as to point 20, which was with respect to the inventory conducted by the FBI and having reviewed his testimony and his submission to the Court, there is just not

any evidence in front of me that he has any expertise on the topic. So absent something more, I am not inclined to allow that testimony."

In the date prior, there had been a discussion about -- there was some suggestion that this was a missing device or an extra device. And the Court had said that if he wanted -- if Mr. Ekeland wanted to point out to the jury that you have three devices on this list and four on this list, without an explanation, that wouldn't be expert testimony. But at that transcript on September 7th, the quote is, "And with 20, I guess I still have a question as to exactly what it is that Mr. Fischbach would testify to. I am not convinced at least at this point, that he does have sort of expertise on how the FBI usually goes about inventorying material at a time of arrest. And to the extent that he is simply saying there were three devices that were seized and four that show up all of a sudden, that strikes me as something that is in the core competence of the jury."

THE COURT: All right. Let me hear from Mr. Ekeland on this.

MR. EKELAND: We are not intending to elicit testimony from Mr. Fischbach about the FBI's inventory numbering system. What we are intending on eliciting testimony about is the fact that that 6 terabyte BitLocker encrypted drive doesn't appear on Government Exhibit 112, which is the

list of items seized from Mr. Sterlingov at the airport. And that it does appear on Ms. Mazars' inventory list which is in evidence as Defendant's Exhibit number 32. And we do intend to just ask him if he heard Ms. Mazars' testimony and what his understanding of -- what is on the hard drive and just what his forensic opinion is in relation to that item. So in terms of him testifying as an expert as just the inventory practices of the FBI, I am not intending to elicit testimony on that point. I am intending on asking him, questioning him about the 6 terabyte drive. The fact it didn't appear on the inventory list seized at the airport and his understanding of Ms. Mazars' testimony about it, as well as what she wrote about that drive on Defendant's Exhibit 32.

THE COURT: Ms. Pelker.

MS. PELKER: The concern -- first, the government has never said or argued that this was a drive that was seized from the defendant at the airport. I think we have been clear about what this is.

THE COURT: Well, tell me what it is.

MS. PELKER: It is simply -- IRS imaged all of the devices. Then when they were doing the evidence transfer so that everyone could have a copy of what had been provided, they then burned all of the images that IRS had already made of the defendant's devices that were seized at the airport onto a drive and gave that to the FBI along with the images. And that

is what Ms. Mazars testified to. It is in evidence because the drive does contain the images from the defendant's devices, but they are just the working images that IRS or copies of the images that IRS had made. And to the extent that Mr. Fischbach wants to offer some sort of a forensic opinion about where it was included on the list, I don't know what that opinion is. It hasn't been disclosed and I don't know what the basis would be for it.

MR. EKELAND: Mr. Fischbach was present when Ms. Mazars testified about what that drive was and what was on it. And that was the first time that we had heard those representations about what was on the drive is when she testified about it. And what we are seeking to do is elicit testimony from Mr. Fischbach as to his understanding what Ms. Mazars testified to in relation to what is on the drive, because we are not -- we are not stipulating to what the government is representing about what was on this drive and what, if any, attempts that Mr. Fischbach made to examine it and what he thinks about what Ms. Mazars said. That isn't in any way related to the FBI's inventory practices.

That is squarely in his review of the devices and is evaluating the testimony that he heard from Ms. Mazars who, again, for the first time, made representations about that drive that we hadn't heard before. And she testified on the stand that she had reviewed that drive. But if you look at

Defendant's Exhibit number 32, it also says on it, did not review because it was encrypted. And given the testimony that the government has elicited at this trial regarding encrypted drives, we think it is an important issue to raise in front of the jury and try to bring some clarification to.

MS. PELKER: Your Honor, we were clear with defense counsel after they attempted to sandbag us with the supposed issue at the last *Daubert* hearing that we ran it down and we were able to later that day determine what this was. And we produced to defense the FBI log that very clearly has the 1B13 entry for this and explains the history of the evidence transfer and has it described as the copy of images from the IRS, alongside all of the other 1B numbers. And to the extent that Mr. Ekeland intends to elicit testimony from Mr. Fischbach regarding his attempts to review it, that sounds like an attempt to air discovery related disputes where defense earlier last week, asked -- I believe asked whether we would be able to pull the device out of storage from Mr. Fischbach to look at. And we expressed confusion and explained, yet again, this was simply a derivative evidence item. It wasn't original evidence that is why it wasn't brought over to the Court, because we were never saying that this was Mr. Sterlingov's device.

And Ms. Mazars was very clear, this was not her official, final report. It was a working kind of summary that would jog her memory of different items. She just exported

what the different 1B numbers were and wrote notes next to them. This is not some sort of indication that this was a device seized by Mr. Sterlingov. The government is not claiming it was.

MR. EKELAND: Your Honor, we are entitled to examine those devices and testify about what Ms. Mazars put on her list. And when she testified, she said that -- I believe she said that she had reviewed the contents on that drive, but Defendant's Exhibit 32 says it is BitLocker encrypted drive that she did not review.

THE COURT: I'm sorry, just to back up here a second, the problem I am having -- and I have to admit, if the concern is confusing the jury, you have confused the judge, because I am still not sure exactly what is going on here. Because there was talk about whether it was on the FBI inventory or not and suggesting maybe it was manufactured out of thin air or wasn't -- and so I am confused about that. But I am still confused about what the expert opinion is that is being offered. An expert shouldn't be offered to simply make argument to the jury that you can make in your closing about the testimony or cross-examination of other witnesses. So the question I have for you is just what is the expert opinion that he is going to offer?

MR. EKELAND: What his understanding of what is on the drive, whether he has been able to examine it and

confirm --

THE COURT: Back up a second. Whether he has been allowed to examine it, doesn't that get into just the issue that Ms. Pelker just raised? I mean, if you are suggesting that there has been some problem with whether the government has provided him access to it, that is an issue and I will -- if I need to, I will correct it to the jury and will say it was available to the defense all along and they didn't seek to examine it. So don't mislead the jury in that regard.

MR. EKELAND: I am not trying to mislead the jury, but it is my understanding the government -- we have asked. I do not -- Mr. Fischbach has been talking about this for the last week or two. We have asked to physically see the drive. But I think what we want to elicit the testimony on is simply, see if -- he was there and he heard the testimony and he heard Ms. Mazars' testimony --

THE COURT: Testimony of what?

MR. EKELAND: Ms. Mazars' testimony about the drive.

THE COURT: About what?

MR. EKELAND: If he thinks that is consistent with what is represented on the device list, which she said she reviewed. And it is named Sterlingov device list and compare that list to the inventory and just what his understanding of it is. And from a forensic viewpoint whether that is -- you know, in his opinion, a sound forensic approach to handling

this kind of evidence. Because we do submit this is -- it is important for the jury to see how evidence and how things were handled in this case, because there is --

THE COURT: But I am still confused. You have got to back up for a second. I am confused. I am not sure what the point is that you would like to make to the jury. Because you keep shifting things. Expert testimony of what is on the device, fine. If he has examined the device and he has used his technology or expert skills to examine what is on the device. And I mean, I am a little bit in the dark here because I don't really understand this. But if he were to say, for example, the government said this was on the device, I looked at what was on the device, it was encrypted. The government couldn't possibly have done that. That seems like fair expert advice. I looked at it, it was encrypted, you couldn't examine it. I am just confused, frankly, as to what is the expert opinion you want to offer here.

MR. EKELAND: I just was going to ask him about that drive, his review of the inventory list.

THE COURT: But you are -- you are not answering my question. My question isn't -- I am just going to ask -- are you going to ask him about the drive? My question is, what is the expert opinion that you are seeking to elicit?

MR. EKELAND: I am going to ask him his opinion of whether -- if he thinks it is an important fact that that drive

is represented as encrypted and that Ms. Mazars stated in her report that she could not review it and whether or not that is consistent with her testimony. What we don't --

THE COURT: No, that is argument though.

I'm sorry. Let me finish.

MR. EKELAND: Yes, Your Honor.

THE COURT: My question still is, what is the expert opinion? Is the expert opinion that there was -- he is familiar with the proper standards for handling evidence? Which gets back to the *Daubert* issue perhaps. But he is familiar with those standards and those standards were violated here? Or his opinion is, that it wasn't possible to look at what is -- what is on the device? I just -- if it is, did you hear her testimony and does that help or hurt the government's case? That is just argument. So I am still -- I am really trying -- I am not trying to foreclose you from doing this here. I am just trying to understand what the expert opinion is that you are trying to offer.

MR. EKELAND: Whether or not Ms. Mazars' representation of that drive is consistent with what he knows about that drive.

THE COURT: So why don't you ask him what he knows about that drive and get that into evidence? And you can offer that and you can then -- if Ms. Mazars testified to something different, you can then argue to the jury and say, you heard

from our expert the following, you heard from the government's witness the following and what he described is inconsistent with what she said and you should reject what she said. I am just not sure what the expert opinion is about saying, did you hear what she said? I mean, he can offer an expert opinion about what is on the drive and what he saw on the drive.

MR. EKELAND: Can -- I'm sorry, Your Honor.

THE COURT: Go ahead.

MR. EKELAND: So can he ask is -- what his understanding of what Ms. Mazars said is consistent with what is -- his understanding of what is on the actual drive, what the drive is?

THE COURT: Ms. Pelker, any problem with that?

MS. PELKER: I don't think he has a basis for it is part of the issue.

THE COURT: Well, maybe that is cross-examination. And if you think it is just wrong in that regard, if he is mistaken about that or -- and if it is misstating the evidence, you can raise an objection with respect to that if it is based on a misstatement of the evidence.

MS. PELKER: I do want to avoid this turning into an airing of some sort of a late discovery -- not a late discovery but a discovery dispute coming out before the jury.

THE COURT: Fair enough. So I will allow the examination about what is on the drive, how he examined the

drive or what he believes is on the drive.

MS. PELKER: I think that --

THE COURT: Go ahead.

MS. PELKER: Apologies, Your Honor. Mr. Fischbach has not examined the drive, which is --

THE COURT: So I guess has he examined a download of the drive -- a copy of the drive? I mean, I know it was given to the defense and they think they put it on to their system or they may have put it on their system.

MS. PELKER: So, Your Honor, this is actually different. This is -- this is basically -- so there are 1B numbers for the individual items and their images.

THE COURT: Right.

MS. PELKER: Then what the IRS did is they took all of those images and put all of them as a working copy onto one hard drive to give to FBI, along with the individuals. And so this is simply a copy of -- like a consolidated copy of everything that was already provided individually. And because it was being transferred from one agency to another, IRS to FBI, it got entered as an item. But it is, in fact, just a drive containing the -- I will have the numbers wrong here, but 1B1 through 11. And so it is not a separate piece of evidence.

Mr. Fischbach has been able to review all of the images that are on that drive.

THE COURT: I guess I am still sort of back -- I

truly am not trying to be difficult here. I don't understand what the proposed testimony is.

MR. EKELAND: Your Honor, we have not -- to the extent that the government is saying that we have gotten images from that drive, I think what we are saying is we have gotten images of the evidence from Mr. Sterlingov's devices seized at the airport. As for that actual drive, that actual drive even if it does contain images of everything that was seized at -- you know, when Mr. Sterlingov was arrested, we haven't been able to examine or gotten, is my understanding, an image of that actual drive. So what the question is -- the government's representation may be true. But we haven't been able to check that. And we found it curious that it was listed on Ms. Mazars' Sterlingov devices reviewed and wasn't described as an IRS or FBI, you know, hard drive listing all of the images of the evidence. What it looked like when we first read it, which is what attracted us -- brought our attention to it in the first place was, well, here is a 6 terabyte encrypted drive that she writes in the -- in her exhibit in her list that she cannot review it. And then when she got up on the stand, if I am recalling her testimony correctly, she said she did review it because it just contained all of the evidence that, you know, they image in the summary drive.

So that is what is I think at the root of what we are wondering about here, because that just sort of goes to I think

just a potential evidentiary issue on how things are being handled. But I understand the Court's concern. We are not trying to go into something about the FBI's inventory numbering system or anything. I think the Court -- I hope the Court understands why we are curious about this drive.

