# 24-3161

# United States Court of Appeals for the District of Columbia

THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
Hon. Randolph D. Moss
United States District Court Case 1-21-cr-00399-RDM-1

## APPENDIX
## Volume XIV of XVII (Pages Appx5721 - Appx6160)

TOR EKELAND, ESQ.
TOR EKELAND LAW PLLC
*Attorneys for Defendant-Appellant*
30 Wall Street, 8th Floor
New York, New York 10005
(718) 737-7264
tor@torekeland.com

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
*Attorneys for Defendant-Appellant*
800 Third Avenue, 20th Floor
New York, New York 10022
(212) 446-2346
maf@fernichlaw.com

MAKSIM NEMTSEV, ESQ.
MAKSIM NEMTSEV PC
*Attorneys for Defendant-Appellant*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
max@mnpc.law

AARON DANIEL, ESQ.
ASYMMETRIC LEGAL
*Attorneys for Defendant-Appellant*
11900 Biscayne Blvd, Suite 400
Miami, Florida 33181
(305) 979-9296
aaron@asymmetric.legal

*(See Inside Cover for Additional Counsel)*

3914



**ELECTRONIC PARALEGAL**

AMY C. COLLINS, ESQ.
THE LAW OFFICE OF
    AMY C. COLLINS
*Attorneys for Defendant-Appellant*
888 17th Street, NW, Suite 1200
Washington DC 20006
(228) 424-0609
amy@amyccollinslaw.com

# TABLE OF CONTENTS

District Court Docket – US v. Sterlingov, 21-CR-00399-RDM .............Appx001

Protective Order of Governing Discovery of Hon. Randolph D. Moss,
Dated September 17, 2021 (ECF Doc. No. 18) ......................................Appx074

Preliminary Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 336) ......................................Appx079

Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 14, 2024 (ECF Doc. No. 338) ....................................Appx085

Judgment in a Criminal Case of Hon. Randolph D. Moss,
Dated November 13, 2024 (ECF Doc. No. 340) ....................................Appx091

Transcript of Motion Hearing, Dated January 13, 2023
(ECF Doc. No. 114) ..............................................................................Appx099

Transcript of Motion Hearing, Dated January 31, 2023
(ECF Doc. No. 115) ..............................................................................Appx190

Transcript of Motions Hearing, Dated June 16, 2023
(ECF Doc. No. 223) ..............................................................................Appx345

Transcript of Motions Hearing, Dated June 23, 2023
(ECF Doc. No. 224) ..............................................................................Appx501

Transcript of Motions Hearing, Dated July 19, 2023
(ECF Doc. No. 225) ..............................................................................Appx682

Transcript of Continued Motions Hearing, Dated July 20, 2023
(ECF Doc. No. 226) ..............................................................................Appx895

Transcript of Motions Hearing, Dated August 22, 2023
(ECF Doc. No. 228) ............................................................................Appx1040

Transcript of Continued Motions Hearing, Dated August 23, 2023
(ECF Doc. No. 229) ............................................................................Appx1266

Transcript of Motions Hearing, Dated August 29, 2023
(ECF Doc. No. 231) ............................................................................Appx1466

Transcript of Pretrial Conference, Dated September 7, 2023
(ECF Doc. No. 232) ...................................................................Appx1524

Transcript of Pretrial Conference, Dated September 8, 2023
(ECF Doc. No. 233) ...................................................................Appx1741

Transcript of Pretrial Conference, Dated September 13, 2023
(ECF Doc. No. 234) ...................................................................Appx1861

Transcript of Pretrial Conference, Dated September 15, 2023
(ECF Doc. No. 235) ...................................................................Appx1999

Transcript of Pretrial Conference, Dated September 18, 2023
(ECF Doc. No. 236) ...................................................................Appx2141

Transcript of Pretrial Conference, Dated September 21, 2023
(ECF Doc. No. 237) ...................................................................Appx2235

Transcript of Motion Conference, Dated November 13, 2023
(ECF Doc. No. 238) ...................................................................Appx2302

Transcript of Jury Trial, Dated February 12, 2024
(ECF Doc. No. 276) ...................................................................Appx2350

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ...................................................................Appx2620

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ...................................................................Appx2688

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 278) ...................................................................Appx2825

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 327) ...................................................................Appx2948

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ...................................................................Appx3074

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ...................................................................Appx3189

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ..................................................................Appx3331

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ..................................................................Appx3446

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 281) ..................................................................Appx3572

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 328) ..................................................................Appx3697

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ..................................................................Appx3858

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ..................................................................Appx3982

Transcript of Jury Trial, Dated February 23, 2024
(ECF Doc. No. 329) ..................................................................Appx4122

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ..................................................................Appx4251

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ..................................................................Appx4394

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 284) ..................................................................Appx4419

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 330) ..................................................................Appx4550

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ..................................................................Appx4581

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ..................................................................Appx4698

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 285) ..................................................................Appx4836

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 286) ...................................................................Appx4955

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 331) ...................................................................Appx5074

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 287) ...................................................................Appx5198

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 332) ...................................................................Appx5344

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...................................................................Appx5359

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ...................................................................Appx5496

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 289) ...................................................................Appx5621

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 333) ...................................................................Appx5762

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 290) ...................................................................Appx5900

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 334) ...................................................................Appx6004

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...................................................................Appx6087

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ...................................................................Appx6190

Transcript of Jury Trial, Dated March 11, 2024
(ECF Doc. No. 292) ...................................................................Appx6324

Transcript of Jury Trial, Dated March 12, 2024
(ECF Doc. No. 293) ...................................................................Appx6344

Virtual Asset Analysis Expert Report of Luke Scholl,
Dated December 8, 2022................................................................Appx6400

Expert Report #1 of Elizabeth Bisbee (Nov. 2022).....................Appx6465

Expert Report #2 of Elizabeth Bisbee (Dec. 2022) .....................Appx6493

Expert Report #3 of Elizabeth Bisbee (Jul. 2023)......................Appx6522

CS-Mazars Expert Report - Device Review Summary,
Dated May 5, 2023 .......................................................................Appx6529

CS-Mazars Expert Report - IP Overlap Analysis,
Dated November 9, 2022 ..............................................................Appx6532

CS-Mazars Expert Report - IP Graph Data Excel File..............Appx6539

Criminal Complaint, Dated April 26, 2021 (ECF Doc. No. 1) .............Appx6542

Arrest Warrant, Dated April 26, 2021 (ECF Doc. No. 5).....................Appx6556

Indictment, Filed June 14, 2021 (ECF Doc. No. 8) .............................Appx6557

Superseding Indictment, Filed July 18, 2022 (ECF Doc. No. 43) .......Appx6561

Defendant's Supporting Memorandum of Law,
Dated August 1, 2022 (ECF Doc. No. 46) ...........................................Appx6567

Attachment to Memorandum of Law -
Proposed Order of Hon. Randolph D. Moss Granting Defendant's
Motion to Dismiss (ECF Doc. No. 46-1) ....................................Appx6585

Attachment to Memorandum of Law -
Defendant's Notice of Motion to Dismiss, Dated August 1, 2022
(ECF Doc. No. 46-2) ....................................................................Appx6586

Government's Opposition to Motion, Filed August 29, 2022
(ECF Doc. No. 52) ................................................................................Appx6589

Defendant's Reply to Government's Opposition to Motion,
Dated September 7, 2022 (ECF Doc. No. 57) ......................................Appx6623

Exhibit A to Defendant's Reply -
Second Declaration of Eric Garland, Dated September 7, 2022
(ECF Doc. No. 57-1) ....................................................................Appx6635

Defendant's Motions in *Limine*, Dated October 24, 2022
(ECF Doc. No. 59) .......................................................................Appx6644

Exhibit A to Motions in *Limine* -
Letter from Tor Ekeland to Christopher B. Brown and
C. Alden Pelker, Dated September 23, 2022, with Exhibit A
(ECF Doc. No. 59-1) ....................................................................Appx6664

Defendant's Opposition to the Government's Motions in *Limine*,
Dated November 7, 2022 (ECF Doc. No. 68) .......................................Appx6680

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated March 6, 2023 (ECF Doc. No. 116) ..........................................Appx6689

Notice of Bill of Particulars for Forfeiture, Filed May 17, 2023
(ECF Doc. No. 119) .....................................................................Appx6709

Defendant's Notice of Intent to Present Expert Testimony,
Dated July 7, 2023 (ECF Doc. No. 145) ..............................................Appx6711

Exhibit A to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Francisco Cabanas (ECF Doc. No. 145-1) ...........................Appx6716

Exhibit B to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Itiel Dror (ECF Doc. No. 145-2) .........................................Appx6725

Exhibit C to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jeffrey Fischbach (ECF Doc. No. 145-3).....................................Appx6731

Exhibit D to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jonelle Still (ECF Doc. No. 145-4) .............................................Appx6737

Exhibit E to Notice of Intent -
Summary of Qualifications and Expected Testimony for
J.W. Verret (ECF Doc. No. 145-5)................................................Appx6741

Supplemental Summary of Qualifications and Expected
Testimony for Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 157) ...................................................................Appx6756

Notice of Expert Report for Defense Expert Jonelle Still of
Ciphertrace, Dated August 8, 2023 (ECF Doc. No. 159) .....................Appx6761

Attachment to Notice of Expert Report -
Defense Expert Report of Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 159-1) .................................................................Appx6764

Exhibit A to Notice of Expert Report -
Data Credibility in Cryptocurrency Investigations of Ciphertrace
(ECF Doc. No. 159-2) .................................................................Appx6805

Exhibit B to Notice of Expert Report -
Article Titled "Bitcoin: A Peer-to-Peer Electronic Cash System"
(ECF Doc. No. 159-3) .................................................................Appx6822

Notice of Bill of Particulars, Filed August 28, 2023
(ECF Doc. No. 173) ...................................................................Appx6832

Defense Response to Government's Motion to Admit Certain
Exhibits, Dated September 4, 2023 (ECF Doc. No. 177) .....................Appx6834

Notice of Source Code Expert Bryan Bishop Regarding Independent
Analysis of Chainalysis Reactor Source Code and Request for
Production of Chainalysis Reactor Source Code and Relevant
Related Brady Material, Dated September 5, 2023
(ECF Doc. No. 179) ...................................................................Appx6843

Chainalysis' Notice in Response to the Court's Request Regarding
Protective Order, Dated September 12, 2023
(ECF Doc. No. 195) ...................................................................Appx6860

Exhibit A to Notice in Response -
[Proposed] Heuristic Information Protective Order of
Hon. Randolph D. Moss (ECF Doc. No. 195-1)............................Appx6862

Exhibit B to Notice in Response -
[Proposed] Heuristic Information Protective Order to Jonelle Still
of Hon. Randolph D. Moss (ECF Doc. No. 195-2)........................Appx6869

Heuristic Information Protective Order to Jonelle Still of Hon.
Randolph D. Moss, Dated September 13, 2023 (ECF Doc. No. 196)...Appx6877

Notice Regarding Court's Proposed Protective Order Governing
Review of Chainalysis' Proprietary Information,
Dated September 20, 2023 (ECF Doc. No. 199) ..................................Appx6884

Notice Regarding Ciphertrace Expert Testimony and Review of
Latest Chainalysis Production, Dated September 22, 2023
(ECF Doc. No. 205) ............................................................................Appx6888

Government's Response to September 18, 2023 Minute Order
Regarding Defendant's Access to Sensitive Heuristics Information
Provided by Chainalysis, Filed September 22, 2023
(ECF Doc. No. 206) ............................................................................Appx6892

Defendant's Opposition to Government's Response to
September 18, 2023, Minute Order Regarding Defendant's Access
to Sensitive Heuristics Information Provided by Chainalysis,
Dated September 29, 2023 (ECF Doc. No. 207) ..................................Appx6901

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 4, 2023 (ECF Doc. No. 210) ....................................Appx6912

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 30, 2023 (ECF Doc. No. 213) ..................................Appx6930

Defendant's  Motion to Exclude any Testimony About Deepweb
Marketplaces, Dated February 8, 2024 (ECF Doc. No. 247)...............Appx6942

Attachment to Motion to Exclude -
[Proposed] Order of Hon. Randolph D. Moss
(ECF Doc. No. 247-2) .................................................................Appx6950

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated February 29, 2024 (ECF Doc. No. 259).....................................Appx6951

Final Jury Instructions and Charges, Filed March 7, 2024
(ECF Doc. No. 265) .............................................................................Appx6982

Government's Motion for Preliminary Order of Forfeiture,
Filed June 7, 2024 (ECF Doc. No. 297)...............................................Appx7061

     Attachment to Motion for Preliminary Order of Forfeiture -
     Proposed Preliminary Order of Forfeiture Hon.
     Randolph D. Moss (ECF Doc. No. 297-1)...................................Appx7072

Defendant's Opposition to Government's Motion for Preliminary
Order of Forfeiture, Dated June 21, 2021 (ECF Doc. No. 305) ...........Appx7078

     Exhibit A to Defendant's Opposition -
     Article Titled "Chainalysis: Most Mixed Bitcoin Not Used
     For Illicit Purposes", Dated August 26, 2019
     (ECF Doc. No. 305-1) .................................................................Appx7095

     Exhibit B to Defendant's Opposition -
     Blockchain Address Search Result from Blockchain.com
     (ECF Doc. No. 305-2) .................................................................Appx7107

Government's Memorandum in Aid of Sentencing,
Filed August 1, 2024 (ECF Doc. No. 314)............................................Appx7112

Sentencing Memorandum on behalf of Roman Sterlingov,
Dated August 15, 2024 (ECF Doc. No. 321) ........................................Appx7157

Memorandum Opinion of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 337) .....................................Appx7194

Defendant's Notice of Appeal, Dated November 19, 2024
(ECF Doc. No. 343) .............................................................................Appx7214

Memorandum for All Department Employees from The Deputy
Attorney General, Subjecting "Ending Regulation by Prosecution",
Dated April 7, 2025..............................................................................Appx7217

**Trial Exhibits:**

Trial Exhibit 601 -
Darknet Market Vendor Transaction Summary
(Document in Evidence and to be Produced Upon Request Due
to Volume) .......................................................................................Appx7221

Trial Exhibit 624.............................................................................Appx7222

Trial Exhibit 625.............................................................................Appx7223

Trial Exhibit 626.............................................................................Appx7224

Trial Exhibit 627.............................................................................Appx7225

Trial Exhibit 628(A).........................................................................Appx7226

Trial Exhibit 628(B).........................................................................Appx7227

Trial Exhibit 629.............................................................................Appx7229

Trial Exhibit 630(A).........................................................................Appx7230

Trial Exhibit 630(B).........................................................................Appx7244

Trial Exhibit 631.............................................................................Appx7247

Trial Exhibit 632.............................................................................Appx7248

Trial Exhibit 633.............................................................................Appx7252

Defense Exhibit 138 -
The-Message-Game, Written by Ice White .........................................Appx7253

Defense Exhibit 139 -
Extracted Page from The-Message-Game, Written by Ice White ......Appx7413

Government Exhibit 721 and Defense Exhibit 143 -
Boox Chat .......................................................................................Appx7414

Exhibit B to Fischbach Declaration -
Declaration of Jeffrey M. Fischbach, for Defendant, Dated August 14, 2024,
with Attachment
(ECF Doc. No. 321-2) ...........................................................................Appx7415

ask you further questions in response. But you should listen to her questions and make sure you are responding to those.

THE WITNESS: Yes, Your Honor. I may have to have some of them restated, because they feel a little compound, so I am trying to be careful to answer completely.

BY MS. PELKER:

Q. The question is just: These files pertain to remote connections; isn't that true?

A. These files -- I will be specific. These files refer to the use of a terminal that can be used for remote connection.

Q. And you have not reviewed the devices that are being set up to be connected to?

A. While I don't know that they are not the Raspberry Pis that are here, which I have asked to see. But I don't know -- if they are those devices, then, yes I would have liked to have looked at them. If there are other devices, I don't know.

MS. PELKER: Your Honor, I don't know if we need to get on the phone for this.--

BY MS. PELKER:

Q. Mr. Fischbach, all of the devices were made available to you and to the defense for the last several years of this case; isn't that true?

A. But not to log in. I had requested to --

THE COURT: All right.

MS. PELKER: I will move on, Your Honor.

THE COURT: Questions relating to the discovery process, are -- those are questions for me to resolve. And they are not questions for the jury. And anything -- any issues that anyone has with respect to discovery, they can raise with me and I will address those issues and they are not questions for the jury.

BY MS. PELKER:

Q. Mr. Fischbach, you haven't reviewed any of the -- any home desktop computer or server located back in Sweden; is that correct?

A. That is correct. I have not been to Sweden, ever I think. I may have briefly driven near.

Q. There is no question before you, Mr. Fischbach.

If we could pull up Exhibit 523A. Scrolling down, Mr. Fischbach, you do agree that this is a zeroed out hard drive?

A. I'm sorry. A zeroed out hard dive?

Q. There is no data on this hard drive?

A. There is no data on this hard drive, at least not -- well, again, I haven't reviewed the hard drive myself. But what is represented here is no data.

Q. Turning now to your discussion of IP addresses.

Mr. Fischbach, you agree with Ms. Mazars that people who are not criminals do use VPNs, proxies and Tor; correct?

A. It feels like a backwards question. But you are asking me

if I agree that ordinary people use VPNs?

Q. You agree with Ms. Mazars' testimony that noncriminals do use those services?

A. I would agree that noncriminals do use those services. And if that was her testimony then, yes, I agree.

Q. Wouldn't you also agree that one use of VPNs, proxies and Tor are to conceal someone's location or identity?

A. Certainly. I mean, that is -- yes, that is a part of what they are designed for.

Q. Isn't it true that some criminals use Tor and VPNs and proxies?

A. In general, I am assuming they would.

Q. And not just in general, but in your experience haven't you seen criminal defendants use Tor, VPNs and proxies?

A. You asked me if criminals do, not criminal defendants. Yes, I have seen criminal defendants use Tor.

Q. Is one of the purposes of using those services to mask your IP address?

A. It is what it is specifically designed to do. That is why I use it.

Q. And is one benefit of that to criminals because an IP address can sometimes be used in an investigation to identify and locate individuals?

A. Absolutely.

Q. And you would agree that law enforcement does use IP

addresses as one of a set of different data points of interest when investigating a case?

A. I have definitely seen IP addresses as part of criminal cases, yes.

Q. Mr. Ekeland asked you regarding how many -- regarding the use of VPNs and different server configurations. The number of people who can use a VPN at one time or share a proxy server may depend on the specific setup and configuration of that server or service; isn't that true?

A. That is absolutely true.

Q. And the number of people sharing that server may vary depending on the service and how the servers are set up?

A. That is correct.

Q. Mr. Fischbach, if one person accessed two different accounts from the same computer at the same time, without taking additional steps, isn't it true that the same IP address would likely appear in the access logs for each account?

A. Again, I want to make sure I am following your question. You are asking me if a person is using their computer and they do two different things on their computer, would it provide the same IP address?

Q. Yes.

A. Minus a VPN or something like that, yes. That is correct, you would consistently use the same IP address.

Q. And the access logs for those two accounts would show the

same IP address?

A. Yes. So if you were reaching your -- if I just want to make sure I understand you. If you were reaching your email and you're going on Facebook, then your email provider and Facebook should see the same IP address, even if it was a VPN.

Q. And even if you were using a VPN or Tor, if you logged into those two accounts from the same device around the same time, each account would likely record that IP address in the log?

A. Yes. Yeah, that -- again that is what is happening here, we are all logging the same IP address.

Q. That is true even when you use a VPN or Tor, assuming you haven't changed the settings in between?

A. No. Unfortunately there I have to disagree. With the VPN, yes. With the Tor, no. All of your Tor connections will reroute constantly as you are using it. So it will be a different IP address all of the time.

Q. If you haven't changed the particular circuit that you are using for connections or changed any sort of routing?

A. No. Even if you don't -- if your Tor is properly configured then you should be changing IP addresses frequently.

Q. The routing will change, but even if you are using Tor, it will be a Tor exit node that will show up in the access logs for the server?

A. Yes. But not necessarily the same access log

consistently -- I'm sorry -- the same exit node. So that is the whole idea is that everything randomizes.

Q. And, Mr. Fischbach, you are aware that there is a difference between using the Tor browser to browse clearnet sites and running a Tor hidden service?

A. I'm sorry. And running a --

Q. Running a Tor hidden service?

A. Running a Tor hidden service. I mean, the difference between running and using it, yes. I mean, certainly it is different to be a user than to run a server.

Q. And that you can -- there is a difference between using Tor to browse clearnet sites with the protection of Tor and with accessing or operating a Tor hidden service site?

A. Can you rephrase that? Because I am not sure the way you are asking that question.

Q. Mr. Fischbach, you can access clearnet sites through Tor; is that right?

A. Yes, you can.

Q. You can also access or run Tor hidden service sites through Tor?

A. That is the only way to access them, yes.

Q. And you are aware that criminals set up and use Tor hidden services?

A. What was the end of that sentence?

Q. Criminals set up and use Tor hidden services?

A.   Oh, Tor hidden services.  Again, by way of this case, I have certainly seen at least one person testify that is what he did.

Q.   Mr. Fischbach, you have had numerous cases involving the darknet, isn't that true?

A.   Involving the darknet?

Q.   Yes.

A.   You mean, involving Tor services onion routers, that sort of thing?

Q.   Yes.

A.   I have, yes.

Q.   And does that include multiple cases where you have been retained by defendants accused of possession or distribution of child sexual abuse material that was tied to Tor hidden service?

A.   No.  Typically, no, because those would be much harder to track.  Typically those are individuals who get them through the clearnet, which is why they are caught.

Q.   You are aware that there are sites on Tor hidden services that distribute child sexual abuse material?

A.   I believe at least through the media I was aware of that in terms of Silk Road.

Q.   Mr. Fischbach, you testify in hundreds of cases involving child sexual abuse material; isn't that correct?

A.   Yeah, hundreds is probably about right.

Q. And your testimony is that you are not aware that darknet Tor hidden services sites are used to distribute child sexual abuse material?

MR. EKELAND: Objection.

THE COURT: What is the objection?

MR. EKELAND: Argumentative.

THE COURT: Overruled.

MR. EKELAND: Asked and answered.

THE WITNESS: I am aware that a -- again, I am trying to be careful, because you are asking me from my work whether I concluded that somebody has done a criminal activity.

BY MS. PELKER:

Q. I am well -- without drawing any conclusions about whether possessing or distributing child sexual abuse material is criminal, are you aware that there are Tor hidden services that purport to offer and offer child sexual abuse material for sharing and downloading?

A. I am aware that is certainly purported, yes. Yes.

Q. Purported. Are you aware of a 2015 study showing the vast majority of traffic on Tor hidden services was tied to child sexual abuse dark markets and bot nets?

MR. EKELAND: Objection.

MS. PELKER: The witness is testifying about the use of the Tor network. I think this is fair cross.

MR. EKELAND: This study wasn't disclosed to the

defense.

MS. PELKER: I am asking whether he is aware of it.

THE COURT: She is asking the --

Overruled.

THE WITNESS: No. Until you asked the question, I have not seen that article.

BY MS. PELKER:

Q. Are you aware of a similar finding that over 80 percent of hidden service traffic around that time was related to viewing child sexual abuse material?

A. I have most certainly have not heard that, no.

Q. Are you familiar with the former hidden services Play Pen?

A. I am familiar with the name.

MR. EKELAND: Objection; relevance.

MS. PELKER: We can move on.

THE COURT: If you want to move on --

I just do want to remind the jury that questions are not evidence in a case.

BY MS. PELKER:

Q. And are you familiar with the site Welcome to Video?

A. Again, through this case.

Q. You are aware that Welcome to Video was a site operating on the darknet distributing child sexual abuse material?

A. Again, I didn't work that case, but I understand that that is what the government was able to conclude from their

investigation.

Q. Mr. Fischbach, you testified regarding static versus dynamic DNS. Do you recall that?

A. Yes.

Q. Now, setting up a dynamic DNS to call back to a particular device, that is what you testified to regarding the log that you reviewed from Mr. Sterlingov's computer?

A. The one that had the ignorelist.com status, yes, that is a dynamic DNS.

Q. That sort of ignorelist can be used to configure to access a particular device that may have a changing IP?

A. Well, the device wouldn't have a changing IP, but the -- this would be because your modem can be assigned an IP from your service provider.

Q. And you testified -- can you set up your dynamic DNS to also configure to allow connections to -- can you set up your dynamic DNS to allow connections to a server that is also operating a website?

A. Yeah. If I understand what you are asking me, you are asking, can you have a home website server?

Q. Yes.

A. Sure. You could certainly set up a home website server.

Q. And, Mr. Fischbach, you have experience with registering web domains?

A. I do. I have website domains, yes.

Q.   You are aware there are different ways to pay for web domains?

A.   Yes, I am aware.

Q.   And credit cards are one way to pay?

A.   I would imagine there is probably a study that is the majority of the way that it gets paid.

Q.   There are different registrars and hosting companies?

A.   Yes, there are several.

Q.   And different registrars and hosting companies have different features?

A.   I am not sure what you are describing as features.  But I know they advertise differently.  But in the end they basically operate the same way.

Q.   They offer different services, different sizes available, different speeds to their users?

A.   I think we are talking -- are we still talking about registration?

Q.   For hosting companies.

A.   Oh, for hosting companies.

Q.   The question was hosting companies -- different registration and hosting companies have different features.

A.   Okay.  My apologies.  I thought you were just talking about registration.  So different hosting companies will typically offer to you different sizes and speeds at different prices, typically, bigger, faster, more expensive; slower,

smaller, less expensive.

Q.   And different payment methods offered as well for hosting companies, similar registrars?

A.   Yes.  I am sure I have seen pull downs to -- typically my credit card has been memorized in there for years, but I am sure I could change it to something else.

Q.   And operating a site as a Tor hidden service can conceal the location of that server; isn't that correct?

A.   Operating a website as a Tor -- I mean, that is -- yes, you would not know where an onion website is physically located, correct.

Q.   And, Mr. Fischbach, isn't it true that you consider yourself more than just a testifying computer forensics expert?

          MR. EKELAND:  Objection.

BY MS. PELKER:

Q.   You have described yourself as more than just a testifying computer forensic expert?

          MR. EKELAND:  Objection; relevance.

          THE COURT:  Overruled.

          THE WITNESS:  I am not quite sure what you are asking about.  If you are asking if that is all that I do, I certainly do a lot more than testify.  I consult with attorneys as well.

BY MS. PELKER:

Q.   And have you described yourself as engaging in strategic litigation?

A.    Yes, absolutely.

Q.    You have been sitting at counsel table for the last several weeks?

A.    I have.

Q.    And you assisted with jury selection and opening?

A.    As I typically do, yes.

Q.    And you assisted with -- defense counsel with the cross of some of the government witnesses?

A.    Gosh, I don't know.  I am -- I have certainly been asked questions regarding cross, yes.

Q.    You expect to help defense counsel with closing?

A.    I don't know.  I am not -- I have not been -- I have not been asked to.

Q.    And when defense attorneys contact you, isn't it true that you specifically tell them in that initial conversation not to tell you anything that would be bad for their client?

A.    Well, most certainly, because I don't have privilege.

Q.    That is because you don't want to learn something that could expose you to cross-examination?

A.    Well, I -- if I am being -- if I am being phone called -- and I get even people off the streets, not just attorneys.  If someone calls me by phone and wants to tell me what happened, I don't want to become a witness to that.  I certainly don't.

Q.    And you also don't want the government to be able to cross-examine you on information that may be adverse to the

defendant; isn't that true?

A.    Well, yes and I also don't want to be dragged all over the country to testify on cases I am not working on.

Q.    And, Mr. Fischbach, you have never actually testified for the prosecution in a case; isn't that true?

A.    So far nobody has put me up.

MS. PELKER:  The Court's indulgence.

THE COURT:  Okay.

MS. PELKER:  No further questions.

THE COURT:  All right.  Redirect.

Go for five minutes.

MR. EKELAND:  Okay.

THE COURT:  Let's get started.  If you need more time, we'll break and come back.

MR. EKELAND:  I will give it a shot and see if I can do it in five.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. EKELAND:

Q.    Mr. Fischbach, Ms. Pelker just asked you about, if I recall correctly, registrars being able to -- now I have got confused.  Can you explain in October when we were discussing I think it was Defendant's Exhibit 127 in October of 2022, what exactly happened to the DNS for BitcoinFog.com?

A.    According to the records, someone logged in and made a

modification to the record.

Q.   And what was that modification, if you recall?

A.   It was to remove name servers, the domain name -- the DNS, I'm sorry.

Q.   And you recall Ms. Pelker asking you if the registrar could do that?

A.   Yes.

Q.   In the review of the records, did you find any indication that the registrar actually did that?

A.   No.  And it would certainly be easy enough to find out.

MS. PELKER:  Objection; move strike that last point.

THE COURT:  Do you want to pick up for a second?

(Conference held at the bench.)

THE COURT:  All right.  Go ahead.

MS. PELKER:  Your Honor, I think to the extent that defense -- the defense witness is trying to -- is trying to suggest here through his testimony, that the -- that the dropping from the registrar is something that the government then should have followed up on, defense provided these exhibits to us indicating the dropped registrar without prior disclosure.  We are not objecting to it.  We recognize it is in the registration of the Who is lookup information.  But to the extent the defense is now trying to turn this into something that the government should have done.  If we had this exhibit prior to Ms. Mazars' testimony, we would have had her testify

to explain this.

THE COURT:  I guess she can testify in your rebuttal case, if you want, if she can do that.

Does that resolve the issue?

MR. EKELAND:  She hasn't been sequestered and she has actually been in the room and watching the testimony.

MS. PELKER:  She is an expert.  There is no sequestration needed.

THE COURT:  Your witness sitting on the stand has been sitting at counsel table listening in on all of the conversations and everything including private conversations with counsel and the Court.

MR. EKELAND:  He is an expert too.

To that point, Your Honor, since we are getting to lunch, if the Court is going to strike it, I'd like to just keep his answer where I think he just said when I asked him, did any -- did you come across any information that the registrar did this and he answered, "no."  I'd like to keep that in the record.  Because my understanding is the government is not objecting to that.  They are objecting to the last part of it where he said, it would be easy enough for the government to look it up.

MS. PELKER:  That is fine, Your Honor.

THE COURT:  Again, my answer to this is as before.  I don't have a problem with leaving the answer, if you want,

Mr. Ekeland. I just think the government can respond to it in its rebuttal case. If I strike it, maybe they are less likely to call a rebuttal witness on this. I don't know.

MR. EKELAND: I am fine with striking -- this is redirect. And, again, I wasn't trying to elicit this. He just said it. I am fine with striking the last part and leaving his answer as it was. He said no and then whatever that last sentence is, let's go ahead and strike it, if that works for everybody.

THE COURT: All right. Ms. Pelker.

MS. PELKER: That is fine. Although the government reserves the right to potentially seek leave to put on a rebuttal case given this dropped DNS line of testimony.

THE COURT: Okay. You have a right to put on a rebuttal case and I don't take anything you say to give up in any respect on that. All right.

(End of bench conference.)

THE COURT: So let me see. Give me a moment here.

So the last question was, in the review of the records did you find any indication that registrar did that?

And the answer was "No" and then there was a sentence after that. I am going to strike everything after the no, so you should disregard everything after the no in the witness' answer. And it should play no role in your deliberations.

MR. EKELAND: Your Honor, we are at 12:30.

THE COURT: And let's break for lunch at 12:30. It's 12:30. Come back at 1:30. And, again, you can say it without me, but don't discuss the case amongst yourself and don't do any type of research relating to the case. And I will see you back at 1:30.

(Jury out at 12:30 p.m.)

THE COURT: All right. How much more time do you think you will need?

MR. EKELAND: Maybe 10, 15 minutes.

THE COURT: So the only question I have is, if we come back for 10, 15 minutes, I do want to voir dire Mr. Sterlingov about whether he wants to take the stand or not. I want him to have the benefit of having heard all of the evidence before he makes that decision. So do we need to come back for 10 minutes and then take a break to do that?

MR. EKELAND: That is fine. He is our last witness, so I think that we are on track. And that is fine with the defense. And then I have one other thing I want to add once we check in with the government.

THE COURT: One more thing -- I am not sure what that means.

MR. EKELAND: What is that?

THE COURT: I'm not sure what that means. One more thing --

MR. EKELAND: I just wanted to raise real quickly

before the break in relation to the voir dire.

THE COURT:  I'm sorry.  Say again?

MR. EKELAND:  Excuse me.  In relation to the voir dire, Mr. Sterlingov has asked me to ask the Court for permission to testify about the fact that he has been in jail for the last three years.

THE COURT:  I can't really see a basis for that.  I don't know what the government's view is on that.  But in other cases, I have certainly not allowed that.  It is purely appealing to issues that are not properly before the Court.  I understand that some of it was relevant to the operation of Bitcoin Fog.  And that came in and that was fair.  But to the extent that the suggestion is that he has already been punished in some way, I think that is completely inappropriate.

MR. EKELAND:  That is not why it is trying to be brought in.  For instance, Mr. Fischbach just testified that it looks like the domain was changed in October of 2022. Mr. Sterlingov was in jail at that time and he did not have access to his devices.  And also to the extent it comes up, if the -- should the government cross on, you know, Mr. Sterlingov's knowledge of all of his assets, one of the issues is that he hasn't been able to do a thorough search from jail.  I mean, so the issues I think that -- and this is why he is asking me.  I understand where the Court is coming from -- to ask the Court is just in relation to what he actually could

have done from jail in relation to Bitcoin Fog, you know, being shut down, which we have stipulated already that for Mr. Scholl's testimony that Mr. Sterlingov was in custody two days later.

Now we have the testimony from Mr. Fischbach about the October 2022 change in the domain. And he is just also concerned about this issue coming up in relation to if he gets questioned -- asked about, well, how come you don't know about all of your assets? And he is concerned that he is not going to be able to say, well, I couldn't do a search, because I didn't have access to --

THE COURT: What would he have wanted to do the search?

MR. EKELAND: What?

THE COURT: What would he have wanted to do?

MR. EKELAND: Well, one of the things that has come out is that government didn't get Mr. Sterlingov's home computer in Sweden. He didn't have access to that. He didn't have access to his apartment. He didn't have access to a whole host of things and then he is -- I mean, as I --

THE COURT: Well, let me let you talk to the government about this in the first instance and bring it up with me. But there may be other solutions here. So, for example, if he wants to testify that he has been in the United States and hasn't been able to leave the United States, that is

a little bit different.  So if the concern is that he wasn't able to go retrieve his computer in Sweden, that is one thing.  Although I have to say that is a little hard to get your head around, because his mother is there and I take it there are people who could have at his request brought the computer here, so I am not sure how much weight that really covers anyway.

MR. EKELAND:  His mother after what happened to Mr. Sterlingov is actually, my understanding, afraid to travel to the United States.

THE COURT:  Somebody.  You could have gotten on a plane and got there to get the computer.

MR. EKELAND:  It is my understanding that I don't even know the computer is there in the apartment anymore by the time I got to the case.  I mean, there is -- it is curious to me that his home laptop wasn't seized, but that is another question.

THE COURT:  Yeah.  So why don't I let you all talk about this first among yourselves.

The witness can take his break as well.  I just will direct that you not discuss your testimony with anybody until it is entirely complete.  And I will let you talk to the government about this in the first instance and whether there is some way to address the concerns.  And I guess we'll come back and do 10 minutes and take a break and then I can have a conversation with Mr. Sterlingov.

And then he can make his decision about whether he wants to take the stand or not and then we can take it from there.

MR. EKELAND:  All right.  Thank you, Your Honor.

(Recess taken at 12:35 p.m.)

C E R T I F I C A T E


        I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.




                    Dated this 6th day of March, 2024.


                    _____
                    Sherry Lindsay, RPR
                    Official Court Reporter

BY EKELAND: [1]  54/7
BY MR. EKELAND: [27]  20/22 30/24
33/3 33/20 35/3 36/13 37/17 38/24
41/17 51/9 55/10 55/23 56/5 56/17
58/20 59/25 60/17 61/21 62/19
64/21 67/4 67/13 74/3 77/22 83/6
90/18 114/19
BY MS. PELKER: [15]  91/23 94/5
94/23 95/8 96/7 96/18 98/10 101/6
101/19 102/7 108/12 109/7 109/19
112/15 112/23
MR. EKELAND: [104]  4/10 7/21 9/9
11/5 11/24 12/10 12/18 12/20
13/18 13/24 14/6 14/19 15/7 15/9
17/3 18/25 19/8 20/3 20/9 20/20
33/19 34/19 34/25 37/16 38/19
38/23 41/25 42/7 42/16 42/24
43/10 44/10 44/17 44/20 45/3 45/9
45/19 46/3 47/14 47/23 48/13 49/6
49/22 50/10 50/23 51/7 55/18
58/13 61/25 64/19 67/2 67/12
69/14 70/8 71/8 71/12 71/18 71/20
72/1 72/6 72/11 72/24 73/2 73/6
73/12 73/15 74/2 77/13 82/23 90/5
91/20 93/24 94/1 94/16 94/18 95/3
95/24 96/15 98/4 108/4 108/6
108/8 108/22 108/25 109/14 112/14
112/18 114/12 114/15 116/5 116/13
117/4 117/25 118/9 118/16 118/22
118/25 119/3 119/15 120/14 120/16
121/7 121/12 122/4
MS. PELKER: [52]  4/6 4/15 5/15
5/19 6/5 6/15 6/19 8/15 8/20 10/6
15/14 15/21 16/2 16/4 16/10 16/14
30/17 33/1 33/11 41/23 42/3 43/19
46/13 47/7 53/24 55/7 55/14 56/10
61/13 64/14 69/9 69/11 69/22
73/20 77/17 83/2 90/1 90/13 90/15
98/6 101/17 101/25 108/23 109/2
109/15 114/7 114/9 115/11 115/15
116/7 116/23 117/11
THE COURT: [148]
THE COURTROOM DEPUTY: [5]  4/2
37/15 38/18 61/24 67/11
THE REPORTER: [1]  40/15
THE WITNESS: [18]  30/20 36/10
38/21 40/17 54/1 62/1 62/14 72/19
90/2 90/7 94/3 94/21 95/6 96/1
101/3 108/9 109/5 112/20

$

$25 [1]  59/19
$3 [1]  66/11

.

.com [1]  68/3

1

10 [6]  71/23 79/22 118/9 118/11
118/15 121/24
10005 [1]  2/4
10445 [1]  41/13
11 [4]  16/22 44/20 44/21 79/22
112 [4]  7/25 61/23 61/25 62/21
114 [1]  3/5
11:00 [1]  69/16
11:01 [1]  69/19
11:06 [1]  72/20
11:20 [1]  69/16
11:26 [1]  73/24
12 [2]  44/11 79/22
120 [1]  6/21
125 [2]  58/14 58/16
126 [7]  3/8 58/14 58/17 75/21
77/15 77/18 77/20
127 [11]  3/8 40/21 52/6 82/5 82/5
82/25 83/3 83/5 86/9 91/24 114/23
127.0.0.1 [3]  40/12 40/14 40/19
127.0.1.1 [1]  40/20
12:30 [6]  74/1 74/2 117/25 118/1

118/2 118/6
12:35 [1]  122/5
13 [2]  79/6 79/17
1301 [1]  1/20
145 [2]  6/5 44/11
15 [4]  45/5 45/7 118/9 118/11
16 [1]  79/22
166 [2]  5/13 44/12
16th [1]  86/20
17 [3]  45/5 45/16 79/22
179 [1]  6/20
18 [1]  44/11
1:30 [2]  118/2 118/5
1B [6]  5/5 5/8 6/9 10/13 11/1
16/11
1B1 [1]  16/22
1B13 [1]  10/10
1st [3]  78/21 80/20 81/21

2

20 [11]  3/4 4/24 5/12 5/17 5/21
6/11 6/23 7/11 45/5 45/19 52/22
20001 [1]  2/9
20005 [1]  1/21
2011 [3]  78/17 83/21 84/7
2012 [2]  84/16 86/17
2014 [1]  86/20
2015 [1]  108/19
2021 [2]  68/4 68/5
2022 [5]  86/22 88/4 114/23 119/17
120/6
2023 [4]  78/22 80/20 81/21 83/12
2024 [2]  1/5 123/10
2026 [3]  69/3 69/5 78/19
20530 [2]  1/14 1/17
21-399 [2]  1/4 4/2
24 [1]  45/5
25th [3]  78/17 78/18 78/19
2nd [3]  83/21 84/6 84/16

3

30 [2]  2/3 96/2
32 [6]  8/3 8/13 10/1 11/9 19/10
63/14
333 [1]  2/8
399 [2]  1/4 4/2

4

4G [2]  59/2 59/4
4th [1]  86/17

5

5.1527 [1]  1/17
523A [1]  102/14
5G [2]  57/6 57/8
5th [3]  86/22 88/4 88/7

6

601 [1]  1/16
6710 [1]  2/8
6th [1]  123/10

7

720 [7]  37/9 37/18 38/4 99/20
100/6 100/14 100/16
721 [1]  64/23
722 [7]  38/16 38/25 39/4 40/1
99/24 100/6 100/14
723 [3]  40/7 40/10 41/18
725 [2]  51/11 51/16
77 [1]  3/8
7th [3]  5/16 6/20 7/10

8

80 [1]  41/10
80 percent [1]  109/8
80.80 [1]  41/11
811 [3]  67/9 67/11 67/15
813 [3]  67/10 67/11 68/8
814 [1]  68/20
83 [1]  3/8

8th [4]  2/4 5/16 6/21 6/22

9

91 [1]  3/4
950 [1]  1/14
9:38 [1]  1/6
9:46 [1]  20/14

A

a.m [5]  1/6 20/14 69/19 72/20
73/24
abide [1]  64/17
ability [4]  57/23 92/6 92/14
92/17
able [26]  10/9 10/17 11/25 16/23
17/10 17/12 23/3 37/4 46/16 54/2
54/17 64/11 64/13 65/13 65/16
65/18 65/24 74/12 74/12 109/25
113/24 114/21 119/22 120/10
120/25 121/2
about [115]  4/19 5/4 5/20 6/14
6/15 6/22 7/5 7/14 7/22 7/24 8/9
8/12 8/12 8/17 9/5 9/10 9/12 9/13
9/17 9/19 9/23 11/6 11/15 11/17
11/18 11/20 12/12 12/18 12/19
13/18 13/22 14/21 14/23 15/4 15/6
15/18 15/25 17/25 18/3 18/5 18/16
18/17 18/22 19/13 24/12 25/7
25/12 26/2 27/8 28/16 31/4 34/22
39/10 41/4 42/4 42/14 43/17 45/2
45/7 45/8 45/9 45/12 47/10 49/10
49/14 49/17 52/17 53/11 55/20
57/9 62/3 62/9 62/12 62/13 63/4
65/1 65/3 66/1 66/25 67/5 71/1
71/15 71/24 72/22 74/7 74/14
80/20 83/8 83/11 88/8 88/25 90/19
94/25 95/19 95/22 96/9 98/15
99/21 107/25 108/13 108/23 111/16
111/23 112/21 114/20 118/12 119/5
120/5 120/7 120/8 120/8 120/22
121/18 121/22 122/1
above [1]  123/5
above-entitled [1]  123/5
absent [2]  5/25 7/2
absolutely [12]  24/13 25/24 26/19
26/25 27/7 29/15 31/7 76/21 89/15
103/24 104/10 113/1
abuse [12]  93/1 93/7 93/9 107/14
107/20 107/24 108/3 108/14 108/16
108/21 109/10 109/23
abuse-related [1]  93/7
access [18]  12/6 21/6 29/10 53/23
93/13 104/17 104/25 105/23 105/25
106/16 106/19 106/21 110/10
119/19 120/11 120/18 120/19
120/19
accessed [3]  45/14 67/25 104/14
accessing [4]  45/9 46/25 72/23
106/13
According [1]  114/25
account [8]  61/4 67/23 81/4 86/4
92/8 92/18 104/17 105/8
accounts [3]  104/15 104/25 105/7
accurate [5]  76/19 76/25 77/9
78/25 82/15
accused [1]  107/13
across [2]  54/9 116/17
Action [1]  1/3
active [4]  22/17 66/22 87/6 99/15
activities [1]  61/20
activity [5]  32/14 46/22 95/21
95/23 108/11
actual [9]  15/11 17/7 17/7 17/11
22/1 66/24 74/18 77/11 97/1
actually [43]  16/10 21/2 22/7
23/25 24/2 24/2 24/5 25/13 27/14
28/9 31/21 39/20 39/22 45/9 45/11
46/2 49/13 49/13 52/10 52/16 54/1
57/21 58/23 59/6 60/14 61/1 61/11
65/8 65/9 66/5 66/7 66/9 68/14
87/10 87/25 91/6 91/14 100/3
114/4 115/9 116/6 119/25 121/8

**A**

add [3]  33/7 60/12 118/18
addition [1]  58/5
additional [4]  46/16 47/2 86/21
 104/16
address [35]  24/8 24/10 25/16
 25/18 26/24 27/3 27/6 27/9 27/11
 27/15 39/6 39/8 48/12 52/6 52/8
 52/12 52/17 52/22 53/4 66/23
 68/18 75/8 84/23 102/5 103/18
 103/22 104/16 104/21 104/24 105/1
 105/5 105/8 105/11 105/17 121/23
addressed [1]  49/18
addresses [8]  24/11 52/21 79/6
 79/8 102/22 104/1 104/3 105/21
adduce [1]  70/10
adjacent [2]  29/12 35/17
admit [1]  11/12
admitted [4]  77/18 77/21 83/3
 83/5
adopt [1]  62/17
adopted [1]  76/18
adverse [1]  113/25
advertise [2]  76/14 111/12
advice [1]  13/15
afraid [1]  121/8
after [11]  10/7 50/19 53/12 69/16
 80/21 88/8 99/12 117/22 117/22
 117/23 121/7
again [40]  9/23 10/19 31/2 33/6
 33/8 35/22 37/1 39/5 41/6 46/3
 50/2 50/11 52/14 68/11 75/25 79/4
 82/21 83/16 86/18 88/16 95/19
 95/19 96/1 96/8 96/22 96/23 98/1
 98/8 98/13 102/20 104/18 105/10
 107/1 108/9 109/21 109/24 116/24
 117/5 118/2 119/2
aged [1]  31/19
agency [1]  16/19
Agent [1]  54/15
ago [1]  26/8
agree [13]  27/20 27/22 27/23 45/3
 61/17 102/15 102/23 103/1 103/2
 103/4 103/5 103/6 103/25
ahead [4]  15/8 16/3 115/14 117/8
air [2]  10/16 11/16
airing [1]  15/22
airport [9]  8/1 8/11 8/17 8/24
 17/7 54/14 60/19 63/2 63/18
Alaska [4]  57/5 57/6 57/7 57/8
Alden [1]  4/6
alerted [1]  79/14
alive [1]  35/24
all [95]  7/16 7/19 8/20 8/23
 10/13 12/8 16/14 16/15 16/23
 17/15 17/22 20/15 21/4 22/22 23/8
 23/9 24/9 24/19 25/18 26/13 26/23
 27/2 27/5 28/16 28/20 28/21 30/20
 30/21 32/14 32/16 32/24 34/14
 36/12 39/20 39/20 39/21 39/21
 39/21 39/22 43/4 44/5 46/12 48/24
 49/18 50/21 51/3 56/22 57/5 58/2
 58/6 59/1 59/9 59/10 59/16 62/2
 62/2 62/3 62/18 64/2 64/3 64/4
 65/20 65/22 70/19 70/23 72/2
 72/19 72/21 74/22 75/12 75/13
 87/21 88/19 89/14 90/10 91/9
 99/18 101/20 101/24 105/11 105/15
 105/17 112/21 114/2 114/10 115/14
 116/10 117/10 117/16 118/7 118/13
 119/21 120/9 121/17 122/4
alleged [1]  89/17
allow [16]  5/25 7/2 15/24 30/18
 47/21 47/25 48/1 48/3 48/21 48/22
 53/25 54/4 54/5 86/8 110/16
 110/17
allowed [4]  12/3 22/17 72/4 119/9
allowing [3]  29/19 47/21 73/5
almost [6]  31/7 31/13 41/21 52/25
 87/16 96/2
along [5]  8/25 12/8 16/16 61/14

86/21
alongside [1]  10/13
already [7]  5/10 8/23 16/18 72/25
 88/20 119/13 120/2
also [27]  10/1 21/13 21/16 22/14
 35/25 37/10 37/11 39/8 44/7 48/22
 54/25 55/2 67/9 68/12 74/23 78/19
 81/6 83/18 94/19 103/6 106/19
 110/16 110/17 113/24 114/2 119/19
 120/6
although [4]  50/1 76/6 117/11
 121/3
always [3]  21/12 26/7 76/13
am [107]  5/11 5/13 5/25 6/2 6/3
 7/2 7/12 8/8 8/9 11/12 11/14
 11/17 11/17 12/10 13/4 13/5 13/5
 13/10 13/16 13/21 13/24 14/15
 14/15 14/16 14/17 15/3 16/25 17/1
 17/21 18/6 18/7 18/14 18/19 19/1
 19/15 19/21 20/1 22/23 23/8 23/12
 24/15 28/21 34/16 34/23 36/15
 38/21 41/15 45/21 48/1 48/3 48/9
 48/18 48/23 49/4 49/6 49/20 50/3
 51/3 55/8 58/3 63/9 63/9 63/11
 71/9 73/2 73/3 73/8 74/8 75/10
 79/9 79/11 82/3 84/8 87/2 87/24
 90/3 90/9 95/19 96/9 97/14 98/2
 100/10 101/5 103/12 104/18 106/14
 108/9 108/9 108/13 108/18 109/2
 109/13 111/3 111/11 112/4 112/5
 112/20 113/9 113/12 113/20 113/20
 114/3 117/4 117/6 117/22 118/20
 121/6
Amazon [4]  22/9 26/12 60/10 66/11
ambiguity [1]  70/19
ambiguous [1]  94/18
AMERICA [2]  1/3 4/3
among [2]  69/17 121/18
amongst [1]  118/3
amount [2]  93/22 96/2
analysis [2]  27/9 27/18
Android [1]  23/22
anecdotes [1]  61/15
Angeles [3]  54/14 63/2 63/17
another [8]  16/19 21/18 22/21
 23/19 26/10 44/3 46/6 121/15
answer [30]  19/2 19/21 33/15
 33/17 36/9 48/15 49/2 49/8 50/16
 51/4 51/5 61/18 71/12 72/15 72/24
 87/16 94/4 95/6 95/16 96/3 96/22
 98/6 100/25 101/5 116/16 116/24
 116/25 117/7 117/21 117/24
answered [2]  108/8 116/18
answering [2]  13/20 98/5
any [72]  4/18 4/25 5/24 5/24 7/1
 7/1 9/18 9/20 15/13 19/12 20/25
 21/9 22/14 24/18 24/20 27/14
 27/22 28/1 29/14 30/15 30/15
 30/23 30/25 31/1 32/21 35/4 43/13
 47/14 47/15 47/20 49/23 53/17
 53/20 54/9 54/9 54/20 56/14 59/15
 61/10 67/24 69/7 69/18 70/1 70/6
 70/20 70/20 70/22 75/2 75/18 77/3
 77/16 80/14 83/1 86/12 86/12
 89/16 90/22 95/10 97/19 98/13
 98/23 102/3 102/8 102/8 105/19
 108/13 115/8 116/17 116/17 117/16
 117/20 118/4
anybody [8]  37/4 61/7 72/18 76/8
 80/5 80/23 84/24 121/20
anymore [2]  80/5 121/13
anyone [2]  54/10 102/4
anything [27]  4/14 18/4 18/10
 28/24 29/19 38/4 40/1 40/4 41/18
 41/19 41/24 43/13 48/6 49/16
 56/14 59/21 59/24 67/21 79/10
 81/21 87/12 88/21 89/11 91/17
 102/3 113/16 117/15
anyway [1]  121/6
anywhere [6]  28/10 43/14 63/7
 81/17 87/2 87/17
apartment [2]  120/19 121/13

apologies [3]  16/4 52/19 111/22
apologize [2]  36/10 40/11
apparently [3]  40/25 65/7 65/25
appealing [1]  119/10
appear [5]  7/25 8/2 8/10 96/25
 104/17
APPEARANCES [3]  1/12 1/23 2/1
appeared [1]  65/22
appears [3]  40/22 52/10 99/23
Apple [1]  35/25
applicability [1]  62/13
approach [2]  4/4 12/25
appropriate [2]  84/23 89/22
appropriately [1]  94/4
archive [1]  22/4
archive.org [6]  21/14 21/20 21/25
 22/2 82/11 83/18
are [227]
are okay [1]  72/8
area [1]  20/4
areas [1]  42/10
aren't [1]  32/11
argue [2]  14/25 18/16
argued [1]  8/16
argument [7]  5/4 11/20 14/4 14/15
 18/20 19/25 70/2
argumentative [2]  70/13 108/6
ARIN [1]  21/17
arise [1]  27/16
around [5]  84/15 91/9 105/7 109/9
 121/4
arrest [2]  7/15 53/12
arrested [3]  17/9 80/21 88/9
art [1]  74/18
article [1]  109/6
as [137]
ascertain [1]  84/13
ask [19]  8/4 13/18 13/21 13/22
 13/24 14/22 15/9 19/2 47/20 55/15
 55/19 59/23 71/10 71/15 72/4 96/8
 101/1 119/4 119/25
asked [19]  10/17 10/17 12/11
 12/13 19/1 36/9 46/19 70/5 101/14
 103/15 104/5 108/8 109/5 113/9
 113/13 114/20 116/16 119/4 120/8
asking [25]  8/9 18/20 29/23 46/19
 52/17 70/11 95/19 96/1 96/9 96/23
 97/14 97/18 98/2 102/25 104/19
 106/15 108/10 109/2 109/3 110/19
 110/20 112/20 112/21 115/5 119/24
aspect [1]  96/24
assets [3]  97/15 119/21 120/9
assigned [5]  5/5 25/2 25/4 61/2
 110/13
assigning [1]  5/8
assisted [2]  113/5 113/7
associated [2]  74/24 81/4
assuming [2]  103/12 105/12
attachment [1]  50/9
attempt [1]  10/16
attempted [1]  10/7
attempting [1]  70/10
attempts [3]  9/18 10/15 19/13
attention [4]  17/17 54/13 62/20
 68/7
attorney's [1]  97/23
attorneys [4]  96/25 112/22 113/14
 113/21
attracted [1]  17/17
authentication [4]  60/20 60/23
 61/3 85/25
author [2]  66/4 66/6
authorize [1]  86/5
authorized [2]  85/19 86/4
automatically [4]  51/19 61/8
 65/20 88/19
automation [2]  39/16 52/4
available [13]  12/8 22/22 26/4
 31/24 37/11 57/13 60/8 60/10
 66/11 75/6 99/1 101/20 111/14
Ave [2]  1/14 1/20
Avenue [1]  2/8

**A**

average [1]  78/10
avoid [2]  4/18 15/21
aware [24]  93/21 94/6 94/9 94/13
94/24 95/9 95/15 95/20 96/11
96/19 106/3 106/22 107/19 107/21
108/1 108/9 108/15 108/18 108/19
109/2 109/8 109/22 111/1 111/3
away [5]  31/17 31/20 60/11 92/13
92/13
awful [2]  30/11 85/15

**B**

back [45]  11/11 12/2 13/5 14/10
16/25 18/9 18/25 19/17 20/15 22/7
26/14 30/13 32/9 34/8 34/9 39/2
44/14 47/7 50/11 50/17 50/19
65/23 69/16 71/15 71/23 72/4
72/15 72/22 73/1 73/11 80/5 80/17
82/10 83/17 83/18 85/18 92/21
102/9 110/5 114/14 118/2 118/5
118/11 118/15 121/24
backed [2]  34/11 34/11
backup [1]  84/2
backups [2]  34/13 86/22
backwards [1]  102/25
bad [1]  113/16
balance [3]  26/4 26/11 57/25
balancing [1]  58/6
bank [7]  41/12 61/3 61/3 61/10
88/20 88/21 92/17
Bankruptcy [1]  2/7
base [1]  56/15
based [7]  15/19 19/9 43/25 56/15
61/19 65/13 96/2
Bash [8]  36/14 36/16 43/11 43/21
46/8 47/17 49/23 51/17
basically [24]  16/11 22/3 23/11
23/14 24/15 25/14 25/20 26/11
31/9 35/6 36/24 38/1 46/5 57/25
75/13 79/24 80/8 84/2 84/11 84/13
88/17 88/18 91/2 111/12
basis [4]  9/7 15/14 50/18 119/7
be [140]
became [2]  62/16 97/2
because [86]  5/12 9/1 9/16 10/2
10/21 11/13 11/14 13/1 13/3 13/6
13/10 16/18 17/22 17/25 19/8 20/5
23/11 24/17 24/19 24/21 26/5
26/12 28/20 29/5 29/6 31/18 31/20
33/6 33/8 35/24 35/25 37/2 38/13
41/12 41/14 43/3 43/4 44/15 46/9
47/8 49/8 52/25 56/21 57/6 59/3
60/3 60/13 61/1 61/6 62/15 65/19
71/10 71/24 72/9 72/12 73/7 76/14
77/11 78/11 79/10 79/18 81/7
81/10 81/11 84/4 85/12 85/14 87/7
87/15 93/16 95/11 95/13 96/6 97/7
97/22 101/4 103/21 106/14 107/16
108/10 110/13 113/17 113/18
116/19 120/10 121/4
become [3]  36/2 55/1 113/23
becomes [3]  28/14 31/22 56/23
bedrock [1]  36/4
been [67]  5/5 5/8 6/5 7/4 8/17
8/22 9/7 11/25 12/2 12/5 12/12
16/23 17/9 17/12 21/5 22/18 22/18
22/19 28/21 30/6 30/7 31/3 32/20
34/20 35/10 41/24 42/6 42/9 42/10
44/6 44/10 50/8 54/1 67/24 71/23
72/10 77/14 79/6 81/13 81/25
82/17 82/24 84/16 84/19 86/20
88/5 88/6 89/17 97/6 97/18 97/22
99/8 102/11 107/12 112/5 113/2
113/9 113/12 113/13 116/5 116/6
116/10 119/5 119/13 119/22 120/24
120/25
before [22]  1/9 4/14 9/24 15/23
19/1 20/10 20/11 22/11 23/20
29/13 31/25 32/2 32/8 42/25 74/5
74/7 91/10 102/13 116/24 118/14

119/1 119/10
beginning [1]  54/16
behind [2]  35/18 81/7
being [21]  11/18 16/19 18/1 36/8
39/9 39/11 44/1 45/13 47/11 53/12
79/13 91/13 93/21 94/6 96/13
96/20 101/11 113/20 113/20 114/21
120/1
believe [22]  5/19 6/6 10/17 11/7
21/2 37/14 43/16 43/24 46/13
58/16 69/22 75/9 75/11 75/12 76/2
81/23 82/1 82/8 89/12 99/21 99/24
107/21
believes [1]  16/1
bench [4]  42/2 51/2 115/13 117/17
benefit [2]  103/21 118/13
best [2]  36/1 89/23
between [7]  19/17 52/14 54/10
105/13 106/4 106/9 106/11
beyond [4]  26/2 33/12 41/24 75/4
big [2]  32/2 32/3
bigger [1]  111/25
bill [4]  74/13 80/3 87/14 87/15
billing [1]  75/12
bind [1]  58/6
bit [15]  13/10 18/19 24/1 24/16
38/7 47/9 50/7 51/12 58/8 66/22
80/17 80/18 81/23 84/11 121/1
Bitcoin [36]  32/22 38/5 40/2
41/20 42/20 43/12 44/25 45/23
46/7 46/11 46/18 46/21 46/23
47/19 53/7 53/11 53/18 54/11 68/1
70/2 70/7 70/9 70/20 70/21 70/22
71/2 71/5 71/6 78/19 91/17 91/18
98/22 98/24 99/5 119/12 120/1
BitcoinFog.com [9]  67/5 67/18
67/19 68/24 68/25 78/3 82/9 84/10
114/24
BitLocker [5]  7/24 11/9 19/10
63/5 63/21
black [1]  65/9
blade [1]  35/6
blank [1]  89/18
blanket [1]  27/21
blanking [1]  19/1
blindsided [1]  43/6
block [5]  31/13 31/15 32/2 32/6
40/21
blocks [2]  31/12 32/3
blow [1]  92/21
blurred [1]  80/7
bomb [1]  34/5
book [3]  66/5 80/5 80/6
books [1]  22/10
bot [1]  108/21
both [8]  6/21 35/8 43/8 44/23
49/4 67/10 96/19 97/11
bother [1]  60/13
break [14]  48/10 48/10 69/13
69/14 69/15 72/17 74/1 96/16
114/14 118/1 118/15 119/1 121/19
121/24
breaking [1]  91/7
brief [1]  4/15
briefly [5]  21/24 39/19 58/21
90/25 102/12
bring [6]  10/5 58/13 67/8 73/11
82/4 120/22
broader [1]  62/13
BRODIE [1]  1/15
broken [4]  28/25 28/25 87/19 91/7
Brooklyn [1]  2/4
brought [5]  10/21 17/17 42/7
119/16 121/5
BROWN [2]  1/15 4/8
browse [2]  106/4 106/12
browser [12]  24/3 24/4 28/6 28/8
28/12 28/14 29/2 29/10 29/14
31/20 88/22 106/4
browsers [1]  24/2
BS [1]  78/5
building [1]  32/3

built [4]  23/22 23/23 24/5 59/6
built-in [1]  24/5
bulk [1]  30/5
bunkerX [5]  40/23 40/23 40/24
40/25 41/1
burden [1]  70/12
burned [1]  8/23
business [2]  77/6 92/9
buy [2]  57/2 61/9

**C**

cable [1]  52/8
call [8]  22/2 23/17 26/11 28/18
35/16 87/17 110/5 117/3
called [16]  23/18 27/24 30/6
31/12 31/23 35/20 37/2 41/8 51/18
55/3 59/14 78/6 78/9 82/13 85/25
113/20
calling [1]  68/7
calls [6]  55/14 57/5 57/14 78/12
95/3 113/22
came [5]  18/9 29/25 43/14 62/14
119/12
cameras [1]  52/4
can [132]
can't [13]  18/8 19/12 24/23 27/1
43/25 60/3 60/3 82/21 92/10 97/24
98/11 98/19 119/7
cannot [1]  17/20
cap [5]  90/20 90/22 90/24 90/25
91/16
capabilities [1]  45/10
capability [1]  45/15
capable [1]  45/14
capture [4]  65/7 65/19 91/1 91/19
captures [1]  65/21
card [4]  30/12 57/2 88/21 112/5
cards [18]  54/18 54/20 55/1 55/4
55/5 55/12 55/17 55/21 55/25 56/3
56/7 56/9 56/16 56/19 56/21 56/25
64/3 111/4
care [1]  29/22
careful [5]  20/4 93/16 95/6 101/5
108/10
carefully [1]  96/8
carry [2]  55/5 55/12
carving [4]  31/4 31/6 31/8 32/8
case [60]  13/3 14/15 21/1 21/4
21/7 21/14 23/4 24/22 26/25 29/1
29/13 32/25 39/6 41/13 43/3 43/5
43/9 43/15 44/7 47/22 47/24 48/3
48/23 50/22 54/9 54/25 57/4 57/5
57/8 58/5 58/15 59/5 62/16 62/16
66/25 67/21 69/7 69/17 70/25
80/13 83/19 86/7 86/12 87/17
94/10 94/10 101/21 104/2 107/1
109/18 109/21 109/24 114/5 116/3
117/2 117/13 117/15 118/3 118/4
121/14
cases [21]  24/13 29/11 30/8 32/11
54/3 55/4 56/20 58/9 82/17 96/24
97/4 97/9 97/10 97/13 97/14 104/4
107/4 107/12 107/23 114/3 119/9
categorically [1]  50/8
CATHERINE [1]  1/13
caught [3]  34/6 48/20 107/18
cause [1]  92/1
caused [2]  93/18 99/10
Ccips [1]  1/19
cell [7]  30/13 35/9 35/9 37/11
54/23 54/24 86/3
cellular [1]  59/2
centered [1]  51/12
certain [1]  41/9
certainly [22]  5/6 21/4 42/5 48/1
48/5 70/8 89/19 93/11 97/12 99/2
103/8 106/9 107/2 108/18 109/11
110/22 112/21 113/9 113/17 113/23
115/10 119/9
certify [1]  123/3
chance [3]  27/18 50/20 100/25
change [15]  50/4 83/11 84/16

**C**

change... [12]  84/24 85/3 87/9 87/10 87/20 87/25 92/1 92/14 98/3 105/22 112/6 120/6
changed [8]  79/8 79/12 86/18 86/21 105/13 105/18 105/19 119/17
changes [10]  21/22 52/6 52/9 52/25 79/5 79/16 86/8 86/16 97/24 98/11
changing [5]  92/21 93/20 105/21 110/11 110/12
characterize [1]  70/18
charge [1]  35/21
chat [2]  66/7 66/9
cheapnames.com [1]  85/7
check [6]  17/12 22/24 38/7 63/10 88/20 118/19
checked [1]  24/5
checking [1]  85/18
checks [1]  85/13
child [13]  30/6 30/7 32/10 97/2 107/14 107/20 107/24 108/2 108/14 108/16 108/20 109/10 109/23
chose [2]  62/17 89/20
CHRISTOPHER [2]  1/15 4/7
circuit [1]  105/18
Cisco [2]  35/6 35/6
citing [1]  90/9
civil [1]  97/12
claiming [1]  11/4
clarification [1]  10/5
clarified [1]  18/10
clarify [2]  62/6 90/9
clear [12]  8/17 10/6 10/23 37/2 62/2 69/23 73/3 74/22 78/3 89/23 95/10 100/10
cleared [1]  31/22
clearer [1]  97/17
clearly [3]  10/10 39/5 39/11
clearnet [8]  29/20 68/2 68/3 84/10 106/4 106/12 106/16 107/18
client [1]  113/16
close [2]  45/1 54/17
closed [2]  41/9 88/22
closer [2]  26/5 45/20
closing [3]  11/20 70/2 113/11
code [1]  86/1
coding [1]  36/25
COLUMBIA [1]  1/1
combination [1]  59/16
combining [1]  60/5
come [21]  19/19 19/24 20/15 24/2 48/11 50/17 50/19 54/9 57/15 59/6 69/16 71/23 72/15 114/14 116/17 118/2 118/11 118/14 120/8 120/16 121/23
comes [5]  24/5 37/10 42/21 76/13 119/19
coming [5]  15/23 29/4 52/19 119/24 120/7
command [7]  37/4 37/5 39/9 39/11 51/17 99/22 100/1
commands [4]  36/20 37/24 39/21 99/25
commercial [6]  41/22 42/5 45/10 45/15 49/10 72/7
committing [1]  95/12
common [1]  92/24
communication [1]  29/4
communications [2]  33/9 54/10
companies [10]  95/17 95/21 111/7 111/9 111/18 111/19 111/20 111/21 111/23 112/3
company [9]  24/17 25/6 26/12 75/7 79/24 80/2 85/7 95/11 97/3
compare [1]  12/22
competence [1]  7/18
competent [1]  71/3
competition [1]  35/25
compilation [2]  64/2 64/5
complaints [1]  93/1

complete [5]  72/18 76/12 82/12 82/19 121/21
completeDNS.com [1]  82/8
completely [3]  71/7 101/5 119/14
completeness [1]  37/10
complicated [1]  32/1
compound [3]  94/19 96/15 101/4
computer [24]  24/24 34/19 36/20 37/4 37/5 37/25 38/2 40/23 41/16 44/1 45/11 100/21 102/9 104/15 104/19 104/20 110/7 112/13 112/17 120/18 121/2 121/5 121/11 121/13
computers [8]  32/15 32/22 34/20 35/4 35/12 41/2 54/2 59/19
conceal [2]  103/7 112/7
concern [5]  8/15 11/12 18/2 95/9 121/1
concerned [6]  94/25 95/22 96/12 96/19 120/7 120/9
concerns [1]  121/23
conclude [3]  27/12 72/4 109/25
concluded [1]  108/11
conclusion [2]  27/14 27/16
conclusions [3]  27/20 27/22 108/13
conduct [1]  69/18
conducted [2]  5/22 6/24
conference [4]  42/2 51/2 115/13 117/17
configuration [2]  99/22 104/8
configurations [2]  100/7 104/6
configure [2]  110/10 110/16
configured [3]  45/24 89/19 105/21
confirm [3]  12/1 54/24 73/18
confirmed [1]  46/20
confused [7]  11/13 11/17 11/18 13/4 13/5 13/16 114/22
confusing [1]  11/13
confusion [2]  4/18 10/19
connect [2]  34/25 37/1
connected [3]  23/8 44/1 101/12
connecting [4]  25/3 39/5 70/21 71/6
connection [10]  37/3 39/24 41/12 41/13 42/4 44/2 50/7 60/4 99/22 101/10
connections [12]  27/2 28/1 43/24 46/14 59/12 100/8 100/15 101/8 105/15 105/19 110/16 110/17
consider [2]  35/11 112/12
consistent [19]  12/20 14/3 14/20 15/10 19/3 42/4 43/20 44/2 44/9 45/23 46/5 46/6 46/22 47/13 47/18 70/12 72/23 78/18 84/7
consistently [2]  104/24 106/1
consolidated [1]  16/17
constantly [2]  22/6 105/16
constitutes [1]  123/4
Constitution [1]  2/8
consult [1]  112/22
consume [1]  20/6
contact [2]  93/7 113/14
contain [2]  9/2 17/8
contained [1]  17/22
containing [1]  16/21
content [2]  29/17 30/3
contents [2]  3/1 11/8
continue [4]  20/18 30/19 99/14 99/17
continued [5]  1/23 2/1 3/4 20/21 95/1
contribute [1]  35/19
control [8]  39/16 44/2 57/22 92/19 97/15 97/25 98/12 98/14
controlled [1]  27/2
controlling [4]  37/24 38/9 38/14 41/15
controls [3]  80/10 80/15 80/24
conversation [3]  65/7 113/15 121/25
conversations [2]  116/11 116/11
convinced [1]  7/12

cooperating [1]  97/7
copies [2]  9/3 22/6
copy [9]  8/22 10/12 16/7 16/15 16/17 16/17 28/10 68/5 84/5
core [3]  7/17 70/14 72/14
corp [1]  78/5
corporate [4]  24/12 24/14 25/1 25/3
corporation [1]  81/8
corporations [1]  25/23
correct [19]  12/7 68/3 77/8 81/3 88/1 93/8 97/20 98/17 100/8 100/15 102/10 102/11 102/24 104/13 104/23 107/24 112/8 112/11 123/4
correctly [4]  17/21 84/9 87/24 114/21
could [93]  5/21 6/23 8/22 14/2 19/19 21/24 22/8 23/12 24/22 26/21 29/25 30/10 31/6 32/20 37/4 37/8 37/21 38/15 38/25 39/1 39/2 39/18 40/6 40/8 40/20 46/10 46/22 48/11 50/2 50/8 51/10 51/11 51/24 52/13 57/4 58/13 58/17 58/21 61/22 62/22 62/23 63/13 64/22 66/4 66/6 67/8 68/7 68/9 68/19 68/21 69/24 74/16 75/7 75/7 75/20 75/22 75/23 77/2 79/7 79/21 80/17 82/3 83/13 84/8 85/1 85/8 85/16 86/2 86/15 87/7 89/18 89/19 89/20 91/9 91/24 92/18 94/3 94/25 95/9 95/22 96/12 98/18 99/17 99/20 100/24 102/14 110/22 112/6 113/19 115/6 119/25 121/5 121/10
couldn't [7]  13/14 13/15 46/5 46/15 47/1 47/5 120/10
counsel [10]  4/4 4/7 4/12 10/7 19/17 113/2 113/7 113/11 116/10 116/12
counted [1]  79/22
country [1]  114/3
couple [1]  76/6
course [1]  34/9
court [35]  1/1 2/6 2/7 4/11 4/22 5/9 5/20 5/23 6/25 7/6 10/21 18/4 18/4 19/11 19/12 19/23 20/10 29/18 29/19 29/21 29/22 29/25 30/2 47/25 50/25 57/21 70/10 116/12 116/15 119/4 119/10 119/24 119/25 123/3 123/13
Court's [4]  18/2 50/23 69/23 114/7
courtroom [1]  70/24
Courts [1]  2/7
cover [2]  45/17 66/5
covered [1]  52/1
covers [1]  121/6
Craigslist [1]  22/5
create [2]  35/20 82/7
created [3]  74/24 78/16 82/6
credit [4]  30/12 88/21 111/4 112/5
crime [1]  95/12
criminal [12]  1/3 93/15 93/22 94/25 96/10 97/12 103/14 103/15 103/16 104/3 108/11 108/15
criminals [6]  102/24 103/10 103/15 103/21 106/22 106/25
CRM [1]  1/19
cross [15]  3/4 11/21 15/16 46/17 70/14 73/8 91/21 91/22 100/24 108/24 113/7 113/10 113/19 113/25 119/20
cross-examination [8]  3/4 11/21 15/16 46/17 91/21 91/22 100/24 113/19
cross-examine [1]  113/25
crossed [1]  18/7
crypto [1]  30/12
cryptocurrency [4]  61/9 61/9 61/10 62/3
CSAM [5]  30/6 30/15 30/23 31/1

**C**

CSAM... [1] 96/10
curiosity [1] 31/2
curious [3] 17/13 18/5 121/14
current [3] 68/5 69/4 79/1
currently [5] 85/10 85/23 87/6
 93/21 94/6
custodial [1] 44/25
custody [1] 120/3
customer [2] 92/10 92/10
cut [2] 44/14 70/16

**D**

dark [2] 13/10 108/21
darknet [4] 107/5 107/6 108/1
 109/23
data [16] 24/19 28/17 32/5 32/6
 34/2 34/5 34/8 34/10 34/13 57/14
 57/15 58/3 102/18 102/19 102/21
 104/1
database [2] 21/17 53/3
databases [1] 21/20
date [7] 7/4 74/24 75/2 75/3 76/3
 77/12 82/2
Dated [1] 123/10
dates [3] 74/23 78/16 78/16
dating [1] 66/1
Daubert [11] 4/20 10/8 14/10 44/6
 48/6 48/19 49/12 49/14 49/17
 49/21 69/22
day [8] 10/9 31/7 78/20 80/5
 83/22 83/23 99/15 123/10
days [5] 53/12 82/1 85/18 88/6
 120/4
DC [5] 1/5 1/14 1/17 1/21 2/9
de [3] 6/7 6/12 93/15
de-platform [1] 93/15
deal [2] 97/6 97/8
dealing [2] 30/3 97/14
dealt [1] 29/16
death [1] 51/14
decades [2] 26/8 26/8
December [5] 78/21 80/20 81/21
 83/11 86/17
December 1st [3] 78/21 80/20
 81/21
December 4th [1] 86/17
decide [3] 48/24 72/22 92/9
decision [2] 118/14 122/1
decisions [1] 69/23
defendant [5] 1/7 2/2 4/11 8/17
 114/1
defendant's [19] 8/3 8/13 8/24
 9/2 10/1 11/9 19/9 63/14 75/21
 77/15 77/18 77/20 82/4 82/5 82/25
 83/3 86/9 91/24 114/23
defendants [4] 103/14 103/15
 103/16 107/13
defense [27] 3/8 3/8 4/20 5/3
 10/6 10/10 10/16 12/8 16/8 43/19
 44/4 47/10 77/13 81/24 82/24 83/5
 100/6 101/21 109/1 113/7 113/11
 113/14 115/16 115/16 115/19
 115/23 118/18
defense's [1] 43/15
definitely [2] 97/11 104/3
delete [2] 31/16 32/4
deleted [2] 31/18 31/22
deliberations [2] 51/5 117/24
denying [1] 89/20
DEPARTMENT [1] 1/13
depend [2] 26/14 104/8
depending [4] 24/10 94/24 99/14
 104/12
depends [1] 26/1
Dept [1] 1/20
derivative [1] 10/20
describe [1] 40/25
described [13] 10/12 15/2 17/14
 22/15 25/16 38/3 52/7 57/24 82/10
 83/16 83/17 112/16 112/24

describing [2] 24/15 111/11
designed [2] 103/9 103/19
desk [2] 69/20 100/21
desktop [2] 28/9 102/9
desktops [1] 35/8
detail [3] 34/22 81/23 81/25
details [1] 75/14
detention [2] 53/14 53/15
determinations [1] 49/15
determine [2] 10/9 80/15
developed [2] 35/10 49/12
device [25] 6/7 6/12 7/6 7/6
 10/18 10/22 11/3 12/21 12/22 13/8
 13/8 13/10 13/12 13/13 14/13
 32/18 58/9 58/22 60/1 60/6 65/22
 105/7 110/6 110/11 110/12
devices [44] 7/8 7/16 8/21 8/24
 9/2 9/21 11/6 17/6 17/14 23/8
 30/16 30/23 32/15 32/22 34/15
 46/16 53/17 53/20 54/8 54/13
 54/15 59/2 59/18 60/18 63/7 64/4
 65/4 65/8 67/20 67/24 67/25 69/6
 70/20 81/13 81/16 81/18 86/6
 86/11 88/12 101/11 101/15 101/16
 101/20 119/19
devoted [1] 21/17
did [79] 5/9 10/1 11/10 14/13
 15/4 16/14 17/21 19/11 21/11
 21/15 22/14 22/16 23/5 25/7 25/9
 27/8 27/10 27/18 27/19 27/23
 30/21 31/4 32/21 47/5 53/17 54/9
 54/15 54/17 54/18 54/19 57/5
 60/21 63/4 63/6 63/20 63/22 64/25
 64/25 65/2 65/6 67/7 69/7 70/1
 70/4 70/19 70/21 71/6 72/21 72/25
 76/2 77/11 80/13 81/16 81/23 82/7
 86/7 86/12 88/11 89/2 89/4 89/5
 89/7 89/8 89/11 90/19 90/19 90/21
 90/22 90/24 91/16 107/3 115/8
 115/9 116/17 116/17 116/18 117/20
 117/20 119/18
didn't [19] 8/10 12/8 43/10 44/5
 49/22 50/6 55/18 65/22 65/25 73/6
 73/8 81/18 87/15 109/24 120/11
 120/17 120/18 120/18 120/19
die [1] 20/7
difference [7] 50/2 52/13 52/14
 70/17 106/4 106/8 106/11
differences [1] 25/13
different [43] 5/11 5/12 10/25
 11/1 14/25 16/11 22/25 24/16
 25/18 25/19 26/11 35/11 35/20
 35/21 50/7 59/8 79/7 79/16 81/24
 83/25 84/18 91/9 95/1 104/1 104/6
 104/14 104/20 105/17 106/10 111/1
 111/7 111/9 111/10 111/14 111/14
 111/15 111/20 111/21 111/23
 111/24 111/24 112/2 121/1
differently [1] 111/12
difficult [6] 17/1 23/21 56/11
 85/2 85/12 93/9
dire [3] 118/11 119/1 119/4
direct [7] 3/4 20/3 20/21 30/12
 46/14 73/7 121/20
Directing [1] 62/20
directly [3] 39/6 53/5 65/24
dirt [1] 32/7
disagree [1] 105/14
disagreed [1] 50/5
disagreement [1] 49/7
disappeared [1] 99/18
disclose [2] 43/8 49/22
disclosed [7] 9/7 41/24 42/6
 42/11 43/13 49/21 108/25
disclosure [5] 4/21 4/24 42/23
 44/13 115/21
disclosures [11] 5/12 6/3 42/13
 42/13 43/2 43/4 43/8 43/14 44/14
 44/16 49/19
discounting [1] 48/18
discovered [1] 32/11
discovery [15] 10/16 15/22 15/22

15/23 43/21 54/9 64/15 67/21 69/7
 80/13 86/7 86/12 88/12 102/1
 102/4
discuss [6] 5/7 69/17 72/18 89/5
 118/3 121/20
discussed [2] 21/21 64/17
discussing [3] 45/11 91/3 114/22
discussion [2] 7/4 102/22
displayed [1] 54/15
displaying [1] 78/1
dispute [2] 15/23 54/24
disputes [2] 10/16 64/15
disregard [2] 51/5 117/23
distance [1] 100/20
distribute [2] 107/20 108/2
distributed [1] 28/13
distributing [2] 108/14 109/23
distribution [1] 107/13
DISTRICT [4] 1/1 1/1 1/10 2/7
dive [1] 102/17
DNS [37] 21/21 21/22 38/2 52/10
 52/11 52/14 52/15 52/16 52/20
 53/8 53/9 66/18 66/20 66/21 66/22
 66/23 75/6 79/3 79/16 82/2 82/11
 82/12 82/15 82/19 82/20 84/20
 92/1 92/4 92/15 110/3 110/5 110/9
 110/15 110/17 114/24 115/3 117/13
do [140]
docket [2] 5/13 44/11
document [6] 18/12 63/3 63/9
 63/11 83/13 83/15
documentation [3] 6/8 6/13 81/15
documented [1] 86/8
DOD [3] 89/24 90/3 90/9
does [36] 7/13 8/2 9/2 14/14 17/8
 22/3 23/19 23/23 26/3 28/4 29/2
 36/18 37/13 56/22 56/25 58/22
 60/15 64/4 66/21 68/15 74/12
 76/22 76/25 77/3 77/4 78/23 81/21
 86/24 87/11 88/23 92/13 92/14
 92/19 103/25 107/12 116/4
doesn't [16] 7/25 12/3 29/22
 31/21 31/22 40/4 45/17 61/2 83/22
 84/4 84/20 92/3 92/6 92/12 96/25
 100/20
doing [12] 8/21 14/16 22/5 23/16
 26/20 30/9 43/4 58/10 71/4 71/23
 87/4 91/7
DOJ [2] 1/16 1/19
DOJ-CRM [1] 1/19
DOJ-USAO [1] 1/16
domain [62] 21/17 22/1 22/14
 22/16 51/23 51/24 52/2 52/11
 52/22 66/13 66/16 66/18 66/20
 66/21 66/21 66/23 67/5 67/17
 67/18 68/13 68/15 74/4 74/7 74/9
 74/19 74/20 74/23 74/25 74/25
 75/17 77/7 78/2 78/4 78/9 78/13
 79/1 79/16 80/10 80/15 80/23
 80/25 81/17 82/9 83/8 83/19 85/14
 85/17 87/4 87/9 87/25 88/2 88/3
 92/11 93/3 93/10 94/24 95/1 95/21
 96/11 115/3 119/17 120/6
domains [7] 78/10 93/15 97/25
 98/11 110/24 110/25 111/2
DomainTools [5] 76/4 76/16 76/22
 76/25 77/10
DomainTools.com [3] 76/3 76/11
 76/19
don't [110] 5/6 5/6 9/6 9/7 12/9
 13/11 14/3 14/22 15/14 17/1 19/21
 20/6 20/6 21/5 26/13 26/19 26/19
 26/21 27/21 27/22 29/23 29/24
 30/1 30/8 30/8 34/6 34/9 35/8
 40/11 43/17 45/1 45/25 46/3 47/8
 47/14 48/2 48/4 48/8 49/1 49/7
 49/18 50/9 50/14 50/14 54/3 54/4
 54/5 55/15 57/9 57/21 58/1 59/23
 60/12 64/3 68/15 69/15 69/17
 69/17 70/10 70/13 71/3 71/24 72/1
 72/10 72/11 73/1 77/2 78/5 78/11
 79/19 80/3 80/3 80/4 85/1 85/7

**D**

**don't... [35]** 87/20 92/9 94/9 95/12 95/16 95/18 96/6 96/16 97/8 98/8 98/13 98/25 99/4 101/13 101/14 101/16 101/17 105/20 113/9 113/12 113/17 113/18 113/23 113/23 113/24 114/2 116/25 117/3 117/15 118/3 118/3 119/8 120/8 121/12 121/17
**done [12]** 13/14 21/9 23/11 25/1 27/1 30/13 72/6 78/21 97/19 108/11 115/24 120/1
**door [6]** 19/16 29/25 47/17 50/18 72/10 73/4
**double [2]** 38/7 63/10
**down [34]** 10/8 24/1 29/24 37/21 38/7 38/15 39/1 40/6 40/15 46/17 49/1 53/10 54/3 60/4 62/22 63/10 63/13 63/15 64/20 66/12 68/8 72/12 75/23 76/1 79/22 82/4 84/3 84/4 84/8 88/11 96/16 100/1 102/14 120/2
**download [1]** 16/6
**downloaded [1]** 66/10
**downloading [1]** 108/17
**downs [1]** 112/4
**drag [1]** 72/12
**dragged [1]** 114/2
**drama [1]** 30/1
**drawing [1]** 108/13
**drive [71]** 5/3 7/25 8/5 8/10 8/12 8/16 8/25 9/2 9/10 9/12 9/15 9/17 9/24 9/25 11/8 11/9 11/25 12/13 12/18 13/19 13/22 13/25 14/20 14/21 14/23 15/6 15/6 15/11 15/12 15/25 16/1 16/1 16/5 16/7 16/7 16/16 16/21 16/24 17/5 17/7 17/7 17/11 17/15 17/18 17/23 18/5 19/3 19/5 19/7 19/10 19/13 31/11 31/15 32/18 40/23 63/5 63/7 63/12 63/17 63/21 64/6 64/8 89/14 89/16 89/18 89/22 89/23 102/16 102/18 102/19 102/20
**driven [1]** 102/12
**drives [7]** 10/4 31/9 41/16 89/5 89/7 89/9 89/12
**drop [9]** 58/12 60/4 73/9 87/9 87/25 88/2 92/7 92/10 92/22
**dropped [2]** 115/20 117/13
**dropping [1]** 115/18
**drugs [1]** 95/14
**due [1]** 94/7
**duplicate [1]** 84/5
**during [3]** 18/14 54/15 63/25
**dynamic [17]** 38/2 39/7 51/23 51/24 52/10 52/11 52/14 52/16 52/17 52/20 52/20 53/7 110/3 110/5 110/9 110/15 110/17

**E**

**e-reader [3]** 65/8 65/9 65/11
**each [6]** 24/7 59/3 59/8 84/2 104/17 105/8
**earlier [3]** 10/16 82/10 91/2
**Earth [1]** 80/7
**easier [2]** 4/18 25/13
**easy [5]** 32/14 32/16 41/14 115/10 116/21
**ebook [4]** 66/1 66/2 66/3 66/10
**effect [2]** 88/3 93/18
**effective [1]** 33/7
**effectively [7]** 26/4 37/1 37/23 39/10 64/2 87/4 87/16
**effort [1]** 29/9
**either [7]** 24/17 31/18 49/25 54/24 59/8 80/11 93/5
**EKELAND [19]** 2/2 2/3 3/4 3/5 4/10 4/17 7/7 7/19 10/14 19/19 20/18 46/17 46/19 51/6 72/21 73/25 100/25 104/5 117/1
**electricity [1]** 99/19

**elicit [10]** 7/21 8/8 9/13 10/14 12/14 13/23 19/12 49/9 72/14 117/5
**elicited [2]** 10/3 47/1
**eliciting [1]** 7/23
**else [5]** 22/24 31/24 59/21 84/18 112/6
**else's [1]** 25/17
**email [6]** 23/16 61/12 67/23 68/18 105/3 105/4
**emails [1]** 65/23
**employees [1]** 25/2
**encrypt [2]** 34/2 34/13
**encrypted [20]** 7/24 10/2 10/3 11/9 13/13 13/15 14/1 17/18 19/10 25/15 25/20 33/21 33/23 34/14 37/3 61/12 63/5 63/21 64/9 64/11
**encryption [5]** 25/21 25/22 33/25 34/3 34/4
**encrypts [2]** 23/19 88/19
**end [9]** 25/17 26/11 26/16 27/2 31/16 51/2 106/24 111/12 117/17
**ends [3]** 31/9 31/11 31/21
**enforcement [6]** 22/13 54/25 76/17 82/19 82/22 103/25
**engaging [1]** 112/24
**enough [7]** 15/24 27/17 28/24 32/12 32/12 115/10 116/21
**enter [1]** 81/9
**entered [3]** 16/20 21/3 21/5
**entire [4]** 21/6 24/22 31/13 32/2
**entirely [4]** 86/23 86/24 89/24 121/21
**entitled [4]** 11/5 18/16 44/6 123/5
**entity [4]** 75/8 80/12 80/24 81/1
**entry [1]** 10/11
**equivalent [1]** 80/8
**error [1]** 76/21
**especially [2]** 34/10 58/11
**essentially [1]** 47/18
**established [1]** 43/1
**Europe [1]** 56/22
**evaluating [1]** 9/22
**even [28]** 17/7 26/5 29/13 29/24 30/2 31/2 32/10 32/11 34/4 43/2 57/4 58/7 62/3 69/17 76/7 76/10 80/3 81/8 85/6 90/16 96/10 105/5 105/6 105/12 105/20 105/22 113/21 121/13
**Eventually [1]** 65/17
**ever [8]** 30/25 32/25 34/9 35/10 48/18 54/4 60/25 102/11
**every [7]** 23/5 23/22 23/22 31/7 35/9 35/9 57/7
**everybody [6]** 23/1 29/8 32/1 41/7 59/10 117/9
**everybody's [1]** 27/1
**everyone [4]** 8/22 23/15 24/11 28/22
**everything [23]** 6/4 16/18 17/8 21/2 21/3 21/7 21/7 21/8 23/19 31/11 42/10 43/4 43/9 60/25 62/2 63/16 64/6 88/24 91/3 106/2 116/11 117/22 117/23
**evidence [55]** 4/25 5/1 5/24 7/1 8/3 8/21 9/1 10/11 10/20 10/20 13/1 13/2 14/9 14/23 15/18 15/20 16/22 17/6 17/16 17/22 37/9 38/16 40/7 42/16 43/15 44/7 46/18 46/20 51/10 58/16 61/22 62/20 63/14 64/22 67/8 67/10 69/25 70/1 70/6 70/9 70/11 70/22 70/25 71/2 71/4 71/4 75/21 77/14 82/4 82/25 89/14 89/15 99/13 109/18 118/14
**evidentiary [2]** 4/22 18/1
**exact [2]** 21/19 26/19
**exactly [6]** 7/11 11/14 60/14 84/12 93/19 114/24
**exaggeration [1]** 66/15
**examination [18]** 3/4 3/4 3/5 11/21 15/16 15/25 18/7 18/14

20/21 30/15 32/21 44/23 46/17 91/21 91/22 100/24 113/19 114/18
**examine [11]** 9/18 11/5 11/25 12/3 12/9 13/9 13/15 17/10 24/13 48/2 113/25
**examined [5]** 13/8 15/25 16/5 16/6 48/2
**example [8]** 13/12 24/4 24/18 32/10 34/24 56/22 87/13 120/24
**except [2]** 21/20 52/6
**exception [1]** 63/16
**Exclusively [1]** 33/24
**Excuse [1]** 119/3
**exhibit [53]** 3/8 3/8 7/25 8/3 8/13 10/1 11/9 17/19 18/11 19/9 21/3 37/9 37/18 38/4 38/16 38/22 38/25 39/4 40/1 40/7 40/10 41/18 51/11 51/16 58/14 58/16 61/23 62/21 63/14 64/23 64/23 67/9 67/10 67/15 68/8 68/20 75/21 77/15 77/18 77/20 81/24 82/5 82/5 82/25 83/3 83/5 83/7 86/9 91/24 99/20 102/14 114/23 115/24
**Exhibit 112 [3]** 7/25 61/23 62/21
**Exhibit 125 [2]** 58/14 58/16
**Exhibit 523A [1]** 102/14
**Exhibit 720 [4]** 37/9 37/18 38/4 99/20
**Exhibit 721 [1]** 64/23
**Exhibit 722 [4]** 38/16 38/25 39/4 40/1
**Exhibit 723 [3]** 40/7 40/10 41/18
**Exhibit 725 [2]** 51/11 51/16
**Exhibit 811 [2]** 67/9 67/15
**Exhibit 813 [2]** 67/10 68/8
**Exhibit 814 [1]** 68/20
**exhibits [7]** 3/7 21/6 42/8 42/17 100/6 100/14 115/20
**exist [3]** 86/19 98/16 98/19
**exists [1]** 31/15
**exit [2]** 105/23 106/1
**expect [3]** 40/4 93/12 113/11
**expensive [3]** 56/24 111/25 112/1
**experience [16]** 44/23 53/22 54/1 54/20 55/5 55/20 55/24 56/6 56/12 61/15 61/20 74/9 96/3 97/4 103/13 110/23
**expert [39]** 7/9 8/7 11/18 11/19 11/22 13/7 13/9 13/14 13/16 13/23 14/7 14/8 14/17 15/1 15/4 15/5 18/15 18/22 18/23 34/17 42/3 43/2 43/13 47/3 47/12 47/15 48/11 48/21 48/22 48/23 56/14 61/16 62/9 62/12 62/12 112/13 112/17 116/7 116/13
**expertise [11]** 5/1 5/7 5/24 7/1 7/13 33/13 42/9 42/14 49/14 56/16 61/19
**expiration [2]** 75/3 87/12
**expire [3]** 75/4 78/20 92/8
**expires [3]** 75/1 78/17 78/19
**explain [15]** 21/24 25/10 31/8 39/19 43/22 51/24 52/13 58/21 77/25 83/13 88/15 90/7 90/25 114/22 116/1
**explained [3]** 6/9 10/19 64/10
**explains [1]** 10/11
**explanation [1]** 7/9
**exploitation [1]** 30/7
**explored [2]** 48/6 48/19
**exported [1]** 10/25
**expose [1]** 113/19
**exposes [1]** 23/20
**exposure [5]** 95/1 95/11 95/13 95/17 95/18
**express [1]** 62/9
**expressed [1]** 10/19
**extended [2]** 69/2 69/5
**extension [1]** 44/25
**extensive [1]** 49/17
**extensively [1]** 21/14
**extent [10]** 7/15 9/4 10/13 17/4

**E**

extent... **[6]**   19/11 64/14 115/15
115/23 119/13 119/19
extra **[6]**   7/6 60/16 78/14 78/24
79/4 79/19

**F**

face **[1]**   96/12
Facebook **[2]**   105/4 105/5
facilitating **[5]**   94/15 95/21
95/23 96/14 96/20
facilitation **[1]**   94/7
facing **[1]**   93/22
fact **[18]**   7/24 8/10 13/25 16/20
26/7 43/20 53/9 68/24 92/3 92/6
92/10 92/24 93/9 93/14 96/12
99/25 100/11 119/5
factor **[4]**   60/19 60/23 61/3 85/25
fail **[4]**   57/25 59/15 59/15 84/2
fails **[1]**   60/4
fair **[9]**   13/14 15/24 45/24 50/21
77/9 93/22 97/10 108/24 119/12
fairly **[1]**   48/20
fairness **[1]**   49/3
familiar **[13]**   14/9 14/11 28/2
28/3 35/13 35/14 36/14 36/21
57/17 63/9 109/12 109/13 109/20
famous **[1]**   52/25
far **[1]**   114/6
fascinating **[1]**   31/10
fast **[2]**   91/6 91/11
faster **[5]**   57/16 58/8 59/12 60/5
111/25
fastest **[2]**   57/12 57/13
favor **[1]**   35/8
FBI **[13]**   5/1 5/3 5/8 5/22 6/24
7/14 8/8 8/25 10/10 11/15 16/16
16/20 17/15
FBI's **[3]**   7/22 9/20 18/3
features **[3]**   111/10 111/11 111/21
February **[1]**   84/16
February 2nd **[1]**   84/16
feel **[3]**   48/7 96/22 101/4
feels **[3]**   26/5 91/6 102/25
few **[4]**   69/16 75/13 82/1 88/6
Fi **[3]**   23/6 23/8 40/13
figure **[1]**   29/4
file **[19]**   21/7 24/22 31/4 31/6
31/8 32/3 32/12 41/1 65/13 65/24
74/24 75/18 79/1 99/22 99/25
100/3 100/4 100/5 100/12
files **[4]**   64/12 101/7 101/9 101/9
fill **[1]**   32/5
filled **[1]**   31/14
final **[6]**   5/20 6/22 10/24 86/18
86/19 86/19
finally **[1]**   86/22
find **[13]**   27/15 29/3 32/12 32/21
54/9 70/1 81/17 82/12 86/12 89/11
115/8 115/10 117/20
finding **[1]**   109/8
fine **[17]**   13/8 30/19 55/17 55/22
61/15 70/22 71/7 71/14 72/16
73/10 98/9 116/23 117/4 117/6
117/11 118/16 118/17
finish **[1]**   14/5
finished **[1]**   98/5
firm **[1]**   24/18
first **[17]**   8/15 9/11 9/23 17/16
17/18 21/12 22/15 28/13 29/13
56/8 60/25 74/24 83/21 83/23
120/22 121/18 121/22
Fischbach **[66]**   3/3 4/23 4/25 5/7
7/12 7/22 9/4 9/9 9/14 9/18 10/14
10/18 12/12 16/4 16/23 18/15
20/17 20/23 35/4 37/18 39/3 40/8
42/20 43/16 44/7 44/8 44/22 46/24
47/12 47/16 51/13 55/24 58/21
61/14 64/23 67/14 69/24 70/5 74/4
75/22 75/24 77/23 77/25 83/7
91/25 96/9 97/24 98/15 99/21

101/20 102/8 102/13 102/15 102/23
104/14 106/3 106/16 107/4 107/23
110/2 110/23 112/12 114/4 114/20
119/16 120/5
Fischbach's **[2]**   4/16 33/12
five **[2]**   114/11 114/16
flag **[1]**   20/10
flagged **[1]**   29/24
flip **[1]**   24/6
Floor **[1]**   2/4
Fog **[35]**   32/23 38/5 40/3 41/20
42/20 43/12 45/23 46/7 46/11
46/18 46/21 46/23 47/19 53/7
53/12 53/18 54/11 68/1 70/2 70/7
70/9 70/20 70/21 70/23 71/2 71/5
71/6 78/19 91/17 91/18 98/22
98/24 99/5 119/12 120/1
followed **[1]**   115/19
following **[3]**   15/1 15/2 104/18
foreclose **[1]**   14/16
foreclosing **[1]**   73/4
foregoing **[1]**   123/4
foreign **[2]**   56/20 97/15
forensic **[10]**   8/6 9/5 12/24 12/25
34/19 65/20 70/11 90/10 90/11
112/17
forensically **[3]**   22/11 22/12
89/21
forensics **[1]**   112/13
forever **[1]**   74/25
forks **[1]**   35/20
form **[1]**   20/25
format **[1]**   98/23
formed **[1]**   47/12
former **[1]**   109/12
forth **[3]**   19/17 65/23 85/18
fortunately **[1]**   30/8
forward **[2]**   53/5 61/18
found **[12]**   17/13 30/22 31/3 31/19
53/20 65/4 65/7 70/6 70/8 76/19
86/14 99/13
four **[12]**   7/8 7/16 35/10 59/2
59/11 59/11 79/5 79/5 79/7 83/25
84/1 84/1
frankly **[7]**   13/16 34/5 36/1 46/8
70/25 85/14 97/8
fraud **[2]**   30/12 30/12
free **[5]**   22/4 24/3 24/6 35/18
51/23
frequently **[5]**   28/7 34/10 52/6
52/9 105/21
front **[12]**   5/14 5/24 7/1 10/4
37/19 42/13 44/22 46/4 48/9 48/24
50/2 58/23
full **[4]**   40/5 40/25 64/5 91/7
functions **[1]**   25/20
further **[2]**   101/1 114/9

**G**

gaming **[1]**   39/14
gander **[1]**   49/4
gave **[5]**   8/25 49/24 61/3 64/18
66/10
GCI **[1]**   57/5
general **[11]**   25/5 33/25 49/19
56/16 76/8 76/22 76/25 77/2 77/4
103/12 103/13
generally **[8]**   33/5 33/16 55/16
55/19 57/24 60/2 85/18 93/2
generator **[1]**   86/1
geographically **[1]**   26/5
Germany **[1]**   26/15
get **[51]**   4/14 12/3 14/23 18/6
19/16 20/12 20/13 24/8 24/24 25/2
29/23 29/24 31/21 31/22 32/8
40/19 43/6 48/17 53/5 55/4 57/8
59/11 59/11 59/12 59/14 60/6 60/7
61/7 61/11 61/22 62/15 74/22
78/11 78/23 78/24 79/17 79/19
81/24 85/24 87/18 91/10 92/20
95/13 98/6 101/18 107/17 113/21
114/13 120/17 121/3 121/11

gets **[4]**   14/10 59/16 111/6 120/7
getting **[7]**   22/23 26/14 34/21
45/20 64/14 79/18 116/14
give **[13]**   16/16 37/15 38/18 45/7
47/24 48/10 49/24 62/6 65/24
72/15 114/15 117/15 117/18
given **[5]**   4/24 10/2 16/7 51/4
117/13
gives **[2]**   41/1 88/23
giving **[1]**   48/9
globe **[1]**   91/9
Gmail **[1]**   61/11
go **[37]**   15/8 16/3 18/3 20/3 21/12
22/7 22/20 22/22 31/20 37/25
46/15 47/7 49/1 50/11 54/6 54/6
57/11 68/8 68/21 71/5 72/4 72/22
73/1 76/9 76/13 76/14 81/9 83/18
84/4 87/14 92/13 92/13 93/7
114/11 115/14 117/8 121/2
GoDaddy **[5]**   76/9 76/10 78/24
81/10 85/9
GoDaddy.com **[1]**   76/13
goes **[6]**   7/14 17/25 18/25 31/17
84/3 87/20
going **[42]**   11/14 11/23 13/18
13/21 13/22 13/24 32/18 39/24
40/18 41/4 43/10 43/22 46/24
47/16 47/25 48/1 48/3 49/6 49/23
51/4 58/12 61/18 71/12 71/15 73/2
73/8 74/1 75/4 79/15 82/8 87/5
87/6 87/15 87/17 95/13 96/2 99/18
99/24 105/4 116/15 117/22 120/9
gone **[3]**   21/4 32/17 32/19
good **[10]**   4/6 4/9 4/10 4/13 20/23
20/24 49/3 49/3 69/12 76/16
Google **[8]**   21/12 22/8 30/9 31/2
35/7 52/24 80/7 85/2
Google.com **[1]**   85/16
goose **[1]**   49/3
gosh **[6]**   27/21 30/12 57/20 60/24
61/11 113/9
got **[17]**   13/4 16/20 17/20 19/2
28/9 28/9 29/13 30/2 35/7 35/7
40/15 57/19 60/21 80/19 114/21
121/11 121/14
gotten **[5]**   17/4 17/5 17/10 73/7
121/10
government **[89]**   4/5 6/8 6/13 7/25
8/15 9/17 10/3 11/3 12/5 12/11
13/12 13/13 17/4 19/1 19/14 19/18
20/5 22/23 30/22 37/9 37/18 38/4
38/16 38/25 39/4 40/1 40/7 40/9
41/18 42/7 42/17 42/17 42/18 44/6
45/25 46/2 47/17 47/21 48/8 48/10
48/19 49/20 49/22 50/6 50/15
50/18 50/21 51/11 51/15 54/15
58/14 58/16 61/23 62/21 63/1
64/22 65/23 67/9 67/10 67/14 68/8
68/19 70/8 70/12 70/13 73/5 73/15
80/14 90/8 90/11 93/17 93/18
94/13 97/7 97/8 109/25 113/8
113/24 115/18 115/24 116/19
116/21 117/1 117/11 118/19 119/20
120/17 120/22 121/22
government's **[13]**   14/14 15/1
17/11 23/3 30/20 42/18 43/3 43/5
43/9 43/13 45/22 47/4 119/8
ground **[1]**   45/25
guarantees **[1]**   58/11
guess **[14]**   7/11 16/6 16/25 18/14
19/11 38/6 41/14 45/21 55/6 62/6
64/13 81/8 116/2 121/23
guess I **[1]**   64/13
guessing **[1]**   41/15
guy **[1]**   23/12
guys **[1]**   21/16

**H**

hacked **[1]**   30/13
hacker **[1]**   29/5
hackers **[1]**   34/7
hacking **[1]**   24/23

**H**

had [46]  4/19 4/20 4/22 5/9 5/13 7/4 7/6 8/22 8/23 9/4 9/11 9/25 11/8 18/12 19/10 21/6 22/15 24/13 27/2 27/22 28/22 29/11 29/25 32/25 43/22 44/15 44/15 45/22 46/24 49/17 50/20 52/22 52/24 57/18 60/19 60/25 67/24 79/5 81/13 97/5 99/12 101/23 107/4 110/8 115/24 115/25
hadn't [4]  9/24 73/7 81/13 98/4
half [2]  80/20 88/8
handed [1]  44/10
handle [1]  58/17
handled [2]  13/3 18/2
handling [4]  4/22 5/1 12/25 14/9
hands [1]  61/1
hanging [1]  61/5
happen [4]  31/25 70/5 87/11 87/12
happened [6]  18/13 21/22 83/22 113/22 114/24 121/7
happening [9]  30/14 31/9 31/11 31/16 31/21 39/10 41/7 91/5 105/10
happens [4]  66/20 90/10 91/5 91/10
happy [3]  48/23 50/3 71/9
hard [27]  8/5 16/16 17/15 31/9 31/11 31/15 32/18 40/23 58/24 59/7 63/12 64/7 89/5 89/7 89/9 89/12 89/14 89/16 89/18 89/22 89/23 102/15 102/17 102/18 102/19 102/20 121/3
harder [4]  29/3 29/3 85/11 107/16
hardware [6]  45/7 45/10 45/12 45/13 90/11 90/12
harm [1]  96/13
has [89]  4/25 5/7 5/24 7/1 8/15 10/3 10/10 10/12 11/25 12/2 12/5 12/6 12/12 13/8 13/8 15/14 16/5 16/6 16/23 18/15 18/22 22/18 22/18 23/12 23/23 26/6 28/22 28/24 30/5 30/7 31/3 31/13 34/20 35/9 35/10 36/2 41/7 41/7 41/8 41/10 41/11 41/13 41/24 42/6 42/7 42/9 42/10 42/21 47/12 47/12 49/14 49/15 52/24 55/16 55/20 56/14 56/15 56/15 61/6 66/4 70/12 73/15 74/12 77/14 79/5 79/6 80/5 81/25 82/17 82/24 85/25 87/1 87/10 92/17 93/18 97/6 97/18 98/24 102/4 108/11 112/5 114/6 116/5 116/9 119/4 119/5 119/13 120/16 120/24
hasn't [5]  9/7 19/7 116/5 119/22 120/25
HASSARD [22]  2/2 4/12 37/8 37/21 38/15 39/1 39/2 40/6 51/10 53/10 61/22 62/22 63/13 67/8 68/19 71/22 75/20 75/23 79/21 80/18 80/19 82/3
have [279]
haven't [14]  17/9 17/12 40/11 50/5 60/8 71/18 71/20 93/14 98/22 102/8 102/20 103/13 105/13 105/18
having [13]  5/22 6/24 11/12 40/2 41/19 45/21 52/2 56/25 72/8 80/1 80/7 93/18 118/13
he [103]  4/16 5/21 5/24 6/6 6/11 6/23 7/1 7/6 7/13 7/15 8/4 9/19 9/22 11/23 11/25 12/2 12/15 12/15 12/15 12/20 13/8 13/8 13/11 13/25 14/8 14/10 14/20 14/22 15/2 15/5 15/6 15/9 15/14 15/17 15/25 16/1 16/6 18/22 19/4 19/6 19/7 19/8 19/19 19/20 19/22 19/24 19/25 34/19 42/8 42/9 42/11 42/14 42/21 42/22 44/15 47/12 49/15 53/14 53/15 53/18 55/16 55/20 56/14 56/15 56/15 60/19 70/6 70/22 89/9 98/4 99/12 107/2 109/2 116/13

116/16 116/18 116/21 117/5 117/7 118/12 118/14 118/16 119/5 119/13 119/18 119/22 119/23 119/25 120/6 120/7 120/9 120/9 120/12 120/15 120/18 120/18 120/19 120/20 120/24 120/24 121/21 122/1 122/1 122/1
head [1]  121/3
headquartered [1]  26/15
hear [13]  7/19 14/14 15/5 25/7 27/8 31/4 55/18 63/4 63/20 64/25 67/7 89/8 90/19
heard [18]  8/4 9/11 9/22 9/24 12/15 12/15 14/25 15/1 18/21 19/4 21/17 28/15 49/16 66/25 88/25 89/10 109/11 118/13
hearing [6]  6/9 6/18 10/8 48/6 49/12 69/22
hearings [3]  4/20 48/19 49/17
heavily [1]  54/3
heavydist [1]  41/5
held [4]  42/2 78/7 85/5 115/13
help [10]  14/14 26/3 32/9 32/9 33/7 35/23 55/1 56/25 65/23 113/11
helpful [2]  59/22 59/24
her [25]  10/23 10/25 11/6 14/1 14/3 14/14 17/19 17/19 17/21 18/8 18/12 18/21 19/4 27/8 27/18 27/20 27/22 65/3 73/6 89/3 89/5 100/25 101/2 103/5 115/25
here [62]  4/18 11/11 11/14 13/10 13/17 14/12 14/17 16/21 17/1 17/18 17/25 23/8 26/2 26/6 30/6 33/13 35/11 36/6 38/6 38/8 40/13 41/5 46/18 46/18 46/18 47/9 47/15 50/2 50/12 53/2 58/25 59/1 59/18 60/21 63/8 63/12 65/9 68/13 69/23 70/15 70/18 70/24 78/1 78/23 81/11 85/20 86/13 87/25 88/2 90/4 91/12 94/11 96/9 100/10 100/17 101/14 102/21 105/10 115/17 117/18 120/23 121/5
hidden [16]  106/5 106/7 106/8 106/13 106/19 106/22 106/25 107/1 107/14 107/19 108/2 108/15 108/20 109/9 109/12 112/7
highhosting.net [1]  83/24
highly [1]  88/18
hijacking [1]  55/3
hill [2]  20/7 47/24
him [21]  4/18 8/4 8/7 8/9 8/9 12/6 13/18 13/22 13/24 14/22 18/20 19/2 23/15 32/22 55/13 55/15 55/19 70/21 71/6 116/16 118/13
his [54]  5/22 6/24 6/25 8/4 8/5 8/11 9/14 9/21 10/15 11/24 12/23 12/25 13/9 13/19 13/24 14/12 15/9 15/11 19/3 19/13 20/3 30/23 30/23 33/12 34/17 34/22 42/9 42/14 43/17 44/22 53/17 55/8 55/20 56/11 56/15 61/11 61/15 67/25 70/20 88/12 94/12 115/17 116/16 117/6 119/19 119/21 120/19 121/2 121/4 121/5 121/7 121/15 121/19 122/1
his To [1]  88/12
historical [2]  21/20 22/4
histories [4]  43/11 43/11 46/8 49/23
history [9]  10/11 43/22 47/17 78/14 79/5 79/15 83/19 84/9 86/15
hit [1]  22/8
hold [3]  44/21 64/4 79/24
holding [1]  87/4
holds [1]  80/12
home [22]  39/16 39/16 39/16 40/13 40/13 40/21 40/24 41/1 41/7 45/11 52/3 52/4 52/6 52/9 52/25 53/4 53/6 102/8 110/20 110/22 120/17 121/15
honest [1]  94/9

honestly [1]  72/13
Honor [51]  4/6 4/10 4/15 5/15 10/6 11/5 14/6 15/7 16/4 16/10 17/3 20/20 30/17 33/1 33/11 35/1 41/23 42/3 43/19 44/10 45/4 45/16 46/4 46/13 47/7 48/13 49/25 51/7 53/24 58/18 61/13 64/19 67/2 69/9 69/23 71/8 74/2 77/13 82/23 90/1 90/13 98/4 98/5 101/3 101/17 101/25 115/15 116/14 116/23 117/25 122/4
HONORABLE [1]  1/9
hope [3]  18/4 31/25 58/15
hopefully [3]  21/6 21/7 83/17
hoping [1]  71/22
horrible [1]  97/3
host [2]  39/7 120/20
hosted [4]  84/10 84/19 85/23 87/21
hosting [13]  79/15 84/21 84/22 87/21 98/20 111/7 111/9 111/18 111/19 111/20 111/21 111/23 112/2
hotmail.com [2]  68/12 68/17
house [2]  31/14 80/7
housekeeping [1]  73/12
houses [1]  31/14
how [41]  5/9 7/13 13/2 13/2 15/25 18/1 19/6 22/3 22/8 22/8 24/10 26/21 31/15 32/10 41/15 49/14 55/21 56/6 56/8 56/16 56/18 56/25 59/5 62/9 62/10 62/15 62/16 65/18 70/10 70/13 71/24 81/1 81/2 81/22 82/7 98/21 104/5 104/12 118/7 120/8 121/6
https [1]  41/12
huh [1]  64/11
humanity [1]  99/18
hundreds [3]  66/13 107/23 107/25
hurt [1]  14/14

**I**

I'd [7]  48/10 49/1 71/24 73/5 97/2 116/15 116/18
I'm [27]  11/11 14/5 15/7 21/16 24/1 34/16 36/6 36/19 40/17 44/12 52/12 59/5 61/24 62/5 67/2 78/16 81/5 83/17 90/2 98/18 100/23 102/17 106/1 106/6 115/4 118/23 119/2
ICANN [3]  22/14 22/16 22/19
idea [5]  28/17 43/19 52/2 56/9 106/2
identical [1]  77/5
identification [2]  77/15 82/25
identified [1]  30/15
identifies [2]  40/2 41/19
identify [2]  38/5 103/22
identifying [1]  75/15
identity [1]  103/7
ignorelist [1]  110/10
ignorelist.com [5]  38/3 38/10 51/20 51/22 110/8
illicit [4]  29/14 29/15 29/16 30/3
image [3]  17/10 17/23 32/12
imaged [1]  8/20
images [15]  5/3 8/23 8/25 9/2 9/3 9/4 10/12 16/12 16/15 16/24 17/4 17/6 17/8 17/15 32/11
imagine [3]  85/16 85/16 111/5
implement [3]  97/24 98/2 98/11
implication [2]  42/19 50/10
implied [1]  45/5
implying [1]  46/10
importance [1]  48/17
important [8]  10/4 13/2 13/25 35/24 36/2 74/11 92/3 100/19
imposed [2]  97/15 97/16
inappropriate [1]  119/14
incarcerated [1]  93/10
inclined [2]  5/25 7/2
include [2]  75/16 107/12

**I**

included [2] 4/21 9/6
including [2] 95/21 116/11
inconsistent [3] 15/2 46/25 50/8
independent [2] 21/9 21/11
independently [1] 22/24
indicate [1] 68/15
indicating [2] 67/21 115/20
indication [8] 11/2 30/25 69/7 88/23 99/6 99/8 115/8 117/20
indications [2] 30/23 32/10
indicative [1] 84/17
indicia [1] 74/9
individual [2] 16/12 94/12
individually [1] 16/18
individuals [3] 16/16 103/23 107/17
indulgence [1] 114/7
information [31] 22/24 23/17 23/20 24/18 27/17 74/20 75/16 76/18 76/20 76/23 77/1 77/3 77/6 77/10 78/1 78/12 78/24 79/4 79/10 79/19 80/9 80/11 80/12 80/12 82/16 83/11 91/16 93/5 113/25 115/22 116/17
informed [1] 73/15
infrastructure [1] 36/25
initial [2] 28/12 113/15
initiate [1] 87/11
ins [2] 81/19 99/13
inside [2] 52/7 54/2
inspect [1] 54/17
install [3] 54/4 54/5 54/5
instance [3] 119/16 120/22 121/22
instantaneous [1] 91/6
instantaneously [1] 91/5
instead [1] 39/7
intend [1] 8/3
intending [4] 7/21 7/23 8/8 8/9
intends [1] 10/14
intentionally [1] 49/9
interest [2] 73/9 104/1
interested [1] 97/6
interface [2] 36/17 36/18
International [3] 54/14 63/2 63/18
internet [11] 22/6 26/5 26/7 26/8 29/17 29/22 41/10 52/21 88/19 88/24 91/4
interrupt [1] 100/23
interrupts [1] 32/4
intervention [1] 99/15
interview [1] 23/13
intimidating [1] 60/9
introduced [1] 22/11
inventory [12] 5/22 6/16 6/24 7/22 8/2 8/7 8/10 9/20 11/15 12/23 13/19 18/3
inventorying [1] 7/14
investigated [1] 74/4
investigating [1] 104/2
investigation [2] 103/22 110/1
investigator [1] 70/11
invoice [3] 68/11 68/23 68/25
involve [2] 56/20 56/21
involved [1] 44/24
involving [5] 55/4 107/4 107/6 107/8 107/23
IP [41] 24/8 24/9 24/11 25/16 25/18 26/23 27/3 27/6 27/8 27/11 27/15 39/6 39/8 52/6 52/12 52/17 52/20 52/22 53/4 66/23 78/14 79/4 79/5 84/23 102/22 103/18 103/21 103/25 104/3 104/16 104/21 104/24 105/1 105/5 105/8 105/11 105/17 105/21 110/11 110/12 110/13
iPhone [1] 23/22
IRS [9] 5/3 8/20 8/23 9/3 9/4 10/13 16/14 16/19 17/15
is [858]
is Government [1] 58/14

is I [1] 17/24
isn't [29] 4/19 9/19 13/21 28/23 33/15 35/21 45/14 48/2 58/1 62/7 66/7 92/24 95/13 98/17 99/22 99/25 100/12 101/8 101/22 103/10 104/9 104/16 107/5 107/24 112/8 112/12 113/14 114/1 114/5
issue [19] 5/10 10/4 10/8 12/3 12/6 14/10 15/15 18/1 20/1 20/10 48/16 49/5 49/19 50/25 52/5 70/4 70/14 116/4 120/7
issued [1] 80/14
issues [9] 6/7 6/12 49/14 55/2 102/4 102/5 119/10 119/22 119/23
it [587]
It's [1] 118/1
item [4] 5/17 8/6 10/20 16/20
items [6] 8/1 10/25 16/12 18/11 21/5 63/1
its [4] 44/7 47/21 48/22 117/2
itself [5] 66/24 75/3 98/16 98/20 99/12

**J**

jacking [1] 55/3
jail [6] 53/19 53/22 119/5 119/18 119/23 120/1
jails [1] 54/2
Jeff [1] 4/8
JEFFREY [3] 1/18 3/3 20/17
jog [1] 10/25
joined [1] 4/7
joining [1] 4/12
judge [2] 1/10 11/13
jury [48] 1/9 4/14 7/7 7/18 10/5 11/13 11/20 12/7 12/9 12/10 13/2 13/6 14/25 15/23 18/16 19/16 20/2 20/12 20/13 20/14 21/24 25/10 31/8 35/15 36/7 36/16 36/23 39/19 48/24 48/24 51/3 51/24 58/21 59/22 69/19 71/1 73/11 73/24 74/16 76/5 77/19 83/4 90/25 102/3 102/6 109/17 113/5 118/6
just [188]
JUSTICE [2] 1/13 1/20

**K**

Kaste [1] 23/14
keep [11] 13/7 24/20 35/24 36/19 41/9 52/2 61/4 61/13 99/18 116/16 116/18
keeping [1] 79/25
keeps [1] 21/20
kept [1] 79/25
key [4] 28/24 60/20 60/23 86/1
kill [8] 53/17 53/21 98/15 98/16 98/19 99/4 99/7 99/9
kind [9] 10/24 13/1 21/12 32/7 33/4 33/16 53/17 74/20 83/18
Kindle [1] 65/9
kinds [2] 30/3 34/15
know [82] 9/6 9/7 12/25 16/7 17/9 17/15 17/23 18/21 19/15 19/18 19/21 20/4 21/3 23/11 23/12 24/12 26/9 26/19 26/20 28/20 28/23 28/24 29/18 31/6 42/25 43/10 43/15 43/25 50/6 50/9 50/24 51/22 52/11 53/7 53/9 57/9 57/21 58/22 60/22 66/2 70/23 70/25 71/24 77/2 77/4 78/5 79/11 80/2 80/3 80/3 81/6 81/9 81/11 81/22 82/20 84/4 85/5 85/6 85/10 85/23 87/7 90/9 94/9 94/21 99/3 99/4 99/6 100/20 101/13 101/14 101/16 101/17 111/12 112/10 113/9 113/12 117/3 119/8 119/20 120/1 120/8 121/13
knowledge [7] 55/16 55/20 55/24 56/14 56/15 56/18 119/21
known [1] 97/2
knows [4] 14/20 14/22 75/5 80/2
Korea's [1] 94/8

**L**

language [2] 23/2 93/2
laptop [5] 28/8 28/9 61/7 61/8 121/15
large [1] 24/10
largest [1] 30/5
last [22] 10/8 10/17 12/13 24/4 51/4 53/4 53/11 75/1 75/2 75/16 75/18 78/21 83/11 101/21 113/2 115/11 116/20 117/6 117/7 117/19 118/16 119/6
late [2] 15/22 15/22
later [3] 10/9 85/7 120/4
law [9] 2/3 22/13 24/18 43/1 54/25 76/17 82/19 82/21 103/25
lawsuits [1] 97/5
lawyer [2] 24/19 24/20
lay [1] 83/14
lead [1] 89/11
leaked [1] 28/23
learn [1] 113/18
least [13] 7/13 28/25 30/22 45/25 50/4 74/23 76/2 79/7 91/2 98/22 102/19 107/2 107/21
leave [3] 73/22 117/12 120/25
leaving [2] 116/25 117/6
left [2] 32/7 61/1
legal [7] 80/14 80/16 95/7 95/19 96/2 97/5 97/12
legality [1] 96/24
legally [1] 96/20
less [4] 6/21 60/9 112/1 117/2
let [18] 7/19 14/5 33/14 45/3 47/20 48/24 50/17 61/17 70/16 71/15 71/23 72/14 96/5 117/18 120/21 120/21 121/17 121/21
let's [10] 5/18 20/13 33/18 50/16 50/19 68/12 69/16 114/13 117/8 118/1
lets [1] 21/21
letting [1] 52/11
level [1] 34/4
liability [9] 95/20 95/22 96/4 96/10 96/13 96/23 97/1 97/10 97/12
life [3] 61/16 62/11 62/11
like [105] 4/18 10/15 13/6 13/14 16/17 17/16 21/20 22/4 22/9 22/20 24/22 26/4 26/10 26/12 26/12 28/16 28/17 28/19 30/10 31/13 32/3 33/6 33/6 34/20 34/25 35/7 36/10 37/23 37/25 38/1 38/3 38/13 39/12 39/15 39/15 39/17 40/4 40/19 40/20 41/9 41/22 42/15 44/25 48/7 48/14 50/23 51/17 51/18 52/3 52/4 52/5 53/1 53/2 55/12 57/4 57/23 58/1 58/4 58/10 58/25 58/25 59/5 60/6 64/3 71/24 73/22 74/17 76/12 77/11 77/14 78/13 78/24 79/12 80/1 80/6 82/10 82/24 83/16 83/21 84/1 84/12 85/7 85/8 85/17 86/1 86/3 87/3 87/12 87/16 88/22 91/5 91/7 92/8 92/17 93/3 93/16 95/11 96/22 97/15 97/23 102/25 104/23 116/15 116/18 119/17
liked [1] 101/15
likelihood [1] 87/21
likely [4] 39/14 104/17 105/8 117/2
limited [1] 54/6
LINDSAY [3] 2/6 123/3 123/12
line [7] 5/2 29/16 39/7 46/7 46/10 50/12 117/13
lines [1] 79/22
Linksys [1] 40/20
Linux [16] 35/13 35/14 35/15 35/18 36/1 36/3 36/3 36/7 37/6 37/7 37/11 38/11 38/12 38/14 42/10 43/11
list [19] 7/8 7/8 8/1 8/2 8/11

**L**

list... [14]  9/6 11/7 12/21 12/22 12/23 13/19 17/19 18/10 18/11 18/11 63/1 63/16 81/18 89/7
listed [6]  17/13 63/7 63/8 75/5 81/11 86/13
listen [4]  36/8 96/8 100/24 101/1
listening [1]  116/10
listing [1]  17/15
litany [1]  61/15
literally [1]  100/20
litigation [1]  112/25
little [17]  13/10 18/6 18/19 24/1 24/16 38/7 50/7 51/12 58/8 66/22 80/17 80/18 81/23 84/11 101/4 121/1 121/3
live [2]  31/13 58/11
load [4]  26/4 26/11 57/24 58/5
loaded [1]  57/11
local [1]  57/2
locate [5]  54/23 65/13 65/16 65/18 103/23
located [2]  102/9 112/11
location [2]  103/7 112/8
locations [1]  26/12
lock [1]  88/22
locked [1]  54/3
log [15]  10/10 81/17 81/19 85/21 85/24 86/7 88/20 99/13 100/5 100/12 100/13 101/23 105/9 105/25 110/6
log-in [4]  81/17 85/21 85/24 86/7
log-ins [1]  81/19
logged [4]  27/11 99/13 105/6 114/25
logging [4]  46/6 46/11 100/18 105/11
logs [3]  104/17 104/25 105/23
long [5]  22/12 40/12 52/24 76/17 85/17
longer [5]  31/18 73/16 87/1 87/2 92/23
look [42]  5/15 9/25 10/18 14/12 19/19 19/19 19/23 19/25 20/1 21/18 22/8 22/9 27/18 30/10 33/14 38/25 39/17 40/4 40/8 45/4 50/3 50/11 50/20 50/21 53/3 62/23 66/6 67/14 68/9 68/21 72/11 72/15 74/18 74/20 75/22 75/24 76/16 78/6 81/23 82/20 84/15 116/22
looked [10]  13/12 13/15 17/16 19/7 27/15 40/11 71/20 87/7 87/8 101/16
looking [12]  5/11 5/13 6/3 6/5 18/13 38/13 60/10 63/9 63/11 67/9 68/13 73/7
looks [10]  37/23 38/1 38/13 39/12 51/17 51/18 58/25 59/5 77/11 119/17
lookup [2]  76/4 115/22
Los [3]  54/14 63/2 63/17
lose [2]  60/4 61/2
loss [1]  18/19
lost [2]  94/11 94/12
lot [22]  22/19 24/2 25/19 26/1 26/6 26/6 30/7 30/11 32/10 34/22 54/23 55/4 76/12 78/11 79/18 85/12 85/15 92/20 94/13 94/19 97/8 112/22
lots [3]  32/4 32/4 35/8
luggage [1]  35/11
lunch [2]  116/15 118/1

**M**

Mac [2]  35/8 36/5
machine [10]  21/13 21/25 22/2 36/4 36/5 38/9 38/14 39/14 82/10 100/19
machines [2]  36/3 59/19
Macintosh [2]  23/23 37/11
made [18]  8/23 9/4 9/18 9/23

18/10 51/19 59/16 67/22 69/1 69/8 70/2 75/2 83/22 85/2 87/25 100/18 101/20 114/25
mail [1]  33/21
main [1]  84/19
mainnameserver.com [1]  84/20
maintain [1]  92/5
maintaining [1]  79/2
major [1]  30/11
majority [2]  108/20 111/6
make [30]  5/4 11/19 11/20 13/6 18/20 19/25 27/14 27/21 29/7 32/18 35/18 43/1 49/4 53/1 57/16 71/9 72/3 72/5 73/3 85/13 85/19 86/8 92/12 92/13 95/16 100/10 101/2 104/18 105/3 122/1
makes [7]  28/15 29/3 33/7 58/7 60/5 97/17 118/14
making [3]  22/6 32/1 49/15
manufactured [1]  11/16
many [4]  32/3 94/6 99/9 104/5
March [2]  1/5 123/10
marked [2]  77/14 82/24
markets [1]  108/21
Martin [1]  23/14
mask [1]  103/17
Mat [1]  54/16
material [11]  7/14 30/7 30/21 107/14 107/20 107/24 108/3 108/14 108/16 109/10 109/23
materials [1]  20/25
math [2]  26/20 80/22
matter [5]  22/20 29/5 43/15 49/2 123/5
may [28]  4/17 16/9 17/12 20/5 20/18 24/9 27/22 39/17 51/7 51/8 58/17 59/6 62/1 71/22 72/9 76/7 77/19 83/4 96/13 96/19 99/7 101/3 102/12 104/8 104/11 110/11 113/25 120/23
maybe [11]  5/11 11/16 15/16 27/23 46/1 86/19 87/5 87/5 90/7 117/2 118/9
Mazarin's [2]  6/7 6/12
Mazars [18]  6/7 6/12 9/1 9/10 9/15 9/19 9/22 10/23 11/6 14/1 14/24 15/10 19/4 31/4 63/4 64/25 74/14 102/23
Mazars' [14]  8/2 8/4 8/11 12/16 12/18 14/19 17/14 27/8 63/20 65/13 71/16 88/25 103/2 115/25
me [75]  4/12 5/14 5/24 6/17 7/1 7/17 7/19 8/19 14/5 18/24 19/24 19/24 19/25 21/8 21/21 22/17 22/22 24/22 29/19 33/14 33/18 38/18 40/9 42/12 42/13 42/13 44/22 45/3 45/7 46/4 47/20 48/6 48/9 50/3 50/15 59/7 60/16 65/24 66/10 68/9 68/22 70/16 71/15 71/23 72/14 73/4 73/15 93/17 94/3 96/1 96/23 97/17 97/18 99/1 100/16 102/2 102/5 102/25 103/15 104/19 108/10 110/19 113/22 113/22 114/6 117/18 117/18 118/3 119/3 119/4 119/24 120/21 120/23 121/15
mean [38]  12/4 13/10 15/5 16/7 19/11 19/21 19/22 26/1 27/1 29/11 34/6 34/6 36/18 45/12 46/21 48/14 64/9 66/4 70/19 74/17 79/13 83/22 84/21 86/24 89/18 92/16 92/18 93/2 98/1 99/17 103/8 106/8 106/9 107/8 112/9 119/23 120/20 121/14
meaning [1]  35/19
meaningful [1]  21/8
means [15]  31/12 31/23 39/22 57/25 59/10 59/15 79/1 79/6 79/9 83/14 84/3 84/21 87/1 118/21 118/23
meant [4]  6/2 64/3 72/13 98/25
media [4]  40/23 41/1 64/3 107/21
Members [1]  51/3

memorized [2]  52/23 112/5
memory [3]  10/25 64/4 81/25
mentioned [3]  33/4 39/18 83/8
mentioned when [1]  83/8
menu [1]  57/11
message [1]  86/3
messages [1]  34/2
messaging [1]  33/23
method [2]  37/24 68/12
methods [1]  112/2
MICHAEL [2]  2/2 4/12
Microsoft [1]  35/25
Microsoft's [1]  52/24
might [12]  6/5 19/20 27/16 32/6 40/19 50/4 55/12 56/2 59/21 90/8 90/8 91/8
mind [3]  49/13 76/14 87/4
mine [1]  75/13
minus [2]  25/21 104/23
minute [1]  37/15
minutes [7]  69/16 71/23 114/11 118/9 118/11 118/15 121/24
mischaracterizing [1]  100/11
mislead [2]  12/9 12/10
missing [2]  7/5 54/25
misstate [1]  47/8
misstatement [1]  15/20
misstating [2]  15/18 89/15
mistaken [1]  15/18
mix [1]  57/15
mixer [5]  28/16 28/17 44/25 94/12 96/11
mixers [6]  93/21 94/6 94/11 94/14 94/15 97/16
mixing [3]  95/2 96/14 96/21
Mobile [1]  59/13
model [2]  35/10 60/9
modem [3]  52/8 58/4 110/13
modern [3]  57/9 57/10 60/13
modification [3]  75/2 115/1 115/2
modifications [1]  79/10
modified [2]  75/2 75/18
moment [4]  44/17 48/9 73/9 117/18
money [3]  60/16 85/15 92/18
Moon [3]  88/13 88/25 90/20
more [38]  5/25 6/21 7/2 24/9 26/2 28/14 28/14 29/7 29/7 33/7 39/14 41/4 49/18 55/15 55/19 70/5 71/9 71/10 71/25 72/1 76/8 76/12 76/18 80/18 81/23 83/11 84/11 92/19 97/11 97/23 111/25 112/13 112/16 112/22 114/13 118/7 118/20 118/23
morning [12]  1/7 4/6 4/9 4/10 4/13 20/10 20/23 20/24 66/17 69/12 69/14 69/15
MOSS [1]  1/9
most [12]  22/3 22/18 27/25 28/19 40/13 56/20 57/9 57/9 57/12 99/1 109/11 113/17
mostly [2]  52/4 90/12
mother [2]  121/4 121/7
mount [1]  41/3
move [15]  33/18 33/19 48/14 49/8 50/16 66/12 77/14 85/9 85/18 90/5 91/9 101/25 109/15 109/16 115/11
moved [1]  85/6
moving [4]  61/13 72/8 84/17 85/11
MPTCP [2]  57/17 57/20
Mr [5]  3/4 3/5 53/11 83/7 101/20
Mr. [156]
Mr. Ekeland [14]  4/17 7/7 7/19 10/14 19/19 20/18 46/17 46/19 51/6 72/21 73/25 100/25 104/5 117/1
Mr. Fischbach [62]  4/23 4/25 5/7 7/12 7/22 9/4 9/9 9/14 9/18 10/14 10/18 12/12 16/4 16/23 18/15 20/23 35/4 37/18 39/3 40/8 42/20 43/16 44/7 44/8 44/22 46/24 47/12 47/16 51/13 55/24 58/21 61/14 64/23 67/14 69/24 70/5 74/4 75/22 75/24 77/23 77/25 91/25 96/9

**M**

Mr. Fischbach... [19]   97/24 98/15
  99/21 102/8 102/13 102/15 102/23
  104/14 106/3 106/16 107/4 107/23
  110/2 110/23 112/12 114/4 114/20
  119/16 120/5
Mr. Fischbach's [2]   4/16 33/12
Mr. Hassard [20]   37/8 37/21 38/15
  39/1 39/2 40/6 51/10 53/10 61/22
  62/22 63/13 67/8 68/19 71/22
  75/20 75/23 79/21 80/18 80/19
  82/3
Mr. Price [1]   89/8
Mr. Scholl's [1]   120/3
Mr. Sterlingov [35]   8/1 11/3 17/9
  30/25 43/12 46/11 50/13 54/10
  54/14 55/12 57/18 60/19 63/2
  63/17 66/2 66/8 66/9 67/22 69/8
  70/1 70/6 70/9 71/2 80/21 81/12
  86/8 88/8 99/7 99/9 118/12 119/4
  119/18 120/3 121/8 121/25
Mr. Sterlingov's [20]   10/22 17/6
  30/16 32/22 53/12 54/8 58/5 65/4
  65/10 67/20 67/24 69/6 81/13
  81/16 86/6 86/11 88/12 110/7
  119/21 120/17
Mr. Verret [1]   4/19
Ms [3]   3/4 8/14 63/20
Ms. [40]   8/2 8/4 8/11 9/1 9/10
  9/15 9/19 9/22 10/23 11/6 12/4
  12/16 12/18 14/1 14/19 14/24
  15/10 15/13 17/14 18/8 18/9 19/4
  20/9 27/8 31/4 46/12 50/5 63/4
  64/25 65/13 71/16 73/18 74/14
  88/25 102/23 103/2 114/20 115/5
  115/25 117/10
Ms. Mazars [16]   9/1 9/10 9/15
  9/19 9/22 10/23 11/6 14/1 14/24
  15/10 19/4 31/4 63/4 64/25 74/14
  102/23
Ms. Mazars' [13]   8/2 8/4 8/11
  12/16 12/18 14/19 17/14 27/8
  65/13 71/16 88/25 103/2 115/25
Ms. Pelker [11]   12/4 15/13 18/8
  18/9 20/9 46/12 50/5 73/18 114/20
  115/5 117/10
much [19]   21/20 22/4 28/16 31/2
  33/22 35/22 47/11 57/23 59/12
  59/12 60/9 60/9 62/15 71/24 72/1
  76/14 107/16 118/7 121/6
multipath [2]   57/20 57/23
multiple [12]   24/7 27/1 35/19
  55/5 55/12 56/2 56/6 56/21 56/25
  60/15 91/8 107/12
my [75]   5/12 12/11 13/20 13/21
  13/22 14/7 17/10 18/13 21/12 23/8
  24/13 25/6 26/20 27/16 28/10
  28/12 29/13 29/21 29/25 32/17
  34/10 35/11 36/1 36/10 37/25 46/1
  46/4 46/7 49/13 50/4 50/4 50/10
  52/21 53/15 54/1 54/21 56/20
  57/14 57/14 57/24 58/2 58/9 60/21
  61/1 61/5 61/7 61/8 61/10 61/10
  61/11 61/12 62/1 62/3 62/6 62/14
  63/3 63/19 64/5 64/9 65/5 65/5
  65/12 66/5 87/3 88/10 97/4 97/22
  98/24 108/10 111/22 112/4 116/19
  116/24 121/8 121/12
myself [4]   26/25 40/17 40/18
  102/20

**N**

N.W [1]   1/16
name [59]   4/5 22/1 22/16 30/13
  32/12 40/22 40/25 41/6 51/23
  51/25 52/2 52/12 66/20 66/21
  66/21 66/23 66/24 67/5 67/17
  67/18 68/13 68/15 74/4 74/7 74/9
  74/19 74/20 74/23 74/25 75/4 75/6
  76/8 76/10 77/7 78/2 79/16 79/24
  80/10 80/15 80/25 81/17 82/9 83/8

83/23 84/14 84/17 85/14 85/17
  86/18 86/19 86/23 86/24 87/5 87/9
  88/3 88/3 109/13 115/3 115/3
named [3]   12/22 40/24 100/11
names [5]   21/18 27/11 66/14 66/16
  78/13
naming [1]   21/19
napkin [1]   26/20
narcotics [1]   96/10
nationals [1]   56/21
nature [1]   42/4
Navy [2]   28/13 33/8
near [1]   102/12
necessarily [9]   20/6 24/23 26/15
  31/17 49/20 77/2 93/12 97/22
  105/25
necessary [2]   34/1 81/17
need [16]   12/7 20/7 26/2 30/1
  33/10 46/1 48/7 48/22 49/4 73/16
  85/3 85/21 101/17 114/13 118/8
  118/14
needed [1]   116/8
needs [4]   19/22 19/25 20/1 76/16
net [1]   57/5
nets [1]   108/21
network [25]   23/16 24/21 25/3
  26/10 28/2 29/20 30/23 36/20 37/4
  41/6 41/7 41/8 44/24 52/4 52/9
  53/2 53/6 53/23 58/3 59/9 88/17
  91/13 91/14 95/14 108/24
networks [2]   58/1 60/5
never [16]   8/16 10/22 19/20 23/7
  29/11 29/12 29/13 29/19 32/19
  46/16 48/5 49/17 76/21 89/19
  89/19 114/4
new [8]   1/20 32/5 32/6 47/12
  47/15 48/11 48/21 79/13
next [6]   1/23 11/1 45/8 45/16
  45/18 100/21
nicer [1]   60/9
no [79]   1/4 4/25 14/4 23/22 24/9
  24/9 29/11 29/15 30/22 30/22
  31/18 35/21 37/2 38/6 38/8 38/12
  41/21 41/21 43/17 43/17 44/4
  46/18 46/21 47/10 53/20 63/12
  63/12 66/4 66/20 67/3 73/15 77/17
  77/20 78/25 79/3 80/16 80/24 83/2
  83/5 85/1 86/14 86/14 87/1 87/2
  87/12 89/14 89/20 90/15 91/18
  92/16 92/23 95/7 95/10 96/3 96/3
  99/2 99/6 99/8 99/13 102/13
  102/18 102/19 102/21 105/14
  105/15 105/20 107/16 107/16 109/5
  109/11 114/9 115/10 116/7 116/18
  117/7 117/21 117/22 117/23 117/24
nobody [3]   85/13 98/24 114/6
node [2]   105/23 106/1
noncriminals [2]   103/2 103/4
none [1]   67/23
nonprofit [1]   22/4
North [1]   94/7
not [187]
note [4]   37/10 40/18 44/11 49/6
notes [1]   11/1
nothing [13]   31/2 31/3 32/24 38/6
  38/8 38/8 48/18 49/12 53/20 54/12
  86/10 87/23 91/18
notice [5]   39/8 44/5 46/24 47/3
  68/11
noticed [2]   43/22 48/5
notion [2]   35/17 41/5
November [1]   86/20
November 16th [1]   86/20
now [30]   19/1 22/12 24/2 28/10
  28/15 28/20 47/11 47/12 50/16
  50/17 50/19 50/21 50/24 52/23
  57/11 61/6 69/4 69/15 70/4 71/21
  78/23 79/3 82/3 91/24 94/10
  102/22 110/5 114/21 115/23 120/5
now because [1]   28/20
NPR [1]   23/14
nuanced [2]   47/9 84/11

number [23]   4/24 5/5 5/9 5/12
  5/17 6/10 8/3 10/1 19/9 21/5
  28/22 44/20 44/21 53/5 61/22
  63/14 68/23 75/8 80/1 85/11 86/3
  104/6 104/11
numbering [3]   6/16 7/23 18/3
numbers [9]   10/13 11/1 16/12
  16/21 28/21 40/16 44/11 44/18
  80/4
numerous [1]   107/4
NW [3]   1/14 1/20 2/8
NY [1]   2/4

**O**

object [1]   20/5
objecting [3]   115/21 116/20
  116/20
objection [34]   15/19 30/17 33/1
  33/11 41/23 47/20 53/24 55/7
  55/14 56/10 64/14 69/9 69/10
  77/16 77/17 83/1 83/2 90/1 90/13
  93/24 93/25 94/16 94/17 95/3
  95/24 96/15 98/4 108/4 108/5
  108/22 109/14 112/14 112/18
  115/11
obscure [1]   41/14
obscures [1]   29/2
obscurity [3]   28/18 29/8 33/7
obtain [1]   83/10
obviously [1]   24/21
occupied [2]   31/13 32/2
occupy [1]   39/24
occupying [1]   39/23
occurred [3]   84/6 85/20 88/2
occurring [1]   27/25
October [11]   78/17 78/18 78/19
  86/22 88/4 88/4 88/7 114/22
  114/23 119/17 120/6
October 2022 [1]   120/6
October 25th [3]   78/17 78/18
  78/19
October 5th [3]   86/22 88/4 88/7
odd [1]   18/23
oddly [1]   31/15
off [6]   34/11 53/18 80/6 80/7
  92/10 113/21
offer [17]   9/5 11/23 13/17 14/18
  14/23 15/5 18/15 42/14 43/9 47/21
  48/22 82/24 95/1 108/16 108/16
  111/14 111/24
offered [3]   11/19 11/19 112/2
offering [1]   94/25
office [2]   24/21 97/15
official [4]   2/7 10/24 123/3
  123/13
offline [4]   29/12 87/22 88/5
  93/19
often [1]   61/2
oh [6]   26/19 30/12 57/20 60/24
  107/1 111/19
okay [22]   20/8 20/13 33/18 35/2
  38/22 44/19 44/21 51/1 52/1 58/23
  71/11 72/8 72/25 73/23 86/4 91/21
  97/17 111/22 114/8 114/12 114/17
  117/14
old [2]   32/8 59/3
older [1]   60/9
once [4]   32/13 70/5 86/17 118/18
one [85]   4/15 5/13 6/2 6/20 6/20
  16/15 16/19 19/17 22/1 22/15 23/5
  24/9 25/6 26/3 26/9 29/1 30/11
  31/14 35/22 37/3 43/7 44/6 44/17
  45/4 45/7 45/8 45/16 45/18 46/6
  52/24 53/25 57/10 57/25 58/4 58/7
  59/3 59/8 59/13 59/13 59/13 59/13
  59/15 60/8 60/12 60/13 60/21 61/1
  61/5 64/6 65/8 65/21 66/17 72/7
  73/12 75/11 76/2 76/13 78/13
  79/19 84/2 84/3 84/15 89/9 89/12
  89/16 92/24 93/4 99/8 99/9 100/16
  103/6 103/17 103/21 104/1 104/7
  104/14 107/2 110/8 111/4 118/18

## O

one... [5]  118/20 118/23 119/21 120/16 121/2
one-way [1]  19/17
ones [6]  33/9 35/11 44/13 60/10 97/16 100/9
onion [3]  28/5 107/8 112/10
online [2]  39/13 85/2
only [14]  22/9 24/20 25/2 32/6 33/9 34/11 57/6 81/25 94/21 94/21 98/21 99/6 106/21 118/10
open [10]  35/16 35/18 35/18 41/10 41/11 59/5 59/6 73/5 74/22 91/13
opened [6]  41/13 47/17 50/18 61/7 72/10 73/4
opening [3]  19/16 78/18 113/5
Opera [1]  24/4
operate [3]  54/2 99/17 111/13
operated [2]  70/22 71/2
operating [21]  23/23 31/19 32/22 35/16 36/2 42/20 43/12 44/24 46/23 47/19 54/10 64/10 70/2 70/7 70/9 98/17 106/13 109/22 110/18 112/7 112/9
operation [4]  38/5 40/2 41/19 119/11
operational [1]  53/22
opine [2]  70/3 93/17
opinion [33]  8/6 9/5 9/6 11/18 11/22 12/25 13/17 13/23 13/24 14/8 14/8 14/12 14/17 15/4 15/5 18/15 18/22 32/17 34/18 42/3 44/5 45/13 47/12 47/15 48/21 61/19 62/9 62/12 62/12 89/16 95/7 95/19 96/2
opinions [3]  21/1 42/15 49/24
opportunity [1]  83/18
Orange [1]  67/6
order [13]  20/25 29/18 29/19 29/21 29/23 29/25 30/2 37/1 41/10 41/11 61/9 85/3 85/21
ordinary [1]  103/1
organization [2]  79/23 97/18
original [7]  10/20 35/17 35/17 60/25 78/7 78/18 79/11
other [19]  10/13 11/21 18/20 19/7 21/5 22/15 25/14 25/16 59/18 69/24 75/8 75/14 79/10 82/17 84/3 101/16 118/18 119/8 120/23
others [3]  34/23 62/9 100/6
otherwise [3]  43/3 56/23 62/10
our [8]  6/15 15/1 17/17 28/21 49/6 61/4 69/12 118/16
out [20]  7/7 10/18 11/16 15/23 22/9 25/21 27/15 29/4 31/19 46/16 50/17 56/9 69/19 92/18 99/19 102/15 102/17 115/10 118/6 120/17
outside [3]  52/8 94/1 95/4
over [20]  10/21 21/4 21/22 26/13 31/20 32/5 32/7 37/3 39/22 51/11 56/22 57/25 59/15 60/5 79/6 79/17 84/2 92/19 109/8 114/2
overdue [3]  68/11 68/16 68/25
overlap [2]  27/24 27/25
Overruled [8]  90/6 94/2 94/20 95/5 95/25 108/7 109/4 112/19
overwritten [1]  31/24
own [6]  24/8 26/20 48/22 60/12 87/5 97/25
owned [1]  85/16

## P

p.m [2]  118/6 122/5
packet [5]  23/18 91/1 91/2 91/3 91/18
packets [3]  23/18 91/8 91/11
page [3]  1/23 87/19 91/7
paid [3]  22/18 22/19 111/6
part [18]  15/15 23/13 24/3 24/13 30/9 32/6 37/6 54/2 54/21 62/16 62/16 74/11 97/18 97/22 103/8

104/3 116/20 117/6
participate [1]  29/8
particular [7]  21/22 22/21 24/10 56/14 105/18 110/5 110/11
parts [2]  91/8 96/23
pass [1]  91/20
passed [1]  78/16
passing [1]  23/17
password [6]  25/4 28/20 28/23 81/2 81/3 81/9
past [3]  23/12 24/17 50/16
path [3]  41/1 65/24 66/10
pay [5]  26/20 60/13 87/15 111/1 111/4
paying [3]  79/2 87/13 87/22
payment [6]  67/22 68/12 68/23 69/1 69/8 112/2
payments [1]  94/7
PC [2]  35/8 37/25
PEARLMAN [2]  1/18 4/8
PELKER [15]  1/13 3/4 4/6 8/14 12/4 15/13 18/8 18/9 20/9 46/12 50/5 73/18 114/20 115/5 117/10
Pen [1]  109/12
pending [2]  62/6 90/17
Pennsylvania [1]  1/14
people [28]  22/3 23/17 24/7 26/17 26/22 27/5 28/19 35/19 38/1 40/13 53/22 55/21 55/25 56/2 56/6 56/16 56/18 57/6 58/10 60/1 78/11 94/11 102/23 103/1 104/7 104/11 113/21 121/5
people's [3]  55/3 55/17 92/21
percent [1]  109/8
perhaps [2]  14/10 20/3
period [1]  99/12
permission [1]  119/5
permitted [2]  4/20 4/23
person [7]  27/13 74/12 75/8 75/15 104/14 104/19 107/2
person's [2]  54/25 83/14
personal [10]  33/12 34/4 34/17 34/22 55/8 56/12 61/16 61/20 61/20 62/11
personally [2]  44/23 56/8
pertain [1]  101/7
phone [31]  23/22 28/10 35/9 35/10 54/23 54/24 57/13 57/14 57/24 58/2 60/14 60/21 61/5 69/11 75/8 78/12 80/1 80/2 80/4 80/5 80/6 80/6 85/11 86/2 86/3 87/17 95/11 95/12 101/18 113/20 113/22
phones [4]  30/13 37/12 57/9 57/10
phrase [1]  39/18
physical [2]  32/18 58/13
physically [2]  12/13 112/10
pick [3]  42/1 69/11 115/12
picturing [1]  75/10
piece [1]  16/22
pieces [1]  69/25
ping [1]  40/14
Pis [2]  59/19 101/13
place [4]  17/18 28/14 65/21 79/7
places [2]  22/20 79/7
Plaintiff [2]  1/4 1/13
plane [1]  121/11
platform [1]  93/15
platforms [1]  95/2
play [2]  109/12 117/24
please [7]  4/4 36/8 37/8 62/23 69/17 75/22 75/23
plenty [1]  97/12
PLLC [1]  2/3
plug [1]  60/14
pocket [1]  59/19
podcasters [1]  58/10
podium [1]  4/4
point [33]  4/15 4/21 4/24 5/21 6/23 7/7 7/13 8/8 13/6 23/19 25/17 28/23 34/5 39/24 39/24 43/7 47/2 47/9 60/2 60/16 62/6 62/8 70/14 71/9 71/13 72/14 75/5 81/13

82/23 84/4 87/2 115/11 116/14
pointed [2]  79/6 83/24
pointing [8]  71/16 79/3 83/20 84/5 84/14 84/14 84/20 87/2
points [4]  26/11 26/16 66/23 104/1
police [2]  29/25 34/6
popular [1]  58/9
pornography [3]  30/7 32/11 97/3
port [7]  41/5 41/6 41/10 41/11 41/13 41/15 60/14
portion [1]  18/7
ports [3]  41/8 41/8 41/9
position [1]  43/16
possessing [1]  108/14
possession [1]  107/13
possibility [2]  41/21 98/14
possible [5]  14/12 26/17 26/22 97/21 99/16
possibly [3]  13/14 39/14 54/24
potential [1]  18/1
potentially [2]  50/13 117/12
practically [1]  35/9
practice [3]  22/21 29/5 55/9
practices [5]  8/7 9/20 34/17 34/22 34/23
prebut [1]  44/8
prefer [3]  22/22 84/1 90/8
prepaid [2]  57/2 57/9
presence [2]  26/3 29/2
present [4]  4/11 9/9 61/7 64/17
preserved [1]  83/23
pretty [3]  28/21 62/15 78/9
previously [4]  4/21 20/17 87/21 100/16
Price [1]  89/8
Price's [1]  54/16
prices [2]  85/8 111/25
primarily [2]  28/12 97/6
prior [8]  4/20 7/4 84/6 86/17 88/4 94/10 115/20 115/25
privacy [2]  81/7 81/8
private [6]  78/6 78/9 78/10 79/25 88/17 116/11
privilege [1]  113/17
privileged [1]  24/20
probably [15]  26/2 30/5 30/11 30/13 41/14 49/2 52/11 52/23 58/24 59/3 61/5 79/12 92/20 107/25 111/5
problem [9]  11/12 12/5 15/13 29/21 45/21 70/18 70/22 79/14 116/25
procedure [1]  64/10
procedures [2]  5/1 5/8
proceed [3]  51/6 51/7 73/25
proceedings [3]  1/7 72/12 123/5
process [8]  47/3 49/21 80/14 85/9 85/11 85/12 85/17 102/2
produced [1]  10/10
professional [7]  44/23 54/20 56/11 56/18 61/14 62/11 62/15
Professor [2]  73/16 73/21
program [1]  94/8
project [1]  35/24
promise [1]  52/1
promised [1]  40/17
proof [1]  70/12
proper [2]  5/8 14/9
properly [3]  95/16 105/20 119/10
proposal [1]  50/23
proposed [2]  5/2 17/2
prosecution [1]  114/5
prosecutions [1]  93/23
protect [2]  24/19 26/10
protection [1]  106/12
protocol [2]  57/20 57/22
prove [1]  29/25
provide [4]  61/19 76/19 76/22 104/20
provided [9]  5/3 6/8 6/13 8/22 12/6 16/18 43/21 81/24 115/19

**P**

**provider [8]** 29/22 52/21 57/6 59/7 61/6 87/21 105/4 110/14
**provides [2]** 27/16 76/18
**providing [2]** 92/12 92/23
**proxies [5]** 25/19 102/24 103/6 103/11 103/14
**proxy [11]** 25/8 25/10 25/15 25/15 25/20 25/23 26/9 26/16 27/4 27/5 104/7
**pseudo [1]** 41/3
**public [9]** 23/6 76/22 76/25 77/3 77/4 80/1 82/19 82/21 93/6
**published [3]** 38/19 77/19 83/4
**pull [9]** 10/18 44/17 47/7 50/15 91/24 99/20 100/17 102/14 112/4
**punished [1]** 119/13
**purchase [2]** 57/8 67/17
**purchased [2]** 31/1 62/4
**purely [1]** 119/9
**purport [1]** 108/16
**purported [2]** 108/18 108/19
**purpose [6]** 22/13 24/16 26/9 29/14 47/2 94/12
**purposes [4]** 29/15 35/21 55/17 103/17
**purview [2]** 97/22 97/23
**put [29]** 11/6 16/8 16/9 16/15 32/9 37/8 38/16 40/6 42/16 42/18 44/7 48/24 50/2 51/10 57/15 60/11 63/13 64/22 65/20 68/14 68/19 73/17 75/20 80/3 93/5 98/8 114/6 117/12 117/14
**putting [3]** 37/23 47/23 60/15
**Putty [6]** 99/25 100/3 100/11 100/12 100/12 100/13
**puzzled [1]** 18/14

**Q**

**qualifications [2]** 43/18 49/16
**qualified [4]** 18/23 42/21 42/22 43/16
**question [50]** 7/11 11/22 13/21 13/21 13/22 14/7 17/11 18/25 19/23 30/18 33/14 33/15 33/16 36/6 38/20 42/23 43/18 48/15 48/16 51/5 55/6 56/13 59/24 60/12 62/5 62/8 70/4 70/18 71/1 71/15 72/22 90/15 90/16 96/6 96/6 96/9 98/7 98/8 98/18 99/1 101/7 102/13 102/25 104/18 106/15 109/5 111/20 117/19 118/10 121/16
**questioned [1]** 120/8
**questioning [3]** 8/9 46/8 50/12
**questions [17]** 35/1 36/8 36/9 71/10 72/5 96/17 96/22 100/25 101/1 101/2 102/1 102/2 102/3 102/6 109/17 113/10 114/9
**quick [5]** 26/6 39/14 39/17 72/11 73/12
**quickly [2]** 33/17 118/25
**quite [9]** 35/25 46/8 70/25 85/14 92/24 93/22 94/13 94/18 112/20
**quote [2]** 5/19 7/10

**R**

**radio [2]** 23/13 59/9
**raise [7]** 4/14 10/4 15/19 49/19 50/25 102/5 118/25
**raised [2]** 12/4 85/8
**ran [3]** 10/8 65/20 99/19
**RANDOLPH [1]** 1/9
**randomizes [1]** 106/2
**Raspberry [2]** 59/19 101/13
**rather [4]** 18/23 22/25 59/24 61/19
**re [1]** 75/17
**re-registered [1]** 75/17
**reach [5]** 41/2 41/10 41/11 52/3 53/2
**reached [1]** 74/13

**reaching [4]** 24/20 38/2 105/2 105/3
**read [4]** 6/17 17/16 39/14 81/15
**readable [1]** 98/23
**reader [3]** 65/8 65/9 65/11
**reading [1]** 24/25
**ready [4]** 20/12 20/19 20/23 73/11
**real [3]** 63/10 70/19 118/25
**reality [1]** 28/20
**really [14]** 13/11 14/15 26/9 26/9 28/13 32/17 48/4 60/3 73/12 75/14 76/15 89/23 119/7 121/6
**reason [7]** 28/13 43/6 50/24 61/4 65/21 65/25 98/13
**reasonably [1]** 48/20
**reasons [2]** 25/19 26/1
**reassemble [1]** 91/10
**rebuttal [16]** 42/8 42/16 42/24 43/9 45/6 47/21 47/23 48/3 48/11 48/23 50/21 116/2 117/2 117/3 117/13 117/15
**recall [12]** 45/25 53/10 60/18 65/3 73/16 74/14 92/1 97/21 110/3 114/21 115/2 115/5
**recalling [1]** 17/21
**receipt [3]** 67/17 67/23 68/20
**received [1]** 79/4
**recently [1]** 22/18
**Recess [2]** 72/20 122/5
**reciprocal [1]** 43/8
**recognize [5]** 51/14 62/24 64/23 76/1 115/21
**recollection [4]** 18/13 46/1 46/4 65/5
**recommend [1]** 88/18
**record [20]** 4/5 73/17 73/19 75/2 76/12 76/15 78/6 79/11 82/15 83/22 84/7 86/23 90/24 92/13 92/15 93/20 105/8 115/1 116/19 123/5
**recorded [2]** 79/13 86/22
**records [15]** 74/4 74/7 75/6 75/9 77/6 79/24 82/11 82/20 86/20 90/22 92/4 92/21 114/25 115/8 117/20
**recover [1]** 32/9
**recovered [1]** 32/19
**redirect [7]** 3/5 18/9 46/19 84/22 114/10 114/18 117/5
**refer [5]** 6/3 22/3 25/17 57/24 101/9
**reference [5]** 6/9 46/21 72/7 86/12 86/14
**referenced [2]** 5/17 91/17
**references [3]** 6/20 70/20 71/5
**referred [1]** 83/10
**referring [2]** 27/23 100/12
**refresh [1]** 46/1
**regard [2]** 12/9 15/17
**regarding [14]** 4/21 4/23 10/3 10/15 49/24 63/20 91/25 94/14 97/16 104/5 104/5 110/2 110/6 113/10
**regime [4]** 93/23 94/3 95/20 96/11
**registered [8]** 22/17 66/13 75/17 78/14 78/21 78/25 81/10 87/18
**registering [2]** 93/4 110/23
**registrant [4]** 74/10 75/7 75/10 79/23
**registrar [17]** 78/4 81/7 92/3 92/6 92/7 92/14 92/25 93/6 94/24 98/1 98/2 115/5 115/9 115/18 115/20 116/18 117/20
**registrar's [1]** 92/20
**registrars [13]** 79/9 92/24 93/14 95/22 96/12 96/19 97/5 97/24 98/11 111/7 111/9 112/3 114/21
**registration [17]** 66/18 66/19 68/6 69/2 69/4 77/6 78/2 78/7 83/9 83/20 85/5 92/11 97/3 111/17 111/21 111/23 115/22
**regularly [1]** 99/13

**rehearsed [1]** 48/13
**reject [2]** 15/3 27/24
**related [14]** 6/8 6/13 9/20 10/16 38/6 38/8 42/9 62/2 80/16 91/18 93/7 99/24 100/14 109/9
**relates [1]** 5/2
**relating [4]** 38/5 53/21 102/1 118/4
**relation [10]** 8/6 9/15 45/11 88/12 90/22 119/1 119/3 119/25 120/1 120/7
**relatively [1]** 27/12
**released [1]** 33/8
**relevance [5]** 19/22 34/17 94/1 109/14 112/18
**relevant [6]** 5/6 34/23 50/15 55/9 90/4 119/11
**reliable [1]** 82/15
**rely [4]** 22/25 76/22 76/25 77/4
**relying [1]** 71/17
**remember [2]** 18/8 87/3
**remembering [1]** 18/7
**remind [7]** 35/15 36/7 36/7 36/16 36/23 74/16 109/17
**remote [6]** 43/24 46/14 100/7 100/15 101/7 101/10
**remotely [2]** 100/18 100/19
**removable [1]** 59/4
**remove [3]** 32/14 92/22 115/3
**removed [4]** 34/11 86/23 86/25 87/10
**removing [1]** 82/1
**renewal [3]** 67/1 67/5 68/1
**renewed [1]** 75/1
**repeat [1]** 76/24
**rephrase [2]** 96/5 106/14
**report [4]** 6/7 6/12 10/24 14/2
**reported [1]** 30/22
**reporter [5]** 2/6 2/7 57/21 123/3 123/13
**reports [3]** 30/21 89/3 89/5
**representation [3]** 14/20 17/12 77/9
**representations [2]** 9/12 9/23
**represented [7]** 12/21 14/1 19/9 63/23 65/19 95/17 102/21
**representing [1]** 9/17
**reputation [1]** 97/4
**reputational [1]** 96/13
**reputationally [1]** 96/20
**request [2]** 61/18 121/5
**requested [1]** 101/23
**requests [2]** 93/7 93/10
**require [1]** 56/23
**required [2]** 24/19 43/1
**requirements [1]** 92/25
**requires [3]** 32/6 45/14 66/21
**reread [1]** 65/6
**reregistered [2]** 66/16 66/17
**reregistration [1]** 75/19
**reroute [1]** 105/16
**research [4]** 21/9 21/11 69/18 118/4
**researched [1]** 78/8
**reserves [1]** 117/12
**resolve [3]** 72/3 102/2 116/4
**respect [9]** 5/21 6/23 15/19 44/12 55/16 55/20 64/18 102/4 117/16
**respond [4]** 48/23 93/1 93/9 117/1
**responding [3]** 43/2 43/5 101/2
**response [4]** 47/22 48/7 48/12 101/1
**responsive [1]** 33/15
**rest [7]** 25/5 41/3 41/3 58/8 59/17 79/17 86/15
**restate [1]** 98/18
**restated [1]** 101/4
**result [1]** 94/10
**results [1]** 77/10
**retained [1]** 107/13
**retrieve [1]** 121/2
**reveal [1]** 53/17

**R**

**review [33]** 5/9 9/21 10/2 10/15 11/10 13/19 14/2 16/23 17/20 17/21 19/11 19/13 46/16 49/23 53/17 54/8 59/4 60/18 64/11 67/20 69/6 80/13 81/12 81/16 86/6 86/11 88/11 89/11 90/19 90/22 91/16 115/8 117/19
**reviewed [21]** 5/22 6/24 9/25 11/8 12/22 17/14 20/25 21/2 21/3 30/20 44/15 58/4 69/25 88/14 89/3 98/22 99/2 101/11 102/8 102/20 110/7
**reviewing [3]** 24/23 42/8 47/16
**revisit [2]** 50/25 73/2
**right [39]** 7/19 16/13 20/15 28/10 36/12 38/21 46/12 47/4 48/25 50/1 51/3 51/20 57/11 58/14 58/15 60/21 62/18 66/17 69/4 71/21 72/19 72/21 79/3 79/22 80/18 80/19 80/22 87/18 101/24 106/17 107/25 114/10 115/14 117/10 117/12 117/14 117/16 118/7 122/4
**road [3]** 29/10 49/1 107/22
**robust [1]** 28/14
**role [3]** 92/3 92/20 117/24
**ROMAN [3]** 1/6 4/3 4/11
**room [6]** 2/8 4/17 28/22 57/13 58/1 116/6
**root [1]** 17/24
**router [4]** 28/5 40/13 40/19 57/17
**routers [1]** 107/8
**routing [2]** 105/19 105/22
**RPR [1]** 123/12
**ruled [2]** 4/22 5/10
**ruling [2]** 5/14 64/18
**run [6]** 36/3 36/4 41/22 51/19 106/10 106/19
**running [8]** 45/14 45/23 99/14 106/5 106/6 106/7 106/8 106/9
**runs [1]** 35/7

**S**

**S23 [1]** 57/10
**safe [5]** 29/6 33/9 41/9 59/15 61/4
**said [26]** 6/17 6/22 7/6 8/16 9/19 11/7 11/8 12/21 13/12 15/3 15/3 15/5 15/10 17/21 19/7 46/2 46/17 48/8 50/5 50/6 65/4 65/14 116/16 116/21 117/6 117/7
**same [52]** 6/21 22/1 22/13 22/22 22/25 23/1 23/2 24/15 25/4 26/18 26/23 26/23 26/24 27/3 27/4 27/6 27/6 27/11 27/12 27/13 35/22 48/10 49/4 52/22 52/24 58/4 59/9 63/11 66/18 68/18 68/23 71/13 75/13 77/3 78/20 79/7 90/12 91/9 93/20 104/15 104/15 104/16 104/21 104/24 105/1 105/5 105/7 105/7 105/11 105/25 106/1 111/13
**Samsung [1]** 57/10
**sanctioned [1]** 94/7
**sanctions [6]** 93/23 94/4 95/20 96/11 97/9 97/15
**sandbag [1]** 10/7
**sat [2]** 23/14 70/24
**saw [9]** 15/6 22/11 27/11 28/25 64/13 70/11 70/24 80/16 90/24
**say [22]** 12/7 13/11 14/25 19/18 36/18 43/11 48/11 50/20 59/24 71/5 71/19 77/2 78/16 85/7 88/15 92/16 97/10 117/15 118/2 119/2 120/10 121/3
**saying [23]** 6/21 7/15 10/22 15/4 17/4 17/5 18/21 19/12 19/12 44/8 44/11 45/13 45/25 47/18 47/24 47/25 49/20 50/7 50/9 84/12 84/13 89/8 92/17
**says [10]** 6/11 10/1 11/9 41/5 44/22 78/4 78/25 79/5 79/23 87/9
**scale [1]** 26/19

**Scholl's [2]** 53/11 120/3
**scope [4]** 4/16 41/24 94/1 95/4
**screen [4]** 65/7 65/19 65/21 66/5
**script [4]** 51/18 52/10 53/1 72/23
**scripts [1]** 49/24
**scroll [11]** 37/21 38/7 39/1 51/11 62/22 63/10 63/15 75/23 80/17 84/8 100/1
**scrolling [3]** 39/8 76/1 102/14
**scrutiny [2]** 93/22 94/14
**search [7]** 22/16 30/21 77/9 77/11 119/22 120/10 120/13
**searched [1]** 30/25
**searches [1]** 30/9
**searching [1]** 22/6
**Seattle [1]** 26/14
**second [10]** 11/11 12/2 13/5 38/18 39/7 44/21 45/4 45/7 84/15 115/12
**secondwave.com [1]** 52/22
**section [1]** 72/6
**secure [4]** 36/24 37/7 37/14 41/12
**securely [1]** 37/1
**security [7]** 28/18 28/19 28/21 28/22 88/18 88/23 88/24
**see [78]** 5/18 12/13 12/15 13/2 19/22 21/18 21/21 22/8 22/8 22/17 22/24 23/3 23/15 23/16 23/16 24/22 24/24 25/18 26/21 32/13 37/18 37/24 38/4 38/8 39/6 39/12 40/1 40/20 40/22 41/18 51/13 51/20 53/3 54/15 54/18 58/24 59/4 60/15 63/7 68/12 68/15 68/17 69/7 69/18 70/13 70/20 70/21 71/6 71/8 73/8 74/21 77/23 77/24 78/3 78/14 79/20 80/13 81/18 82/5 83/14 83/20 83/25 86/7 87/23 88/22 91/4 91/14 91/15 91/16 98/13 98/13 100/9 101/14 105/5 114/15 117/18 118/4 119/7
**seek [2]** 12/8 117/12
**seeking [2]** 9/13 13/23
**seem [1]** 45/17
**seemless [1]** 91/11
**seems [3]** 13/14 18/23 91/11
**seen [27]** 21/7 21/8 22/12 29/11 32/19 43/21 60/8 62/25 67/21 76/17 76/21 82/17 82/21 86/10 94/11 94/22 95/23 96/3 96/13 96/20 98/24 103/14 103/16 104/3 107/2 109/6 112/4
**seized [14]** 7/16 8/1 8/11 8/16 8/24 11/3 17/6 17/8 54/13 60/18 63/1 63/17 81/13 121/15
**selection [1]** 113/5
**sell [4]** 61/10 85/17 87/6 95/14
**selling [2]** 26/13 60/2
**send [3]** 80/2 86/3 91/4
**sending [2]** 24/25 39/23
**sense [1]** 35/23
**sensitive [2]** 20/5 24/18
**sent [6]** 39/9 39/11 39/21 68/11 91/4 91/8
**sentence [3]** 106/24 117/8 117/21
**separate [2]** 5/5 16/22
**September [9]** 5/16 5/16 5/20 6/20 6/21 6/22 7/10 83/21 84/6
**September 2nd [2]** 83/21 84/6
**September 7th [3]** 5/16 6/20 7/10
**September 8 [1]** 5/20
**September 8th [3]** 5/16 6/21 6/22
**sequestered [1]** 116/5
**sequestration [1]** 116/8
**serious [1]** 96/12
**server [52]** 25/11 25/15 25/15 27/5 40/5 41/22 42/5 43/24 44/3 44/9 45/10 45/15 46/15 47/1 47/1 49/10 72/7 72/23 78/7 79/8 84/12 84/17 86/16 87/13 87/14 87/22 88/13 88/14 88/15 88/16 89/1 89/13 90/20 98/16 98/19 98/22 98/25 99/5 99/8 99/14 99/17 102/9 104/6 104/7 104/9 104/11 105/24

**servers [24]** 25/8 25/23 27/4 35/6 42/10 42/21 79/16 79/16 82/2 83/25 84/10 84/14 84/17 85/4 86/13 86/18 86/19 86/23 86/24 87/10 89/6 99/18 104/12 115/3
**serves [1]** 81/25
**service [42]** 24/7 26/18 26/23 27/15 29/22 51/23 51/25 52/20 52/21 53/1 57/3 57/14 59/6 75/4 78/4 80/16 83/24 84/18 84/22 84/24 88/6 92/12 92/13 92/22 92/23 94/25 98/16 98/17 98/19 98/20 99/15 104/9 104/12 106/5 106/7 106/8 106/13 106/19 107/15 109/9 110/14 112/7
**services [16]** 56/23 57/1 94/14 103/3 103/4 103/17 106/23 106/25 107/1 107/8 107/19 108/2 108/15 108/20 109/12 111/14
**set [12]** 26/15 37/23 39/13 89/19 101/11 104/1 104/12 106/22 106/25 110/15 110/16 110/22
**setting [6]** 38/1 39/12 41/4 100/4 100/5 110/5
**settings [5]** 99/25 100/4 100/4 100/7 105/13
**setup [1]** 104/8
**several [5]** 85/18 100/6 101/21 111/8 113/3
**sexual [10]** 30/6 107/14 107/20 107/24 108/2 108/14 108/16 108/21 109/10 109/23
**share [2]** 90/11 104/7
**sharing [6]** 24/11 24/11 26/23 27/5 104/11 108/17
**she [49]** 8/12 9/12 9/24 9/25 10/25 11/7 11/7 11/7 11/8 11/10 12/21 12/21 14/2 15/3 15/3 15/5 17/19 17/19 17/20 17/21 17/21 18/10 18/12 18/12 19/7 19/10 19/10 27/22 43/23 46/4 46/5 46/20 47/5 50/6 61/1 63/23 64/3 64/9 65/3 65/4 65/14 89/5 89/7 109/3 116/2 116/3 116/5 116/5 116/7
**shell [2]** 37/7 37/14
**SHERRY [3]** 2/6 123/3 123/12
**shield [1]** 26/10
**shifting [1]** 13/7
**Shormint [2]** 68/12 68/17
**short [3]** 36/19 52/2 70/16
**shortly [1]** 69/18
**shot [1]** 114/15
**should [31]** 4/23 5/5 15/3 19/24 20/3 24/20 34/10 37/10 51/4 52/23 58/15 59/23 60/12 62/12 62/12 67/10 72/4 82/1 84/5 88/20 88/22 95/10 95/11 101/1 105/5 105/21 115/19 115/24 117/23 117/24 119/20
**shouldn't [1]** 11/19
**show [11]** 7/16 42/12 42/13 50/3 58/22 65/22 65/25 73/4 77/6 104/25 105/23
**showed [5]** 19/20 23/15 86/1 100/7 100/16
**showing [2]** 82/3 108/19
**shown [1]** 100/14
**shows [2]** 67/19 68/25
**shut [2]** 29/23 120/2
**side [1]** 58/23
**sides [2]** 43/8 49/4
**signal [1]** 58/12
**signed [1]** 92/25
**significant [3]** 44/5 55/2 75/14
**significantly [2]** 29/18 44/14
**Silk [2]** 29/10 107/22
**SIM [23]** 54/18 54/20 55/1 55/2 55/3 55/3 55/3 55/5 55/12 55/17 55/21 55/25 56/3 56/6 56/9 56/16 56/18 56/21 56/25 57/2 59/4 64/3 64/4

## S

**similar [5]** 22/23 25/12 39/9 109/8 112/3
**simplest [1]** 25/14
**simplicity [1]** 23/1
**simply [8]** 7/15 8/20 10/20 11/19 12/14 16/17 50/6 92/22
**SIMS [6]** 55/4 57/7 57/7 57/7 57/11 60/15
**simultaneously [1]** 58/7
**since [4]** 21/6 22/21 98/14 116/14
**single [2]** 23/5 30/5
**sit [1]** 23/15
**site [9]** 34/11 44/24 68/2 78/3 84/10 106/13 109/20 109/22 112/7
**sites [9]** 30/9 33/4 33/16 106/5 106/12 106/16 106/19 107/19 108/2
**sitting [6]** 24/21 85/10 93/10 113/2 116/9 116/10
**six [3]** 57/10 79/16 79/16
**sizes [2]** 111/14 111/24
**skills [1]** 13/9
**slider [1]** 22/8
**slightly [1]** 37/21
**slips [1]** 87/3
**slow [6]** 24/1 26/9 40/15 58/7 59/16 60/4
**slower [1]** 111/25
**slowly [2]** 39/1 62/22
**smaller [1]** 112/1
**smartest [1]** 59/1
**sniffed [1]** 91/12
**sniffer [1]** 23/18
**sniffers [1]** 91/3
**sniffing [1]** 91/13
**so [191]**
**so am [1]** 84/8
**Social [2]** 28/21 28/22
**socket [1]** 36/24
**software [8]** 42/18 42/19 42/20 45/8 65/20 89/25 90/10 90/12
**sold [1]** 22/9
**solicited [1]** 78/11
**solutions [1]** 120/23
**some [32]** 5/4 7/5 9/5 10/5 11/2 12/5 15/22 18/17 18/22 25/16 27/22 34/5 36/1 43/5 49/9 50/18 50/24 56/2 57/19 59/4 74/9 75/8 78/23 86/21 88/22 93/2 101/4 103/10 113/8 119/11 119/14 121/23
**somebody [17]** 37/23 39/13 58/25 60/6 76/15 79/1 79/2 79/12 79/13 82/1 85/3 87/10 87/24 88/4 89/20 108/11 121/10
**somehow [1]** 42/20
**someone [12]** 19/24 24/22 25/17 34/6 46/23 46/25 49/14 50/2 50/14 55/12 113/22 114/25
**someone's [2]** 38/9 103/7
**something [34]** 5/25 7/2 7/17 14/24 18/3 22/24 23/24 26/14 31/16 31/17 31/18 31/24 32/7 32/17 39/13 39/15 39/17 39/23 40/20 42/5 43/14 45/14 48/7 62/8 62/13 70/3 72/13 85/8 93/16 104/23 112/6 113/18 115/18 115/23
**sometime [3]** 84/6 84/15 86/17
**sometimes [2]** 99/11 103/22
**somewhat [1]** 70/4
**somewhere [4]** 74/10 79/25 84/18 86/17
**sorry [25]** 11/11 14/5 15/7 21/16 24/1 34/16 36/6 36/19 40/17 44/12 52/12 61/24 62/5 67/2 78/16 81/5 83/17 90/2 98/18 100/23 102/17 106/1 106/6 115/4 119/2
**sort [26]** 4/18 4/25 5/4 7/13 9/5 11/2 15/22 16/25 17/25 18/12 18/20 22/10 27/15 28/17 36/4 39/16 48/9 49/18 59/24 69/25 70/19 79/18 98/23 105/19 107/8

110/10
**sound [2]** 12/25 36/10
**sounds [5]** 10/15 74/17 80/22 93/16 97/23
**source [6]** 35/16 35/18 35/18 65/25 77/1 82/15
**space [2]** 31/21 32/5
**span [1]** 32/3
**speak [3]** 20/7 69/20 82/21
**speaking [2]** 23/2 100/9
**specialist [1]** 34/19
**specific [8]** 22/16 69/25 71/9 71/10 81/25 100/9 101/9 104/8
**specifically [16]** 21/17 22/19 24/3 30/21 40/21 58/9 68/24 76/16 82/11 85/1 90/10 91/17 97/18 97/21 103/19 113/15
**speculation [2]** 55/14 95/3
**speed [3]** 39/12 59/11 59/12
**speeds [2]** 111/15 111/24
**spending [2]** 46/9 60/16
**spinning [2]** 51/14 75/25
**spoke [1]** 20/9
**spoken [1]** 4/17
**sprinklers [1]** 52/4
**Sprint [1]** 59/14
**squarely [1]** 9/21
**SSH [9]** 36/21 36/23 37/6 37/10 39/5 39/11 39/18 39/21 51/17
**stand [11]** 9/25 17/20 20/16 28/4 37/13 47/13 61/18 94/11 116/9 118/12 122/2
**standard [3]** 64/10 89/24 90/3
**standards [4]** 14/9 14/11 14/11 90/9
**stands [1]** 78/5
**Starbucks [2]** 23/15 24/22
**start [1]** 32/5
**started [5]** 20/11 22/9 26/8 29/6 114/13
**starting [2]** 4/5 74/22
**state [1]** 4/4
**stated [1]** 14/1
**statement [1]** 27/21
**statements [2]** 88/21 88/21
**STATES [10]** 1/1 1/3 1/10 4/2 4/7 56/22 57/4 120/25 120/25 121/9
**static [6]** 52/14 52/16 52/17 53/7 53/9 110/2
**station [1]** 23/13
**status [3]** 79/12 92/1 110/8
**stay [1]** 39/13
**stays [1]** 74/25
**stealing [1]** 85/13
**steps [2]** 93/14 104/16
**STERLINGOV [40]** 1/6 4/3 4/11 8/1 11/3 12/22 17/9 17/14 30/25 43/12 46/11 50/13 54/10 54/14 55/12 57/18 60/19 63/2 63/17 66/2 66/8 66/9 67/22 69/8 70/1 70/6 70/9 71/2 80/21 81/12 86/8 88/8 99/7 99/9 118/12 119/4 119/18 120/3 121/8 121/25
**Sterlingov's [20]** 10/22 17/6 30/16 32/22 53/12 54/8 58/5 65/4 65/10 67/20 67/24 69/6 81/13 81/16 86/6 86/11 88/12 110/7 119/21 120/17
**stick [1]** 61/8
**sticks [1]** 59/2
**still [23]** 7/11 11/14 11/17 13/4 14/7 14/15 16/25 18/14 18/19 22/17 30/14 31/15 31/23 57/15 60/8 66/10 79/2 80/4 85/2 87/7 87/14 88/3 111/16
**stipulated [1]** 120/2
**stipulating [1]** 9/16
**stood [1]** 58/25
**stop [3]** 79/21 87/13 92/12
**stops [1]** 87/18
**storage [2]** 10/18 32/15
**stored [3]** 31/11 31/12 74/10

**strange [1]** 19/16
**strategic [1]** 112/24
**streaming [2]** 60/1 60/3
**street [3]** 1/16 2/3 19/18
**streets [2]** 32/4 113/21
**strict [2]** 95/20 97/10
**strike [14]** 48/16 49/2 49/7 50/16 50/19 50/23 51/4 72/24 72/25 115/11 116/15 117/2 117/8 117/22
**strikes [1]** 7/17
**striking [2]** 117/4 117/6
**struck [1]** 72/8
**structure [1]** 70/4
**studied [1]** 56/15
**study [3]** 108/19 108/25 111/5
**stuff [1]** 78/15
**subject [1]** 73/16
**submission [2]** 5/23 6/25
**submit [1]** 13/1
**submitted [1]** 44/15
**subscribe [2]** 23/24 57/2
**substantial [1]** 49/13
**sudden [1]** 7/17
**sufficient [3]** 28/23 49/19 59/20
**suggest [1]** 115/17
**suggesting [2]** 11/16 12/4
**suggestion [2]** 7/5 119/13
**Suite [1]** 1/17
**summary [2]** 10/24 17/23
**supplemental [2]** 6/3 44/13
**support [1]** 52/20
**suppose [2]** 18/18 97/2
**supposed [3]** 6/4 10/7 56/8
**sure [43]** 6/2 11/14 13/5 15/4 19/22 20/1 22/1 28/22 29/7 34/16 34/23 38/12 38/21 40/11 43/25 49/4 53/1 55/8 59/5 72/3 72/5 74/8 79/9 79/11 85/13 85/19 88/17 90/3 95/16 97/2 100/10 101/2 104/18 105/3 106/14 110/22 111/11 112/4 112/6 112/20 118/20 118/23 121/6
**surprise [6]** 44/4 47/10 47/14 48/20 49/7 49/11
**surprised [3]** 43/20 47/11 49/20
**surveillance [4]** 39/15 90/20 90/23 90/24
**survive [1]** 26/21
**suspicious [2]** 18/17 30/10
**sustained [5]** 33/2 55/9 56/13 64/16 90/14
**swap [2]** 57/7 57/7
**swapping [2]** 55/3 56/9
**Sweden [4]** 102/9 102/11 120/18 121/2
**switch [11]** 24/6 53/18 53/21 57/7 57/12 57/12 57/14 98/16 98/19 99/4 99/7
**switches [2]** 98/15 99/9
**switching [2]** 56/23 56/25
**sworn [1]** 20/17
**system [10]** 7/23 16/8 16/9 18/4 23/23 26/4 31/19 35/16 36/2 84/20

## T

**T-Mobile [1]** 59/13
**table [6]** 2/11 4/7 4/12 69/21 113/2 116/10
**tablet [1]** 65/8
**tablets [1]** 35/12
**take [37]** 25/13 25/21 38/15 38/25 39/2 40/6 40/8 45/3 49/8 53/10 59/5 62/23 63/13 64/19 66/12 68/8 68/9 68/21 69/14 69/15 72/11 72/15 72/17 75/22 82/3 83/13 86/15 88/11 92/18 117/15 118/12 118/15 121/4 121/19 121/24 122/2 122/2
**taken [6]** 46/22 71/13 72/20 93/14 93/19 122/5
**taking [3]** 80/6 80/6 104/16
**talk [7]** 11/15 26/2 43/17 71/24

**T**

talk... [3] 120/21 121/17 121/21
talking [12] 12/12 25/12 39/10 45/1 45/8 45/9 45/12 62/3 83/8 111/16 111/16 111/22
talks [1] 42/14
tap [1] 61/9
TCP [1] 57/21
TD1.ignorelist.com [1] 53/3
technical [2] 75/11 79/12
technology [1] 13/9
telecommunication [1] 57/20
tell [15] 8/19 19/24 40/9 46/6 47/5 56/8 59/7 67/15 68/9 68/22 81/22 89/21 113/15 113/16 113/22
Telnet [5] 37/2 39/9 39/21 99/25 100/1
ten [1] 19/19
terabyte [8] 7/24 8/10 17/18 63/4 63/12 63/16 63/21 64/7
term [6] 74/18 76/5 76/8 87/3 91/1 91/13
terminal [7] 36/17 36/18 39/11 39/12 51/17 100/22 101/10
terms [5] 8/6 25/15 57/19 83/14 107/22
test [2] 27/1 27/2
tested [1] 26/25
testified [23] 9/1 9/10 9/13 9/15 9/24 11/7 14/24 42/21 43/23 45/22 46/5 46/14 66/13 74/7 91/25 98/15 99/21 99/24 110/2 110/6 110/15 114/4 119/16
testify [28] 4/23 5/21 6/6 6/11 6/23 7/12 11/6 19/4 23/4 31/4 44/22 46/25 47/5 56/11 61/14 63/4 64/25 69/24 70/5 71/3 107/2 107/23 112/22 114/3 115/25 116/2 119/5 120/24
testifying [5] 8/7 74/14 108/23 112/13 112/16
testimonies [1] 47/18
testimony [71] 4/16 5/2 5/23 6/1 6/25 7/3 7/9 7/22 7/23 8/4 8/8 8/12 9/14 9/22 10/2 10/14 11/21 12/14 12/15 12/16 12/17 12/18 13/7 14/3 14/14 17/2 17/21 18/21 19/13 25/7 27/8 28/16 33/13 42/9 42/19 42/24 43/24 44/8 46/10 47/2 47/10 49/10 50/15 53/11 54/16 61/16 62/1 62/7 63/20 63/25 65/3 65/6 65/14 66/25 70/1 71/16 72/18 88/25 89/8 89/10 90/19 103/2 103/5 108/1 115/17 115/25 116/6 117/13 120/3 120/5 121/20
than [17] 5/13 18/20 18/23 19/7 24/9 26/2 59/24 61/19 70/5 79/10 84/11 85/11 92/19 106/10 112/13 112/16 112/22
Thank [9] 20/20 36/12 37/16 38/23 39/1 51/1 72/19 74/2 122/4
thanks [1] 81/7
that [848]
theft [1] 30/12
their [26] 4/21 16/8 16/9 16/12 24/8 24/20 25/2 28/22 33/8 47/18 76/10 82/8 82/9 85/8 92/22 94/11 95/14 95/22 97/25 98/12 98/14 104/19 104/20 109/25 111/15 113/16
them [30] 11/2 16/15 24/13 25/25 27/2 35/8 40/23 42/8 42/9 44/14 46/9 49/24 54/17 57/15 58/6 58/6 58/8 59/17 60/2 71/12 75/12 76/7 88/18 91/14 92/5 101/4 101/16 106/21 107/17 113/15
themselves [2] 25/19 31/10
then [63] 5/20 6/17 6/22 8/21 8/23 14/24 14/25 16/14 17/20 18/9 18/10 32/5 33/18 40/9 40/22 40/24 41/1 44/14 45/5 46/18 48/10 48/21

49/1 53/4 55/2 56/4 58/2 58/3 59/10 59/14 59/18 68/7 68/25 75/1 75/3 78/21 79/4 79/15 79/17 82/9 85/25 86/18 86/21 86/22 87/20 87/24 88/11 90/7 99/12 100/25 101/15 103/5 105/4 105/21 115/19 117/7 117/21 118/15 118/18 120/20 121/24 122/1 122/2
theoretically [1] 92/17
there [139]
these [22] 38/12 40/12 42/8 42/10 42/17 43/11 43/11 43/23 46/8 46/14 49/13 49/23 59/1 59/2 59/8 59/10 86/16 91/11 101/7 101/9 101/9 115/19
they [125]
they're [1] 97/6
thin [1] 11/16
thing [22] 5/20 6/21 6/22 22/10 24/15 26/3 27/4 39/16 43/7 45/21 66/18 73/13 78/10 79/20 80/4 93/20 99/6 107/9 118/18 118/20 118/24 121/2
things [20] 13/2 13/7 18/1 29/12 30/10 31/20 32/19 38/2 52/5 58/10 61/2 61/13 62/9 64/4 78/12 93/5 97/5 104/20 120/16 120/20
think [117] 4/17 4/24 5/6 5/6 5/9 6/4 8/17 10/4 12/14 15/14 15/17 16/2 16/8 17/5 17/24 17/25 18/4 18/6 18/8 18/9 18/16 18/22 21/5 21/8 21/16 23/14 24/4 24/4 27/24 28/19 28/20 28/25 29/6 29/12 30/10 30/18 33/12 33/19 34/9 35/24 38/17 43/6 45/1 45/5 45/20 45/24 47/9 47/14 48/4 48/4 48/19 48/22 49/3 49/6 49/12 49/18 50/1 50/5 50/24 52/1 52/16 52/19 54/3 55/11 56/13 57/19 58/1 58/2 58/14 59/21 59/23 60/11 62/25 64/3 64/16 68/14 68/14 68/20 70/16 70/17 70/18 70/21 71/1 71/3 71/6 72/7 72/8 72/14 72/25 75/12 80/4 84/1 85/1 90/8 91/1 92/20 93/2 93/11 93/11 94/19 95/25 96/1 96/6 97/17 98/25 100/10 102/11 108/24 111/16 114/23 115/15 116/16 117/1 118/8 118/17 119/14 119/23
thinks [4] 9/19 12/20 13/25 48/25
this [275]
this Linux [1] 38/11
thorough [1] 119/22
those [44] 9/11 11/6 14/11 14/11 16/15 27/25 30/8 30/9 35/7 35/11 36/9 40/15 40/24 41/2 41/8 41/16 44/13 44/15 44/17 49/15 59/3 59/15 64/11 72/5 75/9 84/3 89/6 91/12 91/12 91/15 93/7 99/13 100/7 101/2 101/15 102/2 102/5 103/3 103/4 103/17 104/25 105/7 107/16 107/17
though [6] 14/4 26/5 29/24 30/2 52/10 76/10
thought [3] 32/19 89/9 111/22
thousands [4] 26/17 26/21 26/22 27/4
three [9] 7/8 7/16 34/25 74/23 75/9 75/9 75/12 79/9 119/6
through [27] 16/22 22/10 23/17 28/18 37/23 39/21 39/23 43/23 47/16 67/6 68/4 68/5 69/3 71/5 78/14 83/13 83/19 86/15 91/4 94/22 96/24 106/16 106/20 107/17 107/21 109/21 115/17
ticking [1] 34/5
tied [4] 94/7 95/1 107/14 108/20
Tiger [1] 37/24
time [45] 7/14 9/11 9/23 22/10 22/13 26/18 26/23 26/24 27/6 27/12 27/24 28/19 31/20 34/5 40/5 40/12 46/9 52/24 53/16 57/7 58/4 60/25 63/10 69/12 71/25 72/1 73/9

75/16 75/18 76/17 77/13 82/23 83/21 86/18 86/19 99/12 104/7 104/15 105/8 105/17 109/9 114/14 118/7 119/18 121/14
times [3] 19/19 59/11 76/12
tiny [1] 59/19
title [1] 66/4
today [16] 23/23 26/6 37/3 60/10 60/13 60/16 60/24 61/4 61/6 66/11 85/2 87/7 87/8 88/3 88/3 91/2
together [2] 32/9 57/16
told [2] 19/19 42/25
too [2] 32/1 116/13
took [4] 16/14 23/13 87/22 88/5
tool [2] 22/21 22/22
tools [3] 22/14 23/1 36/1
top [4] 36/3 39/2 39/8 61/6
topic [5] 5/25 7/2 33/18 48/2 64/18
TOR [58] 2/2 2/3 4/10 24/4 28/2 28/6 28/8 28/12 28/14 29/2 29/6 29/10 29/14 29/20 30/1 33/4 33/4 33/10 33/12 33/16 35/23 44/24 53/23 54/4 102/24 103/7 103/10 103/14 103/16 105/6 105/12 105/15 105/15 105/20 105/22 105/23 106/4 106/5 106/7 106/8 106/12 106/12 106/13 106/16 106/19 106/20 106/22 106/25 107/1 107/8 107/14 107/19 108/2 108/15 108/20 108/24 112/7 112/9
total [1] 79/15
touch [1] 33/17
trace [2] 32/21 32/25
traces [1] 32/14
tracing [1] 70/23
track [2] 107/17 118/17
tracking [2] 54/23 54/24
trade [2] 36/1 61/9
traffic [5] 84/23 87/14 88/19 108/20 109/9
trafficking [1] 96/10
training [1] 5/1
transcript [13] 1/9 5/16 6/19 7/10 46/3 47/8 47/16 50/12 50/20 65/6 71/20 73/6 123/4
transfer [2] 8/21 10/12
transferred [1] 16/19
transition [1] 35/1
transmission [1] 57/22
travel [2] 22/10 121/8
traveling [1] 56/22
treating [1] 49/4
trial [6] 1/9 10/3 23/1 54/16 94/21 94/22
trick [1] 99/1
tried [1] 54/4
trigger [2] 99/10 99/11
triggered [2] 99/7 99/9
trouble [1] 95/13
true [15] 17/12 27/4 101/8 101/22 103/10 104/9 104/10 104/16 105/12 107/5 112/12 113/14 114/1 114/5 123/4
truly [1] 17/1
truncate [1] 76/15
try [2] 10/5 81/8
trying [25] 12/10 14/16 14/16 14/17 14/18 17/1 18/3 36/19 39/13 41/2 49/9 54/23 56/10 72/14 83/10 87/3 89/23 98/6 101/5 108/9 115/16 115/16 115/23 117/5 119/15
tunnel [5] 39/11 39/18 39/20 39/22 39/22
turn [2] 24/6 115/23
turned [1] 53/18
turning [3] 15/21 54/13 102/22
turns [1] 50/17
TV [1] 30/12
two [25] 6/20 12/13 27/11 34/25 35/6 35/7 40/23 40/24 41/16 53/12 59/18 60/19 60/23 61/3 70/17

**T**

two... [10]   85/25 96/16 96/22 96/23 99/15 104/14 104/20 104/25 105/7 120/3
two-factor [4]   60/19 60/23 61/3 85/25
type [7]   21/11 36/20 40/18 47/6 53/2 95/23 118/4
types [3]   35/4 49/15 55/21
typical [7]   60/2 60/22 60/24 78/4 78/10 78/20 83/25
typically [14]   37/25 40/12 74/21 75/19 76/15 79/19 86/2 98/21 107/16 107/17 111/24 111/25 112/4 113/6
typing [1]   82/9

**U**

U.S [2]   1/13 2/7
Uh [1]   64/11
Uh-huh [1]   64/11
ultimate [1]   69/23
unallocated [1]   31/23
unanswered [1]   87/17
under [5]   29/18 78/7 78/14 97/25 98/12
underlying [2]   36/25 81/6
understand [23]   4/16 5/2 13/11 14/17 17/1 18/2 34/21 38/15 42/22 47/9 48/17 52/19 68/9 70/10 71/8 81/15 93/18 100/19 105/3 109/24 110/19 119/11 119/24
understanding [44]   6/15 8/5 8/11 9/14 11/24 12/11 12/23 15/10 15/11 17/10 19/3 19/5 19/6 19/8 37/22 39/3 40/9 46/7 50/4 50/10 51/15 53/15 55/11 63/3 63/15 63/19 63/23 64/5 64/7 64/9 65/5 65/10 65/12 66/7 67/15 68/22 69/2 84/9 87/24 88/10 98/24 116/19 121/8 121/12
understands [2]   18/5 76/5
understood [4]   46/21 62/14 64/19 100/3
unencrypted [1]   91/14
unfortunately [2]   30/5 105/14
unique [1]   79/5
UNITED [10]   1/1 1/3 1/10 4/2 4/7 56/22 57/4 120/24 120/25 121/9
UNIX [1]   35/17
unknown [1]   41/14
unless [3]   50/20 59/21 74/25
unlike [1]   56/21
unlisted [2]   80/1 80/4
unnecessarily [1]   72/12
unnecessary [2]   31/19 39/20
unpack [1]   94/3
unsigned [2]   6/6 44/14
unsolicited [1]   78/12
until [5]   27/14 72/18 99/18 109/5 121/20
up [77]   7/16 11/11 12/2 13/5 17/20 19/20 26/15 27/2 27/15 31/9 31/11 31/16 31/21 34/8 34/9 34/11 34/11 37/8 38/16 39/13 40/6 41/4 41/9 41/13 42/1 43/14 47/24 48/11 51/10 54/17 57/11 58/13 58/25 59/16 61/22 63/13 64/22 65/22 66/1 66/6 67/8 68/19 69/11 72/9 74/18 74/20 80/17 80/17 81/23 82/4 82/20 87/7 87/8 89/19 91/24 92/25 99/20 100/4 100/17 101/12 102/14 104/12 105/23 106/22 106/25 110/5 110/15 110/16 110/22 114/6 115/12 115/19 116/22 117/15 119/19 120/7 120/22
update [6]   35/19 78/21 80/17 80/23 81/17 92/15
updated [8]   22/18 52/11 52/12 53/4 80/18 80/20 81/21 81/22
upon [1]   71/17

us [13]   1/20 10/7 17/17 25/5 26/6 28/14 32/9 61/3 67/15 83/13 86/15 91/11 115/20
USAO [1]   1/16
USB [2]   59/2 60/14
USB-C [1]   60/14
use [73]   22/14 23/6 23/7 23/10 23/21 24/7 25/5 25/6 25/23 25/25 26/12 26/17 28/6 28/8 28/10 28/11 28/12 29/5 30/1 33/12 33/21 34/3 34/15 35/5 35/22 35/22 35/23 37/2 37/3 38/1 39/15 39/18 43/11 52/3 55/21 55/25 56/2 56/6 56/16 56/18 58/2 58/6 60/1 60/25 61/6 61/8 61/10 61/11 62/7 82/19 82/22 85/6 87/3 87/5 90/11 101/10 102/24 103/1 103/3 103/4 103/6 103/10 103/14 103/16 103/20 103/25 104/6 104/7 104/24 105/12 106/22 106/25 108/23
used [31]   13/8 21/12 21/13 21/16 21/18 22/9 22/12 22/12 24/17 25/18 29/10 29/14 33/4 37/2 39/6 53/7 53/9 58/9 60/24 62/10 76/8 76/17 82/17 84/19 88/17 91/1 91/14 101/10 103/22 108/2 110/10
used Tor [1]   33/4
useful [2]   22/11 32/7
user [6]   27/11 41/5 41/6 41/13 92/19 106/10
username [6]   81/2 81/3 81/9 85/21 85/24 86/7
users [3]   26/21 29/7 111/15
uses [5]   22/21 37/3 55/17 60/22 60/24
using [28]   22/23 23/9 23/18 25/16 25/17 26/22 27/5 28/15 29/6 33/10 34/4 34/20 37/1 52/9 62/10 77/10 84/22 84/24 95/12 103/17 104/19 105/6 105/16 105/19 105/22 106/4 106/9 106/11
usually [1]   7/14

**V**

vague [1]   94/18
Valerie [2]   6/7 6/12
various [2]   55/17 97/5
vary [1]   104/11
vast [1]   108/19
Velcro [1]   58/25
Verizon [7]   57/15 58/2 58/3 59/11 59/12 59/13 95/13
Verret [3]   4/19 73/16 73/21
version [1]   5/12
versions [1]   35/20
versus [3]   4/3 50/9 110/2
very [31]   10/10 10/23 19/16 21/19 22/12 26/6 28/3 28/16 32/7 32/16 32/16 33/22 34/10 35/14 35/22 36/2 39/5 40/19 46/10 47/11 54/6 56/23 57/23 59/7 76/17 78/9 78/10 83/16 85/2 85/12 85/12
via [4]   24/21 38/2 38/9 39/5
Video [2]   109/20 109/22
videos [1]   58/10
view [3]   48/20 50/4 119/8
viewing [1]   109/9
viewpoint [1]   12/24
violated [1]   14/11
virtual [4]   36/3 36/4 36/5 88/17
visit [4]   29/19 30/8 33/5 33/17
visited [2]   29/13 31/1
VNC [3]   37/24 99/22 100/18
voir [3]   118/11 119/1 119/3
VPN [32]   23/7 23/9 23/10 23/19 23/21 24/3 24/5 24/7 24/10 24/12 24/14 24/21 25/3 25/5 25/14 25/20 25/21 26/17 26/21 26/22 27/1 30/2 39/21 88/14 88/15 88/16 104/7 104/23 105/5 105/6 105/12 105/15
VPNs [7]   25/1 102/24 103/1 103/6 103/10 103/14 104/6

vs [1]   1/5

**W**

wait [1]   38/20
walk [1]   43/23
Wall [1]   2/3
want [62]   12/14 13/17 15/21 18/17 19/15 19/18 20/6 26/13 27/21 29/23 29/24 32/17 33/17 35/23 36/7 38/7 42/1 47/8 48/17 49/1 50/3 50/20 50/25 53/1 54/5 54/6 55/19 58/11 63/10 68/14 71/4 72/3 72/10 72/11 72/22 73/1 73/3 73/17 78/11 85/13 92/9 93/16 93/17 95/6 95/10 95/16 97/8 100/10 104/18 105/2 109/16 109/17 113/18 113/23 113/24 114/2 115/12 116/3 116/25 118/11 118/13 118/18
wanted [12]   7/7 7/7 20/10 29/6 29/8 48/12 60/6 72/5 81/8 118/25 120/12 120/15
wants [7]   5/4 9/5 61/14 113/22 118/12 120/24 122/2
was [228]
Washington [5]   1/5 1/14 1/17 1/21 2/9
wasn't [17]   10/20 10/21 11/17 14/12 17/14 18/11 32/25 43/12 48/13 49/9 49/21 64/13 72/13 108/25 117/5 121/1 121/15
watched [1]   70/24
watching [1]   116/6
way [39]   9/20 18/17 19/17 25/2 25/14 31/10 35/23 38/12 45/24 46/6 50/19 54/22 55/25 58/8 59/1 59/8 60/4 62/14 70/17 75/18 82/10 83/16 83/17 85/11 88/5 89/22 91/4 91/9 94/21 99/3 99/11 106/14 106/21 107/1 111/4 111/6 111/13 119/14 121/23
Wayback [3]   21/13 21/25 22/2
ways [4]   55/21 56/2 91/10 111/1
we [163]
we'll [3]   50/25 114/14 121/23
web [3]   91/7 110/24 111/1
webhostbox.net [1]   86/21
website [20]   21/18 21/19 21/23 67/6 76/6 76/9 78/25 79/3 82/2 84/3 84/5 84/25 87/1 87/6 110/18 110/20 110/22 110/25 112/9 112/10
websites [2]   22/6 93/19
weeds [1]   79/18
week [2]   10/17 12/13
weeks [1]   113/3
weight [1]   121/6
welcome [4]   70/14 73/21 109/20 109/22
well [68]   8/12 8/19 15/16 17/18 18/6 21/2 21/12 23/7 23/8 23/11 25/6 25/12 26/1 27/14 28/9 28/12 30/5 33/6 35/6 35/12 36/3 38/12 39/5 39/20 40/19 41/23 42/7 42/21 43/1 43/16 46/10 47/8 47/24 51/17 54/17 55/1 58/2 60/8 61/11 65/19 70/23 72/17 74/11 76/18 81/12 82/18 83/17 84/19 88/4 91/3 93/11 93/11 94/9 94/14 97/13 102/19 108/13 110/12 112/2 112/22 113/17 113/20 114/2 120/8 120/10 120/16 120/21 121/19
went [3]   22/19 46/17 88/5
were [56]   6/19 7/15 7/16 8/21 8/24 10/6 10/9 10/22 11/1 13/2 13/11 14/11 23/3 25/4 25/12 27/12 29/7 33/9 40/14 40/18 43/6 43/10 43/12 46/14 46/15 46/16 46/20 49/19 49/23 54/13 57/5 64/11 65/3 65/13 65/16 65/18 65/23 71/5 73/7 83/8 84/14 84/21 84/22 86/18 86/23 87/13 87/22 91/12 92/21 95/23 101/20 105/2 105/3 105/6 111/22 114/22

**W**

**what [316]**
**whatever [6]**  18/17 19/20 19/20 52/8 54/5 117/7
**wheel [2]**  51/14 75/25
**when [48]**  5/14 8/21 9/9 9/12 11/7 17/9 17/16 17/20 20/18 22/9 22/17 22/18 22/18 22/21 23/3 24/7 26/7 30/14 31/16 31/17 31/18 32/4 34/11 36/18 42/21 46/19 54/25 64/17 65/19 72/15 74/18 74/20 74/24 75/3 83/8 83/10 83/25 88/20 89/24 91/3 92/21 92/25 93/4 104/2 105/12 113/14 114/22 116/16
**when on [1]**  89/24
**where [44]**  4/19 9/5 10/16 18/7 18/22 22/16 26/14 28/8 29/4 31/13 32/25 36/19 39/23 41/1 41/5 42/12 42/13 43/2 52/19 57/5 58/24 60/6 65/3 70/5 75/5 78/4 78/10 78/23 80/2 81/9 83/20 84/4 84/5 84/14 84/21 85/10 85/23 87/9 87/20 107/12 112/10 116/16 116/21 119/24
**Whereupon [2]**  77/20 83/5
**wherever [4]**  54/6 84/21 87/14 87/18
**whether [42]**  5/4 5/21 6/23 10/17 11/15 11/25 12/2 12/5 12/24 13/25 14/2 14/19 19/2 31/14 32/13 42/22 42/23 46/19 48/16 49/11 49/14 49/15 53/7 56/14 62/7 62/8 69/24 70/6 70/11 71/1 71/3 72/22 72/23 80/14 98/2 99/4 108/10 108/13 109/2 118/12 121/22 122/1
**which [48]**  5/21 6/2 6/6 6/23 7/25 8/2 12/21 14/10 16/5 17/17 21/12 21/13 21/21 22/16 31/23 32/3 33/7 35/21 35/23 37/24 37/25 45/10 45/11 47/13 55/21 58/15 59/1 61/5 64/4 64/9 67/10 68/20 75/7 75/18 77/4 78/3 78/8 78/19 78/25 79/9 84/7 84/12 84/17 86/1 89/24 101/14 107/18 120/2
**whichever [1]**  57/12
**while [5]**  37/10 53/14 53/18 75/24 101/13
**white [1]**  65/9
**who [42]**  4/11 9/22 18/9 23/12 34/20 39/13 40/13 41/7 74/14 74/16 74/17 76/4 76/5 76/6 76/9 76/23 77/1 77/3 77/4 77/6 77/10 77/25 78/6 78/13 80/2 80/10 80/15 81/6 83/17 84/7 85/5 87/22 91/25 93/5 93/6 94/12 97/5 102/23 104/7 107/17 115/22 121/5
**Whois.com [1]**  76/7
**Whois.internet.bs [1]**  78/8
**Whois.org [1]**  76/7
**Whoisprivacy.corp [3]**  79/23 80/9 80/15
**whole [8]**  43/7 46/7 46/10 46/22 47/2 50/12 106/2 120/19
**why [29]**  10/21 14/22 18/5 19/25 20/1 23/10 25/25 33/8 34/2 34/2 35/22 46/9 49/7 50/12 50/14 50/14 55/5 55/8 55/11 55/15 69/15 96/16 98/8 98/14 103/19 107/18 119/15 119/23 121/17
**Wi [3]**  23/6 23/8 40/13
**Wi-Fi [3]**  23/6 23/8 40/13
**wife [1]**  36/10
**wife's [1]**  61/1
**Wikipedia [1]**  22/5
**will [86]**  6/6 6/11 12/6 12/7 12/7 15/24 16/21 20/4 20/4 22/24 24/1 25/18 26/15 28/10 30/1 30/18 31/16 31/20 31/25 32/8 32/9 34/6 34/25 38/7 44/17 44/22 50/16 50/17 52/2 53/1 53/25 55/1 57/7 57/12 57/13 57/14 58/2 58/5 58/6

58/6 59/11 59/11 59/12 61/17 61/18 67/9 69/18 71/10 72/11 72/15 74/22 74/23 75/1 75/6 76/9 78/3 79/20 83/25 86/2 86/4 86/5 87/12 87/14 87/18 87/22 89/21 96/5 96/22 99/9 99/11 99/11 100/25 101/9 101/25 102/5 105/15 105/16 105/22 105/23 105/23 111/23 114/15 118/4 118/8 121/19 121/21
**Windows [3]**  23/24 36/4 37/11
**wipe [2]**  89/21 89/22
**wiped [4]**  89/9 89/12 89/14 89/17
**wiping [1]**  89/24
**withdrawal [1]**  53/11
**withdrawn [1]**  81/20
**within [5]**  37/7 39/11 54/2 66/20 88/6
**without [11]**  7/9 23/7 24/23 26/21 29/19 76/1 99/15 104/15 108/13 115/20 118/2
**witness [30]**  15/2 18/10 20/15 22/21 36/8 43/22 45/22 46/2 46/13 46/20 47/5 48/8 50/6 50/15 56/11 58/17 64/16 70/3 70/24 71/3 71/25 72/17 91/20 108/23 113/23 115/16 116/9 117/3 118/16 121/19
**witness' [2]**  34/17 117/23
**witnesses [7]**  3/2 11/21 23/3 25/7 29/1 69/24 113/8
**WMD [1]**  94/8
**won't [1]**  84/4
**wonderful [1]**  36/4
**wondering [1]**  17/25
**word [2]**  27/24 39/20
**work [19]**  24/16 29/16 30/4 31/10 34/10 54/21 57/8 62/2 62/4 62/7 62/15 81/2 97/11 97/19 98/21 99/10 99/11 108/10 109/24
**worked [3]**  96/24 96/25 97/11
**working [8]**  9/3 10/24 16/15 18/12 58/1 97/4 97/9 114/3
**works [5]**  21/19 31/15 58/2 88/6 117/8
**world [1]**  26/13
**worth [1]**  85/14
**would [124]**
**wouldn't [17]**  7/9 24/24 27/14 33/9 43/3 44/9 60/12 60/15 78/24 81/9 81/10 92/16 93/9 93/12 97/22 103/6 110/12
**write [2]**  40/18 93/6
**writes [1]**  17/19
**written [1]**  19/10
**wrong [3]**  15/17 16/21 57/19
**wrote [4]**  8/12 11/1 57/21 66/2
**www.Google.com [1]**  52/3

**Y**

**yeah [23]**  29/21 31/9 36/17 36/24 51/14 57/19 61/17 63/12 64/13 68/3 74/17 80/22 83/16 85/19 90/16 93/2 93/12 98/25 99/2 105/10 107/25 110/19 121/17
**year [1]**  88/8
**years [14]**  21/22 22/7 22/7 22/7 34/20 52/23 79/6 79/17 80/21 96/3 99/17 101/21 112/5 119/6
**yes [97]**  14/6 20/24 21/10 22/15 25/9 27/19 28/3 29/5 29/18 31/5 31/7 33/22 34/1 34/9 34/14 36/11 36/15 36/22 37/7 51/23 53/13 54/21 54/21 56/1 56/20 58/19 60/21 62/25 64/1 65/5 65/17 66/15 67/7 67/12 67/19 68/6 68/18 68/20 73/14 73/20 74/6 74/8 74/11 74/15 76/2 76/10 77/24 80/22 81/15 82/6 82/14 82/17 88/2 88/14 89/7 89/10 90/21 92/2 92/12 99/23 100/1 100/5 100/17 100/18 101/3 101/15 103/5 103/8 103/16 104/4 104/22 104/23 105/2 105/10 105/15 105/25

106/9 106/18 106/21 107/7 107/10 107/11 108/18 108/18 110/4 110/8 110/21 110/25 111/3 111/8 112/4 112/9 113/1 113/6 113/10 114/2 115/7
**yesterday [6]**  21/21 25/16 38/3 52/1 66/17 91/2
**yet [1]**  10/19
**York [1]**  1/20
**you [599]**
**you'd [1]**  40/4
**you're [1]**  105/4
**your [187]**
**yourself [4]**  112/13 112/16 112/24 118/3
**yourselves [2]**  69/17 121/18
**YouTube [1]**  58/10
**YubiKey [1]**  61/5

**Z**

**zeroed [2]**  102/15 102/17
**zeros [1]**  89/21

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


* * * * * * * * * * * * * * *     )
UNITED STATES OF AMERICA,          )     Criminal Action
                                   )      No. 21-00399
              Plaintiff,           )
                                   )
   vs.                             )     **AFTERNOON SESSION**
                                   )
ROMAN STERLINGOV,                  )     Washington, D.C.
                                   )     March 5, 2024
              Defendant.           )     1:38 p.m.
                                   )
* * * * * * * * * * * * * * *     )


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES:</u>

FOR THE PLAINTIFF:        CHRISTOPHER BROWN, ESQ.
                          UNITED STATES ATTORNEY'S OFFICE FOR
                            THE DISTRICT OF COLUMBIA
                          601 D Street, Northwest
                          Suite 5.1527
                          Washington, D.C. 20530

                          CATHERINE PELKER, ESQ.
                          U.S. DEPARTMENT OF JUSTICE
                          950 Pennsylvania Avenue, Northwest
                          Washington, D.C. 20530


FOR THE DEFENDANT:        TOR EKELAND, ESQ.
                          MICHAEL HASSARD, ESQ.
                          TOR EKELAND LAW, PLLC
                          30 Wall Street
                          Eighth Floor
                          Brooklyn, New York 10005

REPORTED BY:            LISA EDWARDS, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Room 6706
Washington, D.C. 20001
(202) 354-3269

INDEX

WITNESS                                                           PAGE


JEFF FISCHBACH

   Continued Redirect Examination By Mr. Ekeland        53

ROMAN STERLINGOV

   Direct Examination By Mr. Ekeland                    53


E X H I B I T S

Exhibit No.                                                 Received


                    NO EXHIBITS MARKED

THE COURT: Anything before we get the jury?

MS. PELKER: No, your Honor.

MR. EKELAND: No, your Honor.

THE COURT: Let's get the jury.

THE COURTROOM DEPUTY: All rise.

(Whereupon, the jury entered the courtroom at 1:41 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY: The jury is present. You may be seated and come to order.

THE COURT: You may continue, Mr. Ekeland.

MR. EKELAND: Thank you, your Honor.

CONTINUED REDIRECT EXAMINATION

BY MR. EKELAND:

Q. Mr. Fischbach, do you recall Ms. Pelker asking you about kill switches on servers?

A. I'm sorry. About...?

Q. Asking you about kill switches on servers.

A. Yes. Kill switches, yes.

Q. Do you know how kill switches on servers work?

A. I do, yes.

Q. Could you just explain briefly to the jury how they work?

A. So there's a couple of different ways that I've seen them work in cases specifically that I've investigated.

Sometimes they will be connected to something in

Fischbach - REDIRECT - By Mr. Ekeland

the building.  So, for example, a magnetic switch on a door could trigger the hard drive.  It just wipes or encrypts itself.  More typically today, encrypting than wiping.

But it could also be remote-triggered, but it also can be set as like what we'd call a dead man's switch, which is you have to regularly check in and somehow send something that you're alive to the server.  And if you don't, then eventually it would, again, either encrypt or wipe itself.

Q.  Are you aware of where Mr. Sterlingov was before he landed at Los Angeles International Airport?

A.  My understanding is --

MS. PELKER:  Objection, your Honor.  Lack of foundation, calls for hearsay.

THE COURT:  Yes.  Sustained.

MR. EKELAND:  Can I lay a foundation?

THE COURT:  Yes.

MR. EKELAND:  Thank you, your Honor.

BY MR. EKELAND:

Q.  So --

THE COURT:  Also, it's just not clear to me that this is an expert opinion.

MR. EKELAND:  I will -- I will tie it together. This is related to the testimony on the kill switch.

MS. PELKER:  This is an expert opinion, so --

THE COURT:  Right.  But the question is whether

Fischbach - REDIRECT - By Mr. Ekeland

it's an expert opinion or not.

MR. EKELAND:  I'm sorry?

THE COURT:  The question is whether he has expert testimony.  He's testifying not as a fact witness, but as an expert.

MR. EKELAND:  This is part of his -- this is the foundation for his opinion, is what I'm eliciting the testimony regarding.

THE COURT:  Well, I'll --

MR. EKELAND:  Sorry.

THE COURT:  Why don't we pick up for one second.

(Whereupon, the following bench conference was held:)

THE COURT:  Yes.  So I guess what is the expert opinion that he's going to express?

MR. EKELAND:  Whether there was a -- he saw a dead -- anything in his review of Mr. Sterlingov's devices of a dead man's switch that would be triggered after two days, like Mr. Scholl testified, you know, Bitcoin Fog allegedly I think shut off.

And if that -- a dead man's switch would have had to have been on Mr. Sterlingov's devices while he was in Moscow for two weeks before he arrived at LAX.

MS. PELKER:  Your Honor, I believe that the question of whether there was a kill switch on

Fischbach - REDIRECT - By Mr. Ekeland

Mr. Sterlingov's devices is already asked and answered. And this new line of questioning about where Mr. Sterlingov was and how that would impact the effect on a kill switch is something that is outside of this witness's expertise. But also certainly it's not been disclosed and goes beyond the scope of the cross.

THE COURT: But it just seems to me that if his point is that he was -- I mean, I think it already is established the very nature of a kill switch is you don't have to be there to operate it.

MR. EKELAND: That --

THE COURT: But -- go ahead.

MR. EKELAND: That's actually not what he just testified to. He said with a dead man's switch, you need to check in. And so I just -- maybe my question is as simple as -- I just want to follow up. He did testify that he didn't find a kill switch, but maybe my question is as simple as asking if he saw -- found anything in his review of the devices of a dead man's switch on Mr. Sterlingov's devices.

THE COURT: I think that's asked and answered. But I guess that's okay. But the problem is that I think the Government's theory is that it was on the server, if it existed, and not on his devices, which is the reason why I think the asked-and-answered objection is a little -- it

Fischbach - REDIRECT - By Mr. Ekeland

carries some weight here, because we've already plowed this ground.

Can someone confirm for me that it was asked previously and answered? And if it was, I think it's dispositive.

MR. EKELAND: I think I asked him if -- I don't have the transcript in front of me. But if I recall correctly, I asked him if he found any kind of indicia or evidence -- I don't know what word I used -- of there being a kill switch on any of Mr. Sterlingov's devices.

THE COURT: All right. So it is asked and answered, then.

MR. EKELAND: I didn't ask about a particular dead man's switch. But I can ask -- I mean, I'll move on from this. But I mean, I do have a followup question that's related to this, but it's not about a kill switch being on his devices.

THE COURT: What's the followup?

MR. EKELAND: If he's aware of any information on any of Mr. Sterlingov's devices showing that it was communicating with any kill switch on any servers anywhere.

MS. PELKER: I think that that's asked and answered.

The question from the Government's notes that Mr. Ekeland asked is: Did your review of the Defendant's

Fischbach - REDIRECT - By Mr. Ekeland

devices have any -- reveal any sort of kill switch on his devices?

MR. EKELAND: My question is not now about kill switches; it's about communications with kill switches, because now, as the Court said, it appears to be the Government's theory that the kill switch is on the server. And in the nature of a dead man's switch, as Mr. Fischbach just testified, you need to communicate with that dead man's switch to keep it from, you know --

THE COURT: I mean, I will say that I don't think that it's plausible to say this is now the Government's theory. I don't think anyone ever suggested that this wasn't previously the Government's theory.

But I'll allow just this one question of whether there's any evidence that he saw of a communication from the devices with a kill switch. And then you can move on.

MR. EKELAND: Yes, your Honor.

(Whereupon, the following proceedings were had in open court:)

MR. EKELAND: May I proceed, your Honor?

THE COURT: You may.

MR. EKELAND: Thank you.

BY MR. EKELAND:

Q. Mr. Fischbach, in your review of Mr. Sterlingov's devices in the discovery in this case, did you come across

Fischbach - REDIRECT - By Mr. Ekeland

any information that would lead you to believe that any of his computers were communicating with a kill switch on a server anywhere?

A.   No.   Nothing like that was seen.

Q.   Do you recall Ms. Pelker asking you about remote logins?

A.   Yes.

Q.   If someone is remotely logging into a computer, does that mean that they're far away from it?

A.   No, not at all.

Q.   And why not?

A.   Well, for me to use, for example, any of the servers literally next to my desk, I have to log into them.   They don't have screens.   They don't have keyboards.   They're just servers.

To log into any of the Rasberry Pi devices, they don't have screens.   They don't have keyboards.   You remotely log into them.   So that's just a normal thing.   You might not need it for Windows on a laptop, for example, but other things, yes.

Q.   And do you recall Ms. Pelker asking you about -- I think it was the number of people who can use a VPN simultaneously?

A.   Yes.

Q.   And in your -- do you know what traffic logs are for a server?

Fischbach - REDIRECT - By Mr. Ekeland

A.   Absolutely.

Q.   Could you just explain briefly to the jury what traffic logs are?

A.   Yeah.  So unlike standard logs that just let you know what the server has been doing, traffic logs effectively measure the amount of simultaneous use of the machine just so it knows -- it's for the purposes of knowing when you need to upgrade to a faster machine, to a faster connection, that sort of thing.

Q.   Would traffic logs show you how many people were using a server?

A.   It would show you how many people are using a server as well as how much use of the server and --

Q.   In your review of the discovery for this case, have you seen any traffic logs for any of the servers related to the IP addresses in Ms. Mazars's analysis?

A.   I have not, no.

Q.   Do you know what native server logs are?

A.   Yes.

Q.   Could you just explain briefly to the jury what native server logs are?

A.   Yeah.  It's similar to the other kind of log that I was talking about.  So a server, no matter what, if you do nothing with it, as long as it is serving, as long as it's got something to be able to address communications, whether

Fischbach - REDIRECT - By Mr. Ekeland

it's a webpage or an email or whatever it is, it will just keep some basic logs about how the equipment itself is operating.

Q. And in your review of the discovery in this case, have you seen any native server logs in relation to any of the IP addresses listed in Ms. Mazars's IP address analysis?

A. No, I have not.

Q. Do you recall Ms. Pelker asking you about the use of the Tor Browser versus the Tor hidden services?

A. Yes.

Q. Do you know if you could use a Tor hidden service for your smart home?

A. Yeah. As a matter of fact, you can.

I don't know -- was that sufficient?

MS. PELKER: There's no question before the witness.

BY MR. EKELAND:

Q. What kind of -- withdrawn.

Just briefly for the jury, in case there's people on the jury who don't know, what is a smart home?

MS. PELKER: Objection. Beyond the scope of the cross.

THE COURT: Yes. What does this have to do with the cross?

MR. EKELAND: She asked -- Ms. Pelker elicited

Fischbach - REDIRECT - By Mr. Ekeland

testimony from Mr. Fischbach about the difference between a Tor Browser and a Tor hidden site. And the implication from her testimony was that the use of a Tor hidden site implies criminal activity when the testimony that I'm eliciting from Mr. Fischbach right now is that people use Tor --

THE COURT: Please stop testifying.

MR. EKELAND: Well, do you want to pick up the phone?

THE COURT: Yes.

(Whereupon, the following bench conference was held:)

MR. EKELAND: So the --

THE COURT: You know better than that.

MR. EKELAND: I'm sorry, your Honor. I was just trying to answer your question. I apologize to the Court.

So the testimony that Ms. Pelker elicited from Mr. Fischbach was whether or not he knew the difference between a Tor Browser and a Tor hidden site. And she took a line of questioning that implied that Tor hidden sites were just involved in criminality.

What I'm eliciting from Mr. Fischbach is that Tor hidden sites are commonly used for smart homes, home networking. And I was merely asking a followup question, because it occurred to me maybe some people on the jury don't know what a smart home was. I was just asking to

follow up on that. That was all.

THE COURT: Ms. Pelker?

MS. PELKER: Your Honor, defense on its direct asked Mr. Fischbach about Tor and Tor hidden services. The Government crossed on that.

Over the lunch break, defense produced a new exhibit that purports to show one example of a home system that you can set up using a Tor hidden service. We haven't seen this before. I don't know whether Mr. Fischbach has seen it before.

We would have absolutely *Daubert*ed Mr. Fischbach if his testimony was going to be it is common to set up your home security system or your home remote access as a Tor hidden service.

THE COURT: That seems fair.

What's your response?

MR. EKELAND: My response is that he has been noticed as an expert on Tor. It's certainly no surprise and it's common knowledge that Tor hidden services can be used for completely legitimate things like smart homes, you know.

Honestly, I wasn't even aware that this exhibit was just given to the defense and I wasn't planning on introducing it. I was merely -- I mean, I feel like we're spending more time talking about this right now when my last question to Mr. Fischbach was merely just to clarify for the

Fischbach - REDIRECT - By Mr. Ekeland

jury what a smart home was.

I wasn't trying to --

THE COURT: So you're not going to ask about the Tor hidden service; you're going to ask him what a smart home is and that's it?

MR. EKELAND: I think I already elicited testimony that you can run the smart home from a Tor hidden site. He already answered that question.

THE COURT: If you limit it just to the question "What is a smart home," I'll allow that.

MR. EKELAND: Thank you, your Honor.

(Whereupon, the following proceedings were had in open court:)

BY MR. EKELAND:

Q. Mr. Fischbach, just briefly, could you explain to the jury, in case somebody doesn't know, what a smart home is?

A. Yes. A smart home is basically sort of a replacement for things that you already have, like your thermostat and light switches. And it can be, as I think I mentioned yesterday, pet feeders and even litter boxes and a lot of video cameras are a typical part, or even entry systems, entry and exit systems, so like being able to remotely open up your door for somebody when they come over.

And that's -- that all works together as a part of what we would call a smart home.

Fischbach - REDIRECT - By Mr. Ekeland

THE COURT: Okay.

MR. EKELAND: May I ask one more followup?

THE COURT: You said that was your final question. Do you want to go back on the telephone?

MR. EKELAND: No. That's okay. It's okay. I was just going to ask -- it's okay.

I think --

THE COURT: If you have --

MR. EKELAND: No further questions.

THE COURT: The witness is excused.

Thank you.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: Members of the jury, we're going to take a short break now, but I think probably no more than ten minutes.

I'll just remind you again, don't discuss the case even amongst yourselves and don't do any type of research. We'll be back in about ten minutes.

(Whereupon, the jury exited the courtroom at 1:56 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: All right. And so any developments with respect to the question that Mr. Ekeland raised regarding Mr. Sterlingov's confinement?

Fischbach - REDIRECT - By Mr. Ekeland

MR. BROWN: Your Honor, the Government opposes testimony touching on Mr. Sterlingov's confinement because it would only -- there's a serious 403 issue in terms of discussions of potential punishment and conditions of confinement.

The defense argument, as I understand it, is they want to be able to argue that because Mr. Sterlingov was in pretrial detention, he would have been unable to change the DNS registration.

I mean, number one, the testimony in the record says that, you know, there are multiple parties who can change that registration, including the registrar.

Number two, we do not at all agree that Mr. Sterlingov would not have been able to communicate to the outside world. Mr. Sterlingov had internet access; he had phone access; he had access through his attorneys to the outside world.

And one particular example of this is in August of 2022, when our first trial date was on the horizon in January of 2023, defense counsel put Mr. Sterlingov up to a Wired Magazine interview with two Wired Magazine reporters.

We have found no record whatsoever of that communication with those two Wired Magazine reporters, not in Mr. Sterlingov's recorded jail calls, not in the logs of Mr. Sterlingov's jail visitors, not in his monitored email

communications.

So we do not know how he communicated, how he sat for an interview, him and his two attorneys, how they sat for an interview with these two Wired reporters.

It is absolutely possible that he could have communicated at any time with somebody on the outside to provide instructions.

And as I said at the outset, he would not be the only person in the universe who would have been able to change that DNS registration. The registrar could have done that.

THE COURT: So can you remind me? I have some vague sense that actually either the way Mr. Ekeland asked the question or the way it was responded to, it was already presented to the jury that Mr. Sterlingov was incarcerated in October of 2021, I think is the date.

So was --

MR. BROWN: Well, he was detained two days after his arrest. I think that's a different --

THE COURT: No, no, no. I thought when this just came out an hour ago or two hours ago -- maybe I'm wrong about that, but I thought there was something either in the question or the answer that actually made reference to that. But I don't have the transcript open to that page.

MR. BROWN: Your Honor, I'm not --

MR. EKELAND: If I recall, what I asked, I just asked that that was -- so in October 2022, that that was a year and a half after Mr. Sterlingov had been arrested. That's what it was.

THE COURT: I see. So an implication, but not directly saying that. Yes. I think it was the implication, because you were making the point that he couldn't have done it when you said that. In the question, that was sort of implicit in the question. "Well, he couldn't have done it because he had already been arrested."

MR. BROWN: I mean, your Honor, if it has come out already, then I think the Government -- in fairness, we should be able to elicit testimony about why Mr. Sterlingov was in pretrial detention. And I think that that -- but I think that that sends us down a dangerous road also, you know. We would have to talk about the Court's detention decision; we'd have to talk about the two successive defense extensions of this trial that have kept Mr. Sterlingov in pretrial detention for more than a year over the Government's objection. So we'd have to get into all of that.

And we'd have to cross-examine Mr. Sterlingov about his communications with the outside world, including his communications with these two Wired reporters in an interview that his lawyers set up for him.

I think all of this is going to be profoundly distracting for the jury. There is a significant risk of prejudice. And sort of -- it's one thing -- you know, maybe this is already out there. But if it is, then the Government in fairness should be able to respond to the full force of the accusation by pointing out all of these ways that Mr. Sterlingov could have communicated to the outside world.

THE COURT: Mr. Ekeland?

MR. EKELAND: The Zoom call that Mr. Brown is referring to was set up by the Northern Neck Regional Jail and done under their supervision. So I am at a loss as to why there's no record as to that.

In relation to Mr. Sterlingov's internet access, he informs me that he's had none beyond the normal CorrLinks federal prisoner email. All of his phone calls, except for the ones with his attorneys, have been recorded.

So what -- you know, and we were talking to the Government right before the Court came in, trying to see if we could figure out some kind of stipulation. The issue I'm just grappling with and my client is asking me to address the Court on is that he, you know, believes the fact that he was unable to do certain things like, say, turn off the DNS, you know, server in relation to the registrar in October of 2022 or -- I mean, we've already stipulated that he was in

detention two days, you know, after his arrest when Mr. Scholl testified that the last withdrawal to the Bitcoin Fog server --

THE COURT: That's already in. That's not a problem.

MR. EKELAND: That's stipulated. And what -- the Court understands the issue.

And what I'm just grappling with in this case is it's a little bit -- it's unusual, it being a computer case, where the issue is whether or not the servers or the changes that were made to, you know, the DNS service were made after the arrest, which I think, you know, the Court understands from our position is material -- is a material fact in relation to whether -- that goes to his innocence.

And so I understand the 403 concerns. I understand why, you know, the Government is arguing against, you know, it coming out that he's been in jail for three years.

But at the same time, there is, I think, a question perhaps where the jury is going to be wondering well, you know, who cares that the DNS, you know, service was, you know, turned off in October of 2022 if Mr. Sterlingov was just free?

And, you know, one thing perhaps we can just -- I don't know -- I don't know if the Government will agree with

this, because we didn't have time to discuss it -- just stipulate to these facts or if --

THE COURT: Stipulate to what facts?

MR. EKELAND: Stipulate to the fact that maybe he couldn't have turned off -- I don't know what the Government's position is on this -- that he couldn't have been the person who switched off the DNS service in October of 2022.

Then the other thing that we were wondering about is maybe just if Mr. Sterlingov, as he's testifying, feels like, Okay, well, the only way I feel like I can answer that question is addressing the fact that I was detained, that maybe there's some way we can just stop or he can just turn to the Court and ask for a break where we could just address it on an as-needed basis.

THE COURT: Well, let me ask the Government: With respect to the DNS registration, I'm just wondering if maybe the cleanest way to deal with this would be to do something along the lines of what we did with respect to just the period of time shortly afterwards and just have a stipulation or just tell the jury that -- give me a period of days. I mean, it can be a week. You know, I think the testimony was it was -- it would have been a couple of -- it would have had to have been a couple of days, so to say that he was incarcerated during those days.

Because my biggest concern about the testimony about his incarceration -- and, quite frankly, it's a little hard for me to believe that this isn't part of the purpose -- is that -- is a plea for jury nullification or to say to the jury, Well, three years is enough. We heard testimony from two cooperating witnesses who said they were facing 20 years.

And that's just not any of the business of a jury; it's the role of the Court.

But I'm just wondering if we could just take it out of the case like that. Because October 2021 still was two and a half years ago.

MS. PELKER: '22.

MR. EKELAND: '22.

THE COURT: I'm sorry. 2022. Okay. So it's a year and a half ago, still.

MR. BROWN: Your Honor, the problem with this is, we have just received information that the domain was updated by the registrant.

THE COURT: Oh.

MR. BROWN: So what the defense is trying to put forward is a false story. They're trying to put forward a false innuendo that -- so we cannot stipulate to that unless the defense is willing to stipulate that, yes, he was detained at that point and the domain was updated by the

registrant, not by anyone else.

THE COURT: Okay. So --

MR. BROWN: Or the registrar, I should say. The registrar dropped it, in other words, for --

THE COURT: What was your evidence for that?

MR. BROWN: Your Honor, our -- Mr. Lund, who's in the courtroom --

Is this the registrant?

MS. PELKER: I can explain. I believe it's a reach out to the registrar, who's just responded and explained -- and we would have provided this earlier if we had notice -- but what I believe is the registrar has explained that the domain was suspended because the registrant did not verify the registrant's email address. So it was a suspension based on a lack of response.

MR. BROWN: So --

MS. PELKER: We may now have to put on a rebuttal case to explain this. But it's very clear that this was not someone else going in and manipulating it.

THE COURT: Right.

MR. BROWN: So if the defense is willing to stipulate to that, then we can certainly stipulate that Mr. Sterlingov was in detention when the registrar dropped the DNS registration.

THE COURT: Mr. Ekeland, taking the Government at

its representation in that regard and that they do have evidence to that, it does strike me this is more prejudicial than probative at this point if the Government can in fact prove that it was changed by the registrar and that this is just irrelevant at that point in time.

MR. EKELAND: I haven't seen -- I have no reason to doubt the Government and their representation, but I just haven't seen it. So what they just got in from Mr. Lund, I haven't seen it.

THE COURT: You're welcome to take a look at it.

MR. BROWN: That's because this just came today because the defense is trying to pass off this false story to mislead the jury.

THE COURT: I understand.

MR. EKELAND: We're not trying to pass off a false story, your Honor.

So perhaps the Government can send us that information and we can take a look on it -- at it. And then we proceed with Mr. Sterlingov's testimony today. And then if this becomes an issue, maybe -- for some reason, we will just stop and address it with the Court rather than having anything coming out in front of the jury.

THE COURT: Well, for present purposes, then, I'm just going to order that no one make any reference to Mr. Sterlingov's incarceration except for the few days after

his arrest at this point.

And I just want to make clear for the record that that is an order of the Court. I've been burned on that once before, and I wish that I had the contempt power in the other case where I was burned on that. So it is an order of the Court that nobody do so on pain of contempt.

All right. With that, let me -- I'm sorry. Go ahead.

MR. EKELAND: I was just explaining to Mr. Sterlingov what that meant.

THE COURT: Okay. Do you want to come up with Mr. Sterlingov to the podium, then?

MR. EKELAND: Yes.

THE COURT: Right there.

MR. EKELAND: This podium.

THE COURT: Yes. That's the podium.

Mr. Sterlingov, I want to make sure you understand that the decision about whether you testify is your decision alone.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And you have a constitutional right to testify and you have a constitutional right not to testify.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And you understand that if you decided not to testify, I would instruct the jury that they could not hold that decision against you in any way?

THE DEFENDANT: I understand that you would do that.

THE COURT: And do you understand that if you do testify, it may open the door for the Government to be able to ask questions and to get into some topics that it couldn't otherwise get into with respect to your character or any other activities you've been involved in, but that it could allow the Government to introduce evidence that the Government wouldn't otherwise be allowed to introduce?

THE DEFENDANT: Yes.

THE COURT: And have you had an opportunity to consult fully with your attorney about whether you should testify or not?

THE DEFENDANT: Yes.

THE COURT: Okay. But you do understand that it's your decision, though. Correct?

THE DEFENDANT: Yes.

THE COURT: What is your decision?

THE DEFENDANT: My decision is that I would like to testify.

THE COURT: Okay. That's fine, then.

Anything else that anyone thinks I should inquire

about?

MR. BROWN:  No, your Honor.

THE COURT:  Well, then, let's go ahead and get the jury.

You can have a seat and we'll bring the jury in. Yes.  You can have a seat back here.

(Confers with the courtroom deputy privately.)

So just so the marshals don't have to escort him over there, why don't we have him go with the marshals now and have a seat.  They'll be over there, and that will avoid having the marshals escorting him in front of the jury.

MR. EKELAND:  Your Honor, I just saw -- I was just reminded of something, too, that Mr. Sterlingov did ask if the jury would be allowed to ask him questions.

And I -- perhaps maybe we could just remind the jury about their ability to send notes to you with questions.

THE COURT:  What's the Government's view on that?

MR. BROWN:  Your Honor, I don't think it's necessary to remind the jury.  And in any event, I think it's important, especially with Mr. Sterlingov, that, number one, the jury is not allowed to just blurt out questions, that any questions, pursuant to the instructions that the Court gave at the beginning of this case, if there are questions, they need to be passed up at the end of the

testimony.

The Court and the attorneys will discuss the question outside of the presence of the jury. And only then, if the Court decides that that question hasn't been asked and answered and that it seeks to elicit relevant evidence, only then would the Court then bring the jury back in and have that question asked. It would be asked by the Court.

But I don't think that it's necessary to remind the jury that they can ask questions, your Honor.

THE COURT: Yes. I tend to agree with that. I've already instructed the jury on that. And I worry a little bit if I start singling out particular witnesses for that, it suggests that the jury is invited in particular with particular witnesses. I think having it more generic is more appropriate.

So I don't think I'll give that additional instruction at this point.

All right. Should we get the jury?

THE COURTROOM DEPUTY: All rise.

(Whereupon, the jury entered the courtroom at 2:15 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY: The jury is present. You may be seated and come to order.

THE COURT: All right. The defense may call its

next witness.

MR. EKELAND:  The defense calls Roman Sterlingov.

THE COURTROOM DEPUTY:  Mr. Sterlingov, would you please stand and raise your right hand.

ROMAN STERLINGOV, DEFENSE WITNESS, SWORN.

THE COURTROOM DEPUTY:  Thank you.  Please be seated.

THE COURT:  You may proceed.

MR. EKELAND:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. EKELAND:

Q.  Mr. Sterlingov, could you just introduce yourself to the jury, spelling your name.

A.  My name is Roman Sterlingov, R-O-M-A-N; last name, S-T-E-R-L-I-N-G-O-V.

Q.  Mr. Sterlingov, did you ever operate Bitcoin Fog?

A.  No.  I never operated or was administrator of Bitcoin Fog.

Q.  And where were you born?

A.  I was born in Russia in 1988.  I lived there until I was 14.  At that point, my mother and I moved to Sweden.

We moved in general because Russia is a pretty corrupt place.  There are very few opportunities.  There's a lot of criminality.  Just general reasons like that.

Q.  And --

Sterlingov - DIRECT - By Mr. Ekeland

A. I would just like to mention that, not that anybody has alleged that, but I'm just -- I have no connection to the Russian government. I don't support what they're doing. I know there's a war going on now. I don't support any of that. I don't have any contact with them or anything to do with the Russian government.

Q. And when you moved to Sweden, where did you move to?

A. I moved to a town called Jonkoping.

THE COURT REPORTER: I'm sorry?

BY MR. EKELAND:

Q. Could you spell that for the court reporter, please, Mr. Sterlingov.

A. J-O-N-K-O-P-I-N-G.

Q. And how old were you when you moved to Jonkoping?

A. I was 14.

Q. And did you -- how long did you live there?

A. I lived there from 2002 until about I guess 2008. So about six years.

Q. And did you go to school in Jonkoping?

A. Yes. I went to high school in Jonkoping.

Q. And did you graduate high school?

A. Yes.

Q. And did you have any hobbies?

A. Well, yes. I was interested in -- I became interested in video games and computers early on. I was also

Sterlingov - DIRECT - By Mr. Ekeland

interested in electronics and other, you know, nerdy things like that, I think a couple years before I moved from Russia; and that has continued.

Q. And did you have any kind of job while you lived in Jonkoping?

A. After I finished high school, I had a couple of odd jobs here and there, after which I found my more long-term job at Capo Marknadskommunikation. The name is in Swedish, but it's the same thing.

Q. And do you remember when you started working for Capo Marknadskommunikation?

A. It must have been around 2007 or 2006.

Q. And what did you do for them?

A. I was hired as a junior developer. I was doing all sorts of small tasks that they needed. They were working with some websites. They were doing some printed catalogs and other, like, printed productions for other companies.

So I was just helping out with various -- all of those types of projects.

Q. Did you do internet work for them?

A. Excuse me. What?

Q. Internet work for them.

A. Yes. Websites and servers and internet-related work. Yes.

Q. And did you do DNS registrations for them?

Sterlingov - DIRECT - By Mr. Ekeland

A. Yes. I was doing DNS registrations. That's a part of a regular website. And any -- many jobs that involve websites, they will require me to do some work on the DNS.

Q. And do you recall roughly what your salary was at Capo Marknadskommunikation?

A. Yes. I think it was around 25,000 Kroners, which is about 2,500 equivalent in U.S. dollars per month.

Q. And do you recall getting a Namecheap account in 2008?

A. That sounds about right. I don't recall the particular date, but that sounds about right.

Q. And if --

MR. EKELAND: Mr. Hassard, if we could put up -- I'm not sure if it's in evidence. It's Government's Exhibit 521-A.

THE COURTROOM DEPUTY: Yes.

MR. EKELAND: It is in evidence?

THE COURTROOM DEPUTY: Yes.

MR. EKELAND: Thank you.

And, Mr. Hassard, if you could just slowly scroll down this.

BY MR. EKELAND:

Q. Mr. Sterlingov, if you could just review this.

Is this your Namecheap account?

A. Yes. It looks like my Namecheap account.

Q. And what did you use your Namecheap account for?

Sterlingov - DIRECT - By Mr. Ekeland

A.  So Namecheap is used for DNS registrations.  I think they have some other services, but I used my account for DNS registrations mainly.

I -- I'm not sure if there's a question coming, but besides my job at Capo I was also working for a number of freelance, small freelance jobs and tasks on the side.  And many of them involved registering DNS domain names as well.  That's one of the typical tasks that somebody working with websites will do.

Q.  And when you registered a DNS for somebody, would that mean that you owned the website associated with that DNS registration?

A.  No.  Definitely not.  A DNS registration, especially ones --

THE COURT REPORTER:  Sir, I think you're a little too close to the microphone.  I'm getting some feedback.

Thank you, sir.  Forgive me.  Please go ahead.

THE WITNESS:  So no.  A DNS registration is -- I think it takes something like between five and ten minutes in general to make a DNS registration.  And that just gives you sort of the domain name account that you can connect to a website.

So a website would typically take a much longer time to create or buy or however -- whatever you're trying to do with your website.

Sterlingov - DIRECT - By Mr. Ekeland

BY MR. EKELAND:

Q. And you mentioned your freelance work with -- for clients.

When you did your freelance work, were there ever times where they gave you usernames and passwords to their accounts?

A. Yes. This is a very typical situation in any web-related job, like freelance jobs that I took.

I don't see that there could be any other way for it to work because when I am coming onto a project to do, like, a two-hour freelance job, for example, they will typically have a website ready or they would typically have something that they have already built. And I'm just hired to come in there and just perform a small change somewhere. I have to access their accounts.

They -- there are typically all sorts of accounts associated with every project. There'll be DNS accounts; there will be email accounts; there will be forum accounts somewhere.

Sometimes they -- the client will just give me accounts like in a chatroom or something or an email. Sometimes they'll just have documentation that is connected to the whole project, sort of like -- maybe like a Google Drive or just a whole document where I just get access to the whole document and there are all sorts of accounts there

that they want me to use.

I know we've been talking about VPNs. Sometimes there's VPN accounts that they want me to use, which everybody in the project working on that particular website or that particular project or even anybody working for that particular client will try to use, will have to use that VPN account, because that's what they ask you to.

Q. And do you recall the testimony, as well as the exhibits, about your password list in this case?

A. Yes.

Q. And did you keep usernames and passwords for other people's accounts on that password list?

A. Yes. That was typical. Every time I would get on a freelance job, I would put some of the accounts there to make them safe, to put them in my password vault.

Typically it's a good practice that I was also following that I would try to delete all of these accounts that belonged to other people from my -- from this list so that in case that, for example, somebody hacks into my computer and I have all of these passwords to other people, so that I don't become a reason for somebody else getting hacked because I had their passwords like a year after I've done a job for them.

Sometimes I -- I have to look through that list and I see that sometimes I was -- I did not delete some of

Sterlingov - DIRECT - By Mr. Ekeland

my clients' account, but most of the time I tried to delete them after the job is done.

Q. Did you have any way of marking what were your accounts as opposed to client accounts or other accounts in your password list?

A. Yes. I believe you were referring to some of my accounts that are labeled as -- with the word "white." And I mean -- so I just have to explain a little bit of a backstory, because I thought this question -- I thought there were a couple of other questions before that.

THE COURT REPORTER: I'm sorry. I'm just going to ask you to pull the microphone back a little bit. It's sensitive and it's distorting your voice.

THE WITNESS: So mainly on these jobs I started taking them after moving to Gothenburg from Jonkoping. And this was after my -- this was after high school. And I was struggling with quite severe depression at the time. I had -- that was the time where it was most -- the strongest that I had to -- the strongest depression that I had to deal with.

And a lot of these jobs I got from people that I would meet on various meet-ups where I would go for, like, web developer meet-ups.

Later I started going to Bitcoin meet-ups. But at first I was just going to web developer and programming

meet-ups.

And I would -- part of the reason for me was that I just tried to find some friends. I didn't have a lot of friends at the time.

And, long story short, back at the time I didn't pay too much attention to what kind of jobs they were. And after a while I started realizing that some of these jobs -- I think they were sort of in, like, a gray area.

I know, for example, a lot of people were doing affiliate marketing, which is, for example, people would be registering, like, a dozen or 20 different websites, and they would all link to a different website that would send traffic to a third website. And they would try to kind of game the Google system, the ranking system, so that the website that they have would come up on the first page in Google because then they would receive a lot of traffic to that website.

And I remember people were, like, trying to hide from Google from figuring out that there was 20 websites that were owned by the same person.

And if Google figured that out, they would downrank their website.

So, long story short, there were a lot of accounts involved with these jobs. And I was -- I thought some of them were kind of in a gray area. So I marked the accounts

Sterlingov - DIRECT - By Mr. Ekeland

that were only mine that were not involved in any of these jobs, I marked them with the word "white" because I didn't want to mix them up with these other accounts that I had access to throughout these jobs.

And also, when I was going through the list and deleting the accounts for the old jobs, I wouldn't accidentally delete my own accounts.

BY MR. EKELAND:

Q. And when you're talking about these jobs and these accounts you had for these jobs, these were for your freelance jobs?

A. Yes.

Q. And at the same time that you were doing the freelance work, you were also -- were you still working full-time for Capo Marknadskommunikation?

A. Yes. At that time, I was working full-time for Capo as well.

Q. And did there come a time where you stopped doing the freelance work?

A. Yes. So around 2013, I -- I wasn't comfortable anymore with these types of jobs. And also I -- my Bitcoin savings, which I had at the time, had also appreciated. I had a little bit of money to actually quit my job at Capo. But also I stopped doing these freelance jobs because I had no -- I had no -- I didn't want to continue with that and I

Sterlingov - DIRECT - By Mr. Ekeland

wanted to switch to other interests of mine.

Q. Just --

A. So --

Q. I'm sorry. Were you finished, Mr. Sterlingov?

A. Yes.

Q. Thank you.

And then just backing up a little bit now back to about 2009-2010, you said you moved to Gothenburg, Sweden, at some point?

A. Yes. While I was still working at Capo, I moved to a city about two hours away which is called Gothenburg.

Q. And is that when you started going to meet-ups?

A. I was going to meet-ups before that. But that city had many more meet-ups, and I continued going to meet-ups.

Q. For those of us who don't know, can you just briefly describe what a meet-up is.

A. Yeah. Meet-up is just a semi-official organized meeting of people who have similar interests. I would be going to meet-ups of people that are interested in programming, computers, sometimes video games, and they would typically be -- I would call a meet-up if it's something like up to -- I don't know the exact number, but maybe up to 50 people. So it's like a small conference or a small meet-up for people that have common interests where they meet to discuss those interests.

Q.   And where did you live when you were in Gothenburg?

A.   I lived in a couple of student rooms first for I think the first year.

And then I got a small studio apartment, which I had for the rest of my time living in Gothenburg.

Q.   And you mentioned -- well, you mentioned having Bitcoin.

Do you remember the first time you heard about Bitcoin?

A.   I don't remember the specific first time.  But I started reading about Bitcoin first.  Mentions of Bitcoin had been coming up on various news websites for web developers and for computer people, people that were interested in computers.

Regular people did not really know anything about Bitcoin at the time.  But the special websites that were already discussing computers, they mentioned Bitcoin a lot, even that early on.

So I think I read about it a couple of times before it kind of clicked.  And then there was one article which I read which basically explained the whole thing to me.  And I got really interested.  It seemed like a very cool technology with a lot of potential that I -- it just really fascinated me.  I thought the technology was interesting.  I also thought that the potential for improving the society was also interesting.

Sterlingov - DIRECT - By Mr. Ekeland

I've never -- I've never read about anything else like that that had -- where there was, like, some technology that could change people's lives directly.

I don't know if that sounds too philosophical, but it's kind of hard to explain.  I think Bitcoin has a lot of potential to eliminate a lot of problems with our financial system, which maybe there aren't as many in America or in the developed world, but in, like, post-Soviet countries and many other countries, there are a lot of problems where people get a lot of -- where people are being put in positions of power and they start abusing that power.  And Bitcoin seeks to eliminate the need for that.

Q.  And do you remember about when you first got interested in Bitcoin?

A.  It must have been around 2010, 2011.

Q.  And do you remember -- did you start going to Bitcoin meet-ups?

A.  Yes.  Once I got interested in Bitcoin, I started going to Bitcoin meet-ups.

Q.  Do you --

A.  I stopped -- I switched to Bitcoin meet-ups from regular computer meet-ups.

A lot of the people on those meet-ups were sort of the same kind of people that I was -- so for me, that was one of the big reasons why I continued going to meet-ups,

Sterlingov - DIRECT - By Mr. Ekeland

because I was meeting people that I thought was cool, that had -- usually they had interesting jobs.  They had -- I could talk to them about technical topics, about computer topics.

And again, it was sort of a way to meet people and meet new friends, which at the time I was struggling with.

Q.  And do you remember the first time you bought Bitcoin?

A.  I believe so.  I believe I have the -- at least one of the first times when I actually bought Bitcoin.

Q.  And could you just describe to the jury how you bought Bitcoin as you recall it that first time?

A.  Yes.  So it was in a meet-up in a restaurant, as many of them typically are.  I would say most of them that I've been going to afterwards were in restaurants.

And this was a meet-up that I'd been before, I think one time before.  And then the next time I came back; and after seeing somebody trading Bitcoin before, I came prepared.  I had my laptop.  And I found a person who was selling Bitcoin at the time.  I think he was a miner.

Q.  When you say "miner," do you mean like a miner, M-I-N-E-R, or like a minor like a child?

A.  I'm sorry.  Yeah.  A Bitcoin miner.

Q.  Could you just briefly explain what a Bitcoin miner is to the jury, just so --

A.  So briefly, in Bitcoin, there are these -- it's a

Sterlingov - DIRECT - By Mr. Ekeland

network of computers, the Bitcoin network.  Right?  And this network needs certain computations to be made so that the network can function.

And miners are the people who have specialized computers that are performing these calculations so that the rest of the Bitcoin network can function.

And these miners, they get paid in Bitcoin for kind of keeping doing that, keeping helping the network.

It's just -- it's just a term from Bitcoin. They're called mining -- miners.  It's -- I didn't make up the term.  It's what it's called.

Q.  And then this person that you thought may have been a Bitcoin miner, did they sell you Bitcoin?

A.  Yes.  I bought Bitcoin from them, from him.

Q.  And how did you know -- well, do you remember what year this was?

A.  This must have been in 2010.  I don't think it was in 2009.  So it must have been 2010.

Q.  And how did you know what price to pay for the Bitcoin?

A.  It was a difficult process.  There was no -- I think we had to go to, like, an IRC chatroom.  IRC is just a type of a chatroom where a lot of people online who are talking online, they hang out in these chatrooms.  And that's where people were trading Bitcoin at the time when they were trading it online.

Sterlingov - DIRECT - By Mr. Ekeland

And I think I went to go to a chatroom and, like, check some of the recent trades in order to decide what the current price was. I don't remember if there were any exchanges at the time. I don't think so.

In any case, the first exchanges that they had at the time, people didn't really trust them because they could -- you could lose your Bitcoin on an exchange and nobody really knew who set up those exchanges or how they worked or where they were operating. So there was no -- so because there were no exchanges, there was no set price that you could just check at that particular minute, like, what the current price of Bitcoin is.

As I understand today, you can just go online and there's -- there are many number -- there are many exchanges out there where you can check the price.

Q. And do you remember how much Bitcoin you bought?

A. No. But it was in the hundreds.

Q. Do you --

A. I remember seeing, like, hundreds in my wallet, but I don't remember the actual number.

Q. Do you --

A. Like many hundreds.

Q. And do you remember -- well, how did you pay for it?

A. I paid with cash, as was typical. That's what they wanted. That's what everybody wanted --

Sterlingov - DIRECT - By Mr. Ekeland

Q. Do you -- I'm sorry.

A. -- on the meet-ups.

Q. And do you remember about how much cash you paid for the Bitcoin?

A. Yes. I think --

MR. BROWN: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: Yes. I think it was just short of 10,000 Kroners, which is about a thousand dollars equivalent.

BY MR. EKELAND:

Q. And do you remember where you got the money to pay for that Bitcoin?

A. Yes. This money must have come from my paycheck originally. But I had cash at the time. It was normal for me to have small amounts of cash just at home in my wallet. I don't think there's anything strange with that. I don't know where the particular bills came from.

I was also trading a few things on -- there is a Swedish form of craigslist that's called Blocket where everything like the -- it's pretty much craigslist, like where you sell your old car or some tires or -- I sold a screen once. I sold a moped. Just where you sell your everyday regular things.

And at the time, people were paying with cash for

Sterlingov - DIRECT - By Mr. Ekeland

everything.

Q.  And did --

A.  Nowadays, it's a little bit different in Sweden.  They got something like -- I think Cash App.  There's an app in America called Cash App.  In Sweden they've got a similar app.  A lot of those trades are done on this app now instead.  But this was a long time ago.

Q.  And do you recall when you paid the cash for the Bitcoin, where did the person that sold you the Bitcoin send your Bitcoin to?

A.  They -- where did they send me Bitcoin?

Q.  Yeah; after you paid for the Bitcoin.

A.  Right.

Q.  Did they send the Bitcoin to your wallet, if you remember?  Or where did the Bitcoin go to?

A.  Yeah.  They sent it to my wallet on my computer, my laptop that I had with me to the meet-up.

Q.  And did -- I'm sorry.

A.  No.

Q.  And did you set up that wallet yourself?

A.  Yes.

Q.  Was that easy to do?

A.  I don't know if any regular person would think it was easy to do.  I think it was much more complicated back then than it is right now.  But it wasn't that much more

Sterlingov - DIRECT - By Mr. Ekeland

complicated than just installing some software.

But you did have to learn some new terms for the whole Bitcoin thing, which was very new at the time.

Q. And --

A. So now it is very -- almost strange for me to see when, like, in, let's say, 2020s, I could go out in, like, a regular -- meet a new person on the street or in a bar and you -- well, if I mention Bitcoin to them, almost everybody knows what it is. They know a little bit about it.

Back in the day, this was a completely niche thing that nobody has ever heard about. And even people that knew that maybe had Bitcoin or even knew about it, they didn't know all of the -- all these, like, little details that you had to learn about Bitcoin, about the addresses and the private keys and there are all these terms that you had to learn.

So it was complicated in that sense. But that's what a lot of time on the meet-ups was -- that I was spending on, because I was talking to these people and they were teaching me about Bitcoin as well.

Q. Do you know what -- do you know -- are you familiar with the site bitcoin.org?

A. bitcoin.org?

Q. Yes.

A. Yes. I believe that's the main -- probably the first

Sterlingov - DIRECT - By Mr. Ekeland

official site that Bitcoin -- so Bitcoin is open source. It's open-source software. So I think that's the website where the developers of Bitcoin -- it's their official website, I think.

Q. Could you just briefly explain to the jury what open-source software is.

A. Yes, briefly. So technically it just means that everybody can get access to the source code. Source code is what -- it is what makes -- that's what the developers of the software, that's what they use to make the software. And in open source, everybody has access to that.

In practice, this means that a lot more people have access to -- it's a little bit more, I would say, democratic because a lot more people have inputs about how the software should work or how it should be changed or how it should be developed.

So it's both -- it's both a technical term and I would say it's a governance -- it's a certain way of governing software projects.

Q. And could you download wallets from bitcoin.org?

A. Yes. I believe that's where I downloaded my wallet. And that's where the main wallet that you could get that was from bitcoin.org.

Q. And after this first time that you bought Bitcoin, did you buy more Bitcoin from people?

Sterlingov - DIRECT - By Mr. Ekeland

A.   Yes.   So I bought my first Bitcoin because I wanted to see if I can make a little bit of money on the side buying and selling it and taking a small profit, because I was going to the meet-ups; and some people always talked about they wanted to buy, somebody wanted to sell.

We kind of understood it was money, but it wasn't -- at the same time, it wasn't money because nobody really knew what it was.  And it was weird.  I know they called it magic internet money at the time.

So I bought my first Bitcoin.  I bought a little bit more than I wanted to because the guy wanted to -- he gave me a good price, but he wanted to sell me more than I was kind of planning on buying.

And at the time, I got a little bit worried that what am I even going to do with this thing because it wasn't -- I mean, now it's worth a lot of money, as we have seen the price has gone a lot.  But back then, nobody talked about that.  Nobody understood how expensive it was going to get, what it was going to be, if it was going to survive, like, the next six months.

And so, yeah, I was worried what I was going to do with it.  So I tried to find somebody on the next meet-up to buy a little bit of Bitcoin from me.  When I did that, I made a little bit of profit, and then I kind of thought it was cool.  Now I can make a little bit of money while

meeting all these interesting people.

And I continued doing that for a while.

Q. And when you bought Bitcoin, was it always in the same way?

A. I'm not sure what you mean.

Q. Well, did you -- well, you testified that the first time that you bought Bitcoin, you bought it with cash from somebody in a restaurant.

And so when you bought Bitcoin, was it always in-person transactions?

A. No. For a while it was because that was the only way to buy it. But eventually, I got accounts on exchanges. I also bought Bitcoin in peer-to-peer transactions online, where I paid with other payment networks.

Q. Could you just briefly explain to the jury again -- that phrase is getting used a lot -- what a peer-to-peer transaction is?

A. Yeah. To me, peer-to-peer is just when you're buying from another individual.

Q. And could you just take us through what are the steps involved in a peer-to-peer transaction, say, in -- would you do them in a chatroom or how did you -- how did that work?

A. Right. So in person, I would meet the person first and we would discuss the trade, how much we wanted to trade.

I would try to look at them and try to determine

Sterlingov - DIRECT - By Mr. Ekeland

if this person was dangerous or if they were gonna rob me or something like that.

And then after we have decided on a trade, we would -- I would give them the cash. We would -- I would send them the address where they need to send the Bitcoin. And then they would send the Bitcoin.

Q. And --

A. If you're asking about online peer-to-peer trades, it would be going on most of the time in a chatroom or just message -- just text message, through a text message.

Q. And just going back to the in-person peer-to-peer transactions, would you be logged into your computer at the same time that the person you were buying from was logged into their computer?

A. Yes. It would be instantaneous, because I would want to see that the transaction has gone through. When the person says that they send the Bitcoin, I want to see it in my wallet that the Bitcoin has gone through and that nothing has gone wrong with it either, which was a possibility. I think it's still a possibility, but it was much more uncertain at the time, even without the person's -- any -- even without them trying to, like, trick me or not send me Bitcoin. It could still -- there are still a lot of steps along the way where a transaction could get stuck or not verified, as they call it.

Sterlingov - DIRECT - By Mr. Ekeland

But it's really similar to peer-to-peer trades online. They are also instantaneous.

And can I mention the trace?

Q. Well, I --

A. Because I think it's related to some of the claims.

THE COURT: Why don't you just wait for the question. And just listen to the questions that Mr. Ekeland is asking you and then respond to those.

MR. EKELAND: Yes. Thank you, your Honor.

BY MR. EKELAND:

Q. And so just to -- leading up to that, the peer-to-peer transactions, in a chatroom, I think you said, could you just describe just briefly the mechanics of that for the jury, just buying Bitcoin from somebody online, whether -- well, from a chatroom or however you did it?

A. I understand.

So when I was -- whenever I'm buying Bitcoin online, it's typically in a chatroom; and I would be chatting with a person that I'm trading with.

After initial discussion and initial sort of deciding on the terms and deciding on what we want to do, if I am the first to send Bitcoin or to send some kind of payment, as soon as I've sent that payment, I will write them in the chatroom because the person would typically be on the other end of that chatroom, so that they can see

Sterlingov - DIRECT - By Mr. Ekeland

instantly that I have at least -- that I'm claiming to have made the transaction.

So they can see: Okay. Have they received it? Have they not received it? Have I messed up the address? Have I messed up something else?

And if they're not trying to scam me, they will typically instantly send the other side of the transaction, like whatever they were selling me Bitcoin for or buying Bitcoin for.

Q. And did you ever get scammed?

A. I actually got scammed relatively recently. But I had many years where I was not scammed while buying or selling Bitcoin --

Q. And --

A. -- specifically.

Q. -- going back to these peer-to-peer transactions -- and I think this is 2010-2011. Is that right?

A. That's when it started. Yes.

Q. Do you recall hearing Agent Matt Price's testimony where he said that he didn't believe these types of peer-to-peer transactions you're discussing occurred a lot because it requires a lot of trust?

MR. BROWN: Objection. I'm not sure that fairly characterizes the witness's testimony.

THE COURT: Why don't you just put the -- the

Sterlingov - DIRECT - By Mr. Ekeland

jury's recollection of the testimony controls. But why don't you just -- instead of asking about what he testified, ask him the question straight up.

BY MR. EKELAND:

Q. Do you think these peer-to-peer transactions in the chatroom that you just described require a lot of trust?

A. Peer-to-peer transactions in a chatroom require some trust, which I would typically try to achieve that trust by trying to see if that person has already traded with somebody else or they have some sort of history on some platform or I've traded with them before and the trade has completed.

Q. Do you recall generally what amounts of money you were using in these peer-to-peer purchases?

A. In dollar terms, a few hundred dollars, typically. If somebody asked me for, like, $10 of Bitcoin, I would sell them $10 of Bitcoin, too. But I would typically be looking for a little bit higher amount in order to get the percentage.

I don't think I've ever went above, maybe, 2,000, a few thousand dollars equivalent. I might be forgetting some trade, but typically those amounts.

Q. You were also selling Bitcoin at the time?

A. Yes. And as I said, I guess technically my second trade was a sale of Bitcoin. And I was selling it afterwards as

well.

Q. And did you sell Bitcoin in person?

A. Yes.

Q. And did you sell it online?

A. Yes.

Q. Did you ever do an off -- well, do you know what an off-chain transaction is?

A. Are you referring to giving somebody your private key?

Q. Yes. Have you ever just given somebody your private key to your wallet?

A. Yes. I remember a case one time where somebody was trying to buy Bitcoin from me, and they just didn't understand even the basics of how the wallet works, how the software works. And I had to explain all these steps for them.

And then I set up a wallet on my phone or my computer. I'm not sure at the time. In the beginning, I used the computer a lot and then later I started using the phone.

And then I set up the wallet for them and sent Bitcoin to that wallet and then I just sent them the wallet file.

So that sending of the wallet file to them, that's what they call transferring of the private key, because I had access to their -- to the private keys that were in the

wallet. And the private keys is what lets you spend the money in that wallet. It gets a little bit technical here. Just -- I want to explain it correctly. So that me transferring the wallet file, that was giving them the private key.

I might have given somebody a private key at another time as well. It's -- I would agree it's not the most common way to do Bitcoin transactions, because you typically -- giving somebody your private key, that requires more trust because they can -- it's like giving them the key to your wallet. So it does require more trust.

But a lot of these peer-to-peer transactions -- I mean, many of them were just with my friends or somebody I knew or just somebody who was trying to learn about Bitcoin. And we would do a transaction that like $50 worth. I just -- it does require trust.

But if that person, you know, scams me for $50 and then we're not friends anymore, I just don't think that's such a high chance of that happening, which incidentally I think is what happened with Mycelium wallet, where they have shown you the Mycelium wallet I had on my phone. I think the one that says, "Burn, do not use," as best I can remember. That was just me giving somebody the private key. So once I gave them the key to that particular wallet, I labeled it as burned because now another person has a

Sterlingov - DIRECT - By Mr. Ekeland

private key. I don't want to send any more money to that wallet because somebody else has access to it.

And it's a -- it's a little technical detail in that Mycelium wallet, you can't actually delete a wallet, like a subwallet from the middle of the list. I don't know if you remember: They were showing a screenshot from my Mycelium wallet and there was like a list of, like, subaccounts or subwallets. When I had an account in the middle, you can't even delete it from the app. It's just how the app works. If you have more accounts after it, you cannot delete the account that's in the middle. So I just renamed it and never touched it again.

Q. Were some of your funds on your Mycelium wallet, did they come from the purchases that you made of Bitcoin early on?

A. Yes. That's where they all came from. Most of them. That's where most of them came from.

Q. And just now going back to --

MR. EKELAND: Your Honor?

THE COURT: No. No. I'm just leaning forward.

BY MR. EKELAND:

Q. Going back to this period of now 2010-2011, do you know what a paper wallet is?

A. Yes. A paper wallet is pretty much a private key to a wallet in some form. There are different formats that you

can have that's printed on a piece of paper that is -- you know, it's just a piece of paper. It's not connected to any computer; it's not connected to any phone; it cannot be hacked from the internet. It's just a way to have a wallet that's in some ways more safe than a wallet on my phone.

Q. What's written on the paper?

A. Again, you can do it in a couple of different ways. But I have had paper wallets, for example, where the private key is written. It's a long line of letters and digits.

Q. And you used -- did you use paper wallets a lot?

A. I used a few.

Q. Do you remember the last time you used a paper wallet?

A. More than five years ago, I think.

Q. And you said early on there weren't exchanges for Bitcoin.

Do you remember -- well, did you start using exchanges at some point?

A. Yes. So a few years in, when the exchanges started coming up, some of them seemed more trustworthy than before. And in some ways, it's much more convenient to use an exchange or a website and not meeting people in person all the time. So yes.

Q. And what -- could you just elaborate a little bit more on what is so convenient about using an exchange?

A. You can pretty much just do anything from -- trading.

Sterlingov - DIRECT - By Mr. Ekeland

You can do the buying and selling just from your computer. And I guess it's safer in some ways and not safer in other ways.

Q. And --

A. If you ask me more specifically, I might be able to --

Q. Well, for instance, you've heard testimony about the Mt. Gox account associated with the plasma@plasmadivision@hotmail.com. Is that right? The plasma@plasmadivision.com email address.

A. Yes.

Q. Is the plasma@plasmadivision.com email address your email address?

A. Yes.

Q. And is the Mt. Gox account associated with that email address -- and I believe we've heard testimony of it being called Mt. Gox account No. 1 -- is that your Mt. Gox account?

A. Yes.

Q. And was Mt. Gox one of the early exchanges that you joined?

A. Yes. Mt. Gox was, if not the first one, one of the earliest exchanges.

Q. And to the --

A. Mt. Gox is a good example of what I was saying earlier, that some exchanges might be actually less safe than trading

Sterlingov - DIRECT - By Mr. Ekeland

in person, because in 2013 or '14, Mt. Gox -- well, I don't know if you guys know, but it was hacked or was purported to be hacked. But in any case, it collapsed; and a lot of people lost their Bitcoin and also their other money that they had on the exchange in that whole collapse.

Q. Did you lose Bitcoin when that happened?

A. Yes.

Q. And do you recall any other exchanges you used early on besides Mt. Gox?

A. Yes. So I started using quite a few changes a few years in. So what happened a few years after I started trading Bitcoin is that the price started going up a lot. And I wasn't from -- like from the very start, it's not like I was thinking that I'm gonna just buy all of this Bitcoin and I'm gonna sit on it and one day it's gonna be worth these thousands of dollars. But when the price started going up, I was trading it, buying and selling it. And I just had some Bitcoin on my accounts that I was -- that I was trading with.

And some of the Bitcoin I put in cold storage and I put in other wallets. And as the -- a few years in, when the price started going up, suddenly I have a little bit of a nest egg. And I start thinking -- it's -- suddenly I have some money, which I never really had large sums of money before, and -- that was large to me.

Sterlingov - DIRECT - By Mr. Ekeland

And I started -- I understood that now that I have this, you know, Bitcoin price might go down at any point, especially at that time. Neither me nor really people on the meet-ups, they didn't expect it to go up and up and up every year.

So I just started thinking that I need to figure out more about how this thing works. I need to figure out some ways to maybe save this money, maybe make sure it doesn't just disappear. So I started learning about the different exchanges and where I could put it or maybe how I could invest it.

I started also learning about trading it online. And by "trading," I mean this other type of trading where I would try to predict the price, like looking at the chart and try to predict the price of something, Bitcoin in this case, through, like, different indicators and trying to make money on the price movements of the market.

Q. Were you successful --

A. So I started learning about that.

Q. Were you successful at trading Bitcoin?

A. I am not sure how to answer that, because if you look at the whole history of my trading, I think I made money trading. But a lot of that was just because all of my trading was in the Bitcoin market that was just going -- the whole market was going up and up and up. And I think a lot

Sterlingov - DIRECT - By Mr. Ekeland

of my trades were successful just because I was in the market. I don't know -- I doubt that if I would have just not have been doing any trading and just kept it all in Bitcoin, that I would have more money on my wallets at the time.

But it's -- I understood from the beginning that learning how to trade is a long-term -- there are people who are studying that for their lifetimes. I started learning about it. I learned a little bit. I don't think I'm a very good trader. That's just how it is.

MR. EKELAND: Your Honor, I'm just checking when the Court would like to --

THE COURT: I'll leave it up to you. Whenever you want to take your break.

MR. EKELAND: Okay. Does the Court have a preference?

THE COURT: Well, now is fine if you'd like to do it.

MR. EKELAND: Let's take a short break.

THE COURT: It's ten past 3:00. Let's take a break until 3:30.

We're getting far along with the case; but still, don't discuss it, even amongst yourselves, and don't conduct any type of research. And I will see you all back here at 3:30.

Sterlingov - DIRECT - By Mr. Ekeland

THE COURTROOM DEPUTY: All rise.

(Whereupon, the jury exited the courtroom at 3:11 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: Anything anyone wants to raise before the break?

MR. EKELAND: Nothing from the defense, your Honor.

MR. BROWN: No, your Honor.

THE COURT: Let me ask, about how long do you think this examination is going to take? The reason I'm asking is for scheduling purposes.

We had -- you may recall there was one juror, Juror No. 9, who has a doctor's appointment tomorrow morning and can't be here until 11:00. And we had discussed whether, since we do have four alternates, whether we should let that juror go, whether we should just start at 11:00. I can do my best to try to produce the jury instructions tonight so we can do the charging conference tomorrow morning.

But it would be helpful to know how much time you anticipate for scheduling.

MR. EKELAND: That's always a tough question.

Your Honor, maybe a couple hours. I don't -- say one to three hours. It's hard for me to tell. I'm not

Sterlingov - DIRECT - By Mr. Ekeland

planning on doing a whole-day thing, but I do -- I have an outline, but I do this a little bit by feel, too. So I'm not intending on going long, and I do like the idea of, you know, maybe looking at the jury charges tonight and meeting in the morning to go over the jury charges.

But I don't -- I don't know how long the Government's cross is going to be. But I think it is conceivable that we rest our -- you know, depending on the length of the cross, that we rest this case tomorrow, you know.

THE COURT: Okay. Since the Government hasn't heard all the testimony, it's probably going to be hard to know how long the cross is going to be.

MR. BROWN: Yes, your Honor. I mean, maybe one to two hours. But it really does depend on the direct.

THE COURT: Okay. Why don't you all just think a little bit about whether you want to tell the jury to come in at 11:00 tomorrow or whether we want to let that one juror go. I'm happy to do -- if the parties agree on it, I'm happy to do what the parties want. If not, I guess we'll probably just come in at 11:00.

MR. EKELAND: Okay. Thank you.

MR. BROWN: Your Honor, I think that we'd be happy to try to be efficient with the time before 11:00. If we can start, even if we don't finish the charging conference,

Sterlingov - DIRECT - By Mr. Ekeland

I think that would be a good use of time.

MR. EKELAND: The defense agrees.

THE COURT: Give me just a moment.

(Confers with the courtroom deputy privately.)

We have another juror tomorrow who has to leave at 3:30. Just something else to think about. And I think that also -- it relates to a medical appointment of a family member, is my recollection.

All right. I will see you all shortly.

THE COURTROOM DEPUTY: All rise.

(Thereupon a recess was taken, after which the following proceedings were had:)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: Let's get the jury.

THE COURTROOM DEPUTY: All rise.

(Whereupon, the jury entered the courtroom at 3:33 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY: The jury is present. You may be seated and come to order.

THE COURT: Mr. Ekeland, you can continue when you're ready.

MR. EKELAND: Thank you, your Honor.

BY MR. EKELAND:

Q. Mr. Sterlingov, I'd just like to turn your attention to 2011.

How old were you in 2011?

A.  I was born in 1988, so that should be 23.

Q.  Sounds right.

And were you still -- in 2011, were you still living in Gothenburg, Sweden?

A.  Yes.  I was living in Gothenburg.  I was traveling almost every week or every other week to Jonkoping as well, because my -- the offices of Capo Marknadskommunikation were in Jonkoping, and also my parents live there.

Q.  And in 2011, were you still doing freelance work?

A.  Yes.

Q.  And were you still going to Bitcoin meet-ups?

A.  Yes.

Q.  And were you buying and selling Bitcoin in 2011?

A.  2011, yes.

Q.  And were you taking any kind of classes or anything like that, like --

A.  At the second half, so the fall and winter of 2011, I also took classes in an online university.

MR. EKELAND:  Mr. Hassard, if we could put up what's in evidence as Government's Exhibit 313.

THE COURTROOM DEPUTY:  It's coming up.

MR. EKELAND:  Thank you.

BY MR. EKELAND:

Q.  Mr. Sterlingov, do you recall this diagram from the

testimony in this case?

A.  I recall it.

Q.  And this is a diagram of a series of transactions from the end of 2011?

A.  I believe so.

Q.  And up at the top here, where it says the Mt. Gox account No. 1, is that your Mt. Gox account?

A.  Yes.

Q.  Now, do you see how your Mt. Gox account is sending some Bitcoin to an address on the Bitcoin -- sorry -- on the blockchain?

A.  Yes.

Q.  Do you recall this transaction?

A.  No.  I wish I recalled every transaction from 13, 14 years ago.  I just don't.  I wish I was able to tell you exactly, Oh, I didn't do any of these transactions.

I just don't remember specific transactions from that long ago.

I just --

THE COURT:  Why don't you just wait for the next question.

BY MR. EKELAND:

Q.  Looking at this Bitcoin address right there, is that your Bitcoin address?

A.  I --

Sterlingov - DIRECT - By Mr. Ekeland

MR. BROWN: Object to vague.

THE WITNESS: I don't know. I don't know.

MR. BROWN: Object to vague.

THE COURT: He just said he didn't know.

MR. EKELAND: Okay.

THE COURT: That's fine.

BY MR. EKELAND:

Q. Have you seen anything in your review of the discovery in this case to indicate that it was yours?

A. No. So I have no reason to believe it's my Bitcoin address. The reason I'm saying I don't know is just I don't remember every Bitcoin address in every wallet from 13 years ago.

Q. And the same question for the Bitcoin address underneath it: Do you recall if that address is yours?

A. No. I don't recall that that was my address.

Q. But have you seen that address in your review of any of the discovery in this case in relation to being on your devices or in your password list or anything that you controlled?

A. No.

Q. And in your -- is this consistent with you just selling Bitcoin to somebody in 2011?

A. This is consistent with me selling Bitcoin to somebody, as I was doing at the time.

Sterlingov - DIRECT - By Mr. Ekeland

When I'm looking at this, I'm thinking that this is also consistent with if this was a part of some freelance job where somebody asked me to pay for something or transfer money to a certain account. I just know that in the jobs that I was taking at the time, that was a common -- like, every project would have payment accounts associated with it or hosting accounts or many other types of accounts which I had to access to perform the tasks that they were asking me to do.

I just know it was a commonplace task --

Q. And that --

A. -- in freelance jobs.

Q. And you were doing a lot of freelance jobs in 2011?

A. Yes.

Q. And you were buying and selling --

THE COURT: Careful about leading.

MR. EKELAND: Oh, sorry.

BY MR. EKELAND:

Q. And were you doing a fair amount of freelance jobs in 2011?

A. Yes, I was.

Q. And that Mt. Gox account No. 1, did you -- you provided photo identification for that?

A. I believe that was the case. Yes.

Q. And turning your attention to that Mt. Gox account

Sterlingov - DIRECT - By Mr. Ekeland

Appx5831

No. 2, that NFS9000 email there @hotmail.com, is that your email address?

A. No. It's not an email address that I use or own.

Q. And is that your Mt. Gox account, the Mt. Gox account No. 2?

A. No.

Q. And just turning your attention to the Mt. Gox account No. 3 with the email address kolbasa99@rambler.ru, is that your email address?

A. No.

Q. And is that your Mt. Gox account?

A. No. It's not my Mt. Gox account.

Q. And from -- now, you see how this Mt. Gox account No. 3 sends -- I can't see -- some U.S. dollars to AurumXChange right there? Did you have an AurumXChange account?

A. I don't know. I don't think so. I haven't seen anything.

Q. But that's -- if you did have it, that's not your AurumXChange account --

THE COURT: Leading.

BY MR. EKELAND:

Q. Finally, do you see this final -- this Liberty Reserve account down here that says Shormint LR account?

A. I see it.

Q. Did you have a Liberty Reserve account?

Sterlingov - DIRECT - By Mr. Ekeland

A. I used Liberty Reserve. It was a common payment system at the time. It was -- it was used especially among people from CIS countries.

THE COURT REPORTER: Did you say "CIS"?

THE WITNESS: I'm not sure what the term is. But the Eastern European countries, including the old Soviet countries like Ukraine and Czech Republic and other Eastern European countries.

At the time, it was very tough to kind of move money around those countries because there was no developed banking system or there were no apps. People used many types of these payment systems just to send money to their families or friends or paying for something or paying for services or buying things. I remember that.

BY MR. EKELAND:

Q. And do you see how it says Shormint LR account there?

A. I see it.

Q. Is that your Liberty Reserve account?

A. No.

Q. Did you ever have an email address shormint@hotmail.com?

A. No. That is not my email.

MR. EKELAND: We can take that down, Mr. Hassard.

If we could just put us what is in evidence as Government's Exhibit 316. Let me clear it out.

BY MR. EKELAND:

Q. And do you see -- do you remember the testimony about this diagram?

A. I think so.

Q. And starting here, the Liberty Reserve account that says Sterlingov Liberty Reserve account, that is your Liberty Reserve account?

A. I think so.

Q. And it's sending some money on November 27th, 2011, to your Mt. Gox account there, Mt. Gox account No. 1?

A. I see the transaction.

Q. And -- but you have no reason to doubt that that plasma@plasmadivision.com is your Mt. Gox account?

A. I don't have any reason to doubt it.

Q. And that's the one you used your photo IDs for?

A. Excuse me?

Q. The Mt. Gox account, the plasma@plasmadivision.com Mt. Gox account, is the Mt. Gox account that you provided photo ID for?

A. Yes.

Q. And it was in your own name?

A. Yes.

Q. Do you see this transaction here where your Mt. Gox account is sending some money to an address on the blockchain?

Sterlingov - DIRECT - By Mr. Ekeland

A. Yes.

Q. Then do you see it's sending some money to Silk Road?

A. Yes.

Q. And that user PAS, P-A-S, Silk Road account, is that your Silk Road account?

A. I have no reason to doubt it. I had a Silk Road account. I didn't remember after all this time what the username was. But I've seen it in the documents. I think it was my Silk Road account.

So --

Q. And did you see -- sorry.

A. So I used Silk Road for a small number of -- I bought some psychedelics.

As I was explaining earlier at the time, I was struggling with severe depression. I tried really hard to stay away from, like, hard drugs and even alcohol because I knew that, you know, depression is -- it's a high risk to become addicted to things. I really tried to stay away from that.

But my attempts to get help from the Swedish health -- mental health services, they were not very successful. I did not get the help that I wanted. I also had quite a few friends that were dealing with the same issues, and they also -- they told me the same things about the Swedish healthcare system in that regard.

Sterlingov - DIRECT - By Mr. Ekeland

And I was reading several studies about psychedelics and how they were used in treating depression and a couple of other mental health issues; and I decided to try some psychedelics to self-medicate, essentially. I did not know anybody in sort of real life who was, like, selling drugs or who I could get the psychedelics from.

So yeah. I got a Silk Road account. I got a few psychedelics back in -- the last time I think was 2012.

Q. And were those -- I'm sorry. Were those the transactions that Agent Santell testified about?

A. Yes.

Q. And I just want to direct your attention to up at the top above the Silk Road account. Do you see there's 60.41 Bitcoin going into the Silk Road account?

A. I see it.

Q. And do you see how coming out of the Silk Road account there's a little bit more, 60.8 Bitcoin coming out?

A. I can see that.

Q. Do you know why that might be, why more Bitcoin is coming out of your Silk Road account than went in?

A. I'm just not sure after this much time. I remember that I was hesitant while I was buying the psychedelics on Silk Road, and I think this was the last -- this was after my last transaction on Silk Road, where, again, I wasn't comfortable anymore buying from Silk Road.

Sterlingov - DIRECT - By Mr. Ekeland

And eventually, I found other -- so for treating my depression, I think people should be really careful with these psychedelics. But for me, I noticed a good effect when I was trying them. I think they helped me with my depression. So I wanted to find another way to kind of use the psychedelics for continued treating of my depression.

But I wasn't comfortable using Silk Road, so more recently in 2018 and '19, I found something called Ayahuasca Retreats. I started --

MR. BROWN: Your Honor, pardon the interruption. The question was: Does the witness know why the withdrawal from Silk Road was larger than the deposit?

THE COURT: Yes. I think it's a good point.

I'm trying to be respectful of the witness, but I do think it's important to just listen to the questions being asked. Your attorney will get around to asking other questions as followups. Just listen carefully to the questions he's asked and answer those. Then he'll proceed as he thinks appropriate for further questions.

THE WITNESS: I'm sorry, your Honor. He just mentioned Silk Road, and I feel like this is something I had to explain.

THE COURT: I'm not chastising you. I just want to, going forward, make sure we listen carefully.

THE WITNESS: I'm sorry.

Sterlingov - DIRECT - By Mr. Ekeland

BY MR. EKELAND:

Q. And this transaction was in 2011. And I think, if I recall correctly, you also just testified that you did buy some psychedelics from Silk Road in 2012. Is that right?

A. I think so.

Q. But that was -- what Agent Santell testified to was the extent of all the psychedelics you bought from Silk Road; is that fair?

A. Yes. That's correct.

Q. And just --

A. Because --

Q. I'm sorry.

A. That's just kind of the point I was trying to make. That after this experience, I found a better way for me to deal with my depression by going to these ayahuasca retreats in Spain, which are completely legal there. And so I haven't bought any more psychedelics anywhere.

THE COURT REPORTER: Can I just get a spelling on the retreat in Spain.

THE WITNESS: A-Y-A-H-U-A-S-C-A.

THE COURT REPORTER: Thank you.

BY MR. EKELAND:

Q. And just following this trace briefly through here from this Bitcoin address down at the bottom here to Mt. Gox account No. 2 -- and that, as you said, wasn't your Mt. Gox

Sterlingov - DIRECT - By Mr. Ekeland

account?

THE COURT: I'm sorry. If you could be careful about the leading.

MR. EKELAND: I'm just trying to -- understood, your Honor.

BY MR. EKELAND:

Q. Following this transaction, do you see how it says "Bitcoin Fog" down at the bottom?

A. I see that.

MR. EKELAND: Mr. Hassard, you can take this down now.

BY MR. EKELAND:

Q. Do you remember the first time you heard about Bitcoin Fog?

A. No. I heard about mixing in general. But I'm not sure the specific time when I heard about Bitcoin Fog.

Q. Do you remember what you heard initially about mixing?

A. Yeah. So about -- I want to say six months or a year after me starting -- after I started going to these meet-ups, people started mentioning mixing. And it was just another one of these weird geeky things that you kind of had to learn with Bitcoin. Like I said, I mentioned earlier, there's, you know, private keys and there's Merkle trees and there's mining and there was mixing. It was just one of the things that people said that you really should do to

Sterlingov - DIRECT - By Mr. Ekeland

preserve your privacy.

And I don't ultimately know if you need to be doing mixing. I decided to do it after hearing these people on these meet-ups. Some of them were saying you really have to do it. Some of them said it doesn't do anything. Some of them said you've got to do it sometimes.

I don't really know what the truth is. I had to learn all of this on the meet-ups. There was no book. There was no, like, website where you can get, like, reliable information about it.

So --

THE COURT: Again, listen carefully to the question. The question was just: Do you remember when you first heard about mixing?

BY MR. EKELAND:

Q. And why were people saying you should use a mixer?

A. To protect your privacy on the blockchain, which is essentially -- my understanding is it's a public record of all transactions that everybody's doing on the blockchain.

A specific reason that resonated with me was that when one of the guys I was trading with, he explained to me about these robberies that are happening to owners of Bitcoin that had started going up in price a little bit already. That especially when you're trading in person -- if you're trading with somebody in person, they can identify

Sterlingov - DIRECT - By Mr. Ekeland

you on the blockchain because they know who you are right there because you meet them.

And then through the blockchain, they could go and they could track your transactions and they could track your wallets and they could find how much Bitcoin you have or how much Bitcoin you receive or who you are paying or who is paying you.

And that there are cases where people get robbed sometimes in their apartments. People come to apartments of owners of Bitcoin or other cryptocurrencies because they have identified that there are some wallets there.

So that reason resonated with me; and after that I became -- I started mixing more regularly. I know other people also used it just for private -- it's a privacy tool, I think.

Q. And what --

A. The main point that I got out of it is it's a privacy tool for Bitcoin that otherwise is not private.

Q. And what mixers did you use?

A. I used Bitcoin Fog mostly for most of my mixing. I think I tried a couple of other mixers. But Bitcoin Fog was the one that I got introduced early on, and it just kept working. And throughout the years, I think it was the biggest mixer that everybody was recommending. So I just kept using it.

Sterlingov - DIRECT - By Mr. Ekeland

Q. And after you mixed your Bitcoin through Bitcoin Fog, where did you send your Bitcoin?

A. Whenever -- wherever I needed it or just the trading or to --

Q. Did you --

A. Sometimes I sent it to other people when I was trading with them. Sometimes I sent it to my exchange accounts. Sometimes I sent it to my Mycelium wallet. Just anywhere.

Q. And was -- you've heard the testimony about your Kraken accounts. Do you recall that?

A. I don't know what specific testimony you are referring to. But in general, yes.

Q. After you mixed your Bitcoin -- some of the times when you mixed your Bitcoin through Bitcoin Fog, did you send it to your Kraken accounts?

A. I probably did that.

Q. And your Kraken accounts were KYC accounts?

A. Yes. My two Kraken accounts were KYC accounts. One of them was the account of my business. But I owned the business, so it's -- I'm just calling it my account as it's an account of my business.

Q. And was it a general practice of yours to mix your Bitcoin through Bitcoin Fog before you sent it somewhere?

A. Yes. To mix it to achieve the privacy that I -- my understanding was that I needed to do that for the safety

Sterlingov - DIRECT - By Mr. Ekeland

reasons that I mentioned.

Q. And just turning your attention briefly to 2012, what were you doing in 2012?

A. In 2012, I still was working at Capo. I was still taking some freelance jobs on the side. I was going to meet-ups.

Q. Were you still buying and selling Bitcoin?

A. Yes.

Q. And did you have a home computer in 2012?

A. Probably yes. Yes.

Q. And do you remember if you remotely accessed that computer in 2012?

A. I don't think so. Not in 2012. Maybe.

Q. Do you remember --

A. At some point, I started accessing my home computer remotely. I don't remember the date of that.

Q. And is there anything else about 2012 that you'd like to share with the jury before we move on to 2013?

THE COURT: I don't think that's an appropriate question.

MR. EKELAND: Withdrawn.

BY MR. EKELAND:

Q. Moving on to 2013, how old were you in 2013?

A. That would be 25.

Q. 25. Okay.

And what were you doing in 2013?

A. Well, one thing around 2013 or '14 or thereabouts, I -- the Bitcoin that I had saved had appreciated a lot because the price started going up.

And at some point, I realized that I had enough savings to get six months off my job or maybe even 12 months. So that's what I did. I took a leave of absence. And my understanding was also that I could come back to my job almost at any point because they were -- they were hiring people at the time as well. And also, me living in Sweden, we have a really good social security system. So I wasn't really worried about becoming homeless or anything like that.

So I just wanted to pursue other interests of mine, and it was kind of a dream to get this time off my job for a while and now I had the opportunity to do that. So I did that.

Q. And did --

MR. EKELAND: Mr. Hassard, could you put up what's in evidence, I believe, as Government's Exhibit 850.

MR. HASSARD: 850?

MR. EKELAND: 850.

BY MR. EKELAND:

Q. Do you recognize this email, Mr. Sterlingov?

A. I have to say I don't recognize it from my memory. But

I recognize it from seeing it in this trial.

Q. And do you see how it says there in the middle that you're running out quickly?

A. Yes.

Q. Is that a reference to you running out of Bitcoin?

A. I believe there's another email that says that I was running out of Bitcoin. I think this one kind of mentions it.

Q. Uh-huh. And that other email --

MR. EKELAND: Let's take this down.

BY MR. EKELAND:

Q. Do you recall the testimony about that email that the Government elicited testimony on that you were running out of Bitcoin?

A. Yes.

Q. And were you in fact running out of Bitcoin at the time of that email?

A. Should I wait for the email or not?

Q. I'm not sure if I've got the right exhibit number for it, Mr. Sterlingov. If you could just recall from your testimony.

A. Okay. So there -- there is an email where apparently I'm telling somebody that I don't want to trade with them because I've ran out of Bitcoin.

And I know that the Government brought it up in

this trial.  And they've also asked me about it already.

And it's just interesting to me because when I read that, it kind of makes me wonder if they think even for five minutes about this -- these theories, just because -- so this is --

MR. BROWN:  Objection.  This is far from the question.

THE COURT:  The question, I think, was simply:  Do you recall your testimony?  I'm sorry.  If you could recall from your testimony.

So I think you were asking whether he simply recalled the testimony that came in about that, about that issue.

MR. EKELAND:  Yes.  It was:  Do you recall the testimony --

BY MR. EKELAND:

Q.  Do you recall the testimony about the email where you state that you were running out of Bitcoin?

A.  Yes.  I recall my testimony.  And --

THE COURT:  So that's the answer to that question.

So now ask your next question.

BY MR. EKELAND:

Q.  Were you actually running out of Bitcoin?

A.  No.  I did not ran out of Bitcoin.  That email, that -- I'm not seeing it, but there's an email where I mention that

Sterlingov - DIRECT - By Mr. Ekeland

I ran out of Bitcoin.

That was an email with somebody who I was probably trading Bitcoin with beforehand. This was not somebody that I knew well. This was not some of my friends. This was just a random person that I probably met in a meet-up and that I traded a couple of times with.

I have different -- I had different wallets and different -- I kept Bitcoin in different places. And I did not want to trade all of my Bitcoin. Some of the Bitcoin I wanted to save for future. I kept it in paper wallets sometimes. I kept it in other wallets. I'm not required to trade all the Bitcoin that I have just because somebody wants to trade with me.

And also, as I think I've mentioned once before, I was worried about being robbed. So this would be exactly the kind of person that would be -- that I would be worried about. This is a random person that I met on the street that I've already traded with that knows that I have Bitcoin. And they probably know my address.

I don't know if I mixed my Bitcoin or not when I was trading with them. Even if I did, they could figure out what my wallet address is. And this is the exact -- the risk -- this is the person that was potentially a robber that I was worried about. Right? I don't know if they were. I'm just saying, this is the type of person.

Sterlingov - DIRECT - By Mr. Ekeland

So I am not gonna tell this person exactly how much Bitcoin I have and where.

But what really kind of makes me question why this is coming up is that that email kind of destroys the whole theory, because --

THE COURT: I'm sorry. I'm sorry. But that's -- I don't think this is responsive to the question posed.

The question was simply whether you in fact were out of Bitcoin.

I think that was the question. Right?

MR. EKELAND: Yes.

THE COURT: So I think you've answered that question.

So you can ask the next question.

MR. EKELAND: Mr. Hassard, if you could put up what I believe is in evidence as Government's Exhibit 841.

BY MR. EKELAND:

Q. Mr. Sterlingov, do you recognize that email from the testimony in this case?

A. Yes. I recognize it.

Q. And what is your understanding of what you're talking about in this email?

A. This is the email where apparently I am mentioning some shady characters, quote, that are always hanging in McDonald's and that they are starting to recognize me.

I believe this is the same -- this is the same reason that I was worried about being robbed. I just don't want to -- I think I traded Bitcoin at McDonald's a few times before that. And I was just worried that some people that are hanging out there could be seeing me exchanging cash with somebody or doing something, you know, weird on our phones and just being attacked.

MR. EKELAND: You can take this down, Mr. Hassard.

BY MR. EKELAND:

Q. And, Mr. Sterlingov, do you recall there's been a lot of testimony in this case about your notes?

A. Yes. I'm sorry. Are you gonna ask me about the -- running out of Bitcoin?

MR. BROWN: Objection.

THE WITNESS: This is the point I'm --

MR. BROWN: There's no question in front of the witness.

THE COURT: So there's not a question in front of the witness. I mean, I want to make sure the witness has the opportunity to say whatever he wants to say in the case.

But why don't you go on, and we can come back to this later.

MR. EKELAND: I can ask him another followup question on that.

THE COURT: If you know what the followup question

Sterlingov - DIRECT - By Mr. Ekeland

is, yes.  That's fine.

BY MR. EKELAND:

Q.  In relation to the email we were discussing about running out of Bitcoin, you weren't actually running out of Bitcoin.  Is that your testimony?

THE COURT:  That's asked and answered, I think.

BY MR. EKELAND:

Q.  Is there anything else you'd like to share --

THE COURT:  Yes.  So I have --

MR. EKELAND:  I'll move on.

THE COURT:  We can talk about this.  I think the rules with respect to counsel conferring with the witness don't necessarily apply when the witness is the defendant. So you may have an opportunity to talk with him during the break if there's some question that he wants to suggest that you ask.  But rather than doing this all in front of the jury, why don't you go on and we'll talk about that later.

MR. EKELAND:  Certainly, your Honor.

Mr. Hassard, if you could please put up what's in evidence as Government's Exhibit 711-A, as in apple.  And if we could go to Page 6.

BY MR. EKELAND:

Q.  Can you see that, Mr. Sterlingov?

A.  Yes.

Q.  And do you see the title Temp Money?

A. Yes.

Q. What are you talking about there?

A. I believe this was a list of all my accounts that I tried to get into kind of this one document to just keep them all in one place.

MR. EKELAND: Can we just scroll very quickly to the top of these notes.

BY MR. EKELAND:

Q. Were these notes that you took on your computer?

A. Yes. This is a document from my computer.

Q. And what kind of notes were you taking on this document here?

A. So there are quite a few notes on my devices. There are actually hundreds of pages.

Q. And --

A. I believe there's been a certain presentation to make my notes look like they are some sort of well-planned, well-structured evil plan.

I don't believe that's correct. A lot of my notes are not even structured really well. A lot of my notes are just, like, a hodgepodge mix of some philosophy quotes that I found on the internet, some interesting ideas that I had.

This one is tracking of my packages.

Q. We --

A. The --

Sterlingov - DIRECT - By Mr. Ekeland

Q. I'm sorry.

MR. EKELAND: Can we scroll down to the heading Packages?

THE WITNESS: A lot of them are my -- something that's called stream of consciousness. And that's a technique that I learned for my -- I mentioned my depression already. It's a good technique for, like, emotional processing and processing trauma and stuff like that. It's where I just write down whatever comes into my head without trying to filter it, without necessarily even go back and reading it, just, like, trying to vent it on paper. A lot of these notes are like that.

I don't see how I could have been doing that. There's hundreds of pages of notes of me venting. And how could I be running some sort of secret $100 million operation for ten years and not mentioning it once in the notes that I don't even read back? I don't think that would be possible.

Some of these notes have, like, cuss words in them. I apologize if you guys will be reading them if anybody's offended by that.

A lot of the venting is -- I still use it for my depression reasons. So it's like when I have some negative emotions that I am trying to process, sometimes it comes out as cuss words.

Sterlingov - DIRECT - By Mr. Ekeland

I have some technical notes. Some of these documents are a little bit more structured. I have a lot of my passwords in these notes. I have notes about my backups. I have notes -- I have just hundreds and hundreds of links that I've -- like every time there's a link that somebody sends me or that I find on the internet that, there's, like, something interesting about, I put it in my notes.

It doesn't mean that I like the link. It doesn't mean that I'm gonna buy the product. It doesn't mean that I agree with what's in the link. It just might be something interesting. I might be saving it for somebody else that I want to share it with. Some of these notes are like other people that have sent me some information. It's just a mix of everything.

I think that if you go through more than 300 pages of my notes and you just pick and choose individual lines here and there --

THE COURT: I'm sorry. I just think we're losing the process here of just questions and answers. And so I think we should stick with that.

MR. EKELAND: Your Honor, understood.

Mr. Hassard, could we go to Page 4?

BY MR. EKELAND:

Q. Do you see where it says Level Zero Masked Goals?

A. Yes.

Sterlingov - DIRECT - By Mr. Ekeland

Q. What do you mean by Masked Goals?

A. Right. So the word "masked" is used here. It's also the name of this document. It's actually a term from computer science, it's something that happens to a processor when a processor is doing, like, one specific task that it's like 100 percent focused on.

And there are all these other events that are typically happening in, like, a computer system, to try to get the attention of the processor, if you will, away from that specific task. But for the time being, the -- whatever program it is, it doesn't -- it cannot switch from what it is doing. Then it is called -- these extraneous events, they're called masks. They're called masks or maskable interrupts.

It is a term from processor programming. It's very easy to Google. I don't know if you are allowed to do that. I don't know if we have the exhibit. But that's where the name comes from.

And I mean, I apologize for, like, even taking time with this. But it's just the Government has been using these. I think they said something like my file masked is about, like, his efforts to stay masked.

MR. BROWN: Objection. Argumentative and --

THE COURT: Yes.

MR. BROWN: It doesn't fairly characterize the

Sterlingov - DIRECT - By Mr. Ekeland

evidence in the record.

THE COURT:  Fair enough.

I think you can leave argument in the case to your lawyer to make.  But he can ask you the questions and establish the record that way.  And then you can talk with him about whatever arguments you think should be made.

BY MR. EKELAND:

Q.  Would it be fair to say --

THE WITNESS:  Your Honor, I'm sorry.  I'm just trying to explain things about my notes that I don't think anybody else can explain.

THE COURT:  That's entirely fair.  And --

THE WITNESS:  Can I just add the last thing to that?  I'm gonna try to not be an argument.

THE COURT:  Okay.  That's fine.

BY MR. EKELAND:

Q.  Would it be fair to say, Mr. Sterlingov, that your masked lists are just to-do lists?

A.  Sometimes they're to-do lists.  But more generally, they are things that are -- that I didn't want to deal with in the moment.  And I just wrote them down as something that I wanted to maybe come back later or check out later, just like the processor analogy.

And if you look through my masked document, there's also a second document that's called Tech Specific

Sterlingov - DIRECT - By Mr. Ekeland

**Appx5855**

Masks where the word "masked" is used in the same meaning. They don't contain any efforts to stay masked, I guess.

MR. EKELAND: We can take this down, Mr. Hassard.

BY MR. EKELAND:

Q. And then I just -- turning your attention to 2014, are you still working for Capo Marknadskommunikation in 2014?

A. That would be around the time where I got my leave of absence.

Q. And then did you return to Capo after your leave of absence?

A. I returned to them, Capo, at times just to -- they asked me to come back and kind of work on a couple small issues that they had that only I had knowledge about.

But I didn't -- I never returned as a long-term employee at Capo.

Q. And then what, if anything, did you do to earn a living after you left your full-time position at Capo?

A. I had a few attempts at projects. But I never made any money on any of my projects except maybe a little bit on the music studio. So all my money came from Bitcoin, from the Bitcoin price appreciation.

Q. Did you say you had a music studio?

A. Yes. Around that time, I think 2014 or '15, me and two of my friends, we came together to start a small music studio where people were coming in and recording their

projects.  This was one of those -- this is one of the reasons I wanted to leave my job to try to do more interesting things that I had the opportunity to do, that I had now time to do when I didn't --

Q.  And is that music studio still operating?

A.  No.  We shut it down after a few years.  It operated for a few years.  We never made any money.  We made a little bit of money selling it.  But just everybody lost interest after a while, and we just closed it down.

Q.  And were you working on any other kinds of projects during this time period, 2014-2015?

A.  I had a lot of ideas.  Almost every year, I had a lot of ideas that I was trying to pursue.  There were very few of them that came anywhere.  In 2014, I think that was the year where I tried to set up something called Hedged Wallet, which was the one Bitcoin-related project that I came -- even -- it was never operating -- I could never finish it. But that's the one project that I came most close to actually creating a Bitcoin project.

Q.  And what was Hedge Wallet?

A.  Hedged Wallet was a wallet that was gonna kind of trade Bitcoin for you.  But -- so I gave up on the Hedged Wallet because as I started -- as I figured out what it was going to be and I started writing some code for it; and I had to hire somebody to even help me with the Bitcoin code because

I couldn't write all that Bitcoin code myself.

As we had finished a part of the project and we started testing it, it was actually losing money even without -- so we never put any real money in it like any real Bitcoin. But as we were testing the code on the back end, when we were doing the different transactions, there was money already disappearing from the accounts.

So there must have been some kind of bug in the code that we had. And I tried to -- like I tried to find a solution for a while. But I just couldn't -- I couldn't find a solution myself.

And I thought that maybe I could find some other expert, you know, yet another person that maybe could go into it and try to resolve these problems. But I just -- I mean, I got scared that I would end up like Mt. Gox project, meaning that I would lose a lot of money for other people because I didn't know how to complete this project and why the money was disappearing from the accounts.

And even if somebody would fix the problem, I would still not know where it came from and where the next problem like that would come from.

So eventually, I just gave up the whole idea. And --

Q. And then --

A. -- other than that, I didn't have any Bitcoin projects

ever.

Q.  Well, turning your attention to January -- I'm sorry -- turning your attention to 2015, what sort of projects or what were you doing in 2015?

A.  In 2015, I think the studio was still operating.  And I think that was the year where I started working on my Moon VPN project.

Q.  And could you describe -- are you referring to the To the Moon VPN project?

A.  Yes.  That's the same thing.

Q.  Could you explain your To the Moon VPN project to the jury?

A.  To the Moon was going to be a VPN service that was gonna take Bitcoin, among other things.  I'm not describing that as a Bitcoin project because it wasn't gonna handle any money for clients.  It was just gonna -- you were supposed to be able to pay with Bitcoin for VPN.

And I was trying to get it off the ground for a while.  It kind of came in waves.  I got interested and then I got interested in other things.  I let it sit for a while and then I would come back.  I would try to finish some more -- do more work on this VPN.

This was my company in Malta.  It's the same thing as the Moon VPN.  It's the same thing as Bit Coaster.  It's just -- in Malta, they always have two companies to register

the same -- I guess rather two legal entities to register the same company. So one of them is Bit Coaster; one of them is Moon VPN. But they're part of the same thing.

Q. Why did you register your company in Malta?

A. Just tax reasons. Malta is a European, fully -- what's the word? -- fully compliant jurisdiction in Europe; and you get all the access to, like, European markets and it has good -- like a good legal system. It's a developed country. But it has very low tax for Europe.

Q. And did your To the Moon VPN project -- did it ever develop a customer base?

A. No. It never came to that. It was never a completed project. It had a website and I used a -- so I didn't actually develop the code for Moon VPN because it was just a constructer that people could use to make their own VPNs. It's called WHMCS, I think.

So I got that. And I started configuring it and I got a server in Romania that was the Moon VPN server. And I got to hire somebody else to write the Bitcoin code for that, for accepting Bitcoin.

And I just did some work on it and I think it was -- I guess almost operational, but there were never any clients other than like my friends that I asked to just, like, Hey, I'm making this VPN. Can you be -- can you make, like, an order so that I can test the website?

Sterlingov - DIRECT - By Mr. Ekeland

Q.   Turning your attention to 2016, do you recall what you were doing in 2016?

A.   In 2016, I was probably doing the same things.  I also -- so I was still learning how to trade, "trade" meaning trying to predict the prices.

Throughout these -- I think 2014 and '15 and '16, the Bitcoin price started going up even more than it did before.  Suddenly I had even more money than I did before without even really, like, doing anything except that I held onto the Bitcoin.

I started learning more about the different exchanges, the trading.

I think at that time I already started my learning to become a mental health coach.  It's this -- another thing that I wanted to do, like I was also one of the reasons I wanted to take a leave of absence from my job, because I had an interest in that for a long time, connected to me, you know, struggling with my depression, but also I had interest to become a coach that could help other people with those problems as well.

So I started going to seminars and different retreats and things like that to learn how to be a mental health coach.  Just chronologically I think it was around that time.

Q.   Then just turning your attention to 2017, did you in

Sterlingov - DIRECT - By Mr. Ekeland

2017 travel to Miami?

A.   Yes.

Q.   And do you recall how long you were in Miami?

A.   In 2017, it was three months.

Q.   And were you traveling a lot during this period?

A.   I traveled quite a bit, I would say.  In terms of traveling within Europe, for many years I travel a lot.  It's quite easy to travel between different countries in Europe.  It's like going to a different state, I think, if you compare to the U.S.  You don't need any visas or documents.  You just drive there.  You can drive to another country in three hours.

Q.   And at this point in time, were you remotely accessing your home computers on your travels?

A.   In 2017, I'm not sure.  I probably had accessed my home computer before that.  But I don't think it was -- I don't think I had it for three months on in Miami.

MR. EKELAND:  If we could get what is -- I believe it's in evidence -- as Government's Exhibit 414-C, as in Charlie, up on the screen, Mr. Hassard.

THE COURT:  If any jurors want to stand up and stretch, you're welcome to do so.  I'm told it's good for you to get up every now and then.

MR. EKELAND:  How long are we going today?

THE COURT:  Until 5:00.

Sterlingov - DIRECT - By Mr. Ekeland

MR. EKELAND: If we could scroll down to post No. 10.

BY MR. EKELAND:

Q. Mr. Sterlingov, do you recognize these messages from the previous testimony in this case?

A. Yes.

Q. And could you just briefly summarize what these message threads are about?

A. These are my communications with an exchange called Bitstamp, with their support. And the last messages that I believe we had talked about or like the most recent ones are -- I pretty much just got frustrated with their support, and I'm copy-pasting messages.

Q. Did --

A. Bitstamp was already at that time -- Bitstamp was already an exchange that I was trying to stop using because it is -- at that time, I probably had accounts on several other exchanges. And Bitstamp had the least -- the worst functionality of all of those exchanges that I already had experience with. I think you could only trade one cryptocurrency on it, whereas you can trade sometimes hundreds of other -- of cryptocurrencies on other exchanges.

The interface was not very good. And of course a lot of these KYC questions, I know they've come up, but I had at that time experience with other exchanges and their

KYC questions as well.

And when these, like, ten huge questions from Bitstamp from their KYC -- when I saw that, that they're asking me the same questions again as I have already answered, and they -- the level of detail that they're asking, to me it seemed like there was something else going on there. It's not just KYC, because I talked to KYC on other exchanges. I've never seen this many questions being asked.

This is probably -- I'm not -- I don't know what Bitstamp is doing. I'm just explaining my thinking at the time, I guess, why I got frustrated at their support, because I was already trying to stop using the exchange; and then I'm providing them answers and they just are asking more questions and more questions.

MR. EKELAND: Mr. Hassard, could we scroll down to message number -- post No. 23. Actually, could we go to post No. 22 above that.

BY MR. EKELAND:

Q. Do you see that post No. 22, Mr. Sterlingov?

A. Yes.

Q. Are those some of the kinds of questions you were being asked that were frustrating you?

A. I think partly. But it seems like here there's only three questions. So this is a better -- I think at some

Sterlingov - DIRECT - By Mr. Ekeland

point Bitstamp was asking for, like, ten different questions. And then they asked the same ten different questions again, which I don't think are in this post particular -- this particular post.

MR. EKELAND: If we could scroll down and go to posts 28 through 40. Then if you could scroll down to, actually, post 29 -- actually, hold on right there.

BY MR. EKELAND:

Q. Do you see that -- where Urban Kosem is asking you about the .46 Bitcoin deposit?

A. Yes.

MR. EKELAND: If we could just scroll down to -- some more to the reply.

BY MR. EKELAND:

Q. And then you reply there in post No. 30. What is your understanding of what you're saying there?

A. I'm saying that this payment was connected to a payment from a client. I'm saying that I forgot that they were -- I think they were asking about my past payments first. But I got it confused with the more recent payment or --

MR. EKELAND: If we could scroll down a little bit to 31.

BY MR. EKELAND:

Q. Do you see there where they're saying that they notice your BTC address had never received any BTC?

Sterlingov - DIRECT - By Mr. Ekeland

A. Yes.

MR. EKELAND: Could we scroll down to 32.

BY MR. EKELAND:

Q. If you could just take a look at that and just -- instead of just reading it to the jury, just summarize your understanding of your response to them.

A. At this point, I'm just trying to explain to them something about my invoices. But I think I shouldn't have sent this invoice to Bitstamp, because those invoices were for my own records. I know that some of those invoices might have some incorrect information. I never intended to send those invoices anywhere. And I wasn't required to. They are -- I don't know --

Q. Are those the Code Reactor invoices that you're talking about?

A. Yes. Those are the Code Reactor invoices that the Government I think found on my computer.

MR. EKELAND: Mr. Hassard, if we could pull up -- we'll come back to this one -- what's in evidence as Government's Exhibit 414-A, as in apple. 414-A.

BY MR. EKELAND:

Q. Is that one of those Code Reactor invoices?

A. Yes.

Q. And you testified that you didn't send them out to anywhere?

MR. BROWN: Objection. I think that misstates the witness's testimony.

THE COURT: You shouldn't be leading anyway. Why don't you just ask him.

BY MR. EKELAND:

Q. What were those invoices for?

A. These invoices were for me trying to tax some Bitcoin that I had at the time that I had remaining from some of my freelance jobs some years before that.

So I had a wallet with Bitcoin that I had received for those jobs, and I hadn't taxed it at the time. And I kind of understood that I need to tax it because those were for the jobs; and I was trying to figure out the best way in Sweden what would be to tax them.

Also, considering that that money was in Bitcoin and the Swedish government and the Swedish system, they didn't understand Bitcoin. You couldn't just go to them and tell them, Oh, I have this Bitcoin from a client. They see -- they want to see the money on, like, a Swedish bank account. Once it's in the Swedish system, then you can tax it.

So I was trying to figure out what the best way to -- how to exchange that, how to tax that.

I found a simple form of a business. I think it's something like a simplified version of -- I think there's

something in the U.S. called sole proprietorship. That's a very similar form of business. It's not really even a business. It's just my -- it's my Social Security number. It doesn't have its own number. It's a very limited form of business that has very strict limits, even on the amounts.

And --

Q. Do you --

A. -- I've heard that -- there's been allegations that I've been trying to launder my alleged hundreds of millions of dollars through these Code Reactor invoices. That would not be possible. This business type is -- it would never work. There are very strict limits.

Q. And let --

A. And they don't -- I'm sorry -- your question about the invoices: They don't require me to send any invoices. There's no government requirement for that.

I decided to still make invoices to learn how to do that in the future. I thought I would still be doing freelance jobs. But I wasn't paying too much attention to them.

And sometimes I just had to -- because these jobs I have done three, four years prior. And sometimes I had to go back to, like, try to find my records and sometimes just go back to the website that I was working on and try to find, like, the DNS registration and get the name from

there.

Q. Do these invoices reflect money that you actually earned on freelance jobs?

A. Yes. And I think it had appreciated during that time as well, because it was in Bitcoin.

Q. It appreciated because you were paid in Bitcoin?

A. Yes.

Q. And are these actual customer names there, where, like, Anton Beckman or I think we saw one that was Karl Marx? Were you actually using customer names?

A. I didn't see one that was Karl Marx. I believe the Karl Marx was something than an agent put in somewhere.

Q. Were you generating these invoices?

A. Yes.

Q. And were you using an accounting program to do it?

A. Yes.

Q. And besides the one that you sent to Bitstamp, did you ever send one of these invoices anywhere?

A. No. I didn't send them anywhere and I didn't need to send them anywhere. Like I said, for this type of business, they never expected these invoices, which is why I didn't pay as much attention to them as I would have if it was another type of business.

MR. EKELAND: If we could just take this down, Mr. Hassard, and if we could just go back to what's in

Sterlingov - DIRECT - By Mr. Ekeland

evidence as Government's Exhibit 414-C, as in Charlie. If we could just scroll down a little bit more.

BY MR. EKELAND:

Q. Do you see there in post 33 where it says the bulk of your deposited BTC originate from mixing services?

A. The bulk --

Q. It's the posting --

A. Yes. I see that.

Q. Was that an accurate -- do you recall if that's an accurate statement?

A. It could have been. I was using Bitcoin Fog specifically.

Q. Did --

A. I do not recall at the time whether these specific transactions they're talking about -- whether I used the mixer on that specific transaction, whether I used maybe a mixer and then I put it in a different wallet and maybe then I sent it to Bitstamp, whether I didn't use a mixer at all.

These transactions that they're asking about, I think, are several years in the past from the date when they're asking.

Q. Do you -- so that's the reason, because I think I got -- I think I answered that I might have been using --

THE COURT: I'm sorry. Do you need a break? We need a break.

Sterlingov - DIRECT - By Mr. Ekeland

Well, it's a quarter of 5:00. Why don't we just break for the night now, I think. And so -- I'll tell you what. If you can all just go back in the jury room. I just want to talk with the lawyers about what the schedule is for tomorrow. So before you go home, just hang out in the jury room and the deputy clerk will let you know what the schedule is for tomorrow after I talk to the lawyers.

Do not discuss the case with anybody, even among yourselves, and do not conduct any research.

There was a reference at one point where I think Mr. Sterlingov said, "I don't know whether you're allowed to Google or not." I don't know whether he was talking to Mr. Ekeland or who he was talking to. But I wanted to remind you, you should not be conducting any type of research, Google or otherwise, relating to the case.

THE COURTROOM DEPUTY: All rise.

(Whereupon, the jury exited the courtroom at 4:45 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: Mr. Sterlingov, you can go back to the counsel table.

So I wanted to talk to you all about scheduling tomorrow. I will do my best to post some proposed instructions. I'm working on them.

So we could get together in the morning and talk

about the proposed instructions. I will say, though, the reason that we can't start until 11:00 a.m. tomorrow is because Juror No. 9 has an appointment. I don't know if you all noticed this, but Juror 9 was just asleep.

So again, if both sides were of the view that Juror 9 should be excused, I would be open to that. This is at least the third or fourth or fifth time I've noticed her sleeping. She does have -- I don't want to be critical of her at all. She's got a medical issue she's dealing with in the morning, and so it's understandable to me. But I'm happy to handle this however the parties think we should.

MR. EKELAND: May I take a moment to consult with my client?

THE COURT: Yes.

MR. EKELAND: Thank you.

(Confers with the Defendant and co-counsel privately.)

THE COURT: Mr. Ekeland?

MR. EKELAND: We'd prefer to keep the juror.

THE COURT: Okay. She was sleeping during your client's testimony.

MR. EKELAND: Sleeping. Okay.

THE COURT: If you want to keep her -- what's the Government's view?

MR. BROWN: Your Honor, so two considerations.

One, I think at this point it is appropriate to cut her.

She slept through, in fairness, both -- everybody's cases.

THE COURT: I don't think it's one side or the other.

MR. BROWN: But also, a little bit more to the point, although I think initially we expressed some agreement with going forward with the charging conference tomorrow morning, I think the problem there is the evidence just isn't fully in. And there's some issues where I think it makes more sense to get through the witnesses, get through the defense case.

The Government -- we have to figure out if we are presenting any sort of rebuttal case. It makes a lot more sense to do charging conference after that.

And so I think the Government's preference would be, you know, if necessary cut Juror 9, start at 9:00 a.m. tomorrow and try to work through as much of the rest of this trial as we can before 3:30. And, you know, we very well may have time for a charging conference.

THE COURT: Ultimately, I don't think the scheduling so much should drive this as the question about whether she has just actually heard portions of the testimony because she has been asleep.

Do you know, is there precedent on point with

respect to what the standard is for making this determination?

MR. BROWN: Your Honor, none of us know off the top of our heads. We can certainly go back and look for it.

THE COURT: The only thing is we should let her know tonight -- let everyone know tonight what time we're coming to be in in the morning.

Mr. Ekeland, do you have anything else you want to add on this?

MR. EKELAND: No, your Honor.

THE COURT: I think we should just take five or ten minutes to see if there's a precedent on sleeping jurors. My strong suspicion is that if it's a repeated problem, that that is a basis for dismissing a juror.

But let's take a careful look at that before we make a decision on that, although I don't want to keep the jurors waiting too long.

Is there anything else you want to raise, anyone wants to raise tonight while --

MR. EKELAND: Nothing from the defense, your Honor.

MR. BROWN: Nothing else from the Government.

THE COURT: Okay. Also, any objection from the Government to Mr. Ekeland conferring with Mr. Sterlingov about the questions that Mr. Sterlingov wanted him to ask?

My recollection is that the standards are substantially relaxed with respect to the no contact when you're dealing with the Defendant and his counsel and his right to counsel, as well as the fact that he's still on direct, so it's not as though he's going to be rehabilitated for cross in some way.

MR. BROWN:  No, your Honor.

And I'm not recently familiar with the D.C. Circuit precedent on this.  But I know that, as the Court states, the standards are somewhat relaxed.

THE COURT:  So, Mr. Ekeland, if you'd like to confer in following up with Mr. Sterlingov about that, I have no objection to that.

MR. EKELAND:  Thank you, your Honor.

THE COURT:  I just think it was cleaner than doing it in front of the jury.

(Confers with the courtroom deputy privately.)

She also is the juror who is always late, too, which is another issue.  It's less pressing, obviously, as we're getting later in the case.  But she is chronically late.  And, as I said, she's dealing with some issues that make it understandable to me.

(Pause in proceedings.)

THE COURT:  I don't want to keep the jurors too much longer.  Have you found anything?

MR. BROWN: Your Honor, just a handful of citations.

There's an older Ninth Circuit case, *United States versus Velazquez*, which is 110 F.3d 71. It deals with dismissal of a sleeping juror.

The district court has independent authority to substitute an alternate juror for a sleeping juror.

And so long as the substitution takes place prior to deliberations, it's within the Court's prerogative.

In that case, there was a -- the district court observed the sleeping juror, questioned the juror directly and dismissed them pursuant to Rule 24.

The Sixth Circuit case, 690 F.2d 545, *United States versus Warner*, that is from 1982, but it does say that the trial court is -- can replace jurors who are found to be unable to perform their duties and that authorizes the dismissal of sleeping jurors because a juror who sleeps through much of the trial testimony cannot be expected to perform their duties.

And in this Tenth Circuit case -- there's another Tenth Circuit case that talks about, you know, the trial court can consider, you know, whether there's any prejudice from the juror missing large portions of the trial and whether the judge -- the Court itself has observed the juror sleeping.

THE COURT: Yes.

MR. BROWN: I think those are the most on point.

THE COURT: My guess is there's not a lot of precedent on this because it's just not an appellate issue because it's clearly in the discretion of trial court.

MR. BROWN: Yes. Absolutely. All of those show that it's within the discretion of the Court.

THE COURT: I really don't feel terribly strongly about this. I have noticed on several occasions, you know, she's been sleeping and, in fact, there have been times where I've suggested that we stand up and stretch just to wake her up and she's stayed in her chair, has been one of the one or two jurors who don't get up. In one case she was still even asleep or at least partially asleep after I suggested that we stand up to stretch.

I feel bad because she's a nice woman, as I said, dealing with some difficult situations. But I do think she's missed a substantial or a significant portion of the testimony. She has been chronically late and she can't be here tomorrow morning for personal medical reasons.

Anything else, Mr. Ekeland, you want to offer on this? As I said, this is not something that I have a strong feeling about, but I am concerned that she's just repeatedly been asleep. And I think all of the jurors have been quite attentive.

MR. EKELAND: I would add this case is -- it depends if the Government has a rebuttal. But we're almost at the end of the defense's case in chief, and I think I can see, depending on how late the day goes tomorrow, like us resting either tomorrow or early on -- what day is today? -- Tuesday -- early on Thursday.

THE COURT: Right.

Mr. Brown, anything else?

MR. BROWN: No, your Honor.

Just to repeat, I think our position is we would ask the Court to remove Juror 9. We still have four alternates left. And I think that the fact that she's slept through both, you know, portions of the Government case and also large portions of the Defendant's testimony himself, you know, I think it's -- this is an equal-opportunity issue that affects both sides in this case.

THE COURT: Right. And what is I think notable to me is one would think if you're a juror that's going to pay attention to anything at all in a case, it would actually be hearing the Defendant testify. And that's something where you would really be particularly attentive.

But also, this isn't the first -- it's not -- as I said, I don't think it's the first, second, third or fourth time. I think it's been more than four times that someone has noticed her asleep. I personally noticed her asleep at

least three or four times for sustained periods, not just sort of a nodding of the head, but being asleep for sustained periods of time, where I've had to try and rouse her. And she has been chronically late and she can't be here tomorrow morning.

So I think what I will do is, although it makes me sad to do it, I'm going to go ahead and excuse her.

I'll bring the jurors back in and I will tell them -- should we convene at 9:30 tomorrow morning, given this? 9:30 to 3:30? I think that sounds like we'll be able to finish with the presentation of at least the defense case by then and maybe even, if there's a rebuttal case, we might even get through that.

Does that make sense?

MR. BROWN: Yes, your Honor.

THE COURT: Is that acceptable?

MR. EKELAND: Yes, your Honor.

THE COURT: So let's do that.

What I'll do is, after I tell everyone this, she may be a little surprised.

If you want to just ask her, Ms. Walker, to stay back and then I'll explain to her that I know that she has an appointment tomorrow but that we're going to go ahead and let her go and excuse her and thank her for her service but that she -- yes -- but she shouldn't talk about the case

until it's over.

THE COURTROOM DEPUTY:  All rise.

(Whereupon, the jury entered the courtroom at 5:06 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY:  The jury is present.  You may be seated and come to order.

THE COURT:  All right.  Members of the jury, we are going to reconvene tomorrow morning at 9:30.  We're going to go until 3:30 tomorrow.

So I'll remind you overnight again, don't discuss the case with anybody.  No research of any kind.  And I'll see you back here at 9:30.

THE COURTROOM DEPUTY:  All rise.

(Whereupon, the jury exited the courtroom at 5:07 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY:  You may be seated.

(Thereupon, Juror No. 9 entered the courtroom and the following proceedings were had:)

THE COURT:  You can have a seat there, wherever you're comfortable.

So I know you have an appointments tomorrow morning.  You may have been a little panicked when I said we were going to start at 11:30 -- at 9:30 tomorrow.  But we have alternate jurors.  So I'm going to go ahead and let you go.

**Appx5880**

JUROR NO. 9: Okay. Thank you.

THE COURT: But I thank you very much for your service. I know it's been a long time and you've been sitting there listening to the evidence in this case. So I'm very appreciative for your service in the case.

I will ask that you not discuss the case with anybody until you get a call from Ms. Walker, who will tell you that the case is all over and that you're welcome to discuss it with whoever you want.

JUROR NO. 9: Okay.

THE COURT: But please don't do so until then.

Take care. You have my appreciation and the appreciation of the Court for your service.

JUROR NO. 9: Okay. Thank you.

THE COURT: Thank you.

(Thereupon, Juror No. 9 retired from the courtroom and the following proceedings were had:)

THE COURT: I feel bad, but I think it was the right thing to do.

All right. Anything else before we adjourn tonight?

MR. BROWN: No, your Honor.

MR. EKELAND: No, your Honor.

THE COURT: I can confirm for you all in the morning -- I just want to go back and look at my notes --

who the first alternate was and who's now a regular juror. But under the rules, we just go in order.  So whoever is the lowest-numbered alternate will now be a regular juror.

I will see you all at 9:30 tomorrow morning.  As I said, I'm going to do my best to post the proposed instructions tonight.

THE COURTROOM DEPUTY:  All rise.

(Proceedings concluded.)

**CERTIFICATE**

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 5th day of March, 2024.


/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269

## $

**$10** [2] - 55:16, 55:17
**$100** [1] - 91:15
**$50** [2] - 57:15, 57:17

## '

**'14** [2] - 61:1, 83:2
**'15** [2] - 95:23, 100:6
**'16** [1] - 100:6
**'19** [1] - 76:8
**'22** [2] - 23:13, 23:14

## /

**/s** [1] - 122:12

## 1

**1** [4] - 60:16, 68:7, 70:22, 73:10
**10** [1] - 102:2
**10,000** [1] - 46:9
**100** [1] - 93:6
**10005** [1] - 1:23
**110** [1] - 115:4
**11:00** [6] - 64:15, 64:17, 65:18, 65:21, 65:24, 111:2
**11:30** [1] - 119:23
**12** [1] - 83:6
**13** [2] - 68:14, 69:12
**14** [3] - 30:21, 31:15, 68:14
**1982** [1] - 115:14
**1988** [2] - 30:20, 67:2
**1:38** [1] - 1:7
**1:41** [1] - 4:6
**1:56** [1] - 16:20

## 2

**2** [3] - 71:1, 71:5, 77:25
**2,000** [1] - 55:20
**2,500** [1] - 33:7
**20** [3] - 23:7, 38:11, 38:19
**20001** [2] - 2:4, 122:14
**2002** [1] - 31:17
**2006** [1] - 32:12
**2007** [1] - 32:12
**2008** [2] - 31:17, 33:8
**2009** [1] - 44:18

**2009-2010** [1] - 40:8
**2010** [3] - 42:15, 44:17, 44:18
**2010-2011** [2] - 54:17, 58:22
**2011** [14] - 42:15, 66:25, 67:1, 67:4, 67:10, 67:14, 67:15, 67:18, 68:4, 69:23, 70:13, 70:20, 73:9, 77:2
**2012** [9] - 75:8, 77:4, 82:2, 82:3, 82:4, 82:9, 82:12, 82:13, 82:17
**2013** [7] - 39:20, 61:1, 82:18, 82:23, 83:1, 83:2
**2014** [5] - 95:5, 95:6, 95:23, 96:14, 100:6
**2014-2015** [1] - 96:11
**2015** [3] - 98:3, 98:4, 98:5
**2016** [3] - 100:1, 100:2, 100:3
**2017** [4] - 100:25, 101:1, 101:4, 101:15
**2018** [1] - 76:8
**202** [2] - 2:4, 122:15
**2020s** [1] - 48:6
**2021** [2] - 18:16, 23:11
**2022** [6] - 17:19, 19:2, 20:25, 21:22, 22:8, 23:15
**2023** [1] - 17:20
**2024** [2] - 1:7, 122:10
**20530** [2] - 1:16, 1:19
**21-00399** [1] - 1:4
**22** [2] - 103:18, 103:20
**23** [2] - 67:2, 103:17
**24** [1] - 115:12
**25** [2] - 82:24, 82:25
**25,000** [1] - 33:6
**27th** [1] - 73:9
**28** [1] - 104:6
**29** [1] - 104:7
**2:15** [1] - 29:21

## 3

**3** [2] - 71:8, 71:13
**30** [2] - 1:22, 104:15
**300** [1] - 92:15
**31** [1] - 104:22
**313** [1] - 67:21
**316** [1] - 72:24
**32** [1] - 105:2
**33** [1] - 109:4

**333** [2] - 2:3, 122:14
**354-3269** [2] - 2:4, 122:15
**3:00** [1] - 63:20
**3:11** [1] - 64:2
**3:30** [6] - 63:21, 63:25, 66:6, 112:19, 118:10, 119:9
**3:33** [1] - 66:16

## 4

**4** [1] - 92:22
**40** [1] - 104:6
**403** [2] - 17:3, 21:15
**414-A** [2] - 105:20
**414-C** [2] - 101:19, 109:1
**46** [1] - 104:10
**4:45** [1] - 110:17

## 5

**5** [1] - 1:7
**5.1527** [1] - 1:16
**50** [1] - 40:22
**521-A** [1] - 33:14
**53** [2] - 3:5, 3:7
**545** [1] - 115:13
**5:00** [2] - 101:25, 110:1
**5:06** [1] - 119:3
**5:07** [1] - 119:14
**5th** [1] - 122:10

## 6

**6** [1] - 89:21
**60.41** [1] - 75:13
**60.8** [1] - 75:17
**601** [1] - 1:15
**6706** [1] - 2:3
**690** [1] - 115:13

## 7

**71** [1] - 115:4
**711-A** [1] - 89:20

## 8

**841** [1] - 87:16
**850** [3] - 83:20, 83:21, 83:22

## 9

**9** [11] - 64:14, 111:3, 111:4, 111:6, 112:17, 117:11, 119:17, 120:1, 120:10, 120:14, 120:16
**950** [1] - 1:18
**9:00** [1] - 112:17
**9:30** [6] - 118:9, 118:10, 119:8, 119:12, 119:23, 121:4

## A

**A-Y-A-H-U-A-S-C-A** [1] - 77:20
**a.m** [2] - 111:2, 112:17
**ability** [2] - 28:16, 122:7
**able** [12] - 11:25, 15:22, 17:7, 17:14, 18:9, 19:13, 20:5, 27:7, 60:5, 68:15, 98:17, 118:10
**about..** [1] - 4:16
**absence** [4] - 83:7, 95:8, 95:10, 100:16
**absolutely** [4] - 11:1, 14:11, 18:5, 116:6
**abusing** [1] - 42:11
**acceptable** [1] - 118:16
**accepting** [1] - 99:20
**access** [15] - 14:13, 17:15, 17:16, 20:14, 35:15, 35:24, 39:4, 49:8, 49:11, 49:13, 56:25, 58:2, 70:8, 99:7
**accessed** [2] - 82:11, 101:15
**accessing** [2] - 82:15, 101:13
**accidentally** [1] - 39:7
**account** [58] - 33:8, 33:23, 33:24, 33:25, 34:2, 34:21, 36:7, 37:1, 58:8, 58:11, 60:7, 60:14, 60:16, 60:17, 68:7, 68:9, 70:4, 70:22, 70:25, 71:4, 71:7, 71:11, 71:12, 71:13, 71:15, 71:19, 71:23, 71:25, 72:16, 72:18, 73:5, 73:6, 73:7, 73:10,

73:13, 73:17, 73:18, 73:24, 74:4, 74:5, 74:7, 74:9, 75:7, 75:13, 75:14, 75:16, 75:20, 77:25, 78:1, 81:19, 81:20, 81:21, 106:20
**accounting** [1] - 108:15
**accounts** [39] - 35:6, 35:15, 35:16, 35:17, 35:18, 35:21, 35:25, 36:3, 36:12, 36:14, 36:17, 37:3, 37:4, 37:7, 38:23, 38:25, 39:3, 39:6, 39:7, 39:10, 51:12, 58:10, 61:18, 70:6, 70:7, 81:7, 81:10, 81:15, 81:17, 81:18, 90:3, 97:7, 97:18, 102:17
**accurate** [3] - 109:9, 109:10, 122:4
**accusation** [1] - 20:6
**achieve** [2] - 55:8, 81:24
**Action** [1] - 1:3
**activities** [1] - 27:10
**activity** [1] - 13:4
**actual** [2] - 45:20, 108:8
**add** [3] - 94:13, 113:9, 117:1
**addicted** [1] - 74:18
**additional** [1] - 29:17
**address** [31] - 11:25, 12:6, 20:21, 22:14, 24:14, 25:21, 52:5, 54:4, 60:9, 60:11, 60:12, 60:15, 68:10, 68:23, 68:24, 69:11, 69:12, 69:14, 69:15, 69:16, 69:17, 71:2, 71:3, 71:8, 71:9, 72:20, 73:24, 77:24, 86:19, 86:22, 104:25
**addresses** [3] - 11:16, 12:6, 48:14
**addressing** [1] - 22:12
**adjourn** [1] - 120:20
**administrator** [1] - 30:17
**affects** [1] - 117:16
**affiliate** [1] - 38:10
**AFTERNOON** [1] - 1:5
**afterwards** [3] - 22:20, 43:14, 55:25
**Agent** [3] - 54:19,

75:10, 77:6
**agent** [1] - 108:12
**ago** [9] - 18:21, 23:12, 23:16, 47:7, 59:13, 68:15, 68:18, 69:13
**agree** [6] - 17:13, 21:25, 29:11, 57:7, 65:19, 92:10
**agreement** [1] - 112:8
**agrees** [1] - 66:2
**ahead** [7] - 7:12, 26:8, 28:3, 34:17, 118:7, 118:23, 119:24
**Airport** [1] - 5:10
**alcohol** [1] - 74:16
**alive** [1] - 5:7
**allegations** [1] - 107:8
**alleged** [2] - 31:2, 107:9
**allegedly** [1] - 6:20
**allow** [3] - 9:14, 15:10, 27:11
**allowed** [5] - 27:12, 28:14, 28:22, 93:16, 110:11
**almost** [7] - 48:5, 48:8, 67:7, 83:9, 96:12, 99:22, 117:2
**alone** [1] - 26:19
**alternate** [4] - 115:7, 119:24, 121:1, 121:3
**alternates** [2] - 64:16, 117:12
**America** [2] - 42:7, 47:5
**AMERICA** [1] - 1:3
**amount** [3] - 11:6, 55:18, 70:19
**amounts** [4] - 46:16, 55:13, 55:22, 107:5
**analogy** [1] - 94:23
**analysis** [2] - 11:16, 12:6
**Angeles** [1] - 5:10
**answer** [6] - 13:15, 18:23, 22:11, 62:21, 76:18, 85:20
**answered** [13] - 7:1, 7:21, 7:25, 8:4, 8:12, 8:23, 15:8, 29:5, 46:6, 87:12, 89:6, 103:5, 109:23
**answers** [2] - 92:19, 103:14
**anticipate** [1] - 64:22
**Anton** [1] - 108:9
**anyway** [1] - 106:3

**apartment** [1] - 41:4
**apartments** [2] - 80:9
**apologize** [3] - 13:15, 91:20, 93:19
**App** [2] - 47:4, 47:5
**app** [5] - 47:4, 47:6, 58:9, 58:10
**aPPEARANCES** [1] - 1:13
**appellate** [1] - 116:4
**apple** [2] - 89:20, 105:20
**apply** [1] - 89:13
**appointment** [4] - 64:14, 66:7, 111:3, 118:23
**appointments** [1] - 119:21
**appreciated** [4] - 39:22, 83:3, 108:4, 108:6
**appreciation** [3] - 95:21, 120:12, 120:13
**appreciative** [1] - 120:5
**appropriate** [4] - 29:16, 76:19, 82:19, 112:1
**apps** [1] - 72:11
**area** [2] - 38:8, 38:25
**argue** [1] - 17:7
**arguing** [1] - 21:16
**argument** [3] - 17:6, 94:3, 94:14
**argumentative** [1] - 93:23
**arguments** [1] - 94:6
**arrest** [4] - 18:19, 21:1, 21:12, 26:1
**arrested** [2] - 19:3, 19:10
**arrived** [1] - 6:23
**article** [1] - 41:19
**as-needed** [1] - 22:15
**asked-and-answered** [1] - 7:25
**asleep** [8] - 111:4, 112:24, 116:14, 116:24, 117:25, 118:2
**associated** [5] - 34:11, 35:17, 60:7, 60:14, 70:6
**attacked** [1] - 88:7
**attempts** [2] - 74:20, 95:18
**attention** [15] - 38:6, 66:24, 70:25, 71:7, 75:12, 82:2, 93:9,

95:5, 98:2, 98:3, 100:1, 100:25, 107:19, 108:22, 117:19
**attentive** [2] - 116:25, 117:21
**attorney** [2] - 27:15, 76:16
**ATTORNEY'S** [1] - 1:14
**attorneys** [4] - 17:16, 18:3, 20:17, 29:2
**August** [1] - 17:18
**AurumXChange** [3] - 71:14, 71:15, 71:19
**authority** [1] - 115:6
**authorizes** [1] - 115:16
**Avenue** [3] - 1:18, 2:3, 122:14
**avoid** [1] - 28:10
**aware** [3] - 5:9, 8:19, 14:21
**Ayahuasca** [1] - 76:8
**ayahuasca** [1] - 77:15

## B

**backing** [1] - 40:7
**backstory** [1] - 37:9
**backups** [1] - 92:3
**bad** [2] - 116:16, 120:18
**bank** [1] - 106:19
**banking** [1] - 72:11
**bar** [1] - 48:7
**base** [1] - 99:11
**based** [1] - 24:15
**basic** [1] - 12:2
**basics** [1] - 56:13
**basis** [2] - 22:15, 113:14
**became** [2] - 31:24, 80:13
**Beckman** [1] - 108:9
**become** [4] - 36:21, 74:18, 100:14, 100:19
**becomes** [1] - 25:20
**becoming** [1] - 83:12
**BEFORE** [1] - 1:11
**beforehand** [1] - 86:3
**beginning** [3] - 28:24, 56:17, 63:6
**believes** [1] - 20:22
**belonged** [1] - 36:18
**bench** [2] - 6:12, 13:10

**best** [7] - 57:22, 64:18, 106:13, 106:22, 110:23, 121:5, 122:7
**better** [3] - 13:13, 77:14, 103:25
**between** [4] - 13:1, 13:18, 34:19, 101:8
**beyond** [3] - 7:5, 12:21, 20:15
**big** [1] - 42:25
**biggest** [2] - 23:1, 80:24
**bills** [1] - 46:18
**bit** [31] - 21:9, 29:13, 37:8, 37:12, 39:23, 40:7, 47:3, 48:9, 49:13, 50:2, 50:11, 50:14, 50:23, 50:24, 50:25, 55:18, 57:2, 59:23, 61:22, 63:9, 65:2, 65:17, 75:17, 79:23, 92:2, 95:19, 96:7, 101:6, 104:21, 109:2, 112:6
**Bit** [2] - 98:24, 99:2
**Bitcoin** [181] - 6:19, 21:2, 30:16, 30:17, 37:24, 39:21, 41:6, 41:8, 41:10, 41:15, 41:16, 42:5, 42:12, 42:14, 42:16, 42:18, 42:19, 42:21, 43:7, 43:9, 43:11, 43:17, 43:19, 43:22, 43:23, 43:25, 44:1, 44:6, 44:7, 44:9, 44:13, 44:14, 44:19, 44:24, 45:7, 45:12, 45:16, 46:4, 46:13, 47:9, 47:10, 47:11, 47:12, 47:14, 47:15, 48:3, 48:8, 48:12, 48:14, 48:20, 49:1, 49:3, 49:24, 49:25, 50:1, 50:10, 50:23, 51:3, 51:7, 51:9, 51:13, 52:5, 52:6, 52:17, 52:18, 52:23, 53:14, 53:17, 53:22, 54:8, 54:9, 54:13, 55:16, 55:17, 55:23, 55:25, 56:2, 56:12, 56:21, 57:8, 57:14, 58:14, 59:15, 61:4, 61:6, 61:12, 61:14, 61:18, 61:20, 62:2, 62:15, 62:20, 62:24, 63:4, 67:12, 67:14, 68:10, 68:23, 68:24, 69:10,

69:12, 69:14, 69:23, 69:24, 75:14, 75:17, 75:19, 77:24, 78:8, 78:13, 78:16, 78:22, 79:23, 80:5, 80:6, 80:10, 80:18, 80:20, 80:21, 81:1, 81:2, 81:13, 81:14, 81:23, 82:7, 83:3, 84:5, 84:7, 84:14, 84:16, 84:24, 85:18, 85:23, 85:24, 86:1, 86:3, 86:8, 86:9, 86:12, 86:19, 86:20, 87:2, 87:9, 88:3, 88:13, 89:4, 89:5, 95:20, 95:21, 96:16, 96:19, 96:22, 96:25, 97:1, 97:5, 97:25, 98:14, 98:15, 98:17, 99:19, 99:20, 100:7, 100:10, 104:10, 106:7, 106:10, 106:15, 106:17, 106:18, 108:5, 108:6, 109:11
**Bitcoin-related** [1] - 96:16
**bitcoin.org** [4] - 48:22, 48:23, 49:20, 49:23
**Bitstamp** [9] - 102:10, 102:15, 102:18, 103:3, 103:11, 104:1, 105:9, 108:17, 109:18
**bitstamp** [1] - 102:15
**blockchain** [6] - 68:11, 73:25, 79:17, 79:19, 80:1, 80:3
**Blocket** [1] - 46:20
**blurt** [1] - 28:22
**book** [1] - 79:8
**born** [3] - 30:19, 30:20, 67:2
**bottom** [2] - 77:24, 78:8
**bought** [17] - 43:7, 43:9, 43:10, 44:14, 45:16, 49:24, 50:1, 50:10, 51:3, 51:7, 51:9, 51:13, 74:12, 77:7, 77:17
**boxes** [1] - 15:20
**break** [11] - 14:6, 16:15, 22:14, 63:14, 63:19, 63:21, 64:6, 89:15, 109:24, 109:25, 110:2
**briefly** [15] - 4:21, 11:2, 11:20, 12:19,

15:15, 40:15, 43:23, 43:25, 49:5, 49:7, 51:15, 53:13, 77:23, 82:2, 102:7

**bring** [3] - 28:5, 29:6, 118:8

**Brooklyn** [1] - 1:23

**brought** [1] - 84:25

**BROWN** [39] - 1:14, 17:1, 18:18, 18:25, 19:11, 23:17, 23:21, 24:3, 24:6, 24:16, 24:21, 25:11, 28:2, 28:19, 46:6, 54:23, 64:9, 65:14, 65:23, 69:1, 69:3, 76:10, 85:6, 88:14, 88:16, 93:23, 93:25, 106:1, 111:25, 112:6, 113:3, 113:22, 114:7, 115:1, 116:2, 116:6, 117:9, 118:15, 120:22

**Brown** [2] - 20:10, 117:8

**Browser** [3] - 12:9, 13:2, 13:18

**BTC** [3] - 104:25, 109:5

**bug** [1] - 97:8

**building** [1] - 5:1

**built** [1] - 35:13

**bulk** [2] - 109:4, 109:6

**Burn** [1] - 57:22

**burned** [3] - 26:3, 26:5, 57:25

**business** [11] - 23:8, 81:19, 81:20, 81:21, 106:24, 107:2, 107:3, 107:5, 107:11, 108:20, 108:23

**buy** [9] - 34:24, 49:25, 50:5, 50:23, 51:12, 56:12, 61:14, 77:3, 92:9

**buying** [16] - 50:2, 50:13, 51:18, 52:13, 53:14, 53:17, 54:8, 54:12, 60:1, 61:17, 67:14, 70:15, 72:14, 75:22, 75:25, 82:7

**BY** [52] - 2:1, 4:13, 5:18, 9:23, 12:17, 15:14, 30:11, 31:10, 33:21, 35:1, 39:8, 46:11, 53:10, 55:4, 58:21, 66:23, 67:24, 68:22, 69:7, 70:18, 71:21, 72:15, 73:1, 77:1, 77:22, 78:6,

78:12, 79:15, 82:22, 83:23, 84:11, 85:16, 85:22, 87:17, 88:9, 89:2, 89:7, 89:22, 90:8, 92:23, 94:7, 94:16, 95:4, 102:3, 103:19, 104:8, 104:14, 104:23, 105:3, 105:21, 106:5, 109:3

---

# C

**calculations** [1] - 44:5

**cameras** [1] - 15:21

**cannot** [5] - 23:23, 58:11, 59:3, 93:11, 115:18

**Capo** [15] - 32:8, 32:10, 33:4, 34:5, 39:15, 39:16, 39:23, 40:10, 67:8, 82:4, 95:6, 95:9, 95:11, 95:15, 95:17

**car** [1] - 46:22

**care** [1] - 120:12

**careful** [4] - 70:16, 76:2, 78:2, 113:15

**carefully** [3] - 76:17, 76:24, 79:12

**cares** [1] - 21:21

**carries** [1] - 8:1

**case** [53] - 9:25, 11:14, 12:4, 12:19, 15:16, 16:17, 21:8, 21:9, 23:11, 24:18, 26:5, 28:24, 36:9, 36:19, 45:5, 56:11, 61:3, 62:16, 63:22, 65:9, 68:1, 69:9, 69:18, 70:24, 87:19, 88:11, 88:20, 94:3, 102:5, 110:8, 110:15, 112:12, 112:14, 114:20, 115:3, 115:10, 115:13, 115:20, 115:21, 116:13, 117:1, 117:3, 117:13, 117:16, 117:19, 118:11, 118:12, 118:25, 119:11, 120:4, 120:5, 120:6, 120:8

**cases** [3] - 4:24, 80:8, 112:3

**cash** [9] - 45:24, 46:3, 46:15, 46:16, 46:25, 47:8, 51:7, 52:4, 88:6

**Cash** [2] - 47:4, 47:5

**catalogs** [1] - 32:16

**CATHERINE** [1] - 1:17

**certain** [5] - 20:23, 44:2, 49:18, 70:4, 90:16

**certainly** [5] - 7:5, 14:18, 24:22, 89:18, 113:4

**CERTIFICATE** [1] - 122:1

**certify** [1] - 122:4

**chain** [1] - 56:7

**chair** [1] - 116:12

**chance** [1] - 57:19

**change** [5] - 17:8, 17:12, 18:10, 35:14, 42:3

**changed** [2] - 25:4, 49:15

**changes** [2] - 21:10, 61:10

**character** [1] - 27:9

**characterize** [1] - 93:25

**characterizes** [1] - 54:24

**characters** [1] - 87:24

**charges** [2] - 65:4, 65:5

**charging** [5] - 64:19, 65:25, 112:8, 112:15, 112:20

**Charlie** [2] - 101:20, 109:1

**chart** [1] - 62:14

**chastising** [1] - 76:23

**chatroom** [13] - 35:21, 44:21, 44:22, 45:1, 51:22, 52:9, 53:12, 53:15, 53:18, 53:24, 53:25, 55:6, 55:7

**chatrooms** [1] - 44:23

**chatting** [1] - 53:19

**check** [6] - 5:6, 7:15, 45:2, 45:11, 45:15, 94:22

**checking** [1] - 63:11

**chief** [1] - 117:3

**child** [1] - 43:21

**choose** [1] - 92:16

**CHRISTOPHER** [1] - 1:14

**chronically** [3] - 114:20, 116:19, 118:4

**chronologically** [1] - 100:23

**Circuit** [5] - 114:9, 115:3, 115:13, 115:20, 115:21

**CIS** [2] - 72:3, 72:4

**citations** [1] - 115:2

**city** [2] - 40:11, 40:13

**claiming** [1] - 54:1

**claims** [1] - 53:5

**clarify** [1] - 14:25

**classes** [2] - 67:16, 67:19

**cleaner** [1] - 114:15

**cleanest** [1] - 22:18

**clear** [4] - 5:20, 24:18, 26:2, 72:24

**clearly** [1] - 116:5

**clerk** [1] - 110:6

**clicked** [1] - 41:19

**client** [7] - 20:21, 35:20, 36:6, 37:4, 104:18, 106:18, 111:13

**client's** [1] - 111:21

**clients** [3] - 35:3, 98:16, 99:23

**clients'** [1] - 37:1

**close** [2] - 34:16, 96:18

**closed** [1] - 96:9

**co** [1] - 111:16

**co-counsel** [1] - 111:16

**coach** [3] - 100:14, 100:19, 100:23

**Coaster** [2] - 98:24, 99:2

**Code** [4] - 105:14, 105:16, 105:22, 107:10

**code** [9] - 49:8, 96:24, 96:25, 97:1, 97:5, 97:9, 99:14, 99:19

**cold** [1] - 61:20

**collapse** [1] - 61:5

**collapsed** [1] - 61:3

**COLUMBIA** [2] - 1:1, 1:15

**Columbia** [2] - 2:2, 122:13

**comfortable** [4] - 39:20, 75:25, 76:7, 119:20

**coming** [13] - 21:17, 25:22, 34:4, 35:10, 41:11, 59:19, 67:22, 75:16, 75:17, 75:20, 87:4, 95:25, 113:7

**common** [6] - 14:12, 14:19, 40:24, 57:8, 70:5, 72:1

**commonly** [1] - 13:22

**commonplace** [1] - 70:10

**communicate** [2] - 9:8, 17:14

**communicated** [3] - 18:2, 18:6, 20:7

**communicating** [2] - 8:21, 10:2

**communication** [2] - 9:15, 17:23

**communications** [6] - 9:4, 11:25, 18:1, 19:23, 19:24, 102:9

**companies** [2] - 32:17, 98:25

**company** [3] - 98:23, 99:2, 99:4

**compare** [1] - 101:10

**complete** [2] - 97:17, 122:6

**completed** [2] - 55:12, 99:12

**completely** [3] - 14:20, 48:10, 77:16

**compliant** [1] - 99:6

**complicated** [3] - 47:24, 48:1, 48:17

**computations** [1] - 44:2

**computer** [22] - 10:7, 21:9, 36:20, 41:12, 42:22, 43:3, 47:16, 52:12, 52:14, 56:17, 56:18, 59:3, 60:1, 82:9, 82:12, 82:15, 90:9, 90:10, 93:4, 93:8, 101:16, 105:17

**computers** [8] - 10:2, 31:25, 40:20, 41:13, 41:16, 44:1, 44:5, 101:14

**conceivable** [1] - 65:8

**concern** [1] - 23:1

**concerned** [1] - 116:23

**concerns** [1] - 21:15

**concluded** [1] - 121:8

**conditions** [1] - 17:4

**conduct** [2] - 63:23, 110:9

**conducting** [1] - 110:14

**confer** [1] - 114:12

**conference** [8] - 6:12, 13:10, 40:23, 64:19, 65:25, 112:8, 112:15, 112:20

**conferring** [2] - 89:12, 113:24

**Confers** [1] - 28:7

**confers** [3] - 66:4, 111:16, 114:17

**configuring** [1] - 99:17

**confinement** [3] - 16:25, 17:2, 17:5

**confirm** [2] - 8:3, 120:24

**confused** [1] - 104:20

**connect** [1] - 34:21

**connected** [6] - 4:25, 35:22, 59:2, 59:3, 100:17, 104:17

**connection** [2] - 11:8, 31:2

**consciousness** [1] - 91:5

**consider** [1] - 115:22

**considerations** [1] - 111:25

**considering** [1] - 106:15

**consistent** [3] - 69:22, 69:24, 70:2

**constitutes** [1] - 122:4

**Constitution** [2] - 2:3, 122:14

**constitutional** [2] - 26:22, 26:23

**constructer** [1] - 99:15

**consult** [2] - 27:15, 111:12

**contact** [2] - 31:5, 114:2

**contain** [1] - 95:2

**contempt** [2] - 26:4, 26:6

**continue** [3] - 4:10, 39:25, 66:20

**continued** [5] - 32:3, 40:14, 42:25, 51:2, 76:6

**Continued** [1] - 3:5

**CONTINUED** [1] - 4:12

**controlled** [1] - 69:20

**controls** [1] - 55:1

**convene** [1] - 118:9

**convenient** [2] -

59:20, 59:24

**cool** [3] - 41:22, 43:1, 50:25

**cooperating** [1] - 23:6

**copy** [1] - 102:13

**copy-pasting** [1] - 102:13

**correct** [3] - 27:19, 77:9, 90:19

**correctly** [3] - 8:8, 57:3, 77:3

**CorrLinks** [1] - 20:15

**corrupt** [1] - 30:23

**counsel** [6] - 17:20, 89:12, 110:21, 111:16, 114:3

**countries** [8] - 42:8, 42:9, 72:3, 72:6, 72:7, 72:8, 72:10, 101:8

**country** [2] - 99:8, 101:12

**couple** [14] - 4:23, 22:23, 22:24, 32:2, 32:6, 37:10, 41:2, 41:18, 59:7, 64:24, 75:3, 80:21, 86:6, 95:12

**course** [1] - 102:23

**COURT** [139] - 1:1, 4:1, 4:4, 4:10, 5:14, 5:16, 5:20, 5:25, 6:3, 6:9, 6:11, 6:14, 7:7, 7:12, 7:21, 8:11, 8:18, 9:10, 9:21, 12:23, 13:6, 13:9, 13:13, 14:2, 14:15, 15:3, 15:9, 16:1, 16:3, 16:8, 16:10, 16:14, 16:23, 18:12, 18:20, 19:5, 20:9, 21:4, 22:3, 22:16, 23:15, 23:20, 24:2, 24:5, 24:20, 24:25, 25:10, 25:14, 25:23, 26:11, 26:14, 26:16, 26:22, 27:1, 27:6, 27:14, 27:18, 27:21, 27:24, 28:3, 28:18, 29:11, 29:25, 30:8, 31:9, 34:15, 37:11, 46:7, 53:6, 54:25, 58:20, 63:13, 63:17, 63:20, 64:5, 64:10, 65:11, 65:16, 66:3, 66:14, 66:20, 68:20, 69:4, 69:6, 70:16, 71:20, 72:4, 76:13, 76:23, 77:18, 77:21, 78:2, 79:12, 82:19, 85:8, 85:20,

87:6, 87:12, 88:18, 88:25, 89:6, 89:9, 89:11, 92:18, 93:24, 94:2, 94:12, 94:15, 101:21, 101:25, 106:3, 109:24, 110:20, 111:14, 111:18, 111:20, 111:23, 112:4, 112:21, 113:5, 113:11, 113:23, 114:11, 114:15, 114:24, 116:1, 116:3, 116:8, 117:7, 117:17, 118:16, 118:18, 119:7, 119:19, 120:2, 120:11, 120:15, 120:18, 120:24

**court** [8] - 9:19, 15:13, 31:11, 115:6, 115:10, 115:15, 115:22, 116:5

**Court** [27] - 2:1, 2:2, 9:5, 13:15, 20:19, 20:22, 21:7, 21:12, 22:14, 23:9, 25:21, 26:3, 26:6, 28:24, 29:2, 29:4, 29:6, 29:8, 63:12, 63:15, 114:9, 115:24, 116:7, 117:11, 120:13, 122:12, 122:13

**Court's** [2] - 19:16, 115:9

**COURTROOM** [23] - 4:5, 4:8, 16:22, 29:20, 29:23, 30:3, 30:6, 33:15, 33:17, 64:1, 64:4, 66:10, 66:13, 66:15, 66:18, 67:22, 110:16, 110:19, 119:2, 119:5, 119:13, 119:16, 121:7

**courtroom** [14] - 4:6, 16:20, 24:7, 28:7, 29:21, 64:2, 66:4, 66:16, 110:17, 114:17, 119:3, 119:14, 119:17, 120:16

**craigslist** [2] - 46:20, 46:21

**create** [1] - 34:24

**creating** [1] - 96:19

**Criminal** [1] - 1:3

**criminal** [1] - 13:4

**criminality** [2] - 13:20, 30:24

**critical** [1] - 111:8

**cross** [8] - 7:6,

12:22, 12:24, 19:22, 65:7, 65:9, 65:13, 114:5

**cross-examine** [1] - 19:22

**crossed** [1] - 14:5

**CRR** [3] - 2:1, 122:3, 122:12

**cryptocurrencies** [2] - 80:10, 102:22

**cryptocurrency** [1] - 102:21

**current** [2] - 45:3, 45:12

**cuss** [2] - 91:19, 91:25

**customer** [3] - 99:11, 108:8, 108:10

**cut** [2] - 112:1, 112:17

**Czech** [1] - 72:7

**D**

**D.C** [6] - 1:6, 1:16, 1:19, 2:4, 114:8, 122:14

**dangerous** [2] - 19:15, 52:1

**date** [5] - 17:19, 18:16, 33:10, 82:16, 109:20

**Dated** [1] - 122:10

**Dauberted** [1] - 14:11

**days** [7] - 6:19, 18:18, 21:1, 22:22, 22:24, 22:25, 25:25

**dead** [9] - 5:5, 6:17, 6:18, 6:21, 7:14, 7:19, 8:13, 9:7, 9:8

**deal** [4] - 22:18, 37:19, 77:15, 94:20

**dealing** [5] - 74:23, 111:9, 114:2, 114:21, 116:17

**deals** [1] - 115:4

**decide** [1] - 45:2

**decided** [5] - 27:1, 52:3, 75:3, 79:3, 107:17

**decides** [1] - 29:4

**deciding** [2] - 53:21

**decision** [8] - 19:17, 26:18, 27:3, 27:19, 27:21, 27:22, 113:16

**Defendant** [4] - 1:7, 111:16, 114:3, 117:20

**defendant** [1] - 89:13

**DEFENDANT** [8] - 1:20, 26:21, 26:25, 27:4, 27:13, 27:17, 27:20, 27:22

**Defendant's** [2] - 8:25, 117:14

**DEFENSE** [1] - 30:5

**defense** [17] - 14:3, 14:6, 14:22, 17:6, 17:20, 19:17, 23:21, 23:24, 24:21, 25:12, 29:25, 30:2, 64:7, 66:2, 112:12, 113:20, 118:11

**defense's** [1] - 117:3

**definitely** [1] - 34:13

**delete** [7] - 36:17, 36:25, 37:1, 39:7, 58:4, 58:9, 58:11

**deleting** [1] - 39:6

**deliberations** [1] - 115:9

**democratic** [1] - 49:14

**DEPARTMENT** [1] - 1:18

**deposit** [2] - 76:12, 104:10

**deposited** [1] - 109:5

**depression** [12] - 37:17, 37:19, 74:15, 74:17, 75:2, 76:2, 76:5, 76:6, 77:15, 91:6, 91:23, 100:18

**deputy** [4] - 28:7, 66:4, 110:6, 114:17

**DEPUTY** [23] - 4:5, 4:8, 16:22, 29:20, 29:23, 30:3, 30:6, 33:15, 33:17, 64:1, 64:4, 66:10, 66:13, 66:15, 66:18, 67:22, 110:16, 110:19, 119:2, 119:5, 119:13, 119:16, 121:7

**describe** [4] - 40:16, 43:10, 53:13, 98:8

**described** [1] - 55:6

**describing** [1] - 98:14

**desk** [1] - 10:12

**destroys** [1] - 87:4

**detail** [2] - 58:3, 103:5

**details** [1] - 48:13

**detained** [3] - 18:18, 22:12, 23:25

**detention** [6] - 17:8, 19:14, 19:16, 19:19, 21:1, 24:23

determination [1] - 113:2

determine [1] - 51:25

develop [2] - 99:11, 99:14

developed [4] - 42:8, 49:16, 72:10, 99:8

developer [3] - 32:14, 37:23, 37:25

developers [3] - 41:11, 49:3, 49:9

developments [1] - 16:23

devices [16] - 6:17, 6:22, 7:1, 7:19, 7:20, 7:24, 8:10, 8:17, 8:20, 9:1, 9:2, 9:16, 9:25, 10:15, 69:19, 90:13

diagram [3] - 67:25, 68:3, 73:3

difference [2] - 13:1, 13:17

different [21] - 4:23, 18:19, 38:11, 38:12, 47:3, 58:25, 59:7, 62:10, 62:16, 86:7, 86:8, 97:6, 100:11, 100:21, 101:8, 101:9, 104:1, 104:2, 109:17

difficult [2] - 44:20, 116:17

digits [1] - 59:9

Direct [1] - 3:7

direct [4] - 14:3, 65:15, 75:12, 114:4

DIRECT [1] - 30:10

directly [3] - 19:6, 42:3, 115:11

disappear [1] - 62:9

disappearing [2] - 97:7, 97:18

disclosed [1] - 7:5

discovery [5] - 9:25, 11:14, 12:4, 69:8, 69:18

discretion [2] - 116:5, 116:7

discuss [10] - 16:17, 22:1, 29:2, 40:24, 51:24, 63:23, 110:8, 119:10, 120:6, 120:9

discussed [1] - 64:15

discussing [3] - 41:16, 54:21, 89:3

discussion [1] - 53:20

discussions [1] - 17:4

dismissal [2] -

115:5, 115:17

dismissed [1] - 115:12

dismissing [1] - 113:14

dispositive [1] - 8:5

distorting [1] - 37:13

distracting [1] - 20:2

DISTRICT [4] - 1:1, 1:1, 1:11, 1:15

District [3] - 2:2, 2:2, 122:13

district [3] - 115:6, 115:10, 122:13

DNS [21] - 17:9, 18:10, 20:23, 21:11, 21:21, 22:7, 22:17, 24:24, 32:25, 33:1, 33:3, 34:1, 34:2, 34:7, 34:10, 34:11, 34:13, 34:18, 34:20, 35:17, 107:25

doctor's [1] - 64:14

document [8] - 35:24, 35:25, 90:4, 90:10, 90:11, 93:3, 94:24, 94:25

documentation [1] - 35:22

documents [3] - 74:8, 92:2, 101:11

dollar [1] - 55:15

dollars [7] - 33:7, 46:9, 55:15, 55:21, 61:16, 71:14, 107:10

domain [5] - 23:18, 23:25, 24:13, 34:7, 34:21

done [8] - 18:10, 19:7, 19:9, 20:12, 36:23, 37:2, 47:6, 107:22

door [3] - 5:1, 15:23, 27:7

doubt [5] - 25:7, 63:2, 73:12, 73:14, 74:6

down [25] - 19:15, 33:20, 62:2, 71:23, 72:22, 77:24, 78:8, 78:10, 84:10, 88:8, 91:2, 91:9, 94:21, 95:3, 96:6, 96:9, 102:1, 103:16, 104:5, 104:6, 104:12, 104:21, 105:2, 108:24, 109:2

download [1] - 49:20

downloaded [1] - 49:21

downrank [1] - 38:22

dozen [1] - 38:11

dream [1] - 83:15

Drive [1] - 35:24

drive [4] - 5:2, 101:11, 112:22

dropped [2] - 24:4, 24:23

drugs [2] - 74:16, 75:6

during [6] - 22:25, 89:14, 96:11, 101:5, 108:4, 111:20

duties [2] - 115:16, 115:19

# E

earliest [1] - 60:22

early [9] - 31:25, 41:17, 58:14, 59:14, 60:19, 61:8, 80:22, 117:5, 117:6

earn [1] - 95:16

earned [1] - 108:2

Eastern [2] - 72:6, 72:7

easy [4] - 47:22, 47:24, 93:16, 101:8

EDWARDS [2] - 2:1, 122:3

Edwards [1] - 122:12

effect [2] - 7:3, 76:3

effectively [1] - 11:5

efficient [1] - 65:24

efforts [2] - 93:22, 95:2

egg [1] - 61:23

Eighth [1] - 1:22

either [5] - 5:8, 18:13, 18:22, 52:19, 117:5

EKELAND [149] - 1:20, 1:21, 4:3, 4:11, 4:13, 5:15, 5:17, 5:18, 5:22, 6:2, 6:6, 6:10, 6:16, 7:11, 7:13, 8:6, 8:13, 8:19, 9:3, 9:17, 9:20, 9:22, 9:23, 12:17, 12:25, 13:7, 13:12, 13:14, 14:17, 15:6, 15:11, 15:14, 16:2, 16:5, 16:9, 19:1, 20:10, 21:6, 22:4, 23:14, 25:6, 25:15, 26:9, 26:13, 26:15, 28:12, 30:2, 30:9, 30:11, 31:10, 33:12, 33:16, 33:18, 33:21,

35:1, 39:8, 46:11, 53:9, 53:10, 55:4, 58:19, 58:21, 63:11, 63:15, 63:19, 64:7, 64:23, 65:22, 66:2, 66:22, 66:23, 67:20, 67:23, 67:24, 68:22, 69:5, 69:7, 70:17, 70:18, 71:21, 72:15, 72:22, 73:1, 77:1, 77:22, 78:4, 78:6, 78:10, 78:12, 79:15, 82:21, 82:22, 83:19, 83:22, 83:23, 84:10, 84:11, 85:14, 85:16, 85:22, 87:11, 87:15, 87:17, 88:8, 88:9, 88:23, 89:2, 89:7, 89:10, 89:18, 89:22, 90:6, 90:8, 91:2, 92:21, 92:23, 94:7, 94:16, 95:3, 95:4, 101:18, 101:24, 102:1, 102:3, 103:16, 103:19, 104:5, 104:8, 104:12, 104:14, 104:21, 104:23, 105:2, 105:3, 105:18, 105:21, 106:5, 108:24, 109:3, 111:12, 111:15, 111:19, 111:22, 113:10, 113:20, 114:14, 117:1, 118:17, 120:23

Ekeland [16] - 3:5, 3:7, 4:10, 8:25, 16:24, 18:13, 20:9, 24:25, 53:7, 66:20, 110:13, 111:18, 113:8, 113:24, 114:11, 116:21

elaborate [1] - 59:23

electronics [1] - 32:1

elicit [2] - 19:13, 29:5

elicited [4] - 12:25, 13:16, 15:6, 84:13

eliciting [3] - 6:7, 13:4, 13:21

eliminate [2] - 42:6, 42:12

email [33] - 12:1, 17:25, 20:16, 24:14, 35:18, 35:21, 60:9, 60:11, 60:12, 60:14, 71:1, 71:2, 71:3, 71:8, 71:9, 72:20, 72:21, 83:24, 84:6, 84:9, 84:12, 84:17, 84:18, 84:22, 85:17, 85:24,

85:25, 86:2, 87:4, 87:18, 87:22, 87:23, 89:3

emotional [1] - 91:7

emotions [1] - 91:24

employee [1] - 95:15

encrypt [1] - 5:8

encrypting [1] - 5:3

encrypts [1] - 5:2

end [6] - 28:25, 53:25, 68:4, 97:6, 97:15, 117:3

entered [5] - 4:6, 29:21, 66:16, 119:3, 119:17

entirely [1] - 94:12

entities [1] - 99:1

entry [2] - 15:21, 15:22

equal [1] - 117:15

equal-opportunity [1] - 117:15

equipment [1] - 12:2

equivalent [3] - 33:7, 46:10, 55:21

escort [1] - 28:8

escorting [1] - 28:11

especially [5] - 28:21, 34:13, 62:3, 72:2, 79:24

ESQ [4] - 1:14, 1:17, 1:20, 1:21

essentially [2] - 75:4, 79:18

establish [1] - 94:5

established [1] - 7:9

Europe [4] - 99:6, 99:9, 101:7, 101:9

European [4] - 72:6, 72:8, 99:5, 99:7

event [1] - 28:20

events [2] - 93:7, 93:12

eventually [4] - 5:8, 51:12, 76:1, 97:22

everyday [1] - 46:24

evidence [19] - 8:9, 9:15, 24:5, 25:2, 27:11, 29:6, 33:13, 33:16, 67:21, 72:23, 83:20, 87:16, 89:20, 94:1, 101:19, 105:19, 109:1, 112:9, 120:4

evil [1] - 90:18

exact [2] - 40:22, 86:22

exactly [3] - 68:16, 86:15, 87:1

Examination [2] - 3:5, 3:7

examination [1] - 64:11

EXAMINATION [2] - 4:12, 30:10

examine [1] - 19:22

example [11] - 5:1, 10:11, 10:18, 14:7, 17:18, 35:11, 36:19, 38:9, 38:10, 59:8, 60:24

except [4] - 20:16, 25:25, 95:19, 100:9

exchange [9] - 45:7, 59:21, 59:24, 61:5, 81:7, 102:9, 102:16, 103:13, 106:23

exchanges [20] - 45:4, 45:5, 45:8, 45:10, 45:14, 51:12, 59:14, 59:17, 59:18, 60:19, 60:22, 60:25, 61:8, 62:10, 100:12, 102:18, 102:19, 102:22, 102:25, 103:8

exchanging [1] - 88:5

excuse [4] - 32:21, 73:16, 118:7, 118:24

excused [3] - 16:10, 16:13, 111:6

Exhibit [10] - 3:11, 33:13, 67:21, 72:24, 83:20, 87:16, 89:20, 101:19, 105:20, 109:1

exhibit [4] - 14:7, 14:21, 84:19, 93:17

exhibits [1] - 36:9

EXHIBITS [1] - 3:13

existed [1] - 7:24

exit [1] - 15:22

exited [4] - 16:20, 64:2, 110:17, 119:14

expect [1] - 62:4

expected [2] - 108:21, 115:18

expensive [1] - 50:18

experience [3] - 77:14, 102:20, 102:25

expert [8] - 5:21, 5:24, 6:1, 6:3, 6:5, 6:14, 14:18, 97:13

expertise [1] - 7:4

explain [19] - 4:21, 11:2, 11:20, 15:15, 24:9, 24:18, 37:8, 42:5, 43:23, 49:5, 51:15, 56:14, 57:3, 76:22, 94:10, 94:11, 98:11, 105:7, 118:22

explained [4] - 24:11, 24:13, 41:20, 79:21

explaining [3] - 26:9, 74:14, 103:11

express [1] - 6:15

expressed [1] - 112:7

extensions [1] - 19:18

extent [1] - 77:7

extraneous [1] - 93:12

## F

F.2d [1] - 115:13

F.3d [1] - 115:4

facing [1] - 23:7

fact [12] - 6:4, 12:13, 20:22, 21:13, 22:4, 22:12, 25:3, 84:16, 87:8, 114:4, 116:10, 117:12

facts [2] - 22:2, 22:3

fair [7] - 14:15, 70:19, 77:8, 94:2, 94:8, 94:12, 94:17

fairly [2] - 54:23, 93:25

fairness [3] - 19:12, 20:5, 112:2

fall [1] - 67:18

false [4] - 23:22, 23:23, 25:12, 25:15

familiar [2] - 48:21, 114:8

families [1] - 72:13

family [1] - 66:7

far [3] - 10:8, 63:22, 85:6

fascinated [1] - 41:23

faster [2] - 11:8

federal [1] - 20:16

feedback [1] - 34:16

feeders [1] - 15:20

few [19] - 25:25, 30:23, 46:19, 55:15, 55:21, 59:11, 59:18, 61:10, 61:11, 61:21, 74:23, 75:7, 88:3, 90:13, 95:18, 96:6, 96:7, 96:13

fifth [1] - 111:7

figure [7] - 20:20, 62:6, 62:7, 86:21, 106:13, 106:22, 112:13

figured [2] - 38:21, 96:23

figuring [1] - 38:19

file [4] - 56:22, 56:23, 57:4, 93:21

filter [1] - 91:10

final [2] - 16:3, 71:22

finally [1] - 71:22

financial [1] - 42:6

fine [5] - 27:24, 63:17, 69:6, 89:1, 94:15

finish [4] - 65:25, 96:17, 98:21, 118:11

finished [3] - 32:6, 40:4, 97:2

first [27] - 17:19, 37:25, 38:15, 41:2, 41:3, 41:7, 41:9, 41:10, 42:13, 43:7, 43:9, 43:11, 45:5, 48:25, 49:24, 50:1, 50:10, 51:6, 51:23, 53:22, 60:21, 78:13, 79:14, 104:19, 117:22, 117:23, 121:1

FISCHBACH [1] - 3:4

Fischbach [12] - 4:14, 9:7, 9:24, 13:1, 13:5, 13:17, 13:21, 14:4, 14:9, 14:11, 14:25, 15:15

five [4] - 34:19, 59:13, 85:4, 113:11

fix [1] - 97:19

Floor [1] - 1:22

focused [1] - 93:6

Fog [13] - 6:19, 21:3, 30:16, 30:18, 78:8, 78:14, 78:16, 80:20, 80:21, 81:1, 81:14, 81:23, 109:11

follow [2] - 7:16, 14:1

following [19] - 4:7, 6:12, 9:18, 13:10, 15:12, 16:21, 29:22, 36:17, 64:3, 66:12, 66:17, 77:23, 78:7, 110:18, 114:12, 119:4, 119:15, 119:18, 120:17

followup [6] - 8:15, 8:18, 13:23, 16:2, 88:23, 88:25

followups [1] - 76:17

FOR [4] - 1:1, 1:14, 1:14, 1:20

force [1] - 20:6

foregoing [1] - 122:4

forgetting [1] - 55:21

Forgive [1] - 34:17

forgot [1] - 104:18

form [5] - 46:20, 58:25, 106:24, 107:2, 107:4

formats [1] - 58:25

forum [1] - 35:18

forward [5] - 23:22, 58:20, 76:24, 112:8

foundation [3] - 5:13, 5:15, 6:7

four [5] - 64:16, 107:22, 117:11, 117:24, 118:1

fourth [2] - 111:7, 117:23

frankly [1] - 23:2

free [1] - 21:23

freelance [20] - 34:6, 35:2, 35:4, 35:8, 35:11, 36:14, 39:11, 39:13, 39:19, 39:24, 67:10, 70:2, 70:12, 70:13, 70:19, 82:5, 106:9, 107:19, 108:3

friends [10] - 38:3, 38:4, 43:6, 57:13, 57:18, 72:13, 74:23, 86:4, 95:24, 99:23

front [7] - 8:7, 25:22, 28:11, 88:16, 88:18, 89:16, 114:16

frustrated [2] - 102:12, 103:12

frustrating [1] - 103:23

full [5] - 20:5, 39:14, 39:16, 95:17, 122:5

full-time [3] - 39:14, 39:16, 95:17

fully [4] - 27:15, 99:5, 99:6, 112:10

function [2] - 44:3, 44:6

functionality [1] - 102:19

funds [1] - 58:13

future [2] - 86:10, 107:18

## G

game [1] - 38:14

games [2] - 31:25, 40:20

geeky [1] - 78:21

general [6] - 30:22, 30:24, 34:20, 78:15,

81:12, 81:22

generally [2] - 55:13, 94:19

generating [1] - 108:13

generic [1] - 29:15

given [4] - 14:22, 56:9, 57:6, 118:9

Goals [2] - 92:24, 93:1

gonna [12] - 52:1, 61:14, 61:15, 87:1, 88:12, 92:9, 94:14, 96:21, 98:13, 98:15, 98:16

Google [8] - 35:23, 38:14, 38:16, 38:19, 38:21, 93:16, 110:12, 110:15

Gothenburg [7] - 37:15, 40:8, 40:11, 41:1, 41:5, 67:5, 67:6

governance [1] - 49:18

governing [1] - 49:19

government [4] - 31:3, 31:6, 106:16, 107:16

Government [25] - 14:5, 17:1, 19:12, 20:5, 20:19, 21:16, 21:25, 22:16, 24:25, 25:3, 25:7, 25:17, 27:7, 27:11, 27:12, 65:11, 84:13, 84:25, 93:20, 105:17, 112:13, 113:22, 113:24, 117:2, 117:13

Government's [20] - 7:23, 8:24, 9:6, 9:11, 9:13, 19:20, 22:6, 28:18, 33:13, 65:7, 67:21, 72:24, 83:20, 87:16, 89:20, 101:19, 105:20, 109:1, 111:24, 112:16

Gox [30] - 60:7, 60:14, 60:16, 60:19, 60:21, 60:24, 61:1, 61:9, 68:6, 68:7, 68:9, 70:22, 70:25, 71:4, 71:7, 71:11, 71:12, 71:13, 73:10, 73:13, 73:17, 73:18, 73:23, 77:24, 77:25, 97:15

graduate [1] - 31:21

grappling [2] - 20:21, 21:8

gray [2] - 38:8, 38:25

**ground** [2] - 8:2, 98:18
**guess** [11] - 6:14, 7:22, 31:17, 55:24, 60:2, 65:20, 95:2, 99:1, 99:22, 103:12, 116:3
**guy** [1] - 50:11
**guys** [3] - 61:2, 79:21, 91:20

## H

**hacked** [4] - 36:22, 59:4, 61:2, 61:3
**hacks** [1] - 36:19
**half** [4] - 19:3, 23:12, 23:16, 67:18
**hand** [1] - 30:4
**handful** [1] - 115:1
**handle** [2] - 98:15, 111:11
**hang** [2] - 44:23, 110:5
**hanging** [2] - 87:24, 88:5
**happy** [4] - 65:19, 65:20, 65:23, 111:11
**hard** [7] - 5:2, 23:3, 42:5, 64:25, 65:12, 74:15, 74:16
**hassard** [1] - 103:16
**HASSARD** [2] - 1:21, 83:21
**Hassard** [14] - 33:12, 33:19, 67:20, 72:22, 78:10, 83:19, 87:15, 88:8, 89:19, 92:22, 95:3, 101:20, 105:18, 108:25
**head** [2] - 91:9, 118:2
**heading** [1] - 91:2
**heads** [1] - 113:4
**health** [5] - 74:21, 75:3, 100:14, 100:23
**healthcare** [1] - 74:25
**heard** [14] - 23:5, 41:7, 48:11, 60:6, 60:15, 65:12, 78:13, 78:15, 78:16, 78:17, 79:14, 81:9, 107:8, 112:23
**hearing** [3] - 54:19, 79:3, 117:20
**hearsay** [1] - 5:13
**Hedge** [1] - 96:20
**Hedged** [2] - 96:15,

96:22
**hedged** [1] - 96:21
**held** [3] - 6:13, 13:11, 100:9
**help** [4] - 74:20, 74:22, 96:25, 100:19
**helped** [1] - 76:4
**helpful** [1] - 64:21
**helping** [2] - 32:18, 44:8
**hereby** [1] - 122:3
**hesitant** [1] - 75:22
**hidden** [13] - 12:9, 12:11, 13:2, 13:3, 13:18, 13:19, 13:22, 14:4, 14:8, 14:14, 14:19, 15:4, 15:7
**hide** [1] - 38:18
**high** [6] - 31:20, 31:21, 32:6, 37:16, 57:19, 74:17
**higher** [1] - 55:18
**himself** [1] - 117:14
**hire** [2] - 96:25, 99:19
**hired** [2] - 32:14, 35:13
**hiring** [1] - 83:10
**history** [2] - 55:10, 62:22
**hobbies** [1] - 31:23
**hodgepodge** [1] - 90:21
**hold** [2] - 27:3, 104:7
**home** [20] - 12:12, 12:20, 13:22, 13:25, 14:7, 14:13, 15:1, 15:5, 15:7, 15:10, 15:16, 15:17, 15:25, 46:16, 82:9, 82:15, 101:14, 101:15, 110:5
**homeless** [1] - 83:12
**homes** [2] - 13:22, 14:20
**honestly** [1] - 14:21
**Honor** [49] - 4:2, 4:3, 4:11, 5:12, 5:17, 6:24, 9:17, 9:20, 13:14, 14:3, 15:11, 17:1, 18:25, 19:11, 23:17, 24:6, 25:16, 28:2, 28:12, 28:19, 29:10, 30:9, 53:9, 58:19, 63:11, 64:8, 64:9, 64:24, 65:14, 65:23, 66:22, 76:10, 76:20, 78:5, 89:18, 92:21, 94:9, 111:25, 113:3, 113:10, 113:21, 114:7, 114:14, 115:1,

117:9, 118:15, 118:17, 120:22, 120:23
**HONORABLE** [1] - 1:11
**horizon** [1] - 17:19
**hosting** [1] - 70:7
**hotmail.com** [1] - 71:1
**hour** [2] - 18:21, 35:11
**hours** [6] - 18:21, 40:11, 64:24, 64:25, 65:15, 101:12
**huge** [1] - 103:2
**hundred** [1] - 55:15
**hundreds** [9] - 45:17, 45:19, 45:22, 90:14, 91:14, 92:4, 102:22, 107:9

## I

**ID** [1] - 73:19
**idea** [2] - 65:3, 97:22
**ideas** [3] - 90:22, 96:12, 96:13
**identification** [1] - 70:23
**identified** [1] - 80:11
**identify** [1] - 79:25
**IDs** [1] - 73:15
**impact** [1] - 7:3
**implication** [3] - 13:2, 19:5, 19:6
**implicit** [1] - 19:9
**implied** [1] - 13:19
**implies** [1] - 13:3
**important** [2] - 28:21, 76:15
**improving** [1] - 41:25
**in-person** [2] - 51:10, 52:11
**incarcerated** [2] - 18:15, 22:25
**incarceration** [2] - 23:2, 25:25
**incidentally** [1] - 57:19
**including** [3] - 17:12, 19:23, 72:6
**incorrect** [1] - 105:11
**independent** [1] - 115:6
**INDEX** [1] - 3:1
**indicate** [1] - 69:9
**indicators** [1] - 62:16

**indicia** [1] - 8:8
**individual** [2] - 51:19, 92:16
**information** [7] - 8:19, 10:1, 23:18, 25:18, 79:10, 92:13, 105:11
**informs** [1] - 20:15
**initial** [2] - 53:20
**innocence** [1] - 21:14
**innuendo** [1] - 23:23
**inputs** [1] - 49:14
**inquire** [1] - 27:25
**installing** [1] - 48:1
**instance** [1] - 60:6
**instantaneous** [2] - 52:15, 53:2
**instantly** [2] - 54:1, 54:7
**instead** [3] - 47:7, 55:2, 105:5
**instruct** [1] - 27:2
**instructed** [1] - 29:12
**instruction** [1] - 29:18
**instructions** [6] - 18:7, 28:23, 64:18, 110:24, 111:1, 121:6
**intended** [1] - 105:11
**intending** [1] - 65:3
**interest** [3] - 96:8, 100:17, 100:18
**interested** [10] - 31:24, 32:1, 40:19, 41:12, 41:21, 42:13, 42:18, 98:19, 98:20
**interesting** [9] - 41:24, 41:25, 43:2, 51:1, 85:2, 90:22, 92:7, 92:11, 96:3
**interests** [5] - 40:1, 40:18, 40:24, 40:25, 83:14
**interface** [1] - 102:23
**International** [1] - 5:10
**internet** [9] - 17:15, 20:14, 32:20, 32:22, 32:23, 50:9, 59:4, 90:22, 92:6
**internet-related** [1] - 32:23
**interruption** [1] - 76:10
**interrupts** [1] - 93:14
**interview** [4] - 17:21, 18:3, 18:4, 19:25
**introduce** [3] -

27:11, 27:12, 30:12
**introduced** [1] - 80:22
**introducing** [1] - 14:23
**invest** [1] - 62:11
**investigated** [1] - 4:24
**invited** [1] - 29:14
**invoice** [1] - 105:9
**invoices** [17] - 105:8, 105:9, 105:10, 105:12, 105:14, 105:16, 105:22, 106:6, 106:7, 107:10, 107:15, 107:17, 108:2, 108:13, 108:18, 108:21
**involve** [1] - 33:2
**involved** [6] - 13:20, 27:10, 34:7, 38:24, 39:1, 51:21
**IP** [3] - 11:16, 12:5, 12:6
**IRC** [2] - 44:21
**irrelevant** [1] - 25:5
**issue** [10] - 17:3, 20:20, 21:7, 21:10, 25:20, 85:13, 111:9, 114:19, 116:4, 117:15
**issues** [5] - 74:24, 75:3, 95:12, 112:10, 114:21
**itself** [4] - 5:3, 5:8, 12:2, 115:24

## J

**J-O-N-K-O-P-I-N-G** [1] - 31:13
**jail** [3] - 17:24, 17:25, 21:17
**Jail** [1] - 20:11
**January** [2] - 17:20, 98:2
**JEFF** [1] - 3:4
**job** [15] - 32:4, 32:7, 34:5, 35:8, 35:11, 36:14, 36:23, 37:2, 39:23, 70:3, 83:6, 83:9, 83:15, 96:2, 100:16
**jobs** [29] - 32:6, 33:2, 34:6, 35:8, 37:14, 37:21, 38:6, 38:7, 38:24, 39:2, 39:4, 39:6, 39:9, 39:10, 39:11, 39:21, 39:24, 43:2, 70:4, 70:12,

70:13, 70:19, 82:5, 106:9, 106:11, 106:13, 107:19, 107:21, 108:3
**joined** [1] - 60:20
**Jonkoping** [8] - 31:8, 31:14, 31:19, 31:20, 32:5, 37:15, 67:7, 67:9
**JUDGE** [1] - 1:11
**judge** [1] - 115:24
**junior** [1] - 32:14
**jurisdiction** [1] - 99:6
**JUROR** [3] - 120:1, 120:10, 120:14
**juror** [18] - 64:13, 64:17, 65:19, 66:5, 111:19, 113:14, 114:18, 115:5, 115:7, 115:11, 115:17, 115:23, 115:24, 117:18, 121:1, 121:3
**Juror** [8] - 64:14, 111:3, 111:4, 111:6, 112:17, 117:11, 119:17, 120:16
**jurors** [10] - 101:21, 113:13, 113:17, 114:24, 115:15, 115:17, 116:13, 116:24, 118:8, 119:24
**jury** [65] - 4:1, 4:4, 4:6, 4:8, 4:21, 11:2, 11:20, 12:19, 12:20, 13:24, 15:1, 15:16, 16:14, 16:20, 18:15, 20:2, 21:20, 22:21, 23:4, 23:5, 23:8, 25:13, 25:22, 27:2, 28:4, 28:5, 28:11, 28:14, 28:16, 28:20, 28:22, 29:3, 29:6, 29:10, 29:12, 29:14, 29:19, 29:21, 29:23, 30:13, 43:10, 43:24, 49:5, 51:15, 53:14, 64:2, 64:18, 65:4, 65:5, 65:17, 66:14, 66:16, 66:18, 82:18, 89:17, 98:12, 105:5, 110:3, 110:5, 110:17, 114:16, 119:3, 119:5, 119:7, 119:14
**JURY** [1] - 1:10
**jury's** [1] - 55:1
**JUSTICE** [1] - 1:18

**K**

**Karl** [3] - 108:9, 108:11
**keep** [8] - 9:9, 12:2, 36:11, 90:4, 111:19, 111:23, 113:16, 114:24
**keeping** [2] - 44:8
**kept** [7] - 19:18, 63:3, 80:22, 80:25, 86:8, 86:10, 86:11
**key** [12] - 56:8, 56:9, 56:24, 57:5, 57:6, 57:9, 57:10, 57:23, 57:24, 58:1, 58:24, 59:8
**keyboards** [2] - 10:13, 10:16
**keys** [4] - 48:15, 56:25, 57:1, 78:23
**kill** [18] - 4:15, 4:17, 4:18, 4:19, 5:23, 6:25, 7:3, 7:9, 7:17, 8:10, 8:16, 8:21, 9:1, 9:3, 9:4, 9:6, 9:16, 10:2
**kind** [35] - 8:8, 11:22, 12:18, 20:20, 32:4, 38:6, 38:13, 38:25, 41:19, 42:5, 42:24, 44:8, 50:6, 50:13, 50:24, 53:22, 67:16, 72:9, 76:5, 77:13, 78:21, 83:15, 84:7, 85:3, 86:16, 87:3, 87:4, 90:4, 90:11, 95:12, 96:21, 97:8, 98:19, 106:12, 119:11
**kinds** [2] - 96:10, 103:22
**knowing** [1] - 11:7
**knowledge** [2] - 14:19, 95:13
**knows** [3] - 11:7, 48:9, 86:18
**kolbasa99@ rambler.ru** [1] - 71:8
**Kosem** [1] - 104:9
**Kraken** [4] - 81:9, 81:15, 81:17, 81:18
**Kroners** [2] - 33:6, 46:9
**KYC** [7] - 81:17, 81:18, 102:24, 103:1, 103:3, 103:7

**L**

**labeled** [2] - 37:7,

57:25
**lack** [2] - 5:12, 24:15
**landed** [1] - 5:10
**laptop** [3] - 10:18, 43:18, 47:17
**large** [4] - 61:24, 61:25, 115:23, 117:14
**larger** [1] - 76:12
**last** [9] - 14:24, 21:2, 30:14, 59:12, 75:8, 75:23, 75:24, 94:13, 102:10
**late** [5] - 114:18, 114:21, 116:19, 117:4, 118:4
**launder** [1] - 107:9
**LAW** [1] - 1:21
**lawyer** [1] - 94:4
**lawyers** [3] - 19:25, 110:4, 110:7
**LAX** [1] - 6:23
**lay** [1] - 5:15
**lead** [1] - 10:1
**leading** [5] - 53:11, 70:16, 71:20, 78:3, 106:3
**leaning** [1] - 58:20
**learn** [8] - 48:2, 48:14, 48:16, 57:14, 78:22, 79:8, 100:22, 107:17
**learned** [2] - 63:9, 91:6
**learning** [8] - 62:9, 62:12, 62:19, 63:7, 63:8, 100:4, 100:11, 100:13
**least** [7] - 43:8, 54:1, 102:18, 111:7, 116:14, 118:1, 118:11
**leave** [8] - 63:13, 66:5, 83:7, 94:3, 95:7, 95:9, 96:2, 100:16
**left** [2] - 95:17, 117:12
**legal** [3] - 77:16, 99:1, 99:8
**legitimate** [1] - 14:20
**length** [1] - 65:9
**less** [2] - 60:25, 114:19
**letters** [1] - 59:9
**level** [1] - 103:5
**Level** [1] - 92:24
**Liberty** [7] - 71:22, 71:25, 72:1, 72:18, 73:5, 73:6
**life** [1] - 75:5
**lifetimes** [1] - 63:8
**light** [1] - 15:19

**limit** [1] - 15:9
**limited** [1] - 107:4
**limits** [2] - 107:5, 107:12
**line** [3] - 7:2, 13:19, 59:9
**lines** [2] - 22:19, 92:16
**link** [4] - 38:12, 92:5, 92:8, 92:10
**links** [1] - 92:4
**LISA** [2] - 2:1, 122:3
**Lisa** [1] - 122:12
**list** [10] - 36:9, 36:12, 36:18, 36:24, 37:5, 39:5, 58:5, 58:7, 69:19, 90:3
**listed** [1] - 12:6
**listen** [5] - 53:7, 76:15, 76:17, 76:24, 79:12
**listening** [1] - 120:4
**lists** [3] - 94:18, 94:19
**literally** [1] - 10:12
**litter** [1] - 15:20
**live** [3] - 31:16, 41:1, 67:9
**lived** [4] - 30:20, 31:17, 32:4, 41:2
**lives** [1] - 42:3
**living** [5] - 41:5, 67:5, 67:6, 83:10, 95:16
**log** [4] - 10:12, 10:15, 10:17, 11:22
**logged** [2] - 52:12, 52:13
**logging** [1] - 10:7
**logins** [1] - 10:5
**logs** [11] - 10:24, 11:3, 11:4, 11:5, 11:10, 11:15, 11:18, 11:21, 12:2, 12:5, 17:24
**long-term** [3] - 32:7, 63:7, 95:14
**look** [11] - 25:10, 25:18, 36:24, 51:25, 62:21, 90:17, 94:24, 105:4, 113:4, 113:15, 120:25
**looking** [5] - 55:17, 62:14, 65:4, 68:23, 70:1
**looks** [1] - 33:24
**Los** [1] - 5:10
**lose** [3] - 45:7, 61:6, 97:16
**losing** [2] - 92:18,

97:3
**loss** [1] - 20:12
**lost** [2] - 61:4, 96:8
**low** [1] - 99:9
**lowest** [1] - 121:3
**lowest-numbered** [1] - 121:3
**LR** [2] - 71:23, 72:16
**lunch** [1] - 14:6
**Lund** [1] - 24:6
**lund** [1] - 25:8

**M**

**machine** [2] - 11:6, 11:8
**Magazine** [3] - 17:21, 17:23
**magic** [1] - 50:9
**magnetic** [1] - 5:1
**main** [3] - 48:25, 49:22, 80:17
**Malta** [4] - 98:23, 98:25, 99:4, 99:5
**man's** [8] - 5:5, 6:18, 6:21, 7:14, 7:19, 8:14, 9:7, 9:8
**manipulating** [1] - 24:19
**March** [2] - 1:7, 122:10
**marked** [2] - 38:25, 39:2
**MARKED** [1] - 3:13
**market** [4] - 62:17, 62:24, 62:25, 63:2
**marketing** [1] - 38:10
**markets** [1] - 99:7
**marking** [1] - 37:3
**Marknadskommuni kation** [6] - 32:8, 32:11, 33:5, 39:15, 67:8, 95:6
**marshals** [3] - 28:8, 28:9, 28:11
**Marx** [3] - 108:9, 108:11, 108:12
**maskable** [1] - 93:13
**Masked** [2] - 92:24, 93:1
**masked** [7] - 93:2, 93:21, 93:22, 94:18, 94:24, 95:1, 95:2
**masks** [2] - 93:13
**Masks** [1] - 95:1
**material** [2] - 21:13
**Matt** [1] - 54:19
**matter** [2] - 11:23, 12:13

Mazars's [2] - 11:16, 12:6

McDonald's [2] - 87:25, 88:3

mean [25] - 7:8, 8:14, 8:15, 9:10, 10:8, 14:23, 17:10, 19:11, 20:25, 22:22, 34:11, 37:8, 43:20, 50:16, 51:5, 57:13, 62:13, 65:14, 88:19, 92:8, 92:9, 93:1, 93:19, 97:15

meaning [3] - 95:1, 97:16, 100:5

means [2] - 49:7, 49:12

meant [1] - 26:10

measure [1] - 11:6

mechanics [1] - 53:13

medical [3] - 66:7, 111:9, 116:20

medicate [1] - 75:4

meet [40] - 37:22, 37:23, 37:24, 38:1, 40:12, 40:13, 40:14, 40:16, 40:17, 40:19, 40:21, 40:23, 40:24, 42:17, 42:19, 42:21, 42:22, 42:23, 42:25, 43:5, 43:6, 43:12, 43:15, 46:2, 47:17, 48:7, 48:18, 50:4, 50:22, 51:23, 62:4, 67:12, 78:20, 79:4, 79:8, 80:2, 82:6, 86:5

meet-up [9] - 40:16, 40:17, 40:21, 40:23, 43:12, 43:15, 47:17, 50:22, 86:5

meet-ups [24] - 37:22, 37:23, 37:24, 38:1, 40:12, 40:13, 40:14, 40:19, 42:17, 42:19, 42:21, 42:22, 42:23, 42:25, 46:2, 48:18, 50:4, 62:4, 67:12, 78:20, 79:4, 79:8, 82:6

meeting [5] - 40:17, 43:1, 51:1, 59:21, 65:4

member [1] - 66:8

members [2] - 16:14, 119:7

memory [1] - 83:25

mental [4] - 74:21, 75:3, 100:14, 100:22

mention [4] - 31:1,

48:8, 53:3, 85:25

mentioned [10] - 15:19, 35:2, 41:6, 41:16, 76:21, 78:22, 82:1, 86:14, 91:6

mentioning [3] - 78:20, 87:23, 91:16

mentions [2] - 41:10, 84:7

merely [3] - 13:23, 14:23, 14:25

Merkle [1] - 78:23

message [5] - 52:10, 102:7, 103:17

messages [3] - 102:4, 102:10, 102:13

messed [2] - 54:4, 54:5

met [2] - 86:5, 86:17

Miami [3] - 101:1, 101:3, 101:17

MICHAEL [1] - 1:21

microphone [2] - 34:16, 37:12

middle [4] - 58:5, 58:9, 58:11, 84:2

might [12] - 10:18, 55:21, 57:6, 60:5, 60:25, 62:2, 75:19, 92:10, 92:11, 105:11, 109:23, 118:12

million [1] - 91:15

millions [1] - 107:9

mine [3] - 39:1, 40:1, 83:15

miner [6] - 43:19, 43:20, 43:22, 43:23, 44:13

MINER [1] - 43:21

miners [3] - 44:4, 44:7, 44:10

mining [2] - 44:10, 78:24

minor [1] - 43:21

minute [1] - 45:11

minutes [5] - 16:16, 16:19, 34:19, 85:4, 113:12

mislead [1] - 25:13

missed [1] - 116:18

missing [1] - 115:23

misstates [1] - 106:1

mix [5] - 39:3, 81:22, 81:24, 90:21, 92:13

mixed [4] - 81:1, 81:13, 81:14, 86:20

mixer [5] - 79:16, 80:24, 109:16, 109:17, 109:18

mixers [2] - 80:19,

80:21

mixing [9] - 78:15, 78:17, 78:20, 78:24, 79:3, 79:14, 80:13, 80:20, 109:5

moment [3] - 66:3, 94:21, 111:12

Money [1] - 89:25

money [39] - 39:23, 46:12, 46:14, 50:2, 50:6, 50:7, 50:9, 50:16, 50:25, 55:13, 57:2, 58:1, 61:4, 61:24, 62:8, 62:17, 62:22, 63:4, 70:4, 72:10, 72:12, 73:9, 73:24, 74:2, 95:19, 95:20, 96:7, 96:8, 97:3, 97:4, 97:7, 97:16, 97:18, 98:16, 100:8, 106:15, 106:19, 108:2

monitored [1] - 17:25

month [1] - 33:7

months [6] - 50:20, 78:18, 83:6, 83:7, 101:4, 101:17

Moon [9] - 98:6, 98:9, 98:11, 98:13, 98:24, 99:3, 99:10, 99:14, 99:18

moped [1] - 46:23

morning [14] - 64:14, 64:20, 65:5, 110:25, 111:10, 112:9, 113:7, 116:20, 118:5, 118:9, 119:8, 119:22, 120:25, 121:4

Moscow [1] - 6:23

MOSS [1] - 1:11

most [11] - 37:1, 37:18, 43:13, 52:9, 57:8, 58:16, 58:17, 80:20, 96:18, 102:11, 116:2

mostly [1] - 80:20

mother [1] - 30:21

move [6] - 8:14, 9:16, 31:7, 72:9, 82:18, 89:10

moved [8] - 30:21, 30:22, 31:7, 31:8, 31:14, 32:2, 40:8, 40:10

movements [1] - 62:17

moving [2] - 37:15, 82:23

MR [186] - 4:3, 4:11,

4:13, 5:15, 5:17, 5:18, 5:22, 6:2, 6:6, 6:10, 6:16, 7:11, 7:13, 8:6, 8:13, 8:19, 9:3, 9:17, 9:20, 9:22, 9:23, 12:17, 12:25, 13:7, 13:12, 13:14, 14:17, 15:6, 15:11, 15:14, 16:2, 16:5, 16:9, 17:1, 18:18, 18:25, 19:1, 19:11, 20:10, 21:6, 22:4, 23:14, 23:17, 23:21, 24:3, 24:6, 24:16, 24:21, 25:6, 25:11, 25:15, 26:9, 26:13, 26:15, 28:2, 28:12, 28:19, 30:2, 30:9, 30:11, 31:10, 33:12, 33:16, 33:18, 33:21, 35:1, 39:8, 46:6, 46:11, 53:9, 53:10, 54:23, 55:4, 58:19, 58:21, 63:11, 63:15, 63:19, 64:7, 64:9, 64:23, 65:14, 65:22, 65:23, 66:2, 66:22, 66:23, 67:20, 67:23, 67:24, 68:22, 69:1, 69:3, 69:5, 69:7, 70:17, 70:18, 71:21, 72:15, 72:22, 73:1, 76:10, 77:1, 77:22, 78:4, 78:6, 78:10, 78:12, 79:15, 82:21, 82:22, 83:19, 83:21, 83:22, 83:23, 84:10, 84:11, 85:6, 85:14, 85:16, 85:22, 87:11, 87:15, 87:17, 88:8, 88:9, 88:14, 88:16, 88:23, 89:2, 89:7, 89:10, 89:18, 89:22, 90:6, 90:8, 91:2, 92:21, 92:23, 93:23, 93:25, 94:7, 94:16, 95:3, 95:4, 101:18, 101:24, 102:1, 102:3, 103:16, 103:19, 104:5, 104:8, 104:12, 104:14, 104:21, 104:23, 105:2, 105:3, 105:18, 105:21, 106:1, 106:5, 108:24, 109:3, 111:12, 111:15, 111:19, 111:22, 111:25, 112:6, 113:3, 113:10, 113:20, 113:22, 114:7, 114:14, 115:1, 116:2, 116:6, 117:1, 117:9, 118:15,

118:17, 120:22, 120:23

MS [11] - 4:2, 5:12, 5:24, 6:24, 8:22, 12:15, 12:21, 14:3, 23:13, 24:9, 24:17

Mt [30] - 60:7, 60:14, 60:16, 60:19, 60:21, 60:24, 61:1, 61:9, 68:6, 68:7, 68:9, 70:22, 70:25, 71:4, 71:7, 71:11, 71:12, 71:13, 73:10, 73:13, 73:17, 73:18, 73:23, 77:24, 77:25, 97:15

multiple [1] - 17:11

music [4] - 95:20, 95:22, 95:24, 96:5

must [6] - 32:12, 42:15, 44:17, 44:18, 46:14, 97:8

Mycelium [6] - 57:20, 57:21, 58:4, 58:7, 58:13, 81:8

## N

name [9] - 30:13, 30:14, 32:8, 34:21, 73:21, 93:3, 93:18, 107:25

Namecheap [5] - 33:8, 33:23, 33:24, 33:25, 34:1

names [3] - 34:7, 108:8, 108:10

native [3] - 11:18, 11:20, 12:5

nature [2] - 7:9, 9:7

necessarily [2] - 89:13, 91:10

necessary [3] - 28:20, 29:9, 112:17

Neck [1] - 20:11

need [15] - 7:14, 9:8, 10:18, 11:8, 28:25, 42:12, 52:5, 62:6, 62:7, 79:2, 101:10, 106:12, 108:19, 109:24, 109:25

needed [4] - 22:15, 32:15, 81:3, 81:25

needs [1] - 44:2

negative [1] - 91:23

nerdy [1] - 32:1

nest [1] - 61:23

network [6] - 44:1, 44:2, 44:3, 44:6, 44:8

networking [1] -

Appx5892

13:23
**networks** [1] - 51:14
**never** [19] - 30:17, 42:1, 58:12, 61:24, 95:14, 95:18, 96:7, 96:17, 97:4, 99:12, 99:22, 103:8, 104:25, 105:11, 107:11, 108:21
**New** [1] - 1:23
**new** [6] - 7:2, 14:6, 43:6, 48:2, 48:3, 48:7
**news** [1] - 41:11
**next** [9] - 10:12, 30:1, 43:16, 50:20, 50:22, 68:20, 85:21, 87:14, 97:20
**NFS9000** [1] - 71:1
**nice** [1] - 116:16
**niche** [1] - 48:10
**night** [1] - 110:2
**Ninth** [1] - 115:3
**NO** [4] - 3:13, 120:1, 120:10, 120:14
**nobody** [6] - 26:6, 45:8, 48:11, 50:7, 50:17, 50:18
**none** [2] - 20:15, 113:3
**normal** [3] - 10:17, 20:15, 46:15
**Northern** [1] - 20:11
**Northwest** [4] - 1:15, 1:18, 2:3, 122:14
**notable** [1] - 117:17
**notes** [24] - 8:24, 28:16, 88:11, 90:7, 90:9, 90:11, 90:13, 90:17, 90:19, 90:20, 91:12, 91:14, 91:17, 91:19, 92:1, 92:3, 92:4, 92:7, 92:12, 92:16, 94:10, 120:25, 122:5
**nothing** [6] - 10:4, 11:24, 52:18, 64:7, 113:20, 113:22
**notice** [2] - 24:12, 104:24
**noticed** [7] - 14:18, 76:3, 111:4, 111:7, 116:9, 117:25
**November** [1] - 73:9
**nowadays** [1] - 47:3
**nullification** [1] - 23:4
**number** [13] - 10:21, 17:10, 17:13, 28:21, 34:5, 40:22, 45:14, 45:20, 74:12, 84:19,

103:17, 107:3, 107:4
**numbered** [1] - 121:3

## O

**object** [2] - 69:1, 69:3
**objection** [12] - 5:12, 7:25, 12:21, 19:20, 46:6, 54:23, 85:6, 88:14, 93:23, 106:1, 113:23, 114:13
**observed** [2] - 115:11, 115:24
**obviously** [1] - 114:19
**occasions** [1] - 116:9
**occurred** [2] - 13:24, 54:21
**October** [6] - 18:16, 19:2, 20:24, 21:22, 22:7, 23:11
**odd** [1] - 32:6
**OF** [5] - 1:1, 1:3, 1:10, 1:15, 1:18
**off-chain** [1] - 56:7
**offended** [1] - 91:21
**offer** [1] - 116:21
**OFFICE** [1] - 1:14
**offices** [1] - 67:8
**official** [4] - 40:17, 49:1, 49:3, 122:12
**Official** [1] - 2:1
**old** [6] - 31:14, 39:6, 46:22, 67:1, 72:6, 82:23
**older** [1] - 115:3
**once** [7] - 26:4, 42:18, 46:23, 57:24, 86:14, 91:16, 106:20
**one** [58] - 6:11, 9:14, 14:7, 16:2, 17:10, 17:18, 20:3, 21:24, 25:24, 28:22, 34:8, 41:19, 42:25, 43:8, 43:16, 56:11, 57:22, 60:19, 60:21, 61:15, 64:13, 64:25, 65:14, 65:18, 73:15, 78:21, 78:24, 79:21, 80:22, 81:18, 83:2, 84:7, 90:4, 90:5, 90:23, 93:5, 96:1, 96:16, 96:18, 99:2, 100:15, 102:20, 105:19, 105:22, 108:9, 108:11, 108:17,

108:18, 110:10, 112:1, 112:4, 116:12, 116:13, 117:18
**ones** [3] - 20:17, 34:14, 102:11
**online** [12] - 44:22, 44:23, 44:25, 45:13, 51:13, 52:8, 53:2, 53:14, 53:18, 56:4, 62:12, 67:19
**open** [10] - 9:19, 15:13, 15:22, 18:24, 27:7, 49:1, 49:2, 49:6, 49:11, 111:6
**open-source** [2] - 49:2, 49:6
**operate** [2] - 7:10, 30:16
**operated** [2] - 30:17, 96:6
**operating** [5] - 12:3, 45:9, 96:5, 96:17, 98:5
**operation** [1] - 91:16
**operational** [1] - 99:22
**opinion** [5] - 5:21, 5:24, 6:1, 6:7, 6:15
**opportunities** [1] - 30:23
**opportunity** [6] - 27:14, 83:16, 88:20, 89:14, 96:3, 117:15
**opposed** [1] - 37:4
**opposes** [1] - 17:1
**order** [11] - 4:9, 25:24, 26:3, 26:5, 29:24, 45:2, 55:18, 66:19, 99:25, 119:6, 121:2
**organized** [1] - 40:17
**originally** [1] - 46:15
**originate** [1] - 109:5
**otherwise** [4] - 27:9, 27:12, 80:18, 110:15
**outline** [1] - 65:2
**outset** [1] - 18:8
**outside** [7] - 7:4, 17:15, 17:17, 18:6, 19:23, 20:7, 29:3
**overnight** [1] - 119:10
**overruled** [1] - 46:7
**own** [6] - 39:7, 71:3, 73:21, 99:15, 105:10, 107:4
**owned** [3] - 34:11, 38:20, 81:19
**owners** [2] - 79:22, 80:10

## P

**p.m** [9] - 1:7, 4:7, 16:21, 29:22, 64:3, 66:17, 110:18, 119:4, 119:15
**packages** [1] - 90:23
**Packages** [1] - 91:3
**PAGE** [1] - 3:3
**Page** [2] - 89:21, 92:22
**page** [2] - 18:24, 38:15
**pages** [3] - 90:14, 91:14, 92:15
**paid** [7] - 44:7, 45:24, 46:3, 47:8, 47:12, 51:14, 108:6
**pain** [1] - 26:6
**panicked** [1] - 119:22
**paper** [10] - 58:23, 58:24, 59:1, 59:2, 59:6, 59:8, 59:10, 59:12, 86:10, 91:11
**pardon** [1] - 76:10
**parents** [1] - 67:9
**part** [9] - 6:6, 15:21, 15:24, 23:3, 33:1, 38:2, 70:2, 97:2, 99:3
**partially** [1] - 116:14
**particular** [14] - 8:13, 17:18, 29:13, 29:14, 29:15, 33:9, 36:4, 36:5, 36:6, 45:11, 46:18, 57:24, 104:4
**particularly** [1] - 117:21
**parties** [4] - 17:11, 65:19, 65:20, 111:11
**partly** [1] - 103:24
**PAS** [2] - 74:4
**pass** [2] - 25:12, 25:15
**passed** [1] - 28:25
**password** [5] - 36:9, 36:12, 36:15, 37:5, 69:19
**passwords** [5] - 35:5, 36:11, 36:20, 36:22, 92:3
**past** [3] - 63:20, 104:19, 109:20
**pasting** [1] - 102:13
**Pause** [1] - 114:23
**pay** [8] - 38:6, 44:19, 45:23, 46:12, 70:3, 98:17, 108:22, 117:18
**paycheck** [1] - 46:14

**paying** [6] - 46:25, 72:13, 80:6, 80:7, 107:19
**payment** [9] - 51:14, 53:23, 70:6, 72:1, 72:12, 104:17, 104:20
**payments** [1] - 104:19
**peer** [28] - 51:13, 51:16, 51:18, 51:21, 52:8, 52:11, 53:1, 53:11, 54:16, 54:20, 55:5, 55:7, 55:14, 57:12
**peer-to-peer** [14] - 51:13, 51:16, 51:18, 51:21, 52:8, 52:11, 53:1, 53:11, 54:16, 54:20, 55:5, 55:7, 55:14, 57:12
**Pelker** [7] - 4:14, 10:5, 10:20, 12:8, 12:25, 13:16, 14:2
**PELKER** [12] - 1:17, 4:2, 5:12, 5:24, 6:24, 8:22, 12:15, 12:21, 14:3, 23:13, 24:9, 24:17
**Pennsylvania** [1] - 1:18
**people** [59] - 10:21, 11:10, 11:12, 12:19, 13:5, 13:24, 36:18, 36:20, 37:21, 38:9, 38:10, 38:18, 40:18, 40:19, 40:22, 40:24, 41:12, 41:14, 42:10, 42:23, 42:24, 43:1, 43:5, 44:4, 44:22, 44:24, 45:6, 46:25, 48:11, 48:19, 49:12, 49:14, 49:25, 50:4, 51:1, 59:21, 61:4, 62:3, 63:7, 72:2, 72:11, 76:2, 78:20, 78:25, 79:3, 79:16, 80:8, 80:9, 80:14, 81:6, 83:10, 88:4, 92:13, 95:25, 97:16, 99:15, 100:19
**people's** [2] - 36:12, 42:3
**per** [1] - 33:7
**percent** [1] - 93:6
**percentage** [1] - 55:19
**perform** [4] - 35:14, 70:8, 115:16, 115:19
**performing** [1] - 44:5
**perhaps** [4] - 21:20,

21:24, 25:17, 28:15
**period** [5] - 22:20,
22:21, 58:22, 96:11,
101:5
**periods** [2] - 118:1,
118:3
**person** [32] - 18:9,
22:7, 38:20, 43:18,
44:12, 47:9, 47:23,
48:7, 51:10, 51:23,
52:1, 52:11, 52:13,
52:16, 53:19, 53:24,
55:9, 56:2, 57:17,
57:25, 59:21, 61:1,
79:24, 79:25, 86:5,
86:16, 86:17, 86:23,
86:25, 87:1, 97:13
**person's** [1] - 52:21
**personal** [1] - 116:20
**personally** [1] -
117:25
**pet** [1] - 15:20
**philosophical** [1] -
42:4
**philosophy** [1] -
90:21
**phone** [8] - 13:8,
17:16, 20:16, 56:16,
56:19, 57:21, 59:3,
59:5
**phones** [1] - 88:7
**photo** [3] - 70:23,
73:15, 73:19
**phrase** [1] - 51:16
**Pi** [1] - 10:15
**pick** [3] - 6:11, 13:7,
92:16
**piece** [2] - 59:1, 59:2
**place** [3] - 30:23,
90:5, 115:8
**places** [1] - 86:8
**Plaintiff** [1] - 1:4
**PLAINTIFF** [1] - 1:14
**plan** [1] - 90:18
**planned** [1] - 90:17
**planning** [3] - 14:22,
50:13, 65:1
**plasma@**
**plasmadivision.com**
[4] - 60:9, 60:11,
73:13, 73:17
**plasma@**
**plasmadivision@**
**hotmail.com** [1] - 60:8
**platform** [1] - 55:11
**plausible** [1] - 9:11
**plea** [1] - 23:4
**PLLC** [1] - 1:21
**plowed** [1] - 8:1
**podium** [3] - 26:12,

26:15, 26:16
**point** [26] - 7:8, 19:7,
23:25, 25:3, 25:5,
26:1, 29:18, 30:21,
40:9, 59:17, 62:2,
76:13, 77:13, 80:17,
82:15, 83:5, 83:9,
88:15, 101:13, 104:1,
105:7, 110:10, 112:1,
112:7, 112:25, 116:2
**pointing** [1] - 20:6
**portion** [1] - 116:18
**portions** [4] -
112:23, 115:23,
117:13, 117:14
**posed** [1] - 87:7
**position** [4] - 21:13,
22:6, 95:17, 117:10
**positions** [1] - 42:11
**possibility** [2] -
52:19, 52:20
**possible** [3] - 18:5,
91:18, 107:11
**post** [12] - 42:8,
102:1, 103:17,
103:18, 103:20,
104:3, 104:4, 104:7,
104:15, 109:4,
110:23, 121:5
**post-Soviet** [1] -
42:8
**posting** [1] - 109:7
**posts** [1] - 104:6
**potential** [4] - 17:4,
41:22, 41:24, 42:6
**potentially** [1] -
86:23
**power** [3] - 26:4,
42:11
**practice** [3] - 36:16,
49:12, 81:22
**precedent** [4] -
112:25, 113:12,
114:9, 116:4
**predict** [3] - 62:14,
62:15, 100:5
**prefer** [1] - 111:19
**preference** [2] -
63:16, 112:16
**prejudice** [2] - 20:3,
115:22
**prejudicial** [1] - 25:2
**prepared** [1] - 43:18
**prerogative** [1] -
115:9
**presence** [1] - 29:3
**present** [5] - 4:8,
25:23, 29:23, 66:18,
119:5
**presentation** [2] -

90:16, 118:11
**presented** [1] - 18:15
**presenting** [1] -
112:14
**preserve** [1] - 79:1
**pressing** [1] - 114:19
**pretrial** [3] - 17:8,
19:14, 19:19
**pretty** [5] - 30:22,
46:21, 58:24, 59:25,
102:12
**previous** [1] - 102:5
**previously** [2] - 8:4,
9:13
**price** [18] - 44:19,
45:3, 45:10, 45:12,
45:15, 50:12, 50:17,
61:12, 61:16, 61:22,
62:2, 62:14, 62:15,
62:17, 79:23, 83:4,
95:21, 100:7
**Price's** [1] - 54:19
**prices** [1] - 100:5
**printed** [3] - 32:16,
32:17, 59:1
**prisoner** [1] - 20:16
**privacy** [5] - 79:1,
79:17, 80:14, 80:17,
81:24
**private** [16] - 48:15,
56:8, 56:9, 56:24,
56:25, 57:1, 57:5,
57:6, 57:9, 57:23,
58:1, 58:24, 59:8,
78:23, 80:14, 80:18
**privately** [4] - 28:7,
66:4, 111:17, 114:17
**probative** [1] - 25:3
**problem** [7] - 7:22,
21:5, 23:17, 97:19,
97:21, 112:9, 113:14
**problems** [4] - 42:6,
42:9, 97:14, 100:20
**proceed** [4] - 9:20,
25:19, 30:8, 76:18
**proceedings** [16] -
4:7, 9:18, 15:12,
16:21, 29:22, 64:3,
66:12, 66:17, 110:18,
114:23, 119:4,
119:15, 119:18,
120:17, 121:8, 122:6
**process** [3] - 44:20,
91:24, 92:19
**processing** [2] - 91:8
**processor** [5] - 93:4,
93:5, 93:9, 93:15,
94:23
**produce** [1] - 64:18
**produced** [2] - 14:6,

122:6
**product** [1] - 92:9
**productions** [1] -
32:17
**profit** [2] - 50:3,
50:24
**profoundly** [1] - 20:1
**program** [2] - 93:11,
108:15
**programming** [3] -
37:25, 40:19, 93:15
**project** [18] - 35:10,
35:17, 35:23, 36:4,
36:5, 70:6, 96:16,
96:18, 96:19, 97:2,
97:15, 97:17, 98:7,
98:9, 98:11, 98:15,
99:10, 99:13
**projects** [8] - 32:19,
49:19, 95:18, 95:19,
96:1, 96:10, 97:25,
98:3
**proposed** [3] -
110:23, 111:1, 121:5
**proprietorship** [1] -
107:1
**protect** [1] - 79:17
**prove** [1] - 25:4
**provide** [1] - 18:7
**provided** [3] - 24:11,
70:22, 73:18
**providing** [1] -
103:14
**psychedelics** [11] -
74:13, 75:2, 75:4,
75:6, 75:8, 75:22,
76:3, 76:6, 77:4, 77:7,
77:17
**public** [1] - 79:18
**pull** [2] - 37:12,
105:18
**punishment** [1] -
17:4
**purchases** [2] -
55:14, 58:14
**purported** [1] - 61:2
**purports** [1] - 14:7
**purpose** [1] - 23:4
**purposes** [3] - 11:7,
25:23, 64:12
**pursuant** [2] - 28:23,
115:12
**pursue** [2] - 83:14,
96:13
**put** [21] - 17:20,
23:21, 23:22, 24:17,
33:12, 36:14, 36:15,
42:10, 54:25, 61:20,
61:21, 62:10, 67:20,
72:23, 83:19, 87:15,

89:19, 92:7, 97:4,
108:12, 109:17

## Q

**quarter** [1] - 110:1
**questioned** [1] -
115:11
**questioning** [2] -
7:2, 13:19
**questions** [28] -
16:9, 27:8, 28:14,
28:17, 28:22, 28:23,
28:25, 29:10, 37:10,
53:7, 76:15, 76:17,
76:18, 76:19, 92:19,
94:4, 102:24, 103:1,
103:2, 103:4, 103:8,
103:15, 103:22,
103:25, 104:2, 104:3,
113:25
**quickly** [2] - 84:3,
90:6
**quit** [1] - 39:23
**quite** [8] - 23:2,
37:17, 61:10, 74:23,
90:13, 101:6, 101:8,
116:24
**quote** [1] - 87:24
**quotes** [1] - 90:21

## R

**raise** [4] - 30:4, 64:5,
113:18, 113:19
**raised** [1] - 16:24
**ran** [3] - 84:24,
85:24, 86:1
**RANDOLPH** [1] -
1:11
**random** [2] - 86:5,
86:17
**ranking** [1] - 38:14
**Rasberry** [1] - 10:15
**rather** [3] - 25:21,
89:16, 99:1
**RDR** [3] - 2:1, 122:3,
122:12
**reach** [1] - 24:10
**Reactor** [4] - 105:14,
105:16, 105:22,
107:10
**read** [5] - 41:18,
41:20, 42:1, 85:3,
91:17
**reading** [5] - 41:10,
75:1, 91:11, 91:20,
105:5
**ready** [2] - 35:12,

66:21
**real** [3] - 75:5, 97:4, 97:5
**realized** [1] - 83:5
**realizing** [1] - 38:7
**really** [24] - 41:14, 41:21, 41:23, 45:6, 45:8, 50:8, 53:1, 61:24, 62:3, 65:15, 74:15, 74:18, 76:2, 78:25, 79:4, 79:7, 83:11, 83:12, 87:3, 90:20, 100:9, 107:2, 116:8, 117:21
**reason** [16] - 7:24, 25:6, 25:20, 36:21, 38:2, 64:11, 69:10, 69:11, 73:12, 73:14, 74:6, 79:20, 80:12, 88:2, 109:22, 111:2
**reasons** [8] - 30:24, 42:25, 82:1, 91:23, 96:2, 99:5, 100:15, 116:20
**rebuttal** [4] - 24:17, 112:14, 117:2, 118:12
**recalled** [2] - 68:14, 85:12
**receive** [2] - 38:16, 80:6
**Received** [1] - 3:11
**received** [5] - 23:18, 54:3, 54:4, 104:25, 106:10
**recent** [3] - 45:2, 102:11, 104:20
**recently** [3] - 54:11, 76:8, 114:8
**recess** [1] - 66:11
**recognize** [7] - 83:24, 83:25, 84:1, 87:18, 87:20, 87:25, 102:4
**recollection** [3] - 55:1, 66:8, 114:1
**recommending** [1] - 80:24
**reconvene** [1] - 119:8
**record** [7] - 17:10, 17:22, 20:13, 26:2, 79:18, 94:1, 94:5
**recorded** [2] - 17:24, 20:17
**recording** [1] - 95:25
**records** [2] - 105:10, 107:23
**Redirect** [1] - 3:5
**REDIRECT** [1] - 4:12
**reference** [4] - 18:23,

25:24, 84:5, 110:10
**referring** [5] - 20:11, 37:6, 56:8, 81:11, 98:8
**reflect** [1] - 108:2
**regard** [2] - 25:1, 74:25
**regarding** [2] - 6:8, 16:25
**Regional** [1] - 20:11
**register** [3] - 98:25, 99:1, 99:4
**registered** [1] - 34:10
**registering** [2] - 34:7, 38:11
**registrant** [4] - 23:19, 24:1, 24:8, 24:14
**registrant's** [1] - 24:14
**registrar** [9] - 17:12, 18:10, 20:24, 24:3, 24:4, 24:10, 24:12, 24:23, 25:4
**registration** [10] - 17:9, 17:12, 18:10, 22:17, 24:24, 34:12, 34:13, 34:18, 34:20, 107:25
**registrations** [4] - 32:25, 33:1, 34:1, 34:3
**regular** [8] - 33:2, 41:14, 42:21, 46:24, 47:23, 48:7, 121:1, 121:3
**regularly** [2] - 5:6, 80:13
**rehabilitated** [1] - 114:5
**related** [7] - 5:23, 8:16, 11:15, 32:23, 35:8, 53:5, 96:16
**relates** [1] - 66:7
**relating** [1] - 110:15
**relation** [6] - 12:5, 20:14, 20:24, 21:14, 69:18, 89:3
**relatively** [1] - 54:11
**relaxed** [2] - 114:2, 114:10
**relevant** [1] - 29:5
**reliable** [1] - 79:10
**remaining** [1] - 106:8
**remember** [33] - 32:10, 38:18, 41:7, 41:9, 42:13, 42:16, 43:7, 44:15, 45:3, 45:16, 45:19, 45:20,

45:23, 46:3, 46:12, 47:15, 56:11, 57:23, 58:6, 59:12, 59:16, 68:17, 69:12, 72:14, 73:2, 74:7, 75:21, 78:13, 78:17, 79:13, 82:11, 82:14, 82:16
**remind** [7] - 16:17, 18:12, 28:15, 28:20, 29:9, 110:14, 119:10
**reminded** [1] - 28:13
**remote** [3] - 5:4, 10:5, 14:13
**remote-triggered** [1] - 5:4
**remotely** [6] - 10:7, 10:17, 15:22, 82:11, 82:16, 101:13
**remove** [1] - 117:11
**renamed** [1] - 58:12
**repeat** [1] - 117:10
**repeated** [1] - 113:13
**repeatedly** [1] - 116:23
**replace** [1] - 115:15
**replacement** [1] - 15:17
**reply** [2] - 104:13, 104:15
**REPORTED** [1] - 2:1
**REPORTER** [6] - 31:9, 34:15, 37:11, 72:4, 77:18, 77:21
**Reporter** [2] - 2:1, 122:12
**reporter** [1] - 31:11
**reporters** [4] - 17:21, 17:23, 18:4, 19:24
**representation** [2] - 25:1, 25:7
**Republic** [1] - 72:7
**require** [6] - 33:3, 55:6, 55:7, 57:11, 57:16, 107:15
**required** [2] - 86:11, 105:12
**requirement** [1] - 107:16
**requires** [2] - 54:22, 57:9
**research** [5] - 16:18, 63:24, 110:9, 110:15, 119:11
**Reserve** [7] - 71:22, 71:25, 72:1, 72:18, 73:5, 73:6, 73:7
**resolve** [1] - 97:14
**resonated** [2] - 79:20, 80:12
**respect** [7] - 16:24,

22:17, 22:19, 27:9, 89:12, 113:1, 114:2
**respectful** [1] - 76:14
**respond** [2] - 20:5, 53:8
**responded** [2] - 18:14, 24:10
**response** [4] - 14:16, 14:17, 24:15, 105:6
**responsive** [1] - 87:7
**rest** [5] - 41:5, 44:6, 65:8, 65:9, 112:18
**restaurant** [2] - 43:12, 51:8
**restaurants** [1] - 43:14
**resting** [1] - 117:5
**retired** [1] - 120:16
**retreat** [1] - 77:19
**Retreats** [1] - 76:9
**retreats** [2] - 77:15, 100:22
**return** [1] - 95:9
**returned** [2] - 95:11, 95:14
**reveal** [1] - 9:1
**review** [9] - 6:17, 7:18, 8:25, 9:24, 11:14, 12:4, 33:22, 69:8, 69:17
**rise** [9] - 4:5, 29:20, 64:1, 66:10, 66:15, 110:16, 119:2, 119:13, 121:7
**risk** [3] - 20:2, 74:17, 86:23
**Road** [19] - 74:2, 74:4, 74:5, 74:6, 74:9, 74:12, 75:7, 75:13, 75:14, 75:16, 75:20, 75:23, 75:24, 75:25, 76:7, 76:12, 76:21, 77:4, 77:7
**road** [1] - 19:15
**rob** [1] - 52:1
**robbed** [3] - 80:8, 86:15, 88:2
**robber** [1] - 86:23
**robberies** [1] - 79:22
**role** [1] - 23:9
**ROMAN** [4] - 1:6, 3:6, 30:5, 30:14
**Roman** [2] - 30:2, 30:14
**Romania** [1] - 99:18
**Room** [1] - 2:3
**room** [2] - 110:3, 110:6
**rooms** [1] - 41:2
**roughly** [1] - 33:4

**rouse** [1] - 118:3
**Rule** [1] - 115:12
**rules** [2] - 89:12, 121:2
**run** [1] - 15:7
**running** [11] - 84:3, 84:5, 84:7, 84:13, 84:16, 85:18, 85:23, 88:13, 89:4, 91:15
**Russia** [3] - 30:20, 30:22, 32:3
**Russian** [2] - 31:3, 31:6

## S

**S-T-E-R-L-I-N-G-O-V** [1] - 30:15
**sad** [1] - 118:7
**safe** [3] - 36:15, 59:5, 60:25
**safer** [2] - 60:2
**safety** [1] - 81:25
**salary** [1] - 33:4
**sale** [1] - 55:25
**Santell** [2] - 75:10, 77:6
**sat** [2] - 18:2, 18:3
**save** [2] - 62:8, 86:10
**saved** [1] - 83:3
**saving** [1] - 92:11
**savings** [2] - 39:21, 83:6
**saw** [6] - 6:16, 7:18, 9:15, 28:12, 103:3, 108:9
**scam** [1] - 54:6
**scammed** [3] - 54:10, 54:11, 54:12
**scams** [1] - 57:17
**scared** [1] - 97:15
**schedule** [2] - 110:4, 110:7
**scheduling** [4] - 64:12, 64:22, 110:22, 112:22
**Scholl** [2] - 6:19, 21:2
**school** [5] - 31:19, 31:20, 31:21, 32:6, 37:16
**science** [1] - 93:4
**scope** [2] - 7:6, 12:21
**screen** [2] - 46:23, 101:20
**screens** [2] - 10:13, 10:16
**screenshot** [1] - 58:6

135

| | | | | |
|---|---|---|---|---|
| **scroll** [11] - 33:19, 90:6, 91:2, 102:1, 103:16, 104:5, 104:6, 104:12, 104:21, 105:2, 109:2 | 47:9, 47:11, 47:14, 52:5, 52:6, 52:17, 52:22, 53:22, 54:7, 58:1, 72:12, 81:2, 81:14, 105:12, 105:24, 107:15, 108:18, 108:19, 108:20 | 38:5, 38:23, 46:8, 63:19<br>**shortly** [2] - 22:20, 66:9<br>**show** [4] - 11:10, 11:12, 14:7, 116:6<br>**showing** [2] - 8:20, 58:6 | 34:6, 35:14, 40:23, 41:4, 46:16, 50:3, 74:12, 95:12, 95:24<br>**smart** [12] - 12:12, 12:20, 13:22, 13:25, 14:20, 15:1, 15:4, 15:7, 15:10, 15:16, 15:17, 15:25 | **Soviet** [2] - 42:8, 72:6<br>**Spain** [2] - 77:16, 77:19<br>**special** [1] - 41:15<br>**specialized** [1] - 44:4<br>**Specific** [1] - 94:25 |
| **seat** [4] - 28:5, 28:6, 28:10, 119:19 | **sending** [5] - 56:23, 68:9, 73:9, 73:24, 74:2 | **shown** [1] - 57:21<br>**shut** [2] - 6:20, 96:6<br>**side** [5] - 34:6, 50:2, 54:7, 82:5, 112:4 | **Social** [1] - 107:3<br>**social** [1] - 83:11<br>**society** [1] - 41:25 | **specific** [9] - 41:9, 68:17, 78:16, 79:20, 81:11, 93:5, 93:10, 109:14, 109:16 |
| **seated** [10] - 4:9, 16:22, 29:24, 30:7, 64:4, 66:13, 66:19, 110:19, 119:6, 119:16 | **sends** [3] - 19:15, 71:14, 92:6 | **sides** [2] - 111:5, 117:16 | **software** [8] - 48:1, 49:2, 49:6, 49:10, 49:15, 49:19, 56:14 | **specifically** [4] - 4:24, 54:15, 60:5, 109:12 |
| **second** [5] - 6:11, 55:24, 67:18, 94:25, 117:23 | **sense** [5] - 18:13, 48:17, 112:11, 112:15, 118:14 | **significant** [2] - 20:2, 116:18<br>**Silk** [19] - 74:2, 74:4, | **sold** [3] - 46:22, 46:23, 47:9<br>**sole** [1] - 107:1 | **spell** [1] - 31:11<br>**spelling** [2] - 30:13, 77:18 |
| **secret** [1] - 91:15<br>**Security** [1] - 107:3<br>**security** [2] - 14:13, 83:11 | **sensitive** [1] - 37:13<br>**sent** [12] - 47:16, 53:23, 56:20, 56:21, 81:6, 81:7, 81:8, 81:23, 92:13, 105:9, 108:17, 109:18 | 74:5, 74:6, 74:9, 74:12, 75:7, 75:13, 75:14, 75:16, 75:20, 75:22, 75:24, 75:25, 76:7, 76:12, 76:21, 77:4, 77:7 | **solution** [2] - 97:10, 97:11<br>**someone** [4] - 8:3, 10:7, 24:19, 117:24<br>**sometimes** [19] - 4:25, 35:20, 35:22, | **spend** [1] - 57:1<br>**spending** [2] - 14:24, 48:19<br>**stand** [4] - 30:4, 101:21, 116:11, 116:15 |
| **see** [48] - 19:5, 20:19, 35:9, 36:25, 48:5, 50:2, 52:16, 52:17, 53:25, 54:3, 55:9, 63:24, 66:9, 68:9, 71:13, 71:14, 71:22, 71:24, 72:16, 72:17, 73:2, 73:11, 73:23, 74:2, 74:11, 75:13, 75:15, 75:16, 75:18, 78:7, 78:9, 84:2, 89:23, 89:25, 91:13, 92:24, 103:20, 104:9, 104:24, 106:19, 108:11, 109:4, 109:8, 113:12, 117:4, 119:12, 121:4 | **series** [1] - 68:3<br>**serious** [1] - 17:3<br>**server** [17] - 5:7, 7:23, 9:6, 10:3, 10:25, 11:5, 11:11, 11:12, 11:13, 11:18, 11:21, 11:23, 12:5, 20:24, 21:3, 99:18 | **similar** [5] - 11:22, 40:18, 47:5, 53:1, 107:2<br>**simple** [3] - 7:15, 7:18, 106:24<br>**simplified** [1] - 106:25 | 36:2, 36:24, 36:25, 40:20, 79:6, 80:9, 81:6, 81:7, 81:8, 86:11, 91:24, 94:19, 102:21, 107:21, 107:22, 107:23<br>**somewhat** [1] - 114:10 | **standard** [2] - 11:4, 113:1<br>**standards** [2] - 114:1, 114:10<br>**start** [12] - 29:13, 42:11, 42:16, 59:16, 61:13, 61:23, 64:17, 65:25, 95:24, 111:2, 112:17, 119:23 |
| | **servers** [9] - 4:15, 4:17, 4:19, 8:21, 10:11, 10:14, 11:15, 21:10, 32:23 | **simply** [3] - 85:8, 85:11, 87:8<br>**simultaneous** [1] - 11:6 | **somewhere** [4] - 35:14, 35:19, 81:23, 108:12 | **started** [37] - 32:10, 37:14, 37:24, 38:7, 40:12, 41:9, 42:18, 54:18, 56:18, 59:18, |
| **seeing** [5] - 43:17, 45:19, 84:1, 85:25, 88:5 | **service** [12] - 12:11, 14:8, 14:14, 15:4, 21:11, 21:21, 22:7, 98:13, 118:24, 120:3, 120:5, 120:13 | **simultaneously** [1] - 10:22<br>**singling** [1] - 29:13<br>**sit** [2] - 61:15, 98:20<br>**site** [6] - 13:2, 13:3, | **soon** [1] - 53:23<br>**sorry** [30] - 4:16, 6:2, 6:10, 13:14, 23:15, 26:7, 31:9, 37:11, 40:4, 43:22, 46:1, | 61:10, 61:11, 61:12, 61:16, 61:22, 62:1, 62:6, 62:9, 62:12, 62:19, 63:8, 76:9, 78:19, 78:20, 79:23, 80:13, 82:15, 83:4, |
| **seeks** [2] - 29:5, 42:12 | **services** [7] - 12:9, 14:4, 14:19, 34:2, 72:14, 74:21, 109:5 | 13:18, 15:7, 48:22, 49:1<br>**sites** [2] - 13:19, 13:22 | 47:18, 68:10, 70:17, 74:11, 75:9, 76:20, 76:25, 77:12, 78:2, 85:9, 87:6, 88:12, | 96:23, 96:24, 97:3, 98:6, 99:17, 100:7, 100:11, 100:13, 100:21 |
| **self** [1] - 75:4<br>**self-medicate** [1] - 75:4 | **serving** [1] - 11:24<br>**SESSION** [1] - 1:5 | **sitting** [1] - 120:4<br>**situation** [1] - 35:7<br>**situations** [1] - | 91:1, 92:18, 94:9, 98:2, 107:14, 109:24<br>**sort** [18] - 9:1, 11:9, | **starting** [3] - 73:5, 78:19, 87:25<br>**state** [2] - 85:18, |
| **sell** [8] - 44:13, 46:22, 46:23, 50:5, 50:12, 55:16, 56:2, 56:4 | **set** [11] - 5:5, 14:8, 14:12, 19:25, 20:11, 45:8, 45:10, 47:20, 56:16, 56:20, 96:15 | 116:17<br>**six** [4] - 31:18, 50:20, 78:18, 83:6<br>**Sixth** [1] - 115:13 | 15:17, 19:8, 20:3, 34:21, 35:23, 38:8, 42:23, 43:5, 53:20, 55:10, 75:5, 90:17, 91:15, 98:3, 112:14, | 101:9<br>**statement** [1] - 109:10<br>**STATES** [4] - 1:1, 1:3, 1:11, 1:14 |
| **selling** [15] - 43:19, 50:3, 54:8, 54:12, 55:23, 55:25, 60:1, 61:17, 67:14, 69:22, 69:24, 70:15, 75:5, 82:7, 96:8 | **several** [4] - 75:1, 102:17, 109:20, 116:9<br>**severe** [2] - 37:17, 74:15<br>**shady** [1] - 87:24 | **sleeping** [10] - 111:8, 111:20, 111:22, 113:12, 115:5, 115:7, 115:11, 115:17, 115:25, 116:10 | 118:2<br>**sorts** [3] - 32:15, 35:16, 35:25<br>**sounds** [5] - 33:9, 33:10, 42:4, 67:3, 118:10 | **States** [4] - 2:2, 115:3, 115:14, 122:13<br>**states** [1] - 114:10<br>**stay** [5] - 74:16, 74:18, 93:22, 95:2, |
| **semi** [1] - 40:17<br>**semi-official** [1] - 40:17 | **share** [3] - 82:18, 89:8, 92:12<br>**Shormint** [2] - 71:23, | **sleeps** [1] - 115:17<br>**slept** [2] - 112:2, 117:12 | **source** [6] - 49:1, 49:2, 49:6, 49:8, 49:11 | 118:21 |
| **seminars** [1] - 100:21 | 72:16<br>**shormint@hotmail. com** [1] - 72:20 | **slowly** [1] - 33:19<br>**small** [11] - 32:15, | | |
| **send** [25] - 5:6, 25:17, 28:16, 38:12, | **short** [5] - 16:15, | | | |

stayed [1] - 116:12
stenographic [1] - 122:5
steps [3] - 51:20, 52:23, 56:14
Sterlingov [44] - 5:9, 7:2, 17:7, 17:14, 17:15, 17:20, 18:15, 19:3, 19:13, 19:18, 19:22, 20:7, 21:23, 22:10, 24:23, 26:10, 26:12, 26:17, 28:13, 28:21, 30:2, 30:3, 30:12, 30:14, 30:16, 31:12, 33:22, 40:4, 66:24, 67:25, 73:6, 83:24, 84:20, 87:18, 88:10, 89:23, 94:17, 102:4, 103:20, 110:11, 110:20, 113:24, 113:25, 114:12
STERLINGOV [3] - 1:6, 3:6, 30:5
Sterlingov's [14] - 6:17, 6:22, 7:1, 7:19, 8:10, 8:20, 9:24, 16:25, 17:2, 17:24, 17:25, 20:14, 25:19, 25:25
stick [1] - 92:20
still [26] - 23:11, 23:16, 39:14, 40:10, 52:20, 52:23, 63:22, 67:4, 67:10, 67:12, 82:4, 82:7, 91:22, 95:6, 96:5, 97:20, 98:5, 100:4, 107:17, 107:18, 114:4, 116:14, 117:11
stipulate [7] - 22:2, 22:3, 22:4, 23:23, 23:24, 24:22
stipulated [2] - 20:25, 21:6
stipulation [2] - 20:20, 22:21
stop [5] - 13:6, 22:13, 25:21, 102:16, 103:13
stopped [3] - 39:18, 39:24, 42:21
storage [1] - 61:20
story [5] - 23:22, 25:12, 25:16, 38:5, 38:23
straight [1] - 55:3
strange [2] - 46:17, 48:5
stream [1] - 91:5

Street [2] - 1:15, 1:22
street [2] - 48:7, 86:17
stretch [3] - 101:22, 116:11, 116:15
strict [2] - 107:5, 107:12
strike [1] - 25:2
strong [2] - 113:13, 116:22
strongest [2] - 37:18, 37:19
strongly [1] - 116:8
structured [3] - 90:18, 90:20, 92:2
struggling [4] - 37:17, 43:6, 74:15, 100:18
stuck [1] - 52:24
student [1] - 41:2
studies [1] - 75:1
studio [6] - 41:4, 95:20, 95:22, 95:25, 96:5, 98:5
studying [1] - 63:8
stuff [1] - 91:8
subaccounts [1] - 58:8
substantial [1] - 116:18
substantially [1] - 114:1
substitute [1] - 115:7
substitution [1] - 115:8
subwallet [1] - 58:5
subwallets [1] - 58:8
successful [4] - 62:18, 62:20, 63:1, 74:22
successive [1] - 19:17
suddenly [3] - 61:22, 61:23, 100:8
sufficient [1] - 12:14
suggest [1] - 89:15
suggested [3] - 9:12, 116:11, 116:15
suggests [1] - 29:14
Suite [1] - 1:16
summarize [2] - 102:7, 105:5
sums [1] - 61:24
supervision [1] - 20:12
support [5] - 31:3, 31:4, 102:10, 102:12, 103:12
supposed [1] - 98:16
surprise [1] - 14:18

surprised [1] - 118:20
survive [1] - 50:19
suspended [1] - 24:13
suspension [1] - 24:15
suspicion [1] - 113:13
sustained [3] - 5:14, 118:1, 118:3
Sweden [8] - 30:21, 31:7, 40:8, 47:3, 47:5, 67:5, 83:11, 106:14
Swedish [8] - 32:8, 46:20, 74:20, 74:25, 106:16, 106:19, 106:20
switch [23] - 5:1, 5:5, 5:23, 6:18, 6:21, 6:25, 7:3, 7:9, 7:14, 7:17, 7:19, 8:10, 8:14, 8:16, 8:21, 9:1, 9:6, 9:7, 9:9, 9:16, 10:2, 40:1, 93:11
switched [2] - 22:7, 42:21
switches [7] - 4:15, 4:17, 4:18, 4:19, 9:4, 15:19
SWORN [1] - 30:5
system [13] - 14:7, 14:13, 38:14, 42:7, 72:1, 72:11, 74:25, 83:11, 93:8, 99:8, 106:16, 106:20
systems [3] - 15:21, 15:22, 72:12

## T

table [1] - 110:21
talks [1] - 115:21
task [3] - 70:10, 93:5, 93:10
tasks [4] - 32:15, 34:6, 34:8, 70:8
tax [7] - 99:5, 99:9, 106:7, 106:12, 106:14, 106:20, 106:23
taxed [1] - 106:11
teaching [1] - 48:20
Tech [1] - 94:25
technical [5] - 43:3, 49:17, 57:2, 58:3, 92:1
technically [2] - 49:7, 55:24

technique [2] - 91:6, 91:7
technology [3] - 41:22, 41:23, 42:2
telephone [1] - 16:4
Temp [1] - 89:25
ten [9] - 16:16, 16:19, 34:19, 63:20, 91:16, 103:2, 104:1, 104:2, 113:12
tend [1] - 29:11
Tenth [2] - 115:20, 115:21
term [9] - 32:7, 44:9, 44:11, 49:17, 63:7, 72:5, 93:3, 93:15, 95:14
terms [6] - 17:3, 48:2, 48:15, 53:21, 55:15, 101:6
terribly [1] - 116:8
test [1] - 99:25
testified [10] - 6:19, 7:14, 9:8, 21:2, 51:6, 55:2, 75:10, 77:3, 77:6, 105:24
testify [9] - 7:16, 26:18, 26:23, 27:2, 27:7, 27:16, 27:23, 117:20
testifying [3] - 6:4, 13:6, 22:10
testimony [47] - 5:23, 6:4, 6:8, 13:1, 13:3, 13:4, 13:16, 14:12, 15:6, 17:2, 17:10, 19:13, 22:23, 23:1, 23:6, 25:19, 29:1, 36:8, 54:19, 54:24, 55:1, 60:6, 60:15, 65:12, 68:1, 73:2, 81:9, 81:11, 84:12, 84:13, 84:21, 85:9, 85:10, 85:12, 85:15, 85:17, 85:19, 87:19, 88:11, 89:5, 102:5, 106:2, 111:21, 112:24, 115:18, 116:19, 117:14
testing [2] - 97:3, 97:5
text [2] - 52:10
THE [186] - 1:1, 1:11, 1:14, 1:15, 1:20, 4:1, 4:4, 4:5, 4:8, 4:10, 5:14, 5:16, 5:20, 5:25, 6:3, 6:9, 6:11, 6:14, 7:7, 7:12, 7:21, 8:11, 8:18, 9:10, 9:21, 12:23, 13:6, 13:9,

13:13, 14:2, 14:15, 15:3, 15:9, 16:1, 16:3, 16:8, 16:10, 16:12, 16:14, 16:22, 16:23, 18:12, 18:20, 19:5, 20:9, 21:4, 22:3, 22:16, 23:15, 23:20, 24:2, 24:5, 24:20, 24:25, 25:10, 25:14, 25:23, 26:11, 26:14, 26:16, 26:21, 26:22, 26:25, 27:1, 27:4, 27:6, 27:13, 27:14, 27:17, 27:18, 27:20, 27:21, 27:22, 27:24, 28:3, 28:18, 29:11, 29:20, 29:23, 29:25, 30:3, 30:6, 30:8, 31:9, 33:15, 33:17, 34:15, 34:18, 37:11, 37:14, 46:7, 46:8, 53:6, 54:25, 58:20, 63:13, 63:17, 63:20, 64:1, 64:4, 64:5, 64:10, 65:11, 65:16, 66:3, 66:10, 66:13, 66:14, 66:15, 66:18, 66:20, 67:22, 68:20, 69:2, 69:4, 69:6, 70:16, 71:20, 72:4, 72:5, 76:13, 76:20, 76:23, 76:25, 77:18, 77:20, 77:21, 78:2, 79:12, 82:19, 85:8, 85:20, 87:6, 87:12, 88:15, 88:18, 88:25, 89:6, 89:9, 89:11, 91:4, 92:18, 93:24, 94:2, 94:9, 94:12, 94:13, 94:15, 101:21, 101:25, 106:3, 109:24, 110:16, 110:19, 110:20, 111:14, 111:18, 111:20, 111:23, 112:4, 112:21, 113:5, 113:11, 113:23, 114:11, 114:15, 114:24, 116:1, 116:3, 116:8, 117:7, 117:17, 118:16, 118:18, 119:2, 119:5, 119:7, 119:13, 119:16, 119:19, 120:2, 120:11, 120:15, 120:18, 120:24, 121:7
theories [1] - 85:4
theory [5] - 7:23, 9:6, 9:12, 9:13, 87:5
there'll [1] - 35:17
thereabouts [1] -

83:2

**Thereupon** [3] - 66:11, 119:17, 120:16

**thermostat** [1] - 15:18

**they've** [3] - 47:5, 85:1, 102:24

**thinking** [5] - 61:14, 61:23, 62:6, 70:1, 103:11

**thinks** [2] - 27:25, 76:19

**third** [3] - 38:13, 111:7, 117:23

**thousand** [2] - 46:9, 55:21

**thousands** [1] - 61:16

**threads** [1] - 102:8

**three** [9] - 21:17, 23:5, 64:25, 101:4, 101:12, 101:17, 103:25, 107:22, 118:1

**throughout** [3] - 39:4, 80:23, 100:6

**Thursday** [1] - 117:6

**tie** [1] - 5:22

**tires** [1] - 46:22

**title** [1] - 89:25

**to-do** [2] - 94:18, 94:19

**today** [6] - 5:3, 25:11, 25:19, 45:13, 101:24, 117:5

**together** [4] - 5:22, 15:24, 95:24, 110:25

**tomorrow** [22] - 64:14, 64:19, 65:9, 65:18, 66:5, 110:5, 110:7, 110:23, 111:2, 112:9, 112:18, 116:20, 117:4, 117:5, 118:5, 118:9, 118:23, 119:8, 119:9, 119:21, 119:23, 121:4

**tonight** [7] - 64:19, 65:4, 113:6, 113:19, 120:21, 121:6

**took** [5] - 13:18, 35:8, 67:19, 83:7, 90:9

**tool** [2] - 80:14, 80:18

**top** [4] - 68:6, 75:13, 90:7, 113:4

**topics** [3] - 27:8, 43:3, 43:4

**TOR** [2] - 1:20, 1:21

**Tor** [19] - 12:9, 12:11, 13:2, 13:3, 13:5,

13:18, 13:19, 13:21, 14:4, 14:8, 14:13, 14:18, 14:19, 15:4, 15:7

**touched** [1] - 58:12

**touching** [1] - 17:2

**tough** [2] - 64:23, 72:9

**town** [1] - 31:8

**trace** [2] - 53:3, 77:23

**track** [2] - 80:4

**tracking** [1] - 90:23

**trade** [16] - 51:24, 52:3, 55:11, 55:22, 55:24, 63:7, 84:23, 86:9, 86:12, 86:13, 96:21, 100:4, 102:20, 102:21

**traded** [5] - 55:9, 55:11, 86:6, 86:18, 88:3

**trader** [1] - 63:10

**trades** [5] - 45:2, 47:6, 52:8, 53:1, 63:1

**trading** [26] - 43:17, 44:24, 44:25, 46:19, 53:19, 59:25, 60:25, 61:11, 61:17, 61:18, 62:12, 62:13, 62:20, 62:22, 62:23, 62:24, 63:3, 79:21, 79:24, 79:25, 81:3, 81:6, 86:3, 86:21, 100:12

**traffic** [7] - 10:24, 11:2, 11:5, 11:10, 11:15, 38:13, 38:16

**transaction** [16] - 51:17, 51:21, 52:16, 52:24, 54:2, 54:7, 56:7, 57:15, 68:13, 68:14, 73:11, 73:23, 75:24, 77:2, 78:7, 109:16

**transactions** [19] - 51:10, 51:13, 52:12, 53:12, 54:16, 54:21, 55:5, 55:7, 57:8, 57:12, 68:3, 68:16, 68:17, 75:10, 79:19, 80:4, 97:6, 109:15, 109:19

**TRANSCRIPT** [1] - 1:10

**transcript** [4] - 8:7, 18:24, 122:5, 122:6

**transfer** [1] - 70:3

**transferring** [2] - 56:24, 57:4

**trauma** [1] - 91:8

**travel** [3] - 101:1, 101:7, 101:8

**traveled** [1] - 101:6

**traveling** [3] - 67:6, 101:5, 101:7

**travels** [1] - 101:14

**treating** [3] - 75:2, 76:1, 76:6

**trees** [1] - 78:23

**TRIAL** [1] - 1:10

**trial** [10] - 17:19, 19:18, 84:1, 85:1, 112:19, 115:15, 115:18, 115:21, 115:23, 116:5

**trick** [1] - 52:22

**tried** [10] - 37:1, 38:3, 50:22, 74:15, 74:18, 80:21, 90:4, 96:15, 97:9

**trigger** [1] - 5:2

**triggered** [2] - 5:4, 6:18

**true** [2] - 122:4, 122:5

**trust** [8] - 45:6, 54:22, 55:6, 55:8, 57:10, 57:11, 57:16

**trustworthy** [1] - 59:19

**truth** [1] - 79:7

**try** [20] - 36:6, 36:17, 38:13, 51:25, 55:8, 62:14, 62:15, 64:18, 65:24, 75:4, 93:8, 94:14, 96:2, 97:14, 98:21, 107:23, 107:24, 112:18, 118:3

**trying** [33] - 13:15, 15:2, 20:19, 23:21, 23:22, 25:12, 25:15, 34:24, 38:18, 52:22, 54:6, 55:9, 56:12, 57:14, 62:16, 76:4, 76:14, 77:13, 78:4, 91:10, 91:11, 91:24, 94:10, 96:13, 98:18, 100:5, 102:16, 103:13, 105:7, 106:7, 106:13, 106:22, 107:9

**Tuesday** [1] - 117:6

**turn** [3] - 20:23, 22:13, 66:24

**turned** [2] - 21:22, 22:5

**turning** [8] - 70:25, 71:7, 82:2, 95:5, 98:2, 98:3, 100:1, 100:25

**two** [23] - 6:18, 6:23, 17:13, 17:21, 17:23,

18:3, 18:4, 18:18, 18:21, 19:17, 19:24, 21:1, 23:6, 23:12, 35:11, 40:11, 65:15, 81:18, 95:23, 98:25, 99:1, 111:25, 116:13

**two-hour** [1] - 35:11

**type** [9] - 16:18, 44:21, 62:13, 63:24, 86:25, 107:11, 108:20, 108:23, 110:14

**types** [5] - 32:19, 39:21, 54:20, 70:7, 72:12

**typical** [5] - 15:21, 34:8, 35:7, 36:13, 45:24

**typically** [17] - 5:3, 34:23, 35:12, 35:16, 36:16, 40:20, 43:13, 53:18, 53:24, 54:7, 55:8, 55:15, 55:17, 55:22, 57:9, 93:8

## U

**U.S** [5] - 1:18, 33:7, 71:14, 101:10, 107:1

**Ukraine** [1] - 72:7

**ultimately** [2] - 79:2, 112:21

**unable** [3] - 17:8, 20:23, 115:16

**uncertain** [1] - 52:21

**under** [2] - 20:12, 121:2

**underneath** [1] - 69:14

**understandable** [2] - 111:10, 114:22

**understood** [7] - 50:6, 50:18, 62:1, 63:6, 78:4, 92:21, 106:12

**united** [1] - 2:2

**United** [3] - 115:3, 115:13, 122:13

**UNITED** [4] - 1:1, 1:3, 1:11, 1:14

**universe** [1] - 18:9

**university** [1] - 67:19

**unless** [1] - 23:23

**unlike** [1] - 11:4

**unusual** [1] - 21:9

**up** [74] - 6:11, 7:16, 13:7, 14:1, 14:8, 14:12, 15:23, 17:20, 19:25, 20:11, 26:11,

28:25, 33:12, 38:15, 39:3, 40:7, 40:16, 40:17, 40:21, 40:22, 40:23, 41:11, 43:12, 43:15, 44:10, 45:8, 47:17, 47:20, 50:22, 53:11, 54:4, 54:5, 55:3, 56:16, 56:20, 59:19, 61:12, 61:16, 61:22, 62:4, 62:25, 63:13, 67:20, 67:22, 68:6, 75:12, 79:23, 83:4, 83:19, 84:25, 86:5, 87:4, 87:15, 89:19, 96:15, 96:22, 97:15, 97:22, 100:7, 101:20, 101:21, 101:23, 102:24, 105:18, 114:12, 116:11, 116:12, 116:13, 116:15

**updated** [2] - 23:19, 23:25

**upgrade** [1] - 11:8

**ups** [24] - 37:22, 37:23, 37:24, 38:1, 40:12, 40:13, 40:14, 40:19, 42:17, 42:19, 42:21, 42:22, 42:23, 42:25, 46:2, 48:18, 50:4, 62:4, 67:12, 78:20, 79:4, 79:8, 82:6

**Urban** [1] - 104:9

**user** [1] - 74:4

**username** [1] - 74:8

**usernames** [2] - 35:5, 36:11

## V

**vague** [3] - 18:13, 69:1, 69:3

**various** [3] - 32:18, 37:22, 41:11

**vault** [1] - 36:15

**Velazquez** [1] - 115:4

**vent** [1] - 91:11

**venting** [2] - 91:14, 91:22

**verified** [1] - 52:25

**verify** [1] - 24:14

**version** [1] - 106:25

**versus** [3] - 12:9, 115:4, 115:14

**video** [3] - 15:21, 31:25, 40:20

**view** [3] - 28:18,

| | | | |
|---|---|---|---|
| 111:5, 111:24<br>**visas** [1] - 101:10<br>**visitors** [1] - 17:25<br>**voice** [1] - 37:13<br>**VPN** [15] - 10:21,<br>36:3, 36:6, 98:7, 98:9,<br>98:11, 98:13, 98:17,<br>98:22, 98:24, 99:3,<br>99:10, 99:14, 99:18,<br>99:24<br>**VPNs** [2] - 36:2,<br>99:15<br>**vs** [1] - 1:5 | **website** [19] - 33:2,<br>34:11, 34:22, 34:23,<br>34:25, 35:12, 36:4,<br>38:12, 38:13, 38:15,<br>38:17, 38:22, 49:2,<br>49:4, 59:21, 79:9,<br>99:13, 99:25, 107:24<br>**websites** [8] - 32:16,<br>32:23, 33:3, 34:9,<br>38:11, 38:19, 41:11,<br>41:15<br>**week** [3] - 22:22,<br>67:7 | **witness's** [3] - 7:4,<br>54:24, 106:2<br>**witnesses** [4] - 23:6,<br>29:13, 29:15, 112:11<br>**woman** [1] - 116:16<br>**wonder** [1] - 85:3<br>**wondering** [4] -<br>21:20, 22:9, 22:17,<br>23:10<br>**word** [6] - 8:9, 37:7,<br>39:2, 93:2, 95:1, 99:6<br>**words** [3] - 24:4,<br>91:19, 91:25 | **Zoom** [1] - 20:10 |

| | | |
|---|---|---|
| | **weeks** [1] - 6:23<br>**weight** [1] - 8:1<br>**weird** [3] - 50:8,<br>78:21, 88:6<br>**welcome** [3] - 25:10,<br>101:22, 120:8<br>**well-planned** [1] -<br>90:17<br>**well-structured** [1] -<br>90:18<br>**whatsoever** [1] -<br>17:22<br>**whereas** [1] - 102:21<br>**white** [2] - 37:7, 39:2<br>**WHMCS** [1] - 99:16<br>**whole** [11] - 35:23,<br>35:24, 35:25, 41:20,<br>48:3, 61:5, 62:22,<br>62:25, 65:1, 87:4,<br>97:22 | **works** [5] - 15:24,<br>56:13, 56:14, 58:10,<br>62:7<br>**world** [5] - 17:15,<br>17:17, 19:23, 20:8,<br>42:8<br>**worried** [8] - 50:14,<br>50:21, 83:12, 86:15,<br>86:16, 86:24, 88:2,<br>88:4<br>**worry** [1] - 29:12<br>**worst** [1] - 102:18<br>**worth** [3] - 50:16,<br>57:15, 61:15<br>**write** [4] - 53:23,<br>91:9, 97:1, 99:19<br>**writing** [1] - 96:24<br>**written** [2] - 59:6,<br>59:9<br>**wrote** [1] - 94:21 |

## W

| | | |
|---|---|---|
| **wait** [3] - 53:6, 68:20,<br>84:18<br>**waiting** [1] - 113:17<br>**wake** [1] - 116:12<br>**walker** [2] - 118:21,<br>120:7<br>**Wall** [1] - 1:22<br>**wallet** [39] - 45:19,<br>46:16, 47:14, 47:16,<br>47:20, 49:21, 49:22,<br>52:18, 56:10, 56:13,<br>56:16, 56:20, 56:21,<br>56:23, 57:1, 57:2,<br>57:4, 57:11, 57:20,<br>57:21, 57:24, 58:2,<br>58:4, 58:7, 58:13,<br>58:23, 58:24, 58:25,<br>59:4, 59:5, 59:12,<br>69:12, 81:8, 86:22,<br>96:21, 106:10, 109:17<br>**Wallet** [4] - 96:15,<br>96:20, 96:21, 96:22<br>**wallets** [10] - 49:20,<br>59:8, 59:10, 61:21,<br>63:4, 80:5, 80:11,<br>86:7, 86:10, 86:11<br>**wants** [5] - 64:5,<br>86:13, 88:20, 89:15,<br>113:19<br>**war** [1] - 31:4<br>**Warner** [1] - 115:14<br>**Washington** [5] -<br>1:6, 1:16, 1:19, 2:4,<br>122:14<br>**waves** [1] - 98:19<br>**ways** [8] - 4:23, 20:6,<br>59:5, 59:7, 59:20,<br>60:2, 60:3, 62:8<br>**web** [4] - 35:8, 37:23,<br>37:25, 41:11<br>**web-related** [1] -<br>35:8<br>**webpage** [1] - 12:1 | **whole-day** [1] - 65:1<br>**willing** [2] - 23:24,<br>24:21<br>**Windows** [1] - 10:18<br>**winter** [1] - 67:18<br>**wipe** [1] - 5:8<br>**wipes** [1] - 5:2<br>**wiping** [1] - 5:3<br>**Wired** [5] - 17:21,<br>17:23, 18:4, 19:24<br>**wish** [3] - 26:4,<br>68:14, 68:15<br>**withdrawal** [2] -<br>21:2, 76:11<br>**withdrawn** [2] -<br>12:18, 82:21<br>**WITNESS** [15] - 3:3,<br>16:12, 30:5, 34:18,<br>37:14, 46:8, 69:2,<br>72:5, 76:20, 76:25,<br>77:20, 88:15, 91:4,<br>94:9, 94:13<br>**witness** [12] - 6:4,<br>12:16, 16:10, 16:13,<br>30:1, 76:11, 76:14,<br>88:17, 88:19, 89:12,<br>89:13 | **Y** |

| | |
|---|---|
| | **year** [11] - 19:3,<br>19:19, 23:16, 36:22,<br>41:3, 44:15, 62:5,<br>78:18, 96:12, 96:14,<br>98:6<br>**years** [22] - 21:18,<br>23:5, 23:7, 23:12,<br>31:18, 32:2, 54:12,<br>59:13, 59:18, 61:10,<br>61:11, 61:21, 68:15,<br>69:12, 80:23, 91:16,<br>96:6, 96:7, 101:7,<br>106:9, 107:22, 109:20<br>**yesterday** [1] - 15:20<br>**York** [1] - 1:23<br>**yourself** [2] - 30:12,<br>47:20<br>**yourselves** [3] -<br>16:18, 63:23, 110:9 |

## Z

**Zero** [1] - 92:24

**Appx5899**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

ROMAN STERLINGOV,

        Defendant.
_____/

Criminal Action
No. 1: 21-399

Washington, DC
March 6, 2024

9:38 a.m.

MORNING PROCEEDINGS

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:    CATHERINE PELKER
                     U.S. DEPARTMENT OF JUSTICE
                     950 Pennsylvania Ave NW
                     Washington, DC 20530

                     CHRISTOPHER BRODIE BROWN
                     DOJ-USAO
                     601 D Street, N.W.
                     Suite 5.1527
                     Washington, DC 20530

                     JEFFREY PEARLMAN
                     DOJ-CRM
                     Ccips
                     US Dept of Justice
                     1301 New York Ave NW
                     Washington, DC 20005

APPEARANCES CONTINUED ON NEXT PAGE

APPEARANCES CONTINUED

For the Defendant:          TOR EKELAND
                            MICHAEL HASSARD
                            TOR EKELAND LAW PLLC
                            30 Wall Street
                            8th Floor
                            Brooklyn, NY 10005


Court Reporter:             SHERRY LINDSAY
                            Official Court Reporter
                            U.S. District & Bankruptcy Courts
                            333 Constitution Avenue, NW
                            Room 6710
                            Washington, DC 20001

TABLE OF CONTENTS

WITNESSES

Roman Sterlingov

Direct examination continued by Mr. Ekeland    17

EXHIBITS

Defense Exhibits 138, 139    75

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Criminal case, 21-399, *United States of America versus Roman Sterlingov.*

Would counsel please approach the podium and state their name for the record --

MR. BROWN:  Good morning, Your Honor.

THE COURTROOM DEPUTY:  -- starting with the government.

MR. BROWN:  Good morning, Your Honor.  AUSA Chris Brown for the government.  With me at counsel table are Jeff Pearlman and C. Alden Pelker.

THE COURT:  Good morning.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for Defendant Roman Sterlingov, who is present in court.  And joining me at counsel table is Mr. Michael Hassard.

THE COURT:  Good morning.

Were there some issues you wanted to raise this morning?

MR. EKELAND:  Yes.  The first one -- and we do -- we can just put this chat up on the screen is just to clarify the record in relation to the discussion that the government said yesterday they had with the registrar --

THE COURT:  Yes.

MR. EKELAND:  -- in relation -- so we got the chat transcript from the government.  And we just marked it for

identification as Defendant's Exhibit 137. You can see they forwarded this email entitled chat transcript with John Lund. And it says chart started on 5th of March 2024 at 6:43 p.m. I think that is just GMT time. And in it, it says, if you look at the -- John Lund asks the question at 06:49:32. I was surprised to see the changes if the owner is believed to be incarcerated. And then the customer service agent says, "It is updated by the registrant." And then a couple lines down he says domain is suspended as he did not verify the registrant email address. But, Your Honor, that is not the same as the update.

So what we just wanted to put on the record is that it is the defense's position that this has not shown that the registrant didn't update the email. And so but beyond that, we are not, Your Honor, interested in raising the issue of Mr. Sterlingov being in jail or anything. We wanted to clarify the chat, because the government said we were making false statements to the Court. And I don't think this chat establishes that the update wasn't done.

THE COURT: But you are not asking me to do anything? You are not asking to ask questions with respect to Mr. Sterlingov's incarceration?

MR. EKELAND: No, Your Honor. I just wanted to clarify the record on that point.

THE COURT: Okay.

MR. EKELAND: The second issue is a little more difficult and it is not something I have had happen in a case before. And this is in relation to Government Exhibit 721, which came in over the defense's objection. And we have put it up on the screen here. And you may recall that this is what Ms. Mazars de Mazarin testified was a screen capture of Mr. Sterlingov's chats. And it was brought in, essentially, as sort of an admission of guilt where, you know, if you look at the second chat there, it says, "You are wondering what I do in terms of magically having such photos or in terms of money laundering."

Now, when this came in, we tried to find this chat. And Mr. Fischbach tried to find the chat. And we could not find it anywhere in any of the evidence in relation to Mr. Sterlingov's chats. We asked the government for the source of this text. And we were informed it actually came from an ebook that was on Mr. Sterlingov's Kindle that was seized from him at the airport and that it is not a chat. And if we have -- and if you look at the actual page on the ebook --

Mr. Hassard, could we pull up the page where the quote is extracted from?

You can see here, what he is showing you. Here is the ebook, "The message Game, a guide to dating at the touch of a button" written by Ice White. Now, there is all of these chats in this book. It is clearly not by Mr. Sterlingov. What

these chats are just suggestions of pickup lines that maybe you could use in a chat. If you go and actually look at the page, that, you know, this chat that they represented -- Ms. Mazars represented was Mr. Sterlingov's chat --

Could you please blow that up, Mr. Hassard, for the Court if possible.

There it is right there on the bottom. You can see what happened here is that somebody from the government went to the page, zoomed in, left out the fact that, here is Ice, left out the fact this was from the ebook.

And then Ms. Mazars testified that this was a screen capture of Mr. Sterlingov's chats, which is, obviously, false. When Mr. Fischbach yesterday went to go testify in regards to this, the government objected and the Court sustained Mr. Fischbach's objection in relation to him testifying to his forensic analysis of this ebook.

THE COURT: I'm sorry. I am confused, because I thought Mr. Fischbach did testify about this and said that this came from a book and you can get it on Amazon. So I don't recall telling him he couldn't testify about this.

MR. EKELAND: He testified to that, but he wasn't allowed to testify as to his forensic analysis and how essentially there was no way that you could confuse this forensically for chat messages from Mr. Sterlingov. So what we are asking for is and -- or making a proffer for is we are

asking to be able to recall Mr. Fischbach outside the presence of the jury and just have him testify for the record as to his forensic basis for being able to say that there is no way that you could have mistaken what is published in an ebook for a chat message by Mr. Sterlingov. Because this was being brought in as essentially, as an admission of guilt of Mr. Sterlingov as money laundering. And I don't see how -- how the government -- how somebody could -- you have to zoom in on this image on this page and ignore that ice emoji and everything. And then you have to make a huge leap of logic to say, that this is a chat message from Mr. Sterlingov. We just don't understand how this happened. It appears in some sense to be manufactured evidence in the sense that it is selectively edited. And I just -- I am kind of astonished by this.

THE COURT: I guess, I am still at a loss as to why this requires expert forensic analysis versus just testifying and saying, we went and we looked at it, here is what it is. And it was in an ebook and show it to the jury just the way you just showed it to me. And you can draw -- the jury can draw whatever conclusions they want from that. I am not sure why some sort of specialized knowledge with respect to ebooks or -- I am not frankly sure what it is you are talking about that came up. And I am not sure if you raised the objection how it related to this particular text message. And I guess I am still not sure that I understand exactly why some forensic

analysis is necessary rather than just to show this is what it is.

MR. EKELAND: Because we contend and the proffer we are making is that forensic analysis will show this is essentially manufactured evidence and that you had to go in and selectively do this. And then for someone to come in and testify that these were messages -- that this is a chat message from Mr. Sterlingov, when it is clearly not. We are just making a proffer to establish the forensic basis for these conclusions. And I also think that it goes directly to the forensic credibility of Ms. Mazars' testimony here.

THE COURT: You know, you do this to me all of the time, Mr. Ekeland. You speak in these generalities and you don't tell me what you are talking about. What is the forensic analysis here that -- I understand the point. I understand the evidentiary value of all of this. What I don't understand is what the expert forensic testimony is here that you need to establish this?

MR. EKELAND: Just that there is no forensic basis for saying that this is Mr. Sterlingov's chat.

THE COURT: That is -- I'm sorry. You are -- it looks to me like you are right about that. And I don't understand why a jury can't understand why you are right about that. What I don't understand is jazzing it up in the forensic analysis in some way, but maybe I am missing something here. I

think you are entitled to show it to the jury, entitled to show the jury what it actually is. You are entitled to make whatever arguments you think are appropriate based on this. It looks to me like you are correct and that this is not Mr. Sterlingov. And that, obviously, is not a good thing from the government's perspective, because it not only refutes this evidence, but also it -- I think it does create some question or could create some question in the jury's mind more generally about the evidence. And I think that is all fair game.

I am saying I don't understand and you have never really explained to me the --

You started off by saying I didn't allow something in. What testimony is it that I didn't allow in that you think needs to be offered in? And you can try to convince me to allow it. But I need to understand what the testimony is that I didn't allow that is necessary for you to make the point that you just made to me.

MR. EKELAND: Your Honor, I am going to leave it at this, because I am conscious of the time. So essentially what -- after we got into evidence that this is essentially from the ebook, no objection from the government, Mr. Fischbach was going to go on and talk about his forensic analysis and how he came to those conclusions. How, you know --

THE COURT: But how he came to the conclusion it was on the ebook?

MR. EKELAND:  How he -- part of that.  Well, the government told us.  That is how we found out.  But also the difference between a screenshot and a screen capture and how you forensically this is just not something that you would necessarily just make by mistake in doing the forensic analysis.  That is our proffer, Your Honor.  And if --

THE COURT:  If you want to recall him, you just need to explain to me what it is that he hasn't been allowed to -- that he hasn't been allowed to testify to and what you think the basis --

MR. EKELAND:  Essentially --

THE COURT:  I am at a loss.

MR. EKELAND:  -- that the government manufactured the screenshot.  And when they did that they -- a screenshot is just not an isolated image found on his phone.  They had to go to this page and they had to zoom in, and that they had to manufacture this screenshot.  And that was part of their process in presenting it to the jury.  And --

THE COURT:  I guess I am still at a loss as to why that is forensic -- detailed forensic testimony.  You just showed it to me here.  And I don't see any problem with you doing that.  And I suppose if you wanted to recall Mr. Fischbach to do this in greater detail, I would consider allowing that.  But I don't understand why anyone who is older than -- anyone who is older than 12 years old couldn't make

exactly the point you make. And why this is sort of, you know, forensic analysis. Instead of just simply showing them, here it is, what it was, they had to zoom in on this. They had to cut this out. You can argue that to the jury. I don't understand the forensics of this at all.

MR. EKELAND: Your Honor, this evidence -- this may come in today through Mr. Sterlingov's testimony. But this actual page is not in evidence. The book is not in evidence yet.

THE COURT: Offer it.

MR. EKELAND: We will be offering that through Mr. Sterlingov and that may address the issue. But if for some reason, it doesn't come in, then we will be asking the Court again to revisit the issue.

THE COURT: You are welcome to do that. You just have to explain to me what I kept out that should have come in, because I am still at a loss in that.

MR. EKELAND: I mean, we didn't get to these images. Let's see what happens today because I think we want to bring the jury in and get going with this case.

THE COURT: Mr. Brown.

MR. BROWN: Your Honor, just to respond. Your Honor, number 1, the government is happy to withdraw Exhibit 721. I want to clear the air that this was not an intentional manufacturing of evidence or anything. This was a product of

the way that the forensics software carved the data from that tablet. That individual image file must have been separated out and reviewed individually outside of the context -- we are not -- there is -- nobody went in and, you know, clipped this knowingly out of an ebook. So I just want to make sure that is clear.

THE COURT: But you may be explaining to me in some sense why some forensic analysis might be necessary by Mr. Fischbach on that.

MR. BROWN: So, Your Honor, my other point is, Mr. Fischbach was allowed without objection to testify about this image coming from an ebook. He -- Mr. Ekeland and Mr. Fischbach went through a whole colloquy, Your Honor, culminating in Mr. Fischbach's revelation that this was from an ebook on dating. And Mr. Fischbach explained on page 65 of yesterday's transcript, well, because it was represented as a screen capture, when I ran the forensic software, it would automatically put all of the screen captures in one place. So for that reason, it just didn't show up. And he goes on. Mr. Fischbach was allowed to talk about his forensic review.

THE COURT: What did I keep out then.

MR. BROWN: Your Honor, I don't see an objection on this particular line of questioning about the ebook and maybe I am missing it, Your Honor.

MR. EKELAND: You know, it is my understanding the

objection was about the forensic software Mr. Fischbach had used.

THE COURT: So I don't think anyone pointed out to me or to the government at the time that it had anything to do with this. So that may be the problem here.

MR. BROWN: Our point is simply, we will withdraw Exhibit 721. This was an honest mistake. But there was no manufacturing of evidence. And for purposes of the trial, Mr. Fischbach has been allowed to testify about it. He has already been able to -- he has been able to make whatever evidentiary impact -- there is no reason why they couldn't have presented this additional exhibit yesterday with Mr. Fischbach's testimony.

MR. EKELAND: Your Honor, we don't want Exhibit 721 withdrawn, because we think that is crucial for the jury to see and evaluate what the government has done in this case. Also, it is my understanding that this message wasn't forensically carved out and then that is what Mr. Fischbach would have testified to. And as the Court just mentioned, we now see through the government's own statements, why forensics are at issue here. Because they are claiming that it is just an innocent mistake made with their forensic software.

And, additionally, this is why we have also asked to be able to power up Mr. Sterlingov's tablet, his book reader that they are claiming this came out of. And they haven't

allowed us to do that.

THE COURT: Why haven't they allowed you to do that?

MR. EKELAND: I think what -- I am not going -- I think the reason is they are saying that is the integrity of the evidence or something. We have asked when we are looking at the devices that we wanted to power it up. And we were hoping actually that the Court could ask the government to charge the device, you know, today so we could look at it. Just because --

THE COURT: I think the forensics point that you are making is anticipating something that the government hasn't said yet. And so, I mean, maybe -- you might be right that if Mr. Sterlingov today in his testimony explains what this was, says it was an e-reader, shows it to the jury, shows it into context, you can make all of the points you want to make. The only reason you need the forensic is if the government comes back and says, no, no, no, here is what happened here, we carved this out and it was part of the forensic. But no one has said that yet. So from the jury's perspective, it looks just like you say, which is the government zoomed in on just one piece of evidence in a way that misrepresented what this was.

That is what the record will show. I suppose the only reason you would need Mr. Fischbach to testify to the forensics would be if the government in its rebuttal case -- I

can't remember who the witness was who offered this but has the witness come back and explain what it was. And then, you know, I am not sure I have ever seen this before. But if that were the case, then there might be need for a surrebuttal case that would allow you to put Mr. Fischbach back on the stand to say, no, this is not what happened. And that is, obviously, a bit of side light in the case. But as things now stand, I am still not sure why the forensics are relevant. Because anyone can just look at this and see that the way you are describing it is correct. And the only question is whether the government made a mistake for the reasons that Mr. Brown indicated. But that is not in evidence at this point. And no one has suggested this at this point to the jury.

MR. EKELAND: So perhaps as the Court says, we should get on with Mr. Sterlingov's testimony and see if the government puts on rebuttal case. On that note, I am not aware of us having been notified -- perhaps something happened -- well, I haven't checked my email of any rebuttal witnesses in relation to the 24-hour rule that the parties agreed to. So if the government is putting on a rebuttal case tomorrow, calling witnesses, we just merely ask that we be notified as to who those witnesses are.

THE COURT: Okay. Mr. Brown, anything else to add in response to either that final point or to my suggestion on how we handle this issue?

MR. BROWN:  No, Your Honor.  I think on this issue, again, our position is the defense has been allowed to present testimony.  It sounds like this may come up in Mr. Sterlingov's testimony.  And, you know, the point has been made to jury.  I don't think that there is a reason to recall Mr. Fischbach.

And as for the 24-hour rule, I think that we will -- we will see what comes out in testimony today and inform the defense whether or not we have a rebuttal witness or witnesses tomorrow.

THE COURT:  And I should just say that I am still working on the jury instructions.  I was here late last night and I am not quite done yet on them.  But I will get those proposed instructions to you as soon as I can and make sure you have enough time to review them and then we will have to have a charging conference as well.

Are we ready to get the jury?

MR. EKELAND:  Yes, Your Honor.

(Jury in at 9:57 a.m.)

THE COURT:  Welcome back, everyone.

Mr. Ekeland, you may continue.

MR. EKELAND:  Thank you, Your Honor.

ROMAN STERLINGOV, previously sworn

DIRECT EXAMINATION CONTINUED

BY MR. EKELAND:

Q.   Are you ready, Mr. Sterlingov?

A.    Yes.

Q.    Good morning.  I'd just like to touch briefly on, yesterday you testified about going to meetups.  Do you recall that?

A.    Yes.

Q.    And what type of people were going to these meetups?

A.    I started going to meetups related in general to programming and computers and video games and sometimes -- and then I started going to Bitcoin meetups.  A lot of people were having similar interests on Bitcoin meetups.  I actually found that a lot of people were even more interesting to me because usually they would be not just interested in computers.  A lot of them had other -- they were university professors.  There were business owners.  There were just people from various different just -- they were more diverse there.

Q.    And were there people at these meetups that were working on Bitcoin projects?

A.    Yes, a lot of them were.  Every other person had ideas or projects they were working on or they were working with a team that had projects.  It was very common.

Q.    Did you ever have people from the meetups over at your apartment?

A.    Yes.  A few times people from the meetups, also some people I met on the internet that had similar interests.  Some of my friends, of course, came over, yeah.

Q.    And now I'd just like to go back to your testimony yesterday about your freelance work.  Do you recall discussing your freelance work yesterday?

A.    I do.

Q.    Did you ever work for a company called BTCX?

A.    Yes.  That was one of the projects that I had freelanced for.

Q.    And do you recall what sort of work you did for BTCX?

A.    Yes.  I do recall that, because I have seen -- so typically I don't think I would remember such details, because this was in 2012.  But apparently the government found a chat log on my devices where for some reason I saved some of the chats with BTCX.  So I was able to look at that and kind of remember in more detail what I was doing.  I was freelancing for them for a couple of months.  It was like five or six people working I think at the same time in various capacities. Some of them maybe just came in for a week or two.  Some of them left.  There were a lot of people coming and going.

          I remember specifically they asked me to look at their DNS settings.  They gave me their DNS log-in to their websites.  I had to change some settings in their DNS.  They -- I had to access their servers to change some settings in their servers. You can -- well, I can see that in the chat log.  There are actually some passwords right there, which is kind of the reason why I usually delete those things, because I don't want

to be saving other people's passwords.

MR. EKELAND:  Mr. Hassard, if you could put up what is not in evidence and that is marked as Government Exhibit 718 and which I will mark for identification as Defendant's Exhibit 142, Ms. Walker, which is not on your list.  I am marking it right now.

And this isn't in evidence.  And, Mr. Hassard, if you could scroll to the top of that document.  And then slowly scroll through to page 25.  Or jump to page 25.

BY MR. EKELAND:

Q.   And then, Mr. Sterlingov, do you recognize this document?

A.   Yes.  This is the document I have just mentioned.

Q.   And this is the chats you had with BTCX regarding your freelance work for them?

A.   Yes, it is.

Q.   And is this a fair and accurate representation of the chat as you have read it and understand it to be?

A.   Yes.  I think this is an exact representation of the chat.

MR. EKELAND:  Your Honor, at this point in time, the defense would like to offer what has been marked for identification as Defendant's Exhibit 142 into evidence.

THE COURT:  Any objection?

MR. BROWN:  Objection; hearsay.

MR. EKELAND:  Effect on listener, Your Honor.  And --

THE COURT:  I don't think it is -- well, I think we

have got to pick up.

(Conference held at the bench.)

THE COURT:  Tell me what it says.

MR. EKELAND:  These are chats with people telling him to do particular tasks and asking him to do things involving DNS, giving him passwords and access to other accounts.  And it is just a chat log so that -- produced by the government just reflecting the work that he was doing in his freelance capacity for BTCX in 2012.

MR. BROWN:  Your Honor, the defendant can testify about these events based on his recollection.  The exhibit itself is inadmissible hearsay.  It is, you know, statements by multiple third parties, by the defendant.  There is just no applicable hearsay exception.

THE COURT:  Well, the -- I guess I need to know the substance of what they are.  But if it is someone like giving him an access code or something like that, I don't know if that is.  I don't know if it is the effect on the listener or not.  But I guess what I am wondering is at least with respect to his comments on this as whether they would come in as prior consistent statements, because they were statements made before there was any interest in manufacturing a story or creating any distruth.  So why wouldn't at least his statements come in as prior consistent statements?

MR. BROWN:  Your Honor, there is no dispute about the

defendant's recollection here. The government is not alleging the defendant is mistaken or being dishonest about his statements with respect to BTCX. He is perfectly able to testify by memory. I will have to look it up, but I think prior consistent statements are only admissible if the truth or falsity of the statements is at issue.

THE COURT: Correct. That is a correct statement. But it is not an issue then?

MR. BROWN: Your Honor, not with respect to the defendant's work for BTCX. The government is not disputing that the defendant worked on this project. And as the defendant is well able to do, he can testify to the details from his memory.

THE COURT: So, Mr. Ekeland, what is the hearsay exception that would apply here then?

MR. EKELAND: Well, I mean, first, I would think a prior consistent statement in relation just to the fact that the government has essentially alleged I think or implied that there is, you know, no way that Mr. Sterlingov could have handled all of the money he earned to buy the Bitcoin. It also I think explains really why he had access to all of these accounts. I think aside from that, the effect on listener -- what he is going to do, because we are not -- when these say like BTCX says, here is the password to our bank account. We are not offering that for the truth that was the password to

the bank account.  We are offering this to show that this is --
Mr. Sterlingov took that and worked with that.  And so --

THE COURT:  But aren't you offering that for the truth of the matter?  Maybe I am confused about that.  Why is it relevant if it is not for the truth of the matter.  I thought your point was that he was given access to account information that wasn't his.  And maybe some of the transactions that have been traced to him are actually somebody else, simply because he was given access to other people's accounts.  Isn't that the point you are making?

MR. EKELAND:  Which, again, I would argue is effect on the listener.  Because it is not that the truth is not -- what is not at issue was that BTCX's account.  It is, well, he started working with information that was given to him that wasn't his.

THE COURT:  I guess I am not yet convinced that this comes under a hearsay exception.  So why don't you start with your examination and start your examination without this.  And if you think you have laid some foundation, if you think it comes in as a prior consistent statement or if you need it to refresh his recollection, then you can make use of it as appropriate.  But it does sound to me like you are offering it for the truth of the matter asserted that he was given people's actual passwords and information.  And so I guess I would need to be pointed to some exception to the hearsay rule for that to

come in.

MR. EKELAND:  Then I am -- if I can lay the foundation, I will try to move it in late.  But for now, I will use it to refresh.

THE COURT:  Okay.  That is fine.

But, Mr. Ekeland, two things.  You can't refresh his recollection until he doesn't have a recollection.  So you have to start by determining whether he actually recalls or not.  Only if he doesn't recall can you then go back and use it to refresh his recollection.  And then you should make sure she doesn't read it into the record, that he looks at it, puts it aside and ask whether it has refreshed his recollection.

MR. EKELAND:  Yes.  I will stop him to the extent -- I don't want him to read it into the record.  Understood, Your Honor.

THE COURT:  Okay.  Thank you.

(End of bench conference.)

THE COURT:  So the objection is sustained.

BY MR. EKELAND:

Q.   Mr. Sterlingov, just in general, what work again -- just to -- what kind of work did you do for BTCX?

A.   I did change their DNS settings in their DNS panel, that is their account that handles their domain names.  It is what is typical for many projects.  With BTCX, I had to access their servers or VPS or servers.  I am not sure which one, but -- I

don't remember if they had servers or VPS, but one of them, to change -- so I accessed the files on their servers.  I accessed their documentation as I was required to.  They had a page like something like a Google Drive, it is an online document where they keep all of their accounts and documentation for the project that I needed to do the tasks they wanted me to do.

Q.   Mr. Sterlingov, without reading from the document, I am just going to -- could you just read that paragraph right there and let us know if that refreshes your recollection as to whether BTCX had servers?

A.   Yes, that reminds me.

          MR. BROWN:  Your Honor, objection.

          THE COURT:  Yes.

          MR. BROWN:  For refreshing of recollection, we would ask that the witness not have the exhibit in front of him when he testifies to his present recollection.

          THE COURT:  Right.  So I think what you are supposed to do is -- I guess Mr. Hassard has to take it down.  Thank you.

          So members of the jury, just so you know what is going on here is that if there is an exhibit that may not be admissible for some reason, sometimes it can be used to refresh a witness's recollection.  But they have to look at it.  And if it refreshes their recollection, fine, and they can testify from their recollection.  If it doesn't, then we move on.  And

that is why you take the document away.

MR. EKELAND:  Thank you, Your Honor.  May I proceed?

THE COURT:  You may.

BY MR. EKELAND:

Q.   Mr. Sterlingov, do you recall now whether or not BTCX had their own servers?

A.   I do recall that BTCX had their own servers.  I also recall that at at least one point, I was contacting a bank on behalf of BTCX.  So I was talking to a bank and asking them some questions for this project, even though it is not my project.  It is a project that I worked as a freelancer for, but I contacted a bank and then I went back to the project owner and talked to him about how the -- I think some information I got from the bank was helpful for the future of their project or something that they wanted to do.

Q.   And as part of your work for BTCX, were you given log-in access to their accounts?

A.   Yes.  And, again, this was typical I think of all of my freelance projects, certainly the ones that were some sort of a website.  I have to access their accounts to do anything useful for them as a freelancer.

Q.   And --

A.   Including BTCX specifically, as I remember.

Q.   Did that include access to their payment accounts as well?

A.   I am not sure for BTCX.  I don't recall and I don't have

the document in front of me.  I know that was the case for many projects.  I'm not sure about BTCX specifically.

MR. EKELAND:  If we could now, Mr. Hassard, put up what I believe is in evidence as Government Exhibit 857.  That is in evidence?  Thank you.

THE COURTROOM DEPUTY:  Yes.

BY MR. EKELAND:

Q.   Mr. Sterlingov, could you just take a look at this email. And is this the email that you were testifying about yesterday about where you were out of Bitcoin essentially?

A.   I think so.  I think this is the one.

Q.   Were you out of Bitcoin or had you sold all of your Bitcoin at that time?

A.   No.  I was not completely out of Bitcoin.  But I might have been out of Bitcoin that I wanted to trade at the time or trade to this particular individual.  Or as I said yesterday, I think I might have not wanted to trade with them at all, just minimize my risks for robbing and all of that.  This email just -- the reason I think this email is significant is that -- and the reason I said something yesterday, I said, like I don't understand how if anybody thought about this for 5 minutes, is because I don't understand how does the alleged administrator of something like Bitcoin, like a huge mixer, a huge website.

MR. BROWN:  Objection.  This goes beyond the witness' recollection of what he meant in this email.

THE COURT:  Sustained.

BY MR. EKELAND:

Q.    We can take this down, Mr. Hassard.  And if we could put up what is in evidence of Government Exhibit 818B, as in boy.

Mr. Sterlingov, do you recognize this?

A.    I do.

Q.    What is your understanding of what this is?

A.    Rather, I should clarify, I recognize this is a document that I have seen in this case.  I didn't recognize it when they showed it to me or when I saw it in the case the first time.  Apparently this is a document that I had on my Google Drive.  It seems like it is a very old document.

Q.    Did you write this document?

A.    I am not sure, maybe I wrote it.  Maybe I copy and pasted it from somebody.  The reason I wonder if somebody sent me those instructions, because in Russian, which was the original language for this document, the document says like you, like you do this, you do this, so maybe this was an instruction for a freelance job or something.  I'm not sure.

Q.    And is this a -- well, you -- what is it describing?  What is this document?

MR. BROWN:  Objection to lack of personal knowledge.  The witness just testified that he didn't recognize this document and he didn't create this text.

BY MR. EKELAND:

Q. What is your understanding of what this document is saying?

A. It seems to be describing a way to transfer money from one type of account to a different account. It seems to be going -- there is three steps listed. This looks me to as a -- so I remember that back in the day having several steps for moving from one payment system to another was typical, because a lot of these systems they didn't talk to each other. I think I mentioned yesterday that a lot of them were used for former soviet countries like Russia and Ukraine and some eastern European countries where there wasn't a good banking system. So trying to find an exchange or trying to find a payment system that was working with the account that you had, because you had to send it to somebody who didn't have an account in the same system, that type of thing was common. That is as much as I remember.

Q. Thank you. We could take this down, Mr. Hassard.

And then, Mr. Sterlingov, do you recall the testimony about the Bitcoin Talk chat forum?

A. My testimony?

Q. No. You listened to the previous testimony in this case?

A. Yes.

Q. Do you recall testimony about the Bitcoin Talk chat forum?

A. Yes.

Q. And could you just remind the jury what the Bitcoin Talk

chat forum was?

A. Bitcoin Talk was the biggest if not the only forum for Bitcoin enthusiasts and people with related interest back in the day. I don't know if it still is, but it certainly was.

Q. And did you have an account on Bitcoin Talk?

A. Yes, I had an account.

Q. Did the account have a moniker or username?

A. Yes. My account was called Killdozer.

Q. And what did you use that account for on Bitcoin Talk?

A. Just talking to other members of the forum.

Q. And did you -- were you able to private message with your account?

A. I was.

Q. And did you hear the testimony from the government's witness, Duncan Townsend?

A. Yes.

Q. And do you recall how he said that you had sent him private messages about his code for Blind Bitcoin?

A. Well, I didn't receive any source code from Blind Bitcoin. Could you repeat the question?

Q. Do you recall Mr. Townsend's testimony about you sending him private messages asking about the code to Blind Bitcoin?

A. Yes.

Q. Do you remember sending those messages?

A. I am not sure. I don't remember specifically. This was

supposed to have happened 13 years ago.  I did not remember the message.  I am not sure if I sent it, but maybe I did.  I know I was talking about a lot of different ideas, including ideas about Bitcoin with different people.  Like I said, I never received any source code from him.  I never received any source code for any mixer or really any Bitcoin project at all.  I think I heard in his testimony that the time around which this happened, this was right after he shut down his app.  And then he asked all sorts of people to message him, so maybe that was related to that, because it was around the same time frame.

Q.   Did you ever share your Killdozer account with anyone?

A.   I did.  So I guess this is another possibility.  I could have shared an account for something like this.  Because so all of these forums, they are usually based on reputation.  And the more reputation you have, the more kind of access you have to the forum and to different people there.

I mean, for example, if I was hanging out with a couple of people somewhere and they were working on their projects and somebody asked me to -- that they needed to access a certain forum where they didn't have an account, I could have shared my account easily with them.  I know I have used other people's forum accounts.  I know -- I know other people had access to some of my forum accounts as well.  Especially for something -- if I would see it at the time around 2011, I have got to say, to me, it would seem kind of innocent.  Like if somebody asked

me to like use my account to go and sell some drugs, I would never allow anybody to do that. But this seems like an ordinary, innocent request. Because Bitcoin wasn't money at the time. Nobody thought about Bitcoin as money. This is 2011. We didn't know if there was going to be any laws saying that Bitcoin was money. This was just a -- this would have been just a question about a project. So I don't think I would have had any qualms about not sharing my account.

Q. And if we could, Mr. Hassard, put up what I believe is in evidence as Government Exhibit 711A. And do you recall testifying about this document yesterday?

A. Yes.

Q. And, just briefly, could you remind the jury what this document is?

A. This document is, generally speaking, just a collection of various things, ideas or quotes, links or to-do lists that I didn't want to do at the time, so I put them all in like one file in a large heap.

Q. Mr. Hassard, if we could go to page 26. And could we just scroll down a little bit. And could you just stop right there.

Do you see this paragraph here, Mr. Sterlingov?

A. Yes.

Q. Could you just take a look at that and just explain to the jury your understanding of what you are talking about there?

A. Yes. So at some point, I was -- I was using Tor browser

for many years. At some point, I had this idea to try to -- if I remember correctly, this was to try to get all of the addresses of all of the hidden services on the internet. I read about Tor and I got an idea this might be possible.

I heard some testimony about this in the Government's case. And I just got to correct one thing, because I think they said that this is trying to find like IP addresses of the servers, like trying to find where the servers are. This is not even what this was attempting to do. This was attempting to find all of the addresses, the -- like the URLs, like find what URLs you can ever type on Tor and get somewhere.

I don't see how that would be useful to any operator, because they already know the address. And they are trying to make their address public; right? They want people to know their address. And just one thing to realize about this as well, this thing never worked, so I am not -- I just wouldn't agree with the assessment that I have a lot of specific knowledge about Tor and how that source code works, because this thing never worked. If I made something that actually worked and gave some result, then I understand it. But this is a failed attempt at that.

Q. And if we could scroll down to the -- actually the last paragraph of this document. If we could -- and, yes, thank you. Mr. Hassard, if you could leave it right there.

And could you just -- I think this may have been, do you

recall this being read into the record through witness' testimony?

A.    I do.

Q.    Could you just explain your understanding of what you are talking about here?

A.    Yes.  Well, number one, this is not me talking.  This -- I am relatively certain this is a quote that I found somewhere, and I thought was interesting and I put in my file a few years into my -- me trading with Bitcoin, I suddenly -- the remaining Bitcoin that I had became very valuable.  And suddenly I had quite a large sum of money for me.  And I started thinking that Bitcoin can go down at any point, I should try to figure out how to keep this money, how to maybe make it grow to learn what to do with this.  I never before had any opportunity or any need for that.  And so I started looking into trading it.  I started looking into investing.  I also started looking into taxation.  I started looking into a lot of money about taxation.

Sweden is a country that has very high tax.  An average person pays more than half of their money in taxes in Sweden.  I tried to find some ways to not pay as much tax in a legal way, if that was possible, which is what seems to me this quote is talking about.  Also, a lot of these quotes, just when I remember researching -- when you -- when I was researching tax information on the internet, I feel it is sometimes hard to

know what advice is for a legal way to minimize your tax and what advice is for like trying to hide your taxes or avoid taxes. This way seems to be a legal way. But I am not an attorney. I am not sure. It does mention in the examples for the businesses that it talks about, it seems to be mentioning only legal businesses. And it talks about how in the end, how you need to get an address, how you need to do bookkeeping, what countries you need to go to, which is I think why I was interested in this quote at some point. I don't have any interest -- I don't think I ever took any advice from this particular quote. I don't have any companies in Latvia or Cypress or whatever other countries this mentions.

Q.   But you did set up the To the Moon in Malta?

A.   In Malta, yes.

Q.   You can take this down, Mr. Hassard.

And if you could put up what I believe is in evidence as Government Exhibit 709A, as in apple, and if we could --

MS. PELKER:  If we could do B, 709B.  That is the redacted version.

Do you have that, Mr. Hassard?

If we could go to page 12.  Where there is a line that I think says escape the regulators.

Right there.  Thank you, Mr. Hassard.

BY MR. EKELAND:

Q.   Do you see that paragraph there?  Do you recall that being

read into testimony?

A.    I do.

Q.    Can you just explain to the jury your understanding of what you are talking about there?

A.    Yes.  I talk about in general about regulation of Bitcoin, which is -- it is a topic that I sometimes found interesting. I know on almost every meetup that I ever went into, every Bitcoin meetup people were discussing regulation.  I have changed my mind over the years.  I mean, it has been 14 years that Bitcoin has been around.  Sometimes I thought it shouldn't be regulated at all.  Sometimes I thought it should be regulated a little bit, sometimes I thought it should be regulated just as like regular credit cards or banks.  Again, I think this is something like a 50-page document.  And it -- Bitcoin regulation was one of the things that I sometimes thought about.  And you can find examples of that in my documents.

Q.    Do you see the paragraph above where it says, "It is a JavaScript engine"?

A.    Yes.

Q.    Do you know what JavaScript is?

A.    JavaScript is a programming language.

Q.    And are you proficient in JavaScript?

A.    I know some JavaScript.

Q.    And I'm sorry.  Is that the same programming language as

Java?

A.   No.   Java and JavaScript are two completely different programming languages.   They have almost nothing to do with each other.   And somebody who can write JavaScript or speak JavaScript, or however you call it, they cannot write in Java and vice versa.

Q.   Are you proficient in Java?

A.   No.   I have -- I don't think I have ever done a project in Java.

Q.   Do you recall the testimony that was read into the record from Akemashite Omedetou's posts on the Bitcoin forum in Government Exhibit number 1 where she talked about her programming languages?

A.   I believe I do.

Q.   And do you recall that she mentioned that Java was one of her programming languages?

MR. BROWN:   Objection, Your Honor.   Mr. Ekeland just gendered Akemashite Omedetou without a basis in the record.

THE COURT:   Yeah.   I think --

BY MR. EKELAND:

Q.   Do you recall Akemashite Omedetou saying that they were proficient in Java?

A.   Yeah, I do.   I remember there was a quote where she or they or whoever it is, they talk about their programming languages.   And, I mean, I believe it was brought in as like to

try to liken me to that person. And I just don't understand how that post about programming languages does that. Because there are different programming languages listed there. There are two languages that I think are the same PHP and C++, if I am not mistaken. But there are like two or three languages that I have just never done any projects in. And they are not -- programming languages are similar to real languages. It is like if somebody speaks Spanish and you ask them to do something in German, like read a book in German, it just doesn't work. If there is -- like if there is one language that -- there are quite a lot of those languages. And some people know similar languages, but if I don't know Java, I can not do any project in Java. I also haven't done any project in Python or Pearl, as I believe is also mentioned in the --

MR. EKELAND: Thank you.

Mr. Hassard, if you can take that down. If we would just go to -- I think that was -- although that was 709B.

If we could put up what I believe is in evidence as Government Exhibit 119C, as in Charlie. If we could go to page 12. And was I correct that this was in evidence?

THE COURTROOM DEPUTY: Yes.

MR. EKELAND: Thank you.

BY MR. EKELAND:

Q. And then right there, could we just scroll up a little bit, Mr. Hassard. I'm sorry, the other way. My apologies.

Right there, that is perfect. And do you recall this being read into testimony?

A.   I think I do. Certainly it is -- these or other similar lines.

Q.   Do you see how it is talking about a UDP speeder?

A.   Yes.

Q.   What is your understanding of what a UDP speeder is?

A.   UDP speeder was just a piece of software that I tried to use in order to fix my internet problems. I had -- as I was traveling in Europe and Germany, in Spain, in a lot of those places the internet is really bad. It is bad for the phone. Like the phone internet there, you can be driving for an hour on a highway and not have any internet. You can be driving in the middle of Berlin and your internet going off for 15 minutes, I was really frustrated with those problems. And even the wired internet that you had in like Airbnbs, some of that was not working either. So this was one of the solutions that I was trying to find for my internet problems.

Q.   Do you see when you are saying what is the easiest way to reinstall UPS in bunkerX?

A.   Yes.

Q.   What is your understanding of what you are talking about there?

A.   So, first, bunkerX actually as it is written here, this is a translation of my handwritten notes in Russian. And there

are like a few mistranslations here and there.  There are not many of them that are like critical or anything like that.  There are a few important ones.  The bunkerX was never spelled like that, with a big X like it is something -- like the separate words.  BunkerX is just my home computer in Sweden whenever I wanted to connect to it.  And it is like, the X is just the 10, the Roman numeral, because I think this is like the 10th time I have installed my computer forever, like the operating system reinstalled.

Reinstall UPS in bunkerX, I think that refers to me trying to control -- to connect to my home computer in order to make my internet go through that, because I wanted to try that and see if the internet was going to be more stable.

Q.   Do you see how it says launch server on bunkerX?  What is your understanding of what that means?

A.   That would be the UPS.  That is the list of subtasks, I guess, for trying to reinstall the UPS in bunkerX, I think.

Q.   And, Mr. Hassard, if we could take that down.  And now if we could put up what is in evidence as Government Exhibit 720.  And, Mr. Sterlingov, do you recall this exhibit?

A.   I recognize this exhibit.  I don't recognize this file.  I believe this file is like an automatic file that I was probably going into some software and changing some settings.  And this is the file that the software saves.  So like I didn't type everything in this file.  But this is a -- this is a Tiger VNC

configuration file.  Tiger VNC is like a remote desktop.  It is like Go To My PC or Team Viewer.

Q.    And did you see where it says ignorelist.com?

A.    Yes.

Q.    What is your understanding of what ignorelist.com is?

A.    Ignorelist.com is a dynamic DNS provider, just like was -- I heard the explanations the other day.  I agree with --

Q.    Could you just refresh the jurors' recollection as to what the ignorelist.com does or what you were using it for?

A.    I was using it to connect to my computer in Sweden.  It solves the problem where home computers have dynamic IPs.  So that means like IP addresses that change all of the time.  And if I wanted to connect my home computer if the IP address changed, I couldn't do that anymore.  I needed to figure out the new address.  And the ignore service, like ignorelist solves that problem, because instead of typing the IP address, I could type this address.  And it would automatically find my IP address, which is also actually the same reason why I was using Tor.

It is another way to do the same thing, because you can get a free DNS name from Tor, which is going to point to your dynamic IP address.

Q.    You can take this down, Mr. Hassard.  If you can put up what is in evidence as Government Exhibit 722.

And then do you recognize this exhibit, Mr. Sterlingov?

A.    I recognize it from seeing it in this case.

Q.    What is your understanding of what -- what this exhibit shows?

A.    This looks like another similar configuration file for software that -- so I didn't type this file, but it is probably saved by Putty.  It looks like the software that has generated is this Putty.  That is the name of the software.

Q.    Did you use Putty?

A.    Yeah.

Q.    What did you use Putty for?

A.    Putty is an SSH client.  SSH is how you connect to any computer on Linux.  It is something you have to use on Linux.  And Putty is I guess a more graphical -- a little bit more graphical way to do that.

Q.    And, Mr. Hassard, you can take this down.  If you can put up Government Exhibit 723.

     Do you recognize this exhibit?

A.    Yes.

Q.    And what is your understanding of what you are seeing in this exhibit?

A.    This is a script file.  It is like a short file which has some commands in it.  These are probably either -- well, I probably typed some of it.  The way you do usually is you type a little bit and then you like copy, paste a lot of these commands on Linux.  On Linux you have to type a lot of things

in the terminal all of the time.  I mean to like change your sound settings, like you need to type things, to log in you need to type things.  It is just the way Linux works.  And this seems to be connecting -- mounting a hard drive.

Q.   And then the bunkerX home on the bottom, was that your home computer?

A.   Yes, it was.

Q.   And then what is -- is bunkerX media, what is that?

A.   Yeah.  Media is just -- it is kind of just how the files are located on a Linux system.  You have a media folder and you have a home folder.  These are just two names that I think you have on every Linux system.

Q.   Do you know if the government ever seized your home computer in Sweden?

A.   I don't know.  I don't -- from what I heard, they hadn't.

Q.   If we could take this down and move on to the -- what are we on?  Government Exhibit 724, which is in evidence.

And then just briefly, what is your understanding of what this file is?

A.   This is just the opposite to the last file.  This disconnects a hard drive or a folder or the remote folder that -- it looks to be connected to the file that we have just seen.  This does the opposite.

Q.   We can take this down, Mr. Hassard.  And if we could go to Government Exhibit 725.

And then what is your understanding of this file?

A. This file, I am not 100 percent sure. It definitely looks like it is something with the SSH. And it connects to the ignorelist.com URL, so this was my -- me connecting to my home computer. And is this called bunker tunnel? I think this is called bunker tunnel. And the tunnel is just a name used on Linux to connect to a computer. A remote connection is a tunnel.

Q. And then bunker was just the name you gave to your home computer?

A. Yes. I play -- I just thought it was a funny name. I play a lot of video games. They are like war games. There are bunkers in them. I thought it was a funny name.

Q. If we could take this down and go to what is in evidence as Government Exhibit 726. And do you recognize this file?

A. Yeah. This looks to be another version of the file we saw earlier. It is just another Tiger VNC file. I think it is pretty much just the same thing. The URL is different. I think this is the Hop to. It is just another one of those dynamic DNS.

Q. Mr. Hassard, if you could take this down. If you could put up what is in evidence as Government Exhibit 729. What is your understanding of what we are looking at here in Government Exhibit 729?

A. So this file is a Linux command history. It shows some of

the commands that I probably typed. Some of them I think I probably copied, pasted some of them. And then you can go -- there are a lot of different commands there. These are probably over like a period of time. What stands out to me here is here you can see these three commands here is me trying to copy some of the files from my home computer. You see it says, "A Course in Miracles." That is either a book or audio book. And so I am copying these books from my bunkerX home computer. I think you can scroll further down. There was nothing else in this file.

Q. If we could take this down, Mr. Hassard. And if we could put up what I believe is in Government Exhibit 732. Do you recognize -- what is your understanding of what this exhibit shows?

A. This is a similar file. It is also a command history file.

Q. We can take this down. And, Mr. Hassard, if we could put up what is in evidence I believe as Government Exhibit 733. What is your understanding of what this file shows?

A. This file looks to me like an automatic file that you can find on a Linux -- on any Linux system. That is automatically generated. Linux is kind of built on these type of files. There are hundreds of these. Like a Raspberry Pi, for instance, is a Linux system. You get your Raspberry Pi and will have hundreds of these. They are just part of the system.

Q.   We can take these down.

Just turning your attention briefly again to your knowledge of Tor.  Did you ever use Tor command lines?

A.   Yes.  I use command lines to connect to my bunkerX home computer.  You can see I think we didn't scroll down in one of these documents, but I know they show me downloading movies and books and my music which was really most of why I was even connecting to my home computer at all.  Sometimes I used Tor, because I tried -- so I tried to find a dynamic DNS service that could help me find the IP address.  And some of them are paid.  I didn't want to pay for it.  Some of them are free, but they don't work as well.  And I read this article on Tor Project that I can use Tor to do the same thing actually for free.  They give you a free URL.  And it actually works, even it is actually better than even dynamic DNS, because it -- depending on what your firewall and router, sometimes your dynamic DNS will not even work.

This might have been the article that I read.  That is up right now.  It --

MR. BROWN:  Objection, Your Honor.  He is commenting on it.

THE COURT:  Sustained.

BY MR. EKELAND:

Q.   Do you -- Mr. Sterlingov, do you -- you just testified that you read an article about using the Tor service to access

your home.

A.    I did.

Q.    And could you take a look at what is in front of you right now, which is not in evidence as Defendant's Exhibit 136.  Do you recognize that?

A.    Yes.

Q.    Is that the article you were referencing in your testimony?

A.    Yes.

Q.    Is that an accurate and fair depiction of the article that you were just testifying about?

A.    I believe so.  I believe this is an exact depiction.

MR. EKELAND:  Your Honor, at this point in time the defense would like to offer what has been marked for identification as Defendant's Exhibit 136 into evidence.

THE COURT:  Mr. Brown.

MR. BROWN:  Objection; hearsay.  And the defendant hasn't explained -- he just said that this is the article he referenced in his testimony, which is also unclear.  But this isn't inadmissible hearsay, Your Honor.

THE COURT:  All right.  Let's pick up for a second.

(Conference held at the bench.)

MR. EKELAND:  This is merely being offered for the effect on the listener that he read this article and then he started working on, you know, using Tor command lines to access

his home system.

MR. BROWN:  Your Honor, this article -- could we scroll up to the top, please?  This article was written in May 2020.  There is absolutely no foundation for the idea that the defendant read this article in May 2020 to explain, you know, testimony that happened earlier than this.  This appears to be just an article that the defense found and maybe showed to the witness in testimony prep.  But there is no foundation whatsoever for the idea that this is admissible as effect on listener.

THE COURT:  Mr. Ekeland.

MR. EKELAND:  This -- it is my understanding that this was an article that Mr. Sterlingov read and that he started using -- you know, experimenting with Tor commands based on this article.

THE COURT:  Did he use Tor commands before May 2020?

MR. EKELAND:  Yes, he did.  But I don't know if he used them in the context of his home.  And his home -- I mean, that is what this is talking about here if you look down.

THE COURT:  I'm sorry.  When you don't know that he did, why don't you lay that foundation first, if he used it, when he used it in his home first?

MR. EKELAND:  Okay.

THE COURT:  If this is like -- if you are offering it for the fact that this shows how he obtained knowledge and when

he obtained knowledge, it may be admissible on that ground. But you need a foundation that he wasn't using Tor in his home before that. And that this is what then informed him so he could use it in his home. The question is just some aspects of the article that are excludable hearsay, otherwise -- and I obviously haven't read the whole article, so I don't know if there is anything in there that is more problematic just than the fact he used Tor for his home.

MR. EKELAND: Your Honor, as I am sitting here, I don't know if it is worth it. Let me see if I can lay a foundation. I don't want to drag on the proceedings.

Just real quickly, what time would you like us to take our break? I don't want to put the --

THE COURT: I will leave it up to you. It is your witness so if you -- you can tell me. You know, it is 11:00 now. We will probably stop for lunch at 12:30 or 12:45 so you can figure out how you want to balance in the midst of that.

MR. EKELAND: I think I'd like to finish this sequence and then take the break.

THE COURT: Yeah. Let me know.

MR. EKELAND: Okay. Thanks.

(End of bench conference.)

THE COURT: So the objection is sustained subject to the laying of the foundation.

BY MR. EKELAND:

Q.    Mr. Sterlingov, when -- did you use Tor command lines to access your home network?

A.    Sometimes, yes.

Q.    Do you recall when you first started doing that?

A.    Not exactly, probably a few years ago.

Q.    And but at some point, you did start using Tor commands to access your home network?

MR. BROWN:  Objection; leading.

THE COURT:  I think it is just asked and answered.

MR. EKELAND:  Understood, Your Honor.

BY MR. EKELAND:

Q.    What types of things did you do with Tor command lines when you accessed your home network?

A.    I just used it to get my IP address so that I could connect to my home computer, which was really the -- wasn't really a network.  It was just my home computer.

Q.    Did you have security cameras at your apartment?

A.    Yes.  I had a security camera at some point.

Q.    Did you ever use Tor command lines to access the security cameras?

A.    The camera was connected to my computer.  I am not sure specifically if I used it -- it would have been one of the things that I used my computer for, yeah.

Q.    And are you familiar with -- is using a Tor command line the same thing as accessing an onion site?

A.    No.  I never had any onion site.  I think they were -- I believe I heard government testimony when they were saying that I was accessing onion sites.  And I had some onion sites and the command was for the onion site.  I never had an onion site. There is no -- you can't type anything in the browser and get into like any information, like open any website or page.  It was just a way to connect to my home computer and access my files, access my smart home, like smart switches and things like that.

Q.    And are you familiar with the phrase Tor hidden services?

A.    Yes.

Q.    And are Tor hidden services something you could use to access your home network?

A.    Yes.  I believe that is a feature in Tor that you can use that for.

Q.    And did you use the Tor hidden services in Tor to access your home network?

A.    Yes.  I think every time there is the URL that is .onion, there is technically a Tor hidden service as it is called in Tor.

Q.    Why did you use Tor hidden service to access your home network?

A.    Because they give you a free DNS name.  You can get that onion that is completely free.  And it connects to your whatever you want to connect.  It goes through firewalls and

routers, much better than what I could have done with the dynamic DNS service that we have seen in the command lines, which I was trying to do it with dynamic DNS first and it didn't really work with my router. So I looked into the Tor way of doing the same thing.

MR. BROWN: Your Honor, just to pause here. Could we take down the exhibit that is in front of the witness, please.

MR. EKELAND: Yes.

THE COURT: Yes.

BY MR. EKELAND:

Q. And does Tor hidden services also protect your privacy when you access your home network?

A. I know it is very secure. I don't know what it does for privacy for a home -- for my home computer, I know it is a secure connection that is very hard to hack into.

MR. EKELAND: Your Honor, I think we are at a good stopping point at this point.

THE COURT: Okay. Let's take our morning break now. It is almost 5 minutes past 11:00. Let's come back at 11:20. And I will remind you yet again, please don't discuss the case, even amongst yourselves and don't conduct any type of research. And I will see you back at 11:20.

(Jury out at 11:03 a.m.)

THE COURT: All right. Anything before the break?

MR. EKELAND: Nothing for the defense, Your Honor.

MR. BROWN:  No, Your Honor.

THE COURT:  All right.  I will see you shortly.

(Recess taken at 11:04 a.m.)

THE COURT:  Are we ready for the jury?

MR. EKELAND:  Yes, Your Honor.

THE COURT:  Okay.

(Jury in at 11:28 a.m.)

THE COURT:  All right.  Mr. Ekeland, you may continue when you are ready.

MR. EKELAND:  Okay.  Thank you.

May I proceed, Your Honor?

THE COURT:  You may.

MR. EKELAND:  Thank you.

BY MR. EKELAND:

Q.   Mr. Hassard, if we could put up what is in evidence as Defendant's Exhibit 119B, which is I believe in evidence.

THE COURTROOM DEPUTY:  You said 119?

MR. EKELAND:  B as in boy.

THE COURTROOM DEPUTY:  I don't have a 119B.  I just have 119.

MR. EKELAND:  I'm sorry.  Government Exhibit 119, my apologies.

THE COURTROOM DEPUTY:  Oh, Government Exhibit. Government Exhibit 119B?

MR. EKELAND:  As in boy.

THE COURTROOM DEPUTY:  I do not have it in evidence.

MR. EKELAND:  I'm sorry.  What?

THE COURTROOM DEPUTY:  I don't have Government Exhibit 119B in which --

Mr. Brown, is that correct?  I have 119 and 119A.

MR. BROWN:  Your Honor, this may have been a redacted exhibit.  I am not sure.  We are double checking.  In which case 119B might be the redacted version, but let's double check.

MR. EKELAND:  I think that Mr. Brown is right on that.  Could we take a quick look?

MR. BROWN:  Your Honor, I believe 119C, which is a redacted version of this has been admitted into evidence.

THE COURTROOM DEPUTY:  That is correct, 119C is in evidence.

MR. EKELAND:  Okay.

BY MR. EKELAND:

Q.   Could we go to page 17 of that?  And I am looking for the word -- there it is, right there.

And, Mr. Sterlingov, do you recall this exhibit?

A.   I do recall it.

Q.   And do you see where you are talking about Adobe?  Do you see where you are talking about Adobe -- there is Adobe there too?

A.   Yes.

Q.   What is your understanding of what you are talking about there?

A.   So this is from my handwritten notes.  And this would be an example of what I mentioned earlier where my technical notes are mixed with my stream of consciousness and me trying to deal with my emotions, so it is really erratic, this whole document.  But looking at the kind of the line that runs through this portion, I think this starts with the VNC not working and that was probably how I was trying to connect to my home computer.

Q.   And what is these --

THE COURT:  I'm sorry.  Just before you move on, just for these lines of questioning, I think it would be helpful if you can clarify when you are asking the questions or ask so Mr. Sterlingov can clarify, whether he is testifying based on his recollection of what he actually meant when he wrote something back then or if he is testifying based on going back and reading it now that he is inferring what he may have meant, just based on reading something where he doesn't actually have a recollection of what he actually meant at the time.

MR. EKELAND:  Certainly, Your Honor.

BY MR. EKELAND:

Q.   Mr. Sterlingov, do you recall what you meant when you wrote this?

A.   I am trying to do my best to recall the most things about this that I can.

Q.    As you read --

A.    Some a few details, I might not remember, but -- so I -- what I am saying is I am trying to testify from what I remember.

Q.    And as you read this now, what is your understanding of what you are talking about?

A.    Yes.  Yes.  So I am talking about VNC not working and that was related to having problems with the internet in general wherever I was at the time.  And the Adobe line is me trying to figure out, why do I need this thing?  Do I need to connect to my home computer?  And Adobe is what I was using to work on my mental health coaching videos and podcasts that I was doing.

Adobe as maybe many people know already, but Adobe is a software for -- they make software for editing pictures and videos and audio.

Q.    And what -- just could you remind the jury what VNC is again?

A.    VNC is a remote desktop software.

Q.    And if we could go now to page 22 of these notes?

A.    I also mention there that I was watching videos because --

MR. BROWN:  Your Honor, this is nonresponsive to the question.

THE WITNESS:  I was finish my --

THE COURT:  You can continue, Mr. Ekeland.

BY MR. EKELAND:

Q. Do you see the reference there in the middle of the page --

Did okay finish Zigbee?

A. Yes.

Q. What is your understanding of what you are talking about there?

A. This is me talking about my smart home system that I had at home. Zigbee is a format for smart home switches and lights and automation, like you can go and buy a Zigbee switch or Zigbee light. It is a -- it is the technology on which the smart home is built. And here, this is what I was talking about earlier. I have looked at the different solutions of how I could connect to my home computer that had a dynamic IP address and I figured out Tor was the best solution, because it could go through the firewall and the router. And it was just always working better than my dynamic DNS setup.

It mentions Tor SOCKS there I think that was one of the commands from my command history. I was trying to use it to access my Zigbee smart home.

Q. If we could go down to page 23, Mr. Hassard.

And I am looking for a reference that says hass. There we go. Thank you. Do you see where it says hass?

A. Yes.

Q. What is your understanding as you read this today of what you are talking about there?

A.    Hass is software for smart home.  It is what the actual app is called where all of the Zigbee switches and other types of switches as well are connecting to.  And I was setting up my hass.  Hass was also linked to -- or it was the website where the article about using Tor for smart home that I had read that I was talking about earlier that was on the website.  In the open source I think hass is the biggest app for smart home or it was at the time.

Q.    Thank you.  You can take this down, Mr. Hassard.

And do you recall testifying yesterday about your Mycelium wallet?

A.    I am not sure if it was mentioned yesterday.

Q.    Did you have a Mycelium wallet?

A.    Yes, I had a Mycelium wallet on my phone.

Q.    And was that one of the items that the government seized from you?

A.    Yes.

Q.    Could you just briefly remind the jury what a Mycelium wallet is?

A.    Mycelium wallet is a Bitcoin wallet that works on a phone.  I think it -- you also could have other cryptocurrencies in it.  And you -- it has some other functions that I wasn't using, but it is essentially a Bitcoin wallet.

Q.    And where did the Bitcoin that you had on that Bitcoin wallet come from -- on the Mycelium wallet come from?

A.    They came from my savings from the Bitcoin I bought early on.

Q.    And was it password protected?

A.    Yes.  It was password protected, which I think is important.  Because as I know, they have shown you the screenshot that at the time, when they arrested me, the value of Bitcoin in my Mycelium wallet was something like 500,000 US dollars equivalent, which is a lot of money.  It is a big chunk of all of the money I had.  But it wasn't just sitting on my phone like that.  I had a pin code.  I had a password on my Mycelium wallet.  I had password on my phone.  They broke into all of that.

Then, of course, you can see my wallet, but it wasn't like I was just walking around with that wallet unprotected.  That was my main wallet that I was using for most of my transactions.

THE COURT:  So the question was whether it was password protected, so wait for the next question.

BY MR. EKELAND:

Q.    And was your Mycelium wallet your primary wallet?

A.    Yes, it was my primary Bitcoin wallet that I was using. It wasn't a phone -- I don't see much difference if you have a wallet on your phone or on your computer nowadays, because nowadays you can have good wallets on your phone.  It could be well protected.  It is certainly more practical to be able to

do that from your phone.  And I wanted to protect it even more, which is why I had several phones -- one of the main reasons I had several phones.

THE COURT:  I'm sorry.  Just wait for the next question.

BY MR. EKELAND:

Q.   What additional steps, if any, did you take to secure your Mycelium wallet that was on one of your phones?

A.   One step was that I had several phones.  On one of them, I had my wallet.  And whenever I was going to a situation like trading Bitcoin or just any situation where I wasn't completely sure about my safety, I wouldn't bring that phone.  And I wouldn't install -- like if there was any apps that I wasn't sure about that could have viruses or something like that, I would install it on a different phone.

Q.   And are you familiar with something called ADVcash?

A.   Yes.

Q.   And could you tell the jury what ADVcash is?

A.   ADVcash was an account that I had.  It was used for a debit card that I had.  And all the money on my ADVcash debit card that came from my Mycelium wallet.

I did not know that they don't respond to --

THE COURT:  Just the question was, "Can you tell the jury what ADVcash is?"

BY MR. EKELAND:

Q.    Do you use ADVcash?

A.    Yes.

Q.    Do you recall the testimony about BitDials?

A.    Yes.

Q.    Can you remind the jury what BitDials is?

A.    BitDials was a website that was selling luxury and other expensive items for Bitcoin, like cars.  And I know they sell watches and stuff like that.

Q.    Did you buy anything from BitDials?

A.    I bought my Tesla on there.  That is the only thing I bought there, back in 2020 when the price has gone up to the highest it has ever been.

Q.    When you say price, do you mean the price of Bitcoin?

A.    Yes, the price of Bitcoin.  I had a few hundred thousand dollars in value.  It was a lot of money for me.  I decided, okay, now I can maybe buy a car.  I looked around.  I found --

Q.    Did you --

A.    I found a good deal.  I thought it was free charging forever on that car.  I looked at the resale value.  The Teslas have really good resale values.  I figured I could have the car for a while so, yeah, I splurged a little bit on the car.  That is the only thing I ever bought from BitDials ever.

Q.    Did you pay for the Tesla in Bitcoin?

A.    I did.  It was the most expensive item I have ever bought.

Q.    Now, just drawing your attention to the year 2018.  You

turned 32 in 2018?

A.   I was born in 1988, so that would be 30.

Q.   Thirty.  And what are you doing in 2018?

A.   In 2018, I am still trying to get Moon VPN working.  I am still trying to learn to be a mental health coach.  I am still looking to trading.

Q.   Are you still living in Sweden in 2018?

A.   Yes.

Q.   And then in 2019, what are you doing in 2019?

A.   So around 2019, I am looking into moving away from Sweden. Because after researching the tax situation, I figured out that I could save a lot on my tax, which I would have to pay a lot of tax in Sweden if I would have sold my Bitcoin.  All of that Bitcoin I had on my Kraken account and my Mycelium, but if I moved out, I would not have to pay all of that tax.  And I was -- I was advocating moving out as well.  I wanted to travel more.

Q.   And what are you doing in 2020?

A.   In 2020, I started traveling a lot.  I am already not living in Sweden for 6 months.  So you have to spend less than 6 months in a year in Sweden to not be tax liable there, so I was looking to do that in combination with my traveling.

Q.   And --

A.   I started looking into my pilot's license in 2020.

Q.   2020.  What are you doing in 2020?

A. So around 2020, I start looking into getting a pilot's license, because my Bitcoin is growing. It is continuing to grow. It is like having a magical wallet. You saw the Mycelium wallet, it started off as 30 Bitcoin. And as I was spending it and spending it, like my Kraken account and all of that, I spend it down to 10 Bitcoin, but now that 10 Bitcoin was worth more than twice as the 30 Bitcoin was worth in the beginning. It is like a wallet that you are spending money from and it just keeps growing in value.

So I was happy about that, but I also realize that Bitcoin price cannot or might not do that forever. It might go down at any point. It might just stop. And I wanted to have something more robust, like a source of income that I -- that would work for me for a long time and something I like to do as well. My long term intention was to focus more on my mental health coaching. But I knew that was not going to bring me any money for any close period of time. I think it is very hard to make money on that.

So I researched around and I decided to get a pilot's license, because you can make very good money -- it is very flexible. I believe it would work for me like personally to -- I like technology. I like technical stuff. I thought it would be a good fit for me.

Q. What, if any, steps did you take to get your pilot's license?

A.   I was researching it for a really long time, including the -- some of the free lessons that are out there.  There is a lot of stuff on YouTube.  There is a lot of stuff on the internet.  And then eventually I signed up for my flight school.  That is why I came to the US.

Q.   Where was the flight school that you signed up for?

A.   It was in California.

Q.   When were you planning on attending that flight school?

A.   Well, this was in April, 2021.

Q.   And did you -- I'm sorry.  Did you say where the flight school was?

A.   It was in California.

Q.   Do you remember where in California?

A.   I think Sacramento, if I am not mistaken.

Q.   And did you fly to California in 2021?

A.   Yes.

Q.   Did you stop anywhere on the way?

A.   Yes.  I stopped in Russia for two weeks.  I had to quarantine myself there, because there was this really weird regulation at that time in the US having to do with COVID.  There were a lot of disruptions in travel in general, but the US did not allow anybody from the whole European Union to enter into the US, if they were anywhere in the European Union for the last two weeks.  Probably had something to do with vaccines and how much each country was vaccinating their people.  I

don't know why, but they did allow people from Russia to enter. Again, it is really weird to me. That was the regulation at the time, so I had to go to Russia for two weeks and then I flew from Moscow to California.

Q. And what happened -- where did you fly to in California?

A. LAX.

Q. And what happened when you arrived at LAX?

A. I got arrested. As I left the airplane and got into -- I left the airplane. I went through some corridor and someone in one of those corridors, they told me they have to speak to me first and they brought me to a different room. And they went through all of my luggage. And at some point after that, they -- I went to a different room. And then they told me I was under arrest. And then that whole thing happened.

Q. And when they arrested you, they seized all of your items?

A. Yes.

Q. If we could just, Mr. Hassard, put up what is in evidence as Government Exhibit 112.

If you could scroll through that, Mr. Hassard, slowly. Is that the list of items that the government seized from you at LAX?

A. Yes.

Q. And you can take that down, Mr. Hassard.

I am going to ask you some questions about some of those items. And if we could just bring up the -- what is in

evidence -- I am not sure of the number.  I think it is 125 or 126, the LTE mobile router that we looked at yesterday with Mr. Fischbach.

THE COURT:  That is fine.

MR. EKELAND:  And may the defendant handle the device, Your Honor?

THE COURT:  He may.

BY MR. EKELAND:

Q.   Mr. Sterlingov, can you explain to the jury why you were traveling with this device?

A.   Yes.  So as I was explaining earlier, I had a lot of problems with internet as I was traveling around in Europe.  In many other countries -- well in Russia, that was the case; in Sweden -- even in Sweden, you have -- you usually have internet, but you have got to have different SIM cards, because some of them have very small amounts of traffic.  Some of them cost different amounts of money in like different cities.  So I started looking around.  And I found this website that said that we can solve all of your problems.  We can give you this device where you put several SIM cards and it combines them into like a stronger, faster internet connection.

I have to wonder why they brought it up.  There is nothing -- I mean, there is nothing illicit -- I wasn't doing anything illicit with this device.  This is a very fast internet modem.  The reason it even looks like this with all of

the cables and, you know, it looks like things can fall off and it has Raspberry Pis and all of that is because it is cheap. I was looking at Amazon at similar devices. And there are devices like this in nice boxes that look much better than this, but there are -- they are costing like 10s of -- well, I think $5,000 I remember one was costing. This is much cheaper. And I bought this a week before I came to US. This is like very recent.

Q. You mentioned there is Raspberry Pi there. Can you briefly explain to the jury what a Raspberry Pi is and what it is doing attached to that device?

A. Yes. This is how the device came from the manufacturer that I bought it from. They used Raspberry Pis. Raspberry Pis in general are these hobbyist level -- there is a Raspberry Pi in there. It is a small -- I guess, you could call them computer, but they are really not powerful. They cost like $20. They are really popular among hobbyists and people who like electronics. Who I am one of them. I own some Raspberry Pis that did not come in this device. And to me, this device was going to solve my internet problems. But I have got to say, one of the reasons I bought it is because I thought it was cool. It is an exciting piece of technology for me. I am -- you know, I am an enthusiast. I think it is a very cool like way to solve a real technical problem that a lot of people have. This device is for mostly people who stream live from

like streets and events where -- like sports events where they cannot be -- their internet cannot be disconnected even for like short periods of time. Because, you know, maybe they work for a news outlet and they pay a lot of money for that. I was trying to do podcasts. I had some podcasts. I couldn't have internet disconnect in the middle of my podcast. I didn't have that many viewers, so it wouldn't be that big of a deal, but just to me that was important.

Q. Mr. Hassard, if you could put up in evidence what is 368.

THE COURT: Are we done this with this? Can they take that --

MR. EKELAND: Yeah, we are done with this. Thank you.

THE COURTROOM DEPUTY: Hold on. I don't have 368. 368 is a demonstrative.

MR. EKELAND: Published as a demonstrative. I am not moving it into evidence.

THE COURT: That is fine.

BY MR. EKELAND:

Q. Mr Sterlingov, do you recognize that?

A. Yes. This is the website of the manufacturer of this device.

Q. And thank you. Mr. Hassard, you can take that down.

Mr. Sterlingov, when you were arrested at LAX, did you have a 6 terabyte hard drive on you?

A.   Can I finish my answer about the device?

Q.   I didn't realize he wasn't finished.

THE COURT:  We need a question, so I am not sure where we are with the question.  And you want to ask another question about the device?

BY MR. EKELAND:

Q.   So the -- could we get, I guess, Government Exhibit 368 back up.  And this I think you testified was the website that you looked at when you decided to purchase the device?

A.   Yes.

MS. PELKER:  Objection, mischaracterizes the witness's testimony.

THE COURT:  So I think the last question before this one was explaining a Raspberry Pi.  So I am not sure -- I have lost track of where we are with the question.

BY MR. EKELAND:

Q.   This is the website for the router we just looked at that you were physically showing to the jury?

A.   Yes.  This is the website that I looked at before I purchased this router or this modem, rather, I guess.  And when I looked at this website, I notice that it just says, it is a device for fast internet connection.  I did not see anything there about using this device for any illicit purpose or trying to hide from any government or trying to disguise any location or anything like that, which I was not -- was not at any point

my intention with this device, which is all of the SIM cards are in my name, which is why the VPS that you have to do is in my name. This whole device is in my name.

Q. You can take down Government Exhibit 368.

Mr. Sterlingov, when you were arrested at LAX, were you carrying a 6 terabyte hard drive with you?

A. No. I never owned a 6 terabyte hard drive.

MR. EKELAND: And if we could bring out what I believe is in evidence -- and, again, I don't have the number in front of me. It is a bag of Mr. Sterlingov's USB drives that were shown to the jury previously. Is that okay, Your Honor?

THE COURT: That is fine with me if they have it there. Is there an exhibit on that, just so -- maybe the government knows the exhibit number for the record, so we have a clear record on this.

UNIDENTIFIED SPEAKER: 134A through R.

THE COURT: Okay. Thank you.

I don't know if the court reporter was able to hear that or not. It was 134A through R.

UNIDENTIFIED SPEAKER: Is there one that you wanted to show him?

MR. EKELAND: I think he wants to show them to the jury.

THE COURT: Just leave them with the witness. That

is fine.

BY MR. EKELAND:

Q.   Mr. Sterlingov, why are you traveling with so many -- what are those?  What are in those bags right now?

A.   These are -- some of them are memory cards, some of them are USB drives.  There is a key to my gym.  There is a -- that little piece of wire that you get with your phone that you have to use when you like changing your SIM cards.  The -- to explain in general, these are all the small pieces of like plastic electronics that I ever had for the past 15 years.  I just -- I got this pouch -- this little pouch, because I was putting these electronics -- I didn't know what to do with them.  Like, I don't know if I am the only one, but I feel like over the years, you accumulate a lot of SIM cards and memory cards.  I was doing a lot of photography.  And sometimes people would be giving me files on their memory cards.  Sometimes I upgraded a memory card.  And I didn't know really where to put them, because they always get lost and they are easy to break them.  So I just bought a pouch.  And I put all of my things in there.  And as I was traveling, I just brought the pouch.  I never had to worry about what memory card to bring or not to bring or like which one to use.

I mean, I guess if -- I don't see -- I don't understand why they brought this out.  If I was trying to hide my memory cards, I think I would like throw them away or destroy them.

DIRECT EXAMINATION OF MR. STERLINGOV

Instead, I have essentially not on purpose, but I have got all of the memory cards I have ever had for like 15 years with me. I have a pouch in my bag. I have a bag that I don't really unpack as I am traveling. It is just sitting there.

Q. Are those devices encrypted?

A. I don't believe -- I am not sure. There might be some encryption on some of them. I am not -- if you ask me about a specific memory card, maybe I could answer. Most of them are not, definitely not. One of the devices here --

Q. If we could --

A. -- this one, I just want to quickly clear up. I believe somebody said this is an encryption tool or -- I don't remember exactly how they characterized. This is not an encryption tool. This is just something I received from my bank. This generates those codes that I need to like access my bank.

Q. I think we can take those away now. And then I'd just like to bring up his e-reader, his Kindle.

THE COURT: Do we have that over there?

Okay.

BY MR. EKELAND:

Q. Mr. Sterlingov, can you just hold that up to the jury and tell them what it is?

A. This is an e-reader, just like a tablet, one of the screens that are easy to read on.

Q. Did you read ebooks on your e-reader?

A. I did.

Q. Mr. Hassard, if we could put up what is in evidence as Government Exhibit 721. Do you recall testimony about Government Exhibit 721?

A. I do.

Q. Do you recall Ms. Mazars' testimony that this was a chat that she found on your kindle ebook reader?

A. Yes.

Q. And do you recall how she said this was you -- basically testimony asserted this was you?

MR. BROWN: Objection, Your Honor. I don't believe defense counsel is accurately characterizing prior testimony. Defense counsel can, obviously, ask questions about this chat.

THE COURT: In any event, it is leading to do so, so why don't you ask him what his recollection is.

BY MR. EKELAND:

Q. Mr. Sterlingov, can you read the second chat bubble for us?

MR. BROWN: Objection, Your Honor, hearsay.

THE COURT: Overruled.

MR. EKELAND: It is in evidence.

THE WITNESS: All right. So reading from this picture, "You're wondering what I do in terms of magically having such photos or in terms of money laundering."

BY MR. EKELAND:

Q.   Is that you talking?

A.   It is not.

Q.   Do you know where these chat bubbles came from?

A.   Yes, now I know where these chat bubbles came from.  At the time when I heard it, I knew that I never wrote anything like that.  So I let my counsel know.  Now I know that this picture is from an ebook.  They just took a picture from an ebook and presented it as my writing.

Q.   And that ebook was on your Kindle, that is right there on the witness stand beside you; correct?

A.   Yes.

Q.   And if I could just -- Mr. Hassard, if we could bring in what is not in evidence as Defendant's Exhibit 138.

MR. BROWN:  Your Honor, can we not publish defense counsel's computer screen?

THE COURT:  We can wait to do that.

MR. EKELAND:  Where is it?  I didn't realize it was publishing.

THE COURT:  I don't know if it was published or not.

MR. EKELAND:  Was it publishing?

MS. PELKER:  Your Honor, it was.

THE COURT:  It shouldn't be published until the exhibit is admitted.

BY MR. EKELAND:

Q.   And, Mr. Hassard, if you could scroll through that a

little bit.

And do you recognize what is Defendant's Exhibit 138?

A. I do.

Q. And was this the ebook that was on your Kindle?

A. It is.

Q. And then I would just like to leave this up. And I would also like to -- Mr. Hassard, if we could put up what is not in evidence as the Defendant's Exhibit 139. And do you see this page?

A. Yes.

Q. And, Mr. Hassard, if you could go just zoom in a little bit and show the -- and you recognize this as a page from the ebook in what I just showed you as Defendant's Exhibit 138?

A. I recognize this type of content and pictures as seeing similar pictures in this ebook.

MR. EKELAND: And, Your Honor, at this point in time, the defense moves to what has been marked for identification as Defendant's Exhibit 138 and 139 into evidence.

THE COURT: All right. Any objection?

MR. BROWN: No objection.

THE COURT: Defense Exhibit 138 and Defense Exhibit 139 are admitted and may be published to the jury.

(Whereupon, Defense Exhibit Nos. 138, 139 were admitted.)

BY MR. EKELAND:

Q. If we could go back to Defendant's Exhibit 138. Mr. Sterlingov, could you just explain briefly for the jury why you have got this ebook on your kindle?

A. Yeah. I was just looking for dating advice. Somebody recommended this book that supposedly teaches you how to text to people you want to date. It wasn't a good book, but it was interesting to me in the way it was described. So I got it and I looked through a little bit of it.

Q. Did you write any of this book?

A. No, I didn't write any of this book.

Q. Mr. Hassard, if we could take this down and go to what is in evidence as Defendant's Exhibit 139. And if we could zoom out. Then if we could zoom back into the portion you had highlighted or zoomed in on.

And, Mr. Sterlingov, if you could just read the text in that second bubble there.

A. The text in the picture is "You're wondering what I do in terms of magically having such photos or in terms of money laundering."

Q. And this is the exact same text and exact same series of messages that Ms. Mazars testified were your chats?

A. Yes, this is the exact same picture.

Q. We can take that down. And if I could now just see what is in evidence as Government Exhibit 734 and 734A, as in apple.

THE COURT: This is in evidence? I don't recall

seeing this.

THE COURTROOM DEPUTY:  I don't recall seeing it either.  That is not correct.

MR. EKELAND:  Oh, it is not in evidence.

MR. BROWN:  Your Honor, I believe there is a batch admission of multiple exhibits.

THE COURT:  I see.  So it is included -- it was never previously published, but it was in evidence?

MR. BROWN:  (Nodding.)

MR. EKELAND:  So it is okay, it is in evidence.

Mr. Hassard, if we could get back 734.

BY MR. EKELAND:

Q.   And if we could publish to the jury.  Is that you in a Mercedes?

A.   Yes.

Q.   Is that your Mercedes?

A.   No, it is not.

Q.   Whose Mercedes is it?

A.   This was a very fun day back in 2018 or '19.  We had a sort of anniversary thing with my girlfriend at the time.  And we rented this car for 24 hours.  I believe it was something like 800 Euros, the one time I rented a really fast car like that.

Q.   And if you could -- Mr. Hassard, if you could go to 734A. And that is you in the same Mercedes?

A.    Yes.  All of those photos would be from the same 24-hour period which was the rental period.

Q.    You can take it down, Mr. Hassard.  And when you were arrested, are you aware if the government issued a press release about your arrest?

MR. BROWN:  Number 1, objection.  And number 2, can we stop publishing to the jury defense counsel's computer screen?

THE COURT:  Yes.

MR. BROWN:  Object to the question, relevance and hearsay and personal knowledge.

THE COURT:  Why don't we get on the phone.

(Conference held at the bench.)

MR. EKELAND:  The government has made it relevant by saying that the last withdrawal from Bitcoin Fog was two days after Mr. Sterlingov was arrested.  It is entirely relevant because somebody else read the news.  And once they knew that somebody had been falsely accused of operating Bitcoin Fog and been arrested on that basis, it is a good time for somebody to shut stuff down.  As to knowledge, he can certainly testify as to his knowledge of whether or not he is aware of a press release.  And he is not testifying to any of the contents.  He is just merely testifying as to whether he is aware that a press release by the government was issued, which is consistent with what I think Mr. Scholl's testimony that this is standard

practice for the government.

Also I think the Court can take judicial notice of a DOJ press release. It is a standard part of their business. I don't think it is any secret that DOJ regularly issues press releases when they have got a big case like this.

THE COURT: Mr. Brown.

MR. BROWN: Number 1, I think the fact of the press release and certainly the contents of it are not relevant. For the point that the defense is making, which I think the defense has already made in cross-examination of government witnesses, simply the timing of the shutdown of Bitcoin Fog in relation to the defendant's arrest, that is a point that has been brought out by the government and has been crossed on by the defense. This witness I don't think has knowledge of when the DOJ press release came out. I think if there is any knowledge it would have been hearsay. But I don't think that there is any foundation to believe that this witness in particular has personal knowledge of when that press release came out. And certainly the contents are not relevant and he has no personal knowledge.

THE COURT: Mr. Ekeland.

MR. EKELAND: I think he could simply read the date on an official government document issued by the United States Government. And I think that is something that he can testify to. And if the date is wrong by whatever, a day or two, it is

not even necessarily being offered for the truth of the matter for the date. What this is being offered for is his knowledge that the United States government in its official capacity in the regular course of business issued an official press release, which I don't think is even in question whether or not this was issued or not. And if, you know, we are not going to take notice of it here then, you know, maybe we will file something to see if the Court will take judicial notice of it. As for the relevance issue, I don't think -- I think this is completely relevant, because the public's knowledge of the arrest of somebody for Bitcoin Fog is the perfect time for the actual operator to just get out of the business because they know somebody else is taking the heat for it.

MR. BROWN: Your Honor, if the defendant proposes to just read the date off of a document, I mean, that shows that it is being used for a hearsay purpose. There is no effect on the listener, because he did not view this press release. There is no question about his -- this being an effect on the defendant. And this is obviously not -- a DOJ press release is not something that fits within a hearsay exemption for an official government record. There has been absolutely no foundation for that.

MR. EKELAND: First of all, we are not offering the document. I am asking about his knowledge of whether or not the United States government, the Department of Justice issued

a press release.  And there is an exception to the hearsay rule for marketplace and other types of websites that the public commonly rely on.  I think it is 803.15 or 17.  And, you know, unless the government is contending that the public doesn't turn to the United States Department of Justice website, you know, for reliable information as to what the Department of Justice is doing, you know, in the taxpayers' name, I would argue that is a hearsay exception that applies even if you know other ones don't.

MR. BROWN:  Your Honor, 803.17 refers to market quotations, lists, directories or other compilations that are generally relied on by the public or by persons in particular occupations.  That, obviously, not apply to a law enforcement press release about a law enforcement operation.

One other --

THE COURT:  I'm sorry.  Did it come out already, the question of the public notice?  I seem to recall some other evidence on this.  Not necessarily press release, but that there were articles, news articles that were produced?

MR. BROWN:  Your Honor, I don't think any news articles have come into evidence, nor do I think there has been any reference to the DOJ release in testimony.  There has been reference to date that the defendant was arrested.  And the fact, as we had sort of carefully framed earlier in this case, that the defendant was detained on April 29th, which is he was

arrested really April -- April 27th. But there has been no discussion thus far about a DOJ press release. There is no foundation that this defendant read the press release. It would be entirely hearsay.

MR. EKELAND: Mr. Scholl did testify that -- I asked Mr. Scholl about it. He didn't specifically say if there was -- if I recall correctly that there was a press release in this case, but that he wouldn't be surprised. And if I recall his testimony correctly, he said it was a standard practice of the United States government. Are we -- is the government actually disputing that they issued a press release on April 27th, 2021? Because I can go on the internet and so can this Court right now and look it up. And if this is going to be something that we dispute, then I am going to move the Court. I am going to ask the Court simply to take judicial notice of the press release, you know, and let's just put it in the record. Because I -- it is not a fact that can be reasonably disputed.

The United States Government issued two press releases in relation to Mr. Sterlingov's arrest. And that is a regular practice that the United States Government is involved in. So if it is not going to come in here, I ask the Court to take judicial notice of the fact that the government issued a press release and simply just look on the government's own website for confirmation of that.

THE COURT:  Go ahead, Mr. Brown.

MR. BROWN:  Your Honor, whether something -- whether a fact in the world is true or not has no bearing on whether a particular item of evidence or line of testimony is admissible under the Federal Rules of Evidence.

THE COURT:  Pause for a second.  Why isn't this -- one of the few examples we have actually had of something that is coming in not for the truth of the matter asserted, it is coming in for the effect on the listener of people out there in the world, the hypothetical person who saw this thing and thought ah, this is the perfect time for me to stop now.  Because whether it is true or not, I now believe someone has been arrested for this crime and it is the perfect time for me to get out of the business.

MR. BROWN:  If that were the standard for effect on the listener, any newspaper article, any online article, any blog posting, any Twitter posting would be admissible, because someone somewhere in the world saw the article and its effect --

THE COURT:  I'm sorry, Mr. Brown.  But it would be admissible if the question of the effect on the listener was what was relevant or not.  So if, for example, there was a news article that said that the stock market just dropped to zero.  And someone jumped off the building that afternoon, it might be the effect on the listener that the person actually thought the

stock market dropped. And it was completely false. The stock market didn't move a penny. And it was explaining why the person jumped off the building.

MR. BROWN: Your Honor, in that hypothetical, I think it would be admissible for the effect on the listener if there is a foundation that the person who jumped off actually did view -- or the jury could infer that they did view that article. But there would have to be an evidentiary foundation that there was some connection between the article and the hypothetical listener. Here, I don't think there has been any foundation about, you know, some hypothetical effect on a listener somewhere else in the world who, you know, may have happened to pull up the list of DOJ press releases on that particular day and seen this that was one of several press releases.

THE COURT: Okay. Mr. Ekeland, anything final on this?

MR. EKELAND: No. I agree with the Court. And here I think what the particular effect -- I can't believe I didn't raise the effect on listener. You make an excellent point. But here the particular effect is the shutting down of Bitcoin Fog, so I agree with the Court on the effect on listener analysis.

THE COURT: So my only question -- I think it is appropriate for the defense to somehow draw this point out. I

don't know whether this is the right witness to do it. But, you know, maybe rather than -- it makes a mountain out of a molehill to bring in another witness to do this. So I will defer to the government on this, but I do think it is fair game for the defense to show that there was some publication with respect to the prosecution and whether that is through a stipulation, something I tell the jury, another witness or just allowing it with this witness now without actually publishing the press release now itself, I am indifferent to which approach we take.

MR. BROWN: Your Honor, I hear the Court. I don't think this witness is competent to lay an appropriate foundation for this, but we do hear the Court.

THE COURT: So would you want to reach a stipulation on this or do you want me to allow this now?

MR. BROWN: Your Honor, we would be willing to reach a stipulation that a DOJ press release was released on a certain date and time related to this case.

THE COURT: All right. I see Mr. Ekeland is nodding his head yes.

MR. EKELAND: We agree if we stipulate on April 27th, 2021, that United States Department of Justice issued a press release announcing Mr. Sterlingov's arrest, I think we are done with the issue.

MR. BROWN: Your Honor, just one factual question,

the press release was on April 28, 2021.

MR. EKELAND:  Just because I don't want to get --
have to get back on the phone, and would -- is it permissible
with the Court -- I am not trying to game anything -- if I just
ask if he is aware of any press coverage of his arrest
or should --

THE COURT:  Is he aware of other like press coverage
outside of this that is just not hearsay, something he has
learned from counsel, otherwise hearsay?

MR. EKELAND:  I think he has just read what he has
seen from us.

THE COURT:  So I guess I -- I am -- can you hear me?

MR. EKELAND:  Now we can.

THE COURT:  So I guess I am not sure what you are
talking about, but if you told him about it, I don't see how
that can come in.

MR. EKELAND:  He I think -- well, let me ask this --
maybe solve it this way.  Can the stipulation say, the United
States Government issued a press release about Mr. Sterlingov's
arrest and that his arrest was covered in the press?

MR. BROWN:  Your Honor, we can stipulate to the first
clause of that the United States government issued a press
release relating to Mr. Sterlingov's arrest.  But it is not
appropriate -- and we have no basis to stipulate about
additional press coverage of the arrest.

THE COURT: What are you -- do you know -- can you tell me like what press it is or --

MR. EKELAND: Sure. Actually the day before --

THE COURT: The question I have is not so much what you know, but this witness would be able to testify to.

MR. EKELAND: I honestly I don't know if he will be able to testify about the timing. I think he may be able to testify as to the Wired article. And honestly I haven't, you know --

THE COURT: The Wired article, he actually participated in; right?

MR. EKELAND: No. April 27th, the day before the DOJ press release, "Wired Magazine" ran an article on its website announcing the arrest.

MR. BROWN: Your Honor, there is no basis that this witness has any personal knowledge about that. And we certainly do object to this witness or other witnesses being used to testify by way of hearsay about the content of that press coverage.

THE COURT: I have the same question in my mind though is whether it is not being offered for the truth of the matter asserted, but just simply for the fact that there was publication, which could have affected some hypothetical operator of Bitcoin Fog who might have backed down as a result of this.

Let me ask you this, what if we just modify the stipulation to say and the -- and that there was coverage around the same time in "Wired Magazine"?

MR. EKELAND:  That is okay with the defense.

MR. BROWN:  Your Honor, I think stipulating to the existence of media coverage around the same time is fine.

THE COURT:  Okay.

MR. EKELAND:  Excellent.

THE COURT:  Thank you.

(End of bench conference.)

THE COURT:  All right.

MR. EKELAND:  I pass the witness.

THE COURT:  All right.  It is lunch time.  So why don't we take the lunch break now.  It is 12:26.  Let's just come back at 1:30.  I remind you, we are getting close to the end of the case.  But please don't even discuss it amongst yourselves and don't conduct any type of research and have a nice lunch.  And I will see you back here at 1:30.

(Jury out at 12:27 p.m.)

THE COURTROOM DEPUTY:  You may be seated.

THE COURT:  All right.  Anything else before the break?

MR. BROWN:  Just to clarify, are we working until 3:30 this afternoon in front of the jury?

THE COURT:  The deputy clerk is nodding yes.

MR. BROWN:  Yes.  Thank you.

THE COURT:  All right.  So I will see you after lunch break.

(Recess taken at 12:28 p.m.)

C E R T I F I C A T E

I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.

Dated this 7th day of March, 2024.

_____
Sherry Lindsay, RPR
Official Court Reporter

**BY MR. EKELAND: [32]** 17/24 20/10 24/19 26/4 27/7 28/2 28/25 35/24 37/20 38/23 46/23 49/25 50/11 52/10 53/14 54/17 55/21 56/25 59/19 60/6 60/25 66/8 68/19 69/6 69/16 71/2 72/20 73/16 73/25 74/24 75/25 77/12
**MR. BROWN: [48]** 4/6 4/9 12/22 13/10 13/22 14/6 17/1 20/23 21/10 21/25 22/9 25/12 25/14 27/24 28/22 37/17 46/20 47/17 48/2 50/8 52/6 53/1 54/6 54/12 56/21 73/11 73/19 74/14 75/20 77/5 77/9 78/6 78/10 79/7 80/14 81/10 81/20 83/2 83/15 84/4 85/11 85/16 85/25 86/21 87/15 88/5 88/23 89/1
**MR. EKELAND: [82]** 4/13 4/19 4/24 5/23 6/1 7/21 9/3 9/19 10/18 11/1 11/11 11/13 12/6 12/11 12/18 13/25 14/14 15/3 16/14 17/17 17/21 20/2 20/19 20/24 21/4 22/16 23/11 24/2 24/13 26/2 27/3 38/15 38/22 47/13 47/23 48/12 48/17 48/23 49/9 49/18 49/21 50/10 52/8 52/16 52/25 53/5 53/10 53/13 53/18 53/21 53/25 54/2 54/10 54/16 55/20 66/5 68/12 68/16 70/8 70/23 73/21 74/17 74/20 75/16 77/4 77/10 78/14 79/22 80/23 82/5 84/18 85/21 86/2 86/10 86/13 86/17 87/3 87/6 87/12 88/4 88/8 88/12
**MS. PELKER: [3]** 35/18 69/11 74/21
**THE COURT: [109]**
**THE COURTROOM DEPUTY: [13]** 4/2 4/7 27/6 38/21 53/17 53/19 53/23 54/1 54/3 54/14 68/14 77/2 88/20
**THE WITNESS: [2]** 56/23 73/22
**UNIDENTIFIED SPEAKER: [2]** 70/17 70/21

## $

**$20 [1]** 67/17
**$5,000 [1]** 67/6

## '

**'19 [1]** 77/19

## .

**.onion [1]** 51/18

## 0

**06:49:32 [1]** 5/5

## 1

**10 [3]** 40/7 63/6 63/6
**100 percent [1]** 44/2
**10005 [1]** 2/4
**10s [1]** 67/5
**10th [1]** 40/8
**112 [1]** 65/18
**119 [4]** 53/17 53/20 53/21 54/5
**119A [1]** 54/5
**119B [5]** 53/16 53/19 53/24 54/4 54/8
**119C [3]** 38/19 54/12 54/14
**11:00 [2]** 49/15 52/19
**11:03 [1]** 52/23
**11:04 [1]** 53/3
**11:20 [2]** 52/19 52/22
**11:28 [1]** 53/7
**12 [3]** 11/25 35/21 38/20
**125 [1]** 66/1
**126 [1]** 66/2
**12:26 [1]** 88/14
**12:27 [1]** 88/19
**12:28 [1]** 89/4
**12:30 [1]** 49/16
**12:45 [1]** 49/16

**13 [1]** 31/1
**1301 [1]** 1/20
**134A [2]** 70/17 70/20
**136 [2]** 47/4 47/15
**137 [1]** 5/1
**138 [8]** 3/7 74/13 75/2 75/13 75/18 75/21 75/23 76/1
**139 [6]** 3/7 75/8 75/18 75/22 75/23 76/12
**14 [1]** 36/9
**142 [2]** 20/5 20/21
**15 [3]** 39/14 71/10 72/2
**17 [3]** 3/4 54/18 81/3
**1988 [1]** 62/2
**1:30 [2]** 88/15 88/18

## 2

**20001 [1]** 2/9
**20005 [1]** 1/21
**2011 [2]** 31/24 32/5
**2012 [2]** 19/11 21/9
**2018 [6]** 61/25 62/1 62/3 62/4 62/7 77/19
**2019 [3]** 62/9 62/9 62/10
**2020 [10]** 48/4 48/5 48/16 61/11 62/18 62/19 62/24 62/25 62/25 63/1
**2021 [5]** 64/9 64/15 82/12 85/22 86/1
**2024 [3]** 1/5 5/3 90/10
**20530 [2]** 1/14 1/17
**21-399 [2]** 1/4 4/2
**22 [1]** 56/19
**23 [1]** 57/20
**24 [1]** 77/21
**24-hour [3]** 16/19 17/6 78/1
**25 [2]** 20/9 20/9
**26 [1]** 32/19
**27th [4]** 82/1 82/12 85/21 87/12
**28 [1]** 86/1
**29th [1]** 81/25

## 3

**30 [4]** 2/3 62/2 63/4 63/7
**32 [1]** 62/1
**333 [1]** 2/8
**368 [5]** 68/9 68/14 68/15 69/7 70/4
**399 [2]** 1/4 4/2
**3:30 [1]** 88/24

## 5

**5.1527 [1]** 1/17
**50-page [1]** 36/14
**500,000 [1]** 59/7
**5th [1]** 5/3

## 6

**601 [1]** 1/16
**65 [1]** 13/15
**6710 [1]** 2/8
**6:43 p.m [1]** 5/3

## 7

**709A [1]** 35/17
**709B [2]** 35/18 38/17
**711A [1]** 32/10
**718 [1]** 20/3
**720 [1]** 40/19
**721 [6]** 6/3 12/23 14/7 14/14 73/3 73/4
**722 [1]** 41/24
**723 [1]** 42/16
**724 [1]** 43/17
**725 [1]** 43/25
**726 [1]** 44/15
**729 [2]** 44/22 44/24
**732 [1]** 45/12
**733 [1]** 45/18
**734 [2]** 76/24 77/11
**734A [2]** 76/24 77/24

**75 [1]** 3/7
**7th [1]** 90/10

## 8

**800 [1]** 77/22
**803.15 [1]** 81/3
**803.17 [1]** 81/10
**818B [1]** 28/4
**857 [1]** 27/4
**8th [1]** 2/4

## 9

**950 [1]** 1/14
**9:38 [1]** 1/6
**9:57 [1]** 17/18

## A

**a.m [5]** 1/6 17/18 52/23 53/3 53/7
**able [14]** 8/1 8/3 14/10 14/10 14/24 19/13 22/3 22/12 30/11 59/25 70/19 87/5 87/7 87/7
**about [96]**
**above [2]** 36/18 90/5
**above-entitled [1]** 90/5
**absolutely [2]** 48/4 80/21
**access [26]** 19/22 21/6 21/17 22/21 23/6 23/9 24/24 26/17 26/20 26/24 31/15 31/19 31/22 46/25 47/25 50/2 50/7 50/19 51/7 51/8 51/13 51/16 51/21 52/12 57/19 72/15
**accessed [3]** 25/2 25/2 50/13
**accessing [2]** 50/25 51/3
**account [24]** 22/24 23/1 23/6 23/13 24/23 29/4 29/4 29/13 29/14 30/5 30/6 30/7 30/8 30/9 30/12 31/11 31/13 31/20 31/21 32/1 32/8 60/19 62/14 63/5
**accounts [9]** 21/6 22/22 23/10 25/5 26/17 26/20 26/24 31/22 31/23
**accumulate [1]** 71/14
**accurate [2]** 20/16 47/10
**accurately [1]** 73/12
**accused [1]** 78/18
**Action [1]** 1/3
**actual [5]** 6/19 12/8 23/24 58/1 80/12
**actually [25]** 6/16 7/2 10/2 15/7 18/10 19/24 23/8 24/8 33/19 33/22 39/24 41/18 46/13 46/14 46/15 55/15 55/18 55/19 82/11 83/7 83/25 84/6 85/8 87/3 87/10
**add [1]** 16/23
**additional [3]** 14/12 60/7 86/25
**additionally [1]** 14/23
**address [15]** 5/10 12/12 33/13 33/14 33/15 35/7 41/13 41/15 41/16 41/17 41/18 41/22 46/10 50/14 57/14
**addresses [4]** 33/3 33/7 33/10 41/12
**administrator [1]** 27/22
**admissible [8]** 22/5 25/22 48/9 49/1 83/4 83/17 83/21 84/5
**admission [3]** 6/8 8/6 77/6
**admitted [4]** 54/13 74/23 75/22 75/24
**Adobe [7]** 54/22 54/23 54/23 56/9 56/11 56/13 56/13
**ADVcash [6]** 60/16 60/18 60/19 60/20 60/24 61/1
**advice [4]** 35/1 35/2 35/10 76/4
**advocating [1]** 62/16
**affected [1]** 87/23
**after [6]** 10/20 31/8 62/11 65/12 78/16 89/2
**afternoon [2]** 83/24 88/24
**again [11]** 12/14 17/2 23/11 24/20 26/18 36/13 46/2 52/20 56/17 65/2 70/9

**A**

agent [1] 5/7
ago [2] 31/1 50/5
agree [5] 33/17 41/7 84/18 84/22 85/21
agreed [1] 16/19
ah [1] 83/11
ahead [1] 83/1
air [1] 12/24
Airbnbs [1] 39/16
airplane [2] 65/8 65/9
airport [1] 6/18
Akemashite [3] 37/11 37/18 37/21
Alden [1] 4/11
all [54] 6/24 9/12 9/16 10/9 12/5 13/18 15/15 22/20 22/21 25/5 26/18 27/12 27/17 27/18 31/6 31/9 31/13 32/17 33/2 33/3 33/10 36/11 41/12 43/1 46/8 47/21 52/24 53/2 53/8 58/2 59/9 59/12 60/20 62/13 62/15 63/5 65/12 65/15 66/19 66/25 67/2 70/1 71/9 71/19 72/1 73/22 75/19 78/1 80/23 85/19 88/11 88/13 88/21 89/2
alleged [2] 22/18 27/22
alleging [1] 22/1
allow [9] 10/12 10/13 10/15 10/16 16/5 32/2 64/22 65/1 85/15
allowed [9] 7/22 11/8 11/9 13/11 13/20 14/9 15/1 15/2 17/2
allowed to [1] 11/8
allowing [2] 11/24 85/8
almost [3] 36/7 37/3 52/19
already [6] 14/10 33/13 56/13 62/19 79/10 81/16
also [22] 9/10 10/7 11/2 14/16 14/23 18/23 22/20 26/7 34/16 34/23 38/13 38/14 41/18 45/15 47/19 52/11 56/20 58/4 58/21 63/10 75/7 79/2
although [1] 38/17
always [2] 57/16 71/18
am [74] 7/17 8/14 8/15 8/20 8/22 8/23 8/24 9/25 10/10 10/18 10/19 11/12 11/19 12/17 13/24 15/3 16/3 16/7 16/16 17/10 17/12 20/5 21/19 23/4 23/16 24/2 24/25 25/7 26/25 28/14 30/25 31/2 33/16 34/7 35/3 35/4 38/5 44/2 45/8 49/9 50/21 54/7 54/18 55/24 56/3 56/3 56/7 57/21 58/12 62/4 62/4 62/5 62/10 62/19 64/14 65/24 66/1 67/18 67/22 67/23 68/16 69/3 69/14 71/13 72/4 72/6 72/7 80/24 82/14 82/15 85/9 86/4 86/12 86/14
Amazon [2] 7/19 67/3
AMERICA [2] 1/3 4/3
among [1] 67/17
amongst [2] 52/21 88/16
amounts [2] 66/16 66/17
analysis [12] 7/16 7/22 8/16 9/1 9/4 9/15 9/25 10/22 11/6 12/2 13/8 84/23
anniversary [1] 77/20
announcing [2] 85/23 87/14
another [10] 29/7 31/12 41/20 42/4 44/16 44/17 44/19 69/4 85/3 85/7
answer [2] 69/1 72/8
answered [1] 50/9
anticipating [1] 15/11
any [59] 6/14 11/21 16/18 20/22 21/22 21/22 30/19 31/5 31/5 31/6 31/6 32/5 32/8 33/12 34/12 34/14 34/14 35/9 35/10 35/11 38/6 38/13 38/13 39/13 42/11 45/21 51/1 51/6 51/6 52/21 60/7 60/11 60/13 63/12 63/16 63/17 63/24 69/23 69/24 69/24 69/25 73/14 75/19 76/9 76/10 78/22 79/4 79/15 79/16 81/20 81/22 83/16 83/16 83/16

83/17 84/10 86/5 87/16 88/17
anybody [3] 27/21 32/2 64/22
anymore [1] 41/14
anyone [5] 11/24 11/25 14/3 16/8 31/11
anything [18] 5/16 5/20 12/25 14/4 16/23 26/20 40/2 49/7 51/5 52/24 61/9 66/24 69/22 69/25 74/5 84/16 86/4 88/21
anywhere [3] 6/14 64/17 64/23
apartment [2] 18/22 50/17
apologies [2] 38/25 53/22
app [3] 31/8 58/2 58/7
apparently [2] 19/11 28/11
APPEARANCES [3] 1/12 1/23 2/1
appears [2] 8/12 48/6
apple [2] 35/17 76/24
applicable [1] 21/14
applies [1] 81/8
apply [2] 22/15 81/13
approach [2] 4/4 85/10
appropriate [5] 10/3 23/22 84/25 85/12 86/24
apps [1] 60/13
April [8] 64/9 81/25 82/1 82/1 82/12 85/21 86/1 87/12
April 27th [4] 82/1 82/12 85/21 87/12
April 28 [1] 86/1
April 29th [1] 81/25
are [140]
aren't [1] 23/3
argue [3] 12/4 23/11 81/8
arguments [1] 10/3
around [13] 31/7 31/10 31/24 36/10 59/14 61/16 62/10 63/1 63/19 66/12 66/18 88/3 88/6
arrest [12] 65/14 78/5 79/12 80/11 82/20 85/23 86/5 86/20 86/20 86/23 86/25 87/14
arrested [11] 59/6 65/8 65/15 68/24 70/5 78/4 78/16 78/19 81/23 82/1 83/13
arrived [1] 65/7
article [25] 46/12 46/18 46/25 47/7 47/10 47/18 47/24 48/2 48/3 48/5 48/7 48/13 48/15 49/5 49/6 58/5 83/16 83/16 83/18 83/23 84/8 84/9 87/8 87/10 87/13
articles [3] 81/19 81/19 81/21
as [111]
aside [2] 22/22 24/12
ask [17] 5/21 15/7 16/21 24/12 25/15 38/8 55/13 65/24 69/4 72/7 73/13 73/15 82/15 82/22 86/5 86/17 88/1
asked [9] 6/15 14/23 15/5 19/19 31/9 31/19 31/25 50/9 82/5
asking [10] 5/20 5/21 7/25 8/1 12/13 21/5 26/9 30/22 55/13 80/24
asks [1] 5/5
aspects [1] 49/4
asserted [4] 23/23 73/10 83/8 87/22
assessment [1] 33/17
astonished [1] 8/14
attached [1] 67/11
attempt [1] 33/21
attempting [2] 33/9 33/9
attending [1] 64/8
attention [2] 46/2 61/25
attorney [1] 35/4
audio [2] 45/7 56/15
AUSA [1] 4/9
automatic [2] 40/22 45/20
automatically [3] 13/18 41/17 45/21
automation [1] 57/9
Ave [2] 1/14 1/20
Avenue [1] 2/8
average [1] 34/19
avoid [1] 35/2

**B**

aware [6] 16/16 78/4 78/21 78/23 86/5 86/7
away [4] 26/1 62/10 71/25 72/16

back [22] 15/17 16/2 16/5 17/19 19/1 24/9 26/12 29/6 30/3 52/19 52/22 55/16 55/16 61/11 69/8 76/1 76/13 77/11 77/19 86/3 88/15 88/18
backed [1] 87/24
bad [2] 39/11 39/11
bag [3] 70/10 72/3 72/3
bags [1] 71/4
balance [1] 49/17
bank [8] 22/24 23/1 26/8 26/9 26/12 26/14 72/14 72/15
banking [1] 29/11
Bankruptcy [1] 2/7
banks [1] 36/13
based [7] 10/3 21/11 31/14 48/15 55/14 55/16 55/18
basically [1] 73/9
basis [8] 8/3 9/9 9/19 11/10 37/18 78/19 86/24 87/15
batch [1] 77/5
be [70] 5/6 8/1 8/12 10/14 12/11 12/13 13/7 13/8 14/5 14/24 15/12 15/25 16/4 16/21 18/12 20/1 20/17 23/25 25/21 25/22 29/3 29/4 32/5 33/4 33/12 35/3 35/5 36/11 36/11 36/12 39/12 39/13 40/13 40/16 43/4 43/22 44/16 48/6 49/1 54/8 55/3 55/12 59/24 59/25 62/2 62/5 62/21 63/23 68/2 68/2 68/7 71/16 72/6 74/22 75/22 78/12 82/4 82/8 82/14 82/17 83/17 83/20 83/24 84/5 84/8 85/16 87/5 87/6 87/7 88/20
bearing [1] 83/3
became [1] 34/10
because [62] 5/17 7/17 8/5 9/3 10/6 10/19 12/17 12/19 13/16 14/15 14/21 15/9 16/8 18/11 19/9 19/10 19/25 21/21 22/23 23/9 23/12 27/22 28/16 29/7 29/13 31/10 31/13 32/3 33/6 33/13 33/18 38/2 40/7 40/12 41/16 41/20 46/9 46/15 51/23 56/20 57/14 59/5 59/23 62/11 63/2 63/20 64/19 66/15 67/2 67/21 68/3 71/11 71/18 78/17 80/10 80/12 80/17 82/12 82/17 83/12 83/17 86/2
been [34] 11/8 11/9 13/2 14/9 14/10 14/10 16/17 17/2 17/4 20/20 23/8 27/15 32/7 33/25 36/9 36/10 46/18 47/14 50/22 54/6 54/13 61/12 75/17 78/18 78/19 79/12 79/13 79/16 80/21 81/21 81/22 82/1 83/13 84/10
before [15] 1/9 6/3 16/3 21/21 34/14 48/16 49/3 52/24 55/11 67/7 69/13 69/19 87/3 87/12 88/21
beginning [1] 63/8
behalf [1] 26/9
being [14] 5/16 8/3 8/5 22/2 34/1 35/25 39/1 47/23 80/1 80/2 80/16 80/18 87/17 87/21
believe [26] 27/4 32/9 35/16 37/14 37/25 38/14 38/18 40/22 45/12 45/18 47/12 47/12 51/2 51/14 53/16 54/12 63/21 70/9 72/6 72/11 73/11 77/5 77/21 79/17 83/12 84/19
believed [1] 5/6
bench [6] 21/2 24/17 47/22 49/22 78/13 88/10
Berlin [1] 39/14
beside [1] 74/10
best [2] 55/24 57/14
better [4] 46/15 52/1 57/16 67/4
between [2] 11/3 84/9

**B**

**beyond [2]** 5/14 27/24
**big [4]** 40/4 59/8 68/7 79/5
**biggest [2]** 30/2 58/7
**bit [10]** 16/6 32/20 36/12 38/25 42/13 42/24 61/21 75/1 75/12 76/8
**Bitcoin [59]** 18/9 18/10 18/17 22/20 27/10 27/12 27/13 27/14 27/15 27/23 29/19 29/23 29/25 30/2 30/3 30/5 30/9 30/18 30/19 30/22 31/4 31/6 32/3 32/4 32/6 34/9 34/10 34/12 36/5 36/8 36/10 36/15 37/11 58/20 58/23 58/24 58/24 59/1 59/7 59/21 60/11 61/7 61/13 61/14 61/23 62/13 62/14 63/2 63/4 63/6 63/6 63/7 63/10 78/15 78/18 79/11 80/11 84/21 87/24
**BitDials [5]** 61/3 61/5 61/6 61/9 61/22
**Blind [3]** 30/18 30/19 30/22
**blog [1]** 83/17
**blow [1]** 7/5
**book [11]** 6/25 7/19 12/8 14/24 38/9 45/7 45/8 76/5 76/6 76/9 76/10
**bookkeeping [1]** 35/7
**books [2]** 45/8 46/7
**born [1]** 62/2
**bottom [2]** 7/7 43/5
**bought [9]** 59/1 61/10 61/11 61/22 61/24 67/7 67/13 67/21 71/19
**boxes [1]** 67/4
**boy [3]** 28/4 53/18 53/25
**break [8]** 49/13 49/19 52/18 52/24 71/18 88/14 88/22 89/3
**briefly [7]** 18/2 32/13 43/18 46/2 58/18 67/10 76/2
**bring [10]** 12/19 60/12 63/16 65/25 70/8 71/21 71/22 72/17 74/12 85/3
**BRODIE [1]** 1/15
**broke [1]** 59/11
**Brooklyn [1]** 2/4
**brought [8]** 6/7 8/5 37/25 65/11 66/22 71/20 71/24 79/12
**BROWN [11]** 1/15 4/10 12/21 16/11 16/23 47/16 54/5 54/10 79/6 83/1 83/20
**browser [2]** 32/25 51/5
**BTCX [18]** 19/5 19/8 19/13 20/13 21/9 22/3 22/10 22/24 24/21 24/24 25/10 26/5 26/7 26/9 26/16 26/23 26/25 27/2
**BTCX's [1]** 23/13
**bubble [2]** 73/17 76/16
**bubbles [2]** 74/3 74/4
**building [2]** 83/24 84/3
**built [2]** 45/22 57/11
**bunker [3]** 44/5 44/6 44/9
**bunkers [1]** 44/13
**bunkerX [11]** 39/20 39/24 40/3 40/5 40/10 40/14 40/17 43/5 43/8 45/8 46/4
**business [5]** 18/14 79/3 80/4 80/12 83/14
**businesses [2]** 35/5 35/6
**button [1]** 6/24
**buy [4]** 22/20 57/9 61/9 61/16

**C**

**cables [1]** 67/1
**California [6]** 64/7 64/12 64/13 64/15 65/4 65/5
**call [2]** 37/5 67/15
**called [7]** 19/5 30/8 44/5 44/6 51/19 58/2 60/16
**calling [1]** 16/20
**came [19]** 6/4 6/12 6/16 7/19 8/23 10/23 10/24 14/25 18/25 19/17 59/1 60/21 64/5 67/7 67/12 74/3

74/4 79/15 79/18
**camera [2]** 50/18 50/21
**cameras [2]** 50/17 50/20
**can [94]**
**can't [5]** 9/23 16/1 24/6 51/5 84/19
**cannot [4]** 37/5 63/11 68/2 68/2
**capacities [1]** 19/16
**capacity [2]** 21/8 80/3
**capture [4]** 6/6 7/12 11/3 13/17
**captures [1]** 13/18
**car [6]** 61/16 61/19 61/20 61/21 77/21 77/22
**card [5]** 60/20 60/21 71/17 71/21 72/8
**cards [11]** 36/13 66/15 66/20 70/1 71/5 71/8 71/14 71/15 71/16 71/25 72/2
**carefully [1]** 81/24
**carrying [1]** 70/6
**cars [1]** 61/7
**carved [3]** 13/1 14/18 15/18
**case [24]** 4/2 6/2 12/20 14/16 15/25 16/4 16/4 16/7 16/16 16/20 27/1 28/9 28/10 29/21 33/6 42/1 52/20 54/8 66/13 79/5 81/24 82/8 85/18 88/16
**CATHERINE [1]** 1/13
**Ccips [1]** 1/19
**certain [3]** 31/19 34/7 85/18
**certainly [9]** 26/19 30/4 39/3 55/20 59/25 78/20 79/8 79/19 87/17
**certify [1]** 90/3
**change [6]** 19/21 19/22 24/22 25/2 41/12 43/1
**changed [2]** 36/9 41/14
**changes [1]** 5/6
**changing [2]** 40/23 71/8
**characterized [1]** 72/13
**characterizing [1]** 73/12
**charge [1]** 15/8
**charging [2]** 17/15 61/18
**Charlie [1]** 38/19
**chart [1]** 5/3
**chat [30]** 4/20 4/24 5/2 5/17 5/18 6/9 6/12 6/13 6/18 7/2 7/3 7/4 7/24 8/5 8/11 9/7 9/20 19/11 19/23 20/16 20/18 21/7 29/19 29/23 30/1 73/6 73/13 73/17 74/3 74/4
**chats [9]** 6/7 6/15 6/25 7/1 7/12 19/13 20/13 21/4 76/21
**cheap [1]** 67/2
**cheaper [1]** 67/6
**check [1]** 54/9
**checked [1]** 16/18
**checking [1]** 54/7
**Chris [1]** 4/9
**CHRISTOPHER [1]** 1/15
**chunk [1]** 59/8
**cities [1]** 66/17
**claiming [2]** 14/21 14/25
**clarify [7]** 4/20 5/16 5/24 28/8 55/13 55/14 88/23
**clause [1]** 86/22
**clear [4]** 12/24 13/6 70/16 72/11
**clearly [2]** 6/25 9/8
**clerk [1]** 88/25
**client [1]** 42/11
**clipped [1]** 13/4
**close [2]** 63/17 88/15
**coach [1]** 62/5
**coaching [2]** 56/12 63/16
**code [8]** 21/17 30/18 30/19 30/22 31/5 31/6 33/18 59/10
**codes [1]** 72/15
**collection [1]** 32/15
**colloquy [1]** 13/13
**COLUMBIA [1]** 1/1
**combination [1]** 62/22
**combines [1]** 66/20

**come [18]** 9/6 12/7 12/13 12/16 16/2 17/3 21/20 21/23 24/1 52/19 58/25 58/25 67/19 81/16 81/21 82/22 86/16 88/15
**comes [4]** 15/16 17/7 23/17 23/20
**coming [4]** 13/12 19/18 83/8 83/9
**command [12]** 44/25 45/15 46/3 46/4 47/25 50/1 50/12 50/19 50/24 51/4 52/2 57/18
**commands [9]** 42/22 42/25 45/1 45/3 45/5 48/14 48/16 50/6 57/18
**commenting [1]** 46/20
**comments [1]** 21/20
**common [2]** 18/20 29/15
**commonly [1]** 81/3
**companies [1]** 35/11
**company [1]** 19/5
**competent [1]** 85/12
**compilations [1]** 81/11
**completely [6]** 27/14 37/2 51/24 60/11 80/10 84/1
**computer [28]** 40/5 40/8 40/11 41/10 41/13 42/12 43/6 43/14 44/5 44/7 44/10 45/6 45/9 46/5 46/8 50/15 50/16 50/21 50/23 51/7 52/14 55/9 56/11 57/13 59/23 67/16 74/15 78/7
**computers [3]** 18/8 18/12 41/11
**conclusion [1]** 10/24
**conclusions [3]** 8/20 9/10 10/23
**conduct [2]** 52/21 88/17
**conference [7]** 17/15 21/2 24/17 47/22 49/22 78/13 88/10
**configuration [2]** 41/1 42/4
**confirmation [1]** 82/25
**confuse [1]** 7/23
**confused [2]** 7/17 23/4
**connect [13]** 40/6 40/11 41/10 41/13 42/11 44/7 46/4 50/15 51/7 51/25 55/9 56/10 57/13
**connected [2]** 43/22 50/21
**connecting [4]** 43/4 44/4 46/8 58/3
**connection [5]** 44/7 52/15 66/21 69/22 84/9
**connects [2]** 44/3 51/24
**conscious [1]** 10/19
**consciousness [1]** 55/5
**consider [1]** 11/23
**consistent [6]** 21/21 21/24 22/5 22/17 23/20 78/24
**constitutes [1]** 90/4
**Constitution [1]** 2/8
**contacted [1]** 26/12
**contacting [1]** 26/8
**contend [1]** 9/3
**contending [1]** 81/4
**content [2]** 75/14 87/18
**contents [4]** 3/1 78/22 79/8 79/19
**context [3]** 13/3 15/15 48/18
**continue [3]** 17/20 53/8 56/24
**continued [4]** 1/23 2/1 3/4 17/23
**continuing [1]** 63/2
**control [1]** 40/11
**convince [1]** 10/14
**convinced [1]** 23/16
**cool [2]** 67/22 67/23
**copied [1]** 45/2
**copy [3]** 28/14 42/24 45/6
**copying [1]** 45/8
**correct [11]** 10/4 16/10 22/7 22/7 33/6 38/20 54/5 54/14 74/10 77/3 90/4
**correctly [3]** 33/2 82/7 82/9
**corridor [1]** 65/9
**corridors [1]** 65/10
**cost [2]** 66/17 67/16
**costing [2]** 67/5 67/6
**could [104]**
**couldn't [5]** 7/20 11/25 14/11 41/14 68/5
**counsel [7]** 4/4 4/10 4/15 73/12

**C**

counsel... [3]  73/13 74/6 86/9
counsel's [2]  74/15 78/7
countries [5]  29/10 29/11 35/8
  35/12 66/13
country [2]  34/19 64/25
couple [3]  5/8 19/15 31/17
course [4]  18/25 45/7 59/13 80/4
court [25]  1/1 2/6 2/7 4/14 5/18
  7/6 7/14 12/13 14/19 15/7 16/14
  70/19 79/2 80/8 82/13 82/15 82/15
  82/22 84/18 84/22 85/11 85/13
  86/4 90/3 90/13
Courts [1]  2/7
coverage [6]  86/5 86/7 86/25
  87/19 88/2 88/6
covered [1]  86/20
COVID [1]  64/20
create [3]  10/7 10/8 28/24
creating [1]  21/22
credibility [1]  9/11
credit [1]  36/13
crime [1]  83/13
Criminal [2]  1/3 4/2
critical [1]  40/2
CRM [1]  1/19
cross [1]  79/10
cross-examination [1]  79/10
crossed [1]  79/13
crucial [1]  14/15
cryptocurrencies [1]  58/21
culminating [1]  13/14
customer [1]  5/7
cut [1]  12/4
Cypress [1]  35/12

**D**

data [1]  13/1
date [7]  76/6 79/22 79/25 80/2
  80/15 81/23 85/18
Dated [1]  90/10
dating [3]  6/23 13/15 76/4
day [9]  29/6 30/4 41/7 77/19
  79/25 84/14 87/3 87/12 90/10
days [1]  78/15
DC [5]  1/5 1/14 1/17 1/21 2/9
de [1]  6/6
deal [3]  55/5 61/18 68/7
debit [2]  60/20 60/20
decided [3]  61/15 63/19 69/9
defendant [16]  1/7 2/2 4/14 21/10
  21/13 22/2 22/11 22/12 47/17 48/5
  66/5 80/14 80/19 81/23 81/25 82/3
defendant's [16]  5/1 20/4 20/21
  22/1 22/10 47/4 47/15 53/16 74/13
  75/2 75/8 75/13 75/18 76/1 76/12
  79/12
defense [21]  3/7 17/2 17/8 20/20
  47/14 48/7 52/25 73/12 73/13
  74/14 75/17 75/21 75/21 75/23
  78/7 79/9 79/9 79/13 84/25 85/5
  88/4
defense's [2]  5/13 6/4
defer [1]  85/4
definitely [2]  44/2 72/9
delete [1]  19/25
demonstrative [2]  68/15 68/16
DEPARTMENT [5]  1/13 80/25 81/5
  81/6 85/22
depending [1]  46/16
depiction [2]  47/10 47/12
Dept [1]  1/20
deputy [1]  88/25
described [1]  76/7
describing [3]  16/9 28/20 29/3
desktop [2]  41/1 56/18
destroy [1]  71/25
detail [2]  11/23 19/14
detailed [1]  11/20
details [3]  19/10 22/12 56/2
detained [1]  81/25

determining [1]  24/8
device [18]  15/8 66/6 66/10 66/20
  66/24 67/11 67/12 67/19 67/19
  67/25 68/22 69/1 69/5 69/9 69/22
  69/23 70/1 70/3
devices [6]  15/6 19/12 67/3 67/4
  72/5 72/9
did [64]  5/9 7/18 11/14 13/21
  18/21 19/5 19/8 24/21 24/22 26/24
  28/13 30/5 30/7 30/9 30/11 30/14
  31/1 31/2 31/11 31/12 35/13 41/3
  42/8 42/10 46/3 47/2 48/16 48/17
  48/21 50/1 50/6 50/12 50/17 50/19
  51/16 51/21 57/3 58/13 58/24 60/7
  60/22 61/9 61/17 61/23 61/24
  63/24 64/10 64/10 64/15 64/17
  64/22 65/1 65/5 67/19 68/24 69/22
  72/25 73/1 76/9 80/17 81/16 82/5
  84/6 84/7
didn't [29]  5/14 10/12 10/13
  10/16 12/18 13/19 28/9 28/23
  28/24 29/8 29/14 30/19 31/20 32/5
  32/17 40/24 42/5 46/5 46/11 52/4
  68/6 69/2 71/12 71/17 74/17 76/10
  82/6 84/2 84/19
difference [2]  11/3 59/22
different [16]  18/15 29/4 31/3
  31/4 31/16 37/2 38/3 44/18 45/3
  57/12 60/15 65/11 65/13 66/15
  66/17 66/17
difficult [1]  6/2
Direct [2]  3/4 17/23
directly [1]  9/10
directories [1]  81/11
disconnect [1]  68/6
disconnected [1]  68/2
disconnects [1]  43/21
discuss [2]  52/20 88/16
discussing [2]  19/2 36/8
discussion [2]  4/21 82/2
disguise [1]  69/24
dishonest [1]  22/2
dispute [2]  21/25 82/14
disputed [1]  82/18
disputing [2]  22/10 82/11
disruptions [1]  64/21
DISTRICT [4]  1/1 1/1 1/10 2/7
distruth [1]  21/23
diverse [1]  18/15
DNS [16]  19/19 19/20 19/21 21/6
  24/22 24/22 41/6 41/21 44/20 46/9
  46/15 46/17 51/23 52/2 52/3 57/16
do [131]
document [25]  20/8 20/11 20/12
  25/4 25/7 26/1 27/1 28/8 28/11
  28/12 28/13 28/17 28/17 28/21
  28/24 29/1 32/11 32/14 32/15
  33/23 36/14 55/6 79/23 80/15
  80/24
documentation [2]  25/3 25/5
documents [2]  36/17 46/6
does [9]  10/7 23/22 27/22 35/4
  38/2 41/9 43/23 52/11 52/13
doesn't [8]  12/13 24/7 24/9 24/11
  25/25 38/10 55/18 81/4
doing [15]  11/5 11/22 19/14 21/8
  50/4 52/5 56/12 62/3 62/9 62/18
  62/25 66/23 67/11 71/15 81/7
DOJ [11]  1/16 1/19 79/3 79/4
  79/14 80/19 81/22 82/2 84/13
  85/17 87/12
DOJ-CRM [1]  1/19
DOJ-USAO [1]  1/16
dollars [2]  59/8 61/15
domain [2]  5/9 24/23
don't [88]  5/18 7/19 8/7 8/11
  9/14 9/16 9/22 9/24 10/10 11/21
  11/24 12/4 13/22 14/3 14/14 17/5
  19/10 19/25 20/25 21/17 21/18
  23/17 24/14 25/1 26/25 26/25
  27/20 27/22 30/4 30/25 32/7 33/12
  35/9 35/10 35/11 37/8 38/1 38/12

40/21 43/15 43/15 46/12 48/17
  48/20 48/21 49/6 49/10 49/11
  49/13 52/13 52/20 52/21 53/19
  54/3 59/22 60/22 65/1 68/14 70/9
  70/19 71/13 71/23 71/23 72/3 72/6
  72/12 73/11 73/15 74/19 76/25
  77/2 78/12 79/4 79/14 79/16 80/5
  80/9 81/9 81/20 84/10 85/1 85/11
  86/2 86/15 87/6 88/14 88/16 88/17
done [10]  5/19 14/16 17/12 37/8
  38/6 38/13 52/1 68/10 68/12 85/23
double [2]  54/7 54/8
down [37]  5/8 25/18 28/3 29/17
  31/8 32/20 33/22 34/12 35/15
  38/16 40/18 41/23 42/15 43/16
  43/24 44/14 44/21 45/9 45/11
  45/17 46/1 46/5 48/19 52/7 57/20
  58/9 63/6 63/11 65/24 68/23 70/4
  76/11 76/23 78/3 78/20 84/21
  87/24
downloading [1]  46/6
drag [1]  49/11
draw [3]  8/19 8/19 84/25
drawing [1]  61/25
drive [7]  25/4 28/11 43/4 43/21
  68/25 70/6 70/7
drives [2]  70/10 71/6
driving [2]  39/12 39/13
dropped [2]  83/23 84/1
drugs [1]  32/1
Duncan [1]  30/15
dynamic [11]  41/6 41/11 41/22
  44/20 46/9 46/15 46/17 52/2 52/3
  57/13 57/16

**E**

e-reader [4]  15/14 72/17 72/23
  72/25
each [3]  29/8 37/4 64/25
earlier [7]  44/17 48/6 55/4 57/12
  58/6 66/11 81/24
early [1]  59/1
earned [1]  22/20
easiest [1]  39/19
easily [1]  31/21
eastern [1]  29/10
easy [2]  71/18 72/24
ebook [21]  6/17 6/19 6/23 7/10
  7/16 8/4 8/18 10/21 10/25 13/5
  13/12 13/15 13/23 73/7 74/7 74/8
  74/9 75/4 75/13 75/15 76/3
ebooks [2]  8/21 72/25
edited [1]  8/14
editing [1]  56/14
effect [19]  20/24 21/18 22/22
  23/11 47/24 48/9 80/16 80/18 83/9
  83/15 83/19 83/21 83/25 84/5
  84/11 84/19 84/20 84/21 84/22
either [5]  16/24 39/17 42/22 45/7
  77/3
EKELAND [16]  2/2 2/3 3/4 4/13
  9/13 13/12 17/20 22/14 24/6 37/17
  48/11 53/8 56/14 79/21 84/16
  85/19
electronics [3]  67/18 71/10 71/12
else [7]  16/23 23/9 45/10 78/17
  80/13 84/12 88/21
email [9]  5/2 5/10 5/14 16/18
  27/8 27/9 27/18 27/19 27/25
emoji [1]  8/9
emotions [1]  55/6
encrypted [1]  72/5
encryption [3]  72/7 72/12 72/13
end [5]  24/17 35/6 49/22 88/10
  88/16
enforcement [2]  81/13 81/14
engine [1]  36/19
enough [1]  17/14
enter [2]  64/22 65/1
enthusiast [1]  67/23
enthusiasts [1]  30/3
entirely [2]  78/16 82/4

**E**

**entitled [5]** 5/2 10/1 10/1 10/2 90/5
**equivalent [1]** 59/8
**erratic [1]** 55/6
**escape [1]** 35/22
**Especially [1]** 31/23
**essentially [11]** 6/7 7/23 8/6 9/5 10/19 10/20 11/11 22/18 27/10 58/23 72/1
**establish [2]** 9/9 9/18
**establishes [1]** 5/19
**Europe [2]** 39/10 66/12
**European [3]** 29/11 64/22 64/23
**Euros [1]** 77/22
**evaluate [1]** 14/16
**even [17]** 18/11 26/10 33/9 39/15 46/7 46/14 46/15 46/17 52/21 60/1 66/14 66/25 68/2 80/1 80/5 81/8 88/16
**event [1]** 73/14
**events [3]** 21/11 68/1 68/1
**eventually [1]** 64/4
**ever [17]** 16/3 18/21 19/5 31/11 33/11 35/10 36/7 37/8 43/13 46/3 50/19 61/12 61/22 61/22 61/24 71/10 72/2
**every [5]** 18/18 36/7 36/7 43/12 51/18
**everyone [1]** 17/19
**everything [2]** 8/9 40/25
**evidence [57]** 6/14 8/13 9/5 10/7 10/9 10/20 12/6 12/8 12/8 12/25 14/8 15/5 15/21 16/12 20/3 20/7 20/21 27/4 27/5 28/4 32/10 35/16 38/18 38/20 40/19 41/24 43/17 44/14 44/22 45/18 47/4 47/15 53/15 53/16 54/1 54/13 54/15 65/17 66/1 68/9 68/17 70/9 73/2 73/21 74/13 75/8 75/18 76/12 76/24 76/25 77/4 77/8 77/10 81/18 81/21 83/4 83/5
**evidentiary [3]** 9/16 14/11 84/8
**exact [5]** 20/18 47/12 76/20 76/20 76/22
**exactly [4]** 8/25 12/1 50/5 72/13
**examination [5]** 3/4 17/23 23/18 23/18 79/10
**example [3]** 31/17 55/4 83/22
**examples [3]** 35/4 36/16 83/7
**excellent [2]** 84/20 88/8
**exception [6]** 21/14 22/15 23/17 23/25 81/1 81/8
**exchange [1]** 29/12
**exciting [1]** 67/22
**excludable [1]** 49/5
**exemption [1]** 80/20
**exhibit [64]** 5/1 6/3 12/23 14/7 14/12 14/14 20/3 20/4 20/21 21/11 25/15 25/21 27/4 28/4 32/10 35/17 37/12 38/19 40/19 40/20 40/21 41/24 41/25 42/2 42/16 42/17 42/20 43/17 43/25 44/15 44/22 44/24 45/12 45/13 45/18 47/4 47/15 52/7 53/16 53/21 53/23 53/24 54/4 54/7 54/20 65/18 69/7 70/4 70/14 70/15 73/3 73/4 74/13 74/23 75/2 75/8 75/13 75/18 75/21 75/23 76/1 76/12 76/24
**Exhibit 112 [1]** 65/18
**Exhibit 119 [1]** 53/21
**Exhibit 119B [2]** 53/24 54/4
**Exhibit 119C [1]** 38/19
**Exhibit 368 [2]** 69/7 70/4
**Exhibit 709A [1]** 35/17
**Exhibit 711A [1]** 32/10
**Exhibit 718 [1]** 20/3
**Exhibit 720 [1]** 40/19
**Exhibit 721 [6]** 6/3 12/23 14/7 14/14 73/3 73/4
**Exhibit 722 [1]** 41/24

**Exhibit 723 [1]** 42/16
**Exhibit 724 [1]** 43/17
**Exhibit 725 [1]** 43/25
**Exhibit 726 [1]** 44/15
**Exhibit 729 [2]** 44/22 44/24
**Exhibit 732 [1]** 45/12
**Exhibit 734 [1]** 76/24
**Exhibit 818B [1]** 28/4
**Exhibit 857 [1]** 27/4
**Exhibit number [1]** 37/12
**exhibits [3]** 3/6 3/7 77/6
**existence [1]** 88/6
**expensive [2]** 61/7 61/24
**experimenting [1]** 48/14
**expert [2]** 8/16 9/17
**explain [11]** 11/8 12/16 16/2 32/23 34/4 36/3 48/5 66/9 67/10 71/9 76/2
**explained [3]** 10/11 13/15 47/18
**explaining [4]** 13/7 66/11 69/14 84/2
**explains [2]** 15/13 22/21
**explanations [1]** 41/7
**extent [1]** 24/13
**extracted [1]** 6/21

**F**

**fact [11]** 7/9 7/10 22/17 48/25 49/8 79/7 81/24 82/17 82/23 83/3 87/22
**factual [1]** 85/25
**failed [1]** 33/21
**fair [4]** 10/9 20/16 47/10 85/4
**fall [1]** 67/1
**false [3]** 5/17 7/12 84/1
**falsely [1]** 78/18
**falsity [1]** 22/6
**familiar [3]** 50/24 51/10 60/16
**far [1]** 82/2
**fast [3]** 66/24 69/22 77/22
**faster [1]** 66/21
**feature [1]** 51/14
**Federal [1]** 83/5
**feel [2]** 34/25 71/13
**few [8]** 18/23 34/8 40/1 40/3 50/5 56/2 61/14 83/7
**figure [4]** 34/12 41/14 49/17 56/10
**figured [3]** 57/14 61/20 62/11
**file [29]** 13/2 32/18 34/8 40/21 40/22 40/22 40/24 40/25 41/1 42/4 42/5 42/21 42/21 43/19 43/20 43/22 44/1 44/2 44/15 44/16 44/17 44/25 45/10 45/15 45/16 45/19 45/20 45/20 80/7
**files [6]** 25/2 43/9 45/6 45/22 51/8 71/16
**final [2]** 16/24 84/16
**find [16]** 6/12 6/13 6/14 29/12 29/12 33/7 33/8 33/10 33/10 34/21 36/16 39/18 41/17 45/21 46/9 46/10
**fine [7]** 24/5 25/24 66/4 68/18 70/13 71/1 88/6
**finish [4]** 49/18 56/23 57/3 69/1
**finished [1]** 69/2
**firewall [2]** 46/16 57/15
**firewalls [1]** 51/25
**first [11]** 4/19 22/16 28/10 39/24 48/21 48/22 50/4 52/3 65/11 80/23 86/21
**Fischbach [18]** 6/13 7/13 7/18 8/1 10/21 11/23 13/9 13/11 13/13 13/15 13/20 14/1 14/9 14/18 15/24 16/5 17/5 66/3
**Fischbach's [3]** 7/15 13/14 14/13
**fit [1]** 63/23
**fits [1]** 80/20
**five [1]** 19/15
**fix [1]** 39/9
**flew [1]** 65/4
**flexible [1]** 63/21

**flight [4]** 64/4 64/6 64/8 64/10
**Floor [1]** 2/4
**fly [2]** 64/15 65/5
**focus [1]** 63/15
**Fog [6]** 78/15 78/18 79/11 80/11 84/22 87/24
**folder [4]** 43/10 43/11 43/21 43/21
**foregoing [1]** 90/4
**forensic [24]** 7/16 7/22 8/3 8/16 8/25 9/4 9/9 9/11 9/14 9/17 9/19 9/24 10/22 11/5 11/20 11/20 12/2 13/8 13/17 13/20 14/1 14/22 15/16 15/18
**forensically [3]** 7/24 11/4 14/17
**forensics [6]** 12/5 13/1 14/20 15/10 15/25 16/8
**forever [3]** 40/8 61/19 63/11
**format [1]** 57/8
**former [1]** 29/9
**forum [10]** 29/19 29/23 30/1 30/2 30/10 31/16 31/20 31/22 31/23 37/11
**forums [1]** 31/14
**forwarded [1]** 5/2
**found [11]** 11/2 11/15 18/10 19/11 34/7 36/6 48/7 61/16 61/18 66/18 73/7
**foundation [15]** 23/19 24/3 48/4 48/8 48/21 49/2 49/11 49/24 79/17 80/22 82/3 84/6 84/8 84/11 85/13
**frame [1]** 31/10
**framed [1]** 81/24
**frankly [1]** 8/22
**free [8]** 41/21 46/14 46/14 46/14 51/23 51/24 61/18 64/2
**freelance [6]** 19/2 19/3 20/14 21/8 26/19 28/19
**freelanced [1]** 19/6
**freelancer [2]** 26/11 26/21
**freelancing [1]** 19/14
**friends [1]** 18/25
**front [6]** 25/15 27/1 47/3 52/7 70/10 88/24
**frustrated [1]** 39/15
**fun [1]** 77/19
**functions [1]** 58/22
**funny [2]** 44/11 44/13
**further [1]** 45/9
**future [1]** 26/14

**G**

**game [4]** 6/23 10/9 85/4 86/4
**games [3]** 18/8 44/12 44/12
**gave [3]** 19/20 33/20 44/9
**gendered [1]** 37/18
**general [7]** 18/7 24/20 36/5 56/8 64/21 67/14 71/9
**generalities [1]** 9/13
**generally [3]** 10/8 32/15 81/12
**generated [2]** 42/6 45/22
**generates [1]** 72/15
**German [2]** 38/9 38/9
**Germany [1]** 39/10
**get [26]** 7/19 12/18 12/20 16/15 17/12 17/16 33/2 33/11 35/7 41/21 45/24 50/14 51/5 51/23 62/4 63/19 63/24 69/7 71/7 71/18 77/11 78/12 80/12 83/14 86/2 86/3
**getting [2]** 63/1 88/15
**girlfriend [1]** 77/20
**give [3]** 46/14 51/23 66/19
**given [5]** 23/6 23/9 23/14 23/23 26/16
**giving [3]** 21/6 21/16 71/16
**GMT [1]** 5/4
**go [33]** 7/2 7/13 9/5 10/22 11/15 19/1 24/9 32/1 32/19 34/12 35/8 35/21 38/17 38/19 40/12 41/2 43/24 44/14 45/2 54/18 56/19 57/9 57/15 57/20 57/22 63/11 65/3 75/11 76/1 76/11 77/24 82/12 83/1

**G**

goes [4]  9/10 13/19 27/24 51/25
going [28]  10/18 10/22 12/20 15/3
  18/3 18/6 18/7 18/9 19/18 22/23
  25/8 25/21 29/5 32/5 39/14 40/13
  40/23 41/21 55/16 60/10 63/16
  65/24 67/20 80/6 82/13 82/14
  82/15 82/22
gone [1]  61/11
good [16]  4/6 4/9 4/12 4/13 4/16
  10/5 18/2 29/11 52/16 59/24 61/18
  61/20 63/20 63/23 76/6 78/19
Google [2]  25/4 28/11
got [16]  4/24 10/20 21/1 26/14
  31/24 33/4 33/6 65/8 65/8 66/15
  67/20 71/11 72/1 76/3 76/7 79/5
government [82]  4/8 4/10 4/21
  4/25 5/17 6/3 6/15 7/8 7/14 8/8
  10/21 11/2 11/13 12/23 14/4 14/16
  15/7 15/11 15/16 15/20 15/25
  16/10 16/16 16/20 19/11 20/3 21/7
  22/1 22/10 22/18 27/4 28/4 32/10
  35/17 37/12 38/19 40/19 41/24
  42/16 43/13 43/17 43/25 44/15
  44/22 44/23 45/12 45/18 51/2
  53/21 53/23 53/24 54/3 58/15
  65/18 65/20 69/7 69/24 70/4 70/15
  73/3 73/4 76/24 78/4 78/14 78/24
  79/1 79/10 79/13 79/23 79/24 80/3
  80/21 80/25 81/4 82/10 82/10
  82/19 82/21 82/23 85/4 86/19
  86/22
government's [5]  10/6 14/20 30/14
  33/5 82/24
graphical [2]  42/13 42/14
greater [1]  11/23
ground [1]  49/1
grow [2]  34/13 63/3
growing [2]  63/2 63/9
guess [17]  8/15 8/24 11/19 21/15
  21/19 23/16 23/24 25/18 31/12
  40/17 42/13 67/15 69/7 69/20
  71/23 86/12 86/14
guide [1]  6/23
guilt [2]  6/8 8/6
gym [1]  71/6

**H**

hack [1]  52/15
had [73]  4/22 6/2 9/5 11/15 11/16
  11/16 12/3 12/3 14/1 14/4 18/13
  18/18 18/20 18/24 19/6 19/21
  19/21 20/13 22/21 24/24 25/1 25/3
  25/10 26/5 26/7 27/12 28/11 29/13
  29/14 30/6 30/17 31/22 32/8 33/1
  34/10 34/10 34/14 39/9 39/16
  50/18 51/1 51/3 51/4 57/7 57/13
  58/5 58/14 58/24 59/9 59/10 59/10
  59/11 60/2 60/3 60/9 60/10 60/19
  60/20 61/14 62/14 64/18 64/24
  65/3 66/11 68/5 71/10 71/21 72/2
  76/13 77/19 78/18 81/24 83/7
hadn't [1]  43/15
half [1]  34/20
handle [2]  16/25 66/5
handled [1]  22/20
handles [1]  24/23
handwritten [2]  39/25 55/3
hanging [1]  31/17
happen [1]  6/2
happened [12]  7/8 8/12 15/17 16/6
  16/17 31/1 31/8 48/6 65/5 65/7
  65/14 84/13
happens [1]  12/19
happy [2]  12/23 63/10
hard [8]  34/25 43/4 43/21 52/15
  63/17 68/25 70/6 70/7
has [44]  5/13 14/9 14/9 14/10
  14/16 15/19 16/1 16/12 17/2 17/4
  20/20 22/18 24/12 25/18 34/19
  36/9 36/10 42/6 42/21 47/14 54/13

58/22 61/11 61/12 67/2 75/17
  78/14 79/10 79/12 79/13 79/14
  79/17 79/19 80/21 81/21 81/22
  82/1 83/3 83/12 84/10 86/8 86/10
  86/10 87/16
hasn't [4]  11/8 11/9 15/11 47/18
hass [6]  57/21 57/22 58/1 58/4
  58/4 58/7
HASSARD [42]  2/2 4/15 6/20 7/5
  20/2 20/7 25/18 27/3 28/3 29/17
  32/9 32/19 33/24 35/15 35/20
  35/23 38/16 38/25 40/18 41/23
  42/15 43/24 44/21 45/11 45/17
  53/15 57/20 58/9 65/17 65/19
  65/23 68/9 68/23 73/2 74/12 74/25
  75/7 75/11 76/11 77/11 77/24 78/3
have [138]
haven't [6]  14/25 15/2 16/18
  38/13 49/6 87/8
having [9]  6/10 16/17 18/10 29/6
  56/8 63/3 64/20 73/24 76/18
he [86]  5/8 5/9 6/22 7/20 7/21
  7/21 10/23 10/24 11/1 11/8 11/9
  13/12 13/19 14/9 14/10 21/8 22/3
  22/12 22/20 22/21 22/23 23/6 23/9
  23/13 23/23 24/7 24/8 24/9 24/11
  25/16 27/25 28/23 28/24 30/17
  31/8 31/9 46/20 47/18 47/18 47/24
  47/24 48/13 48/16 48/17 48/17
  48/20 48/21 48/22 48/25 49/1 49/2
  49/3 49/8 55/14 55/15 55/15 55/16
  55/17 55/17 55/18 55/19 66/7 69/2
  70/23 78/20 78/21 78/22 78/22
  78/23 79/19 79/22 79/24 80/17
  81/25 82/6 82/8 82/9 86/5 86/7
  86/8 86/10 86/10 86/17 87/6 87/7
  87/10
head [1]  85/20
health [3]  56/12 62/5 63/15
heap [1]  32/18
hear [5]  30/14 70/19 85/11 85/13
  86/12
heard [6]  31/7 33/5 41/7 43/15
  51/2 74/5
hearsay [20]  20/23 21/12 21/14
  22/14 23/17 23/25 47/17 47/20
  49/5 73/19 78/11 79/16 80/16
  80/20 81/1 81/8 82/4 86/8 86/9
  87/18
heat [1]  80/13
held [3]  21/2 47/22 78/13
help [1]  46/10
helpful [2]  26/14 55/12
her [2]  37/12 37/16
here [40]  6/5 6/22 6/22 7/8 7/9
  8/17 9/11 9/15 9/17 9/25 11/21
  12/2 14/5 14/21 15/17 15/17 17/11
  21/1 22/15 22/24 25/21 32/21 34/5
  39/24 40/1 44/23 45/5 45/5 45/5
  48/19 49/9 52/6 57/11 72/9 80/7
  82/22 84/10 84/18 84/21 88/18
hidden [7]  33/3 51/10 51/12 51/16
  51/19 51/21 52/11
hide [3]  35/2 69/24 71/24
high [1]  34/19
highest [1]  61/12
highlighted [1]  76/14
highway [1]  39/13
him [23]  6/18 7/15 7/20 8/2 11/7
  21/4 21/5 21/6 21/17 23/8 23/14
  24/13 24/14 25/15 26/13 30/17
  30/22 31/5 31/9 49/3 70/22 73/15
  86/15
his [44]  7/15 7/22 8/2 10/22
  11/15 13/20 14/24 15/13 21/8
  21/11 21/19 21/23 22/2 22/13 23/7
  23/15 23/21 24/6 24/10 24/12
  25/16 30/18 31/7 31/8 47/19 48/1
  48/18 48/18 48/22 49/2 49/4 49/8
  55/15 72/17 72/17 73/15 78/21
  80/2 80/18 80/24 82/9 85/20 86/5
  86/20

history [3]  44/25 45/15 57/18
hobbyist [1]  67/14
hobbyists [1]  67/17
hold [2]  68/14 72/21
home [46]  40/5 40/11 41/11 41/13
  43/5 43/6 43/11 43/13 44/4 44/9
  45/6 45/8 46/4 46/8 47/1 48/1
  48/18 48/18 48/22 49/2 49/4 49/8
  50/2 50/7 50/13 50/15 50/16 51/7
  51/8 51/13 51/17 51/21 52/12
  52/14 52/14 55/9 56/11 57/7 57/8
  57/8 57/11 57/13 57/19 58/1 58/5
  58/7
honest [1]  14/7
honestly [2]  87/6 87/8
Honor [63]  4/6 4/9 4/13 5/10 5/15
  5/23 10/18 11/6 12/6 12/22 12/22
  13/10 13/13 13/22 13/24 14/14
  17/1 17/17 17/21 20/19 20/24
  21/10 21/25 22/9 24/15 25/12 26/2
  37/17 46/20 47/13 47/20 48/2 49/9
  50/10 52/6 52/16 52/25 53/1 53/5
  53/11 54/6 54/12 55/20 56/21 66/6
  70/12 73/11 73/19 74/14 74/21
  75/16 77/5 80/14 81/10 81/20 83/2
  84/4 85/11 85/16 85/25 86/21
  87/15 88/5
HONORABLE [1]  1/9
Hop [1]  44/19
hoping [1]  15/7
hour [4]  16/19 17/6 39/12 78/1
hours [1]  77/21
how [39]  7/22 8/7 8/7 8/8 8/12
  8/23 10/22 10/23 10/24 11/1 11/2
  11/3 16/24 26/13 27/21 27/22
  30/17 33/12 33/18 34/13 34/13
  35/6 35/6 35/7 38/2 39/5 40/14
  42/11 43/9 48/25 49/17 55/9 57/12
  64/25 67/12 72/13 73/9 76/5 86/15
however [1]  37/5
huge [3]  8/10 27/23 27/23
hundred [1]  61/14
hundreds [2]  45/23 45/25
hypothetical [5]  83/10 84/4 84/10
  84/11 87/23

**I**

I'd [4]  18/2 19/1 49/18 72/16
I'm [14]  7/17 9/21 27/2 28/19
  36/25 38/25 48/20 53/21 54/2
  55/11 60/4 64/10 81/16 83/20
ice [3]  6/24 7/9 8/9
idea [4]  33/1 33/4 48/4 48/9
ideas [4]  18/18 31/3 31/3 32/16
identification [5]  5/1 20/4 20/21
  47/15 75/17
ignore [2]  8/9 41/15
ignorelist [1]  41/15
ignorelist.com [5]  41/3 41/5 41/6
  41/9 44/4
illicit [3]  66/23 66/24 69/23
image [4]  8/9 11/15 13/2 13/12
images [1]  12/18
impact [1]  14/11
implied [1]  22/18
important [3]  40/3 59/5 68/8
inadmissible [2]  21/12 47/20
incarcerated [1]  5/7
incarceration [1]  5/22
include [1]  26/24
included [1]  77/7
including [3]  26/23 31/3 64/1
income [1]  63/13
indicated [1]  16/11
indifferent [1]  85/9
individual [2]  13/2 27/16
individually [1]  13/3
infer [1]  84/7
inferring [1]  55/17
inform [1]  17/7
information [7]  23/7 23/14 23/24
  26/14 34/25 51/6 81/6

**I**

informed [2]  6/16 49/3
innocent [3]  14/22 31/25 32/3
install [2]  60/13 60/15
installed [1]  40/8
instance [1]  45/24
instead [3]  12/2 41/16 72/1
instruction [1]  28/18
instructions [3]  17/11 17/13 28/16
integrity [1]  15/4
intention [2]  63/15 70/1
intentional [1]  12/24
interest [3]  21/22 30/3 35/10
interested [3]  5/15 18/12 35/9
interesting [4]  18/11 34/8 36/6 76/7
interests [2]  18/10 18/24
internet [23]  18/24 33/3 34/25 39/9 39/11 39/12 39/13 39/14 39/16 39/18 40/12 40/13 56/8 64/4 66/12 66/15 66/21 66/25 67/20 68/2 68/6 69/22 82/12
investing [1]  34/16
involved [1]  82/21
involving [1]  21/5
IP [9]  33/7 41/12 41/13 41/16 41/18 41/22 46/10 50/14 57/13
IPs [1]  41/11
is [531]
is .onion [1]  51/18
isn't [4]  20/7 23/10 47/20 83/6
isolated [1]  11/15
issue [12]  5/15 6/1 12/12 12/14 14/21 16/25 17/1 22/6 22/8 23/13 80/9 85/24
issued [12]  78/4 78/24 79/23 80/4 80/6 80/25 82/11 82/19 82/23 85/22 86/19 86/22
issues [2]  4/17 79/4
it [366]
item [2]  61/24 83/4
items [5]  58/15 61/7 65/15 65/20 65/25
its [4]  15/25 80/3 83/18 87/13
itself [2]  21/12 85/9

**J**

jail [1]  5/16
Java [9]  37/1 37/2 37/5 37/7 37/9 37/15 37/22 38/12 38/13
JavaScript [8]  36/19 36/21 36/22 36/23 36/24 37/2 37/4 37/5
jazzing [1]  9/24
Jeff [1]  4/10
JEFFREY [1]  1/18
job [1]  28/19
John [2]  5/2 5/5
joining [1]  4/15
JUDGE [1]  1/10
judicial [4]  79/2 80/8 82/15 82/23
jump [1]  20/9
jumped [3]  83/24 84/3 84/6
jurors' [1]  41/8
jury [44]  1/9 8/2 8/18 8/19 9/23 10/1 10/2 11/18 12/4 12/20 14/15 15/14 16/13 17/4 17/11 17/16 17/18 25/20 29/25 32/13 32/24 36/3 52/23 53/4 53/7 56/16 58/18 60/18 60/24 61/5 66/9 67/10 69/18 70/11 70/24 72/21 75/22 76/2 77/13 78/7 84/7 85/7 88/19 88/24
jury's [2]  10/8 15/19
just [167]
JUSTICE [6]  1/13 1/20 80/25 81/5 81/7 85/22

**K**

keep [3]  13/21 25/5 34/13
keeps [1]  63/9

**kept** [1]  12/16
key [1]  71/6
Killdozer [2]  30/8 31/11
kind [9]  8/14 19/13 19/24 24/21 31/15 31/25 43/9 45/22 55/7
kindle [6]  6/17 72/17 73/7 74/9 75/4 76/3
knew [3]  63/16 74/5 78/17
know [80]  6/8 7/3 9/12 10/23 12/1 13/4 13/25 15/8 16/2 17/4 21/12 21/15 21/17 21/18 22/19 25/9 25/20 27/1 30/4 31/2 31/21 31/22 31/22 32/5 33/13 33/14 35/1 36/7 36/21 36/24 38/12 38/12 43/13 43/15 46/6 47/25 48/5 48/14 48/17 48/20 49/6 49/10 49/15 49/20 52/13 52/13 52/14 56/13 59/5 60/22 61/7 65/1 67/1 67/23 68/3 70/19 71/12 71/13 71/17 74/3 74/4 74/6 74/6 74/19 80/6 80/7 80/13 81/3 81/6 81/7 81/8 82/16 84/11 84/12 85/1 85/2 87/1 87/5 87/6 87/9
knowingly [1]  13/5
knowledge [17]  8/21 28/22 33/18 46/3 48/25 49/1 78/11 78/20 78/21 79/14 79/15 79/18 79/20 80/2 80/10 80/24 87/16
knows [1]  70/15
Kraken [2]  62/14 63/5

**L**

lack [1]  28/22
laid [1]  23/19
language [4]  28/17 36/22 36/25 38/10
languages [12]  37/3 37/13 37/16 37/25 38/2 38/3 38/4 38/5 38/7 38/7 38/11 38/12
large [2]  32/18 34/11
last [6]  17/11 33/22 43/20 64/24 69/13 78/15
late [2]  17/11 24/3
Latvia [1]  35/11
launch [1]  40/14
laundering [4]  6/11 8/7 73/24 76/19
law [3]  2/3 81/13 81/14
laws [1]  32/5
LAX [5]  65/6 65/7 65/21 68/24 70/5
lay [4]  24/2 48/21 49/10 85/12
laying [1]  49/24
leading [2]  50/8 73/14
leap [1]  8/10
learn [2]  34/13 62/5
learned [1]  86/9
least [3]  21/19 21/23 26/8
leave [5]  10/18 33/24 49/14 70/25 75/6
left [5]  7/9 7/9 19/18 65/8 65/9
legal [4]  34/21 35/1 35/3 35/6
less [1]  62/20
lessons [1]  64/2
let [6]  25/9 49/10 49/20 74/6 86/17 88/1
let's [7]  12/19 47/21 52/18 52/19 54/8 82/16 88/14
level [1]  67/14
liable [1]  62/21
license [4]  62/24 63/2 63/20 63/25
light [2]  16/7 57/10
lights [1]  57/8
like [125]
liken [1]  38/1
LINDSAY [3]  2/6 90/3 90/12
line [6]  13/23 35/21 50/24 55/7 56/9 83/4
lines [11]  5/8 7/1 39/4 46/3 46/4 47/25 50/1 50/12 50/19 52/2 55/12
linked [1]  58/4

**links** [1]  32/16
Linux [13]  42/12 42/12 42/25 42/25 43/3 43/10 43/12 44/7 44/25 45/21 45/21 45/22 45/24
list [4]  20/5 40/16 65/20 84/13
listed [2]  29/5 38/3
listened [1]  29/21
listener [16]  20/24 21/18 22/22 23/12 47/24 48/10 80/17 83/9 83/16 83/21 83/25 84/5 84/10 84/12 84/20 84/22
lists [2]  32/16 81/11
little [12]  6/1 32/20 36/12 38/24 42/13 42/24 61/21 71/7 71/11 75/1 75/11 76/8
live [1]  67/25
living [2]  62/7 62/20
located [1]  43/10
location [1]  69/24
log [6]  19/12 19/20 19/23 21/7 26/16 43/2
log-in [2]  19/20 26/16
logic [1]  8/10
long [3]  63/14 63/15 64/1
look [18]  5/4 6/8 6/19 7/2 15/8 16/9 19/13 19/19 22/4 25/23 27/8 32/23 47/3 48/19 54/11 67/4 82/13 82/24
looked [11]  8/17 52/4 57/12 61/16 61/19 66/2 69/9 69/17 69/19 69/21 76/8
looking [17]  15/5 34/15 34/16 34/16 34/17 44/23 54/18 55/7 57/21 62/6 62/10 62/22 62/24 63/1 66/18 67/3 76/4
looks [13]  9/22 10/4 15/19 24/11 29/5 42/4 42/6 43/22 44/2 44/16 45/20 66/25 67/1
loss [4]  8/15 11/12 11/19 12/17
lost [2]  69/15 71/18
lot [30]  18/9 18/11 18/12 18/18 19/18 29/8 29/9 31/3 33/17 34/17 34/23 38/11 39/10 42/24 42/25 44/12 45/3 59/8 61/15 62/12 62/12 62/19 64/3 64/3 64/21 66/11 67/24 68/4 71/14 71/15
LTE [1]  66/2
luggage [1]  65/12
lunch [5]  49/16 88/13 88/14 88/18 89/2
Lund [2]  5/2 5/5
luxury [1]  61/6

**M**

made [8]  10/17 14/22 16/10 17/4 21/21 33/19 78/14 79/10
Magazine [2]  87/13 88/3
magical [1]  63/3
magically [3]  6/10 73/23 76/18
main [2]  59/15 60/2
make [20]  8/10 10/2 10/16 11/5 11/25 12/1 13/5 14/10 15/15 15/15 17/13 23/21 24/10 33/14 34/13 40/11 56/14 63/17 63/20 84/20
makes [1]  85/2
making [7]  5/17 7/25 9/4 9/9 15/11 23/10 79/9
Malta [2]  35/13 35/14
manufacture [1]  11/17
manufactured [3]  8/13 9/5 11/13
manufacturer [2]  67/12 68/21
manufacturing [3]  12/25 14/8 21/22
many [8]  24/24 27/1 33/1 40/2 56/13 66/13 68/7 71/3
March [3]  1/5 5/3 90/10
March 2024 [1]  5/3
mark [1]  20/4
marked [5]  4/25 20/3 20/20 47/14 75/17
market [4]  81/10 83/23 84/1 84/2
marketplace [1]  81/2

**M**

marking [1]  20/5
matter [7]  23/4 23/5 23/23 80/1 83/8 87/22 90/5
may [26]  6/5 12/6 12/12 13/7 14/5 17/3 17/20 25/21 26/2 26/3 33/25 48/3 48/5 48/16 49/1 53/8 53/11 53/12 54/6 55/17 66/5 66/7 75/22 84/12 87/7 88/20
May 2020 [2]  48/5 48/16
maybe [22]  7/1 9/25 13/23 15/12 19/17 23/4 23/7 28/14 28/14 28/18 31/2 31/9 34/13 48/7 56/13 61/16 68/3 70/14 72/8 80/7 85/2 86/18
Mazarin [1]  6/6
Mazars [4]  6/6 7/3 7/11 76/21
Mazars' [2]  9/11 73/6
me [75]  4/10 4/15 5/20 8/19 9/12 9/14 9/22 10/4 10/11 10/14 10/17 11/8 11/21 12/16 13/7 14/3 18/11 19/19 19/20 21/3 23/22 25/6 25/11 27/1 28/10 28/15 29/5 31/19 31/25 32/1 34/6 34/9 34/11 34/22 38/1 40/10 44/4 45/4 45/5 45/20 46/6 46/10 49/10 49/15 49/20 55/5 56/9 57/7 59/6 61/15 63/14 63/16 63/21 63/23 65/2 65/10 65/10 65/11 65/13 67/19 67/22 68/8 70/10 70/13 71/16 72/2 72/7 76/7 83/11 83/13 85/15 86/12 86/17 87/2 88/1
mean [12]  12/18 15/12 22/16 31/17 36/9 37/25 43/1 48/18 61/13 66/23 71/23 80/15
means [2]  40/15 41/12
meant [5]  27/25 55/15 55/17 55/19 55/22
media [4]  43/8 43/9 43/10 88/6
meetup [2]  36/7 36/8
meetups [8]  18/3 18/6 18/7 18/9 18/10 18/16 18/21 18/23
members [2]  25/20 30/10
memory [10]  22/4 22/13 71/5 71/14 71/16 71/17 71/21 71/24 72/2 72/8
mental [3]  56/12 62/5 63/15
mention [2]  35/4 56/20
mentioned [8]  14/19 20/12 29/9 37/15 38/14 55/4 58/12 67/9
mentioning [1]  35/5
mentions [2]  35/12 57/17
Mercedes [4]  77/14 77/16 77/18 77/25
merely [3]  16/21 47/23 78/23
message [9]  6/23 8/5 8/11 8/24 9/7 14/17 30/11 31/2 31/9
messages [6]  7/24 9/7 30/18 30/22 30/24 76/21
met [1]  18/24
MICHAEL [2]  2/2 4/15
middle [3]  39/14 57/1 68/6
midst [1]  49/17
might [15]  13/8 15/12 16/4 27/14 27/17 33/4 46/18 54/8 56/2 63/11 63/11 63/12 72/6 83/24 87/24
mind [3]  10/8 36/9 87/20
minimize [2]  27/18 35/1
minutes [3]  27/21 39/15 52/19
Miracles [1]  45/7
mischaracterizes [1]  69/11
misrepresented [1]  15/21
missing [2]  9/25 13/24
mistake [4]  11/5 14/7 14/22 16/11
mistaken [4]  8/4 22/2 38/5 64/14
mistranslations [1]  40/1
mixed [1]  55/5
mixer [2]  27/23 31/6
mobile [1]  66/2
modem [2]  66/25 69/20
modify [1]  88/1
molehill [1]  85/3
money [23]  6/10 8/7 22/20 29/3 32/3 32/4 32/6 34/11 34/13 34/17

34/20 59/8 59/9 60/20 61/15 63/8 63/16 63/18 63/20 66/17 68/4 73/24 76/18
moniker [1]  30/7
months [3]  19/15 62/20 62/21
Moon [2]  35/13 62/4
more [18]  6/1 10/8 18/11 18/15 19/14 31/15 31/15 34/20 40/13 42/13 42/13 49/7 59/25 60/1 62/17 63/7 63/13 63/15
morning [9]  1/7 4/6 4/9 4/12 4/13 4/16 4/18 18/2 52/18
Moscow [1]  65/4
MOSS [1]  1/9
most [5]  46/7 55/24 59/15 61/24 72/8
mostly [1]  67/25
mountain [1]  85/2
mounting [1]  43/4
move [6]  24/3 25/25 43/16 55/11 82/14 84/2
moved [1]  62/15
moves [1]  75/17
movies [1]  46/6
moving [4]  29/7 62/10 62/16 68/17
Mr [7]  3/4 9/13 28/3 68/20 78/25 82/5 82/6
Mr Sterlingov [1]  68/20
Mr. [136]
Mr. Brown [9]  12/21 16/11 16/23 47/16 54/5 54/10 79/6 83/1 83/20
Mr. Ekeland [11]  13/12 17/20 22/14 24/6 37/17 48/11 53/8 56/24 79/21 84/16 85/19
Mr. Fischbach [18]  6/13 7/13 7/18 8/1 10/21 11/23 13/9 13/11 13/13 13/15 13/20 14/1 14/9 14/18 15/24 16/5 17/5 66/3
Mr. Fischbach's [3]  7/15 13/14 14/13
Mr. Hassard [39]  6/20 7/5 20/2 20/7 25/18 27/3 29/17 32/9 32/19 33/24 35/15 35/20 35/23 38/16 38/25 40/18 41/23 42/15 43/24 44/21 45/11 45/17 53/15 57/20 58/9 65/17 65/19 65/23 68/9 68/23 73/2 74/12 74/25 75/7 75/11 76/11 77/11 77/24 78/3
Mr. Michael [1]  4/15
Mr. Sterlingov [38]  5/16 6/25 7/4 8/5 8/6 8/11 9/8 10/5 12/12 15/13 17/25 20/11 22/19 23/2 24/20 25/7 26/5 27/8 28/5 29/18 32/21 40/20 41/25 46/24 48/13 50/1 54/20 55/14 55/22 66/9 68/24 70/5 71/3 72/21 73/17 76/2 76/15 78/16
Mr. Sterlingov's [16]  5/22 6/7 6/15 6/17 7/4 7/12 9/20 12/7 14/24 16/15 17/3 70/10 82/20 85/23 86/19 86/23
Mr. Townsend's [1]  30/21
Ms. [7]  6/6 7/3 7/11 9/11 20/5 73/6 76/21
Ms. Mazars [4]  6/6 7/3 7/11 76/21
Ms. Mazars' [2]  9/11 73/6
Ms. Walker [1]  20/5
much [9]  29/16 34/21 44/18 52/1 59/22 64/25 67/4 67/6 87/4
multiple [2]  21/13 77/6
music [1]  46/7
must [1]  13/2
my [112]
Mycelium [13]  58/10 58/13 58/14 58/18 58/20 58/25 59/7 59/11 59/20 60/8 60/21 62/14 63/4
myself [1]  64/19

**N**

N.W [1]  1/16
name [12]  4/5 41/21 42/7 44/6 44/9 44/11 44/13 51/23 70/2 70/3

70/3 81/7
names [2]  24/23 43/11
necessarily [3]  11/5 80/1 81/18
necessary [3]  9/1 10/16 13/8
need [20]  9/17 10/15 11/7 15/16 15/24 16/4 21/15 23/20 23/24 34/15 35/7 35/7 35/8 43/2 43/3 49/2 56/10 56/10 69/3 72/15
needed [3]  25/6 31/19 41/14
needs [1]  10/14
network [8]  50/2 50/7 50/13 50/16 51/13 51/17 51/22 52/12
never [15]  10/10 31/4 31/5 32/2 33/16 33/19 34/14 38/6 40/3 51/1 51/4 70/7 71/21 74/5 77/7
new [2]  1/20 41/15
news [5]  68/4 78/17 81/19 81/20 83/22
newspaper [1]  83/16
next [3]  1/23 59/18 60/4
nice [2]  67/4 88/18
night [1]  17/11
no [42]  1/4 5/23 7/23 8/3 9/19 10/21 14/7 14/11 15/17 15/17 15/17 15/18 16/6 16/12 17/1 21/13 21/25 22/19 27/14 29/21 37/2 37/8 48/4 48/8 51/1 51/5 53/1 70/7 75/20 76/10 77/17 79/19 80/16 80/18 80/21 82/1 82/2 83/3 84/18 86/24 87/12 87/15
nobody [2]  13/4 32/4
nodding [3]  77/9 85/19 88/25
nonresponsive [1]  56/21
Nos [1]  75/23
not [147]
note [1]  16/16
notes [4]  39/25 55/3 55/4 56/19
nothing [5]  37/3 45/10 52/25 66/23 66/23
notice [7]  69/21 79/2 80/7 80/8 81/17 82/16 82/23
notified [2]  16/17 16/21
now [33]  6/12 6/24 14/19 16/7 19/1 20/6 24/3 26/5 27/3 40/18 46/19 47/4 49/16 52/18 55/17 56/5 56/19 61/16 61/25 63/6 71/4 72/16 74/4 74/6 76/23 82/13 83/11 83/12 85/8 85/9 85/15 86/13 88/14
nowadays [2]  59/23 59/24
number [9]  12/23 34/6 37/12 66/1 70/9 70/15 78/6 78/6 79/7
numeral [1]  40/7
NW [3]  1/14 1/20 2/8
NY [1]  2/4

**O**

object [2]  78/10 87/17
objected [1]  7/14
objection [24]  6/4 7/15 8/23 10/21 13/11 13/22 14/1 20/22 20/23 24/18 25/12 27/24 28/22 37/17 46/20 47/17 49/23 50/8 69/11 73/11 73/19 75/19 75/20 78/6
obtained [2]  48/25 49/1
obviously [7]  7/12 10/5 16/6 49/6 73/13 80/19 81/13
occupations [1]  81/13
off [8]  10/12 39/14 63/4 67/1 80/15 83/24 84/3 84/6
offer [3]  12/10 20/20 47/14
offered [6]  10/14 16/1 47/23 80/1 80/2 87/21
offering [7]  12/11 22/25 23/1 23/3 23/22 48/24 80/23
official [7]  2/7 79/23 80/3 80/4 80/21 90/3 90/13
Oh [2]  53/23 77/4
okay [19]  5/25 16/23 24/5 24/16 48/23 49/21 52/18 53/6 53/10 54/16 57/3 61/16 70/11 70/18 72/19 77/10 84/16 88/4 88/7

**O**

old [2] 11/25 28/12
older [2] 11/24 11/25
Omedetou [2] 37/18 37/21
Omedetou's [1] 37/11
once [1] 78/17
one [45] 4/19 13/18 15/18 15/21 16/12 19/6 24/25 25/1 26/8 27/11 29/3 29/7 32/17 33/6 33/15 34/6 36/15 37/15 38/10 39/17 44/19 46/5 50/22 57/17 58/15 60/2 60/8 60/9 60/9 65/10 67/6 67/18 67/21 69/14 70/21 71/13 71/22 72/9 72/11 72/23 77/22 81/15 83/7 84/14 85/25
ones [3] 26/19 40/3 81/9
onion [7] 50/25 51/1 51/3 51/3 51/4 51/4 51/24
online [2] 25/4 83/16
only [12] 10/6 15/16 15/24 16/10 22/5 24/9 30/2 35/6 61/10 61/22 71/13 84/24
open [2] 51/6 58/7
operating [2] 40/9 78/18
operation [1] 81/14
operator [3] 33/12 80/12 87/24
opportunity [1] 34/14
opposite [2] 43/20 43/23
order [2] 39/9 40/11
ordinary [1] 32/3
original [1] 28/16
other [27] 13/10 18/13 18/18 20/1 21/6 23/9 29/8 30/10 31/21 31/22 35/12 37/4 38/25 39/3 41/7 58/2 58/21 58/22 61/6 66/13 81/2 81/9 81/11 81/15 81/17 86/7 87/17
otherwise [2] 49/5 86/9
our [6] 11/6 14/6 17/2 22/24 49/13 52/18
out [42] 7/9 7/10 11/2 12/4 12/16 13/3 13/5 13/21 14/3 14/18 14/25 15/18 17/7 27/10 27/12 27/14 27/15 31/17 34/12 41/14 45/4 49/17 52/23 56/10 57/14 62/11 62/15 62/16 64/2 70/8 71/24 76/13 79/13 79/15 79/18 80/12 81/16 83/9 83/14 84/25 85/2 88/19
outlet [1] 68/4
outside [3] 8/1 13/3 86/8
over [7] 6/4 18/21 18/25 36/9 45/4 71/14 72/18
Overruled [1] 73/20
own [5] 14/20 26/6 26/7 67/18 82/24
owned [1] 70/7
owner [2] 5/6 26/13
owners [1] 18/14

**P**

p.m [3] 5/3 88/19 89/4
page [23] 1/23 6/19 6/20 7/2 7/9 8/9 11/16 12/8 13/15 20/9 20/9 25/3 32/19 35/21 36/14 38/19 51/6 54/18 56/19 57/2 57/20 75/9 75/12
paid [1] 46/11
panel [1] 24/22
paragraph [5] 25/8 32/21 33/23 35/25 36/18
part [6] 11/1 11/17 15/18 26/16 45/25 79/3
participated [1] 87/11
particular [11] 8/24 13/23 21/5 27/16 35/11 79/17 81/12 83/4 84/14 84/19 84/21
parties [2] 16/19 21/13
pass [1] 88/12
password [7] 22/24 22/25 59/3 59/4 59/10 59/11 59/18
passwords [4] 19/24 20/1 21/6 23/24
past [2] 52/19 71/10

paste [1] 42/24
pasted [2] 28/14 45/2
pause [2] 52/6 83/6
pay [6] 34/21 46/11 61/23 62/12 62/15 68/4
payment [3] 26/24 29/7 29/12
pays [1] 34/20
PC [1] 41/2
Pearl [1] 38/14
PEARLMAN [2] 1/18 4/11
PELKER [2] 1/13 4/11
Pennsylvania [1] 1/14
penny [1] 84/2
people [29] 18/6 18/9 18/11 18/14 18/16 18/21 18/23 18/24 19/16 19/18 21/4 30/3 31/4 31/9 31/16 31/18 31/22 33/14 36/8 38/12 56/13 64/25 65/1 67/17 67/24 67/25 71/15 76/6 83/9
people's [4] 20/1 23/9 23/23 31/21
percent [1] 44/2
perfect [4] 39/1 80/11 83/11 83/13
perfectly [1] 22/3
perhaps [2] 16/14 16/17
period [4] 45/4 63/17 78/2 78/2
periods [1] 68/3
permissible [1] 86/3
person [7] 18/18 34/20 38/1 83/10 83/25 84/3 84/6
personal [5] 28/22 78/11 79/18 79/19 87/16
personally [1] 63/21
persons [1] 81/12
perspective [2] 10/6 15/19
phone [16] 11/15 39/11 39/12 58/14 58/20 59/10 59/11 59/22 59/23 59/24 60/1 60/12 60/15 71/7 78/12 86/3
phones [4] 60/2 60/3 60/8 60/9
photography [1] 71/15
photos [4] 6/10 73/24 76/18 78/1
PHP [1] 38/4
phrase [1] 51/10
physically [1] 69/18
Pi [6] 45/23 45/24 67/9 67/10 67/14 69/14
pick [2] 21/1 47/21
pickup [1] 7/1
picture [5] 73/23 74/7 74/7 76/17 76/22
pictures [3] 56/14 75/14 75/15
piece [4] 15/21 39/8 67/22 71/7
pieces [1] 71/9
pilot's [4] 62/24 63/1 63/19 63/24
pin [1] 59/10
Pis [4] 67/2 67/13 67/13 67/19
place [1] 13/18
places [1] 39/11
Plaintiff [2] 1/4 1/13
planning [1] 64/8
plastic [1] 71/10
play [2] 44/11 44/12
please [6] 4/4 7/5 48/3 52/7 52/20 88/16
PLLC [1] 2/3
podcast [1] 68/6
podcasts [3] 56/12 68/5 68/5
podium [1] 4/4
point [33] 5/24 9/15 10/16 12/1 13/10 14/6 15/10 16/12 16/13 16/24 17/4 20/19 23/6 23/10 26/8 32/25 33/1 34/12 35/9 41/21 47/13 50/6 50/18 52/17 52/17 63/12 65/12 69/25 75/16 79/9 79/12 84/20 84/25
pointed [2] 14/3 23/25
points [1] 15/15
popular [1] 67/17
portion [2] 55/8 76/13

position [2] 5/13 17/2
possibility [1] 31/12
possible [3] 7/6 33/4 34/22
post [1] 38/2
posting [2] 83/17 83/17
posts [1] 37/11
pouch [5] 71/11 71/11 71/19 71/20 72/3
power [2] 14/24 15/6
powerful [1] 67/16
practical [1] 59/25
practice [3] 79/1 82/9 82/21
prep [1] 48/8
presence [1] 8/1
present [3] 4/14 17/2 25/16
presented [2] 14/12 74/8
presenting [1] 11/18
press [36] 78/4 78/21 78/24 79/3 79/4 79/7 79/14 79/18 80/4 80/17 80/19 81/1 81/14 81/18 82/2 82/3 82/7 82/11 82/16 82/19 82/24 84/13 84/14 85/9 85/17 85/22 86/1 86/5 86/7 86/19 86/20 86/22 86/25 87/2 87/13 87/19
pretty [1] 44/18
previous [1] 29/21
previously [3] 17/22 70/11 77/8
price [5] 61/11 61/13 61/13 61/14 63/11
primary [2] 59/20 59/21
prior [6] 21/20 21/24 22/5 22/17 23/20 73/12
privacy [2] 52/11 52/14
private [3] 30/11 30/18 30/22
probably [11] 40/22 42/5 42/22 42/23 45/1 45/2 45/4 49/16 50/5 55/9 64/24
problem [5] 11/21 14/5 41/11 41/16 67/24
problematic [1] 49/7
problems [7] 39/9 39/15 39/18 56/8 66/12 66/19 67/20
proceed [2] 26/2 53/11
proceedings [3] 1/7 49/11 90/5
process [1] 11/18
produced [2] 21/7 81/19
product [1] 12/25
professors [1] 18/13
proffer [4] 7/25 9/3 9/9 11/6
proficient [3] 36/23 37/7 37/22
programming [10] 18/8 36/22 36/25 37/3 37/13 37/16 37/24 38/2 38/3 38/7
project [13] 22/11 25/6 26/10 26/11 26/11 26/12 26/15 31/6 32/7 37/8 38/13 38/13 46/13
projects [9] 18/17 18/19 18/20 19/6 24/24 26/19 27/2 31/18 38/6
proposed [1] 17/13
proposes [1] 80/14
prosecution [1] 85/6
protect [2] 52/11 60/1
protected [4] 59/3 59/4 59/18 59/25
provider [1] 41/6
public [5] 33/14 81/2 81/4 81/12 81/17
public's [1] 80/10
publication [2] 85/5 87/23
publish [2] 74/14 77/13
published [6] 8/4 68/16 74/19 74/22 75/22 77/8
publishing [4] 74/18 74/20 78/7 85/8
pull [2] 6/20 84/13
purchase [1] 69/9
purchased [1] 69/20
purpose [3] 69/23 72/1 80/16
purposes [1] 14/8
put [29] 4/20 5/12 6/4 13/18 16/5 20/2 27/3 28/3 32/9 32/17 34/8 35/16 38/18 40/19 41/23 42/15

**P**

**put...** [13]  44/22 45/12 45/17 49/13 53/15 65/17 66/20 68/9 71/17 71/19 73/2 75/7 82/16
**puts** [2]  16/16 24/11
**putting** [2]  16/20 71/12
**Putty** [6]  42/6 42/7 42/8 42/10 42/11 42/13
**Python** [1]  38/14

**Q**

**qualms** [1]  32/8
**quarantine** [1]  64/19
**question** [26]  5/5 10/7 10/8 16/10 30/20 32/7 49/4 56/22 59/17 59/18 60/5 60/23 69/3 69/4 69/5 69/13 69/15 78/10 80/5 80/18 81/17 83/21 84/24 85/25 87/4 87/20
**questioning** [2]  13/23 55/12
**questions** [5]  5/21 26/10 55/13 65/24 73/13
**quick** [1]  54/11
**quickly** [2]  49/12 72/11
**quite** [3]  17/12 34/11 38/11
**quotations** [1]  81/11
**quote** [6]  6/21 34/7 34/22 35/9 35/11 37/23
**quotes** [2]  32/16 34/23

**R**

**raise** [2]  4/17 84/20
**raised** [1]  8/23
**raising** [1]  5/15
**ran** [2]  13/17 87/13
**RANDOLPH** [1]  1/9
**Raspberry** [10]  45/23 45/24 67/2 67/9 67/10 67/13 67/13 67/14 67/18 69/14
**rather** [4]  9/1 28/8 69/20 85/2
**reach** [2]  85/14 85/16
**read** [30]  20/17 24/11 24/14 25/8 33/4 34/1 36/1 37/10 38/9 39/2 46/12 46/18 46/25 47/24 48/5 48/13 49/6 56/1 56/5 57/24 58/5 72/24 72/25 73/17 76/15 78/17 79/22 80/15 82/3 86/10
**reader** [6]  14/24 15/14 72/17 72/23 72/25 73/7
**reading** [4]  25/7 55/17 55/18 73/22
**ready** [4]  17/16 17/25 53/4 53/9
**real** [3]  38/7 49/12 67/24
**realize** [4]  33/15 63/10 69/2 74/17
**really** [20]  10/11 22/21 31/6 39/11 39/15 46/7 50/15 50/16 52/4 55/6 61/20 64/1 64/19 65/2 67/16 67/17 71/17 72/3 77/22 82/1
**reason** [15]  12/13 13/19 14/11 15/4 15/16 15/24 17/5 19/12 19/25 25/22 27/19 27/20 28/15 41/18 66/25
**reasonably** [1]  82/18
**reasons** [3]  16/11 60/2 67/21
**rebuttal** [5]  15/25 16/16 16/18 16/20 17/8
**recall** [42]  6/5 7/20 8/1 11/7 11/22 17/5 18/3 19/2 19/8 19/9 24/9 26/5 26/7 26/8 26/25 29/18 29/23 30/17 30/21 32/10 34/1 35/25 37/10 37/15 37/21 39/1 40/20 50/4 54/20 54/21 55/22 55/24 58/10 61/3 73/3 73/6 73/9 76/25 77/2 81/17 82/7 82/8
**recalls** [1]  24/8
**receive** [1]  30/19
**received** [3]  31/5 31/5 72/14
**recent** [1]  67/8
**Recess** [2]  53/3 89/4
**recognize** [17]  20/11 28/5 28/8 28/9 28/23 40/21 40/21 41/25 42/1

**42/17** 44/15 45/13 47/5 68/20 75/2 75/12 75/14
**recollection** [18]  21/11 22/1 23/21 24/7 24/7 24/10 24/12 25/9 25/14 25/16 25/23 25/24 25/25 27/25 41/8 55/15 55/19 73/15
**recommended** [1]  76/5
**record** [16]  4/5 4/21 5/12 5/24 8/2 15/23 24/11 24/14 34/1 37/10 37/18 70/15 70/16 80/21 82/17 90/5
**redacted** [4]  35/19 54/6 54/8 54/13
**reference** [4]  57/1 57/21 81/22 81/23
**referenced** [1]  47/19
**referencing** [1]  47/7
**refers** [2]  40/10 81/10
**reflecting** [1]  21/8
**refresh** [6]  23/21 24/4 24/6 24/10 25/22 41/8
**refreshed** [1]  24/12
**refreshes** [2]  25/9 25/24
**refreshing** [1]  25/14
**refutes** [1]  10/6
**regarding** [1]  20/13
**regards** [1]  7/13
**registrant** [3]  5/8 5/9 5/14
**registrar** [1]  4/22
**regular** [3]  36/13 80/4 82/21
**regularly** [1]  79/4
**regulated** [3]  36/11 36/12 36/13
**regulation** [5]  36/5 36/8 36/15 64/20 65/2
**regulators** [1]  35/22
**reinstall** [3]  39/20 40/10 40/17
**reinstalled** [1]  40/9
**related** [6]  8/24 18/7 30/3 31/10 56/8 85/18
**relating** [1]  86/23
**relation** [9]  4/21 4/24 6/3 6/14 7/15 16/19 22/17 79/11 82/20
**relatively** [1]  34/7
**release** [27]  78/5 78/22 78/24 79/3 79/8 79/15 79/18 80/5 80/17 80/19 81/1 81/14 81/18 81/22 82/2 82/3 82/7 82/11 82/16 82/24 85/9 85/17 85/23 86/1 86/19 86/23 87/13
**released** [1]  85/17
**releases** [4]  79/5 82/20 84/13 84/15
**relevance** [2]  78/10 80/9
**relevant** [8]  16/8 23/5 78/14 78/16 79/8 79/19 80/10 83/22
**reliable** [1]  81/6
**relied** [1]  81/12
**rely** [1]  81/3
**remaining** [1]  34/9
**remember** [19]  16/1 19/10 19/14 19/19 25/1 26/23 29/6 29/16 30/24 30/25 31/1 33/2 34/24 37/23 56/2 56/4 64/13 67/6 72/12
**remind** [7]  29/25 32/13 52/20 56/16 58/18 61/5 88/15
**reminds** [1]  25/11
**remote** [4]  41/1 43/21 44/7 56/18
**rental** [1]  78/2
**rented** [2]  77/21 77/22
**repeat** [1]  30/20
**reporter** [5]  2/6 2/7 70/19 90/3 90/13
**representation** [2]  20/16 20/18
**represented** [3]  7/3 7/4 13/16
**reputation** [2]  31/14 31/15
**request** [1]  32/3
**required** [1]  25/3
**requires** [1]  8/16
**resale** [2]  61/19 61/20
**research** [2]  52/21 88/17
**researched** [1]  63/19
**researching** [4]  34/24 34/24 62/11

64/1
**respect** [6]  5/21 8/21 21/19 22/3 22/9 85/6
**respond** [2]  12/22 60/22
**response** [1]  16/24
**result** [2]  33/20 87/24
**revelation** [1]  13/14
**review** [2]  13/20 17/14
**reviewed** [1]  13/3
**revisit** [1]  12/14
**right** [35]  7/7 9/22 9/23 15/12 19/24 20/6 25/8 25/17 31/8 32/20 33/14 33/24 35/23 38/24 39/1 46/19 47/3 47/21 52/24 53/2 53/8 54/10 54/19 71/4 73/22 74/9 75/19 82/13 85/1 85/19 87/11 88/11 88/13 88/21 89/2
**risks** [1]  27/18
**robbing** [1]  27/18
**robust** [1]  63/13
**ROMAN** [6]  1/6 3/3 4/3 4/14 17/22 40/7
**room** [3]  2/8 65/11 65/13
**router** [6]  46/16 52/4 57/15 66/2 69/17 69/20
**routers** [1]  52/1
**RPR** [1]  90/12
**rule** [4]  16/19 17/6 23/25 81/1
**Rules** [1]  83/5
**runs** [1]  55/7
**Russia** [5]  29/10 64/18 65/1 65/3 66/13
**Russian** [2]  28/16 39/25

**S**

**Sacramento** [1]  64/14
**safety** [1]  60/12
**said** [18]  4/21 5/17 7/18 15/12 15/19 27/16 27/20 27/20 30/17 31/4 33/7 47/18 53/17 66/18 72/12 73/9 82/9 83/23
**same** [20]  5/10 19/16 29/15 31/10 36/25 38/4 41/18 41/20 44/18 46/13 50/25 52/5 76/20 76/20 76/22 77/25 78/1 87/20 88/3 88/6
**save** [1]  62/12
**saved** [2]  19/12 42/6
**saves** [1]  40/24
**saving** [1]  20/1
**savings** [1]  59/1
**saw** [5]  28/10 44/16 63/3 83/10 83/18
**say** [13]  8/3 8/10 15/20 16/5 17/10 22/23 31/24 61/13 64/10 67/21 82/6 86/18 88/2
**saying** [12]  8/17 9/20 10/10 10/12 15/4 29/2 32/5 37/21 39/19 51/2 56/3 78/15
**says** [19]  5/3 5/4 5/7 5/9 6/9 15/14 15/17 16/14 21/3 22/24 28/17 35/22 36/18 40/14 41/3 45/7 57/21 57/22 69/21
**Scholl** [2]  82/5 82/6
**Scholl's** [1]  78/25
**school** [4]  64/5 64/6 64/8 64/11
**screen** [9]  4/20 6/5 6/6 7/11 11/3 13/17 13/18 74/15 78/8
**screens** [1]  72/24
**screenshot** [5]  11/3 11/14 11/14 11/17 59/6
**script** [1]  42/21
**scroll** [10]  20/8 20/9 32/20 33/22 38/24 45/9 46/5 48/3 65/19 74/25
**seated** [1]  88/20
**second** [6]  6/1 6/9 47/21 73/17 76/16 83/6
**secret** [1]  79/4
**secure** [3]  52/13 52/15 60/7
**security** [3]  50/17 50/18 50/19
**see** [46]  5/1 5/6 6/22 7/7 8/7 11/21 12/19 13/22 14/15 14/19 16/9 16/15 17/7 19/23 31/24 32/21

Appx5999

**S**

see... [30]  33/12 35/25 36/18 39/5 39/19 40/13 40/14 41/3 45/5 45/6 46/5 49/10 52/22 53/2 54/22 54/23 57/1 57/22 59/13 59/22 69/22 71/23 75/8 76/23 77/7 80/8 85/19 86/15 88/18 89/2
seeing [5]  42/1 42/19 75/14 77/1 77/2
seem [2]  31/25 81/17
seems [8]  28/12 29/3 29/4 32/2 34/22 35/3 35/5 43/4
seen [7]  16/3 19/9 28/9 43/23 52/2 84/14 86/11
seized [5]  6/17 43/13 58/15 65/15 65/20
selectively [2]  8/13 9/6
sell [2]  32/1 61/7
selling [1]  61/6
send [1]  29/14
sending [2]  30/21 30/24
sense [3]  8/12 8/13 13/8
sent [3]  28/15 30/17 31/2
separate [1]  40/5
separated [1]  13/2
sequence [1]  49/19
series [1]  76/20
server [1]  40/14
servers [11]  19/22 19/22 24/25 24/25 25/1 25/2 25/10 26/6 26/7 33/8 33/8
service [7]  5/7 41/15 46/9 46/25 51/19 51/21 52/2
services [5]  33/3 51/10 51/12 51/16 52/11
set [1]  35/13
setting [1]  58/3
settings [6]  19/20 19/21 19/22 24/22 40/23 43/2
setup [1]  57/16
several [6]  29/6 60/2 60/3 60/9 66/20 84/14
share [1]  31/11
shared [2]  31/13 31/20
sharing [1]  32/8
she [6]  24/10 37/12 37/15 37/23 73/7 73/9
SHERRY [3]  2/6 90/3 90/12
short [2]  42/21 68/3
shortly [1]  53/2
should [9]  12/16 16/14 17/10 24/10 28/8 34/12 36/11 36/12 86/6
shouldn't [2]  36/10 74/22
show [13]  8/18 9/1 9/4 10/1 10/1 13/19 15/23 23/1 46/6 70/22 70/23 75/12 85/5
showed [5]  8/19 11/21 28/10 48/7 75/13
showing [3]  6/22 12/2 69/18
shown [3]  5/13 59/5 70/11
shows [8]  15/14 15/14 42/3 44/25 45/14 45/19 48/25 80/15
shut [2]  31/8 78/20
shutdown [1]  79/11
shutting [1]  84/21
side [1]  16/7
signed [2]  64/4 64/6
significant [1]  27/19
SIM [5]  66/15 66/20 70/1 71/8 71/14
similar [9]  18/10 18/24 38/7 38/12 39/3 42/4 45/15 67/3 75/15
simply [8]  12/2 14/6 23/9 79/11 79/22 82/15 82/24 87/22
site [4]  50/25 51/1 51/4 51/4
sites [2]  51/3 51/3
sitting [3]  49/9 59/9 72/4
situation [3]  60/10 60/11 62/11
six [1]  19/15
slowly [2]  20/8 65/19
small [3]  66/16 67/15 71/9

smart [9]  51/8 51/8 57/7 57/8 57/11 57/19 58/1 58/5 58/7
so [106]
SOCKS [1]  57/17
software [14]  13/1 13/17 14/1 14/22 39/8 40/23 40/24 42/5 42/6 42/7 56/14 56/14 56/18 58/1
sold [2]  27/12 62/13
solution [1]  57/14
solutions [2]  39/17 57/12
solve [4]  66/19 67/20 67/24 86/18
solves [2]  41/11 41/16
some [72]  4/17 8/12 8/21 8/25 9/25 10/7 10/8 12/12 13/7 13/8 18/23 18/24 19/12 19/12 19/17 19/17 19/21 19/22 19/24 23/7 23/19 23/25 25/22 26/10 26/13 26/19 29/10 31/23 32/1 32/25 33/1 33/5 33/20 34/21 35/9 36/24 38/11 39/16 40/23 40/23 42/22 42/23 44/25 45/1 45/2 45/6 46/10 46/11 49/4 50/6 50/18 51/3 56/2 58/22 64/2 65/9 65/12 65/24 65/24 66/16 66/16 67/18 68/5 71/5 71/5 72/6 72/7 81/17 84/9 84/11 85/5 87/23
somebody [17]  7/8 8/8 23/8 28/15 28/15 29/14 31/19 31/25 37/4 38/8 72/12 76/4 78/17 78/18 78/19 80/11 80/13
somehow [1]  84/25
someone [6]  9/6 21/16 65/9 83/12 83/18 83/24
something [40]  6/2 9/25 10/12 11/4 15/5 15/11 16/17 21/17 25/4 26/15 27/20 27/23 28/19 31/13 31/23 33/19 36/14 38/9 40/4 42/12 44/3 51/12 55/16 55/18 59/7 60/14 60/16 63/12 63/14 64/24 72/14 77/21 79/24 80/8 80/20 82/14 83/2 83/7 85/7 86/8
sometimes [13]  18/8 25/22 34/25 36/6 36/10 36/11 36/12 36/15 46/8 46/16 50/3 71/15 71/16
somewhere [5]  31/18 33/11 34/7 83/18 84/12
soon [1]  17/13
sorry [12]  7/17 9/21 36/25 38/25 48/20 53/21 54/2 55/11 60/4 64/10 81/16 83/20
sort [7]  6/8 8/21 12/1 19/8 26/19 77/20 81/24
sorts [1]  31/9
sound [2]  23/22 43/2
sounds [1]  17/3
source [7]  6/15 30/19 31/5 31/5 33/18 58/7 63/13
soviet [1]  29/10
Spain [1]  39/10
Spanish [1]  38/8
speak [3]  9/13 37/4 65/10
speaking [1]  32/15
speaks [1]  38/8
specialized [1]  8/21
specific [2]  33/17 72/8
specifically [6]  19/19 26/23 27/2 30/25 50/22 82/6
speeder [3]  39/5 39/7 39/8
spelled [1]  40/3
spend [2]  62/20 63/6
spending [3]  63/5 63/5 63/8
splurged [1]  61/21
sports [1]  68/1
SSH [3]  42/11 42/11 44/3
stable [1]  40/13
stand [3]  16/5 16/7 74/10
standard [4]  78/25 79/3 82/9 83/15
stands [1]  45/4
start [5]  23/17 23/18 24/8 50/6 63/1
started [17]  5/3 10/12 18/7 18/9 23/14 34/11 34/15 34/16 34/16

34/17 47/25 48/14 50/4 62/19 62/24 63/4 66/18
starting [1]  4/7
starts [1]  55/8
state [1]  4/4
statement [3]  22/7 22/17 23/20
statements [10]  5/18 14/20 21/12 21/21 21/21 21/23 21/24 22/3 22/5 22/6
STATES [14]  1/1 1/3 1/10 4/3 79/23 80/3 80/25 81/5 82/10 82/19 82/21 85/22 86/19 86/22
step [1]  60/9
steps [4]  29/5 29/6 60/7 63/24
STERLINGOV [44]  1/6 3/3 4/3 4/14 5/16 6/25 7/24 8/5 8/6 8/11 9/8 10/5 12/12 15/13 17/22 17/25 20/11 22/19 23/2 24/20 25/7 26/5 27/8 28/5 29/18 32/21 40/20 41/25 46/24 48/13 50/1 54/20 55/14 55/22 66/9 68/20 68/24 70/5 71/3 72/21 73/17 76/2 76/15 78/16
Sterlingov's [16]  5/22 6/7 6/15 6/17 7/4 7/12 9/20 12/7 14/24 16/15 17/3 70/10 82/20 85/23 86/19 86/23
still [11]  8/15 8/25 11/19 12/17 16/7 17/10 30/4 62/4 62/5 62/5 62/7
stipulate [3]  85/21 86/21 86/24
stipulating [1]  88/5
stipulation [5]  85/7 85/14 85/17 86/18 88/2
stock [3]  83/23 84/1 84/1
stop [7]  24/13 32/20 49/16 63/12 64/17 78/7 83/11
stopped [1]  64/18
stopping [1]  52/17
story [1]  21/22
stream [2]  55/5 67/25
Street [2]  1/16 2/3
streets [1]  68/1
stronger [1]  66/21
stuff [5]  61/8 63/22 64/3 64/3 78/20
subject [1]  49/23
substance [1]  21/16
subtasks [1]  40/16
such [4]  6/10 19/10 73/24 76/18
suddenly [2]  34/9 34/10
suggested [1]  16/12
suggestion [1]  16/24
suggestions [1]  7/1
Suite [1]  1/17
sum [1]  34/11
suppose [2]  11/22 15/23
supposed [2]  25/17 31/1
supposedly [1]  76/5
sure [29]  8/20 8/22 8/23 8/25 13/5 16/3 16/8 17/13 24/10 24/25 26/25 27/2 28/14 28/19 30/25 31/2 35/4 44/2 50/21 54/7 58/12 60/12 60/14 66/1 69/3 69/14 72/6 86/14 87/3
surprised [2]  5/6 82/8
surrebuttal [1]  16/4
suspended [1]  5/9
sustained [5]  7/14 24/18 28/1 46/22 49/23
Sweden [12]  34/19 34/20 40/5 41/10 43/14 62/7 62/10 62/13 62/20 62/21 66/14 66/14
switch [1]  57/9
switches [4]  51/8 57/8 58/2 58/3
sworn [1]  17/22
system [12]  29/7 29/11 29/13 29/15 40/9 43/10 43/12 45/21 45/24 45/25 48/1 57/7
systems [1]  29/8

**T**

table [3]  2/12 4/10 4/15

**T**

tablet [3]   13/2 14/24 72/23
take [42]   25/18 26/1 27/8 28/3
 29/17 32/23 35/15 38/16 40/18
 41/23 42/15 43/16 43/24 44/14
 44/21 45/11 45/17 46/1 47/3 49/13
 49/19 52/7 52/18 54/11 58/9 60/7
 63/24 65/23 68/11 68/23 70/4
 72/16 76/11 76/23 78/3 79/2 80/7
 80/8 82/15 82/23 85/10 88/14
taken [2]   53/3 89/4
taking [1]   80/13
talk [11]   10/22 13/20 29/8 29/19
 29/23 29/25 30/2 30/5 30/9 36/5
 37/24
talked [2]   26/13 37/12
talking [25]   8/22 9/14 26/9 30/10
 31/3 32/24 34/5 34/6 34/23 36/4
 39/5 39/22 48/19 54/22 54/23 55/1
 56/6 56/7 57/5 57/7 57/11 57/25
 58/6 74/1 86/15
talks [2]   35/5 35/6
tasks [2]   21/5 25/6
tax [9]   34/19 34/21 34/24 35/1
 62/11 62/12 62/13 62/15 62/21
taxation [2]   34/17 34/18
taxes [3]   34/20 35/2 35/3
taxpayers' [1]   81/7
teaches [1]   76/5
team [2]   18/19 41/2
technical [3]   55/4 63/22 67/24
technically [1]   51/19
technology [3]   57/10 63/22 67/22
tell [8]   9/14 21/3 49/15 60/18
 60/23 72/22 85/7 87/2
telling [2]   7/20 21/4
terabyte [3]   68/25 70/6 70/7
term [1]   63/15
terminal [1]   43/1
terms [6]   6/10 6/10 73/23 73/24
 76/18 76/18
Tesla [2]   61/10 61/23
Teslas [1]   61/19
testified [9]   6/6 7/11 7/21 14/19
 18/3 28/23 46/24 69/8 76/21
testifies [1]   25/16
testify [22]   7/13 7/18 7/20 7/22
 8/2 9/7 11/9 13/11 14/9 15/24
 21/10 22/4 22/12 25/24 56/3 78/20
 79/24 82/5 87/5 87/7 87/8 87/18
testifying [10]   7/15 8/16 27/9
 32/11 47/11 55/14 55/16 58/10
 78/22 78/23
testimony [40]   9/11 9/17 10/13
 10/15 11/20 12/7 14/13 15/13
 16/15 17/3 17/4 17/7 19/1 29/18
 29/20 29/21 29/23 30/14 30/21
 31/7 33/5 34/2 36/1 37/10 39/2
 47/8 47/19 48/6 48/8 51/2 61/3
 69/12 73/3 73/6 73/10 73/12 78/25
 81/22 82/9 83/4
text [7]   6/16 8/24 28/24 76/5
 76/15 76/17 76/20
than [13]   9/1 11/25 11/25 34/20
 46/15 48/6 49/7 52/1 57/16 62/20
 63/7 67/4 85/2
thank [19]   17/21 24/16 25/18 26/2
 27/5 29/17 33/23 35/23 38/15
 38/22 53/10 53/13 57/22 58/9
 68/12 68/23 70/18 88/9 89/1
Thanks [1]   49/21
that [514]
their [34]   4/5 11/17 14/22 19/19
 19/20 19/20 19/21 19/22 19/22
 24/22 24/22 24/23 24/23 24/24
 25/2 25/3 25/5 25/24 25/25 26/6
 26/7 26/15 26/17 26/20 26/24
 31/18 33/14 33/15 34/20 37/24
 64/25 68/2 71/16 79/3
them [42]   12/2 17/12 17/14 18/13
 18/18 19/15 19/17 19/18 20/14

25/1 26/9 26/21 27/17 29/9 31/21
 32/17 38/8 40/2 44/13 45/1 45/2
 46/10 46/11 48/18 60/9 66/16
 66/16 66/20 67/15 67/18 70/23
 70/25 71/5 71/5 71/13 71/18 71/19
 71/25 71/25 72/7 72/8 72/22
then [49]   5/7 5/8 7/11 8/10 9/6
 12/13 13/21 14/18 16/2 16/4 17/14
 18/9 20/8 20/11 22/8 22/15 23/21
 24/2 24/9 24/10 25/25 26/12 29/18
 31/8 33/20 38/24 41/25 42/24 43/5
 43/8 43/18 44/1 44/9 45/2 47/24
 49/3 49/19 55/16 59/13 62/9 64/4
 65/3 65/13 65/14 72/16 75/6 76/13
 80/7 82/14
there [130]
these [36]   6/24 7/1 9/7 9/9 9/13
 12/18 18/6 18/16 21/4 21/11 22/21
 22/23 29/8 31/14 34/23 39/3 42/22
 42/24 43/11 45/3 45/5 45/8 45/22
 45/23 45/25 46/1 46/6 55/10 55/12
 56/19 67/14 71/5 71/9 71/12 74/3
 74/4
they [98]
thing [17]   10/5 29/15 33/6 33/15
 33/16 33/19 41/20 44/18 46/13
 50/25 52/5 56/10 61/10 61/22
 65/14 77/20 83/10
things [15]   16/7 19/25 21/5 24/6
 32/16 36/15 42/25 43/2 43/3 50/12
 50/23 51/8 55/24 67/1 71/19
think [110]
thinking [1]   34/11
third [1]   21/13
Thirty [1]   62/3
this [361]
those [18]   10/23 16/22 17/12
 19/25 28/16 30/24 38/11 39/10
 39/15 44/19 65/10 65/24 71/4 71/4
 72/5 72/15 72/16 78/1
though [2]   26/10 87/21
thought [16]   7/18 23/6 27/21 32/4
 34/8 36/10 36/11 36/12 36/16
 44/11 44/13 61/18 63/22 67/21
 83/11 83/25
thousand [1]   61/14
three [3]   29/5 38/5 45/5
through [18]   12/7 12/11 13/13
 14/20 20/9 34/1 40/12 51/25 55/7
 57/15 65/9 65/12 65/19 70/17
 70/20 74/25 76/8 85/6
throw [1]   71/25
thus [1]   82/2
Tiger [3]   40/25 41/1 44/17
time [44]   5/4 9/13 10/19 14/4
 17/14 19/16 20/19 27/13 27/15
 28/10 31/7 31/10 31/24 32/4 32/17
 40/8 41/12 43/1 45/4 47/13 49/12
 51/18 55/19 56/9 58/8 59/6 63/14
 63/17 64/1 64/20 65/3 68/3 74/5
 75/16 77/20 77/22 78/19 80/11
 83/11 83/13 85/18 88/3 88/6 88/13
times [1]   18/23
timing [2]   79/11 87/7
today [6]   12/7 12/19 15/8 15/13
 17/7 57/24
told [4]   11/2 65/10 65/13 86/15
tomorrow [2]   16/20 17/9
too [1]   54/24
took [3]   23/2 35/10 74/7
tool [2]   72/12 72/14
top [2]   20/8 48/3
topic [1]   36/6
TOR [38]   2/2 2/3 4/13 32/25 33/4
 33/11 33/18 41/19 41/21 46/3 46/3
 46/8 46/12 46/13 46/25 47/25
 48/14 48/16 49/2 49/8 50/1 50/6
 50/12 50/19 50/24 51/10 51/12
 51/14 51/16 51/16 51/19 51/20
 51/21 52/4 52/11 57/14 57/17 58/5
touch [2]   6/23 18/2
Townsend [1]   30/15

Townsend's [1]   30/21
traced [1]   23/8
track [1]   69/15
trade [3]   27/15 27/16 27/17
trading [4]   34/9 34/15 60/11 62/6
traffic [1]   66/16
transactions [2]   23/8 59/16
transcript [5]   1/9 4/25 5/2 13/16
 90/4
transfer [1]   29/3
translation [1]   39/25
travel [2]   62/16 64/21
traveling [8]   39/10 62/19 62/22
 66/10 66/12 71/3 71/20 72/4
trial [2]   1/9 14/8
tried [6]   6/12 6/13 34/21 39/8
 46/9 46/9
true [3]   83/3 83/12 90/4
truth [9]   22/5 22/25 23/4 23/5
 23/12 23/23 80/1 83/8 87/21
try [7]   10/14 24/3 33/1 33/2
 34/12 38/1 40/12
trying [24]   29/12 29/12 33/7 33/8
 33/13 35/2 39/18 40/10 40/17 45/5
 52/3 55/5 55/9 55/24 56/3 56/9
 57/18 62/4 62/5 68/5 69/23 69/24
 71/24 86/4
tunnel [4]   44/5 44/6 44/6 44/8
turn [1]   81/5
turned [1]   62/1
turning [1]   46/2
twice [1]   63/7
Twitter [1]   83/17
two [12]   19/17 24/6 37/2 38/4
 38/5 43/11 64/18 64/24 65/3 78/15
 79/25 82/19
type [16]   18/6 29/4 29/15 33/11
 40/24 41/17 42/5 42/23 42/25 43/2
 43/3 45/22 51/5 52/21 75/14 88/17
typed [2]   42/23 45/1
types [3]   50/12 58/2 81/2
typical [3]   24/24 26/18 29/7
typically [1]   19/10
typing [1]   41/16

**U**

U.S [2]   1/13 2/7
UDP [3]   39/5 39/7 39/8
Ukraine [1]   29/10
unclear [1]   47/19
under [3]   23/17 65/14 83/5
understand [18]   8/12 8/25 9/15
 9/15 9/16 9/23 9/23 9/24 10/10
 10/15 11/24 12/5 20/17 27/21
 27/22 33/20 38/1 71/23
understanding [23]   13/25 14/17
 28/7 29/1 32/24 34/4 36/3 39/7
 39/22 40/15 41/5 42/2 42/19 43/18
 44/1 44/23 45/13 45/19 48/12 55/1
 56/5 57/5 57/24
Understood [2]   24/14 50/10
Union [2]   64/22 64/23
UNITED [14]   1/1 1/3 1/10 4/2
 79/23 80/3 80/25 81/5 82/10 82/19
 82/21 85/22 86/18 86/22
university [1]   18/13
unless [1]   81/4
unpack [1]   72/4
unprotected [1]   59/14
until [3]   24/7 74/22 88/23
up [48]   4/20 6/5 6/20 7/5 8/23
 9/24 13/19 14/24 15/6 17/3 20/2
 21/1 22/4 27/3 28/4 32/9 35/13
 35/16 38/18 38/24 40/19 41/23
 42/16 44/22 45/12 45/18 46/18
 47/21 48/3 49/14 53/15 58/3 61/11
 64/4 64/6 65/17 65/25 66/22 68/9
 69/8 72/11 72/17 72/21 73/2 75/6
 75/7 82/13 84/13
update [3]   5/11 5/14 5/19
updated [1]   5/8
upgraded [1]   71/17

**U**

**UPS [4]** 39/20 40/10 40/16 40/17
**URL [4]** 44/4 44/18 46/14 51/18
**URLs [2]** 33/10 33/11
**us [14]** 1/20 11/2 15/1 16/17 25/9 49/12 59/7 64/5 64/20 64/22 64/23 67/7 73/18 86/11
**USAO [1]** 1/16
**USB [2]** 70/10 71/6
**use [25]** 7/2 23/21 24/4 24/9 30/9 32/1 39/9 42/8 42/10 42/12 46/3 46/4 46/13 48/16 49/4 50/1 50/19 51/12 51/14 51/16 51/21 57/18 61/1 71/8 71/22
**used [17]** 14/2 25/22 29/9 31/21 44/6 46/8 48/18 48/21 48/22 49/8 50/14 50/22 50/23 60/19 67/13 80/16 87/18
**useful [2]** 26/20 33/12
**username [1]** 30/7
**using [16]** 32/25 41/9 41/10 41/19 46/25 47/25 48/14 49/2 50/6 50/24 56/11 58/5 58/22 59/15 59/21 69/23
**usually [5]** 18/12 19/25 31/14 42/23 66/14

**V**

**vaccinating [1]** 64/25
**vaccines [1]** 64/24
**valuable [1]** 34/10
**value [5]** 9/16 59/6 61/15 61/19 63/9
**values [1]** 61/20
**various [3]** 18/14 19/16 32/16
**verify [1]** 5/9
**versa [1]** 37/6
**version [4]** 35/19 44/16 54/8 54/13
**versus [2]** 4/3 8/16
**very [14]** 18/20 28/12 34/10 34/19 52/13 52/15 63/17 63/20 63/20 66/16 66/24 67/8 67/23 77/19
**vice [1]** 37/6
**video [2]** 18/8 44/12
**videos [3]** 56/12 56/15 56/20
**view [3]** 80/17 84/7 84/7
**Viewer [1]** 41/2
**viewers [1]** 68/7
**viruses [1]** 60/14
**VNC [7]** 40/25 41/1 44/17 55/8 56/7 56/16 56/18
**VPN [1]** 62/4
**VPS [3]** 24/25 25/1 70/2
**vs [1]** 1/5

**W**

**wait [3]** 59/18 60/4 74/16
**Walker [1]** 20/5
**walking [1]** 59/14
**Wall [1]** 2/3
**wallet [24]** 58/11 58/13 58/14 58/19 58/20 58/20 58/23 58/25 58/25 59/7 59/11 59/13 59/14 59/15 59/20 59/20 59/21 59/23 60/8 60/10 60/21 63/3 63/4 63/8
**wallets [1]** 59/24
**want [22]** 8/20 11/7 12/19 12/24 13/5 14/14 15/15 19/25 24/14 32/17 33/14 46/11 49/11 49/13 49/17 51/25 69/4 72/11 76/6 85/14 85/15 86/2
**wanted [17]** 4/17 5/12 5/16 5/23 11/22 15/6 25/6 26/15 27/15 27/17 40/6 40/12 41/13 60/1 62/16 63/12 70/21
**wants [1]** 70/23
**war [1]** 44/12
**was [245]**
**Washington [5]** 1/5 1/14 1/17 1/21 2/9

**wasn't [18]** 5/19 7/21 14/17 23/7 23/15 29/11 32/3 49/2 50/15 58/22 59/9 59/13 59/22 60/11 60/13 66/23 69/2 76/6
**watches [1]** 61/8
**watching [1]** 56/20
**way [26]** 7/23 8/3 8/18 9/25 13/1 15/21 16/9 22/19 29/3 34/22 35/1 35/3 35/3 38/25 39/19 41/20 42/14 42/23 43/3 51/7 52/5 64/17 67/24 76/7 86/18 87/18
**ways [1]** 34/21
**we [156]**
**website [15]** 26/20 27/23 51/6 58/4 58/6 61/6 66/18 68/21 69/8 69/17 69/19 69/21 81/5 82/25 87/13
**websites [2]** 19/20 81/2
**week [2]** 19/17 67/7
**weeks [3]** 64/18 64/24 65/3
**weird [2]** 64/19 65/2
**welcome [2]** 12/15 17/19
**well [26]** 11/1 13/16 16/18 17/15 19/23 20/25 21/15 22/12 22/16 23/13 26/24 28/20 30/19 31/23 33/16 34/6 42/22 46/12 58/3 59/25 62/16 63/14 64/9 66/13 67/5 86/17
**went [10]** 7/8 7/13 8/17 13/4 13/13 26/12 36/7 65/9 65/11 65/13
**were [50]** 4/17 5/17 6/16 9/7 15/6 16/3 18/6 18/9 18/11 18/13 18/14 18/14 18/15 18/16 18/16 18/18 18/19 18/19 19/18 21/21 26/16 26/19 27/9 27/10 27/12 29/9 30/11 31/18 36/8 37/21 41/9 47/7 47/11 51/1 51/2 64/8 64/21 64/23 66/9 68/24 69/18 70/5 70/5 70/11 75/23 76/21 78/3 81/19 81/19 83/15
**what [192]**
**what is [1]** 43/18
**whatever [6]** 8/20 10/3 14/10 35/12 51/25 79/25
**whatsoever [1]** 48/9
**when [42]** 6/12 7/13 9/8 11/14 13/17 15/5 22/23 25/15 28/9 28/10 34/23 34/24 34/24 39/19 48/20 48/22 48/25 50/1 50/4 50/13 51/2 52/12 53/9 55/13 55/15 55/22 59/6 61/11 61/13 64/8 65/7 65/15 68/24 69/9 69/20 70/5 71/8 74/5 78/3 79/5 79/14 79/18
**whenever [2]** 40/6 60/10
**where [36]** 6/8 6/20 19/12 25/4 27/10 29/11 31/20 33/8 35/21 36/18 37/12 37/23 41/3 41/11 54/22 54/23 55/4 55/18 57/22 58/2 58/4 58/24 60/11 64/6 64/10 64/13 65/5 66/20 68/1 68/1 69/4 69/15 71/17 74/3 74/4 74/17
**Whereupon [1]** 75/23
**wherever [1]** 56/9
**whether [20]** 16/10 17/8 21/20 24/8 24/12 25/10 26/5 55/14 59/17 78/21 78/23 80/5 80/24 83/2 83/2 83/3 83/12 85/1 85/6 87/21
**which [42]** 6/4 7/12 15/20 19/24 20/4 20/5 23/11 24/25 28/16 31/7 34/22 35/8 36/6 41/18 41/21 42/21 43/17 46/7 47/4 47/19 50/15 52/3 53/16 54/4 54/7 54/12 57/10 59/4 59/8 60/2 62/12 69/25 70/1 70/2 71/22 78/2 78/24 79/9 80/5 81/25 85/9 87/23
**while [1]** 61/21
**White [1]** 6/24
**who [15]** 4/14 11/24 11/25 16/1 16/1 16/21 29/14 37/4 67/17 67/18 67/25 83/10 84/6 84/12 87/24
**whoever [1]** 37/24
**whole [6]** 13/13 49/6 55/6 64/22 65/14 70/3
**Whose [1]** 77/18

**why [40]** 8/15 8/20 8/25 9/23 9/23 11/19 11/24 12/1 13/8 14/11 14/20 14/23 15/2 16/8 19/25 21/23 22/21 23/4 23/17 26/1 35/8 41/18 46/7 48/21 51/21 56/10 60/2 64/5 65/1 66/9 66/22 70/2 71/3 71/24 73/15 76/2 78/12 83/6 84/2 88/13
**will [27]** 9/4 12/11 12/13 14/6 15/23 17/6 17/7 17/12 17/14 20/4 22/4 24/3 24/3 24/13 45/25 46/17 49/14 49/16 52/20 52/22 53/2 80/7 80/8 85/3 87/6 88/18 89/2
**willing [1]** 85/16
**wire [1]** 71/7
**wired [5]** 39/16 87/8 87/10 87/13 88/3
**withdraw [2]** 12/23 14/6
**withdrawal [1]** 78/15
**withdrawn [1]** 14/15
**within [1]** 80/20
**without [5]** 13/11 23/18 25/7 37/18 85/8
**witness [22]** 16/1 16/2 17/8 25/15 28/23 30/15 48/8 49/15 52/7 70/25 74/10 79/14 79/17 85/1 85/3 85/7 85/8 85/12 87/5 87/16 87/17 88/12
**witness' [2]** 27/24 34/1
**witness's [2]** 25/23 69/12
**witnesses [7]** 3/2 16/18 16/21 16/22 17/8 79/10 87/17
**wonder [2]** 28/15 66/22
**wondering [4]** 6/9 21/19 73/23 76/17
**word [1]** 54/19
**words [1]** 40/5
**work [18]** 19/2 19/3 19/5 19/8 20/14 21/8 22/10 24/20 24/21 26/16 38/10 46/12 46/17 52/4 56/11 63/13 63/21 68/3
**worked [6]** 22/11 23/2 26/11 33/16 33/19 33/20
**working [15]** 17/11 18/16 18/19 18/19 19/16 23/14 29/13 31/18 39/17 47/25 55/8 56/7 57/16 62/4 88/23
**works [4]** 33/18 43/3 46/14 58/20
**world [4]** 83/3 83/10 83/18 84/12
**worry [1]** 71/21
**worth [3]** 49/10 63/7 63/7
**would [55]** 4/4 11/4 11/23 13/17 14/18 15/24 15/25 16/5 18/12 19/10 20/20 21/20 22/15 22/16 23/11 23/24 25/14 31/24 31/25 32/1 32/6 32/7 33/12 38/16 40/16 41/17 47/14 49/12 50/22 55/3 55/12 60/15 62/2 62/12 62/13 62/15 63/13 63/21 63/22 71/16 71/25 75/6 75/6 78/1 79/15 81/7 82/4 83/17 83/20 84/5 84/8 85/14 85/16 86/3 87/5
**wouldn't [6]** 21/23 33/16 60/12 60/13 68/7 82/8
**write [5]** 28/13 37/4 37/5 76/9 76/10
**writing [1]** 74/8
**written [3]** 6/24 39/24 48/3
**wrong [1]** 79/25
**wrote [4]** 28/14 55/15 55/23 74/5

**Y**

**yeah [11]** 18/25 37/19 37/23 42/9 43/9 44/16 49/20 50/23 61/21 68/12 76/4
**year [2]** 61/25 62/21
**years [10]** 11/25 31/1 33/1 34/8 36/9 36/9 50/5 71/10 71/14 72/2
**yes [84]** 4/19 4/23 17/17 18/1 18/5 18/18 18/23 19/6 19/9 20/12 20/15 20/18 24/13 25/11 25/13 26/18 27/6 29/22 29/24 30/6 30/8 30/16 30/23 32/12 32/22 32/25 33/23 34/6 35/14 36/5 36/20 38/21

**Y**

yes... **[52]**  39/6 39/21 41/4 42/18
 43/7 44/11 46/4 47/6 47/9 48/17
 50/3 50/18 51/11 51/14 51/18 52/8
 52/9 53/5 54/25 56/7 56/7 57/4
 57/23 58/14 58/17 59/4 59/21
 60/17 61/2 61/4 61/14 62/8 64/16
 64/18 65/16 65/22 66/11 67/12
 68/21 69/10 69/19 73/8 74/4 74/11
 75/10 76/22 77/15 78/1 78/9 85/20
 88/25 89/1
yesterday **[14]**  4/22 7/13 14/12
 18/3 19/2 19/3 27/9 27/16 27/20
 29/9 32/11 58/10 58/12 66/2
yesterday's **[1]**  13/16
yet **[6]**  12/9 15/12 15/19 17/12
 23/16 52/20
York **[1]**  1/20
you **[466]**
You're **[2]**  73/23 76/17
your **[146]**
yourselves **[2]**  52/21 88/17
YouTube **[1]**  64/3

**Z**

zero **[1]**  83/23
Zigbee **[6]**  57/3 57/8 57/9 57/10
 57/19 58/2
zoom **[6]**  8/8 11/16 12/3 75/11
 76/12 76/13
zoomed **[3]**  7/9 15/20 76/14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * *    )
UNITED STATES OF AMERICA,         )        Criminal Action
                                  )         No. 21-00399
                Plaintiff,        )
                                  )
    vs.                           )        **AFTERNOON SESSION**
                                  )
ROMAN STERLINGOV,                 )        Washington, D.C.
                                  )        March 6, 2024
                Defendant.        )        1:43 p.m.
                                  )
* * * * * * * * * * * * * * *    )


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES:</u>

FOR THE PLAINTIFF:       CHRISTOPHER BROWN, ESQ.
                         UNITED STATES ATTORNEY'S OFFICE FOR
                           THE DISTRICT OF COLUMBIA
                         601 D Street, Northwest
                         Suite 5.1527
                         Washington, D.C. 20530

                         CATHERINE PELKER, ESQ.
                         U.S. DEPARTMENT OF JUSTICE
                         950 Pennsylvania Avenue, Northwest
                         Washington, D.C. 20530


FOR THE DEFENDANT:       TOR EKELAND, ESQ.
                         MICHAEL HASSARD, ESQ.
                         TOR EKELAND LAW, PLLC
                         30 Wall Street
                         Eighth Floor
                         Brooklyn, New York 10005

REPORTED BY:        LISA EDWARDS, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Room 6706
Washington, D.C. 20001
(202) 354-3269

INDEX

WITNESS                                                          PAGE

ROMAN STERLINGOV

    Cross-Examination By Mr. Brown                                 64


E X H I B I T S

Exhibit No.                                                  Received


                    NO EXHIBITS MARKED

THE COURT: Mr. Sterlingov can return to the witness box.

(The Defendant retakes the witness stand.)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: Ready for the jury?

MR. BROWN: Yes, your Honor.

MR. EKELAND: Yes, your Honor.

THE COURT: Please bring in the jury.

THE COURTROOM DEPUTY: All rise.

(Whereupon, the jury entered the courtroom at 1:43 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY: The jury is present. You may be seated and come to order.

THE COURT: You may proceed when you're ready, Mr. Brown.

(ROMAN STERLINGOV, DEFENSE WITNESS, PREVIOUSLY SWORN.)

CROSS-EXAMINATION

BY MR. BROWN:

Q. Good afternoon, Mr. Sterlingov.

A. Good afternoon.

Q. Now, I want to make sure that the record is totally clear on one fact. You don't remember whether or not you set up the clearnet domain bitcoinfog.com. Is that correct?

A. I doubt that I set it up. If you were asking me about buying the actual domain name, I feel like I would have

Sterlingov - CROSS - By Mr. Brown

remembered that. I said I don't remember the specific transactions that were or were not involved in the trace that they were showing. I'm not sure about those.

Q. But it's your testimony that you don't remember one way or the other. Correct?

MR. EKELAND: Asked and answered.

THE COURT: Overruled.

THE WITNESS: Can you be more specific?

BY MR. BROWN:

Q. Isn't it your testimony that you cannot remember one way or the other whether you set up the clearnet domain bitcoinfog.com?

A. Is it the same -- exactly same question? I feel like I've answered that. I can answer it again.

I doubt I -- I think I would have remembered if I actually registered the domain name, like going to the registrar, to the actual page that sells the domain names, because I've been using Bitcoin Fog after that.

Q. Why --

A. I am less certain about any individual transactions. They've been showing a lot of transactions from apparently 13 years ago. I don't have any memory of those. But I don't have any -- I don't really remember any individual transactions from 13 years ago. So I can't say one way or another about the individual transactions.

Sterlingov - CROSS - By Mr. Brown

Q. And you're not actually denying that you did set up the domain bitcoinfog.com. Correct?

A. Like I said, I doubt that I actually bought the domain name on the registrar page.

Q. Is it your testimony that you doubt you did it or is it your testimony that you did not do it?

MR. EKELAND: Objection. Compound.

THE COURT: Overruled.

THE WITNESS: I don't remember doing it. And I doubt that I would have done it and not remember it.

BY MR. BROWN:

Q. And you gave an interview with two reporters from Wired Magazine. Correct?

MR. EKELAND: Objection. Outside the scope.

THE COURT: Overruled.

BY MR. BROWN:

Q. You gave an interview with two Wired reporters. Correct?

A. I think it was only one. At least one.

Q. So you gave an interview with one Wired reporter?

A. Yeah.

Q. And that was on August 2nd, 2022?

A. I don't remember the actual date. And to answer this question, I have to ask the judge.

THE WITNESS: Can I do that?

Sterlingov - CROSS - By Mr. Brown

THE COURT: I'm sorry? You have to ask whether to answer?

THE WITNESS: Yes. Because you told me to ask you.

THE COURT: Oh.

MR. BROWN: Just the date.

THE COURT: I think the question is just -- if you don't remember the date, that's fine. You can tell him you don't remember the date. He's just asking if you remember the date or not.

THE WITNESS: I remember the circumstances, and I would like to share. But I have to --

MR. BROWN: That is not the question.

THE COURT: That wasn't the question. The question is just whether you -- and particularly with cross-examination, you should just listen to the question you're asked, and if you'd just answer that question and not other questions. Your attorney will get a chance to ask you later questions and to follow up. But for present purposes, you should just answer the questions exactly as they are put to you. Okay?

THE WITNESS: I'll do my best.

BY MR. BROWN:

Q. And you told those -- you told that one Wired Magazine reporter that you, quote, "can't remember," end quote, if

Sterlingov - CROSS - By Mr. Brown

you set up the bitcoinfog.com domain.  Correct?

A.  It sounds correct.  I don't remember the actual words.

Q.  And you also told that Wired reporter, "That was 11 years ago.  It's really hard for me to say anything specific"?

A.  That sounds like -- I guess I don't have any reason to doubt -- I'm sure you got the quote from somewhere.

Q.  Mr. Sterlingov, do you not remember what you told those two Wired -- what you told that one Wired Magazine reporter?

MR. EKELAND:  Asked and answered.

THE WITNESS:  I remember the contents.  I don't remember the actual words.  If you're asking me if that's my exact quote, I don't know.

THE COURT:  Overruled.  Overruled.

BY MR. BROWN:

Q.  And you testified in a pretrial hearing in this case on January 31st.  Correct?

A.  Yes.

Q.  And you were questioned about whether you set up the bitcoinfog.com domain.  Correct?

A.  I think so.

Q.  And you said -- and I quote -- "I'm not sure."  And you also said -- and I quote -- "I don't remember" --

MR. EKELAND:  Objection.  Counsel's testifying. Is this -- is there a question?  Is he reading from the

transcript?

THE COURT: I think this is permissible.

BY MR. BROWN:

Q. And you said -- and I quote -- "I'm not sure." And you said -- and I quote -- "I don't remember doing those transactions." Correct?

A. I have no reason to doubt that your quote is accurate.

Q. Do you not remember what you said during your pretrial testimony on January 31st, 2023?

A. If you're asking me about the general meaning, then I remember. But I don't remember the specific words from that -- if you're reading me a quote, I...

Q. And isn't it correct that on January 31st, 2023, you were asked if you denied setting up the bitcoinfog.com domain or if you didn't deny it. And you said --

A. Can you repeat, please? If I was asked...?

Q. Let me rephrase the question.

You were asked in that January 31st, 2023, hearing about whether you denied to the Wired Magazine reporter setting up the Bitcoin Fog domain.

And the question was, "But you did not deny it to them and you're not denying it today?"

And your answer was, "That's correct."

Isn't that correct?

A. You're asking about what I said on January 1st -- I'm

Sterlingov - CROSS - By Mr. Brown

sorry -- 31st?

Q. Yes.

A. I think that's correct.

Q. Now, is it your testimony that you registered domains for your work at Capo Marknadskommunikation?

A. Yes. Registered domains, subdomains and just handling the DNS settings for some of the websites.

Q. And is it your testimony that you also set up domains in your freelance work?

A. Yes.

Q. And can you give a few examples of domains that you set up for Capo or for your freelance work?

A. No. I don't remember specific names. There were dozens of them.

Q. I'd like to direct your attention to Government's Exhibit 315, please.

THE COURTROOM DEPUTY: You said 315?

MR. BROWN: Yes. 315. Yes. Actually, could we scroll down? Yes. So Government's Exhibit 315.

Now, if we could zoom in to the top part of this chart here.

BY MR. BROWN:

Q. You've seen this chart before. Right?

A. Yes.

Q. And you were questioned about it during your direct

Sterlingov - CROSS - By Mr. Brown

examination?

A. I believe I was questioned about a different chart.

Q. Oh, yes.

Now, looking at this chart here, do you recognize the account that's marked here as Mt. Gox account 1, tied to the email address plasma@plasmadivision.com?

A. Oh, that's my email. Yes.

Q. And the account referred to in this chart, that's your account. Right?

A. Yes.

Q. And directing your attention to Exhibit 406-E, is this -- this is user information that you provided for your Mt. Gox account linked to plasma@plasmadivision.com?

A. Looks like it.

Q. And this is the Mt. Gox account in the name of Roso987341870?

A. I think that's the username.

Q. And that's the username for your Mt. Gox account. Correct?

A. Yes.

Q. You opened this Mt. Gox account on September 29th, 2011. Correct?

A. I don't remember the actual date. But it could be correct.

Sterlingov - CROSS - By Mr. Brown

Q. Could I direct your attention to Government's Exhibit 873, please.

Do you recognize this email?

A. I don't recognize it as -- I mean, I don't remember this email. But I'm sure this is a real email.

Q. And this is your email account, plasma@plasmadivision.com?

A. Yes.

Q. And this email appears to correspond to your Mt. Gox account with the username Roso987341870?

A. Yes.

Q. Now, going back to Exhibit 315, yesterday you were asked if you had an AurumXChange account.

Do you remember that?

A. Yes.

Q. And do you remember how you answered that?

A. Well, I don't remember if I had an AurumXChange account. So I think I probably answered the same thing.

Q. And, well, for the record to be clear, did you have an AurumXChange account?

A. I don't know. I had a lot of different accounts and a lot of different payment services. I don't remember specifically an AurumXChange account.

Q. Directing your attention to Exhibit 878, please. Now, this is an email to your email account, isn't it,

plasma@plasmadivision.com?

A. Yes.

Q. And this is an email from AurumXChange. Correct?

A. Appears to be.

Q. And this email details that AurumXChange received a payment that's listed in this email; isn't that correct?

A. Yes.

Q. And you made that payment. Correct?

A. I don't have a recollection of that. But it's possible.

Q. And then directing your attention to Exhibit 881, this is another email sent to your email account, plasma@plasmadivision.com, isn't it?

A. It looks to be.

Q. And it is an email sent from AurumXChange, isn't it?

A. It looks to be the same type of email as the last one.

Q. And this email details another payment that you made from your Mt. Gox account to AurumXChange. Correct?

A. Again, I don't remember this payment. But that's what the email says.

Q. And then directing your attention to Exhibit 899, this is another email to another one of your email accounts, isn't it?

A. @plasmadivision. Yeah.

Q. And this email account is spam@plasmadivision.com instead of plasma@plasmadivision.com. Correct?

A. Yes.

Q. And this email was sent from AurumXChange?

A. Yes.

Q. And this email confirms the payment that you made out of your Mt. Gox account to AurumXChange. Correct?

A. Again, I don't remember an actual payment. But this could be what it -- yes.

Q. And then flipping back to Exhibit 315, after those funds were received in AurumXChange, they were sent forward to a Liberty Reserve account, weren't they?

A. That's what the chart says.

Q. Do you have any recollection of sending those funds to a Liberty Reserve account?

A. I do not.

Q. This is your Liberty Reserve account, isn't it?

A. Yes.

Q. And directing your attention to Exhibit 403, this is account registration information that you provided in setting up your Liberty Reserve account, didn't you?

A. I think so.

Q. And this account is set up with the email address plasma@plasmadivision.com. Correct?

A. Yes.

Q. And that's your email address?

A. Yes.

Sterlingov - CROSS - By Mr. Brown

Q.  And it's in your name, Roman Sterlingov?

A.  Yes.

Q.  And for the account recovery question on Line 17, the heading is "high school name"; isn't that correct?

A.  Yes.

Q.  And what did you put down for your account recovery answer?

A.  It looks to be just some random numbers and letters.

Q.  And then turning to the last tab of this record and looking at Lines 32, 34, 38 and 40, these were all log-in or logout events that you did with your Liberty Reserve account.  Correct?

A.  Again, I don't remember these transactions.  I don't remember if I logged in or logged out.  But that's what the records show.

Q.  And each of these log-in or logout events was done from IP address 212.117.160.123.  Correct?

A.  That's what the record shows.

Q.  And directing your attention to Exhibit 364, the third tab over, isn't it true that IP address 212.117.160.132 corresponds to a VPN company called Crypto VPN?

A.  I have no knowledge about that.  But that's what the -- your file here shows.  I don't remember what IP is -- or if I ever knew what IP is owned by what company.  I don't remember IP addresses like that.

Sterlingov - CROSS - By Mr. Brown

Q. And you used Crypto VPN. Correct?

A. I think so. I'm not sure.

Q. Now, going back to Exhibit 315, on October 8th, 2011, after receiving those funds from AurumXChange, you sent $100 from your Liberty Reserve account to a Mt. Gox account linked to the email volfprius@hotmail.com. Correct?

A. That's what the chart shows.

Q. Do you deny that you sent $100 to the Mt. Gox account linked to email address volfprius@hotmail.com?

A. I am simply saying that I don't remember individual transactions like these from 13 years ago. I don't remember.

MR. BROWN: Now we can take this down.

BY MR. BROWN:

Q. Directing your attention to Exhibit 316, Government's Exhibit 316. Now, zooming in just a little bit on the top of this chart, in the upper left-hand corner, there is a reference to your Liberty Reserve account. Correct?

A. Yes.

Q. And that's the Liberty Reserve account that we were just looking at. Correct?

A. Yes.

Q. And this series of transactions starts with your Liberty Reserve account sending $130 for your Mt. Gox account tied to the email plasma@plasmadivision.com. Correct?

A.  Yes.

Q.  And from plasma@plasmadivision.com, you sent approximately 60 Bitcoin to your Silk Road account, didn't you?

A.  That's what the chart says.

Q.  Do you remember doing this?

A.  I don't.  I don't remember specific transactions like this from 13 years ago.  I just don't remember every time I sent money somewhere or not send money somewhere.  I just can't tell you.

Q.  But you don't deny that you sent approximately 60 Bitcoin from your Mt. Gox account to your Silk Road account?

A.  I guess I'm just saying that I don't remember.

Q.  And you didn't send it directly; you sent it through an intermediate Bitcoin address that's marked here on the right, 1PFK and so forth.  Correct?

A.  I don't know if that's an intermediary address or if that's just how the wallet works or what the -- what exact -- where the address is from or how it --

Q.  Now, that Bitcoin address -- and let me circle it on the screen -- is that Bitcoin address part of one of your wallets?

A.  I don't know.  I don't have a good memory for Bitcoin addresses.  As you can see, they're pretty long streams of various numbers.

Sterlingov - CROSS - By Mr. Brown

Q. And then from there, you sent -- you deposited a little bit more than 60 Bitcoin into your Silk Road account. Correct?

A. That's what the chart says.

Q. But you have no memory of this. Is that your testimony?

A. I don't.

Q. And you wouldn't be able to explain why you sent the Bitcoin indirectly through one intermediate address into your Silk Road account?

MR. EKELAND: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: I don't know one way or another. It could be -- I don't know if that's part of a wallet or if that's how wallet software works or what. I don't know.

BY MR. BROWN:

Q. And that's the Silk Road account that you opened with the username pas, P-A-S. Correct?

A. Yes.

Q. Now, directing your attention to Exhibit 603-D and looking at Lines 6 and 7, these are transaction records for your Silk Road address with the username pas, P-A-S. Correct?

A. I think so.

Q. Do you recognize any of the other transactions on your Silk Road account?

Sterlingov - CROSS - By Mr. Brown

A. If I recognize them? No. I don't -- I generally don't remember transactions like that from 13 years ago, like how much.

Q. On November 27th, you deposited about 60 Bitcoin into your Silk Road account, and that's shown in Line 6. Correct?

A. It says Deposit. Yeah.

Q. And then on Line 7, it shows that you withdrew approximately 60 Bitcoin from your Silk Road account. Correct?

A. Yes.

Q. And that was not linked to any purchase; it was just moving funds through your Silk Road account. Correct?

A. That's what it says. Yeah.

Q. But you have no reason to doubt that these records are accurate. Correct?

A. I do not.

Q. And then moving on -- moving back to Exhibit 316, after the funds leave Silk Road, they go to another Bitcoin address, 1C7KW. Correct?

A. That's what the chart says.

Q. And then shortly after that, the funds are moved to a Mt. Gox account NFS and linked to an email address nfs9000@hotmail.com. Correct?

A. That's what the chart says.

Sterlingov - CROSS - By Mr. Brown

Q. And is it your testimony that you just don't remember any of these transactions?

A. It is. I don't remember individual transactions, like I said, from 13 years ago.

Q. And then turning your attention to Government's Exhibit 313-A, this set of transactions also starts in your Mt. Gox account shown in the upper right-hand corner. Is that correct?

A. Yes.

Q. And you deposited 89.87 euros into your Mt. Gox account. Correct?

A. That's what the chart says.

Q. Do you remember depositing those euros?

A. I do not. I've got to say, I don't really remember any transaction from 13 years ago from any --

Q. Now, directing --

A. I just don't memorize my transaction, whether these are my transactions or not. I don't remember transfers like that.

Q. Even if you --

A. I don't know whether anybody actually remembers their transactions from 13 years ago, but I don't.

Q. Even if you don't remember the exact details of this transaction, do you remember what it was for?

A. No.

Sterlingov - CROSS - By Mr. Brown

Q.   And then directing your attention to Exhibit 406-A and Line 288, this shows a deposit into your Mt. Gox account on October 12th, 2011.  Correct?

A.   Yes.

Q.   And looking at Column H here, that deposit was from a bank account in the name of Sterlingov, Roman.  Correct?

A.   Yes.

Q.   And then directing your attention to Exhibit 887, this is an email you received in your email account plasma@plasmadivision.com.  Right?

A.   It looks to be.

Q.   And this was sent from Mt. Gox.  Correct?

A.   I think so.

Q.   And this shows the deposit of 89.87 euros from a bank account in your name to the Mt. Gox account in your name.  Correct?

A.   Yes.  It says the account here.  Yep.

Q.   And then going back to Exhibit 406-A and directing your attention to Lines 289, 290 and 291, this shows that after you deposited the euros from your bank account, you sold the euros and purchased Bitcoin.  Isn't that correct?

A.   BTC bought -- yeah.  I think so.

Q.   And then going back to Exhibit 313-A, on October 19th, 2011, you sent out 36 of those Bitcoins that you had just purchased to a Bitcoin address circled here.  Correct?

Sterlingov - CROSS - By Mr. Brown

A. I don't remember that transaction. That's what the chart says.

Q. And the same day, that same Bitcoin address transfers to another Bitcoin address and then transfers to the Mt. Gox account tied to the email address nfs9000@hotmail.com. Correct?

A. That's what the chart says.

Q. Now, you can't tell the jury anything further about this transaction, can you?

A. I really can't. I --

Q. So you can't tell the jury -- sorry.

A. I don't have any specific information, like remembering a specific transaction or...

Q. Is it your testimony that this relates to a peer-to-peer Bitcoin sale?

A. It's a -- it's what I think it could relate to. It's either -- it could be a peer-to-peer sale, which I had been doing a lot of those at the time. Another possibility is that it could be related to a freelance job that I was taking at the time.

Q. And the possibility that it relates to a freelance job, you can't tell the jury any details about the freelance job that this would relate to, can you?

A. I don't remember specific details about that.

Q. Now, looking at the bottom right-hand corner of this

Sterlingov - CROSS - By Mr. Brown

chart, there's reference to another Liberty Reserve account. Correct?

A. Yes.

Q. And this is Liberty Reserve account number U0845692. Correct?

A. Yes.

Q. And directing your attention to Exhibit 401, this is account registration information for Liberty Reserve account number U0845692. Correct?

A. Yes.

Q. And this is the Liberty Reserve account that is tied to the email address shormint@hotmail.com?

A. Yes.

Q. And it's registered in the name of Vasily Kunnikov?

A. That's what it says.

Q. By the way, is Vasily a boy's name or a girl's name?

A. Vasily is a Russian name for a male name.

Q. And the account recovery question here is favorite movie; isn't that correct?

A. Yes.

Q. And is it possible to read the account recovery answer?

A. It looks like just a set of random letters, which was really common at the time. I -- several people at the meet-ups that I remember, they actually taught me to always put the random letters, as I did on my account. This is not

Sterlingov - CROSS - By Mr. Brown

my account. This was a very common practice at the time.

I'm not sure if you're trying to say that random letters on this account means something that -- and random numbers and letters in my account, if you're trying to connect those two. It seems like you're trying to make that link.

Q. Mr. Sterlingov, I have not asked you a question.

A. You asked me about the recovery answer.

Q. Now, you don't know anything about this Shormint Liberty Reserve account U0845692 paying for a specific VPN service in 2011 called Crypto VPN, do you?

A. I believe I've seen something in this case. I don't --

Q. And you have no -- you can't tell the jury anything about the Shormint Liberty Reserve account number U0845692 being accessed on October 10th, 2011, on October 25th, 2011, from an IP address with an abuse contact for Swedish Telia in Gothenburg, Sweden?

A. I don't have any specific recollection of that, whether -- I don't know if I ever had any information about that.

Q. And, Mr. Sterlingov, you've never sent a message to another user saying that you were going to send $9.50 in Liberty Reserve payments from this account, do you?

A. I'm not even sure what you're referring to. No.

Q. It's your testimony that you've never sent funds out of

this account?

A. I have no recollection of sending any funds from this account or seeing this account before.

Q. Now, I'd like to direct your attention to Exhibit 818-B.

Now, during your direct examination, you were asked if this -- you wrote this document. Right?

A. I was asked if I was -- if I wrote this document, I believe.

Q. And what is your testimony? Did you write this document?

A. I'm not sure if I wrote it or if I wrote it from somebody's instructions or maybe if I copied it from somewhere. Some of the other lines in this document, the other text items, they suggest to me that this is -- this was a -- that it could have been a document where I was copy/pasting different information and just putting them in the same document.

Q. And that first line, "So the first step is the most effing mind-blowing," it's your testimony that you didn't write that line yourself in the original Russian?

A. I don't think I ever gave that testimony. I said I'm not sure exactly how this text came to be in this document, if it was typed or if it was copied or if it was recorded by me from instructions from somebody giving me instructions.

And also I have to mention that there's just a

Sterlingov - CROSS - By Mr. Brown

small mistranslation there from Russian because they made me read the Russian original. This document was in Russian. It doesn't say mind-blowing; it just says great. It's a weird -- I don't know if it matters. I just don't like...

I don't understand what -- what "mind-blowing" would refer to in this context.

Q. Now, you were asked about this during your direct examination and you said --

A. Sorry. About what?

Q. You were asked about this during your direct examination.

A. Are you saying about this document? I can't hear.

Q. Mr. Sterlingov, let me finish the question. I'm just trying to go slowly for you.

You were asked about this document during your direct examination.

A. Yes.

Q. And you said something to the effect that this was -- that these steps were a typical arrangement in that time, in 2011. Is that correct?

A. I don't think I said that these particular steps were a typical arrangement. I think I said that going between different payment systems and different accounts was typical, because many of the systems didn't work with each other. And especially people sending money between the

Sterlingov - CROSS - By Mr. Brown

Eastern European countries, there were -- there was a lot of friction between the different systems. I think I said something like that.

Q. Now, if somebody were trying to set up a website, is it your testimony that this would be a typical way to pay for that website registration?

MR. EKELAND: Objection.

THE COURT: Overruled.

THE WITNESS: Are you asking me, like, to speculate? I don't understand.

BY MR. BROWN:

Q. Would you like me to repeat the question, sir?

A. Yes, please.

Q. If somebody were setting up a website, is it your testimony that going through these steps would be a typical way to pay for the website registration?

A. I don't know. I think people set up websites in many ways. I don't know.

Q. So it's your testimony that it's neither typical nor atypical. You just don't know?

MR. EKELAND: Objection.

THE COURT: Overruled.

THE WITNESS: Yes. I don't understand what "typical" would mean in this context.

Sterlingov - CROSS - By Mr. Brown

BY MR. BROWN:

Q. How about common? Would this be a common way to pay for setting up a website?

MR. EKELAND: Objection.

THE COURT: What's the objection?

MR. EKELAND: A, calls for speculation. B, vague and ambiguous as to common. C, asked and answered.

THE COURT: Overruled.

THE WITNESS: I don't know if these are common steps. I think maybe what this question goes to is, I think you asked me once before if this was common. And I gave you an answer that it doesn't look like a common set of steps for setting up a domain or website.

But I -- after the day I had to go back and I had to think about all the questions that I've received. And actually, a more truthful answer is that I don't know if this is common.

BY MR. BROWN:

Q. So just so the jury is able to follow along, you're referring to testimony you gave on January 31st, 2023. Correct?

A. Yes.

Q. And that was in a pretrial hearing on this case?

A. Yes.

Q. And you were questioned whether going through these

Sterlingov - CROSS - By Mr. Brown

steps would be a common way to pay for a website registration?

A. Something like that, yes.

Q. And at the time, you said that it does not sound like a common or regular way. Correct?

A. Yes.

Q. And your testimony here today is you've changed your mind about that. Correct?

A. Yes.

Also, that I didn't understand the question as good as I thought I did. And I just don't have any knowledge of whether this is a common set of steps.

Q. Now, Mr. Sterlingov, if one wanted to convert euros to Liberty Reserve dollars, would all of these steps be required?

MR. EKELAND: Objection. Calls for speculation.

THE COURT: Overruled.

THE WITNESS: I don't know. They might have been many years ago when, like I said, there were a lot of friction between moving funds, between different payment systems and wallets and crypto and different currencies.

BY MR. BROWN:

Q. Mr. Sterlingov, I'd like to direct your attention to Exhibit 437.

Now, is it your testimony that AurumXChange did

Sterlingov - CROSS - By Mr. Brown

not accept bank wires in 2011?

A. I don't know specifically whether AurumXChange accepted bank wires in 2011. In general, I can say that a lot of these -- this type of exchanges and this type of accounts and payment services, there was a lot of friction; and a lot of payment methods were not accepted.

In addition, really, to -- it was a typical situation where you went on a website and it said that it accepted something; and then you tried to send that type of payment and you go, like, a couple of pages in and then they say, Well, we actually don't accept it or, like, We're not -- typically, we accept it, but right now there are no reserves in this type of currency.

There were a lot of problems similar to that --

Q. Mr. Sterlingov --

A. -- just in general. I'm not sure that this is specific to AurumXChange website.

Q. Specifically with respect to AurumXChange, do you have experience trying to send euros to AurumXChange and AurumXChange not accepting them?

A. I don't know. I don't remember.

Q. So you can't say whether you could have just converted euros into Liberty Reserve dollars using AurumXChange without going through Bitcoin first?

A. I don't know. I believe it's the same question.

Sterlingov - CROSS - By Mr. Brown

Q. Now, shifting focus --

MR. BROWN: We can take down these exhibits.

BY MR. BROWN:

Q. You testified earlier that you first learned about Bitcoin Fog during Bitcoin meet-ups?

A. About Bitcoin Fog specifically or mixing?

Q. The question was about Bitcoin Fog. Please correct me if my memory is not accurate.

Did you testify yesterday that you first learned about Bitcoin Fog during Bitcoin meet-ups?

A. I don't know if I did. It was either on a meet-up or from a person that I was trading with.

Q. Do you remember the person who told you about Bitcoin Fog?

A. No. I remember the person that got me into mixing, but I'm not sure if he gave me the actual address to Bitcoin Fog or if he told me the name and to look it up or if I found it somewhere after talking to him. I'm not sure.

Q. And to the best of your recollection, how did you meet this person who told you about mixing?

A. He wasn't the first one that told me about mixing.

But this particular person, this is the one that told me about all the robberies and how he mixed because he was trading in person. I met him -- I was trading Bitcoin with him.

Sterlingov - CROSS - By Mr. Brown

Q. And when did this person first tell you about mixing?

A. Are you asking for a specific date?

Q. To the best of your knowledge, when did this person tell you about mixing?

A. I don't remember a specific date.

Q. To the best of your knowledge, where were you when this person told you about mixing?

A. Oh, we were in -- we met in Gothenburg, in --

Q. And where in Gothenburg were you?

A. It's a place close to something called Brunnsparken.

Q. And do you remember the name of this person?

A. I do not. I think you asked me once again.

Q. And when did you first learn about Bitcoin Fog then?

MR. EKELAND: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: I don't remember specifically. But it was either on the meet-ups or it was this person that was talking about the robberies or I learned about it on the internet after talking to this person and becoming more serious about mixing. I'm not sure which specific.

BY MR. BROWN:

Q. So is it your testimony that you might have learned about Bitcoin Fog not from talking to a person, but learning about it on the internet?

A. I might have.

Sterlingov - CROSS - By Mr. Brown

Q. And I don't suppose you remember when you first learned about Bitcoin Fog?

A. I don't remember when I first learned about Bitcoin Fog. I don't remember when I first learned about Liberty Reserve. I don't remember when I -- exactly when I first learned about Bitcoin. I don't have that kind of memory going back 13 years or 14 or more.

Q. When was your first transaction on Bitcoin Fog?

A. I don't remember a specific date of my first transaction on Bitcoin Fog.

Q. How about an approximate date? When was your first transaction on Bitcoin Fog?

A. Around 2000 -- I would have said -- well, I know what this case says about when Bitcoin Fog has started. So I kind of know it has to be in 2011.

I thought it was earlier. If -- when I was just remembering it, I thought it was earlier. But if it didn't exist, I -- maybe my recollection was wrong.

Q. Do you recall about when in 2011 your first transaction would have been?

A. I do not remember a specific date of my first transaction on Bitcoin Fog.

Q. Do you recall what season of the year it was?

A. No. I think I would have been inside.

Q. Did you try any other mixers before Bitcoin Fog?

Sterlingov - CROSS - By Mr. Brown

A. No.

Q. So Bitcoin Fog --

A. Maybe -- well --

Q. -- was the first mixer you used?

MR. EKELAND: Objection. He was still answering the question, your Honor.

THE COURT: Well, you can answer.

THE WITNESS: If you count mixers -- so a lot of people on the meet-ups, they talked about mixing in general.

And before I knew about specific mixers, I also knew that people were kind of doing their own mixing, because you can -- it's like the way that you set up your wallet and the way that you -- it's like you can have different addresses and you can do, like, little things like sending Bitcoin in a certain way and -- or not sending it into a specific address. Like people were doing that sort of mixing.

I -- I saw that before I used an actual mixer. So if you count that as mixing, I might have done that before, but not like a website mixing.

BY MR. BROWN:

Q. It's your testimony that you might have experimented, played around, with mixing your own transactions before you used a mixer website?

A. Yes.

Sterlingov - CROSS - By Mr. Brown

Q. Now, your user account on Bitcoin Talk is Killdozer. Correct?

A. Yes.

MR. BROWN: If I could just pull up Government's Exhibit 865.

BY MR. BROWN:

Q. Do you recognize this email?

A. I do not. But I'm --

Q. Do you --

A. I have no reason to believe this is not a real email.

Q. Do you recall setting up an account on the Bitcoin Wiki in the name of Killdozer?

A. I have to say I do not specifically recall that.

Q. Now, directing your attention to Government's Exhibit 862-A, this is a translation from an email that you sent. Correct?

A. Yes.

Q. And you sent this from your heavydist@gmail.com email address. Correct?

A. Yes.

Q. And you were telling the recipient of this email that they could find you on Bitcoin Talk under the username Killdozer. Correct?

A. Yes. This looks to be a person that was setting up another meet-up, and I told them about my --

Sterlingov - CROSS - By Mr. Brown

Q. And you told this person that they could find you on Bitcoin Talk under the username Killdozer. Correct?

A. Yes.

Q. Now, directing your attention to Exhibit 910, this is an email thread that you sent to somebody from a website called Total Commander. Right?

A. Yes.

Q. And scrolling down to the bottom, there's a quoted passage that's your words. Correct?

A. I believe so. Yes.

Q. And you told this person that the name Cray Killdozer is, quote, "my identity, which I have been living with and used in my work and the only one I associate myself with -- I associate myself in those contexts." Correct?

A. It's not a correct statement, but it's what I wrote.

If you look at the rest of the email, this was a -- Total Commander was a piece of software that I was using. It's -- you can use it for free. It just shows you some commercials. But you could also pay for it. And I was using for a long time.

And I was thinking, this is good software, you know. I should reward the people or -- I don't know if it was one person or however it was -- I thought I should buy the license.

And they didn't want to give me the license for

Sterlingov - CROSS - By Mr. Brown

the name Cray Killdozer because they had some problem with, like, nicknames.  I think that was the issue.

And I was just trying to convince them to give me the license for the name that I wanted.

Q.  And is it your testimony today that you were not being sincere when you told this person from Total Commander that "this was my identity which I have been living with and used in my work and the only one I associate myself in those contexts"?  That was not sincere.  Is that your testimony?

MR. EKELAND:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I would say it's an exaggeration. It's -- like I already said, Killdozer was my account on Bitcoin Talk.

BY MR. BROWN:

Q.  Mr. Sterlingov -- I'm sorry to interrupt.  The question was not if Killdozer was your --

A.  I --

Q.  -- account on Bitcoin Talk.

A.  Oh.

THE COURT:  One at a time, please.

BY MR. BROWN:

Q.  The question was:  Were you being sincere in your statement to the Total Commander person here?

MR. EKELAND:  Objection.  Asked and answered.

Sterlingov - CROSS - By Mr. Brown

THE COURT: Overruled.

THE WITNESS: It's -- it was an exaggeration.

BY MR. BROWN:

Q. Now, turning to Exhibit -- Government's Exhibit 13 and message ID 423953, now scrolling down to -- well, first of all, from this view, this is a series of posts made on Bitcoin Talk by your account, Killdozer. Correct?

A. I believe so.

Q. And looking at this message, scrolling down just a little bit, this is a message that you posted on Bitcoin using your username, Killdozer. Correct?

A. I think so.

Q. And the body of this message has to do with -- you're trying to fix some errors in code. Is that fair to say?

A. Yes. Just with a small addition that I don't know if it's the code that I am trying to create or if this is a code for a freelance job or something else. But some sort of code.

Q. And this is a post that you made using Killdozer on Bitcoin Talk. Correct?

A. I think so.

Q. Do you think it might not be true?

A. I just don't remember this post. But I -- I think so.

MR. BROWN: If we could scroll down a little bit under the number 2, where it says "errors." And then there

is a series of text, a few lines of text here.

BY MR. BROWN:

Q. Doesn't this refer to a user called heavydist?

A. It does.

Q. And that's you. Right?

A. I've used the username heavydist.

Q. And then scrolling back up to the top of this message, this was posted in August of 2011. Correct?

A. Yes.

Q. And your status on Bitcoin Talk as of that date was as a noobie. Correct?

A. I'm not sure. It could have been.

Q. Looking at that first block of text, isn't it correct that you say, "But I am a noobie, so let's hope he will see it here instead"? Correct?

A. Yes.

Q. Now, isn't it true that on Bitcoin Talk, you could send and receive private messages regardless of your status on Bitcoin Talk? Correct?

A. I'm not sure one way or another. I know that reputation and status in general are important on many of these forums and you get more access to various functions or messages or things like that.

Q. But you can't say -- you can't tell the jury that noobies were restricted from sending or receiving private

Sterlingov - CROSS - By Mr. Brown

messages on Bitcoin Talk, can you?

A.   I don't know about that.

Q.   And as Killdozer, you were the one who reached out to Duncan Townsend about blind Bitcoin.  Isn't that correct?

A.   Could you repeat the question?

Q.   You were the one using the Bitcoin Talk account Killdozer who reached out to Duncan Townsend about blind Bitcoin?

A.   So I'm not sure.  As I think I testified yesterday or today, it could have been me.  There's also another possibility that I was sharing my account with somebody who needed to just access the forum.

Q.   You used Jabber.  Right?

A.   I've used Jabber.

Q.   You were favoring Jabber as a means of communication back in 2011.  Correct?

          MR. EKELAND:  Objection.  Did you say "favoring"? I just didn't --

          THE COURT:  Yes.  Favoring.

          MR. EKELAND:  Vague and ambiguous as to "favoring."

          THE COURT:  Overruled.

          THE WITNESS:  I don't know.  I wouldn't characterize it like that.

Sterlingov - CROSS - By Mr. Brown

BY MR. BROWN:

Q. And it's your testimony to the jury that you just can't remember one way or another whether you reached out about blind Bitcoin?

MR. EKELAND: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: Yes. That's correct.

MR. BROWN: Now we can take this down.

BY MR. BROWN:

Q. And directing your attention to Exhibit 702 --

MR. BROWN: And we'll have to shut off the monitor in the gallery.

THE COURT: While you're doing that, let me ask, we are adjourning at 3:30 today. The question is whether if we powered straight through to 3:30, would we be done? Or should we take a break now for 15 minutes and then come back and finish up at 3:30 with having to do some finishing tomorrow? We'll need some time for redirect as well.

MR. BROWN: Your Honor, I'm not sure I'll finish by 3:30, so this might be a good time.

THE COURT: Why don't we go ahead take a break now until 3:00. I do know that we have to finish by 3:30 today.

I'll remind you once again, don't talk about the case even amongst yourselves and don't conduct any type of research.

Sterlingov - CROSS - By Mr. Brown

THE COURTROOM DEPUTY: All rise.

(Whereupon, the jury exited the courtroom at 2:43 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: Anything anyone wants to say before the break?

MR. BROWN: No, your Honor.

MR. EKELAND: No, your Honor.

THE COURT: All right. I will see you back shortly.

THE COURTROOM DEPUTY: All rise.

(Thereupon a recess was taken, after which the following proceedings were had:)

THE COURTROOM DEPUTY: All rise.

THE COURT: Ready to get the jury?

MR. BROWN: Yes.

THE COURT: Let's get the jury.

THE COURTROOM DEPUTY: All right.

(Whereupon, the jury entered the courtroom at 3:06 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY: The jury is present. You may be seated and come toward order.

THE COURT: Mr. Brown, you may continue when you're ready.

Sterlingov - CROSS - By Mr. Brown

BY MR. BROWN:

Q. Now, Mr. Sterlingov, during your direct examination, you were asked about a password file.

Do you recall that testimony?

A. I think so.

Q. And directing your attention to Exhibit 702 -- and this is the one that I think we already have the monitor for the gallery turned off for this. Now, this may not be the same format that you're used to looking at. But do you recognize the content of Exhibit 702?

A. I do recognize many of them.

Q. And is this -- is the content -- is that content from your password file that you kept?

A. Yes.

Q. And was this saved on a USB drive that you were carrying at the time of your arrest?

A. It -- I think so. It could have been.

Q. Do you --

A. I don't know exactly where, which USB or what.

Q. Do you have any reason to believe it was not saved on one of the --

A. No.

Q. -- USBs?

A. No.

Q. And when you discussed this file during your direct

Sterlingov - CROSS - By Mr. Brown

examination, isn't it true that you said that some of these accounts belonged to you and some of them didn't belong to you?

A. Right. I saved the accounts that I had to access from my freelance jobs for my job at Capo and just various other accounts that I had to share. I sometimes would save them in this file as well. I would add in there. I would try to remove them after the job would be done, just not to keep any other people's accounts or passwords.

Q. And so -- well, let me ask you this: For the accounts that belonged to you, was it important for you to save the log-in information for those accounts in your password file?

MR. EKELAND: Objection.

THE COURT: What's the objection?

MR. EKELAND: Vague and ambiguous as to "important."

THE COURT: Overruled.

THE WITNESS: Could you clarify that?

BY MR. BROWN:

Q. For the accounts in this file that belonged to you, was it important for you to save the user account and password information in this file?

A. I think you just asked the same question. I don't -- I don't understand the importance -- I don't understand.

Q. Is one of the reasons why you kept this file because it

Sterlingov - CROSS - By Mr. Brown

was your practice for account recovery questions to just put in a line of code or gibberish?

A. The reason for putting accounts in this file?

Q. Let's try it this way.

So directing your attention to Exhibit 838, please, this is an email that you sent from your heavydist@gmail.com account. Right?

A. I think so.

Q. You think so. Do you have a recollection of sending this email?

A. I do not.

Q. Do you believe somebody else might have sent this email?

A. I have no reason to -- I don't know. I don't think so.

Q. Now, in the first line of this email, you, or whoever wrote this email, talk about a secret answer. Isn't that correct?

A. Yes.

Q. And that's part of the account recovery process for, in this case, Centre Gold. Right?

A. Yes.

Q. So Centre Gold had it set up so you if forgot your passport, you could type in a secret answer. Correct?

A. That's what it sounds like from reading the email.

Q. And you explained to Centre Gold that it was your practice to write some code like an extra password in such

Sterlingov - CROSS - By Mr. Brown

fields. Correct?

A. Right. But it's not just my practice; it was a common practice that I've been taught.

Q. And that means that if you happen to forget your password for a given account, you would not be able to use an account recovery process. Correct?

A. I wouldn't be able to use the account recovery process?

Q. So if you sign up for an account and you forgot your account password, and there's a secret answer or an account recovery question, you would have to know the exact code that you had entered when you set up that account. You couldn't just remember, say, you know, the name of the street where you grew up on or your mother's maiden name. Correct?

A. Right. I think the point is that you would try to save that, whatever the answer was.

Q. And is that --

A. So I don't know -- it depends on the -- whatever it is. They might still let you recover your account without it. It just depends, I think.

Q. And is that some of the information that you saved in your password file?

A. I might have, yeah.

Q. Now, going back to Exhibit 702, is it your testimony that for the accounts that don't belong to you, these were

accounts that you were given access to in the course of your freelance work?

A. My freelance work, my regular job and also just sharing some of the accounts if -- if I was working with somebody on some project.

Q. Now, during your direct examination, you talked about working on a project for BTC-X.

Do you remember that?

A. Yes.

Q. That's a project that you worked on in 2012. Correct?

A. I think so.

Q. Not 2011. Correct?

A. I think so.

Q. And in your testimony, you said that BTC-X shared certain log-in information with you?

A. Yes.

Q. And BTC-X doesn't appear anywhere in your password list here, does it?

A. I'm not sure if it does. If it doesn't, like I said before, I try to go through this list and remove all the accounts associated with past jobs or projects just so that I don't keep any passwords that are owned by other people just in case I get hacked so that those passwords get leaked because of something that I did. Sometimes I forget to delete some of the accounts, but it's my best practice that

Sterlingov - CROSS - By Mr. Brown

I try to delete them.

Q.  And just as kind of a side question, BTC-X didn't ask you to register the domain name bitcoinfog.com.  Correct?

A.  No.

Q.  Now, during your direct examination, you said that you had a system to mark which of these accounts belonged to only you.  Correct?

A.  Yes.

Q.  And what was that system that you had?

A.  Right.  I would add the word "white" on the name of the account.

Q.  And so directing your attention to Line 100, is this an example of one of the accounts that you have marked "white"?

A.  Yes.

Q.  And this is a Liberty Reserve account in the name of Jackson -- with a username Jacksonson.  Correct?

A.  Yes.  It's obviously not a perfect system.  And many times I wouldn't do that on some accounts.  I wouldn't mark them that way.

Q.  On some accounts you would not mark them as "white"?

A.  That's correct.

Q.  So that was not your system to keep track of accounts that belonged to you versus accounts that may have belonged to others?

A.  It was my system.  But it wasn't a perfect system and I

Sterlingov - CROSS - By Mr. Brown

wasn't perfect at working with that system.

Q.   And so directing your attention to Line 105, is this another example of an account that you've marked as "white"?

A.   Yes.

Q.   And this is the Mt. Gox account with username Roso987341870?

A.   Yes.

Q.   And that's the same Mt. Gox account that we've been talking about that you opened using your true name, Roman Sterlingov?

A.   Yes.

Q.   Now, directing your attention to Line 65, this refers to a Bitstamp account.  Isn't that true?

A.   Yes.

Q.   And it doesn't have the word "white."  Correct?

A.   That's correct.

Q.   And if you scroll -- if you look at Column B, there's a number listed there?

A.   Is that a question?

Q.   Yes.  It is a question.  Is there a number listed there?

A.   Yes.

Q.   And that's 52443?

A.   Yes.

Q.   And then scrolling over to Column AA, which is the Notes column here, you have an email address listed.  Right?

Sterlingov - CROSS - By Mr. Brown

A. I have what?

Q. You have an email address listed under Column AA. Right?

A. Yes.

Q. And that's your email address, heavydist@gmail.com?

A. Yes.

Q. And directing your attention to Exhibit 414-C, Bitstamp account records, this is a record of your account at Bitstamp. Correct?

A. Yes.

Q. And looking at the second field down from the top, it says customer ID and then it has the number 52443. Correct?

A. Yes.

Q. Then going back to Exhibit 702, Line 28, this is your Namecheap account, isn't it?

A. Yes. I think so.

Q. And it's not labeled as "white," is it?

A. It is not.

Q. And in Column B, the username is kellerman. Correct?

A. Yes.

Q. And then directing your attention to Exhibit 521-A, on Page 1 here, these are Namecheap account records. Right?

A. Yes.

Q. And this is your Namecheap account that you opened in the name of Roman Sterlingov. Right?

Sterlingov - CROSS - By Mr. Brown

A. Yes.

Q. Now, if we scroll to Page 2, the username associated with all of these entries is kellerman; isn't that correct?

A. Yes.

Q. Now, going back to Exhibit 702, Line 83, please. Now, this is an entry for an account on exploit.in. Correct?

A. Yes, it is. But it has been incorrectly described as my account. It's not my account.

Q. Is it your testimony that this account was given to you for your freelance work?

A. This account, I was hired to promote it, to promote the reputation of that account.

Q. Now, exploit.in is a cybercrime forum, isn't it?

A. That's not how it was described to me.

Q. Now, directing your attention --

A. Looking at it afterwards, there seems to be some cybercrime activity there. After looking at it -- at some information in this case, it --

Q. Directing your attention to Exhibit 893, this is an email that you received in your spam@plasmadivision.com account?

A. Correct.

MR. BROWN: By the way, I think for the moment we can turn the monitor back on.

MR. EKELAND: Sorry. I didn't hear you, Mr.

Sterlingov - CROSS - By Mr. Brown

Brown.

MR. BROWN: For the moment, I think we can turn the monitor back on.

MR. EKELAND: Oh, okay.

BY MR. BROWN:

Q. And the date of this email is October 14th, 2008. Correct?

A. Yes.

Q. And this is an email showing that you have registered an account at exploit.in. Correct?

A. Yes.

Q. And it's for a username called thetwo. Correct?

A. Yes.

Q. And then directing your attention to Exhibit 898, please, this is another email that you received in your spam@plasmadivision.com account. Right?

A. Yes.

Q. And this was received on September 20th, 2011. Right?

A. Yes.

Q. And it's an email addressed to your account thetwo. Correct?

A. Yes.

Q. And there's link here that includes the lines "lostpassform." Right?

A. Yes.

Sterlingov - CROSS - By Mr. Brown

Q.   Did you forget your password to exploit.in?

A.   I'm not sure.  It's possible.

Q.   And then --

MR. BROWN:  I'm sorry, Mr. Pearlman.  We do have to turn the monitor back off.

BY MR. BROWN:

Q.   Returning to Exhibit 702, please.  Scrolling over to Column K on Line 83, Column K, this reflects when the information was entered into your password file.  Right?

A.   I think so.  I --

MR. BROWN:  If we scroll up to the very top of the spreadsheet, can we see what Column K shows.

BY MR. BROWN:

Q.   So Column K shows the time the entry was created. Right?

A.   I think so.

Q.   And then scrolling back down to Line 83, the entry for the meth account on exploit.in was created on September 22nd, 2011?

A.   That's correct.

Q.   And that was two days after you received the lost password account for your thetwo account @exploit.in. Right?

A.   Yes, that's right.

MR. EKELAND:  Your Honor, I'm going to object as

Sterlingov - CROSS - By Mr. Brown

this being beyond the scope of the direct.

THE COURT: Overruled.

THE WITNESS: I just -- I would like to add it doesn't seem correct to describe that I lost the password, because that was a password restore link in that email and that would have given you the new password.

BY MR. BROWN:

Q. Is it your testimony that you maintained your access to the username account thetwo@exploit.in?

A. I'm not sure. I don't remember this specific name.

Q. Now, one more question about the password list. This had all of your important passwords that you needed to keep track of. Right?

A. Yeah.

Q. Why isn't there an entry in here for your user account on Bitcoin Fog?

A. I didn't really have a permanent account on Bitcoin Fog. You could create an account in, like, a minute there.

Q. Is it your testimony that every time you used Bitcoin Fog you created a new user account?

A. Every few times. Every couple of times. Yeah.

Q. How many transactions do you think you've conducted on Bitcoin Fog between 2011 and 2021?

A. Maybe a few dozen.

Q. That's it?

Sterlingov - CROSS - By Mr. Brown

A. I think so.

Q. During your direct examination, you were asked about offchain transactions.

Do you recall that line of questions?

A. Yes.

Q. And an offchain transaction is where you give somebody a copy of your private keys instead of sending Bitcoin to them on the blockchain. Correct?

A. Yes. Or you give them the whole wallet or you give them -- I've also heard people give them the restore phrase for the wallet, but it's essentially the same thing as giving them the wallet.

Q. And this requires a lot of trust between the two parties, doesn't it?

A. Yes. It requires trust in a sense that the other person can access the account and they can move the funds.

As I mentioned earlier, I don't agree that it requires that much trust for, like, small transactions because it doesn't require that much trust that your friend is not gonna scam you for, like, $100 worth of crypto or a transaction.

And it's just -- the whole phrase that it requires a lot of trust, I think there's like a lot of it -- there's a lot in it. I think it's just more complicated. Like if you give somebody -- if you give somebody a wallet and then

Sterlingov - CROSS - By Mr. Brown

you don't use that wallet afterwards, it doesn't require any trust, because they have taken over the wallet.

Q. In your testimony, you said that you only did this with friends because if they scammed you out of $50 --

MR. BROWN: Oh, Ms. Walker, can you pull down the screen, please.

BY MR. BROWN:

Q. Sorry. Let me start that again.

In your testimony, you said that you only did these offchain transactions with friends because you said something to the effect of if they scammed you out of $50, then you're no longer friends. Isn't that right?

MR. EKELAND: Objection. Mischaracterizes the testimony.

THE COURT: The jury's recollection will control.

THE WITNESS: Excuse me. I didn't hear you. Your Honor? Is it overruled?

MR. BROWN: Let me rephrase the question.

THE COURT: Okay.

BY MR. BROWN:

Q. You testified that you only did these transactions with friends; and you provided an explanation, something to the effect of -- and I'm not trying to quote you -- something to the effect of, if your friend scammed you out of $50, then you're no longer friends. Is that the explanation that you

Sterlingov - CROSS - By Mr. Brown

gave yesterday?

MR. EKELAND:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Well, not exactly.  I said that they're no longer friends if they scam you out of $50 as an example.

I said specifically that I did it with at least one person that wasn't technically my friend, like I wouldn't call them a friend.  It was just a person on a meet-up that didn't know how to set up their own wallet.  So I set up a wallet for them and then I sent them the wallet.

But other than that, maybe I did it with a few friends and maybe a couple more transactions that I don't remember.  But not any large number of transactions.

BY MR. BROWN:

Q.  And isn't it true that actually the person who receives your private keys has to trust you in that sort of transaction?

A.  Not unless you delete the wallet.

Q.  Well --

A.  If I transfer somebody my wallet and they can see me on the phone or whatever it is, on the computer, that I delete it, I would say it doesn't require that much trust.  I mean, I guess you can, like, try to --

Q.  So that person has to trust you that you've deleted all

Sterlingov - CROSS - By Mr. Brown

your copies of the keys.  Correct?

A.  Well, I guess that's correct.  Yeah.

Q.  And you could have copies of those keys in more than one place?

A.  I guess you could try technically to finagle that sort of operation.  I don't think -- I don't think there is, like, an easy way to do that technically.  Maybe there is. I think it wouldn't be -- it wouldn't make sense for, like, a $100 worth transaction.  But maybe somebody can do that.

But --

Q.  Mr. Sterlingov, you testified earlier today that you kept copies of your Bitcoin wallet on more than one phone. Right?

A.  That I kept copies of my Bitcoin wallet?

Q.  Isn't that what you told the jury earlier today?

^ Header MR. EKELAND:  Objection.

THE WITNESS:  Could you point me to a specific --

THE COURT:  Mr. Brown, is this a good time to break for the evening?

MR. BROWN:  We can bring for the evening.

THE COURT:  Why don't we break for the evening now.

I want to talk to the lawyers just about the schedule for tomorrow.  I think there's one juror who has to run to an appointment.  And if you can't wait for a few

minutes while we figure this out, just let the deputy clerk know and she'll send you an email or a text telling you what time we're meeting in the morning.

Please don't discuss the case with anybody overnight. And I'll actually bring you back in to let you know what time we're going to meet tomorrow.

So let's just take a break.

THE COURTROOM DEPUTY: All rise.

(Whereupon, the jury exited the courtroom at 3:31 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: So I will have the draft jury instructions to you all maybe within half an hour of getting off the bench. I'm just about done with them.

The question is: Do you want to meet to talk about those later tonight? I want to make sure you have time to look at them. But we could at least get started tonight, and if you wanted to finish up with any final comments in the morning and maybe we could just ask the jurors to come back at 10:00 a.m., and that way I don't have jurors sitting here. We can finish up with the jury instructions by 10:00, finish up with the presentation of the evidence and move to closing arguments tomorrow.

Does that make sense for the schedule?

MR. BROWN: Yes, your Honor. That's fine with the

Government.

MR. EKELAND: Sorry. Just so I understand, you want to have the jury charge conference tonight?

THE COURT: We'll start it tonight. But if you have more tomorrow morning, that would be fine as well.

MR. EKELAND: Yeah. Just what time are you proposing?

THE COURT: Well, I can get it to you by 4:00. So we could just go from 4:30 to 5:00.

MR. EKELAND: Okay. Sure.

THE COURT: Okay. So let's bring the jurors back in and I will tell them -- well, why don't we bring them back in.

THE COURTROOM DEPUTY: Okay.

THE COURT: I'll tell you what. Any objection to my just having the deputy clerk tell them 10:00 and admonish them not to discuss the case? If they don't know that one by now, we're in trouble.

Is that acceptable to everyone?

MR. BROWN: No objection, your Honor.

MR. EKELAND: No objection, your Honor.

THE COURT: Thanks.

(Thereupon, the courtroom deputy retired from the courtroom and the following proceedings were had:)

THE COURT: Anything that anyone else wants to

raise before we break so I can get you the instructions?

MR. BROWN: No, your Honor.

THE COURT: If you want, you can wait here in the courtroom. I'll give you hard copies of them.

MR. EKELAND: No, your Honor.

THE COURT: Okay. Well, I will get them to you shortly.

(Thereupon a recess was taken, after which the following proceedings were had:)

THE COURT: All right. I don't want to keep the court staff too late tonight, but let's at least get started on things.

Who wants to go first?

MR. BROWN: Your Honor, the Government -- aside from just a few sort of typos and minor language tweaks, we don't have any substantive disagreement with the draft jury instructions.

Just to flag, the conspiracy instruction seems to require special unanimity; and I just don't know offhand if that's required for the objects of the conspiracy.

THE COURT: Yeah. I think that's a good question. In the past I think I've instructed on unanimity for the objects of the conspiracy, and it's probably worth looking at that overnight to make sure -- because it depends on --

MR. BROWN: Yes.

Charge Conference

THE COURT:  -- the type of conspiracy or the particular conspiracy provision that we're dealing with as to whether I think that's required or not.

MR. BROWN:  Yes, your Honor.

So that's a research question that we will look into overnight.

THE COURT:  Okay.

MR. BROWN:  But other than that, we don't have any significant concerns.  And we can, you know, send language or typos or however the Court would best --

THE COURT:  Let me hear from Mr. Ekeland and then we can talk about how to sort of submit the comments.

MR. EKELAND:  This is, of course, based on a speed read.  But I mean, generally we have the same view as the Government.

I will just quickly flip through some stuff that I very hastily marked up.

THE COURT:  Okay.  Great.

MR. EKELAND:  And you know, I haven't given this a thorough, close read.

But there's one question:  Is the indictment going back with the jury?

THE COURT:  No.  I typically don't send the indictment back.

MR. EKELAND:  I wanted to make sure on that.

Charge Conference

What am I looking at?

THE COURT: The other thing is, overnight I'll work on a verdict form because I think, depending on where I come out on the question of the objects of the conspiracy, we may need a special verdict for that. And I think that there's agreement that we should have a special verdict with respect to the three different ways of proving --

MR. EKELAND: Yes.

THE COURT: -- operating an unlicensed money transaction business.

MR. EKELAND: Yes. I agree with that. I did read that.

THE COURT: Okay.

MR. EKELAND: And I think -- this is just for purposes of the record. I think we've already preserved this, but I wanted -- we object to the willful blindness instruction, because we just don't think there's anything --

THE COURT: Tell me why you object to that. Is it because you think there's no evidentiary basis for it?

MR. EKELAND: I think there's no evidentiary basis for it. There's nothing that's come out in this trial that supports -- well, I think you know our position.

THE COURT: I'm asking you, is there any other reason to oppose that other than that? Because my thinking on that was that it's in the nature of a mixer itself that

one engages in willful blindness, or could.  I'm not saying that it was done here, but there could be willful blindness because the whole point of the mixer is to not know who the transactions are coming from or who they're going to.

MR. EKELAND:  No, your Honor.

THE COURT:  Okay.  Well, I will get them to you shortly.

(Thereupon a recess was taken, after which the following proceedings were had:)

THE COURT:  All right.  I don't want to keep the Court staff too late tonight, but let's at least get started on things.

Who wants to go first?

MR. BROWN:  Your Honor, the Government -- aside from just a few sort of typos and minor language tweaks, we don't have any substantive disagreement with the draft jury instructions.

Just to flag, the conspiracy instruction seems to require special unanimity and I just don't know offhand if that's required for the objects of the conspiracy.

THE COURT:  Yeah.  I think that's a good question. In the past I think I've instructed on unanimity for the objects of the conspiracy and it's probably worth looking at that overnight to make sure -- because it depends on --

MR. BROWN:  Yes.

Charge Conference

THE COURT: -- the type of conspiracy or the particular conspiracy provision that we're dealing with as to whether I think that's required or not.

MR. BROWN: Yes, your Honor.

So that's a research question that we will look into overnight.

THE COURT: Okay.

MR. BROWN: But other than that, we don't have any significant concerns. And we can, you know, send language or typos or however the Court would best --

THE COURT: Let me hear from Mr. Ekeland and then we can talk about how to sort of submit the comments.

MR. EKELAND: This is, of course, based on a speed read. But I mean, I think generally we have the same view as the Government. I will just quickly flip through some stuff that I very hastily marked up.

THE COURT: Okay. Great.

MR. EKELAND: And you know, I haven't given this a thorough close read.

But one question, is the indictment going back with the jury?

THE COURT: No. I typically don't send the indictment back.

MR. EKELAND: I wanted to make sure on that.

What am I looking at?

Charge Conference

THE COURT: The other thing is overnight I'll work on a verdict form because I think, depending on where I come out on the question of the objects of the conspiracy, we may need a special verdict for that. And I think that there's agreement that we should have a special verdict with respect to the three different ways of proving --

MR. EKELAND: Yes.

THE COURT: -- operating an unlicensed money transaction business.

MR. EKELAND: Yes. I agree with that. I did read that.

THE COURT: Okay.

MR. EKELAND: And I think -- this is just for purposes of the record. I think we've already preserved this, but I wanted -- we object to the willful blindness instruction, because we just don't think there's anything --

THE COURT: Tell me why you object to that. Is it because you think there's no evidentiary basis for it?

MR. EKELAND: I think there's no evidentiary basis for it. There's nothing that's come out in this trial that supports -- well, I think you know our position.

THE COURT: I'm asking you, is there any other reason to oppose that other than that? Because my thinking on that was that it's in the nature of a mixer itself, that one engages in willful blindness or could. I'm not saying

Charge Conference

that it was done here, but there could be willful blindness because the whole point of the mixer is to not know who the transactions are coming from or who they're going to.

MR. EKELAND: But my concern there is that it then -- it sort of almost becomes like a negligence standard. It's like, what is -- like, my concern is that, like, where's the evidence that Mr. Sterlingov, like, turned a blind eye? Right?

Like because when you just say, Okay, well, the mixer was running and, you know, people could have run illicit funds through it, you know, "willful" implies intentionality and more than a negligence standard.

So I think that my concern there is that this is confusing to the jury, that they think it's, Oh, okay. He just ran a mixer. He's automatically willfully blind.

But I can -- I'll look into it sort of deeper tonight.

THE COURT: Yes. If you can do that. And I will do the same.

MR. EKELAND: Thank you, your Honor.

And then where else? I think we're generally okay on the substantive counts. I obviously want to read it closer. There's just an obvious typo on Page 57. "Otherwise" in the header is spelled wrong. It's just a typo.

Charge Conference

THE COURT: Let me see that while we're here.

MR. EKELAND: It says, "Money transmitting: Otherwise," and the H and the E are transposed.

THE COURT: Oh, yes. Thank you.

MR. EKELAND: That's low-hanging fruit.

THE COURT: Okay.

MR. EKELAND: On the venue, I'm happy with --

Oh, on the statute of limitations, I'm assuming those dates are just running back from the indictment, the June 14, 2016, dates? Is that where --

THE COURT: This is my understanding --

MR. EKELAND: Yeah.

THE COURT: -- of them.

MR. BROWN: Your Honor, sorry. That reminds me. In fairness, I think that Count 1 was added in the superseding indictment.

THE COURT: Oh.

MR. BROWN: And so in fairness, I think that we would be counting back five years from the superseding indictment but for Count 1.

THE COURT: So you all will have to give me the date for that tomorrow, I guess, unless you have it offhand.

MR. BROWN: So I think -- so the indictment was July 18th, 2022, or the superseding indictment. And so I think for Count 1, the statute of limitations date would be

Charge Conference

July 8, 2017.

THE COURT: Okay.

MR. EKELAND: Sorry, your Honor.

THE COURT: I'll add that.

MR. EKELAND: Just the language leading up to it, maybe I'm misunderstanding it. This is just sort of for style clarity. It says, "I will instruct you that the Government must prove beyond a reasonable doubt that conduct related to Counts 1, 3 and 4 continued up until at least the following dates."

THE COURT: I think it should be "up to and until." Is that right?

MR. EKELAND: Or it -- could it be "after"? Aren't we saying after, after those dates? It has to be within those dates? It's not going -- can we just say something -- Counts 1, 3 and 4 continued after --

THE COURT: Maybe it should be "up to at least"? Is that what you're saying?

MR. EKELAND: I'm sorry. I just didn't hear what you said.

THE COURT: "Continued up to at least."

MR. EKELAND: "Up to at least." Oh, right. So then it's like touching -- I see where that's going. I'm a little tired. And just --

THE COURT: I'm happy to change that from "until"

Charge Conference

to "to," if that's clearer. "Up to at least."

MR. EKELAND: "Up to at least." I think that works.

And then that, I think, on our quick and hasty read here at the end of a long day --

THE COURT: Well, I will take a look at the willful blindness issue as well as the unanimity requirement on the objects of the conspiracy overnight.

And then do you all want to convene at 9:00 tomorrow morning? Or do you think we need less time than that? I'm happy to start later, 9:15, if you think 45 minutes is enough. But I don't want to keep the jury waiting.

MR. EKELAND: I'm happy with 9:15. I'll take the extra 15 minutes, if that's okay with the Government.

THE COURT: Mr. Brown?

MR. BROWN: 9:15 sounds good.

THE COURT: I'll see you all at 9:15 tomorrow, then, for final comments on the instructions.

MR. EKELAND: We're going a full day tomorrow and I'm assuming we're going to try to get closings in tomorrow? Is that the -- I'm trying to get a --

THE COURT: My view is -- I'm not aware of any jury issue. My view is in general that we should just press forward with everything we have. So we may be able to get

Charge Conference

to closings tomorrow.

MR. EKELAND: That's my hope. Maybe the Government can let us know -- maybe they already have, because I haven't checked my email -- if they're doing a rebuttal tomorrow or not or if we're just doing Mr. Sterlingov and going into closings.

THE COURT: How long do you think your closing will last?

MR. EKELAND: Honestly, I don't think -- I'm not intending to go that long. I would say like absolute top ceiling -- and I don't think I'm going to go there -- two hours. I think more realistically, I'm going to try to shoot for something like half an hour, an hour. I'm not looking to do some, you know, crazy thing.

THE COURT: In my experience, shorter is typically more effective.

MR. EKELAND: I absolutely agree with that.

THE COURT: Yes. Okay.

Mr. Brown, anything else you can tell us about scheduling?

MR. BROWN: No, your Honor.

I mean, your Honor, I think for our closing plus rebuttal, I think collectively maybe an hour and a half. But -- oh, sorry.

My co-counsel are correcting me, your Honor. Up

to two hours between closing and rebuttal.

THE COURT: Okay.

MR. BROWN: And the Government at this time anticipates presenting a very short rebuttal witness, but subject to change of plans.

THE COURT: Have you disclosed who that is to the defense yet?

MR. BROWN: Yes, your Honor. We've disclosed to the defense. We may call Ms. Mazars de Mazarin as a rebuttal witness.

THE COURT: All right. Well, thank you all. We're getting close. So I will see you in the morning. 9:15.

MR. EKELAND: Thank you, your Honor.

(Proceedings concluded.)

**CERTIFICATE**

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 6th day of March, 2024.


/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269

**$**

**$100** [4] - 16:4, 16:8, 55:20, 58:9
**$130** [1] - 16:24
**$50** [4] - 56:4, 56:11, 56:24, 57:5
**$9.50** [1] - 24:22

**/**

**/s** [1] - 73:12

**1**

**1** [7] - 11:6, 50:22, 68:15, 68:20, 68:25, 69:9, 69:16
**100** [1] - 48:12
**10005** [1] - 1:23
**105** [1] - 49:2
**10:00** [3] - 59:20, 59:22, 60:16
**10th** [1] - 24:15
**11** [1] - 8:3
**12th** [1] - 21:3
**13** [10] - 5:22, 5:24, 16:11, 17:8, 19:2, 20:4, 20:15, 20:22, 33:7, 38:4
**14** [2] - 33:7, 68:10
**14th** [1] - 52:6
**15** [2] - 41:16, 70:15
**17** [1] - 15:3
**18th** [1] - 68:24
**19th** [1] - 21:23
**1:43** [2] - 1:7, 4:10
**1C7KW** [1] - 19:20
**1PFK** [1] - 17:16
**1st** [1] - 9:25

**2**

**2** [2] - 38:25, 51:2
**2000** [1] - 33:13
**20001** [2] - 2:4, 73:14
**2008** [1] - 52:6
**2011** [18] - 11:22, 16:3, 21:3, 21:24, 24:11, 24:15, 26:20, 30:1, 30:3, 33:15, 33:19, 39:8, 40:16, 47:12, 52:18, 53:19, 54:23
**2012** [1] - 47:10
**2016** [1] - 68:10
**2017** [1] - 69:1

**202** [2] - 2:4, 73:15
**2021** [1] - 54:23
**2022** [2] - 6:22, 68:24
**2023** [4] - 9:9, 9:13, 9:18, 28:20
**2024** [2] - 1:7, 73:10
**20530** [2] - 1:16, 1:19
**20th** [1] - 52:18
**21-00399** [1] - 1:4
**212.117.160.123** [1] - 15:17
**212.117.160.132** [1] - 15:20
**22nd** [1] - 53:19
**25th** [1] - 24:15
**27th** [1] - 19:4
**28** [1] - 50:14
**288** [1] - 21:2
**289** [1] - 21:19
**290** [1] - 21:19
**291** [1] - 21:19
**29th** [1] - 11:22
**2:43** [1] - 42:2
**2nd** [1] - 6:22

**3**

**3** [2] - 69:9, 69:16
**30** [1] - 1:22
**313-A** [2] - 20:6, 21:23
**315** [7] - 10:16, 10:17, 10:18, 10:19, 12:12, 14:8, 16:3
**316** [3] - 16:15, 16:16, 19:18
**31st** [6] - 8:17, 9:9, 9:13, 9:18, 10:1, 28:20
**32** [1] - 15:10
**333** [2] - 2:3, 73:14
**34** [1] - 15:10
**354-3269** [2] - 2:4, 73:15
**36** [1] - 21:24
**364** [1] - 15:19
**38** [1] - 15:10
**3:00** [1] - 41:22
**3:06** [1] - 42:19
**3:30** [5] - 41:14, 41:15, 41:17, 41:20, 41:22
**3:31** [1] - 59:9

**4**

**4** [2] - 69:9, 69:16
**40** [1] - 15:10

**401** [1] - 23:7
**403** [1] - 14:17
**406-A** [2] - 21:1, 21:18
**406-E** [1] - 11:12
**414-C** [1] - 50:7
**423953** [1] - 38:5
**437** [1] - 29:24
**45** [1] - 70:11
**4:00** [1] - 60:8
**4:30** [1] - 60:9

**5**

**5.1527** [1] - 1:16
**521-A** [1] - 50:21
**52443** [2] - 49:22, 50:12
**57** [1] - 67:23
**5:00** [1] - 60:9

**6**

**6** [3] - 1:7, 18:20, 19:5
**60** [5] - 17:3, 17:11, 18:2, 19:4, 19:9
**601** [1] - 1:15
**603-D** [1] - 18:19
**64** [1] - 3:5
**65** [1] - 49:12
**6706** [1] - 2:3
**6th** [1] - 73:10

**7**

**7** [2] - 18:20, 19:8
**702** [7] - 41:10, 43:6, 43:10, 46:24, 50:14, 51:5, 53:7

**8**

**8** [1] - 69:1
**818-B** [1] - 25:4
**83** [3] - 51:5, 53:8, 53:17
**838** [1] - 45:5
**862-A** [1] - 35:15
**865** [1] - 35:5
**873** [1] - 12:2
**878** [1] - 12:24
**881** [1] - 13:10
**887** [1] - 21:8
**89.87** [2] - 20:10, 21:14
**893** [1] - 51:19

**898** [1] - 52:14
**899** [1] - 13:20
**8th** [1] - 16:3

**9**

**910** [1] - 36:4
**950** [1] - 1:18
**9:00** [1] - 70:9
**9:15** [5] - 70:11, 70:14, 70:17, 70:18, 72:13

**A**

**a.m** [1] - 59:20
**AA** [2] - 49:24, 50:2
**ability** [1] - 73:7
**able** [5] - 18:7, 28:19, 46:5, 46:7, 70:25
**absolute** [1] - 71:10
**absolutely** [1] - 71:17
**abuse** [1] - 24:16
**accept** [3] - 30:1, 30:11, 30:12
**acceptable** [1] - 60:19
**accepted** [3] - 30:2, 30:6, 30:9
**accepting** [1] - 30:20
**access** [6] - 39:22, 40:12, 44:4, 47:1, 54:8, 55:16
**accessed** [1] - 24:15
**account** [122] - 11:5, 11:6, 11:9, 11:10, 11:14, 11:16, 11:19, 11:22, 12:6, 12:10, 12:13, 12:17, 12:20, 12:23, 12:25, 13:11, 13:17, 13:24, 14:5, 14:10, 14:13, 14:15, 14:18, 14:19, 14:21, 15:3, 15:6, 15:12, 16:5, 16:8, 16:18, 16:20, 16:24, 17:3, 17:12, 18:2, 18:9, 18:16, 18:25, 19:5, 19:9, 19:13, 19:23, 20:7, 20:10, 21:2, 21:6, 21:9, 21:15, 21:17, 21:20, 22:5, 23:1, 23:4, 23:8, 23:11, 23:18, 23:21, 23:25, 24:1, 24:3, 24:4, 24:10, 24:14, 24:23, 25:1, 25:3, 35:1, 35:11, 37:13,

37:19, 38:7, 40:6, 40:11, 44:21, 45:1, 45:7, 45:18, 46:5, 46:6, 46:7, 46:8, 46:9, 46:11, 46:19, 48:11, 48:15, 49:3, 49:5, 49:8, 49:13, 50:8, 50:15, 50:22, 50:24, 51:6, 51:8, 51:9, 51:11, 51:12, 51:21, 52:10, 52:16, 52:20, 53:18, 53:22, 54:9, 54:15, 54:17, 54:18, 54:20, 55:16
**accounts** [23] - 12:21, 13:21, 26:23, 30:4, 44:2, 44:4, 44:6, 44:9, 44:10, 44:12, 44:20, 45:3, 46:25, 47:1, 47:4, 47:21, 47:25, 48:6, 48:13, 48:18, 48:20, 48:22, 48:23
**accurate** [4] - 9:7, 19:16, 31:8, 73:4
**Action** [1] - 1:3
**activity** [1] - 51:17
**actual** [9] - 4:25, 5:17, 6:23, 8:2, 8:12, 11:24, 14:6, 31:16, 34:18
**add** [4] - 44:7, 48:10, 54:3, 69:4
**added** [1] - 68:15
**addition** [2] - 30:7, 38:15
**address** [27] - 11:6, 14:21, 14:24, 15:17, 15:20, 16:9, 17:15, 17:17, 17:19, 17:20, 17:21, 18:8, 18:21, 19:20, 19:24, 21:25, 22:3, 22:4, 22:5, 23:12, 24:16, 31:16, 34:16, 35:19, 49:25, 50:2, 50:5
**addressed** [1] - 52:20
**addresses** [3] - 15:25, 17:24, 34:14
**adjourning** [1] - 41:14
**admonish** [1] - 60:16
**afternoon** [2] - 4:19, 4:20
**AFTERNOON** [1] - 1:5
**afterwards** [2] - 51:16, 56:1
**ago** [10] - 5:22, 5:24,

8:4, 16:11, 17:8, 19:2, 20:4, 20:15, 20:22, 29:19
**agree** [4] - 55:17, 63:11, 66:10, 71:17
**agreement** [2] - 63:6, 66:5
**ahead** [1] - 41:21
**almost** [1] - 67:5
**ambiguous** [3] - 28:7, 40:20, 44:15
**AMERICA** [1] - 1:3
**answer** [16] - 5:14, 6:23, 7:2, 7:17, 7:20, 9:23, 15:7, 23:21, 24:8, 28:12, 28:16, 34:7, 45:15, 45:22, 46:9, 46:16
**answered** [10] - 5:6, 5:14, 8:10, 12:16, 12:18, 18:10, 28:7, 32:14, 37:25, 41:5
**answering** [1] - 34:5
**anticipates** [1] - 72:4
**appear** [1] - 47:17
**aPPEARANCES** [1] - 1:13
**appointment** [1] - 58:25
**approximate** [1] - 33:11
**arguments** [1] - 59:23
**arrangement** [2] - 26:19, 26:22
**arrest** [1] - 43:16
**aside** [2] - 61:14, 64:14
**asked..** [1] - 9:16
**associate** [3] - 36:13, 36:14, 37:8
**associated** [2] - 47:21, 51:2
**assuming** [2] - 68:8, 70:21
**attention** [30] - 10:15, 11:12, 12:1, 12:24, 13:10, 13:20, 14:17, 15:19, 16:15, 18:19, 20:5, 21:1, 21:8, 21:19, 23:7, 25:4, 29:23, 35:14, 36:4, 41:10, 43:6, 45:5, 48:12, 49:2, 49:12, 50:7, 50:21, 51:15, 51:19, 52:14
**attorney** [1] - 7:18
**ATTORNEY'S** [1] - 1:14
**atypical** [1] - 27:20

**August** [2] - 6:22, 39:8
**AurumXChange** [19] - 12:13, 12:17, 12:20, 12:23, 13:3, 13:5, 13:14, 13:17, 14:2, 14:5, 14:9, 16:4, 29:25, 30:2, 30:17, 30:18, 30:19, 30:20, 30:23
**automatically** [1] - 67:15
**Avenue** [3] - 1:18, 2:3, 73:14
**aware** [1] - 70:23

## B

**bank** [5] - 21:6, 21:14, 21:20, 30:1, 30:3
**based** [2] - 62:13, 65:13
**basis** [4] - 63:19, 63:20, 66:18, 66:19
**becomes** [1] - 67:5
**becoming** [1] - 32:19
**BEFORE** [1] - 1:11
**belong** [2] - 44:2, 46:25
**belonged** [6] - 44:2, 44:11, 44:20, 48:6, 48:23
**bench** [1] - 59:14
**best** [8] - 7:22, 31:19, 32:3, 32:6, 47:25, 62:10, 65:10, 73:7
**between** [8] - 26:22, 26:25, 27:2, 29:20, 54:23, 55:13, 72:1
**beyond** [2] - 54:1, 69:8
**bit** [4] - 16:16, 18:2, 38:10, 38:24
**Bitcoin** [65] - 5:18, 9:20, 17:3, 17:12, 17:15, 17:20, 17:21, 17:23, 18:2, 18:8, 19:4, 19:9, 19:19, 21:21, 21:25, 22:3, 22:4, 22:15, 30:24, 31:5, 31:6, 31:7, 31:10, 31:13, 31:16, 31:24, 32:13, 32:23, 33:2, 33:3, 33:6, 33:8, 33:10, 33:12, 33:14, 33:22, 33:25, 34:2, 34:15, 35:1, 35:11,

35:22, 36:2, 37:14, 37:19, 38:7, 38:10, 38:20, 39:10, 39:17, 39:19, 40:1, 40:4, 40:6, 40:8, 41:4, 54:16, 54:17, 54:19, 54:23, 55:7, 58:12, 58:14
**bitcoinfog.com** [7] - 4:23, 5:12, 6:2, 8:1, 8:20, 9:14, 48:3
**Bitcoins** [1] - 21:24
**Bitstamp** [3] - 49:13, 50:7, 50:9
**blind** [5] - 40:4, 40:7, 41:4, 67:8, 67:15
**blindness** [7] - 63:16, 64:1, 64:2, 66:15, 66:25, 67:1, 70:7
**block** [1] - 39:13
**blockchain** [1] - 55:8
**blowing** [3] - 25:19, 26:3, 26:5
**body** [1] - 38:13
**bottom** [2] - 22:25, 36:8
**bought** [2] - 6:3, 21:22
**box** [1] - 4:2
**boy's** [1] - 23:16
**break** [7] - 41:16, 41:21, 42:6, 58:19, 58:21, 59:7, 61:1
**bring** [5] - 4:8, 58:20, 59:5, 60:11, 60:12
**Brooklyn** [1] - 1:23
**BROWN** [72] - 1:14, 4:6, 4:18, 5:9, 6:11, 6:16, 7:6, 7:13, 7:23, 8:15, 9:3, 10:18, 10:22, 16:13, 16:14, 18:15, 27:11, 28:1, 28:18, 29:22, 31:2, 31:3, 32:21, 34:21, 35:4, 35:6, 37:15, 37:22, 38:3, 38:24, 39:2, 41:1, 41:8, 41:9, 41:11, 41:19, 42:7, 42:16, 43:1, 44:19, 51:23, 52:2, 52:5, 53:4, 53:6, 53:11, 53:13, 54:7, 56:5, 56:7, 56:18, 56:20, 57:15, 58:20, 59:25, 60:20, 61:2, 61:14, 61:25, 62:4, 62:8, 64:14, 64:25, 65:4, 65:8, 68:14, 68:18, 68:23, 70:17, 71:21,

72:3, 72:8
**Brown** [7] - 3:5, 4:15, 42:23, 52:1, 58:18, 70:16, 71:19
**Brunnsparken** [1] - 32:10
**BTC** [5] - 21:22, 47:7, 47:14, 47:17, 48:2
**BTC-X** [4] - 47:7, 47:14, 47:17, 48:2
**business** [2] - 63:10, 66:9
**buy** [1] - 36:23
**buying** [1] - 4:25
**BY** [34] - 2:1, 4:18, 5:9, 6:11, 6:16, 7:23, 8:15, 9:3, 10:22, 16:14, 18:15, 27:11, 28:1, 28:18, 29:22, 31:3, 32:21, 34:21, 35:6, 37:15, 37:22, 38:3, 39:2, 41:1, 41:9, 43:1, 44:19, 52:5, 53:6, 53:13, 54:7, 56:7, 56:20, 57:15

## C

**cannot** [1] - 5:10
**Capo** [3] - 10:5, 10:12, 44:5
**carrying** [1] - 43:15
**case** [10] - 8:16, 24:12, 28:23, 33:14, 41:24, 45:19, 47:23, 51:18, 59:4, 60:17
**CATHERINE** [1] - 1:17
**ceiling** [1] - 71:11
**Centre** [3] - 45:19, 45:21, 45:24
**certain** [3] - 5:20, 34:15, 47:15
**CERTIFICATE** [1] - 73:1
**certify** [1] - 73:4
**chance** [1] - 7:18
**change** [2] - 69:25, 72:5
**changed** [1] - 29:7
**characterize** [1] - 40:24
**charge** [1] - 60:3
**chart** [16] - 10:21, 10:23, 11:2, 11:4, 11:9, 14:11, 16:7, 16:17, 17:5, 18:4, 19:21, 19:25, 20:12,

22:2, 22:7, 23:1
**checked** [1] - 71:4
**CHRISTOPHER** [1] - 1:14
**circle** [1] - 17:20
**circled** [1] - 21:25
**circumstances** [1] - 7:11
**clarify** [1] - 44:18
**clarity** [1] - 69:7
**clear** [2] - 4:22, 12:19
**clearer** [1] - 70:1
**clearnet** [2] - 4:23, 5:11
**clerk** [2] - 59:1, 60:16
**close** [4] - 32:10, 62:20, 65:19, 72:12
**closer** [1] - 67:23
**closing** [4] - 59:23, 71:7, 71:22, 72:1
**closings** [3] - 70:21, 71:1, 71:6
**co** [1] - 71:25
**co-counsel** [1] - 71:25
**code** [7] - 38:14, 38:16, 38:17, 38:18, 45:2, 45:25, 46:10
**collectively** [1] - 71:23
**COLUMBIA** [2] - 1:1, 1:15
**Columbia** [2] - 2:2, 73:13
**Column** [9] - 21:5, 49:17, 49:24, 50:2, 50:19, 53:8, 53:12, 53:14
**column** [1] - 49:25
**coming** [2] - 64:4, 67:3
**Commander** [4] - 36:6, 36:17, 37:6, 37:24
**comments** [4] - 59:19, 62:12, 65:12, 70:19
**commercials** [1] - 36:19
**common** [13] - 23:23, 24:1, 28:2, 28:7, 28:9, 28:11, 28:12, 28:17, 29:1, 29:5, 29:12, 46:2
**communication** [1] - 40:15
**company** [2] - 15:21, 15:24

complete [1] - 73:6
complicated [1] - 55:24
compound [1] - 6:7
computer [1] - 57:22
concern [3] - 67:4, 67:6, 67:13
concerns [2] - 62:9, 65:9
concluded [1] - 72:15
conduct [2] - 41:24, 69:8
conducted [1] - 54:22
conference [1] - 60:3
confirms [1] - 14:4
confusing [1] - 67:14
connect [1] - 24:5
conspiracy [13] - 61:18, 61:20, 61:23, 62:1, 62:2, 63:4, 64:18, 64:20, 64:23, 65:1, 65:2, 66:3, 70:8
constitutes [1] - 73:4
Constitution [2] - 2:3, 73:14
contact [1] - 24:16
content [3] - 43:10, 43:12
contents [1] - 8:11
context [2] - 26:6, 27:24
contexts [2] - 36:14, 37:9
continue [1] - 42:23
continued [3] - 69:9, 69:16, 69:21
control [1] - 56:15
convene [1] - 70:9
convert [1] - 29:13
converted [1] - 30:22
convince [1] - 37:3
copied [2] - 25:12, 25:23
copies [5] - 58:1, 58:3, 58:12, 58:14, 61:4
copy [1] - 55:7
copy/pasting [1] - 25:16
corner [3] - 16:17, 20:7, 22:25
correct [107] - 4:23, 5:5, 6:2, 6:13, 6:18, 8:1, 8:2, 8:17, 8:20, 9:6, 9:13, 9:23, 9:24, 10:3, 11:20, 11:23, 11:25, 13:3, 13:6, 13:8, 13:17, 13:25,

14:5, 14:22, 15:4, 15:12, 15:17, 16:1, 16:6, 16:18, 16:21, 16:25, 17:16, 18:3, 18:17, 18:22, 19:6, 19:10, 19:13, 19:16, 19:20, 19:24, 20:8, 20:11, 21:3, 21:6, 21:12, 21:16, 21:21, 21:25, 22:6, 23:2, 23:5, 23:9, 23:19, 26:20, 28:21, 29:5, 29:8, 31:7, 35:2, 35:16, 35:19, 35:23, 36:2, 36:9, 36:14, 36:15, 38:7, 38:11, 38:20, 39:8, 39:11, 39:13, 39:15, 39:19, 40:4, 40:16, 41:7, 45:16, 45:22, 46:1, 46:6, 46:14, 47:10, 47:12, 48:3, 48:7, 48:16, 48:21, 49:15, 49:16, 50:9, 50:12, 50:19, 51:3, 51:6, 51:22, 52:7, 52:10, 52:12, 52:21, 53:20, 54:4, 55:8, 58:1, 58:2
correcting [1] - 71:25
correspond [1] - 12:9
corresponds [1] - 15:21
counsel [1] - 71:25
counsel's [1] - 8:24
count [2] - 34:8, 34:19
Count [3] - 68:15, 68:20, 68:25
counting [1] - 68:19
countries [1] - 27:1
counts [1] - 67:22
Counts [2] - 69:9, 69:16
couple [3] - 30:10, 54:21, 57:13
course [3] - 47:1, 62:13, 65:13
Court [7] - 2:1, 2:2, 62:10, 64:11, 65:10, 73:12, 73:13
court [1] - 61:11
COURT [101] - 1:1, 4:1, 4:5, 4:8, 4:14, 5:7, 6:8, 6:15, 7:1, 7:5, 7:7, 7:14, 8:14, 9:2, 18:11, 27:8, 27:22, 28:5, 28:8, 29:17, 32:15, 34:7,

37:11, 37:21, 38:1, 40:19, 40:22, 41:6, 41:13, 41:21, 42:5, 42:9, 42:15, 42:17, 42:23, 44:14, 44:17, 54:2, 56:15, 56:19, 57:3, 58:18, 58:21, 59:12, 60:4, 60:8, 60:11, 60:15, 60:22, 60:25, 61:3, 61:6, 61:10, 61:21, 62:1, 62:7, 62:11, 62:18, 62:23, 63:2, 63:9, 63:13, 63:18, 63:23, 64:6, 64:10, 64:21, 65:1, 65:7, 65:11, 65:17, 65:22, 66:1, 66:8, 66:12, 66:17, 66:22, 67:18, 68:1, 68:4, 68:6, 68:11, 68:13, 68:17, 68:21, 69:2, 69:4, 69:11, 69:17, 69:21, 69:25, 70:6, 70:16, 70:18, 70:23, 71:7, 71:15, 71:18, 72:2, 72:6, 72:11
COURTROOM [13] - 4:4, 4:9, 4:12, 10:17, 42:1, 42:4, 42:11, 42:14, 42:18, 42:21, 59:8, 59:11, 60:14
courtroom [7] - 4:10, 42:2, 42:19, 59:9, 60:23, 60:24, 61:4
Cray [2] - 36:11, 37:1
crazy [1] - 71:14
create [2] - 38:16, 54:18
created [3] - 53:14, 53:18, 54:20
Criminal [1] - 1:3
CROSS [1] - 4:17
Cross [1] - 3:5
cross [1] - 7:16
CROSS-EXAMINATION [1] - 4:17
Cross-Examination [1] - 3:5
cross-examination [1] - 7:16
CRR [3] - 2:1, 73:3, 73:12
Crypto [3] - 15:21, 16:1, 24:11
crypto [2] - 29:21, 55:20
currencies [1] - 29:21

currency [1] - 30:13
customer [1] - 50:12
cybercrime [2] - 51:13, 51:17

**D**

D.C [5] - 1:6, 1:16, 1:19, 2:4, 73:14
date [15] - 6:23, 7:6, 7:8, 7:9, 7:10, 11:24, 32:2, 32:5, 33:9, 33:11, 33:21, 39:10, 52:6, 68:22, 68:25
Dated [1] - 73:10
dates [5] - 68:9, 68:10, 69:10, 69:14, 69:15
days [1] - 53:21
de [1] - 72:9
dealing [2] - 62:2, 65:2
deeper [1] - 67:16
Defendant [2] - 1:7, 4:3
DEFENDANT [1] - 1:20
DEFENSE [1] - 4:16
defense [2] - 72:7, 72:9
delete [4] - 47:25, 48:1, 57:19, 57:22
deleted [1] - 57:25
denied [2] - 9:14, 9:19
deny [4] - 9:15, 9:21, 16:8, 17:11
denying [2] - 6:1, 9:22
DEPARTMENT [1] - 1:18
Deposit [1] - 19:7
deposit [3] - 21:2, 21:5, 21:14
deposited [4] - 18:1, 19:4, 20:10, 21:20
depositing [1] - 20:13
DEPUTY [13] - 4:4, 4:9, 4:12, 10:17, 42:1, 42:4, 42:11, 42:14, 42:18, 42:21, 59:8, 59:11, 60:14
deputy [3] - 59:1, 60:16, 60:23
describe [1] - 54:4
described [2] - 51:7, 51:14
details [5] - 13:5,

13:16, 20:23, 22:22, 22:24
different [12] - 11:2, 12:21, 12:22, 25:16, 26:23, 27:2, 29:20, 29:21, 34:14, 63:7, 66:6
direct [15] - 10:15, 10:25, 12:1, 25:4, 25:5, 26:7, 26:10, 26:16, 29:23, 43:2, 43:25, 47:6, 48:5, 54:1, 55:2
directing [26] - 11:12, 12:24, 13:10, 13:20, 14:17, 15:19, 16:15, 18:19, 20:16, 21:1, 21:8, 21:18, 23:7, 35:14, 36:4, 41:10, 43:6, 45:5, 48:12, 49:2, 49:12, 50:7, 50:21, 51:15, 51:19, 52:14
directly [1] - 17:14
disagreement [2] - 61:16, 64:16
disclosed [2] - 72:6, 72:8
discuss [2] - 59:4, 60:17
discussed [1] - 43:25
district [1] - 73:13
DISTRICT [4] - 1:1, 1:1, 1:11, 1:15
District [3] - 2:2, 2:2, 73:13
DNS [1] - 10:7
document [10] - 25:6, 25:7, 25:10, 25:13, 25:15, 25:17, 25:22, 26:2, 26:12, 26:15
dollars [2] - 29:14, 30:23
domain [13] - 4:23, 4:25, 5:11, 5:16, 5:17, 6:2, 6:3, 8:1, 8:20, 9:15, 9:20, 28:13, 48:3
domains [4] - 10:4, 10:6, 10:8, 10:11
done [8] - 6:10, 15:16, 34:19, 41:15, 44:8, 59:14, 64:2, 67:1
doubt [9] - 4:24, 5:15, 6:3, 6:5, 6:10, 8:7, 9:7, 19:15, 69:8
down [12] - 10:19,

15:6, 16:13, 31:2, 36:8, 38:5, 38:9, 38:24, 41:8, 50:11, 53:17, 56:5

**dozen** [1] - 54:24

**dozens** [1] - 10:13

**draft** [3] - 59:12, 61:16, 64:16

**drive** [1] - 43:15

**Duncan** [2] - 40:4, 40:7

**during** [13] - 9:8, 10:25, 25:5, 26:7, 26:10, 26:15, 31:5, 31:10, 43:2, 43:25, 47:6, 48:5, 55:2

## E

**Eastern** [1] - 27:1

**easy** [1] - 58:7

**EDWARDS** [2] - 2:1, 73:3

**Edwards** [1] - 73:12

**effect** [4] - 26:18, 56:11, 56:23, 56:24

**effective** [1] - 71:16

**effing** [1] - 25:19

**Eighth** [1] - 1:22

**either** [3] - 22:17, 31:11, 32:17

**Ekeland** [2] - 62:11, 65:11

**EKELAND** [68] - 1:20, 1:21, 4:7, 5:6, 6:7, 6:14, 8:10, 8:24, 18:10, 27:7, 27:21, 28:4, 28:6, 29:16, 32:14, 34:5, 37:10, 37:25, 40:17, 40:20, 41:5, 42:8, 44:13, 44:15, 51:25, 52:4, 53:25, 56:13, 57:2, 58:16, 60:2, 60:6, 60:10, 60:21, 61:5, 62:13, 62:19, 62:25, 63:8, 63:11, 63:14, 63:20, 64:5, 65:13, 65:18, 65:24, 66:7, 66:10, 66:13, 66:19, 67:4, 67:20, 68:2, 68:5, 68:7, 68:12, 69:3, 69:5, 69:13, 69:19, 69:22, 70:2, 70:14, 70:20, 71:2, 71:9, 71:17, 72:14

**email** [57] - 11:6, 11:8, 12:3, 12:5, 12:6, 12:9, 12:25, 13:3,

13:5, 13:6, 13:11, 13:14, 13:15, 13:16, 13:19, 13:21, 13:24, 14:2, 14:4, 14:21, 14:24, 16:6, 16:9, 16:25, 19:23, 21:9, 22:5, 23:12, 35:7, 35:10, 35:15, 35:18, 35:21, 36:5, 36:16, 45:6, 45:10, 45:12, 45:14, 45:15, 45:23, 49:25, 50:2, 50:5, 51:20, 52:6, 52:9, 52:15, 52:20, 54:5, 59:2, 71:4

**end** [2] - 7:25, 70:5

**engages** [2] - 64:1, 66:25

**entered** [4] - 4:10, 42:19, 46:11, 53:9

**entries** [1] - 51:3

**entry** [4] - 51:6, 53:14, 53:17, 54:15

**errors** [2] - 38:14, 38:25

**especially** [1] - 26:25

**ESQ** [4] - 1:14, 1:17, 1:20, 1:21

**essentially** [1] - 55:11

**European** [1] - 27:1

**euros** [8] - 20:10, 20:13, 21:14, 21:20, 21:21, 29:13, 30:19, 30:23

**evening** [3] - 58:19, 58:20, 58:21

**events** [2] - 15:11, 15:16

**evidence** [2] - 59:23, 67:7

**evidentiary** [4] - 63:19, 63:20, 66:18, 66:19

**exact** [4] - 8:13, 17:19, 20:23, 46:10

**exactly** [6] - 5:13, 7:20, 25:22, 33:5, 43:19, 57:4

**exaggeration** [2] - 37:12, 38:2

**Examination** [1] - 3:5

**examination** [11] - 7:16, 11:1, 25:5, 26:8, 26:11, 26:16, 43:2, 44:1, 47:6, 48:5, 55:2

**EXAMINATION** [1] - 4:17

**example** [3] - 48:13,

49:3, 57:6

**examples** [1] - 10:11

**exchanges** [1] - 30:4

**excuse** [1] - 56:16

**Exhibit** [42] - 3:9, 10:16, 10:19, 11:12, 12:1, 12:12, 12:24, 13:10, 13:20, 14:8, 14:17, 15:19, 16:3, 16:15, 16:16, 18:19, 19:18, 20:5, 21:1, 21:8, 21:18, 21:23, 23:7, 25:4, 29:24, 35:5, 35:14, 36:4, 38:4, 41:10, 43:6, 43:10, 45:5, 46:24, 50:7, 50:14, 50:21, 51:5, 51:19, 52:14, 53:7

**exhibits** [1] - 31:2

**EXHIBITS** [1] - 3:11

**exist** [1] - 33:18

**exited** [2] - 42:2, 59:9

**experience** [2] - 30:19, 71:15

**experimented** [1] - 34:22

**explain** [1] - 18:7

**explained** [1] - 45:24

**explanation** [2] - 56:22, 56:25

**exploit.in** [6] - 51:6, 51:13, 52:10, 53:1, 53:18, 53:22

**extra** [2] - 45:25, 70:15

**eye** [1] - 67:8

## F

**fact** [1] - 4:22

**fair** [1] - 38:14

**fairness** [2] - 68:15, 68:18

**favoring** [4] - 40:15, 40:17, 40:19, 40:21

**favorite** [1] - 23:18

**few** [8] - 10:11, 39:1, 54:21, 54:24, 57:12, 58:25, 61:15, 64:15

**field** [1] - 50:11

**fields** [1] - 46:1

**figure** [1] - 59:1

**file** [12] - 15:23, 43:3, 43:13, 43:25, 44:7, 44:12, 44:20, 44:22, 44:25, 45:3, 46:22, 53:9

**finagle** [1] - 58:5

**final** [2] - 59:18, 70:19

**fine** [3] - 7:8, 59:25, 60:5

**finish** [7] - 26:13, 41:17, 41:19, 41:22, 59:18, 59:21, 59:22

**finishing** [1] - 41:17

**first** [23] - 25:18, 30:24, 31:4, 31:9, 31:21, 32:1, 32:13, 33:1, 33:3, 33:4, 33:5, 33:8, 33:9, 33:11, 33:19, 33:21, 34:4, 38:5, 39:13, 45:14, 61:13, 64:13

**five** [1] - 68:19

**fix** [1] - 38:14

**flag** [2] - 61:18, 64:18

**flip** [2] - 62:16, 65:15

**flipping** [1] - 14:8

**Floor** [1] - 1:22

**focus** [1] - 31:1

**Fog** [23] - 5:18, 9:20, 31:5, 31:6, 31:7, 31:10, 31:14, 31:16, 32:13, 32:23, 33:2, 33:3, 33:8, 33:10, 33:12, 33:14, 33:22, 33:25, 34:2, 54:16, 54:17, 54:20, 54:23

**follow** [2] - 7:19, 28:19

**following** [9] - 4:11, 42:3, 42:13, 42:20, 59:10, 60:24, 61:9, 64:9, 69:10

**FOR** [4] - 1:1, 1:14, 1:14, 1:20

**foregoing** [1] - 73:4

**forget** [3] - 46:4, 47:24, 53:1

**forgot** [2] - 45:21, 46:8

**form** [2] - 63:3, 66:2

**format** [1] - 43:9

**forth** [1] - 17:16

**forum** [2] - 40:12, 51:13

**forums** [1] - 39:21

**forward** [2] - 14:9, 70:25

**free** [1] - 36:18

**freelance** [10] - 10:9, 10:12, 22:19, 22:21, 22:22, 38:17, 44:5, 47:2, 47:3, 51:10

**friction** [3] - 27:2,

29:20, 30:5

**friend** [4] - 55:19, 56:24, 57:8, 57:9

**friends** [7] - 56:4, 56:10, 56:12, 56:22, 56:25, 57:5, 57:13

**fruit** [1] - 68:5

**full** [2] - 70:20, 73:5

**functions** [1] - 39:22

**funds** [11] - 14:8, 14:12, 16:4, 19:13, 19:19, 19:22, 24:25, 25:2, 29:20, 55:16, 67:11

## G

**gallery** [2] - 41:12, 43:8

**general** [6] - 9:10, 30:3, 30:16, 34:9, 39:21, 70:24

**generally** [4] - 19:1, 62:14, 65:14, 67:21

**gibberish** [1] - 45:2

**girl's** [1] - 23:16

**given** [6] - 46:5, 47:1, 51:9, 54:6, 62:19, 65:18

**Gold** [3] - 45:19, 45:21, 45:24

**gonna** [1] - 55:20

**Gothenburg** [3] - 24:17, 32:8, 32:9

**Government** [9] - 60:1, 61:14, 62:15, 64:14, 65:15, 69:8, 70:15, 71:3, 72:3

**Government's** [8] - 10:15, 10:19, 12:1, 16:15, 20:5, 35:4, 35:14, 38:4

**Gox** [21] - 11:6, 11:14, 11:16, 11:19, 11:22, 12:9, 13:17, 14:5, 16:5, 16:8, 16:24, 17:12, 19:23, 20:6, 20:10, 21:2, 21:12, 21:15, 22:4, 49:5, 49:8

**great** [3] - 26:3, 62:18, 65:17

**grew** [1] - 46:13

**guess** [6] - 8:6, 17:13, 57:24, 58:2, 58:5, 68:22

## H

**hacked** [1] - 47:23
**half** [3] - 59:13, 71:13, 71:23
**hand** [3] - 16:17, 20:7, 22:25
**handling** [1] - 10:6
**hanging** [1] - 68:5
**happy** [4] - 68:7, 69:25, 70:11, 70:14
**hard** [2] - 8:4, 61:4
**HASSARD** [1] - 1:21
**hastily** [2] - 62:17, 65:16
**hasty** [1] - 70:4
**header** [2] - 58:16, 67:24
**heading** [1] - 15:4
**hear** [6] - 26:12, 51:25, 56:16, 62:11, 65:11, 69:19
**heard** [1] - 55:10
**hearing** [3] - 8:16, 9:18, 28:23
**heavydist** [2] - 39:3, 39:6
**heavydist@gmail.com** [3] - 35:18, 45:7, 50:5
**hereby** [1] - 73:3
**high** [1] - 15:4
**hired** [1] - 51:11
**honestly** [1] - 71:9
**Honor** [26] - 4:6, 4:7, 34:6, 41:19, 42:7, 42:8, 53:25, 56:17, 59:25, 60:20, 60:21, 61:2, 61:5, 61:14, 62:4, 64:5, 64:14, 65:4, 67:20, 68:14, 69:3, 71:21, 71:22, 71:25, 72:8, 72:14
**HONORABLE** [1] - 1:11
**hope** [2] - 39:14, 71:2
**hour** [4] - 59:13, 71:13, 71:23
**hours** [2] - 71:12, 72:1

## I

**I..** [1] - 9:12
**ID** [2] - 38:5, 50:12
**identity** [2] - 36:12, 37:7

**illicit** [1] - 67:11
**implies** [1] - 67:11
**importance** [1] - 44:24
**important** [5] - 39:21, 44:11, 44:16, 44:21, 54:12
**includes** [1] - 52:23
**incorrectly** [1] - 51:7
**INDEX** [1] - 3:1
**indictment** [9] - 62:21, 62:24, 65:20, 65:23, 68:9, 68:16, 68:20, 68:23, 68:24
**indirectly** [1] - 18:8
**individual** [5] - 5:20, 5:23, 5:25, 16:10, 20:3
**information** [12] - 11:13, 14:18, 22:12, 23:8, 24:19, 25:16, 44:12, 44:22, 46:21, 47:15, 51:18, 53:9
**inside** [1] - 33:24
**instead** [3] - 13:25, 39:15, 55:7
**instruct** [1] - 69:7
**instructed** [2] - 61:22, 64:22
**instruction** [4] - 61:18, 63:17, 64:18, 66:16
**instructions** [9] - 25:12, 25:24, 59:13, 59:22, 61:1, 61:17, 64:17, 70:19
**intending** [1] - 71:10
**intentionality** [1] - 67:12
**intermediary** [1] - 17:17
**intermediate** [2] - 17:15, 18:8
**internet** [2] - 32:19, 32:24
**interrupt** [1] - 37:16
**interview** [3] - 6:12, 6:17, 6:20
**involved** [1] - 5:2
**IP** [6] - 15:17, 15:20, 15:23, 15:24, 15:25, 24:16
**issue** [3] - 37:2, 70:7, 70:24
**items** [1] - 25:14
**itself** [2] - 63:25, 66:24

## J

**Jabber** [3] - 40:13, 40:14, 40:15
**Jackson** [1] - 48:16
**Jacksonson** [1] - 48:16
**January** [6] - 8:17, 9:9, 9:13, 9:18, 9:25, 28:20
**job** [7] - 22:19, 22:21, 22:22, 38:17, 44:5, 44:8, 47:3
**jobs** [2] - 44:5, 47:21
**judge** [1] - 6:24
**JUDGE** [1] - 1:11
**July** [2] - 68:24, 69:1
**June** [1] - 68:10
**juror** [1] - 58:24
**jurors** [3] - 59:20, 59:21, 60:11
**JURY** [1] - 1:10
**jury** [28] - 4:5, 4:8, 4:10, 4:12, 22:8, 22:11, 22:22, 24:13, 28:19, 39:24, 41:2, 42:2, 42:15, 42:17, 42:19, 42:21, 58:15, 59:9, 59:12, 59:21, 60:3, 61:16, 62:22, 64:16, 65:21, 67:14, 70:12, 70:24
**jury's** [1] - 56:15
**JUSTICE** [1] - 1:18

## K

**keep** [7] - 44:8, 47:22, 48:22, 54:12, 61:10, 64:10, 70:12
**kellerman** [2] - 50:19, 51:3
**kept** [4] - 43:13, 44:25, 58:12, 58:14
**keys** [4] - 55:7, 57:17, 58:1, 58:3
**Killdozer** [13] - 35:1, 35:12, 35:23, 36:2, 36:11, 37:1, 37:13, 37:17, 38:7, 38:11, 38:19, 40:3, 40:7
**kind** [4] - 33:6, 33:15, 34:11, 48:2
**knowledge** [4] - 15:22, 29:12, 32:3, 32:6
**Kunnikov** [1] - 23:14

## L

**labeled** [1] - 50:17
**language** [5] - 61:15, 62:9, 64:15, 65:9, 69:5
**large** [1] - 57:14
**last** [3] - 13:15, 15:9, 71:8
**late** [2] - 61:11, 64:11
**LAW** [1] - 1:21
**lawyers** [1] - 58:23
**leading** [1] - 69:5
**leaked** [1] - 47:23
**learn** [1] - 32:13
**learned** [8] - 31:4, 31:9, 32:18, 32:22, 33:1, 33:3, 33:4, 33:5
**learning** [1] - 32:23
**least** [11] - 6:19, 57:7, 59:17, 61:11, 64:11, 69:9, 69:17, 69:21, 69:22, 70:1, 70:2
**leave** [1] - 19:19
**left** [1] - 16:17
**left-hand** [1] - 16:17
**less** [2] - 5:20, 70:10
**letters** [5] - 15:8, 23:22, 23:25, 24:3, 24:4
**Liberty** [20] - 14:10, 14:13, 14:15, 14:19, 15:11, 16:5, 16:18, 16:20, 16:23, 23:1, 23:4, 23:8, 23:11, 24:9, 24:14, 24:23, 29:14, 30:23, 33:4, 48:15
**license** [3] - 36:24, 36:25, 37:4
**like..** [1] - 26:4
**limitations** [2] - 68:8, 68:25
**Line** [11] - 15:3, 19:5, 19:8, 21:2, 48:12, 49:2, 49:12, 50:14, 51:5, 53:8, 53:17
**line** [5] - 25:18, 25:20, 45:2, 45:14, 55:4
**Lines** [3] - 15:10, 18:20, 21:19
**lines** [3] - 25:13, 39:1, 52:23
**link** [3] - 24:6, 52:23, 54:5
**linked** [5] - 11:14, 16:6, 16:9, 19:12, 19:23
**LISA** [2] - 2:1, 73:3
**Lisa** [1] - 73:12
**list** [3] - 47:17, 47:20, 54:11
**listed** [5] - 13:6, 49:18, 49:20, 49:25, 50:2
**listen** [1] - 7:16
**living** [2] - 36:12, 37:7
**log** [4] - 15:10, 15:16, 44:12, 47:15
**log-in** [4] - 15:10, 15:16, 44:12, 47:15
**logged** [2] - 15:14
**logout** [2] - 15:11, 15:16
**look** [9] - 28:12, 31:17, 36:16, 49:17, 59:17, 62:5, 65:5, 67:16, 70:6
**looking** [17] - 11:4, 15:10, 16:21, 18:20, 21:5, 22:25, 38:9, 39:13, 43:9, 50:11, 51:16, 51:17, 61:23, 63:1, 64:23, 65:25, 71:14
**looks** [7] - 11:15, 13:13, 13:15, 15:8, 21:11, 23:22, 35:24
**lost** [2] - 53:21, 54:4
**lostpassform** [1] - 52:24
**low** [1] - 68:5
**low-hanging** [1] - 68:5

## M

**Magazine** [4] - 6:13, 7:24, 8:9, 9:19
**maiden** [1] - 46:13
**maintained** [1] - 54:8
**male** [1] - 23:17
**March** [2] - 1:7, 73:10
**mark** [3] - 48:6, 48:18, 48:20
**MARKED** [1] - 3:11
**marked** [6] - 11:5, 17:15, 48:13, 49:3, 62:17, 65:16
**Marknadskommuni kation** [1] - 10:5
**matters** [1] - 26:4
**Mazarin** [1] - 72:9
**Mazars** [1] - 72:9

**mean** [6] - 12:4, 27:24, 57:23, 62:14, 65:14, 71:22
**meaning** [1] - 9:10
**means** [3] - 24:3, 40:15, 46:4
**meet** [11] - 23:24, 31:5, 31:10, 31:11, 31:19, 32:17, 34:9, 35:25, 57:10, 59:6, 59:15
**meet-up** [3] - 31:11, 35:25, 57:10
**meet-ups** [5] - 23:24, 31:5, 31:10, 32:17, 34:9
**meeting** [1] - 59:3
**memorize** [1] - 20:17
**memory** [5] - 5:22, 17:23, 18:5, 31:8, 33:6
**mention** [1] - 25:25
**mentioned** [1] - 55:17
**message** [6] - 24:21, 38:5, 38:9, 38:10, 38:13, 39:7
**messages** [3] - 39:18, 39:22, 40:1
**met** [2] - 31:24, 32:8
**meth** [1] - 53:18
**methods** [1] - 30:6
**MICHAEL** [1] - 1:21
**might** [10] - 29:18, 32:22, 32:25, 34:19, 34:22, 38:22, 41:20, 45:12, 46:19, 46:23
**mind** [4] - 25:19, 26:3, 26:5, 29:8
**mind-blowing** [3] - 25:19, 26:3, 26:5
**minor** [2] - 61:15, 64:15
**minute** [1] - 54:18
**minutes** [4] - 41:16, 59:1, 70:12, 70:15
**mischaracterizes** [1] - 56:13
**mistranslation** [1] - 26:1
**misunderstanding** [1] - 69:6
**mixed** [1] - 31:23
**mixer** [9] - 34:4, 34:18, 34:24, 63:25, 64:3, 66:24, 67:2, 67:10, 67:15
**mixers** [3] - 33:25, 34:8, 34:10
**mixing** [14] - 31:6,

31:15, 31:20, 31:21, 32:1, 32:4, 32:7, 32:20, 34:9, 34:11, 34:17, 34:19, 34:20, 34:23
**moment** [2] - 51:23, 52:2
**money** [6] - 17:9, 26:25, 63:9, 66:8, 68:2
**monitor** [5] - 41:11, 43:7, 51:24, 52:3, 53:5
**morning** [5] - 59:3, 59:19, 60:5, 70:10, 72:12
**MOSS** [1] - 1:11
**most** [1] - 25:18
**mother's** [1] - 46:13
**move** [2] - 55:16, 59:23
**moved** [1] - 19:22
**movie** [1] - 23:19
**moving** [4] - 19:13, 19:18, 29:20
**MR** [137] - 4:6, 4:7, 4:18, 5:6, 5:9, 6:7, 6:11, 6:14, 6:16, 7:6, 7:13, 7:23, 8:10, 8:15, 8:24, 9:3, 10:18, 10:22, 16:13, 16:14, 18:10, 18:15, 27:7, 27:11, 27:21, 28:1, 28:4, 28:6, 28:18, 29:16, 29:22, 31:2, 31:3, 32:14, 32:21, 34:5, 34:21, 35:4, 35:6, 37:10, 37:15, 37:22, 37:25, 38:3, 38:24, 39:2, 40:17, 40:20, 41:1, 41:5, 41:8, 41:9, 41:11, 41:19, 42:7, 42:8, 42:16, 43:1, 44:13, 44:15, 44:19, 51:23, 51:25, 52:2, 52:4, 52:5, 53:4, 53:6, 53:11, 53:13, 53:25, 54:7, 56:5, 56:7, 56:13, 56:18, 56:20, 57:2, 57:15, 58:16, 58:20, 59:25, 60:2, 60:6, 60:10, 60:20, 60:21, 61:2, 61:5, 61:14, 61:25, 62:4, 62:8, 62:13, 62:19, 62:25, 63:8, 63:11, 63:14, 63:20, 64:5, 64:14, 64:25, 65:4, 65:8, 65:13, 65:18,

65:24, 66:7, 66:10, 66:13, 66:19, 67:4, 67:20, 68:2, 68:5, 68:7, 68:12, 68:14, 68:18, 68:23, 69:3, 69:5, 69:13, 69:19, 69:22, 70:2, 70:14, 70:17, 70:20, 71:2, 71:9, 71:17, 71:21, 72:3, 72:8, 72:14
**Mt** [21] - 11:6, 11:14, 11:16, 11:19, 11:22, 12:9, 13:17, 14:5, 16:5, 16:8, 16:24, 17:12, 19:23, 20:6, 20:10, 21:2, 21:12, 21:15, 22:4, 49:5, 49:8
**must** [1] - 69:8

## N

**name** [28] - 4:25, 5:16, 6:4, 11:16, 15:1, 15:4, 21:6, 21:15, 23:14, 23:16, 23:17, 31:17, 32:11, 35:12, 36:11, 37:1, 37:4, 46:12, 46:13, 48:3, 48:10, 48:15, 49:9, 50:25, 54:10
**Namecheap** [3] - 50:15, 50:22, 50:24
**names** [2] - 5:17, 10:13
**nature** [2] - 63:25, 66:24
**need** [4] - 41:18, 63:5, 66:4, 70:10
**needed** [2] - 40:12, 54:12
**negligence** [2] - 67:5, 67:12
**never** [2] - 24:21, 24:25
**new** [2] - 54:6, 54:20
**New** [1] - 1:23
**NFS** [1] - 19:23
**nfs9000@hotmail. com** [2] - 19:24, 22:5
**nicknames** [1] - 37:2
**NO** [1] - 3:11
**noobie** [2] - 39:11, 39:14
**noobies** [1] - 39:25
**Northwest** [4] - 1:15, 1:18, 2:3, 73:14
**notes** [1] - 73:5
**Notes** [1] - 49:24

**nothing** [2] - 63:21, 66:20
**November** [1] - 19:4
**number** [8] - 23:4, 23:9, 24:14, 38:25, 49:18, 49:20, 50:12, 57:14
**numbers** [3] - 15:8, 17:25, 24:4

## O

**object** [5] - 53:25, 63:16, 63:18, 66:15, 66:17
**objection** [23] - 6:7, 6:14, 8:24, 18:10, 27:7, 27:21, 28:4, 28:5, 29:16, 32:14, 34:5, 37:10, 37:25, 40:17, 41:5, 44:13, 44:14, 56:13, 57:2, 58:16, 60:15, 60:20, 60:21
**objects** [7] - 61:20, 61:23, 63:4, 64:20, 64:23, 66:3, 70:8
**obvious** [1] - 67:23
**obviously** [2] - 48:17, 67:22
**October** [6] - 16:3, 21:3, 21:23, 24:15, 52:6
**OF** [5] - 1:1, 1:3, 1:10, 1:15, 1:18
**offchain** [3] - 55:3, 55:6, 56:10
**offhand** [3] - 61:19, 64:19, 68:22
**OFFICE** [1] - 1:14
**official** [1] - 73:12
**Official** [1] - 2:1
**once** [3] - 28:11, 32:12, 41:23
**one** [39] - 4:22, 5:4, 5:10, 5:24, 6:19, 6:20, 7:24, 8:9, 13:15, 13:21, 17:21, 18:8, 18:12, 29:13, 31:21, 31:22, 36:13, 36:23, 37:8, 37:21, 39:20, 40:3, 40:6, 41:3, 43:7, 43:21, 44:25, 48:13, 54:11, 57:8, 58:3, 58:12, 58:24, 60:17, 62:21, 64:1, 65:20, 66:25
**opened** [4] - 11:22, 18:16, 49:9, 50:24

**operating** [2] - 63:9, 66:8
**operation** [1] - 58:6
**oppose** [2] - 63:24, 66:23
**or..** [1] - 22:13
**order** [2] - 4:13, 42:22
**original** [2] - 25:20, 26:2
**otherwise** [2] - 67:24, 68:3
**outside** [1] - 6:14
**overnight** [8] - 59:5, 61:24, 62:6, 63:2, 64:24, 65:6, 66:1, 70:8
**overruled** [19] - 5:7, 6:8, 6:15, 8:14, 18:11, 27:8, 27:22, 28:8, 29:17, 32:15, 37:11, 38:1, 40:22, 41:6, 44:17, 54:2, 56:17, 57:3
**own** [3] - 34:11, 34:23, 57:10
**owned** [2] - 15:24, 47:22

## P

**P-A-S** [2] - 18:17, 18:21
**p.m** [5] - 1:7, 4:11, 42:3, 42:20, 59:10
**PAGE** [1] - 3:3
**page** [2] - 5:17, 6:4
**Page** [3] - 50:22, 51:2, 67:23
**pages** [1] - 30:10
**part** [4] - 10:20, 17:21, 18:13, 45:18
**particular** [4] - 26:21, 31:22, 62:2, 65:2
**particularly** [1] - 7:15
**parties** [1] - 55:14
**pas** [2] - 18:17, 18:21
**passage** [1] - 36:9
**passport** [1] - 45:22
**password** [16] - 43:3, 43:13, 44:12, 44:21, 45:25, 46:5, 46:9, 46:22, 47:17, 53:1, 53:9, 53:22, 54:4, 54:5, 54:6, 54:11
**passwords** [4] -

44:9, 47:22, 47:23, 54:12

**past** [3] - 47:21, 61:22, 64:22

**pay** [5] - 27:5, 27:16, 28:2, 29:1, 36:19

**paying** [1] - 24:10

**payment** [12] - 12:22, 13:6, 13:8, 13:16, 13:18, 14:4, 14:6, 26:23, 29:20, 30:5, 30:6, 30:10

**payments** [1] - 24:23

**Pearlman** [1] - 53:4

**peer** [4] - 22:14, 22:17

**peer-to-peer** [2] - 22:14, 22:17

**PELKER** [1] - 1:17

**Pennsylvania** [1] - 1:18

**people** [10] - 23:23, 26:25, 27:17, 34:9, 34:11, 34:16, 36:22, 47:22, 55:10, 67:10

**people's** [1] - 44:9

**perfect** [3] - 48:17, 48:25, 49:1

**permanent** [1] - 54:17

**permissible** [1] - 9:2

**person** [24] - 31:12, 31:13, 31:15, 31:20, 31:22, 31:24, 32:1, 32:3, 32:7, 32:11, 32:17, 32:19, 32:23, 35:24, 36:1, 36:11, 36:23, 37:6, 37:24, 55:15, 57:8, 57:9, 57:16, 57:25

**phone** [2] - 57:22, 58:12

**phrase** [2] - 55:10, 55:22

**piece** [1] - 36:17

**place** [2] - 32:10, 58:4

**Plaintiff** [1] - 1:4

**PLAINTIFF** [1] - 1:14

**plans** [1] - 72:5

**plasma@ plasmadivision.com** [10] - 11:7, 11:14, 12:7, 13:1, 13:12, 13:25, 14:22, 16:25, 17:2, 21:10

**plasmadivision** [1] - 13:23

**played** [1] - 34:23

**PLLC** [1] - 1:21

**plus** [1] - 71:22

**point** [4] - 46:15, 58:17, 64:3, 67:2

**position** [2] - 63:22, 66:21

**possibility** [3] - 22:18, 22:21, 40:11

**possible** [3] - 13:9, 23:21, 53:2

**post** [2] - 38:19, 38:23

**posted** [2] - 38:10, 39:8

**posts** [1] - 38:6

**powered** [1] - 41:15

**practice** [6] - 24:1, 45:1, 45:25, 46:2, 46:3, 47:25

**present** [3] - 4:12, 7:19, 42:21

**presentation** [1] - 59:22

**presenting** [1] - 72:4

**preserved** [2] - 63:15, 66:14

**press** [1] - 70:24

**pretrial** [3] - 8:16, 9:8, 28:23

**pretty** [1] - 17:24

**PREVIOUSLY** [1] - 4:16

**private** [4] - 39:18, 39:25, 55:7, 57:17

**problem** [1] - 37:1

**problems** [1] - 30:14

**proceed** [1] - 4:14

**proceedings** [10] - 4:11, 42:3, 42:13, 42:20, 59:10, 60:24, 61:9, 64:9, 72:15, 73:6

**process** [3] - 45:18, 46:6, 46:7

**produced** [1] - 73:6

**project** [3] - 47:5, 47:7, 47:10

**projects** [1] - 47:21

**promote** [2] - 51:11

**proposing** [1] - 60:7

**prove** [1] - 69:8

**provided** [3] - 11:13, 14:18, 56:22

**proving** [2] - 63:7, 66:6

**provision** [2] - 62:2, 65:2

**pull** [2] - 35:4, 56:5

**purchase** [1] - 19:12

**purchased** [2] - 21:21, 21:25

**purposes** [3] - 7:19, 63:15, 66:14

**put** [4] - 7:20, 15:6, 23:25, 45:1

**putting** [2] - 25:16, 45:3

---

### Q

**questioned** [4] - 8:19, 10:25, 11:2, 28:25

**questions** [6] - 7:18, 7:19, 7:20, 28:15, 45:1, 55:4

**quick** [1] - 70:4

**quickly** [2] - 62:16, 65:15

**quote** [12] - 7:25, 8:7, 8:13, 8:22, 8:23, 9:4, 9:5, 9:7, 9:12, 36:12, 56:23

**quoted** [1] - 36:8

---

### R

**raise** [1] - 61:1

**ran** [1] - 67:15

**RANDOLPH** [1] - 1:11

**random** [5] - 15:8, 23:22, 23:25, 24:2, 24:3

**RDR** [3] - 2:1, 73:3, 73:12

**reached** [3] - 40:3, 40:7, 41:3

**read** [10] - 23:21, 26:2, 62:14, 62:20, 63:11, 65:14, 65:19, 66:10, 67:22, 70:5

**reading** [3] - 8:25, 9:12, 45:23

**ready** [4] - 4:5, 4:14, 42:15, 42:24

**real** [2] - 12:5, 35:10

**realistically** [1] - 71:12

**really** [7] - 5:23, 8:4, 20:14, 22:10, 23:23, 30:7, 54:17

**reason** [9] - 8:6, 9:7, 19:15, 35:10, 43:20, 45:3, 45:13, 63:24, 66:23

**reasonable** [1] - 69:8

**reasons** [1] - 44:25

**rebuttal** [5] - 71:5, 71:23, 72:1, 72:4,

72:10

**receive** [1] - 39:18

**Received** [1] - 3:9

**received** [8] - 13:5, 14:9, 21:9, 28:15, 51:20, 52:15, 52:18, 53:21

**receives** [1] - 57:16

**receiving** [2] - 16:4, 39:25

**recess** [3] - 42:12, 61:8, 64:8

**recipient** [1] - 35:21

**recognize** [8] - 11:4, 12:3, 12:4, 18:24, 19:1, 35:7, 43:9, 43:11

**recollection** [8] - 13:9, 14:12, 24:18, 25:2, 31:19, 33:18, 45:9, 56:15

**record** [7] - 4:21, 12:19, 15:9, 15:18, 50:8, 63:15, 66:14

**recorded** [1] - 25:23

**records** [5] - 15:15, 18:20, 19:15, 50:8, 50:22

**recover** [1] - 46:19

**recovery** [10] - 15:3, 15:6, 23:18, 23:21, 24:8, 45:1, 45:18, 46:6, 46:7, 46:10

**redirect** [1] - 41:18

**refer** [2] - 26:6, 39:3

**reference** [2] - 16:18, 23:1

**referred** [1] - 11:9

**referring** [2] - 24:24, 28:20

**refers** [1] - 49:12

**reflects** [1] - 53:8

**regardless** [1] - 39:18

**register** [1] - 48:3

**registered** [5] - 5:16, 10:4, 10:6, 23:14, 52:9

**registrar** [2] - 5:17, 6:4

**registration** [5] - 14:18, 23:8, 27:6, 27:16, 29:2

**regular** [2] - 29:5, 47:3

**relate** [2] - 22:16, 22:23

**related** [2] - 22:19, 69:9

**relates** [2] - 22:14,

22:21

**remember** [70] - 4:22, 5:1, 5:4, 5:10, 5:23, 6:9, 6:10, 6:23, 7:8, 7:9, 7:11, 7:25, 8:2, 8:8, 8:11, 8:12, 8:23, 9:5, 9:8, 9:11, 10:13, 11:24, 12:4, 12:14, 12:16, 12:17, 12:22, 13:18, 14:6, 15:13, 15:14, 15:23, 15:25, 16:10, 16:12, 17:6, 17:7, 17:8, 17:13, 19:2, 20:1, 20:3, 20:13, 20:14, 20:18, 20:23, 20:24, 22:1, 22:24, 23:24, 30:21, 31:13, 31:15, 32:5, 32:11, 32:16, 33:1, 33:3, 33:4, 33:5, 33:9, 33:21, 38:23, 41:3, 46:12, 47:8, 54:10, 57:14

**remembered** [2] - 5:1, 5:15

**remembering** [2] - 22:12, 33:17

**remembers** [1] - 20:21

**remind** [1] - 41:23

**reminds** [1] - 68:14

**remove** [2] - 44:8, 47:20

**repeat** [3] - 9:16, 27:12, 40:5

**rephrase** [2] - 9:17, 56:18

**REPORTED** [1] - 2:1

**reporter** [5] - 6:20, 7:25, 8:3, 8:9, 9:19

**Reporter** [2] - 2:1, 73:12

**reporters** [2] - 6:12, 6:17

**reputation** [2] - 39:20, 51:12

**require** [5] - 55:19, 56:1, 57:23, 61:19, 64:19

**required** [5] - 29:15, 61:20, 62:3, 64:20, 65:3

**requirement** [1] - 70:7

**requires** [4] - 55:13, 55:15, 55:18, 55:22

**research** [3] - 41:25, 62:5, 65:5

**Reserve** [20] - 14:10, 14:13, 14:15, 14:19,

15:11, 16:5, 16:18, 16:20, 16:24, 23:1, 23:4, 23:8, 23:11, 24:10, 24:14, 24:23, 29:14, 30:23, 33:4, 48:15

**reserves** [1] - 30:13
**respect** [3] - 30:18, 63:7, 66:5
**rest** [1] - 36:16
**restore** [2] - 54:5, 55:10
**restricted** [1] - 39:25
**retakes** [1] - 4:3
**retired** [1] - 60:23
**return** [1] - 4:1
**returning** [1] - 53:7
**reward** [1] - 36:22
**right-hand** [2] - 20:7, 22:25
**rise** [5] - 4:9, 42:1, 42:11, 42:14, 59:8
**Road** [11] - 17:3, 17:12, 18:2, 18:9, 18:16, 18:21, 18:25, 19:5, 19:9, 19:13, 19:19
**robberies** [2] - 31:23, 32:18
**ROMAN** [3] - 1:6, 3:4, 4:16
**Roman** [4] - 15:1, 21:6, 49:9, 50:25
**Room** [1] - 2:3
**Roso987341870** [3] - 11:17, 12:10, 49:6
**run** [2] - 58:25, 67:10
**running** [2] - 67:10, 68:9
**Russian** [5] - 23:17, 25:20, 26:1, 26:2

## S

**sale** [2] - 22:15, 22:17
**save** [4] - 44:6, 44:11, 44:21, 46:15
**saved** [4] - 43:15, 43:20, 44:4, 46:21
**saw** [1] - 34:18
**scam** [2] - 55:20, 57:5
**scammed** [3] - 56:4, 56:11, 56:24
**schedule** [2] - 58:24, 59:24
**scheduling** [1] - 71:20

**school** [1] - 15:4
**scope** [2] - 6:14, 54:1
**screen** [2] - 17:21, 56:6
**scroll** [5] - 10:19, 38:24, 49:17, 51:2, 53:11
**scrolling** [7] - 36:8, 38:5, 38:9, 39:7, 49:24, 53:7, 53:17
**season** [1] - 33:23
**seated** [5] - 4:4, 4:13, 42:4, 42:22, 59:11
**second** [1] - 50:11
**secret** [3] - 45:15, 45:22, 46:9
**see** [9] - 17:24, 39:14, 42:9, 53:12, 57:21, 68:1, 69:23, 70:18, 72:12
**seeing** [1] - 25:3
**seem** [1] - 54:4
**sells** [1] - 5:17
**send** [11] - 17:9, 17:14, 24:22, 30:9, 30:19, 39:17, 59:2, 62:9, 62:23, 65:9, 65:22
**sending** [9] - 14:12, 16:24, 25:2, 26:25, 34:15, 39:25, 45:9, 55:7
**sense** [3] - 55:15, 58:8, 59:24
**sent** [22] - 13:11, 13:14, 14:2, 14:9, 16:4, 16:8, 17:2, 17:9, 17:11, 17:14, 18:1, 18:7, 21:12, 21:24, 24:21, 24:25, 35:15, 35:18, 36:5, 45:6, 45:12, 57:11
**September** [3] - 11:22, 52:18, 53:18
**series** [3] - 16:23, 38:6, 39:1
**serious** [1] - 32:20
**service** [1] - 24:10
**services** [2] - 12:22, 30:5
**SESSION** [1] - 1:5
**set** [20] - 4:23, 4:24, 5:11, 6:1, 8:1, 8:19, 10:8, 10:11, 14:21, 20:6, 23:22, 27:4, 27:17, 28:12, 29:12, 34:12, 45:21, 46:11, 57:10, 57:11

**setting** [8] - 9:14, 9:20, 14:19, 27:14, 28:3, 28:13, 35:11, 35:24
**settings** [1] - 10:7
**several** [1] - 23:23
**share** [2] - 7:12, 44:6
**shared** [1] - 47:14
**sharing** [2] - 40:11, 47:3
**shifting** [1] - 31:1
**shoot** [1] - 71:13
**Shormint** [2] - 24:9, 24:14
**shormint@hotmail. com** [1] - 23:12
**short** [1] - 72:4
**shorter** [1] - 71:15
**shortly** [4] - 19:22, 42:10, 61:7, 64:7
**show** [1] - 15:15
**showing** [3] - 5:3, 5:21, 52:9
**shown** [2] - 19:5, 20:7
**shows** [10] - 15:18, 15:23, 16:7, 19:8, 21:2, 21:14, 21:19, 36:18, 53:12, 53:14
**shut** [1] - 41:11
**side** [1] - 48:2
**sign** [1] - 46:8
**significant** [2] - 62:9, 65:9
**Silk** [11] - 17:3, 17:12, 18:2, 18:9, 18:16, 18:21, 18:25, 19:5, 19:9, 19:13, 19:19
**similar** [1] - 30:14
**simply** [1] - 16:10
**sincere** [3] - 37:6, 37:9, 37:23
**sitting** [1] - 59:21
**situation** [1] - 30:8
**slowly** [1] - 26:14
**small** [3] - 26:1, 38:15, 55:18
**software** [3] - 18:14, 36:17, 36:21
**sold** [1] - 21:20
**sometimes** [2] - 44:6, 47:24
**somewhere** [5] - 8:7, 17:9, 25:13, 31:18
**sorry** [13] - 7:1, 10:1, 22:11, 26:9, 37:16, 51:25, 53:4, 56:8, 60:2, 68:14, 69:3, 69:19, 71:24

**sort** [11] - 34:16, 38:17, 57:17, 58:5, 61:15, 62:12, 64:15, 65:12, 67:5, 67:16, 69:6
**sound** [1] - 29:4
**sounds** [4] - 8:2, 8:6, 45:23, 70:17
**spam@ plasmadivision.com** [3] - 13:24, 51:20, 52:16
**special** [6] - 61:19, 63:5, 63:6, 64:19, 66:4, 66:5
**specific** [21] - 5:1, 5:8, 8:5, 9:11, 10:13, 17:7, 22:12, 22:13, 22:24, 24:10, 24:18, 30:16, 32:2, 32:5, 32:20, 33:9, 33:21, 34:10, 34:16, 54:10, 58:17
**specifically** [7] - 12:23, 30:2, 30:18, 31:6, 32:16, 35:13, 57:7
**speculate** [1] - 27:10
**speculation** [2] - 28:6, 29:16
**speed** [2] - 62:13, 65:13
**spelled** [1] - 67:24
**spreadsheet** [1] - 53:12
**staff** [2] - 61:11, 64:11
**stand** [1] - 4:3
**standard** [2] - 67:6, 67:12
**start** [3] - 56:8, 60:4, 70:11
**started** [4] - 33:14, 59:17, 61:11, 64:11
**starts** [2] - 16:23, 20:6
**statement** [2] - 36:15, 37:24
**STATES** [4] - 1:1, 1:3, 1:11, 1:14
**States** [2] - 2:2, 73:13
**status** [3] - 39:10, 39:18, 39:21
**statute** [2] - 68:8, 68:25
**stenographic** [1] - 73:5
**step** [1] - 25:18
**steps** [8] - 26:19,

26:21, 27:15, 28:10, 28:12, 29:1, 29:12, 29:14
**Sterlingov** [18] - 4:1, 4:19, 8:8, 15:1, 21:6, 24:7, 24:21, 26:13, 29:13, 29:23, 30:15, 37:16, 43:2, 49:10, 50:25, 58:11, 67:7, 71:6
**STERLINGOV** [3] - 1:6, 3:4, 4:16
**still** [2] - 34:5, 46:19
**straight** [1] - 41:15
**streams** [1] - 17:24
**street** [1] - 46:13
**Street** [2] - 1:15, 1:22
**stuff** [2] - 62:16, 65:16
**style** [1] - 69:7
**subdomains** [1] - 10:6
**subject** [1] - 72:5
**submit** [2] - 62:12, 65:12
**substantive** [3] - 61:16, 64:16, 67:22
**suggest** [1] - 25:14
**Suite** [1] - 1:16
**superseding** [3] - 68:16, 68:19, 68:24
**supports** [2] - 63:22, 66:21
**suppose** [1] - 33:1
**Sweden** [1] - 24:17
**Swedish** [1] - 24:16
**SWORN** [1] - 4:16
**system** [7] - 48:6, 48:9, 48:17, 48:22, 48:25, 49:1
**systems** [4] - 26:23, 26:24, 27:2, 29:21

## T

**tab** [2] - 15:9, 15:20
**taught** [2] - 23:24, 46:3
**technically** [3] - 57:8, 58:5, 58:7
**Telia** [1] - 24:16
**testified** [5] - 8:16, 31:4, 40:9, 56:21, 58:11
**testify** [1] - 31:9
**testifying** [1] - 8:24
**testimony** [34] - 5:4, 5:10, 6:5, 6:6, 9:9, 10:4, 10:8, 18:5, 20:1,

22:14, 24:25, 25:9, 25:19, 25:21, 27:5, 27:15, 27:19, 28:20, 29:7, 29:25, 32:22, 34:22, 37:5, 37:9, 41:2, 43:4, 46:24, 47:14, 51:9, 54:8, 54:19, 56:3, 56:9, 56:14

**text** [6] - 25:14, 25:22, 39:1, 39:13, 59:2

**THE** [141] - 1:1, 1:11, 1:14, 1:15, 1:20, 4:1, 4:4, 4:5, 4:8, 4:9, 4:12, 4:14, 5:7, 5:8, 6:8, 6:9, 6:15, 6:25, 7:1, 7:3, 7:5, 7:7, 7:11, 7:14, 7:22, 8:11, 8:14, 9:2, 10:17, 18:11, 18:12, 27:8, 27:9, 27:22, 27:23, 28:5, 28:8, 28:9, 29:17, 29:18, 32:15, 32:16, 34:7, 34:8, 37:11, 37:12, 37:21, 38:1, 38:2, 40:19, 40:22, 40:23, 41:6, 41:7, 41:13, 41:21, 42:1, 42:4, 42:5, 42:9, 42:11, 42:14, 42:15, 42:17, 42:18, 42:21, 42:23, 44:14, 44:17, 44:18, 54:2, 54:3, 56:15, 56:16, 56:19, 57:3, 57:4, 58:17, 58:18, 58:21, 59:8, 59:11, 59:12, 60:4, 60:8, 60:11, 60:14, 60:15, 60:22, 60:25, 61:3, 61:6, 61:10, 61:21, 62:1, 62:7, 62:11, 62:18, 62:23, 63:2, 63:9, 63:13, 63:18, 63:23, 64:6, 64:10, 64:21, 65:1, 65:7, 65:11, 65:17, 65:22, 66:1, 66:8, 66:12, 66:17, 66:22, 67:18, 68:1, 68:4, 68:6, 68:11, 68:13, 68:17, 68:21, 69:2, 69:4, 69:11, 69:17, 69:21, 69:25, 70:6, 70:16, 70:18, 70:23, 71:7, 71:15, 71:18, 72:2, 72:6, 72:11

**Thereupon** [4] - 42:12, 60:23, 61:8, 64:8

**thetwo** [3] - 52:12,

52:20, 53:22

**thetwo@exploit.in** [1] - 54:9

**they've** [1] - 5:21

**thinking** [3] - 36:21, 63:24, 66:23

**third** [1] - 15:19

**thorough** [2] - 62:20, 65:19

**thread** [1] - 36:5

**three** [2] - 63:7, 66:6

**tied** [4] - 11:6, 16:24, 22:5, 23:11

**tired** [1] - 69:24

**today** [8] - 9:22, 29:7, 37:5, 40:10, 41:14, 41:22, 58:11, 58:15

**tomorrow** [12] - 41:18, 58:24, 59:6, 59:23, 60:5, 68:22, 70:10, 70:18, 70:20, 70:21, 71:1, 71:5

**tonight** [7] - 59:16, 59:18, 60:3, 60:4, 61:11, 64:11, 67:17

**top** [6] - 10:20, 16:16, 39:7, 50:11, 53:11, 71:10

**TOR** [2] - 1:20, 1:21

**Total** [4] - 36:6, 36:17, 37:6, 37:24

**totally** [1] - 4:21

**touching** [1] - 69:23

**toward** [1] - 42:22

**Townsend** [2] - 40:4, 40:7

**trace** [1] - 5:2

**track** [2] - 48:22, 54:13

**trading** [3] - 31:12, 31:24

**transaction** [18] - 18:20, 20:15, 20:17, 20:24, 22:1, 22:9, 22:13, 33:8, 33:9, 33:12, 33:19, 33:22, 55:6, 55:21, 57:18, 58:9, 63:10, 66:9

**transactions** [27] - 5:2, 5:20, 5:21, 5:24, 5:25, 9:6, 15:13, 16:11, 16:23, 17:7, 18:24, 19:2, 20:2, 20:3, 20:6, 20:18, 20:22, 34:23, 54:22, 55:3, 55:18, 56:10, 56:21, 57:13, 57:14, 64:4, 67:3

**transcript** [3] - 9:1,

73:5, 73:6

**TRANSCRIPT** [1] - 1:10

**transfer** [1] - 57:21

**transfers** [3] - 20:18, 22:3, 22:4

**translation** [1] - 35:15

**transmitting** [1] - 68:2

**transposed** [1] - 68:3

**TRIAL** [1] - 1:10

**trial** [2] - 63:21, 66:20

**tried** [1] - 30:9

**trouble** [1] - 60:18

**true** [9] - 15:20, 38:22, 39:17, 44:1, 49:9, 49:13, 57:16, 73:4, 73:5

**trust** [9] - 55:13, 55:15, 55:18, 55:19, 55:23, 56:2, 57:17, 57:23, 57:25

**truthful** [1] - 28:16

**try** [10] - 33:25, 44:7, 45:4, 46:15, 47:20, 48:1, 57:24, 58:5, 70:21, 71:12

**trying** [11] - 24:2, 24:4, 24:5, 26:14, 27:4, 30:19, 37:3, 38:14, 38:16, 56:23, 70:22

**turn** [3] - 51:24, 52:2, 53:5

**turned** [2] - 43:8, 67:7

**turning** [3] - 15:9, 20:5, 38:4

**tweaks** [2] - 61:15, 64:15

**two** [8] - 6:12, 6:17, 8:9, 24:5, 53:21, 55:13, 71:11, 72:1

**type** [9] - 13:15, 30:4, 30:9, 30:13, 41:24, 45:22, 62:1, 65:1

**typed** [1] - 25:23

**typical** [8] - 26:19, 26:22, 26:24, 27:5, 27:15, 27:19, 27:24, 30:7

**typically** [4] - 30:12, 62:23, 65:22, 71:15

**typo** [2] - 67:23, 67:25

**typos** [4] - 61:15,

62:10, 64:15, 65:10

## U

**U.S** [1] - 1:18

**U0845692** [4] - 23:4, 23:9, 24:10, 24:14

**unanimity** [5] - 61:19, 61:22, 64:19, 64:22, 70:7

**under** [4] - 35:22, 36:2, 38:25, 50:2

**united** [1] - 2:2

**UNITED** [4] - 1:1, 1:3, 1:11, 1:14

**United** [1] - 73:13

**unless** [2] - 57:19, 68:22

**unlicensed** [2] - 63:9, 66:8

**up** [49] - 4:23, 4:24, 5:11, 6:1, 7:19, 8:1, 8:19, 9:14, 9:20, 10:8, 10:12, 14:19, 14:21, 27:4, 27:14, 27:17, 28:3, 28:13, 31:11, 31:17, 34:12, 35:4, 35:11, 35:24, 35:25, 39:7, 41:17, 45:21, 46:8, 46:11, 46:13, 53:11, 57:10, 57:11, 59:18, 59:21, 59:22, 62:17, 65:16, 69:5, 69:9, 69:11, 69:17, 69:21, 69:22, 70:1, 70:2, 71:25

**upper** [2] - 16:17, 20:7

**ups** [5] - 23:24, 31:5, 31:10, 32:17, 34:9

**USB** [2] - 43:15, 43:19

**USBs** [1] - 43:23

**user** [7] - 11:13, 24:22, 35:1, 39:3, 44:21, 54:15, 54:20

**username** [15] - 11:18, 11:19, 12:10, 18:17, 18:21, 35:22, 36:2, 38:11, 39:6, 48:16, 49:5, 50:19, 51:2, 52:12, 54:9

## V

**vague** [3] - 28:6, 40:20, 44:15

**various** [3] - 17:25, 39:22, 44:5

**Vasily** [3] - 23:14, 23:16, 23:17

**venue** [1] - 68:7

**verdict** [6] - 63:3, 63:5, 63:6, 66:2, 66:4, 66:5

**versus** [1] - 48:23

**view** [5] - 38:6, 62:14, 65:14, 70:23, 70:24

**volfprius@hotmail. com** [2] - 16:6, 16:9

**VPN** [5] - 15:21, 16:1, 24:10, 24:11

**vs** [1] - 1:5

## W

**wait** [2] - 58:25, 61:3

**waiting** [1] - 70:13

**Walker** [1] - 56:5

**Wall** [1] - 1:22

**wallet** [17] - 17:18, 18:13, 18:14, 34:13, 55:9, 55:11, 55:12, 55:25, 56:1, 56:2, 57:10, 57:11, 57:19, 57:21, 58:12, 58:14

**wallets** [2] - 17:22, 29:21

**wants** [4] - 42:5, 60:25, 61:13, 64:13

**Washington** [5] - 1:6, 1:16, 1:19, 2:4, 73:14

**ways** [3] - 27:18, 63:7, 66:6

**website** [12] - 27:4, 27:6, 27:14, 27:16, 28:3, 28:13, 29:1, 30:8, 30:17, 34:20, 34:24, 36:5

**websites** [2] - 10:7, 27:17

**weird** [1] - 26:4

**white** [6] - 48:10, 48:13, 48:20, 49:3, 49:15, 50:17

**whole** [4] - 55:9, 55:22, 64:3, 67:2

**Wiki** [1] - 35:11

**willful** [8] - 63:16, 64:1, 64:2, 66:15, 66:25, 67:1, 67:11, 70:7

**willfully** [1] - 67:15

**Wired** [8] - 6:12, 6:17, 6:20, 7:24, 8:3, 8:9, 9:19

**wires** [2] - 30:1, 30:3
**withdrew** [1] - 19:8
**WITNESS** [25] - 3:3, 4:16, 5:8, 6:9, 6:25, 7:3, 7:11, 7:22, 8:11, 18:12, 27:9, 27:23, 28:9, 29:18, 32:16, 34:8, 37:12, 38:2, 40:23, 41:7, 44:18, 54:3, 56:16, 57:4, 58:17
**witness** [4] - 4:2, 4:3, 72:4, 72:10
**word** [2] - 48:10, 49:15
**words** [4] - 8:2, 8:12, 9:11, 36:9
**works** [3] - 17:18, 18:14, 70:3
**worth** [4] - 55:20, 58:9, 61:23, 64:23
**write** [3] - 25:9, 25:20, 45:25
**wrote** [6] - 25:6, 25:7, 25:11, 36:15, 45:15

## Y

**year** [1] - 33:23
**years** [12] - 5:22, 5:24, 8:4, 16:11, 17:8, 19:2, 20:4, 20:15, 20:22, 29:19, 33:7, 68:19
**yesterday** [4] - 12:12, 31:9, 40:9, 57:1
**York** [1] - 1:23
**yourself** [1] - 25:20
**yourselves** [1] - 41:24

## Z

**zoom** [1] - 10:20
**zooming** [1] - 16:16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

ROMAN STERLINGOV,

        Defendant.

_____/

Criminal Action
No. 1: 21-399

Washington, DC
March 7, 2024

9:22 a.m.

MORNING PROCEEDINGS

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:    CATHERINE PELKER
                     U.S. DEPARTMENT OF JUSTICE
                     950 Pennsylvania Ave NW
                     Washington, DC 20530

                     CHRISTOPHER BRODIE BROWN
                     DOJ-USAO
                     601 D Street, N.W.
                     Suite 5.1527
                     Washington, DC 20530

                     JEFFREY PEARLMAN
                     DOJ-CRM
                     Ccips
                     US Dept of Justice
                     1301 New York Ave NW
                     Washington, DC 20005

APPEARANCES CONTINUED ON NEXT PAGE

APPEARANCES CONTINUED

For the Defendant:     TOR EKELAND
                       MICHAEL HASSARD
                       TOR EKELAND LAW PLLC
                       30 Wall Street
                       8th Floor
                       Brooklyn, NY 10005


Court Reporter:        SHERRY LINDSAY
                       Official Court Reporter
                       U.S. District & Bankruptcy Courts
                       333 Constitution Avenue, NW
                       Room 6710
                       Washington, DC 20001

TABLE OF CONTENTS

WITNESSES

Roman Sterlingov

Cross-examination continued by Mr. Brown — 34
Redirect examination by Mr. Ekeland — 51

Valerie Mazars de Mazarin

Direct examination by Ms. Pelker — 58
Cross-examination by Mr. Ekeland — 61

EXHIBITS

Government Exhibit 721 withdrawn — 60
Defense Exhibit 143 admitted — 62

MISCELLANY

Closing argument by Ms. Pelker — 64

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Criminal case 21-399, *United States of America versus Roman Sterlingov.*

Would counsel please approach the podium and state their name for the record starting with government counsel.

MR. BROWN:  Good morning, Your Honor.  AUSA Chris brown for the government.  With me at counsel table are C. Alden Pelker and Jeff Pearlman.

THE COURT:  Good morning.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for Defendant Roman Sterlingov, who is present in court.  And joining me at counsel table is Michael Hassard.

THE COURT:  Good morning to you as well.

So we are here to continue the charging conference. I have four things on my agenda and you may all have additional items that you would like to raise now as well.  But I need to hear more from you and consider what to do about the willful blindness instruction.  I need to see what to do about the -- instruct the jury that they need to be unanimous with respect to which or both of the two objects of the conspiracy have been proved.  I want your views on, if we do get to the forfeiture proceeding, how you intend that to work.  And, finally, any comments that you may have on the proposed verdict form.

So why don't we start with the couple of more substantial issues.  And I -- I know the government was going

to look overnight at the question of whether in its view unanimity was required with respect to the objects of the conspiracy, which is the way I drafted the instructions.

Mr. Brown.

MR. BROWN: Yes, Your Honor. We did do some additional research on that. And we are satisfied that it does make sense to have a special unanimity requirement.

THE COURT: So I probably should add that to the special unanimity charge, which was on page 69 then.

MR. BROWN: Yes, Your Honor. I think that would be appropriate. And just one note in page -- I think it is page 39, where there is the substantive discussion of the conspiracy charge. We would just ask that the Court make it clear that the jury doesn't have to be unanimous as to -- they don't have to find unanimously that both objects were fulfilled or were agreed to as part of the conspiracy. They can chose either one or the other or both.

THE COURT: I thought I did, but that is that not --

MR. BROWN: So, Your Honor, I think the instructions that you circulated last night at the top of page 39. There is the sentence, "It is enough that the government proves beyond a reasonable doubt that there was a common understanding among those who were involved to commit" -- and we would insert the words "at least one of the crimes that are the two alleged objects of the conspiracy."

THE COURT: Okay.

MR. BROWN: Just to make it clear that the jury could choose object one, object two, or both or neither.

THE COURT: Okay. I think you are correct as a matter of law, so I just need to make sure the instructions are correct on that. And then I do later say, you must be unanimous as to at least one of the objectives that the defendants conspired to accomplish. That is on page 41.

MR. BROWN: Yes, Your Honor.

THE COURT: Okay. That is a reasonable addition. And I take it, Mr. Ekeland, that you have no objection to requiring unanimity?

MR. EKELAND: No objection, Your Honor.

THE COURT: And anything on the other suggestion that Mr. Brown made?

MR. EKELAND: I think that is a correct reading of the law.

THE COURT: Okay. Agreed.

All right. So now willful blindness, who wants to go first on it, I am fine.

MR. BROWN: Yes, Your Honor. We so we think, number one, the instruction is appropriate. This is a pattern jury instruction. And, number two, we think that the evidence that was adduced at trial supports at least giving the instruction to the jury. There are essentially two prongs to a willful

blindness -- to the willful blindness standard.  Number one is the defendant must subjectively believe there is a high probability that a fact exists and referring to *Global-Tech Appliances*.  And with respect to the defendant's subjective belief, the proof adduced at trial includes, number one, the defendant -- it is undisputed that the defendant had a Silk Road account that he used to purchase psychedelic drugs.  Number two, the defendant's Killdozer account posted that the entire Bitcoin network is "plausibly deniable money laundering."  The defendant's Exploit account, Meth, although that may be disputed, the Meth post, you know, the defendant using that moniker posted, referring to Tor hidden services "Drugs are sold and unfortunately child pornography."  And this is not to mention, you know, to the extent that there has been a preliminary showing at least, a prima facie showing that the defendant is Akemashite Omedetou.  The Akemashite Omedetou posts are rife with references to using Bitcoin Fog to protect criminal activity.  So we think that there is sufficient evidence in the record to justify subjective belief.

And then, the second prong is deliberate actions to avoid learning of that fact.  And the evidence at trial that came in about the design and structure of Bitcoin Fog includes the fact that Bitcoin Fog deliberately deleted logs.  It made logs of transactions that were purged after one week.  So there is a deliberate action to destroy records of transactions.  And

also maybe a little bit of a more abstract point, the user interface was designed not to collect any identifying information about the transactions or the nature of those transactions. So we think both prongs of the *Global-Tech* legal standard are satisfied here.

THE COURT: And so you think this is relevant to the question of whether Mr. Sterlingov knew that Bitcoin Fog was being used to launder the proceeds of illegal activity?

MR. BROWN: Yes, Your Honor. So it is relevant to the money laundering conspiracy in Count 1.

THE COURT: Right.

MR. BROWN: It is also relevant to the 1960(b)(1)(C) prong, which is operating a money transmitting business that essentially transacts in either the proceeds of crime or property that -- that transacts in property that the defendant knew was either the proceeds of crime or intended to promote crime. So that element of knowledge comes in both in the substantive offenses that were the objects of the conspiracy that the defendant knew that the transactions executed by Bitcoin Fog involved the proceeds of some unlawful activity. That is what the statute requires, proceeds of some unlawful activity. That is a knowledge standard. But as we have briefed it. Even that knowledge standard incorporates and was intended by Congress to incorporate a willful blindness standard. The same knowledge question comes in at

1960(b)(1)(C) at Count 3. And, again, we think the law on willful blindness is willful blindness is an alternative way of satisfying the knowledge prong. So we think it is fair to instruct the jury they may find that the defendant had knowledge of a fact, if they find that the defendant deliberately closed his eyes to something that would otherwise be obvious to them. And we think that is a --

THE COURT: What about the knowledge requirement as it relates to some of the registration requirements? So, for example, you know, as I have drafted the instructions here to convict on Count 4, the jury would have to conclude that Mr. Sterlingov knowingly engaged in the business of money transmission in the District of Columbia.

MR. BROWN: Yes, Your Honor. So I think I was a little bit confused by the question. The knowledge requirement in Count 4 and the first two prongs of Count 3, the knowledge really applies to the operation of the business, it doesn't apply to the failure to register or failure to obtain a license.

THE COURT: I understand that. What I was going to say though is, knowing that he was operating a business in DC, or knowing even that he was operating a money laundering business that had this sufficient nexus in the United States for purposes of Count 3.

MR. BROWN: Yes, Your Honor. And I think that

also -- the willful blindness instruction would be appropriate in those situations too, to the extent that there is any knowledge. There is a requirement that he has knowledge with respect to the geographic location of the business. I think it is -- if he is -- number one, the knowledge of Silk Road. He knows that Silk Road is a drug marketplace that operates globally. It was operated out of the United States. It had United States vendors. There is certainly a high probability that among the customers of Silk Road are other darknet markets, there would be customers located in the District of Columbia. And there would therefore be customers of Bitcoin Fog who are interested in using that to mask their transactions or their drug sales on darknet markets like Silk Road. And, again, you know, going back to the -- you know, the structure and design of Bitcoin Fog, it was -- I mean, it was in English. It wasn't in, you know, Russian or Swedish or some other -- or Spanish or some other language. -- there were numerous references in the Akemashite Omedetou posts comparing the idea that Bitcoin Fog was based on Tor, that this was sort of an imitation of or following the model, I should say, of Silk Road that, you know, it is hard to find a Tor hidden service, just look at Silk Road.

There is a clear indication that the creation of Bitcoin Fog was designed to be shielded on Tor just the same way that Silk Road was. And the whole user interface was

designed not to collect any sort of user identification information, including where those users might reside.

THE COURT: I actually think this is a really interesting question. And as you know, as I read *Alston-Graves*, the D.C. Circuit prior to the Superior Court decision in *Global-Tech* was the one Circuit that expressed skepticism about willful blindness. But the skepticism that the D.C. Circuit expressed was that if the statute requires knowledge, then you ought not be able to prove it with something other than knowledge. If willful blindness means you didn't actually know, then how can you violate the statute? And, obviously, in *Global-Tech* the Supreme Court was aware and cited to the D.C. Circuit and I think fairly can be seen to have just taken a different view on that question.

But the reason I bring this up it does seem to me that there are two variations or ways of thinking about it, one is just an instruction on what it means to know something. And in the same way, you can say you might rely on circumstantial evidence or all of the evidence and draw reasonable inferences and, you know, we never know what is in someone else's head and therefore you can rely on their actions and all of the evidence to infer what is in their head. It is arguably a variation on that. If there is a high probability that something is true and someone is engaged in conduct that is avoiding that, it is fair to infer that they actually do know it. And that they

are -- their actions to avoid it are actually some evidence that they know what is going on.

There is the other version, which is that people ought not to be able to escape liability by saying, I am a drug mule, don't tell me what is in the bag. But I am picking it up from the drug dealer and I am dropping it off at another drug dealer, but don't tell me what is in there. And, again, maybe that is another way of inference -- again, what I am wondering -- two things based on all of that windup is, one, whether -- one possibility might be not to give a willful blindness instruction, which -- just calling it out separately suggests to the jury that it is enough just to keep from knowing something, but to actually just build it into the definition of knowledge at some point. And to just say, that one can know something -- knowledge doesn't require certainty. But if there is a -- if you believe that to a high degree -- to a -- if you believe that there is high probability that something is the case and you don't actually believe otherwise, you can infer that the person knew the facts. And I don't have a strong view on that. I am just throwing that out as one possibility.

The other thing is I am wondering in light *of* *Global-Tech* and its apparent approval of the model penal code language, as well as Justice Scalia's plurality opinion in *United States versus Santos,* which also I think cites

approvingly to the model penal code in the context of money laundering, if giving a version of the model penal code instruction would be preferable to giving the model that you have proposed which, obviously, doesn't come from the D.C. Circuit since the D.C. Circuit is not terribly receptive to charging in any event.

So if I did the latter, it would be something along the following lines:  You may find the defendant had knowledge of the fact, if you find a defendant deliberately closed his eyes, to what otherwise would be obvious to him.  In other words, when knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person has a subjective belief that there is high probability of its existence unless he actually believes it does not exist, thus although knowledge on the part of a defendant cannot be established merely by demonstrating that a defendant was negligent, reckless, careless or foolish, knowledge can be inferred if a defendant deliberately blinded himself to the existence of a fact that he had a high -- that he believed -- that he was aware of a high probability of its existence or something like that.

MR. BROWN:  Yes, Your Honor.  I think that does sound appropriate.  We are not wedded to this language.  And, I mean, in fairness the -- there are no D.C. Circuit substantive --

THE COURT:  I understand.  No, the red book doesn't

even have one in it.

MR. BROWN:  That is true.  Yes.

I think the model penal code approach makes sense. And I think that certainly the Supreme Court's opinion in *Global-Tech* and the other circuits that have approved these sorts of instructions, the way that they phrased it is this is a way to prove knowledge, as opposed to this is a certain alternative scienter requirement.  So I think that that approach as the Court just read it --

THE COURT:  One of the reasons I said this is an interesting question, because it is also -- it is ultimately just an epistemological question of what the word belief means or knowledge means.  And I believe the way knowledge is defined in epistemology is a justified true belief.  And the question for present purposes is whether it is -- you have a belief and you believe things without being certain.  And I am not sure there is any law on the question of whether the word belief means preponderance, something less than preponderance, something more than preponderance.  And I don't think there is any law that I am aware of on that question, but we all believe lots and lots of things to be true where we are far from certain that they are true.

I believe we'll get through closings today, but maybe not.  So I don't know if providing some additional help for the jury in some way, maybe the model penal code is the way to do

it just with respect really with what it means to know something which ultimately turns on what it means to believe something.

MR. BROWN: Yes, Your Honor. I think that is a helpful way to think about it in the way that in thinking of like a willful blindness instruction, it is also relevant that -- I mean, there is no such thing -- there is very rarely direct proof of knowledge even for knowledge from the circumstances of -- circumstantial evidence of direct knowledge is very close to circumstantial evidence or direct evidence of willful blindness or deliberate blinding.

THE COURT: In that spirit, I guess another distinct possibility to put on the table would be dropping the first sentence of the willful blindness instruction. So not starting with that you may find the defendant had the knowledge of a fact if you find that he deliberately closed his eyes to what would otherwise have been obvious to him, but instead just after giving the usual knowledge instruction say, when knowledge of the existence a particular fact is an element of the offense, such knowledge can be established if a person is aware of a high probability of its existence, unless he actually believed that it does not exist, thus although knowledge on the part of defendant cannot be established by mere negligence and so forth. It can be inferred if a defendant deliberately blinded himself to the existence of the

facts where he knew -- where he believed there was a high probability they were true or something like that. I am really just searching for answers here. I don't have a strong view on this issue.

MR. BROWN: Your Honor, I don't think the government has a strong view. I think any of these formulations are consistent with the law.

THE COURT: Okay.

MR. BROWN: It does make sense, I think as the Court suggests to frame this just in terms of the definition of knowledge for the jury as opposed to sort of introducing this as a separate concept.

THE COURT: All right. Let me see what Mr. Ekeland has to say on this.

MR. EKELAND: I agree with the Court that this is an interesting epistemological question. I think in *Alston-Graves* the D.C. Circuit did a good job in just pointing out what is so problematic about the willful blindness instruction. And that is essentially that it allows for basically a scienter in a criminal case based on a negligence and recklessness standard. And I think why I think the defense thinks this is such a problematic instruction and it should just be stricken is that essentially it is changing, I think, the statutory scienter requirement in that it is introducing something that -- I mean, we are just sitting here trying to discuss the definition and

the vagaries of it, because I think there is some ambiguity or vagueness to just the epistemological concept of knowledge. And it is just -- I think the jurors should be instructed on the scienter requirement based on the statutory language and what the law requires and not introduce some outside concept that arguably modifies the scienter requirement and also potentially introduces a negligence and recklessness standard.

THE COURT: So two things: One is, even in *Alston-Graves*, which is sort of the most extreme view of -- the next extreme case for not giving the instruction, the Court there didn't say, even in that case don't ever give it. It just said give it with real caution and it has to be an appropriate case. It does strike me that a money laundering case in a case in which the alleged conduct involved obfuscating who it was we were dealing with and was marketed on that ground is -- if there is ever a case for it, it seems like that is the case where it would be appropriate. So even under *Alston-Graves*, I think it may very well be appropriate. But *Alston-Graves* was dicta. But the Supreme Court's opinion in *Global-Tech* comes after *Alston-Graves*. And arguably it is dicta, although I am not sure it is dicta. I mean it was certainly necessary to the holding in the case, although it was a civil case rather than a criminal case. And the Supreme Court expresses approval of the model penal code language and actually expresses some disapproval of *Alston-Graves* in the

context of doing that. So I think the state of the law is the Court should be cautious about this.

MR. EKELAND: I think this is a question for Congress in terms of writing the statute. And that the danger here -- you know, we can see how slippery this concept is. Is that actually what is happening is that the actual statute itself is being modified and the scienter requirement in the statute is being modified. And if Congress had wanted to put this in the statute, Congress is quite capable of saying -- putting that in the statutory language and it is not there. So I think the Court understands my point.

THE COURT: I do understand your point. But that leads me back to some of the questions that I was asking Mr. Brown about of then, you know, would your preference be -- if I conclude that it is appropriate to give the jury some guidance on -- additional guidance on knowledge, particularly in a context in which steps are taken to obfuscate who you are dealing with, so if I cross that bridge and say, well, I think I need something just beyond the usual knowledge instruction, do you have a view about whether I should give a separate willful blindness instruction or whether I should fold something into the knowledge instruction? And if I fold something into the knowledge instruction, should I just give sort of the second half, using the model penal code language about, you know, the person being aware of or believing that

there is a high probability of the existence of a fact, that the person doesn't actually believe does not exist?

MR. EKELAND: Just to make it clear, I think it is obvious, because we object to any of the language. But if the Court is going to put something in, like, I mean, this is -- I think the problem is with the concept, right, in saying you intentionally don't know something, so it is bringing in the sort of intentional scienter concept to a state of ignorance and --

THE COURT: I'm sorry. Just to -- I don't mean to interrupt you. But it is not -- I see your point on that I and I am sympathetic to that point.

MR. EKELAND: I'm sorry.

THE COURT: But I think the model penal code approach that I am talking about requires that the government actually prove that the person believed that there was a high probability of the existence of a fact, which, you know --

MR. EKELAND: But, again, that goes back to the statutory language that Congress drafted. And that is not the scienter requirement in the statute.

THE COURT: But isn't it? Again, you know, this goes back to the question of what the word knowledge means. I think there is a high probability that we are going to give closing arguments today. I don't have any reason to think that is not the case. And as long as I am justified in that view and it

turns out to be true, then I knew that fact; right?

MR. EKELAND: I would disagree with that, because you wouldn't know the fact until it empirically occurred.

THE COURT: That is -- I mean, I know the sun is going to rise tomorrow.

MR. EKELAND: Well, now we are to Hume's problem of induction. Right? If we are going to get into epistemology, you don't know that for certain. That is an inductive argument based on what -- maybe the -- I'm sorry, Your Honor.

THE COURT: We are going down a path here that has no relevance here to this case because the effect --

MR. EKELAND: Well --

THE COURT: I'm sorry. Let me finish. The events in this case have occurred in the past, so the analogy may not have been a perfect one. But if I thought that there was a high probability that I would get stuck in traffic coming to work today and I was justified in that belief, because I turned on the news this morning and they said there was a traffic jam because of the State of the Union Address and they were closing a whole bunch of roads. And I, in fact, got stuck in traffic, you would say I had knowledge; right?

MR. EKELAND: Not necessarily because what I -- and I guess what this is getting at and I think this is why it is so slippery is there is a distinction to be made between deductive knowledge, which follows by logical necessity, I see Silk Road

making deposits into Bitcoin Fog, therefore I can necessarily conclude that it is true that Bitcoin Fog is, you know, taking money from Silk Road. Whereas opposed to the inductive approach, I have seen a set of empirical circumstances occur. It is not necessarily going to happen the next time. I think this is why this instruction is so problematic. I am not trying to get into an epistemological argument, I will just say the defense objects to any willful blindness instruction by the Court. And if the Court is going to, you know, put one in, then I think the model penal code one based on the high probability of knowledge comes closest to --

THE COURT: It is not high probability of knowledge. That is --

MR. EKELAND: I'm sorry. I probably misspoke what --

THE COURT: Yeah. It is a high probability of -- where someone is aware of the high probability of the existence of a fact.

Let me ask you -- I am not sure you finished your sentence here. But the question is, okay, fine, I am giving something, what is your preference? If I am giving something, what is your preference if I am giving something or do you have a preference?

MR. EKELAND: So the model penal code one, you just said and then what was the other one? A modification that -- taking out the first sentence to the instruction and the

proposed jury charge is --

THE COURT: Just including it in the definition of knowledge rather than having separate willful blindness instruction?

MR. EKELAND: That is a tough one.

I'd probably go with the model penal code.

THE COURT: As a separate instruction?

MR. EKELAND: As a separate instruction.

THE COURT: That is fine.

MR. EKELAND: Over defense's objection, just to be clear.

THE COURT: No. I understand the defense objects. I will say, just for the record on this, I think that our discussion there to my mind is evidence of why this is necessary. And that just to actually inform the jury, because I think you are wrong in saying that the word knowledge in a criminal statute requires the type of deductive conclusion that you are talking about versus inductive conclusions.

And I don't think the word knowledge is included -- is limited to those circumstances in which you can say, you know, I saw with my very own two eyes Silk Road deposit money into Bitcoin Fog and withdrawing money from Bitcoin Fog. I don't think that is what the word knowledge means. I think, as I said, I think it is a justified, true belief. And I think to the extent that we are talking about what is in the defendant's

head, that simply means whether he believed it to be the case. And the belief can be formed based on deduction or induction.

MR. EKELAND: Not to argue epistemology with the Court, that raises the question what justification and truth is. And I have heard the Court and I understand. We do have some other smaller things.

THE COURT: Why don't you give me those? Let me see. I want to make sure -- I have got the version from last night in front of me.

MR. EKELAND: So on the statute of limitations language -- this isn't a substantive point. This is a style point.

THE COURT: Can you point me to the page you are looking at?

MR. EKELAND: Yes. Let me find it. I lost it here.

THE COURT: While you are looking for that, I just want to state this for the record. I will go back and tinker with the language and show you the language again, I am convinced that a willful blindness of some sort is appropriate here. And in reaching that conclusion, I recognize that courts need to be extremely cautious in giving willful blindness instructions. And I am also concerned about not in any way watering down the meaning of the word knowledge of in the knowledge requirement in the statute. But I think on the facts of this case and for the reasons that Mr. Brown gave, but also

just given the entire nature of the alleged conspiracy and alleged criminal conduct here, which was founded on the notion of blindness and not knowing who you are dealing with. And intentionally to engage in criminal activity, that if there is ever a case in which it is appropriate, it is this sort of case. So that is the reason that I conclude that it is appropriate. I agree, frankly, with the sentiment expressed in the D.C. Circuit's decision in *Alston-Graves* that the Court has to be extremely cautious in giving this type of instruction. And I also in doing so will also go out of my way to make clear to the jury that this is not -- that a finding of negligence or recklessness or carelessness is not sufficient.

Okay. You have a page number for me?

MR. EKELAND: Yes. Page 65 of the statute of limitations, third paragraph down. This is not a substantive point. This is a stylistic point.

THE COURT: Okay.

MR. EKELAND: We discussed this briefly yesterday.

THE COURT: Sixty-five?

MR. EKELAND: Sixty-six, my apologies. Sixty-six, third full paragraph down starting, I will instruct you that the government must prove beyond a reasonable doubt that conduct related to Counts 1, 3 and 4, we would just -- I think -- I forgot what we changed it to yesterday, but the language in the original is continued up until the following

dates.

THE COURT: Yes.

MR. EKELAND: Stylistically I think that is a little confusing. It implies that the conduct was occurring. And what we are suggesting is saying something to the effect of, related to Counts 1, 3 and 4 occurred on or after and then, those dates. And I think what I am -- I think what -- the reason this language is in here is because there is a concern that while the conspiracy could have started before the statute of limitations and continued on afterwards. So if that is a concern maybe just add a sentence saying, you know, if you find that the -- you know, the conspiracy started before the statute of limitations, but was still continuing into it, you know, that -- you know, addressing that concern. But the language just I think sounds a little bit like, A, it assumes the conduct was occurring beforehand. And I think it is just a little confusing. And I want to make clear it has to have occurred on or after the date of the applicable statute of limitations.

And then, the next page, I don't -- I am a little confused by this, where it says for Count 2 -- this is starting on the bottom of page 66. I will instruct you that the government must prove beyond a reasonable doubt that the financial transaction charged in Count 2 must have occurred before the following date. I think that should be after, on or

after June 14th, 2016 or am I just confused about that?

THE COURT: I think you may be right. Let's see here.

MR. EKELAND: I think that is just a typo.

THE COURT: Does the government agree with that, change the word before to after?

MR. BROWN: Yes, Your Honor.

THE COURT: That is a good catch. Thank you.

MR. EKELAND: I wasn't sure if it was one of those things where I wasn't sure if I didn't understand the --

And is there an instruction -- maybe I missed it -- on just abandonment of the conspiracy?

THE COURT: I don't think there is. I don't recall one in there.

MR. EKELAND: I don't either. I was hoping we could add a boiler plate abandonment of the conspiracy, if you find that even if he did join the conspiracy and he took some affirmative step to, you know, whatever the law is on that, I think there is standard --

THE COURT: My recollection for the law on that is -- and this is just off the top of my head. But the law is, you know, something of the nature, you have to go to authorities and turn your co-conspirators in or something to that effect. It is not enough to simply say, I stopped doing it.

MR. EKELAND: No, it is not enough. I can't off the

top of my head, you like say, for instance, the thing that pops into my head is Mr. Sterlingov testified, I stopped doing freelance jobs in 2013; right? I think that could be, again, without having taken a deep dive into the law --

THE COURT: I will take a look at it and -- to give the instruction, you will have to convince me that there is some evidentiary basis for it. And I think we both need to look at it, but, as I said, my recollection is it requires a lot more than that rather than I just stopped doing it.

MR. EKELAND: But that is a fact question for the jury if they were properly instructed; right?

THE COURT: No. I have to conclude that there is some factual basis, you know, and an iota of evidence before I give an instruction.

MR. EKELAND: Okay. No argument. You know, if the Court takes a look at it and let us know and --

THE COURT: If you want to point me to some evidence of abandonment beyond just the fact that he allegedly stopped doing freelance jobs.

MR. EKELAND: It is the defense position that there is no evidence of a conspiracy. We don't need to go down the rabbit hole.

THE COURT: Okay.

MR. EKELAND: There is -- on page 56 -- let me make sure I am looking at the right thing.

THE COURT: Just before we move off the statute of limitations, does the government have any objection to the change of adding occurred on or after instead of continued up to at least?

MR. BROWN: Your Honor, I think that would actually introduce more confusion, the language here. Because the issue here, as the preceding paragraph makes clear, these are -- at least some of the offenses charged here are continuing offenses. And so the relevant question for the jury really is, whether there was a continuation of the offense past the relevant statute of limitations dates. So I think at most looking at the sentence here -- I would have to do some word smithing, but something to the effect of began -- either occurred after those dates or began before and continued through, you know, up to at least the following dates. But I think just in terms of way the evidence came in, there is, you know, a basis -- if the jury is going to find that Counts 1, 3 and 4, you know -- if there is a basis for Counts 1, 3 and 4, the jury is going to find that they began before the relevant statute of limitations dates. So the question really is for the jury whether those offenses continued, not whether they, you know, occurred necessarily.

MR. EKELAND: I think that language, if you say began -- I think the issue we were having is with the continued, because it implies like it actually did happen. I

think saying that it began and then, you know, or occurred after like that -- the thing I was concerned with is there is an implicit assumption in the language that is in there right now, that it actually did occur and continued into the relevant dates.

THE COURT: What if I just say that the conduct related to Counts 1, 3 and 4, if any, continued up to -- so just insert "if any"? I am not suggesting it did happen or there was any conduct.

MR. EKELAND: I'm sorry. Could you repeat the language, Your Honor, just so I can --

THE COURT: Yeah. Sure. I will instruct you that the government must prove beyond a reasonable doubt that conduct related to Counts 1, 3 and 4, if any, occurred or continued up to at least the following dates.

MR. EKELAND: Yeah. Okay.

THE COURT: So I will do that. I will insert the "if any".

MR. EKELAND: Yeah.

THE COURT: Okay. All right. And you were going to 56, I think?

MR. EKELAND: Yeah. 56, it discusses FinCEN --

THE COURT: Yes.

MR. EKELAND: -- under the money services. Business must register with the Secretary of Treasury -- I am going to

drop this. I am going -- withdrawn. I am not going to argue that point.

And then I think that is it, unless the Court has any question of the defense right now.

THE COURT: No. Does the government have any additional comments or evidence?

MR. BROWN: Your Honor, just one very, very minor comment on page 35 in the discussion of Count 2, where it says at the bottom of the paragraph of Count 2, unlawful activity on November 21st, 2019 --

THE COURT: Yes.

MR. BROWN: We would ask the Court to insert on or about November 21st.

THE COURT: That is fine.

MR. BROWN: I think that is consistent with the way the charge was phrased in the superseding indictment.

THE COURT: That is my understanding as well.

Okay. Fine. Anything else?

MR. BROWN: Nothing further, Your Honor.

THE COURT: Anything else?

MR. EKELAND: Nothing further, Your Honor.

THE COURT: All right. So should we go ahead and get the jury?

I'm sorry. Give me a second.

Any comments on the verdict form?

MR. BROWN: Nothing from the government, Your Honor.

THE COURT: Anything from the defense?

MR. EKELAND: No, Your Honor.

THE COURT: And then what do you all anticipate that -- if there is a conviction on a relevant count, are you anticipating having like another proceeding on forfeiture or just some argument on forfeiture?

MR. BROWN: So, Your Honor, we haven't set it in stone. As the Court is aware, the evidentiary standards for forfeiture proceeding under 32.2 are more relaxed. We can rely on hearsay. So I -- and the jury can rely on evidence that was introduced at trial that they are familiar with. So I think at most we would anticipate, you know, essentially having one witness who can testify to kind of an analysis of the relevant properties that are subject to forfeiture. And then, you know, I think it is sometimes done where there is essentially an attorney summation. But this is not like a big closing argument. It would just be maybe a little bit of witness testimony. Obviously, the defense would have an opportunity to present evidence. But then, you know, we would just want to sort of tee that up for the jury in hopefully a more relaxed form than compared to closing arguments.

THE COURT: Would I instruct the jury on the law before or after you do that?

MR. BROWN: Your Honor --

THE COURT: Because I don't have preliminary jury instructions to tell them what they are doing.

MR. BROWN: Yes, Your Honor. That is a good point. And we did submit --

THE COURT: You submitted instructions, but just one set.

MR. BROWN: Yes, Your Honor. And those instructions, now that I think about it, are sort of phrased in terms of the standards that the jury should apply. The government ultimately doesn't have a strong feeling one way or the other. It might make sense to -- we can go through it. And some of those instructions are really phrased more globally in terms of this is what forfeiture is. This is -- it is a lower standard of proof. This is the purpose of it. And those could be given as more of a preliminary instruction. We could present the very limited case that we want to present and then have the Court instruct with respect to the specific standards that are applied to those properties.

THE COURT: Mr. Ekeland, do you have a view on this?

MR. EKELAND: I think we are generally in accord with that. I am not expecting any big proceeding. And I think it might be helpful to -- without having a strong opinion on it for the jury to hear it beforehand to have something to frame everything that is going on.

THE COURT: I have had jurors ask me before in other

cases to give them more instructions up front, so that may make sense here if we get to that point.

All right. That is fine. And any update on whether there is going to be a rebuttal case or not?

MR. BROWN: Yes, Your Honor. Just a very short, like, 10-minute direct examination of Ms. Mazars de Mazarin.

THE COURT: Is that going to involve exhibits, do you know, new exhibits?

MR. BROWN: No new exhibits.

THE COURT: No new exhibits. All right.

I guess why don't we go ahead and get the jury and continue then?

Mr. Sterlingov can go back to the witness box.

MR. EKELAND: Your Honor, real quick housekeeping at some point maybe at the break about the stipulation we agreed to yesterday.

THE COURT: Okay. Great. Before we rest, you ought to resolve that so it can be read to the jury.

MR. EKELAND: Yes.

THE COURT: If you have agreement with respect to stipulation --

If you are in agreement, I will -- you know, I can read it to the jury whenever you think appropriate and I am happy to have either side read, whoever wants to. You don't need me if you are in agreement.

MR. EKELAND:  I will read it at an appropriate point.

(Jury in at 10:11 a.m.)

THE COURT:  Welcome back.

Mr. Brown, you may continue.

CROSS-EXAMINATION CONTINUED

BY MR. BROWN:

Q.   Good morning, Mr. Sterlingov.

A.   Good morning.

Q.   Now, during your direct exam, you testified that I believe it was by 2019 you were exploring leaving Sweden; is that correct?

A.   I was exploring it probably earlier, but, yeah, around that time.

Q.   And that was for tax reasons?

A.   Tax reasons and I also wanted to travel more.

Q.   And by 2020, you had started living in other countries; is that correct?

A.   For some parts of the year.

Q.   And I believe was it your testimony that you could live in Sweden for no more than six months for tax purposes?

A.   Yes.

Q.   And where else were you living during that time after 2020 and beyond?

A.   That was mostly Germany and Spain.

Q.   Now, you testified that you started buying Bitcoin -- when

was it that you first started buying Bitcoin?

A.    Around 2010.

Q.    And at that point, you were employed by the company CapO Marknadskommunikation?

A.    Yes, that is correct.

Q.    And that was essentially your only source of funds to buy the Bitcoin, was your salary?

A.    That and a few freelance jobs, but also only that, yeah.

Q.    And you have testified in a pretrial hearing on January 31st, 2023; correct?

A.    Yes.

Q.    And during that hearing, when you were asked about the source of your funds, you didn't mention freelance jobs or selling items, did you?

A.    I am not sure.

Q.    And what was your monthly salary at CapO?

A.    I believe it was around 25,000 Swedish krona which is around 2,500 per month.

Q.    And if you multiply 2,500 per month by 12 months, that works out to about 30,000 US dollars per year?

A.    How much did you say?

Q.    30,000; is that correct?

A.    No.  I think it is 2500 per month that would be more than 3,000 per year.

Q.    If it were 10 months, 2,500 times 10 would be 25,000;

right?

A.    Yes.

Q.    And then if it were two months more, that would be another 5,000; correct?

A.    Right, so that is 30,000, not 3,000.

Q.    I apologize if I misspoke.  It would be about $30,000 per year; correct?

A.    Right.

Q.    And you testified earlier this week that you were going to Bitcoin meetups during this time?

A.    That is correct.

Q.    And that you were purchasing Bitcoin at these Bitcoin meetups?

A.    Sometimes at the meetups, sometimes I would meet people outside of a meetup.  But, yes, on the meetups as well.

Q.    You testified that some of your trades could be as high as 2,000 or a few thousand dollars; correct?

A.    That was probably rare.  Some of them -- I think most of them were smaller, but, yeah, I think I had had trades for a few thousand.

Q.    And you left CapO at some point in 2014; is that correct?

A.    That is correct.

Q.    And since that point from 2014 through 2021 you had no other significant sources of income?

A.    That is correct.  That studio did not really give me a lot

of income.

Q.   And you had Bitcoin that was appreciating in price; correct?

A.   Yes.

Q.   But you can't buy more Bitcoin with the Bitcoin by selling Bitcoin, can you?

A.   Yes.  I can sell it and then use that money to buy Bitcoin, I guess, but not -- it wouldn't be a lot more Bitcoin because I had no, like, fiat -- I had no kronas coming in from any paycheck or anything like that.

Q.   Now, you have testified about being a user of Bitcoin Fog; correct?

A.   That is correct.

Q.   And you acknowledge that many of your financial accounts, such as Kraken or Poloniex or other cryptocurrency accounts, those received funds from Bitcoin Fog; correct?

A.   They received funds that I mixed through Bitcoin Fog.  I was using Bitcoin Fog and then I deposited funds into my exchange accounts.

Q.   And when you were -- when you testified, when you say that you were sending funds to Bitcoin Fog to mix them before sending them to Kraken or another account, where do these funds originate when they go to Bitcoin Fog in your testimony?

A.   That was the Bitcoin that I had bought and accumulated buying and selling it.

Q.    And where are the records of those transactions stored?

A.    Those records would be in the wallets that I had at the time.  They would be in my paper wallets.

Q.    Would those wallets be saved on a different computer?

A.    Different than -- I have had like six, seven computers over the past 13 years.  That is why you see my bunker X is named X, as the Roman numeral for 10.  That is like every time I reinstall it, the number will increase.

Q.    And is bunker X different from the laptop that you were carrying when you were arrested?

A.    Yes, that is different.

Q.    Where is bunker X?

A.    Right now, I don't know.  I haven't been able to -- I don't know how much I can say.  Well --

Q.    Where did you last see bunker X?

A.    That was at my home in Sweden.

Q.    Even though you were living in Germany and other places from 2020 onward?

A.    Right.  Well, at that point it wasn't there.  Rather I stored it there.  It wasn't online though.  But the last time I saw it was in my apartment.

Q.    Now, yesterday, you testified about private key transactions or maybe it wasn't yesterday, maybe it was earlier in the week you testified about transactions in which you handed over your private keys to a wallet to somebody else;

correct?

A.    Yes.

Q.    And you testified that this happened once with somebody who is not very familiar with Bitcoin and you had to set up their wallet for them?

A.    Yes.

Q.    And when did that transaction occur?

A.    That was in one of the earlier meetups.

Q.    If we could pull up Government Exhibit 313A, please, which is already in evidence.  I just want to make clear for the record, this transfer here of Bitcoin out of your Mt. Gox account, this is not the instance that you are thinking of when you transferred private keys to someone else?

A.    As I have said before, when I am looking at this chart, I don't remember the specific transactions or addresses.  This was supposedly going on, again, 13 years ago, so I don't know specifically what this transaction is or isn't.

Q.    Now we can take this down, please.

      You were asked during your direct examination about invoices you prepared for your company, Code Reactor.  Do you recognize that?

A.    Yes.

Q.    And you testified earlier that you created the Code Reactor invoices for tax purposes; is that correct?

A.    Yes.  For taxing my Bitcoin that I still had for the jobs

that I had been doing earlier.

Q.   And I wanted to clarify this testimony because I am not sure if I followed it.  You said that you completed these jobs three or four years prior; is that correct?

A.   Yes.

Q.   And so if an invoice is dated on date X, you would have -- the job would have been conducted three or four years before date X.  Is that your testimony?

A.   Yeah.

Q.   And the Bitcoin transactions that corresponded to those invoices, were those Bitcoin transactions that occurred on the date listed on the invoice or was that the date that you created the invoice?

A.   The date listed on the invoice would probably be similar to the date that the invoice was created.

Q.   And is it your testimony these were all real freelance jobs that you conducted?

A.   Yeah.  They were real freelance jobs.  But at that point, I didn't have exact knowledge about specific jobs like how much was each job and how much was each invoice for.  So specific amounts and information on the invoice, I understood they could be not completely correct, because I was just putting information that I could recall at the time.  Because I knew that I wouldn't need to send invoices anywhere, so I wasn't as adamant about keeping them 100 percent correct.

Q. So there may be details on those invoices that are not true; is that correct?

A. Incorrect, not -- yeah.

Q. I would like to direct your attention to Exhibit 719A, please. And this is an example of an invoice that we looked at earlier in the case; correct?

A. I think so.

Q. And looking at the top of -- here. The date of this invoice is April 29th, 2016?

A. Yes.

Q. And so in your testimony this invoice would have been created three or four years after April 2016; is that correct?

A. No. I said that the date that invoice was created that would probably be a very similar date to the date on the invoice.

Q. So this invoice is dated April 29th, 2016. Is it your testimony that you would have created this invoice at on or about April 29th, 2016?

A. Yeah. Because that was -- so that would be the date where I am taking this money into the Swedish financial system, like Swedish bank, where the Swedish like tax office and the country can actually see the money and like tax it and do all of that. They can't really understand Bitcoin wallets or Bitcoin payments or like money that I had in my Bitcoin wallet, I didn't see any way for me just go to them and say here is

Bitcoin.

Q. So it is your testimony that the work that is referenced in this invoice occurred three or four years earlier than 2016?

A. Yes.

Q. There is a reference here named Artem Chukanov. Is that a real customer?

A. Yes.

Q. And you have never sent or received any emails to or from Artem Chukanov in your heavydist@gmail.com, Spam@plasmadivision.com or plasma@plasmadivision.com emails?

A. I am not sure. I had to -- when I was registering these invoices -- so I kept the -- the point with invoices was just to keep track of what money I had taxed and not. And it was just for my own reference. So I -- the customers that you recorded there, I tried to recall them as best I could at that time, which was a few years after jobs have happened. Sometimes I just had to go -- I had to reference the website and look it up on the DNS what name was there.

Q. And there is a --

A. This is what I meant when I said there is some information on these invoices that might be incorrect.

Q. And there is an address here. Is this an address that you remembered by memory or had to look up on the internet?

A. For this one, I am not sure. I don't remember.

Q. And it is your testimony that Artem Chukanov did actually

pay you for services referenced in this invoice?

A.    Yes.   Well, I had a customer or client that paid me for services.   Yeah.

Q.    Was that customer or client named Artem Chukanov?

A.    I am not sure anymore the specific names.   I had to go back and try look up.   If I looked up a name on the DNS and that wasn't the same name as the person who was dealing with me, then it wouldn't even be the same name on the invoice.

Q.    And there is payment information down here at the bottom of the invoice, isn't there?

A.    Yes.

Q.    And there is an international bank account number; correct?

A.    Yes.

Q.    And this not your bank account number, is it?

A.    Yeah.   I think this is an account that I pulled from Bitstamp where I was paying somebody from Bitstamp at an earlier date.   And I messed up the account, because that was the account that was still listed on the Bitstamp account.

Q.    So I'd like to direct your attention to Exhibits 432A and 432C, which I believe have been previously admitted.

Scrolling down to the bottom of the first page of 432A, there is reference here to a bank account number that ends -- starts SE, ends 6637.   And then looking at Exhibit 432C, these are records returned from the Swedish authorities pursuant to a

multilateral mutual legal assistance treaty request providing details about Swedish bank account records. At the bottom of page 1 of Exhibit 432C, there is a reference to a bank account number. Is this the same bank account number that we just saw on the invoice that we were looking at?

A. I don't remember the actual number, but it could be.

Q. Well, this bank account belongs to Frederik Akerström, according to this information from Sweden; correct?

A. Yes.

Q. And then flipping back to 719A, down at the bottom, that is the same Swedish bank account ending in 6637; isn't it?

A. Yes.

Q. And then beneath that there is a Bitcoin address starting 1EUDR; isn't that true?

A. Yes.

Q. And it is your testimony that Artem Chukanov or maybe a different customer paid you Bitcoin for approximately 660 Euros three or four years earlier than this invoice; correct?

A. Yes.

Well, I don't know the actual -- the sum.

Q. But it is your testimony that this invoice corresponds to a real payment by a customer for approximately 660 Euros?

A. Yes. But it -- approximately, yes. But specific amounts may be incorrect as well. I had not taxed this money back when these jobs were happening, which I should have done. A few

years after I realized that I should tax it and I just tried to figure out what would be the best, correct legal way to do it and this is the way I came up with.  I haven't had any problems with the Swedish tax office.  I believe it is all taxed as it should have been.  But if I made some mistake there, I am happy to work with them on that.

Q.   Just to be clear, did the customer here pay you in 2016 to that Bitcoin address or did he pay you three or four years earlier to that Bitcoin address?

A.   That was much earlier.

Q.   If we could flip to Exhibit 306 and I believe it is page 5.

And so this is a printout from a blockchain explorer showing a Bitcoin transaction one day after this invoice is dated on April 30th, 2016; correct?

MR. EKELAND:  Objection.  Is there a question?

MR. BROWN:  It was a leading question.

THE COURT:  Overruled.

BY MR. BROWN:

Q.   Is that true, Mr. Sterlingov?

A.   I can see that the date on this screenshot is April 30, 2016.

Q.   And this is a transaction into that same Bitcoin address that you had listed on your invoice; correct?

THE COURT:  I'm sorry.

THE COURTROOM DEPUTY:  Is this supposed to be published?

MR. BROWN:  Please publish this.

THE COURT:  You said Exhibit 306?

MR. BROWN:  Yes.  It was admitted through Ms. Glave's testimony.

BY MR. BROWN:

Q.   So, Mr. Sterlingov, I have circled here the recipient address of this transaction on April 30th, 1EUDR.  That is the same Bitcoin address that was listed at the bottom of your invoice, isn't it?

A.    It could be.  The addresses are on the -- Bitcoin addresses on the invoices, they were just my own wallets where I already had the Bitcoin.  I knew that the Swedish government did not require me to make or send any invoices.  I also knew they didn't really understand Bitcoin.  And if I had Bitcoin on my Bitcoin wallets, I couldn't even show it to them.  The first point at which, as I understood it, the Swedish tax office would, like, understand the payments and was able to tax those payments was when they came into a Swedish bank.

Q.   Did you repay yourself the same approximate amount that Artem Chukanov supposedly paid you three or four years earlier on April 30th, 2016?

A.    I didn't repay myself or pay myself.  I just transferred the money that I was taxing at that time to a specific wallet

to be able to track it.

Q. And you transferred it from this 1PLBO Bitcoin address; correct?

A. It looks like it.

Q. And the source of funds for the 1PLBO Bitcoin address was Bitcoin Fog, wasn't it?

A. I didn't have any funds that were sourced from Bitcoin Fog.

Q. Directing your attention to Exhibit 414A, which is already in evidence. This is another Code Reactor invoice that you prepared; correct?

A. Yes.

Q. And then the date of this invoice is February 12th, 2017; correct?

A. Yes.

Q. And is it your testimony that you prepared this on or about February 12th, 2017?

A. It would be somewhere around that date.

Q. And you prepared it for a customer that you did business with three or four years earlier?

A. Right. Except I didn't prepare it for the customer. I was never going to send it to the customer. The customer was all gone. I prepared it for my own records.

Q. And the customer listed here is Anton Beckman; is that correct?

A.    That's correct.

Q.    And Anton Beckman has an address in Hong Kong; correct?

A.    That's correct.

Q.    Is Anton Beckman the real name of the customer for this invoice?

A.    To the best of my recollection, yes.  I think the guy from Hong Kong that was a some sort of scraping project where I was helping them scrape the information from some sort of trading system.

Q.    And had you kept records of Anton Beckman in Hong Kong or were you remembering this from memory when you created the invoice?

A.    Sometimes it was from memory, sometimes it had -- if I could find some records or if I could find a domain name that was associated with it, I would look up the domain name.

Q.    Now, this was the invoice that you sent to Bitstamp; isn't that correct?

A.    Yes.  I -- I mean, I have got to say at the time I knew that my invoices were not all correct.  I knew that I kept them for my own records.  I just got really frustrated with Bitstamp, but I shouldn't have sent them this.

Q.    Why shouldn't you have sent them?

A.    Because, like I said, these invoices were just for my own records.  And I mean, I knew that -- I didn't keep the information with -- I wasn't due diligent enough with the

information on this invoice.

Q.    Now, directing your attention to Exhibit 414C and message 29, please.  Now Exhibit 414C, these are the records of your account from the exchange Bitstamp; correct?

A.    That is correct.

Q.    And in message 29, the date of this message is March 3rd, 2018; correct?

A.    That is correct.

Q.    And this is a message from an employee of Bitstamp to you asking for you to explain a transaction that occurred on February 12th, 2017 originating from this Bitcoin address; correct?

A.    Correct.

Q.    Can we scroll down and see how you responded.

      You responded on March 7th, 2018; correct?

A.    Yes.

Q.    And you told Bitstamp that you found the invoice that this was in response to this payment; correct?

A.    Yes.

Q.    And you sent the invoice that we were just looking at to Bitstamp, didn't you?

A.    I think I did in a follow-up message or message before that.

Q.    Isn't it true that Bitstamp found a mistake in the invoice?

A.    I think so.

Q.    And what was that mistake?

A.    Wasn't it a number, the invoice number or --

Q.    If we could scroll down to post 31.  Isn't it true that Bitstamp told you, "We have noticed that the BTC address specified on your submitted address never received any BTC."  Isn't that true?

A.    Yeah, I think it says that.

Q.    And scroll down to your reply in the next post.  You explained that there was an error in the Bitcoin address, because it was listed as starting with the number 1 instead of the number 3; correct?

A.    Yes.

Q.    And if we can flip back to Exhibit 414A and just look at the bottom.  Wasn't this the source of the error, it was that leading number was 1 when it should have been 3; correct?

A.    That is what the message says, yeah.

Q.    And then going back to Exhibit 414C, you told Bitstamp the following:  "This was clarified personally to my client from whom I received the funds."  Correct?

A.    Yeah, that is correct.  At this point, I was -- like I was explaining earlier.  I was really frustrated with the Bitstamp support.  I kind of thought that they -- I suspected they were asking all of those questions for some other reason, because they just didn't have the money or something.  Because I just

never dealt with this kind of KYC before.  I had accounts in other exchanges.  And I had KYC questions.  I had just never seen anything like this.  And at this point, I am just trying to get my money out and just don't use Bitstamp ever again.  So, yeah.  I might have some things that were incorrect.

Q.   In fact, you created this whole invoice -- the whole invoice was fake, wasn't it?

A.   No, it wasn't fake.  It represents a real job.

Q.   You just testified that real job occurred years before 2017; correct?

A.   Yes.

Q.   And Bitstamp was asking about a transaction in 2017; correct?

A.   Yes.

Q.   Directing your attention to Exhibit 305 at page 9.  Do you recall seeing this exhibit during Ms. Glave's testimony?

A.   I think I do.

Q.   And isn't it true that there were at least eight invoices that you created that were all paid out of Bitcoin Fog?

A.   So like I said, the Bitcoin addresses or the Bitcoin wallet were just my own wallets that -- for the Bitcoin that I already had, because I received it years before that.

          MR. BROWN:  No further questions at this time.

          THE COURT:  All right.  Redirect.

                    REDIRECT EXAMINATION

BY MR. EKELAND:

Q.   Mr. Sterlingov, did you use your Code Reactor invoices to money launder?

A.   No.  I didn't use it to money launder.  I used it to tax funds that I hadn't taxed that I thought that I should have taxed earlier.

Q.   Could you just explain to the jury why you were using these Code Reactor invoices to pay your Swedish taxes?

A.   So I tried to figure out what the best way would be or like easiest way for me to tax some money that I had before which was in Bitcoin, which the tax office did not understand. And I didn't really consult anybody, I just started researching on the internet and this was a way I found that I could tax it.

Q.   And at the time that you were doing these Code Reactor invoices, had the Swedish government issued any clear guidance on paying taxes related to Bitcoin income?

A.   No, they had not.  I couldn't find any.  That was one of the problems.

Q.   And Mr. Brown asked you about your purchases of Bitcoin after you left your job at CapO.  Do you recall that?

A.   I think so.

Q.   During the period after you left CapO, did the price of Bitcoin go up and down?

A.   Yes.  It went down a lot throughout the time, mostly up though if you --

Q.    Were there any times where you were able to buy when the price of Bitcoin was low and then later sell it when the price of Bitcoin was high?

A.    Well, yeah, that -- was I ever able to buy it?  Can you --

Q.    I am just wondering if there were times when during the period after you left CapO, that you were able to buy Bitcoin at a lower price than you later sold it at.

A.    Yes.  Are you asking if I was able to -- I mean, the answer is, yes.  I was able to and I did it a few times.

Q.    And in terms of the source of funds that you used to purchase Bitcoin, did you also use funds that you got from selling items on the Swedish version of Craigslist?

A.    Well, yes.  I guess, when I was -- I think this question came up before.  So the items that I sold on Swedish Craiglist, I guess many of those items were bought with my paycheck.  So that money originally came from the paycheck.  But if I bought an item first and then I sold it, then it came from Craigslist. I am trying to be clear.

Q.    And then you I think testified that none of the source of your funds was from Bitcoin Fog.  What did you mean by that?

A.    Well, I mean I never received any like fees or royalties or I don't know what they call them, like the fees that the mixer supposedly collects.

          MR. EKELAND:  No further questions.

          THE COURT:  All right.  The witness can step down.

I guess the question is whether Mr. Ekeland has anything else.

MR. EKELAND:  I'm sorry.

THE COURT:  Do you have anything else?  Do you want to come to the podium?

Why don't you come to the podium?

MR. EKELAND:  That is a good point, Your Honor.

The defense rests, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Brown.

MR. BROWN:  If we could ask -- this would be a good place, if we could ask for a short recess to get our witness.

THE COURT:  All right.  So let's see.  It is a quarter -- why don't we come back at 5 minutes after 11:00. Even though you have now heard the government's case, the defense case, still do not discuss the case even amongst yourselves.  And I will see you back here at 5 minutes after 11:00.

(Jury out at 10:47 a.m.)

THE COURT:  All right.  Anything anyone wants to raise before the break?

MR. BROWN:  No, Your Honor.

MR. EKELAND:  Your Honor, at this point in time the defense moves for a directed verdict on the basis that no reasonable juror could find the defendant guilty on this

evidence.

THE COURT:  For the same reasons I have previously given, that motion is denied.

Was there -- I forget was there something more administerial that you had wanted to raise?  I can't remember.

MR. EKELAND:  I think it was just the stipulation.

THE COURT:  All right.

MR. BROWN:  We can read that.

THE COURT:  Okay.  So Mr. Brown can -- if you want to start by reading that when the jury comes back or when do you want to do that?

MR. EKELAND:  We can read it when they come back.

MR. BROWN:  We could read it in or we could have the Court read it in.

THE COURT:  Whichever you prefer.  I am happy to do it or you can do it yourselves.

MR. EKELAND:  I think if it could come from you, if we can send it to you.  Is that okay?

THE COURT:  That is fine.  Make sure if you send it to me, copy Mr. Brown to make sure you are all on the same page.  I don't want to read something that someone frowns at as I am doing it.

I will see you shortly.

(Recess taken at 10:49 a.m.)

THE COURT:  All right.  Before we get the jury,

Mr. Ekeland, anything else on the withdrawal from the conspiracy issue?  I just took a quick look at it.  I need to defer to you on this, but the red book commentary indicates that there has to be some affirmative action to defeat or disavow the purpose of the conspiracy and that the defendant bears the burden of proof showing withdrawal.  So I don't know if you have anything else to add on that or if you think that is a correct statement of the law.

MR. EKELAND:  I think that is correct, Your Honor.

THE COURT:  And is there any evidence of an affirmative action to defeat or disavow the purpose of the conspiracy?

MR. EKELAND:  To the extent -- it is not even clear to us what the act was joining the conspiracy, because this all seems to be inchoate innuendo.  But if it would be anything, I think it would be just stopping doing the freelance work.  I mean, I had problems saying what the affirmative act is, because I don't see any affirmative agreement anywhere.  This theory of conspiracy just seems to be based on being implicit.

THE COURT:  Okay.  I don't think that is sufficient to justify providing that instruction.  So I won't provide the instruction.  We are reposting the jury instructions for a final look before you give your closings just to make sure there is not anything that I have missed or that you still think needs correction in those instructions.

And should we get the jury then and proceed?

MS. PELKER:  Yes, Your Honor.

THE COURT:  And also we do need to break at 12:30 today, which I know may be in the midst of closings.  But just so -- it probably helps for you to be aware of that so you can figure out how to pace things.  And if you want to break a little bit earlier, because it is a natural breaking point in closings, you are welcome to do that too.  Okay.  I think we are ready for the jury.

(Jury in at 11:19 a.m.)

THE COURT:  We are now ready for the government's rebuttal case.  Before we hear from the government, there is another stipulation from the parties that I want to read to you.  And I will remind you that a stipulation is an agreement between the parties with respect to the evidence in a certain respect.  And you should take a stipulation as undisputed evidence for purposes of your deliberations.

And the stipulation is on April 28th, 2021, the United States Department of Justice issued a press release announcing Mr. Sterlingov's arrest for the alleged operation of Bitcoin Fog.  The press also covered Mr. Sterlingov's arrest.

Okay.  And you may call your witness.

MS. PELKER:  The governments calls CS Mazars de Mazarin.

THE COURT:  Okay.

Valerie Mazars de Mazarin, previously sworn.

THE COURT:  You may proceed.

DIRECT EXAMINATION

BY MS. PELKER:

Q.   CS Mazars, do you remember your prior testimony regarding Exhibit 721?

A.   Yes.

Q.   And can you remind the jury what your understanding was of Exhibit 721?

A.   My understanding of that exhibit was that it was a screenshot of some dating app messages that the case team had determined were sent by the defendant.

Q.   Do you recall what device the image was retrieved from?

A.   The image itself was retrieved from the tablet.

Q.   If we could pull up Defendant's Exhibit 32.  And can you remind the jury what this was?

A.   This was the overview of all of the devices' images that I analyzed in my forensic examination of -- for the case and some high level notes about what I found on them.

Q.   Do you see the tablet on this list?

A.   Yes.

Q.   Can you point that out where it appears on the chart?

A.   The first row, 1B1.

Q.   And did you perform a forensic analysis of the tablet?

A.   No.

Q.   Did you later assist in a limited triage of an extraction of this tablet obtained by the IRS?

A.   Yes, a processed version of the extraction in Axiom, which is a forensic tool.

Q.   To clarify, did you view the extraction from the IRS in the forensic tool Axiom?

A.   Yes.

Q.   And when you view an extraction in Axiom, do you see the files in the way they appear on the device?

A.   No.

Q.   Can you explain that?

A.   So as I think I described previously, the forensic tool apart from showing the files in the tree, makes lots of little categories to help the examiner view documents by type.  So everything it thinks is a Word document, for example, will go regardless of which location or even which device, if you have loaded multiple, all of those will go into a documents folder.  And there will also be an images folder.  And, for example, in that folder, so to speak, it will have all of the image files that were found as is on the device as the user might have seen it.  But additionally it will be things Axiom thinks are image files that were retrieved from zip files, like archives, sometimes that were carved out of videos or PowerPoints or PDFs.

It is not clear to me exactly which pattern matching it

does to find images. But on occasion I found images that came from other documents pulled out by -- depending on how the case was processed and put in those folders.

Q. When the government was reviewing the tablet extraction, did Exhibit 721 appear to you to be part of a dating ebook?

A. No.

Q. You have now heard the defendant's testimony. Do you have any reason to doubt that it was originally part of a dating ebook?

A. I have no reason to doubt that.

Q. And not drafted by the defendant?

A. That is correct.

Q. If you had seen that it was part of an ebook, would you have testified to this exhibit in that way?

A. Not at all.

MS. PELKER: The government moves to withdraw Exhibit 721 and passes the witness.

(Whereupon, Government Exhibit No. 721 was withdrawn.)

THE COURT: Any objection?

MR. EKELAND: Yes, we object, Your Honor. It is -- should we go on the phone?

THE COURT: No. I think if you want to leave -- the government has requested it withdrawn. They offered it, but if you want to offer it or leave it in evidence, that is fine.

MR. EKELAND:  We want it to remain in evidence.

THE COURT:  Okay.  That is fine.

MS. PELKER:  That is fine.

THE COURT:  Any cross?

CROSS-EXAMINATION

BY MR. EKELAND:

Q.   Ms. Mazars, is it your testimony that what is in evidence as Government Exhibit 721, is just an extraction resulting from Axiom?

A.   The way I saw it, it must have been, because I saw the exhibit exactly as is.  But if it came from a greater document, then it must have been a file that Axiom found somewhere on the device.  Where exactly it found it, I am not sure.

Q.   And, Mr. Hassard, could we put in what has been admitted in evidence as Government Exhibit 721 and publish it to the jury?

THE COURT:  I think maybe we should relabel this as a defense at this point, since the government has withdrawn it. Do you want to give it a defense number?

MR. EKELAND:  Yes, that is fine.  If I could -- if Ms. Walker can let us know what the -- or Mr. Hassard.

THE COURTROOM DEPUTY:  The next exhibit number is 143.

MR. EKELAND:  We submit this exhibit as 143, Your Honor.

THE COURT: Okay. Defense Exhibit 143.

(Whereupon, Defense Exhibit No. 143 was admitted.)

BY MR. EKELAND:

Q. Ms. Mazars, when you say you reviewed it, is this how it was when you reviewed it?

A. This is how I remember seeing it.

Q. And when you saw it, your understanding of it was that it was coming from a chat file from the defendant?

A. No. I didn't think it came from a chat file. At the time that I pulled it up, I noticed that it appeared to be low resolution and was in some kind of image format, I think. I don't remember. And so I noted that it appeared to be a screenshot taken at some point, but not a native or actual chat file.

Q. But you didn't do anything to check or confirm that, did you?

A. No. Because it was on an IRS laptop. I was sitting next to my team as they were reviewing it and I pointed it out. But this was after I had already done my review. And I was not adding it to my list of artifacts.

Q. And when you testified about this previously, you didn't testify that this was from an ebook, did you?

A. No, I didn't.

MR. EKELAND: No further questions.

THE COURT: All right. Any redirect?

MS. PELKER:  No, Your Honor.

THE COURT:  All right.  The witness is excused. Thank you.

All right.  Ms. Pelker, anything else?

MS. PELKER:  No, Your Honor.

THE COURT:  And does the government rest then?

MS. PELKER:  The government rests.

THE COURT:  All right.  Members of the jury, that concludes the presentation of the evidence in this case and we are now ready for closing arguments.

So government can proceed first.

MS. PELKER:  Your Honor, can we turn this podium the way it was previously?

THE COURTROOM DEPUTY:  You want this one?  It has to be this one.

MS. PELKER:  If the jury can take a stretch break, we'll need between 1 to 2 minutes.

THE COURT:  While you are doing that I will also, I just remind you, as you are getting ready to hear the arguments from the lawyers, their arguments are for purposes of helping you understand the evidence that has been admitted from their perspective, but their arguments are not evidence.  And the evidence is what you have heard and it is your recollection of the evidence rather than what the lawyers argue that controls. So keep in mind that it is your recollection of the evidence

that is controlling.

MS. PELKER: Thank you, Mr. Brown and Mr. Pearlman.

Is that okay for the court reporter?

THE COURT: Yeah, that is fine.

MS. PELKER: And with Ms. Walker's assistance, the government does have a closing PowerPoint to display.

THE COURTROOM DEPUTY: I'm sorry.

MS. PELKER: The government does have a closing PowerPoint to display.

THE COURT: Okay. Hold on.

And you may proceed.

MS. PELKER: Thank you, Your Honor.

CLOSING ARGUMENT

MS. PELKER: Bitcoin Fog was a staple of the darknet money laundering world. And it was set up and run for a decade by the defendant, Roman Sterlingov; the defendant, who designed Bitcoin Fog to be the highest possible anonymity outpost in the Bitcoin world, a place for serious criminals with real problems with the law to hide their money.

At the beginning of this case, we told you that we would prove beyond a reasonable doubt that the defendant was the creator, owner and operator of the darknet money laundering operation that was Bitcoin Fog. And that is exactly what we have shown. You have heard testimony from over a dozen witnesses and seen hundreds of exhibits. You have heard step

by step how the defendant registered and paid for BitcoinFog.com. The defendant tried to hide his connection to these payments, sending them through different steps and accounts that he created just for that purpose.

But the government was able to trace the money and connect the activity back to the defendant. You heard about how the defendant sent money into Bitcoin Fog before it was ever announced, when the only person who would know about it was the administrator. The defendant was user zero.

After the site's launch, hundreds of darknet drug dealers came to rely on Bitcoin Fog to hide their money. Bitcoin Fog laundered 10s of millions of dollars for criminals on the darknet. Drug dealers like Crystal Buddha and West Coast RX; people seeking child sexual abuse material like Billy Bob 1337, Slammer 88; hackers like Ilya Lichtenstein. They all came to Bitcoin Fog because they knew that the defendant would help them hide their criminal payments from the authorities.

The defendant got a cut of all of the criminal proceeds moving through Bitcoin Fog. You heard about the hundreds of thousands of dollars pouring into the defendant's financial accounts, accounts at virtual currently exchanges like LocalBitcoins, Kraken, Bitstamp. And you heard that the government was able to trace that money back to its source, Bitcoin Fog.

The government -- the defendant's only meaningful

source of income, Bitcoin Fog. And what happened to Bitcoin Fog as soon as the defendant was arrested? A decade long criminal institution, suddenly halted operations. The $70 million worth of Bitcoin sitting in the Bitcoin Fog wallet, it has sat untouched since just after the defendant was arrested. Why? Because the Bitcoin Fog operator, the defendant, can no longer access it.

For his actions, the defendant is charged with four crimes: Money laundering conspiracy, sting money laundering, operating an unlicensed money transmitting business, and DC money transmission without a license.

Over the next hour -- and we will break for lunch at 12:30, I am going to discuss some of the key pieces of evidence and testimony that you will want to consider when you go back to deliberate. I am also going to explain how those facts prove each of the elements that the government must show for each count that the defendant is charged with.

The story of Bitcoin Fog began back in 2011. The darknet drug market Silk Road had given drug dealers a platform to sell meth, heroin, cocaine, fentanyl to people all across the United States and the world. But the dealers had a problem. It turned out that Bitcoin, the cryptocurrency behind all of those darknet drug payments was highly traceable. And law enforcement could follow those Bitcoin right back to the dealers.

The defendant understood the need for anonymity.  He was an early user of Silk Road and a member of the Russian cybercriminal forum exploit.in.  He understood Bitcoin.  He studied an early mixer.  And he saw an opportunity.  People could send him their criminal Bitcoin proceeds and he would make the funds untraceable by law enforcement.

First, the defendant tried to buy an existing mixer, Blind Bitcoin.  Blind Bitcoin had already been shut down.  And posts on the popular Bitcoin Talk forum warned that sort of mixing could be illegal.  The defendant was watching this.  Undeterred by the money laundering concerns that others raised, the defendant reached out to the Blind Bitcoin operator, Duncan Townsend, and asked to buy Blind Bitcoin.  And here is where the defendant made one of his first mistakes.  He used his personal Bitcoin Talk account, Killdozer.  That account was tied to Roman Sterlingov's true identity.

Duncan Townsend didn't sell Blind Bitcoin to the defendant or anyone else, so the defendant launched his own mixer, Bitcoin Fog.  He created a new username on Bitcoin Talk, Akemashite Omedetou, and told everyone his site was loosely based on Blind Bitcoin, but different.  Roman Sterlingov tried to delete his Killdozer post with Mr. Townsend, but the damage had been done.  Bitcoin Talk kept records of the messages and law enforcement later got copies with a search warrant.

Why did the defendant set up a new anonymous Bitcoin

Talk account? The defendant knew he couldn't set up a site like Bitcoin Fog in his own name. The defendant wanted Bitcoin Fog to be a site for people who have real problems with the law. He knew that if a site could be traced back to him, people might go to jail. So what did he do? He created a plan to set up the servers and fund the site in a way that he thought would be impossible to trace back to him. He thought that he could disappear into the Fog. But the defendant didn't realize that years later, many of those records would end up in the hands of law enforcement. And using those records, law enforcement was able to pierce through the Fog and see exactly who set up Bitcoin Fog, the defendant.

And over the past month, you have been able to see those records right here in this courtroom. In the first week of this trial, Special Agent Rovensky showed you this chart and walked through the records and spreadsheets step by step and line by line showing how the defendant registered BitcoinFog.com.

You heard more testimony from Mr. Scholl, the FBI blockchain expert. What did those records show? They showed conclusively that it was the defendant who registered and set up Bitcoin Fog. What exactly did the defendant do? First, he developed a plan to move the money in a way that he thought couldn't be traced back to him. And he saved his plan to a Google Drive titled putting money. He posted on Exploit asking

68

Appx6154

about ways to anonymously fund a Liberty Reserve account and referencing Aurum Xchange.

In October 2011, the defendant put his plan into motion. Over the course of just over a week, the defendant created a series of brand new accounts. First, he created new accounts at Liberty Reserve and Mt. Gox, tied to his PlasmaDivision email account. He needed a true name account to receive a bank wire, the start of this chain. Then, the defendant created a Liberty Reserve account for his new alter ego, Akemashite Omedetou. He used his new email address, Shormint@hotmail.com.

And then, all during this same time period, the defendant created three more brand new Mt. Gox accounts to use in the scheme: NFS9000, Kolbasa and Volf.prius. All of the accounts on this chart were set up and controlled by the defendant. And the burner accounts, they were set up specifically for this scheme, used for this scheme, and then they were never used again.

On October 3rd, the defendant began testing and fine tuning his plan. This was the first time any of these accounts were used. The very first transactions out of the defendant's brand new Mt. Gox and Liberty Reserve account tied to his true name and the money was sent through the defendant's burner accounts, Volf.prius, NFS9000 and Kolbasa. After testing his method, the defendant was ready to go for the real thing.

So on October 19th and 20th, the defendant rapidly moved funds through these accounts. Again, this time depositing money into the Shormint Liberty Reserve account. This money in the Shormint account came from the defendant. From there, the defendant was able to register and pay for BitcoinFog.com on High Hosting and Bitcoin Fog was born.

A few weeks later in November of 2011, the defendant again sent money out of his true name accounts through his burner accounts and into Bitcoin Fog. First, he sent a batch through Volf.prius. Then he used the burner accounts, Kolbasa and NFS9000, along with his Silk Road account. And then those burner accounts are never used again.

Those accounts Kolbasa, NFS9000 and Volf.prius, the only transactions that ever went through them were payments from the defendant's true name accounts. They were set up right before receiving the first transactions and abandoned right afterward. They were never used or even logged into ever again.

Their only purpose was to layer the defendant's payments. This becomes even more apparent when you look at the timing of these transactions. The defendant asked the government's experts whether these could be Mr. Sterlingov's sales to other people. But Mr. Scholl explained these transactions are too close in time and are in a repeated pattern. It was clear to Mr. Scholl that this was an

indication of layering, of sending money into an account and then back out just to make the tracing harder.

Several things on this chart are not in real dispute. The PlasmaDivision account at the top left, that is Mr. Sterlingov's account. And the payment to Shormint to High Hosting down in the bottom right, that is the payment for the Bitcoin Fog domain registration. And on October 19th, the defendant withdrew 36 Bitcoin from his Mt. Gox account. And the very next day, an equivalent amount in dollars was deposited into the Shormint Liberty Reserve account. In less than 24 hours, the money moves through this series of accounts on this chart, sometimes with just minutes between transactions, all just to purchase a domain, something that could have been done in a few minutes using a credit card.

But the defendant knew that he would be in trouble if this site were linked back to him. He knew the authorities would be watching. That is why he did this. That is why he came up with this plan.

Bank wire to Mt. Gox, convert to Bitcoin and then to dollars, then send the money through Aurum Xchange to Liberty Reserve. Starting from Mt. Gox, that is the defendant's true name Mt. Gox account and going to Liberty Reserve. And what is the Liberty Reserve account it was going to? The Shormint Liberty Reserve account, that is where the defendant is moving these funds.

That isn't the only thing the defendant's true name and Shormint account share. The Shormint account's recovery question was the same sort of random string of letters and numbers that the defendant used again and again in his true name accounts. On October 27th, Bitcoin Fog was officially launched. It was announced on Bitcoin Talk and on Twitter. And of all of the people in the world, who was its very first customer? Roman Sterlingov.

But there was something not quite right about the defendant's deposit. Because a normal customer can't deposit funds into a service that doesn't exist yet. But the defendant sent money to Bitcoin Fog before its launch was announced. The only person who would have known about Bitcoin Fog at that time was the person setting it up and running it, Roman Sterlingov.

You heard the defendant testify that he was a Bitcoin Fog user. He claimed that maybe he heard about Fog from somebody at a meetup or online. But that is not consistent with the defendant being the very first person to send money to Fog before it was ever announced.

A few weeks later, the defendant sends more money into Bitcoin Fog. This time using his account at Silk Road to try to conceal the path. The defendant was confident in the invulnerability of Silk Road. He wrote on the cybercriminal forum Exploit, "Also like Silk Road, go ahead and accept payments in Bitcoin, then you will not be intimidated by even

the US government."

But after Silk Road was taken down by law enforcement, something happened that the defendant could not have foreseen. The FBI seized the site's records. And that meant law enforcement could trace the defendant's payments through Silk Road. He didn't use the money to buy drugs that time. He sent the money in and then right back out again, through the burner accounts, NFS9000, Kolbasa and then off to Bitcoin Fog. And after that, all of the burner accounts are abandoned, never used again.

The defendant was obsessively disciplined in hiding himself online. He used Tor, VPN and proxies for all of his internet communications. The defendant programmed kill switches into his communications to make sure he would never connect over an IP that could be used to identify him all to make sure that his digital trail never came back to him.

But as CS Mazars testified, your IP can still be significant, even if you are using Tor or proxies. She reviewed the IP records used by the defendant in his true name and those tied to Akemashite Omedetou. And what did she find? Roman Sterlingov and Akemashite Omedetou using the same IP close in time, evidence that Roman Sterlingov was Akemashite Omedetou.

What did the IP analysis show? First, that the defendant and Akemashite Omedetou were repeatedly using some of

the same IP in very close periods of time.  Second, that Akemashite Omedetou and the defendant were using the same services at the same time, the same VPNs, proxy providers, sharing common practices and op sec.  And, third, the Shormint Liberty Reserve account was accessed from a residential IP tied to Gothenburg, Sweden.  And who was living in Gothenburg at the time?  The defendant.

CS Mazars' analysis showed repeated ties between the defendant and the accounts tied to Bitcoin Fog.  Take, for example, the .123 address controlled by Crypto VPN.  This was a small obscure VPN service that was purchased through the Shormint account.  The defendant talks about Crypto VPN in his personal notes that he was carrying when he was arrested, shown at the top of this slide.  Quite the coincidence.

But there was more.  Because what accounts were accessed from that .123 IP address all around the same time?  The defendant's PlasmaDivision Liberty Reserve account in his true name.  But also the Liberty Reserve Shormint account and all of the Mt. Gox burner accounts, Volf.prius, Kolbasa and NFS9000.  That is Peter NFS.  And on October 8th, the defendant used a different IP ending in .148 to access his Liberty Reserve PlasmaDivision account and the Mt. Gox Volf.prius account.  Two different shared IPs on two different occasions.

The IP overlap cemented the links between all of the burner accounts and the Shormint account.  Repeatedly, the