# 24-3161

# United States Court of Appeals for the District of Columbia

THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
Hon. Randolph D. Moss
United States District Court Case 1-21-cr-00399-RDM-1

## APPENDIX
## Volume XV of XVII (Pages Appx6161 - Appx6600)

TOR EKELAND, ESQ.
TOR EKELAND LAW PLLC
*Attorneys for Defendant-Appellant*
30 Wall Street, 8th Floor
New York, New York 10005
(718) 737-7264
tor@torekeland.com

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
*Attorneys for Defendant-Appellant*
800 Third Avenue, 20th Floor
New York, New York 10022
(212) 446-2346
maf@fernichlaw.com

MAKSIM NEMTSEV, ESQ.
MAKSIM NEMTSEV PC
*Attorneys for Defendant-Appellant*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
max@mnpc.law

AARON DANIEL, ESQ.
ASYMMETRIC LEGAL
*Attorneys for Defendant-Appellant*
11900 Biscayne Blvd, Suite 400
Miami, Florida 33181
(305) 979-9296
aaron@asymmetric.legal

*(See Inside Cover for Additional Counsel)*

3914



**ELECTRONIC PARALEGAL**

AMY C. COLLINS, ESQ.
THE LAW OFFICE OF AMY C. COLLINS
*Attorneys for Defendant-Appellant*
888 17th Street, NW, Suite 1200
Washington DC 20006
(228) 424-0609
amy@amyccollinslaw.com

# TABLE OF CONTENTS

District Court Docket – US v. Sterlingov, 21-CR-00399-RDM .............Appx001

Protective Order of Governing Discovery of Hon. Randolph D. Moss,
Dated September 17, 2021 (ECF Doc. No. 18) ......................................Appx074

Preliminary Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 336) ......................................Appx079

Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 14, 2024 (ECF Doc. No. 338) .....................................Appx085

Judgment in a Criminal Case of Hon. Randolph D. Moss,
Dated November 13, 2024 (ECF Doc. No. 340) .....................................Appx091

Transcript of Motion Hearing, Dated January 13, 2023
(ECF Doc. No. 114) .................................................................................Appx099

Transcript of Motion Hearing, Dated January 31, 2023
(ECF Doc. No. 115) .................................................................................Appx190

Transcript of Motions Hearing, Dated June 16, 2023
(ECF Doc. No. 223) .................................................................................Appx345

Transcript of Motions Hearing, Dated June 23, 2023
(ECF Doc. No. 224) .................................................................................Appx501

Transcript of Motions Hearing, Dated July 19, 2023
(ECF Doc. No. 225) .................................................................................Appx682

Transcript of Continued Motions Hearing, Dated July 20, 2023
(ECF Doc. No. 226) .................................................................................Appx895

Transcript of Motions Hearing, Dated August 22, 2023
(ECF Doc. No. 228) ...............................................................................Appx1040

Transcript of Continued Motions Hearing, Dated August 23, 2023
(ECF Doc. No. 229) ...............................................................................Appx1266

Transcript of Motions Hearing, Dated August 29, 2023
(ECF Doc. No. 231) ...............................................................................Appx1466

Transcript of Pretrial Conference, Dated September 7, 2023
(ECF Doc. No. 232) ...................................................................Appx1524

Transcript of Pretrial Conference, Dated September 8, 2023
(ECF Doc. No. 233) ...................................................................Appx1741

Transcript of Pretrial Conference, Dated September 13, 2023
(ECF Doc. No. 234) ...................................................................Appx1861

Transcript of Pretrial Conference, Dated September 15, 2023
(ECF Doc. No. 235) ...................................................................Appx1999

Transcript of Pretrial Conference, Dated September 18, 2023
(ECF Doc. No. 236) ...................................................................Appx2141

Transcript of Pretrial Conference, Dated September 21, 2023
(ECF Doc. No. 237) ...................................................................Appx2235

Transcript of Motion Conference, Dated November 13, 2023
(ECF Doc. No. 238) ...................................................................Appx2302

Transcript of Jury Trial, Dated February 12, 2024
(ECF Doc. No. 276) ...................................................................Appx2350

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ...................................................................Appx2620

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ...................................................................Appx2688

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 278) ...................................................................Appx2825

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 327) ...................................................................Appx2948

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ...................................................................Appx3074

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ...................................................................Appx3189

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ........................................................Appx3331

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ........................................................Appx3446

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 281) ........................................................Appx3572

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 328) ........................................................Appx3697

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ........................................................Appx3858

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ........................................................Appx3982

Transcript of Jury Trial, Dated February 23, 2024
(ECF Doc. No. 329) ........................................................Appx4122

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ........................................................Appx4251

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ........................................................Appx4394

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 284) ........................................................Appx4419

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 330) ........................................................Appx4550

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ........................................................Appx4581

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ........................................................Appx4698

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 285) ........................................................Appx4836

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 286) ................................................................Appx4955

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 331) ................................................................Appx5074

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 287) ................................................................Appx5198

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 332) ................................................................Appx5344

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ................................................................Appx5359

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ................................................................Appx5496

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 289) ................................................................Appx5621

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 333) ................................................................Appx5762

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 290) ................................................................Appx5900

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 334) ................................................................Appx6004

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ................................................................Appx6087

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ................................................................Appx6190

Transcript of Jury Trial, Dated March 11, 2024
(ECF Doc. No. 292) ................................................................Appx6324

Transcript of Jury Trial, Dated March 12, 2024
(ECF Doc. No. 293) ................................................................Appx6344

Virtual Asset Analysis Expert Report of Luke Scholl,
Dated December 8, 2022................................................................Appx6400

Expert Report #1 of Elizabeth Bisbee (Nov. 2022)......................Appx6465

Expert Report #2 of Elizabeth Bisbee (Dec. 2022) ......................Appx6493

Expert Report #3 of Elizabeth Bisbee (Jul. 2023).......................Appx6522

CS-Mazars Expert Report - Device Review Summary,
Dated May 5, 2023 .......................................................................Appx6529

CS-Mazars Expert Report - IP Overlap Analysis,
Dated November 9, 2022 ..............................................................Appx6532

CS-Mazars Expert Report - IP Graph Data Excel File..............Appx6539

Criminal Complaint, Dated April 26, 2021 (ECF Doc. No. 1) .............Appx6542

Arrest Warrant, Dated April 26, 2021 (ECF Doc. No. 5)....................Appx6556

Indictment, Filed June 14, 2021 (ECF Doc. No. 8) ............................Appx6557

Superseding Indictment, Filed July 18, 2022 (ECF Doc. No. 43) .......Appx6561

Defendant's Supporting Memorandum of Law,
Dated August 1, 2022 (ECF Doc. No. 46) ..........................................Appx6567

Attachment to Memorandum of Law -
Proposed Order of Hon. Randolph D. Moss Granting Defendant's
Motion to Dismiss (ECF Doc. No. 46-1) ....................................Appx6585

Attachment to Memorandum of Law -
Defendant's Notice of Motion to Dismiss, Dated August 1, 2022
(ECF Doc. No. 46-2) ....................................................................Appx6586

Government's Opposition to Motion, Filed August 29, 2022
(ECF Doc. No. 52) ...............................................................................Appx6589

Defendant's Reply to Government's Opposition to Motion,
Dated September 7, 2022 (ECF Doc. No. 57) ......................................Appx6623

Exhibit A to Defendant's Reply -
Second Declaration of Eric Garland, Dated September 7, 2022
(ECF Doc. No. 57-1) ......................................................................Appx6635

Defendant's Motions in *Limine*, Dated October 24, 2022
(ECF Doc. No. 59) ..........................................................................Appx6644

Exhibit A to Motions in *Limine* -
Letter from Tor Ekeland to Christopher B. Brown and
C. Alden Pelker, Dated September 23, 2022, with Exhibit A
(ECF Doc. No. 59-1) ......................................................................Appx6664

Defendant's Opposition to the Government's Motions in *Limine*,
Dated November 7, 2022 (ECF Doc. No. 68) ......................................Appx6680

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated March 6, 2023 (ECF Doc. No. 116) ..........................................Appx6689

Notice of Bill of Particulars for Forfeiture, Filed May 17, 2023
(ECF Doc. No. 119) ........................................................................Appx6709

Defendant's Notice of Intent to Present Expert Testimony,
Dated July 7, 2023 (ECF Doc. No. 145) ..............................................Appx6711

Exhibit A to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Francisco Cabanas (ECF Doc. No. 145-1) ............................Appx6716

Exhibit B to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Itiel Dror (ECF Doc. No. 145-2) ..........................................Appx6725

Exhibit C to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jeffrey Fischbach (ECF Doc. No. 145-3)....................................Appx6731

Exhibit D to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jonelle Still (ECF Doc. No. 145-4) ............................................Appx6737

Exhibit E to Notice of Intent -
Summary of Qualifications and Expected Testimony for
J.W. Verret (ECF Doc. No. 145-5).................................................Appx6741

Supplemental Summary of Qualifications and Expected
Testimony for Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 157) ......................................................................Appx6756

Notice of Expert Report for Defense Expert Jonelle Still of
Ciphertrace, Dated August 8, 2023 (ECF Doc. No. 159) .....................Appx6761

Attachment to Notice of Expert Report -
Defense Expert Report of Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 159-1) ................................................................Appx6764

Exhibit A to Notice of Expert Report -
Data Credibility in Cryptocurrency Investigations of Ciphertrace
(ECF Doc. No. 159-2) ................................................................Appx6805

Exhibit B to Notice of Expert Report -
Article Titled "Bitcoin: A Peer-to-Peer Electronic Cash System"
(ECF Doc. No. 159-3) ................................................................Appx6822

Notice of Bill of Particulars, Filed August 28, 2023
(ECF Doc. No. 173) ......................................................................Appx6832

Defense Response to Government's Motion to Admit Certain
Exhibits, Dated September 4, 2023 (ECF Doc. No. 177) .....................Appx6834

Notice of Source Code Expert Bryan Bishop Regarding Independent
Analysis of Chainalysis Reactor Source Code and Request for
Production of Chainalysis Reactor Source Code and Relevant
Related Brady Material, Dated September 5, 2023
(ECF Doc. No. 179) ......................................................................Appx6843

Chainalysis' Notice in Response to the Court's Request Regarding
Protective Order, Dated September 12, 2023
(ECF Doc. No. 195) ......................................................................Appx6860

Exhibit A to Notice in Response -
[Proposed] Heuristic Information Protective Order of
Hon. Randolph D. Moss (ECF Doc. No. 195-1)............................Appx6862

Exhibit B to Notice in Response -
[Proposed] Heuristic Information Protective Order to Jonelle Still
of Hon. Randolph D. Moss (ECF Doc. No. 195-2).......................Appx6869

Heuristic Information Protective Order to Jonelle Still of Hon.
Randolph D. Moss, Dated September 13, 2023 (ECF Doc. No. 196)...Appx6877

Notice Regarding Court's Proposed Protective Order Governing
Review of Chainalysis' Proprietary Information,
Dated September 20, 2023 (ECF Doc. No. 199) ..................................Appx6884

Notice Regarding Ciphertrace Expert Testimony and Review of
Latest Chainalysis Production, Dated September 22, 2023
(ECF Doc. No. 205) ..............................................................................Appx6888

Government's Response to September 18, 2023 Minute Order
Regarding Defendant's Access to Sensitive Heuristics Information
Provided by Chainalysis, Filed September 22, 2023
(ECF Doc. No. 206) ..............................................................................Appx6892

Defendant's Opposition to Government's Response to
September 18, 2023, Minute Order Regarding Defendant's Access
to Sensitive Heuristics Information Provided by Chainalysis,
Dated September 29, 2023 (ECF Doc. No. 207) ..................................Appx6901

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 4, 2023 (ECF Doc. No. 210) ....................................Appx6912

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 30, 2023 (ECF Doc. No. 213) ..................................Appx6930

Defendant's  Motion to Exclude any Testimony About Deepweb
Marketplaces, Dated February 8, 2024 (ECF Doc. No. 247)...............Appx6942

Attachment to Motion to Exclude -
[Proposed] Order of Hon. Randolph D. Moss
(ECF Doc. No. 247-2) ...............................................................Appx6950

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated February 29, 2024 (ECF Doc. No. 259)......................................Appx6951

Final Jury Instructions and Charges, Filed March 7, 2024
(ECF Doc. No. 265) .................................................................................Appx6982

Government's Motion for Preliminary Order of Forfeiture,
Filed June 7, 2024 (ECF Doc. No. 297)..................................................Appx7061

      Attachment to Motion for Preliminary Order of Forfeiture -
      Proposed Preliminary Order of Forfeiture Hon.
      Randolph D. Moss (ECF Doc. No. 297-1)....................................Appx7072

Defendant's Opposition to Government's Motion for Preliminary
Order of Forfeiture, Dated June 21, 2021 (ECF Doc. No. 305) ...........Appx7078

      Exhibit A to Defendant's Opposition -
      Article Titled "Chainalysis: Most Mixed Bitcoin Not Used
      For Illicit Purposes", Dated August 26, 2019
      (ECF Doc. No. 305-1) ...................................................................Appx7095

      Exhibit B to Defendant's Opposition -
      Blockchain Address Search Result from Blockchain.com
      (ECF Doc. No. 305-2) ...................................................................Appx7107

Government's Memorandum in Aid of Sentencing,
Filed August 1, 2024 (ECF Doc. No. 314)..............................................Appx7112

Sentencing Memorandum on behalf of Roman Sterlingov,
Dated August 15, 2024 (ECF Doc. No. 321) .........................................Appx7157

Memorandum Opinion of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 337) .....................................Appx7194

Defendant's Notice of Appeal, Dated November 19, 2024
(ECF Doc. No. 343) .................................................................................Appx7214

Memorandum for All Department Employees from The Deputy
Attorney General, Subjecting "Ending Regulation by Prosecution",
Dated April 7, 2025.................................................................................Appx7217

x

**Trial Exhibits:**

Trial Exhibit 601 -
Darknet Market Vendor Transaction Summary
(Document in Evidence and to be Produced Upon Request Due
to Volume) ........................................................................................Appx7221

Trial Exhibit 624.............................................................................Appx7222

Trial Exhibit 625.............................................................................Appx7223

Trial Exhibit 626.............................................................................Appx7224

Trial Exhibit 627.............................................................................Appx7225

Trial Exhibit 628(A).........................................................................Appx7226

Trial Exhibit 628(B).........................................................................Appx7227

Trial Exhibit 629.............................................................................Appx7229

Trial Exhibit 630(A).........................................................................Appx7230

Trial Exhibit 630(B).........................................................................Appx7244

Trial Exhibit 631.............................................................................Appx7247

Trial Exhibit 632.............................................................................Appx7248

Trial Exhibit 633.............................................................................Appx7252

Defense Exhibit 138 -
The-Message-Game, Written by Ice White ........................................Appx7253

Defense Exhibit 139 -
Extracted Page from The-Message-Game, Written by Ice White ......Appx7413

Government Exhibit 721 and Defense Exhibit 143 -
Boox Chat ........................................................................................Appx7414

Exhibit B to Fischbach Declaration -
Declaration of Jeffrey M. Fischbach, for Defendant, Dated August 14, 2024,
with Attachment
(ECF Doc. No. 321-2) ...............................................................................Appx7415

accounts are accessed from the same IPs.

The defense suggested that more than one person could have been using these IPs at the same time. But CS Mazars explained the significance of these IPs and the timing to you. It was like investigating a bank robbery and seeing a distinct 2012 white Nissan Altima leaving the scene. Then, seeing the same car in front of your suspect's house and at different spots related to the crime. Multiple people in the world can be driving a 2012 white Nissan Altima. But if you see the car in all of the locations you are investigating at exactly the right times, that is not a coincidence.

What did the defendant set up Bitcoin Fog to do? Bitcoin Fog was designed to launder money. It took customer deposits, mixed them up with other customers' funds and allowed users to withdraw Bitcoin that couldn't be traced back to them or the crimes.

You heard testimony about the technical details that made all of this possible. The defendant went to great lengths to make sure Bitcoin Fog's mixing was effective. He made sure that any authorities wouldn't be able to follow the funds. That path would be lost in the Fog. So who was using Bitcoin Fog? Criminals. In the defendant's own words, people with real problems with the law, people who would go to jail if the server were found, people who wanted to avoid the authorities. That is the user base the defendant wanted. That is what he

designed Bitcoin Fog for.  And that is what he got.

Bitcoin Fog facilitated massive amounts of money moving to and from darknet markets, 10s of millions of dollars, from markets like Silk Road, Silk Road 2, Alpha Bay, Agora, the list goes on.  Hundreds of drug dealers were relying on Bitcoin Fog to help them stay hidden from the authorities, drug dealers like Symbiosis who sent over $1.5 million through Bitcoin Fog tied to his thousands of sales of cocaine.  Drug dealers like Trevor Philips Enterprises who used Fog to launder over $150,000 from his sale of cocaine and MDMA shipped from the United States.  Trevor Philips Enterprises even included a warning to customers that his drugs were so potent they could kill you.  Drug dealers like peels4u and West Coast RX who sold fentanyl and other drugs, again both from the United States.  Silk Road gave them a worldwide customer base and Bitcoin Fog ensured they could stay hidden.

Mr. Scholl and Special Agent Santell walked you through a sampling of darknet vendors who laundered their funds through Bitcoin Fog.  But there were hundreds more like them.  For years, they have been able to stay hidden in the Fog, thanks to the defendant.

And it wasn't just drug dealers.  Those darknet markets pedaled stolen identification documents, stolen financial information, hacking tools; and also on the darknet, child sexual abuse material.  In a post on Exploit, the

defendant wrote, "Stop struggling and get a Tor hidden service. For years drugs are sold and unfortunately child pornography distributed through it."

The defendant said it was unfortunate that Tor hidden services were used to distribute child pornography. Unfortunate, but he certainly knew about it. He then set up Bitcoin Fog to help those very people, people like Billy Bob 1337 and Slammer 88 who used Bitcoin Fog to buy access to child sexual abuse material on sites like Welcome to Video. And when Welcome to Video was taken down and law enforcement was working to identify its users, those who used Bitcoin Fog were able to disappear back into the Fog, just like the defendant intended.

Mr. Scholl testified that money continued to flow into Bitcoin Fog even after the sites were taken down. And Bitcoin Fog continued laundering money right through April 2021. The defendant was disciplined in not keeping his Bitcoin Fog notes and records on his devices, at least not in a place or way that FBI and IRS could access. But his retrieved notes and unencrypted files still revealed quite a bit about what the defendant was doing and thinking.

And, repeatedly, the defendant researched and talked about concerns with people de-anonymizing Tor hidden services. He wrote about address sniffing. That is efforts by the authorities to identify a Tor hidden services's true location. That is what that is. He wrote about setting up his own set of

Tor nodes in his control. On Exploit, he wrote about Tor hidden service configurations. He planned a setup to mask hidden service traffic going to a server. CS Mazars explained these various notes. They were technical and complicated, the product of a sophisticated computer user. But she explained the bottom line. These weren't just the concerns of a VPN or Tor user seeking privacy. These were things that a Tor hidden services administrator would be concerned with. The concern was centered on authorities locating a hidden services server. Because the defendant did not want the authorities to find Bitcoin Fog.

You heard the defendant's argument in opening, no logs, no servers. Unfortunately, the defendant's efforts to hide his tracks were successful, in at least some ways. The government never got a copy of the Bitcoin Fog server, at least not in a way they could access or read. Why? Because the defendant hid it. His work paid off. Shortly after launching Bitcoin Fog, the defendant posted to Exploit and told his fellow criminals, stop struggling and get a Tor hidden services. He wrote, "If you configure such a server correctly then no matter how hard one tries no one will fucking find where it is."

The defense has suggested the defendant couldn't have run Bitcoin Fog because it wasn't saved to a laptop he was traveling with. That is not how a website or server operates.

You saw evidence that the defendant had access to multiple servers and devices over time, ample locations from which to operate Bitcoin Fog.

Bitcoin Fog was designed to hide itself and the person running it, the defendant. And the evidence has shown that the defendant had the ability, the skills and the infrastructure to run Bitcoin Fog and keep it hidden. The defendant's devices were teeming with examples of his connections to other computers. There were numerous virtual machines, VMs. He had set up remote desktop software and configured remote connections. His notes said that he was keeping additional cryptocurrency wallets in VMs, wallets the government has not found.

He was repeatedly connecting back to bunker, a computer in Sweden. And now, he doesn't know where. For a while, the defendant backed up his data including a bunker at SpiderOak. But then posts emerged online suggesting that SpiderOak had complied with an order from law enforcement. So what did the defendant do? He decided that SpiderOak had been burned. He wrote in his notes, move everything off SpiderOak, delete it from his computers. It was burned. All because people were saying it complied with a court order.

The government was never able to get copies of the defendant's servers at SpiderOak or servers at RamNode or the other remote serves the defendant set up. That was the point,

to hide the infrastructure and make it largely unreachable by law enforcement. The defendant's concerns with being caught by law enforcement, continued. Elsewhere in his notes, he flagged VPN services that had been burned. That is, complied with a court order. Because any service that would cooperate with law enforcement when given a court order was a threat to the defendant's anonymity. He needed to stay hidden in the Fog.

Then there are the defendant's servers at M247 in Romania, supposedly for his business, Moon VPN. The defendant rented server space at M247, configured from multiple IP addresses. He set up a business account at Kraken and the name To the Moon received payments from his Moon VPN customers. But Moon VPN wasn't a functioning business. When Special Agent Price tried to set up an account on Moon VPN, the VPN service never actually worked and the money going into the Moon VPN Kraken account, it came from Bitcoin Fog.

In late 2015, around the same time Bitcoin Fog was having technical issues, the defendant shipped a package to M247. And soon after that, Akemashite Omedetou told everyone that Fog's hardware issues had been resolved.

The Romanian government found the defendant's servers and seized them. And when CS Mazars analyzed them, she found three drives. One, the records from Moon VPN. The defendant's business that by his own admission was never really operational. On a second drive, Bitcoin Core, a Bitcoin wallet

client. And the third disk, wiped clean. Nothing on it, completely zeroed out.

Mr. Scholl testified about the Bitcoin Fog addresses, how he studied them closely, learned their patterns. And he testified about the many, many transactions that moved through Bitcoin Fog between 2011 and April 2021. Too many to be manual transactions that were automated, but those automated transactions ground to a halt right after the defendant was arrested. Bitcoin Fog, a service that had been operating for nearly a decade, abruptly stopped sending anymore transactions.

Right now there is $70 million worth of Bitcoin just sitting in Bitcoin Fog's wallet and it hasn't moved since April 2021. $70 million, just sitting there. Why hasn't it moved? Why wouldn't someone collect the money? Because the defendant was arrested.

Bitcoin Fog was laundering 10s of millions of dollars every year. And the defendant was getting a cut of every single transaction that moved through the site. 2012, that was around $85,000 a year. By 2014, it surged to 1.8 million and then settled into the mid to high six figures. In total, the defendant would have earned about $8 million from 2011 through 2021.

Now, defense suggested that the Bitcoin Fog operator should have much more than that, upwards of 100 million or even a billion dollars. That in addition to running Bitcoin Fog,

Akemashite Omedetou was the world's shrewdest Bitcoin investor, never spending a cent until cash out at the very highest point of a notoriously volatile market. But Professor Verret conceded that even he didn't actually believe that this was likely. That is not consistent with the actual evidence that you saw or your common sense.

What did you see? You heard testimony from forensic accountant Sarah Glave about the defendant's financial accounts. Specifically, the subset of his accounts that were tied to his true name and for which the government could get records. These are not all of the defendant's assets. He had many, many more, such as the gold he kept hidden at his mother's house, his Mycelium wallet on his phone and numerous other accounts, known and unknown, that the government could not access.

You heard that in 2013 alone, the defendant deposited at least $260,000 worth of Bitcoin into his accounts in a single year. This was while he was working at his day job in Sweden with a salary of around $30,000 per year. In over just three years, he spent $90,000 on prepaid cards. Just prepaid cards alone. You saw the defendant not only deposited huge sums of Bitcoin into his accounts, but also sold or transferred out significant sums. Especially in the early years, 2011, 2012, 2013, when the price of Bitcoin was rapidly rising, he sold or sent out almost as much Bitcoin as he was depositing

into his accounts. You heard the defendant's testimony and explanation, but use your common sense, and remember testimony of forensic accountant Sarah Glave and Luke Scholl, this was not activity of someone who was holding onto their Bitcoin as a longterm investment.

Ms. Glave walked you through her review and calculations. And what did she find? The defendant's expenditures, his spending exceeded the money coming into his bank accounts through explainable sources. What does that mean? As Ms. Glave testified, that is a sign of unexplained sources of income. What was the defendant's true income? Bitcoin Fog.

When the defendant was arrested, he had half a million dollars of cryptocurrency stored on his phone and another $800,000 worth in his Kraken account. He had just recently purchased a 150,000 Tesla with Bitcoin. Separate from that Tesla purchase, he had transferred another $280,000 worth of Bitcoin into his wallet into a single transaction. Over a quarter of a million dollars, just to use as casual, walking around money on his phone. He stored it in a wallet called straight outta mint. What was that mint that the funds had come straight outta? Bitcoin Fog. Because with the defendant, everything comes back to Bitcoin Fog.

Where did the majority of Roman Sterlingov's money come from? Bitcoin Fog. His LocalBitcoins account, Bitcoin

Fog.  His Kraken accounts, Bitcoin Fog.  Mt. Gox, Bitcoin Fog.
Poloniex all from Bitcoin Fog.  Binance, Bitfinex, Bitstamp;
Bitcoin Fog, Bitcoin Fog, Bitcoin Fog.  Even the defendant's To
the Moon business account, the account that was supposed to be
receiving money from To the Moon clients, the money coming into
that account came from Bitcoin Fog.  Hundreds of thousands of
dollars pouring into accounts spread across numerous financial
institutions and exchanges.  And the government was able to
trace these funds back to Bitcoin Fog.

You heard testimony about the invoices for the
defendant's Code Reactor business -- well, what were intended
to look like invoices, invoices to different customers, at
different times, spread across the globe.  But as you saw,
there was something very strange about these invoices.  When
the government experts looked at where the money was coming
from, what did they find?  Customer payments for totally
different customers were coming from the same Bitcoin address.
And the funds had originated from Bitcoin Fog.  The defendant
tried to come up with an excuse for these invoices when he
testified.  They were for old customers or maybe not.  He
wanted to have them for his tax reporting, but he wasn't
planning to give them to anyone.  And the defendant could not
explain why he had gone to such great lengths to develop these
false invoices if he was trying to report his old freelance
earnings.  That is just not credible.  It more consistent with

the defendant misrepresenting his invoices to hide the funds originating from Bitcoin Fog.

Remember what happened when Bitstamp asked the defendant about his use of mixers? The defendant was full of excuses. This was just a question about whether he was using tumblers or mixers or he was angry, frustrated. He said, he couldn't remember if he did, he couldn't remember if he did, if he did it was a long time ago. But the evidence showed that the defendant was actively receiving funds from Bitcoin Fog as he was sending these messages.

Later, when Bitstamp again questioned the defendant about the source of his funds he tried to use one of his fake invoices. But the address on the invoice, it wasn't even a valid Bitcoin address. Bitstamp caught on and kept asking questions. You heard the defendant testify about why he was so frustrated with Bitstamp here. He said that it seemed like there was something else going on. Well, something else was going on. Bitstamp had flagged the defendant's transactions as suspicious. That is why the defendant was so annoyed. He knew that Bitstamp was on to him.

And what happens after Bitstamp's inquiry? Mr. Sterlingov abandoned the money. He just leaves it sitting there in the account and never logs in again. And he writes a note to himself, "Withdrawn everything when they started delaying withdrawals and started and asking for ten stupid

questions. Do not use them. Tell everyone to stop using them." The defendant could afford to just abandon money at Bitstamp, because he had plenty more coming in, his earnings from Bitcoin Fog.

Members of the jury, the defense has no obligation to put on a case, none. They can sit here and put us to our burden of proof. But when they do put on a case, you have the right to examine it and ask yourself, does it make sense? The defendant took the stand and walked you through each year of his life since high school. But when he was cross-examined by Mr. Brown, his answer to almost every question was, I don't remember. I don't know. It was a long time ago. When asked whether he registered the Bitcoin Fog domain, he said, I don't remember doing it. Members of the jury, you can use your own common sense to evaluate that.

Your Honor, we have maybe 20 minutes, but I know we have a hard stop at 12:20.

THE COURT: 12:30. It is entirely up to you.

MS. PELKER: We can break now. I do think we'll go just past 12:30 and I know there was a hard stop.

THE COURT: Let me just check. One second.

(Pause.)

THE COURT: All right. So let's go ahead and break now. I will stand up, members of the jury, so I can see you. We are getting far along, obviously, in the case now. You have

heard all of the evidence. You have heard a portion of one of the closing arguments. Still do not discuss the case even among yourselves. No research. It is 12:15. Why don't we come back at 1:30? Have a nice lunch and I will see you at 1:30.

(Jury out at 12:16 p.m.)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: All right. Anything before we break?

MS. PELKER: Not from the government, Your Honor.

MR. EKELAND: Nothing from defense, Your Honor.

THE COURT: All right. I will see you all shortly. All right. Thank you.

(Recess taken at 12:17 p.m.)

C E R T I F I C A T E

I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.

Dated this 8th day of March, 2024.

Sherry Lindsay, RPR
Official Court Reporter

BY MR. BROWN: [3]   34/6 45/19 46/7
BY MR. EKELAND: [3]   52/1 61/6 62/3
BY MS. PELKER: [1]   58/4
MR. BROWN: [37]   4/6 5/5 5/10 5/19 6/2 6/9 6/21 8/9 8/12 9/14 9/25 13/22 14/2 15/4 16/5 16/9 26/7 28/5 30/7 30/12 30/15 30/19 31/1 31/8 31/25 32/3 32/7 33/5 33/9 45/17 46/3 46/5 51/23 54/11 54/22 55/8 55/13
MR. EKELAND: [60]   4/10 6/13 6/16 16/15 18/3 19/3 19/13 19/18 20/2 20/6 20/12 20/22 21/14 21/23 22/5 22/8 22/10 23/3 23/10 23/15 24/14 24/18 24/20 25/3 26/4 26/9 26/15 26/25 27/10 27/15 27/20 27/24 28/23 29/10 29/16 29/19 29/22 29/24 30/21 31/3 32/20 33/14 33/19 34/1 45/16 53/24 54/3 54/7 54/23 55/6 55/12 55/17 56/9 56/13 60/21 61/1 61/20 61/24 62/24 87/10
MS. PELKER: [16]   57/2 57/23 60/16 61/3 63/1 63/5 63/7 63/12 63/16 64/2 64/5 64/8 64/12 64/14 86/19 87/9
THE COURT: [111]
THE COURTROOM DEPUTY: [6]   4/2 46/1 61/22 63/14 64/7 87/7

**$**

$1.5 [1]   76/7
$1.5 million [1]   76/7
$150,000 [1]   76/10
$260,000 [1]   82/17
$280,000 [1]   83/17
$30,000 [2]   36/6 82/19
$70 [3]   66/4 81/11 81/13
$70 million [3]   66/4 81/11 81/13
$8 [1]   81/21
$8 million [1]   81/21
$800,000 [1]   83/15
$85,000 [1]   81/19
$90,000 [1]   82/20

**.**

.123 [2]   74/10 74/16
.148 [1]   74/21

**1**

1.8 million [1]   81/19
10 [3]   35/25 35/25 38/7
10-minute [1]   33/6
100 [1]   81/24
100 percent [1]   40/25
10005 [1]   2/4
10:11 [1]   34/2
10:47 [1]   54/19
10:49 [1]   55/24
10s [3]   65/12 76/3 81/16
11:00 [2]   54/14 54/18
11:19 [1]   57/10
12 [1]   35/19
12:15 [1]   87/3
12:16 [1]   87/6
12:17 [1]   87/13
12:20 [1]   86/17
12:30 [4]   57/3 66/13 86/18 86/20
12th [3]   47/13 47/17 49/11
13 [2]   38/6 39/16
1301 [1]   1/20
1337 [2]   65/15 77/8
143 [5]   3/10 61/23 61/24 62/1 62/2
14th [1]   26/1
150,000 [1]   83/16
1960 [2]   8/12 9/1
19th [2]   70/1 71/7

**1:30 [2]**   87/4 87/5
1B1 [1]   58/23
1EUDR [2]   44/14 46/9
1PLBO [2]   47/2 47/5

**2**

2,000 [1]   36/17
2,500 [3]   35/18 35/19 35/25
20 [1]   86/16
20001 [1]   2/9
20005 [1]   1/21
2010 [1]   35/2
2011 [6]   66/18 69/3 70/7 81/6 81/21 82/23
2012 [4]   75/6 75/9 81/18 82/24
2013 [3]   27/3 82/16 82/24
2014 [3]   36/21 36/23 81/19
2015 [1]   80/17
2016 [10]   26/1 41/9 41/12 41/16 41/18 42/3 45/7 45/15 45/22 46/23
2017 [5]   47/13 47/17 49/11 51/10 51/12
2018 [2]   49/7 49/15
2019 [2]   30/10 34/10
2020 [3]   34/16 34/22 38/18
2021 [6]   36/23 57/18 77/16 81/6 81/13 81/22
2023 [1]   35/10
2024 [2]   1/5 88/10
20530 [2]   1/14 1/17
20th [1]   70/1
21-399 [2]   1/4 4/2
21st [2]   30/10 30/13
24 [1]   71/11
25,000 [2]   35/17 35/25
2500 [1]   35/23
27th [1]   72/5
28th [1]   57/18
29 [2]   49/3 49/6
29th [3]   41/9 41/16 41/18

**3**

3,000 [2]   35/24 36/5
30 [2]   2/3 45/21
30,000 [3]   35/20 35/22 36/5
305 [1]   51/15
306 [2]   45/11 46/4
30th [3]   45/15 46/9 46/23
31 [1]   50/4
313A [1]   39/9
31st [1]   35/10
32 [1]   58/15
32.2 [1]   31/10
333 [1]   2/8
34 [1]   3/4
35 [1]   30/8
36 [1]   71/8
39 [2]   5/12 5/20
399 [2]   1/4 4/2
3rd [2]   49/6 69/19

**4**

41 [1]   6/8
414A [2]   47/9 50/14
414C [3]   49/2 49/3 50/18
432A [2]   43/20 43/22
432C [3]   43/21 43/24 44/3

**5**

5,000 [1]   36/4
5.1527 [1]   1/17
51 [1]   3/4
56 [3]   27/24 29/21 29/22
58 [1]   3/7

**6**

60 [1]   3/10
601 [1]   1/16
61 [1]   3/7
62 [1]   3/10
64 [1]   3/13

**65 [1]**   24/14
66 [1]   25/22
660 [2]   44/17 44/22
6637 [2]   43/24 44/11
6710 [1]   2/8
69 [1]   5/9

**7**

719A [2]   41/4 44/10
721 [8]   3/10 58/6 58/9 60/5 60/17 60/18 61/8 61/15
7th [1]   49/15

**8**

88 [2]   65/15 77/8
8th [3]   2/4 74/20 88/10

**9**

950 [1]   1/14
9:22 [1]   1/6

**A**

a.m [5]   1/6 34/2 54/19 55/24 57/10
abandon [1]   86/2
abandoned [3]   70/16 73/10 85/22
abandonment [3]   26/12 26/16 27/18
ability [1]   79/6
able [20]   11/9 12/4 38/13 46/19 47/1 53/1 53/4 53/6 53/8 53/9 65/5 65/23 68/11 68/13 70/5 75/20 76/20 77/11 79/23 84/8
about [62]   4/17 4/18 7/22 8/3 9/8 11/7 11/16 15/5 16/18 18/2 18/14 18/20 18/25 19/15 22/18 22/25 23/22 26/1 30/13 32/8 33/15 35/12 35/20 36/6 37/11 38/22 38/24 39/19 40/19 40/25 41/18 44/2 47/17 51/12 52/19 58/19 62/21 65/6 65/8 65/19 69/1 72/9 72/13 72/16 74/12 75/17 77/6 77/19 77/22 77/23 77/25 78/1 81/3 81/5 81/21 82/8 84/10 84/14 85/4 85/5 85/12 85/15
above [1]   88/5
above-entitled [1]   88/5
abruptly [1]   81/10
abstract [1]   8/1
abuse [3]   65/14 76/25 77/9
accept [1]   72/24
access [7]   66/7 74/21 77/8 77/18 78/16 79/1 82/15
accessed [3]   74/5 74/16 75/1
accomplish [1]   6/8
accord [1]   32/20
according [1]   44/8
account [55]   7/7 7/8 7/10 37/22 39/12 43/12 43/15 43/16 43/18 43/19 43/19 43/23 44/2 44/3 44/4 44/7 44/11 49/4 67/15 67/15 68/1 69/1 69/7 69/7 69/9 69/22 70/3 70/4 70/11 71/1 71/4 71/5 71/8 71/10 71/22 71/23 71/24 72/2 72/21 74/5 74/12 74/17 74/18 74/22 74/23 74/25 80/11 80/14 80/16 83/15 83/25 84/4 84/4 84/6 85/23
account's [1]   72/2
accountant [2]   82/8 83/3
accounts [39]   37/14 37/15 37/19 51/1 65/4 65/21 65/21 69/5 69/6 69/13 69/15 69/16 69/20 69/24 70/2 70/8 70/9 70/10 70/12 70/13 70/15 71/11 72/5 73/8 73/9 74/9 74/15 74/19 74/25 75/1 82/9 82/9 82/14 82/17 82/22 83/1 83/9 84/1 84/7
accumulated [1]   37/24
acknowledge [1]   37/14
across [3]   66/20 84/7 84/13
act [2]   56/14 56/17

**A**

action [4]  1/3 7/25 56/4 56/11
actions [4]  7/20 11/21 12/1 66/8
actively [1]  85/9
activity [8]  7/18 8/8 8/20 8/22
  24/4 30/9 65/6 83/4
actual [5]  18/6 44/6 44/20 62/13
  82/5
actually [20]  11/3 11/11 11/25
  12/1 12/13 12/18 13/14 15/22
  17/25 18/6 19/2 19/15 22/15 28/5
  28/25 29/4 41/22 42/25 80/15 82/4
adamant [1]  40/25
add [4]  5/8 25/11 26/16 56/7
adding [2]  28/3 62/20
addition [2]  6/10 81/25
additional [6]  4/15 5/6 14/24
  18/16 30/6 79/12
additionally [1]  59/21
address [23]  20/19 42/22 42/22
  44/13 45/8 45/9 45/23 46/9 46/10
  47/2 47/5 48/2 49/11 50/5 50/6
  50/10 69/10 74/10 74/16 77/23
  84/17 85/13 85/14
addresses [6]  39/15 46/12 46/13
  51/20 80/11 81/3
addressing [1]  25/14
adduced [2]  6/24 7/5
administerial [1]  55/5
administrator [2]  65/9 78/8
admission [1]  80/24
admitted [6]  3/10 43/21 46/5
  61/14 62/2 63/21
affirmative [5]  26/18 56/4 56/11
  56/17 56/18
afford [1]  86/2
after [33]  7/24 15/18 17/20 25/6
  25/18 25/25 26/1 26/6 28/3 28/14
  29/2 31/24 34/22 41/12 42/16 45/1
  45/14 52/20 52/22 53/6 54/14
  54/17 62/19 65/10 66/5 69/24 73/2
  73/9 77/14 78/17 80/19 81/8 85/21
afterward [1]  70/17
afterwards [1]  25/10
again [22]  9/1 10/14 12/7 12/8
  19/18 19/21 23/18 27/3 39/16 51/4
  69/18 70/2 70/8 70/12 70/18 72/4
  72/4 73/7 73/10 76/14 85/11 85/23
agenda [1]  4/15
Agent [3]  68/15 76/17 80/13
ago [3]  39/16 85/8 86/12
Agora [1]  76/4
agree [3]  16/15 24/7 26/5
agreed [3]  5/16 6/18 33/15
agreement [5]  33/20 33/22 33/25
  56/18 57/14
ahead [4]  30/22 33/11 72/24 86/23
Akemashite [12]  7/16 7/16 10/18
  67/20 69/10 73/20 73/21 73/22
  73/25 74/2 80/19 82/1
Akerström [1]  44/7
Alden [1]  4/8
all [61]  4/15 6/19 11/19 11/21
  12/9 14/20 16/13 29/20 30/22 31/4
  33/3 33/10 40/16 41/22 45/4 47/23
  48/19 50/24 51/19 51/24 53/25
  54/9 54/13 54/20 55/7 55/20 55/25
  56/14 58/17 59/17 59/19 60/15
  62/25 63/2 63/4 63/8 65/15 65/18
  66/20 66/23 69/12 69/14 71/13
  72/7 73/9 73/12 73/15 74/16 74/19
  74/24 75/10 75/18 79/21 82/11
  84/2 86/23 87/1 87/8 87/11 87/11
  87/12
alleged [5]  5/24 17/14 24/1 24/2
  57/20
allegedly [1]  27/18
allowed [1]  75/14
allows [1]  16/19
almost [2]  82/25 86/11
alone [2]  82/16 82/21

along [3]  13/7 70/11 86/25
Alpha [1]  76/4
already [6]  39/10 46/14 47/9
  51/22 62/19 67/8
also [24]  8/1 8/12 10/1 12/25
  14/11 15/6 17/6 23/22 23/25 24/10
  24/10 34/15 35/8 46/15 53/11 57/3
  57/21 59/18 63/18 66/15 72/24
  74/18 76/24 82/22
Alston [8]  11/5 16/16 17/9 17/18
  17/19 17/20 17/25 24/8
Alston-Graves [8]  11/5 16/16 17/9
  17/18 17/19 17/20 17/25 24/8
alter [1]  69/9
alternative [2]  9/2 14/8
although [5]  7/10 13/15 15/22
  17/21 17/22
Altima [2]  75/6 75/9
am [47]  6/20 12/4 12/5 12/6 12/8
  12/20 12/22 14/16 14/20 16/2
  17/21 19/12 19/15 19/25 21/6
  21/18 21/19 21/20 21/21 23/18
  23/22 25/7 25/20 26/1 27/25 29/8
  29/25 30/1 30/1 32/21 33/23 35/15
  39/14 40/2 41/20 42/11 42/24 43/5
  45/5 51/3 53/5 53/18 55/15 55/22
  61/13 66/13 66/15
ambiguity [1]  17/1
AMERICA [2]  1/3 4/3
among [3]  5/22 10/9 87/3
amongst [1]  54/16
amount [2]  46/21 71/9
amounts [3]  40/21 44/23 76/2
ample [1]  79/2
analogy [1]  20/14
analysis [4]  31/14 58/24 73/24
  74/8
analyzed [2]  58/18 80/22
angry [1]  85/6
announced [4]  65/8 72/6 72/12
  72/19
announcing [1]  57/20
annoyed [1]  85/19
anonymity [3]  64/17 67/1 80/7
anonymizing [1]  77/22
anonymous [1]  67/25
anonymously [1]  69/1
another [10]  12/6 12/8 15/12 31/6
  36/3 37/22 47/10 57/13 83/15
  83/17
answer [2]  53/9 86/11
answers [1]  16/3
anticipate [2]  31/4 31/13
anticipating [1]  31/6
Anton [4]  47/24 48/2 48/4 48/10
any [43]  4/22 8/2 10/2 11/1 13/6
  14/17 14/20 16/6 19/4 19/24 21/8
  23/22 28/2 29/7 29/8 29/9 29/14
  29/18 30/3 30/5 30/25 32/21 33/3
  37/10 41/25 42/8 45/3 46/15 47/7
  50/6 52/15 52/17 53/1 53/21 56/10
  56/18 60/8 60/20 61/4 62/25 69/20
  75/20 80/5
anybody [1]  52/12
anymore [2]  43/5 81/10
anyone [3]  54/20 67/18 84/22
anything [16]  6/14 30/18 30/20
  31/2 37/10 51/3 54/2 54/4 54/20
  56/1 56/7 56/15 56/24 62/15 63/4
  87/8
anywhere [2]  40/24 56/18
apart [1]  59/13
apartment [1]  38/21
apologies [1]  24/20
apologize [1]  36/6
app [1]  58/11
apparent [2]  12/23 70/20
appear [2]  59/9 60/5
APPEARANCES [3]  1/12 1/23 2/1
appeared [2]  62/10 62/12
appears [1]  58/22
Appliances [1]  7/4

applicable [1]  25/18
applied [1]  32/18
applies [1]  9/17
apply [2]  9/18 32/9
appreciating [1]  37/2
approach [5]  4/4 14/3 14/9 19/14
  21/4
appropriate [13]  5/11 6/22 10/1
  13/23 17/13 17/17 17/18 18/15
  23/19 24/5 24/7 33/23 34/1
approval [2]  12/23 17/24
approved [1]  14/5
approvingly [1]  13/1
approximate [1]  46/21
approximately [3]  44/17 44/22
  44/23
April [12]  41/9 41/12 41/16 41/18
  45/15 45/21 46/9 46/23 57/18
  77/16 81/6 81/13
April 2016 [1]  41/12
April 2021 [3]  77/16 81/6 81/13
April 28th [1]  57/18
April 29th [3]  41/9 41/16 41/18
April 30 [1]  45/21
April 30th [3]  45/15 46/9 46/23
archives [1]  59/22
are [77]  4/7 4/14 5/6 5/24 6/4
  6/5 6/25 7/13 7/17 8/5 10/9 10/12
  11/16 12/1 12/1 13/23 13/24 14/21
  14/22 16/6 16/25 18/17 18/17
  19/23 20/6 20/7 20/10 22/16 22/18
  22/25 23/13 23/16 24/3 25/5 28/7
  28/8 31/5 31/10 31/12 31/15 32/2
  32/8 32/12 32/17 32/20 33/22
  33/25 38/1 39/12 41/1 43/25 46/12
  49/3 53/8 55/20 56/22 57/8 57/9
  57/11 59/21 63/10 63/18 63/19
  63/20 63/22 70/12 70/24 70/24
  71/3 73/9 73/18 75/1 75/10 77/2
  80/8 82/11 86/25
arguably [3]  11/22 17/6 17/20
argue [3]  23/3 30/1 63/24
argument [8]  3/13 20/8 21/7 27/15
  31/7 31/18 64/13 78/12
arguments [7]  19/24 31/22 63/10
  63/19 63/20 63/22 87/2
around [10]  34/12 35/2 35/17
  35/18 47/18 74/16 80/17 81/19
  82/19 83/20
arrest [2]  57/20 57/21
arrested [7]  38/10 66/2 66/6
  74/13 81/9 81/15 83/13
Artem [6]  42/5 42/9 42/25 43/4
  44/16 46/22
artifacts [1]  62/20
as [66]  4/13 4/16 5/14 5/16 6/4
  6/7 8/22 9/8 9/10 11/4 11/4 12/20
  12/24 12/24 14/7 14/9 16/9 16/11
  16/12 19/25 19/25 22/7 22/8 22/23
  27/8 28/7 30/17 31/9 32/15 36/15
  36/16 36/16 37/15 38/7 39/14
  40/24 42/15 43/7 44/24 45/4 46/18
  50/11 55/17 57/16 59/12 59/20
  59/20 61/8 61/11 61/15 61/17
  61/24 62/18 63/19 66/2 66/2 73/17
  82/12 82/25 82/25 83/4 83/10
  83/19 84/13 85/9 85/18
ask [7]  5/13 21/18 30/12 32/25
  54/11 54/12 86/8
asked [7]  35/12 39/19 52/19 67/13
  70/21 85/3 86/12
asking [8]  18/13 49/10 50/24
  51/12 53/8 68/25 85/14 85/25
assets [1]  82/11
assist [1]  59/1
assistance [2]  44/1 64/5
associated [1]  48/15
assumes [1]  25/15
assumption [1]  29/3
attention [5]  41/4 43/20 47/9
  49/2 51/15
attorney [1]  31/17

**A**

**Aurum [2]** 69/2 71/20
**AUSA [1]** 4/6
**authorities [10]** 26/22 43/25 65/17 71/16 75/20 75/24 76/6 77/24 78/9 78/10
**automated [2]** 81/7 81/7
**Ave [2]** 1/14 1/20
**Avenue [1]** 2/8
**avoid [3]** 7/21 12/1 75/24
**avoiding [1]** 11/24
**aware [8]** 11/12 13/20 14/20 15/21 18/25 21/16 31/9 57/5
**Axiom [6]** 59/3 59/6 59/8 59/21 61/9 61/12

**B**

**back [34]** 10/14 18/13 19/18 19/22 23/17 33/13 34/3 43/6 44/10 44/24 50/14 50/18 54/14 54/17 55/10 55/12 65/6 65/23 66/14 66/18 66/24 68/4 68/7 68/24 71/2 71/16 73/7 73/16 75/15 77/12 79/14 83/23 84/9 87/4
**backed [1]** 79/16
**bag [1]** 12/5
**bank [14]** 41/21 43/12 43/15 43/23 44/2 44/3 44/4 44/7 44/11 46/20 69/8 71/19 75/5 83/9
**Bankruptcy [1]** 2/7
**base [2]** 75/25 76/15
**based [9]** 10/19 12/9 16/20 17/4 20/9 21/10 23/2 56/19 67/21
**basically [1]** 16/19
**basis [5]** 27/7 27/13 28/17 28/18 54/24
**batch [1]** 70/9
**Bay [1]** 76/4
**be [106]**
**bears [1]** 56/6
**because [41]** 14/11 17/1 19/4 20/2 20/11 20/17 20/19 20/22 22/15 25/8 28/6 28/25 32/1 37/9 40/2 40/22 40/23 41/19 43/18 48/23 50/11 50/24 50/25 51/22 56/14 56/18 57/7 61/10 62/17 65/16 66/6 72/10 74/15 78/10 78/16 78/24 79/21 80/5 81/14 83/22 86/3
**Beckman [4]** 47/24 48/2 48/4 48/10
**becomes [1]** 70/20
**been [25]** 4/20 7/14 15/17 20/15 38/13 40/1 40/7 41/11 43/21 45/5 50/16 61/10 61/12 61/14 63/21 67/8 67/23 68/13 71/14 75/3 76/20 79/19 80/4 80/20 81/9
**before [30]** 1/9 25/9 25/12 25/25 26/6 27/13 28/1 28/14 28/19 31/24 32/25 33/17 37/21 39/14 40/7 49/22 51/1 51/9 51/22 52/10 53/14 54/21 55/25 56/23 57/12 65/7 70/16 72/12 72/19 87/8
**beforehand [2]** 25/16 32/23
**began [7]** 28/13 28/14 28/19 28/24 29/1 66/18 69/19
**beginning [1]** 64/20
**behind [1]** 66/22
**being [9]** 8/8 14/16 18/7 18/8 18/25 37/11 56/19 72/18 80/2
**belief [10]** 7/5 7/19 13/13 14/12 14/14 14/15 14/17 20/17 22/24 23/2
**believe [17]** 7/2 12/16 12/17 12/18 14/13 14/16 14/20 14/23 15/2 19/2 34/9 34/19 35/17 43/21 45/4 45/11 82/4
**believed [5]** 13/19 15/22 16/1 19/16 23/1
**believes [1]** 13/14
**believing [1]** 18/25
**belongs [1]** 44/7
**beneath [1]** 44/13

**best [4]** 42/15 45/2 48/6 52/9
**between [7]** 20/24 57/15 63/17 71/12 74/8 74/24 81/6
**beyond [8]** 5/21 18/19 24/22 25/23 27/18 29/13 34/23 64/21
**big [2]** 31/17 32/21
**billion [1]** 81/25
**Billy [2]** 65/14 77/7
**Binance [1]** 84/2
**bit [6]** 8/1 9/15 25/15 31/18 57/7 77/19
**Bitcoin [188]**
**BitcoinFog.com [3]** 65/2 68/18 70/6
**Bitfinex [1]** 84/2
**Bitstamp [24]** 43/17 43/17 43/19 48/16 48/21 49/4 49/9 49/17 49/21 49/24 50/5 50/18 50/22 51/4 51/12 65/22 84/2 85/3 85/11 85/14 85/16 85/18 85/20 86/3
**Bitstamp's [1]** 85/21
**Blind [6]** 67/8 67/8 67/12 67/13 67/17 67/21
**blinded [2]** 13/18 15/25
**blinding [1]** 15/11
**blindness [21]** 4/18 6/19 7/1 7/1 8/24 9/2 9/2 10/1 11/7 11/10 12/11 15/6 15/11 15/14 16/18 18/21 21/8 22/3 23/19 23/21 24/3
**blockchain [2]** 45/13 68/20
**Bob [2]** 65/15 77/7
**boiler [1]** 26/16
**book [2]** 13/25 56/3
**born [1]** 70/6
**both [8]** 4/20 5/15 5/17 6/3 8/4 8/17 27/7 76/14
**bottom [10]** 25/22 30/9 43/9 43/22 44/2 44/10 46/10 50/15 71/6 78/6
**bought [3]** 37/24 53/15 53/16
**box [1]** 33/13
**brand [3]** 69/5 69/13 69/22
**break [9]** 33/15 54/21 57/3 57/6 63/16 66/12 86/19 86/23 87/8
**breaking [1]** 57/7
**bridge [1]** 18/18
**briefed [1]** 8/23
**briefly [1]** 24/18
**bring [1]** 11/15
**bringing [1]** 19/7
**BRODIE [1]** 1/15
**Brooklyn [1]** 2/4
**brown [14]** 1/15 3/4 4/7 5/4 6/15 18/14 23/25 34/4 52/19 54/10 55/9 55/20 64/2 86/11
**BTC [2]** 50/5 50/6
**Buddha [1]** 65/13
**build [1]** 12/13
**bunch [1]** 20/20
**bunker [6]** 38/6 38/9 38/12 38/15 79/14 79/16
**burden [2]** 56/6 86/7
**burned [3]** 79/20 79/21 80/4
**burner [9]** 69/16 69/23 70/9 70/10 70/12 73/8 73/9 74/19 74/25
**business [15]** 8/13 9/12 9/17 9/21 9/23 10/4 29/24 47/19 66/10 80/9 80/11 80/13 80/24 84/4 84/11
**buy [10]** 35/6 37/5 37/7 53/1 53/4 53/6 67/7 67/13 73/6 77/8
**buying [3]** 34/25 35/1 37/25

**C**

**calculations [1]** 83/7
**call [2]** 53/22 57/22
**called [1]** 83/20
**calling [1]** 12/11
**calls [1]** 57/23
**came [17]** 7/22 28/16 45/3 46/20 53/14 53/16 53/17 60/1 61/11 62/9 65/11 65/16 70/4 71/18 73/16 80/16 84/6
**can [54]** 5/16 11/11 11/13 11/18

11/21 12/15 12/19 13/17 15/20 15/24 18/5 21/1 22/20 23/2 23/13 29/11 31/10 31/11 31/14 32/11 33/13 33/18 33/22 37/6 37/7 38/14 39/18 41/22 45/21 49/14 50/14 53/4 53/25 55/8 55/9 55/12 55/16 55/18 57/5 58/8 58/15 58/22 59/11 61/21 63/11 63/12 63/16 66/7 73/17 75/8 86/6 86/14 86/19 86/24
**can't [5]** 26/25 37/5 41/23 55/5 72/10
**cannot [2]** 13/15 15/23
**capable [1]** 18/9
**CapO [6]** 35/3 35/16 36/21 52/20 52/22 53/6
**car [2]** 75/7 75/9
**card [1]** 71/14
**cards [2]** 82/20 82/21
**careless [1]** 13/17
**carelessness [1]** 24/12
**carrying [2]** 38/10 74/13
**carved [1]** 59/23
**case [36]** 4/2 12/18 16/20 17/10 17/11 17/13 17/14 17/14 17/16 17/17 17/22 17/23 17/23 19/25 20/11 20/14 23/1 23/25 24/5 24/6 32/16 33/4 41/6 54/15 54/16 54/16 57/12 58/11 58/18 60/2 63/9 64/20 86/6 86/7 86/25 87/2
**cases [1]** 33/1
**cash [1]** 82/2
**casual [1]** 83/19
**catch [1]** 26/8
**categories [1]** 59/14
**CATHERINE [1]** 1/13
**caught [2]** 80/2 85/14
**caution [1]** 17/12
**cautious [3]** 18/2 23/21 24/9
**Ccips [1]** 1/19
**cemented [1]** 74/24
**cent [1]** 82/2
**centered [1]** 78/9
**certain [5]** 14/7 14/16 14/22 20/8 57/15
**certainly [4]** 10/8 14/4 17/22 77/6
**certainty [1]** 12/15
**certify [1]** 88/3
**chain [1]** 69/8
**change [2]** 26/6 28/3
**changed [1]** 24/24
**changing [1]** 16/23
**charge [4]** 5/9 5/13 22/1 30/16
**charged [4]** 25/24 28/8 66/8 66/17
**charging [2]** 4/14 13/6
**chart [6]** 39/14 58/22 68/15 69/15 71/3 71/12
**chat [3]** 62/8 62/9 62/13
**check [2]** 62/15 86/21
**child [6]** 7/13 65/14 76/25 77/2 77/5 77/8
**choose [1]** 6/3
**chose [1]** 5/16
**Chris [1]** 4/6
**CHRISTOPHER [1]** 1/15
**Chukanov [6]** 42/5 42/9 42/25 43/4 44/16 46/22
**circled [1]** 46/8
**Circuit [8]** 11/5 11/6 11/8 11/13 13/5 13/5 13/24 16/17
**Circuit's [1]** 24/8
**circuits [1]** 14/5
**circulated [1]** 5/20
**circumstances [3]** 15/9 21/4 22/20
**circumstantial [3]** 11/18 15/9 15/10
**cited [1]** 11/13
**cites [1]** 12/25
**civil [1]** 17/23
**claimed [1]** 72/16
**clarified [1]** 50/19
**clarify [2]** 40/2 59/5

**C**

clean [1]  81/1
clear [15]  5/14 6/2 10/23 19/3 22/11 24/10 25/17 28/7 39/10 45/7 52/15 53/18 56/13 59/25 70/25
client [4]  43/2 43/4 50/19 81/1
clients [1]  84/5
close [4]  15/10 70/24 73/22 74/1
closed [3]  9/6 13/9 15/16
closely [1]  81/4
closest [1]  21/11
closing [10]  3/13 19/23 20/19 31/17 31/22 63/10 64/6 64/8 64/13 87/2
closings [4]  14/23 56/23 57/4 57/8
co [1]  26/23
co-conspirators [1]  26/23
Coast [2]  65/14 76/13
cocaine [3]  66/20 76/8 76/10
code [18]  12/23 13/1 13/2 14/3 14/25 17/24 18/24 19/14 21/10 21/23 22/6 39/20 39/23 47/10 52/2 52/8 52/14 84/11
coincidence [2]  74/14 75/11
collect [3]  8/2 11/1 81/14
collects [1]  53/23
COLUMBIA [3]  1/1 9/13 10/11
come [10]  13/4 54/5 54/6 54/14 55/12 55/17 83/22 83/25 84/19 87/4
comes [6]  8/17 8/25 17/20 21/11 55/10 83/23
coming [8]  20/16 37/9 62/8 83/8 84/5 84/15 84/17 86/3
comment [1]  30/8
commentary [1]  56/3
comments [3]  4/23 30/6 30/25
commit [1]  5/23
common [5]  5/22 74/4 82/6 83/2 86/15
communications [2]  73/13 73/14
company [2]  35/3 39/20
compared [1]  31/22
comparing [1]  10/18
completed [1]  40/3
completely [2]  40/22 81/2
complicated [1]  78/4
complied [3]  79/18 79/22 80/4
computer [3]  38/4 78/5 79/15
computers [3]  38/5 79/9 79/21
conceal [1]  72/22
conceded [1]  82/4
concept [6]  16/12 17/2 17/5 18/5 19/6 19/8
concern [4]  25/8 25/11 25/14 78/8
concerned [3]  23/22 29/2 78/8
concerns [4]  67/11 77/22 78/6 80/2
conclude [5]  9/11 18/15 21/2 24/6 27/12
concludes [1]  63/9
conclusion [2]  22/17 23/20
conclusions [1]  22/18
conclusively [1]  68/21
conduct [9]  11/24 17/14 24/2 24/23 25/4 25/16 29/6 29/9 29/14
conducted [2]  40/7 40/17
conference [1]  4/14
confident [1]  72/22
configurations [1]  78/2
configure [1]  78/20
configured [2]  79/11 80/10
confirm [1]  62/15
confused [3]  9/15 25/21 26/1
confusing [2]  25/4 25/17
confusion [1]  28/6
Congress [5]  8/24 18/3 18/8 18/9 19/19
connect [2]  65/6 73/15
connecting [1]  79/14

connection [1]  65/2
connections [2]  79/9 79/11
consider [2]  4/17 66/14
consistent [5]  16/7 30/15 72/17 82/5 84/25
conspiracy [20]  4/20 5/3 5/13 5/16 5/25 8/10 8/18 24/1 25/9 25/12 26/12 26/16 26/17 27/21 56/2 56/5 56/12 56/14 56/19 66/9
conspirators [1]  26/23
conspired [1]  6/8
constitutes [1]  88/4
Constitution [1]  2/8
consult [1]  52/12
CONTENTS [1]  3/1
context [3]  13/1 18/1 18/17
continuation [1]  28/10
continue [3]  4/14 33/12 34/4
continued [16]  1/23 2/1 3/4 24/25 25/10 28/3 28/14 28/21 28/25 29/4 29/7 29/15 34/5 77/13 77/15 80/3
continuing [2]  25/13 28/8
control [1]  78/1
controlled [2]  69/15 74/10
controlling [1]  64/1
controls [1]  63/24
convert [1]  71/19
convict [1]  9/11
conviction [1]  31/5
convince [1]  27/6
convinced [1]  23/19
cooperate [1]  80/5
copies [2]  67/24 79/23
copy [2]  55/20 78/15
Core [1]  80/25
correct [60]  6/4 6/6 6/16 34/11 34/17 35/5 35/10 35/22 36/4 36/7 36/11 36/17 36/21 36/22 36/25 37/3 37/12 37/13 37/16 39/1 39/24 40/4 40/22 40/25 41/2 41/6 41/12 43/13 44/8 44/18 45/2 45/15 45/24 47/3 47/11 47/14 47/25 48/1 48/2 48/3 48/17 48/19 49/4 49/5 49/7 49/8 49/12 49/13 49/15 49/18 50/12 50/16 50/20 50/21 51/10 51/13 56/8 56/9 60/12 88/4
correction [1]  56/25
correctly [1]  78/20
corresponded [1]  40/10
corresponds [1]  44/21
could [49]  6/2 25/9 26/15 27/3 29/10 32/14 32/15 34/19 36/16 39/9 40/21 40/23 42/15 44/6 45/11 46/12 48/14 48/14 50/4 52/7 52/13 54/11 54/12 54/25 55/3 55/13 55/17 58/15 61/14 61/20 66/24 67/5 67/10 68/4 68/8 70/22 71/14 73/3 73/5 73/15 75/2 76/12 76/16 77/18 78/16 82/10 82/14 84/22 86/2
couldn't [8]  46/17 52/17 68/1 68/24 75/15 78/23 85/7 85/7
counsel [4]  4/4 4/5 4/7 4/12
count [12]  8/10 9/1 9/11 9/16 9/16 9/24 25/21 25/24 30/8 30/9 31/5 66/17
countries [1]  34/16
country [1]  41/21
Counts [6]  24/23 25/6 28/17 28/18 29/7 29/14
couple [1]  4/24
course [1]  69/4
court [32]  1/1 2/6 2/7 4/11 5/13 11/5 11/12 14/9 16/9 16/15 17/10 17/24 18/2 18/11 19/5 21/9 21/9 23/4 23/5 24/8 27/16 30/3 30/12 31/9 32/17 55/14 64/3 79/22 80/5 80/6 88/3 88/13
Court's [2]  14/4 17/19
courtroom [1]  68/14
courts [2]  2/7 23/20
covered [1]  57/21

Craiglist [1]  53/14
Craigslist [2]  53/12 53/17
created [16]  39/23 40/13 40/15 41/12 41/13 41/17 48/11 51/6 51/19 65/4 67/19 68/5 69/5 69/5 69/9 69/13
creation [1]  10/23
creator [1]  64/22
credible [1]  84/25
credit [1]  71/14
crime [4]  8/14 8/16 8/17 75/8
crimes [3]  5/24 66/9 75/16
criminal [12]  1/3 4/2 7/18 16/20 17/23 22/17 24/2 24/4 65/17 65/18 66/3 67/5
criminals [4]  64/18 65/12 75/22 78/19
CRM [1]  1/19
cross [7]  3/4 3/7 18/18 34/5 61/4 61/5 86/10
Cross-examination [4]  3/4 3/7 34/5 61/5
cross-examined [1]  86/10
Crypto [2]  74/10 74/12
cryptocurrency [4]  37/15 66/22 79/12 83/14
Crystal [1]  65/13
CS [7]  57/23 58/5 73/17 74/8 75/3 78/3 80/22
currently [1]  65/21
customer [17]  42/6 43/2 43/4 44/17 44/22 45/7 47/19 47/21 47/22 47/22 47/24 48/4 72/8 72/10 75/13 76/15 84/16
customers [9]  10/9 10/10 10/11 42/14 76/12 80/12 84/12 84/17 84/20
customers' [1]  75/14
cut [2]  65/18 81/17
cybercriminal [2]  67/3 72/23

**D**

D.C [8]  11/5 11/8 11/13 13/4 13/5 13/24 16/17 24/8
damage [1]  67/22
danger [1]  18/4
darknet [12]  10/9 10/13 64/14 64/22 65/10 65/13 66/19 66/23 76/3 76/18 76/22 76/24
data [1]  79/16
date [18]  25/18 25/25 40/6 40/8 40/12 40/12 40/14 40/15 41/8 41/13 41/14 41/14 41/19 43/18 45/21 47/13 47/18 49/6
dated [4]  40/6 41/16 45/15 88/10
dates [8]  25/1 25/7 28/11 28/14 28/15 28/20 29/5 29/15
dating [3]  58/11 60/5 60/8
day [4]  45/14 71/9 82/18 88/10
DC [7]  1/5 1/14 1/17 1/21 2/9 9/21 66/10
de [5]  3/6 33/6 57/23 58/1 77/22
de-anonymizing [1]  77/22
dealer [2]  12/6 12/7
dealers [10]  65/11 65/13 66/19 66/21 66/25 76/5 76/6 76/8 76/13 76/22
dealing [4]  17/15 18/18 24/3 43/7
dealt [1]  51/1
decade [3]  64/15 66/2 81/10
decided [1]  79/19
decision [2]  11/6 24/8
deduction [1]  23/2
deductive [2]  20/24 22/17
deep [1]  27/4
defeat [2]  56/4 56/11
defendant [127]
defendant's [35]  7/4 7/8 7/10 22/25 58/15 60/7 65/20 65/25 69/21 69/23 70/15 70/19 71/21 72/1 72/10 73/5 74/17 75/22 78/12 78/13 79/8 79/24 80/2 80/7 80/8

**D**

**defendant's... [10]** 80/21 80/23 82/8 82/11 83/1 83/7 83/11 84/3 84/11 85/18
**defendants [1]** 6/8
**defense [20]** 3/10 16/21 21/8 22/12 27/20 30/4 31/2 31/19 54/8 54/16 54/24 61/18 61/19 62/1 62/2 75/2 78/23 81/23 86/5 87/10
**defense's [1]** 22/10
**defer [1]** 56/3
**defined [1]** 14/13
**definition [4]** 12/14 16/10 16/25 22/2
**degree [1]** 12/16
**delaying [1]** 85/25
**delete [2]** 67/22 79/21
**deleted [1]** 7/23
**deliberate [4]** 7/20 7/25 15/11 66/15
**deliberately [6]** 7/23 9/6 13/9 13/18 15/16 15/25
**deliberations [1]** 57/17
**demonstrating [1]** 13/16
**deniable [1]** 7/9
**denied [1]** 55/3
**DEPARTMENT [2]** 1/13 57/19
**depending [1]** 60/2
**deposit [3]** 22/21 72/10 72/10
**deposited [4]** 37/18 71/10 82/16 82/21
**depositing [2]** 70/3 82/25
**deposits [2]** 21/1 75/14
**Dept [1]** 1/20
**described [1]** 59/12
**design [2]** 7/22 10/15
**designed [7]** 8/2 10/24 11/1 64/16 75/13 76/1 79/4
**desktop [1]** 79/10
**destroy [1]** 7/25
**details [3]** 41/1 44/2 75/17
**determined [1]** 58/12
**develop [1]** 84/23
**developed [1]** 68/23
**device [5]** 58/13 59/9 59/16 59/20 61/13
**devices [3]** 77/17 79/2 79/8
**devices' [1]** 58/17
**dicta [3]** 17/19 17/21 17/21
**did [50]** 5/5 5/18 13/7 16/17 26/17 28/25 29/4 29/8 32/4 35/14 35/21 36/25 38/15 39/7 42/25 45/7 45/8 46/15 46/21 47/19 49/22 52/2 52/11 52/22 53/9 53/11 53/20 58/24 59/1 59/5 60/5 62/15 62/22 67/25 68/5 68/20 68/22 71/17 73/20 73/24 75/12 78/10 79/19 82/7 83/7 83/24 84/16 85/7 85/7 85/8
**didn't [23]** 11/11 17/11 26/10 35/13 40/19 41/25 46/16 46/24 47/7 47/21 48/24 49/21 50/25 52/4 52/12 62/9 62/15 62/21 62/23 67/17 68/8 73/6 82/4
**different [15]** 11/14 38/4 38/5 38/9 38/11 44/17 65/3 67/21 74/21 74/23 74/23 75/7 84/12 84/13 84/17
**digital [1]** 73/16
**diligent [1]** 48/25
**direct [10]** 3/7 15/8 15/9 15/10 33/6 34/9 39/19 41/4 43/20 58/3
**directed [1]** 54/24
**directing [3]** 47/9 49/2 51/15
**disagree [1]** 20/2
**disappear [2]** 68/8 77/12
**disapproval [1]** 17/25
**disavow [2]** 56/5 56/11
**disciplined [2]** 73/11 77/16
**discuss [4]** 16/25 54/16 66/13 87/2

**discussed [1]** 24/18
**discusses [1]** 29/22
**discussion [3]** 5/12 22/14 30/8
**disk [1]** 81/1
**display [2]** 64/6 64/9
**dispute [1]** 71/3
**disputed [1]** 7/11
**distinct [2]** 15/12 75/5
**distinction [1]** 20/24
**distribute [1]** 77/5
**distributed [1]** 77/3
**DISTRICT [6]** 1/1 1/1 1/10 2/7 9/13 10/10
**dive [1]** 27/4
**DNS [2]** 42/18 43/6
**do [48]** 4/17 4/18 4/21 5/5 6/6 11/25 14/25 18/12 18/20 21/21 23/5 28/12 29/17 31/4 31/24 32/19 33/7 37/22 39/20 41/22 45/2 51/15 51/17 52/20 54/4 54/4 54/16 55/10 55/11 55/15 55/15 57/3 57/8 58/5 58/13 58/20 59/8 60/7 61/19 62/15 68/5 68/22 75/12 79/19 86/1 86/7 86/19 87/2
**document [2]** 59/15 61/11
**documents [4]** 59/14 59/17 60/2 76/23
**does [17]** 5/6 11/15 13/14 13/22 15/22 16/9 17/13 19/2 26/5 28/2 30/5 60/1 63/6 64/6 64/8 83/9 86/8
**doesn't [9]** 5/14 9/17 12/15 13/4 13/25 19/2 32/10 72/11 79/15
**doing [14]** 18/1 24/10 26/24 27/2 27/9 27/19 32/2 40/1 52/14 55/22 56/16 63/18 77/20 86/14
**DOJ [2]** 1/16 1/19
**DOJ-CRM [1]** 1/19
**DOJ-USAO [1]** 1/16
**dollars [12]** 35/20 36/17 65/12 65/20 71/9 71/20 76/3 81/16 81/25 83/14 83/19 84/7
**domain [5]** 48/14 48/15 71/7 71/13 86/13
**don't [46]** 4/24 5/15 12/5 12/7 12/18 12/19 14/19 14/24 16/3 16/5 17/11 19/7 19/10 19/24 20/8 22/19 22/23 23/7 25/20 26/13 26/13 26/15 27/21 32/1 33/11 33/24 38/13 38/14 39/15 39/16 42/24 44/6 44/20 51/4 53/22 54/6 54/14 55/21 56/6 56/18 56/20 62/12 86/11 86/12 86/13 87/3
**done [5]** 31/16 44/25 62/19 67/23 71/14
**doubt [7]** 5/22 24/22 25/23 29/13 60/8 60/10 64/21
**down [20]** 20/10 23/23 24/15 24/21 27/21 39/18 43/9 43/22 44/10 49/14 50/4 50/9 52/23 52/24 53/25 67/8 71/6 73/2 77/10 77/14
**dozen [1]** 64/24
**drafted [4]** 5/3 9/10 19/19 60/11
**draw [1]** 11/19
**drive [2]** 68/25 80/25
**drives [1]** 80/23
**driving [1]** 75/9
**drop [1]** 30/1
**dropping [2]** 12/6 15/13
**drug [15]** 10/6 10/13 12/4 12/6 12/6 65/10 65/13 66/19 66/19 66/23 76/5 76/6 76/8 76/13 76/22
**drugs [6]** 7/7 7/13 73/6 76/12 76/14 77/2
**due [1]** 48/25
**Duncan [2]** 67/12 67/17
**during [9]** 34/9 34/22 35/12 36/10 39/19 51/16 52/22 53/5 69/12

**E**

**each [5]** 40/20 40/20 66/16 66/17 86/9

**earlier [17]** 34/12 36/9 38/23 39/8 39/23 40/1 41/6 42/3 43/18 44/18 45/9 45/10 46/22 47/20 50/22 52/6 57/7
**early [3]** 67/2 67/4 82/23
**earned [1]** 81/21
**earnings [2]** 84/25 86/3
**easiest [1]** 52/10
**ebook [4]** 60/5 60/9 60/13 62/22
**effect [4]** 20/11 25/5 26/23 28/13
**effective [1]** 75/19
**efforts [2]** 77/23 78/13
**ego [1]** 69/10
**eight [1]** 51/18
**either [6]** 5/17 8/14 8/16 26/15 28/13 33/24
**EKELAND [10]** 2/2 2/3 3/4 3/7 4/10 6/11 16/13 32/19 54/1 56/1
**element [3]** 8/17 13/12 15/19
**elements [1]** 66/16
**else [13]** 30/18 30/20 34/22 38/25 39/13 54/2 54/4 56/1 56/7 63/4 67/18 85/17 85/17
**else's [1]** 11/20
**Elsewhere [1]** 80/3
**email [2]** 69/7 69/10
**emails [2]** 42/8 42/10
**emerged [1]** 79/17
**empirical [1]** 21/4
**empirically [1]** 20/3
**employed [1]** 35/3
**employee [1]** 49/9
**end [1]** 68/9
**ending [2]** 44/11 74/21
**ends [2]** 43/23 43/24
**enforcement [12]** 66/24 67/6 67/24 68/10 68/11 73/3 73/5 77/10 79/18 80/2 80/3 80/6
**engage [1]** 24/4
**engaged [2]** 9/12 11/24
**English [1]** 10/15
**enough [5]** 5/21 12/12 26/24 26/25 48/25
**ensured [1]** 76/16
**Enterprises [2]** 76/9 76/11
**entire [2]** 7/9 24/1
**entirely [1]** 86/18
**entitled [1]** 88/5
**epistemological [4]** 14/12 16/16 17/2 21/7
**epistemology [3]** 14/14 20/7 23/3
**equivalent [1]** 71/9
**error [2]** 50/10 50/15
**escape [1]** 12/4
**Especially [1]** 82/23
**essentially [7]** 6/25 8/14 16/19 16/23 31/13 31/16 35/6
**established [4]** 13/12 13/16 15/20 15/23
**Euros [2]** 44/17 44/22
**evaluate [1]** 86/15
**even [26]** 8/23 9/22 14/1 15/8 17/8 17/11 17/17 26/17 38/17 43/8 46/17 54/15 54/16 56/13 59/16 70/17 70/20 72/25 73/18 76/11 77/14 81/24 82/4 84/3 85/13 87/2
**event [1]** 13/6
**events [1]** 20/13
**ever [9]** 17/11 17/16 24/5 51/4 53/4 65/8 70/14 70/17 72/19
**every [4]** 38/7 81/17 81/17 86/11
**everyone [3]** 67/20 80/19 86/1
**everything [5]** 32/24 59/15 79/20 83/23 85/24
**evidence [41]** 6/23 7/19 7/21 11/19 11/19 11/21 12/1 15/9 15/10 15/10 22/14 27/13 27/17 27/21 28/16 30/6 31/11 31/20 39/10 47/10 55/1 56/10 57/15 57/17 60/25 61/1 61/7 61/15 63/9 63/21 63/22 63/23 63/24 63/25 66/13 73/22 79/1 79/5 82/5 85/8 87/1

**E**

evidentiary [2]  27/7 31/9
exact [1]  40/19
exactly [7]  59/25 61/11 61/13
  64/23 68/11 68/22 75/10
exam [1]  34/9
examination [11]  3/4 3/4 3/7 3/7
  33/6 34/5 39/19 51/25 58/3 58/18
  61/5
examine [1]  86/8
examined [1]  86/10
examiner [1]  59/14
example [5]  9/10 41/5 59/15 59/18
  74/10
examples [1]  79/8
exceeded [1]  83/8
Except [1]  47/21
exchange [2]  37/19 49/4
exchanges [3]  51/2 65/21 84/8
excuse [1]  84/19
excused [1]  63/2
excuses [1]  85/5
executed [1]  8/19
exhibit [30]  3/10 3/10 39/9 41/4
  43/24 44/3 45/11 46/4 47/9 49/2
  49/3 50/14 50/18 51/15 51/16 58/6
  58/9 58/10 58/15 60/5 60/14 60/17
  60/18 61/8 61/11 61/15 61/22
  61/24 62/1 62/2
Exhibit 305 [1]  51/15
Exhibit 306 [1]  46/4
Exhibit 313A [1]  39/9
Exhibit 414A [2]  47/9 50/14
Exhibit 414C [2]  49/2 50/18
Exhibit 432C [2]  43/24 44/3
Exhibit 719A [1]  41/4
Exhibit 721 [5]  58/6 58/9 60/5
  60/17 61/8
exhibits [7]  3/9 33/7 33/8 33/9
  33/10 43/20 64/25
exist [4]  13/14 15/22 19/2 72/11
existence [10]  13/11 13/14 13/19
  13/20 15/19 15/21 15/25 19/1
  19/17 21/16
existing [1]  67/7
exists [1]  7/3
expecting [1]  32/21
expenditures [1]  83/8
expert [1]  68/20
experts [2]  70/22 84/15
explain [5]  49/10 52/7 59/11
  66/15 84/23
explainable [1]  83/9
explained [5]  50/10 70/23 75/4
  78/3 78/5
explaining [1]  50/22
explanation [1]  83/2
Exploit [6]  7/10 68/25 72/24
  76/25 78/1 78/18
exploit.in [1]  67/3
explorer [1]  45/13
exploring [2]  34/10 34/12
expressed [3]  11/6 11/8 24/7
expresses [2]  17/24 17/25
extent [4]  7/14 10/2 22/25 56/13
extraction [6]  59/1 59/3 59/5
  59/8 60/4 61/8
extreme [2]  17/9 17/10
extremely [2]  23/21 24/9
eyes [4]  9/6 13/10 15/16 22/21

**F**

facie [1]  7/15
facilitated [1]  76/2
fact [18]  7/3 7/21 7/23 9/5 13/9
  13/11 13/19 15/16 15/19 19/1
  19/17 20/1 20/3 20/20 21/17 27/10
  27/18 51/6
facts [4]  12/19 16/1 23/24 66/15
factual [1]  27/13
failure [2]  9/18 9/18

fair [2]  9/3 11/25
fairly [1]  11/13
fairness [1]  13/24
fake [3]  51/7 51/8 85/12
false [1]  84/24
familiar [2]  31/12 39/4
far [2]  14/21 86/25
FBI [3]  68/19 73/4 77/18
February [3]  47/13 47/17 49/11
February 12th [3]  47/13 47/17
  49/11
feeling [1]  32/10
fees [2]  53/21 53/22
fellow [1]  78/19
fentanyl [2]  66/20 76/14
few [9]  35/8 36/17 36/20 42/16
  44/25 53/9 70/7 71/14 72/20
fiat [1]  37/9
figure [3]  45/2 52/9 57/6
figures [1]  81/20
file [4]  61/12 62/8 62/9 62/14
files [6]  59/9 59/13 59/19 59/22
  59/22 77/19
final [1]  56/23
finally [1]  4/22
financial [7]  25/24 37/14 41/20
  65/21 76/24 82/8 84/7
FinCEN [1]  29/22
find [23]  5/15 9/4 9/5 10/21 13/8
  13/9 15/15 15/16 23/15 25/11
  26/16 28/17 28/19 48/14 48/14
  52/17 54/25 60/1 73/20 78/10
  78/21 83/7 84/16
finding [1]  24/11
fine [13]  6/20 21/19 22/9 30/14
  30/18 33/3 55/19 60/25 61/2 61/3
  61/20 64/4 69/19
finish [1]  20/13
finished [1]  21/18
first [22]  6/20 9/16 15/13 21/25
  35/1 43/22 46/17 53/17 58/23
  63/11 67/7 67/14 68/14 68/22 69/5
  69/20 69/21 70/9 70/16 72/7 72/18
  73/24
five [1]  24/19
flagged [2]  80/3 85/18
flip [2]  45/11 50/14
flipping [1]  44/10
Floor [1]  2/4
flow [1]  77/13
Fog [110]
Fog's [3]  75/19 80/20 81/12
fold [2]  18/21 18/22
folder [3]  59/17 59/18 59/19
folders [1]  60/3
follow [3]  49/22 66/24 75/20
follow-up [1]  49/22
followed [1]  40/3
following [7]  10/20 13/8 24/25
  25/25 28/15 29/15 50/19
follows [1]  20/25
foolish [1]  13/17
foregoing [1]  88/4
forensic [7]  58/18 58/24 59/4
  59/6 59/12 82/7 83/3
foreseen [1]  73/4
forfeiture [6]  4/21 31/6 31/7
  31/10 31/15 32/13
forget [1]  55/4
forgot [1]  24/24
form [3]  4/23 30/25 31/22
format [1]  62/11
formed [1]  23/2
formulations [1]  16/6
forth [1]  15/24
forum [3]  67/3 67/9 72/24
found [12]  49/17 49/24 52/13
  58/19 59/20 60/1 61/12 61/13
  75/24 79/13 80/21 80/22
founded [1]  24/2
four [10]  4/15 40/4 40/7 41/12
  42/3 44/18 45/8 46/22 47/20 66/8

frame [2]  16/10 32/23
frankly [1]  24/7
Frederik [1]  44/7
freelance [8]  27/3 27/19 35/8
  35/13 40/16 40/18 56/16 84/24
front [3]  23/9 33/1 75/7
frowns [1]  55/21
frustrated [4]  48/20 50/22 85/6
  85/16
fucking [1]  78/21
fulfilled [1]  5/15
full [2]  24/21 85/4
functioning [1]  80/13
fund [2]  68/6 69/1
funds [27]  35/6 35/13 37/16 37/17
  37/18 37/21 37/22 47/5 47/7 50/20
  52/5 53/10 53/11 53/20 67/6 70/2
  71/25 72/11 75/14 75/20 76/18
  83/21 84/9 84/18 85/1 85/9 85/12
further [5]  30/19 30/21 51/23
  53/24 62/24

**G**

gave [2]  23/25 76/15
generally [1]  32/20
geographic [1]  10/4
Germany [2]  34/24 38/17
get [16]  4/21 14/23 20/7 20/16
  21/7 30/22 33/2 33/11 51/4 54/12
  55/25 57/1 77/1 78/19 79/23 82/10
getting [4]  20/23 63/19 81/17
  86/25
give [16]  12/10 17/11 17/12 18/15
  18/20 18/23 19/23 23/7 27/5 27/14
  30/24 33/1 36/25 56/23 61/19
  84/22
given [5]  24/1 32/14 55/3 66/19
  80/6
giving [10]  6/24 13/2 13/3 15/18
  17/10 21/19 21/20 21/21 23/21
  24/9
Glave [4]  82/8 83/3 83/6 83/10
Glave's [2]  46/5 51/16
Global [7]  7/3 8/4 11/6 11/12
  12/23 14/5 17/20
Global-Tech [7]  7/3 8/4 11/6
  11/12 12/23 14/5 17/20
globally [2]  10/7 32/12
globe [1]  84/13
gmail.com [1]  42/9
go [25]  6/19 22/6 23/17 24/10
  26/22 27/21 30/22 32/11 33/11
  33/13 37/23 41/25 42/17 43/5
  52/23 59/15 59/17 60/22 66/14
  68/5 69/25 72/24 75/23 86/19
  86/23
goes [3]  19/18 19/21 76/5
going [32]  4/25 9/20 10/14 12/2
  19/5 19/23 20/5 20/7 20/10 21/5
  21/9 28/17 28/19 29/20 29/25 30/1
  30/1 32/24 33/4 33/7 36/9 39/16
  47/22 50/18 66/13 66/15 71/22
  71/23 78/3 80/15 85/17 85/18
gold [1]  82/12
gone [2]  47/23 84/23
good [11]  4/6 4/9 4/10 4/13 16/17
  26/8 32/3 34/7 34/8 54/7 54/11
Google [1]  68/25
got [9]  20/20 23/8 48/18 48/20
  53/11 65/18 67/24 76/1 78/15
Gothenburg [2]  74/6 74/6
government [45]  3/10 4/5 4/7 4/25
  5/21 16/5 19/15 24/22 25/23 26/5
  28/2 29/13 30/5 31/1 32/9 39/9
  46/14 52/15 57/12 60/4 60/16
  60/18 60/24 61/8 61/15 61/18 63/6
  63/7 63/11 64/6 64/8 65/5 65/23
  65/25 66/16 73/1 78/15 79/13
  79/23 80/21 82/10 82/14 84/8
  84/15 87/9
government's [3]  54/15 57/11
  70/22

## G

**governments [1]**  57/23
**Gox [11]**  39/11 69/6 69/13 69/22 71/8 71/19 71/21 71/22 74/19 74/22 84/1
**Graves [8]**  11/5 16/16 17/9 17/18 17/19 17/20 17/25 24/8
**great [3]**  33/17 75/18 84/23
**greater [1]**  61/11
**ground [2]**  17/16 81/8
**guess [7]**  15/12 20/23 33/11 37/8 53/13 53/15 54/1
**guidance [3]**  18/16 18/16 52/15
**guilty [1]**  54/25
**guy [1]**  48/6

## H

**hackers [1]**  65/15
**hacking [1]**  76/24
**had [71]**  7/6 9/4 9/23 10/7 13/8 13/19 15/15 18/8 20/21 32/25 34/16 36/19 36/19 36/23 37/2 37/9 37/9 37/24 38/2 38/5 39/4 39/25 40/1 41/24 42/11 42/13 42/17 42/17 42/23 43/2 43/5 44/24 45/3 45/24 46/14 46/16 48/10 48/13 51/1 51/2 51/2 51/22 52/10 52/15 52/17 55/5 56/17 58/11 60/13 62/19 66/19 66/21 67/8 67/23 79/1 79/6 79/10 79/18 79/19 80/4 80/20 81/9 82/11 83/13 83/15 83/17 83/21 84/18 84/23 85/18 86/3
**hadn't [1]**  52/5
**half [2]**  18/24 83/13
**halt [1]**  81/8
**halted [1]**  66/3
**handed [1]**  38/25
**hands [1]**  68/10
**happen [3]**  21/5 28/25 29/8
**happened [5]**  39/3 42/16 66/1 73/3 85/3
**happening [2]**  18/6 44/25
**happens [1]**  85/21
**happy [3]**  33/24 45/5 55/15
**hard [4]**  10/21 78/21 86/17 86/20
**harder [1]**  71/2
**hardware [1]**  80/20
**has [23]**  7/14 10/3 13/13 16/6 16/14 17/12 20/10 24/8 25/17 30/3 48/2 54/1 56/4 60/24 61/14 61/18 63/14 63/21 66/5 78/23 79/5 79/13 86/5
**hasn't [2]**  81/12 81/13
**HASSARD [4]**  2/2 4/12 61/14 61/21
**have [109]**
**haven't [3]**  31/8 38/13 45/3
**having [7]**  22/3 27/4 28/24 31/6 31/13 32/22 80/18
**he [114]**
**head [6]**  11/20 11/22 23/1 26/21 27/1 27/2
**hear [4]**  4/17 32/23 57/12 63/19
**heard [21]**  23/5 54/15 60/7 63/23 64/24 64/25 65/6 65/19 65/22 68/19 72/15 72/16 75/17 78/12 82/7 82/16 83/1 84/10 85/15 87/1 87/1
**hearing [2]**  35/9 35/12
**hearsay [1]**  31/11
**heavydist [1]**  42/9
**help [5]**  14/24 59/14 65/17 76/6 77/7
**helpful [2]**  15/5 32/22
**helping [2]**  48/8 63/20
**helps [1]**  57/5
**her [1]**  83/6
**here [34]**  4/14 8/5 9/10 16/3 16/25 18/4 20/10 20/11 21/19 23/15 23/20 24/2 25/8 26/3 28/6 28/7 28/8 28/12 33/2 39/11 41/8 41/25 42/5 42/22 43/9 43/23 45/7

46/8 47/24 54/17 67/13 68/14 85/16 86/6
**heroin [1]**  66/20
**hid [1]**  78/17
**hidden [17]**  7/12 10/21 76/6 76/16 76/20 77/1 77/4 77/22 77/24 78/2 78/3 78/7 78/9 78/19 79/7 80/7 82/12
**hide [8]**  64/19 65/2 65/11 65/17 78/14 79/4 80/1 85/1
**hiding [1]**  73/11
**high [25]**  7/2 10/8 11/23 12/16 12/17 13/13 13/19 13/20 15/21 16/1 19/1 19/16 19/23 20/16 21/10 21/12 21/15 21/16 36/16 53/3 58/19 70/6 71/5 81/20 86/10
**highest [2]**  64/17 82/2
**highly [1]**  66/23
**him [10]**  13/10 15/17 67/5 68/4 68/7 68/24 71/16 73/15 73/16 85/20
**himself [4]**  13/18 15/25 73/12 85/24
**his [78]**  9/6 13/9 15/16 65/2 66/8 67/14 67/14 67/18 67/20 67/22 68/2 68/24 69/3 69/6 69/9 69/10 69/20 69/22 69/24 70/8 70/8 70/11 71/8 72/4 72/21 73/12 73/14 73/16 73/19 74/12 74/17 74/21 76/8 76/10 76/12 77/16 77/17 77/18 77/25 78/1 78/14 78/17 78/18 79/8 79/11 79/16 79/20 79/21 80/3 80/9 80/12 80/24 82/9 82/10 82/12 82/13 82/13 82/17 82/18 82/22 83/1 83/8 83/8 83/14 83/15 83/18 83/20 83/25 84/1 84/21 84/24 85/1 85/4 85/12 85/12 86/3 86/10 86/11
**Hold [1]**  64/10
**holding [2]**  17/22 83/4
**hole [1]**  27/22
**home [1]**  38/16
**Hong [3]**  48/2 48/7 48/10
**Honor [44]**  4/6 4/10 5/5 5/10 5/19 6/9 6/13 6/21 8/9 9/14 9/25 13/22 15/4 16/5 20/9 26/7 28/5 29/11 30/7 30/19 30/21 31/1 31/3 31/8 31/25 32/3 32/7 33/5 33/14 54/7 54/8 54/22 54/23 56/9 57/2 60/21 61/25 63/1 63/5 63/12 64/12 86/16 87/9 87/10
**HONORABLE [1]**  1/9
**hopefully [1]**  31/21
**hoping [1]**  26/15
**Hosting [2]**  70/6 71/6
**hotmail.com [1]**  69/11
**hour [1]**  66/12
**hours [1]**  71/11
**house [2]**  75/7 82/13
**housekeeping [1]**  33/14
**how [19]**  4/22 11/11 18/5 35/21 38/14 40/19 40/20 49/14 57/6 60/2 62/4 62/6 65/1 65/7 66/15 68/17 78/21 78/25 81/4
**huge [1]**  82/21
**Hume's [1]**  20/6
**hundreds [6]**  64/25 65/10 65/20 76/5 76/19 84/6

## I

**I'd [2]**  22/6 43/20
**I'm [10]**  19/10 19/13 20/9 20/13 21/14 29/10 30/24 45/25 54/3 64/7
**idea [1]**  10/18
**identification [2]**  11/1 76/23
**identify [3]**  73/15 77/11 77/24
**identifying [1]**  8/2
**identity [1]**  67/16
**ignorance [1]**  19/8
**illegal [2]**  8/8 67/10
**Ilya [1]**  65/15
**image [5]**  58/13 58/14 59/19 59/21 62/11

**images [4]**  58/17 59/18 60/1 60/1
**imitation [1]**  10/20
**implicit [2]**  29/3 56/19
**implies [2]**  25/4 28/25
**impossible [1]**  68/7
**inchoate [1]**  56/15
**included [2]**  22/19 76/11
**includes [2]**  7/5 7/22
**including [3]**  11/2 22/2 79/16
**income [6]**  36/24 37/1 52/16 66/1 83/11 83/11
**incorporate [1]**  8/24
**incorporates [1]**  8/23
**incorrect [4]**  41/3 42/21 44/24 51/5
**increase [1]**  38/8
**indicates [1]**  56/3
**indication [2]**  10/23 71/1
**indictment [1]**  30/16
**induction [2]**  20/7 23/2
**inductive [3]**  20/8 21/3 22/18
**infer [3]**  11/22 11/25 12/19
**inference [1]**  12/8
**inferences [1]**  11/19
**inferred [2]**  13/18 15/24
**inform [1]**  22/15
**information [11]**  8/3 11/2 40/21 40/23 42/20 43/9 44/8 48/8 48/25 49/1 76/24
**infrastructure [2]**  79/7 80/1
**innuendo [1]**  56/15
**inquiry [1]**  85/21
**insert [4]**  5/23 29/8 29/17 30/12
**instance [2]**  27/1 39/12
**instead [3]**  15/17 28/3 50/11
**institution [1]**  66/3
**institutions [1]**  84/8
**instruct [7]**  4/19 9/4 24/21 25/22 29/12 31/23 32/17
**instructed [2]**  17/3 27/11
**instruction [31]**  4/18 6/22 6/23 6/24 10/1 11/17 12/11 13/3 15/6 15/14 15/18 16/18 16/22 17/10 18/19 18/21 18/22 18/23 21/6 21/8 21/25 22/4 22/7 22/8 24/9 26/11 27/6 27/14 32/15 56/21 56/22
**instructions [13]**  5/3 5/19 6/5 9/10 14/6 23/22 32/2 32/5 32/7 32/12 33/1 56/22 56/25
**intend [1]**  4/22
**intended [4]**  8/16 8/24 77/12 84/11
**intentional [1]**  19/8
**intentionally [2]**  19/7 24/4
**interested [1]**  10/12
**interesting [3]**  11/4 14/11 16/16
**interface [2]**  8/2 10/25
**international [1]**  43/12
**internet [3]**  42/23 52/13 73/13
**interrupt [1]**  19/11
**intimidated [1]**  72/25
**introduce [2]**  17/5 28/6
**introduced [1]**  31/12
**introduces [1]**  17/7
**introducing [2]**  16/11 16/24
**investigating [2]**  75/5 75/10
**investment [1]**  83/5
**investor [1]**  82/1
**invoice [37]**  40/6 40/12 40/13 40/14 40/15 40/20 40/21 41/5 41/9 41/11 41/13 41/15 41/16 41/17 42/3 43/1 43/8 43/10 44/5 44/18 44/21 45/14 45/24 46/11 47/10 47/13 48/5 48/12 48/16 49/1 49/17 49/20 49/25 50/3 51/6 51/7 85/13
**invoices [24]**  39/20 39/24 40/11 40/24 41/1 42/12 42/12 42/21 46/13 46/15 48/19 48/23 51/18 52/2 52/8 52/15 84/10 84/12 84/12 84/14 84/19 84/24 85/1 85/13
**involve [1]**  33/7
**involved [3]**  5/23 8/20 17/14

**I**

invulnerability [1]   72/23
iota [1]   27/13
IP [11]   73/15 73/17 73/19 73/21
  73/24 74/1 74/5 74/16 74/21 74/24
  80/10
IPs [4]   74/23 75/1 75/3 75/4
IRS [4]   59/2 59/5 62/17 77/18
is [377]
isn't [13]   19/21 23/11 39/17
  43/10 44/11 44/14 46/11 48/16
  49/24 50/4 50/7 51/18 72/1
issue [4]   16/4 28/6 28/24 56/2
issued [2]   52/15 57/19
issues [3]   4/25 80/18 80/20
it [322]
item [1]   53/17
items [5]   4/16 35/14 53/12 53/14
  53/15
its [9]   5/1 12/23 13/14 13/20
  15/21 65/23 72/7 72/12 77/11
itself [3]   18/6 58/14 79/4

**J**

jail [2]   68/5 75/23
jam [1]   20/18
January [1]   35/10
January 31st [1]   35/10
Jeff [1]   4/8
JEFFREY [1]   1/18
job [7]   16/17 40/7 40/20 51/8
  51/9 52/20 82/18
jobs [11]   27/3 27/19 35/8 35/13
  39/25 40/3 40/17 40/18 40/19
  42/16 44/25
join [1]   26/17
joining [2]   4/12 56/14
JUDGE [1]   1/10
June [1]   26/1
June 14th [1]   26/1
juror [1]   54/25
jurors [2]   17/3 32/25
jury [48]   1/9 4/19 5/14 6/2 6/22
  6/25 9/4 9/11 12/12 14/25 16/11
  18/15 22/1 22/15 24/11 27/11 28/9
  28/17 28/19 28/21 30/23 31/11
  31/21 31/23 32/1 32/9 32/23 33/11
  33/18 33/23 34/2 52/7 54/19 55/10
  55/25 56/22 57/1 57/9 57/10 58/8
  58/16 61/16 63/8 63/16 86/5 86/14
  86/24 87/6
just [112]
JUSTICE [4]   1/13 1/20 12/24 57/19
justification [1]   23/4
justified [4]   14/14 19/25 20/17
  22/24
justify [2]   7/19 56/21

**K**

keep [5]   12/12 42/13 48/24 63/25
  79/7
keeping [3]   40/25 77/16 79/12
kept [6]   42/12 48/10 48/19 67/23
  82/12 85/14
key [2]   38/22 66/13
keys [2]   38/25 39/13
kill [2]   73/13 76/13
Killdozer [3]   7/8 67/15 67/22
kind [4]   31/14 50/23 51/1 62/11
knew [19]   8/7 8/16 8/19 12/19
  16/1 20/1 40/23 46/14 46/15 48/18
  48/19 48/24 65/16 68/1 68/4 71/15
  71/16 77/6 85/19
know [62]   4/25 7/11 7/14 9/10
  10/14 10/14 10/16 10/21 11/4
  11/11 11/17 11/20 11/20 11/25
  12/2 12/15 14/24 15/1 18/5 18/14
  18/25 19/7 19/17 19/21 20/3 20/4
  20/8 21/2 21/9 22/21 25/11 25/12
  25/13 25/14 26/18 26/22 27/13
  27/15 27/16 28/15 28/17 28/18

28/22 29/1 31/13 31/15 31/20 33/8
  33/22 38/13 38/14 39/16 44/20
  53/22 56/6 57/4 61/21 65/8 79/15
  86/12 86/16 86/20
knowing [4]   9/21 9/22 12/13 24/3
knowingly [1]   9/12
knowledge [50]   8/17 8/22 8/23
  8/25 9/3 9/5 9/8 9/15 9/16 10/3
  10/3 10/5 11/9 11/10 12/14 12/15
  13/8 13/11 13/12 13/15 13/17 14/7
  14/13 14/13 15/8 15/8 15/9 15/15
  15/18 15/19 15/20 15/23 16/11
  17/2 18/16 18/19 18/22 18/23
  19/22 20/21 20/25 21/11 21/12
  22/3 22/16 22/19 22/23 23/23
  23/24 40/19
known [2]   72/13 82/14
knows [1]   10/6
Kolbasa [6]   69/14 69/24 70/10
  70/13 73/8 74/19
Kong [3]   48/2 48/7 48/10
Kraken [7]   37/15 37/22 65/22
  80/11 80/16 83/15 84/1
krona [1]   35/17
kronas [1]   37/9
KYC [2]   51/1 51/2

**L**

language [19]   10/17 12/24 13/23
  17/4 17/24 18/10 18/24 19/4 19/19
  23/11 23/18 23/18 24/25 25/8
  25/14 28/6 28/23 29/3 29/11
laptop [3]   38/9 62/17 78/24
largely [1]   80/1
last [4]   5/20 23/8 38/15 38/20
late [1]   80/17
later [9]   6/6 53/2 53/7 59/1
  67/24 68/9 70/7 72/20 85/11
latter [1]   13/7
launch [2]   65/10 72/12
launched [2]   67/18 72/6
launching [1]   78/17
launder [5]   8/8 52/3 52/4 75/13
  76/9
laundered [2]   65/12 76/18
laundering [12]   7/10 8/10 9/22
  13/2 17/13 64/22 66/9 66/9
  67/11 77/15 81/16
law [30]   2/3 6/5 6/17 9/1 14/17
  14/20 16/7 17/5 18/1 26/18 26/20
  26/21 27/4 31/23 56/8 64/19 66/24
  67/6 67/24 68/4 68/10 68/10 73/2
  73/5 75/23 77/10 79/18 80/2 80/3
  80/5
lawyers [2]   63/20 63/24
layer [1]   70/19
layering [1]   71/1
leading [2]   45/17 50/16
leads [1]   18/13
learned [1]   81/4
learning [1]   7/21
least [13]   5/24 6/7 6/24 7/15
  28/4 28/8 28/15 29/15 51/18 77/17
  78/14 78/15 82/17
leave [2]   60/23 60/25
leaves [1]   85/22
leaving [2]   34/10 75/6
left [5]   36/21 52/20 52/22 53/6
  71/4
legal [3]   8/4 44/1 45/2
lengths [2]   75/18 84/23
less [2]   14/18 71/10
let [9]   16/13 20/13 21/18 23/7
  23/15 27/16 27/24 61/21 86/21
let's [3]   26/2 54/13 86/23
letters [1]   72/3
level [1]   58/19
liability [1]   12/4
Liberty [14]   69/1 69/6 69/9 69/22
  70/3 71/10 71/20 71/22 71/23
  71/24 74/5 74/17 74/18 74/21
license [2]   9/19 66/11

Lichtenstein [1]   65/15
life [1]   86/10
light [1]   12/22
like [52]   4/16 10/13 13/21 15/6
  16/2 17/16 19/5 25/15 27/1 28/25
  29/2 31/6 31/17 33/6 37/9 37/10
  38/5 38/7 40/19 41/4 41/20 41/21
  41/22 41/24 43/20 46/19 47/4
  48/23 50/21 51/3 51/20 52/10
  53/21 53/22 59/22 65/13 65/14
  65/15 65/22 68/2 72/24 75/5 76/4
  76/7 76/8 76/13 76/19 77/7 77/9
  77/12 84/12 85/16
likely [1]   82/5
limitations [8]   23/10 24/15 25/10
  25/13 25/19 28/2 28/11 28/20
limited [3]   22/20 32/16 59/1
LINDSAY [3]   2/6 88/3 88/12
line [3]   68/17 68/17 78/6
lines [1]   13/8
linked [1]   71/16
links [1]   74/24
list [3]   58/20 62/20 76/5
listed [7]   40/12 40/14 43/19
  45/24 46/10 47/24 50/11
little [9]   8/1 9/15 25/3 25/15
  25/17 25/20 31/18 57/7 59/13
live [1]   34/19
living [4]   34/16 34/22 38/17 74/6
loaded [1]   59/17
LocalBitcoins [2]   65/22 83/25
located [1]   10/10
locating [1]   78/9
location [3]   10/4 59/16 77/24
locations [2]   75/10 79/2
logged [1]   70/17
logical [1]   20/25
logs [4]   7/23 7/24 78/13 85/23
long [4]   19/25 66/2 85/8 86/12
longer [1]   66/7
longterm [1]   83/5
look [14]   5/1 10/22 27/5 27/8
  27/16 42/18 42/23 43/6 48/15
  50/14 56/2 56/23 70/20 84/12
looked [3]   41/5 43/6 84/15
looking [9]   23/14 23/16 27/25
  28/12 39/14 41/8 43/24 44/5 49/20
looks [1]   47/4
loosely [1]   67/20
lost [2]   23/15 75/21
lot [4]   27/9 36/25 37/8 52/24
lots [3]   14/21 14/21 59/13
low [2]   53/2 62/10
lower [2]   32/13 53/7
Luke [1]   83/3
lunch [2]   66/12 87/4

**M**

M247 [3]   80/8 80/10 80/19
machines [1]   79/10
made [7]   6/15 7/23 20/24 45/5
  67/14 75/18 75/19
majority [1]   83/24
make [24]   5/7 5/13 6/2 6/5 16/9
  19/3 23/8 24/10 25/17 27/24 32/11
  33/1 39/10 46/5 55/19 55/20
  56/23 67/6 71/2 73/14 73/16 75/19
  80/1 86/8
makes [3]   14/3 28/7 59/13
making [1]   21/1
manual [1]   81/6
many [8]   37/14 53/15 68/9 81/5
  81/5 81/6 82/12 82/12
March [4]   1/5 49/6 49/15 88/10
March 3rd [1]   49/6
March 7th [1]   49/15
market [2]   66/19 82/3
marketed [1]   17/15
marketplace [1]   10/6
markets [5]   10/10 10/13 76/3 76/4
  76/23
Marknadskommunikation [1]   35/4

**M**

mask [2] 10/12 78/2
massive [1] 76/2
matching [1] 59/25
material [3] 65/14 76/25 77/9
matter [3] 6/5 78/21 88/5
may [18] 4/15 4/23 7/11 9/4 13/8
15/15 17/18 20/14 26/2 33/1 34/4
41/1 44/24 57/4 57/22 58/2 64/11
87/7
maybe [16] 8/1 12/7 14/23 14/25
20/9 25/11 26/11 31/18 33/15
38/23 38/23 44/16 61/17 72/16
84/20 86/16
Mazarin [4] 3/6 33/6 57/24 58/1
Mazars [11] 3/6 33/6 57/23 58/1
58/5 61/7 62/4 73/17 75/3 78/3
80/22
Mazars' [1] 74/8
MDMA [1] 76/10
me [31] 4/7 4/12 11/15 12/5 12/7
16/13 17/13 18/13 20/13 21/18
23/7 23/7 23/9 23/13 23/15 24/13
27/6 27/17 27/24 30/24 32/25
33/25 36/25 41/25 43/2 43/8 46/15
52/10 55/20 59/25 86/21
mean [15] 10/15 13/23 15/7 16/24
17/21 19/5 19/10 20/4 48/18 48/24
53/8 53/20 53/21 56/17 83/10
meaning [1] 23/23
meaningful [1] 65/25
means [10] 11/10 11/17 14/12
14/13 14/18 15/1 15/2 19/22 22/23
23/1
meant [2] 42/20 73/5
meet [1] 36/14
meetup [2] 36/15 72/17
meetups [5] 36/10 36/13 36/14
36/15 39/8
member [1] 67/2
members [4] 63/8 86/5 86/14 86/24
memory [3] 42/23 48/11 48/13
mention [2] 7/14 35/13
mere [1] 15/24
merely [1] 13/16
message [7] 49/2 49/6 49/6 49/9
49/22 49/22 50/17
messages [3] 58/11 67/23 85/10
messed [1] 43/18
meth [3] 7/10 7/11 66/20
method [1] 69/25
MICHAEL [2] 2/2 4/12
mid [1] 81/20
midst [1] 57/4
might [9] 11/2 11/18 12/10 32/11
32/22 42/21 51/5 59/20 68/5
million [9] 66/4 76/7 81/11 81/13
81/19 81/21 81/24 83/14 83/19
millions [3] 65/12 76/3 81/16
mind [2] 22/14 63/25
minor [1] 30/7
mint [2] 83/21 83/21
minute [1] 33/6
minutes [6] 54/14 54/17 63/17
71/12 71/14 86/16
MISCELLANY [1] 3/12
misrepresenting [1] 85/1
missed [2] 26/11 56/24
misspoke [2] 21/14 36/6
mistake [3] 45/5 49/24 50/2
mistakes [1] 67/14
mix [1] 37/21
mixed [2] 37/17 75/14
mixer [4] 53/23 67/4 67/7 67/19
mixers [2] 85/4 85/6
mixing [2] 67/10 75/19
model [13] 10/20 12/23 13/1 13/2
13/3 14/3 14/25 17/24 18/24 19/14
21/10 21/23 22/6
modification [1] 21/24
modified [2] 18/7 18/8

modifies [1] 17/6
money [64] 7/9 8/10 8/13 9/12
9/22 13/1 17/13 21/3 22/21 22/22
29/24 37/7 41/20 41/22 41/24
42/13 44/24 46/25 50/25 51/4 52/3
52/4 52/10 53/16 64/15 64/19
64/22 65/5 65/7 65/11 65/23 66/9
66/9 66/10 66/11 67/11 68/23
68/25 69/23 70/3 70/4 70/8 71/1
71/11 71/20 72/12 72/18 72/20
73/6 73/7 75/13 76/2 77/13 77/15
80/15 81/14 83/8 83/20 83/24 84/5
84/5 84/15 85/22 86/2
moniker [1] 7/12
month [4] 35/18 35/19 35/23 68/13
monthly [1] 35/16
months [4] 34/20 35/19 35/25 36/3
Moon [9] 80/9 80/12 80/12 80/13
80/14 80/15 80/23 84/4 84/5
more [29] 4/17 4/24 8/1 14/19
27/9 28/6 31/10 31/21 32/12 32/15
33/1 34/15 34/20 35/23 36/3 37/5
37/8 55/4 68/19 69/13 70/20 72/20
74/15 75/2 76/19 81/24 82/12
84/25 86/3
morning [8] 1/7 4/6 4/9 4/10 4/13
20/18 34/7 34/8
MOSS [1] 1/9
most [4] 17/9 28/11 31/13 36/18
mostly [2] 34/24 52/24
mother's [1] 82/13
motion [2] 55/3 69/4
move [3] 28/1 68/23 79/20
moved [5] 70/2 81/5 81/12 81/14
81/18
moves [3] 54/24 60/16 71/11
moving [3] 65/19 71/24 76/3
Mr [9] 3/4 3/4 3/7 68/19 70/23
70/25 76/17 77/13 81/3
Mr. [33] 5/4 6/11 6/15 8/7 9/12
16/13 18/14 23/25 27/2 32/19
33/13 34/4 34/7 45/20 46/8 52/2
52/19 54/1 54/10 55/9 55/20 56/1
57/20 57/21 61/14 61/21 64/2 64/2
67/22 70/22 71/5 85/22 86/11
Mr. Brown [11] 5/4 6/15 18/14
23/25 34/4 52/19 54/10 55/9 55/20
64/2 86/11
Mr. Ekeland [5] 6/11 16/13 32/19
54/1 56/1
Mr. Hassard [2] 61/14 61/21
Mr. Pearlman [1] 64/2
Mr. Sterlingov [9] 8/7 9/12 27/2
33/13 34/7 45/20 46/8 52/2 85/22
Mr. Sterlingov's [4] 57/20 57/21
70/22 71/5
Mr. Townsend [1] 67/22
Ms [2] 3/7 3/13
Ms. [10] 33/6 46/5 51/16 61/7
61/21 62/4 63/4 64/5 83/6 83/10
Ms. Glave [2] 83/6 83/10
Ms. Glave's [2] 46/5 51/16
Ms. Mazars [3] 33/6 61/7 62/4
Ms. Pelker [1] 63/4
Ms. Walker [1] 61/21
Ms. Walker's [1] 64/5
Mt. [11] 39/11 69/6 69/13 69/22
71/8 71/19 71/21 71/22 74/19
74/22 84/1
Mt. Gox [11] 39/11 69/6 69/13
69/22 71/8 71/19 71/21 71/22
74/19 74/22 84/1
much [7] 35/21 38/14 40/19 40/20
45/10 81/24 82/25
mule [1] 12/5
multilateral [1] 44/1
multiple [4] 59/17 75/8 79/1
80/10
multiply [1] 35/19
must [10] 6/6 7/2 24/22 25/23
25/24 29/13 29/25 61/10 61/12
66/16

mutual [1] 44/1
my [36] 4/15 18/11 22/14 22/21
24/10 24/20 26/20 26/21 27/1 27/2
27/8 30/17 37/18 38/3 38/6 38/16
38/21 39/25 41/24 42/14 46/13
46/17 47/23 48/6 48/19 48/20
48/23 50/19 51/4 51/21 53/15
58/10 58/18 62/18 62/19 62/20
Mycelium [1] 82/13
myself [2] 46/24 46/24

**N**

N.W [1] 1/16
name [20] 4/5 42/18 43/6 43/7
43/8 48/4 48/14 48/15 68/2 69/7
69/23 70/8 70/15 71/22 72/1 72/5
73/19 74/18 80/11 82/10
named [3] 38/7 42/5 43/4
names [1] 43/5
native [1] 62/13
natural [1] 57/7
nature [3] 8/3 24/1 26/22
nearly [1] 81/10
necessarily [4] 20/22 21/1 21/5
28/22
necessary [2] 17/22 22/15
necessity [1] 20/25
need [14] 4/16 4/18 4/19 6/5
18/19 23/21 27/7 27/21 33/25
40/24 56/2 57/3 63/17 67/1
needed [2] 69/7 80/7
needs [1] 56/25
negligence [4] 15/24 16/20 17/7
24/11
negligent [1] 13/17
neither [1] 6/3
network [1] 7/9
never [19] 11/20 42/8 47/22 50/6
51/1 51/2 53/21 69/18 70/12 70/17
73/10 73/14 73/16 78/15 79/23
80/15 80/24 82/2 85/23
new [12] 1/20 33/8 33/9 33/10
67/19 67/25 69/5 69/5 69/9 69/10
69/13 69/22
news [1] 20/18
next [9] 1/23 17/10 21/5 25/20
50/9 61/22 62/17 66/12 71/9
nexus [1] 9/23
NFS [1] 74/20
NFS9000 [6] 69/14 69/24 70/11
70/13 73/8 74/20
nice [1] 87/4
night [2] 5/20 23/8
Nissan [2] 75/6 75/9
no [49] 1/4 6/11 6/13 13/24 13/25
15/7 20/10 22/12 26/25 27/12
27/15 27/21 30/5 31/3 33/9 33/10
34/20 35/23 36/23 37/9 37/9 41/13
51/8 51/23 52/4 52/17 53/24 54/22
54/24 58/25 59/10 60/6 60/10
60/18 60/23 62/2 62/9 62/17 62/23
62/24 63/1 63/5 66/7 78/12 78/13
78/21 78/21 86/5 87/3
nodes [1] 78/1
none [2] 53/19 86/6
normal [1] 72/10
not [95]
note [2] 5/11 85/24
noted [1] 62/12
notes [8] 58/19 74/13 77/17 77/19
78/4 79/11 79/20 80/3
Nothing [5] 30/19 30/21 31/1 81/1
87/10
noticed [2] 50/5 62/10
notion [1] 24/2
notoriously [1] 82/3
November [3] 30/10 30/13 70/7
November 21st [2] 30/10 30/13
now [25] 4/16 6/19 20/6 29/4 30/4
32/8 34/9 34/25 37/11 38/13 38/22
39/18 48/16 49/2 49/3 54/15 57/11
60/7 63/10 79/15 81/11 81/23

**N**

now... [3]  86/19 86/24 86/25
number [21]  6/21 6/23 7/1 7/5 7/8
  10/5 24/13 38/8 43/12 43/15 43/23
  44/4 44/4 44/6 50/3 50/3 50/11
  50/12 50/16 61/19 61/22
numbers [1]  72/4
numeral [1]  38/7
numerous [4]  10/17 79/9 82/13
  84/7
NW [3]  1/14 1/20 2/8
NY [1]  2/4

**O**

obfuscate [1]  18/17
obfuscating [1]  17/15
object [4]  6/3 6/3 19/4 60/21
objection [6]  6/11 6/13 22/10
  28/2 45/16 60/20
objectives [1]  6/7
objects [7]  4/20 5/2 5/15 5/25
  8/18 21/8 22/12
obligation [1]  86/5
obscure [1]  74/11
obsessively [1]  73/11
obtain [1]  9/18
obtained [1]  59/2
obvious [4]  9/7 13/10 15/17 19/4
obviously [4]  11/12 13/4 31/19
  86/25
occasion [1]  60/1
occasions [1]  74/23
occur [3]  21/4 29/4 39/7
occurred [14]  20/3 20/14 25/6
  25/18 25/24 28/3 28/14 28/22 29/1
  29/14 40/11 42/3 49/10 51/9
occurring [2]  25/4 25/16
October [6]  69/3 69/19 70/1 71/7
  72/5 74/20
October 19th [2]  70/1 71/7
October 2011 [1]  69/3
October 27th [1]  72/5
October 8th [1]  74/20
off [7]  12/6 26/21 26/25 28/1
  73/8 78/17 79/20
offense [3]  13/12 15/20 28/10
offenses [4]  8/18 28/8 28/9 28/21
offer [1]  60/25
offered [1]  60/24
office [4]  41/21 45/4 46/18 52/11
Official [3]  2/7 88/3 88/13
officially [1]  72/5
okay [24]  6/1 6/4 6/10 6/18 16/8
  21/19 24/13 24/17 27/15 27/23
  29/16 29/20 30/18 33/17 55/9
  55/18 56/20 57/8 57/22 57/25 61/2
  62/1 64/3 64/10
old [2]  84/20 84/24
Omedetou [12]  7/16 7/16 10/18
  67/20 69/10 73/20 73/21 73/23
  73/25 74/2 80/19 82/1
once [1]  39/3
one [45]  5/11 5/17 5/24 6/3 6/7
  6/22 7/1 7/5 7/24 10/5 11/6 11/16
  12/9 12/10 12/15 12/20 14/1 14/10
  17/8 20/15 21/9 21/10 21/23 21/24
  22/5 26/9 26/14 30/7 31/13 32/5
  32/10 39/8 42/24 45/14 52/17
  63/14 63/15 67/14 75/2 78/21
  78/21 80/23 85/12 86/21 87/1
online [4]  38/20 72/17 73/12
  79/17
only [9]  35/6 35/8 65/8 65/25
  70/14 70/19 72/1 72/13 82/21
onward [1]  38/18
op [1]  74/4
opening [1]  78/12
operate [1]  79/3
operated [1]  10/7
operates [2]  10/6 78/25
operating [5]  8/13 9/21 9/22

66/10 81/9
operation [3]  9/17 57/20 64/23
operational [1]  80/25
operations [1]  66/3
operator [4]  64/22 66/6 67/12
  81/23
opinion [4]  12/24 14/4 17/19
  32/22
opportunity [2]  31/19 67/4
opposed [3]  14/7 16/11 21/3
order [4]  79/18 79/22 80/5 80/6
original [1]  24/25
originally [2]  53/16 60/8
originate [1]  37/23
originated [1]  84/18
originating [2]  49/11 85/2
other [27]  5/17 6/14 10/9 10/16
  10/17 11/10 12/3 12/22 13/10 14/5
  21/24 23/6 32/10 32/25 34/16
  36/24 37/15 38/17 50/24 51/2 60/2
  70/23 75/14 76/14 79/9 79/25
  82/14
others [1]  67/11
otherwise [4]  9/6 12/18 13/10
  15/17
ought [3]  11/9 12/4 33/17
our [3]  22/13 54/12 86/6
out [30]  10/7 12/11 12/20 16/17
  20/1 21/25 24/10 35/20 39/11 45/2
  51/4 51/19 52/9 54/19 57/6 58/22
  59/23 60/2 62/18 66/22 67/12
  69/21 70/8 71/2 73/7 81/2 82/2
  82/23 82/25 87/6
outpost [1]  64/17
outside [2]  17/5 36/15
outta [2]  83/21 83/22
over [14]  22/10 38/6 38/25 64/24
  66/12 68/13 69/4 69/4 73/15 76/7
  76/9 79/2 82/19 83/18
overlap [1]  74/24
overnight [1]  5/1
Overruled [1]  45/18
overview [1]  58/17
own [13]  22/21 42/14 46/13 47/23
  48/20 48/23 51/21 67/18 68/2
  75/22 77/25 80/24 86/14
owner [1]  64/22

**P**

p.m [2]  87/6 87/13
pace [1]  57/6
package [1]  80/18
page [18]  1/23 5/9 5/11 5/12 5/20
  6/8 23/13 24/13 24/14 25/20 25/22
  27/24 30/8 43/22 44/3 45/11 51/15
  55/21
page 39 [1]  5/12
paid [6]  43/2 44/17 46/22 51/19
  65/1 78/17
paper [1]  38/3
paragraph [4]  24/15 24/21 28/7
  30/9
part [6]  5/16 13/15 15/23 60/5
  60/8 60/13
particular [2]  13/11 15/19
particularly [1]  18/16
parties [2]  57/13 57/15
parts [1]  34/18
passes [1]  60/17
past [5]  20/14 28/10 38/6 68/13
  86/20
path [3]  20/10 72/22 75/21
pattern [3]  6/22 59/25 70/25
patterns [1]  81/4
Pause [1]  86/22
pay [6]  43/1 45/7 45/8 46/24 52/8
  70/5
paycheck [3]  37/10 53/15 53/16
paying [2]  43/17 52/16
payment [5]  43/9 44/22 49/18 71/5
  71/6
payments [12]  41/24 46/19 46/20

65/3 65/17 66/23 70/14 70/20
  72/25 73/5 80/12 84/16
PDFs [1]  59/24
PEARLMAN [3]  1/18 4/8 64/2
pedaled [1]  76/23
peels4u [1]  76/13
PELKER [5]  1/13 3/7 3/13 4/8 63/4
penal [11]  12/23 13/1 13/2 14/3
  14/25 17/24 18/24 19/14 21/10
  21/23 22/6
Pennsylvania [1]  1/14
people [17]  12/3 36/14 65/14
  66/20 67/4 68/3 68/5 70/23 72/7
  75/8 75/22 75/23 75/24 77/7 77/7
  77/22 79/22
per [7]  35/18 35/19 35/20 35/23
  35/24 36/6 82/19
percent [1]  40/25
perfect [1]  20/15
perform [1]  58/24
period [3]  52/22 53/6 69/12
periods [1]  74/1
person [13]  12/19 13/13 15/20
  18/25 19/2 19/16 43/7 65/8 72/13
  72/14 72/18 75/2 79/5
personal [2]  67/15 74/13
personally [1]  50/19
perspective [1]  63/22
Peter [1]  74/20
Philips [2]  76/9 76/11
phone [4]  60/22 82/13 83/14 83/20
phrased [4]  14/6 30/16 32/8 32/12
picking [1]  12/5
pieces [1]  66/13
pierce [1]  68/11
place [3]  54/12 64/18 77/18
places [1]  38/17
Plaintiff [2]  1/4 1/13
plan [6]  68/5 68/23 68/24 69/3
  69/20 71/18
planned [1]  78/2
planning [1]  84/22
plasma [1]  42/10
PlasmaDivision [4]  69/7 71/4
  74/17 74/22
plasmadivision.com [2]  42/10
  42/10
plasmadivision.com emails [1]
  42/10
plate [1]  26/16
platform [1]  66/19
plausibly [1]  7/9
please [6]  4/4 39/9 39/18 41/5
  46/3 49/3
plenty [1]  86/3
PLLC [1]  2/3
plurality [1]  12/24
podium [4]  4/4 54/5 54/6 63/12
point [34]  8/1 12/14 18/11 18/12
  19/11 19/12 23/11 23/12 23/13
  24/16 24/16 27/17 30/2 32/3 33/2
  33/15 34/1 35/3 36/21 36/23 38/19
  40/18 42/12 46/18 50/21 51/3 54/7
  54/23 57/7 58/22 61/18 62/13
  79/25 82/2
pointed [1]  62/18
pointing [1]  16/17
Poloniex [2]  37/15 84/2
pops [1]  27/1
popular [1]  67/9
pornography [3]  7/13 77/2 77/5
portion [1]  87/1
position [1]  27/20
possibility [3]  12/10 12/21 15/13
possible [2]  64/17 75/18
post [5]  7/11 50/4 50/9 67/22
  76/25
posted [4]  7/8 7/12 68/25 78/18
posts [4]  7/17 10/18 67/9 79/17
potent [1]  76/12
potentially [1]  17/7
pouring [2]  65/20 84/7

**P**

PowerPoint [2]   64/6 64/9
PowerPoints [1]   59/23
practices [1]   74/4
preceding [1]   28/7
prefer [1]   55/15
preferable [1]   13/3
preference [4]   18/14 21/20 21/21
  21/22
preliminary [3]   7/15 32/1 32/15
prepaid [2]   82/20 82/20
prepare [1]   47/21
prepared [5]   39/20 47/11 47/16
  47/19 47/23
preponderance [3]   14/18 14/18
  14/19
present [5]   4/11 14/15 31/20
  32/15 32/16
presentation [1]   63/9
press [2]   57/19 57/21
pretrial [1]   35/9
previously [6]   43/21 55/2 58/1
  59/12 62/21 63/13
price [7]   37/2 52/22 53/2 53/2
  53/7 80/14 82/24
prima [1]   7/15
printout [1]   45/13
prior [3]   11/5 40/4 58/5
privacy [1]   78/7
private [3]   38/22 38/25 39/13
probability [16]   7/3 10/8 11/23
  12/17 13/13 13/20 15/21 16/2 19/1
  19/17 19/23 20/16 21/11 21/12
  21/15 21/16
probably [8]   5/8 21/14 22/6 34/12
  36/18 40/14 41/14 57/5
problem [3]   19/6 20/6 66/22
problematic [3]   16/18 16/22 21/6
problems [6]   45/3 52/18 56/17
  64/18 68/3 75/23
proceed [4]   57/1 58/2 63/11 64/11
proceeding [4]   4/22 31/6 31/10
  32/21
proceedings [2]   1/7 88/5
proceeds [7]   8/8 8/14 8/16 8/20
  8/21 65/19 67/5
processed [2]   59/3 60/3
product [1]   78/5
Professor [1]   82/3
programmed [1]   73/13
project [1]   48/7
promote [1]   8/16
prong [3]   7/20 8/13 9/3
prongs [3]   6/25 8/4 9/16
proof [5]   7/5 15/8 32/14 56/6
  86/7
properly [1]   27/11
properties [2]   31/15 32/18
property [2]   8/15 8/15
proposed [3]   4/23 13/4 22/1
protect [1]   7/17
prove [8]   11/9 14/7 19/16 24/22
  25/23 29/13 64/21 66/16
proved [1]   4/21
proves [1]   5/21
provide [1]   56/21
providers [1]   74/3
providing [3]   14/24 44/1 56/21
proxies [2]   73/12 73/18
proxy [1]   74/3
psychedelic [1]   7/7
publish [2]   46/3 61/15
published [1]   46/2
pull [2]   39/9 58/15
pulled [3]   43/16 60/2 62/10
purchase [4]   7/7 53/11 71/13
  83/17
purchased [2]   74/11 83/16
purchases [1]   52/19
purchasing [1]   36/12
purged [1]   7/24

purpose [5]   32/14 56/5 56/11 65/4
  70/19
purposes [6]   9/24 14/15 34/20
  39/24 57/17 63/20
pursuant [1]   43/25
put [10]   15/13 18/8 19/5 21/9
  60/3 61/14 69/3 86/6 86/6 86/7
putting [3]   18/9 40/22 68/25

**Q**

quarter [2]   54/14 83/19
question [27]   5/1 8/7 8/25 9/15
  11/4 11/14 14/11 14/12 14/14
  14/17 14/20 16/16 18/3 19/22
  21/19 23/4 27/10 28/9 28/20 30/4
  45/16 45/17 53/13 54/1 72/3 85/5
  86/11
questioned [1]   85/11
questions [8]   18/13 50/24 51/2
  51/23 53/24 62/24 85/15 86/1
quick [2]   33/14 56/2
quite [4]   18/9 72/9 74/14 77/19

**R**

rabbit [1]   27/22
raise [3]   4/16 54/21 55/5
raised [1]   67/11
raises [1]   23/4
RamNode [1]   79/24
RANDOLPH [1]   1/9
random [1]   72/3
rapidly [2]   70/1 82/24
rare [1]   36/18
rarely [1]   15/7
rather [5]   17/23 22/3 27/9 38/19
  63/24
reached [1]   67/12
reaching [1]   23/20
Reactor [7]   39/20 39/24 47/10
  52/2 52/8 52/14 84/11
read [13]   11/4 14/9 33/18 33/23
  33/24 34/1 55/8 55/12 55/13 55/14
  55/21 57/13 78/16
reading [2]   6/16 55/10
ready [5]   57/9 57/11 63/10 63/19
  69/25
real [14]   17/12 33/14 40/16 40/18
  42/6 44/22 48/4 51/8 51/9 64/18
  68/3 69/25 71/3 75/23
realize [1]   68/9
realized [1]   45/1
really [14]   9/17 11/3 15/1 16/2
  28/9 28/20 32/12 36/25 41/23
  46/16 48/20 50/22 52/12 80/24
reason [7]   11/15 19/24 24/6 25/8
  50/24 60/8 60/10
reasonable [8]   5/22 6/10 11/19
  24/22 25/23 29/13 54/25 64/21
reasons [5]   14/10 23/25 34/14
  34/15 55/2
rebuttal [2]   33/4 57/12
recall [6]   26/13 40/23 42/15
  51/16 52/20 58/13
receive [1]   69/8
received [8]   37/16 37/17 42/8
  50/6 50/20 51/22 53/21 80/12
receiving [3]   70/16 84/5 85/9
recently [1]   83/16
receptive [1]   13/5
recess [3]   54/12 55/24 87/13
recipient [1]   46/8
reckless [1]   13/17
recklessness [3]   16/20 17/7 24/12
recognize [2]   23/20 39/21
recollection [5]   26/20 27/8 48/6
  63/23 63/25
record [6]   4/5 7/19 22/13 23/17
  39/11 88/5
recorded [1]   42/15
records [22]   7/25 38/1 38/2 43/25
  44/2 47/23 48/10 48/14 48/20
  48/24 49/3 67/23 68/9 68/10 68/14

68/16 68/20 73/4 73/19 77/17
  80/23 82/11
recovery [1]   72/2
red [2]   13/25 56/3
redirect [4]   3/4 51/24 51/25
  62/25
reference [5]   42/5 42/14 42/17
  43/23 44/3
referenced [2]   42/2 43/1
references [2]   7/17 10/18
referencing [1]   69/2
referring [2]   7/3 7/12
regarding [1]   58/5
regardless [1]   59/16
register [3]   9/18 29/25 70/5
registered [4]   65/1 68/17 68/21
  86/13
registering [1]   42/11
registration [2]   9/9 71/7
reinstall [1]   38/8
relabel [1]   61/17
related [6]   24/23 25/6 29/7 29/14
  52/16 75/8
relates [1]   9/9
relaxed [2]   31/10 31/21
release [1]   57/19
relevance [1]   20/11
relevant [10]   8/6 8/9 8/12 15/6
  28/9 28/11 28/19 29/4 31/5 31/14
rely [5]   11/18 11/21 31/10 31/11
  65/11
relying [1]   76/5
remain [1]   61/1
remember [13]   39/15 42/24 44/6
  55/5 58/5 62/6 62/12 83/2 85/3
  85/7 85/7 86/12 86/14
remembered [1]   42/23
remembering [1]   48/11
remind [4]   57/14 58/8 58/16 63/19
remote [3]   79/10 79/11 79/25
rented [1]   80/10
repay [2]   46/21 46/24
repeat [1]   29/10
repeated [2]   70/24 74/8
repeatedly [4]   73/25 74/25 77/21
  79/14
reply [1]   50/9
report [1]   84/24
reporter [5]   2/6 2/7 64/3 88/3
  88/13
reporting [1]   84/21
reposting [1]   56/22
represents [1]   51/8
request [1]   44/1
requested [1]   60/24
require [2]   12/15 46/15
required [1]   5/2
requirement [11]   5/7 9/8 9/15
  10/3 14/8 16/24 17/4 17/6 18/7
  19/20 23/24
requirements [1]   9/9
requires [6]   8/21 11/8 17/5 19/15
  22/17 27/8
requiring [1]   6/12
research [2]   5/6 87/3
researched [1]   77/21
researching [1]   52/12
Reserve [14]   69/1 69/6 69/9 69/22
  70/3 71/10 71/21 71/22 71/23
  71/24 74/5 74/17 74/18 74/22
reside [1]   11/2
residential [1]   74/5
resolution [1]   62/11
resolve [1]   33/18
resolved [1]   80/20
respect [9]   4/19 5/2 7/4 10/4
  15/1 32/17 33/20 57/15 57/16
responded [2]   49/14 49/15
response [1]   49/18
rest [2]   33/17 63/6
rests [2]   54/8 63/7
resulting [1]   61/8

**R**

retrieved [4] 58/13 58/14 59/22 77/18
returned [1] 43/25
revealed [1] 77/19
review [2] 62/19 83/6
reviewed [3] 62/4 62/5 73/19
reviewing [2] 60/4 62/18
rife [1] 7/17
right [50] 6/19 8/11 16/13 19/6 20/1 20/7 20/21 26/2 27/3 27/11 27/25 29/3 29/20 30/4 30/22 33/3 33/10 36/1 36/5 36/8 38/13 38/19 47/21 51/24 53/25 54/9 54/13 54/20 55/7 55/25 62/25 63/2 63/4 63/8 66/24 68/14 70/16 70/17 71/6 72/9 73/7 75/11 77/15 81/8 81/11 86/8 86/23 87/8 87/11 87/12
rise [1] 20/5
rising [1] 82/24
Road [22] 7/7 10/5 10/6 10/9 10/13 10/20 10/22 10/25 20/25 21/3 22/21 66/19 67/2 70/11 72/21 72/23 72/24 73/2 73/6 76/4 76/4 76/15
roads [1] 20/20
robbery [1] 75/5
ROMAN [13] 1/6 3/3 4/3 4/11 38/7 64/16 67/16 67/21 72/8 72/14 73/21 73/22 83/24
Romania [1] 80/9
Romanian [1] 80/21
Room [1] 2/8
Rovensky [1] 68/15
row [1] 58/23
royalties [1] 53/21
RPR [1] 88/12
run [3] 64/15 78/24 79/7
running [3] 72/14 79/5 81/25
Russian [2] 10/16 67/2
RX [2] 65/14 76/13

**S**

said [18] 14/10 17/12 20/18 21/24 22/24 27/8 39/14 40/3 41/13 42/20 46/4 48/23 51/20 77/4 79/11 85/6 85/16 86/13
salary [3] 35/7 35/16 82/19
sale [1] 76/10
sales [3] 10/13 70/23 76/8
same [25] 8/25 10/24 11/18 43/7 43/8 44/4 44/11 45/23 46/10 46/21 55/2 55/20 69/12 72/3 73/21 74/1 74/2 74/3 74/3 74/16 75/1 75/3 75/7 80/17 84/17
sampling [1] 76/18
Santell [1] 76/17
Santos [1] 12/25
Sarah [2] 82/8 83/3
sat [1] 66/5
satisfied [2] 5/6 8/5
satisfying [1] 9/3
saved [3] 38/4 68/24 78/24
saw [11] 22/21 38/21 44/4 61/10 61/10 62/7 67/4 79/1 82/6 82/21 84/13
say [23] 6/6 9/21 10/20 11/18 12/14 15/18 16/14 17/11 18/18 20/21 21/7 22/13 22/20 26/24 27/1 28/23 29/6 35/21 37/20 38/14 41/25 48/18 62/4
saying [9] 12/4 18/9 19/6 22/16 25/5 25/11 29/1 56/17 79/22
says [4] 25/21 30/8 50/8 50/17
Scalia's [1] 12/24
scene [1] 75/6
scheme [3] 69/14 69/17 69/17
Scholl [7] 68/19 70/23 70/25 76/17 77/13 81/3 83/3
school [1] 86/10
scienter [8] 14/8 16/19 16/23

17/4 17/6 18/7 19/8 19/20
scrape [1] 48/8
scraping [1] 48/7
screenshot [3] 45/21 58/11 62/13
scroll [3] 49/14 50/4 50/9
Scrolling [1] 43/22
SE [1] 43/24
search [1] 67/24
searching [1] 16/3
seated [1] 87/7
sec [1] 74/4
second [6] 7/20 18/24 30/24 74/1 80/25 86/21
Secretary [1] 29/25
see [26] 4/18 16/13 18/5 19/11 20/25 23/7 26/2 38/6 38/15 41/22 41/25 45/21 49/14 54/13 54/17 55/23 56/18 58/20 59/8 68/11 68/13 75/9 82/7 86/24 87/4 87/11
seeing [4] 51/16 62/6 75/5 75/6
seeking [2] 65/14 78/7
seem [1] 11/15
seemed [1] 85/16
seems [3] 17/16 56/15 56/19
seen [6] 11/13 21/4 51/3 59/20 60/13 64/25
seized [2] 73/4 80/22
sell [4] 37/7 53/2 66/20 67/17
selling [4] 35/14 37/5 37/25 53/12
send [8] 40/24 46/15 47/22 55/18 55/19 67/5 71/20 72/18
sending [6] 37/21 37/22 65/3 71/1 81/10 85/10
sends [1] 72/20
sense [9] 5/7 14/3 16/9 32/11 33/2 82/6 83/2 86/8 86/15
sent [14] 42/8 48/16 48/21 48/22 49/20 58/12 65/7 69/23 70/8 70/9 72/12 73/7 76/7 82/25
sentence [6] 5/21 15/14 21/19 21/25 25/11 28/12
sentiment [1] 24/7
separate [6] 16/12 18/20 22/3 22/7 22/8 83/16
separately [1] 12/11
series [2] 69/5 71/11
serious [1] 64/18
server [7] 75/24 78/3 78/9 78/15 78/20 78/25 80/10
servers [7] 68/6 78/13 79/2 79/24 79/24 80/8 80/21
serves [1] 79/25
service [9] 10/21 72/11 74/11 77/1 78/2 78/3 80/5 80/14 81/9
services [11] 7/12 29/24 43/1 43/3 74/3 77/5 77/22 78/8 78/9 78/20 80/4
services's [1] 77/24
set [20] 21/4 31/8 32/6 39/4 64/15 67/25 68/1 68/6 68/12 68/21 69/15 69/16 70/15 75/12 77/6 77/25 79/10 79/25 80/11 80/14
setting [2] 72/14 77/25
settled [1] 81/20
setup [1] 78/2
seven [1] 38/5
Several [1] 71/3
sexual [3] 65/14 76/25 77/9
share [1] 72/2
shared [1] 74/23
sharing [1] 74/4
she [5] 73/18 73/20 78/5 80/22 83/7
SHERRY [3] 2/6 88/3 88/12
shielded [1] 10/24
shipped [2] 76/10 80/18
Shormint [12] 69/11 70/3 70/4 71/5 71/10 71/23 72/2 72/2 74/4 74/12 74/18 74/25
short [2] 33/5 54/12
shortly [3] 55/23 78/17 87/11

should [21] 5/8 10/20 16/22 17/3 18/2 18/20 18/21 18/23 25/25 30/22 32/9 44/25 45/1 45/5 50/16 52/5 57/1 57/16 60/22 61/17 81/24
shouldn't [2] 48/21 48/22
show [5] 23/18 46/17 66/16 68/20 73/24
showed [4] 68/15 68/20 74/8 85/8
showing [6] 7/15 7/15 45/14 56/6 59/13 68/17
shown [3] 64/24 74/13 79/5
shrewdest [1] 82/1
shut [1] 67/8
side [1] 33/24
sign [1] 83/10
significance [1] 75/4
significant [3] 36/24 73/18 82/23
Silk [22] 7/6 10/5 10/6 10/9 10/13 10/20 10/22 10/25 20/25 21/3 22/21 66/19 67/2 70/11 72/21 72/23 72/24 73/2 73/6 76/4 76/4 76/15
similar [2] 40/14 41/14
simply [2] 23/1 26/24
since [6] 13/5 36/23 61/18 66/5 81/12 86/10
single [3] 81/18 82/18 83/18
sit [1] 86/6
site [7] 67/20 68/1 68/3 68/4 68/6 71/16 81/18
site's [2] 65/10 73/4
sites [2] 77/9 77/14
sitting [6] 16/25 62/17 66/4 81/12 81/13 85/22
situations [1] 10/2
six [5] 24/20 24/20 34/20 38/5 81/20
Sixty [3] 24/19 24/20 24/20
Sixty-five [1] 24/19
Sixty-six [2] 24/20 24/20
skepticism [2] 11/7 11/7
skills [1] 79/6
Slammer [2] 65/15 77/8
slide [1] 74/14
slippery [2] 18/5 20/24
small [1] 74/11
smaller [2] 23/6 36/19
smithing [1] 28/13
sniffing [1] 77/23
so [93]
software [1] 79/10
sold [8] 7/13 53/7 53/14 53/17 76/13 77/2 82/22 82/25
some [46] 5/5 8/20 8/21 9/9 10/16 10/17 12/1 12/14 14/24 14/25 17/1 17/5 17/25 18/13 18/15 23/6 23/19 26/17 27/7 27/13 27/17 28/8 28/12 31/7 32/11 33/15 34/18 36/16 36/18 36/21 42/20 45/5 48/7 48/8 48/14 50/24 51/5 52/10 56/4 58/11 58/18 62/11 62/13 66/13 73/25 78/14
somebody [4] 38/25 39/3 43/17 72/17
someone [7] 11/20 11/24 21/16 39/13 55/21 81/14 83/4
something [37] 9/6 11/10 11/17 11/23 12/13 12/15 12/18 13/7 13/21 14/18 14/19 15/2 15/3 16/2 16/24 18/19 18/22 18/23 19/5 19/7 21/20 21/20 21/21 25/5 26/22 26/23 28/13 32/23 50/25 55/4 55/21 71/13 72/9 73/3 84/14 85/17 85/17
sometimes [8] 31/16 36/14 36/14 42/17 48/13 48/13 59/23 71/12
somewhere [2] 47/18 61/12
soon [2] 66/2 80/19
sophisticated [1] 78/5
sorry [10] 19/10 19/13 20/9 20/13 21/14 29/10 30/24 45/25 54/3 64/7
sort [14] 10/19 11/1 16/11 17/9

**S**

sort... [10]  18/24 19/8 23/19 24/5 31/21 32/8 48/7 48/8 67/9 72/3
sorts [1]  14/6
sound [1]  13/22
sounds [1]  25/15
source [9]  35/6 35/13 47/5 50/15 53/10 53/19 65/23 66/1 85/12
sourced [1]  47/7
sources [3]  36/24 83/9 83/11
space [1]  80/10
Spain [1]  34/24
Spam [1]  42/10
Spanish [1]  10/17
speak [1]  59/19
special [5]  5/7 5/9 68/15 76/17 80/13
specific [7]  32/17 39/15 40/19 40/20 43/5 44/23 46/25
specifically [3]  39/17 69/17 82/9
specified [1]  50/6
spending [2]  82/2 83/8
spent [1]  82/20
SpiderOak [5]  79/17 79/18 79/19 79/20 79/24
spirit [1]  15/12
spots [1]  75/8
spread [2]  84/7 84/13
spreadsheets [1]  68/16
stand [2]  86/9 86/24
standard [9]  7/1 8/5 8/22 8/23 8/25 16/20 17/7 26/19 32/13
standards [3]  31/9 32/9 32/17
staple [1]  64/14
start [3]  4/24 55/10 69/8
started [8]  25/9 25/12 34/16 34/25 35/1 52/12 85/24 85/25
starting [7]  4/5 15/14 24/21 25/21 44/13 50/11 71/21
starts [1]  43/24
state [5]  4/4 18/1 19/8 20/19 23/17
statement [1]  56/8
STATES [12]  1/1 1/3 1/10 4/3 9/23 10/7 10/8 12/25 57/19 66/21 76/11 76/14
statute [18]  8/21 11/8 11/11 18/4 18/6 18/7 18/9 19/20 22/17 23/10 23/24 24/14 25/9 25/12 25/18 28/1 28/11 28/20
statutory [4]  16/23 17/4 18/10 19/19
stay [4]  76/6 76/16 76/20 80/7
step [6]  26/18 53/25 64/25 65/1 68/16 68/16
steps [2]  18/17 65/3
STERLINGOV [19]  1/6 3/3 4/3 4/11 8/7 9/12 27/2 33/13 34/7 45/20 46/8 52/2 64/16 67/21 72/8 72/14 73/21 73/22 85/22
Sterlingov's [6]  57/20 57/21 67/16 70/22 71/5 83/24
still [8]  25/13 39/25 43/19 54/16 56/24 73/17 77/19 87/2
sting [1]  66/9
stipulation [7]  33/15 33/21 55/6 57/13 57/14 57/16 57/18
stolen [2]  76/23 76/23
stone [1]  31/9
stop [5]  77/1 78/19 86/1 86/17 86/20
stopped [5]  26/24 27/2 27/9 27/18 81/10
stopping [1]  56/16
stored [4]  38/1 38/20 83/14 83/20
story [1]  66/18
straight [2]  83/21 83/22
strange [1]  84/14
Street [2]  1/16 2/3
stretch [1]  63/16

stricken [1]  16/22
strike [1]  17/13
string [1]  72/3
strong [5]  12/20 16/3 16/6 32/10 32/22
structure [2]  7/22 10/14
struggling [2]  77/1 78/19
stuck [2]  20/16 20/20
studied [2]  67/4 81/4
studio [1]  36/25
stupid [1]  85/25
style [1]  23/11
stylistic [1]  24/16
Stylistically [1]  25/3
subject [1]  31/15
subjective [3]  7/4 7/19 13/13
subjectively [1]  7/2
submit [2]  32/4 61/24
submitted [2]  32/5 50/6
subset [1]  82/9
substantial [1]  4/25
substantive [5]  5/12 8/18 13/24 23/11 24/15
successful [1]  78/14
such [8]  13/12 15/7 15/20 16/21 37/15 78/20 82/12 84/23
suddenly [1]  66/3
sufficient [4]  7/18 9/23 24/12 56/20
suggested [3]  75/2 78/23 81/23
suggesting [3]  25/5 29/8 79/17
suggestion [1]  6/14
suggests [2]  12/12 16/10
Suite [1]  1/17
sum [1]  44/20
summation [1]  31/17
sums [2]  82/22 82/23
sun [1]  20/4
Superior [1]  11/5
superseding [1]  30/16
support [1]  50/23
supports [1]  6/24
supposed [2]  46/1 84/4
supposedly [4]  39/16 46/22 53/23 80/9
Supreme [4]  11/12 14/4 17/19 17/23
sure [22]  6/5 14/16 17/21 21/18 23/8 26/9 26/10 27/25 29/12 35/15 40/3 42/11 42/24 43/5 55/19 55/20 56/23 61/13 73/14 73/16 75/19 75/19
surged [1]  81/19
suspect's [1]  75/7
suspected [1]  50/23
suspicious [1]  85/19
Sweden [7]  34/10 34/20 38/16 44/8 74/6 79/15 82/19
Swedish [16]  10/16 35/17 41/20 41/21 41/21 43/25 44/2 44/11 45/4 46/14 46/18 46/20 52/8 52/15 53/12 53/14
switches [1]  73/14
sworn [1]  58/1
Symbiosis [1]  76/7
sympathetic [1]  19/12
system [2]  41/20 48/9

**T**

table [4]  2/12 4/7 4/12 15/13
tablet [5]  58/14 58/20 58/24 59/2 60/4
take [6]  6/11 27/5 39/18 57/16 63/16 74/9
taken [9]  11/14 18/17 27/4 55/24 62/13 73/2 77/10 77/14 87/13
takes [1]  27/16
taking [3]  21/2 21/25 41/20
Talk [6]  67/9 67/15 67/19 67/23 68/1 72/6
talked [1]  77/21
talking [3]  19/15 22/18 22/25

talks [1]  74/12
tax [15]  34/14 34/15 34/20 39/24 41/21 41/22 45/1 45/4 46/18 46/19 52/4 52/10 52/11 52/13 84/21
taxed [5]  42/13 44/24 45/4 52/5 52/6
taxes [2]  52/8 52/16
taxing [2]  39/25 46/25
team [2]  58/11 62/18
Tech [7]  7/3 8/4 11/6 11/12 12/23 14/5 17/20
technical [3]  75/17 78/4 80/18
tee [1]  31/21
teeming [1]  79/8
tell [4]  12/5 12/7 32/2 86/1
ten [1]  85/25
terms [6]  16/10 18/4 28/16 32/8 32/12 53/10
terribly [1]  13/5
Tesla [2]  83/16 83/17
testified [22]  27/2 34/9 34/25 35/9 36/9 36/16 37/11 37/20 38/22 38/24 39/3 39/23 51/9 53/19 60/14 62/21 73/17 77/13 81/3 81/5 83/10 84/20
testify [4]  31/14 62/22 72/15 85/15
testimony [26]  31/19 34/19 37/23 40/2 40/8 40/16 41/11 41/17 42/2 42/25 44/16 44/21 46/6 47/16 51/16 58/5 60/7 61/7 64/24 66/14 68/19 75/17 82/7 83/1 83/2 84/10
testing [2]  69/19 69/24
than [18]  11/10 14/18 14/19 17/23 22/3 27/9 27/9 31/22 34/20 35/23 38/5 42/3 44/18 53/7 63/24 71/11 75/2 81/24
Thank [6]  26/8 54/9 63/3 64/2 64/12 87/12
thanks [1]  76/21
that [596]
That's [2]  48/1 48/3
their [18]  4/5 10/12 10/13 11/21 11/22 12/1 39/5 63/20 63/21 63/22 64/19 65/11 65/17 67/5 70/19 76/18 81/4 83/4
them [34]  9/7 32/2 33/1 36/18 36/19 37/21 37/22 39/5 40/25 41/25 42/15 45/6 46/17 48/8 48/19 48/21 48/22 53/22 58/19 65/3 65/17 70/14 75/14 75/15 76/6 76/15 76/19 80/22 80/22 81/4 84/21 84/22 86/1 86/2
then [51]  5/9 6/6 7/20 11/9 11/11 18/14 20/1 21/10 21/24 25/6 25/20 29/1 30/3 31/4 31/15 31/20 32/16 33/12 36/3 37/7 37/18 43/8 43/24 44/10 44/13 47/13 50/18 53/2 53/17 53/17 53/19 57/1 61/12 63/6 69/8 69/12 69/17 70/10 70/11 71/2 71/19 71/20 72/25 73/7 73/8 75/6 77/6 78/21 79/17 80/8 81/20
theory [1]  56/19
there [98]
therefore [3]  10/11 11/21 21/1
these [33]  14/5 16/6 28/7 36/12 37/22 40/3 40/16 42/11 42/21 43/24 44/25 48/23 49/3 52/8 52/14 65/3 69/20 70/2 70/21 70/22 70/23 71/25 75/3 75/4 78/4 78/6 78/7 82/11 84/9 84/14 84/19 84/23 85/10
they [53]  4/19 5/14 5/16 9/4 9/5 11/25 11/25 12/2 14/6 14/22 16/2 20/18 20/19 27/11 28/19 28/21 31/12 32/2 37/17 37/23 38/3 40/18 40/21 41/23 46/13 46/16 46/20 50/23 50/23 50/25 52/17 53/22 55/12 59/9 60/24 62/18 65/15 65/16 68/20 69/16 69/18 70/15 70/17 76/12 76/16 76/20 78/4 78/16 84/16 84/20 85/24 86/6 86/7

## T

**thing [7]** 12/22 15/7 27/1 27/25 29/2 69/25 72/1
**things [12]** 4/15 12/9 14/16 14/21 17/8 23/6 26/10 51/5 57/6 59/21 71/3 78/7
**think [111]**
**thinking [4]** 11/16 15/5 39/12 77/20
**thinks [3]** 16/21 59/15 59/21
**third [4]** 24/15 24/21 74/4 81/1
**this [167]**
**this is [1]** 19/5
**those [41]** 5/23 8/3 10/2 11/2 22/20 23/7 25/7 26/9 28/14 28/21 32/7 32/12 32/14 32/18 37/16 38/1 38/2 38/4 40/10 40/11 41/1 46/19 50/24 53/15 56/25 59/17 60/3 66/15 66/23 66/24 68/9 68/10 68/14 68/20 70/11 70/13 73/20 76/22 77/7 77/11 81/7
**though [5]** 9/21 38/17 38/20 52/25 54/15
**thought [7]** 5/18 20/15 50/23 52/5 68/7 68/7 68/23
**thousand [2]** 36/17 36/20
**thousands [3]** 65/20 76/8 84/6
**threat [1]** 80/6
**three [11]** 40/4 40/7 41/12 42/3 44/18 45/8 46/22 47/20 69/13 80/23 82/20
**through [31]** 14/23 28/15 32/11 36/23 37/17 46/5 65/3 65/19 68/11 68/16 69/23 70/2 70/8 70/10 70/14 71/11 71/20 73/6 73/8 74/11 76/7 76/18 76/19 77/3 77/15 81/5 81/18 81/21 83/6 83/9 86/9
**throughout [1]** 52/24
**throwing [1]** 12/20
**thus [2]** 13/15 15/22
**tied [8]** 67/16 69/6 69/22 73/20 74/5 74/9 76/8 82/10
**ties [1]** 74/8
**time [33]** 21/5 34/13 34/22 36/10 38/3 38/7 38/20 40/23 42/16 46/25 48/18 51/23 52/14 52/24 54/23 62/9 69/12 69/20 70/2 70/24 72/13 72/21 73/7 73/22 74/1 74/3 74/7 74/16 75/3 79/2 80/17 85/8 86/12
**times [6]** 35/25 53/1 53/5 53/9 75/11 84/13
**timing [2]** 70/21 75/4
**tinker [1]** 23/17
**titled [1]** 68/25
**today [4]** 14/23 19/24 20/17 57/4
**told [7]** 49/17 50/5 50/18 64/20 67/20 78/18 80/19
**tomorrow [1]** 20/5
**too [4]** 10/2 57/8 70/24 81/6
**took [4]** 26/17 56/2 75/13 86/9
**tool [3]** 59/4 59/6 59/12
**tools [1]** 76/24
**top [6]** 5/20 26/21 27/1 41/8 71/4 74/14
**TOR [18]** 2/2 2/3 4/10 7/12 10/19 10/21 10/24 73/12 73/18 77/1 77/4 77/22 77/24 78/1 78/1 78/7 78/7 78/19
**total [1]** 81/20
**totally [1]** 84/16
**tough [1]** 22/5
**Townsend [3]** 67/13 67/17 67/22
**trace [5]** 65/5 65/23 68/7 73/5 84/9
**traceable [1]** 66/23
**traced [3]** 68/4 68/24 75/15
**tracing [1]** 71/2
**track [2]** 42/13 47/1
**tracks [1]** 78/14
**trades [2]** 36/16 36/19
**trading [1]** 48/8

**traffic [4]** 20/16 20/18 20/20 78/3
**trail [1]** 73/16
**transaction [10]** 25/24 39/7 39/17 45/14 45/23 46/9 49/10 51/12 81/18 83/18
**transactions [23]** 7/24 7/25 8/3 8/4 8/19 10/12 38/1 38/23 38/24 39/15 40/10 40/11 69/21 70/14 70/16 70/21 70/24 71/13 81/5 81/7 81/8 81/10 85/18
**transactions executed [1]** 8/19
**transacts [2]** 8/14 8/15
**transcript [2]** 1/9 88/4
**transfer [1]** 39/11
**transferred [5]** 39/13 46/24 47/2 82/22 83/17
**transmission [2]** 9/13 66/11
**transmitting [2]** 8/13 66/10
**travel [1]** 34/15
**traveling [1]** 78/25
**Treasury [1]** 29/25
**treaty [1]** 44/1
**tree [1]** 59/13
**Trevor [2]** 76/9 76/11
**triage [1]** 59/1
**trial [6]** 1/9 6/24 7/5 7/21 31/12 68/15
**tried [9]** 42/15 45/1 52/9 65/2 67/7 67/21 80/14 84/19 85/12
**tries [1]** 78/21
**trouble [1]** 71/15
**true [30]** 11/23 14/2 14/14 14/21 14/22 16/2 20/1 21/2 22/24 41/2 44/14 45/20 49/24 50/4 50/7 51/18 67/16 69/7 69/22 70/8 70/15 71/21 72/1 72/4 73/19 74/18 77/24 82/10 83/11 88/4
**truth [1]** 23/4
**try [2]** 43/6 72/22
**trying [5]** 16/25 21/7 51/3 53/18 84/24
**tumblers [1]** 85/6
**tuning [1]** 69/20
**turn [2]** 26/23 63/12
**turned [2]** 20/17 66/22
**turns [2]** 15/2 20/1
**Twitter [1]** 72/6
**two [14]** 4/20 5/24 6/3 6/23 6/25 7/8 9/16 11/16 12/9 17/8 22/21 36/3 74/23 74/23
**type [3]** 22/17 24/9 59/14
**typo [1]** 26/4

## U

**U.S [2]** 1/13 2/7
**ultimately [3]** 14/11 15/2 32/10
**unanimity [4]** 5/2 5/7 5/9 6/12
**unanimous [3]** 4/19 5/14 6/7
**unanimously [1]** 5/15
**under [3]** 17/17 29/24 31/10
**understand [11]** 9/20 13/25 18/12 22/12 23/5 26/10 41/23 46/16 46/19 52/11 63/21
**understanding [5]** 5/22 30/17 58/8 58/10 62/7
**understands [1]** 18/11
**understood [4]** 40/21 46/18 67/1 67/3
**Undeterred [1]** 67/11
**undisputed [2]** 7/6 57/16
**unencrypted [1]** 77/19
**unexplained [1]** 83/10
**unfortunate [2]** 77/4 77/6
**unfortunately [3]** 7/13 77/2 78/13
**Union [1]** 20/19
**UNITED [12]** 1/1 1/3 1/10 4/2 9/23 10/7 10/8 12/25 57/19 66/21 76/11 76/14
**unknown [1]** 82/14
**unlawful [3]** 8/20 8/21 30/9
**unless [3]** 13/14 15/21 30/3

**unlicensed [1]** 66/10
**unreachable [1]** 80/1
**until [3]** 20/3 24/25 82/2
**untouched [1]** 66/5
**untraceable [1]** 67/6
**up [48]** 11/15 12/5 24/25 28/3 28/15 29/7 29/15 31/21 33/1 39/4 39/9 42/18 42/23 43/6 43/6 43/18 45/3 48/15 49/22 52/23 52/24 53/14 58/15 62/10 64/15 67/25 68/1 68/6 68/9 68/12 68/22 69/15 69/16 70/15 71/18 72/14 75/12 75/14 77/6 77/25 79/10 79/16 79/25 80/11 80/14 84/19 86/18 86/24
**update [1]** 33/3
**upwards [1]** 81/24
**us [7]** 1/20 27/16 35/20 56/14 61/21 73/1 86/6
**USAO [1]** 1/16
**use [13]** 37/7 51/4 52/2 52/4 53/11 69/13 73/6 83/2 83/19 85/4 85/12 86/1 86/14
**used [22]** 7/7 8/8 52/4 53/10 67/14 69/10 69/17 69/18 69/21 70/10 70/12 70/17 72/4 73/10 73/12 73/15 73/19 74/21 76/9 77/5 77/8 77/11
**user [11]** 8/1 10/25 11/1 37/11 59/20 65/9 67/2 72/16 75/25 78/5 78/7
**username [1]** 67/19
**users [3]** 11/2 75/15 77/11
**using [17]** 7/12 7/17 10/12 18/24 37/18 52/7 68/10 71/14 72/21 73/18 73/21 73/25 74/2 75/3 75/21 85/5 86/1
**usual [2]** 15/18 18/19

## V

**vagaries [1]** 17/1
**vagueness [1]** 17/2
**Valerie [2]** 3/6 58/1
**valid [1]** 85/14
**variation [1]** 11/22
**variations [1]** 11/16
**various [1]** 78/4
**vendors [2]** 10/8 76/18
**verdict [3]** 4/23 30/25 54/24
**Verret [1]** 82/3
**version [5]** 12/3 13/2 23/8 53/12 59/3
**versus [3]** 4/3 12/25 22/18
**very [18]** 15/7 15/10 17/18 22/21 30/7 30/7 32/16 33/5 39/4 41/14 69/21 71/9 72/7 72/18 74/1 77/7 82/2 84/14
**Video [2]** 77/9 77/10
**videos [1]** 59/23
**view [12]** 5/1 11/14 12/20 16/3 16/6 17/9 18/20 19/25 32/19 59/5 59/8 59/14
**views [1]** 4/21
**violate [1]** 11/11
**virtual [2]** 65/21 79/9
**VMs [2]** 79/10 79/12
**volatile [1]** 82/3
**Volf.prius [6]** 69/14 69/24 70/10 70/13 74/19 74/22
**VPN [13]** 73/12 74/10 74/11 74/12 78/6 80/4 80/9 80/12 80/13 80/14 80/14 80/15 80/23
**VPNs [1]** 74/3
**vs [1]** 1/5

## W

**walked [4]** 68/16 76/17 83/6 86/9
**Walker [1]** 61/21
**Walker's [1]** 64/5
**walking [1]** 83/19
**Wall [1]** 2/3
**wallet [11]** 38/25 39/5 41/24

# W

**wallet... [8]** 46/25 51/21 66/4 80/25 81/12 82/13 83/18 83/20
**wallets [9]** 38/2 38/3 38/4 41/23 46/13 46/17 51/21 79/12 79/12
**want [21]** 4/21 23/8 23/17 25/17 27/17 31/20 32/16 39/10 54/4 55/9 55/11 55/21 57/6 57/13 60/23 60/25 61/1 61/19 63/14 66/14 78/10
**wanted [8]** 18/8 34/15 40/2 55/5 68/2 75/24 75/25 84/21
**wants [3]** 6/19 33/24 54/20
**warned [1]** 67/9
**warning [1]** 76/12
**warrant [1]** 67/24
**was [254]**
**Washington [5]** 1/5 1/14 1/17 1/21 2/9
**wasn't [19]** 10/16 26/9 26/10 38/19 38/20 38/23 40/24 43/7 47/6 48/25 50/3 50/15 51/7 51/8 76/22 78/24 80/13 84/21 85/13
**watching [2]** 67/10 71/17
**watering [1]** 23/23
**way [31]** 5/3 9/2 10/25 11/18 12/8 14/6 14/7 14/13 14/25 14/25 15/5 15/5 23/22 24/10 28/16 30/15 32/10 41/25 45/2 45/3 52/9 52/10 52/13 59/9 60/14 61/10 63/13 68/6 68/23 77/18 78/16
**ways [3]** 11/16 69/1 78/14
**we [99]**
**we'll [3]** 14/23 63/17 86/19
**website [2]** 42/17 78/25
**wedded [1]** 13/23
**week [5]** 7/24 36/9 38/24 68/14 69/4
**weeks [2]** 70/7 72/20
**welcome [4]** 34/3 57/8 77/9 77/10
**well [20]** 4/13 4/16 12/24 17/18 18/18 20/6 20/12 30/17 36/15 38/14 38/19 43/2 44/7 44/20 44/24 53/4 53/13 53/21 84/11 85/17
**went [3]** 52/24 70/14 75/18
**were [84]** 5/15 5/16 5/23 7/24 8/18 10/17 16/2 17/15 20/19 27/11 28/24 29/20 34/10 34/22 35/3 35/12 35/25 36/3 36/9 36/12 36/19 37/20 37/21 38/9 38/10 38/17 39/19 40/11 40/16 40/18 44/5 44/25 46/13 47/7 48/11 48/19 48/23 49/20 50/23 51/5 51/18 51/19 51/21 52/7 52/14 53/1 53/1 53/5 53/6 53/15 58/12 59/20 59/22 59/23 62/18 69/15 69/16 69/18 69/21 70/14 70/15 70/17 71/16 73/25 74/2 74/15 75/24 76/5 76/12 76/19 77/5 77/11 77/14 78/4 78/7 78/14 79/8 79/9 79/22 81/7 82/9 84/11 84/17 84/20
**weren't [1]** 78/6
**West [2]** 65/13 76/13
**what [86]** 4/17 4/18 8/21 9/8 9/20 11/17 11/20 11/22 12/2 12/5 12/7 12/8 13/10 14/12 15/1 15/2 15/16 16/13 16/17 17/5 18/6 19/22 20/9 20/22 20/23 21/14 21/20 21/21 21/24 22/23 22/25 23/4 24/24 25/5 25/7 25/7 29/6 31/4 32/2 32/13 35/16 39/17 42/13 42/18 42/20 45/2 50/2 50/17 52/9 53/20 53/22 56/14 56/17 58/8 58/13 58/16 58/19 61/7 61/14 61/21 63/23 63/24 64/23 66/1 68/5 68/20 68/22 71/22 73/20 73/24 74/15 75/12 75/25 76/1 77/20 77/25 79/19 82/7 83/7 83/9 83/11 83/21 84/11 84/16 85/3 85/21
**whatever [1]** 26/18
**when [49]** 13/11 15/18 34/25 35/12 37/20 37/20 37/20 37/23 38/10 39/7 39/12 39/14 42/11 42/20 44/24 46/20 48/11 50/16 53/1 53/2 53/5 53/13 55/10 55/10 55/12 59/8 60/4 62/4 62/5 62/7 62/21 65/8 66/14 70/20 74/13 77/9 80/6 80/13 80/22 82/24 83/13 84/14 84/19 85/3 85/11 85/24 86/7 86/10 86/12
**whenever [1]** 33/23
**where [30]** 5/12 11/2 14/21 16/1 16/1 17/17 21/16 25/21 26/10 30/8 31/16 34/22 37/22 38/1 38/12 38/15 41/19 41/21 43/17 46/13 48/7 53/1 58/22 61/13 67/13 71/24 78/22 79/15 83/24 84/15
**Whereas [1]** 21/3
**Whereupon [2]** 60/18 62/2
**whether [16]** 5/1 8/7 12/10 14/15 14/17 18/20 18/21 23/1 28/10 28/21 28/21 33/3 54/1 70/22 85/5 86/13
**which [34]** 4/20 5/3 5/9 8/13 12/3 12/11 12/25 13/4 15/2 17/9 17/14 18/17 19/17 20/25 22/20 24/2 24/5 35/17 38/24 39/9 42/16 43/21 44/25 46/18 47/9 52/11 52/11 57/4 59/3 59/16 59/16 59/25 79/2 82/10
**Whichever [1]** 55/15
**while [5]** 23/16 25/9 63/18 79/16 82/18
**white [2]** 75/6 75/9
**who [28]** 4/11 5/23 6/19 10/12 17/15 18/17 24/3 31/14 39/4 43/7 64/16 65/8 68/3 68/12 68/21 72/7 72/13 74/6 75/21 75/23 75/24 76/7 76/7 76/13 76/18 77/8 77/11 83/4
**whoever [1]** 33/24
**whole [4]** 10/25 20/20 51/6 51/6
**whom [1]** 50/20
**why [23]** 4/24 16/21 20/23 21/6 22/14 23/7 33/11 38/6 48/22 52/7 54/6 54/14 66/6 67/25 71/17 71/17 78/16 81/13 81/14 84/23 85/15 85/19 87/3
**will [30]** 21/7 22/13 23/17 24/10 24/21 25/22 27/5 27/6 29/12 29/17 29/17 33/22 34/1 38/8 54/17 55/23 57/14 59/15 59/17 59/18 59/19 59/21 63/18 66/12 66/14 72/25 78/21 86/24 87/4 87/11
**willful [20]** 4/17 6/19 6/25 7/1 8/24 9/2 9/2 10/1 11/7 11/10 12/10 15/6 15/11 15/14 16/18 18/21 21/8 22/3 23/19 23/21
**windup [1]** 12/9
**wiped [1]** 81/1
**wire [2]** 69/8 71/19
**withdraw [2]** 60/16 75/15
**withdrawal [2]** 56/1 56/6
**withdrawals [1]** 85/25
**withdrawing [1]** 22/22
**withdrawn [6]** 3/10 30/1 60/19 60/24 61/18 85/24
**withdrew [1]** 71/8
**without [4]** 14/16 27/4 32/22 66/11
**witness [8]** 31/14 31/18 33/13 53/25 54/12 57/22 60/17 63/2
**witnesses [2]** 3/2 64/25
**won't [1]** 56/21
**wondering [3]** 12/9 12/22 53/5
**word [10]** 14/12 14/17 19/22 22/16 22/19 22/23 23/23 26/6 28/12 59/15
**words [3]** 5/24 13/11 75/22
**work [6]** 4/22 20/17 42/2 45/6 56/16 78/17
**worked [1]** 80/15
**working [2]** 77/10 82/18
**works [1]** 35/20
**world [5]** 64/15 64/18 66/21 72/7 75/8
**world's [1]** 82/1
**worldwide [1]** 76/15
**worth [5]** 66/4 81/11 82/17 83/15 83/17
**would [69]** 4/4 4/16 5/10 5/13 5/23 9/6 9/11 10/1 10/10 10/11 13/3 13/7 13/10 15/13 15/17 17/17 18/14 20/2 20/16 20/21 24/23 28/5 28/12 30/12 31/13 31/18 31/19 31/20 31/23 35/23 35/25 36/3 36/6 36/14 38/2 38/3 38/4 40/6 40/7 40/14 41/4 41/11 41/14 41/17 41/19 45/2 46/19 47/18 48/15 52/9 54/11 56/15 56/16 60/13 64/21 65/8 65/16 67/5 68/7 68/9 71/15 71/17 72/13 73/14 75/21 75/23 78/8 80/5 81/21
**wouldn't [6]** 20/3 37/8 40/24 43/8 75/20 81/14
**writes [1]** 85/23
**writing [1]** 18/4
**wrong [1]** 22/16
**wrote [7]** 72/23 77/1 77/23 77/25 78/1 78/20 79/20

# X

**Xchange [2]** 69/2 71/20

# Y

**yeah [20]** 21/15 29/12 29/16 29/19 29/22 34/12 35/8 36/19 40/9 40/18 41/3 41/19 43/3 43/16 50/8 50/17 50/21 51/5 53/4 64/4
**year [9]** 34/18 35/20 35/24 36/7 81/17 81/19 82/18 82/19 86/9
**years [19]** 38/6 39/16 40/4 40/7 41/12 42/3 42/16 44/18 45/1 45/8 46/22 47/20 51/9 51/22 68/9 76/20 77/2 82/20 82/23
**yes [66]** 5/5 5/10 6/9 6/21 8/9 9/14 9/25 13/22 14/2 15/4 23/15 24/14 25/2 26/7 29/23 30/11 32/3 32/7 33/5 33/19 34/21 35/5 35/11 36/2 36/15 37/4 37/7 38/11 39/2 39/6 39/22 39/25 40/5 41/10 42/4 42/7 43/2 43/11 43/14 44/9 44/12 44/15 44/19 44/23 44/23 46/5 47/12 47/15 48/6 48/18 49/16 49/19 50/13 51/11 51/14 52/24 53/8 53/9 53/13 57/2 58/7 58/21 59/3 59/7 60/21 61/20
**yesterday [5]** 24/18 24/24 33/16 38/22 38/23
**yet [1]** 72/11
**York [1]** 1/20
**you [334]**
**your [105]**
**yourself [2]** 46/21 86/8
**yourselves [3]** 54/17 55/16 87/3

# Z

**zero [1]** 65/9
**zeroed [1]** 81/2
**zip [1]** 59/22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


United States of America,      ) Criminal Action
                               ) No. 21-cr-399
            Plaintiff,         )
                               ) JURY TRIAL
vs.                            )
                               ) Washington, DC
Roman Sterlingov,             ) March 7, 2024
                               ) Time:  1:30 p.m.
            Defendant.         )

_____

TRANSCRIPT OF JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

_____

A P P E A R A N C E S

For Plaintiff:      **Christopher Brown**
                    DOJ-USAO
                    601 D Street, NW, Suite 5.1527
                    Washington, DC  20530
                    Email:  Christopher.brown6@usdoj.gov
                    **Catherine Pelker**
                    US DOJ
                    950 Pennsylvania Avenue NW
                    Washington, DC  20530
                    Email:  Catherine.pelker@usdoj.gov
                    **Jeffrey Pearlman**
                    DOJ-CRM
                    1301 New York Avenue NW
                    Washington, DC  20005
                    Email:  Jeffrey.pearlman@usdoj.gov

For Defendant:      **Tor Ekeland**
                    **Michael Hassard**
                    Tor Ekeland Law PLLC
                    30 Wall Street, 8th Floor
                    Brooklyn, NY  10005
                    Email:  Tor@torekeland.com
                    Email:  Michael@torekeland.com


Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
                    Email:  Janice_e_dickman@dcd.uscourts.gov

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURT: Ready to get the jury?

MS. PELKER: Yes, Your Honor.

(Whereupon the jurors enter the courtroom.)

THE COURTROOM DEPUTY: Jury is present.

You may be seated and come to order.

THE COURT: All right. Welcome -- welcome back, everybody. I can see some of you.

Ms. Pelker, you may continue when you're ready.

MS. PELKER: Thank you.

And if -- with Ms. Walker's assistance, if we could get the PowerPoint put back up.

Thank you, Ms. Walker.

Members of the jury, you heard the evidence, that it was the defendant who has behind Bitcoin Fog. Because he set up, ran, and took profits from Bitcoin Fog as a money laundering conspiracy, the defendant is charged with four counts: Money laundering conspiracy, sting money laundering, operating an unlicensed money transmission business, and D.C. illegal money transmitting.

Judge Moss will instruct you on the law later this afternoon, but I'm going to walk you through the elements of each and briefly explain how you already know that the defendant's actions meet each of the elements.

Count 1 is a conspiracy to commit money laundering.

So, first, what is money laundering?  Well, it's exactly what it sounds like.

First, doing a financial transaction.  And here, you have thousands and thousands of Bitcoin transactions that the defendant conducted through Bitcoin Fog.

Second, the defendant knew the money was proceeds of some kind of unlawful activity.  And the defendant absolutely did know that.  He had set up Bitcoin Fog for people with real problems with the law, who would go to jail if their transaction information were revealed.  And he talks repeatedly about all the things he's doing to hide from the authorities. The defendant knew there was dirty money going through Bitcoin Fog.

Third, the money did come from an unlawful activity. Here, narcotics trafficking.  And you saw voluminous evidence of the tens of millions of dollars of darknet drug proceeds going through Bitcoin Fog and coming out untraceable.

Mr. Scholl and Special Agent Santell walked you through examples of over a dozen specific vendors who used Bitcoin Fog to launder their drug proceeds.  And there were hundreds more.

And, fourth, that the defendant intended to promote or conceal the unlawful activity.

Judge Moss will explain that this conspiracy has two different potential objects:  Promotional money laundering and

concealment money laundering. And you can find that the defendant committed either or both.

Judge Moss will instruct you that to promote the carrying on of an activity means to contribute to the prosperity of something, or to further it. And conceal just means what it sounds like, to hide or to disguise.

And, again, how do you know the defendant did this? Because that's what Bitcoin Fog was intended to do. The defendant says so. He is going to extreme lengths to help his customers hide from the authorities, to conceal their transactions, and to promote their activity. To contribute to their prosperity and his own prosperity in the process.

Bitcoin Fog was a money laundering site, plain and simple. Its stated and entire purpose for existing was to launder money. So that's money laundering.

And here the defendant is charged with money laundering conspiracy. That means the defendant doesn't need to have been the one conducting each of these individual transactions. He is charged with the conspiracy, the agreement to do these transactions.

A conspiracy is just an agreement and it doesn't have to be a formal, written agreement. Sometimes conspiracies exist where different parties depend on one another for the success of a common enterprise. They may not all know each other, but each one is like a link in a chain and the

conspiracy rises or falls based on each party playing their part.

Here, you have several different players involved for peddling drugs for Bitcoin online. We have the darknet market administrators and vendors who are selling the drugs and we have the buyers who are purchasing drugs online. But in order for that drug trafficking to evade detection, they need to use Bitcoin and they need a way to move Bitcoin that is not traceable by the authorities. That's where Bitcoin Fog came in.

Bitcoin Fog supplied the missing link for those online drug deals. It provided a way for buyers to pay in Bitcoin without having it trace back to them and it let the vendors cash out their Bitcoin without having it tied to their known darknet market activity.

Without Bitcoin Fog, these drug deals would have been traceable by the authorities. With Bitcoin Fog, everything is hidden in the fog. Everyone in this illicit arrangement benefits; the drug market, dealers and sellers who can carry on their drug trafficking without fear of detection, and Bitcoin Fog, the defendant, who gets a cut of every transaction. That is a conspiracy.

Judge Moss will instruct you that in a conspiracy the defendant doesn't need to personally know all of the other conspirators. He doesn't have to be involved in each aspect of

the scheme, he just has to have a general understanding of the scope of the conspiracy.

Criminal conspiracies often have people entering at different points. The defendant is active in this conspiracy from the very beginning. As time went on, additional drug markets emerged and more drug dealers and criminals joined the conspiracy.

As I expect Judge Moss will likely instruct you, it doesn't matter when a person becomes part of a criminal conspiracy, even if it's just at the beginning or just at the end. The conspirators are criminally liable for everything that happens as part of the conspiracy, as long as it's foreseeable to them before or after they join.

Count 2 is the sting money laundering count. This charge relates to the undercover transaction that Special Agent Price conducted here in D.C. where he told Bitcoin Fog the funds were the proceeds of illegal activity.

Sting money laundering has three elements: First, that the defendant conducted or tried to conduct a transaction. Second, the transaction involved property that law enforcement represented were illicit proceeds. And, third, the defendant had the intent to promote specified unlawful activity or to conceal or disguise certain things about the property. Similar to the money laundering conspiracy count that we just discussed.

Here, you know there was a transaction, and Special Agent Price represented that it was illicit proceeds. He said he wanted Bitcoin Fog's help in cleaning his Bitcoin; that's concealment. And he asked for help with future drug money laundering; that is promoting a future offense. And the defendant sent the Bitcoin on anyway; that is sting money laundering.

The message system that Special Agent Price used to contact the defendant, that's the messaging system built into the Bitcoin Fog site. The message system that the defendant, posting as Akemashite Omedetou, told everyone to use.

On BitcoinTalk, he repeatedly referenced reading the messages. And, of course, you would if you were running a money laundering site that depended on customers entrusting you with their money. That's just good customer service.

Bitcoin Fog never replied to Special Agent Price. But what happened? The funds moved. They went into the fog. Mr. Scholl testified to how he tracked the IRS and FBI undercover transactions and that if he hadn't had the records, he would not have been able to trace them through the fog. The service worked as it was intended, as the defendant designed.

Count 3 is the federal charge of operating an unlicensed money transmitting business. As you've heard, in the United States there are regulations and requirements for financial institutions. They're in place to protect the U.S.

financial system and all American citizens from money laundering. And one of those requirements is that any entity in the business of transmitting funds must register with the U.S. Department of Treasury. That requirement comes along with some other obligations, like collecting identifying information about your customers, filing reports, or SARs, that would notify law enforcement of suspected money laundering. Those requirements applied to businesses that transmitted funds, including Bitcoin, from one person or location to another.

Now, Bitcoin Fog was not designed to comply with financial regulations, but that doesn't make the law any less applicable. You could argue Bitcoin Fog and money laundering services like it are the reason these regulations are in effect.

So was Bitcoin Fog in the business of transmitting funds? Absolutely. That was its entire purpose. Bitcoin Fog's core business was money transmitting, taking funds from one address and remitting them to another.

And that means it was required to register with the financial crimes enforcement network, or FinCEN, the Treasury agency tasked with overseeing some of these laws. And it was required to register with state authorities and state regulators, including the District of Columbia's Department of Insurance, Securities, and Banking, or DISB. But Bitcoin Fog didn't register. Of course it didn't.

Under the law there are three different ways you can be unlicensed, and the defendant did all three: First, he didn't register Bitcoin Fog as a money transmitter with D.C. or any other state. Second, he didn't register Bitcoin Fog with FinCEN. You heard Mr. Vlahakis from FinCEN tell you that all money transmitters must register and must follow the Bank Secrecy Act. Bitcoin Fog, the defendant, never did that.

And there's a third way that the law considers Bitcoin Fog unlicensed. Even if the defendant had registered -- which he didn't -- he would still be guilty if the funds in the business were derived from criminal activity. And here, you know they were. The defendant set up the whole operation to help criminals hide their assets.

To prove Count 3 the government must also show that the defendant controlled or managed Bitcoin Fog in some way. And that's what all of the evidence before you has shown.

And finally, the government must show that Bitcoin Fog affected interstate commerce. Again, here, that is abundantly clear. Bitcoin Fog moved payments across the globe; that is affecting interstate commerce.

The last charge is a D.C. code offense. The District of Columbia is a special place to be a juror because usually federal charges are brought in federal court and state charges are brought in a separate court. But here, in D.C., as a juror, you are responsible for both. All in one case.

So, Count 4 is the local D.C. corollary to Count 3, the federal money transmitting business violation.

Count 4 charges the defendant with operating his business without registering in D.C. This has just two elements: First, that the defendant was engaged in the business of money transmission. And, second, that the defendant did not have a license to engage in the business of money transmission in the District of Columbia.

And you saw that D.C.'s DISB queried its records and Bitcoin Fog never registered, despite processing payments to and from people located in the District of Columbia, like IRS Undercover Matthew Price and FBI Undercover Alexandra Comolli.

Judge Moss will give you instructions on a number of different legal concepts. You should pay close attention to all of them, but there are several in particular I want to highlight for you here.

Judge Moss will give you an instruction on what's called aiding and abetting. Aiding and abetting means that if the defendant intentionally helped someone commit these crimes, under the law he is guilty of the crime itself.

Now, it's clear from the evidence before you that Roman Sterlingov was instrumental in setting up and running Bitcoin Fog. Other people may have helped him along the way.

In posting as Akemashite Omedetou, the defendant refers repeatedly to the "Fog team," but legally that doesn't

matter. Even if the only thing Roman Sterlingov had done was register the Bitcoin Fog domain, if he did that to help the conspiracy, knowing what Bitcoin Fog was, he is guilty of conspiring to commit money laundering and he is guilty of aiding and abetting. But we know that Roman Sterlingov did much more than that because he continued to operate and profit from Bitcoin Fog right up until he was arrested.

A statute of limitations is when the clock starts running to charge an offense. Count 2 occurred on a specific date within the statute of limitations. Judge Moss will instruct you that on -- Counts 1, 3, and 4 are continuing offenses. A continuing offense is a continuous course of unlawful conduct. The statute of limitations for a continuing offense only begins to run after the last day of that continuing offense.

For Bitcoin Fog we've argued, and the evidence shows, that unlawful conduct continued all the way up to April 2021.

Judge Moss will instruct you on venue. Bitcoin Fog was accessed from computers right here in the District of Columbia. You heard from Special Agent Matt Price and Alexandra Comolli how they did transactions on the site while sitting right here in D.C. Money was moving back and forth between Bitcoin Fog and Washington, D.C.

As I mentioned before, D.C. is a special place to be a juror. And that's for more reasons than one. The District

of Colombia is the seat of the federal government and home of the Department of Treasury, including the Financial Crimes Enforcement Network. That means that failing to register with FinCEN, that omission is a crime occurring in D.C.

The same holds true for the defendant failing to obtain a money transmitter license from DISB. That's an omission that occurs in the District of Columbia. And that failure to register or obtain a license was more than just not filling out paperwork. Evading FinCEN, regulators, and the authorities was central to the defendant's money laundering scheme, and that crime occurred here in Washington, D.C.

The Court will also instruct you on the concept of knowledge. And in the law, knowledge and intent matter. What did the defendant know about the nature of the funds going through Bitcoin Fog? And what did he intend for Bitcoin Fog to do?

Now, there is very rarely direct evidence of intent or knowledge in a case. No one can see inside a defendant's mind. But you can infer knowledge and intent based on all the evidence that you've seen and by applying your own common sense.

Judge Moss will instruct you that it's not a defense to deliberately cover your eyes and ears to avoid learning the truth. Think of an ostrich sticking its head in the sand. Under the law, if the defendant knew there was a high

probability of Bitcoin Fog being used to move drug proceeds and he deliberately blinded himself to avoid learning the details of those drug deals, that can be considered evidence of knowledge. He can't just stick his head in the sand.

Like any good money launderer, the defendant designed Bitcoin Fog to avoid learning unnecessary details of his customers' crimes. He set up his service to automatically delete logs. He added features to allow people to delete their messages and transaction history. He even deliberately designed his site to avoid collecting even basic records of its users. Even if they wanted to, users couldn't even add an email address to allow for password resets. That was all done intentionally by the defendant.

And here, the defendant absolutely knew that huge amounts of illicit proceeds were moving through his site. That's what he built it for. It is exactly what he intended. He specifically designed Bitcoin Fog to move money for serious criminals.

When Mr. Brown spoke to you nearly a month ago, he asked you to listen carefully to the witnesses and pay close attention to the evidence. We appreciate your focus these past several weeks as the evidence was introduced.

Second, Mr. Brown asked you to follow Judge Moss's instructions on the law, and you'll be receiving more of those instructions later today, which will walk you through what the

government must prove.

And, third, Mr. Brown asked you to use your common sense, to apply the common sense that you use every day outside this courtroom, to deliberate and be the judges of the facts in this case.

Now that you have seen and heard all the evidence, you can see clearly through the fog.  All the evidence in this case leads to a single inescapable conclusion, that the defendant, Roman Sterlingov, is guilty beyond a reasonable doubt of all charges.

THE COURT:  All right.  Thank you.  And the jurors can stand and stretch for a minute while Mr. Ekeland gets set up.

MR. EKELAND:  Can we just take a short break while we set up?

THE COURT:  We'll just -- I think we can just -- folks can just stretch in here while you get set up.

(Off-the-record discussion.)

THE COURT:  So, I guess we're going to go ahead and take a break.  But even though now you've heard the government's closing, please don't discuss the case among yourselves.  We're just taking a restroom break, and we'll be back in ten minutes.

(Whereupon the jurors leave the courtroom.)

(Recess from 2:00 p.m. to 2:06 p.m.)

THE COURT: All right. Ready to get the jury?

MR. EKELAND: Yes, Your Honor.

THE COURT: Okay.

(Whereupon the jurors enter the courtroom.)

THE COURT: Mr. Ekeland, you can proceed whenever you are ready.

MR. EKELAND: Thank you, Your Honor.

Good afternoon. I think no single piece of evidence in this case typifies the government's case than this piece of evidence right here. What you were told about this piece of evidence from the government was that it was a chat by Mr. Sterlingov --

THE JURORS: (Raise hands.)

MR. EKELAND: I'm sorry, is it not published to the jury?

THE COURTROOM DEPUTY: I am so sorry. I am so sorry.

MR. EKELAND: How about now? Can you see it now?

THE JURORS: Yes.

MR. EKELAND: Okay. Great. Sorry about that.

So what you were told by the government about this piece of evidence is that this was a chat, a screen capture of a chat of Mr. Sterlingov, and in it you can see that he's supposedly saying -- referencing money laundering. But what did we discover?

What we discovered was that this actually wasn't a

chat by Mr. Sterlingov, but it came from a kind of an e-Book that was on his NOOK reader. Yet Ms. Mazars de Mazarin, the government's alleged expert, who is the same forensic expert that wants you to believe the IP overlap address analysis that she did, she's the one who told you that this was Mr. Sterlingov's chat, essentially. But it wasn't. And you saw the government just now trying to withdraw it.

You can see here the page in the book, on the bottom left, where that chat actually came from. And you just heard her today say, "Well, this was, you know, pulled out by this AXIOM software that the IRS gave me." She said -- and she said she didn't check it.

Okay, well, you've seen a lot of software in this case. You've seen a lot of stuff coming from the IRS. As a matter of fact, one of the things that Ms. Mazars de Mazarin testified to was that those IP addresses that she based her analysis on, that she got those from the IRS, too, and that she actually never examined the native server logs to those servers because the government doesn't have them, just like the government doesn't have Mr. Sterlingov's Bunker Number 10 computer, the one that Mr. Sterlingov testified to that he logged into, that was his home computer.

For some reason the government never got it, even though the government was in contact with Swedish law enforcement. And if the government had gotten that computer,

Mr. Sterlingov's computer, they could have checked their work. But you see that time and time again in this case. You don't have any corroborating evidence.

There's a blowup of that chat. You don't have any servers. You don't have the Bitcoin Fog servers. You don't have Bitcoin Fog server logs. You don't have Bitcoin Fog ledgers. You have no communications that you can point to between Mr. Sterlingov and anybody, anybody operating Bitcoin Fog. You know, you've got the government sort of pointing all over the place to things. They say, you know, the shormint email kind of shows he's Akemashite Omedetou. But you did not hear Ms. Mazars de Mazarin say, "Oh, Mr. Sterlingov is definitely shormint."

You're getting a bunch of stuff about an IP address overlap on VPNs, which thousands of people can be using, that they told you that they didn't have the traffic logs to, that they don't have the native server logs to, then they use words like "likely," "probably," "maybe," right? But have you seen any corroborating evidence at all that definitively shows Mr. Sterlingov is shormint@hotmail.com, is Akemashite Omedetou? Because I have not this entire trial, and I can't think of it.

You may remember when I was crossing Mr. Scholl and I asked him sort of the same question, and he said, "It's the totality of the government's case." But no one can ever point to any specific thing showing it's Mr. Sterlingov.

Same thing with the traces. You don't see anything in his notes. They caught him with years and years and years of his notes, details about all sorts of stuff and they pored through it. You saw all these little extracts that they took out, trying to make him look bad. Imagine if you had ten years, or however long it was, of notes and the government's going through it after they've arrested you at the airport; your diaries, everything. Yet not a single thing, not one thing referencing Bitcoin Fog.

There's no evidence anywhere that Mr. Sterlingov ever operated Bitcoin Fog. Think about it. Look back on this entire trial. Point to something that's not innuendo. Or, like what I told you in the beginning, in my opening, point to me some piece of evidence that doesn't involve you having to guess, to speculate, to take some leap of faith.

You hear over and over again in this case people telling you, well, yeah, that trace is consistent with Mr. Sterlingov just selling Bitcoin, but it could be consistent with him doing something nefarious. Well, he could be logging into his home computer, or he could be running Bitcoin Fog. Right?

This case a great example of what the government's burden of proof is and why we have it. The government, not the defendant, the government has to prove every element of its case beyond a reasonable doubt. That means the government has

to prove that Mr. Sterlingov was operating Bitcoin Fog, not that Mr. Sterlingov has to prove that he wasn't.

You're the jury, you decide the facts.

And the prosecution needs to prove each and every element of its case, every element beyond a reasonable doubt. And we start with the presumption of innocence in America, not the presumption of guilt. The presumption of innocence. That means you're looking at Mr. Sterlingov as if he's innocent and you're asking the question: Has the government met its burden? Not the other way around.

So if you have a situation where, well, this is entirely consistent with Mr. Sterlingov logging into his home computer, or I could speculate and say he's logging into some darknet server, you've got to go with his innocence, right? He doesn't have to prove he's innocent. He's already presumed innocent. That's a crucial, crucial, crucial feature of our system that sets us apart from a lot of countries in this world.

So you just heard from the government outlining the counts. And, of course, Judge Moss is the ultimate arbiter of the law, but I do think it's helpful and I agree with the government here that it's helpful to go through these counts and just sort of have a framework as you're going through everything.

And you're going to get a whole log, packet, listing

the nuance to this, right? But essentially, Count 1, it's a conspiracy count, and that essentially -- what you need -- the essence of it is that you need to find that Mr. Sterlingov entered into an agreement to commit money laundering. And when you get the packet, you'll see that there's a couple, two types of money laundering listed -- and there's more detail to this -- and that he intentionally -- intentionally -- joined this conspiracy. And that's where I think there's a huge problem here, because what evidence is there of him intentionally joining any conspiracy?

They're showing you a bunch of traces from 2011, which you've heard from the government's own witnesses saying those are consistent with maybe him just selling Bitcoin. If you look at that one -- I think it's -- what is it? 313? It's the one where they're saying he's paying for the BitcoinFog.com Clearnet registration. Right in that first hop where you're going into that Bitcoin address, you heard Mr. Scholl say we don't have the private key for that. So we don't have any definitive evidence of who actually controls that address. Right there it breaks down. Right?

And even though -- consider -- just think, if it even is Mr. Sterlingov going all the way through and registering a DNS for a Clearnet domain site in 2011, that's not criminal. Registering a website DNS is not criminal, right? And you still have to make the leap that somehow he's intentionally

joining a conspiracy doing that. But you don't even have him doing that. I look at these traces in this case, and what I think a lot is the only reason that they're naming Mr. Sterlingov is because those are the only KYC accounts that they can trace back to. You heard Mr. Scholl say it would have been really easy for somebody just to start this panic using a wallet that isn't KYC. Right? Like, it doesn't make sense. When you start to look at these transactions and these traces, it doesn't make sense that somebody like Akemashite Omedetou, who is so sophisticated and talking about, you know, timing of transactions and tracing and all this stuff, is going -- he or she, it -- he, she, it, I don't know. They set up the DNS registration for Bitcoin Fog starting with the KYC account, a Mt. Gox KYC account in 2011, when you weren't even required to KYC your account? That's what the government wants you to believe, right?

So, two opposites of the conspiracy. The first -- either one, if you find beyond a reasonable doubt that that's -- you know, you don't have to find both the objects, you can find just one of the objects -- that's money laundering, in violation of 18 U.S.C. 1956(a)(1)(A)(i). You will get the paperwork on that. And then there's another second object you can find.

Count 2 is what they call a substantive charge. So conspiracy, this is incohat because it's just an agreement.

You don't actually to have done it, you just have to agree to do it. Right?

The substantive charge, Count 2, money laundering. The defendant conducted or attempted to conduct a financial transaction. The transaction involved property represented by law enforcement to be the proceeds of unlawful activity.

Now, here you heard Ms. Pelker talking about the -- the undercover transaction in D.C., and I think you just saw -- and it's in evidence, the message sort of sent to Bitcoin Fog customer support or help desk, or whatever it was, right? saying: Hi, I just sold some drugs. I just sold Mollies. It's a really safe place to, you know, launder my money.

Something to think about here. No response. Zero response. And have you seen any evidence that Mr. Sterlingov ever saw that message? Have you seen any evidence that Mr. Sterlingov was operating Bitcoin Fog at the time that that message was sent, which was in 2019?

Think about how much evidence in this case you're seeing from 2011; 14 years ago. And, yeah, Mr. Sterlingov said a lot on the stand: I can't remember. Yeah, I can't remember what I did 13 years ago. I have, like, you know, big-picture stuff. But if you asked me: How much money did you withdraw from the ATM on October 27th, 2011, you know, I'd draw a blank.

So, Number 3, the defendant acted with intent. Intent. And that's important. He intentionally did what he's

being accused of to promote the carrying on of the unspecified, unlawful activity. Again, you decide. That's your role as the jury, right? whether or not there's evidence to support the fact that he intentionally did it.

Four, that the defendant acted with the intent to conceal or disguise the nature, location, source, ownership, or control of the property he believed -- again, you decide whether or not he had the intent -- that he believed to be the proceeds of the specified unlawful activity.

Count 3 is operating an unlicensed money transmission business. You have to find that Bitcoin Fog was an unlicensed money transmission business. The defendant knowingly -- and here's the key thing -- knowingly controlled, conducted, managed, supervised, directed, or owned that business.

Where is that in the evidence? Again, you're being asked to believe that certain traces in 2011, that are entirely consistent with Mr. Sterlingov selling Bitcoin peer to peer, a whole host of things, that's the government's primary evidence that Mr. Sterlingov is running Bitcoin Fog.

Think about it. What have you seen from 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021? Right? What have you seen? No eyewitnesses. No eyewitnesses. And you may remember that they -- they mentioned, I think, Ms. Mazars' example of the white Nissan at the bank, right? where you see the person. Well, that example involves an eyewitness.

You haven't heard from a single eyewitness in this case. What you're hearing from in this case is people who are sitting at their desks, thousands of miles away, running software like the AXIOM software that, you know, sort of pulled that e-Book chat off and that they tried to pass off on you as Mr. Sterlingov's own chat, right? That's what you're seeing.

You're not seeing anybody in Sweden, like on the ground. You're not even getting his home computer because for some -- whatever reason, you heard Ms. Mazars de Mazarin say, I don't know, they didn't get the computer. Maybe it was paperwork, or whatever.

Well, if this case was so important, why didn't they get his BunkerX computer? Is it because maybe if they got it they could actually check their work and find out that everything that they did in their investigation was wrong? Were they just trying to avoid actually checking their work, just like they avoided checking their work on that e-Book extraction? That's up for you to decide.

Then the third thing is that the money transmission business affected interstate or foreign commerce.

Now, before, money transmission without a license in D.C., that the defendant, again, knowingly engaged in the business of money transmission in the District of Columbia. Ask yourself what evidence there is of Mr. Sterlingov knowingly conducting a business in D.C., when he's in Sweden this entire

time, right?

And that the defendant did not have a license to engage in the business of money transmission in the District of Columbia. We'll admit that. We've seen that, right? Mr. Sterlingov didn't get a license in D.C. Probably because he wasn't running Bitcoin Fog.

Venue. Venue, you have to decide on -- this is a little different. This is the one part -- and, again, Judge Moss tells you the law. That is not -- the standard is not beyond a reasonable doubt. It's by the preponderance of the evidence, which is a civil standard, which is generally described as more likely than not. And there's nuances to it. Just look carefully at it and ask yourself, well, is there venue in D.C., when Mr. Sterlingov spent the majority of his time in Sweden?

As a matter of fact, the only time that Mr. Sterlingov seems to have ever been in D.C. is after he was arrested and hauled into this court to be charged with operating Bitcoin Fog.

The statute of limitations, you do have to find beyond each -- that each crime occurred within the relevant statute of limitations beyond a reasonable doubt. Again, this is nuanced. Read what Judge Moss is going to show you on that, listen to what he says.

But for Count 1, the relevant statute of limitations

is July 18th, 2017 and forward. Now, if something had occurred before July 17th and then continues, like Ms. Pelker was saying a continuing offense, then it comes within the statute of limitations. But these are the cutoffs I'm giving you.

Count 2, June 14, 2016. Count 3, it's June 4th, (sic) 2016. Count 4, June 14th, 2015.

Please, I ask, on Mr. Sterlingov's behalf, that you just pay attention to those dates when you're looking at the evidence because a lot of this evidence that you're seeing is outside those dates. Well outside those dates, right? And you have to decide whether or not, you know, the crime that was maybe -- even if it was committed back in 2011, it was continuing to go within the statute of limitations.

So you heard from Mr. Sterlingov, and I -- I think you are well qualified to judge what he said. Remember what he said? Judge his credibility. That's the traditional role of juries for centuries, right?

He got into Bitcoin early, in 2010. In 2010, you could get one Bitcoin for roughly 30 cents. Right? And I don't know if you saw the papers the other day, but Bitcoin hit an all-time high of $69,000. All right.

You heard him say, when he was talking about his Mycelium wallet, like it was like a magic wallet, and that he would be spending his Bitcoin because he didn't have a job, right? But he would spend the Bitcoin and he would still end

up with more money afterwards because Bitcoin was going up so much.

You learned his first purchases were offline in peer-to-peer transactions, you know, in person. He's going on LocalBitcoins, he's meeting -- going to Meetups, right? He could have interacted with somebody who actually started Bitcoin Fog. Maybe he was at one of these meetings. We don't know, right? And the government has the burden of proof there, again, to prove beyond a reasonable doubt. Mr. Sterlingov doesn't have to prove his innocence.

He worked in tech, he had side jobs freelancing. But you also heard that in 2013 he stopped freelancing because he was a little bit worried about the gray areas. Right? And one of the gray areas was math. Right? That mathexploit.io where -- it was a hacking site, right, and he -- it's not -- that account was shared. None of those posts the government have shown you mentioned Bitcoin Fog at all. Right? They're trying to make you think, okay, he's some kind of scary hacker who has all these skills. But have you seen any evidence of him hacking anywhere?

You see him like, you know, trash talking. What is he? He's like 21, 22 at the time. Right? But have you seen any evidence of him actually running around and hacking things? No. Nothing has come in, right?

So you've got his To the Moon VPN server, sort of his

failed business that really never makes any money. They're trying to make it sound sinister, right? They were like, Oh, there's a -- was it Bitcoin Core on -- software on one of the -- you know, one of the hard drives. Well, yeah, that's how, like, the business was meant to -- for you to be able to go get VPN, by paying Bitcoin. So that's what you need to take payments in Bitcoin. Right?

But you heard the government's witnesses and you heard Mr. Fischbach testify, look, the remaining -- government was basically surveilling the signal traffic on the To the Moon server. And there's nothing related to Bitcoin Fog from it. Nothing. Right?

And you've heard repeatedly from government witnesses that they never got the Bitcoin Fog servers. So I just don't think any kind of theory that the To the Moon server, singular -- Ms. Pelker said on her closing "servers," plural; well, it's just one server -- was the Bitcoin Fog server.

And here's something else. They keep saying that the -- where the hard drives on that server were wiped. But you heard Mr. Fischbach say, oh, that's entirely consistent, that it's just a new hard drive or unformatted hard drive.

If you're the operator of Bitcoin Fog and you've got millions of dollars worth of Bitcoin on your hard drive, are you going to wipe it or are you just going to encrypt it, if something happens? It doesn't make sense that you would wipe

the hard drive -- that may have millions of dollars on it -- with some kind of kill switch, which you haven't seen -- heard any evidence of being on that server.

You heard, I think, Ms. Pelker start talking about the kill switch on Mr. Sterlingov's phone, which is a feature built into Android related to VPNs. Not about, you know, triggering some server somewhere or turning off some server.

And in relation to that -- in relation to the supposed last withdrawal of Bitcoin Fog happening two days after Mr. Sterlingov's arrest, number one, how did he shut it off if he was in jail? And, number 2, you've heard that the United States government issued a press release and the press covered Mr. Sterlingov's arrest.

If I'm the real operator of Bitcoin Fog and I see that somebody has been popped for Bitcoin Fog, that's a good time for me to step out. And that $70 million that they're saying is in Bitcoin Fog, that's not the Bitcoin Fog operator's, that's somebody -- or, people who are still sending money through Bitcoin Fog.

I just don't think this theory that Mr. Sterlingov somehow shut down Bitcoin Fog, that there was a kill switch -- which you haven't heard any evidence of anywhere -- is just at all plausible.

So you heard that he sold Bitcoin at Meetups, conferences, peer-to-peer, through chat forums. You heard that

he shared account logins, like that math exploit account was one.  You've seen his password list, right?  Look at how long his password list is.  What have you seen on his password list related to Bitcoin Fog?  Like, you don't have any administrator login to Bitcoin, you don't have anything like that.

What kind -- look how detailed Mr. Sterlingov is with his stuff, right?  Like he's got -- you've got a detailed list of this guy's passwords that were encrypted.  They caught him at the airport, right?  They arrest him at the airport with a ton of stuff and nothing -- nothing on it shows him operating Bitcoin Fog.

You're getting these sort of like, you know, red-yarn-and-thumbtack theories about, well, you know, he talked about Tor, Tor hidden services, or, you know, over here this and that.  Right?  We've gone down the rabbit hole.  But ask yourself, well, in all of that, where's the concrete evidence?  Right?  Where is something that's not a guess, not speculation?  That's for you to decide.

Here's the other thing, Mr. Sterlingov -- all these accounts -- almost all of them that you're hearing about, they're KYC accounts, Know Your Customer.  He's getting photo IDs for stuff.  He's putting his passport up.

They want you to believe that Akemashite Omedetou was taking the license fees from Bitcoin Fog and just depositing them in his KYC accounts.  Think about -- go back and look at

Government Exhibit 1, which is Akemashite Omedetou's posts on Bitcoin Fog, and just go read them and tell me if you think they were -- come to your own conclusion if you think that that person -- that that person would be putting all their post-mixed funds KYC accounts, or that they'd even pay for the DNS registration through some convoluted, you know, layering thing. Start in the KYC account.

Mr. Sterlingov was KYCing his Mt. Gox account when he didn't have to. Here you see -- here is a couple of exhibits that show Mr. Sterlingov trading peer-to-peer through local Bitcoins.

Now, you heard from Mr. Fischbach, our expert. He's the one who pointed out that Ms. Mazars wasn't correct when she testified, essentially, that the government had found a chat that they could attribute to Mr. Sterlingov. I mean, I just can't get over that in this case that's all about making an attribution to Mr. Sterlingov. The government just made this huge misattribution and they -- they presented it to you like it was the truth.

Now, you've also heard from Mr. Fischbach, that the registered owner of Bitcoin Fog updated the DNS registration after Mr. Sterlingov's arrest. You can imagine the kind of scrutiny he was under after his arrest.

You heard Mr. Fischbach talk about that, you know, LiveLTE router, the government wants you to believe is some

sort of exotic -- I don't know what -- spyware that Mr. Sterlingov is using to operate Bitcoin Fog on the road, but think about -- who was it -- I think it was maybe Mr. Price, Matt Price, or Rovensky talking about it in Miami when Mr. Sterlingov was in Miami for three months in 2017 and he's under investigation.  Have you heard a peep about the government's surveillance of Mr. Sterlingov in Miami for months during this case?  No.  They've kept quiet about that, and that's something you should think about.  That's another place where, like, why aren't they talking about that, if they found something?

MR. PEARLMAN:  Objection.

THE COURT:  Pick up.

(Bench conference:)

MR. PEARLMAN:  There's nothing to find.  He's putting something before the jury that is not in evidence.

MR. EKELAND:  I believe Mr. Price and Mr. Rovensky testified as to the surveillance in Miami, and I am making an argument about it.

MR. PEARLMAN:  Neither Price nor Rovensky were present for any surveillance in Miami.

MR. EKELAND:  Did he read the case files?  I asked him that and he said, I believe, something to the effect that I did do something about that.  And I'm -- Your Honor, I think that's totally justified.

THE COURT: Anything else?

MR. PEARLMAN: Nothing else, Your Honor.

THE COURT: I've told the jury about a thousand times they're not supposed to do any independent research. You certainly went beyond the evidence. Did you read the paper? Did you see what the price is today? What I've been telling the jury not to do. I may, when you're done -- they're supposed to make the decision based on the evidence and not anything they read outside of the courtroom.

MR. EKELAND: That's fine, Your Honor.

(Open court:)

MR. EKELAND: Mr. Fischbach told you about how the Tor network is regularly used by computer professionals and the legitimate uses for the Tor network. I think he even testified, or you heard testimony that the Tor network was originally developed by the United States Navy and shared with the public and that you can go to the Tor non-profit and download it yourself and use it.

You also heard him testify that there was no kill switches anywhere in his device review of Mr. Sterlingov's devices and that there was no evidence of a remote kill switch access by Mr. Sterlingov.

Now, after less than four months from that original DNS registration that -- the government showing you all those traces for, Akemashite Omedetou transfers the

www.BitcoinFog.com site away from highhosting.  Ask yourself what you've seen in evidence of Mr. Sterlingov being involved in that, because there's nothing.  Right?

On October 12th, 2015, the registered owner removed the DNS registration from Bitcoin Fog through 2026.  Ask yourself, again, what evidence there is in the record of Mr. Sterlingov having anything to do with that?  And you know the answer.  There's nothing.

And October 5th, 2022, the registered owner removed the DNS registration from www.BitcoinFog.com.  And this is after Mr. Sterlingov is arrested.  And ask yourself what evidence you've seen that Mr. Sterlingov was involved in that?  And, of course, the answer is nothing.

And then on December 1st, 2023, the registered owner updated the DNS registration for www.BitcoinFog.com.  Same question.  What evidence have you seen that Mr. Sterlingov was involved with that?  Absolutely nothing.

Then you've got the mystery of the missing Bitcoin that Professor Verret talked to you about.  And I think Ms. Pelker showed the chart that Mr. Scholl did where Mr. Scholl just calculated how much Bitcoin the operator of Bitcoin Fog should have based on a 1 to 3 percent randomized fee.  But Mr. Scholl made the assumption that as soon as the Bitcoin Fog operator got the Bitcoin, he, she, or it converted it to U.S. dollars.  And that's a big assumption because we all

know at this point, we've seen that Bitcoin is going up and down and it's appreciating greatly. So even if you wait, you know, a month, a few months, year, whatever, that sum would be a lot, lot higher.

And if Mr. Sterlingov actually was the operator of Bitcoin Fog when the government arrested him, he should have had a lot more money than what he was arrested with. Yeah, he had a good chunk of money because he got into Bitcoin in 2010. Right? Who doesn't wish they had gotten into Bitcoin in 2010. Right?

But like on the high end, you heard from Mr. Verret that this could be close to $1 billion, right? Or maybe hundreds of millions of dollars, or even 10 or $20 million, which is much more than the roughly 1.8, a little bit less than $2 million that the government has seized from Mr. Sterlingov. The numbers, the math just doesn't add up.

You heard from Professor Verret about the massive appreciation that Bitcoin had, and you also heard about how roughly less than 10 percent of funds going into mixers were illicit.

And here's a key point: Using a mixer is legal, right? Like, assuming you license it with FinCEN and you're not using it to launder money, right? So Mr. Sterlingov isn't -- you know, he's being charged with, you know, conspiracy to money launder and running an unlicensed mixer,

but that's a core concept that mixing just per se isn't illegal.

You heard from Luke Scholl. That was one of the government's early witnesses. And he told you that he never traced through Bitcoin Fog for any of Mr. Sterlingov's transactions. And this is a key point because they keep on saying that the source of Mr. Sterlingov's funds was Bitcoin Fog. That's not true.

You heard from Mr. Sterlingov himself, he told you what he did is he took his Bitcoin that he'd gotten 2010, 2011, 2012, '13 and he mixed it through Bitcoin Fog and then he put it in his KYC account. You know, his KYC account, his personal one, his one for To the Moon. Right? Like, Mr. Scholl never traced through. They can't actually tell you the course of the funds because Bitcoin Fog worked, right? And they haven't really shown you anything on the other side of Bitcoin Fog that Mr. Sterlingov putting his funds through. But when you hear him saying, oh, it's the source of funds, that's not true, right? Mr. Sterlingov isn't receiving license fees from Bitcoin Fog. If he did, he would have a ton, ton more money.

You also heard that Mr. Sterlingov's -- all those traces they're showing were consistent with him just selling Bitcoin. Right? So, like, where is the evidence that they actually were illegal? Right? Here you are, 13 years later, looking at traces. You know, it does, it looks like a

conspiracy theory chart with red pieces of yarn, right?

You've got to go down the rabbit hole. Maybe if they had corroborating evidence, right? when they arrested him. And I think this is really what happened here, that when they arrested him, they were rolling the dice. And what they were saying is when we get him, we'll get the evidence. Then they're like, uh-oh, oh, there's nothing on there. Let's go through his notes. Well, he talks about Tor. Does he talk about Bitcoin Fog? Is his password on there? No. Right? I think you can figure that out.

And you also know -- have you heard anybody just come out and say here's definitive evidence that Mr. Sterlingov is behind the shormint@hotmail.com. I asked -- you know, I asked Mr. Scholl about that. You heard him talking about the totality of the circumstances and everyone is pointing over here and I'm hearing about IP address overlaps when there's not even an overlap because they're not occurring at the same time and all this stuff. Right?

But ask yourself: Where's the definitive attribution? Even Ms. Mazars de Mazarin said I'm not making a -- these aren't exactly her words, but she said: I'm not making a definitive attribution. Where is it? You're looking at IP addresses from 13 years ago, you don't even have the server logs to, that you're getting from the IRS, just like you got that e-Book information or that -- you know, that chat

they're showing and we're supposed to take that as a definitive attribution?

MR. PEARLMAN:  Objection.  Misstates evidence.

THE COURT:  Phone, please.

(Bench discussion:)

MR. PEARLMAN:  He stated that the evidence for all the other evidence in the case came in the same way as the tablet, and that's simply not accurate.  I certainly don't object to him saying that.  That's kind of a shoddy approach, and you could consider that, but he's making a direct statement that that is the way that it was brought in.

THE COURT:  I'm looking at the actual language.  Give me a second.

(Pause.)

THE COURT:  I think it certainly can be construed that way.  Maybe there's some ambiguity in it, Mr. Ekeland?

MR. EKELAND:  I don't have the transcript in front of me.  I'm not going to argue with the Court.  I'm just -- I can move on.

THE COURT:  All right.  And, Mr. Pearlman, you can just clean it up in your rebuttal.

MR. PEARLMAN:  Very well.

THE COURT:  Thank you.

(Open court:)

MR. EKELAND:  You also heard that the government

doesn't have the private keys to key points in those traces. And I'm talking about the first hop in that trace -- I always forget the number, I think it's Government Exhibit 313 -- leading to the DNS registration. And if you look at that trace where they're saying it's Mr. Sterlingov making the first deposit into Bitcoin Fog, right on that first hop, right to that first address there, they don't have the private key to that.

And, again, not to belabor the point, but if you don't have the private key, you don't have definitive evidence about who controls it because whoever has got the private key to an address is the person who controls it. And if you look at that long trace, where they're saying it's Mr. Sterlingov making a deposit, the first deposit into Bitcoin Fog, right? it goes through two wallets, which that analysis is based on the sort of co-spend heuristic from Chainalysis Reactor which they couldn't tell you any of the error rates for and all that stuff.

And if you look in between those two wallets, again, there's another address that the government doesn't have the private key to. So right at the start of that, it could be Mr. Sterlingov selling Bitcoin to somebody. There's no evidence that Mr. Sterlingov controlled that first wallet. Then in between that first wallet and the second wallet, I think Mr. Scholl said it looks like two separate people

controlled it. There's another address that they don't have the private key to. There's like -- I think there's like ten hops in that transaction, involving 19 different addresses, and the only one that's KYC is the one they traced all back to.

I mean, I keep thinking when I look at this case, the reason Mr. Sterlingov is sitting in that seat over there is because he's the only one who was KYCing his account that you could trace it back to. Right? Like, I mean, take a look at that transaction. No private keys.

Flow of control is different than the flow of funds, right? And this is important when you look at these traces, right? That that's the example of, okay, I'm going into Starbucks and I've giving them 20 bucks for a latte. They give that 20-dollar bill to somebody else as change. That person spends it at Duane Reade. Duane Reade gives it to somebody who, you know, gets it and then buys drugs with it. I haven't bought drugs. Right?

I think about the flow of funds is not the same as the flow of control of the funds. And so think about that when you're looking through the traces. Well, how do we know who is controlling these funds, you know, at every hop?

Government Exhibit Number 1, Akemashite Omedetou. He, she, or it understood tracing. Right? I mean, just -- you-all can read. You can see how he, she, or it understood, okay, well, if I use the same amount of money at relatively the

same time, people can trace me.  So what did that first transaction for the DNS registration -- and ask yourself, would Akemashite Omedetou actually do something like this?  Because it's a similar sum of money going through accounts in a relatively close period of time.  Right?  You're the judge of that.

But, like I said, use your common sense there. Right?  Because when you start to look closely at stuff in this case, it doesn't make sense.  It's only when you step back and you sort of make the assumption that the government must be right; they wouldn't have arrested him without a reason.  They have all this fancy software.  Then, yeah, okay, but once you start to be critical about it and look at it, it doesn't make sense.

So.  Ms. Mazara de Mazarin, she told you -- she's another one of the witnesses that the government doesn't have the Bitcoin Fog servers, logs, ledgers, source code or the back end.  And she talked to you about file carving.  And if you remember, file carving is a forensic way of going through devices and looking for diluted information and finding stuff. And she told you they file-carved Mr. Sterlingov's devices. And then, again, what did they find showing Mr. Sterlingov operating Bitcoin Fog when they file-carved his devices?  No surprise.  They didn't find anything.  Right?

So we're back to speculation.  We're back to

conjecture. Right? We're back to 2011, you know, with traces being done by people who really weren't even working on the case until after Mr. Sterlingov was arrested, right? who were being told Mr. Sterlingov has been arrested, he operated Bitcoin Fog. Go confirm what we already think. Right?

MR. PEARLMAN: Objection.

THE COURT: I think the jury should disregard counsel's speculation, if it's not in evidence, about what someone may or may not have been told.

MR. EKELAND: May I proceed?

THE COURT: You may.

MR. EKELAND: The government has not shown you any communications between Mr. Sterlingov and anybody operating Bitcoin Fog. You haven't seen anything in the To the Moon packet -- server packet captures related to Bitcoin Fog.

They don't definitively attribute the shormint@hotmail.com email to Mr. Sterlingov. Right? You get a bunch of, sort of, you know, what I would characterize as ambivalent answers.

Shormint@hotmail.com doesn't appear in the PCAP captures, including the BunkerX access, is consistent with Mr. Sterlingov accessing his home computer through Tor. Again, I -- in this case, I just fail to understand why the United States government did not get Mr. Sterlingov's home computer. And you've heard testimony that they were talking to

Swedish law enforcement. Right?

Like, you've learned about the screenshot, right? which turned out to be from an e-Reader book. And she also told you that her IP address analysis was unscientific. Elizabeth Bisbee, from Chainalysis, she said straight up at the top, she's not making any attribution to Mr. Sterlingov. And after you heard about how great their software was and all that stuff about the software, ask yourself this question: Why didn't Chainanalysis Reactor attribute anything to Mr. Sterlingov?

The government will tell you that's because we didn't hire them to make that attribution. But why didn't the government hire them to make that attribution?

She told you that she didn't know the error rates, she didn't know the false positive rates, she didn't know the false negative rates. She told you that there's no scientific peer reviewed paper attesting to Chainalysis Reactors' accuracy. She told you that there's no industry standards or industry oversight of blockchain tracing. And she told you that there's no independent audit of Chainanalysis Reactor software.

Sarah Glave. She didn't do any analysis of any of Mr. Sterlingov's early accounts. She just analyzed what she was given by the government. But there's -- you know, you heard Mr. Sterlingov testify about his paper wallets and all

sorts of stuff. Right? So it's not safe to assume that her analysis has the whole universe of Mr. Sterlingov's assets going back to 2010. Again, she is someone coming in after the fact, after Mr. Sterlingov has been arrested, doing an analysis based just on what, you know, she's being handed by the government. And it's primarily an analysis based on Mr. Sterlingov's KYC accounts.

Ilya Lichtenstein. One of the government's cooperating witnesses who pled guilty to conspiracy, I believe, to money laundering. He doesn't know Mr. Sterlingov. He hacked Bitfinex for, what was it? 120,000 Bitcoin. And when they arrested -- they arrested Mr. Lichtenstein -- I think this is the key point -- they caught him with the private keys. Right?

When they arrested Lichtenstein, they found corroborating evidence. That's in sharp contrast to Mr. Sterlingov. He had a luxurious lifestyle and the government seized hundreds of millions of dollars from Mr. Lichtenstein. Again, that stands in stark contrast to Mr. Sterlingov.

Larry D. Harmon. He took a guilty plea. He's got a cooperation deal, just like Ilya Lichtenstein. He didn't know Mr. Sterlingov. He operated the Helix mixer, the Helix Light mixer, and Grams. And the government got the Helix mixer private keys, they seized hundreds of millions of dollars,

multiple bank accounts --

MR. PEARLMAN:  Objection.

(Bench conference:)

MR. PEARLMAN:  We didn't seize the private keys.

THE COURT:  Is there any evidence that the private keys were seized?

MR. EKELAND:  I thought that was in his testimony, but maybe that's a mistake.

THE COURT:  Do you want to correct that yourself then?

MR. EKELAND:  I'll correct it, yeah.

THE COURT:  I mean, I don't know --

MR. PEARLMAN:  He turned them over.  For Helix he did not -- no.  He essentially deleted the service by 2017.  He was arrested later.

MR. EKELAND:  The government is saying that you didn't get any private keys from Mr. Harmon?

THE COURT:  For Helix, I think.

MR. PEARLMAN:  For Helix, which I thought is what you referred to.

MR. EKELAND:  I was referring -- okay.  I'll clarify that.  But they did get private keys.

MR. PEARLMAN:  We got some private keys, but not for the mixer.

MR. EKELAND:  I'll clarify that.

MR. PEARLMAN: Thank you.

(Open court:)

MR. EKELAND: The government didn't get private keys from the mixer, but they did get some private keys from Mr. Harmon.

You also heard Mr. Harmon testify about how -- I think there was a photo or picture -- excuse me -- of him -- of the operating -- the admin panel, I think, to one of the mixers, I think he testified. You guys can, I think, remember that. Right?

Long story short, with Ilya Lichtenstein and Harmon, when they were arrested, the government found evidence that proved their case. That's why those guys took pleas.

MR. PEARLMAN: Objection.

THE COURT: Yeah. Why don't you just move on from this. I think you know what the concern is.

MR. EKELAND: Sir William Blackstone. Outside this courthouse, there's a statue of William Blackstone. He's one of my heroes. He grew up with a single mom in 18th century London and then went on to write some of the most famous works in the history of our legal tradition called the *Commentaries on the Laws of England*, very influential. Like, Abraham Lincoln trained on it. If you know who John Marshall is, one of our first great Supreme Court justices, whose house was right outside of here, his dad bought him a first edition of

Blackstone.

Blackstone once said that it is better to let ten guilty people escape than one innocent person suffer. And that -- when he's saying that, what he's doing is he's embodying the core ideal in our criminal justice system for centuries, and that is that the government's burden of proof is beyond a reasonable doubt for every element of the crime.

I thank you, Mr. Sterlingov thanks you, the defense team thanks you. I think the government thanks you. The Court thanks you for taking your time to listen and be part of a very, very important tradition that's about 800, 900 years old in our legal system -- the jury system, the great bulwark of liberty in our system.

So now I have said my peace. This is the last time you're going to hear from me and I hand off Mr. Sterlingov's future to you. And I've never ever, ever known a jury not to take the role seriously. So thank you immensely for your time.

THE COURT: All right. Thank you.

Just two things I wanted to add before we hear finally from the government.

And first of all, I think at one point in time Mr. Ekeland referred to something that was in the newspapers and said, "You may have all seen in the newspapers." I've been instructing you all along that you're not supposed to be conducting any type of research or bringing anything that you

learned outside of the courtroom to the case, and so I would ask that you ignore those comments. Everything you decide has to be based on the evidence that was presented in the courtroom.

And finally, with the references to Blackstone at the end, I will instruct you on the law and what the beyond-a-reasonable-doubt standard means.

All right. You can proceed.

MR. PEARLMAN: Court's brief indulgence.

So, may it please the Court, defense counsel, Mr. Sterlingov, members of the jury. Good afternoon. We're almost done. I'll only take a few minutes to talk to you about a couple of the things that Mr. Ekeland said and stress a couple of points that I think might be useful to you as you go back and look at all the evidence.

I want to particularly focus on the concept of circumstantial evidence and its role in this case, the defendant's credibility, and how you might view some of the evidence.

I want to start off by saying your factual recollection controls, not the attorneys. If you agree to something Ms. Pelker and I said or disagree with something that Mr. Ekeland said, again, your recollection controls.

For example, you may have listened to the testimony of Mr. Scholl and recalled that the charts that he referred to

over several hours were consistent with layering, not with standard runoff transactions.

And then Mr. Scholl was fairly definitive in his view of what those charts said. That the first transaction in Chart 313, that's the -- that's the first major chart that involves the incorporation of bitcoinfog.com. That was not an ambiguous transaction that had something to do with heuristics that required the use of Chainalysis software. No. This was something that Mr. Scholl was able to determine by himself because it directly went from Mr. Sterlingov's account to certain other identified addresses, back over to Mt. Gox.

Chainalysis, just -- just so we're clear, is there something in question about anything that Chainalysis has done in this case with respect to their analysis and has the defense offered any reason to question the credibility of Chainalysis?

We would suggest that Ms. Bisbee testified, she testified that Chainalysis was something that she had worked with for a long time, it was useful, it was accurate. And Mr. Scholl testified at some length about the chain tracing technique and it is a valid way to view these various transactions that are on the blockchain.

Go back and ask yourself, was there some question about some of the work that they did?

You may disagree with the ultimate conclusions, but is -- is there some question that Chainalysis doesn't work? Or

that Mr. Scholl can't trace by hand certain transactions? I would stipulate (sic) that the answer is no. There is no question there. They are both credible sources of information that you can consider under the circumstances.

Now, you've heard Mr. Ekeland throughout this trial, it's a litany; no logs, no servers, no passkeys. And you heard Mr. Scholl say, yeah, passkeys would be a nice thing to have. So how do you resolve that conflict?

Well, ladies and gentlemen, there's a certain thing called circumstantial evidence. Right now I think everyone in this room can say we really don't know if it's raining outside. Now, if someone walks through that door and shouts out, wow, it's really coming down outside. Well, then we know. That's direct evidence. We could put that person on the stand and they could testify it was raining and we could count on that direct evidence.

But suppose a couple of people came in from those doors with rain coats and umbrellas and they're shaking those umbrellas out -- off, and they're wiping the water from those jackets, do you need those people to tell you that it's raining outside? No. You can put two and two together. Common sense. We do it all the time.

And this is a case involving circumstantial evidence. And the judge will tell you that you can, if you choose, consider circumstantial evidence to be just as relevant in

assessing whether the government has met the burden of proof on the elements in this case. You can decide that.

There is no video of the defendant operating Bitcoin Fog. So what? The question you need to ask yourself is: Has the government met its burden with the evidence that we've brought forth?

And I got to tell you that the evidence about the Chainalysis and the tracing of Bitcoin and the various ways in which we attribute the identity of Akemashite Omedetou to the defendant is something that you can decide, if you choose, well, that's enough. You have the ability to do that. I agree with Mr. Ekeland, you are the judge of these facts. You are.

I want to clear something up about mixers. Other than what came out of the defendant's mouth concerning why someone might use a mixer, because there might be some physical robbery, have you heard any evidence that anyone would use a mixer for anything other than illegal conduct?

It's not illegal to use a mixer. You can use a mixer. You could go out today and use a mixer. But the evidence in this case, it seems, is that the vast, overwhelming purpose of Bitcoin Fog specifically was to mix illegal fund activity from the darknet. That's its stated purpose. That's what it was designed to do.

Yes, we're not -- we're not blaming Mr. Sterlingov if, in fact, he used Bitcoin Fog just because he wanted to mix

innocent money that he obtained legitimately. No, that's not our point at all.

We're saying that the Bitcoin Fog that Mr. Sterlingov -- I'm sorry. Bitcoin Fog Bitcoin that Mr. Sterlingov had came because he ran Bitcoin Fog and he took the 2 percent fee and he put that in various places where we recovered some of the money. Kraken, the Mycelium wallet, Poloniex, and so forth.

Bitcoin Fog was about laundering money for darknet drug markets. Markets that included Trevor Philips Enterprises, which gave not-so-helpful instructions on what to do if you're using their high-quality drugs, and came out and said they could be lethal. Right? The darknet, which gives people access to CSAM material.

The defendant, as you have heard, knew what the darknet was for. The defendant is not a fool. He knew what it was for. He had various messages and chats about his knowledge of exactly what the darknet was for. He used it himself. And so not even he really believed in this for any notion of privacy. It wasn't out of fear. Even in 2020, when Bitcoin is much more developed, he is still sending $280,000 worth of Bitcoin out of Bitcoin Fog right to his Mycelium wallet. That's not about fear. That's not about fear.

Let's talk about a little bit Ms. Mazars, computer scientist, Mazars. I think you could read her testimony to be

that essentially she made a mistake because that one piece of evidence she was not involved in processing, she ran it through a machine that did process it, and the way that it came out, she wasn't able to tell what it came from in e-Book. We own that mistake. She owns that mistake. That's got nothing to do with any of the other evidence in this case.

Did you hear any problem with any of the other evidence recovered in this case? Is there an argument that we mistranslated something or that we got something else flat out wrong? No. Is that a reason to doubt an entirely separate IP analysis?

And when you go back there, do me a favor. Take a look at Exhibit 363. That is the analysis. Do you even need an expert, ask yourself, to look at that analysis and think it's anything other than one person? You know all those addresses, that were together for a fairly short time period, back and forth, back and forth, like notes in a symphony, and they're singing one song. And that's him.

As the defendant said -- this is on the Meth! chats, and that's Exhibit 55.a (sic). You'll have a chance to see it. There is no 100 percent protection from anything at all -- this, by the way, is a month before he opens up Bitcoin Fog -- there are only levels of probabilities that you will be found. As far as I understand, that's why you want a VPN.

The more money you launder, the darker the schemes

you crank out, the more information about you is leaking out to the network, et cetera, the higher is this probability. You can read all of it. The more you do to isolate yourself from what you're doing, the better off you'll be.

It is, as the defendant said, up to you. It is important to understand that, by all means, it is our burden. There's enough evidence in this case to convict the defendant, we would suggest. But the fact that certain things weren't found doesn't mean that we haven't proven our case.

Take, for example, the defendant coming into LAX airport. I think Mr. Ekeland said at the beginning of this case he's kind of a digital nomad. There's no evidence of that.

By 2021, use your common experience. People are able to access the internet. They're able to access servers and there's nothing that was found on him that is inconsistent, and is, in fact, consistent with his ability to get ahold of a Tor hidden service.

Now, that by itself is not a bad thing. If you want to go to a Tor hidden service for some particular reason, that doesn't make you a criminal. It also doesn't make you a criminal for most people if who happen to own a gun. But if there's a gun crime, you sure want to know if the person that you're investigating had a gun in the first place, and that's what we did here.

And you heard a lot of testimony about what was located on the defendant at LAX because it's important to understand the defendant, up until the point he got arrested, was still able to access the Tor network, was still able to do things consistent with the administrator of Bitcoin Fog.

And now the bigger details, such as the various charts. We hope those don't give you nightmares, but those are, again, not just consistent, but actually strong circumstantial evidence, we would suggest, of the defendant's series of choices that he made. It's important to point that out.

You heard the defendant get up on that stand and give you -- give you an invoice like he were Bitcoin stamp. You heard some of the things he said. And some of those things, some of you might find just isn't credible. The same way he was talking to Bitcoin stamp -- I'm sorry, Bitstamp. The defendant was in a tricky position because all those transactions are locked in stone. They are things that happened. They're all charted out. The defendant knew it.

He'd listened to all the evidence in this case and he got up and testified. And he had a problem because if he rejected those transactions, well, he knew how strong the case was that the government had brought. And if he accepted them, well, then he's essentially confessing. So he walked a tightrope.

But you heard Mr. Brown question him, for example, about the Bitstamp transaction. Bitstamp, those annoying people who are doing their jobs, those customer service representatives, asking him questions to clarify a February 2017 transaction. You remember those conversations. And he got frustrated. Why did he get frustrated and why did he show them an invoice that he testified to you was for transactions from 2014 or 2015? It doesn't make any sense.

What he was doing with those invoices, you may infer, is the same thing he's doing with those payment cards. It's laundering.

He's trying to turn those funds into legit transactions so that he can turn that Bitcoin into something that he can actually spend. Because that's the problem when you have all this Bitcoin, it's not that easy to spend. So he's constantly trying to turn it into something else. And that's what he was trying to do with Bitstamp.

If he didn't have a problem with the transaction in February 2017 from Bitcoin Fog that he sent to Bitstamp, why can't he just tell Bitstamp that he got the transaction from Bitcoin Fog?

On the statute of limitations, ladies and gentlemen, we've demonstrated that Charges 1, 3, and 4 were within the statute of limitations. Now, there's $70 million sitting in a pot somewhere in those deposit addresses. There's $17 million

of deposits in the wallet over the first four months of 2021. Bitcoin Fog was doing pretty well. It was largely automated by that point. And it ground to a halt only after the defendant was arrested.

The defendant, as recently as June of 2020, transferred a $280,000 deposit to the Mycelium wallet. As recently as 2018, he was not been truthful with Bitstamp about where his funds had come from. And you can consider that a further act in the course of the conspiracy.

I would just note a couple more things. When you go back and look at Akemashite's posts, take a close look at who he's talking about when it comes to taking security precautions. Akemashite only got to his referring to the users of Bitcoin Fog. He's not talking about himself.

Mr. Ekeland talked to you about the money. What we know is that he took the vast majority of his $2.3 million in his recovered Mycelium wallet and his other exchanges, and that their argument is the theory that all this money came from the fact that he just happened to come along to Bitcoin in the early 2010s.

But he didn't have any saved account credentials for any Bitcoin Fog user profile in his password files. He told you he had to open accounts with Bitcoin Fog 20 or 30 times. And he never wrote that down. And why? And why would you even do it 20 or 30 times? Larry Harmon told you how clunky the

site is, how annoying it was to have to log on.  In fact, it was a feature of Helix that you didn't have to log on.

You can recall from your common experience, is it enjoyable to go into a site and create a new login and new registration every time you go in, when you're using that site on multiple, multiple occasions?  That doesn't make any sense.

With respect to Professor Verret, he would have to be one of the best investors in history to have bought Bitcoin and figured that you'd hold onto it in the likelihood that it would be at the price that it is as of February 2024.  I wish that people could invest by buying low and selling high all the time.  But you can consider whether a person making about $40,000 a year is just constantly saving their money or he's got expenses.  And that's one of the things that Ms. Glave testified about.

He's got a lot of outlays.  He's using a lot of this money.  He's moving it into accounts.  He's moving it into more than, what? $90,000 worth of prepaid cards over a little over two years?  And he's -- by his own acknowledgment, he's trading.  Those coins are moving in and out.  And so, when this man testifies about the 2700-some Bitcoin going in and out, that's consistent.  That makes sense.

Professor Verret, who -- by the way, you'll have an exhibit, Government Exhibit 915, about whether Professor Verret was even truthful to you about his compensation scheme for this

case. Professor Verret looks at Bitcoin as if back in 2011 it's just Christmas presents, unwrapped Christmas presents to look under a tree.

No. Bitcoin, at the time, was a commodity like any other, that had certain risks, and people tried to figure it out for themselves. There's no reason, and Mr. Verret doesn't provide you much of a reason why you should assume that anybody who's got this Bitcoin stuff in 2011, 2012 is going to hold onto it for one, two, three, four, years, make a billion dollars. That's pie in the sky thinking and that doesn't make any sense. And you can consider that that is not common sense.

Mr. Ekeland also talked about the domain registration. And I just want to be clear. There are a couple of changes to the bitcoinfog.com domain after the defendant was arrested. There isn't evidence about whether the registrar automatically changed it for some reason or changed it on its own or whether the defendant changed it or whether somebody else changed it. It's ambiguous.

We contend not knowing why the registrar changed more than a year after the defendant was arrested is still consistent with finding the defendant guilty.

Now, I have two more things to say, and I swear I'll sit down. It is possible that one of you is going to say, when you go back there, Well, was he working with somebody? And that is conceivable. Under conspiracy, multiple people can

come together and have a general arrangement. The strength of this conspiracy here, if you will, is the conspiracy between the admin of Bitcoin Fog and the various drug dealers who were using it to make a profit.

Is it possible that Mr. Sterlingov had help? Sure. But that's what aiding and abetting is all about. That's about whether the defendant was acting or wasn't acting. If he helped incorporate that Bitcoin Fog site and that assisted in the running in the conspiracy of Bitcoin Fog, you could find that that is sufficient to establish that he's a member of that conspiracy.

I want to be very clear. The evidence is that he is the owner and operator of Bitcoin Fog. But if he assisted, he is as guilty as if he was the primary person.

To think that the defendant was simply -- to think that he was simply caught up in all these transactions and wasn't involved, had made all this money, but not by operating Bitcoin Fog, you would have to think that the defendant was both the most unlucky person you've ever heard of for having been trapped in all these transactions, and yet the luckiest person for having kept just enough Bitcoin to explain why he's got so much Bitcoin Fog in his assets.

Ladies and gentlemen, as the other attorneys have indicated, thank you for your attention. Thank you for your time. Take a look at the judge's instructions and good luck.

THE COURT: All right. Thank you.

So that concludes the arguments in the case. The only two things left to do in the case, I need to offer you the instructions on the law, and then you need to deliberate.

So, why don't we just take a short, just a ten-minute break, come back. I will give you the legal instructions tonight, and then that way you can just start fresh tomorrow morning with your deliberations.

And even though -- now you've even heard all the arguments, I'm still going to ask that you not discuss the case, even amongst yourselves, until you've received my instructions and we've sent them back to you in the jury room and tell you it's time to start your deliberations. You're getting close, but you're not there. So I'll see you all in ten minutes.

(Whereupon the jurors leave the courtroom.)

THE COURT: All right.

(Recess from 3:23 p.m. to 3:37 p.m.)

(Whereupon the jurors enter the courtroom.)

THE COURT: The time has now come when all the evidence is in and you've heard the closing arguments of the lawyers. And we're about to enter your final duty in the case, which is to decide the issues of fact and to return a verdict.

It's up to me to instruct you on the law, and I ask that you listen carefully, just as you have throughout the

trial.

Before we talk about the specific charges alleged here and some of the specific issues in this case, however, I want to take a few minutes to talk about some general rules of law. Some of this may repeat what I told you in my preliminary instructions.

To start, I will provide you with a copy of my instructions. During your deliberations, you may, if you want to, refer to these instructions. While you may refer to any particular portion of the instructions, you are to consider the instructions as a whole, and you may not follow some and ignore others. If you have any questions about the instructions, you should feel free to send me a note, and please return your instructions to me when your verdict is rendered.

My function is to conduct the trial in a orderly, fair and efficient manner, to rule on questions of law, and to instruct you on the law that applies in this case. It is your duty to accept the law as I instruct you. You should consider all the instructions as a whole. You may not ignore or refuse to follow any of them.

Your function as the jury is to determine what the facts are in this case. You are the sole judges of the facts. While it is my responsibility to decide what is admitted as evidence during the trial, you alone decide what weight, if any, to give to that evidence. You alone decide the

credibility or believability of the witnesses. You should determine the facts without prejudice, fear, sympathy or favoritism. You should not be improperly influenced by anyone's race, ethnicity, nationality, gender or any such trait. You must decide the case solely from a fair consideration of the evidence.

You shall not take anything that I may have said or done during the trial as indicating how I think you should decide this case. If you believe that I've expressed or indicated any such opinion, you should ignore it. The verdict in this case is your sole and exclusive responsibility.

If any reference by me or the attorneys to the evidence is different from your own memory of the evidence, it is your memory that should control during your deliberations.

During the trial I have permitted all jurors who want to do so to take notes. You may take your notebooks with you to the jury room and use them during your deliberations, if you wish. As I told you at the beginning of the trial, your notes are only to be an aid to your memory. They are not evidence in the case and you should -- they should not replace your own memory of the evidence.

Those jurors who have not taken notes should rely on their own memories of the evidence. The notes are intended to be for the notetaker's own personal use.

During your deliberations you may consider only the

evidence properly admitted in this trial. The evidence in this case consists of the sworn testimony of the witnesses, and the exhibits that were admitted into evidence, and the facts and testimony stipulated to by the parties.

During the trial you were told that the parties have stipulated -- that is, agreed -- to certain facts. And as I told you, you should consider any stipulation of fact to be undisputed evidence.

When you consider the evidence you are permitted to draw from the facts that you find have been proven such reasonable inferences as you feel are justified in light of your experience. You should give any evidence such weight as in your judgment it is fairly entitled to receive.

The statements and arguments of the lawyers are not evidence, they are only intended to assist you in understanding the evidence. Similarly, the questions of the lawyers are not evidence.

The indictment is merely the formal way of accusing a person of a crime. You must not consider the indictment as evidence of any kind. You may not consider it as any evidence of the defendant's guilt or draw any inference of guilt from it.

Every defendant in a criminal case is presumed to be innocent. This presumption of innocence remains with the defendant throughout the trial, unless and until the government

has proven he is guilty beyond a reasonable doubt. This burden never shifts throughout the trial. The law does not require the defendant to prove his innocence or to produce any evidence at all.

If you find that the government has proven beyond a reasonable doubt every element of an offense with which the defendant is charged, it is your duty to find him guilty of that offense.

On the other hand, if you find the government has failed to prove any particular element -- I'm sorry -- prove any element of a particular offense beyond a reasonable doubt, you must find the defendant not guilty of that offense.

The government has the burden of proving the defendant guilty beyond a reasonable doubt. In civil cases, it's only necessary to prove that a fact is more likely true than not, or, in some cases, that its truth is highly probable. This is a criminal case, however, and in criminal cases the government's proof must be more powerful than that. It must be beyond a reasonable doubt.

Reasonable doubt, as the name implies, is a doubt based on reason. A doubt for which you have a reason based upon the evidence or lack of evidence in the case. If, after careful, honest, and impartial consideration of all the evidence, you cannot say that you are firmly convinced of the defendant's guilt, then you have a reasonable doubt.

Reasonable doubt is the kind of -- kind of doubt that would cause a reasonable person, after careful and thoughtful reflection, to hesitate to act in the graver or more important matters in life. However, it is not an imaginary doubt, nor a doubt based on speculation or guesswork. It is a doubt based on reason.

The government is not required to prove guilt beyond all doubt or to a mathematical or scientific certainty. Its burden is to prove guilt beyond a reasonable doubt.

There are two types of evidence from which you may determine what the facts are in this case, direct evidence and circumstantial evidence.

When a witness, such as an eyewitness, asserts actual knowledge of a fact, that witness's testimony is direct evidence. On the other hand, evidence of facts and circumstances from which reasonable inferences may be drawn is circumstantial evidence.

Let me give you an example. Assume a person looked out a window and saw that the snow was falling. If he later testified in court about what he had seen, his testimony would be direct evidence that snow was falling at the time he saw it happen. Assume, however, that he looked out the window and saw no snow on the ground and then he went to sleep and saw snow on the ground after he woke up. His testimony about what he had seen would be circumstantial evidence, that it had snowed while

he was asleep.

The law says that both direct and circumstantial evidence are acceptable as means of proving a fact. The law does not favor one form of evidence over another. It is for you to decide how much weight to give to any particular evidence, whether it is direct or circumstantial. You are permitted to give equal weight to both. Circumstantial evidence does not require a greater degree of certainty than direct evidence. In reaching a verdict in this case, you should consider all the evidence presented, both direct and circumstantial.

One of the questions you were asked when we were selecting this jury was whether the nature of the charges themselves would affect your ability to reach a fair and impartial verdict. We asked you that question because you must not allow the nature of a charge to affect your verdict. You must consider only the evidence that has been presented in this case in reaching a fair and impartial verdict.

The weight of the evidence is not necessarily determined by the number of witnesses testifying for each side. Rather, you should consider all the facts and circumstances in evidence to determine whether -- which of the -- I'm sorry -- to determine which of the witnesses you believe. You might find that the testimony of a smaller number of witnesses on one side is more believable than the testimony of a greater number

of witnesses on the other side, or you might find the opposite.

The lawyers in this case sometimes objected when the other side asked a question, made an argument, or offered evidence that the objecting lawyer believed was not proper. You must not hold such objections against the lawyer who made them or the party he represents or she represents. It is the lawyer's responsibility to object to evidence that they believe is not admissible.

If, during the course of the trial, I sustained an objection to a lawyer's question, you should ignore the question and you must not speculate as to what the answer would have been. If, after a witness answered a question, I ruled that the answer should be stricken, you should ignore both the question and the answer and they should play no part in your deliberations. Likewise, exhibits as to which I have sustained an objection or that I ordered stricken are not evidence and you must not consider them in your deliberations.

In determining whether the government has proven the charges against the defendant beyond a reasonable doubt, you must consider the testimony of all the witnesses who have testified. You are the sole judges of the credibility of the witnesses. You alone determine whether to believe any witness and the extent to which a witness should be believed.

Judging the witness's credibility means evaluating whether the witness has testified truthfully, and also whether

the witness accurately observed, recalled, and described the matters about which the witness testified.

As I instructed you at the beginning of trial, you should evaluate the credibility of witnesses free from prejudices and biases.  You may consider anything else that in your judgment affects the credibility of any witness.

For example, you may consider the demeanor and the behavior of the witness on the witness stand, the witness's manner of testifying, whether the witness impresses you as having an accurate memory, or the witness has any reason for not telling the truth, whether the witness had a meaningful opportunity to observe the matter about which he or she has testified, and whether the witness has any interest in the outcome of this case, stands to gain anything by testifying, or has friendship or hostility toward other people concerned with this case.

In evaluating the accuracy of a witness's memory you may consider the circumstances surrounding the event, including the time that elapsed between the event and any later recollection of the event, and the circumstances under which the witness was asked to recall details of the event.

You may consider whether there are any consistencies or inconsistencies in a witness's testimony or between the witness's testimony and any previous statement made by the witness.  You may also consider any consistencies or

inconsistencies between the witness's testimony and any other evidence that you credit. You may consider whether any inconsistencies are the result of lapses in memory, mistake, misunderstanding, intentional falsehood or differences in perception. You may consider the reasonableness or unreasonableness, the probability or unprobability of the testimony of a witness in determining whether to accept it as true and accurate. You may consider whether the witness has been contradicted or supported by other evidence that you credit.

If you believe that any witness has shown him or herself to be biased or prejudiced, for or against either side in this trial, or motivated by self-interest, you may consider and determine whether such bias or prejudice has colored the testimony of the witness so as to affect the desire and capability of that witness to tell the truth. You should give the testimony of each witness such weight as in your judgment it is fairly entitled to receive.

You've heard evidence that Ilya Lichtenstein and Larry Harmon entered into plea agreements with the government pursuant to which each agreed to testified truthfully in this case. And the government agreed to bring Mr. Lichtenstein's and Mr. Harmon's cooperation to the attention of their respective sentencing judges and to consider filing papers with the respective sentencing judges which would permit those

judges to impose a more lenient sentence than those judges might otherwise be able to impose.

The government is permitted to enter into this kind of plea agreement. You, in turn, may accept the testimony of such a witness and convict the defendant on the basis of this testimony alone if it convinces you of the defendant's guilt beyond a reasonable doubt.

A witness who has entered into a plea agreement is under the same obligation to tell the truth as is any other witness. The plea agreement does not protect him against a prosecution for perjury or false statement, should he lie under oath.

However, you may consider whether a witness who has entered into such an agreement has a interest different from other types of witnesses. You may consider whether the plea agreement the witness entered into with the government has motivated him to testify falsely against the defendant. The testimony of a witness who has entered into a plea agreement should be considered with caution. You should give the testimony as much weight as in your judgment it deserves.

A law enforcement agent's testimony should be evaluated by you just as any other evidence in this case. In evaluating the officer's or agent's credibility, you should use the same guidelines that you apply to the testimony of any witness. In no event should you give either greater or lesser

weight to the testimony of any witness merely because she or he is a law enforcement agent.

A defendant has a right to become a witness in his own behalf. His testimony should not be disbelieved merely because he is the defendant. In evaluating his testimony, however, you may consider the fact that the defendant has a keen interest in the outcome of this trial. As with the testimony of any other witness, you should give the defendant's testimony as much weight as, in your judgment, it deserves.

In this case you heard the testimony of six witnesses who expressed opinions concerning the following topics: Luke Scholl on blockchain analysis and cryptocurrency, Valerie Mazars de Mazarin on internet routing, network and IP analysis, digital device forensics, operational security used by cyber criminals, particularly tools and techniques used to conceal location and identity online, as well as cyber terms and tools.

Sarah Glave on forensic accounting.

Elizabeth Bisbee on cryptocurrency and blockchain analysis.

J.W. Verret on financial forensics and forensic accounting.

And Jeffrey Fischbach on computer forensics.

If scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or determining a fact at issue, a witness who possesses

knowledge, skill, experience, training, or education may testify and state an opinion concerning such matters. You are not bound to accept this witness's opinion. If you find that the opinion is not based on sufficient education or experience, that the reasons supporting the opinion are not sound or the opinion is outweighed by other evidence, you may completely or partially disregard the opinion. You should consider this evidence with all the other evidence in the case and give it as much weight as you think it fairly deserves.

Motive is not an element of the offenses charged, and the government is not required to prove motive in this case. You may, however, consider evidence of motive or lack of evidence of motive in deciding whether or not the government has proved the charges beyond a reasonable doubt.

I have admitted multiple documents that are in Russian and Swedish along with English translations. While some of you may know the languages used, it is important that all jurors consider the same evidence and, therefore, you must accept the English translations.

If, however, you have a question as to the accuracy of an English translation, you should bring this matter to my attention immediately by raising your hand or with a note. You should not ask your question or make any comments about the translation in the presence of any jurors or otherwise share your question or concerns with any of them, and I will take

steps to see if your question can be answered and any discrepancy resolved. If, however, after such efforts a discrepancy remains, you must rely upon only the English translation provided by the court interpreter or the other interpreter and not on your own translation.

Certain charts or summaries have been shown to you in order to help you -- to help explain the facts disclosed by the files, records, or other underlying evidence in this case. Those charts or summaries are used for your convenience. These charts and summaries are not themselves evidence or proof of any facts. You should determine the facts from the evidence.

Certain charts and summaries have been received into evidence. Charts and summaries are valid only to the extent that they accurately affect the underlying supporting evidence. You should give them only such weight as you think they deserve.

You've heard evidence that the defendant purchased drugs on Silk Road. It is up to you to decide whether to accept that evidence. If you find that the defendant did purchase drugs on Silk Road or otherwise visited the site, you may use this evidence only for the limited purpose of deciding whether the government has proven beyond a reasonable doubt that the defendant knew that money or property that Bitcoin Fog mixed was the proceeds of some kind of unlawful activity. You may not use this evidence for any other purpose.

The defendant is only on trial for the crimes charged. He's not charged in this case with any offense related to his purchase of drugs on Silk Road or any other similar market and you may not use this evidence to conclude the defendant's a bad character or that he has a criminal personality. The law does not allow you to convict him simply because you believe he may have done bad things not specifically charged as crimes in this case.

Someone's state of mind ordinarily cannot be proved directly because there's no way of knowing what a person is actually thinking. But you may infer someone's intent from the surrounding circumstances. You may consider any statement made or act done by the defendant and all other facts and circumstances received in evidence which indicate his or her intent.

You may infer but are not required to infer that a person intends the natural and probable consequences of acts he or she intentionally did or did not do. It is entirely up to you, however, to decide what facts to find from the evidence received during this trial. You should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt the defendant acted with the necessary state of mind.

The word "knowingly," as that term is used from time

to time in these instruction, means that the act was done voluntarily and intentionally and not because of ignorance, mistake or accident.

In considering whether the defendant had knowledge of a fact, you may consider whether he deliberately closed his eyes to what would otherwise have been obvious to him, when knowledge of the existence of a particular fact is an element of an offense, such knowledge can be established if a person has a subjective belief of a high probability of its existence, unless he actually believes that it does not exist.

Thus, other knowledge on the part of the defendant cannot be established merely by demonstrating the defendant was negligent, reckless, careless or foolish. Knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact that he believed to a high probability of certainty existed.

As I've already instructed you, you should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt the defendant acted with the necessary state of mind.

In criminal cases, a mistake of law on the part of the accused does not justify his actions. If a defendant deliberately and intentionally engaged in conduct the law prohibits, his actions are criminal, regardless of his belief

that his actions were lawful or guided by high motive.  To summarize, ignorance of the law does not negate a defendant's criminal liability if the government proves the elements of the offense beyond a reasonable doubt.

The indictment charges that certain offenses were committed on or about the period from October 27th, 2011 to April 27th, 2021.  The proof need not establish to a certainty the exact date of the alleged offense.  It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the dates alleged.

I now want to talk with you about the specific offenses charged in this case.  The alleged crimes are charged in what are called counts.  And the indictment contains four counts.

In Count 1, the indictment charges that from on or about October 27, 2011, and continuing until at least on or about April 27th, 2021, the defendant, together with others, known and unknown, including darknet vendors and darknet market administrative teams, conspired to commit certain offenses against the United States through the use of a Bitcoin mixer known as Bitcoin Fog.

Count 1 alleges two objects of this conspiracy, both involving the alleged laundering of monetary instruments in violation of 18 U.S.C. Section 1956(a)(1).

In Count 2 the indictment charges that the defendant conducted a money laundering transaction involving property represented to be the proceeds of unlawful activity on or about November 21st, 2019, in violation of 18 U.S.C. Section 1956(a)(3).

In Count 3 the indictment charges that from on or about October 27, 2011, and continuing until at least on or about April 27th, 2021, the defendant operated an unlicensed money transmitting business known as Bitcoin Fog, or aided and abided others in doing so, in violation of 18 U.S.C. Section 1960(a) and 19 U.S.C. Section 2.

And in Count 4 the indictment charges that from on or about October 27th, 2011, and continuing until at least on or about April 27th, 2021, the defendant, through the operation of Bitcoin Fog, engaged in the business of money transmission without a license in the District of Columbia, in violation of Section 26-1023(c) of the D.C. code.

Each count of a multiple indictment -- I'm sorry each count of the indictment charges a separate offense.  You should consider each offense and the evidence which applies to it separately, and you should return separate verdicts as to each count.  The fact that you may find the defendant guilty or not guilty on any one count of the indictment should not influence your verdict with respect to any other count of the indictment.

I'll now discuss with you the rules that govern

whether the crimes charged have been proven beyond a reasonable doubt.

In Count 1 defendant is charged with conspiring to commit two offenses against the United States. First, money laundering in violation of 18 U.S.C. Section 1956(a)(1)(A)(i), and, second, money laundering in violation of 18 U.S.C. Section 1956(a)(1)(B)(i). These are called the objects of the conspiracy.

The charge of conspiracy to launder money is a separate charge from money laundering itself, with which the defendant is also charged. And I will instruct you on conspiracy and then I'll discuss each of the two alleged objects of the conspiracy.

A conspiracy is an agreement by two or more persons to commit an unlawful act. In other words, it is a kind of partnership for criminal purposes. Every member of the conspiracy becomes the agent or partner of every other member.

The elements of conspiracy, each of which the government must prove beyond a reasonable doubt, are that, first, that from on or about October 27th, 2011, through on or about April 27, 2021, an agreement existed between two or more people to commit an act in violation of, first, Title 18 U.S. Code § 1956(a)(1)(A)(i), or, second, Title 18 U.S. Code § 1956(a)(1)(B)(i). This does not have to be a formal agreement or plan in which everyone involved sat down together

and worked out the details. On the other hand, merely because people get together and talk about common interests or do similar things does not necessarily show that an agreement exists. It is enough that the government proves beyond a reasonable doubt that there was a common understanding among those who were involved to commit at least one of the two crimes that are the alleged objects of the conspiracy, which, as I mentioned, I'll instruct you about in just a moment.

So the first thing the government must prove is the existence of an agreement. Second, the government must prove the defendant intentionally joined in that agreement. It is not necessary to find that he agreed to all the details of the crime, or that he knew the identity of all the other people the government has claimed were participating in the agreement. A person may become a member of a conspiracy even if that person agrees to play only a minor part, as long as that person understands the unlawful nature of the plan and voluntarily, knowingly, and intentionally joins in it with the intent to advance or further the unlawful object of the conspiracy.

Different people may become part of the conspiracy at different times. However, mere presence at the scene of the agreement or the crime, or merely being with the other participants does not show that a defendant knowingly joins in the agreement. Also, unknowingly acting in a way that helps the participants, or merely knowing about the agreement itself,

without more, does not make the defendant part of the conspiracy. So the second thing that must be shown is that the defendant was part of the conspiracy.

A conspiracy can be proved indirectly, by facts and circumstances that lead to a conclusion that a conspiracy existed. The government must prove that such facts and circumstances existed and that they lead to the conclusion that a conspiracy existed.

Someone's intent or knowledge ordinarily cannot be proved directly because there's no way of knowing what a person is actually thinking. But you may infer someone's intent or knowledge from the surrounding circumstances. You may consider any statement made or acts done or omitted by the defendant and all other facts and circumstances received in evidence which indicate his intent or knowledge.

You may infer, but are not required to infer, that a person intends the natural and probable consequences of acts he or she intentionally did or did not do. It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.

You should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that the defendant acted with the necessary state of mind.

There is no requirement that all members of the

conspiracy be charged and prosecuted or tried together in one proceeding. Nor is there any requirement that the names of all the other conspirators are listed in the indictment. An indictment can charge a defendant with a conspiracy involving people whose names are not given, as long as the government can prove that the defendant conspired with one or more of them, whether they are named or not does not matter.

To prove that the defendant committed conspiracy, the government is not required to prove that the objective of committing an act in violation of, first, 18 U.S.C. Section 1956(a)(1)(A)(i) or, second, 18 U.S.C. Section 1956(a)(1)(B)(i) was achieved. The government must prove, however, the defendant conspired to commit one of these two offenses. You must be unanimous to at least one of the objectives the defendant conspired to accomplish.

I'll now discuss with you the elements of the two substantive offenses charged as the objects of the conspiracy.

The first alleged object of the conspiracy is money laundering, in violation of 19 U.S.C. Section 1956(a)(1)(A)(i). And that crime includes four elements: First, that the defendant knowingly conducted or attempted to conduct a financial transaction.

Second, that the defendant knew that the money or property involved in the transaction was the proceeds of some kind of unlawful activity.

Third, that the money or property came from an unlawful activity. Specifically, the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical, in violation of 21 U.S.C. Sections 841(a)(1) and 846.

And, fourth, that the defendant acted with intent to promote the carrying on of a specified unlawful activity, specifically, the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical, in violation of 21 U.S.C. Sections 841(a)(1) and 846.

The second alleged object of the conspiracy is money laundering, in violation of 18 U.S.C. Section 1956(a)(1)(B)(i). That crime includes four elements:

First, the defendant conducted or attempted to conduct a financial transaction.

Second, that the defendant knew that the money or property involved in the transaction was the proceeds of some kind of unlawful activity.

Third, that the defendant -- that the money or property did come from an unlawful activity, specifically, the felonous manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance or listed chemical, in violation of 21 U.S.C. Sections 841(a)(1) and 846.

And, fourth, the defendant knew that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or the control of the proceeds.

In other words, the government must prove that the transaction was motivated, at least in part, by a desire to conceal or disguise the nature, location, source, ownership, or control of the proceeds. The money laundering section does not criminalize mere spending or investing of illegally obtained funds.

For purposes of both the first and second alleged objects of the money laundering conspiracy, you should use the following definitions and instructions:

To, "act with the intent to promote the carrying on of a specified unlawful activity," means the defendant acted willfully, not by mistake or accident, with the deliberate purpose of promoting, facilitating, or assisting the carrying on of the specified unlawful activity.

To promote the carrying on of an activity means to contribute to the prosperity of something or to further something.

To "conduct a transaction," means to start or to finish a transaction or to participate in a transaction at any point.

A "transaction" includes a purchase, sale, transfer,

delivery, or other disposition.

And with respect to a financial institution, includes a deposit, withdrawal, transfer between accounts, exchange of currency, or other payments, transfers, or delivery by, through, or to a financial institution by whatever means affected.

A "financial transaction" means, A., a transaction which in any way or degree affects interstate or foreign commerce involving the movement of funds by wire or other means, or, B., a transaction involving the use of a financial institution which is engaged in or the activities which affect interstate or foreign commerce in any way or degree. For purposes of this definition, the term "funds" includes Bitcoin.

The term "financial institution" includes any person or entity who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money, domestically or internationally, outside the conventional financial institution system.

"Interstate or foreign commerce" means trade and other business activity between people or businesses in at least two states or between people or businesses in the United States and people or businesses outside the United States. The government is not required to prove the

defendant knew or intended the effect on interstate commerce, merely that such effect occurred.

To know "that the money or property involved in the transaction came from some kind of unlawful activity" is to know that the money or property came from an activity that is a felony under state, federal, or foreign law. This knowledge requirement includes instances of willful blindness. The government is not required to prove the defendant knew what the unlawful activity was.

The term "proceeds" means any property derived from or obtained or retained directly or indirectly through some form of unlawful activity, including the gross receipts of the activity. The government is not required to prove that all of the funds involved in the charged transactions were the proceeds of the specified unlawful activity. It is sufficient if the government proves beyond a reasonable doubt that at least part of the funds involved in a transaction represented proceeds of specified unlawful activity.

The phrase "specified unlawful activity" means the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical, in violation of 21 U.S.C. Sections 841(a)(1) and 846.

And I will instruct you as a matter of law that it is a felony to manufacture, distribute, or dispense, or possess

with intent to manufacture, distribute, or dispense a controlled substance, or to attempt or to conspire to commit such an offense.

In this case, the defendant is not charged with committing the underlying specified unlawful activity himself, only the conspiring to launder the proceeds of specified unlawful activity committed by others. In other words, the government does not need to prove the defendant himself committed or is responsible for any controlled substance offense. However, the government needs to prove that at least some amount of money or property the defendant conspired to launder represented proceeds of the manufacture, distribution, or dispensing of controlled substances.

And as I explained above, the defendant is charged with conspiring to commit one or both of these alleged crimes. The government is not required to prove that either of those objectives was achieved, but it is required to prove beyond a reasonable doubt that the defendant joined a conspiracy to commit one or both of those crimes.

Count 2 of the indictment charges the defendant with violating or attempting to violate 18 U.S.C. Section 1956(a)(3)(A) and (B). And that statute provides, in relevant part: Whoever, with the intent to promote the carrying on or specified unlawful activity, or to conceal or disguise the nature, location, source, ownership, or control of property

believed to be the proceeds of specified unlawful activity, conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity or property used to conduct or facilitate specified unlawful activity shall be guilty of an offense against the United States.

The charge of money laundering, in violation of 18 U.S.C. Section 1956(a)(3)(A) and (B) contains three elements, each of which the government must prove beyond a reasonable doubt.

First, the defendant conducted or attempted to conduct the financial transaction.

Second, that the transaction involved property represented by a law enforcement officer to be the proceeds of some form of unlawful activity.

Third, that, first, the defendant acted with the intent to promote the carrying on of the specified unlawful activity, or, second, the defendant acted with the intent to conceal or disguise the nature, location, source, ownership, or control of the property he believed to be the proceeds of the specified unlawful activity.

I just wanted to correct one minor thing. When I read you from the statute, I think I used the word "or" and it should have been "of." So I'll read you the statute one more time.

Whoever, with the intent to promote the carrying on of specified unlawful activity -- and I had said "or" by mistake the first time through, so that should be "of."

Here, the indictment alleges that the property represented to be the proceeds of specified unlawful activity -- that is, the felonious manufacturer, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance -- was the November 21, 2019, movement of approximately 0.01146764 Bitcoin by wire or other means from Bitcoin Fog to an IRS-CI controlled undercover wallet.

The government is the not required to prove that the law enforcement officer made an express, affirmative statement to the defendant that the property involved was the proceeds of unlawful activity. Instead, the government must prove that the law enforcement officer represented to the defendant circumstances from which a reasonable person would infer that the property was the proceeds of illegal activity.

You should consider all of the evidence in determining whether the government has satisfied this standard.

The phrase "To act with the intent to promote and carry on -- carry on specified unlawful activity," "conduct a transaction," "transaction," "financial transaction," "financial institution," "interstate or foreign commerce," "proceeds," and "specified unlawful activity," have the same

meaning that I just described to you in addressing the objects of the conspiracy count and you should rely on those same definitions in your deliberations.

And you can consider it merciful -- both to you and to me -- not to have to read through all those definitions again.

In this case, the defendant is not charged with committing the underlying specified unlawful activity himself, only with laundering property represented to be the proceeds of specified unlawful activity committed by others or intended to be used to promote specified unlawful activity committed by others. In other words, the government does not need to prove the defendant himself committed or was responsible for any controlled substance offense.

Count 3 of the indictment charges the defendant with violating 18 U.S.C. Section 1960(a). This statute provides, in relevant part: Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business shall be guilty of an offense against the United States.

In order to find the defendant guilty of violating 18 U.S.C. Section 1960(a), the government must prove the following elements beyond a reasonable doubt: First, that Bitcoin Fog was an unlicensed money transmitting business. And I will explain what an unlicensed money transmitting business is in a

moment.

Second, that the defendant knowingly -- knowingly controlled, conducted, managed, supervised, directed, or otherwise owned the business. The government is not required to prove the defendant did all of the things in this list, but only that he did one of them.

And, third, that the money transmitting business affected interstate or foreign commerce.

For purposes of this count, interstate or foreign commerce simply means the movement of goods, services, money in individuals between states or between the United States and a foreign state or nation.

The government must prove that the money transmitting business affected interstate or foreign commerce in any manner -- I'm sorry.

The government must prove that the money transmitting business affected interstate or foreign commerce in any manner, no matter how minimal.

Now I'll provide more explanation about the first element the government must prove beyond a reasonable doubt, that Bitcoin Fog was an unlicensed money transmitting business.

A business is a commercial enterprise that is regularly carried on for profit. A single, isolated instance of money transmitting is not a business under this definition.

The term "money transmitting" includes transferring

funds on behalf of the public by any and all means, including, but not limited to, transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier. For purposes of this definition, the term "funds" includes Bitcoin.

An unlicensed money transmitting business means a money transmitting business that satisfies any one of the following three elements:

You can find the defendant guilty on this count if you unanimously find any one of the elements -- of these elements were satisfied. You don't have to find that all three were satisfied.

The first is that the money transmitting business operated with an appropriate money transmitting license -- I'm sorry.

The money transmitting business operated without an appropriate money transmitting license in the District of Columbia where such operation is punishable as a misdemeanor or felony under District of Columbia law, whether or not the defendant knew a license was required or was punishable by District of Columbia law.

Second, the money transmitting business failed to comply with the money transmitting business registration requirements under federal law.

Or, third, the money transmitting business involved

the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or intended to be used to promote or support unlawful activity.

So I'll now walk through each of these three for purposes of considering whether the defendant operated an unlicensed money laundering business in a state where doing so is punishable as a misdemeanor or felony.

I will instruct you the term "state" includes the District of Columbia, and that a violation of Section 26-1023(c) of the D.C. Code is punishable as a felony.

The elements of money transmission without a license, in violation of Section 26-1023(c) of the D.C. Code, each of which the government must prove beyond a reasonable doubt, are as follows:

First, the defendant knowingly engaged in the business of money transmission in the District of Columbia. And, second, the defendant did not have a license to engage in the business of money transmission in the District of Columbia.

Under D.C. law money transmission means the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States or to a location abroad by any and all means, including, but not limited to, payment instrument, wire, facsimile, or electronic transfer. D.C. law, in turn, requires that someone -- that someone engaged in a money transmission

business obtain a license from the D.C. government to operate in the District of Columbia.  For purposes of this provision, the term "money" includes Bitcoin.

To satisfy the District of Columbia licensing element, the government does not need to prove the defendant knew that a license was required by D.C. law to operate a money transmitting business, but it must prove that he knowingly operated a money transmitting business in the District of Columbia and that he did not have a license to do so.

The government may also satisfy the unlawful money transmitting business element by proving the defendant failed to comply with the money transmitting business registration requirements under 31 U.S.C. Section 5330 or its implementing regulations.  And this is the second way.

Under those regulations, money services businesses must register with the Secretary of Treasury, or FinCEN.  The term "money services business" is defined to include any money transmitter.  A money transmitter is a person or entity that provides money transmission services for any other person or entity engaged in the transfer of funds.

"Money transmission services" means the acceptance of currency from one person in the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means, including an electronic transfer network or an informal value transfer system.

Money transmission services are required to register if they are doing business, whether or not on a regular basis, or as an organized or licensed business, in substantial part with the United States.

For purposes of these definitions, the term "funds" includes Bitcoin.  The movement of Bitcoin from one Bitcoin address to another Bitcoin address on the Bitcoin blockchain can represent movement of funds from one location or person to another location or person.

And then, finally, and this is the third way the government can satisfy the unlicensed money transmitting business requirement, by proving that the money transmitting business involved the transportation or transmission of funds that were known to the defendant to have been derived from a criminal offense, or that were intended to be used to promote or to support unlawful activity.  For purposes of this element, any criminal offense or unlawful activity is sufficient.  The government is not limited to proving that the funds were derived from or intended to promote a specific criminal offense.

As I explained above, to return a verdict of guilty on Count 3 you do not need to find that the defendant operated an unlicensed money transmitting business in all three of the ways I've just described, but you must unanimously find beyond a reasonable doubt that he did so in at least one of these

ways.

The verdict form will ask you, if you find the defendant guilty on Count 3, to indicate which one, two, or three of the ways I've described you unanimously agree applies here.

Count 4 charges the defendant with money transmission without a license, in violation of D.C. Code § 26-1023(c). The elements of that offense, both of which the government must prove beyond a reasonable doubt are as follows:

First, of the defendant knowingly engaged in the business of money transmission in the District of Columbia, and, second, the defendant did not have a license to engage in the business of money transmission in the District of Columbia.

Engaging in the business of money transmission means engaging in the business of receiving money for transmission, or transmitting money within the United States or to a location abroad by any and all means including but not limited to payment instrument, wire, facsimile or electronic transfer. D.C. law, in turns, requires that any money transmission business obtain a license from the D.C. government to operate in the District of Columbia. For purposes of these provisions the term "money" includes Bitcoin.

To satisfy the District of Columbia licensing element the government does not need to prove the defendant knew a license was required by D.C. law to operate a money

transmitting business, but it must prove that he knowingly operated a money transmitting business in the District of Columbia and that he did not have a license to do so.

You may find the defendant guilty of a crime charged in the indictment without finding that he personally committed each of the acts constituting the offense or was personally present at the commission of the offense. A defendant is responsible for an act which he willfully causes to be done if the act would be criminal if performed by him directly or by another. To cause an act to be done means to bring it about.

You may convict the defendant of the offense charged if you find that the government has proved beyond a reasonable doubt each element in the offense, and the defendant willfully caused such an act to be done, with the intent to commit the crime.

You may find the defendant guilty of any of the crimes charged in the indictment without finding that he personally committed each of the acts that make up the crime, or that he was present while the crime was being committed. Any person who in some way intentionally participates in the commission of a crime can be found guilty either as an aider and abettor or as a principal offender. It makes no difference which label you attach, the person is as guilty of the crime as he would be if he had personally committed each of the acts that make up the crime.

To fine that a defendant aided and abetted in committing a crime you must find the defendant knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about, and that intended by his actions to make it succeed.

Such affirmative conduct by the defendant in planning or carrying out the crime is necessary. Mere physical presence by the defendant at the place in time the crime is committed is not by itself sufficient to establish his guilt. It is not necessary that you find the defendant was actually present while the crime was being committed. The government is not required to prove that anyone discussed or agreed upon a specific time or method of committing the crime.

The government is not required to prove the crime was committed in the particular way planned or agreed upon. Nor need the government prove that the principal offender and the person alleged to be the aider and abetter directly communicated with each other. It is not necessary that all people who committed the crime be caught or identified. It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone and that the defendant knowingly and intentionally aided and abetted in committing that crime.

For each offense charged in the indictment, the indictment alleges that some act or omission in furtherance of the offense occurred in the District of Columbia. There is no

requirement that all aspects of the offense charged take place in the District of Columbia. But for you to return a guilty verdict the government must convince you that some act or omission in furtherance of the crime charged took place in the District of Columbia.

Like all the elements that I've described, this fact only has to be proved by a preponderance of the evidence. This means the government only has to convince you that it is more likely than not that some act or omission in furtherance of the crime charged took place here. Remember that the government must prove all the elements I've described -- all the other elements I've described to you beyond a reasonable doubt.

For Count 1 there is no requirement that the entire or even a substantial portion of the alleged conspiracy take place in this district. But in order for you to return a guilty verdict the government must prove by a preponderance of the evidence that either an agreement to commit an unlawful act or an overt act took place in this district, even if the defendant never set foot in this district. And an overt act is an act performed to affect the object or objects of a conspiracy, although it remains separate and distinct from the conspiracy itself. Although the overt act need not be criminal in nature, it must be done in furtherance of the object or objects of the conspiracy. The overt act need not be completed by the defendant, or even by a co-conspirator; it can be

completed by a government agent, as long as it was made in furtherance of the object or objects of the conspiracy.

For Count 2, venue is proper under 18 U.S.C. Section had 1956(i)(1)(A), in any District in which the financial or money transaction that constitutes the offense is conducted. It is not necessarily that the entire transaction occur in this district. Rather, all that required is that the transaction start or finish, or that someone participate in the transaction at any point in this district.

For count 3 and 4 venue is proper in any district where the offense was committed. This means that venue is proper in any district where some conduct constituting the offense occurred. For crimes that allege a failure to register or to obtain a license, the conduct constituting the offense includes the failure to register or to obtain a license in the jurisdiction where doing so is required. But the relevant conduct can also include the underlying financial transactions.

In general, the statute of limitations is not part of the case that the government has to prove. However, if the defendant raises a defense that the statute of limitations has elapsed for any crime -- any of the crimes charged in the indictment, then the government must prove the crime was committed during the limitations period.

The money laundering conspiracy charged in Count 1 is a continuing offense. Similarly, the unlicensed money

transmitting business offenses charged in Counts 3 and 4 are also continuing offenses. A continuing offense is defined as a continuous course of unlawful conduct. The statute of limitations for a continuing offense only begins to run after the last of the continuing offense -- or, the last day of the continuing offense.

I will instruct you that the government must prove beyond a reasonable doubt that conduct related to Counts 1, 3, and 4, if any, continued up to at least the following dates --

I'm sorry. Let me read that again. I will instruct you the government must prove beyond a reasonable doubt that the conduct related to Counts 1, 3, and 4, if any, continued up to at least the following days to be within the applicable statute of limitation period: For Count 1, July 18th 2017. For Count 3, July -- or, June 14th, 2016. And for Count 4, June 14th, 2015.

For Count 2, I will instruct you that the government move prove beyond a reasonable doubt that the financial transaction charged in Count 2 must have occurred on or after the following date to be within the applicable statute of limitations, and that's June 14th, 2016.

A verdict must represent the considered judgment of each juror. And in order to return a verdict each juror must agree on the verdict. In other words, your verdict on each count must be unanimous.

As I previously explained, for purposes of Count 1 you need to reach a unanimous verdict with respect to the crime charged in that count. And you must reach a unanimous verdict with respect to each of the two alleged objects of the conspiracy. You may find the defendant guilty on this count only if the government proves beyond a reasonable doubt that the defendant conspired to commit at least one of the two alleged objects of the conspiracy.

For purposes of Count 3 you need to reach a unanimous verdict with respect to the crime charged in that count and you must reach a unanimous verdict with respect to each of the three alternative ways in which the government alleges the defendant engaged in an unlicensed money transacting business. You may find the defendant guilty on this count only if the government proves beyond a reasonable doubt the defendant conducted an unlicensed money transmitting business in at least of the these three ways.

We're getting close.

You will be provided with a verdict form for use when you have concluded your deliberations. The form is not evidence in this case and nothing in it should be taken to suggest or convey any opinion by me as to what verdict -- what the verdict should be. Nothing in the form replaces the instructions of law I've already given you. And nothing in it replaces or modifies the instructions about the elements which

the government must prove beyond a reasonable doubt.  The form is meant only to assist you in returning or recording your verdict.

I will be sending into the jury room with you the exhibits that have been admitted into evidence.  You may examine any and all of them as you consider your verdicts. Please keep in mind that the exhibits that were only marked for identification but were not admitted into evidence will not be given to you to examine or consider in reaching your verdict.

During the course of this trial a number of the exhibits were admitted in evidence and sometimes only portions of an exhibit was admitted, such as portions of a document with some words or pictures blacked out or otherwise removed.  There are a variety of reasons why only a portion of an exhibit is admitted, including that the other portions are inadmissible or implicate an individual's privacy.

As you examine these exhibits and you see or hear portions where there appear to be omissions, you should consider only the portions that were admitted.  You should not guess as to what has been taken out or why and you should not hold it against either party.  You are to decide the facts only from the evidence that is before you.

When you return to the jury room, you should first select a foreperson to preside over your deliberations and to be your spokesperson here in court.  There are no specific

rules regarding how you should select a foreperson; that is up to you. However, as you go about the task, be mindful of your mission to reach a fair and just verdict based on the evidence. Consider selecting a foreperson who will be able to facilitate your discussions, who can help you organize the evidence, will encourage civility and mutual respect among all of you, who will invite each juror to speak up regarding his or her views about the evidence, and who will promote a full and fair consideration of that evidence.

The question of possible punishment of the defendant in the event of a conviction is not a concern of yours and should not enter into or influence your deliberations in any way. The duty of imposing sentence in the event of a conviction rests exclusively with me. Your verdict should be based solely on the evidence in this case and you should not consider the matter of punishment at all.

I would like to remind you that in some cases, although not necessarily this one, there may be reports in the newspaper or on the radio, internet, or television concerning the case. If there should be such media coverage in this case, you may be tempted to read, listen to, or watch it. You must not read, listen to, or watch such reports because you must decide this case solely on the evidence presented in the courtroom.

If any publicity about this trial inadvertently comes

to your attention, do not discuss it with other jurors or with anyone else. Just let me or the clerk know as soon as it happens and we will briefly discuss it with you.

And as you retire to the jury room to deliberate, I want to remind you of an instruction that I gave you at the beginning of the trial and I've given you throughout the trial: During your deliberations you may not communicate with anyone not on the jury about this case. That includes any electronic communication, such as email or text or any blogging about the case.

In addition, you may not conduct any independent investigation of any kind during your deliberations. This means that you may not conduct any research in person, electronically via the internet or in any other way.

If it becomes necessary during your deliberations to communicate with me, you may send a note by the deputy clerk or marshal, signed by your foreperson or by one more members of the jury. No members of jury should try to communicate with me except by such a signed note. And I will never communicate with any member of the jury on any matter concerning the merits of this case, except in writing or orally here in open count.

Bear in mind, also, that you are never, under any circumstances, to reveal to any person -- not the deputy clerk, the marshal, or me -- how jurors are voting until you have reached a unanimous verdict. This means that you should not

tell me, in writing or in open court, how the jury is divided on any matter; for example, 6 to 6, or 7 to 5, or 11 to 1, or any other fashion, whether the vote is for conviction or acquittal, or on any other issue.

The attitude and conduct of jurors at the beginning of their deliberations is a matter of considerable importance. It may not be useful for a juror, upon entering the jury room, to voice a strong expression of an opinion on the case or to announce a determination to stand for a certain verdict. When one does that at the outset, a sense of pride may cause that juror to hesitate to back away from an announced position after discussion of the case.

Furthermore, many juries find it useful to avoid an initial vote upon retiring to the jury room. Calmly reviewing and discussing the case at the beginning of deliberations is often a more useful way to proceed. Remember that you are not partisans or advocates in this matter, but you are the judges of the facts.

The last thing I must do before you -- excusing you for the day is to excuse the alternate jurors. And as I told you, the selection of alternate jurors was an entirely random process. It is nothing personal. We selected the four seats to be the alternate seats before you entered the courtroom, before you even began the jury selection process.

And I will now excuse the alternate jurors who are in

seats 6, 11, and 14. And before you leave, I'm going to ask that you tear the pages out of your notebooks -- or give your notebooks -- or, tear a page out of your notebook and write your name and daytime number and hand it to the deputy clerk.

I do this because it's possible, although unlikely, that we will need to summon you back to rejoin the jury in case something happens to a regular juror. And since that possibility exists, I'm going to instruct you not to discuss the case with anyone until we call you to let you know that we have a verdict in the case. My earlier instruction on the use of the internet still applies. Do not research the case or communicate about it on the internet.

In all likelihood we'll be calling to tell you there's been a verdict and you are now free to discuss the case. There is, however, a small chance that we will need to bring you back onto the jury.

I thank you very much for your service. And I'll ask that you give your juror badge to the deputy clerk.

I will say in particular, in a case of this length, this is one of the things that pains me the most. I mean, it may be that some people are perfectly happy not to deliberate, but there are others who have sat though a long proceeding and won't join in the deliberations, and I -- I'm sorry for that. It's something that's important to the system. But I really am extremely appreciative to your -- to your participation in this

case because it's something of enormous importance.

And we had four alternates, given the length of this case, and we only ended up losing one juror along the way, which is unusual for a case of this length. So I do thank you for your service.

So I am now going to excuse you briefly with the deputy clerk and she can provide you with a little bit of orientation and then you can start your deliberations first thing tomorrow morning.

You can -- you can start your deliberations as soon as all of you are convened. You should not start your deliberations until every one of the jurors is in the jury room because we do not want anyone missing out or not participating fully in all of the discussion. So only deliberate, both at the beginning and throughout the process, when all of the jurors are present.

And we will have my jury instructions for you and copies for each of you in the morning. And we will also have the exhibits available for you then.

So -- yes?

A JUROR: Should everyone who is deliberating wait until the alternates leave before they start deliberating?

THE COURT: Well, no, because they're not going to start -- because it's the end of the day, so they're not going to start their deliberations until tomorrow morning anyway. So

I think that's fine, and you're welcome to say -- I know you've all been together, so you're welcome to say your farewells as well in that -- in that process.

And then, you know, what time would you like to start tomorrow?  9 o'clock?  Does that make sense?

THE JURORS:  Nine.

THE COURT:  Yes?

THE JURORS:  At 9 there's an appointment I should call into.  So I can physically be here, but...

THE COURT:  How long will it take?

THE JURORS:  If it starts on time, it will be done at 9:20.

THE COURT:  All right.  So why don't we do this:  Why doesn't everyone try and be here at 9 so that at 9:30 -- you can really promptly start at 9:30.

Everyone try and get here at 9.  We'll have breakfast.  You get lunch during deliberations, as well.  And get here early and we'll plan at 9:30 to be able to close the door and start your deliberations right then.

Anything else before I excuse you all for the night?

Oh, and I just remind you, still don't discuss the case with anybody.  And don't discuss even with each other until you're ready to start your deliberations.

So, thank you.  We'll see you tomorrow.

(Whereupon the jurors leave the courtroom.)

THE COURT: So everyone should be -- I guess you don't need to be here available until 9:30. But counsel for both sides should be available on ten minutes call. So don't go far. And you probably want to set up in the attorneys' lounge or somewhere like that, or certainly nearby so that when you get a call from the deputy clerk, you can be here in ten minutes, if we get a note or anything from the jury.

Yes?

MR. PEARLMAN: The Court wants us here at 9:30 tomorrow morning though?

THE COURT: No. I don't think -- that's up to you, but I don't think we need to bring the jury -- unless you saw any reason to bring the jurors in, just to see all of you before they begin their deliberations.

MR. PEARLMAN: No.

THE COURT: So I just need you to be available starting at 9:30, in case there's an immediate note. Seems unlikely, but you never know.

One question I have for you, though, is if the deliberations go beyond a day, do you want me to convene the jury at the end of the day to instruct them not to talk about the case and to tell them to be back the next day, or on Monday? Or are you content with leaving that up to the deputy clerk, to just keep us all updated on when they want to come back?

And if they want to leave at 4, they're welcome to leave at 4. If they want to stay until 5, they're welcome to say until 5, and just have the deputy clerk keep us posted.

MR. PEARLMAN: From the government's perspective, the deputy clerk keeping them posted, or something informal.

THE COURT: Mr. Ekeland?

MR. EKELAND: The defense agrees with the government.

THE COURT: Okay. So we'll do that. I will ask the deputy clerk to remind them -- even though they are sick of hearing it -- not to discuss the case with anybody if and when they go home at the end of the day.

MR. EKELAND: And, Your Honor, they're -- I'm assuming the jury is sitting for the full day tomorrow, right?

THE COURT: Say it again?

MR. EKELAND: The jury is going to sit for the full day tomorrow?

THE COURT: As far as I know they are. Yeah, I'm not aware -- other that that item I just heard about just now, I'm not aware of any issues.

The first issue I have is on Wednesday, there is somebody who has a medical appointment. But you never know, there could be more.

All right. Well, we will keep you posted. So thank you all.

You may have noticed, I think there were one or two

small changes -- one typo I caught as I was reading through the instructions, so we'll just make that correction when we send it back to the jury.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 8th day of March, 2024

---

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C. 20001

**$**

**$17** [1] - 56:25
**$20** [1] - 35:13
**$280,000** [2] - 52:21, 57:6
**$40,000** [1] - 58:13
**$69,000** [1] - 26:21
**$70** [2] - 29:16, 56:24
**$90,000** [1] - 58:18

**'**

**'13** [1] - 36:11

**0**

**0.01146764** [1] - 89:9

**1**

**1** [19] - 2:25, 11:11, 20:1, 25:25, 31:1, 34:22, 35:12, 40:22, 56:23, 77:16, 77:23, 79:3, 99:13, 100:24, 101:8, 101:12, 101:14, 102:1, 106:2
**1.8** [1] - 35:14
**10** [3] - 16:20, 35:13, 35:19
**100** [1] - 53:21
**11** [1] - 106:2
**120,000** [1] - 44:11
**12th** [1] - 34:4
**13** [3] - 22:21, 36:24, 37:23
**14** [2] - 22:19, 26:5
**14th** [4] - 26:6, 101:15, 101:16, 101:21
**17th** [1] - 26:2
**18** [16] - 21:21, 77:25, 78:4, 78:10, 79:5, 79:6, 79:22, 79:23, 82:10, 82:11, 83:13, 87:21, 88:8, 90:16, 90:21, 100:3
**18th** [3] - 26:1, 46:19, 101:14
**19** [3] - 40:3, 78:11, 82:19
**1956(a)(1)** [1] - 77:25
**1956(a)(1)(A)(i** [3] - 79:5, 79:23, 82:11
**1956(a)(1)(A)(i)** [2] - 21:21, 82:19
**1956(a)(1)(B)(i** [1] - 82:11
**1956(a)(1)(B)(i)** [3] - 79:7, 79:24, 83:13

**1956(a)(3)** [1] - 78:5
**1956(a)(3)(A** [2] - 87:22, 88:8
**1956(i)(1)(A** [1] - 100:4
**1960(a** [2] - 78:11, 90:22
**1960(a)** [1] - 90:16
**1st** [1] - 34:14

**2**

**2** [14] - 6:14, 11:9, 21:24, 22:3, 26:5, 29:11, 35:15, 52:6, 78:1, 78:11, 87:20, 100:3, 101:17, 101:19
**2.3** [1] - 57:16
**20** [3] - 40:13, 57:23, 57:25
**20-dollar** [1] - 40:14
**2010** [6] - 26:18, 35:8, 35:9, 36:10, 44:3
**2010s** [1] - 57:20
**2011** [16] - 20:11, 20:23, 21:14, 22:19, 22:23, 23:16, 26:12, 36:10, 42:1, 59:1, 59:8, 77:6, 77:17, 78:7, 78:13, 79:20
**2012** [3] - 23:20, 36:11, 59:8
**2013** [2] - 23:20, 27:12
**2014** [2] - 23:21, 56:8
**2015** [5] - 23:21, 26:6, 34:4, 56:8, 101:16
**2016** [5] - 23:21, 26:5, 26:6, 101:15, 101:21
**2017** [7] - 23:21, 26:1, 32:5, 45:14, 56:5, 56:19, 101:14
**2018** [2] - 23:21, 57:7
**2019** [4] - 22:17, 23:21, 78:4, 89:8
**2020** [3] - 23:21, 52:20, 57:5
**2021** [9] - 11:17, 23:21, 54:14, 57:1, 77:7, 77:18, 78:8, 78:14, 79:21
**2022** [1] - 34:9
**2023** [1] - 34:14
**2024** [1] - 58:10
**2026** [1] - 34:5
**21** [6] - 27:22, 83:5, 83:11, 83:24, 86:22, 89:8
**21st** [1] - 78:4
**22** [1] - 27:22
**26-1023(c** [3] - 78:17, 93:10, 93:12

**26-1023(c)** [1] - 96:7
**27** [3] - 77:17, 78:7, 79:21
**2700-some** [1] - 58:21
**27th** [8] - 22:23, 77:6, 77:7, 77:18, 78:8, 78:13, 78:14, 79:20
**2:00** [1] - 14:25
**2:06** [1] - 14:25

**3**

**3** [19] - 7:22, 9:14, 10:1, 11:11, 22:24, 23:10, 26:5, 34:22, 56:23, 78:6, 90:15, 95:22, 96:3, 100:10, 101:1, 101:8, 101:12, 101:15, 102:9
**30** [3] - 26:19, 57:23, 57:25
**31** [1] - 94:13
**313** [3] - 20:14, 39:3, 49:5
**363** [1] - 53:13
**3:23** [1] - 61:18
**3:37** [1] - 61:18

**4**

**4** [12] - 10:1, 10:3, 11:11, 26:6, 56:23, 78:12, 96:6, 100:10, 101:1, 101:9, 101:12, 101:15
**4th** [1] - 26:5

**5**

**5** [1] - 106:2
**5330** [1] - 94:13
**55.a** [1] - 53:20
**5th** [1] - 34:9

**6**

**6** [2] - 106:2

**7**

**7** [1] - 106:2

**8**

**800** [1] - 47:11
**841(a)(1** [4] - 83:5, 83:11, 83:25, 86:23
**846** [4] - 83:5, 83:11, 83:25, 86:23

**9**

**900** [1] - 47:11
**915** [1] - 58:24

**A**

**abetted** [2] - 98:1, 98:22
**abetter** [1] - 98:17
**abetting** [4] - 10:18, 11:5, 60:6
**abettor** [1] - 97:22
**abided** [1] - 78:10
**ability** [3] - 51:11, 54:17, 67:14
**able** [10] - 7:20, 28:5, 49:9, 53:4, 54:14, 54:15, 55:4, 71:2, 104:4
**Abraham** [1] - 46:22
**abroad** [3] - 92:3, 93:22, 96:17
**absolutely** [4] - 3:7, 8:16, 13:14, 34:17
**abundantly** [1] - 9:19
**accept** [6] - 62:18, 70:7, 71:4, 73:3, 73:19, 74:19
**acceptable** [1] - 67:3
**acceptance** [1] - 94:21
**accepted** [1] - 55:23
**access** [6] - 33:22, 42:21, 52:14, 54:15, 55:4
**accessed** [1] - 11:19
**accessing** [1] - 42:22
**accident** [2] - 76:3, 84:16
**accomplish** [1] - 82:15
**account** [13] - 21:13, 21:14, 21:15, 27:16, 30:1, 31:7, 31:8, 36:12, 40:7, 49:10, 57:21
**accounting** [2] - 72:17, 72:21
**accounts** [12] - 21:4, 30:20, 30:21, 30:25, 31:5, 41:4, 43:23, 44:7, 45:1, 57:23, 58:17, 85:3
**accuracy** [3] - 43:18, 69:17, 73:20
**accurate** [4] - 38:8, 49:18, 69:10, 70:8
**accurately** [2] - 69:1, 74:14
**accused** [2] - 23:1, 76:23

accusing [1] - 64:18
achieved [2] - 82:12, 87:17
acknowledgment [1] - 58:19
acquittal [1] - 106:4
act [22] - 57:9, 66:3, 75:13, 76:1, 79:15, 79:22, 82:10, 84:14, 89:21, 97:8, 97:9, 97:10, 97:14, 98:24, 99:3, 99:9, 99:17, 99:18, 99:19, 99:20, 99:22, 99:24
Act [1] - 9:7
acted [9] - 22:24, 23:5, 75:23, 76:20, 81:24, 83:6, 84:15, 88:16, 88:18
acting [3] - 60:7, 80:24
actions [5] - 2:24, 76:23, 76:25, 77:1, 98:5
active [1] - 6:4
activities [1] - 85:11
activity [53] - 3:7, 3:14, 3:23, 4:4, 4:11, 5:15, 6:17, 6:22, 9:11, 22:6, 23:2, 23:9, 51:22, 74:24, 78:3, 82:25, 83:2, 83:7, 83:19, 83:21, 84:15, 84:18, 84:19, 85:22, 86:4, 86:5, 86:9, 86:12, 86:13, 86:15, 86:18, 86:19, 87:5, 87:7, 87:24, 88:1, 88:4, 88:5, 88:15, 88:18, 88:21, 89:2, 89:6, 89:15, 89:18, 89:22, 89:25, 90:8, 90:10, 90:11, 93:3, 95:16, 95:17
acts [6] - 75:17, 81:13, 81:17, 97:6, 97:18, 97:24
actual [2] - 38:12, 66:13
add [3] - 13:11, 35:16, 47:19
added [1] - 13:8
addition [1] - 105:11
additional [1] - 6:5
address [14] - 8:18, 13:12, 16:4, 17:14, 20:17, 20:19, 37:16, 39:7, 39:12, 39:20, 40:1, 43:4, 95:7
addresses [6] - 16:16, 37:23, 40:3, 49:11, 53:16, 56:25

addressing [1] - 90:1
admin [2] - 46:8, 60:3
administrative [1] - 77:20
administrator [2] - 30:4, 55:5
administrators [1] - 5:5
admissible [1] - 68:8
admit [1] - 25:4
admitted [10] - 62:23, 64:1, 64:3, 73:15, 103:5, 103:8, 103:11, 103:12, 103:15, 103:19
advance [1] - 80:19
advocates [1] - 106:17
affect [6] - 67:14, 67:16, 70:15, 74:14, 85:11, 99:20
affected [6] - 9:18, 24:20, 85:6, 91:8, 91:14, 91:17
affecting [1] - 9:20
affects [2] - 69:6, 85:8
afternoon [3] - 2:22, 15:8, 48:11
afterwards [1] - 27:1
agency [1] - 8:21
Agent [6] - 3:18, 6:16, 7:2, 7:8, 7:16, 11:20
agent [3] - 72:2, 79:17, 100:1
agent's [2] - 71:21, 71:23
ago [4] - 13:19, 22:19, 22:21, 37:23
agree [6] - 19:21, 22:1, 48:21, 51:11, 96:4, 101:24
agreed [6] - 64:6, 70:21, 70:22, 80:12, 98:12, 98:15
agreement [22] - 4:19, 4:21, 4:22, 20:4, 21:25, 71:4, 71:8, 71:10, 71:14, 71:16, 71:18, 79:14, 79:21, 79:25, 80:3, 80:10, 80:11, 80:14, 80:22, 80:24, 80:25, 99:17
agreements [1] - 70:20
agrees [1] - 80:16
ahead [1] - 14:19
ahold [1] - 54:17
aid [1] - 63:19
aided [3] - 78:9, 98:1, 98:22
aider [2] - 97:21, 98:17
aiding [4] - 10:18,

11:5, 60:6
airport [4] - 18:7, 30:9, 54:11
Akemashite [12] - 7:11, 10:24, 17:11, 17:20, 21:9, 30:23, 31:1, 33:25, 40:22, 41:3, 51:9, 57:13
Akemashite's [1] - 57:11
Alexandra [2] - 10:12, 11:21
all-time [1] - 26:21
allege [1] - 100:13
alleged [16] - 16:3, 62:2, 77:8, 77:11, 77:13, 77:24, 79:12, 80:7, 82:18, 83:12, 84:11, 87:15, 98:17, 99:14, 102:4, 102:8
alleges [4] - 77:23, 89:4, 98:24, 102:12
allow [4] - 13:8, 13:12, 67:16, 75:6
almost [2] - 30:20, 48:12
alone [4] - 62:24, 62:25, 68:22, 71:6
alternate [4] - 106:20, 106:21, 106:23, 106:25
alternative [1] - 102:12
ambiguity [1] - 38:16
ambiguous [2] - 49:7, 59:18
ambivalent [1] - 42:19
America [1] - 19:6
American [1] - 8:1
amount [2] - 40:25, 87:11
amounts [1] - 13:15
analysis [15] - 16:4, 16:17, 39:15, 43:4, 43:22, 44:2, 44:4, 44:6, 49:14, 53:11, 53:13, 53:14, 72:12, 72:13, 72:19
analyzed [1] - 43:23
Android [1] - 29:6
announce [1] - 106:9
announced [1] - 106:11
annoying [2] - 56:2, 58:1
answer [6] - 34:8, 34:13, 50:2, 68:11, 68:13, 68:14
answered [2] - 68:12, 74:1
answers [1] - 42:19

anyway [1] - 7:6
apart [1] - 19:17
appear [2] - 42:20, 103:18
applicable [3] - 8:12, 101:13, 101:20
applied [1] - 8:8
applies [3] - 62:17, 78:20, 96:4
apply [2] - 14:3, 71:24
applying [1] - 12:20
appreciate [1] - 13:21
appreciating [1] - 35:2
appreciation [1] - 35:18
approach [1] - 38:9
appropriate [2] - 92:14, 92:17
April [6] - 11:17, 77:7, 77:18, 78:8, 78:14, 79:21
arbiter [1] - 19:20
areas [2] - 27:13, 27:14
argue [2] - 8:12, 38:18
argued [1] - 11:16
argument [4] - 32:19, 53:8, 57:18, 68:3
arguments [4] - 61:2, 61:10, 61:21, 64:14
arrangement [2] - 5:18, 60:1
arrest [5] - 29:10, 29:13, 30:9, 31:22, 31:23
arrested [21] - 11:7, 18:7, 25:18, 34:11, 35:6, 35:7, 37:3, 37:5, 41:11, 42:3, 42:4, 44:4, 44:12, 44:15, 45:15, 46:12, 55:3, 57:4, 59:15, 59:20
asleep [1] - 67:1
aspect [1] - 5:25
aspects [1] - 99:1
asserts [1] - 66:13
assessing [1] - 51:1
assets [3] - 9:13, 44:2, 60:22
assist [3] - 64:15, 72:24, 103:2
assistance [1] - 2:11
assisted [2] - 60:8, 60:13
assisting [1] - 84:17
associated [1] - 98:3
assume [4] - 44:1, 59:7, 66:18, 66:22
assuming [1] - 35:22
assumption [3] -

34:23, 34:25, 41:10
**ATM** [1] - 22:23
**attach** [1] - 97:23
**attempt** [1] - 87:2
**attempted** [4] - 22:4, 82:21, 83:15, 88:11
**attempting** [1] - 87:21
**attempts** [1] - 88:2
**attention** [7] - 10:14, 13:21, 26:8, 60:24, 70:23, 73:22, 105:1
**attesting** [1] - 43:17
**attitude** [1] - 106:5
**attorneys** [3] - 48:21, 60:23, 63:12
**attribute** [4] - 31:15, 42:16, 43:9, 51:9
**attribution** [7] - 31:17, 37:20, 37:22, 38:2, 43:6, 43:12, 43:13
**audit** [1] - 43:20
**authorities** [6] - 3:11, 4:10, 5:9, 5:17, 8:22, 12:10
**automated** [1] - 57:2
**automatically** [2] - 13:7, 59:16
**avoid** [6] - 12:23, 13:2, 13:6, 13:10, 24:16, 106:13
**avoided** [1] - 24:17
**AXIOM** [2] - 16:11, 24:4

## B

**B)** [1] - 87:22
**bad** [4] - 18:5, 54:19, 75:5, 75:7
**Bank** [1] - 9:6
**bank** [2] - 23:24, 45:1
**Banking** [1] - 8:24
**based** [16] - 5:1, 12:19, 16:16, 33:8, 34:22, 39:15, 44:5, 44:6, 48:3, 65:21, 66:5, 73:4, 104:3, 104:15
**basic** [1] - 13:10
**basis** [2] - 71:5, 95:2
**bear** [1] - 105:22
**become** [3] - 72:3, 80:15, 80:20
**becomes** [3] - 6:9, 79:17, 105:15
**began** [1] - 106:24
**beginning** [9] - 6:5, 6:10, 18:13, 54:11, 63:18, 69:3, 105:6, 106:5, 106:15
**begins** [2] - 11:14,

101:4
**behalf** [3] - 26:7, 72:4, 92:1
**behavior** [1] - 69:8
**behind** [2] - 2:15, 37:13
**belabor** [1] - 39:9
**belief** [2] - 76:9, 76:25
**believability** [1] - 63:1
**believable** [1] - 67:25
**believes** [1] - 76:10
**bench** [3] - 32:14, 38:5, 45:3
**benefits** [1] - 5:19
**best** [1] - 58:8
**better** [2] - 47:2, 54:4
**between** [15] - 11:23, 17:8, 39:19, 39:24, 42:13, 60:2, 69:19, 69:23, 70:1, 79:21, 85:3, 85:22, 85:23, 91:11
**beyond** [47] - 14:9, 18:25, 19:5, 21:18, 25:10, 25:21, 25:22, 27:9, 33:5, 47:7, 48:7, 65:1, 65:5, 65:11, 65:14, 65:19, 66:7, 66:9, 68:19, 71:7, 73:14, 74:22, 75:22, 76:19, 77:4, 77:9, 79:1, 79:19, 80:4, 81:23, 86:16, 87:17, 88:9, 90:23, 91:20, 93:13, 95:24, 96:9, 97:12, 98:20, 99:12, 101:8, 101:11, 101:18, 102:6, 102:15, 103:1
**beyond-a-reasonable-doubt** [1] - 48:7
**bias** [1] - 70:14
**biased** [1] - 70:12
**biases** [1] - 69:5
**big** [2] - 22:21, 34:25
**big-picture** [1] - 22:21
**bigger** [1] - 55:6
**bill** [1] - 40:14
**billion** [2] - 35:12, 59:9
**Bisbee** [3] - 43:5, 49:16, 72:18
**bit** [3] - 27:13, 35:14, 52:24
**Bitcoin** [186] - 2:15, 2:16, 3:4, 3:5, 3:8, 3:12, 3:17, 3:20, 4:8, 4:13, 5:4, 5:8, 5:9, 5:11, 5:13, 5:14, 5:16, 5:17, 5:20, 6:17, 7:3, 7:6, 7:10, 7:16, 8:9,

8:10, 8:12, 8:15, 8:16, 8:24, 9:3, 9:4, 9:7, 9:9, 9:15, 9:17, 9:19, 10:10, 10:23, 11:2, 11:3, 11:7, 11:16, 11:18, 11:23, 12:15, 13:1, 13:6, 13:17, 17:5, 17:6, 17:8, 18:9, 18:11, 18:18, 18:20, 19:1, 20:13, 20:17, 21:13, 22:9, 22:16, 23:11, 23:17, 23:19, 25:6, 25:19, 26:18, 26:19, 26:20, 26:24, 26:25, 27:1, 27:7, 27:17, 28:3, 28:6, 28:7, 28:11, 28:14, 28:17, 28:22, 28:23, 29:9, 29:14, 29:15, 29:17, 29:19, 29:21, 29:24, 30:4, 30:5, 30:11, 30:24, 31:2, 31:21, 32:2, 34:5, 34:18, 34:21, 34:22, 34:24, 35:1, 35:6, 35:8, 35:9, 35:18, 36:5, 36:7, 36:10, 36:11, 36:15, 36:16, 36:20, 36:23, 37:9, 39:6, 39:14, 39:22, 41:17, 41:23, 42:5, 42:14, 42:15, 44:11, 51:3, 51:8, 51:21, 51:25, 52:3, 52:4, 52:5, 52:9, 52:20, 52:22, 53:22, 55:5, 55:13, 55:16, 56:13, 56:15, 56:19, 56:21, 57:2, 57:14, 57:19, 57:22, 57:23, 58:8, 58:21, 59:1, 59:4, 59:8, 60:3, 60:8, 60:9, 60:13, 60:18, 60:21, 60:22, 74:23, 77:21, 77:22, 78:9, 78:15, 85:13, 89:9, 89:10, 90:23, 91:21, 92:5, 94:3, 95:6, 95:7, 96:22
**bitcoinfog.com** [2] - 49:6, 59:14
**BitcoinFog.com** [1] - 20:15
**Bitcoins** [1] - 31:11
**BitcoinTalk** [1] - 7:12
**Bitfinex** [1] - 44:11
**Bitstamp** [7] - 55:16, 56:2, 56:17, 56:19, 56:20, 57:7
**blacked** [1] - 103:13
**Blackstone** [5] - 46:17, 46:18, 47:1, 47:2, 48:5

**blaming** [1] - 51:24
**blank** [1] - 22:23
**blinded** [2] - 13:2, 76:14
**blindness** [1] - 86:7
**blockchain** [5] - 43:19, 49:21, 72:12, 72:18, 95:7
**blogging** [1] - 105:9
**blowup** [1] - 17:4
**Book** [5] - 16:1, 24:5, 24:17, 37:25, 53:4
**book** [2] - 16:8, 43:3
**bottom** [1] - 16:8
**bought** [3] - 40:17, 46:25, 58:8
**bound** [1] - 73:3
**break** [4] - 14:14, 14:20, 14:22, 61:6
**breaks** [1] - 20:20
**brief** [1] - 48:9
**briefly** [2] - 2:23, 105:3
**bring** [4] - 70:22, 73:21, 97:10, 98:4
**bringing** [1] - 47:25
**brought** [5] - 9:23, 9:24, 38:11, 51:6, 55:23
**brown** [4] - 13:19, 13:23, 14:2, 56:1
**bucks** [1] - 40:13
**built** [3] - 7:9, 13:16, 29:6
**bulwark** [1] - 47:12
**bunch** [3] - 17:14, 20:11, 42:18
**Bunker** [1] - 16:20
**BunkerX** [2] - 24:13, 42:21
**burden** [10] - 18:23, 19:9, 27:8, 47:6, 51:1, 51:5, 54:6, 65:1, 65:13, 66:9
**business** [67] - 2:19, 7:23, 8:3, 8:15, 8:17, 9:11, 10:2, 10:4, 10:6, 10:7, 23:11, 23:12, 23:14, 24:20, 24:23, 24:25, 25:3, 28:1, 28:5, 78:9, 78:15, 85:15, 85:16, 85:18, 85:22, 90:19, 90:24, 90:25, 91:4, 91:7, 91:14, 91:17, 91:21, 91:22, 91:24, 92:6, 92:7, 92:13, 92:16, 92:22, 92:23, 92:25, 93:6, 93:16, 93:18, 93:20, 94:1, 94:7, 94:8, 94:11, 94:12, 94:17, 95:2,

95:3, 95:12, 95:13, 95:23, 96:11, 96:13, 96:14, 96:15, 96:20, 97:1, 97:2, 101:1, 102:13, 102:16

**businesses** [5] - 8:8, 85:22, 85:23, 85:24, 94:15

**buyers** [2] - 5:6, 5:12

**buying** [6] - 58:11, 83:3, 83:9, 83:23, 86:21, 89:7

**buys** [1] - 40:16

## C

**calculated** [1] - 34:21

**calmly** [1] - 106:14

**cannot** [4] - 65:24, 75:9, 76:12, 81:9

**capability** [1] - 70:16

**capture** [1] - 15:21

**captures** [2] - 42:15, 42:21

**cards** [2] - 56:10, 58:18

**careful** [2] - 65:23, 66:2

**carefully** [3] - 13:20, 25:13, 61:25

**careless** [1] - 76:13

**carried** [1] - 91:23

**carry** [3] - 5:19, 89:22

**carrying** [10] - 4:4, 23:1, 83:7, 84:14, 84:17, 84:19, 87:23, 88:17, 89:1, 98:7

**carved** [2] - 41:21, 41:23

**carving** [2] - 41:18, 41:19

**case** [87] - 9:25, 12:18, 14:5, 14:8, 14:21, 15:9, 16:14, 17:2, 17:24, 18:16, 18:22, 18:25, 19:5, 21:2, 22:18, 24:2, 24:12, 31:16, 32:8, 32:22, 38:7, 40:5, 41:9, 42:3, 42:23, 46:13, 48:1, 48:17, 49:14, 50:23, 51:2, 51:20, 53:6, 53:8, 54:7, 54:9, 54:12, 55:20, 55:22, 59:1, 61:2, 61:3, 61:11, 61:22, 62:3, 62:17, 62:22, 63:5, 63:9, 63:11, 63:20, 64:2, 64:23, 65:17, 65:22, 66:11, 67:9, 67:18, 68:2, 69:14, 69:16,

70:22, 71:22, 72:10, 73:8, 73:11, 74:8, 75:2, 75:8, 77:9, 77:13, 87:4, 90:7, 100:19, 102:21, 104:15, 104:20, 104:23, 105:8, 105:10, 105:21, 106:8, 106:12, 106:15

**cases** [5] - 65:14, 65:16, 65:17, 76:22, 104:17

**cash** [1] - 5:14

**caught** [5] - 18:2, 30:8, 44:13, 60:16, 98:19

**caused** [1] - 97:14

**causes** [1] - 97:8

**caution** [1] - 71:19

**central** [1] - 12:10

**cents** [1] - 26:19

**centuries** [2] - 26:17, 47:6

**century** [1] - 46:19

**certain** [13] - 6:23, 23:16, 49:11, 50:1, 50:9, 54:8, 59:5, 64:6, 74:6, 74:12, 77:5, 77:20, 106:9

**certainly** [3] - 33:5, 38:8, 38:15

**certainty** [4] - 66:8, 67:8, 76:16, 77:7

**cetera** [1] - 54:2

**chain** [2] - 4:25, 49:19

**Chainalysis** [10] - 39:16, 43:5, 43:17, 49:8, 49:12, 49:13, 49:15, 49:17, 49:25, 51:8

**Chainanalysis** [2] - 43:9, 43:20

**chance** [1] - 53:20

**change** [1] - 40:14

**changed** [5] - 59:16, 59:17, 59:18, 59:19

**changes** [1] - 59:14

**character** [1] - 75:5

**characterize** [1] - 42:18

**charge** [11] - 6:15, 7:22, 9:21, 11:9, 21:24, 22:3, 67:16, 79:9, 79:10, 82:4, 88:7

**charged** [34] - 2:17, 4:16, 4:19, 25:18, 35:24, 65:7, 73:10, 75:2, 75:8, 77:13, 79:1, 79:3, 79:11, 82:1, 82:17, 86:14, 87:4, 87:14, 90:7, 97:4,

97:11, 97:17, 98:23, 99:1, 99:4, 99:10, 100:21, 100:24, 101:1, 101:19, 102:3, 102:10

**charges** [17] - 9:23, 10:3, 14:10, 62:2, 67:13, 68:19, 73:14, 77:5, 77:16, 78:1, 78:6, 78:12, 78:19, 87:20, 90:15, 96:6

**Charges** [1] - 56:23

**chart** [3] - 34:20, 37:1, 49:5

**Chart** [1] - 49:5

**charted** [1] - 55:19

**charts** [8] - 48:25, 49:4, 55:7, 74:6, 74:9, 74:10, 74:12, 74:13

**chat** [12] - 15:11, 15:21, 15:22, 16:1, 16:6, 16:9, 17:4, 24:5, 24:6, 29:25, 31:14, 37:25

**chats** [2] - 52:17, 53:19

**check** [3] - 16:12, 24:14, 92:3

**checked** [1] - 17:1

**checking** [2] - 24:16, 24:17

**chemical** [4] - 83:4, 83:10, 83:24, 86:22

**choices** [1] - 55:10

**choose** [2] - 50:24, 51:10

**Christmas** [2] - 59:2

**chunk** [1] - 35:8

**CI** [1] - 89:10

**circumstances** [17] - 37:15, 50:4, 66:16, 67:21, 69:18, 69:20, 75:12, 75:14, 75:21, 76:18, 81:5, 81:7, 81:12, 81:14, 81:21, 89:17, 105:23

**circumstantial** [12] - 48:17, 50:10, 50:23, 50:25, 55:9, 66:12, 66:17, 66:25, 67:2, 67:6, 67:7, 67:11

**citizens** [1] - 8:1

**civil** [2] - 25:11, 65:14

**civility** [1] - 104:6

**claimed** [1] - 80:14

**clarify** [3] - 45:21, 45:25, 56:4

**clean** [1] - 38:21

**cleaning** [1] - 7:3

**clear** [6] - 9:19, 10:21, 49:12, 51:13, 59:13,

60:12

**clearly** [1] - 14:7

**Clearnet** [2] - 20:16, 20:23

**clerk** [3] - 105:2, 105:16, 105:23

**clock** [1] - 11:8

**close** [7] - 10:14, 13:20, 35:12, 41:5, 57:11, 61:14, 102:18

**closed** [1] - 76:5

**closely** [1] - 41:8

**closing** [3] - 14:21, 28:16, 61:21

**clunky** [1] - 57:25

**co** [2] - 39:16, 99:25

**co-conspirator** [1] - 99:25

**co-spend** [1] - 39:16

**coats** [1] - 50:18

**Code** [5] - 79:23, 93:10, 93:12, 96:7

**code** [3] - 9:21, 41:17, 78:17

**coins** [1] - 58:20

**collecting** [2] - 8:5, 13:10

**Colombia** [1] - 12:1

**colored** [1] - 70:14

**Columbia** [25] - 9:22, 10:8, 10:11, 11:20, 12:7, 24:23, 25:4, 78:16, 92:18, 92:19, 92:21, 93:9, 93:16, 93:18, 94:2, 94:4, 94:9, 96:11, 96:13, 96:21, 96:23, 97:3, 98:25, 99:2, 99:5

**Columbia's** [1] - 8:23

**coming** [5] - 3:17, 16:14, 44:3, 50:13, 54:10

**Commentaries** [1] - 46:21

**comments** [2] - 48:2, 73:23

**commerce** [12] - 9:18, 9:20, 24:20, 85:9, 85:12, 85:21, 86:1, 89:24, 91:8, 91:10, 91:14, 91:17

**commercial** [1] - 91:22

**commission** [3] - 97:7, 97:21, 98:3

**commit** [16] - 2:25, 10:19, 11:4, 20:4, 77:20, 79:4, 79:15, 79:22, 80:6, 82:13, 87:2, 87:15, 87:19,

97:14, 99:17, 102:7

**committed** [21] - 4:2, 26:12, 77:6, 77:10, 82:8, 87:7, 87:9, 90:10, 90:11, 90:13, 97:5, 97:18, 97:19, 97:24, 98:8, 98:11, 98:15, 98:19, 98:21, 100:11, 100:23

**committing** [6] - 82:10, 87:5, 90:8, 98:2, 98:13, 98:22

**commodity** [1] - 59:4

**common** [11] - 4:24, 12:20, 14:2, 14:3, 41:7, 50:21, 54:14, 58:3, 59:11, 80:2, 80:5

**communicate** [4] - 105:7, 105:16, 105:18, 105:19

**communicated** [1] - 98:18

**communication** [1] - 105:9

**communications** [2] - 17:7, 42:13

**Comolli** [2] - 10:12, 11:21

**compensation** [1] - 58:25

**completed** [2] - 99:24, 100:1

**completely** [1] - 73:6

**comply** [3] - 8:10, 92:23, 94:12

**computer** [14] - 16:21, 16:22, 16:25, 17:1, 18:20, 19:13, 24:8, 24:10, 24:13, 33:13, 42:22, 42:25, 52:24, 72:22

**computers** [1] - 11:19

**conceal** [10] - 3:23, 4:5, 4:10, 6:23, 23:6, 72:15, 84:2, 84:7, 87:24, 88:19

**concealment** [7] - 4:1, 7:4, 83:3, 83:9, 83:22, 86:20, 89:7

**conceivable** [1] - 59:25

**concept** [3] - 12:12, 36:1, 48:16

**concepts** [1] - 10:14

**concern** [2] - 46:16, 104:11

**concerned** [1] - 69:15

**concerning** [5] - 51:14, 72:11, 73:2, 104:19, 105:20

**concerns** [1] - 73:25

**conclude** [1] - 75:4

**concluded** [1] - 102:20

**concludes** [1] - 61:2

**conclusion** [4] - 14:8, 31:3, 81:5, 81:7

**conclusions** [1] - 49:24

**concrete** [1] - 30:16

**conduct** [24] - 6:19, 11:13, 11:17, 22:4, 51:17, 62:15, 76:24, 82:21, 83:16, 84:22, 88:2, 88:4, 88:12, 89:22, 98:6, 100:12, 100:14, 100:17, 101:3, 101:8, 101:12, 105:11, 105:13, 106:5

**conducted** [12] - 3:5, 6:16, 6:19, 22:4, 23:13, 78:2, 82:21, 83:15, 88:11, 91:3, 100:5, 102:16

**conducting** [3] - 4:18, 24:25, 47:25

**conducts** [2] - 88:2, 90:17

**conference** [2] - 32:14, 45:3

**conferences** [1] - 29:25

**confessing** [1] - 55:24

**confirm** [1] - 42:5

**conflict** [1] - 50:8

**conjecture** [1] - 42:1

**consequences** [2] - 75:17, 81:17

**consider** [49] - 20:21, 38:10, 50:4, 50:25, 57:8, 58:12, 59:11, 62:10, 62:18, 63:25, 64:7, 64:9, 64:19, 64:20, 67:10, 67:17, 67:21, 68:17, 68:20, 69:5, 69:7, 69:18, 69:22, 69:25, 70:2, 70:5, 70:8, 70:13, 70:24, 71:13, 71:15, 72:6, 73:7, 73:12, 73:18, 75:12, 75:20, 76:5, 76:17, 78:20, 81:12, 81:21, 89:19, 90:4, 103:6, 103:9, 103:19, 104:4, 104:16

**considerable** [1] - 106:6

**consideration** [3] - 63:6, 65:23, 104:9

**considered** [3] - 13:3,

71:19, 101:22

**considering** [2] - 76:4, 93:5

**considers** [1] - 9:8

**consistencies** [2] - 69:22, 69:25

**consistent** [14] - 18:17, 18:18, 19:12, 20:13, 23:17, 28:20, 36:22, 42:21, 49:1, 54:17, 55:5, 55:8, 58:22, 59:21

**consists** [1] - 64:2

**conspiracies** [2] - 4:22, 6:3

**conspiracy** [66] - 2:17, 2:18, 2:25, 3:24, 4:17, 4:19, 4:21, 5:1, 5:22, 5:23, 6:2, 6:4, 6:7, 6:10, 6:12, 6:24, 11:3, 20:2, 20:8, 20:10, 21:1, 21:17, 21:25, 35:25, 37:1, 44:9, 57:9, 59:25, 60:2, 60:9, 60:11, 77:23, 79:8, 79:9, 79:12, 79:13, 79:14, 79:17, 79:18, 80:7, 80:15, 80:19, 80:20, 81:2, 81:3, 81:4, 81:5, 81:8, 82:1, 82:4, 82:8, 82:17, 82:18, 83:12, 84:12, 87:18, 90:2, 99:14, 99:21, 99:22, 99:24, 100:2, 100:24, 102:5, 102:8

**conspirator** [1] - 99:25

**conspirators** [3] - 5:25, 6:11, 82:3

**conspire** [1] - 87:2

**conspired** [6] - 77:20, 82:6, 82:13, 82:15, 87:11, 102:7

**conspiring** [4] - 11:4, 79:3, 87:6, 87:15

**constantly** [2] - 56:16, 58:13

**constitutes** [1] - 100:5

**constituting** [3] - 97:6, 100:12, 100:14

**construed** [1] - 38:15

**contact** [2] - 7:9, 16:24

**contains** [2] - 77:14, 88:8

**contend** [1] - 59:19

**continue** [1] - 2:9

**continued** [4] - 11:6, 11:17, 101:9, 101:12

**continues** [1] - 26:2

**continuing** [15] - 11:11, 11:12, 11:13, 11:15, 26:3, 26:13, 77:17, 78:7, 78:13, 100:25, 101:2, 101:4, 101:5, 101:6

**continuous** [2] - 11:12, 101:3

**contradicted** [1] - 70:9

**contrast** [2] - 44:16, 44:19

**contribute** [3] - 4:4, 4:11, 84:20

**control** [8] - 23:7, 40:10, 40:19, 63:14, 84:3, 84:8, 87:25, 88:20

**controlled** [15] - 9:15, 23:13, 39:23, 40:1, 83:4, 83:10, 83:23, 86:21, 87:2, 87:9, 87:13, 89:8, 89:10, 90:14, 91:3

**controlling** [1] - 40:21

**controls** [6] - 20:19, 39:11, 39:12, 48:21, 48:23, 90:17

**convenience** [1] - 74:9

**conventional** [1] - 85:19

**conversations** [1] - 56:5

**converted** [1] - 34:24

**convey** [1] - 102:22

**convict** [4] - 54:7, 71:5, 75:6, 97:11

**conviction** [3] - 104:11, 104:14, 106:3

**convince** [2] - 99:3, 99:8

**convinced** [1] - 65:24

**convinces** [1] - 71:6

**convoluted** [1] - 31:6

**cooperating** [1] - 44:9

**cooperation** [2] - 44:22, 70:23

**copy** [1] - 62:7

**Core** [1] - 28:3

**core** [3] - 8:17, 36:1, 47:5

**corollary** [1] - 10:1

**correct** [4] - 31:13, 45:9, 45:11, 88:22

**corroborating** [4] - 17:3, 17:19, 37:3, 44:16

**counsel** [1] - 48:10

**counsel's** [1] - 42:8

**count** [32] - 2:25, 6:14,

6:24, 7:22, 10:3, 11:9, 20:2, 21:24, 23:10, 26:5, 50:15, 77:23, 78:18, 78:19, 78:22, 78:23, 78:24, 87:20, 90:2, 90:15, 91:9, 92:9, 96:6, 100:10, 101:25, 102:3, 102:5, 102:10, 102:14, 105:21

**Count** [24] - 9:14, 10:1, 20:1, 22:3, 25:25, 26:6, 77:16, 78:1, 78:6, 78:12, 79:3, 95:22, 96:3, 99:13, 100:3, 100:24, 101:14, 101:15, 101:17, 101:19, 102:1, 102:9

**countries** [1] - 19:17

**country** [1] - 92:2

**Counts** [4] - 11:11, 101:1, 101:8, 101:12

**counts** [5] - 2:18, 19:20, 19:22, 77:14, 77:15

**couple** [7] - 20:5, 31:9, 48:13, 48:14, 50:17, 57:10, 59:13

**courier** [1] - 92:3

**course** [10] - 7:13, 8:25, 11:12, 19:20, 34:13, 36:14, 57:9, 68:9, 101:3, 103:10

**Court** [5] - 12:12, 38:18, 46:24, 47:9, 48:10

**court** [10] - 9:23, 9:24, 25:18, 33:11, 38:24, 46:2, 66:20, 74:4, 103:25, 106:1

**COURT** [27] - 2:2, 2:7, 14:11, 14:16, 14:19, 15:1, 15:3, 15:5, 32:13, 33:1, 33:3, 38:4, 38:12, 38:15, 38:20, 38:23, 42:7, 42:11, 45:5, 45:9, 45:12, 45:18, 46:15, 47:18, 61:1, 61:17, 61:20

**court's** [1] - 48:9

**courthouse** [1] - 46:18

**courtroom** [11] - 2:4, 14:4, 14:24, 15:4, 33:9, 48:1, 48:4, 61:16, 61:19, 104:24, 106:23

**COURTROOM** [2] - 2:5, 15:16

**cover** [1] - 12:23

**coverage** [1] - 104:20

**covered** [1] - 29:13

**crank** [1] - 54:1

**create** [1] - 58:4

**credentials** [1] - 57:21

**credibility** [9] - 26:16, 48:18, 49:15, 63:1, 68:21, 68:24, 69:4, 69:6, 71:23

**credible** [2] - 50:3, 55:15

**credit** [2] - 70:2, 70:10

**crime** [36] - 10:20, 12:4, 12:11, 25:21, 26:11, 47:7, 54:23, 64:19, 80:13, 80:22, 82:20, 83:14, 97:4, 97:15, 97:18, 97:19, 97:21, 97:23, 97:25, 98:2, 98:3, 98:4, 98:7, 98:8, 98:11, 98:13, 98:14, 98:19, 98:20, 98:22, 99:4, 99:10, 100:21, 100:22, 102:2, 102:10

**crimes** [13] - 8:20, 10:19, 13:7, 75:1, 75:8, 77:13, 79:1, 80:7, 87:15, 87:19, 97:17, 100:13, 100:21

**Crimes** [1] - 12:2

**criminal** [22] - 6:3, 6:9, 9:11, 20:23, 20:24, 47:5, 54:21, 54:22, 64:23, 65:17, 75:5, 76:22, 76:25, 77:3, 79:16, 93:2, 95:15, 95:17, 95:19, 97:9, 99:22

**criminalize** [1] - 84:9

**criminally** [1] - 6:11

**criminals** [4] - 6:6, 9:13, 13:18, 72:15

**critical** [1] - 41:13

**crossing** [1] - 17:22

**crucial** [3] - 19:16

**cryptocurrency** [2] - 72:12, 72:18

**CSAM** [1] - 52:14

**currency** [4] - 85:4, 94:22, 94:23

**Customer** [1] - 30:21

**customer** [3] - 7:15, 22:10, 56:3

**customers** [3] - 4:10, 7:14, 8:6

**customers'** [1] - 13:7

**cut** [1] - 5:21

**cutoffs** [1] - 26:4

**cyber** [2] - 72:14, 72:16

## D

**D.C** [29] - 2:19, 6:16, 9:3, 9:21, 9:24, 10:1, 10:4, 11:22, 11:23, 11:24, 12:4, 12:11, 22:8, 24:22, 24:25, 25:5, 25:14, 25:17, 78:17, 93:10, 93:12, 93:19, 93:24, 94:1, 94:6, 96:7, 96:19, 96:20, 96:25

**D.C.'s** [1] - 10:9

**dad** [1] - 46:25

**darker** [1] - 53:25

**darknet** [11] - 3:16, 5:4, 5:15, 19:14, 51:22, 52:9, 52:13, 52:16, 52:18, 77:19

**date** [4] - 11:10, 77:8, 77:10, 101:20

**dates** [5] - 26:8, 26:10, 77:10, 101:9

**days** [2] - 29:9, 101:13

**de** [7] - 16:2, 16:15, 17:12, 24:9, 37:20, 41:15, 72:13

**deal** [1] - 44:22

**dealers** [3] - 5:19, 6:6, 60:3

**dealing** [5] - 83:4, 83:9, 83:23, 86:21, 89:7

**deals** [3] - 5:12, 5:16, 13:3

**December** [1] - 34:14

**decide** [22] - 19:3, 23:2, 23:7, 24:18, 25:7, 26:11, 30:18, 48:2, 51:2, 51:10, 61:23, 62:23, 62:24, 62:25, 63:5, 63:9, 67:5, 74:18, 75:19, 81:19, 103:21, 104:23

**deciding** [2] - 73:13, 74:21

**decision** [1] - 33:8

**defendant** [171] - 2:15, 2:17, 3:5, 3:6, 3:7, 3:12, 3:22, 4:2, 4:7, 4:9, 4:16, 4:17, 5:21, 5:24, 6:4, 6:19, 6:21, 7:6, 7:9, 7:10, 7:21, 9:2, 9:7, 9:9, 9:12, 9:15, 10:3, 10:5, 10:7, 10:19, 10:24, 12:5, 12:14, 12:25, 13:5, 13:13, 13:14, 14:9, 18:24, 22:4, 22:24, 23:5, 23:12, 24:22,

25:2, 51:3, 51:10, 52:15, 52:16, 53:19, 54:5, 54:7, 54:10, 55:2, 55:3, 55:12, 55:17, 55:19, 57:3, 57:5, 59:14, 59:17, 59:20, 59:21, 60:7, 60:15, 60:18, 64:23, 64:25, 65:3, 65:7, 65:12, 65:14, 68:19, 71:5, 71:17, 72:3, 72:5, 72:6, 74:17, 74:19, 74:23, 75:1, 75:13, 75:23, 76:4, 76:11, 76:12, 76:14, 76:20, 76:23, 77:18, 78:1, 78:8, 78:14, 78:22, 79:3, 79:11, 80:11, 80:23, 81:1, 81:3, 81:13, 81:24, 82:4, 82:6, 82:8, 82:13, 82:15, 82:21, 82:23, 83:6, 83:15, 83:17, 83:20, 84:1, 84:15, 86:1, 86:8, 87:4, 87:8, 87:11, 87:14, 87:18, 87:20, 88:11, 88:16, 88:18, 89:14, 89:16, 90:7, 90:13, 90:15, 90:21, 91:2, 91:5, 92:9, 92:20, 93:2, 93:5, 93:15, 93:17, 94:5, 94:11, 95:14, 95:22, 96:3, 96:6, 96:10, 96:12, 96:24, 97:4, 97:7, 97:11, 97:13, 97:16, 98:1, 98:2, 98:6, 98:8, 98:10, 98:21, 99:19, 99:25, 100:20, 102:5, 102:7, 102:13, 102:14, 102:15, 104:10

**defendant's** [12] - 2:24, 12:10, 12:18, 48:18, 51:14, 55:9, 64:21, 65:25, 71:6, 72:8, 75:5, 77:2

**defense** [5] - 12:22, 47:8, 48:10, 49:14, 100:20

**defined** [2] - 94:17, 101:2

**definitely** [1] - 17:13

**definition** [3] - 85:13, 91:24, 92:4

**definitions** [4] - 84:13, 90:3, 90:5, 95:5

**definitive** [7] - 20:19, 37:12, 37:19, 37:22, 38:1, 39:10, 49:3

**definitively** [2] - 17:19,

42:16

**degree** [3] - 67:8, 85:8, 85:12
**delete** [2] - 13:8
**deleted** [1] - 45:14
**deliberate** [4] - 14:4, 61:4, 84:16, 105:4
**deliberately** [6] - 12:23, 13:2, 13:9, 76:5, 76:14, 76:24
**deliberations** [17] - 61:8, 61:13, 62:8, 63:14, 63:17, 63:25, 68:15, 68:17, 90:3, 102:20, 103:24, 104:12, 105:7, 105:12, 105:15, 106:6, 106:15
**delivery** [2] - 85:1, 85:4
**demeanor** [1] - 69:7
**demonstrated** [1] - 56:23
**demonstrating** [1] - 76:12
**Department** [3] - 8:4, 8:23, 12:2
**depended** [1] - 7:14
**deposit** [6] - 39:6, 39:14, 56:25, 57:6, 85:3
**depositing** [1] - 30:24
**deposits** [1] - 57:1
**DEPUTY** [2] - 2:5, 15:16
**deputy** [2] - 105:16, 105:23
**derived** [5] - 9:11, 86:10, 93:2, 95:14, 95:19
**described** [8] - 25:12, 69:1, 90:1, 95:24, 96:4, 99:6, 99:11, 99:12
**deserve** [1] - 74:16
**deserves** [3] - 71:20, 72:9, 73:9
**designed** [7] - 7:21, 8:10, 13:5, 13:10, 13:17, 51:23, 84:2
**desire** [2] - 70:15, 84:6
**desk** [1] - 22:10
**desks** [1] - 24:3
**despite** [1] - 10:10
**detail** [1] - 20:6
**detailed** [2] - 30:6, 30:7
**details** [7] - 13:2, 13:6, 18:3, 55:6, 69:21, 80:1, 80:12
**detection** [2] - 5:7, 5:20

**determination** [1] - 106:9
**determine** [9] - 49:9, 62:21, 63:2, 66:11, 67:22, 67:23, 68:22, 70:14, 74:11
**determined** [1] - 67:20
**determining** [7] - 68:18, 70:7, 72:25, 75:22, 76:19, 81:22, 89:20
**developed** [2] - 33:16, 52:21
**device** [2] - 33:20, 72:14
**devices** [4] - 33:21, 41:20, 41:21, 41:23
**diaries** [1] - 18:8
**dice** [1] - 37:5
**difference** [1] - 97:22
**differences** [1] - 70:4
**different** [13] - 3:25, 4:23, 5:3, 6:4, 9:1, 10:14, 25:8, 40:3, 40:10, 63:13, 71:14, 80:20, 80:21
**digital** [2] - 54:12, 72:14
**diluted** [1] - 41:20
**direct** [11] - 12:17, 38:10, 50:14, 50:16, 66:11, 66:14, 66:21, 67:2, 67:6, 67:9, 67:10
**directed** [2] - 23:14, 91:3
**directly** [6] - 49:10, 75:10, 81:10, 86:11, 97:9, 98:17
**directs** [1] - 90:18
**dirty** [1] - 3:12
**disagree** [2] - 48:22, 49:24
**DISB** [3] - 8:24, 10:9, 12:6
**disbelieved** [1] - 72:4
**disclosed** [1] - 74:7
**discover** [1] - 15:24
**discovered** [1] - 15:25
**discrepancy** [2] - 74:2, 74:3
**discuss** [7] - 14:21, 61:10, 78:25, 79:12, 82:16, 105:1, 105:3
**discussed** [2] - 6:25, 98:12
**discussing** [1] - 106:15
**discussion** [3] - 14:18, 38:5, 106:12
**discussions** [1] -

104:5

**disguise** [7] - 4:6, 6:23, 23:6, 84:2, 84:7, 87:24, 88:19
**dispense** [2] - 86:25, 87:1
**dispensing** [1] - 87:13
**disposition** [1] - 85:1
**disregard** [2] - 42:7, 73:7
**distinct** [1] - 99:21
**distribute** [2] - 86:25, 87:1
**distribution** [1] - 87:12
**District** [28] - 8:23, 9:21, 10:8, 10:11, 11:19, 11:25, 12:7, 24:23, 25:3, 78:16, 92:17, 92:19, 92:21, 93:9, 93:16, 93:18, 94:2, 94:4, 94:8, 96:11, 96:13, 96:21, 96:23, 97:2, 98:25, 99:2, 99:5, 100:4
**district** [7] - 99:15, 99:18, 99:19, 100:7, 100:9, 100:10, 100:12
**divided** [1] - 106:1
**DNS** [11] - 20:23, 20:24, 21:12, 31:6, 31:21, 33:24, 34:5, 34:10, 34:15, 39:4, 41:2
**document** [1] - 103:12
**documents** [1] - 73:15
**dollars** [8] - 3:16, 28:23, 29:1, 34:25, 35:13, 44:18, 44:25, 59:10
**domain** [4] - 11:2, 20:23, 59:12, 59:14
**domestically** [1] - 85:19
**done** [16] - 11:1, 13:12, 22:1, 33:7, 42:2, 48:12, 49:13, 63:8, 75:7, 75:13, 76:1, 81:13, 97:8, 97:10, 97:14, 99:23
**door** [1] - 50:12
**doors** [1] - 50:18
**doubt** [55] - 14:10, 18:25, 19:5, 21:18, 25:10, 25:22, 27:9, 47:7, 48:7, 53:10, 65:1, 65:6, 65:11, 65:14, 65:19, 65:20, 65:21, 65:25, 66:1, 66:4, 66:5, 66:8, 66:9, 68:19, 71:7,

73:14, 74:22, 75:23, 76:20, 77:4, 77:9, 79:2, 79:19, 80:5, 81:23, 86:16, 87:18, 88:10, 90:23, 91:20, 93:13, 95:25, 96:9, 97:13, 98:20, 99:12, 101:8, 101:11, 101:18, 102:6, 102:15, 103:1
**down** [9] - 20:20, 29:21, 30:15, 35:2, 37:2, 50:13, 57:24, 59:23, 79:25
**download** [1] - 33:18
**dozen** [1] - 3:19
**draft** [1] - 92:3
**draw** [3] - 22:23, 64:10, 64:21
**drawn** [1] - 66:16
**drive** [4] - 28:21, 28:23, 29:1
**drives** [2] - 28:4, 28:19
**drug** [14] - 3:16, 3:20, 5:7, 5:12, 5:16, 5:19, 5:20, 6:5, 6:6, 7:4, 13:1, 13:3, 52:10, 60:3
**drugs** [10] - 5:4, 5:5, 5:6, 22:11, 40:16, 40:17, 52:12, 74:18, 74:20, 75:3
**Duane** [2] - 40:15
**during** [17] - 32:8, 62:8, 62:24, 63:8, 63:14, 63:15, 63:17, 63:25, 64:5, 68:9, 75:20, 81:20, 100:23, 103:10, 105:7, 105:12, 105:15
**duty** [4] - 61:22, 62:18, 65:7, 104:13

## E

**e-Book** [5] - 16:1, 24:5, 24:17, 37:25, 53:4
**e-Reader** [1] - 43:3
**early** [4] - 26:18, 36:4, 43:23, 57:20
**ears** [1] - 12:23
**easy** [2] - 21:6, 56:15
**edition** [1] - 46:25
**education** [2] - 73:1, 73:4
**effect** [4] - 8:14, 32:23, 86:1, 86:2
**efficient** [1] - 62:16
**efforts** [1] - 74:2
**either** [8] - 4:2, 21:18, 70:12, 71:25, 87:16,

97:21, 99:17, 103:21

**Ekeland** [11] - 14:12, 15:5, 38:16, 47:22, 48:13, 48:23, 50:5, 51:12, 54:11, 57:15, 59:12

**EKELAND** [21] - 14:14, 15:2, 15:7, 15:14, 15:17, 15:19, 32:17, 32:22, 33:10, 33:12, 38:17, 38:25, 42:10, 42:12, 45:7, 45:11, 45:16, 45:21, 45:25, 46:3, 46:17

**elapsed** [2] - 69:19, 100:21

**electronic** [4] - 93:24, 94:24, 96:18, 105:8

**electronically** [1] - 105:14

**element** [15] - 18:24, 19:5, 47:7, 65:6, 65:10, 65:11, 73:10, 76:7, 91:20, 94:5, 94:11, 95:16, 96:23, 97:13

**elements** [21] - 2:22, 2:24, 6:18, 10:5, 51:2, 77:3, 79:18, 82:16, 82:20, 83:14, 88:9, 90:23, 92:8, 92:10, 92:11, 93:11, 96:8, 99:6, 99:11, 99:12, 102:25

**Elizabeth** [2] - 43:5, 72:18

**email** [4] - 13:12, 17:11, 42:17, 105:9

**embodying** [1] - 47:5

**emerged** [1] - 6:6

**encourage** [1] - 104:6

**encrypt** [1] - 28:24

**encrypted** [1] - 30:8

**end** [5] - 6:11, 26:25, 35:11, 41:18, 48:6

**Enforcement** [1] - 12:3

**enforcement** [11] - 6:20, 8:7, 8:20, 16:25, 22:6, 43:1, 71:21, 72:2, 88:14, 89:13, 89:16

**engage** [5] - 10:7, 25:3, 85:18, 93:17, 96:12

**engaged** [10] - 10:5, 24:22, 76:24, 78:15, 85:11, 93:15, 93:25, 94:20, 96:10, 102:13

**engages** [2] - 85:15, 85:16

**engaging** [3] - 93:20,

96:14, 96:15

**England** [1] - 46:22

**English** [4] - 73:16, 73:19, 73:21, 74:3

**enjoyable** [1] - 58:4

**enter** [6] - 2:4, 15:4, 61:19, 61:22, 71:3, 104:12

**entered** [7] - 20:4, 70:20, 71:8, 71:14, 71:16, 71:18, 106:23

**entering** [2] - 6:3, 106:7

**enterprise** [2] - 4:24, 91:22

**Enterprises** [1] - 52:11

**entire** [7] - 4:14, 8:16, 17:21, 18:12, 24:25, 99:13, 100:6

**entirely** [7] - 19:12, 23:16, 28:20, 53:10, 75:18, 81:18, 106:21

**entitled** [2] - 64:13, 70:18

**entity** [4] - 8:2, 85:15, 94:18, 94:20

**entrusting** [1] - 7:14

**equal** [1] - 67:7

**error** [2] - 39:17, 43:14

**escape** [1] - 47:3

**essence** [1] - 20:3

**essentially** [7] - 16:6, 20:1, 20:2, 31:14, 45:14, 53:1, 55:24

**establish** [3] - 60:10, 77:7, 98:9

**established** [2] - 76:8, 76:12

**establishes** [1] - 77:9

**et** [1] - 54:2

**ethnicity** [1] - 63:4

**evade** [1] - 5:7

**evading** [1] - 12:9

**evaluate** [1] - 69:4

**evaluated** [1] - 71:22

**evaluating** [4] - 68:24, 69:17, 71:23, 72:5

**event** [7] - 69:18, 69:19, 69:20, 69:21, 71:25, 104:11, 104:13

**evidence** [169] - 2:14, 3:15, 9:16, 10:21, 11:16, 12:17, 12:20, 13:3, 13:21, 13:22, 14:6, 14:7, 15:8, 15:10, 15:11, 15:21, 17:3, 17:19, 18:10, 18:14, 20:9, 20:19, 22:9, 22:14, 22:15, 22:18, 23:3, 23:15, 23:18,

24:24, 25:11, 26:9, 27:19, 27:23, 29:3, 29:22, 30:17, 32:16, 33:5, 33:8, 33:21, 34:2, 34:6, 34:12, 34:16, 36:23, 37:3, 37:6, 37:12, 38:3, 38:6, 38:7, 39:10, 39:23, 42:8, 44:16, 45:5, 46:12, 48:3, 48:15, 48:17, 48:19, 50:10, 50:14, 50:16, 50:23, 50:25, 51:5, 51:7, 51:16, 51:20, 53:2, 53:6, 53:8, 54:7, 54:12, 55:9, 55:20, 59:15, 60:12, 61:21, 62:24, 62:25, 63:6, 63:13, 63:19, 63:21, 63:23, 64:1, 64:3, 64:8, 64:9, 64:12, 64:15, 64:16, 64:17, 64:20, 65:3, 65:22, 65:24, 66:10, 66:11, 66:12, 66:15, 66:17, 66:21, 66:25, 67:3, 67:4, 67:6, 67:8, 67:9, 67:10, 67:17, 67:19, 67:22, 68:4, 68:7, 68:16, 70:2, 70:9, 70:19, 71:22, 72:24, 73:6, 73:8, 73:12, 73:13, 73:18, 74:8, 74:10, 74:11, 74:13, 74:14, 74:17, 74:19, 74:21, 74:25, 75:4, 75:14, 75:19, 75:21, 76:18, 77:9, 78:20, 81:14, 81:19, 81:21, 89:19, 99:7, 99:17, 102:21, 103:5, 103:8, 103:11, 103:22, 104:3, 104:5, 104:8, 104:9, 104:15, 104:23

**exact** [1] - 77:8

**exactly** [4] - 3:1, 13:16, 37:21, 52:18

**examine** [3] - 103:6, 103:9, 103:17

**examined** [1] - 16:18

**example** [10] - 18:22, 23:24, 23:25, 40:12, 48:24, 54:10, 56:1, 66:18, 69:7, 106:2

**examples** [1] - 3:19

**except** [2] - 105:19, 105:21

**exchange** [1] - 85:3

**exchanges** [1] - 57:17

**exclusive** [1] - 63:11

**exclusively** [1] -

104:14

**excuse** [3] - 46:7, 106:20, 106:25

**excusing** [1] - 106:19

**Exhibit** [6] - 31:1, 39:3, 40:22, 53:13, 53:20, 58:24

**exhibit** [3] - 58:24, 103:12, 103:14

**exhibits** [7] - 31:9, 64:3, 68:15, 103:5, 103:7, 103:11, 103:17

**exist** [2] - 4:23, 76:10

**existed** [5] - 76:16, 79:21, 81:6, 81:7, 81:8

**existence** [4] - 76:7, 76:9, 76:15, 80:10

**existing** [1] - 4:14

**exists** [1] - 80:4

**exotic** [1] - 32:1

**expect** [1] - 6:8

**expenses** [1] - 58:14

**experience** [5] - 54:14, 58:3, 64:12, 73:1, 73:4

**expert** [4] - 16:3, 31:12, 53:14

**explain** [5] - 2:23, 3:24, 60:21, 74:7, 90:25

**explained** [3] - 87:14, 95:21, 102:1

**explanation** [1] - 91:19

**exploit** [1] - 30:1

**express** [1] - 89:13

**expressed** [2] - 63:9, 72:11

**expression** [1] - 106:8

**extent** [2] - 68:23, 74:13

**extraction** [1] - 24:18

**extracts** [1] - 18:4

**extreme** [1] - 4:9

**eyes** [2] - 12:23, 76:6

**eyewitness** [3] - 23:25, 24:1, 66:13

**eyewitnesses** [2] - 23:22

---

**F**

**facilitate** [2] - 88:4, 104:4

**facilitating** [2] - 84:17, 85:18

**facsimile** [3] - 92:3, 93:24, 96:18

**fact** [21] - 16:15, 23:4, 25:16, 44:4, 51:25,

54:8, 54:17, 57:19, 58:1, 61:23, 64:7, 65:15, 66:14, 67:3, 72:6, 72:25, 76:5, 76:7, 76:15, 78:22, 99:6

**facts** [23] - 14:4, 19:3, 51:12, 62:22, 63:2, 64:3, 64:6, 64:10, 66:11, 66:15, 67:21, 74:7, 74:11, 75:13, 75:19, 81:4, 81:6, 81:14, 81:19, 103:21, 106:18

**factual** [1] - 48:20

**fail** [1] - 42:23

**failed** [4] - 28:1, 65:10, 92:22, 94:11

**failing** [2] - 12:3, 12:5

**failure** [3] - 12:8, 100:13, 100:15

**fair** [6] - 62:16, 63:5, 67:14, 67:18, 104:3, 104:8

**fairly** [5] - 49:3, 53:16, 64:13, 70:18, 73:9

**faith** [1] - 18:15

**falling** [2] - 66:19, 66:21

**falls** [1] - 5:1

**false** [3] - 43:15, 43:16, 71:11

**falsehood** [1] - 70:4

**falsely** [1] - 71:17

**famous** [1] - 46:20

**fancy** [1] - 41:12

**far** [1] - 53:24

**fashion** [1] - 106:3

**favor** [2] - 53:12, 67:4

**favoritism** [1] - 63:3

**FBI** [2] - 7:18, 10:12

**fear** [5] - 5:20, 52:20, 52:23, 63:2

**feature** [3] - 19:16, 29:5, 58:2

**features** [1] - 13:8

**February** [3] - 56:4, 56:19, 58:10

**federal** [7] - 7:22, 9:23, 10:2, 12:1, 86:6, 92:24

**fee** [2] - 34:23, 52:6

**fees** [2] - 30:24, 36:19

**felonious** [4] - 83:2, 83:8, 86:20, 89:6

**felonous** [1] - 83:22

**felony** [5] - 86:6, 86:25, 92:19, 93:7, 93:10

**few** [3] - 35:3, 48:12, 62:4

**figure** [2] - 37:10, 59:5

**figured** [1] - 58:9

**file** [4] - 41:18, 41:19, 41:21, 41:23

**file-carved** [2] - 41:21, 41:23

**files** [3] - 32:22, 57:22, 74:8

**filing** [2] - 8:6, 70:24

**filling** [1] - 12:9

**final** [1] - 61:22

**finally** [4] - 9:17, 47:20, 48:5, 95:10

**Financial** [1] - 12:2

**financial** [22] - 3:3, 7:25, 8:1, 8:11, 8:20, 22:4, 72:20, 82:22, 83:16, 85:2, 85:5, 85:7, 85:10, 85:14, 85:20, 88:2, 88:12, 89:23, 89:24, 100:4, 100:17, 101:18

**FinCEN** [7] - 8:20, 9:5, 12:4, 12:9, 35:22, 94:16

**fine** [2] - 33:10, 98:1

**finish** [2] - 84:23, 100:8

**firmly** [1] - 65:24

**First** [1] - 96:10

**first** [40] - 3:1, 3:3, 6:18, 9:2, 10:5, 20:16, 21:17, 27:3, 39:2, 39:5, 39:6, 39:7, 39:14, 39:23, 39:24, 41:1, 46:24, 46:25, 47:21, 49:4, 49:5, 54:24, 57:1, 79:4, 79:20, 79:22, 80:9, 82:10, 82:18, 82:20, 83:15, 84:11, 88:11, 88:16, 89:3, 90:23, 91:19, 92:13, 93:15, 103:23

**Fischbach** [7] - 28:9, 28:20, 31:12, 31:20, 31:24, 33:12, 72:22

**flat** [1] - 53:9

**flow** [4] - 40:10, 40:18, 40:19

**focus** [2] - 13:21, 48:16

**Fog** [123] - 2:15, 2:16, 3:5, 3:8, 3:13, 3:17, 3:20, 4:8, 4:13, 5:9, 5:11, 5:16, 5:17, 5:21, 6:17, 7:10, 7:16, 8:10, 8:12, 8:15, 8:24, 9:3, 9:4, 9:7, 9:9, 9:15, 9:18, 9:19, 10:10, 10:23, 10:25, 11:2,

11:3, 11:7, 11:16, 11:18, 11:23, 12:15, 13:1, 13:6, 13:17, 17:5, 17:6, 17:9, 18:9, 18:11, 18:20, 19:1, 21:13, 22:9, 22:16, 23:11, 23:19, 25:6, 25:19, 27:7, 27:17, 28:11, 28:14, 28:17, 28:22, 29:9, 29:14, 29:15, 29:17, 29:19, 29:21, 30:4, 30:11, 30:24, 31:2, 31:21, 32:2, 34:5, 34:22, 34:24, 35:6, 36:5, 36:8, 36:11, 36:15, 36:16, 36:20, 37:9, 39:6, 39:14, 41:17, 41:23, 42:5, 42:14, 42:15, 51:4, 51:21, 51:25, 52:3, 52:4, 52:5, 52:9, 52:22, 53:22, 55:5, 56:19, 56:21, 57:2, 57:14, 57:22, 57:23, 60:3, 60:8, 60:9, 60:13, 60:18, 60:22, 74:23, 77:22, 78:9, 78:15, 89:10, 90:23, 91:21

**fog** [4] - 5:18, 7:17, 7:20, 14:7

**Fog's** [2] - 7:3, 8:17

**folks** [1] - 14:17

**follow** [4] - 9:6, 13:23, 62:11, 62:20

**following** [7] - 72:11, 84:13, 90:22, 92:8, 101:9, 101:13, 101:20

**follows** [2] - 93:14, 96:9

**fool** [1] - 52:16

**foolish** [1] - 76:13

**foot** [1] - 99:19

**foreign** [11] - 24:20, 85:8, 85:12, 85:21, 86:6, 89:24, 91:8, 91:9, 91:12, 91:14, 91:17

**forensic** [4] - 16:3, 41:19, 72:17, 72:20

**forensics** [3] - 72:14, 72:20, 72:22

**foreperson** [4] - 103:24, 104:1, 104:4, 105:17

**foreseeable** [1] - 6:13

**forget** [1] - 39:3

**form** [8] - 67:4, 86:12, 88:15, 96:2, 102:19, 102:20, 102:23, 103:1

**formal** [3] - 4:22, 64:18, 79:24

**forth** [5] - 11:22, 51:6, 52:8, 53:17

**forums** [1] - 29:25

**forward** [1] - 26:1

**four** [9] - 2:17, 23:5, 33:23, 57:1, 59:9, 77:14, 82:20, 83:14, 106:22

**fourth** [3] - 3:22, 83:6, 84:1

**framework** [1] - 19:23

**free** [2] - 62:13, 69:4

**freelancing** [2] - 27:11, 27:12

**fresh** [1] - 61:7

**friendship** [1] - 69:15

**front** [1] - 38:17

**frustrated** [2] - 56:6

**full** [1] - 104:8

**function** [2] - 62:15, 62:21

**fund** [1] - 51:21

**funds** [35] - 6:17, 7:17, 8:3, 8:8, 8:16, 8:17, 9:11, 12:14, 31:5, 35:19, 36:7, 36:15, 36:17, 36:18, 40:10, 40:18, 40:19, 40:21, 56:12, 57:8, 84:10, 85:9, 85:13, 85:16, 86:14, 86:17, 92:1, 92:4, 93:1, 94:20, 94:23, 95:5, 95:8, 95:13, 95:18

**furtherance** [5] - 98:24, 99:4, 99:9, 99:23, 100:2

**furthermore** [1] - 106:13

**future** [3] - 7:4, 7:5, 47:16

---

## G

**gain** [1] - 69:14

**gender** [1] - 63:4

**general** [4] - 6:1, 60:1, 62:4, 100:18

**generally** [1] - 25:11

**gentlemen** [3] - 50:9, 56:22, 60:23

**given** [5] - 43:24, 82:5, 102:24, 103:9, 105:6

**Glave** [3] - 43:22, 58:14, 72:17

**globe** [1] - 9:19

**goods** [1] - 91:10

**govern** [1] - 78:25

**government** [122] - 9:14, 9:17, 12:1, 14:1,

15:11, 15:20, 16:7, 16:19, 16:20, 16:23, 16:24, 16:25, 17:9, 18:23, 18:24, 18:25, 19:9, 19:19, 19:22, 21:15, 27:8, 27:16, 28:9, 28:13, 29:12, 31:14, 31:17, 31:25, 33:24, 35:6, 35:15, 38:25, 39:20, 41:10, 41:16, 42:12, 42:24, 43:11, 43:13, 43:24, 44:6, 44:18, 44:24, 45:16, 46:3, 46:12, 47:9, 47:20, 51:1, 51:5, 55:23, 64:25, 65:5, 65:9, 65:13, 66:7, 68:18, 70:20, 70:22, 71:3, 71:16, 73:11, 73:13, 74:22, 75:22, 76:19, 77:3, 79:19, 80:4, 80:9, 80:10, 80:14, 81:6, 81:23, 82:5, 82:9, 82:12, 84:5, 85:25, 86:8, 86:13, 86:16, 87:8, 87:10, 87:16, 88:9, 89:12, 89:15, 89:20, 90:12, 90:22, 91:4, 91:13, 91:16, 91:20, 93:13, 94:1, 94:5, 94:10, 95:11, 95:18, 96:8, 96:20, 96:24, 97:12, 98:11, 98:14, 98:16, 99:3, 99:8, 99:10, 99:16, 100:1, 100:19, 100:22, 101:7, 101:11, 101:17, 102:6, 102:12, 102:15, 103:1

**Government** [4] - 31:1, 39:3, 40:22, 58:24

**government's** [14] - 14:21, 15:9, 16:3, 17:24, 18:6, 18:22, 20:12, 23:18, 28:8, 32:7, 36:4, 44:8, 47:6, 65:18

**Gox** [3] - 21:14, 31:8, 49:11

**Grams** [1] - 44:24

**graver** [1] - 66:3

**gray** [2] - 27:13, 27:14

**great** [5] - 15:19, 18:22, 43:7, 46:24, 47:12

**greater** [3] - 67:8, 67:25, 71:25

**greatly** [1] - 35:2

**grew** [1] - 46:19

**gross** [1] - 86:12

**ground** [4] - 24:8, 57:3, 66:23, 66:24

**guess** [4] - 14:19, 18:15, 30:17, 103:20

**guesswork** [1] - 66:5

**guided** [1] - 77:1

**guidelines** [1] - 71:24

**guilt** [8] - 19:7, 64:21, 65:25, 66:7, 66:9, 71:6, 98:9

**guilty** [30] - 9:10, 10:20, 11:3, 11:4, 14:9, 44:9, 44:21, 47:3, 59:21, 60:14, 65:1, 65:7, 65:12, 65:14, 78:22, 78:23, 88:5, 90:19, 90:21, 92:9, 95:21, 96:3, 97:4, 97:16, 97:21, 97:23, 99:2, 99:16, 102:5, 102:14

**gun** [3] - 54:22, 54:23, 54:24

**guys** [2] - 46:9, 46:13

## H

**hacked** [1] - 44:11

**hacker** [1] - 27:18

**hacking** [3] - 27:15, 27:20, 27:23

**halt** [1] - 57:3

**hand** [6] - 47:15, 50:1, 65:9, 66:15, 73:22, 80:1

**handed** [1] - 44:5

**hands** [1] - 15:13

**hard** [6] - 28:4, 28:19, 28:21, 28:23, 29:1

**Harmon** [5] - 44:21, 46:5, 46:11, 57:25, 70:20

**harmon** [2] - 45:17, 46:6

**Harmon's** [1] - 70:23

**hauled** [1] - 25:18

**head** [2] - 12:24, 13:4

**hear** [7] - 17:12, 18:16, 36:17, 47:15, 47:19, 53:7, 103:17

**heard** [60] - 2:14, 7:23, 9:5, 11:20, 14:6, 14:20, 16:9, 19:19, 20:12, 20:17, 21:5, 22:7, 24:1, 24:9, 26:14, 26:22, 27:12, 28:8, 28:9, 28:13, 28:20, 29:2, 29:4, 29:11, 29:22, 29:24, 29:25, 31:12,

31:20, 31:24, 32:6, 33:15, 33:19, 35:11, 35:17, 35:18, 36:3, 36:9, 36:21, 37:11, 37:14, 38:25, 42:25, 43:7, 43:25, 46:6, 50:5, 50:6, 51:16, 52:15, 55:1, 55:12, 55:14, 56:1, 60:19, 61:9, 61:21, 70:19, 72:10, 74:17

**hearing** [3] - 24:2, 30:20, 37:16

**Helix** [7] - 44:23, 44:24, 45:13, 45:18, 45:19, 58:2

**help** [10] - 4:9, 7:3, 7:4, 9:13, 11:2, 22:10, 60:5, 74:7, 104:5

**helped** [3] - 10:19, 10:23, 60:8

**helpful** [3] - 19:21, 19:22, 52:11

**helps** [1] - 80:24

**heroes** [1] - 46:19

**herself** [1] - 70:12

**hesitate** [2] - 66:3, 106:11

**heuristic** [1] - 39:16

**heuristics** [1] - 49:7

**hi** [1] - 22:11

**hidden** [4] - 5:18, 30:14, 54:18, 54:20

**hide** [4] - 3:11, 4:6, 4:10, 9:13

**high** [8] - 12:25, 26:21, 35:11, 52:12, 58:11, 76:9, 76:15, 77:1

**high-quality** [1] - 52:12

**higher** [2] - 35:4, 54:2

**highhosting** [1] - 34:1

**highlight** [1] - 10:16

**highly** [1] - 65:16

**himself** [11] - 13:2, 36:9, 49:9, 52:18, 57:14, 76:14, 87:5, 87:8, 90:8, 90:13, 98:3

**hire** [2] - 43:12, 43:13

**history** [3] - 13:9, 46:21, 58:8

**hit** [1] - 26:20

**hold** [4] - 58:9, 59:8, 68:5, 103:21

**holds** [1] - 12:5

**hole** [2] - 30:15, 37:2

**home** [7] - 12:1, 16:22, 18:20, 19:12, 24:8, 42:22, 42:24

**honest** [1] - 65:23

**Honor** [6] - 2:3, 15:2, 15:7, 32:24, 33:2, 33:10

**hop** [4] - 20:16, 39:2, 39:6, 40:21

**hope** [1] - 55:7

**hops** [1] - 40:3

**host** [1] - 23:18

**hostility** [1] - 69:15

**hours** [1] - 49:1

**house** [1] - 46:24

**huge** [3] - 13:14, 20:8, 31:18

**hundreds** [4] - 3:21, 35:13, 44:18, 44:25

## I

**ideal** [1] - 47:5

**identification** [1] - 103:8

**identified** [2] - 49:11, 98:19

**identifying** [1] - 8:5

**identity** [3] - 51:9, 72:16, 80:13

**IDs** [1] - 30:22

**ignorance** [2] - 76:2, 77:2

**ignore** [6] - 48:2, 62:11, 62:19, 63:10, 68:10, 68:13

**illegal** [8] - 2:20, 6:17, 36:2, 36:24, 51:17, 51:18, 51:21, 89:18

**illegally** [1] - 84:9

**illicit** [5] - 5:18, 6:21, 7:2, 13:15, 35:20

**Ilya** [4] - 44:8, 44:22, 46:11, 70:19

**imaginary** [1] - 66:4

**imagine** [1] - 31:22

**Imagine** [1] - 18:5

**immediately** [1] - 73:22

**immensely** [1] - 47:17

**impartial** [3] - 65:23, 67:15, 67:18

**implementing** [1] - 94:13

**implicate** [1] - 103:16

**implies** [1] - 65:20

**importance** [1] - 106:6

**important** [9] - 22:25, 24:12, 40:11, 47:11, 54:6, 55:2, 55:10, 66:3, 73:17

**importation** [5] - 83:3, 83:8, 83:22, 86:20, 89:6

impose [2] - 71:1, 71:2
imposing [1] - 104:13
impresses [1] - 69:9
improperly [1] - 63:3
inadmissible [1] - 103:15
inadvertently [1] - 104:25
include [2] - 94:17, 100:17
included [1] - 52:10
includes [15] - 82:20, 83:14, 84:25, 85:2, 85:13, 85:14, 86:7, 91:25, 92:4, 93:8, 94:3, 95:6, 96:22, 100:15, 105:8
including [13] - 8:9, 8:23, 12:2, 42:21, 69:18, 77:19, 85:16, 86:12, 92:1, 93:23, 94:24, 96:17, 103:15
incohat [1] - 21:25
inconsistencies [3] - 69:23, 70:1, 70:3
inconsistent [1] - 54:16
incorporate [1] - 60:8
incorporation [1] - 49:6
independent [3] - 33:4, 43:20, 105:11
indicate [3] - 75:14, 81:15, 96:3
indicated [2] - 60:24, 63:10
indicating [1] - 63:8
indictment [22] - 64:18, 64:19, 77:5, 77:14, 77:16, 78:1, 78:6, 78:12, 78:18, 78:19, 78:23, 78:24, 82:3, 82:4, 87:20, 89:4, 90:15, 97:5, 97:17, 98:23, 98:24, 100:22
indirectly [2] - 81:4, 86:11
individual [1] - 4:18
individual's [1] - 103:16
individuals [1] - 91:11
indulgence [1] - 48:9
industry [2] - 43:18, 43:19
inescapable [1] - 14:8
infer [9] - 12:19, 56:9, 75:11, 75:16, 81:11, 81:16, 89:17
inference [1] - 64:21
inferences [2] - 64:11,

66:16
inferred [1] - 76:14
influence [2] - 78:23, 104:12
influenced [1] - 63:3
influential [1] - 46:22
informal [2] - 85:17, 94:25
information [6] - 3:10, 8:5, 37:25, 41:20, 50:3, 54:1
initial [1] - 106:14
innocence [6] - 19:6, 19:7, 19:14, 27:10, 64:24, 65:3
innocent [6] - 19:8, 19:15, 19:16, 47:3, 52:1, 64:24
innuendo [1] - 18:12
inside [1] - 12:18
instance [1] - 91:23
instances [1] - 86:7
instead [1] - 89:15
institution [6] - 85:2, 85:5, 85:11, 85:14, 85:20, 89:24
institutions [1] - 7:25
instruct [19] - 2:21, 4:3, 5:23, 6:8, 11:11, 11:18, 12:12, 12:22, 48:6, 61:24, 62:17, 62:18, 79:11, 80:8, 86:24, 93:8, 101:7, 101:10, 101:17
instructed [2] - 69:3, 76:17
instructing [1] - 47:24
instruction [3] - 10:17, 76:1, 105:5
instructions [19] - 10:13, 13:24, 13:25, 52:11, 60:25, 61:4, 61:6, 61:12, 62:6, 62:8, 62:9, 62:10, 62:11, 62:12, 62:14, 62:19, 84:13, 102:24, 102:25
instrument [2] - 93:23, 96:18
instrumental [1] - 10:22
instruments [2] - 77:24, 93:20
Insurance [1] - 8:24
intend [1] - 12:15
intended [12] - 3:22, 4:8, 7:21, 13:16, 63:23, 64:15, 86:1, 90:10, 93:3, 95:15, 95:19, 98:5
intends [2] - 75:17,

81:17
intent [23] - 6:22, 12:13, 12:17, 12:19, 22:24, 22:25, 23:5, 23:8, 75:11, 75:15, 80:18, 81:9, 81:11, 81:15, 83:6, 84:14, 87:1, 87:23, 88:17, 88:18, 89:1, 89:21, 97:14
intentional [1] - 70:4
intentionally [16] - 10:19, 13:13, 20:7, 20:10, 20:25, 22:25, 23:4, 75:18, 76:2, 76:24, 80:11, 80:18, 81:18, 97:20, 98:22
interacted [1] - 27:6
interest [4] - 69:13, 70:13, 71:14, 72:7
interests [1] - 80:2
internationally [1] - 85:19
internet [4] - 54:15, 72:13, 104:19, 105:14
interpreter [2] - 74:4, 74:5
interstate [12] - 9:18, 9:20, 24:20, 85:8, 85:12, 85:21, 86:1, 89:24, 91:8, 91:9, 91:14, 91:17
introduced [1] - 13:22
invest [1] - 58:11
investigating [1] - 54:24
investigation [3] - 24:15, 32:6, 105:12
investing [1] - 84:9
investors [1] - 58:8
invite [1] - 104:7
invoice [2] - 55:13, 56:7
invoices [1] - 56:9
involve [1] - 18:14
involved [20] - 5:3, 5:25, 6:20, 22:5, 34:2, 34:12, 34:17, 53:2, 60:17, 79:25, 80:6, 82:24, 83:18, 86:3, 86:14, 86:17, 88:13, 89:14, 92:25, 95:13
involves [2] - 23:25, 49:6
involving [8] - 40:3, 50:23, 77:24, 78:2, 82:4, 85:9, 85:10, 88:3
IP [8] - 16:4, 16:16, 17:14, 37:16, 37:23, 43:4, 53:10, 72:13

IRS [7] - 7:18, 10:11, 16:11, 16:14, 16:17, 37:24, 89:10
IRS-CI [1] - 89:10
isolate [1] - 54:3
isolated [1] - 91:23
issuance [1] - 93:20
issue [2] - 72:25, 106:4
issued [1] - 29:12
issues [2] - 61:23, 62:3
itself [6] - 10:20, 54:19, 79:10, 80:25, 98:9, 99:22

J

J.W [1] - 72:20
jackets [1] - 50:20
jail [2] - 3:9, 29:11
Jeffrey [1] - 72:22
job [1] - 26:24
jobs [2] - 27:11, 56:3
John [1] - 46:23
join [1] - 6:13
joined [4] - 6:6, 20:7, 80:11, 87:18
joining [2] - 20:10, 21:1
joins [2] - 80:18, 80:23
Judge [14] - 2:21, 3:24, 4:3, 5:23, 6:8, 10:13, 10:17, 11:10, 11:18, 12:22, 13:23, 19:20, 25:9, 25:23
judge [5] - 26:15, 26:16, 41:5, 50:24, 51:12
judge's [1] - 60:25
judges [8] - 14:4, 62:22, 68:21, 70:24, 70:25, 71:1, 106:17
judging [1] - 68:24
judgment [6] - 64:13, 69:6, 70:17, 71:20, 72:9, 101:22
July [4] - 26:1, 26:2, 101:14, 101:15
June [7] - 26:5, 26:6, 57:5, 101:15, 101:16, 101:21
juries [2] - 26:17, 106:13
jurisdiction [1] - 100:16
juror [8] - 9:22, 9:25, 11:25, 101:23, 104:7, 106:7, 106:11
jurors [16] - 2:4, 14:11,

14:24, 15:4, 61:16, 61:19, 63:15, 63:22, 73:18, 73:24, 105:1, 105:24, 106:5, 106:20, 106:21, 106:25

**JURORS** [2] - 15:13, 15:18

**jury** [30] - 2:2, 2:5, 2:14, 15:1, 15:15, 19:3, 23:3, 32:16, 33:3, 33:7, 42:7, 47:12, 47:16, 48:11, 61:12, 62:21, 63:17, 67:13, 72:24, 103:4, 103:23, 105:4, 105:8, 105:18, 105:20, 106:1, 106:7, 106:14, 106:24

**justice** [1] - 47:5

**justices** [1] - 46:24

**justified** [2] - 32:25, 64:11

**justify** [1] - 76:23

## K

**keen** [1] - 72:7

**keep** [4] - 28:18, 36:6, 40:5, 103:7

**kept** [2] - 32:8, 60:21

**key** [11] - 20:18, 23:13, 35:21, 36:6, 39:1, 39:7, 39:10, 39:11, 39:21, 40:2, 44:13

**keys** [11] - 39:1, 40:9, 44:13, 44:25, 45:4, 45:6, 45:17, 45:22, 45:23, 46:3, 46:4

**kill** [5] - 29:2, 29:5, 29:21, 33:19, 33:21

**kind** [20] - 3:7, 16:1, 17:11, 27:18, 28:15, 29:2, 30:6, 31:22, 38:9, 54:12, 64:20, 66:1, 71:3, 74:24, 79:15, 82:25, 83:19, 86:4, 105:12

**knowing** [5] - 11:3, 59:19, 75:10, 80:25, 81:10

**knowingly** [17] - 23:12, 23:13, 24:22, 24:24, 75:25, 80:18, 80:23, 82:21, 90:17, 91:2, 93:15, 94:7, 96:10, 97:1, 98:2, 98:21

**knowledge** [18] - 12:13, 12:18, 12:19, 13:4, 52:17, 66:14, 72:24, 73:1, 76:4, 76:7,

76:8, 76:11, 76:13, 81:9, 81:12, 81:15, 86:6

**known** [7] - 5:15, 47:16, 77:19, 77:22, 78:9, 93:1, 95:14

**Kraken** [1] - 52:7

**KYC** [13] - 21:4, 21:7, 21:13, 21:14, 21:15, 30:21, 30:25, 31:5, 31:7, 36:12, 40:4, 44:7

**KYCing** [2] - 31:8, 40:7

## L

**label** [1] - 97:23

**lack** [2] - 65:22, 73:12

**ladies** [3] - 50:9, 56:22, 60:23

**language** [1] - 38:12

**languages** [1] - 73:17

**lapses** [1] - 70:3

**largely** [1] - 57:2

**Larry** [3] - 44:21, 57:25, 70:20

**last** [7] - 9:21, 11:14, 29:9, 47:14, 101:5, 106:19

**latte** [1] - 40:13

**launder** [9] - 3:20, 4:15, 22:12, 35:23, 35:25, 53:25, 79:9, 87:6, 87:12

**launderer** [1] - 13:5

**laundering** [42] - 2:17, 2:18, 2:25, 3:1, 3:25, 4:1, 4:13, 4:15, 4:17, 6:14, 6:18, 6:24, 7:5, 7:7, 7:14, 8:2, 8:7, 8:12, 11:4, 12:10, 15:23, 20:4, 20:6, 21:21, 22:3, 44:10, 52:9, 56:11, 77:24, 78:2, 79:5, 79:6, 79:10, 82:19, 83:13, 84:8, 84:12, 88:7, 90:9, 93:6, 100:24

**law** [46] - 2:21, 3:9, 6:20, 8:7, 8:11, 9:1, 9:8, 10:20, 12:13, 12:25, 13:24, 16:24, 19:21, 22:6, 25:9, 43:1, 48:6, 61:4, 61:24, 62:5, 62:16, 62:17, 62:18, 65:2, 67:2, 67:3, 71:21, 72:2, 75:6, 76:22, 76:24, 77:2, 86:6, 86:24, 88:14, 89:13, 89:16, 92:19, 92:21,

92:24, 93:19, 93:24, 94:6, 96:19, 96:25, 102:24

**lawful** [1] - 77:1

**Laws** [1] - 46:22

**laws** [1] - 8:21

**lawyer** [2] - 68:4, 68:5

**lawyer's** [2] - 68:7, 68:10

**lawyers** [4] - 61:22, 64:14, 64:16, 68:2

**LAX** [2] - 54:10, 55:2

**layering** [2] - 31:6, 49:1

**lead** [2] - 81:5, 81:7

**leading** [1] - 39:4

**leads** [1] - 14:8

**leaking** [1] - 54:1

**leap** [2] - 18:15, 20:25

**learned** [3] - 27:3, 43:2, 48:1

**learning** [3] - 12:23, 13:2, 13:6

**least** [14] - 77:17, 78:7, 78:13, 80:6, 82:14, 84:6, 85:23, 86:17, 87:10, 95:25, 101:9, 101:13, 102:7, 102:16

**leave** [2] - 14:24, 61:16

**ledgers** [2] - 17:7, 41:17

**left** [2] - 16:9, 61:3

**legal** [5] - 10:14, 35:21, 46:21, 47:12, 61:6

**legally** [1] - 10:25

**legit** [1] - 56:12

**legitimate** [1] - 33:14

**legitimately** [1] - 52:1

**length** [1] - 49:19

**lengths** [1] - 4:9

**lenient** [1] - 71:1

**less** [4] - 8:11, 33:23, 35:14, 35:19

**lesser** [1] - 71:25

**lethal** [1] - 52:13

**levels** [1] - 53:23

**liability** [1] - 77:3

**liable** [1] - 6:11

**liberty** [1] - 47:13

**license** [25] - 10:7, 12:6, 12:8, 24:21, 25:2, 25:5, 30:24, 35:22, 36:19, 78:16, 92:14, 92:17, 92:20, 93:11, 93:17, 94:1, 94:6, 94:9, 96:7, 96:12, 96:20, 96:25, 97:3, 100:14, 100:15

**licensed** [1] - 95:3

**licensing** [2] - 94:4, 96:23

**Lichtenstein** [7] - 44:8, 44:12, 44:15, 44:19, 44:22, 46:11, 70:19

**Lichtenstein's** [1] - 70:22

**lie** [1] - 71:11

**life** [1] - 66:4

**lifestyle** [1] - 44:17

**light** [1] - 64:11

**Light** [1] - 44:23

**likelihood** [1] - 58:9

**likely** [5] - 6:8, 17:18, 25:12, 65:15, 99:9

**likewise** [1] - 68:15

**limitation** [1] - 101:14

**limitations** [15] - 11:8, 11:10, 11:13, 25:20, 25:22, 25:25, 26:4, 26:13, 56:22, 56:24, 100:18, 100:20, 100:23, 101:4, 101:21

**limited** [5] - 74:21, 92:2, 93:23, 95:18, 96:17

**Lincoln** [1] - 46:23

**link** [2] - 4:25, 5:11

**list** [5] - 30:2, 30:3, 30:7, 91:5

**listed** [6] - 20:6, 82:3, 83:4, 83:10, 83:24, 86:22

**listen** [6] - 13:20, 25:24, 47:10, 61:25, 104:21, 104:22

**listened** [2] - 48:24, 55:20

**listing** [1] - 19:25

**litany** [1] - 50:6

**LiveLTE** [1] - 31:25

**local** [2] - 10:1, 31:10

**LocalBitcoins** [1] - 27:5

**located** [2] - 10:11, 55:2

**location** [12] - 8:9, 23:6, 72:16, 84:3, 84:7, 87:25, 88:19, 93:22, 94:24, 95:8, 95:9, 96:16

**locations** [1] - 92:3

**locked** [1] - 55:18

**log** [3] - 19:25, 58:1, 58:2

**logged** [1] - 16:22

**logging** [3] - 18:19, 19:12, 19:13

login [2] - 30:5, 58:4
logins [1] - 30:1
logs [8] - 13:8, 16:18, 17:6, 17:16, 17:17, 37:24, 41:17, 50:6
London [1] - 46:20
look [25] - 18:5, 18:11, 20:14, 21:2, 21:8, 25:13, 28:9, 30:2, 30:6, 30:25, 39:4, 39:12, 39:19, 40:5, 40:8, 40:11, 41:8, 41:13, 48:15, 53:13, 53:14, 57:11, 59:3, 60:25
looked [2] - 66:18, 66:22
looking [7] - 19:8, 26:8, 36:25, 37:22, 38:12, 40:20, 41:20
looks [3] - 36:25, 39:25, 59:1
low [1] - 58:11
luck [1] - 60:25
luckiest [1] - 60:20
Luke [2] - 36:3, 72:11
luxurious [1] - 44:17

## M

machine [1] - 53:3
magic [1] - 26:23
major [1] - 49:5
majority [2] - 25:14, 57:16
man [1] - 58:21
managed [3] - 9:15, 23:14, 91:3
manages [1] - 90:17
manner [4] - 62:16, 69:9, 91:15, 91:17
manufacture [7] - 83:2, 83:8, 83:22, 86:20, 86:25, 87:1, 87:12
manufacturer [1] - 89:6
marked [1] - 103:7
market [5] - 5:4, 5:15, 5:19, 75:4, 77:19
markets [3] - 6:6, 52:10
marshal [2] - 105:17, 105:24
Marshall [1] - 46:23
massive [1] - 35:17
material [1] - 52:14
math [3] - 27:14, 30:1, 35:16
mathematical [1] - 66:8

mathexploit.io [1] - 27:14
Matt [2] - 11:20, 32:4
matter [15] - 6:9, 11:1, 12:13, 16:15, 25:16, 69:12, 73:21, 82:7, 86:24, 91:18, 104:16, 105:20, 106:2, 106:6, 106:17
matters [3] - 66:4, 69:2, 73:2
Matthew [1] - 10:12
Mazara [1] - 41:15
Mazarin [7] - 16:2, 16:15, 17:12, 24:9, 37:20, 41:15, 72:13
Mazars [9] - 16:2, 16:15, 17:12, 24:9, 31:13, 37:20, 52:24, 52:25, 72:13
Mazars' [1] - 23:23
mean [6] - 31:15, 40:5, 40:8, 40:23, 45:12, 54:9
meaning [1] - 90:1
meaningful [1] - 69:11
means [37] - 4:4, 4:6, 4:17, 8:19, 10:18, 12:3, 18:25, 19:8, 48:7, 54:6, 67:3, 68:24, 76:1, 84:15, 84:19, 84:22, 85:5, 85:7, 85:10, 85:21, 86:10, 86:19, 89:10, 91:10, 92:1, 92:6, 93:19, 93:22, 94:21, 94:24, 96:14, 96:17, 97:10, 99:8, 100:11, 105:13, 105:25
meant [2] - 28:5, 103:2
media [1] - 104:20
meet [1] - 2:24
meeting [1] - 27:5
meetings [1] - 27:7
Meetups [2] - 27:5, 29:24
member [5] - 60:10, 79:16, 79:17, 80:15, 105:20
members [5] - 2:14, 48:11, 81:25, 105:17, 105:18
memories [1] - 63:23
memory [7] - 63:13, 63:14, 63:19, 63:21, 69:10, 69:17, 70:3
mentioned [4] - 11:24, 23:23, 27:17, 80:8
merciful [1] - 90:4
mere [3] - 80:21, 84:9, 98:7

merely [8] - 64:18, 72:1, 72:4, 76:12, 80:1, 80:22, 80:25, 86:2
merits [1] - 105:20
message [5] - 7:8, 7:10, 22:9, 22:15, 22:17
messages [3] - 7:13, 13:9, 52:17
messaging [1] - 7:9
met [3] - 19:9, 51:1, 51:5
Meth [1] - 53:19
method [1] - 98:13
Miami [5] - 32:4, 32:5, 32:7, 32:18, 32:21
might [9] - 48:14, 48:18, 51:15, 55:15, 67:23, 68:1, 71:2, 72:24
miles [1] - 24:3
million [6] - 29:16, 35:13, 35:15, 56:24, 56:25, 57:16
millions [6] - 3:16, 28:23, 29:1, 35:13, 44:18, 44:25
mind [7] - 12:19, 75:9, 75:24, 76:21, 81:24, 103:7, 105:22
mindful [1] - 104:2
minimal [1] - 91:18
minor [2] - 80:16, 88:22
minute [2] - 14:12, 61:5
minutes [4] - 14:23, 48:12, 61:15, 62:4
misattribution [1] - 31:18
misdemeanor [2] - 92:18, 93:7
missing [2] - 5:11, 34:18
mission [1] - 104:3
misstates [1] - 38:3
mistake [9] - 45:8, 53:1, 53:5, 70:3, 76:3, 76:22, 84:16, 89:3
mistranslated [1] - 53:9
misunderstanding [1] - 70:4
mix [2] - 51:21, 51:25
mixed [3] - 31:5, 36:11, 74:24
mixer [13] - 35:21, 35:25, 44:23, 44:24, 45:24, 46:4, 51:15, 51:17, 51:18, 51:19,

77:21
mixers [3] - 35:19, 46:9, 51:13
mixing [1] - 36:1
modifies [1] - 102:25
Mollies [1] - 22:11
mom [1] - 46:19
moment [2] - 80:8, 91:1
monetary [1] - 77:24
money [151] - 2:16, 2:18, 2:19, 2:20, 2:25, 3:1, 3:6, 3:12, 3:14, 3:25, 4:1, 4:13, 4:15, 4:16, 6:14, 6:18, 6:24, 7:5, 7:6, 7:14, 7:15, 7:23, 8:1, 8:7, 8:12, 8:17, 9:3, 9:6, 10:2, 10:6, 10:8, 11:4, 11:22, 12:6, 12:10, 13:5, 13:17, 15:23, 20:4, 20:6, 21:20, 22:3, 22:12, 22:22, 23:10, 23:12, 24:19, 24:21, 24:23, 25:3, 27:1, 28:1, 29:19, 35:7, 35:8, 35:23, 35:25, 36:20, 40:25, 41:4, 44:10, 52:1, 52:7, 52:9, 53:25, 57:15, 57:18, 58:13, 58:17, 60:17, 74:23, 78:2, 78:9, 78:15, 79:4, 79:6, 79:9, 79:10, 82:18, 82:23, 83:1, 83:12, 83:17, 83:20, 84:8, 84:12, 85:17, 85:18, 86:3, 86:5, 87:11, 88:7, 90:18, 90:24, 90:25, 91:7, 91:10, 91:13, 91:16, 91:21, 91:24, 91:25, 92:6, 92:7, 92:13, 92:14, 92:16, 92:17, 92:22, 92:23, 92:25, 93:6, 93:11, 93:16, 93:18, 93:19, 93:21, 93:25, 94:3, 94:6, 94:8, 94:10, 94:12, 94:15, 94:17, 94:18, 94:19, 94:21, 95:1, 95:11, 95:12, 95:23, 96:6, 96:11, 96:13, 96:14, 96:15, 96:16, 96:19, 96:22, 96:25, 97:2, 100:5, 100:24, 100:25, 102:13, 102:16
month [3] - 13:19, 35:3, 53:22
months [5] - 32:5, 32:7, 33:23, 35:3, 57:1

**Moon** [5] - 27:25, 28:10, 28:15, 36:13, 42:14
**morning** [1] - 61:8
**Moss** [13] - 2:21, 3:24, 4:3, 5:23, 6:8, 10:13, 10:17, 11:10, 11:18, 12:22, 19:20, 25:9, 25:23
**Moss's** [1] - 13:23
**most** [3] - 46:20, 54:22, 60:19
**motivated** [3] - 70:13, 71:17, 84:6
**motive** [5] - 73:10, 73:11, 73:12, 73:13, 77:1
**mouth** [1] - 51:14
**move** [6] - 5:8, 13:1, 13:17, 38:19, 46:15, 101:18
**moved** [2] - 7:17, 9:19
**movement** [5] - 85:9, 89:9, 91:10, 95:6, 95:8
**moving** [5] - 11:22, 13:15, 58:17, 58:20
**MR** [37] - 14:14, 15:2, 15:7, 15:14, 15:17, 15:19, 32:12, 32:15, 32:17, 32:20, 32:22, 33:2, 33:10, 33:12, 38:3, 38:6, 38:17, 38:22, 38:25, 42:6, 42:10, 42:12, 45:2, 45:4, 45:7, 45:11, 45:13, 45:16, 45:19, 45:21, 45:23, 45:25, 46:1, 46:3, 46:14, 46:17, 48:9
**MS** [2] - 2:3, 2:10
**Mt** [3] - 21:14, 31:8, 49:11
**multiple** [6] - 45:1, 58:6, 59:25, 73:15, 78:18
**must** [58] - 8:3, 9:6, 9:14, 9:17, 14:1, 41:10, 63:5, 64:19, 65:12, 65:18, 67:15, 67:17, 68:5, 68:11, 68:17, 68:20, 73:18, 74:3, 79:19, 80:9, 80:10, 81:2, 81:6, 82:12, 82:14, 84:5, 88:9, 89:15, 90:22, 91:13, 91:16, 91:20, 93:13, 94:7, 94:16, 95:24, 96:8, 97:1, 98:2, 99:3, 99:11, 99:16, 99:23, 100:22, 101:7, 101:11,

101:19, 101:22, 101:23, 101:25, 102:3, 102:11, 103:1, 104:21, 104:22, 106:19
**mutual** [1] - 104:6
**Mycelium** [5] - 26:23, 52:7, 52:22, 57:6, 57:17
**mystery** [1] - 34:18

# N

**name** [1] - 65:20
**named** [1] - 82:7
**names** [2] - 82:2, 82:5
**naming** [1] - 21:3
**narcotics** [1] - 3:15
**nation** [1] - 91:12
**nationality** [1] - 63:4
**native** [2] - 16:18, 17:17
**natural** [2] - 75:17, 81:17
**nature** [10] - 12:14, 23:6, 67:13, 67:16, 80:17, 84:3, 84:7, 87:25, 88:19, 99:23
**Navy** [1] - 33:16
**near** [1] - 77:10
**nearly** [1] - 13:19
**necessarily** [4] - 67:19, 80:3, 100:6, 104:18
**necessary** [9] - 65:15, 75:23, 76:20, 80:12, 81:24, 98:7, 98:10, 98:18, 105:15
**need** [23] - 4:17, 5:7, 5:8, 5:24, 20:2, 20:3, 28:6, 50:20, 51:4, 53:13, 61:3, 61:4, 77:7, 87:8, 90:12, 94:5, 95:22, 96:24, 98:16, 99:22, 99:24, 102:2, 102:9
**needs** [2] - 19:4, 87:10
**nefarious** [1] - 18:19
**negate** [1] - 77:2
**negative** [1] - 43:16
**negligent** [1] - 76:13
**Network** [1] - 12:3
**network** [9] - 8:20, 33:13, 33:14, 33:15, 54:2, 55:4, 72:13, 85:17, 94:25
**never** [15] - 7:16, 9:7, 10:10, 16:18, 16:23, 28:1, 28:14, 36:4, 36:13, 47:16, 57:24, 65:2, 99:19, 105:19,

105:22
**new** [3] - 28:21, 58:4
**newspaper** [1] - 104:19
**newspapers** [2] - 47:22, 47:23
**nice** [1] - 50:7
**nightmares** [1] - 55:7
**Nissan** [1] - 23:24
**nomad** [1] - 54:12
**non** [1] - 33:17
**non-profit** [1] - 33:17
**none** [1] - 27:16
**NOOK** [1] - 16:2
**not-so-helpful** [1] - 52:11
**note** [5] - 57:10, 62:13, 73:22, 105:16, 105:19
**notebooks** [1] - 63:16
**notes** [9] - 18:2, 18:3, 18:6, 37:8, 53:17, 63:16, 63:18, 63:22, 63:23
**notetaker's** [1] - 63:24
**nothing** [18] - 27:24, 28:11, 28:12, 30:10, 32:15, 33:2, 34:3, 34:8, 34:13, 34:17, 37:7, 53:5, 54:16, 102:21, 102:23, 102:24, 106:22
**notify** [1] - 8:7
**notion** [1] - 52:19
**November** [2] - 78:4, 89:8
**nuance** [1] - 20:1
**nuanced** [1] - 25:23
**nuances** [1] - 25:12
**number** [8] - 10:13, 29:10, 29:11, 39:3, 67:20, 67:24, 67:25, 103:10
**Number** [3] - 16:20, 22:24, 40:22
**numbers** [1] - 35:16

# O

**oath** [1] - 71:12
**object** [9] - 21:23, 38:9, 68:7, 80:19, 82:18, 83:12, 99:20, 99:23, 100:2
**objected** [1] - 68:2
**objecting** [1] - 68:4
**objection** [7] - 32:12, 38:3, 42:6, 45:2, 46:14, 68:10, 68:16
**objections** [1] - 68:5
**objective** [1] - 82:9
**objectives** [2] - 82:14,

87:17
**objects** [15] - 3:25, 21:19, 21:20, 77:23, 79:7, 79:13, 80:7, 82:17, 84:12, 90:1, 99:20, 99:24, 100:2, 102:4, 102:8
**obligation** [1] - 71:9
**obligations** [1] - 8:5
**observe** [1] - 69:12
**observed** [1] - 69:1
**obtain** [6] - 12:6, 12:8, 94:1, 96:20, 100:14, 100:15
**obtained** [3] - 52:1, 84:9, 86:11
**obvious** [1] - 76:6
**occasions** [1] - 58:6
**occur** [1] - 100:6
**occurred** [8] - 11:9, 12:11, 25:21, 26:1, 86:2, 98:25, 100:13, 101:19
**occurring** [2] - 12:4, 37:17
**occurs** [1] - 12:7
**October** [8] - 22:23, 34:4, 34:9, 77:6, 77:17, 78:7, 78:13, 79:20
**off-the-record** [1] - 14:18
**offender** [2] - 97:22, 98:16
**offense** [44] - 7:5, 9:21, 11:9, 11:12, 11:14, 11:15, 26:3, 65:6, 65:8, 65:11, 65:12, 75:2, 76:8, 77:4, 77:8, 77:10, 78:19, 78:20, 87:3, 87:10, 88:5, 90:14, 90:19, 93:2, 95:15, 95:17, 95:20, 96:8, 97:6, 97:7, 97:11, 97:13, 98:23, 98:25, 99:1, 100:5, 100:11, 100:13, 100:14, 100:25, 101:2, 101:4, 101:5, 101:6
**offenses** [10] - 11:12, 73:10, 77:5, 77:13, 77:20, 79:4, 82:13, 82:17, 101:1, 101:2
**offer** [1] - 61:3
**offered** [2] - 49:15, 68:3
**officer** [3] - 88:14, 89:13, 89:16
**officer's** [1] - 71:23
**offline** [1] - 27:3
**often** [2] - 6:3, 106:16

Appx6315

**old** [1] - 47:11
**Omedetou** [10] - 7:11, 10:24, 17:11, 17:20, 21:9, 30:23, 33:25, 40:22, 41:3, 51:9
**Omedetou's** [1] - 31:1
**omission** [5] - 12:4, 12:7, 98:24, 99:4, 99:9
**omissions** [1] - 103:18
**omitted** [1] - 81:13
**once** [2] - 41:12, 47:2
**one** [73] - 4:18, 4:23, 4:25, 8:2, 8:9, 8:18, 9:25, 11:25, 12:18, 16:5, 16:15, 16:21, 17:24, 18:8, 20:14, 20:15, 21:18, 21:20, 25:8, 26:19, 27:7, 27:13, 28:3, 28:4, 28:17, 29:10, 30:2, 31:13, 36:3, 36:13, 40:4, 40:7, 41:16, 44:8, 46:8, 46:18, 46:23, 47:3, 47:21, 53:1, 53:15, 53:18, 58:8, 58:14, 59:9, 59:23, 67:4, 67:12, 67:24, 78:23, 80:6, 82:1, 82:6, 82:13, 82:14, 87:15, 87:19, 88:22, 88:24, 91:6, 92:7, 92:10, 94:22, 95:6, 95:8, 95:25, 96:3, 102:7, 104:18, 105:17, 106:10
**online** [4] - 5:4, 5:6, 5:12, 72:16
**open** [5] - 33:11, 38:24, 57:23, 105:21, 106:1
**Open** [1] - 46:2
**opening** [1] - 18:13
**opens** [1] - 53:22
**operate** [6] - 11:6, 32:2, 94:1, 94:6, 96:20, 96:25
**operated** [10] - 18:11, 42:4, 44:23, 78:8, 92:14, 92:16, 93:5, 94:8, 95:22, 97:2
**operating** [14] - 2:19, 7:22, 10:3, 17:8, 19:1, 22:16, 23:10, 25:19, 30:10, 41:23, 42:13, 46:8, 51:3, 60:17
**operation** [3] - 9:13, 78:14, 92:18
**operational** [1] - 72:14
**operator** [6] - 28:22, 29:14, 34:21, 34:24,

35:5, 60:13
**operator's** [1] - 29:18
**opinion** [9] - 63:10, 73:2, 73:3, 73:4, 73:5, 73:6, 73:7, 102:22, 106:8
**opinions** [1] - 72:11
**opportunity** [1] - 69:12
**opposite** [1] - 68:1
**opposites** [1] - 21:17
**orally** [1] - 105:21
**order** [6] - 2:6, 5:6, 74:7, 90:21, 99:15, 101:23
**ordered** [1] - 68:16
**orderly** [1] - 62:15
**ordinarily** [2] - 75:9, 81:9
**organize** [1] - 104:5
**organized** [1] - 95:3
**original** [1] - 33:23
**originally** [1] - 33:16
**ostrich** [1] - 12:24
**otherwise** [11] - 71:2, 73:24, 74:20, 76:6, 83:4, 83:9, 83:23, 86:21, 89:7, 91:4, 103:13
**outcome** [2] - 69:14, 72:7
**outlays** [1] - 58:16
**outlining** [1] - 19:19
**outset** [1] - 106:10
**outside** [12] - 14:3, 26:10, 33:9, 46:17, 46:25, 48:1, 50:11, 50:13, 50:21, 85:19, 85:24
**outweighed** [1] - 73:6
**overlap** [3] - 16:4, 17:15, 37:17
**overlaps** [1] - 37:16
**overseeing** [1] - 8:21
**oversight** [1] - 43:19
**overt** [4] - 99:18, 99:19, 99:22, 99:24
**overwhelming** [1] - 51:20
**own** [15] - 4:12, 12:20, 20:12, 24:6, 31:3, 53:4, 54:22, 58:19, 59:17, 63:13, 63:20, 63:23, 63:24, 72:4, 74:5
**owned** [2] - 23:14, 91:4
**owner** [5] - 31:21, 34:4, 34:9, 34:14, 60:13
**ownership** [5] - 23:6,

84:3, 84:7, 87:25, 88:19
**owns** [2] - 53:5, 90:18

## P

**p.m** [4] - 14:25, 61:18
**packet** [4] - 19:25, 20:5, 42:15
**page** [1] - 16:8
**panel** [1] - 46:8
**panic** [1] - 21:6
**paper** [3] - 33:5, 43:17, 43:25
**papers** [2] - 26:20, 70:24
**paperwork** [3] - 12:9, 21:22, 24:11
**part** [20] - 5:2, 6:9, 6:12, 25:8, 47:10, 68:14, 76:11, 76:22, 80:16, 80:20, 81:1, 81:3, 84:2, 84:6, 86:17, 87:23, 90:17, 90:18, 95:3, 100:18
**partially** [1] - 73:7
**participants** [2] - 80:23, 80:25
**participate** [2] - 84:23, 100:8
**participated** [1] - 98:4
**participates** [1] - 97:20
**participating** [1] - 80:14
**particular** [8] - 10:15, 54:20, 62:10, 65:10, 65:11, 67:5, 76:7, 98:15
**particularly** [2] - 48:16, 72:15
**parties** [3] - 4:23, 64:4, 64:5
**partisans** [1] - 106:17
**partner** [1] - 79:17
**partnership** [1] - 79:16
**party** [3] - 5:1, 68:6, 103:21
**pass** [1] - 24:5
**passkeys** [2] - 50:6, 50:7
**passport** [1] - 30:22
**password** [6] - 13:12, 30:2, 30:3, 37:9, 57:22
**passwords** [1] - 30:8
**past** [1] - 13:21
**Pause** [1] - 38:14
**pay** [5] - 5:12, 10:14, 13:20, 26:8, 31:5

**paying** [2] - 20:15, 28:6
**payment** [4] - 56:10, 93:20, 93:23, 96:18
**payments** [4] - 9:19, 10:10, 28:7, 85:4
**PCAP** [1] - 42:20
**peace** [1] - 47:14
**Pearlman** [1] - 38:20
**PEARLMAN** [16] - 32:12, 32:15, 32:20, 33:2, 38:3, 38:6, 38:22, 42:6, 45:2, 45:4, 45:13, 45:19, 45:23, 46:1, 46:14, 48:9
**peddling** [1] - 5:4
**peep** [1] - 32:6
**peer** [9] - 23:17, 27:4, 29:25, 31:10, 43:17
**peer-to-peer** [3] - 27:4, 29:25, 31:10
**PELKER** [2] - 2:3, 2:10
**Pelker** [7] - 2:9, 22:7, 26:2, 28:16, 29:4, 34:20, 48:22
**people** [33] - 3:8, 6:3, 10:11, 10:23, 13:8, 17:15, 18:16, 24:2, 29:18, 39:25, 41:1, 42:2, 47:3, 50:17, 50:20, 52:14, 54:14, 54:22, 56:3, 58:11, 59:5, 59:25, 69:15, 79:22, 80:2, 80:13, 80:20, 82:5, 85:17, 85:22, 85:23, 85:24, 98:19
**per** [1] - 36:1
**percent** [4] - 34:22, 35:19, 52:6, 53:21
**perception** [1] - 70:5
**performed** [2] - 97:9, 99:20
**period** [5] - 41:5, 53:16, 77:6, 100:23, 101:14
**perjury** [1] - 71:11
**permit** [1] - 70:25
**permitted** [4] - 63:15, 64:9, 67:7, 71:3
**person** [41] - 6:9, 8:9, 23:25, 27:4, 31:4, 39:12, 40:14, 47:3, 50:14, 53:15, 54:23, 58:12, 60:14, 60:19, 60:21, 64:19, 66:2, 66:18, 75:10, 75:17, 76:8, 80:15, 80:16, 81:10, 81:17, 85:14, 85:16, 89:17, 94:18,

94:19, 94:22, 94:24, 95:8, 95:9, 97:20, 97:23, 98:17, 105:13, 105:23

**personal** [3] - 36:12, 63:24, 106:22

**personality** [1] - 75:6

**personally** [5] - 5:24, 97:5, 97:6, 97:18, 97:24

**persons** [1] - 79:14

**Philips** [1] - 52:10

**phone** [2] - 29:5, 38:4

**photo** [2] - 30:21, 46:7

**phrase** [2] - 86:19, 89:21

**physical** [2] - 51:15, 98:7

**pick** [1] - 32:13

**picture** [2] - 22:21, 46:7

**pictures** [1] - 103:13

**pie** [1] - 59:10

**piece** [6] - 15:8, 15:9, 15:10, 15:21, 18:14, 53:1

**pieces** [1] - 37:1

**place** [13] - 7:25, 9:22, 11:24, 17:10, 22:12, 32:9, 54:24, 98:8, 99:1, 99:4, 99:10, 99:15, 99:18

**places** [1] - 52:6

**plain** [1] - 4:13

**plan** [2] - 79:25, 80:17

**planned** [1] - 98:15

**planning** [1] - 98:6

**plausible** [1] - 29:23

**play** [2] - 68:14, 80:16

**players** [1] - 5:3

**playing** [1] - 5:1

**plea** [7] - 44:21, 70:20, 71:4, 71:8, 71:10, 71:15, 71:18

**pleas** [1] - 46:13

**pled** [1] - 44:9

**plural** [1] - 28:16

**point** [16] - 17:7, 17:24, 18:12, 18:13, 35:1, 35:21, 36:6, 39:9, 44:13, 47:21, 52:2, 55:3, 55:10, 57:3, 84:24, 100:9

**pointed** [1] - 31:13

**pointing** [2] - 17:9, 37:15

**points** [3] - 6:4, 39:1, 48:14

**Poloniex** [1] - 52:8

**popped** [1] - 29:15

**pored** [1] - 18:3

**portion** [3] - 62:10, 99:14, 103:14

**portions** [5] - 103:11, 103:12, 103:15, 103:18, 103:19

**position** [2] - 55:17, 106:11

**positive** [1] - 43:15

**possess** [1] - 86:25

**possesses** [1] - 72:25

**possible** [3] - 59:23, 60:5, 104:10

**post** [1] - 31:5

**post-mixed** [1] - 31:5

**posting** [2] - 7:11, 10:24

**posts** [3] - 27:16, 31:1, 57:11

**pot** [1] - 56:25

**potential** [1] - 3:25

**powerful** [1] - 65:18

**PowerPoint** [1] - 2:12

**precautions** [1] - 57:13

**prejudice** [2] - 63:2, 70:14

**prejudiced** [1] - 70:12

**prejudices** [1] - 69:5

**preliminary** [1] - 62:5

**prepaid** [1] - 58:18

**preponderance** [3] - 25:10, 99:7, 99:16

**presence** [3] - 73:24, 80:21, 98:7

**present** [5] - 2:5, 32:21, 97:7, 97:19, 98:10

**presented** [5] - 31:18, 48:3, 67:10, 67:17, 104:23

**presents** [2] - 59:2

**preside** [1] - 103:24

**press** [2] - 29:12

**presumed** [2] - 19:15, 64:23

**presumption** [4] - 19:6, 19:7, 64:24

**pretty** [1] - 57:2

**previous** [1] - 69:24

**previously** [1] - 102:1

**Price** [8] - 6:16, 7:2, 7:8, 7:16, 10:12, 11:20, 32:4, 32:20

**price** [4] - 32:3, 32:17, 33:6, 58:10

**pride** [1] - 106:10

**primarily** [1] - 44:6

**primary** [2] - 23:18, 60:14

**principal** [2] - 97:22, 98:16

**privacy** [2] - 52:20, 103:16

**private** [17] - 20:18, 39:1, 39:7, 39:10, 39:11, 39:21, 40:2, 40:9, 44:13, 44:25, 45:4, 45:5, 45:17, 45:22, 45:23, 46:3, 46:4

**probabilities** [1] - 53:23

**probability** [5] - 13:1, 54:2, 70:6, 76:9, 76:15

**probable** [3] - 65:16, 75:17, 81:17

**problem** [5] - 20:9, 53:7, 55:21, 56:14, 56:18

**problems** [1] - 3:9

**proceed** [4] - 15:5, 42:10, 48:8, 106:16

**proceeding** [1] - 82:2

**proceeds** [30] - 3:6, 3:16, 3:20, 6:17, 6:21, 7:2, 13:1, 13:15, 22:6, 23:9, 74:24, 78:3, 82:24, 83:18, 84:4, 84:8, 86:10, 86:15, 86:18, 87:6, 87:12, 88:1, 88:3, 88:14, 88:20, 89:5, 89:14, 89:18, 89:25, 90:9

**process** [4] - 4:12, 53:3, 106:22, 106:24

**processing** [2] - 10:10, 53:2

**produce** [1] - 65:3

**professionals** [1] - 33:13

**Professor** [6] - 34:19, 35:17, 58:7, 58:23, 58:24, 59:1

**profile** [1] - 57:22

**profit** [4] - 11:6, 33:17, 60:4, 91:23

**profits** [1] - 2:16

**prohibits** [1] - 76:25

**promote** [17] - 3:22, 4:3, 4:11, 6:22, 23:1, 83:7, 84:14, 84:19, 87:23, 88:17, 89:1, 89:21, 90:11, 93:3, 95:15, 95:19, 104:8

**promoting** [2] - 7:5, 84:17

**promotional** [1] - 3:25

**proof** [7] - 18:23, 27:8, 47:6, 51:1, 65:18,

74:10, 77:7

**proper** [4] - 68:4, 100:3, 100:10, 100:12

**properly** [1] - 64:1

**property** [23] - 6:20, 6:23, 22:5, 23:7, 74:23, 78:2, 82:24, 83:1, 83:18, 83:21, 86:3, 86:5, 86:10, 87:11, 87:25, 88:3, 88:4, 88:13, 88:20, 89:4, 89:14, 89:18, 90:9

**prosecuted** [1] - 82:1

**prosecution** [2] - 19:4, 71:11

**prosperity** [4] - 4:5, 4:12, 84:20

**protect** [2] - 7:25, 71:10

**protection** [1] - 53:21

**prove** [58] - 9:14, 14:1, 18:24, 19:1, 19:2, 19:4, 19:15, 27:9, 27:10, 65:3, 65:10, 65:15, 66:7, 66:9, 73:11, 79:19, 80:9, 80:10, 81:6, 82:6, 82:8, 82:9, 82:12, 84:5, 85:25, 86:8, 86:13, 87:8, 87:10, 87:16, 87:17, 88:9, 89:12, 89:15, 90:12, 90:22, 91:5, 91:13, 91:16, 91:20, 93:13, 94:5, 94:7, 96:9, 96:24, 97:1, 98:12, 98:14, 98:16, 99:11, 99:16, 100:19, 100:22, 101:7, 101:11, 101:18, 103:1

**proved** [10] - 46:13, 73:14, 75:9, 75:22, 76:19, 81:4, 81:10, 81:23, 97:12, 99:7

**proven** [7] - 54:9, 64:10, 65:1, 65:5, 68:18, 74:22, 79:1

**proves** [5] - 77:3, 80:4, 86:16, 102:6, 102:15

**provide** [3] - 59:7, 62:7, 91:19

**provided** [3] - 5:12, 74:4, 102:19

**provides** [3] - 87:22, 90:16, 94:19

**proving** [5] - 65:13, 67:3, 94:11, 95:12, 95:18

**provision** [1] - 94:2

**provisions** [1] - 96:21

**public** [2] - 33:17, 92:1
**publicity** [1] - 104:25
**published** [1] - 15:14
**pulled** [2] - 16:10, 24:4
**punishable** [4] - 92:18, 92:20, 93:7, 93:10
**punishment** [2] - 104:10, 104:16
**purchase** [3] - 74:20, 75:3, 84:25
**purchased** [1] - 74:17
**purchases** [1] - 27:3
**purchasing** [1] - 5:6
**purpose** [7] - 4:14, 8:16, 51:21, 51:22, 74:21, 74:25, 84:17
**purposes** [12] - 79:16, 84:11, 85:13, 91:9, 92:4, 93:5, 94:2, 95:5, 95:16, 96:21, 102:1, 102:9
**pursuant** [1] - 70:21
**put** [5] - 2:12, 36:11, 50:14, 50:21, 52:6
**putting** [4] - 30:22, 31:4, 32:15, 36:17

## Q

**qualified** [1] - 26:15
**quality** [1] - 52:12
**queried** [1] - 10:9
**questions** [5] - 56:4, 62:12, 62:16, 64:16, 67:12
**quiet** [1] - 32:8

## R

**rabbit** [2] - 30:15, 37:2
**race** [1] - 63:4
**radio** [1] - 104:19
**rain** [1] - 50:18
**raining** [3] - 50:11, 50:15, 50:20
**Raise** [1] - 15:13
**raises** [1] - 100:20
**raising** [1] - 73:22
**ran** [3] - 2:16, 52:5, 53:2
**random** [1] - 106:21
**randomized** [1] - 34:22
**rarely** [1] - 12:17
**rates** [4] - 39:17, 43:14, 43:15, 43:16
**rather** [2] - 67:21, 100:7
**reach** [6] - 67:14,

102:2, 102:3, 102:9, 102:11, 104:3
**reached** [1] - 105:25
**reaching** [3] - 67:9, 67:18, 103:9
**Reactor** [3] - 39:16, 43:9, 43:20
**Reactors'** [1] - 43:17
**Read** [1] - 25:23
**read** [13] - 31:2, 32:22, 33:5, 33:9, 40:24, 52:25, 54:3, 88:23, 88:24, 90:5, 101:10, 104:21, 104:22
**Reade** [2] - 40:15
**reader** [1] - 16:2
**Reader** [1] - 43:3
**reading** [1] - 7:12
**ready** [4] - 2:2, 2:9, 15:1, 15:6
**real** [2] - 3:8, 29:14
**really** [9] - 21:6, 22:12, 28:1, 36:16, 37:4, 42:2, 50:11, 50:13, 52:19
**reason** [16] - 8:13, 16:23, 21:3, 24:9, 40:6, 41:11, 49:15, 53:10, 54:20, 59:6, 59:7, 59:16, 65:21, 66:6, 69:10
**reasonable** [51] - 14:9, 18:25, 19:5, 21:18, 25:10, 25:22, 27:9, 47:7, 48:7, 64:11, 65:1, 65:6, 65:11, 65:14, 65:19, 65:20, 65:25, 66:1, 66:2, 66:9, 66:16, 68:19, 71:7, 73:14, 74:22, 75:23, 76:20, 77:4, 77:9, 79:1, 79:19, 80:5, 81:23, 86:16, 87:18, 88:10, 89:17, 90:23, 91:20, 93:13, 95:25, 96:9, 97:12, 98:20, 99:12, 101:8, 101:11, 101:18, 102:6, 102:15, 103:1
**reasonableness** [1] - 70:5
**reasonably** [1] - 77:10
**reasons** [3] - 11:25, 73:5, 103:14
**rebuttal** [1] - 38:21
**recalled** [2] - 48:25, 69:1
**receipts** [1] - 86:12
**receive** [2] - 64:13, 70:18
**received** [6] - 61:11, 74:12, 75:14, 75:20,

81:14, 81:20
**receiving** [9] - 13:24, 36:19, 83:3, 83:9, 83:22, 86:20, 89:7, 93:21, 96:15
**recently** [2] - 57:5, 57:7
**recess** [2] - 14:25, 61:18
**reckless** [1] - 76:13
**recollection** [3] - 48:21, 48:23, 69:20
**record** [2] - 14:18, 34:6
**recording** [1] - 103:2
**records** [4] - 7:19, 10:9, 13:10, 74:8
**recovered** [3] - 52:7, 53:8, 57:17
**red** [2] - 30:13, 37:1
**red-yarn-and-thumbtack** [1] - 30:13
**refer** [2] - 62:9
**reference** [1] - 63:12
**referenced** [1] - 7:12
**references** [1] - 48:5
**referencing** [2] - 15:23, 18:9
**referred** [3] - 45:20, 47:22, 48:25
**referring** [2] - 45:21, 57:13
**refers** [1] - 10:25
**reflection** [1] - 66:3
**refuse** [1] - 62:19
**regarding** [2] - 104:1, 104:7
**regardless** [1] - 76:25
**register** [14] - 8:3, 8:19, 8:22, 8:25, 9:3, 9:4, 9:6, 11:2, 12:3, 12:8, 94:16, 95:1, 100:13, 100:15
**registered** [6] - 9:10, 10:10, 31:21, 34:4, 34:9, 34:14
**registering** [3] - 10:4, 20:22, 20:24
**registrar** [2] - 59:15, 59:19
**registration** [14] - 20:16, 21:13, 31:6, 31:21, 33:24, 34:5, 34:10, 34:15, 39:4, 41:2, 58:5, 59:13, 92:23, 94:12
**regular** [1] - 95:2
**regularly** [2] - 33:13, 91:23
**regulations** [5] - 7:24,

8:11, 8:13, 94:14, 94:15
**regulators** [2] - 8:23, 12:9
**rejected** [1] - 55:22
**related** [7] - 28:11, 29:6, 30:4, 42:15, 75:3, 101:8, 101:12
**relates** [1] - 6:15
**relation** [2] - 29:8
**relatively** [2] - 40:25, 41:5
**release** [1] - 29:12
**relevant** [9] - 25:21, 25:25, 50:25, 75:21, 76:18, 81:22, 87:22, 90:17, 100:16
**rely** [3] - 63:22, 74:3, 90:2
**remaining** [1] - 28:9
**remains** [3] - 64:24, 74:3, 99:21
**Remember** [1] - 106:16
**remember** [9] - 17:22, 22:20, 23:23, 26:15, 41:19, 46:9, 56:5, 99:10
**remind** [2] - 104:17, 105:5
**remitting** [1] - 8:18
**remote** [1] - 33:21
**removed** [3] - 34:4, 34:9, 103:13
**rendered** [1] - 62:14
**repeat** [1] - 62:5
**repeatedly** [4] - 3:10, 7:12, 10:25, 28:13
**replace** [1] - 63:20
**replaces** [2] - 102:23, 102:25
**replied** [1] - 7:16
**reports** [3] - 8:6, 104:18, 104:22
**represent** [2] - 95:8, 101:22
**representatives** [1] - 56:4
**represented** [11] - 6:21, 7:2, 22:5, 78:3, 86:17, 87:12, 88:3, 88:14, 89:5, 89:16, 90:9
**represents** [2] - 68:6
**require** [2] - 65:2, 67:8
**required** [24] - 8:19, 8:22, 21:14, 49:8, 66:7, 73:11, 75:16, 81:16, 82:9, 85:25, 86:8, 86:13, 87:16, 87:17,

89:12, 91:4, 92:20, 94:6, 95:1, 96:25, 98:12, 98:14, 100:7, 100:16

**requirement** [7] - 8:4, 81:25, 82:2, 86:7, 95:12, 99:1, 99:13

**requirements** [5] - 7:24, 8:2, 8:8, 92:24, 94:13

**requires** [2] - 93:24, 96:19

**research** [3] - 33:4, 47:25, 105:13

**resets** [1] - 13:12

**resolve** [1] - 50:8

**resolved** [1] - 74:2

**respect** [9] - 49:14, 58:7, 78:24, 85:2, 102:2, 102:4, 102:10, 102:11, 104:6

**respective** [2] - 70:24, 70:25

**response** [2] - 22:13, 22:14

**responsibility** [3] - 62:23, 63:11, 68:7

**responsible** [4] - 9:25, 87:9, 90:13, 97:8

**restroom** [1] - 14:22

**rests** [1] - 104:14

**result** [1] - 70:3

**retained** [1] - 86:11

**retire** [1] - 105:4

**retiring** [1] - 106:14

**return** [8] - 61:23, 62:13, 78:21, 95:21, 99:2, 99:15, 101:23, 103:23

**returning** [1] - 103:2

**reveal** [1] - 105:23

**revealed** [1] - 3:10

**review** [1] - 33:20

**reviewed** [1] - 43:17

**reviewing** [1] - 106:14

**rises** [1] - 5:1

**risks** [1] - 59:5

**Road** [3] - 74:18, 74:20, 75:3

**road** [1] - 32:2

**robbery** [1] - 51:16

**role** [4] - 23:2, 26:16, 47:17, 48:17

**rolling** [1] - 37:5

**Roman** [4] - 10:22, 11:1, 11:5, 14:9

**room** [8] - 50:11, 61:12, 63:17, 103:4, 103:23, 105:4, 106:7, 106:14

**roughly** [3] - 26:19, 35:14, 35:19

**router** [1] - 31:25

**routing** [1] - 72:13

**Rovensky** [3] - 32:4, 32:17, 32:20

**rule** [1] - 62:16

**ruled** [1] - 68:12

**rules** [3] - 62:4, 78:25, 104:1

**run** [2] - 11:14, 101:4

**running** [10] - 7:13, 10:22, 11:9, 18:20, 23:19, 24:3, 25:6, 27:23, 35:25, 60:9

**runoff** [1] - 49:2

**Russian** [1] - 73:16

## S

**safe** [2] - 22:12, 44:1

**sale** [2] - 84:25, 93:19

**sand** [2] - 12:24, 13:4

**Santell** [1] - 3:18

**Sarah** [2] - 43:22, 72:17

**SARs** [1] - 8:6

**sat** [1] - 79:25

**satisfied** [3] - 89:20, 92:11, 92:12

**satisfies** [1] - 92:7

**satisfy** [4] - 94:4, 94:10, 95:11, 96:23

**saved** [1] - 57:21

**saving** [1] - 58:13

**saw** [11] - 3:15, 10:9, 16:7, 18:4, 22:8, 22:15, 26:20, 66:19, 66:21, 66:22, 66:23

**scary** [1] - 27:18

**scene** [1] - 80:21

**scheme** [3] - 6:1, 12:11, 58:25

**schemes** [1] - 53:25

**Scholl** [19] - 3:18, 7:18, 17:22, 20:17, 21:5, 34:20, 34:21, 34:23, 36:3, 36:13, 37:14, 39:25, 48:25, 49:3, 49:9, 49:19, 50:1, 50:7, 72:12

**scientific** [3] - 43:16, 66:8, 72:23

**scientist** [1] - 52:25

**scope** [1] - 6:2

**screen** [1] - 15:21

**screenshot** [1] - 43:2

**scrutiny** [1] - 31:23

**se** [1] - 36:1

**seat** [2] - 12:1, 40:6

**seated** [1] - 2:6

**seats** [2] - 106:22, 106:23

**second** [24] - 3:6, 6:20, 9:4, 10:6, 13:23, 21:23, 38:13, 39:24, 79:6, 79:23, 80:10, 81:2, 82:11, 82:23, 83:12, 83:17, 84:11, 88:13, 88:18, 91:2, 92:22, 93:17, 94:14, 96:12

**Secrecy** [1] - 9:7

**Secretary** [1] - 94:16

**section** [1] - 84:8

**Section** [19] - 77:25, 78:4, 78:10, 78:11, 78:17, 79:5, 79:6, 82:10, 82:11, 82:19, 83:13, 87:21, 88:8, 90:16, 90:22, 93:9, 93:12, 94:13, 100:3

**Sections** [4] - 83:5, 83:11, 83:24, 86:22

**Securities** [1] - 8:24

**security** [2] - 57:12, 72:14

**see** [19] - 2:8, 12:18, 14:7, 15:17, 15:22, 16:8, 17:2, 18:1, 20:5, 23:24, 27:21, 29:14, 31:9, 33:6, 40:24, 53:20, 61:14, 74:1, 103:17

**seeing** [4] - 22:19, 24:6, 24:7, 26:9

**seize** [1] - 45:4

**seized** [4] - 35:15, 44:18, 44:25, 45:6

**select** [2] - 103:24, 104:1

**selected** [1] - 106:22

**selecting** [2] - 67:13, 104:4

**selection** [2] - 106:21, 106:24

**self** [1] - 70:13

**self-interest** [1] - 70:13

**sellers** [1] - 5:19

**selling** [12] - 5:5, 18:18, 20:13, 23:17, 36:22, 39:22, 58:11, 83:3, 83:9, 83:23, 86:21, 89:7

**send** [2] - 62:13, 105:16

**sending** [3] - 29:18, 52:21, 103:4

**sense** [16] - 12:21,

14:3, 21:7, 21:9, 28:25, 41:7, 41:9, 41:14, 50:21, 56:8, 58:6, 58:22, 59:11, 106:10

**sent** [5] - 7:6, 22:9, 22:17, 56:19, 61:12

**sentence** [2] - 71:1, 104:13

**sentencing** [2] - 70:24, 70:25

**separate** [7] - 9:24, 39:25, 53:10, 78:19, 78:21, 79:10, 99:21

**separately** [1] - 78:21

**series** [1] - 55:10

**serious** [1] - 13:17

**seriously** [1] - 47:17

**server** [15] - 16:18, 17:6, 17:17, 19:14, 27:25, 28:11, 28:15, 28:17, 28:19, 29:3, 29:7, 37:24, 42:15

**servers** [8] - 16:18, 17:5, 28:14, 28:16, 41:17, 50:6, 54:15

**service** [7] - 7:15, 7:21, 13:7, 45:14, 54:18, 54:20, 56:3

**services** [8] - 8:13, 30:14, 91:10, 94:15, 94:17, 94:19, 94:21, 95:1

**set** [9] - 2:15, 3:8, 9:12, 13:7, 14:12, 14:15, 14:17, 21:12, 99:19

**sets** [1] - 19:17

**setting** [1] - 10:22

**several** [4] - 5:3, 10:15, 13:22, 49:1

**shaking** [1] - 50:18

**shall** [3] - 63:7, 88:5, 90:19

**share** [1] - 73:24

**shared** [3] - 27:16, 30:1, 33:16

**sharp** [1] - 44:16

**shifts** [1] - 65:2

**shoddy** [1] - 38:9

**shormint** [2] - 17:10, 17:13

**shormint@hotmail. com** [4] - 17:20, 37:13, 42:17, 42:20

**short** [4] - 14:14, 46:11, 53:16, 61:5

**shouts** [1] - 50:12

**show** [7] - 9:14, 9:17, 25:23, 31:10, 56:6, 80:3, 80:23

showed [1] - 34:20

showing [6] - 17:25, 20:11, 33:24, 36:22, 38:1, 41:22

shown [7] - 9:16, 27:17, 36:16, 42:12, 70:11, 74:6, 81:2

shows [4] - 11:16, 17:11, 17:19, 30:10

shut [2] - 29:10, 29:21

sic [2] - 26:6, 50:2

sic) [1] - 53:20

side [7] - 27:11, 36:16, 67:20, 67:25, 68:1, 68:3, 70:12

signal [1] - 28:10

signed [2] - 105:17, 105:19

Silk [3] - 74:18, 74:20, 75:3

similar [4] - 6:23, 41:4, 75:4, 80:3

similarly [2] - 64:16, 100:25

simple [1] - 4:14

simply [5] - 38:8, 60:15, 60:16, 75:6, 91:10

singing [1] - 53:18

single [6] - 14:8, 15:8, 18:8, 24:1, 46:19, 91:23

singular [1] - 28:16

sinister [1] - 28:2

sit [1] - 59:23

site [14] - 4:13, 7:10, 7:14, 11:21, 13:10, 13:15, 20:23, 27:15, 34:1, 58:1, 58:4, 58:5, 60:8, 74:20

sitting [4] - 11:22, 24:3, 40:6, 56:24

situation [1] - 19:11

six [1] - 72:10

skill [1] - 73:1

skills [1] - 27:19

sky [1] - 59:10

sleep [1] - 66:23

smaller [1] - 67:24

snow [4] - 66:19, 66:21, 66:23

snowed [1] - 66:25

software [10] - 16:11, 16:13, 24:4, 28:3, 41:12, 43:7, 43:8, 43:21, 49:8

sold [3] - 22:11, 29:24

sole [3] - 62:22, 63:11, 68:21

solely [3] - 63:5, 104:15, 104:23

someone [9] - 10:19, 42:9, 44:3, 50:12, 51:15, 93:25, 98:21, 100:8

sometimes [3] - 4:22, 68:2, 103:11

somewhere [2] - 29:7, 56:25

song [1] - 53:18

soon [2] - 34:23, 105:2

sophisticated [1] - 21:10

sorry [12] - 15:14, 15:16, 15:19, 52:4, 55:16, 65:10, 67:22, 78:18, 91:15, 92:15, 101:10

sort [11] - 17:9, 17:23, 19:23, 22:9, 24:4, 27:25, 30:12, 32:1, 39:16, 41:10, 42:18

sorts [2] - 18:3, 44:1

sound [2] - 28:2, 73:5

sounds [2] - 3:2, 4:6

source [8] - 23:6, 36:7, 36:18, 41:17, 84:3, 84:7, 87:25, 88:19

sources [1] - 50:3

Special [6] - 3:18, 6:16, 7:2, 7:8, 7:16, 11:20

special [2] - 9:22, 11:24

specialized [1] - 72:23

specific [9] - 3:19, 11:9, 17:25, 62:2, 62:3, 77:12, 95:19, 98:13, 103:25

specifically [6] - 13:17, 51:21, 75:8, 83:2, 83:8, 83:21

specified [23] - 6:22, 23:9, 83:7, 84:15, 84:18, 86:15, 86:18, 86:19, 87:5, 87:6, 87:24, 88:1, 88:3, 88:5, 88:17, 88:21, 89:2, 89:5, 89:22, 89:25, 90:8, 90:10, 90:11

speculate [3] - 18:15, 19:13, 68:11

speculation [4] - 30:18, 41:25, 42:8, 66:5

spend [4] - 26:25, 39:16, 56:14, 56:15

spending [2] - 26:24, 84:9

spends [1] - 40:15

spent [1] - 25:14

spokesperson [1] - 103:25

spyware [1] - 32:1

stamp [2] - 55:13, 55:16

stand [6] - 14:12, 22:20, 50:14, 55:12, 69:8, 106:9

standard [5] - 25:9, 25:11, 48:7, 49:2, 89:20

standards [1] - 43:18

stands [2] - 44:19, 69:14

Starbucks [1] - 40:13

stark [1] - 44:19

start [14] - 19:6, 21:6, 21:8, 29:4, 31:7, 39:21, 41:8, 41:13, 48:20, 61:7, 61:13, 62:7, 84:22, 100:8

started [1] - 27:6

starting [1] - 21:13

starts [1] - 11:8

state [13] - 8:22, 9:4, 9:23, 73:2, 75:9, 75:23, 76:20, 81:24, 86:6, 91:12, 93:6, 93:8

statement [6] - 38:10, 69:24, 71:11, 75:12, 81:13, 89:13

statements [1] - 64:14

States [14] - 7:24, 29:12, 33:16, 42:24, 77:21, 79:4, 85:24, 85:25, 88:6, 90:20, 91:11, 93:22, 95:4, 96:16

states [2] - 85:23, 91:11

statue [1] - 46:18

statute [19] - 11:8, 11:10, 11:13, 25:20, 25:22, 25:25, 26:3, 26:13, 56:22, 56:24, 87:22, 88:23, 88:24, 90:16, 100:18, 100:20, 101:3, 101:14, 101:20

step [2] - 29:16, 41:9

steps [1] - 74:1

sterlingov [3] - 27:9, 30:19, 44:23

Sterlingov [77] - 10:22, 11:1, 11:5, 14:9, 15:12, 15:22, 16:1, 16:21, 17:8, 17:12, 17:20, 17:25, 18:10, 18:18, 19:1, 19:2, 19:8, 19:12, 20:3, 20:22, 21:4, 22:14, 22:16, 22:19, 23:17, 23:19, 24:24, 25:5, 25:14, 25:17, 26:14, 29:20, 30:6, 31:8, 31:10, 31:15, 31:17, 32:2, 32:5, 32:7, 33:22, 34:2, 34:7, 34:11, 34:12, 34:16, 35:5, 35:15, 35:23, 36:9, 36:17, 36:19, 37:12, 39:5, 39:13, 39:22, 39:23, 40:6, 41:22, 42:3, 42:4, 42:13, 42:17, 42:22, 43:6, 43:10, 43:25, 44:4, 44:10, 44:17, 44:20, 47:8, 48:11, 51:24, 52:4, 52:5, 60:5

Sterlingov's [20] - 16:6, 16:20, 17:1, 24:6, 26:7, 29:5, 29:10, 29:13, 31:22, 33:20, 36:5, 36:7, 36:21, 41:21, 42:24, 43:23, 44:2, 44:7, 47:15, 49:10

stick [1] - 13:4

sticking [1] - 12:24

still [9] - 9:10, 20:25, 26:25, 29:18, 52:21, 55:4, 59:20, 61:10

sting [4] - 2:18, 6:14, 6:18, 7:6

stipulate [1] - 50:2

stipulated [2] - 64:4, 64:6

stipulation [1] - 64:7

stone [1] - 55:18

stopped [1] - 27:12

story [1] - 46:11

straight [1] - 43:5

strength [1] - 60:1

stress [1] - 48:13

stretch [2] - 14:12, 14:17

stricken [2] - 68:13, 68:16

strong [3] - 55:8, 55:22, 106:8

stuff [15] - 16:14, 17:14, 18:3, 21:11, 22:22, 30:7, 30:10, 30:22, 37:18, 39:18, 41:8, 41:20, 43:8, 44:1, 59:8

subjective [1] - 76:9

substance [8] - 83:4, 83:10, 83:23, 86:21, 87:2, 87:9, 89:8, 90:14

**substances** [1] - 87:13

**substantial** [2] - 95:3, 99:14

**substantive** [3] - 21:24, 22:3, 82:17

**substitutes** [1] - 94:23

**succeed** [1] - 98:5

**success** [1] - 4:24

**suffer** [1] - 47:3

**sufficient** [7] - 60:10, 73:4, 77:8, 86:15, 95:17, 98:9, 98:20

**suggest** [4] - 49:16, 54:8, 55:9, 102:22

**sum** [2] - 35:3, 41:4

**summaries** [5] - 74:6, 74:9, 74:10, 74:12, 74:13

**summarize** [1] - 77:2

**supervised** [2] - 23:14, 91:3

**supervises** [1] - 90:18

**supplied** [1] - 5:11

**support** [4] - 22:10, 23:3, 93:3, 95:16

**supported** [1] - 70:9

**supporting** [2] - 73:5, 74:14

**suppose** [1] - 50:17

**supposed** [5] - 29:9, 33:4, 33:8, 38:1, 47:24

**supposedly** [1] - 15:23

**Supreme** [1] - 46:24

**surprise** [1] - 41:24

**surrounding** [3] - 69:18, 75:12, 81:12

**surveillance** [3] - 32:7, 32:18, 32:21

**surveilling** [1] - 28:10

**suspected** [1] - 8:7

**sustained** [2] - 68:9, 68:15

**swear** [1] - 59:22

**Sweden** [3] - 24:7, 24:25, 25:15

**Swedish** [3] - 16:24, 43:1, 73:16

**switch** [4] - 29:2, 29:5, 29:21, 33:21

**switches** [1] - 33:20

**sworn** [1] - 64:2

**sympathy** [1] - 63:2

**symphony** [1] - 53:17

**system** [12] - 7:8, 7:9, 7:10, 8:1, 19:17, 47:5, 47:12, 47:13, 85:17, 85:20, 94:25

**T**

**tablet** [1] - 38:8

**talks** [2] - 3:10, 37:8

**task** [1] - 104:2

**tasked** [1] - 8:21

**team** [2] - 10:25, 47:9

**teams** [1] - 77:20

**tech** [1] - 27:11

**technical** [1] - 72:23

**technique** [1] - 49:20

**techniques** [1] - 72:15

**television** [1] - 104:19

**tempted** [1] - 104:21

**ten** [6] - 14:23, 18:5, 40:2, 47:3, 61:5, 61:15

**ten-minute** [1] - 61:5

**tens** [1] - 3:16

**term** [11] - 75:25, 85:13, 85:14, 86:10, 91:25, 92:4, 93:8, 94:3, 94:17, 95:5, 96:22

**terms** [1] - 72:16

**testified** [19] - 7:18, 16:16, 16:21, 31:14, 32:18, 33:15, 46:9, 49:16, 49:17, 49:19, 55:21, 56:7, 58:15, 66:20, 68:21, 68:25, 69:2, 69:13, 70:21

**testifies** [1] - 58:21

**testify** [7] - 28:9, 33:19, 43:25, 46:6, 50:15, 71:17, 73:2

**testifying** [3] - 67:20, 69:9, 69:14

**testimony** [32] - 33:15, 42:25, 45:7, 48:24, 52:25, 55:1, 64:2, 64:4, 66:14, 66:20, 66:24, 67:24, 67:25, 68:20, 69:23, 69:24, 70:1, 70:7, 70:15, 70:17, 71:4, 71:6, 71:18, 71:20, 71:21, 71:24, 72:1, 72:4, 72:5, 72:8, 72:9, 72:10

**text** [1] - 105:9

**THE** [31] - 2:2, 2:5, 2:7, 14:11, 14:16, 14:19, 15:1, 15:3, 15:5, 15:13, 15:16, 15:18, 32:13, 33:1, 33:3, 38:4, 38:12, 38:15, 38:20, 38:23, 42:7, 42:11, 45:5, 45:9, 45:12, 45:18, 46:15, 47:18, 61:1, 61:17, 61:20

**themselves** [3] - 59:6, 67:14, 74:10

**theories** [1] - 30:13

**theory** [4] - 28:15, 29:20, 37:1, 57:18

**therefore** [1] - 73:18

**they've** [2] - 18:7, 32:8

**thinking** [4] - 40:5, 59:10, 75:11, 81:11

**third** [11] - 3:14, 6:21, 9:8, 14:2, 24:19, 83:1, 83:20, 88:16, 91:7, 92:25, 95:10

**thoughtful** [1] - 66:2

**thousand** [1] - 33:3

**thousands** [4] - 3:4, 17:15, 24:3

**three** [13] - 6:18, 9:1, 9:2, 32:5, 59:9, 88:8, 92:8, 92:11, 93:4, 95:23, 96:4, 102:12, 102:17

**throughout** [5] - 50:5, 61:25, 64:25, 65:2, 105:6

**thumbtack** [1] - 30:13

**tied** [1] - 5:14

**tightrope** [1] - 55:25

**timing** [1] - 21:10

**Title** [2] - 79:22, 79:23

**today** [4] - 13:25, 16:10, 33:6, 51:19

**together** [7] - 50:21, 53:16, 60:1, 77:18, 79:25, 80:2, 82:1

**tomorrow** [1] - 61:7

**ton** [3] - 30:10, 36:20

**tonight** [1] - 61:7

**took** [10] - 2:16, 18:4, 36:10, 44:21, 46:13, 52:5, 57:16, 99:4, 99:10, 99:18

**tools** [2] - 72:15, 72:16

**top** [1] - 43:6

**topics** [1] - 72:11

**Tor** [11] - 30:14, 33:13, 33:14, 33:15, 33:17, 37:8, 42:22, 54:17, 54:20, 55:4

**totality** [2] - 17:24, 37:15

**totally** [1] - 32:25

**toward** [1] - 69:15

**trace** [10] - 5:13, 7:20, 18:17, 21:5, 39:2, 39:4, 39:13, 40:8, 41:1, 50:1

**traceable** [2] - 5:9, 5:17

**traced** [3] - 36:5, 36:14, 40:4

**traces** [12] - 18:1, 20:11, 21:2, 21:8,

23:16, 33:25, 36:22, 36:25, 39:1, 40:11, 40:20, 42:1

**tracing** [5] - 21:11, 40:23, 43:19, 49:19, 51:8

**tracked** [1] - 7:18

**trade** [1] - 85:21

**trading** [2] - 31:10, 58:20

**tradition** [2] - 46:21, 47:11

**traditional** [1] - 26:16

**traffic** [2] - 17:16, 28:10

**trafficking** [3] - 3:15, 5:7, 5:20

**trained** [1] - 46:23

**training** [1] - 73:1

**trait** [1] - 63:5

**transacting** [1] - 102:13

**transaction** [47] - 3:3, 3:10, 5:21, 6:15, 6:19, 6:20, 7:1, 13:9, 22:5, 22:8, 40:3, 40:9, 41:2, 49:4, 49:7, 56:2, 56:5, 56:18, 56:20, 78:2, 82:22, 82:24, 83:16, 83:18, 84:1, 84:6, 84:22, 84:23, 84:25, 85:7, 85:10, 86:4, 86:17, 88:2, 88:12, 88:13, 89:23, 100:5, 100:6, 100:7, 100:8, 101:19

**transactions** [21] - 3:4, 4:11, 4:19, 4:20, 7:19, 11:21, 21:8, 21:11, 27:4, 36:6, 49:2, 49:21, 50:1, 55:18, 55:22, 56:7, 56:13, 60:16, 60:20, 86:14, 100:17

**transcript** [1] - 38:17

**transfer** [9] - 84:25, 85:3, 85:17, 85:18, 93:24, 94:20, 94:25, 96:18

**transferred** [1] - 57:6

**transferring** [1] - 91:25

**transfers** [3] - 33:25, 85:4, 92:2

**translation** [4] - 73:21, 73:24, 74:4, 74:5

**translations** [2] - 73:16, 73:19

**transmission** [29] - 2:19, 10:6, 10:8, 23:10,

23:12, 24:19, 24:21, 24:23, 25:3, 78:15, 85:15, 93:1, 93:11, 93:16, 93:18, 93:19, 93:21, 93:25, 94:19, 94:21, 94:22, 95:1, 95:13, 96:6, 96:11, 96:13, 96:14, 96:15, 96:19

**transmitted** [1] - 8:8
**transmitter** [4] - 9:3, 12:6, 94:18
**transmitters** [1] - 9:6
**transmitting** [38] - 2:20, 7:23, 8:3, 8:15, 8:17, 10:2, 78:9, 90:19, 90:24, 90:25, 91:7, 91:13, 91:16, 91:21, 91:24, 91:25, 92:6, 92:7, 92:13, 92:14, 92:16, 92:17, 92:22, 92:23, 92:25, 93:21, 94:7, 94:8, 94:11, 94:12, 95:11, 95:12, 95:23, 96:16, 97:1, 97:2, 101:1, 102:16
**transportation** [2] - 93:1, 95:13
**trapped** [1] - 60:20
**trash** [1] - 27:21
**Treasury** [4] - 8:4, 8:20, 12:2, 94:16
**tree** [1] - 59:3
**Trevor** [1] - 52:10
**trial** [24] - 17:21, 18:12, 50:5, 62:1, 62:15, 62:24, 63:8, 63:15, 63:18, 64:1, 64:5, 64:25, 65:2, 68:9, 69:3, 70:13, 72:7, 75:1, 75:20, 81:20, 103:10, 104:25, 105:6
**tricky** [1] - 55:17
**tried** [4] - 6:19, 24:5, 59:5, 82:1
**triggering** [1] - 29:7
**true** [5] - 12:5, 36:8, 36:18, 65:15, 70:8
**truth** [6] - 12:24, 31:19, 65:16, 69:11, 70:16, 71:9
**truthful** [2] - 57:7, 58:25
**truthfully** [2] - 68:25, 70:21
**try** [1] - 105:18
**trying** [8] - 16:7, 18:5, 24:16, 27:18, 28:2, 56:12, 56:16, 56:17
**turn** [5] - 56:12, 56:13,

56:16, 71:4, 93:24
**turned** [2] - 43:3, 45:13
**turning** [1] - 29:7
**turns** [1] - 96:19
**two** [28] - 3:24, 10:4, 20:5, 21:17, 29:9, 39:15, 39:19, 39:25, 47:19, 50:21, 58:19, 59:9, 59:22, 61:3, 66:10, 77:23, 79:4, 79:12, 79:14, 79:21, 80:6, 82:13, 82:16, 85:23, 96:3, 102:4, 102:7
**type** [1] - 47:25
**types** [3] - 20:5, 66:10, 71:15
**typifies** [1] - 15:9

## U

**U.S** [5] - 7:25, 8:4, 34:25, 79:22, 79:23
**U.S.C** [21] - 21:21, 77:25, 78:4, 78:10, 78:11, 79:5, 79:6, 82:10, 82:11, 82:19, 83:5, 83:11, 83:13, 83:24, 86:22, 87:21, 88:8, 90:16, 90:22, 94:13, 100:3
**uh-oh** [1] - 37:7
**ultimate** [2] - 19:20, 49:24
**umbrellas** [2] - 50:18, 50:19
**unanimous** [7] - 82:14, 101:25, 102:2, 102:3, 102:9, 102:11, 105:25
**unanimously** [3] - 92:10, 95:24, 96:4
**under** [20] - 9:1, 10:20, 12:25, 31:23, 32:6, 50:4, 59:3, 59:25, 69:20, 71:9, 71:11, 86:6, 91:24, 92:19, 92:24, 93:19, 94:13, 94:15, 100:3, 105:22
**Undercover** [2] - 10:12
**undercover** [4] - 6:15, 7:19, 22:8, 89:10
**underlying** [5] - 74:8, 74:14, 87:5, 90:8, 100:17
**understood** [2] - 40:23, 40:24
**undisputed** [1] - 64:8

**unformatted** [1] - 28:21
**United** [14] - 7:24, 29:12, 33:16, 42:24, 77:21, 79:4, 85:24, 85:25, 88:6, 90:20, 91:11, 93:22, 95:4, 96:16
**universe** [1] - 44:2
**unknowingly** [1] - 80:24
**unknown** [1] - 77:19
**unlawful** [50] - 3:7, 3:14, 3:23, 6:22, 11:13, 11:17, 22:6, 23:2, 23:9, 74:24, 78:3, 79:15, 80:17, 80:19, 82:25, 83:2, 83:7, 83:19, 83:21, 84:15, 84:18, 86:4, 86:9, 86:12, 86:15, 86:18, 86:19, 87:5, 87:7, 87:24, 88:1, 88:4, 88:5, 88:15, 88:17, 88:21, 89:2, 89:5, 89:15, 89:22, 89:25, 90:8, 90:10, 90:11, 93:3, 94:10, 95:16, 95:17, 99:17, 101:3
**unless** [2] - 64:25, 76:10
**unlicensed** [19] - 2:19, 7:23, 9:2, 9:9, 23:10, 23:11, 35:25, 78:8, 90:18, 90:24, 90:25, 91:21, 92:6, 93:6, 95:11, 95:23, 100:25, 102:13, 102:16
**unlucky** [1] - 60:19
**unnecessary** [1] - 13:6
**unprobability** [1] - 70:6
**unreasonableness** [1] - 70:6
**unscientific** [1] - 43:4
**unspecified** [1] - 23:1
**untraceable** [1] - 3:17
**unwrapped** [1] - 59:2
**up** [40] - 2:12, 2:16, 3:8, 9:12, 10:22, 11:7, 11:17, 13:7, 14:13, 14:15, 14:17, 21:12, 24:18, 27:1, 30:22, 32:13, 35:1, 35:16, 38:21, 43:5, 46:19, 51:13, 53:22, 54:5, 55:3, 55:12, 55:21, 60:16, 61:24, 66:24, 74:18, 75:18, 81:18,

97:18, 97:25, 101:9, 101:12, 104:1, 104:7
**updated** [2] - 31:21, 34:15
**useful** [5] - 48:14, 49:18, 106:7, 106:13, 106:16
**user** [1] - 57:22
**users** [3] - 13:11, 57:13
**uses** [1] - 33:14

## V

**Valerie** [1] - 72:12
**valid** [2] - 49:20, 74:13
**value** [2] - 94:23, 94:25
**variety** [1] - 103:14
**various** [6] - 49:20, 51:8, 52:6, 52:17, 55:6, 60:3
**vast** [2] - 51:20, 57:16
**vendors** [4] - 3:19, 5:5, 5:14, 77:19
**venue** [7] - 11:18, 25:7, 25:14, 100:3, 100:10, 100:11
**verdict** [29] - 61:23, 62:14, 63:10, 67:9, 67:15, 67:16, 67:18, 78:24, 95:21, 96:2, 99:3, 99:16, 101:22, 101:23, 101:24, 102:2, 102:3, 102:10, 102:11, 102:19, 102:22, 102:23, 103:3, 103:9, 104:3, 104:14, 105:25, 106:9
**verdicts** [2] - 78:21, 103:6
**Verret** [9] - 34:19, 35:11, 35:17, 58:7, 58:23, 58:24, 59:1, 59:6, 72:20
**via** [1] - 105:14
**video** [1] - 51:3
**view** [3] - 48:18, 49:3, 49:20
**views** [1] - 104:7
**violate** [1] - 87:21
**violating** [3] - 87:21, 90:16, 90:21
**violation** [20] - 10:2, 21:21, 77:25, 78:4, 78:10, 78:16, 79:5, 79:6, 79:22, 82:10, 82:19, 83:5, 83:10, 83:13, 83:24, 86:22, 88:7, 93:9, 93:12, 96:7

visited [1] - 74:20
Vlahakis [1] - 9:5
voice [1] - 106:8
voluminous [1] - 3:15
voluntarily [2] - 76:2, 80:17
vote [2] - 106:3, 106:14
voting [1] - 105:24
VPN [3] - 27:25, 28:6, 53:24
VPNs [2] - 17:15, 29:6

## W

wait [1] - 35:2
walk [3] - 2:22, 13:25, 93:4
walked [2] - 3:18, 55:24
walker [1] - 2:13
walker's [1] - 2:11
walks [1] - 50:12
wallet [12] - 21:7, 26:23, 39:23, 39:24, 52:7, 52:22, 57:1, 57:6, 57:17, 89:11
wallets [3] - 39:15, 39:19, 43:25
wants [3] - 16:4, 21:15, 31:25
Washington [2] - 11:23, 12:11
watch [2] - 104:21, 104:22
water [1] - 50:19
ways [7] - 9:1, 51:8, 95:24, 96:1, 96:4, 102:12, 102:17
website [1] - 20:24
weeks [1] - 13:22
weight [11] - 62:24, 64:12, 67:5, 67:7, 67:19, 70:17, 71:20, 72:1, 72:9, 73:9, 74:15
welcome [2] - 2:7
white [1] - 23:24
whole [7] - 9:12, 19:25, 23:18, 44:2, 62:11, 62:19, 84:2
willful [1] - 86:7
willfully [3] - 84:16, 97:8, 97:13
William [2] - 46:17, 46:18
window [2] - 66:19, 66:22
wipe [2] - 28:24, 28:25
wiped [1] - 28:19
wiping [1] - 50:19

wire [5] - 85:9, 89:9, 92:3, 93:23, 96:18
wish [3] - 35:9, 58:10, 63:18
wished [1] - 98:4
withdraw [2] - 16:7, 22:22
withdrawal [2] - 29:9, 85:3
witness [33] - 66:13, 68:12, 68:22, 68:23, 68:25, 69:1, 69:2, 69:6, 69:8, 69:9, 69:10, 69:11, 69:13, 69:21, 69:25, 70:7, 70:8, 70:11, 70:15, 70:16, 70:17, 71:5, 71:8, 71:10, 71:13, 71:16, 71:18, 71:25, 72:1, 72:3, 72:8, 72:25
witness's [8] - 66:14, 68:24, 69:8, 69:17, 69:23, 69:24, 70:1, 73:3
witnesses [18] - 13:20, 20:12, 28:8, 28:13, 36:4, 41:16, 44:9, 63:1, 64:2, 67:20, 67:23, 67:24, 68:1, 68:20, 68:22, 69:4, 71:15, 72:10
woke [1] - 66:24
word [2] - 75:25, 88:23
words [8] - 17:17, 37:21, 79:15, 84:5, 87:7, 90:12, 101:24, 103:13
works [1] - 46:20
world [1] - 19:18
worried [1] - 27:13
worth [3] - 28:23, 52:21, 58:18
wow [1] - 50:12
write [1] - 46:20
writing [2] - 105:21, 106:1
written [1] - 4:22
wrote [1] - 57:24
www.BitcoinFog. com [3] - 34:1, 34:10, 34:15

## Y

yarn [2] - 30:13, 37:1
year [3] - 35:3, 58:13, 59:20
years [11] - 18:2, 18:6, 22:19, 22:21, 36:24, 37:23, 47:11, 58:19,

59:9
you-all [1] - 40:24
yourself [15] - 24:24, 25:13, 30:16, 33:18, 34:1, 34:6, 34:11, 37:19, 41:2, 43:8, 45:9, 49:22, 51:4, 53:14, 54:3
yourselves [2] - 14:22, 61:11

## Z

zero [1] - 22:13

## §

§ [3] - 79:23, 79:24, 96:7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

      vs.

ROMAN STERLINGOV,

        Defendant.

_____/

Criminal Action
No. 1: 21-399

Washington, DC
March 11, 2024

3:27 p.m.

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:    CATHERINE PELKER
                    U.S. DEPARTMENT OF JUSTICE
                    950 Pennsylvania Ave NW
                    Washington, DC 20530

                    CHRISTOPHER BRODIE BROWN
                    DOJ-USAO
                    601 D Street, N.W.
                    Suite 5.1527
                    Washington, DC 20530

                    JEFFREY PEARLMAN
                    DOJ-CRM
                    Ccips
                    US Dept of Justice
                    1301 New York Ave NW
                    Washington, DC 20005

APPEARANCES CONTINUED ON NEXT PAGE

APPEARANCES CONTINUED

For the Defendant:       TOR EKELAND
                         MICHAEL HASSARD
                         TOR EKELAND LAW PLLC
                         30 Wall Street
                         8th Floor
                         Brooklyn, NY 10005


Court Reporter:          SHERRY LINDSAY
                         Official Court Reporter
                         U.S. District & Bankruptcy Courts
                         333 Constitution Avenue, NW
                         Room 6710
                         Washington, DC 20001

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Criminal case, 21-399, *United States versus Roman Sterlingov.*

Would counsel please state their names for the record starting with government counsel.

MR. BROWN:  Good afternoon, Your Honor.  AUSA Chris Brown for the government.  And with me at counsel table are C Alden Pelker and Jeffrey Pearlman.

THE COURT:  Good afternoon.

MR. EKELAND:  Good afternoon, Your Honor.  Tor Ekeland for Defendant Roman Sterlingov, who is present in court.  And joining me at counsel table is Michael Hassard.

THE COURT:  All right.  Good afternoon to you as well.

So we have a note from the jury, which has been provided to all of you.  And the note reads as follows:  "For Count 4, the first element recites:  'The defendant knowingly engaged in the business of money transmission in the District of Columbia.'  Does the knowledge requirement apply to both engaging in the business and in the District of Columbia that is, is knowledge of the location required?"

And I think, unless I am missing something, the answer to this is yes.  But I will hear what the parties have to say.

MR. BROWN:  Your Honor.  Based on our initial reading

of this and our quick research, the answer should be no.  And I would start out with the plain text of the statute, which is D.C. Code section 26-1001 and 1023.  23 defines -- 23(c) defines the criminal offense.  It says nothing about any sort of knowledge, let alone knowledge that the money transmitting business is within the District of Columbia.  26-1001, subsection 10, defines money transmission.  And, similarly, money transmission itself is defined very, very broadly.  It includes the transmission of money within the United States, or to locations abroad by any and all means.  Again, there is no reference limiting the geographic scope of this to the District of Columbia, either in sweep or in certainly the defendant's knowledge.

As we have looked at this, the statute, it appears obvious to us that the statute should be read as a general intent crime.  There is no specific mens rea spelled out at all here.  But there is a presumption in favor of reading criminal statutes as general intent crimes.

However, that presumption in favor of this being a general intent crime doesn't mean that the knowledge requirement travels to every element of the offense.  And let me just reiterate, being in DC or having a business located in DC, that is not actually spelled out in any of the statutory elements of the offense.  If there is a geographic limitation to DC, that is a limitation on the District's regulatory power,

but that is not an element of the offense that the DC lawmakers enacted here.

And in terms of scienter, we would liken this to a jurisdictional element, that if the Court is going to read in a jurisdictional element, which makes sense, that the conduct occur in DC, the Supreme Court in *Rehaif versus United States*, and that is one 39 S. Ct. 2191, emphasized that the presumption in favor of scienter generally does not apply to jurisdictional elements. Because that is -- the jurisdictional element goes to the limits of the legislative power. It doesn't go to "The evil that Congress seeks to prevent." And so based on the plain text of the statute, based on the structure of the statute and based on Supreme Court case law, there are a couple other cites I can give the Court: *United States versus Campa*, 529 F.3d 980. That is an Eleventh Circuit case holding that intent that a murder occur within the special maritime and territorial jurisdiction of the United States is not an element of a 18 U.S.C. 111 --

THE COURT: Although you are dealing there with a crime that is -- I am going to blank on the Latin phrase for it. Is one that is on its face a --

MR. BROWN: Malum in se.

THE COURT: Thank you very much.

Malum in se versus malum prohibitum. And this statute here is more in the category malum prohibitum.

MR. BROWN: Yes, Your Honor. And, therefore, we agree that it is appropriate to read this as a general intent crime. But the approach with this statute with -- I think this statute should be read, number one, similar to the way that -- so what should be informative to the Court is the way that courts construe 18 U.S.C. 1960, which also similarly deals with malum prohibitum. And 1960 was explicitly based on 18 U.S.C. 1955, the prohibition on operation of unlicensed gambling businesses.

And courts have been quite uniform in construing 18 U.S.C. 1955 as requiring scienter only to the factual elements of the offense, only to the element that you are operating a business that sort of fits these factual predicates, not that it was required to be -- not that there is any sort of state -- there is no heightened willfulness requirement.

THE COURT: The deputy clerk lined the jurors up. And I think this may take longer than that, so why don't you tell them they can go back to the jury room so they are not just standing there.

THE COURTROOM DEPUTY: Okay.

MR. BROWN: Your Honor, I think this -- and this -- let me back up a second. I think that the approach for 1955, 1960 and -- should also inform this Court's approach to the D.C. Code offense in this case. Which is that the scienter requirements really only apply to the factual predicates. They

don't apply to, in this case what is on atextual jurisdictional element. It is not an element of the offense that the legislature wrote down into the elements of the offense. It is something that -- and it is --

THE COURT: Okay.

MR. BROWN: I would just add, it is important to distinguish in terms of understanding that the wrongfulness of the defendant's conduct -- the wrongfulness just has to do with operating the business. And I think it is fair to look at either the willfulness requirement or knowledge as to jurisdiction as both falling in the same general category of, these are additional sort of scienter requirements that are not based in the text of the statute. And it is appropriate for the Court not to require additional proof on those -- on either of those two elements or either of those two -- they are not even elements. They are just sort of parts of the offense.

THE COURT: So when you say the wrongfulness is just in operating the business, I get that, for example, with respect to the subsection of the federal registering requirement, subpart C, that you are engaged in or that the money laundering is furthering unlawful conduct for example. But it is a little hard to know how the failure to comply with registration or a licensing requirement that the wrongful conduct is operating the business. The wrongful conduct is operating the business without getting the license or

registering. And I realize, it is not an expressed term in the statute itself, but it does seem at least plausible. And I want to hear from Mr. Ekeland on this. And it does seem plausible to infer that actually as an element of the offense under the theory that I don't think that the DC Council thought to itself, our goal here is to require registration of anyone who is engaged in running a money transferring business or whatever the language was -- money transmission business anywhere in the world. That is our goal. That is what we are doing. You have got to go to DC and you have to register. But we realize we only have so much jurisdiction and we realize there will be a jurisdictional element that will limit the reach of what we are doing. But what we are saying is if you are running this business, come to DC and register. That seems implausible to me.

MR. BROWN: Your Honor, I think the intent -- the legislative intent behind the Money Transmitters Act -- it is a consumer protection statute. So I think the intent is to capture any conduct that affects the citizens of the District of Columbia. But that is not the same as saying the intent is to capture the conduct of somebody who knowingly affect -- you know, does business with District of Columbia citizens. I think that the whole legislative scheme for any sort of money transmitter is regulation, is it is an action-enforcing mechanism. If you are running a business, especially these

days, if are running a business online, it is incumbent upon you -- I mean, this is why there is no heightened willfulness requirement, which I think this is almost a backdoor way of having a heightened willfulness requirement. It is incumbent on the business to either make sure they have an appropriate license or to make sure they are not doing business in a jurisdiction that requires a license.

And the one other point I'd point out to the Court is that we briefed this is in ECF 176. And one of the -- we briefed the Court's question on ECF 176, which was a little bit different, which was about a brick and mortar physical location requirement under the DC --

THE COURT: I remember this.

MR. BROWN: And in what we attached as Exhibit 1 was a bulletin from the Commissioner of DISB, which basically said that they are not requiring a brick and mortar location because their intent is to capture money transmitting activity, even if it is conducted by -- this is -- actually, I think it is Exhibit 2, where they said that in light of the *Harmon* decision by Chief Judge Howell, they are no longer -- they want to clarify that the Money Transmitters Act applies to mobile applications and/or online transactions. Those also count as engaging in the business of money transmission.

I think it would be a little bit inconsistent with the evident intent of the commissioner of DISB to capture any

sort of online conduct that affects District residents by requiring that -- well, qualifying that and saying that, well, because Helix, for example, Larry Harmon's mixer, maybe Larry Harmon didn't know the particular fact that he was doing business with a resident of the District of Columbia, there is nothing in the DC -- the DISB commissioner's advisory that suggests that is what they were thinking.

To the contrary, they are thinking we need to capture online activity as a whole. And, again, this is an action enforcing mechanism. It is a consumer protection mechanism. So if you are out there doing business online, it is up to you to figure out if you need a license, not to, you know, wait until you know, you have knowledge that you are doing business in a given jurisdiction.

THE COURT: I can't remember which of you argued the issue, but wasn't one of the theories that the government presented as to why a willful blindness instruction was appropriate because there was evidence or reason to think that Mr. Sterlingov was willfully blind with respect to the location where the money laundering was occurring?

MR. BROWN: Yes. Yes, Your Honor. And, I mean, that is a separate argument. That maybe -- you know, maybe there is knowledge as to, you know, doing business in the District of Columbia.

THE COURT: But wasn't that the premise of that

argument is that knowledge was required?

MR. BROWN: I don't think -- I don't think that was the premise of our -- the government's argument. I think that to the extent that there is a knowledge requirement, certainly that the willful blindness of definition of knowledge would apply there. But again, Your Honor, I think that this is a jurisdictional element akin to an interstate commerce nexus, maybe something that is little less malum in se-ish is the transportation of counterfeit securities under the National Stolen Property Act, *United States versus Squires*, 581 F.2d 408, Fourth Circuit case saying that under the National Stolen Properties Act, the government isn't required to prove knowledge of the interstate nature of the transportation. And I think that this is similar. And, if anything, it is even having to prove an interstate commerce nexus, at least there is a textual basis for that in Federal criminal statutes. There is no textual basis for reading a knowing in the District of Columbia element into the DC Money Transmitters Act.

THE COURT: All right. Let me hear from Mr. Ekeland.

MR. EKELAND: I agree with the Court in that the -- I think that the government is taking an incredibly broad reading of this DC municipal statute in trying to read out the requirement of scienter as to knowledge of the money transmission occurring in DC. I think, if anything, the rule of lenity requires here where we have a question --

interpretation of the statute, one which is incredibly broad and the other which is more specific and narrow, I think the rule of lenity requires that we find that there is a scienter requirement in relation to Mr. Sterlingov having to know that money transmission was occurring in DC. And I also think that accords with just the plain textual reading of the statute. I think to take out, you know, knowing that the money transmission was occurring in DC, you have to sort of take a few interpretative jumps that I think take you outside the plain text.

THE COURT: Although that seems to me where the government's argument is the strongest, the statute doesn't say anything about in DC.

MR. EKELAND: Well, it is a DC municipal statute. And I would argue that the interpretative background of the statute as it is being promulgated, I don't think they need to say, oh, look, we are in DC and promulgating a DC statute. I think just looking at it against its interpretive background, which is quite plain, I think the plain textual reading and the rule of lenity just requires knowing -- it is not, as the Court says, just a general statute against money transmission anywhere in the world. And I think that combined with the rule of lenity requires the Court read a scienter requirement that Mr. Sterlingov knew that the money transmission was occurring in DC.

THE COURT: Anything else?

MR. EKELAND: No, Your Honor.

THE COURT: All right. Anything else, Mr. Brown?

MR. BROWN: Just on the rule of lenity, the rule of lenity requires there to be a statutory provision that can be read in a more or less lenient way. Here, the rule on lenity doesn't require the Court to invent atextual elements in criminal statutes and then impose those. There is no grievous ambiguity that requires the Court to construe a specific textual provision of the DC Money Transmitters Act in favor of the defendant, because there is no textual provision of the DC Money Transmitters Act that requires knowledge or conduct within the District of Columbia.

THE COURT: So in your view then, if there was a money transmission business that was located in Sweden, all of the websites and materials are in Swedish in that -- for that money transmission system. It is advertised only in Sweden. And somebody sitting in the District of Columbia perhaps in a sting operation sends a request for a transmission in Swedish to that site and says, I am in Stockholm and I'd like you to make the following transmission or transaction for me as I am sitting here in Stockholm. The person engages in that transaction and the jurisdictional element is satisfied because the person who sent that sting email was sitting in DC at the time. That person has committed a DC crime by responding to

that.

MR. BROWN: Your Honor, I think potentially. The focus of the DC Money Transmitters Act is on the consumer. It is on the DC consumer who is being protected by the regulation of money transmitting businesses. And I think this does point out the fact that most global or national level money transmitting businesses do some sort of screening. If they don't want to do business in the United States, they will screen out US customers through IP blocking or other ways. I think in that case, what you would have is almost a mistake of fact defense, if anything. But I don't think that would be a situation where the Court would be required to read in an atextual jurisdictional, not just a jurisdictional element, but a knowledge -- a scienter element as to a jurisdictional element that doesn't exist in the statute.

THE COURT: All right. Well, give me a couple of minutes. I want to take a look at a couple of things. If you want to all wait here, I will come back and let you know when I am done reading.

MR. BROWN: Yes.

(Recess taken at 3:47 p.m.)

THE COURT: All right. So I am going to answer this question in the affirmative and indicate that both are required. And I realize this is a difficult question. This is a variant of the question I raised with the parties early on in

the case. But I am going to answer yes for a number of reasons.

First of all, I think that was our understanding when I crafted the instructions the way I did. And I think this is literally what the instruction actually requires. It is not only that sentence of the instruction, but later in the instruction, I say you are not required to find that the defendant knew that he was required to register under DC law, but you are required to know that he engaged in the business in the District of Columbia. And so I say it twice in that same instruction. And I think that was my understanding at the time we gave the instruction. And when we crafted the instructions, that is how I understood it. And that is how I thought the parties understood it and the parties closed on based on that understanding of the instruction.

And I raised this issue as well during the charging conference with respect to the willful blindness. And I am not saying that the government conceded the point. I think that Mr. Brown in response to my question was careful, but did concede at least that if the knowledge requirement applied, the willful blindness instruction would be justified for that reason as well, although that wasn't the principle reason.

But the other reason that I reached this conclusion is that the law is not particularly receptive to strict liability crimes, particularly felonies. They are permissible

and there is actually some D.C. Circuit precedent that suggests that the D.C. Code provision that we are talking about here is a strict liability provision. But I think it is strict liability in the way that I gave the instruction and that you don't have to know that you had to register. But you had to know that you were at least engaging in the underlying conduct.

And the Supreme Court in the *Staples* case notes that even when you are dealing with a strict liability crime -- and this may or not be one -- I think the government is indicating in their view a general scienter crime. But in any event, even if it were a strict liability crime, under Supreme Court precedent, the government would still have the burden of proving the person knew they were engaged in the relevant underlying conduct. And this is not a malum in se crime, it is a malum prohibitum crime. And I think that then drives me back to this question that was framed by our discussion a little while ago about whether the nexus to DC purely jurisdictional nexus or whether it is an element of the statute itself.

And although I disagree with Mr. Ekeland that the statute or the text includes a nexus to DC requirement, it is hard for me to imagine that the District of Columbia when it passed this law actually intended for people to register where they were not engaged in any conduct in the District of Columbia. And that it was simply viewed as a jurisdictional nexus in that DC just wouldn't have the power to reach beyond

the District of Columbia. And I can't imagine that the District of Columbia would want people engaged in money transmission businesses across the world to start registering in DC, saying, you know, I know we are not engaged in any business in DC, but we are registering here because it is just a jurisdictional element of the crime.

I realize that this is a close question though. But I think this was, at least as I understood the instructions at the time I gave them and at the time the parties closed. And I also do think that it would be a very harsh rule and one that I think courts would do their best to avoid to conclude that someone who has no knowledge whatsoever or even reason to know that they are engaged in money transmitting in the District of Columbia, nonetheless can commit a felony if they don't obtain a license in the District of Columbia if by chance there is a transaction or two that hit upon the District of Columbia unbeknownst to that person for some reason. So that is what I will do.

And I am happy to do it however the parties want. I can -- we can bring the jury in and I can say the answer to your question is yes or if you prefer I can just write on the jury note that the answer to your question is yes.

MR. BROWN: Your Honor, the government doesn't have a preference.

THE COURT: Mr. Ekeland.

MR. EKELAND:  You can bring the jury in.

THE COURT:  That is your preference?

MR. EKELAND:  Yes, Your Honor.

THE COURT:  All right.  Just to clarify something, I may have said D.C. Circuit statute is strict liability, I meant the DC Court of Appeals.

But I will tell the jury they should consider my instructions as a whole in making that determination.

(Jury in at 4:05 p.m.)

THE COURT:  Well, good to see all of you.  I have a note from you.  And the note says "For Count 4, the first element recites the defendant knowingly engaged in the business of money transmission in the District of Columbia.  Does the knowledge requirement apply to both, engaged in the business and in the District of Columbia?  That is, is knowledge of the location required?"

And the answer to that question is, yes, it applies to both.  And in answering that question, you should consider my instructions as a whole.  Okay.  So thank you.

(Jury out at 4:06 p.m.)

THE COURTROOM DEPUTY:  You may be seated.

THE COURT:  All right.  Anything else before we switch up again here?

MR. BROWN:  No, Your Honor.

MR. EKELAND:  No, Your Honor.

THE COURT:  All right.  I will keep you posted if we here anything else.

(Proceedings concluded at 4:07 p.m.)

C E R T I F I C A T E

I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.

Dated this 18th day of April, 2024.

Sherry Lindsay, RPR
Official Court Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

       Plaintiff,

    vs.

ROMAN STERLINGOV,

       Defendant.

_____/

Criminal Action
No. 1: 21-399

Washington, DC
March 12, 2024

11:11 a.m.

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:    CATHERINE PELKER
                     U.S. DEPARTMENT OF JUSTICE
                     950 Pennsylvania Ave NW
                     Washington, DC 20530

                     CHRISTOPHER BRODIE BROWN
                     DOJ-USAO
                     601 D Street, N.W.
                     Suite 5.1527
                     Washington, DC 20530

                     JEFFREY PEARLMAN
                     DOJ-CRM
                     Ccips
                     US Dept of Justice
                     1301 New York Ave NW
                     Washington, DC 20005

APPEARANCES CONTINUED ON NEXT PAGE

                    APPEARANCES CONTINUED

For the Defendant:      TOR EKELAND
                        MICHAEL HASSARD
                        TOR EKELAND LAW PLLC
                        30 Wall Street
                        8th Floor
                        Brooklyn, NY 10005


Court Reporter:         SHERRY LINDSAY
                        Official Court Reporter
                        U.S. District & Bankruptcy Courts
                        333 Constitution Avenue, NW
                        Room 6710
                        Washington, DC 20001

TABLE OF CONTENTS

WITNESSES

Luke Scholl

Direct examination by Mr. Brown          18
Cross-examination by Mr. Ekeland         27

MISCELLANY

Closing argument by Mr. Brown            29
Closing argument by Mr. Ekeland          37

EXHIBITS

Government Exhibit 1001                   22
Government Exhibit 1002                   24

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Criminal case 21-399, *United States of America versus Roman Sterlingov.*

Would counsel please approach the podium and state their name for the record starting with government counsel.

MR. BROWN:  Good afternoon, Your Honor.  AUSA Chris Brown for the government.  And with me at counsel table are C. Alden Pelker and Jeffrey Pearlman.

THE COURT:  All right.  Good morning.

MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland for defendant Roman Sterlingov, who is present in court.  And joining me at counsel table is Michael Hassard.

THE COURT:  All right.  Good morning to you as well. So we have a verdict.  Before we bring the jury in, let me just ask, was the government requesting that I poll the jury?

MR. BROWN:  No, Your Honor.

THE COURT:  Okay.  Would the defense request that I poll the jury?

MR. EKELAND:  Yes, Your Honor.

THE COURT:  All right.  Let's get the jury.

(Jury in at 11:12 a.m.)

THE COURT:  All right.  Welcome back, members of the jury.  If I could ask the foreperson to stand.  Has the jury reached a unanimous verdict?

A JUROR:  We have, Your Honor.

THE COURT: If you could pass the verdict form to the clerk.

All right. And if I could ask the foreperson to stand please. And we'll go through this count by count.

How does the jury find with respect to Count 1, conspiracy to money laundering?

A JUROR: Guilty, Your Honor.

THE COURT: And do you unanimously find that the defendant conspired to launder money in violation of 18 U.S.C. section 1956(a)(1)(A)(i)?

A JUROR: Yes.

THE COURT: Do you find that the defendant conspired to launder money in violation of 18 U.S.C. section 1956(a)(1)(B)(i?).

A JUROR: Yes, Your Honor.

THE COURT: How does the jury find with respect to Count 2, money laundering?

A JUROR: Guilty, Your Honor.

THE COURT: How does the jury find with respect to Count 3, operating an unlicensed money transmitting business?

A JUROR: Guilty.

THE COURT: And do you unanimously find the defendant operated a money laundering transmitting business without an appropriate money transmitting license in the District of Columbia?

A JUROR: Yes.

THE COURT: Do you find that the defendant operated a money transmitting business that failed to comply with money transmitting business requirements under federal law?

A JUROR: Yes.

THE COURT: Do you find that the defendant operated a money transmitting business that involved the transportation or transmission of funds that were known to the defendant to have been derived from a criminal offense or were intended to be used to promote or support unlawful activity?

A JUROR: Yes.

THE COURT: How does the jury find with respect to Count 4, money transmission without a license in the District of Columbia?

A JUROR: Guilty, Your Honor.

THE COURT: Okay. So what I am going to do now is go juror by juror and ask each of the jurors whether the verdict as just read represents their verdict, their personal verdict in the case.

So Juror number 1?

A JUROR: Yes, Your Honor.

THE COURT: Juror number 2?

A JUROR: Yes.

THE COURT: Juror number 3?

A JUROR: Yes, Your Honor.

THE COURT: Juror number 4?

A JUROR: Yes.

THE COURT: Juror number 5?

A JUROR: Yes.

THE COURT: Juror number 7?

A JUROR: Yes.

THE COURT: Juror number 8?

A JUROR: Yes, Your Honor.

THE COURT: Juror number 10?

A JUROR: Yes.

THE COURT: Juror number 12?

A JUROR: Yes, Your Honor.

THE COURT: Juror number 13?

A JUROR: Yes, Your Honor.

THE COURT: Juror number 15?

A JUROR: Yes, Your Honor.

THE COURT: And Juror number 16?

A JUROR: Yes, Your Honor.

THE COURT: All right. Thank you.

So members of the jury, there is actually one more step in this case. And that is that I am going to ask you to consider whether certain property seized by the government should be forfeited in the case and what I am going to do is I am going to ask you to step back into the jury room for a few minutes. I want to talk to the lawyers about that. We'll come

out. I will then give you instructions on that final task for you in the case, provide an opportunity for the lawyers to present anything else they want to present to you with respect to that issue and then send you back to deliberate on that final issue in the case. I do thank you for your service. I'm sorry to have to continue it further, but this is another step that we have to go through. All right.

(Jury out at 11:16 a.m.)

THE COURT: All right. So I have the draft forfeiture jury instructions. I invited the defense to submit anything they wanted to submit by March 8th. They did not submit anything. The defense did not submit anything, so my clerk --

Do you have a copy?

I can pass to you the instructions.

The only thing that needs to be filled in in the instructions are the counts in which there were convictions. Otherwise I think they are in good shape. But I will give you all a chance to give them a quick look. And also we have the verdict form, which is, again, the one that the government submitted with respect to forfeiture, which looks fine to me. But there again we'll have to clarify the counts of conviction. I think this only applies to the federal offenses and not to the DC offense.

MR. BROWN: Yes, Your Honor. Counts 1 through 3.

THE COURT: I'm sorry?

MR. BROWN: Counts 1 through 3, Your Honor.

THE COURT: Okay. Yes. Correct.

While you all are looking at that, I will direct that the clerk file and record the verdict.

All right. Any final comments on the forfeiture jury instructions?

MR. BROWN: No, Your Honor. And I guess the government would suggest if the Court were to give a preliminary instruction to sort of orient the jury, at least the forfeiture generally instruction and the burden of proof, but --

THE COURT: I thought what we had discussed earlier was that I would just read the final instructions now and on the theory that -- and we can send them back to them -- back with them to the jury room to have with them as they consider it. But I am not anticipating there is going to be a big gap in time between when I give these instructions and when we actually send the jury back to deliberate. Which I guess the question is, are you going to present argument or do you want to present additional evidence?

MR. BROWN: Yes, Your Honor. Our plan is to just present a very brief direct examination to supplement the evidence that is already in the trial record. We would estimate maybe 10 minutes, calling Mr. Scholl back to the

stand.

THE COURT: Okay. And, Mr. Ekeland, what are your views with respect to the process here?

MR. EKELAND: We are fine with all of that. If anything, I would maybe do a brief cross of Mr. Scholl, but that -- I think everything the Court has outlined is fine.

THE COURT: All right.

MR. BROWN: Your Honor, just to hopefully streamline this further, because the forfeiture phase is an element of sentencing, the case law is clear, we didn't brief this pretrial, but the case law is clear that reliable hearsay is admissible in a forfeiture proceeding. And so I just wanted to make sure that there is an understanding, so -- because we do intend to admit two records, one of which arguably contains hearsay.

THE COURT: All right. Mr. Ekeland.

MR. EKELAND: I just didn't hear the last thing Mr. Brown said which is arguably --

MR. BROWN: One of which arguably contains hearsay.

And I did immediately before the verdict -- I emailed defense counsel with two proposed additional exhibits to supplement the record in this case.

MR. EKELAND: We will take a look at them. I haven't looked at them. I haven't seen them yet. So I will just take a look.

THE COURT: If you have an objection as it is coming in, you can raise that at that time then?

MR. EKELAND: Certainly.

THE COURT: Should we bring the jury back and I should read them the jury instructions, the government can put on anything it wants to put on, the defense can put on anything it wants to put on. We'll give you a finalized version of the verdict form and the instructions that I will send back to the jury. But we can do that after we go through this brief phrase.

MR. BROWN: Yes, Your Honor.

THE COURT: All right. Let's get the jury.

(Jury in at 11:23 a.m.)

THE COURT: Members of the jury, in view of your verdict that the defendant is guilty on Counts 1 through 3 and those were the federal counts of the indictment, you have another task to perform before you are discharged. I now must ask you to render special verdicts considering property that the government has alleged is subject to forfeiture by the United States.

The purpose of forfeiture is to ensure that no one profits from criminal conduct. Forfeiture in this case means that the defendant will be divested or deprived of his ownership or his interest, if any, in certain property as a penalty for committing violations of certain federal laws. You

must now consider what verdict to render on the question of whether there is a connection between the following specific property and the counts to which you have already found the defendant guilty. The items that the government seeks to forfeit in this matter include the following six items:

First, $349,625.72 seized from Kraken account number AA68N84GQUXTDGMY held in the name of Roman Sterlingov and number AA24N84GWW46KQ5Y held in the name of To the Moon, Roman.

Second, approximately .10877 Bitcoin currency, after required fees, seized from Kraken accounts number AA68N84GQUXTDGMY held in the name of Roman Sterlingov, and number AA24N84GWW46KQ5Y held in the name of To The Moon LTD, Roman.

Third, approximately 205.9625 Ethereum cryptocurrency, after required fees, seized from Kraken accounts number AA68N84GQUXTDGMY held in the name of Roman Sterlingov and number AA24N84GWW46KQ5Y held in the name of To The Moon LTD, Roman.

Fourth, approximately 9,371.52683 Stellar cryptocurrency, after required fees, seized from Kraken account numbers AA68N84GQUXTDGMY held in the name of Roman Sterlingov, and number AA24N84GWW46KQ5Y held in the name of To the Moon, Roman.

Fifth, approximately 35.9998 Monero cryptocurrency, after required fees, seized from Kraken account numbers

AA68N84GQUXTDGMY, held in the name of Roman Sterlingov, and number AA24N84GWW46KQ5Y, held in the name of To the Moon, Roman.

And sixth, approximately 1,354 Bitcoin currency held in the Bitcoin Fog wallet identified by root 1YZJKaAx2HAWvcbCXDBtQbBZcRU46WJqw.

You must now consider what verdict to render on the question of whether there is a connection between that specific property and Counts 1, 2 and/or 3 for which you have already found the defendant guilty.

It is the government's burden to establish the required connection between the specific property and the offense or offenses committed by the defendant which would make the property subject to forfeiture. You should find that the government has met its burden if it has established that connection by a preponderance of the evidence.

This is a lower standard from that which applied to the guilt or innocence phase of the trial. At that stage of the case, the government was required to meet its burden beyond a reasonable doubt. At this forfeiture stage, however, the government need only establish its proof by a preponderance of the evidence.

Preponderance of the evidence means that the government has to prove evidence which considered in light of the facts leads you to believe that what the government claims

is more likely true than not true.  To put it differently, if you were to put the government's evidence and the defendant's evidence on opposite sides of a balance scale, the government's evidence would have to make the scale tip slightly on its side of the balance.  If the government's evidence fails to do this, then the government has not met its burden of proof.

So let me start with forfeiture pursuant 18 U.S.C. section 982(a)(1).  Section 982(a)(1) of Title 18 of the United States Code provides in relevant part that whoever engages in a money laundering conspiracy in violation of Title 18 United States Code section 1956(h) money laundering, in violation of 18 U.S.C. Code section 1956(a)(3)(A) or (B), or operating an unlicensed money transmitting business in violation of 18 U.S.C. section 1960(a) shall forfeit to the United States any property, real or personal, involved in such an offense or any property traceable to such property.

The government alleges that certain properties are forfeitable under this category because -- I'm sorry -- based on the defendant's conviction or convictions.  Each item of property is set out in a special verdict form, which I will provide to you as well.

As to each item of property, you must determine whether or not the applicable connection exists between the property and the above category.

The phrase "any property real or personal involved

in" a money laundering offense includes: First, the money or other property that was being laundered.

Second, any commissions or fees paid to the launderer.

And, third, any property used to facilitate the laundering offense.

Property that was used to facilitate the money laundering offense may include property that was not part of the transaction itself, but was used to make the money laundering offense easier to commit or harder to detect. This may include untainted property if it was commingled with the property being laundered and facilitated the money laundering offense.

In the case of a money laundering conspiracy that takes the form of a business, the property that is "involved in" the money laundering conspiracy includes all funds that flowed through the business to bankroll or otherwise facilitate the conspiracy. It is not limited to specific transactions.

Property involved in a money laundering offense includes any property traceable to the property that was involved in the offense. The phrase any property traceable to such property includes property that was acquired or maintained with the proceeds of the underlying money laundering crime. The phrase "any property real or personal involved in" an unlicensed money transmitting business offense includes any

property involved in operation of the business during the time period while the business was operating in violation of the law, regardless of its purpose or whether the property was involved in specific transactions. This includes any property that passed through the unlicensed money transmitting business' accounts during the relevant time period.

Property "involved in" an unlicensed money laundering transmitting business offense includes any property traceable to the property that was involved in the offense. The phrase "any property traceable to" such property includes property that was acquired or maintained with the proceeds of the underlying money laundering crime.

Property traceable to the proceeds of an offense includes property that was acquired or maintained with the proceeds. For example, if someone uses the proceeds of the crime to buy a car, the car is regarded as property traceable to the proceeds. The point is that the proceeds of an offense remain the proceeds even as they change from one thing to another.

All instructions previously given to you concerning your consideration of the evidence, other than instructions on the standard of proof, will apply during your supplemental deliberations concerning the forfeiture allegations. These previous instructions include, but are not limited to, instructions on the credibility of witnesses, your duty to

deliberate together and the necessity of reaching a unanimous verdict. In your consideration of the forfeiture allegations, you are instructed that your previous determination, the defendant is guilty of Counts 1, 2 and 3 charged in the indictment is binding on this part of the proceeding. Thus you must not seek to discuss or reconsider the guilt or innocence of the defendant.

While deliberating, you may consider any evidence offered by the parties at any time during this trial. Thus, you may consider any evidence offered during the guilt or innocence phase of the trial as well as any additional evidence offered during the forfeiture phase of the trial.

You are also instructed that what happens to any property that you find has a connection to a crime is exclusively a matter for the Court to decide. Similarly, any claims that the forfeiture of the property will constitute excessive punishment will be taken into account by the court at a later time. Your only concern is to determine whether the government has established the requisite connection between the specific property and the defendant's crimes.

Your verdict that these property are subject to forfeiture must be unanimous. That is, you must reach a unanimous verdict as to each question on the specific verdict form.

I will send back with you a copy of these

instructions during your deliberations as well as the special verdict form that you can use in recording your verdict.

So we don't anticipate this phase, at least the presentations for this phase taking a great deal of time. But the government does want to call an additional witness.

And, Mr. Brown, you may do so now.

MR. BROWN: The government calls Luke Scholl.

LUKE SCHOLL, sworn

THE WITNESS: I do.

THE COURTROOM DEPUTY: Thank you. Please be seated.

THE COURT: All right. Mr. Brown, you may proceed when you are ready.

DIRECT EXAMINATION

BY MR. BROWN:

Q. All right. Good morning, Mr. Scholl.

Could you please reintroduce yourself to the jury?

A. Yes. My name is Luke Scholl; L-U-K-E, S-C-H-O-L-L.

Q. During the trial did you testify about your source-of-funds analysis for Mr. Sterlingov's accounts?

A. Yes, sir, I did.

Q. And what did you do to complete your source of funds analysis?

A. I analyzed the account records for Mr. Sterlingov's accounts, identified the deposits and traced those funds backwards.

Q.   And, in general, what was the substantial source of funds for the funds deposited into Mr. Sterlingov's accounts?

A.   In general, sir, the substantial source of funds was Bitcoin Fog.

Q.   I'd like to direct your attention to Government Exhibit 356, which was admitted during the trial.

(Pause.)

THE COURT:  You all can pull the monitors back out again.

MS. PELKER:  Do you want us to turn the large screen?

THE COURTROOM DEPUTY:  They have it on now, but thank you.

BY MR. BROWN:

Q.   Is this exhibit your source-of-funds analysis?

A.   Yes, sir, a summary.

Q.   And you reviewed several accounts in your source-of-funds analysis?

A.   Yes, sir, I did.

Q.   And so I would like to flip to the second page of this. To start out here, was this one of Mr. Sterlingov's two Kraken accounts?

A.   Yes, sir, it was.

Q.   And what was this account in the name of?

A.   This account is in the name of Roman Sterlingov.

Q.   And looking at the source of funds for this Kraken

account, what were the substantial sources of funds here?

A. Substantial source of funds, indirect transfers from Bitcoin Fog.

Q. And are there also transfer into this account from Mr. Sterlingov's LocalBitcoins account?

A. Yes, sir, there are.

Q. If we could flip back to page 1 of this exhibit. What was the substantial source of funds for the LocalBitcoin account?

A. A substantial source of funds for the LocalBitcoins account was Bitcoin Fog.

Q. Is that going by dollar value or Bitcoin value or both?

A. So there was 260 Bitcoin deposited, 64 Bitcoin were directly from Bitcoin Fog, 35 Bitcoin were indirectly from Bitcoin Fog, but the US dollar value -- a total US dollar value of $870,000 approximately were deposited. And approximately $629,000 came direct from Bitcoin Fog and approximately $44,000 came indirectly from Bitcoin Fog.

Q. And then flipping forward to page 3 of this. Is this the source-of-funds analysis for Mr. Sterlingov's second Kraken account?

A. Yes, sir, it is.

Q. And what is this Kraken account in the name of?

A. To the Moon, LTD.

Q. And what was To the Moon, LTD?

A. The VPN service Mr. Sterlingov was purporting to operate.

Q.   And what is the substantial source of funds for this To the Moon, LTD Kraken account?

A.   The substantial source of funds is Bitcoin Fog.

Q.   Now, Mr. Scholl, are you familiar with the seizure of funds from the defendant's two Kraken accounts?

A.   Yes, sir I am.

Q.   Was that seizure completed in or about July of 2021?

A.   I don't remember the exact date, but it sounds correct.

Q.   And at the time of the seizure, did the defendant's two Kraken accounts contain a mix of different assets?

A.   Yes, sir, they did.

Q.   I would like to direct your attention to Exhibit 1001, which is a new exhibit, which has not yet been admitted.

Mr. Scholl, do you recognize what has been marked as Exhibit 1001?

A.   Yes, sir, I do.

Q.   And what is this exhibit?

A.   This is the IRS memorandum of the seizure.

Q.   And is this a fair and accurate copy of the IRS memorandum for the seizure?

A.   Yes, sir, it is.

MR. BROWN:   The government moves to admit and publish Government Exhibit 1001.

THE COURT:   Any objection?

MR. EKELAND:   Hearsay.

THE COURT: So Exhibit 1001 is admitted and may be published to the jury.

(Whereupon, Government Exhibit No. 1001 was admitted.)

BY MR. BROWN:

Q. Mr. Scholl, is this the IRS memo memorializing the seizure of cryptocurrencies from those two Kraken accounts?

A. Yes, sir, it is.

Q. And if we scroll down to the bottom of this memo, does this show which, if any, cryptocurrencies were seized from those accounts?

A. Yes, sir, it does.

Q. And starting from the top line of the listing of cryptocurrencies, what sort of cryptocurrency is listed in that top line?

A. Bitcoin, sir.

Q. And it actually looks like are there two entries for Bitcoin seizures from the account?

A. Yes, sir, there are.

Q. And do you have an understanding of why that was, why there would be be two separate seizures of Bitcoin?

A. Yes, sir, I do. Generally when transferring large amounts of money, we conduct a test transaction. And it appears how the IRS has noted it here, a test transfer and then a main transfer.

Q.   And why would you undertake a test transfer?

A.   To make sure that there is not a typographical error in address.

Q.   And besides Bitcoin, what other forms of cryptocurrency were seized?

A.   Ethereum, Monero and Stellar Lumens, sir.

Q.   And are the totals of the cryptocurrency amounts in their contemporary dollars values, are those listed in this memo?

A.   Yes, sir, they are.

Q.   Now, we can take this down.  And then directing your attention to Government Exhibit 1002.

Let me back up.  Mr. Scholl, did -- at the time of these seizures, did the government also seize fiat cryptocurrency from these Kraken accounts?

A.   Yes, sir, they did.

Q.   And what form of fiat currency was held in the Kraken accounts when the seizure warrant was served?

A.   Euros were held in the Kraken accounts, sir.

Q.   What form of currency was actually seized from the accounts?

A.   The government received dollars from Kraken, sir.

Q.   Did Kraken convert the Euros into dollars at the time of seizure?

A.   That is my understanding, sir, yes.

Q.   So directing your attention to what is on the screen,

which has been marked as 1002, which is two pages, do you recognize this document?

A.    Yes, sir, I do.

Q.    And what is this document?

A.    It is a wire transfer.

Q.    And does this wire transfer document memorialize a specific wire transfer?

A.    Yes, sir, it does.  The transfer from Kraken to Treasury forfeiture funds.

MR. BROWN:  The government moves to admit and publish Exhibit 1002?

THE COURT:  Any objection?

MR. EKELAND:  No objection.

THE COURT:  Exhibit 1002 is admitted and may be published to the jury.

(Whereupon, Government Exhibit No. 1002 was admitted.)

BY MR. BROWN:

Q.    And, Mr. Scholl, could you just review for the jury what is shown on the screen here?

A.    This is the receipt for the wire transfer from Kraken to Treasury for the funds seized from Mr. Sterlingov's accounts.

Q.    And, Mr. Scholl, when the government executed the seizure warrant on Kraken, did Kraken collect funds from both of those two accounts and produce them together?

A.   Yes, sir, they did.

Q.   We can take this down.  Mr. Scholl, during the trial you also testified about the Bitcoin Fog cluster.  Do you recall that?

A.   Yes, sir, I do.

Q.   And what is the Bitcoin Fog cluster?

A.   It is a collection of addresses attributed by Chainalysis Reactor to Bitcoin Fog.

Q.   Now, directing your attention to trial Exhibit 326, which was admitted during the trial.  What does this exhibit show?

A.   Sir, this exhibit shows a list of all of the addresses in the Chainalysis Bitcoin Fog Cluster.

Q.   Could you identify by the first several letters, what is the first address listed in the Bitcoin Fog cluster?

A.   Yes, sir.  1YZJKa.

Q.   And is there a special name for the first Bitcoin address in a cluster like this?

A.   It is often referred to as the root address, sir.

Q.   Now, do you recall testifying about the early Bitcoin Fog consolidation addresses?

A.   Yes, sir, I do.

Q.   What is a consolidation address?

A.   A consolidation address is an address that was used to collect funds from multiple user deposit addresses.

Q.   And what role did consolidation addresses play -- let me

back up.  And do you see one of the Bitcoin Fog consolidation addresses on the screen here?

A.   Yes, sir, I do.

Q.   Could you identify which one that is?

A.   In row two, sir, the same address, 1YZJKa.

Q.   And we can take this down.  And I'd like to direct your attention to Government Exhibit 308, which was admitted at trial.

It was admitted as a summary.

Mr. Scholl, do you recall Government Exhibit 308?

A.   Yes, sir, I do.

Q.   Is this your summary of the Bitcoin Fog cluster?

A.   Yes, sir, it is.

Q.   And as of the date of your testimony at trial, what was the current balance in the Bitcoin Fog cluster?

A.   At trial, I testified that it was approximately $70 million.

Q.   And approximately how many Bitcoin was in that?

A.   Approximately 1,354 Bitcoin, sir.

Q.   And remind the jury what you said about the last known withdrawal from the Bitcoin Fog cluster?

A.   Yes, sir.  The last known withdrawal was on or about April 29th, 2021.

MR. BROWN:  No further questions.

THE COURT:  All right.  Mr. Ekeland.

CROSS-EXAMINATION

BY MR. EKELAND:

Q.   Good morning, Mr. Scholl.

A.   Good morning, sir.

          MR. EKELAND:  May I proceed, Your Honor?

          THE COURT:  You may.

          MR. EKELAND:  Thank you.

BY MR. EKELAND:

Q.   Mr. Scholl, you testified at trial that in relation to Mr. Sterlingov's Bitcoin Fog transactions, you never traced through Bitcoin Fog to see the source deposits into Bitcoin Fog; is that correct?

A.   Yes, sir, that is correct.  The government's position is that they aren't necessarily deposits associated with the funds withdrawn to Mr. Sterlingov's accounts.

Q.   But you have never traced through to determine that one way or the other; correct?

A.   That is correct, sir.  I am not aware of any deposits associated with those withdrawals.

Q.   And you didn't -- nevermind, withdrawn.

          And then in relation to -- you just testified in relation to some Ethereum that Mr. Sterlingov held; is that correct?

A.   Yes, sir, it is.

Q.   Bitcoin Fog didn't mix Ethereum, did it?

A.   No, sir.  The Ethereum was traded for in the Kraken

accounts. Bitcoin was deposited to the Kraken accounts. And those Ethereum were generated through trades of the Bitcoin in the Kraken account.

Q. And you testified as to Monero. And Bitcoin Fog didn't mix Monero?

A. That is correct, sir, it did not. The Monero in the Kraken account was obtained through selling Bitcoin and purchasing Monero, sir.

Q. And you testified to Stellar as well. And Bitcoin Fog didn't mix Stellar?

A. That's correct, sir.

Q. And you also testified about the Euros in the Kraken account. And Bitcoin Fog didn't mix Euros; correct?

A. Yes, sir, it didn't. The Euros again in the Kraken account came from trading Bitcoin for Euros.

MR. EKELAND: No further questions, Your Honor.

THE COURT: All right. Thank you.

Any redirect?

MR. BROWN: No redirect, Your Honor.

THE COURT: All right. So the witness is excused.

Any further witnesses?

MR. BROWN: No, Your Honor.

THE COURT: Do you have any witnesses you would like to call, Mr. Ekeland?

MR. EKELAND: No, Your Honor.

THE COURT: Mr. Brown, are there any remarks you want to make to the jury?

MR. BROWN: Yes, Your Honor. And if you --

THE COURT: That concludes the presentation of the evidence along with all of the other evidence you have heard in the case and we'll now move to arguments.

MR. BROWN: Brief indulgence, Your Honor.

CLOSING ARGUMENT

MR. BROWN: All right. Members of the jury, you have one more task before this case is done. This is called the forfeiture phase of trial. The purpose of forfeiture is to insure that no one profits from their criminal conduct. And in this part of the trial, you will decide whether certain listed properties constitute either proceeds of the defendant's crime or were otherwise involved in the defendant's crimes.

When the defendant was indicted in this case, the indictment contained something called a forfeiture allegation. This provided formal notice that certain properties were subject to forfeiture. Why? Because of the connection between those properties and the defendant's crimes. The indictment listed six different specific properties.

Properties 1 through 5 are all properties seized from the defendant's two Kraken accounts. And that includes fiat currency, US dollars, as well as various kinds of cryptocurrencies: Bitcoin, Ethereum, Stellar and Monero. You

will recall testimony and exhibits about these Kraken accounts from the trial and just now from Mr. Scholl's testimony. I will review this evidence with you briefly and review how the Kraken accounts were used to receive and launder the defendant's profits from operating Bitcoin Fog.

Property 6 is the Bitcoin Fog cluster, the group of Bitcoin Fog addresses controlled and used by defendant's service, Bitcoin Fog. You will also recall trial evidence relating to the Bitcoin Fog cluster as well as Mr. Scholl's testimony here today.

Again, I will walk you through the evidence and review how this cluster contains both the defendant's profits and how it was used to facilitate the money laundering conspiracy and the illegal money transmitting business. In deciding whether the government has carried its burden in showing a connection between these properties and the defendant's crimes, you are entitled to rely on the evidence at trial, as well as Mr. Scholl's testimony here today.

Judge Moss has instructed you on the basic principles you will apply in making your forfeiture determination. And I just wanted to review a couple of those.

Judge Moss told you about something called property that is involved in a money laundering or unlicensed money transmitting offense. To understand the concept of property involved in a offense, you can start with the idea of criminal

proceeds. If a bank robber robs a bank and walks away with $5,000, that $5,000 is his proceeds. It is his profits from committing the crime. If a fraudster defrauds somebody out of $1,000, that $1,000 is his proceeds. It is what the defendant gains from his crimes.

As Judge Moss instructed you, property involved in a money laundering or unlicensed money transmitting offense is broader than just proceeds. It includes proceeds, but it also includes some other categories of property. First, if a money launderer conducts a money laundering transaction with a customer's money, the property involved in the offense includes the customer's money that is the subject of the transaction. So for Bitcoin Fog, the property involved in the offense, includes all of the customer transactions sent through Bitcoin Fog, not just the 1 to 3 percent fee.

Second, property involved in the offense includes the money launderer's commission or fees. That is the defendant's profits, the 1 to 3 percent commission.

And, third, property involved in the offense also includes facilitating property. When a money launderer commingles clean and dirty funds, that is facilitating property. Facilitating property can also include property used to conduct the offense or make it harder to detect.

And Judge Moss also told you that when a conspiracy, money laundering conspiracy takes the form of an illegal

business, as here, then the property involved in the conspiracy includes all of the funds that flow through the business to bankroll or otherwise facilitate the illegal business.

The same concept of property involved in an offense applies to Count 3, operating an unlicensed money transmitting business. So this includes not just the defendant's 1 to 3 percent fee, but also any property that was involved in the operation of the business during the time period when it was operating here between 2011 through 2021.

And Judge Moss also instructed you about the concept of tracing property that is traceable to the property involved in an offense. In this case, what does that mean? It means that the defendant earned Bitcoin from operating Bitcoin Fog and he used that Bitcoin to buy another asset, maybe another form of cryptocurrency, maybe converting the Bitcoin into fiat currency like US dollars or Euros, then those assets are also subject to forfeiture, because they are traceable to the assets that the defendant purchased with Bitcoin.

Now, on to the specific properties. I want to start out with the Bitcoin Fog cluster. During this trial, just now, you heard testimony from the government's blockchain expert FBI Staff Operations Specialist Luke Scholl. He told you about the Bitcoin Fog cluster. This is the cluster of addresses controlled by Bitcoin Fog.

During the lifetime of Bitcoin Fog, the Bitcoin Fog

cluster received and sent more than 1.2 million Bitcoin and that it includes more than $395.5 million worth of Bitcoin coming in. And since there is a delay in sending out the Bitcoin that is more than $402.8 million sent out on behalf of Bitcoin Fog customers. So the Bitcoin Fog cluster includes all of the funds that were received by Bitcoin Fog or sent out from Bitcoin Fog during its entire lifetime. In other words, all of the customer transactions, including that 1 to 3 percent fee charged by the defendant, which is the difference between input and output on individual transactions.

Mr. Scholl also provided a complete list of all of the addresses in the Bitcoin Fog cluster and that is here in Exhibit 326. And this goes on to list every single one of the more than 925,000 addresses clustered into the Bitcoin Fog cluster.

The first address 1YZJKA is known as the root address. Mr. Scholl also testified in more detail during the trial, about how the Bitcoin Fog cluster worked to facilitate Bitcoin Fog, in other words how the cluster was used to make the mixing and laundering possible. As Mr. Scholl testified, Bitcoin Fog originally operated through something called consolidation addresses. So when users sent money into Bitcoin Fog, all of the deposit addresses would transfer or sweep into the consolidation address. That was sort of a holding area for the user's funds. And then they were commingled and

consolidated. And then Bitcoin Fog would sent out peel chains from consolidation addresses and break off individual payments to go to individual users.

1YZJKA was one of the original consolidation addresses. So the Bitcoin Fog clustering wasn't just addresses receiving or sending funds through Bitcoin Fog. It was also the machinery of the Bitcoin Fog process itself. It was used to consolidate, mix and launder and send out the funds through Bitcoin Fog.

You also heard testimony about the defendant's two Kraken accounts. Mr. Scholl and Special Agent Rovensky testified at trial that the defendant had two Kraken accounts. One was the personal account in the name of Roman Sterlingov. The other was purportedly a business account in the name of To the Moon, LTD for the defendant's Moon VPN service. But as the trial evidence showed, both accounts were used to receive and launder the defendant's profits from running Bitcoin Fog.

Mr. Scholl testified about his source of funds analysis for those two accounts. Mr. Scholl looked at the defendant's LocalBitcoins account and determined that much of the Bitcoin deposited into these LocalBitcoins accounts were traceable to Bitcoin Fog. Then he looked at the defendant's two Kraken accounts. As Mr. Scholl testified, that the substantial or primary source of funds in both accounts was Bitcoin Fog. For the first Kraken account, there were 16

deposits totaling 84 Bitcoin, more than $247,000 sourced from Bitcoin Fog. There were another four deposits, totaling 16 Bitcoin or $164,000 from the defendant's LocalBitcoin accounts, which in turn were substantially sourced from Bitcoin Fog. So this Kraken account, to begin with, contains a majority of funds traceable back to Bitcoin Fog. Those are the defendant's profits, his criminal proceeds, that he earned from operating Bitcoin Fog. That is property involved in the money laundering and unlicensed money transmitter offenses.

It is also property involved in the defendant's crimes for a second reason. Now, you probably noticed that the defendant moved money from Bitcoin Fog to LocalBitcoins and then on to Kraken. That is layering, the money laundering technique that Mr. Scholl testified about at trial. So this is an example of the defendant's self laundering, trying to clean his own funds by sending them through multiple accounts before converting them to fiat and spending them. That made it harder for Kraken or anyone else to identify the source of the defendant's funds as coming from Bitcoin Fog.

During the trial you heard testimony about Bitstamp. And remember how Bitstamp was asking the defendant where his Bitcoin came from and pressing him to answer whether he had ever used any cryptocurrency tumblers. To avoid uncomfortable questions like that, the defendant layered some of the funds coming into his Kraken account through Bitcoin Fog.

So that is a second kind of way that this property is involved in the defendant's money laundering offenses. And then there is the defendant's second Kraken account, To the Moon, LTD. Similar to his personal Kraken account, this account was mostly funded by deposits from Bitcoin Fog. Again, these are the defendant's criminal proceeds from operating Bitcoin Fog.

And again, To the Moon LTD, was also involved in the defendant's self laundering. You heard testimony at trial that Moon VPN was basically a front for money laundering. You heard that IRS Special Agent Matt Price tried to sign up for Moon VPN service using a fake name, Karl Marx, and an address in Australia. He paid for the service using Bitcoin. And he downloaded the software which didn't seem to work. And he tracked where his Bitcoin payment went. And he saw on the blockchain that no one even bothered to collect the Bitcoin that he paid. It was still sitting in the payment address as of the date of Special Agent Price's testimony during trial.

And so what happened with the Kraken account opened up for this nonfunctional business? It was used as a piggy bank for the defendant's spending funded by Bitcoin Fog. Deposit Bitcoin from Bitcoin Fog into Kraken, convert to Euros then withdraw and spend. He did this again and again. Thousands of dollars worth of Bitcoin laundered through the Kraken To the Moon account. It may not be a huge account

relative to the defendant's total earings. But it did provide the defendant with plausible deniability. So if anybody asked about where the money was coming from, the defendant had an answer. It came from his VPN business. So both of these Kraken accounts are comprised of proceeds from the defendant's accounts. And they were used to facilitate the defendant's money laundering and unlicensed money transmitting business crimes.

Over the past month of this case, you have seen the evidence. You have listened to the testimony and you have carefully deliberated over the defendant's guilt. We ask you to turn your attention to this one final task. And we ask that you return the only verdict that is consistent with the evidence in the case, that these six properties were involved in the defendant's crimes and are subject to forfeiture.

THE COURT: All right. Mr. Ekeland.

CLOSING ARGUMENT

MR. EKELAND: Briefly.

You just heard Mr. Brown say that the majority of the funds or some of the accounts were mostly funded. We just ask that you take a look at the evidence to see what you can clearly say was linked to Bitcoin Fog and what wasn't in making your determination and make your determination very carefully. Thank you.

THE COURT: All right. Thank you.

All right. So I will let you go back to the jury room to deliberate on this final issue. I will promptly get back to you my instructions and a copy of the special verdict form for this final phase of the proceeding.

(Jury out at 12:03 p.m.)

THE COURT: So I am going to ask that my clerk print out copies of the final instruction of the special verdict form and the instructions, just so you all can take a quick look at that before we send it back.

MR. EKELAND: Your Honor --

THE COURT: Yes.

MR. EKELAND: Just a brief bit of housekeeping, if I may approach?

THE COURT: That is fine. Go ahead.

MR. EKELAND: So Mr. Sterlingov has just asked if it is possible -- and I have not discussed this with the government yet, if his handwritten notes, his notes from his computer and all of his passwords be sealed or in some way protected from the public accessing them.

THE COURT: Well, the -- I will let you discuss with the government. It strikes me if there is any PII in that that would be appropriate to seal it, so any passwords, personal telephone numbers, things like that, I think it would be appropriate. But under D.C. Circuit guidance I think as much of the case has to be open to the public as possible. You are

welcome to go through it and discuss it, in the first instance, with the government. If there are things that should be redacted from any materials that are publically available, that is acceptable to me.

I will say that it is not as -- the evidence is not getting published online where someone can just go online and find it. So exhibits wouldn't be available online. But if there is something that should be redacted, I am happy to consider doing so. And with respect to his passports and/or passports and other materials, I suppose that they will remain as evidence in the control of the government for the time being at least pending any appeal and final disposition of the case.

But I will let you confer with them in the first instance about that as well. I wouldn't anticipate anybody would have access to his passports, for example.

MR. EKELAND: Maybe the thing is to discuss it with the government and file an appropriate motion.

THE COURT: That is fine.

And then shall we set a date for sentencing?

THE COURTROOM DEPUTY: Are the parties available -- are the parties available for July 15th at 10 a.m.?

MR. BROWN: Your Honor, the government is available July 15th.

THE COURT: All right. Mr. Ekeland.

MR. EKELAND: One moment, Your Honor, waiting for my

calendar to boot up.

THE COURT: Okay. That is fine.

MR. EKELAND: Yes, Your Honor, we are available that day.

THE COURT: So put the matter down for sentencing on July 15th at 10:00 a.m.

And I will direct that the defense file its sentencing memorandum on or before the 8th of July and that the government file its sentencing memorandum on or before the 1st of July. And that way, Mr. Ekeland, you have an opportunity to respond to anything that you might not anticipate the government would raise.

My clerk is just getting the copies of the final instructions and special verdict form for you to look at.

(Pause.)

THE COURT: While she is doing that, is there anything else that needs to be addressed before we adjourn?

MR. BROWN: Your Honor, the government has loaded up the two additional exhibits onto the drive. I previously sent them to the defense -- sent copies to the defense for their review. So the evidence is ready to go, from the government's perspective.

THE COURT: Is that acceptable to you, Mr. Ekeland?

MR. EKELAND: I think so. Which exhibits are they, the ones you just showed?

MR. BROWN:  New Exhibit 1001, which was the IRS seizure memorandum; and then 1002, which was the wire transfer document.

MR. EKELAND:  No.  That is fine, Your Honor.

THE COURT:  That is fine to give that to the jury then.

Anything else before we adjourn?

MR. BROWN:  Nothing else, Your Honor.

THE COURT:  Mr. Ekeland.

MR. EKELAND:  Nothing else, Your Honor.

THE COURT:  So maybe what I will do is I will step off the bench.  And you all can look at the verdict form and the instructions.  And if there is anything that you think isn't right, let me know and I will come back out and we can discuss that.  But if you have no concerns with it, then we can send it back to the jury room.

MR. EKELAND:  Were those emailed to us?

THE COURT:  My clerk is printing them out in hard copy.

And we will let you know when we hear something from the jury otherwise.  All right.  Thank you.

(Recess taken at 12:11 p.m.)

THE COURT:  All right.  We have a verdict on the forfeiture counts.  Would anybody like me to poll the jury with respect to forfeiture?

MR. BROWN: No, Your Honor.

MR. EKELAND: Yes, Your Honor.

THE COURT: Okay. All right. So I will do that.

THE COURTROOM DEPUTY: Are we ready?

THE COURT: Yes, we are ready.

(Jury in at 1:25 p.m.)

THE COURT: All right. If I could ask the foreperson to stand.

Has the jury reached a verdict with respect to the forfeiture proceedings?

A JUROR: We have, Your Honor.

THE COURT: Can I ask you to pass that to the deputy clerk? Okay.

If I could ask you to stand, please. And I am going to ask -- what is the jury's finding with respect to the allegation that $349,225.72 seized from Kraken account and I am going to use the shorthand AA68 held in the name of Roman Sterlingov and number AA24NG4 held in the name of To the Moon, LTD Roman named in the forfeiture allegation and the indictment is property, real or personal, involved in the offense or offenses for which the defendant Roman Sterlingov has been convicted as charged in Counts 1, 2 and 3 of the indictment?

A JUROR: Yes, Your Honor.

THE COURT: And how does the jury find with respect to the allegation that approximately .10877 Bitcoin

cryptocurrency, after required fees, seized from Kraken accounts -- and I will use the shorthand again, number AA68 held in the name of Roman Sterlingov and number AA24N84 held in the name of To the Moon LTD, Roman named in the forfeiture allegation of the indictment is property real or personal involved in the offense or offenses for which the defendant Roman Sterlingov has been convicted as charged in Counts 1, 2 and 3 of the indictment?

A JUROR: Yes, Your Honor.

THE COURT: And how does the jury find with respect to the allegation that approximately 205.9625 Ethereum cryptocurrency, after required fees, seized from Kraken accounts number AA68 held -- that again the shorthand held in the name of Roman Sterlingov and number AA24N84 held in the name of To the Moon LTD, Roman named in the forfeiture allegation of the indictment is property, real or personal, involved in the offense or offenses for which the defendant Roman Sterlingov has been convicted as charged in Counts 1, 2 and 3 of the indictment?

A JUROR: Yes, Your Honor.

THE COURT: And how does the jury find that approximately 9,371.5283 Stellar cryptocurrency, after required fees, seized from the Kraken account number AA68, held in the name of Roman Sterlingov, and number AA24N84, held in the name of To the Moon, Roman named in the forfeiture allegation of the

indictment is property, real or personal, involved in the offense or offenses for which the defendant, Roman Sterlingov, has been convicted as charged in Counts 1, 2 and 3 of the indictment?

A JUROR: Yes, Your Honor.

THE COURT: How does the jury find with respect to the allegation that approximately 35.9998 Monero cryptocurrency, after required fees, seized from Kraken accounts number AA68 held in the name of Roman Sterlingov and number AA24N84, held in the name of To the Moon, LTD, Roman named in the forfeiture allegation in the indictment is property, real or personal, involved in the offense or offenses for which the defendant, Roman Sterlingov, has been convicted as charged in Counts 1, 2 and 3 of the indictment?

A JUROR: Yes, Your Honor.

THE COURT: Finally, how does the jury find with respect to the allegation that approximately 1,354 Bitcoin currently held in the Bitcoin Fog wallet identified by root address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw named in the forfeiture allegation, in the indictment is property, real or personal, involved in the offense or offenses for which the defendant, Roman Sterlingov, has been convicted as charged in Counts 1, 2 and 3 of the indictment?

A JUROR: Yes, Your Honor.

THE COURT: Just for clarity of the record, each time

that I referred to a count AA68, did you understand that I was referring to AA68NG84GQUTXDGMY?

A JUROR: I'm sorry. Your Honor, TX or XT?

THE COURT: XT.

A JUROR: Yes, Your Honor.

THE COURT: I referred to number AA24N84 that I was referring to number AA24N84GWW46KQ5Y?

A JUROR: Yes, Your Honor.

THE COURT: So let me go through and ask each juror one by one whether the verdict as just announced represents your personal verdict with respect to each of those allegations.

Juror number 1?

A JUROR: Yes, Your Honor.

THE COURT: Juror number 2?

A JUROR: Yes, sir.

THE COURT: Juror number 3?

A JUROR: Yes, Your Honor.

THE COURT: Juror number 4?

A JUROR: Yes.

THE COURT: Juror number 5?

A JUROR: Yes.

THE COURT: Juror number 7?

A JUROR: Yes.

THE COURT: Juror number 8?

A JUROR:  Yes, Your Honor.

THE COURT:  Juror number 10?

A JUROR:  Yes.

THE COURT:  Juror number 12?

A JUROR:  Yes, Your Honor.

THE COURT:  Juror number 13?

A JUROR:  Yes, Your Honor.

THE COURT:  Juror number 15?

A JUROR:  Yes, Your Honor.

THE COURT:  And Juror number 16?

A JUROR:  Yes, Your Honor.

THE COURT:  All right.  Anything else before I excuse the jury?

MR. BROWN:  No, Your Honor.

MR. EKELAND:  No, Your Honor.

THE COURT:  Well, I thank you all very much for your service.  This was a lengthy case that involved -- required careful attention.  And so I am very appreciative.

You all are discharged.  You are free to discuss the case or not discuss the case with anyone as you see fit.  At this point, if you want to go back in the jury room, I would be happy to come back and just say a brief hello to you.  But you are also -- your service is complete and you are also more than welcome to head out the door and I won't be insulted if you pick up and leave.  But I will go in the jury room in a minute

or two, just to say hello for anyone who is still there. But you do have both my sincere thanks and the thanks of the Court more generally for your service. This was a substantial portion of your time and commitment. But it is also incredibly important to our system and how our system works, so I do thank you all for your service. Thank you.

(Jury out at 1:32 p.m.)

THE COURT: All right. Anything else before we adjourn?

MR. BROWN: No, Your Honor.

MR. EKELAND: No, Your Honor.

THE COURT: All right. Well, thank you all. I know for all of you this was an enormous undertaking and a tremendous amount of energy from everyone involved. And I thank you all for your professionalism and the manner that you handled this difficult case. So I do very much appreciate your service to the system on both sides as well, so thank you all. And I am sure you all are in need of a little bit of rest at this point.

So I am going to direct that the clerk record the verdict with respect to the forfeiture as well.

All right. And you all are excused.

MR. EKELAND: Thank you, Your Honor.

(Proceedings concluded at 1:33 p.m.)

<u>C E R T I F I C A T E</u>

I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.

Dated this 18th day of April, 2024.

_____
Sherry Lindsay, RPR
Official Court Reporter

A JUROR: [44]  4/25 5/7 5/11 5/15 5/18 5/21 6/1 6/5 6/11 6/15 6/21 6/23 6/25 7/2 7/4 7/6 7/8 7/10 7/12 7/14 7/16 7/18 42/11 42/23 43/9 43/20 44/5 44/15 44/24 45/3 45/5 45/8 45/14 45/16 45/18 45/20 45/22 45/24 46/1 46/3 46/5 46/7 46/9 46/11
BY MR. BROWN: [4]  18/14 19/13 22/5 24/18
BY MR. EKELAND: [2]  27/2 27/8
MR. BROWN: [25]  4/6 4/16 8/25 9/2 9/8 9/22 10/8 10/19 11/11 18/7 21/22 24/10 26/24 28/19 28/22 29/3 29/7 29/9 39/22 40/18 41/1 41/8 42/1 46/14 47/10
MR. EKELAND: [27]  4/10 4/19 10/4 10/17 10/23 11/3 21/25 24/13 27/5 27/7 28/16 28/25 37/18 38/10 38/12 38/15 39/16 39/25 40/3 40/24 41/4 41/10 41/17 42/2 46/15 47/11 47/23
MS. PELKER: [1]  19/10
THE COURT: [96]
THE COURTROOM DEPUTY: [5]  4/2 18/10 19/11 39/20 42/4
THE WITNESS: [1]  18/9

## $

$1,000 [2]  31/4 31/4
$164,000 [1]  35/3
$247,000 [1]  35/1
$349,225.72 [1]  42/16
$349,625.72 [1]  12/6
$395.5 [1]  33/2
$395.5 million [1]  33/2
$402.8 [1]  33/4
$402.8 million [1]  33/4
$44,000 [1]  20/16
$5,000 [2]  31/2 31/2
$629,000 [1]  20/16
$70 [1]  26/17
$70 million [1]  26/17
$870,000 [1]  20/15

## .

.10877 [2]  12/9 42/25

## 1

1,354 [3]  13/4 26/19 44/17
1.2 million [1]  33/1
10 [4]  7/9 9/25 39/21 46/2
10005 [1]  2/4
1001 [7]  3/10 21/12 21/15 21/23 22/1 22/3 41/1
1002 [7]  3/10 23/11 24/1 24/11 24/14 24/16 41/2
10:00 a.m [1]  40/6
11:11 [1]  1/6
11:12 [1]  4/21
11:16 [1]  8/8
11:23 [1]  11/13
12 [3]  1/5 7/11 46/4
12:03 [1]  38/5
12:11 [1]  41/22
13 [2]  7/13 46/6
1301 [1]  1/20
15 [2]  7/15 46/8
15th [3]  39/21 39/23 40/6
16 [4]  7/17 34/25 35/2 46/10
18 [8]  3/4 5/9 5/13 14/7 14/8 14/10 14/12 14/13
18th [1]  48/10
1956 [4]  5/10 5/14 14/11 14/12
1960 [1]  14/14
1:25 [1]  42/6
1:32 [1]  47/7
1:33 [1]  47/24
1st [1]  40/9
1YZJKa [4]  25/15 26/5 33/16 34/4

1YZJKaAx2HAWvcbCXDBtQbBZcRU46WJqw [1]  13/6
1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw [1]  44/19

## 2

20001 [1]  2/9
20005 [1]  1/21
2011 [1]  32/9
2021 [3]  21/7 26/23 32/9
2024 [2]  1/5 48/10
205.9625 [2]  12/14 43/11
20530 [2]  1/14 1/17
21-399 [2]  1/4 4/2
22 [1]  3/10
24 [1]  3/10
260 [1]  20/12
27 [1]  3/4
29 [1]  3/7
29th [1]  26/23

## 3

3 percent [4]  31/15 31/18 32/7 33/8
30 [1]  2/3
308 [2]  26/7 26/10
326 [2]  25/9 33/13
333 [1]  2/8
35 [1]  20/13
35.9998 [2]  12/24 44/7
356 [1]  19/6
37 [1]  3/7
399 [2]  1/4 4/2

## 5

5.1527 [1]  1/17

## 6

601 [1]  1/16
64 [1]  20/12
6710 [1]  2/8

## 8

84 [1]  35/1
8th [3]  2/4 8/11 40/8

## 9

9,371.52683 [1]  12/19
9,371.5283 [1]  43/22
925,000 [1]  33/14
950 [1]  1/14
982 [2]  14/8 14/8

## A

a.m [6]  1/6 4/21 8/8 11/13 39/21 40/6
AA24N84 [5]  43/3 43/14 43/24 44/10 45/6
AA24N84GWW46KQ5Y [6]  12/8 12/12 12/17 12/22 13/2 45/7
AA24NG4 [1]  42/18
AA68 [6]  42/17 43/2 43/13 43/23 44/9 45/1
AA68N84GQUXTDGMY [5]  12/7 12/11 12/16 12/21 13/1
AA68NG84GQUTXDGMY [1]  45/2
about [19]  7/25 18/18 21/7 25/3 25/19 26/20 26/22 28/12 30/1 30/22 32/10 32/22 33/18 34/10 34/18 35/14 35/20 37/3 39/14
above [2]  14/24 48/5
above-entitled [1]  48/5
acceptable [2]  39/4 40/23
access [1]  39/15
accessing [1]  38/19
account [34]  12/6 12/20 12/25 17/17 18/23 19/23 19/24 20/1 20/4 20/5 20/8 20/10 20/20 20/22 21/2 22/18 28/3 28/7 28/13 28/15 34/13 34/14 34/20 34/25 35/5 35/25 36/3 36/4 36/5 36/19 36/25 36/25 42/16

43/23
accounts [39]  12/10 12/16 16/6 18/19 18/24 19/2 19/16 19/21 21/5 21/10 22/7 22/11 23/14 23/17 23/18 23/20 24/22 24/25 27/15 28/1 28/1 29/23 30/1 30/4 34/11 34/12 34/16 34/19 34/21 34/23 34/24 35/3 35/16 37/5 37/6 37/20 43/2 43/13 44/9
accurate [1]  21/19
acquired [3]  15/22 16/11 16/14
Action [1]  1/3
activity [1]  6/10
actually [4]  7/20 9/19 22/17 23/19
additional [5]  9/21 10/21 17/11 18/5 40/19
address [14]  23/3 25/14 25/16 25/18 25/22 25/23 25/23 26/5 33/16 33/17 33/24 36/12 36/17 44/19
addressed [1]  40/17
addresses [15]  25/7 25/11 25/20 25/24 25/25 26/2 30/7 32/23 33/12 33/14 33/22 33/23 34/2 34/5 34/5
adjourn [3]  40/17 41/7 47/9
admissible [1]  10/12
admit [3]  10/14 21/22 24/10
admitted [9]  19/6 21/13 22/1 22/4 24/14 24/17 25/10 26/7 26/9
after [9]  11/9 12/9 12/15 12/20 12/25 43/1 43/12 43/22 44/8
afternoon [1]  4/6
again [11]  8/20 8/22 19/9 28/14 30/11 36/5 36/8 36/23 36/23 43/2 43/13
Agent [3]  34/11 36/11 36/18
ahead [1]  38/14
Alden [1]  4/8
all [57]
allegation [12]  29/17 42/16 42/19 42/25 43/5 43/11 43/16 43/25 44/7 44/11 44/17 44/20
allegations [3]  16/23 17/2 45/12
alleged [1]  11/19
alleges [1]  14/17
along [1]  29/5
already [3]  9/24 12/3 13/9
also [23]  8/19 17/13 20/4 23/13 25/3 28/12 30/8 31/8 31/19 31/22 31/24 32/7 32/10 32/16 33/11 33/17 34/6 34/10 35/10 36/8 46/23 46/23 47/4
am [14]  6/16 7/21 7/23 7/24 9/17 21/6 27/18 38/6 39/8 42/14 42/16 46/18 47/18 47/20
AMERICA [2]  1/3 4/3
amount [1]  47/14
amounts [2]  22/22 23/7
analysis [6]  18/19 18/22 19/14 19/17 20/19 34/19
analyzed [1]  18/23
announced [1]  45/10
another [6]  8/6 11/17 16/19 32/14 32/14 35/2
answer [2]  35/22 37/4
anticipate [3]  18/3 39/14 40/11
anticipating [1]  9/17
any [34]  9/6 11/24 14/14 14/15 14/25 15/3 15/5 15/20 15/21 15/24 15/25 16/4 16/8 16/10 17/8 17/9 17/10 17/11 17/13 17/15 21/24 22/10 24/12 27/18 28/18 28/21 28/23 29/1 32/7 35/23 38/21 38/22 39/3 39/12
anybody [3]  37/2 39/14 41/24
anyone [3]  35/18 46/20 47/1
anything [13]  8/3 8/11 8/12 8/12 10/5 11/6 11/6 40/11 40/17 41/7 41/13 46/12 47/8
appeal [1]  39/12
APPEARANCES [3]  1/12 1/23 2/1

**A**

appears [1]  22/23
applicable [1]  14/23
applied [1]  13/17
applies [2]  8/23 32/5
apply [2]  16/22 30/20
appreciate [1]  47/16
appreciative [1]  46/18
approach [2]  4/4 38/13
appropriate [4]  5/24 38/22 38/24 39/17
approximately [16]  12/9 12/14 12/19 12/24 13/4 20/15 20/15 20/16 26/16 26/18 26/19 42/25 43/11 43/22 44/7 44/17
April [2]  26/23 48/10
April 29th [1]  26/23
are [46]  4/7 8/17 8/18 9/4 9/20 10/2 10/4 11/17 14/17 16/24 17/3 17/13 17/21 18/12 20/4 20/6 21/4 22/17 22/19 23/7 23/8 23/9 29/1 29/22 30/17 32/16 32/17 35/6 36/6 37/5 37/15 38/25 39/2 39/3 39/20 39/21 40/3 40/24 42/4 42/5 46/19 46/19 46/23 46/23 47/18 47/22
area [1]  33/24
aren't [1]  27/14
arguably [3]  10/14 10/18 10/19
argument [5]  3/7 3/7 9/20 29/8 37/17
arguments [1]  29/6
as [51]
ask [16]  4/15 4/23 5/3 6/17 7/21 7/24 11/18 37/11 37/12 37/20 38/6 42/7 42/12 42/14 42/15 45/9
asked [2]  37/2 38/15
asking [1]  35/21
asset [1]  32/14
assets [3]  21/10 32/16 32/17
associated [2]  27/14 27/19
attention [8]  19/5 21/12 23/11 23/25 25/9 26/7 37/12 46/18
attributed [1]  25/7
AUSA [1]  4/6
Australia [1]  36/13
available [6]  39/3 39/7 39/20 39/21 39/22 40/3
Ave [2]  1/14 1/20
Avenue [1]  2/8
avoid [1]  35/23
aware [1]  27/18
away [1]  31/1

**B**

back [22]  4/22 7/24 8/4 9/15 9/15 9/19 9/25 11/4 11/8 17/25 19/8 20/7 23/12 26/1 35/6 38/1 38/3 38/9 41/14 41/16 46/21 46/22
backwards [1]  18/25
balance [3]  14/3 14/5 26/15
bank [3]  31/1 31/1 36/21
bankroll [2]  15/17 32/3
Bankruptcy [1]  2/7
based [1]  14/18
basic [1]  30/19
basically [1]  36/10
be [23]  6/9 7/23 8/16 9/17 11/23 17/17 17/22 18/10 22/1 22/21 22/21 24/14 36/25 38/18 38/22 38/23 38/25 39/2 39/7 39/8 40/17 46/21 46/24
because [5]  10/9 10/13 14/18 29/19 32/17
been [10]  6/9 21/13 21/14 24/1 42/21 43/7 43/18 44/3 44/13 44/22
before [13]  1/9 4/14 10/20 11/17 29/10 35/16 38/9 40/8 40/9 40/17 41/7 46/12 47/8
begin [1]  35/5
behalf [1]  33/4
being [3]  15/2 15/12 39/11

believe [1]  13/25
bench [1]  41/12
besides [1]  23/4
between [10]  9/18 12/2 13/8 13/12 14/23 17/19 29/19 30/16 32/9 33/9
beyond [1]  13/19
big [1]  9/17
binding [1]  17/5
bit [2]  38/12 47/18
Bitcoin [106]
Bitstamp [2]  35/20 35/21
blockchain [2]  32/21 36/16
boot [1]  40/1
both [8]  20/11 24/24 30/12 34/16 34/24 37/4 47/2 47/17
bothered [1]  36/16
bottom [1]  22/9
break [1]  34/2
brief [7]  9/23 10/5 10/10 11/9 29/7 38/12 46/22
briefly [2]  30/3 37/18
bring [2]  4/14 11/4
broader [1]  31/8
BRODIE [1]  1/15
Brooklyn [1]  2/4
BROWN [9]  1/15 3/4 3/7 4/7 10/18 18/6 18/11 29/1 37/19
burden [6]  9/11 13/11 13/15 13/19 14/6 30/15
business [22]  5/20 5/23 6/3 6/4 6/7 14/13 15/15 15/17 15/25 16/1 16/2 16/8 30/14 32/1 32/2 32/3 32/6 32/8 34/14 36/20 37/4 37/7
business' [1]  16/5
buy [2]  16/16 32/14

**C**

calendar [1]  40/1
call [2]  18/5 28/24
called [4]  29/10 29/17 30/22 33/21
calling [1]  9/25
calls [1]  18/7
came [5]  20/16 20/17 28/15 35/22 37/4
can [20]  8/15 9/15 11/2 11/5 11/6 11/9 18/2 19/8 23/10 25/2 26/6 30/25 31/22 37/21 38/8 39/6 41/12 41/14 41/15 42/12
car [2]  16/16 16/16
careful [1]  46/18
carefully [2]  37/11 37/23
carried [1]  30/15
case [24]  4/2 6/19 7/21 7/23 8/2 8/5 10/10 10/11 10/22 11/22 13/19 15/14 29/6 29/10 29/16 32/12 37/9 37/14 38/25 39/12 46/17 46/20 46/20 47/16
categories [1]  31/9
category [2]  14/18 14/24
CATHERINE [1]  1/13
Ccips [1]  1/19
certain [6]  7/22 11/24 11/25 14/17 29/13 29/18
Certainly [1]  11/3
certify [1]  48/3
Chainalysis [2]  25/7 25/12
chains [1]  34/1
chance [1]  8/19
change [1]  16/18
charged [8]  17/4 33/9 42/22 43/7 43/18 44/3 44/14 44/22
Chris [1]  4/6
CHRISTOPHER [1]  1/15
Circuit [1]  38/24
claims [2]  13/25 17/16
clarify [1]  8/22
clarity [1]  44/25
clean [2]  31/21 35/15
clear [2]  10/10 10/11
clearly [1]  37/22
clerk [8]  5/2 8/13 9/5 38/6 40/13

41/18 42/13 47/20
Closing [4]  3/7 3/7 29/8 37/17
cluster [20]  25/3 25/6 25/12 25/14 25/17 26/12 26/15 26/21 30/6 30/9 30/12 32/20 32/23 32/23 33/1 33/5 33/12 33/15 33/18 33/19
clustered [1]  33/14
clustering [1]  34/5
Code [3]  14/9 14/11 14/12
collect [3]  24/24 25/24 36/16
collection [1]  25/7
COLUMBIA [3]  1/1 5/25 6/14
come [3]  7/25 41/14 46/22
coming [5]  11/1 33/3 35/19 35/25 37/3
comments [1]  9/6
commingled [2]  15/11 33/25
commingles [1]  31/21
commission [2]  31/17 31/18
commissions [1]  15/3
commit [1]  15/10
commitment [1]  47/4
committed [1]  13/13
committing [2]  11/25 31/3
complete [3]  18/21 33/11 46/23
completed [1]  21/7
comply [1]  6/3
comprised [1]  37/5
computer [1]  38/18
concept [3]  30/24 32/4 32/10
concern [1]  17/18
concerning [2]  16/20 16/23
concerns [1]  41/15
concluded [1]  47/24
concludes [1]  29/4
conduct [4]  11/22 22/23 29/12 31/23
conducts [1]  31/10
confer [1]  39/13
connection [9]  12/2 13/8 13/12 13/16 14/23 17/14 17/19 29/19 30/16
consider [7]  7/22 9/16 12/1 13/7 17/8 17/10 39/9
consideration [2]  16/21 17/2
considered [1]  13/24
considering [1]  11/18
consistent [1]  37/13
consolidate [1]  34/8
consolidated [1]  34/1
consolidation [9]  25/20 25/22 25/23 25/25 26/1 33/22 33/24 34/2 34/4
conspiracy [9]  5/6 14/10 15/14 15/16 15/18 30/14 31/24 31/25 32/1
conspired [2]  5/9 5/12
constitute [2]  17/16 29/14
constitutes [1]  48/4
Constitution [1]  2/8
contain [1]  21/10
contained [1]  29/17
contains [4]  10/14 10/19 30/12 35/5
contemporary [1]  23/8
CONTENTS [1]  3/1
continue [1]  8/6
CONTINUED [2]  1/23 2/1
control [1]  39/11
controlled [2]  30/7 32/24
convert [2]  23/22 36/22
converting [2]  32/15 35/17
convicted [6]  42/22 43/7 43/18 44/3 44/13 44/22
conviction [2]  8/22 14/19
convictions [2]  8/17 14/19
copies [3]  38/7 40/13 40/20
copy [5]  8/14 17/25 21/19 38/3 41/19
correct [11]  9/3 21/8 27/12 27/13 27/17 27/18 27/22 28/6 28/11 28/13 48/4

**C**

could [10]   4/23 5/1 5/3 18/16
20/7 24/19 25/13 26/4 42/7 42/14
counsel [5]   4/4 4/5 4/7 4/12
10/21
count [8]   5/4 5/4 5/5 5/17 5/20
6/13 32/5 45/1
counts [16]   8/17 8/22 8/25 9/2
11/15 11/16 12/3 13/9 17/4 41/24
42/22 43/7 43/18 44/3 44/14 44/23
couple [1]   30/21
court [11]   1/1 2/6 2/7 4/11 9/9
10/6 17/15 17/17 47/2 48/3 48/13
Courts [1]   2/7
credibility [1]   16/25
crime [6]   15/23 16/12 16/16 17/14
29/14 31/3
crimes [8]   17/20 29/15 29/20
30/17 31/5 35/11 37/8 37/15
criminal [8]   1/3 4/2 6/9 11/22
29/12 30/25 35/7 36/6
CRM [1]   1/19
cross [3]   3/4 10/5 27/1
Cross-examination [2]   3/4 27/1
cryptocurrencies [4]   22/7 22/10
22/14 29/25
cryptocurrency [13]   12/15 12/20
12/24 22/14 23/4 23/7 23/13 32/15
35/23 43/1 43/12 43/22 44/8
currency [6]   12/9 13/4 23/16
23/19 29/24 32/16
current [1]   26/15
currently [1]   44/18
customer [2]   31/14 33/8
customer's [2]   31/11 31/12
customers [1]   33/5

**D**

D.C [1]   38/24
date [4]   21/8 26/14 36/18 39/19
Dated [1]   48/10
day [2]   40/4 48/10
DC [6]   1/5 1/14 1/17 1/21 2/9
8/24
deal [1]   18/4
decide [2]   17/15 29/13
deciding [1]   30/15
defendant [33]   1/7 2/2 4/11 5/9
5/12 5/22 6/2 6/6 6/8 11/15 11/23
12/4 13/10 13/13 17/4 17/7 29/16
31/4 32/13 32/18 33/9 34/12 35/12
35/21 35/24 37/2 37/3 42/21 43/6
43/17 44/2 44/13 44/22
defendant's [35]   14/2 14/19 17/20
21/5 21/9 29/14 29/15 29/20 29/23
30/5 30/7 30/12 30/17 31/17 32/6
34/10 34/15 34/17 34/20 34/22
35/3 35/6 35/10 35/15 35/19 36/2
36/3 36/6 36/9 36/21 37/1 37/5
37/6 37/11 37/15
defense [8]   4/17 8/10 8/12 10/21
11/6 40/7 40/20 40/20
defrauds [1]   31/3
delay [1]   33/3
deliberate [4]   8/4 9/19 17/1 38/2
deliberated [1]   37/11
deliberating [1]   17/8
deliberations [2]   16/23 18/1
deniability [1]   37/2
DEPARTMENT [1]   1/13
deposit [3]   25/24 33/23 36/22
deposited [5]   19/2 20/12 20/15
28/1 34/21
deposits [7]   18/24 27/11 27/14
27/18 35/1 35/2 36/5
deprived [1]   11/23
Dept [1]   1/20
deputy [1]   42/12
derived [1]   6/9
detail [1]   33/17
detect [2]   15/10 31/23

determination [4]   17/3 30/20
37/23 37/23
determine [3]   14/22 17/18 27/16
determined [1]   34/20
did [21]   8/11 8/12 10/20 18/18
18/20 18/21 19/18 21/9 21/11
23/12 23/13 23/15 23/22 24/24
25/1 25/25 27/24 28/6 36/23 37/1
45/1
didn't [9]   10/10 10/17 27/20
27/24 28/4 28/10 28/13 28/14
36/14
difference [1]   33/9
different [2]   21/10 29/21
differently [1]   14/1
difficult [1]   47/16
direct [10]   3/4 9/4 9/23 18/13
19/5 20/16 21/12 26/6 40/7 47/20
directing [3]   23/10 23/25 25/9
directly [1]   20/13
dirty [1]   31/21
discharged [2]   11/17 46/19
discuss [7]   17/6 38/20 39/1 39/16
41/15 46/19 46/20
discussed [2]   9/13 38/16
disposition [1]   39/12
DISTRICT [6]   1/1 1/1 1/10 2/7
5/24 6/13
divested [1]   11/23
do [38]   5/8 5/12 5/22 6/2 6/6
6/16 7/23 8/5 8/14 9/20 10/5
10/13 11/9 14/5 18/6 18/9 18/21
19/10 21/14 21/16 22/20 22/22
24/1 24/3 25/3 25/5 25/19 25/21
26/1 26/3 26/10 26/11 28/23 41/11
42/3 47/2 47/5 47/16
document [4]   24/2 24/4 24/6 41/3
does [16]   5/5 5/16 5/19 6/12 18/5
22/9 22/12 24/6 24/8 25/10 32/12
42/24 43/10 43/21 44/6 44/16
doing [2]   39/9 40/16
DOJ [2]   1/16 1/19
DOJ-CRM [1]   1/19
DOJ-USAO [1]   1/16
dollar [3]   20/11 20/14 20/14
dollars [6]   23/8 23/21 23/22
29/24 32/16 36/24
don't [2]   18/3 21/8
done [1]   29/10
door [1]   46/24
doubt [1]   13/20
down [5]   22/9 23/10 25/2 26/6
40/5
downloaded [1]   36/14
draft [1]   8/9
drive [1]   40/19
during [18]   16/1 16/6 16/22 17/9
17/10 17/12 18/1 18/18 19/6 25/2
25/10 32/8 32/20 32/25 33/7 33/17
35/20 36/18
duty [1]   16/25

**E**

each [7]   6/17 14/19 14/22 17/23
44/25 45/9 45/11
earings [1]   37/1
earlier [1]   9/13
early [1]   25/19
earned [2]   32/13 35/7
easier [1]   15/10
either [1]   29/14
EKELAND [14]   2/2 2/3 3/4 3/7 4/10
10/2 10/16 26/25 28/24 37/16
39/24 40/10 40/23 41/9
element [1]   10/9
else [8]   8/3 35/18 40/17 41/7
41/8 41/10 46/12 47/8
emailed [2]   10/20 41/17
energy [1]   47/14
engages [1]   14/9
enormous [1]   47/13
ensure [1]   11/21

entire [1]   33/7
entitled [2]   30/17 48/5
entries [1]   22/17
error [1]   23/2
establish [2]   13/11 13/21
established [2]   13/15 17/19
estimate [1]   9/25
Ethereum [8]   12/14 23/6 27/22
27/24 27/25 28/2 29/25 43/11
Euros [8]   23/18 23/22 28/12 28/13
28/14 28/15 32/16 36/22
even [2]   16/18 36/16
ever [1]   35/23
every [1]   33/13
everyone [1]   47/14
everything [1]   10/6
evidence [27]   9/21 9/24 13/16
13/22 13/23 13/24 14/2 14/3 14/4
14/5 16/21 17/8 17/10 17/11 29/5
29/5 30/3 30/8 30/11 30/17 34/16
37/10 37/14 37/21 39/5 39/11
40/21
exact [1]   21/8
examination [5]   3/4 3/4 9/23
18/13 27/1
example [3]   16/15 35/15 39/15
excessive [1]   17/17
exclusively [1]   17/15
excuse [1]   46/12
excused [2]   28/20 47/22
executed [1]   24/23
exhibit [23]   3/10 3/10 19/6 19/14
20/7 21/12 21/13 21/15 21/17
21/23 22/1 22/3 23/11 24/11 24/14
24/16 25/9 25/10 25/11 26/7 26/10
33/13 41/1
Exhibit 1001 [1]   21/23
Exhibit 308 [1]   26/7
Exhibit 326 [2]   25/9 33/13
Exhibit 356 [1]   19/6
exhibits [6]   3/9 10/21 30/1 39/7
40/19 40/24
exists [1]   14/23
expert [1]   32/21

**F**

facilitate [7]   15/5 15/7 15/17
30/13 32/3 33/18 37/6
facilitated [1]   15/12
facilitating [3]   31/20 31/21
31/22
facts [1]   13/25
failed [1]   6/3
fails [1]   14/5
fair [1]   21/19
fake [1]   36/12
familiar [1]   21/4
FBI [1]   32/21
federal [4]   6/4 8/23 11/16 11/25
fee [3]   31/15 32/7 33/8
fees [10]   12/10 12/15 12/20 12/25
15/3 31/17 43/1 43/12 43/23 44/8
few [1]   7/24
fiat [5]   23/13 23/16 29/23 32/15
35/17
Fifth [1]   12/24
file [4]   9/5 39/17 40/7 40/9
filled [1]   8/16
final [10]   8/1 8/5 9/6 9/14 37/12
38/2 38/4 38/7 39/12 40/13
finalized [1]   11/7
Finally [1]   44/16
find [17]   5/5 5/8 5/12 5/16 5/19
5/22 6/2 6/6 6/12 13/14 17/14
39/7 42/24 43/10 43/21 44/6 44/16
finding [1]   42/15
fine [8]   8/21 10/4 10/6 38/14
39/18 40/2 41/4 41/5
first [10]   12/6 15/1 25/13 25/14
25/16 31/9 33/16 34/25 39/1 39/13
fit [1]   46/20
flip [2]   19/19 20/7

**F**

flipping [1]   20/18
Floor [1]   2/4
flow [1]   32/2
flowed [1]   15/17
Fog [70]
following [2]   12/2 12/5
foregoing [1]   48/4
foreperson [3]   4/23 5/3 42/7
forfeit [2]   12/5 14/14
forfeitable [1]   14/18
forfeited [1]   7/23
forfeiture [35]   8/10 8/21 9/6
  9/11 10/9 10/12 11/19 11/21 11/22
  13/14 13/20 14/7 16/23 17/2 17/12
  17/16 17/22 24/9 29/11 29/11
  29/17 29/19 30/20 32/17 37/15
  41/24 41/25 42/10 42/19 43/4
  43/15 43/25 44/11 44/20 47/21
form [15]   5/1 8/20 11/8 14/20
  15/15 17/24 18/2 23/16 23/19
  31/25 32/15 38/4 38/7 40/14 41/12
formal [1]   29/18
forms [1]   23/4
forward [1]   20/18
found [2]   12/3 13/10
four [1]   35/2
Fourth [1]   12/19
fraudster [1]   31/3
free [1]   46/19
front [1]   36/10
funded [3]   36/5 36/21 37/20
funds [37]   6/8 15/16 18/19 18/21
  18/24 19/1 19/2 19/3 19/14 19/16
  19/25 20/1 20/2 20/8 20/9 20/19
  21/1 21/3 21/5 24/9 24/22 24/24
  25/24 27/14 31/21 32/2 33/6 33/25
  34/6 34/8 34/18 34/24 35/6 35/16
  35/19 35/24 37/20
further [5]   8/6 10/9 26/24 28/16
  28/21

**G**

gains [1]   31/5
gap [1]   9/17
general [2]   19/1 19/3
generally [3]   9/11 22/22 47/3
generated [1]   28/2
get [3]   4/20 11/12 38/2
getting [2]   39/6 40/13
give [7]   8/1 8/18 8/19 9/9 9/18
  11/7 41/5
given [1]   16/20
go [13]   5/4 6/16 8/7 11/9 34/3
  38/1 38/14 39/1 39/6 40/21 45/9
  46/21 46/25
goes [1]   33/13
going [11]   6/16 7/21 7/23 7/24
  9/17 9/20 20/11 38/6 42/14 42/17
  47/20
good [8]   4/6 4/9 4/10 4/13 8/18
  18/15 27/3 27/4
government [43]   3/10 3/10 4/5 4/7
  4/15 7/22 8/20 9/9 11/5 11/19
  12/4 13/15 13/19 13/21 13/24
  13/25 14/6 14/17 17/19 18/5 18/7
  19/5 21/22 21/23 22/3 23/11 23/13
  23/21 24/10 24/16 24/23 26/7
  26/10 30/15 38/17 38/21 39/2
  39/11 39/17 39/22 40/9 40/12
  40/18
government's [7]   13/11 14/2 14/3
  14/5 27/13 32/21 40/21
great [1]   18/4
group [1]   30/6
guess [2]   9/8 9/19
guidance [1]   38/24
guilt [4]   13/18 17/6 17/10 37/11
guilty [8]   5/7 5/18 5/21 6/15
  11/15 12/4 13/10 17/4

**H**

had [4]   9/13 34/12 35/22 37/3
handled [1]   47/16
handwritten [1]   38/17
happened [1]   36/19
happens [1]   17/13
happy [2]   39/8 46/22
hard [1]   41/18
harder [3]   15/10 31/23 35/17
has [25]   4/23 10/6 11/19 13/15
  13/15 13/24 14/6 17/14 17/19
  21/13 21/14 22/24 24/1 30/15
  30/19 38/15 38/25 40/18 42/9
  42/21 43/7 43/18 44/3 44/13 44/22
HASSARD [2]   2/2 4/12
have [31]   4/14 4/25 6/8 8/6 8/7
  8/9 8/14 8/19 8/22 9/16 11/1
  11/16 12/3 13/9 14/4 19/11 22/20
  27/16 28/23 29/5 29/9 37/9 37/10
  37/10 38/16 39/15 40/10 41/15
  41/23 42/11 47/2
haven't [2]   10/23 10/24
he [11]   32/14 32/22 34/22 35/7
  35/22 36/13 36/13 36/14 36/15
  36/17 36/23
head [1]   46/24
hear [2]   10/17 41/20
heard [7]   29/5 32/21 34/10 35/20
  36/9 36/10 37/19
hearsay [4]   10/11 10/15 10/19
  21/25
held [26]   12/7 12/8 12/11 12/12
  12/16 12/17 12/21 12/22 13/1 13/2
  13/4 23/16 23/18 27/22 42/17
  42/18 43/3 43/3 43/13 43/13 43/14
  43/23 43/24 44/9 44/10 44/18
hello [2]   46/22 47/1
here [11]   10/3 19/20 20/1 22/24
  24/20 26/2 30/10 30/18 32/1 32/9
  33/12
him [1]   35/22
his [20]   11/23 11/24 31/2 31/2
  31/4 31/5 34/18 35/7 35/16 35/21
  35/25 36/4 36/15 37/4 38/17 38/17
  38/17 38/18 39/9 39/15
holding [1]   33/24
Honor [61]
HONORABLE [1]   1/9
hopefully [1]   10/8
housekeeping [1]   38/12
how [18]   5/5 5/16 5/19 6/12 22/23
  26/18 30/3 30/12 30/13 33/18
  33/19 35/21 42/24 43/10 43/21
  44/6 44/16 47/5
however [1]   13/20
huge [1]   36/25

**I**

I invited [1]   8/10
I'd [2]   19/5 26/6
I'm [4]   8/5 9/1 14/18 45/3
idea [1]   30/25
identified [3]   13/5 18/24 44/18
identify [3]   25/13 26/4 35/18
illegal [3]   30/14 31/25 32/3
immediately [1]   10/20
important [1]   47/5
include [5]   12/5 15/8 15/11 16/24
  31/22
includes [20]   15/1 15/16 15/20
  15/22 15/25 16/4 16/8 16/10 16/14
  29/23 31/8 31/9 31/11 31/14 31/16
  31/20 32/2 32/6 33/2 33/5
including [1]   33/8
incredibly [1]   47/4
indicted [1]   29/16
indictment [16]   11/16 17/5 29/17
  29/20 42/19 42/22 43/5 43/8 43/16
  43/19 44/1 44/4 44/11 44/14 44/20
  44/23
indirect [1]   20/2

**K**

Karl [1]   36/12
kind [1]   36/1
kinds [1]   29/24
know [3]   41/14 41/20 47/12
known [4]   6/8 26/20 26/22 33/16
Kraken [50]

**L**

L-U-K-E [1]   18/17
large [2]   19/10 22/22
last [3]   10/17 26/20 26/22
later [1]   17/18
launder [5]   5/9 5/13 30/4 34/8
  34/17
laundered [3]   15/2 15/12 36/24
launderer [3]   15/4 31/10 31/20
launderer's [1]   31/17

indirectly [2]   20/13 20/17
individual [3]   33/10 34/2 34/3
indulgence [1]   29/7
innocence [3]   13/18 17/6 17/11
input [1]   33/9
instance [2]   39/1 39/14
instructed [5]   17/3 17/13 30/19
  31/6 32/10
instruction [3]   9/10 9/11 38/7
instructions [18]   8/1 8/10 8/15
  8/17 9/7 9/14 9/18 11/5 11/8
  16/20 16/21 16/24 16/25 18/1 38/3
  38/8 40/14 41/13
insulted [1]   46/24
insure [1]   29/12
intend [1]   10/14
intended [1]   6/9
interest [1]   11/24
invited [1]   8/10
involved [36]   6/7 14/15 14/25
  15/15 15/19 15/21 15/24 16/1 16/4
  16/7 16/9 29/15 30/23 30/25 31/6
  31/11 31/13 31/16 31/19 32/1 32/4
  32/7 32/11 35/8 35/10 36/2 36/8
  37/14 42/20 43/6 43/17 44/1 44/12
  44/21 46/17 47/14
IRS [6]   21/18 21/19 22/6 22/24
  36/11 41/1
is [142]
isn't [1]   41/14
issue [3]   8/4 8/5 38/2
it [62]
item [2]   14/19 14/22
items [2]   12/4 12/5
its [10]   13/15 13/19 13/21 14/4
  14/6 16/3 30/15 33/7 40/7 40/9
itself [2]   15/9 34/7

**J**

JEFFREY [2]   1/18 4/8
joining [1]   4/12
JUDGE [6]   1/10 30/19 30/22 31/6
  31/24 32/10
July [6]   21/7 39/21 39/23 40/6
  40/8 40/10
July 15th [3]   39/21 39/23 40/6
juror [27]   6/17 6/17 6/20 6/22
  6/24 7/1 7/3 7/5 7/7 7/9 7/11
  7/13 7/15 7/17 45/9 45/13 45/15
  45/17 45/19 45/21 45/23 45/25
  46/2 46/4 46/6 46/8 46/10
jurors [1]   6/17
jury [50]
jury's [1]   42/15
just [29]   4/14 6/18 9/14 9/22
  10/8 10/12 10/17 10/24 24/19
  27/21 30/2 30/21 31/8 31/15 32/6
  32/20 34/5 37/19 37/20 38/8 38/12
  38/15 39/6 40/13 40/25 44/25
  45/10 46/22 47/1
Just a [1]   38/12
JUSTICE [2]   1/13 1/20

**L**

laundering [29]  5/6 5/17 5/23 14/10 14/11 15/1 15/6 15/8 15/10 15/12 15/14 15/16 15/19 15/23 16/7 16/12 30/13 30/23 31/7 31/10 31/25 33/20 35/8 35/13 35/15 36/2 36/9 36/10 37/7
law [5]  2/3 6/4 10/10 10/11 16/3
laws [1]  11/25
lawyers [2]  7/25 8/2
layered [1]  35/24
layering [1]  35/13
leads [1]  13/25
least [3]  9/10 18/3 39/12
leave [1]  46/25
lengthy [1]  46/17
let [10]  4/14 14/7 23/12 25/25 38/1 38/20 39/13 41/14 41/20 45/9
Let's [2]  4/20 11/12
letters [1]  25/13
license [2]  5/24 6/13
lifetime [2]  32/25 33/7
light [1]  13/24
like [11]  19/5 19/19 21/12 22/17 25/17 26/6 28/23 32/16 35/24 38/23 41/24
likely [1]  14/1
limited [2]  15/18 16/24
LINDSAY [3]  2/6 48/3 48/12
line [2]  22/13 22/15
linked [1]  37/22
list [3]  25/11 33/11 33/13
listed [5]  22/14 23/8 25/14 29/13 29/21
listened [1]  37/10
listing [1]  22/13
little [1]  47/18
loaded [1]  40/18
LocalBitcoin [2]  20/8 35/3
LocalBitcoins [5]  20/5 20/9 34/20 34/21 35/12
look [7]  8/19 10/23 10/25 37/21 38/8 40/14 41/12
looked [3]  10/24 34/19 34/22
looking [2]  9/4 19/25
looks [2]  8/21 22/17
lower [1]  13/17
LTD [12]  12/12 12/18 20/23 20/24 21/2 34/15 36/4 36/8 42/19 43/4 43/15 44/10
Luke [5]  3/3 18/7 18/8 18/17 32/22
Lumens [1]  23/6

**M**

machinery [1]  34/7
made [1]  35/17
main [1]  22/24
maintained [3]  15/22 16/11 16/14
majority [2]  35/5 37/19
make [9]  10/13 13/13 14/4 15/9 23/2 29/2 31/23 33/19 37/23
making [2]  30/20 37/22
manner [1]  47/15
many [1]  26/18
March [2]  1/5 8/11
March 8th [1]  8/11
marked [2]  21/14 24/1
Marx [1]  36/12
materials [2]  39/3 39/10
Matt [1]  36/11
matter [4]  12/5 17/15 40/5 48/5
may [12]  15/8 15/11 17/8 17/10 18/6 18/11 22/1 24/14 27/5 27/6 36/25 38/13
maybe [6]  9/25 10/5 32/14 32/15 39/16 41/11
me [12]  4/7 4/12 4/14 8/21 14/7 23/12 25/25 38/21 39/4 41/14 41/24 45/9
mean [1]  32/12

means [3]  11/22 13/23 32/12
meet [1]  13/19
members [4]  4/22 7/20 11/14 29/9
memo [3]  22/6 22/9 23/8
memorandum [5]  21/18 21/19 40/8 40/9 41/2
memorialize [1]  24/6
memorializing [1]  22/6
met [2]  13/15 14/6
MICHAEL [2]  2/2 4/12
might [1]  40/11
million [4]  26/17 33/1 33/2 33/4
minute [1]  46/25
minutes [2]  7/25 9/25
MISCELLANY [1]  3/6
mix [6]  21/10 27/24 28/5 28/10 28/13 34/8
mixing [1]  33/20
moment [1]  39/25
Monero [8]  12/24 23/6 28/4 28/5 28/6 28/8 29/25 44/7
money [52]
monitors [1]  19/8
month [1]  37/9
Moon [20]  12/8 12/12 12/18 12/22 13/2 20/23 20/24 21/2 34/15 34/15 36/4 36/8 36/10 36/11 36/25 42/18 43/4 43/15 43/25 44/10
more [11]  7/20 14/1 29/10 33/1 33/2 33/4 33/14 33/17 35/1 46/23 47/3
morning [6]  4/9 4/10 4/13 18/15 27/3 27/4
MOSS [6]  1/9 30/19 30/22 31/6 31/24 32/10
mostly [2]  36/5 37/20
motion [1]  39/17
move [1]  29/6
moved [1]  35/12
moves [2]  21/22 24/10
Mr [25]  3/4 3/4 3/7 3/7 9/25 10/5 18/15 21/4 21/14 22/6 24/19 24/23 25/2 26/10 27/3 27/9 30/9 30/18 33/11 33/17 33/20 34/11 34/19 34/23 35/14
Mr. [29]  10/2 10/16 10/18 18/6 18/11 18/19 18/23 19/2 19/20 20/5 20/19 20/25 23/12 24/22 26/25 27/10 27/15 27/22 28/24 29/1 30/2 34/18 37/16 37/19 38/15 39/24 40/10 40/23 41/9
Mr. Brown [5]  10/18 18/6 18/11 29/1 37/19
Mr. Ekeland [9]  10/2 10/16 26/25 28/24 37/16 39/24 40/10 40/23 41/9
Mr. Scholl [2]  23/12 34/18
Mr. Scholl's [1]  30/2
Mr. Sterlingov [3]  20/25 27/22 38/15
Mr. Sterlingov's [9]  18/19 18/23 19/2 19/20 20/5 20/19 24/22 27/10 27/15
much [4]  34/20 38/24 46/16 47/16
multiple [2]  25/24 35/16
must [7]  11/17 12/1 13/7 14/22 17/6 17/22 17/22
my [9]  8/12 18/17 23/24 38/3 38/6 39/25 40/13 41/18 47/2

**N**

N.W [1]  1/16
name [29]  4/5 12/7 12/8 12/11 12/12 12/16 12/17 12/21 12/22 13/1 13/2 18/17 19/23 19/24 20/22 25/16 34/13 34/14 36/12 42/17 42/18 43/3 43/4 43/14 43/15 43/24 43/24 44/9 44/10
named [6]  42/19 43/4 43/15 43/25 44/11 44/19
necessarily [1]  27/14
necessity [1]  17/1

need [2]  13/21 47/18
needs [2]  8/16 40/17
never [2]  27/10 27/16
nevermind [1]  27/20
new [3]  1/20 21/13 41/1
NEXT [1]  1/23
no [22]  1/4 4/16 9/8 11/21 22/3 24/13 24/16 26/24 27/25 28/16 28/19 28/22 28/25 29/12 36/16 41/4 41/15 42/1 46/14 46/15 47/10 47/11
nonfunctional [1]  36/20
not [23]  8/11 8/12 8/23 9/17 14/1 14/6 14/23 15/8 15/18 16/24 17/6 21/13 23/2 27/18 28/6 31/15 32/6 36/25 38/16 39/5 39/5 40/11 46/20
noted [1]  22/24
notes [2]  38/17 38/17
Nothing [2]  41/8 41/10
notice [1]  29/18
noticed [1]  35/11
now [16]  6/16 9/14 11/17 12/1 13/7 18/6 19/11 21/4 23/10 25/9 25/19 29/6 30/2 32/19 32/20 35/11
number [43]  6/20 6/22 6/24 7/1 7/3 7/5 7/7 7/9 7/11 7/13 7/15 7/17 12/6 12/8 12/10 12/12 12/16 12/17 12/22 13/2 42/18 43/2 43/3 43/13 43/14 43/23 43/24 44/9 44/10 45/6 45/7 45/13 45/15 45/17 45/19 45/21 45/23 45/25 46/2 46/4 46/6 46/8 46/10
numbers [3]  12/21 12/25 38/23
NW [3]  1/14 1/20 2/8
NY [1]  2/4

**O**

objection [4]  11/1 21/24 24/12 24/13
obtained [1]  28/7
off [2]  34/2 41/12
offense [32]  6/9 8/24 13/13 14/15 15/1 15/6 15/8 15/10 15/13 15/19 15/21 15/25 16/8 16/9 16/13 16/17 30/24 30/25 31/7 31/11 31/13 31/16 31/19 31/23 32/4 32/12 42/20 43/6 43/17 44/2 44/12 44/21
offenses [10]  8/23 13/13 35/9 36/2 42/21 43/6 43/17 44/2 44/12 44/21
offered [3]  17/9 17/10 17/12
Official [3]  2/7 48/3 48/13
often [1]  25/18
Okay [7]  4/17 6/16 9/3 10/2 40/2 42/3 42/13
one [20]  7/20 8/20 10/14 10/19 11/21 16/18 19/20 26/1 26/4 27/16 29/10 29/12 33/13 34/4 34/13 36/16 37/12 39/25 45/10 45/10
ones [1]  40/25
online [3]  39/6 39/6 39/7
only [5]  8/16 8/23 13/21 17/18 37/13
open [1]  38/25
opened [1]  36/19
operate [1]  20/25
operated [4]  5/23 6/2 6/6 33/21
operating [9]  5/20 14/12 16/2 30/5 32/5 32/9 32/13 35/7 36/6
operation [2]  16/1 32/8
Operations [1]  32/22
opportunity [2]  8/2 40/10
opposite [1]  14/3
orient [1]  9/10
original [1]  34/4
originally [1]  33/21
other [10]  15/2 16/21 23/4 27/17 29/5 31/9 33/7 33/19 34/14 39/10
otherwise [5]  8/18 15/17 29/15 32/3 41/21
our [3]  9/22 47/5 47/5
out [18]  8/1 8/8 14/20 19/8 19/20

**O**

out... [13]  31/3 32/20 33/3 33/4 33/6 34/1 34/8 38/5 38/7 41/14 41/18 46/24 47/7
outlined [1]  10/6
output [1]  33/10
over [2]  37/9 37/11
own [1]  35/16
ownership [1]  11/24

**P**

p.m [5]  38/5 41/22 42/6 47/7 47/24
page [4]  1/23 19/19 20/7 20/18
pages [1]  24/1
paid [3]  15/3 36/13 36/17
part [4]  14/9 15/8 17/5 29/13
parties [3]  17/9 39/20 39/21
pass [3]  5/1 8/15 42/12
passed [1]  16/5
passports [3]  39/9 39/10 39/15
passwords [2]  38/18 38/22
past [1]  37/9
Pause [2]  19/7 40/15
payment [2]  36/15 36/17
payments [1]  34/2
PEARLMAN [2]  1/18 4/8
peel [1]  34/1
PELKER [2]  1/13 4/8
penalty [1]  11/25
pending [1]  39/12
Pennsylvania [1]  1/14
percent [4]  31/15 31/18 32/7 33/8
perform [1]  11/17
period [3]  16/2 16/6 32/8
personal [14]  6/18 14/15 14/25 15/24 34/13 36/4 38/22 42/20 43/5 43/16 44/1 44/12 44/21 45/11
perspective [1]  40/22
phase [8]  10/9 13/18 17/11 17/12 18/3 18/4 29/11 38/4
phrase [5]  11/10 14/25 15/21 15/24 16/9
pick [1]  46/25
piggy [1]  36/20
PII [1]  38/21
Plaintiff [2]  1/4 1/13
plan [1]  9/22
plausible [1]  37/2
play [1]  25/25
please [5]  4/4 5/4 18/10 18/16 42/14
PLLC [1]  2/3
podium [1]  4/4
point [3]  16/17 46/21 47/19
poll [3]  4/15 4/18 41/24
portion [1]  47/4
position [1]  27/13
possible [3]  33/20 38/16 38/25
preliminary [1]  9/10
preponderance [3]  13/16 13/21 13/23
present [6]  4/11 8/3 8/3 9/20 9/21 9/23
presentation [1]  29/4
presentations [1]  18/4
pressing [1]  35/22
pretrial [1]  10/11
previous [2]  16/24 17/3
previously [2]  16/20 40/19
Price [1]  36/11
Price's [1]  36/18
primary [1]  34/24
principles [1]  30/19
print [1]  38/6
printing [1]  41/18
probably [1]  35/11
proceed [2]  18/11 27/5
proceeding [3]  10/12 17/5 38/4
proceedings [3]  42/10 47/24 48/5
proceeds [17]  15/23 16/11 16/13

16/15 16/15 16/17 16/17 16/18 29/14 31/1 31/2 31/4 31/8 31/8 35/7 36/6 37/5
process [2]  10/3 34/7
produce [1]  24/25
professionalism [1]  47/15
profits [8]  11/22 29/12 30/5 30/12 31/2 31/18 34/17 35/7
promote [1]  6/10
promptly [1]  38/2
proof [4]  9/11 13/21 14/6 16/22
properties [10]  14/17 29/14 29/18 29/20 29/21 29/22 29/22 30/16 32/19 37/14
property [71]
proposed [1]  10/21
protected [1]  38/19
prove [1]  13/24
provide [3]  8/2 14/21 37/1
provided [2]  29/18 33/11
provides [1]  14/9
public [2]  38/19 38/25
publically [1]  39/3
publish [2]  21/22 24/10
published [3]  22/2 24/15 39/6
pull [1]  19/8
punishment [1]  17/17
purchased [1]  32/18
purchasing [1]  28/8
purportedly [1]  34/14
purporting [1]  20/25
purpose [3]  11/21 16/3 29/11
pursuant [1]  14/7
put [7]  11/5 11/6 11/6 11/7 14/1 14/2 40/5

**Q**

question [4]  9/20 12/1 13/8 17/23
questions [3]  26/24 28/16 35/24
quick [2]  8/19 38/8

**R**

raise [2]  11/2 40/12
RANDOLPH [1]  1/9
reach [1]  17/22
reached [2]  4/24 42/9
reaching [1]  17/1
Reactor [1]  25/8
read [3]  6/18 9/14 11/5
ready [4]  18/12 40/21 42/4 42/5
real [9]  14/15 14/25 15/24 42/20 43/5 43/16 44/1 44/12 44/20
reason [1]  35/11
reasonable [1]  13/20
recall [5]  25/3 25/19 26/10 30/1 30/8
receipt [1]  24/21
receive [2]  30/4 34/16
received [3]  23/21 33/1 33/6
receiving [1]  34/6
Recess [1]  41/22
recognize [2]  21/14 24/2
reconsider [1]  17/6
record [7]  4/5 9/5 9/24 10/22 44/25 47/20 48/5
recording [1]  18/2
records [2]  10/14 18/23
redacted [2]  39/3 39/8
redirect [2]  28/18 28/19
referred [3]  25/18 45/1 45/6
referring [2]  45/2 45/7
regarded [1]  16/16
regardless [1]  16/3
reintroduce [1]  18/16
relating [1]  30/9
relation [3]  27/9 27/21 27/21
relative [1]  37/1
relevant [2]  14/9 16/6
reliable [1]  10/11
rely [1]  30/17
remain [2]  16/18 39/10
remarks [1]  29/1

remember [2]  21/8 35/21
remind [1]  26/20
render [3]  11/18 12/1 13/7
Reporter [4]  2/6 2/7 48/3 48/13
represents [2]  6/18 45/10
request [1]  4/17
requesting [1]  4/15
required [11]  12/10 12/15 12/20 12/25 13/12 13/19 43/1 43/12 43/22 44/8 46/17
requirements [1]  6/4
requisite [1]  17/19
respect [17]  5/5 5/16 5/19 6/12 8/3 8/21 10/3 39/9 41/25 42/9 42/15 42/24 43/10 44/6 44/17 45/11 47/21
respond [1]  40/11
rest [1]  47/18
return [1]  37/13
review [6]  24/19 30/3 30/3 30/12 30/21 40/21
reviewed [1]  19/16
right [31]  4/9 4/13 4/20 4/22 5/3 7/19 8/7 8/9 9/6 10/7 10/16 11/12 18/11 18/15 26/25 28/17 28/20 29/9 37/16 37/25 38/1 39/24 41/14 41/21 41/23 42/3 42/7 46/12 47/8 47/12 47/22
robber [1]  31/1
robs [1]  31/1
role [1]  25/25
ROMAN [31]  1/6 4/3 4/11 12/7 12/8 12/11 12/13 12/16 12/18 12/21 12/23 13/1 13/3 19/24 34/13 42/17 42/19 42/21 43/3 43/4 43/7 43/14 43/15 43/18 43/24 43/25 44/2 44/9 44/10 44/13 44/22
room [7]  2/8 7/24 9/16 38/2 41/16 46/21 46/25
root [4]  13/5 25/18 33/16 44/18
Rovensky [1]  34/11
row [1]  26/5
RPR [1]  48/12
running [1]  34/17

**S**

S-C-H-O-L-L [1]  18/17
said [2]  10/18 26/20
same [2]  26/5 32/4
saw [1]  36/15
say [5]  37/19 37/22 39/5 46/22 47/1
scale [2]  14/3 14/4
Scholl [26]  3/3 9/25 10/5 18/7 18/8 18/15 18/17 21/4 21/14 22/6 23/12 24/19 24/23 25/2 26/10 27/3 27/9 32/22 33/11 33/17 33/20 34/11 34/18 34/19 34/23 35/14
Scholl's [3]  30/2 30/9 30/18
screen [4]  19/10 23/25 24/20 26/2
scroll [1]  22/9
seal [1]  38/22
sealed [1]  38/18
seated [1]  18/10
second [8]  12/9 15/3 19/19 20/19 31/16 35/11 36/1 36/3
section [7]  5/10 5/13 14/8 14/8 14/11 14/12 14/14
see [4]  26/1 27/11 37/21 46/20
seek [1]  17/6
seeks [1]  12/4
seem [1]  36/14
seen [2]  10/24 37/9
seize [1]  23/13
seized [16]  7/22 12/6 12/10 12/15 12/20 12/25 22/10 23/5 23/19 24/22 29/22 42/16 43/1 43/12 43/23 44/8
seizure [10]  21/4 21/7 21/9 21/18 21/20 22/6 23/17 23/23 24/23 41/2
seizures [3]  22/18 22/21 23/13
self [2]  35/15 36/9

**S**

selling [1]  28/7
send [8]  8/4 9/15 9/19 11/8 17/25 34/8 38/9 41/16
sending [3]  33/3 34/6 35/16
sent [8]  31/14 33/1 33/4 33/6 33/22 34/1 40/19 40/20
sentencing [5]  10/10 39/19 40/5 40/8 40/9
separate [1]  22/21
served [1]  23/17
service [11]  8/5 20/25 30/8 34/15 36/12 36/13 46/17 46/23 47/3 47/6 47/17
set [2]  14/20 39/19
several [2]  19/16 25/13
shall [2]  14/14 39/19
shape [1]  8/18
she [1]  40/16
SHERRY [3]  2/6 48/3 48/12
shorthand [3]  42/17 43/2 43/13
should [6]  7/23 11/4 11/5 13/14 39/2 39/8
show [2]  22/10 25/10
showed [2]  34/16 40/25
showing [1]  30/16
shown [1]  24/20
shows [1]  25/11
side [1]  14/4
sides [2]  14/3 47/17
sign [1]  36/11
Similar [1]  36/4
Similarly [1]  17/15
since [1]  33/3
sincere [1]  47/2
single [1]  33/13
sir [46]  18/20 19/3 19/15 19/18 19/22 20/6 20/21 21/6 21/11 21/16 21/21 22/8 22/12 22/16 22/19 22/22 23/6 23/9 23/15 23/18 23/21 23/24 24/3 24/8 25/1 25/5 25/11 25/15 25/18 25/21 26/3 26/5 26/11 26/13 26/19 26/22 27/4 27/13 27/18 27/23 27/25 28/6 28/8 28/11 28/14 45/16
sitting [1]  36/17
six [3]  12/5 29/21 37/14
sixth [1]  13/4
slightly [1]  14/4
so [46]  4/14 6/16 6/20 7/20 8/9 8/12 10/12 10/13 10/24 14/7 18/3 18/6 19/19 20/12 22/1 23/25 28/20 31/13 32/6 33/5 33/22 34/5 35/4 35/14 36/1 36/19 37/2 37/4 38/1 38/6 38/8 38/15 38/22 39/7 39/9 40/5 40/21 40/24 41/11 42/3 45/9 46/18 47/5 47/16 47/17 47/20
software [1]  36/14
some [5]  27/22 31/9 35/24 37/20 38/18
somebody [1]  31/3
someone [2]  16/15 39/6
something [5]  29/17 30/22 33/21 39/8 41/20
sorry [4]  8/6 9/1 14/18 45/3
sort [3]  9/10 22/14 33/24
sounds [1]  21/8
source [17]  18/19 18/21 19/1 19/3 19/14 19/16 19/25 20/2 20/8 20/9 20/19 21/1 21/3 27/11 34/18 34/24 35/18
sourced [2]  35/1 35/4
sources [1]  20/1
special [10]  11/18 14/20 18/1 25/16 34/11 36/11 36/18 38/3 38/7 40/14
Specialist [1]  32/22
specific [10]  12/2 13/8 13/12 15/18 16/4 17/20 17/23 24/7 29/21 32/19
spend [1]  36/23

spending [2]  35/17 36/21
Staff [1]  32/22
stage [2]  13/18 13/20
stand [5]  4/23 5/4 10/1 42/8 42/14
standard [2]  13/17 16/22
start [4]  14/7 19/20 30/25 32/19
starting [2]  4/5 22/13
state [1]  4/4
STATES [8]  1/1 1/3 1/10 4/3 11/20 14/9 14/11 14/14
Stellar [6]  12/19 23/6 28/9 28/10 29/25 43/22
step [4]  7/21 7/24 8/6 41/11
STERLINGOV [24]  1/6 4/3 4/11 12/7 12/11 12/17 12/21 13/1 19/24 20/25 27/22 34/13 38/15 42/18 42/21 43/3 43/7 43/14 43/18 43/24 44/2 44/9 44/13 44/22
Sterlingov's [9]  18/19 18/23 19/2 19/20 20/5 20/19 24/22 27/10 27/15
still [2]  36/17 47/1
streamline [1]  10/8
Street [2]  1/16 2/3
strikes [1]  38/21
subject [7]  11/19 13/14 17/21 29/19 31/12 32/17 37/15
submit [4]  8/10 8/11 8/12 8/12
submitted [1]  8/21
substantial [10]  19/1 19/3 20/1 20/2 20/8 20/9 21/1 21/3 34/24 47/3
substantially [1]  35/4
such [4]  14/15 14/16 15/22 16/10
suggest [1]  9/9
Suite [1]  1/17
summary [3]  19/15 26/9 26/12
supplement [2]  9/23 10/22
supplemental [1]  16/22
support [1]  6/10
suppose [1]  39/10
sure [3]  10/13 23/2 47/18
sweep [1]  33/23
sworn [1]  18/8
system [3]  47/5 47/5 47/17

**T**

table [3]  2/10 4/7 4/12
take [7]  10/23 10/24 23/10 25/2 26/6 37/12 38/8
taken [2]  17/17 41/22
takes [2]  15/15 31/25
taking [1]  18/4
talk [1]  7/25
task [4]  8/1 11/17 29/10 37/12
technique [1]  35/14
telephone [1]  38/23
test [3]  22/23 22/24 23/1
testified [13]  25/3 26/16 27/9 27/21 28/4 28/9 28/12 33/17 33/20 34/12 34/18 34/23 35/14
testify [1]  18/18
testifying [1]  25/19
testimony [11]  26/14 30/1 30/2 30/10 30/18 32/21 34/10 35/20 36/9 36/18 37/10
than [9]  14/1 16/21 31/8 33/1 33/2 33/4 33/14 35/1 46/23
thank [16]  7/19 8/5 18/10 19/11 27/7 28/17 37/24 37/25 41/21 46/16 47/5 47/6 47/12 47/15 47/17 47/23
thanks [2]  47/2 47/2
that [174]
That's [1]  28/11
their [6]  4/5 6/18 6/18 23/7 29/12 40/20
them [17]  8/19 9/15 9/15 9/16 9/16 10/23 10/24 10/24 11/5 24/25 35/16 35/17 35/17 38/19 39/13 40/20 41/18

then [20]  8/1 8/4 11/2 14/6 20/18 22/24 23/10 27/21 32/1 32/16 33/25 34/1 34/22 35/13 36/3 36/23 39/19 41/2 41/6 41/15
theory [1]  9/15
there [26]  7/20 8/17 8/22 9/17 10/13 12/2 13/8 20/4 20/6 20/12 22/17 22/19 22/21 23/2 25/16 29/1 33/3 34/25 35/2 36/3 38/21 39/2 39/8 40/16 41/13 47/1
these [12]  9/18 16/23 17/21 17/25 23/12 23/14 30/1 30/16 34/21 36/6 37/4 37/14
they [17]  8/3 8/11 8/11 8/18 9/16 16/18 19/11 21/11 23/9 23/15 25/1 27/14 32/17 33/25 37/6 39/10 40/24
thing [4]  8/16 10/17 16/18 39/16
things [2]  38/23 39/2
think [7]  8/18 8/23 10/6 38/23 38/24 40/24 41/13
third [3]  12/14 15/5 31/19
this [80]
those [15]  11/16 18/24 22/7 22/11 23/8 24/24 27/19 28/2 29/20 30/21 32/16 34/19 35/6 41/17 45/11
thought [1]  9/13
Thousands [1]  36/24
through [25]  5/4 8/7 8/25 9/2 11/9 11/15 15/17 16/5 27/11 27/16 28/2 28/7 29/22 30/11 31/14 32/2 32/9 33/21 34/6 34/8 35/16 35/25 36/24 39/1 45/9
Thus [2]  17/5 17/9
time [14]  9/18 11/2 16/1 16/6 17/9 17/18 18/4 21/9 23/12 23/22 32/8 39/11 44/25 47/4
tip [1]  14/4
Title [2]  14/8 14/10
today [2]  30/10 30/18
together [2]  17/1 24/25
told [3]  30/22 31/24 32/22
top [2]  22/13 22/15
TOR [3]  2/2 2/3 4/10
total [2]  20/14 37/1
totaling [2]  35/1 35/2
totals [1]  23/7
traceable [11]  14/16 15/20 15/21 16/8 16/10 16/13 16/16 32/11 32/17 34/22 35/6
traced [3]  18/24 27/10 27/16
tracing [1]  32/11
tracked [1]  36/15
traded [1]  27/25
trades [1]  28/2
trading [1]  28/15
transaction [4]  15/9 22/23 31/10 31/12
transactions [6]  15/18 16/4 27/10 31/14 33/8 33/10
transcript [2]  1/9 48/4
transfer [11]  20/4 22/24 22/25 23/1 24/5 24/6 24/7 24/8 24/21 33/23 41/2
transferring [1]  22/22
transfers [1]  20/2
transmission [2]  6/8 6/13
transmitter [1]  35/9
transmitting [15]  5/20 5/23 5/24 6/3 6/4 6/7 14/13 15/25 16/5 16/8 30/14 30/24 31/7 32/5 37/7
transportation [1]  6/7
Treasury [2]  24/8 24/22
tremendous [1]  47/14
trial [28]  1/9 9/24 13/18 17/9 17/11 17/12 18/18 19/6 25/2 25/9 25/10 26/8 26/14 26/16 27/9 29/11 29/13 30/2 30/8 30/18 32/20 33/18 34/12 34/16 35/14 35/20 36/9 36/18
tried [1]  36/11
true [3]  14/1 14/1 48/4

**T**

**trying [1]** 35/15
**tumblers [1]** 35/23
**turn [3]** 19/10 35/4 37/12
**two [18]** 10/14 10/21 19/20 21/5 21/9 22/7 22/17 22/21 24/1 24/25 26/5 29/23 34/10 34/12 34/19 34/23 40/19 47/1
**TX [1]** 45/3
**typographical [1]** 23/2

**U**

**U.S [2]** 1/13 2/7
**U.S.C [5]** 5/9 5/13 14/7 14/12 14/14
**unanimous [4]** 4/24 17/1 17/22 17/23
**unanimously [2]** 5/8 5/22
**uncomfortable [1]** 35/23
**under [3]** 6/4 14/18 38/24
**underlying [2]** 15/23 16/12
**understand [2]** 30/24 45/1
**understanding [3]** 10/13 22/20 23/24
**undertake [1]** 23/1
**undertaking [1]** 47/13
**UNITED [8]** 1/1 1/3 1/10 4/2 11/20 14/8 14/10 14/14
**unlawful [1]** 6/10
**unlicensed [10]** 5/20 14/13 15/25 16/5 16/7 30/23 31/7 32/5 35/9 37/7
**untainted [1]** 15/11
**up [7]** 23/12 26/1 36/11 36/20 40/1 40/18 46/25
**us [7]** 1/20 19/10 20/14 20/14 29/24 32/16 41/17
**USAO [1]** 1/16
**use [3]** 18/2 42/17 43/2
**used [16]** 6/10 15/5 15/7 15/9 25/23 30/4 30/7 30/13 31/22 32/14 33/19 34/7 34/16 35/23 36/20 37/6
**user [1]** 25/24
**user's [1]** 33/25
**users [2]** 33/22 34/3
**uses [1]** 16/15
**using [2]** 36/12 36/13

**V**

**value [4]** 20/11 20/11 20/14 20/14
**values [1]** 23/8
**various [1]** 29/24
**verdict [30]** 4/14 4/24 5/1 6/17 6/18 6/18 8/20 9/5 10/20 11/8 11/15 12/1 13/7 14/20 17/2 17/21 17/23 17/23 18/2 18/2 37/13 38/3 38/7 40/14 41/12 41/23 42/9 45/10 45/11 47/21
**verdicts [1]** 11/18
**version [1]** 11/7
**versus [1]** 4/3
**very [5]** 9/23 37/23 46/16 46/18 47/16
**view [1]** 11/14
**views [1]** 10/3
**violation [6]** 5/9 5/13 14/10 14/11 14/13 16/2
**violations [1]** 11/25
**VPN [5]** 20/25 34/15 36/10 36/11 37/4
**vs [1]** 1/5

**W**

**waiting [1]** 39/25
**walk [1]** 30/11
**walks [1]** 31/1
**Wall [1]** 2/3
**wallet [2]** 13/5 44/18
**want [8]** 7/25 8/3 9/20 18/5 19/10 29/1 32/19 46/21
**wanted [3]** 8/11 10/12 30/21

**wants [2]** 11/6 11/7
**warrant [2]** 23/17 24/24
**was [71]**
**Washington [5]** 1/5 1/14 1/17 1/21 2/9
**wasn't [2]** 34/5 37/22
**way [4]** 27/17 36/1 38/18 40/10
**we [40]** 4/14 4/14 4/25 8/7 8/19 9/13 9/15 9/18 9/24 10/4 10/10 10/13 10/23 11/4 11/9 11/9 18/3 20/7 22/9 22/23 23/10 25/2 26/6 37/11 37/12 37/20 38/9 39/19 40/3 40/17 41/7 41/14 41/15 41/20 41/20 41/23 42/4 42/5 42/11 47/8
**we'll [5]** 5/4 7/25 8/22 11/7 29/6
**welcome [3]** 4/22 39/1 46/24
**well [14]** 4/13 14/21 17/11 18/1 28/9 29/24 30/9 30/18 38/20 39/14 46/16 47/12 47/17 47/21
**went [1]** 36/15
**were [28]** 6/8 6/9 8/17 9/9 11/16 14/2 20/1 20/12 20/13 20/15 22/10 23/5 23/18 28/2 29/15 29/18 30/4 33/6 33/25 34/16 34/21 34/25 35/2 35/4 37/6 37/14 37/20 41/17
**what [39]** 6/16 7/23 9/13 10/2 12/1 13/7 13/25 17/13 18/21 19/1 19/23 20/1 20/7 20/22 20/24 21/1 21/14 21/17 22/14 23/4 23/16 23/19 23/25 24/4 24/19 25/6 25/10 25/13 25/22 25/25 26/14 26/20 31/4 32/12 36/19 37/21 37/22 41/11 42/15
**when [12]** 9/18 9/18 18/12 22/22 23/17 24/23 29/16 31/20 31/24 32/8 33/22 41/20
**where [4]** 35/21 36/15 37/3 39/6
**Whereupon [2]** 22/3 24/16
**whether [11]** 6/17 7/22 12/2 13/8 14/23 16/3 17/18 29/13 30/15 35/22 45/10
**which [34]** 8/17 8/20 8/21 9/19 10/14 10/18 10/19 12/3 13/9 13/13 13/17 13/24 14/20 19/6 21/13 21/13 22/10 24/1 24/1 25/9 26/4 26/7 33/9 35/4 36/14 40/24 41/1 41/2 42/21 43/6 43/17 44/2 44/13 44/21
**while [4]** 9/4 16/2 17/8 40/16
**who [2]** 4/11 47/1
**whoever [1]** 14/9
**why [4]** 22/20 22/20 23/1 29/19
**will [32]** 8/1 8/18 9/4 10/23 10/24 11/8 11/23 14/20 16/22 17/16 17/17 17/25 29/13 30/1 30/3 30/8 30/11 30/20 38/1 38/2 38/20 39/5 39/10 39/13 40/7 41/11 41/11 41/14 41/20 42/3 43/2 46/25
**wire [5]** 24/5 24/6 24/7 24/21 41/2
**withdraw [1]** 36/23
**withdrawal [2]** 26/21 26/22
**withdrawals [1]** 27/19
**withdrawn [2]** 27/15 27/20
**without [2]** 5/23 6/13
**witness [2]** 18/5 28/20
**witnesses [4]** 3/2 16/25 28/21 28/23
**won't [1]** 46/24
**words [2]** 33/7 33/19
**work [1]** 36/14
**worked [1]** 33/18
**works [1]** 47/5
**worth [2]** 33/2 36/24
**would [21]** 4/4 4/17 9/9 9/14 9/24 10/5 13/13 14/4 19/19 21/12 22/21 23/1 28/23 33/23 34/1 38/22 38/23 39/15 40/12 41/24 46/21
**wouldn't [2]** 39/7 39/14

**X**

**XT [2]** 45/3 45/4

**Y**

**yes [78]**
**yet [3]** 10/24 21/13 38/17
**York [1]** 1/20
**you [157]**
**your [97]**
**yourself [1]** 18/16

**Virtual Asset Analysis**


**UNITED STATES OF AMERICA**

**v.**

**Roman Sterlingov**


**Luke Scholl**

**Staff Operations Specialist**

**Federal Bureau of Investigation**

Signature: _____ Date: 12/8/2022

1

## Table of Contents

Section 1: Definitions .................................................................................................................3

Section 2: Attribution of the Fog Cluster...........................................................................8

Section 3: Darknet Market Exposure ...................................................................... 12

Section 4: Sterlingov Accounts........................................................................... 19

Section 5: Specific Payments ............................................................................. 35

Appx6401

## Section 1: Definitions

For this report, the FBI adopts the definition of virtual asset introduced by the Financial Action Task Force (FATF) in their June 2019 Report, titled Guidance for a Risk-Based Approach to Virtual Assets and Virtual Asset Service Providers.[1]

"Virtual asset" is a digital representation of value that can be digitally traded or transferred and can be used for payment or investment purposes.

Use of virtual assets has evolved over nearly three decades as the Internet expanded. Until 2009, all virtual assets existed in centralized systems. In the centralized model, a private company controls the virtual asset, issues units to its users, determines the virtual asset's value, records transactions, keeps track of customers' balances, and maintains records.

Bitcoin, created in 2009, used elements of cryptographic security to enable the transmission of value in a peer-to-peer network, removing the need for a centralized authority. Because of this, Bitcoin, and other virtual assets like it, are often called decentralized "cryptocurrencies".

**Address**: A digital location where virtual assets can be sent to or from. Addresses are derived from a public key but are not the same. They act as identities on a blockchain network. Bitcoin addresses are often 25 characters or longer.

**Blockchain:** A ledger organized into a series of chronological, interlinked data blocks. Many virtual assets, including Bitcoin, rely on public blockchains which allow anyone to see a record of every transaction on the network.

**Change Address:** When an address spends Bitcoin, it references a transaction on the Bitcoin blockchain in which it received the Bitcoin that it now wants to spend. In the new spending transaction, the previously received Bitcoin will be used as an "input". The input Bitcoin must be spent in its entirety. In some cases, the value of the input Bitcoin is higher than what the owner wishes to spend. In this case, the wallet creates a transaction with two outputs; one representing the payment it wishes to make and one representing the "change". The output representing the change must be sent to a Bitcoin address which the spending wallet also controls. This is known as a change address. When reviewing transaction data from the blockchain, analysis of multiple factors is required to assess which output represents the payment and which output represents the change.

---

[1] Online Publication | Financial Action Task Force | Guidance for a Risk-Based Approach to Virtual Assets and Virtual Asset Service Providers | 21 June 2019 | https://www.fatf-gafi.org/publications/fatfrecommendations/documents/guidance-rba-virtual-assets.html | accessed on 23 November 2022.

3



*Figure 1: Example change depiction.*

This is similar to creating change for purchases made in cash. Consider the example of a customer at a coffee shop purchasing a $5 coffee with a $10 bill. In this example, the $10 bill is the "input" to the transaction. This input was previously received by the customers wallet and now they would like to spend it. The customer must "spend" the whole bill and cannot simply rip the $10 bill in half, the same way a Bitcoin wallet must spend the whole input to a transaction. In the coffee shop transaction, the cashier provides a $5 bill as change which returns to the customer's wallet. With Bitcoin, the customer makes their own change by creating a transaction with two outputs; one output to an address controlled by the coffee shop (the payment), and one output to an address in the customer's own wallet (the change).

Different wallet software have different methods for how they handle change addresses. Most often, wallet software will generate a new address to send change to. Other wallet software may, for instance, send the change back to the same sending address or may have a designated change address which always receives change outputs. Many wallets allow the user to configure how their wallet will handle change in the wallet's settings.

**Co-Spending:** A transaction can contain multiple input addresses and multiple output addresses. When a transaction contains multiple inputs addresses, the input addresses are said to be co-spending. The transaction in this case must be signed by each of the private keys corresponding to the input addresses. Co-spending is the most common method of attributing addresses to the same entity because the private keys are all used in the same transaction. It is noted that transactions can be created which spend funds from addresses not in the same wallet.

To give another example, a customer walks into a grocery store with only two items in their pocket: a $20 bill and a $10 bill. They wish to purchase $30 worth of groceries. The customer hands the cashier the $20 bill and the $10 bill to pay for the groceries. The $20 bill and $10 bill are co-spent to send the full $30 to the cashier. No change is given back to the customer since the exact amount was paid.

4

If this transaction occurred using Bitcoin, the $20 BTC-equivalent input and the $10 BTC-equivalent may have come from different Bitcoin addresses co-spent in this transaction. When reviewing the transaction on the blockchain, from an outside perspective, based on this co-spending we would have a high degree of confidence that both input addresses in this transaction belong to the same wallet.

**Confirmations:** Once a virtual asset transaction has been included in a block and added to a blockchain, it has one confirmation. As soon as another block is mined on the same blockchain, the transaction has two confirmations, and so forth.

**Exchange (Centralized):** A business or platform that allows customers to trade fiat and digital currencies. The exchange also typically maintains custody of the user's private keys, which means the user is trusting the exchange to carry out transactions that the user tells it to. Examples of centralized exchanges are Coinbase, Kraken, Binance, and Bittrex.

**Keypair:** In cryptography, this refers to a private key and its corresponding public key.

> **Private Key:** A secret piece of data cryptographically tied to a public (sharable) key that acts as proof of ownership for virtual assets. Anyone with possession of a private key can spend the funds held by the corresponding address.

> **Public key:** A shareable piece of data cryptographically tied to a private (secret) key. Knowing the public key does not reveal any information about the private key. Addresses are derived from public keys and act as identities on a blockchain network.

**Know Your Customer (KYC) Information:** Information such as name, date of birth, Social Security Number, phone number, email address, passport, driver's license, photograph of the user, and physical address collected by companies to understand the individuals using the company's platform to execute transactions. Companies may be required by Anti-Money Laundering or other regulations to obtain this information form their customers.

**Peel Chain:** A peel chain is a pattern of Bitcoin transactions that occurs when a wallet receives a relatively large amount of Bitcoin which it gradually spends in multiple, sequential transactions. Typically, each transaction has one input and two outputs: one output constituting a payment to a separate entity and one output constituting the "change" (see change definition above) sent to a new Bitcoin address which is controlled by the same wallet as the input address. In a subsequent transaction, this change address then spends this change in the same fashion again with two outputs: one payment output and one change output. The initial value received by the wallet is gradually spent in multiple transactions by multiple change addresses forming a peel chain.

5



*Figure 2: Example peel chain depiction.*

**Transaction fee:** Most virtual asset transactions are confirmed by "miners," economic participants on networks who validate and secure the blockchain through expensive computation work. Think of miners as special users who offer their computer's processing power to confirm transactions. In reward for their work, each miner who confirms a set of transactions receives a quantity of newly generated virtual asset for every block of transactions and any voluntary transaction fees users added. Adding the fee incentivizes the miners to include the transaction in the next block.

**Transaction Hash**: A unique character string which identifies a specific transaction on the blockchain. This is akin to a serial number or accounting journal entry number.

**Wallet**: Act as a container for key pairs and help users manage virtual asset transactions. Used to send, receive, and store virtual assets. There are many types of wallets:

>   **Software wallet**: Private keys are stored on the user's local device.

>   **Paper wallet**: Private keys are printed on a piece of paper.

>   **Full client wallets**: Also known as Full Node wallets. Keep updated copies of the entire virtual asset blockchain and act as a "full node" on the network. A full node validates transactions and blocks. They can autonomously and authoritatively verify any transaction without external reference. Full clients query the entire blockchain to verify transactions.

>   **Lightweight client wallets:** Maintain only a subset of the blockchain—the pieces they need to verify specific transactions they care about. Lightweight clients must "reach out" and query a copy of the blockchain hosted elsewhere. Mobile wallets are Simplified Payment Verification (SPV) wallets.

>   **Hardware wallets**: Private keys are stored on a piece of removable hardware. Hardware wallets are small (often USB-sized) hardware devices that store a user's private keys. They are generally secured with PINs and backed up with a recovery key.

6

Appx6405

It should be noted that there are other definitions in the cryptocurrency space, but the above definitions are the ones most directly related to the analysis in this report.

Unless otherwise noted, all cryptocurrency amounts and USD conversion rate amounts are approximations. USD values were calculated based on an average daily value of Bitcoin in USD at the time of the transaction.

Appx6406

## Section 2:  Attribution of the BITCOIN FOG CLUSTER

**Chainalysis Reactor**

This report utilized information provided by Virtual Asset Service Providers or obtained through law enforcement activity when that information was available.  This report relied upon Chainalysis Reactor for attribution of Bitcoin addresses to BITCOIN FOG and at times other entities as noted in the report when that information was not otherwise available for analysis.  I have used Chainalysis Reactor since 2016 in numerous investigations and have found it to be reliable.

Chainalysis Reactor is a blockchain analysis software tool which provides investigators with several features as relevant here:

1. A graphical user interface which displays data from the Bitcoin blockchain in the form of a linked graph.
2. Grouping of addresses into "clusters" or, groups of addresses identified by Chainalysis as controlled by the same entity based on co-spending and other heuristics.
3. Attribution information, in some cases, identifying the entity which controls a given cluster.
4. Data analysis functions including tools for calculating aggregate flows of funds as utilized in Section 3 of this report.

As of November 2022, Chainalysis Reactor had clustered a group of approximately 925,743 Bitcoin addresses as belonging to the same entity.  Chainalysis Reactor had attributed this entity to BITCOIN FOG.  This cluster (the "BITCOIN FOG CLUSTER") was relied upon throughout this report for attribution of addresses to BITCOIN FOG.  A complete list of addresses in the BITCOIN FOG CLUSTER addresses will be provided with raw data supporting the information in this report.

The information contained in the rest of this section is provided to validate the BITCOIN FOG CLUSTER.


**FBI Undercover Transaction**

According to an FBI document, on or about 7/26/2016, an Online Covert Employee (OCE) conducted an undercover transaction to BITCOIN FOG.  The OCE accessed BITCOIN FOG via its Tor Hidden Service address on the darkweb at foggeddriztrcar2.onion and navigated to the deposit page.  According to contemporaneous screenshots included in the file, the OCE received the deposit address 1Nuf3K1kjgi7TfonYabTzDQww39oiJfe52 ("BITCOIN FOG DEPOSIT ADDRESS 1") [2] from the BITCOIN FOG website.  According to the document, the OCE deposited approximately 0.1628 BTC to BITCOIN FOG.

---

[2] Analysis in this section is based on the Bitcoin address recorded in the contemporaneous screenshots, 1Nuf3K1kjgi7TfonYabTzDQww39oiJfe52 (BITCOIN FOG DEPOSIT ADDRESS 1).  The deposit address

8

According to the Bitcoin blockchain, BITCOIN FOG DEPOSIT ADDRESS 1 received 0.16280000 BTC on or about 7/26/2016 in Transaction Hash 5beeb950fe8416bfc61aaf90a73687ee6d53e28d37d04a8835ffa87b55a5d14a.

According to Chainalysis Reactor, BITCOIN FOG DEPOSIT ADDRESS 1 was contained in the BITCOIN FOG CLUSTER.

According to the FBI document, on 7/26/2016, the OCE withdrew 0.15974667 BTC (the funds deposited above minus a fee imposed by BITCOIN FOG) from BITCOIN FOG. According to contemporaneous screenshots, funds were withdrawn to Bitcoin address 15dB1qxrnVmhq4qkByAQCTNTGgoHfWz3Ws ("UC WITHDRAWAL ADDRESS 1").[3]

According to the Bitcoin blockchain, UC WITHDRAWAL ADDRESS 1 received two deposits on or about 7/26/2016 totaling 0.15974667 BTC in Transaction Hashes 9ecc3fa031772f0201de5e68b79dc0e6cea2443a236dd51ec9fbddf6c7046941 and 7956f8e829b16f42780c96846aa2685a24543878b33c1ddd089fa01e5c2e264d. According to the Bitcoin blockchain, these transactions came from Bitcoin addresses 1DKkdzoZJr3GjFEb1w618pA7TFekT1MfdT ("BITCOIN FOG WITHDRAWAL ADDRESS 1") and 1JGMMCE68sLNzaeLbz9KaRfVxgQ8M26jPe ("BITCOIN FOG WITHDRAWAL ADDRESS 2"), respectively.

According to Chainalysis Reactor, BITCOIN FOG WITHDRAWAL ADDRESS 1 and BITCOIN FOG WITHDRAWAL ADDRESS 2 were contained in the BITCOIN FOG CLUSTER.


**IRS-CI Undercover Transaction**

According to an IRS-CI document, on or about 9/11/2019 an IRS-CI Special Agent conducted an undercover transaction to BITCOIN FOG. An IRS-CI Special Agent accessed BITCOIN FOG via its Tor Hidden Service address on the darkweb at foggedriztrcar2.onion. According to screenshots embedded in the document, the BITCOIN FOG website provided Bitcoin address 34pQQkTWMXPsQ65qKE3pTHnnjP47ZDfzSD[4]
 ("BITCOIN FOG DEPOSIT ADDRESS 2") for deposit to their account. According to the document, the IRS-CI Special Agent sent approximately 0.02494228 BTC to this address.

recorded in the document itself contained transcription errors. Specifically, these errors included two capital "W"s and one lowercase "j", in bold and underlined here: 1Nuf3K1kjgi7TfonYabTzDQ**WW**39oi**j**fe52.

[3] Analysis in this section is based on the withdrawal address as recorded in the contemporaneous screenshots, 15dB1qxrnVmhq4qkByAQCTNTGgoHfWz3Ws (UC WITHDRAWAL ADDRESS 1). The withdrawal address recorded in the document itself contained a transcription error. Specifically, this error was an omission of a single character "1", added here in bold and underlined: 15dB**1**qxrnVmhq4qkByAQCTNTGgoHfWz3Ws.

[4] Analysis in this section is based on the withdrawal address as recorded in the embedded screenshots, 34pQQkTWMXPsQ65qKE3pTHnnjP47ZDfzSD (BITCOIN FOG DEPOSIT ADDRESS 2). The Bitcoin address recorded in the document text included a single transcription error. Specifically, this error was that an "S" was transcribed as a "5", underlined and bolded here: 34pQQkTWMXPsQ65qKE3pTHnnjP47ZDfz**5**D.

9

According to the Bitcoin blockchain, on or about 9/11/2019, BITCOIN FOG DEPOSIT ADDRESS 2 received approximately 0.02488936 BTC[5] in Transaction Hash cea5bb8c8ca5c08e7d078ca6bb4e46bf4a6bbcca390f610e74c0065add1048c5.

According to Chainalysis Reactor, BITCOIN FOG DEPOSIT ADDRESS 2 was contained in the BITCOIN FOG CLUSTER.

According to the IRS-CI document, on or about 9/12/2014, the IRS-CI Special Agent withdrew approximately 0.02 BTC from their BITCOIN FOG account to Bitcoin address 18P1oMvnAYx5mjgorgLXgDRuifdz7gqrYT ("UC WITHDRAWAL ADDRESS 2").

According to the Bitcoin blockchain, Bitcoin address UC WITHDRAWAL ADDRESS 2 received approximately 0.02000000 BTC on or about 9/12/2019 in Transaction Hash de5f6dc49e64168117546911850013a8d1451215ef56de6aa86f5cde50135cd7. According to the Bitcoin blockchain, this transaction came from Bitcoin address 3N5N3Bmd58QXRH7qHXyRrevRGRg8eXkhrb ("BITCOIN FOG WITHDRAWAL ADDRESS 3").

BITCOIN FOG WITHDRAWAL ADDRESS 3 was not included in the BITCOIN FOG CLUSTER by Chainalysis Reactor. However, Chainalysis Reactor included the address sending funds to BITCOIN FOG WITHDRAWAL ADDRESS 3 in the BITCOIN FOG CLUSTER.

**Summary of Undercover Transactions and Chainalysis Clustering**



*Figure 3: Summary of undercover transactions and Chainalysis clustering.*

---

[5] The difference in the transaction value recorded in the IRS-CI document and the Bitcoin blockchain (0.00005292 BTC) was accounted for by the exact blockchain fee associated with this transaction.

10

Based on the undercover transactions, five Bitcoin addresses can be attributed to BITCOIN FOG. Chainalysis Reactor attributed four of these five Bitcoin addresses to the BITCOIN FOG CLUSTER. Chainalysis Reactor did not cluster the fifth known address, BITCOIN FOG WITHDRAWAL ADDRESS 3, however it did cluster the address which sent funds to BITCOIN FOG WITHDRAWAL ADDRESS 3. It is logical that BITCOIN FOG WITHDRAWAL ADDRESS 3 would have received funds from other BITCOIN FOG addresses based on the necessary behavior of a Bitcoin mixer.

Chainalysis Reactor did not include any of the addresses controlled by the government employees in the BITCOIN FOG CLUSTER. In other words, there were no false positives.

It should be noted that these identified BITCOIN FOG addresses represent a very small subset of the BITCOIN FOG CLUSTER. However, the performance of Chainalysis Reactor's clustering on this subset was generally consistent with my experience using the tool in numerous investigations.


**TRM Labs Confirmation of BITCOIN FOG CLUSTER**

A second reputable blockchain analysis tool, TRM Labs, was used to corroborate the Chainalysis BITCOIN FOG CLUSTER to a limited extent. Analysis presented later in this report identified approximately 43 transactions which sent funds directly from the BITCOIN FOG CLUSTER (attributed by Chainalysis Reactor) to STERLINGOV's accounts and Mycelium wallet. According to the Bitcoin blockchain, these transactions involved approximately 148 unique sending addresses (attributed by Chainalysis to BITCOIN FOG). TRM Labs' blockchain analysis tool corroborated the attribution of all 148 of these addresses to BITCOIN FOG.

11

## Section 3: Darknet Market Exposure

This section of the report includes analysis of aggregate Bitcoin transactions transferring funds between Bitcoin Fog and multiple illicit services described below, including Silk Road, Silk Road 2.0, AlphaBay, Agora, Nucleus, Abraxas, Pandora, Sheep Market, Black Bank, and Welcome to Video. This section of the report relied heavily upon clustering and attribution information provided by Chainalysis Reactor for BITCOIN FOG Bitcoin addresses as well as the Bitcoin addresses of the other darknet sites. Lists of the addresses attributed to each darknet site will be included as attachments to this report. The raw data behind the figures expressed in this section of the report were obtained from Chainalysis Reactor.

### SILK ROAD

SILK ROAD was the first major darknet market intended to enable its users to buy and sell drugs and other illegal goods and services anonymously and outside the reach of law enforcement. The vast majority of items for sale on Silk Road were illegal drugs, which were openly advertised as such on the site. SILK ROAD included a Bitcoin-based payment system that served to facilitate the illegal commerce conducted on the site, including by concealing the identities and locations of the users transmitting and receiving funds through the site. Silk Road was taken down by law enforcement in October 2013.

*SILK ROAD funds sent to BITCOIN FOG*

Blockchain analysis identified approximately 16,667 transactions which sent funds directly from SILK ROAD to BITCOIN FOG. These transactions occurred from on or about 12/19/2011 to on or about 10/2/2013. In total, these transactions transferred approximately 377,102 BTC worth approximately $9,724,911 from SILK ROAD directly to BITCOIN FOG.

In addition to these direct transfers, indirect transfers of funds from SILK ROAD to BITCOIN FOG totaled approximately 101,784 BTC, worth approximately $10,340,446.

*BITCOIN FOG funds sent to SILK ROAD*

Blockchain analysis identified approximately 51,717 transactions which sent funds directly from BITCOIN FOG to SILK ROAD. These transactions occurred from on or about 11/12/2011 to on or about 10/1/2013. In total, these transactions transferred approximately 106,523 BTC worth approximately $2,321,637 from BITCOIN FOG directly to SILK ROAD.

In addition to these direct transfers, indirect transfers of funds from BITCOIN FOG to SILK ROAD totaled approximately 51,273 BTC, worth approximately $1,471,025.

### SILK ROAD 2.0

SILK ROAD 2.0 was a darknet market site that launched in November 2014 following the government's seizure of the original Silk Road website. SILK ROAD 2.0 operated in the same

way as the original SILK ROAD. SILK ROAD 2.0 was shut down by law enforcement in November 2014.

*SILK ROAD 2.0 funds sent to BITCOIN FOG*

Blockchain analysis identified approximately 13,824 transactions which sent funds directly from SILK ROAD 2.0 to BITCOIN FOG. These transactions occurred from on or about 11/13/2013 to on or about 11/6/2014. In total, these transactions transferred approximately 22,864 BTC worth approximately $12,582,929 from SILK ROAD 2.0 directly to BITCOIN FOG.

In addition to these direct transfers, indirect transfers of funds from SILK ROAD 2.0 to BITCOIN FOG totaled approximately 12,438 BTC, worth approximately $6,463,629.

*BITCOIN FOG funds sent to SILK ROAD 2.0*

Blockchain analysis identified approximately 43,198 transactions which sent funds directly from BITCOIN FOG to SILK ROAD 2.0. These transactions occurred from on or about 11/23/2013 to on or about 12/7/2014. In total, these transactions transferred approximately 11,274 BTC worth approximately $5,852,300 from BITCOIN FOG directly to SILK ROAD 2.0.

In addition to these direct transfers, indirect transfers of funds from BITCOIN FOG to SILK ROAD 2.0 totaled approximately 4,320 BTC, worth approximately $2,534,628.


**ALPHABAY**

ALPHABAY was a darknet marketplace launched in December 2014. The site was designed to facilitate illicit commerce including illegal drugs, stolen and fraudulent identification documents and access devices, counterfeit goods, malware and other hacking tools, firearms, and toxic chemicals. The site utilized cryptocurrencies including Bitcoin, Monero, and Ethereum to assist in obfuscating its users and site administrators. ALPHABAY was shut down by law enforcement in July 2017.

*ALPHABAY funds sent to BITCOIN FOG*

Blockchain analysis identified approximately 14,040 transactions which sent funds directly from ALPHABAY to BITCOIN FOG. These transactions occurred from on or about 4/30/2015 to on or about 7/5/2017. In total, these transactions transferred approximately 5,701 BTC worth approximately $3,062,842 from ALPHABAY directly to BITCOIN FOG.

In addition to these direct transfers, indirect transfers of funds from ALPHABAY to BITCOIN FOG totaled approximately 2,827 BTC, worth approximately $1,868,844.

*BITCOIN FOG funds sent to ALPHABAY*

Blockchain analysis identified approximately 13,354 transactions which sent funds directly from BITCOIN FOG to ALPHABAY. These transactions occurred from on or about 4/30/2015 to on or about 7/5/2017. In total, these transactions transferred approximately 3,651 BTC worth approximately $1,679,212 from BITCOIN FOG directly to ALPHABAY.

13

In addition to these direct transfers, indirect transfers of funds from BITCOIN FOG to ALPHABAY totaled approximately 2,639 BTC, worth approximately $1,342,528.

**AGORA**

Agora was a darknet market launched in 2013. The site facilitated the sales of illicit goods and services including illegal drugs, stolen and fraudulent identification documents and access devices, firearms, hacking tools, and counterfeit goods. The site's administrators shutdown the platform 2015.

*AGORA funds sent to BITCOIN FOG*

Blockchain analysis identified approximately 23,594 transactions which sent funds directly from AGORA to BITCOIN FOG. These transactions occurred from on or about 12/10/2013 to on or about 9/6/2015. In total, these transactions transferred approximately 41,972 BTC worth approximately $14,231,729 from AGORA directly to BITCOIN FOG.

In addition to these direct transfers, indirect transfers of funds from AGORA to BITCOIN FOG totaled approximately 25,680 BTC, worth approximately $8,624,142.

*BITCOIN FOG funds sent to AGORA*

Blockchain analysis identified approximately 69,945 transactions which sent funds directly from BITCOIN FOG to AGORA. These transactions occurred from on or about 12/6/2013 to on or about 10/14/2015. In total, these transactions transferred approximately 26,398 BTC worth approximately $8,588,675 from BITCOIN FOG directly to AGORA.

In addition to these direct transfers, indirect transfers of funds from BITCOIN FOG to AGORA totaled approximately 10,027 BTC, worth approximately $3,389,947.

**NUCLEUS**

Nucleus was a darknet market that launched in 2014. The site facilitated the sale of illegal drugs, counterfeit goods, hacking tools, weapons, and chemicals. The site went offline in 2016.

*NUCLEUS funds sent to BITCOIN FOG*

Blockchain analysis identified approximately 2,182 transactions which sent funds directly from NUCLEUS to BITCOIN FOG. These transactions occurred from on or about 12/1/2014 to on or about 4/12/2016. In total, these transactions transferred approximately 5,240 BTC worth approximately $1,438,077 from NUCLEUS directly to BITCOIN FOG.

In addition to these direct transfers, indirect transfers of funds from NUCLEUS to BITCOIN FOG totaled approximately 2,820 BTC, worth approximately $886,452.

*BITCOIN FOG funds sent to NUCLEUS*

14

Appx6413

Blockchain analysis identified approximately 7,130 transactions which sent funds directly from BITCOIN FOG to NUCLEUS. These transactions occurred from on or about 11/30/2014 to on or about 4/13/2016. In total, these transactions transferred approximately 2,830 BTC worth approximately $802,798 from BITCOIN FOG directly to NUCLEUS.

In addition to these direct transfers, indirect transfers of funds from BITCOIN FOG to NUCLEUS totaled approximately 1,463 BTC, worth approximately $400,639.

## ABRAXAS

ABRAXAS was a darknet market which launched in 2014. The site facilitated the sale of illegal drugs and counterfeit goods. The site shutdown in 2015.

### *ABRAXAS funds sent to BITCOIN FOG*

Blockchain analysis identified approximately 1,278 transactions which sent funds directly from ABRAXAS to BITCOIN FOG. These transactions occurred from on or about 1/27/2015 to on or about 11/4/2015. In total, these transactions transferred approximately 4,117 BTC worth approximately $1,027,249 from ABRAXAS directly to BITCOIN FOG.

In addition to these direct transfers, indirect transfers of funds from ABRAXAS to BITCOIN FOG totaled approximately 1,896 BTC, worth approximately $558,194.

### *BITCOIN FOG funds sent to ABRAXAS*

Blockchain analysis identified approximately 5,324 transactions which sent funds directly from BITCOIN FOG to ABRAXAS. These transactions occurred from on or about 1/29/2015 to on or about 11/6/2015. In total, these transactions transferred approximately 2,066 BTC worth approximately $516,058 from BITCOIN FOG directly to ABRAXAS.

In addition to these direct transfers, indirect transfers of funds from BITCOIN FOG to ABRAXAS totaled approximately 903 BTC, worth approximately $229,535.

## PANDORA OPENMARKET

PANDORA was a darknet market which launched in 2013. The site facilitated the sale of illegal drugs, counterfeit goods, counterfeit US currency, and stolen credit card information. The site was shut down by law enforcement in 2014.

### *PANDORA funds sent to BITCOIN FOG*

Blockchain analysis identified approximately 2,256 transactions which sent funds directly from PANDORA to BITCOIN FOG. These transactions occurred from on or about 12/1/2013 to on or about 11/6/2015. In total, these transactions transferred approximately 2,033 BTC worth approximately $1,254,828 from PANDORA directly to BITCOIN FOG.

In addition to these direct transfers, indirect transfers of funds from PANDORA to BITCOIN FOG totaled approximately 418 BTC, worth approximately $238,695.

*BITCOIN FOG funds sent to PANDORA*

Blockchain analysis identified approximately 2,913 transactions which sent funds directly from BITCOIN FOG to PANDORA. These transactions occurred from on or about 11/30/2013 to on or about 10/30/2014. In total, these transactions transferred approximately 553 BTC worth approximately $299,141 from BITCOIN FOG directly to PANDORA.

In addition to these direct transfers, indirect transfers of funds from BITCOIN FOG to PANDORA totaled approximately 401 BTC, worth approximately $260,550.

**SHEEP**

SHEEP was a darknet market launched in 2013. The site was used predominantly for the illicit sale of narcotics. The site shut down in 2013.

*SHEEP funds sent to BITCOIN FOG*

Blockchain analysis identified approximately 1,925 transactions which sent funds directly from SHEEP to BITCOIN FOG. These transactions occurred from on or about 10/3/2013 to on or about 11/27/2013. In total, these transactions transferred approximately 7,647 BTC worth approximately $2,788,483 from SHEEP directly to BITCOIN FOG.

In addition to these direct transfers, indirect transfers of funds from SHEEP to BITCOIN FOG totaled approximately 2,748 BTC, worth approximately $1,494,597.

*BITCOIN FOG funds sent to SHEEP*

Blockchain analysis identified approximately 2,766 transactions which sent funds directly from BITCOIN FOG to SHEEP. These transactions occurred from on or about 10/9/2013 to on or about 12/1/2013. In total, these transactions transferred approximately 1,548 BTC worth approximately $361,895 from BITCOIN FOG directly to SHEEP.

In addition to these direct transfers, indirect transfers of funds from BITCOIN FOG to SHEEP totaled approximately 1,925 BTC, worth approximately $551,001.

**BLACK BANK**

BLACK BANK was a darknet market that launched in 2014. The site shutdown in 2015. Open source information indicated that a substantial portion of the listings on BLACK BANK were drug listings.

*BLACK BANK funds sent to BITCOIN FOG*

16

Blockchain analysis identified approximately 999 transactions which sent funds directly from BLACK BANK to BITCOIN FOG. These transactions occurred from on or about 10/19/2013 to on or about 5/17/2015. In total, these transactions transferred approximately 2,918 BTC worth approximately $912,669 from BLACK BANK directly to BITCOIN FOG.

In addition to these direct transfers, indirect transfers of funds from BLACK BANK to BITCOIN FOG totaled approximately 2,147 BTC, worth approximately $1,043,156.

*BITCOIN FOG funds sent to BLACK BANK*

Blockchain analysis identified approximately 3,996 transactions which sent funds directly from BITCOIN FOG to BLACK BANK. These transactions occurred from on or about 10/19/2013 to on or about 5/22/2015. In total, these transactions transferred approximately 1,632 BTC worth approximately $427,255 from BITCOIN FOG directly to BLACK BANK.

In addition to these direct transfers, indirect transfers of funds from BITCOIN FOG to BLACK BANK totaled approximately 947 BTC, worth approximately $280,495.


**WELCOME TO VIDEO**

WELCOME TO VIDEO was a darknet site that launched in 2015. The site sold access to child sexual abuse material (CSAM) for Bitcoin. The site was taken down by international law enforcement in 2018 and resulted in the seizure of approximately eight terabytes of CSAM.

*WELCOME TO VIDEO funds sent to BITCOIN FOG*

Blockchain analysis did not identify any flow of funds from WELCOME TO VIDEO to BITCOIN FOG.

*BITCOIN FOG funds sent to WELCOME TO VIDEO*

Blockchain analysis identified approximately 37 transactions which sent funds directly from BITCOIN FOG to WELCOME TO VIDEO. These transactions occurred from on or about 7/25/2015 to on or about 5/25/2017. In total, these transactions transferred approximately 2.47 BTC worth approximately $989 from BITCOIN FOG directly to WELCOME TO VIDEO.

In addition to these direct transfers, indirect transfers of funds from BITCOIN FOG to WELCOME TO VIDEO totaled approximately 1.68 BTC, worth approximately $846.

17

**Summary Table of BITCOIN FOG Darknet Market Exposure**

| Counterparty Name | | Directly Sent to BITCOIN FOG | Indirectly Sent to BITCOIN FOG | Directly Received from BITCOIN FOG | Indirectly Received from BITCOIN FOG |
|---|---|---|---|---|---|
| SILK ROAD | BTC | 377102.7388 | 101783.57 | 106522.7697 | 51273.39 |
| | USD | $9,724,911 | $10,340,446 | $2,321,637 | $1,471,025 |
| SILK ROAD 2.0 | BTC | 22863.74065 | 12438.155 | 11274.31369 | 4320.23 |
| | USD | $12,582,929 | $6,463,629 | $5,852,300 | $2,534,628 |
| ALPHABAY | BTC | 5700.845981 | 2826.69 | 3651.443827 | 2638.945 |
| | USD | $3,062,842 | $1,868,844 | $1,679,212 | $1,342,528 |
| AGORA | BTC | 41972.36366 | 25679.985 | 26398.44487 | 10027.08 |
| | USD | $14,231,729 | $8,624,142 | $8,588,675 | $3,389,947 |
| NUCLEUS | BTC | 5240.193979 | 2820.15 | 2829.752662 | 1463.475 |
| | USD | $1,438,077 | $886,452 | $802,798 | $400,639 |
| ABRAXAS | BTC | 4116.93734 | 1895.51 | 2066.420789 | 903.39 |
| | USD | $1,027,249 | $558,194 | $516,058 | $229,535 |
| PANDORA | BTC | 2032.569964 | 418.28 | 553.2503671 | 401.155 |
| | USD | $1,254,828 | $238,695 | $299,141 | $260,550 |
| SHEEP | BTC | 7646.828974 | 2747.84 | 1547.522515 | 1925.09 |
| | USD | $2,788,483 | $1,494,597 | $361,895 | $551,001 |
| BLACK BANK | BTC | 2918.068006 | 2146.795 | 1632.1633 | 947.065 |
| | USD | $912,669 | $1,043,156 | $427,255 | $280,495 |
| WELCOME TO VIDEO | BTC | 0 | 0 | 2.47269674 | 1.675 |
| | USD | $0 | $0 | $989 | $846 |

18

Appx6417

## Section 4: STERLINGOV Accounts

This section presents an analysis of the source of funds in multiple financial accounts associated with STERLINGOV as well as accounts receiving funds from STERLINGOV with a focus on connections to BITCOIN FOG. This section of the report relied upon Chainalysis Reactor for attribution of Bitcoin addresses to BITCOIN FOG. Attribution of addresses to various accounts came from records from the various Virtual Asset Service Providers through legal process returns and in some cases through law enforcement actions to obtain those records. The analysis in Section 4 and Section 5 included reviewing records from these accounts as well blockchain analysis based on the addresses and transactions identified in those records. Those records included:

a) STERLINGOV's LocalBitcoins account obtained from LocalBitcoins, held in the name of Roman Sterlingov and associated with the username gothencoin. ("LOCALBITCOINS ACCOUNT 1").

b) STERLINGOV's Kraken accounts obtained from Payward Ventures, Inc. dba Kraken (hereafter, "Kraken") including two accounts; #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov ("KRAKEN ACCOUNT 1"); and account #AA24 N84G WW46 KQ5Y, held in the name of TO THE MOON LTD ("KRAKEN ACCOUNT 2") which listed STERLINGOV as its sole beneficiary.

c) Mt. Gox records obtained from the Mt. Gox servers, including the following accounts:
1. ("MTGOX ACCOUNT 1")
   User: roso987341870
   User ID: 908f8fe5-d8bb-4e7b-a7e9-d1120c78b5b7
   Email address: plasma@plasmadivision.com

2. ("MTGOX ACCOUNT 2")
   User: peternfs
   User ID: a16d5abe-2308-469e-baf7-274cc4177ff9
   Email address: nfs9000@hotmail.com

3. ("MTGOX ACCOUNT 3")
   User: kolbasa
   User ID: d7057509-c8a2-4210-8cfb-af51b049fb2a
   Email address: kolbasa99@rambler.ru

4. ("MTGOX ACCOUNT 4")
   User: volfprius
   User ID: 3a18748f-cc67-44e6-897a-7116eed28294
   Email address: volf.prius@hotmail.com

d) STERLINGOV's Bitstamp account obtained from Bitstamp Limited, in the name of Roman Sterlingov and associated with Customer ID: 52443 ("BITSTAMP ACCOUNT 1").

19

e) STERLINGOV's Poloniex account obtained from Circle Internet Financial, LLC and Poloniex, LLC, in the name of Roman Sterlingov and associated with Account #11423418 ("POLONIEX ACCOUNT 1").

f) STERLINGOV's Binance account obtained from Binance, in the name of Roman Sterlingov associated with User ID: 25666351 ("BINANCE ACCOUNT 1").

g) STERLINGOV's Bitfinex account, Username: Clichon, obtained from Bitfinex. This account was associated with User ID: 201161 and had associated Know Your Customer documents in the name of Roman Sterlingov ("BITFINEX ACCOUNT 1").

h) Liberty Reserve records from the seized Liberty Reserve servers, including the following accounts
   1. ("SHORMINT LR ACCOUNT")
      Account ID:        U0845692
      Account Name:      shormint
      First Name:        Vasily
      Last Name:         Kunnikov
      Email:             shormint@hotmail.com

   2. ("STERLINGOV LR ACCOUNT")
      Account ID:        U7489869
      Account Name:      Roso7234852
      First Name:        Roman
      Last Name:         Sterlingov
      Email:             plasma@plasmadivision.com

i) STERLINGOV's NameCheap, Inc. account obtained from NameCheap, in the name of Roman Sterlingov associated with User ID: 255555 ("NAMECHEAP ACCOUNT 1").

j) Subpoena response records obtained from Coinbase associated with multiple payments to Expedia.inc.

k) STERLINGOV's RamNode account obtained from RamNode LLC, in the name of Roman Sterlingov associated with email address heavydist@gmail.com ("RAMNODE ACCOUNT 1").

l) A Mycelium wallet export file found on STERLINGOV's mobile device, a Samsung GSM_SM-A750FN Galaxy A7 (2018).

20

**Characterization of Indirect Transfers of Funds from the BITCOIN FOG CLUSTER to Accounts Belonging to STERLINGOV**

Blockchain analysis documented in this report identified many separate paths funds took from the BITCOIN FOG CLUSTER to STERLINGOV's accounts and from STERLINGOV's accounts to specific payments, including both direct and indirect paths. This subsection is intended to explain generally the types of indirect paths that funds took from the BITCOIN FOG CLUSTER to STERLINGOV's accounts.

In some cases, the indirect paths consisted of two transactions and single intermediary address, as shown in the example below.



*Figure 4: Example of a flow of funds from Bitcoin Fog to a STERLINGOV's account, KRAKEN ACCOUNT 2, with one intermediary address.*

In many other cases, the indirect paths between the BITCOIN FOG CLUSTER and STERLINGOV's accounts included multiple transactions and intermediary addresses. Indirect paths ranged from as few as one intermediary address to approximately 159 intermediary addresses in the case of one deposit to BITSTAMP ACCOUNT 1.

Generally, most of the indirect paths between the BITCOIN FOG CLUSTER and STERINGOV's accounts considered in this section of the report consisted of transactions forming peel chains. In the example below and in other cases in this analysis, based on my training and experience and the spending behavior of these transactions, I believe it is likely that all of the intermediary addresses in the peel chain are contained in a single Bitcoin wallet and therefore controlled by the same entity.

21



*Figure 5: Example peel chain path from BITCOIN FOG CLUSTER to KRAKEN ACCOUNT 1.*

In some cases, addresses in the same peel chain made payments to multiple STERLINGOV accounts, such as in the example below (Figure 6). In this example, Bitcoin address 1HHhjQfvZPCs71ASuteG6KTiGRGFKLJEZk received three withdrawals from the BITCOIN FOG CLUSTER on 9/7/2016. The three withdrawal outputs were spent in transactions which formed three separate peel chains. Figure 6 shows one of those peel chains making payments to multiple STERLINGOV accounts. [The other peel chains alluded to in Figure 6, Peel Chain 1 and Peel Chain 2, are expanded upon in Section 4 subsection "Expedia Payments through Coinbase" and displayed in the graph included as Figure 32.]

22

Appx6421



*Figure 6: Peel Chain from BITOCIN FOG CLUSTER to multiple STERINGOV accounts.*

23

Appx6422

This pattern of long peel chains was also observed in STERLINGOV's MYCELIUM WALLET spending behavior. The MYCELIUM WALLET, discussed later in this report, received a large deposit directly from the BITCOIN FOG CLUSTER. It spent these funds in a series of payments, sending the change forward to a new Bitcoin address in each transaction, forming a peel chain. Blockchain analysis of the transactions recorded in the file indicated that the MYCELIUM WALLET transactions created a peel chain approximately 69 addresses long, all of which are known to be part of the MYCELIUM WALLET.

Long peel chains are not inherently illicit, but rather are often the result of normal wallet behavior that may occur when a relatively large input is spent in sequential relatively small payments with change forwarded to new addresses in the same wallet each time. Again, this subsection was intended to generally characterize the indirect paths funds took from the BITCOIN FOG CLUSTER to STERLINGOV's accounts.

**LOCALBITCOINS ACCOUNT 1**

Records obtained from LocalBitcoins indicated that LOCALBITCOINS ACCOUNT 1 was created on 9/20/2012 with username: gothencoin, Real name: ROMAN STERLINGOV, and email: gothencoin@aol.com.

According to these records, LOCALBITCOINS ACCOUNT 1 received 73 deposits totaling 259.81 BTC. These deposits included approximately 70 transactions which occurred on the Bitcoin blockchain (these transactions included a Bitcoin transaction hash), one transaction which was specified as internal to LocalBitcoins (and therefore not recorded on the Bitcoin blockchain), and two transactions which were neither specified as internal nor included a Bitcoin transaction hash.

Blockchain analysis of the Bitcoin deposit addresses belonging to LOCALBITCOINS ACCOUNT 1 identified in these records indicated that LOCALBITCOINS ACCOUNT 1 received a total of approximately 259.67 BTC in approximately 80 deposits[6], valued at approximately $870,941. Accounting for the single internal deposit on or about 9/25/2017 of approximately 0.15 Bitcoin worth approximately $533, the total value deposited to the account was approximately 259.82 BTC valued at approximately $871,494.

Blockchain analysis indicated that deposits to LOCALBITCOINS ACCOUNT 1 which came directly or indirectly from the BITCOIN FOG CLUSTER totaled approximately 99.23 BTC, valued at approximately $629,923 as detailed below.

Approximately nine deposits to LOCALBITCOINS ACCOUNT 1 came directly from the BITCOIN FOG CLUSTER totaling approximately 64.33 BTC, valued at approximately $585,804. These deposits occurred from on or about 12/11/2017 to on or about 10/17/2018.

---

[6] The difference in the number of deposits indicated in the LocalBitcoins records and the blockchain analysis appeared to result from grouped transactions in the LocalBitcoins records in 2012 and 2013. The LocalBitcoins records listed two deposits which did not have a specific Bitcoin transaction hash associated with them and were not indicated as "internal" transactions. The records for these deposits indicated deposit addresses and deposit values matching the sum of multiple deposits recorded on the Bitcoin blockchain to those addresses.

24

Approximately 29 deposits to LOCALBITCOINS ACCOUNT 1 cane indirectly from the BITCOIN FOG CLUSTER totaling approximately 34.92 BTC, valued at approximately $44,192. These deposits occurred from on or about 10/29/2015 to on or about 9/27/2019.

Approximately five deposits to LOCALBITCOINS ACCOUNT 1 were directly from withdrawals from BITSTAMP ACCOUNT 1, also controlled by STERLINGOV. These deposits totaled approximately 16 BTC valued at approximately $143,116. These transactions occurred from on or about 3/11/2018 to 3/13/2018. The majority of Bitcoin deposits into BITSTAMP ACCOUNT 1 came directly from the BITCOIN FOG cluster as described in the BITSTAMP ACCOUNT 1 subsection below.

Approximately two deposits to LOCALBITCOINS ACCOUNT 1 came directly from BINANCE ACCOUNT 1. These deposits totaled approximately 2 BTC valued at approximately $12,568. The transactions occurred on or about 12/21/2018 and on or about 6/29/2018. The majority of funds deposited to BINANCE ACCOUNT 1 came directly from LOCALBITCOINS ACCOUNT 1 as described in the BINANCE ACCOUNT 1 subsection.


## KRAKEN ACCOUNT 1

According to records provided by Kraken, STERLINGOV opened KRAKEN ACCOUNT 1 in the name of Roman Sterlingov on or about March 18, 2014. According to these records, from account opening through on or about 5/24/2021, KRAKEN ACCOUNT 1 received 29 deposits totaling approximately 111.39 BTC and one deposit of approximately 9.56 Bitcoin Cash (BCH).

Blockchain analysis based on the deposit addresses belonging to KRAKEN ACCOUNT 1 identified in these records indicated KRAKEN ACCOUNT 1 received approximately 29 deposits totaling approximately 111.39 BTC, valued at approximately $418,394. In addition, KRAKEN ACCOUNT 1 received a single Bitcoin Cash (BCH) deposit of 9.56 BCH valued at approximately $12,670. The total USD value deposited to the account was approximately $431,064. The majority of these deposits, both in the number of Bitcoin and in USD value, came directly from withdrawals from LOCALBITCOINS ACCOUNT 1 or came indirectly from the BITCOIN FOG CLUSTER as detailed below.

Approximately four deposits to KRAKEN ACCOUNT 1 came directly from LOCALBITCOINS ACCOUNT 1 and totaled approximately 15.75 BTC, valued at approximately $164,885. These transactions occurred between on or about 5/26/2017 and on or about 9/23/2019.

Approximately 16 deposits to KRAKEN ACCOUNT 1 included funds which came indirectly from the BITCOIN FOG CLUSTER totaling approximately 83.84 BTC, valued at approximately $247,396. These deposits occurred from on or about 9/23/2014 to on or about 11/17/2020.

These two sources of funds combined accounted for approximately 89% of the total Bitcoin and 96% of the total USD value deposited to KRAKEN ACCOUNT 1.


## KRAKEN ACCOUNT 2

According to records provided by Kraken, STERLINGOV opened KRAKEN ACOUNT 2 in the name of TO THE MOON LTD | ROMAN on or about December 16, 2015. These records

included a document disclosing information about the company TO THE MOON LTD which indicated that Roman Sterlingov was the 100% Ultimate Beneficial Owner (UBO). The document listed Roman Sterlingov as a company officer, as well as a second individual listed as a secretary and 0% UBO. The records provided by Kraken included the following image of an identification document for STERLINGOV, as part of their KYC compliance program.



*Figure 7: KYC document for KRAKEN ACCOUNT 2.*

According to the records provided by Kraken, from account opening through on or about 5/24/2021 KRAKEN ACCOUNT 2 received approximately 15 deposits totaling approximately 14.37 BTC.

Blockchain analysis of the deposit addresses belonging to KRAKEN ACCOUNT 2 identified in these records revealed that KRAKEN ACCOUNT 2 received approximately 15 deposits totaling approximately 14.37 BTC, valued at approximately $13,158. The majority of these deposits, both in the number of Bitcoin deposited and in USD value, came directly from withdrawals from LOCALBITCOINS ACCOUNT 1 or came indirectly from to the BITCOIN FOG CLUSTER as detailed below.

A single deposit to KRAKEN ACCOUNT 2 came directly from LOCALBITCOINS ACCOUNT 1 of approximately 0.57 BTC, valued at approximately $946. This transaction occurred on or about 5/9/2017.

Approximately six deposits to KRAKEN ACCOUNT 2 included funds which came indirectly from the BITCOIN FOG Cluster totaling approximately 11.47 BTC, valued at approximately $7,871. These transactions occurred from on or about 4/5/2016 to on or about 11/12/2017.

These two sources of funds combined accounted for approximately 83% of the total Bitcoin and 67% of the total USD value deposited to KRAKEN ACCOUNT 2.

26

**MT. GOX**

MTGOX ACCOUNT 1 was created on or about 9/29/2011 by user roso987341870 with email address plasma@plasmadivision.com. The Mt. Gox records included the following image of an ID in the name of Roman Sterlingov.



*Figure 8: MTGOX ACCOUNT 1 ID from Mt. Gox records.*

According to records obtained from Mt. Gox, MTGOX ACCOUNT 1 received 26 Bitcoin deposits totaling approximately 1,636 BTC from 7/5/2012 to 4/12/2013.

Records obtained from Mt. Gox indicated that MTGOX ACCOUNT 1 received the following two deposits from bank accounts. On or about 10/3/2011, MT GOX ACCOUNT 1 received approximately 100 Euros with the following information included in the "Info" field of the ledger; "VIR STERLINGOV,ROMAN 30066-12-11276370036590 MTG92441X". On or about 10/12/2011, MT GOX ACCOUNT 1 received approximately 90 Euros with the following information included in the "Info" field of the ledger; "STERLINGOV,ROMAN   MTG92441X /I05P11277160170".

MTGOX ACCOUNT 1 received one deposit from a Liberty Reserve account held in the name of Roman Sterlingov, Account ID: U0074465. On or about 11/27/2011, MTGOX ACCOUNT 1 received approximately $130 with the following information included in the "Info" field of the ledger; "Roso7234852 (U7489869) – 77527847 MtGox.com Funding MTGOX#92441X".

Blockchain analysis of the Bitcoin deposit addresses belonging to MTGOX ACCOUNT 1 identified in the Mt. Gox records confirmed the Bitcoin deposit information in those records, showing 26 Bitcoin deposits totaling approximately 1,636 BTC worth approximately $122,181.

Approximately 15 deposits to MTGOX ACCOUNT 1 came directly from the BITCOIN FOG CLUSTER. These deposits totaled approximately 700 BTC valued at approximately $63,301. These transactions occurred from on or about 8/25/2012 to on or about 4/3/2013.

27

Approximately two deposits to MTGOX ACCOUNT 1 came directly from withdrawals from LOCALBITCOINS ACCOUNT 1. These deposits totaled approximately 40 BTC valued at approximately $4,935. These transactions both occurred on or about 4/12/2013.

## BITSTAMP ACCOUNT 1

According to records obtained from Bitstamp Limited ("Bitstamp"), BITSTAMP ACCOUNT 1 was created on 4/3/2013 in the name of Roman Sterlingov. Bitstamp obtained the following identifying documents from STERLINGOV as part of their KYC compliance program.



*Figure 9: KYC document for BITSTAMP ACCOUNT 1.*

28



*Figure 10: KYC document for BITSTAMP ACCOUNT 1.*

According to records obtained from Bitstamp, BITSTAMP ACCOUNT 1 received approximately 26 Bitcoin deposits totaling approximately 715 BTC from on or about 4/18/2013 to on or about 2/12/2017. In addition to Bitcoin deposits, these records reflected the following two deposits; BITSTAMP ACCOUNT 1 received a single Bitcoin Cash (BCH) deposit of approximately 10 BCH on or about 9/26/2017 and a single USD deposit of approximately $1,000 on or about 4/12/2013.

Blockchain analysis of the Bitcoin addresses belonging to BITSTAMP ACCOUNT 1 confirmed the Bitcoin deposit information above, showing 26 transactions totaling approximately 715 BTC worth approximately $125,180. These transactions occurred from on or about 4/8/2013 to on or about 2/12/2017.

Approximately 18 of these deposits to BITSTAMP ACCOUNT 1 came directly from the BITCOIN FOG CLUSTER. These deposits totaled approximately 623 BTC valued at approximately $102,037. These transactions occurred from on or about 4/8/2013 to on or about 11/11/2013.

Additionally, approximately five deposits to BITSTAMP ACCOUNT 1 were contained funds which came indirectly from to BITCOIN FOG CLUSTER. These deposits totaled approximately 51 BTC valued at approximately $17,308 and all occurred on or about 11/11/2013.

Approximately two deposits to BITSTAMP ACCOUNT 1 came directly from withdrawals from MTGOX ACCOUNT 1. These deposits totaled approximately 40 BTC valued at $5,372 and occurred on or about 8/22/2013 and on or about 9/2/2013.

**POLONIEX ACCOUNT 1**

According to records obtained from Poloniex, POLONIEX ACCOUNT 1 was created on 8/3/2017 in the name of Roman Sterlingov using email address info@dangerzone.today.

According to records obtained from Poloniex, POLONIEX ACCOUNT 1 received a single Bitcoin deposit of approximately 2.3 BTC to Bitcoin address 1JKZc82EymuM1FvpUrbZrtTvEfD1uzzGFV on or about 8/3/2017.

29

Appx6428

Blockchain analysis of the single deposit address contained in the Poloniex records also indicated that POLONIEX ACCOUNT 1 received a single deposit of approximately 2.3 BTC valued at approximately $6,318 on or about 8/3/2017. The funds in this deposit came indirectly from the BITCOIN FOG CLUSTER (see Figure 11: Peel Chain from BITOCIN FOG CLUSTER to multiple STERINGOV accounts.)

**BINANCE ACCOUNT 1**

According to records obtained from Binance, BINANCE ACCOUNT 1, was opened in the name of Roman Sterlingov on or about 1/29/2018. On 12/21/2018, Binance obtained the following images to authenticate STERLINGOV as part of their KYC compliance program.






*Figure 13: KYC document for BINANCE ACCOUNT 1.*    *Figure 12: KYC image for BINANCE ACCOUNT 1.*

According to the records provided by Binance, BINANCE ACCOUNT 1 received approximately two Bitcoin deposits totaling approximately 7 BTC. These transactions occurred on or about 1/29/2018 and on or about 2/10/2018.

Blockchain analysis of the Bitcoin deposit address included in these records indicated that BINANCE ACCOUNT 1 received approximately two Bitcoin deposits totaling approximately 7 BTC valued at approximately $76,232.

Blockchain analysis indicated that on or about 1/29/2018, BINANCE ACCOUNT 1 received approximately 5 BTC valued at approximately $58,839. According to records from LocalBitcoins, this deposit came directly from LOCALBITCOINS ACCOUNT 1.

On or about 2/10/2018, BINANCE ACCOUNT 1 received approximately 2 BTC valued at approximately $17,394. Blockchain analysis and records from LocalBitcoins indicated that these funds came from indirectly from LOCAL BITCOINS ACCOUNT 1, through two intermediary addresses.

**BITFINEX ACCOUNT 1**

According to records obtained from Bitfinex, Username: Clichon first logged into BITFINEX ACCOUNT 1 on or about 4/5/2016. The following identification document in the name of Roman Sterlingov was included with these records.



*Figure 14: Bitfinex KYC Document for BITFINEX ACCOUNT 1*

According to the records provided by Bitfinex, BITFINEX ACCOUNT 1 received a single Bitcoin deposit of approximately 3.84 BTC in transaction 125b78373c975dc12e7bdcb4b40077349f856226c9c2702ee5de20cd936558eb.

Blockchain analysis of the Bitcoin deposit address included in these records confirmed that BINANCE ACCOUNT 1 received a single Bitcoin deposit of 3.84 BTC valued at approximately $26,172 in transaction 125b78373c975dc12e7bdcb4b40077349f856226c9c2702ee5de20cd936558eb which occurred on or about 4/5/2018.

According to records from LocalBitcoins, this deposit to BITFINEX ACCOUNT 1 came directly from LOCALBITCOINS ACCOUNT 1.

**RAMNODE ACCOUNT 1**

According to records provided by RamNode in a 2018 subpoena response, RAMNODE ACCOUNT 1 was created on 8/26/2015 in the name of Roman Sterlingov using email address heavydist@gmail.com.

According to the records provided by RamNode in the 2018 subpoena response, RAMNODE ACCOUNT 1 received a total of ten payments through the payment processors BitPay and Stripe. These payments occurred from on or about 8/26/2015 to on or about 8/27/2018. The records provided by RamNode included only internal transaction identifiers used by the payment processors and no specific Bitcoin addresses or transaction hashes.

| Payment # | RamNode Provided Information | Date | Amount |
|---|---|---|---|
| 1 | Invoice Payment (#755039) - Trans ID: WwKfXSYeJwi4fWWLVdeMQg | 8/26/2015 | $35.63 |
| 2 | Invoice Payment (#957344) - Trans ID: py_17htCn2fLzijI26tV0XQjmDN | 2/23/2016 | $35.63 |
| 3 | Invoice Payment (#1170331) - Trans ID: py_18jWkI2fLzijI26tUg60GCNc | 8/17/2016 | $35.63 |
| 4 | Invoice Payment (#1261246) - Trans ID: py_19CCq72fLzijI26tg92AsF1a | 11/4/2016 | $71.25 |
| 5 | Invoice Payment (#1375876) - Trans ID: 6eNVTXwZfv8WWnJBTLgyMk | 2/28/2017 | $35.63 |
| 6 | Invoice Payment (#1452299) - Trans ID: 9WLf4Bt1uTVoboViMq6SsY | 5/6/2017 | $71.25 |
| 7 | Invoice Payment (#1579422) - Trans ID: 3ZasfvHvEp1PxFCa7CYGgu | 8/18/2017 | $35.63 |
| 8 | Invoice Payment (#1660010) - Trans ID: TALyZD95JE8CVdHMeTbt2b | 11/1/2017 | $71.25 |
| 9 | Invoice Payment (#1796600) - Trans ID: py_1C0rjK2fLzijI26tQcMPISmP | 3/1/2018 | $35.63 |
| 10 | Invoice Payment (#2013877) - Trans ID: Bbo2KfNTDTKSSeJSJhNF7Q | 8/27/2018 | $35.63 |

*Figure 15: RAMNODE ACCOUNT 1 Payments per RamNode 2018 response.*

According to records provided by RamNode in response to a 2017 subpoena, three RAMNODE ACCOUNT 1 payments were identified by links to the payment addresses at the block explorer website Blockchain.info. A review of these three payment addresses on the Bitcoin blockchain indicated that each address had received only a single payment and therefore the Bitcoin address alone was sufficient to determine which transaction was associated with the payment to RamNode. Each of these three transactions' respective approximate date and approximate USD amount correlated to that of a payment identified in the 2018 RamNode subpoena response.

| Payment # | RamNode Provided Information | Blockchain Date | Approx USD |
|---|---|---|---|
| 2 | https://blockchain.info/address/1GjcvgqyPPSoBPTvfrE3njuiruQxK46tzk?filter=2 | 2/24/2016 | 35.62 |
| 3 | https://blockchain.info/address/1M1PGfk7n3ricHzRkphbAybguK7S2YhGCe?filter=2 | 8/17/2016 | 36.09 |
| 4 | https://blockchain.info/address/1NmA7SAVXjhqu7LBGrLNt5jzoS8oY7hCND?filter=2 | 11/5/2016 | 72.01 |

*Figure 16: RAMNODE ACCOUNT 1 payment addresses per RamNode 2017 response.*

According to records provided by BitPay, six of the ten RAMNODE ACCOUNT 1 payments recorded in the 2018 subpoena response were processed by BitPay. The BitPay records were used to correlate the internal identifiers provided by RamNode to specific payments recorded on the Bitcoin blockchain.

In total, nine of the ten RAMNODE ACCOUNT 1 payments identified in the 2018 RamNode subpoena response were correlated to specific payments on the Bitcoin blockchain. One of the ten payments was not identified by this analysis.

32

| Payment # | Bitcoin Transaction Hash | Bitcoin Payment Address |
|---|---|---|
| 1 | e0ae86e253da91537fa13d180e9df241a1ae40ebeedee37f1615a38b25aaaa0b | 18ATfPjC3ufjnnkpGw3KujdEDkN4goJV2Z |
| 2 | 73cac2c2231b33533111d01b762cf68d0860090a4ac600dd0c68bb2760557aae | 1GjcvgqyPPSoBPTvfrE3njuiruQxK46tzk |
| 3 | bb80aaf76c54e02621f279968a375e6cb0d69717fd3ba9cf86655414594a533e | 1M1PGfk7n3ricHzRkphbAybguK7S2YhGCe |
| 4 | 1719b4e9608fdce9571ea97412ba3d2d987bbecd32f19e70c93ea4881e374f9e | 1NmA7SAVXjhqu7LBGrLNt5jzoS8oY7hCND |
| 5 | c0d113f3d41d2d3aedc4f9c581f9a9fc3c25761b349e2d8dec39fc0fca76f7e0 | 16s2LTwziYx9GEQFwwoF9wfwqUdCr1i1vg |
| 6 | d56c66f61dec5e8b43ff92a18a5fbc46b4a7fcf1bcc85820724af527107eb5a0 | 19SBZ3bp6UKLNnzhPJymZnX54VdvzKJSEt |
| 7 | 5a329ce5487188b404fc24b7a6e4d8ff23e3358f40b40bed8e6c1980fcd4d7ac | 18Mq9PXwGfvfTpt1Q1EHAwoZucMp3VUZs1 |
| 8 | d6aa2206fd0f5311979dedb3594c2810a5e83747f4f3617f85bc713c141c6c5d | 1i2Ph1kfp6SBw95Xacfu995fNYL1U93Ud |
| 9 | Unknown | Unknown |
| 10 | aaae7cc536d6409f8825427439385d5da744073c75e6f4de09b165d18da533a7 | 1Bq57yKH64KAv8N6zW24AQHoVGGVX2pbZT |

*Figure 17: Correlation of RAMNODE ACCOUNT 1 payments to specific payments on the Bitcoin blockchain.*

Blockchain analysis of the nine identified Bitcoin payments to RAMNODE ACCOUNT 1 described above indicated that these transactions occurred from on or about 8/26/2015 to on or about 8/27/2018.  These payments totaled approximately 0.507131 BTC valued at approximately $429.

Blockchain analysis indicated that eight of the nine identified payments to RAMNODE ACCOUNT 1 were composed entirely of funds indirectly from the BITCOIN FOG CLUSTER. These payments totaled approximately 0.501801 BTC valued at approximately $393 at times of deposit.  These payments occurred from on or about 8/26/2015 to on or about 11/1/2017.

According to records from Local Bitcoins, one of the nine identified payments to RAMNODE ACCOUNT 1 came directly from LOCAL BITCOINS ACCOUNT 1.  This payment was in the amount of approximately 0.00533 BTC valued at approximately $36 and occurred on or about 8/27/2018.

**MYCELIUM WALLET**

A Mycelium Bitcoin Wallet file recovered from one of STERLINGOV's mobile devices[7] contained a log of 72 transactions involving the MYCELIUM WALLET's addresses including approximately 3 deposits and approximately 69 withdrawals which occurred from on or about 6/17/2020 to on or about 2/22/2021.  The only significant deposit to the MYCELIUM WALLET was the first transaction recorded in the file on 6/17/2020 depositing a value of 29.44819244 BTC to the MYCELIUM WALLET on 6/17/2020.[8]

---

[7] The file name was "MyceliumExport_Account_15_straight_outta_mint_1614099652141.csv".  The file was found in the Mycelium Bitcoin Wallet mobile application files on the Samsung GSM_SM-A750FN Galaxy A7 (2018) device.

[8] Blockchain analysis indicated that the two other deposits listed in the MYCELIUM WALLET file, which were not spent by the wallet, (Tx Hash: 3f1e06656b635f4609586c97178defbc3328ef575f2da370eabfb48ce6bf45bc and Tx Hash: 7da36b8384e399a7355c251208915357372ccfb03fcea60dd2ae60ef06be985c) acted as spam messages advertising for the blockchain messaging service memo.sv and sent a small fraction of a Bitcoin (approximately 0.00000547 BTC, valued at approximately seven cents) to hundreds of different Bitcoin addresses, including two addresses in the MYCELIUM WALET.

33

Blockchain analysis of the transactions included in the file indicated that the MYCELIUM WALLET received a deposit of approximately 29 BTC valued at $280,544 on 6/17/2020.  This deposit came directly from the BITCOIN FOG CLUSTER and was the source of funds of all 69 subsequent withdrawals from the MYCELIUM WALLET.

## Section 5: Specific Payments

**Payments for Web Services from the SHORMINT LR ACCOUNT**
Liberty Reserve user shormint made multiple payments from the SHORMINT LR ACCOUNT to infrastructure providers and service providers by transferring funds from the SHORMINT LR ACCOUNT to the Liberty Reserve accounts of these providers.   On or about 10/25/2011, the SHORMINT LR ACCOUNT paid the Liberty Reserve account of HighHosting.net.  Records from HighHosting.net indicated this payment was in part for the domain name registration for the domain "bitcoinfog.com".  Analysis revealed that the source of the funds utilized by the SHORMINT LR ACCOUNT in the payment to HighHosting.net was STERLINGOV's MTGOX ACCOUNT 1, as described below.  The SHORMINT LR ACCOUNT also made payments to other service providers including OK2Host, and CryptoVPN.



*Figure 18: Flow of funds from MTGOX ACCOUNT 1 to infrastructure purchases.*

35

Appx6434

According to Mt Gox records, on or about 10/11/2011, approximately 89.87 Euros were deposited to MTGOX ACCOUNT 1. The Mt. Gox record of this transaction included the name of Roman Sterlingov in the following text in the "Info" field, ""STERLINGOV,ROMAN MTG92441X    /I05P11277160170"." Mt Gox sent plasma@plasmadivision.com the following email, confirming the deposit, including the name of Roman Sterlingov.

**Subject:** [mtgox] Funds Received
**From:** Mt.Gox <info@mtgox.com>
**Date:** 10/11/2011, 7:08 PM
**To:** roso987341870 <plasma@plasmadivision.com>

Dear roso987341870,

We have deposited 89.87000 € into your account roso987341870.

    Transaction Reference: a55cd645-8397-4cb2-81e5-576551a36eaa
    Transaction Date: 2011-10-06

Please note that any fees that may have been deducted by your bank, intermediate bank or by the payment processor are not provided in this summary. If you plan to deposit funds in different currencies, please make sure to review your wallet/deposit behaviors on your accounts settings page.

---------------------------------------
Transaction Details

STERLINGOV,ROMAN
MTG92441X        /I05P11277160170


- The Mt.Gox Team

*Figure 19: Mt. Gox Deposit confirmation email to plasma@plasmadivision.com.*

According to the Mt. Gox records, these funds were converted to Bitcoin in multiple transactions on Mt. Gox occurring from on or about 10/13/2011 to on or about 10/19/2011. On or about 10/19/2011 at approximately 12:29 UTC[9], approximately 36 Bitcoin were withdrawn from MTGOX ACCOUNT 1 and sent to Bitcoin address 1JzbuKkqxoK6yZFi9TaCHC778U2NQyJtrg (Address 1).

---

[9] Timestamps in the Mt. Gox transactions logs did not include time zone information. The Universal Coordinated Time (UTC) time zone for Mt. Gox transactions throughout this report was inferred from a comparison of Mt. Gox user email logs which included time zone information in withdrawal notification emails and the relevant withdrawals in the Mt. Gox transaction logs. For example, on or about 8/25/2012, the transaction logs for MTGOX ACCOUNT 1 recorded a withdrawal at "8/25/2012  7:54:22 PM" (without a time zone). The Mt. Gox user email logs for MTGOX ACCOUNT 1 recorded an email notification of the withdrawal which indicated in the body of the email that the withdrawal occurred on "Date: 2012-08-25 19:54:22 GMT". Greenwich Mean Time (GMT) is equivalent to UTC.

36

According to the Bitcoin blockchain, on 10/19/2011 at approximately 12:41 UTC, Address 1 received approximately 36 BTC in the transaction depicted below.



*Figure 20: Bitcoin transaction to Address 1. Screenshot from mempool.space.*

At approximately 21:16 UTC the same day, Address 1 sent these funds (minus fee) to Bitcoin address 14RzfWf9FGKiqavEpkLFAKr8jvgY9PJ5Ub (Address 2) in the transaction depicted below.



*Figure 21: Bitcoin transaction to 14RzfWf9FGKiqavEpkLFAKr8jvgY9PJ5Ub. Screenshot from mempool.space.*

37

**Appx6436**

At approximately 21:47 UTC the same day, Address 2 sent these funds (minus fee) to Bitcoin address 1HvkjK2L2Hy6CF13KgpcWzvfVQfRKunbWq (Address 3) in the transaction depicted below.



*Figure 22: Bitcoin transaction to 1HvkjK2L2Hy6CF13KgpcWzvfVQfRKunbWq. Screenshot from mempool.space.*

According to the Mt. Gox records, on or about 10/19/2011 at approximately 22:45 UTC, MTGOX ACCOUNT 2 (peternfs) was credited for the Bitcoin deposit of 35.999 BTC made to Address 3. Approximately 22 minutes later at 23:06 UTC, MTGOX ACCOUNT 2 withdrew 35 BTC in the form of a "redeem code", or a voucher for funds on Mt. Gox. The redeem code was "MTGOX-BTC-3EAUM-YJAKD-7KGUM-FFD2B".

According to the Mt. Gox records, on 10/20/2011 at 07:01 UTC, MTGOX ACCOUNT 3 (User: kolbasa) was credited with a deposit of 35 BTC by redeeming the same code, "MTGOX-BTC-3EAUM-YJAKD-7KGUM-FFD2B".

According to the Mt. Gox records, on 10/20/2011 at approximately 07:01 UTC, MTGOX ACCOUNT 3 sold the 35 BTC for US dollars in approximately four separate transactions on Mt. Gox resulting in a USD balance approximately $80.50. At approximately 07:04 UTC, MTGOX ACCOUNT 3 withdrew $80 in the form of a redeem code. The redeem code was "MTGOX-USD-JJMSN-2926Y-62DVC-18CAB". The Mt. Gox records associated IP address 70.90.169.13 (IP ADDRESS 1) with this withdrawal.

According to the Mt. Gox records, on 10/20/2011 at approximately 07:17 UTC, Mt. Gox User ID: ff0b1ee6-1af1-43ef-9a19-6607ae58cf51 redeemed the same code, Redeem Code USD-JJMSN-2926Y-62DVC-18CAB. Mt. Gox User ID: ff0b1ee6-1af1-43ef-9a19-6607ae58cf51 was associated with the identifiers Login: aurumxchange and email address admin@aurumxchange.com.

The internal flow of funds at AurumXchange was unknown. However, according to records from Liberty Reserve, Liberty Reserve user shormint (U0845692) logged into the SHORMINT LR ACCOUNT at approximately 07:10 [10] on 10/20/2011 from IP ADDRESS 1, the same IP used

---

[10] The Liberty Reserve records reviewed did not specify time zone information.

38

by MTGOX ACCOUNT 3 to withdraw the redeem code from Mt. Gox. At approximately 07:18 on 10/20/2011, the SHORMINT LR ACCOUNT received a deposit from the AurumXchange Company (Liberty Reserve Account Number: U2213781) in the amount of 77.6 Liberty Reserve Dollars (LRUSD). This deposit was the first transaction in the SHORMINT LR ACCOUNT. The difference in the value withdrawn from Mt. Gox and the value deposited to the SHORMINT LR ACCOUNT was similar to other transfers of funds through AurumXchange, discussed in the next subsection "Example 1 of Similar Funds Movement Out of MT GOX ACCOUNT 1", where email records for AurumXchange orders were obtained by investigators in this case.

### Ok2Host Payment

According to records from Liberty Reserve, on 10/20/2011, the SHORMINT LR ACCOUNT sent 22.22 LRUSD, a portion of the funds originally from MTGOX ACCOUNT 1, to the Liberty Reserve account of Ok2Host (Liberty Reserve Account Number: U7354422). The transaction included the memo text, "OK2HOST - Invoice #105".

### HighHosting.net Payment

According to records from Liberty Reserve, on 10/25/2011 the SHORMINT LR ACCOUNT sent 14 LRUSD, a portion of the funds originally from MTGOX ACCOUNT 1, to the Liberty Reserve account of HighHosting.net (Account Number: U9214765). The transaction included the memo text, "HighHosting.net - Invoice #10651".

According to records provided by HighHosting.net, HighHosting.net Invoice #10651 was associated with the HighHosting.net Order ID: 4447. The records provided by HighHosting.net indicated that the customer for this order used the shormint@hotmail.com email address and that this order was in part for the registration of the domain "bitcoinfog.com". The text of that record read:

**Order Information**

Order ID: 4447
Order Number: 9475014344
Date/Time: 10/25/2011 10:16
Invoice Number: 10651
Payment Method: Liberty Reserve

**Customer Information**

Customer ID: 3374
Name: Akemashite Omedetou
Email: shormint@hotmail.com
Company: n/a
Address 1: Shibya Kine 372
Address 2:
City: Kyoto
State: Japan
Postcode: 47381

39

Country: JP
Phone Number: 81134624494

**Order Items**

Product/Service: Share Hosting - Mini Hosting
Domain: bitcoinfog.com
First Payment Amount: $2.00 USD
Recurring Amount: $2.00 USD
Billing Cycle: Monthly

Domain Registration: Register
Domain: bitcoinfog.com
First Payment Amount: $12.00 USD
Recurring Amount: $12.00 USD
Registration Period: 1 Year/s

Total Due Today: $14.00 USD

**ISP Information**

IP: 173.254.192.38
Host: hazare.torservers.net

http://highhosting.net/whmcs/admin/orders.php?action=view&id=4447

--b1_28fcf3001ce6b9928ca3e844eb7a449e--

*CryptoVPN Payment*

According to records from Liberty Reserve, on 11/6/2011 the SHORMINT LR ACCOUNT sent 21 LRUSD, a portion of the funds deposited above, to the Liberty Reserve account of CryptoVPN (U5271070). The transaction included the memo text, "Account replenishment.".

*Super socks Payment*

According to records from Liberty Reserve, on 11/11/2011 the SHORMINT LR ACCOUNT sent 9.8 LRUSD, a portion of the funds deposited above, to the Liberty Reserve account of Super socks (Account Number: U4564599).

Many of the same methods, exchanges, and accounts used in the flow of funds from MTGOX ACCOUNT 1 to these web services payments were similar to other funds movements out of MTGOX ACCOUNT 1. The following examples are intended to show similar patterns of money movement involving funds from MTGOX ACCOUNT 1.

**Example 1 of Similar Funds Movement Out of MT GOX ACCOUNT 1**

40

Appx6439



According to Mt Gox records, on or about 10/3/2011 at approximately 11:08 UTC,
approximately 100 Euros were deposited to MTGOX ACCOUNT 1. This was the first activity

41

Appx6440

in the account. The Mt Gox record of this transaction included the name of Roman Sterlingov in the Info field; "VIR STERLINGOV,ROMAN    30066-12-11276370036590 MTG92441X". Mt Gox sent plasma@plasmadivision.com the following email, confirming the deposit, including the name of Roman Sterlingov.

**Subject:** [mtgox] Funds Received
**From:** Mt.Gox <info@mtgox.com>
**Date:** 10/3/2011, 4:08 AM
**To:** roso987341870 <plasma@plasmadivision.com>

Dear roso987341870,

We have deposited 100.00000 € into your account roso987341870.

   Transaction Reference: 1c14294f-f99f-46c9-9925-215ab1326e4b
   Transaction Date: 2011-10-03

Please note that any fees that may have been deducted by your bank, intermediate bank or by the payment processor are not provided in this summary. If you plan to deposit funds in different currencies, please make sure to review your wallet/deposit behaviors on your accounts settings page.

---------------------------------------
Transaction Details

VIR STERLINGOV,ROMAN
30066-12-11276370036590
MTG92441X


- The Mt.Gox Team

*Figure 24: Mt. Gox Deposit Confirmation Email 10/3/2011.*

According to the Mt. Gox records, on 10/3/2011 MTGOX ACCOUNT 1 converted these Euros first to Bitcoin and then to USD in multiple transactions and withdrew funds denominated in USD in three separate Redeem Codes. At approximately 11:58 UTC, MTGOX ACCOUNT 1 withdrew $25 as the Redeem Code MTGOX-USD-A2LKD-6NESR-9UM7X-4841F. At approximately 16:56 UTC, the account withdrew $25 as the Redeem Code MTGOX-USD-LZ4RX-2LSXN-CBAR5-92562. At approximately 18:29 UTC, the account withdrew $80 as the Redeem Code MTGOX-USD-BW3ZM-KRRAK-X47MZ-23E1D.

According to email records for plasma@plasmadivision.com obtained through a legal request, on 10/3/2011, email address plasma@plasmadivision.com received three emails from the AurumXchange Company (Email: noreply@aurumxchange.com) containing invoices for orders placed on the exchange. The three invoices were in the amounts of $25, $25, and $80. The invoices indicated that these orders were created on 10/3/2011 at approximately 11:45 UTC, 16:57 UTC, and 18:29 UTC, respectively. Each of these orders indicated that upon payment,

42

funds would be transferred to the Liberty Reserve Account U7489869, Account Name; Roso7234852 in the amounts of 24.5, 24.5 and 78.4, respectively. Liberty Reserve account U7489869 was the STERLINGOV LR ACCOUNT in the name of Roman Sterlingov.



*Figure 25: Screenshot of email to plasma@plasmadivision.com from AurumXchange Company showing an Exchange Order to send funds to the STERLINGOV LR ACCOUNT (U7489869).*

According to records from Liberty Reserve, on 10/3/2011 the STERLINGOV LR ACCOUNT received three deposits of 24.5 LRUSD, 24.5 LRUSD, and 78.4 LRUSD, a total of 127.4 LRUSD. These deposits came from the Liberty Reserve account of the AurumXchange Company (U2213781). These were the first deposits to the STERLINGOV LR ACCOUNT.

According to the records from Liberty Reserve, 126 LRUSD of the 127.4 LRUSD deposited above was withdrawn in two transactions. The first withdrawal, on 10/8/2011, sent 100 LRUSD

43

to the Liberty Reserve account xMtGox (Account ID: U8227430) and included the Memo Text "MtGox.com Funding MTGOX#93693X". The second transaction on 11/24/2011 sent 26 LRUSD to the same xMtGox account and included the Memo Text "MtGox.com Funding MTGOX#93693X".

*The First Withdrawal from the STERLINOGV LR ACCOUNT*

According to the records from Mt. Gox, on 10/8/2011 MTGOX ACCOUNT 4 (volfprius) received a deposit of $100 with the following text in the Info field, "Liberty Reserve: MtGox.com Funding MTGOX#93693X". The Mt. Gox records indicated that MTGOX ACCOUNT 4 converted approximately $100 to approximately 25.44 Bitcoin in three transactions on 10/8/2011. MTGOX ACCOUNT 4 then withdrew approximately 25.44 BTC to Bitcoin address 1BbaVGU5SRMSUpvdZpJTdMY8YH1FydYCsJ.

According to the Bitcoin blockchain, on 10/8/2011, Bitcoin address 1BbaVGU5SRMSUpvdZpJTdMY8YH1FydYCsJ received approximately 25.44 BTC. These funds (minus fee) were sent to Bitcoin address 1CRm234XE72QmaQ14GFv4fVBgYVmnbucAz the same day. On 10/9/2011, these funds (minus fee) were sent to Bitcoin address 1PBSo84vHSS5DMfAkibAYSdhyCT49TKEbv.

According to the records from Mt. Gox, on 10/9/2011, MTGOX ACCOUNT 2 received a deposit of approximately 25.4 BTC associated with Bitcoin address 1PBSo84vHSS5DMfAkibAYSdhyCT49TKEbv. The same day, MTGOX ACCOUNT 2 withdrew these funds as Mt. Gox Redeem Code: MTGOX-BTC-W96X5-ZUP6X-9H62L-0EA25.

According to the records from Mt. Gox, on 10/9/2011, MTGOX ACCOUNT 3 (kolbasa) received a deposit of approximately 25.4 BTC associated with redeeming the Redeem Code: MTGOX-BTC-W96X5-ZUP6X-9H62L-0EA25. The same day, MTGOX ACCOUNT 3 converted these funds to US Dollars in approximately four transactions. The same day, MTGOX ACCOUNT 3 withdrew these funds as a Mt. Gox Redeem Code: MTGOX-USD-FHWBL-ESTNW-NEC6D-82D85.

According to the Mt. Gox records, on 10/9/2011, Mt. Gox User ID: ff0b1ee6-1af1-43ef-9a19-6607ae58cf51 redeemed the same code, Redeem Code MTGOX-USD-FHWBL-ESTNW-NEC6D-82D85. User ID: ff0b1ee6-1af1-43ef-9a19-6607ae58cf51 was associated with the Login: aurumxchange and email address admin@aurumxchange.com. The account internal to AurumXchange which was credited with these funds was not determined by this analysis.

*The Second Withdrawal from the STERLINOGV LR ACCOUNT*

The second withdrawal from the STERLINGOV LR ACCOUNT on or about 11/24/2011, discussed above, which sent 26 LRUSD to Mt. Gox with Memo Text "MtGox.com Funding MTGOX#93693X" was also received by MTGOX ACCOUNT 4.

44

Appx6443



*Figure 26: Example of funds flows out of MTGOX ACCOUNT 1.*

According to the Mt. Gox records, on 11/24/2011, MTGOX ACCOUNT 4 (volfprius) received a deposit of $26 from the STERLINGOV LR ACCOUNT with the following text in the Info field, "Roso7234852 (U7489869) - 77278265
MtGox.com Funding MTGOX#93693X".  After the deposit, the USD balance in MTGOX ACCOUNT 4 was approximately $26.05 (the majority of the USD funds in the account at this time were from this deposit on 11/24/2011).  The records indicate that on the same day, MTGOX ACCOUNT 4 converted these funds to Bitcoin in approximately five transactions, resulting Bitcoin balance of approximately 10.965 BTC.  On 11/24/2011, MTGOX ACCOUNT 4 withdrew Bitcoin in two transactions of 2 BTC and 8.965 BTC to Bitcoin address 1KQt5Rsm9qwiNMaf5B4Kwy1nUzrHkRwcpf.

45

Appx6444

According to the Bitcoin blockchain, address 1KQt5Rsm9qwiNMaf5B4Kwy1nUzrHkRwcpf received two deposits on 11/24/2011 of 2 BTC and 8.965 BTC. The same day, 1KQt5Rsm9qwiNMaf5B4Kwy1nUzrHkRwcpf sent these funds (minus fee) in a single transaction of 10.955 BTC to Bitcoin address 1LZvkK1QMCCPUoRRsJb7mxqX2tcLUqGuYX.

Bitcoin address 1LZvkK1QMCCPUoRRsJb7mxqX2tcLUqGuYX was part of the BITCOIN FOG CLUSTER.

**Example 2 of Similar Funds Movements Out of MT GOX ACCOUNT 1**



*Figure 27: Example 2 of Flow of Funds Out of MTGOX ACCOUNT 1.*

According to records from Liberty Reserve, on 11/26/2011 the STERLINGOV LR ACCOUNT received approximately 132 LRUSD from the AurumXchange. On 11/27/2011, the STERLINGOV LR ACCOUNT sent 130 LRUSD to the Liberty Reserve account xMtGox

46

Appx6445

(Account ID: U8227430), with the following information in the Memo Text field: "MtGox.com Funding MTGOX#92441X"

According to records from Mt. Gox, on 11/27/2011 MTGOX ACCOUNT 1 received a deposit of $132 with the following text in the Info field indicating the deposit was from the STERLINGOV LR ACCOUNT; "Roso7234852 (U7489869) – 77527847 MtGox.com Funding MTGOX#92441XX". On 11/27/2011 MTGOX ACCOUNT 1 used these funds to purchase Bitcoin in multiple transactions totaling approximately 52 BTC. These funds were added to the previous BTC balance in the account of approximately 8 BTC. On 11/27/2011, MTGOX ACCOUNT 1 withdrew approximately 60 BTC to Bitcoin address 1Pfkqm3YsCYnWeA7h14Zmm1j8kiFruFvqA.

According to the Bitcoin blockchain, on 11/27/2011, Bitcoin address 1Pfkqm3YsCYnWeA7h14Zmm1j8kiFruFvqA received one deposit of 60.417 BTC. On or about 11/27/2011, these funds (minus fee) were sent to Bitcoin address 12MDVJ4mKK3SqXn3TekpbcU4cfw5hUmHh5.

According to records from seized Silk Road servers, on or about 11/27/2011, Silk Road User: *pas* (User ID: 29894) received a deposit of 60.41 BTC to Bitcoin address 12MDVJ4mKK3SqXn3TekpbcU4cfw5hUmHh5. This deposit brought the account balance to approximately 60.8 BTC. On or about 11/27/2011 at time 21:04. Silk Road User ID: 29894 withdrew approximately 60.8 BTC. The Silk Road records I reviewed did not include the withdrawal address or transaction hash for this withdrawal.

According to the Bitcoin blockchain, there was only one Bitcoin transaction that occurred between 11/26/2011 and 11/28/2011 (inclusively) with an output amount of exactly 60.8 BTC. The transaction, detailed below, occurred on 11/27/2011 and was included in the blockchain at time 21:09 UTC.[11]

("SILK ROAD WITHDRAWAL TX")

| | |
|---|---|
| Transaction Hash: | 71db86ae4f3d791a10d86396c11e532cb50666f1d21cae448a989b4e811dbefe |
| Included in Block: | 155,011 |
| Block Time: | 21:09 UTC |
| Input Address: | 14gbjpkD2r5pDquk3DmMs6vYpveJrB1Kkp |
| Input Amount: | 61.00000000 BTC |
| Output Address 1: | 1JJFREKTWaxmFRfNz2Q4tZD7CfaR8KZCeg |
| Output Amount 1: | 0.20000000 BTC |
| Output Address 2: | 1C7kWtPjfCgUH4Ye5GdAqdQVutx2NrvWi |
| Output Amount 2: | 60.80000000 BTC |

According to Chainalysis Reactor, SILK ROAD WITHDRAWAL TX Input Address 14gbjpkD2r5pDquk3DmMs6vYpveJrB1Kkp was part of the SILK ROAD cluster.

---

[11] The website Blockchair.com was utilized to conduct a search of the Bitcoin blockchain for Bitcoin transaction outputs in the exact amount of 60.8 BTC in the date range of 11/26/2011 to 11/28/2011. The results of this search included a single transaction, Transaction Hash 71db86ae4f3d791a10d86396c11e532cb50666f1d21cae448a989b4e811dbefe (the SILK ROAD WITHDRAWAL TX).

47

According to the Bitcoin blockchain, on 11/28/2011 Bitcoin address 1C7kWtPjfCgUH4Ye5GdAqdQVutx2NrvWi sent 60.7 BTC to Bitcoin address 1C81Mn4iPJhr9LPyHFZPFaQxfPBagHuk8D in Transaction Hash b5cfcc9eb56208e35ad44d7dfecd67a48441de78569e8e763591187eecc68a06.

According to records from Mt. Gox, on 11/28/2011, MTGOX ACCOUNT 2 (Login: peternfs, Email: nfs9000@hotmail.com) received a Bitcoin deposit of 60.7 BTC at Bitcoin address 1C81Mn4iPJhr9LPyHFZPFaQxfPBagHuk8D.  On 11/28/2011, MTGOX ACCOUNT 2 withdrew 61.699 BTC in the form of Mt. Gox Redeem Code: MTGOX-BTC-T6CX5-XTRX9-W2H3S-F916D.

According to records from Mt. Gox, on 11/28/2011, MTGOX ACCOUNT 3 (Login: kolbasa, Email: kolbasa99@rambler.ru) received a deposit of approximately 61.699 BTC associated with redeeming Redeem Code: MTGOX-BTC-T6CX5-XTRX9-W2H3S-F916D.  On 11/29/2011, MTGOX ACCOUNT 3 withdrew a portion of these funds, 27 BTC, to Bitcoin address 16mT7VrXheWGRiwdy8DSJHEVqnFK1y4Vgy.

According to the Bitcoin blockchain, 16mT7VrXheWGRiwdy8DSJHEVqnFK1y4Vgy received a deposit of 27 BTC on or about 11/29/2011 in Transaction Hash 971b5eecc99e5bcefce658231db5941f019626b8b005b17d761fe6a4f75ca143.

According to Chainalysis Reactor, 16mT7VrXheWGRiwdy8DSJHEVqnFK1y4Vgy was part of the BITCOIN FOG CLUSTER.


**MTGOX ACCOUNT 1 to the BITCOIN FOG CLUSTER**

According to Mt. Gox records, on or about 10/11/2011, approximately 89.87 Euros were deposited into MT GOX ACCOUNT 1 (The same deposit described above which funded BITCOIN FOG infrastructure payments).  On or about 10/13/2011, MT GOX ACCOUNT 1 purchased approximately two BTC for approximately six Euros.  On 10/13/2011, MT GOX ACCOUNT 1 withdrew approximately 2 Bitcoin to Bitcoin address 12NSB5HE8VUjK44cQPJgtLUgj6YXLeUyU4.

The Bitcoin blockchain recorded one deposit to address 12NSB5HE8VUjK44cQPJgtLUgj6YXLeUyU4, on 10/13/2011 in the following transaction:

("Tx0")
Transaction Hash: d9ecaabe55e024a17353882d6d0b48d5a77a800e5c45dee71291659408975bf7
Included in Block:      149148
Input Address 1:        1LaXTasvhz6xkjwyv6aCt2osiruyGTq2P4
Input Amount 1:         0.06881494 BTC
Input Address 2:        1ENXwzuFzHSdgfUo9XDFQXJ9aNaEGG7JsN
Input Amount 2:         1.94957463 BTC
Output Address 1:       1LChRcpokJNhkq6rJ7o5YE4h8hFvAPRUMh
Output Amount 1:        0.02188957 BTC
Output Address 2:       12NSB5HE8VUjK44cQPJgtLUgj6YXLeUyU4
Output Amount 2:        1.996 BTC

48

Appx6447

These funds withdrawn from MTGOX ACCOUNT 1 were moved through approximately 10 intermediary transactions which ultimately deposited the majority of the funds withdrawn from MTGOX ACCOUNT 1 in Tx0 to the BITCOIN FOG CLUSTER.

The intermediary transactions are detailed below, but a general description is presented here first.

First, all on or about 10/14/2011, the first five intermediary transactions moved funds withdrawn from MTGOX ACCOUNT 1 in Tx0 through multiple addresses and distributed the majority of these funds to other addresses known to be in the same wallet based on subsequent co-spending.

Then, all on or about 10/27/2011, immediately before the public launch of BITCOIN FOG, the next four intermediary transactions sent these funds through multiple addresses and deposited the majority of the funds withdrawn in Tx0 to two addresses known to belong to the same wallet based on subsequent co-spending.

This wallet subsequently received multiple deposits from other sources into different addresses. Then on or about 11/10/2011, the funds from withdrawn MTGOX ACCOUNT 1 in Tx0 were co-spent with the funds from other sources, making the first deposit to the BITCOIN FOG CLUSTER.



*Figure 28: Flow of Funds from MTGOX ACCOUNT 1 to the BITCOIN FOG CLUSTER*

*List of Relevant Transactions*

49

Appx6448

"Tx1"
Transaction Hash: b1bb2d6bb437c280e61a76b549224f7d4596b3663eb9912f693ec21c3c11558c
Included in Block:      149246
Input Address:          12NSB5HE8VUjK44cQPJgtLUgj6YXLeUyU4
Input Amount:           1.996 BTC
Output Address 1:       1C8HV5dfgFMbaFf6sgdMWTZVBxQ2GUCP1t
Output Amount 1:        1.8955 BTC
Output Address 2:       15GLqBsebPRjq9YMQznUpbVNvmWMvG2ixJ
Output Amount 2:        0.1 BTC

"Tx2"
Transaction Hash: 2d42f865af09c0d9e1f6e24ee74d21a90ee565a7154adbd9a290a6b6440dd7f8
Included in Block:      149246
Input Address:          1C8HV5dfgFMbaFf6sgdMWTZVBxQ2GUCP1t
Input Amount:           1.8955 BTC
Output Address 1:       19S1xX26peJzZ5nQSRPceHpmcd71vEbv53
Output Amount 1:        1.795 BTC
Output Address 2:       15GLqBsebPRjq9YMQznUpbVNvmWMvG2ixJ
Output Amount 2:        0.1 BTC

"Tx3"
Transaction Hash: d97176a012381255bd547b87bb86b7b2b767569fd0503f475d8180263a4432ea
Included in Block:      149259
Input Address 1:        15GLqBsebPRjq9YMQznUpbVNvmWMvG2ixJ
Input Amount 1:         0.1 BTC
Input Address 2:        15GLqBsebPRjq9YMQznUpbVNvmWMvG2ixJ
Input Amount 2:         0.1 BTC
Output Address 1:       1Ju2kV2eDzaJvz4N3LtdbNs5cd7ybyJikE
Output Amount 1:        0.0995 BTC
Output Address 2:       15GLqBsebPRjq9YMQznUpbVNvmWMvG2ixJ
Output Amount 2:        0.1 BTC

"Tx4"
Transaction Hash: 10526da51dd266ba2f941590535c936f5a0e4230b35a283ef116b2f28289e9b6
Included in Block:      149267
Input Address:          19S1xX26peJzZ5nQSRPceHpmcd71vEbv53
Input Amount:           1.795 BTC
Output Address 1:       164wQdzBDLWTpUaVZEsStwnCYXuNtDDik6
Output Amount 1:        0.299 BTC
Output Address 2:       15GLqBsebPRjq9YMQznUpbVNvmWMvG2ixJ
Output Amount 2:        1.4955 BTC

"Tx5"
Transaction Hash: 8f09bf594d7de53e1777ce221e4a44c8af9e2729b06a383fafdc62c38e2831d8
Included in Block:      149267
Input Address 1:        1Ju2kV2eDzaJvz4N3LtdbNs5cd7ybyJikE
Input Amount 1:         0.0995 BTC

50

**Appx6449**

| | |
|---|---|
| Input Address 2: | 15GLqBsebPRjq9YMQznUpbVNvmWMvG2ixJ |
| Input Amount 2: | 0.1 BTC |
| Input Address 3: | 164wQdzBDLWTpUaVZEsStwnCYXuNtDDik6 |
| Input Amount 3: | 0.299 BTC |
| Output Address 1: | 123Yxph2U5A1TDvf2RtucPGBPC5wbQPnUq |
| Output Amount 1: | 0.0848648 BTC |
| Output Address 2: | 1KWMcxNJU4mneER8qLeLVHQAG5VGHHnCgt |
| Output Amount 2: | 0.4131352 BTC |

"Tx6"

Transaction Hash: c778835b945a53380004fba50cd7cedf93c58300e88840f86ed56c38596f6550

| | |
|---|---|
| Included in Block: | 150761 |
| Input Address 1: | 15GLqBsebPRjq9YMQznUpbVNvmWMvG2ixJ |
| Input Amount 1: | 1.4955 BTC |
| Input Address 2: | 123Yxph2U5A1TDvf2RtucPGBPC5wbQPnUq |
| Input Amount 2: | 0.0848648 BTC |
| Output Address 1: | 15GLqBsebPRjq9YMQznUpbVNvmWMvG2ixJ |
| Output Amount 1: | 0.0103648 BTC |
| Output Address 2: | 1NeWNPH7sxkCoHjvvKwWqLLFjRjLLJJiMP |
| Output Amount 2: | 1.57 BTC |

"Tx7"

Transaction Hash: e4cf308fe9757a2a9a0b99064e02392059b6705318b03a69aedf659302a451e9

| | |
|---|---|
| Included in Block: | 150806 |
| Input Address: | 1NeWNPH7sxkCoHjvvKwWqLLFjRjLLJJiMP |
| Input Amount: | 1.57 BTC |
| Output Address 1: | 1M3npLMWhS4MfKobKsw1Ch8bd5GxTygByh |
| Output Amount 1: | 1.5695 BTC |

"Tx8"

Transaction Hash: 34185647de0609419e8aa27d3a6f9077ef4c652ae573df72e289c95d22427494

| | |
|---|---|
| Included in Block: | 150811 |
| Input Address 1: | 1M3npLMWhS4MfKobKsw1Ch8bd5GxTygByh |
| Input Amount 1: | 1.5695 BTC |
| Output Address 1: | 15Hfac7efgPbgjwnXZHmR2KEQMs9YoHeF7 |
| Output Amount 1: | 1.067714 BTC |
| Output Address 2: | 1EThRmUKpP1XUfC4Z5CALXJ8EMmWtPY49K |
| Output Amount 2: | 0.501286 BTC |

"Tx9"

Transaction Hash: d57db8478e6a70666ea81d55a1e5a15f1c7f925838a58d5b6a2452fe7a57b2ea

| | |
|---|---|
| Included in Block: | 150831 |
| Input Address 1: | 15Hfac7efgPbgjwnXZHmR2KEQMs9YoHeF7 |
| Input Amount 1: | 1.067714 BTC |
| Output Address 1: | 12PBevuCVYzZY9xXsgoDb5WQ1aZp7qz1WF |
| Output Amount 1: | 0.5685 BTC |
| Output Address 2: | 1EThRmUKpP1XUfC4Z5CALXJ8EMmWtPY49K |
| Output Amount 2: | 0.498714 BTC |

Appx6450

"Tx10"
Transaction Hash: 6586649970d8fe8a8db1dacf17665ae6bade88e090fa73904efb05f49dcc379a
Included in Block:      152678
Input Address 1:        1JGSkCGZYy9bEkjQ231eeFhPPTBBTCEf9J
Input Amount 1:         2 BTC
Input Address 2:        1T4rNvBGSB3STXtUnwTNuPLBwPTFAHes2
Input Amount 2:         17.10668183 BTC
Input Address 3:        1NRrE8pmYa3vy6287VRUAw6xHqSVYYewYK
Input Amount 3:         23 BTC
Input Address 4:        1EThRmUKpP1XUfC4Z5CALXJ8EMmWtPY49K
Input Amount 4:         0.501286 BTC
Input Address 5:        12PBevuCVYzZY9xXsgoDb5WQ1aZp7qz1WF
Input Amount 5:         0.5685 BTC
Input Address 6:        1EThRmUKpP1XUfC4Z5CALXJ8EMmWtPY49K
Input Amount 6:         0.498714 BTC
Output Address 1:       1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw
Output Amount 1:        43.67468183 BTC

*Co-Spending Analysis for WALLET 1*

In transaction Tx5, Bitcoin addresses 1Ju2kV2eDzaJvz4N3LtdbNs5cd7ybyJikE, 15GLqBsebPRjq9YMQznUpbVNvmWMvG2ixJ, and 164wQdzBDLWTpUaVZEsStwnCYXuNtDDik6 were used as inputs to the same transaction. This co-spending indicating these addresses were controlled by the same wallet ("WALLET 1").

In transaction Tx6, Bitcoin addresses 15GLqBsebPRjq9YMQznUpbVNvmWMvG2ixJ (controlled by Wallet 1) and 123Yxph2U5A1TDvf2RtucPGBPC5wbQPnUq were used as inputs to the same transaction, indicating these addresses were controlled by the same wallet. Therefore, co-spending in Tx5 and Tx6 collectively indicated that all four addresses used as inputs to these two transactions were controlled by WALLET 1.

"WALLET 1" Addresses:

- 1Ju2kV2eDzaJvz4N3LtdbNs5cd7ybyJikE
- 15GLqBsebPRjq9YMQznUpbVNvmWMvG2ixJ
- 164wQdzBDLWTpUaVZEsStwnCYXuNtDDik6
- 123Yxph2U5A1TDvf2RtucPGBPC5wbQPnUq

Addresses in WALLET 1 are attributed to the same entity in this analysis based on the co-spending described above. This group of addresses is not necessarily all inclusive of the addresses belonging to the wallet. It's possible, for example that the actual wallet containing addresses in WALLET 1 included additional addresses, even other addresses on the graph.

*Co-Spending Analysis for WALLET 2*

In transaction Tx10, Bitcoin addresses 1JGSkCGZYy9bEkjQ231eeFhPPTBBTCEf9J, 1T4rNvBGSB3STXtUnwTNuPLBwPTFAHes2,

52

**Appx6451**

1NRrE8pmYa3vy6287VRUAw6xHqSVYYewYK,
1EThRmUKpP1XUfC4Z5CALXJ8EMmWtPY49K, and
12PBevuCVYzZY9xXsgoDb5WQ1aZp7qz1WF were used as inputs to the same transaction (co-spent), indicating these addresses were controlled by the same wallet ("WALLET 2").

"WALLET 2" Addresses:

- 1JGSkCGZYy9bEkjQ231eeFhPPTBBTCEf9J
- 1T4rNvBGSB3STXtUnwTNuPLBwPTFAHes2
- 1NRrE8pmYa3vy6287VRUAw6xHqSVYYewYK
- 1EThRmUKpP1XUfC4Z5CALXJ8EMmWtPY49K
- 12PBevuCVYzZY9xXsgoDb5WQ1aZp7qz1WF

Addresses in WALLET 2 were attributed to the same entity in this analysis based on the co-spending described above. This group of addresses is not necessarily all inclusive of the addresses belonging to the wallet.

*Flow of Funds*

Transactions Tx1, Tx2, and Tx4 collectively deposited all funds withdrawn from MTGOX ACCOUNT 1 in Tx0 (minus Bitcoin fees) to WALLET 1 through multiple addresses. Tx4 sent funds to two different addresses within WALLET 1, splitting funds to different addresses while transferring the value to the same wallet. These transactions appeared to be designed to obscure the flow of funds to WALLET 1.

In transaction Tx3, all input and output addresses were controlled by WALLET 1. This transaction appeared to be designed to obscure the flow of funds.

Tx5 sent a portion of the funds originally withdrawn from MTGOX ACCOUNT 1 to two addresses, one of which was in WALLET 1 (123Yxph2U5A1TDvf2RtucPGBPC5wbQPnUq) and one of which was not known to be in WALLET 1 (1KWMcxNJU4mneER8qLeLVHQAG5VGHHnCgt).

Tx6 sent funds previously withdrawn from MTGOX ACCOUNT 1 from multiple addresses in WALLET 1 to Bitcoin address 1NeWNPH7sxkCoHjvvKwWqLLFjRjLLJJiMP (outside of WALLET 1).

Tx7 sent the funds received in Tx6 to Bitcoin address 1M3npLMWhS4MfKobKsw1Ch8bd5GxTygByh which were subsequently spent in Tx8.

Transactions Tx8 and Tx9 both sent funds previously withdrawn from MTGOX ACCOUNT 1 to addresses controlled by WALLET 2 within a short period of time, approximately 4 hours. This transaction behavior was similar to the collective behavior exhibited in transactions Tx1, Tx2, and Tx4. Tx9 sent funds to two separate addresses in Wallet 2. This transaction behavior was similar to the behavior exhibited in transaction Tx4.

Funds deposited to Wallet 2 in transactions Tx8 and Tx9 totaled approximately 1.5685 BTC. These funds consisted entirely of funds previously withdrawn from MTGOX ACCOUNT 1 in Tx0. Tx8 occurred on or about 10/27/2011 and was included in the blockchain at approximately

53

12:53 UTC. Tx9 occurred on or about 10/27/2011 and was included in the blockchain at approximately 16:57 UTC.

Transaction Tx10, on or about 11/10/2011, combined those funds from transactions Tx8 and Tx9 with funds from other sources and sent them to output address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw ("1YZJKa"). Address 1YZJKa was part of the BITCOIN FOG CLUSTER. Tx10 was the first deposit to the BITCOIN FOG CLUSTER.

### *Tx10 and the Significance of Bitcoin Address 1YZJKa*

Other sources of funds co-spent in Tx10 included three deposits to other addresses in WALLET 2 which all occurred after the announcements of BITCOIN FOG, on or about 11/1/2011, 11/6/2011, and 11/9/2011, respectively. One of these deposits, on or about 11/6/2011, deposited 2.0 BTC from to Bitcoin address 1JGSkCGZYy9bEkjQ231eeFhPPTBBTCEf9J (part of Wallet 2). These funds were sent from Bitcoin address 177o5gn7DwWWm5Rrq1A5aJAh9d9y5SKygE in Transaction Hash 3667ce7401eb94767fdc076ba8738dc76bcd8d1f916c924601301fcbff563738. Based on forum posts on the Bitcoin Talk website (bitcointalk.org), address 177o5gn7DwWWm5Rrq1A5aJAh9d9y5SKygE belonged to Bitcoin Talk. Bitcoin Talk administrator theymos posted this address to receive funds for advertising auctions on Bitcoin Talk.



*Figure 29: Screenshot of Bitcoin Talk forum post by administrator theymos; https://bitcointalk.org/index.php?topic=48286.msg586245#msg586245*

Tx10 appeared to spend funds from multiple sources and consolidate them at 1YZJKa.

According to the Bitcoin blockchain, 1YZJKa address was involved in 66 total Bitcoin transactions, including 33 deposits and 33 withdrawals. These 33 deposits totaled approximately 30,458 BTC and occurred from on or about 11/10/2011 to on or about 3/25/2012. Multiple individual deposit transactions made into 1YZJKa included over 50 input addresses. Based on my training an experience, 1YZJKa was not consistent with a typical user deposit address at a service. 1YZJKa appeared to be an internal address at BITCOIN FOG used to consolidate multiple deposits made by multiple users.

54

**Appx6453**

Other user deposits to the BITCOIN FOG CLUSTER discussed in this report were subsequently consolidated into 1YZJKa. For example, in subsection "Example 1 of Similar Funds Movements Out of MTGOX ACCOUNT 1", funds originally withdrawn from MTGOX ACCOUNT 1 were deposited to Bitcoin address 1LZvkK1QMCCPUoRRsJb7mxqX2tcLUqGuYX in the BITCOIN FOG CLUSTER on or about 11/24/2011. According to the Bitcoin blockchain, on or about 11/24/2011, 1LZvkK1QMCCPUoRRsJb7mxqX2tcLUqGuYX sent these funds to 1YZJKa in Transaction Hash fd3717a821d796631fc3a13e65c26e441a17c6430e678a5f489a7891b51ad221. This transaction included inputs from six other sources.

As another example, in subsection "Example 2 of Similar Funds Movements Out of MTGOX ACCOUNT 1", funds originally withdrawn from the STERLINGOV LR ACCOUNT were subsequently deposited to Bitcoin address 16mT7VrXheWGRiwdy8DSJHEVqnFK1y4Vgy in the BITCOIN FOG CLUSTER on or about 11/29/2011. According to the Bitcoin blockchain, on or about 11/30/2011, 16mT7VrXheWGRiwdy8DSJHEVqnFK1y4Vgy sent these funds to the 1YZJKa address in Transaction Hash f0b29c6d88581035b80df922b83e758b384d245f6a901fc375ff94fefee6b2b1. This transaction included inputs from four other sources.

According to Chainalysis Reactor, 31 of the 33 the deposits to 1YZJKa (including the two examples above) came from Bitcoin addresses within the BITCOIN FOG CLUSTER. Only the first two deposits, including Tx10 and one other deposit[12], were from addresses not attributed by Chainalysis to the BITCOIN FOG CLUSTER.

Bitcoin address 1YZJKa was very likely an internal consolidation address at BITCOIN FOG and not a user deposit address. Therefore, Tx10 was very likely an internal transaction at BITCOIN FOG and addresses in WALLET 2 were part of BITCOIN FOG.

*Timing of the BITCOIN FOG Announcements*

It is my understanding that the earliest announcement of the BITCOIN FOG service identified by this investigation occurred on the Bitcoin Talk forum. This appeared to be consistent with open-source reporting, but this analysis cannot rule out that an earlier announcement existed.

According to forum post on the Bitcoin Talk forum, Bitcoin Talk user Akemashite Omedetou announced the BITCOIN FOG service on Bitcoin Talk on or about 10/27/2011 at approximately 17:05 UTC.[13]

---

[12] The other deposit to 1YZJKa which was not attributed to the BITCOIN FOG CLUSTER occurred in Transaction Hash: 2192911b15e4f7c4853b1b32fbb143b68e5ddf6cd8a3f29b7459cc8697fad15f. The only input address to this transaction was 13PyZruVTJ2R7oMaeHbpfx9aYNzjHCoNMf. 13PyZruVTJ2R7oMaeHbpfx9aYNzjHCoNMf received a single deposit on or about 11/07/2011, after the BITCOIN FOG announcements.

[13] The date time stamp in the screenshot of the BITCOIN FOG announcement on Bitcoin Talk was "October 27, 2011, 05:05:07 PM", but did not indicate a time zone. The production from BITCOIN TALK included this post and indicated the time of the post was 17:05:07 UTC.

55



*Figure 30: Screenshot of BITCOIN FOG Announcement on Bitcoin Talk (https://bitcointalk.org/index.php?topic=50037.0, accessed on 11/28/2022).*

The Twitter account @BitcoinFog, linked to in the Bitcoin Talk announcement, tweeted an announcement of the launch of BITCOIN FOG on or about 11/27/2011 at approximately 18:45 UTC.[14]



*Figure 31: Screenshot of BITCOIN FOG announcement on Twitter.*
*(https://twitter.com/BitcoinFog/status/129629806181613568?cxt=HHwWgICQ3ObnxMwDAAAA, accessed on 11/28/2022)*

### *Conclusion*

Funds previously withdrawn from STERLINGOV's MTGOX ACCOUNT 1 were deposited to WALLET 2 in two transactions on or about 10/27/2011 at approximately 12:53 UTC and approximately 16:57 UTC. Wallet 2 was very likely part of BITCOIN FOG. These deposits

---

[14] According to the Twitter production, the BITCOIN FOG announcement tweet, ID 1296298061816135568, was created at "Thu Oct 27 18:45:28 +0000 2011". The timestamp in the screenshot appeared to be converted to the device's local time.

56

occurred before the first known public announcement of BITCOIN FOG which occurred on 11/27/2011 at 17:05 UTC.

**Expedia Payments through Coinbase**

Investigators identified multiple payments to Expedia which I understand to be associated with STERLINGOV that were facilitated by Coinbase, a cryptocurrency exchange.

A subpoena return from Coinbase indicated that these Expedia payments were associated with the following Coinbase payment orders.

1. ("Coinbase Order 1")
   a. Order Code:   2FEYI2Y9
   b. Created:      2/12/2017
   c. Merchant:     Expedia, Inc.
   d. Address:      1CVPxbJJMoxVnkBLz91C5r5669d4B3cTru
   e. Amount:       0.256857 BTC ($259.30)
2. ("Coinbase Order 2")
   a. Order Code:   90WWJQV3
   b. Created:      2/14/2017
   c. Merchant:     Expedia, Inc.
   d. Address:      1DQohq3s3A85w4SNGX3H5BqPmLA8Nkw2g7
   e. Amount:       0.142173 BTC ($144.06)
3. ("Coinbase Order 3")
   a. Order Code:   WPYKWPFD
   b. Created:      2/15/2017
   c. Merchant:     Expedia, Inc.
   d. Address:      1GA878vjrBJ34uAFyhcHVdatQ6q59cfZjm
   e. Amount:       0.18944 BTC ($192.09)
4. ("Coinbase Order 4")
   a. Order Code:   L7LW1FS0
   b. Created:      2/16/2017
   c. Merchant:     Expedia, Inc.
   d. Address:      1MwtneJhHCUmxPL8cRraDxQq9pvssmNJCB
   e. Amount:       0.524643 BTC ($548.00)
5. ("Coinbase Order 5")
   a. Order Code:   XB0D7KJO
   b. Created:      2/16/2017
   c. Merchant:     Expedia, Inc.
   d. Address:      1P8tcQmYSbr3kB3Jpn2bxLm18QDBDk113Y
   e. Amount:       0.183971 BTC ($192.09)

Blockchain analysis indicated that the funds in all five of these payments came indirectly from the BITCOIN FOG CLUSTER. These withdrawals were both sent to the same Bitcoin address,

Appx6456

1HHhjQfvZPCs71ASuteG6KTiGRGFKLJEZk ("1HHhjQ").  From 1HHhjQ, funds from these withdrawals flowed through multiple addresses in two separate peel chains.

Appx6457



*Figure 32: Peel chains spending funds withdrawn from the BITCOIN FOG CLUSTER in payments for Coinbase orders associated with Expedia purchases.*

59

*Peel Chain 1*

Addresses in the BITCOIN FOG CLUSTER sent the first transaction to Bitcoin address 1HHhjQ of approximately 8.85617033 BTC on or about 09/07/2016 in Transaction Hash f1dc9bb5ce13b1b996bf709165e02e1b3cdfeaaa2cf83a55324a9b9a45392043.

Funds flowed through 12 additional addresses in a peel chain before being sent to Bitcoin address 1HajEEWKJR26DCQQfR2WxxVjrst2yMp2qQ ("1HajEE"). On or about 2/15/2017, 1HajEE sent approximately 0.0142173 BTC to Bitcoin address 1DQohq3s3A85w4SNGX3H5BqPmLA8Nkw2g7 in Transaction Hash 8dc41a6a283a0c4d9f3e184918df59bc261cf35ee0e76937945275740f3d38f0. This transaction paid Coinbase Order 2.

In the same transaction that paid Coinbase Order 2, the remaining funds input to this transaction by 1HajEE (minus fee) were sent to Bitcoin address 1PXYFh3zTk4zuJFq8n5GCCtX4ms7ZLsH1R ("1PXYF").

On or about 12/17/2017, Bitcoin address 1PXYFh sent 0.183971 BTC to Bitcoin address 1P8tcQmYSbr3kB3Jpn2bxLm18QDBDk113Y in Transaction Hash fcf6be70c8294745949c528b5ce10ec138707b12ec6cf880ff863e5fea34c7ac. This transaction paid Coinbase Order 5.

*Peel Chain 2*

Addresses in the BITCOIN FOG CLUSTER sent the second transaction to Bitcoin address 1HHhjQ of approximately 25.9710379 BTC on or about 09/07/2016 (the same day as the first transaction) in Transaction Hash f1dc9bb5ce13b1b996bf709165e02e1b3cdfeaaa2cf83a55324a9b9a45392043.

Funds flowed through 12 additional addresses in a peel chain before being sent to Bitcoin address 171tSzYNiu2dWGR9vQ8Yzw9fFSNxa1BsyL ("171tSz"). On or about 2/12/2017, 171tSz sent approximately 0.256857 BTC to Bitcoin address 1CVPxbJJMoxVnkBLz91C5r5669d4B3cTru in Transaction Hash ee819aa54ef22cb5cca0d2c0a8b468f028ddfdaa0da14c24290183aa8f30c5e1. This transaction paid Coinbase Order 1.

In the same transaction that paid Coinbase Order 1, the remaining funds input by 171tSz (minus fee) were sent to Bitcoin address 1Cw7sbW8DsbaVZFFc5NCyAJVmHmYotpP39 ("1Cw7sb").

On or about 2/14/2017, 1Cw7sb spent these funds in Transaction Hash 357a26414abfad6179adefe2def48b5ff7ede141ae95c2549e51b8d85a91700c, sending approximately 10.00880894 BTC to Bitcoin address 1JPmnHkEJKUHxCbnPJ7AYJYDu2Aiq9Ljgz ("1JPmnH").

On or about 2/16/2017, 1JPmnH spent these funds in Transaction Hash 1d99fbe3426a6b034ae369c085bfd94172c9c6900d926cafb63b7d1d16d51fca which sent approximately 0.18944 BTC to Bitcoin address 1GA878vjrBJ34uAFyhcHVdatQ6q59cfZjm ("1GA878") and approximately 9.81931714 BTC to Bitcoin address 1HMjdSoatzomdHEsBvzML9kh5NB3WEhJK ("1HMjdS"). The payment to 1GA878 paid Coinbase Order 3.

60

On or about 2/18/2017, 1HMjdS spent the funds received above in Transaction Hash 607b78daccc3d247133bcb85b6f77dd3569077d75c2db0184d55996409deeabc which sent approximately 0.524643 BTC to Bitcoin address 1MwtneJhHCUmxPL8cRraDxQq9pvssmNJCB ("1Mwtne") and the remainder (minus fee) to another address. The payment to 1Mwtne paid Coinbase Order 4.

**NameCheap Payment**

According to records provided by NameCheap, Inc., STERLINGOV opened NAMECHEAP ACCOUNT 1 with User ID: 255555 in the name of Roman Sterlingov on 5/8/2008.

The NameCheap records included a single Bitcoin payment. On or about 10/15/2020, NAMECHEAP ACCOUNT 1 was credited with a deposit of approximately 0.0138654 BTC to Bitcoin address 1FaRciAuFWLY313bDHofRe4abPyLisnVTf.

According to the Bitcoin blockchain, Bitcoin address 1FaRciAuFWLY313bDHofRe4abPyLisnVTf received 0.0138654 BTC on or about 10/15/2020 in Transaction Hash 1e3e6c2ca8243bb64158c7358e38c4fb2c89ebb7d531d3d87d9ec8841d4c28b9.

The MYCELIUM WALLET records obtained from STERLINGOV's device included a withdrawal to 1FaRciAuFWLY313bDHofRe4abPyLisnVTf on or about 10/15/2020 in the same Transaction Hash, 1e3e6c2ca8243bb64158c7358e38c4fb2c89ebb7d531d3d87d9ec8841d4c28b9. This indicated that the NAMECHEAP ACCOUNT 1 payment came from STELRINGOV's MYCELIUM WALLET. As discussed above, all of the funds spent by the MYCELIUM WALLET were received by the MYCELIUM WALLET in a single transaction directly from the BITCOIN FOG CLUSTER.

**Purchase from Microtronix for SSL associated with BITCOIN FOG**

According to records from Microtronix, an SSL certificate for the domain name gate.bitcoinfog.com was purchased by the following user

- First Name: Akveduk
- Last Name: Papademos
- Company Name: Bitcoin Fog
- Email Address: shormint@hotmail.com

The Microtronix records indicated that the purchase of this certificate was associated with Microtronix Invoice #1308, which was paid through the Bitcoin payment processor BitPay on or about 12/1/2012. The records indicated the invoice was for approximately $82.00 and that BitPay processed a payment of 6.5548 BTC associated with this invoice.

Records from BitPay indicated that BitPay processed a payment from buyer Akveduk Papademos using email address shormint@hotmail.com to the merchant Microtronix on 12/1/2012 in the amount of 6.5548 BTC. The records indicated that this payment was received by BitPay in Transaction Hash

61

4509098a6b62ddae1d7373d197436d10fe8d134e7a103ea8011dbd518feb3bbe and the BitPay receiving address was 1ND9Uq7Cabbg1qYBtyraS4Vbphgre6RTtp.

The Bitcoin blockchain confirmed this transaction information. According to the Bitcoin blockchain, Transaction Hash 4509098a6b62ddae1d7373d197436d10fe8d134e7a103ea8011dbd518feb3bbe sent approximately 6.5548 BTC to Bitcoin address 1ND9Uq7Cabbg1qYBtyraS4Vbphgre6RTtp on or about 12/1/2012. This transaction, depicted below contained multiple input addresses.



*Figure 33: Transaction which purchased gate.bitcoinfog.com. Screenshot from mempool.space.*

According to Chainalysis Reactor, the input addresses in transaction 4509098a6b62ddae1d7373d197436d10fe8d134e7a103ea8011dbd518feb3bbe which made this payment, including Bitcoin address 1PGbZEExmdp9anLce8KhFPHP43aztXUNqY, belonged to the Instawallet.org cluster.

**Payments to OrangeWebsite.com**

According to records from BitPay, the email address shormint@hotmail.com was associated with two payments to the merchant OrangeWebsite.com.

*OrangeWebsite.com Payment 1*

According to the records from BitPay, on or about 9/14/2014, BitPay processed a payment from *Buyer Name:* "Privacy Department" using email address shormint@hotmail.com to *Merchant*

62

Appx6461

*Name:* "OrangeWebsite.com - Bitcoin Hosting". This payment was in the amount of approximately 0.2715 BTC and valued by BitPay at approximately $129.15. The records indicated that this payment was received by BitPay in Transaction Hash 5f50f0c6bbbc059765912a6eb46c2079a2f2c744752aa495ad0ca783be32040b and that the BitPay receiving address was 14hih6cKRFLznt9rkCdzdwRab2YXiNMAnV.

According to the Bitcoin blockchain, Transaction Hash 5f50f0c6bbbc059765912a6eb46c2079a2f2c744752aa495ad0ca783be32040b sent approximately 0.27150000 BTC to Bitcoin address 14hih6cKRFLznt9rkCdzdwRab2YXiNMAnV on or about 9/14/2014.



*Figure 34: Bitcoin Transaction Hash 5f50f0c6bbbc059765912a6eb46c2079a2f2c744752aa495ad0ca783be32040b. Screenshot from mempool.space.*

According to the Bitcoin blockchain, the sending address in this transaction was Bitcoin address 1KfuXDwu2wjr7sfaYRQtkEfytMDFvNSxab.

According to Chainalysis Reactor, 1KfuXDwu2wjr7sfaYRQtkEfytMDFvNSxab was contained in the BITCOIN FOG CLUSTER.

*OrangeWebsite.com Payment 2*

According to the records from BitPay, on or about 10/12/2015, BitPay processed a second payment from *Buyer Name:* "Privacy Department" using email address shormint@hotmail.com to *Merchant Name:* "OrangeWebsite.com - Bitcoin Hosting". This payment was in the amount of approximately 0.298976 BTC and valued by BitPay at approximately $73.35. The records indicated that this payment was received by BitPay in Transaction Hash 4f4145c244e85790ffb68f6846c2fc3f147f881336d48e9e397ed1d81b5af2f0 and that the BitPay receiving address was 1itHRj32qMLACe5qEqZP6hZQ9zYvg5iEv.

63

According to the Bitcoin blockchain, on or about 10/12/2015, Transaction Hash 4f4145c244e85790ffb68f6846c2fc3f147f881336d48e9e397ed1d81b5af2f0 sent approximately 0.29897600 BTC to Bitcoin address 1itHRj32qMLACe5qEqZP6hZQ9zYvg5iEv.



*Figure 35: Bitcoin Transaction Hash 4f4145c244e85790ffb68f6846c2fc3f147f881336d48e9e397ed1d81b5af2f0. Screenshot from mempool.space*

According to the Bitcoin blockchain, the sending address in this transaction was Bitcoin address 1LUm6pkdghFH1DUpEWaPdj4vYoQd99iduU.

According to Chainalysis Reactor, the source of these funds sent by 1LUm6pkdghFH1DUpEWaPdj4vYoQd99iduU was the EasyWallet.org cluster in Transaction Hash 0d076449e6ad604a469564b35886ef50ac5e60f5238eee3139f3a6a747ef0fd5, through one intermediary address.

**Purchase of the Bitcoin Talk Ad by Bitcoin Talk User Akemashite Omedetou**

According to records from BitcoinTalk.org, Bitcoin Talk user Akemashite Omedetou purchased banner ads on Bitcoin Talk on or about 10/4/2012. Bitcoin Talk indicated that Omedetou paid 2 BTC to Bitcoin Talk Bitcoin Address 1FUNBCQctD2iVAzg3o9gWFTsrga6Wyd2Cw in Transaction Hash 8ba845b58251a384b70bfd6e0ac60bf56bb316458d2193607e87edb85cbfcc8e.

According to the Bitcoin blockchain, Transaction Hash 8ba845b58251a384b70bfd6e0ac60bf56bb316458d2193607e87edb85cbfcc8e sent approximately 2 BTC to Bitcoin address 1FUNBCQctD2iVAzg3o9gWFTsrga6Wyd2Cw on or about 10/4/2012. The input (sending) address to this transaction was 1EWaN255MZMUuQFrh7VXvcXoFsxb4nzukU.

64

**Appx6463**



*Figure 36: Transaction which purchased Bitcoin Talk banner ads. Screenshot from mempool.space.*

According to Chainalysis Reactor, Bitcoin address
1EWaN255MZMUuQFrh7VXvcXoFsxb4nzukU belonged to the Instawallet.org cluster.

**Appx6464**



# US v Sterlingov

Prepared by Chainalysis Government Solutions
Director of Investigation Solutions
Elizabeth Bisbee



# Table of Contents:

**Background**      **3**

Blockchain Background      3

     Heuristic 1 - Co-spend clustering - UTXO Transactions      6

     Heuristic 2 - Behavioral Clustering      6

         Peel Chain Behavior - UTXO Coins      8

         Service-specific Behavior - UTXO and Account Based Coins      9

     Heuristic 3 - Intelligence Based Clustering      9

1 Bitcoin Fog      9

     1.1 Bitcoin Fog Attribution      10

     1.2 Bitcoin Fog Clustering      12

     Transaction Features      13

2 Alphabay Market      13

     2.1 Alphabay Attribution      14

     2.2 Alphabay Clustering      16

3 Evolution Market      17

     3.1 Evolution Market Attribution      17

     3.2 Evolution Market Clustering      18

4 Agora Market      18

     4.1 Agora Market Attribution      19

     4.2 Agora Market Clustering      19

5 Nucleus Market      19

     5.1 Nucleus Market Attribution      20

     5.2 Nucleus Market Clustering      20

6 Abraxas Market      21

     6.1 Abraxas Market Attribution      21

     6.2 Abraxas Market Clustering      22

7 Pandora Market      22

     7.1 Pandora Market Attribution      23

     7.2 Pandora Market Clustering      23

8 Sheep Market      23

     8.1 Sheep Market Attribution      24

     8.2 Sheep Market Clustering      25

9 Black Bank Market      25

     9.1 Black Bank Attribution      25

     9.2 Black Bank Clustering      26

10 Flow of Funds      27

     Summary      27

Attachment: BitcoinFog Data Summary xlsx



Appx6466

## Background

The United States Attorney Office for District of Columbia requested Chainalysis Government Solutions (CGS) Director of Investigation Solutions, Elizabeth Bisbee, to provide an expert report on the blockchain analysis and Chainalysis clustering of services and the aggregate flow of funds between Bitcoin Fog and eight following services:

- Alphabay
- Evolution
- Agora
- Nucleus
- Abraxas
- Pandora
- Sheep Market
- Black Bank

### Blockchain Background

Cryptocurrency is a type of virtual currency that may be used as a substitute for fiat currency.  Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers.

One of the defining characteristics of cryptocurrency is that it is decentralized and peer-to-peer network-based.  This means that no single person or entity has control.  Rather, all users of a cryptocurrency retain collective control, and users may exchange cryptocurrency between themselves directly without the involvement of a central authority.  Payments or transfers of value made with most cryptocurrency are recorded on public distributed ledgers, often referred to as a "blockchain."  The blockchain is run by the decentralized network for each cryptocurrency and contains the historical records of every transaction ("blocks").  Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or



entities behind the public addresses are not recorded on these ledgers.  This is why cryptocurrency transactions are sometimes described as "pseudonymous," or partially anonymous.  Thus, cryptocurrency allows users to transfer funds more anonymously[1] than would be possible through traditional banking and financial systems.

There are several ways for users to acquire cryptocurrency.  The most straightforward way is directly from other users.  Another common way to acquire cryptocurrency is through a cryptocurrency exchange, an online company that enables individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies.

Users can also acquire cryptocurrency by "mining," which involves an individual using their computer's computing power to solve a complicated "proof of work" algorithm and then verifying and recording payments on the blockchain by operating a node on the peer-to-peer network.  The node (the computer) validates transactions and broadcasts to other connected nodes within the network. Transaction fees are used to incentivize the miners in selecting transactions; typically, the higher the transaction fees, the more quickly the transactions are confirmed.  Miners are rewarded for being the first to successfully complete this computational task by receiving newly created units of cryptocurrency and the fees associated with the transactions.

Cryptocurrencies are stored in a virtual account called a "wallet."  Wallets are software programs.  Wallets interface with a cryptocurrency's blockchain and store the public and private "keys" used to send and receive cryptocurrency.  A public key, or "address," is akin to a bank account number, and a private key is akin to a PIN or password that allows a user the ability to access and transfer value associated with the public address and the private key.  To conduct transactions on a blockchain, an individual must use the public address and

---

[1] Some cryptocurrencies, referred to as "privacy coins," have additional layers of anonymity.  For example, Monero is a decentralized public distributed ledger with privacy-enhancing technologies that obfuscate transaction details, such as value being transferred and the cryptocurrency address(es). These privacy features add additional layers of anonymity compared to Bitcoin.



Appx6468

the corresponding private key.  A wallet is a collection of private keys that correspond to addresses.

A transaction consists of at least three things: an input, output, and the amount.  The input is the public address from which value is sent.  The output is the public address receiving the value.  If the input has a greater value than the value being sent, the wallet software generates a "change address" to send the remainder value to as another output.  This is similar to buying a $5 coffee with a $20 bill.  The $20 bill cannot be divided into quarters to pay for the $5 coffee.  Instead, change is provided to the purchaser; likewise you cannot pay for a $5 dollar cup of coffee with a one dollar bill, five $1 dollar bills need to be co-spent to pay for the one cup of coffee.  A collection of cryptocurrency addresses that co-spend (i.e., addresses that are observed to be on the same input side of a transaction) are highly likely to be controlled by the same entity. This association of addresses is often referred to as "grouping" or "cluster."

These associations between addresses ("clusters") are difficult to identify without special techniques and software.  Chainalysis uses proprietary methods to collect and catalog addresses for particular transactions and, where possible, identify the entities behind the transactions.  Identification is done primarily through "ground-truth data collection" (such as conducting transactions with the entities to capture addresses owned by the entity, collecting addresses identified in court documents, open-source research, etc.) and data-sharing agreements with exchanges or law enforcement ("collection partner").

Using deterministic methodology, Chainalysis identifies which addresses are managed by the same entity and should therefore be grouped together in a cluster. Chainalysis clustering methodology varies on whether the cryptocurrency is UTXO (unspent transaction output) based (e.g. Bitcoin, Bitcoin Cash, Litecoin, Dash and Zcash) or account based (e.g. Ethereum, Ethereum cash, and Ripple). Chainalysis utilizes three heuristics[2] to cluster addresses.

---

[2] Heuristic: is a computational function that ranks different search algorithms at each branching step based on available information to decide which branch to follow.



**Appx6469**

## Heuristic 1 - Co-spend clustering - UTXO Transactions

The co-spend heuristic groups addresses that are contributing inputs to a single transaction. When multiple cryptocurrency addresses are being used as inputs in the same transaction, the contributing addresses are controlled by the same entity. Co-spend clustering is an automated process that identifies the continuous control by the same entity of addresses with a high degree of accuracy. Not only are the addresses now linked in that transaction, but all previous and future transactions involving these addresses are now linked. Additionally, Chainalysis clusters co-spending across forks[3].

## Heuristic 2 - Behavioral Clustering

Behavioral clustering refers to detecting patterns in the timing or structure of transactions to identify a specific wallet software. Wallets have distinctive ways of handling fees and change addresses, and can help identify Virtual Asset Service Provider (VASPs) or specific wallet software. Chainalysis is able to apply standard clustering algorithms to map addresses belonging to that service. Additionally, Chainalysis investigates a service's particular transaction patterns to develop clustering algorithms specific to that service. Each transaction and address provide a blockchain fingerprint, referred to as a transaction or address feature. Table 1 and 2 demonstrates the transaction and address features, respectively.

**Table 1: Transaction Features**

| Transaction Feature[4] | Description |
| --- | --- |
| **SegWit** | Segregated Witness: a modified version of a transaction introduced in August 2017. In 2020, most wallets default to Segwit transactions. |
| **Replace By Fee (RBF)** | Replace by fee:  a transaction type which you can modify and re-issue. You can use this |

---

3 Blockchain fork: Occurs when there is no longer consensus with the blockchain protocol and the blockchain diverges into two separate paths forward.
4 https://www.oreilly.com/library/view/mastering-bitcoin/9781491902639/ch05.html



Appx6470

| | feature to increase the fee should you want the transaction mined sooner. |
|---|---|
| **Lock Time (LT)** | Lock time: a parameter that schedules a minimal time before the blockchain accepts a transaction. |
| **Multisig** | Multi-signature transaction: a transaction that requires a certain number of private key holders to sign. Exchanges and other custodians of funds commonly use multi-signature transactions to ensure no one party has complete control.. |
| **Fee [BTC]** | The amount of Bitcoin paid as a transaction fee. Wallet software uses similar transaction fees when processing on the same day. You can use similar transaction fees in a peel chain to determine ownership. |
| **Fee [Sat / byte]** | The amount of Bitcoin paid as a transaction fee divided by the size of the data. |
| **Size [bytes]** | The size of the data contained in the transaction. Wallet software will generate transactions of a consistent size. You can use this information to identify peel chains and determine no change of custody occurred. |

**Table 2: Address Features**

| Address Feature[5] | Description |
|---|---|
| **v1** | Version 1: an address used from older bitcoin wallets. |
| **v2** | Version 2: an address used in newer bitcoin wallets. |

---

[5] https://www.oreilly.com/library/view/mastering-bitcoin-2nd/9781491954379/ch04.html



**Appx6471**

| P2PKH | Pay to Public Key Hash: also known as "Legacy" address and is the first version of a Bitcoin address that begins with **1**. |
|---|---|
| P2SH | Pay to Script Hash: a SegWit address that begins with **3**. |
| P2WPKH | Pay to Witness Public Key Hash bech32: a native Segwit address that begins with **bc1**. |
| UnknownPK | Unknown public key: an address that has never spent any UTXOs. |
| Compressed[6] | Public key that is 33 bits. |
| Uncompressed[7] | Public key that is 65 bits. |
| SPK reed | Shared public key: used in conjunction with a multisig transaction. |

## Peel Chain Behavior - UTXO Coins

A peel chain is a common spending pattern of Bitcoin wallets that uses leftover change from one transaction to fund the next transaction. A peel chain typically consists of a chain of clusters where each cluster has only two transactions, and each transaction consists of one input and two outputs and has a consistent address type. The 'peel' refers to the smaller, spending transactions and the 'chain' refers to the linked change addresses that continue on. Chainalysis algorithm identifies peel chains and automatically clusters them. It does so by identifying long sequences of transactions in which there is no clear indication of which address is changed and which is payment. It then finds the end of the chain and finds a co-spend with an address that appeared at the beginning of the chain. This demonstrates that the full peel chain is controlled by the same wallet.

[6] A private key is used to derive a public key. A private key, when used for derivation, gives out two outputs in the form of a public-key which are x and y. Both outputs (x and y) are 32 bits. Compressed public key is calculated by the 32 bits of x public key output +1, resulting in 33 bits.
[7] A private key is used to derive a public key. A private key, when used for derivation, gives out two outputs in the form of a public-key which are x and y. Both outputs (x and y) are 32 bits Uncompressed public key is calculated by the 32 bits of x and y +1, resulting in 65 bits.

 

**Appx6472**

## Service-specific Behavior - UTXO and Account Based Coins

Wallets have distinctive ways of handling fees and change addresses. Ultimately, a wallet is a piece of software that leaves deterministic patterns in the blockchain. Once Chainalysis has identified some of a service's wallet, heuristics are identified to capture these structures.

### *Heuristic 3 - Intelligence Based Clustering*

Chainalysis gathers information from other sources to enable better clustering. Data sources include but are not limited to: data-leaks, court documents, Chainalysis data partnerships, exchanges that share their addresses with Chainalysis, and manual merges due to services changing wallets

## 1 Bitcoin Fog

Bitcoin Fog was a bitcoin mixing service[8] (or tumbler). The Bitcoin Fog service has been clustered and attributed by Chainalysis. The Bitcoin Fog cluster contains 925,743 addresses and was active between November 10, 2011 and August 28, 2022.[9] There are a total of 1,213,266 transfers linked to this cluster, consisting of 521,042 deposits and 692,224 withdrawals. Bitcoin Fog received a total of 1,284,251.08225937 BTC, valued at USD $395,563,025.39061, and sent a total of  1,280,935.1339285 BTC, valued at USD $402,778,871.67989.

Bitcoin Fog was known as a custodial mixer, meaning the service had exclusive custody of the bitcoin deposited onto the platform by its customers. In summary, once a customer deposited funds into the mixer, they no longer controlled the private keys for the bitcoin deposited to Bitcoin Fog. In order to withdraw funds, the customer would log-in using the

---

[8] Mixing service: obfuscates the relationship between originating and destination addresses on the blockchain by consolidating multiple unrelated payments into output transactions.
[9] Research indicates that the cluster remains technically active as several addresses related to the service have received payments after the site was taken down. However, there have been no withdrawals from Bitcoin Fog since April 2021.



**Appx6473**

Bitcoin Fog user interface, entering their username and password. Bitcoin Fog was available on both the clear and darknet.[10]

## 1.1 Bitcoin Fog Attribution

On June 25, 2019, Chainalysis made a deposit to Bitcoin Fog of 0.00222386 BTC, Figure 1.



Figure 1: Screenshot of Bitcoin Fog site detailing the deposit address
3HQ3nVH2qzGNMhNtdYFxrQP3v7DSWhRzFN

Funds were sent to the Bitcoin Fog deposit address 3HQ3nVH2qzGNMhNtdYFxrQP3v7DSWhRzFN represented with transaction hash eab69f437f30f86b2ca447423167d475432c378f85988635900b879f2ad0ae47, Figure 2.

---

[10] The darknet, sometimes referred to as the darkweb, is an encrypted portion of the internet that is not indexed by traditional search engines, such as Google. In order to access the darknet specific software is required to make a connection.



**Appx6474**



Figure 2: Transaction eab69f437f30f86b2ca447423167d475432c378f85988635900b879f2ad0ae47

On June 25, 2019, Chainalysis made a withdrawal from Bitcoin Fog of 0.00177638 BTC, Figure 3.



Figure 3: Screenshot of Bitcoin Fog site detailing the withdrawal and receiving address 1Kw1iEjFCHudFkxd18kBXT3PX4iMbGJYN

Funds were sent from the Bitcoin Fog withdrawal address 35oKuFiBQYrU9oLaQntXwkMi8Nj2K3yEyA to Chainalysis controlled address 1Kw1iEjFCHudFkxd18kBXT3PX4iMbGJYN represented with transaction hash

 

**Appx6475**

7ea4dc1758f5ebbb77c33d2709723bfd20c09be416eb6ce87d583463f3d3f919, Figure 4.



Figure 4: Transaction 7ea4dc1758f5ebbb77c33d2709723bfd20c09be416eb6ce87d583463f3d3f919

## 1.2 Bitcoin Fog Clustering

Bitcoin Fog service used P2PKH Uncompressed addresses until 2012, then the P2PKH Compressed addresses changed to using Segwit addresses. The first known Bitcoin Fog transaction where the change is a P2SH-WPKH Segwit address in block 534129: 9a7e1cdb9f68573eaf64ba4f8908ebf05aee9321246188c1c746a297e8821ffb. Bitcoin Fog service used two wallets, one for deposits and one for withdrawals. The deposits were consolidated and moved to withdrawal wallets, with the same address being reused majority of the time. The following are the consolidation addresses that Bitcoin Fog used from 2011 to 2014.

- 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw
- 1F9kYDpu2CqwR18ovineZr8Y88NQfW1bzR
- 1BPgf9qGD5emvf154XAwNSrJu667S9H9j
- 1JmQN8NvX3XXWWrJW3rEEcKQMQd5DUgkH3
- 1MsmThtteKPu6fWxwn2SMDEnmJex3vKSBk
- 15U5NjgAbKqKyGKwayS648WwJoiCCvGnTG
- 1Cwb33nqn4S2uDsXwhNrUNy7FPdiRYhyM8
- 1P5pMkN1wr3ozHXwCXtRmv6kJBYLyPPMzc
- 16FgQXGzSLRtdwuwCN7mcaPUtbJ6JFTkVw
- 17gH1u6VJwhVD9cWR59jfeinLMzag2GZ43

 
**Appx6476**

After 2014, the consolidation address was newly created for each transaction. These addresses were identified by locating transactions sent from the deposit wallets. Withdrawal transactions were identified by following peels chains from these addresses.

**Transaction Features**

Bitcoin Fog never used RF. Before block 390000 no transactions used lock time but after block 392500 all transactions used lock time. Before block 466100 all transactions were v1 and after block 466300 all transactions were v2. Before block 324000 all transactions associated with Bitcoin Fog had either one or two outputs; after block 324000 there could be more than two outputs. Bitcoin Fog's transaction fees changed several times over the life of the service from a static fee at the beginning and then to a dynamic fee.

Approximately 50.26 percent of the clustering for Bitcoin Fog was dependent on Heuristic 1, representing 46,532 addresses that co-spent. The remaining addresses were clustered through Heuristic 2. Figure 2 represents the deposit address (output address) that was clustered through co-spend heuristic and Figure 4 represents the input address for the withdrawal that was clustered through behavioral heuristic.

## 2 Alphabay Market

Alphabay was a darknet market service. The Alphabay service has been clustered and attributed by Chainalysis. The Alphabay cluster contains 2,726,132 addresses and was active between April 30, 2015 and November 4, 2022[11]. There are a total of 5,926,666 transfers linked to this cluster, consisting of 2,866,235 deposits and 3,060,431 withdrawals. Alphabay received a total of 1,044,084.61714749 BTC, valued at USD $723,264,639.77163, and sent a total of 1,042,942.16799985 BTC, valued at USD $724,704,923.43925.

---

[11] Research indicates that the cluster remains technically active as several addresses related to the service have received and sent payments after the site was taken down.



Appx6477

Alphabay was known as a darknet market selling black market goods and services. Alphabay had an escrow service, meaning Alphabay provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Alphabay account, once a buyer had created an order and deposited funds into escrow, Alphabay controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order. In order to withdraw funds, the seller would log-in using the AlphabBay user interface, entering their username and password. Alphabay was available on the darknet.

## 2.1 Alphabay Attribution

On April 23, 2016, Chainalysis made a deposit to Alphabay of 0.01 BTC, Figure 5.



**Figure 5:** Screenshot of Alphabay Market site detailing the deposit address 1PJrmSGUZtibbS9o6LeuQQBZ3wkFqrSPjW

Funds were sent to the Alphabay deposit address 1PJrmSGUZtibbS9o6LeuQQBZ3wkFqrSPjW represented with transaction hash 3d371c8d2641e4a33735fa6a9a0faf7f1e2ffd7ff1bb08357c5d613b3cf9c5bb, Figure 6.


**Appx6478**



Figure 6: Transaction 3d371c8d2641e4a33735fa6a9a0faf7f1e2ffd7ff1bb08357c5d613b3cf9c5bb

Chainalysis also identified three additional deposit addresses on the Alphabay Market site, pwoah7foa6au2pul[.]onion:

- 1BiEWbPiusgohygnJLWuXssK6HV3SFLp8v (Figure 7)
- 1EP2hYJ7ezLJSyJRjyv7AbUrkKNxhcQL8G (Figure 8)
- 1PxmbuquKdcXbtBp1miK89THvq2rvqCeXh (Figure 9)



Figure 7: Transaction involving Alphabay deposit address 1BiEWbPiusgohygnJLWuXssK6HV3SFLp8v



Figure 8: Transaction involving Alphabay deposit address 1EP2hYJ7ezLJSyJRjyv7AbUrkKNxhcQL8G



**Appx6479**



Figure 9: Transaction involving Alphabay deposit address 1PxmbuquKdcXbtBp1miK89THvq2rvqCeXh

Chainalysis also received Alphabay addresses from a data sharing agreement with the US government.

## 2.2 Alphabay Clustering

It was observed that Alphabay had co-spend and transactional behavior fingerprints. Chainalysis' earliest detected address belonging to Alphabay was 1NGpmfXeFmKB4csqeUhSqCNXBJtCWua8fr, which was identified as being a co-spend cluster with activity from August 2015 and September 2015.

In September 2015, Alphabay changed its co-spend fingerprint to use a new address 1Px5FuAdzNFNRrMM4S6GDZ6XUrtaMHU9T5. This address was identified as being a co-spend cluster with activity between September 2, 2015 and February 18, 2016. Transactions were identified as having one or two outputs, with one output as a change address when two outputs were present. Transactions identified occurring in blocks after approximately 400500 returned the change to the same address as the one of the inputs instead of creating a new change address.

Approximately 0.26 percent of the clustering for Alphabay was dependent on Heuristic 1, representing 7,151 addresses that co-spent. The remaining addresses were clustered through a combination of Heuristic 1, Heuristic 2, and Heuristic 3[12]. Figure 7 represents the

---

[12] When ingesting the file, some safety checks are carried on to avoid false positives. Addresses are not added to the merge file in the following cases:
- If the address' cluster is older than 1NGpmfXeFmKB4csqeUhSqCNXBJtCWua8fr 's root address



GOVERNMENT SOLUTIONS

Proprietary and Confidential                    16

**Appx6480**

deposit address (output address) that was clustered through co-spend heuristic and Figure 6 represents the input address for the withdrawal that was clustered through behavioral heuristic.

## 3 Evolution Market

Evolution Market was a darknet market service. The Evolution Market service has been clustered and attributed by Chainalysis. The Evolution Market cluster contains 421,860 addresses and was active between January 16, 2014 and November 28, 2020[13]. There are a total of 575,793 transfers linked to this cluster, consisting of 455,873 deposits and 119,920 withdrawals. Evolution Market received a total of 239,554.8339942 BTC, valued at USD $69,761,494.67821, and sent a total of 239,477.30924596 BTC, valued at USD $69,624,626.55358.

Evolution Market was known as a darknet market selling black market goods and services. Evolution Market had an escrow service, meaning Evolution Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Evolution Market account, once a buyer had created an order and deposited funds into escrow, Evolution Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order. In order to withdraw funds, the seller would log-in using the Evolution Market user interface, entering their username and password. Evolution Market was available on the darknet.

### 3.1 Evolution Market Attribution

Chainalysis identified a deposit address, 11PzG24xAcUC6KyLEuUWLDEdfF3kwHdb9, on the Evolution Market site k5zq47j6wd3wdvjq[.]onion, Figure 10.

---

- If an address has transactions after block 400500 and this transaction has more than one input address
- The address type is different from Start1.PK.Compressed

[13] Research indicates that the cluster remains technically active as several addresses related to the service have received payments after March 20, 2015 16:51 UTC. There have not been any withdrawals since this time.



Appx6481



Figure 10: Transaction involving Evolution Market deposit address 11PzG24xAcUC6KyLEuUWLDEdfF3kwHdb9

## *3.2 Evolution Market Clustering*

Approximately 99.86 percent of the clustering for Evolution Market was dependent on Heuristic 1, representing 420,516 addresses that co-spent. The remaining 1,344 addresses were identified through Heuristic 2, peel chain detection.

## 4 Agora Market

Agora Market was a darknet market service. The Agora Market service has been clustered and attributed by Chainalysis. The Agora Market cluster contains 516,428 addresses and was active between December 4, 2013 and October 13, 2022[14]. There are a total of 1,479,098 transfers linked to this cluster, consisting of 997,108 deposits and 481,990 withdrawals. Agora Market received a total of 719,098.18805962 BTC, valued at USD $220,878,096.44986, and sent a total of 718,934.06912148 BTC, valued at USD $220,596,386.20024.

Agora Market was known as a darknet market selling black market goods and services. Agora Market had an escrow service, meaning Agora Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Agora Market account, once a buyer had created an order and deposited funds into escrow, Agora Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order. In order to withdraw funds, the seller would

---

[14] Research indicates that the cluster remains technically active as several addresses related to the service have received payments after September 6, 2015 17:13 UTC. There have not been any withdrawals since this time.

 

Appx6482

log-in using the Agora Market user interface, entering their username and password. Agora Market was available on the darknet.

## 4.1 Agora Market Attribution

Chainalysis identified a deposit address, 1AnELbeQ8YS3RyjbxhSvC7zmxSC6rLxWWr, on the Agora Market site agorahooawayyfoe[.]onion, Figure 11.



Figure 11: Transaction involving Agora Market deposit address 1AnELbeQ8YS3RyjbxhSvC7zmxSC6rLxWWr

## 4.2 Agora Market Clustering

Approximately 99.43  percent of the clustering for Agora Market was dependent on Heuristic 1, representing 497,984 addresses that co-spent. The remaining 18,444 addresses were identified through Heuristic 2, change address detection[15].

## 5 Nucleus Market

Nucleus Market  was a darknet market service. The Nucleus Market service has been clustered and attributed by Chainalysis. The Nucleus Market cluster contains 263,536 addresses and was active between November 13, 2014 and January 1, 2021[16]. There are a total of 593,589 transfers linked to this cluster, consisting of 404,795 deposits and 188,794 withdrawals. Nucleus Market received a total of 278,511.47948421 BTC, valued at USD

---

[15] The change detection will, given a transaction, return the change address. It only allows a single address to be the change, and if multiple addresses are matching the criteria it will consider that none of them is the change. The criteria for an address to be the change are:
  1) It should be of type Start1.PK.Compressed or Start1.PK.Uncompressed
  2) The change value should be like 0.01xxxxxxxxBTC
  3) The address should only be involved in two transactions
  4) Transaction fees for both transactions should be the same

[16] Research indicates that the cluster remains technically active as several addresses related to the service have received payments after April 13, 2016 07:30 UTC. There have not been any withdrawals since this time.



**Appx6483**

$89,181,521.9589 , and sent a total of 272,295.82054851 BTC, valued at USD $87,946,107.55336.

Nucleus Market was known as a darknet market selling black market goods and services. Nucleus Market had an escrow service, meaning Nucleus Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Nucleus Market account, once a buyer had created an order and deposited funds into escrow, Nucleus Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order. In order to withdraw funds, the seller would log-in using the Nucleus Market user interface, entering their username and password. Nucleus Market was available on the darknet.

## 5.1 Nucleus Market Attribution

Chainalysis identified a deposit address, **1BdveB7SBXSBwwkh8tfRV2pVNSBb2HP9yU**, on the Nucleus Market sites dkf2lnsctjvoivow[.]onion; o7v3h5ts5tah4yiw.onion, Figure 12.



Figure 12: Transaction involving Nucleus Market deposit address 1BdveB7SBXSBwwkh8tfRV2pVNSBb2HP9yU

## 5.2 Nucleus Market Clustering

It was observed that 55.54 percent of the clustering of addresses for Nucleus Marker was dependent on Heuristic 1, representing 146,381 addresses. Heuristic 2 represents the



Appx6484

remainder of the addresses. Chainlaysis identified numerous addresses and only received a single transaction from Nucleus Market with an output equal to .01xxxxxx BTC (where x is an integer between 0 and 9). The heuristic[17] utilized transactions sent from the co-spend cluster 1BdveB7SBXSBwwkh8tfRV2pVNSBb2HP9yU.

## 6 Abraxas Market

Abraxas Market is a darknet market service. The Abraxas Market service has been clustered and attributed by Chainalysis. The Abraxas Market cluster contains 149,803 addresses and was active between December 22, 2014 and March 23, 2020[18]. There are a total of 259,769 transfers linked to this cluster, consisting of 184,877 deposits and 74,892 withdrawals. Abraxas Market received a total of 141,143.07510686 BTC, valued at USD $35,613,069.53856, and sent a total of 141,125.80946199 BTC, valued at USD $35,659,633.02943.

Abraxas Market is known as a darknet market selling black market goods and services. Abraxas Market had an escrow service, meaning Abraxas Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Abraxas Market account, once a buyer had created an order and deposited funds into escrow, Abraxas Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order.

In order to withdraw funds, the seller would log-in using the Abraxas Market user interface, entering their username and password. Abraxas Market was available on the darknet.

### 6.1 Abraxas Market Attribution

Chainalysis identified a deposit address, 1AiCf2qcQyxh4zMgLKdEow8iX82tc2S3TG, on the Abraxas Market site abraxasdegupusel[.]onion, Figure 13.

---

[17] Criteria for the heuristic included Legacy address, PK compressed and identifying if the change address has no more than one transaction (both received and sent) before block 481873.
[18] Research indicates that the cluster remains technically active as several addresses related to the service have received payments and sent funds.





Figure 13: Transaction involving Nucleus Market deposit address 1AiCf2qcQyxh4zMgLKdEow8iX82tc2S3TG. Note, only the first 10 outputs are displayed.

## 6.2 Abraxas Market Clustering

It was observed that 79.52 percent of the clustering for Abraxas Market was dependent on Heuristic 1, representing 119,119 addresses. Heuristic 2 clustering represented the remainder of the addresses.

## 7 Pandora Market

Pandora Market is a darknet market service. The Pandora Market service has been clustered and attributed by Chainalysis. The Pandora Market cluster contains 71,039 addresses and was active between October 20, 2013 and January 16, 2018.[19] There are a total of 121,849 transfers linked to this cluster, consisting of 81,869 deposits and 39,980 withdrawals. Pandora Market received a total of 24,979.66216001 BTC, valued at USD $14,728,284.98002, and sent a total of 24,974.35392904 BTC, valued at USD $16,904,639.29289.

---

[19] Research indicates that the cluster was technically active as several addresses related to the service have received payments after September 23, 2014 15:42 UTC. There were seven withdrawals on January 16, 2018 between 07:58 UTC and 19:12 UTC. There have not been any transfers since.

 

Appx6486

Pandora Market is known as a darknet market selling black market goods and services. Pandora Market had an escrow service, meaning Pandora Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Pandora Market account, once a buyer had created an order and deposited funds into escrow, Pandora Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order.

In order to withdraw funds, the seller would log-in using the Pandora Market user interface, entering their username and password. Pandora Market was available on the darknet.

## 7.1 Pandora Market Attribution

Chainalysis identified a deposit address, 1NhmZVDMtgRPvN27UeUP9RPGeFZr7stsgV, on the Pandora Market site  pandorajodqp5zrr[.]onion, Figure 14.



Figure 14: Transaction involving Pandora  Market deposit address 1NhmZVDMtgRPvN27UeUP9RPGeFZr7stsgV

## 7.2 Pandora Market Clustering

It was observed that 78.49 percent of the clustering for Pandora Market was dependent on Heuristic 1, representing 55,757 addresses. Heuristic 2 clustering represented the remainder of the addresses.

## 8 Sheep Market

Sheep Market is a darknet market service. The Sheep Market service has been clustered and attributed by Chainalysis. The Sheep Market cluster contains 53,639 addresses and was



**Appx6487**

active between February 1, 2013 and November 29, 2019[20]. There are a total of 103,624 transfers linked to this cluster, consisting of 75,808 deposits and 27,816 withdrawals. Sheep Market received a total of 70,492.23091884 BTC, valued at USD $17,993,206.70493, and sent a total of 70,455.89396781 BTC, valued at USD $22,138,762.14717.

Sheep Market is known as a darknet market selling black market goods and services. Sheep Market had an escrow service, meaning Sheep Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Sheep Market account, once a buyer had created an order and deposited funds into escrow, Sheep Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order.

In order to withdraw funds, the seller would log-in using the Sheep Market user interface, entering their username and password. Sheep Market was available on the darknet.

## 8.1 Sheep Market Attribution

Chainalysis identified a deposit address, 1113hFG857ykQSEWJAVNcSnRzrMU6v7nK, on the Sheep Market site sheep5u64fi457aw[.]onion, Figure 15. Address was also confirmed in legal process[21].



Figure 15: Transaction involving Sheep Market deposit address 1113hFG857ykQSEWJAVNcSnRzrMU6v7nK

[20] Research indicates that the cluster remains technically active as several addresses related to the service have received payments after December 1, 2013 01:16 UTC. There have not been any withdrawals since this time.
[21] https://www.justice.gov/usao-mdfl/pr/more-17-million-forfeited-funds-presented-law-enforcement-agencies



Appx6488

## 8.2 Sheep Market Clustering

One hundred  percent of the clustering for Sheep Market was dependent on Heuristic 1, representing addresses that co-spent.

## 9 Black Bank Market

Black Bank  is a darknet marketplace. The Black Bank service has been clustered and attributed by Chainalysis. The Black Bank Market cluster contains 83,339 addresses and was active between October 18, 2013 and August 23, 2016[22]. There are a total of 131,724 transfers linked to this cluster, consisting of 92,736 deposits and 38,988 withdrawals. Black Bank Market received a total of 68,127.82725026 BTC, valued at USD $19,370,893.45443, and sent a total of 68115.64485595 BTC, valued at USD $19,465,595.93619.

Black Bank Market is known as a darknet market selling black market goods and services. Black Bank Market had an escrow service, meaning Black Bank Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Black Bank Market account, once a buyer had created an order and deposited funds into escrow, Black Bank Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order.

In order to withdraw funds, the seller would log-in using the Black Bank Market user interface, entering their username and password. Black Bank Market was available on the darknet.

## 9.1 Black Bank Attribution

Chainalysis identified a deposit address, 1NWGVKNdsXxYLMJRzqYh9pT3vvHmdHtHKt, that was reported on multiple open source forums for Black Bank Market site

---

[22] Research indicates that the cluster remains technically active as several addresses related to the service have received payments after June 10, 2015 15:16 UTC. There have not been any withdrawals since this time.



**Appx6489**

wztyb7vlfcw6l4xd[.]onion, Figure 16. Chainalysis also identified a deposit address, 15hCsZsxvahuCBPDqUdPzisL8jQad7peHo, for Black Bank Market site, Figure 17.



Figure 16: Transaction involving Black Bank Market deposit address 1NWGVKNdsXxYLMJRzqYh9pT3vvHmdHtHKt



Figure 17: Transaction involving Black Bank Market deposit address 15hCsZsxvahuCBPDqUdPzisL8jQad7peHo

## 9.2 Black Bank Clustering

It was observed that 61.05 percent of the clustering for Black Bank was dependent on Heuristic 1, representing 50,878 addresses. Heuristic 2 clustering, specific to peel chain detection, represented the remainder of the addresses.

 

**Appx6490**

## 10 Flow of Funds

Analysis was conducted on the direct and indirect sending and receiving exposure between Bitcoin Fog and the eight darknet market services. Direct exposure represents services and entities that are direct counterparties of another address/cluster across a transaction/s. Indirect exposure represents how a service or entity on the blockchain is correlated based on the flow of funds indirectly to other entities. This correlation can be many transactions (or hops) away (e.g., 100) or very closely related (e.g., one or two hops). Aside from direct exposure, all other correlations would be considered indirect. Therefore, Entity 1 can be indirectly exposed to Entity 2, which could mean that they correlate to each other via hundreds and hundreds of other transactions, or that Entity 1 is only three transactions away from Entity 2.

The eight darknet market services sent an aggregate direct amount of 80,728.598808180 BTC, valued at USD $27,910,946.76 between October 3, 2013 and July 5, 2017 to Bitcoin Fog. Bitcoin Fog sent an aggregate direct amount of 45,152.452110840 BTC, valued at USD $14,531,853.29 between October 9, 2013 and July 5, 2017 to the eight darknet market services. The eight darknet market services sent an aggregate indirect[23] amount of 31,792.530 BTC, valued at USD $10,828,680.77 between October 2, 2013 and July 4, 2017 to Bitcoin Fog. Bitcoin Fog sent an aggregate indirect amount of 13,610.257630 BTC, valued at USD $4,705,909.83 between February 28, 2013 and July 4, 2017 to the eight darknet market services. Refer to attachment: BitcoinFog data summary.xlsx for a breakdown of each darknet market direct and indirect sending and receiving exposure with Bitcoin Fog.

## Summary

Bitcoin Fog was a bitcoin mixing service that operated on the clear and dark web. The addresses used to move funds through Bitcoin Fog were grouped together and attributed by

---

[23] All the direct counterparties of both darknet market services and Bitcoin Fog were identified and pulled all of the possible indirect exposure that could be attributed to Bitcoin Fog (i.e., flow of funds through intermediary cluster). The indirect exposure only represents one counterparty between the two services in order to limit the possibility of potentially incorrect or unnecessary exposure being included.



Appx6491

Chainalysis. Bitcoin Fog received a total of 1,284,251.08225937 BTC, valued at USD $395,563,025.39061, and sent a total of 1,280,935.1339285 BTC, valued at USD $402,778,871.67989. Of the 1,284,251.08225937 BTC Bitcoin Fog received, 80,728.598808180 BTC, valued at USD $27,910,946.76, was sent directly from eight darknet market sites while 31,792.530 BTC, valued at USD $10,828,680.77, was indirectly sent from eight darknet market sites. Of the 1,280,935.1339285 BTC Bitcoin Fog sent, 45,152.452110840 BTC, valued at USD $14,531,853.29, was sent directly to eight darknet market sites while 13,610.257630 BTC, valued at USD $4,705,909.83, was sent indirectly to with darknet market sites.

 

**Appx6492**



# US v Sterlingov

Prepared by Chainalysis Government Solutions
Director of Investigation Solutions
Elizabeth Bisbee



**Table of Contents:**

Background     **3**

  Blockchain Background     3

    Heuristic 1 - Co-spend clustering - UTXO Transactions     6

    Heuristic 2 - Behavioral Clustering     6

      Peel Chain Behavior - UTXO Coins     8

      Service-specific Behavior - UTXO and Account Based Coins     9

    Heuristic 3 - Intelligence Based Clustering     9

  1 Bitcoin Fog     9

    1.1 Bitcoin Fog Attribution     10

    1.2 Bitcoin Fog Clustering     12

      Transaction Features     13

  2 Alphabay Market     13

    2.1 Alphabay Attribution     14

    2.2 Alphabay Clustering     16

  3 Evolution Market     17

    3.1 Evolution Market Attribution     17

    3.2 Evolution Market Clustering     18

  4 Agora Market     18

    4.1 Agora Market Attribution     19

    4.2 Agora Market Clustering     19

  5 Nucleus Market     19

    5.1 Nucleus Market Attribution     20

    5.2 Nucleus Market Clustering     20

  6 Abraxas Market     21

    6.1 Abraxas Market Attribution     21

    6.2 Abraxas Market Clustering     22

  7 Pandora Market     22

    7.1 Pandora Market Attribution     23

    7.2 Pandora Market Clustering     23

  8 Sheep Market     23

    8.1 Sheep Market Attribution     24

    8.2 Sheep Market Clustering     25

  9 Black Bank Market     25

    9.1 Black Bank Attribution     26

    9.2 Black Bank Clustering     26

  10 Flow of Funds     27

  Summary     27

  Attachments     28

  Expert Report Signature     29



Appx6494

## Background

The United States Attorney Office for District of Columbia requested Chainalysis Government Solutions (CGS) Director of Investigation Solutions, Elizabeth Bisbee, to provide an expert report on the blockchain analysis and Chainalysis clustering of services and the aggregate flow of funds between Bitcoin Fog and eight following services:

- Alphabay
- Evolution
- Agora
- Nucleus
- Abraxas
- Pandora
- Sheep Market
- Black Bank

## Blockchain Background

Cryptocurrency is a type of virtual currency that may be used as a substitute for fiat currency.  Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers.

One of the defining characteristics of cryptocurrency is that it is decentralized and peer-to-peer network-based.  This means that no single person or entity has control. Rather, all users of a cryptocurrency retain collective control, and users may exchange cryptocurrency between themselves directly without the involvement of a central authority. Payments or transfers of value made with most cryptocurrency are recorded on public distributed ledgers, often referred to as a "blockchain."  The blockchain is run by the decentralized network for each cryptocurrency and contains the historical records of every transaction ("blocks").  Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these ledgers.  This is why

 

Appx6495

cryptocurrency transactions are sometimes described as "pseudonymous," or partially anonymous.  Thus, cryptocurrency allows users to transfer funds more anonymously[1] than would be possible through traditional banking and financial systems.

There are several ways for users to acquire cryptocurrency.  The most straightforward way is directly from other users.  Another common way to acquire cryptocurrency is through a cryptocurrency exchange, an online company that enables individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies.

Users can also acquire cryptocurrency by "mining," which involves an individual using their computer's computing power to solve a complicated "proof of work" algorithm and then verifying and recording payments on the blockchain by operating a node on the peer-to-peer network.  The node (the computer) validates transactions and broadcasts to other connected nodes within the network. Transaction fees are used to incentivize the miners in selecting transactions; typically, the higher the transaction fees, the more quickly the transactions are confirmed.  Miners are rewarded for being the first to successfully complete this computational task by receiving newly created units of cryptocurrency and the fees associated with the transactions.

Cryptocurrencies are stored in a virtual account called a "wallet."  Wallets are software programs.  Wallets interface with a cryptocurrency's blockchain and store the public and private "keys" used to send and receive cryptocurrency.  A public key, or "address," is akin to a bank account number, and a private key is akin to a PIN or password that allows a user the ability to access and transfer value associated with the public address and the private key.  To conduct transactions on a blockchain, an individual must use the public address and the corresponding private key.  A wallet is a collection of private keys that correspond to addresses.

---

[1] Some cryptocurrencies, referred to as "privacy coins," have additional layers of anonymity.  For example, Monero is a decentralized public distributed ledger with privacy-enhancing technologies that obfuscate transaction details, such as value being transferred and the cryptocurrency address(es). These privacy features add additional layers of anonymity compared to Bitcoin.



A transaction consists of at least three things: an input, output, and the amount.  The input is the public address from which value is sent.  The output is the public address receiving the value.  If the input has a greater value than the value being sent, the wallet software generates a "change address" to send the remainder value to as another output.  This is similar to buying a $5 coffee with a $20 bill.  The $20 bill cannot be divided into quarters to pay for the $5 coffee.  Instead, change is provided to the purchaser; likewise you cannot pay for a $5 dollar cup of coffee with a one dollar bill, five $1 dollar bills need to be co-spent to pay for the one cup of coffee.  A collection of cryptocurrency addresses that co-spend (i.e., addresses that are observed to be on the same input side of a transaction) are highly likely to be controlled by the same entity. This association of addresses is often referred to as "grouping" or "cluster."

These associations between addresses ("clusters") are difficult to identify without special techniques and software.  Chainalysis uses proprietary methods to collect and catalog addresses for particular transactions and, where possible, identify the entities behind the transactions.  Identification is done primarily through "ground-truth data collection" (such as conducting transactions with the entities to capture addresses owned by the entity, collecting addresses identified in court documents, open-source research, etc.) and data-sharing agreements with exchanges or law enforcement ("collection partner").

Using deterministic methodology, Chainalysis identifies which addresses are managed by the same entity and should therefore be grouped together in a cluster. Chainalysis clustering methodology varies on whether the cryptocurrency is UTXO (unspent transaction output) based (e.g. Bitcoin, Bitcoin Cash, Litecoin, Dash and Zcash) or account based (e.g. Ethereum, Ethereum cash, and Ripple). Chainalysis utilizes three heuristics[2] to cluster addresses.

---

[2] Heuristic: is a computational function that ranks different search algorithms at each branching step based on available information to decide which branch to follow.



Appx6497

## Heuristic 1 - Co-spend clustering - UTXO Transactions

The co-spend heuristic groups addresses that are contributing inputs to a single transaction. When multiple cryptocurrency addresses are being used as inputs in the same transaction, the contributing addresses are controlled by the same entity. Co-spend clustering is an automated process that identifies the continuous control by the same entity of addresses with a high degree of accuracy. Not only are the addresses now linked in that transaction, but all previous and future transactions involving these addresses are now linked. Additionally, Chainalysis clusters co-spending across forks[3].

## Heuristic 2 - Behavioral Clustering

Behavioral clustering refers to detecting patterns in the timing or structure of transactions to identify a specific wallet software. Wallets have distinctive ways of handling fees and change addresses, and can help identify Virtual Asset Service Provider (VASPs) or specific wallet software. Chainalysis is able to apply standard clustering algorithms to map addresses belonging to that service. Additionally, Chainalysis investigates a service's particular transaction patterns to develop clustering algorithms specific to that service. Each transaction and address provide a blockchain fingerprint, referred to as a transaction or address feature. Table 1 and 2 demonstrates the transaction and address features, respectively.

**Table 1: Transaction Features**

| Transaction Feature[4] | Description |
|---|---|
| **SegWit** | Segregated Witness: a modified version of a transaction introduced in August 2017. In 2020, most wallets default to Segwit transactions. |
| **Replace By Fee (RBF)** | Replace by fee:  a transaction type which you can modify and re-issue. You can use this |

---

[3] Blockchain fork: Occurs when there is no longer consensus with the blockchain protocol and the blockchain diverges into two separate paths forward.
[4] https://www.oreilly.com/library/view/mastering-bitcoin/9781491902639/ch05.html



**Appx6498**

| | feature to increase the fee should you want the transaction mined sooner. |
|---|---|
| **Lock Time (LT)** | Lock time: a parameter that schedules a minimal time before the blockchain accepts a transaction. |
| **Multisig** | Multi-signature transaction: a transaction that requires a certain number of private key holders to sign. Exchanges and other custodians of funds commonly use multi-signature transactions to ensure no one party has complete control. |
| **Fee [BTC]** | The amount of Bitcoin paid as a transaction fee. Wallet software uses similar transaction fees when processing on the same day. You can use similar transaction fees in a peel chain to determine ownership. |
| **Fee [Sat / byte]** | The amount of Bitcoin paid as a transaction fee divided by the size of the data. |
| **Size [bytes]** | The size of the data contained in the transaction. Wallet software will generate transactions of a consistent size. You can use this information to identify peel chains and determine no change of custody occurred. |

**Table 2: Address Features**

| Address Feature[5] | Description |
|---|---|
| **v1** | Version 1: an address used from older bitcoin wallets. |
| **v2** | Version 2: an address used in newer bitcoin wallets. |

---

[5] https://www.oreilly.com/library/view/mastering-bitcoin-2nd/9781491954379/ch04.html



Appx6499

| P2PKH | Pay to Public Key Hash: also known as "Legacy" address and is the first version of a Bitcoin address that begins with **1**. |
|---|---|
| P2SH | Pay to Script Hash: a SegWit address that begins with **3**. |
| P2WPKH | Pay to Witness Public Key Hash bech32: a native Segwit address that begins with **bc1**. |
| UnknownPK | Unknown public key: an address that has never spent any UTXOs. |
| Compressed[6] | Public key that is 33 bits. |
| Uncompressed[7] | Public key that is 65 bits. |
| SPK reed | Shared public key: used in conjunction with a multisig transaction. |

## Peel Chain Behavior - UTXO Coins

A peel chain is a common spending pattern of Bitcoin wallets that uses leftover change from one transaction to fund the next transaction. A peel chain typically consists of a chain of clusters where each cluster has only two transactions, and each transaction consists of one input and two outputs and has a consistent address type. The 'peel' refers to the smaller, spending transactions and the 'chain' refers to the linked change addresses that continue on. Chainalysis algorithm identifies peel chains and automatically clusters them. It does so by identifying long sequences of transactions in which there is no clear indication of which address is changed and which is payment. It then finds the end of the chain and finds a co-spend with an address that appeared at the beginning of the chain. This demonstrates that the full peel chain is controlled by the same wallet.

[6] A private key is used to derive a public key. A private key, when used for derivation, gives out two outputs in the form of a public-key which are x and y. Both outputs (x and y) are 32 bits. Compressed public key is calculated by the 32 bits of x public key output +1, resulting in 33 bits.
[7] A private key is used to derive a public key. A private key, when used for derivation, gives out two outputs in the form of a public-key which are x and y. Both outputs (x and y) are 32 bits Uncompressed public key is calculated by the 32 bits of x and y +1, resulting in 65 bits.


**Appx6500**

## Service-specific Behavior - UTXO and Account Based Coins

Wallets have distinctive ways of handling fees and change addresses. Ultimately, a wallet is a piece of software that leaves deterministic patterns in the blockchain. Once Chainalysis has identified some of a service's wallet, heuristics are identified to capture these structures.

### *Heuristic 3 - Intelligence Based Clustering*

Chainalysis gathers information from other sources to enable better clustering. Data sources include but are not limited to: data-leaks, court documents, Chainalysis data partnerships, exchanges that share their addresses with Chainalysis, and manual merges due to services changing wallets

## 1 Bitcoin Fog

Bitcoin Fog was a bitcoin mixing service[8] (or tumbler). The Bitcoin Fog service has been clustered and attributed by Chainalysis. The Bitcoin Fog cluster contains 925,743 addresses (**Attached: Bitcoin Fog_addresses.csv**) and was active between November 10, 2011 and August 28, 2022.[9] There are a total of 1,213,266 transfers linked to this cluster, consisting of 521,042 deposits and 692,224 withdrawals. Bitcoin Fog received a total of 1,284,251.08225937 BTC, valued at USD $395,563,025.39061, and sent a total of 1,280,935.1339285 BTC, valued at USD $402,778,871.67989.

Bitcoin Fog was known as a custodial mixer, meaning the service had exclusive custody of the bitcoin deposited onto the platform by its customers. In summary, once a customer deposited funds into the mixer, they no longer controlled the private keys for the bitcoin deposited to Bitcoin Fog. In order to withdraw funds, the customer would log-in using the

---

[8] Mixing service: obfuscates the relationship between originating and destination addresses on the blockchain by consolidating multiple unrelated payments into output transactions.
[9] Research indicates that the cluster remains technically active as several addresses related to the service have received payments after the site was taken down. However, there have been no withdrawals from Bitcoin Fog since April 2021.



Appx6501

Bitcoin Fog user interface, entering their username and password. Bitcoin Fog was available on both the clear and darknet.[10]

## 1.1 Bitcoin Fog Attribution

On June 25, 2019, Chainalysis made a deposit to Bitcoin Fog of 0.00222386 BTC, Figure 1.



Figure 1: Screenshot of Bitcoin Fog site detailing the deposit address
3HQ3nVH2qzGNMhNtdYFxrQP3v7DSWhRzFN

Funds were sent to the Bitcoin Fog deposit address 3HQ3nVH2qzGNMhNtdYFxrQP3v7DSWhRzFN represented with transaction hash eab69f437f30f86b2ca447423167d475432c378f85988635900b879f2ad0ae47, Figure 2.

---

[10] The darknet, sometimes referred to as the darkweb, is an encrypted portion of the internet that is not indexed by traditional search engines, such as Google. In order to access the darknet specific software is required to make a connection.

 

**Appx6502**



Figure 2: Transaction eab69f437f30f86b2ca447423167d475432c378f85988635900b879f2ad0ae47

On June 25, 2019, Chainalysis made a withdrawal from Bitcoin Fog of 0.00177638 BTC, Figure 3.



Figure 3: Screenshot of Bitcoin Fog site detailing the withdrawal and receiving address
1Kw1iEjFCHudFkxd18kBXT3PX4iMbGJYN

Funds were sent from the Bitcoin Fog withdrawal address
35oKuFiBQYrU9oLaQntXwkMi8Nj2K3yEyA to Chainalysis controlled address
1Kw1iEjFCHudFkxd18kBXT3PX4iMbGJYN represented with transaction hash



**Appx6503**

7ea4dc1758f5ebbb77c33d2709723bfd20c09be416eb6ce87d583463f3d3f919, Figure 4.



Figure 4: Transaction 7ea4dc1758f5ebbb77c33d2709723bfd20c09be416eb6ce87d583463f3d3f919

## 1.2 Bitcoin Fog Clustering

Bitcoin Fog service used P2PKH Uncompressed addresses until 2012, then the P2PKH Compressed addresses changed to using Segwit addresses. The first known Bitcoin Fog transaction where the change is a P2SH-WPKH Segwit address in block 534129: 9a7e1cdb9f68573eaf64ba4f8908ebf05aee9321246188c1c746a297e8821ffb. Bitcoin Fog service used two wallets, one for deposits and one for withdrawals. The deposits were consolidated and moved to withdrawal wallets, with the same address being reused majority of the time. The following are the consolidation addresses that Bitcoin Fog used from 2011 to 2014.

- 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw
- 1F9kYDpu2CqwR18ovineZr8Y88NQfW1bzR
- 1BPgf9qGD5emvf154XAwNSrJu667S9H9j
- 1JmQN8NvX3XXWWrJW3rEEcKQMQd5DUgkH3
- 1MsmThtteKPu6fWxwn2SMDEnmJex3vKSBk
- 15U5NjgAbKqKyGKwayS648WwJoiCCvGnTG
- 1Cwb33nqn4S2uDsXwhNrUNy7FPdiRYhyM8
- 1P5pMkN1wr3ozHXwCXtRmv6kJBYLyPPMzc
- 16FgQXGzSLRtdwuwCN7mcaPUtbJ6JFTkVw
- 17gH1u6VJwhVD9cWR59jfeinLMzag2GZ43

 

**Appx6504**

After 2014, the consolidation address was newly created for each transaction. These addresses were identified by locating transactions sent from the deposit wallets. Withdrawal transactions were identified by following peels chains from these addresses.

## Transaction Features

Bitcoin Fog never used RF. Before block 390000 no transactions used lock time but after block 392500 all transactions used lock time. Before block 466100 all transactions were v1 and after block 466300 all transactions were v2. Before block 324000 all transactions associated with Bitcoin Fog had either one or two outputs; after block 324000 there could be more than two outputs. Bitcoin Fog's transaction fees changed several times over the life of the service from a static fee at the beginning and then to a dynamic fee.

Approximately 50.26 percent of the clustering for Bitcoin Fog was dependent on Heuristic 1, representing 46,532 addresses that co-spent. The remaining addresses were clustered through Heuristic 2. Figure 2 represents the deposit address (output address) that was clustered through co-spend heuristic and Figure 4 represents the input address for the withdrawal that was clustered through behavioral heuristic.

## 2 Alphabay Market

Alphabay was a darknet market service. The Alphabay service has been clustered and attributed by Chainalysis. The Alphabay cluster contains 2,726,132 addresses (**Attached: Alphabay Market_addresses.csv**)  and was active between April 30, 2015 and November 4, 2022[11]. There are a total of 5,926,666 transfers linked to this cluster, consisting of 2,866,235 deposits and 3,060,431 withdrawals. Alphabay received a total of 1,044,084.61714749 BTC, valued at USD  $723,264,639.77163, and sent a total of 1,042,942.16799985 BTC, valued at USD  $724,704,923.43925.

---

[11] Research indicates that the cluster remains technically active as several addresses related to the service have received and sent payments after the site was taken down.



Appx6505

Alphabay was known as a darknet market selling black market goods and services. Alphabay had an escrow service, meaning Alphabay provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Alphabay account, once a buyer had created an order and deposited funds into escrow, Alphabay controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order. In order to withdraw funds, the seller would log-in using the AlphabBay user interface, entering their username and password. Alphabay was available on the darknet.

## 2.1 Alphabay Attribution

On April 23, 2016, Chainalysis made a deposit to Alphabay of 0.01 BTC, Figure 5.



Figure 5:  Screenshot of  Alphabay Market site detailing the deposit address

1PJrmSGUZtibbS9o6LeuQQBZ3wkFqrSPjW

Funds were sent to the Alphabay deposit address 1PJrmSGUZtibbS9o6LeuQQBZ3wkFqrSPjW represented with transaction hash 3d371c8d2641e4a33735fa6a9a0faf7f1e2ffd7ff1bb08357c5d613b3cf9c5bb, Figure 6.


**Appx6506**



Figure 6: Transaction 3d371c8d2641e4a33735fa6a9a0faf7f1e2ffd7ff1bb08357c5d613b3cf9c5bb

Chainalysis also identified three additional deposit addresses on the Alphabay Market site, pwoah7foa6au2pul[.]onion:

- 1BiEWbPiusgohygnJLWuXssK6HV3SFLp8v (Figure 7)
- 1EP2hYJ7ezLJSyJRjyv7AbUrkKNxhcQL8G (Figure 8)
- 1PxmbuquKdcXbtBp1miK89THvq2rvqCeXh (Figure 9)



Figure 7: Transaction involving Alphabay deposit address 1BiEWbPiusgohygnJLWuXssK6HV3SFLp8v



Figure 8: Transaction involving Alphabay deposit address 1EP2hYJ7ezLJSyJRjyv7AbUrkKNxhcQL8G



**Appx6507**



Figure 9: Transaction involving Alphabay deposit address 1PxmbuquKdcXbtBp1miK89THvq2rvqCeXh

Chainalysis also received Alphabay addresses from a data sharing agreement with the US government.

## 2.2 Alphabay Clustering

It was observed that Alphabay had co-spend and transactional behavior fingerprints. Chainalysis' earliest detected address belonging to Alphabay was 1NGpmfXeFmKB4csqeUhSqCNXBJtCWua8fr, which was identified as being a co-spend cluster with activity from August 2015 and September 2015.

In September 2015, Alphabay changed its co-spend fingerprint to use a new address 1Px5FuAdzNFNRrMM4S6GDZ6XUrtaMHU9T5. This address was identified as being a co-spend cluster with activity between September 2, 2015 and February 18, 2016. Transactions were identified as having one or two outputs, with one output as a change address when two outputs were present. Transactions identified occurring in blocks after approximately 400500 returned the change to the same address as the one of the inputs instead of creating a new change address.

Approximately 0.26 percent of the clustering for Alphabay was dependent on Heuristic 1, representing 7,151 addresses that co-spent. The remaining addresses were clustered through a combination of Heuristic 1, Heuristic 2, and Heuristic 3[12]. Figure 7 represents the

---

[12] When ingesting the file, some safety checks are carried on to avoid false positives. Addresses are not added to the merge file in the following cases:
- If the address' cluster is older than 1NGpmfXeFmKB4csqeUhSqCNXBJtCWua8fr 's root address


Appx6508

deposit address (output address) that was clustered through co-spend heuristic and Figure 6 represents the input address for the withdrawal that was clustered through behavioral heuristic.

## 3 Evolution Market

Evolution Market was a darknet market service. The Evolution Market service has been clustered and attributed by Chainalysis. The Evolution Market cluster contains 421,860 addresses (**Attached: Evolution Market_addresses.csv**) and was active between January 16, 2014 and November 28, 2020[13]. There are a total of 575,793 transfers linked to this cluster, consisting of 455,873 deposits and 119,920 withdrawals. Evolution Market received a total of 239,554.8339942 BTC, valued at USD $69,761,494.67821, and sent a total of 239,477.30924596 BTC, valued at USD $69,624,626.55358.

Evolution Market was known as a darknet market selling black market goods and services. Evolution Market had an escrow service, meaning Evolution Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Evolution Market account, once a buyer had created an order and deposited funds into escrow, Evolution Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order. In order to withdraw funds, the seller would log-in using the Evolution Market user interface, entering their username and password. Evolution Market was available on the darknet.

### 3.1 Evolution Market Attribution

Chainalysis identified a deposit address, 11PzG24xAcUC6KyLEuUWLDEdfF3kwHdb9, on the Evolution Market site k5zq47j6wd3wdvjq[.]onion, Figure 10.

---

- If an address has transactions after block 400500 and this transaction has more than one input address
- The address type is different from Start1.PK.Compressed

[13] Research indicates that the cluster remains technically active as several addresses related to the service have received payments after March 20, 2015 16:51 UTC. There have not been any withdrawals since this time.

 

**Appx6509**



Figure 10: Transaction involving Evolution Market deposit address 11PzG24xAcUC6KyLEuUWLDEdfF3kwHdb9

## 3.2 Evolution Market Clustering

Approximately 99.86 percent of the clustering for Evolution Market was dependent on Heuristic 1, representing 420,516 addresses that co-spent. The remaining 1,344 addresses were identified through Heuristic 2, peel chain detection.

## 4 Agora Market

Agora Market was a darknet market service. The Agora Market service has been clustered and attributed by Chainalysis. The Agora Market cluster contains 516,428 addresses (**Attached: Agora Market_addresses.csv**) and was active between December 4, 2013 and October 13, 2022[14]. There are a total of 1,479,098 transfers linked to this cluster, consisting of 997,108 deposits and 481,990 withdrawals. Agora Market received a total of 719,098.18805962 BTC, valued at USD $220,878,096.44986, and sent a total of 718,934.06912148 BTC, valued at USD $220,596,386.20024.

Agora Market was known as a darknet market selling black market goods and services. Agora Market had an escrow service, meaning Agora Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Agora Market account, once a buyer had created an order and deposited funds into escrow, Agora Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order. In order to withdraw funds, the seller would

---

[14] Research indicates that the cluster remains technically active as several addresses related to the service have received payments after September 6, 2015 17:13 UTC. There have not been any withdrawals since this time.



**Appx6510**

log-in using the Agora Market user interface, entering their username and password. Agora Market was available on the darknet.

## 4.1 Agora Market Attribution

Chainalysis identified a deposit address, 1AnELbeQ8YS3RyjbxhSvC7zmxSC6rLxWWr, on the Agora Market site agorahooawayyfoe[.]onion, Figure 11.



Figure 11: Transaction involving Agora Market deposit address 1AnELbeQ8YS3RyjbxhSvC7zmxSC6rLxWWr

## 4.2 Agora Market Clustering

Approximately 99.43  percent of the clustering for Agora Market was dependent on Heuristic 1, representing 497,984 addresses that co-spent. The remaining 18,444 addresses were identified through Heuristic 2, change address detection[15].

## 5 Nucleus Market

Nucleus Market  was a darknet market service. The Nucleus Market service has been clustered and attributed by Chainalysis. The Nucleus Market cluster contains 263,536 addresses (**Attached: Nucleus Market_addresses.csv**) and was active between November 13, 2014 and January 1, 2021[16]. There are a total of 593,589 transfers linked to this cluster, consisting of 404,795 deposits and 188,794 withdrawals. Nucleus Market received a total of

---

[15] The change detection will, given a transaction, return the change address. It only allows a single address to be the change, and if multiple addresses are matching the criteria it will consider that none of them is the change. The criteria for an address to be the change are:
1) It should be of type Start1.PK.Compressed or Start1.PK.Uncompressed
2) The change value should be like 0.01xxxxxxxxBTC
3) The address should only be involved in two transactions
4) Transaction fees for both transactions should be the same

[16] Research indicates that the cluster remains technically active as several addresses related to the service have received payments after April 13, 2016 07:30 UTC. There have not been any withdrawals since this time.



**Appx6511**

278,511.47948421 BTC, valued at USD  $89,181,521.9589 , and sent a total of 272,295.82054851 BTC, valued at USD  $87,946,107.55336.

Nucleus Market was known as a darknet market selling black market goods and services. Nucleus Market had an escrow service, meaning Nucleus Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Nucleus Market account, once a buyer had created an order and deposited funds into escrow, Nucleus Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order. In order to withdraw funds, the seller would log-in using the Nucleus Market user interface, entering their username and password. Nucleus Market was available on the darknet.

## 5.1 Nucleus Market Attribution

Chainalysis identified a deposit address, **1BdveB7SBXSBwwkh8tfRV2pVNSBb2HP9yU**, on the Nucleus Market sites dkf2lnsctjvoivow[.]onion; o7v3h5ts5tah4yiw.onion, Figure 12.



Figure 12: Transaction involving Nucleus Market deposit address 1BdveB7SBXSBwwkh8tfRV2pVNSBb2HP9yU

## 5.2 Nucleus Market Clustering

It was observed that 55.54 percent of the clustering of addresses for Nucleus Marker was dependent on Heuristic 1, representing 146,381 addresses. Heuristic 2 represents the

 

**Appx6512**

remainder of the addresses. Chainlaysis identified numerous addresses and only received a single transaction from Nucleus Market with an output equal to .01xxxxxx BTC (where x is an integer between 0 and 9). The heuristic[17] utilized transactions sent from the co-spend cluster 1BdveB7SBXSBwwkh8tfRV2pVNSBb2HP9yU.

## 6 Abraxas Market

Abraxas Market is a darknet market service. The Abraxas Market service has been clustered and attributed by Chainalysis. The Abraxas Market cluster contains 149,803 addresses (**Attached: Abraxas Market_addresses.csv**) and was active between December 22, 2014 and March 23, 2020[18]. There are a total of 259,769 transfers linked to this cluster, consisting of 184,877 deposits and 74,892 withdrawals. Abraxas Market received a total of 141,143.07510686 BTC, valued at USD $35,613,069.53856, and sent a total of 141,125.80946199 BTC, valued at USD $35,659,633.02943.

Abraxas Market is known as a darknet market selling black market goods and services. Abraxas Market had an escrow service, meaning Abraxas Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Abraxas Market account, once a buyer had created an order and deposited funds into escrow, Abraxas Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order.

In order to withdraw funds, the seller would log-in using the Abraxas Market user interface, entering their username and password. Abraxas Market was available on the darknet.

### 6.1 Abraxas Market Attribution

Chainalysis identified a deposit address, 1AiCf2qcQyxh4zMgLKdEow8iX82tc2S3TG, on the Abraxas Market site abraxasdegupusel[.]onion, Figure 13.

---

[17] Criteria for the heuristic included Legacy address, PK compressed and identifying if the change address has no more than one transaction (both received and sent) before block 481873.
[18] Research indicates that the cluster remains technically active as several addresses related to the service have received payments and sent funds.





Figure 13: Transaction involving Nucleus Market deposit address 1AiCf2qcQyxh4zMgLKdEow8iX82tc2S3TG. Note, only the first 10 outputs are displayed.

## 6.2 Abraxas Market Clustering

It was observed that 79.52 percent of the clustering for Abraxas Market was dependent on Heuristic 1, representing 119,119 addresses. Heuristic 2 clustering represented the remainder of the addresses.

## 7 Pandora Market

Pandora Market is a darknet market service. The Pandora Market service has been clustered and attributed by Chainalysis. The Pandora Market cluster contains 71,039 addresses (**Attached: Pandora OpenMarket_adddresses.csv**) and was active between October 20, 2013 and January 16, 2018.[19] There are a total of 121,849 transfers linked to this cluster, consisting of 81,869 deposits and 39,980 withdrawals. Pandora Market received a total of 24,979.66216001 BTC, valued at USD $14,728,284.98002, and sent a total of 24,974.35392904 BTC, valued at USD $16,904,639.29289.

---

[19] Research indicates that the cluster was technically active as several addresses related to the service have received payments after September 23, 2014 15:42 UTC. There were seven withdrawals on January 16, 2018 between 07:58 UTC and 19:12 UTC. There have not been any transfers since.



**Appx6514**

Pandora Market is known as a darknet market selling black market goods and services. Pandora Market had an escrow service, meaning Pandora Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Pandora Market account, once a buyer had created an order and deposited funds into escrow, Pandora Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order.

In order to withdraw funds, the seller would log-in using the Pandora Market user interface, entering their username and password. Pandora Market was available on the darknet.

## 7.1 Pandora Market Attribution

Chainalysis identified a deposit address, 1NhmZVDMtgRPvN27UeUP9RPGeFZr7stsgV, on the Pandora Market site  pandorajodqp5zrr[.]onion, Figure 14.



Figure 14: Transaction involving Pandora  Market deposit address 1NhmZVDMtgRPvN27UeUP9RPGeFZr7stsgV

## 7.2 Pandora Market Clustering

It was observed that 78.49 percent of the clustering for Pandora Market was dependent on Heuristic 1, representing 55,757 addresses. Heuristic 2 clustering represented the remainder of the addresses.

## 8 Sheep Market

Sheep Market is a darknet market service. The Sheep Market service has been clustered and attributed by Chainalysis. The Sheep Market cluster contains 53,639 addresses (**Attached: Sheep Marketplace_addresses.csv**) and was active between February 1, 2013 and



Appx6515

November 29, 2019[20]. There are a total of 103,624 transfers linked to this cluster, consisting of 75,808 deposits and 27,816 withdrawals. Sheep Market received a total of 70,492.23091884 BTC, valued at USD $17,993,206.70493, and sent a total of 70,455.89396781 BTC, valued at USD $22,138,762.14717.

Sheep Market is known as a darknet market selling black market goods and services. Sheep Market had an escrow service, meaning Sheep Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Sheep Market account, once a buyer had created an order and deposited funds into escrow, Sheep Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order.

In order to withdraw funds, the seller would log-in using the Sheep Market user interface, entering their username and password. Sheep Market was available on the darknet.

## 8.1 Sheep Market Attribution

Chainalysis identified a deposit address, 1113hFG857ykQSEWJAVNcSnRzrMU6v7nK, on the Sheep Market site sheep5u64fi457aw[.]onion, Figure 15. Address was also confirmed in legal process[21].



Figure 15: Transaction involving Sheep Market deposit address 1113hFG857ykQSEWJAVNcSnRzrMU6v7nK

[20] Research indicates that the cluster remains technically active as several addresses related to the service have received payments after December 1, 2013 01:16 UTC. There have not been any withdrawals since this time.
[21] https://www.justice.gov/usao-mdfl/pr/more-17-million-forfeited-funds-presented-law-enforcement-agencies



**Appx6516**

## 8.2 Sheep Market Clustering

One hundred  percent of the clustering for Sheep Market was dependent on Heuristic 1, representing addresses that co-spent.

## 9 Black Bank Market

Black Bank  is a darknet marketplace. The Black Bank service has been clustered and attributed by Chainalysis. The Black Bank Market cluster contains 83,339 addresses (**Attached: Black Bank Market_addresses.csv**) and was active between October 18, 2013 and August 23, 2016[22]. There are a total of 131,724 transfers linked to this cluster, consisting of 92,736 deposits and 38,988 withdrawals. Black Bank Market received a total of 68,127.82725026 BTC, valued at USD $19,370,893.45443, and sent a total of 68115.64485595 BTC, valued at USD $19,465,595.93619.

Black Bank Market is known as a darknet market selling black market goods and services. Black Bank Market had an escrow service, meaning Black Bank Market provided a service to protect the buyers and sellers funds. In summary, a buyer would transfer bitcoin to their Black Bank Market account, once a buyer had created an order and deposited funds into escrow, Black Bank Market controlled the private keys for the bitcoin deposited and would release escrow once the seller had completed the buyer's order.

In order to withdraw funds, the seller would log-in using the Black Bank Market user interface, entering their username and password. Black Bank Market was available on the darknet.

## 9.1 Black Bank Attribution

Chainalysis identified a deposit address, 1NWGVKNdsXxYLMJRzqYh9pT3vvHmdHtHKt, that was reported on multiple open source forums for Black Bank Market site

---

[22] Research indicates that the cluster remains technically active as several addresses related to the service have received payments after June 10, 2015 15:16 UTC. There have not been any withdrawals since this time.



**Appx6517**

wztyb7vlfcw6l4xd[.]onion, Figure 16. Chainalysis also identified a deposit address, 15hCsZsxvahuCBPDqUdPzisL8jQad7peHo, for Black Bank Market site, Figure 17.



Figure 16: Transaction involving Black Bank Market deposit address 1NWGVKNdsXxYLMJRzqYh9pT3vvHmdHtHKt



Figure 17: Transaction involving Black Bank Market deposit address 15hCsZsxvahuCBPDqUdPzisL8jQad7peHo

## 9.2 Black Bank Clustering

It was observed that 61.05 percent of the clustering for Black Bank was dependent on Heuristic 1, representing 50,878 addresses. Heuristic 2 clustering, specific to peel chain detection, represented the remainder of the addresses.

 

**Appx6518**

## 10 Flow of Funds

Analysis was conducted on the direct and indirect sending and receiving exposure between Bitcoin Fog and the eight darknet market services. Direct exposure represents services and entities that are direct counterparties of another address/cluster across a transaction/s. Indirect exposure represents how a service or entity on the blockchain is correlated based on the flow of funds indirectly to other entities. This correlation can be many transactions (or hops) away (e.g., 100) or very closely related (e.g., one or two hops).  Aside from direct exposure, all other correlations would be considered indirect.   Therefore, Entity 1 can be indirectly exposed to Entity 2, which could mean that they correlate to each other via hundreds and hundreds of other transactions, or that Entity 1 is only three transactions away from Entity 2.

The eight darknet market services sent an aggregate direct amount of 80,728.598808180 BTC, valued at USD $27,910,946.76 between October 3, 2013 and July 5, 2017 to Bitcoin Fog. Bitcoin Fog sent an aggregate direct amount of 45,152.452110840 BTC, valued at USD $14,531,853.29 between October 9, 2013 and July 5, 2017 to the eight darknet market services. The eight darknet market services sent an aggregate indirect[23] amount of 31,792.530 BTC, valued at USD $10,828,680.77 between October 2, 2013 and July 4, 2017 to Bitcoin Fog. Bitcoin Fog sent an aggregate indirect amount of 13,610.257630 BTC, valued at USD $4,705,909.83 between February 28, 2013 and July 4, 2017 to the eight darknet market services. Refer to attachment: BitcoinFog data summary.xlsx for a breakdown of each darknet market direct and indirect sending and receiving exposure with Bitcoin Fog. (**Attached: one_hop_bf_sending.csv; one_hop_bf_receiving.csv**)

## Summary

---

[23] All the direct counterparties of both darknet market services and Bitcoin Fog were identified and pulled all of the possible indirect exposure that could be attributed to Bitcoin Fog (i.e., flow of funds through intermediary cluster). The indirect exposure only represents one counterparty between the two services in order to limit the possibility of potentially incorrect or unnecessary exposure being included.



**Appx6519**

Bitcoin Fog was a bitcoin mixing service that operated on the clear and dark web. The addresses used to move funds through Bitcoin Fog were grouped together and attributed by Chainalysis. Bitcoin Fog received a total of 1,284,251.08225937 BTC, valued at USD $395,563,025.39061, and sent a total of 1,280,935.1339285 BTC, valued at USD $402,778,871.67989. Of the 1,284,251.08225937 BTC Bitcoin Fog received, 80,728.598808180 BTC, valued at USD $27,910,946.76, was sent directly from eight darknet market sites while 31,792.530 BTC, valued at USD $10,828,680.77, was indirectly sent from eight darknet market sites. Of the 1,280,935.1339285 BTC Bitcoin Fog sent, 45,152.452110840 BTC, valued at USD $14,531,853.29, was sent directly to eight darknet market sites while 13,610.257630 BTC, valued at USD $4,705,909.83, was sent indirectly to with darknet market sites.

## Attachments

- BitcoinFog Data Summary xlsx
- one_hop_bf_sending.csv
- one_hop_bf_receiving.csv
- bf_direct_sending.csv
- bf_direct_receiving.csv
- Abraxas Market_addresses.csv
- abraxas_market_with_cospend.csv
- Agora Market_addresses.csv
- alphabay_market_with_cospend.csv
- Alphabay Market_addresses.csv
- Bitcoin Fog_addresses.csv
- bitcoin_fog_with_cospend.csv
- Black Bank Market_addresses.csv
- black_bank_market_with_cospend.csv
- Evolution Market_addresses.csv
- evoluation_market_with_cospend.csv
- Nucleus Market_addresses.csv
- nuclelus_market_with_cospend.csv
- Pandora OpenMarket_adddresses.csv
- pandora_openmarket_with_cospend.csv
- Sheep Marketplace_addresses.csv
- sheep_marketplace_with_cospend.csv


**Appx6520**

## Expert Report Signature

Elizabeth Bisbee


**Appx6521**



# US v. Sterlingov
# Supplemental Expert Report

Prepared by Director of Investigation Solutions
Elizabeth Bisbee

July 28, 2023



# Table of Contents:

**Supplemental Expert Report**                                    3
**Additional Information**                                        3
**Bitcoin Fog**                                                  3
**Alphabay Market**                                              4
**Evolution Market**                                             4
**Agora Market**                                                 4
**Nucleus Market**                                               4
**Abraxas Market**                                               5
**Pandora Market**                                               5
**Sheep Market**                                                 5
**Black Bank Market**                                            5
**Appendix**                                                     7
**Expert Report Signature**                                      8



Appx6523

## Supplemental Expert Report

This report supplements the previous Expert Report in US v. Sterlingov prepared by Elizabeth Bisbee, signed December 2, 2022. This report also outlines additional information not included in the original report.

## Additional Information

After the initial Daubert hearing on June 23, 2023, a review of the original Expert Report was conducted in response to the Court's request for any Chainalysis margins of error, false positives, and false negatives. As part of this review, it was determined that the spreadsheets specific to the co-spend did not represent all of the true co-spends. This supplemental report updates the primary set of data provided in the original report as it relates to the co-spend within each of the following nine clusters and included data:

- abraxas_market_with_cospend.csv
- agora_market_with_cospend.csv
- alphabay_market_with_cospend.csv
- bitcoin_fog_with_cospend.csv
- black_bank_market_with_cospend.csv
- evoluation_market_with_cospend.csv
- nuclelus_market_with_cospend.csv
- pandora_openmarket_with_cospend.csv
- sheep_marketplace_with_cospend.csv

In the attachments provided in the original report, the designation of co-spend pulled only the primary co-spend. This supplemental report includes the primary co-spend as well as the secondary, or consolidated, co-spends[1]. This additional information strengthened the original co-spend analysis, as depicted in the Expert Report. The following is a full representation of the true co-spend for each of the nine services.

---

[1] Primary co-spend is the first set of co-spends that is pulled within a cluster. Secondary co-spend are a subset of co-spends within the overall cluster.



### Bitcoin Fog

The total number of addresses clustered as Bitcoin Fog is 925,742[2]. Of the 925,742 addresses, 61.91 percent, or 573,213 addresses are based on Heuristic 1. (see **bitcoin_fog_market_addrs_cospend.csv**).

### Alphabay Market

The total number of addresses clustered as Alphabay Market is 2,726,135[3]. Of the 2,726,135 addresses, 9.039 percent, or 246,424 addresses are based on Heuristic 1. (see **alphabay_market_addres_cospend1.csv, alphabay_market_addres_cospend2.csv, alphabay_market_addres_cospend3.csv**).

### Evolution Market

The total number of addresses clustered as Evolution Market is 421,860. Of the 421,860 addresses, 100 percent, or 421,860 addresses, are based on Heuristic 1.  There were approximately 1,344 addresses that were also identified through Heuristic 2, peel chain detection but still ultimately co-spent. (see **evolution_market_addrs_cospend.csv**).

### Agora Market

The total number of addresses clustered as Agora Market is 516,428. Of the 516,428 addresses, 99.77 percent, or 515,271 addresses, are based on Heuristic 1. (see **agora_market_addrs_cospend.csv**).

---

[2] In the original report, the top row of the spreadsheet was erroneously counted as an address.
[3] In the original report, the number of addresses reported was 2,726,132. I transposed the 2 and the 5 when typing,



Appx6525

## Nucleus Market

The total number of addresses clustered as Nucleus Market is 263,536. Of the 263,536 addresses, 62.44 percent, or 164,552 addresses, are based on Heuristic 1. (see **nucleus_market_addrs_cospend.csv**).

## Abraxas Market

The total number of addresses clustered as Abraxas Market is 149,803. Of the 149,803 addresses, 98.62 percent, or 147,737 addresses, are based on Heuristic 1. ( see **abraxas_market_addrs_cospend.csv**).

## Pandora Market

The total number of addresses clustered as Pandora Market is 71,039. Of the 71,039 addresses, 98.14 percent, or 69,722 addresses, are based on Heuristic 1. (see **pandora_market_addrs_cospend.csv**).

## Sheep Market

The total number of addresses clustered as Sheep Market is 53,639. Of the 53,639 addresses, 100 percent, or 53,639 addresses, are based on Heuristic 1. (see **sheep_market_addrs_cospend.csv**).

## Black Bank Market

The total number of addresses clustered as Black Bank Market is 83,339. Of the 83,339 addresses, 99.54 percent, or 82,959 addresses, are based on Heuristic 1. (see **black_bank_market_addrs_cospend.csv**).



It should be noted that the services outlined above were controlled for CoinJoin and none of the services had CoinJoin. CoinJoin is an obfuscation technique which allows a user to contribute their coins and combine them with the coins of multiple other users in a single transaction. When the CoinJoin is complete, the user has the same number of coins as they originally contributed but now have another user's contributed coins.

## Appendix

- Supplemental Appendix Key - Sterlingov.pdf
- abraxas_market_addrs_cospend.csv
- agora_market_addrs_cospend.csv
- alphabay_market_addres_cospend1.csv
- alphabay_market_addres_cospend2.csv
- alphabay_market_addres_cospend3.csv
- bitcoin_fog_market_addrs_cospend.csv
- black_bank_market_addrs_cospend.csv
- evolution_market_addrs_cospend.csv
- nucleus_market_addrs_cospend.csv
- pandora_market_addrs_cospend.csv
- sheep_market_addrs_cospend.csv



Appx6527

## Expert Report Signature

Elizabeth Bisbee

 

Appx6528

# Sterlingov Devices Review Summary

## Date: 5 May 2023

## Author: Valerie Mazars de Mazarin

| EVIDENCE NUMBER | SOURCE ITEM | SUMMARY |
|---|---|---|
| 1B1 | Boox N96 Tablet | CART notes indicate that they could not obtain extraction; Not analyzed |
| 1B2_1 | 1 TB Samsung SSD Drive | Bootable OS Linux Mint 19 "Tara" xfce edition; would expect a DVD or USB to contain the rest of the actual OS |
| 1B2_2 | 1 TB Samsung SSD Drive | Mostly empty; File carve recovers primarily Adobe programs; reference to heavydist in unallocated space |
| 1B2_3 | 1 TB Samsung SSD Drive | Windows 10, appears to be at least partial backup of files from 1B6_1; TigerVNC remote desktop software; Attempted FTP connections to 188.149.52.168 on port 8017, Tor Browser |
| 1B3_1 | 16 GB Kingston SD Card | Linux Debian Raspberry Pi. VNC installed, overall appears not highly customized |
| 1B4_1 | SIM card | ICCID:89701012074639512985 IMSI:250017463951298 |
| 1B4_2 | SIM card | ICCID:89490240001832820398 IMSI:262011105707507 |
| 1B4_3 | 16 GB SanDisk Micro SD Card | Raspberry Pi used with Xeoma security camera |
| 1B4_4 | 16 B Toshiba Micro SD Card | Raspberry Pi with OpenVpn configuration file to connect to rrras753.ignorelist.com on port 38230, and VNC server software |
| 1B5_1 | 64 GB Samsung Micro SD Card | Raspberry Pi used with Xeoma security camera with email alert functionality to 'dangerzone' and 'gravytrain' addresses |
| 1B7 | iLepo power source | Portable charger with no media to analyze |

| EVIDENCE NUMBER | SOURCE ITEM | SUMMARY |
|---|---|---|
| 1B6_1 | 1 TB HDD from 1B6 (Laptop) | Main user profile named "studio"; OpenVPN configuration file to connect to Mullvad.net addresses, multiple virtual machines; X2go remote desktop software and Tor browser installed; PasswordSafe vault |
| 1B8 | 2 Raspberry PIs | CART notes indicate that they could not obtain extraction; No media |
| 1B9_1 | SD card | CART notes indicate that they could not obtain extraction; Not analyzed |
| 1B9_2 | SIM card | ICCID:89701991161150150495 IMSI:250996687368463 |
| 1B9_3 | SIM card | ICCID:89701010050322439530 IMSI:250015032243953 |
| 1B9_4 | SIM card | ICCID:89462048009042053554 IMSI:240078222335358 |
| 1B9_5 | SIM card | ICCID:89701010068325180018 IMSI:250016832518001 |
| 1B9_6 | 4 GB Micro SD Card | ExFAT file system, no readable files recovered |
| 1B9_7 | 4 GB Micro SD Card | FAT32 filesystem, "Android" directory but no files of note contained within |
| 1B9_8 | 512 MB Kingston SD Card | FAT 16 filesystem; primarily camera photos and music files |
| 1B9_9 | 32 GB SanDisk SD Card | NTFS-formatted, contains Tor Browser, files and drivers from a possible ASUS laptop, and torrented/downloaded instructional videos |
| 1B9_10 | 2 GB Transcend SD Card | DOS FAT 16, contains primarily music |
| 1B9_11 | 1 GB SanDisk SD Card | Android media card; includes file containing the strings "Webmoney" and `vvpetrov@gmail.com` |
| 1B9_13 | 8 GB SanDisk Thumb Drive | Linux, contains ssh key for connection with `rsa2@22:83.248.64.79`; appears that a ssh connection via putty was attempted to this IP with session name recorded as `bunkerx` |
| 1B9_14 | 128 GB SanDisk | NTFS, volume label "TESLADRIVE", various documents |

| EVIDENCE NUMBER | SOURCE ITEM | SUMMARY |
| --- | --- | --- |
| | Thumb Drive | |
| 1B9_18 | 32 GB SanDisk Thumb Drive | Attempted ssh to `root@dangerzone.today` and `root@kcqmpkpahvgukiuc.onion`, set up alias `bunkertunnel` to connect to `sshuser@td1.hopto.org`, which also appeared in a TigerVNC configuration |
| 1B10 | 2 Samsung phones, SIM | Samsung A750FN and Samsung GalaxyA20 and a SIM (ICCID:89462048009042053539 IMSI:240078222335356) |
| 1B11 | LiveLTE.RU device | Portable hotspot; not analyzed further |
| 1B12 | DVD disc | Contains video from "Star Wars: Episode III" |
| 1B13 | 6 TB HDD | Bitlocker-encrypted drive, could not review |
| 1B14 | 250 GB HDD | Drive containing extraction of two Android phones (Samsung A750FN and Samsung GalaxyA20e) and a SIM (ICCID:89462048009042053539 IMSI:240078222335356); Additional physical review of mobile phones |
| 1B32 | Samsung S7 | Contains Mycelium wallet, Eclair wallet, Orbot proxy app |

# IP Overlap Analysis

9 November 2022
Valerie Mazars de Mazarin, FBI

## Background

Computer Scientist - Field Operations Valerie Mazars de Mazarin (CS Mazars) analyzed IP login data provided by IRS for overlap and connections. This analysis focused on possible connections between the following groups of accounts:

- those associated with `shormint@hotmail.com` or any Bitcoin Fog admin-related moniker
- those using the moniker `killdozer`
- those associated with Roman Sterlingov (via email addresses or true-name registration)
- those additional Mt. Gox accounts identifed by IRS

## Data Summary

CS Mazars summarized data provided by IRS into a spreadsheet with columns for IP address, timestamp, and data source. To refer to data sources (including subpoena returns and search warrant returns) in a consistant manner, CS Mazars assigned each a reference name. The data summary contained entries from 29 data sources.

## Initial Triage

CS Mazars created a diagram in Maltego Casefile by ingesting the summarized spreadsheet data and performing the following steps to reduce redundency:

1. Removed data sources not linked to any other data sources
2. Removed IP addresses with fewer than 2 corresponding data sources

Summarized data graph



This graph view showed two distinct networks. The first and largest ("Network A") showed links across 15 data sources. The second network ("Network B") linked four accounts: Bitcoin Talk account for `Ak.Omedetou@gmail.com`, Twitter account for `bitcoinfogg`, Twitter account for `bltcoinfog`, and Google account for `gorski.serafin`. CS Mazars saved "Network A" to a new Maltego graph.

CS Mazars reduced the overlap dataset by performing the following steps:

1. Removed links between data sources that already contained the same email address

2. Removed IPs linked with only data sources associated with Roman Sterlingov, including any accounts associated with `heavydist@gmail.com` and any `plasmadivision.com` email address

3. Removed IPs that functioned as Tor exit nodes during the times used, with timestamps far enough apart as to likely rule out use within the same session.

The remaining IPs were left for analysis:

```
61.19.252.148
70.90.169.13
83.254.53.11
83.248.132.4
95.168.163.228
212.16.7.171
212.117.160.123
213.66.214.217
```

# Overlap Analysis

Each of the remaining IPs, CS Mazars reviewed individually to determine a timeline of their appearances across data sources, sorting their timestamps into chronological order and focusing on the times when the data source changed. Time zones were not specified; by convention, they were understood to be in UTC.

CS Mazars assessed a window of time that constituted possible overlap based on how each IP was likely used in the time period it was observed (for example, as a Tor exit node or as a residential ISP connection). Tools used to conduct IP research included ExoneraTor, Maxmind, DomainTools, Shodan, and Wayback Machine.

## 61.19.252.148

| TIMESTAMP | SOURCE |
| --- | --- |
| 10/8/2011 13:27:22 | LR-PLASMA |
| 10/8/2011 13:36:16 | MTGOX-VOLFPRIUS |

This IP did not appear to be a Tor node and was owned by Thai provider CAT Telecom. According to FBI holdings, this IP was likely used as a proxy server and was mentioned on a criminal forum. CS Mazars assigned a window of probable overlap of 10 minutes. These two events occurred within 9 minutes.

## 70.90.169.13

| TIMESTAMP | SOURCE |
| --- | --- |
| 10/20/2011 07:00:22 | MTGOX-KOLBASA |
| 10/20/2011 07:09:53 | LR-SHORMINT |

This IP did not appear to be a Tor node and was owned by US provider Comcast. According to FBI holdings, this IP was also likely used as a proxy server and was mentioned on a criminal forum. CS Mazars assigned a window of probable overlap of 10 minutes. These two events occured within 10 minutes.

## 83.254.53.11

| TIMESTAMP | SOURCE |
|---|---|
| 11/27/2011 01:42:38 | MTGOX-PLASMA |
| 01/25/2012 19:30:35 | BT-KILLDOZER |

This ip appeared to be a Tor node on 11/27/11 but not on 1/25/12. However, on the first date, according to ExoneraTor it was not used as an exit relay, so any traffic to websites from this IP would not have come from the Tor network. On these dates, the IP appeared to be a residential or business connection with no apparent services running and was owned by Swedish provider comhem.se (now Tele2). CS Mazars assigned a window of probable overlap of 12 months. These events occurred within 2 months.

## 83.248.132.4

| TIMESTAMP | SOURCE |
|---|---|
| 06/03/2012 10:19:28 | BT-KILLDOZER |
| 06/05/2012 01:01:15 | TWI-CRAYKILL |
| 07/05/2012 11:29:00 | LR-PLASMA |
| 10/01/2013 18:07:45 | BT-KILLDOZER |
| 10/19/2013 17:47:10 | BITSTAMP-HEAVY |

Note: this list is an excerpt; see full event list in attached spreadsheet.

This ip appeared to be a Tor node at some dates in 2012, which CS Mazars filtered out due to the spacing of events exceeding 10 minutes. At the rest of the timestamps analyzed, it appeared to be a residential or business connection with no apparent services running and was owned by Swedish provider comhem.se (now Tele2). According to Maxmind and Censys, this network is located in Gothenburg, Sweden. CS Mazars assigned an acceptable overlap window of 12 months. All events occurred between 3/9/2013 and 10/19/2013.

## 95.168.163.228

| TIMESTAMP | SOURCE |
|---|---|
| 10/10/2011 14:03:48 | LR-SHORMINT |
| 10/10/2011 14:04:30 | MTGOX-KOLBASA |

This IP did not appear to be a Tor node and was owned by German provider Leaseweb. Based on passive DNS results for this IP, CS Mazars could not determine whether this IP was a dedicated VPS or a VPN, and assigned the more conservative window of probable overlap of 10 minutes. These two events occurred within one minute.

## 212.16.7.171

| TIMESTAMP | SOURCE |
|---|---|
| 10/25/2011 13:39:55 | MTGOX-PETERNFS |
| 10/25/2011 13:40:28 | MTGOX-KOLBASA |

This IP did not appear to be a Tor node and was owned by Russian provider ISS. Based on passive DNS results for this IP, CS Mazars could not determine whether this IP was dedicated infrastructure or a VPN, and assigned the more conservative window of probable overlap of 10 minutes. These two events occured within one minute.

## 212.117.160.123

| TIMESTAMP | SOURCE |
|---|---|
| 11/24/2011 00:17:51 | LR-PLASMA |
| 11/24/2011 00:25:12 | MTGOX-VOLFPRIUS |
| 11/24/2011 00:27:15 | LR-PLASMA |

This IP did not appear to be a Tor node and was owned by Luxembourgish VPS provider Root SA. Based on passive DNS results for this IP, CS Mazars assessed that this IP was likely a VPN, possibly from "cryptovpn.com". CS Mazars assigned a window of probable overlap of 10

minutes. The events occurred within 7.5 minutes and 2.5 minutes respectively.

## 213.66.214.217

| TIMESTAMP | SOURCE |
|---|---|
| 10/24/2013 00:36:22 | BITSTAMP-HEAVY |
| 12/27/2012 11:29:08 | BT-KILLDOZER |

This IP did not appear to be a Tor node and was owned by Swedish provider Telia. This IP appears to have been used as a residential or business connection with no apparent services running at the time in question. CS Mazars assigned an acceptable overlap window of 1 year. The events occurred within 10 months.

CS Mazars ingested the final event list into Maltego Casefile to create a network graph.



The reference names in this event list and graph corresponded to the below documents:

| REFERENCE | PROVIDER | ACCOUNT | FILENAME |
|---|---|---|---|
| BITSTAMP-HEAVY | Bitstamp | ID 52443 "Roman Sterlingov" | 71852443932_account_history.txt |
| BT-KILLDOZER | Bitcoin Talk | jordan.butch @ mail.ru | Bitcoin Talk Response, 4.20.18.pdf |
| LR-PLASMA | Liberty Reserve | U7489869 (plasma @ plasmadivision.com) | U7489869-Plasma.xlsx |
| LR-SHORMINT | Liberty Reserve | U0845692 (shormint @ hotmail.com) | U0845692-shormint.xlsx |
| MTGOX-KOLBASA | Mt Gox | kolbasa (kolbasa99 @ rambler.ru) | mtg_log.xlsx, mtg_wallet_history.xlsx |
| MTGOX-PETERNFS | Mt Gox | peternfs (nfs9000 @ hotmail.com) | mtg_log.xlsx, mtg_wallet_history.xlsx |
| MTGOX-PLASMA | Mt Gox | roso987341870 (spam @ plasmadivision.com) | mtg_log.xlsx, mtg_wallet_history.xlsx |
| MTGOX-VOLFPRIUS | Mt Gox | volfprius (volf.prius @ hotmail.com) | mtg_log.xlsx, mtg_wallet_history.xlsx |
| TWI-CRAYKILL | Twitter | craykilldozer (spam @ plasmadivision.com) | 599704975-account.txt |

## Conclusions

CS Mazars arrived at the following conclusions from reviewing the events:

1. The same user most likely accessed the

   - Mt Gox accounts `volfprius` and `roso987341870`
   - Liberty Reserve account U7489869 `plasma@plasmadivision.com`
   - Bitstamp account 52443 `Roman Sterlingov`
   - Twitter account `craykilldozer`
   - Bitcoin Talk account `killdozer`

2. The same user most likely accessed the Mt Gox accounts for `kolbasa` and `peternfs` and the Liberty Reserve account U0845692 `shormint@hotmail.com`.

Appx6538

| IP | TIMESTAMP | SOURCE |
|---|---|---|
| 61.19.252.148 | 10-08-2011 13:27 | LR-PLASMA |
| 61.19.252.148 | 10-08-2011 13:36 | MTGOX-VOLFPRIUS |
| 70.90.169.13 | 10/20/2011 7:00 | MTGOX-KOLBASA |
| 70.90.169.13 | 10/20/2011 7:09 | LR-SHORMINT |
| 95.168.163.228 | 10-10-2011 14:03 | LR-SHORMINT |
| 95.168.163.228 | 10-10-2011 14:04 | MTGOX-KOLBASA |
| 212.16.7.171 | 10/25/2011 13:39 | MTGOX-PETERNFS |
| 212.16.7.171 | 10/25/2011 13:40 | MTGOX-KOLBASA |
| 212.117.160.123 | 11/24/2011 0:17 | LR-PLASMA |
| 212.117.160.123 | 11/24/2011 0:25 | MTGOX-VOLFPRIUS |
| 212.117.160.123 | 11/24/2011 0:27 | LR-PLASMA |
| 213.66.214.217 | 10/24/2013 0:36 | BITSTAMP-HEAVY |
| 213.66.214.217 | 12/27/2012 11:29 | BT-KILLDOZER |
| 83.248.132.4 | 06-03-2012 10:19 | BT-KILLDOZER |
| 83.248.132.4 | 06-05-2012 01:01 | TWI-CRAYKILL |
| 83.248.132.4 | 06-05-2012 01:01 | TWI-CRAYKILL |
| 83.248.132.4 | 06-10-2012 12:13 | BT-KILLDOZER |
| 83.248.132.4 | 07-04-2012 00:07 | BT-KILLDOZER |
| 83.248.132.4 | 07-05-2012 11:29 | LR-PLASMA |
| 83.248.132.4 | 8/16/2012 21:25 | MTGOX-PLASMA |
| 83.248.132.4 | 10-12-2012 22:36 | BT-KILLDOZER |
| 83.248.132.4 | 03-09-2013 11:55 | BT-KILLDOZER |
| 83.248.132.4 | 03-09-2013 21:24 | MTGOX-PLASMA |
| 83.248.132.4 | 03-09-2013 21:44 | BT-KILLDOZER |
| 83.248.132.4 | 03-09-2013 21:53 | BT-KILLDOZER |
| 83.248.132.4 | 03-09-2013 22:03 | MTGOX-PLASMA |
| 83.248.132.4 | 03-10-2013 13:27 | BT-KILLDOZER |
| 83.248.132.4 | 03-10-2013 14:09 | BT-KILLDOZER |
| 83.248.132.4 | 03-10-2013 17:34 | MTGOX-PLASMA |
| 83.248.132.4 | 03-10-2013 19:40 | BT-KILLDOZER |
| 83.248.132.4 | 3/13/2013 11:54 | BT-KILLDOZER |
| 83.248.132.4 | 3/13/2013 19:00 | MTGOX-PLASMA |
| 83.248.132.4 | 3/13/2013 20:08 | MTGOX-PLASMA |
| 83.248.132.4 | 3/13/2013 21:52 | BT-KILLDOZER |
| 83.248.132.4 | 3/19/2013 16:05 | BT-KILLDOZER |
| 83.248.132.4 | 3/20/2013 22:49 | MTGOX-PLASMA |
| 83.248.132.4 | 3/22/2013 10:37 | MTGOX-PLASMA |
| 83.248.132.4 | 3/22/2013 13:18 | BT-KILLDOZER |
| 83.248.132.4 | 3/24/2013 17:16 | BT-KILLDOZER |
| 83.248.132.4 | 3/27/2013 9:31 | MTGOX-PLASMA |
| 83.248.132.4 | 3/28/2013 9:41 | MTGOX-PLASMA |
| 83.248.132.4 | 3/29/2013 0:21 | BT-KILLDOZER |
| 83.248.132.4 | 3/29/2013 1:18 | MTGOX-PLASMA |
| 83.248.132.4 | 04-03-2013 18:30 | BITSTAMP-HEAVY |
| 83.248.132.4 | 04-04-2013 10:15 | BT-KILLDOZER |
| 83.248.132.4 | 04-04-2013 10:43 | BT-KILLDOZER |

| | | |
|---|---|---|
| 83.248.132.4 | 04-06-2013 07:25 | MTGOX-PLASMA |
| 83.248.132.4 | 04-06-2013 08:32 | MTGOX-PLASMA |
| 83.248.132.4 | 04-06-2013 20:00 | BT-KILLDOZER |
| 83.248.132.4 | 04-06-2013 20:05 | BT-KILLDOZER |
| 83.248.132.4 | 04-07-2013 16:40 | MTGOX-PLASMA |
| 83.248.132.4 | 04-08-2013 19:04 | BITSTAMP-HEAVY |
| 83.248.132.4 | 04-08-2013 19:13 | BT-KILLDOZER |
| 83.248.132.4 | 04-09-2013 03:08 | BITSTAMP-HEAVY |
| 83.248.132.4 | 04-09-2013 15:00 | BITSTAMP-HEAVY |
| 83.248.132.4 | 04-10-2013 01:04 | BT-KILLDOZER |
| 83.248.132.4 | 04-10-2013 07:54 | BITSTAMP-HEAVY |
| 83.248.132.4 | 04-10-2013 13:25 | BT-KILLDOZER |
| 83.248.132.4 | 04-10-2013 13:28 | BT-KILLDOZER |
| 83.248.132.4 | 04-11-2013 07:45 | MTGOX-PLASMA |
| 83.248.132.4 | 04-12-2013 23:40 | BITSTAMP-HEAVY |
| 83.248.132.4 | 4/13/2013 0:13 | BT-KILLDOZER |
| 83.248.132.4 | 4/16/2013 11:02 | BT-KILLDOZER |
| 83.248.132.4 | 4/16/2013 21:19 | MTGOX-PLASMA |
| 83.248.132.4 | 4/16/2013 21:57 | BITSTAMP-HEAVY |
| 83.248.132.4 | 4/17/2013 17:52 | BT-KILLDOZER |
| 83.248.132.4 | 4/17/2013 18:25 | MTGOX-PLASMA |
| 83.248.132.4 | 4/18/2013 12:53 | BT-KILLDOZER |
| 83.248.132.4 | 4/18/2013 19:33 | BT-KILLDOZER |
| 83.248.132.4 | 4/22/2013 22:45 | MTGOX-PLASMA |
| 83.248.132.4 | 4/30/2013 15:04 | BT-KILLDOZER |
| 83.248.132.4 | 4/30/2013 15:17 | BITSTAMP-HEAVY |
| 83.248.132.4 | 4/30/2013 15:18 | MTGOX-PLASMA |
| 83.248.132.4 | 05-01-2013 13:56 | BITSTAMP-HEAVY |
| 83.248.132.4 | 05-01-2013 19:37 | BT-KILLDOZER |
| 83.248.132.4 | 05-01-2013 19:41 | BT-KILLDOZER |
| 83.248.132.4 | 05-01-2013 19:48 | MTGOX-PLASMA |
| 83.248.132.4 | 05-01-2013 19:49 | MTGOX-PLASMA |
| 83.248.132.4 | 05-01-2013 23:13 | BT-KILLDOZER |
| 83.248.132.4 | 05-02-2013 19:14 | BITSTAMP-HEAVY |
| 83.248.132.4 | 6/15/2013 18:33 | MTGOX-PLASMA |
| 83.248.132.4 | 6/16/2013 20:58 | BT-KILLDOZER |
| 83.248.132.4 | 6/19/2013 0:40 | BT-KILLDOZER |
| 83.248.132.4 | 6/19/2013 21:03 | BITSTAMP-HEAVY |
| 83.248.132.4 | 6/19/2013 21:08 | BITSTAMP-HEAVY |
| 83.248.132.4 | 6/19/2013 23:31 | MTGOX-PLASMA |
| 83.248.132.4 | 6/19/2013 23:31 | MTGOX-PLASMA |
| 83.248.132.4 | 6/22/2013 18:21 | BITSTAMP-HEAVY |
| 83.248.132.4 | 6/25/2013 14:57 | BT-KILLDOZER |
| 83.248.132.4 | 07-01-2013 21:58 | BT-KILLDOZER |
| 83.248.132.4 | 07-05-2013 22:00 | BITSTAMP-HEAVY |
| 83.248.132.4 | 07-05-2013 22:00 | BITSTAMP-HEAVY |
| 83.248.132.4 | 07-06-2013 21:21 | BT-KILLDOZER |

| | | |
|---|---|---|
| 83.248.132.4 | 07-07-2013 07:53 | BT-KILLDOZER |
| 83.248.132.4 | 07-07-2013 23:41 | BITSTAMP-HEAVY |
| 83.248.132.4 | 07-07-2013 23:59 | BITSTAMP-HEAVY |
| 83.248.132.4 | 07-08-2013 18:02 | MTGOX-PLASMA |
| 83.248.132.4 | 07-09-2013 20:43 | BT-KILLDOZER |
| 83.248.132.4 | 07-10-2013 09:16 | BT-KILLDOZER |
| 83.248.132.4 | 07-12-2013 16:25 | MTGOX-PLASMA |
| 83.248.132.4 | 07-12-2013 19:16 | MTGOX-PLASMA |
| 83.248.132.4 | 7/18/2013 22:43 | BT-KILLDOZER |
| 83.248.132.4 | 08-01-2013 08:28 | MTGOX-PLASMA |
| 83.248.132.4 | 8/19/2013 17:05 | BITSTAMP-HEAVY |
| 83.248.132.4 | 8/22/2013 12:02 | BT-KILLDOZER |
| 83.248.132.4 | 8/22/2013 15:05 | MTGOX-PLASMA |
| 83.248.132.4 | 8/22/2013 15:11 | BITSTAMP-HEAVY |
| 83.248.132.4 | 8/31/2013 7:20 | BT-KILLDOZER |
| 83.248.132.4 | 09-02-2013 18:46 | MTGOX-PLASMA |
| 83.248.132.4 | 9/27/2013 19:58 | BITSTAMP-HEAVY |
| 83.248.132.4 | 10-01-2013 18:07 | BT-KILLDOZER |
| 83.248.132.4 | 10/19/2013 17:47 | BITSTAMP-HEAVY |
| 83.254.53.11 | 11/27/2011 1:42 | MTGOX-PLASMA |
| 83.254.53.11 | 1/25/2012 19:30 | BT-KILLDOZER |

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the

District of Columbia

| | |
|---|---|
| United States of America<br>v.<br>ROMAN STERLINGOV<br><br>**Date of Birth:  XXXXXXXX**<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br> |

Case: 1:21−mj−00400
Assigned To : Meriweather, Robin M.
Assign. Date : 4/26/2021
Description: COMPLAINT W/ ARREST WARRANT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  October 27, 2011 to April 26, 2021  in the county of _____ in the

_____ in the District of ___Columbia___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC 1960(a) Unlicensed Money Transmission | |
| 18 USC 1956(a)(3) Money Laundering - Sting | |
| D.C. Code 26-1023(c) Money Transmission without a License | |

This criminal complaint is based on these facts:

See attached statement of facts.

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Devon Beckett, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1
by telephone.

Date: ___04/26/2021___

_____
*Judge's signature*

City and state:  Washington D.C.

Robin M. Meriweather, Magistrate Judge
*Printed name and title*

Appx6542

### STATEMENT OF FACTS

Your affiant, Devon Beckett, is a Special Agent assigned to the Internal Revenue Service, Criminal Investigation (IRS-CI). As a special agent, my responsibilities include the investigation of criminal violations of the Internal Revenue Code (Title 26, United States Code), the Money Laundering Control Act (Title 18, United States Code, Sections 1956 and 1957), the Bank Secrecy Act (including relevant parts of Title 31, United States Code), and related offenses. I have experience investigating crimes involving virtual currency and the darknet, including "mixing" and "tumbling" services, as further described below. I also am experienced in analyzing and tracing virtual currency transactions. Currently, I am tasked with investigating the BITCOIN FOG darknet money laundering service. As a Special Agent, I am authorized by law or by a Government agency to engage in or supervise the prevention, detection, investigation, or prosecution of a violation of Federal criminal laws.

The facts and information contained in this Affidavit are based on my personal knowledge and observations, information provided to me by others involved in the investigation, and a review of documents and records. This Affidavit does not contain each and every fact known to the government. It contains only those facts I believe are necessary to support a finding of probable cause that ROMAN STERLINGOV, a citizen of Russia and Sweden, committed the following offenses: Laundering of Monetary Instruments, in violation of 18 U.S.C. § 1956(a)(3)(B); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c).

### A. Introduction

IRS-CI and the Federal Bureau of Investigation (FBI) have been investigating an illicit Bitcoin money transmitting and money laundering service called BITCOIN FOG. BITCOIN FOG is an Internet-based service accessible from the District of Columbia and U.S. states. It can be accessed through the Tor hidden website located at http://foggeddriztrcar2.onion.[1] BITCOIN FOG functions as a Bitcoin "tumbler" or "mixer" service.[2] It allows users to send bitcoins to designated

---

[1] Tor is a computer network designed to facilitate anonymous communication over the Internet. The Tor network does this by routing a user's communications through a globally distributed network of relay computers, or proxies, rendering conventional Internet Protocol ("IP") address-based methods of identifying users ineffective. To access the Tor network, a user must install Tor software either by downloading an add-on to the user's web browser or by downloading the free "Tor browser bundle," which is available at www.torproject.org. When a Tor user accesses a website, only the IP address of the last relay computer (the "exit node"), as opposed to the user's actual IP address, is logged by the website. The Tor network also makes it possible for users to operate websites, called "hidden services," in a manner that conceals the true IP address of the computer hosting the website. Unlike standard Internet websites, a Tor-based web address is comprised of a series of 16 algorithm-generated characters, for example "asdlk8fs9dflku7f," followed by the suffix ".onion." As with all Tor communications, communications between users' computers and a Tor hidden-service webserver are routed through a series of intermediary computers. Accordingly, neither law enforcement nor hidden-service users can use public lookups or ordinary investigative means to determine the true IP address—and therefore the location—of a computer server that hosts a hidden service. For these reasons, hidden services are often referenced as residing on the "darknet" or "Dark Web," and ordinary Internet websites are often referenced as residing on the "clearnet."

[2] The virtual currency bitcoin (abbreviated "BTC") is a form of value that is able to be transacted over the Internet using Bitcoin software. This software provides all necessary services including allowing users to create "Bitcoin addresses," roughly analogous to anonymous accounts; the injection of new bitcoin into circulation; and securely

recipients in a manner designed to conceal and obfuscate the source of the bitcoins.  It works by disassociating incoming bitcoin from particular Bitcoin addresses or transactions and then comingling that bitcoin with other incoming bitcoin prior to conducting any further transactions. This process allows BITCOIN FOG customers engaged in unlawful activities to launder their proceeds by concealing the nature, source, and location of their "dirty" bitcoin.  BITCOIN FOG publicly advertised this service as a way to help users obfuscate the source of their bitcoin. BITCOIN FOG charges customers a fee for this service.

BITCOIN FOG was launched on or about October 27, 2011, and was still operational as of April 26, 2021.  The website is one of the original Bitcoin tumbling sites on the darknet darknet (i.e., areas of the Internet that can usually only be accessed with specific software, configurations, or authorization).  As described below, more than 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) has been sent through the site from in or about October 2011 through the present.  Historically, the largest senders of BTC through BITCOIN FOG have been darknet markets, such as Agora, Silk Road 2.0, Silk Road, Evolution, and AlphaBay, that primarily trafficked in illegal narcotics and other illegal goods.

BITCOIN FOG was publicly advertised on Internet forums and well-known web pages promoting darknet markets as a tool for anonymizing bitcoin transactions. The administrator of BITCOIN FOG publicly promoted the service through a clearnet site (www.bitcoinfog.com  and www.bitcoinfog.info) and a Twitter page.  These outlets allowed users to easily locate and access the hidden services site through simple clearnet Internet searches.

## B. BITCOIN FOG Advertised Its Mixing Service Would Conceal BTC Transactions from Authorities

BITCOIN FOG's launch was announced in an October 27, 2011 posting titled "[ANNOUNCE] Bitcoin Fog: Secure Bitcoin Anonymization" on the BitcoinTalk.org online forum.  The announcement was posted by a user with the pseudonym Akemashite Omedetou (Japanese for "Happy New Year") and included links to a clearnet website for BITCOIN FOG (www.bitcoinfog.com), the Tor onion site (http://foggeddriztrcar2.onion), and a Twitter feed for updates on the site (www.twitter.com/#!/@Bitcoinfog).

The announcement post described BITCOIN FOG as a tool to make it difficult for "interested parties, be it authorities or just interested researchers" to trace users' Bitcoin transactions across the Bitcoin network.  The post stated that BITCOIN FOG: "mix(es) up your bitcoins in our own pool with other users…get paid back to other accounts from our mixed pool…can eliminate any chance of finding your payments and making it impossible to prove any connection between a deposit and a withdraw inside our service."

After announcing the launch of BITCOIN FOG, the pseudonym Akemashite Omedetou continued to post on BitcoinTalk.org, extolling the anonymizing features of BITCOIN FOG and providing updates on the service.  For example, on or about November 11, 2011, in response to an

---

transferring bitcoin from one Bitcoin address to another.  For security and privacy reasons, it is common for a single Bitcoin user to control numerous Bitcoin addresses, which are stored and controlled in a "wallet."  Each address is controlled through the use of a unique "private key," akin to a password.

2

online comment that questioned a design feature of BITCOIN FOG, Akemashite stated: "should we make it easier…to do statistical analysis on our payouts…to help[ing] them start finding our bitcoin client? (that could only be done by an authority of course…) We won't make their life easier."

In another post, dated on or about February 9, 2012, Akemashite responded to a comment from a poster about using mainstream Bitcoin exchanges to mix virtual currency. Akemashite stated: "most of them [exchanges] are also run as legitimate, visible businesses, which will be forced to reveal information about your funds, should such a request be made by the authorities…us on the other hand, the authorities have to find first, which, as Silk Road have [sic] demonstrated, can prove problematic."

The Twitter account @BitcoinFog was established on or about October 27, 2011, the date on which BITCOIN FOG was launched. The @BitcoinFog account regularly posted updates regarding the status of the BITCOIN FOG hidden site, including tweeting a link on November 14, 2014 to http://foggeddriztrcar2.onion, the current hidden services address for BITCOIN FOG.

The @BitcoinFog account also tweeted links to stories discussing why users should tumble bitcoins – to thwart law enforcement.  For example, on or about September 13, 2017, the @BitcoinFog account tweeted a link to a story about the IRS using blockchain analysis software to track bitcoin.  On or about June 11, 2019, @BitcoinFog tweeted a link to a Europol press release announcing the law enforcement takedown of Bestmixer.io, another Bitcoin mixer/tumbler, commenting: "this is why you need to use ONLY a Tor-based mixing service (Such a surprise)."

## C. BITCOIN FOG Operated as an Illegal Money Transmitting and Money Laundering Service on the Darknet

While the identity of a Bitcoin address owner is generally anonymous (unless the owner opts to make the information publicly available), law enforcement can often identify the owner of a particular Bitcoin address by analyzing the blockchain.[3] The analysis can also reveal additional addresses controlled by the same individual or entity. For example, a user or business may create many Bitcoin addresses to receive payments from different customers. When the user wants to transact the bitcoin that it has received (for example, to exchange bitcoin for other currency or to purchase goods or services), it may group those addresses together to send a single transaction. Law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions. These companies analyze the blockchain and attempt to identify the individuals or groups involved in the virtual currency transactions. Specifically, these companies create large databases that group transactions into "clusters" through analysis of data underlying the virtual currency transactions.

Using blockchain analysis, law enforcement confirmed that over 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) have been sent through BITCOIN

---

[3] All Bitcoin transactions are recorded on what is known as the blockchain.  The blockchain is essentially a distributed public ledger that keeps track of all Bitcoin transactions, incoming and outgoing, and updates approximately six times per hour.  The blockchain records every address that has ever received a bitcoin and maintains records of every transaction.

3

FOG since the site was launched in 2011.  This figure includes BTC from various sources: all direct and indirect transactions from sources such as darknet markets; funds stolen from bitcoin addresses through hacks; direct deposits and withdrawals from Bitcoin wallets; sends and receives from wallets not apparently affiliated with a known hosted service; and other unknown sources. IRS-CI cyber analysts reviewed all inputs and outputs from BITCOIN FOG to identify bitcoins sent directly to BITCOIN FOG from known darknet markets and bitcoins sent from BITCOIN FOG to known darknet markets.  IRS-CI's analysis determined BITCOIN FOG received approximately 486,861.69 BTC (approximately $54,897,316.44 at the time of the transactions) *directly* from darknet markets.  BITCOIN FOG sent approximately 164,931.13 BTC (approximately $23,690,956.28 at the time of the transactions) *directly* to darknet markets.  In sum, BITCOIN FOG sent or received more than $78 million in transactions involving known darknet markets, counting only direct transactions.

Among these, IRS-CI cyber analysts identified direct deposits into BITCOIN FOG from at least 35 darknet markets. Below are the top five markets by U.S. dollar value of deposits:[4]

| Source Market | Total Received (BTC) | Total Received (USD) |
|---|---|---|
| Agora Market | 41,966.87 | $14,398,754.73 |
| Silk Road 2.0 Market | 22,863.74 | $12,518,636.97 |
| Silk Road Marketplace | 377,102.74 | $9,556,159.49 |
| Evolution Market | 11,100.79 | $3,199,542.15 |
| AlphaBay Market | 5,442.86 | $2,907,508.67 |

IRS-CI cyber analysts identified funds sent directly from BITCOIN FOG to at least 51 different darknet markets. Below are the top five markets by dollar value of sends:

| Destination Market | Total Sent (BTC) | Total Sent (USD) |
|---|---|---|
| Agora Market | 26,398.12 | $8,680,430.34 |
| Silk Road 2.0 Market | 11,274.21 | $5,871,831.33 |
| Silk Road Marketplace | 106,522.77 | $2,289,509.42 |
| Evolution Market | 6,473.24 | $1,860,053.75 |
| AlphaBay Market | 3,375.90 | $1,557,931.95 |

Based on my training and experience, including experience in other darknet investigations, darknet markets exist primarily to traffic in illegal narcotics and other illegal goods and services – a fact well-known among darknet market user and administrators, and intended by the administrators.  That the darknet markets listed above primarily traffic in illegal narcotics and other illegal goods and services would be apparent to anyone using the markets because that the categories listed on each market, and the majority of specific listings, openly discuss illegal goods

---

[4] The U.S. dollar value is calculated as of the date of each BTC transaction.  Because the price of BTC has fluctuated significantly since BITCOIN FOG first became operational in or about October 2011, the tables presented above do not show a consistent exchange rate between BTC and U.S. dollars.

and services. I am familiar with each of the darknet markets listed in the tables above, and am aware that illegal narcotics and other illegal goods and services constituted the majority of items for sale on each market. Accordingly, there is probable cause to believe that the bitcoin transactions sent to and from BITCOIN FOG involved the proceeds of "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), such as the narcotics distribution (21 U.S.C. § 841); identity theft and the sale of stolen personally identifiable information (PII) (18 U.S.C. § 1028A); and computer fraud and abuse, including the sale of computer hacking tools and exploits (18 U.S.C. § 1030).

### D.  Undercover Transactions on BITCOIN FOG

#### 1.  September 2019 Undercover Transaction

On or about September 11, 2019, an IRS-CI Special Agent (SA) physically located in the District of Columbia and operating in an online undercover capacity accessed BITCOIN FOG at foggeddriztrcar2.onion through the Tor browser. The SA created an account through the registration page by creating a username, password, and entering a security text phrase pictured below the registration text boxes. The registration page of BITCOIN FOG stated: "As an anonymous service, we do not collect any additional information about you besides a user name and password."

The SA was never asked for any identifying information such as an email account, date of birth, social security number, or passport number, or for any other proof of identification, when creating the account.

On or about September 11, 2019, while physically located in the District of Columbia, the SA sent approximately 0.02488936 BTC ($249.99) from an IRS-CI controlled covert wallet ("UC Sending Wallet") into a wallet address provided by BITCOIN FOG.

On or about September 12, 2019, while physically located in the District of Columbia the SA accessed foggeddriztrcar2.onion. The SA's undercover BITCOIN FOG account showed a balance of approximately 0.02425700. The difference of approximately 0.00063236 BTC between the amount the SA deposited and the balance shown is approximately 2.5% of the total deposit. This is the service fee charged by BITCOIN FOG. On or about September 12, 2019, while physically located in the District of Columbia, the SA sent 0.02 BTC from BITCOIN FOG to an IRS-CI controlled covert wallet ("UC Receiving Wallet").

Through blockchain analysis, investigators traced bitcoin from the BITCOIN FOG deposit address to known BITCOIN FOG Bitcoin clusters identified through blockchain analysis. IRS-CI investigators also traced bitcoin sent to the UC Receiving Wallet and confirmed that the bitcoin was sourced from BITCOIN FOG clusters.

Investigators were unable to directly trace any direct link between the "UC Sending Wallet" and the "UC Receiving Wallet," confirming that BITCOIN FOG successfully tumbled the transaction by breaking the link in the blockchain between the source and ultimate destination of the funds.

### 2.  November 2019 Undercover Transaction

On or about November 18, 2019, while physically located in the District of Columbia, an IRS-CI SA operating in an online undercover capacity sent approximately 0.01173987 BTC to BITCOIN FOG from an IRS-CI controlled undercover account on the Apollon darknet market. Apollon was a darknet market known to sell illegal narcotics, stolen PII, and other illegal items. On November 19, 2019, while physically located in the District of Columbia, the SA accessed BITCOIN FOG at foggeddriztrcar2.onion.  The SA's undercover account on BITCOIN FOG showed that the account had been credited by the amount of the send transaction, less an approximately 2.32% fee.

On or about November 19, 2019, while physically located in the District of Columbia and after confirming the deposit of funds from Apollon Market had been credited to the SA's BITCOIN FOG account, the SA sent the message below to the BITCOIN FOG administrator using the messaging function on the BITCOIN FOG site, stating the funds were the proceeds of illegal narcotics sales:



On or about November 21, 2019, while physically located in the District of Columbia, the SA again accessed BITCOIN FOG operating in an online undercover capacity.  There was no response to the above message posted by the SA on or about November 19, 2019.  The SA then directed BITCOIN FOG to send 0.01146764 BTC from the undercover account on BITCOIN FOG to an IRS-CI controlled undercover wallet.  BITCOIN FOG did so.

The IRS-CI SA clearly stated that the BTC was from the sale of ecstasy/molly, an illegal narcotic.  At no point did the administrators of BITCOIN FOG prevent the deposit of funds from Apollon or prevent the withdrawal of funds after the funds were represented to be the proceeds of illegal drug sales.

6

Appx6548

Through blockchain analysis, investigators traced bitcoin from the IRS-CI controlled account on Apollon Market, to the BITCOIN FOG deposit address, to known BITCOIN FOG bitcoin clusters identified through blockchain analysis. IRS-CI investigators also traced bitcoin sent to the IRS-CI controlled undercover wallet and confirmed that the bitcoin was sourced from BITCOIN FOG clusters.

### E. Attribution of BITCOIN FOG to ROMAN STERLINGOV

Analysis of bitcoin transactions, financial records, Internet service provider records, e-mail records, and additional investigative information, identifies ROMAN STERLINGOV as the principal operator of BITCOIN FOG.

#### 1. "Akemashite Omedotou" and the Shormint@hotmail.com Account

Early in the investigation, identifiers connected BITCOIN FOG to the pseudonym Akemashite Omedotou and the email account shormint@hotmail.com. As noted above, BITCOIN FOG's launch was announced in a posting on the BitcoinTalk.org forum on or about October 27, 2011 by a user called Akemashite Omedetou. Records from BitcoinTalk.org for the account associated with Akemashite Omedetou revealed that the account was created on or about October 25, 2011, using email address shormint@hotmail.com. The account registration information included the website title "Bitcoin Fog" and website URL http://www.bitcoinfog.com.

According to account details obtained from Twitter, the account @BitcoinFog was created on October 27, 2011 (the date BITCOIN FOG was announced) and was registered with email address shormint@hotmail.com.

Records from Microsoft pertaining to shormint@hotmail.com revealed that the account was created on October 7, 2011, using an apparent fake name and accessed through a Virtual Private Network (VPN) service, used to anonymize user's Internet traffic. Based on my training and experience, I know that criminals often set up "burner" accounts in order to register domains and pay for services tied to their illicit activity.

#### 2. Connecting the BITCOIN FOG Domain to STERLINGOV

Additional investigation, as described below, connects STERLINGOV to the original BITCOIN FOG clearnet domain.

According to publicly available WhoIs information, www.bitcoinfog.com was registered through the web hosting service Highhosting.net on October 25, 2011. The WhoIs records showed that the domain was registered to "Akemashite Omedetou" using email address shormint@hotmail.com. Records from Highhosting.net revealed that Akemashite Omedetou used a Liberty Reserve[5] account (Liberty Reserve Account 1) to pay for the domain. Liberty Reserve records showed that Liberty Reserve Account 1 was registered to shormint@hotmail.com.

---

[5] Liberty Reserve was a Costa Rica-based digital currency exchange service that allowed users to register and transfer money to other users with only a name, e-mail address, and birth date. Deposits could be made through third parties using a credit card or bank wire, among other deposit options. Liberty Reserve did not directly process deposits or

7

Investigators reviewed the account activity associated with Liberty Reserve Account 1 and determined that STERLINGOV had funded the account using a series of layered transactions through multiple payment platforms, performed in close temporal proximity and apparently designed to make it difficult to trace the payment to his true identity.  Specifically:

- On September 29, 2011, according to records from the virtual currency exchange Mt. Gox,[6] Roman STERLINGOV opened an account in his true name at Mt. Gox (Mt. Gox Account 1), using the email address plasma@plasmadivision.com.

- On October 3, 2011, STERLINGOV funded Mt. Gox Account 1 with 100 euros.

- On October 19, 2011, Mt. Gox Account 1 sent 36 BTC through an off-platform Bitcoin address to a second Mt. Gox Account (Mt. Gox Account 2) (registered to "nfs9000@hotmail.com").

- On October 20, 2011, Mt. Gox Account 2 sent 35 BTC to a third Mt. Gox Account (Mt. Gox Account 3) (registered to "kolbasa99@rambler.ru").

- On October 20, 2011, Mt. Gox Account 3 sent $80 USD to an account at Aurum Xchange (Aurum Xchange Account 1), another digital payment platform.

- On October 20, 2011, Aurum Xchange Account 1 sent $76 USD to Liberty Reserve Account 1.

- On October 25, 2011, Liberty Reserve Account 1 paid the domain fees for www.bitcoinfog.com to Highhosting.net.

This series of transactions is depicted in the below chart:



withdrawals.  Deposited funds were then "converted" into Liberty Reserve Dollars (LRUSD) or Liberty Reserve Euros (LREUR), which were tied to the value of the U.S. dollar and the euro, respectively.  The service was shut down by U.S. law enforcement in May 2013 after the founder was charged in the United States with money laundering and operation of an unlicensed money service business.

[6] Mt. Gox was a Bitcoin exchange based in Japan that suspended operation in April 2014 after suffering a hack that stole 850,000 bitcoins.

An analysis of the IP addresses used to access the above Liberty Reserve and Mt. Gox accounts confirmed that the accounts shared a common owner: STERLINGOV.  For example, IP logs from Mt. Gox and Liberty Reserve showed that on November 24, 2011, a user using the IP address 212.117.160.123 logged into Mt. Gox Account 2, Mt. Gox Account 3, and Liberty Reserve Account 1, as well as another Liberty Reserve account registered to Roman STERLINGOV (Liberty Reserve Account 2).  STERLINGOV was also the named account owner of a third Liberty Reserve account (Liberty Reserve Account 3) registered using the email address heavydist@gmail.com (Google Account 1).

Liberty Reserve records revealed that Liberty Reserve Account 2 was registered in STERLINGOV's true name using the email address plasma@plasmadivision.com, the same e-mail tied to Mt. Gox Account 1.  The account registration information included a residential address in Gothenburg, Sweden corresponding to STERLINGOV's home address.  Both Liberty Reserve Account 2 and Liberty Reserve Account 3 were registered using a Swedish telephone number, TELEPHONE NUMBER 1, which Swedish telecommunications provider records revealed is registered to STERLINGOV

On August 25, 2012, Mt. Gox Account 1 received a 180 BTC deposit sent from an account at BTC-e[7] (BTC-e Account 1).  According to records from BTC-e,  BTC-e Account 1 was registered to Roman STERLINGOV, using Google Account 1.

Records from Google pertaining to Google Account 1 revealed that the account was registered to "Roman Heavydist" and was linked to TELEPHONE NUMBER 1, identified above as STERLINGOV's phone number.  Investigators obtained the contents of Google Account 1 pursuant to a lawfully authorized search warrant.  Google Account 1's Google Drive folder contained Russian language document titled Ввод денег ("Putting Money"), dated September 29, 2011 (less than a month prior to the launch of BITCOIN FOG).  A translation of the document showed that the document appeared to be notes taken by STERLINGOV describing how to layer funds.  The steps outlined in the document match the steps that STERLINGOV took to pay for the domain www.bitcoinfog.com.  The below chart displays the relevant text of the document overlayed on the transaction path used by STERLINGOV to pay for the BitcoinFog.com domain.

---

[7] BTC-e was cryptocurrency exchange that was shut down in July 2017 when the exchange founder was indicted in the United States for money laundering and the servers were seized by U.S. law enforcement.



### 3. STERLINGOV's Connections to Early BITCOIN FOG Test Transactions

Blockchain analysis of the earliest transactions associated with BITCOIN FOG's activity on the blockchain revealed a series of small value transactions, beginning in early October 2011, approximately two weeks before BITCOIN FOG was officially launched on October 27, 2011. The transactions appeared to be test transactions conducted to beta test the BITCOIN FOG mixer before it went live. These transactions originated from Mt. Gox Account 1, registered in STERLINGOV's true name.

As shown by Mt. Gox records and blockchain analysis, on October 13, 2011, Mt. Gox Account 1 sent approximately two BTC to Bitcoin cluster 12NSB5. This deposit was then broken into smaller amounts through a series of four Bitcoin transactions. Subsequently, the bitcoin was deposited into two new bitcoin wallets, 1KWMex (0.41 BTC) and 1NeWNP (1.57 BTC). The transaction pattern within cluster 12NSB5 is consistent with mixing/tumbling transactions, including those seen from BITCOIN FOG.

Wallet 1KWMex held its 0.41 bitcoin idle, while wallet 1NeWNP transferred its bitcoin to a new address. Through blockchain analysis, investigators traced the outflow of the balance of 1.57 BTC from wallet 1NeWNP to BITCOIN FOG.

Based on my training and experience, I know that software and web developers typically beta-test new software and websites prior to launching them. Beta testing is conducted to confirm that a site's features work and, in the case of a mixer such as BITCOIN FOG, to ensure the tumbler's algorithm is properly working. Law enforcement has observed on numerous occasions darknet market site administrators conduct beta testing prior to launching darknet platforms to the public. Based on my training and experience, including previous investigations of Bitcoin mixers, I believe that the activity described above is consistent with beta testing the BITCOIN FOG

10

**Appx6552**

platform.  I am aware that such beta testing would typically only be conducted an individual involved in administrating a website or service.

### 4.  STERLINGOV's Receipt of Proceeds from BITCOIN FOG

BITCOIN FOG charges a variable fee of 2% to 2.5% on each deposit.  Blockchain analysis revealed that these fees are retained within the BITCOIN FOG cluster, and that the administrator made periodic withdrawals from the BITCOIN FOG cluster to pay himself.  These withdrawals occur sporadically and in the same manner as a regular user.  The withdrawals appear to be concealed to blend in with regular mixing transactions in order to protect the site administrator from scrutiny.  Based on BITCOIN FOG's transaction activity over time, STERLINGOV would have made approximately $8 million in commissions from BITCOIN FOG transactions if he had cashed out the administrative fees near the time that the transactions occurred.  Due to the significant increase in value of bitcoin over the course of BITCOIN FOG's operation – from a low of approximately $2 shortly after BITCOIN FOG launched in fall 2011 to a current value of $50,000 – STERLINGOV has been able to reap significant appreciation from his profits that were kept in bitcoin.  The current value of the BITCOIN FOG cluster – including customer funds in STERLINGOV's control and STERLINGOV's own money – is nearly $70 million.

Investigators obtained records of STERLINGOV's true-name accounts at several cryptocurrency exchanges.  Analysis of STERLINGOV's accounts revealed the vast majority of cryptocurrency deposited into his accounts was originally sourced and traced back to BITCOIN FOG clusters.  This activity continued through at least 2019.

### F.  BITCOIN FOG Is Not Registered with FinCEN or Licensed in the District of Columbia

Records from the Financial Crimes Enforcement Network ("FinCEN"), a division of the U.S. Department of Treasury, revealed that neither ROMAN STERLINGOV nor BITCOIN FOG was registered as a Money Services Business under federal law, despite conducting transactions with U.S. based customers.  Similarly, records from the District of Columbia Department of Insurance and Banking (DISB) revealed that neither ROMAN STERLINGOV nor BITCOIN FOG was licensed as a Money Transmitter under District of Columbia law, despite conducting transactions with persons based in the District of Columbia.

Based on my training and experience, I am aware that the Bank Secrecy Act requires anyone who owns or controls a money transmitting business to register with the Secretary of the Treasury.  *See* 31 U.S.C. § 5330(a)(1).  I am further aware that federal regulations issued pursuant to the Bank Secrecy Act define "money services business" ("MSBs"), which include "money transmitter[s]." 31 C.F.R. § 1010.100(ff)(5).  Money transmitters are defined broadly, and include anyone who "accept[s] . . . currency, funds, or other value that substitutes for currency from one person and . . . transmi[ts] . . . currency, funds, or other value that substitutes for currency to another location or person by any means," as well as "[a]ny other person engaged in the transfer of funds." 31 C.F.R. § 1010.100(ff)(5)(i)(A)-(B).  MSBs are required to register with the FinCEN, unless specific exemptions apply.  31 C.F.R. § 1022.380(a)(1).  MSBs are required to establish

11

and maintain anti-money laundering programs, to detect and report suspicious transactions, and to collect certain records of customers and customer transactions.

I am further aware that, in the District of Columbia, anyone engaging in the "business of money transmission" is generally required to obtain a license from the Superintendent of the Office of Banking and Financial Institutions of the District of Columbia.  D.C. Code § 26-1002(a). "Money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer."  D.C. Code § 26-1001(10).  Under District of Columbia code, engaging in the business of money transmission without a license is punishable as a felony. D.C. Code § 26-1023(c).

I am further aware that Bitcoin "mixers" or "tumblers" such as BITCOIN FOG are considered to be MSBs under federal law, and they are also considered to be money transmitting businesses under District of Columbia law.  *See* U.S. Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001 (May 9, 2019), at 19-20; *United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020).

## **CONCLUSION**

Based on the foregoing, your affiant submits that there is probable cause to believe that ROMAN STERLINGOV violated 18 U.S.C. § 1956(a)(3)(B), which makes it a crime to conduct or attempt to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity.

Your affiant submits there is also probable cause to believe that ROMAN STERLINGOV violated 18 U.S.C. § 1960(a), which makes it a crime to knowingly conduct, control, manage, supervise, direct, or own all or part of an "unlicensed money transmitting business," defined as a money transmitting business which affects interstate or foreign commerce in any manner or degree and (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable; (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

12

Appx6554

Finally, your affiant submits there is probable cause to believe ROMAN STERLINGOV violated D.C. Code § 26-1023(c), which makes it a crime to engage in the business of money transmission without a license.

_Devon A. Beckett_
Devon A. Beckett
Special Agent
IRS-Criminal Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 26th day of April 2021.

_____
ROBIN M. MERIWEATHER
U.S. MAGISTRATE JUDGE

13

Appx6555

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case: 1:21-mj-00400 |
| | ) | Assigned To : Meriweather, Robin M. |
| ROMAN STERLINGOV | ) | Assign. Date : 4/26/2021 |
| | ) | Description: COMPLAINT W/ ARREST WARRANT |
| _____ | ) | |
| *Defendant* | ) | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*                    ROMAN STERLINGOV                    ,
who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment          ❏ Superseding Indictment          ❏ Information          ❏ Superseding Information          ☒ Complaint
❏ Probation Violation Petition          ❏ Supervised Release Violation Petition          ❏ Violation Notice          ❏ Order of the Court

This offense is briefly described as follows:

18 USC 1960(a) Unlicensed Money Transmission
18 USC 1956(a)(3) Money Laundering - Sting
 D.C. Code 26-1023(c) Money Transmission without a License

Date:      04/26/2021                                          *hd ~ Meriweather*
                                                                                *Issuing officer's signature*

City and state:   Washington D.C.                      Robin M. Meriweather, Magistrate Judge
                                                                                *Printed name and title*

| **Return** |
|---|
| This warrant was received on *(date)*   04/26/2021   , and the person was arrested on *(date)*   04/27/2021   at *(city and state)*   Los Angeles, California   . |
| Date:   04/27/2021                                   *Devon A Beckett* |
|                                                                       *Arresting officer's signature* |
|                                                        Devon A Beckett, Special Agent |
|                                                                       *Printed name and title* |

Appx6556

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term
Grand Jury Sworn in on January 28, 2021**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Criminal No.** _____ |
| | : | |
| v. | : | **Magistrate No. 21-MJ-400** |
| | : | |
| **ROMAN STERLINGOV,** | : | **Offenses:** |
| | : | |
| Defendant. | : | **Count One: 18 U.S.C. § 1956(a)(3)(A), (B) (Money Laundering)** |
| | : | |
| | : | **Count Two: 18 U.S.C. § 1960(a) (Operating an Unlicensed Money Transmitting Business)** |
| | : | |
| | : | **Count Three: D.C. Code § 26-1023(c) (Money Transmission Without a License)** |
| | : | |
| | : | **Forfeiture: 18 U.S.C. § 982(a)(1); 21 U.S.C. § 853(p)** |

**INDICTMENT**

The Grand Jury charges that:

**COUNT ONE
(Money Laundering)**

1.  On or about the date and in the amount set forth below, in the District of Columbia and elsewhere, ROMAN STERLINGOV, a resident of Sweden and a citizen of Russia and Sweden, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce and involving property represented to be the proceeds of specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance, knowing and intending that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and

Appx6557

control of property believed to be the proceeds of specified unlawful activity, and intending to promote the carrying on of specified unlawful activity:

| Count | On or About Date | Amount | Financial Transaction |
|-------|------------------|--------|------------------------|
| 1 | November 21, 2019 | Approximately 0.01146764 BTC | Movement of Bitcoin (BTC) by wire or other means from BITCOIN FOG to IRS-CI controlled undercover wallet |

**(Money Laundering, in violation of**
**Title 18, United States Code, Section 1956(a)(3)(A), (B))**

## COUNT TWO
**(Operating an Unlicensed Money Transmitting Business)**

2.     From on or about October 27, 2011, and continuing until at least on or about April 27, 2021, in the District of Columbia and elsewhere, ROMAN STERLINGOV, a resident of Sweden and a citizen of Russia and Sweden, knowingly conducted, controlled, managed, supervised, directed, and owned an unlicensed money transmitting business, that is, BITCOIN FOG, as that term is defined in Title 18, United States Code, Section 1960(b)(1), affecting interstate and foreign commerce, and which:

     a. Operated without an appropriate money transmitting license in the District of Columbia, where such operation is punishable as a felony under District of Columbia law, whether or not STERLINGOV knew that the operation was required to be licensed or that the operation was so punishable;

     b. Failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330, and the regulations prescribed thereunder; and

     c. Otherwise involved the transportation and transmission of funds known to STERLINGOV to have been derived from a criminal offense and intended to be used to promote and support unlawful activity;

2

**Appx6558**

in violation of Title 18, United States Code, Section 1960(a).

**(Operating an Unlicensed Money Transmitting Business, in violation of Title 18, United States Code, Section 1960(a))**

### COUNT THREE
**(Money Transmission Without a License)**

3.      From on or about October 27, 2011, and continuing until at least on or about April 27, 2021, in the District of Columbia and elsewhere, ROMAN STERLINGOV, a resident of Sweden and a citizen of Russia and Sweden, did, without obtaining a license issued by the Superintendent of the Office of Banking and Financial Institutions of the District of Columbia, engage in the business of money transmission, as that term is defined in D.C. Code Section 26-1001(10), through the operation of BITCOIN FOG, in that he engaged in the business of receiving money for transmission, and transmitting money, within the United States and to locations abroad.

**(Money Transmission Without a License, in violation of § 26-1023(c) of the D.C. Code)**

### FORFEITURE ALLEGATION

1.      Upon conviction of the offenses alleged in Counts One and Two, the defendant shall forfeit to the United States any property, real or personal, involved in the offense, and any property traceable thereto, pursuant to Title 18, United States Code, Section 982(a)(1). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, involved in Counts One and Two, and any property traceable thereto.

2.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the Court;

Appx6559

     d.     has been substantially diminished in value; or

     e.     has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 982(a)(1); and Title 21, United States Code, Section 853(p))**

A TRUE BILL:

FOREPERSON.

_Channing D. Phillips /jph_

ATTORNEY OF THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA

4

**Appx6560**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on February 14, 2022

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 21-CR-399 (RDM) |
| | : | |
| v. | : | Magistrate No. 21-MJ-400 |
| | : | |
| ROMAN STERLINGOV, | : | Offenses: |
| | : | |
| Defendant. | : | Count One:  18 U.S.C. § 1956(h) |
| | : | (Money Laundering Conspiracy) |
| | : | |
| | : | Count Two:  18 U.S.C. § 1956(a)(3)(A), |
| | : | (B) (Money Laundering) |
| | : | |
| | : | Count Three:  18 U.S.C. §§ 1960(a) & 2 |
| | : | (Operating an Unlicensed Money |
| | : | Transmitting Business) |
| | : | |
| | : | Count Four:  D.C. Code § 26-1023(c) |
| | : | (Money Transmission Without a |
| | : | License) |
| | : | |
| | : | Forfeiture:  18 U.S.C. § 982(a)(1); |
| | : | 21 U.S.C. § 853(p) |

INDICTMENT

The Grand Jury charges that:

COUNT ONE
(Money Laundering Conspiracy)

1.     From on or about October 27, 2011, and continuing until at least on or about April 27, 2021, in the District of Columbia and elsewhere, through the operation of BITCOIN FOG, ROMAN STERLINGOV, a resident of Sweden and a citizen of Russia and Sweden, together with other co-conspirators known and unknown, including darknet vendors and darknet market

administrative teams, did knowingly and willfully combine, conspire, confederate and agree to commit the following offenses against the United States:

    a. Conducting and attempting to conduct financial transactions affecting interstate commerce, that is, the sending and receiving of bitcoin transactions, which involved the proceeds of specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance, knowing that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

    b. Conducting and attempting to conduct financial transactions affecting interstate commerce, that is, the sending and receiving of bitcoin transactions, which involved the proceeds of specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance, knowing that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

2

all in violation of Title 18, United States Code, Section 1956(h).

**(Money Laundering Conspiracy, in violation of
Title 18, United States Code, Section 1956(h))**

## COUNT TWO
**(Money Laundering)**

2.      On or about the date and in the amount set forth below, in the District of Columbia and elsewhere, ROMAN STERLINGOV, a resident of Sweden and a citizen of Russia and Sweden, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce and involving property represented to be the proceeds of specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance, knowing and intending that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, and intending to promote the carrying on of specified unlawful activity:

| Count | On or About Date | Amount | Financial Transaction |
|-------|------------------|--------|-----------------------|
| TWO | November 21, 2019 | Approximately 0.01146764 BTC | Movement of Bitcoin (BTC) by wire or other means from BITCOIN FOG to IRS-CI controlled undercover wallet |

**(Money Laundering, in violation of
Title 18, United States Code, Section 1956(a)(3)(A), (B))**

## COUNT THREE
**(Operating an Unlicensed Money Transmitting Business)**

3.      From on or about October 27, 2011, and continuing until at least on or about April 27, 2021, in the District of Columbia and elsewhere, ROMAN STERLINGOV, a resident of Sweden and a citizen of Russia and Sweden, knowingly conducted, controlled, managed, supervised, directed, and owned an unlicensed money transmitting business, that is, BITCOIN

3

Appx6563

FOG, as that term is defined in Title 18, United States Code, Section 1960(b)(1), affecting interstate and foreign commerce, and which:

a. Operated without an appropriate money transmitting license in the District of Columbia, where such operation is punishable as a felony under District of Columbia law, whether or not STERLINGOV knew that the operation was required to be licensed or that the operation was so punishable;

b. Failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330, and the regulations prescribed thereunder; and

c. Otherwise involved the transportation and transmission of funds known to STERLINGOV to have been derived from a criminal offense and intended to be used to promote and support unlawful activity;

in violation of Title 18, United States Code, Section 1960(a).

**(Operating an Unlicensed Money Transmitting Business and Aiding and Abetting, in violation of Title 18, United States Code, Sections 1960(a) and 2)**

## COUNT FOUR
**(Money Transmission Without a License)**

4.     From on or about October 27, 2011, and continuing until at least on or about April 27, 2021, in the District of Columbia and elsewhere, ROMAN STERLINGOV, a resident of Sweden and a citizen of Russia and Sweden, did, without obtaining a license issued by the Superintendent of the Office of Banking and Financial Institutions of the District of Columbia, engage in the business of money transmission, as that term is defined in D.C. Code Section 26-

4

Appx6564

1001(10), through the operation of BITCOIN FOG, in that he engaged in the business of receiving money for transmission, and transmitting money, within the United States and to locations abroad.

**(Money Transmission Without a License, in violation of § 26-1023(c) of the D.C. Code)**

## FORFEITURE ALLEGATION

1.      Upon conviction of the offenses alleged in Counts One, Two, and Three, the defendant shall forfeit to the United States any property, real or personal, involved in the offense, and any property traceable thereto, pursuant to Title 18, United States Code, Section 982(a)(1). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, involved in Counts One, Two, and Three, and any property traceable thereto.

2.      The United States will also seek forfeiture of the following specific property upon conviction of the offenses alleged in Counts One, Two, and Three:

   a.   $349,625.72, seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

   b.   Approximately 0.10877 Bitcoin (BTC) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

   c.   Approximately 205.9625 Ethereum (ETH) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

   d.   Approximately 9,371.52683 Stellar (XLM) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

5

e. Approximately 35.9998 Monero (XMR) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN; and

f. Approximately 1,354 BTC currently held in the Bitcoin Fog wallet, identified by root address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw.

3. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 982(a)(1); and Title 21, United States Code, Section 853(p))**

A TRUE BILL:

FOREPERSON.

ATTORNEY OF THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA

6

Appx6566

# United States District Court
## District of Columbia

*United States of America,*

        Plaintiffs,

     v.

*Roman Sterlingov,*

        Defendant.

**21 - CR - 399 (RDM)**

**Memorandum of Law in Support of Defendant's Motion to Dismiss the Indictment**

TABLE OF CONTENTS

*Introduction* ................................................................................................................. 1

*Legal Standard* ............................................................................................................. 4

*Argument* ...................................................................................................................... 5

I.      *Venue is Unconstitutional in the District of Columbia* ................................... 6

   A.   There is no Locus Delicti in the District of Columbia ................................................7

   B.   No Substantial or Essential Conduct Occurred in D.C. ..............................................8

   C.   18 U.S.C. § 1956's Venue Provisions are Unconstitutional as Applied ......................8

   D.   The Sixth Amendment Forbids Venue for Criminal Trials in the District of Columbia .................9

II.     *Count One Insufficiently Pleads Conspiracy* ................................................... 9

III.    *The Court Should Dismiss the Indictment for Legal and Factual Insufficiency* ...............10

IV.     *The Indictment Violates Fifth Amendment Due Process as Applied* ...............10

V.      *The Statute of Limitations Has Run on All Counts* .........................................11

   A.   The Five-Year Statute of Limitations Has Run on Count One .....................................11

   B.   The Five-Year Statute of Limitations Has Run on Count Two......................................12

   C.   The Five-Year Statute of Limitations Has Run on Count Three ...................................12

   D.   The Six-Year Statute of Limitations Has Run on Count Four ......................................13

VI.     *The Indictment Violates the First Amendment as Applied*............................13

*Conclusion* ....................................................................................................................13

# TABLE OF AUTHORITIES

## Cases

*Elonis v. United States*, 575 U.S. 723 (2015)..............................................................................13
*Russell v. United States*, 369 U.S. 749 (1962)................................................................................5
*Sandvig v. Barr*, 451 F. Supp. 3d 73 (D.D.C. 2020) .....................................................................13
Travis v. United States, 364 U.S. 631 (1961)...................................................................................6
*United States v. Auernheimer*, 748 F.3d 525, 534 (3d Cir. 2014)..............................................6, 8
*United States v. Bowdin*, 770 F. Supp. 2d. 142 (D.D.C. 2011) ......................................................4
United States v. Brown, No. 07-75 (CKK), 2007 U.S. Dist. LEXIS 49169, at *4-5 (D.D.C. July
    9, 2007)......................................................................................................................................5
*United States v. Cabrales*, 524 U.S. 1 (1998) ................................................................................6
*United States v. Cabrales*, 524 U.S. 1, 6-7, 118 S. Ct. 1772 (1998). ...........................................7
*United States v. El-Saadi*, 549 F. Supp. 3d 148 (D.D.C. 2021) .................................................4, 9
*United States v. Gamble*, No. 19-348 (CKK), 2020 U.S. Dist. LEXIS 116370, at *11-12 (D.D.C.
    July 2, 2020) ............................................................................................................................8
*United States v. Gamble*, No. 19-348 (CKK), 2020 U.S. Dist. LEXIS 116370, at *12-13 (D.D.C.
    July 2, 2020) .........................................................................................................................4, 8
*United States v. Green*, 599 F.3d 360 (4th Cir. 2010)....................................................................9
*United States v. Hewlett*, 395 F.3d 458 (D.C. Cir. 2005)...............................................................5
*United States v. Hillie*, 227 F. Supp. 3d 57 (D.D.C. 2017) .........................................................10
*United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130 (D.D.C. 2015).....................................5
*United States v. Nance*, 533 F.2d 699 (1976)..............................................................................10
*United States v. Saffarinia*, 424 F. Supp. 3d 46 (D.D.C. 2020) .................................................10
*United States v. Sanford, Ltd.*, 859 F. Supp. 2d 102 (D.D.C. 2012) .............................................5
*United States v. Sitzmann*, 74 F. Supp. 3d 96 (D.D.C. 2014).......................................................6
*United States v. Sunia*, 643 F. Supp. 2d 51 (D.D.C. 2009) .................................................4, 5, 10
*United States v. Wright*, 651 F.3d 764 (7th Cir. 2011)...................................................................9

## Statutes
18 U.S.C.S. § 3282(a)....................................................................................................................11
D.C. Municipal Code § 26-1023 ...................................................................................................10
Fed. R. Crim. P. 18(c)(1)................................................................................................................3

## Other Authorities
Adam Hayes, Jefreda R. Brown, Suzanne Kvilhaug, *What is a Blockchain?*, Investopedia,
    https://www.investopedia.com/terms/b/blockchain.asp (last visited Aug. 1, 2022) ..................2

## Constitutional Provisions
U.S. Const. Amend. VI....................................................................................................................6

Appx6569

Defendant Roman Sterlingov, through his undersigned attorneys, move this Court under Article III, and the First, Fifth, and Sixth Amendments of the United States Constitution, Federal Rules of Criminal Procedure 12(a)(i), (b)(iii), statute, and the common law to dismiss the Indictment because:

1. Venue is unconstitutional under Article III and the Sixth Amendment to the United States Constitution - no crime occurred in the District of Columbia, and the Government illegally hales Mr. Sterlingov into a hostile district thousands of miles from his home, family, and friends in Gothenburg, Sweden to a jurisdiction he had never set foot in.

2. The Indictment insufficiently pleads the elements of conspiracy

3. The Indictment violates the Fifth Amendment's Due Process clause, as applied

4. The statute of limitations has run on all Counts.

5. The Indictment Violates the First Amendment, as applied

## Introduction

Despite an expensive six-year investigation involving, among others, the DOJ, FBI, IRS, international and domestic law enforcement, for-profit forensic vendors Excygent, LLC and Chainalysis, Inc., and multiple United States Attorney's Offices, the Superseding Indictment (the "Indictment") is bare bones. It pleads no facts to justify its insufficiently pled legal accusations. This empty Indictment fails to place Mr. Sterlingov on the required constitutional notice as to what he must defend himself against and lacks the necessary detail to act as a future double jeopardy bar. There is little recourse to the record outside the Indictment; in the District of Columbia, consideration of a Motion to Dismiss for an Indictment is generally limited to the four corners of the Indictment except as to venue questions.

1

The Government cannot constitutionally justify its venue selection through unilateral internet forum shopping that implicitly asserts a universal jurisdiction that obliterates our Constitution's Venue Clauses in the digital age. The Government attempts to evade its thorny venue problems by withholding from the Indictment any specific reference to locale and cloaking any such talk in vagaries. Assuming one can even properly speak in terms of physical world locations when it comes to cyberspace.

Further complicating matters is the Indictment's implicit factual assumption that information distributed globally over networked computers - like the distributed ledger technology behind Bitcoin - has a determinate physical location (as a matter of law or fact) and that the exchange of this information over that network functions in the same way as a mid-twentieth brick and mortar wire or bank transfer.[1] One of the Blockchain's core features is that it's decentralized; to talk of its location is to use a physical analogy and not an expression of empirical reality. The Indictment's naive background assumption - shared by many laypeople - that the Blockchain and the Onion Network operate in the same way as a conventional brick and mortar wire or bank transfer denies the empirical reality of the computer networks it stakes its claims on. We are not in Kansas anymore. Kansas has been digitized, decentralized, and distributed.

Again, the Government dodges the issue by failing to state any facts with specificity describing any of the alleged transaction's details or mechanics. Within the four corners of the Indictment, one is left guessing, an unconstitutional guessing game that denies Mr. Sterlingov his

---

1 See, e.g., Adam Hayes, Jefreda R. Brown, Suzanne Kvilhaug, *What is a Blockchain?*, Investopedia, https://www.investopedia.com/terms/b/blockchain.asp (last visited Aug. 1, 2022) (generally discussing distributed ledger technology).

right to mount a complete defense, welcomes surprise at trial, and insufficiently serves as a bar to future double jeopardy because all the counts lack the necessary factual predicates.

Currently, the discovery produced to the Defense by the Government is over 3 Terabytes of data. Most of it appears to be fluff, larded on for impression rather than substance, but within the four corners of the Indictment lies no metric for determining this with certainty - a disquieting thought for a defense lawyer, heavy like a sandbag when someone's liberty is at stake. It diverts resources in a way an indictment with a "plain, concise, and definite written statement of the essential facts constituting the offense charged" doesn't.[2]

Nothing in the Indictment, beyond broad date ranges starting well before the statute of limitations, and the ambiguous "movement of Bitcoin (BTC)" referenced in Count Two, provides specific notice to the Defense of what its defending against. There are no criteria with which to sail the sea of data.

This vagueness and ambiguity of the empty Indictment render it void for vagueness and ambiguity under the Fifth Amendment; likewise with the Government's anachronistic projection of criminal intent a decade into the past to a time when 1 Bitcoin ("BTC") could be bought for 30 cents, in January 2011. The Government accuses Mr. Sterlingov of hiding, yet it hides its investigation from this Indictment, unable to point to anything concrete from its lengthy, costly, and error-laden investigation that ties Mr. Sterlingov to its speculative and convoluted accusations. The Government cannot state its case plainly, not bothering with defining its term "BITCOIN FOG" in the Indictment, so we are left guessing, like the purported "blockchain analysis", as to what is being referenced. A business entity? A clearnet website? An onion site? A fog machine? Hype? A fog indeed.

---

[2] Fed. R. Crim. P. 18(c)(1).

Appx6572

No answers are to be found in the Indictment, and the law generally prohibits looking outside the four corners of the Indictment for a facial challenge on a Motion to Dismiss. Thus, this Court should dismiss the Indictment because, as argued below, its defects, insufficiencies, and lack of specificity render it unconstitutional. This Court should dismiss this bare-bones Indictment in this complex cryptographic computer case involving distributed ledger technology and globally networked computers because of its legal and factual defects, insufficiencies, and lack of specificity, as argued below. This Motion to Dismiss incorporates by reference all relevant arguments made in the concurrently filed Motion for Reconsideration of Pre-Trial Detention, Motion to Release Seized Assets, and the Motion for a Bill of Particulars.

## Legal Standard

A Motion to Dismiss an Indictment is a facial challenge, viewing the Indictment as a whole, assuming its allegations as true, and generally not turning outside the four corners of the Indictment to justify its allegations; except as to questions of venue.[3] For venue questions, courts in this District routinely turn outside the record.[4]

When the question of guilt turns on specific questions of fact, the United States Supreme Court requires that an Indictment do more than parrot the charged statutes and decorate them

---

3 *See United States v. Bowdin*, 770 F. Supp. 2d. 142, 145-46 (D.D.C. 2011); *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009); *United States v. El-Saadi*, 549 F. Supp. 3d 148, 157 n.4 (D.D.C. 2021) ("[D]ecisions in this District resolving pretrial motions to dismiss for improper venue in criminal cases routinely rely on allegations outside the four corners of the indictment." (citing *United States v. Han*, 280 F. Supp. 3d 144, 149-52 (D.D.C. 2017); *United States v. Gamble*, No. 19-cr-348, 2020 U.S. Dist. LEXIS 116370, 2020 WL 3605829, at *3-5 (D.D.C. July 2, 2020)); *see also United States v. El-Saadi*, 549 F. Supp. 3d 148, 157 n.4 (D.D.C. 2021) (The Court thus concludes that it should grant Defendants' motions to dismiss only if the "reasonably available" evidence shows that the government could not prove by a preponderance of the evidence that the charged offenses occurred in the District of Columbia.)
4 *United States v. El-Saadi*, 549 F. Supp. 3d 148, 157 n.4 (D.D.C. 2021) ("And decisions in this District resolving pretrial motions to dismiss for improper venue in criminal cases routinely rely on allegations outside the four corners of the indictment.")

4

with conclusory facts.[5] The focus is on the language of the Indictment, which the Fifth Amendment requires "be limited to the unique allegations of the indictments returned by the grand jury," language that Federal Rule of Criminal Procedure 7(c)(1) prescribes "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ."[6] A motion to dismiss doesn't challenge the sufficiency of the evidence; it challenges defects in, and the sufficiency and specificity of, the indictment as alleged in law and fact.[7] Finally, "while a pretrial motion need not state explicitly the grounds upon which a motion is made, it must contain facts and arguments that make clear the basis of defendant's objections."[8]

## Argument

First, the Indictment is defective because venue in the District of Columbia is unconstitutional. No crime occurred in D.C. under a substantial contacts or a locus delicti analysis, an analysis hampered by the Indictment's lack of specificity. This lack of specificity deprives Mr. Sterlingov of notice as to what he is defending against, renders the Indictment's use as a bar to double jeopardy impossible, fails to state offenses as to all counts, and violates the Fifth Amendment's Due Process clause as applied for vagueness and ambiguity.

---

5 *Russell v. United States*, 369 U.S. 749, 765 (1962) ("It is an elementary principle of criminal pleading, that where the definition of an offence, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species, -- it must descend to particulars." (citation omitted)); *United States v. Nance*, 533 F.2d 699, 701-02 (1976) ("Ordinarily, it is proper for an indictment to be drawn in the language of the statute, but following the generic wording of a statute is not necessarily sufficient." (citations omitted)); *United States v. Sanford, Ltd.*, 859 F. Supp. 2d 102, 107-08 (D.D.C. 2012).
6 *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009).
7 *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 154 (D.D.C. 2015).
8 *United States v. Hewlett*, 395 F.3d 458, 460 (D.C. Cir. 2005) (quoting United States v. Mitchell, 951 F.2d 1291, 1296 (D.C. Cir. 1991)); United States v. Brown, No. 07-75 (CKK), 2007 U.S. Dist. LEXIS 49169, at *4-5 (D.D.C. July 9, 2007).

5

## I.      Venue is Unconstitutional in the District of Columbia

The constitutionality of venue in a Federal criminal trial is a threshold question. The Declaration of Independence complains of the British Crown transporting colonists " beyond Seas to be tried."[9] In 1787, the Constitutional Convention in Philadelphia mandated under Article III § 2 that "[t]he trial of all crimes . . .shall be by Jury; and such trial shall be in the State where the said crimes shall have been committed; but when not committed within any, the Trial shall be at such place or place as the Congress may by Law have directed." The location of the jury venire impacts the outcome, and this concern manifests in the First Congress's drafting of the Sixth Amendment, which restricts venue further, mandating that "all criminal prosecutions . . . [be] by an impartial jury of the state and the district wherein the crime shall have been committed, which district shall have been previously ascertained by law. [10] A revolutionary arrested in 1776 in Philadelphia and hauled off to trial in London faces a different jury than one at home. This is no mere technicality; proper venue is fundamental to our criminal justice system.[11]

The Government bears the burden of proof for venue by the preponderance of the evidence, a burden it cannot meet here because no crime occurred in D.C. as a matter of law.[12]

---

9 *United States v. Cabrales*, 524 U.S. 1, 6 (1998).
10 U.S. Const. Amend. VI.
11 *See, United States v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014); Travis v. United States, 364 U.S. 631, 634 (1961) ("[Q]uestions of venue are more than matters of mere procedure. They raise deep issues of public policy in the light of which legislation must be construed." (quotation marks omitted)).
12 See, e.g., *United States v. Sitzmann*, 74 F. Supp. 3d 96, 102-03 (D.D.C. 2014).

6

Mr. Sterlingov faces a situation similar to an American Revolutionary in 1776, plucked off the streets of Philadelphia to stand trial in London. Detained far from family, friends, home, and resources, tarred by innuendo as a Russian Crypto Drug Money Launderer in the press, in a town handpicked by the prosecution for its own convenience and familiar, friendly jury pool. Technology has changed, but prosecutorial forum shopping has not. The dangers of a government-hand-picked venue have grown, however, with the rise of the internet and global connectivity, and threaten to obliterate the Constitution's venue clauses by giving ambitious local prosecutors global jurisdiction through a few clicks of their keyboard.

Here, the Government effectively claims venue in D.C. for any crime it chooses to, creating venue by way of the internet, simply by sending a message through the internet and, receiving no response, accessing government-controlled accounts on the internet, with no evidence of the presence of a defendant - no human on the other side of the entrapment with a mens rea to be coerced. There is no specific allegation in the Indictment or evidence in the discovery, to date, of Mr. Sterlingov committing any crime or transacting any business in the District of Columbia. Despite a six-year investigation that included surveillance, wiretaps, and pen traps, the government has come up with no evidence that Mr. Sterlingov did anything in D.C., so they unilaterally attempted to manufacture something. But lacking any specificity, the Indictment fails both of the two main tests for criminal venue: the locus delicti test and the substantial contacts test.

## A.      There is no Locus Delicti in the District of Columbia

The locus delicti test focuses on the nature of the alleged crimes and the location of the acts constituting them.[13] The alleged crimes here are conspiracy to money launder, money

---

[13] *United States v. Cabrales*, 524 U.S. 1, 6-7, 118 S. Ct. 1772, 1776 (1998).

7

laundering, operating an unlicensed money transmitting business, and violating D.C. Municipal Code's felony prohibition on money transmission without a license. As for location, the Indictment contains no specific allegations of Mr. Sterlingov's presence or conduct in D.C., nor is there anything in the Government's discovery produced to date evidencing his presence or conduct in D.C. Nor does the Indictment allege any victims in D.C., or any felt effects of the alleged crimes.[14] This Court should dismiss the Indictment because under the locus delicti test it violates the United States Constitution's venue clauses.

### B.      No Substantial or Essential Conduct Occurred in D.C.

Hypothetically, if anything unlawful transpired, it would have had to have taken place in Sweden, where Mr. Sterlingov has lived since he was 14, working different computer jobs until his fortunes changed because he was an early adopter of Bitcoin. There are no particular allegations, nor any evidence, of Mr. Sterlingov engaging in any conduct in the District of Columbia. Even assuming arguendo that the Government's messaging the foggedriztrcar2.onion site, receiving no response, and then accessing the government-controlled account at that onion site to send BTC to another government-controlled account counts as conduct in D.C., it is neither substantial nor essential to the charged crimes and venue in the District of Columbia is unconstitutional when viewed from a substantial or essential conduct test.[15]

### C.      18 U.S.C. § 1956's Venue Provisions are Unconstitutional as Applied

Outside the fact that there are no specific factual predicates related to Mr. Sterlingov supporting the Indictment's money laundering allegations, 18 U.S.C. 1956(i) & (f)'s venue

---

[14] *See United States v. Gamble*, No. 19-348 (CKK), 2020 U.S. Dist. LEXIS 116370, at *11-12 (D.D.C. July 2, 2020).
15 *United States v. Gamble*, No. 19-348 (CKK), 2020 U.S. Dist. LEXIS 116370, at *12-13 (D.D.C. July 2, 2020); *United States v. Auernheimer*, 748 F.3d 525, 534 (3d Cir. 2014).

8

provisions are unconstitutional as applied under the Fifth and Sixth Amendment's to the United States Constitution. The statute fails in a computer law setting; the rise of the internet and decentralized data ledgers like the Blockchain obliterate its implicit twentieth-century brick and mortar mentality of wire and bank transfers, and the vague and ambiguous language used to attempt to encapsulate technological change. The fact that the application of 18 U.S.C. § 1956's venue provisions here would erase any reasonable jurisdictional limitations on prosecutors when it internet, comes to the merely by the unilateral internet action of law enforcement, is a sign that the application here of those venue provisions is constitutionally defective.

**D.     The Sixth Amendment Forbids Venue for Criminal Trials in the District of Columbia**

The Sixth Amendment of the United States Constitution requires all criminal trials to be in the state and district where the crime occurred. The District of Columbia is not a state, no crime occurred in D.C., and therefore venue for Mr. Sterlingov's federal criminal trial in the District of Columbia is unconstitutional under the plain text of the Sixth Amendment to the United States Constitution.

**II.     Count One Insufficiently Pleads Conspiracy**

The Indictment insufficiently pleads the elements of conspiracy.[16] It identifies no conspiratorial statements or precise conduct, fails to define the scope of the agreement, names no co-conspirators, lacks particularity as to the time, place, and specific manner of the conspiracy, and insufficiently pleads the illegal object of the conspiracy with the necessary specificity. The

---

[16] *See United States v. Wright*, 651 F.3d 764, 770 (7th Cir. 2011); *United States v. Green*, 599 F.3d 360, 372-73 (4th Cir. 2010). *United States v. El-Saadi*, 549 F. Supp. 3d 148, 157 n.4 (D.D.C. 2021) ("And decisions in this District resolving pretrial motions to dismiss for improper venue in criminal cases routinely rely on allegations outside the four corners of the indictment.")

Appx6578

Court should dismiss Count One because it fails to state an offense and is insufficient as a matter of law and fact.

## III.    The Court Should Dismiss the Indictment for Legal and Factual Insufficiency

The worms spring out of the can when you try to discern the factual predicates related to the general, specific, and knowing intentional mental states the Government must prove beyond a reasonable doubt.[17] In a complex, novel computer law case like this, that deals with revolutionary information technologies and where almost all the evidence is electronic, the bare-bones Indictment's rote recitation of statutory language decorated with expansive and seemingly arbitrary date ranges (if one does not look outside the four corners) is insufficient as a matter of law and fact. The factual predicates necessary to make that law cognizable are missing, and this deprives Mr. Sterlingov of his constitutional rights. Nor will a Bill of Particulars necessarily cure the defects.[18]

## IV.    The Indictment Violates Fifth Amendment Due Process as Applied

The Government's Indictment violates the Fifth Amendment to the United States Constitution's Due Process clause because all the counts in the Indictment are void for constitutional notice, vagueness, ambiguity, and overbreadth grounds, as applied.

---

[17] To the extent that D.C. Municipal Code § 26-1023 requires no intent or knowledge it is an unconstitutional strict liability criminal statute offensive to the Constitution.

[18] *See United States v. Nance*, 533 F.2d 699, 701-02 (1976); *United States v. Saffarinia*, 424 F. Supp. 3d 46, 56-57 (D.D.C. 2020); *United States v. Hillie*, 227 F. Supp. 3d 57, 69 (D.D.C. 2017) ("A valid indictment also preserves the Fifth Amendment's protections against abusive criminal charging practices; specifically, it guarantees that a criminal defendant can only be prosecuted for offenses that a grand jury has actually passed up on, and that a defendant who is convicted of a crime so charged cannot be prosecuted again for that same offense.").

10

## V.     The Statute of Limitations Has Run on All Counts

This Court should not allow the Government to game the statute of limitations on the charged crimes through the bare-bones Indictment.[19] The prior filings and discovery evidence that the Government predicates its case on alleged conduct by Mr. Sterlingov in 2011, such as registering the domain name to a website, or being an early adopter of Bitcoin. Whatever conduct is at issue here happened well outside the statute of limitations. This Court should dismiss the Indictment because the statute of limitations has run on all its counts.

Unless otherwise specified in a statute, the default statute of limitations for non-capital federal criminal statutes is five years.[20] 18 U.S.C. § 1956, the money laundering statute underlying Count One's conspiracy charge and Count Two's substantive money laundering allegation, does not specify any statute of limitations. Likewise, the statute of limitations for Count Three's accusation under 18 U.S.C. §§ 1960(a) and 2 of operating an unlicensed money transmitting business runs out after five years. Furthermore, as a felony not enumerated with a specific statute of limitations, the statute of limitations on the D.C. Municipal Code § 26-1023(e) is six years. This is well short of the time period necessary to prosecute any alleged conduct from 2011.

### A.     The Five-Year Statute of Limitations Has Run on Count One

Count One insufficiently pleads the nature of the alleged conspiracy as argued above. Beyond the assertion of a date range "from on or about October 27, 2011, and continuing until at least on or about April 27, 2021 . . ." it lacks specificity and is insufficient as to the nature and

---

[19] *See United States v. Sunia*, 643 F. Supp. 2d 51, 70-71 (D.D.C. 2009).
20 18 U.S.C.S. § 3282(a) ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.").

11

scope of the conspiratorial agreement, the names of the conspirators, and particulars of the time, place and manner of the conspiracy. The Government cannot charge Mr. Sterlingov with a conspiracy that starts outside the statute of limitations on such an empty Indictment. This invites the Government to run the statute of limitations with a threadbare indictment. The Court should dismiss Count One's conspiracy count because it is insufficient as a matter of law and fact, and is outside the statute of limitations. The Government began this investigation no later than 2015 and has had ample time to bring a conspiracy charge with specificity.

### B.    The Five-Year Statute of Limitations Has Run on Count Two

Count Two insufficiently pleads the nature of the money laundering at issue. Its vague and ambiguous description of an alleged BTC transfer between Government controlled accounts isn't sufficient to establish that Mr. Sterlingov committed the charged crime within the permissible statute of limitations. The Indictment does not allege where Mr. Sterlingov was or what he was doing when the Government accessed its internet accounts on November 21, 2019, with no one else in sight.

### C.    The Five-Year Statute of Limitations Has Run on Count Three

Count Three insufficiently pleads the nature of the operation of an Unlicensed Money Business. Beyond the assertion of a date range "from on or about October 27, 2011, and continuing until at least on or about April 27, 2021 . . ." it lacks specificity and is insufficient as a matter of law and fact. Running a business in a jurisdiction implies a course of conduct. The Indictment specifies no business course of conduct attributable to Mr. Sterlingov. The Court should dismiss Count Three because it is outside the statute of limitations.

Appx6581

### D. The Six-Year Statute of Limitations Has Run on Count Four

Count Four insufficiently pleads the nature of the money transmission without a license under D.C. Municipal Code § 26-1023(c). Beyond the assertion of a date range "from on or about October 27, 2011, and continuing until at least on or about April 27, 2021 . . ." it lacks specificity and is insufficient as a matter of law and fact. The Court should dismiss Count Four because it is outside the statute of limitations.

## VI. The Indictment Violates the First Amendment as Applied

Computer code and information traveling the internet are forms of speech, often published on computer screens.[21] This potentially implicates the First Amendment in relation to criminal prosecutions based on electronic digital information exchanged between networked computers. It also implicates First Amendment concerns regarding the immediacy of the targeted speech's harm.[22]

### Conclusion

This Court should dismiss the bare-bones Indictment.

---

[21] *See, e.g., Sandvig v. Barr*, 451 F. Supp. 3d 73 (D.D.C. 2020).
[22] *See, e.g., Elonis v. United States*, 575 U.S. 723 (2015).

Dated: August 1, 2022

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

/s/ Marina Medvin, Esq.
Counsel for Defendant
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com

*Counsel for Defendant Roman Sterlingov*

14

**Certificate of Service**

I hereby certify that on the 1st day of August 2022, the forgoing document was filed with the Clerk of Court using the CM/ECF System. I also certify that a true and correct copy of the foregoing was sent to the following individuals via e-mail and mail delivery via first class mail:

<u>s/ Tor Ekeland</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

15

**Appx6584**

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | **21-CR-399 (RDM)** |
| *Plaintiff,* | |
| v. | **[Proposed] Order Granting Defendant's Motion to Dismiss** |
| ROMAN STERLINGOV, | |
| *Defendant.* | |

On this day, came on to be considered Defendant's Motion to Dismiss, and the Court after hearing the argument and evidence thereon and being of the opinion that said Motion should be GRANTED.

IT IS THEREFORE ORDERED by the Court that said Motion to Dismiss be GRANTED.

IT IS SO ORDERED.

Dated: _____ 2022

_____
RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

**Appx6585**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | **21-CR-399 (RDM)** |
| *Plaintiff,* | **NOTICE OF MOTION** |
| v. | |
| ROMAN STERLINGOV, | |
| *Defendant.* | |

PLEASE TAKE NOTICE that upon Defendant Roman Sterlingov, through his undersigned counsels, and upon the Motion to Dismiss herein, will move this Court, before the Honorable Randolph D. Moss of the United States District Court for the District of Columbia, in United States Courthouse, Courtroom 8, 333 Constitution Ave. N.W., Washington, D.C. 20001, for an Order granting the Defendant's Motion to Dismiss, pursuant to the following schedule set by the Court:

1.  Opposition papers, if any, are to be served on or before August 29, 2022;

2.  Reply papers, if any, are to be served on or before September 7, 2022;

Dated: New York, New York

August 1, 2022

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

/s/ Marina Medvin, Esq.
Counsel for Defendant
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com

*Counsel for Defendant Roman Sterlingov*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of August 2022, the forgoing document was filed with the Clerk of Court using the CM/ECF System. I also certify that a true and correct copy of the foregoing was sent to the following individuals via e-mail and mail delivery via first class mail:

<u>s/ Tor Ekeland</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

**Appx6588**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :
                                  :
          v.                      :          CRIMINAL NO. 21-cr-399 (RDM)
                                  :
ROMAN STERLINGOV,                 :
                                  :
          Defendant.              :

GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

The United States of America, by and through the United States Attorney for the District

of Columbia, respectfully opposes the defendant's Motion To Dismiss the Indictment, ECF No.

46.  The defendant raises a number of scattershot arguments—invoking everything from venue to

the First, Fifth, and Sixth Amendments to the statute of limitations, and even arguing that criminal

trials cannot constitutionally be held in the District of Columbia.  The defendant's motion relies

on overwrought rhetoric about computers and the Internet, but provides very little legal authority

or argument to back up its overheated claims.  As set forth below, the Superseding Indictment is

well-supported by the weight of authority.  Venue is well-founded based on the undercover

transactions and the defendant's omissions in the District of Columbia; the defendant misconstrues

the text, purpose, and history of the Sixth Amendment in the District of Columbia; and none of the

defendant's arguments provide any basis for this Court to set aside the judgment of two separate

grand juries in returning indictments against the defendant.

## ARGUMENT

### A.  Standard of Review on a Motion To Dismiss an Indictment

"[T]o be sufficient, an indictment need only inform the defendant of the precise offense of

which he is accused so that he may prepare his defense and plead double jeopardy in any further

prosecution for the same offense." *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014). "Because a court's use of its supervisory power to dismiss an indictment directly encroaches upon the fundamental role of the grand jury, dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015) (internal citations and alterations omitted). Accordingly, "a pretrial motion to dismiss an indictment 'allows a district court to review the sufficiency of the government's pleadings, but it is not a permissible vehicle for addressing the sufficiency of the government's evidence.'" *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 154 (D.D.C. 2015) (quoting 24 James W. Moore *et al.*, Moore's Fed. Practice § 612.02 (3d ed. 2015)). "Thus, '[w]hen considering a motion to dismiss an indictment, a court assumes the truth of [the government's] factual allegations.'" *Id.* (quoting *Ballestas*, 795 F.3d at 149).

### B. Venue Is Proper in the District of Columbia

#### 1. Legal Standard

"Although an allegation of venue is not essential to the validity of an indictment or information, venue is a fact that must be proved at the trial . . . ." 2 Fed. Prac. & Proc. Crim. § 307 (4th ed.).[1] "Venue may be proper in more than one district." *United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C. Cir. 1991); *see also United States v. Muhammad*, 502 F.3d 646, 654 (7th Cir. 2007) (same); *United States v. Bowens*, 224 F.3d 302, 309 (4th Cir. 2000) (same). As this Court explained in *United States v. El-Saadi*, 549 F. Supp. 3d 148 (D.D.C. 2021), on a motion to

---

[1] However, venue is not always a question that must be submitted to the jury at trial. Venue is only a jury question if "(1) the defendant objects to venue prior to or at the close of the prosecution's case-in-chief, (2) there is a genuine issue of material fact with regard to proper venue, and (3) the defendant timely requests a jury instruction." *United States v. Sitzmann*, 893 F.3d 811, 824 (D.C. Cir. 2018) (quoting *United States v. Haire*, 371 F.3d 833, 840 (D.C. Cir. 2004), *vacated on other grounds*, 543 U.S. 1109 (2005)). In *Haire*, as in *Sitzmann*, the D.C. Circuit upheld a trial court's refusal to instruct the jury on venue for failing both the first and second prongs. *See Haire*, 371 F.3d at 840 ("[T]here is no genuine issue of material fact as to the commission of acts in furtherance of the offense in the District of Columbia.").

2

dismiss for lack of venue, the language of Fed. R. Crim. P. 12(b)(3) allows the Court to "consider evidence beyond the face of the indictment where such evidence is 'reasonably available,'" and "decisions in this District resolving pretrial motions to dismiss for improper venue in criminal cases routinely rely on allegations outside the four corners of the indictment." *Id.* at 157 n.4.

The Supreme Court has also addressed the appropriate standard for venue in two cases, *United States v. Cabrales*, 524 U.S. 1 (1998), and *United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999). In *Cabrales*, the defendant was charged in the Western District of Missouri with, *inter alia*, two substantive money laundering counts based on transactions that occurred in Florida, involving the proceeds of cocaine trafficking in Missouri. 524 U.S. at 3-4. The Supreme Court held that venue was improper in Missouri based solely on the drug offenses that generated the unlawful proceeds. *Id.* at 4. The Court indicated that venue must be based on the *"locus delicti"* of the offense, which is determined "from the nature of the crime alleged and the location of the act or acts constituting it." *Id.* at 6-7 (internal quotations omitted). Looking to the statutory definitions of the money laundering offenses, the Court found that they only punished the individual laundering transactions, not the cocaine trafficking that generated the unlawful proceeds, and so venue could only be based in the district where the transactions occurred. *Id.* at 7 ("Here, the crimes described in Counts II and III are defined in statutory proscriptions, 18 U.S.C. §§ 1956(a)(1)(B)(ii), 1957, that interdict only the financial transactions (acts located entirely in Florida), not the anterior criminal conduct that yielded the funds allegedly laundered."). The Court specifically distinguished the substantive money laundering charges in *Cabrales*, based on discrete transactions, from a hypothetical money laundering conspiracy in which venue could be based on "overt acts of a co-conspirator" in the charging district. *Id.* at 8.

**Appx6591**

In *Rodriguez-Moreno*, the Court applied *Cabrales* to the case of a defendant charged with using or carrying a firearm "during and in relation to any crime of violence," in violation of 18 U.S.C. § 924(c). 526 U.S. at 276. The defendant in *Rodriguez-Moreno* participated in drug-related kidnapping that began in Texas and continued in New Jersey, New York, and Maryland. *Id.* at 277. The defendant only used a firearm during the last leg of the journey, in Maryland, but he was charged in New Jersey. *Id.* The Third Circuit reversed his conviction, reasoning that venue should be limited to the district in which the defendant "uses" or "carries" a firearm—which, in the defendant's case, would only include Maryland. *Id.* at 277. The Supreme Court reversed. *Id.* The Court reiterated the *locus delicti* test articulated in *Cabrales*—under which "a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts," *id.* at 279—but found that the Third Circuit was unduly restrictive in applying it to the defendant's § 924(c) offense. Eschewing the Third Circuit's "verb test," the Court found that "a defendant's violent acts are essential conduct elements" of the § 924(c) offenses, because the government was required to prove that the defendant "committed all the acts necessary to be subject to punishment for kidnapping," in addition to his use of a firearm while committing the kidnapping offense. *Id.* at 279-80. Thus, the Court found "two distinct conduct elements"—kidnapping and using and carrying a firearm—and found that venue based on the continuing kidnapping offense in New Jersey was sufficient under the Constitution. *Id.* at 280, 282.

As explained in further detail below, venue is proper in the District of Columbia for the four counts in the Superseding Indictment pursuant to Rule 18, Fed. R. Crim. P. (venue is proper in "district where the offense was committed"); the continuing offense venue statute, 18 U.S.C. § 3237(a) (venue for "any offense against the United States begun in one district and completed in

4

Appx6592

another, or committed in more than one district" is proper in "any district in which [the] offense was begun, continued, or completed"); and the express venue provision in the money laundering statute, 18 U.S.C. § 1956(i) (venue for money laundering is proper in, *inter alia*, "any district in which the financial or monetary transaction is conducted," and, for conspiracy or attempt, venue in "the district where venue would lie for the completed offense under [the provision authorizing venue in district in which financial or monetary transaction is conducted], or in any other district where an act in furtherance of the attempt or conspiracy took place"). Application of these venue statutes in this case is, moreover, entirely consistent with the Supreme Court's decisions in *Cabrales* and *Rodriguez-Moreno*.

### 2. The Undercover Transactions Support Venue in the District of Columbia

As noted in the Superseding Indictment (ECF No. 43, ¶ 2) and described in further detail in the Complaint Affidavit (ECF No. 1-1, at 5-7), on multiple occasions, undercover agents sitting in the District of Columbia accessed Bitcoin Fog, created accounts on the Bitcoin Fog darknet site, sent money to Bitcoin Fog, submitted messages to Bitcoin Fog, provided Bitcoin Fog with instructions on where to transfer the post-laundered funds, and (on or about November 21, 2019 and on other occasions) received money from Bitcoin Fog. In addition, the undercover agents received an update on the status of the transactions in the District of Columbia by means of the defendant's Bitcoin Fog darknet site. All of that activity necessarily involved wire communications and the transfer of funds to and from locations in the District of Columbia. These undercover transactions in the District of Columbia provide ample basis for both statutory and constitutional venue.

### i.  Venue for Money Laundering Conspiracy and § 1960(b)(1)(C)

Money laundering conspiracy is a continuing offense, *see United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999), so venue is proper under 18 U.S.C. § 3237(a) in any district where the conspiracy was "begun, continued, or completed."  In addition, the money laundering statute provides that venue is proper in "any district in which the financial or monetary transaction is conducted," and, in a prosecution for conspiracy or attempt, venue is proper "in the district where venue would lie for the completed offense . . . or in any other district where an act in furtherance of the attempt or conspiracy took place."  18 U.S.C. § 1956(i)(1)(A), (2).  The Supreme Court has indicated that the money laundering venue provision in § 1956(i) provides an "alternative venue option in money laundering conspiracy cases" which "serves to supplement, rather than supplant, the default venue rule."  *Whitfield v. United States*, 543 U.S. 209, 218 (2005).

It is well-established that a "sting" transaction constitutes an act in furtherance of a conspiracy and is sufficient to justify venue in the district where it occurred.  For example, in *United States v. Sitzmann*, 74 F. Supp. 3d 96 (D.D.C. 2014)—one of the cases on which the defendant relies—Judge Friedman found venue appropriate in this District for prosecution of a drug trafficking conspiracy based on "a single wire transfer" sent to a government informant in the District of Columbia.  *Id.* at 102-04.  In fact, the government informant requested the wire transfer from one of the defendant's co-conspirators, Mr. Jones, telling him he needed the money to travel to Florida to deliver cocaine, as part of a "ruse orchestrated by law enforcement in part to establish venue in this jurisdiction."  *Id.* at 103-04.  The defendant himself was not involved in the wire transfer because he had been jailed in France the previous month.  *Id.* at 104.

Judge Friedman found that the wire transfer counted as an "overt act in support of the conspiracy," and held that, "[s]o long as Mr. Jones made the wire transfer in furtherance of the

6

conspiracy with Mr. Sitzmann to traffic in cocaine for profit, venue lies in the District of Columbia." *Id.* at 105, 107. In so holding, Judge Friedman found it irrelevant that the government informant—the only person in the District of Columbia—was not an actual member of the conspiracy. The conspiracy existed at the time, the defendant and his co-conspirator were both members of the conspiracy, and the requested wire transfer was made "in order to facilitate the transportation of drugs" in connection with the conspiracy. *Id.* at 105.

> In these circumstances, it does not matter whether Mr. Colligan was a government informant. Nor does it matter whether Mr. Sitzmann knew about or participated in the wire transfer, so long as Sitzmann previously reached a conspiratorial agreement with Mr. Jones . . . and never affirmatively withdrew from that agreement.

*Id.* at 106. The D.C. Circuit affirmed Sitzmann's convictions. *See United States v. Sitzmann*, 893 F.3d 811 (D.C. Cir. 2018).

Judge Friedman's opinion in *Sitzmann* is consistent with numerous decisions finding venue appropriate based on undercover or sting activities in the district of prosecution. Most recently, in *United States v. Iossifov*, --- F.4th ----, 2022 WL 3335692 (6th Cir. Aug. 12, 2022), the Sixth Circuit affirmed venue for a bitcoin-related RICO and money laundering conspiracy prosecution in the Eastern District of Kentucky, even though the defendant was located overseas and had never set foot inside Kentucky, based on the fact that a "confidential source, who acted in furtherance of the scheme and laundered money under the government's supervision, was based in the district," as well as the presence of victims within the district. *Id.* at *4. As the court explained, "venue for money laundering conspiracy is proper 'in any . . . district where an act in furtherance of the attempt or conspiracy took place," and "[c]ritically, a co-conspirator's acts need not be foreseeable to a defendant for venue to properly lie in the district where such acts took place, nor is it necessary for a co-conspirator to 'have entered the district' where venue lies 'so long as this standard is

**Appx6595**

met.'" *Id.* (quoting 18 U.S.C. § 1956(i)(2) and *United States v. Crozier*, 259 F.3d 503, 519 (6th Cir. 2001)).[2]

Other courts are in accord. *See, e.g., United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007) (finding in conspiracy case that "it [does not] matter whether the conspirator is communicating with someone who is a knowing confederate, an undercover agent, or an unwitting third-party," because "[w]hat is determinative of venue . . . is whether the conspirator used the [communication] to further the objectives of the conspiracy"); *United States v. Naranjo*, 14 F.3d 145, 146-47 (2d Cir. 1994) (finding venue appropriate where co-conspirator of defendant made phone calls to undercover agent in Manhattan, explaining that "[t]he defendant need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there"); *United States v. Barnes*, 681 F.2d 717, 724 (11th Cir. 1982) (affirming venue for charge of using telephone to facilitate the commission of a drug conspiracy based on single telephone call by the defendant to a government informant located in the charging district, and explaining that " "the question is not whether [the defendant] could have conspired with a government informant, but rather whether his call to [the informant] was knowingly or intentionally made for the purpose of facilitating the conspiracy that he was involved in with persons other than [the informant]."); *United States v. Day*, 700 F.3d 713, 727 (4th Cir. 2012) (venue was proper, in prosecution for mail fraud, conspiracy, and other charges, based on at least two classes of overt acts: phone calls that a co-conspirator made in furtherance of the conspiracies and e-mail sent by coconspirators *to* victim

---

[2] *Iossifov* was only the latest in a long line of cases to hold that conspiracy defendants located overseas may be charged in the United States even if they had never set foot in the United States. *See, e.g., United States v. Perez-Herrera*, 610 F.2d 289, 291 (5th Cir. 1980) (collecting cases and stating, "[w]e have repeatedly held it is not a defense to a conspiracy charge that the defendant never entered the country, at least so long as an overt act in furtherance of the conspiracy occurred within the United States").

personnel in district); *United States v. Brito*, 379 F. App'x 320, 321 (5th Cir. 2010) ("Venue can

be based on evidence of any single act that initiated, perpetuated, or completed the crime . . . .");

*id.* ("'[O]ne co-conspirator's travel through a judicial district in furtherance of the crime alleged

establishes venue as to all co-conspirators.'") (quoting *United States v. Mendoza*, 587 F.3d 682,

687 (5th Cir. 2009)); *United States v. Renteria*, 903 F.3d 326, 332 n.35 (3d Cir. 2018) ("[A]

confidential informant's presence in the [district] during telephone calls with a co-conspirator

'sufficed to establish venue there on the conspiracy charge.'") (quoting *United States v. Gonzalez*,

683 F.3d 1221, 1225 (9th Cir. 2012)); *United States v. Cordero*, 668 F.2d 32, 43-44 (1st Cir. 1981)

(venue was appropriate in Puerto Rico when an undercover law enforcement agent was located

there and spoke to the conspirators on the phone there); *Smith v. United States*, 92 F.2d 460, 461

(9th Cir. 1937) (affirming venue based on "telephone from Honolulu to Los Angeles," explaining

that "[a]n overt act . . . is a part of the conspiracy itself, and where, as here, it is alleged as occurring

in the Territory and in California, it is sufficient to make it an offense within the statute, even

though the indictment had stated that the place in which the conspiracy was formed is unknown").[3]

---

[3] Numerous courts have also rejected claims of entrapment or "manufactured" venue based on undercover law enforcement activities. *See, e.g.*, *United States v. Spriggs*, 102 F.3d 1245, 1250 (D.C. Cir. 1996) (approving venue in District of Columbia where undercover agents "purposefully" arranged to meet defendants in the District of Columbia rather than locations in Maryland or Virginia); *United States v. Al-Talib*, 55 F.3d 923, 928 (4th Cir. 1995) (finding venue proper based on location of a government sting operation, despite defense arguments that the government "manipulated events to draw defendants into a venue"); *United States v. Celaya Valenzuela*, 849 F.3d 477, 488 (1st Cir. 2017) (venue proper even where government informant drove defendant across state lines into the district in which venue was laid); *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 462 (7th Cir. 2006) (agents may influence where the federal crime occurs, and thus where venue lies); *see also United States v. Sitzmann*, 893 F.3d 811, 823 (D.C. Cir. 2018) (noting that courts "have rejected the concept of manufactured venue," and— though declining to reach the issue—emphasizing that "[w]e remain unconvinced that 'manufactured venue' or 'venue entrapment' are viable theories").

This well-established line of cases, moreover, is consistent with *Cabrales* and *Rodriguez-Moreno*. In both cases, the Supreme Court explicitly preserved the theory of venue articulated here—conspiracy venue based on overt acts committed in the charging district, regardless of the defendant's presence. *See Cabrales*, 524 U.S. at 8 ("In *Hyde*[ *v. United States*, 225 U.S. 347 (1912)], the defendants were convicted in the District of Columbia of conspiracy to defraud the United States. Although none of the defendants had entered the District as part of the conspiracy, venue was nevertheless appropriate, the Court ruled, based on the overt acts of a co-conspirator there. By contrast, the counts at issue in this case allege no conspiracy. They describe activity in which Cabrales alone, untied to others, engaged."); *Rodriguez-Moreno*, 526 U.S. at 281-82 (citing *Hyde* as an example of proper venue). Moreover, by permitting venue in a district where the kidnapping occurred but not the using and carrying of a firearm, *Rodriguez-Moreno* confirmed that constitutional venue does not require that *all* of the essential elements of an offense occur in the charging district.[4]   Even the Third Circuit's decision in *United States v. Aurnheimer*, 748 F.3d 525 (3d Cir. 2014), on which the defendant relies, acknowledged that "overt acts" committed in the charging district, New Jersey, could have supported venue for the conspiracy charged in that case. *Id.* at 535. *See also, e.g.*, *Iossifov*, 2022 WL 3335692, at *4-5 (citing *Cabrales* and affirming venue for conspiracy on both statutory and constitutional grounds).

Here, as in *Sitzmann*, the defendant and his co-conspirators (including darknet vendors and darknet market administrative teams, *see* ECF No. 43, at 1-2) participated in a money laundering conspiracy during a time period encompassing the dates of the undercover transactions in 2019.

---

[4] *Rodriguez-Moreno* further confirmed the longstanding principle for continuing offenses that, "'where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done.'" 526 U.S. at 281 (quoting *United States v. Lombardo*, 241 U.S. 73, 77 (1916)).

10

The funds involved in the November 21, 2019 transaction were represented to be the proceeds of illegal drug trafficking ("coins from selling ecstasy") and to promote further drug trafficking ("ive been selling on WSM and dream . . . I have more coins I need cleaned but how do I know I can trust you???"). ECF No. 1-1, at 6. And the laundering transaction itself was conducted while the undercover agent was located in the District of Columbia, while interacting with the Bitcoin Fog site and receiving a status update confirming his transaction.

Moreover, Bitcoin Fog advertised that it "mix(es) up your bitcoins in our own pool with other users" in order to "eliminate any chance of finding your payments and making it impossible to prove any connection between a deposit and a withdraw inside our service." ECF No. 1-1 at 2. In order to do so, Bitcoin Fog required a stream of users to provide a variety of sources of bitcoin, which Bitcoin Fog commingled with other customers' funds to ensure effective laundering. Thus, Bitcoin Fog's processing of the undercover transactions not only furthered the conspiracy through the individual transaction with the undercover agent, but also by contributing to the pool and allowing Bitcoin Fog to launder *other* Bitcoin Fog users' transactions. In both a specific and general sense, then, the undercover transactions constituted acts in furtherance of the money laundering conspiracy sufficient to justify venue in this District.

Similarly, the undercover transactions support venue in the District of Columbia for the third prong of Count Three, charging operation of a money transmitting business that involved the transportation and transmission of funds known to have been derived from a criminal offense and intended to be used to promote and support unlawful activity, in violation of 18 U.S.C. § 1960(b)(1)(C). *See* ECF NO. 43, at 4. One of the ways to prove a violation of this statute is through instances of promotional laundering—engaging in a transaction with "funds" that "are intended to be used to promote or support unlawful activity," 18 U.S.C. § 1960(b)(1)(C). Unlike

11

many money laundering offenses under § 1956, this offense under § 1960(b)(1)(C) does not require the funds themselves to be the proceeds of illegal activity. *See* H.R. Rep No. 107-250(I), at 54 (Oct. 17, 2001) ("Thus, a person who agrees to transmit or to transport drug proceeds for a drug dealer, or *funds from any source* for a terrorist, knowing such funds are to be used to commit a terrorist act, would be engaged in the operation of an unlicensed money transmitting business.") (emphasis added); *cf. United States v. Krasinski*, 545 F.3d 546, 550-51 (7th Cir. 2008) (construing international promotional money laundering offense in violation of 18 U.S.C. § 1956(a)(2)(A), which also does not contain any statutory requirement that the transaction involve criminal proceeds, and finding that "[t]he absence of a 'proceeds' requirement in section 1956(a)(2)(A) reflects that Congress decided to prohibit *any* funds transfer out of the country that promotes the carrying on of certain unlawful activity") (emphasis added). Accordingly, this provision covers "sting" transactions involving undercover funds that are intended to be used to promote or support unlawful activity. Thus, in the same way that the undercover transactions here constitute acts in furtherance of the conspiracy and support venue for money laundering conspiracy, they also constitute one of the essential elements of a § 1960(b)(1)(C) offense and support venue under § 3237(a).

### ii.  Venue for Sting Money Laundering

For a substantive money laundering count, such as the "sting" money laundering offense charged in Count Two, "[t]he core of money laundering, which distinguishes one such offense from another, is the laundering transaction itself." *United States v. Smith*, 44 F.3d 1259, 1265 (4th Cir. 1995); *cf. Cabrales*, 524 U.S. at 8 (finding that venue in Missouri was improper for substantive money laundering counts based on "transactions" that "began, continued, and were completed in Florida") (internal citations omitted). The sting transaction that forms the basis of Count Two was

12