# 24-3161

# United States Court of Appeals for the District of Columbia

THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
Hon. Randolph D. Moss
United States District Court Case 1-21-cr-00399-RDM-1

## APPENDIX
## Volume XVI of XVII (Pages Appx6601 - Appx7040)

TOR EKELAND, ESQ.
TOR EKELAND LAW PLLC
*Attorneys for Defendant-Appellant*
30 Wall Street, 8th Floor
New York, New York 10005
(718) 737-7264
tor@torekeland.com

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
*Attorneys for Defendant-Appellant*
800 Third Avenue, 20th Floor
New York, New York 10022
(212) 446-2346
maf@fernichlaw.com

MAKSIM NEMTSEV, ESQ.
MAKSIM NEMTSEV PC
*Attorneys for Defendant-Appellant*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
max@mnpc.law

AARON DANIEL, ESQ.
ASYMMETRIC LEGAL
*Attorneys for Defendant-Appellant*
11900 Biscayne Blvd, Suite 400
Miami, Florida 33181
(305) 979-9296
aaron@asymmetric.legal

*(See Inside Cover for Additional Counsel)*

3914



**ELECTRONIC PARALEGAL**

AMY C. COLLINS, ESQ.
THE LAW OFFICE OF
    AMY C. COLLINS
*Attorneys for Defendant-Appellant*
888 17th Street, NW, Suite 1200
Washington DC 20006
(228) 424-0609
amy@amyccollinslaw.com

# TABLE OF CONTENTS

District Court Docket – US v. Sterlingov, 21-CR-00399-RDM .............Appx001

Protective Order of Governing Discovery of Hon. Randolph D. Moss,
Dated September 17, 2021 (ECF Doc. No. 18) ......................................Appx074

Preliminary Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 336) ......................................Appx079

Order of Forfeiture of Hon. Randolph D. Moss,
Dated November 14, 2024 (ECF Doc. No. 338) ....................................Appx085

Judgment in a Criminal Case of Hon. Randolph D. Moss,
Dated November 13, 2024 (ECF Doc. No. 340) ....................................Appx091

Transcript of Motion Hearing, Dated January 13, 2023
(ECF Doc. No. 114) ..............................................................................Appx099

Transcript of Motion Hearing, Dated January 31, 2023
(ECF Doc. No. 115) ..............................................................................Appx190

Transcript of Motions Hearing, Dated June 16, 2023
(ECF Doc. No. 223) ..............................................................................Appx345

Transcript of Motions Hearing, Dated June 23, 2023
(ECF Doc. No. 224) ..............................................................................Appx501

Transcript of Motions Hearing, Dated July 19, 2023
(ECF Doc. No. 225) ..............................................................................Appx682

Transcript of Continued Motions Hearing, Dated July 20, 2023
(ECF Doc. No. 226) ..............................................................................Appx895

Transcript of Motions Hearing, Dated August 22, 2023
(ECF Doc. No. 228) ..............................................................................Appx1040

Transcript of Continued Motions Hearing, Dated August 23, 2023
(ECF Doc. No. 229) ..............................................................................Appx1266

Transcript of Motions Hearing, Dated August 29, 2023
(ECF Doc. No. 231) ..............................................................................Appx1466

Transcript of Pretrial Conference, Dated September 7, 2023
(ECF Doc. No. 232) ....................................................Appx1524

Transcript of Pretrial Conference, Dated September 8, 2023
(ECF Doc. No. 233) ....................................................Appx1741

Transcript of Pretrial Conference, Dated September 13, 2023
(ECF Doc. No. 234) ....................................................Appx1861

Transcript of Pretrial Conference, Dated September 15, 2023
(ECF Doc. No. 235) ....................................................Appx1999

Transcript of Pretrial Conference, Dated September 18, 2023
(ECF Doc. No. 236) ....................................................Appx2141

Transcript of Pretrial Conference, Dated September 21, 2023
(ECF Doc. No. 237) ....................................................Appx2235

Transcript of Motion Conference, Dated November 13, 2023
(ECF Doc. No. 238) ....................................................Appx2302

Transcript of Jury Trial, Dated February 12, 2024
(ECF Doc. No. 276) ....................................................Appx2350

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ....................................................Appx2620

Transcript of Jury Trial, Dated February 13, 2024
(ECF Doc. No. 277) ....................................................Appx2688

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 278) ....................................................Appx2825

Transcript of Jury Trial, Dated February 14, 2024
(ECF Doc. No. 327) ....................................................Appx2948

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ....................................................Appx3074

Transcript of Jury Trial, Dated February 15, 2024
(ECF Doc. No. 279) ....................................................Appx3189

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ...................................................................Appx3331

Transcript of Jury Trial, Dated February 20, 2024
(ECF Doc. No. 280) ...................................................................Appx3446

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 281) ...................................................................Appx3572

Transcript of Jury Trial, Dated February 21, 2024
(ECF Doc. No. 328) ...................................................................Appx3697

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ...................................................................Appx3858

Transcript of Jury Trial, Dated February 22, 2024
(ECF Doc. No. 282) ...................................................................Appx3982

Transcript of Jury Trial, Dated February 23, 2024
(ECF Doc. No. 329) ...................................................................Appx4122

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ...................................................................Appx4251

Transcript of Jury Trial, Dated February 26, 2024
(ECF Doc. No. 283) ...................................................................Appx4394

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 284) ...................................................................Appx4419

Transcript of Jury Trial, Dated February 27, 2024
(ECF Doc. No. 330) ...................................................................Appx4550

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ...................................................................Appx4581

Transcript of Jury Trial, Dated February 28, 2024
(ECF Doc. No. 285) ...................................................................Appx4698

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 285) ...................................................................Appx4836

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 286) ........................................................Appx4955

Transcript of Jury Trial, Dated February 29, 2024
(ECF Doc. No. 331) ........................................................Appx5074

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 287) ........................................................Appx5198

Transcript of Jury Trial, Dated March 1, 2024
(ECF Doc. No. 332) ........................................................Appx5344

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ........................................................Appx5359

Transcript of Jury Trial, Dated March 4, 2024
(ECF Doc. No. 288) ........................................................Appx5496

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 289) ........................................................Appx5621

Transcript of Jury Trial, Dated March 5, 2024
(ECF Doc. No. 333) ........................................................Appx5762

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 290) ........................................................Appx5900

Transcript of Jury Trial, Dated March 6, 2024
(ECF Doc. No. 334) ........................................................Appx6004

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ........................................................Appx6087

Transcript of Jury Trial, Dated March 7, 2024
(ECF Doc. No. 291) ........................................................Appx6190

Transcript of Jury Trial, Dated March 11, 2024
(ECF Doc. No. 292) ........................................................Appx6324

Transcript of Jury Trial, Dated March 12, 2024
(ECF Doc. No. 293) ........................................................Appx6344

Virtual Asset Analysis Expert Report of Luke Scholl,
Dated December 8, 2022................................................................Appx6400

Expert Report #1 of Elizabeth Bisbee (Nov. 2022).....................Appx6465

Expert Report #2 of Elizabeth Bisbee (Dec. 2022) .....................Appx6493

Expert Report #3 of Elizabeth Bisbee (Jul. 2023).......................Appx6522

CS-Mazars Expert Report - Device Review Summary,
Dated May 5, 2023 ........................................................................Appx6529

CS-Mazars Expert Report - IP Overlap Analysis,
Dated November 9, 2022 ...............................................................Appx6532

CS-Mazars Expert Report - IP Graph Data Excel File..............Appx6539

Criminal Complaint, Dated April 26, 2021 (ECF Doc. No. 1) .............Appx6542

Arrest Warrant, Dated April 26, 2021 (ECF Doc. No. 5).....................Appx6556

Indictment, Filed June 14, 2021 (ECF Doc. No. 8) .............................Appx6557

Superseding Indictment, Filed July 18, 2022 (ECF Doc. No. 43) .......Appx6561

Defendant's Supporting Memorandum of Law,
Dated August 1, 2022 (ECF Doc. No. 46) ...........................................Appx6567

Attachment to Memorandum of Law -
Proposed Order of Hon. Randolph D. Moss Granting Defendant's
Motion to Dismiss (ECF Doc. No. 46-1) ....................................Appx6585

Attachment to Memorandum of Law -
Defendant's Notice of Motion to Dismiss, Dated August 1, 2022
(ECF Doc. No. 46-2) ....................................................................Appx6586

Government's Opposition to Motion, Filed August 29, 2022
(ECF Doc. No. 52) ...............................................................................Appx6589

Defendant's Reply to Government's Opposition to Motion,
Dated September 7, 2022 (ECF Doc. No. 57) ......................................Appx6623

Exhibit A to Defendant's Reply -
Second Declaration of Eric Garland, Dated September 7, 2022
(ECF Doc. No. 57-1) ....................................................................Appx6635

Defendant's Motions in *Limine*, Dated October 24, 2022
(ECF Doc. No. 59) .......................................................................Appx6644

Exhibit A to Motions in *Limine* -
Letter from Tor Ekeland to Christopher B. Brown and
C. Alden Pelker, Dated September 23, 2022, with Exhibit A
(ECF Doc. No. 59-1) ....................................................................Appx6664

Defendant's Opposition to the Government's Motions in *Limine*,
Dated November 7, 2022 (ECF Doc. No. 68) .......................................Appx6680

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated March 6, 2023 (ECF Doc. No. 116) ..........................................Appx6689

Notice of Bill of Particulars for Forfeiture, Filed May 17, 2023
(ECF Doc. No. 119) .....................................................................Appx6709

Defendant's Notice of Intent to Present Expert Testimony,
Dated July 7, 2023 (ECF Doc. No. 145) .............................................Appx6711

Exhibit A to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Francisco Cabanas (ECF Doc. No. 145-1) ...........................Appx6716

Exhibit B to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Dr. Itiel Dror (ECF Doc. No. 145-2) ..........................................Appx6725

Exhibit C to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jeffrey Fischbach (ECF Doc. No. 145-3)....................................Appx6731

Exhibit D to Notice of Intent -
Summary of Qualifications and Expected Testimony for
Jonelle Still (ECF Doc. No. 145-4) .............................................Appx6737

Exhibit E to Notice of Intent -
Summary of Qualifications and Expected Testimony for
J.W. Verret (ECF Doc. No. 145-5)................................................Appx6741

Supplemental Summary of Qualifications and Expected
Testimony for Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 157) ..................................................................Appx6756

Notice of Expert Report for Defense Expert Jonelle Still of
Ciphertrace, Dated August 8, 2023 (ECF Doc. No. 159) .....................Appx6761

Attachment to Notice of Expert Report -
Defense Expert Report of Jonelle Still, Dated August 7, 2023
(ECF Doc. No. 159-1) ...............................................................Appx6764

Exhibit A to Notice of Expert Report -
Data Credibility in Cryptocurrency Investigations of Ciphertrace
(ECF Doc. No. 159-2) ...............................................................Appx6805

Exhibit B to Notice of Expert Report -
Article Titled "Bitcoin: A Peer-to-Peer Electronic Cash System"
(ECF Doc. No. 159-3) ...............................................................Appx6822

Notice of Bill of Particulars, Filed August 28, 2023
(ECF Doc. No. 173) ..................................................................Appx6832

Defense Response to Government's Motion to Admit Certain
Exhibits, Dated September 4, 2023 (ECF Doc. No. 177) .....................Appx6834

Notice of Source Code Expert Bryan Bishop Regarding Independent
Analysis of Chainalysis Reactor Source Code and Request for
Production of Chainalysis Reactor Source Code and Relevant
Related Brady Material, Dated September 5, 2023
(ECF Doc. No. 179) ..................................................................Appx6843

Chainalysis' Notice in Response to the Court's Request Regarding
Protective Order, Dated September 12, 2023
(ECF Doc. No. 195) ..................................................................Appx6860

Exhibit A to Notice in Response -
[Proposed] Heuristic Information Protective Order of
Hon. Randolph D. Moss (ECF Doc. No. 195-1)............................Appx6862

Exhibit B to Notice in Response -
[Proposed] Heuristic Information Protective Order to Jonelle Still
of Hon. Randolph D. Moss (ECF Doc. No. 195-2).......................Appx6869

Heuristic Information Protective Order to Jonelle Still of Hon.
Randolph D. Moss, Dated September 13, 2023 (ECF Doc. No. 196)...Appx6877

Notice Regarding Court's Proposed Protective Order Governing
Review of Chainalysis' Proprietary Information,
Dated September 20, 2023 (ECF Doc. No. 199) ..................................Appx6884

Notice Regarding Ciphertrace Expert Testimony and Review of
Latest Chainalysis Production, Dated September 22, 2023
(ECF Doc. No. 205) ..................................................................Appx6888

Government's Response to September 18, 2023 Minute Order
Regarding Defendant's Access to Sensitive Heuristics Information
Provided by Chainalysis, Filed September 22, 2023
(ECF Doc. No. 206) ..................................................................Appx6892

Defendant's Opposition to Government's Response to
September 18, 2023, Minute Order Regarding Defendant's Access
to Sensitive Heuristics Information Provided by Chainalysis,
Dated September 29, 2023 (ECF Doc. No. 207) ..................................Appx6901

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 4, 2023 (ECF Doc. No. 210) ...................................Appx6912

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated November 30, 2023 (ECF Doc. No. 213) .................................Appx6930

Defendant's Motion to Exclude any Testimony About Deepweb
Marketplaces, Dated February 8, 2024 (ECF Doc. No. 247)..............Appx6942

Attachment to Motion to Exclude -
[Proposed] Order of Hon. Randolph D. Moss
(ECF Doc. No. 247-2) ...............................................................Appx6950

Memorandum Opinion and Order of Hon. Randolph D. Moss,
Dated February 29, 2024 (ECF Doc. No. 259).....................................Appx6951

Final Jury Instructions and Charges, Filed March 7, 2024
(ECF Doc. No. 265) .............................................................................Appx6982

Government's Motion for Preliminary Order of Forfeiture,
Filed June 7, 2024 (ECF Doc. No. 297)................................................Appx7061

      Attachment to Motion for Preliminary Order of Forfeiture -
      Proposed Preliminary Order of Forfeiture Hon.
      Randolph D. Moss (ECF Doc. No. 297-1)...................................Appx7072

Defendant's Opposition to Government's Motion for Preliminary
Order of Forfeiture, Dated June 21, 2021 (ECF Doc. No. 305) ...........Appx7078

      Exhibit A to Defendant's Opposition -
      Article Titled "Chainalysis: Most Mixed Bitcoin Not Used
      For Illicit Purposes", Dated August 26, 2019
      (ECF Doc. No. 305-1) .................................................................Appx7095

      Exhibit B to Defendant's Opposition -
      Blockchain Address Search Result from Blockchain.com
      (ECF Doc. No. 305-2) .................................................................Appx7107

Government's Memorandum in Aid of Sentencing,
Filed August 1, 2024 (ECF Doc. No. 314)............................................Appx7112

Sentencing Memorandum on behalf of Roman Sterlingov,
Dated August 15, 2024 (ECF Doc. No. 321) ........................................Appx7157

Memorandum Opinion of Hon. Randolph D. Moss,
Dated November 4, 2024 (ECF Doc. No. 337) .....................................Appx7194

Defendant's Notice of Appeal, Dated November 19, 2024
(ECF Doc. No. 343) .............................................................................Appx7214

Memorandum for All Department Employees from The Deputy
Attorney General, Subjecting "Ending Regulation by Prosecution",
Dated April 7, 2025..............................................................................Appx7217

**Trial Exhibits:**

Trial Exhibit 601 -
Darknet Market Vendor Transaction Summary
(Document in Evidence and to be Produced Upon Request Due
to Volume) ...................................................................................Appx7221

Trial Exhibit 624................................................................................Appx7222

Trial Exhibit 625................................................................................Appx7223

Trial Exhibit 626................................................................................Appx7224

Trial Exhibit 627................................................................................Appx7225

Trial Exhibit 628(A)...........................................................................Appx7226

Trial Exhibit 628(B)...........................................................................Appx7227

Trial Exhibit 629................................................................................Appx7229

Trial Exhibit 630(A)...........................................................................Appx7230

Trial Exhibit 630(B)...........................................................................Appx7244

Trial Exhibit 631................................................................................Appx7247

Trial Exhibit 632................................................................................Appx7248

Trial Exhibit 633................................................................................Appx7252

Defense Exhibit 138 -
The-Message-Game, Written by Ice White .........................................Appx7253

Defense Exhibit 139 -
Extracted Page from The-Message-Game, Written by Ice White ......Appx7413

Government Exhibit 721 and Defense Exhibit 143 -
Boox Chat ..........................................................................................Appx7414

Exhibit B to Fischbach Declaration -
Declaration of Jeffrey M. Fischbach, for Defendant, Dated August 14, 2024,
with Attachment
(ECF Doc. No. 321-2) ...............................................................Appx7415

conducted from the District of Columbia, thus rendering venue proper under Rule 18 and 18 U.S.C. § 3237(a).

### 3. The Defendant's Failure To Obtain a License from DISB or Register with FinCEN Are Omissions that Support Venue in the District of Columbia

The first two prongs of Count Three charge the defendant with operating a money transmitting business without an appropriate money transmitting license in the District of Columbia, in violation of 18 U.S.C. § 1960(b)(1)(A); and operating a money transmitting business without registering as a money transmitting business under federal regulation, in violation of 18 U.S.C. § 1960(b)(1)(B). *See* ECF No. 43, at 4. Count Four charges the defendant with engaging in the business of money transmission without obtaining an appropriate license in the District of Columbia, in violation of the D.C. Money Transmitters Act (MTA), D.C. Code § 26-1023(c). *Id.* at 4-5. For both Counts Three and Four, the appropriate licensing and registration authorities are located in the District of Columbia—namely, the D.C. Department of Insurance, Securities, and Banking (DISB) and the Financial Crimes Enforcement Network (FinCEN).

### i. DISB and FinCEN Are Located in the District of Columbia

Pursuant to D.C. Code § 26-551.03, licensing authority for money transmitters under the MTA is held by the Commissioner of the Department of Insurance, Securities, and Banking. *See also United States v. Harmon*, 514 F. Supp. 3d 47, 49 (D.D.C. 2020) (noting that DISB is "the local MTA licensing authority"). DISB is a government agency of the District of Columbia located in Washington, D.C.

Federal registration of money transmitting businesses is regulated by the Bank Secrecy Act (BSA), 31 U.S.C. § 5311, *et seq.* Regulations promulgated under 31 U.S.C. § 5330 require registration with the FinCEN, an agency within the U.S. Department of Treasury. 31 C.F.R. § 1022.380(a)(1). FinCEN and the Treasury Department are based in Washington, D.C.

**ii. The Defendant's Omissions Support Venue in the District of Columbia**

"Venue in cases involving a failure to make required filing is typically in the district in which that failure occurred." *United States v. Montgomery*, 441 F. Supp. 2d 58, 61 (D.D.C. 2006) (finding venue proper in District of Columbia where defendant engaged in prohibited export activity without requisite permission from the Department of Commerce, located in Washington, D.C.); *see also Johnston v. United States*, 351 U.S. 215, 221 (1956) ("[W]here the crime charged is a failure to do a legally required act, the place fixed for its performance fixes the situs of the crime"); *United States v. DiJames*, 731 F.2d 758, 762 (11th Cir. 1984) (finding venue proper in the District of Columbia for a charge of failure to file a report with the Secretary of Labor, because "he is located in the District of Columbia").

Judge Contreras considered and affirmed the question of venue based on a failure to register with the Department of Treasury in *United States v. Hassanshahi*, 185 F. Supp. 3d 55, 58 (D.D.C. 2016). The defendant in *Hassanshahi* was charged with violations of the International Emergency Economic Powers Act (IEEPA) for conspiring to export goods and technology from Canada to Iran. *Id.* at 55-56. The defendant was not alleged to have ever set foot in the District of Columbia or to have conducted any activity in the District of Columbia. However, the defendant's business—if he had conducted it lawfully—would have required a license issued by the Office of Foreign Assets Control (OFAC), FinCEN's sister agency in the U.S. Department of Treasury. *See id.* at 57. Judge Contreras held the defendant's failure to obtain a license from OFAC was sufficient to venue the criminal case in the District of Columbia. "Although Mr. Hassanshahi's failure to secure a license is admittedly only a part of the criminal offense with which he has been charged, it is a critical one." *Id.* at 57. He further explained that while OFAC license applications could be submitted online from anywhere in the world, "any application must

14

be sent to, received by, and then approved by the Department of the Treasury," and "[t]herefore the place of *performance* of the request—regardless of from where that request is sent— remains the District of Columbia." *Id.* (emphasis in original).

*Hassanshahi* was not the first case to find venue in the District of Columbia for failure to obtain a license from the Department of Treasury. *United States v. Quinn*, 401 F. Supp. 2d 80 (D.D.C. 2005), similarly involved a defendant who failed to secure necessary licenses from OFAC. In *Quinn*, Judge Bates recognized that venue was proper in the District of Columbia because "the alleged omissions that are part of the crimes charged (namely the failure to secure licenses for exports to Iran from OFAC)," *id.* at 87, occurred in the District of Columbia. *See also, e.g., Montgomery*, 441 F. Supp. 2d at 60-61 (concluding that venue was proper in the District of Columbia where the defendant was charged with exporting arms and other items in violation of a Department of Commerce Office of Export Administration denial order, because the defendant's "failure to ask for authorization to export . . . occurred in the District of Columbia").

The same venue theory was confirmed by then-Judge Ketanji Brown Jackson in a civil forfeiture proceeding, *United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, 324 F. Supp. 3d 38 (D.D.C. 2018), in adopting a Report and Recommendation by Magistrate Judge Harvey that approved the forfeiture of funds involved in a North Korean money laundering scheme. *Id.* at 42. As Judge Harvey explained: "[T]he Defendant Funds are subject to forfeiture because the interested parties failed to procure licenses from OFAC, which is located in Washington, D.C. . . . Each payment involving the defendant properties required a license from OFAC . . . Yet for each payment, Minzheng failed to obtain the requisite license. That omission is sufficient to support venue [for forfeiture] in this district." *Id.* at 46 (cleaned up).

15

**Appx6603**

These decisions accord with longstanding Supreme Court precedent, which has noted the appropriateness of venue in the District of Columbia in a variety of contexts where defendants failed to file required paperwork with a federal agency or official. *See Travis v. United States*, 364 U.S. 631 (1961) (venue for prosecution for false affidavits filed with the National Labor Relations Board was proper in the District of Columbia, where the Board was located); *Rumely v. McCarthy*, 250 U.S. 283 (1919) (venue for failure to file report with the Alien Property Custodian was proper in the District of Columbia, where the Custodian was located); *United States v. Lombardo*, 241 U.S. 73 (1916) (venue for prosecution for failure to file a statement with federal Commissioner General of Immigration was proper in District of Columbia, where the office of the Commissioner of Immigration was located).

Even the Third Circuit in *Aurnheimer* confirmed that an omission may be sufficient for venue so long as "a preexisting legal duty requires the act that the defendant failed to do," such as failing to report to a military draft board, failing to report to prison after being sentenced, or failure to file income tax returns. 748 F.3d at 538 (collecting cases). Similarly, here, the D.C. Money Transmitters Act and the BSA both impose preexisting legal duties for money transmitting businesses such as Bitcoin Fog to obtain a license from DISB and register with FinCEN.

The government's theory of venue falls squarely within this long line of cases, which establish that the defendant's omissions—his failure to obtain the necessary licensure and registration from agencies in the District of Columbia—are sufficient to support venue for the first two prongs of Count Three and for Count Four.

#### 4. The Defendant's Failure To Register with FinCEN Is Also an Act in Furtherance of the Money Laundering Conspiracy

The defendant's failure to register with FinCEN is also an act or omission in furtherance of the charged money laundering conspiracy. The defendant promoted Bitcoin Fog as an

16

**Appx6604**

alternative to "legitimate" businesses that "comply with anti-money laundering laws" and cooperate with "the authorities." *See* ECF No. 19, at 5. For example, in a post to the popular Bitcoin forum BitcoinTalk dated on or about March 9, 2014, the defendant's alter ego, "Akemashite Omedetou," responded to a comment from a poster asking about the "Shared Coin" feature offered by a mainstream wallet hosting provider, Blockchain.info. Akemashite Omedetou contrasted "Shared Coin" with his service, Bitcoin Fog, by suggesting that Bitcoin Fog was designed for "washing" bitcoins and noting, negatively, that Blockchain.info would cooperate with authorities: "Blockchain is a public company and is required by law to comply with anti- money laundering laws, as well as revealing user information and logs, should the law require that." *Id.* In another BitcoinTalk posting dated on or about February 9, 2012, Akemashite Omedetou responded to a comment from a poster about using mainstream Bitcoin exchanges to mix virtual currency. Akemashite stated: "most of them [exchanges] are also run as legitimate, visible businesses, which will be forced to reveal information about your funds, should such a request be made by the authorities...us on the other hand, the authorities have to find first, which, as Silk Road[5] have [*sic*] demonstrated, can prove problematic." ECF No. 1-1 at 2.

The success of the defendant's money laundering conspiracy hinged on his ability to remain undetected by "the authorities." Eschewing the U.S. anti-money laundering laws was integral to the conspiracy. The defendant's decision not to register with FinCEN or comply with the related regulatory requirements under the Bank Secrecy Act (BSA)—such as verifying his customers' identities, monitoring for suspicious  transactions, and filing Suspicious Activity Reports (SARs), as required by the BSA, *see* Bank Secrecy Act Regulations; Definitions and Other

---

[5] At the time of the post, Silk Road was still operating as the largest darknet marketplace, openly peddling large volumes of illegal narcotics and other criminal goods and services. The site was seized by law enforcement and its administrator was arrested in 2013.

17

Appx6605

Regulations Relating to Money Services Businesses, 76 Fed. Reg. 43585, 43592 (July 21, 2011)—is what made Bitcoin Fog such a successful criminal enterprise.

### 5.   The Defendant's Counterarguments Lack Merit

The defendant provides few legal authorities to support his venue challenge (at 9-12), and attempts to cover up the paucity of his arguments with rhetoric about 1776 and the mysteries of the Internet. Indeed, the defendant seems to suggest that the very concept of venue cannot exist in cyberspace. *See* ECF No. 46 at 5 ("Assuming one can even properly speak in terms of physical world locations when it comes to cyberspace."); ("[T]o talk of [the blockchain's] location is to use a physical analogy and not an expression of empirical reality.") ("Kansas has been digitized, decentralized, and distributed"). That suggestion is unmoored from any legal authority, and the defendant fails to explain why crimes committed over the Internet should have no legal venue.

To the extent the defendant offers any specific reason to doubt venue in the District of Columbia, it seems to be (at 11) that there are "no specific allegations of Mr. Sterlingov's presence or conduct in D.C." As outlined above, however, none of the government's venue theories relies on the defendant's physical presence, let alone residence, in the District of Columbia. *See generally Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 245 (1964) (rejecting as "erroneous" the argument "that criminal defendants have a constitutionally based right to a trial in their home districts"). Instead, they rely on the undercover transactions in the District of Columbia and the defendant's omissions—his failure to obtain D.C. licensure or federal registration—in the District of Columbia.

Appx6606

The defendant also argues (at 11-12) that the money laundering statute's specific venue provision, 18 U.S.C. § 1956(i), is "unconstitutional as applied."[6] The defendant's argument—to the extent it can be discerned—appears to be a hand-waving argument about computers and the Internet, presented without any case law or legal authority. But courts have encountered few difficulties applying traditional criminal statutes and legal concepts to crimes involving virtual currencies. *See, e.g.*, *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014) (holding that bitcoin qualified as "money" or "funds" under § 1960 and that the defendant's activities in connection with the Silk Road darknet market made him a "money transmitter"); *United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020) (holding that bitcoin qualified as "money" under D.C. Money Transmitters Act, and that bitcoin mixing service Helix was an unlicensed money transmitting business under § 1960, explaining that Helix "transmit[tted] to a new location on the blockchain hosted by a different entity, just as a traditional money transmitter's acceptance of funds from one bank account to send to another bank account is transmission to a new location").

Nor is there any reason to believe that the specific venue provision at issue here, § 1956(i), is unconstitutional as applied. The Supreme Court considered it at length in *Whitfield v. United States*, 543 U.S. 209 (2005), without indicating any doubts as to its constitutionality. Indeed, it is well-established that Congress has the power to define by statute "where it considered the place of committing the crime to be" by enacting "an express venue provision," just as it can define any other element of a crime. *Rodriguez-Moreno*, 526 U.S. at 279 n.1 (internal quotations and alteration omitted); *see also United States v. Pendleton*, 658 F.3d 299, 303 (3d Cir. 2011) ("Congress may fix jurisdiction in any district where a 'crucial element' of the crime is

---

[6] The defendant also sweeps the extraterritoriality clause, 18 U.S.C. § 1956(f), into his vague constitutional challenge, but § 1956(f) goes to the scope of the substantive offense, not venue, and it is not necessary for the government's theory of venue in this case.

19

performed."). The defendant provides no reason for this Court to disregard the "express venue provision," *Rodriguez-Moreno*, 526 U.S. at 279 n.1, contained in § 1956(i). The defendant's vague and unsupported constitutional argument should be rejected.

## C. Trials are Constitutional in the District of Columbia

The defense argues (at 12) that any criminal trial in the District of Columbia violates the Sixth Amendment, because the District of Columbia is not a state. The defendant does not cite a single case or provide any supporting legal authority, nor does he elaborate on his argument beyond the bare reliance on the word "state" in the Sixth Amendment's vicinage clause. Yet his argument, if true, would sweep away more than two centuries of continuous judicial practice and nullify venue for *any* criminal prosecution in this District. This is a gross misreading of the Sixth Amendment's text and purpose as applied to the District of Columbia.

### 1. The District of Columbia Is a "State" For Purposes of the Sixth Amendment

First, the District of Columbia should be considered a state for purposes of the Sixth Amendment. The Supreme Court has described the District of Columbia as "'an exceptional community . . . established under the Constitution as the seat of the National Government,'" which is in many respects "*sui generis* in our government structure." *District of Columbia v. Carter*, 409 U.S. 418, 420 (1973) (quoting *District of Columbia v. Murphy*, 314 U.S. 441, 452 (1941)). As the Court further explained:

> Whether the District of Columbia constitutes a State or Territory within the meaning of any particular statutory or constitutional provision depends upon the character and aim of the specific provision involved. Indeed, such words generally have different shades of meaning, and are to be construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at, not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed.

20

**Appx6608**

*Carter*, 409 U.S. at 420 (internal quotations omitted). Indeed, in *District of Columbia v. Heller*, 554 U.S. 570, 597 (2008), the Court specifically rejected a variation of the argument now advanced by the defendant: that the use of the word "state" in the Second Amendment made it inapplicable to the District of Columbia. *See id.* at 597. To the contrary, the Supreme Court explained that "the word 'state' did not have a single meaning in the Constitution," and construed the text of the Amendment in light of its broader history and purposes. *Id.* Similarly, in his 1833 Commentaries on the Constitution, Joseph Story observed that, "the word 'state' is used in various senses [and in] its most enlarged sense it means the people composing a particular nation or community." 1 Story § 208 (cited in *Heller*, 554 U.S. at 597).

Consistent with this broad understanding, the Supreme Court has found that the Sixth Amendment jury right applies on its own terms to the District of Columbia. *See, e.g., Capital Traction Co. v. Hof*, 174 U.S. 1, 5 (1899) ("It is beyond doubt at the present day that the provisions of the Constitution of the United States securing the right of trial by jury, whether in civil or in criminal cases, are applicable to the District of Columbia."). In *Callan v. Wilson*, 127 U.S. 540 (1888), the Court relied in part on the Sixth Amendment to overturn a criminal conviction obtained without a jury trial in a "police court" of the District of Columbia. Writing for the Court, Justice Harlan rejected the argument that the Sixth Amendment applied only to "trial by jury in the states, and nowhere else"—a "position," he stated, that "cannot be sustained without violence to the letter and the spirit of the constitution." *Id.* at 548. Instead, "it was taken for granted that the sixth amendment of the constitution secured to the people of the territories the right of trial by jury in criminal prosecutions," and, he reasoned, "[w]e cannot think that the people of this District have, in that regard, less rights than those accorded to the people of the territories of the United States." *Id.* at 550 (citing *Reynolds v. United States*, 98 U.S. 145 (1878)).

This understanding is consistent with the long and continuous practice of criminal prosecutions in the District of Columbia. *See Ruthenberg v. United States*, 245 U.S. 480, 482 (1918) (relying on "continuous legislative and judicial practice from the beginning" to construe meaning of the Sixth Amendment vicinage clause). When the Sixth Congress enacted the Organic Act of 1801 to provide for the government of the District of Columbia, *see* 2 Stat. 103, ch. 15, it established the first "circuit court of the district of Columbia," and endowed it with jurisdiction over, *inter alia*, "all crimes and offences committed within said district," *id.* §§ 3, 5.[7] The circuit court absorbed existing courts in Alexandria, Virginia and Georgetown, Maryland, whose cases were "continued over" into the new federal court. *Id.* § 14. The Organic Act further provided for the appointment of a United States Attorney as well as a Marshal, who would "have the custody of the gaols" in the District of Columbia "and be accountable for the safe keeping of all prisoners legally committed therein." *Id.* §§ 6, 9. The following year, the Judiciary Act of 1802 established the position of "chief judge of the district of Columbia" to sit on the district court for the District of Columbia, and provided that the district court would exercise "the same powers and jurisdiction which are by law vested in the district courts of the United States." 2 Stat. 156, ch. 31, § 24.[8]

If the defense theory were correct, and the Sixth Amendment operated to limit venue for criminal trials to the "states," then the creation of the District of Columbia in 1801 would have immediately divested the courts within its borders of any power to try criminal cases. This is, of

---

[7] The Judiciary Act of 1801, enacted earlier in the same year, had established a new federal district court for the "district of Potomac" to be seated in Alexandria, Virginia. *See* 2 Sta. 89, ch. 4.

[8] See generally D.C. Circuit Historical Society, *The History of the Courts of the D.C. Circuit*, *available at* https://dcchs.org/wp-content/uploads/2018/12/1_History-ilovepdf-compressed-1.pdf (explaining that "Congress has repeatedly reorganized the D.C. courts, reallocating jurisdiction for federal and local matters between the various courts, sometimes unifying the courts, sometimes dividing them").

Appx6610

course, the opposite of how the early Congresses actually treated the question of criminal venue in the District of Columbia when they created a federal court system to operate within the District and explicitly gave it jurisdiction over "all crimes and offences committed within said district." Such early congressional enactments—roughly a decade after the Bill of Rights was ratified in 1791—are especially relevant to understanding the meaning of the Sixth Amendment as it applied in the District of Columbia. *See Heller*, 554 U.S. at 605 (relying on "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification," characterizing these as a "critical tool of constitutional interpretation" in construing Second Amendment); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127-28 (2022) (same). This early history—to say nothing of the two centuries of continuous judicial practice that followed—conclusively refutes the defendant's novel argument.

### 2.   The Defendant's Counterarguments Misunderstand the Sixth Amendment Vicinage Clause

The defendant's argument appears to arise from a fundamental misunderstanding of the purpose and history of the Sixth Amendment's vicinage clause. As this history shows, the vicinage clause was not concerned with reserving to the "states" the authority to try criminal cases, but with preserving a specific common-law right to have a jury pool drawn from a particular geographic area. *See United States v. Grisham*, 63 F.3d 1074, 1079 (11th Cir. 1995) ("At common law, a criminal defendant was entitled to a jury drawn from the locality of the crime, usually an English county. In considering amendments to the Constitution, Congress debated whether to provide a guarantee to federal criminal defendants regarding vicinage. . . . The text of the Sixth Amendment represents a compromise: a constraint on the source of the jury was constitutionalized, but the size of the vicinage was left to Congressional determination.").

23

**Appx6611**

During the efforts to ratify the U.S. Constitution in the State Ratifying Conventions in 1788, several influential figures raised concerns at the absence of a constitutional requirement that juries be fielded from the vicinity of the trial venue. *See, e.g.,* Patrick Henry, Speech Before the Virginia Ratifying Convention (June 14, 1788), *available at* https://archive.csac.history.wisc.edu/Patrick_Henry_Speech_in_the_Virginia_Convention(2).pdf ("Under this extensive provision . . . Persons accused may be carried from one extremity of the State to another, and be tried not by an impartial jury of the vicinage"). To address these concerns, James Madison introduced what would become the Sixth Amendment. The original text that Madison introduced in the House provided: "The trial of all crimes . . . shall be by an impartial jury of freeholders of the vicinage, with the requisite of unanimity for conviction, of the right of challenge, and other accustomed requisites. . . ." 1 Annals of Cong. 435 (1789). However, this vicinage requirement was viewed as too restrictive by the Senate. Madison observed:

> [The Senate is] equally inflexible in opposing a definition of the *locality* of Juries. The vicinage they contend is either too vague or too strict a term, too vague if depending on limits to be fixed by the pleasure of the law, too strict if limited to the County. It was proposed to insert after the word juries—"with the accustomed requisites"—leaving the definition to be construed according to the judgment of professional men. Even this could not be obtained. The truth is that in most of the States the practice is different, and hence the irreconcilable difference of ideas on the subject. In some States, jurors are drawn from the whole body of the community indiscrim[in]ately; In others, from large districts comprehending a number of Counties; and in a few only from a single County.

Letter from James Madison to Edmund Pendleton, Sept. 23, 1789, *available at* https://founders.archives.gov/documents/Madison/01-12-02-0268. The Madison letters are significant in that they reveal that the Senate was concerned about being too restrictive in the localities from which a jury could be sourced, and made changes intended to *broaden* the Constitutionally permissible vicinage beyond what Madison had proposed. Ultimately, the Senate passed the final version of the Sixth Amendment, which states: "In all criminal prosecutions, the

24

Appx6612

accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." U.S. Const. amend. VI.

### 3. Article III, Section 2 Provides an Independent Authorization for Jury Trials in the District of Columbia

In the alternative, even if the Sixth Amendment were held not to apply because the District of Columbia is not a "state," that would not render venue in the District of Columbia unconstitutional. That is because Article III, section 2 of the Constitution authorizes Congress to specify the venue for crimes not committed within any "State":

> The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but *when not committed within any State,* the Trial shall be *at such Place or Places as the Congress may by Law have directed.*

U.S. Const. Art. III § 2 cl. 3 (emphasis added). The relevant venue statutes here, Rule 18, 18 U.S.C. § 3237(a), and 18 U.S.C. § 1956(i), speak in terms of the "district," not state, where the offense was begun, continued, or completed. This would encompass the judicial district for the District of Columbia.

The Supreme Court invoked Article III, section 2 in early cases involving crimes occurring in U.S. territories or annexed Native American lands. In doing so, the Supreme Court explained: "The only regulation in the Constitution, as it respects crimes committed out of the limits of a State, is to be found in the 3d art., sec. 2, of the Constitution." *United States v. Dawson,* 56 U.S. 467, 487 (1854); *see also United States v. Dawson,* 56 U.S. 467, 488 (1854) ("A crime, therefore, committed against the laws of the United States, out of the limits of a State . . . may be tried at such place as Congress shall designate by law."); *Cook v. United States,* 138 U.S. 157, 181-82 (1891) ("The Sixth Amendment added the further guaranty, in respect to the place of trial, that the district should have been previously ascertained by law, leaving the trial of offences not committed

25

within any State, to be controlled by the second section of article three."). Although it would hardly seem apposite to compare the seat of the federal government to unincorporated territories of the United States, such precedents would support venue under Article III, section 2 in the event this Court were to decide that the Sixth Amendment does not apply in the District of Columbia.

### D. Count One of the Superseding Indictment Sufficiently Pleads Conspiracy

The defendant challenges (at 12-13) the sufficiency of Count One of the Superseding Indictment, which charges Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h). As the D.C. Circuit has explained, "[t]o be sufficient under the Constitution, an indictment 'need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense.'" *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018) (quoting *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014)). "'[I]t is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Id.* at 130.

Here, Count One of the Superseding Indictment sets forth the conspiracy offense and the predicate offenses that constitute the objects of the conspiracy in language that mirrors the legal and statutory elements. *See* ECF No. 43 (alleging that defendant and co-conspirators "did knowingly and willfully combine, conspire, confederate and agree to commit" violations of the money laundering statute, 18 U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i)). The indictment contains a plain and concise statement of *who* was involved in the conspiracy (the defendant Roman Sterlingov, "co-conspirators known and unknown," and "darknet vendors and darknet market administrative teams"); *when* the conspiracy occurred ("[f]rom on or about October 27, 2011, and

26

continuing until at least on or about April 27, 2021"); *where* the conspiracy reached ("in the District of Columbia and elsewhere"); and *how* the conspiracy operated ("through the operation of BITCOIN FOG"). Indeed, language of Count One answers many of the questions raised by the defendant—including the scope of the conspiracy; particularity as to the time, place, and manner of the conspiracy; and the illegal objects of the conspiracy. Under *Williamson* and related authorities, this is more than sufficient to inform the defendant of the precise offense with which he is charged and to allow him to prepare a defense. The defendant's challenge should be rejected.

### E.  The Indictment Is Legally and Factually Sufficient

The defendant further argues (at 13) that the entire Superseding Indictment is "insufficient as a matter of law and fact," but it is difficult to understand the basis for this sweeping claim. The defendant cites no legal authority to support it, and, to the extent he articulates any reasoning at all, it seems to be a vague normative claim that more detail must be needed because this case involves computers. *See* ECF No. 46, at 13 (arguing that the indictment is insufficient because this is "a complex, novel computer law case . . . that deals with revolutionary information technologies and where almost all the evidence is electronic"). The defendant's premise is hardly accurate—this is a money laundering case, not a "computer law" case, and virtually any complex criminal case in 2022 involves electronic evidence—and he offers no legal support for his contention that Rule 7(c) changes depending on how much technology is involved in the case.

To the contrary, as the D.C. Circuit has made clear: the indictment "need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense." *Williamson*, 903 F.3d at 130. As explained more fully in the government's opposition to the motion for a bill of particulars, the Superseding Indictment generally tracks the relevant statutory language, provides basic factual

27

details, and sufficiently puts the defendant on notice of the charges against him and allows him to prepare a defense.[9] Nothing further is needed.

### F. The Defendant's Unexplained "Due Process" Objections Are Meritless

The defendant asserts (at 13) that "all the counts in the Indictment are void" under the Fifth Amendment due process clause, including "constitutional notice, vagueness, ambiguity, and overbreadth grounds." The defendant does not explain his reasoning or provide any specific points of law or authorities in support of this sweeping, conclusory assertion—and he has waived his opportunity to do so on reply, *see N.Y. Rehabilitation Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (arguments raised for the first time on reply are waived "in order to prevent the 'sandbagging' of another party"). Indeed, the defendant appears to be trying to raise several related but distinct constitutional doctrines under the Fifth Amendment, each with its own legal test and body of case law, *see, e.g., United States v. Lanier*, 520 U.S. 259, 266 (1997) (distinguishing between vagueness, lenity, and retroactivity).[10] The defendant ignores this complexity, and instead asks the Court to overturn the grand jury's indictment based on nothing more than invocation of legal buzzwords.

In general, a defendant raising one of these doctrines would point to particular statutory word or phrase and explain why he believes it to be vague, ambiguous, or otherwise deficient as

---

[9] In a footnote, the defendant argues (at 13 n.17) that the D.C. Money Transmitters Act violation charged in Count Four is an "unconstitutional strict liability criminal statute," but the general rule of construction is that "where a statute does not specify a heightened mental element such as specific intent, general intent is presumed to be the required element," *United States v. Brown*, 915 F.2d 219, 225 (6th Cir. 1990); *cf. United States v. E-Gold*, 550 F. Supp. 2d 82, 98 (D.D.C. 2008) ("Section 1960 sets forth a general intent crime.").

[10] Overbreadth is yet another distinct doctrine, which arises from the First Amendment and not the Fifth Amendment, and it also has its own set of legal standards—none of which the defendant addresses. *See United States v. Williams*, 553 U.S. 285, 304 (2008) (distinguishing between vagueness under Fifth Amendment and overbreadth under First Amendment).

28

applied. Without knowing the defendant's actual argument, it is impossible to respond. Suffice it to note, however, that digital currency prosecutions are neither unusual nor novel, and courts in this District have consistently rejected due process objections in similar cases since as early as 2008. *See, e.g., United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008) (rejecting vagueness, lenity, and novel construction challenges to prosecution involving the digital currency company e-Gold under 18 U.S.C. § 1960 and Bank Secrecy Act); *United States v. Harmon*, 2021 WL 1518344 (D.D.C. Apr. 16, 2021) (rejecting vagueness challenge to prosecution of involving the bitcoin mixer Helix under 18 U.S.C. § 1960, Bank Secrecy Act, and D.C. Money Transmitters Act). The Court should disregard the defendant's conclusory and unexplained "due process" claim.

### G. The Statute of Limitations Has Not Run on Any of the Continuing Offenses or the 2019 Undercover Transaction Charged in the Superseding Indictment

The defendant argues (at 14-16) that the statute of limitations has run on all four counts. Not so. Counts One, Three, and Four each allege a continuing course of conduct for the duration of Bitcoin Fog's operational lifespan—from the site's public launch on or about October 27, 2011 through the date of the defendant's arrest on April 27, 2021.[11] Meanwhile, Count Two arises from a specific money laundering transaction that was executed on or about November 21, 2019. The original Indictment (June 14, 2021) and Superseding Indictment (July 18, 2022) were plainly returned within the applicable five- and six-year limitations periods.[12]

---

[11] The Tor site for Bitcoin Fog went down following the defendant's arrest and is currently inaccessible.

[12] The government agrees that the applicable limitations periods are five years for each of the federal offenses, pursuant to 18 U.S.C. § 3282, and six years for the D.C. Code offense alleged in Count Four, pursuant to D.C. Code § 23-113(a)(4).

29

Appx6617

**1. Counts One, Three, and Four Charge Continuing Offenses Within the Statute of Limitations**

The money laundering conspiracy and illegal money transmitting business offenses alleged in Counts One, Three, and Four are all continuing offenses. *See Monaco*, 194 F.3d at 386 (characterizing "conspiracy to commit money laundering" as a "continuing offense"); *United States v. McGoff*, 831 F.2d 1071, 1078 (D.C. Cir. 1987) ("The classic example of a continuing offense is conspiracy."); *United States v. Elfgeeh*, 2004 WL 3767299, at *9 (E.D.N.Y. Apr. 13, 2004) (characterizing violations of 18 U.S.C. § 1960 as "continuing offenses"). As the D.C. Circuit explained in *McGoff*, the concept of a "continuing offense" refers to "an unlawful course of conduct that does perdure." 831 F.2d at 1078; *see also United States v. Midstate Horticultural Co.*, 306 U.S. 161, 166 (1939) ("A continuing offense is a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy."). "The other feature displayed by continuing offenses is that the harm done to society through their commission necessarily continues on for as long as the crime is ongoing." *United States v. Morales*, 11 F.3d 915, 921 (9th Cir. 1993) (O'Scannlain, J., concurring in part and dissenting in part).

It is a matter of black-letter law that "the statute of limitations as to prosecutions for continuing offenses runs from the last day of the continuing offense." *McGoff*, 831 F.3d at 1079.[13] Here, Bitcoin Fog operated on an ongoing basis from 2011 up until at least the date of the defendant's arrest on April 27, 2021. Thus, for the conspiracy alleged in Count One and the continuing operation of an illegal money transmitting business alleged in Counts Three and Four,

---

[13] The same rule applies to the D.C. offense alleged under Count Four. As set forth under D.C. Code, "[a]n offense is committed either when every element occurs, or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct, or the defendant's complicity therein, is terminated." D.C. Code § 23-113(b). Accordingly, "[t]ime starts to run on the day after the offense is committed or completed." *Id.*

Appx6618

the statute of limitations only began to run when the defendant's participation in the offense ceased—when he was arrested in 2021.

To the extent the defendant intends to argue that he withdrew from the conspiracy more than five years before his indictment, the Supreme Court has made clear that withdrawal is an affirmative defense on which the defense bears the burden of proof. "Commission of the crime within the statute-of-limitations period is not an element of the conspiracy offense. The Government need not allege the time of the offense in the indictment . . . and it is up to the defendant to raise the limitations defense." *Smith v. United States*, 568 U.S. 106, 112 (2013) (internal citations omitted). Indeed, a defendant's responsibility for a conspiracy "endures even if he is entirely *inactive* after joining it." *Id.* at 114 (emphasis in original). "To withdraw from a conspiracy, an individual must come clean to the authorities or communicate his or her abandonment in a manner reasonably calculated to reach co-conspirators." *United States v. Bostick*, 791 F.3d 127, 143 (D.C. Cir. 2015) (internal citations omitted); *see also United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000) ("[M]ere cessation of activity is not enough to start the running of the statute . . . .") (internal citations omitted). The defendant has not proffered any evidence to show withdrawal from the Bitcoin Fog conspiracy. And it would be improper to dismiss an indictment based on an affirmative defense on which the defendant bears the burden of proof at trial. *See, e.g., United States v. Hoskins*, 73 F. Supp. 3d 154 (D. Conn. 2014) (denying motion to dismiss conspiracy indictment on withdrawal and statute of limitations grounds, explaining that, "[w]here a defendant asserts an affirmative defense that is not plain from the face of the indictment and that he or she bears the burden of proving, there must usually be a factual determination of the merits of the charged offense, which must be made at trial by the jury in the first instance").

31

**2. Count Two Charges an Offense Arising from a 2019 Undercover Transaction Within the Statute of Limitations**

The defendant also argues (at 15) that the statute of limitations has run on the sting money laundering offense alleged in Count Two. As the Superseding Indictment makes clear, that offense arises from a transaction executed on November 21, 2019. ECF No. 43, at 3; *see also* ECF No. 1-1, at 6 (describing circumstances of "sting" money laundering transaction sent by Bitcoin Fog to an undercover wallet). The defendant claims (at 15) the indictment should have alleged "where Mr. Sterlingov was or what he was doing" at the time of the transaction, but this is an argument about the merits, not an argument that the statute of limitations for the 2019 transaction had expired before the original indictment in 2021.

**H. The Defendant's Underdeveloped First Amendment Argument Is Meritless**

Finally, the defendant suggests (at 16) that the Superseding Indictment suffers from some defect under the First Amendment, but the exact nature of the defendant's claim remains a mystery (and he cannot use his reply to supply the necessary explanation). The defendant appears to be suggesting that crimes committed online are constitutionally protected because they are "based on electronic digital information exchanged between networked computers," but this argument, if true, would sweep away all manner of criminal liability involving "information traveling the internet" on First Amendment grounds, including fraud, theft (*e.g.*, theft of cryptocurrencies), drug trafficking, child pornography, criminal copyright infringement, and so forth. There is no legal basis for this absurd outcome.

The fact that the defendant operated a money laundering and money transmitting business that transacted in electronic cryptocurrency, as opposed to fiat currency, is irrelevant. *See, e.g.*, *Harmon*, 474 F. Supp. 3d at 99-109 (applying 18 U.S.C. § 1960 and Bank Secrecy Act to bitcoin

32

**Appx6620**

mixer).  Neither of the defendant's inapposite authorities says anything remotely to the contrary.[14]

The defendant's vague invocation of computers and the Internet to conjure up a First Amendment

claim should be rejected.

## CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss the Superseding Indictment

should be denied.

---

[14] *Sandvig v. Barr*, 451 F. Supp. 3d 73 (D.D.C. 2020), concerned a pre-enforcement challenge to the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, brought by two researchers who were planning to test whether employment websites discriminated on the basis of race and gender by submitting fake employment applications, in arguable violation of the websites' terms of service. *Id.* at 76.  The defendant, however, misunderstands the nature of the First Amendment interest at stake in *Sandvig*.  The conduct for which the researchers claimed First Amendment protection was their "research," not the mere sending of signals over the Internet.  *See id.* at 80-81.  The defendant does not identify any comparable research or similar conduct in operating Bitcoin Fog that he could characterize as constitutionally protected "speech."  Meanwhile, *Elonis v. United States*, 575 U.S. 723 (2015), is even farther afield.  *Elonis* addressed the mens rea requirement to convict a defendant of transmitting threats in interstate commerce; it did not suggest that the mere fact that a threat was transmitted over the Internet, by itself, transforms otherwise unprotected conduct into First Amendment speech.  *Id.* at 726.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:   */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
C. Alden Pelker, Maryland Bar
Trial Attorney, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007
Catherine.Pelker@usdoj.gov

**Appx6622**

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        *Plaintiff,*

        v.

ROMAN STERLINGOV,

        *Defendant.*

**21-CR-399 (RDM)**

**Defendant's Reply to Government's Opposition to Defendant's Motion to Dismiss**

# Table of Contents

*Introduction*................................................................................................*3*

*Argument*..................................................................................................*3*

*I.     Venue is Unconstitutional* .................................................................*4*

   A.     There is No Essential Conduct in this District .........................................5

   B.     Venue for any Federal Criminal Trial is Unconstitutional in D.C. ..........6

*II.     The Indictment Violates Due Process* ................................................*7*

*III.  The Statute of Limitations on all Counts has Run* ..............................*8*

*IV.     The First Amendment Applies to Defendant's Speech and Internet Access* ... *9*

*Conclusion*................................................................................................*9*

## Table of Authorities

**Cases**

*Taylor v. United States*, 579 U.S. 301 (2016) .............................................................................7

*Timbs v. Indiana*, 139 S. Ct. 682 (2019) .................................................................................7

*United States v. Auernheimer*, 748 F. 3d 525 (3d Cir. 2014) .............................................4, 5, 6

## Introduction

Nothing happened in the District of Columbia that justifies venue in this District. In its Opposition, the Government retreads venue arguments it lost in *United States v. Andrew Auernheimer*. Just like nothing happened in New Jersey that justified venue in *Auernheimer*, nothing happened in D.C. that justifies venue here. No crime occurred in the District of Columbia. There is no allegation Mr. Sterlingov had any knowledge of the Government's unilateral actions. Nor does anything in the discovery support the Government's venue shopping. Venue in this District hangs on the Government's solitary "sting" with no plausible connection to Mr. Sterlingov, nor allegation of his awareness of it. This is unconstitutional.

Furthermore, as argued in Defendant's Motion to Dismiss, the Indictment violates Due Process and is insufficient as a matter of law and fact. Nothing inside or outside the four corners of its Indictment can change the Government's inability to name any persons or facts to support its bare bones, conclusory, vague, and ambiguous accusations. The Government cannot state its case plainly, concisely, and factually. It is the one hiding; not Mr. Sterlingov. The Court should dismiss the Indictment because it is constitutionally defective as to venue, violates due process, and is insufficient as a matter of law and fact.

## Argument

Venue is unconstitutional in the District of Columbia for two reasons:

First, the Indictment alleges no criminal conduct by the Defendant in the District of Columbia, merely the unilateral act of a Government agent using Government internet accounts without the alleged presence of any counterparty with mens rea. There is no plausible allegation that anyone but the Government knew about its unilateral sting. In essence the Government is pleading an unconstitutional strict liability crime because it erases

**Appx6626**

mens rea from the equation here; the Defendant is not present when the Government commits the crime it accuses him of. A strict liability criminal statute like this is unconstitutional and offensive to centuries of our criminal justice system's traditions and norms.

Second, no amount of originalist definitional hair splitting can change the fact that the plain text of Article III, as further restricted by the Sixth Amendment, renders any federal criminal trial in the District of Columbia unconstitutional on venue grounds because the District of Columbia is not a state.

## I.      Venue is Unconstitutional

The Indictment alleges no criminal act in the District of Columbia by the Defendant that justifies venue in this District. The Government has a bigger problem here than it had in *United States v. Auernheimer*, 748 F. 3d 525 (3d Cir. 2014), a prosecution that tried to pin venue in New Jersey on a copied email address list from AT&T's publicly facing servers. The list contained email addresses of New Jersey residents but neither the defendants, servers, or the AT&T entity involved were in New Jersey when the alleged crime occurred.[1] Here there is no evidence of any connection with the District of Columbia, except the Government's unilateral "sting" operation. There is no evidence or allegation the Defendant was even aware of the sting. And despite its mountain of discovery and paper, the Government has yet to name a single particular criminal act by the Defendant.

The Government's arbitrary venue designation isn't a trivial matter - it goes to the core of a criminal defendant's constitutional rights:

---

[1] *See United States v. Auernheimer*, 748 F. 3d 525 (3d Cir. 2014) (undersigned counsel was counsel for Mr. Auernheimer).

The Supreme Court has repeatedly made clear that the
constitutional limitations on venue are extraordinarily
important. "[Q]uestions of venue are more than matters of mere
procedure. They raise deep issues of public policy in the light of
which legislation must be construed." "The provision for trial in
the vicinity of the crime is a safeguard against the unfairness
and hardship involved when an accused is prosecuted in a
remote place." The founders were so concerned with the
location of a criminal trial that they placed the venue
requirement, which is "principally a protection for the
defendant,", in the Constitution in two places. See U.S. Const.
art. III, § 2, cl. 3 and amend. VI.[2]

## A.      There is No Essential Conduct in this District

The Government's Opposition retreads its losing arguments for venue from *United*

*States v. Auernheimer.* It hasn't alleged any essential conduct, to say nothing of circumstantial

conduct, by the Defendant in the District of Columbia. It tries to argue that Mr. Sterlingov had

preexisting duties as a business operator in the District of Columbia, as a way of haling Mr.

Sterlingov from Sweden into D.C., but the Indictment doesn't allege a single particular

business transaction in D.C. by Mr. Sterlingov, nor any course of conduct constituting doing

business in D.C. or anywhere else.[3] Without any essential conduct in the District of Columbia,

venue is unconstitutional:

> In performing our venue inquiry, we must be careful to separate
> "essential conduct elements" from "circumstance element[s]."
> Rodriguez-Moreno, 526 U.S. at 280 & n.4. For example, in
> Cabrales the Supreme Court considered whether venue for
> money laundering activities was proper in Missouri. 524 U.S. at
> 4. The laundered proceeds were generated by illegal narcotics
> sales in Missouri, but all acts constituting the money laundering
> offense took place in Florida. Id. The Court held that venue was
> improper in Missouri. Id. at 10. The Supreme Court, later
> reflecting on Cabrales, observed that the "existence of

---

[2] *United States v. Auernheimer*, 748 F.3d 525, 540 (3d Cir. 2014) (citations omitted).
[3] (*See* Second Decl. of E. Garland, attached as Ex. A.).

> criminally generated proceeds" was only a "circumstance
> element" of money laundering. Rodriguez-Moreno, 526 U.S. at
> 280 n.4. Although it was an element of the crime that the
> Government had to prove to the jury, it was a "circumstance
> element" because it was simply a fact that existed at the time
> that the defendant performed her laundering acts. Only
> "essential conduct elements" can provide the basis for venue;
> "circumstance elements" cannot. United States v. Bowens, 224
> F.3d 302, 310 (4th Cir. 2000).[4]

The Government cannot hang venue on its "sting" operation because of the simple fact there is no particular allegation or evidence that anyone else besides the Government was aware of the Government's alleged account transfers, which in and of themselves weren't criminal.

### B. Venue for any Federal Criminal Trial is Unconstitutional in D.C.

The Government cites no dispositive case on the constitutionality of federal criminal venue in the District of Columbia. Instead, it turns to originalist parsings of the meaning of the words "state" and "district".

The issue with the Government's originalist tack is that the Framers of 1787 and the Bill of Rights rejected a general federal police power. It only begins to emerge during Reconstruction, after creation of the Department of Justice to enforce federal law under the 14th Amendment. Congress does not even grant the United State Supreme Court power to hear criminal appeals until the end of the 19th century. And it is not until the 20th century that courts' expansive readings of the Constitution's interstate commerce clause create a general

---

[4] *United States v. Auernheimer*, 748 F.3d 525, 533 (3d Cir. 2014).

federal police power by making all crimes economic - contrary to the original Framers' intent.[5] Originalist readings cannot usurp the plain text of Article III and the Sixth Amendment.

Nor can recourse be had, as the Government tries, to Article III's grant of congressional venue power. The Bill of Rights is a further restriction on federal power, the price extracted for ratification of the Constitution of 1787 by those fearing an abusive federal police power. The Sixth Amendment restricts the scope of Article III's grant of constitutional criminal venue to "the state and district wherein the crime shall have been committed." The District of Columbia is not a state, and venue in the District of Columbia is unconstitutional under a plain textual reading of Article III and the Sixth Amendment. The Government cites no case holding otherwise.

Finally, the Government's appeal to the concept of vicinage cannot save it, as the concept of vicinage is for the benefit of the Defendant, not the Government. Mr. Sterlingov, a citizen of Sweden and resident of Gothenburg, Sweden since moving there when he was 14, is far from his vicinage and a jury of his peers.

This Court should dismiss the Indictment because it is constitutionally defective as to venue.

## II.     The Indictment Violates Due Process

The Superseding Indictment's conspiracy count is a last-minute addition not present in the Criminal Complaint or original Indictment. The count names no co-conspirators, and its

---

[5] *See, e.g, Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019); *Taylor v. United States*, 579 U.S. 301, 306 (2016)

predecessors provide no factual basis for the new conspiracy charge; nor does the discovery provide any evidence of a conspiracy.

The Indictment fails to provide notice of what Mr. Sterlingov must defend against. This lack of notice invites surprise at trial and does not foreclose future double jeopardy because of the unclear scope of the charged crimes.

Outside the four corners of the Superseding Indictment the Government primarily bases its case on a 2011 website registration, its solo sting operation, and junk forensics. To date it has not identified a single criminal act tied to Mr. Sterlingov and fights every request that it state its case clearly. Mr. Sterlingov faces a potential life sentence. The Constitution requires the Government plead its case so he knows what he is defending against. They've failed to do so, and thus this Court should dismiss the Superseding Indictment.

## III.   The Statute of Limitations on all Counts has Run

The Government had ample time over the course of its seven-year investigation to charge crimes within the Statute of Limitations. It's refusal to provide factual particularity as to the elements of the charged crimes allow it to thwart the Statute of Limitations by making vague and ambiguous allegations of continuous conduct without identifying any of that conduct with particularity.

## IV.    The First Amendment Applies to Defendant's Speech and Internet Access

The Government's prosecution touches on core areas of protected speech. For instance, the text on the clearnet website www.bitcoinfog.com cannot sustain a criminal conviction under First Amendment incitement law. And because the First Amendment applies to accessing information as well as the publication of information, to the extent that the Government criminalizes Mr. Sterlingov accessing the internet they implicate the First Amendment. And there is an argument that computer code, as a form of information, is protected speech. But because of the Government's bare bones Indictment, Mr. Sterlingov is not on notice on how to defend himself with the First Amendment.

### Conclusion

Nothing happened in the District of Columbia that constitutionally justifies venue. For all its paper and terabytes of data, the Government is unable to make a clear and concise factual statement of its case that puts Mr. Sterlingov on notice of what he must defend against, prevents surprise at trial, and forecloses future double jeopardy. The Court should grant Mr. Sterlingov's Motion to Dismiss. In the alternative this Court should grant a hearing.

Dated: September 7, 2022
New York, New York

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

/s/ Marina Medvin, Esq.
Counsel for Defendant
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com

*Counsel for Defendant Roman Sterlingov*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of September 2022, the forgoing document was filed with the Clerk of Court using the CM/ECF System. I also certify that a true and correct copy of the foregoing was sent to the following individuals via e-mail and mail delivery via first class mail:

<u>s/ Tor Ekeland</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

United States of America,

     *Plaintiff,*

 v.

Roman Sterlingov,

     *Defendant.*

**21-cr-399 (RDM)**

**SECOND DECLARATION OF ERIC GARLAND**

   I, Eric Arnold Garland, hereby declare under the penalty of perjury to 28 U.S.C. § 1746 that the following statements are true and correct to the best of my knowledge and belief:

1. My investigation is ongoing as to the methodology used by the Government to analyze the commercial dynamic between several private sector companies involved with the instant case. This analysis includes the Government's use of the phrase "Bitcoin Fog" as the firm allegedly operated by the Defendant as an unlicensed money transmission business in the District of Columbia ("Bitcoin Fog"). My analysis also examines multiple vendors to the U.S. Government which supposedly provided evidence for this prosecution. My investigation also extends to potential national security risks implicated by some of the relationships of the above private firms.

2. The methodology behind the Government's analysis of the business activities of Bitcoin Fog is not similar to any forensic financial analysis that would be produced for use in the field of competitive intelligence. Based on my experience, the affiants whose declarations have been submitted on behalf of the Government do not appear to have the education,

**Appx6636**

training, or credentials required to provide financial analysis admissible in federal court for a matter involving financial fraud and money laundering. The data set that has been submitted is unreliable. And there does not appear to be any methodology employed to describe the operations of an ongoing commercial concern, legal or illegal, much less a methodology that would be broadly accepted by competitive intelligence professionals, executives, regulators, or courts of law. To wit, the Government has presented no declarations by experts in forensic accounting, nor by anyone familiar with the practices of money laundering, or even anyone with a cursory knowledge of how a business operates. Based on information and belief, the Government has presented no evidence that describes the totality of Bitcoin Fog's operations as an ongoing business, one that would have been required by law to apply for licensure around the world; it has not presented data that outlines as much as a blurry sketch of a firm. As such, lacking any business information to process, there is no commonly accepted methodology employed by the Government in reaching its conclusions that Bitcoin Fog has operated as a money laundering operation.

**THE GOVERNMENT HAS NOT PRESENTED EVIDENCE ABOUT BITCOIN FOG'S BUSINESS OPERATIONS**

3. The Government alleges that Roman Sterlingov is the sole operator of Bitcoin Fog, a financial services company that operates in the District of Columbia and other locations around the world. It further alleges that Mr. Sterlingov has knowingly conducted financial transactions involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, etc, in violation of 18 U.S. Code § 1956 (a)(3)(b). It further alleges that Mr. Sterlingov knowingly and unlawfully owned, directed, or conducted his money transmission

2

**Appx6637**

business in the District of Columbia without a license, as required by D.C. Code § 26-1001(a), and thus was in violation of 18 U.S. Code § 1960(a).

4. In my experience, the owners and operators of businesses of any size produce substantial documentary evidence in the conduct of their enterprise. They typically begin by organizing their firm under the laws of some political entity, be it on-shore or offshore, well-known or obscure. They register trademarks and patents to protect their investment of time, money, and labor. They open bank accounts—which now may include cryptocurrency wallets—and these accounts function to take in revenue as well as to expend money on capital, professional services, and labor. Profit is generated and distributed among investors, if any; these investors almost always wish for detailed accounting to assure fair play. Customers are acquired and cultivated, while marketing efforts are ongoing to assure the acquisition of more customers. Salaries are paid, even if to a single operator, even if this is more categorized as "profit distribution" or "bonus" rather than regular compensation. Taxes are filed with relevant agencies. All of the above features are as common to completely legitimate business entities as they are to firms engaged in complicated fraudulent schemes or companies acting primarily as fronts for organized crime.

5. In my analysis of the Government's allegations and its evidence, I have seen no documentation around the establishment of Bitcoin Fog as a business, even an illegitimate one. I have never seen an address where the business is located. Mr. Sterlingov isn't listed as an officer of any company according to the global business database search engine opencorporates.com. I have never seen articles of incorporation in any country for Bitcoin Fog. I have never seen anyone's legal name associated with its

creation. All I have seen is the allegation that Mr. Sterlingov may have registered a clearnet domain name, which any anyone can do, even under a pseudonym. The Government's details about this alleged enterprise lack the basics of even the most ephemeral Internet-based business.

6. I have seen no financial statements of any kind showing the operation of Bitcoin Fog by Mr. Sterlingov or any other individual. There is no statement of annual revenue for any year since operations supposedly began in 2011, either from the business itself or reconstructed by the Government after its seven-year investigation. There is no analysis of expenditures of web hosting, office space, printers, toner cartridges, coffee creamer, staplers, software, or a desk. No computers are listed as assets of any company, not even the electronics seized from Mr. Sterlingov's bags, thus there is no way to assess how much was spent on information technology at the company, much less how its cost was amortized over a period of time.

7. Tax returns in Sweden are public documents; a subpoena is not even required to obtain them. The Government has not, to my knowledge, even presented Mr. Sterlingov's taxes to this Court. Money laundering charges should usually trigger a tax investigation in an offender's home country, as false declarations were, by definition, made. It is not clear that the Government is cooperating with a parallel prosecution by Skatteverket for the additional criminal investigations that would be a natural consequence of this supposed ten-year financial crime spree. It bears emphasizing that, in my experience, the crime of money laundering is committed so that ill-gotten gains can be processed through a business such that the proceeds can be spent freely without arousing suspicions about

4

their origin. It thus shocks me to see a money laundering prosecution without as much as a mention of taxation in one or more countries.

8. The Government has not listed a single customer of Bitcoin Fog in its 11-year history, nor evidence of the amount of money transacted, nor the dates, nor the fees earned from the transactions. It submitted the following chart in its Statement of Facts. ECF 1 at 4.

Among these, IRS-CI cyber analysts identified direct deposits into BITCOIN FOG from at least 35 darknet markets. Below are the top five markets by U.S. dollar value of deposits:[4]

| Source Market | Total Received (BTC) | Total Received (USD) |
|---|---|---|
| Agora Market | 41,966.87 | $14,398,754.73 |
| Silk Road 2.0 Market | 22,863.74 | $12,518,636.97 |
| Silk Road Marketplace | 377,102.74 | $9,556,159.49 |
| Evolution Market | 11,100.79 | $3,199,542.15 |
| AlphaBay Market | 5,442.86 | $2,907,508.67 |

IRS-CI cyber analysts identified funds sent directly from BITCOIN FOG to at least 51 different darknet markets. Below are the top five markets by dollar value of sends:

| Destination Market | Total Sent (BTC) | Total Sent (USD) |
|---|---|---|
| Agora Market | 26,398.12 | $8,680,430.34 |
| Silk Road 2.0 Market | 11,274.21 | $5,871,831.33 |
| Silk Road Marketplace | 106,522.77 | $2,289,509.42 |
| Evolution Market | 6,473.24 | $1,860,053.75 |
| AlphaBay Market | 3,375.90 | $1,557,931.95 |

The Government has presented no evidence substantiating these amounts, via American Generally-Accepted Accounting Procedures (GAAP), Swedish standards established by Bokforingsnamnden, or any other standard. No evidence ties these amounts to Mr. Sterlingov or Bitcoin Fog.

9. I have seen no evidence provided by the Government that suggests any activities by Mr. Sterlingov or Bitcoin Fog within the District of Columbia. I have seen no evidence that the Government of the District of Columbia became aware of any money transmission activities by Mr. Sterlingov or Bitcoin Fog, nor that they exercised their discretion to institute an administrative cease and desist proceeding. There is no evidence that the

Government of the District of Columbia is aware of activities by Mr. Sterlingov or Bitcoin Fog, or that it has attempted to enforce its laws pursuant to D.C. Code § 26-1022.

10. Lacking any evidence of the existence of this company, or its connections to Mr. Sterlingov, and lacking any data common to the analysis of any business concern, legitimate or illicit, there is thus no analytical methodology by the Government on which to comment.

11. In my practice of competitive intelligence, I have been required to analyze risks to my clients' economic interests, be they common ones like the actions of traditional business competitors, or extraordinary ones such as the conduct of organized crime syndicates or hostile nation-state intelligence services. Money laundering is a common feature of both these extraordinary risks. "Money laundering" is defined by illegal activities—drug trafficking, securities fraud, public corruption, arms dealing, tax evasion, etc.—which produce cash flow that is then disguised as income at a legitimate-looking "front business." This metaphor dates back to the Chicago Outfit crime syndicate processing the cash from illegal activities through coin-operated laundromats and similar businesses. Modern money laundering may involve innovations such as cryptocurrency, but it is still identified when criminals who are engaged in felonious activities send their money through a business which takes a cut, such that the remaining cash can be spent without worry. The total cost of money laundering can be 40% or higher, which produces substantial illicit wealth, usually for a network of individuals involved in a racketeering enterprise. There is no evidence that Mr. Sterlingov is engaged in this activity. There is no evidence of money derived from a specific criminal act. There is no evidence of any specific transaction from a criminal or a criminal enterprise. There is no front business.

6

There are no tax returns. There are no offshore accounts, nor dollar, ruble, euro, or kroner amounts of transactions. There certainly isn't any evidence of this in the District of Columbia.

12. My investigation into this matter is ongoing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of September 2022

Eric A. Garland

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of September 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

<u>/s/ Tor Ekeland</u>

8

**Appx6643**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | 21-CR-399 (RDM) |
| Plaintiff, | |
| v. | |
| ROMAN STERLINGOV, | |
| Defendant. | |

Defendant's Motions in Limine

1

Appx6644

## Table of Contents

*Introduction* ............................................................................................................. *4*

*Argument* .................................................................................................................. *5*

*I.    This Court Should Bar the Government's Blockchain Analysis and Digital Forensics Because They Cannot be Authenticated* ............................................. *6*

A.    Federal Rule of Evidence 901 Bars Admission of the Government's Blockchain Analysis and Digital Forensics ................................................................................. 7

B.    Witness Testimony is Insufficient to Authenticate the Software Used in this Investigation ................................................................................................................ 7

*II.    The Court Should Block Testimonial Forensic Statements Not Subject to Cross Examination* ................................................................................................. *8*

*III.    This Court Should Bar Testimony Under FRE 401, 403, and 404 Regarding Unspecified Criminal Transactions the Government has no Evidence are Connected to Defendant* ............................................................................................................... *8*

*IV.    This Court Should Bar Lay Opinion Testimony as to the Results of Any "Blockchain Analysis" or Digital Forensics Under FRE 702* ............................... *10*

*V.    In the Alternative the Court Should Order a Daubert/Frye Hearing to Determine the Authenticity of the Government's Digital Forensics* .................... *12*

1

**VI.      *Defendant Cannot Effectively Review Evidence and Prepare His Defense from the Northern Neck Regional Jail, Warsaw, VA, and this Court Should Hold a Hearing to Address his Inability to Review the Discovery*** .................................................................... *12*

**VII.     *The Court Should Only Permit Translations by Certified Translators*** ........... *13*

**VIII.    *The Court Should Order Early Disclosure of any Jencks Material*** ................. *14*

**IX.      *Former FBI Agent and Current AUSA Catherine Pelker is a Material Fact Witness and the Court Should Hold a Hearing as to Her Role as Prosecutor in this Case*** .... *14*

**X.       *Motion to Compel*** ........................................................................ *15*

***Conclusion*** ...................................................................................... *15*

2

# Table of Authorities

### Cases

*Asplundh Manufacturing Division v. Benton Harbor Engineering*, 57 F.3d 1190 (3rd

    Cir.1995) ........................................................................................................... 11

*Bullcoming v. New Mexico*, 564 US 647 (2011) ........................................................ 8

*Burlington N. R. Co. v. State of Neb.*, 802 F.2d 994 (8th Cir. 1986) ........................ 11

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) .................................... 10

*Hartzell Mfg., Inc. v. Am. Chem. Techs., Inc.*, 899 F. Supp. 405 (D. Minn. 1995) ......... 11

*Kumho Tire Co., Ltd, v. CurMichael*, etc., 526 US. 137 (1999) ............................... 10

*Melendez-Diaz v. Massachusetts*, 557 US 305 (2009) ............................................. 8

*Old Chief v. United States*, 519 U.S. 172 (1997) ..................................................... 9

*United States v. Holmes*, 413 F.3d 770 (8th Cir. 2005) ............................................ 9

*United States v. Lamons*, 532 F.3d 1251 (11th Cir. 2008) ....................................... 6

*United States v. Moon*, 512 F.3d 359 (7th Cir. 2008) .............................................. 6

*United States v. Nelson*, 533 F. Supp. 3d 779 (N.D. Cal. 2021) .............................. 6

*United States v. Peoples*, 250 F.3d 630 (8th Cir. 2001) .......................................... 11

*United States v. Smith*, 591 F.3d 974 (8th Cir. 2010) ............................................. 11

*United States v. Washington*, 498 F.3d 225 (4th Cir. 2007) .................................... 6

*US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687 (8th Cir. 2009) ......................... 11

### Rules

ABA Model Rules of Professional Conduct 3.7 ...................................................... 15

D.C. Bar Rules of Professional Conduct 3.7 ......................................................... 15

Fed. R. Evid. 401 ........................................................................................................9

Fed. R. Evid. 403 ........................................................................................................9

Fed. R. Evid. 404 ........................................................................................................9

Fed. R. Evid. 602 .......................................................................................................11

Fed. R. Evid. 702 .......................................................................................................10

Fed. R. Evid. 901(8)......................................................................................................7

Fed. R. Evid. 901(9)......................................................................................................7

Fed. R. Evid. 901(a)......................................................................................................7

Fed.R.Evid. 703 .........................................................................................................11

3

**Appx6648**

## Introduction

The Government's entire case turns on an amorphous mass of unscientific, unverifiable, and speculative blockchain analysis and digital forensics. All layered with hearsay. None of the Government's conclusions in its pleadings and discovery produced to date are reproduceable. The Defense has not had access to the software, source codes, object codes, complete input and output datasets, relevant native computer logs, and original sources underlying the Government's conclusory accusations.

Despite the Defense's request, the Government has not produced anything in discovery that provides any valid scientific basis for its forensics. Under Federal Rule of Evidence 901 this Court should bar all statements - whether testimonial or raw data machine statements - based on the Government's use of forensic computer software like Chainalysis Reactor, or Elliptic LLC's, because it has not been produced to the Defense in its native computer code in the versions used by the Government in its multi-year investigation. Without this information, there is no effective way to cross examine any live expert witness whose testimony is based on the output of the digital forensic computer programs and methodologies at the heart of this case. This makes it impossible to mount an effective, complete defense.

Moreover, the Government's discovery is laden with hearsay statements based on the informational outputs of computer programs that appear to involve the input of speculative human hearsay. As such, this Court should bar it unless the Government can produce a live expert witness with direct knowledge (and not a surrogate witness with only superficial knowledge) subject to cross examination by a Defense that has had the opportunity to forensically examine the source of the witness's opinions and testimony, including the full

4

input and output datasets and relevant source codes.

This case turns entirely on the digital forensic analysis, there are no eyewitnesses, no corroborating evidence (unlike almost all blockchain cases) and based on the discovery there is no way to reproduce or verify any of the Government's methodologies or conclusions. This Court should bar the Government's blockchain analysis and digital forensics in its entirety. In the alternative, this Court should order a Daubert/Frye hearing to address the Government's digital forensic foundations and the extent they are laden with speculative hearsay from input through output.

Additionally, given the technical complexity and novelty of this case, this Court should require that all experts that are going to testify be subject to pretrial voir dire and Daubert scrutiny, outside the presence of the jury. Both to avoid surprise and delay at trial, and mistrial.

Furthermore, this Court should bar the Government under FRE 401, 403, and 404 from introducing evidence discussing Silk Road, Agora, or any other online criminal marketplace as irrelevant, prejudicial, and impermissible character evidence. Of which the Government has no evidence of any connection to Mr. Sterlingov.

The Defense also moves this Court to order a hearing as to AUSA Catherine Pelker's role as a prosecutor in this case. She is a material fact witness, who upon information and belief, initiates this investigation in 2014, actively participates in this investigation while she is an FBI agent, and is responsible for the transfer of this case from Philadelphia to Washington D.C. Her name appears on numerous investigative documents in the discovery.

## Argument

None of the Government's purported blockchain analysis or digital forensics in this

5

case are reproduceable or verifiable based on the discovery produced to date. The Government

has not - despite request from the Defense - produced the software, methodologies, or

scientific proof for its conclusory forensic opinions. There is no community consensus

regarding the Government's novel and untested forensics. And human testimony isn't

sufficient to establish the accuracy of statements generated through source codes; to say

nothing of the fact that the datasets and a host of variables related to the Government's ill

defined "blockchain analysis" are nowhere to be found in the discovery.

## I.      This Court Should Bar the Government's Blockchain Analysis and Digital Forensics Because They Cannot be Authenticated

The Defense does not have access to the same datasets, software, and original sources

with which to authenticate the Government's discovery. The Government has not produced

them, and the Defense has asked.[1] This makes it difficult to determine to what extent the

statements generated by the digital forensic software and methodologies in this case contain

human hearsay and speculation as an informational input. If so, they are subject to

confrontation clause and hearsay challenges. If they are the raw data output of a machine, then

the challenge is to the machine's output's accuracy - which requires analysis of the

functioning of the machine or code in question.[2] This Court should either bar the

---

[1] (*See* Ex. A. (Defense R. 16 Letter)).
[2] *See e.g, United States v. Washington*, 498 F.3d 225, 230-32 (4th Cir. 2007); *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008) (Easterbrook, C.J.); *United States v. Lamons*, 532 F.3d 1251, 1263-65 (11th Cir. 2008); *United States v. Nelson*, 533 F. Supp. 3d 779, 801 (N.D. Cal. 2021).

Government's blockchain analysis and digital forensics or compel production of the necessary information to authenticate its accuracy.

### A.   Federal Rule of Evidence 901 Bars Admission of the Government's Blockchain Analysis and Digital Forensics

Federal Rule of Evidence 901 requires that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."[3] In relation to the digital forensics in this case, particularly the purported "blockchain analysis," this means "[e]vidence describing a process or system and showing that it produces an accurate result."[4] Moreover, Rule 901 requires an authenticity inquiry as to data compilations - like those in the Government's discovery.[5] This requires defense expert analysis of all computer code used to generate statements in this case whether testimonial or raw data.

### B.   Witness Testimony is Insufficient to Authenticate the Software Used in this Investigation

Without access to the software and its computer code for analysis, the Defense cannot effectively challenge the validity of the Government's digital forensics. Any effective cross examination of any Government expert testifying based on the digital software used in this investigation requires access by the Defense to the underlying computer code; both for evidentiary and impeachment purposes. Otherwise, there is no way to confront a witness's fabrications on the stand.

---

[3] Fed. R. Evid. 901(a).
[4] Fed. R. Evid. 901(9).
[5] Fed. R. Evid. 901(8)

7

## II. The Court Should Block Testimonial Forensic Statements Not Subject to Cross Examination

To the extent that the blockchain analysis, digital forensics and methodologies in this case constitute testimonial statements, they should be barred under the Confrontation Clause, unless the Government can produce a witness for cross-examination justifying their use.[6] The problem with the discovery is that it doesn't provide the information necessary to determine the extent of the hearsay at play here. Both as informational input and output. This Court should bar the introduction of the Government's digital forensic evidence, or in the alternative order a comprehensive Daubert/Frye hearing to address these extensive issues.

The original digital source materials are lacking from the Government's production to date. Despite requests from the Defense, the Government has not produced any of the original software, source code, or the like, only some of the outputs, which are either produced as static PDFs or image files without significant metadata. There is no way to verify its validity. Precisely what dataset, or datasets, the Government uses to arrive at its conclusions cannot be gleaned with particularity from the discovery. The Government's forensic conclusions appear laden with hearsay based on unauthenticated methodologies.

## III. This Court Should Bar Testimony Under FRE 401, 403, and 404 Regarding Unspecified Criminal Transactions the Government has no Evidence are Connected to Defendant

---

[6] *See Bullcoming v. New Mexico*, 564 US 647 (2011); *Melendez-Diaz v. Massachusetts*, 557 US 305 (2009).

8

To date, the Government has not identified a single particular criminal transaction tied to Mr. Sterlingov. The Court should only permit the Government to discuss specific allegations against Mr. Sterlingov it has evidence for, and not innuendo-laden character evidence in violation of Federal Rules of Evidence 401, 403 and 404.[7] Specifically, the Defense asks that this Court bar reference, among other things, to the online marketplaces mentioned in the Criminal Complaint such as Silk Road, Agora and the like; unless the Government can provide some evidentiary basis for its seemingly irrelevant and highly prejudicial use. The Government repeatedly makes untethered accusations of Defendant's criminal activity, but to date has failed to identify a single particular criminal transaction. This Court should bar as irrelevant, prejudicial, and improper all evidence and testimony related to illicit online marketplaces having no connection to Mr. Sterlingov.

There is no probative value to the Government's discussion in its Criminal Complaint of online onion markets like Silk Road, or Agora - there is no evidence of any connection to Mr. Sterlingov and it is highly prejudicial as it is intended to stain him with the criminality of sites he has nothing to do with. It constitutes unfair prejudice which misleads the jury into determining guilt on different grounds from specific factual proof of the offense charged.[8]

---

[7] See Fed. R. Evid. 401 ("Evidence is relevant is it has a tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action"); Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."); Fed. R. Evid. 404 ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character trait.")

[8] Old Chief v. United States, 519 U.S. 172, 180, (1997); see also United States v. Holmes, 413 F.3d 770, 776 (8th Cir. 2005).

9

## IV. This Court Should Bar Lay Opinion Testimony as to the Results of Any "Blockchain Analysis" or Digital Forensics Under FRE 702

The Court should only allow qualified experts to testify as to any blockchain analysis or digital forensics, and the Defense must have the opportunity to examine all their sources, methodologies, and software relied upon, in order to mount a complete defense. The Government's experts should be able to independently verify the Government's work, if it is verifiable and reproduceable, and should do so and present their findings in open court pre-trial for adversarial challenge.

In deciding the admissibility of expert testimony, courts have a "gatekeeping obligation" to ensure expert testimony is reliable.[9] Federal Rule of Evidence 702 requires that such testimony satisfy three separate relevance and reliability standards: (1) expert testimony must be based upon sufficient facts or data, (2) expert testimony must be the product of reliable principles and methods, and (3) the expert witness must have applied the principles and methods reliably to the facts of the case.[10]

Federal Rule of Evidence 701 states that if a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is (1) rationally based on the witness's perception; (2) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (3) not based on scientific, technical, or other specialized

---

[9] *Kumho Tire Co., Ltd, v. CurMichael*, etc., 526 US. 137,141 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).
[10] Fed. R. Evid. 702.

10

knowledge within the scope of Rule 702.[11] Fact witnesses must also have personal knowledge about the subject matter of their testimony,[12] and may testify to matters within the common knowledge of laypersons or from their experience.[13] There are no fact witnesses like this in this case besides Mr. Sterlingov. The entire investigation took place thousands of miles away, primarily at desks. The Government does not have a single eyewitness for any of its accusations.

An "essential difference" between expert and non-expert testimony is that only a qualified expert may answer hypothetical questions.[14] Expert witnesses may testify from "facts or data" "perceived by him," and also from what is "made known to him at or before the hearing."[15] A lay witness's testimony, however, should be excluded when that testimony is based on their perceptions alone and merely expresses the witness's belief without assisting

---

[11] "The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance and an endless number of items that cannot be described factually in words apart from inferences." *Hartzell Mfg., Inc. v. Am. Chem. Techs., Inc.*, 899 F. Supp. 405, 408 (D. Minn. 1995) (citing *Asplundh Manufacturing Division v. Benton Harbor Engineering*, 57 F.3d 1190, 1196 (3rd Cir.1995)).

[12] *See* Fed. R. Evid. 602; "Personal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience, is a sufficient foundation for lay opinion testimony." *Burlington N. R. Co. v. State of Neb.*, 802 F.2d 994, 1005 (8th Cir. 1986). *See also United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001) (holding that district court erred in admitting testimony from agent who lacked first-hand knowledge about the matters about which she testified and that the agent's opinions were based on investigation after the fact, not her perception of the facts).

[13] "A witness may provide lay opinion testimony 'about facts within his or her range of generalized knowledge, experience, and perception.'... '[P]erceptions based on industry experience, is a sufficient foundation for lay opinion testimony.'" *US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 690 (8th Cir. 2009) (citations omitted). *See also Burlington N. R. Co. v. State of Neb.*, 802 F.2d 994, 1005 (8th Cir. 1986) (allowing railroad executives to testify based on their industry knowledge and experience and review of employee reports prepared in the ordinary course of business); but "This inquiry requires a case-by-case analysis of both the witness and the witnesses's [sic] opinion." *United States v. Smith*, 591 F.3d 974, 983 (8th Cir. 2010) (citations omitted).

[14] *Hartzell Mfg., Inc. v. Am. Chem. Techs., Inc.*, 899 F. Supp. 405, 408–09 (D. Minn. 1995).

[15] Fed.R.Evid. 703.

11

with the formation of an opinion that would be helpful to an understanding of the facts of the case.[16] In other words, lay testimony that amounts to speculation and conjecture is improper.[17]

## V.      In the Alternative the Court Should Order a Daubert/Frye Hearing to Determine the Authenticity of the Government's Digital Forensics

The Government has no eyewitnesses nor corroborating evidence for its blockchain conjectures. Nor does it have any scientific support for its methodologies, and nothing in the discovery to date allows for the reproducibility of the Government's forensics. Despite request from the Defense, the Government has not produced any of the software, software versions, source code, or the like for analysis. Nor can any valid methodology be gleaned from the discovery. Given the centrality of the digital evidence in this case the Court should, in the alternative, order a comprehensive Daubert/Frye hearing to test the authenticity and admissibility of the Government's digital forensics, particularly its alleged blockchain analysis, outside the presence of the jury. It is the Defense's position that the Government's blockchain analysis is junk science and their digital forensics are rife with hearsay based on unscientific methodologies and basic errors of computer science.

## VI.     Defendant Cannot Effectively Review Evidence and Prepare His Defense from the Northern Neck Regional Jail, Warsaw, VA, and this Court Should Hold a Hearing to Address his Inability to Review the Discovery

---

[16] *Hartzell Mfg., Inc. v. Am. Chem. Techs., Inc.*, 899 F. Supp. 405, 408–09 (D. Minn. 1995).
[17] *See US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 690 (8th Cir. 2009).

12

**Appx6657**

The Government is currently jailing Mr. Sterlingov in the Northern Neck Regional Jail in Warsaw, Virginia ("Jail"). Any review of evidence from Defense hard drives submitted to the jail can only be done on shared, limited capacity laptops in a noisy room of sixty people, for at best an hour or two. People compete for time on the laptops and look over your shoulder. Mr. Sterlingov cannot access the Defense's e-discovery platform from Jail to search, tag, annotate and communicate with his lawyers about the discovery. The Jail's laptops can only handle basic PDF and other limited filetypes, and have limited memory. They are insufficient to meet the needs of a complex, 21st century, crypto case. Jail hours, staffing, and technical capacity make unmonitored phone and video conferencing with his lawyers difficult. And it takes six hours driving one way for his lawyers to visit him in the remote, rural Jail.

The Defense requests the Court hold a hearing to discuss solutions to the issues posed by Mr. Sterlingov's inability to effectively review the Government's evidence in this case. In the interim, the Defense requests permission to provide Mr. Sterlingov with a laptop solely for his use and for the purposes of preparing his defense.

At any hearing the Defense would also like to address the question of Mr. Sterlingov's detention during trial. Currently, for court appearances, the Jail wakes him up at 2 am and the ensuing process of transporting him to court deprives him of sleep. The Defense is concerned that if Mr. Sterlingov is held at the Jail during trial the ensuing sleep deprivation will detrimentally affect his ability to mount a complete defense. The Defense requests that Mr. Sterlingov be detained near the Court during the pendency of his trial, and in such manner as to avoid sleep deprivation or other impediments to his defense.

## VII.   The Court Should Only Permit Translations by Certified Translators

Appx6658

The Defense objects to any use of machine translation tools like Google Translate to translate any of the non-English languages at issue in this case.

## VIII.  The Court Should Order Early Disclosure of any Jencks Material

To the extent the Government is withholding any evidentiary basis for its forensics or scientific evidence for its forensics because of *Jencks*, this Court should order its production immediately for review by the Defense. Its withholding violates *Brady*, Due Process, and the Sixth Amendment. Furthermore, the antiquated McCarthy-era *Jencks* statute is unconstitutional as applied when it comes to 21st century blockchain cases like this one. If the purported scientific evidence and supporting sources aren't turned over until after a witness's direct examination, the Defense will be forced to move for a lengthy continuance in order to subject such evidence to necessary scrutiny. Already, if the Government were to produce the original datasets, sources, source code, and methodologies it used for its investigation the Defense would be hard pressed to analyze the data in time for trial. There is no way it can be quickly done at trial while preserving Mr. Sterlingov's constitutional right to put on a complete adversarial defense.

## IX.  Former FBI Agent and Current AUSA Catherine Pelker is a Material Fact Witness and the Court Should Hold a Hearing as to Her Role as Prosecutor in this Case

Upon information and belief, in 2014, Ms. Pelker originated this investigation when she was an FBI intelligence analyst in the Philadelphia Office of the FBI. Initially using Chainalysis software licensed to the Treasury Department, she was instrumental in getting DOJ to purchase a Chainalysis software license. Ms. Pelker's name is present on investigative

14

Appx6659

documents in this case from its inception.

Ms. Pelker is the reason this case was transferred from Philadelphia to D.C. In 2016, after graduating from a D.C. law school, she becomes a prosecutor on this case. Ms. Pelker is heavily involved as an FBI Agent in investigating it. Her name is on numerous documents as an FBI agent. As such, she is one of Mr. Sterlingov's accusers whom, under the Sixth Amendment, he is entitled to confront. The Court should hold a hearing as to her role as a material fact witness and removal as a prosecutor in this case.[18] The Defense has requested that Ms. Pelker step down as a prosecutor because she is a material fact witness. The Government has refused. The Defense intends to subpoena her testimony under the Sixth Amendment's Confrontation Clause.

## X.    Motion to Compel

In the alternative to barring the Government's blockchain analysis and digital forensics, this Court should order the Government to produce its original source codes, software versions, methodologies, datasets, information and the like, relied upon in coming to its forensic conclusions. If the Government is incapable of producing verifiable, reproducible proof of its forensic conclusions then this Court should bar them in their entirety.

### Conclusion

None of the Government's forensic conclusions are reproducible based on its discovery. This renders it impossible to mount an effective, complete defense because there is

---

[18] *See* D.C. Bar Rules of Professional Conduct 3.7; ABA Model Rules of Professional Conduct 3.7.

no way the Defense can challenge the black-box of computer software and speculative digital forensic methodologies used in the Government's seven-year investigation. None of it has been produced.

It is impossible to impeach testimony based on the Government's forensic software without examining the computer code itself. There is no way to determine the accuracy of the Government's allegations without a review of source code and methodologies. Because the Government refuses to produce any foundational authenticating evidence for its conclusory allegations, this Court should bar its blockchain analysis and digital forensics in their entirety.

In the alternative, this Court should order a comprehensive pre-trial Daubert/Frye Hearing so that the Government's forensics can be tested outside the presence of a jury.

Additionally, this Court should permit Mr. Sterlingov use of a laptop and order a hearing to address his inability to effectively review discovery in this case from jail.

This Court should also order a hearing as to AUSA Catherine Pelker's role as a prosecutor on this case, because she is a material fact witness.

Finally, in the alternative to barring the Government's blockchain analysis and digital forensics evidence, this Court should compel the production of the Government's original sources, source codes, datasets, methodologies and the like, necessary to properly authenticate the Government's allegations – if they exist.

16

**Appx6661**

Dated: October 24th, 2022
New York, New York

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

/s/ Marina Medvin, Esq.
Counsel for Defendant
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com

*Counsel for Defendant Roman Sterlingov*

17

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of October 2022, the forgoing document was filed with the Clerk of Court using the CM/ECF System. I also certify that a true and correct copy of the foregoing was sent to the following individuals via e-mail and mail delivery via first class mail:

s/ Tor Ekeland

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

18

**Appx6663**

# Exhibit 'A'

# TOR EKELANDLAW PLLC

Tor Ekeland
Managing Partner

(718) 737-7264
tor@torekeland.com

**September 23, 2022**

**Via Email**

Christopher B. Brown
Assistant U.S. Attorney
christopher.brown6@usdoj.gov

C. Alden Pelker
Trial Attorney
catherine.pelker@usdoj.gov

U.S. Attorney's Office for the District of Columbia
Computer Crime & Intellectual Property Section
Patrick Henry Building
601 D. Street. N.W.
Washington, D.C. 20530
(202) 252-7153

**Re:**   *United States v. Roman Sterlingov*, **21-CR-399 (D.D.C.): Def.'s First R. 16 Letter**

Counsel,

        This letter is Mr. Sterlingov's first formal discovery request under Federal Rules of Criminal Procedure ("Fed. R. Crim. Pro." or "Rules") 12 and 16, *Brady*[1], *Giglio*[2], *Rovario*[3], and their progeny. It is intended to invoke the full scope of discovery under the Rules, applicable case law, and statutes. Attached as Exhibit "A" are definitions for key terms.

## Requests

        As part of this request, we ask that all electronically stored information ("ESI") be produced in native format with all metadata intact. Specifically, we request the following, to the extent it has not been previously or fully provided:

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1983).
[2] *Giglio v. United States*, 405 U.S. 150 (1972).
[3] *Rovario v. United* States, 353 U.S. 53 (1957).



**1.** **Requests Under Fed. R. Crim. Pro. 12(b)(4)(B) & 16(a)(1)(A)(B) and (D)**

1.  A complete list of every specific criminal transaction you will use at trial as evidence against Mr. Sterlingov, and any evidence relating Mr. Sterlingov to those specific crimes.

2.  All oral, written, or recorded statements or testimony made by Mr. Sterlingov, which are in the possession, custody, or control of the government, or which could become known by the exercise of due diligence.

3.  Any statement made by Mr. Sterlingov to any law enforcement officer, government agent, informant, or other third party. This request includes any statement by defendant subsequently incorporated into any report, memorandum, transcript, or other document.

4.  Any statement made by Andrew White to any law enforcement officer, government agent, informant, or other third party. This request includes any statement by Mr. White subsequently incorporated into any report, memorandum, transcript, or other document.

5.  All communications between Catherine A. Pelker and Kathleen M. Kaderabek regarding this investigation.

6.  All communications between Mike Howell, the former CEO of highhosting.net and any law enforcement officer, government agent, informant, or other third party. This request includes any statement by Mr. Howell subsequently incorporated into any report, memorandum, transcript or other document.

7.  Any communications between Aaron Bice and Catherine Alden Pelker.

8.  Any communications between the government and reporters for WIRED or any other media outlet about anything related to this case, including investigators in this case, or private contractors involved in this case.

9.  Any communications related to the placement of Excygent in DOJ press releases announcing Mr. Sterlingov's arrest.

10. Any communications between law enforcement agencies, entities and individuals mentioned as participating in this case in DOJ press releases including communications with Swedish law enforcement and the Swedish Government.

**Appx6666**



11. Any communications with Excygent.

12. Any communications related to Chainalysis, particularly any communications related to Mr. Sterlingov's arrest, and any press related to that arrest, as well as any communications in general about Mr. Sterlingov, before, during or after his arrest.

13. Any communications between the DOJ and IRS regarding this case.

14. Any methodologies used by Chainalysis to investigate this case.

15. Any methodologies used by the government, including any software platforms developed by Chainalysis, to investigate this case.

16. Any methodologies used by Excygent to investigate this case.

17. Any methodologies used by Elliptic Ltd. to investigate this case.

18. Any methodologies used by the government to identify all the IP addresses mentioned in discovery.

19. Any contracts, agreements, memorandums of understanding, and the like between Chainalysis and the government, and any billing records related to this case.

20. Any contracts, agreements, memorandums of understanding, and the like between Excygent, LLC and the government and any billing records related to this case.

21. Any contracts, agreements, memorandums of understanding, and the like between Elliptic Ltd. and the government and any billing records related to this case.

22. A complete list of contractors, vendors, agents and any other entities the government worked with in this case to conduct blockchain analysis.

23. All contracts, agreements, memorandums of understanding, and the like for anyone or any entity related to request *u* above, including billing records.

24. Any software used by the government to investigate this case.

25. Any software the government used to conduct blockchain analysis.

26. Any computer forensics program that has been used in investigating this case.



27. Any documents related to any National Security investigation into Bitcoin Fog or Mr. Sterlingov.

28. A complete list of people who performed or are performing blockchain analysis for the government in relation to this case.

29. A complete list of entities who performed or are performing blockchain analysis for the government in relation to this case.

30. A list of all employees, agents, and individuals who worked on the investigation into Mr. Sterlingov, including those no longer with the government.

31. Any billing records sent between the government and Elliptic Ltd., Chainalysis or Excygent, LLC regarding the investigation into Bitcoin Fog or Mr. Sterlingov.

32. Subpoena #GJ2017020737280 sent to highhosting.net regarding bitcoinfog.com.

33. The complete shormint.zip files as mentioned in STERLINGOV-0000740, and the shormint_v2.zip files mentioned in STERLINGOV-0000741.

34. A current copy of Mr. Sterlingov's prior criminal record, if any. This record should include at a minimum all arrests and convictions relevant to any sentencing issues under Chapter Four of the United States Sentencing Commission Guidelines.

35. Any communications involving Mr. Sterlingov acquired through surveillance, wiretaps, pentraps, or any other type of communication intercept. This request includes any statement by defendant subsequently incorporated into any report, memorandum, transcript or other document.

36. Notice of the government's intention to use any evidence obtained as a result of a search, seizure, electronic intercept, or statement by Mr. Sterlingov. Please specify, if applicable, whether electronic or video intercepts were used.

37. A copy of (or reasonable opportunity to inspect and copy) any books, papers, documents, data, photographs, or tangible objects obtained from or belonging to Mr. Sterlingov.

38. Any documents and communications related to any transaction involved with this case.

39. A copy of (or reasonable opportunity to inspect and copy) any books, papers,

**Appx6668**



documents, data, photographs, or tangible objects which will be used in the government's case in chief. This includes not only documents that will be marked and offered into evidence, but also documents or tangible objects that will be referred to in any way by any witness called by the government during its case in chief. It is requested that any documents or tangible objects in this category be specifically identified from among any other records that may be produced to enable the defense to prepare effectively for trial.

40. A copy of (or reasonable opportunity to inspect and copy) any books, papers, documents, data, photographs, or tangible objects ("Information") which are material to the preparation of the defendant's case at trial or at sentencing.

41. Native format access logs from Mr. Sterlingov's email accounts, covering the time of the alleged acts.

42. Native format and complete records of the Google drive search warrant return related to all Mr. Sterlingov's accounts.

43. Identify the start date of the government's investigation into Bitcoin Fog.

44. Identify the start date of the government's investigation into Mr. Sterlingov.

45. Produce the information relied upon by the Office of the Director of National Intelligence, Central Intelligence Agency, National Security Agency, Federal Bureau of Investigation, or Department of Homeland Security.

46. Any logs, including server logs for the IP address 212.117.160.123.

47. Identify any methodologies that the Government used to collect the information referenced above in *vi*.

48. Any logs, including server logs for IP address 70.90.169.13.

49. Identify any methodologies that the Government used to collect the information referenced above in *viii*.

50. Any logs, including server logs, for bitcoinfog.com.

51. Identify any methodologies that the Government used to collect the information referenced above in *x*.

**Appx6669**



52. Any Whois search results related to this investigation.

53. Any documents or communications between Mr. Sterlingov and bitcoinfog.com.

54. Any evidence, including logs, server logs, communications, or documents related to inva7id@gmail.com.

55. Any evidence, including logs, server logs, communications, or documents related to bayareaanarchy@gmail.com.

56. Any evidence, including logs, server logs, communications, or documents related to +1 (415) 265-3858.

57. Any evidence including logs, server logs, communications, or documents related to +1 (516) 387-2248.

58. Any evidence, including logs, server logs, communications, or documents related to any cryptocurrency transactions by Andrew White.

59. Any evidence of cryptocurrency accounts created by or related to Andrew White.

60. Any evidence including logs, server logs, communications, or documents related to highhosting.net.

61. Any evidence, including logs, server logs, communications, or documents related to BTC-e.

62. Any evidence, including logs, server logs, communications, or documents related to The Aurum Xchange Company

63. Any evidence including logs, server logs, communications, or documents related to lr4485@aurumxchange.com.

64. Any evidence including logs, server logs, communications, or documents related to Mauro Pilipis.

65. Any evidence including logs, server logs, communications, or documents related to Liberty Reserve.

66. Any evidence including logs, server logs, communications, or documents related to Liberty Reserve ID U9440180.



67. Any evidence including logs, server logs, communications, or documents related to Liberty Reserve username andrew415.

68. Any evidence including logs, server logs, communications, or documents related to email shormint@hotmail.com.

69. Any evidence including logs, server logs, communications, or documents related to plasma@plasmadivision.com.

70. Any evidence including logs, server logs, communications, or documents related to heavydist@gmail.com.

71. Any evidence including logs, server logs, communications, or documents related to Vasily Kunnikov.

72. Any evidence including logs, server logs, communications, or documents related to Akemashite Omedetou.

73. Any evidence including logs, server logs, communications, or documents related to Mt. Gox

74. Any evidence including logs, server logs, communications, or documents related to Mt. Gox username Roso987341870.

75. Any evidence including logs, server logs, communications, or documents related to plasma@plasmadivision.com.

76. Any evidence including logs, server logs, communications, or documents related to nfs9000@hotmail.com.

77. Any evidence including logs, server logs, communications, or documents related to Daniel Garcia Muñoz.

78. Any evidence including logs, server logs, communications, or documents related to Mt. Gox username volfprius.

79. Any evidence including logs, server logs, communications, or documents related to volf.prius@hotmail.com.

80. Any evidence including logs, server logs, communications, or documents related to

**Appx6671**



Mt. Gox username kolbasa.

81. Any evidence including logs, server logs, communications, or documents related to kolbasa99@rambler.ru.

82. Any evidence including logs, server logs, communications, or documents related to Payward Ventures, Inc., a.k.a., Kraken, accounts.

83. Any evidence including logs, server logs, communications, or documents related to open-source public records databases related to the investigation.

84. Any evidence including logs, server logs, communications, or documents related to any banking institutions related to the investigation.

85. Any evidence including logs, server logs, communications, or documents related to bitcoinfog.com, their employees, or volunteers.

86. Any evidence including logs, server logs, communications, or documents related to LocalBitcoins.

87. Any evidence including logs, server logs, communications, or documents related to bitcoinfog.com and communications with any U.S. customers of bitcoinfog.com.

88. Any information related to the chain of custody and authentication of all digital evidence, including email accounts, as well as all the items and property seized from Mr. Sterlingov.

89. Any search warrants and arrest warrants.

90. Any information related to the transactions from any website to and from bitcoinfog.com, including all subdomains of bitcoinfog.com (including but not limited to gate.bitcoinfog.com and ftp.bitcoin fog.com) to any other website.

91. Any communications regarding this case between the DOJ and any potential witnesses, particularly but without limitation any alleged victim and any staff employed by or working with bitcoinfog.com.

92. Any documents of FBI interviews including "302 reports", and any relevant video and audio recordings.

93. Any email logs, and other memorialized forms of communication that are referenced



in the government's pleadings, criminal complaint, statement of facts, and supporting affidavits and declarations.

94. Any evidence including logs, server logs, communications, or documents related to undercover transactions intended or conducted by the government to be with Bitcoin Fog since 2011.

95. Any evidence including logs, server logs, communications, or documents of all correspondence, communications, records, or materials received or collected by the government in relation to this case.

96. A list of all government agents who participated in the investigation.

97. A record of all government employees, agents, contractors, vendors and the like who worked on this investigation, and when they worked on it.

98. A list of all unique individual bitcoin addresses Mt. Gox assigned to users.

99. A list of all non-unique bitcoin addresses Mt. Gox assigned to users

100. Any noted differences and/or disparities between Chainalysis and Elliptic Ltd. Regarding issues of fact or opinion related to this case.

101. Any contracts, agreements, billing records, documents, and communications between MITRE Corporation and the Government related to this case, particularly those for Aaron Bice.

2. **Expert Disclosure under Fed. R. Crim. Pro. 16**

102. Disclosure of the names of expert witnesses the government intends to call at trial, their qualifications, subject of testimony, and any reports by those witnesses.

103. Any documents, communications, information, experiments, and methodologies relied upon in the creation of any reports in relation to *94* above.

104. The results of tests, examinations or experiments which are intended for use by the government as evidence at trial, or which are material to the preparation of the defense. This latter category includes any examinations or tests conducted by the government that are incomplete, inconclusive, or not intended to be used by the government at trial.

**Appx6673**



**3.     *Brady, Giglio, Jencks, & Rovario* Material**

The Defense hereby requests all material it is entitled to, as soon as it is entitled to it, under *Brady* v. *Maryland*, 373 U.S. 83 (1963); *Giglio* v. *United States*, 405 U.S. 150 (1972); *Jencks* v. *United States*, 353 U.S. 657 (1957); *Rovario* v. *United* States, 353 U.S. 53 (1957), and their respective progeny; and 18 U.S.C. § 3500 and any relevant Court Rule or Order. This includes, without limitation:

a)  Information which would tend to attenuate, exculpate, exonerate, or mitigate the defendant's involvement in the circumstances alleged in the Indictment.

b)  Any information affecting the credibility of any government witnesses, including prior criminal records, inconsistent statements, "deals" or immunity agreements with any state or federal governmental personnel, and any benefits of any kind the witness may receive in return for cooperation.

c)  Any information from whatever source which may benefit the defendant under the Federal Sentencing Guidelines, including deductions in base offense level, reductions in specific offense characteristics, reductions in role in the offense, disputing relevant conduct, reducing criminal history, etc.

**4.     FRE 404(b) Evidence**

The defense requests notice of the government's intention to introduce into evidence under Federal Rule of Evidence 404(b) any evidence of other crimes, wrongs, or acts allegedly committed by the defendant. Such notice should include the nature of this evidence, the pertinent witnesses, any supporting documentation, and the legal theory of admissibility to be relied upon by the government.

**5.     Form of Production**

For all non-publicly available electronic material the defense requests production in native formats with all metadata intact.

This letter does not purport to exclusively list the material the defense seeks under the U.S. Constitution, the Federal Rules of Criminal Procedure, any relevant statute or common law authority, or any relevant Court Order or Rule. To the extent the government is in possession, custody, or control of material that it has an obligation to produce but that is not mentioned in this letter, we ask that you produce that material as soon as reasonably possible. Nothing in this letter is to be construed as an admission or any type of waiver. These are ongoing requests, and we reserve the right to make additional discovery requests.

**Appx6674**



Sincerely,

Tor Ekeland
Michael Hassard

*Counsel for Defendant Roman Sterlingov*



# EXHIBIT A



## Definitions

1.    The term "any" includes "any," "all" and "every."

2.    The term "Document" shall be construed in the broadest sense allowed by law. The term "Document" includes, but is not limited to, any writings, drawings, graphs, charts, photographs, phonograph records, tape recordings, notes, diaries, reports, calendars, books, papers, accounts, electronic or videotape recordings, and any computer-generated, computer-stored, or electronically stored matter from which information can be obtained and translated, if necessary, into reasonable useable form. The term "Document" includes preliminary versions, drafts, and revisions.

3.    The term "records" shall be construed in the broadest sense allowed by law and includes but is not limited to any communications, emails, text messages, bank records, financial statements, notes, recordings, or the like.

4.    The terms "include" or "including" are used merely to emphasize certain types of information requested and should not be construed as limiting a subpoena in any way. "Including" should be construed in all cases as followed by the phrase "but not limited to."

5.    The terms "person," "individual," or "entity" mean any natural person or any business, legal or governmental entity or association.

6.    The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this subpoena all documents and information that would be excluded if such words were not so construed. The present tense includes the past and future tenses.

7.    The term "Chainalysis" includes the following entity and any affiliates, subsidiaries, agents, or vendors related to this matter:

**CHAINALYSIS, LLC** (Delaware Division of Corporations File No. 5731603)

**Appx6677**



and its directors, members, contractors, employees, volunteers, agents, representatives, or any affiliated entities controlled or owned by the above listed entity.

8.      The term "Excygent" means following entity and any affiliates, subsidiaries, agents, or vendors related to this matter:

**EXCYGENT LLC** (Virginia Corporation Commission Entity No. S6918975)

and its directors, members, contractors, employees, volunteers, agents, representatives, or any affiliated entities controlled or owned by the above listed entity.

9.      The term "MITRE" means the following entity and any affiliates, subsidiaries, agents, or vendors related to this matter:

**MITRE ENGENUITY, INCORPORATED** (Virginia Corporation Commission Entity No. 11037123)

and its directors, members, contractors, employees, volunteers, agents, representatives, or any affiliated entities controlled or owned by the above listed entity.

10.     The term "Bitcoin Fog" refers to the meaning of the same term as used by the Government in its pleadings and papers; and any evidence of its operations, directors, members, contractors, employees, volunteers, agents, representatives, or any affiliated entities.

11.     The term "blockchain analysis" refers to the meaning of the same term as used by the Government in its pleadings and papers; and any source code, algorithms, digital, analog, textual, mechanical, or investigative, methodologies used to trace any cryptocurrency or transactions in this case.



12.    The term "communication" means the transmission of information by any means, electronic, paper or other (in the form of facts, ideas, inquiries or otherwise), including, but not limited to e-mails, text messages, chat messages, web postings, social media postings, and messages from any and all messaging applications (including but not limited to Facebook, Google, Twitter, Slack, Chanty, Microsoft Teams, Discord, Mattermost, Confluence, Whatsapp, Signal). All communications shall include Source Codes, metadata, time stamps, dates, and complete content.

13.    All "communications" include communications made in both professional and personal capacities.

14.    The term "Source Code" includes any computer code used to perform blockchain analysis, log communications, or conduct investigations.

15.    The term "methodologies" includes any practices, procedures, rules or sets of methods.

16.    The term "Native File Format" refers to the default file format that a computer application or program uses to create or save files in a proprietary format that only that program or application can recognize and includes all the metadata attached to those files. For example, Microsoft Word documents should be produced in .doc format and not as a .pdf, and with all metadata, including track changes, intact.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROMAN STERLINGOV,<br><br>Defendant. | 21-CR-399 (RDM) |

**Defendant's Opposition to the Government's Motions in Limine for a
Willful Blindness Instruction as to Counts One & Three, and Permission to
Use in Opening - Dkt. 66**

1

Appx6680

# Table of Contents

*Introduction*........................................................................................................*2*

*Legal Standard*....................................................................................................*2*

*Argument*.............................................................................................................*3*

    **I.**    **This Court Should Reject the Willful Blindness Instruction** ................................... 3

        1.    There is no Evidence that Mr. Sterlingov was Involved with Bitcoin Fog that Justifies a Willful Blindness Instruction ................................................................................................... 3

        2.    The Facts do not Support an Inference of Defendant's Conscious Course of Deliberate Ignorance ......................................................................................................................... 4

        3.    The Government's Proposed Jury Instruction is Easily Misunderstood by Jurors as Mandating the Inference of Knowledge ..................................................................................... 5

    **II.**    **The Government's Request for a Willful Blindness Jury Instruction Should be Dealt With When the Court Decides on the Jury Charges** ........................................................... 5

    **III.**    **Application of a Willful Blindness Instruction is an Impermissible Importation of a Tort Standard into Criminal Law** ............................................................................................... 5

    **IV.**    **The Government's Proposed Jury Instruction Seeks to Side-Step the** *Mens Rea* **Requirements of the Charged Crimes** ................................................................................... 6

    *Conclusion*..........................................................................................................*6*

1

## Introduction

This Court should deny the Government's motion to allow a willful blindness jury instruction and deny the Government's request to refer to willful blindness in its opening statement. The Government has no direct evidence implicating Mr. Sterlingov as the operator of Bitcoin Fog. This Court should deny the Government's motion because it would be overly prejudicial to the defendant, and confusing to the jury.

## Legal Standard

A jury instruction as to willful blindness must meet a three-part test. The trial court may instruct the jury concerning willful blindness when (1) a defendant claims a lack of knowledge, (2) the facts support an inference of defendant's conscious course of deliberate ignorance, and (3) the instruction, taken as a whole, cannot be misunderstood by a juror as mandating the inference of knowledge.[1] More specifically, the jury instruction is proper when there is evidence to "support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution."[2]

---

[1] *See United States v. St. Michael's Credit Union,* 880 F.2d 579, 584 (1st Cir.1989); *see also United States v. Picciandra,* 788 F.2d 39, 46 (1st Cir.), *cert. denied,* 479 U.S. 847 (1986).
[2] *See United States v. Rivera,* 944 F.2d 1563, 1571 (11th Cir.1991) (citing *United States v. Alvarado,* 838 F.2d 311, 314 (9th Cir.1987), *cert. denied,* 487 U.S. 1222 (1988)).

The danger of an improper willful blindness instruction is "'the possibility that the jury will be led to employ a negligence standard and convict a defendant on the impermissible grounds that he should have known [an illegal act] was taking place.'"[3]

## Argument

I.     **This Court Should Reject the Willful Blindness Instruction**

1.     <u>There is no Evidence that Mr. Sterlingov was Involved with Bitcoin Fog that Justifies a Willful Blindness Instruction</u>

The Government attempts to improperly instruct the jury on willful blindness when there is no evidence that the Defendant has taken any steps to avoid knowledge of the specific criminal activity. There is no evidence at all that anyone ever saw any of the messages sent by the Government before its unilateral transfer of Government funds to and from a Bitcoin Fog account. There are no logs. There no eyewitnesses. There are no computer logs. There is no forensic evidence whatsoever in the discovery that shows anyone ever saw the Government's self-serving communications. This is why the Government's actions don't constitute entrapment, because entrapment requires the presence of a Defendant.

The Government is not entitled to a willful blindness jury instruction if it cannot establish that Mr. Sterlingov actually operated Bitcoin Fog. There is no such evidence despite th Government having seized all of his electronics and hand-written notes upon his arrest at LAX and placing him under physical surveillance, wiretap and pentraps when he travelled to the United States.

---

[3] *See United States v. Littlefield,* 840 F.2d 143, 148 n. 3 (1st Cir.), *cert. denied,* 488 U.S. 860 (1988) (quoting *United States v. White,* 794 F.2d 367, 371 (8th Cir.1986)) (additional citation omitted).

3

There is no evidence at all in the discovery regarding anything having to do with Mr. Sterlingov's knowledge of Bitcoin Fog's operation.

2.      The Facts do not Support an Inference of Defendant's Conscious Course of Deliberate Ignorance

The jury, as a matter of law, would not be able to make an inference that Mr. Sterlingov deliberately chose ignorance with respect to the undercover messages sent to Bitcoin Fog because there is no evidence that he ever saw them. An entirely legal website registration in 2011 does not support the proposition that Mr. Sterlingov saw an IRS agent's message sent to Bitcoin Fog in 2019. Nor does anything else in the discovery. The causal attenuation here is preposterous.

There is no evidence to support the inference that Mr. Sterlingov was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution. There is no evidence indicating that Mr. Sterlingov ever operated Bitcoin Fog, or had any knowledge of its operation.

Typically, in cases where a willful blindness instruction is requested, there is some direct evidence, like eyewitnesses, to place the defendant at the scene of the crime. Here, there is none whatsoever. Despite the Government's nearly decade-long investigation, the Government has been unable to produce any evidence linking Mr. Sterlingov to the operation of Bitcoin Fog beyond unscientific speculation. Without any evidence linking Mr. Sterlingov to the crimes for which he is accused, the Government is doubling down on its prosecution by requesting this Court to lower their handicap and allow the prosecution to refer to willful

4

**Appx6684**

blindness it it's opening statement. This Court should deny the Government's motion in its entirety.

### 3. The Government's Proposed Jury Instruction is Easily Misunderstood by Jurors as Mandating the Inference of Knowledge

The Government glazes over the fact that there is no evidence of implicating Mr. Sterlingov in the operation of Bitcoin Fog. Introducing the Government's proposed jury instruction runs a high risk of confusing the jury as to the general and specific intent requirements for all counts in the Indictment by making the jury think that it is merely enough that Mr. Sterlingov should have known of the operation of Bitcoin Fog rather than having the constitutionally required mens rea.

The prosecution's opening statement is not an appropriate time to bring up the concept of willful blindness with the jury because the Government at this juncture has yet to prove anything. It is unduly prejudicial and argumentative and as such does not belong in an opening statement. There is no evidence that Mr. Sterlingov ignored the Government's messages to Bitcoin Fog because there is no evidence that he knew of their existence.

## II. The Government's Request for a Willful Blindness Jury Instruction Should be Dealt With When the Court Decides on the Jury Charges

The Government's motion for a willful blindness jury instruction is premature. Its proper place is in the Government's motion for proposed jury charges, currently scheduled for a deadline of November 21, 2022. This Court should deny the Government's Motion in Limine because this is a jury charge question and not an issue for resolution on motions in limine.

## III. Application of a Willful Blindness Instruction is an Impermissible Importation of a Tort Standard into Criminal Law

5

**Appx6685**

The Government's request for a willful blindness instruction and the ability to use it in its opening statement is a constitutionally impermissible importation of a tort law negligence standard into criminal law. As such, it violates both the Fifth and Sixth Amendments of the United States Constitution.

**IV.     The Government's Proposed Jury Instruction Seeks to Side-Step the *Mens Rea* Requirements of the Charged Crimes**

The Government has the burden of proving beyond a reasonable doubt that Mr. Sterlingov possessed the appropriate *mens rea* at the time of the charged crime. There is no evidence as to Mr. Sterlingov's *mens rea* because there is no evidence that Mr. Sterlingov ever operated Bitcoin Fog. The Government is not entitled to a jury instruction on a defendant willfully ignoring criminal behavior when there is no evidence that the defendant could have known of the criminal behavior in question. This tort-like negligence standard implicit in the willful blindness jury instruction risks erasing all the general and specific intent requirements of the charged crimes and substitutes an amorphous, ambiguous and confusing *mens rea* standard for the jury to consider that is found nowhere in the relevant statutes, and is unconstitutional as a matter of criminal law.

**Conclusion**

This Court should deny the Government's motion to allow a willful blindness jury instruction, and deny the Government the discretion to refer to willful blindness in its opening statement. In the alternative, this Court should hold a hearing on this matter.

6

**Appx6686**

Dated: November 7th, 2022
Brooklyn, New York

Respectfully submitted,

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Marina Medvin, Esq.
Counsel for Defendant
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com

*Counsel for Defendant Roman Sterlingov*

7

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of November 2022, the forgoing document was filed with the Clerk of Court using the CM/ECF System. I also certify that a true and correct copy of the foregoing was sent to the following individuals via e-mail.

<u>s/ Tor Ekeland</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

8

**Appx6688**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 21-399 (RDM) |
| ROMAN STERLINGOV, | |
| *Defendant.* | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Roman Sterlingov's motion for release of funds, Dkt. 48, and supplemental motion for the same, Dkt. 101. Sterlingov is charged with money laundering conspiracy, money laundering, operating an unlicensed money transmitting business, and money transmission without a license, all in relation to his alleged operation of a Bitcoin mixer known as Bitcoin Fog. Dkt. 43 (Superseding Indictment). Pursuant to a warrant issued by a U.S. Magistrate Judge, the government has seized certain of his assets that it alleges were involved in the charged offenses. *See* Dkt 40; Dkt. 53-2. Sterlingov seeks release of these funds to pay for his legal defense. Dkt. 48; Dkt. 101. For the reasons that follow, the Court will **DENY** Sterlingov's motions. Dkt. 48; Dkt. 101.

## I. BACKGROUND

The following background is taken from the government's charging instruments; the affidavit of Special Agent Devon Beckett; the parties' proffers and testimony at the hearings held on January 13, 2023 and January 31, 2023; and the exhibits tendered to the Court, including the seizure warrant affidavit and the declaration of Staff Operations Specialist Luke Scholl. It bears emphasis, however, that the Court's description of the facts is necessarily preliminary and does

**Appx6689**

not represent a determination on the merits, which is both premature and, in any event, the sole province of the jury.

The government contends that Sterlingov operated "an illicit Bitcoin money transmitting and money laundering service" known as Bitcoin Fog.  Dkt. 1-1 at 1; *see also* Dkt. 43.  Bitcoin, also known as BTC, "is a decentralized form of electronic or digital currency that exists only on the internet." *United States v. Harmon*, 474 F. Supp. 3d 76, 80 (D.D.C. 2020) (quotation marks and alterations omitted).  The term "bitcoin" refers both to "a system" that facilitates financial transactions and to "a unit" of currency. *Id.*  Bitcoin the system "is a peer-to-peer network enabling proof and transfer of ownership—of units, or tokens, also called bitcoin—without involving a third-party such as a bank." *id.*; bitcoin the unit is a virtual currency "transacted over the Internet using Bitcoin software," Dkt. 1-1 at 1 n.2.  This software permits users to create "'Bitcoin addresses,' roughly analogous to anonymous accounts," and to "securely transfer[] bitcoin from one Bitcoin address to another." *Id.*  "[T]he identity of a Bitcoin address owner is generally anonymous." *Id.* at 3.  But the government maintains that "law enforcement can often identify the owner of a particular Bitcoin address by analyzing the blockchain," which "is essentially a distributed public ledger that keeps track of all Bitcoin transactions, incoming and outgoing, and . . . records every address that has ever received a bitcoin and maintains records of every transaction." *Id.* at 3 & n.3.  Sterlingov and his experts do not accept this premise and, instead, argue that blockchain analysis is unscientific and unreliable. *See, e.g.*, Dkt. 48 at 7–11; Dkt. 48-1 (Vickery Decl.).

Bitcoin Fog is a bitcoin mixer (or tumbler) that offers enhanced anonymity to those engaged in bitcoin transactions.  Dkt. 1-1 at 1. The service enables users to "send bitcoins to designated recipients in a manner designed to conceal and obfuscate the source of the bitcoins."

2

Dkt. 1-1 at 1–2. Bitcoin Fog does this by "disassociating incoming bitcoin from particular Bitcoin addresses or transactions and then comingling that bitcoin with other incoming bitcoin prior to conducting any further transactions." *Id.* at 2. Simplified somewhat, the process works as follows: Users who register with Bitcoin Fog receive a randomly generated account into which they can deposit bitcoins. Dkt. 106-1 at 2 (Gov't's Suppl. Ex. 1). Bitcoin Fog then gradually draws these bitcoins down into a centralized pool comprised of many bitcoins from many users. *Id.* Users can then schedule withdrawals, at which point funds from the pool are sent to them at a separate account, at random times and in random amounts, until the full withdrawal has been accomplished. *Id.* This process makes it next to impossible to determine the origin of the bitcoin deposited in that separate account. Dkt. 1-1 at 2. For that reason, Bitcoin Fog is allegedly used by those engaged in criminal activity to launder illicitly obtained funds. *Id.*

Bitcoin Fog makes money by charging a fee of between 2% and 2.5% of each transaction that it processes. *Id.* at 11. Based on the service's alleged transaction volume, the government calculates that it has generated approximately $8 million in fees, assuming that its proceeds (taken in bitcoin) were converted into cash at or near the time of the relevant transactions. *Id.* But bitcoin has appreciated dramatically since Bitcoin Fog's inception—from $2 during the fall of 2011 when Bitcoin Fog launched to around $50,000 at the time Sterlingov was charged—so the government estimates that Bitcoin Fog may have generated nearly $70 million in profits at more recent valuations. *Id.*

The government has proffered some evidence that parties seeking to launder the proceeds of criminal activities comprise a substantial portion of Bitcoin Fog's customer base. *Id.* at 3–5. In particular, the government presents evidence that Bitcoin Fog has processed more than $78

3

**Appx6691**

million in transactions from "darknet markets"—hidden online businesses that "primarily traffic in illegal narcotics and other illegal goods and services." *Id.* at 4. There is also evidence that Bitcoin Fog's operators were aware of the nature of its customers. *Id.* at 2–3. Indeed, one of Bitcoin Fog's selling points was that its operators could not be found by nor would they cooperate with the authorities. *Id.* at 2–3. In addition, the government has provided evidence that Sterlingov was involved in Bitcoin Fog's founding and operations. *Id.* at 7–11.

On April 26, 2021, the government charged Sterlingov by criminal complaint with money laundering, in violation of 18 U.S.C. § 1956(a)(3); operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a); and money transmission without a license, in violation of D.C. Code § 26-1023(c). Dkt. 1. Sterlingov was arrested the following day in Los Angeles and was subsequently transported to the District of Columbia. Dkt. 53 at 3. He was later charged in a three-count indictment with the same offenses charged in the complaint: money laundering (Count One), operating an unlicensed money transmitting business (Count Two), and money transmission without a license (Count Three). Dkt. 8 at 1–3. The indictment also contained a criminal forfeiture allegation, seeking forfeiture, upon Sterlingov's conviction on Counts One and Two, of "any property, real or personal, involved in the offense, and any property traceable thereto," pursuant to 18 U.S.C. § 982(a)(1). *Id.* at 3.

Three days after Sterlingov was indicted, a U.S. Magistrate Judge of this Court issued a seizure warrant for the contents of two accounts associated with Sterlingov at the digital currency exchange known as Kraken. Dkt. 53-2 at 5. The warrant was issued based on an affidavit alleging probable cause to believe that the contents of these accounts "constitute the proceeds of, and property involved in" the operation of Bitcoin Fog, in violation of 18 U.S.C. § 1956(a) and 18 U.S.C. § 1960(a). *Id.* at 31. One of these accounts was held in Sterlingov's name and the

4

other in the name of TO THE MOON LTD. *Id.* at 5; Rough Hearing Tr. at 109 (Jan. 31, 2023). The government executed the warrant and seized the following:

- $349,625.72 in cash

- 0.10877 in BTC

- 205.9625 Ethereum (ETH) (a cryptocurrency)

- 9,371.52683 Stellar (XLM) (a cryptocurrency)

- 35.9998 Monero (XMR) (a cryptocurrency)

Dkt. 40 at 1–2. The government has also provided notice that, if Sterlingov is convicted, it intends to seek forfeiture of 1,354 BTC currently held in a cryptocurrency wallet that the government attributes to Bitcoin Fog. *Id.* at 2

A grand jury returned a superseding indictment on July 18, 2022. Dkt. 43. The superseding indictment contains a new Count One for Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h). *Id.* at 1–2. The other counts mirror those in the original indictment: Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A), (B) (Count Two); Operating an Unlicensed Money Transmitting Business and Aiding and Abetting in violation of 18 U.S.C. § 1960(a) & 2 (Count Three); and Money Transmission Without a License in violation of D.C. Code § 26-1023(c) (Count Four). *Id.* at 3–5. As before, the indictment also contains a criminal forfeiture allegation under 18 U.S.C. § 982(a)(1). *Id.* at 5–6. This allegation provides additional detail on the seized contents of the Kraken accounts and reflects the government's intent to seek forfeiture of the contents of the alleged Bitcoin Fog wallet if Sterlingov is convicted. *Id.*

Sterlingov now seeks release of his seized funds. Dkt. 48; Dkt. 101. He contends that he needs the money to pay for the counsel of his choice and other litigation expenses, most notably

5

expert witness fees. Dkt. 48 at 25–26; Dkt. 101 at 12–16. The Court held hearings on this matter on January 13, 2023 and January 31, 2023, at which the parties presented evidence and argument regarding Sterlingov's need for his funds and the evidentiary basis of the seizure. Min. Entry (Jan. 13, 2023); Min. Entry (Jan. 31, 2023).

## II. ANALYSIS

### A.    Legal Framework

Individuals convicted of certain federal crimes, including all three federal crimes charged here, must forfeit to the United States any property "involved in" their offenses or property "traceable to" property involved in their offenses. 18 U.S.C. § 982(a)(1). Even before trial, the government can seize the property of a defendant indicted for these crimes if it can convince a court that there is probable cause to believe that: (1) "the defendant has committed an offense permitting forfeiture," and (2) "the property at issue has the requisite connection to that crime." *Kaley v. United States*, 571 U.S. 320, 323–24 (2014); *see also* 18 U.S.C. § 982(b)(1); 21 U.S.C. § 853(e), (f). In other words, if there is probable cause to believe that an indicted defendant's property will be subject to forfeiture upon the defendant's conviction, the government can seize it in advance. *United States v. Monsanto*, 491 U.S. 600, 615 (1989) (upholding the constitutionality of this practice). And, once the government has seized property on this basis, the property lies beyond the defendant's reach pending further order of the court, even if the defendant "seeks to use the disputed property to pay for a lawyer." *Kaley*, 571 U.S. at 322.

A defendant may move for the release of his seized assets, but he faces a high hurdle. He must first make a showing of need. *See United States v. E-Gold, LTD.*, 521 F.3d 411, 417, 421 (D.C. Cir. 2008), *abrogated in part on other grounds by Kaley v. United States*, 571 U.S. 320. This requirement is satisfied "at least where access to the assets is necessary for [the defendant's]

6

**Appx6694**

effective exercise of the Sixth Amendment right to counsel"—*i.e.* if the defendant needs the funds to pay for his counsel of choice. *Id.* at 421. A defendant who makes that showing may then challenge the seizure of his assets on the merits and has the right to an adversarial hearing in which to do so. *Id.* at 419. But he may not attack the grand jury's determination of probable cause that he has "committed an offense permitting forfeiture;" the indictment is "conclusive" on that score. *Kaley*, 571 U.S. at 323, 331. Instead, the defendant may only challenge *whether the specific property that has been seized is forfeitable*—that is, whether the property at issue is sufficiently connected to the charged crime. *See E-Gold*, 521 F.3d at 419; *United States v. Bikundi*, 125 F. Supp. 3d 178, 185 (D.D.C. 2015) (recognizing that *Kaley* specifically declined to decide whether a defendant can challenge "the forfeitability of the specified property" and that *E–Gold*'s recognition of a right to make such a challenge, accordingly, remains intact); *see also Kaley*, 571 U.S. at 324 ("Since *Monsanto*, the lower courts have generally provided a hearing to any indicted defendant seeking to lift an asset restraint to pay for a lawyer. In that hearing, they have uniformly allowed the defendant to litigate . . . whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment."). Where forfeiture is based on allegations of money laundering or operating an unlicensed money transmitting business, this means that a defendant may challenge whether the seized property was "involved in" these offenses or is traceable to property that was. *E-Gold*, 521 F.3d at 419; 18 U.S.C. § 982(a)(1).

The weight of authority holds that once a defendant has satisfied the need prong of the inquiry, the government bears the burden of showing—defending, really, since it has already made the showing once—that there is probable cause to conclude that the seized property is traceable to the charged offenses. *See United States v. Bonventre*, 720 F.3d 126, 131 (2d Cir.

2013); *United States v. Jamieson*, 427 F.3d 394, 406 (6th Cir. 2005); *United States v. Omidi*, No. 17-661, 2021 WL 7629897, at *5 (C.D. Cal. June 15, 2021); *United States v. Swenson*, No. 13-00091, 2013 WL 4782134, at *2 (D. Idaho Sep. 5, 2013). *But see United States v. Farmer*, 274 F.3d 800, 805 (4th Cir. 2001). Although the D.C. Circuit has yet to address this question, the government is willing to assume *arguendo* that it bears the burden here, and the Court will assume the same. That said, probable cause is "not a high bar." *Kaley*, 571 U.S. at 338. "It requires only the 'kind of fair probability on which reasonable and prudent people, not legal technicians, act.'" *Id.* (cleaned up) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

**B.     Need**

Sterlingov has met his burden of showing that he needs the seized funds. He has attested that, without these funds, he lacks the means to pay his current counsel, who is counsel of choice. Dkt. 101-1 at 10 (Sterlingov Decl. ¶ 58). In support of this assertion, he has submitted a declaration affirming that his legal expenses "far exceed" what he has been able to pay his attorneys using the assets at his disposal and that he lacks money "to pay for the expensive experts necessary in this complex blockchain prosecution." *Id.* He has also provided the Court a summary of his assets, both seized and unseized. *Id.* at 8–9 (Sterlingov Decl. ¶¶ 47–58); Dkt. 102 (Pl.'s Sealed Exhibit). Based on that summary and representations from Sterlingov's counsel, the Court finds that Sterlingov's unseized assets are insufficient to retain his current counsel, at least for the duration of this case and without limiting the scope of the work that his counsel recommends. Rough Hearing Tr. at 24–27 (Jan. 13, 2023). His counsel repeatedly affirmed that absent access to the seized funds or some other accommodation he could not afford to continue representing Sterlingov in this matter, at least not with the same degree of time and investment as he has to date. *Id.* Nor was he prepared to commit to handle the case through trial

and without significant limitation at the reduced rates available under the Criminal Justice Act. Rough Hearing Tr. at 129 (Jan. 31, 2023). Finally, the Court notes that this is complex case and that the fees and expenses that Sterlingov's counsel anticipates incurring appear realistic. Rough Hearing Tr. at 8–9, 15, 17–18 (Jan. 13, 2023); *see* Dkt. 110 at 3 (Def.'s Ex. K).

Sterlingov's showing of need is in line with the showing that was deemed sufficient in *E-Gold*, the D.C. Circuit's leading precedent on this issue. There, as here, the defendants provided statements under the penalty of perjury detailing their assets and attesting that, without the encumbered funds, they would not be able to pay for the counsel of their choice. *See, e.g., E–Gold*, No. 07-109, Dkt. 35-5 at 6 (D. Jackson Aff. ¶ 15); Dkt. 35-6 at 3 (R. Jackson Aff. ¶¶ 4–7); Dkt. 35-7 at 4–5 (Downey Aff. ¶¶ 10, 16); Dkt. 35-3 at 4 (E–Gold Aff. ¶ 17). It is true that some defendants in this district who have made similar representations have nevertheless failed to meet the need hurdle, because they could not substantiate that their counsel of choice would be unable to represent them without access to their funds. *See, e.g., United States v. Emor*, 794 F. Supp. 2d 143, 149 (D.D.C. 2011); *United States v. Edwards*, 856 F. Supp. 2d 42, 46 (D.D.C. 2012). But as explained, Sterlingov and his counsel have made that showing. So the Court is satisfied that absent the release of his seized funds Sterlingov will, in all likelihood, be deprived of his counsel of choice—if not immediately and totally, at least at some point or to some material extent before the case reaches verdict.

The government must therefore satisfy its burden on the issue of traceability in order to preclude Sterlingov from accessing the seized assets.

## C.     Traceability

The key facts bearing on the traceability inquiry are less contested than one might expect. Sterlingov admits that most if not all of the seized funds arrived in his Kraken accounts by way

9

of Bitcoin Fog, either directly or after passing through intermediary accounts. Dkt. 101-1 at 9 (Sterlingov Decl. ¶ 54) ("It was a common security practice of mine to mix any assets through Bitcoin Fog before depositing them into my Kraken account.").[1] Rather than take aim at that premise, he devotes the bulk of his factual response to advancing the contention that he earned the funds deposited in those accounts through legitimate means. *Id.* at 5 (Sterlingov Decl. ¶ 29); Rough Hearing Tr. at 21–22 (Jan. 31, 2023). As Sterlingov tells it, his Kraken accounts contain money he earned from licit employment and gains from his cryptocurrency investments, not proceeds earned from operating Bitcoin Fog or any other illegal activity. Dkt. 101-1 at 4–6 (Sterlingov Decl. ¶¶ 14, 17, 20, 28, 35); Rough Hearing Tr. at 21–22 (Jan. 31, 2023). The government, for its part, agrees that the seized funds reached Sterlingov's Kraken accounts by way of Bitcoin Fog, a conclusion that it reached independently through its analysis of the blockchain. Dkt. 53-2 (Warrant Aff.); Dkt. 53-5 (Scholl Decl.). And, although the government relies on the grand jury's finding of probable cause that Sterlingov operated Bitcoin Fog as a money laundering enterprise, it devotes little effort to showing that the specific funds deposited

---

[1] Sterlingov confirmed this admission at the hearing:

Q:  And you stated in paragraph 54 of that declaration: It was a common security practice of mine to mix any assets through Bitcoin Fog before depositing them into my Kraken account, right?

A:  Yes.

Q:  And that's true, right?

A:  It's true.

Q:  And is it true that you mixed most, if not all, of the deposits into that Kraken account through Bitcoin Fog before depositing them?

A:  Yes.

Rough Hearing Tr. at 53–54 (Jan. 31, 2023).

10

in the Kraken accounts constitute the profits that Sterlingov earned by doing so. Rough Hearing Tr. at 110–12 (Jan. 31, 2023). As a result, the Court will consider whether—regardless of how Sterlingov initially obtained the funds at issue—the fact that the funds were transmitted through Bitcoin Fog is sufficient to establish probable cause that they were "involved in" one or more of the charged offenses. 18 U.S.C. § 982(a)(1).

The applicable law, the offenses charged, and the nature of Bitcoin Fog's service all weigh against Sterlingov's request for relief. Begin with the law. The relevant forfeiture statute, 18 U.S.C. § 982(a)(1), "sweeps broadly" to cover all funds "involved in" money laundering, money laundering conspiracy, or operating an unlicensed money transmitting business. *United States v. Bikundi*, 926 F.3d 761, 793 (D.C. Cir. 2019). Because money laundering typically "depends upon the use of legitimate monies to advance or facilitate the scheme," even funds that are not themselves the proceeds of illegal activity can become "involved in" a money laundering operation. *Id.* (internal quotation marks omitted). To be sure, the D.C. Circuit has yet definitively to interpret this provision. But it has observed—without qualification or disapproval—that "other circuits have held that funds 'involved in' money laundering include those that 'facilitate' the money laundering scheme, which encompasses unlaundered funds when they are transferred 'in order to conceal the nature and source' of [criminal] proceeds." *Id.* The Tenth Circuit, for instance, has explained that although "the mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture, . . . forfeiture of legitimate and illegitimate funds commingled in an account is proper as long as the government demonstrates that the defendant pooled the funds to facilitate, i.e., disguise the nature and source of [] his scheme." *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998). Other circuits have held that property

11

"facilities" criminal activity—and is thus "involved in" it—where it makes such activity "less difficult or more or less free from obstruction or hindrance." *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997) (quoting *United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990)).

This interpretation of § 982(a) comports with the plain language of the statute and with common sense. Not only has the interpretation been widely embraced in other circuits, *see, e.g., United States v. McGauley*, 279 F.3d 62, 76–77 (1st Cir. 2002); *Tencer*, 107 F.3d at 1134; *United States v. Baker*, 227 F.3d 955, 969–70 (7th Cir. 2000); *Bornfield*, 145 F.3d at 1135; *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003), it also gives the phrase "any property . . . involved in such offense" its natural meaning, 18 U.S.C. § 982(a). Had Congress intended to limit forfeiture under § 982(a) to the *proceeds* of the illegal activity, it could easily have done so. But instead Congress wrote the statute to reach money "involved" in such activity. *See Involved*, Merriam-Webster, https://www.merriam-webster.com/dictionary/involved (last visited Mar. 2, 2023) ("having a part in something: included in something"); *Involved*, Oxford English Dictionary (2d ed. 1989), https://www.oed.com/oed2/00120757 (last visited Mar. 3, 2023) (def. 5 "[t]o implicate in a charge or crime; to cause or prove (a person) to be concerned in it;" def. 6 "[t]o include; to contain, imply"). The D.C. Circuit approved this reading of the statute under a plain error standard in *United States v. Bikundi*, 926 F.3d at 793–94, and Sterlingov has failed to identify any authority to the contrary, *cf. United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352–53 (D.C. Cir. 2002) (noting that 18 U.S.C. § 1956, the substantive money laundering statute, reaches all funds "involved" in covered criminal activity, including, for example, "a particular [] sum used as the bankroll facilitating the fraud" (internal quotation marks omitted)).

12

**Appx6700**

There is less precedent on forfeiture related to the operation of an unlicensed money transmitting business, but such law as there is suggests that all money transmitted through such a business is subject to forfeiture. In *United States v. Elfgeeh*, 515 F.3d 100, 122, 138 (2d Cir. 2008), for instance, the defendants had been convicted of running an unlicensed money transmitting business out of an ice cream shop. The Second Circuit upheld, albeit in part under a plain-error standard, the forfeiture of "all assets that passed through the [ice cream shop's] account"—a number that appears to have included all money unlawfully transferred as well as any proceeds the ice cream shop collected. *See id.* As the court saw it, funds "transferred in the unlicensed operation" of the business were "involved in" it, which is all 18 U.S.C. § 982(a)(1) requires. *Id.* at 138–39; *id.* at 139 (treating the "total amount" deposited in and withdrawn from the ice cream shop's account as "integral to the offenses"); *see also United States v. $715,031.27*, 587 F. Supp. 2d 1275, 1277–78 (N.D. Ga. 2008) (same under identically worded civil forfeiture statute); *cf. United States v. Hodge*, 558 F.3d 630, 635 (7th Cir. 2009) (explaining that "[w]hen a business has both lawful and unlawful aspects, only income attributable to the unlawful activities is forfeitable," but when "the business as a whole was overwhelmingly [unlawful], . . . everything is forfeitable"). Here, however, the Court need not go as far as the Second Circuit did in *Elfgeeh*. Unlike what may have been true of funds in the ice cream shop's account, *all* funds deposited with Bitcoin Fog were intermingled (or tumbled) with other funds, and thus *all* of the funds were "involved in" the alleged operation of an unlicensed money transmitting business.

The potency of the forfeiture statute is enhanced in this context by the rule of *Kaley*: the Court must assume that there is probable cause to believe that Sterlingov committed the charged offenses. 571 U.S. at 323. Although the Court is aware of no decision analyzing the extent to

13

**Appx6701**

which the grand jury's finding of probable cause that the alleged crimes were committed should bleed into the traceability analysis, the Supreme Court's reasoning in *Kaley* applies with equal force in this context: "[a] defendant has no right to judicial review of a grand jury's determination of probable cause to think a defendant committed a crime." 571 U.S. at 333. That is so regardless of whether the defendant seeks to revisit that finding to challenge an indictment as factually inaccurate, to obtain pretrial release, to challenge the probable cause foundation of a seizure order, or to challenge traceability. *Id.* at 327–33 & n.6. The grand jury's finding of probable cause that Sterlingov operated Bitcoin Fog as a money laundering enterprise and as an unlicensed money transmitting business, therefore, bears on the Court's analysis of whether the Kraken funds are traceable to the crimes charged in the indictment. Dkt. 43 at 1, 3. And if that much is a given, Sterlingov must be presumed both to have understood how Bitcoin Fog worked and to have knowingly participated in its alleged unlawful activities. *Id.* at 1–2.

This legal framework—broad forfeiture authority and a presumption that Sterlingov has committed the charged offenses in the manner specified in the indictment—must then be applied to two essential facts. The first, as noted above, is that Sterlingov admits that he mixed most, if not all, of the seized funds using Bitcoin Fog before those funds reached his personal accounts. Dkt. 101-1 at 9 (Sterlingov Decl. ¶ 54); Rough Hearing Tr. at 53–54 (Jan. 31, 2023). The second is that the very essence of Bitcoin Fog's service was commingling—that is, mixing—funds. Dkt. 106-1 at 2 ("[U]sing our service you mix up your bitcoins in our own pool, with other users' bitcoins, and get paid back to other accounts from our mixed pool, which, if properly done by you can eliminate any chance of finding your payments and mak[e] it impossible to prove any connection between a deposit and a withdraw[al] inside our service."). It anonymized bitcoins by combining them with other bitcoins, and, importantly, without a sufficiently large pool of

14

**Appx6702**

bitcoins to mix, it would not have worked. *Id.* Each deposit of funds into Bitcoin Fog therefore contributed to its efficacy and facilitated its activities—both lawful and unlawful. To be sure, the seized funds represent only a small fraction of the total funds that Bitcoin Fog allegedly mixed. But that fact does not mean that the seized funds were "uninvolved" in Bitcoin Fog's money laundering or unlicensed money transmitting operations. Just as someone playing a game of Jenga can remove a block without the tower falling, one can remove specific funds from a money laundering operation without crippling the scheme. But there is little doubt that those funds, like the Jenga blocks, support the endeavor.

Taken together, these propositions lead inescapably to the conclusion that there is probable cause to believe that Sterlingov's seized funds were "involved in" the charged offenses. By running funds through Bitcoin Fog, Sterlingov facilitated its operations, irrespective of how the funds were initially procured. And those operations, the Court must assume, were generally unlawful because Bitcoin Fog was an unlicensed money transmitting business and because they, at least in part, involved a money laundering conspiracy. *See* Dkt. 43. As the presumed operator of Bitcoin Fog, Sterlingov would have understood all of this. So even if the funds at issue were first obtained through legal means, Sterlingov would have known that by combining them with the rest of the funds in Bitcoin Fog's pool, he was facilitating Bitcoin Fog's criminal activities. The seized funds are therefore subject to forfeiture. *See* 18 U.S.C. 982(a)(1); *Bornfield,* 145 F.3d at 1135.

This result mirrors that which Chief Judge Howell reached in *United States v. Harmon,* 474 F. Supp. 3d 76 (D.D.C. 2020), another Bitcoin mixer case. Like Sterlingov, the *Harmon* defendant was charged with money laundering conspiracy and operating an unlicensed money transmitting business. *Id.* at 80. The government seized certain of his funds pretrial, and he too

15

moved for their release so that he could pay his counsel. *Id.* at 85 n.5. Chief Judge Howell denied the motion, rejecting the defendant's contention that only funds "shown to be from narcotics transactions" could be forfeited. *Id.* She explained that "property need not be directly derived from the predicate unlawful activity to be forfeitable, as the [forfeiture] statute covers any property 'involved in' the ongoing conspiracy." *Id.* As such, she reasoned, when a "[money laundering] conspiracy takes the form of a business, all funds flowing through the business that 'bankroll' or otherwise facilitate the alleged conspiracy are 'involved in it'" and may be restrained. *Id.* (quoting *Baker*, 227 F.3d at 969–70). So it is here as well.

**D.      Counterarguments**

Sterlingov offers several counterarguments, none of which is persuasive. Most of all he attacks the strength of the government's evidence that he operated Bitcoin Fog. *See* Dkt. 48 at 7–8; Dkt. 101 at 3, 6–7, 10, 14–15; Rough Hearing Tr. at 31, 34, 118–23 (Jan. 31, 2023). Under *Kaley*, however, this argument misses the point. 571 U.S. at 331. The grand jury's finding of probable cause that Sterlingov committed the charged offenses through his operation of Bitcoin Fog is "conclusive" for present purposes. *Id.* Sterlingov also contends that the blockchain tracing analysis that the government used to tie the funds in his Kraken accounts to Bitcoin Fog is unreliable. Dkt. 48 at 6–11; Dkt. 48-1 (Vickery Decl.). But because he has admitted that the funds in his Kraken account arrived there after being mixed in Bitcoin Fog, Dkt. 101-1 at 9 (Sterlingov Decl. ¶ 54); Rough Hearing Tr. at 53–54 (Jan. 31, 2023), he has conceded the very thing that the government was trying to prove through its blockchain analysis. That analysis is thus corroborated, or, in any event, unnecessary in light of Sterlingov's own testimony.

Sterlingov spent much of the hearing attempting to show that the seized funds were initially derived from lawful activity and were not profits earned through the operation of Bitcoin

Fog.  Rough Hearing Tr. at 121–23 (Jan. 31, 2023).  He testified that he had legitimate sources of income and that he was an early investor in Bitcoin, which has appreciated dramatically over the last decade.  *Id.* at 10–12, 16, 17, 22.  The government has its counterpoints: It elicited some evidence that Sterlingov had spent most of the bitcoin he concededly had acquired through lawful means years ago, long before the funds at issue were transferred from Bitcoin Fog to his Kraken accounts.  *Id.* at 83–85.  It also points out that if Sterlingov in fact obtained his funds lawfully before mixing them, then there should be some electronic record of his transfers *into* Bitcoin Fog.  Dkt. 106 at 7, 9–10; Rough Hearing Tr. at 95–96 (Jan. 31, 2023).  Yet neither the government nor Sterlingov has identified any such records, raising the inference, says the government, that Sterlingov generated the funds through the operation of Bitcoin Fog.  Dkt. 106 at 7, 9–10.

None of this dueling evidence makes a difference, however, because, as the Court has explained, the seizure of Sterlingov's funds can be sustained even if the Court accepts Sterlingov's position that the funds were lawfully acquired in the first instance.  By tumbling his funds through Bitcoin Fog—with knowledge, the Court must assume, of its operations, lack of a license, and involvement in money laundering—Sterlingov facilitated Bitcoin Fog's unlawful activities.  Thus, even though Sterlingov is correct that it is not per se unlawful to mix cryptocurrency, Rough Hearing Tr. at 126 (Jan. 31, 2023), that is no answer under the circumstances present here.  It *is* unlawful to mix cryptocurrency if one is the operator of a bitcoin mixer that is both an unlicensed money transmitting business and involved in a money laundering conspiracy, because adding funds to the mixer's underlying pool of funds facilitates its criminal activity.  The combination of broad statutory forfeiture authority, the nature of the

17

charged offenses, Bitcoin Fog's business model, and Sterlingov's concession regarding his use of Bitcoin Fog resolve the issue.

Sterlingov's remaining contentions can be dealt with in short order. He maintains that the seizure warrant lacks particularity and was unsupported by probable cause. Dkt. 48 at 18–21. For all of the reasons just provided, the Court disagrees as to probable cause. Nor does the seizure warrant lack particularity, as it specifically identifies the two Kraken accounts, the contents of which were seized. Dkt. 53-2 at 5. He also argues that the forfeiture was conducted in violation of the Department of Justice's Asset Forfeiture Policy Manual. Dkt. 48 at 23. But, as the government points out, this policy manual states that it "does not create or confer any legal rights, privileges, or benefits that may be enforced in any way by private parties." Dep't of Just., *Asset Forfeiture Policy Manual* 1 (2021), https://www.justice.gov/criminal-afmls/file/839521/download. Finally, Sterlingov renews his attack on criminal venue in the District of Columbia, made at greater length in his motion to dismiss the indictment. *See* Dkt. 46 at 9–12. But the legality of venue is not at issue here. The only thing Sterlingov can contest in moving to release his funds is whether those funds have a sufficient connection to the charged offenses. *Kaley*, 571 U.S. at 324 n.3, 333. The Court will take up Sterlingov's venue arguments at another time.[2]

## CONCLUSION

The Court recognizes that Sterlingov finds himself in a difficult position. He is incarcerated thousands of miles from his home, facing serious criminal charges. And, although he is presumed innocent, the grand jury's finding of probable cause precludes him from

---

[2] Sterlingov's arguments that failure to provide him a hearing regarding the seizure of his funds violated the Fifth and Sixth amendments were addressed by holding a hearing. Dkt. 48 at 22–23.

18

**Appx6706**

contesting the factual predicate for the government's seizure of the assets that he wants to use to retain the counsel of his choice. Faced with this conundrum at the hearing, Sterlingov's counsel invoked Chief Justice Roberts' dissenting opinion in *Kaley v. United States.* Rough Hearing Tr. at 120, 126 (Jan. 31, 2023). As the Chief Justice observed, a criminal defendant "faces a foe of powerful might and vast resources, intent on seeing him behind bars." 571 U.S. at 357 (Roberts, C.J., dissenting). Yet our law allows that same foe "effectively [to] remove a defendant's primary weapon of defense—the attorney he selects and trusts—by freezing assets he needs to pay his lawyer," and it constrains his ability to do anything about it. *Id.* at 341. Like Sterlingov's counsel, the Chief Justice posited that the Constitution does not permit the government to place a defendant in this predicament.

Notably, Justice Kagan, who authored the *Kaley* decision, has expressed similar concerns about the state of the law and has described *United States v. Monsanto*, 491 U.S. 600 (1989), as "a troubling decision." *Luis v. United States*, 578 U.S. 5, 51 (2016) (Kagan, J., dissenting). As she has observed, "[i]t is one thing to hold . . . that a convicted felon has no Sixth Amendment right to pay his lawyer with funds adjudged forfeitable" but "quite another thing to say that the Government may, prior to trial, freeze assets that a defendant needs to hire an attorney, based on nothing more than probable cause to believe that the property will ultimately be proved forfeitable." *Id.* (internal quotation marks omitted).

But *Kaley* and *Monsanto* are controlling precedent, and this Court is constrained to apply the view of the law reflected in the majority opinions in those cases. Because that precedent leaves no room for the arguments that Sterlingov's counsel presses here, the Court must deny his motions for release of funds, Dkt. 48; Dkt. 101.

19

**Appx6707**

\*       \*       \*

For these reasons, it is **ORDERED** that Sterlingov's motions for release of funds Dkt. 48; Dkt. 101, are **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 6, 2023

20

**Appx6708**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :
                                  :
          v.                :      **CRIMINAL NO. 21-cr-399 (RDM)**
                                    :
ROMAN STERLINGOV,         :
                                    :
        Defendant.       :

## NOTICE OF BILL OF PARTICULARS FOR FORFEITURE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, files this Bill of Particulars for the Forfeiture Allegation in the Superseding Indictment, ECF No. 43.

Upon conviction of the offenses alleged in Counts Counts One, Two, and Three of the Superseding Indictment, the United States will seek forfeiture of the following specific properties:

     a.   $349,625.72, seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

     b.   Approximately 0.10877 Bitcoin (BTC) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

     c.   Approximately 205.9625 Ethereum (ETH) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

     d.   Approximately 9,371.52683 Stellar (XLM) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

e.   Approximately 35.9998 Monero (XMR) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

f.   Approximately 1,354 BTC currently held in the Bitcoin Fog wallet, identified by root address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw; and

g.   Approximately 10.25623378 BTC cryptocurrency (after required fees), seized from nine Mycelium Wallet Accounts located on one Samsung Galaxy S8+ Mobile Telephone.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:   */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
C. Alden Pelker, Maryland Bar
Trial Attorney, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007
Catherine.Pelker@usdoj.gov

2

**Appx6710**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| UNITED STATES OF AMERICA | |
|---|---|
| Plaintiff, | **No. 21-cr-399 (RDM)** |
| v. | |
| ROMAN STERLINGOV | |
| Defendant. | |

**DEFENDANT'S NOTICE OF INTENT TO PRESENT EXPERT TESTIMONY**

Defendant Roman Sterlingov by and through counsel, and under Fed. R. Evid. 702, 703, and 705, and Federal Rule of Criminal Procedure 16, hereby provides notice of his intent to introduce expert testimony as necessary at the upcoming Daubert and In Limine hearings and at trial. All these witnesses, except for Jonelle Still from Ciphertrace, have previously been noticed to the Government. The Defense hereby provides notice of the anticipated testimony of the expert witnesses listed below:

- Dr. Francisco Cabanas - Exhibit A

- Dr. Itiel Dror - Exhibit B

- Jeff Fischbach - Exhibit C

- Jonelle Still (Ciphertrace) - Exhibit D

- J.W. Verret -Exhibit E

This notice attaches their revised and signed expert disclosures. Based on the Government's sealed filings, and discussions with the Government, the Defense is withdrawing Mr. Jonathan Scott as an expert witness and proffers Ms. Still's expert testimony as a blockchain tracing expert in his stead. Mr. Fischbach's disclosure is currently unsigned, as he is in Alaska

1

Appx6711

and having internet connectivity issues preventing the Defense from obtaining his e-signature. The Defense will provide a signed copy of his disclosure as soon as possible. The witnesses listed in the attached exhibits possess special skills and knowledge that will assist the Court and Jury in understanding the evidence in this case. These witnesses' testimony should be considered expert testimony under Rule 702. Each expert witnesses' curriculum vitae has been sent to the Court and the Government via email, along with a list of cases from the last four years that the witnesses have testified in and their publications from the prior ten years.

As the Defense's investigation and review of the Government's discovery proceeds, the Defense will supplement these disclosures as necessary.

The Government charges Mr. Sterlingov with Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h); Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A), (B); Operating an Unlicensed Money Transmitting Business and Aiding and Abetting, in violation of 18 U.S.C. § 1960(a) and 18 U.S.C. § 2; and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c).

There is no evidence of Roman Sterlingov ever operating Bitcoin Fog. What forensics evidence the Government has turns on new and standardless black-box blockchain forensic software implementing unscientific, non-peer-reviewed heuristic algorithms to trace Bitcoin transactions. Using speculative digital forensics, the Government indulges in cognitive and confirmation bias, making inaccurate I.P. address attributions, blockchain clustering assertions, and conclusory assumptions about The Onion Routing Network (TOR Network), financial accounting forensics, encryption, mathematics, and computer science that are not within the common knowledge of the average juror. The lack of forensic evidence showing Mr. Sterlingov operating Bitcoin Fog, its complete absence from any of his seized electronic devices, storage

2

devices, notes, and diaries goes directly to the integrity of the Government's prosecution. This is the first real test of Chainalysis Inc.'s black-box blockchain forensics. It is the first time the Government's forensics in a blockchain case like this face adversarial testing at trial. The testimony of these experts is crucial to demonstrating the Government's flawed, biased forensics, and glaring omissions. Particularly after the Government's own experts testified at the last Daubert Hearing on June 23, 2023, that they could neither cite any scientific peer-reviewed paper attesting to Chainalysis Reactor's accuracy, nor had any knowledge of its statistical error rate, false positive rate, or false negative rate. Indeed, the Government's proffered witness from Chainalysis testified that she was not aware of any internal analysis at Chainalysis of Chainalysis Reactor's error rate. The Defense's proffered experts are necessary to rebut the Junk Science the Government is peddling as valid without a scrap of scientific evidence.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Expert testimony is appropriate if specialized knowledge will assist the jury "to understand the evidence or to determine a fact in issue." *United States v. Eiland*, No. 04-379 RCL, 2006 WL 2844921, at *5 (D.D.C. Oct. 2, 2006) *aff'd*, 738 F.3d 338 (D.C. Cir. 2013).

A witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* (citing Fed. R. Evid. 702).

## CONCLUSION

The Defense submits that the expert testimony of the witnesses disclosed in the attachments to this filing will assist the jury and the Court in their understanding of the evidence in this case.

Dated: July 7, 2023
New York, New York

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

*Counsel for Defendant Roman Sterlingov*

4

**Appx6714**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of July 2023, the forgoing document was filed with the Clerk of Court using the CM/ECF System. I also certify that a true and correct copy of the foregoing was sent to the following individuals via e-mail, and that experts' CVs were separately sent to the Court and the government via email:

<u>s/ Tor Ekeland</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

**Appx6715**

# Exhibit 'A'

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 21-cr-399 (RDM) |
| Plaintiff, | |
| v. | |
| ROMAN STERLINGOV | |
| Defendant. | |

**SUMMARY OF QUALIFICATIONS AND EXPECTED TESTIMONY FOR
DR. FRANCISCO CABAÑAS**

Mr. Sterlingov intends to call **DR. FRANCISCO CABAÑAS** ("Dr. Cabañas") as an expert witness. His qualifications, along with review and analysis of relevant records, reports, facts, and evidence set forth the basis for his expected testimony.

Dr. Cabañas' testimony is based on his review of discovery in this case, and his depth of experience in digital currencies, blockchain forensics and statistical analysis. Since 2016, he has been a core team member of Monero's development organization. He is a key contributor to the European Union's Public Consultation on Preventing Money Laundering and Terrorism Financing. He has 45 years of experience as a computer and network administrator and has a wide range of experience with data analysis and technologies.

Since 2020, Dr. Cabañas has been a contributor with the Monero Policy Working Group through which he has advanced the privacy protocols of the Monero cryptocurrency and developed scaling technologies to expand the Monero network.

Dr. Cabañas has spoken at many panels and conferences around the world advocating for privacy in cryptocurrency and has shared his research with privacy interest groups around the globe.

1

**Appx6717**

Dr. Cabañas holds a Ph.D. in Physics, a M.Sc. in Physics, and a B.Sc. Honors in Physics and Mathematics from the University of British Columbia. He has over 20 years of experience in the fields of experimental physics, physical chemistry, and radio astronomy where he specialized in mathematical analysis of random errors (or noise) and systematic errors (bias) in statistics.

At the July 19, 2023, hearing on Motions in Limine and *Daubert* challenges, as well as at trial, the Defense expects Dr. Cabañas to testify regarding the following:

1. Dr. Cabañas will testify to the critical importance of identifying and quantifying both systemic error (bias) and random error (noise) in the Government's and Chainalysis's investigation into Bitcoin Fog.

2. Dr. Cabañas will explain that while clustering over a large number of transactions and statistical techniques can mitigate random error, clustering over a large number of transactions and using statistical techniques does not mitigate systemic error.

3. Dr. Cabañas will testify that systemic error in investigations results in inaccurate conclusions that cannot be relied upon.

4. Dr. Cabañas will testify to the prevalence of systemic errors in the Government's and Chainalysis's investigation into Bitcoin Fog.

5. Dr. Cabañas will explain that the Government's and Chainalysis's investigation into Bitcoin Fog is dependent upon multiple assumptions, otherwise described as heuristics. These assumptions are introduced at every step in the investigation. A failure of any assumption at any step will add systemic error to the investigation.

6. Dr. Cabañas will explain that the discrepancies between the Government's proffered experts Luke Scholl's and Elizabeth Bisbee's testimony at the June 23rd,

2

**Appx6718**

2023, Daubert Hearing, and contained in their expert reports, regarding the total amount of illicit funds claimed to have flowed through Bitcoin Fog from TOR-based marketplaces is indicative of systemic error in the investigation and cannot be relied upon.

7. Dr. Cabañas will testify to the limitations of the assumptions applied by Chainalysis and the Government in their investigation.

8. Dr. Cabañas will explain that the assumptions relied upon during the course of the investigation compound the systemic error.

9. Dr. Cabañas will testify that the co-spending assumption incorporated by Chainalysis in the investigation contributed to its inaccurate conclusions.

10. He will explain that it is incorrect to assume that multiple cryptocurrency addresses are controlled by the same individual or entity when they are used as inputs in the same transaction.

11. He will explain how this assumption ignores techniques that pool addresses such as CoinJoins or PayJoins and that application of the co-spending assumption results in inaccurate conclusions.

12. Dr. Cabañas will testify that even without CoinJoins or PayJoins a simple merchant refund can cause clustering on a different chain, leading to additional systemic error.

13. Dr. Cabañas will testify that the behavioral clustering assumption incorporated by Chainalysis in the investigation contributed to its inaccurate conclusions.

14. He will explain that spatial and temporal proximity, or use of the same or similar wallet software, is not necessarily indicative of common ownership.

3

**Appx6719**

15. He will explain that depending on the false positive rate of a particular methodology, application of the behavioral clustering assumption jeopardizes the accuracy of the analysis, and the fact that Chainalysis has no data on its false positive rates compounds the possibility of errors in its tracing analysis.

16. Dr. Cabañas will testify that the intelligence-based clustering assumption incorporated by Chainalysis in the investigation contributed to its inaccurate conclusions.

17. He will explain that there is no way to validate the accuracy of leaked data incorporated into Chainalysis's blockchain tracing and how it jeopardizes the accuracy of the investigation.

18. He will explain how this assumption is particularly vulnerable to human error and that incorporating human error into assumption-based analysis further compounds the risk of systemic error in an investigation.

19. Dr. Cabañas will testify to the relative systemic errors prevalent in Chainalysis's assumptions.

20. He will explain the scope of illicit virtual asset transfers, as documented by the Financial Action Task Force study referenced by proffered Government expert Luke Scholl in his expert report.

21. He will explain how different blockchain forensic tracing software make contradictory cluster attributions for identical addresses.

22. He will explain how this variability introduces a high level of arbitrariness into forensic conclusions in blockchain investigations that rely upon assumptions.

4

**Appx6720**

23. He will explain that the percentage of transactions implicated in illegal activity may be as low as 0.5% or as high as 12.7% depending on which blockchain surveillance company conducts the analysis.

24. He will explain how this is indicative of the very high level of systemic error in blockchain surveillance.

25. Dr. Cabañas will testify that it is possible to transfer Bitcoin without leaving any trace on the blockchain, and that this possibility makes attribution of blockchain activity to a specific individual unverifiable absent corroborating evidence.

26. He will explain how public and private keys work on the blockchain.

27. He will explain how it is impossible to know for certain who, if anyone, exercises direct control over the keys.

28. He will explain how digital currency like Bitcoin can be transferred off chain.

29. He will explain the problems that off-chain transfers of cryptocurrency cause for blockchain tracing forensics.

30. Dr. Cabañas will testify on the arbitrariness of the number of hops assumption, and how the number of hops is not indicative of ownership.

31. He will explain how a simple private key transfer can negate the assumption of ownership.

32. Dr. Cabañas will testify how, without identifying the false positive and false negative rates, the scientific legitimacy of the investigation is put into question.

33. Dr. Cabañas will testify that random error or "noise" is a phenomenon that jeopardizes the accuracy of the investigation's conclusions.

5

**Appx6721**

34. Dr. Cabañas will explain that without any analysis on the statistics of random error, the conclusions of the investigation are not reliable.

35. Dr. Cabañas will testify that statistical analysis is key to determining the scientific accuracy of the Government's investigation.

36. Dr. Cabañas will testify that statistical analysis is required to determine the scientific legitimacy of an investigation, and that without such a study, the conclusions of the investigation are not reliable.

37. Dr. Cabañas will testify to the statistical and mathematical limitations of the blockchain tracing methodologies employed by the Government and Chainalysis in its investigation.

38. He will explain how blockchain surveillance software like Chainalysis Reactor cannot mathematically scale with the rise in global cryptocurrency activity and produces inaccurate tracing as a result of its inability to scale.

39. Dr. Cabañas will testify that identifying the random error and systemic error rates is integral to ascertaining the scientific legitimacy of forensic conclusions.

40. Dr. Cabañas will testify that without any analysis into an investigation's false positive rates, it is impossible to validate the conclusions derived from that investigation.

41. Dr. Cabañas will testify to the comments and posts made by Akemashite Omedetou on BitcoinTalk.org. As a well-respected voice on BitcoinTalk.org with "legendary" status on the platform, Dr. Cabañas will testify to the inferences that can be drawn from the language used in specific posts identified by the Government.

6

**Appx6722**

42. Dr. Cabañas will testify to how BitcoinTalk was used by Bitcoin enthusiasts during the time-period in question.

43. Dr. Cabañas will testify to the culture of the cryptocurrency space during the time-period in question.

44. Dr. Cabañas will testify to the importance of possessing private keys in order to determine custody and control of digital assets.

45. Dr. Cabañas will testify to the difficulties jurisdictions around the world are having with effectively and accurately attributing blockchain transactions to the individuals behind them.

46. He will discuss The Monero Policy Working Group contributions to United States, the European Union, and The Financial Action Task Force.

47. Dr. Cabañas will testify to the challenges involved with developing privacy protecting technologies.

48. He will explain his work with the Monero project before and after the launch of confidential transactions in 2017.

49. He will explain large and outlier transactions together with the use of noise to create privacy.

50. He will explain the issue of large and outlier transactions in Bitcoin Fog and Coinjoins, and the need to test with large and outlier amounts.

51. Dr. Cabañas will testify to the difficulties with calibrating blockchain forensics.

52. He will explain the mathematical obstacles of properly calibrating the false positive rate of the Government's digital forensics.

7

**Appx6723**

53. Dr. Cabañas will testify to the mathematical inconsistencies when applying probabilistic blockchain assumption-based methodologies in blockchain forensics.

54. He will explain the mathematical limitations of Chainalysis' assumption based clustering techniques.

55. The Defense expects Dr. Cabañas to testify in rebuttal to the Government's expert testimony. However, the content of Dr. Cabañas' rebuttal testimony is contingent on the substance of testimony from the witnesses produced by the Government in the Hearings and at trial.

Witness Attestation

I, Francisco Cabañas, have reviewed and approve the contents of this filing.

DocuSigned by:

*Francisco Cabañas*
F1735270B4AE4DF...

Dr. Francisco Cabañas

7/6/2023

Date

8

**Appx6724**

# Exhibit 'B'

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

Plaintiff,

v.

ROMAN STERLINGOV

Defendant.

No. 21-cr-399 (RDM)

**SUMMARY OF QUALIFICATIONS AND EXPECTED TESTIMONY FOR
DR. ITIEL DROR**

Mr. Sterlingov intends to call **DR. ITIEL DROR** ("Dr. Dror") as an expert witness. His

qualifications, along with review and analysis of relevant records, reports, facts, and evidence set

forth the basis for his expected testimony. His CV has been sent to the Court and the

Government via email along with a list of the cases that he has testified in during the last four

years.

Dr. Dror's testimony is based on his review of discovery in this case, and his academic

and professional experiences. Dr. Dror is a Principal Consultant and Researcher with Cognitive

Consultants International ("CCI-HQ") through which he provides research, training, and

consultancy services to organizations around the world concentrating on minimizing bias and

error in expert decision making and investigations. Dr. Dror holds a Ph.D. and a master's degree

from Harvard University in Psychology.[1]

Dr. Dror trained the forensic digital experts at the Serious Fraud Office (SFO) in the

United Kingdom (the U.K. governmental body investigating serious fraud, where digital

evidence is critical). He was commissioned by the United States Attorney's Office in this District

---

[1] (*See* Dkt. 122, Ex. C.)

1

**Appx6726**

for a *Daubert* Hearing. Dr. Dror trains forensic experts at top investigative agencies all over the world, including the United States, about bias in digital and other forensic domains. He has been commissioned to train forensic experts at the FBI, NYPD, LAPD, and many other agencies, on how to minimize biases and errors in their investigations. He has been invited by the National Institute of Justice and the Department of Justice, as well as many other agencies, to deliver keynote presentations. Recently, the Attorney General of the State of Maryland has asked Dr. Dror to be part of the design team for the review of potential bias in forensic decisions made about deaths of people while in police custody.

Dr. Dror has published over 150 articles which have been cited over 11,000 times, with an h-index of 56 (i.e., 56 articles that are cited over 56 times), these include articles with over 600 citations, and over 30 articles with over 100 citations. Many of the articles appear on the most viewed and most cited lists of several journals. Furthermore, his articles and research have been cited in various court cases,[2] as well as by the U.S. National Commission on Forensic Science, the National Academy of Science report on forensic science, and the President's Council of Advisors on Science and Technology's report on forensic science, who, in addion to citing his research, invited Dr. Dror to provide expert testimony in-person.[3]

Dr. Dror has been an Associate Editor and on the Board of Editors for multiple journals, including *Forensic Science International: Mind and Law, Science & Justice, Journal of Experimental Psychology: Applied, Journal of Applied Memory & Cognition,* and *Pragmatics & Cognition.*

---

[2] *See e.g. Regina v. Dlugosz, Pickering, and MDS* (2013) (United Kingdom Court of Appeal); *Commonwealth vs. Gambora* (2012) (Supreme Court of Massachusetts).
[3] (*See* Dkt. 122, Exs. D-F).

2

**Appx6727**

Top scientific journals such as *Science* and *Nature*, as well as media outlets like *The Economist, the New York Times, the Guardian* and *the London Times* cover Dr. Dror's work and research findings on how bias impacts forensic science decisions, and ways to minimize such biases.[4]

Specifically in digital investigation and digital forensic analyses, Dr. Dror has published a number of peer reviewed scientific articles, published, for example, in *Digital Investigations* an article on "Cognitive and human factors in digital forensics: Problems, challenges, and the way forward" (*Digital Investigation*, 2019, 29, 101-108), and "A Hierarchy of Expert Performance (HEP) applied to digital forensics: Reliability and biasability in digital forensics decision making" (*Forensic Science International: Digital Investigation*, 2021, 37, 301175). At the July 19, 2023, hearing on Motions in Limine and *Daubert* challenges, as well as at trial, the Defense expects Dr. Dror to testify regarding the following:

1. The Defense expects Dr. Dror to testify generally about cognitive bias in forensic science, and particularly about the role of confirmation and other biases in digital forensic investigations.

2. He will explain the concept of cognitive bias (in contrast to the everyday notion of intentional and discriminatory biases).

3. He will explain the current state of the research and scientific standards related to cognitive bias in relation to forensic decisions.

4. He will explain how the brain processes decisions, and how architecture constraints give rise to biases.

---

[4] (*See* Dkt. 122, Ex. G).

**Appx6728**

5. He will explain the eight sources of cognitive and human error that exist specifically within the framework of digital forensics, and the six fallacies about bias.

6. The Defense expects Dr. Dror to testify about confirmation and other biases in digital forensics and how they impact the underlying heuristic assumptions at play in the use of Chainalysis Reactor and other blockchain forensics involved in this case. He will also testify to the impact of cognitive bias and confirmation bias on the forensic analysis in general on this case including the Mt. Gox data, and the IP address attributions made by the Government to Mr. Sterlingov. He will also testify as to the distorting effects of the financial and status incentives involved in the Government's use of private forensic investigators like Chainalysis and the Government's extensive use of publicity to promote this case.

7. He will explain how confirmation and other biases that impact forensic experts, and how they are at play in this case.

8. He will explain how confirmation and other biases can taint an investigation.

9. He will explain evidence of confirmation bias in the Government's discovery.

10. He will explain how escalation of commitment can lead to inaccurate conclusions contrary to the evidence, and explain how just such an escalation of commitment occurred in this case.

11. The Defense expects Dr. Dror to testify to the cognitive and human factors in digital forensics.

12. He will explain how miscarriages of justice and misleading evidence highlight human error as an issue within forensic science, and the threat they pose in this case.

Appx6729

13. He will explain the issues and the fertile ground for biases created by the lack of objective standards in blockchain forensics and how the lack of any scientific evidence for the accuracy of the blockchain forensics used in this case, and the total lack of any evidence as to the statistical error rates, false positive rates or false negative rates for Chainalysis Reactor impacts the cognitive and confirmation biases at play in this case.

14. Testimony will be based on the Government's disclosures, the Government's experts' testimony and reports, as well as his extensive experience as one of the world's leading experts in cognitive and confirmation biases in forensic practices.

15. The Defense expects Dr. Dror to testify in rebuttal to the government's expert testimony.

16. The content of Dr. Dror's rebuttal testimony is contingent on the substance of testimony from the witnesses produced by the Government in the Hearings and at trial.

---

Witness Attestation

I, Dr. Itiel Dror, have reviewed and approve the contents of this filing.

DocuSigned by:

*Dr. Itiel Dror*

6AEB22F168F14CE...

7/7/2023

Dr. Itiel Dror

Date

---

5

**Appx6730**

# Exhibit 'C'

**Appx6731**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | **No. 21-cr-399 (RDM)** |
| Plaintiff, | |
| v. | |
| ROMAN STERLINGOV | |
| Defendant. | |

**SUMMARY OF QUALIFICATIONS AND EXPECTED TESTIMONY FOR**
**JEFFREY FISCHBACH**

Mr. Sterlingov intends to call **JEFFREY FISCHBACH** ("Mr. Fischbach") as an expert

witness. His qualifications, along with review and analysis of relevant records, reports, facts, and

evidence set forth the basis for his expected testimony.

Mr. Fischbach's testimony is based on his review of the discovery in this case, and his

experience as a Board Recognized Forensic Examiner specializing in computer forensics,

information communication, stored data, and electronic location technologies. Mr. Fischbach is

an expert in these fields for over twenty-five years and has consulted on, and testified in,

municipal, federal, and military court, both domestic and foreign, in dozens of cases involving

computer forensics and digital evidence. Mr. Fischbach routinely lectures and provides training

in his areas of expertise to civilian attorneys, law enforcement, and judges throughout North

America.

Mr. Fischbach is the founder and President of SecondWave, Inc., a technology consulting

firm specializing in forensic technology, evidence preservation, and authentication. Mr.

Fischbach has expert-level knowledge of Windows, MacOS, Linux, iOS and Android operating

**Appx6732**

systems. He has qualified in numerous courts as a computer, internet, cellular and satellite expert. He has previously been granted national security clearance by the United States Department of Justice.

Mr. Fischbach will explain the forensically unsound techniques used in this case including the chain of custody and authenticity issues inherent in the Government's digital evidence and forensics. He will testify to the problems involved with the IP address attributions made by the Government, both in the produced discovery as well as the Government's expert reports. Mr. Fischbach will testify that the Government's unsound forensic and chain of custody techniques appear to have led them to mix evidence from an unrelated case with the evidence in Mr. Sterlingov's case, and how this compromises the integrity of the Government's conclusions.

At the July 19, 2023, hearing on Motions in Limine and *Daubert* challenges, as well as at trial, the Defense expects Mr. Fischbach to testify regarding the following:

1. The Defense expects Mr. Fischbach to testify that the Government has failed to produce any sound forensic evidence that demonstrates Mr. Sterlingov created or operated the Bitcoin Fog onion bitcoin mixing site.

2. The Defense expects Mr. Fischbach to testify to the fact that the chain of custody of the Mt. Gox data is unreliable, cannot be authenticated as a business record, and that the public record demonstrates the Mt. Gox data is corrupt and unreliable, and should be excluded from evidence.

3. He will explain how Mark Karpeles's conviction for manipulation of the Mt. Gox data, inexplicable errors in the Mt. Gox data presented in discovery by the Government, as well as the numerous hacks of Mt. Gox render any reliance of the Mt. Gox data forensically unsound.

4. He will explain how the derivative Mt. Gox data produced by the Government cannot be authenticated because there are no original server logs, or any original native data that can be independently verified.

5. He will testify as to how the Japanese bankruptcy trustee cannot attest to the authenticity of the Mt. Gox data as this requires an individual with knowledge of the data's generation and chain of custody while it was at Mt. Gox, and before the trustee took possession of it.

6. The Defense expects Mr. Fischbach to testify that using IP addresses as personal identifiers is forensically unsound and how the Government has made its IP attributions in this case.

7. He will explain that thousands of people can share the same IP address through VPNs, proxy servers, IP address spoofing, use of common WiFi routers, IP address high jacking and the like.

8. He will explain why IP address matches are an unreliable means of identifying an individual, to which he has previously provided testimony as an expert witness.

9. He will explain that courts generally do not accept IP address matches as personally identifying information.

10. The Defense expects Mr. Fischbach to testify to the fact that the Government's and Chainalysis's forensic methodologies fail basic forensic standards.

11. Mr. Fischbach will testify as to what is involved in operating a TOR network site and custodial mixer like Bitcoin Fog.

12. He will explain the need for constant maintenance of the site.

13. He will explain the high level of information security required for a TOR network site like Bitcoin Fog that is subject to continual hacking attempts.

14. He will discuss the staffing requirements to run an enterprise like Bitcoin Fog.

15. The Defense expects Mr. Fischbach to testify to the use and application of the hardware Mr. Sterlingov had in his possession at the time of his arrest.

16. He will explain how the hardware Mr. Sterlingov was travelling with when he was arrested is common in the computer world, and what each piece of hardware is legitimately used for.

17. He will identify the purpose and function of each device Mr. Sterlingov had in his possession at the time of his arrest.

18. He will testify to the complete lack of any forensic evidence on any of Mr. Sterlingov's devices indicating that he ever operated Bitcoin Fog.

19. He will testify to the issues involved in Valerie Mazars de Mazarin's IP Overlap Analysis and related documentation produced by the Government.

20. He will testify to the issues in Valerie Mazars de Mazarin's Device Report and related documentation produced by the Government.

21. The Defense expects Mr. Fischbach to testify to Chainalysis's flawed hypothesis that the DNS registration for the Clearnet site www.bitcoinfog.com implicates Mr. Sterlingov.

22. He will explain how the Government's and Chainalysis's tracing analysis is arbitrary and unverifiable.

23. He will explain how DNS registrations work, how they need to be renewed, and how the DNS identified in the Criminal Complaint was renewed.

24. The Defense expects Mr. Fischbach to testify in rebuttal to the Government's expert testimony. In particular the expert testimony and reports of St. Jean and Mazarin.

    a.  The content of Mr. Fischbach's rebuttal testimony is contingent on the substance of testimony from the witnesses produced by the Government in the Hearings and at trial.

Witness Attestation

I, Jeff Fischbach, have reviewed and approve the contents of this filing.

_____        _____

Jeff Fischbach                  Date

# Exhibit 'D'

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 21-cr-399 (RDM) |
| Plaintiff, | |
| v. | |
| ROMAN STERLINGOV | |
| Defendant. | |

**SUMMARY OF QUALIFICATIONS AND EXPECTED TESTIMONY FOR
JONELLE STILL**

Mr. Sterlingov intends to call **JONELLE STILL** ("Ms. Still") as an expert witness. Her

qualifications, along with review and analysis of relevant records, reports, facts, and evidence set

forth the basis for her expected testimony.

Ms. Still is an Air Force veteran and serves as Ciphertrace's Director of Crypto

Investigations, the terrorism financing SME, and is a Co-Chair of the Defenders League – a pro-

bono crypto investigations service. In her role as recognized global expert in on-chain forensics,

she trains: law enforcement, law firms, domestic and foreign government agencies, and financial

crime specialists. She is a regular contributor to Ciphertrace's quarterly Cryptocurrency Anti-

Money Laundering report and has presented on these critical topics at the OSCE, CEPOL,

Europol, INTERPOL and the UNODC. Jonelle is a member of the Institute of Security and

Technology Ransomware Task Force and the Blockchain and Distributed Ledger Technologies

Special Interest Group which focuses on Financial Crime and Human Trafficking.

Ms. Still's testimony is rooted in her extensive theoretical and practical expertise in on-

chain blockchain forensics including her work for Ciphertrace, a Mastercard company.

Ciphertrace received seed funding from DARPA. Ms. Still's testimony is based on her review of

the discovery and the public Bitcoin blockchain.

**Appx6738**

Ms. Still is well-versed in the diverse tools used for blockchain forensic tracing and will discuss her efforts to replicate the Government's tracing methods for the crucial aspects of the Government's case. This includes her efforts to replicate the tracing work done by the Government's proffered expert witness Luke Scholl as contained in his expert report.

At the July 19, 2023, hearing on Motions in Limine and *Daubert* challenges, as well as at trial, the Defense expects Ms. Still to testify regarding the following:

1. The Defense expects Ms. Still to testify to her and Ciphertrace's review of the Government's blockchain tracing forensics in this case, particularly as to work done using Chainalysis Reactor and relevant traces that were not included in the Government's report.

2. She will explain how the Government's tracing fails to verify that Mr. Sterlingov is the operator of Bitcoin Fog and how the transactions are inconsistent with his ownership of the service.

3. She will testify as to peel chain typologies and their relevance to this case.

4. Ms. Still will testify to best practices in the attribution process which includes collection, storage, and audits.

5. The Defense expects Ms. Still to testify to the inherent limitations in the clustering heuristics and tracing methodology involved with the Government's use of Chainalysis Reactor and other blockchain tracing software in this case.

6. She will testify to the inherent limitations and misconceptions regarding the heuristics used for Chainalysis's clustering.

7. She will explain the difference between custodial and non-custodial wallets including personally held wallets, services and exchanges.

Appx6739

8. The Defense expects Ms. Still to testify in rebuttal to the government's expert testimony. The content of Ms. Still's rebuttal testimony is contingent on the substance of testimony from the witnesses produced by the Government in the Hearings and at trial.

<div style="border:1px solid black;">

**Witness Attestation**

I, Jonelle Still, have reviewed and approve the contents of this filing.

DocuSigned by:

_____                    7/7/2023
3028BCF51C15418...                          _____

Jonelle Still                                Date
Ciphertrace

</div>

Exhibit 'E'

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

        Plaintiff,

v.

ROMAN STERLINGOV

        Defendant.

No. 21-cr-399 (RDM)

**SUMMARY OF QUALIFICATIONS AND EXPECTED TESTIMONY FOR
J.W. VERRET**

Mr. Sterlingov intends to call **JOHN WALLACE "J.W." VERRET** JD, MPP, CPA/CFF, CFE, CVA ("Mr. Verret") as an expert witness. His qualifications, along with review and analysis of relevant records, reports, facts, and evidence set forth the basis for his expected testimony.

Mr. Verret is an expert in crypto forensics, financial privacy, forensic accounting, financial forensics, banking regulation, and anti-money laundering. An Associate Professor of Law at the George Mason University Antonin Scalia School of Law, he teaches legal courses in forensic accounting, corporate law, securities law, and banking law/AML. He is a practicing attorney and works in internal accounting investigations and financial regulatory enforcement, the latter with an emphasis on digital currency projects.

Mr. Verret was a Visiting Professor at Stanford Law School, where he taught a course in financial regulation. He has a J.D. from Harvard Law School, a Masters in Public Policy from the Harvard Kennedy School with an emphasis in financial regulation, and a B.S. from Louisiana State University in Accounting. He holds a certificate from the Wharton Business School in the Economics of Blockchain. He is a Certified Public Accountant in the state of Virginia, is

1

**Appx6742**

Certified in Financial Forensics (CFF) by the AICPA, is a Certified Fraud Examiner (CFE) and a Certified Valuation Analyst (CVA).

Mr. Verret serves on the Financial Accounting Standards Advisory Council, a group that advises the Financial Accounting Standards Board on the development of Generally Accepted Accounting Standards (GAAP) and where he recently advised on the development of a new accounting standard for cryptocurrency reporting by public companies.

He currently serves on the board of directors of the Zcash Foundation, a non-profit that funds research into the zero-knowledge proof cryptography that underlies the privacy enhanced cryptocurrency Zcash and that other cryptocurrencies like Ethereum and Monero use to preserve user financial privacy. He is a columnist on cryptocurrency regulation and privacy for CoinTelegraph.

In 2013 he led the first briefing for members of Congress on the operation of Bitcoin. From 2013-2015, he was a Chief Economist and Senior Counsel for the U.S. House Financial Services Committee, where he works on congressional oversight of the Federal Reserve, Treasury Department, AML/BSA compliance policy reform. While there he leads an investigation into insider trading at the Federal Reserve that results in the resignation of the President of the Federal Reserve Bank of Richmond. In his Senior Counsel role, he leads congressional oversight of the Treasury's Department's policy reforms to sanctions and money laundering and know your customer regulations regarding cryptocurrency. He has testified about financial and banking regulatory matters over a dozen times in the U.S. House of Representatives and the U.S. Senate. He is currently writing a book on cryptocurrency privacy and forensics for MIT Press.

2

**Appx6743**

Mr. Verret bases his expert opinions upon his extensive experience in cryptocurrency, financial privacy, financial forensic investigations, and law. His training and experience with federal regulators, combined with his proficiency and practice in cryptocurrency forensics, financial privacy, cryptocurrency, financial forensics, financial forensic investigations, professional accounting, banking regulations, anti-money laundering, and academia more than qualify him to present detailed expert opinion regarding this case.

At the July 19, 2023, hearing on Motions in Limine and *Daubert* challenges, as well as at trial, the Defense expects Mr. Verret to testify regarding the following:

1. Mr. Verret will testify to how the evidence offered by the government is consistent with Sterlingov being early to Bitcoin and using Bitcoin Fog for legitimate personal privacy interests. He will explain why the Government's evidence is not consistent with Mr. Sterlingov running the Bitcoin Fog mixer.

2. Mr. Verret will testify to two key points related to the government's assertion that funds transferred back to Mr. Sterlingov's KYC Kraken accounts from Bitcoin Fog were fees generated by the operator of Bitcoin Fog. First, Mr. Verret will show that the Bitcoin Fog fees were many times larger than the total crypto assets ever attributed to Sterlingov. Second, Mr. Verret will explain that the government has shown no non-crypto assets owned by Mr. Sterlingov, whose source is unaccounted for.

3. Mr. Verret will testify that the account balances in Mr. Sterlingov's seized accounts show less than 10% of the amount that someone running Bitcoin Fog would be expected to have. Mr. Verret will testify that an objective investigator in a case like this would typically use a "net worth analysis" and/or "net income analysis" to show a large

3

**Appx6744**

magnitude of assets owned by a suspect that had no known income source (net of expenses) or known assets (net of liabilities) to explain them. *See e.g.* Paul Eisenberg, Application of the Net Worth Method In Forensic Accounting Investigations, *International Research Journal of Multidisciplinary Studies*, 2019, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3324282#:~:text=Under%20the%20 net%20worth%20method,during%20the%20period%20of%20investigation. Mr. Verret will rely upon his experience and knowledge as a Certified Fraud Examiner and explain that while the Government has done in this type of anti-money laundering analysis in prior crypto related cases, it failed to do so in this case.

4.  Mr. Verret will testify to the pattern of transfers from what Chainalysis describes as the "Bitcoin Fog Cluster" to accounts owned by Mr. Sterlingov, and how they do not show any recognizable pattern that might in some way link Mr. Sterlingov the operation of Bitcoin Fog. Mr. Verret will rely upon his training as a Certified Valuation Analyst and experience as Chief Economist and Senior Counsel for the U.S. House Financial Services Committee to show how the Government's attributions appear to be just a random pattern more in line with a regular Bitcoin investor using Bitcoin Fog to obtain some measure of personal privacy.

5.  Mr. Verret will display a chart of crypto prices since 2009 and present a narrative description to demonstrate how little fiat money one would need to buy 1600 bitcoin in the early years of Bitcoin.

6.  Mr. Verret will explain how the creator of the Bitcoin Fog service displays an expert-level knowledge of blockchain privacy concepts like anonymity set, transaction history, and post-mix privacy. Mr. Verret will explain these concepts and how he teaches them to

4

**Appx6745**

his students at George Mason University. He will emphasize how someone with the expertise that the creator of Bitcoin Fog has exhibited would not send the proceeds from running a mixer back to their own KYC'd accounts. Mr. Verret will testify that a skilled privacy programmer would be significantly likely to send any proceeds into account logins purchasable on the TOR network sites and then swap them out or transfer them from there. Mr. Verret will also testify that an alternative to that method would be to trade the proceeds peer to peer to effectively obfuscate their source.

7. Mr. Verret will testify that because Mt. Gox was repeatedly hacked, there is a distinct possibility that a third-party hacker may have used Sterlingov's Mt. Gox account the purpose of obfuscating his own unlawful transactions.

8. Mr. Verret will testify that privacy measures are regularly employed by users of cryptocurrency and that efforts to maintain financial privacy are not, as the government repeatedly suggests in their filings, something suspicious or illicit in and of itself.

9. Mr. Verret will testify that "wrench attacks" (assaults and kidnapping) against bitcoin holders are a real threat to crypto users, in part because it is easier for a kidnapper or thief to demand that the victim transfer large quantities of money in the low friction environment of crypto self-custody relative to the higher friction environment of withdrawing large quantities of cash out of a bank. See, as one example, Department of Justice, U.S. Attorney's Office, Southern District of New York, Press Release, "Two Men Charged with Plan to Commit Home Invasion Robbery for Tens of Millions of Dollars in Bitcoin," https://www.justice.gov/usao-sdny/pr/two-men-charged-plan-commit-home-invasion-robbery-tens-millions-dollars-bitcoin. Mr. Verret will testify that

5

**Appx6746**

privacy measures such as mixing services, are one way that crypto users prevent such attacks.

10. Mr. Verret will testify that totalitarian regimes around the world have used blockchain tracing to abuse human rights protestors.

11. Mr. Verret will testify that the Bitcoin Fog mixing service was an early tool to address these legitimate privacy concerns and that according to the government's own estimates, most of the activity in the Bitcoin Fog mixer was legitimate.

12. Mr. Verret will testify to the findings in multiple public reports, including those done by Government-contractor Chainalysis, and testify that most transactions sent through mixing services like Bitcoin Fog are done for legitimate privacy concerns and are not illicit. Mr. Verret will describe how comparable analysis of BSA/AML regimes by international financial regulatory bodies demonstrate that a comparable percentage of illicit finance runs through traditional banking institutions and how simply using Bitcoin Fog would not lead one to automatically suspect that using it was somehow illicit. *See, e.g.,* Chainalysis, Crypto Mixer Usage Reaches All Time Highs in 2022, available at https://blog.chainalysis.com/reports/crypto-mixer-criminal-volume-2022/#:~:text=The%20increase%20in%20illicit%20cryptocurrency,up%20from%2012%25%20in%202021; Organization for Economic Development and Cooperation, Illicit Financial Flows from Developing Countries: Measuring OECD Responses, available at https://www.oecd.org/corruption/illicit_financial_flows_from_developing_countries.pdf; Michel Camdessus, Managing Director of the International Monetary Fund (IMF), address at the plenary meeting of the Financial Action Task Force (FATF), "Money Laundering: The Importance of International Countermeasures," February 10, 1998;

6

**Appx6747**

United Nations Office on Drugs and Crime (UNODC), Estimating Illicit Financial Flows Resulting from Drug Trafficking and Other Transnational Organized Crimes, October 2011.

13. Mr. Verret will testify that attribution of property ownership is a vital element to financial forensic investigations done in compliance with recognized standards. Mr. Verret will rely upon his CFF and CFE designations, his experience as a fraud examiner, and his review of the DOJ's published best practice that direct employees of federal agencies how to appropriately collect and process material in crypto financial forensic investigations. *See* Michele R. Korver, C. Alden Pelker and Elisabeth Poteat, "Attribution in Cryptocurrency Cases," Department of Justice Journal of Law and Practice (February 2019) at 233, available at https://www.justice.gov/media/991181/dl?inline.

14. Mr. Verret will testify that the Government's own advice to US attorneys, as published by the Department of Justice, recommends obtaining physical memorialization of private keys in possession of the defendant to assign control of the assets and the public key that is associated with that private key. *See* Michele R. Korver, C. Alden Pelker and Elisabeth Poteat, "Attribution in Cryptocurrency Cases," Department of Justice Journal of Law and Practice (February 2019) at 233, available at https://www.justice.gov/media/991181/dl?inline.

15. Mr. Verret will testify that tracing methods utilized by the Government and Chainalysis threaten user privacy because they rely upon probabilistic determinations to attribute cryptocurrency accounts to specific individuals.

**Appx6748**

16. Mr. Verret will testify that the tracing methodologies utilized by the Government and Chainalysis are probabilistic, not determinative, and that they should only be used to generate leads not to attribute conduct.

17. Mr. Verret will testify that the tracing methodologies utilized by the Government and Chainalysis may be used to commence an investigation and generate leads but should not substitute for empirical confirmation of traces. As part of this line of testimony, Mr. Verret rely upon publicly available documents produced by Chainalysis and available at: https://www.coindesk.com/business/2021/09/21/leaked-slides-show-how-chainalysis-flags-crypto-suspects-for-cops/.

18. Mr. Verret will testify that the word "heuristic" is a synonymous with the words "assumption" or "guess." He will emphasize that the heuristics employed by Chainalysis in this investigation, such as the common ownership heuristic, and the peel chain heuristic, are a novel approach in a nascent area of forensics, and that they have not been empirically tested or peer-reviewed. As part of this line of testimony, Mr. Verret will rely upon literature indicating that heuristics are probabilistic, not determinative. *See* Stockinger, J. (2021). *Analysis of decentralized mixing services in the greater bitcoin ecosystem* [Diploma Thesis, Technische Universität Wien]. reposiTUm. https://doi.org/10.34726/hss.2021.87269. See also Greg Maxwell, "Coinjoin: Bitcoin Privacy For The Real World," *Bitcoin Talk Forum*, at https://bitcointalk.org/index.php?topic=279249.0; Sarah Meiklejohn, Marjori Pomarole, Grant Jordan, Kirill Levchenko, Damon McCoy, Geoffrey M. Voelker and Stefan Savage, "A Fistful of Bitcoins: Characterizing Payments Among Men With No Names," *Proceedings of the Internet Measurement Conference* 2013; Harroon Yousaf, George

8

**Appx6749**

Kappos & Sarah Meiklejohn, Tracing Transactions Across Cryptocurrency Ledgers, available at https://arxiv.org/pdf/1810.12786.pdf; Matt Di Salvo, "Bitcoin's privacy problem–And What Cypherpunks are Doing to Solve It," *Decrypt*, August 12, 2022, available at https://decrypt.co/107376/bitcoin-privacy-problem-what-cypherpunks-are-doing; See Sarah Meiklejohn and Caludio Orlandi, "Privacy-Enhancing Overlays in Bitcoin," Financial Cryptography and Data Security (Springer 2015) pp 127-141. Available at https://link.springer.com/chapter/10.1007/978-3-662-48051-9_10; Rainer Stutz, Johann Stockinger, Bernard Haselhofer, Pedro Morena-Sanchez, Matteo Maffei, "Adoption and Actual Privacy of Decentralized Coinjoin implementations of Bitcoin," *Arvix* 2022, available at https://arxiv.org/abs/2109.10229.

19. Mr. Verret will testify that Sarah Meiklejohn, who is credited with inventing the methods and assumptions relied upon by Chainalysis in its investigation into Bitcoin Fog, has repeatedly emphasized the limitations of these techniques. *See* Andy Greenberg, Tracers in the Dark: The Global Hunt for the Crime Lords of Cryptocurrency, Doubleday (November 15, 2022). As part of this line of testimony, Mr. Verret will rely upon a presentation by Sarah Meiklejohn available at: https://www.youtube.com/watch?v=slZgOwXt2jM&t=7s.

20. Mr. Verret will testify that one simply way to break heuristics like the common ownership heuristic on the Bitcoin blockchain is to use CoinJoin or PayJoin transactions. These are transactions in which multiple inputs to a bitcoin transaction actually involve different individuals, which is directly contrary to the assumption underlying the common ownership heuristic employed by the Government and Chainalysis in their investigation into Bitcoin Fog.

9

**Appx6750**

21. Mr. Verret will testify that Chainalysis also uses these various heuristics opportunistically. He will explain how Chainalysis uses some heuristics to make assumptions, and when their assumptions do not obtain the result they are hoping to obtain they then use even more flexible, unexplained or "black box" heuristics, like the intelligence heuristic. Mr. Verret will emphasize that the approach taken by Chainalysis in its investigation into Bitcoin Fog is not objective and has high risk of misattributing ownership of blockchain assets. He will base this testimony on the Government's expert reports, testimony, disclosures and discovery.

22. Mr. Verret will testify that Chainalysis's application of probabilistic methodologies in this case appears in his judgment to have been tailored to generate evidence that improperly implicated a previously identified defendant.

23. Mr. Verret will testify that the heuristics employed by Chainalysis in its investigation into Bitcoin rely on default assumptions that transfers on the blockchain are self-transfers between the same person unless proven otherwise. Mr. Verret will emphasize that this is a dangerous assumption to rely upon because it simply assumes attribution, when attribution of property cannot be assumed in a forensic investigation, it must be demonstrated.

24. Mr. Verret will testify that it would violate core tenets of forensic accounting and financial forensics principles to use Chainalysis's' heuristic assumptions attribute blockchain activity to a specific individual. He will explain that without something more, like hard evidence on a server with a list of private keys associated with those addresses, there is no way to attribute ownership or activity to a specific individual.

10

Appx6751

25. Mr. Verret will testify that the heuristics cannot definitively prove ownership of cryptocurrency. Mr. Verret will explain that heuristics are guesses, guesses based in part on an assumption that most bitcoin transactions take place between public addresses owned by the same individual. Definitive assessments of identity linking non-KYC public keys with individuals based on these heuristics are inconsistent with the standards of the AICPA (for CPA/CFF designations) and ASCFE (for CFE designation). *See* AICPA Statement on Standards for Forensic Services, available at https://www.aicpa-cima.com/resources/download/statement-on-standards-for-forensic-services; Association of Certified Fraud Examiners, CFE Code of Professional Standards, available at https://www.acfe.com/about-the-acfe/-/media/E805D87A1E144558BF27A7F4B0B8317B.ashx

26. Mr. Verret will testify that in order to establish ownership by the Defendant at the end of a chain of transactions the government alleges were all conducted by Mr. Sterlingov, the Government would need proof that transfers from his KYC accounts were done so pursuant to his instruction, and were not to public keys along the chain of transactions that he did not own and control and that were instead owned and controlled by a third party.

27. Mr. Verret will testify that there are multiple situations that could have been misinterpreted by the Government and Chainalysis in their investigation into Bitcoin Fog. Mr. Verret will explain that a reasonable explanation for the misattributions in the Bitcoin Fog investigation may be that the Defendant transferred bitcoin to an individual in an exchange, and that individual or another in a chain of individuals, was the ultimate purchaser of the Clearnet domain. Mr. Verret will further explain that another reasonable

11

**Appx6752**

explanation is that whoever hacked Mt. Gox also hacked the Defendant's account and used it to facilitate external transfers.

28. Mr. Verret will testify that attribution of asset ownership can be a difficult problem in financial forensics generally. He will explain that forensic techniques are more settled in traditional financial investigations than in the blockchain context. Mr. Verret will explain that the extensive KYC measures implemented in traditional finance make it easier for investigators to attribute custody and control over assets in ways that are not necessarily applicable in the blockchain context. Mr. Verret will explain that despite recent efforts to incorporate KYC protocols in the blockchain space, these developments are not yet complete, and there are many ways users can avoid KYC protocols in blockchain finance.

29. Mr. Verret will testify that there is no way to definitively determine who controls a blockchain asset because the KYC regime lags that of traditional finance. Mr. Verret will explain the challenges associated with determining where a digital asset exists, who possesses custodial control of a digital asset, and even whether a digital asset exists.

30. Mr. Verret will testify that the nature of the blockchain has fundamentally altered the notion of property ownership itself, and that the nature of the blockchain makes it difficult to confirm ownership or control over digital assets. Mr. Verret will explain how he teaches his students that obtaining some physical representation of the seed phrase or private key on a suspect's hard drive is key to establishing an individual's connection to the public keys used to attribute ownership or control over digital assets. Mr. Verret will further explain that even the DOJ's own criminal practice journal emphasizes the importance of identifying seed phrases or private keys associated with digital assets to attribute custody or control. *See* Michele R. Korver, C. Alden Pelker and Elisabeth

12

**Appx6753**

Poteat, "Attribution in Cryptocurrency Cases," Department of Justice Journal of Law and Practice (February 2019) at 233, available at https://www.justice.gov/media/991181/dl?inline.

31. Mr. Verret will testify that there is a high risk of misidentification when relying upon heuristics in blockchain forensics. Mr. Verret will explain that the Government's characterization of bitcoin transactions as "beta transactions" is not reasonable, and that it is unlikely the identified transactions were in fact "beta transactions". Mr. Verret will explain that the evidence is consistent with these transactions being mundane transactions that any user could have done. Mr. Verret will explain that the pattern of activity identified by the Government as "beta transactions" could have simply been something as simple as a user testing a new wallet, or a user on-boarding new users to a crypto platform. Mr. Verret will emphasize that such mundane activity would appear identical to the evidence purported by the Government to be "beta transactions".

32. Mr. Verret will testify that there is not sufficient evidence in the record to determine the amount of illicit funds flowing from TOR-based marketplaces to what the Government purports is the Bitcoin Fog cluster. Mr. Verret will explain that there are legal products offered on the darknet marketplaces, and that it would be inaccurate to propose that all the funds flowing from TOR-based marketplaces constitute illicit funds. Mr. Verret will explain that there are many legal products and services available for purchase on TOR-based marketplaces that would not constitute illegal activity. Mr. Verret will testify that the Government has wrongfully categorized all funds originating from TOR-based marketplaces as illicit, and that the Government has failed to present a breakdown of

13

**Appx6754**

which funds are related to illegal products and purposes and which funds are associated with completely legal activity.

33. Mr. Verret will testify that this case has caused him to rethink how he teaches students about blockchain privacy tools.

| Witness Attestation |
| --- |
| I, J.W. Verret, have reviewed and approve the contents of this filing. |

DocuSign by:

_J.W. Verret_
90124720A2034F9...

7/7/2023

J.W. Verret                                         Date

14

**Appx6755**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 21-cr-399 (RDM) |
| Plaintiff, | |
| v. | |
| ROMAN STERLINGOV | |
| Defendant. | |

**SUPPLEMENTAL SUMMARY OF QUALIFICATIONS AND EXPECTED TESTIMONY FOR JONELLE STILL**

Mr. Sterlingov intends to call **JONELLE STILL** ("Ms. Still") as an expert witness. Her qualifications, along with her expert report written in conjunction with Ciphertrace and produced to the Government in this Court and a review and analysis of relevant records, reports, facts, and evidence produced by the Government set forth the basis for her expected testimony.

Ms. Still is an Air Force veteran and serves as Ciphertrace's Director of Cryptocurrency Investigations and Intelligence, as the terrorism financing Subject Matter Expert, and as a Co-Chair of the Defenders League – a pro-bono crypto investigations service. In her role as a recognized global expert in on-chain forensics, she trains: law enforcement, law firms, domestic and foreign government agencies, and financial crime specialists. She is a regular contributor to Ciphertrace's quarterly Cryptocurrency Anti-Money Laundering report and presents on these critical topics at the Organization for Security and Co-operation in Europe, European Union Agency for Law Enforcement Training, Europol, INTERPOL and the United Nations Office for Drugs and Crime. Ms. Still is a member of the Institute of Security and Technology Ransomware Task Force in Washington D.C., and the Blockchain and Distributed Ledger Technologies Special Interest Group which focuses on Financial Crime and Human Trafficking. In October 2023, she will present to the European Commission as part of an experts' conference to counter

1

Appx6756

terrorist financial networks in Brussels, Belgium. In November, 2023, she will train, in conjunction with CEPOL, judges and prosecutors on best practices for cryptocurrency analysis in court cases.

Ms. Still's testimony is rooted in her extensive theoretical and practical expertise in on-chain blockchain forensics, including her work for Ciphertrace, a Mastercard company. Ciphertrace received seed funding from Defense Advanced Research Projects Agency ("DARPA"). Ms. Still's testimony is based on her review of the discovery and the public Bitcoin, Ethereum, and Moneo networks. Her analysis utilizes a combination of public and proprietary tracing technologies including Mempool, Bitaps, Sentry, and Inspector.

Ms. Still is well-versed in the diverse tools used for blockchain forensic tracing and will discuss her efforts to replicate the Government's tracing methods for the crucial aspects of the Government's case. This includes her efforts to replicate the tracing work and analysis done by the Government's proffered expert witnesses Luke Scholl and Elizabeth Bisbee of Chainalysis as contained in their expert reports.

At the August 22nd and 23rd *Daubert* hearings, as well as at trial, the Defense expects Ms. Still to testify regarding the following:

1. She will testify to her and Ciphertrace's review of the Government's blockchain tracing forensics in this case, particularly as to work done using Chainalysis Reactor and the errors, omissions and inconsistencies in the Government's and Chainalysis's work.

2. She will testify as to the contents of Ciphertrace's expert report produced to both the Court and the Government via email on August 7, 2023.

2

**Appx6757**

3. She will explain how the Government's tracing fails to verify that Mr. Sterlingov is the operator of Bitcoin Fog and how the patterns of the transactions are inconsistent with ownership, creation or administration of the service.

4. She will testify as to the lack of contextual analysis in the Government's and Chainalysis's expert reports and how the Government and Chainalysis ignore on-chain transactions from Bitcoin Fog to wallets not controlled by Mr. Sterlingov, that could be controlled by the real operators and administrators of Bitcoin Fog.

5. She will testify as to peel chain typologies and their relevance to this case.

6. She will testify to best practices in the attribution process which includes collection, storage, and audits.

7. She will testify that blockchain tracing is an emerging technology that has no recognized standards, no oversight, no governing standards body akin to the Institute of Electrical and Electronics Engineers ("IEEE") - which governs standards for the internet, or the United States Government's National Institute for Standards in Technology ("NIST") - which govern standards in physical sciences, and no scientific consensus as to the validity or accuracy of the methodologies.

8. She will testify to the inherent limitations in the clustering heuristics and tracing methodology involved with the Government's use of Chainalysis Reactor and other blockchain tracing software in this case.

9. She will testify that Chainalysis's use of single-entity clustering leads to error, and her experience with this type of error occurring on a regular basis with law enforcement and other Chainalysis clients on a global scale.

3

**Appx6758**

10. She will testify to the inherent limitations and misconceptions regarding the heuristics used for Chainalysis's clustering.

11. She will testify to the fundamentals of blockchain and distributed ledger technology and their relationship to cryptocurrency.

12. She will testify to the strengths and limitations of public and proprietary tools.

13. She will testify to the nature of CoinJoin, mixers, PayJoins, and other obfuscation techniques that break the assumptions (heuristics) used in the Government's and Chainalysis's investigation.

14. She will testify to the process of transferring value between cryptocurrency and fiat currency.

15. She will testify generally to the crypto culture.

16. She will explain the difference between custodial and non-custodial wallets including personally held wallets, services and exchanges.

17. She will explain how cryptocurrency exchanges, such as KuCoin, Huobi Global and Gemini, make the best mixers because of KYC policies and the nature of their internal accounting methods that include off-chain transactions, OTC brokers, and off-chain services provided to high-net worth individuals, all of which obfuscate ownership and control.

4

**Appx6759**

18. The Defense expects Ms. Still to testify in rebuttal to the government's expert testimony. The content of Ms. Still's rebuttal testimony is contingent on the substance of testimony from the witnesses produced by the Government in the Hearings and at trial.

---

Witness Attestation

I, Jonelle Still, have reviewed and approve the contents of this filing.

DocuSigned by:

_____          8/7/2023
3928BCF51C15418...                        _____

Jonelle Still                             Date
Ciphertrace

---

**Appx6760**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

        Plaintiff,

v.

ROMAN STERLINGOV

        Defendant.

**No. 21-cr-399 (RDM)**

**NOTICE OF EXPERT REPORT FOR DEFENSE EXPERT JONELLE STILL OF CIPHERTRACE**

This filing supplements Mr. Sterlingov's Notice of Supplemental Expert Witness Disclosure for Jonelle Still filed on August 7, 2023 (Dkt. 157). The attached Expert Report by Ms. Still of Ciphertrace, and its Exhibits, were sent to both the Court and the Government via email contemporaneously with the filing.

On August 8, 2023, the Court instructed undersigned counsel to file this Expert Report via ECF. Accordingly, Ciphertrace's Expert Report is attached.

Dated: August 8, 2023
New York, New York

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

*Appointed Counsel for Defendant Roman Sterlingov*

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of August 2023, the forgoing document was filed with the Clerk of Court using the CM/ECF System, and sent by email to the attorneys for the Government listed below:

<div align="right">s/ Tor Ekeland</div>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

Jeffrey Pearlman
Jeffrey.Pearlman@usdoj.gov

# DEFENSE EXPERT REPORT

*United States v. Roman Sterlingov*

21-CR00399 (RDM)

Jonelle Still
Director of Investigations and Intelligence
Ciphertrace, by Mastercard

August 7, 2023

**ciphertrace**
by

Background ......................................................................................................... 3

Critical Factors that Impact and Contradict the Government's Conclusions ........... 3

Executive Summary ........................................................................................... 7

A Brief History of CoinJoins and Mixers ............................................................. 11

    **CoinShuffle - 2014** ......................................................................................... **13**

    **CoinShuffle++ - 2016** ..................................................................................... **13**

    **TumbleBit - 2016** ........................................................................................... **13**

    **ValueShuffle - 2017** ....................................................................................... **13**

    **CoinJoinXT - 2018** ......................................................................................... **14**

    **SNICKER - 2019** ............................................................................................. **14**

    **Wormhole - 2020** ........................................................................................... **14**

    **WabiSabi - 2020** ............................................................................................. **15**

    **Non-Exclusive List of Wallets that Implement CoinJoins** .................................... **15**

CoinJoin Examples ........................................................................................... 16

    **Example of a 3x4 Mt. Gox Coinjoin Transaction from 2015:** ................................. **16**

    **Example of a 2x4 CoinJoin Transaction from 2014:** ........................................... **17**

Payjoins ......................................................................................................... 18

Things that Break Clustering Heuristics ............................................................. 18

    **Why it Matters** ............................................................................................... **18**

Evaluation of Sarah Meiklejohn's Papers: How to Peel a Million & A Fistful of Bitcoins ........................................................................................................... 18

Evaluation of the Application of Heuristic 2 to Chainalysis' Model ...................... 20

Summary of Literature on False Discovery Rates ................................................ 20

Difference Between a Wallet and a Cluster ......................................................... 23

Best Practices in Address Attribution & Data Integrity:  Collection, Storage and Access ............................................................................................................ 23

Evaluation of Chainalysis Expert Reports .......................................................... 24

Evaluation of Chainalysis Bitcoin Fog Attribution .............................................. 27

    **Summary of Chainalysis bitcoin_fog_market_addrs_cospend.csv Data** ............... **27**

    **Ciphertrace Sentry API Pulls from Clusters** ..................................................... **30**

Appx6765

Comparison of Ciphertrace and Chainalysis Dark Market Attributions ................ 34

Evaluation of the Scholl Report ................................................................ 34

What is Needed to Determine Control of Bitcoin Fog ....................................... 39

Other Domain Name Registrations of Bitcoin Fog ............................................. 39

Notes on Publicly Available Tools .............................................................. 39

Conclusion .............................................................................................. 39

Appx6766

## Background

Roman Sterlingov's defense counsel reached out to Ciphertrace in July 2023 and requested case support regarding cryptocurrency portions in U.S. v. Sterlingov. Ciphertrace accepted the case pro bono. Ciphertrace understands that a majority if not all of Mr. Sterlingov's accounts have been frozen and he does not therefore have access to them. Ciphertrace understands that the Government has presented Chainalysis data for the on-chain cryptocurrency portion of this investigation and unless otherwise noted, I have used this data to interrogate the Government's claims. Ciphertrace understands that the Government utilized at least two proprietary (commercial) tools to trace cryptocurrency, one from Chainalysis and one from TRM, however, Ciphertrace does not have access to these tools as it is not a customer of either company.

My opinions are based upon my analysis of Chainalysis data, Expert Reports and Declarations, and the exchange production provided in the Discovery unless otherwise noted. I, Jonelle Still, reserve the right to amend my opinion as I go through the current evidence in this case and as I am presented with new evidence. Given the large volume of data and the large volume of undisclosed information by the Government and Chainalysis, this analysis is ongoing and this expert report will be supplemented as necessary.

## Critical Factors that Impact and Contradict the Government's Conclusions

For the reasons discussed below, Chainalysis' attributions are unverifiable and should not be used in a Court of law. These data have never been verified externally nor independently, have not been audited, utilize novel algorithms, are based upon experimental research, and, as expert witness Elizabeth Bisbee, from Chainalysis, testified at the Daubert Hearings, there are no known error rates, false positive rates, false negative rates, or any scientifically peer-reviewed inquiry validating the accuracy of Chainalysis' data application of its models. Therefore, I cannot verify the vast majority of Chainalysis' attribution as presented by the Government.

Three primary factors which limited this expert report are as follows:  the integrity of Chainalysis' data, access to the pertinent data, and time.

Because of the lack of Chainalysis' data integrity, arising from the absence of any statistical analysis, model validation or external audits, to effectively review the scope of Chainalysis' work here necessitates the review over six million cryptocurrency addresses and over 20 million cryptocurrency transactions. This is on top of the multiple expert reports from the Government and Chainalysis, and their declarations. At essence, the lack of Chainalysis' data integrity, the lack of any scientific validity, the lack of any statistical analysis as to error rates, and the lack of model validation, all unnecessarily increase the scope of work needed to thoroughly interrogate the data to root out all of the errors. This work should have already been done by the FBI and Chainalysis but it was not. Because of this failure, it is impossible to rule out other suspects as operators

3

Appx6767

and administrators of Bitcoin Fog. A primary component of the Government investigation is its singular focus on Mr. Sterlingov while ignoring almost all other Bitcoin Fog transactions.

The Government's investigation is massively incomplete. The singularity of their focus on making attributions to Mr. Sterlingov ignores an entire universe of transactions that the Government fails to discuss in their expert reports.

For a case this size Ciphertrace will typically spend a minimum of four months utilizing a team of at least three analysts. My review of Chainalysis' analysis is limited by the fact that Chainalysis has not done the proper validation, authentication, or auditing on their data and models necessary for the Government to justify their conclusions. However, what can be analyzed reveals errors, omissions, and a lack of methodological rigor calling the Government's conclusions into serious doubt.

The Government's discovery does not contain the Bitcoin Fog ledger, nor does Ciphertrace have access to it to determine all cryptocurrency addresses, transactions, dates and amounts used in the lifespan of the privacy service. It is my understanding that the Government does not have possession of the Bitcoin Fog servers and has not yet found this ledger nor the server(s) on which it was stored, nor the private keys; therefore, the Government cannot verify its conclusions. This makes any analysis on Bitcoin Fog's inner workings and its owners speculative.

The Government provided no access to Roman Sterlingov's seized wallets, only screen shots. These screenshots require manually entering the data from the screen shots line by line, a time consuming and tedious process. Moreover, the production of screenshots is not a forensically appropriate method of presenting evidence to the Defense for analysis. I cannot confirm there are no errors in the screen shots of the government's rebuilding of Mr. Sterlingov's wallets. The naming conventions are such that it appears the investigators were unsure how to properly name each wallet. Due to the number of errors identified in the Government's experts' reports, I am concerned there are errors in the imported data. The only way to confirm this is to have access to the wallets seed phrase (private key) or rebuild it in "watch only" mode via a Master Extended Public key which would allow me to rebuild the wallet and confirm all addresses, amounts, dates/times, and transactions. This extended public key does not allow me to change or modify the wallets or transactions, nor does it allow me to spend any bitcoin. The Defense requested this from the Government, the Government stated that they were unable to provide the master extended public key. They further stated that they would provide a list of addresses, unfortunately a list of addresses is not the complete record necessary for verifying the wallets and their addresses, amounts, dates/times, and transactions.

The Government has provided no source for Chainalysis' attribution for Bitcoin Fog or all dark markets mentioned in the Government's Expert Reports. The Defense requested this information but has not received it. The Government responded by asking for the relevancy and discoverability of this data. The requested data speaks directly to the integrity of Chainalysis' data and audit trail. The Department of Justice maintains a

number of internal policies and guidance regarding information dissemination and data integrity.[1] The Department of Justice's own guidelines discuss the importance of data integrity:

> Investigations and prosecutions based in whole or in part upon forensic science must be based upon sound science - from the crime scene to the courtroom to post-conviction reviews, and each step along the way.[2]

The Defense requested access to Chainalysis Reactor. The Government stated that they could not provide the Defense with access to Chainalysis Reactor. I am therefore unable to rebuild the cryptocurrency traces exactly as presented in the Expert Reports; meaning I cannot use the same proprietary tools the Government used during the course of its cryptocurrency investigation.

I also had no access to TRM attribution data and source, date, or the time of collection for Bitcoin Fog as it was identified in FBI Analyst Luke Scholl's Expert Report ("Scholl Report"). It is my understanding that the Defense has requested this data, and that the Government responded that they did not have it.

In a letter dated July 26, 2023, the Defense requested from the Government a summary of Chainalysis' and TRM's data integrity as follows:

> 7. We further request all of Chainalysis' Bitcoin Fog attributions; the source and date of all collections of data related to the attributions on a per address basis; the number of clustering errors and how they were resolved and the date/timestamp when those errors and resolutions occurred on a per address basis; the type and quality of each Bitcoin Fog address attribution as they relate to the heuristics described in the Bisbee report on a per address basis, specifying whether they were direct, via clustering, change addresses, or through some other heuristic. Included in this request is a breakdown of each cluster which should contain: Cluster identifier, Number of addresses in cluster, for each address in a cluster whether it identified by heuristic 1, 2, or 3 as described in the Bisbee report, Source Date/Timestamp of data collected, number of clustering errors over time with each identified cluster….

---

[1] *See e.g.* https://www.justice.gov/information-quality; https://www.whitehouse.gov/wp-content/uploads/2022/01/01-22-Protecting_the_Integrity_of_Government_Science.pdf; https://www.justice.gov/sites/default/files/open/legacy/2013/07/29/doj-scientific-integrity-policy.pdf.

[2] *See* U.S. Department of Justice Scientific and Research Integrity Policy, (available at https://www.justice.gov/sites/default/files/open/legacy/2013/07/29/doj-scientific-integrity-policy.pdf).

5

17. We requested information on Mr. Scholl's alleged confirmation of his tracing using TRM's blockchain tracing software. You stated that you had nothing to provide on this front as Mr. Scholl merely used the TRM software and it generated no records.

The Government told the Defense that there was nothing to provide in relation to Mr. Scholl's use of the TRM software because it generated no records. However, if Mr. Scholl utilized TRM's Application Programming Interface[3] ("API"), the API generates log data and TRM would have a record of those API calls.

The Government has failed to provide the necessary data to evaluate their attributions. In order to verify the Government's attributions, it is necessary to assess every attribution point. This means assessing all the records and cryptocurrency addresses referenced in the Government's expert reports, and their attribution data which was largely obtained via Chainalysis; the source and date of all collections of data related to the attributions on a per address basis; the number of clustering errors and how they were resolved and the date/timestamp when those errors and resolutions occurred on a per address basis; the type and quality of all address attributions as they relate to the heuristics described in the Government's expert reports on a per address basis which may differ depending on which heuristics were used; knowing whether they were direct attribution, via clustering, change addresses, or through some other heuristic. Neither the Government nor Chainalysis have provided this information. Nor is it apparent from the Government's expert reports, and expert testimony at the *Daubert* hearings, that they have done this review.

In order to verify the Government's attribution properly I need a breakdown of each cluster on a per address basis which should contain: cluster identifier; number of cryptocurrency addresses in each cluster; whether, for each address in a cluster, it was identified by heuristic 1, 2, or 3 as described in the Government's expert reports; the source date/timestamp of data collected; the number of clustering errors over time within each identified cluster (date/timestamp added). Basically, I need an audit trail of every single cryptocurrency address from the time it was collected to the present. This is a basic requirement necessary to validate any data.

Attributions can change over time, just like heuristics. Ms. Bisbee, in her expert report and declaration, claims that Chainalysis Reactor software is deterministic. However, cluster errors can arise when an address has more than one attribution. For instance, an address can have two owners, like in a "nested exchange," such as Chatex or Suex, where the service operates inside of the exchange. The wallets offered by nested services operate in such a way that ownership may be attributed to the exchange, the service, or the user. Furthermore, exchanges, like Coinbase, Binance, Kraken and Mt. Gox, maintain such a massive amount of liquidity that entire services operate inside of

---

[3] An Application Programming Interface is a set of defined rules that enable different applications to communicate with each other. API allows users to pull large amounts of data and automate processes without going through the front-end of user interfaces.

6

them. The concepts of ownership and control are plastic in the sense that they are subject to the vagaries of how they are defined. There is intense debate in the Cryptocurrency Anti-Money Laundering ("AML") community about the definition of these core concepts. Mr. Scholl references this debate when he discusses the very definitions he uses in his report.

The issue is critically relevant when it comes to the Mt. Gox data. Before Mt Gox collapsed, Mt. Gox keys were hacked, stolen and sold. This makes attributions related to Mt. Gox data challenging because it's difficult, if not impossible, to make accurate ownership attributions. Additionally, the exchange Kraken stepped in to support Mt. Gox following Mt. Gox's collapse and is rumored to hold some of the keys. During its operation, Mt. Gox also allowed users to import their own private keys which created a massive issue in determining correct clustering and ownership. Deterministic algorithms are problematic in that they'll always attribute those keys to Mt. Gox, even though they are no longer under Mt. Gox's control.

In Ms. Bisbee's report she stated that the Bitcoin Fog address types changed over time. She also stated that Chainalysis' software is deterministic, and that Chainalysis uses Heuristic 2 (behavioral) which includes cryptocurrency address types, and the raw data associated with those addresses. This raises serious questions regarding the claim that Chainalysis Reactor is deterministic. In order for Chainalysis Reactor to be deterministic, the outputs should not change. But if that's true, then there is a serious problem with Chainalysis' attribution process because services and users can change the address types they use over time. Ownership can change over time as well, as demonstrated by the Mt. Gox private keys being hacked, stolen and sold. This is a glaring inconsistency in Ms. Bisbee's expert report and is exactly why audit trails are necessary.

## Executive Summary

The Government's claims that Roman Sterlingov operated/administered Bitcoin Fog cannot be verified using on-chain data because:

- **High Number of Errors**: Numerous factual errors and improper assumptions in the Government's Expert Reports.
- **Data Discrepancy**: There exists discrepancy rates between Ciphertrace and Chainalysis attribution data upwards of 60%. Ciphertrace utilizes Heuristic 1 (multi-input clustering) for attributions other than direct attribution. Ciphertrace does not utilize Heuristic 2 (behavioral) because it is inaccurate, error-prone, and over inclusive.
- **Data Standards for Court:** The Chainalysis attribution data should not be used in court for this case nor any other case:  it has not been audited, the model has not been validated, nor has the collection trail been identified.
  - Upwards of 64% error rate for Heuristic 2;
  - Over 527,000 Bitcoin Fog addresses clustered by Chainalysis using Heuristic 2;

7

Appx6771

- This means that the Government's reliance on Chainalysis' count of dark market interactions with Bitcoin Fog is likely misplaced and flawed.
- **Lack of Data Integrity**:  The Government relies on data for which there is no independent model validation. There are no error rates cited for each cryptocurrency address or clustering heuristic, as Ms. Bisbee testified at the *Daubert* Hearings, and reiterated in her Declaration. Chainalysis did not / has not collected the data. I estimate there are hundreds of millions of data points that are unverified. Chainalysis does not appear to have verified any of their datasets via independent audits, and only makes vague claims referencing unnamed data scientists in regards to any internal validation.
  - Other cases relying upon Chainalysis data may warrant re-examination in light of these revelations;
  - Recently, a federal judge dismissed the testimony of a witness who relied upon data which had not been verified within a two-year timeframe as it violated DOJ guidelines.[4]
- **CoinJoins break heuristics**:  Privacy services are intentionally designed to break clustering and other heuristics blockchain analytics companies rely upon for the creation of their attribution database. This is a bugbear for companies like Chainalysis whose customers rely on their data.
- **Lack of Blockchain Analytics Oversight**:  Currently, there does not exist a standards body which oversees blockchain analytics companies, their models, data collection or attribution. As an emerging field, definitions, practices, and data collection are not standardized.
- **Chainalysis 'fixes' information and timeline for IRS**:  The discovery produced by the Government contains a spreadsheet authored by IRS-CI Devon Beckett, last updated on August 8, 2016. In it, he appears to refer to Chainalysis manipulating the data in this case because it did not fit in to the Government's preconceived notions. The spreadsheet states:

  > ? If BCF is truly not up an [sic] until this date, then timeline appears to fit well excluding the custom onion generation. Chainalysis seems to think there [sic] transactions before this date and should be releasing a "fix" which provide more accurate display of information/timeline

  - I understand this to mean that the traces were not aligning in an advantageous way, so Chainalysis offered to adjust their algorithm or data manually to create a more favorable trace for the IRS.

---

[4] *See e.g.* Jude tosses testimony on 'unverified' data from Penguin Random House executive, COURTHOUSE NEWS SERVICE, Emily Zantow (Aug. 17, 2022) (available at: https://www.courthousenews.com/judge-tosses-testimony-on-unverified-data-from-penguin-random-house-executive/).

- **IRS Consensus on Withdrawal Patterns**:  Mr. Sterlingov's withdrawal pattern from Bitcoin Fog is entirely consistent with user withdrawals; this is corroborated by the Search Warrant Affidavit signed by IRS-CI Special Agent Leo Rovensky[5] "These withdrawals occurred sporadically and in the same manner as a regular user."[6] The affidavit goes on to make a leap of logic stating that the likely reason Mr. Sterlingov's withdrawals match other user withdrawals is that he was trying to obfuscate his ownership. However, we know that Mr. Sterlingov deposited his funds into exchanges that required him to upload a copy of his government ID and take a selfie. The conclusion made by IRS-CI Special Agent Leo Rovensky that Mr. Sterlingov is the administrator of Bitcoin Fog is unfounded and illogical.

- **IP Address is likely a VPN or Proxy Server:** On page 18 of Mr. Rovensky's Warrant Affidavit, IP address 212.117.160.123 is identified as the address that accesses Liberty Reserve and Mt Gox accounts.[7] The Government uses this IP address to attribute ownership and control of the Mt. Gox accounts #2 and #3 to Mr. Sterlingov. However, this IP address appears to be a VPN, or a proxy server. That is, any number of entities or persons from anywhere in the world could be using this IP address at any one time. Ciphertrace collects IP addresses via our own node operation and links them to bitcoin addresses. The large number of bitcoin address clusters, cryptocurrency services, and exchanges that are linked or traceable to this IP address identified in the Warrant strongly point to a VPN or proxy server. Additionally, some of the bitcoin addresses linked to this IP address are also linked to multiple IP addresses. Critically, none of the bitcoin addresses linked to the 212.117.160.123 IP address are listed in the Government's findings. None of the bitcoin addresses linked to 212.117.160.123 IP address ever interacted with Bitcoin Fog. None of the bitcoin addresses linked to 212.117.160.123 IP address were ever under Mr. Sterlingov's control in his Mycelium wallet.

- **Assumption Errors**:  No address attributed to Mr. Sterlingov in the Scholl Report sent funds on Oct. 27, 2011, to Bitcoin Fog via Wallet 2, as Mr. Scholl stated in his report.[8] Mr. Scholl stated in his report that the deposit occurred prior to the announcement of Bitcoin Fog on the Bitcoin Talk forum. However, this appears to not be the case and warrants further examination. This is but one of the many assumptions that are pervasive in the Scholl Report and this case.

- **The Tesla:** Mr. Sterlingov's purchases and behaviors do not match that of a crypto bro who made millions. In Mr. Rovensky's Warrant Affidavit, he claims that a majority of cryptocurrency in Mr. Sterlingov's accounts are back traceable to Bitcoin Fog and alleges that Mr. Sterlingov used funds coming from the privacy service to buy gift cards, goods and services, and other cryptocurrencies.[9]

---

[5] Search Warrant Application by IRS-CI Leo Rovensky, Dkt. 22-SC-2023 (Aug. 9, 2022).

[6] *Id.* at 20.

[7] *Id.* at 18.

[8] *See* TxID 6586649970D8FE8A8DB1DACF17665AE6BADE88E090FA73904EFB05F49DCC379A.

[9] Search Warrant Application by IRS-CI Leo Rovensky, Dkt. 22-SC-2023, p. 21 (Aug. 9, 2022).

However, the Superseding Indictment does not include a wire fraud charge. Therefore, the fiat sources were not determined to be illicit. A Tesla purchase is not unheard of, but is out of the ordinary for a person who allegedly made millions in cryptocurrency. The phrase, "wen lambo," describes the crypto investor's goal of purchasing a Lamborghini as a sign of wealth and status.[10] There are countless examples of crypto investors and traders using their gains to purchase 'lambos,' and these cars make appearances at cryptocurrency-centric events like Bitcoin Miami and ETH Denver.



An example of crypto-bro meme culture

- **The Government Ignored Other Leads:** Other withdrawal patterns for unknown addresses may better align with administrator payouts (size, frequency, amounts). The IRS sent subpoenas to Binance, and requested they not alert the account holders. At least 3 account holders were identified who withdrew from Bitcoin Fog. However, the Government generally ignores the universe of Bitcoin Fog withdrawals and almost exclusively focuses on Mr. Sterlingov. There are millions of Bitcoin Fog transactions.
- **There are no wire fraud charges**:  In cryptocurrency cases, a wire fraud charge is typically included as the cryptocurrency (purportedly from an illicit source) is swapped for fiat currency and used to purchase luxury goods, services and in some cases, gold.[11]
- **Other Privacy Services**:  Mr. Sterlingov's use of other privacy services like Wasabi CoinJoin, Bitmixer, and Mt Gox CoinJoins demonstrate he was a user of privacy services, not that he controlled them.

---

[10] *See* When Lambo? How Lamborghini became the status brand of the crypto boom, DIGIDAY, Shareen Pathak (May 24, 2018) (available at:  https://digiday.com/marketing/lambo-lamborghini-became-status-brand-crypto-boom/).

[11] *See* Buried gold, burning trash: US couple admits to hiding hacked crypto, REUTERS, Luc Cohen (Aug. 3, 2023).

10

- **Questions of Bitcoin Fog Ownership**: The privacy service Bitcoin Fog utilized multiple different deposit and withdrawal patterns in its lifetime. This suggests that the service may have had multiple owners or changed hands.
- **Not a true mixer?:** Analysis shows that it is possible Bitcoin Fog was utilizing user deposits for withdrawals. This could explain why users could withdraw funds after a month or two, and not regularly. Mr. Sterlingov typically made several withdrawals on the same day once a month or once every other month into his Mycelium wallet. This pattern matches other user withdrawals as investigated by the IRS, and complaints made on the Bitcoin Talk forum that Bitcoin Fog was a scam.
- **Advertising for Privacy is not Illegal**: Bitcoin Fog advertised itself as a privacy service. Other mixers and privacy services have sometimes advertised themselves on the Clearnet and websites accessible via TOR that they will help hide illicit proceeds. Bitcoin Fog did not.
- **Questioning the Narrative**: If Mr. Sterlingov was running a mixer and taking payouts, why was he buying bitcoin at Local Bitcoins and other exchanges?
- **Differences in Graphical Tracing Tools Leads to Errors:** Chainalysis Reactor employs single-entity clustering; that means that for each transaction on a graph, the entire entity will appear to spend funds in that interaction, even if only one address is assigned to that entity transacted. A root address is assigned to the entity which may or may not be the correct address that transacted.[12] This single entity clustering leads to many tracing errors.
- **Ciphertrace Inspector employs separated clusters**: This means that our clusters are truest to the activity that occurred on chain. Our graphs show the true addresses that participated in a transaction, individually. Law enforcement and other customers of Chainalysis have approached Ciphertrace on this topic and have expressed frustration related to the errors they experience using Chainalysis Reactor. The Scholl Report exhibits these types of errors.[13]

## A Brief History of CoinJoins and Mixers

It is often said that exchanges make the best mixers. This is due to the shared practices between the two. Exchanges accomplish what is termed 'off-chain' transactions, which means that cryptocurrency and values of cryptocurrency are moved around without being sent to the mempool (pool of transactions waiting to be validated and added to the next block) and validated. When a retail customer logs into their exchange account, they will see a deposit address and amount of cryptocurrency associated with that address or account. However, that number is essentially an IOU. Exchanges may use user withdrawals for other purposes such as withdrawal requests and trading. In the infamous case of exchange FTX, it is alleged that Sam Bankman-Fried used user deposits to trade at his institutional trading firm Alameda Research.

---

[12] *See* Data Credibility in Cryptocurrency Investigations, CIPHERTRACE (2021) (attached as Ex. A).
[13] *See e.g.* Scholl Report at 22-23, 46.

11

Appx6775

CoinJoins and mixers have a long history in Bitcoin. In *Section 10 Privacy* of his Satoshi Nakamoto's Bitcoin whitepaper that invents Bitcoin and the blockchain, Mr. Nakamoto states:

> The traditional banking model achieves a level of privacy by limiting access to information to the parties involved and the trusted third party. The necessity to announce all transactions publicly precludes this method, but privacy can still be maintained by breaking the flow of information in another place: by keeping public keys anonymous. The public can see that someone is sending an amount to someone else, but without information linking the transaction to anyone. This is similar to the level of information released by stock exchanges, where the time and size of individual trades, the "tape", is made public, but without telling who the parties were. As an additional firewall, a new key pair should be used for each transaction to keep them from being linked to a common owner. Some linking is still unavoidable with multi-input transactions, which necessarily reveal that their inputs were owned by the same owner. The risk is that if the owner of a key is revealed, linking could reveal other transactions that belonged to the same owner.[14]

Early adopters of Bitcoin understood the value of privacy and adapted their on-chain transactions to preserve their privacy as outlined by Satoshi, to break the potential linking accomplished via multi-input transactions. [15]

The first main discussions around CoinJoin techniques were from Gregory Maxwell in 2013 iterating off of David Chaum's approach to privacy from the 1980s and 1990s.[16] CoinJoin operations were taking place already on the blockchain prior to Mr. Maxwell's 2013 post. Mr. Maxwell posted to the Bitcoin Dev Forum in August 2013 regarding:

> [A] transaction style Bitcoin users can use to dramatically improve their privacy which I've been calling CoinJoin. It involves no changes to the Bitcoin protocol and has already seen some very limited use spanning back a couple of years now but it seems to not be widely understood.[17]

CoinJoin transactions started circulating more and more through forums as people noted that inputs of a CoinJoin-based Bitcoin transactions should be separately signed

---

[14] *See* Bitcoin: A Peer-to-Peer Electronic Cash System, Satoshi Nakamoto (2008) (attached as Ex. B).

[15] Bitcoin Q + A, BITCOIN.GUIDE, Gregory Maxwell (2013) (available at https://bitcoiner.guide/qna/CoinJoin/#:~:text=CoinJoin%20(sometimes%20called%20mixing)%20is,belong%20to%20the%20same%20entity).

[16] Untraceable Electronic Mail, Return Addresses, and Digital Pseudonyms, TECHNICAL NOTE PROGRAMMING 21 TECHNIQUES AND DATA STRUCTURES 2, David L. Chaum (Feb. 1981) (available at: https://dl.acm.org/doi/pdf/10.1145/358549.358563).

[17] *See* https://bitcointalk.org/index.php?topic=279249.0.

12

with associated signatures, thus the users could jointly create one transaction with their inputs. In that manner, they would break the "common ownership" heuristic (Heuristic 1), and they can hide the relation of inputs to outputs. Outside of just CoinJoin itself, there were protocols that built off of it such as CoinShuffle, CoinShuffle++, ValueShuffle, CoinJoinXT, and others.

### CoinShuffle - 2014

CoinShuffle focused on a small communication overhead via the Dissent protocol. This protocol allows every participant to generate a fresh ephemeral encryption/decryption key pair and broadcast the public encryption key to the network. Note that this is not via the Bitcoin network. Every participant then generates a fresh Bitcoin address, designates their output address in the mixing transaction and then becomes part of the shuffling. The shuffling is the movement of these freshly generated output addresses in an oblivious manner. Each shuffling becomes another shuffle by the next participant. Each participant can individually verify that their output address is in the list of outputs. If so, the participant signs the transaction with their signing key and broadcasts the signature. Upon receiving the signatures from all participants, the transaction can be fully-signed and broadcast to the Bitcoin network.

### CoinShuffle++ - 2016

CoinShuffle++ builds off of CoinShuffle, however it is only utilized via Decred CoinJoin transactions. The process is to obfuscate ownership of DCR (Decred) coins, where the output addresses are anonymized via some type of mixnet. The mixnet used for this is DiceMix. DiceMix claims to allow pseudonymous users to issue transactions which would be unlinkable and fully compatible with various blockchain-based systems. Through the use of an additional mixnet, CoinShuffle++ can make the outputs indistinguishable by allowing each output "mix" to have a fixed denomination. This is similar to future protocols such as CoinMixer.

### TumbleBit - 2016

TumbleBit allows parties to make fast, anonymous, off-chain payments through an untrusted service known as a "tumbler". This "tumbler" follows the principles set out by David Chaum's eCash principles while allowing the payments and mixing to be done offline through TumbleBit itself.

### ValueShuffle - 2017

ValueShuffle builds off of the predecessors in CoinJoin technology, however this time the developers focus on hiding the funds. This would be one of the first instances of trying to build out privacy enhancements to Bitcoin itself. The way of hiding transaction amounts was created much earlier than CoinJoin transactions and is known as Confidential Transactions. Confidential Transactions (CT) is a cryptographic principle

which allows one to make the value amounts in a given transaction be hidden, i.e. encrypted by one which makes it possible for the parties participating in the transaction to view the amounts. As this builds off of CoinShuffle++, the use of DiceMix will be utilized. Outside of the ValueShuffle whitepaper, there is not a lot of credible information on whether this was actually used. As it integrates CT, this would require a full consensus upgrade to Bitcoin which did not happen.

### CoinJoinXT - 2018

CoinJoinXT was presented by Adam Gibson in 2018 which focused on both improving the privacy of Bitcoin, while also focusing on breaking transactional graph analysis. At the time of the presentation, Mr. Gibson focused on how SegWit enables pre-signing of not just individuals but chains of transactions.[18] Thus, he aims to create co-agreed upon contractual agreements within the Bitcoin scripts to require transferring ownership of coins into a shared controlled area - i.e. the CoinJoinXT interface itself. It then allows a refund policy which can occur through multiple steps. A lot of the work around this was considered PoC (Proof-of-Concept), however over time one can see how it correlates to JoinMarket.

### SNICKER - 2019

Adam Gibson proposed another alternative to CoinJoins building off of his previous work in 2019 entitled "SNICKER." SNICKER stands for *Simple Non-Interactive CoinJoin with Keys for Encryption Reused*. It's a method for allowing various wallets to create CoinJoin transactions non-interactively through a multi-step process. The first step would be that User A determines a UTXO for which they know the owner's public key. User A selected those UTXO's whose value is less than the amount controlled by their wallet and creates a proposed CoinJoin between that UTXO and their own wallet's UTXO. This transaction creates three outputs: CoinJoin Output for User A, CoinJoin output of the owner of the selected UTXO (User B), and the change output to User A. From this, User A then creates a shared secret via ECDH (Elliptic Curve Diffie-Hellman) and allows User B to derive User A's public key. The full proposal is available on GitHub.[19]

### Wormhole - 2020

Wormhole was proposed in 2020 by Max Hillebrand on the Bitcoin-Dev mailing list.[20] Wormhole was initially proposed by the Wasabi Wallet team, yet Mr. Hillebrand took the proposal and built upon it and requested feedback. The protocol sends payments as

---

[18] AdamISZ GitHub Repositroy (available at: https://gist.github.com/AdamISZ/a5b3fcdd8de4575dbb8e5fba8a9bd88c).
[19] AdamISZ GitHub Repository, SNICKER_BIP_draft.mediawiki (available at: https://gist.github.com/AdamISZ/2c13fb5819bd469ca318156e2cf25d79).
[20] Wormhole: Sending and receiving bitcoin anonymously, LINUX FOUNDATION , Max Hillebrand (Jan. 15, 2020) (available at: https://lists.linuxfoundation.org/pipermail/bitcoin-dev/2020-January/017585.html).

Appx6778

part of a Chaumian CoinJoin but also prevents the spender from learning of the received Bitcoin address. Similar to TumbleBit, it provides a trustless payment service that issues multiple rounds of communication.

## WabiSabi - 2020

Yuval Kogman posted to the Bitcoin-Dev mailing list research into CoinJoins about a new protocol called WabiSabi.[21] The protocol extends the existing Wasabi Wallet protocol with an adapted technique of Confidential Transactions (CT) that was mentioned above. Through this the client can create a commitment to arbitrary outputs and amounts, without ever revealing the amounts, and is still able to prove that each amount is individually within a specified range, thus collectively summing the outputs to a specified value. The protocol is very different than the existing Wasabi Wallet implementation as of 2020 and replaces Blind Signatures with keyed-verification anonymous credentials.

## Non-Exclusive List of Wallets that Implement CoinJoins
- Wasabi Wallet;
- Samourai Wallet;
- Sparrow Wallet;
- JoinMarket.
- And more

---

[21] WabiSabi: a building block for coordinated CoinJoins, LINUX FOUNDATION , Yuval Kogman (Jan. 11, 2020).

15

## CoinJoin Examples

Example of a 3x4 Mt. Gox Coinjoin Transaction from 2015:[22]



*Note that the attribution states "Mt Gox and Coin Joins". Mt Gox, in addition to operating an exchange, also offered CoinJoin services.

---

[22] *See e.g.* 3x4 CoinJoin transaction from 2015 (available at:
https://btc.bitaps.com/92a78def188053081187b847b267f0bfabf28368e9a7a642780ce46a78f551ba).

Appx6780

Example of a 2x4 CoinJoin Transaction from 2014:[23]



[23] *See e.g.* 2x4 CoinJoin transaction from 2014 (available at:
https://bitaps.com/c38aac9910f327700e0f199972eed8ea7c6b1920e965f9cb48a92973e7325046).

17

Appx6781

### Payjoins

Payjoins or Pay to End Point (P2EP) are a special type of CoinJoin in which one participant pays another and the transaction is indistinguishable from a regular bitcoin transaction. The amount paid from one participant to the other cannot be determined. These Payjoins may be accomplished with or without special software.

CoinJoins provide users with a level of entropy, or privacy, for example via Chaumian blinding or Schnorr signatures.[24] Mixers can be custodial (Blender.io) or non-custodial (Tornado.Cash) – both services are sanctioned by OFAC.[25] It is important to note here that Bitcoin Fog is not, and has never been, sanctioned.

### Things that Break Clustering Heuristics

- Mixers
- CoinJoins
- Payjoins
- WabiSabi
- Layer 2 solutions (L2) – Omni Layer, Counterparty, Lightning Network
- Cross-chain atomic swaps
- Built-in privacy in wallet software such as Samourai Wallet,Electrum, Blue Wallet, JoinMarket, Sparrow, Wasabi Wallet etc.[26]

### Why it Matters

CoinJoins break Heuristic 1, which all blockchain tracing companies use to try to deanonymize cryptocurrency transactions on a blockchain.

### Evaluation of Sarah Meiklejohn's Papers: How to Peel a Million & A Fistful of Bitcoins

Some of the key assumptions and limitations in Sarah Meiklejohn's, et al. research papers include:

- Chainalysis provided Sarah Meiklejohn with data related to this case. In *How to Peel a Million* Sarah Meiklejohn, et al. lays out a chapter in which she attempts to validate Chainalysis' findings using a pair of proposed algorithmic tracing models. The two new models produced contradictory results.
- *How to Peel a Million* assumes the validity of the data provided to them by Chainalysis. No effort was made by Sarah Meiklejohn, et al. to independently verify the dataset. We

---

[24] *See e.g.* Schnorr Identification and Signatures, STANFORD UNIVERSITY, David Mandell Freeman (Oct. 29, 2011) (available at: https://web.stanford.edu/class/cs259c/lectures/schnorr.pdf).

[25]*See* U.S. Treasury Issues Forst-Ever Sanctions on a Virtual Currency Mixer, Targets DPRK Cyber Threats, U.S. DEP'T OF THE TREASURY (May 6, 2022) (available at: https://home.treasury.gov/news/press-releases/jy0768).

[26]*See e.g.* Samourai Wallet (available at: https://samouraiwallet.com/features).

cannot verify the dataset, and we know that Chainalysis has not performed any independent audits on their data collection process. Therefore, we cannot reproduce the work.

- The dataset was hand curated by Chainalysis. This suggests a concern that the dataset was inaccurate.
- Without any independent verification of the accuracy of the provided dataset, there is no way to assess the accuracy of the conclusions drawn from that dataset.
- In 2011, Bitcoin addresses all had the same features.
- All the transactions discussed in Section 7.3.1 (Bitcoin Fog) of *How to Peel a Million* had the same address features. This is why the algorithms used in the paper produced contradictory results.
- *How to Peel a Million* acknowledges that the models used are ineffective for peel-chains with the same address types.
- As *How to Peel a Million* states:

  > We then followed the funds from the Mt. Gox withdrawal forwards, using FOLLOWFWD, to see if we would reach the deposit to Bitcoin Fog. Both FINDNEXT and FINDNEXT2 failed after only one hop, however, as the two outputs in TX2 had the same address features and were spent in transactions with the same features. Our algorithms were thus unable to isolate the change output. These outputs were both furthermore fresh, meaning it was their first appearance in the blockchain, so the other change heuristics described in Section 7.2 also would have been unable to follow the transaction forwards.[27]

- In *A fistful of Bitcoins*, Ms. Meiklejohn's previous research into peel chain attribution via algorithms computed a False Discovery Rate ("FDR") of 51.64%.[28]
- The research demonstrates that for 80% new attribution there will be a 50% FDR. This is not a reliable model.

| Heuristic | Expsn | FDR |
|---|---|---|
| findNext | 147.43 | 0.62 |
| findNext2 | 124.46 | 0.02 |
| Androulaki et al. [2] | 93.03 | 64.19 |
| Meiklejohn et al. [31] | 79.94 | 51.64 |
| Goldfeder et al. [14] | 73.7 | 48.7 |
| Ermilov et al. [10] | 28.6 | 12.7 |

[29]

---

[27] S. Meiklejohn et al., *How to Peel a Million: Validating and Expanding Bitcoin Clusters*, Sec. 7.3.1 (May 2022).

[28] S. Meiklejohn, M. Pomarole, G. Jordan, K. Levchenko, D. McCoy, G. M. Voelker, and S. Savage. *A fistful of bitcoins: Characterizing payments among men with no names*, PROCEEDINGS OF THE INTERNET MEASUREMENT CONFERENCE - IMC '13, number 6, pages 127–140, 2013.

[29] *See Id.*

- The FindNext2 Heuristic was applied to the hand curated dataset that Chainalysis provided for *How to peel a million*. This heuristic failed to validate the Mt. Gox trace to Bitcoin Fog that the Government attributes to Mr. Sterlingov.
- As Ms. Bisbee testified at the *Daubert* Hearings, Chainalysis has not conducted any statistical analysis of their false positive or error rates.

## Evaluation of the Application of Heuristic 2 to Chainalysis' Model

Chainalysis is vague with regards to Heuristic 2. The three heuristics identified by Ms. Bisbee in her expert report are not static. Many different assumptions can be applied under the category of Heuristic 2. Which subcategories of assumptions that are applied impact the accuracy of Heuristic 2.

Chainalysis has not revealed which sub-categories of Heuristic 2 they apply in their model in relation to Mr. Sterlingov. An external model validation, which Chainalysis has not done, could confirm the accuracy of the results. In my expert opinion the application of Heuristic 2 by Chainalysis is reckless.

Ciphertrace identified 527,731 addresses that did not cluster via Chainalysis Heuristic 1. Ciphertrace also uses Heuristic 1 multi-input clustering as the primary heuristic for non-direct attribution. Ciphertrace does not utilize Heuristic 2 as described by Chainalysis because it is often unreliable and not a true representation of the flow of funds on chain. The high prevalence of errors in Heuristic 2 are described by Ms. Meiklejohn to be between 12.7% and 64%. It is surprising that, knowing this, Chainalysis chose to apply the over inclusive Heuristic 2, despite its claims that it takes a conservative approach.

Chainalysis and Ciphertrace have a shared 397,255 addresses clustered via multi-input clustering (Heuristic 1). The 527,731 outstanding addresses were clustered under Chainalysis' undefined Heuristic 2 model. We have calculated a discrepancy rate of roughly 64% which is due to Chainalysis' use of the over inclusive Heuristic 2. The over-inclusivity of Heuristic 2 leads to dramatically high rates of false positives and implicates innocent cryptocurrency users.

In this case, the over inclusivity of Chainalysis' flawed heuristics leads to false positives. Chainalysis' over inclusive clustering methods leave it to be determined whether they have attributed addresses to Bitcoin Fog that never had anything to do with Bitcoin Fog. Without significant time to go through each of the 527,731 addresses by hand, we cannot account for the extremely large discrepancy except to point to the research and note that the difference lies in the application and error rates of Heuristic 2.

## Summary of Literature on False Discovery Rates

The Government's Supplemental Notice of Intent to Present Expert Testimony states:

> Additionally, attached as Exhibit 2 is a research paper authored by several notable blockchain academics, including Sarah

20

Appx6784

> Meiklejohn. See Ex. 2 (George Kappos et al., How to Peel a
> Million: Validating and Expanding Bitcoin Clusters (2022), at 2,
> https://arxiv.org/abs/2205.13882). The paper was previously
> cited in the government's Opposition to Defendant's Omnibus
> Motions in Limine. ECF No. 73, note 4. The paper's focus is on the
> proposal of a new peel chain heuristic, but, **relevant to the
> Court's inquiry, the researchers used information provided by
> Chainalysis as "ground truth" data, indicating a high confidence
> among the academic community in the reliability of the
> information**. Ex. 2 at 1-2. The paper's "Related Work" section
> includes discussion of and citation to further academic research in
> blockchain analysis. Id. at 2. (emphasis added).

Section 4 of *How to peel a million* states that the 'ground truth data' consisted of 60 hand curated clusters:

> To start, we were given 241 Bitcoin addresses and 20,016 Bitcoin
> transactions by Chainalysis, a company that provides blockchain
> data and analysis to businesses and government agencies. The
> addresses represented true positive clusters, in the sense that
> Chainalysis had manually verified that all the addresses in the
> same co-spend cluster as this address really did belong to the
> same service (typically by confirming directly with the service).
> The transactions were all CoinJoins and thus represented false
> positive clusters, meaning all of the addresses in the resulting co-
> spend cluster would not actually belong to the same service. Each
> address formed a distinct cluster, and there was no overlap
> between the addresses in the true positive (TP) clusters and the
> ones used as inputs in the false positive (FP) transactions. This
> ground-truth dataset was necessary for evaluating our heuristics,
> and would not have been possible to get at this scale without
> working with Chainalysis or directly with the services themselves.
> None of the clusters represented individual users, and we had no
> additional information about the entities represented by the
> clusters (e.g., the name of the service).[30]

These hand curated data points were selected specifically to eliminate the possibility of false positives. The fact that hand curated data was used rather than raw data speaks to the fact that raw data is not reliable enough to validate heuristics.

---

[30] S. Meiklejohn et al., *How to Peel a Million: Validating and Expanding Bitcoin Clusters*, Sec. 4, p. 3 (May 2022).

21

Section 7.3.1 of *How to peel a million* attempts to find a link between a withdrawal from Mt Gox and a deposit to BitcoinFog. Both forward tracing heuristics, FINDNEXT and FINDNEXT2, failed after the first transaction hop. They were able to produce a trace using a backward tracing heuristic, but they say this heuristic produces more errors.

The academic cited in *How to peel a million* lists a wide-range of error rates for various heuristics ranging from 12.7% to 64.19%. Notably, the heuristics with the highest claimed accuracy rate, FINDNEXT and FINDNEXT2, were the heuristics that failed to find a link between the Mt. Gox transactions and Bitcoin Fog.

- **Androulaki et al. [2]** identify the change output in a transaction tx if (1) the transaction has exactly two outputs, and (2) it has the only fresh address in tx.outputs, meaning output.addr is the only one appearing for the first time in the blockchain.
    o This method produced a **64.19%** False Discovery Rate using the hand curated set
    o [2] E. Androulaki, G. O. Karame, M. Roeschlin, T. Scherer, and S. Capkun. Evaluating user privacy in Bitcoin. In International Conference on Financial Cryptography and Data Security, volume 7859 LNCS, pages 34–51, 2013.

- **Meiklejohn et al. [31]** identify the change output in a transaction tx if (1) it has the only fresh address in tx.outputs; (2) tx is not a coin generation; and (3) there is no selfchange address in tx.outputs, meaning no address used as both an input and an output.
    o This method produced a **51.64%** FDR
    o [31] S. Meiklejohn, M. Pomarole, G. Jordan, K. Levchenko, D. McCoy, G. M. Voelker, and S. Savage. A fistful of bitcoins: Characterizing payments among men with no names. In Proceedings of the Internet Measurement Conference - IMC '13, number 6, pages 127–140, 2013.

- **Goldfeder et al. [14]** use the same conditions as the one by Meiklejohn et al. but additionally require that (4) the transaction tx is not a CoinJoin.
    o This method produced a **48.7%** FDR
    o [14] S. Goldfeder, H. Kalodner, D. Reisman, and A. Narayanan. When the cookie meets the blockchain: Privacy risks of web payments via cryptocurrencies. arXiv preprint arXiv:1708.04748, 2017.

- **Ermilov et al. [10]** were the first to consider not only the behavior of the outputs and their addresses but also the value they received. They identify the change output in a transaction tx if (1) the transaction has exactly two outputs; (2) the transaction does not have two inputs; (3) there is no self-change address; (4) the output has the only fresh address in tx.outputs; and (5) the output's value is significant to at least the fourth decimal place
    o This method produced a **12.7%** FDR
    o [10] D. Ermilov, M. Panov, and Y. Yanovich. Automatic Bitcoin address clustering. In Proceedings of the 16th IEEE International Conference on Machine Learning and Applications (ICMLA 2017), pages 461–466, 2018.

22

Appx6786

The two new heuristics cited in *How to peel a million*, that failed to find a link between the Mt. Gox and Bitcoin Fog have alleged FDR rates as follows:

- FINDNEXT    - 0.62% FDR
- FINDNEXT2  - 0.02% FDR

This new heuristic is purportedly accurate because it is more discriminating.

## Difference Between a Wallet and a Cluster

A wallet "contains" all the addresses derived from a private key. This includes addresses on multiple chains if they are from the same private key. It is specific to only one private key. It is only possible to know the addresses in the wallet if the key to the wallet is possessed. A cluster is all the addresses which are related to each other via co-spending. A cluster can include addresses from multiple wallets if the wallets have been used to construct a "CoinJoin" transaction. CoinJoin is used here to denote any transaction involving multiple private keys (wallets) regardless of who controls them. Wallet addresses that have not co-spent are not in the same cluster.

This effects Heuristic 1 (multi-input clustering) because:  in an explorer there may be multiple clusters associated with a wallet, especially in wallets that are managed to minimize co-spending; in a public block explorer there may be multiple wallets in a cluster. The multi-input clustering heuristic assumes that the keys to the inputs of a transaction are controlled by the same party. This allows for multiple keys being used. This also assumes the logistical difficulty, but not impossibility, of multiple parties coordinating to sign a given transaction.

This impacts Heuristic 2 because:  the major issue with Meiklejohn's research is this heuristic can have a False Positive Rate between 12.7% and 64.19% depending on the methodology used. This was measured by running the various heuristics on a hand curated data set; these errors would then be compounded by successive runs of Heuristic 1 and 2 on the new clusters interactions.

## Best Practices in Address Attribution & Data Integrity:  Collection, Storage and Access

The Best Practices in Cryptocurrency Address Attribution are meant to serve as a guide and are non-exhaustive. They generally follow the data integrity definition and roadmap outlined by Harvard Business School (HBS). HBS defines data integrity as "the accuracy,

23

Appx6787

completeness, and quality of data as it's maintained over time and across formats. Preserving the integrity of your company's data is a constant process." [31]

## Evaluation of Chainalysis Expert Reports

There are number of errors, omissions, and inconsistencies in Ms. Bisbee's Chainalysis Report. A non-exhaustive list of the errors follows:

Page 8, Table 2[32]

- This table is missing a number of Bitcoin script types such as:  P2PK (different than P2PKH), P2MS, P2WSH, or P2TR.

- The table states that P2SH is *"a SegWit address that begins with 3"*. That is false. Once SegWit became active on August 23rd, 2017, it could utilize SegWit to create a nested P2WSH address that is nested in a BIP-16 enabled P2SH address format. However, prior to August 23rd, 2017, all Bitcoin addresses that have the prefix of "3" are pure BIP-16 P2SH addresses, not SegWit.

- The table uses the <u>wrong unit of data</u> when referring to *compressed* and *uncompressed* keys. The table uses bits instead of bytes. This is a critical error. A *bit* is the smallest unit of data that a computer can process and store. Public Key Cryptography, or asymmetric cryptography, utilize the use of private and public key pairs. For Bitcoin, we use ECDSA (Elliptic Curve Digital Signature Algorithm) - with this we generate a 256-*bit* number for a Private Key. 256 *bits* is equivalent to 32 *bytes*. Thus, through ECDSA, an uncompressed public key is 65 *bytes* and a compressed public key is 33 *bytes*. Because of this, the mathematics in footnotes 6 and 7 are incorrect.

Page 12, Section 1.2

- It does not make sense that Bitcoin Fog used uncompressed keys until 2012 when the report then states *"the P2PKH Compressed addresses changed to using SegWit addresses"*. How can the same addresses be switched from uncompressed to compressed and still output the same human-readable address hash?

- The report states that *"The first known Bitcoin Fog transaction where the change is a P2SH-WPKH Segwit address in block 534129: 9a7e1cdb9f68573eaf64ba4f8908ebf05aee932124 6188c1c746a297e8821ffb"*. Reviewing this transaction, reveals there is no witness data and no addresses participating in this transaction that are SegWit enabled. The following two open source explorers confirm this:

---

[31] What is Data Integrity and Why Does it Matter, Harvard Business School, Catherine Cote at 1 (Feb. 4, 2021) (available at: https://online.hbs.edu/blog/post/what-is-data-integrity).
[32] The Nov. and Dec. Expert Reports by Ms. Bisbee are substantially the same.

24

Appx6788



mempool.space



bitaps

25

Page 13, Section 1.2

- What is *RF*? If *RF* means *RBF*, (Replace-by-Fee), then it is important to note that a majority of transactions in the report would never have been able to utilize RBF as it was not present in Bitcoin Core until Bitcoin Core v0.12 which was released November 1st, 2016.[33]

Page 15, Section 2.1

- There are no screenshots to support the identified deposit addresses from pwoah7foa6au2pul[.]onion.

Page 16, Section 2.2

- The report states that the address identified as a co-spend participant, 1NGpmfXeFmKB4csqeUhSqCNXBJtCWua8fr, had *"activity from August 2015 and September 2015"*. When looking at the address, it was not active during this time-period. It only had two transactions, one on April 29th, 2015, and the other on May 4th, 2015.

Page 17, Section 3.1

- There are no screenshots to support the identified deposit addresses from k5zq47j6wd3wdvjq[.]onion.

Page 19, Section 4.1

- There are no screenshots to support the identified deposit addresses from agorahooawayyfoe[.]onion.

Page 20, Section 5.1

- There are no screenshots to support the identified deposit addresses from dkf2lnsctjvoivow[.]onion and o7v3h5ts5tah4yiw[.]onion.

Page 21, Section 6.1

- There are no screenshots to support the identified deposit addresses from abraxasdegupusel[.]onion.

Page 23, Section 7.1

- There are no screenshots to support the identified deposit addresses from pandorajodqp5zrr[.]onion.

Page 24, Section 8.1

- There are no screenshots to support the identified deposit addresses from sheep5u64fi457aw[.]onion.

---

[33] Bitcoin Core v0.12.0, sipa, (Nov. 1, 2016) (available at: https://github.com/bitcoin/bitcoin/releases/tag/v0.12.0).

26

<u>Page 26, Section 9.1</u>

- There are no screenshots to support the identified deposit addresses from wztyb7vlfcw6l4xd[.]onion.

## Evaluation of Chainalysis Bitcoin Fog Attribution

This evaluation uses Chainalysis provided data in the CSV file produced by the Government titled: "bitcoin_fog_market_addrs_cospend".

### Summary of Chainalysis bitcoin_fog_market_addrs_cospend.csv Data

Ciphertrace identified 527,731 addresses that did not cluster via Chainalysis Heuristic 1. Ciphertrace also uses Heuristic 1 Multi-input Clustering as the primary heuristic for non-direct attribution. Ciphertrace does not utilize Heuristic 2 as described by Chainalysis, as it is often unreliable and not a true representation of the flow of funds on chain. The high prevalence of errors in Heuristic 2 are described to be between 12.7% and 64%. Therefore, the discrepancy rate between Ciphertrace and Chainalysis Bitcoin Fog attribution is roughly 67%.

Without significant time to go through each of the 527,731 addresses by hand, we cannot account for the extremely large discrepancy except to point to the research documenting error rates and note the difference lies in the use of Heuristic 2.

The data provided in the csv is formatted as follows:

| address | asset | aid | entity | bid | bid_last_change | name | category | co_spend_flag | co_spend_root_address |
|---|---|---|---|---|---|---|---|---|---|
| 111233LRj5a | 0 | 74780392 | 2479113 | 355136 | 355136 | Bitcoin Fog | mixing | 1 | UNCLUSTERED IN CO-SPEND |
| 11126bGUSt | 0 | 141613993 | 2479113 | 407872 | 407872 | Bitcoin Fog | mixing | 1 | UNCLUSTERED IN CO-SPEND |
| 11128U2TcD | 0 | 35885413 | 2479113 | 300708 | 300708 | Bitcoin Fog | mixing | 0 | UNCLUSTERED IN CO-SPEND |
| 11129bx2XkL | 0 | 61774570 | 2479113 | 340098 | 340098 | Bitcoin Fog | mixing | 1 | 17aBK3VYVyvvWsSEc4rGaYJ6b3qriB845a |

There is one row for each address attributed to BitcoinFog. The addresses are categorized according to their co_spend_root_address, the address they are clustered with. The following Summary of co_spend_root_address comparing Chainalysis' attribution data with Ciphertrace's.

| co_spend_root_address | Chainalysis Address Count | Ciphertrace WalletId | Owner | Type | Ciphertrace Cluster Size |
|---|---|---|---|---|---|
| UNCLUSTERED IN CO-SPEND | 527731 | | | | |
| 17aBK3VYVyvvWsSEc4rGaYJ6b3qriB845a | 244975 | 003739a5 | BitcoinFog | mixer | 244975 |
| 15CLUub6yaov3yMZtmxPQ4pSeR22PuDSLT | 46532 | 0323355a | BitcoinFog | mixer | 46532 |
| 1Mzz2hhbrCr26HX6wDgSBRheu8qphDoR9b | 31994 | 046d1ba1 | BitcoinFog | mixer | 31994 |

Appx6791

| | | | | | |
|---|---|---|---|---|---|
| 1EXTHjVRMao2AQsMTRJE5aTAGoYMmxc3Ji | 22043 | 0538451e | BitcoinFog | mixer | 22043 |
| 1DxmvN5tEEPz6HiTfTb634ndMfhRkKnaom | 50569 | 060e8473 | BitcoinFog | mixer | 50569 |
| 16FgQXGzSLRtdwuwCN7mcaPUtbJ6JFTkVw | 1140 | 01b92444 | BitcoinFog | mixer | 1140 |
| 17gH1u6VJwhVD9cWR59jfeinLMzag2GZ43 | 726 | 0274e40d | Unknown | Unknown | 726 |
| 1P5pMkN1wr3ozHXwCXtRmv6kJBYLyPPMzc | 4 | 01918b80 | Unknown | Unknown | 4 |
| 1Cwb33nqn4S2uDsXwhNrUNy7FPdiRYhyM8 | 16 | 016a834c | Unknown | Unknown | 16 |
| 15U5NjgAbKqKyGKwayS648WwJoiCCvGnTG | 2 | 1257968 | Unknown | Unknown | 2 |
| 1JmQN8NvX3XXWWrJW3rEEcKQMQd5DUgkH3 | 6 | 0099a1fc | Unknown | Unknown | 6 |
| 1F9kYDpu2CqwR18ovineZr8Y88NQfW1bzR | 2 | 0042232e | Unknown | Unknown | 2 |
| 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw | 2 | 351640 | BitcoinFog | mixer | 2 |
| | | | | Total | 398011 |

There are 398,011 addresses which are clustered together, and another 527,731 addresses attributed by other heuristics. Cluster 003739a5 is the customer deposit cluster. This is corroborated by the Chainalysis, FBI, and IRS deposits. Cluster 060e8473 is the withdrawal hot wallet cluster corroborated by the Chainalysis, FBI, and IRS withdrawals.

28

Appx6792



Consolidation to New Style Hot Wallet

Appx6793

Ciphertrace Sentry API Pulls from Clusters

<u>Cluster 0323355a</u>

Example                                                                                                           TX
69AD7BAEE97CD809D71A1EA4D72758A0CF5C2D3C56B22D5B078CF1AE888E3F01,   Feb
7, 2015.

<div align="center"><u>Inputs</u></div>

```
"pos": 0,
        "address": "157zj77TD8CT62wPTp7YBEVWtMXNB3iDg6",
        "value": 0.172


        "pos": 1,
        "address": "1Pet1bkEtXJSHZXpcEhiJn4Up8cZt1kydM",
        "value": 0.20725958


        "pos": 2,
        "address": "14zwCx9nXPkiwpUqnEuKnRynP4D2gVpwvD",
        "value": 0.07785078


        "pos": 3,
        "address": "1AyRHdPouNcrEGGECuWKWExdRGP6u74p2q",
        "value": 0.8999


        "pos": 4,
        "address": "19C4vVRq9r1igEZjfGvcYkX1ohoFKKZhDf",
        "value": 0.3496


        "pos": 5,
        "address": "1FWHVxL73sX9SmbJpU9U7Vhfb9FfT2RHJ3",
        "value": 0.07575247
```

<div align="center"><u>Outputs</u></div>

```
"pos": 0,
        "address": "17ehuXt67dMDvQFV7Mfg9735B3yisXSHzQ",
        "value": 0.18741046
```

<div align="center">30</div>

<div align="center">Appx6794</div>

"pos": 1,

"address": "1A2VpWmdGW2aR8bFVkPW3v82Pe63bys7G7",

"value": 0.03314727

"pos": 2,

"address": "1DnhH18t8A1Km5z6nGLjQLVrzPGS2kAcG",

"value": 0.21808353

"pos": 3,

"address": "1PtoUTyaVZvqXT2wjSuj73e81VNsnZk2p2",

"value": 0.20053006

"pos": 4,

"address": "1LNBfzZgAbsHqbnQrMZnRjiwe53VUFh3K4",

"value": 0.17846811

"pos": 5,

"address": "17ahuMui9cTRNHpyZFTgtUpzr2TJ3sjtQr",

"value": 0.18208911

"pos": 6,

"address": "1F6kGH6BRGe9iSNcUJp6egEU9DYFzYcQxi",

"value": 0.16379711

"pos": 7,

"address": "18bULF4dmniBdS4SUkkKB14qooLdoBCBdj",

"value": 0.21211967

"pos": 8,

"address": "1HDo364e5PnMbC4Wb6XADkGKrgSTheV4dG",

"value": 0.20836623

"pos": 9,

31

DocuSign Envelope ID: F384BDD8-302C-4974-8060-D93123520CFE

```
            "address": "15CLUub6yaov3yMZtmxPQ4pSeR22PuDSLT",
            "value": 0.19815128
```

All the inputs and output position (pos) 1 are from cluster 003739a5, the deposit cluster. The remaining outputs belong to Cluster 0323355a. A graphical trace is below:

32

Appx6796

DocuSign Envelope ID: F384BDD8-302C-4974-8960-D93123F20CFE



Appx6797

## Comparison of Ciphertrace and Chainalysis Dark Market Attributions

The following lists the discrepancy rates between Ciphertrace and Chainalysis's dark market attributions.

Abraxas - 20%
Agora – 3.5%
AlphaBay – 96%
Bitcoin Fog – 67%
BlackBank – 16%
Nucleus – 44%
Pandora – 21%
Sheep – 0%
SilkRoad – 43%
SilkRoad2.0 – 0%
WelcomeToVideo – 1%

Ciphertrace attributes these discrepancies to Heuristic 2, and other unnamed heuristics utilized by Chainalysis, which were not explicitly stated in their expert reports. Chainalysis has not produced the sources, dates and times of collections, clustering errors and error rates on a per address basis but have not received this information.

## Evaluation of the Scholl Report

There are numerous errors, omissions, and inaccuracies in the Scholl Report.

Page 10

Dates are incorrect. The 2014 date should be 2019.

Page 34

When stating *"Blockchain analysis of the transactions included in the file indicated that the MYCELIUM WALLET received a deposit of approximately 29 BTC valued at $280,544 on 6/17/2020. This deposit came directly from the BITCOIN FOG CLUSTER and was the source of funds of all 69 subsequent withdrawals from the MYCELIUM WALLET."*.

This is a conclusory statement with no verifying data. There is no list of transactions that total 29 BTC. In order to verify this, the master extended public key or the seed phrase are required. Neither of which the Government has provided to the Defense.

Page 45

There is no data presented justifying the conclusion that address 1LZvkK1QMCCPUoRRsJb7mxqX2tcLUqGuYX is Bitcoin Fog. The conclusory attribution lacks support.

34

Appx6798

Page 46

There are multiple errors on this page.

The address 12MDVJ4mKK3SqXn3TekpbcU4cfw5hUmHh5 never sends funds to the address identified on this page. Also, the date is incorrect. Furthermore, the user ID is incorrect according to internal Silk Road records provided in the Government's discovery. In the previous transaction, from Mr. Sterlingov's Mt. Gox account to address 1Pfkqm3YsCYnWeA7h14Zmm1j8kiFruFvqA, there is no co-spend, as identified in the Scholl Report. The 1Pfk has no additional input with the 7.9 BTC prior balance as mentioned in the Scholl report. This address only receives funds one time, from Mt. Gox and sends funds one time. The owner of this address is unknown.

Silk Road deposit address 12MDVJ4mKK3SqXn3TekpbcU4cfw5hUmHh5 received funds one time, in a co-spend, whose source is the exchange VirWox.com. No such exchange has been identified or discussed in any of the Government's reports.

Below is tracing demonstrating the complete history for cryptocurrency address 12MDVJ4mKK3SqXn3TekpbcU4cfw5hUmHh5. This contradicts Mr. Scholl's report.



Ciphertrace Inspector

35

Appx6799



mempool.space

The Scholl Report claims that on 10/27/2011 60.8 BTC transaction occurred. No such transaction occurred on this date. There is a transaction on 11/27/2011 that sends 60.8 BTC to 1C7kWtPjfCgUH4Ye5GdAqdQVutx2NrvWi but it is not from 12MDVJ4mKK3SqXn3TekpbcU4cfw5hUmHh5. The 60.8 BTC comes from 14gbjpkD2r5pDquk3DmMs6vYpveJrB1Kkp. 14gbjpkD2r5pDquk3DmMs6vYpveJrB1Kkp according to the Scholl Report is part of Silk Road. However it is not the actual "spender" of funds nor is there a UTXO that displays what Mr. Scholl's graph shows. Thus, it is incorrect statement of the flow of funds from a blockchain forensics perspective.



36

Appx6800

Page 49

Mr. Scholl incorrectly concludes that Mr. Sterlingov deposited funds into Bitcoin Fog on Bitcoin Fog's first day of public operation. Between Mr. Sterlingov's Mt. Gox account withdrawal and his alleged deposit into Bitcoin Fog, there are 19 unattributed, unknown cryptocurrency addresses. The image below documents this fact:



Crucially, none of these 19 intermediary addresses are in Mr. Sterlingov's Mycelium wallet, or any other wallet identified by the Government as being under his control. The conclusion that Mr. Sterlingov deposited funds into Bitcoin Fog on its first day of operation is illogical, speculative, and incorrect.

37

Appx6801

What appears to have happened is because there are deposits in the same timeframe whose ownership it is impossible to determine, the Government seems to have latched on to Mr. Sterlingov because his account was the only one that could be traced back to a KYC account – his Mt. Gox account. The other deposits to Bitcoin Fog at this time come from an Instawallet/Paymium address (which kept no records), a mining transaction, and BitcoinTalk.

There is no evidence that Mr. Sterlingov controlled any of the 19 intermediary addresses between Bitcoin Fog and his Mt. Gox account. Any attribution of Mr. Sterlingov controlling these 19 intermediary addresses is pure speculation for which there is no corroborating evidence.

Page 54

Mr. Scholl makes the following observation on the bottom of page 54 of his expert report:

> Tx10 appeared to spend funds from multiple sources and consolidate them at 1YZJKa. According to the Bitcoin blockchain, 1YZJKa address was involved in 66 total Bitcoin transactions, including 33 deposits and 33 withdrawals. These 33 deposits totaled approximately 30,458 BTC and occurred from on or about 11/10/2011 to on or about 3/25/2012. Multiple individual deposit transactions made into 1YZJKa included over 50 input addresses. Based on my training an experience, 1YZJKa was not consistent with a typical user deposit address at a service. 1YZJKa appeared to be an internal address at BITCOIN FOG used to consolidate multiple deposits made by multiple users.

Page 55

> According to Chainalysis Reactor, 31 of the 33 deposits to 1YZJKa (including the two examples above) came from Bitcoin addresses within the BITCOIN FOG CLUSTER. Only the first two deposits, including Tx10 and one other deposit12, were from addresses not attributed by Chainalysis to the BITCOIN FOG CLUSTER.

> Bitcoin address 1YZJKa was very likely an internal consolidation address at BITCOIN FOG and not a user deposit address. Therefore, Tx10 was very likely an internal transaction at BITCOIN FOG and addresses in WALLET 2 were part of BITCOIN FOG.

> Without the internal ledgers to Bitcoin Fog, this conjecture cannot be verified. Ciphertrace compiled the following chart showing all received transactions for the likely internal consolidation address for Bitcoin Fog:  1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw.

38

Appx6802

## What is Needed to Determine Control of Bitcoin Fog

- Bitcoin Fog Server access – the Government does not have the Bitcoin Fog servers.
- Private keys to all wallets – the Government has not provided ANY private keys to the Defense.
- Evidence as to what parties had control of the private keys to Bitcoin Fog and/or had access to the servers.  – the Government has produced no evidence at all regarding these two crucial factors.

## Other Domain Name Registrations of Bitcoin Fog

Since Mr. Sterlingov has been in jail awaiting trial, someone registered the Bitcoin Fog mixing service on an Ethereum-based DNS domain.

Ethereum Name Service (ENS) registered bitcoinfog.eth on Address 0xE7f1f0657128e1eD321B0A849F12457AC5eF608F on the Ethereum Network as an ERC-721 on March 31, 2023 and is due to expire on March 30, 2024 Ref: https://app.ens.domains/bitcoinfog.eth?tab=more

https://etherscan.io/tx/0xeabf670000064081aa5efe9affe72897941033c5594f96f1966b00874954f28e

It is possible that this domain was registered prior to the ENS implementation of token standard ERC-721. ENS names are non-fungible tokens (NFTs).

## Notes on Publicly Available Tools

Chainalysis Reactor is a proprietary, black-box, forensic surveillance software that is not publicly available. It is very expensive to purchase a license. It should not be confused with publicly available explorers, which are free, and often open source.

## Conclusion

Blockchain forensics should only be used to generate investigatory leads. Standing alone, they are insufficient as a primary source of evidence. What is striking about this case is the conclusions reached without any corroborating evidence for the blockchain forensics.

The blockchain forensics and tracing tools used in this case were misused to erroneously conclude that Mr. Sterlingov was the operator of Bitcoin Fog when no such evidence exists on-chain.

The failures in the blockchain analysis in this case highlight some of the structural problems with this space. To prevent wrongful arrests like this one, and failures in compliance, like with FTX, it is recommended that Chainalysis, and their methodologies of blockchain analysis be independently audited.

39

Appx6803

Date: August 7, 2023

DocuSigned by:

_____   _____

3928BCF51C15418...

Jonelle Still, Ciphertrace

Appx6804

# Exhibit 'A'

Appx6806

CIPHERTRACE

Data Credibility in Cryptocurrency Investigations

# The Black Box Approach





# Importance of model validation

- Customers of a blockchain analytics provider may not know they are using a **Black Box** model.

- Model validation verifies the **accuracy** of the data enrichment and checks the **performance** of the model.

  – Providers should have well documented, auditable processes for attribution and clustering.

  – Providers should assess ongoing and historical attribution and clustering activity.

 CIPHERTRACE



Separated Cluster Example: Al Qassam Brigades



17QAWGVpFV4gZ25NQug46e5mBho4uDP6MD

3LhP8JYJ77cj2eVXBasY92Z6omTyRbUdbh

CIPHERTRACE

## Separated Cluster Example: Al Qassam Brigades

Appx6812



Case Study

# Single Entity Tracing

A *Global exchange* was contacted by a blockchain analytics firm (utilizing wallet-based tracing tools) who informed them that they had a customer send a very small BTC donation to al Qassam Brigades.

*Global exchange* approached CipherTrace to verify the trace:



*recreated trace view

Appx6813

CIPHERTRACE

Case Study

# Single Entity Tracing

**What the on-chain trace actually looks like.**

Appx6814



CIPHERTRACE



Case Study

# Single Entity Tracing

Wasabi CoinJoin

Appx6815



Destination Output 1PAaf

Appx6817



| | |
|---|---|
| Address | 1PAafXXXXXXXXXXXXXXXXXXXXXXX |
| Transactions | 3 |
| Total Received | 0.79950000 BTC |
| Total Sent | 0.79950000 BTC |
| Final Balance | 0.00000000 BTC |

Appx6818





Appx6820

**Case Study**

# Artificial Clustering w/ Cluster Based Tracing



19 hops

9.17 BTC Transaction

VASP client's Deposit Peel-chain

CipherTrace stopping point.

Peel-chain consolidates with other high-volume deposits.

CIPHERTRACE

# Exhibit 'B'

# Bitcoin: A Peer-to-Peer Electronic Cash System

Satoshi Nakamoto
satoshin@gmx.com
www.bitcoin.org

**Abstract.**  A purely peer-to-peer version of electronic cash would allow online payments to be sent directly from one party to another without going through a financial institution.  Digital signatures provide part of the solution, but the main benefits are lost if a trusted third party is still required to prevent double-spending. We propose a solution to the double-spending problem using a peer-to-peer network. The network timestamps transactions by hashing them into an ongoing chain of hash-based proof-of-work, forming a record that cannot be changed without redoing the proof-of-work.  The longest chain not only serves as proof of the sequence of events witnessed, but proof that it came from the largest pool of CPU power.  As long as a majority of CPU power is controlled by nodes that are not cooperating to attack the network, they'll generate the longest chain and outpace attackers.  The network itself requires minimal structure.  Messages are broadcast on a best effort basis, and nodes can leave and rejoin the network at will, accepting the longest proof-of-work chain as proof of what happened while they were gone.

## 1.    Introduction

Commerce on the Internet has come to rely almost exclusively on financial institutions serving as trusted third parties to process electronic payments.  While the system works well enough for most transactions, it still suffers from the inherent weaknesses of the trust based model. Completely non-reversible transactions are not really possible, since financial institutions cannot avoid mediating disputes.   The cost of mediation increases transaction costs, limiting the minimum practical transaction size and cutting off the possibility for small casual transactions, and there is a broader cost in the loss of ability to make non-reversible payments for non-reversible services.  With the possibility of reversal, the need for trust spreads.  Merchants must be wary of their customers, hassling them for more information than they would otherwise need. A certain percentage of fraud is accepted as unavoidable.  These costs and payment uncertainties can be avoided in person by using physical currency, but no mechanism exists to make payments over a communications channel without a trusted party.

What is needed is an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party.  Transactions that are computationally impractical to reverse would protect sellers from fraud, and routine escrow mechanisms could easily be implemented to protect buyers.  In this paper, we propose a solution to the double-spending problem using a peer-to-peer distributed timestamp server to generate computational proof of the chronological order of transactions.  The system is secure as long as honest nodes collectively control more CPU power than any cooperating group of attacker nodes.

**Appx6823**

## 2.  Transactions

We define an electronic coin as a chain of digital signatures.  Each owner transfers the coin to the next by digitally signing a hash of the previous transaction and the public key of the next owner and adding these to the end of the coin.  A payee can verify the signatures to verify the chain of ownership.



   The problem of course is the payee can't verify that one of the owners did not double-spend the coin.  A common solution is to introduce a trusted central authority, or mint, that checks every transaction for double spending.  After each transaction, the coin must be returned to the mint to issue a new coin, and only coins issued directly from the mint are trusted not to be double-spent. The problem with this solution is that the fate of the entire money system depends on the company running the mint, with every transaction having to go through them, just like a bank.
   We need a way for the payee to know that the previous owners did not sign any earlier transactions.  For our purposes, the earliest transaction is the one that counts, so we don't care about later attempts to double-spend.  The only way to confirm the absence of a transaction is to be aware of all transactions.  In the mint based model, the mint was aware of all transactions and decided which arrived first.  To accomplish this without a trusted party, transactions must be publicly announced [1], and we need a system for participants to agree on a single history of the order in which they were received.  The payee needs proof that at the time of each transaction, the majority of nodes agreed it was the first received.

## 3.  Timestamp Server

The solution we propose begins with a timestamp server.  A timestamp server works by taking a hash of a block of items to be timestamped and widely publishing the hash, such as in a newspaper or Usenet post [2-5].  The timestamp proves that the data must have existed at the time, obviously, in order to get into the hash.  Each timestamp includes the previous timestamp in its hash, forming a chain, with each additional timestamp reinforcing the ones before it.



2

**Appx6824**

## 4.   Proof-of-Work

To implement a distributed timestamp server on a peer-to-peer basis, we will need to use a proof-of-work system similar to Adam Back's Hashcash [6], rather than newspaper or Usenet posts. The proof-of-work involves scanning for a value that when hashed, such as with SHA-256, the hash begins with a number of zero bits. The average work required is exponential in the number of zero bits required and can be verified by executing a single hash.

For our timestamp network, we implement the proof-of-work by incrementing a nonce in the block until a value is found that gives the block's hash the required zero bits. Once the CPU effort has been expended to make it satisfy the proof-of-work, the block cannot be changed without redoing the work. As later blocks are chained after it, the work to change the block would include redoing all the blocks after it.



The proof-of-work also solves the problem of determining representation in majority decision making. If the majority were based on one-IP-address-one-vote, it could be subverted by anyone able to allocate many IPs. Proof-of-work is essentially one-CPU-one-vote. The majority decision is represented by the longest chain, which has the greatest proof-of-work effort invested in it. If a majority of CPU power is controlled by honest nodes, the honest chain will grow the fastest and outpace any competing chains. To modify a past block, an attacker would have to redo the proof-of-work of the block and all blocks after it and then catch up with and surpass the work of the honest nodes. We will show later that the probability of a slower attacker catching up diminishes exponentially as subsequent blocks are added.

To compensate for increasing hardware speed and varying interest in running nodes over time, the proof-of-work difficulty is determined by a moving average targeting an average number of blocks per hour. If they're generated too fast, the difficulty increases.

## 5.   Network

The steps to run the network are as follows:

1) New transactions are broadcast to all nodes.
2) Each node collects new transactions into a block.
3) Each node works on finding a difficult proof-of-work for its block.
4) When a node finds a proof-of-work, it broadcasts the block to all nodes.
5) Nodes accept the block only if all transactions in it are valid and not already spent.
6) Nodes express their acceptance of the block by working on creating the next block in the chain, using the hash of the accepted block as the previous hash.

Nodes always consider the longest chain to be the correct one and will keep working on extending it. If two nodes broadcast different versions of the next block simultaneously, some nodes may receive one or the other first. In that case, they work on the first one they received, but save the other branch in case it becomes longer. The tie will be broken when the next proof-of-work is found and one branch becomes longer; the nodes that were working on the other branch will then switch to the longer one.

3

New transaction broadcasts do not necessarily need to reach all nodes. As long as they reach many nodes, they will get into a block before long. Block broadcasts are also tolerant of dropped messages. If a node does not receive a block, it will request it when it receives the next block and realizes it missed one.

## 6.   Incentive

By convention, the first transaction in a block is a special transaction that starts a new coin owned by the creator of the block. This adds an incentive for nodes to support the network, and provides a way to initially distribute coins into circulation, since there is no central authority to issue them. The steady addition of a constant of amount of new coins is analogous to gold miners expending resources to add gold to circulation. In our case, it is CPU time and electricity that is expended.

The incentive can also be funded with transaction fees. If the output value of a transaction is less than its input value, the difference is a transaction fee that is added to the incentive value of the block containing the transaction. Once a predetermined number of coins have entered circulation, the incentive can transition entirely to transaction fees and be completely inflation free.

The incentive may help encourage nodes to stay honest. If a greedy attacker is able to assemble more CPU power than all the honest nodes, he would have to choose between using it to defraud people by stealing back his payments, or using it to generate new coins. He ought to find it more profitable to play by the rules, such rules that favour him with more new coins than everyone else combined, than to undermine the system and the validity of his own wealth.

## 7.   Reclaiming Disk Space

Once the latest transaction in a coin is buried under enough blocks, the spent transactions before it can be discarded to save disk space. To facilitate this without breaking the block's hash, transactions are hashed in a Merkle Tree [7][2][5], with only the root included in the block's hash. Old blocks can then be compacted by stubbing off branches of the tree. The interior hashes do not need to be stored.




Transactions Hashed in a Merkle Tree          After Pruning Tx0-2 from the Block

A block header with no transactions would be about 80 bytes. If we suppose blocks are generated every 10 minutes, 80 bytes * 6 * 24 * 365 = 4.2MB per year. With computer systems typically selling with 2GB of RAM as of 2008, and Moore's Law predicting current growth of 1.2GB per year, storage should not be a problem even if the block headers must be kept in memory.

4

**Appx6826**

## 8.   Simplified Payment Verification

It is possible to verify payments without running a full network node. A user only needs to keep a copy of the block headers of the longest proof-of-work chain, which he can get by querying network nodes until he's convinced he has the longest chain, and obtain the Merkle branch linking the transaction to the block it's timestamped in. He can't check the transaction for himself, but by linking it to a place in the chain, he can see that a network node has accepted it, and blocks added after it further confirm the network has accepted it.



As such, the verification is reliable as long as honest nodes control the network, but is more vulnerable if the network is overpowered by an attacker. While network nodes can verify transactions for themselves, the simplified method can be fooled by an attacker's fabricated transactions for as long as the attacker can continue to overpower the network. One strategy to protect against this would be to accept alerts from network nodes when they detect an invalid block, prompting the user's software to download the full block and alerted transactions to confirm the inconsistency. Businesses that receive frequent payments will probably still want to run their own nodes for more independent security and quicker verification.

## 9.   Combining and Splitting Value

Although it would be possible to handle coins individually, it would be unwieldy to make a separate transaction for every cent in a transfer. To allow value to be split and combined, transactions contain multiple inputs and outputs. Normally there will be either a single input from a larger previous transaction or multiple inputs combining smaller amounts, and at most two outputs: one for the payment, and one returning the change, if any, back to the sender.



It should be noted that fan-out, where a transaction depends on several transactions, and those transactions depend on many more, is not a problem here. There is never the need to extract a complete standalone copy of a transaction's history.

5

**Appx6827**

## 10.  Privacy

The traditional banking model achieves a level of privacy by limiting access to information to the parties involved and the trusted third party.  The necessity to announce all transactions publicly precludes this method, but privacy can still be maintained by breaking the flow of information in another place: by keeping public keys anonymous.  The public can see that someone is sending an amount to someone else, but without information linking the transaction to anyone.  This is similar to the level of information released by stock exchanges, where the time and size of individual trades, the "tape", is made public, but without telling who the parties were.



As an additional firewall, a new key pair should be used for each transaction to keep them from being linked to a common owner.  Some linking is still unavoidable with multi-input transactions, which necessarily reveal that their inputs were owned by the same owner.  The risk is that if the owner of a key is revealed, linking could reveal other transactions that belonged to the same owner.

## 11.  Calculations

We consider the scenario of an attacker trying to generate an alternate chain faster than the honest chain.  Even if this is accomplished, it does not throw the system open to arbitrary changes, such as creating value out of thin air or taking money that never belonged to the attacker.  Nodes are not going to accept an invalid transaction as payment, and honest nodes will never accept a block containing them.  An attacker can only try to change one of his own transactions to take back money he recently spent.

The race between the honest chain and an attacker chain can be characterized as a Binomial Random Walk.  The success event is the honest chain being extended by one block, increasing its lead by +1, and the failure event is the attacker's chain being extended by one block, reducing the gap by -1.

The probability of an attacker catching up from a given deficit is analogous to a Gambler's Ruin problem.  Suppose a gambler with unlimited credit starts at a deficit and plays potentially an infinite number of trials to try to reach breakeven.  We can calculate the probability he ever reaches breakeven, or that an attacker ever catches up with the honest chain, as follows [8]:

$p$ = probability an honest node finds the next block
$q$ = probability the attacker finds the next block
$q_z$ = probability the attacker will ever catch up from z blocks behind

$$q_z = \begin{cases} 1 & if\ p \le q \\ (q/p)^z & if\ p > q \end{cases}$$

6

**Appx6828**

Given our assumption that $p > q$, the probability drops exponentially as the number of blocks the attacker has to catch up with increases. With the odds against him, if he doesn't make a lucky lunge forward early on, his chances become vanishingly small as he falls further behind.

We now consider how long the recipient of a new transaction needs to wait before being sufficiently certain the sender can't change the transaction. We assume the sender is an attacker who wants to make the recipient believe he paid him for a while, then switch it to pay back to himself after some time has passed. The receiver will be alerted when that happens, but the sender hopes it will be too late.

The receiver generates a new key pair and gives the public key to the sender shortly before signing. This prevents the sender from preparing a chain of blocks ahead of time by working on it continuously until he is lucky enough to get far enough ahead, then executing the transaction at that moment. Once the transaction is sent, the dishonest sender starts working in secret on a parallel chain containing an alternate version of his transaction.

The recipient waits until the transaction has been added to a block and $z$ blocks have been linked after it. He doesn't know the exact amount of progress the attacker has made, but assuming the honest blocks took the average expected time per block, the attacker's potential progress will be a Poisson distribution with expected value:

$$\lambda = z\frac{q}{p}$$

To get the probability the attacker could still catch up now, we multiply the Poisson density for each amount of progress he could have made by the probability he could catch up from that point:

$$\sum_{k=0}^{\infty} \frac{\lambda^k e^{-\lambda}}{k!} \cdot \begin{cases} (q/p)^{(z-k)} & \text{if } k \le z \\ 1 & \text{if } k > z \end{cases}$$

Rearranging to avoid summing the infinite tail of the distribution...

$$1 - \sum_{k=0}^{z} \frac{\lambda^k e^{-\lambda}}{k!}\left(1 - (q/p)^{(z-k)}\right)$$

Converting to C code...

```c
#include <math.h>
double AttackerSuccessProbability(double q, int z)
{
    double p = 1.0 - q;
    double lambda = z * (q / p);
    double sum = 1.0;
    int i, k;
    for (k = 0; k <= z; k++)
    {
        double poisson = exp(-lambda);
        for (i = 1; i <= k; i++)
            poisson *= lambda / i;
        sum -= poisson * (1 - pow(q / p, z - k));
    }
    return sum;
}
```

7

**Appx6829**

Running some results, we can see the probability drop off exponentially with z.

```
q=0.1
z=0     P=1.0000000
z=1     P=0.2045873
z=2     P=0.0509779
z=3     P=0.0131722
z=4     P=0.0034552
z=5     P=0.0009137
z=6     P=0.0002428
z=7     P=0.0000647
z=8     P=0.0000173
z=9     P=0.0000046
z=10    P=0.0000012

q=0.3
z=0     P=1.0000000
z=5     P=0.1773523
z=10    P=0.0416605
z=15    P=0.0101008
z=20    P=0.0024804
z=25    P=0.0006132
z=30    P=0.0001522
z=35    P=0.0000379
z=40    P=0.0000095
z=45    P=0.0000024
z=50    P=0.0000006
```

Solving for P less than 0.1%...

```
P < 0.001
q=0.10    z=5
q=0.15    z=8
q=0.20    z=11
q=0.25    z=15
q=0.30    z=24
q=0.35    z=41
q=0.40    z=89
q=0.45    z=340
```

## 12.  Conclusion

We have proposed a system for electronic transactions without relying on trust. We started with the usual framework of coins made from digital signatures, which provides strong control of ownership, but is incomplete without a way to prevent double-spending. To solve this, we proposed a peer-to-peer network using proof-of-work to record a public history of transactions that quickly becomes computationally impractical for an attacker to change if honest nodes control a majority of CPU power. The network is robust in its unstructured simplicity. Nodes work all at once with little coordination. They do not need to be identified, since messages are not routed to any particular place and only need to be delivered on a best effort basis. Nodes can leave and rejoin the network at will, accepting the proof-of-work chain as proof of what happened while they were gone. They vote with their CPU power, expressing their acceptance of valid blocks by working on extending them and rejecting invalid blocks by refusing to work on them. Any needed rules and incentives can be enforced with this consensus mechanism.

8

## References

[1]  W. Dai, "b-money," http://www.weidai.com/bmoney.txt, 1998.

[2]  H. Massias, X.S. Avila, and J.-J. Quisquater, "Design of a secure timestamping service with minimal trust requirements," In *20th Symposium on Information Theory in the Benelux*, May 1999.

[3]  S. Haber, W.S. Stornetta, "How to time-stamp a digital document," In *Journal of Cryptology*, vol 3, no 2, pages 99-111, 1991.

[4]  D. Bayer, S. Haber, W.S. Stornetta, "Improving the efficiency and reliability of digital time-stamping," In *Sequences II: Methods in Communication, Security and Computer Science*, pages 329-334, 1993.

[5]  S. Haber, W.S. Stornetta, "Secure names for bit-strings," In *Proceedings of the 4th ACM Conference on Computer and Communications Security*, pages 28-35, April 1997.

[6]  A. Back, "Hashcash - a denial of service counter-measure," http://www.hashcash.org/papers/hashcash.pdf, 2002.

[7]  R.C. Merkle, "Protocols for public key cryptosystems," In *Proc. 1980 Symposium on Security and Privacy*, IEEE Computer Society, pages 122-133, April 1980.

[8]  W. Feller, "An introduction to probability theory and its applications," 1957.

Appx6831

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 21-cr-399 (RDM) |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

NOTICE OF BILL OF PARTICULARS

The United States of America, by and through the United States Attorney for the District

of Columbia, files this Bill of Particulars pursuant to the Court's oral ruling on July 20, 2023,

requiring the government to identify, either by providing names or other descriptive matter, the

alleged co-conspirators whom the government intends to identify at trial. In response whereof, the

government states as follows:

Pursuant to Count One of the Superseding Indictment, ECF No. 43, the government alleges

that the defendant conspired with other co-conspirators known and unknown, including darknet

vendors and darknet administrative teams, including without limitation the following:

> a. All darknet vendors, including vendors on Silk Road; Silk Road 2.0; AlphaBay;
> Agora; Nucleus; Abraxas; Pandora; Sheep; Black Bank; and Evolution; who moved
> funds directly and indirectly through Bitcoin Fog, including the vendors noted in
> the following files provided in discovery: bcf_dnm_users; dnm_to_bcf;
> dnm_to_bcf_v2; and Copy of dnm_to_bcf_oxyfent_vendor; and darknet vendors
> specifically identified as Budworx-UK; MarijuanaIsMyMuse; peels4u; RoxiPal;
> Symbiosis; Tyl3r-Durden; UK-GROW-TEK; WestCoastRX; budworx;
> chemicalbrothers; crystalbuddha; mariosgramshoppe; shine-cartel; sunwu-int;
> sunwu-us; trevorphilipsenterprises; appletits; revolvshun; TripWithScience (James
> V. Barlow); and dashiki, Penisbreath, CaptainCum, SargentSemen, WhaleScrotom,
> and xanaxman (Ryan Farace); and
>
> b. All darknet administrative teams, including administrators and administrative
> teams for Silk Road (including Ross Ulbricht); Silk Road 2.0; AlphaBay (including
> Alexandre Cazes); Agora; Nucleus; Abraxas; Pandora; Sheep; Black Bank; and
> Evolution; whose darknet markets received and sent funds directly and indirectly
> through Bitcoin Fog on behalf of darknet vendors and buyers.

**Appx6832**

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:   /s/ Christopher B. Brown
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

/s/ C. Alden Pelker
/s/ Jeffrey Pearlman
C. Alden Pelker, Maryland Bar
Jeff Pearlman, D.C. Bar No. 466901
Trial Attorneys, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007 (Pelker)
(202) 579-6543 (Pearlman)
Catherine.Pelker@usdoj.gov
Jeffrey.Pearlman2@usdoj.gov

2

**Appx6833**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

        Plaintiff,

v.

ROMAN STERLINGOV

        Defendant.

No. 21-cr-399 (RDM)

**DEFENSE RESPONSE TO GOVERNMENT'S MOTION TO ADMIT CERTAIN EXHIBITS**

Except as noted below, the Defense stipulates to the Government's proffered certifications of authenticity but does not stipulate to the admissibility of any of the proffered evidence. These stipulations only relate to the specific business records, certified by the custodian of record or government official, as produced by the Government in discovery.

**Background**

On October 24, 2023, the Government filed a Notice and Motion in Limine to Admit Certain Government Exhibits (Dkt. 62).

On November 7, 2022, the Defense filed its Opposition to Government's Motion in Limine to Admit Certain Government Exhibits (Dkt. 71).

On November 14, 2022, the Government filed its Reply in Support of the Government's Motion in Limine to Admit Certain Government Exhibits (Dkt. 78).

On June 21, 2023, the Government filed a Supplement to its Motion in Limine to Admit Certain Exhibits (Dkt. 140). The Government's supplemental briefing solely concerns the Mt. Gox records.

1

**Appx6834**

On July 5, 2023, the Defense filed its Opposition to the Government's Supplemental briefing for the Government's Motion in Limine to Admit Certain Exhibits (Dkt. 144).

On July 11, 2023, the Government filed a Reply in Support of its Supplemental briefing for its Motion in Limine to Admit Certain Exhibits (Dkt. 146).

On August 30, 2023, following a hearing in which this matter was discussed, this Court ordered that the Defense meet and confer with the Government and to file a brief on or before September 4, 2023, setting forth the specific grounds, if any, that the Defense has for opposing the Government's motion to admit certain Government exhibits.

On September 1, 2023, the Defense met and conferred with the Government regarding the Government's efforts to admit certain Government exhibits.

### Defense's Response to the Government's Motion to Admit Certain Evidence

Except as noted below, the Defense stipulates to the certifications of the proffered evidence as authentic but does not stipulate to its admissibility.

1. **Defense Response to the Government's Original Motion in Limine to Admit Certain Exhibits**

    A. Records from Financial Institutions, Online Service Providers, and Other Business

The Defense stipulates to the authenticity of the records from the 47 entities identified on pages 4 and 5 of the Government's Motion in Limine to Admit Certain Exhibits (Dkt. 62) but does not stipulate to their admissibility at trial. Furthermore, the Defense only stipulates to the authenticity to the records from the entities to the extent that they have been produced in Discovery to the Defense.

2

B. Official Government Records – Lack of Registration or Licensure

The Defense stipulates that Bitcoin Fog never registered for a license as a money transmission business in Washington D.C. with either FinCen or the District of Columbia Department of Insurance, Securities, and Banking.

C. Archive.org Screenshots

The Defense stipulates to the authenticity of the screenshots from archive.org but does not stipulate to their admissibility at trial. Moreover, the Defense only stipulates to the authenticity of the archive.org screenshots to the extent they have been produced to the Defense in discovery.

D. Blockchain Records

The Defense stipulates to the authenticity of the publicly viewable blockchain ledger but does not stipulate to its admissibility at trial. The Defense does not stipulate to the authenticity or admissibility of any conclusions, opinions, or speculations derived from using heuristics, proprietary algorithms, or any other methodology that goes beyond what is recorded in the public blockchain ledger.

E. Records Seized from Electronic Devices

a. Devices Seized from the Defendant at the Time of Arrest

The Defense stipulates to the authenticity in relation to the electronic devices actually seized from Mr. Sterlingov when he was arrested at Los Angeles International Airport. However, the discovery reveals that the Government appears to have mixed up electronic devices from other cases unrelated to Mr. Sterlingov, and the Defense does not stipulate to the authenticity of any of those unrelated devices, and reserves all rights to object to the contamination of the chain of custody of the electronic devices in this case by electronic devices from unrelated cases.

3

**Appx6836**

Moreover, the Defense only stipulates to the authenticity of the records from the electronic devices actually seized from Mr. Sterlingov to the extent they have been produced to the Defense in discovery.

### b. Defendant's To the Moon VPN Servers in Romania

The Defense stipulates to the authenticity of the business records for the To the Moon VPN servers but does not stipulate to their admissibility at trial. Moreover, the Defense only stipulates to the authenticity of the To the Moon VPN Server records to the extent they have been produced to the Defense in discovery.

### c. Seized Electronic Evidence from Other Investigations

#### i. Mt. Gox

The Defense does not stipulate to the authenticity of the Mt. Gox records, nor their admissibility at trial. The Mt. Gox records are inauthentic and inaccurate. The Defense refers to its supplemental briefing on this issue (Dkts. 71, 144), and incorporates those arguments here by reference.

Additionally, the Government has not produced a full, native set of the Mt. Gox data for review by the Defense, merely producing fragmented spreadsheets. The Government has withheld production on the grounds that the records are sensitive and insisted that the Defense review the records at the FBI offices in Manassas, Virginia. Not only is this impractical, unduly burdensome, and unduly expensive, it has no sound basis in law or in fact, as a protective order is in place, and none of the referenced data contains national security information or child pornography. Moreover, the Mt. Gox database was publicly leaked years ago. Additionally, the Government has produced numerous other records containing sensitive information, like the records from darknet markets, such as Silk Road, without withholding them from the Defense. The real reason it appears that the Government is withholding the Mt. Gox records from the

4

Defense is because they are riddled with errors, potentially contain forged information, and are central to the Government's charges against Mr. Sterlingov.

The Defense does not stipulate to the authenticity of the Mt. Gox records, nor their admissibility at trial.

### ii.   BTC-e Records

The Defense stipulates to the authenticity of the BTC-e records, but does not stipulate to their admissibility at trial. Moreover, the Defense only stipulates to the authenticity of the BTC-e records to the extent they have been produced to the Defense in discovery.

### iii.   Liberty Reserve Records

The Defense stipulates to the authenticity of the Liberty Reserve records, but does not stipulate to their admissibility at trial. Moreover, the Defense only stipulates to the authenticity of the Liberty Reserve records to the extent they have been produced to the Defense in discovery.

### iv.   Silk Road

The Defense stipulates to the authenticity of the Silk Road records, but does not stipulate to their admissibility at trial. Moreover, the Defense only stipulates to the authenticity of the Silk Road records to the extent they have been produced to the Defense in discovery.

### v.   Silk Road 2.0

The Defense stipulates to the authenticity of the Silk Road 2.0 records, but does not stipulate to their admissibility at trial. Moreover, the Defense only stipulates to the authenticity of the Silk Road 2.0 records to the extent they have been produced to the Defense in discovery.

5

**Appx6838**

vi.   AlphaBay

The Defense stipulates to the authenticity of the AlphaBay records, but does not stipulate to their admissibility at trial. Moreover, the Defense only stipulates to the authenticity of the AlphaBay records to the extent they have been produced to the Defense in discovery.

vii.   Welcome to Video

The Defense stipulates to the authenticity of the Welcome to Video records, but does not stipulate to their admissibility at trial. Moreover, the Defense only stipulates to the authenticity of the Welcome to Video records to the extent they have been produced to the Defense in discovery.

F.   Records from Foreign Document Requests

The Defense recognizes the foreign document returns as authentic to the extent they are actual business records and not the work product of foreign governments or other individuals. The Defense does not stipulate to any of the foreign documents' admissibility at trial. Moreover, the Defense only stipulates to the authenticity of the foreign records to the extent they have been produced to the Defense in discovery.

G.   Charts and Testimony

The only summary charts that the Defense has been provided with are those for Government proffered expert witness Sarah Glave. The Defense is still reviewing them for their accuracy and reserves the right to object to their use should it be warranted.

H.   Demonstratives

No demonstratives have been provided to the Defense, and the Defense reserves its right to object to any Government demonstratives as necessary.

**Appx6839**

## Conclusion

As described above, the Defense generally stipulates to the authenticity, but not the admissibility of the proffered Government evidence. The Defense stipulates to the authenticity of the proffered evidence based on the certifications provided by the Government and limited to the scope of those certifications and as produced in the discovery to the Defense. As noted above, and in its prior briefing, the Defense objects to both the authenticity and admissibility of the Mt. Gox data, because it is both inauthentic and inaccurate, and it has not been fully produced in its native format to the Defense.

Appx6840

Dated: September 4, 2023
Brooklyn, New York

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

*Counsel for Defendant Roman Sterlingov*

8

**Appx6841**

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of September 2023, the forgoing document was filed with the Clerk of Court using the CM/ECF System, and sent by email to the attorneys for the Government listed below:

<u>s/ Tor Ekeland</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

Jeffrey Pearlman
Jeffrey.Pearlman@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | No. 21-cr-399 (RDM) |
| v. | |
| ROMAN STERLINGOV | |
| Defendant. | |

NOTICE OF SOURCE CODE EXPERT BRYAN BISHOP REGARDING
INDEPENDENT ANALYSIS OF CHAINALYSIS REACTOR SOURCE CODE AND
REQUEST FOR PRODUCTION OF CHAINALYSIS REACTOR SOURCE CODE AND
RELEVANT RELATED BRADY MATERIAL

Mr. Sterlingov proposes calling **BRYAN BISHOP** ("Mr. Bishop") as an expert witness to analyze the Chainalysis's Reactor software central to this case and present his findings at trial. Mr. Bishop's resume has been sent to the Court and the Government via email. His qualifications, along with review and analysis of relevant records, reports, facts, and evidence set forth the basis for his expected testimony. The Defense considers the requested information *Brady* material that should have been produced to the Defense as part of the Government's initial Federal Rule of Criminal Procedure 16 production at the onset of this case. The Defense has been requesting access to the Chainalysis Reactor source code since the beginning of undersigned counsel's representation of Mr. Sterlingov.

The below requests are particularly critical to Mr. Sterlingov's due process rights given the fact neither the Government nor Chainalysis is able to produce any evidence involving Chainalysis Reactor's error rates, rate of false positives, or rate of false negatives. Nor can the Government or Chainalysis produce a single scientific peer-reviewed paper attesting to the accuracy of their software. Nor has any independent audit or model validation been performed

1

**Appx6843**

on Chainalysis Reactor. Moreover, the Defense's expert witness Ciphertrace's Jonelle Still's expert report documents numerous issues with the Chainalysis Reactor software and concludes that it should not be used in a federal criminal trial.

Despite these established facts, Chainalysis and the Government claim, in their supplemental expert filings after their *Daubert* testimony, that their software is both scientific and deterministic. The only way for the Defense to rebut these belated claims by the Government and Chainalysis is for access to the information requested below. In the alternative, this Court should exclude any evidence derived from Chainalysis Reactor in its entirety from this trial as it meets none of the *Daubert* factors.

### Background

On August 28, 2023, Defense counsel provided notice to the Government and this Court of its desire to present Laurent Salat ("Mr. Salat") as an expert to review the Chainalysis source code and change logs. Mr. Salat is a world-renowned expert in bitcoin protocol as well as blockchains and distributed ledger technology. He co-founded OXT (https://oxt.me) an open blockchain analytics platform exclusively focused on the bitcoin blockchain, and previously worked for the French Central Bank where he redesigned the ledger system for the Banque de France.

On August 29, 2023, at a hearing on the matter, the Court, citing competitive concerns, denied Laurent Salat as a suitable witness to review the Chainalysis source code because of his involvement with OXT and because he is a French citizen.

On August 30, 2023, the Court directed the Defense to propose another computer science expert who can review the source code and change logs for the Chainalysis Reactor software used by the Government and Chainalysis in its investigation. Additionally, the Court directed the

2

**Appx6844**

Defense to identify someone who can analyze the source code and change logs without posing a competitive risk to Chainalysis. The Court requested that any proffered expert prepare an explanation of precisely what is needed to review the source code and for what reasons.

## Bryan Bishop

Bryan Bishop is an independent software developer based out of Austin, Texas. Mr. Bishop is not affiliated with any known competitor of Chainalysis Inc. Mr. Bishop is a co-founder of Custodia Bank (previously named Avanti Bank & Trust) and served its Chief Technology Officer. In his non-commercial work, Mr. Bishop volunteers as a contributor to the Bitcoin Core project. He is also a public speaker and published scholar.

Mr. Bishop has a background in software engineering. He worked at LedgerX from 2014-2018 before beginning as a freelance consultant in the fintech and biotech industries. Mr. Bishop started his own consulting agency in 2018 called 10x Management. In his consulting work, Mr. Bishop has advised cryptocurrency projects and constructed systems for private over-the-counter swaps.

As part of his work with the Bitcoin Core project, Mr. Bishop directly contributed to Bitcoin's success when he created a mechanism of cold storage and vaults that shield wallets, and other custody solutions, from theft by placing a ceiling on the maximum quantity of Bitcoin that a thief could steal.

Mr. Bishop co-founded Custodia Bank to serve as a compliant bridge to the U.S. dollar payments system and as a custodian of digital assets that can meet the strictest levels of institutional custody standards. Custodia Bank fully complies with all applicable laws and regulations, including the Bank Secrecy Act, federal know-your-customer ("KYC") laws, anti-money laundering laws, and all other relevant laws and regulations. Custodia Bank is posed to

3

**Appx6845**

grow substantially as the global economy shifts away from centralized financial institutions and the U.S. dollar, and becomes increasingly decentralized through the adoption of cryptocurrency.

Like many of the greatest minds in blockchain and computer science, Mr. Bishop has no post-secondary degree. Mr. Bishop has been engaged in the computer sciences for over two decades and is a respected authority in the blockchain space.

Mr. Bishop holds two patents. He holds a patent for the cryptographic token with separate circulation groups, as well as a patent for systems and methods for data storage in nucleic acids. Mr. Bishop is at the forefront of constructing computer technology systems that replicate the form of nature and incorporate biological elements, and a well-respected biohacker with experience in genetic manipulation.

Mr. Bishop is an American citizen, and he does not work for a competitor of Chainalysis. Mr. Bishop has requested the following categories of production and provided justification for each request as outlined below.

<div align="center"><b>Specific Requests and Justifications</b></div>

1)      **Source Code**

Chainalysis source code, broadly. Requests are not necessarily restricted to Chainalysis Reactor or the Chainalysis frontend visualization tools that the prosecution or investigators may have used, as other important software and data is involved in the Chainalysis services. For example, this request also covers data collection and analysis, other data processing pipeline software, or other data integration software created by or used by Chainalysis. This includes Chainalysis' use of any data ingestion system or data collection team for collection, annotation and labeling, processing, querying or presentation of data.

<div align="center"><b>Appx6846</b></div>

Source code is requested for the periods leading up to the investigation and the investigatory period during which Chainalysis software was used, such that any previous data processing can also be analyzed in addition to data analysis functions at the exact time the product was used.

Independent of when the data was processed, this request also covers the source code of any systems that were used to process the data. Logs, records, or details pertaining to software dependencies and libraries - such as system software dependencies, system packages, application-level dependencies and packages or libraries such as from software package repositories - that were used in the making of the Chainalysis Reactor software. If possible, the exact versions of those libraries as used during the relevant investigation period and software operation period, including for data collection, data analysis, data querying, and data visualization.

This source code request includes affirmation from Chainalysis as to whether a given feature or software was used during the investigation, as the software underlying this capability should also be analyzed to determine the accuracy of the visualizations.

A quote from the Chainalysis Reactor marketing website states: "Build a narrative with custom notes and annotations. Investigators can share graphs directly or export raw data for a complete record of their findings." It is important to analyze the customer notes and annotations, including whether those annotations affected the clustering input datasets.

This source code request includes any source code or software related to bitcoin block indexing used by Chainalysis, any source code or software related to Bitcoin nodes, and any vendors that provide bitcoin node services. The Defense needs to review all applicable

5

**Appx6847**

information about those integrations, either included in diagrams, documentation, or other materials.

This source code request includes any machine/disk images of cloud VMs or computers that Chainalysis was using during the time of the investigation, with snapshots of the software that was running, and any docker container images.

This source code request includes access to the automated software test suites that are used internally at Chainalysis for automatic software testing of the Chainalysis Reactor product both on the frontend, backend, and any other related system or component necessary to operate the Chainalysis Reactor product or any data collection, data processing, data querying, or data visualization activities.

This source code request includes both compiled binaries as well as underlying source code, as well as build environments necessary to compile the source code into the software.

This source code request includes whether Chainalysis is using deterministic builds for its software The Defense requires information about deterministic builds at Chainalysis. If the builds are non-deterministic, then that should also be possible to determine from the requested materials.

This source code request includes any software or source code for theorem proving and formal correctness proofs regarding any aspects of the Chainalysis software.

As indicated in its 2021 Whitepaper, Chainalysis's high-level system architecture consists of multiple cloud services and APIs.[1]

---

[1] Chainalysis Privacy and Security Whitepaper, CHAINALYSIS INC. (Dec. 21, 2021) (last accessed Sept. 1, 2023) (available at: https://www.chainalysis.com/wp-content/uploads/2023/05/privacy-and-security-white-paper.pdf).



Based on this publicly available Whitepaper, there are several key components that need to be fully reviewed by the Defense.

- Chainalysis Reactor frontend and backend source code, and any relevant kubernetes or docker containers, other OCI images or virtual machine ("VM") images, including environment variables and other product configuration settings;

- To the extent used by the investigators during this case, Chainalysis Know Your Transaction ("KYT") Monitoring, both frontend and backend source code and kubernetes or docker containers, including environment variables and product configuration settings;

- Chainalysis API Platform source code and any execution environment;

7

- Application microservices. At minimum, a list and overview of these microservices, as well as the source code, execution environments, and configurations;

- Chainalysis Data Platform microservices. At minimum, a list and overview of these microservices, as well as the source code, execution environments, and configurations;

- Access logs and schema for the Amazon RDS and Aurora database services, and information pertaining to Amazon S3 object/file storage. Especially any files that were used in the facilitation of any investigation or relevant report for this case.

- Source code and operating environments, and configurations, from relevant third-party integrations such as the bitcoin node/network integration, flashpoint integration, or any other vendors that provide data processing or threat intelligence information that may have been used to produce data, labeled or unlabeled, annotated or unannotated, in the process of the product's use during the investigation into Bitcoin Fog.

　　*a)　　Justification:*

"Source code" refers to the set of human-readable instructions that get transformed into machine code for a particular software project or product. While machine code itself is important to study and examine to see what the machine was told to do at the time the software was executed, "source code" is itself valuable because it shows high level abstractions, concepts, and the intentions of the programmers which can be compared against the machine code. It includes details such as comments, version history, and human-readable documentation as to the purpose of different function calls, libraries, and dependencies.

This source code request includes software beyond Chainalysis Reactor because it is possible the Reactor product itself is only a visualization and query interface to other Chainalysis systems and that meaningful computations do not occur directly within Chainalysis Reactor.

**Appx6850**

Without having an overview of the Chainalysis systems and not having previously reviewed Chainalysis architecture and source code, it is difficult to determine whether Chainalysis Reactor itself will encompass the materials sufficient to draw conclusions as to the accuracy of Chainalysis's clustering methods. Software related to data collection, annotation, and other data functions is also requested because data and processed data is the basis of the product's supposed value.

**2)      Source Code Version History**

Chainalysis software version control history leading up to the use of the software in the investigation and for all relevant periods of the investigation. Any changelogs from a version control history perspective, but also any written or automated product changelogs describing changes for different software releases, tags, cuts, branches, forks, or deployments, that were used for the software during the course of the investigation and prior to the investigatory period. In addition to source code version control repository access, or any such history, any software-oriented or product-oriented "changelog" that was maintained is also requested, which lists out changes in human-readable language along with each version or release of the software, usually prepared for upper management as a summary of changes.

a)      *Justification:*

"Source code" and other artifacts of software development teams are usually stored in software version control history repositories, such as "git", "svn", or "cvs" type files. These versions represent ongoing work of a company and refer specifically to different versions of the source code and the resulting software derived from the source code and other software artifacts or software inputs. During the investigation period, it is possible that multiple versions of the Chainalysis software were used to resolve investigatory requests or queries while using the

9

product or loading the product into the investigator's web browser. A complete understanding of the change log history and the types of changes made to the software is integral to putting on a complete defense.

### 3) Independent Software Environment

Information and tooling to recapitulate the Chainalysis web applications and other software in a separate, isolated environment to investigate the function and behavior of the Chainalysis software using independent data and Chainalysis-provided data such as any proprietary data that was used in any calculations, querying, or processing of data whether open-source intelligence data or proprietary data.

This independent software environment request includes access to appropriate hardware and software environments to replicate the conditions under which the software was used, and replication of the conditions under which data was collected, inserted, analyzed, processed, and transformed or converted, to produce results that were then displayed in the Chainalysis Reactor product frontend.

This independent software environment request includes access to the datasets that the Chainalysis Reactor frontend and backend was pulling from at the time of the investigation. As well as access to the datasets that were used to produce the datasets that were used by the Chainalysis Reactor software or any other backend software for statistical inference, clustering, or any other algorithmic processing.

### a) *Justification*:

Having an independent software environment is critical to being able to reconstruct the results using the Chainalysis software. It provides substantial information about the types of data that are used in the software system and provides opportunity for investigating different

10

**Appx6852**

scenarios without interference from other Chainalysis systems on latest versions of the software which have been updated since the investigation period.

If the data sets are proprietary or otherwise not downloadable from the public Internet, then it is important to have the Chainalysis data sets made available to check the independent isolated operation of their software, how results are computed and the meaning of those results from that data. The ability to tweak data and test other scenarios is also relevant for determining the behavior of the software under different circumstances.

Having an independent Chainalysis software environment would enable the ability to conduct controlled experiments on the Chainalysis software, such as to determine the consistency of outputs and operation on any input data, input queries, output data, etc.

Having an independent Chainalysis software environment would also enable an analysis of bias or discrimination in its analysis, particularly if it involves critical human-based decision-making processes. This could involve analyzing the software's algorithms or human intervention points, such as for Chainalysis employee administrator dashboards that can be used to manage data, update, or edit data, manage or view results, or update other information.

4)      **Logs**

Chainalysis user access logs for the investigators involved in this case, including query logs and any other logs for their queries or investigations. Any data, and how it was accessed, that was served to these investigators during the course of the investigation.

This logs request includes answers to the following questions:

- Were users also assessing a separate investigation simultaneously?

- How many simultaneous investigations were these users engaged in?

- Is it possible that they conflated data from different queries?

- Were there any saved reports, and if so, why weren't they produced?

- Were the saved reports created later?

- How many times was Chainalysis Reactor accessed and used during the course of the investigation, and were conflicting results ever produced?

This logs request includes access to all conflicting results or even slightly differing results, as well as any logs and records pertaining to investigator user certification of the Chainalysis software.

a)      *Justification*:

Product logs, such as traffic logs, usage logs, access logs, HTTP logs, and other logs, provide critical information as to how the product was used and which features were used by which users at which times. This can be used to assemble a "trace" of the user history as the user navigated through the product and tried different queries, rejecting different data, and accepting other data as the user may have done. These logs can be used by the Defense's proffered expert Mr. Bishop to reconstruct the user's activity and attempt to use the product in a similar way.

5)      **Training Materials**

The Defense requests a copy of the training materials or training course Chainalysis provides to investigators. This training materials request includes answers to the following questions regarding the training materials:

- Was the training module certification granted on a pass/fail basis?

- What is the subject matter of the Chainalysis webinars?

- On the Chainalysis website, they advertise (as of 2023): "Chainalysis Reactor's intuitive interface allows users with minimal training to create powerful visualizations of

cryptocurrency flows. Trace the flow of funds through an unlimited number of "hops" and link suspicious activity to real-world entities." What is this minimal training consist of?

- How is suspicious activity identified in Chainalysis Reactor and on what basis?

a)   *Justification:*

Training materials are key to determining whether the investigators conducting the investigation into Bitcoin Fog were using the Chainalysis Reactor Source code in a manner that would allow them to derive accurate conclusions. In conjunction with the change logs, the training materials will allow the Defense to determine whether the conduct of the investigators aligns with Chainalysis' use protocol.

6)   **Documentation**

This request includes internal documentation describing the Chainalysis system architecture, documentation pertaining to the product design and specifications of the Chainalysis Reactor software and related subsystems or other systems, internal documentation of said products and systems, and external user-facing documentation for Chainalysis customers.

This documentation request pertains to pre-existing documentation, and does not require the creation of any new documentation of existing or previous systems. Any internal system diagrams or architecture documents for the architecture of Chainalysis's data collection, predictive analytics or statistical clustering algorithms, as well as downstream user-facing products.

This documentation request includes any standard operating procedures or manuals for employees or contractors on any data collection team, documentation detailing the sources of proprietary data and the methods used for data collection, aggregation, and transformation.

This documentation request includes any documentation or training materials used for data collection teams, whether for writing new data collection software or for manually inserting any data into the Chainalysis system.

a) *Justification:*

This documentation will allow expert witness Mr. Bishop to more expeditiously navigate the Chainalysis source code, products, and isolated environments and hasten the work of analyzing the Chainalysis source code, algorithms, and other information. Standard operating procedures and other policies or instructions for data collection teams are also critical for evaluating the procedures of teams or data entry into the software, if any, such that activities beyond software that strongly influence the operation of the software are captured by the request.

7) **Assistance**

Some assistance from Chainalysis is requested for handling Chainalysis software and software environments. This request could be satisfied by a full-stack software engineer, principal architect, devops engineer, or anyone else from Chainalysis who can facilitate the setup of the software and basic assessment of the system's functionality in normal operating parameters.

a) *Justification:*

Having the assistance of a Chainalysis employee will speed up the process of setting up the software and debugging any issues with taking Chainalysis software into an isolated software environment. It could also be the case that this has never been done before, and Chainalysis expertise may be required to fix or update their product to allow for this kind of external expert analysis.

**Appx6856**

## Conclusion

This Court should recognize Mr. Bishop as an expert witness and order Chainalysis to produce the requested categories of materials listed above in their entirety. It is only upon a complete review of the Chainalysis Reactor source code and its connected materials that a complete picture of Chainalysis' software and clustering methodologies can be evaluated and its accuracy assessed. Neither the Government nor Chainalysis has ever appeared to have done any such work. The Government's reliance on Chainalysis Reactor software in this case justifies this Court to allow the Defense to conduct an in-depth review of the software's accuracy for the first time ever.

Appx6857

Dated: September 5, 2023
Brooklyn, New York

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

*Counsel for Defendant Roman Sterlingov*

16

**Appx6858**

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of September, 2023, the forgoing document was filed with the Clerk of Court using the CM/ECF System, and sent by email to the attorneys for the Government listed below:

<div align="right">s/ Tor Ekeland</div>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

Jeffrey Pearlman
Jeffrey.Pearlman@usdoj.gov

**Appx6859**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**ROMAN STERLINGOV**,<br><br>Defendant. | Criminal No. 21-CR-399 (RDM) |

**CHAINALYSIS' NOTICE IN RESPONSE TO THE COURT' S REQUEST REGARDING PROTECTIVE ORDER**

Chainalysis Inc. ("Chainalysis"), hereby respectfully provides for the Court copies of the following:

1.     Exhibit A, a Proposed Protective Order addressing an expert to be named by the defense, or, alternatively;

2. Exhibit B, a Proposed Protective Order if the defense were to choose Jonelle Still, who is known to have a competitive interest with Chainalysis through her employment.

Dated this 12th day of September, 2023.

Respectfully submitted,

MORRISON & FOERSTER LLP

By:     /s/ William Frentzen
William Frentzen (D.C. Bar No. 1740835)
WFrentzen@mofo.com
425 Market Street, 32nd Floor
San Francisco, CA 94105
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

OF COUNSEL:

Michael Komorowski
MKomorowski@mofo.com
Emani N. Oakley
EOakley@mofo.com
425 Market Street, 32nd Floor
San Francisco, CA  94105
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

*Attorneys for Non-party Chainalysis Inc.*

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROMAN STERLINGOV,<br><br>Defendant. | Criminal No. 21-CR-399 (RDM) |

### [PROPOSED] HEURISTIC INFORMATION PROTECTIVE ORDER

This Heuristic Information Protective Order supplements the Protective Order approved by the Court on September 17, 2021 (ECF No. 18), and which Chainalysis Inc. ("Chainalysis") incorporates herein by reference.  Where the Protective Order Governing Discovery and this Heuristic Code Protective Order conflict in their treatment, this Protective Order shall control.

Chainalysis, Inc. hereby submits a supplemental protective order to govern the information or items relevant to the voluntary production of heuristic information that relates to this matter in response to the Court's August 30, 2023 order (August 30, 2023, Order).  In providing this Protective Order, Chainalysis neither waives any objections nor concedes to Defendant's requests for review of any material outside of what has been voluntarily provided. Accordingly, it is HEREBY ORDERED THAT:

#### Highly Confidential Heuristic Information Materials

1.      The government may provide access to defense counsel (defined as counsel of record in this case) and one designated expert [insert named expert] with access to voluntarily provided heuristic information that contains certain trade secret and proprietary information, including heuristic data, files and associated information, disclosure of which to another party would create a substantial risk of serious harm that could not be avoided by less restrictive means

1

sf-5629143

**Appx6863**

("HIGHLY CONFIDENTIAL HEURISTIC INFORMATION").

2.    The protections conferred by this Protective Order cover not only HIGHLY CONFIDENTIAL HEURISTIC INFORMATION (as defined above), but also (1) any information copied from HIGHLY CONFIDENTIAL HEURISTIC INFORMATION; (2) all copies, excerpts, summaries, or compilations of HIGHLY CONFIDENTIAL HEURISTIC INFORMATION in any form and created by any individual; and (3) any testimony, conversations, or presentations that might reveal HIGHLY CONFIDENTIAL HEURISTIC INFORMATION.

3.    Prior to being given access to any HIGHLY CONFIDENTIAL HEURISTIC INFORMATION, [insert named expert], will swear and affirm that he/she is not a past or current employee of a competitor to Chainalysis, that he/she is not and is not anticipated to become an employee of a competitor to Chainalysis, that he/she is hereby prohibited from engaging in competitive behavior with Chainalysis during this litigation and for five (5) years following the conclusion of this litigation, and that he/she will comply with the terms of this Protective Order. [Insert named expert] will return a signed acknowledgement form attached as Attachment A to this Order to the Court, the United States, and Chainalysis.

4.    Prior to being given access to any HIGHLY CONFIDENTIAL HEURISTIC INFORMATION, defense counsel will swear and affirm that they will comply with the terms of this Protective Order.  Defense counsel will return a signed acknowledgement form attached as Attachment B to this Order to the Court, the United States, and Chainalysis.

5.    All HIGHLY CONFIDENTIAL HEURISTIC INFORMATION may be used by defense counsel and their expert [insert named expert] solely in connection with the defense of this case, and for no other purpose, and in connection with no other proceeding, without notice to the government, Chainalysis and further order of this Court.

2

sf-5629143

**Appx6864**

6.      The defendant, defense counsel, and [insert named expert] shall not disclose any HIGHLY CONFIDENTIAL HEURISTIC INFORMATION to any person or entity without notice to the government, Chainalysis and prior permission from the Court.

7.      Defense counsel and [insert named expert] shall maintain in its custody and control any materials and all copies made thereof derived in any way from HIGHLY CONFIDENTIAL HEURISTIC INFORMATION and shall not disclose such information in any way to any other person.

8.      Upon conclusion of all stages of this case or any action brought pursuant to 28 U.S.C. Section 2255, any materials and all copies made thereof derived in any way from HIGHLY CONFIDENTIAL HEURISTIC INFORMATION shall be destroyed or returned to the United States or Chainalysis, unless otherwise ordered by the Court.  The Court may require a certification as to the disposition of any such materials.

9.      The procedures for use of HIGHLY CONFIDENTIAL HEURISTIC INFORMATION during any hearing or the trial of this matter shall be determined by the parties, Chainalysis, and the Court in advance of the hearing or trial.  No party shall disclose HIGHLY CONFIDENTIAL HEURISTIC INFORMATION in open court or in public filings without prior consideration by the Court.

## Scope of this Order

11.     **Supplemental Nature of This Order.** This Order supplements and does not modify the existing Protective Order Governing Discovery (ECF No. 18), which was entered by the Court on September 17, 2021

12.     **Modification Permitted.** Nothing in this Order shall prevent any party from seeking modification of this Order or from objecting to discovery that it believes to be otherwise

3

sf-5629143

**Appx6865**

improper.

13.     **No Waiver**. Chainalysis neither waives any objections nor concedes to Defendant's requests for review of any Source Code.

14.     **No Ruling on Discoverability or Admissibility**. This Order does not constitute a ruling on the question of whether any particular material is properly discoverable or admissible and does not constitute any ruling on any potential objection to the discoverability of any material.


IT IS SO ORDERED this _____ day of _____ 2023.


_____
Randolph D. Moss
United States District Judge

sf-5629143

**Appx6866**

<u>EXHIBIT A</u>

<u>ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND</u>

I, [insert named expert], declare under penalty of perjury that I have read in its entirety and understand the Heuristic Information Protective Order that was issued by the United States District Court for the District of Columbia on [date] in the case of *United States v. Sterlingov*, No. 21-CR-399 (RDM).  I agree to comply with and to be bound by all the terms of this Heuristic Information Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Heuristic Information Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further swear and affirm that I am not a past or current employee of a competitor to Chainalysis, that I am not and am not anticipated to become an employee of a competitor to Chainalysis, that I am hereby prohibited from engaging in competitive behavior with Chainalysis during this litigation and for five years following the conclusion of this litigation.

I further agree to submit to the jurisdiction of the United States District Court for the District of Columbia for the purpose of enforcing the terms of this Heuristic Information Protective Order, even if such enforcement proceedings occur after termination of this action.


Date: _____

City and State where sworn and signed: _____


Printed name: _____
                         [printed name]

Signature: _____
                         [signature]

sf-5629143

**Appx6867**

<u>EXHIBIT B</u>

<u>ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND</u>

I, [insert name of defense counsel], declare under penalty of perjury that I have read in its entirety and understand the Heuristic Information Protective Order that was issued by the United States District Court for the District of Columbia on [date] in the case of *United States v. Sterlingov*, No. 21-CR-399 (RDM). I agree to comply with and to be bound by all the terms of this Heuristic Information Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Heuristic Information Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the District of Columbia for the purpose of enforcing the terms of this Heuristic Information Protective Order, even if such enforcement proceedings occur after termination of this action.

Date: _____

City and State where sworn and signed: _____

Printed name: _____
                        [printed name]

Signature: _____
                        [signature]

6

sf-5629143

**Appx6868**

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Criminal No. 21-CR-399 (RDM) |
| v. | |
| **ROMAN STERLINGOV**, | |
| Defendant. | |

### [PROPOSED] HEURISTIC INFORMATION PROTECTIVE ORDER TO JONELLE STILL

This Heuristic Information Protective Order supplements the Protective Order approved by the Court on September 17, 2021 (ECF No. 18), and which Chainalysis Inc. ("Chainalysis") incorporates herein by reference. Where the Protective Order Governing Discovery and this Heuristic Code Protective Order conflict in their treatment, this Protective Order shall control.

Chainalysis hereby submits a supplemental protective order to govern the information or items relevant to the voluntary production of heuristic information that relates to this matter in response to the Court's August 30, 2023 order (August 30, 2023, Order). In providing this Protective Order, Chainalysis neither waives any objections nor concedes to Defendant's requests for review of any material outside of what has been voluntarily provided. Accordingly, it is HEREBY ORDERED THAT:

### Highly Confidential Heuristic Information Materials

1.      The government may provide access to defense counsel (defined as counsel of record in this case) and Jonelle Still with access to voluntarily provided heuristic information that contains certain trade secret and proprietary information, including heuristic data, files and associated information, disclosure of which to another party, person, or entity would create a substantial risk of serious harm that could not be avoided by less restrictive means ("HIGHLY

1

sf-5629143

**Appx6870**

CONFIDENTIAL HEURISTIC INFORMATION").

2.      The protections conferred by this Protective Order cover not only HIGHLY CONFIDENTIAL HEURISTIC INFORMATION (as defined above), but also (1) any information copied from HIGHLY CONFIDENTIAL HEURISTIC INFORMATION; (2) all copies, excerpts, summaries, or compilations of HIGHLY CONFIDENTIAL HEURISTIC INFORMATION in any form and created by any individual; and (3) any testimony, conversations, or presentations that might reveal HIGHLY CONFIDENTIAL HEURISTIC INFORMATION.

3.      Prior to being given access to any HIGHLY CONFIDENTIAL HEURISTIC INFORMATION, Jonelle Still, will swear and affirm that she understands and agrees that she is hereby prohibited from utilizing this HIGHLY CONFIDENTIAL HEURISTIC INFORMATION as well as any thoughts or impressions or ideas derived therefrom in order to engage in any competitive behavior with Chainalysis,  that she expressly will not share this HIGHLY CONFIDENTIAL HEURISITC INFORMATION with Ciphertrace, any of its employees or contractors, or any investors in Ciphertrace, and that she will not utilize any devices or systems belonging to Ciphertrace in order to view, examine, save, download, process, or analyze this HIGHLY CONFIDENTIAL HEURISTIC INFORMATION, and that she will comply with the terms of this Protective Order.  Jonelle Still will return a signed acknowledgement form attached as Attachment A to this Order to the Court, the United States, and Chainalysis.

4.      Prior to being given access to any HIGHLY CONFIDENTIAL HEURISTIC INFORMATION, defense counsel will swear and affirm that they will comply with the terms of this Protective Order.  Defense counsel will return a signed acknowledgement form attached as Attachment B to this Order to the Court, the United States, and Chainalysis.

5.      All HIGHLY CONFIDENTIAL HEURISTIC INFORMATION may be used by

2

sf-5629143

**Appx6871**

defense counsel and their expert  Jonelle Still solely in connection with the defense of this case, and for no other purpose, and in connection with no other proceeding, without notice to the government, Chainalysis and further order of this Court.

6.      The defendant, defense counsel, and Jonelle Still shall not disclose any HIGHLY CONFIDENTIAL HEURISTIC INFORMATION to any person or entity without notice to the government, Chainalysis and prior permission from the Court.

7.      Defense counsel and Jonelle Still shall maintain in its custody and control any materials and all copies made thereof derived in any way from HIGHLY CONFIDENTIAL HEURISTIC INFORMATION and shall not disclose such information in any way to any other person or entity.

8.      Upon conclusion of all stages of this case or any action brought pursuant to 28 U.S.C. Section 2255, any materials and all copies made thereof derived in any way from HIGHLY CONFIDENTIAL HEURISTIC INFORMATION shall be destroyed or returned to the United States or Chainalysis, unless otherwise ordered by the Court.  The Court may require a certification as to the disposition of any such materials.

9.      The procedures for use of HIGHLY CONFIDENTIAL HEURISTIC INFORMATION during any hearing or the trial of this matter shall be determined by the parties, Chainalysis, and the Court in advance of the hearing or trial.  No party shall disclose HIGHLY CONFIDENTIAL HEURISTIC INFORMATION in open court or in public filings without prior consideration by the Court.

## Scope of this Order

11.     **Supplemental Nature of This Order.** This Order supplements and does not modify the existing Protective Order Governing Discovery (ECF No. 18), which was entered by

3

sf-5629143

**Appx6872**

the Court on September 17, 2021.

12.     **Modification Permitted.** Nothing in this Order shall prevent any party from seeking modification of this Order or from objecting to discovery that it believes to be otherwise improper.

13.     **No Waiver.** Chainalysis neither waives any objections nor concedes to Defendant's requests for review of any Source Code.

14.     **No Ruling on Discoverability or Admissibility.** This Order does not constitute a ruling on the question of whether any particular material is properly discoverable or admissible and does not constitute any ruling on any potential objection to the discoverability of any material.

IT IS SO ORDERED this _____ day of _____ 2023.

_____
Randolph D. Moss
United States District Judge

4

sf-5629143

**Appx6873**

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, Jonelle Still, declare under penalty of perjury that I have read in its entirety and understand the Heuristic Information Protective Order that was issued by the United States District Court for the District of Columbia on [date] in the case of *United States v. Sterlingov*, No. 21-CR-399 (RDM). I agree to comply with and to be bound by all the terms of this Heuristic Information Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Heuristic Information Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further swear and affirm that I understand and agree that I am hereby prohibited from utilizing this HIGHLY CONFIDENTIAL HEURISTIC INFORMATION as well as any thoughts or impressions or ideas derived therefrom in order to engage in any competitive behavior with Chainalysis. I swear and affirm that I expressly will not share this HIGHLY CONFIDENTIAL HEURISITC INFORMATION with Ciphertrace, any of its employees or contractors, or any investors in Ciphertrace, and that I will not utilize any systems belonging to Ciphertrace in order to view, examine, save, download, process or analyze this HIGHLY CONFIDENTIAL HEURISTIC INFORMATION, and that I will comply with all of the terms of this Protective Order.I further agree to submit to the jurisdiction of the United States District Court for the District of Columbia for the purpose of enforcing the terms of this Heuristic Information Protective Order, even if such enforcement proceedings occur after termination of this action.

Date: _____

5

sf-5629143

**Appx6874**

City and State where sworn and signed: _____

Printed name: _____
                        [printed name]

Signature: _____
                        [signature]

<u>EXHIBIT B</u>

<u>ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND</u>

I, [insert name of defense counsel], declare under penalty of perjury that I have read in its entirety and understand the Heuristic Information Protective Order that was issued by the United States District Court for the District of Columbia on [date] in the case of *United States v. Sterlingov*, No. 21-CR-399 (RDM).  I agree to comply with and to be bound by all the terms of this Heuristic Information Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Heuristic Information Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the District of Columbia for the purpose of enforcing the terms of this Heuristic Information Protective Order, even if such enforcement proceedings occur after termination of this action.

Date: _____

City and State where sworn and signed: _____

Printed name: _____
                        [printed name]

6

sf-5629143

**Appx6875**

Signature: _____
                              [signature]

sf-5629143

**Appx6876**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Criminal No. 21-CR-399 (RDM) |
| v. | |
| **ROMAN STERLINGOV,** | |
| Defendant. | |

## [PROPOSED] HEURISTIC INFORMATION PROTECTIVE ORDER TO JONELLE STILL

This Heuristic Information Protective Order supplements the Protective Order approved by the Court on September 17, 2021 (ECF No. 18), and which Chainalysis Inc. ("Chainalysis") incorporates herein by reference. Where the Protective Order Governing Discovery and this Heuristic Code Protective Order conflict in their treatment, this Protective Order shall control.

Chainalysis hereby submits a supplemental protective order to govern the information or items relevant to the voluntary production of heuristic information that relates to this matter in response to the Court's August 30, 2023 order (August 30, 2023, Order). In providing this Protective Order, Chainalysis neither waives any objections nor concedes to Defendant's requests for review of any material outside of what has been voluntarily provided. Accordingly, it is HEREBY ORDERED THAT:

### Highly Confidential Heuristic Information Materials

1.      The government may provide access to defense counsel (defined as counsel of record in this case) and Jonelle Still with access to voluntarily provided heuristic information that contains certain trade secret and proprietary information, including heuristic data, files and associated information, disclosure of which to another party, person, or entity would create a substantial risk of serious harm that could not be avoided by less restrictive means ("HIGHLY

1

sf-5629143

**Appx6877**

CONFIDENTIAL HEURISTIC INFORMATION").

2.   The protections conferred by this Protective Order cover not only HIGHLY CONFIDENTIAL HEURISTIC INFORMATION (as defined above), but also (1) any information copied from HIGHLY CONFIDENTIAL HEURISTIC INFORMATION; (2) all copies, excerpts, summaries, or compilations of HIGHLY CONFIDENTIAL HEURISTIC INFORMATION in any form and created by any individual; and (3) any testimony, conversations, or presentations that might reveal HIGHLY CONFIDENTIAL HEURISTIC INFORMATION.

3.   Prior to being given access to any HIGHLY CONFIDENTIAL HEURISTIC INFORMATION, Jonelle Still, will swear and affirm that she understands and agrees that she is hereby prohibited from utilizing this HIGHLY CONFIDENTIAL HEURISTIC INFORMATION as well as any thoughts or impressions or ideas derived therefrom in order to engage in any competitive behavior with Chainalysis,  that she expressly will not share this HIGHLY CONFIDENTIAL HEURISITC INFORMATION with Ciphertrace, any of its employees or contractors, or any investors in Ciphertrace, and that she will not utilize any devices or systems *(without prior leave of the Court)* belonging to Ciphertrace in order to view, examine, save, download, process, or analyze this HIGHLY CONFIDENTIAL HEURISTIC INFORMATION, and that she will comply with the terms of this Protective Order.  Jonelle Still will return a signed acknowledgement form attached as Attachment A to this Order to the Court, the United States, and Chainalysis.

4.   Prior to being given access to any HIGHLY CONFIDENTIAL HEURISTIC INFORMATION, defense counsel will swear and affirm that they will comply with the terms of this Protective Order.  Defense counsel will return a signed acknowledgement form attached as Attachment B to this Order to the Court, the United States, and Chainalysis.

5.   All HIGHLY CONFIDENTIAL HEURISTIC INFORMATION may be used by

sf-5629143

defense counsel and their expert Jonelle Still solely in connection with the defense of this case, and for no other purpose, and in connection with no other proceeding, without notice to the government, Chainalysis and further order of this Court.

6.     The defendant, defense counsel, and Jonelle Still shall not disclose any HIGHLY CONFIDENTIAL HEURISTIC INFORMATION to any person or entity without notice to the government, Chainalysis and prior permission from the Court.

7.     Defense counsel and Jonelle Still shall maintain in its custody and control any materials and all copies made thereof derived in any way from HIGHLY CONFIDENTIAL HEURISTIC INFORMATION and shall not disclose such information in any way to any other person or entity.

8.     Upon conclusion of all stages of this case or any action brought pursuant to 28 U.S.C. Section 2255, any materials and all copies made thereof derived in any way from HIGHLY CONFIDENTIAL HEURISTIC INFORMATION shall be destroyed or returned to the United States or Chainalysis, unless otherwise ordered by the Court. The Court may require a certification as to the disposition of any such materials.

9.     The procedures for use of HIGHLY CONFIDENTIAL HEURISTIC INFORMATION during any hearing or the trial of this matter shall be determined by the parties, Chainalysis, and the Court in advance of the hearing or trial. No party shall disclose HIGHLY CONFIDENTIAL HEURISTIC INFORMATION in open court or in public filings without prior consideration by the Court.

### Scope of this Order

11.     **Supplemental Nature of This Order.** This Order supplements and does not modify the existing Protective Order Governing Discovery (ECF No. 18), which was entered by

3

sf-5629143

the Court on September 17, 2021.

12.     **Modification Permitted.** Nothing in this Order shall prevent any party from seeking modification of this Order or from objecting to discovery that it believes to be otherwise improper.

13.     **No Waiver.** Chainalysis neither waives any objections nor concedes to Defendant's requests for review of any Source Code.

14.     **No Ruling on Discoverability or Admissibility.** This Order does not constitute a ruling on the question of whether any particular material is properly discoverable or admissible and does not constitute any ruling on any potential objection to the discoverability of any material.

IT IS SO ORDERED this 13ᵗʰ day of September 2023.

Randolph D. Moss
United States District Judge

4

sf-5629143

**Appx6880**

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, Jonelle Still, declare under penalty of perjury that I have read in its entirety and understand the Heuristic Information Protective Order that was issued by the United States District Court for the District of Columbia on [date] in the case of *United States v. Sterlingov*, No. 21-CR-399 (RDM). I agree to comply with and to be bound by all the terms of this Heuristic Information Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Heuristic Information Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further swear and affirm that I understand and agree that I am hereby prohibited from utilizing this HIGHLY CONFIDENTIAL HEURISTIC INFORMATION as well as any thoughts or impressions or ideas derived therefrom in order to engage in any competitive behavior with Chainalysis. I swear and affirm that I expressly will not share this HIGHLY CONFIDENTIAL HEURISITC INFORMATION with Ciphertrace, any of its employees or contractors, or any [without prior leave of the Court]. RDM investors in Ciphertrace, and that I will not utilize any systems belonging to Ciphertrace in order to view, examine, save, download, process or analyze this HIGHLY CONFIDENTIAL HEURISTIC INFORMATION, and that I will comply with all of the terms of this Protective Order.I further agree to submit to the jurisdiction of the United States District Court for the District of Columbia for the purpose of enforcing the terms of this Heuristic Information Protective Order, even if such enforcement proceedings occur after termination of this action.

Date: _____   _____

5

sf-5629143

**Appx6881**

City and State where sworn and signed: _____

Printed name: _____
                  [printed name]

Signature: _____
                  [signature]

<div align="center">

EXHIBIT B

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

</div>

I, [insert name of defense counsel], declare under penalty of perjury that I have read in its entirety and understand the Heuristic Information Protective Order that was issued by the United States District Court for the District of Columbia on [date] in the case of *United States v. Sterlingov*, No. 21-CR-399 (RDM). I agree to comply with and to be bound by all the terms of this Heuristic Information Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Heuristic Information Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the District of Columbia for the purpose of enforcing the terms of this Heuristic Information Protective Order, even if such enforcement proceedings occur after termination of this action.

Date: _____

City and State where sworn and signed: _____

Printed name: _____
                  [printed name]

<div align="center">

6

</div>

sf-5629143

<div align="center">

**Appx6882**

</div>

Signature: _____
                [signature]

sf-5629143

**Appx6883**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | **No. 21-cr-399 (RDM)** |
| v. | |
| ROMAN STERLINGOV | |
| Defendant. | |

## NOTICE REGARDING COURT'S PROPOSED PROTECTIVE ORDER GOVERNING REVIEW OF CHAINALYSIS'S PROPRIETARY INFORMATION

Counsel for Defendant Roman Sterlingov has conferred with counsel for Ciphertrace, Jonelle Still's employer, regarding the Court's proposed protective order (Dkt. 196) for the recent production of evidence from Chainalysis, Inc. The Court has requested that counsel for Ciphertrace appear (either in-person or via Zoom) at a hearing before the Court concerning the protective order and Chainalysis, Inc.'s recent production on this Thursday, September 21, 2023 at 10:00 am.

Defense Counsel, in order to be efficient with the Court's resources, wishes to inform the Court in advance of the hearing that Counsel for Ciphertrace has informed us that:

1. Neither Ciphertrace nor Ms. Still may accept, receive, handle, analyze, or otherwise opine on any of the heuristic data from Chainalysis, Inc., regardless of the scope of any protective order.

**Appx6884**

2. Ciphertrace and Ms. Still cannot accept and review proprietary Chainalysis, Inc. heuristic data because, among other reasons; (a) Ciphertrace and Chainalysis, Inc. are direct competitors, and sharing proprietary data raises competition concerns; (b) review of such proprietary data would subject Ciphertrace to extensive potential intellectual property and other claims by Chainalysis, Inc.; (c) any such review would interfere with her work at Ciphertrace and her ability to work for future employers in blockchain related fields.

3. Accordingly, Ciphertrace and Ms. Still must respectfully decline the Court's invitation to review and opine on proprietary data of a competitor.

**Appx6885**

Dated: September 20, 2023

Alexandria, Virginia

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

*Counsel for Defendant Roman Sterlingov*

**Appx6886**

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of September 2023, the forgoing document was filed with the Clerk of Court using the CM/ECF System, and sent by email to the attorneys for the Government listed below:

<u>s/ Tor Ekeland</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

Jeffrey Pearlman
Jeffrey.Pearlman@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | No. 21-cr-399 (RDM) |
| v. | |
| ROMAN STERLINGOV | |
| Defendant. | |

## NOTICE REGARDING CIPHERTRACE EXPERT TESTIMONY AND REVIEW OF LATEST CHAINALYSIS PRODUCTION

Defense Counsel for Defendant Roman Sterlingov wishes to inform the Court that they were contacted by Ciphertrace's counsel, A. Joseph Jay III, late in the morning of September 22, 2023[1]. In that communication, Mr. Jay informed Defense Counsel that upon further consultation with his client, Ciphertrace, neither Ms. Still nor Ciphertrice are willing and able to review the latest discovery produced by Chainalysis that was the subject of yesterday morning's hearing.

Mr. Jay confirmed, however, that Ciphertrace expert, Ms. Jonelle Still, is still available to testify based on her review of the discovery and her expert report produced to the Court. He further confirmed to Defense Counsel that Ms. Still will be available to testify on any day and time that the Court may find convenient.

Finally, Mr. Jay confirmed that Ciphertrace is taking steps to immediately have all persons, including Ms. Still and those who assisted her or reviewed discovery in this matter, to

---

[1] The Court will recall that Mr. Jay had promised the Court during the hearing the prior day that he would confirm with Defense Counsel whether Ms. Still and/or Ciphertrace would be able to review the highly sensitive heuristic information produced by Chainalysis by this morning, September 22, 2023.

1

**Appx6888**

personally sign the acknowledgement to the protective order in this case (Dkt. No. 18) and will

promptly provide undersigned counsel with copies of such acknowledgements.

2

**Appx6889**

Dated: September 22, 2023
Alexandria, Virginia

Respectfully submitted,


/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com


/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

*Counsel for Defendant Roman Sterlingov*

3

**Appx6890**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of September 2023, the forgoing document was filed with the Clerk of Court using the CM/ECF System, and sent by email to the attorneys for the Government listed below:

<u>s/ Michael Hassard</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

Jeffrey Pearlman
Jeffrey.Pearlman@usdoj.gov

Appx6891

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 21-cr-399 (RDM) |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S RESPONSE TO SEPTEMBER 18, 2023
MINUTE ORDER REGARDING DEFENDANT'S ACCESS TO
SENSITIVE HEURISTICS INFORMATION PROVIDED BY CHAINALYSIS

The United States of America, by and through the United States Attorney for the District of Columbia, files the following response in response to the Court's minute order on September 18, 2023, directing the government to submit "a brief in support of its position that the protective order at Dkt. [196] restricts Defendant from viewing the materials in question." *See* Minute Order (Sept. 18, 2023). The referenced restriction applies specifically to the highly sensitive, proprietary heuristics information Enhanced Protective Order provided by Chainalysis in September 2023.

**LEGAL STANDARD**

This Court has broad discretion to fashion an appropriate Protective Order under Fed. R. Crim. P. 16(d)(1), which provides that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." As the D.C. Circuit has advised, "a 'trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect.'" *United States v. Cordova*, 806 F.3d 1085, 1090 (D.C. Cir. 2015) (quoting *Alderman v. United States*, 394 U.S. 165, 185 (1969)).

The party seeking the protective order bears the burden of showing "good cause." *Id.* Good cause may be based upon, but is not limited to, "the safety of witnesses and others, a particular

danger or perjury or witness intimidation, the protection of information vital to the national security, and the protection of business enterprises from economic reprisals." Fed. R. Crim. P. 16 Advisory Committee's Notes to 1966 Amendment. Courts balance the risk that disclosure would pose a "hazard to others" against any prejudice to the defendant and the public's interest in disclosure. *United States v. Dixon*, 355 F. Supp. 3d 1, 4 (D.D.C. 2019). "[O]nce a showing of good cause has been made, the court has relatively unconstrained discretion to fashion an appropriate protective order." *United States v. Johnson*, 314 F. Supp.3d 248, 251 (D.D.C. 2018); *see also* 2 Charles Alan Wright & Peter J. Henning, Federal Practice & Procedure § 262 (4th ed. 2009) ("The discretion provided to the trial court by Rule 16(d)(1) is vast.").

The defendant does not have a right to personally review all discovery materials. "The Supreme Court has made clear that '[t]here is no general constitutional right to discovery in a criminal case.'" *United States v. Bisong*, 645 F.3d 384, 396 (quoting *United States v. Ruiz*, 536 U.S. 622, 629 (2002)); *see also, e.g., Galloway v. United States*, No. CR RDB-10-775, 2018 WL 1326399, at *3 (D. Md. Mar. 15, 2018) ("Where security is a concern, the right to discovery is not unfettered."). Courts have repeatedly denied claims that a criminal defendant must review every single document produced in discovery. *See, e.g., United States v. Faulkner*, 2011 WL 3962513 at *4 (N.D. Tex. Sept. 8, 2011) (denying continuance to a defendant who wanted "to review all of the data himself and discuss this evidence with his attorney," explaining: "Faulkner cites no authority for his argument that, to be ensured effective assistance of counsel, a defendant must be able to personally review all of the relevant discovery before trial. . . . Faulkner's personal review of the disclosed digital data prior to trial is not constitutionally required or otherwise legally mandated where, as here, Faulkner is represented by counsel who has had the ability to review the discovery before trial."); *United States v. Thompson*, 2013 WL 1809659, at *6–7 (D. Me. Apr. 29,

2

2013), *aff'd*, 851 F.3d 129 (1st Cir. 2017) ("Thompson does not assert either that the government failed to provide his lawyer with the discovery materials or that his lawyer failed to review discovery, only that Thompson *personally* was not given the opportunity to review the materials. Thompson was not representing himself, such that he needed to assess on his own what evidence was admissible and how persuasive it was. Courts appoint lawyers for defendants in criminal cases so that the lawyers can do the legwork in preparing for trial and give sound advice about whether a defendant should go to trial or plead guilty.").

Consistent with these principles, courts can and do enter protective orders in criminal cases containing "Attorneys' Eyes Only" (AEO) provisions limiting disclosure of certain sensitive materials to defense counsel only. *E.g.*, *United States v. Byrd*, 2023 WL 2822154 (S.D.N.Y. Apr. 6, 2023); *United States v. Felix-Aracena*, 2022 WL 17352436 (S.D.N.Y Dec. 1, 2022); *United States v. Lambert*, 2020 WL 6257119 (S.D.N.Y. Oct. 23, 2020). The decision in *United States v. Diaz-Rojas*, 2016 WL 4718432 (S.D. Cal. Sept. 8, 2016), presents an instructive example. In *Diaz-Rojas*, a Magistrate Judge entered an AEO provision in a drug trafficking case to protect sensitive law enforcement records relating to the training of the drug detection dog that alerted on the defendant's vehicle. *See id.* The court recognized the government's concern that the records, if disclosed, "may be used by criminals, drug trafficking organizations, and terrorists to 'reverse engineer' the training methods and techniques and would reasonably be expected to risk circumvention of the law." *Id.* at *3 (quoting CBP Decl.). Accordingly, the court approved of the AEO designation over these records, finding that the restriction would strike an appropriate balance between the "high risk of harm to the government" and the "de minimis" prejudice to the defendant "given the technical nature of the information and its attenuated pertinence to the elements of the offense for which the defendant is charged." *Id.* at *4.

3

Courts have also upheld restrictions on defendants' ability to review certain sensitive records in other contexts, including Jencks Act productions, CIPA litigation, and review by defendants in pretrial detention. *E.g., United States v. Hung*, 667 F.2d 1105, 1107-08 (4th Cir. 1981) (affirming protective order restricting defendants from viewing disputed Jencks Act materials, where "the comments of defendants and their further testimony could not have been of any aid in reaching a decision"); *United States v. Fuller*, 2017 WL 3457166, at *3-4 (S.D. Cal. Aug. 11, 2017) (entering protective order with AEO provision for Jencks Act materials relating to cooperating witnesses); *United States v. Mejia*, 448 F.3d 436, 454-59 (D.C. Cir. 2006) (affirming protective order restricting defense review of classified documents); *Bisong*, 645 F.3d at 397 (finding no prejudice where defendant's "retained counsel and AFPD had access to the seized records and discovery materials," even if "arrangements for [the defendant] to have personal access prior to trial did not work out to the full extent ordered by the district court"); *United States v. Youker*, 2015 WL 13864169, at *2 (E.D. Wash. Apr. 30, 2015) (finding that pro se defendant was not entitled to "possession of all discovery materials in pretrial detention," and "[t]his is especially true given the reasonable solution that the Court has provided by appointing standby counsel"). In doing so, courts have reinforced the principle that reasonable restrictions on access to sensitive materials are consistent with defendants' trial and discovery rights.

## ARGUMENT

### A. Good Cause Exists To Maintain the Protective Order Restrictions

There is good cause to prevent the defendant from personally accessing and reviewing the highly sensitive and proprietary Chainalysis heuristics information at issue. Such a restriction is necessary to prevent inadvertent disclosure of sensitive law enforcement techniques, and to prevent the defendant or others from developing criminal countermeasures to blockchain analysis. *See,*

4

**Appx6895**

*e.g., United States v. McCaughey*, 534 F. Supp. 3d 132, 139 (D.D.C. 2021) (finding good cause for protective order where disclosure could "reveal the sources and methods law-enforcement officials have used, and will continue to use, to investigate other criminal conduct related to the publicly filed charges"); *Diaz-Rojas*, 2016 WL 4718432, at *3-4 (entering protective order where disclosure might allow criminal adversaries "to 'reverse engineer' the training methods and techniques" at issue). The supplemental Chainalysis heuristics information contains granular, non-public information about the behavioral heuristics used to "fingerprint" specific Darknet markets and other illegal services, as well as information about the techniques used by Chainalysis to detect and control for adversarial coinjoin services intended to obfuscate Bitcoin transactions. As in *McCaughey* and *Diaz-Rojas*, there is a significant risk that disclosure would allow the defendant or others to develop specific countermeasures to these sensitive techniques.

The defendant's primary purpose in operating Bitcoin Fog for nearly a decade was to help customers launder their funds in a way that could not be traced by blockchain analysis firms like Chainalysis, or their law enforcement and financial institution compliance customers. The defense's own expert, Dr. Cabanas, has described an "arms race" with the blockchain analysis companies and the individuals trying to evade their tracing capabilities. 6/6/23 Tr. at 124. This is borne out in the defendant's own statements through his alter-ego, Akemashite Omedetou, describing the various features that Bitcoin Fog was implementing specifically to prevent "the authorities" from doing "statistical analysis" or tracing transactions.

As discussed in prior briefing, *see* ECF No. 61, 73, the defendant has devoted extensive attention and study to attempting to evade "statistical analysis" by blockchain analysis firms and "the authorities." This concern is repeated extensively in the defendant's posts to Bitcoin Talk using the moniker Akemashite Omedetou. For example, in a November 8, 2013, post, Akemashite

5

Omedetou posted, "I imagine that by now, someone somewhere has sniffed enough information about fog addresses for being able to tell when a transaction goes in or out of the Fog." The post went on to explain the value of Bitcoin Fog's withdrawal waiting periods, noting, "If someone sees two transactions, in and out of the fog, approximately for the same amount at the same time, there the connection can be made as well." In another post, Akemashite Omedetou cautioned users that they should "never withdraw the same amount as you have deposited" from Bitcoin Fog. As the defendant explained, "If you transfer 1.382 to us, and the next day you withdraw ~1.38 bitcoins to another account, those amounts will be visible in the block chain, and unless there were 10 other people that day that also withdrew just 1.38 bitcoins, the link between your deposit and your withdrawal will be pretty obvious."

On June 30, 2012, Akemashite Omedetou announced that Bitcoin Fog would begin reusing deposit addresses in order to enhance customer anonymity. Akemashite Omedetou explained: "This seems to help obscuring the origin of the bitcoins: even if authorities would find one of your deposit addresses, they won't even be sure that all the deposits to that address were made by you." This is a reference to attempting to prevent law enforcement authorities from using blockchain analysis to trace deposits into Bitcoin Fog and attribute them to a particular user.

The defendant operated a service that was designed to circumvent what the defendant understood to be the "authorities" ability to conduct blockchain analysis. Providing the defendant a highly detailed breakdown of the heuristics used by Chainalysis to cluster Bitcoin Fog and other darknet services would be handing him a roadmap to circumvent this analysis in the future. As the defense's own expert Ms. Still conceded, criminals use mixing services to conceal their illicit activity. *See* 8/22/23 Tr. at 171. Additionally, some illicit actors use CoinJoin implementations in order to evade tracing and attribution by blockchain analysis firms. Revealing the heuristics

6

**Appx6897**

used to detect and cluster mixers, and the techniques used to control for CoinJoin, would jeopardize numerous law enforcement investigations and impact the effectiveness of law enforcement tracing tools. This supports a finding of good cause to restrict the defendant's access to the materials.

## B. The Defendant Is Not Prejudiced by the Protective Order

At the outset, it is important to recognize the *sui generis* nature of the Chainalysis heuristics information at issue here. The heuristics information is not evidence that the government will introduce against the defendant at trial. The heuristics information did not even exist, and it was certainly not in the prosecution team's possession, before Chainalysis compiled it for purposes of this litigation—and thus it falls outside the scope of ordinary criminal discovery under Rule 16(a)(1)(E), let alone *Brady* or *Giglio*. The heuristics information was not consulted or relied upon by any of the government's experts in forming their opinions—and thus it falls outside the scope of expert disclosure and discovery under Rule 16(a)(1)(G). Instead, the heuristics information was compiled and voluntarily disclosed by Chainalysis to the defense, prompted by an overbroad Rule 17(c) subpoena, for the sole purpose of assisting the defense expert and defense team in vigorously cross-examining the government's blockchain experts. Under such unique circumstances, the government is unaware of *any* legal authority supporting any claimed "right" by the defendant to personally review the sensitive heuristics information. *See Mejia*, 448 F.3d at 458 (finding no Fifth or Sixth Amendment right by defendant *or even defense counsel* to review classified material that did not qualify as *Brady*).

Further, there is no prejudice to the defendant in precluding him from personally reviewing Chainalysis' sensitive, proprietary heuristics information. While it is true that a protective order may not be so restrictive as to deny "an accused's constitutional right to the effective assistance of counsel in criminal prosecutions," *United States v. Torres*, 2020 WL 4500046, at *4 (D.N.J. Aug.

5, 2020), the defendant has been and will continue to be a full partner in assisting his attorneys even without the additional, highly technical information provided in the supplemental heuristics information.  *See id.* at *6 (finding no prejudice from protective order which provided "a reasonable layer of security for the victims without unduly burdening or hampering Defendant's counsel").  The defendant has been able to review prior discovery productions, consistent with the terms of the Protective Order in this case, read the government's expert reports, and participate in extensive *Daubert* hearings regarding clustering and blockchain analysis.  Indeed, the defendant has competent and zealous defense counsel who will be reviewing the materials to hone their cross-examination of the government's blockchain experts and to inform their arguments about the efficacy of the Chainalysis heuristics.

Here, as in *Diaz-Rojas*, the "technical nature of the information" further weighs against the defendant's need for personal access.  2016 WL 4718432, at *4.  The defendant has never before seen the sensitive heuristics information at issue and can offer no personal insight or contextual information about it to his attorneys —unlike virtually all of the other evidence in this case, such as the defendant's email communications, or translations of the defendant's handwritten or electronic notes, or even records of the defendant's personal transactions on Mt. Gox and other cryptocurrency platforms.  The defendant is presumably not intending to take the stand to testify about his own expert assessment of the heuristics—as doing so would be tantamount to a concession that he did, in fact, operate Bitcoin Fog and thus does have an expert-level knowledge of clustering heuristics.  There is no prejudice to the defendant in limiting his personal review of this narrow, highly technical sliver of the massive volume of discovery in this case.

CONCLUSION

Good cause exists to restrict the defendant from reviewing the sensitive Chainalysis heuristics information. The defendant is not prejudiced by not being permitted to review the materials himself.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:   /s/ Christopher B. Brown
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

/s/ C. Alden Pelker
/s/ Jeffrey Pearlman
C. Alden Pelker, Maryland Bar
Jeff Pearlman, D.C. Bar No. 466901
Trial Attorneys, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007 (Pelker)
(202) 579-6543 (Pearlman)
Catherine.Pelker@usdoj.gov
Jeffrey.Pearlman2@usdoj.gov

Appx6900

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

Plaintiff,

v.

ROMAN STERLINGOV

Defendant.

No. 21-cr-399 (RDM)

**DEFENDANT'S OPPOSITION TO GOVERNMENT'S RESPONSE TO
SEPTEMBER 18, 2023, MINUTE ORDER REGARDING DEFENDANT'S
ACCESS TO SENSITIVE HEURISTICS INFORMATION PROVIDED BY
CHAINALYSIS**

The Government seeks to ban Defendant Mr. Sterlingov from personally reviewing

specific, produced, novel material evidence in the Government's case against him. This specific

produced material evidence purportedly addresses the alleged accuracy of the Chainalysis

Reactor software central to the Government's money laundering case. However, because of

intellectual property and proprietary concerns raised by the Government and Chainalysis, none

of the Defense's experts are willing to review this produced specific material evidence out of fear

of future intellectual property and trade secrets litigation being brought by Chainalysis, Inc. This

leaves Mr. Sterlingov's attorneys as the only ones currently able to review this specific,

produced, novel material evidence ("the evidence").

1

**Appx6901**

This ban on Mr. Sterlingov's personal review of the evidence directly relevant to a core issue in this case – the inaccuracy of Chainalysis Reactor software and its lack of scientific validity – violates Mr. Sterlingov's Fifth Amendment due process rights, particularly his right to put on a complete defense, and his Sixth Amendment rights to effective assistance of counsel and to confront his accusers.

Throughout these proceedings, Mr. Sterlingov has been treated as if he is presumptively guilty, rather than as presumptively innocent. Here, the Government's presumption of guilt comes into play when it argues that Mr. Sterlingov should be prohibited from reviewing the Government's secret surveillance heuristics because Mr. Sterlingov might use this knowledge to thwart future law enforcement efforts. This is arbitrary, the reverse of what the Constitution requires, and thwarts Mr. Sterlingov's right to put on a complete defense. It presumes his attorneys are qualified to review this novel, technical evidence, and that his review is unnecessary as it would add nothing to the analysis. This is arbitrary because it denies the obvious fact that a review and full discussion of the specific produced material evidence between Mr. Sterlingov and his attorneys will be more cogent, fulsome, and efficient if everyone has reviewed the material. The only reason the Government seeks to forbid Mr. Sterlingov access to the evidence is to prevent him from gaining full knowledge of it, but without full knowledge of the evidence, Mr. Sterlingov cannot meaningfully and effectively participate in his own defense.

To the extent that any of the sparse and factually disanalogous case law cited by the Government can be read to support such a ban, the Government's position is without merit. As argued below, the ban lacks good cause and prejudices Mr. Sterlingov, assuming that this is the correct standard to apply in this novel arena.

2

**Appx6902**

This Court should permit Mr. Sterlingov to review the produced specific, produced, novel material evidence related to Chainalysis Reactor's inaccuracies.

## Argument

The main issue here is whether the Court can forbid a federal criminal defendant from reviewing specific, produced, novel material evidence directly relevant to his case. Outside of the national security or witness protection context, none of the cases cited by the Government endorse the outright ban of a defendant's ability to personally review evidence. The case law on whether a federal court can ban a defendant from personally reviewing specific material evidence is sparse, inconclusive, and undeveloped when it comes to the issues at play in this novel case. Many of the cases the Government cites are unpublished or involve *pro se* defendants and dissimilar fact patterns unlike Mr. Sterlingov's.

The issues here, like many in this unique and novel case, involve matters of first impression that have not been thoroughly litigated in a credibly analogous manner by other courts. The evidence that Mr. Sterlingov seeks to personally review – if the self-interested claims of market-oriented, for-profit, black-box, surveillance vendor Chainalysis, Inc. are to be believed - goes to the purported accuracy of the novel, untested, nature of the highly hyped and heavily marketed Chainalysis Reactor software. None of the cases cited by the Government have the type of fact pattern that we find here:  a novel, untested software facing its first *Daubert* challenge and first real test of any significance.

The evidence at issue here goes to whether Chainalysis Reactor is accurate. It is unique and not redundant. The Government's position presumes the accuracy of Chainalysis's tracing and conveniently uses that presumption to prevent Mr. Sterlingov from personally reviewing the material necessary to assess that presumption. The circularity is Kafkaesque. And the

Government has created this situation by voluntarily choosing to use a private vendor rather than conducting this investigation in-house through the FBI.

The evidence the Government seeks to deny Mr. Sterlingov from personally reviewing was produced by order of the Court after the recent *Daubert* hearings established that Chainalysis has done no internal error rate analysis, cannot state the statistical error rate for its software, and cannot state Chainalysis Reactor's rates of false positives or rates of false negatives.[1] Nor can Chainalysis or the Government point to a single scientific, peer-reviewed paper attesting to the accuracy of its software. Yet, the Government argues that Mr. Sterlingov cannot personally review the purportedly sensitive, granular heuristic disclosure from Chainalysis because it will reveal secret law enforcement surveillance technology, thereby somehow allowing criminals to evade detection. But this assumes that the software works as advertised, which is the very question that Mr. Sterlingov seeks to answer. The Government does not deny; indeed, it asserts, that Mr. Sterlingov has the requisite skills to review the purportedly sensitive heuristics. This is the basis of the Government's criminal paranoia.

The Government's expressed concern is that Mr. Sterlingov will use the evidence for nefarious purposes. But this presumes guilt rather than innocence and is an unconstitutional reversal of the pretrial presumption of innocence. Under this arbitrary standard a court could preclude any defendant from reviewing any evidence simply because they've been indicted.

Moreover, the Government's feverish concern with the exposure of hyped, heavily-marketed, black-box blockchain surveillance software highlights the fact that Chainalysis is essentially a government agent and that the specific material evidence in question is *Brady* material.

---

[1] *See* Transcripts from *Daubert* hearings on June 23, 2023.

## A. Chainalysis' Heuristics are *Brady* Material

The Government mistakes the issue in arguing that there is no general constitutional right to discovery in a federal criminal case. That is not the issue here. First, the discovery at issue is specific, novel, material and has been produced in response to this Court's order. Second, the relevant question is whether Mr. Sterlingov, a defendant the Government accuses of having the requisite skills, and who has time to review the produced evidence, can constitutionally be prohibited from reviewing it. Third, the produced purportedly sensitive heuristics (if the self-serving statements of the Government and Chainalysis are credible) constitute *Brady* material because Chainalysis is effectively an agent of the United States Government, and the heuristics are arguably exculpatory. The material in question was produced as a direct result of the Defense bringing into the record the lack of any scientific, peer-reviewed papers attesting to the accuracy of Chainalysis Reactor, the lack of any information on its false positive rates or false negative rates, and the fact that it has never been subject to an independent audit or any type of model validation. As *Brady* material, Mr. Sterlingov has a Fifth Amendment right to personally review Chainalysis's recently produced heuristics because the Fifth and Sixth Amendments require it, he is prejudiced without this personal review, and no good cause exists justifying preventing him from reviewing it.

While there is no case that says a defendant has a constitutional right to personally review *Brady* evidence, this is a novel case. *Brady* evidence requires heightened constitutional scrutiny as it goes directly to a defendant's liberty interest. The fact that the purported sensitive heuristics are arguably *Brady* material goes to the core of the Government's money laundering accusations against Mr. Sterlingov. This is no ancillary affair. The Government and its for-profit agent,

5

**Appx6905**

Chainalysis, use their clustering heuristics to make attributions between alleged illicit deep-web markets and the Bitcoin Fog mixer. Evidence showing its inaccuracy is exculpatory.

### i.   The Prohibition on Review Prejudices Mr. Sterlingov

This Court's protective orders have effectively prevented Mr. Sterlingov's expert witnesses, specifically Ciphertrace, from reviewing the purportedly sensitive heuristics because of the concern of future intellectual property litigation as discussed at the recent pretrial hearings. Mr. Sterlingov's defense attorneys do not have the technical skills to effectively review the material, and even if they did, it would still require extensive discussion with Mr. Sterlingov. In essence, a prohibition on Mr. Sterlingov's review and discussion of the evidence at issue here with his attorneys denies him his Fifth Amendment right to put on a complete defense, on top of denying him his Sixth Amendment rights to effective assistance of counsel and to confront his accusers.

### ii.   No Good Cause Exists to Prevent Mr. Sterlingov from Reviewing the Specific Material Evidence

To the extent that good cause can be said to govern the ability of a court to entirely prevent a defendant from personally reviewing specific material evidence, something that is not clear from the case law, the Government fails to meet this burden. Good cause may be based upon "the safety of witnesses and others, a particular danger of perjury or witness intimidation, the protection of information vital to the national security, and the protection of business enterprises from economic reprisals."[2]

First, the Government does not allege any perjury or witness safety concerns here because there are none. Their only witnesses are expert witnesses and co-operating criminal witnesses who have no personal knowledge of Mr. Sterlingov. All of their witnesses, during all

---

[2] Fed. R. Crim. P. 16 Advisory Committee's Notes to 1966 Amendment.

relevant times, were thousands of miles away from Mr. Sterlingov until his arrest, and never interacted with him. There is no corroborating evidence for the Government's wild and speculative claims in this Orwellian prosecution gone awry. This is why the Government is so desperate in its uncorroborated claims that Mr. Sterlingov is Akemashite Omedetou, the pseudonymous alleged founder of Bitcoin Fog who posts on the Bitcoin Talk forum. Yet, even after eight years of intensive investigation, this attribution lacks foundation, is entirely speculative, and isn't one that any of their experts endorse.

Tellingly, Ms. Mazars de Mazarin's Government expert report and *Daubert* hearing testimony contradict the Government's assertion that Mr. Sterlingov is Akemashite Omedetou. Ms. Mazars de Mazarin extensively reviewed the evidence in this case and nowhere concludes that Mr. Sterlingov is Akemashite Omedetou. This is particularly relevant because Ms. Mazars de Mazarin's expert report is on alleged IP address overlaps between email addresses found in the discovery. Ms. Mazars de Mazarin's report groups the shormint@hotmail.com email address that was used to register Akemashite Omedetou's Bitcoin Talk forum account separately from what the report alleges to be a group of Mr. Sterlingov's accounts.[3] Moreover, on cross-examination at her *Daubert* hearing, Ms. Mazars de Mazarin admitted that none of her expert report was based on review of native server log files, raising serious foundational issues as to the validity of an IP address analysis done without native server logs. Furthermore, Mr. Scholl's Government expert report does not identify Mr. Sterlingov as Akemashite Omedetou. Nor does Chainalysis expert Ms. Bisbee make that identification either. Again, Mr. Sterlingov is presumed innocent until proven guilty and the Government, in its usual fashion, reverses this constitutional standard to

---

[3] Expert Report, Ms. Mazars de Mazarin at 7; *see also* Expert Report, Mr. Scholl at 39, 55, and 64.

argue that because Mr. Sterlingov is guilty before any trial, he cannot be trusted to review their secret surveillance software.

Second, there is no allegation that any of the specific material evidence is information vital to the national security interests of the United States. Indeed, it is quite possible, given the lack of scientific evidence and independent validation of Chainalysis Reactor's accuracy, that the software itself is a risk to the national security of the United States because its misattributions leave the real guilty parties free, to say nothing of the possibility that Chainalysis provides the Government with faulty intelligence.

Third, Mr. Sterlingov is not, nor was he ever, in any position to engage in economic reprisals against Chainalysis. Any alleged threat on this front is speculative and arbitrary. There is no evidence in the record that Mr. Sterlingov ever competed against Chainalysis, Inc., just like there is zero evidence in the record of Mr. Sterlingov ever administering or operating Bitcoin Fog. Again, the Defense objects on Fifth Amendment due process grounds to the unconstitutional elevation of intellectual property interests over a federal criminal defendant's liberty interests. Profits pervert justice. Mr. Sterlingov is not a competitor of Chainalysis in the marketplace and there is no risk of an economic reprisal should Mr. Sterlingov be afforded his constitutional right to personally review the proprietary black-box surveillance heuristic evidence at issue here.

### B. Whether the Government Intends to Use the Evidence is Irrelevant

Whether or not the Government is intending to use the evidence at issue here at trial is irrelevant to Mr. Sterlingov's constitutional right to put on a complete defense. Mr. Sterlingov has a constitutional right to review and use the evidence in defense of his liberty. The Government's choices should not dictate how the Defense can mount its case. Unfortunately, that is what has been happening here. Proprietary and intellectual property interests have been used to

8

effectively preclude the Defense's own choice of experts and its choice of expert review software because of deference to Chainalysis Inc.'s proprietary interests over Mr. Sterlingov's liberty interests. A rationale that precludes a Defendant from reviewing material evidence solely because the Government chooses not to use it in their case-in-chief is not only irrational, it violates due process by allowing the Government to unilaterally dictate what evidence the Defense can review and use based on the Government's choice as to whether to use that evidence or not.

## Conclusion

This Court should allow Mr. Sterlingov to personally review the produced, specific, novel material heuristic evidence going directly to the issue of Chainalysis Reactor's inaccuracy.

9

**Appx6909**

Dated: September 29, 2023
Brooklyn, New York

Respectfully submitted,


/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com


*Counsel for Defendant Roman Sterlingov*

10

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September 2023, the forgoing document was filed with the Clerk of Court using the CM/ECF System, and sent by email to the attorneys for the Government listed below:

s/ Michael Hassard

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

Jeffrey Pearlman
Jeffrey.Pearlman@usdoj.gov

11

Appx6911

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ROMAN STERLINGOV,<br><br>*Defendant.* | Criminal Action No. 21-399 (RDM) |

**MEMORANDUM OPINION AND ORDER**

The question before the Court is whether a supplemental protective order previously entered in this case, Dkt. 196, restricts Defendant Roman Sterlingov from viewing certain materials prepared by the government's expert witness, Chainalysis, for the benefit of the defense and produced in September 2023. To date, only counsel has reviewed that material, which provides further detail regarding the heuristics that a Chainalysis software product called Reactor used to cluster blockchain transactions relevant to the charges currently pending against Sterlingov. Although Chainalysis prepared this material for the benefit of Sterlingov's expert, Jonelle Still of Ciphertrace by Mastercard, she has since indicated that she is unwilling to review the materials—regardless of the terms of any protective order. *See* Dkt. 205 at 1. Apparently, Ciphertrace has plans to develop similar heuristics and is concerned that it could be accused of poaching Chainalysis's intellectual property if one of its employees is granted access to Chainalysis's proprietary heuristics and similar heuristics subsequently appear in Ciphertrace's competing software. *See* Sept. 21, 2023 Hrg. Tr. at 10–13. Sterlingov has failed to request that any other testifying or non-testifying expert receive access to the material and, instead, suggests

(without actually saying) that he personally has the requisite expertise to analyze the material in aid of his own defense. *See generally* Dkt. 207.[1]

As it currently stands, the record lacks information sufficient to permit the Court to determine: (1) whether the government has carried its burden of demonstrating that "good cause" exists to deny Sterlingov access to the detailed heuristic information; (2) whether some portions of the materials at issue raise greater concerns than other portions; and (3) whether Sterlingov is entitled to personal access to the information even if good cause for the limitation otherwise exists because he cannot adequately prepare and present his defense without that access (in other words, whether there is a basis to conclude that, in the unique circumstances present here, Sterlingov's Fifth and Sixth Amendment rights trump or limit Federal Rule of Criminal Procedure 16(d)(1)).

To fill this vacuum, the parties are hereby **ORDERED** to appear for a hearing on November 13, 2023, at 1:30 p.m.

## I.

The Court assumes the parties' familiarity with the relevant factual background and procedural history and offers here only one important point of clarification, which bears at least indirectly on the question presented.

According to the defense, the "Court's protective orders have effectively prevented . . . Sterlingov's expert witnesses, specifically Ciphertrace, from reviewing the purportedly sensitive heuristics because of the concern of future intellectual property litigation," Dkt. 207 at 6, and "[p]roprietary and intellectual property interests have been used to effectively preclude the

---

[1] The parties agreed amongst themselves, and the Court adopted an order that no new testifying experts shall be added in this matter. Sept. 21, 2023 Hrg. Tr. at 39–40.

2

Defense's own choice of experts and its choice of expert review software." *Id.* at 8–9. Neither assertion is correct.

The relevant terms of the protective order at issue evolved over the course of four hearings held between September 13 and September 21, 2023. For clarity, the Court summarizes those (and earlier) proceedings and the various representations made at each. At bottom, the record does not support any suggestion that protective orders have prevented Sterlingov's expert from reviewing the detailed heuristic information. To the contrary, that choice was made by Still and her employer, Ciphertrace—notwithstanding the Court's repeated invitation to the company to propose any reasonable changes to the protective order and repeated efforts to facilitate Still's access. In response to these entreaties, Ciphertrace made clear that its objection was not to the terms of the protective order and, instead, that it would not permit Still (or any other Ciphertrace employee) to review the materials because Ciphertrace is developing a competing product and wants to avoid any risk (no matter how small) that it might someday be accused of misappropriating Chainalysis's intellectual property. Indeed, it adhered to that position even though Still is not employed by Ciphertrace in a technical position, plays no role in product development (and, in fact, during her *Daubert* testimony was unaware of details concerning the heuristics that Ciphertrace itself uses in its own tracing software, *see* Aug. 22, 2023 Hrg. Tr. at 244–47), and even though any Ciphertrace employee who has anything to do with developing new products could be walled off from this case, thereby eliminating any plausible risk of a non-frivolous suit. Sept. 21, 2023 Hrg. Tr. at 10–13.

Early in the life of this case, and long before the heuristic production now at issue, the Court entered a protective order, which permitted defense counsel to disclose materials provided by the government in discovery to Sterlingov and "persons employed to assist in the defense

3

(including experts)," but which (1) precluded the defense team from using those materials except "in connection with the defense of this case," Dkt. 18 at 1 (Protective Order ¶ 1), (2) required that any defense expert sign the required "acknowledgment form" before retaining copies of any of the materials, *id.* (Protective Order ¶ 2), (3) required that any defense expert sign the "acknowledgment form" before even being shown any "sensitive materials," *id.* at 2 (Protective Order ¶ 8), and (4) allowed defense counsel to show "sensitive materials" to Sterlingov but, with certain exceptions explained in the order, did not permit Sterlingov to keep copies of those materials in his possession, *id.* at 3 (Protective Order ¶ 9). The protective order defined "sensitive materials" to include "non-public information about or relating to third parties and potential witnesses." *Id.* at 2 (Protective Order ¶ 7). The "acknowledgment form" required the expert or other third party to attest that she had read the protective order and "agree[d] to abide by its terms;" it required defense counsel to certify that the disclosure to the expert or other third party was "necessary for the purposes of this litigation;" and it required defense counsel to provide the acknowledgment "to the Court for *ex parte* review upon request by the Court or the United States." *Id.* at 5.

Fast forward nearly two years: On September 9, 2023, in response to the defense's requests for access to the Reactor source code, Chainalysis voluntarily prepared and produced to the government a detailed summary of the heuristics used in the Reactor software for purposes of this case. *See* Dkt. 188 at 1. According to the government, much of this information was already available in the discovery provided in the case, and it stresses that the summary was created only in response to the Court's direction that the defense should have comprehensive access to all of the assumptions used in Chainalysis's expert analysis. *See* Sept. 13, 2023 Hrg. Tr. at 39. Because its heuristics are both proprietary and law-enforcement sensitive, Chainalysis requested

4

**Appx6915**

that the Court enter a separate protective order limiting the use and disclosure of the detailed, heuristic information. *See* Dkt. 188.[2]

The government relayed Chainalysis's proposed protective order to the defense. *Id.* On September 11, 2023, defense counsel informed the government that they had objections to the proposed protective order. *Id.* At the time, trial was set to commence in a matter of days, so both the government and Chainalysis urged defense counsel to agree to the terms of the proposed protective order as an intermediate measure to facilitate immediate production of the additional heuristic information. Sept. 13, 2023 Hrg. Tr. at 5. Defense counsel was unwilling to do so. As the Court understands it, at that time, defense counsel's primary objection was that the proposed protective order included a five-year noncompete clause. In their view, that condition posed a difficulty for Still and (implausibly) implicated counsel's own ability to represent new clients in future cases involving the blockchain. *See id.*

In response to those objections, Chainalysis filed two proposed protective orders on the docket: the first was written for an unnamed expert and contained a five-year noncompete clause, and the second was written specifically for Still and omitted the noncompete clause. *See* Dkt. 195. The second proposed protective order provided, among other things, that "[a]ll highly

---

[2] On September 13, the Court denied the defense's request for leave to issue a Rule 17(c) subpoena seeking Chainalysis Reactor's source code, Dkt. 155, because, despite numerous opportunities: (1) the defense remained unable to articulate with any specificity why it needed the code itself; (2) the reasons that the defense did give to support its request were unrelated to source code (and in fact persuasive evidence that the defense did not in fact need access to code); and (3) the defense had failed, despite the Court's instructions, to identify an expert in computer code (a) who was subject to the Court's power to compel compliance with a protective order (or, in the alternative, was not a competitor of, or otherwise adverse to, Chainalysis), and (b) who provided the Court, as directed, with a statement *by the expert* explaining what information the expert hoped to glean from the source code and why that information was necessary to the defense. The defense never complied with these requirements, which the Court explained were, on the facts of this case, necessary to meet the requirements of Rule 17(c). *See* Sept. 13, 2023 Hrg. Tr. at 91–114.

confidential heuristic information may be used by defense counsel and their expert Jonelle Still

solely in connection with the defense of this case, and for no other purpose, and in connection

with no other proceeding, without notice to the government, Chainalysis and further order of this

Court." Dkt. 195-2 at 3–4 (capitalization altered). The Court has since made clear that it sees no

material difference between that second protective order and the protective order that the Court

had entered almost two years earlier. *See* Min. Order (Sept. 21, 2023). "Under either protective

order, it's clear that this information can only be used for the purpose of this case and cannot be

disclosed to anybody else." Sept. 21, 2023 Hrg. Tr. at 13–14.

**A.      The September 13 Hearing**

On September 13, the day before jury selection was set to begin, the parties appeared

before the Court. Defense counsel had still not viewed the heuristic production because of their

continued objections to the proposed protective order. The Court's objective at the September

13 hearing was simple: "Mr. Ekeland, what can I do to get this [material] in your hands as

quickly as possible?" Hrg. Tr. at 6.[3] At the hearing, it was not clear that defense counsel had

actually reviewed the revised proposed protective order from Chainalysis; notably, counsel

continued strenuously to object to a five-year noncompete, prompting the Court to inform him

that the alternative version proposed by Chainalysis no longer included the five-year noncompete

for Still or defense counsel. *See id.* at 10.

---

[3] The Court stated: "I'm giving you every break I possibly can. But you have to [avoid] doing
everything you can possibly [do] to get to a 'no' answer. You have to be looking at how to get to
the 'yes' answer and find ways to actually make this work rather than—quite frankly, it feels at
times that you're more concerned with just having an appellate issue than actually getting what
you need in the case. Every time I try [to] accommodate you in some way, you don't accept that;
and you don't accept the Court's invitations to do things that will actually get you what need.
So, all I'm trying to do right now is get you what you need." *Id.* at 9–10.

6

With that clarification, defense counsel objected that the protective order was too restrictive with respect to the conditions of Still's access and use. Specifically, counsel stated that Still and her "superiors at CipherTrace" were concerned that the protective order would not allow her to "run" the new information "through CipherTrace's software" on Ciphertrace's own computers. *Id.* at 8. That limitation would not work "for [Still and Ciphertrace]," defense counsel argued, "because they need to take the data and use CipherTrace's systems to evaluate the stuff." *Id.* In response, the Court noted that neither defense counsel nor Still had yet seen the materials at issue, making it difficult for them to form any views about whether and how they might use it. *Id.* To that end, the Court entered an order providing that defense counsel "can look at [the production;] that your colleagues from your law firm can look at it; [but] that [you] may not disclose it or discuss . . . the contents of it with anybody else, absent further order of the Court." *Id.* at 12. The Court then recessed to allow defense counsel to review the detailed heuristic production to facilitate a more productive conversation regarding next steps.

The proceedings resumed. With the benefit of both sides having reviewed the heuristic production, the Court heard argument on the protective order proposed to govern Still's review of that information. The Court then entered Chainalysis's second proposed protective order (the one drafted specifically to address the concerns voiced by defense counsel and Still about the noncompete clause), with one further modification made in response to defense counsel's then-most-recent objection. *See* Dkt. 196. The modified version of the protective order allowed Still to seek leave of Court to "run" the Chainalysis data through Ciphertrace computers as needed. *See id.* at 2. Having addressed each of the concerns raised by the defense, it appeared that the matter was settled.

**B.      The September 15 Hearing**

At a hearing two days later, however, defense counsel informed the Court that Still and Ciphertrace remained unwilling to look at the heuristic production.  In defense counsel's words, it would be a "career killer" for Still to review the material, given Ciphertrace's "perception of the threat, whether or not it's real," that it would risk "contempt of court" or suit by Chainalysis if Still were allowed to review the material and Ciphertrace were, someday, to market its own version of Reactor's behavioral heuristic.  Sept. 15, 2023 Hrg. Tr. (Rough at 8).  The Court expressed doubts about the plausibility of that concern, noting that Still had testified at her *Daubert* hearing that she is not employed by Ciphertrace in any technical capacity and, thus, that her review of the heuristic production would not pose a realistic threat to Chainalysis or to Ciphertrace—her review would not, for example, pose the classic risk of, say, a software engineer trying to "unsee" the solution to a problem.  *Id.*

Nonetheless, in yet further effort to assuage Ciphertrace's concerns and to facilitate disclosure, the Court added that Still could "be walled off" from others at Ciphertrace regarding the heuristics; she could review the materials off site; and the Court could "accommodate [Ciphertrace's] concerns and [could] come up with ways in which their risk [would be] extremely minimal." *Id.* at 14; *see also id.* at 8–9.  Despite the Court's best efforts, however, defense counsel represented that Ciphertrace remained unwilling to permit Still to look at the heuristic production. *Id.* at 12 ("From my understanding and I don't want to put words in their mouths, [Ciphertrace] is simply looking at this and saying, we don't even want to take the risk."). At that point, rather than continuing to play a game of telephone, the Court invited a Ciphertrace representative to address the Court on behalf of the company. *Id.* at 12, 18.  The Court stated: "If that's their bottom line, I think I can provide them with whatever assurances we can and we can

8

**Appx6919**

put measures [in place] to try and minimize that risk, for example, as I said, by having Ms. Still go to Chainalysis and look at [the heuristic production] there." *Id.* at 12. That invitation was first made after lunch on September 15, 2023.

As the hearing progressed, defense counsel kept the Court informed about various unsuccessful efforts to get in touch with a Ciphertrace lawyer through Still, prompting the Court to request that somebody from the company be made available by Zoom at 3:30 p.m. on September 15. *Id.* at 27. By 4:25 p.m., when the Court adjourned for the day, counsel for Ciphertrace had not appeared and had not responded in any way to the Court's invitation.

## C.      The September 18 Hearing

The following Monday, September 18, the parties returned. At the start of the hearing, defense counsel informed the Court that: "[W]e've reached out again to CipherTrace. They don't want to appear. They are counseling Ms. Still not to sign the protective order. It's my understanding that Ms. Still doesn't want to sign the protective order." Sept. 18, 2023 Hrg. Tr. (Rough at 2). The Court responded:

> . . . I think this is ultimately a question between the defense and the defense expert[,] and [if] the defense expert is unwilling to take reasonable steps to look at the evidence, I'm not sure that's the government's problem. I'm not sure it's my problem. And that's up to the defense. They've got an expert who is refusing to look at evidence that the defense requested, knowing that a protective order was going to be a condition of providing that information . . . .
>
> It's a shame that we wasted all our time going through all these steps to get the information for the defense [and] that the defense [expert] is not prepared to look at [it]. That's ultimately, I think, their business. If they're not willing to look at it and . . . [the defense expert] is unwilling to engage with the Court to explain to me what it is they think that needs to change in the protective order to accommodate any concerns, I think that's their problem . . . .

*Id.* at 6–7. The Court was clear that it was prepared, if necessary, to "modify the [protective] order" in order to accommodate Ciphertrace's concerns, but "they won't even engage with me on

9

**Appx6920**

it." *Id.* at 10. Finally, toward the end of the September 18 hearing, which stretched into the afternoon, defense counsel informed the Court that counsel for Ciphertrace had requested permission to appear on Thursday, September 21 to discuss the proposed protective order. *Id.* at 112–13.[4]

On September 20, defense counsel filed on the public docket a notice informing the Court that "[n]either Ciphertrace nor Ms. Still may accept, receive, handle, analyze, or otherwise opine on any of the heuristic date from Chainalysis, Inc., *regardless of the scope of any protective order.*" Dkt. 199 at 1 (emphasis added). The notice further stated that "Ciphertrace and Ms. Still must respectfully decline the Court's invitation to review and opine on proprietary data of a competitor." *Id.* at 2.

**D.     The September 21 Hearing**

On September 21, outside counsel for Ciphertrace, Joseph Jay of Sheppard Mullin, appeared by Zoom. Hrg. Tr. at 3. Defense counsel argued that there was a "substantial due process issue[]" because the government was "attempting to dictate" who "the defense can have for an expert and how the evidence can be reviewed on purely competitive concerns." *Id.* In response, before hearing from Jay, the Court clarified that it was the defense that had filed a notice "saying that [Still] refused *under any circumstances* to look at the disclosures that have been made. It's nothing the government is doing." *Id.* (emphasis added).

The Court then heard from Jay, who expressed Ciphertrace's concern that the protective order adopted by the Court on September 13, Dkt. 196, refers to the heuristic production as proprietary data, which, in his view, risked exposing Ciphertrace to "potential sanction or at least

_____

[4] In the interim, the government had requested permission to reach out to Ciphertrace directly using contact information it had found on the Internet in an effort to facilitate the company's appearance, and the defense consented to that limited form of contact. *Id.* at 74.

10

litigation over potential sanction or future litigation because . . . once you turn that stuff over, sensitive information . . . the horse is out of the barn." *Id.* at 9–10. The Court reiterated its confusion about this argument, given the Court's understanding (which neither defense counsel nor Jay has ever disputed) that "Ms. Still is not involved in *any way* in product development, that she is certainly not a coder, [and that] she's not writing or preparing algorithms."[5] *Id.* at 10 (emphasis added). The Court then proposed a solution.

The Court asked Jay if Ciphertrace would allow Still to review the materials offsite, with the use of a computer that could subsequently be wiped clean, subject to the terms of the original protective order that the Court had entered nearly two years earlier and that Ciphertrace had already agreed to abide by, Dkt. 18. *See* Sept. 21, 2023 Hrg. Tr. at 11–13. "That way you wouldn't have to worry about anyone subsequently claiming that CipherTrace stole Chainalysis's proprietary information, and Chainalysis would be comfortable that its material and information was secure." *Id.* at 13.

Jay indicated that he would have to check with his client, but that he thought that approach would be feasible. *Id.* After a brief recess, Jay reported that he had "preliminarily conferred with [his] client" and that Ciphertrace would "take [the Court] up on the suggestion of a clean room for review of the additional material subject to it being subject to the existing protective order at Docket 18." *Id.* at 40–41. To accommodate Ciphertrace and Chainalysis, the Court stated that it would enter a minute order clarifying that the original protective order, Dkt. 18, and the most recent protective order, Dkt. 196, are materially the same. *Id.* at 43–44. When

---

[5] The Court also notes that Ciphertrace, a sophisticated company owned by Mastercard, could not plausibly have believed before this time that Chainalysis's heuristics were anything but proprietary.

11

the Court broke for lunch, Jay and the government had just begun to discuss the location of a potential clean room in California. *See id.* at 55.

The Court subsequently entered the following minute order:

> This **ORDER** clarifies that the original protective order entered in this case, Dkt. 18, applies to each and every individual who has viewed or will view information provided by Chainalysis; each and every individual must personally sign Attachment A attached to Dkt. 18. The Court further clarifies what it has always understood to be true: Any individual who receives information provided by Chainalysis (1) may not disclose that information to any other person who is not subject to the protective order at Dkt. 18 and who has not also signed Attachment A and (2) may not use that information for any purpose other than in connection with this case. The Court further understands that, at the request of counsel for Ciphertrace and counsel for Chainalysis, the material from Chainalysis that the government first offered to produce to the Defense on September 9 or 10, 2023 will be viewed by Ms. Still (and any other Ciphertrace employee working with her who signs Attachment A and abides by the conditions herein) at a neutral location to be agreed upon by the parties, shall not be removed from that location, and shall not be downloaded on any computers or servers other than those mutually agreed upon by the parties. It is further **ORDERED** that those who have received or will receive access to the Chainalysis material first offered for production by the government on September 9 or 10, 2023 shall not disclose or discuss that information with anyone who is not a signatory to the protective order at Dkt. 196 without prior leave of Court.

Minute Order (Sept. 21, 2023).

To the Court's surprise, however, defense counsel filed a notice the very next day stating that Jay had informed him that, "upon further consultation with his client, Ciphertrace, neither Ms. Still nor Ciphertrace are willing and able to review the latest discovery produced by Chainalysis." Dkt. 205 at 1. With respect to Still and Ciphertrace's review of the detailed heuristic information, that ended the matter.

As this background demonstrates, defense counsel's assertion that the Court's protective orders have prevented Still from reviewing the heuristic production is inaccurate. To the contrary, this Court did everything in its power to accommodate the needs of Still and

12

**Appx6923**

Ciphertrace and to assuage their concerns.  In the face of these efforts, Still and Ciphertrace ultimately concluded that they were unwilling to review the material at issue, and they have made clear to the Court that their refusal is based on their own competitive concerns and not based on the protective order, whatever form it might take.  Their choice not to review the heuristic production is just that—their choice.  The same can be said, moreover, of defense counsel's failure to seek authorization to disclose the detailed heuristic information to any non-testifying expert—that is defense counsel's choice.[6]  Finally, the Court notes that none of this should have come as a surprise to the defense, which sought detailed information relating to the workings of Chainalysis's Reactor without first exploring whether its expert was willing to review that material or making efforts to identify an expert who was willing to do so.[7]

## II.

The defense argues that the most recent protective order, which focuses on the detailed heuristic material should not be construed to prevent disclosure of the materials to Sterlingov himself.  Although less than clear, this argument can be understood in one of two ways—or perhaps both ways:  First, the request might simply reflect the reasonable premise that a defendant in a criminal case should, absent compelling reason, have access to all evidence and related information regarding the case against him.  Second, against the background discussed above, the defense's request might—without saying as much—be premised on the notion that

---

[6] Although the parties have agreed, and the Court has ordered, that it is now too late to designate any new testifying experts, defense counsel has not asked that any of its current testifying experts review the material, nor has defense counsel identified any new, non-testifying expert who might review the material to assist the defense.

[7] Nor can the defense plausibly suggest that no qualified expert would agree to review the material or, if necessary, to comply with a reasonable protective order.  The Court, for example, repeatedly has suggested to counsel (without success) that they might seek the assistance of an academic rather than a competitor of Chainalysis.

Sterlingov is himself an expert on the blockchain and on how blockchain transactions might (or might not) be traced and might, in essence, seek to allow Sterlingov to serve as his own non-testifying expert (in lieu of Still, Ciphertrace, or anyone else).

Provided there is good cause, the law grants district courts broad discretion to fashion protective orders under Federal Rule of Criminal Procedure 16(d)(1), which provides that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." *See United States v. Johnson*, 314 F. Supp. 3d 248, 251 (D.D.C. 2018); *United States v. Cordova*, 806 F.3d 1085, 1090 (D.C. Cir. 2015). The government bears the burden of showing good cause and must do so with specificity. *See Johnson*, 314 F. Supp. 3d at 351. Good cause may be based on the safety of witnesses and others, a particular danger of perjury or witness intimidation, and the protection of information vital to national security. *See Cordova*, 806 F.3d at 1090. The commentary to Rule 16(d) adds that good cause might also include "the protection of business enterprises from economic reprisals." Fed. R. Crim. P. 16 (advisory committee's note to 1966 amendment).

Here, the government argues that good cause exists for two reasons: (1) to prevent inadvertent disclosure of sensitive law enforcement techniques and (2) to prevent the defendant or others from developing criminal countermeasures to blockchain analysis. Dkt. 206 at 4. Sterlingov answers that precluding his "personal review of the evidence directly relevant to a core issue in this case—the inaccuracy of Chainalysis Reactor software and its lack of scientific validity—violates [his] Fifth Amendment due process rights, particularly his right to put on a complete defense, and his Sixth Amendment rights to effective assistance of counsel and to confront his accusers." Dkt. 207 at 2. He adds that his "defense attorneys do not have the technical skills to effectively review the material, and even if they did, it would still require

14

extensive discussion with Mr. Sterlingov." *Id.* at 6. And he further argues that the heuristics constitute *Brady* material and that the government has failed to establish good cause to limit the disclosure of that material. *Id.* at 5–8.

Sterlingov's *Brady* argument is a bit of a red herring, since the materials at issue were prepared by a third-party merely to assist the defense, and it has, in fact, been provided to the defense. Beyond that issue, however, the briefing and factual record before the Court are too sparse to permit the Court to determine whether good cause exists for Rule 16 purposes under the present circumstances and whether, even if it does, Sterlingov is nonetheless entitled under the Fifth and Sixth Amendments to receive access to the detailed heuristics.

Among other things, the government has indicated that there is at least some overlap between the detailed heuristic production and the government's prior disclosures. *See* Sept. 13, 2023 Hrg. Tr. at 60, 84. But because Sterlingov has had access to those prior disclosures, and because it seems likely that some of the more detailed heuristic information will be revealed at trial (if not on direct, then on cross-examination of Elizabeth Bisbee of Chainalysis), it is unclear what harm would result from disclosing the detailed heuristics to Sterlingov now. Similarly, although the government expresses concern about educating Sterlingov (or others with whom he may have contact) about how to evade blockchain tracing, it is not apparent how real this risk is. It is unclear, for example, how the additional detail would make it easier to evade blockchain tracing, how frequently methodologies change (and thus how quickly the information at issue may become outdated)[8]; and it is unclear whether this risk applies to all of the information at

---

[8] All the more so because Bisbee's expert report suggests that at least one of the heuristics at issue, Heuristic 2, was custom-built for Bitcoin Fog. In describing that heuristic, her report states that "[w]allets have distinctive ways of handling fees and change addresses," so Chainalysis is able to "investigate[] a service's particular transaction patterns" and "develop clustering algorithms specific to that service." Gov't's Ex. 20 at 6 (Bisbee Expert Report).

15

issue or only a subset. Nor can the Court discern on the present record whether disclosing the detailed heuristics to Sterlingov would pose a material risk to Chainalysis's proprietary interests, or whether anything short of full disclosure will serve the interests at stake and, if so, whether a limited disclosure will protect the interests of the government and Chainalysis.

Finally, to the extent that Sterlingov maintains that, even if good cause exists under Rule 16, his Fifth and Sixth Amendment rights nonetheless entitle him to access to the detailed heuristic material, he needs better to explain his position. With respect to the governing law, he fails to cite any case law addressing the intersection of Rule 16 and the Constitution; indeed, other than referring, in general, to *Daubert* and *Brady*, he fails to cite a single case in his opposition. And, with respect to the facts, he fails to explain in any detail why he needs access to the detailed heuristics to satisfy due process or his right to counsel. To the extent he maintains that only he can fill the role of a non-testifying expert on the heuristics, for example, he needs to explain why that is the case. The Court appreciates that defense counsel may lack the expertise necessary to understand the detailed heuristics but, presumably, other non-testifying experts (who would be willing to sign a reasonable protective order) are available. To the extent Sterlingov is uniquely situated to assist the defense (and thus to ensure that the trial comports with due process), the Court needs to understand why. If the defense needs to make that showing in an *ex parte* filing, counsel should seek leave to do so.

In short, the government and the defense both raise—or at least allude to—important considerations that weigh on the pending motion. Both, however, need to do more to explain and to support their respective positions.

To provide the parties with the opportunity to address these issues, the Court hereby **ORDERS** the parties to appear for a hearing on November 13, 2023 to address the parties'

16

respective interests.  The parties should be prepared to address the questions posed above and to provide the Court with the technical details necessary to decide whether good cause exists to preclude or to limit disclosure.  To the extent necessary to address these questions, the parties should ensure that technical or other witnesses are available to testify.

A final note:  At the September 21, 2023, hearing, the Court learned that while a Ciphertrace "authorized signatory" had signed the "acknowledgement form" attached to the original protective order, Dkt. 18, no individual at Ciphertrace, including Still, had done so.  Hrg. Tr. at 8.  At that same hearing, Jay informed the Court that Ciphertrace would "have all of the people who have worked on the expert report individually sign the protective order . . . promptly." *Id.* at 42.  That commitment was reaffirmed in a notice filed by defense counsel on September 22, which stated that "Ciphertrace is taking steps to immediately have all persons, including Ms. Still and those who assisted her or reviewed discovery in this matter, to personally sign the acknowledgement to the protective order in this case (Dkt. No. 18) and will promptly provide undersigned counsel with copies of such acknowledgements." Dkt. 205 at 1–2.  To date, the Court has not received any update regarding this issue.

In light of this uncertainty, the Court hereby **ORDERS** that counsel for the defense file *ex parte* with the Court signed acknowledgment forms for all individuals, other than counsel of record, who have, directly or indirectly, (1) received copies of any non-public material disclosed by the government or (2) seen any "sensitive materials" produced by the government on or before November 10, 2023.[9]

_____

[9] Chainalysis has requested that the Court clarify that "both the original protective order and the Heuristic Information Protective Order prohibit any disclosure or use outside of this case of the materials subject to the protective orders." Dkt. 208 at 1.  That is already clear from both protective orders, Dkt. 18; Dkt. 196, and the Minute Order entered on September 21, 2023.  Chainalysis seems particularly concerned with Ciphertrace employees apart from Still reviewing

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  November 4, 2023

---

the heuristic production, Dkt. 208 at 4, but Ciphertrace has already been clear that *no* Ciphertrace employee has been or will be permitted to review that material. *See* Dkt. 205.

Chainalysis also requests that, "if the defendant proposes a new expert to review the materials . . . this individual should not be a Chainalysis competitor and should be bound by the terms of the [original Proposed] Heuristic Information Protective Order at ECF No. 195-1," that is the proposed protective order which contains the five-year noncompete clause. Dkt. 208 at 1. Because the defense has not requested that any other expert receive access to the detailed heuristic information, the Court need not consider that hypothetical concern at this juncture.

18

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, |
| |
| v. |
| |
| ROMAN STERLINGOV, |
| *Defendant.* |

Criminal Action No. 21-399 (RDM)

<u>**MEMORANDUM OPINION AND ORDER**</u>

On November 4, 2023, the Court issued a decision addressing whether the supplemental protective order in this case, Dkt. 196, should be construed to restrict the defendant, Roman Sterlingov, from personally reviewing the covered material. *See* Dkt. 210. As explained in that decision, the supplemental protective order covers the sensitive, supplemental heuristic information that was created by the government's expert (for the benefit of the defense) and provided to the defense in September 2023. *See id.* at 1; Dkt. 196. At the time of the Court's November 4 decision, the Court was unable to determine from the parties' prior briefing: (1) whether the government had met its burden of demonstrating good cause to deny Sterlingov access to that information; (2) whether any such good cause justification extended to the entire sensitive, supplemental production or only to parts of it; and (3) whether Sterlingov was seeking access to the material because he had relevant expertise that might assist his counsel in preparing his defense or whether, instead, he merely sought access as a matter of principle. Dkt. 210 at 2.

Having reviewed the parties' filings, Dkt. 206; Dkt. 207, and having considered their representations at the November 13, 2023 hearing, the Court now finds that the government has carried its burden of showing that good cause exists to restrict Sterlingov from reviewing the

1

**Appx6930**

sensitive, supplemental heuristic information and that the defense has failed to offer any countervailing justification supporting disclosure.

**I.**

Under Federal Rule of Criminal Procedure 16(d)(1), "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d); *see also United States v. Cordova*, 806 F.3d 1085, 1090 (D.C. Cir. 2015); *United States v. Johnson*, 314 F. Supp. 3d 248, 251 (D.D.C. 2018). The government bears the burden of showing good cause and must do so with specificity. *See Johnson*, 314 F. Supp. 3d at 251. Good cause may be based on "the safety of witnesses and others, a particular danger of perjury or witness intimidation, [and] the protection of information vital to national security." *See Cordova*, 806 F.3d at 1090 (alteration in original) (quoting Fed. R. Crim. P. 16, Advisory Committee's Note to 1966 Amendment to Former Subdivision (e)). The Advisory Committee's Notes to the 1966 amendment to Rule 16 also lists, "[a]mong the considerations to be taken into account by the court," "the protection of business enterprises from economic reprisal." Fed. R. Crim. P. 16, Advisory Committee's Note to 1966 Amendment to Former Subdivision (e). "[O]nce a showing of good cause has been made, the court has . . . discretion to fashion an appropriate protective order." *Johnson*, 314 F. Supp. 3d at 251.

Here, good cause exists for limiting access to the sensitive, supplemental heuristic material in the manner that the government proposes. As government counsel persuasively explained at the November 13, 2023 hearing, the material at issue is neither evidence against the defendant nor is it exculpatory evidence. *See* Hrg. Tr. (Rough at 2–3, 16). Instead, the information is best understood as a supplemental expert disclosure. It was provided to the defense, at the Court's urging, to ensure that the defense was fully apprised of the heuristics used

2

**Appx6931**

in Chainalysis's Reactor software, which the government's experts, Luke Scholl and Elizabeth Bisbee, used to cluster certain blockchain transactions at issue in the case. This supplemental expert disclosure did not exist at the time either of the government experts prepared their reports, and the government itself came into possession of the material from Chainalysis only as an intermediary, before passing it along to defense counsel. *See, e.g.*, Dkt. 188 at 1.

The government also explained that the sensitive, supplemental heuristic information provides a more granular account of the behavioral heuristics that Reactor employs than the account previously disclosed to Sterlingov, defense counsel, and an array of defense experts in Bisbee's expert report and appendices. That additional detail includes "exactly how" specific behavioral heuristics are "implemented and weighed," and, significantly, it "includes information about the kickouts"—that is, "what behavior would cause Chainalysis *not* to cluster" a given address. Nov. 13, 2023 Hrg. Tr. (Rough at 7–10) (emphasis added). Armed with this information, those bent on preventing the government (or its expert) from clustering addresses, and thereby identifying their owners and connecting them to potentially illicit transactions, could readily adjust their conduct to evade detection. *Id.* at 10.

By way of analogy, consider criminal enterprises that engage in sophisticated bank robberies. Imagine that the government can identify those enterprises by tracking down shell companies that have engaged in certain behaviors—say, opening a new bank account within $x$ hours of a robbery and making deposits into that account between one and $y$ hours post-robbery and then never again. Imagine further that the government has studied the behavior of particular criminal enterprises and knows that for Enterprise A, "$x$" equals 48 hours and "$y$" equals 12 hours, but that for Enterprise B, "$x$" equals 24 hours and "$y$" equals 6 hours. Armed with details about their behavioral patterns, the government would be able to identify which criminal

3

**Appx6932**

enterprise likely robbed a particular bank. And were that information ever to be made public, both Enterprise A and Enterprise B would be able to evade detection by changing their distinctive behaviors. As the government explains it, the defense—including Sterlingov—has long had access to the general methodology that Chainalysis uses. To continue the analogy, they know that the government pays attention to the timing of account openings and deposit patterns. But what the sensitive, supplemental heuristic information discloses is the precise temporal windows—the $x$ and $y$ values—used for each of the services, and darknet marketplaces, at issue. *See generally id.* at 12–13.

The testimony elicited during the multiple *Daubert* hearings in this case confirm that the sort of cat-and-mouse dynamic described above is far from hypothetical. To take just one example, services like Chainalysis (as well as defense expert, Ciphertrace) rely on the fact that when multiple addresses contribute bitcoin to fund a single transaction, the contributing addresses are likely owned by the same entity. *See* Gov't's Ex. 20 at 6 (Bisbee Expert Report); Aug. 22, 2023 Hrg. Tr. 163 (Still) (testifying that the "co-spend technique is highly reliable and the most-used metric in commercial blockchain analysis tools").[1] That is because, in order to contribute bitcoin to a transaction, an individual must have the private key to the address that originally held the bitcoin in question. *See United States v. Harmon*, 474 F. Supp. 3d 76, 81 (D.D.C. 2020) (explaining that a "sender must sign [a] transaction using a digital signature generated using the sender's private key"). Private keys are like bank account passwords—for

---

[1] This phenomenon is often referred to as the "co-spend" or "common spend" heuristic, and its origins can be traced back to the white paper on bitcoin authored by its pseudonymous inventor. *See* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System*, at 6 (2008), https://bitcoin.org/bitcoin.pdf ("Some linking is still unavoidable with multi-input transactions, *which necessarily reveal that their inputs were owned by the same owner.* The risk is that if the owner of a key is revealed, linking could reveal other transactions that belonged to the same owner." (emphasis added)).

4

**Appx6933**

obvious reasons, account owners are unlikely to share them with strangers. *See id.* "Coinjoin" services, however, permit individuals to contribute bitcoin to each other's transactions, without sharing their private key information with one another, thereby defeating (or at least frustrating) the assumption that when multiple addresses fund a single transaction, they are controlled by one entity. *See* Dkt. 149-1 at 3 (Bisbee Decl.). In response to the advent of coinjoin services, law enforcement clustering products like Chainalysis's Reactor and Ciphertrace's Inspector, in turn, have developed (or have attempted to develop) methods of detecting the presence of coinjoin services. *See id.* ("Chainalysis has controls in place to detect CoinJoin and can skip the CoinJoin co-spends so the addresses are not clustered/associated."); Aug. 23, 2023 Hrg. Tr. 245–47 (Still) (testifying that she would need to speak to Ciphertrace's engineering team before confirming how and if Inspector controls for coinjoins).

In this manner, each disclosure of how the government (or its experts) cluster or track bitcoin transactions ups the ante in the detection-evasion, cat-and-mouse game. Indeed, the government alleges that Bitcoin Fog, a bitcoin mixing service, was itself designed and employed to help bitcoin users avoid clustering and tracing of their on-chain activities. Dkt. 1-1 at 1–2 (Crim. Compl.); *see also Matter of Search of Multiple Email Accounts*, 585 F. Supp. 3d 1, 8 (D.D.C. 2022) (explaining that bitcoin mixers or tumblers employ a method "whereby one user's payment or transaction is jumbled with other payments and transactions to make it harder to detect the owner of the [bitcoin]"); *Harmon*, 474 F. Supp. 3d at 82. Against this backdrop, the Court finds that the government's concern regarding providing Sterlingov, the alleged administrator of Bitcoin Fog, with personal access to the granular behavioral heuristics used by Chainalysis is both valid and substantial.

5

At the November 13, 2023 hearing, the Court inquired whether the granular heuristics in the sensitive, supplemental information remain confidential and in use today, given the speed with which technology develops. *See* Dkt. 210 at 15 ("It is unclear, for example, how the additional detail would make it easier to evade blockchain tracing, how frequently methodologies change (and thus how quickly the information at issue may become outdated) . . . ."). In response, the government assured the Court that these heuristics "are still used for clustering . . . being actively built and tested by Chainalysis now" and that the government is relying on this clustering "in very significant criminal cases and significant national security cases where [the government has] a very important and compelling interest [in] not allow[ing] [the government's] adversaries to . . . contravene those measures." Nov. 13, 2023 Hrg. Tr. (Rough at 10–11). In short, the measures and details at issue are neither inactive nor obsolete.

The Court also inquired whether at least portions of the sensitive, supplemental information might be disclosed without posing a risk to ongoing criminal or national security investigations. In response, government counsel stated:

> Your Honor, we did review in the Court's opinion and order the suggestion that we look at whether there [are] things that may be less sensitive. What we found [is] that really anything that was less sensitive was really in the prior report and if we went through to try and redact out what would be considered active and sensitive, we would essentially . . . be eliminating [from the attachments] the additional columns that were added to this report[,] so it would put [the] defense pretty much back at what the original attachments [to the Bisbee report] were.
>
> And[,] then[,] with the report[] itself, we would—it would look like a series of black boxes without anything really in the way of substantive information that would be of any sort of use to the defendant.

*Id.* (Rough at 12). Defense counsel, who have had access to the sensitive, supplemental material for several weeks now, did not disagree with this assessment or with the government's more

6

**Appx6935**

general representation that disclosure of the information would permit those engaged in illicit bitcoin transactions to evade clustering or tracking.

Rather than take issue with the government's characterization of the sensitive, supplemental information or with the risk that disclosure might undermine ongoing law enforcement and national security activities, the defense argues that the government's request is impermissibly premised on the assumption that Sterlingov is guilty of the crimes with which he is charged (and that, as such, he cannot be trusted to comply with the supplemental protective order, and he has the means and the motive to use the supplemental heuristic information to evade clustering in the future). Dkt. 207 at 2, 7–8. The defense is, of course, correct that every criminal defendant is presumed innocent unless and until the government carries its burden of proof beyond a reasonable doubt. But that does not mean that the Court is required to ignore the government's concerns regarding ongoing criminal and national security investigations. This concept is not novel. Indeed, it is the very premise of the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. III, §§ 1–16, that, at times, it is appropriate to limit a criminal defendant's access to sensitive information that his or her counsel can review, notwithstanding the presumption of innocence. And, although CIPA deals with uniquely sensitive information, it does not stand alone; to the contrary, it is not unusual for courts to limit access to sensitive information to defense counsel alone, barring access by the defendant himself. *E.g.*, *United States v. Byrd*, 2023 WL 2822154, at *1–2 (S.D.N.Y. Apr. 6, 2023); *United States v. Felix-Aracena*, 2022 WL 17352436, at *1–2 (S.D.N.Y Dec. 1, 2022); *United States v. Lambert*, 2020 WL 6257119, at *1–2 (S.D.N.Y. Oct. 23, 2020); *United States v. Diaz-Rojas*, 2016 WL 4718432, at *2–4 (S.D. Cal. Sept. 8, 2016). Finally, the defense ignores the fact that a grand jury has made a finding of probable cause in this case, which, in other contexts, has been deemed sufficient to

7

**Appx6936**

trigger significant, adverse consequences, such as an arrest or temporary loss of employment, *see, e.g.*, *FDIC v. Mallen*, 486 U.S. 230, 241 (1988).

The Court, accordingly, finds (1) that the government has carried its burden of demonstrating good cause for limiting the disclosure of the sensitive, supplemental heuristic information to counsel and qualified experts who are needed to assist counsel and who are prepared to sign a reasonable protective order, and (2) that this good cause extends to the entire sensitive, supplemental production.

## II.

The Court must also consider whether Sterlingov's need for access to the sensitive, supplemental information is sufficient to trump the government's showing of good cause for purposes of Rule 16 or, more significantly, whether denying Sterlingov the requested access would violate his rights under the Fifth or Sixth Amendment to the Constitution.  The facts of this case do not support his request under either Rule 16 or the Constitution.

In its prior decision, the Court raised the question whether Sterlingov was seeking access to the sensitive, supplemental information so that he could actively assist in his own defense or was merely positing that he, like every other criminal defendant, is entitled to have access to any and all information pertaining to the case against him.  Dkt. 210 at 2, 16–17.  At the November 13, 2023 hearing, which was held in part so that counsel could answer just this question, *see id.* at 16, Sterlingov's counsel made clear that he was pressing only the latter contention, *see, e.g.*, Nov. 13, 2023 Hrg. Tr. (Rough at 28).  Counsel made no mention of any special expertise or knowledge that Sterlingov might bring to bear, *id.* ("We're not attributing any secret skills to [Sterlingov]."), and counsel has failed to take the Court up on its invitation to seek leave, if

necessary, to make any such showing in an *ex parte* submission, *see* Dkt. 210 at 16. More specifically, the following exchange occurred at the November 12, 2023 hearing:

> COURT:     That's what I want to drill down on, though. So[,] the point you've just made to me is just as a matter of principle, Mr. Sterlingov should be allowed to examine anything that has a bearing on the accuracy or inaccuracy of the evidence in the case against him. I take that. I will definitely consider that point. Is there anything more than just that sort of [general] notion that as a matter of principle, the defendant in the case ought to have access to anything that might or might not reflect on the accuracy of evidence that's being offered?
>
> COUNSEL:   No, Your Honor. That's been our central point. As we said, it's about the Fifth Amendment and the Sixth Amendment issue.
>
> COURT:     That's helpful for me to understand. I've been raising these issues about whether there are other individuals that you could have to consult with you. If that's not the argument you're making, that's helpful for me to understand.
>
> COUNSEL:   I do want to say that sitting here today, I don't know what—you know, if I am going to use this for impeachment or how I'm going to use it on cross. A lot depends how the direct goes. To the extent that the government is maintaining that it's not important to the defense, we just disagree with that. I think the reasons are obvious.

Nov. 13, 2023 Hrg. Tr. (Rough at 32–33). In short, notwithstanding the Court's observation that, if "Sterlingov is uniquely situated to assist the defense (and thus to ensure that the trial comports with due process)[,] the Court needs to understand why," Dkt. 210 at 16, defense counsel has failed to identify any such justification and, instead, invokes only the general principle that all criminal defendants have the right "to review the evidence against them except[] [in] compelling circumstances," Nov. 13, 2023 Hrg. Tr. (Rough at 21).

Nor can the Court discern any reason why, as a matter of constitutional law, Sterlingov needs access to the highly technical information at issue. As noted above, the information is not evidence that the government intends to offer against Sterlingov, nor did it even exist at the time

9

**Appx6938**

Sterlingov was charged. Rather, the information simply provides more granular detail about the behavioral heuristics (referred to by Chainalysis as "Heuristic 2") used by Reactor to cluster and attribute addresses that, according to the government's experts, show that Bitcoin Fog was used to launder large amounts of cryptocurrency associated with certain darknet sites. Notably, moreover, the parties seem to agree that the information at issue has no bearing on the core question of whether Sterlingov operated Bitcoin Fog. Nov. 13, 2023 Hrg. Tr. (Rough at 23–24, 28). And, even with respect to the question of how many transactions (and thus how much money) traveled from addresses affiliated with darknet sites to Bitcoin Fog, and vice versa, the parties seem to agree that many (although not precisely how many) such transactions occurred. *See id.* (Rough at 31–32). As the Court observed at the hearing—without disagreement from the defense—the defense's own expert, Jonelle Still of Ciphertrace, seemed to concede at her *Daubert* hearing that a substantial portion of Bitcoin Fog's activity involved darknet customers.[2] *Id.* The dispute is only about how big a portion that was.

---

[2] Chainalysis attributed over 900,000 addresses to transactions with Bitcoin Fog and, according to Still, Ciphertrace agrees with respect to almost 400,000 of those addresses. Aug. 22, 2023 Hrg. Tr. 189 (Still). Although the Court will leave this question for the jury, the zone of expert agreement may be even greater than that due to Still's misreading of an appendix provided by Chainalysis that contained a guide for how to parse its data. *Id.* at 185. Moreover, Ciphertrace and Chainalysis's darknet cluster attributions also appear to align with respect to several darknet marketplaces, including Agora (3.5% difference), Sheep (0% difference), Silk Road 2.0 (0% difference), and WelcomeToVideo (1% difference). Dkt. 159-1 at 35 (Still Expert Report). As Still clarified in her testimony at the *Daubert* hearing, the percentage figures in her report are not error rates; rather she used them to quantify how many *more* addresses Chainalysis clustered as compared to Ciphertrace. Aug. 22, 2023 Hrg. Tr. 123–24 (Still). To be sure, the discrepancy rates for other dark market attributions are higher; for example, the discrepancy rate for AlphaBay is 96%, *id.*, but the government explained that the AlphaBay cluster was created in reliance on Heuristic 3, Sept. 7, 2023 Hrg. Tr. 107, which merely refers to information obtained from sources—in the case of AlphaBay "information that was provided by the government following the seizure in that case," *id.*—and thus is unrelated to any on-chain activity or technical process. Indeed, Still testified that, what Chainalysis calls Heuristic 3, Ciphertrace simply calls "direct attribution." Aug. 22, 2023 Hrg. Tr. 150 (Still).

To be sure, it is possible that the magnitude of Bitcoin Fog's transactions with darknet sites might have some bearing on whether the jury believes that the Bitcoin Fog administrator was aware that Bitcoin Fog was being used to launder illicit gains. But the Court has no reason to believe that the more detailed behavioral heuristics described in the sensitive, supplemental information will shed substantially more light on that question than the large quantity of less sensitive expert disclosures already have. Given ample opportunity to show otherwise, the defense simply reverts to *ipse dixit*, asserting: "To the extent the government is maintaining that it's not important to the defense, we just disagree with that" for "reasons [that] are obvious." Nov 13, 2023 Hrg. Tr. (Rough at 33). The Court does not doubt that thorough preparation for trial will include review of this supplemental information, which may (or may not) include detail useful to counsel for cross-examination of the government's experts regarding the magnitude of Bitcoin Fog transactions traceable to the darknet. But, beyond that, the value of the information is far from obvious.

Finally, the Court notes that Sterlingov has long had access to reams of information relating to Chainalysis's efforts to connect hundreds of thousands of darknet bitcoin transactions to Bitcoin Fog. All that is at issue here is the most granular detail regarding the assumptions used in one category of heuristics (Heuristic 2) that Chainalysis employed to draw those connections. It is important that defense counsel (with the assistance of an expert, if necessary) have access to that more detailed information to ensure that no stone is left unturned in preparing Sterlingov's defense. But, as defense counsel conceded after having reviewed the sensitive, supplemental material, he is unsure whether or how he will make use of the information in cross-examining the government's expert, Nov. 13, 2023 Hrg. Tr. (Rough at 33–34), nor has he

11

identified (at the hearing or in any *ex parte* filing) anything in the supplemental material that Sterlingov himself needs to review in order to assist counsel in preparing the defense.

The Court, accordingly, concludes that Sterlingov has failed to identify any reason why he personally needs to review the sensitive, supplemental information, which might overcome the government's showing of good cause.

## CONCLUSION

For the foregoing reasons, the Court finds that good cause exists to restrict defendant Roman Sterlingov from personally reviewing the sensitive, supplemental heuristic information.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  November 30, 2023

12

Appx6941

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | **No. 21-cr-399 (RDM)** |
| v. | |
| ROMAN STERLINGOV | |
| Defendant. | |

## DEFENDANT'S MOTION TO EXCLUDE ANY TESTIMONY ABOUT DEEPWEB MARKETPLACES

Roman Sterlingov, by and through undersigned counsel, moves this Court to enter an Order excluding any evidence about deepweb marketplaces.[1] Almost all the deepweb marketplaces were shut down outside the statute of limitations, their operation is irrelevant to the question of whether Mr. Sterlingov actually operated Bitcoin Fog, their inclusion in evidence – to the extent that they are relevant at all – is far more prejudicial than probative, and the Government has yet to identify a single conspiratorial communication between Mr. Sterlingov and anyone.

### FACTS

Mr. Sterlingov was arrested on April 27, 2021, and has remained in pretrial custody since.

On December 8, 2022, FBI Staff Operations Specialist Luke Scholl produced his expert report to this Court and opposing counsel in anticipation of the hearing on the release of Mr.

---

[1] The Government uses the prejudicial term "Darknet".

Sterlingov's funds and the *Daubert* hearings.[2] In it, Mr. Scholl states the end dates of various deepweb marketplaces that the Government alleges are co-conspirators with Mr. Sterlingov. Almost all of the deepweb marketplaces listed in the Government's Notice of Bill of Particulars (Dkt. 173) were shut down well outside the statute of limitations.

Silk Road was shut down in October 2013.[3]

Silk Road 2.0 was shut down in November 2014.[4]

Agora was shut down in August 2015.[5]

Nucleus was shut down in April 2016.[6]

Abraxas was shut down in November 2015.[7]

Pandora was shut down in December 2013.[8]

Sheep was shut down in December 2013.[9]

BlackBank was shut down in May 2015.[10]

---

[2] Virtual Asset Analysis, United States of America v. Roman Sterlingov, Staff Operations Specialist Luke Scholl, FBI (Dec. 8, 2022) ("Scholl Report") (admitted into evidence at the *Daubert* hearing on June 23, 2023, as Govt. Ex. 2).

[3] *See, e.g.*, Scholl Report, p. 12 ("Silk Road was taken down by law enforcement in October 2013."); *see also*, https://www.ice.gov/news/releases/ross-ulbricht-aka-dread-pirate-roberts-sentenced-life-federal-prison-creating

[4] *See, e.g.*, Scholl Report, p. 13 ("SILK ROAD 2.0 was shut down by law enforcement in November 2014."); *see also*, https://www.reuters.com/article/idUSKBN0IQ1UV/

[5] *See, e.g.*, Scholl Report, p. 14 ("The site's administrators shutdown the platform 2015."); *see also*, https://www.coindesk.com/markets/2015/08/26/dark-market-agora-shuts-down-citing-security-threat/

[6] *See, e.g.*, Scholl Report, p. 14 ("The site went offline in 2016…[the Nucleus] transactions occurred from on or about 12/1/2014 to on or about 4/12/2016"); *see also*, https://www.vice.com/en/article/mg7bgq/dark-web-market-disappears-users-migrate-in-panic-circle-of-life-continues

[7] *See, e.g.*, Scholl Report, p. 15 ("The site shutdown in 2015…[the Abraxas] transactions occurred from on or about 1/29/2015 to on or about 11/6/2015."); *see also*, https://news.bitcoin.com/dormant-144m-in-bitcoin-from-defunct-abraxas-darknet-market-moved-after-years-of-inactivity/

[8] *See, e.g.*, Scholl Report, p. 15-16 ("The site was shut down by law enforcement in 2014…[the Pandora] transactions occurred from on or about 11/30/2013 to on or about 10/30/2014); *see also*, https://www.dailydot.com/crime/pandora-deep-web-marketplace-hacked/

[9] *See, e.g.*, Scholl Report, p. 16 ("The site shut down in 2013…[the Sheep] transactions occurred from on or about 10/9/2013 to on or about 12/1/2013); *see also*, https://thehackernews.com/2013/12/Sheep-Marketplace-scam-Bitcoin-stolen-Silk-Road.html

[10] *See, e.g.*, Scholl Report, p. 16-17 ("The site shutdown in 2015…[Black Bank] transactions occurred from on or about 10/19/2013 to on or about 5/22/2015.")

Evolution was shut down in March 2014.[11]

Only two deepweb marketplaces were briefly in operation at any point in time during the statute of limitations: AlphaBay and Welcome to Video. AlphaBay was shut down in July of 2017. AlphaBay's administrator, and named co-conspirator, Alexandre Cazes was arrested in Thailand on July 5, 2017, and subsequently committed suicide inside a Thai prison several days later.[12] The Government has not produced any communications between Mr. Cazes and Mr. Sterlingov. Nor has the Government produced a single communication between Mr. Sterlingov and any of the alleged co-conspirators listed in its Bill of Particulars.

Welcome to Video, a site that dealt with child pornography, was shut down in May of 2018.[13] According to the Scholl Report, no funds were sent from Bitcoin Fog to Welcome to Video. [14] Mr. Scholl's report claims that between July 25, 2015 and on or about May 25, 2017, roughly $989 worth of Bitcoin went from Bitcoin Fog directly to Welcome to Video, and that during this same period there were indirect transfers worth approximately $846.[15] There is no evidence of any communications between Welcome to Video and Mr. Sterlingov, nor is there any evidence that Mr. Sterlingov possessed, or had anything to do with child pornography.

The Government only lists the names of two alleged operators of deepweb marketplaces – Ross Ulbricht, and Alexandre Cazes. Mr. Ulbricht was sentenced to life in prison without the possibility of parole on May 29, 2015, well outside the statute of limitations. There are no communications between Mr. Sterlingov and Mr. Ulbricht or Mr. Cazes anywhere in the discovery.

---

[11] *See, e.g.,* https://www.wired.com/2015/03/evolution-disappeared-bitcoin-scam-dark-web/
[12] *See, e.g.,* https://www.washingtonpost.com/news/morning-mix/wp/2017/07/18/suspected-alphabay-founder-dies-in-bangkok-jail-while-online-black-market-remains-closed/
[13] *See, e.g.,* Scholl Report, p. 17 ("The site was taken down by international law enforcement in 2018").
[14] *See id,* ("Blockchain analysis did not identify any flow of funds from Welcome to Video to Bitcoin Fog.")
[15] *See id.*

## LEGAL STANDARD

Federal Rule of Evidence 401 states that "Evidence is relevant [only] if: (a) it has any tendency to make a fact more or less probable that it would be without the evidence; and (b) the fact is of consequence in determining the action."

Federal Rule of Evidence 403 states that "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

The statute of limitations for 18 U.S.C § 1956(a)(3)(A), money laundering is five years.[16]

The statute of limitations for 18 U.S.C § 1956(h), money laundering is five years.[17]

The statute of limitations for 18 U.S.C § 1960(a), operating an unlicensed money transmission business is five years.[18]

The statute of limitations for 18 U.S.C § 1956(a)(3)(A), (B), money laundering is five years.[19]

The statute of limitations for 18 U.S.C § 1960(a) & 2, operating an unlicensed money transmission business and aiding and abetting is five years.[20]

The statute of limitations for D.C. Code § 26-1023(C), money transmission without a license, is not explicitly stated in the municipal code, but is at most six years, as it is a felony for which the statute of limitation is not otherwise mentioned.[21]

---

[16] *See* 18 U.S.C. § 3282(a).
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] D.C. Code § 23-113(a)(4).

## ARGUMENT

The Government has not produced any communications between any of the alleged co-conspirators and Mr. Sterlingov. To the extent that evidence related to the co-conspirators listed in the Government's Bill of Particulars is relevant, it is of conditional relevance at best. Before the issue of money laundering through Bitcoin Fog by Mr. Sterlingov becomes relevant, the Government needs to meet its burden of proof on the question of whether Mr. Sterlingov operated Bitcoin Fog at all.

Regardless, given the highly prejudicial nature of all evidence related to the deepweb markets, this Court should exclude all such evidence as more prejudicial than probative under Federal Rule of Evidence 403. This is particularly true of any evidence related to Welcome to Video, to the extent it is relevant at all, as it relates to child pornography. Mr. Sterlingov is not charged with possessing or dealing in child pornography, nor is there any evidence anywhere in the discovery of anything related to it. The Government invokes Welcome to Video to inflame the jury's passions against Mr. Sterlingov by raising the unsupported allegation that he has anything to do with such an abhorrent site.

Despite seizing and analyzing all of Mr. Sterlingov's electronic devices following his arrest, the Government has not identified a single conspiratorial communication between Mr. Sterlingov and anyone. Faced with a lack of evidence, the Government seeks to condemn Mr. Sterlingov through guilt by association with co-conspirators that he never associated with and there is no evidence that he ever associated with.

The Government has not produced any communications identifying the commencement of any alleged conspiracy. Allowing the Government to make these baseless allegations in front

of the jury will unduly prejudice Mr. Sterlingov because of the public perception of these deepweb markets.

## CONCLUSION

For the foregoing reasons, this Court should exclude any testimony about deepweb marketplaces as irrelevant under Federal Rule of Evidence 401, or in the alternative, under Federal Rule of Evidence 403, because any such evidence is far more prejudicial than probative given the Government's complete lack of evidence relating to any conspiratorial agreement, to say nothing of its lack of evidence showing Mr. Sterlingov ever operating Bitcoin Fog.

Dated: February 8th, 2024
Brooklyn, New York

Respectfully submitted,


/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

*Counsel for Defendant Roman Sterlingov*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of February 2024, the forgoing document was filed with the Clerk of Court using the CM/ECF System, and sent by email to the attorneys for the Government listed below:

<u>s/ Michael Hassard</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

Jeffrey Pearlman
Jeffrey.Pearlman@usdoj.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

        Plaintiff,

v.

ROMAN STERLINGOV

        Defendant.

**No. 21-cr-399 (RDM)**

**[PROPOSED] ORDER**

Upon consideration of the Defendant's Motion to Exclude Any Testimony About Deepweb Marketplaces, it is hereby

ORDERED, that all references to deepweb marketplaces are excluded.

Dated this _____ day of February 2024.

_____
HON. RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

Appx6950

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br><br>v.<br><br>ROMAN STERLINGOV,<br><br>*Defendant.* | Criminal Action No. 21-399 (RDM) |

## MEMORANDUM OPINION AND ORDER

Defendant Roman Sterlingov is charged with money laundering conspiracy, money laundering, operating an unlicensed money transmitting business, and money transmission without a license, all in relation to his alleged operation of a bitcoin mixer known as Bitcoin Fog. Dkt. 43 (Superseding Indictment). Both sides have proffered multiple expert witnesses. In June, July, and August 2023, the Court held a series of *Daubert* hearings at which it heard testimony from nearly all of these proposed experts and considered lengthy expert reports, at least one of which was accompanied by a series of large datafiles. *See, e.g.*, Dkt. 224 (June 23, 2023 Hrg. Tr.); Dkt. 228 (Aug. 22, 2023 Hrg. Tr.); Dkt. 229 (Aug. 23, 2023 Hrg. Tr.). In September, the Court heard argument on the admissibility of the proposed experts' testimony. *See* Dkt. 232 (Sept. 7, 2023 Hrg. Tr.); Dkt. 233 (Sept. 8, 2023 Hrg. Tr.); Dkt. 235 (Sept. 15, 2023 Hrg. Tr.); Dkt. 236 (Sept. 18, 2023 Hrg. Tr.). The parties subsequently submitted supplemental briefing concerning a subset of the expert testimony issues, as well as further supporting evidence. Dkt. 191; Dkt. 192; Dkt. 193. The Court has issued multiple rulings from the bench regarding the admissibility of the proposed expert testimony. This opinion provides additional explanation regarding the Court's rejection of defendant's *Daubert* challenge to the reliance by two of the

government's experts, Luke Scholl of the Federal Bureau of Investigations ("FBI") and Elizabeth

Bisbee of Chainalysis Government Solutions ("Chainalysis"), on a software product known as

Chainalysis Reactor ("Reactor").

Although bitcoin transactions are anonymous in the sense that each transaction is

identified only by lengthy sets of numbers and letters representing the sending address(es), the

receiving address(es), and the transaction ID(s), they are, at the same time, public in the sense

that the amount, timing, sending address(es), and receiving address(es) of every transaction is

recorded on the blockchain, which is a decentralized, immutable, public ledger available to

anyone with an interest in looking. As result, bitcoin transactions are both uniquely anonymous

and uniquely public. As explained further below, the public ledger permits law enforcement and

others not only to trace bitcoin moving through specific transactions, but to cluster bitcoin

addresses in a manner that provides a window into otherwise anonymous activity. The most

widely accepted means of clustering relies on a concept referred to as "co-spend," which occurs

when the user on the sending side of the transaction draws on bitcoin held in multiple addresses.

It is possible to associate those multiple sending addresses with a single sender, since the sender

would need the "private key," akin to a password, for each of the sending addresses to effectuate

the transfer. When the process of identifying co-spend transactions is repeated for multiple

transactions, it is possible to build a larger and larger cluster associated with the user or entity in

question.

Given the volume of transactions recorded on the blockchain, investigators frequently

make use of proprietary software like Chainalysis Reactor to cluster bitcoin transactions using

the co-spend and other heuristics. Much of this work could be done manually given enough

time, and as explained below, it is possible to corroborate (or to challenge) the results generated

2

**Appx6952**

by the software for particular clusters with the public blockchain data, a pad of paper, a pencil, and hours of work.[1] Reactor also uses other heuristics based on unique identifiers that Chainalysis has associated with particular services that have in the past or that currently transact on the blockchain.

The defense argues that Scholl and Bisbee's reliance on Reactor fails the *Daubert* test and that the Court should, accordingly, exclude all testimony and evidence based on clustering performed using that software. The defense contends that Reactor is "junk science," which has not been peer reviewed and has no known error rate, and that, as a result, any testimony based on Reactor is not "the product of reliable principles and methods," Fed. R. Evid. 702(c). For the reasons explained below, the Court is unpersuaded. Although the defense is correct that not all of the heuristics used in this case have been subject to "peer review" and that Chainalysis does not gather and record an error rate in a central location, substantial evidence supports the government's submission that the software is highly reliable—and, if anything, conservative—in clustering (and then attributing) bitcoin addresses. The defense, of course, remains free to challenge the accuracy and reliability of Reactor before the jury. But the Court is satisfied that it is "more likely than not" that the evidence and testimony at issue will help the jury to understand the evidence, that it is based on sufficient facts or data and reliable principles and methods, and that Scholl and Bisbee have reliably applied those principles and methods. *See* Fed. R. Evid. 702.

---

[1] In one company's account: "Prior to selecting Reactor as its investigating solution, [the exchange] was doing the work manually, which was particularly challenging for investigating peel chains. With the new Peel Chain Detection feature in Reactor, the team can now automate much of that work with a single click." *Bitstamp Chooses Chainalysis to Supercharge Its Compliance Program*, Chainalysis, https://www.chainalysis.com/customer-story-bitstamp (last visited Feb. 28, 2024).

## I. BACKGROUND

### A.    The Bitcoin Blockchain

Some explanation of the Bitcoin system and the blockchain is necessary to understand how Reactor operates. "Bitcoin is a purely online virtual currency, unbacked by either physical commodities or sovereign obligation," and which, instead, "relies on a combination of cryptographic protection and peer-to-peer protocol for witnessing settlements." Sarah Meiklejohn *et al.*, *A Fistful of Bitcoins: Characterizing Payments Among Men with No Names*, at 1 (October 2013), https://cseweb.ucsd.edu/~smeiklejohn/files/imc13.pdf (hereinafter "Meiklejohn"). Although other cryptocurrencies exist, Bitcoin is the most popular. Each unit of currency on the "Bitcoin" system (referred to with a capital B) is called a "bitcoin" (referred to with a lowercase b). *See United States v. Harmon*, 474 F. Supp. 3d 76, 80–81 (D.D.C. 2020).

The Bitcoin system is a peer-to-peer network "enabling proof and transfer of ownership" of bitcoin "without involving a third-party such as a bank," *id.* at 80, or any other central authority in its transaction. Bitcoin transactions are recorded on a decentralized, immutable, chronological, public ledger, referred to as the "blockchain." In simplified terms, transferring or using bitcoin requires three things: (1) a sending address, (2) a receiving address, and (3) a private encryption key. An address is a "long string of letters and numbers"—usually twenty-five characters or longer—and is similar to a bank account number. *Id.* at 81 (citing *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020)). Every address is associated with a public key, which is derived from a private key. Private keys "are secret, like passwords." *Id.* "[U]sers can use any number of public keys and their activity using one set of public keys is not inherently tied to their activity using another set, or to their real-world identity." Meiklejohn at 2. "[B]ecause each of these transactions references the previous transaction (i.e., in sending

4

**Appx6954**

bitcoins, the current owner must specify where they came from), the transactions form a chain," and "[t]o verify the validity of a bitcoin, a user can check the validity of each of the signatures in this chain." *Id.*

"To transfer bitcoin from one address to another, the sender transmits a message—called a transaction—on the Bitcoin public network, and that transaction is eventually recorded on a blockchain." *Harmon*, 474 F. Supp. 3d at 81. "The transaction must contain: (1) the amount of bitcoin to be transferred; (2) the address to which the bitcoin will be sent [the receiving address]; (3) the address from which the bitcoin is being sent [the sending address]; and (4) the public key associated with the sender and the sending address." *Id.* In order to execute the transaction, "the sender must sign the transaction using a digital signature generated using the sender's private key. Once signed, the transaction is broadcast to the Bitcoin network." *Id.* (internal citations omitted). To verify the transaction, the network confirms that:

> (1) the public key is associated with the address of the sender and (2) the digital signature was produced for this transaction using the sender's private key. After the transaction is verified, the bitcoin being sent becomes associated with the recipient address and its attendant private and public keys. The transaction is also recorded on the blockchain. The recording process is a complex one that involves nodes on the network "bundling up transactions into blocks of aggregated transactions and appending each block to the prior block."

*Id.* at 81–82 (internal citations omitted).

A transaction "generally incurs a 'common fee' or 'miner transaction fee' associated with this verification process." *United States v. Costanzo*, 956 F.3d 1088, 1091 (9th Cir. 2020). "Mining" is the process by which individuals contribute their computing power to solve a complex algorithm that is used to verify and to record payments on the blockchain using computers (referred to as "nodes") operating within the distributed system. In exchange for contributing their computing power, miners receive bitcoin. Once the miner verifies the

5

transaction, "he broadcasts it to his peers, who again broadcast it to their peers." Meiklejohn at 3. Transaction fees can be used to incentivize miners to select or to prioritize certain transactions over others—typically, the higher the transaction fee offered, the more quickly a transaction is confirmed. *See* Eric D. Chason, *How Bitcoin Functions As Property Law*, 49 Seton Hall L. Rev. 129, 162–63 (2018). The final result of this process is that "every node in the network 'has a current, immutable history of all transactions ever logged on the blockchain.'" *Harmon*, 474 F. Supp. 3d at 81–82 (internal citations omitted).

As relevant here, the Bitcoin blockchain records "only the sender's address, the receiver's address, and the amount of Bitcoin transferred," *id.* at 82, along with a unique time stamp used to prevent double spending, Meiklejohn at 2. In this sense, the transaction is pseudonymous—but, at the same time, "all transactions are completely transparent." *Id.* at 1. Every transaction is recorded and publicly available on the ever-growing blockchain ledger. And, even though the "owners of addresses are anonymous," "it is possible to discover the owner of a Bitcoin address by analyzing the blockchain." *Harmon*, 474 F. Supp. 3d at 82 (quoting *Gratkowski*, 964 F.3d at 309). Chainalysis and its peer blockchain analytics companies (including Ciphertrace by Mastercard, Elliptic, and TRM Labs) are in the business of analyzing the Bitcoin blockchain.

## B.    Chainalysis Reactor

Chainalysis Reactor is a software product used to cluster cryptocurrency addresses that are likely controlled by the same entity and to then tie those clusters to particular entities based on information gleaned from other sources, including by conducting test transactions with those entities, researching open sources, and exchanging information with various cryptocurrency exchanges and law enforcement agencies. *See* Bisbee Expert Report at 5. Here, Reactor clustered and attributed to Bitcoin Fog over 900,000 addresses, traced receipt of approximately

6

1,284,251 bitcoin (valued at almost $400 million) to Bitcoin Fog, and traced withdrawals of approximately 1,280,935 bitcoin (valued at a little over $400 million) from Bitcoin Fog. *Id.* at 9. Reactor also clustered and attributed thousands of Bitcoin addresses to eight darknet market sites, including AlphaBay Market, Evolution Market, Agora Market, and Pandora Market, and concluded that "[t]he eight darknet market services sent an aggregate direct amount" of about 80,729 bitcoin (valued at over $27.9 million) to Bitcoin Fog and received over 45,152 bitcoin (valued at over $14.5 million) directly from Bitcoin Fog between October 2013 and July 2017. *Id.* at 27. According to the results generated by Reactor, these same darknet market sites also *indirectly* sent to Bitcoin Fog and *indirectly* received from Bitcoin Fog many thousands of additional bitcoin, valued at many millions of dollars. *Id.*

As explained by Bisbee and reflected in expert reports and discovery provided to the defense, Reactor clusters addresses using three "heuristics." *Id.* at 5. The term "heuristic" has long been used by the cryptography community to describe cryptocurrency clustering techniques. *See, e.g.*, Meiklejohn at 5 ("In this section, we present two heuristics for linking addresses controlled by the same user, with the goal of collapsing the many public keys seen in the block chain into larger entities."). As Bisbee explains, a heuristic is a "computational function that ranks different search algorithms at each branching step based on available information to decide which branch to follow." Bisbee Expert Report at 5 n.2.

Chainalysis uses three types of heuristics. First, it uses the co-spend or common spend heuristic, referred to as "Heuristic 1." This heuristic is based on a unique feature of the blockchain: "A transaction can contain multiple input addresses and multiple output addresses," and "[w]hen a transaction contains multiple inputs addresses, the input addresses are said to be co-spending." Scholl Expert Report at 4. But because each transaction input requires that the

7

sender have access to the private key for each of the corresponding input addresses, it is very

likely that a single person or entity controls each of the input addresses. *See id.* Imagine, for

example, that a virtual wallet holds three bitcoin addresses. The first address contains 1.5

bitcoin, the second address contains 2 bitcoin, and the third address contains 3 bitcoin. If the

owner of the wallet wants to purchase an item that costs 4.5 bitcoin, or transfer that amount to a

different address for any other reason, he would need to fund that transaction with two of his

three addresses. In order to do so, moreover, he would have to enter the private key for each

sending address. Using the co-spend heuristic, it would then be possible to cluster the two co-

spending input addresses together because it is highly unlikely that a user would share his private

keys with others. The following diagram reflects this simplified example of co-spending:



**Figure 1***: Example co-spend depiction. See Gov't Tr. Ex. 307 at 15.*

The co-spend heuristic dates back to the creation of the Bitcoin system in late 2008 and

early 2009. A white paper prepared by the inventor of the Bitcoin system recognized this

weakness in the purported anonymity of the system, observing that "[s]ome linking is . . .

unavoidable with multi-input transactions, which necessarily reveal that their inputs were owned

by the same owner. The risk is that if the owner of a key is revealed, linking could reveal other

8

**Appx6958**

transactions that belonged to the same owner." *See* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System*, at 6 (2008), https://bitcoin.org/bitcoin.pdf. In a 2013 article, Professor Sarah Meiklejohn and her team of researchers from the University of California at San Diego and George Mason University, described the co-spend heuristic as based on "an inherent property of the Bitcoin protocol" and recognized that it had "already been used many times in previous work." Meiklejohn at 5. As her paper explains, the heuristic is "quite safe: the sender in the transaction must know the private signing key belonging to each public key used as an input, so it is unlikely that the collection of public keys [is] controlled by multiple entities (as these entities would need to reveal their private keys to each other)." *Id.* at 6; *see also United States v. 155 Virtual Currency Assets*, 2021 U.S. Dist. LEXIS 69035, at *4 (D.D.C. Apr. 9, 2021) ("[B]ecause users often combine multiple bitcoin addresses and use them together in the same transaction (a 'cluster'), analysis of one transaction might reveal many addresses belonging to a single individual or organization.").

The defense responds that "CoinJoin" services enable different individuals to contribute inputs to a single transaction, thereby defeating the assumption that when multiple addresses fund a single transaction, they are controlled by one entity. But Bisbee attests that Chainalysis has "controls in place to detect CoinJoin" and that it "can skip the CoinJoin co-spends" in its clustering. Dkt. 149-1 at 3 (Bisbee Decl.); *see also* Dkt. 229 at 243 (Aug. 23, 2023 Hrg. Tr.) (Still) (testifying that most blockchain analytics companies are able to identify transactions that occur through Wasabi, one of the most common CoinJoin implementations).

The second heuristic ("Heuristic 2") is based on observing and tracking a particular entity's on-chain behaviors and patterns. The theory underlying Heuristic 2 is that every large-scale participant in the blockchain leaves a digital "fingerprint," which can be discerned by

9

looking at the information publicly available on the blockchain ledger and conducting test transactions with addresses known to belong to the target entity. *See* Dkt. 187 at 2 n.1. Once those behaviors have been identified, an algorithm can be used to cluster the potentially thousands of addresses that engage in transactions that match the pattern. *Id.* at 2–3 n.1 (describing how "rules are customized for each entity" in Heuristic 2 "based on close study of that entity and an understanding of the particular pattern in which the addresses within the cluster interact").

Given the risk that revealing the precise details regarding Heuristic 2 would permit cybercriminals to circumvent detection in ongoing investigations, Chainalysis provided those details to defense counsel pursuant to a protective order, *see* Dkt. 210; Dkt. 213, and the Court will, for present purposes, explain the heuristic only at a more general level, using examples. To begin, the heuristic might look to the address type employed and the behavior of the virtual wallet software used by the entity, especially as it relates to "change" addresses. By way of background, blockchain participants typically "store their private keys securely in a digital wallet, which 'can take the form of software or hardware.'" *Harmon*, 474 F. Supp. 3d at 82 (quoting Shawn Amuial *et al.*, The Blockchain: A Guide for Legal & Business Professionals § 1:9 (2016)). As noted above, the fee charged for mining (*i.e.*, verifying and transmitting a bitcoin transaction) can vary based on the speed (or priority) with which the sending entity seeks to effectuate the transaction. In addition, when the sending entity holds more bitcoin in the sending address than is necessary to complete the transaction, only some of the bitcoin in the sending address are sent to the receiving address, and the remaining amount is sent to what is referred to as the "change" address. (The Bitcoin system does not permit a user to spend only a portion of the bitcoin held in a given sending address, necessitating the creation of a "change"

10

**Appx6960**

address to receive the unspent bitcoin.)  Software wallets, moreover, "have distinctive ways of handling [1] fees and [2] change addresses," permitting Chainalysis to "investigate[] a service's particular transaction patterns" and to "develop clustering algorithms specific to that service." Bisbee Expert Report at 6.  Through repeated observation, Chainalysis can track unique features, such as the "size of the data contained in the transaction" or the "[l]ock time" (which is "a parameter that schedules a minimal time before the blockchain accepts a transaction"). *Id.* at 7; *see also id.* at 9; Dkt. 24 at 106–07 (June 23, 2023 Hrg. Tr.) (Bisbee).

Chainalysis can then use these unique characteristics to identify and to cluster addresses involving the same darknet service.  In one case, for example, a darknet marketplace employed a sliding scale for miner transaction fees such that the fee the marketplace paid varied depending on the size of a transaction—in effect, the service paid more so that the Bitcoin network would record larger transactions more quickly. *See* Andy Greenberg, *Tracers in the Dark: The Global Hunt for the Crime Lords of Cryptocurrency* 170 (2022).  By using this marker, along with many others, Chainalysis was then able to cluster together the addresses controlled by that marketplace. *Id.*  Part of the reason that Heuristic 2 works is that "bigger clusters tend to be more predictable in terms of their behavior" because "the operators of these big clusters use automated scripts in order to form their transactions."  George Kappos *et al.*, *How to Peel a Million: Validating and Expanding Bitcoin Clusters*, arXiV (Cornell University) 1, 11 (2022), https://arxiv.org/abs/2205.13882 (hereinafter "Kappos"); *see* Dkt. 149-2.

Heuristic 2 also employs another technique, first discussed by Professor Meiklejohn, known as "peel chain behavior."  Bisbee Expert Report at 8 (capitalization altered).  As noted above, the Bitcoin system does not permit a user to expend only a portion of the bitcoin held in an address; instead, when the user wants to engage in a transaction requiring fewer than all of the

**Appx6961**

bitcoin in the address, the remainder—or "change"—is sent to a change address, which remains

under the control the original sender.  "A peel chain is a pattern of Bitcoin transactions that

occurs when a wallet receives a relatively large amount of [b]itcoin[,] which it gradually spends

in multiple, sequential transactions."  Scholl Expert Report at 5.  "Typically, each transaction has

one input and two outputs: one output constituting a payment to a separate entity and one output

constituting the 'change' . . . sent to a new Bitcoin address [that] is controlled by the same wallet

as the input address."  *Id.*  This process can repeat itself through a series of transactions, creating

a chain in which "[t]he 'peel' refers to the smaller, spending transaction and the 'chain' refers to

the linked change addresses that continue on."  Bisbee Expert Report at 8.  Although, absent

other information, the peel chain itself will not necessarily reveal which is the "peel," or

payment, and which is the "change" address, Bisbee explains that when Chainalysis "finds the

end of the chain and finds a co-spend with an address that appeared at the beginning of the

chain," it can then "demonstrate[] that the full peel chain is controlled by the same wallet."  *Id.*

In other words, finding an address at the end of a chain that has co-spent with an address at the

beginning of the chain makes clear which addresses are in fact change and which are in fact

payment.  The following diagram offers a simple example of a peel chain:



**Figure 2***:* **Example peel chain depiction.**  *See* **Scholl Expert Report at 6.**

12

The third heuristic used by Chainalysis is the so-called intelligence-based heuristic ("Heuristic 3"), which is not actually a heuristic at all. It refers, instead, to information that Chainalysis has gathered off-chain, from sources such as "data leaks, court documents, Chainalysis data partnerships, exchanges that share their addresses with Chainalysis, and manual merges due to services changing wallets." Bisbee Expert Report at 9. Unlike Heuristics 1 and 2, which analyze the blockchain, this heuristic relies on information obtained from sources unrelated to any on-chain activity or analysis. Indeed, Jonelle Still—an employee of Ciphertrace, who the defense had originally noticed as a testifying expert, *see* Dkt. 243 ("withdrawing the Ciphertrace expert report and not calling Ciphertrace expert Ms. Still as a testifying expert witness")—explained during her *Daubert* hearing that what Chainalysis calls Heuristic 3, Ciphertrace simply calls "direct attribution." Dkt. 228 at 150 (Aug. 22, 2023 Hrg. Tr.) (Still). At any rate, in the instant case, Heuristic 3 was used in a very limited capacity, only (along with Heuristics 1 and 2) to cluster addresses attributed to the darknet marketplace AlphaBay. Dkt. 232 at 107 (Sept. 7, 2023 Hrg. Tr.). The government seized AlphaBay, *see id.*, and Chainalysis reports that it "received Alphabay addresses from a data sharing agreement with the US government," Bisbee Expert Report at 16.[2]

As used by Scholl and Bisbee in this case, Reactor employed each of the three heuristics, but in varying degrees depending on the darknet entity at issue. For the Sheep Market, for

---

[2] Bisbee's original report describes these three heuristics. A subsequent, more detailed explanation of the heuristics used in this case, *see generally* Dkt. 210 (discussing this additional production); Dkt. 213 (same), however, identified a fourth heuristic, *see* Dkt. 234 at 60–61 (Sept. 13, 2023 Hrg. Tr.). The government has represented that the fourth heuristic was not used to generate the Bitcoin Fog cluster and was otherwise so marginal to this case as to have no impact on any of Bisbee's findings as summarized in her report. *Id.* at 61–62. For that reason, the Court will discuss only the three heuristics that were addressed in Bisbee's original expert report and at the *Daubert* hearings.

13

example "[o]ne hundred percent of the clustering . . . was dependent on Heuristic 1," and for Evolution Market and Agora Market, almost all of the clustering (99.86% and 99.43%, respectively) was dependent on Heuristic 1. *Id.* at 25, 18, 19. For other darknet markets, Reactor used Heuristics 1 and 2 in the following percentages: Nucleus Market (55.54% Heuristic 1, 44.46% Heuristic 2), *id.* at 20; Abraxas Market (79.52% Heuristic 1, 20.48% Heuristic 2), *id.* at 22; and Pandora Market (78.49% Heuristic 1, 21.51% Heuristic 2), *id.* at 23. For AlphaBay, Reactor relied on all three heuristics. *Id.* at 16. Finally, for Bitcoin Fog, Reactor relied on Heuristic 1 (50.26%) and Heuristic 2 (49.74%) to cluster addresses. *Id.* at 13.

The question before the Court is whether Chainalysis Reactor, and Scholl and Bisbee's use of that software, passes muster under *Daubert* and Federal Rule of Evidence 702. The defense argues that "the [g]overnment's 'blockchain analysis' is junk science." Dkt. 76 at 3 (capitalization altered); *see also, e.g.*, Dkt. 45 at 8 ("We are asked to trust the [g]overnment's guesses . . . through a convoluted process laden with speculative junk science . . . ."); Dkt. 55 at 5 ("the pervasive error, speculation, and junk science at the heart of the [g]overnment's case"); Dkt. 57 at 9 ("the Government primarily bases its case on . . . junk forensics"); Dkt. 59 at 14 ("It is the Defense's position that the Government's blockchain analysis is junk science . . . ."). More specifically, the defense maintains that because Reactor's heuristics have not been peer reviewed and because Chainalysis does not track its rate of false positives, *see* Dkt. 149-1 at 4 (Bisbee Decl.), any testimony based on Reactor is too unreliable to satisfy the *Daubert* standard, *see, e.g.*, Dkt. 232 at 77 (Sept. 7, 2023 Hrg. Tr.) ("The problem is we have no data set, no scientific data set with which we can measure the reliability and the accuracy of this software."); *see generally id.* at 77–100. For the reasons explained below, the Court is persuaded that it is more likely than not that the evidence at issue is "the product of reliable principles and methods" and that Scholl

14

and Bisbee's testimony will assist the jury in understanding the overwhelming mass of data found on the blockchain. The defense, of course, may question the government's evidence at trial, including the accuracy of the clusters of Bitcoin addresses generated using Reactor, and the jury will ultimately decide whether to credit the government's evidence.

## II. LEGAL STANDARD

A district court has "broad discretion in determining whether to admit or exclude expert testimony." *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010) (internal citation and quotation marks omitted). Federal Rule of Evidence 702 provides that a qualified expert may testify if the "proponent demonstrates to the court that it is more likely than not that:"

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court identified certain factors that can inform the reliability analysis under Rule 702. Those factors include: (1) whether the expert's theory or technique "can be (and has been) tested;" (2) whether it has been "subjected to peer review and publication;" (3) its "known or potential" error rate; and (4) whether it has attracted widespread acceptance within a relevant scientific community. *See id.* at 593–94. But as the Supreme Court explained in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case," *id.* at

15

142. Ultimately, the trial court must assess the reliability of the expert testimony at issue based on "the particular circumstances of the particular case" and should apply, or decline to apply, the specific *Daubert* factors "depending on the nature of the issue." *Id.* at 150 (internal quotation marks omitted).

### III. ANALYSIS

Against this backdrop, it is important to place the government's reliance on Chainalysis Reactor in context. This is not a case in which the government's theory that Sterlingov was the operator of Bitcoin Fog turns exclusively, or even primarily, on Scholl and Bisbee's use of the Reactor software. *See, e.g.,* Dkt. 224 at 120–21 (June 23, 2023 Hrg. Tr.) (Bisbee); Dkt. 222 at 4–5 (defense filing arguing that Reactor is only a small part of the government's case). Rather, in its effort to establish that crucial point, the government relies in substantial part on materials found in Sterlingov's possession when he was arrested, various posts on an online forum called Bitcoin Talk, internet protocol ("IP") analyses showing an individual accessing accounts directly linked to the Bitcoin Fog administrator and accounts directly linked to Sterlingov in close temporal proximity to one another, and traditional blockchain tracing that Scholl performed one Bitcoin address at a time. In the words of the defense, the testimony that will be offered based on the use of the Reactor software constitutes a "minor witness" in the case. Dkt. 222 at 5.

Nor is this a case in which the government relies on a black box, which it has declined to disclose to the defense. The defense has received reams of material explaining how the clustering was done and, at the Court's urging, received a highly confidential, supplemental production that contained additional detail about the specific methods employed as part of Heuristic 2. *See generally* Dkt. 210 (discussing this additional production); Dkt. 213 (same). The defense, moreover, has all of the underlying addresses and data and has had ample

**Appx6966**

opportunity to perform its own tracing to assess the accuracy of the clustering results (or at least a representative sampling of the results) generated by the software. As discussed below, many of the results generated by Reactor have been confirmed by traditional blockchain analysis performed both before and after government witnesses used Reactor. Nothing has kept the defense from performing its own blockchain traces in an effort to refute the results generated using Reactor.

Much of the government's use of the Reactor clustering, moreover, does not involve issues requiring precise line drawing; most notably, Scholl and Bisbee have used the software to gauge the general magnitude of the transactions involving Bitcoin Fog and various darknet sites, like AlphaBay, Evolution, Agora, and Pandora. This is not to say that *Daubert* has no place in the Court's analysis of that clustering; it certainly does. But the question whether the software reliably clusters hundreds of thousands of addresses to gauge the magnitude of illicit activity is very different from the question whether it has correctly identified a single address (or handful of addresses). At least in that context, a handful of errors (if any) among hundreds of thousands of addresses is likely immaterial. *See* Dkt. 234 at 61–62 (Sept. 13, 2023 Hrg. Tr.).

In challenging the government's use of the Reactor software, the defense focuses exclusively on subsection (c) of Rule 702. *See* Fed. R. Evid. 702(c) (whether "the testimony is the product of reliable principles and methods"). The defense does not dispute that the testimony at issue "will help the trier of fact to understand the evidence or to determine a fact in issue;" that "the testimony is based on sufficient facts or data;" or that "the expert's opinion reflects a reliable application of the principles and methods" at issue. Fed. R. Evid. 702(a), (b), and (d). Indeed, when the Court inquired whether the defense wished to raise "any of the other 702 issues," the defense did not clearly raise any. Dkt. 232 at 87 (Sept. 7, 2023 Hrg. Tr.). But even

17

if the defense had launched a broader challenge, the Court would be unpersuaded. The amount of data recorded on the blockchain is staggering, *see* Understanding 460 Million Bitcoin Addresses and Economic Activity, Chainalysis, https://www.chainalysis.com/blog/bitcoin-addresses/ (Dec. 19, 2018) (in 2018, over 460 million addresses were recorded on the blockchain), and no jury could possibly discern whether a particular darknet site, for example, had made significant use of a bitcoin mixer without the use of a tool like Reactor. The "facts or data" that Scholl and Bisbee used, moreover, is plainly sufficient; they are derived from an immutable, public ledger, which is available for all to see. Finally, assuming that Reactor is itself reliable, there is no question that Scholl and Bisbee applied that tool in a reliable manner; they are both very experienced in the use of Reactor.

The defense, instead, maintains that the government's reliance on Reactor fails each of the four *Daubert* factors, which principally concern subsection (c) of Rule 702. Those factors are: (1) "Whether a 'theory or technique . . . can be (and has been) tested;'" (2) "Whether it 'has been subjected to peer review and publication;'" (3) "Whether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation;'" and (4) "Whether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" *Kumho Tire Co.*, 526 U.S. at 149–50 (quoting *Daubert*, 509 U.S. at 592–94) (alterations in original). As explained above, however, these factors are not cut in stone and, indeed, trial courts are required to adapt their inquiry to the unique circumstances of the case at issue. The question posed by Rule 702(c) is whether the testimony is based on "reliable principles and methods," and, in making that assessment, trial courts have substantial "latitude [both] in deciding *how* to test an expert's reliability" and in deciding "*whether or not* that expert's testimony is reliable," *Kumho Tire*, 526 U.S. at 152

18

(emphases added). Here, the Court finds that Reactor easily clears the threshold for reliability, and thus admissibility, set by Rule 702(c) and *Daubert*. *See also* Feb. 22, 2024 AM Trial Tr. at 58–60 (ruling from the bench). The Court is persuaded by the ample corroborating evidence and testimony that Reactor's reliability has been established by a preponderance of the evidence in this case.

**A.**

The testimony that Scholl and Bisbee gave during their respective *Daubert* hearing testimony is both probative and persuasive. Scholl has worked as a cybersecurity specialist with the FBI since 2015 and is currently detailed to the Department of Justice's National Cryptocurrency Enforcement Team, serving as the lead tracing analyst for the group. Dkt. 124-1 at 1. He has used Reactor since 2016 in numerous investigations and, based on this real-world experience, he confirms that it is highly reliable. *See* Scholl Expert Report at 8. Notably, he testified as follows at his *Daubert* hearing:

> A.      . . . Every time we send a subpoena to an exchange to get back account information, we have the opportunity to check [whether] those Bitcoin addresses that belong to this account at this exchange were properly attributed by Chainalysis to the exchange that we subpoenaed.
>
> Q.      So breaking that down a bit more, if you see funds in Chainalysis going to what Chainalysis has clustered and attributed as an exchange, you send the exchange a subpoena for records from that address. Is it your testimony that the response back from the exchange[,] verifying with records from that address that the exchange does control that address[,] . . . validat[es] Chainalysis's clustering?
>
> A.      Yes, ma'am, I believe it is.
>
> Q.      Do you have a—is this something that you and your colleagues do frequently in your blockchain analysis type cases?
>
> A.      Yes, ma'am. We do this every day.
>
> Q.      Do you have a sense of the rough estimate of the volume there?

19

**Appx6969**

> A.   I'd imagine a thousand times a day throughout the FBI; not me personally.

Dkt. 224 at 56 (June 23, 2023 Hrg. Tr.) (Scholl). At trial, Scholl confirmed this testimony, explaining that he could not "recall a time that [he] reviewed a subpoena where [the] Chainalysis attribution wasn't correct." Feb. 23, 2024 Trial Tr. at 16 (Scholl); *see also id.* at 17 (Scholl) ("analyz[ing] all of the subpoena returns that [he] used in [his] analysis for this case and f[inding] no false positives").

Bisbee testified at her *Daubert* hearing that, when she used Chainalysis as a specialist at the Drug Enforcement Agency ("DEA"), her experience was consistent with Scholl's—Chainalysis clustered addresses and those clusters were routinely corroborated through legal process or through evidence recovery. Dkt. 224 at 101–102 (June 23, 2023 Hrg. Tr.) (Bisbee). While working at Chainalysis, moreover, she has verified Chainalysis clustering in a similar manner, only now through feedback she receives from Chainalysis's customers, including large exchanges. *Id.* at 116–18 (Bisbee). She testified as follows:

> Q.   Could you speak, generally, without divulging any sort of sensitive details on a particular case, about instances where Chainalysis Reactor is used and has been found to be reliable[?]
>
> A.   So in all of the investigations that my team supports, we provide investigative reports to our public sector customers. They're then able to leverage that to further their investigations, and we have never, in the last two and a half years I've been with Chainalysis, ever received anything back that says that it was not correct or that it was incorrectly attributed for the information we provided.

20

**Appx6970**

*Id.* at 134 (Bisbee).[3]  Indeed, Bisbee explained that the typical feedback she receives is that

Chainalysis's clustering and attribution is, if anything, *underinclusive*—because the company

takes a "conservative approach" to clustering.  *Id.* at 118 (Bisbee).  She testified that in her work

at the DEA, and now at Chainalysis, spanning hundreds of investigations, with the clustering of

thousands upon thousands of addresses, she is not aware of a *single false positive* encountered by

her or anyone working with her.  *Id.* at 138–39 (Bisbee).

In a sealed supplemental filing, the government offered additional corroboration of

Reactor's reliability.  As that filing explains, a confidential cooperating defendant reviewed a

large number of addresses clustered by Chainalysis and confirmed that 99.9146% had been

correctly clustered and attributed.  *See* Dkt. 193 at 8 & n.1; *cf. In the Matter of Search of*

*Multiple Email Accts.*, 585 F. Supp. 3d 1, 20 (D.D.C. 2022) ("[I]n an unrelated case, [Redacted]

clustering software directed the government to over 50 customers of a darknet child pornography

site.  In each one of the 50 subsequent law enforcement actions, the software's data was

corroborated by statements and search warrant returns from the targets' devices." (alteration in

original)).

Reactor's reliability is further corroborated by the investigation that was conducted in this

case.  First, as Scholl discusses in his report, the FBI and the Internal Revenue Service, Criminal

Investigation ("IRS-CI") conducted sting transactions directly with Bitcoin Fog by accessing

Bitcoin Fog's Tor hidden services address on the darknet and making deposits and withdrawals

there.  Scholl Expert Report at 8–10.  Those undercover transactions led Scholl to attribute, by

---

[3] Although Bisbee testified earlier during the *Daubert* hearing that Chainalysis receives feedback
from clients when they get "false hits," she clarified a few moments later that the feedback
Chainalysis typically receives is that Reactor's clustering was underinclusive. *Id.* at 116–18.
And, as noted above, she also testified that she had never received any feedback indicating that
Reactor's clustering incorrectly had attributed addresses.

**Appx6971**

hand, five Bitcoin addresses to Bitcoin Fog. *Id.* at 11. Chainalysis Reactor correctly had attributed four of the five addresses to the Bitcoin Fog cluster. *Id.* It did not include the fifth address in the Bitcoin Fog cluster because it is deliberately conservative and thus underinclusive; Reactor did, however, cluster an address closely associated with the fifth address as Bitcoin Fog—the address which had sent funds to that fifth address. *Id.* At least as used in this case, the fact that Reactor is conservative—that is, if in doubt, do not include the address—is hardly reason to discount its reliability. To be sure, four addresses is a small subset of the Bitcoin Fog cluster, but Reactor's performance on that subset speaks to its reliability given the random nature with which its accuracy was tested. Reactor correctly attributed four addresses to the Bitcoin Fog cluster, as confirmed by Scholl's hand tracing, out of hundreds of millions Bitcoin addresses. The hand-tracing that Scholl conducted following the FBI and IRS-CI sting transactions, thus, corroborates the clustering by Chainalysis.

In addition, although Reactor was primarily used to link Bitcoin Fog to darknet marketplaces, the government identified 43 transactions which sent funds from 144 unique addresses within the Bitcoin Fog cluster to Sterlingov's accounts. *Id.* at 11; *see* Dkt. 232 at 49 (Sept. 7, 2023 Hrg. Tr.). Reactor clustered the 144 addresses as Bitcoin Fog, and the blockchain analysis tool, TRM Labs, corroborated the attribution for all 144 of those addresses. Scholl Expert Report at 11.

But it is not just the government's evidence that supports Reactor's reliability: The defense itself has provided evidence of Reactor's reliability through (1) the pretrial testimony of Sterlingov himself, and (2) the pretrial testimony of its then-testifying witness, Jonelle Still of Ciphertrace. To start, Sterlingov testified under oath at a pretrial proceeding that the bitcoin in his Kraken account arrived there after being mixed in Bitcoin Fog, thereby conceding "the very thing that the government was trying to prove through its blockchain analysis." Dkt. 116 at 16

22

(Memorandum Opinion). Scholl independently confirmed this, in part through the use of Reactor's clustering. *See* Scholl Expert Report at 8, 21–22, 25–26.

As for Still, she observed in her expert report that her employer, Ciphertrace, "also uses Heuristic 1 Multi-input Clustering as the *primary heuristic* for non-direct attribution." Dkt. 159-1 at 28 (Still Expert Report) (emphasis added). Before the Court, Still testified about the contents of an affidavit she submitted in another case, in which she affirmed that the "co-spend technique is *highly reliable and the most-used metric* in commercial blockchain analysis tools." Dkt. 228 at 163 (Aug. 22, 2023 Hrg. Tr.) (Still) (emphasis added).[4] And, with respect to Heuristic 3, Still testified that Ciphertrace uses its own version of that heuristic but refers to it as "direct attribution," instead of as a heuristic. *Id.* at 150 (Still). Finally, with respect to Heuristic 2, although Still originally opined that the heuristic is "error-prone," Dkt. 159-1 at 8 (Still Expert Report), defense counsel subsequently informed the Court that Ciphertrace is currently developing its own version of Heuristic 2, casting substantial doubt on Still's original view, *see generally* Dkt. 210 (Memorandum Opinion).

Beyond using similar methods, Chainalysis and Ciphertrace also arrived at substantially similar results in important respects. For example, Chainalysis attributed over 900,000 addresses to the Bitcoin Fog cluster, and Still testified that Ciphertrace agreed with respect to ahnost 400,000 of those addresses.[5] Dkt. 228 at 189 (Aug. 22, 2023 Hrg. Tr.) (Still). With respect to

---

[4] Still was reading, at the government's request, from a sworn affidavit she submitted in another case. Dkt. 228 at 158–61 (Aug. 22, 2023 Hrg. Tr.) (Still). Although Still pointed out that the underlying case concerned a different type of cryptocurrency, Ether, on the Ethereum network, *id.* at 161 (Still), the language of the affidavit as read into the record by Still plainly discusses clustering for "cryptocurrency" writ large, not specifically Ether.

[5] Moreover, Still's testimony on cross examination suggests that the Chainalysis and Ciphertrace clusters for Bitcoin Fog are even more similar than Still's report initially indicated. The government elicited on cross examination that Chainalysis had clustered 575,213 addresses into

the 500,000-address delta, however, Still was unable to identify any address or set of addresses that Ciphertrace had determined was *not* Bitcoin Fog and that Chainalysis had mistakenly included in the Bitcoin Fog cluster. *Id.* at 177–79 (Still). In other words, Ciphertrace was unable to identify a single false positive and actually confirmed almost 400,000 of the addresses at issue; the fact that Ciphertrace was even more conservative (or arguably less adroit) in its analysis does not cast doubt on the reliability of Reactor's results. Finally, it is also noteworthy that Ciphertrace and Chainalysis's darknet cluster attributions largely align with respect to several darknet marketplaces, including Agora (3.5% difference), Sheep (0% difference), Silk Road 2.0 (0% difference), and WelcomeToVideo (1% difference). Dkt. 159-1 at 35 (Still Expert Report).[6]

For all of these reasons, the Court concludes by a preponderance of the evidence that—at least as used in this case and as confirmed by the other evidence before the Court, including Sterlingov's own pretrial testimony—Chainalysis Reactor is reliable.[7]

---

the Fog cluster *all based on Heuristic 1*, but Still erroneously believed that figure was just 398,011 because she misread an appendix provided by Chainalysis that contained a guide for how to parse its data. *Id.* at 185 (Still). Still's analysis was off by approximately 200,000 addresses, leading the Court to conclude that the 500,000-address delta between the Chainalysis and Ciphertrace Bitcoin Fog clusters is, in all likelihood, considerably smaller.

[6] As Still clarified in her testimony, the percentage figures in her report are not error rates; rather she used them to quantify how many *more* addresses Chainalysis clustered as compared to Ciphertrace. Dkt. 228 at 123–24 (Aug. 22, 2023 Hrg. Tr.) (Still).

[7] Earlier in the life of this case, there was dispute over the use of the word "deterministic" to describe Reactor; the government and Chainalysis, however, have made clear that Reactor is deterministic in the sense that when Reactor is run on a fixed data set, its algorithm will produce the same results (clusters) every time. *See* Dkt. 149-1 at 3 (Bisbee Decl.). In other words, Reactor performs consistently.

In response to the defense's concerns about Reactor performing consistently, the Court made clear that it believed the defense was "entitled to run the analysis and to make sure you get the same result [as the government] using Reactor." Dkt. 228 at 31 (Aug. 22, 2023 Hrg. Tr.). To

**B.**

The Court's analysis could end there. But, because the defense argues that "Chainalysis

Reactor doesn't meet any of the *Daubert* factors, not one," Dkt. 232 at 91 (Sept. 7, 2023 Hrg.

Tr.), the Court will briefly explain why that is not the case. At the outset, the Court observes,

once again, that the *Daubert* factors "do *not* constitute a definitive checklist or test." *Kumho*

*Tire*, 526 U.S. at 150 (emphasis in original). As the D.C. Circuit recently noted, "the *Daubert*

factors 'may or may not be pertinent in assessing reliability' in specific circumstances." *United*

*States v. Morgan*, 45 F.4th 192, 203 (D.C. Cir. 2022) (internal citation omitted). Instead, the

"reasonable measures of reliability in a particular case is a matter that the law grants the trial

judge broad latitude to determine," *Kumho*, 526 at 152–53; *see also United States v. Straker*, 800

F.3d 570, 631 (D.C. Cir. 2015) (holding that the district court did not abuse its discretion in

denying motion to strike and subsequent motion for a new trial based on admission of fingerprint

expert who did not present testimony of an error rate because the factors "listed in *Daubert* do

not constitute a definitive checklist or test" and because the district court properly took the

reliability of the expert's fingerprint methodology for granted).

---

that end, the Court invited the defense to apply to the Court for funding to seek a Reactor license
or, if more cost-effective, for funding to retain an expert with his or her own Reactor license. *Id.*
at 31–33. At the time, Sterlingov was still proceeding *in forma pauperis* and receiving funding
pursuant to the Criminal Justice Act ("CJA"). *See* Dkt. 118. The Court directed the defense to
"follow [its] instructions promptly and [] find out how much the license is," noting that if it
"need[ed] to authorize a payment . . . [it would] do so." *Id.* at 33; Dkt. 229 at 80 (Aug. 23, 2023
Hrg. Tr.) ("As I've said, if someone just asks me to authorize funding for a license . . . I'm
prepared to do that."). The defense never followed through and applied for CJA funding to
obtain a Reactor license, and subsequently, Sterlingov withdrew his request to proceed *in forma*
*pauperis.* Dkt. 234 at 83 (Sept. 13, 2023 Hrg. Tr.) ("I've already told Mr. Ekeland multiple
times that he can obtain a license or find somebody with a license and run the software. And
although he withdrew from CJA today, before that I already told him that I would approve a CJA
voucher which he never filed with respect to seeking a license for the Reactor software."); *see id.*
at 107–09; *see also* Min. Entry (Sept. 15, 2023).

Starting with the first *Daubert* factor—"whether the theory or technique can be and has been tested," *Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996)—the Court finds that Reactor's clustering can be and has been tested. Clustering, whether conducted by Chainalysis or any other blockchain analytics company, can be replicated by competitor software products and, on a smaller scale, by hand, because the underlying data is publicly available on the blockchain. In this case, for example, Scholl corroborated Reactor's clustering through manual tracing and through TRM Labs' software. *See* Scholl Expert Report at 9–11. Similarly, Still was able to run the same blockchain data through Ciphertrace's competing clustering software and to create a Bitcoin Fog cluster that differed in size from, but also shared meaningful overlap with, Chainalysis's Bitcoin Fog cluster. *See* Dkt. 157 at 2; Dkt. 159-1 at 8 (Still Expert Report); Dkt. 228 at 189 (Aug. 22, 2023 Hrg. Tr.) (Still). That Still reached an overlapping but less expansive result does not negate the fact that she was able to test Reactor's clustering.

Second, with respect to peer review and publication, Chainalysis Reactor has not itself been subject to peer review, but the co-spend heuristic has received widespread academic approval. As discussed above, "Heuristic 1" not only has it its origins in the white paper inventing bitcoin, but it has also been widely discussed and relied upon in academia. *See* Meiklejohn at 6 (recognizing that co-spend "has already been used many times in previous work"). The notion of "peer review" in the context of Heuristic 2, moreover, is an odd fit: As explained, Heuristic 2 varies from case-to-case and entity-to-entity because Chainalysis identifies distinct digital behaviors—or tells—for each darknet market or service for which it is seeking to cluster addresses and then incorporates those features in an algorithm. Bisbee Expert Report at 6. Thus, the fact that the Heuristic 2 algorithms developed for the darknet services at issue in this case have not been the subject of peer review is neither surprising nor dispositive.

As *Daubert* itself made clear "[t]echnical fields need not be held to the standard of peer review applicable to traditional sciences, which are often considered in scholarly journals." *United States v. Frabizio*, 445 F. Supp. 2d 152, 165 (D. Mass. 2006) (citing *Daubert*, 509 U.S. at 593–94); *Daubert*, 509 U.S. at 593 ("Publication (which is but one element of peer review) is not a sine qua non of admissibility; it does not necessarily correlate with reliability."). And, as the D.C. Circuit recently observed, a court may "understandably decline[] to automatically exclude evidence because it is too new, or of too limited outside interest, to generate extensive independent research or peer-reviewed publications." *Morgan*, 45 F.4th at 203 (quotation marks omitted).

The concept of "peer review" is also inapt when it comes to Heuristic 3, which consists of data and information obtained off-chain from, among other things, Chainalysis's clients and partners (which include global cryptocurrency exchanges), government subpoenas, and data leaks. Bisbee Expert Report at 9. To be sure, Professor Meiklejohn and her team have observed that when they engaged in similar practices without the subpoena power (cataloguing addresses that they found on various forum and blog posts), they "regarded this [] kind of tagging as less reliable than our own observed data." Meiklejohn at 4. But a jury is well equipped to decide, through cross examination, whether addresses clustered based on blog posts and data leaks are less reliably de-anonymized than those addresses that are identified through the subpoena power or through exchanges voluntarily sharing user information with Chainalysis. In the decade since Meiklejohn made that observation in 2013, moreover, academic research focused on cryptocurrency, the blockchain, and blockchain analytics has only grown alongside the industry.[8]

---

[8] *See, e.g.*, Kappos at 2 (summarizing noteworthy scholarship on clustering and collecting citations). Chainalysis has shared its data with researchers, *see, e.g., id.*, and Chainalysis's own

27

Finally, the Court notes that, in this case, the government relies on Heuristic 3 only as applied to the AlphaBay cluster and, even there, it was used in combination with Heuristics 1 and 2. Bisbee Expert Report at 16.

With respect to the third *Daubert* factor—"the method's known or potential rate of error," *Ambrosini*, 101 F.3d at 134—Bisbee explained that Chainalysis "has not gathered and recorded in a central location false positives/false negatives because [it] is design[ed] to be more conservative in the clustering of addresses." Dkt. 149-1 at 4 (Bisbee Decl.).[9] The lack of a compiled "error rate" of this sort, however, does not alter the Court's finding that Reactor is reliable. As detailed above, Scholl offered persuasive testimony concerning the lack of false positives in his extensive experience using Reactor and as confirmed by the tracing he performed in this case. Dkt. 224 at 56 (June 23, 2023 Hrg. Tr.) (Scholl); Feb. 23, 2024 Trial Tr. at 16 (Scholl). Likewise, Reactor's clustering was confirmed by clustering conducted using software from TRM Labs. Scholl Expert Report at 11. Even the clustering by Ciphertrace and testified to by Still confirmed much of the work done by Reactor's Heuristic 1. Dkt. 228 at 189 (Aug. 22, 2023 Hrg. Tr.) (Still). Nothing more is required.[10]

---

staff researchers have submitted scholarly articles, both on their own and as part of larger University-led research teams, *see, e.g.*, Daniel Goldsmith *et al.*, *Analyzing Hack Subnetworks in the Bitcoin Transaction Graph*, arXiV (Cornell University) (2019) https://arxiv.org/abs/1910.13415; Alberto Bracci *et al.*, *Macroscopic Properties of Buyer-Seller Networks in Online Marketplaces*, arXiV (Cornell University) (2021) https://arxiv.org/abs/2112.09065; *see also* Dkt. 73 at 14 & n.4.

[9] The error rates identified in the Kappos paper pertain to different heuristics developed by prior researchers between the years of 2013 and 2018, not to Reactor's heuristics. *See* Kappos at 12, 15–16; Dkt. 229 at 257–68 (Aug. 23, 2023 Hrg. Tr.) (Still) (discussing the error rates in the Kappos paper).

[10] Like the governing caselaw, the Committee Notes to the recent amendment to Rule 702 recognize that the known or potential rate of error is not always available. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("In deciding whether to admit forensic expert

28

Finally, with respect to the fourth *Daubert* factor—"whether the theory or technique finds general acceptance in the relevant scientific community," *Ambrosini*, 101 F.3d at 134—the defense offers no response to the evidence that blockchain tracing, like that at issue here, is widely relied upon by both the law enforcement and business communities, *see* Dkt. 232 at 57 (Sept. 7, 2023 Hrg. Tr.) ("[Blockchain analysis] has been used extensively by law enforcement in the United States, by law enforcement all around the world, by private sector, by financial institutions, by consulting firms, by incident response firms, by regulators . . . ."). Chainalysis "in particular is viewed as an industry standard tool and has customers from the Department of the Treasury, the Department of Justice, the Department of Homeland Security, the Department of State, and the Consumer Financial Protection Bureau." Dkt. 73 at 19 (citing Recipient Profile: Chainalysis Inc., USASpending.gov, https://www.usaspending.gov/recipient/93c1b742-3801-7f06-775d-da2c3fff3fd6-C/latest (last visited Feb. 28, 2024)).

With respect to the private sector, major virtual currency exchanges and other financial institutions use blockchain analysis software tools as part of their anti-money laundering programs in order to comply with their regulatory obligations and monitor transactions for suspicious activity. *See* Dkt. 73 at 20–21. As Bisbee testified, large exchanges use a Chainalysis software product called KYT, named for "Know Your Transaction," for compliance purposes. Dkt. 224 at 115–16 (June 23, 2023 Hrg. Tr.) (Bisbee). KYT utilizes the same underlying data as Reactor, and, crucially, exchanges and compliance firms "rely on [Chainalysis' accuracy] in order to have credibility within the ecosystem." *Id.* at 116. This is the sort of widespread industry acceptance that the D.C. Circuit credited in *United States v. Morgan*, 45 F.4th 192 (D.C.

---

testimony, the judge should (*where possible*) receive an estimate of the known or potential rate of error of the methodology employed . . . ." (emphasis added)).

**Appx6979**

Cir. 2022). There, in evaluating the district court's finding that the expert's testimony was "the product of reliable principles and methods," the D.C. Circuit relied in part on the fact that "drive testing technology has been relied upon, tested and reviewed for decades in the multibillion dollar wireless communications industry." 45 F.4th at 202 (citation omitted).

For all of these reasons and based on the extensive testimony and expert reports in this case, the Court is persuaded that blockchain analytics in general, and Reactor in particular, is not junk science. Some of the defense's arguments might (or might not) offer fruitful ground for cross examination before the jury. The Court's role, however, is to act only as a gatekeeper, and, applying a preponderance of the evidence standard, to ensure that the testimony offered for the jury's consideration is "the product of reliable principles and methods," Fed. R. Evid. 702(c). As the Supreme Court has explained, it is not exclusion, but instead "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" that "are the traditional and appropriate means of attacking [arguably] shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Here, the government's blockchain tracing evidence readily clears the hurdle necessary to reach the jury.

Appx6980

## CONCLUSION

As previously explained on the record and further explained above, the Court finds that the government has demonstrated by a preponderance of the evidence that the blockchain analysis generated by Chainalysis Reactor is the product of reliable principles and methods, and the Court, accordingly, **DENIES** defendant's requests to exclude the testimony and evidence based on that analysis, *see* Dkt. 59; Dkt. 72; Dkt. 251.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  February 29, 2024

Appx6981

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> ROMAN STERLINGOV, <br><br> *Defendant.* | Criminal No. 21-399 (RDM) |

**<u>FINAL JURY INSTRUCTIONS</u>**

**[DRAFT]**

1

**PRELIMINARY REMARKS**

The time has now come when all of the evidence is in and you have heard the closing arguments of the lawyers. We're about to enter your final duty in this case, which is to decide the issues of fact and to return a verdict. It is up to me to instruct you on the law, and I ask you to listen carefully, just as you have throughout this trial. Before we talk about the specific charges alleged here and some of the specific issues in the case, however, I want to take a few minutes to talk about some general rules of law. Some of this may repeat what I told you in my preliminary instructions.

2

## FURNISHING THE JURY WITH A COPY OF THE INSTRUCTIONS

To start, I will provide you with a copy of my instructions. During your deliberations, you may, if you want, refer to these instructions. While you may refer to any particular portion of the instructions, you are to consider the instructions as a whole, and you may not follow some and ignore others. If you have any questions about the instructions, you should feel free to send me a note. Please return your instructions to me when your verdict is rendered.

3

## FUNCTION OF THE COURT

My function is to conduct this trial in an orderly, fair, and efficient manner; to rule on questions of law; and to instruct you on the law that applies in this case. It is your duty to accept the law as I instruct you. You should consider all the instructions as a whole. You may not ignore or refuse to follow any of them.

4

**Appx6985**

## FUNCTION OF THE JURY

Your function, as the jury, is to determine what the facts are in this case. You are the sole judges of the facts. While it is my responsibility to decide what is admitted as evidence during the trial, you alone decide what weight, if any, to give to that evidence. You alone decide the credibility or believability of the witnesses.

You should determine the facts without prejudice, fear, sympathy, or favoritism. You should not be improperly influenced by anyone's race, ethnicity, nationality, gender, or any such trait. You must decide the case solely from a fair consideration of the evidence.

You shall not take anything that I may have said or done during trial as indicating how I think you should decide this case. If you believe that I have expressed or indicated any such opinion, you should ignore it. The verdict in this case is your sole and exclusive responsibility.

5

## JURY'S RECOLLECTION CONTROLS

If any reference by me or the attorneys to the evidence is different from your own memory of the evidence, it is your memory that should control during your deliberations.

## NOTETAKING BY JURORS

During the trial, I have permitted all jurors who wanted to do so to take notes. You may take your notebooks with you to the jury room and use them during your deliberations if you wish. As I told you at the beginning of the trial, your notes are only to be an aid to your memory. They are not evidence in the case, and they should not replace your own memory of the evidence. Those jurors who have not taken notes should rely on their own memory of the evidence. The notes are intended to be for the notetaker's own personal use.

## EVIDENCE IN THE CASE

During your deliberations, you may consider only the evidence properly admitted in this trial. The evidence in this case consists of the sworn testimony of the witnesses and the exhibits that were admitted into evidence, and the facts and testimony stipulated to by the parties.

During the trial, you were told that the parties had stipulated—that is, agreed—to certain facts. You should consider any stipulation of fact to be undisputed evidence.

When you consider the evidence, you are permitted to draw, from the facts that you find have been proven, such reasonable inferences as you feel are justified in the light of your experience. You should give any evidence such weight as in your judgment it is fairly entitled to receive.

8

**STATEMENTS OF COUNSEL**

The statements and arguments of the lawyers are not evidence.  They are only intended to assist you in understanding the evidence.  Similarly, the questions of the lawyers are not evidence.

9

**INDICTMENT IS NOT EVIDENCE**

The Indictment is merely the formal way of accusing a person of a crime. You must not consider the Indictment as evidence of any kind—you may not consider it as any evidence of the defendant's guilt or draw any inference of guilt from it.

Appx6991

## BURDEN OF PROOF—PRESUMPTION OF INNOCENCE

Every defendant in a criminal case is presumed to be innocent.  This presumption of innocence remains with the defendant throughout the trial unless and until the government has proven he is guilty beyond a reasonable doubt.  This burden never shifts throughout the trial.  The law does not require the defendant to prove his innocence or to produce any evidence at all.  If you find that the government has proven beyond a reasonable doubt every element of an offense with which the defendant is charged, it is your duty to find him guilty of that offense.  On the other hand, if you find the government has failed to prove any element of a particular offense beyond a reasonable doubt, you must find the defendant not guilty of that offense.

11

**Appx6992**

## REASONABLE DOUBT

The government has the burden of proving the defendant guilty beyond a reasonable doubt. In civil cases, it is only necessary to prove that a fact is more likely true than not, or, in some cases, that its truth is highly probable. This is a criminal case, however, and in criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt. Reasonable doubt, as the name implies, is a doubt based on reason—a doubt for which you have a reason based upon the evidence or lack of evidence in the case. If, after careful, honest, and impartial consideration of all the evidence, you cannot say that you are firmly convinced of the defendant's guilt, then you have a reasonable doubt.

Reasonable doubt is the kind of doubt that would cause a reasonable person, after careful and thoughtful reflection, to hesitate to act in the graver or more important matters in life. However, it is not an imaginary doubt, nor a doubt based on speculation or guesswork; it is a doubt based on reason. The government is not required to prove guilt beyond all doubt or to a mathematical or scientific certainty. Its burden is to prove guilt beyond a reasonable doubt.

12

**Appx6993**

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

There are two types of evidence from which you may determine what the facts are in this case: direct evidence and circumstantial evidence. When a witness, such as an eyewitness, asserts actual knowledge of a fact, that witness's testimony is direct evidence. On the other hand, evidence of facts and circumstances from which reasonable inferences may be drawn is circumstantial evidence.

Let me give you an example. Assume a person looked out a window and saw that snow was falling. If he later testified in court about what he had seen, his testimony would be direct evidence that snow was falling at the time he saw it happen. Assume, however, that he looked out a window and saw no snow on the ground, and then went to sleep and saw snow on the ground after he woke up. His testimony about what he had seen would be circumstantial evidence that it had snowed while he was asleep.

The law says that both direct and circumstantial evidence are acceptable as a means of proving a fact. The law does not favor one form of evidence over another. It is for you to decide how much weight to give to any particular evidence, whether it is direct or circumstantial. You are permitted to give equal weight to both. Circumstantial evidence does not require a greater degree of certainty than direct evidence. In reaching a verdict in this case, you should consider all of the evidence presented, both direct and circumstantial.

13

**Appx6994**

## NATURE OF CHARGES

One of the questions you were asked when we were selecting this jury was whether the nature of the charges themselves would affect your ability to reach a fair and impartial verdict. We asked you that question because you must not allow the nature of a charge to affect your verdict. You must consider only the evidence that has been presented in this case in reaching a fair and impartial verdict.

14

## NUMBER OF WITNESSES

The weight of the evidence is not necessarily determined by the number of witnesses testifying for each side.  Rather, you should consider all the facts and circumstances in evidence to determine which of the witnesses you believe.  You might find that the testimony of a smaller number of witnesses on one side is more believable than the testimony of a greater number of witnesses on the other side or you might find the opposite.

15

## INADMISSIBLE AND STRICKEN EVIDENCE

The lawyers in this case sometimes objected when the other side asked a question, made an argument, or offered evidence that the objecting lawyer believed was not proper. You must not hold such objections against the lawyer who made them or the party she or he represents. It is the lawyers' responsibility to object to evidence that they believe is not admissible.

If, during the course of the trial, I sustained an objection to a lawyer's question, you should ignore the question, and you must not speculate as to what the answer would have been. If, after a witness answered a question, I ruled that the answer should be stricken, you should ignore both the question and the answer and they should play no part in your deliberations. Likewise, exhibits as to which I have sustained an objection or that I ordered stricken are not evidence, and you must not consider them in your deliberations.

16

## CREDIBILITY OF WITNESSES

In determining whether the government has proven the charges against a defendant beyond a reasonable doubt, you must consider the testimony of all the witnesses who have testified.

You are the sole judges of the credibility of the witnesses. You alone determine whether to believe any witness and the extent to which a witness should be believed. Judging a witness's credibility means evaluating whether the witness has testified truthfully and also whether the witness accurately observed, recalled, and described the matters about which the witness testified.

As I instructed you at the beginning of trial, you should evaluate the credibility of witnesses free from prejudices and biases.

You may consider anything else that in your judgment affects the credibility of any witness. For example, you may consider the demeanor and the behavior of the witness on the witness stand; the witness's manner of testifying; whether the witness impresses you as having an accurate memory; whether the witness has any reason for not telling the truth; whether the witness had a meaningful opportunity to observe the matters about which he or she has testified; and whether the witness has any interest in the outcome of this case, stands to gain anything by testifying, or has friendship or hostility toward other people concerned with this case.

17

**Appx6998**

In evaluating the accuracy of a witness's memory, you may consider the circumstances surrounding the event, including the time that elapsed between the event and any later recollections of the event, and the circumstances under which the witness was asked to recall details of the event.

You may consider whether there are any consistencies or inconsistencies in a witness's testimony or between the witness's testimony and any previous statements made by the witness. You may also consider any consistencies or inconsistencies between the witness's testimony and any other evidence that you credit. You may consider whether any inconsistencies are the result of lapses in memory, mistake, misunderstanding, intentional falsehood, or differences in perception.

You may consider the reasonableness or unreasonableness, the probability or improbability, of the testimony of a witness in determining whether to accept it as true and accurate. You may consider whether the witness has been contradicted or supported by other evidence that you credit.

If you believe that any witness has shown him or herself to be biased or prejudiced, for or against either side in this trial, or motivated by self-interest, you may consider and determine whether such bias or prejudice has colored the testimony of the witness so as to affect the desire and capability of that witness to tell the truth.

18

**Appx6999**

You should give the testimony of each witness such weight as in your judgment it is fairly entitled to receive.

**Appx7000**

## WITNESS WITH A PLEA AGREEMENT

You have heard evidence that Ilya Lichtenstein and Larry Harmon entered into plea agreements with the government pursuant to which they each agreed to testify truthfully in this case and the government agreed to bring Mr. Lichtenstein's and Mr. Harmon's cooperation to the attention of their respective sentencing judges and to consider filing papers with their respective sentencing judges which would permit those judges to impose a more lenient sentence than those judges might otherwise be able to impose.

The government is permitted to enter into this kind of plea agreement. You, in turn, may accept the testimony of such a witness and convict the defendant on the basis of this testimony alone, if it convinces you of the defendant's guilt beyond a reasonable doubt. A witness who has entered into a plea agreement is under the same obligation to tell the truth as is any other witness; the plea agreement does not protect him against a prosecution for perjury or false statement, should he lie under oath.

However, you may consider whether a witness who has entered into such an agreement has an interest different from other types of witnesses. You may consider whether the plea agreement the witness entered into with the government has motivated him to testify falsely against the defendant. The testimony of a

20

**Appx7001**

witness who has entered into a plea agreement should be considered with caution.

You should give the testimony as much weight as in your judgment it deserves.

**Appx7002**

## LAW ENFORCEMENT AGENT'S TESTIMONY

A law enforcement agent's testimony should be evaluated by you just as any other evidence in the case. In evaluating the officer's or agent's credibility, you should use the same guidelines that you apply to the testimony of any witness. In no event should you give either greater or lesser weight to the testimony of any witness merely because she or he is a law enforcement agent.

22

## DEFENDANT AS A WITNESS

A defendant has a right to become a witness in his own behalf. His testimony should not be disbelieved merely because he is the defendant. In evaluating his testimony, however, you may consider the fact that the defendant has a keen interest in the outcome of this trial. As with the testimony of any other witness, you should give the defendant's testimony as much weight as in your judgment it deserves.

Appx7004

## SPECIALIZED OPINION TESTIMONY

In this case, you heard the testimony of six witnesses who expressed opinions concerning the following topics:

1) Luke Scholl: blockchain analysis and cryptocurrency

2) Valerie Mazars de Mazarin: internet routing, network and IP analysis, digital device forensics, operational security used by cyber criminals, particularly tools and techniques used to conceal location and identity online, as well as cyber terms and tools

3) Sarah Glave: forensic accounting

4) Elizabeth Bisbee: cryptocurrency and blockchain analysis

5) J.W. Verret: financial forensics and forensic accounting

6) Jeffrey Fischbach: computer forensics

If scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness who possesses knowledge, skill, experience, training, or education may testify and state an opinion concerning such matters. You are not bound to accept this witness's opinion. If you find that the opinion is not based on sufficient education or experience, that the reasons supporting the opinion are not sound, or that the opinion is outweighed by other evidence, you may completely or partially

24

**Appx7005**

disregard the opinion.  You should consider this evidence with all the other

evidence in the case and give it as much weight as you think it fairly deserves.

Appx7006

## MOTIVE

Motive is not an element of the offenses charged and the government is not required to prove motive in this case. You may, however, consider evidence of motive or lack of evidence of motive in deciding whether or not the government has proved the charges beyond a reasonable doubt.

26

**TRANSLATION OF FOREIGN LANGUAGE DOCUMENT**

I have admitted multiple documents that are in Russian and Swedish along with English translations.  Although some of you may know the languages used, it is important that all jurors consider the same evidence.  Therefore, you must accept the English translation.  If, however, you have a question as to the accuracy of the English translation, you should bring this matter to my attention immediately by raising your hand.  You should not ask your question or make any comment about the translation in the presence of the other jurors, or otherwise share your question or concern with any of them.  I will take steps to see if your question can be answered and any discrepancy resolved.  If, however, after such efforts a discrepancy remains, you must rely only upon the official English translation provided by the court interpreter and not on your own translation.

Appx7008

## CHARTS AND SUMMARIES

Certain charts or summaries have been shown to you in order to help explain the facts disclosed by the files, records, or other underlying evidence in the case. Those charts or summaries are used for your convenience. These charts and summaries are not themselves evidence or proof of any facts. You should determine the facts from the evidence. Certain charts and summaries have been received into evidence. Charts and summaries are valid only to the extent that they accurately reflect the underlying supporting evidence. You should give them only such weight as you think they deserve.

28

## OTHER CRIMES EVIDENCE

You have heard evidence that the defendant purchased drugs on Silk Road. It is up to you to decide whether to accept that evidence.

If you find that the defendant did purchase drugs on Silk Road or otherwise visited the site, you may use this evidence only for the limited purpose of deciding whether the government has proven beyond a reasonable doubt that defendant knew that money or property that Bitcoin Fog mixed was the proceeds of some kind of unlawful activity.

You may not use this evidence for any other purpose. The defendant is only on trial for the crimes charged. He is not charged in this case with any offense relating to his purchase of drugs on Silk Road or any other similar market and you may not use this evidence to conclude that the defendant has a bad character or that he has a criminal personality. The law does not allow you to convict him simply because you believe that he may have done bad things not specifically charged as crimes in this case.

**Appx7010**

**PROOF OF STATE OF MIND**

Someone's intent ordinarily cannot be proved directly because there is no way of knowing what a person is actually thinking, but you may infer someone's intent from the surrounding circumstances. You may consider any statement made or acts done by the defendants and all other facts and circumstances received in evidence which indicate his or her intent.

You may infer, but are not required to infer, that a person intends the natural and probable consequences of acts he or she intentionally did or did not do. It is entirely up to you, however, to decide what facts to find from the evidence received during this trial. You should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that a defendant acted with the necessary state of mind.

30

**Appx7011**

**KNOWINGLY**

The word "knowingly," as that terms is used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of ignorance, mistake, or accident.

31

**Appx7012**

## WILLFUL BLINDNESS

In considering whether the defendant had knowledge of a fact, you may consider whether he deliberately closed his eyes to what would otherwise have been obvious to him. When knowledge of the existence of a particular fact is an element of an offense, such knowledge can be established if a person has a subjective belief of a high probability of its existence, unless he actually believes that it does not exist. Thus, although knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, reckless, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact that he believed to a high probability of certainty existed.

As I have already instructed you, you should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that a defendant acted with the necessary state of mind.

32

**Appx7013**

## MISTAKE OF LAW

In criminal cases, a mistake of law on the part of the accused does not justify his actions. It a defendant deliberately and intentionally engages in conduct the law prohibits, his actions are criminal, regardless of his belief that his actions were lawful or guided by high motive. To summarize, ignorance of the law does not negate a defendant's criminal liability, if the government proves the elements of the offense beyond a reasonable doubt.

**"ON OR ABOUT"—PROOF OF**

The indictment charges that certain offenses were committed "on or about" the period from October 27, 2011 to April 27, 2021. The proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the dates alleged.

34

## SUBSTANTIVE OFFENSES INTRODUCTORY REMARKS

I would now like to talk with you about the specific offenses charged in this case. The alleged crimes are charged in what are called counts. The Indictment contains four counts.

In Count One, the indictment charges that from on or about October 27, 2011 and continuing until at least on or about April 27, 2021, the defendant together with others known and unknown, including darknet venders and darknet market administrative teams, conspired to commit certain offenses against the United States through the use of a bitcoin mixer known as Bitcoin Fog. Count One alleges two objects of this conspiracy, both involving the alleged laundering of monetary instruments in violation of 18 U.S.C. § 1956(a)(1).

In Count Two, the indictment charges that the defendant conducted a money laundering transaction involving property represented to be the proceeds of unlawful activity on or about November 21, 2019, in violation of 18 U.S.C. § 1956(a)(3).

In Count Three, the indictment charges that from on or about October 27, 2011 and continuing until at least on or about April 27, 2021 the defendant operated an unlicensed money transmitting business, known as Bitcoin Fog, or aided and abetted others in doing so, in violation of 18 U.S.C. § 1960(a) and 18 U.S.C. § 2.

35

**Appx7016**

And in Count Four, the indictment charges that from on or about October 27, 2011 and continuing until at least on or about April 27, 2021 the defendant, through the operation of Bitcoin Fog, engaged in the business of money transmission without a license in the District of Columbia in violation of § 26-1023(c) of the D.C. Code.

Appx7017

## MULTIPLE COUNTS—ONE DEFENDANT

Each count of the indictment charges a separate offense. You should consider each offense, and the evidence which applies to it, separately, and you should return separate verdicts as to each count. The fact that you may find the defendant guilty or not guilty on any one count of the indictment should not influence your verdict with respect to any other count of the indictment.

I will now discuss with you the rules of law that govern whether the crimes charged have been proven beyond a reasonable doubt.

## COUNT I

In Count One, the defendant is charged with conspiring to commit two offenses against the United Sates: (1) money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and (2) money laundering in violation of 18 U.S.C. § 1956(A)(1)(B)(i).  These are called the "objects" of the conspiracy.  The charge of conspiracy to launder money is a separate charge from money laundering itself, with which the defendant also is charged.  I will first instruct you on conspiracy and then I will discuss each of the two alleged "objects" of the conspiracy.

A "conspiracy" is an agreement by two or more persons to commit an unlawful act.  In other words, it is a kind of partnership for criminal purposes.  Every member of the conspiracy becomes the agent or partner of every other member.  The elements of conspiracy, each of which the government must prove beyond a reasonable doubt, are that:

First, that from on or about October 27, 2011 through on or about April 27, 2021, an agreement existed between two or more people to commit an act in violation of (a) Title 18, United States Code, Section 1956(a)(1)(A)(i) or (b) Title 18, United States Code, Section 1956(a)(1)(B)(i).  This does not have to be a formal agreement or plan, in which everyone involved sat down together and worked out the details.  On the other hand, merely because people get together and talk about common interests or do similar things does not necessarily show that an

38

**Appx7019**

agreement exists. It is enough that the government proves beyond a reasonable doubt that there was a common understanding among those who were involved to commit at least one of the two crimes that are the alleged "objects" of the conspiracy, which I will instruct you about in just a moment. So, the first thing that must be shown is the existence of an agreement.

Second, the government must prove that the defendant intentionally joined in that agreement. It is not necessary to find that he agreed to all the details of the crime, or that he knew the identity of all the other people the government has claimed were participating in the agreement. A person may become a member of a conspiracy even if that person agrees to play only a minor part, as long as that person understands the unlawful nature of the plan and voluntarily, knowingly and intentionally joins in it with the intent to advance or further the unlawful object of the conspiracy. Different people may become part of the conspiracy at different times. However, mere presence at the scene of the agreement or of the crime, or merely being with the other participants, does not show that a defendant knowingly joined in the agreement. Also, unknowingly acting in a way that helps the participants, or merely knowing about the agreement itself, without more, does not make a defendant part of the conspiracy. So, the second thing that must be shown is that the defendant was part of the conspiracy.

A conspiracy can be proved indirectly, by facts and circumstances that lead to a conclusion that a conspiracy existed. The government must prove that such facts and circumstances existed and that they lead to the conclusion that a conspiracy existed.

Someone's intent or knowledge ordinarily cannot be proved directly because there is no way of knowing what a person is actually thinking, but you may infer someone's intent or knowledge from the surrounding circumstances. You may consider any statement made or acts done or omitted by the defendant and all other facts and circumstances received in evidence which indicate his intent or knowledge.

You may infer, but are not required to infer, that a person intends the natural and probable consequences of acts he or she intentionally did or did not do. It is entirely up to you, however, to decide what facts to find from the evidence received during this trial. You should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that the defendant acted with the necessary state of mind.

There is no requirement that all members of a conspiracy be charged and prosecuted or tried together in one proceeding. Nor is there any requirement that the names of all the other conspirators are listed in the indictment. An indictment

40

**Appx7021**

can charge a defendant with a conspiracy involving people whose names are not given, as long as the government can prove that the defendant conspired with one or more of them. Whether they are named or not does not matter.

To prove that the defendant committed conspiracy, the government is not required to prove that the objective of committing an act in violation of (a) 18 U.S.C. § 1956(a)(1)(A)(i), or (b) 18 U.S.C. § 1956(a)(1)(B)(i), was achieved. The government must prove, however, that the defendant conspired to commit one of these two offenses. You must be unanimous as to at least one of the objectives that the defendant conspired to accomplish. I will now discuss with you the elements of the two substantive offenses charged as objects of the conspiracy.

## OBJECT ONE: MONEY LAUNDERING IN VIOLATION OF 18 U.S.C. § 1956(a)(1)(A)(i)

The first alleged "object" of the conspiracy is money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  That crime includes four elements:

First, that the defendant knowingly conducted or attempted to conduct a financial transaction;

Second, that the defendant knew that the money or property involved in the transaction was the proceeds of some kind of unlawful activity;

Third, that the money or property came from an unlawful activity, specifically the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and

Fourth, that the defendant acted with intent to promote the carrying on of specified unlawful activity, specifically the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

## OBJECT TWO: MONEY LAUNDERING IN VIOLATION OF
## 18 U.S.C. § 1956(a)(1)(B)(i)

The second alleged "object" of the conspiracy is money laundering in

violation of 18 U.S.C. § 1956(a)(1)(B)(i).  That crime includes four elements:

First, that the defendant conducted or attempted to conduct a financial

transaction;

Second, that the defendant knew that the money or property involved in the

transaction was the proceeds of some kind of unlawful activity;

Third, that the money or property did come from an unlawful activity,

specifically the felonious manufacture, importation, receiving, concealment,

buying, selling, or otherwise dealing in a controlled substance or listed chemical, in

violation of 21 U.S.C.§§ 841(a)(1) and 846; and

Fourth, that the defendant knew that the transaction was designed, in whole

or in part, to conceal or disguise the nature, location, source, ownership, or the

control of the proceeds.  In other words, the government must prove that the

transaction was motivated, at least in part, by a desire to conceal or disguise the

nature, location, source, ownership or control of the proceeds.  The money

laundering statute does not criminalize the mere spending or investing of illegally

obtained funds.

43

**Appx7024**

## COMMON DEFINITIONS AND INSTRUCTIONS

For purposes of both the first and second alleged objects of the money laundering conspiracy, you should use the following definitions and instructions.

To "act with the intent to promote the carrying on of specified unlawful activity" means that the defendant acted willfully, not by mistake or accident, with the deliberate purpose of promoting, facilitating, or assisting the carrying on of the specified unlawful activity. To promote the carrying on of an activity means to contribute to the prosperity of something, or to further something.

To "conduct a transaction" means to start or to finish a transaction or to participate in a transaction at any point.

A "transaction" includes a purchase, sale, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected.

A "financial transaction" means (a) a transaction which in any way or degree affects interstate or foreign commerce involving the movement of funds by wire or other means, or (b) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in

44

**Appx7025**

any way or degree. For purposes of this definition, the term "funds" includes bitcoin.

The term "financial institution" includes any person or entity who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system.

"Interstate or foreign commerce" means trade and other business activity between people or businesses in at least two states or between people or businesses in the United States and people or businesses outside the United States. The government is not required to prove that the defendant knew or intended the effect on interstate commerce, merely that such an effect occurred.

To know "that the money or property involved in the transaction came from some kind of unlawful activity" is to know that the money or property came from an activity that is a felony under state, Federal, or foreign law. The government is not required to prove that the defendant knew what the unlawful activity was. This knowledge requirement includes instances of willful blindness.

The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of the activity. The government is not required to prove that all

45

of the funds involved in the charged transactions were the proceeds of the specified unlawful activity. It is sufficient if the government proves beyond a reasonable doubt that at least part of the funds involved in a transaction represents such proceeds of specified unlawful activity.

The phrase "specified unlawful activity" means the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical, in violation of 21 U.S.C. §§ 841(a)(1) and 846. I will instruct you as a matter of law that it is a felony to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance, or to attempt or to conspire to commit such an offense.

In this case, the defendant is not charged with committing the underlying specified unlawful activity himself, only with conspiring to launder the proceeds of specified unlawful activity committed by others. In other words, the government does not need to prove that the defendant himself committed or was responsible for any controlled substances offense. However, the government needs to prove that at least some amount of the money or property the defendant conspired to launder represented proceeds of the manufacture, distribution, or dispensing of controlled substances.

46

As I explained above, the defendant is charged with conspiring to commit one or both of these alleged crimes. The government is not required to prove that either of those objectives was achieved. But it is required to prove beyond a reasonable doubt that the defendant joined a conspiracy to commit one or both of these crimes.

47

Appx7028

## COUNT II

Count Two of the Indictment charges the defendant with violating or attempting to violate 18 U.S.C. 1956(a)(3)(A) and (B). This statute provides, in relevant part:

> Whoever with the intent . . .to promote the carrying on or specified unlawful activity; [or] (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity . . . conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity

shall be guilty of an offense against the United States.

The charge of money laundering in violation of 18 U.S.C. § 1956(a)(3)(A) and (B) contains three elements, each of which the government must prove beyond a reasonable doubt:

First, that the defendant conducted or attempted to conduct a financial transaction;

Second, that the transaction involved property represented by a law enforcement officer to be the proceeds of some form of unlawful activity;

Third, that (1) the defendant acted with the intent to promote the carrying on of specified unlawful activity *or* (2) the defendant acted with the intent to conceal or disguise the nature, location, source, ownership, or control of the property he believed to be the proceeds of specified unlawful activity.

48

**Appx7029**

Here, the indictment alleges that the "property represented to be the proceeds of specified unlawful activity, that is the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance" was the November 21, 2019 movement of approximately 0.01146764 bitcoin by wire or other means from Bitcoin Fog to an IRS-CI controlled undercover wallet.

The government is not required to prove that the law enforcement officer made an express affirmative statement to the defendant that the property involved was the proceeds of unlawful activity. Instead, the government must prove that the law enforcement officer represented to the defendant circumstances from which a reasonable person would infer that the property was the proceeds of illegal activity. You should consider all of the evidence in determining whether the government has satisfied this standard.

The phrases to "act with the intent to promote the carrying on of specified unlawful activity," "conduct a transaction," "transaction," "financial transaction," "financial institution," "Interstate or foreign commerce," "proceeds," and "specified unlawful activity" have the same meaning that I have just described to in addressing the objects of the conspiracy count, and you should rely on those same definitions in your deliberations.

In this case, the defendant is not charged with committing the underlying

49

**Appx7030**

specified unlawful activity himself, only with laundering property represented to be the proceeds of specified unlawful activity committed by others, or intended to be used to promote specified unlawful activity committed by others. In other words, the government does not need to prove that the defendant himself committed or was responsible for any controlled substances offense.

Appx7031

## COUNT III

Count Three of the Indictment charges the defendant with violating 18 U.S.C. § 1960(a).  This statute provides, in relevant part:

Whoever knowingly conducts, controls, manages, supervises, directs or owns all or part of an unlicensed money transmitting business

shall be guilty of an offense against the United States.

In order for you to find the defendant guilty of violating 18 U.S.C. § 1960(a), the government must prove the following elements beyond a reasonable doubt:

First, that Bitcoin Fog was an unlicensed money transmitting business.  I will explain what an unlicensed money transmitting business is in a moment; and

Second, that the defendant knowingly controlled, conducted, managed, supervised, directed, or owned that business.  The government is not required to prove that the defendant did all of the things in this list, but only that he did one of them; and

Third, that the money transmitting business affected interstate or foreign commerce.

For purposes of this Count, interstate or foreign commerce simply means the movement of goods, services, money, and individuals between states or between the United States and a foreign state or nation.  The government must prove that

51

**Appx7032**

the money transmitting business affected interstate or foreign commerce in any manner, no matter how minimal.

Now I will provide more explanation about the first element the government must prove beyond a reasonable doubt—that Bitcoin Fog was an unlicensed money transmitting business.

A "business" is a commercial enterprise that is regularly carried on for profit. Thus, a single isolated instance of money transmitting is not a business under this definition.

The term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier. For purposes of this definition, the term "funds" includes bitcoin.

An "unlicensed money transmitting business" means a money transmitting business that satisfies any one of the following three elements. You can find the defendant guilty of this count if you unanimously find any one of these elements was satisfied. You do not need to find that all three were satisfied.

First, the money transmitting business operated without an appropriate money transmitting license in the District of Columbia, where such operation is punishable as a misdemeanor or felony under District of Columbia law, whether or

52

not the defendant knew a license was required or was punishable by District of Columbia law; or

Second, the money transmitting business failed to comply with the money transmitting business registration requirements under federal law; or

Third, the money transmitting business involved the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

## OPERATING A MONEY TRANSMITTING BUSINESS WITHOUT A LICENSE IN THE DISTRICT OF COLUMBIA

For purposes of considering whether the defendant operated an unlicensed money laundering business in a State where doing so is punishable as a misdemeanor or felony, I will instruct you that the term "State" includes the District of Columbia and that a violation of § 26-1023(c) of the D.C. Code is punishable as a felony.

The elements of Money Transmission Without a License in violation of § 26-1023(c) of the D.C. Code, each of which the government must prove beyond a reasonable doubt, are as follows:

First, that the defendant knowingly engaged in the business of money transmission in the District of Columbia; and

Second, that the defendant did not have a license to engage in the business of money transmission in the District of Columbia.

Under D.C. law, "money transmission" means the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to a location abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer. D.C. law, in turn, requires that someone engaged in a money transmission business obtain a license from the D.C.

54

**Appx7035**

government to operate in the District of Columbia. For purposes of these provisions, the term "money" includes bitcoin.

To satisfy the District of Columbia licensing element, the government does not need to prove that the defendant knew a license was required by D.C. law to operate a money transmitting business, but it must prove that he knowingly operated a money transmitting business in the District of Columbia and that he did not have a license to do so.

## FAILING TO COMPLY WITH MONEY TRANSMITTING BUSINESS REGISTRATION REQUIREMENTS UNDER FEDERAL LAW

The government may also satisfy the "unlawful money transmitting business" element by proving that the defendant failed to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330 or its implementing regulations.

Under those regulations, money services businesses must register with the Secretary of the Treasury (or "FinCEN"). The term "money services business" is defined to include any "money transmitter." A "money transmitter" is a person or entity that provides money transmission services or any other person or entity engaged in the transfer of funds. "Money transmission services" means the acceptance of currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means, including an electronic funds transfer network or an informal value transfer system. Money transmission services are required to register if they are doing business, whether or not on a regular basis, or as an organized or licensed business, in substantial part within the United States.

For purposes of these definitions, the term "funds" includes bitcoin. The movement of bitcoin from one bitcoin address to another bitcoin address on the Bitcoin blockchain can represent movement of funds from one location or person to another location or person.

56

**Appx7037**

## MONEY TRANSMITTING OTHERWISE INVOLVING THE TRANSMISSION OF FUNDS KNOWN TO HAVE BEEN DERRIVED FROM A CRIMINAL OFFENSE OR INTENED TO B USED IN A CRIMINAL OFFENSE

Finally, the government can satisfy the "unlicensed money transmitting business" requirement by proving that the money transmitting business involved the transportation or transmission of funds that were known to the defendant to have been derived from a criminal offense or that were intended to be used to promote or to support unlawful activity. For purposes of this element, any "criminal offense" or "unlawful activity" is sufficient. The government is not limited to proving that the funds were derived from or intended to promote a specific criminal offense.

Appx7038

## ADDITIONAL GENERAL INSTRUCTIONS REGARDING COUNT THREE

As explained above, to return a verdict of guilty on Count Three, you do not need to find that the defendant operated an unlicensed money transmitting business in all three of the ways I have just described, but you must unanimously find beyond a reasonable doubt that he did so in at least one of these ways. The Verdict Form will ask that, if you find the defendant guilty on Count Three, you indicate which one, two, or three of the ways that I have described you unanimously agree applies here.

Appx7039

## COUNT IV

Count Four charges the defendant with Money Transmission Without a License in violation of D.C. Code § 26-1023(c).

The elements of that offense, both of which the government must provide beyond a reasonable doubt, are as follows:

First, that the defendant knowingly engaged in the business of money transmission in the District of Columbia; and

Second, that the defendant did not have a license to engage in the business of money transmission in the District of Columbia.

"Money transmission" means engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer. D.C. law, in turn, requires that a money transmission business obtain a license from the D.C. government to operate in the District of Columbia. For purposes of these provisions, the term "money" includes bitcoin.

To satisfy the District of Columbia licensing element, the government does not need to prove that the defendant knew a license was required by D.C. law to operate a money transmitting business, but it must prove that he knowingly