THE COURT: I get -- well, I am a little -- I think I am remembering the portion of the examination where you crossed her on this. And Ms. Pelker I think was -- I can't remember -- I think it was Ms. Pelker who then came back on redirect and the witness then clarified she just made a list of anything -- it wasn't an exhibit list or a list of items -- it was just sort of her working document of what she had and/or what she was looking at. That is my recollection of what happened during the examination. And so I guess I am still just puzzled as to what expert opinion it is that Mr. Fischbach has to offer about it. I think you are entitled to argue to the jury whatever you want about that and it is suspicious in some way, I suppose.

But I just -- I am still at a little bit of a loss other than just to sort of asking him to make your argument and saying that, you know, you heard her testimony, what do you think about it? There has to be some expert opinion where he is qualified as an expert in that rather than it just seems odd to me.

MR. EKELAND: That goes back to the question, the

government -- I asked before and now I am just blanking if I got an answer on or not is whether or not I can ask him if what his understanding of the drive is and if that is consistent with what he heard Ms. Mazars testify as to what her understanding of the drive was.

THE COURT: How can he have an understanding of the drive other than what she said if he hasn't looked at it?

MR. EKELAND: Because he can have an understanding based on that it was represented in Defendant's Exhibit number 32 as BitLocker encrypted drive and she had written that she did not review. To the extent -- I mean, I guess the Court is not saying the -- is the Court saying we can't elicit any testimony about his attempts to review this drive? The government --

THE COURT: If you want to do that, I am -- you know, it is opening a very strange door for a jury to get into the back and forth between counsel. But it is not a one-way street. And if -- you know, you want the government to say, look, we told Mr. Ekeland ten times he could come look at this or whatever and he just never showed up or whatever it might be, I don't know what the answer is. I just -- I mean, I am not sure I see the relevance of this. I mean, if he needs to look at it, that is a question for the Court.

And someone should come to me and tell me that he needs to look at this and make an argument to me as to why he

needs to look at it.  I am just not sure why that is an issue for the jury.

MR. EKELAND:  Perhaps we should just go to his direct and I will be careful in that area.  And I will, you know, be sensitive that the government may object.  And because I don't -- I don't want to consume -- this is not necessarily a hill I need to die on, so to speak.

THE COURT:  Okay.

MR. EKELAND:  But we -- Ms. Pelker and I spoke this morning and we just wanted to flag the issue before the Court before we started.

THE COURT:  Are we ready to get the jury?

Okay.  Let's get the jury.

(Jury in at 9:46 a.m.)

THE COURT:  All right.  And the witness can come back to the stand.

JEFFREY FISCHBACH, previously sworn.

THE COURT:  Mr. Ekeland, you may continue when you are ready.

MR. EKELAND:  Thank you, Your Honor.

DIRECT EXAMINATION CONTINUED

BY MR. EKELAND:

Q.   Good morning, Mr. Fischbach.  Are you ready?

A.   Yes.  Good morning.

Q.   What materials if any have you reviewed in order to form

your opinions in this case?

A.   Well, I believe I reviewed everything in -- actually I know I reviewed everything that is entered as an exhibit in the case.  I have certainly gone over all of that.  There are a number of other items I don't think have been entered as exhibits, but hopefully since I have had access to the entire case file, hopefully I have seen everything.  Not everything is meaningful to me, but I think I have seen everything.

Q.   And have you done any independent research?

A.   I have, yes.

Q.   And what type of independent research did you do?

A.   Well, I used Google which is kind of always my first go to.  But I have also used The Wayback Machine, which is archive.org extensively in the case.

Q.   Did you --

A.   I'm sorry.  I have also used the -- I think you guys have heard as ARIN, the database specifically devoted to domain names.  And I have used another website.  I have to look to see the exact naming of it.  But it is a website that works very much like archive.org, except it keeps historical databases of DNS, which we discussed yesterday.  So it just lets me see what changes have happened in DNS over the years for a particular website.

Q.   Could you just briefly explain to the jury what archive.org and The Wayback Machine is?

A.    Sure.  They are one and the same.  The actual domain name is archive.org.  They call it The Wayback Machine.  And that is how most people refer to it.  Basically what it does is it is a historical archive.  It is free.  It is a nonprofit much like Craigslist or Wikipedia.  And what it is doing is it is constantly searching the internet and making copies of websites for years and years and years and you can actually go back and hit a slider and see how -- you could look and see how Google started out or what Amazon used to look like when it only sold books, that sort of thing, so travel through time.  But it is useful forensically.  I was introduced to it before I saw it used forensically.  But I have seen it now used for a very long time by law enforcement for the same purpose.

Q.    And did you also use any ICANN domain tools?

A.    Yes.  That was the other one that I had first described.  ICANN is where I did the specific domain name search, which allowed me to see what was still active when it was registered, when it has been updated, when it has been paid, most recently been paid.  And I went to ICANN specifically.  There is a lot of places you can go, but what I like to do as a matter of practice when another witness uses a particular tool, since they are all available to me, I prefer to go to the same tool that the government is using, just so I am getting similar information.  I will independently check something else to see if it is different.  But if it is the same, I would rather rely

on the same tools for the simplicity of trial so everybody is speaking the same language.

Q.   When were you able to see the government's witnesses testify in this case?

A.   I did, every single one.

Q.   Do you use public Wi-Fi?

A.   Well, I use it, but not without a VPN.  I would never -- well, I am connected to the Wi-Fi here on all of my devices but they are all using a VPN.

Q.   Why do you use a VPN?

A.   Well, basically because I know what I have done in the past.  I know what I could do.  And I am the guy who has -- I took a radio station there to do it as part of an interview.  I sat there with Martin Kaste I think from NPR and basically showed him, as we sit at a Starbucks I can see what everyone is doing on the network.  I can see your email.  I can see what information people are passing through as what they call packets, using what is called a packet sniffer.  And with a VPN, what it does is it encrypts everything to another point before it exposes that information.

Q.   And is VPN difficult to use?

A.   No.  It is built into every iPhone, every Android phone today, Macintosh operating system has it built in as does Windows.  You just have to subscribe to something.  And actually there is --

I'm sorry.  I will slow down a little bit.

There is actually a lot of browsers now that actually come with a free VPN as part of the browser, not just specifically Tor, but I think the Opera browser, for example, I think last I checked actually comes with a built-in VPN that you can just flip a switch and turn it on and it is free.

Q.   And when multiple people use a VPN service, do they each get their own IP address?

A.   No.  No, not at all.  There may be more than one IP address at a particular VPN depending on how large they are. But they are sharing.  Everyone is sharing IP addresses.

Q.   And what about on -- do you know what corporate VPN is?

A.   Absolutely.  I had to examine them as part of my cases.

Q.   What is just a corporate VPN?

A.   It is basically the same thing that I am describing but the purpose is a little bit different.  So if you work for a company that either in the past, it was because they used sensitive information.  So, for example, as a law firm, any lawyer because they are required to protect all of the data and keep it privileged, any lawyer should only be reaching their office network via VPN.  Because, obviously, if you are sitting at Starbucks, someone like me could see your entire case file as you are reviewing.  I can't necessarily without hacking wouldn't get into your computer, but I can see what you are sending and what you are reading.

So what the corporate VPNs have done is they have just assigned that to their employees. And the only way to get into that corporate network is by connecting to the VPN with the password that you were assigned. So it is not the same as just a general VPN that the rest of us would use.

And I do use one for my company for that as well.

Q. And did you hear the testimony from the witnesses about proxy servers?

A. Yes, I did.

Q. And is it -- can you just explain to the jury what a proxy server is?

A. Well, it is similar to what we were talking about. The differences -- I would -- it would actually be easier to take it the other way. So a VPN is basically, in the simplest terms, an encrypted proxy server. So a proxy server is you are using some other IP address, as I described yesterday. You are using someone else's, what we refer to as an end point. So you will see that IP address. And they are used for all different reasons. So proxies by themselves can have a lot of different functions. But a VPN is basically an encrypted proxy. So if you take out the encryption, that is -- it is VPN minus the encryption.

Q. Do corporations use proxy servers?

A. Absolutely.

Q. Why do they use them?

A.    Well, it depends.  I mean, there are a lot of reasons, probably more than beyond what we need to talk about here. But, for one thing, it does help to have a presence in -- effectively like to load balance, to have your system available geographically closer.  Because even though the internet feels very quick to us, a lot of what is here today, has a lot to do with the fact that the internet was not always -- when I started with the internet, decades and decades ago, it was really, really slow.  So for, you know, one purpose of proxy is to protect your network like a shield.  Another is to what we call load balance to basically have end points at different locations.  Like a company like Amazon would use that because they are selling all over the world.  And you just don't want to depend on something getting back to Seattle where they are headquartered necessarily from Germany.  So they will set up proxy end points.

Q.    And is it possible for thousands of people to use a VPN service at the same time?

A.    Oh, absolutely.  I don't -- I don't know the exact scale, but just doing my own, you know, napkin math of what I pay, I don't see how a VPN could survive without thousands of users.

Q.    Is it possible if thousands of people are using a VPN service at the same time they are all sharing the same IP address at the same time?

A.    Absolutely.  I tested that myself and that is the case.  I

mean, I can't test everybody's, but I have done multiple VPN connections as a controlled test and had them all end up with the same IP address.

Q.   Is the same thing true of proxy servers, if thousands of people are using a proxy server, they can all be sharing the same IP address at the same time?

A.   Absolutely.

Q.   And did you hear Ms. Mazars' testimony about her IP address analysis?

A.   I did.

Q.   If you saw two user names logged in to the same IP address at relatively the same time, would you conclude that they were the same person?

A.   Well, I wouldn't make any conclusion until I actually looked up that IP address to find out what sort of service it was.  So my conclusion might arise from that if that provides enough information.

Q.   And did you have a chance to look at her analysis?

A.   Yes, I did.

Q.   Do you agree with her conclusions?

A.   Gosh, I don't want to make a blanket statement that I don't agree with any of her conclusions.  She may have had some that maybe I did agree with, if you are referring to the time -- I think, it was called overlap.  I reject the word overlap.  That is not what was occurring in most of those

connections, if any.

Q.    Are you familiar with the Tor network?

A.    Very familiar, yes.

Q.    What does that stand for?

A.    It is The Onion Router.

Q.    Do you use a Tor browser?

A.    Frequently.

Q.    Where do you use your Tor browser on your laptop?

A.    Laptop, desktop.  I got -- well, actually I have got a copy on my phone right now.  I will use it anywhere.

Q.    And what do you use it for?

A.    Well, primarily my initial use of the Tor browser was really for the reason that the Navy distributed in the first place is that the Tor browser becomes more robust as more of us are using it.  It makes it -- it is -- now that I have heard all of the testimony about a mixer, it is very much like that.  The idea is it is sort of like a mixer but for your data.  It is what we call security through obscurity.

So most of the time people think of security as like a password.  But in reality, I think we all know by now because all of our Social Security numbers have been -- I am pretty sure everyone in this room has had their Social Security number leaked at this point.  We know a password isn't sufficient enough.  And we know that anything that has a key can be broken -- can be broken into, as I think we saw from at least

one of the witnesses in this case.

So what a Tor browser does is it obscures your presence. It makes you so that you are harder to find. It is harder to figure out where that communication is coming from for a hacker. So, yes, I use it as a matter of practice, because I think it is safe. But I started using Tor because I wanted to make sure there were more users on there so there was more obscurity for everybody. I wanted to participate in the effort.

Q. Have you used the Tor browser to access Silk Road?

A. No. I never have. I mean, I have seen cases. I have had things adjacent to it. I have never -- I think it was offline before I even got my first case, so I have never visited.

Q. Have you used the Tor browser for any illicit purpose?

A. No. For illicit purposes, absolutely not.

Q. So you have in your line of work dealt with illicit internet content?

A. Significantly, yes. Under court order. So, you know, I never visit anything without a court order allowing me to.

Q. And on the Tor network or on the clearnet?

A. Yeah. This is the problem. With the court order my internet service provider doesn't care that I have a court order. They are not asking for it. I don't want to get shut down. I don't want to get flagged. And even though if the police came to my door, I could prove that I had a court order,

I just don't need to have that drama. So I will use the Tor and a VPN, even though I have got a court order.

Q. What kinds of illicit content are you dealing with in your work?

A. Well, unfortunately, probably the largest single bulk has been what we have called here is CSAM, child sexual exploitation material, child pornography. So it has been a lot of those cases. I don't -- fortunately I don't have to visit those sites as a part of that. But in doing Google searches for things like that, I think it could look suspicious.

That is probably the major one. I do an awful lot of credit card fraud, crypto fraud, gosh, oh, Direct TV theft, you name it, I have probably done it. I hacked cell phones back when that was still happening.

Q. From your examination, was any CSAM identified on any of Mr. Sterlingov's devices?

MS. PELKER: Objection, Your Honor.

THE COURT: I will allow the question. I think it is -- it is -- you can continue. That is fine.

THE WITNESS: I have reviewed all of the government's reports and all of the material and specifically did a search for that. The government found no -- at least reported no indications of CSAM on any of his devices or his network.

BY MR. EKELAND:

Q. Was there any indication that Mr. Sterlingov ever searched

for or visited or purchased any CSAM?

A.    Not so much as even a curiosity Google, nothing.  Again, nothing that has been found.

Q.    Did you hear Ms. Mazars testify about file carving?

A.    Yes.

Q.    And could you -- do you know what file carving is?

A.    Yes, absolutely.  I do it almost every day.

Q.    Can you explain to the jury what file carving is?

A.    Yeah.  Basically what ends up happening is hard drives in and of themselves are fascinating the way that they work.  But what ends up happening is everything stored on a hard drive is stored in what is called blocks.  So what that means is it is almost like where you live, an entire block has to be occupied, whether there is one house on it or it is filled with houses. The block still exists.  That is how a hard drive works oddly.

So what will end up happening, when you delete something, when something goes away, it is not necessarily that you deleted it, when something is no longer there either because the operating system found it unnecessary or it aged out because things that are in your browser will go away over time. What ends up happening is that space actually doesn't get deleted, it doesn't get cleared.  It just becomes what is called unallocated, which means it is still there, but it is available to be overwritten by something else.

What will happen is if what was there before -- and I hope

everybody is -- that I not making this too complicated.  If what was there before occupied an entire block, if it is a big file, which would span many blocks, so like a big building that interrupts lots and lots of streets, when you delete that and then you start to fill that space over with new data, if the new data only requires a part of a block, there might be something very useful left over kind of in the dirt of the old -- of what was there before.  Carving will get that and help put it back together and it will help us recover -- just even indications -- for example, this is how a lot of child pornography cases are discovered.  Even if the images aren't there, we can find enough of an image or enough of a file name to see whether or not it once was there.

Q.  Is it easy to remove all traces of your activity from your computers and storage devices?

A.  It is not easy at all.  It is a very, very -- I -- it is my opinion that if you really want something gone, you are going to have to make that hard drive, that physical device gone.  I have seen things recovered I would have never thought could have been.

Q.  And did your examination find any trace on Mr. Sterlingov's computers and devices of him operating Bitcoin Fog?

A.  Nothing at all.

Q.  And have you ever had a case where there wasn't a trace --

MS. PELKER:  Objection, Your Honor --

THE COURT:  Sustained.

BY MR. EKELAND:

Q.   You mentioned that you used Tor.  What kind of Tor sites do you generally visit?

A.   Well, what I like to do is -- again, because I like to help add to the obscurity, which makes it more effective.  And again that is why the Navy released it, because their communications wouldn't be safe if they were the only ones using Tor.  They need to be --

MS. PELKER:  Objection, Your Honor.  If this is Mr. Fischbach's personal use of Tor, I think that is beyond his expertise and testimony here.

THE COURT:  Let me look at the question.

So the question -- the answer isn't responsive.  The question was just, what kind of Tor sites do you generally visit?  So if you want to just answer, quickly touch on that topic, that is okay with me.  But then let's just move on.

MR. EKELAND:  We can move on.  I think --

BY MR. EKELAND:

Q.   Do you use encrypted mail?

A.   Yes, very much.

Q.   And encrypted messaging?

A.   Exclusively.

Q.   And encryption in general?

A.    Yes.  It is necessary.

Q.    And why do you encrypt your messages and data?  Why do you use encryption?

A.    Even on a personal level, not using encryption is, frankly, just a ticking time bomb.  At some point your data will be caught by someone.  I don't mean by the police, I mean by hackers.

Q.    Do you back up your data?

A.    Yes, of course.  I don't think I ever back it up as frequently as I should.  But especially my work data is very backed up and not only backed up, but removed off site when I can.

Q.    Do you encrypt your data backups?

A.    Yes.  They are all encrypted.

Q.    What kinds of devices do you use?

THE COURT:  I'm sorry.  I am not sure what the relevance of the witness' personal practices are to his expert opinion.

MR. EKELAND:  He is a computer forensic specialist who has been using computers for years just like --

THE COURT:  I understand.  But we are just getting into a lot of detail about what his personal practices are.  I am not sure that is relevant to what the practices of others are, for example.

MR. EKELAND:  I will connect in like two or three

questions, Your Honor.  This is a transition.

THE COURT:  Okay.

BY MR. EKELAND:

Q.   Mr. Fischbach, what types of computers, if any, do you use?

A.   I have a Cisco -- well, two Cisco blade servers, basically like what Google runs on.  I have got two of those.  I have got lots of desktops.  I don't favor Mac or PC.  I have them both. I have practically every cell phone that has -- every cell phone model that has ever been developed.  And I have four different ones here just in my luggage.  I consider those computers as well, tablets.

Q.   Are you familiar with Linux?

A.   Very familiar with Linux.

Q.   Can you just remind the jury what Linux is?

A.   It is an open source operating system.  It is what I call UNIX adjacent.  So that was the original -- the original notion behind Linux was to make a free, open source -- so open source meaning that multiple people contribute to it and update it and create what are called forks, different versions of it for different purposes.  But there is no charge to it, which isn't why I use it.  I use it again very much in the same -- in one sense in the way that I use Tor, which is that I want to help keep the project alive.  Because I think it is important that Apple and Microsoft have competition.  And also because, quite

frankly, some of the best tools for my trade are on Linux.

So it has become a very important operating system.  And I do run virtual machines as well on top of Linux.  So Linux is a wonderful sort of bedrock to run a Windows virtual machine and a Mac virtual machine.

THE COURT:  I'm sorry.  The question here was, "Can you remind the jury what Linux is?"  I just want to remind the witness, please just listen to the questions that are being asked of you and answer those questions.

THE WITNESS:  I apologize.  You sound like my wife, yes.

THE COURT:  All right.  Thank you.

BY MR. EKELAND:

Q.   Are you familiar with Bash?

A.   I am, yes.

Q.   Can you remind the jury what Bash is?

A.   Yeah.  It is just a terminal interface.

Q.   When you say terminal interface, what does that mean?

A.   I'm sorry, trying to keep it short.  So it is where you type commands to your computer or to a network.

Q.   And are you familiar with SSH?

A.   Yes.

Q.   And can you just remind the jury what SSH is?

A.   Yeah.  It is a secure socket.  It is basically the underlying infrastructure of the coding that you are

effectively using in order to connect, again, securely. Because we used to use what was called Telnet in the clear. No one uses that today. You just use an encrypted connection over a network to be able to command your computer or anybody could command your computer.

Q.   Is SSH a part of Linux?

A.   Yes.  It is a secure shell within Linux.

Q.   And, Mr. Hassard, if you could please put up what is in evidence as Government Exhibit 720.

A.   I also should note for completeness, SSH while it comes with Linux is also available for Windows, Macintosh, cell phones.

Q.   What does it stand for?

A.   I believe it is secure shell.

THE COURTROOM DEPUTY:  Give it a minute.

MR. EKELAND:  Thank you.

BY MR. EKELAND:

Q.   And, Mr. Fischbach, do you see Government Exhibit 720 in front of you?

A.   I do.

Q.   And, Mr. Hassard, could you just slightly scroll down. And what is your understanding of what this is?

A.   This looks like somebody effectively putting through a set of commands.  I see Tiger VNC, which is a method of controlling a computer, like Go To My PC, which would be what typically

people would use. And this looks like it is basically setting things on the computer that it is reaching via a dynamic DNS, ignorelist.com. So like I described yesterday.

Q. And do you see anything at Government Exhibit 720 that you can identify as relating to the operation of Bitcoin Fog?

A. No. There is nothing on here related to -- I guess if you want to scroll down a little bit, I will double check. But I see nothing -- no, there is nothing here related to that. This is just the controlling of someone's machine via ignorelist.com.

Q. And is this Linux?

A. These -- well, there is no way for sure that it is Linux just looking at it, because it just looks like it is controlling a Linux machine.

Q. Understand. If we could take this down, Mr. Hassard, and put up what is in evidence as Government Exhibit 722.

A. That is I think --

THE COURTROOM DEPUTY: Give me a second.

MR. EKELAND: That is not published.

THE COURT: And wait for a question.

THE WITNESS: I am not sure if this is the right exhibit. Okay.

MR. EKELAND: Thank you.

BY MR. EKELAND:

Q. If you could just take a look at Government Exhibit 722.

And, Mr. Hassard, if you could slowly scroll down. Thank you. Mr. Hassard, if you could take it back to the top.

Mr. Fischbach, what is your understanding of what Government Exhibit 722 is?

A. Well, this is very clearly connecting in again via SSH. And you can see in this case, the IP address is used directly, instead of a dynamic -- a host that is the second line from the top would be the IP address. I also notice as it was scrolling that there is a Telnet command being sent, similar to what I was talking about. So effectively what is happening, a terminal command is being clearly sent within the SSH tunnel. But I see it setting a terminal speed. And it looks like somebody who is trying to set up something to stay online, just as a quick read of it. Possibly a gaming machine, more likely something like a -- you would use this for like surveillance of your home or home control, home automation, that sort of thing. It is a quick look, but it may be something like that.

Q. And you mentioned you use the phrase SSH tunnel. Could you just explain that briefly to the jury?

A. Well, all tunnel -- the word is actually unnecessary. All SSH, all Telnet, all commands that are sent through -- all VPN, actually -- it is all over a tunnel. So what the tunnel means is you are occupying, you are sending something through where you are going to occupy that connection from point A to point B.

Q.    And on Government Exhibit 722, do you see anything that identifies it as having to do with the operation of Bitcoin Fog?

A.    This doesn't look anything like what you'd expect for a full time server.

Q.    And if we could take that down, Mr. Hassard, and put up what is in evidence as Government Exhibit 723.

And, Mr. Fischbach, if you could just take a look at that and then tell me what your understanding of what Government Exhibit 723 is.

A.    Sure.  And I apologize.  I don't -- I haven't looked at these in a long time.  But what -- so 127.0.0.1 is typically a home router.  So most people here who have Wi-Fi at home, if you were to ping 127.0.0.1 --

THE REPORTER:  You have got to slow down on those numbers.

THE WITNESS:  I'm sorry.  I promised myself I was going to write myself a note.  If you were to type in 127.0.0.1.  You very well might get your router, like you would see in Linksys or something like that.  It could be 127.0.1.1, but that 127 block is for your home specifically.

And then I see the name of what appears to be a computer hard drive, two of them bunkerX media and bunkerX home.  And so it is just named bunkerX.  And then those two apparently describe what it is.  But the full name is bunkerX

media and bunkerX home.  And then it gives a file path to where it is trying to reach on those computers.

The rest of it is pseudo mount.  The rest of it is just more about setting it up so that you are going in.  This notion of a port where it says here, user heavydist would be the user name.  The port is that on your network -- again everybody who has a network at home has this happening.  Your network has what is called ports.  And those ports are there to keep you safe.  They are closed up.  But certain ports like port 80 has to be open in order to reach the internet.

And port 80.80 has to be open in order to reach your bank, because that is your https connection, your secure connection.  So in this case the user has opened up port 10445 probably because it is an obscure, unknown, not easy to guess port.  And I am guessing that is how they are controlling this computer with those two drives.

BY MR. EKELAND:

Q.  Do you see anything on Government Exhibit 723 that identifies it as having anything to do with the operation of Bitcoin Fog?

A.  No.  There is -- almost no possibility of it that a commercial server would run like this.

MS. PELKER:  Objection, Your Honor.  That is well beyond the scope of anything that has been disclosed.

MR. EKELAND:  We do --

THE COURT:  Do you want to pick up?

(Conference held at the bench.)

MS. PELKER:  Your Honor, that is an expert opinion about the nature of this connection that this is not consistent with a commercial server and that is certainly not something that has been disclosed.

MR. EKELAND:  Well, the government has brought in these exhibits.  He is reviewing them in rebuttal to the testimony related to them.  He has been -- his expertise in these areas and Linux and servers and everything has been disclosed.  And he --

THE COURT:  So show me where -- I have the disclosures in front of me.  Show me where in the disclosures that it talks about his expertise or that he would offer opinions like this.

MR. EKELAND:  This is rebuttal to evidence put in by the government.  The government -- these exhibits and this software was put in by the government.  And the government's implication and the testimony from this software was that the software was somehow operating Bitcoin Fog.  Mr. Fischbach is well qualified when it comes to servers.  He has testified --

THE COURT:  I understand whether he is qualified.  The question is whether there was a disclosure on this.

MR. EKELAND:  This is rebuttal testimony.

THE COURT:  I know.  But I have told you before that

the law is well established that you are required to make expert disclosures, even where you are responding to government's case, because otherwise you wouldn't have to do disclosures at all, because everything you are doing is responding to the government's case. So if there is some reason to think that you were blindsided by this, I get that. That is one thing. But if not, the whole point of the reciprocal disclosures is that both sides have to disclose and everything you offer is in rebuttal to the government's case.

MR. EKELAND: We didn't know that they were going to use these Linux histories and Bash histories to say that these were Mr. Sterlingov operating Bitcoin Fog. That wasn't anything that was disclosed in any of the government's expert disclosures anywhere. This was something that came up as a matter of evidence in the case. And you know the defense's position. We believe that Mr. Fischbach is well qualified.

THE COURT: No. No. Don't talk about his qualifications. That is not the question.

MS. PELKER: Your Honor, the idea that the defense is surprised by this is just not consistent with the fact that this was provided in discovery. They have seen the Bash history. We had noticed that the witness was going to explain and walk through what this was. She testified these are connections to a remote server. I believe the testimony was that we can't know for sure based on this what is on the --

what this computer is that is being connected to.  But that this would be consistent with a connection to and control of another server.

This is no surprise to the defense.  And they just didn't notice this at all.  What is significant opinion and that the government would have been entitled to, one, *Daubert* Mr. Fischbach on, but also put in evidence in its case to prebut this testimony from Mr. Fischbach saying that this wouldn't be consistent with a server.

MR. EKELAND:  I have, Your Honor, just been handed a note saying in docket 145 numbers 12, 18 --

THE COURT:  I'm sorry.  With respect to 166, the supplemental disclosure.  Those are the ones that are the unsigned disclosures and then you cut them back significantly because he had not reviewed what you had submitted as those disclosures.

MR. EKELAND:  One moment and I will pull those numbers.

THE COURT:  Okay.

MR. EKELAND:  Number 11.

THE COURT:  Okay.  Hold on a second.  So number 11, I have in front of me says, "Mr. Fischbach will testify from his experience, both personally and from professional examination as to what is involved in operating a Tor network site and by extension a custodial mixer like Bitcoin."

I don't think that is close to what we are talking about that.

MR. EKELAND: I would agree with that. Let me take a look. One second, Your Honor.

I think it is implied by 15, 17, 20 and then 24 is just rebuttal.

THE COURT: Give me one second. 15 is about hardware and we are talking about software. What is the next one?

MR. EKELAND: We are talking about actually accessing hardware. And the capabilities of commercial server, which in relation to home computer which is actually discussing hardware. We are talking about the -- I mean, what that opinion was, was saying that the hardware that is being accessed isn't capable of running something that requires the capability of a commercial server.

But the next one was 17, Your Honor.

THE COURT: That doesn't seem to cover this. What is the next one?

MR. EKELAND: 20.

THE COURT: So I think you are getting closer with this, but the thing is that -- I guess, the problem I am having with this, if the government's witness had testified that this was consistent with running Bitcoin Fog and that it can be configured in this way, I think that you would be on fair ground. I don't recall at least the government saying that.

But maybe you need to refresh my recollection of what the government witness actually said.

MR. EKELAND:  Again, I don't have the transcript in front of me, Your Honor.  But my recollection is that she basically testified that this was consistent, that she couldn't tell one way or another, but it was consistent with logging into Bitcoin Fog.  That was my understanding of the whole line of questioning on these Bash histories.  And, quite frankly, that is why we are spending time on them is because of that whole line of testimony implying that this very well could be Mr. Sterlingov logging into Bitcoin Fog.

THE COURT:  All right.  Ms. Pelker.

MS. PELKER:  Your Honor, I believe the witness testified on direct that these were remote connections and we couldn't go what the server was, but that there were -- was additional devices out there that we were never able to review.  And on cross-examination, Mr. Ekeland went down and said there is no evidence of Bitcoin Fog here, here and here.  And then on redirect I asked, when Mr. Ekeland was asking whether there was evidence you were -- that the witness confirmed that she understood that to mean there is no reference to Bitcoin Fog.  And that taken as a whole, the activity could be consistent with someone operating Bitcoin Fog.

If we had notice that Mr. Fischbach was going to testify this would be inconsistent with someone accessing a

server and this couldn't be a server, we would have elicited additional testimony on this point. That is the whole purpose of the expert notice process.

THE COURT: Right. So but if the government's witness did testify that this -- that she couldn't tell what type of --

MS. PELKER: Your Honor, we can go back and pull the transcript as well. I don't want to misstate because I understand it is a bit of a nuanced point here. I think the -- there is no surprise to the defense about what the testimony was. And we are now being very much surprised by what Mr. Fischbach has now -- a new expert opinion he has formed on the stand, which is that this is not consistent.

MR. EKELAND: I don't think there is any surprise here or that this is any new expert opinion. This is Mr. Fischbach going through and reviewing the transcript and the Bash history that the government opened the door to in their testimonies essentially saying that it is consistent with operating Bitcoin Fog.

THE COURT: Let me ask you this: Any objection if I allow this to allowing the government to offer in its rebuttal case a response to this?

MR. EKELAND: If they are putting on a rebuttal case -- well, are you saying if I give up on this hill, you are not going to allow it, is that what the Court is saying?

THE COURT:  So I am certainly not going to allow it on a topic that isn't examined.  So if you don't examine on it, I am not going to allow a rebuttal case on it.  If you do do it, I think that it is -- I don't think this really was noticed.  And there -- it is certainly -- this was never anything that was explored with me at the *Daubert* hearing.  But if you feel like you need to do this in response to something that the government witness said -- and I don't have that in front of me at the moment.  And if I am giving you sort of a break on that, then I'd give the government the same break and say they could come up in with a new expert on rebuttal if they wanted to address this in response.

MR. EKELAND:  Your Honor, this wasn't rehearsed and so, I mean, I can move on from this.  Like this is not --

THE COURT:  The question -- there is an answer to strike.  So the question is whether we -- this is an issue we want to get into.  And I understand the importance of this and I am not discounting that.  But this is nothing that was ever explored in the *Daubert* hearings and I do think the government is fairly reasonably of the view it was caught by the surprise by the new expert opinion.  And if I allow it, then I just think that I need to also allow the expert to offer its own expert in a rebuttal case to respond to this.  So I am happy to put it all in front of the jury and let the jury decide what it thinks is right.

But if you don't want to go down that road, then I'd probably have to strike the answer, just as a matter of fairness. I think what is good for the goose is good for the gander. I need to make sure I am treating both sides the same on this issue.

MR. EKELAND: I think that I am going to note our disagreement that this is a surprise. But why don't we strike the answer and move on because -- and take it from there. This is not some -- I wasn't trying to intentionally elicit this testimony about the commercial server.

THE COURT: Whether it is surprise or not, I just think it is nothing that was developed at the *Daubert* hearing. And I actually -- to my mind these are actually substantial *Daubert* issues about whether and how someone has expertise into making those types of determinations and whether he has the qualifications to do that or not. I have not heard anything about that. And we had extensive *Daubert* hearings and never was addressed at all. And I don't think sort of the more general disclosures were sufficient to raise this issue. So I am not saying the government was necessarily surprised, but it wasn't disclosed in the *Daubert* process.

MR. EKELAND: And the government didn't disclose that they were going to review the Bash histories or any of these scripts and give the opinions that they gave regarding them either, Your Honor.

THE COURT: Right. Although I do think that the difference here is -- again, someone could put it in front of me and I am happy to look at it. If you want to show me and it might change my view. But my understanding at least on what Ms. Pelker said and I think you haven't disagreed with this, is that the government witness simply said she didn't know what the connection was. That is a little bit different from saying this is categorically inconsistent, this could not have been an attachment versus saying I don't know.

MR. EKELAND: It is my understanding the implication was -- again, I would have to go back and look at the transcript. This is why the whole line of questioning is here is that this was potentially Mr. Sterlingov.

THE COURT: Why don't we do this? Why don't someone pull the relevant testimony from the government witness for me. Let's move on past this for now. I will strike the answer for now. I will let you come back to it if it turns out there is a basis for it and the government opened the door on this in some way. But let's strike it for now and you can come back after I had a chance to look at the transcript, unless you want to say now, look, all is fair and the government can have a rebuttal case on this.

MR. EKELAND: I like the Court's proposal, we strike if for now and if for some reason, we think that, you know, we want to revisit the issue, we'll raise it with the Court.

THE COURT: Okay. Thank you.

(End of bench conference.)

THE COURT: All right. Members of the jury, I am going to strike the last answer that was given and you should disregard that question and answer in your deliberations.

And you can proceed, Mr. Ekeland.

MR. EKELAND: May I proceed, Your Honor?

THE COURT: You may.

BY MR. EKELAND:

Q. Mr. Hassard, if we could put up what is in evidence as Government Exhibit 725. And if we could just scroll over a little bit so it is centered.

Mr. Fischbach, can you see that?

A. I do. Yeah, I recognize this spinning wheel of death.

Q. And what is your understanding of what Government Exhibit 725 is?

A. Well, this is a Bash terminal SSH command. It looks like it is a -- what would be called a script, so it looks like it is made to run automatically.

Q. Do you see the ignorelist.com right there?

A. I do.

Q. And do you know what ignorelist.com is?

A. Yes. It is a free, dynamic domain name service.

Q. And could you explain to the jury what a dynamic domain name service is?

A.   Okay.   I think I covered this yesterday, so I promise I will keep it short.   It is the idea of having a domain name like a www.Google.com that you can use to reach your home network for mostly home automation, like sprinklers and cameras and things like that, but there is that issue that at your home, your IP address changes frequently.   Except for that 127 I just described, that is just for you, inside.   But your outside address on your cable modem or your -- or whatever you are using, that changes frequently on a home network.   And so this dynamic DNS -- this script actually appears as though it is probably letting that dynamic DNS know the updated domain name -- I'm sorry -- updated IP address.

Q.   What is -- what is the difference if you could explain again what the difference between a dynamic DNS and a static DNS is?

A.   So it is actually not dynamic and static DNS, but I think you are asking about dynamic and static IP address.

Q.   I was --

A.   Apologies.   I think I understand where you are coming from.   So the dynamic DNS service is to support dynamic IP addresses from your internet service provider.   So for my domain, secondwave.com, I have had the same IP address for 20 years.   I probably should have memorized it by now.

Google has had the same one for a long time.   Microsoft's is almost famous.   But at home, because it changes, this

service and a script like this, will make sure that if you want to reach a network here, it would be like you would type TD1.ignorelist.com, it would look in the database to see what IP address was last updated for your home.  And then it would forward you directly to that number so you can get into your home network.

Q.   Do you know whether Bitcoin Fog used a dynamic or static DNS?

A.   I know for a fact it used a static DNS.

Q.   You can take that down, Mr. Hassard.  And do you recall Mr. Scholl's testimony about the last withdrawal from Bitcoin Fog being two days after Mr. Sterlingov's arrest?

A.   I do, yes.

Q.   While he was in detention?

A.   That is my understanding is that he was in detention at that time.

Q.   Did your review of his devices reveal any kind of kill switch that would have turned off Bitcoin Fog while he was in jail?

A.   No.  There was nothing found on any of the devices relating to kill switch.

Q.   And in your experience, do people in jail have operational access to the Tor network?

        MS. PELKER:  Objection, Your Honor.

        THE COURT:  I will allow this one.

THE WITNESS:  My experience and I have actually been able to operate computers from within inside of jails as part of cases, they are heavily locked down.  I don't think I have ever tried to install Tor.  But they don't allow you to just install whatever you want to install.  And they don't allow you to go wherever you want to go.  It is very limited.

BY EKELAND:

Q.    In your review of Mr. Sterlingov's devices and the discovery in this case, did you find any -- come across any communications between Mr. Sterlingov and anyone operating Bitcoin Fog?

A.    Nothing.

Q.    Turning your attention to the devices that were seized from Mr. Sterlingov at the Los Angeles International Airport.  Did you see the devices the government displayed during Agent Mat Price's testimony at the beginning of this trial?

A.    I did.  And I was able to inspect them up close as well.

Q.    Did you see the SIM cards?

A.    I did.

Q.    Do you have any professional experience with SIM cards?

A.    Yes.  As a part of my work, yes.

Q.    In what way?

A.    I do a lot of cell phone tracking, trying to locate -- either to confirm or possibly dispute cell phone tracking from law enforcement, but also when we have a missing person's case,

I will help with that as well. So the SIM cards become significant. And then we also have issues of SIM, what is called SIM swapping, SIM jacking, and hijacking people's SIM cards, so I get a lot of cases involving SIMS.

Q. Why do you carry multiple SIM cards?

A. I guess the question is, do I? I do.

MS. PELKER: Objection.

THE COURT: If you -- I am not sure why his personal practice is relevant, so sustained.

BY MR. EKELAND:

Q. Can you think of -- what is your understanding of why someone like Mr. Sterlingov might carry multiple SIM cards with him?

MS. PELKER: Objection; calls for speculation and --

THE COURT: Why don't -- if you can ask him more generally if he has experience or knowledge with respect to people's uses of SIM cards for various purposes that is fine.

MR. EKELAND: I didn't hear that.

THE COURT: If you want to ask him more generally about his -- if he has experience and knowledge with respect to how -- the types of ways in which people use SIM cards, that is fine.

BY MR. EKELAND:

Q. Mr. Fischbach, do you have experience and knowledge in the way people use SIM cards?

A.    Yes, I do.

Q.    What are some of the ways that people might use multiple SIM cards?

THE COURT:  Then it --

BY MR. EKELAND:

Q.    What is your experience in how people use multiple SIM cards?

A.    I can tell you how I personally was first supposed to the idea of swapping out SIM cards.

MS. PELKER:  Objection.  We are not trying to be difficult.  The witness can testify to his professional experience, not personal.

THE COURT:  Sustained.  So I think the question is whether he has any particular expert knowledge that is anything that he has studied and he has a knowledge base based on his expertise as to how people in general use SIM cards.

BY MR. EKELAND:

Q.    Do you have professional knowledge of how people use SIM cards?

A.    I do, yes.  Most of my cases that involve foreign nationals involve multiple SIM cards.  Because unlike the United States, traveling all over Europe for example, does require switching services, otherwise it becomes very expensive.

Q.    How does having multiple SIM cards help with switching

services?

A.    You can subscribe or buy a prepaid SIM card for the local service.

Even in the United States, this could be a case -- like in Alaska I did a case where all of the calls were on GCI net because they are the only 5G provider in Alaska.  So people in Alaska will swap SIMS.  I swap SIMS.  I switch SIMS every time I work in Alaska on a case so I can get 5G.  You just purchase a prepaid -- and most modern phones -- I don't know about most modern phones.  This is a Samsung S23.  I this one I have six SIMS loaded up in it right now.  I can go into a menu and switch or it will switch to whichever is fastest or most available.  So if AT&T is fastest in this room, the phone will switch to AT&T for my data service, but my phone calls will still come in by Verizon.  Or it can mix the data and put them together to make it faster.

Q.    Are you familiar with the MPTCP, that router Mr. Sterlingov had?

A.    Yeah.  I think you got some of the terms wrong.  It is multipath MPTCP, telecommunication protocol -- oh, gosh.  I don't know.  Actually, I wrote it for the court reporter.  TCP is transmission control protocol.

So multipath is the ability to -- very much like I described with my phone to what we generally refer to as load balance or fail over.  It basically means that if one of the

networks isn't working, so like I think in this room, I don't think AT&T works as well as Verizon then my phone will use all of the data from Verizon if I am not on the network.  And then at the same time with a modem like the one that I reviewed for Mr. Sterlingov's case, what it will do in addition to load balancing, it will bind them and it will use all of them simultaneously.  So that even if one is slow, it just makes the rest of them a little bit faster.  That is -- by the way, it is specifically used for -- that is a popular device from my cases for podcasters, people doing YouTube videos, things like that, especially if you want to do it live.  It just guarantees you are not going to drop your signal.

MR. EKELAND:  If we could bring up -- the physical -- I think it is Government Exhibit 125, 126 if I have that right, which should just be the case.  I hope I have it right.  And this is what in evidence I believe as Government Exhibit 125 and 126.  And if we could -- can we -- may the witness handle that, Your Honor?

THE COURT:  Yes.

BY MR. EKELAND:

Q.   Mr. Fischbach, if you could briefly explain to the jury -- just show what this device does, if you know?

A.   Okay.  So this is the front side.  There is actually -- it is probably hard to see from where you are.  But there is Velcro here, so it looks like somebody stood this up like this,

which would be the smartest way to do it.  All of these here, the four sticks are USB cellular devices.  These are 4G, probably because it is old.  But so each one of those would be 4G, with -- I can see some in review there was a removable SIM. I'm not sure how you open it.  It looks like you take the case open or it may actually just come built in with the service provider -- very hard for me to tell.

But either way, each one of these would be a different radio.  They can all be on the same network.  And if you do that, then it means if everybody is -- if all of these are on Verizon, you will get four times the speed.  You will get four Verizon connections and you will get a much, much faster speed. If one is T-Mobile, one is Verizon, one is AT&T and one is Sprint, then what you get is you have what would be called a fail safe or fail over.  And it means that any one of those that is slow gets made up for by the combination of all of the rest of them.

And then the other two devices that I have here are Raspberry Pis, just tiny pocket computers, $25 machines.  Is that sufficient?

Q.    Unless there is anything else that you think might be helpful to the jury.

THE COURT:  I don't think that is -- you should ask a question rather than sort of just say anything helpful.

BY MR. EKELAND:

Q.   Is that a device that people use for streaming?

A.   That is the typical selling point of them generally is because with streaming, you really can't -- you can't have it slow down or lose, drop a connection.  So this way, it fails over and makes it faster by combining the networks.

Q.   If somebody wanted to get a device like that, where would they get it?

A.   Well, I haven't seen this one still available.  It is an older model.  There are much, much nicer, less intimidating looking ones available on Amazon today.

Q.   I think we can put that away.

A.   I should add to the question, I don't own one and wouldn't bother to pay for one.  Because today if you have a modern phone you can actually plug into USB-C port and do exactly what that does just by putting multiple SIMs.  So I wouldn't see the point for me in spending the extra money in that today.

BY MR. EKELAND:

Q.   And do you recall in your review of the devices seized from Mr. Sterlingov at the airport that he had a two-factor authentication key?

A.   Yes, I did.  I have got one right here on my phone.

Q.   And what are the typical uses, if you know, of a two-factor authentication key?

A.   Oh, gosh, typical uses.  Today they are used for everything.  But the original use, the first time I ever had

one -- actually I left it in my wife's hands because she doesn't lose things as often as I do. But it was assigned by the bank. So the bank gave us a two-factor authentication to keep our account safe. Today, they are the reason I have this one hanging from my phone from YubiKey, which is probably the top provider today, is because now I can use it so that it has to be present for my laptop to be opened, for anybody to get in my laptop. I use it -- I have to automatically stick it in or tap it in order to trade cryptocurrency, to buy cryptocurrency or to sell any of my cryptocurrency. I use it for my bank as well. Gosh, I use it actually just to get into my Gmail or into my encrypted email.

MS. PELKER: Your Honor, just to keep things moving along, if Mr. Fischbach wants to testify from his professional experience, that is fine. But a litany of anecdotes from his personal life is not expert testimony.

THE COURT: Yeah, I agree with that. I will let the answer stand. But going forward, I will request that you provide opinion based on your expertise rather than your personal activities or personal experience.

BY MR. EKELAND:

Q. Mr. Hassard, if we could get up what is in evidence as Government Exhibit 112.

THE COURTROOM DEPUTY: What number? I'm sorry.

MR. EKELAND: 112.

THE WITNESS: If I may, just so that my testimony was clear, all of that was -- that is all work related. Everything that I was talking about, that is all -- even my cryptocurrency was purchased for work.

THE COURT: I'm sorry. There is not a question pending. And I guess my point and just to clarify as you give your testimony, whether you use it for your work or not isn't the point. The question is whether it is something you can express an expert opinion about what others do or how things are used otherwise, not just how you are using it in your personal life or your professional life. That is not what the expert opinion should be about. The expert opinion should be about something with broader applicability.

THE WITNESS: Understood. This came by way of my professional work. That is pretty much how I get -- because it became part of a case. So as part of a case, that is how I chose to adopt it.

THE COURT: All right.

BY MR. EKELAND:

Q. Directing your attention to what is in evidence as Government Exhibit 112.

And, Mr. Hassard, if you could just slowly scroll down that, if you could please take a look at that. Do you recognize what that is?

A. I think I have seen this, yes.

Q.    And is that the list of items that the government seized from Mr. Sterlingov at Los Angeles International Airport?

A.    That is my understanding of this document.

Q.    Did you hear Ms. Mazars testify about the 6 terabyte BitLocker encrypted drive?

A.    I did.

Q.    Do you see that drive listed anywhere on the devices listed here?

A.    I am familiar with the document, but just so I am looking in real time, if you want to scroll down I can double check that I am looking at the same document.

Yeah.  No, there is no 6 terabyte hard drive here.

Q.    Mr. Hassard, if we could take that down and put up what is in evidence as Defendant's Exhibit number 32.  And if we can just scroll down that.  And is it your understanding that everything on this list with the exception of the 6 terabyte drive was seized from Mr. Sterlingov at Los Angeles International Airport?

A.    That is my understanding.

Q.    Did you hear Ms. Mazars' testimony regarding this 6 terabyte BitLocker encrypted drive?

A.    I did.

Q.    What was your understanding of what she represented it to be?

A.    During testimony?

Q.    Yes.

A.    That it was effectively a compilation of all of this.  I don't think she meant like the SIM cards, but all of the media devices, all of the things that hold memory, which a SIM does not.  But that is my understanding, it was a full compilation of everything on one drive.

Q.    What is your understanding of what that 6 terabyte hard drive is?

A.    I mean, my understanding it is encrypted, which she explained was standard operating procedure.

Q.    Uh-huh.  And were you able to review those encrypted files?

A.    Yeah.  I wasn't able.  And I guess I saw the --

        MS. PELKER:  Objection.  To the extent we are getting into discovery disputes.

        THE COURT:  Sustained.  I think the witness was present when we discussed this, so if you can just abide by the ruling that I gave with respect to this topic.

        MR. EKELAND:  Understood, Your Honor.  We can take that down.

BY MR. EKELAND:

Q.    If we could put up what is in evidence as Government Exhibit 721.  Do you recognize this exhibit, Mr. Fischbach?

A.    I do.

Q.    And did you -- what -- did you hear Ms. Mazars testify

about it?

A.    I did.

Q.    Were you -- do you recall her testimony about where she said she found it on Mr. Sterlingov's devices?

A.    Yes.  My understanding or my recollection from the testimony -- and I did reread the transcript is that it was a screen capture from a conversation that was apparently found on a e-reader, a tablet.  It is actually a -- one of the devices here.  It is actually a Kindle, black and white e-reader.

Q.    And it is your understanding that was Mr. Sterlingov's e-reader?

A.    That is my understanding.

Q.    Were you able to locate this file based on Ms. Mazars' testimony of what she said it was?

A.    I was not.

Q.    Were you able to locate it?

A.    Eventually, yes.

Q.    And how were you able to locate it?

A.    Well, because it was represented as a screen capture, when I ran the forensic software, it would automatically put all of the screen captures in one place.  So for that reason it just didn't show up, it appeared not to be on the device at all. With the help of government emails back and forth, they were able to give me a path directly to the file that that was apparently the source of this.  And the reason it didn't show

up is it is an ebook about dating.

Q.    Was the ebook -- do you know if Mr. Sterlingov wrote that ebook?

A.    No.  It has the title -- I mean, the author.  I could actually have on my screen I have the cover of the book.  I could look up the author.

Q.    Is it your understanding that this isn't actually a chat from Mr. Sterlingov?

A.    This is actually not a chat from Mr. Sterlingov.  This is the path they gave me was to an ebook downloaded still available today for $3 at Amazon.

Q.    And we can take this down and move on.

You testified that you registered hundreds of domain names?

A.    Yes, that is not an exaggeration.

Q.    And have you reregistered domain names?

A.    Right.  I just reregistered one yesterday morning.

Q.    Is a domain registration the same thing as DNS registration?

A.    No.  It is a -- DNS happens within the domain name, but there is -- a DNS requires a domain name.  A domain name does not have to have an active DNS.  So they are little bit -- the DNS is what points to the IP address.  The domain name is the actual name itself.

Q.    And you have heard the testimony in the case about the

renewal of the --

MR. EKELAND:  I'm sorry, Your Honor.

THE COURT:  No.

BY MR. EKELAND:

Q.    -- about the renewal of the BitcoinFog.com domain name through Orange website?

A.    Yes, I did hear that.

Q.    Mr. Hassard, if we could bring up what is in evidence as Government Exhibit 811.  And we will also be looking at Government Exhibit 813, which both should be in evidence.

THE COURTROOM DEPUTY:  811 and 813?

MR. EKELAND:  Yes.

BY MR. EKELAND:

Q.    And just, Mr. Fischbach, if you just look at Government Exhibit 811 and just tell us what your understanding of that is?

A.    This is just a receipt for the purchase of a domain name.

Q.    Is that domain name BitcoinFog.com?

A.    Yes.  That shows BitcoinFog.com.

Q.    And have you in your review of Mr. Sterlingov's devices and discovery in this case, have you seen anything indicating that Mr. Sterlingov made this payment?

A.    This receipt was not on nor this email account, none of this was on any of Mr. Sterlingov's devices nor had they been accessed from his devices.

Q.   And the -- this is just a renewal of the Bitcoin Fog clearnet site?

A.   That is correct, yeah.  The .com would be the clearnet.

Q.   That is through 2021?

A.   This copy is through 2021.  That is not the current registration, but, yes.

Q.   And then just calling your attention to -- if we could take that down and go to Government Exhibit 813.  And if you could just take a look at that and tell me what you understand it to be?

A.   Again, this is an overdue notice, an invoice sent to Shormint@hotmail.com also for -- let's see, payment method -- looking for the domain name on here.

Q.   I think I put the -- I think I want actually --

A.   I don't see the domain name.  It does indicate it is overdue.

Q.   And you see it is to Shormint@hotmail.com?

A.   It is to the same email address, yes.

Q.   Mr. Hassard, if we could put up what is in Government Exhibit 814, which I think is the receipt.  Yes, that is -- there we go.  And if you could just take a look at this and tell me what your understanding of this is?

A.   So this is a payment for the same invoice number.  But specifically for BitcoinFog.com so that was, in fact, a BitcoinFog.com invoice that was overdue and then it shows the

payment was made.

Q.   And is it your understanding that registration is extended through 2026?

A.   That is the current registration right now is that it was extended to 2026.

Q.   And in your review of Mr. Sterlingov's devices and discovery in your case, did you see any indication that Mr. Sterlingov made this payment?

MS. PELKER:  Objection, Your Honor.

THE COURT:  What is the objection.

MS. PELKER:  We can pick up the phone?

THE COURT:  Is this a good time for our morning break?

MR. EKELAND:  We can take the morning break.

THE COURT:  Why don't we take the morning break now. So it is a few minutes after 11:00.  Let's come back at 11:20. Please don't discuss the case even among yourselves and don't conduct any research and I will see you shortly.

(Jury out at 11:01 a.m.)

THE COURT:  You can speak at your desk there, at the table.

MS. PELKER:  I believe at the *Daubert* hearing and in the Court's ultimate decisions here, Your Honor was clear that Mr. Fischbach and other witnesses could testify to whether they reviewed for specific pieces of evidence, but that this sort of

testimony, did you find any evidence that Mr. Sterlingov was operating Bitcoin Fog, was an argument to be made in closing, not for something for the witness to opine on. So it is somewhat of a structure of the question issue, but it did now happen more than once where Mr. Fischbach was asked to testify as to whether he found any evidence that Mr. Sterlingov was operating Bitcoin Fog.

MR. EKELAND: Certainly, if the government found evidence of Mr. Sterlingov operating Bitcoin Fog, they would be attempting to adduce it in court so I don't understand how asking a forensic investigator whether they saw evidence consistent with what the government has the burden of proof on, I don't see how that is argumentative that the government is welcome to cross on that point. But that is the core issue here.

THE COURT: Let me -- I think I can cut this short. I do think that the difference in the way the two of you characterize the question is the problem here in that I think there is a real sort of ambiguity -- if all you mean is, did you see any references to Bitcoin Fog on any of his devices, did you see him connecting to Bitcoin Fog? That is, I think, fine. The problem with any evidence that he operated Bitcoin Fog, well, you know, there is all of the tracing that the witness sat here and saw and watched in the courtroom. That is evidence that is in the case. And, quite frankly, you know, I

think it is a question for the jury about whether that is evidence that Mr. Sterlingov operated Bitcoin Fog or not. I don't think this witness is competent to testify as to whether that is evidence or not evidence in doing so. So if you want to go through and say, were there references to Bitcoin Fog? Did you see him connecting to Bitcoin Fog? I think that is completely fine.

MR. EKELAND: I understand, Your Honor. I see what your point is. I am happy to make it more specific. And I will just ask more specific questions, because there is --

THE COURT: Okay.

MR. EKELAND: The answer to them is going to be the same. Point taken.

THE COURT: That is fine.

Let me ask going back to the question about Ms. Mazars' testimony what is it that you are pointing to or relying upon.

MR. EKELAND: I haven't --

THE COURT: To say that --

MR. EKELAND: I haven't looked at the transcript right now.

THE COURT: If you -- I was hoping Mr. Hassard may have been doing that but -- let me come back in 10 minutes. Because I'd like to talk about that. I don't know how much more time you have with this witness.

MR. EKELAND: I don't have that much more time at all.

THE COURT: I want to make sure that I resolve that, so if I do conclude you should be allowed to go back and ask those questions, I wanted to make sure you can do it.

MR. EKELAND: If we are done with that section, I think it is just that one reference to the commercial server. I think we are okay just with having it struck and moving on.

THE COURT: That is up to you. Because it may have been a door that was opened and I don't want to --

MR. EKELAND: I will take a quick look. I don't want to drag down the proceedings with this unnecessarily, because, honestly, it wasn't something that I was -- I meant -- was trying to elicit. But I do think it is a core point. Let me take a look. When we come back, I will give you an answer.

THE COURT: That is fine.

The witness can take your break as well. But do not discuss your testimony with anybody until it is complete.

THE WITNESS: All right. Thank you.

(Recess taken at 11:06 a.m.)

THE COURT: All right. And, Mr. Ekeland, what did you decide about whether you want to go back to the question of whether that script is consistent with accessing a server?

MR. EKELAND: We can just strike the answer.

THE COURT: Okay. I think I already did strike it,

so if you don't want to go back to it --

MR. EKELAND: I am not going to revisit it.

THE COURT: I want to make clear that I am not foreclosing, if you can show me the door was opened by the government, I'd be open to allowing you to do that.

MR. EKELAND: We didn't have the transcript of her direct, because we hadn't gotten it. So we were looking in the cross, but didn't see it. So I am just going to in the interest of time at the moment drop that.

THE COURT: That is fine.

Are we ready to bring the jury back?

MR. EKELAND: Just one really quick housekeeping thing.

THE COURT: Yes.

MR. EKELAND: The government has informed me they no longer need to have Professor Verret subject to recall. I just want to put that on the record.

THE COURT: Is that -- Ms. Pelker, just to confirm for the record?

MS. PELKER: Yes.

THE COURT: So, Professor Verret, you are welcome to leave, if you would like.

Okay.

(Jury in at 11:26 a.m.)

THE COURT: Mr. Ekeland, you can proceed. We are

going to break at 12:30.

MR. EKELAND:  12:30.  Thank you, Your Honor.

BY MR. EKELAND:

Q.   Mr. Fischbach, have you investigated domain name records before?

A.   I have, yes.

Q.   Have you testified about domain name records before?

A.   I am sure I have, yes.

Q.   In your experience is some indicia of the domain name registrant stored somewhere?

A.   Well, that is -- yes, that is an important part of it.  It does have to be able to -- a person has to be able to be reached to bill.

Q.   Do you recall Ms. Mazars testifying about the Who is?

A.   Yes.

Q.   And could you remind the jury what Who is is?

A.   Yeah.  I mean, it is what it sounds like.  It is Who is. And it is -- it is the actual term of art for when you look up a domain name.

Q.   When you look up a domain name, what kind of information do you typically see?

A.   If it is all open in the clear, you will get starting with the domain name, you will also have at least three dates associated with it.  The date when the file was first created, so that stays with the domain name forever, unless the domain

expires and is not renewed. And then you will have the last modified, so last date any modification was made to the record itself. And then you have the -- the expiration date when it is going to expire. Beyond that, you do have the name service listed in there, so it knows where to point to, so that is the DNS records. And if it is available, you will have the name of the registrant, which could be a company or it could be a person or some other entity, address, phone number.

And there is three -- I believe three of those records that I am just picturing it. There is the registrant. There is one for -- I believe there is a technical and there is a billing, so I think there -- I believe all of them have three. So mine I have basically all the same. And there is a few other details in there, but not really significant to identifying a person.

Q. And would the information include the last time that the domain was re-registered?

A. The last time that the file was modified in any way, which was typically a reregistration.

Q. And, Mr. Hassard, if we could put in what is not in evidence as Defendant's Exhibit 126.

And, Mr. Fischbach, could you please take a look at that.

And if, Mr. Hassard, if you could please scroll down so Mr. Fischbach can look at that while we --

A. We have the spinning wheel again.

Q.    Without scrolling down, do you recognize what that is?

A.    Yes.  I believe this is the one that I did, at least from the date.  And it would be from DomainTools.com.

Q.    And this is a Who is lookup from DomainTools?

A.    This is a Who is.  Just so the jury understands the term Who is, although there is a website -- there is a couple of them, there is Whois.com and Whois.org and there may even be more, but the name is a general term that is used for anybody.

So if you go to GoDaddy, you will Who is a website at GoDaddy, even though that is not their name.  So yes.

Q.    What is DomainTools.com?

A.    It is just a more complete record -- a lot of times, like if you go to GoDaddy.com, it is just the one that always comes to mind, because they advertise so much.  If you go there, they typically truncate the record to just what somebody really specifically needs to look at.  And DomainTools is good.  I have seen it used by law enforcement for a very long time, so I have adopted it as well.  It just provides more information.

Q.    Have you found DomainTools.com to provide accurate information?

A.    Absolutely.  I have never seen an error in it.

Q.    Does the public in general rely on DomainTools to provide Who is information?

A.    Can you repeat that?

Q.    Does the general public rely on DomainTools as an accurate

source for Who is information?

A.   I don't know that I could necessarily say the general public does.  But the information is the same as any Who is.  And I know the general public does rely on a Who is which would be identical to this.

Q.   Who is business records show the registration information for domain name?

A.   That is correct.

Q.   Is this a fair and accurate representation of your search results for who is information using DomainTools?

A.   This looks like the actual search that I did, just because of the date.

MR. EKELAND:  Your Honor, at this time, the defense would like to move into evidence what has been marked for identification as Defendant's Exhibit 126.

THE COURT:  Any objection?

MS. PELKER:  No objection.

THE COURT:  Defendant's Exhibit 126 is admitted and may be published to the jury.

(Whereupon, Defendant's Exhibit No. 126 was admitted.)

BY MR. EKELAND:

Q.   You can see that, Mr. Fischbach?

A.   I see that, yes.

Q.   Mr. Fischbach, can you explain what this Who is

information is displaying here?

A.   So this is the domain name registration for BitcoinFog.com, which would be the clear site.  As you will see where it says registrar, this is a typical domain service.  I don't know what BS corp stands for.  But it is a -- this is what is called a private record.  So if you look at Who is server, the original registration is held under Whois.internet.bs, which I have researched.  That is what is called a private domain.  It is a pretty -- that is a very typical, very average thing.  I do have private domains where I just don't want to be solicited, because a lot of people get your information for -- for unsolicited phone calls and things like that from your domain names.  But that is who this one was registered through.  And I see under IP history this is extra stuff.

I'm sorry.  I passed dates.  So the dates say created on 2011, October 25th.  It expires -- so that would be the original -- October 25th would be consistent with the opening of Bitcoin Fog.  Expires 2026, also October 25th, which is typical that it would expire on the same day as it was registered.  And then the last update was done on December 1st, 2023.

It does -- now, here is where we get into some of the extra information that you wouldn't get from like a GoDaddy.  It says registered and no website, which is accurate for this.

So that means that the domain file is current, somebody is still paying for it, somebody is maintaining it, but that it is -- there is no DNS pointing to a website right now. And then again, this extra information that you received, so IP history, it says it has had four changes and four unique IP addresses over 13 years. So that means it has been pointed to four different places. It could be the same place but at least the server addresses have changed.

Three registrars, which I am not sure that that means anything other than modifications in the information, because we know for sure that this is the original record. So I am not -- somebody probably changed like the technical status that would be recorded there. So, I mean, somebody new was being alerted if there was a problem.

And then the hosting history, they are going to a total of six changes and six different domain name servers. DNS servers over 13 years. And then as you get to the rest of it, you are sort of getting into the weeds, because this is just a lot of the extra information you don't typically get. But one thing you will see --

Mr. Hassard, if you could stop. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 -- 16 -- 17 lines down if I counted that right. It says registrant organization, Whoisprivacy.corp. So that is the name of the company that basically would hold the records that do have to be kept somewhere, but keeping it private from

the public. So it is like having an unlisted phone number. So the phone company knows who you are. They know where to send a bill. But they don't put your -- I don't know even know if that is still a thing, unlisted phone numbers. I don't think anybody has a phone book anymore. But back in the day, it would be like taking your phone off the phone book or taking your house off of Google Earth and having it blurred. It is basically equivalent to that.

Q. So the Whoisprivacy.corp would have the information as to who controls this domain name?

A. They would either have the information or they would have the information of the entity that holds that information.

Q. In your review of the discovery in this case, did you see whether or not the government issued any legal process to Whoisprivacy.corp to determine who controls this domain name?

A. I saw no legal service related to that.

Q. If we could scroll back up a little bit to the update, up a little bit more, Mr. Hassard, right there. Updated on -- I got it, Mr. Hassard, right there.

Updated on 2023, December 1st, that is about 2 and a half years after Mr. Sterlingov was arrested?

A. Yeah. The math sounds right, yes.

Q. And what is it -- can anybody just update the domain?

A. No. It would have to be the entity that controls that domain name.

Q.   And how would the entity do that?  Would they have a username or password?  How would that work?

A.   That is correct.  There would be a username and password associated with the account.

Q.   And -- I'm sorry.

A.   They would also have to know who is the underlying registrar behind this, because thanks to privacy -- to the privacy corporation, even if you wanted to try to guess the username and password, you wouldn't know where to go to enter it.  Because if this was registered on GoDaddy, you wouldn't know because it is not listed here.

Q.   And in your review of Mr. Sterlingov -- well, Mr. Sterlingov's devices had been seized at this point, hadn't they?

A.   As I understand from the documentation I have read, yes.

Q.   But in your review of Mr. Sterlingov's devices, did you anywhere find the necessary log-in to update this domain name?

A.   I didn't see that on the devices or on the list of log-ins.

Q.   And -- withdrawn.

     What, if anything, does the updated December 1st, 2023 tell you?  Do you know how it was updated?

A.   I did look up a little bit more detail.  I believe it was a different exhibit that I provided to the defense just to get the specific detail.  If memory serves and it has only been a

few days, so it should.  I believe that was somebody removing the DNS servers from the website on that date.

Q.    And now I am showing you -- Mr. Hassard, if we could take this down.  And bring up what is not in evidence as Defendant's Exhibit 127.  And do you see that, Defendant's Exhibit 127?

A.    Yes, I created this.

Q.    And how did you create this?

A.    By going to completeDNS.com, I believe is their -- is their domain name.  And then typing in BitcoinFog.com and this is what I described earlier as like a Way Back Machine or archive.org, but specifically for DNS records.

Q.    And do you find the -- what is this Complete DNS it is called?

A.    Yes.

Q.    To be an accurate and reliable source for DNS record information?

A.    Yes, it has been.  And I have seen it used in other cases as well.

Q.    And do law enforcement and the public use Complete DNS to look up DNS records, if you know?

A.    Again, I can't speak to the public, but I have seen law enforcement use this.

        MR. EKELAND:  Your Honor, at this point in time the defense would like to offer what has been marked for identification as Defendant's Exhibit 127 into evidence?

THE COURT:  Any objection?

MS. PELKER:  No objection.

THE COURT:  Defendant's Exhibit 127 is admitted and may be published to the jury.

(Whereupon, Defense Exhibit No. 127 was admitted.)

BY MR. EKELAND:

Q.   Mr. Fischbach, is this what -- the exhibit you just mentioned when we were talking about the domain name registration?

A.   This is what I referred to when I was trying to obtain more information about what the last change was in December of 2023.

Q.   Could you just take us through this document and explain in lay person's terms what it means what you see in this document?

A.   Yeah.  This is -- again, very like the way I described -- hopefully well described Who is.  I'm sorry.  Way Back, archive.org.  This is also kind of an opportunity to go back through the history of in this case just the domain registration from where it was pointing, so what we would see is like on September 2nd, 2011, would be the first time there was a record made.  That doesn't mean it happened on the day, but that is the first day that it was preserved that the name service pointed to highhosting.net.

And it is typical when you will see four different servers

like that -- I would prefer four. I think I do have four. It just -- each one is basically a backup or a fail over for the other. So it means if one of those goes down, your website won't go down because it doesn't know where to point. There is a duplicate copy of where your website should be pointing to. So that would have occurred sometime prior to September 2nd, 2011, which is consistent with the Who is record.

Q. And if we could just scroll down. It is -- so am I understanding correctly that this is just a history of the servers that hosted the BitcoinFog.com clearnet site?

A. Basically, it is a little bit more nuanced than that. It is not like it is saying exactly which server it is. But you can ascertain that from this. What it is basically saying is where the name servers were pointing, what it was pointing to.

So if you look at the second one, sometime around February 2nd of 2012, there would have been a change of the name servers, which would be indicative of the server moving somewhere else, to a different service. And that would have been hosted by main -- well, it would have used the mainnameserver.com DNS system pointing to it. That doesn't mean where it was hosting, but it means that wherever they were hosting, that is what they were using as a service to redirect traffic to the appropriate IP address.

Q. Can just anybody change the service that you are using for your website?

A.   No.  It is -- specifically, if you could, I don't think Google would still be online today.  It is made very difficult.

Q.   So what would somebody need in order to change the servers?

A.   They would have to know who the registration was held with.  And that can be moved, so even if you do use, you know, cheapnames.com, you can later say, I don't like that company or they raised their prices or something like that and you could move it to GoDaddy and there is a process for that.  But you would have to know where it was currently sitting.  And by the way, that process is harder than moving your phone number.  It is just a very, very difficult process, because there is a lot of checks.  They want to make sure nobody is stealing your domain name.  Because, quite frankly, they can be worth an awful lot of money.

Imagine if you owned Google.com, imagine what you could sell a domain name like that for.  It is a long process.  It is generally several days to move it back and forth, checking to make sure you are authorized to do it.  Yeah, that is what occurred here.

Q.   Would you need a username and a log-in, in order to do this?

A.   You would have to know where it is currently hosted.  And you would have to have the username and log-in to get there.  And then if it has what is called two-factor authentication,

which is like the key that I showed you or a code generator that you could have on your phone or typically they will have to like send a message to a cell phone number that is authorized on the account. And you will have to okay it and you will have to authorize it.

Q. In your review of Mr. Sterlingov's devices and the discovery in this case, did you see a username or log-in that would allow Mr. Sterlingov to make the changes documented in Defendant's Exhibit 127?

A. I have seen nothing.

Q. And in your review of Mr. Sterlingov's devices and the discovery in your case, did you find any reference to any of the servers listed here?

A. No, I found no reference.

Q. If you could take us through the history of the rest of these server changes.

A. So once somewhere in 2012, sometime prior to December 4th, the name servers were changed again. And then a final time -- maybe not a final time, the final name servers that exist in the records would have been November 16th of 2014. And it is then changed to webhostbox.net along with some additional backups. And then finally on October 5th, 2022, it recorded a record that the name servers were entirely removed.

Q. What does that mean, that the name servers are entirely removed?

A.     It just means that it -- it no longer has a website to point to it.  It is no longer pointing anywhere.  It is -- I am trying to remember the term that they like to use.  It slips my mind.  Effectively what you are doing is holding the domain name.  You own it, maybe you are going to use it, maybe you are going to sell it, but it is not currently active to a website.  But it could still be looked up today, as we know because I looked it up today.

Q.     Is that a change where it says the domain drop, name servers removed is that a change that somebody has to actually initiate or does it just happen?

A.     No, it will not just happen by expiration or anything like that.  So, for example, if you were to stop paying a server bill, your traffic will still go to wherever that server is, just because you didn't pay the bill, they are just not going to answer it.  But effectively it would be almost like an unanswered phone call.  In this case, it is not going anywhere.  It just stops right at wherever it is registered.  You will get a broken page.

But if you don't change that, then it goes to where it was previously hosted.  But in all likelihood, the hosting provider who you were paying just took that server offline so you will see nothing.

Q.     If I am understanding you correctly then that somebody actually made a change to drop the domain here; is that

correct?

A.    Yes, that is what occurred here.  Not to drop the domain name.  The domain name is still in effect today as of today.  But somebody on October -- well, prior to October 5th, 2022, just went and took it offline.  It would have been the way this service works, it would have been within a few days of October 5th.

Q.    This was about a year and a half after Mr. Sterlingov was arrested?

A.    That is my understanding.

Q.    We can take this down.  And then did you review the discovery and Mr. Sterlingov's devices in relation to his To the Moon server?

A.    The VPN server, yes, I reviewed that.

Q.    And you say it is a VPN server.  What -- can you explain what a VPN server is again?

A.    Sure.  A virtual private network, basically used for security.  I highly recommend them.  And it just basically encrypts all of your internet traffic, just automatically.  So your bank should do it already.  So when you log in to check your bank statements or your credit card statements, anything like that, you should see a lock closed on your browser, some indication that you have security.  What this does is gives you that security with everything you do on the internet.

Q.    And you heard Ms. Mazars' testimony about the To the Moon

server?

A. I did.

Q. And you reviewed her reports?

A. I did.

Q. And in her reports, did she discuss the hard drives on those servers?

A. Yes, she did list the hard drives.

Q. And I -- did you hear the testimony of Mr. Price saying that he thought one of the hard drives was wiped?

A. I heard that testimony, yes.

Q. And did you in your review find anything that would lead you to believe that one of the hard drives was wiped on that server?

A. There is no evidence that the hard drive was wiped at all. That is absolutely misstating what the evidence is.

Q. And what, if any, is your opinion of the one hard drive that was alleged to have been wiped?

A. It is just a blank hard drive. That could mean it was just never set up and never configured. It certainly could be -- there is no denying that it could be that somebody chose to wipe it with zeros. I will tell you forensically, that is not the appropriate way to wipe a hard drive. That is not your best -- if you are trying to really clear the hard drive entirely, that is not the DOD standard which when on the wiping software --

MS. PELKER:  Objection, Your Honor.

THE WITNESS:  I'm sorry.

THE COURT:  I am not sure the DOD standard is relevant here.

MR. EKELAND:  We can move on.

THE COURT:  Overruled.

THE WITNESS:  Maybe I can explain that and then I think I might -- the government might prefer that I just clarify.  I am not citing that I know the DOD standards.  What happens is in all of the forensic software and specifically the forensic hardware that I share with the government and I use mostly the same hardware and software --

MS. PELKER:  Objection, Your Honor.

THE COURT:  Sustained.

MS. PELKER:  There is no question.

THE COURT:  Yeah.  There is not even a question pending.

BY MR. EKELAND:

Q.   Did you review -- did you hear the testimony about the P cap surveillance on the To the Moon server?

A.   I did, yes.

Q.   Did you review any records in relation to the P cap surveillance?

A.   I did.  I saw the P cap record surveillance.

Q.   Can you just briefly explain to the jury what P cap is?

A.    So it is a packet capture.  I think I have used that term at least earlier today or yesterday.  But basically a packet -- well, when I was discussing the packet sniffers.  Everything that you send through the internet is not sent the way we see it like instantaneously.  It just happens to be happening so fast that it feels instantaneous.  But what it is actually doing is it is breaking -- like a full web page is broken into multiple parts as packets.  And they might be sent to you the same way.  They could move all around the globe in different ways before they get to you and reassemble.  It just happens so fast it seems seemless to us.  So these are the packets.

And those can be, as they were here, those can be sniffed on an open network.  You can -- sniffing being the term that is used.  You can actually see them -- in an unencrypted network, you can see what those are.

Q.    In your review of the P cap information, did you see anything that specifically referenced Bitcoin Fog?

A.    No, there was nothing related to Bitcoin Fog in the packet capture.

MR. EKELAND:  I pass the witness.

THE COURT:  Okay.  Cross-examination.

CROSS-EXAMINATION

BY MS. PELKER:

Q.    If we could pull up Defendant's Exhibit 127.  Now, Mr. Fischbach, you testified regarding what can -- who can

cause a change to the DNS status. Do you recall that?

A. Yes.

Q. In fact, doesn't the registrar have an important role in DNS records?

A. They maintain them.

Q. And so, in fact, doesn't the registrar have the ability to drop you from a registrar?

A. Like to expire your account?

Q. If they decide they don't want to do business with a customer, can't they in fact drop that customer off of the registration for a domain?

A. They can stop providing service, yes. That doesn't make the record go away, but it does make the service go away.

Q. But the registrar does have the ability to change and update the DNS record?

A. I wouldn't -- no, I would not say that. I mean, theoretically that is like saying the bank has the ability to take money out of your account. They could. I mean they have more control over it than the user does. But that is not the registrar's role. I think they would probably get a lot of blow back if they were changing people's records. When they drop you, they just simply remove you from their service. They are no longer providing service to you.

Q. In fact, isn't it quite common for registrars to -- if one of your requirements when you are signed up to a registrar is

to respond to abuse complaints?

A.    Yeah.  I mean, I think there is generally some language like that in there.

Q.    And that when you are registering a domain, one of the things you have to put in for your Who is information, either in the public Who is or with the registrar, is to write a contact for those abuse-related requests to go to?

A.    That is correct.

Q.    And, in fact, wouldn't it be difficult to respond to abuse requests for a domain if you are sitting incarcerated?

A.    Well, I would certainly think -- well, I would think it would.  Yeah, I wouldn't expect that you would necessarily have access to that.

Q.    And, in fact, haven't registrars taken steps to de-platform criminal domains?

A.    I want to be careful, because this sounds like something the government would not want me to opine to.  But I do understand that the government has caused the effect of having websites taken offline.  But it is not -- that is not exactly the same thing as changing the record.

Q.    And are you aware that mixers are currently being -- facing quite a fair amount of scrutiny, not just in criminal prosecutions but in the regime of sanctions?

        MR. EKELAND:  Objection.

        THE COURT:  What is the objection?

MR. EKELAND:  Relevance and outside the scope.

THE COURT:  Overruled.

THE WITNESS:  Could you unpack for me the regime of sanctions, just so I answer it appropriately?

BY MS. PELKER:

Q.   Are you aware that many mixers are currently being sanctioned due to the facilitation of payments tied to North Korea's WMD program?

A.   Well, to be honest, I don't know that I was aware of that prior to this case.  But as a result of this case, I have now seen people here on the stand that have lost their mixers or -- an individual who lost his mixer for that purpose.

Q.   So you are aware that there is quite a lot of government scrutiny regarding the mixers as well as services that are facilitating the mixers?

MR. EKELAND:  Objection.

THE COURT:  What is the objection?

MR. EKELAND:  It is vague and ambiguous as to quite a lot and I also think it was compound.

THE COURT:  Overruled.

THE WITNESS:  Only by way of this trial.  I only know what I have seen through this trial.

BY MS. PELKER:

Q.   And are you aware that a domain registrar depending on the service they are offering, could be concerned about criminal

exposure if they continued to offer a domain tied to different

mixing platforms?

MR. EKELAND:  Objection; calls for speculation,

outside the scope.

THE COURT:  Overruled.

THE WITNESS:  I want to be careful not to answer this

with a legal opinion, but, no.

BY MS. PELKER:

Q.    Are you aware this could be a concern?

A.    No.  I want to be clear, they should not have any

exposure, because they should be like the phone company.  If

you are committing a crime using the phone, they don't have

exposure.  Verizon isn't going to get in trouble because you

sell drugs on their network.

Q.    So you are aware --

A.    I want to make sure I answer that properly.  They don't

have exposure.  I have represented companies with that.  They

don't have exposure.

Q.    Again, I am not asking about the legal opinion.  Again, in

a strict liability sanctions regime, you are aware that

companies that are facilitating activity including domain

registrars, could be concerned about their liability if they

were seen as facilitating this type of activity?

MR. EKELAND:  Objection.

THE COURT:  Overruled.  I think that is --

THE WITNESS: Again, I think you are asking me for what is going to amount to a legal opinion based on almost 30 years of experience, the answer is, no, I have seen no liability.

THE COURT: So I -- I will let you rephrase the question, because I don't think that is what the question was.

BY MS. PELKER:

Q. And, again, I would ask you to listen carefully to the question here, Mr. Fischbach. I am not asking you about criminal liability for narcotics trafficking or even for CSAM. But in a mixer in a sanctions regime, are you aware that domain registrars can be concerned they could, in fact, face serious liability and they may have reputational harm from being seen as facilitating mixing?

MR. EKELAND: Objection, compound.

THE COURT: Why don't you break that down into two questions?

BY MS. PELKER:

Q. Are you aware that registrars may be concerned both legally and/or reputationally with being seen as facilitating mixing?

A. Again, I feel like that is two questions, so I will answer it in two parts. Again, you are asking me the liability or the legality aspect of it. Through the cases that I have worked and the attorneys that I have worked for, it doesn't appear

they have actual liability for it.

Sure, I'd suppose if you became known as the child pornography registration company, that would be a horrible reputation to have. But my experience in working on cases with registrars who have had various lawsuits and legal things to deal with has just been that what they're primarily interested in is cooperating with the government, because they just frankly don't want to have to deal a lot with the government.

Q. In your cases that you are working on are not sanctions, strict liability cases, is that fair to say?

A. I have definitely worked on both. I do more work in criminal, but I certainly have plenty of legal civil liability cases as well.

Q. So I am asking you, that your cases are not dealing with sanctions imposed by the Office of Foreign Assets Control, like the ones that are imposed regarding mixers?

A. Okay. I think that makes it clearer for me. You are asking me specifically if that organization has been a part of any of the work that I have done?

Q. Correct.

A. Not that I specifically recall. It is possible and just wouldn't have been necessarily a part of my purview, because that sounds more like that would be the attorney's purview.

Q. And, Mr. Fischbach, can't registrars implement changes to the domains that are under their own control?

A.    I mean, again, what they can -- a registrar --

Q.    I am just asking you whether a registrar can implement change to a --

MR. EKELAND:  Objection, Your Honor.  He hadn't finished answering, Your Honor.

MS. PELKER:  We are just trying to get an answer to the question.

THE COURT:  Why don't you put the question again. That is fine.

BY MS. PELKER:

Q.    Can't registrars implement changes to the domains that are under their control?

A.    Again, it is not what I see.  But I don't see any reason why that is not a possibility, since it is in their control.

Q.    And, Mr. Fischbach, you testified about kill switches.  A kill switch for a service can exist on the server itself operating that service; isn't that correct?

A.    I'm sorry.  Could you restate the question?

Q.    Can't a kill switch for a service exist on the server itself that is hosting that service?

A.    Not only can it, that is typically how it would work.

Q.    And you haven't reviewed the Bitcoin Fog server at least in any sort of readable format?

A.    To my understanding nobody has seen the Bitcoin Fog server.  So, yeah, that is a -- I don't think you meant that as

a trick question. But if it was available to me, I most certainly would have reviewed it. But, yeah, so there is no way to know that.

Q. So you don't know whether or not there was a kill switch on the Bitcoin Fog server?

A. The only thing that I know is that there is no indication that Mr. Sterlingov triggered a kill switch. There may have been one on the server, but there is no indication that Mr. Sterlingov triggered one or, as many kill switches will work, would have caused to not trigger.

So sometimes the way it will work is it will trigger itself after a period of time. But then he would had to have logged in regularly. And I found no evidence of those log ins.

Q. And a server can continue running for a -- depending on the service, for a day or two without active intervention, that is possible?

A. A server could continue to operate for years. I mean, if all of humanity disappeared, the servers would keep going until the electricity ran out.

Q. If we could pull up Exhibit 720.

Mr. Fischbach, I believe you testified about this is a command or connection. Isn't this a VNC configuration file?

A. Yes, that is what it appears to be.

Q. And going to 722, I believe you testified this related to Telnet commands. Isn't this in fact a Putty settings file?

A.    Yes.  If you scroll down there is a Telnet command in there.

Q.    Understood.  But what this file actually is, is a Putty settings file that are setting up the settings?

A.    It is -- yes, it is -- it is setting the log file.

Q.    And Exhibits 720, 722, several of the others that defense showed you, those are settings or configurations for remote connections; is that correct?

A.    I would have to see the specific ones you are speaking of, but I do want to make sure I am clear here.  I think we are mischaracterizing this as a Putty -- the fact that it is named Putty log.  This isn't a Putty file, it is just referring to the Putty log.

Q.    720 and 722, the exhibits that are shown, are related to remote connections; is that correct?

A.    720 was the one you just previously showed me?

Q.    Yes.  We can pull it up here.

A.    It is, yes.  VNC is made for remotely logging into a machine.  But it is important to understand that remotely doesn't have a distance.  It can be literally, you know, the computer next to you at your desk.  It is just this is a terminal --

        THE COURT:  I'm sorry to interrupt.

        Just for cross-examination, if you could listen and answer her questions and then Mr. Ekeland will have a chance to