No. 24-3161

In the United States Court of Appeals for the
District of Columbia Circuit

————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,
*Defendant-Appellant.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
D. CT. NO. 1:21-CR-399 (MOSS, J.)

————————

SUPPLEMENTAL APPENDIX FOR THE UNITED STATES

————————

JEANINE FERRIS PIRRO
United States Attorney
District of Columbia

A. TYSEN DUVA
Assistant Attorney General

JOSH A. GOLDFOOT
Deputy Assistant Attorney General

JENNY C. ELLICKSON
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave. NW, Ste. 1264
Washington, DC 20530
(202) 305-1674
jenny.ellickson@usdoj.gov

JEFFREY PEARLMAN
C. ALDEN PELKER
Trial Attorneys
Computer Crime and
   Intellectual Property Section
Criminal Division
U.S. Department of Justice

# TABLE OF CONTENTS

10/24/22   Government's Notice of Intent to Present Expert Testimony (Dkt. 61) .............................................................................. 1

10/24/22   Government's Notice and Motion in Limine Regarding Willful Blindness Instruction as to Counts One and Three, and Permission to Refer to Willful Blindness in Opening Statement (Dkt. 66) ............................................................. 18

11/21/22   Government's Proposed Jury Instructions (Dkt. 92) ........................ 32

11/30/22   Government's Motion to Quash Early-Return Rule 17(c) Subpoenas (Dkt. 93) .......................................................... 157

                Subpoenas (Dkt. 93-1) ................................................................ 173

7/18/23   Supplement to the Government's Supplemental Notice of Intent to Present Expert Testimony (Dkt. 149) ............................... 226

                Declaration of Elizabeth A. Bisbee (Dkt. 149-1) ............................ 228

                "How to Peel a Million: Validating and Expanding Bitcoin Clusters" (Dkt. 149-2) ...................................................... 233

8/2/23   Defendant's Motion to Authorize Issuance and Pretrial Return of Subpoena Duces Tecum to Chainalysis, Inc. Under Federal Rule of Criminal Procedure 17(c) (Dkt. 155) .................................. 250

                Defendant's Memorandum in Support of Defendant's Motion for Leave to Authorize Issuance and Pretrial Return of Subpoenas Duces Tecum to Chainalysis, Inc. Under Federal Rule of Criminal Procedure 17(c) (Dkt. 155-1) .............................. 253

                Subpoena for Documents (Dkt. 155-2) ........................................... 264

                Subpoena for Documents Exhibit A (Dkt. 155-3) ........................... 267

8/30/23   Order (Dkt. 174) ........................................................................ 271

9/11/23   Government's Response to September 8, 2023 Minute Order (Dkt. 193) ...................................................................... 276

1/26/24    Defendant's Opposition to Government's Motion in Limine at
           Dkt. 221 (Dkt. 222) ............................................................................ 295

2/4/24     Government's Emergency Motion in Limine for Rule 16
           Expert Discovery in Light of Disclosure That "Parts of the
           Ciphertrace Report are Unreliable" (Dkt. 239) ................................. 305

           Letter from Counsel for Ciphertrace (Dkt. 239-1) .......................... 312

2/5/24     Defendant's Response to Government's Emergency Motion in
           Limine for Rule 16 and Rule 26.2 Production (Dkt. 243) ............... 316

11/8/24    Sentencing Transcript (Dkt. 346) ..................................................... 320

Government Exhibit 55A ...................................................................................... 426

Government Exhibit 364 ....................................................................................... 427

Government Exhibit 401 ....................................................................................... 428

Government Exhibit 601 ....................................................................................... 429

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 21-cr-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S NOTICE OF INTENT TO PRESENT EXPERT TESTIMONY

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, hereby provides notice of its intent to introduce expert testimony pursuant to Fed. R. Evid. 702, 703, and 705, and Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure. Many of the witnesses below will testify primarily as fact witnesses, but they possess special skills or knowledge that will assist the jury in understanding some of the evidence in the case. To the extent that aspects of these witnesses' testimony could be considered expert testimony under Rule 902, the government is providing this notice of their anticipated testimony. The curriculum vitae (or other relevant statement of qualifications) for the witnesses are being provided to defense counsel under separate cover.

### INTRODUCTION

The defendant, Roman Sterlingov ("Sterlingov" or the "defendant"), is charged with Conspiracy To Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h); Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A), (B); Operating an Unlicensed Money Transmitting Business and Aiding and Abetting, in violation of 18 U.S.C. § 1960(a) and 18 U.S.C. § 2; and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c). As summarized in the Indictment and in pretrial briefing, the Indictment arises from Sterlingov's

operation of a darknet cryptocurrency money laundering and money transmission service known as Bitcoin Fog from 2011 through 2021.

The evidence in this case centers around cryptocurrency and the darknet—technical and specialized topics that are likely not within the common knowledge of the average juror.  The evidence also will include significant evidence retrieved through forensic review of the voluminous electronic evidence obtained during the course of the investigation.  As explained below, such topics are suitable for expert testimony.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Expert testimony is appropriate if specialized knowledge will assist the jury "to understand the evidence or to determine a fact in issue." *United States v. Eiland*, No. 04-379 RCL, 2006 WL 2844921, at *5 (D.D.C. Oct. 2, 2006), *aff'd*, 738 F.3d 338 (D.C. Cir. 2013).

A witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* (citing Fed. R. Evid. 702).

In order to qualify as an expert and offer expert testimony, a witness must possess "knowledge, skill, experience, training, or education" on the subject about which he is testifying. Fed. R. Evid. 702.  The advisory committee's notes to Rule 702 specifically contemplate government agents with "extensive experience" serving as experts on issues within their unique purview.  *See* Fed. R. Evid. 702 advisory committee's note.

## WITNESSES

The United States intends to call the below witnesses.  Their qualifications, along with review and analysis of relevant records, reports, facts, and evidence, set forth the bases for their testimony.

### A.  Luke Scholl

The government intends call Luke Scholl to testify on virtual currency and blockchain analysis, including clustering.[1]  Mr. Scholl has worked with the Federal Bureau of Investigation (FBI) since 2015.  He is employed as a Staff Operations Specialist and is detailed to the Department of Justice's National Cryptocurrency Enforcement Team, serving as the lead tracing analyst for the group, which was formed to work on the Department of Justice's most serious cryptocurrency-related matters.  Mr. Scholl was a founding member of the FBI's Virtual Currency Response Team (VCRT) and has provided virtual currency investigative support through blockchain analysis and case strategy consultation in dozens of investigations across the FBI.  Mr. Scholl has developed and delivered training curriculum on virtual currency, including blockchain analysis, and related topics to a variety of audiences.  Mr. Scholl has extensive experience in using numerous blockchain analysis products, including those offered by Chainalysis, TRM, and Coinbase, as well as free public blockchain analysis tools.  He has experience in tracing bitcoin and other cryptocurrencies connected to darknet markets, ransomware, and other unlawful schemes, and is familiar with the use of mixers and different mixing and laundering typologies through his investigative work.  Mr. Scholl's additional qualifications, training, experience, and certifications are detailed in his curriculum vitae, which is being provided to defense counsel under separate cover.

---

[1] Other government witnesses, who are not being noticed here, will also provide testimony regarding darknet marketplaces, Tor, virtual currency, exchanges, blockchain analysis, and similar topics.  Their testimony, however, will be as fact witnesses based on their personal knowledge and conduct of the investigation, not as expert testimony as defined in Fed. R. Evid. 702.

Through his testimony, Mr. Scholl is expected to explain bitcoin, including how bitcoin transactions are conducted, and how transactions can be traced on the blockchain. Mr. Scholl will explain the structure of a bitcoin transaction, and will define and explain terms and concepts such as bitcoin addresses, private keys, and wallets. Mr. Scholl will testify as to what information is recorded on the bitcoin blockchain and how that blockchain is stored and updated. Mr. Scholl will explain the function of virtual currency exchanges and will explain how bitcoin can be converted to other forms of value, including fiat currency and other cryptocurrencies. He will explain what information virtual currency exchanges collect and will testify regarding the importance of that information.

Mr. Scholl will testify regarding the basis for bitcoin's pricing and how that price fluctuates over time. Mr. Scholl will explain that in his work, he uses several sources for calculating bitcoin prices, including the pricing used by virtual currency exchanges and several widely used pricing indexes, such as CoinMarketCap, as well as the pricing integrated into Chainalysis Reactor and other blockchain analysis products.

Mr. Scholl's testimony will include testimony regarding the basic tenets of other cryptocurrencies in addition to bitcoin, including monero. Mr. Scholl will testify regarding the use of monero to conceal transactions, since monero does not rely on a transparent blockchain.

Mr. Scholl will explain the meaning and significance of various cryptocurrency-related records, references, and files found on the defendant's devices. For example, Mr. Scholl is expected to testify regarding the different systems noted in the defendant's document titled, "Blockchains and Tokens," the defendant's references to various virtual currency exchanges and their compliance programs, and the defendant's notes about different systems and features.

**Supp.App.4**

Mr. Scholl will testify regarding common terms and jargon used among cryptocurrency users.  For example, Mr. Scholl will testify regarding the meaning and significance of "hodl," a term used to reference holding on to bitcoin indefinitely, despite price fluctuations; "to the moon," a term used by cryptocurrency investors to reference skyrocketing trading prices; and various popular memes.

Mr. Scholl will explain the role of Bitcoin Talk as a popular forum for Bitcoin users, particularly in the early days of Bitcoin.  Mr. Scholl will explain the use of bitcoin on darknet markets, and the evolution of the darknet market and cryptocurrency ecosystems since Silk Road.

Mr. Scholl will explain different wallet software, including Bitcoin Core and Mycellium, and other bitcoin-related programs, such as Bisq.  He will explain the different ways that individuals can store their bitcoin, including through paper wallets, hardware wallets, and wallet files.  He will explain the difference between custodial wallets, where keys are controlled in whole or in part by a third party, and non-custodial, where the keys are controlled by the individual.

Mr. Scholl is also expected to testify regarding clustering, a blockchain analysis technique that identifies linked addresses held by an individual or organization.  Mr. Scholl will explain the role of clustering in identifying wallets controlled by a target.  Mr. Scholl will explain "co-spend," or "common input," analysis, in which addresses that are spent together in the same transaction can be determined to be under common control.  Mr. Scholl will also testify regarding different transaction patterns that inform blockchain analysis, such as the presence of change addresses and peel chains.  Mr. Scholl will explain different blockchain analysis products, particularly Chainalysis Reactor, and will testify as to his use of the products to conduct analysis, and will testify that he has found the products that he uses to be reliable.  He will also testify as to how he tests and verifies the clusters and attribution by comparing the information in the tools to

**Supp.App.5**

information from cases.  Mr. Scholl will describe how in this case he verified that transactions sent to and from different exchanges, as confirmed through subpoena returns, were correctly designated in blockchain analysis tools used; that the undercover transactions sent to Bitcoin Fog were recorded in the blockchain analysis tools and that Chainalysis had identified the receiving addresses as belonging to the Bitcoin Fog cluster; and that the defendant's own statements to the press confirming that he received money from Bitcoin Fog further corroborated the clustering.

Mr. Scholl's testimony will include a discussion of the *modus operandi* of criminals operating on the darknet, including common money laundering techniques used to complicate blockchain analysis.  Mr. Scholl will explain how darknet market criminals and others try to thwart blockchain analysis and how blockchain analysis addresses those efforts.  He will explain how mixers make it more difficult to trace funds on the blockchain, and will testify as to their popularity among criminals for that reason.

Mr. Scholl will testify regarding the addresses held by Bitcoin Fog, as well as other darknet platforms, such as Silk Road, Silk Road 2.0, AlphaBay, Agora, Nucleus, Abraxas, Pandora, Sheep Market, Black Bank, and Welcome to Video.  Mr. Scholl will testify to the aggregate direct and indirect fund flows between Bitcoin Fog and these darknet sites and will testify to tracing funds tied to narcotics trafficking, identity theft, fraudulent financial documents, ransomware, computer hacking, and other unlawful activities, to and from Bitcoin Fog.

Mr. Scholl will testify to the blockchain analysis performed in support of the Bitcoin Fog investigation.  This testimony will include tracing funds from Mr. Sterlingov's accounts to Bitcoin Fog and infrastructure connected to Bitcoin Fog, as well as tracing funds from Bitcoin Fog to Mr. Sterlingov's accounts or purchases made by Mr. Sterlingov.  Mr. Scholl will testify that he reviewed financial records for Mr. Sterlingov's accounts at numerous traditional financial

**Supp.App.6**

institutions and virtual currency exchanges, and that he then conducted a source of funds analysis to trace the origin of the funds.  Mr. Scholl will testify that the bulk of Mr. Sterlingov's funds in these accounts can be traced to Bitcoin Fog.

Mr. Scholl is compiling a more formal report memorializing the blockchain analysis conducted for the case.  The report will be provided to defense counsel upon its completion.  The report will be consistent with the blockchain analysis and other records already provided to defense counsel in discovery.

### B.  Elizabeth Bisbee

The government intends to call Ms. Elizabeth Bisbee, an expert in virtual currency and blockchain analysis.  Ms. Bisbee is the Director of Investigation Solutions for the blockchain analytics company Chainalysis.  Prior to joining Chainalysis in January 2021, Ms. Bisbee was the Drug Enforcement Administration's (DEA) national subject matter expert for virtual currency investigations, practices, and policies.  During that time, Ms. Bisbee served as the DEA's lead expert witness for virtual currency.  Ms. Bisbee was involved in over 400 virtual currency investigations, including work on covert operations, blockchain analysis, suspect interviews, seizure of cryptocurrency, and trial preparation.  She developed DEA's training curriculum related to virtual currency and blockchain analysis and has additionally taught numerous classes on virtual currency and virtual currency investigations.  Ms. Bisbee's work has been published in the *Department of Justice Journal of Federal Law and Practice*.  Ms. Bisbee's experience and qualifications are further detailed in a curriculum vitae which is being provided to defense counsel under separate cover.  Ms. Bisbee's testimony will be based on her experience in virtual currency investigations and blockchain analysis and her work at Chainalysis on blockchain analysis and clustering.

Supp.App.7

Ms. Bisbee is expected to testify regarding blockchain analysis, explaining to the jury how law enforcement and others can trace transactions on the blockchain.  Ms. Bisbee will explain how cryptocurrency transactions are structured, and will further explain how information from the blockchain can be used to determine "clusters" of addresses held by the same individual or entity. Ms. Bisbee will explain how the blockchain can be coupled with other sources of information, including undercover transactions, to determine who controls particular clusters.  Ms. Bisbee will explain how she performed this work at DEA and Chainalysis.  Ms. Bisbee will testify regarding the clusters associated with Bitcoin Fog and with key darknet marketplaces, including AlphaBay, Evolution, Agora, Nucleus, Abraxas, Pandora, Sheep Market, and Black Bank.  Ms. Bisbee will testify to fund flow analysis between Bitcoin Fog and darknet markets, through both direct and indirect transactions.

Ms. Bisbee is compiling a more formal report memorializing the analysis conducted for the case.  The report will be provided to defense counsel upon its completion.

### C.   Matthew St. Jean

The government intends to call Matthew St. Jean to testify at trial.  Mr. St. Jean is a Special Agent and Computer Investigative Specialist at the Internal Revenue Service (IRS) – Criminal Investigation, and has been so employed since 2009.  Prior to his role with IRS, Mr. St. Jean worked as a Computer Forensic Agent with the U.S. Department of State, and previously as a forensic consultant in the private sector.   Mr. St. Jean holds multiple computer forensics certifications, including certification as a Certified Forensic Computer Examiner (CFCE).  Mr. St. Jean has particular expertise reviewing electronic evidence tied to cryptocurrency and is considered an IRS subject matter expert for virtual currency, virtual currency-related forensics review, and virtual currency seizures.  Mr. St. Jean has been recognized for his considerable

**Supp.App.8**

accomplishments through numerous awards, including a 2020 award from IRS for cryptocurrency support to the field.  Mr. St. Jean's additional training qualifications and certifications are detailed in his curriculum vitae, which is being provided to defense counsel under separate cover.

Mr. St. Jean is expected to provide testimony about his examination of devices seized from the defendant and other electronic evidence relevant to this case.  He is expected to identify particular data that he viewed and extracted from those devices.  Mr. St. Jean is expected to explain the metadata associated with certain files and related significance to the investigation.

Mr. St. Jean is also expected to explain certain scripts, code, and software found on the defendant's devices.  Mr. St. Jean will explain the nature of the various electronic devices seized from the defendant, including the unusual modem device, the Raspberry Pi microcomputer, and the many SIM cards.  Mr. St. Jean will testify to the use of virtual private networks (VPNs), Tor, proxies, and other tools and techniques used to conceal one's location or identity online.

Mr. St. Jean will provide testimony explaining cyber concepts and terms.  The defendant wrote notes to himself with technical details regarding his work configuring different devices and concealing his activity.  Much of these notes use technical terms and references to actions on a computer that are familiar to individuals such as Mr. St. Jean, but which would not be understandable to a lay jury without explanation.

For example, in a file titled "info-settings," the defendant wrote (translated from Russian into English), "Until it works, maybe you'll have to add these discs inside the Windows machine? . . . Or remake these drives into a regular Linux disk?," and, "On local policy MMC configuration add the new user group to  the 'Access this computer from the network'(Win7) (or some s*** like that) policy. (Need to have a special group otherwise even if the Users group is removed, windows still lets him log in interactively.)"  In handwritten notes in Russian, the defendant discusses

needing to establish a static IP, and asks himself, "Do we need a dhcp service, at least for the VPN?" and remarks that it needs to be tested first.  In another note, the defendant asks himself how the UDP is not working, and wonders how he can reinstall UPS in BunkerX.  He discusses changing the address in the UDP speeder client and opening new ports in BunkerX.  In yet another document, the defendant discusses needing to insert a SIM card and set up a VPN and then says he can test 168.12 and 168.11 WAN8 MV-4 MV-2 wlan6 first.  There are many notes about setting up and configuring VPNs and proxies, as well as files containing references to other technical concepts.  A lay jury would benefit from Mr. St. Jean providing context and explaining the meaning of the defendant's many notes and files containing references to technical terms.

As noted below, Mr. St. Jean's insight in this area overlaps considerably with that of FBI Computer Scientist CS Valerie Mazars de Mazarin.  Aspects of Mr. St. Jean's expected testimony described above may be covered by CS Mazars de Mazarin, and vice versa.

### D.  Valerie Mazars de Mazarin

The government intends to call FBI Computer Scientist (CS) Valerie Mazars de Mazarin to testify at trial.  CS Mazars de Mazarin has worked with the FBI since 2018, performing cyber forensic analysis of digital evidence.   She works on cyber criminal intrusion matters and supports investigations through technical analysis, cyber research, and custom tool development.  She has experience triaging malware and writing tools to parse large datasets and facilitate review of evidence in cyber cases.  She also supports the FBI Washington Field Office by configuring secure and anonymous setups for sensitive online operations, and is highly familiar with Tor, proxies, and VPNs.  Prior to her work with the FBI, CS Mazars de Mazarin worked as a technologist and analytical tool developer for Booz Allen Hamilton and as a solutions architect at Honeywell.  She has a Bachelor of Science in Computer Science from Georgetown University and is proficient in

numerous programming languages, including Python, bash, C/C++, R, JavaScript, SQL, and Visual Basic/VBA.  She holds multiple cybersecurity certifications, including GIAC Reverse Engineering Malware (GREM) and GIAC Security Essentials Certification (GSEC).  She has participated in numerous cybersecurity team competitions, including a first-place team win at a SANS competition in August 2020.

CS Mazars de Mazarin is expected to provide testimony about her examination of devices seized from the defendant and other electronic evidence relevant to this case, including servers controlled by the defendant that were located at the time in Romania.  CS Mazars de Mazarin is expected to identify particular data that she viewed and extracted from those devices.  CS Mazars de Mazarin is expected to explain the metadata associated with certain files and related significance to the investigation.

CS Mazars de Mazarin will explain the nature of the various electronic devices seized from the defendant, including the unusual modem device and the Raspberry Pi microcomputer.  CS Mazars de Mazarin is also expected to explain certain scripts, code, and software found on the defendant's devices.  CS Mazars de Mazarin will testify to the use of Tor, proxies, VPNs, PGP keys, and encryption.  CS Mazars will provide testimony regarding how websites are set up and hosted and how user traffic is routed over the Internet, including the use of IP addresses.  CS Mazars de Mazarin will explain how IP address blocks are assigned and how IP addresses are allocated across hosting providers, and will testify regarding IP address geolocation.  CS Mazars de Mazarin will testify regarding IP addresses used by the defendant and will testify regarding her analysis of those IP addresses and overlap across accounts.

CS Mazars de Mazarin will provide testimony explaining cyber concepts and terms.  As described above in the subsection pertaining to Mr. St. Jean's expected testimony, the defendant

Supp.App.11

wrote notes to himself with technical details of his work.  Much of these notes use technical terms and references to actions on a computer that are familiar to individuals such as Mr. St Jean or CS Mazars de Mazarin, but which would not be understandable to a lay jury.  CS Mazars de Mazarin's testimony will explain these cyber concepts and terms.  CS Mazars de Mazarin is also expected to explain certain other scripts or pieces of code found on the defendant's devices.  This will include testimony regarding CS Mazars de Mazarin's review of the defendant's command line history, which includes commands related to server configuration.  CS Mazars de Mazarin will explain the function of those commands.  CS Mazars de Mazarin will also testify regarding the defendant's use of the Bitcoin Core client and evidence of the defendant sending bitcoin transactions through the command line, and will explain the purpose of such activity.  CS Mazars de Mazarin will essentially serve as a translator, explaining technical terms, computer code, programs, metadata, or technical details to the jury.

The government is determining the scope of Mr. St. Jean's testimony in relation to that of CS Mazars de Mazarin, and will make those decisions closer to trial.  The government submits that Mr. St. Jean and CS Mazars de Mazarin are both highly qualified to discuss the topics outlined in the other's respective sections.

### E.   Theodore Vlahakis

The government intends to call Theodore Vlahakis to testify at trial. Mr. Vlahakis is a Senior Compliance Officer in the Enforcement Division of the U.S. Department of Treasury's Financial Crimes Enforcement Network (FinCEN).  Mr. Vlahakis has worked at FinCEN since 2009 in multiple roles that have developed his expertise in the statutes and regulations that FinCEN is responsible for enforcing to safeguard the financial system from illicit use, combat money laundering, and promote national security.  Mr. Vlahakis serves as a FinCEN subject matter expert

on financial institutions' registration, recordkeeping, reporting, and program requirements to comply with the Bank Secrecy Act (BSA), the USA PATRIOT Act, and other relevant statutes and regulations enforced by FinCEN.  Mr. Vlahakis is responsible for advising senior FinCEN management on enforcement actions and strategy, examining filings submitted by financial institutions, and reviewing FinCEN enforcement decisions and informational materials.  Mr. Vlahakis regularly represents FinCEN before other federal agencies, industry groups, and foreign officials, and conducts trainings and presentations about FinCEN's authorities and regulatory requirements.  Mr. Vlahakis performs detailed Suspicious Activity Report (SAR) analyses and has overseen Currency Transaction Report (CTR) processes.  Prior to his current position, Mr. Vlahakis served as the Chief of FinCEN's Resource Center where he oversaw FinCEN's Regulatory Helpline, which provides basic and interpretive guidance for inquiries received from industry, regulators, and law enforcement regarding BSA regulations, reports, and published rulings.  Mr. Vlahakis also served as a BSA Resource Specialist at FinCEN, where he directly assisted financial institutions in determining whether to submit a SAR, advised money services businesses (MSBs) of their anti-money laundering program requirements, and conducted outreach to potentially unregistered money service businesses to assist the with their registration, reporting, and recordkeeping requirements.  Mr. Vlahakis' additional qualifications, training, experience, and certifications are detailed in his curriculum vitae, which is being provided to defense counsel under separate cover.

Mr. Vlahakis will provide testimony about FinCEN's role and responsibilities to oversee and enforce federal anti-money laundering laws and rules.  Mr. Vlahakis will describe the BSA and its related regulations, their purpose, and how they govern money transmitting and work to combat criminal activity.  Mr. Vlahakis is expected to explain what MSBs and money transmitters

Supp.App.13

are, how those entities must register with FinCEN, and why these registration requirements exist. Mr. Vlahakis may also provide an overview of MSBs' additional state-imposed registration requirements.  Mr. Vlahakis will provide testimony describing the types of records MSBs must keep, what reports they are required to file, including SARs and CTRs, and how these reports help advance anti-money laundering efforts.  Mr. Vlahakis is also expected to testify about other anti-money laundering compliance requirements that MSBs must implement and what resources exist to help MSBs comply with their FinCEN-enforced obligations.

Mr. Vlahakis is expected to testify about how the BSA and other federal laws and regulations enforced by FinCEN apply to certain entities handling cryptocurrency transactions. Mr. Vlahakis will provide testimony about how U.S. federal anti-money laundering laws and regulations apply to MSBs located abroad that conduct transactions with U.S.-based customers. Mr. Vlahakis will also testify that Bitcoin Fog was not registered as an MSB with FinCEN and that FinCEN did not receive any reports from Bitcoin Fog regarding any transactions or suspicious activity.

Mr. Vlahakis is being noticed here due to his specialized knowledge.  He will not be asked to opine as to whether Bitcoin Fog should have registered with FinCEN and/or whether the defendant violated the law by failing to register.  That issue will ultimately be left to the court and finder of fact.

### F.  Additional Authentication Witnesses

The government is separately filing a motion seeking to authenticate certain electronic evidence through certifications that comply with the requirements of Fed. R. Evid. 902(11), 902(13), 902(14), and/or 18 U.S.C. § 3505, and through the evidence's distinctive characteristics under Fed. R. Evid. 901(b)(4).  If that motion is not granted, the government will need to call

**Supp.App.14**

additional witnesses to testify regarding the process through which information from various electronic devices or files was reliably retrieved and/or copied.  These witnesses may need to be noticed for their testimony regarding the processes by which the electronic evidence was obtained. The government may therefore supplement and amend this notice as trial approaches and will provide reasonable notice before trial.

### G.  Translators

The government intends to admit at trial numerous documents that were written in foreign languages, including Swedish, Russian, and Romanian.   In particular, the defendant wrote extensive notes to himself, both handwritten and in text documents saved to his devices and accounts.  These notes transition with varying frequency between the numerous languages that the defendant speaks, particularly English, Swedish, and Russian.   The evidence also includes recordings of the defendant's conversations from jail, and records that originated from providers in foreign countries.   The government has provided the original records to defense counsel in discovery, and has provided some official translations, some machine translations, and some translation summaries.  The government is having additional official translations completed and certified by qualified translators who would be available to testify at trial if needed.   The government is committed to working with defense counsel to resolve any disputes regarding translations in advance of trial and hopes to be able to stipulate to the translations in order to streamline the trial.  If stipulations cannot be reached, the government will be calling multiple translators at trial to testify regarding their translations of documents and records in this matter. Each translator is employed by or contracted with the U.S. Department of Justice, FBI, or IRS, and has language training and experience in translating documents for court purposes.  The translations

**Supp.App.15**

will assist the jury in understanding the underlying texts or conversations, which are written or spoken in languages that would not otherwise be understood by most U.S. jurors.

## **CONCLUSION**

The government respectfully submits that the testimony of the above witnesses will help the jury understand the evidence in this case.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:     */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
C. Alden Pelker, Maryland Bar
Trial Attorney, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007
Catherine.Pelker@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal No. 21-cr-399 (RDM)** |
| | **:** | |
| **ROMAN STERLINGOV,** | **:** | |
| | **:** | |
| **Defendant** | **:** | |

## <u>ORDER</u>

Upon consideration of the government's Notice of Intent to Provide Expert Testimony, any

opposition thereto, and such evidence and argument as has been presented at any hearing on the

motion, it is this _____ day of _____, 2022, hereby

ORDERED, that the motion is GRANTED.

_____
THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 21-CR-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S NOTICE AND MOTION *IN LIMINE* REGARDING
WILLFUL BLINDNESS INSTRUCTION AS TO COUNTS ONE AND THREE, AND
PERMISSION TO REFER TO WILLFUL BLINDNESS IN OPENING STATEMENT**

The United States of America, by and through the United States Attorney for the District

of Columbia, respectfully provides notice and moves this Court *in limine* to find that a willful

blindness jury instruction is appropriate for Counts One and Three, and to permit the government

to refer to willful blindness in its opening statement when discussing these Counts.  In support

whereof, the government states as follows:

**FACTUAL BACKGROUND**

On February 14, 2022, a federal grand jury in the District of Columbia returned an

indictment against the defendant, Roman Sterlingov ("Sterlingov" or the "defendant"), on counts

of Conspiracy To Commit Money Laundering, in violation of 18 U.S.C. § 1956(h); Money

Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A), (B); Operating an Unlicensed Money

Transmitting Business and Aiding and Abetting, in violation of 18 U.S.C. § 1960(a) and 18 U.S.C.

§ 2; and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c).

As summarized by the sworn agent affidavit in support of the criminal complaint in this

case, ECF No. 1-1, and in pretrial briefing, Sterlingov served as the principal operator of one of

the largest and longest-running darknet money laundering and money transmission services known

as Bitcoin Fog from 2011 until his arrest on April 27, 2021.  For a variable fee, Bitcoin Fog allowed

users to send bitcoins to designated recipients in a manner designed to conceal and obfuscate the

source of the bitcoins.  ECF No. 1-1, at 1–2.  This type of service is commonly referred to as a

bitcoin "mixer" or "tumbler."  The largest volume of transactions sent through Bitcoin Fog, worth

more than $78 million, directly involved illegal darknet markets trafficking illegal narcotics and

other illicit goods.  *See* ECF No. 1-1, at 2-4.  One of these markets, Agora, was promoted by

Bitcoin Fog and vice-versa.  Agora market accounted for the largest identifiable share of

transaction volume on Bitcoin Fog.  *See* ECF No. 1-1, at 4.

Bitcoin Fog advertised its ability to help users evade law enforcement, including in an

online forum post announcing that Bitcoin Fog would make it difficult for "authorities" and others

to trace users' bitcoin transactions and "making it impossible to prove any connection between a

deposit and a withdraw inside our service."  ECF No. 1-1, at 2.  Evidence at trial will show that

Bitcoin Fog was designed and advertised for the purpose of laundering bitcoin without collecting

records of users' identities or their individual transactions.  Statements made on BitcoinTalk by

Sterlingov's online moniker, Akemashite Omedetou, confirmed that Bitcoin Fog was deliberately

designed to avoid collecting such information:

- When asked whether Bitcoin Fog was a "honeypot," he replied: "That's a difficult one, isn't it?  If you have any good ideas of how I could prove the service is not run by the government, I would like to hear them! :P   Everything I have is circumstantial, but here are some points:  The service specifically tries not to collect *any* extra information about users than what is needed.  Any government-run site would probably use this chance to get as much information about users as they could . . . ."

- Responding to a question asking about the difference between Bitcoin Fog and any other web service that accepts bitcoin deposits, he stated: "Well because you don't actually KNOW that the service is going to launder your coins.  And because all 'normal' services can and do keep logs of usernames/ip addresses linked to deposits.  Should the time come, the police won't try to guess what happened from the block chain, they will simply come to the service and ask for the information

**Supp.App.19**

from the logs, which any legitimate service will provide because they don't want any problems with the law. They are also much easier to find and contact for the authorities than an anonymous-good-luck-to-find tor hidden service."

- Responding to a question about the difference between Bitcoin Fog and an ordinary virtual currency exchange, he stated: "As I see it, you do get some anonymity by mixing it like that (and that is the only other choice apart from mixing services I guess), but those companies do not try to make your payments anonymous deliberately, do not mix a lot just to hide all the traces. Most of them are also run as legitimate, visible businesses, which will be forced to reveal information about your funds, should such a request be made by the authorities. I would assume they are also keeping very long logs, since they don't have any reason not to. Us on the other hand, the authorities have to find first, which, as Silk Road have demonstrated, can prove problematic."

- "We keep logs for 1 week for debugging and troubleshooting purposes. After that they are automatically deleted. ALL logs are taken care of. Even the bitcoin client we use is purged every week, starting with a fresh installation of only the block chain, and importing all the addresses we need at that point automatically. That way, if you have received a payment from us a month ago, not even the address will be left on our server."

- "As for logs, based on my experience with similar web applications, any website that says 'we don't keep logs as all, not even for 1 second' are basically lying. What if the server crashes in a middle of a transaction? What if your server was down for hours yesterday and you don't know why? etc. etc. No good web master or programmer will have such a service running without any logs at all. That is why our policy is to be open about this, and make sure everything is deleted after one week (by making this automatic)."

- "Oh, but there is a BIG difference here. MTGOX is an official company with official owners, addresses, taxes... They never were nor ever said they would be anonymous. If any problem with the law ever comes up, all their logs will be in the hands of well, you know. Japan is probably as far from the offshore mentality as it gets. But apart from that, if you would deposit your money to MTGOX, and then manually payout it to your other addresses, manually randomizing all the transactions, then sure, it would be like our service. We do this automatically, anonymously and without any persisting logs."

Sterlingov's knowledge that his service, Bitcoin Fog, was transacting in the proceeds of illegal activity is one of the elements in Counts One and Three.[1] In Count One, Sterlingov is

---

[1] Sterlingov is also charged in Count Two with violation of the "sting" money laundering statute, 18 U.S.C. § 1956(a)(3), which makes it a crime to conduct certain transactions with "property *represented to be* the proceeds of specified unlawful activity, or property used to conduct or

**Supp.App.20**

charged with conspiring with co-conspirators known and unknown, including darknet vendors and darknet market administrative teams, to commit various money laundering offenses—specifically, promotional money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Both violations require proof that the defendant knew that the property being laundered constituted the proceeds of "some form of unlawful activity." 18 U.S.C. § 1956(a)(1).

In Count Three, Sterlingov is charged with operating an unlicensed money transmitting business, in violation of each of the three prongs of 18 U.S.C. § 1960(b)(1).  Under the third prong, Sterlingov is charged with operating a money transmitting business that "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."  18 U.S.C. § 1960(b)(1)(C).  Thus, this prong—to the extent it relies on transmission of funds "known . . . to have been derived from" criminal activity—also requires proof of the defendant's knowledge.

## ARGUMENT

### I.   Willful Blindness Is Well-Established by Supreme Court and Other Judicial Precedent

"The doctrine of willful blindness is well established in criminal law."  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).  "[I]n the federal courts, willful blindness

---

facilitate specified unlawful activity" (emphasis added).  There is no separate knowledge requirement under § 1956(a)(3) regarding the source of the funds.  *See* 134 Cong. Rec. S17360-02 (Nov. 10, 1988) (Senate Judiciary Committee analysis of Anti-Drug Abuse Act of 1988) ("The amendment would add to section 1956 a new subsection (a)(3) dealing specifically with undercover operations. . . .  [T]here would not be any separate knowledge requirement regarding the source of the property involved in the transaction.  The defendant would not have to know or believe that the property involved in the financial transaction was drug money.  It would be sufficient that a law enforcement officer had represented it as such.  While this would mean that everyone involved in the financial transaction would be guilty of this offense whether he was aware of the law enforcement officer's representation or not, the strengthened specific intent requirement would guard against innocent persons being prosecuted.")

**Supp.App.21**

instructions—sometimes called 'deliberate ignorance' or 'conscious avoidance' or 'ostrich' instructions—are now commonly given and commonly upheld." *United States v. Alston-Graves*, 435 F.3d 331, 338 (D.C. Cir. 2006) (collecting cases); *see also Global-Tech*, 563 U.S. at 768 (noting the "long history of willful blindness and its wide acceptance in the Federal Judiciary").

A willful blindness jury instruction prevents defendants from "escap[ing] the reach of" statutes that require knowledge or willfulness as an element "by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances." *Global-Tech*, 563 U.S. at 766; *see also United States v. Holloway*, 731 F.2d 378, 381 (6th Cir. 1984) (deliberate ignorance instruction "prevents a criminal defendant from escaping conviction merely by deliberately closing his eyes to the obvious risk that he is engaging in unlawful conduct."). "The traditional rationale for th[e] [willful blindness] doctrine is that defendants who behave in this manner are just as culpable as those who have actual knowledge." *Global-Tech*, 563 U.S. at 766; *see also United States v. Gross*, 661 F. App'x 1007, 1020 n.25 (11th Cir. 2016) (per curiam) ("This court has consistently recognized deliberate ignorance of criminal activity as the equivalent of knowledge.") (internal quotations omitted); *United States v. Tai*, 750 F.3d 309, 314 (3d Cir. 2014) ("A willful blindness instruction is typically delivered in the context of explaining how the Government may sustain its burden to prove that a defendant acted knowingly in committing a charged offense.").

In *Global-Tech*, the Supreme Court surveyed Courts of Appeals cases applying willful blindness in the criminal context. 563 U.S. at 769 & n.9. It found that "[w]hile the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of

5

that fact." *Id.* at 769.  The Court held that "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.*

In *Alston-Graves*, decided before *Global-Tech*, the D.C. Circuit expressed concern that a willful blindness instruction might result in a jury "convict[ing] a defendant for acting recklessly . . . or even for acting negligently." *Alston-Graves*, 435 F.3d at 340.  The Supreme Court directly addressed that concern in *Global-Tech*.  It concluded that the two requirements for willful blindness that it had pronounced "give willful blindness an appropriately limited scope that surpasses recklessness and negligence." *Global-Tech*, 563 U.S. at 769.

The Government does not need to "present direct evidence of conscious avoidance to justify a willful blindness instruction." *United States v. Stadtmauer*, 620 F.3d 238, 259 (3d Cir. 2010) (emphasis omitted).  A sufficient factual predicate exists if "there is evidence that the defendant engaged in behavior that could reasonably be interpreted as having been intended to shield him from confirmation of his suspicion that he was involved in criminal activity." *United States v. Macias*, 786 F.3d 1060, 1062 (7th Cir. 2015); *see also United States v. Lange*, 834 F.3d 58, 78 (2d Cir. 2016) ("To establish a factual predicate, there must be evidence that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.") (internal quotations omitted); *United States v. Trejo*, 831 F.3d 1090, 1095 (8th Cir. 2016) ("A willful blindness or deliberate indifference instruction is appropriate when there is evidence to support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts."); *United States v. Ford*, 821 F.3d 63, 74 (1st Cir. 2016) (evidence supporting willful blindness instruction "can include evidence that the defendant was confronted with 'red flags'"); *United States v. Moreno-Azua*, 598

F. App'x 150, 154 (4th Cir. 2015) (per curiam) (willful blindness instruction appropriate when defendant's "theory of defense, as asserted in his opening and closing arguments, was that the Government lacked sufficient evidence to establish his knowledge" and there were a "myriad of warning signs" to support deliberate ignorance); *Moore v. Hartman*, 102 F. Supp. 3d 35, 118 (D.D.C. 2015) ("plainly or deliberately ignor[ing] [] red flags" raises issue of willful blindness).

"[T]he government is not required to choose between an actual knowledge and a conscious avoidance theory." *United States v. Addario*, 662 F. App'x 61, 64 (2d Cir. 2016) (summary order). "[A]ssuming there to be sufficient evidence as to both theories, it is not inconsistent for a court to charge a jury on both an actual knowledge theory and a willful blindness theory." *United States v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999). "[E]ven when there is evidence of actual knowledge, a willful blindness instruction is proper if there is sufficient evidence to support an inference of deliberate ignorance." *United States v. Magallon*, 984 F.3d 1263, 1286 (8th Cir. 2021) (quoting *United States v. Lewis*, 557 F.3d 601, 613 (8th Cir. 2009)).

## II.   A Willful Blindness Instruction Is Particularly Appropriate for Money Laundering Counts

Courts have recognized that a willful blindness instruction is particularly appropriate in money laundering cases. For example, in *United States v. McBride*, 724 F.3d 754, 757 (7th Cir. 2013), the Seventh Circuit relied on *Global Tech* and another Supreme Court decision, *United States v. Santos*, 553 U.S. 507 (2008),[2] to find that "willful blindness" was sufficient to establish

---

[2] In the plurality opinion in *Santos*, Justice Scalia observed that "the knowledge element of [a] money-laundering offense—knowledge that the transaction involves profits of unlawful activity— that will be provable (as knowledge must almost always be proved) by circumstantial evidence." 553 U.S. at 521. Separately, and in addition to circumstantial evidence of direct knowledge, the plurality went on to discuss the applicability of a willful blindness instruction: "Moreover, the Government will be entitled to a willful blindness instruction if the professional money launderer, aware of a high probability that the laundered funds were profits, deliberately avoids learning the

the knowledge required for a money laundering conspiracy in violation of 18 U.S.C. § 1956(h). The court found that that the defendant's friend was willfully blind to the source of the defendant's proceeds. *Id.* The court relied on the fact that the friend "knew the defendant was a drug dealer, knew that most of the money she was depositing didn't come from the sale of clothing, and either knew that the money could have come only from his drug dealings or suspected as much yet feared that inquiring of the defendant would confirm her suspicion—a form of willful blindness that the law equates to knowledge." *Id.* (citing *Global-Tech* and *Santos*). Thus, the failure to inquire as to the source of suspected illegal funds is a "deliberate action[]" that satisfies the willful blindness standard articulated in *Global-Tech*.

In *United States v. Flores*, the Third Circuit held that knowledge may be demonstrated by showing that a defendant either had actual knowledge or "deliberately closed his eyes to what otherwise would have been obvious to him concerning the fact in question." 454 F.3d 149, 155-56 (3rd Cir. 2006) (internal citation and quotation omitted). That the defendant "did not ask the natural follow-up questions to determine the source of those funds could reasonably be considered by a jury to be evidence of willful blindness." *Id.* (quoting *United States v. Wert-Ruiz*, 228 F.3d 250, 257 (3d Cir.2000)). Instead of asking these questions, the defendant engaged in additional money laundering transactions of the same ilk. *Flores*, 454 F.3d at 155-56. "In sum, the jury's verdict reflects that it reasonably concluded, based on the evidence before it, that Flores was willfully blind to the illegal source and disposition of the funds in the accounts of the corporations he formed." *Id.* Thus, the failure by a person to ask questions regarding the legitimacy of the

---

truth about them—as might be the case when he knows that the underlying crime is one that is rarely unprofitable." *Id.*

money involved in transactions in their name is a deliberate action warranting a willful blindness instruction.

The legislative history of the money laundering statute confirms that a willful blindness instruction is appropriate.  Relying on the Senate report for the bill that enacted Section 1956, the Sixth Circuit found that the knowledge element should be interpreted broadly.  *See United States v. Hill*, 167 F.3d 1055, 1066-67 (6th Cir. 1999).  The court relied in part on language from the Senate Report explaining that the knowledge requirement for money laundering was intended "to include instances of 'willful blindness.'" *Id.* (quoting S. Rep. No. 99-433 (1986), at 9).  Similarly, the Seventh Circuit relied upon this same report when upholding the use of a willful blindness instruction.  *See United States v. Antzoulatos*, 962 F.2d 720, 724-25 (7th Cir. 1992).  In *Antzoulatos*, the court noted in dicta that the legislative history of Section 1956 confirmed that more than a mere suspicion is required on a merchant's part that his customers are drug dealers.  *Id.* at 724 n.3.  In fact, an earlier version of the statute contained "reason to know" and "reckless disregard" for the knowledge standards; however, the legislature replaced this language with "knowingly." *Id.*  Yet, the report noted, as stated above, "'knowing' was to be defined like existing 'knowing' scienter requirements, to include instances of 'willful blindness.'" *Id.*  Because the legislative history specifically identifies willful blindness as satisfying the knowledge element of money laundering, it is appropriately applied in this case.

Numerous federal courts of appeals have held that a willful blindness instruction is appropriate in a money laundering prosecution.  *See United States v. Miller*, 41 F.4th 302, 314 (4th Cir. 2022) (approving willful blindness instruction because "there was ample evidence to infer that [the defendant] subjectively believed there was a high probability [his co-conspirator spouse] was laundering their money" and "to infer that [the defendant] took deliberate actions to avoid learning

**Supp.App.26**

the specifics of the money-laundering scheme."); *United States v. Alaniz*, 726 F.3d 586, 611-13 (5th Cir. 2013) (approving "deliberate indifference" instruction where defendants conducted multiple financial transactions for which they did not have legitimate funds to conduct, allowed others to conduct transactions through their accounts, and received large cash deposits and wire transfers into their bank accounts); *United States v. Clay*, 618 F.3d 946, 953-54 (8th Cir. 2010) (finding willful blindness instruction appropriate where jury could reasonably conclude that defendant either knew of the illegal activity or buried his head in the sand); *United States v. Bohn*, 281 F. App'x 430, 441 (6th Cir. 2008) (unpublished) ("In this Circuit the knowledge requirements of § 1956 are construed to include instances of willful blindness."); *United States v. Rivera-Rodriguez*, 318 F.3d 268, 272 (1st Cir. 2003) ("[I]t would suffice for the jury to conclude that Trinidad consciously averted his eyes from the obvious explanation for the funds; he did not have to witness drug dealing or hear a confession.").  In addition, at least one circuit has referenced willful blindness among its pattern money laundering instructions.  *See* Eighth Circuit Pattern Instructions, at 533 n.12 ("The 1956(a)(1)(B) 'knowing' requirement encompasses instances of 'willful blindness.'").  Although *Alston* noted various circuits' decisions advising that willful blindness instructions are rarely appropriate, it also stated that willful blindness instructions "are now commonly given and commonly upheld" and that "[a]ll of the other circuits with criminal jurisdiction have approved such instructions for a wide range of criminal offenses."  435 F.3d 338, 341.

The same logic applies to the knowledge prong under 18 U.S.C. § 1960(b)(1)(C), which parallels the substance of Section 1956 in referring to the defendant's knowledge that the funds involved in the transactions were derived from a criminal offense.  *Compare* 18 U.S.C. § 1956(a)(1) (referring to defendant "knowing" that property represented "proceeds of some form

**Supp.App.27**

of unlawful activity"), *with* 18 U.S.C. § 1960(b)(1)(C) (referring to whether funds are "known" by defendant to have been "derived from a criminal offense"). Indeed, § 1960(b)(1)(C) is sometimes characterized as a kind of "money laundering" offense, *e.g.*, *United States v. Hellinger*, 538 F. App'x 211, 213 (3d Cir. 2013) (referring to "money laundering in violation of 18 U.S.C. § 1960(b)(1)(C)"), and violations of § 1960(b)(1)(C) are sentenced under the money laundering guideline, U.S.S.G. § 2S1.1, rather than the guideline that applies to federal and state registration offenses, U.S.S.G. § 2S1.3. Congress enacted subsection (b)(1)(C) as a new offense under Section 1960 in 2001 as part of the USA Patriot Act. *See* Pub. L. 107-56, tit. III, § 373(b), 115 Stat. 272 (Oct. 26, 2001). In doing so, Congress would have been aware of the existing body of case law applying willful blindness to Section 1956, including the decisions discussed above in *United States v. Hill*, 167 F.3d 1055 (6th Cir. 1999), and *United States v. Antzoulatos*, 962 F.2d 720 (7th Cir. 1992), and can be presumed to have adopted this construction of the knowledge element into the new § 1960(b)(1)(C). *See Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*, 139 S. Ct. 628, 634 (2019) ("In adopting the language used in the earlier act, Congress must be considered to have adopted also the construction given by this Court to such language, and made it a part of the enactment.") (quoting *Shapiro v. United States*, 335 U.S. 1, 16 (1948); internal quotations omitted).

Here, the government anticipates introducing both direct and circumstantial evidence of the defendant's *actual* knowledge that the bitcoin funds laundered through Bitcoin Fog represented the proceeds of darknet drug trafficking offenses and other unlawful activity. In addition, the government respectfully submits that a willful blindness instruction would be appropriate in light

of *Global-Tech* and the other authorities discussed above.[3]  Finally, on the basis of the evidence it expects to introduce, and such legal authority, the government seeks permission to refer to willful blindness in the government's opening statement.

---

[3] The government will submit its final proposed jury instructions as required by the Court's pretrial scheduling order.  Meanwhile, for ease of reference, other Circuit Courts of Appeals have similar model instructions. Among others, the Eighth Circuit Criminal Pattern Instruction reads:

> You may find that the defendant [(name)] acted knowingly if you find beyond a reasonable doubt that the defendant [(name)] believed there was a high probability that (state fact as to which knowledge is in question (*e.g.*, that "drugs were contained in his suitcase")) and that [he] [she] took deliberate actions to avoid learning of that fact. Knowledge may be inferred if the defendant [(name)] deliberately closed [his] [her] eyes to what would otherwise have been obvious to [him] [her]. A willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. You may not find the defendant acted "knowingly" if you find he/she was merely negligent, careless or mistaken as to (state fact as to which knowledge is in question (*e.g.*, that "drugs were contained in his suitcase")).

Instruction 7.04 ("Deliberate Ignorance/Willful Blindness") at 693 (footnote omitted), available at https://www.ca8.uscourts.gov/sites/ca8/files/2021%20Edition-Criminal%20Jury%20Instructions.pdf .  Similarly, the parallel Fifth Circuit Criminal Pattern Jury Instruction reads:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his [her] eyes to what would otherwise have been obvious to him [her]. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself [herself] to the existence of a fact.

Instruction 1.42 ("Deliberate Ignorance") at 63, available at https://www.lb5.uscourts.gov/juryinstructions/fifth/crim2019.pdf.  Other Circuits have a similar standard instruction:.  *See, e.g.*, Third Circuit Model Criminal Instruction 5.06 (Willful Blindness [Deliberate Ignorance]), available at https://www.ca3.uscourts.gov/sites/ca3/files/2021%20Chapter%205%20for%20posting%20final.pdf ; Sixth Circuit Pattern Criminal Jury Instructions, Instruction 2.09 (Deliberate Ignorance), available at https://www.ca6.uscourts.gov/sites/ca6/files/documents/pattern_jury/pdf/crmpattjur_full.pdf ; Eleventh Circuit Pattern Jury Instructions, Criminal Cases, Instruction S8 (Deliberate Ignorance as Proof of Knowledge), available at https://www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/FormCriminalPatternJuryInstructionsRevisedMAR2022.pdf .

## <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully provides notice and moves for this

Court to allow a willful blindness jury instruction and to permit the government to refer to willful

blindness in its opening statement.

<div style="margin-left: 40%;">

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

</div>

BY:    */s/ Christopher B. Brown*
           Christopher B. Brown, D.C. Bar No. 1008763
           Assistant United States Attorney
           U.S. Attorney's Office for the District of Columbia
           601 D Street, N.W.
           Washington, D.C. 20530
           (202) 252-7153
           Christopher.Brown6@usdoj.gov

           */s/ C. Alden Pelker*
           C. Alden Pelker, Maryland Bar
           Trial Attorney, U.S. Department of Justice
           Computer Crime & Intellectual Property Section
           1301 New York Ave., N.W., Suite 600
           Washington, D.C. 20005
           (202) 616-5007
           Catherine.Pelker@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal No. 21-cr-399 (RDM)** |
| | **:** | |
| **ROMAN STERLINGOV,** | **:** | |
| | **:** | |
| **Defendant** | **:** | |

## <u>ORDER</u>

Upon consideration of the government's Notice and Motion *In Limine* Regarding Willful Blindness Instruction as to Counts One and Three, and Permission To Refer to Willful Blindness in Opening Statement, any opposition thereto, and such evidence and argument as has been presented at any hearing on the motion, it is this _____ day of _____, 2022, hereby

ORDERED, that the motion is GRANTED.


_____
THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Supp.App.31**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>GOVERNMENT'S PROPOSED JURY INSTRUCTIONS</u>

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully submits the following proposed jury instructions, with the understanding that it may be necessary to propose additional or adjusted instructions depending on events at trial. Because the declined refused to confer regarding jury instructions, share its objections with the government, or disclose its proposed competing instructions to the government prior to its separate filing, the government reserves the right to make objections and submit additional instructions in response to the defense filings.

The government anticipates that footnotes and sourcing information would be stripped out of the finalized jury instructions.

**Supp.App.32**

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:    */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
C. Alden Pelker, Maryland Bar
Trial Attorney, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007
Catherine.Pelker@usdoj.gov

2

## **PRELIMINARY INSTRUCTIONS**

1.102            Preliminary Instruction Before Trial
*Along with these Instructions, to be inserted where indicated in 1.102:*

1.105A          Preliminary Instruction when Notetaking is Permitted
1.107            Preliminary Instructions to Jury Where Identity of Alternates is Not Disclosed
1.108            A Juror's Recognition of a Witness or Other Party Connected to the Case

**Supp.App.34**

**Instruction 1.102**

**PRELIMINARY INSTRUCTION BEFORE TRIAL**

Before we begin the trial, I want to explain some of the legal rules that will be important in this trial. I want to emphasize that these remarks are not meant to be a substitute for the detailed instructions that I will give at the end of the trial just before you start your deliberations. These preliminary instructions are intended to give you a sense of what will be going on in the courtroom and what your responsibilities as jurors will be.

———————————————

Source:  Red Book 1.102

4

**Instruction 1.105**

**NOTETAKING BY JURORS (Preliminary Instruction)**

When you took your seats, you probably noticed that each of you had a notebook and pencil waiting for you. That is because I permit jurors to take notes during trial if they wish. Whether you take notes or not is entirely up to you. Many people find that taking notes helps them remember testimony and evidence; others find it distracts them from listening to the witnesses.

You will be permitted to take your notebooks back with you into the jury room during deliberations. You should remember, however, that your notes are only an aid to your memory. They are not evidence in the case, and they should not replace your own memory of the evidence. Those jurors who do not take notes should rely on their own memory of the evidence and should not be influenced by another juror's notes.

Other than during your deliberations, the notebooks will remain locked in the courtroom during recesses and overnight. You will not be able to take the notebooks with you as you come and go and you will not be permitted to take them home with you overnight. At the end of the trial, when you come back to the courtroom to deliver your verdict, your notebooks will be collected, and the pages torn out and destroyed. No one, including myself, will ever look at any notes you have taken, so you may feel free to write whatever you wish.

———————————————

Source: Red Book 1.05A

5

**Instruction 1.107**

**PRELIMINARY INSTRUCTION TO JURY WHERE**

**IDENTITY OF ALTERNATES IS NOT DISCLOSED**

You have probably noticed that there are fourteen (14) of you sitting in the jury box.

Only twelve (12) of you will retire to deliberate in this matter. Before any of you even entered

the courtroom, we randomly selected the alternates' seats. I will not disclose who the alternate

jurors are until the end of my final instructions just before you begin your deliberations. As any

seat might turn out to be an alternate's seat, it is important that each of you think of yourselves as

regular jurors during this trial, and that all of you give this case your fullest and most serious

attention.

------------------------------------------------

Source:  Red Book 1.07

6

**Instruction 1.108**

**A JUROR'S RECOGNITION OF A WITNESS**

**OR OTHER PARTY CONNECTED TO THE CASE**

At the beginning of the jury selection process, you were introduced to some witnesses in person. Others were identified to you only by name. If, at any time during this trial, you suddenly realize that you recognize or might know any witness, lawyer, someone who is mentioned in the testimony or evidence, or anyone else connected with this case in any way, you should raise your hand immediately and ask to speak with me.

_____

Source: Red Book 1.108

**Instruction 1.102**

**PRELIMINARY INSTRUCTION BEFORE TRIAL (continued)**

Now let me explain briefly some of the procedures we will follow and some of the rules of law that will be important in this case. This is a criminal case that began when the grand jury returned an indictment.

The indictment contains four counts for events that occurred between approximately October 2011 through approximately April 2021.  In Count One, the indictment charges that, through the operation of Bitcoin Fog, the defendant conspired with co-conspirators known and unknown, including darknet vendors and darknet administrative teams, to engage in a Money Laundering Conspiracy.  In Count Two, the indictment charges that the defendant conducted a money laundering transaction involving property represented to be the proceeds of unlawful activity on November 21, 2019.  In Count Three, the indictment charges that the defendant operated an unlicensed money transmitting business, Bitcoin Fog.  And in Count Four, the indictment charges that the defendant, through the operation of Bitcoin Fog, engaged in the business of money transmission without a license in the District of Columbia.

You should understand clearly that the indictment that I just summarized is not evidence. The indictment is just a formal way of charging a person with a crime in order to bring him to trial. You must not think of the indictment as any evidence of the guilt of the defendant, or draw any conclusion about the guilt of the defendant just because he has been indicted.

8

At the end of the trial, you will have to decide whether or not the evidence presented has convinced you beyond a reasonable doubt that the defendant committed the offenses with which he has been charged.

*[Read elements of the offenses and any other required instruction relating to the substantive offense.]*

Every defendant in a criminal case is presumed to be innocent. This presumption of innocence remains with the defendant throughout the trial unless and until he is proven guilty beyond a reasonable doubt. The burden is on the government to prove the defendant guilty beyond a reasonable doubt, and that burden of proof never shifts throughout the trial. The law does not require a defendant to prove his innocence or to produce any evidence. If you find that the government has proven beyond a reasonable doubt every element of a particular offense with which the defendant is charged, it is your duty to find him guilty of that offense. On the other hand, if you find that the government has failed to prove any element of a particular offense beyond a reasonable doubt, you must find the defendant not guilty of that offense.

As I explain how the trial will proceed, I will refer to the "government" and to the "defense" or the "defendant." When I mention the "government," I am referring to Assistant United States Attorney Christopher Brown and Department of Justice Trial Attorney Alden Pelker.  When I mention the defendant or the defense, I am referring either to the defendant, Mr. Roman Sterlingov, or his attorneys, Mr. Tor Ekeland and Mr. Michael Hassard.

Supp.App.40

As the first step in this trial, the government and the defendant will have an opportunity to make opening statements. The defendant may make an opening statement immediately after the government's opening statement or he may wait until the beginning of the defendant's case, or he may choose not to make an opening statement at all. You should understand that the opening statements are not evidence. They are only intended to help you understand the evidence that the parties expect will be introduced.

After the opening statement or statements, the government will put on what is called its case-in-chief. This means that the government will call witnesses to the witness stand and ask them questions. This is called direct examination. When the government is finished, the defense may ask questions. This is called cross-examination. When the defense is finished, the government may have brief re-direct examination. After the government presents its evidence, the defendant may present evidence, but he is not required to do so. The law does not require a defendant to prove his innocence or to produce any evidence. If the defense does put on evidence, the defense attorneys will call witnesses to the stand and ask questions on direct examination, the government will cross-examine, and the defense may have brief re-direct examination. When the defense is finished, the government may offer a rebuttal case, which would operate along the same lines as its case-in-chief.

*[The following paragraph should be given when the court gives the final instructions after the closing arguments:*

At the end of all of the evidence, each side will have an opportunity to make a closing argument in support of its case. The lawyers' closing arguments, just like their opening

Supp.App.41

statements, are not evidence in this case. They are only intended to help you understand the evidence.

Finally, at the end of the evidence and after both sides have finished closing arguments, I will tell you in detail about the rules of law that you must follow when you consider what your verdicts shall be. Your verdicts must be unanimous; that is, all twelve jurors must agree on the verdicts.

*[The following paragraph should be given when the court gives the final instructions before the closing arguments:*

At the end of all the evidence, I will instruct you once more on the rules of law that you are to apply in your deliberations when you retire to consider your verdict in this case. Then each side will have a chance to present closing arguments in support of its case. The statements of the lawyers in their closing arguments, just as in their questions and in their opening statements, are not evidence in this case. They are intended only to help you understand the evidence and what each side claims the evidence shows. Finally, at the end of the closing arguments, I will have a few additional instructions for you before you begin your deliberations.

I want to briefly describe my responsibilities as the judge and your responsibilities as the jury. My responsibility is to conduct this trial in an orderly, fair, and efficient manner, to rule on legal questions that come up in the course of the trial, and to instruct you about the law that applies to this case. It is your sworn duty as jurors to accept and apply the law as I state it to you.

Your responsibility as jurors is to determine the facts in the case. You--and only you--are the judges of the facts. You alone determine the weight, the effect, and the value of the evidence, as well as the credibility or believability of the witnesses. You must consider and weigh the

testimony of all witnesses who appear before you. You alone must decide the extent to which you believe any witness.

You must pay very careful attention to the testimony of all of the witnesses because you will not have any transcripts or summaries of the testimony available to you during your deliberations. You will have to rely entirely on your memory and your notes if you choose to take any.

As human beings, we all have personal likes and dislikes, opinions, prejudices, and biases. Generally, we are aware of these things, but you also should consider the possibility that you have implicit biases, that is, biases of which you may not be consciously aware. Personal prejudices, preferences, or biases have no place in a courtroom, where the goal is to arrive at a just and impartial verdict. All people deserve fair treatment in the legal system regardless of race, national or ethnic origin, religion, age, disability, sex, gender identity or expression, sexual orientation, education, income level, or any other personal characteristic. You should determine the facts solely from a fair consideration of the evidence.

During this trial, I may rule on motions and objections by the lawyers, make comments to lawyers, question the witnesses, and instruct you on the law. You should not take any of my statements or actions as any indication of my opinion about how you should decide the facts. If you think that somehow I have expressed or even hinted at any opinion as to the facts in this case, you should disregard it. The verdict in this case is your sole and exclusive responsibility.

You may consider only the evidence properly admitted in this case. That evidence includes the sworn testimony of witnesses and the exhibits admitted into evidence. Sometimes a lawyer's question suggests the existence of a fact, but the lawyer's question alone is not evidence.

If the evidence includes anything other than testimony and exhibits, I will instruct you about these other types of evidence when they are admitted during the trial.

During the trial, if the court or a lawyer makes a statement or asks a question that refers to evidence that you remember differently, you should rely on your memory of the evidence during your deliberations.

The lawyers may object when the other side asks a question, makes an argument, or offers evidence that the objecting lawyer believes is not properly admissible. You must not hold such objections against the lawyer who makes them or the party she or he represents. It is the lawyer's responsibility to object to evidence that they believe is not admissible.

If I sustain an objection to a question asked by a lawyer, the question must be withdrawn, and you must not guess or speculate what the answer to the question would have been. If a question is asked and answered, and I then rule that the answer should be stricken from the record, you must disregard both the question and the answer in your deliberations. You should follow this same rule if any of the exhibits are stricken.

You are not permitted to discuss this case with anyone until this case is submitted to you for your decision at the end of my final instructions. This means that, until the case is submitted to you, you may not talk about it even with your fellow jurors. This is because we don't want you making decisions until you've heard all the evidence and the instructions of law. In addition, you may not talk about the case with anyone else. It should go without saying that you also may not write about the case electronically through any blog, posting, or other communication, including "social networking" sites such as Facebook or Twitter until you have delivered your verdict and the case is over. This is because you must decide the case based on what happens here in the

13

courtroom, not on what someone may or may not tell you outside the courtroom. I'm sure that,

when we take our first recess, you will call home or work and tell them you have been selected

for a jury. They will undoubtedly ask what kind of case you're sitting on. You may tell them it is

a criminal case, but nothing else. Now, when the case is over, you may discuss any part of it with

anyone you wish, but until then, you may not do so.

Although it is a natural human tendency to talk with people with whom you may come

into contact, you must not talk to any of the parties, their attorneys, or any witnesses in this case

during the time you serve on this jury. If you encounter anyone connected with the case outside

the courtroom, you should avoid having any conversation with them, overhearing their

conversation, or having any contact with them at all. For example, if you find yourself in a

courthouse corridor, elevator, or any other location where the case is being discussed by

attorneys, parties, witnesses, or anyone else, you should immediately leave the area to avoid

hearing such discussions. If you do overhear a discussion about the case, you should report that

to me as soon as you can. Finally, if you see any of the attorneys or witnesses involved in the

case and they turn and walk away from you, they are not being rude; they are merely following

the same instruction that I gave to them.

It is very unlikely, but if someone tries to talk to you about the case, you should refuse to

do so and immediately let me know by telling the clerk or the marshal. Don't tell the other jurors;

just let me know, and I'll bring you in to discuss it.

Between now and when you are discharged from jury duty, you must not provide to or

receive from anyone, including friends, co-workers, and family members, any information about

your jury service. You may tell those who need to know where you are, that you have been

14

picked for a jury, and how long the case may take. However, you must not give anyone any information about the case itself or the people involved in the case. You must also warn people not to try to say anything to you or write to you about your jury service or the case. This includes face-to-face, phone, or computer communications.

In this age of electronic communication, I want to stress that you must not use electronic devices or computers to talk about this case, including tweeting, texting, blogging, e-mailing, posting information on a website or chat room, or any other means at all. Do not send or accept messages, including email and text messages, about your jury service. You must not disclose your thoughts about your jury service or ask for advice on how to decide any case.

You must decide the facts based on the evidence presented in court and according to the legal principles about which I will instruct you. You are not permitted, during the course of the trial, to conduct any independent investigation or research about the case. That means, for example, you cannot use the Internet to do research about the facts or the law or the people involved in the case. Research includes something even as simple or seemingly harmless as using the Internet to look up a legal term or view a satellite photo of the scene of the alleged crime.

I want to explain the reasons why you should not conduct your own investigation. All parties have a right to have the case decided only on evidence and legal rules that they know about and that they have a chance to respond to. Relying on information you get outside this courtroom is unfair because the parties would not have a chance to refute, correct, or explain it. Unfortunately, information that we get over the Internet or from other sources may be incomplete or misleading or just plain wrong. It is up to you to decide whether to credit any

15

evidence presented in court and only the evidence presented in court may be considered. If evidence or legal information has not been presented in court, you cannot rely on it.

Moreover, if any of you do your own research about the facts or the law, this may result in different jurors basing their decisions on different information. Each juror must make his or her decision based on the same evidence and under the same rules.

In some cases, there may be reports in the newspaper or on the radio, Internet, or television concerning the case while the trial is ongoing. If there should be such media coverage in this case, you may be tempted to read, listen to, or watch it. You must not read, listen to, or watch such reports because you must decide this case solely on the evidence presented in this courtroom. If any publicity about this trial inadvertently comes to your attention during trial, do not discuss it with other jurors or anyone else. Just let me or my clerk know as soon after it happens as you can, and I will then briefly discuss it with you.

After I submit the case to you, you may discuss it only when I instruct you to do so, and only in the jury room and only in the presence of all your fellow jurors. It is important that you keep an open mind and not decide any issue in the case until after I submit the entire case to you with my final instructions.

―――――――――――――――――――

Source:  Red Book 1.102

16

**<u>ANTICIPATED INSTRUCTIONS DURING TRIAL</u>**

1.103A          Stipulation of Fact
1.202           Cautionary Instruction on the Use of the Internet and Publicity

**Supp.App.48**

**Instruction 1.103**

## **STIPULATION OF FACT (during trial)**

The government and the defendant may stipulate--that is, agree--to certain facts. You should consider any stipulation of fact to be undisputed evidence.

———————————————————————

Source:  Red Book 1.103A

18

**Instruction 1.202**

## <u>CAUTIONARY INSTRUCTION ON THE USE OF THE INTERNET AND PUBLICITY</u>
*[for consideration as an instruction to be read at the end of the day]*

You may not communicate with anyone not on the jury about this case. As I explained earlier, this includes any electronic communication such as emailing or texting or any blogging about the case. In addition, you may not conduct any independent investigation before or during deliberations. This means you may not conduct any research in person or electronically via the Internet or in any other way.

In some cases, although not necessarily this one, there may be reports in the newspaper or on the radio, Internet, or television concerning the case while the trial is going on. If there should be such media coverage in this case, you may be tempted to read, listen to, or watch it. You must not read, listen to, or watch such reports because you must decide this case solely on the evidence presented in this courtroom. If any publicity about this trial inadvertently comes to your attention during trial, do not discuss it with other jurors or anyone else. Just let me or my clerk know as soon after it happens as you can, and I will then briefly discuss it with you.

_____

Source: Red Book 1.202

19

## FINAL INSTRUCTIONS

2.100   Furnishing the Jury with a Copy of the Instructions
2.101   Function of the Court
2.102   Function of the Jury
2.103   Jury's Recollection Controls
1.105B  Final Instruction When Notetaking is Permitted
2.104   Evidence in the Case:  Exhibits, Facts Stipulated to by the Parties (if applicable)
2.105   Statements of Counsel
2.106   Indictment Not Evidence
2.107   Burden of Proof – Presumption of Innocence
2.108   Reasonable Doubt [U.S. District Court Alternative]
2.109   Direct and Circumstantial Evidence
2.110   Nature of Charges Not to Be Considered
2.111   Number of Witnesses
2.112   Inadmissible and Stricken Evidence
2.200   Credibility of Witnesses
2.203   Witness with a Plea Agreement (if applicable)
2.207   Police Officer's and Law Enforcement Agent's Testimony (modified)
2.208   Right of Defendant Not to Testify (if applicable)
2.209   Defendant as Witness (if applicable)
2.210   False or Inconsistent Statement by Defendant (if applicable)
2.215   Specialized Opinion Testimony
2.216   Evaluation of Prior Inconsistent Statement of a Witness (if applicable)
2.217   Evaluation of Prior Consistent Statement of a Witness (if applicable)
2.218   Impeachment by Proof of Conviction of a Crime—Witness (if applicable)
2.230   Identification
2.307   Motive
2.310   Transcripts of Tape Recordings
        Charts and Summaries
2.321   Other Crimes Evidence (if applicable)

DEFINITIONS, THEORIES OF LIABILITY, AND CHARGES
3.101   Proof of State of Mind
        Willful Blindness
        Mistake of Law
2.402   Multiple Counts – One Defendant
        Count One:  Conspiracy To Launder Monetary Instruments—Basic Instruction, 18 U.S.C.
        § 1956(h)
        Count One (Continued):  Laundering of Monetary Instruments—Promotional Money
        Laundering, 18 U.S.C. § 1956(a)(1)(A)(i)
        Count One (Continued):  Laundering of Monetary Instruments—Concealment Money
        Laundering, 18 U.S.C. § 1956(a)(1)(B)(i)
        Count Two:  Sting Money Laundering, 18 U.S.C. § 1956(a)(3)

Count Three:  Operating an Unlicensed Money Transmitting Business, 18 U.S.C. § 1960(a)

Count Four:  Money Transmission Without a License, D.C. Code § 26-1023(c)

3.102   Willfully Causing an Act To Be Done
3.200   Aiding and Abetting
3.103   "On or About" Proof of
        Venue (if applicable)
        Statute of Limitations (if applicable)


DEFENDANT'S THEORY OF THE CASE AND AFFIRMATIVE DEFENSES
9.100   Defendant's Theory of Case
        Affirmative Defenses—General
        Withdrawal from a Conspiracy


ASPECTS OF DELIBERATIONS
2.405   Unanimity—General
2.406   Unanimity—Special
2.407   Verdict Form Explanation
2.501   Exhibits During Deliberations
2.500   Redacted Documents


CLOSING REMARKS
2.502   Selection of a Foreperson
2.505   Possible Punishment Not Relevant
2.508   Cautionary Instruction on Publicity, Communication and Research
2.509   Communications Between Court and Jury During Jury's Deliberations
2.510   Attitude and Conduct of Jurors in Deliberations
2.511   Excusing Alternate Jurors

Supp.App.52

**Instruction 2.100**

**FURNISHING THE JURY WITH A COPY OF THE INSTRUCTIONS**

I will provide you with a copy of my instructions. During your deliberations, you may, if you want, refer to these instructions. While you may refer to any particular portion of the instructions, you are to consider the instructions as a whole and you may not follow some and ignore others. If you have any questions about the instructions, you should feel free to send me a note. Please return your instructions to me when your verdict is rendered.

———————————————————

Source:  Red Book 2.100

**Supp.App.53**

**Instruction 2.101**

**FUNCTION OF THE COURT**

My function is to conduct this trial in an orderly, fair, and efficient manner; to rule on questions of law; and to instruct you on the law that applies in this case.

It is your duty to accept the law as I instruct you. You should consider all the instructions as a whole. You may not ignore or refuse to follow any of them.

———————————————————

Source: Red Book 2.101

Supp.App.54

**Instruction 2.102**

**FUNCTION OF THE JURY**

Your function, as the jury, is to determine what the facts are in this case. You are the sole judges of the facts. While it is my responsibility to decide what is admitted as evidence during the trial, you alone decide what weight, if any, to give to that evidence. You alone decide the credibility or believability of the witnesses.

As I explained earlier, as human beings, we all have personal likes and dislikes, opinions, prejudices, and biases. Generally, we are aware of these things, but you also should consider the possibility that you have implicit biases, that is, biases of which you may not be consciously aware. Personal prejudices, preferences, or biases have no place in a courtroom, where the goal is to arrive at a just and impartial verdict. All people deserve fair treatment in the legal system regardless of any personal characteristic, such as race, national or ethnic origin, religion, age, disability, sex, gender identity or expression, sexual orientation, education, or income level, or any other personal characteristic. You should determine the facts solely from a fair consideration of the evidence.

You may not take anything I may have said or done as indicating how I think you should decide this case. If you believe that I have expressed or indicated any such opinion, you should ignore it. The verdict in this case is your sole and exclusive responsibility.

---

Source:  Red Book 2.102

24

**Instruction 2.103**

**JURY'S RECOLLECTION CONTROLS**

If any reference by me or the attorneys to the evidence is different from your own

memory of the evidence, it is your memory that should control during your deliberations.

———————————————————————

Source: Red Book 2.103

Supp.App.56

**Instruction 1.105B**

**NOTETAKING BY JURORS (Final Instruction When Notetaking Is Permitted)**

During the trial, I have permitted those jurors who wanted to do so to take notes. You may take your notebooks with you to the jury room and use them during your deliberations if you wish. As I told you at the beginning of the trial, your notes are only to be an aid to your memory. They are not evidence in the case, and they should not replace your own memory of the evidence. Those jurors who have not taken notes should rely on their own memory of the evidence. The notes are intended to be for the notetaker's own personal use.

_____

Source: Red Book 1.105B

26

**Instruction 2.104**

**EVIDENCE IN THE CASE**
**JUDICIAL NOTICE AND STIPULATIONS (IF APPLICABLE)**

During your deliberations, you may consider only the evidence properly admitted in this trial.  The evidence in this case consists of the sworn testimony of the witnesses, the exhibits that were admitted into evidence, [the facts of which I took judicial notice], and the facts and testimony stipulated to by the parties.

[I may take what is called "judicial notice" of public acts, places, facts, and events that I consider to be matters of common knowledge or matters that can be determined easily through undisputed sources. In this case, I took judicial notice of [describe fact of which the court took judicial notice]. When I take judicial notice of a particular fact, you may [if you choose to do so,] regard that fact as proven evidence. [Because you are the sole judges of the facts, however, you are not required to accept any fact that is judicially noted.] ]

[During the trial, you were told that the parties had stipulated--that is, agreed--to certain facts. You should consider any stipulation of fact to be undisputed evidence.]

[During the trial, you were told that the parties had stipulated--that is, agreed--to what testimony [name of witness] would have given if s/he had testified in this case. You should consider this stipulated testimony to be exactly what s/he would have said had s/he testified here.]

27

When you consider the evidence, you are permitted to draw, from the facts that you find have been proven, such reasonable inferences as you feel are justified in the light of your experience.  You should give any evidence such weight as in your judgment it is fairly entitled to receive.

––––––––––––––––––––––––––––––––––––

Source: Red Book 2.104

**Supp.App.59**

**Instruction 2.105**

**STATEMENTS OF COUNSEL**

The statements and arguments of the lawyers are not evidence. They are only intended to assist you in understanding the evidence.  Similarly, the questions of the lawyers are not evidence.

───────────────────────────

Source:  Red Book 2.105

**Instruction 2.106**

**INDICTMENT NOT EVIDENCE**

The indictment is merely the formal way of accusing a person of a crime. You must not consider the indictment as evidence of any kind – you may not consider it as any evidence of the defendant's guilt or draw any inference of guilt from it.

---

Source:  Red Book 2.106

**Instruction 2.107**

**BURDEN OF PROOF--PRESUMPTION OF INNOCENCE**

Every defendant in a criminal case is presumed to be innocent. This presumption of innocence remains with the defendant throughout the trial unless and until the government has proven he is guilty beyond a reasonable doubt. This burden never shifts throughout the trial. The law does not require the defendant to prove his innocence or to produce any evidence at all. If you find that the government has proven beyond a reasonable doubt every element of a particular offense with which the defendant is charged, it is your duty to find him guilty of that offense. On the other hand, if you find the government has failed to prove any element of a particular offense beyond a reasonable doubt, it is your duty to find the defendant not guilty of that offense.

———————————————————

Source: Red Book 2.107

31

**Instruction 2.108**

**REASONABLE DOUBT**

The government has the burden of proving the defendant guilty beyond a reasonable doubt as to each count or charge against him. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely than not true, which we call the preponderance of the evidence. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If, on the other hand, you think there is a real possibility that a defendant is not guilty, you must give him the benefit of the doubt and find him not guilty.

––––––––––––––––––––––––––––

Source: Red Book 2.108, alternative in commentary approved for use in U.S. District Court

**Instruction 2.109**

**DIRECT AND CIRCUMSTANTIAL EVIDENCE**

There are two types of evidence from which you may determine what the facts are in this case – direct evidence and circumstantial evidence.  When a witness, such as an eyewitness, asserts actual knowledge of a fact, that witness's testimony is direct evidence.  On the other hand, evidence of facts and circumstances from which reasonable inferences may be drawn is circumstantial evidence.

Let me give you an example.  Assume a person looked out a window and saw that snow was falling.  If he later testified in court about what he had seen, his testimony would be direct evidence that snow was falling at the time he saw it happen.  Assume, however, that he looked out a window and saw no snow on the ground, and then went to sleep and saw snow on the ground after he woke up.  His testimony about what he had seen would be circumstantial evidence that it had snowed while he was asleep.

The law says that both direct and circumstantial evidence are acceptable as a means of proving a fact. The law does not favor one form of evidence over another.  It is for you to decide how much weight to give to any particular evidence, whether it is direct or circumstantial.  You are permitted to give equal weight to both.  Circumstantial evidence does not require a greater degree of certainty than direct evidence.  In reaching a verdict in this case, you should consider all of the evidence presented, both direct and circumstantial.

_____

Source: Red Book 2.109

Supp.App.64

**Instruction 2.110**

**NATURE OF CHARGES NOT TO BE CONSIDERED**

One of the questions you were asked when we were selecting this jury was whether the nature of the charges would affect your ability to reach a fair and impartial verdict.  We asked you that question because you must not allow the nature of a charge to affect your verdict. You must consider only the evidence that has been presented in this case in reaching a fair and impartial verdict.

––––––––––––––––––––––––––––––––––––

Source: Red Book 2.110

Supp.App.65

**Instruction 2.111**

**NUMBER OF WITNESSES**

The weight of the evidence is not necessarily determined by the number of witnesses testifying for each side. Rather, you should consider all the facts and circumstances in evidence to determine which of the witnesses you believe. You might find that the testimony of a smaller number of witnesses on one side is more believable than the testimony of a greater number of witnesses on the other side or you might find the opposite.

———————————————————————

Source: Red Book 2.111

**Supp.App.66**

**Instruction 2.112**

**INADMISSIBLE AND STRICKEN EVIDENCE**

The lawyers in this case sometimes objected when the other side asked a question, made an argument, or offered evidence that the objecting lawyer believed was not proper. You must not hold such objections against the lawyer who made them or the party she or he represents.  It is the lawyers' responsibility to object to evidence that they believe is not admissible.

If, during the course of the trial, I sustained an objection to a lawyer's question, you should ignore the question, and you must not speculate as to what the answer would have been. If, after a witness answered a question, I ruled that the answer should be stricken, you should ignore both the question and the answer and they should play no part in your deliberations. [Likewise, exhibits as to which I have sustained an objection or that I ordered stricken are not evidence, and you must not consider them in your deliberations.]

---

Source: Red Book 2.112

**Supp.App.67**

**Instruction 2.200**

**CREDIBILITY OF WITNESSES**

In determining whether the government has proved the charges against the defendant beyond a reasonable doubt, you must consider the testimony of all the witnesses who have testified.

You are the sole judges of the credibility of the witnesses. You alone determine whether to believe any witness and the extent to which a witness should be believed. Judging a witness's credibility means evaluating whether the witness has testified truthfully and also whether the witness accurately observed, recalled, and described the matters about which the witness testified.

As I instructed you at the beginning of trial and again just now, you should evaluate the credibility of witnesses free from prejudices and biases.

You may consider anything else that in your judgment affects the credibility of any witness. For example, you may consider the demeanor and the behavior of the witness on the witness stand; the witness's manner of testifying; whether the witness impresses you as having an accurate memory; whether the witness has any reason for not telling the truth; whether the witness had a meaningful opportunity to observe the matters about which he or she has testified; whether the witness has any interest in the outcome of this case, stands to gain anything by testifying, or has friendship or hostility toward other people concerned with this case. In evaluating the accuracy of a witness's memory, you may consider the circumstances surrounding the event, including the time that elapsed between the event and any later

37

recollections of the event, and the circumstances under which the witness was asked to recall details of the event.

You may consider whether there are any [consistencies or] inconsistencies in a witness's testimony or between the witness's testimony and any previous statements made by the witness. You may also consider any consistencies or inconsistencies between the witness's testimony and any other evidence that you credit. You may consider whether any inconsistencies are the result of lapses in memory, mistake, misunderstanding, intentional falsehood, or differences in perception.

You may consider the reasonableness or unreasonableness, the probability or improbability, of the testimony of a witness in determining whether to accept it as true and accurate. You may consider whether the witness has been contradicted or supported by other evidence that you credit.

If you believe that any witness has shown him or herself to be biased or prejudiced, for or against either side in this trial, or motivated by self-interest, you may consider and determine whether such bias or prejudice has colored the testimony of the witness so as to affect the desire and capability of that witness to tell the truth.

You should give the testimony of each witness such weight as in your judgment it is fairly entitled to receive.

---

Source: Red Book 2.200

Supp.App.69

**Instruction 2.203**

**WITNESS WITH A PLEA AGREEMENT**

You have heard evidence that [name of witness] entered into a plea agreement with the government pursuant to which [name of witness] agreed to testify truthfully in this case and the government agreed to [bring [name of witness's] cooperation to the attention of his/her sentencing judge] [and] [consider filing papers with his/her judge which would permit that judge to impose a more lenient sentence than that judge might otherwise be able to impose].

The government is permitted to enter into this kind of plea agreement. You, in turn, may accept the testimony of such a witness and convict the defendant on the basis of this testimony alone, if it convinces you of the defendant's guilt beyond a reasonable doubt. A witness who has entered into a plea agreement is under the same obligation to tell the truth as is any other witness; the plea agreement does not protect him/her against a prosecution for perjury or false statement, should s/he lie under oath.

However, you may consider whether a witness who has entered into such an agreement has an interest different from other types of witnesses. You may consider whether the plea agreement the witness entered into with the government has motivated him/her to testify falsely against the defendant. The testimony of a witness who has entered into a plea agreement should be considered with caution. You should give the testimony as much weight as in your judgment it deserves.

———————————————————

Source: the Red Book 2.203

**Supp.App.70**

**Instruction 2.207**

**POLICE OFFICER'S OR LAW ENFORCEMENT AGENT'S TESTIMONY**

A police officer's or law enforcement agent's testimony should be evaluated by you just as any other evidence in the case. In evaluating the officer's or agent's credibility, you should use the same guidelines that you apply to the testimony of any witness. In no event should you give either greater or lesser weight to the testimony of any witness merely because he or she is a police officer or law enforcement agent.

––––––––––––––––––––––––––––––

Source: Red Book 2.207 (modified to add reference to law enforcement official given presence of federal agents in this case)

40

**Instruction 2.208**

**RIGHT OF DEFENDANT NOT TO TESTIFY (IF APPLICABLE)**

Every defendant in a criminal case has an absolute right not to testify.  The defendant has chosen to exercise this right.  You must not hold this decision against him, and it would be improper for you to speculate as to the reason or reasons for his decision.  You must not assume the defendant is guilty because he chose not to testify.

―――――――――――――――――――――

Source: Red Book 2.208

*Please note that the Red Book commentary indicates that this instruction must be given upon the request of the defendant.  Should the defendant affirmatively waive any request for this instruction, then the government withdraws this proposed instruction.*

41

**Instruction 2.209**

**DEFENDANT AS WITNESS (IF APPLICABLE)**

A defendant has a right to become a witness in his own behalf. His testimony should not be disbelieved merely because he is the defendant. In evaluating his testimony, however, you may consider the fact that the defendant has a vital interest in the outcome of this trial. As with the testimony of any other witness, you should give the defendant's testimony as much weight as in your judgment it deserves.

_____

Source: Red Book 2.209

42

**Instruction 2.210**

**FALSE OR INCONSISTENT STATEMENT BY DEFENDANT (IF APPLICABLE)**

You have heard evidence that the defendant made statements in explanation of his actions that may have been false or inconsistent. It is up to you to decide whether he made the statements, and whether they were, in fact, false or inconsistent. If you find he did make such statements and that they were false or inconsistent, you may consider such evidence as tending to show his feelings of guilt, which you may, in turn, consider as tending to show actual guilt. On the other hand, you may also consider that he may have given such statements for reasons unrelated to this case or consistent with his innocence.

If you find that the defendant made a false or inconsistent statement in explanation of his actions, you should give the testimony as much weight as in your judgment it deserves.

_____

Source: Red Book 2.210

43

**Instruction 2.215**

**SPECIALIZED OPINION TESTIMONY**

In this case, you heard the testimony of [name of witness] who expressed opinions concerning [certain subjects; specify the subject(s), if possible]. If scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness who possesses knowledge, skill, experience, training, or education may testify and state an opinion concerning such matters. You are not bound to accept this witness's opinion. If you find that the opinion is not based on sufficient education or experience, that the reasons supporting the opinion are not sound, or that the opinion is outweighed by other evidence, you may completely or partially disregard the opinion. You should consider this evidence with all the other evidence in the case and give it as much weight as you think it fairly deserves.

––––––––––––––––––––––––––––––––––––

Source: Red Book 2.215

44

**Instruction 2.216**

**EVALUATION OF PRIOR INCONSISTENT STATEMENT OF A WITNESS**
**(IF APPLICABLE)**

*[When more than one of the following Parts is being given, the court should give the following paragraph first:]*

The law treats prior inconsistent statements differently depending on the circumstances in which they were made. I will now explain how you should evaluate those statements.

**ALTERNATIVE A** (for use when prior statements not made under oath are introduced):

You have heard evidence that [name of witness] made a statement on an earlier occasion and that this statement may be inconsistent with his/her testimony here at trial. It is for you to decide whether the witness made such a statement and whether in fact it was inconsistent with the witness's testimony here. If you find such an inconsistency, you may consider the earlier statement in judging the credibility of the witness, but you may not consider it as evidence that what was said in the earlier statement was true.

**ALTERNATIVE B** (for use when prior statements made under oath are introduced):

You [also] have heard evidence that [name of witnesses] made an earlier statement under oath, subject to the penalty of perjury at [a prior proceeding] [the grand jury] [a deposition] and that this statement[s] may be inconsistent with [his] [her] testimony here at trial. If you find that the earlier statement is inconsistent with the witness's testimony here in court, you may consider this inconsistency in judging the credibility of the witness. You also may consider this earlier statement as evidence that what was said in the earlier statement was true.

**ALTERNATIVE C** (for use when prior identification statements are used to impeach a witness)

You [also] have heard evidence that [name of witness] [made an identification] [provided a description] on an earlier occasion, and that his/her testimony here at trial may be inconsistent with that [identification] [description].  It is for you to decide whether s/he [made such an identification] [provided such a description] and whether his/her testimony here was, in fact, inconsistent with it.  If you find such an inconsistency, you may consider this inconsistency in judging the credibility of [name of witness].  You also may consider the earlier [identification] [description] as evidence that what was said in the prior [identification] [description] was true.

---

Source: Red Book 2.216

46

Supp.App.77

**Instruction 2.217**

**EVALUATION OF PRIOR CONSISTENT STATEMENT OF A WITNESS
(IF APPLICABLE)**

You have heard evidence that [name of witness] made a statement on an earlier occasion and that this statement may be consistent with his/her testimony here at trial. This earlier statement was brought to your attention [both] to help you in evaluating the credibility of the witness [and as evidence in this case]. If you find that the earlier statement is consistent with the witness's present testimony in court, you may consider this consistency [both] in judging the credibility of the witness here at trial [but you may not use it] [and] as proof that what was said in the earlier statement was true.

It is for you to decide whether a witness made a statement on an earlier occasion and whether it was in fact consistent with the witness's in-court testimony here.

_____

Source:  Red Book 2.217

47

**Instruction 2.218**

**IMPEACHMENT BY PROOF OF CONVICTION OF A CRIME—WITNESS**

**(IF APPLICABLE)**

You have heard evidence that [name of witness] has been convicted of a crime. You may consider this conviction only in evaluating the credibility of that witness's testimony in this case.

_____

Source:  Red Book 2.218

48

**Instruction 2.230**

**IDENTIFICATION**

The burden is on the government to prove beyond a reasonable doubt, not only that the offenses were committed, but also that the defendant is the person who committed them.

In deciding whether the government has proved beyond a reasonable doubt that the defendant is the person who committed the offenses, you may consider any evidence relating to the identity of that person.

A number of factors may affect the accuracy of an identification of the defendant by an alleged eyewitness.

1. The witness's opportunity to observe the criminal acts and the person committing them, including, but not limited to, the length of the encounter, the distance between the various parties, the lighting conditions at the time, and the witness's state of mind at the time of the offense;

2. Any subsequent identification and the circumstances surrounding that identification, including the length of time that elapsed between the crime and the identification, the witness's state of mind when making the identification, any suggestive circumstances that may have influenced the witness, and any statements or actions by law enforcement officers concerning the identification;

3. Any failure of the witness to identify the defendant as the person who committed the offense;

4. An identification by the witness of another person as the person who committed the offense; and

49

5.  Any other factors that have been brought to your attention by [specialized opinion

testimony and] the remaining evidence that you conclude bears upon the accuracy of the

witness's in-court or out-of-court identification of the defendant.

Based upon any identification(s) by the witness(es) and all additional evidence you have heard,

you must be satisfied beyond a reasonable doubt that the defendant is the person who committed

this offense before you may convict him. If the evidence concerning the identification of the

defendant is not convincing beyond a reasonable doubt, you must find the defendant not guilty.

---

Source:  Red Book 2.230

Supp.App.81

**Instruction 2.307**

**MOTIVE**

Motive is not an element of the offenses charged, and the government is not required to prove motive in this case. You may, however, consider evidence of motive or lack of evidence of motive in deciding whether or not the government has proved the charges beyond a reasonable doubt.

---

Source:  Red Book 2.307.

51

**Instruction 2.311**

**TRANSLATION OF FOREIGN LANGUAGE DOCUMENT OR RECORDING**

[You are about to listen to or watch a recording in [<u>language used</u>]. Each of you has been given a transcript that translates the recording into English.] [I have admitted a document that is in [<u>language used</u>] along with an English translation.]

Although some of you may know [<u>language used</u>], it is important that all jurors consider the same evidence. Therefore, you must accept the English translation contained in the transcript.

If, however, you have a question as to the accuracy of the English translation, you should bring this matter to my attention immediately by raising your hand. You should not ask your question or make any comment about the translation in the presence of the other jurors, or otherwise share your question or concern with any of them. I will take steps to see if your question can be answered and any discrepancy resolved. If, however, after such efforts a discrepancy remains, you must rely only upon the official English translation provided by the court interpreter and not on your own translation.

---

Source:  Red Book 2.311.

**Supp.App.83**

## CHARTS AND SUMMARIES

Certain charts or summaries have been shown to you in order to help explain the facts disclosed by the files, records, or other underlying evidence in the case. Those charts or summaries are used for your convenience. These charts and summaries are not themselves evidence or proof of any facts. You should determine the facts from the evidence.

Certain charts and summaries have been received into evidence. Charts and summaries are valid only to the extent that they accurately reflect the underlying supporting evidence. You should give them only such weight as you think they deserve.

---

Source:  Fed. R. Evid. 1006

**Instruction 2.321**

**OTHER CRIMES EVIDENCE (IF APPLICABLE)**

**A.  EVIDENCE OF OTHER CRIMES ADMITTED TO SHOW MOTIVE, IDENTITY, OR COMMON SCHEME OR PLAN**

You have heard evidence that the defendant [describe other crimes evidence]. It is up to you to decide whether to accept that evidence.

If you find that the defendant [describe the other crimes evidence], you may use this evidence only for the limited purpose of deciding whether

[1.    The defendant had a motive to commit the offenses charged in the indictment, namely, Money Laundering Conspiracy, Money Laundering, Operating an Unlicensed Money Transmitting Business, and Money Transmission Without a License.]

[2.    The circumstances of the other crimes and charged offense(s) are so similar that it is likely that the person who [describe the other crimes conduct] also committed the offenses charged in the indictment, namely, Money Laundering Conspiracy, Money Laundering, Operating an Unlicensed Money Transmitting Business, and Money Transmission Without a License.]

[3.    The [describe the other crimes conduct] and the offenses charged in the indictment, namely, Money Laundering Conspiracy, Money Laundering, Operating an Unlicensed Money Transmitting Business, and Money Transmission Without a License, are part of a common scheme or plan.]

If you conclude that

[1.    The defendant had such a motive.]

54

[2.    The [describe the other crimes conduct] is so similar to the charged offense[s] that it is likely that the same person committed both of them.]

[3.    There was a common scheme or plan.]

You may use this evidence in determining whether the government has proved beyond a reasonable doubt that

[The defendant is the person who committed the offenses charged in the indictment, namely, Money Laundering Conspiracy, Money Laundering, Operating an Unlicensed Money Transmitting Business, and Money Transmission Without a License.]

[The defendant [insert purpose for which evidence was introduced].]

You may not use this evidence for any other purpose. The defendant is only on trial for the crimes charged. He is not charged in this case with any offense relating to [describe the other crimes conduct], and you may not use this evidence to conclude that the defendant has a bad character, or that the defendant has a criminal personality. The law does not allow you to convict him simply because you believe he may have done bad things not specifically charged as crimes in this case.

## B.  EVIDENCE OF OTHER CRIMES ADMITTED TO SHOW INTENT, ABSENCE OF MISTAKE, ACCIDENT, OR KNOWLEDGE

You have heard evidence that the defendant [describe other crimes evidence]. It is up to you to decide whether to accept that evidence.

[You must first decide, without considering [describe other crimes evidence] at all, whether the government has proved beyond a reasonable doubt that the defendant [insert actus

55

reus]. If you find that the government has proved beyond a reasonable doubt, that the defendant

[insert actus reus], then you may consider the evidence that he [describe other crimes evidence].]

If you find that the defendant [describe other crimes evidence], you may use this

evidence only for the limited purpose of deciding/determining whether the government has

proved beyond a reasonable doubt that the defendant [intended to [insert object of intent] [acted

knowingly and on purpose, and not by mistake or by accident] [knew that [insert purpose for

which the evidence was introduced]].

You may not use this evidence for any other purpose. The defendant is only on trial for

the crimes charged. The defendant is not charged in this case with any offense relating to

[describe the other crimes conduct], and you may not use this evidence to conclude that s/he has

a bad character, or that the defendant has a criminal personality. The law does not allow you to

convict the defendant simply because you believe he may have done bad things not specifically

charged as crimes in this case.

―――――――――――――――――――

Source:  Red Book 2.321.

**Instruction 3.101**

**PROOF OF STATE OF MIND**

     Someone's intent or knowledge ordinarily cannot be proved directly, because there is no way of knowing what a person is actually thinking, but you may infer someone's intent or knowledge from the surrounding circumstances. You may consider any statement made or acts done or omitted by the defendant, and all other facts and circumstances received in evidence which indicate his intent or knowledge.

     You may infer, but are not required to infer, that a person intends the natural and probable consequences of acts he intentionally did or intentionally did not do.  It is entirely up to you, however, to decide what facts to find from the evidence received during this trial. You should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that the defendant acted with the necessary state of mind.

_____

Source:  Red Book 3.101

57

**Supp.App.88**

**WILLFUL BLINDNESS**

You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

---

Source:  Fifth Circuit Pattern Jury Instructions (Criminal Cases) (2019 ed.), § 1.42 (Deliberate Ignorance); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) ("While the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact.  We think these requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence.")

Supp.App.89

**MISTAKE OF LAW**

In criminal cases, a mistake of law on the part of the accused does not justify his actions. It a defendant deliberately and intentionally engages in conduct the law prohibits, his actions are criminal, regardless of his belief that his actions were lawful or guided by high motive. To summarize, ignorance of the law does not negate a defendant's criminal liability, if the government proves the elements of the offense beyond a reasonable doubt.

---

Source:  *United States v. Juvenal Ovidio Ricardo Palmera Pineda*, D.D.C. No. 04-cr-232 (RCL), ECF No. 324, at 22-23; *see also Bryan v. United States*, 524 U.S. 184, 193 (1998) (to act "knowingly" is to act with "knowledge of the facts that constitute the offense" but not necessarily with knowledge that the facts amount to illegal conduct, unless the statute indicates otherwise.); *Ratzlaf v. United States*, 510 U.S. 135, 149 (1994) (referring to "the venerable principle that ignorance of the law generally is no defense to a criminal charge."); *Cheek v. United States*, 498 U.S. 192, 199 (1991) (ignorance of the law is not a defense to its violation); *United States v. Baker*, 546 F.2d 940, 944 (1976) ("It is settled law that a conviction under this section requires proof that the offender acted with a 'specific intent' to interfere with the federal rights in question. This does not mean that he must have acted with the subjective awareness that his action was unlawful. It is enough that he intentionally performed acts which, under the circumstances of the case, would have been clearly in violation of federal law, absent any other defense.").

Supp.App.90

**Instruction 2.402**

**MULTIPLE COUNTS--ONE DEFENDANT**

Each count of the indictment charges a separate offense. You should consider each

offense, and the evidence which applies to it, separately, and you should return separate verdicts

as to each count. The fact that you may find the defendant guilty or not guilty on any one count

of the indictment should not influence your verdict with respect to any other count of the

indictment.

––––––––––––––––––––––––––––––

Source:  Red Book 2.402

**COUNT ONE**

**MONEY LAUNDERING CONSPIRACY—BASIC INSTRUCTION, 18 U.S.C. § 1956(h)**

In Count One, the defendant is charged with Money Laundering Conspiracy. It is against the law to agree with someone to commit the crime(s) of money laundering. Here, the defendant is charged with conspiring with other persons, including darknet vendors and darknet market administrative teams and other persons, to commit the following offenses:

1. To conduct and attempt to conduct financial transactions affecting interstate commerce, that is, the sending and receiving of bitcoin transactions, which involved the proceeds of specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance, knowing that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

2. To conduct and attempt to conduct financial transactions affecting interstate commerce, that is, the sending and receiving of bitcoin transactions, which involved the proceeds of specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance, knowing that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in

Supp.App.92

whole and in part to conceal and disguise the nature, the location, the source, the

ownership, and the control of the proceeds of specified unlawful activity, in violation of

Title 18, United States Code, Section 1956(a)(1)(B)(i).


I will first instruct you on conspiracy and then I will discuss each of the two criminal

laws that the indictment alleges the defendant and co-conspirators conspired to violate—namely,

Money Laundering, in violation of (a) Title 18, United States Code, Section 1956(a)(1)(A)(i), or

(b) Title 18, United States Code, Section 1956(a)(1)(B)(i).

A "conspiracy" is an agreement by two or more persons to commit an unlawful act. In

other words, it is a kind of partnership for criminal purposes. Every member of the conspiracy

becomes the agent or partner of every other member.

The government is not required to prove that the objective was achieved. The elements of

conspiracy, each of which the government must prove beyond a reasonable doubt, are that:

1.  <u>First</u>, that from on or about October 27, 2011 through on or about April 27, 2021, an

    agreement existed between two or more people to commit an act in violation of (a) Title

    18, United States Code, Section 1956(a)(1)(A)(i), or (b) Title 18, United States Code,

    Section 1956(a)(1)(B)(i).  This does not have to be a formal agreement or plan, in which

    everyone involved sat down together and worked out the details. On the other hand,

    merely because people get together and talk about common interests, or do similar things

    does not necessarily show that an agreement exists. It is enough that the government

    proves beyond a reasonable doubt that there was a common understanding among those

Supp.App.93

who were involved to commit the crime of violating one of the three crimes listed. I will

discuss with you the elements required for those two crimes, which are alleged to be the

objectives of the conspiracy charged in Count One, later in these instructions.  So, the

first thing that must be shown is the existence of an agreement.

2.  Second, the government must prove that the defendant intentionally joined in that

agreement. It is not necessary to find that he agreed to all the details of the crime, or that

he knew the identity of all the other people the government has claimed were

participating in the agreement. A person may become a member of a conspiracy even if

that person agrees to play only a minor part, as long as that person understands the

unlawful nature of the plan and voluntarily, knowingly and intentionally joins in it with

the intent to advance or further the unlawful object of the conspiracy. Different people

may become part of the conspiracy at different times. However, mere presence at the

scene of the agreement or of the crime, or merely being with the other participants, does

not show that a defendant knowingly joined in the agreement. Also, unknowingly acting

in a way that helps the participants, or merely knowing about the agreement itself,

without more, does not make a defendant part of the conspiracy. So, the second thing that

must be shown is that the defendant was part of the conspiracy.


Someone's intent or knowledge ordinarily cannot be proved directly, because there is no

way of knowing what a person is actually thinking, but you may infer someone's intent or

knowledge from the surrounding circumstances. You may consider any statement made or acts

Supp.App.94

done or omitted by the defendant and all other facts and circumstances received in evidence which indicate his intent or knowledge.

You may infer, but are not required to infer, that a person intends the natural and probable consequences of acts he or she intentionally did or did not do. It is entirely up to you, however, to decide what facts to find from the evidence received during this trial. You should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that the defendant acted with the necessary state of mind.

Some of the people who may have been involved in these events are not on trial. This does not matter. There is no requirement that all members of a conspiracy be charged and prosecuted, or tried together in one proceeding. Nor is there any requirement that the names of the all the other conspirators are listed in the indictment. An indictment can charge a defendant with a conspiracy involving people whose names are not given, as long as the government can prove that the defendant conspired with one or more of them. Whether they are named or not does not matter.

As previously instructed, to prove that the defendant committed conspiracy, the government is not required to prove that the objective of committing an act in violation of (a) Title 18, United States Code, Section 1956(a)(1)(A)(i), or (b) Title 18, United States Code, Section 1956(a)(1)(B)(i), was achieved. The government must prove, however, that the defendant conspired to commit one of these two offenses, and I will discuss with you the elements of each of those offenses.

64

Source:  Red Book 7.102; *United States v. Bikundi*, No. 14-cr-30 (BAH) (D.D.C.), ECF No. 350 (Instructions to the Jury), at 8-12; *see generally Whitfield v. United States*, 543 U.S. 209, 214 (2005) (no overt act requirement for money laundering conspiracy in violation of 18 U.S.C. § 1956(h)).

65

Supp.App.96

**COUNT ONE (CONTINUED)**

**MONEY LAUNDERING—PROMOTIONAL MONEY LAUNDERING, 18 U.S.C.**

**§ 1956(a)(1)(A)(i)**

The charge of Laundering of Monetary Instruments, in violation of 18 U.S.C.

§ 1956(a)(1)(A)(i), contains four elements, each of which the government must prove beyond a

reasonable doubt:

First, that the defendant conducted or tried to conduct a financial transaction;

Second, that the defendant knew that the money or property involved in the transaction

was the proceeds of some kind of unlawful activity;

Third, that the money or property did come from an unlawful activity, specifically the

felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise

dealing in a controlled substance or listed chemical, in violation of Title 21, United States Code,

Sections 841(a)(1) and 846; and

Fourth, that the defendant the defendant acted with intent to promote the carrying on of

specified unlawful activity, specifically the felonious manufacture, importation, receiving,

concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical, in

violation of Title 21, United States Code, Sections 841(a)(1) and 846.[1]

To "act with the intent to promote the carrying on of specified unlawful activity" means

that the defendant acted willfully, not by mistake or accident, with the deliberate purpose of

---

[1] Adapted from 3 Modern Federal Jury Instructions-Criminal P 50A.01 (2021).

promoting, facilitating, or assisting the carrying on of the specified unlawful activity.[2]  To

promote the carrying on of an activity means to contribute to the prosperity of something, or to

further something.[3]

A "conduct a transaction" means to start or finish a transaction, or to participate in a

transaction at any point.

A "transaction" includes a purchase, sale, transfer, delivery, or other disposition, and with

respect to a financial institution includes a deposit, withdrawal, transfer between accounts,

exchange of currency, or any other payment, transfer, or delivery by, through, or to a financial

institution, by whatever means effected.[4]

A "financial transaction" means (A) a transaction which in any way or degree affects

interstate or foreign commerce involving the movement of funds by wire or other means, or (B) a

transaction involving the use of a financial institution which is engaged in, or the activities of

which affect, interstate or foreign commerce in any way or degree.[5]  For purposes of this

definition, the term "funds" includes Bitcoin.[6]

---

[2] 3 Modern Federal Jury Instructions-Criminal P 50A.01 (2021).
[3] *United States v. Santos*, 553 U.S. 507, 517–18 (2008) (plurality opinion) (explaining that to "promote the carrying on of a specified unlawful activity" means "[t]o contribute to the prosperity of something, or to further something," such as promoting "the carrying on of a gambling enterprise by merely ensuring that it continues in business") (internal quotations omitted)
[4] 18 U.S.C. § 1956(c)(3).
[5] 18 U.S.C. § 1956(c)(4)(A)(i) & (B).
[6] *United States v. Iossifov*, 45 F.4th 899, 913-14 (6th Cir. 2022) ("[W]hile the terms 'monetary instrument' and 'funds' are not defined within the money laundering statute, courts that have addressed this question have unanimously determined that Bitcoin falls under those terms. . . . Iossifov's contention that Bitcoin does not fall under the money laundering statute is unavailing."); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) ("Bitcoins can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things.  . . . Indeed, the only value for Bitcoin lies in

The term "financial institution" includes any person or entity who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system.[7]

"Interstate or foreign commerce" means trade and other business activity between people or businesses in at least two states or between people or businesses in the United States and people or businesses outside the United States. The government is not required to prove that the defendant knew or intended the effect on interstate commerce, merely that such an effect occurred.

To know "that the money or property involved in the transaction came from some kind of unlawful activity" is to know that the money or property came from an activity that is a felony under state, Federal, or foreign law. The government is not required to prove that the defendant knew what the unlawful activity was.  This knowledge requirement includes instances of willful blindness.[8]

---

its ability to pay for things . . . .  Sellers using Silk Road are not alleged to have given their narcotics and malicious software away for free—they are alleged to have sold them. . . .  One can money launder using Bitcoin."); *United States v. Budovsky*, 2015 WL 5602853, at *13-15 (S.D.N.Y. Sept. 23, 2015) ("Next, Budovsky appears to argue that virtual currencies cannot be included within the term 'funds.'  This precise argument was rejected recently in a case applying § 1956 to the owner and operator of the website Silk Road, a marketplace for illegal drugs that used the virtual currency Bitcoin. . . .  The *Ulbricht* court's reasoning is adopted here."); *United States v. Ologeanu*, 2020 WL 1676802, at *10-11 (E.D. Ky. Apr. 4, 2020) (collecting cases and concluding that "the federal district courts have unanimously and univocally concluded that Bitcoin constitutes 'money' and 'funds'") (internal quotations and alterations omitted).
[7] 18 U.S.C. § 1956(c)(6)(A); 31 U.S.C. § 5312(a)(2)(R) (definition of "financial institution").
[8] *United States v. Hill*, 167 F.3d 1055, 1067 (6th Cir. 1999) (citing Senate Report No. 99-443 (1986) to hold that "the knowledge requirements [in § 1956] are "to be construed, like existing

Supp.App.99

The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of the activity. The government is not required to prove that all of the funds involved in the charged transactions were the proceeds of the specified unlawful activity. It is sufficient if the government proves beyond a reasonable doubt that at least part of the funds involved in a transaction represents such proceeds of specified unlawful activity.

The phrase "specified unlawful activity" means the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.[9]  I will instruct you as a matter of law that it is a felony to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance, or to attempt or conspire to commit such an offense.[10]

In this case, the defendant is not charged with committing the underlying specified unlawful activity himself, only with conspiring to launder the proceeds of specified unlawful activity committed by others.  In other words, the government does not need to prove that the defendant himself committed or was responsible for any controlled substances offense. However, the government needs to prove that at least some amount of the money or property the

---

'knowing' scienter requirements, to include instances of 'wilful blindness'"); *United States v. Santos*, 553 U.S. 507, 521 (2008) ("Moreover, the Government will be entitled to a willful blindness instruction if the professional money launderer, aware of a high probability that the laundered funds were profits, deliberately avoids learning the truth about them . . . .").
[9] 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1)(D) (defining SUA).
[10] 21 U.S.C. §§ 841(a)(1), 846.

**Supp.App.100**

defendant conspired to launder represented proceeds of the manufacture, distribution, or

dispensing of controlled substances.[11]

---

Source:  *United States v. Bikundi*, No. 14-cr-30 (BAH) (D.D.C.), ECF No. 350 (Instructions to the Jury), at 25-28; as supplemented by other sources cited in footnotes.

---

[11] *See United States v. Golb*, 69 F.3d 1417, 1429 (9th Cir. 1995) ("The jury was instructed 'as a matter of law that the manufacture, importation, and distribution of controlled substances is a specified unlawful activity' and that the government had to prove that at least some of the funds involved represented the proceeds of the 'manufacture, importation and distribution of controlled substances.'  These instructions closely track those approved in *United States v. Mickens,* 926 F.2d 1323, 1330 (2d Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992).  Because the drug trafficking which was the source of the proceeds was not part of the charged money-laundering offense, *i.e.,* the drug traffickers were not on trial, the jury did not need to be further instructed.") (internal citation omitted); *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1351-55 (D.C. Cir. 2002) (holding that money laundering offense can involve comingled clean and dirty funds, because "[t]he broad language of the statute suffices to reach transactions that 'involve[]' illegal proceeds").

Supp.App.101

**COUNT ONE (CONTINUED)**

**MONEY LAUNDERING—CONCEALMENT MONEY LAUNDERING, 18 U.S.C.**

**§ 1956(a)(1)(B)(i)**

The charge of Laundering of Monetary Instruments, in violation of 18 U.S.C.

§ 1956(a)(1)(B)(i), contains four elements, each of which the government must prove beyond a

reasonable doubt:

First, that the defendant conducted or tried to conduct a financial transaction;

Second, that the defendant knew that the money or property involved in the transaction

was the proceeds of some kind of unlawful activity;

Third, that the money or property did come from an unlawful activity, specifically the

felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise

dealing in a controlled substance or listed chemical, in violation of Title 21, United States Code,

Sections 841(a)(1) and 846; and

Fourth, that the defendant knew that the transaction was designed, in whole or in part, to

conceal or disguise the nature, location, source, ownership, or the control of the proceeds. In

other words, the government must prove that the transaction was motivated, at least in part, by a

desire to conceal or disguise the nature, location, source, ownership or control of the proceeds.

The money laundering statute does not criminalize the mere spending or investing of illegally

obtained funds. [12]

---

[12] Adapted from 3 Modern Federal Jury Instructions-Criminal P 50A.02 (2021).

Supp.App.102

To "conduct a transaction" means to start or finish a transaction, or to participate in a transaction at any point.

A "transaction" includes a purchase, sale, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected.[13]

A "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce involving the movement of funds by wire or other means, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.[14]  For purposes of this definition, the term "funds" includes Bitcoin.[15]

---

[13] 18 U.S.C. § 1956(c)(3).

[14] 18 U.S.C. § 1956(c)(4)(A)(i) & (B).

[15] *United States v. Iossifov*, 45 F.4th 899, 913-14 (6th Cir. 2022) ("[W]hile the terms 'monetary instrument' and 'funds' are not defined within the money laundering statute, courts that have addressed this question have unanimously determined that Bitcoin falls under those terms. . . . Iossifov's contention that Bitcoin does not fall under the money laundering statute is unavailing."); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) ("Bitcoins can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things.  . . . Indeed, the only value for Bitcoin lies in its ability to pay for things . . . .  Sellers using Silk Road are not alleged to have given their narcotics and malicious software away for free—they are alleged to have sold them. . . .  One can money launder using Bitcoin."); *United States v. Budovsky*, 2015 WL 5602853, at *13-15 (S.D.N.Y. Sept. 23, 2015) ("Next, Budovsky appears to argue that virtual currencies cannot be included within the term 'funds.'  This precise argument was rejected recently in a case applying § 1956 to the owner and operator of the website Silk Road, a marketplace for illegal drugs that used the virtual currency Bitcoin. . . .  The *Ulbricht* court's reasoning is adopted here."); *United States v. Ologeanu*, 2020 WL 1676802, at *10-11 (E.D. Ky. Apr. 4, 2020) (collecting cases and concluding that "the federal district courts have unanimously and univocally concluded that Bitcoin constitutes 'money' and 'funds'") (internal quotations and alterations omitted).

The term "financial institution" includes any person or entity who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system.[16]

"Interstate or foreign commerce" means trade and other business activity between people or businesses in at least two states or between people or businesses in the United States and people or businesses outside the United States. The government is not required to prove that the defendant knew or intended the effect on interstate commerce, merely that such an effect occurred.

To know "that the money or property involved in the transaction came from some kind of unlawful activity" is to know that the money or property came from an activity that is a felony under state, Federal, or foreign law. The government is not required to prove that the defendant knew what the unlawful activity was.  This knowledge requirement includes instances of willful blindness.[17]

The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of the activity. The government is not required to prove that all of the funds involved in the charged transactions

---

[16] 18 U.S.C. § 1956(c)(6)(A); 31 U.S.C. § 5312(a)(2)(R) (definition of "financial institution").

[17] *United States v. Hill*, 167 F.3d 1055, 1067 (6th Cir. 1999) (citing Senate Report No. 99-443 (1986) to hold that "the knowledge requirements [in § 1956] are "to be construed, like existing 'knowing' scienter requirements, to include instances of 'wilful blindness'"); *United States v. Santos*, 553 U.S. 507, 521 (2008) ("Moreover, the Government will be entitled to a willful blindness instruction if the professional money launderer, aware of a high probability that the laundered funds were profits, deliberately avoids learning the truth about them . . . .").

Supp.App.104

were the proceeds of the specified unlawful activity. It is sufficient if the government proves

beyond a reasonable doubt that at least part of the funds involved in a transaction represents such

proceeds of specified unlawful activity.

      The phrase "specified unlawful activity" means the felonious manufacture, importation,

receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed

chemical, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.[18]  I will

instruct you as a matter of law that it is a felony to manufacture, distribute, or dispense, or

possess with intent to manufacture, distribute, or dispense, a controlled substance, or to attempt

or conspire to commit such an offense.[19]

      In this case, the defendant is not charged with committing the underlying specified

unlawful activity himself, only with conspiring to launder the proceeds of specified unlawful

activity committed by others.  In other words, the government does not need to prove that the

defendant himself committed or was responsible for any controlled substances offense.

However, the government needs to prove that at least some amount of the money or property the

defendant conspired to launder represented proceeds of the manufacture, distribution, or

dispensing of controlled substances.[20]

---

[18] 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1)(D) (defining SUA).

[19] 21 U.S.C. §§ 841(a)(1), 846.

[20] *See United States v. Golb*, 69 F.3d 1417, 1429 (9th Cir. 1995) ("The jury was instructed 'as a matter of law that the manufacture, importation, and distribution of controlled substances is a specified unlawful activity' and that the government had to prove that at least some of the funds involved represented the proceeds of the 'manufacture, importation and distribution of controlled substances.'  These instructions closely track those approved in United States v. Mickens, 926 F.2d 1323, 1330 (2d Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992).  Because the drug trafficking which was the source of the proceeds was not part of the charged money-laundering offense, *i.e.,* the drug traffickers were not on trial, the jury did not need to be further instructed.") (internal citation omitted); *United States v. Braxtonbrown-Smith*,

Supp.App.105

Source:  *United States v. Bikundi*, No. 14-cr-30 (BAH) (D.D.C.), ECF No. 350 (Instructions to the Jury), at 25-28; as supplemented by other sources cited in footnotes.

---

278 F.3d 1348, 1351-55 (D.C. Cir. 2002) (holding that money laundering offense can involve comingled clean and dirty funds, because "[t]he broad language of the statute suffices to reach transactions that 'involve[]' illegal proceeds").

Supp.App.106

## COUNT TWO

## STING MONEY LAUNDERING, 18 U.S.C. § 1956(a)(3)(A), (B)

The charge of Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A) and (B),

contains three elements, each of which the government must prove beyond a reasonable doubt:

First, that the defendant conducted or tried to conduct a financial transaction;

Second, that the transaction involved property represented by a law enforcement officer

to be the proceeds of some form of unlawful activity;

Third, that the defendant acted with the intent to promote the carrying on of specified

unlawful activity, *or* that the defendant acted with the intent to conceal or disguise the nature,

location, source, ownership, or control of the property he believed to be the proceeds of specified

unlawful activity.[21]

The government is not required to prove that the law enforcement officer made an

express affirmative statement to the defendant that the property involved was the proceeds of

unlawful activity. Instead, the government must prove that the law enforcement officer

---

[21] Adapted from 3 Modern Federal Jury Instructions-Criminal P 50A.05 (2021). There is no separate knowledge requirement under § 1956(a)(3) regarding the source of the funds. *See* 134 Cong. Rec. S17360-02 (Nov. 10, 1988) (Senate Judiciary Committee analysis of Anti-Drug Abuse Act of 1988) ("The amendment would add to section 1956 a new subsection (a)(3) dealing specifically with undercover operations. . . . [T]here would not be any separate knowledge requirement regarding the source of the property involved in the transaction. The defendant would not have to know or believe that the property involved in the financial transaction was drug money. It would be sufficient that a law enforcement officer had represented it as such. While this would mean that everyone involved in the financial transaction would be guilty of this offense whether he was aware of the law enforcement officer's representation or not, the strengthened specific intent requirement would guard against innocent persons being prosecuted.").

Supp.App.107

represented to the defendant circumstances from which a reasonable person would infer that the property was the proceeds of illegal activity. You should consider all of the evidence in determining whether the government has satisfied this standard.[22]

To "act with the intent to promote the carrying on of specified unlawful activity" means that the defendant acted willfully, not by mistake or accident, with the deliberate purpose of promoting, facilitating, or assisting the carrying on of the specified unlawful activity.[23]  To promote the carrying on of an activity means to contribute to the prosperity of something, or to further something.[24]

To "conduct a transaction" means to start or finish a transaction, or to participate in a transaction at any point.

A "transaction" includes a purchase, sale, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected.[25]

---

[22]  Adapted from 3 Modern Federal Jury Instructions-Criminal P 50A.05 (2021).  There is no separate knowledge requirement under § 1956(a)(3) regarding the source of the funds.  *See* 134 Cong. Rec. S17360-02 (Nov. 10, 1988) (Senate Judiciary Committee analysis of Anti-Drug Abuse Act of 1988).

[23] 3 Modern Federal Jury Instructions-Criminal P 50A.01 (2021); *see United States v. Hua Leung*, 787 F. App'x 925, 928 (9th Cir. Sept. 11, 2019) ("We have said that the intent requirements of § 1956(a)(3) and § 1956(a)(1) are nearly identical.") (internal quotations omitted).

[24] *United States v. Santos*, 553 U.S. 507, 517–18 (2008) (plurality opinion) (explaining that to "promote the carrying on of a specified unlawful activity" means "[t]o contribute to the prosperity of something, or to further something," such as promoting "the carrying on of a gambling enterprise by merely ensuring that it continues in business") (internal quotations omitted)

[25] 18 U.S.C. § 1956(c)(3).

Supp.App.108

A "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce involving the movement of funds by wire or other means, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.[26]  For purposes of this definition, the term "funds" includes Bitcoin.[27]

The term "financial institution" includes any person or entity who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system.[28]

"Interstate or foreign commerce" means trade and other business activity between people or businesses in at least two states or between people or businesses in the United States and

---

[26] 18 U.S.C. § 1956(c)(4)(A)(i) & (B).

[27] *United States v. Iossifov*, 45 F.4th 899, 913-14 (6th Cir. 2022) ("[W]hile the terms 'monetary instrument' and 'funds' are not defined within the money laundering statute, courts that have addressed this question have unanimously determined that Bitcoin falls under those terms. . . . Iossifov's contention that Bitcoin does not fall under the money laundering statute is unavailing."); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) ("Bitcoins can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things.  . . . Indeed, the only value for Bitcoin lies in its ability to pay for things . . . .  Sellers using Silk Road are not alleged to have given their narcotics and malicious software away for free—they are alleged to have sold them. . . .  One can money launder using Bitcoin."); *United States v. Budovsky*, 2015 WL 5602853, at *13-15 (S.D.N.Y. Sept. 23, 2015) ("Next, Budovsky appears to argue that virtual currencies cannot be included within the term 'funds.'  This precise argument was rejected recently in a case applying § 1956 to the owner and operator of the website Silk Road, a marketplace for illegal drugs that used the virtual currency Bitcoin. . . .  The *Ulbricht* court's reasoning is adopted here."); *United States v. Ologeanu*, 2020 WL 1676802, at *10-11 (E.D. Ky. Apr. 4, 2020) (collecting cases and concluding that "the federal district courts have unanimously and univocally concluded that Bitcoin constitutes 'money' and 'funds'") (internal quotations and alterations omitted).

[28] 18 U.S.C. § 1956(c)(6)(A); 31 U.S.C. § 5312(a)(2)(R) (definition of "financial institution").

Supp.App.109

people or businesses outside the United States. The government is not required to prove that the

defendant knew or intended the effect on interstate commerce, merely that such an effect

occurred.

The term "proceeds" means any property derived from or obtained or retained, directly or

indirectly, through some form of unlawful activity, including the gross receipts of the activity.

The government is not required to prove that all of the funds involved in the charged transactions

were the proceeds of the specified unlawful activity. It is sufficient if the government proves

beyond a reasonable doubt that at least part of the funds involved in a transaction represents such

proceeds of specified unlawful activity.

The phrase "specified unlawful activity" means the felonious manufacture, importation,

receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed

chemical, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.[29]  I will

instruct you as a matter of law that it is a felony to manufacture, distribute, or dispense, or

possess with intent to manufacture, distribute, or dispense, a controlled substance, or to attempt

or conspire to commit such an offense.[30]

In this case, the defendant is not charged with committing the underlying specified

unlawful activity himself, only with laundering property represented to be the proceeds of

specified unlawful activity committed by others, or intended to be used to promote specified

---

[29] 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1)(D) (defining SUA).
[30] 21 U.S.C. §§ 841(a)(1), 846.

Supp.App.110

unlawful activity committed by others.  In other words, the government does not need to prove

that the defendant himself committed or was responsible for any controlled substances offense.[31]

—————————————————

Source:  As cited in footnotes.

—————————————————

[31] *See United States v. Golb*, 69 F.3d 1417, 1429 (9th Cir. 1995) ("The jury was instructed 'as a matter of law that the manufacture, importation, and distribution of controlled substances is a specified unlawful activity' and that the government had to prove that at least some of the funds involved represented the proceeds of the 'manufacture, importation and distribution of controlled substances.'  These instructions closely track those approved in United States v. Mickens, 926 F.2d 1323, 1330 (2d Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992).  Because the drug trafficking which was the source of the proceeds was not part of the charged money-laundering offense, *i.e.,* the drug traffickers were not on trial, the jury did not need to be further instructed.") (internal citation omitted); *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1351-55 (D.C. Cir. 2002) (holding that money laundering offense can involve comingled clean and dirty funds, because "[t]he broad language of the statute suffices to reach transactions that 'involve[]' illegal proceeds").

Supp.App.111

**COUNT THREE**

**OPERATING AN UNLICENSED MONEY TRANSMITTING BUSINESS,**

**18 U.S.C. § 1960(a)**

In Count Three, the defendant is charged with Operating an Unlicensed Money

Transmitting Business, for the time period from on or about October 27, 2011 through on or

about April 27, 2021.

The elements of Operating an Unlicensed Money Transmitting Business, each of which

the government must prove beyond are reasonable doubt, are the following:

First, that Bitcoin Fog was an unlicensed money transmitting business.  I will explain

what an unlicensed money transmitting business is in a moment.

Second, that the defendant knowingly controlled, conducted, managed, supervised,

directed, or owned that business. The government is not required to prove that the defendant did

all of the things in this list, but only that he did one of them.

Third, that the money transmitting business affected interstate or foreign commerce.[32]

Interstate or foreign commerce simply means the movement of goods, services, money

and individuals between states or between the United States and a foreign state or nation.  The

government must prove that the money transmitting business affected interstate or foreign

commerce in any manner, no matter how minimal.[33]

---

[32] 1 Modern Federal Jury Instructions-Criminal P 50A.07; 18 U.S.C. § 1960(b)(1).
[33] 1 Modern Federal Jury Instructions-Criminal P 50A.07.

81

Now I will provide more explanation about the first element the government must prove beyond a reasonable doubt, that Bitcoin Fog was an unlicensed money transmitting business.

A "business" is a commercial enterprise that is regularly carried on for profit. Thus, a single isolated instance of money transmitting is not a business under this definition. [34]

The term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.[35] For purposes of this definition, the term "funds" includes Bitcoin.[36]

An "unlicensed money transmitting business" means a money transmitting business that satisfies any one of the following three elements. You can find the defendant guilty of this count if you find any one of these elements was satisfied; you do not need to find all three were satisfied.[37]

A. The money transmitting business operated without an appropriate money transmitting

license in the District of Columbia, where such operation is punishable as a

---

[34] 1 Modern Federal Jury Instructions-Criminal P 50A.07

[35] 18 U.S.C. § 1960(b)(2).

[36] *United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016).

[37] *United States v. Talebnejad*, 460 F.3d 563, 567 n.2 (4th Cir. 2006) ("For purposes of this appeal, we accept the Government's contention that § 1960 sets forth one offense—conducting an unlicensed money transmitting business—that may be committed in multiple ways."); *United States v. Coughlin*, 610 F.3d 89, 107 n.10 (D.C. Cir. 2010) ("Indeed, under Circuit precedent, the correct method of pleading alternative means of committing a single crime is to allege the means in the conjunctive.") (internal quotations and alterations omitted); *United States v. Burton*, 871 F.2d 1566, 1573 (11th Cir. 1989) ("Where a penal statute . . . prescribes several alternative ways in which the statute may be violated and each is subject to the same punishment, however, the indictment may charge any or all of the acts conjunctively, in a single count, as constituting the same offense, and the government may satisfy its burden by proving that the defendant, by committing any one of the acts alleged, violated the statute.").

Supp.App.113

misdemeanor or felony under District of Columbia law, whether or not the defendant

knew a license was required or was punishable by District of Columbia law; *or*

B.  The money transmitting business failed to comply with the money transmitting

business registration requirements under federal law; *or*

C.  The money transmitting business involved the transportation or transmission of funds

that are known to the defendant to have been derived from a criminal offense, or are

intended to be used to promote or support unlawful activity.[38]


The District of Columbia licensing element is sometimes called the "state" licensing

element because the statute refers to the word "State." However, I will instruct you as a matter

of law that, for purposes of this offense, the term "State" includes the District of Columbia.[39]

To satisfy the District of Columbia licensing element, the government does not need to

prove that the defendant knew a license was required by District of Columbia law to operate a

money transmitting business.[40]

The elements of Money Transmission Without a License, under Section 26-1023(c) of

the District of Columbia Code, are as follows:

First, that the defendant was engaged in the business of money transmission; and

---

[38] Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina (2020 online ed.), at 360.
[39] 18 U.S.C. § 1960(b)(3).
[40] 18 U.S.C. § 1960(b)(1)(A); *United States v. Dimitrov*, 546 F.3d 409, 413 (7th Cir. 2008).

Supp.App.114

Second, that the defendant did not have a license to engage in the business of money transmission in the District of Columbia.[41]

"Money transmission" means engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer.[42]  For purposes of this definition, the term "money" includes Bitcoin.[43]

I will instruct you that, as a matter of law, Section 26-1002(a) of the District of Columbia Code requires that a money transmission business obtain a license from the District of Columbia government to operate in the District of Columbia.  I will further instruct you that, as a matter of law, under Section 26-1023(c) of the District of Columbia Code, operating a money transmission business without a license is punishable as a felony under District of Columbia law.[44]


To satisfy the federal registration element, the government does not need to prove that the defendant knew federal registration was required to operate a money transmitting business.[45] The government may prove that the money transmitting business that the defendant conducted failed to comply with the money transmitting business registration requirements under statute, namely, Title 31, United States Code, Section 5330, or that it failed to comply with the regulations prescribed under that statute.

---

[41] D.C. Code § 26-1023(c).
[42] D.C. Code § 26-1001(10)
[43] *United States v. Harmon*, 474 F. Supp. 3d 76, 88-99 (D.D.C. 2020).
[44] D.C. Code §§ 26-1002(a), 26-1023(c).
[45] *United States v. Dimitrov*, 546 F.3d 409, 413 (7th Cir. 2008); *United States v. Keleta*, 441 F. Supp. 2d 1, 3 (D.D.C. 2006).

Supp.App.115

Under the statute, Title 31, United States Code, Section 5330 requires that any person who owns or controls a money transmitting business must register the business with the United States Secretary of the Treasury within 180 days from the date on which the business was established.[46]

A "money transmitting business" means any business that engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system.[47]

Under regulations prescribed under that statute, a category of businesses called "money transmitters" are required to register with the United States Secretary of the Treasury. A "money transmitter" is a person or entity that provides money transmission services, or any other person or entity engaged in the transfer of funds. "Money transmission services" means the acceptance of currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means, including an electronic funds transfer network or an informal value transfer system.[48]

---

[46] 18 U.S.C. § 1960(b)(1)(B); 31 U.S.C. § 5300(a)(1).
[47] 31 U.S.C. § 5330(d)(1) (2020). Note that Section 5330(d)(1)(A) was amended as part of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. Law 116-283, 134 Stat. 3388 (Jan. 1, 2021) (the "NDAA"), replacing the phrase "funds" with "currency, funds, or value that substitutes for currency." *Id.* § 6102, at *4553.
[48] 31 C.F.R. § 1010.100(ff)(5)(1)(A).

Supp.App.116

For purposes of these definitions, the term "funds" includes Bitcoin.[49]  The movement of bitcoin from one bitcoin address to another bitcoin address on the Bitcoin blockchain can represent movement of funds from one location or person to another location or person.[50]

To satisfy the element that the money transmitting business involved the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense, or are intended to be used to promote or support unlawful activity, any "criminal offense" or "unlawful activity" is sufficient.  The government is not limited to proving that the funds were derived from or intended to promote a specific criminal offense.[51]

---

Source:  See sources cited in footnotes.
*The parties anticipate using a special verdict form for Count Three to ensure unanimity on each of the three prongs of § 1960(b)(1)(A), (B), and (C).*

---

[49] *United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016).
[50] *United States v. Harmon*, 474 F. Supp. 3d 76, 103-09 (D.D.C. 2020).
[51] 18 U.S.C. § 1960(b)(1)(C).

Supp.App.117

**COUNT FOUR**

**MONEY TRANSMISSION WITHOUT A LICENSE, D.C. Code § 26-1023(c)**

In Count Four, the defendant is charged with Money Transmission Without a License, for the time period from on or about October 27, 2011 through on or about April 27, 2021.

The elements of Money Transmission Without a License, under Section 26-1023(c) of the District of Columbia Code, are as follows:

First, that the defendant was engaged in the business of money transmission; and

Second, that the defendant did not have a license to engage in the business of money transmission in the District of Columbia.[52]

"Money transmission" means engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer.[53]  For purposes of this definition, the term "money" includes Bitcoin.[54]

I will instruct you that, as a matter of law, Section 26-1002(a) of the District of Columbia Code requires that a money transmission business obtain a license from the District of Columbia government to operate in the District of Columbia.[55]

---

[52] D.C. Code § 26-1023(c).
[53] D.C. Code § 26-1001(10)
[54] *United States v. Harmon*, 474 F. Supp. 3d 76, 88-99 (D.D.C. 2020).
[55] D.C. Code §§ 26-1002(a), 26-1023(c).

Supp.App.118

The government is not required to prove that the defendant knew that he was required to obtain a license from the District of Columbia government to operate a money transmission business.[56]

---

Source:  See sources cited in footnotes.

---

[56] See D.C. Code § 26-1023(c) (defining offense of engaging in the business of money transmission without a license as general intent crime, without willfulness or other heightened mens rea requirement); *cf.* Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina (2020 online ed.), at 344 (for offense of operating illegal gambling business in violation of 18 U.S.C. § 1955, "[t]he government is not required to prove that the defendant knew that his or her conduct constituted illegal gambling under state law"); *United States v. Lawson*, 677 F.3d 629, 652 (4th Cir. 2012) ("Section 1955 is a general intent crime, which does not require the government to establish that the defendants knew that their conduct violated state law."); *United States v. O'Brien*, 131 F.3d 1428, 1430 (10th Cir. 1997) ("Section 1955 is not a specific intent statute. To be convicted under this provision, therefore, a defendant need not know that the gambling business involved five or more people, remained in operation for thirty days, or was violative of state law. The statute requires only a general criminal intent, which is satisfied whenever the defendant knowingly does an act made unlawful by the statute."); *United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976) ("We have previously held that [section] 1955 and related statutes do not condition guilt upon knowledge that a federal law has been violated.  It is sufficient that appellants intended to do all of the acts prohibited by the statute and proceeded to do them.") (internal quotations omitted).

**Instruction 3.102**

**WILLFULLY CAUSING AN ACT TO BE DONE**

You may find the defendant guilty of the crime charged in the indictment without finding that he personally committed each of the acts constituting the offense or was personally present at the commission of the offense. A defendant is responsible for an act which he willfully causes to be done if the act would be criminal if performed by him directly or by another. To "cause" an act to be done means to bring it about. You may convict the defendant of the offense charged if you find that the government has proved beyond a reasonable doubt each element of the offense and that the defendant willfully caused such an act to be done, with the intent to commit the crime.

_____

Source:  Red Book 3.102.

Supp.App.120

**Instruction 3.200**

**AIDING AND ABETTING**

You may find the defendant guilty of any of the crimes charged in the indictment without finding that he personally committed each of the acts that make up the crime or that he was present while the crime was being committed. Any person who in some way intentionally participates in the commission of a crime can be found guilty either as an aider and abettor or as a principal offender. It makes no difference which label you attach. The person is as guilty of the crime as he would be if he had personally committed each of the acts that make up the crime.

To find that a defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed.

Some affirmative conduct by the defendant in planning or carrying out the crime is necessary. Mere physical presence by the defendant at the place and time the crime is committed is not by itself sufficient to establish his guilt. It is not necessary that you find that the defendant was actually present while the crime was committed.

The government is not required to prove that anyone discussed or agreed upon a specific time or method of committing the crime. The government is not required to prove that the crime was committed in the particular way planned or agreed upon. Nor need the government prove that the principal offender and the person alleged to be the aider and abettor directly communicated with each other.

It is not necessary that all the people who committed the crime be caught or identified. It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone and that the defendant knowingly and intentionally aided and abetted in committing the crime.

---

Source:  Red Book 3.200 (with addition of last paragraph for cases in which the principal offender is not on trial with the defendant).

91

Supp.App.122

**Instruction 3.103**

**"ON OR ABOUT"—PROOF OF**

The indictment charges that the offenses were committed "on or about" certain dates. The proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

––––––––––––––––––

Source: Red Book 3.103

92

## 1.20 VENUE (if applicable)[57]

For each offense charged in the Indictment, the Indictment alleges that some act or omission in furtherance of the offense occurred in the District of Columbia.  There is no requirement that all aspects of the offense charged take place here in the District of Columbia.  But for you to return a guilty verdict, the government must convince you that some act or omission in furtherance of the crime charged took place here in the District of Columbia.

Unlike all the elements that I have described, this fact only has to be proved by a preponderance of the evidence.  This means the government only has to convince you that it is more likely than not that some act or omission in furtherance of the crime charged took place here.  Remember that the government must prove all the elements I have described beyond a reasonable doubt.

For the Conspiracy charged in Count One, there is no requirement that the entire conspiracy take place here in the District of Columbia.  But in order for you to return a guilty verdict, the government must prove by a preponderance of the evidence that either the agreement or an overt act took place in this district, even if the defendant never set foot in the district. An overt act is an act performed to affect the object of a conspiracy, although it remains separate and

---

[57] Venue is not always a question that must be submitted to the jury at trial.  Venue is only a jury question if "(1) the defendant objects to venue prior to or at the close of the prosecution's case-in-chief, (2) there is a genuine issue of material fact with regard to proper venue, and (3) the defendant timely requests a jury instruction."  *United States v. Sitzmann*, 893 F.3d 811, 824 (D.C. Cir. 2018) (quoting *United States v. Haire*, 371 F.3d 833, 840 (D.C. Cir. 2004), *vacated on other grounds*, 543 U.S. 1109 (2005)).  In *Haire*, as in *Sitzmann*, the D.C. Circuit upheld a trial court's refusal to instruct the jury on venue for failing both the first and second prongs.  *See Haire*, 371 F.3d at 840 ("[T]here is no genuine issue of material fact as to the commission of acts in furtherance of the offense in the District of Columbia.").

Supp.App.124

distinct from the conspiracy itself. Though the overt act need not be of criminal nature, it must be done in furtherance of the object of the conspiracy. The overt act need not be completed by the defendant or even by a co-conspirator; it can be completed by a government agent as long as it was made in furtherance of the object of conspiracy.

---

Source: Adapted from S1 Modern Federal Jury Instructions-Criminal 3.09 (2022). For the addition of "omission" language, see *United States v. Montgomery*, 441 F. Supp. 2d 58, 61 (D.D.C. 2006) ("Venue in cases involving a failure to make required filing is typically in the district in which that failure occurred."); *Johnston v. United States*, 351 U.S. 215, 221 (1956) ("[W]here the crime charged is a failure to do a legally required act, the place fixed for its performance fixes the situs of the crime"); *United States v. DiJames*, 731 F.2d 758, 762 (11th Cir. 1984) (finding venue proper in the District of Columbia for a charge of failure to file a report with the Secretary of Labor, because "he is located in the District of Columbia"); *United States v. Hassanshahi*, 185 F. Supp. 3d 55, 58 (D.D.C. 2016) ("Therefore, 'venue is proper here because of the alleged omissions that are part of the crimes charged (namely the failure to secure licenses for exports to Iran from OFAC).'") (quoting *United States v. Quinn*, 401 F. Supp. 2d 80, 87 (D.D.C. 2005)). For conspiracy, adapted from S1 Modern Federal Jury Instructions-Criminal 1.20 (2022); *see also* 18 U.S.C. § 1956(i)(1)(A) (providing venue for § 1956 offenses in "any district in which the financial or monetary transaction is conducted") & (2) (providing venue for § 1956 attempt and conspiracy offenses in "the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place"); *United States v. Sitzmann*, 74 F. Supp. 3d 96 (D.D.C. 2014) ("In these circumstances, it does not matter whether Mr. Colligan was a government informant. Nor does it matter whether Mr. Sitzmann knew about or participated in the wire transfer, so long as Sitzmann previously reached a conspiratorial agreement with Mr. Jones . . . . So long as Mr. Jones made the wire transfer in furtherance of his conspiracy with Mr. Sitzmann to traffic in cocaine for profit, venue lies in the District of Columbia."); *United States v. Iossifov*, 45 F.4th 899, 911 (6th Cir. 2022) ("As provided by 18 U.S.C. § 1956(i), venue for money laundering conspiracy is proper 'in any . . . district where an act in furtherance of the attempt or conspiracy took place.' Critically, a co-conspirator's acts need not be foreseeable to a defendant for venue to properly lie in the district where such acts took place, nor is it necessary for a co-conspirator to have entered the district where venue lies so long as this standard is met.") (cleaned up).

## STATUTE OF LIMITATIONS (if applicable)

In general, the statute of limitations is not part of the case that the government has to prove. However, if the defendant raises a defense that the statute of limitations has elapsed for any of the crimes charged in the indictment, then the government must prove that the crime was committed during the limitations period.[58]

The money laundering conspiracy charged in Count One is a continuing offense. Similarly, the unlicensed money transmitting business offenses charged in Counts Three and Four are also continuing offenses. A continuing offense is defined as a continuous course of unlawful conduct.[59] The statute of limitations for a continuing offense only begins to run after the last day of the continuing offense.[60]

---

[58] *Musacchio v. United States*, 577 U.S. 237, 248 (2016) ("As explained above, a statute-of-limitations defense becomes part of a case only if the defendant puts the defense in issue. When a defendant presses a limitations defense, the Government then bears the burden of establishing compliance with the statute of limitations by presenting evidence that the crime was committed within the limitations period or by establishing an exception to the limitations period. If a defendant fails to press a limitations defense, the defense does not become part of the case and the Government does not otherwise have the burden of proving that it filed a timely indictment.) (citation omitted).

[59] *See Monaco*, 194 F.3d at 386 (characterizing "conspiracy to commit money laundering" as a "continuing offense"); *United States v. Elfgeeh*, 2004 WL 3767299, at *9 (E.D.N.Y. Apr. 13, 2004) (characterizing violations of 18 U.S.C. § 1960 as "continuing offenses"); *United States v. McGoff*, 831 F.2d 1071, 1078 (D.C. Cir. 1987) (noting that "[t]he classic example of a continuing offense is conspiracy," and defining continuing offense as "an unlawful course of conduct that does perdure."); *United States v. Midstate Horticultural Co.*, 306 U.S. 161, 166 (1939) ("A continuing offense is a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy."). *McGoff*, 831 F.3d at 1079 ("[T]he statute of limitations as to prosecutions for continuing offenses runs from the last day of the continuing offense."); C. Code § 23-113(b) ("An offense is committed either when every element occurs, or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct, or the defendant's complicity therein, is terminated. Time starts to run on the day after the offense is committed or completed.").

Supp.App.126

I will instruct you that the government must prove beyond a reasonable doubt that conduct related to Counts One, Three, and Four continued up until at least the following dates to be within the applicable statute of limitations periods:

1. For Count One, July 18, 2017;

2. For Count Three, June 14, 2016; and

3. For Count Four, June 14, 2015.

For Count Two, I will instruct you that the government must prove beyond a reasonable doubt that the financial transaction charged in Count Two must have occurred before the following date to be within the applicable statute of limitations: June 14, 2016.

**Instruction 9.100**

**DEFENDANT'S THEORY OF CASE**

*With leave of Court, the defense proposes to submit the defendant's theory of the case at the*

*conclusion of the evidence.*

_____

Source: Red Book 9.100

Supp.App.128

## AFFIRMATIVE DEFENSES—GENERALLY

The defendant in this case has raised certain affirmative defenses, namely, [*withdrawal from a conspiracy*].  I instruct you that it is a defense to Count One of the Indictment that the defendant withdrew from the conspiracy more than five years before the date of the Indictment; The defendant must prove that this was the case by a preponderance of the evidence.  I will instruct you on the elements of this affirmative defenses in a moment.

As I told you the defendant has the burden of proving the elements of the affirmative defense by a preponderance of the evidence.  To prove something by a preponderance of the evidence means to prove only that it is more likely true than not true.  It is determined by considering all of the evidence and deciding which evidence is more convincing.  In determining whether the defendant has proven this defense, you may consider the relevant testimony of all of the witnesses, regardless of who may have called them, and all of the relevant exhibits, regardless of who may have produced them.  If the evidence appears to be equally balanced, or you cannot say upon which side it weighs heavier, you must resolve this question against the defendant.  However, it is important to remember that the fact that the defendant has raised this defense does not relieve the government of the burden of proving all of the elements of the crime as I have defined them for you.  These are things that the government still must prove beyond a reasonable doubt.

––––––––––––––––––

Source: Adapted from 1 Modern Federal Jury Instructions-Criminal P 4.01 (2022).

Supp.App.129

## WITHDRAWAL FROM A CONSPIRACY

It is a defense to the conspiracy charged in Count One of the Indictment if the defendant proves that the defendant withdrew from the conspiracy more than five years before the date when he was first indicted for that count. I will instruct you that, for Count One, the relevant question is whether the defendant withdrew from the conspiracy before July 18, 2017.

Once a person joins a conspiracy, that person remains a member until he completely withdraws from it. A person can withdraw from a conspiracy by taking affirmative steps to terminate or abandon his participation in, and efforts to promote, the conspiracy. In other words, the defendant must have demonstrated some type of positive action that disavowed or defeated the purpose of the conspiracy.[61] A withdrawal must be complete and it must be done in good faith; a partial or temporary withdrawal is insufficient.

To withdraw from a conspiracy, it is not enough for an individual to simply remain inactive. Instead, he must come clean to the authorities or communicate his abandonment in a manner reasonably calculated to reach co-conspirators.[62] Merely doing nothing or avoiding contact with other members of the conspiracy is not enough.

---

[61] 1 Modern Federal Jury Instructions-Criminal P 19.01 (2022); Ninth Circuit Manual of Model Criminal Jury Instructions 11.5 (Withdrawal from Conspiracy).

[62] *Smith v. United States*, 568 U.S. 106, 114 (2013) (co-conspirator's liability "endures even if he is entirely *inactive* after joining it"); *United States v. Bostick*, 791 F.3d 127, 143 (D.C. Cir. 2015) ("To withdraw from a conspiracy, an individual must come clean to the authorities or communicate his or her abandonment in a manner reasonably calculated to reach co-conspirators.") (internal citations omitted); *see also United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000) ("[M]ere cessation of activity is not enough to start the running of the statute . . . .") (internal citations omitted).

Supp.App.130

The defendant has the burden of proving that he withdrew from the conspiracy by a preponderance of the evidence.[63]

---

[63] 1 Modern Federal Jury Instructions-Criminal P 19.01 (2022).

**Instruction 2.405**

**UNANIMITY--GENERAL**

A verdict must represent the considered judgment of each juror, and in order to return a

verdict, each juror must agree on the verdict. In other words, your verdicts must be unanimous.

---

Source: Red Book 2.405

Supp.App.132

**Instruction 2.406**

**UNANIMITY--SPECIAL**

In Count Three of the Indictment, the defendant has been charged with one count of Operating an Unlicensed Money Transmitting Business. You have heard evidence of more than one act or incident related to this count. Specifically, you have heard evidence related to three different ways of Operating an Unlicensed Money Transmitting Business:

A.  The money transmitting business operated without an appropriate money transmitting license in the District of Columbia, where such operation is punishable as a misdemeanor or felony under District of Columbia law, whether or not the defendant knew a license was required or was punishable by District of Columbia law; *or*

B.  The money transmitting business failed to comply with the money transmitting business registration requirements under federal law; *or*

C.  The money transmitting business involved the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense, or are intended to be used to promote or support unlawful activity.

You may find the defendant guilty on this count if the government proves beyond a reasonable doubt that the defendant committed any one of these acts/incidents. However, in order to return a guilty verdict on this count, you must all agree on the same way or ways that the defendant operated an unlicensed money transmitting business—meaning that you must all agree that the defendant (A) operated a money transmitting business without an appropriate money transmitting license in the District of Columbia; or you must all agree that the defendant (B)

102

Supp.App.133

operated a money transmitting business without complying with the money transmitting business

registration requirements under federal law; and/or you must all agree that the defendant (C)

operated a money transmitting business that involved the transportation or transmission of funds

that are known to the defendant to have been derived from a criminal offense, or are intended to

be used to promote or support unlawful activity.

_____

Source: Adapted from Red Book 2.406

Supp.App.134

**Instruction 2.407**

**VERDICT FORM EXPLANATION**

You will be provided with a Verdict Form for use when you have concluded your deliberations. The form is not evidence in this case, and nothing in it should be taken to suggest or convey any opinion by me as to what the verdict should be. Nothing in the form replaces the instructions of law I have already given you, and nothing in it replaces or modifies the instructions about the elements which the government must prove beyond a reasonable doubt. The form is meant only to assist you in recording your verdict.

———————————————

Source: Red Book 2.407

104

**Instruction 2.501**

**EXHIBITS DURING DELIBERATIONS**

I will be sending into the jury room with you the exhibits that have been admitted into evidence. You may examine any or all of them as you consider your verdict(s). Please keep in mind that exhibits that were only marked for identification but were not admitted into evidence will not be given to you to examine or consider in reaching your verdict.

If you wish to hear those portions of the audio recordings which I have admitted into evidence, please notify the clerk by a written note and we will assemble in the courtroom with the appropriate equipment.

––––––––––––––––––––––––

Source: Red Book 2.501

Supp.App.136

**Instruction 2.500**

**REDACTED DOCUMENTS**

During the course of this trial, a number of exhibits were admitted in evidence.
Sometimes only portions of an exhibit were admitted, such as portions of a longer video, a
document with some words or pictures blacked out or otherwise removed, or a video played
without audio. There are a variety of reasons why only a portion of an exhibit is admitted,
including that the other portions are inadmissible or implicate an individual's privacy. As you
examine the exhibits, and you see or hear portions where there appear to be omissions, you
should consider only the portions that were admitted. You should not guess as to what has been
taken out or why, and you should not hold it against either party. You are to decide the facts only
from the evidence that is before you.

—————————————————

Source: Red Book 2.500

Supp.App.137

**Instruction 2.502**

**SELECTION OF FOREPERSON**

When you return to the jury room, you should first select a foreperson to preside over your deliberations and to be your spokesperson here in court. There are no specific rules regarding how you should select a foreperson. That is up to you. However, as you go about the task, be mindful of your mission--to reach a fair and just verdict based on the evidence. Consider selecting a foreperson who will be able to facilitate your discussions, who can help you organize the evidence, who will encourage civility and mutual respect among all of you, who will invite each juror to speak up regarding his or her views about the evidence, and who will promote a full and fair consideration of that evidence.

_____

Source:  Red Book 2.502

Supp.App.138

**Instruction 2.505**

**POSSIBLE PUNISHMENT NOT RELEVANT**

The question of possible punishment of the defendant in the event of a conviction is not a concern of yours and should not enter into or influence your deliberations in any way. The duty of imposing sentence in the event of a conviction rests exclusively with me. Your verdict should be based solely on the evidence in this case, and you should not consider the matter of punishment at all.

––––––––––––––––––––––––––––––––

Source:  Red Book 2.505

Supp.App.139

**Instruction 2.508**

**CAUTIONARY INSTRUCTION ON PUBLICITY,**

**COMMUNICATION AND RESEARCH**

I would like to remind you that, in some cases, although not necessarily this one, there may be reports in the newspaper or on the radio, internet, or television concerning this case. If there should be such media coverage in this case, you may be tempted to read, listen to, or watch it. You must not read, listen to, or watch such reports because you must decide this case solely on the evidence presented in this courtroom. If any publicity about this trial inadvertently comes to your attention, do not discuss it with other jurors or anyone else. Just let me or my clerk know as soon after it happens as you can, and I will then briefly discuss it with you.

As you retire to the jury room to deliberate, I also wish to remind you of an instruction I gave you at the beginning of the trial. During deliberations, you may not communicate with anyone not on the jury about this case. This includes any electronic communication such as email or text or any blogging about the case. In addition, you may not conduct any independent investigation during deliberations. This means you may not conduct any research in person or electronically via the internet or in another way.

_____

Source:  Red Book 2.508

Supp.App.140

**Instruction 2.509**

**COMMUNICATIONS BETWEEN COURT**

**AND JURY DURING JURY'S DELIBERATIONS**

If it becomes necessary during your deliberations to communicate with me, you may send a note by the clerk or marshal, signed by your foreperson or by one or more members of the jury. No member of the jury should try to communicate with me except by such a signed note, and I will never communicate with any member of the jury on any matter concerning the merits of this case, except in writing or orally here in open court.

Bear in mind also that you are never, under any circumstances, to reveal to any person-- not the clerk, the marshal or me--how jurors are voting until after you have reached a unanimous verdict. This means that you should never tell me, in writing or in open court, how the jury is divided on any matter--for example, 6-6 or 7-5 or 11-1, or in any other fashion--whether the vote is for conviction or acquittal or on any other issue in the case.

_____

Source:  Red Book 2.509

Supp.App.141

**Instruction 2.510**

**ATTITUDE AND CONDUCT OF JURORS IN DELIBERATIONS**

The attitude and conduct of jurors at the beginning of their deliberations are matters of considerable importance. It may not be useful for a juror, upon entering the jury room, to voice a strong expression of an opinion on the case or to announce a determination to stand for a certain verdict. When one does that at the outset, a sense of pride may cause that juror to hesitate to back away from an announced position after a discussion of the case. Furthermore, many juries find it useful to avoid an initial vote upon retiring to the jury room. Calmly reviewing and discussing the case at the beginning of deliberations is often a more useful way to proceed. Remember that you are not partisans or advocates in this matter, but you are judges of the facts.

---

Source:  Red Book 2.510

111

**Instruction 2.511**

**EXCUSING ALTERNATE JURORS**

The last thing I must do before you begin your deliberations is to excuse the alternate jurors. As I told you before, the selection of alternates was an entirely random process; it's nothing personal. We selected two seats to be the alternate seats before any of you entered the courtroom. Since the rest of you have remained healthy and attentive, I can now excuse those jurors in seats [insert seat numbers].

Before you two leave, I am going to ask you to tear out a page from your notebook, and to write down your name and daytime phone number and hand this to the clerk. I do this because it is possible, though unlikely, that we will need to summon you back to rejoin the jury in case something happens to a regular juror. Since that possibility exists, I am also going to instruct you not to discuss the case with anyone until we call you. My earlier instruction on use of the Internet still applies; do not research this case or communicate about it on the Internet. In all likelihood, we will be calling you to tell you there has been a verdict and you are now free to discuss the case; there is, however, the small chance that we will need to bring you back on to the jury. Thank you very much for your service, and please report back to the jury office to turn in your badge on your way out.

———————————————————

Source:  Red Book 2.511

112

## FORFEITURE JURY INSTRUCTIONS

These proposed instructions will only be necessary if the jury finds the defendant guilty of Count One, Count Two, and/or Count Three, and if the defense requests, pursuant to Fed. R. Crim. P. 32.2(b)(5)(A), that the jury be retained to determine the forfeitability of specific property listed in the Indictment and Bill of Particulars for Forfeiture.

Forfeiture:  Generally
Burden of Proof
Forfeiture Pursuant to 18 U.S.C. § 982(a)(1)
Definition of Property "Involved In" a Money Laundering Offense
Definition of Property "Involved In" an Unlicensed Money Transmitting Business Offense
Definition of Property "Traceable To"
Instructions on Guilty Verdict and Prior Jury Instructions
Evidence That May Be Considered
Disposition of Forfeited Property
Unanimous Verdict

**FORFEITURE:  GENERALLY**

Members of the jury, in view of your verdict that the defendant is guilty of Counts

_____ of the Indictment, you have another task to perform before you are

discharged.  I now must ask you to render special verdicts concerning property that the

government has alleged is subject to forfeiture to the United States.

The purpose of forfeiture is to ensure that no one profits from criminal conduct.

"Forfeiture" in this case means the defendant will be divested or deprived of his ownership or his

interest, if any, in certain property as a penalty for committing violations of certain federal laws.

You must now consider what verdict to render on the question of whether there is a connection

between the following specific property and the Count(s) to which you have already found the

defendant guilty.  The items that the government seeks to forfeit in this matter include the

following six items:

1.  $349,625.72, seized from Kraken accounts #AA68 N84G QUXT DGMY, held in
    the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name
    of TO THE MOON LTD | ROMAN;

2.  Approximately 0.10877 Bitcoin (BTC) cryptocurrency (after required fees),
    seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of
    Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE
    MOON LTD | ROMAN;

3.  Approximately 205.9625 Ethereum (ETH) cryptocurrency (after required fees),
    seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of
    Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE
    MOON LTD | ROMAN;

4.  Approximately 9,371.52683 Stellar (XLM) cryptocurrency (after required fees),
    seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of

114

**Supp.App.145**

Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN;

5. Approximately 35.9998 Monero (XMR) cryptocurrency (after required fees), seized from Kraken accounts #AA68 N84G QUXT DGMY, held in the name of Roman Sterlingov, and #AA24N84GWW46KQ5Y, held in the name of TO THE MOON LTD | ROMAN; and

6. Approximately 1,354 BTC currently held in the Bitcoin Fog wallet, identified by root address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw.

You must now consider what verdict to render on the question of whether there is a connection between that specific property and [Count One, Count Two, and/or Count Three], for which you have already found the defendant guilty.[64]

---

[64] Fed. R. Crim. P. 32.2(b)(1) and (5); *Bennis v. Michigan*, 516 U.S. 442, 45-52 (1996) (noting that forfeiture is meant to punish the defendant and to serve as a deterrent by preventing further illegal use of the forfeited property and by rendering illegal behavior unprofitable); *United States v. All Assets and Equipment of West Side Bldg. Corp.*, 58 F.3d 1181, 1187 (7th Cir. 1995) ("[P]roperty illegally obtained or used to promote illegal activities should be forfeited to the United States government so that criminals do not profit from their crimes.") (internal quotation marks and alterations omitted).

Supp.App.146

**BURDEN OF PROOF**

It is the Government's burden to establish the required connection between the specific property and the offense or offenses committed by the defendant which would make the property subject to forfeiture. You should find that the Government has met its burden if it has established that connection by a "preponderance of the evidence."

This is a lower standard from that which applied to the guilt or innocence phase of the trial. At that stage of the case, the Government was required to meet its burden "beyond a reasonable doubt." At this forfeiture stage, however, the Government need only establish its proof by a "preponderance of the evidence."

"Preponderance of the evidence" means that the Government has to produce evidence which, considered in light of all of the facts, leads you to believe that what the Government claims is more likely true than not true. To put it differently, if you were to put the Government's evidence and the Defendant's evidence on opposite sides of a balance scale, the Government's evidence would have to make the scale tip slightly on its side of the balance. If the Government's evidence fails to do this, then the Government has not met its burden of proof.[65]

---

[65] *United States v. DeFries*, 129 F.3d 1293, 1312-13 (D.C. Cir. 1997) (holding that "[t]he government must prove its forfeiture allegations by a preponderance of the evidence" because criminal forfeiture is an aspect of sentencing, citing *Libretti v. United States*, 516 U.S. 29, 38 39 (1995)); *see also United States v. Martin*, 662 F.3d 301, 307 (4th Cir. 2011) ("[T]he government must establish a nexus between the property for which it is seeking forfeiture and the crime by a preponderance of the evidence."); *Blossom v. CSX Transp., Inc.*, 13 F.3d 1477, 1480 (11th Cir. 1994) (ruling that the "tipping the scales" language is a proper illustration of a preponderance of the evidence standard, and that district court's refusal to permit such instruction was reversible error); *see also United States v. Khedr*, 343 F.3d 96, 110 (2nd Cir. 2003) ("To satisfy the

**FORFEITURE PURSUANT TO 18 U.S.C. § 982(a)(1)**

Section 982(a)(1) of Title 18 of the United States Codes provides, in relevant part, that whoever engages in a Money Laundering Conspiracy, in violation of Title 18, United States Code, Section 1956(h); Money Laundering, in violation of Title 18, United States Code, Section 1956(a)(3)(A) or (B); or Operating an Unlicensed Money Transmitting Business, in violation of Title 18, United States Code, Section 1960(a), shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

The Government alleges that certain properties are forfeitable under this category based on the defendant's conviction(s). Each item of property is set out in a Special Verdict Form which follows at the end of these instructions. As to each item of property, you must determine whether or not the applicable connection exists between that property and the above category.[66]

---

preponderance standard, evidence need only be sufficient to cause the evidentiary scales to tip, however slightly . . . .") (internal quotation marks and alterations omitted).
[66] 18 U.S.C. § 982(a)(1).

Supp.App.148

**DEFINITION OF PROPERTY "INVOLVED IN" A MONEY LAUNDERING OFFENSE**

The phrase "any property, real or personal, involved in" a money laundering offense includes:

1. The money or other property that was being laundered;

2. Any commissions or fees paid to the launderer; and

3. Any property used to facilitate the laundering offense.

Property that was used to facilitate the money laundering transaction may include property that was not part of the transaction itself, but was used to make the money laundering offense easier to commit or harder to detect. This may include untainted property if it was comingled with the property being laundered and facilitated the money laundering offense.

In the case of a money laundering conspiracy that takes the form of a business, the property that is "involved in" the money laundering conspiracy includes all funds that flow through the business to "bankroll" or otherwise facilitate the conspiracy. It is not limited to specific transactions.

Property "involved in" a money laundering offense includes any property traceable to the property that was involved in the offense. The phrase "any property traceable to" such property includes property that was acquired or maintained with the proceeds of the underlying money laundering crime.[67]

---

[67] *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (property involved in money laundering offense includes "the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense"); *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (the SUA proceeds involved in a financial transaction, as well as any clean money commingled with it, constitute the corpus of the money laundering transaction; both are subject to forfeiture); *United States v. Warshak*, 2008 WL 509258, at *1 (S.D. Ohio 2008) (district court sets forth, in full, its

instruction defining "property involved in a money laundering offense," to include the subject matter of the financial transaction, commissions and fees, and property used to facilitate the offense); *United States v. Nicolo*, 597 F. Supp. 2d 342, 355 (W.D.N.Y. 2009) (if funds in a bank account are subject to forfeiture as property involved in money laundering, then a vehicle purchased with those funds is forfeitable as property traceable to such property); *United States v. Harmon*, 474 F. Supp. 3d 76, 85 n.5 (D.D.C. 2020) ("Where, as here, the conspiracy takes the form of a business, all funds flowing through the business that 'bankroll' or otherwise facilitate the alleged conspiracy are 'involved in' it. Thus, any untainted funds used as 'seed' money to start Helix or to run Grams, Helix's companion service, were used to further Helix's core business, which was cleaning bitcoins used in Darknet drug purchases. Finally, to the extent some of Helix's business came from transactions unrelated to drug activity, the fees from those transactions remain forfeitable because the evidence suggests that the business as a whole was overwhelmingly devoted to transactions from Darknet markets, which, in turn, overwhelmingly deal in drugs.") (internal citations omitted); *United States v. Garza-Gonzalez*, 512 F. App'x 60, 67 (2d Cir. Feb. 21, 2013) (unpublished) ("Datta used his perfume business to conceal the fact that he was laundering the proceeds of drug transactions, and the district court did not err in viewing the business's cash receipts during the period in question as 'property . . . involved in' Datta's conspiracy to violate § 1956. Those cash receipts, including the $7 million in drug money, totaled $29,505,265."); *United States v. Coffman*, 859 F. Supp. 2d 871, 879 (E.D. Ky. 2012) ("[T]he conspiracy to commit money laundering conviction . . . is not based on or limited to specific transactions, but encompasses the whole of Coffman's scheme and his attempts and plans to conceal and disguise the nature, location, source, ownership and control of the proceeds of the fraud."); *United States v. Swank Corp.*, 797 F. Supp. 497, 502 (E.D. Va. 1992) ("The ability to forfeit a business entity which is used to facilitate the offense of money laundering is well established."); *United States v. Cherry*, 330 F.3d 658, 669 n.17 (4th Cir. 2003) (the court properly instructed the jury that it had to find, by a preponderance of the evidence, that the property "fairly represents the property which was involved in, or is traceable to property involved in" the money laundering counts).

## DEFINITION OF PROPERTY "INVOLVED IN" AN UNLICENSED MONEY
## TRANSMITTING BUSINESS OFFENSE

The phrase "any property, real or personal, involved in" an unlicensed money transmitting business offense includes any property "involved in" operation of the business during the time period while the business was operating in violation of the law, regardless of its purpose or whether the property was involved in specific transactions. This includes any property that passed through the unlicensed money transmitting business's accounts during the relevant time period.

Property "involved in" an unlicensed money transmitting business offense includes any property traceable to the property that was involved in the offense. The phrase "any property traceable to" such property includes property that was acquired or maintained with the proceeds of the underlying money laundering crime.[68]

---

[68] *United States v. Elfgeeh*, 2004 WL 3767299, at *9 (E.D.N.Y. Apr. 13, 2004) (violation of 18 U.S.C. § 1960(a) is a "continuing offense"); *United States v. Elfgeeh*, 515 F.3d 100, 122, 138-39 (2d Cir. 2008) ("all assets that passed through" account belonging to unlicensed hawala were subject to forfeiture); *United States v. 50.44 Bitcoins*, 2016 WL 3049166, at *2 (D. Md. May 31, 2016) (bitcoins seized from married couple that operated unlicensed Darknet virtual currency exchange were subject to forfeiture "[b]ecause the business operated by [the defendants] . . . was not registered to transmit money as required by state and federal law"); *United States v. $829,442.42 in U.S. Currency*, 2013 WL 2446486, at *8-9 (D. Conn. June 5, 2013) (bank accounts belonging to unlicensed money transmitting business were subject to forfeiture in their entirety); *United States v. $715,031.27*, 587 F. Supp. 2d 1275, 1276-78 (N.D. Ga. 2008) ("entire" bank accounts belonging to unlicensed money transmitting business were subject to forfeiture); *United States v. Cherry*, 330 F.3d 658, 669 n.17 (4th Cir. 2003) (the court properly instructed the jury that it had to find, by a preponderance of the evidence, that the property "fairly represents the property which was involved in, or is traceable to property involved in" the money laundering counts).

## DEFINITION OF PROPERTY "TRACEABLE TO"

Property "traceable to" the proceeds of an offense includes property that was acquired or maintained with the proceeds.  For example, if someone uses the proceeds of a crime to buy a car, the car is regarded as property traceable to the proceeds.  The point is that the proceeds of an offense remain the proceeds of the offense even as they change from one thing to another.[69]

---

[69] *United States v. Bornfield*, 145 F.3d 1123, 1135–36 (10th Cir. 1998) ("[P]roperty "traceable to" means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources.  In other words, proof that the proceeds of the money laundering transaction enabled the defendant to acquire the property is sufficient to warrant forfeiture as property "traceable to" the offense.  For example, if a defendant receives $500,000 in cash in a money laundering scheme and hides the cash in his house, the government may seize that money as property "involved in" the money laundering offense.  If, on the other hand, the defendant purchases a $500,000 item with that money, the government may seek the item purchased as property "traceable to" property involved in the money laundering offense.") (internal citations omitted); *United States v. Stewart*, 185 F.3d 112, 129-30 (3d Cir. 1999) (§ 982- tainted funds traced into account which held untainted funds were forfeitable as "involved in" and "traceable to" money laundering); *United States v. Hawkey*, 148 F.3d 920, 927-28 (8th Cir. 1998) (§ 982- property "traceable to" the laundering violation and any appreciation in value is forfeitable; entire motor home forfeitable even if untainted funds added to value of it); *United States v. Betancourt*, 422 F.3d 240 (5th Cir. 2005) (if defendant buys a lottery ticket with drug proceeds, the lottery winnings are traceable to the offense even though the value of the ticket appreciated enormously when it turned out to contain the winning number); *United States v. Swanson*, 394 F.3d 520, 529 n.4 (7th Cir. 2005) (a change in the form of the proceeds does not prevent forfeiture; property traceable to the forfeitable property is forfeitable as well); *United States v. Wittig*, 2006 WL 13158, at *2 (D. Kan. 2006) (court instructs jury that property "derived from" the proceeds of an offense means money or other property obtained using the money or other source of wealth gained as a result of the offense; property "traceable to" the offense means property whose acquisition was attributable to the offense rather than from untainted sources).

**INSTRUCTIONS ON GUILTY VERDICT AND PRIOR JURY INSTRUCTIONS**

All instructions previously given to you concerning your consideration of the evidence, other than instructions on the standard of proof, will apply during your supplemental deliberations concerning the forfeiture allegations.  These previous instructions include but are not limited to, instructions on the credibility of witnesses, your duty to deliberate together, and the necessity of reaching a unanimous verdict.

In your consideration of the forfeiture allegations, you are instructed that your previous determination that the defendant is guilty of [Count One, Count Two, and/or Count Three] charged in the Indictment is binding on this part of the proceeding.  Thus, you must not seek to discuss or reconsider the guilt or innocence of the defendant.

Supp.App.153

## EVIDENCE THAT MAY BE CONSIDERED

While deliberating, you may consider any evidence offered by the parties at any time during this trial.  Thus, you may consider any evidence offered during the guilt or innocence phase of the trial as well as any additional evidence offered during the forfeiture phase of the trial.[70]

---

[70] Fed. R. Crim. P. 32.2(b)(1) (court's determination may be based on evidence already in the record); *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007) (the court may rely on evidence from the guilt phase of the trial, even if the forfeiture is contested; it is not necessary for government to reintroduce that evidence in the forfeiture hearing); *United States v. Bornfield*, 145 F.3d 1123, 1134 (10th Cir. 1998) (quoting jury instruction that while deliberating on forfeiture "you may consider any evidence offered by the parties before your previous deliberations").

Supp.App.154

## DISPOSITION OF FORFEITED PROPERTY

You are also instructed that what happens to any property that you find has a connection to a crime is exclusively a matter for the Court to decide. Similarly, any claims that the forfeiture of the property would constitute excessive punishment will be taken into account by the Court at a later time. Your only concern is to determine whether the government has established the requisite connection between the specific property and the defendant's crime(s).[71]

---

[71] Fed. R. Crim. P. 32.2(b)(2)(A) (providing that ownership issues are deferred to the ancillary proceeding); *United States v. Nava*, 404 F.3d 1119, 1132 (9th Cir. 2005) (district court properly instructed jury that questions of ownership "were not before them"; therefore, jury's return of special verdict of forfeiture says nothing about the ownership of the property); *United States v. Wittig*, 2006 WL 13158, *3 (D. Kan. 2006) (court instructs jury that it is not to concern itself with anyone's ownership interest in the property, "as the jury's responsibility is solely to determine whether the Government has adequately proven the nexus between the offenses and the property").

Supp.App.155

**UNANIMOUS VERDICT**

Your verdict that these properties are subject to forfeiture must be unanimous; that is, you must reach a unanimous verdict as to each question on the special verdict form.

Supp.App.156

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 21-cr-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MOTION TO QUASH EARLY-RETURN RULE 17(c) SUBPOENAS

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully moves to quash the defendant's four Rule 17(c) subpoenas issued on November 18, 2022 to Chainalysis, Inc. and to three of its employees, with a three-week deadline for the production of documents directly to defense counsel. These subpoenas impermissibly demand early production without prior leave of Court; they seek to misuse Rule 17(c) as an improper discovery tool seeking a massive volume of irrelevant and inadmissible records; and they were accompanied by inappropriate threats to the third-party respondents about "potential liability should [Roman Sterlingov] be acquitted." The government requests that the Court quash the subpoenas and order the defense to comply with Rule 17(c)'s requirement that the issuing party obtain specific leave of Court before issuing any early-return Rule 17(c) subpoenas.

### FACTUAL BACKGROUND

On November 18, 2022, the defendant purported to serve four Rule 17(c) subpoenas on respondents Chainalysis, Inc. ("Chainalysis") and three of its employees, Michael Gronager, Jonathan Levin, and Youli Lee, by delivering a demand to Chainalysis's General Counsel via email and FedEx. *See* Ex. 1 (Def. Rule 17(c) Subpoenas). The defense did not provide notice of its early-return third-party subpoenas to the government. The government only learned about the subpoenas after being notified by counsel for the respondents on Monday, November 21, 2022.

In a cover letter accompanying the subpoenas, defense counsel threatened the respondents about unspecified legal liability: "Finally, please be advised because of your company's involvement in Mr. Sterlingov's prosecution, you face potential liability should he be acquitted." *Id.* at 2.[1]  The cover letter did not explain the legal basis for this "liability" or why it would depend on the verdict in this criminal prosecution.

The defense subpoenas purported to require testimony and the production of documents directly to defense counsel prior to trial, either on December 21, 2022 or "21 days from date of receipt," *i.e.*, December 9, 2022 (the two deadlines appear in different parts of the defendant's subpoenas).   Notably, the third-party subpoenas appear to have been served *after* the government filed its opposition to the defendant's motion to continue the trial at approximately 2:38 p.m. on November 18, 2022.  *See* ECF No. 84.  In that filing, the government specifically flagged the defendant's then-apparent intent to issue early-return subpoenas without leave of Court, and directed the defendant's attention to Supreme Court and District-specific authorities holding that such practices violate the plain text of Rule 17(c).  *Id.* at 3-4 n.2 (citing *United States v. Binh Tang Vo*, 78 F. Supp. 3d 171 (D.D.C. 2015); *Bowman Dairy Co. v. United States*, 341 U.S. 214 (1951); *United States v. Santiago-Lugo*, 904 F. Supp. 43 (D.P.R. 1995)).

## ARGUMENT

### A. The Defendant Failed To Obtain Court Approval for Early-Return Rule 17(c) Subpoenas

Rule 17(a) and (c) allows a party to issue a trial or hearing subpoena *duces tecum*, which requires a witness "to produce any books, papers, documents, data, or other objects the subpoena

---

[1] Defense counsel has made similar threats about unspecified "litigation" to undersigned counsel for the government, including his September 12, 2022 email stating: "[Y]ou are on notice that we consider all your communications with Wired, Andy Greenberg, and anyone else you've been selling your story to the last couple of years relevant not only to this case but any litigation afterwards."

Supp.App.158

designates." Fed. R. Crim. P. 17(c)(1).  The rule further provides: "*The court* may direct the witness to produce the designated items in court *before trial* or *before they are to be offered in evidence*." *Id.* (emphasis added).  Under the plain text of the rule, only "[t]he court" may authorize an early-return subpoena "before trial."

In *United State v. Binh Tang Vo*, 78 F. Supp. 3d 171 (D.D.C. 2015), Judge Sullivan held that prior authorization was required for an early-return subpoena.  This requirement, moreover, is not just a formality, but an important safeguard that arises out of the Court's duty to supervise the proper use of Rule 17(c) subpoenas:

> Rule 17 first creates a general rule: Subpoenas are issued without the court's involvement when they command the recipient's presence and possibly the production of documents at a particular hearing.  Rule 17(c) creates a limited exception to this rule, declaring that "[t]he court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." . . .  The Rule, in leaving advance production to the court's discretion, is no mere technicality.  It is a vital protection against misuse or improvident use of such subpoenas.

*Id.* at 178 (cleaned up).  The D.C. Circuit has long held that an early-return subpoena is permissible "only upon a showing" by the issuing party that the subpoena is proper.  *United States v. Haldeman*, 559 F.2d 31, 75 (D.C. Cir. 1976) ("Criminal Rule 17(c), which is not a discovery device, confines a subpoena duces tecum to admissible evidence, authorizes the quashing of the subpoena if it is 'unreasonable or oppressive,' and *indulges pretrial inspection of subpoenaed papers only upon a showing* (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'") (emphasis added, cleaned up); *see also Monroe v. United States*, 234 F.2d 49, 55 (D.C. Cir. 1956)

Supp.App.159

(noting that "the trial court *in its discretion* could have required pre-trial production" of admissible recordings) (emphasis added).

Here, the defendant purported to serve four early-return subpoenas on Chainalysis and its employees without prior leave of Court—requiring production of documents, and possibly testimony,[2] directly to defense counsel in as short a period as three weeks (over the Thanksgiving holiday weekend).  The defendant has offered no justification for the three-week turnaround or for the requirement that the records be produced only to defense counsel.  The subpoenas are procedurally invalid and should be quashed.

Further, as discussed in detail below, the defendant's end-run around the procedural protections of Rule 17(c) prevents the Court from supervising the appropriate use of the third-party subpoenas in the first instance.  Thus, because "it is this court's duty to make certain that the subpoena power is invoked legitimately and legally," *United States v. Santiago-Lugo*, 904 F.Supp. 43, 45 (D.P.R.1995), not to mention the plain text of Rule 17(c), the Court should order the defendant to obtain specific leave of Court before issuing any more early-return Rule 17(c) subpoenas.

## B. The Defendant's Rule 17(c) Subpoenas Fail the *Nixon* Test for Relevancy, Admissibility, and Specificity

### 1. Legal Framework

Under Rule 17(c), "'[t]he Court has an independent duty to review the propriety of the subpoena.'"  *Binh Tang Vo*, 78 F. Supp. 3d at 176 (quoting *United States v. Vasquez*, 258 F.R.D. 68, 72 (E.D.N.Y. 2009)); *accord Bowman Dairy*, 341 U.S. at 221 ("The burden is on the court to

---

[2] Each subpoena is styled as a "Subpoena for Documents and Testimony."  It is not clear whether the intended testimony is limited to authentication at trial (contrary to the early-return date) or whether the defendant intends to conduct a civil-style deposition of the Chainalysis witnesses at defense counsel's offices on December 9, 2022.

see that the subpoena is good in its entirety and it is not upon the [subpoenaed party] to cull the good from the bad.").  The trial court retains the power to "quash or modify" the subpoena "if compliance would be unreasonable or oppressive."  Fed. R. Crim. P. 17(c)(2).  The decision to quash or modify a subpoena lies within the "sound discretion of the Trial Court."  *United States v. Boyle*, 338 F. Supp. 1025, 1028 (D.D.C. 1971).

Courts have consistently ruled that Rule 17(c) was intended as a vehicle to secure specific pieces of evidence for trial.  It was not intended to be used—as the defendant attempts to do here— as a vehicle to compel broad, civil-style discovery from third parties.  "A long line of precedent makes clear that Rule 17(c) is 'not intended to provide a means of discovery for criminal cases.'"  *United States v. Fitzsimons*, 342 F.R.D. 18, 20 (D.D.C. 2022) (quoting *United States v. Nixon*, 418 U.S. 683, 698-99 (1974), and collecting cases).  As the Third Circuit has explained:

> [R]ule 17(c) is designed as an aid for obtaining relevant evidentiary material that the moving party may use at trial. . . . Courts must be careful that rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed. R. Crim. P. 16.

*United States v. Cuthbertson*, 630 F.2d 139, 144, 146 (3d Cir. 1980).  Judge Sullivan emphasized the same point in *Binh Tang Vo*:

> Rule 17 is not a rule for discovery.  It does contain the additional provision that the Court may make a subpoena *duces tecum* returnable prior to the trial.  It was not the purpose of this provision to permit some sort of discovery.  The object was to prevent delays during the trial when documents are produced in response to a subpoena *duces tecum* and are offered in evidence.

78 F. Supp. 3d at 179 (quoting *United States v. Ferguson*, 37 F.R.D. 6, 7-8 (D.D.C. 1965) (internal alterations omitted)); *see also United States v. Edwards*, 191 F. Supp. 2d 88, 89 (D.D.C. 2002) ("While a Rule 17(c) subpoena *duces tecum* is a legitimate device to obtain evidentiary material, it was never intended to be a broad discovery device going beyond that which is required either by Rule 16 of the Federal Rules of Criminal Procedure or by *Brady*."); *United States v. Brooks*, 966

F.2d 1500, 1505 (D.C. Cir. 1992); *United States v. Gonzalez-Acosta*, 989 F.2d 384, 389 (10th Cir. 1993); *United States v. Adritti*, 955 F.2d 331, 346 (5th Cir. 1992); *United States v. George*, 883 F.2d 1407, 1418 (9th Cir. 1989).   As such, Rule 17(c) subpoenas may only be used to obtain relevant and admissible evidence "that the moving party may use at trial." *Cuthbertson*, 630 F.2d at 144.

A Rule 17(c) subpoena cannot properly be issued upon a "mere hope." *United States v. Hang*, 75 F.3d 1275, 1283 (8th Cir. 1996); *see also Cuthbertson*, 630 F.2d at 146 ("Thus, the defendants' broad request . . . was based solely on the mere hope that some exculpatory material might turn up. We do not think that this 'mere hope' justifies enforcement of a subpoena under rule 17(c).").   Accordingly, court have universally disapproved the use of a Rule 17(c) subpoena to conduct an open-ended "fishing expedition."   *See, e.g.*, *Bowman Dairy*, 341 U.S. at 221 (invalidating "catch-all provision" in Rule 17(c) subpoena because it was "not intended to produce evidentiary materials but is merely a fishing expedition to see what may turn up"); *United States v. Libby*, 432 F. Supp. 2d 26, 34 (D.D.C. 2006) (rejecting Rule 17(c) demand for witness's calendar and telephone records because "the defendant has not provided this Court with any basis upon which it can draw a reasonable inference that there is a real likelihood that the telephone records and calendar would contain relevant and admissible evidence," and "the requests again appear to be nothing more than a fishing expedition"); *Boyle*, 338 F. Supp. at 1027-28 (rejecting Rule 17(c) subpoenas to Department of Justice officials related to claims of selective enforcement because "to allow the instant subpoenas duces tecum to stand would be tantamount to authorizing a fishing expedition which is not authorized by either Rules 16 or 17 of the Federal Rules of Criminal Procedure"); *Binh Tang Vo*, 78 F. Supp. 3d at 182 (rejecting Rule 17(c) subpoena for defendant's call records because "it is clear that the subpoenas were just a fishing expedition").

**Supp.App.162**

The Supreme Court distilled these principles into a three-part test in *United States v. Nixon*, 418 U.S. 683 (1974), holding that a party seeking to enforce a Rule 17(c) subpoena "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Id.* at 700. "The burden of satisfying the 'exacting standards' of the three-part *Nixon* test falls 'on the party requesting the information.'" *Fitzsimons*, 342 F.R.D. at 20 (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 386-87 (2004)).

### 2.    The Defendant Cannot Articulate Any General Theory of Relevance for His Fishing Expedition

The defendant's Rule 17(c) subpoenas fail at each step of the *Nixon* test. Even before reaching the subpoena requests, the defendant's vaguely menacing cover letter—threatening that "you face potential liability should [Mr. Sterlingov] be acquitted"—suggests that the subpoenas are *intended* to be "unreasonable" and "oppressive," Fed. R. Crim. P. 17(c)(2). Defense counsel in this case has exhibited a personal animosity toward the respondents that appears to go well beyond the issues in this case. He has repeatedly used his personal Twitter account, as well as the interview he and his client conducted for WIRED reporters, to make out-of-court statements attacking Chainalysis as "the Theranos of blockchain analysis"—making an outlandish and false claim that the company is a fraudulent or even criminal enterprise. Whatever defense counsel's personal feelings toward the respondents, they do not justify the sweeping and irrelevant discovery demands made in his client's name in the Rule 17(c) subpoenas.

Nor do the subpoena requests themselves reflect that "the application is made in good faith and is not intended as a general 'fishing expedition.'" *Nixon*, 418 U.S. at 700. To begin with, subject to a single exception, *every single request* calls for the production of "[a]ny documents, records and communications" related to a given topic. The only exception is request No. 20 from the subpoena to Jonathan Levin, which simply demands "[a]ll communications with WIRED

Supp.App.163

reporter Andy Greenberg"—unbounded by subject matter or date range. Open-ended demands for "any" or "all" records are, in themselves, strong evidence that these requests are fishing expeditions that fail the relevancy and specificity prongs of *Nixon*. As Judge Walton explained in *Libby*, "courts will not approve a subpoena for documents based upon requests for disclosure from broad categories of documents." 432 F. Supp. 2d at 31.

The defendant cannot articulate any theory of relevance to justify his sweeping demands. Indeed, all of the defendant's requests suffer from the same defect: they appear designed to uncover materials that may or may not exist, without any articulated relevance to any issue in this case, much of which is inadmissible hearsay. This type of fishing expedition might be acceptable in civil discovery, but Rule 17(c) is substantially more narrow in scope: "Rule 17(c) can be contrasted with the civil rules which permit the issuance of subpoenas to seek production of documents or other materials which, although not themselves admissible, could lead to admissible evidence." *Libby*, 432 F. Supp. 2d at 30 (internal quotations omitted). As Judge Contreras explained in *Fitzsimons*:

> The relevance prong is not satisfied merely because a defendant can articulate what they hope to find in the subpoenaed evidence. . . . [C]ourts have quashed subpoenas based on a defendant's mere expectation about what could be recovered without a showing of a sufficient likelihood that the documents actually contained relevant evidence.

342 F.R.D. at 21. In much the same way, the defendant's demands here reflect, at best, what the defendant "hope[s]" to find among the respondent's records. He cannot satisfy his threshold burden of showing a "sufficient likelihood" that the requested documents "actually" will contain relevant evidence.

To the extent any rationale can be discerned, the subpoena requests appear to arise from the defendant's nebulous conspiracy theory about Chainalysis and alleged government

**Supp.App.164**

"profiteering."  The defendant has now had numerous opportunities to explain the logic behind his

conspiracy theory and articulate its relevance to any material fact before the jury at trial.  To date,

however, he has only been able to restate his conclusion—that his conspiracy theory, whatever it

is, relates in some vague way to the "weight, credibility, and integrity of the Government's

evidence."  ECF No. 69, at 5.  Especially here, in the context of a third-party subpoena, such

conclusory assertions of relevance are insufficient to satisfy the defendant's burden under *Nixon*.

Nor can the defendant justify the Rule 17(c) subpoenas merely because the government

has noticed a Chainalysis employee, Elizabeth Bisbee, as one of its blockchain experts.  *See* ECF

No. 61, at 7-8 (noticing expected testimony about blockchain analysis and the clusters associated

with Bitcoin Fog and key darknet marketplaces).  The defendant will have the opportunity to cross-

examine Ms. Bisbee about her qualifications, her analysis, the tools she used, and any sources of

potential bias.  But the conspiracy theory asserted by the defendant in his pleadings, and reflected

in his third-party subpoena requests, goes well beyond the scope of any challenge to the single

government witness affiliated with Chainalysis.  The defendant cannot use Rule 17(c) to expand

the scope of expert discovery otherwise provided for under Rule 16.  *See United States v. Raheja*,

2022 WL 2870902, at *8 (N.D. Ohio July 20, 2022) ("By his own admissions, Dr. Sawhny's Rule

17(c) requests to Dr. Schneck are designed to expand expert discovery beyond that to which he is

entitled under Rule 16. . . .  By seeking an extensive list of documents and information to which

he is not entitled under Rule 16—including internal communications, timesheets, and invoices—

it is clear that the present subpoena is being used to expand the scope of expert discovery beyond

that supported by Rule 16.  It, therefore, represents an abuse of the Court's subpoena power, and

Dr. Sawhny's second motion is denied for this additional reason.").

**Supp.App.165**

**3.** **The Defendant Cannot Carry His Burden of Showing His Individual Requests Seek Relevant, Admissible, and Specific Records**

As the party seeking enforcement of the third-party subpoena, the defendant bears the burden of showing in the first instance that each request satisfies the three-part *Nixon* test for (1) relevancy, (2) admissibility, and (3) specificity. *Fitzsimons*, 342 F.R.D. at 20. The government is not required to exhaustively address each one of the defendant's *eighty-one* discovery requests. But even a sampling of the requests shows that they are grossly overbroad and irrelevant, and cannot pass muster under *Nixon*.

Request No. 1 to Chainalysis, Inc. calls for any records related to "the DOJ press releases [*sic*] announcing Roman Sterlingov's arrest."[3] The defendant cannot articulate any real theory of relevance for the requested records. Even assuming (doubtfully) that the respondents are in possession of documents related to the Department of Justice press release, there is no conceivable explanation for how such records would constitute admissible evidence for the jury. The mere fact that a press release was issued does not make any material fact at issue before the jury more or less probable. Request No. 1 goes on to demand records related to "the timing of the release, and communications with WIRED reporter Andy Greenberg"—appearing to rehash the defendant's false theory that there was something untoward about the timing of the press release announcing the defendant's arrest.[4] Even if the theory were true, the *timing* of a press release bears no more relevance to the jury's deliberations than the fact that a press release was issued in the first place.

---

[3] The four subpoenas to Chainalysis and its employees contain mostly identical requests. For the sake of discussion, the government focuses here on the subpoena to the corporate entity, Chainalysis, Inc., but its objections apply across the board to all four subpoenas.

[4] As the government has previously explained, the complaint and arrest warrant were automatically unsealed upon the defendant's arrest on April 27, 2021, and the initial WIRED reporting credited a tip-off from a well-known PACER researcher. *See* ECF No. 53, at 3 n.2.

Supp.App.166

Further, the defendant offers no basis to believe such records even exist within the respondent's possession, custody, or control. Where the requesting party "is unable to verify whether the requested material even exists," *United States v. Morris*, 287 F.3d 985, 991 (10th Cir. 2002), that is a red flag indicating that the subpoena is being used for an impermissible fishing expedition.

Almost as an afterthought, the last clause of Request No. 1 makes a sweeping demand for "any communications related to Andy Greenberg's book 'Tracers in the Dark – The Global Hunt for the Crime Lords of Cryptocurrency.'" The defendant does not confine this demand to communications related to the Bitcoin Fog case. In fact, the government understands that Mr. Greenberg's book focuses overwhelmingly on other, unrelated cases and investigations: out of 326 pages, the Bitcoin Fog case occupies less than 2 pages of the book.[5] Such a broad demand goes well beyond the bounds of the *Nixon* test. And even if the request were limited to communications in which Bitcoin Fog is discussed, they would have no probative value regarding any material fact in front of the jury. Any communications between two third-party observers, such as Mr. Greenberg and employees of the respondent, would be nothing more than spectator commentary about a case that both are following. That is not relevant evidence of anything. (Nor, for that matter, would such hearsay communications likely be admissible.)

Request No. 3 is a catch-all request for "[a]ny documents, records and communications" that are "related" in any way to the Bitcoin Fog case. Request No. 16 is a variation of the same request, demanding "[a]ny documents, records and communications" that were "initiated or received by Michael Gronager, Jonathan Levin, Youli Lee, John Lewis Golinvaux, Gurvais Grigg,

---

[5] Ironically, given the defendant's accusations about Mr. Greenberg's book in his pleadings and in correspondence with the government (accusations that the government was leaking non-public information about the case), publication of the book now shows that *defense counsel* was one of Mr. Greenberg's sources on the Bitcoin Fog case. *See* Andy Greenberg, *Tracers in the Dark* 291 (2022) (quoting Tor Ekeland on his client's case).

**Supp.App.167**

*or anyone else affiliated with Chainalysis*" (emphasis added) that are "related" to the Bitcoin Fog case. As the Supreme Court stated in *Bowman Dairy*, in rejecting a similarly unbounded request: "This is a catch-all provision, not intended to produce evidentiary materials but is merely a fishing expedition to see what may turn up. The clause is therefore invalid." 341 U.S. at 221.

Other requests appear to call for communications between various persons and entities. *See, e.g.*, Request No. 10 (communications "between Chainalysis and Catherine Alden Pelker"); Request No. 11 (communications "between Chainalysis and Excygent"); Request No. 12 (communications "between Chainalysis and Elliptic"); Request No. 13 (communications "between Chainalysis and MITRE"); Request No. 14 (communications "between Chainalysis and Excygent" [*sic*], duplicating Request No. 11); Request No. 15 (communications "between Chainalysis and Aaron Bice"); Request No. 17 (communications "between Chainalysis and the Swedish Prosecution Authority"); Request No. 18 (communications "between Chainalysis and the Financial Crimes Enforcement Network"); Request No. 19 (communications "between Chainalysis and any other federal agency"). First, these are impermissible catch-all requests of the type the Supreme Court rejected in *Bowman Dairy*. *See* 341 U.S. at 221. The defendant has not articulated any basis to believe specific "communications" related to Bitcoin Fog even exist among the listed parties, let alone that they would constitute relevant and admissible evidence in this case. *See Libby*, 432 F. Supp. 2d at 31 ("If the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused.") (internal quotations and alteration omitted).

Second, any records of "communications" between third parties will likely be inadmissible hearsay. *See United States v. Cherry*, 876 F. Supp. 547, 552-53 (S.D.N.Y. 1995) ("The weight of

Supp.App.168

authority holds that in order to be procurable by means of a Rule 17(c) subpoena, materials must themselves be admissible evidence."); *Cuthbertson*, 651 F.2d at 195 (denying Rule 17(c) subpoena for "materials [that] are simply hearsay" where neither party "asserted a relevant exception to the hearsay rule"); *United States v. Basciano*, 2006 WL 8451585, at *5 (E.D.N.Y. Apr. 17, 2006) (denying Rule 17(c) subpoena for agents' "investigative files" in part because "at least a portion of the material is inadmissible hearsay"); *United States v. Brown*, 1995 WL 387698, at *10 (S.D.N.Y. June 30, 1995) (denying Rule 17(c) subpoena for memoranda of interviews conducted by NYPD or the Bronx District Attorney's Office because "[s]uch memoranda would, of course, be hearsay, and inadmissible as evidence at trial"). The defendant does not articulate any hearsay exception that would permit introduction of the communications at trial—nor could he, because these are general fishing expeditions and he cannot identify the general content or circumstances of the communications in question. The requests therefore fail the admissibility prong of the *Nixon* test, in addition to the relevancy and specificity prongs.[6]

Request No. 9 calls for records relating to the "development of Chainalysis Reactor software," listing out categories of documents such as "reports, sandbox results, beta testing,

---

[6] The Supreme Court has cautioned that "[g]enerally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *Nixon*, 418 U.S. at 701; *see, e.g.*, *United States v. Weissman*, 2002 WL 31875410, at *1 (S.D.N.Y. Dec. 26, 2002) ("Defendant argues that he needs to examine the materials to determine their evidentiary value. He asserts that the subpoena *may* have some evidentiary basis other than impeachment—such as to show bias, to show state of mind or as recorded recollection. Defendant's argument, however, fails because the *Nixon* standards prohibit the use of a Rule 17(c) subpoena as a fishing expedition."). Although courts have recognized limited exceptions to this rule, "a witness's memory and credibility are only at issue if that witness actually testifies," and the defendant bears the burden of showing "with a reasonable probability" that the proposed statements would actually constitute impeachment material. *Fitzsimons*, 342 F.R.D. at 21-22 (denying Rule 17(c) subpoena to obtain outtakes of interview of "key witness for the government" because the defendant could not show the requested statements would be inconsistent with his testimony). Here, none of the individuals listed in the defendant's subpoenas will be called as a government witness at trial.

Supp.App.169

penetration testing results," and so forth.   Notably, this request does not actually demand production of "source code," which the defendant has demanded from the government in his omnibus motions *in limine*.[7] But it appears to be of a piece with the defendant's baseless fixation on the software tools used by the government's investigators, rather than the data and conclusions that will be introduced at trial.   As the government has previously explained, the defendant does not need access to obscure technical details of a given software application—whether source code or, as here, records of the software's "development"—in order to effectively cross-examine a witness who used the software to conduct analysis presented at trial.   *See* ECF No. 73, at 32-35; *see also United States v. Morgan*, 45 F.4th 192, 203 (D.C. Cir. 2022) ("But we have never held that Rule 702 requires an expert to have a sophisticated understanding of the software underlying her technological tools.   If we required expert witnesses to have detailed knowledge of the software underlying their testimony, they could almost never testify on matters related to proprietary technology.   For example, anyone who testifies using any basic software such as Excel to provide financial analysis would be required to be an expert in the algorithms by which Excel codes its formula and calculations.") (cleaned up).   That is especially so here, where any blockchain evidence presented by the government at trial can be tested against the publicly available blockchain or examined by any competing expert with knowledge of the blockchain and blockchain evidence.   ECF No. 73, at 12-13.   The defense will have ample opportunity to cross-examine the government's blockchain experts at trial or in any *Daubert* proceeding.   The defendant has not made the preliminary showing needed to show that technical information related of the software tools used in this case is relevant and material to his defense.

---

[7] To be clear, source code of any kind is irrelevant to this case.   The defendant has not articulated any basis to compel the production of source code from any party, for the reasons outlined in the government's opposition to the defendant's omnibus motions *in limine*, *see* ECF No. 73, at 32-37.

Supp.App.170

Finally, Request No. 8 demands records and communications that were "exchanged" between Chainalysis and certain named "researchers" in connection with a whitepaper presented at the USENIX Security Symposium in August 2022.[8]  The government finds itself at a loss about how this whitepaper, or materials "exchanged" between the respondents and the whitepaper's authors, is supposed to make any material fact before the jury more or less probable.  The government can only speculate it is because the paper uses the *publicly available* Complaint Affidavit in this case, ECF No. 1-1, to replicate Special Agent Beckett's analysis of the beta-test mixing transaction originating from the defendant's Mt. Gox account prior to the launch of Bitcoin Fog.  *See* ECF No. 1-1, at 10-11.  If anything, this provides external validation of the government's case.  But it is unclear how the records being requested—specifically, materials "exchanged" between Chainalysis and the researchers—relate to any question before the jury in this case or would otherwise be admissible.

## CONCLUSION

For the foregoing reasons, the Court should quash the defendant's Rule 17(c) subpoenas to Chainalysis, Inc. and its employees, and it should order the defendant to seek specific leave of Court before issuing any early-return Rule 17(c) subpoenas.

---

[8] George Kappos *et al.*, *How to Peel a Million: Validating and Expanding Bitcoin Clusters* (2022), https://www.usenix.org/system/files/sec22-kappos.pdf.

Supp.App.171

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:     */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
C. Alden Pelker, Maryland Bar
Trial Attorney, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007
Catherine.Pelker@usdoj.gov

16

# Exhibit 1



Tor Ekeland
Managing Partner
(718) 737-7264
tor@torekeland.com

**November 18th, 2022**

**Via Email and FedEx**

Sarah Ward
General Counsel
Chainalysis, Inc.

114 5th Avenue, 18th Floor
New York, NY
10011

Re:     *United States v. Roman Sterlingov*, 21-CR-00399 (D.D.C.):  Subpoenas

Ms. Ward,

     Please find enclosed subpoenas for Chainalysis Inc. ("Chainalysis"), Michael Gronager, Jonathan Levin and Youli Lee. As you are aware, Chainalysis participated in the investigation of the above-referenced case dating back to at least 2016, if not earlier. Among other things, our subpoenas seek the source code, object code, algorithms, and all software code used by Chainalysis for the investigation in the above-referenced case. Additionally, it has come to our attention that you have circulated evidence in this case to third-parties for analysis and presentation at the USENIX Security Symposium. Our subpoenas also seek all information related to this research and whitepaper. The subpoenas are enclosed.

     Currently this matter is scheduled to go to trial on January 9th, 2023, thus time is of the essence. There is a pending motion for a 3-month continuance. We will inform you of any schedule changes. We hereby tender the statutory witness fees, please let us know where you would like to have them sent. We look forward to speaking with you at your earliest convenience to make this as easy as possible for everyone.

     Given the complexities of this case, we foresee the possibility of having to issue further subpoenas for both testimony and information from your company.



Finally, please be advised because of your company's involvement in Mr. Sterlingov's prosecution, you face potential liability should he be acquitted. Thus, since civil litigation is a foreseeable event, your duty to preserve all documents, communications, information, and records relating to anything having to do with Mr. Sterlingov has attached. This includes your discussions with any investors and potential investors about this case.

Sincerely,

Tor Ekeland
Michael Hassard

AO 89B  (07/16)  Subpoena to Produce Documents, Information, or Objects in a Criminal Case

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Roman Sterlingov | ) | Case No.   21-CR-00399 (RDM) |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS IN A CRIMINAL CASE

To:   Chainalysis, Inc.

---
*(Name of person to whom this subpoena is directed)*

**YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following books, papers, documents, data, or other objects:

See Exhibit 'A'

| Place: Tor Ekeland Law, PLLC<br>30 Wall St., 8th Floor<br>New York, NY 10005 | Date and Time:   12/21/2022 9:00 am |
|---|---|

Certain provisions of Fed. R. Crim. P. 17 are attached, including Rule 17(c)(2), relating to your ability to file a motion to quash or modify the subpoena; Rule 17(d) and (e), which govern service of subpoenas; and Rule 17(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

*(SEAL)*

Date:   11/18/2022

CLERK OF COURT

_____
*Signature of Clerk or Deputy Clerk*

---

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Roman Sterlingov
, who requests this subpoena, are:

Tor Ekeland Law, PLLC,30 Wall St., 8th Floor, New York, NY 10005, 718-737-7264, tor@torekeland.com

---

### Notice to those who use this form to request a subpoena

Before requesting and serving a subpoena pursuant to Fed. R. Crim. P. 17(c), the party seeking the subpoena is advised to consult the rules of practice of the court in which the criminal proceeding is pending to determine whether any local rules or orders establish requirements in connection with the issuance of such a subpoena. If no local rules or orders govern practice under Rule 17(c), counsel should ask the assigned judge whether the court regulates practice under Rule 17(c) to 1) require prior judicial approval for the issuance of the subpoena, either on notice or ex parte; 2) specify where the documents must be returned (e.g., to the court clerk, the chambers of the assigned judge, or counsel's office); and 3) require that counsel who receives produced documents provide them to opposing counsel absent a disclosure obligation under Fed. R. Crim. P. 16.

Please note that Rule 17(c) (attached) provides that a subpoena for the production of certain information about a victim may not be issued unless first approved by separate court order.

**Supp.App.176**

AO 89B  (07/16)  Subpoena to Produce Documents, Information, or Objects in a Criminal Case  (Page 2)

Case No.   21-CR-00399 (RDM)

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Criminal Procedure 17 (c), (d), (e), and (g) (Effective 12/1/08)

**(c) Producing Documents and Objects.**

> **(1)  In General.** A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

> **(2)  Quashing or Modifying the Subpoena.** On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.

> **(3)  Subpoena for Personal or Confidential Information About a Victim.** After a complaint, indictment, or information is filed, a subpoena requiring the production of personal or confidential information about a victim may be served on a third party only by court order. Before entering the order and unless there are exceptional circumstances, the court must require giving notice to the victim so that the victim can move to quash or modify the subpoena or otherwise object.

**(d) Service.** A marshal, a deputy marshal, or any nonparty who is at least 18 years old may serve a subpoena. The server must deliver a copy of the subpoena to the witness and must tender to the witness one day's witness-attendance fee and the legal mileage allowance. The server need not tender the attendance fee or mileage allowance when the United States, a federal officer, or a federal agency has requested the subpoena.

**(e)  Place of Service.**

> **(1)  In the United States.** A subpoena requiring a witness to attend a hearing or trial may be served at any place within the United States.

> **(2)  In a Foreign Country.** If the witness is in a foreign country, 28 U.S.C. § 1783 governs the subpoena's service.

**(g)  Contempt.** The court (other than a magistrate judge) may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by a federal court in that district. A magistrate judge may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by that magistrate judge as provided in 28 U.S.C. § 636(e).

Tor Ekeland (*pro hac vice*)
tor@torekeland.com
**TOR EKELAND LAW, PLLC**
30 Wall Street, 8th Floor
New York, NY 10005-2205
(718) 737 – 7264

Michael Hassard (*pro hac vice*)
michael@torekeland.com
**TOR EKELAND LAW, PLLC**
30 Wall Street, 8th Floor
New York, NY 10005-2205
(718) 737 – 7264

*Attorneys for Defendant*
*Roman Sterlingov*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

United States of America,

                    Plaintiff,

      v.

Roman Sterlingov,

                    Defendant.

21-CR-00399-RDM

**SUBPOENA FOR DOCUMENTS
AND TESTIMONY**

**EXHIBIT 'A'**

To:
**CHAINALYSIS INC** (Delaware Division of Corporations File No.5731603)

Resident Agent:
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

# Definitions

1.      The term "any" includes "any," "all" and "every."

2.      The term "Document" shall be construed in the broadest sense allowed by federal law. The term "Document" includes, but is not limited to, any writings, drawings, graphs, charts, photographs, phonograph records, tape recordings, notes, diaries, calendars, books, papers, accounts, electronic or videotape recordings, and any computer-generated, computer-stored, or electronically stored matter from which information can be obtained and translated, if necessary, into reasonable useable form. The term "Document" includes preliminary versions, drafts, and revisions.

3.      The term "records" shall be construed in the broadest sense allowed by federal law and includes but is not limited to any communications, emails, text messages, bank records, financial statements, notes, recordings, or the like.

4.      The terms "include" or "including" are used merely to emphasize certain types of information requested and should not be construed as limiting a subpoena in any way. "Including" should be construed in all cases as followed by the phrase "but not limited to."

5.      The terms "person," "individual," or "entity" mean any natural person or any business, legal or governmental entity or association.

6.      The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this subpoena all documents and information that would be excluded if such words were not so construed. The present tense includes the past and future tenses.

7.      The term "Chainalysis" means the following entity:

**CHAINALYSIS, LLC** (Delaware Division of Corporations File No. 5731603) and its subsidiaries, affiliates, directors, contractors, employees, volunteers, agents, representatives, or any entities controlled or owned by Chainalysis, LLC.

8.      The term "Excygent" means the following entity:

**EXCYGENT, LLC** (Virginia Corporation Commission Entity No. S6918975)

and its subsidiaries, affiliates, directors, contractors, employees, volunteers, agents, representatives, or any entities controlled or owned by Excygent, LLC.

9.      The term "**ELLIPTIC**" means the blockchain analytic company with offices in London, New York City, Tokyo, and Singapore with the following website: www.elliptic.co.

10.      The term "**MITRE**" means the following entity:

**MITRE ENGENUITY, INCORPORATED** (Virginia Corporation Commission Entity No. 11037123)

and its subsidiaries, affiliates, directors, contractors, employees, volunteers, agents, representatives, or any entities controlled or owned by MITRE Engenuity, Inc.

11.      The term "Bitcoin Fog" refers to any bitcoin tumbling or mixing .onion site, or the like, that Excygent, Aaron Bice, John Golinvaux or Tyler Travis investigated or researched on behalf of, with, or alongside the United States Government that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

12.      The term "communication" means the transmission of information by any means, electronic, paper or other (in the form of facts, ideas, inquiries or otherwise), including, but not limited to e-mails, text messages, chat messages, web postings, social media postings, and messages from any and all messaging applications (including but not limited to Facebook, Google, Twitter, Slack, Chanty, Microsoft Teams, Discord, Mattermost, Confluence, Whatsapp, Signal) which are in the possession, custody or control of Chainalysis, wherever located. All communications shall include source codes, object codes, algorithms, computer software, metadata, time stamps, dates, and complete content.

13.      All "communications" include communications made in both professional and personal capacities.

14.      The term "whitepaper" means the "How to Peel a Million: Validating and Expanding Bitcoin Clusters" written by George Kappos, Haaron Yousaf, Rainer Stütz, Sofia Rollet, Bernhard Haslhofer and Sarah Meiklejohn, and presented at the USENIX Security Symposium in Boston, MA in August 2022.

15.     The term "entities" includes any corporation, partnership, sole proprietorship, LLC, LLP, or any type of business entity related in any way to the investigation of Bitcoin Fog and the investigation and prosecution of Mr. Sterlingov.

16.     The term "Source Code" includes any coding, abbreviations, or means of identification used to conduct blockchain analysis, log communications, or conduct investigations.

17.     The term "Native File Format" refers to the default file format that a computer application or program uses to create or save files in a proprietary format that only that program or application can recognize and includes all the metadata attached to those files. For example, Microsoft Word documents should be produced in .doc format and not as a .pdf, and with all metadata, including track changes, intact.

## Testimony Requested

1.      This subpoena includes a request for a custodian of records, or other qualified person, who can authenticate any produced material in accordance with Federal Rule of Evidence 902(11).

2.      For materials that are not self-authenticating, the Defense requests that Chainalysis produce an individual with knowledge who can testify as to the authenticity of the produced material.

## Documents and Objects to be Produced

1.      Any documents, records and communications, including individual notes to one's self, related to the DOJ press releases announcing Roman Sterlingov's arrest. This includes communications between Chainalysis and the Department of Justice in scheduling interviews, the timing of the release, and communications with WIRED reporter Andy Greenberg, as well as any communications related to Andy Greenberg's book "Tracers in the Dark – The Global Hunt for the Crime Lords of Cryptocurrency".

2.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and investors or potential investors related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.). This includes pitchbooks, newsletters, and any material mentioning Chainalysis's work on Mr. Sterlingov's case and Bitcoin Fog.

3.      Any documents, records and communications, including individual notes to one's self, exchanged between employees, agents, contractors, entities, and anyone else at Chainalysis related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

4.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and Aaron Bice, Excygent, John Golinvaux, Tyler Travis, MITRE, Catherine A. Pelker, the IRS, the U.S. Treasury Department, the DOJ, the FBI, Elliptic, and any other foreign or domestic law enforcement agency, third party vendor or contractors, or entities in any combination whatsoever, related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

5.      Any documents, records, and communications, including any contracts or memorandums of understanding between the United States Government and Chainalysis in relation to the work related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

6.      Any documents, records and communications regarding the purchase of Excygent by Chainalysis, including due diligence documents, the price paid, any memorandums of understanding, sales agreements, negotiations, contracts and records of payment whether via cash, equity, options, or any other form of consideration.

7.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and WIRED Magazine, Andy Greenberg, or any other reporter related to blockchain analysis or Andy Greenberg's book "Tracers in the Dark – The Global Hunt for the Crime-Lords of Cryptocurrency" released on in November 15, 2022.

8.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and any researcher from University College London, IC3, the Austrian Institute of Technology, or the Complexity Science Hub Vienna, including, but not limited to, George Kappos, Haaron Yousaf, Rainer Stütz, Sofia Rollet, Bernhard Haslhofer, or Sarah Meiklejohn related to the presentation of the whitepaper at the USENIX Security Symposium and the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.). This includes datasets, draft versions of the whitepaper, source code, object code, algorithms, heuristics, methodologies, and Chainalysis research sent to researchers, as well as all software editions with complete code in native file format.

9.      Any documents, records and communications, including individual notes to one's self, regarding the development of Chainalysis Reactor software and any other software related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.), including any reports, sandbox results, beta testing, penetration testing results, GitHub or the like archives or repositories, wiki documents, peer reviews, error rates, clustering methodologies and propensity for false positives.

10.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and Catherine Alden Pelker related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

11.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and Excygent related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

12.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and Elliptic related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.). This includes all communications between Excygent and Elliptic.

13.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and MITRE related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

14.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and Excygent related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

15.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and Aaron Bice related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

16.     Any documents, records and communications, including individual notes to one's self, initiated or received by Michael Gronanger, Jonathan Levin, Youli Lee, John Lewis Golinvaux, Gurvais Grigg, or anyone else affiliated with Chainalysis, related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

17.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and the Swedish Prosecution Authority related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

18.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and the Financial Crimes Enforcement Network related to the

investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

19.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and any other federal agency related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

20.     Please produce a log documenting all material withheld on the basis of privilege, work-product doctrine, or otherwise.

21.     All production must be in Native File Format unless otherwise agreed to.


Deadline and place for production:

On or before 21 days from date of receipt.


Tor Ekeland Law, PLLC
30 Wall Street
8th Floor
New York, NY 10005
(718) 737-7264
tor@torekeland.com

November 18, 2022

Submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No.
4493631)
Tor Ekeland Law, PLLC

/s/ Michael Hassard
Michael Hassard (NYS Bar No.
5824768)
Tor Ekeland Law, PLLC


30 Wall Street
8th Floor
New York, NY
10005
(718) 737 - 7264
tor@torekeland.com

*Attorneys for Roman Sterlingov*

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Roman Sterlingov | ) | Case No.   21-CR-00399 (RDM) |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:   Michael Gronager

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | The U.S. District Court for D.C.<br>333 Constitution Avenue N.W.<br>Washington D.C. 20001 | Courtroom No.: | 8 |
|---|---|---|---|
| | | Date and Time: | 01/09/2023 9:00 am |

You must also bring with you the following documents, electronically stored information, or objects _(blank if not applicable)_:

See Exhibit 'A'

(SEAL)

Date:   11/18/2022

_CLERK OF COURT_

_____
_Signature of Clerk or Deputy Clerk_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_   Roman Sterlingov
_____ , who requests this subpoena, are:

Tor Ekeland Law, PLLC
30 Wall St., 8th Floor
New York, NY
10005
718-737-7264
tor@torekeland.com

**Supp.App.189**

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-CR-00399 (RDM)

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**Supp.App.190**

Tor Ekeland (*pro hac vice*)
tor@torekeland.com
**TOR EKELAND LAW, PLLC**
30 Wall Street, 8th Floor
New York, NY 10005-2205
(718) 737 – 7264

Michael Hassard (*pro hac vice*)
michael@torekeland.com
**TOR EKELAND LAW, PLLC**
30 Wall Street, 8th Floor
New York, NY 10005-2205
(718) 737 – 7264

*Attorneys for Defendant*
*Roman Sterlingov*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

United States of America,

                    Plaintiff,

      v.

Roman Sterlingov,

                    Defendant.

21-CR-00399-RDM

**SUBPOENA FOR DOCUMENTS
AND TESTIMONY**

**EXHIBIT 'A'**

To:
**MICHAEL GRONAGER, CEO/CO-FOUNDER - CHAINALYSIS INC** (Delaware Division
of Corporations File No.5731603)

Resident Agent:
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

## Definitions

1.      The term "any" includes "any," "all" and "every."

2.      The term "Document" shall be construed in the broadest sense allowed by federal law. The term "Document" includes, but is not limited to, any writings, drawings, graphs, charts, photographs, phonograph records, tape recordings, notes, diaries, calendars, books, papers, accounts, electronic or videotape recordings, and any computer-generated, computer-stored, or electronically stored matter from which information can be obtained and translated, if necessary, into reasonable useable form. The term "Document" includes preliminary versions, drafts, and revisions.

3.      The term "records" shall be construed in the broadest sense allowed by federal law and includes but is not limited to any communications, emails, text messages, bank records, financial statements, notes, recordings, or the like.

4.      The terms "include" or "including" are used merely to emphasize certain types of information requested and should not be construed as limiting a subpoena in any way. "Including" should be construed in all cases as followed by the phrase "but not limited to."

5.      The terms "person," "individual," or "entity" mean any natural person or any business, legal or governmental entity or association.

6.      The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this subpoena all documents and information that would be excluded if such words were not so construed. The present tense includes the past and future tenses.

7.      The term "Chainalysis" means the following entity:

**CHAINALYSIS, LLC** (Delaware Division of Corporations File No. 5731603) and its subsidiaries, affiliates, directors, contractors, employees, volunteers, agents, representatives, or any entities controlled or owned by Chainalysis, LLC.

8.      The term "Excygent" means the following entity:

**EXCYGENT, LLC** (Virginia Corporation Commission Entity No. S6918975)

and its subsidiaries, affiliates, directors, contractors, employees, volunteers, agents, representatives, or any entities controlled or owned by Excygent, LLC.

9.      The term "**ELLIPTIC**" means the blockchain analytic company with offices in London, New York City, Tokyo, and Singapore with the following website: www.elliptic.co.

10.     The term "**MITRE**" means the following entity:

**MITRE ENGENUITY, INCORPORATED** (Virginia Corporation Commission Entity No. 11037123)

and its subsidiaries, affiliates, directors, contractors, employees, volunteers, agents, representatives, or any entities controlled or owned by MITRE Engenuity, Inc.

11.     The term "Bitcoin Fog" refers to any bitcoin tumbling or mixing .onion site, or the like, that Excygent, Aaron Bice, John Golinvaux or Tyler Travis investigated or researched on behalf of, with, or alongside the United States Government that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C).

12.     The term "communication" means the transmission of information by any means, electronic, paper or other (in the form of facts, ideas, inquiries or otherwise), including, but not limited to e-mails, text messages, chat messages, web postings, social media postings, and messages from any and all messaging applications (including but not limited to Facebook, Google, Twitter, Slack, Chanty, Microsoft Teams, Discord, Mattermost, Confluence, Whatsapp, Signal) which are in the possession, custody or control of Chainalysis, wherever located. All communications shall include source codes, object codes, algorithms, computer software, metadata, time stamps, dates, and complete content.

13.     All "communications" include communications made in both professional and personal capacities.

14.     The term "whitepaper" means the "How to Peel a Million: Validating and Expanding Bitcoin Clusters" written by George Kappos, Haaron Yousaf, Rainer Stütz, Sofia Rollet, Bernhard Haslhofer and Sarah Meiklejohn, and presented at the USENIX Security Symposium in Boston, MA in August 2022.

15.     The term "entities" includes any corporation, partnership, sole proprietorship, LLC, LLP, or any type of business entity related in any way to the investigation of Bitcoin Fog and the investigation and prosecution of Mr. Sterlingov.

16.     The term "Source Code" includes any coding, abbreviations, or means of identification used to conduct blockchain analysis, log communications, or conduct investigations.

17.     The term "Native File Format" refers to the default file format that a computer application or program uses to create or save files in a proprietary format that only that program or application can recognize and includes all the metadata attached to those files. For example, Microsoft Word documents should be produced in .doc format and not as a .pdf, and with all metadata, including track changes, intact.

## Testimony Requested

1.      This subpoena includes a request for a custodian of records, or other qualified person, who can authenticate any produced material in accordance with Federal Rule of Evidence 902(11).

2.      For materials that are not self-authenticating, the Defense requests that Chainalysis produce an individual with knowledge who can testify as to the authenticity of the produced material.

## Documents and Objects to be Produced

1.      Any documents, records and communications, including individual notes to one's self, related to the DOJ press releases announcing Roman Sterlingov's arrest. This includes communications between Chainalysis or Michael Gronager and the Department of Justice in scheduling interviews, the timing of the release, and communications with WIRED reporter Andy Greenberg, as well as any communications related to Andy Greenberg's book "Tracers in the Dark – The Global Hunt for the Crime Lords of Cryptocurrency".

2.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and investors or potential investors related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.). This includes pitchbooks, newsletters, and any material mentioning Chainalysis's work on Mr. Sterlingov's case and Bitcoin Fog.

3.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and employees, agents, contractors, entities, or anyone else at Chainalysis related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

4.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and Aaron Bice, Excygent, John Golinvaux, Tyler Travis, MITRE, Catherine A. Pelker, the IRS, the U.S. Treasury Department, the DOJ, the FBI, Elliptic, and any other foreign or domestic law enforcement agency, third party vendor or contractors, or entities in any combination whatsoever, related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

5.      Any documents, records, and communications, including any contracts or memorandums of understanding between the United States Government and Chainalysis or Michael Gronager in

relation to the work related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

6.      Any documents, records and communications regarding the purchase of Excygent by Chainalysis, including due diligence documents, the price paid, any memorandums of understanding, sales agreements, negotiations, contracts and records of payment whether via cash, equity, options, or any other form of consideration.

7.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and WIRED Magazine, Andy Greenberg, or any other reporter related to blockchain analysis or Andy Greenberg's book "Tracers in the Dark – The Global Hunt for the Crime-Lords of Cryptocurrency" released on in November 15, 2022.

8.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and any researcher from University College London, IC3, the Austrian Institute of Technology, or the Complexity Science Hub Vienna, including, but not limited to, George Kappos, Haaron Yousaf, Rainer Stütz, Sofia Rollet, Bernhard Haslhofer, or Sarah Meiklejohn related to the presentation of the whitepaper at the USENIX Security Symposium and the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.). This includes datasets, draft versions of the whitepaper, source code, object code, algorithms, heuristics, methodologies, and Chainalysis research sent to researchers, as well as all software editions with complete code in native file format.

9.      Any documents, records and communications, including individual notes to one's self, regarding the development of Chainalysis Reactor software and any other software related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.), including any reports, sandbox results, beta testing, penetration testing results, GitHub or the like archives or repositories, wiki documents, peer reviews, error rates, clustering methodologies and propensity for false positives.

10.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and Catherine Alden Pelker related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

11.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and Excygent related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

12.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and Elliptic related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.). This includes all communications between Excygent and Elliptic.

13.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and MITRE related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

14.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and Excygent related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

15.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and Aaron Bice related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

16.     Any documents, records and communications, including individual notes to one's self, initiated or received by Michael Gronager, Jonathan Levin, Youli Lee, John Lewis Golinvaux, Gurvais Grigg, or anyone else affiliated with Chainalysis, related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

17.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and the Swedish Prosecution Authority

related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

18.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and the Financial Crimes Enforcement Network related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

19.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and any other federal agency related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

20.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Michael Gronager and anyone else regarding any press releases announcing Mr. Sterlingov's arrest. This includes all communications with WIRED Magazine reporters, individuals at the Department of Justice, or anyone else.

21.     Please produce a log documenting all material withheld on the basis of privilege, work-product doctrine, or otherwise.

22.     All production must be in Native File Format unless otherwise agreed to.


Deadline and place for production:

On or before 21 days from date of receipt.


Tor Ekeland Law, PLLC
30 Wall Street
8th Floor
New York, NY 10005
(718) 737-7264
tor@torekeland.com

November 18, 2022

Submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No.
4493631)
Tor Ekeland Law, PLLC

/s/ Michael Hassard
Michael Hassard (NYS Bar No.
5824768)
Tor Ekeland Law, PLLC


30 Wall Street
8th Floor
New York, NY
10005
(718) 737 - 7264
tor@torekeland.com

*Attorneys for Roman Sterlingov*

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Roman Sterlingov | ) | Case No.  21-CR-00399 (RDM) |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:   Jonathan Levin

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | The U.S. District Court for D.C.
333 Constitution Avenue N.W.
Washington D.C. 20001 | Courtroom No.: | 8 |
|---|---|---|---|
| | | Date and Time: | 01/09/2023 9:00 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

See Exhibit 'A'

(SEAL)

Date:   11/18/2022

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Roman Sterlingov
, who requests this subpoena, are:

Tor Ekeland Law, PLLC
30 Wall St., 8th Floor
New York, NY
10005
718-737-7264
tor@torekeland.com

**Supp.App.201**

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-CR-00399 (RDM)

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❑  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**Supp.App.202**

Tor Ekeland (*pro hac vice*)
tor@torekeland.com
**TOR EKELAND LAW, PLLC**
30 Wall Street, 8th Floor
New York, NY 10005-2205
(718) 737 – 7264

Michael Hassard (*pro hac vice*)
michael@torekeland.com
**TOR EKELAND LAW, PLLC**
30 Wall Street, 8th Floor
New York, NY 10005-2205
(718) 737 – 7264

*Attorneys for Defendant*
*Roman Sterlingov*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>    v.<br><br>Roman Sterlingov,<br><br>                Defendant. | 21-CR-00399-RDM<br><br>**SUBPOENA FOR DOCUMENTS**<br>**AND TESTIMONY**<br><br>**EXHIBIT 'A'** |

To:
**JONATHAN LEVIN, CSO/CO-FOUNDER - CHAINALYSIS INC** (Delaware Division of
Corporations File No.5731603)

Resident Agent:
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

# Definitions

1.      The term "any" includes "any," "all" and "every."

2.      The term "Document" shall be construed in the broadest sense allowed by federal law. The term "Document" includes, but is not limited to, any writings, drawings, graphs, charts, photographs, phonograph records, tape recordings, notes, diaries, calendars, books, papers, accounts, electronic or videotape recordings, and any computer-generated, computer-stored, or electronically stored matter from which information can be obtained and translated, if necessary, into reasonable useable form. The term "Document" includes preliminary versions, drafts, and revisions.

3.      The term "records" shall be construed in the broadest sense allowed by federal law and includes but is not limited to any communications, emails, text messages, bank records, financial statements, notes, recordings, or the like.

4.      The terms "include" or "including" are used merely to emphasize certain types of information requested and should not be construed as limiting a subpoena in any way. "Including" should be construed in all cases as followed by the phrase "but not limited to."

5.      The terms "person," "individual," or "entity" mean any natural person or any business, legal or governmental entity or association.

6.      The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this subpoena all documents and information that would be excluded if such words were not so construed. The present tense includes the past and future tenses.

7.      The term "Chainalysis" means the following entity:

**CHAINALYSIS, LLC** (Delaware Division of Corporations File No. 5731603) and its subsidiaries, affiliates, directors, contractors, employees, volunteers, agents, representatives, or any entities controlled or owned by Chainalysis, LLC.

8.      The term "Excygent" means the following entity:

**EXCYGENT, LLC** (Virginia Corporation Commission Entity No. S6918975)

and its subsidiaries, affiliates, directors, contractors, employees, volunteers, agents, representatives, or any entities controlled or owned by Excygent, LLC.

9.      The term "**ELLIPTIC**" means the blockchain analytic company with offices in London, New York City, Tokyo, and Singapore with the following website: www.elliptic.co.

10.     The term "**MITRE**" means the following entity:

**MITRE ENGENUITY, INCORPORATED** (Virginia Corporation Commission Entity No. 11037123)

and its subsidiaries, affiliates, directors, contractors, employees, volunteers, agents, representatives, or any entities controlled or owned by MITRE Engenuity, Inc.

11.     The term "Bitcoin Fog" refers to any bitcoin tumbling or mixing .onion site, or the like, that Excygent, Aaron Bice, John Golinvaux or Tyler Travis investigated or researched on behalf of, with, or alongside the United States Government that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C).

12.     The term "communication" means the transmission of information by any means, electronic, paper or other (in the form of facts, ideas, inquiries or otherwise), including, but not limited to e-mails, text messages, chat messages, web postings, social media postings, and messages from any and all messaging applications (including but not limited to Facebook, Google, Twitter, Slack, Chanty, Microsoft Teams, Discord, Mattermost, Confluence, Whatsapp, Signal) which are in the possession, custody or control of Chainalysis, wherever located. All communications shall include source codes, object codes, algorithms, computer software, metadata, time stamps, dates, and complete content.

13.     All "communications" include communications made in both professional and personal capacities.

14.     The term "whitepaper" means the "How to Peel a Million: Validating and Expanding Bitcoin Clusters" written by George Kappos, Haaron Yousaf, Rainer Stütz, Sofia Rollet, Bernhard Haslhofer and Sarah Meiklejohn, and presented at the USENIX Security Symposium in Boston, MA in August 2022.

15.     The term "entities" includes any corporation, partnership, sole proprietorship, LLC, LLP, or any type of business entity related in any way to the investigation of Bitcoin Fog and the investigation and prosecution of Mr. Sterlingov.

16.     The term "Source Code" includes any coding, abbreviations, or means of identification used to conduct blockchain analysis, log communications, or conduct investigations.

17.     The term "Native File Format" refers to the default file format that a computer application or program uses to create or save files in a proprietary format that only that program or application can recognize and includes all the metadata attached to those files. For example, Microsoft Word documents should be produced in .doc format and not as a .pdf, and with all metadata, including track changes, intact.

## Testimony Requested

1.      This subpoena includes a request for a custodian of records, or other qualified person, who can authenticate any produced material in accordance with Federal Rule of Evidence 902(11).

2.      For materials that are not self-authenticating, the Defense requests that Chainalysis produce an individual with knowledge who can testify as to the authenticity of the produced material.

## Documents and Objects to be Produced

1.      Any documents, records and communications, including individual notes to one's self, related to the DOJ press releases announcing Roman Sterlingov's arrest. This includes communications between Chainalysis or Jonathan Levin and the Department of Justice in scheduling interviews, the timing of the release, and communications with WIRED reporter Andy Greenberg, as well as any communications related to Andy Greenberg's book "Tracers in the Dark – The Global Hunt for the Crime Lords of Cryptocurrency".

2.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and investors or potential investors related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.). This includes pitchbooks, newsletters, and any material mentioning Chainalysis's work on Mr. Sterlingov's case and Bitcoin Fog.

3.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and employees, agents, contractors, entities, or anyone else at Chainalysis related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

4.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and Aaron Bice, Excygent, John Golinvaux, Tyler Travis, MITRE, Catherine A. Pelker, the IRS, the U.S. Treasury Department, the DOJ, the FBI, Elliptic, and any other foreign or domestic law enforcement agency, third party vendor or contractors, or entities in any combination whatsoever, related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

5.      Any documents, records, and communications, including any contracts or memorandums of understanding between the United States Government and Chainalysis or Jonathan Levin in relation to the work related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

6.      Any documents, records and communications regarding the purchase of Excygent by Chainalysis, including due diligence documents, the price paid, any memorandums of understanding, sales agreements, negotiations, contracts and records of payment whether via cash, equity, options, or any other form of consideration.

7.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and WIRED Magazine, Andy Greenberg, or any other reporter related to blockchain analysis or Andy Greenberg's book "Tracers in the Dark – The Global Hunt for the Crime-Lords of Cryptocurrency" released on in November 15, 2022.

8.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and any researcher from University College London, IC3, the Austrian Institute of Technology, or the Complexity Science Hub Vienna, including, but not limited to, George Kappos, Haaron Yousaf, Rainer Stütz, Sofia Rollet, Bernhard Haslhofer, or Sarah Meiklejohn related to the presentation of the whitepaper at the USENIX Security Symposium and the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.). This includes datasets, draft versions of the whitepaper, source code, object code, algorithms, heuristics, methodologies, and Chainalysis research sent to researchers, as well as all software editions with complete code in native file format.

9.      Any documents, records and communications, including individual notes to one's self, regarding the development of Chainalysis Reactor software and any other software related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.), including any reports, sandbox results, beta testing, penetration testing results, GitHub or the like archives or repositories, wiki documents, peer reviews, error rates, clustering methodologies and propensity for false positives.

10.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and Catherine Alden Pelker related to the

investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

11.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and Excygent related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

12.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and Elliptic related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.). This includes all communications between Excygent and Elliptic.

13.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and MITRE related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

14.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and Excygent related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

15.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and Aaron Bice related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

16.      Any documents, records and communications, including individual notes to one's self, initiated or received by Michael Gronager, Youli Lee, John Lewis Golinvaux, Gurvais Grigg, or anyone else affiliated with Chainalysis, related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

17.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and the Swedish Prosecution Authority related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

18.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and the Financial Crimes Enforcement Network related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

19.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and any other federal agency related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

20.     All communications with WIRED reporter Andy Greenberg.

21.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Jonathan Levin and anyone else regarding any press releases announcing Mr. Sterlingov's arrest. This includes all communications with WIRED Magazine reporters, individuals at the Department of Justice, or anyone else.

22.     Please produce a log documenting all material withheld on the basis of privilege, work-product doctrine, or otherwise.

23.     All production must be in Native File Format unless otherwise agreed to.


Deadline and place for production:

On or before 21 days from date of receipt.


Tor Ekeland Law, PLLC
30 Wall Street
8th Floor
New York, NY 10005
(718) 737-7264
tor@torekeland.com

November 18, 2022

Submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No.
4493631)
Tor Ekeland Law, PLLC

/s/ Michael Hassard
Michael Hassard (NYS Bar No.
5824768)
Tor Ekeland Law, PLLC

30 Wall Street
8th Floor
New York, NY
10005
(718) 737 - 7264
tor@torekeland.com

*Attorneys for Roman Sterlingov*

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Roman Sterlingov | ) | Case No.   21-CR-00399 (RDM) |
| _____ | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:   Youli Lee

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | The U.S. District Court for D.C.<br>333 Constitution Avenue N.W.<br>Washington D.C. 20001 | Courtroom No.: | 8 |
|---|---|---|---|
| | | Date and Time: | 01/09/2023 9:00 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

See Exhibit 'A'

*(SEAL)*

Date:   11/18/2022

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Roman Sterlingov
_____ , who requests this subpoena, are:

Tor Ekeland Law, PLLC
30 Wall St., 8th Floor
New York, NY
10005
718-737-7264
tor@torekeland.com

Supp.App.213

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-CR-00399 (RDM)

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____  on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Tor Ekeland (*pro hac vice*)
tor@torekeland.com
**TOR EKELAND LAW, PLLC**
30 Wall Street, 8th Floor
New York, NY 10005-2205
(718) 737 – 7264

Michael Hassard (*pro hac vice*)
michael@torekeland.com
**TOR EKELAND LAW, PLLC**
30 Wall Street, 8th Floor
New York, NY 10005-2205
(718) 737 – 7264

*Attorneys for Defendant
Roman Sterlingov*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America,<br><br>                              Plaintiff,<br><br>        v.<br><br>Roman Sterlingov,<br><br>                              Defendant. | 21-CR-00399-RDM<br><br>**SUBPOENA FOR DOCUMENTS AND TESTIMONY**<br><br>**EXHIBIT 'A'** |

To:
**YOULI LEE, SR. LEGAL DIRECTOR - CHAINALYSIS INC** (Delaware Division of Corporations File No.5731603)

Resident Agent:
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

# Definitions

1.      The term "any" includes "any," "all" and "every."

2.      The term "Document" shall be construed in the broadest sense allowed by federal law. The term "Document" includes, but is not limited to, any writings, drawings, graphs, charts, photographs, phonograph records, tape recordings, notes, diaries, calendars, books, papers, accounts, electronic or videotape recordings, and any computer-generated, computer-stored, or electronically stored matter from which information can be obtained and translated, if necessary, into reasonable useable form. The term "Document" includes preliminary versions, drafts, and revisions.

3.      The term "records" shall be construed in the broadest sense allowed by federal law and includes but is not limited to any communications, emails, text messages, bank records, financial statements, notes, recordings, or the like.

4.      The terms "include" or "including" are used merely to emphasize certain types of information requested and should not be construed as limiting a subpoena in any way. "Including" should be construed in all cases as followed by the phrase "but not limited to."

5.      The terms "person," "individual," or "entity" mean any natural person or any business, legal or governmental entity or association.

6.      The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this subpoena all documents and information that would be excluded if such words were not so construed. The present tense includes the past and future tenses.

7.      The term "Chainalysis" means the following entity:

**CHAINALYSIS, LLC** (Delaware Division of Corporations File No. 5731603) and its subsidiaries, affiliates, directors, contractors, employees, volunteers, agents, representatives, or any entities controlled or owned by Chainalysis, LLC.

8.      The term "Excygent" means the following entity:

**EXCYGENT, LLC** (Virginia Corporation Commission Entity No. S6918975)

and its subsidiaries, affiliates, directors, contractors, employees, volunteers, agents, representatives, or any entities controlled or owned by Excygent, LLC.

9.      The term "**ELLIPTIC**" means the blockchain analytic company with offices in London, New York City, Tokyo, and Singapore with the following website: www.elliptic.co.

10.     The term "**MITRE**" means the following entity:

**MITRE ENGENUITY, INCORPORATED** (Virginia Corporation Commission Entity No. 11037123)

and its subsidiaries, affiliates, directors, contractors, employees, volunteers, agents, representatives, or any entities controlled or owned by MITRE Engenuity, Inc.

11.     The term "Bitcoin Fog" refers to any bitcoin tumbling or mixing .onion site, or the like, that Excygent, Aaron Bice, John Golinvaux or Tyler Travis investigated or researched on behalf of, with, or alongside the United States Government that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C).

12.     The term "communication" means the transmission of information by any means, electronic, paper or other (in the form of facts, ideas, inquiries or otherwise), including, but not limited to e-mails, text messages, chat messages, web postings, social media postings, and messages from any and all messaging applications (including but not limited to Facebook, Google, Twitter, Slack, Chanty, Microsoft Teams, Discord, Mattermost, Confluence, Whatsapp, Signal) which are in the possession, custody or control of Chainalysis, wherever located. All communications shall include source codes, object codes, algorithms, computer software, metadata, time stamps, dates, and complete content.

13.     All "communications" include communications made in both professional and personal capacities.

14.     The term "whitepaper" means the "How to Peel a Million: Validating and Expanding Bitcoin Clusters" written by George Kappos, Haaron Yousaf, Rainer Stütz, Sofia Rollet, Bernhard Haslhofer and Sarah Meiklejohn, and presented at the USENIX Security Symposium in Boston, MA in August 2022.

15.     The term "entities" includes any corporation, partnership, sole proprietorship, LLC, LLP, or any type of business entity related in any way to the investigation of Bitcoin Fog and the investigation and prosecution of Mr. Sterlingov.

16.     The term "Source Code" includes any coding, abbreviations, or means of identification used to conduct blockchain analysis, log communications, or conduct investigations.

17.     The term "Native File Format" refers to the default file format that a computer application or program uses to create or save files in a proprietary format that only that program or application can recognize and includes all the metadata attached to those files. For example, Microsoft Word documents should be produced in .doc format and not as a .pdf, and with all metadata, including track changes, intact.

## Testimony Requested

1.      This subpoena includes a request for a custodian of records, or other qualified person, who can authenticate any produced material in accordance with Federal Rule of Evidence 902(11).

2.      For materials that are not self-authenticating, the Defense requests that Chainalysis produce an individual with knowledge who can testify as to the authenticity of the produced material.

## Documents and Objects to be Produced

1.      Any documents, records and communications, including individual notes to one's self, related to the DOJ press releases announcing Roman Sterlingov's arrest. This includes communications between Chainalysis or Youli Lee and the Department of Justice in scheduling interviews, the timing of the release, and communications with WIRED reporter Andy Greenberg, as well as any communications related to Andy Greenberg's book "Tracers in the Dark – The Global Hunt for the Crime Lords of Cryptocurrency".

2.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and investors or potential investors related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.). This includes pitchbooks, newsletters, and any material mentioning Chainalysis's work on Mr. Sterlingov's case and Bitcoin Fog.

3.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and employees, agents, contractors, entities, or anyone else at Chainalysis related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

4.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and Aaron Bice, Excygent, John Golinvaux, Tyler Travis, MITRE, Catherine A. Pelker, the IRS, the U.S. Treasury Department, the DOJ, the FBI, Elliptic, and any other foreign or domestic law enforcement agency, third party vendor or contractors, or entities in any combination whatsoever, related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

5.      Any documents, records, and communications, including any contracts or memorandums of understanding between the United States Government and Chainalysis or Youli Lee in relation to the work related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

6.      Any documents, records and communications regarding the purchase of Excygent by Chainalysis, including due diligence documents, the price paid, any memorandums of understanding, sales agreements, negotiations, contracts and records of payment whether via cash, equity, options, or any other form of consideration.

7.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and WIRED Magazine, Andy Greenberg, or any other reporter related to blockchain analysis or Andy Greenberg's book "Tracers in the Dark – The Global Hunt for the Crime-Lords of Cryptocurrency" released on in November 15, 2022.

8.      Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and any researcher from University College London, IC3, the Austrian Institute of Technology, or the Complexity Science Hub Vienna, including, but not limited to, George Kappos, Haaron Yousaf, Rainer Stütz, Sofia Rollet, Bernhard Haslhofer, or Sarah Meiklejohn related to the presentation of the whitepaper at the USENIX Security Symposium and the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.). This includes datasets, draft versions of the whitepaper, source code, object code, algorithms, heuristics, methodologies, and Chainalysis research sent to researchers, as well as all software editions with complete code in native file format.

9.      Any documents, records and communications, including individual notes to one's self, regarding the development of Chainalysis Reactor software and any other software related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.), including any reports, sandbox results, beta testing, penetration testing results, GitHub or the like archives or repositories, wiki documents, peer reviews, error rates, clustering methodologies and propensity for false positives.

10.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and Catherine Alden Pelker related to the

investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

11.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and Excygent related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

12.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and Elliptic related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.). This includes all communications between Excygent and Elliptic.

13.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and MITRE related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

14.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and Excygent related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

15.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and Aaron Bice related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

16.     Any documents, records and communications, including individual notes to one's self, initiated or received by Michael Gronanger, Jonathan Levin, Youli Lee, John Lewis Golinvaux, Gurvais Grigg, or anyone else affiliated with Chainalysis, related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

17.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and the Swedish Prosecution Authority related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

18.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and the Financial Crimes Enforcement Network related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

19.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and any other federal agency related to the investigation that led to the prosecution in *United States v. Roman Sterlingov* 21-CR-00399-RDM (D.D.C.).

20.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis or Youli Lee and anyone else regarding any press releases announcing Mr. Sterlingov's arrest. This includes all communications with WIRED Magazine reporters, former colleagues at the Department of Justice or anyone else.

21.     Any documents, records and communications, including individual notes to one's self, exchanged between Chainalysis and Youli Lee regarding Youli Lee's employment at Chainalysis. This includes any recruitment efforts, job applications, onboarding files, projects, contacts, work done and internal communications.

22.     Please produce a log documenting all material withheld on the basis of privilege, work-product doctrine, or otherwise.

23.     All production must be in Native File Format unless otherwise agreed to.


Deadline and place for production:

On or before 21 days from date of receipt.


Tor Ekeland Law, PLLC
30 Wall Street
8th Floor
New York, NY 10005
(718) 737-7264
tor@torekeland.com

November 18, 2022

Submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No.
4493631)
Tor Ekeland Law, PLLC

/s/ Michael Hassard
Michael Hassard (NYS Bar No.
5824768)
Tor Ekeland Law, PLLC

30 Wall Street
8th Floor
New York, NY
10005
(718) 737 - 7264
tor@torekeland.com

*Attorneys for Roman Sterlingov*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 21-cr-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>ORDER</u>

Upon consideration of the Government's Motion To Quash Early-Return Rule 17(c) Subpoenas, it is hereby,

ORDERED, that the Defendant's subpoenas dated November 18, 2022 and issued pursuant to Fed. R. Crim. P. 17(c) to Chainalysis, Inc., Michael Gronager, Jonathan Levin, and Youli Lee, shall be quashed; and it is further

ORDERED, that the Defendant shall seek and obtain leave of Court prior to serving any subpoenas pursuant to Fed. R. Crim. P. 17(c) that require records to be produced or testimony to be taken before trial or before such records or testimony are to be offered in evidence.

Dated this _____ day of December, 2022.


_____
RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 21-cr-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

**SUPPLEMENT TO THE GOVERNMENT'S  SUPPLEMENTAL**
**NOTICE OF INTENT TO PRESENT EXPERT TESTIMONY**

The United States respectfully files this Supplement to the Government's Supplemental Notice of Intent to Present Expert Testimony, ECF No. 124, in order to respond to the Court's questions raised during the June 23, 2023 hearing.  Specifically, the Court inquired whether Chainalysis could provide additional information regarding verification, testing, or analysis of the Chainalysis Reactor software.  Proffered government expert Ms. Elizabeth Bisbee prepared the attached declaration in response to the Court's request.  *See* Ex. 1.

Additionally, attached as Exhibit 2 is a research paper authored by several notable blockchain academics, including Sarah Meiklejohn.  *See* Ex. 2 (George Kappos et al., *How to Peel a Million: Validating and Expanding Bitcoin Clusters* (2022), at 2, https://arxiv.org/abs/2205.13882).  The paper was previously cited in the government's Opposition to Defendant's Omnibus Motions *in Limine*.  ECF No. 73, note 4.  The paper's focus is on the proposal of a new peel chain heuristic, but, relevant to the Court's inquiry, the researchers used information provided by Chainalysis as "ground truth" data, indicating a high confidence among the academic community in the reliability of the information.  Ex. 2 at 1-2.  The paper's "Related Work" section includes discussion of and citation to further academic research in blockchain analysis.  *Id.* at 2.

1

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:     */s/ Christopher B. Brown*
        Christopher B. Brown, D.C. Bar No. 1008763
        Assistant United States Attorney
        U.S. Attorney's Office for the District of Columbia
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-7153
        Christopher.Brown6@usdoj.gov

        */s/ C. Alden Pelker*
        C. Alden Pelker, Maryland Bar
        Trial Attorney, U.S. Department of Justice
        Computer Crime & Intellectual Property Section
        1301 New York Ave., N.W., Suite 600
        Washington, D.C. 20005
        (202) 616-5007
        Catherine.Pelker@usdoj.gov

Supp.App.227



# Declaration of Elizabeth A. Bisbee



© 2023 Chainalysis  |  Proprietary and Confidential   1

**Supp.App.228**



My name is Elizabeth (Beth) A. Bisbee.  I am the Director of Investigation Solutions for Chainalysis Government Solutions, a wholly owned subsidiary of Chainalysis Inc., a blockchain analytics and forensic investigative firm.

Prior to joining Chainalysis in January 2021, I was the Drug Enforcement Administration's national subject matter expert for virtual currency investigations, practices, and policies.  In that role, I served as the DEA's lead expert witness for virtual currency and was involved in over 400 virtual currency investigations, including work on covert operations, blockchain analysis, suspect interviews, seizure of cryptocurrency, and trial preparation and testimony.  I developed the DEA's training curriculum related to virtual currency and blockchain analysis, and I have taught numerous classes on virtual currency and virtual currency investigations.  This declaration is based on information that has been relayed to me by Chainalysis data engineers and data scientists.  If called as a witness I could and would competently testify to the matters stated herein.

This declaration is in response to the request from the Court on June 23, 2023 for additional context as it relates to Chainalysis clustering methodology. This report also provides information related to the Chainalysis error rate.

## Chainalysis Clustering Methodologies

Chainalysis clustering methodologies have not been peer-reviewed in the sense that an academic paper would get peer-reviewed with data and methodology(ies) reviewed in a separate study by other scientists. However, every single clustering heuristic in the system has been reviewed by numerous Chainlaysis data scientists, intelligence analysts, and investigators that specialize in blockchain analytics. Chainalysis clustering algorithms are based on deep scientific research in cryptography, blockchains, distributed systems, and computer science.  For example, the co-spend heuristic was originally developed by Sarah





Mieklejohn, a professor of cryptography in the information security group in the computer science department at University College London[1].

Chainalysis clustering heuristics are also deterministic which means there is no randomness (i.e., the algorithm[2] will produce the same result every time); the data supporting each independent heuristic result reached in this case can be independently verified and reproduced via the blockchain. This is similar to how Chainalysis creates other clustering heuristics where a combination of facts can only lead to a single conclusion. For example, if Chainalysis conducts transactions with Exchange A on the blockchain, Exchange A must provide deposit addresses for Chainalysis to send funds. Once funds have been sent to Exchange A, the deposit addresses then sweep their funds into a single address. On the blockchain, that single address receives from thousands of other deposit addresses with no other counterparty on the sending side. This means that this address is a consolidation address for Exchange A because deposit addresses of an exchange only send funds to the internal infrastructure of the exchange[3]. Since Exchange A consolidation address has been identified, that also means that the thousands of other deposit addresses also belong to Exchange A. This conclusion is not probabilistic and the transaction pattern can be validated on the blockchain. This is also represented as an intelligence based heuristic.

The co-spend heuristic is also deterministic. If two UTXOs are spent in the same transaction, either they are controlled by the same private key or the two private keys are accessible by the same person. There are scenarios where the algorithm determining the co-spend heuristic identifies an outcome that doesn't fit this logic.  This occurs when there an obfuscation technique implemented, such as CoinJoin[4]. Chainalysis has controls in place to detect CoinJoin and can skip the CoinJoin co-spends so the addresses are not clustered/associated.

---

[1] Meiklejohn S, Pomarole M, Jordan G, et al. A fistful of Bitcoins. *Communications of the ACM.* 2016;59(4):86-93.doi:https://doi.org/10.1145/2896384. This seminal paper has been peer reviewed and been cited by over 1,600 other papers.
[2] One way to describe an algorithm: set of rules that can only lead to a single conclusion.
[3] This is similar to a financial institution consolidating daily deposits into the bank's treasury account.
[4] CoinJoin is an obfuscation technique for combining multiple Bitcoin payments into one transaction in such a way that ownership of coins is unclear.





Chainalysis also validates the clustering and identity of named services that actually belong in the real world. This verification occurs every day hundreds of thousands of times. Chainalysis clusters centralized exchanges and other services on the blockchain that are our own customers, independent of the data they provide. For example, KYT (Know Your Transaction) customers send Chainalysis their transactions for transaction monitoring. As part of the transactions, they are provided with addresses that are controlled by them on the blockchain. Chainalysis then cross-validates the information the customer is detailing against what Chainalysis found independently through clustering and attribution.

There is also validation that occurs with other named entities that are not Chainalysis customers. Every day law enforcement agencies around the world send legal processes to exchanges identified in Chainalysis tools. If the information were incorrect, the exchange receiving the legal process would respond that the address does not match or be controlled by them. Chainalysis does not know how often this happens but this is extremely rare otherwise law enforcement customers would not be able to use Chainalysis tools to further their investigations.

## Margin of Error / False Positive / False Negative

Historically, Chainalysis has not gathered and recorded in a central location false positives /false negatives because there is design to be more conservative in the clustering of addresses. In response to the Court's inquiry, Chainalysis is looking into the potential of trying to collect and record any potential false positives and margin of error, but such a collection does not currently exist.





Declarant Signature

Elizabeth Bisbee    Digitally signed by Elizabeth
                    Bisbee
                    Date: 2023.07.18 18:06:22 -04'00'

Elizabeth A Bisbee



# How to Peel a Million: Validating and Expanding Bitcoin Clusters

George Kappos[1], Haaroon Yousaf[1], Rainer Stütz[2], Sofia Rollet[2], Bernhard Haslhofer[3], and Sarah Meiklejohn[1]

[1]University College London and IC3
[2]AIT - Austrian Institute of Technology
[3]Complexity Science Hub Vienna

## Abstract

One of the defining features of Bitcoin and the thousands of cryptocurrencies that have been derived from it is a globally visible transaction ledger. While Bitcoin uses pseudonyms as a way to hide the identity of its participants, a long line of research has demonstrated that Bitcoin is not anonymous. This has been perhaps best exemplified by the development of *clustering heuristics*, which have in turn given rise to the ability to track the flow of bitcoins as they are sent from one entity to another.

In this paper, we design a new heuristic that is designed to track a certain type of flow, called a *peel chain*, that represents many transactions performed by the same entity; in doing this, we implicitly cluster these transactions and their associated pseudonyms together. We then use this heuristic to both validate and expand the results of existing clustering heuristics. We also develop a machine learning-based validation method and, using a ground-truth dataset, evaluate all our approaches and compare them with the state of the art. Ultimately, our goal is to not only enable more powerful tracking techniques but also call attention to the limits of anonymity in these systems.

## 1 Introduction

Since its introduction in 2008, Bitcoin has used a pseudonymous system for transferring coins, with entities forming transactions in which they and their recipient(s) are identified using just a set of *pseudonyms* or *addresses* that have no inherent link to their identity. It has been demonstrated by now, however, that this use of pseudonyms does not make Bitcoin anonymous. This has in large part been driven by the development of various *clustering heuristics* that identify multiple pseudonyms operated by the same entity [2, 10, 14, 31, 44–46], with research also showing that de-anonymization is possible at the network layer [5, 25]. These clustering heuristics use patterns of usage present in the Bitcoin blockchain as evidence of the shared ownership of the pseudonyms they cluster together; one heuristic that has been particularly widely

adopted is the so-called *co-spend* heuristic, which says that all addresses used as input to the same transaction belong to the same entity. This heuristic has been so effective that companies such as Chainalysis now use it — and heuristics derived from it — to provide Bitcoin tracking as a service to both law enforcement agencies and financial institutions, such as cryptocurrency exchanges, looking to comply with anti-money laundering (AML) regulations. These heuristics can be used not only to cluster together pseudonyms operated by the same entity but, as a consequence, to track flows of bitcoins as they are transferred from one entity to another.

This ability to track flows of bitcoins has been used in several high-profile investigations, such as the indictment of Ross Ulbricht as the operator of the Silk Road marketplace [15]; the blocked movement of funds paid to the WannaCry ransomware operators [9]; the takedown of one of the largest websites hosting child sexual abuse material [50]; and the takedown of several terrorist financing campaigns [51]. More recently, Roman Sterlingov was arrested based on allegations that he served as the operator of the Bitcoin Fog mixing service for ten years [16]. Despite the arrest taking place in April 2021, the allegations were supported by evidence taken from the Bitcoin blockchain as early as 2011 [4]. This investigation thus makes clear just what is possible when all transactions are stored in a globally visible and immutable ledger.

In this paper, we extend known heuristics for tracking flows of bitcoins by formalizing in Section 5 the notion of a *peel chain*, which is a set of linked transactions that are all initiated by the same entity, and presenting heuristics for identifying peel chains and following them forwards and backwards. As compared with previous heuristics, ours are based not on properties of individual transactions or addresses within transactions, but rather on general features associated with a cluster formed by the co-spend heuristic. In particular, we describe in Section 4 how we assign features to a cluster based on the transactions and addresses it contains.

We also describe in Section 4 our main dataset, which consists of 120 clusters formed by the co-spend heuristic. Using data provided to us by Chainalysis, we know that 60 of

1

arXiv:2205.13882v1 [cs.CR] 27 May 2022

these clusters are *true positives*, meaning all addresses they contain really do belong to the same entity, and that 60 of them are *false positives*, meaning they contain one or more *Coinjoin* transactions and thus all addresses do not actually belong to the same entity. This access to ground-truth data provides us with the rare ability to evaluate the accuracy of our heuristics, as well as ones that were previously proposed.

In particular, we argue how our basic heuristic for identifying and following peel chains can be used to both *validate* and *expand* traditional clustering heuristics such as the co-spend heuristic. In this first usage, presented in Section 6.2, we argue that we can use the ability to identify peel chains to increase our confidence in the results of the co-spend heuristic. We also present in Section 6.1 a machine learning approach for validating a cluster as a whole; i.e., for classifying it as either a true positive or a false positive. Using our ground-truth dataset, we are able to evaluate this classifier and show that it achieves an accuracy of 89%.

In the second usage as an *expansion* heuristic, we demonstrate how the ability to identify peel chains can be used to expand the results of the co-spend heuristic. In particular, following a peel chain forwards means identifying the *change output* in each transaction in the chain, so our algorithm includes an implicit change heuristic. As compared with previous change heuristics [2, 10, 14, 31], we demonstrate using our ground-truth dataset that our change heuristic achieves a false discovery rate of only 0.02%; the next-best heuristic achieves a false discovery rate of 12.7%. We then apply this expansion heuristic to investigate ransomware addresses and to track the funds withdrawn from an exchange account associated with Roman Sterlingov to their deposit into the Bitcoin Fog mixing service, showing that our heuristic is able to link these two transactions whereas all previous heuristics would be unable to do so.

To summarize, we make the following contributions:

- We provide a heuristic, based on a robust set of features, for both identifying peel chains and following them forwards and backwards.

- We present a machine learning-based classifier and a validation heuristic, both of which can be used to influence the confidence we can have in the results of the co-spend heuristic.

- We present a heuristic for expanding co-spend clusters, and evaluate it using a custom-built ground-truth dataset. Our comparison with previous heuristics shows that ours is significantly more effective and significantly safer.

The techniques we develop are directly applicable in cryptocurrency investigations, and thus have the potential to be adopted and used in them. Above all, however, we hope that our work helps to correct the misperception of Bitcoin [1, 26, 30] as "anonymous and almost untraceable" [11]

and a way to allow "people [to] receive digital payments without revealing their identity" [32].

## 2 Related Work

### 2.1 Bitcoin clustering

The ability to cluster together the addresses used as an input to a transaction was first observed in the original Bitcoin whitepaper [35], and has been used in many subsequent works [2, 31, 44–46]. Beyond this *co-spend heuristic*, researchers have developed other heuristics for clustering together Bitcoin addresses. In particular, Meiklejohn et al. [31] and Androulaki et al. [2] defined a heuristic for identifying which output in a Bitcoin transaction represented the change being made; this *change heuristic* then said that this output was controlled by the same entity as the input addresses. This heuristic was later refined by Goldfeder et al. [14] and Ermilov et al. [10]. There have been many academic studies using these heuristics in order to track crime [20,21,38,39,42,54]. Finally, in concurrent work Möser and Narayanan propose a machine learning-based heuristic for identifying change outputs that uses some of the same transaction and address features as in our work [33].

Beyond proposing new clustering heuristics, a number of studies have attempted to quantify their effectiveness and accuracy. Nick [36] measured the accuracy of different clustering algorithms using a ground-truth dataset consisting of 37,585 user wallets, which was obtained via a vulnerability in the BitcoinJ light client implementation. The results showed that on average more than 69% of the addresses could be linked using only the co-spend heuristic. Harrigan and Fretter [19] studied reasons for the effectiveness of the co-spend heuristic and concluded that address reuse and avoidable merging were the main drivers. Fröwis et al. [13] discussed the effectiveness of the combined use of clustering heuristics and attribution tags as forensic tools. By empirically quantifying the effect of Coinjoin transactions, they showed that clustering heuristics can lead to false interpretation and pointed to the need for additional metrics to quantify the reliability of clustering results.

### 2.2 Bitcoin entity classification

Bartoletti et al. [3] investigated data mining techniques to automatically detect Ponzi schemes carried out using Bitcoin. Using supervised learning algorithms, the authors could correctly classify Ponzi schemes with a very low rate of false positives. A number of other studies use supervised learning in order to classify unknown addresses according to the entities they belong to [18, 49, 53]. Unsupervised learning methods have also been used in Bitcoin to attempt to identify fraud [40, 41, 56].

Supp.App.234

Ranshous et al. [43] applied the notion of motifs in directed hypergraphs to identify distinct statistical properties related to Bitcoin exchange addresses. They build different classification models (Random Forest, AdaBoost, Linear SVM, Perceptron, Logistic Regression) using a set of features, obtaining the best results with Random Forest and AdaBoost. Jourdan et al. [22] consider the more general problem of classifying entities in multiple classes on the basis of properties of their extended transaction neighborhoods.

## 3   Background

### 3.1   Bitcoin transactions

A Bitcoin transaction tx consists of ordered lists of inputs (tx.inputs) and outputs (tx.outputs). We use tx.inputs[$i$] to denote the $i$-th input and do the same for tx.outputs. Each output output in a transaction is associated with an address output.addr and a value output.value representing the amount of coins received by the address in this transaction. Each input to a transaction is similarly associated with an address input.addr and a value input.value representing the amount of coins being sent by the address in this transaction. Furthermore, an input is itself a *transaction output* (*TXO*); i.e. an input points to the transaction in which its associated address received coins. Other peers in Bitcoin's peer-to-peer network can then check that all inputs to a transaction are well formed and are *unspent* (meaning they are *UTXOs*), before propagating the transaction to other peers and eventually enabling its inclusion in the blockchain. This ensures that double-spending is not included in the blockchain, which acts as a global ledger of all transactions.

Concretely, this means that transactions point both *backwards*, in terms of the input UTXOs pointing to the past transactions in which they received the coins they are now spending, and *forwards*, in terms of the UTXOs in future transactions that reference any output addresses that get spent. We denote the transaction that an input input points backwards to by input.prev, and the transaction that an output output points forwards to by output.next (if it is spent). We also denote by input.prevIdx the index of an input input in input.prev.outputs; i.e., the index of its transaction output in the transaction in which it was created. For the rest of this work, when we refer to *following* an input to a transaction we mean looking backwards at the past transaction that created this UTXO, and when we refer to following an output we mean looking forwards to any UTXOs that reference it.

### 3.2   Clustering Bitcoin addresses

A valid Bitcoin transaction needs to be signed using the private keys associated with all its inputs. This has given rise to a common heuristic for clustering together Bitcoin addresses, known as the multi-input or *co-spend* heuristic [2, 31, 44–46].

This heuristic states that all inputs to a transaction are controlled by the same entity, using the fact that they have all signed the transaction as evidence of shared ownership.

Although this heuristic is considered safe in general and has been adopted in practice, it can be invalidated by a specific type of transaction called a *Coinjoin*. When forming a Coinjoin, users work together to create a transaction in which they each control a different input and the outputs likewise represent different recipients. This acts to mix together the coins of these users and thus destroys the link between each individual sender and recipient. Furthermore, it invalidates the co-spend heuristic as it is no longer the case that all inputs are controlled by the same entity.

Beyond the co-spend heuristic, there are a number of proposed *change* heuristics [2, 10, 31]; i.e., heuristics for identifying which output in a transaction that the sender uses to send themselves their change (the value of their UTXO subtracted by the amount they are sending to the recipient). As observed by Meiklejohn et al. [31], identifying such outputs not only makes it possible to include this address in the same cluster as the sender and thus enhance the co-spend heuristic, it also makes it possible to identify that the transaction in which this change output is spent is also performed by the same entity. We describe this pattern of following *peel chains* in more detail in Section 5, and describe these proposed change heuristics in more detail in Section 7.2 when we compare our own heuristic against them.

## 4   Dataset and Methodology

To start, we were given 241 Bitcoin addresses and 20,016 Bitcoin transactions by Chainalysis, a company that provides blockchain data and analysis to businesses and government agencies.[1] The addresses represented *true positive* clusters, in the sense that Chainalysis had manually verified that all the addresses in the same co-spend cluster as this address really did belong to the same service (typically by confirming directly with the service). The transactions were all Coinjoins and thus represented *false positive* clusters, meaning all of the addresses in the resulting co-spend cluster would not actually belong to the same service. Each address formed a distinct cluster, and there was no overlap between the addresses in the true positive (TP) clusters and the ones used as inputs in the false positive (FP) transactions. This ground-truth dataset was necessary for evaluating our heuristics, and would not have been possible to get at this scale without working with Chainalysis or directly with the services themselves. None of the clusters represented individual users, and we had no additional information about the entities represented by the clusters (e.g., the name of the service).

From this initial dataset, we created clusters using the co-spend heuristic and represented each cluster C as a tuple

---

[1] https://www.chainalysis.com/

Supp.App.235

$(C_{addr}, C_{tx})$ where $C_{addr}$ is the set of all addresses in the cluster and $C_{tx}$ is the set of all transactions initiated by one or more addresses in $C_{addr}$. This resulted in 241 TP clusters and 16,974 false positive FP clusters. We describe in Section 4.2 how from this initial dataset we created a more balanced dataset of 60 true positive (TP) and 60 false positive (FP) clusters that we then used in the remainder of our analysis. In order to do so, we first describe the features we defined for transactions, addresses, and the overall cluster.

## 4.1   Features

We consider features of three different types of objects within Bitcoin: transactions, addresses, and clusters. These features are largely defined by the wallet software used by a given entity and the decisions they make in scripting their transactions, and as we will see the set of possible features is largely stable within even large clusters. This consistency is crucial in the algorithms we develop for following *peel chains* in Section 5. Our set of chosen features is based on Bitcoin usage today, but we stress that new features can be incorporated as Bitcoin evolves without changing our overall approach.

### 4.1.1   Transaction features

Every Bitcoin transaction has a different set of features, according to both the action it is performing and the wallet program and version used to generate it. We consider the following four features.

**Replace-by-fee/sequence number.** At any given point in time, there can be multiple versions of the same transaction in the Bitcoin network; for example, if a user broadcasts a transaction to the network but it never gets included in a block, they may broadcast a new version with an increased fee in the hopes of increasing its chances. The *sequence number* helps identify different versions of a transaction, with a higher sequence number indicating that the transaction is more recent. If a user does not want transactions to be able to be replaced they can thus set the sequence number to be the maximum value ($\texttt{0xffffffff}$). The sequence number is set for each transaction input, and the transaction is considered to be *replaceable* if any of its inputs have a sequence number less than this maximum value [17]. We thus set this feature to be true for a transaction if it is replaceable and false if it is not.

**Locktime.** A transaction can set a *locktime* (or time lock) to indicate that it cannot be spent before a block at some height has been mined. We set this feature to be true if a locktime has been set and false if not.

**Version.** The *version* of a transaction, which is either 1 or 2, determines the rules used to validate the transaction [12].

| Address type | TP (%) | FP (%) |
|---|---|---|
| pubkey hash (compressed) | 41.15 | 1.19 |
| pubkey hash (uncompressed) | 0.0 | 0.010 |
| witness pubkey hash (compressed) | 5.76 | 37.44 |
| witness pubkey hash (uncompressed) | 37.04 | 61.36 |
| multisig (2/2) | 5.6 | 0.0 |
| multisig (2/3) | 2.8 | 0.0 |
| multisig (3/4) | 0.1 | 0.0 |
| multisig (2/6) | 0.24 | 0.0 |
| SegWit multisig (2/2) | 2.22 | 0.0 |
| SegWit multisig (2/3) | 5.12 | 0.0 |

Table 1: Types of addresses found across all clusters.

**SegWit.** *SegWit* (Segregated Witness) [29] allows a transaction to be separated into its semantic data (i.e., information about who is sending and receiving bitcoins) and its signature data. A transaction can indicate if it uses SegWit by setting its fifth byte to $\texttt{0x00}$. We set this feature to be true if SegWit is enabled and false if not.

We thus represent the features of a transaction tx as a 4-tuple containing binary values (1/2 for the version and true/false for the rest) in each entry. We denote by $\text{features}_{tx}$ the function used to extract these features from a transaction.

### 4.1.2   Address features

The BlockSci tool [23] categorizes Bitcoin scripts into ten generic types: pubkey, pubkey hash, witness pubkey hash, multisig, multisig pubkey, script hash, witness script hash, witness unknown, non-standard, and nulldata (with the witness prefix indicating that it uses SegWit). Some of these categories can be further broken down according to whether the address is *compressed* or *uncompressed*. To briefly explain some of the more common types, the pubkey format allows users to send coins to a public key. Both pubkey hash and witness pubkey hash allow users to instead send coins to the hash of a public key. The script hash and witness script hash formats allow users to send coins to the hash of an arbitrary script. These coins can then be spent only by the owner(s) of the underlying script. A common script in Bitcoin is an *m-of-n* multisig. Using a multisig address, a user or set of users can require that at least $m$ of the $n$ available keys specified in the script must sign a transaction in order to spend the coins from that address.

Across our set of 246,600 addresses, we identified 10 distinct combinations of these categories that were used, as summarized in Table 1. We thus represent the features of an address as its address type, which takes one of these ten values. We denote by $\text{features}_{addr}$ the function used to extract the feature from an address.

Supp.App.236

### 4.1.3 Cluster features

Each cluster contains a set of addresses and a set of transactions. From these sets $C_{tx}$ and $C_{addr}$, we can extract the relevant features (which we did using BlockSci) to build the sets $TF_C$ and $AF_C$ of all transaction and address features present in the cluster.

In addition to these sets of features, we define for each cluster a *change strategy*, which we denote by $change_C$. This cluster-level feature considers the pattern, if any, the transactions in this cluster exhibit when forming change outputs. We identify a change output in a transaction in $C_{tx}$ if there is exactly one output whose address belongs to the cluster (i.e., is in $C_{addr}$). If there are zero or multiple such addresses then we ignore this transaction for the purposes of setting the change strategy.

Intuitively, some wallet software may send the change in a transaction to a specific output index by default; e.g., the first or last output. As many entities are likely to use scripts or other automated methods to form transactions, it may be the case that their transactions thus have patterns in terms of the index of the change output. To this end, we define four different values for the cluster's $change_C$:

$change_C = -1$. For every transaction in $C_{tx}$ with a single identified change output, it was always at the last index.

$change_C = 0$. For every transaction in $C_{tx}$ with a single identified change output, it was always at the first index.

$change_C = 1$. For every transaction in $C_{tx}$ with a single identified change output, it was always at either the first or the last index.

$change_C = None$. There was at least one transaction in $C_{tx}$ that did not follow the patterns above; i.e., with a single identified change output that was at neither the first nor the last index.

## 4.2 Creating a cluster dataset

In building a dataset of clusters, our goal was to have it be as balanced as possible, in terms of the features introduced in the previous section. This was particularly important in our validation of the co-spend heuristic in Section 6, in which we differentiate between TP and FP clusters based on their features and need to avoid overfitting. Concretely, we focused on creating a balance between true and false positives for the following three parameters: (1) the number of clusters in each category, (2) the sizes of both $C_{addr}$ and $C_{tx}$, and (3) the period of time in which which the cluster was active. We refer to the last property as the cluster's *lifespan*. The first two properties are generally important in creating a balanced dataset, and this last property is also essential as behavior in Bitcoin transactions has changed significantly over time. Ensuring that the lifespans of TP and FP clusters had a significant overlap was thus the only way to ensure a fair comparison; e.g., making it so we could not trivially distinguish because all TP clusters had one transaction feature set to true and all FP clusters had it set to false.

To start, we set a minimum threshold of 10 for both $C_{tx}$ and $C_{addr}$ and discarded all clusters that were smaller. This left us with 183 TP clusters (out of 241) but only 75 FP clusters (out of 16,974). This overrepresentation of singleton FP clusters was largely due to the way in which we obtained data from Chainalysis, as we asked for false positive transactions (i.e., Coinjoins) but true positive addresses that would form a meaningful cluster (i.e., not a singleton). Additionally, the vast majority of the inputs to the Coinjoin transactions were one-time addresses, meaning the resulting cluster was such that $|C_{tx}| = 1$. After obtaining these 183 TP and 75 FP clusters, we further observed that they were highly imbalanced in the parameters we considered, as shown in Figure 1a.

This figure shows that not only are there more TP clusters, but also they are much larger on average than the FP clusters. For example, in our initial dataset, TP clusters had up to 3.2M transactions (with an average of 56K) whereas FP clusters had only up to 283K (with an average of 19K). To this end, we removed the 108 biggest TP clusters from our analysis (in terms of $|C_{addr}| + |C_{tx}|$). This created a dataset of 75 TP and 75 FP clusters, each of comparable size (in terms of both $C_{addr}$ and $C_{tx}$), as we see in Figure 1b.

This approach created a balance in terms of the first property, but did not address the issue of having overlapping lifespans: as we see in Figure 1c, there are several TP clusters whose lifespan ended before any FP clusters even began. We can also see this has a direct impact on our transaction features, as several of our TP clusters existed before SegWit was introduced but none of our FP clusters did. To address this imbalance, we removed the TP clusters whose lifespan didn't overlap with the lifespan of any FP clusters. We ended up with 60 TP and 60 FP clusters that were balanced in all three properties, as shown in Figure 1b and Figure 1d. In the end, all clusters had between 15 and 3415 addresses (with an average of 258.6 for FP clusters and 642.6 for TP ones), between 11 and 3448 transactions (with an average of 307.7 for FP clusters and 692.4 for TP ones), and operated at some point between April 2017 and April 2021.

**Feature statistics.** In terms of transaction features, we found each of the possible 16 4-tuples in at least one of our clusters. Most clusters (76 out of 120) used only a single combination of transaction features, however, and all clusters used six or fewer. The average number of features was 1.55 for FP clusters and 1.67 for TP clusters. This suggests that clusters are largely consistent in their transaction behavior. We found a similar level of consistency when looking at address features: 56.7% of TP clusters and 53.3% of FP clusters used only one address type, and all clusters used three or fewer.

We found that 18 of our TP clusters had a completely

Supp.App.237

   

(a)                    (b)                    (c)                    (d)

Figure 1: Balancing the sizes (Figures 1a and 1b, with the y-axis on a log scale) and lifespans (Figures 1c and 1d) for our true positive (TP) and false positive (FP) clusters. Figures 1a and 1c represent the cluster sizes and lifespans before balancing, and Figures 1c and 1d represent these values after balancing. In Figure 1c, the vertical line represents the date on which SegWit was introduced.

consistent change strategy (change$_C$ = 0 or −1) and 30 had change$_C$ = 1; this left 12 with no change strategy. As might be expected, FP clusters were less consistent (given that they actually contained different sets of users): 34 had no identifiable change strategy, 8 had a completely consistent change strategy, and 18 had change$_C$ = 1.

To understand the overlap in features across different clusters, we looked at the Jaccard similarity between the sets of 5-tuples representing their combined transaction and address features. We found that the average Jaccard similarity across all pairs of clusters was 0.13, which suggests that they are relatively dissimilar in these features. There were several notable exceptions, however, and in particular cases where the features were not only overlapping but in fact identical. For example, there were 26 clusters whose transactions all had the same combination of features (Version 1 and SegWit-enabled transactions that had no locktime and were not replaceable) and whose addresses were all of the same type (uncompressed witness pubkey hash). This is unsurprising as it represents the default setting of the standard Bitcoin wallet software.

## 5  Following Peel Chains

In this section, we define the concept of a peel chain and present our heuristics for identifying them, according to the features defined in the previous section.

### 5.1  Defining a peel chain

The concept of a peel chain was first introduced by Meiklejohn et al. [31] as a series of transactions originating from a transaction with a relatively large UTXO as input (i.e., a UTXO with a large associated value). When this UTXO is spent it creates two outputs: a small one representing a payment to an external entity and a larger one representing the change. This pattern can then be repeated many times, with each hop in the chain slowly "peeling" smaller values from the original UTXO, until the remaining change amount is small (at which point it can be combined with other small UTXOs to create a large one and start the process over again). In this work we consider more general peel chains in which transactions might have more than one input and more than two outputs. In fact, our only requirement is that each adjacent hop in the peel chain is connected by a change output.

Peel chains are in some sense fundamental to UTXO-based cryptocurrencies, which do not allow the partial spending of transaction outputs. Given that it is highly unlikely for an entity to have the exact amount they want to pay someone associated with a UTXO, their payment inevitably forms a change output that can in turn be used as input to a subsequent payment. A second reason that peel chains are very common in Bitcoin is more specific to bigger services, as we explore in Section 6.2. In particular, it would be time-consuming, error-prone, and inefficient for big services to craft thousands of transactions manually. For these reasons, they naturally perform transactions using scripts. This automated behavior not only creates long peel chains but also creates patterns that make these peel chains easier to identify and follow.

### 5.2  Identifying inputs and outputs

In order to follow peel chains, the first step is to link together transactions according to their change outputs. Concretely, this means introducing two algorithms: findNext, which aims to identify the unique change output in a transaction, and findPrev, which aims to identify the input(s) in a transaction that originate from transactions conducted by the same entity (as opposed to transactions in which that entity received coins from another one). In its goal, findNext is comparable to previous work that developed change identification heuris-

Supp.App.238

tics [2, 10, 14, 31]. As we describe in more detail in Section 7.2, however, these previous works identify change outputs based on the freshness of output addresses and the output values. In contrast, findNext focuses on the index of the output (according to $change_C$), the cluster's features (according to $TF_C$ and $AF_C$), and the next hops of every output that has been spent.

We formally specify findNext and findPrev in Algorithms 1 and 2. Intuitively, both start with a transaction $tx \in C_{tx}$, and aim to output either the next hop in this transaction's peel chain (findNext) or the previous hops (findPrev), according to the features exhibited by the cluster.

**findNext.** For findNext, we first identify the set of outputs that might represent the change output, according to the cluster's change strategy $change_C$ (lines 1–6 in Algorithm 2). If the change strategy is associated with a single output index $i$ (either 0 or −1) then we include only that output in this candidate set, while if it 1 we include both the first and last outputs and if it is None we include all outputs. Next, for each candidate change output output we check to see if:

1. The output is spent, meaning $output.next \neq \bot$.

2. The address has a type that exists within the cluster, meaning $features_{addr}(output.addr) \in AF_C$.

3. The next hop of the output has features that exist within the cluster, meaning $features_{tx}(output.next) \in TF_C$.

If each of these checks pass, we add the transaction in which this output is spent to a set representing the possible next hops in the peel chain (line 13). At the end, if there is only one candidate transaction then we output it as the next hop. If there are zero or multiple choices then we output $\bot$ to indicate that we are unsure of the change output.

We experimentally evaluate the accuracy of findNext in Section 7.2, where we see it produces a very low number of false positives. To see why, we consider that findNext incorrectly identifies the next hop in a peel chain only if two things happen simultaneously: (1) the transaction either doesn't produce a change output or the cluster deviates from its known address and transaction features only in spending the change output in $tx$, and (2) exactly one output that meaningfully receives coins in $tx$ has the same address features as C, and produces the same transaction features when it spends the received coins. In other words, an entity would have to change its established behavior at the same time as it sends coins to another entity with the exact same features. For the first point, as we discussed above it is unlikely for a transaction to have no change output given that one bitcoin is highly divisible (to the eighth decimal place) and an entity would have to have the exact amount (plus fees) that they wanted to pay someone associated with a UTXO. As we saw in Section 4.2, clusters are highly consistent in both their address and transaction

---

**Algorithm 1:** findNext

**Result:** nextTx
**Input :** tx, $change_C$, $TF_C$, $AF_C$

1 **if** $change_C \in \{0, -1\}$ **then**
2    | candidates ← $\{tx.outputs[change_C]\}$
3 **else if** $change_C = 1$ **then**
4    | candidates ← $\{tx.outputs[0], tx.outputs[-1]\}$
5 **else**
6    | candidates ← tx.outputs
7 nextTx ← $\emptyset$
8 **for** output ∈ candidates **do**
9    | $b_{next}$ ← (output.next $\neq \bot$)
10   | $b_{addr}$ ← ($features_{addr}$(output.addr) ∈ $AF_C$)
11   | $b_{tx}$ ← ($features_{tx}$(output.next) ∈ $TF_C$)
12   | **if** $b_{addr} \wedge b_{next} \wedge b_{tx}$ **then**
13      | nextTx ← nextTx ∪ {output.next}
14 **if** $|nextTx| = 1$ **then**
15   | **return** nextTx[0]
16 **else**
17   | **return** $\bot$

---

features, which also makes deviations in their behavior unlikely. For the second point, we also saw in Section 4.2 that clusters are largely non-overlapping in their behavior (with some exceptions).

In terms of false negatives, findNext fails to identify the change output if either (1) it finds no suitable candidate or (2) it finds more than one candidate. In the first case, the cluster would need to either use a different change strategy $change_C$ (putting the change output at a different index from expected) or use a different set of features in both the address and the next transaction. In the second case, there needs to be at least one receiving output that behaves in the same way as C, in terms of having the same address and transaction features. It also needs to be the case that C has $change_C = 1$ or $change_C =$ None, because in the case where $change_C = 0$ or $change_C = -1$, there is no chance of findNext finding multiple candidates since only one will be investigated. As with false positives, the consistent and distinct qualities of cluster features thus suggest that false negatives are relatively unlikely to occur as well.

**findPrev.** Our second algorithm, findPrev, looks at the inputs to a transaction rather than at its outputs. In particular, while the co-spend heuristic tells us that each input belongs to the same entity, it may be the case that some of these inputs represent coins received from other entities. Our goal is to be able to follow peel chains (which are created by a single entity) backwards, which means findPrev must thus isolate the previous transactions in which these inputs were used as change outputs. This means that we first map each input to a transaction $tx$ to the transaction in which it was

---

**Algorithm 2:** findPrev

   **Result:** prevTxs

   **Input :** tx, $change_C$, $TF_C$, $AF_C$

1   $candidates_0, candidates_{-1}, candidates \leftarrow \emptyset$

2   **for** input $\in$ tx.inputs **do**

3      **if** $features_{tx}(input.prev) \in TF_C$ **then**

4         $i \leftarrow$ input.prevIdx

5         **if** $i \in \{0, -1\}$ **then**

6           $candidates_i \leftarrow candidates_i \cup \{input.prev\}$

7         $candidates \leftarrow candidates \cup \{input.prev\}$

8   **if** $change_C \in \{0, -1\}$ **then**

9      **return** $candidates_{change_C}$

10 **else if** $change_C = 1$ **then**

11      **return** $candidates_0 \cup candidates_{-1}$

12 **else**

13      **return** $candidates$

---

**Algorithm 3:** followFwd

   **Result:** $fwdTxs_{tx}$

   **Input :** tx, heur, $C_{tx}$, $change_C$, $TF_C$, $AF_C$

1   $fwdTxs_{tx,heur} \leftarrow \emptyset$

2   $tx_{cur} \leftarrow tx$

3   **while** $tx_{cur} \neq \bot$ **do**

4      **if** heur = validation $\wedge$ $tx_{cur} \notin C_{tx}$ **then**

5         **break**

6      $fwdTxs_{tx,heur} \leftarrow fwdTxs_{tx,heur} \cup \{tx_{cur}\}$

7      $tx_{cur} \leftarrow$ findNext($tx_{cur}$, $change_C$, $TF_C$, $AF_C$)

8   **return** $fwdTxs_{tx,heur}$

---

**Algorithm 4:** followBkwd

   **Result:** $bkwdTxs_{tx,heur}$

   **Input :** tx, heur, $C_{tx}$, $change_C$, $TF_C$, $AF_C$

1   $bkwdTxs_{tx,heur} \leftarrow \emptyset$

2   $bkwdScope \leftarrow \{tx\}$

3   **while** $|bkwdScope| > 0$ **do**

4      $tx_{cur} \leftarrow bkwdScope[0]$

5      $bkwdTxs_{tx,heur} \leftarrow bkwdTxs_{tx,heur} \cup \{tx_{cur}\}$

6      $prevTxs \leftarrow$ findPrev($tx_{cur}$, $change_C$, $TF_C$, $AF_C$)

7      **if** heur = validation **then**

8         $prevTxs \leftarrow prevTxs \cap C_{tx}$

9      $bkwdScope \leftarrow bkwdScope \cup \{prevTxs\}$

10 **return** $bkwdTxs_{tx,heur}$

---

created (input.prev) and to its index in the output list of that transaction (input.prevIdx). We next filter out all previous transactions that do not match the transaction features of the cluster (line 3 in Algorithm 2), and then within this filtered set keep track of all transactions (candidates), in addition to all transactions in which one of the inputs was created at either the first or last index ($candidates_0$ and $candidates_{-1}$ respectively). Then, as with findNext, we consider the change strategy defined by the cluster and use it to decide which of these candidate sets to return (lines 8–13).

The potential for false positives in findPrev is significantly higher than for findNext, as the algorithm returns multiple transactions rather than a single one. Thus, false positives can occur if any of the entities sending coins in a previous hop exhibits the same transaction features and follows the same change strategy. In other words, we rely more heavily on cluster features being distinct (as compared to findNext where we also could count on their consistency), which as we saw in Section 4.2 is not always the case. We discuss this further in Section 7.

In terms of false negatives, findPrev fails to identify a input.prev originating from the same cluster only if that input.prev deviates in its transaction features or follows a different $change_C$. Here again we can rely on the consistency of cluster transaction features to argue that this is relatively unlikely to happen.

### 5.3 Following transactions

With findNext and findPrev in place, we can define algorithms for following peel chains forwards (followFwd) and backwards (followBkwd). The ability to follow a transaction both forwards and backwards allows us to capture the full peel chain, regardless of the position of our starting transaction. These algorithms are defined in Algorithms 3 and 4.

**followFwd.** To follow a transaction tx forwards, followFwd continues going to the next hop in the peel chain, as identified by findNext, until the peel chain ends or findNext otherwise cannot identify a next hop. Along the way it adds the hops to a set of transactions $fwdTxs_{tx}$, which it outputs at the end. Line 4 of this algorithm includes a check that is specific to our validation heuristic; we describe this modification in Section 6.2 when we present that heuristic.

**followBkwd.** Following transactions backwards is more involved than following them forwards, as findPrev outputs a set of transactions rather than a single one. We can think of followBkwd as performing a breadth-first search: it defines a set of transactions to follow, which is initially set to be just the starting transaction (line 2 of Algorithm 4). As long as there are transactions left to follow, it picks the first of these, adds it to the set, and looks at its previous hops according to findPrev (line 6). It then adds these previous hops to the set of transactions (line 9) and continues. Again, this algorithm contains an additional check in the case of the validation heuristic (line 7), which we describe in Section 6.2.

8

# 6   Cluster Validation

Currently, the clusters output by the co-spend heuristic are largely treated as ground truth, despite the fact that there exist techniques such as Coinjoin that invalidate them. In this section, we thus investigate ways to improve one's confidence in the results of this heuristic. In particular, we explore two approaches, each of which is applicable in a different scenario.

Our first approach, described in Section 6.1, is a classifier for co-spend clusters that attempts to distinguish between TP and FP clusters. This type of classifier can implicitly be realized by a Coinjoin detection mechanism, such as the one implemented in BlockSci, and indeed when we implement this approach we find it achieves 87.5% accuracy. Our classifier, which is based on Random Forest, achieves 89.2% accuracy. It achieves, however, a much lower false negative rate (10% as compared to 20%), which in turn lowers the risk of an investigator or researcher making an incorrect assumption about the results of the co-spend heuristic. Furthermore, our classifier is more robust as it depends on the behavior of entities in general rather than just the characteristics of a single Coinjoin transaction (which can be changed by a Coinjoin service such as JoinMarket to avoid detection).

Our second approach, described in Section 6.2, links together transactions within the same co-spend cluster that our heuristics from Section 5 identify as belonging to the same peel chain. In doing so, we increase our confidence that these transactions were indeed performed by the same entity. Moreover, if we run it for every transaction in the cluster then we see that TP and FP clusters have different behaviors in terms of how many distinct peel chains they contain.

## 6.1   Cluster classification

Based on the transaction characteristics defined in Section 4.1.1, we computed aggregated cluster-level features. For the SegWit and locktime features, we calculated the fraction of transactions in the cluster that had this value set to true (`prop_segwit_enabled` and `prop_locktime_enabled` respectively). For the version feature, we calculated the proportion of version 1 transactions (`prop_v1`). We did not compute a feature column for version 2 transactions to avoid multi-collinearity issues, since `prop_v2` is given by $1 - $ `prop_v1`. Within each cluster we also determined the proportion of all available input address types (as defined in Section 4.1.2). These values were aggregated to a single feature using the maximal value (`address_type_max_prop`). Finally, the cluster feature (defined in Section 4.1.3) was transformed into two classes (`change_strategy`): no change strategy (`change`$_C$ = None), or an identified change strategy on either the first or last output (`change`$_C \in \{-1, 0, 1\}$).

Due to the small sample size (60 FP and 60 TP samples), we selected classification models that do not require extensive hyper-parameter tuning and tend to perform very well in a

| Statistic | RF | Conditional RF |
|---|---|---|
| Mean accuracy | 0.892 | 0.842 |
| Standard error | 0.017 | 0.031 |

Table 2: Performance of our Random Forest model after 5-fold cross-validation.

default setting [28]. We applied Random Forest (RF) [6, 28], which is a popular and powerful machine learning method. RF is an advancement of single classification and regression trees (CART [7]). As compared to CART, RF can handle a large number of covariates effectively without overfitting and are able to account for correlation as well as interactions among features. Another important property of RF is that it immediately provides internal variable importance measures that can be used to rank covariates. For fitting of the CART-based RF approach, we used the implementation in the R-package *ranger* [52]. As an alternative, we also applied the *cforest* implementation from the package *party* [47,48].

### 6.1.1   Classification results

We fit RF models with 500 trees to the dataset consisting of the features described above and using the cluster type (TP/FP) as the target variable. First, we fit the models to the full dataset and analyzed the intrinsic variable importance measures. According to both the CART-based RF and the *cforest* model, the most important features were the proportion of SegWit transactions, the proportion of version 1 transactions, and the proportion of transactions with enabled locktime.

For training and testing of the models we implemented a cross-validation (CV) procedure. Accuracy, meaning the proportion of correctly classified instances, was chosen as a model performance evaluation metric. The mean accuracy values and their associated standard errors after a 5-fold CV are shown in Table 2, and the ROC curve is in Figure 2. We obtain a mean accuracy between 84% and 89%. According to the standard errors, these values are also relatively stable on the CV-testing folds.

Overall, while our classifier would of course benefit from extended experimentation with a larger dataset, these results and the high level of accuracy suggest that it would be possible to deploy this method in the manner suggested earlier in this section; i.e., for an investigator to use it to gain some confidence in the results of the co-spend heuristic at an early stage in an investigation.

### 6.1.2   Comparison with BlockSci

To compare our approach to the current state of the art, we explore the Coinjoin detection feature available in BlockSci [23] as the function `isCoinjoin`. This function works at the level of transactions, meaning given a transaction it outputs 0 or



Figure 2: The ROC curve for our Random Forest model (AUC=0.923).

|  | Truth | | Class error |
|---|---|---|---|
| Prediction | FP | TP | |
| FP | 54 | 7 | 11.5 % |
| TP | 6 | 53 | 10.2 % |

(a) Confusion matrix of our RF model (summed values after 5-fold CV).

|  | Truth | | Class error |
|---|---|---|---|
| Heuristic | FP | TP | |
| FP | 48 | 3 | 5.9 % |
| TP | 12 | 57 | 17.4 % |

(b) Confusion matrix for the BlockSci classifier.

Table 3: Comparison of classification results.

1 according to whether or not it seems to be a Coinjoin, as identified by a heuristic developed by Goldfeder et al. [14].

Using this function, we define a cluster-level classifier by saying that if any transaction in the cluster is flagged as a Coinjoin, the entire cluster is a false positive. We tested this classifier on our full dataset of TP and FP clusters; the results are in Table 3b. As we can see, both BlockSci and our classifier have high accuracy (87.5% and 89.2% respectively), with BlockSci having twice as many false negatives and our classifier having more false positives (7 as compared to 3). As argued earlier, the false negative rate is more crucial in our imagined use case, as a false negative could cause an investigator to believe that a cluster represents a single entity when in fact it does not. Furthermore, the fact that our classifier is based on all of the features within a cluster makes it more robust than our constructed BlockSci classifier, which

depends only on the features of a single transaction and can thus be easily evaded by constructing Coinjoins without these specific features.

## 6.2 A validation heuristic

Our second method for increasing the confidence we have in a cluster focuses less on the cluster as a whole and more on the connections between individual transactions. In particular, we utilize the heuristics defined in Section 5 to partition the transactions of a cluster into peel chains.

### 6.2.1 Defining the heuristic

Our starting point is a co-spend cluster $C$, represented by the tuple $(C_{addr}, C_{tx})$. Next, we run followFwd and followFwd with the parameter heur = validation for every $tx \in C_{tx}$. Crucially, this parameter means that we do not follow any transactions that are not already in the cluster. For a given $tx$ this gives us the sets $fwdTxs_{tx,validation}$ and $bkwdTxs_{tx,validation}$, which collectively represent all transactions within the cluster that lie along the same peel chain as the starting one. We denote the union of these two sets as $Pchain_V(tx)$.

After obtaining the set $\{Pchain_V(tx)\}_{tx} \in C_{tx}$ of all such peel chains, we noticed that some peel chains contained overlapping but not identical sets of transactions, according to the starting transaction $tx$. We thus merged these overlapping peel chains in a transitive fashion to end up with a set of distinct peel chains, $Pchain_V(C)$, that is a partition of all transactions in the cluster. To measure the overall tendency for a cluster to form peel chains, we use the value $Val_C = \frac{|Pchain_V(C)|}{|C_{tx}|}$, which is closer to 1 if a cluster consists of many peel chains and closer to 0 if it consists of fewer.

Our *validation heuristic* then says that for any two transactions $tx_1, tx_2 \in Pchain_V$ for $Pchain_V \in Pchain_V(C)$ (i.e., two transactions that are part of the same cluster and part of the same peel chain), we can have higher confidence that they were performed by the same entity than for two transactions $tx_1, tx_2 \in C_{tx}$.

### 6.2.2 Applying the heuristic

It is not possible to assess the accuracy of our validation heuristic directly, as we do not have the relevant ground-truth data. For our FP clusters, for example, we knew that they contained at least one Coinjoin but did not have any information about the other transactions (and indeed for some FP clusters it was clear they contained other Coinjoins beyond the ones we were given). For our TP clusters, we knew that all transactions were performed by the same entity but not if they represented the same peel chain.

Instead, we used our validation heuristic to understand the behavior of our TP and FP clusters. To this end, we ran the validation heuristic for each of our clusters and looked at the

Supp.App.242



(a) TP clusters

(b) FP clusters

Figure 3: For our 60 TP and FP clusters, the distribution of $|Val_C|$ (the color of the bar), with the clusters ordered from left to right by $|C_{tx}|$ (the height of the bar, on a log scale.

resulting value of $Val_C$. As our results in Figure 3 show, the FP clusters had significantly higher values of $Val_C$ on average: 0.43 as compared to 0.14 for TP clusters. Overall, $Val_C$ did not increase with the size of the cluster, despite the possible expectation that clusters with a higher number of transactions would form a higher number of peel chains. This suggests instead that bigger clusters tend to be more predictable in terms of their behavior, which is perhaps not surprising if we consider that the operators of these big clusters use automated scripts in order to form their transactions.

In terms of using this heuristic in practice, there are currently several *nested services* [8] that operate using accounts maintained at a variety of different exchanges. Using just the co-spend heuristic, these nested services would thus appear to be operated by the same entity as the exchange they use. Using our validation heuristic, however, it would be possible to separate out the activities of these nested services (which would likely form their own peel chains) from the activities of the exchange itself.

Furthermore, while we defined our validation heuristic for pairs of transactions, as we can see in Figure 3 a lower value of $Val_C$ can also increase our confidence in the cluster overall. This is difficult to quantify given our current source of ground truth, however, so we leave as open work a more thorough evaluation of the impact of this heuristic on overall cluster confidence.

## 7   Expanding Clusters

Our expansion heuristic is structurally similar to our validation heuristic, in that it is also based on the ability to identify peel chains, but it has a different goal: to identify new transactions that were not already in the cluster but for which we

nevertheless have high confidence that they were formed by the same entity. In this approach, this heuristic more closely resembles previous change heuristics in the literature.

### 7.1   Defining the heuristic

As with the validation heuristic, our starting point is a co-spend cluster C represented by a tuple $(C_{addr}, C_{tx})$. Next, we run followFwd and followBkwd with the parameter heur = expansion for every $tx \in C_{tx}$. This gives us the sets fwdTxs$_{tx,expansion}$ and bkwdTxs$_{tx,expansion}$ for every tx, which still represent the set of all transactions that lie along the same peel chain as tx but crucially may contain transactions that are not already in the cluster. We denote the union of these sets, representing all identified transactions, as Txs$_{expansion}$ and denote by expansion$_C$ the set of newly identified transactions; i.e., the ones that weren't already in the cluster (Txs$_{expansion} \setminus C_{tx}$). Our *expansion* heuristic then says that all transactions in expansion$_C$ were carried out by the same entity represented by the cluster.

After defining this heuristic, our goal was to identify its accuracy and effectiveness. To measure effectiveness we defined the *expansion factor* Expsn as the increase of a cluster's coverage in terms of its number of transactions ($100 \cdot \frac{|expansion_C|}{|C_{tx}|}$). To measure accuracy, we treated as ground truth the set of tags provided to us in the Chainalysis Reactor tool,[2] which are tags that are gathered internally by Chainalysis and from public websites and documents. In particular, for each transaction in expansion$_C$, if Chainalysis had tagged it as belonging to an entity then we considered it a false positive. If it had no tag for the transaction, we considered it an *unknown positive*; i.e., we could not be sure that the transaction was formed by the same entity, but there was at least no evidence to the contrary. We then considered the *false discovery rate* FDR as the number of false positives divided by the size of expansion$_C$ (which is the standard definition for false discovery rate if we treat unknown positives as true positives).

In running the heuristic in its basic form, however, we encountered two problems. First, because previous transactions were not filtered out in followBkwd in the way they were for the validation heuristic, the set bkwdScope was significantly larger and it became computationally infeasible to run the algorithm for longer peel chains. Second, including so many transactions also increased the possibility of encountering a false positive, as discussed in Section 5.2, and thus made the algorithm more prone to error. For both of these reasons we decided to limit our expansion heuristic and only follow peel chains forwards using followFwd.

After running this version of our heuristic, we achieved an FDR of 0.62%, which was already quite low relative to the other heuristics (as we see below in Section 7.2). Nevertheless, after manually inspecting some of the false positive

---

[2] https://www.chainalysis.com/chainalysis-reactor/



(a) findNext



(b) findNext2

Figure 4: Evaluation of findNext and the modified algorithm findNext2 for the ten TP clusters with the initial highest FDR, with the number of transactions on a log scale.

transactions, we observed that the main cause was following outputs to transactions with multiple inputs that were in turn part of a bigger cluster. We thus added an extra condition into findNext requiring that the inputs in the next hop next represented the entirety of the addresses in their cluster. In other words, we added only those transactions whose inputs were only ever co-spent with each other. We call this modified change heuristic findNext2.

To illustrate the effect of this modification, Figure 4a shows the ten TP clusters for which findNext had the highest FDR and thus performed the least well. We then re-ran expansion using findNext2; Figure 4b shows the results for the same clusters. As we can see, in eight of the clusters, findNext2 eliminated all false positives, at the cost of missing a relatively small number of unknown positives.

## 7.2    Evaluating the heuristic

In order to best evaluate our expansion heuristic, we sought to compare it with previous change heuristics.

**Androulaki et al. [2]** identify the change output in a transaction tx if (1) the transaction has exactly two outputs, and (2) it has the only *fresh* address in tx.outputs, meaning

output.addr is the only one appearing for the first time in the blockchain.

**Meiklejohn et al. [31]** identify the change output in a transaction tx if (1) it has the only fresh address in tx.outputs; (2) tx is not a coin generation; and (3) there is no *self-change address* in tx.outputs, meaning no address used as both an input and an output.

**Goldfeder et al. [14]** use the same conditions as the one by Meiklejohn et al. but additionally require that (4) the transaction tx is not a Coinjoin.

**Ermilov et al. [10]** were the first to consider not only the behavior of the outputs and their addresses but also the value they received. They identify the change output in a transaction tx if (1) the transaction has exactly two outputs; (2) the transaction does not have two inputs; (3) there is no self-change address; (4) the output has the only fresh address in tx.outputs; and (5) the output's value is significant to at least the fourth decimal place.

We implemented each of these heuristics and ran the expansion heuristic on each of our 60 TP clusters using these algorithms as well as our own algorithms findNext and findNext2. The results, in terms of false discovery rate (FDR) and expansion factor (Expsn), are in Table 4.

As Table 4 shows, our heuristics achieve both a significantly lower false positive rate than all previous heuristics and a significantly higher expansion rate. The heuristics from Androulaki et al. and Meiklejohn et al. have the highest false discovery rates, which is somewhat expected given that Bitcoin has changed considerably since they were introduced in 2013. As might also be expected, the heuristic from Goldfeder et al. achieved similar results to the one from Meiklejohn et al., with the extra Coinjoin requirement reducing both the expansion and the false positive rates by a small amount. Finally, Ermilov et al. achieved the lowest FDR of the four because of the stricter conditions of their heuristic, but this came at the expense of having the lowest expansion rate.

| Heuristic | Expsn | FDR |
|---|---|---|
| findNext | 147.43 | 0.62 |
| findNext2 | 124.46 | 0.02 |
| Androulaki et al. [2] | 93.03 | 64.19 |
| Meiklejohn et al. [31] | 79.94 | 51.64 |
| Goldfeder et al. [14] | 73.7 | 48.7 |
| Ermilov et al. [10] | 28.6 | 12.7 |

Table 4: The expansion factor and false discovery rate of findNext and findNext2, as evaluated on our 60 TP clusters and as compared with previous change heuristics. Both metrics are averaged across all clusters.

12

## 7.3   Case studies

To test our expansion heuristic in practice, we sought to run it for clusters that had been associated with known illicit activities.

### 7.3.1   Bitcoin Fog

To start, we looked at a recent case against Roman Sterlingov, who was accused of being the operator of the Bitcoin Fog mixing service for almost 10 years [16]. According to the affidavit of an IRS special agent [4], one of the main pieces of evidence against Sterlingov was the connection of a deposit made in 2011 to the Bitcoin Fog cluster ($tx_3$ in Figure 5) with a withdrawal from the Mt. Gox exchange cluster ($tx_1$), in which Sterlingov had an account using his real name.

We first checked whether or not the cluster that received the coins from Mt. Gox was the same as the cluster that sent the coins to Bitcoin Fog, in order to check if it would be possible to link $tx_1$ with $tx_3$ based solely on the co-spend heuristic. This was not the case, however, meaning it was necessary to take intermediate transactions into account.

We then followed the funds from the Mt. Gox withdrawal forwards, using followFwd, to see if we would reach the deposit to Bitcoin Fog. Both findNext and findNext2 failed after only one hop, however, as the two outputs in $tx_2$ had the same address features and were spent in transactions with the same features. Our algorithms were thus unable to isolate the change output. These outputs were both furthermore *fresh*, meaning it was their first appearance in the blockchain, so the other change heuristics described in Section 7.2 also would have been unable to follow the transaction forwards.

We thus worked backwards instead; i.e., we started with the deposit to Bitcoin Fog and followed the funds backwards to see if we would eventually find the withdrawal from Mt. Gox. While running followBkwd for all transactions in a cluster was computationally infeasible, it was possible to do it here as we started with only a single transaction. Indeed, after seven hops, we ended up with $tx_1$ in our set bkwdTxs$_{tx_3,expansion}$. While this same analysis was likely done manually by the IRS agent, this would quickly become infeasible if there were more intermediate hops; furthermore, manual analysis is arguably more error-prone as it is subject to human judgment.

While successful in this case, it is important to remember our discussion in Section 5.2 that followBkwd is more prone to false positives than followFwd. Indeed, in 2011 all transactions had the same features (as the ones we use were not introduced until years later), meaning followBkwd could continue backwards indefinitely without ever registering a change in the entity performing the transactions. In our case, the paths from the last three deposits in $tx_3$ all led back to the same origin (the second output in $tx_1$), which in turn sent all its money to these three inputs and two unspent UTXOs, meaning we could be more sure in the link between the two. While care must thus be taken when using followBkwd in this

way, applying it to a present-day scenario would likely be more safe as transactions would be expected to have a more diverse set of features.

### 7.3.2   Tracking ransomware addresses

We next looked at a broader set of addresses associated with ransomware. On December 22, 2021 we scraped the 'Ransomware Help & Tech Support' forum of Bleeping Computer,[3] a well known and actively used resource. We extracted Bitcoin addresses from 627 posts between October 2013 and December 2021. Of the addresses, 410 were distinct and 213 of these were never used, indicating that those victims did not pay the ransom.

For the remaining 197 addresses, we began by identifying their co-spend clusters. For 75 addresses, this cluster was a singleton, meaning it was a one-time address. For 102 addresses, the cluster was relatively small (58 addresses on average). For 20 addresses, the resulting cluster was very large, with an average size of 2.9 million addresses. This suggested that these addresses belonged to a large service rather than an individual, indicating that those ransomware operators used a custodial solution (such as an exchange) rather than run their own wallet. To confirm this, we obtained the category of the tags for these clusters from Chainalysis and found that they all belonged to either an exchange, a hosted wallet service, a mixing service, or a darknet market. We thus excluded these clusters from our analysis.

The remaining 177 addresses were associated with 52 different ransomware families, with Dharma and Xorist appearing the most frequently (with 38 and 11 addresses respectively), and formed 169 distinct co-spend clusters. For each of these clusters we applied and evaluated our expansion heuristic (using findNext2). Across all clusters, the average expansion factor was 257.5, with a maximum expansion factor of 3400 for a CrypMIC cluster. There were 32 clusters that did not expand at all, belonging to 20 different ransomware families; 23 of these were singleton clusters. In addition to expanding the clusters, for each hop we followed we also collected the *counterparty* addresses; i.e., the non-change output addresses that represented the entity or entities to whom the peel chain operator sent coins. In total we collected 91,493 counterparty addresses, 88,518 of which were distinct. The vast majority (96%) of these counterparty addresses were one-time addresses. This is consistent with them belonging to services like exchanges, which typically provide one-time deposit addresses, but does not clearly imply this as there are many other reasons why one-time addresses occur.

While the original co-spend clusters were all distinct in terms of their associated ransomware family, after performing the expansion heuristic the clusters of two ransomware families (and only two) merged: Dharma and Phobos. When

---

[3] https://www.bleepingcomputer.com/forums/f/239/ransomware-help-tech-support/



Figure 5: Transactions representing the link between a withdrawal from Mt. Gox ($tx_1$) and a deposit into Bitcoin Fog ($tx_3$), with an additional transaction of interest, $tx_2$, highlighted in blue. The gray nodes represent multiple UTXOs of the same address and transaction outputs with a dashed outline are unspent.

we analyzed the counterparty addresses of these clusters as well, we observed that one of the addresses in the expanded Phobos cluster was also one of the counterparty addresses for a Dharma cluster; i.e., an address that our expansion heuristic tagged as belonging to Phobos was also tagged as a counterparty in a peel chain formed by the Dharma ransomware operator. In fact, this address was a counterparty 83 times, making it the most frequently used counterparty across all Dharma peel chains. Furthermore, in several of the hops in this peel chain both transaction outputs were fresh, meaning they could not have been followed by any previous change heuristic. While further investigation is of course needed, this is in line with the hypothesis that these ransomware families are operated by the same entity [37].

## 8   Limitations and Countermeasures

Both our heuristics and our classifier could be made significantly less effective by a motivated party randomizing the features of their transactions and addresses. Performing this randomization requires a relatively high level of technological sophistication and familiarity with Bitcoin but does not incur any computational or monetary costs, and would be effective in making it either impossible to follow hops in a peel chain (because their features would be randomized and thus not match the expected behavior) or make the features associated with a cluster so varied that any attempt to follow its transactions would be likely to result in a false positive. Transactions that are private and internal to the ledger of some large entity (like an exchange) would also make it impossible for our heuristics, which rely on public blockchain data, to work. Given this, investigators should not rely on the output of either our heuristics or our classifier as definitive evidence.

All previous clustering heuristics share these limitations, however, and are still broadly effective in practice due to the fact that many entities lack either the motivation or the technical ability to evade them. For example, exchanges and other regulated entities have no reason to evade these heuristics, and previous research has shown that the ability to identify their transactions has a knock-on effect in terms of anonymity even for participants who do actively try to perform such evasions.

Just as with previous clustering heuristics, the heuristics presented here may also become less effective as Bitcoin evolves. As discussed in Section 5.2, our heuristics produce few false positives due to the fact that many entities are consistent in their behavior and are largely non-overlapping in terms of their features. If all entities had the same features then our heuristics would stop working, and similarly if many entities had the same features and were less consistent in their behavior then our heuristics might produce more false positives. As a concrete example, a recent pull request in the main Bitcoin repository[4] ensures that the type of the change address matches exactly the type of the counterparty address. If this version of the wallet software were adopted by every entity in the Bitcoin ecosystem, it would make our address heuristic entirely ineffective (although our transaction and change heuristics would still work).

## 9   Conclusion

In this paper, we presented heuristics to expand and validate the applicability of widely used Bitcoin clustering heuristics, using a balanced ground-truth dataset to evaluate them. While this research arguably further reduces anonymity in Bitcoin, we believe that it ultimately benefits the developers and users of this project in revealing the extent to which tracking flows of bitcoins is possible and motivating further research into improved anonymity protocols. As an immediate countermeasure, users who are concerned about their privacy can switch to more privacy-focused cryptocurrencies such as Zcash and Monero, although previous work has shown that even these are subject to some degree of deanonymization [24,27,34,55].

---
[4] https://github.com/bitcoin/bitcoin/pull/23789

## Acknowledgements

We are grateful to Chainalysis for working with us to create the dataset that made this work possible and to Jacob Illum and Peter Sebastian Nordholt in particular for many helpful discussions. We would also like to thank the anonymous reviewers and our shepherd, Anita Nikolich, for their feedback. The authors were supported in part by the EU H2020 TITANIUM project under grant agreement number 740558, in part by the Austrian security research programme KIRAS of the Federal Ministry of Agriculture, Regions and Tourism (BMLRT) under the project KRYPTOMONITOR (879686), and in part by IC3 industry partners.

## References

[1] S. Abramova, A. Voskobojnikov, K. Beznosov, and R. Böhme. Bits under the mattress: Understanding different risk perceptions and security behaviors of crypto-asset users. In *CHI Conference on Human Factors in Computing Systems (CHI)*, 2021.

[2] E. Androulaki, G. O. Karame, M. Roeschlin, T. Scherer, and S. Capkun. Evaluating user privacy in Bitcoin. In *International Conference on Financial Cryptography and Data Security*, volume 7859 LNCS, pages 34–51, 2013.

[3] M. Bartoletti, B. Pes, and S. Serusi. Data mining for detecting Bitcoin Ponzi schemes, 2018. http://arxiv.org/abs/1803.00646.

[4] D. Beckett. Statement of facts, Apr. 2021. https://storage.courtlistener.com/recap/gov.uscourts.dcd.230456/gov.uscourts.dcd.230456.1.1_1.pdf.

[5] A. Biryukov, D. Khovratovich, and I. Pustogarov. Deanonymisation of clients in Bitcoin P2P network. In *Proceedings of ACM CCS*, 2014.

[6] L. Breiman. Random forests. *Machine Learning*, 45(1):5–32, 2001.

[7] L. Breiman, J. Friedman, C. J. Stone, and R. A. Olshen. *Classification and Regression Trees*. Chapman and Hall/CRC, 1984.

[8] Chainalysis Team. 270 service deposit addresses drive 55% of money laundering in cryptocurrency, Feb. 2021. https://blog.chainalysis.com/reports/cryptocurrency-money-laundering-2021.

[9] J. Dunietz. The Imperfect Crime: How the WannaCry Hackers Could Get Nabbed, Aug. 2017. https://www.scientificamerican.com/article/the-imperfect-crime-how-the-wannacry-hackers-could-get-nabbed/.

[10] D. Ermilov, M. Panov, and Y. Yanovich. Automatic Bitcoin address clustering. In *Proceedings of the 16th IEEE International Conference on Machine Learning and Applications (ICMLA 2017)*, pages 461–466, 2018.

[11] B. Faucon, I. Talley, and S. Said. Israel-Gaza Conflict Spurs Bitcoin Donations to Hamas, June 2021. https://www.wsj.com/articles/israel-gaza-conflict-spurs-bitcoin-donations-to-hamas-11622633400.

[12] M. Friedenbach, BtcDrak, N. Dorier, and kinoshitajona. BIP 68: Relative lock-time using consensus-enforced sequence numbers, 2015. https://github.com/bitcoin/bips/blob/master/bip-0068.mediawiki.

[13] M. Fröwis, T. Gottschalk, B. Haslhofer, C. Rückert, and P. Pesch. Safeguarding the Evidential Value of Forensic Cryptocurrency Investigations, 2019. http://arxiv.org/abs/1906.12221.

[14] S. Goldfeder, H. Kalodner, D. Reisman, and A. Narayanan. When the cookie meets the blockchain: Privacy risks of web payments via cryptocurrencies. *arXiv preprint arXiv:1708.04748*, 2017.

[15] A. Greenberg. Prosecutors Trace $13.4M in Bitcoins From the Silk Road to Ulbricht's Laptop, Jan. 2015. https://www.wired.com/2015/01/prosecutors-trace-13-4-million-bitcoins-silk-road-ulbrichts-laptop/.

[16] A. Greenberg. Feds Arrest an Alleged $336M Bitcoin-Laundering Kingpin, Apr. 2021. https://www.wired.com/story/bitcoin-fog-dark-web-cryptocurrency-arrest/.

[17] D. A. Harding and P. Todd. BIP 125: Opt-in Full Replace-by-Fee Signaling, 2015. https://github.com/bitcoin/bips/blob/master/bip-0125.mediawiki.

[18] M. A. Harlev, H. Sun Yin, K. C. Langenheldt, R. Mukkamala, and R. Vatrapu. Breaking bad: De-anonymising entity types on the bitcoin blockchain using supervised machine learning. In *Proceedings of the 51st Hawaii International Conference on System Sciences*, 2018.

[19] M. Harrigan and C. Fretter. The Unreasonable Effectiveness of Address Clustering. In *Proceedings of the 13th IEEE International Conference on Ubiquitous Intelligence and Computing*, pages 368–373, 2017.

Supp.App.247

[20] D. Y. Huang, M. M. Aliapoulios, V. G. Li, L. Invernizzi, E. Bursztein, K. McRoberts, J. Levin, K. Levchenko, A. C. Snoeren, and D. McCoy. Tracking ransomware end-to-end. In *2018 IEEE Symposium on Security and Privacy (SP)*, pages 618–631, 2018.

[21] D. Y. Huang, H. Dharmdasani, S. Meiklejohn, V. Dave, C. Grier, D. McCoy, S. Savage, N. Weaver, A. C. Snoeren, and K. Levchenko. Botcoin: Monetizing stolen cycles. In *NDSS*. Citeseer, 2014.

[22] M. Jourdan, S. Blandin, L. Wynter, and P. Deshpande. Characterizing Entities in the Bitcoin Blockchain, 2018. http://arxiv.org/abs/1810.11956.

[23] H. Kalodner, M. Möser, K. Lee, S. Goldfeder, M. Plattner, A. Chator, and A. Narayanan. Blocksci: Design and applications of a blockchain analysis platform. In *29th USENIX Security Symposium (USENIX Security 20)*, pages 2721–2738. USENIX Association, Aug. 2020.

[24] G. Kappos, H. Yousaf, M. Maller, and S. Meiklejohn. An empirical analysis of anonymity in zcash. In *27th USENIX Security Symposium (USENIX Security 18)*, pages 463–477, Baltimore, MD, Aug. 2018. USENIX Association.

[25] P. Koshy, D. Koshy, and P. McDaniel. An analysis of anonymity in Bitcoin using P2P network traffic. In *International Conference on Financial Cryptography and Data Security (FC)*, 2014.

[26] K. Krombholz, A. Judmayer, M. Gusenbauer, and E. Weippl. The other side of the coin: User experiences with Bitcoin security and privacy. In *International Conference on Financial Cryptography and Data Security*, 2016.

[27] A. Kumar, C. Fischer, S. Tople, and P. Saxena. A traceability analysis of Monero's blockchain. In S. N. Foley, D. Gollmann, and E. Snekkenes, editors, *Computer Security – ESORICS 2017*, pages 153–173, Cham, 2017. Springer International Publishing.

[28] A. Liaw and M. Wiener. Classification and regression by randomForest. *R News*, 2(3):18–22, 2002.

[29] E. Lombrozo, J. Lau, and P. Wuille. BIP 141: Segregated Witness (Consensus layer), 2015. https://github.com/bitcoin/bips/blob/master/bip-0141.mediawiki.

[30] A. Mai, K. Pfeffer, M. Gusenbauer, E. Weippl, and K. Krombholz. User mental models of cryptocurrency systems - a grounded theory approach. In *Proceedings of the Symposium on Usable Privacy and Security (SOUPS)*, 2020.

[31] S. Meiklejohn, M. Pomarole, G. Jordan, K. Levchenko, D. McCoy, G. M. Voelker, and S. Savage. A fistful of bitcoins: Characterizing payments among men with no names. In *Proceedings of the Internet Measurement Conference - IMC '13*, number 6, pages 127–140, 2013.

[32] R. Monroe. How to negotiate with ransomware hackers, June 2021. https://www.newyorker.com/magazine/2021/06/07/how-to-negotiate-with-ransomware-hackers.

[33] M. Möser and A. Narayanan. Resurrecting address clustering in Bitcoin, 2021. https://arxiv.org/pdf/2107.05749.pdf.

[34] M. Möser, K. Soska, E. Heilman, K. Lee, H. Heffan, S. Srivastava, K. Hogan, J. Hennessey, A. Miller, A. Narayanan, and N. Christin. An empirical analysis of linkability in the Monero blockchain. *Proceedings on Privacy Enhancing Technologies*, 2017.

[35] S. Nakamoto. Bitcoin: A Peer-to-Peer Electronic Cash System, 2008. bitcoin.org/bitcoin.pdf.

[36] J. D. Nick. Data-Driven De-Anonymization in Bitcoin. Master's thesis, ETH Zürich, 2015.

[37] D. Palmer. New Phobos ransomware exploits weak security to hit targets around the world, Jan. 2019. https://www.zdnet.com/article/new-phobos-ransomware-exploits-weak-security-to-hit-targets-around-the-world/.

[38] M. Paquet-Clouston, B. Haslhofer, and B. Dupont. Ransomware payments in the Bitcoin ecosystem. *Journal of Cybersecurity*, 5(1), 05 2019. tyz003.

[39] M. Paquet-Clouston, M. Romiti, B. Haslhofer, and T. Charvat. Spams meet cryptocurrencies: Sextortion in the bitcoin ecosystem. In *Proceedings of the 1st ACM conference on advances in financial technologies*, pages 76–88, 2019.

[40] P. T. Pham and S. Lee. Anomaly Detection in the Bitcoin System-A Network Perspective, 2014. https://arxiv.org/abs/1611.03942.

[41] T. Pham and S. Lee. Anomaly Detection in Bitcoin Network Using Unsupervised Learning Methods, 2016. http://arxiv.org/abs/1611.03941.

[42] R. S. Portnoff, D. Y. Huang, P. Doerfler, S. Afroz, and D. McCoy. Backpage and bitcoin: Uncovering human traffickers. In *Proceedings of the 23rd ACM SIGKDD International Conference on Knowledge Discovery and Data Mining*, pages 1595–1604, 2017.

Supp.App.248

[43] S. Ranshous, C. A. Joslyn, S. Kreyling, K. Nowak, N. F. Samatova, C. L. West, and S. Winters. Exchange pattern mining in the Bitcoin transaction directed hypergraph. In *International Conference on Financial Cryptography and Data Security*, volume 10323 LNCS, pages 248–263, 2017.

[44] F. Reid and M. Harrigan. An analysis of anonymity in the Bitcoin system. *Security and Privacy in Social Networks*, pages 197–223, 2013.

[45] D. Ron and A. Shamir. Quantitative analysis of the full Bitcoin transaction graph. In *International Conference on Financial Cryptography and Data Security*, 2013.

[46] M. Spagnuolo, F. Maggi, and S. Zanero. BitIodine: Extracting intelligence from the Bitcoin network. In *International Conference on Financial Cryptography and Data Security*, volume 8437, pages 457–468, 2014.

[47] C. Strobl, A.-L. Boulesteix, T. Kneib, T. Augustin, and A. Zeileis. Conditional variable importance for random forests. *BMC Bioinformatics*, 9(307), 2008.

[48] C. Strobl, A.-L. Boulesteix, A. Zeileis, and T. Hothorn. Bias in random forest variable importance measures: Illustrations, sources and a solution. *BMC Bioinformatics*, 8(25), 2007.

[49] H. Sun Yin and R. Vatrapu. A first estimation of the proportion of cybercriminal entities in the Bitcoin ecosystem using supervised machine learning. In *2017 IEEE International Conference on Big Data (Big Data)*, pages 3690–3699, 2017.

[50] United States Department of Justice. South Korean national and hundreds of others charged worldwide in the takedown of the largest darknet child pornography website, which was funded by Bitcoin, Oct. 2019. `https://www.justice.gov/opa/pr/south-korean-national-and-hundreds-others-charged-worldwide-takedown-largest-darknet-child`.

[51] United States Department of Justice. Global disruption of three terror finance cyber-enabled campaigns, Aug. 2020. `https://www.justice.gov/opa/pr/global-disruption-three-terror-finance-cyber-enabled-campaigns`.

[52] M. N. Wright and A. Ziegler. `ranger`: A fast implementation of random forests for high dimensional data in C+ and R. *Journal of Statistical Software*, 77(1):1–17, 2017.

[53] H. H. S. Yin, K. Langenheldt, M. Harlev, R. R. Mukkamala, and R. Vatrapu. Regulating cryptocurrencies: A supervised machine learning approach to de-anonymizing the Bitcoin blockchain. *Journal of Management Information Systems*, 36(1):37–73, 2019.

[54] H. Yousaf, G. Kappos, and S. Meiklejohn. Tracing transactions across cryptocurrency ledgers. In *28th USENIX Security Symposium (USENIX Security 19)*, pages 837–850, Santa Clara, CA, Aug. 2019. USENIX Association.

[55] Z. Yu, M. H. Au, J. Yu, R. Yang, Q. Xu, and W. F. Lau. New empirical traceability analysis of CryptoNote-style blockchains. In I. Goldberg and T. Moore, editors, *Financial Cryptography and Data Security*, pages 133–149, Cham, 2019. Springer International Publishing.

[56] D. Zambre and A. Shah. Analysis of Bitcoin Network Dataset for Fraud. Stanford CS 224W Project Final Report, 2013. `http://snap.stanford.edu/class/cs224w-2013/projects2013/cs224w-030-final.pdf`.

**Supp.App.249**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

        Plaintiff,

v.

ROMAN STERLINGOV

        Defendant.

**No. 21-cr-399 (RDM)**

## Motion to Authorize Issuance and Pretrial Return of Subpoena Duces Tecum to Chainalysis, Inc. Under Federal Rule of Criminal Procedure 17(c)

Defendant Roman Sterlingov ("Mr. Sterlingov") moves this Court under Federal Rule of Criminal Procedure 17(c) to authorize the issuance of the attached subpoenas duces tecum to Chainalysis, Inc. ("Chainalysis"), commanding the production of the items listed on the subpoenas on or before August 14, 2023, at 9:00 am., for the reasons set forth in the attached memorandum in support of this motion.

**Supp.App.250**

Dated: August 2, 2023
New York, New York

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Appointed Counsel*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Appointed Counsel*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

*Counsel for Defendant Roman Sterlingov*

**Supp.App.251**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of August 2023, the forgoing document was filed with

the Clerk of Court using the CM/ECF System, and sent by email to the attorneys for the

Government listed below:

<u>s/ Tor Ekeland</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

        Plaintiff,

v.

ROMAN STERLINGOV

        Defendant.

**No. 21-cr-399 (RDM)**

**Defendant's Memorandum in Support of Defendant's Motion for Leave to Authorize Issuance and Pretrial Return of Subpoenas Duces Tecum to Chainalysis, Inc. Under Federal Rule of Criminal Procedure 17(c)**

1

## Introduction

Defendant Roman Sterlingov, through undersigned counsel, submits this memorandum in support of his motion to authorize the issuance of Subpoenas Duces Tecum to Chainalysis, Inc. ("Chainalysis"), commanding that it produces pretrial the items listed on the subpoenas on or before August 14, 2023.

## Statement of the Case

At the June 16th and 23rd, 2023 Daubert Hearings Government expert witness, and Director of Investigation Solutions at Chainalysis, Elizabeth Bisbee testified that the Chainalysis Reactor software at the core of the Government's case has no known error rates, no false positive rates, and no false negative rates. Moreover, Ms. Bisbee testified that she could cite no scientific peer-reviewed paper attesting to the accuracy of the Chainalysis Reactor software. In response to a question from AUSA Catherine Alden Pelker on direct-examination, Ms. Bisbee informed the Court that she has no knowledge of Chainalysis ever collecting information about "error rates or false positives."[1]

The Government's case relies almost entirely upon Chainalysis' forensic software. Given that neither Chainalysis nor the Government can produce any scientific evidence regarding Chainalysis Reactor's accuracy, error rates, or rates of false positives and false negatives, the Defense requires access to the Chainalysis Reactor source code for testing. As both Ms. Bisbee and Government expert witness Luke Scholl's testimony established at the recent Daubert Hearings, Chainalysis Reactor software is nearly entirely based upon assumptions to formulate its output. These assumptions are embedded in the Chainalysis Reactor source code and the Defense needs to review this source code in order to effectively challenge the output of the blockchain forensic software being used in this case. Careful scrutiny of the blockchain forensics

---

[1] Daubert Hearing, Jun. 23, 2023, Tr. 117:4-12.

Supp.App.254

used in this case is integral to putting on a complete defense for Mr. Sterlingov and for him to challenge his accusers under the Fifth and Sixth Amendments to the United States Constitution.

On October 24, 2022, Mr. Sterlingov filed a Motion in Limine.[2] In this motion, Mr. Sterlingov challenged the admissibility of the Government's blockchain forensics. Because Mr. Sterlingov's motion presents constitutional questions of first impression, and because so little is publicly known about the underlying methodologies and technologies used by the Government and its for-profit black-box blockchain surveillance vendor Chainalysis, Mr. Sterlingov has consistently maintained that access to its source code is necessary and material to preparing his defense. The recent Daubert Hearings proved the validity of Mr. Sterlingov's assertions on this front.

The Government relies upon Chainalysis Reactor software to conduct its blockchain investigations, but there is no scientific evidence that the Chainalysis Reactor software is accurate, nor can the Government or Chainalysis produce its error rates, rates of false positives, or rates of false negatives. Mr. Sterlingov faces a potential life sentence based on what appears to be junk science forensic software. In coding the Chainalysis Reactor software, Chainalysis incorporated assumptions, also referred to as "heuristics." Chainalysis Reactor applies these assumptions (guesses) to produce generalized clusters which then attribute particular transactions on the blockchain to specific entities or individuals. In her expert report, Ms. Bisbee identified three assumptions that Chainalysis coded into their Reactor source code.[3]

    1.  Co-Spend Assumptions

        a.  The co-spend assumption assumes that all inputs into a single transaction are controlled by the same entity, and groups them based on this common

---

[2] *See* ECF 59.
[3] Expert Report of Chainalysis Director of Investigation Solutions Elizabeth Bisbee, moved into evidence at the June 16, 2023, Daubert Hearing.

**Supp.App.255**

input characteristic. Simple obfuscation techniques regularly used throughout the blockchain community, such as CoinJoins, invalidate this assumption, but Chainalysis and the Government appear to have relied upon this assumption when tracing transactions purportedly related to Mr. Sterlingov.

2. Behavioral Assumptions

    a. The behavioral assumption refers to Chainalysis' efforts to group particular Bitcoin addresses together based on purported patterns in the timing or structure of bitcoin wallet softwares. One example of the behavioral assumptions employed by Chainalysis in coding their Reactor software is the indiscriminate and automated clustering of peel chains. While it is entirely possible for multiple actors to participate in a common peel-chain, Chainalysis appears to have opted to ignore that possibility and seems to have coded this biased assumption into their unscientific software.

3. Intelligence-Based Assumptions

    a. The intelligence-based assumption relies upon data acquired through open-source intelligence, leaked documents, or Chainalysis' research and partnerships. Reliance on open-source data raises significant questions as to the accuracy and verifiability of that data that can only be answered through an analysis of the Reactor source code and the sources used to generate that code.

Supp.App.256

The lack of corroborating evidence in this case makes examination of the source code even more crucial because neither the Government nor Chainalysis can point to a single piece of direct evidence showing that Mr. Sterlingov ever operated Bitcoin Fog. And the Government's limited circumstantial evidence is entirely consistent with Mr. Sterlingov's innocence. It requires a huge speculative leap to implicate Mr. Sterlingov in the operation of Bitcoin Fog. That speculative leap is almost entirely based upon Chainalysis Reactor's output. Thus, thorough examination of the Chainalysis Reactor source code is critical to Mr. Sterlingov's defense.

The Defense requires access to the Chainalysis Reactor source code in the versions it was used by the Government when conducting their investigation in order to test the accuracy of the Chainalysis Reactor software. Aside from the source code, the Defense also requires the change logs for Chainalysis Reactor documenting the changes made to the software during the pendency of this investigation because of errors, inaccuracies, bug fixes, and for any other reasons.

Defense Counsel has repeatedly requested access to the Chainalysis Reactor software, and its source code, in the versions used by Government during the course of its investigation, but both the Government and Chainalysis have refused to produce them. Most recently, in response to the Defense's July 26th, 2023, discovery request for production of Chainalysis Reactor, its source code and its change logs, the Government informed Defense Counsel that:

> The government reiterates that Chainalysis source code is not within the government's possession, custody, and control, and that the government cannot force Chainalysis to disclose its source code. The government also reiterates its position that the underlying source code is irrelevant, see ECF No. 73, at 32-37; ECF No. 93, at 13-14. For much the same reason, the government does not have possession, custody, and control of change logs, nor does the government see their relevance to this case.[4]

---

[4] Ltr. from Government to the Defense, July 28, 2023.

Supp.App.257

The Government may not be able to force Chainalysis to disclose its source code, but this Court can. As AUSAs Catherine Alden Pelker and Christopher Brown state in an article they co-authored for the DOJ's Journal of Federal Law and Practice, blockchain forensics should not be used as primary evidence in a criminal case.[5] Chainalysis Reactor appears not to have been designed to survive the high level of scrutiny demanded by the United States Constitution for a federal criminal trial. This is probably why Chainalysis never conducted any kind of statistical analysis of its success or failure rates. Chainalysis seems to have designed Reactor to provide the Government and financial institutions with the tools to generate initial investigatory leads that would lead to corroborating evidence. Unfortunately, for the Government, this did not happen in this case. There is no corroborating evidence, and the Government is forced to rely on Chainalysis Reactor as its primary evidence in this case. This makes analysis of its source code directly relevant to this case given the lack of scientific evidence for the accuracy of the software. Therefore, this Court should order Chainalysis to produce the Chainalysis Reactor source code and the change logs for Chainalysis Reactor pretrial, so that the Defense can forensically examine the source code to evaluate its accuracy.

## Legal Standard

Rule 17(c) of the Federal Rules of Criminal Procedure provides in pertinent part as follows:

> A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

---

[5] *See* Catherine Alden Pelker, et al., *Using Blockchain Analysis from Investigation to Trial,* 69 DEPARTMENT OF JUSTICE JOURNAL OF FEDERAL LAW AND PRACTICE 59, 64-66 (May 2021).

Supp.App.258

The right of an accused to have compulsory process for obtaining witnesses and evidence in his favor is guaranteed in federal trials by the Sixth Amendment to the United States Constitution.[6] The history of compulsory process is the story of the development of the adversary process and the demise of the inquisitorial method, which was found not only unfair to the accused, but an inefficient way of determining the truth.[7] The United States Supreme Court has considered and approved the propriety of employing the provision of Rule 17(c) for the early production of materials not obtainable through Rule 16.[8]

> "Any document or other materials, admissible as evidence . . . is subject to subpoena" under Rule 17(c). *Bowman Dairy*, 71 S.Ct. at 679. Rule 16, which severely restricts discovery in criminal cases, does not define outer limits of materials available under a 17(c) subpoena, nor how wide the Rule 17(c) door will open. Indeed, documents and materials possessed by the government but not discoverable under Rule 16 can be reached by a Rule 17(c) subpoena – so long as the documents and materials are evidentiary. Cf. Id, at 678.[9]

The moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend to unreasonably delay the trial; and (4) that the application is made in good faith and is not intended as a general fishing expedition.[10] In *United States v. La Rouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988), the

---

[6] *Washington v. Texas*, 388 U.S. 14 (1967).
[7] P. Weston, *The Compulsory Process*, 30 MICH. L. REV. 71, 171 (Nov. 1974).
[8] *Bowman Dairy Company v. United States*, 341 U.S. 214 (1951).
[9] *United States v. Adritti*, 955 F.2d 331, 346-47 (5th Cir. 1992) (Goldberg, J., specially concurring).
[10] *See United States v. Nixon*, 418 U.S. 683, 699-700 (1974); *United States v. La Rouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988).

**Supp.App.259**

First Circuit affirmed the trial court's order requiring production of documents because the defendant met the threshold showing of "admissibility, relevancy and specificity."[11]

Mr. Sterlingov meets all the threshold requirements necessary for the issuance of the subpoena duces tecum this motion seeks. Access to Chainalysis Reactor, its source code, and its change logs are evidentiary and relevant, and they are not otherwise procurable in advance of trial by the Defense's exercise of due diligence because they are proprietary and exclusively controlled by Chainalysis. Chainalysis Reactor software's output is the Government's primary forensic evidence in this case, and if its source code is inadmissible, everything that its source code generates is inadmissible as well. Flawed source code generates flawed outputs. Additionally, Mr. Sterlingov cannot properly prepare for the upcoming trial without the advanced production and inspection of these materials and, therefore, the failure to obtain the inspection of Chainalysis Reactor, its source code, and its change logs will unreasonably delay and prolong the trial of this case.

Mr. Sterlingov is making a specific request for materials known to exist, which are specifically relevant to the issues involved in this case. Gaining access to the requested materials will allow the Defense to: scrutinize the Chainalysis Reactor source code; identify which assumptions were in play when it was used to misidentify Mr. Sterlingov as Bitcoin Fog's operator; determine whether any changes were made to the Chainalysis Reactor software during the course of the investigation because of errors; and generally asses its' accuracy.

This application is specific and made in good faith. Therefore it is not a general fishing expedition. The request is solely that this Court require these particular materials be produced to Defense Counsel before the date of trial so that counsel will have a fair opportunity to review the

---

[11] *United States v. La Rouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988); *see also United States v. Poindexter*, 732 F. Supp. 135, 138 (D.D.C. 1990) (court ordered disclosure of former President Reagan's diaries after in camera review to determine relevancy).

Supp.App.260

materials and prepare for a for trial. Although counsel can subpoena the requested documents at trial, without seeking the permission of the Court to do so, receiving the materials at that late date will unnecessarily lengthen the proceedings and will require a continuance so that the parties can review the materials thoroughly.

## Conclusion

For the reasons stated above, this Court should grant the issuance of the attached subpoenas duces tecum to Chainalysis under Federal Rule of Criminal Procedure 17(c), and order pretrial return of the requested materials.

**Supp.App.261**

Dated: August 2, 2023
New York, New York

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Appointed Counsel*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Appointed Counsel*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

*Counsel for Defendant Roman Sterlingov*

Supp.App.262

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of August 2023, the forgoing document was filed with

the Clerk of Court using the CM/ECF System, and sent by email to the attorneys for the

Government listed below:

<u>s/ Tor Ekeland</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

Supp.App.263

AO 89B  (07/16)  Subpoena to Produce Documents, Information, or Objects in a Criminal Case

# UNITED STATES DISTRICT COURT

### for the
District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Roman Sterlingov | ) | Case No.  21-CR-00399 (RDM) |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS IN A CRIMINAL CASE

To:   Chainalysis, Inc.

*(Name of person to whom this subpoena is directed)*

     **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following books, papers, documents, data, or other objects:

See Exhibit 'A'

| Place:  Tor Ekeland Law, PLLC<br>30 Wall St., 8th Floor<br>New York, NY 10005 | Date and Time:  08/14/2023 9:00 am |
|---|---|

     Certain provisions of Fed. R. Crim. P. 17 are attached, including Rule 17(c)(2), relating to your ability to file a motion to quash or modify the subpoena; Rule 17(d) and (e), which govern service of subpoenas; and Rule 17(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

     *(SEAL)*

Date:   08/02/2023



*CLERK OF COURT*

                            *Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*     Roman Sterlingov
, who requests this subpoena, are:

Tor Ekeland Law, PLLC,30 Wall St., 8th Floor, New York, NY 10005, 718-737-7264, tor@torekeland.com

### Notice to those who use this form to request a subpoena

Before requesting and serving a subpoena pursuant to Fed. R. Crim. P. 17(c), the party seeking the subpoena is advised to consult the rules of practice of the court in which the criminal proceeding is pending to determine whether any local rules or orders establish requirements in connection with the issuance of such a subpoena. If no local rules or orders govern practice under Rule 17(c), counsel should ask the assigned judge whether the court regulates practice under Rule 17(c) to 1) require prior judicial approval for the issuance of the subpoena, either on notice or ex parte; 2) specify where the documents must be returned (e.g., to the court clerk, the chambers of the assigned judge, or counsel's office); and 3) require that counsel who receives produced documents provide them to opposing counsel absent a disclosure obligation under Fed. R. Crim. P. 16.

Please note that Rule 17(c) (attached) provides that a subpoena for the production of certain information about a victim may not be issued unless first approved by separate court order.

**Supp.App.264**

AO 89B  (07/16)  Subpoena to Produce Documents, Information, or Objects in a Criminal Case  (Page 2)

Case No.   21-CR-00399 (RDM)

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 89B  (07/16)  Subpoena to Produce Documents, Information, or Objects in a Criminal Case (Page 3)

## Federal Rule of Criminal Procedure 17 (c), (d), (e), and (g) (Effective 12/1/08)

**(c) Producing Documents and Objects.**

**(1)  In General.** A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

**(2)  Quashing or Modifying the Subpoena.** On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.

**(3)  Subpoena for Personal or Confidential Information About a Victim.** After a complaint, indictment, or information is filed, a subpoena requiring the production of personal or confidential information about a victim may be served on a third party only by court order. Before entering the order and unless there are exceptional circumstances, the court must require giving notice to the victim so that the victim can move to quash or modify the subpoena or otherwise object.

**(d)  Service.** A marshal, a deputy marshal, or any nonparty who is at least 18 years old may serve a subpoena. The server must deliver a copy of the subpoena to the witness and must tender to the witness one day's witness-attendance fee and the legal mileage allowance. The server need not tender the attendance fee or mileage allowance when the United States, a federal officer, or a federal agency has requested the subpoena.

**(e)  Place of Service.**

**(1)  In the United States.** A subpoena requiring a witness to attend a hearing or trial may be served at any place within the United States.

**(2)  In a Foreign Country.** If the witness is in a foreign country, 28 U.S.C. § 1783 governs the subpoena's service.

**(g)  Contempt.** The court (other than a magistrate judge) may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by a federal court in that district. A magistrate judge may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by that magistrate judge as provided in 28 U.S.C. § 636(e).

Tor Ekeland (*Appointed Counsel*)
tor@torekeland.com
**TOR EKELAND LAW, PLLC**
30 Wall Street, 8th Floor
New York, NY 10005-2205
(718) 737 – 7264

Michael Hassard (*Appointed Counsel*)
michael@torekeland.com
**TOR EKELAND LAW, PLLC**
30 Wall Street, 8th Floor
New York, NY 10005-2205
(718) 737 – 7264

*Attorneys for Defendant*
*Roman Sterlingov*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| United States of America, | |
| Plaintiff, | 21-CR-00399-RDM |
| v. | **SUBPOENA FOR DOCUMENTS** |
| Roman Sterlingov, | **EXHIBIT 'A'** |
| Defendant. | |

To:
**CHAINALYSIS INC** (Delaware Division of Corporations File No.5731603)

| Resident Agent: | William Frentzen Esq. |
|---|---|
| Corporation Service Company | Morrison & Foerster LLP |
| 251 Little Falls Drive | 425 Market Street |
| Wilmington, DE 19808 | San Francisco, CA 20037 |

1

**Supp.App.267**

## Documents and Objects to be Produced

1.      Access to Chainalysis Reactor software.

2.      The Source Code for Chainalysis Reactor software in all the versions used during the pendency of the investigation in *United States v. Roman Sterlingov* (21-CR-00399-RDM Federal District Court for the District of Columbia).

3.      All Change Logs for Chainalysis Reactor software.

4.      The final version of the internal Chainalysis study cited by Hanna Curtis in the webinar "Cryptocurrency Typologies: What You Should Know About Who's Who on the Blockchains" which concluded that roughly 90% of the funds sent through mixers were done so for legal personal privacy reasons.[1]

5.      Please produce a log documenting all material withheld on the basis of privilege, work-product doctrine, or otherwise.

6.      All production must be in Native File Format unless otherwise agreed to.

7.      Defense Counsel is available for consultation to discuss any issues related to the production of the requested items.


Deadline and place for production:

On or before August 14, 2023.


Tor Ekeland Law, PLLC
30 Wall Street
8th Floor
New York, NY 10005
(718) 737-7264
tor@torekeland.com

---

[1] https://bitcoinmagazine.com/culture/chainalysis-most-mixed-bitcoin-not-used-for-illicit-purposes

Supp.App.268

## Testimony Requested

1.      This subpoena includes a request for a custodian of records, or other qualified person, who can authenticate any produced material in accordance with Federal Rule of Evidence 902(11).

2.      For materials that are not self-authenticating, the Defense requests that Chainalysis produce an individual with knowledge who can testify as to the authenticity of the produced material.

Supp.App.269

August 2, 2023
Brooklyn, NY

Submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No.
4493631)
Tor Ekeland Law, PLLC

/s/ Michael Hassard
Michael Hassard (NYS Bar No.
5824768)
Tor Ekeland Law, PLLC

30 Wall Street
8th Floor
New York, NY
10005
(718) 737 - 7264
tor@torekeland.com

*Attorneys for Roman Sterlingov*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 21-399 (RDM) |
| ROMAN STERLINGOV, | |
| *Defendant*. | |

## <u>ORDER</u>

This Order addresses a variety of matters raised during the hearing held on August 29, 2023; most substantively, the Court makes findings of fact related to Defendant's motion for leave to file a motion to authorize issuance and pretrial return of subpoena *duces tecum* to Chainalysis, Inc., Dkt. 155.

**First**, as discussed during the hearing, it is **ORDERED** that:

(1)    the Government shall file a brief on or before September 4, 2023, addressing whether D.C. Code § 26-1023(c) applies in the circumstances alleged here and how 18 U.S.C. § 1960, especially § 1960(b)(1)(B), applies to this case;

(2)    the Defense shall file a response on or before September 6, 2023;

(3)    the Defense shall meet and confer with the Government and then shall file a brief on or before September 4, 2023, setting forth in detail the specific grounds, if any, it has for opposing the Government's motion to admit certain government exhibits, Dkt. 62; and

(4)    the Defense shall meet and confer with the Government and then shall file with the Court on or before September 5, 2023, a document identifying with specificity its objections, if any, to the Government's translations.

**Second**, at the hearing, the Court directed the Government to provide the Defense with the following information obtained from Chainalysis: (1) the specific assumptions and specific

**Supp.App.271**

heuristics utilized as part of the behavioral heuristics in Heuristic 2 used in the analysis relied upon by the Government in this case; (2) specifics as to how Heuristic 1 detects and controls for coin joins; and (3) information regarding whether there were manual alterations made in relation to Heuristic 3 and if so, what they were.  Chainalysis may file a motion or report with the Court on or before August 31 addressing any need to revise or amend this requirement.

As for the source code itself, the Defense has yet to convince the Court that its proposed expert, Laurent Salat, is an appropriate expert to review Chainalysis's Reactor source code.  By way of background:  On June 16, the Court instructed Defense counsel to find a computer code expert and have that expert prepare a statement detailing the specific facts that the expert needed to "make an assessment of whether [Reactor] is fairly predictive."  June 16, 2023 Hrg. Tr. (Rough at 27).  The Court further instructed Defense counsel to provide their expert's statement to the Government and Chainalysis and to meet and confer with them about it.  *Id.*  Defense counsel agreed that this was an "excellent idea."  *Id.* at 28.

During a *Daubert* hearing held on July 20, Defense counsel again affirmed their need for the source code, and the Court again asked if they had a computer code expert.  July 19, 2023 Hrg. Tr. (Rough at 76).  The Defense pointed to Jeff Fischbach, who had just testified.  But Mr. Fishbach has not taken a single course in computer science and has no other coding experience.  *Id.* at 76–77; *id.* at 77 ("I didn't hear any testimony about his experience as a coder or knowledge as a coder.").  The Defense seemingly agreed stating: "I'm not going to argue the point with you here," and "I'm quite confident that I can find somebody who can read the source code through my connections."  *Id.*

On August 22, over a month later, the Defense still had not identified an expert and had not provided the required expert statement to the Government, Chainalysis, or the Court.  At that

**Supp.App.272**

time, the Court stated: "I was pretty clear about the process that I intended to take place, and you didn't seem to follow that where I said what I need is [for] you to provide me with some statement by a coding expert or other person with the relevant knowledge to identify to me what is it in the code that you need." Aug. 22, 2023 Hrg. Tr. (Rough at 10).  The Court again summarized its guidance: "[G]ive me an expert that can tell me what they want to look at and someone who is not [Chainalysis's] principal competitor who is expert in code." *Id.* at 11. Defense counsel agreed that they would "find an expert that will meet those parameters," adding "[t]here's [never] been a moment where we thought this wouldn't be subject to come kind of protective order in terms of competitive concerns." *Id.* at 12.

The discussion ended with "the same order I gave you last time.  Go find that expert, have that expert write down what it is the expert needs to look for in the source code.  Come up with a plan for how to do it.  Discuss it with Chainalysis, discuss it with the government.  I'm not saying you need to reach agreement.  But you [need to] discuss it with them." *Id.* at 18.

On August 27, 2023, the Defense, for the first time, complied in part with that order.  On that day, Defense counsel sent Mr. Salat's resume to the Government and Chainalysis.  It was emailed to the Court on the evening of August 28.  On August 29, the Court heard from Defense counsel, counsel for Chainalysis, and the Government on Mr. Salat.

At this juncture, the Court is not convinced that Mr. Salat is an appropriate expert to review the Reactor source code for at least three reasons.

First, the Defense has not provided a statement of any kind prepared by Mr. Salat explaining, as directed, what he might need to review or hope to find in the source code.  Nor has the Defense otherwise explained to the Court what the source code would reveal that it could not otherwise obtain, including from disclosure of the relevant heuristics.

Second, the Court finds that Mr. Salat founded a competing company (OXT).  According to his resume, Mr. Salat is presently employed by OXT as a sub-contractor.  At the hearing, counsel for Chainalysis represented that OXT is a "competitor whose mission is effectively to try to put other blockchain analytics programs out of business or to assist people in evading the detection."  Aug. 29, 2023 Hrg. Tr. (Rough at 8).  Thus, Chainalysis argued, OXT is "in the business of not only competing but trying to defeat Chainalysis—handing [Mr. Salat] the source code is handing him a golden ticket."  *Id.* at 11.

OXT itself states that its "mission is to improve financial privacy within the Bitcoin ecosystem."  About, Oxt, oxt.me/about (last visited Aug. 30, 2023).  A tweet by Samourai Wallet, which acquired OXT in 2017 (*see* FAQ, Oxt, oxt.me/faq (last visited Aug. 30, 2023)), states that OXT "gives individuals the possibility of self defensive chain analysis." @SamouraiWallet, X (Apr. 19, 2023, 7:29 a.m.), https://twitter.com/SamouraiWallet/status/1648649920033824769.  And, in its Terms and Conditions, OXT states that it is "available to all users without restriction with the exception of" "law enforcement" agencies and "any entity investigating 'money laundering' or 'unexplained wealth.'"  Terms & Conditions, Oxt, oxt.me/faq (last visited Aug. 30, 2023).  More generally, it appears that OXT's business model (even if not-for-profit) is directly at odds with Chainalysis's business model.  In addition, Mr. Salat's posts on Twitter, now-X, read into the record by counsel for Chainalysis and the Government, strongly suggest that he views Chainalysis as a competitor who he is seeking to undermine.

In response, Defense counsel stated that he did not agree with the characterization of OXT as a competitor, but only because OXT is an open-source service.  Beyond that, he failed to offer any rebuttal to the legitimate concerns voiced by Chainalysis.  If Defense counsel has a

Supp.App.274

specific rebuttal, they should promptly offer it, be it through testimony of Mr. Salat or other means.

Third, Mr. Salat apparently resides outside of the United States and is a non-U.S. citizen; it would thus seem that he is beyond the contempt power of this Court.  Given this context, the Defense has not demonstrated that Mr. Salat is someone who could be granted access to highly confidential, proprietary information on which law enforcement agencies currently rely.

Defense counsel is once again instructed to find an appropriate expert, that is, an expert who could review the source code without posing a competitive risk to Chainalysis, and relatedly, to have such an expert prepare an explanation of precisely what he or she would need to review in the source code and for what reason.

And, the Court once again cautions Defense counsel that trial is fast approaching and that, unless and until, Defense counsel complies with the Court's directives, the Court will not enforce a pretrial subpoena requiring access to the Reactor source code.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  August 30, 2023

Supp.App.275

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 21-cr-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S RESPONSE TO SEPTEMBER 8, 2023 MINUTE ORDER**</u>

The United States of America, by and through the United States Attorney for the District of Columbia, files the following response to the Court's order on September 8, 2023, directing the government to submit a notice directing the Court's attention to "any evidence, reports, analyses or other material or experience tending to confirm Reactors reliability." *See* Minute Order (Sept. 8, 2023).

## I.    Summary of Prior Filings and Testimony

At the hearing on Sept. 8, 2023, the Court asked the government to include in the instant brief direction to prior materials that would be relevant to the Court's inquiry. The government's November 7, 2022 Opposition to the Defendant's Omnibus Motions *In Limine* devoted the first 25 pages to analyzing blockchain analysis' admissibility under *Daubert*. ECF No. 73. The government also addressed the Daubert analysis in its reply in support of its expert notice. ECF No. 77, at 6-7. There was also significant testimony regarding the reliability of Chainalysis Reactor during Mr. Scholl's and Ms. Bisbee's testimony at the June 23, 2023 *Daubert* hearing.

**A. Filing Discussing *Daubert* Legal Analysis**

The government's November 7, 2022, opposition discussed how blockchain analysis has been tested, including testing through law enforcement investigations. ECF No. 73 at 10-12. The

**Supp.App.276**

government also noted at the time that the defense could conduct its own testing, ECF No. 73 at 12-13, which the defense has now done through Ms. Still.

The filing also discussed that blockchain analysis has been studied by academics, with citations to a number of academic articles in the text and in the footnotes. ECF No. 73 at 13-14. The discussion of academic articles surrounding blockchain analysis continued in the reports and testimony of the defense experts, Mr. Verret and Ms. Still.  The government's Nov. 7, 2022 filing noted the measures that are taken in clustering to avoid false positives, and discussed some of the applicable academic literature in that vein.  *Id.* at 15-16.  In particular, the filing referenced Dr. Meiklejohn's 2013 paper and its early efforts to minimize false detection rates.  *Id.*  The filing also briefly discussed how one may control for CoinJoin, citing a 2022 academic paper presenting an algorithm that was over 99% effective in detecting two popular CoinJoin implementations.  *Id.* at 16.

The government's Nov. 7, 2022, filing noted that blockchain analysis does have commercially accepted standards, even in the absence of a government standards body or certification board.  *Id.* at 18.  The filing further explained that blockchain analysis companies, including Chainalysis, often publish reports detailing tracing conducted by their in-house investigators.  *Id*. at 14.  Chainalysis frequently posts materials on its blog which show how information from significant public cases can be viewed in Chainalysis Reactor.  *See* https://www.chainalysis.com/blog/.

The government's prior filing further emphasized that blockchain analysis is a "technical tool that has earned wide acceptance in a relevant industry," similar to the drive testing that the D.C. Circuit found significant in *U.S. v. Morgan*, 45 F.4th 192, 199 (D.C. Cir. 2022).  As explained in the government's papers, blockchain analysis is widely used by law enforcement, and

**Supp.App.277**

Chainalysis is viewed as an industry standard tool with customers across the government and the private sector.  ECF No. 73 at 19-20.  The filing noted numerous law enforcement cases in which blockchain analysis supported criminal cases.  *Id.* at 19, note 14.  It also discussed blockchain analysis' wide adoption outside of law enforcement and noted that financial institutions dealing in cryptocurrency use blockchain analysis tools as part of their anti-money laundering programs.  *Id.* at 20.  The filing also discussed numerous instances where courts have found blockchain analysis reliable, including instances where blockchain analysis and clustering were presented at trial and withstood scrutiny by defense counsel.  *Id.* at 21-23.  The filing also noted how competition within the blockchain analysis market bolsters reliability.  *Id.* at 23.

## B.  *Daubert* Testimony

At the *Daubert* hearing on June 23, 2023, FBI blockchain analysis expert Luke Scholl testified that he has validated the clusters and attributions in Chainalysis "very frequently," 6/23/23 Tr. at 55-56, and that validation is done "every day,"  and "thousands of times a day throughout the FBI."  6/23/23 Tr. at 56.  Mr. Scholl also testified regarding how he corroborated Chainalysis' clustering for Bitcoin Fog specifically.  6/23/23 Tr. at 60-63.  This validation included checking Chainalysis' cluster against known transactions, such as undercover transactions, and checking the attribution key addresses relevant to the instant case in another blockchain analysis tool.  *Id.*  Ms. Bisbee testified regarding the reliability of Chainalysis' clustering, including that she has found the Chainalysis to be accurate, conservative, and reliable.  6/23/23 Tr. at 115-118.  Ms. Bisbee similarly testified to assessing the reliability of blockchain analysis tools, including Chainalysis, in her time at DEA through the use of information received in legal process or when recovering evidence, such as during a seizure.  6/23/23 Tr. at 101.  Ms. Bisbee testified that while she had access to a number of tools at DEA, Chainalysis was the primary tool that she used, and

**Supp.App.278**

noted the importance of Chainalysis' accurate clustering of exchanges in sending legal process. 6/23/23 Tr. at 102. Mr. Scholl and Ms. Bisbee also testified regarding the detectability of CoinJoins. 6/23/23 Tr. at 77-79 (Scholl), 90-91 (Scholl), 122 (Bisbee).

## II.      Law Enforcement Validation

The information from Chainalysis is frequently validated and found to be reliable in numerous law enforcement investigations. As Mr. Scholl testified at the *Daubert* hearing on June 23, 2023, the FBI validates Chainalysis' clustering every day, and it is "generally reliable and conservative." 6/23/23 Tr. at 56, 62. Ms. Bisbee further remarked that in her work doing hundreds of investigations, with thousands upon thousands of addresses, she was not aware of a single false positive instance encountered by her or anyone working with her. 6/23/23 Tr. at 139.

Following the Court's order on Friday, September 8, 2023, the government began assembling materials to highlight the extensive reliability of Chainalysis Reactor. Given the limited timeline available before the filing deadline on Monday, September 11, 2023, the government's collection below is not complete, but includes significant demonstrations of Chainalysis' reliability across numerous law enforcement investigations over a multi-year period.

### A.      Subpoenas

Law enforcement frequently uses Chainalysis Reactor to identify the exchanges that subjects are using to cash out their ill-gotten gains. Once law enforcement traces funds of interest to an exchange, they frequently follow up by sending a subpoena to that exchange seeking further records of the transaction and the user. Subpoenas commonly seek records pertaining to specific deposit addresses or withdrawal transactions, identified by bitcoin address or transaction hash. The exchanges then search the provided identifiers on their end in order to associate it to a particular customer of the exchange and provide responsive records. Each time this is done, for

Supp.App.279

each address or transaction, is a micro-level validation test of Chainalysis' clustering.   The exchanges' responses with records are their own confirmations that the addresses that Chainalysis identified as being part of that exchange's cluster are, in fact, controlled by that exchange.  As Mr. Scholl explained in his *Daubert* hearing testimony, "Every time we send a subpoena to an exchange to get back account information, we have the opportunity to check that those Bitcoin addresses that belong to this account at this exchange were properly attributed by Chainalysis to the exchange that we subpoenaed."  6/23/23 Tr. at 56.  Mr. Scholl testified that this validation is done "every day" in blockchain analysis cases, and estimated that it is done "thousands of times a day throughout the FBI." 6/23/23 Tr. at 56.

> Judge Faruqui noted a similar practice in issuing a search warrant in this district:

> Blockchain analysis revealed that Website 1 used a "payment processing service . . . operated by a known cryptocurrency exchange service (the 'Exchange') located in the United States" to effectuate the illicit transactions.  By subpoenaing the Exchange, law enforcement obtained documents revealing the identity of the Subject.  Records from the Exchange further detailed what law enforcement saw on the blockchain: the sending of BTC by the Subject to Website 1 in November 2019.

*In re Search of One Address*, 512 F. Supp. 3d 23, 27 (D.D.C. 2021) (cleaned up).

> In order to provide the court with additional data points regarding this form of validation, over the weekend Mr. Scholl attempted to reverse the above process, comparing exchange records to information in Chainalysis Reactor.  Mr. Scholl reviewed the records of eight different virtual currency exchange accounts controlled by the defendant, along with the defendant's Mycelium wallet.  Mr. Scholl identified over 1,000 addresses, and then reviewed them in Chainalysis Reactor to determine whether any were incorrectly attributed.  Mr. Scholl's findings are attached hereto as Exhibit 1.  Of the 1010 addresses reviewed, there was not a single confirmed false positive; four addresses were inconclusive due to the reasons explained in the attachment.  (The government

**Supp.App.280**

recognizes that this is not a statistically perfect exercise, but is attempting to be responsive to the Court's request on a condensed timeframe.)

Earlier today, the government undertook a similar exercise for another case in which the defendant recently pleaded guilty. Over the course of that investigation, investigators obtained records from multiple accounts at several cryptocurrency exchanges. The government checked the addresses that were received from those exchanges against the clustering and attribution in Chainalysis Reactor. There was not a single confirmed false positive. Those findings are attached hereto as Exhibit 2.

**B.      Search Warrant Executions**

Blockchain analysis is often used in support of warrants to search electronic communication accounts or physical premises. In many cases, information retrieved from the search corroborates the tracing. At the *Daubert* hearing, Ms. Bisbee testified that while at DEA, she used Chainalysis Reactor in support of many search and seizure warrants, and that the results corroborated the information from Reactor. 6/23/23 Tr. at 135. In this way, search executions provide validation for Chainalysis Reactor clustering. The Fifth Circuit consider one such case in *United States v. Gratkowski,* 964 F.3d 307 (5th Cir. 2020). *Gratkowski* had similar facts to *In re Search of One Address.* but pertained to a different service. There, as the Fifth Circuit explained:

> Federal agents used an outside service to analyze the publicly viewable Bitcoin blockchain and identify a cluster of Bitcoin addresses controlled by the Website. Once they identified the Website's Bitcoin addresses, agents served a grand jury subpoena on Coinbase—rather than seeking and obtaining a warrant—for all information on the Coinbase customers whose accounts had sent Bitcoin to any of the addresses in the Website's cluster. Coinbase identified Gratkowski as one of these customers. With this information, agents obtained a search warrant for Gratkowski's house. At his house, agents found a hard drive containing child pornography, and Gratkowski admitted to being a Website customer.

*Gratkowski,* 964 F.3d at 309.

Supp.App.281

### C.     Defendant Communications

Often, a subject's own communications and statements will provide substantial corroboration of the clustering in Chainalysis Reactor.

In this case, the defendant's own statements corroborate the Bitcoin Fog cluster — he does not contest that he received funds from Bitcoin Fog.  At the *Monsanto* hearing, the defendant testified that he moved funds from Bitcoin Fog to the wallets on his computer and to "a lot of different places," including his Kraken account.  1/11/23 Tr. at 16-17.

Additionally, the communications and other evidence that will be presented at trial contains extensive data points corroborating Chainalysis' clustering and attribution of numerous addresses. For example, on the January 26, 2013, the darknet market vendor Symbiosis sent a message to Silk Road Vendor Support about a delayed withdrawal, stating, "Earlier today I withdrew 630 coins to bitcoin fog but it has not shown up on their system."  Symbiosis asked Silk Road to confirm that the funds were withdrawn to 1B7tRVgQfVqSPRZ1QvWp7DKYke8TZkjmMN.      The address 1B7tRVgQfVqSPRZ1QvWp7DKYke8TZkjmMN was clustered by Chainalysis as Bitcoin Fog. Silk Road Vendor Support responded, "we are a little behind, please give it a few more hours." Chainalysis Reactor shows a transfer shortly after that message in the amount of 630 bitcoin from Silk Road to Bitcoin Fog deposit address 1B7tRVgQfVqSPRZ1QvWp7DKYke8TZkjmMN.  The message from Symbiosis about his withdrawal of 630 bitcoin from Silk Road to Bitcoin Fog corroborates Chainalysis' clustering of both entities.   These sorts of confirmations and corroborations happen repeatedly, in this investigation and others.

### D.     Undercovers

Darknet market and cryptocurrency money laundering investigations often involve the use of undercovers, who interact with services and send funds.  Often, undercovers, or members of the

**Supp.App.282**

related case teams, conduct blockchain analysis to follow the funds that the undercover has sent or spent. This creates opportunities for validation, wherein the undercover holds verified information regarding a transaction that the undercover personally conducted, and that information can be checked against the tracing and attribution in Chainalysis Reactor. The discovery in this case shows prior blockchain analysis being conducted by FBI and IRS as part of the follow-up to the undercover transactions conducted through Bitcoin Fog. At the *Daubert* hearing on June 23, 2023, Mr. Scholl testified that he validated the Chainalysis Bitcoin Fog cluster by comparing undercover transactions into and out of Bitcoin Fog to the addresses clustered in Chainalysis. 6/23/23 Hr. at 61-63. That work was also detailed in Mr. Scholl's Expert Report. 6/23/23 Daubert Hr'g., Gov Ex. 2, Scholl Report at 8-10. Mr. Scholl's analysis showed the Chainalysis cluster was under-inclusive and accurate.

**E.      Validation By Cooperating Defendants**

Chainalysis Reactor clustering is also validated by cooperating defendants who, as part of their cooperation, provide additional information and insight into the addresses held by themselves, their organizations, and/or their associates. Ms. Bisbee testified that in her time at the DEA, on numerous instances, the subjects of investigations admitted to and corroborated the information in the tracing. 6/23/23 Tr. at 135. Alongside the instant submission, the government is providing a sealed supplement which provides further information regarding one recent example of a cooperator verifying information in Chainalysis Reactor. In that instance, the cooperator reviewed a large number of addresses clustered in Chainalysis and confirmed that 99.9146%[1] were correctly clustered and attributed.

---

[1] The sealed supplement also contains the likely explanation for the apparent false detections, which the government believes is atypical and includes addresses held by closely associated individuals and/or entities being included in the cluster.

**Supp.App.283**

**F.**     **Victim Identification and Outreach**

Law enforcement also uses blockchain analysis in its victim identification and outreach efforts.  For example, in many fraud and ransomware schemes, perpetrators create many addresses in order to receive funds from victims.  Chainalysis Reactor, like other blockchain analysis tools, can often cluster the fraudster's addresses together, identifying them as being controlled by the same individual.  When law enforcement receives an initial victim report, they often trace the victim's payment to the cluster held by the fraudster.  Tracing efforts continue onward to attempt to identify the perpetrator, but law enforcement also looks at the other deposits into the cluster in order to identify additional potential victims.  Law enforcement then follows up with this identification by conducting victim outreach.  In numerous cases, law enforcement has identified and contacted likely victims through this method, and the contacted individuals have confirmed that they were victims of the scheme.

In one recent example, law enforcement used blockchain analysis to identify 35 victims of a fraud scheme.   Law enforcement contacted the victims, 100% of whom verified they made the transactions as discovered using blockchain analysis, and 33 of whom admitted to being victims of fraud. The two others did not admit to victimization, which is extremely common among fraud victims still being victimized.

### III.     Case Examples

**A.**     **Analogous Case Examples**

U.S. v. Sterlingov is not the first matter in which the government has used Chainalysis Reactor to identify the clusters of addresses associated with darknet marketplaces.  In many of those cases, defendants ultimately pleaded guilty and corroborated the government's tracing, including the clustering and attribution in Chainalysis Reactor.  Two cases in particular have

Supp.App.284

significant parallels to the instant matter: *U.S. v. Tal Prihar*, 2:19-cr-115 (W.D. Pa.)  and *U.S. v. Larry Dean Harmon*, 19-cr-395 (BAH) (D.D.C.).

### i. *U.S. v. Tal Prihar, 2:19-cr-115 (W.D. Pa.)*

Tal Prihar, the operator of the darknet promotional site DeepDotWeb, was charged with money laundering conspiracy related to his receipt and laundering of kickback payments from various darknet marketplaces.  Using blockchain analysis and clustering in Chainalysis Reactor, the government identified over 8,155 bitcoin sent from clusters attributed to darknet markets to a cluster that the government identified as DeepDotWeb's bitcoin wallet.  ECF No. 6 at 8.  The government's blockchain analysis showed that the funds were deposited into DeepDotWeb's wallet over a series of 40,000 transactions.  *Id.*  At a plea hearing held March 31, 2021, the defendant admitted that the 40,000 deposits were kickback payments transferred from the darknet markets to the DeepDotWeb wallet, 3/31/21 Tr. at 17, confirming the government's blockchain analysis and clustering of the darknet markets and the DeepDotWeb wallet.  The specific marketplace clusters involved in that matter included AlphaBay, Abraxas, and Agora, ECF No. 6 at 8, which are three of the clusters that the government is presenting in this case.

### ii. *U.S. v. Larry Dean Harmon, 19-cr-395 (BAH) (D.D.C.)*

Larry Dean Harmon, the administrator of the darknet mixing service Helix, was charged by indictment on December 3, 2019,  with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, and money transmission without a license in violation of D.C. Code §26-1023(c).  ECF No. 1.  Based in part on tracing done using Chainalysis Reactor, the government alleged that Helix exchanged at least approximately 354,468 bitcoins—the equivalent of approximately $311,145,854 million in U.S. dollars at the time of the transactions, including substantial funds

**Supp.App.285**

tied to darknet markets.  In preparation for trial, the government noticed expert testimony on blockchain analysis and clustering from Ms. Bisbee in her capacity at Chainalysis, as well as an FBI employee.  ECF No. 120.  The noticed testimony included testimony regarding clusters of addresses held by several darknet markets.  ECF No. 120.  The defendant pleaded guilty, so no expert witness testimony was presented.  In his plea agreement, the defendant agreed that the property involved in Helix's money laundering conspiracy totaled at least the amounts alleged in the government's indictment, which were supported by Chainalysis Reactor.

## B.    Significant Operations

Law enforcement has used information from Chainalysis in support of significant multi-district and international operations.  Information from those operations, including evidence gathered in search warrant executions and in ultimate guilty pleas, has corroborated information provided by Chainalysis Reactor.

In a review of a search warrant application in this District, Judge Faruqui commented on the significance of one such operation, in which law enforcement used Chainalysis to identify over 50 customers of a site trafficking in darknet child sexual abuse material.  *See In re: Search of Multiple Email Accounts*, 585 F.Supp 3d 1 (D.D.C. 2022).  Judge Faruqui quoted from the government's search warrant affidavit, noting, "In each one of the 50 subsequent law enforcement actions, the software's data was corroborated by statements and search warrant returns from the targets' devices.  In sum, this software has correctly analyzed data on the blockchain in hundreds of investigations." at 27.  Judge Faruqui devoted a section of his opinion to an assessment of the "reliability of clustering software," and ultimately observed:

> [S]uccess in the hundreds, with a perfect record in one case as corroborated by 50 search warrant returns, makes this clustering software one of the most reliable bases for a search ever. Going 50 for 50 is beyond what could be expected of a mere human. The unprecedented rate of prior success, lack of incentive or capacity to lie, and incredible level

**Supp.App.286**

of detail (the software draws out each transaction block-by-block that comprises a cluster), make the clustering software a reliable foundation for probable cause …

*Search of Multiple Email Accts.*, 585 F. Supp. 3d at 20.

Other example of a significant law enforcement action involving the use of blockchain analysis is Operation DisrupTor.  Using blockchain analysis and other law enforcement investigative techniques, law enforcement identified and attributed darknet market vendor accounts to real individuals selling illicit goods.  Operation DisrupTor resulted in the arrest of 179 darknet criminals who engaged in tens of thousands of sales of illicit goods and services across the United States and Europe.  *See* https://www.justice.gov/opa/pr/international-law-enforcement-operation-targeting-opioid-traffickers-darknet-results-over-170.  The operation resulted in the seizure of over $6.5 million in both cash and virtual currencies; approximately 500 kilograms of drugs worldwide; 274 kilograms of drugs, including fentanyl, oxycodone, hydrocodone, methamphetamine, heroin, cocaine, ecstasy, MDMA, and medicine containing addictive substances in the United States; and 63 firearms.  *See id.*  Information collected in Operation DisrupTor corroborated the underlying blockchain analysis.

Blockchain analysis was also used in support of Operation SaboTor, a 2019 operation to disrupt criminal activity on the darknet.  In Operation SaboTor, U.S. and international law enforcement agencies made 61 arrests and shut down 50 darknet accounts used for illegal activity.  *See* https://www.fbi.gov/news/press-releases/j-code-announces-61-arrests-in-its-second-coordinated-law-enforcement-operation-targeting-opioid-trafficking-on-the-darknet**.**  Law enforcement executed 65 search warrants, seizing 299.5 kilograms of drugs, 51 firearms, and more than $7 million ($4.5 million in cryptocurrency, $2.48 million in cash, and $40,000 in gold).  Information collected in Operation SaboTor corroborated the underlying blockchain analysis.

Supp.App.287

**C.      In-Court Testimony and Hearings**

As the government previously noted, Blockchain analysis has been presented in testimony

at numerous trials and hearings and has withstood scrutiny by defense counsel.  For example, in

*United States v. Dove*, No. 8:19-cr-33-T-36CPT, 2020 U.S. Dist. LEXIS 251313 (M.D. Fla. Sep.

4, 2020), the defendant raised a *Franks* challenge to a warrant based in part on blockchain analysis.

*Id.* at \*3. In denying the *Franks* motion, the magistrate judge confirmed that the affidavit was

sufficient to establish probable cause. *Id.* at \*34-35. In particular, the judge credited the affidavit's

assertions related to blockchain analysis:

> Although the blockchain contains very little information about the BTC senders and
> recipients, blockchain analysis can be used to identify the individuals and entities involved
> in BTC transactions. Blockchain analysis companies do this by creating large databases
> that group BTC transactions into "clusters" through the examination of the data underlying
> the BTC transactions. As a result, law enforcement can utilize third-party blockchain
> analysis software to locate BTC addresses that transact at the same time (*i.e.*, the
> blockchain logs transactions at the same time by two different BTC addresses) and then
> "cluster" these addresses together to represent the same owner. The third-party blockchain
> analysis software has supported many investigations and has been found to be reliable.

*Id.*

Additional examples of blockchain analysis testimony, including clustering that was

originally based on Chainalysis Reactor, include:

- *U.S. v. Freeman*, 21-cr-41 (D. N.H.) (Government used Chainalysis Reactor clustering to
  connect various parts of defendant's unlawful bitcoin sales/money laundering business. At
  a *Daubert* hearing, an FBI analyst testified to how she manually recreated the cluster using
  accepted clustering heuristics, namely co-spend clustering. The Court determined that the
  financial analysis testimony was not "expert" testimony and ruled it admissible at trial,
  noting: "The witness will not be referred to or qualified as an "expert" during the trial, but
  the witness will be permitted to testify regarding her work and observations." Minute Order
  Denying In Part 180 Motion In Limine re: Daubert Challenge to Forensic Blockchain
  Analysis 11/22/2022.);

- *U.S. v. Klyushin*, 1:21-cr-10104 (D. Ma.) (Government witness testified to using change
  address analysis to group addresses together.  The defendant was convicted of multiple
  counts of wire fraud, securities fraud, and computer fraud.);

Supp.App.288

- *United States v. Ologeanu et al*, 5:19-cr-00010 (E.D. Ky.) (defendant Iossifov was convicted at trial following testimony regarding blockchain analysis; multiple other defendants pleaded guilty in advance of trial);

- *United States v. Dove*, 8:19-cr-33 (M.D. Fla.) (defendant pleaded guilty mid-trial following testimony regarding blockchain analysis);

- *United States v. Felton*, No. 20-cr-347 (N.D. Ga.) (defendant pleaded guilty mid-trial to multiple counts of wire fraud, securities fraud, and money laundering, following blockchain analysis testimony);

- *United States v. Costanzo*, No. 2:17-cr-00585 (D. Ariz.) (defendant found guilty of money laundering at trial following testimony regarding blockchain analysis) (upheld in *United States v. Costanzo*, 956 F.3d 1088 (9th Cir. 2020)).

## D.    Plea Agreements

Information from blockchain analysis and Chainalysis Reactor is also corroborated when

defendants plead guilty and admit facts consistent with the government's blockchain analysis.

Each case may provide multiple points of validation, for different areas of tracing.

- *United States v. Farace,* Case No. 18-cr-00018 (D. Md.) (Government identified defendant in part through blockchain analysis. Defendant pleaded guilty to Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute Alprazolam, in violation of 21 U.S.C. § 846, and Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h).);

- *United States v. Chychasov*, Case No. 8:22-cr-72 (MDFL) (Government identified defendant in part through blockchain analysis. Defendant pleaded guilty to conspiracy to commit access device fraud, in violation of 18 U.S.C. § 371, and trafficking in unauthorized access devices, in violation of 18 U.S.C. § I029(a)(2).);

- *United States v. Vachon-Desjardins,* Case No. 8:20-cr-366 (MDFL) (Government identified defendant in part through blockchain analysis. Defendant pleaded guilty to Conspiracy to Commit Computer Fraud, in violation of 18 U.S.C. § 371, Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349, Intentional Damage to a Protected Computer, in violation of 18 U.S.C. §§ 1030(a)(5)(A), (c)(4)(A)(i)(I), (c)(4)(A)(i)(VI), and (c)(4)(B)(i), and Transmitting a Demand in Relation to Damaging a Protected Computer, in violation of 18 U.S.C. §§ 1030(a)(7)(B), (a)(7)(C), (c)(3)(A).);

- *United States v. Osborn et al.*, 1:21-cr-158 (D. Idaho) (Defendants Osborn and Russell pled guilty to conspiring to distribute controlled substances and conspiring to commit money laundering. Co-conspirators used cryptocurrency to purchase controlled

**Supp.App.289**

substances on the internet and to launder drug proceeds. Blockchain analysis (including Chainalysis and other blockchain tools) was used to trace drug proceeds involved in multiple bitcoin transactions to a wallet controlled by the defendants.);

- *United States v. Vallerius*, No. 17-CR-20648 (S.D. Fla.) (senior moderator of Dream Market pleaded guilty after he was identified through blockchain analysis);

- *United States v. Bridges, et al.*, No. 15-cr-319 (N.D. Cal.) (corrupt former federal agents pleaded guilty to money laundering after stolen cryptocurrency was traced to them through blockchain analysis);

- *United States v. Ilg*, No. 21-cr-49 (E.D. Wa.) (defendant pleaded guilty to threats arising from his attempts to hire a hitman after investigators traced funds to his cryptocurrency account using blockchain analysis);

- *United States v. Kancharla*, 1:22-cr-75 (E.D. Va.) (defendant pleaded guilty to distributing fentanyl after he was identified in part through blockchain analysis);

- *United States v. Mulford,* Case No. 19-cr-028 (N.D. Ohio) (Government identified defendant in part through blockchain analysis. Defendant pleaded guilty to Conspiracy to Distribute and Possess with Intent to Distribute Alprazolam, in violation of 21 U.S.C. § 846, Distribution of Controlled Substances by Means of the Internet, in violation of 21 U.S.C. § 841, and Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h).).

## E.  Forfeiture

Courts have found blockchain analysis conducted through Chainalysis Reactor and other tracing products sufficiently reliable to support forfeiture of a variety of properties in many cases.  For example:

- *United States v. Approximately 32133.63 Tether (USDT) Cryptocurrency From Binance Acct. No. Ending in 8770*, No. 22-CV-989-PP, 2023 WL 5334352, at *4 (E.D. Wis. Aug. 18, 2023) (Government's motion for default judgment in *in rem* forfeiture action granted where blockchain analysis showed victim of fraud scheme transferred Bitcoin that was transferred to defendant virtual currency accounts.)

## F.  Other Proceedings

- *United States v. Glowacki*, 22-3279 (6th Cir.  Jan. 13, 2023) (Defendant charged with receipt and possession of child exploitation materials filed motion to suppress evidence obtained in search of his home or, alternatively, for a *Franks* hearing. Defendant pled

**Supp.App.290**

guilty to receipt of child exploitation materials and appealed denial of motion to suppress. Affidavit described investigators use of blockchain analysis to trace bitcoin from Defendant's Coinbase account to an address associated with a darknet website that advertised child exploitation materials. During search of defendant's home, investigators seized several electronic items which contained child exploitation materials. Appellate court affirmed denial of motion to suppress.);

- *United States v. Patel*, 23-3082 1 (D.D.C. Aug. 8, 2023) (Upholding order of detention pending trial where blockchain analysis showed defendant had access to substantial cryptocurrency resources);

- *In re: Criminal Complaint*, 22-mj-067 4 (D.D.C. May 13, 2022) (Blockchain analysis established probable cause that defendant was operating an online payments and remittances platform designed to evade U.S. sanctions);

- *United States v. Payward Ventures, Inc*, 23-mc-80029 at 26-28 (N.D. Ca. June 30, 2023) (Cryptocurrency exchange platform ordered to supply transaction hash information and blockchain addresses to IRS to facilitate blockchain analysis in taxpayer compliance investigation).

## G.    Civil Cases

Blockchain analysis has been used in support of numerous civil matters, including:

- *Bureau of Consumer Financial Protection v. Consumer Advocacy Ctr.*, 19-cv-1998 (C.D. Ca. Oct. 7, 2022) (Order to show cause issued relying in part on CipherTrace blockchain analysis showing defendant likely controlled significant amount of cryptocurrency not disclosed to government);

- *Astrove v. Doe*, 22-cv-80614 (S.D. Fl. Apr. 22, 2022) (Temporary restraining order issued based on blockchain analysis tracing stolen funds to various cryptocurrency exchanges);

- *Astrove v. Doe*, 2022 WL 2805345 *3-4 (S.D. Fl. June 17, 2022) (finding a substantial likelihood of success on a variety of claims of fraud based in part on blockchain analytics tracing cryptocurrency funds deposited by the plaintiff to cryptocurrency wallet addresses at multiple cryptocurrency exchanges owned or controlled by the defendant);

- *Jacobo v. Doe*, 2022 WL 2052637 *2 (E.D. Ca. June 7, 2022) (relying on a civil plaintiff's use of blockchain analytics to trace the transfer of plaintiff's assets to cryptocurrency wallet addresses at multiple exchanges under the defendant's control and enjoining the transfer or withdrawal of funds from the identified addresses);

**Supp.App.291**

- *Audet v. Fraser*, 332 F.R.D. 53, 73 (D. Conn. 2019) (Certifying class action and finding that cryptocurrency records, including blockchain data, are "sufficient to establish membership in a class.");

- *Ohlin v. Defendant One*, 2023 WL 3676797 ** 1-2 (N.D. Fl. May 26, 2023) (granting a temporary restraining order preventing the transfer or withdrawal of funds from cryptocurrency wallet addresses at multiple exchanges that were identified through blockchain analytics tracing).

## IV.   Conclusion

The reliability of blockchain analysis, including the clustering in Chainalysis Reactor, has borne out across extensive law enforcement investigations.  It more than meets the inclusive standard for admission under *Daubert*.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:     */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
*/s/ Jeffrey Pearlman*
C. Alden Pelker, Maryland Bar
Jeff Pearlman, D.C. Bar No. 466901
Trial Attorneys, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007 (Pelker)
(202) 579-6543 (Pearlman)
Catherine.Pelker@usdoj.gov
Jeffrey.Pearlman2@usdoj.gov

Supp.App.292

| Chainalysis Data Evaluation | | | | | | | |
|---|---|---|---|---|---|---|---|
| Exchange | User ID/Account Number/Customer ID | Name | # of Exchange Addresses Identified | # True Positive | # Unattributed | # False Positive | # Inconclusive |
| LocalBitcoins | gothencoin | Roman Sterlingov | 188 | 125 | 63 | 0 | 0 |
| Kraken | xDGMY | Roman Sterlingov | 18 | 14 | 4 | 0 | 0 |
| Kraken | xKQ5Y | TO THE MOON LTD | 8 | 7 | 1 | 0 | 0 |
| MtGox | x78b5b7 | Roman Sterlingov | 45 | 41 | 0 | 0 | 4* |
| Bitstamp | x443 | Roman Sterlingov | 75 | 70 | 5 | 0 | 0 |
| Poloniex | x3418 | Roman Sterlingov | 1 | 1 | 0 | 0 | 0 |
| Binance | x6351 | Roman Sterlingov | 3 | 3 | 0 | 0 | 0 |
| Bitfinex | x1161 | Roman Sterlingov | 5 | 5 | 0 | 0 | 0 |
| | | | | | | | |
| Exchange Sub-Total: | | | 343 | 266 | 73 | 0 | 4 |
| | | | | | | | |
| Mycellium Wallet | N/A | N/A | 667 | 0 | 667 | 0 | 0 |
| | | | | | | | |
| Total: | | | 1010 | 266 | 740 | 0 | 4 |

*For withdrawals, the Mt. Gox records list transaction hashes rather than addresses, which is common for exchanges.  For this analysis, the government evaluated the input addresses to those withdrawal transactions.  However, on two occasions, there were inputs to a Mt. Gox withdrawal transaction that Chainalysis appears to have detected as a CoinJoin and attributed to two different sources -- one from Mt. Gox and the other from the St. Eligius mining pool.  The government is unable with the information presently available and on the timeframe provided to definitively evaluate these addresses and confirm Chainalysis' attribution.

# Chainalysis Data Validation

## Case 2

| Category | Address Count | % |
|---|---|---|
| Total | 76 | 100.0% |
| True Positive | 71 | 93.4% |
| Unattributed | 5 | 6.6% |
| False Positive | - | 0.0% |

UNITED STATES OF AMERICA

       Plaintiff,

v.

ROMAN STERLINGOV

      Defendant.

No. 21-cr-399 (RDM)

## DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE (DKT. 221)

Defendant Roman Sterlingov, by and through undersigned counsel, submits this Opposition to the Government's latest Motion in Limine (Dkt. 221). For the foregoing reasons, the Government's motion should be dismissed with prejudice because there is no potential or actual conflict of interest.

### FACTS

On January 19, 2024, Plaintiff Exceptional Media Ltd. filed a civil suit in New York State Court against Defendant Chainalysis, Inc. and several of its employees for defamation per se and tortious interference with business relationships. Tor Ekeland Law, PLLC represents Exceptional Media Ltd. Plaintiff's cause of action arises from Chainalysis, Inc.'s ongoing misidentification of Exceptional Media's YieldNodes project as a scam. Among other allegations the lawsuit alleges that Chainalysis Inc. and several of its employees authored a globally-distributed document titled *The 2022 Crypto Crime Report* in which it identified YieldNodes as the second largest scam of

2022, and, upon information and belief, flagged cryptocurrency accounts affiliated with YieldNodes and its clients in its globally-distributed compliance software. Exceptional Media Ltd. solicited Tor Ekeland Law, PLLC to file the lawsuit on their behalf.

The New York State civil lawsuit is against Chainalysis, Inc., and some of its employees. This is a distinct entity from the Government's hired expert in Mr. Sterlingov's case, Chainalysis Government Solutions, LLC. Chainalysis Government Solutions, LLC is a limited liability company based in Ashburn, Virginia. Chainalysis, Inc. is a Delaware corporation registered as a foreign business corporation in New York State. Chainalysis Government Solutions, LLC witness Ms. Elizabeth Bisbee's *Daubert* hearing testimony confirms this:

> **Mr. Ekeland**: …[T]here's actually two Chainalysis companies, correct?
> **Ms. Bisbee**: Correct.
> **Mr. Ekeland**: There's Chainalysis, Incorporated, which initially developed Chainalysis Reactor; is that correct?
> **Ms. Bisbee**: Correct.
> **Mr. Ekeland**: And you actually work for Chainalysis Global Solutions, correct?
> **Ms. Bisbee**: Chainalysis Government Solutions.[1]

Neither Chainalysis, Inc., nor Chainalysis Government Solutions, LLC are clients of Tor Ekeland Law, PLLC, nor does the firm receive any benefit from any relationship from either entity. As of this writing, process has not been served in the civil case, and defendants have not answered.

Recently, Mr. Sterlingov communicated his interest in a plea deal with the United States Government for time served. The Government responded by offering the same ten-year plea deal as before, which Mr. Sterlingov rejected on January 24, 2024. On January 25, 2024, the

---

[1] Tr. 120:1-8 (Testimony of E. Bisbee) June 23, 2023.

Government offered a cooperation plea with a possibility of a 5K1.1 downward departure for substantial assistance, which was communicated to Mr. Sterlingov on January 26, 2024.

## LEGAL STANDARD

DC Rule of Professional Conduct 1.7 ("Rule 1.7") lays out the analysis of any potential conflict of interest. It generally tracks the ABA Model Rules.[2] Rule 1.7 emphasizes the risk of representing clients with adverse interests, or instances in which "the lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests."[3]

However, even if a conflict of interest exists, it may be waived by a client. The conditions are the same under both the ABA Model Rules and the D.C. Rules of Professional Conduct, and state that a lawyer may represent a client in a potentially conflicted matter if there is full disclosure and consent by the clients and that the lawyer reasonably believes that they will be able to provide competent and diligent representation to each affected client.

## ARGUMENT

### A. There is No Actual or Potential Conflict

First, Chainalysis Government Solutions LLC is a legally distinct business entity from Chainalysis, Inc. If they are not distinct entities, then serious issues involving veil piercing and entity liability arise. If the Government is arguing on Chainalysis Government Solution LLC's behalf and wishes to take the position that it is the same legal entity as Chainalysis, Inc., it should state so clearly, as it does nowhere in its Motion in Limine. Moreover, Chainalysis

---

[2] D.C. R. Prof'l. Cond. 1.7.
[3] *Id.*

Government Solutions LLC's employee and Government witness Elizabeth Bisbee is not a named party in the New York civil lawsuit.

The Government absurdly alleges that Mr. Sterlingov's decision to testify or to take a plea may be adversely affected by its manufactured conflict of interest and sudden concern for Mr. Sterlingov's welfare. But Mr. Sterlingov has no knowledge of Chainalysis Reactor or Chainalysis Inc. at all. There is nothing that he could testify to related to Chainalysis, Inc. or Chainalysis Government Solutions, LLC for that matter. There is nothing about the civil case which could affect his decision whether to testify on his own behalf. As for the decision whether to take a plea, that is Mr. Sterlingov's and not counsel's decision to make. And the record demonstrates he has been fully informed of every plea offer. The Government admits in its motion that his recent interest in taking a plea for time served was communicated to them, although the Government failed to mention to the Court that Mr. Sterlingov was seeking an offer for time served.

### B. Exceptional Media's and Mr. Sterlingov's Interests are Aligned

There is no actual or potential conflict between the Plaintiff in the civil lawsuit and Mr. Sterlingov because their interests are aligned. In both instances, Plaintiff and Defendant are defending themselves from false accusations brought about by shoddy blockchain analysis, failures in due diligence, and lack of corroborating evidence. Moreover, a key difference between the two cases involves the fact that Chainalysis Government Solutions, LLC makes no attribution regarding Mr. Sterlingov at all:

> **Mr. Ekeland**: Okay. And that's who you work for, Chainalysis Government Solutions. Okay. Now, if I recall your testimony correctly, you've made no attributions regarding Mr. Sterlingov anywhere in your expert report, correct?
> **Ms. Bisbee**: Correct.

> **Mr. Ekeland**: And the only place that Mr. Sterlingov's name appears on your expert report is on the title page, correct?
> **Ms. Bisbee**: Correct.[4]

Whereas the civil lawsuit alleges that Chainalysis, Inc. explicitly and falsely accused Plaintiff of running a scam.

### C. The Government's Caselaw is Inapposite

The Government cites to *United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir. 1980), a Ninth Circuit case in which defense counsel had a book contract that could have affected tactical decision making. Here, the Defense does not have any kind of book contract whatsoever, nor is it in negotiations for any. One is hard pressed to manufacture a hypothetical where Defense counsel could elicit statements beneficial to a non-existent book contract. If anything, winning an acquittal would be beneficial to any hypothetical book contract. The Government's citation makes no sense in the current context.

As for *Wheat v. United States*, 486 U.S. 153 (1988), the Supreme Court analyzed whether a conflict of interest could be found when a single lawyer represents two separate defendants in a criminal case. That is not happening here. Here, Counsel represents Mr. Sterlingov as a criminal defendant in a federal district court and Plaintiff Exceptional Media, Ltd. in a civil matter for defamation in New York State Court that is not substantially related to Mr. Sterlingov's case. In Mr. Sterlingov's federal case, Chainalysis Government Solutions, LLC is a minor witness, whereas in the state civil case, the distinct entity Chainalysis, Inc. is a named defendant.

As for *United States v. Lorenzana-Cordon*, 125 F. Supp. 3d 129 (D.D.C. 2015), the Court found that there was no conflict of interest in the representation of a defendant in a criminal case, even though the defendant's counsel was also representing a witness against the defendant in a

---

[4] Tr. 120:19-121:2 Testimony of E. Bisbee) June 23, 2023.

separate case. That is not the fact pattern here. In *Lorenzana-Cordon* the Court held a conflict hearing because the potential conflict was obvious. Here, the Government seeks to manufacture a conflict to knock out competent and diligent defense counsel it is afraid of losing to.

### D. The Two Matters are Distinct

While Exceptional Media's and Mr. Sterlingov's interests are aligned, Exceptional Media's civil case against Chainalysis Inc. is distinct from Mr. Sterlingov's defense. There is no risk of divided loyalty or the potential for compromised judgment.

Exceptional Media's lawsuit (not as the Government mischaracterizes it 'Counsel's Lawsuit') was filed independently for independent reasons and has nothing to do with Mr. Sterlingov's case. There are obvious statute of limitation issues that required filing the civil case in January.[5] If Mr. Sterlingov's case had proceeded to trial in September, this discussion would not be occurring. Plaintiff solicited Tor Ekeland Law, PLLC to represent them, not the other way around. Furthermore, Mr. Sterlingov's trial will be concluded well before any substantive proceedings in the civil case. Process has yet to be served, no answers or dispositive motions have been filed, discovery has not commenced, and no judge has been assigned. Mr. Sterlingov's matter is well advanced and was already scheduled for trial in September 2023, well before the filing of the civil lawsuit. They are two distinct cases that involve different parties, different facts, different jurisdictions, different procedural postures and different timelines.

### E. There is No Harassment

The only contact Defense Counsel has had with Chainalysis Global Solutions, LLC or Chainalysis, Inc. has been through legal process. Chainalysis, Inc. is a corporation with a multi-

---

[5] Chainalysis Inc. published some of its defamatory statements in February 2022. New York State has a one-year statute of limitations on defamation claims. *See* N.Y. C.P.L.R. § 215(3).

billion-dollar market valuation and multiple law firms representing it. Likewise, Chainalysis Global Solutions, LLC has been ably and fiercely represented by former AUSA William Frentzen of Morrison Foerster. Both Chainalysis, Inc. and Chainalysis Government Solutions, LLC are public figures operating on an international scale. Chainalysis Government Solutions, LLC is a primary government contractor for agencies like the United States Department of Justice and the Treasury Department, to name just two. It willingly, knowingly and profitably stepped into the public arena and the Government's complaints that political criticisms of any Chainalysis entity constitute harassment, or that legal proceedings against Chainalysis, Inc. for defamation constitute harassment, ring hollow.

The Government, with its zealous advocacy on behalf of Chainalysis Government Solutions, LLC, raises the specter of its own conflict of interest given the facts that Chainalysis Inc., or Chainalysis Government Solutions, LLC: (1) hired one of the prosecutors from this case, Youli Lee; (2) bought a company five months after Mr. Sterlingov's arrest from IRS-CI Aaron Bice, who worked on this case, that was formed during the pendency of this case and used to investigate this case; (3) hired the Government's proffered expert witness Elizabeth Bisbee, formerly of the DEA; and (4) hired a former Assistant Director of the FBI Laboratory, Gurvais Grigg.[6] If anything, the Government has a core conflict of interest between justice and its advocacy on behalf of a potential future employer and investor. The real conflict of interest here is in the Government using private contractors that hire prosecutors from this case, buy companies from investigators on this case, and that people working on this case know that they can potentially later profitably work for.[7]

---

[6] *See* WHY I JOINED CHAINALYSIS AFTER 23 YEARS AT THE FBI, Gurvais Grigg (April 6, 2021) (available at https://www.chainalysis.com/blog/gurvais-grigg-chainalysis/) (last accessed January 25, 2024).
[7] *See e.g.* Dkt. 220 at 7-8.

What the Government is really trying to do with its motion is eliminate competent, diligent and zealous Defense Counsel that has exposed the deep flaws in the Government's ill-conceived, misguided prosecution. Now, on the eve of trial, the Government is afraid of losing, and makes baseless claims of witness harassment. Nothing that Defense Counsel has done rises to the level of witness harassment under any legal standard. This is the reason the Government fails to even mention the legal standard for witness harassment – because they cannot meet it.

### F. The Government's Motion is Frivolous Harassment

The real reason the Government filed its motion on the eve of trial is because they are afraid of losing. The Government does not have the Bitcoin Fog servers, the Bitcoin Fog server logs, or the Bitcoin Fog ledgers. As such, it cannot verify its allegations. It has no eye-witnesses and lacks corroborating evidence. Its investigation is riddled with errors running from typos through baseless speculation. Desperate to avoid exposure at trial of its deeply flawed investigation, methodologies and prosecution, it now files a last-minute motion in the desperate hopes of removing its adversary from this case under the false pretext of concern for the Defendant it has jailed pretrial for the last three years on the flimsiest of evidence.

### CONCLUSION

For the foregoing reasons, this Court should deny the Government's Motion in Limine.

Dated: January 26, 2024
Brooklyn, New York

Respectfully submitted,

/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

*Counsel for Defendant Roman Sterlingov*

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of January 2024, the forgoing document was filed with the Clerk of Court using the CM/ECF System, and sent by email to the attorneys for the Government listed below:

<u>s/ Michael Hassard</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

Jeffrey Pearlman
Jeffrey.Pearlman@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 21-cr-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S EMERGENCY MOTION *IN LIMINE* FOR
RULE 16 EXPERT DISCOVERY IN LIGHT OF DISCLOSURE THAT
"PARTS OF THE CIPHERTRACE REPORT ARE UNRELIABLE"**

The United States of America respectfully moves the Court *in limine* for an emergency order to compel discovery pursuant to Fed. R. Crim. P. 16(b)(1)(C) from the defense relating to the proffered defense expert Jonelle Still, *see* ECF Nos. 145, 157, 159, in light of the disclosure by counsel for Jonelle Still's employer, Ciphertrace—but not defense counsel themselves—that "parts of the Ciphertrace Report are unreliable."  Ltr. from J. Jay III to the Hon. R.D. Moss (Feb. 1, 2024), attached as Ex. A (the "Ciphertrace Letter") (emphasis added).  This revelation comes after months of *Daubert* proceedings concerning Ms. Still's proffered expert testimony, and it casts into doubt whether Ms. Still's testimony "is the product of reliable principles and methods," and whether it "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(c)-(d) (emphases added).

To avoid disruption of the trial schedule, the Court should compel *immediate* updated disclosure by the defense of Ms. Still's expert opinions and the "bases and reasons" for them, *see* Fed. R. Crim. P. 16(b)(1)(C)(ii), (iii), to include any information that has come to light in the months following Ms. Still's *Daubert* testimony in August 2023 relating to the newly discovered unreliability of her Ciphertrace Report.  The Court should also order pretrial production of Ms. Still's communications and any other out-of-court statements relating to the subject matter of her

anticipated expert testimony pursuant to Fed. R. Crim. P. 26.2(a).   Further relief—including preclusion and/or limiting of Ms. Still's testimony because of these revelations' impact on the reliability of any testimony or as a sanction for defense counsel's breaches of their Rule 16 discovery obligations—may be appropriate, depending on the disclosures.

## **BACKGROUND**

The extended *Daubert* proceedings in this case are familiar to the Court.   On the eve of jury selection before the prior trial date in September, the defense moved (for the second time) for a continuance over the government's objection.   *See* Minute Order (Sept. 13, 2023).   The Court rescheduled the trial to begin on February 12, 2024.   *See* Minute Order (Sept. 22, 2023).   The Court granted the continuance on the express condition that the defense "will not seek leave to designate any additional expert witnesses at this late date (which is long past the date for identifying experts)."   *Id.*

Between the disclosure of Ms. Still's Ciphertrace Report on August 8, 2023, and February 1, 2024, the government has received no further expert disclosure or discovery from the defense.

On February 1, 2024, counsel for Ciphertrace, which is a wholly owned subsidiary of Mastercard, sent a letter to Chambers, attached hereto as Exhibit A.   In the letter, Ciphertrace's counsel revealed for the first time:

> It recently came to Mastercard's attention that, contrary to the wording of the Ciphertrace Report, some of the data relied upon may be unverifiable and unauditable. . . .   It also appears that at least some of the data relied upon in the Ciphertrace Report may have come from other companies, including Chainalysis.

Ciphertrace Letter at 1.   Notably, defense counsel has not made any accompanying disclosures regarding this significant revelation.   No further detail was provided to explain what data in the

Supp.App.306

Ciphertrace Report was found to be "unverifiable and unauditable," or what data may have originated from other companies "including Chainalysis."

The Ciphertrace Letter continued:

> As soon as Mastercard counsel learned about the potential data issues, Mastercard launched an expedited, privileged investigation involving internal and outside counsel and an outside forensics team. This investigation is ongoing, but we have learned enough to conclude that parts of the Ciphertrace Report are unreliable.

*Id.* Again, no further detail was provided to explain which "parts" of the Ciphertrace Report have been deemed unreliable. The Ciphertrace Letter also revealed for the first time that Ciphertrace conducted an internal investigation involving "an outside forensics team"—but provided no detail about when the investigation was initiated, how long it has proceeded, what "outside forensics team" was retained, or what, specifically, this investigation has concluded.

The Ciphertrace Letter stated that "Mastercard has advised defense counsel of this matter." *Id.* The letter, however, was silent about when defense counsel and Ms. Still first became aware of these issues with "unverifiable and unauditable data" in the Ciphertrace Report, the use of data "from other companies, including Chainalysis," the existence of an internal investigation involving "an outside forensics team," and Ciphertrace's conclusion that "parts of the Ciphertrace Report are unreliable."

## <u>ARGUMENT</u>

Rule 16 governs both the substance and the timing of expert disclosures. The defense must disclose "a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief" as well as "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C)(iii). These disclosures must be made well in advance of trial: "The time" for such disclosures "must be sufficiently before trial to provide a fair opportunity for the government to

3

meet the defendant's evidence."  Fed. R. Crim. P. 16(b)(1)(C)(ii).  There is also a continuing duty

of disclosure: "A party who discovers additional evidence or material before or during trial must

promptly disclose its existence to the other party or the court."  Fed. R. Crim. P. 16(c).

      The Ciphertrace Letter indicates that the defense has not complied with its duties under

Rule 16 to disclose—"promptly" and on a continuing basis—the substance and the "bases" and

"reasons" for Ms. Still's anticipated expert testimony.  Ms. Still gave sworn testimony before this

Court during a two-day *Daubert* hearing on August 22 and 23, 2023, regarding her expert opinions

and their bases.  If Ms. Still has been informed since then of critical infirmities in the data she

relied on and testified to, and that "parts" of her expert report "are unreliable," then she would

presumably plan to update the substance of her expert testimony.

      If so—if Ms. Still has changed or adjusted her expert conclusions as a result of information

that came to light through Ciphertrace's internal investigation—then the government is entitled to

discovery of her updated "opinions" under Rule 16.  Given the untimely nature of such a

disclosure, the Court could properly preclude Ms. Still's amended testimony under Rule 16.  If

Ms. Still plans to testify to the same opinions, but is no longer relying on data that she now knows

is "unverifiable" and "unauditable," then the government is entitled to discovery of her updated

"bases and reasons" under Rule 16.  And if Ms. Still plans to make no changes whatsoever to her

expert opinions or the bases and reasons for them, despite being informed that parts of her report

"are unreliable," that raises significant questions for the Court about whether her testimony should

be allowed at all under Rule 702.[1]

---

[1] Depending on the substance of the updated defense expert disclosure, the government reserves
the right to reopen *Daubert* proceedings concerning Ms. Still.  The impending trial date makes
immediate disclosure imperative.

Supp.App.308

That this disclosure did not come from defense counsel, but instead was made by outside counsel for Ms. Still's employer, Ciphertrace—and that it came more than five months after Ms. Still's *Daubert* testimony on August 22 and 23, 2023, and just eleven days before jury selection on February 12, 2024—should disturb the Court as much as the government.  Indeed, to date, the defense has made no disclosure at all about the defects in Ms. Still's expert report.  This context— the timing, lack of disclosure, and the significance of the Ciphertrace revelations—underscores the need for the Court to order compliance with Rule 16's continuing disclosure obligations.

Further, in light of the Ciphertrace revelations, the defense's production of Rule 26.2 materials for Ms. Still is particularly important.  Ms. Still is a member of the defense team.  If she communicated with Ciphertrace's internal investigation team regarding the subject matter of her testimony, that would fall within the ambit of Rule 26.2.  If she communicated with defense counsel regarding the internal investigation and its findings as to the unreliability of her expert report, that, too, would be discoverable under Rule 26.2.  Other defense witnesses confirmed the existence of defense-expert email chains or other written communications related to blockchain analysis, which presumably involved Ms. Still.  *See, e.g.*, 7/19/23 Tr. at 141:2-4 (Prof. Verret) ("We have had discussions with the experts [about blockchain analysis].  Memorialized – I mean, we've had emails.  We have an email chain discussion among the experts."); 7/20/23 Tr. at 291:17-19 (Fischbach) ("I have conversed with counsel and the rest of the team.  So to some degree there's some memorialization there.").  To date, the government has received no production from the defense pursuant to Fed. R. Crim. P. 26.2(a).  In order to avoid interruptions during trial, the government requests that the defense make a pretrial production of Ms. Still's Rule 26.2 statements.

Finally, depending upon the nature of the disclosures, further relief—including preclusion of testimony—may be appropriate.  Because the propriety of such relief depends on as-yet undisclosed facts about the substantive impact of the defects in Ms. Still's expert report and when they became known to the witness and the defense, prompt and immediate disclosure will assist all parties to address them and avoid disruption of next week's trial date.

## **CONCLUSION**

The Court should order the defense to immediately update its expert disclosure as to the complete opinions of Ms. Still and the bases and reasons for them, pursuant to Fed. R. Crim. P. 16(b)(1)(C) and (c), in light of the Ciphertrace Letter's revelation that "parts" of Ms. Still's report "are unreliable."  The Court should also order the defense to produce any statements of Ms. Still relating to the subject matter of her testimony, pursuant to Fed. R. Crim. P. 26.2(a), no later than February 12, 2024.

6

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:   */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
*/s/ Jeffrey Pearlman*
C. Alden Pelker, Maryland Bar
Jeff Pearlman, D.C. Bar No. 466901
Trial Attorneys, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007 (Pelker)
(202) 579-6543 (Pearlman)
Catherine.Pelker@usdoj.gov
Jeffrey.Pearlman2@usdoj.gov

Supp.App.311

# Exhibit A

**Sheppard**Mullin



Sheppard, Mullin, Richter & Hampton LLP

www.sheppardmullin.com

A. Joseph Jay III

February 1, 2024

<u>**VIA EMAIL**</u>

The Honorable Randolph D. Moss
United States District Court Judge
U.S. District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

   Re: <u>*United States v. Sterlingov,* Case No. 21-cr-399 (RDM)</u>

Dear Judge Moss:

As you know, we represent Ciphertrace, a wholly owned subsidiary of Mastercard International Incorporated ("Mastercard"). Defense counsel engaged Ciphertrace as an expert in the matter of *U.S. vs. Sterlingov*, 21-cr-399 (RDM). Ciphertrace prepared an expert report (the "Ciphertrace Report"), and a Ciphertrace employee, Ms. Jonelle Still, testified at a *Daubert* hearing before the Court in August 2023.

It recently came to Mastercard's attention that, contrary to the wording of the Ciphertrace Report, some of the data relied upon may be unverifiable and unauditable. This issue was unknown to Ms. Still at the time of the Report and appears to be due to data collection practices originating prior to Mastercard's acquisition of Ciphertrace. It also appears that at least some of the data relied upon in the Ciphertrace Report may have come from other companies, including Chainalysis. Mastercard has advised defense counsel of this matter and writes to bring it directly to the Court's attention.

As soon as Mastercard counsel learned about the potential data issues, Mastercard launched an expedited, privileged investigation involving internal and outside counsel and an outside forensics team. This investigation is ongoing, but we have learned enough to conclude that parts of the Ciphertrace Report are unreliable.

We regret the unavoidable impact of this issue on the Defense, the Government, and, of course,

**Sheppard**Mullin

February 1, 2024
Page 2

this Court – especially with the fast approaching trial date. We stand ready to answer the Court's questions.

Respectfully,

A. Joseph Jay III
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

cc:   Tor Ekeland, Esq. (tor@torekeland.com)
      Michael Hassard, Esq. (michael@torekeland.com)
      Catherine A. Pelker, Esq. (catherine.pelker@usdoj.gov)
      Christopher Brodie Brown, Esq. (christopher.brown6@usdoj.gov)
      Jeffrey Pearlman, Esq. (jeffrey.pearlman@usdoj.gov)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal No. 21-cr-399 (RDM)** |
| | **:** | |
| **ROMAN STERLINGOV,** | **:** | |
| | **:** | |
| **Defendant** | **:** | |

**ORDER**

Upon consideration of the February 1, 2024 letter to the Court from counsel for Ciphertrace, and the Government's Emergency Motion *In Limine* for Rule 16 Expert Discovery in Light of Disclosure that "Parts of the Ciphertrace Report Are Unreliable," and for good cause, it is hereby

ORDERED, that the motion shall be granted, and that the defendant is ordered to provide a supplemental disclosure of "a complete statement of all opinions that the defendant will elicit . . . in the defendant's case-in-chief" from Ciphertrace witness Jonelle Still, and "the bases and reasons for them," pursuant to Fed. R. Crim. P. 16(b)(1)(C)(iii), no later than February _____, 2024; it is further

ORDERED, that the defendant shall produce any statement of Ms. Still that relates to the subject matter of Ms. Still's testimony, no later than February 12, 2024.

Dated this _____ day of February, 2024.

_____
THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

**Supp.App.315**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

        Plaintiff,

v.

ROMAN STERLINGOV

        Defendant.

**No. 21-cr-399 (RDM)**

**DEFENDANT'S RESPONSE TO GOVERNMENT'S EMERGENCY MOTION *IN LIMINE* FOR RULE 16 AND RULE 26.2 PRODUCTION (Dkt. 239)**

Roman Sterlingov, by and through undersigned counsel, files this Response to the Government's Motion as ordered in the Minute Order filed by this Court on the docket requiring a Response by 3:00 pm on February 5, 2024.

Upon information and belief, this morning Sheppard Mullin – counsel for Ciphertrace - held a phone call with the Government explaining the current situation and how Defense Counsel was unaware of any of the issues with Ciphertrace's expert report until this Thursday, February 1, 2024, shortly before Ciphertrace's counsel sent a letter to this Court and the Government. Upon information and belief, Sheppard Mullin explained to the Government that undersigned Defense Counsel had no prior knowledge of these issues. Nor does the Defense know what the issues are beyond what has been conveyed to the Government and the Court.

Given the circumstances, the Defense withdraws the Ciphertrace Expert Report as well as Ms. Still as a testifying expert at trial. The Defense notes that the problems disclosed by Ciphertrace go precisely to the issues that the Defense has repeatedly raised since the beginning of this case. Blockchain forensics are a standardless and unreliable pseudoscientific field that

**Supp.App.316**

hasn't matured sufficiently to be used as evidence in a federal criminal proceeding. As the Court

is aware from the *Daubert* hearings, Chainalysis Reactor has never been subject to an

independent audit, nor are there any scientific peer-reviewed papers attesting to the accuracy of

its heuristics.

## CONCLUSION

This Court should deny the Government's motion as moot because the Defense is

withdrawing the Ciphertrace expert report and not calling Ciphertrace expert Ms. Still as a

testifying expert witness at trial.

Dated: February 5, 2024
Brooklyn, New York

Respectfully submitted,


/s/ Michael Hassard
Michael Hassard (NYS Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

*Counsel for Defendant Roman Sterlingov*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of February 2024, the forgoing document was filed

with the Clerk of Court using the CM/ECF System, and sent by email to the attorneys for the

Government listed below:

<u>s/ Michael Hassard</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

Jeffrey Pearlman
Jeffrey.Pearlman@usdoj.gov

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3     UNITED STATES OF AMERICA,
                                            Criminal Action
 4              Plaintiff,                  No. 1: 21-399

 5         vs.                              Washington, DC
                                            November 8, 2024
 6     ROMAN STERLINGOV,
                                            2:06 p.m.
 7              Defendant.
       _____/
 8

 9                   TRANSCRIPT OF SENTENCING
             BEFORE THE HONORABLE RANDOLPH D. MOSS
10                UNITED STATES DISTRICT JUDGE

11

12     APPEARANCES:

13     For the Plaintiff:      Catherine Pelker
                               U.S. DEPARTMENT OF JUSTICE
14                             950 Pennsylvania Ave NW
                               Washington, DC 20530
15
                               Christopher Brodie Brown
16                             DOJ-USAO
                               601 D Street, N.W.
17                             Suite 5.1527
                               Washington, DC 20530
18
                               Jeffrey Pearlman
19                             DOJ-CRM
                               Ccips
20                             US Dept of Justice
                               1301 New York Ave NW
21                             Washington, DC 20005

22

23               APPEARANCES CONTINUED ON NEXT PAGE

24

25
```

```
 1                      APPEARANCES CONTINUED

 2   For the Defendant:        Tor Ekeland
                               Michael Hassard
 3                             TOR EKELAND LAW PLLC
                               30 Wall Street
 4                             8th Floor
                               Brooklyn, NY 10005
 5
                               Marc Fernich
 6                             Law Office of Marc Fernich
                               800 Third Avenue
 7                             Ste Floor 20
                               New York, NY 10022
 8
                               Maksim Nemtsev
 9                             Maksim Nemtsev, PC
                               20 Park Plaza
10                             Suite 1000
                               Boston, MA 02116
11
     Court Reporter:           Sherry Lindsay
12                             Official Court Reporter
                               U.S. District & Bankruptcy Courts
13                             333 Constitution Avenue, NW
                               Room 6710
14                             Washington, DC 20001

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S
 2           THE COURTROOM DEPUTY:  Calling case number 21-399,
 3   United States of America versus Roman Sterlingov.
 4           Would counsel please approach the podium, state your
 5   name for the record, starting with government counsel.
 6           MR. BROWN:  Good afternoon, Your Honor.  Chris Brown,
 7   Alden Pelker and Jeff Pearlman for the government.
 8           THE COURT:  All right.  Good afternoon.
 9           MR. FERNICH:  Good afternoon, Your Honor.  Marc
10   Fernich and Max Nemtsev and Tor Ekeland and Mike Hassard for
11   Mr. Sterlingov.
12           THE COURT:  All right.  Good afternoon to you.  So we
13   are here this afternoon for the sentencing of Roman Sterlingov,
14   who on March 12th, 2024, was convicted by a jury of Count 1,
15   money laundering conspiracy in violation of 1956(h); Count 2,
16   money laundering in violation of 18 U.S.C. section
17   1956(a)(3)(A) and (B); Count 3, operating an unlicensed money
18   transmitting business in violation of 18 U.S.C. section 1960(a)
19   and as well as section 2; and Count 4, money transmission
20   without a license in violation of D.C. Code section 26-1023(c).
21           I have received and reviewed the presentence report
22   and the sentencing recommendation from the probation office.  I
23   probably should have given you the opportunity to make your
24   appearance as well.
25           MS. FIELD:  Thank you, Your Honor.  Hana Field with
```

```
1   US Probation.

2          THE COURT:  Thank you for being here.

3          And I also reviewed the sentencing memoranda from the

4   government, from the defense, as well as the letters that have

5   been submitted on behalf of Mr. Sterlingov.

6          Let me just ask whether there are any additional

7   materials, Mr. Brown, that the government will request that I

8   consider today?

9          MR. BROWN:  No, Your Honor.

10         THE COURT:  And Mr. Fernich?

11         MR. FERNICH:  Judge, just the notice of supplemental

12  authority, which I am sure the Court has that we put in a

13  couple of days ago.

14         THE COURT:  Yes.  Yes, I did see that.  Thank you.

15         MR. FERNICH:  For the record, we reviewed the PSR

16  with Mr. Sterlingov.  And we have gone over that with him and

17  all of that.

18         THE COURT:  Okay.  Good.  I will turn to that in just

19  a second because I will want to know if there are any

20  differences of opinion on that.

21         So, Mr. Sterlingov, today's proceeding is going to go

22  through a number of steps.  I am sure you are anxious just to

23  get to the bottom line.  I need to go through all of these

24  steps just to make sure there is agreement on the relevant

25  facts, the law, the guidelines.  And if there is any
```

1    disagreement, I need to resolve those disagreements.

2              So we'll have to start with the presentence report.

3    And I will resolve any outstanding objections as to that.  The

4    second step is for me to determine what guidelines apply in

5    your case and whether there are grounds for departure.  The

6    third step is for me to hear from government counsel; your

7    counsel; you, if you would like to address the Court; anyone

8    else you would like me to hear from.

9              And the last step will be for the Court to fashion a

10   just and fair sentence in light of the factors that Congress

11   has specified in a statute, which is at 18 U.S.C. section

12   3553(a).  And as part of that last step, I will actually impose

13   the sentence in the case.

14             So let's start with the presentence report.  The

15   final presentence report and recommendation were filed on

16   August 14th, 2024.

17             Does the government have any objections to any of the

18   factual material set forth in the presentence report,

19   Mr. Brown?

20             MR. BROWN:  Your Honor, other than what is noted as

21   the government's objections to the PSR, we don't have any

22   further.

23             THE COURT:  Are there any that you think that I need

24   to resolve for purposes of sentencing?  I mean, I know there

25   were some where it may have been more in the nature of

```
1    characterization.  But if there are factual disputes that I
2    need to resolve, then we need to go through them one by one.
3             MR. BROWN:  Your Honor, there is a series of -- I
4    don't think these are really material factual disputes, but
5    there are series of factual disagreements about, for example,
6    when Mr. Sterlingov quit his job at Capo Marknadskommunikation
7    and what was the nature of his flight training, those sorts of
8    factual disputes that, again, I don't think they are going to
9    be material to the Court's sentencing determination, but we do
10   stand on those objections.
11            THE COURT:  Are you asking me to amend or direct the
12   PSR be amended?
13            MR. BROWN:  Your Honor, at least with respect to
14   paragraph 112 of the presentence report -- paragraph 112,
15   paragraph 115 -- paragraph 112 and 115, which refer to the
16   dates of the defendant's employment.  I think those paragraphs
17   are inconsistent with the evidence that was adduced at trial,
18   which is --
19            THE COURT:  So let's take these one at time then.
20   Paragraph 112 says at the time of his arrest, the defendant was
21   employed.  Is that the objection is that you think he was
22   unemployed at that time?
23            MR. BROWN:  Yes, Your Honor.
24            THE COURT:  Okay.  And, Mr. Fernch, are you the one
25   who is speaking today?  I know that Mr. Ekeland knows the
```

1    record well.

2            MR. FERNICH:  That's right, Judge.  Some judges don't

3    like to be tag teamed.  Whoever knows best I think would be

4    great.

5            THE COURT:  Mr. Ekeland, do you have an objection to

6    me striking from paragraph 112 at the time of his arrest he was

7    employed?

8            MR. EKELAND:  I'm sorry.  He was --

9            THE COURT:  Employed.

10           MR. FERNICH:  Judge, we don't have any factual

11   objections to the PSR that would be material to the sentencing

12   determination.  So we would just rest on our papers with that

13   stuff.

14           THE COURT:  What about -- the government is asking

15   that I drop the --

16           MR. FERNICH:  I think we should leave it alone.  The

17   probation office conducted an investigation in consultation

18   with the government.  And we know that the government has

19   substantial influence sometimes over what goes into the PSR.

20   So I think the PSR factually should be left alone.

21           THE COURT:  Usually what I tend to do is -- and I

22   realize this is a little bit of a different case since I sat

23   through the entire trial in the case.  Typically what I will do

24   is adopt the facts as set forth in the PSR as my findings of

25   fact.  But if they are not correct, then I need to correct

1    them.

2           MR. FERNICH:  We don't take any position on this

3    issue.

4           THE COURT:  So if you don't take any position on the

5    issue and the government represents it is inaccurate that the

6    defendant was employed and I don't remember evidence of

7    employment at the time of his arrest.  And I also think that it

8    is probably not material anyway, so I will drop the -- or

9    direct that the sentence that says "At the time of his arrest

10   the defendant was employed" and drop the word "However" in the

11   next sentence.  So it just says, he was unemployed at the time

12   of sentencing due to his custodial status.

13          Okay.  Then what about 115, Mr. Brown?

14          MR. BROWN:  Your Honor, actually if I could back up.

15   I think this entire employment record section -- these -- the

16   government filed objections to most of these paragraphs.  So

17   maybe we could go one paragraph at a time.

18          THE COURT:  Okay.

19          MR. BROWN:  So paragraph 113.

20          THE COURT:  Yeah.

21          MR. BROWN:  There are representations about a, quote,

22   business, Moon VPN, as a virtual private network service.  The

23   service never went into operation.  We don't dispute it never

24   went into operation as a functional business.  But we believe

25   the evidence at trial supports that Moon VPN was never a real

1   business, that it was a front for the defendant to launder his

2   profits from Bitcoin Fog.

3          THE COURT:  All right.  Any objection from the

4   defense from my just dropping that paragraph on the grounds

5   that it is not material for present purposes anyway?

6          MR. FERNICH:  That is fine, Judge.  The record will

7   speak for itself there.

8          THE COURT:  I agree with that.  So I will drop 113

9   and record will speak itself.

10         114.

11         MR. BROWN:  Paragraph 114.  We have no objection to

12   the description of the music studio, Adrenal Productions.  We

13   object to that last sentence, "Following the termination of

14   this business and prior to his incident arrest, the defendant

15   financially supported himself through his Bitcoin investments."

16   We object to that.  The source of his wealth was not Bitcoin

17   investments, it was Bitcoin Fog.

18         THE COURT:  All right.  Any objection to my just

19   dropping that on the grounds that the record speaks for itself.

20         MR. FERNICH:  Same.

21         THE COURT:  So I will drop the final sentence of 114.

22         115.

23         MR. BROWN:  Paragraph 115, we object to the -- first,

24   the characterization of the time frame during which the

25   defendant was employed by the CapO Market Communications firm.

1    As he testified at trial --

2              THE COURT:  Let me speed this along.  Any objection

3    from anyone from me just dropping 115.

4              MR. FERNICH:  No.

5              THE COURT:  Okay.  115.  What is next?

6              MR. BROWN:  Paragraph 117 and 117A, I just want to

7    point out to the Court, this makes representations about a

8    statement of financial assets that the government has never

9    seen.

10             THE COURT:  So I could be wrong.  What I assumed that

11   was referring to was the statement that was submitted at the

12   hearing on whether to unfreeze the assets.

13             Is that correct, Mr. Ekeland?

14             MR. EKELAND:  Yes, that right.

15             THE COURT:  That is all I thought it was referring

16   to.

17             MR. BROWN:  If that is true, Your Honor, we object

18   that is not an accurate statement.  It wasn't accurate at the

19   time and certainly is not accurate today, for all of the

20   reasons that we explored during cross-examination of the

21   defendant, during --

22             THE COURT:  Does it ever say here, though, that it is

23   accurate?  I mean, I guess --

24             MR. BROWN:  Well, it says according to the financial

25   assets document provided by the defense counsel, the defendant

```
1     has --

2            THE COURT:  So why don't I do this then?  I will

3     amend 117A to say that according to the defense, the defendant

4     has the following assets.  Any objection?

5            MR. EKELAND:  No, Judge.

6            MR. FERNICH:  No, Judge.

7            MR. BROWN:  Your Honor, I don't think that there are

8     any other material factual disputes here.

9            THE COURT:  Okay.  All right.  Any material factual

10    disputes from the defense?

11           MR. FERNICH:  No, Judge.  We'll stand on our papers.

12    That is fine.

13           THE COURT:  Okay.  Mr. Sterlingov, are you fully

14    satisfied with the assistance of your counsel in this case?

15           THE DEFENDANT:  Can you explain the question, please?

16           THE COURT:  Yeah.  What I want to do is, I just want

17    to make sure that you are satisfied with the assistance of the

18    counsel that you have received.  Because my next question is

19    going to be whether you have had enough time to talk with your

20    counsel about the presentence report and the sentencing and all

21    of that.  I want to make sure that as we proceed with

22    sentencing that you are satisfied with the assistance that you

23    are receiving with respect to sentencing.  And if you -- this

24    is without prejudice if someday down the road you ever wanted

25    to bring a habeas petition arguing ineffective assistance of
```

1    counsel, I am not asking you to give that up now.

2            I am just asking for purposes of proceeding with

3    sentencing, have you had enough time to confer with your

4    counsel and are you fully satisfied with the assistance of your

5    counsel with respect to sentencing?

6            THE DEFENDANT:  I think I understand, Your Honor.

7    Yes.

8            THE COURT:  Okay.  Did you have enough time to talk

9    with your counsel about the presentence report and the

10   government's sentencing memorandum?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Okay.  Did you have enough time to review

13   that yourself as well?

14           THE DEFENDANT:  Yes.

15           THE COURT:  All right.  So then with the amendment

16   that I have made --

17           You can have a seat.  Thank you.

18           -- I will accept the statement of facts as set forth

19   in the presentence report as supplemented by my own

20   understanding of the facts from trial as my findings of fact

21   for purpose of today's proceeding.

22           And I am sure as we go through things today, there

23   will be discussions of some of the evidence at trial.  And I

24   will note for the record when I am make making particular

25   findings or if there is disagreements I will resolve those

1    disagreements as we proceed.

2          So turning to the guidelines, the presentence report

3    lays out the probation office's calculation of the advisory

4    guidelines that applies in this case.  And let me summarize

5    this.  And I know there is some disagreement and we can talk

6    about the areas of disagreement as we go.  Just by way of

7    background, the statutory maximum for money laundering

8    conspiracy in violation of 18 U.S.C. section 1956(h) is 20

9    years.  The statutory maximum for money laundering in violation

10   of 18 U.S.C. section 1956(a)(3)(A) and (B) is 20 years.  The

11   statutory maximum for operating an unlicensed money

12   transmitting business in violation of 18 U.S.C. section

13   1960(a), and section 2 is 5 years.  And the statutory maximum

14   for money transmission without license in violation of D.C.

15   Code 26-20 -- 26-1023(e) is 5 years.

16          Turning to the guidelines for Counts 1 and 2, the

17   parties agree that the applicable guideline is section 2S1.1,

18   which provides a base offense level of 8, plus the number of

19   offense levels in table 2B1.1.  For Count 3, the sentencing

20   guidelines provide that section 2S1.1 also applies to a

21   violation of 1960(b)(1)(C) while 2S1.3 applies to a violation

22   of 1960(b)(1)(A) and (B).

23          Section 2S1.3 provides a base offense level of 6 plus

24   the number of offense levels from the table on section 2B1.1.

25          The parties agree that Counts 1 through 3 should be

1    grouped.  And the probation office and the government have

2    slightly different theories as to the grouping.  But I don't

3    think there is any disagreement that the bottom line is the

4    same and all of those offenses should be grouped together.

5          And I have to say, I am persuaded that the offenses

6    should be grouped and that subsection C appears to be the most

7    applicable here, since the Sentencing Commission's guidance on

8    grouping instructs that where different counts have different

9    guidelines, the Court should first look to see if section C

10   applies.  And because the offenses are grouped, the base

11   offense level applies -- it applies to the group as determined

12   by the most serious of the counts, that is the one with the

13   highest offense level.  And the parties agree that under

14   section 2S1.1, we get the highest offense level.  So that is

15   what I will focus on.

16         The parties do dispute how many levels should be

17   added, pursuant to the table.  The government argues that there

18   should be a 28-level increase.  And Mr. Sterlingov is of the

19   view there should be a 22-level increase.  And I suppose if the

20   parties want to be heard on that, this is probably the best

21   time to do it.  And if there is anything I have said thus far

22   that the parties want to hear about, I am happy to hear from

23   you now about that as well.  Why don't I go ahead and start

24   with Mr. Brown?

25         Is there anything that you disagree with with respect

1    to the calculation today as well as addressing the right

2    offense level under 2B1.1?

3          MR. BROWN:  Your Honor, other than the technical

4    disagreement about the grouping, the prevailing rule for

5    grouping, the government does not disagree with the calculation

6    in the PSR.

7          And to address the property, the value of the

8    laundered funds issue, the value of the laundered funds is a

9    defined term under the guidelines.  It is defined under 2S1.1

10   in the commentary to mean the property, funds or monetary

11   instrument involved in the transaction --

12         THE COURT:  Can you slow down, please?

13         MR. BROWN:  It is defined in the application notes to

14   2S1.1, to mean the property, funds or monetary instrument

15   involved in the transaction, et cetera, in violation of section

16   1956 or 1957.  That "involved in" verbiage mirrors the same

17   statutory phrase in the text of the money laundering statute,

18   1956, as well as the text of the forfeiture statute, the

19   applicable forfeiture statute 982(a)(1).  And it is the

20   government's position those should be read consistently.

21         Now, the dispute here is about the commingling of the

22   funds.  So the government has produced evidence at trial that,

23   you know, that tens of millions of dollars out of the

24   395 million that was deposited into Bitcoin Fog is either

25   directly or indirectly traceable to specified darknet markets.

1    I think it is important to note that there is no evidence in

2    the record whatsoever other than the defendant's perjured and

3    self serving testimony that there were any legitimate

4    transactions on Bitcoin Fog.  The entirety of the record is

5    that Bitcoin Fog processed illegal transactions.

6         Under the D.C. Circuit precedent of

7    *Braxtonbrown-Smith*, it is appropriate to count not just the

8    value of what we can directly identify as, you know, one hop

9    away from a darknet market, but to include commingled amounts.

10   And because Bitcoin Fog was a money laundering service that

11   worked by pooling funds and because there is no way to

12   disaggregate what supposedly was a legitimate input into that

13   transaction, then it is appropriate under *Braxtonbrown-Smith* to

14   find that the entire 395 million should count.

15        I want to add, Your Honor, that under application

16   note 3 to 2S1.1, application note 3 specifically addresses this

17   question.

18        THE COURT:  I'm sorry.  I want to get that in front

19   of me.  One second.  Okay.

20        MR. BROWN:  Application note 3 sub B, addresses

21   commingled funds.  And the default rule under the sentencing

22   guidelines is there at the bottom of that paragraph.  If the

23   amount of criminally derived funds is difficult or

24   impracticable --

25        THE COURT:  I'm sorry.  You have lost me here.  I

1    want to make sure I am where you are.  If the application

2    notes -- okay.  One -- application note -- oh, I'm sorry.  I am

3    in the wrong guideline.  Application note to which section?

4            MR. BROWN:  2S1.1.

5            THE COURT:  Okay.  Hold on a second.

6            Okay.  I am with you now.

7            MR. BROWN:  So application note 3(B) to 2S1.1 --

8    essentially let me paraphrase it for the Court.  The default

9    rule is if there is a money laundering transaction that

10   involves both criminal funds and commingled non-criminal funds,

11   the default is that the entire transaction counts as the value

12   of the laundered funds unless the defendant carries a burden of

13   showing sufficient information to determine the amount of

14   criminally derived funds without unduly complicating or

15   prolonging the sentencing process.  And I would cite to the

16   Court *United States versus Alaniz*, A-L-A-N-I-Z.  That is 726

17   F.3d 586 in the Fifth Circuit.  That confirms that the burden

18   rests with the defendant to disambiguate.  If there is some

19   question about clean funds being commingled with dirty funds

20   the burden rests on the defendant to come forward with

21   sufficient evidence to show the amount of clean funds.  And I

22   will just say, Your Honor, as I have -- I don't want to belabor

23   the point.  There is zero evidence in the record that there

24   were any clean funds deposited into Bitcoin Fog, other than you

25   might say, the government's undercover transactions.

1          So the defendant has not borne that burden.  He

2     cannot bear that burden under the record.  And so the entire

3     395 million should be counted.

4          If I could address the defendant's argument.  The

5     defendant cites to cases that deal with a different question.

6     The different question that the defense cases deal with is not

7     commingling, but layering and aggregating layered transactions.

8     So in other words, for example, if, Your Honor, there is a bank

9     robbery, the bank robber, you know, converts the dollars into

10    Euros and then sends a wire transfer to a second bank account

11    and then converts that into gold.  If you were aggregating the

12    layers of that laundering process -- and this is what courts

13    used to do before the 2001 amendments to the money laundering

14    guideline -- then you would count each step in that layering

15    process.  So if the bank robber robbed a bank for $100,000 and

16    then went through four layers, your violation would essentially

17    be $400,000, because you could count each layer individually.

18          And the cases that the defense cites to deal with

19    that situation.  That is not the situation that we have here.

20    We are not proposing that Court count all of the internal

21    laundering mechanism that Bitcoin Fog did.  We are not asking

22    the Court to count each hop in a peel chain that was part of

23    the laundering process.  We are asking the Court to count money

24    coming in and money going out of the laundering process.  And

25    that money is commingled and under the straightforward

1     application of 2S1.1, the D.C. Circuit binding precedent in

2     *Braxtonbrown-Smith* and just the record in this case, we think

3     that is well supported.

4               THE COURT:  Okay.  Mr. Fernich.

5               MR. FERNICH:  Judge, the problem with their argument

6     is that the D.C. Circuit case and the *Martin* case are all

7     interpreting a different phrase than the sentencing guidelines,

8     which is value of the funds involved in the transaction.  And,

9     of course, it has now been amended to value of the laundered

10    funds.  And laundered funds has a straightforward meaning.  And

11    the two most pertinent cases are simply citing the *Martin* case

12    that they cited in their original papers.  That is *the Pizano*

13    case out of the Eighth Circuit and the *Paley* case out of the

14    Eleventh Circuit.  And it is quite clear the value of the

15    laundered funds equates to the amount of dirty money that was

16    originally, quote, injected into the scheme.  In all of this,

17    they talk about it being commingled.  It is impossible to

18    disambiguate or whatever.  They have done it for us.  And we

19    are relying on their own expert testimony on page 4 of the

20    chart they have created in their brief to meet our burden.

21               And they break it down quite clearly.  They say -- if

22    the Court follows *Paley* and follows *Pizano* that the value of

23    the funds laundered means the dirty money originally injected

24    into the scheme and they break it down.  $47 million came from

25    the darknet into the scheme.  That is --

```
1              THE COURT:  I don't think they have ever said it was
2    a total of 47 million.  I think they said at least 47 million
3    associated with those particular sites.  And they also talk
4    about the fact that --
5              MR. FERNICH:  There is some indirect --
6              THE COURT:  Mr. Lichtenstein and Mr. Harmon used the
7    site as well.  I don't think they say that is the sum total.  I
8    think they say these are the ones we can trace to particular
9    darknet subsites.
10             MR. FERNICH:  I am not sure that is subsumed with
11   indirectly.  If the Court looks at page 4 of the brief, there
12   is directly the dirty money that came right in and they break
13   that down for us for 47 million.  I don't know what they are
14   talking about with indirectly, because we cited in our papers
15   the excerpt that we believe is on point from the trial
16   testimony.  And we detailed why that shouldn't count, because
17   they are downstream transactions they went -- by the time the
18   money hit us at BitcoinFog, they went through several layers
19   first.  And, PS, they say all over their brief that we are the
20   ultimate layering machine.  That is their quote.  And I just
21   pulled that one out of the brief.  But it is over and over
22   again.  So to come in here and tell us that we are not
23   layering, that doesn't really make a whole lot of sense.
24             The cases are really pretty clear since 2001.  And,
25   you know, the interesting thing about these 2001 amendments is
```

1    they not only moved in the value of the funds laundered to be

2    the primary driver of the base offense level, but all of these

3    other specific offense characteristics that we are getting,

4    knowing that it comes from drug money, being in the business or

5    sophisticated laundering.  All of this stuff came in at 2001.

6    And if the Court reads *Pizano*, the whole point was before 2001,

7    the value of the funds -- again, not the laundered funds -- was

8    supposed to approximate the magnitude and scale of the scheme,

9    which undoubtedly is large in this case.  But now, with the

10   2001 enhancements -- and unfortunately I am old enough to

11   remember when all of this stuff came in.  They moved it in

12   there -- and, A, the whole point of 2001 was to whether you are

13   a direct launderer or a secondary launderer, the whole point

14   was to tie this more closely to the underlying conduct.

15   Because in the nineties the sentences were just so eye popping

16   under the money laundering guidelines.

17            So what they did was, they not only moved -- they

18   changed the language of the -- from value of funds to value of

19   laundered funds.  They added a sophisticated means specific

20   offense level characteristic.  They added a 6-point bump,

21   Judge, for knowledge that it comes from, in this case, drug

22   activity.  And they added a bump for business of the laundered

23   funds.  So I know that the Court is going to have to make a

24   calculation of the base offense level.

25            But, ultimately, I want to make this clear what our

1    ultimate position is here.  And that position really boils down

2    to two things, Judge, the *Lauersen* case that I cited from the

3    Second Circuit, which is where there is a number of overlapping

4    enhancements that really punish the same conduct in different

5    ways.  And there is not a dispute that what this is, is

6    designed to do the whole -- all of these different enhancements

7    are designed to punish him for running a large scale, huge, if

8    we are to accept the verdict, money laundering operation.  And

9    they are banging him in six different ways, which may

10   technically apply, for doing the same thing.  And it results in

11   a -- in our view at least, a 12-point overstatement.  That is

12   right out of *Lauersen*.  In my early part of my career, when

13   this was just departures, that was a recognized ground for

14   departure.  We are not asking for that.  But under 3553, it is

15   the exact same rationale.  We have got seven different

16   enhancements.  Now, if we are going to give him 28 instead of

17   22 for the value of funds laundered, you end up with an

18   eye-popping sentence.  And that leads -- segues fairly nicely

19   into the other main point, which is the *Patel* case.

20        And, Your Honor, the Court was thinking exactly along

21   the same lines that we were, because, candidly, we had already

22   prepared the notice of supplemental authority and were getting

23   ready to give that to the Court when the Court issued its --

24   got its response to the query from the Sentencing Commission.

25   I mean, this is a Supreme Court justice in the United States.

1    And, you know, there is a plea in that case, I get it.

2    Potentially there is an obstruction enhancement in this case,

3    which Mr. Ekeland will address.  And it was a very big scale of

4    money laundering in that case.  It was sophisticated.  It was

5    layered.  The guy was involved in a Ponzi scheme.  It was a

6    $250 million laundering scheme.  It was complicated.  And you

7    have got a sitting Supreme Court Justice who said, you know,

8    these are wildly inflated numbers.  He gave him 36.  And if the

9    Court wants -- I get it.  He pled -- Patel did.  He accepted

10   responsibility, our client didn't.  So, you know, you can add

11   something for that, potentially.  And, again, Mr. Ekeland will

12   address it.  If the Court finds that he perjured himself, he

13   deserves to be punished for that.  How much, 200 times?  Double

14   because maybe he didn't plead?  Give him something for the

15   perjury.  What does that amount to?

16          So in our view, ultimately -- and we talk about the

17   guidelines and the Court will find them and the Court has to do

18   this, but it is our ultimate position that a sentence of above

19   7 and a half years to the extent that the Court gives him a

20   perjury enhancement, it is very, very difficult to square that

21   with *Patel* in this district from a Supreme Court justice.  And

22   it is certainly hard to square that with *Lauersen*, because you

23   are really adding enhancements for the same -- different

24   aspects of the same conduct.  And the upshot is that it is

25   literally off the charts, so it is serious conduct.

1          It is very extensive conduct.  We accept the verdict,

2     obviously, as we must for purposes of sentencing.  But it is

3     very, very hard to rationalize it with those two precedents.

4     And part of the reason why the 20 -- I think the 22 is -- the

5     47 million and the 22 is highly appropriate, based on the

6     evidence that they have proffered.  And we are relying on that

7     for 22.  But the extra 6 points, again, it is designed to get

8     at the same thing that these other enhancements that were

9     propounded in 2001 punish.  And if we are going to add those 6

10    points, really something has to come off somewhere to

11    compensate for it, because that is the point of *Lauersen* and

12    the point of these enhancements, the amendments, I should say,

13    was to bring it all down and to tie it more directly to the

14    underlying conduct.  And, you know, they could have charged him

15    with the underlying conduct untimely.  They could have charged

16    him with aiding and abetting it, if he knows it.  They didn't

17    do that.  That is their prerogative.  They didn't do that.

18    That is fine.  We are at sentencing now.  It is just,

19    empirically speaking, too much time relative to *Patel* and under

20    the *Lauersen* rationale.

21          THE COURT:  All right.  Anything else, Mr. Brown, on

22    this issue.

23          MR. BROWN:  Your Honor, if I could just respond with

24    respect to calculation of the -- this specific offense

25    characteristic as opposed to everything under the sun.

1              THE COURT:  We will turn to the others later.

2              MR. BROWN:  Yes, Your Honor.  With respect to the

3    question of *Paley* and *Pizano* -- and really *Paley* is not about

4    aggregation or layering at all.  It is about stock that

5    increases in price.  The only case that they are really relying

6    on is *Pizano*.  *Pizano* just had to do with a different --

7    conceptually different, distinct fact pattern, which is do you

8    count layering, in other words, every separate laundering --

9    step in the laundering process.  That is not what we are

10   talking about here.  That is not what was at issue in

11   *Braxtonbrown-Smith*.  I just want to point the Court to, again,

12   D.C. Circuit's decision *Braxtonbrown-Smith*, page 1355

13   specifically addressed the Court did not error in considering

14   the, "Total amount of money involved in the charged

15   transactions," which in that case was $487,290.78 rather than

16   only some portion of that amount based on the proportion of

17   illegitimate funds in the PDA account in calculating the value

18   of the laundered funds.

19             THE COURT:  Wasn't that case from before the

20   amendments to the guidelines?

21             MR. BROWN:  It was.  But, Your Honor, this deals with

22   a different -- this is a holding as to commingling.  So if you

23   have a laundering transaction that involved both proceeds of

24   crime and arguably licit funds, *Braxtonbrown-Smith* says you

25   count the whole transaction.  That is not about layering.  It

1    is not about the -- what was amended in the guideline.  And it

2    is significant, Your Honor, that if you look at the actual

3    verbiage that the D.C. Circuit uses here, the D.C. Circuit says

4    this is the way you calculate the value of the laundered funds.

5    The 2001 amendment inserted the word laundered into

6    2S1.1(a)(2).  So before that it read, value of the funds.  And

7    after the amendments it read, value of the laundered funds.  I

8    know we don't read judicial opinions as statutes, but it is

9    significant.  This is conceptually different and it uses the

10    specific language that is now the prevailing standard in the

11    guidelines.

12         If we were asking the Court to count layering, we

13    would ask the Court to count every single peel chain, every

14    single hop.  So you deposit 1 Bitcoin into Bitcoin Fog, that

15    goes through 5, 10, 100 transactions.  We would be asking for

16    5, 10, 100 times the amount of funds deposited into Bitcoin

17    Fog.  That is not what we are asking for.  This is commingled

18    funds, at best.  And if it is commingled funds, the defendant

19    bears the burden of coming forward with information sufficient

20    to disambiguate the funds and they haven't even attempted to do

21    that.

22         THE COURT:  All right.

23         MR. BROWN:  One last point, the table on page 4, it

24    is about 47 million if you add it up for the direct

25    transactions.

1          THE COURT:  Right.

2          MR. BROWN:  The indirect, if you add it up, it is

3     another roughly $60 million, so we would really be talking

4     about 100 or so million dollars in that range, if the Court

5     were to go down that road.

6          THE COURT:  Okay.

7          MR. FERNICH:  Judge, this is just a purely fanciful

8     reading of the law.  I don't have anything else to say.  If you

9     read *Paley* and *Pizano* especially, it says -- it is a materially

10    different guideline.  We count only the dirty money initially.

11    So this is just -- it is just fanciful.

12         THE COURT:  Right.

13         MR. FERNICH:  I don't know what -- and I briefed it

14    about the indirect monies.  So they haven't explained what the

15    indirect monies are.  They are downstream transactions.

16    The trial --

17         THE COURT:  I think they are upstream transactions,

18    at least what they are talking about now.

19         MR. FERNICH:  I don't know what they are talking

20    about, but the indirect monies had to go through several steps

21    before they got into Bitcoin Fog.  And the case law says, it is

22    the original dirty funds that are involved in the transaction

23    in the first instance that drives the value of the laundered

24    funds.

25         THE COURT:  Yeah.  Fair enough.  And I think I have

1    enough to give you my views on this.  But what I will say

2    though on that, this isn't a circumstance where someone

3    where -- the person who goes to the safe -- owns the Safeway,

4    takes the profits home at the end of the day and goes to the

5    dog food store and buys some dog food.  And the person who owns

6    the dog food store goes to the shoe store and then that person

7    deposits the money.  This is the way funds get hidden in

8    Bitcoin transactions is going through various hops in order to

9    obscure the transactions.

10    You we may be right.  We don't know with respect to

11    every one whether there may have been some legitimate pause in

12    the path there, but what the analysis showed was that these

13    were traced back to the darknet sites.  And it is fair --

14    MR. FERNICH:  Judge, what the cases --

15    THE COURT:  It is a fair inference, the darknet -- it

16    might be a coincidence on the darknet site someone says, oh, I

17    am going to spend $1,000 on some item.  It seems improbable.

18    And then whoever did that then says, oh, I am going to go put

19    the money into Bitcoin Fog.  I think the more reasonable -- and

20    it is just the preponderance now -- inference is with those

21    transactions going on was whoever was running the darknet sites

22    was engaging in some hops to further obscure themselves.

23    MR. FERNICH:  But what the cases say, Judge, is, the

24    takeaway from the 2001 amendments is that we get at that -- the

25    harm that creates is the sophistication and the intricacy and

1    the difficulty of hiding it from law enforcement.  And we get

2    it through that.  And we get it through the business of

3    being -- of laundering.  And we get it through the knowledge,

4    ostensibly, of the underlying specified unlawful activity.

5    That is why, the -- I mean, you can't just say, the '93 case or

6    whatever, from the D.C. Circuit solves this, because it is

7    interpreting a whole different amendment that didn't have these

8    things.  So the way you get at that is not through value.  But

9    through sophistication.  That is the harm.  And we all know

10   that the harm of money laundering is a societal harm.  So that

11   is accounted for in other ways under the guideline.

12           I am -- of course, it is not like going to the Buster

13   Brown shoe store and hiding the money in a pair of shoes.  It

14   is sophisticated.  It is complex.  It is difficult to unravel,

15   all of that, whether it is commingled, whether it is not

16   commingled, all of that -- whether there is any licit funds or

17   whether it is purely illicit, all of that is tied up in the

18   other enhancements.  And if we are going to pound all of this

19   stuff together and give him 6 points on top of it for the

20   value --

21           THE COURT:  No.  I am going to give you a chance to

22   address those separately.  So let me give you my views on this

23   one and then we can turn to the others.

24           You know, as you may have noted from reading my

25   opinion on the excessive fines, I think there is a legitimate

1    question about 1956 and the extent to which the word

2    transactions in that statute is intended to refer only to the

3    transactions involving the illicit goods or whether it includes

4    the transaction in the broader sense that would include the

5    mixing with licit funds.

6         And I know that there is some D.C. Circuit law that

7    tends to support the government's view on this question.  And

8    there may be some language, as I pointed to in my opinion,

9    which further supports that view.  I don't know that that issue

10   is one that is fully resolved.  And I don't think I need to

11   fully resolve that question today.

12        Because I do agree with the government's argument

13   that the application note and in particular note 3B does

14   address this circumstance.  And there it provides and explains

15   in a case in which a transaction, financial transaction,

16   monetary transaction, results in commingling of legitimately

17   derived funds with criminally derived funds, the value of the

18   laundered funds for subsection (a)(2) is the amount of the

19   criminally derived funds, not the total amount of the

20   commingled funds if the defendant provides sufficient

21   information to determine the amount of criminally derived funds

22   without unduly complicating or prolonging the sentencing

23   process.

24        And here, as I indicated, I don't agree with the

25   proposition that the government has already defined what the

1    illicit funds were and distinguished them from the licit funds.

2    And the government has been pretty clear in its view that its

3    position is they were all or likely all from unlawful activity

4    and they just pointed to examples where they can -- were able

5    to trace it in ways to actually prove that, but I don't think

6    they intended to draw any finer lines than that.

7         And so I do conclude that the government is right

8    that under the guidelines, the 28 levels should be added.  I

9    will say, however, that that doesn't make a difference in the

10   end, because for reasons that I will explain later today, I

11   think that either a variance or a departure is appropriate.

12   Because I think, as even the government seems to concede with

13   respect to its sentencing recommendation, that just applying

14   the guidelines and that vary large adjustment results with a

15   sentencing range, which I just think is excessive.  And I -- I

16   don't need to repeat what all of my colleagues have said over

17   the years about the table and how the table, at least in some

18   cases, does overstate the culpability of the defendant.  But

19   here, in these circumstances, and as we'll get into greater

20   detail below, I think that applying the 28 levels, which I

21   think literally does apply under the guidelines, does result in

22   a suggested sentence which is significantly too high.

23        And I want to make sure that I hear from everyone on

24   everything else before I get to this.  I do want to just note

25   for the benefit of the record and Mr. Fernich that although I

1  disagree with you on the law and the interpretation of the

2  guidelines, I don't disagree with you with respect to where

3  this takes us.

4            MR. FERNICH:  It is not the first time I have heard

5  that, Judge, people disagreeing with me on the law.

6            THE COURT:  Maybe it is the first time on the second

7  part.  I don't know.  But I am actually agreeing with you about

8  the concerns that you are identifying.

9            MR. FERNICH:  Broken clocks, Judge.

10           THE COURT:  Yes.  But what I will say though is

11  that -- so I think that in some sense how I come out on this is

12  not outcome determinative in this case, because even though I

13  agree with the government on the application of the guidelines,

14  I think I would vary down in any event, at least by the amount

15  to the 22 levels if not below that, for reasons that we can

16  discuss later.  So then that leads to the question of whether

17  there should be a 6-level adjustment under section 2S1.1(b)(1)

18  because Mr. Sterlingov knew laundered funds were proceeds of

19  illegal or unlawful narcotics activity or CSAM transactions.

20           And the government and the probation officer also

21  both suggest there should be a 4-level adjustment because

22  Mr. Sterlingov was in the business of laundering funds.

23  Probation and the government also agree there should be a

24  2-level -- let me put that aside for a second before I turn to

25  the obstruction issue, because I think that is a distinct

1    question.

2            The parties disagree about whether there should be a

3    2-level enhancement under 3C1.4.  So let me start with the

4    6-level enhancement under 2S1.1(b)(1) and the 4-level

5    enhancement under 2S1.1(b)(2)(C).  And I suppose my question is

6    whether the defense disagrees with the proposition that those

7    provisions technically apply.  And you're, of course, welcome

8    to argue that I should vary because those may overstate the

9    nature of the offense or the culpability of the defendant.  But

10   if there is a technical difference that I should resolve, I

11   need to know what that is.

12           MR. FERNICH:  So the first one is knowledge.

13           THE COURT:  That he knew the laundered funds were the

14   proceeds of at least narcotics?

15           MR. FERNICH:  Yeah.  We are going to stand on the

16   papers about that one.  We have nothing to add.

17           THE COURT:  On that one, I do find there was

18   sufficient evidence in the record that Mr. Sterlingov knew that

19   Bitcoin Fog was being used to launder narcotics -- illegal

20   narcotics funds.  And so I find that as a technical matter that

21   enhancement applies.  The second one is that Mr. Sterlingov was

22   in the business of laundering funds.

23           MR. FERNICH:  We think that it is a *Hobson*'s choice

24   for us, business of laundering funds versus the 2 for

25   sophisticated means and violating 1956.  It turns out to 4

```
1    points one way or the other.  And we don't have an argument on
2    the sophisticated means and the 1956 violation.
3              So, otherwise, we'll stand on the papers with respect
4    to this issue.
5              THE COURT:  And I conclude that as a technical matter
6    that that enhancement does apply as well.  Again, the parties
7    are free to argue there should be a variance in light of that
8    or even a departure if you would like to.
9              Yes, Mr. Brown.
10             MR. BROWN:  Your Honor, just to point a
11   clarification, on the 2S1.1(b)(2) enhancement, is the Court
12   finding that solely on the basis of knowledge of drug
13   trafficking or also knowledge of transactions related to child
14   sexual abuse?
15             THE COURT:  Why does that matter?
16             MR. BROWN:  Just for clarity of the record.
17             THE COURT:  I guess I would like -- I don't think I
18   need to do that for the guidelines calculation.  If you want to
19   argue to me about that in allocuting more generally, I can make
20   a determination about that.  I would like to hear more on that
21   question.  But I don't think I need to decide that for purposes
22   of the guidelines calculation, because I think it is clear with
23   respect to the illegal narcotics transactions.
24             MR. BROWN:  Thank you, Your Honor.
25             THE COURT:  Okay.  So I think that then does lead to
```

1    the 2-level obstruction enhancement.  And maybe it makes sense

2    for me to hear first of all from Mr. Ekeland on that.

3            MR. EKELAND:  Your Honor, it is just a simple

4    argument that we did reference in our papers.  If the Court

5    recalls that the government argued at closing to the jury that

6    all they needed to convict Mr. Sterlingov was to find that he

7    registered the domain name to the clearnet site.  The Court, of

8    course, recalls there was a willful blindness jury instruction

9    as well as aiding and abetting jury instruction.  And we just

10   submit that Mr. Sterlingov's testimony is entirely consistent

11   with that.  And him actually not operating and administrating

12   Bitcoin Fog.

13           I would point out that no direct evidence came in, in

14   trial at all of Mr. Sterlingov administrating or operating

15   Bitcoin Fog.  There is no communications between him and anyone

16   else operating Bitcoin Fog.  There is no server logs.  There is

17   no ledgers.  There is nothing -- the entire, I think, case --

18   the evidence against Mr. Sterlingov in relation to operation

19   and administration is purely circumstantial.

20           THE COURT:  Okay.  Thank you.

21           Mr. Brown.

22           MR. BROWN:  Your Honor, I would direct the Court's

23   attention to this section in our sentencing memo.  And I just

24   point out that there are four clearcut examples of perjury.

25   Now, it is true that virtually every bit of the defendant's

1    testimony was misleading or incomplete in some way, but these

2    four examples are, number one, he was asked a direct question,

3    "Did you ever operate Bitcoin Fog?"

4         And he said, "No.  I never operated or was

5    administrator of Bitcoin Fog."

6         That is just incompatible with the jury's verdict of

7    guilty on all counts.  Even if he operated it for purposes of

8    setting up the domain, he still was operating or administering

9    Bitcoin Fog in some sense.

10        Number two, when he was asked to explain how he first

11   learned of Bitcoin Fog, he told a story that he just heard

12   about Bitcoin Fog at one of these Meetups.  And somebody told

13   him that he should use this to mix his funds.  Your Honor, even

14   if all that he did was register the clearnet domain for Bitcoin

15   Fog, he could not have heard about it from somebody else at a

16   Bitcoin Meetup, because it didn't exist until the defendant set

17   up that clearnet domain.

18        Number three, he testified that he had no funds

19   sourced from Bitcoin Fog.

20        Again, that is incompatible with the jury's verdict.

21   There were heaps of evidence that, number one, that -- that he

22   received millions upon millions of dollars directly or

23   indirectly traceable from Bitcoin Fog.  And there is no

24   evidence in the record showing a legitimate source of those

25   funds, especially postdating the date that he quit his day job

1    in 2014.

2              And, number four, he testified at trial, quote --

3    when he was asked how many transactions he ever made on Bitcoin

4    Fog he testified, "Maybe a few dozen."

5              Over ten years, he testified that he only made a few

6    dozen transactions on Bitcoin Fog.  That is just totally

7    incompatible with just the mountain of evidence showing Bitcoin

8    flowing in to his accounts, to his Mycelium wallet, to Local

9    Bitcoins, to Kraken, to Bitstamp, all of these wallets under

10    his control -- it was way more than a few dozen transactions

11    over 10 years.  And that is incompatible with the jury's

12    verdict finding him criminally responsible for the Bitcoin Fog

13    money laundering conspiracy, for the undercover transaction,

14    for operating or even just aiding and abetting the operation of

15    an unlicensed money transmission business and for engaging in

16    the business of money transaction in the District of Columbia.

17    It is just incompatible.  So those are four clearcut, factual

18    statements the defendant made that cannot be true.  The jury

19    could not have believed those statements and still come out

20    with the verdict that it did.

21              And if there is any doubt about the defendant's

22    intent here, the defendant's intent is made manifest by all of

23    this blizzard of feigned amnesia, I can't remember.  He

24    testified he couldn't remember if he set up the Bitcoin Fog

25    clearnet domain, not that he never did it, he couldn't

1    remember.  He couldn't remember half of the answers to the

2    questions he was asked on cross.  And I think that that shows

3    very clearly that he was trying to mislead the jury.  And that

4    shows that for these specific four factual -- clear factual

5    misstatements that his intent was to lie and to commit perjury.

6             THE COURT:  Okay.  Thank you.

7             Mr. Ekeland.

8             MR. EKELAND:  Just briefly, Your Honor, registering a

9    domain name for a website on the internet is not the same as

10   operating, administrating that website.  And it is entirely

11   possible that Mr. Sterlingov did hear about Bitcoin Fog at a

12   Meetup before he registered the domain name.  And I actually as

13   I am sitting here, I am wondering or questioning if that is

14   actually material to the case.  Because it is -- again, as the

15   government argued in closing told the jury that all they had to

16   do was find that he registered that domain name and that they

17   could find him guilty of everything.

18            In terms of the few dozen transactions, there is --

19   here, I think, there is sort of playing games with the language

20   here.  Because what the government is saying is that all of

21   these transactions that went through Bitcoin Fog from third

22   parties, whatever Silk Road and everything, they are saying

23   those are his transactions.  And Mr. Sterlingov's testimony

24   there is entirely consistent with him saying -- and the

25   evidence is consistent with him roughly doing around a dozen

1      transactions of his own funds through Bitcoin Fog.

2            So I just don't think that the government, you know,

3      meets the standard here for perjury of, you know, willfully

4      intending to deceive the Court.  And that I think his testimony

5      was entirely consistent with the jury just finding that he was

6      somehow aiding and abetting this or willfully blind.  And,

7      again, there is no direct evidence in the record of him ever

8      operating or administrating Bitcoin Fog.  Any evidence relating

9      to that is purely circumstantial.

10           THE COURT:  All right.  Thank you.

11           Well, I do find that the enhancement does apply here.

12     And I, in general and in this case, am cautious about applying

13     this enhancement, because I don't think people should have to

14     face an enhanced sentence merely because they testify in their

15     own defense and sometimes people see the world differently.

16     But, on the other hand, where someone I think affirmatively

17     attempts to mislead the jury, it is a different matter and the

18     enhancement applies.  And I do think that by way of example,

19     that Mr. Sterlingov was intentionally untruthful when he was

20     asked whether he ever operated Bitcoin Fog.  And he responded,

21     "No.  I never operated or was an administrator of Bitcoin Fog."

22           And Mr. Ekeland's argument is that you can understand

23     the jury's verdict based on a willful blindness theory.  But

24     that is not really what I understood the willful blindness

25     was -- I don't think the willful blindness was, was he

1     operating it or was he not operating it and maybe he didn't

2     realize he was operating it.  I think the willful blindness

3     instruction was about willfully blind about where the money was

4     coming from that was being deposited into Bitcoin Fog and

5     whether he went to the trouble of figuring out and knew that it

6     was coming from unlawful drug transactions, by way of example,

7     or whether he just chose not to know that and was willfully

8     blind to the fact that those -- the deposits were coming from

9     unlawful drug transactions and other unlawful activity.  I

10    think that is what the willful blindness instruction was about.

11          And I don't know, quite frankly, how one could

12    reconcile the jury's verdict with a finding that Mr. Sterlingov

13    never operated or administered Bitcoin Fog, because he wouldn't

14    have been engaged in money laundering had he not done those

15    things.  And so I think that that, just by way of one example,

16    was intentionally false testimony that was offered.

17          With respect to the registering of the domain name,

18    it is true that there was not a great deal of evidence in the

19    case directly linked to Mr. Sterlingov and that the

20    registration of the domain name was one of those pieces of

21    evidence.  It was, obviously, a very important piece of

22    evidence.  I don't think it was the only evidence though

23    linking things to Mr. Sterlingov and linking Bitcoin Fog and

24    the operation of Bitcoin Fog to Mr. Sterlingov in the case.

25    Similarly, with respect to the source of Mr. Sterlingov's

1    Bitcoin wealth, he said that he didn't have any funds that were

2    sourced from Bitcoin Fog.  I think that also is at odds with

3    the jury's verdict and the overwhelming evidence in the case.

4    And I think this is an example of somewhere where things may

5    not have gone particularly well for Mr. Sterlingov in his

6    testimony.  But when he testified about the invoices that he

7    had generated and claimed that he had done those after the

8    fact, my recollection is for tax purposes, I think that the

9    jury likely, and in my view quite reasonably, would have based

10   on my listening to the evidence concluded that that testimony

11   was not truthful.  And that the invoices were generated for the

12   purposes of hiding the source of the income.  So I find that

13   enhancement does apply.

14          Which then leads to the question about whether the

15   registration of the domain name enhancement should apply from

16   section 3C1.4.  And I am happy to hear from you all on that as

17   well.

18          MR. FERNICH:  Judge, we are going to stand on our

19   papers about that.  But I will just preview this, for my

20   cocounsels' edification as well as the Court's.  If it

21   technically applies, I think this goes into the 3553 hopper,

22   because they could have charged the underlying activity.  And I

23   get it.  There is an ongoing debate about the standard of proof

24   of the guidelines -- under the guidelines.  This harkens back

25   to pre-Booker stuff.  You have great opinions from Scalia

1    before he passed in the *Jones* case.  Maybe they can do it under

2    current law.  Should they do it?  It is a little cheeky.  And I

3    think that belongs in the 3553 hopper, otherwise we'll stand on

4    our papers about that.

5              THE COURT:  Mr. Brown.

6              MR. BROWN:  Your Honor, if I could just clarify the

7    work that false registration of the domain name is doing here.

8    It is applied here because there is a specific enhancement in

9    the guidelines for conduct that fits 3559(g) in terms of

10   registering a false domain name, which means registering in the

11   manner that prevents the effective identification of or contact

12   with the person who registers.  3559(g) can come up in a case

13   in one of two ways.  In one way, it can be something that is

14   charged and the jury renders a verdict.

15              And if that is the case then by operation of the

16   statute, the statute causes the statutory maximum to increase

17   by either double or plus 7.  That is one way to apply it.  That

18   is not the way that we are asking the Court to apply it here.

19   We are asking the Court to apply the guidelines enhancement,

20   which applies because those facts are satisfied.  What we are

21   not asking the Court to do is increase the statutory maximum

22   punishment.  That is the issue that the defense cases deal with

23   is whether the jury needs to find facts that increase the

24   statutory maximum.  That is not how this is being used here.

25   And the D.C. Circuit has been clear that the principle that in

1    order to increase the statutory maximum the jury has to make a

2    finding beyond a reasonable doubt that -- or at least by a

3    preponderance.  That is not what we are asking for here.

4          It is clear under D.C. Circuit precedent, which is

5    cited -- I think it is the *Fields* case in our brief -- that

6    simply applying the sentencing enhancement, which increases the

7    recommended guideline range, but does not increase the total

8    statutory maximum exposure of criminal punishment for the

9    defendant, there is no constitutional question about doing

10   that.  We are just applying the guideline, not increasing the

11   stat maxes in this case.

12         MR. FERNICH:  Well, let me just make this clear for

13   the record, because Your Honor is not an appellate court.  I

14   agree, to an extent, with what my friend just said.  I do

15   believe that it violates the Sixth Amendment.  And I believe

16   that when you put a statute under the guidelines that the law

17   should be and someday may well be, that we have a right to have

18   a jury determine whether the statute was violated, have a jury

19   determine that beyond a reasonable doubt, as opposed to a judge

20   at sentencing -- no offense to Your Honor.  You have been

21   great -- by a preponderance of the evidence.  And that is by no

22   means some sort of outre proposition.  So certainly, three

23   justices I believe, maybe two in *Jones* agreed with that.  And I

24   think Justice Gorsuch would agree with that heartily.  Maybe

25   some of the so called liberal justices would agree with it as

```
 1    well.  So this is for another audience.  But I do think if it
 2    ever gets that far, this is a pretty good test case for it,
 3    because it is rare in the guidelines where they are asking Your
 4    Honor to make a finding after the fact that his conduct
 5    violated a federal statute, which they could have, but chose
 6    not to put before the jury.  So I know they are not -- whatever
 7    he said about what they are asking and what they are not asking
 8    the Court to do, I agree with that.  That doesn't mean at the
 9    end of the day it is constitutional and I don't think it is.
10              THE COURT:  All right.  Give me a moment here.
11              (Pause.)
12              THE COURT:  So I have to say, I think this is a hard
13    question on the law.  The government argues that the guideline
14    doesn't apply, because it says if a statutory enhancement under
15    18 U.S.C. section 3559(g)(1) applies, increase by 2 levels.  It
16    doesn't say if you are convicted of violating 18 U.S.C.
17    3559(g)(1) then apply the enhancement.
18              As far as we have been able to determine, there have
19    been no cases decided or at least no reported decisions
20    interpreting this provision.  And I am -- the provision is
21    implementing section 204(b) of Public Law 108-482, which is
22    what I was just looking at.  And that provision says that
23    pursuant to section 944(p) of Title 28, which is the Sentencing
24    Commission provision -- but let me just pull that up as well.
25    P says the Commission at or after the beginning of the regular
```

1    session of Congress may promulgate under A of this section and

2    submit to Congress amendments to the guidelines.  But then the

3    provision from Public Law 108-482 goes on and says that the

4    Commission shall review and amend the guidelines and policy

5    statements to ensure that the applicable guidelines range for a

6    defendant convicted of any felony offense carried out online

7    that may be facilitated through the use of a domain name,

8    registered under materially false contact information is

9    sufficiently stringent to determine -- to deter commission of

10   such acts.  But then 2 says, in carrying out the subsection,

11   Sentencing Commission shall provide sentencing enhancements for

12   anyone convicted of any felony offense furthered through

13   knowingly providing or knowingly causing to be provided

14   materially false contact information to a domain name

15   registrar.

16           And in that language it is not entirely clear whether

17   Congress is talking about being convicted of an offense and

18   then the Court makes a separate, independent determination

19   about whether that offense someone was convicted of was

20   furthered in the -- or whether that actually is what the

21   conviction involves, which would be a violation of section

22   359 -- 3559(g)(1).  And I quite frankly think you can argue

23   this either way pretty reasonably as to whether Congress or the

24   Sentencing Commission intended that there be a conviction.

25           And just looking at the plain language of 3C1.4,

1    Congress -- or the Sentencing Commission didn't say if the

2    factors set forth in that provision are satisfied, then

3    enhance.  It says, "If a statutory enhancement applies."  And I

4    think that as a matter of just plain language that one could

5    quite reasonably conclude that that enhancement only applies

6    when there is a conviction under that section.

7         And so my view is that, although a close question, I

8    am of the view that 3C1.4 does not apply under these

9    circumstances.  And in any event, for the reasons that

10   Mr. Fernich has provided with respect to overcounting based on

11   each element of the scheme here, I would conclude that a

12   variance would be appropriate with respect to this enhancement

13   as well, so I am not going to apply that enhancement.

14        Then Mr. Sterlingov is eligible for a 2-level

15   reduction as a zero-point offender.  And so I think that all

16   then leads to a total offense level of 44.  Any objections,

17   clarifications, anything else for the record that has not

18   already been covered with respect to the guidelines

19   calculation?

20        MR. BROWN:  Your Honor, just reviewing the math on

21   that so --

22        THE COURT:  It is always a good idea with me.

23        MR. BROWN:  If we are using essentially the PSR as a

24   guideline calculation, but dropping out the plus-2 enhancement

25   for false registration of a domain name, would that not --

1            THE COURT:  That still leads us to 46; is that right?

2            MR. BROWN:  So it is 50, minus 2, for the dropping of

3    the domain name, minus 2 for the zero-point offender, yes, 46.

4    Yes.

5            THE COURT:  46, everyone agree with that?

6            MR. FERNICH:  That's right, Judge.

7            THE COURT:  Mr. Sterlingov has no criminal history so

8    is in criminal history category 1.  And under the guidelines,

9    because we are above 43, we drop the guidelines down to 43.

10   And so that would mean that the guidelines would recommend a

11   sentence of life in prison.

12            And then under the D.C. Circuit voluntary guidelines,

13   Count 4 is a group 9 offense.  And that would mean that the DC

14   voluntary guidelines would recommend a sentence of between 1 to

15   12 months.  Anything else to clarify or --

16            MR. FERNICH:  Could I have a word with my cocounsel

17   for just one minute?

18            THE COURT:  Yes, you may.

19            MR. FERNICH:  Nothing further.

20            MR. BROWN:  Nothing from the government, Your Honor.

21            THE COURT:  Then for purposes of Counts 1 and 2, as I

22   have mentioned before, the maximum sentence is 20 years.  For

23   Counts 3 and 4, the maximum sentence is 5 years.  Under 18

24   U.S.C. section 3583 a Court may impose a term of supervised

25   release of up to 3 years for Counts 1 to 3 with those terms

1    running concurrently.  And if the Court imposes a sentence of

2    more than 1 year for Count 4, the Court shall also impose a

3    term of supervised release of 3 years under DC law.

4           Under section 5D1.2 of the guidelines, the

5    recommended term of supervised release is between 1 and 3 years

6    for Counts 1 and 2.  And the DC guidelines do not provide a

7    requirement regarding the imposition of supervised release.

8    And because Mr. Sterlingov is a removable alien, the courts

9    generally do not impose a term of supervised release, although

10   I can do so if I conclude that it would be appropriate if there

11   was some period of time where he might continue to reside in

12   the United States or if anyone thought there was some reason

13   for me to do so even after he is removed from the United

14   States.

15          Under 18 U.S.C. section 3561(c)(1), the defendant is

16   eligible for 1 to 5 years of probation for Counts 1 to 3.  And

17   he is eligible for a term of probation not exceeding 5 years on

18   Count 4.  Under the guidelines, no term of probation is

19   recommended.

20          I have already issued a couple of opinions now on my

21   preliminary order with respect to forfeiture.  Anything else

22   anyone wants to add with respect to forfeiture at this point?

23          MR. FERNICH:  No, Judge.  Just stand on our papers.

24          MR. BROWN:  No, Your Honor.

25          THE COURT:  I understand.  Okay.  I will then enter

1    the order of -- preliminary order of -- or proposed order of

2    forfeiture as part of my sentence in this case.

3         For Counts 1 and 2, the maximum statutory fine is

4    $500,000 or twice the value of the property involved in the

5    transaction.  And for Count 3, the maximum fine is $250,000.

6    And for Count 4 the maximum fine is $12,500.  And the

7    guidelines recommend a fine of between 50- and $500,000 for

8    Counts 1 through 3.  And the DC guidelines don't recommend

9    imposition of a fine.  There is just no fine provision at all.

10   There is a mandatory special assessment of $300 for Counts 1 to

11   3.  And a mandatory special assessment of between 100 and

12   $5,000 for Count 4.

13        Would the parties like to be heard?  I want to -- I

14   will decide variances after I hear from you all with respect to

15   the 3553(a) factors.  But does anyone want to address

16   departures before we get to that?

17        MR. FERNICH:  Six in one, half a dozen in the other

18   from our perspective, Judge.

19        THE COURT:  Okay.

20        MR. BROWN:  No, Your Honor.

21        THE COURT:  Well, I do conclude that a *Smith*

22   departure would be appropriate in this case.  And I will apply

23   a *Smith* departure of 6 months from whatever sentence I

24   ultimately impose under *United States versus Smith*, 27 F.3d

25   649.

1    And I will also note for the record and you are

2    welcome to address this in the context of variances.  But under

3    5K2.0(a)(2), the guidelines recognize that the courts may

4    depart if the Court finds there exists an aggravating or

5    mitigating circumstance of a kind and to a degree not

6    adequately taken into consideration by the guidelines in

7    formulating the guidelines.  And I think other than the *Smith*

8    issue I am not of the view that any of that applies here.

9    The probation office, as you all know, has

10   recommended a sentence of 240 months of imprisonment for all

11   counts to run concurrently.  Obviously, counts that carry

12   sentences shorter than that would just be at the statutory

13   maximum.  Probation office also recommends 36 months supervised

14   release and a special assessment of $100.  That is based purely

15   on information set forth in the PSR.

16   I now need to consider the factors Congress has

17   specified in 18 U.S.C. section 3553(a).  And I have to ensure

18   that I impose a sentence that is sufficient but not greater

19   than necessary to comply with purposes of sentencing.  Those

20   purposes include the need for the sentence imposed to reflect

21   the seriousness of the offense, to promote respect for the law

22   and to provide just punishment for the offense.  The sentence

23   should also afford adequate deterrence to criminal conduct,

24   protect the public from future crimes of the defendant and

25   promote rehabilitation.

```
 1              In addition to the guidelines and sentencing
 2    statements, the Court must consider the nature and
 3    circumstances of the offense, the history and characteristics
 4    of the defendant, the need for the sentence imposed, the
 5    guidelines range, and the need to avoid unwarranted sentencing
 6    disparities among defendants with similar records who have been
 7    found guilty of similar conduct and the types of sentences
 8    available.
 9              We have been going for about an hour and a quarter or
10    so at this point.  I also have a plea that I am supposed to
11    take at 3:30.  So I don't know if --
12              Are counsel here for that matter?
13              MR. BERMAN:  Yes, Your Honor.
14              THE COURT:  Would you like -- if we take a break
15    would you like to proceed with that?
16              MR. BERMAN:  Certainly.
17              THE COURT:  So why don't we take a break.
18              I don't think it is necessary -- I mean, it is up to
19    you.  I don't think it is necessary for you to clear away
20    everything you have on the table.  I don't want to burden you
21    too much.  Hopefully if there is anything sensitive, you can
22    take it with you, but otherwise you can leave your things
23    there.
24              I am going to take a 5-minute break, come back, take
25    the plea and that way I can hear from you without interrupting
```

```
 1    you.
 2                (Recess taken at 3:26 p.m.)
 3                THE COURTROOM DEPUTY:  Recalling criminal case number
 4    21-399.
 5                THE COURT:  All right.  So I am ready to hear from
 6    the parties.  And if the government wants to go first, I am
 7    happy to hear from you, Mr. Brown.
 8                MR. BROWN:  Yes, Your Honor.
 9                The government is asking for 30 years of
10    imprisonment.  That is a downward departure or variance from
11    the applicable guidelines range.  We think that 30 years is a
12    fair and just sentence under the 3553(a) factors.  And to walk
13    through those factors -- I don't want to belabor everything in
14    our sentencing memo, because I am sure the Court has reviewed
15    that.  I just want to highlight a few points that we think are
16    especially relevant.  And the first point that we wanted to
17    highlight is the duration of this criminal scheme.
18                Bitcoin Fog started in October of 2011.  That is
19    significant, because just less than a year earlier -- and I
20    think it was February 2011 that is when the first real darknet
21    market launched, Silk Road, that sold drugs in exchange for
22    Bitcoin.  Bitcoin Fog grew up with Silk Road.  And if you look
23    at Government Exhibit 601, that table of the transactions to
24    and from these darknet markets, you see that during the course
25    of Silk Road's lifespan Bitcoin Fog processed about $11 million
```

1    in direct transactions to and from and another $11 million in

2    indirect transactions to and from Silk Road.

3          So Bitcoin Fog really helped to enable this illicit

4    drug trafficking ecosystem from the very beginning.  And then

5    when Silk Road was taken down, Bitcoin Fog continued.  And it

6    serviced Silk Road 2.0, AlphaBay, Agora, Nucleus.

7          THE COURT:  Wasn't Silk Road basically performing its

8    own mixing services and that you would put your money in an

9    account there and then when you took your money out, there

10   would be separate or different Bitcoin that you would draw out?

11         MR. BROWN:  Yes, Your Honor.  That did come out

12   during the testimony that Silk Road acted like any other

13   custodial service, where if you deposit funds, it is held in an

14   account in your name.  But when you withdraw, it comes from a

15   different Bitcoin address.  The problem though for vendors on

16   Silk Road or users is they are still withdrawing funds from a

17   known darknet service.  They still needed Bitcoin Fog.  Say if

18   you are a vendor, you are selling cocaine, like the Symbiosis

19   vendor on Silk Road.  When Symbiosis is withdrawing cocaine

20   trafficking funds, Symbiosis can't just deposit that into his

21   Kraken or Coinbase account, because Coinbase will see it comes

22   directly from Silk Road.  So Bitcoin Fog served that essential

23   mixing service.  It was year in, year out.

24         And it is significant if the Court looks at

25   Exhibit 325 that breaks down Bitcoin Fog's transactions over --

1    on a yearly basis.  It ramped up and by 2013 and onward, there

2    was never a year in which Bitcoin Fog transacted less than

3    $35 million in transactions.

4         $35 million dollars per year.  And even in the

5    partial year of 2021 when Roman Sterlingov was arrested,

6    interrupting Bitcoin Fog's operations, just in that partial

7    year, January through April of 2021, it was $17 million.  This

8    is criminal activity of a staggering scale over a prolonged

9    period of time.

10        And the scale of harm that was facilitated by the

11   defendant by his actions in creating this criminal service is

12   also staggering in its scale.  We are talking about tens of

13   millions of dollars in drug trafficking transactions, tens of

14   millions of dollars in cocaine, methamphetamine, fentanyl, all

15   sorts of illegal drugs.  That is tens of millions of dollars

16   worth of lives interrupted and destroyed by addiction, of

17   overdoses, chronic health problems, families impacted.

18        And then there is the child sexual abuse material.

19   And I know this is a point where the defense likes to ridicule

20   that is only about $1,800 in total that Bitcoin Fog processed

21   for users of Welcome to Video, $1,800 worth of payments into

22   Welcome to Video.  This Court saw those exhibits before they

23   were redacted.

24        THE COURT:  The chart has 800 or 900 in front of me;

25   right?

```
 1              MR. BROWN:  It is nine --

 2              THE COURT:  I see.  You have got the direct and

 3      indirect.

 4              MR. BROWN:  Yes, Your Honor.  And if you add that up,

 5      it is about I think it is $1,835.

 6              THE COURT:  Yep.

 7              MR. BROWN:  But that is $1,835 of child sexual abuse

 8      images.  And I know this Court saw those text descriptions of

 9      those videos.  And it wasn't one or two or three videos, it was

10      dozens upon dozens of videos.  And in each video, there is a

11      child who is raped, sexually abused.  And users of that website

12      were accessing it using the defendant's services.

13              And the defendant knew that his service would be used

14      for this sort of activity.  And I direct the Court to

15      Exhibit 55A.  This is contemporaneous with when the defendant

16      was setting up Bitcoin Fog.  He, in his posting on the

17      Exploit.in, the Russian cybercrime forum, he said, and I quote,

18      "Folks, I will share with you an awesome idea.  Stop struggling

19      and get a Tor hidden service."  Then he says, "For years, drugs

20      are sold and unfortunately, child pornography distributed

21      through it."  And then at the bottom he says, "Thank me later."

22      There is a smiley emoji.  And then he says, "Else also like

23      Silk Road, go ahead and accept payments in Bitcoins and then

24      you will not be intimidated by even the US government."

25              So he knew that the darknet drug trafficking economy,
```

1    the Tor-based illicit economy that is fueled by Bitcoin

2    involves drug trafficking.  And he knew that it involved child

3    sexual abuse material.  This is not a case where there is a

4    mystery about what the defendant thought or what he knew or

5    what he was trying to accomplish in setting up Bitcoin Fog.

6    His words are all over the exhibits in this case.  They are in

7    the words of Akemashite Omedetou, the moniker, the alter ego of

8    Bitcoin Fog.  They are in his postings on Exploit.in under his

9    Meth persona.  They are in his statements by Killdozer on

10    Bitcoin Talk and in his private correspondence and his private

11    notes.  And those are all quoted in our sentencing memo.  He

12    knew that Bitcoin was a service for people who had "Real

13    problems with the law" -- "for people who have real problems

14    with the law."

15            "If we were to reveal any account information to any

16    unauthorized party, people might go to jail."

17            "We will never be found and dealt with by the proper

18    authorities."

19            "Us, on the other hand, the authorities have to find

20    first which as Silk Road have demonstrated can prove

21    problematic."

22            He knew what he was doing.  He created Bitcoin Fog

23    for the purpose of facilitating criminal activity.  And it is

24    not just his words.  It is the design of the service itself.

25    It is the choice to put it on the Tor network, but with that

1    clearnet domain pointing towards the onion address on the Tor

2    network, but to place it beyond the reach of authorities on the

3    Tor network, to not keep any logs, to not require any log-in

4    information other than a username and password, not even an

5    email address for password recovery.  He deliberately created a

6    service that closed its eyes to the way that -- to who its

7    users actually were.  That was by design.  And he went to

8    equally extreme measures to protect his own identity.  That was

9    all brought out during the trial.

10            So this was a crime that was deliberate and

11   intentional.

12            And the other point that I think is really

13   significant in this case is the lack of remorse, which is

14   related to his perjury and his deliberate attempts to mislead

15   not just this Court, not just the government, but to lie to the

16   jury and mislead them during the course of this trial.  That

17   includes his feigned amnesia during his testimony.  And it,

18   frankly, includes his misrepresentations throughout the course

19   of this whole prosecution about his financial assets.  He

20   told -- and that starts from the very beginning when he claimed

21   indigency, even as he was paying Max Nemtsev out of his Bitcoin

22   holdings.

23            And to this date he has provided no financial

24   information to substantiate any sort of inability to pay a

25   fine.

1          And I want to address the comparable sentences.  We

2    have laid out what we think is the most apposite case, which is

3    the Ross Ulbricht sentencing for operating Silk Road.  That is

4    a different case.  And Silk Road only processed, I think it was

5    $183 million worth of drug transactions.  Bitcoin Fog processed

6    almost $400 million worth of laundering transactions.  Silk

7    Road was active for I think two or three years.  Bitcoin was

8    active for 10 years.

9          But what is similar is the basic characteristics of

10   those cases.  This is somebody who perhaps out of some sort of

11   misguided or lack of morality created a criminal service that

12   he knew would be used for criminal activities.  It was a novel

13   service.  It was exploiting a new technology and turning it

14   into a criminal instrumentality.  And it is the sort of case

15   where both specific and general deterrence call for a

16   significant punishment.

17          THE COURT:  I have to say, I would think very, very

18   differently about this case if there were any evidence or

19   reason to think that Mr. Sterlingov ever plotted a contract

20   murder of somebody.  I think that the Ross Ulbricht case is

21   very different in that fundamental way.

22          MR. BROWN:  Yes, Your Honor.  And I would point out

23   that Ross Ulbricht was not convicted of the attempted murder.

24          THE COURT:  Right.  But as you know, judges at

25   sentencing consider the case as whole.

```
1              MR. BROWN:  Yes, Your Honor.  But -- and we cited the
2    sentencing transcript.  Judge Forrest did not -- I am not sure
3    she even mentioned the attempted murder.  She certainly did not
4    dwell on the attempted murder.
5              THE COURT:  Didn't the Second Circuit talk about it?
6              MR. FERNICH:  They did, Judge.  I happened to attend
7    the argument.
8              MR. BROWN:  The Second Circuit was not the sentencing
9    court.  Judge Forrest was --
10             THE COURT:  Anyway, I am the sentencing court here.
11   And that does strike me that that is a major difference in
12   someone's character.
13             MR. BROWN:  Yes, Your Honor.  And there are
14   differences here.  In some ways, the conduct here is far more
15   grave:  The scale, the duration, as well as the defendant's
16   perjury at trial.  And I just want to address some of these
17   other so-called comparable cases.
18             The defense, Mr. Fernich, mentioned the *Firoz Patel*
19   case.  I know this Court is familiar with *Firoz Patel.*
20             THE COURT:  You know, it is actually assigned to me
21   at the moment.
22             MR. BROWN:  Yes, Your Honor.  The 2255 case is
23   assigned to you.  I am familiar with it, because I was one of
24   the undersigned -- I was one of the assigned prosecutors for
25   the second Firoz Patel case.  So as this Court is aware, and
```

1    maybe the defense is not aware, Firoz Patel was sentenced by

2    then Judge Ketanji Brown Jackson.  And he was given a period of

3    time to self surrender.  And in the period between when he was

4    sentenced and just a couple months later when he

5    self-surrendered to jail, he laundered $24 million worth of

6    criminal proceeds from the Payza conspiracy.  And he tried to

7    hide it in an account on -- a UK-based account in his father's

8    name.  He committed money laundering.  He engaged in this whole

9    scheme to cover it up and to mislead the US Attorney's Office.

10   And he was indicted and he has been prosecuted.  He has pled

11   guilty.  And his sentencing is pending before Judge Friedrich

12   right now.  So the *Firoz Patel* case is not exactly a great

13   example of specific deterrence or what an appropriate sentence

14   would be in this case.

15       And it is also very, very distinguishable because he

16   pled.  Payza was not -- it was a dirty money transmitting

17   business, but it was not conceived from the ground up as

18   nothing but a criminal laundering service.  It was not a

19   Tor-based criminal money laundering service that catered almost

20   exclusively to darknet hidden services.

21       And the *Feliks Medvedev* case, again, that was a plea.

22   It was not a contested trial.  There are no aggravating

23   circumstances that I am aware of, such as perjury.  He was

24   only -- he wasn't sentenced for money laundering.  He was only

25   sentenced for operating an unlicensed money transmitting.  And

1    his business was otherwise legitimate.  It just happened to

2    engage in transactions involving sanctioned parties, in that

3    case, from Russia.  That was not -- again, it wasn't a business

4    built from the ground up like Bitcoin Fog solely to cater to

5    criminals.  And it was not a business that processed almost

6    $400 million worth of criminal proceeds.

7            THE COURT:  I know this is not a question that your

8    office has the authority to decide.  But based on just past

9    precedent and Department of Justice practice, do you know

10   whether Mr. Sterlingov's incarceration is likely to be

11   transferred to Sweden in a manner that would allow him to serve

12   all or a portion of his sentence in Sweden?

13           MR. BROWN:  The Court's indulgence.

14           MS. PELKER:  I am happy to address that issue.  Your

15   Honor may remember that one of the post terms of the plea was

16   that we would not oppose if the defense put in a request.

17   There is an active prisoner transfer treaty between the United

18   States and Sweden.  It is certainly a request that can be made.

19   The Department of Justice generally will look at the different

20   factors of the sentence that will be served in the other

21   country.  Sweden is a country that we can do transfers with.

22           I will say, given -- and we would evaluate that

23   request when it comes up.  We haven't predetermined what our

24   recommendation would be.  In a case like this, there certainly

25   would be factors that would weigh against the Department of

1    Justice supporting such an application.  That said, I have had

2    cases where even with Department of Justice nonsupport

3    essentially -- it is not our decision and the prisoner is still

4    transferred out.

5           THE COURT:  The reason I ask about that is,

6    obviously, serving a sentence here in the United States is

7    not -- it is not just harsher because the prisons may be less

8    pleasant here in the United States, but it is harsher because

9    he is away from his home and his mother who he hasn't seen now

10   for three and a half years who is getting older.  And that just

11   increases the severity of the sentence.

12          MS. PELKER:  It is also up to the other country to be

13   willing to accept the prisoner.  And that is a whole other

14   calculus that we don't actually have any say in.

15          MR. FERNICH:  If it helps, Judge, I once had a

16   case --

17          THE COURTROOM DEPUTY:  Microphone, please.

18          MR. FERNICH:  -- in Australia with an Australian

19   defendant.  And my -- he had an 11-year sentence.  And it was

20   very, very difficult to even initiate the transfer process,

21   until he had served like 6 or 7 years of the sentence.  And it

22   was an extraordinarily -- and he was a solid -- I mean, he got

23   convicted of a serious financial crime, but he was a -- it was

24   actually a case with Judge Forrest.  She was very favorably

25   disposed toward him.  It was a very, very difficult process for

1    us to do.  And it took a long time.

2           THE COURT:  Okay.  Thank you.

3           Mr. Brown.

4           MR. BROWN:  Your Honor, if I could just point out --

5    I don't have it at my fingertips, but I am sure the Court is

6    familiar with the policy statement and the sentencing

7    guidelines that family obligations are generally not

8    appropriate factors to consider, except under very narrow

9    circumstances such as where the defendant is the sole caregiver

10   for minor children.  So to the extent the concern is about the

11   defendant's access to his mother, that is under the --

12          THE COURT:  I am just thinking about this in a much

13   more practical way.  For anyone to serve a sentence thousands

14   of miles away from their home and where anyone can visit them

15   is just a harsher matter than serving a sentence closer to

16   home.  It is -- more often than not when I sentence someone

17   their request is that I make a request to the Bureau of Prisons

18   that they be housed somewhere close to their family and their

19   home so they can visit with people.

20          MR. BROWN:  Yes, Your Honor.

21          THE COURT:  All right.  Mr. Fernich.

22          MR. NEMTSEV:  It is going to be me, Judge.

23          THE COURT:  All right.  I am seeing everyone today.

24          MR. NEMTSEV:  So I guess a lot was said by

25   Mr. Fernich actually on this topic regarding the sentencing

1  guidelines.  And I really don't want to repeat and take up

2  your time with the arguments, specifically *Lauersen* that -- and

3  all of these enhancements, lump one on top of the other,

4  creating this unsustainable guideline level where life in

5  prison is what essentially they tell the Court to sentence

6  Mr. Sterlingov to.

7          And I think in the words of Judge Brown Jackson, that

8  is draconian and that is out of whack.  And I think you have to

9  look at cases that are similar.  Similarly situated defendants,

10  similarly situated conduct and similar harm to society in order

11  to recess where a sentence should be under the circumstances of

12  this case.  And I think *Patel* in this district is probably the

13  most precedential case.

14          THE COURT:  Although in *Patel*, the government only

15  sought a 52-month sentence.  And the government thinks this is

16  a case that should be 30 years.  And in that case, they thought

17  it should be 52 months.  That must be some measure of the

18  seriousness of the offenses.

19          MR. NEMTSEV:  Well, if you look at the facts, I think

20  the government conceded that the guidelines didn't make sense

21  in Patel and they don't make sense in this case.  Because the

22  guidelines were astronomical there and they are astronomical

23  here.

24          THE COURT:  Right.

25          MR. NEMTSEV:  There is a difference obviously.  Patel

1    pled guilty.  Mr. Sterlingov exercised his right to go to

2    trial.  In terms of the --

3            THE COURT:  I am not disagreeing with the proposition

4    that the guidelines here --

5            MR. NEMTSEV:  I get it, Judge.

6            THE COURT:  -- are less helpful than in some cases,

7    because they are so extreme it makes it much harder to make a

8    lot of use of them.  So I am trying to figure out what the

9    right sentence is.  And I have to consider the guidelines as

10   one factor, but I recognize that largely because of the loss

11   amount, there is -- as Mr. Fernich put it to me, they are

12   literally off the chart.

13           MR. NEMTSEV:  Yeah.  It is literally off the chart.

14   And that is why I want to focus Your Honor's attention on

15   Patel, where the conduct -- the laundering conduct involved the

16   same amount of money.  It was 250-plus million in terms of the

17   guidelines.  It was actually at least one of the transactions

18   just from one of the Ponzi schemes that he engaged in was

19   closer to 340 million.  So you could imagine that all of the

20   Ponzi schemes that he helped out, all of the victims he helped

21   defraud were probably in the half of a billion dollars.  And

22   there was a C plea.  And it was a range between 20 and 52.  The

23   judge sentenced him to 36 months.

24           *Patel* operated the scheme for these -- for longer

25   than Bitcoin Fog was in operation.  His first company started

1    in 2005.  He didn't stop until he was arrested or charged in

2    2018 and then subsequently charged in 2020.  So that is the

3    same 15 years more than Bitcoin Fog ever operated.  And

4    Mr. Sterlingov never participated in any of the schemes.  He

5    didn't participate in the drug trafficking.  There is certainly

6    no evidence that he participated in anything related to child

7    pornography except for the fact that $900 from Bitcoin Fog went

8    to a website.  And there is no evidence that he knew that or

9    that he had an opportunity to prevent that, but the government

10   focuses on it because --

11           THE COURT:  There is some evidence that he was aware

12   that --

13           MR. NEMTSEV:  That child pornography could exist on

14   the dark web and --

15           THE COURT:  And that he was facilitating dark web

16   transactions.

17           MR. NEMTSEV:  If that was the email that was prior to

18   the beginning of Bitcoin Fog --

19           THE COURT:  Right.

20           MR. NEMTSEV:  -- one, it doesn't sound like he is

21   happy about it.  Two is, it is just a general observation that

22   the dark web has child pornography.

23           THE COURT:  I am just responding to your point where

24   you said there was no evidence that he knew.  I think there is

25   some evidence that he at least thought there was reason to

1    believe that could happen.

2           MR. NEMTSEV:  Yeah.  I understand, Judge.

3           In terms of Mr. Patel, he also had every opportunity

4    to stop.  He was getting cease and desist letters from

5    regulators across all of the states.  He hired consultants that

6    advised him that you are operating illegally in 45 states.  He

7    changed the name of his company five times and tried to move

8    around these clients so that they can't be detected.  And he

9    was -- he was ordered to forfeit the funds that he made and it

10   was approximately $4.6 million.  Your Honor's preliminary

11   forfeiture order which I expect to become final at the end of

12   this is going to be close to $400 million.

13          THE COURT:  Right.

14          MR. NEMTSEV:  So that is an additional added

15   punishment on top of *Patel* that carries some weight, Judge.

16   You know, even if he is in Sweden, the government has access to

17   mutual legal assistance treaties.  They can request access to

18   his assets through the Swedish prosecutors.

19          And *Patel* is not the only case.  *Medvedev* was also

20   helping to move $160 million for sanctioned entities that -- I

21   read the detention transcript -- came from an illegal gambling

22   operation in western United States.  And it was -- he used

23   eight shell companies.  It wasn't legitimate businesses.  He

24   literally created companies to move monies around to move them

25   to Singapore to buy gold so that gold could be shipped

1    somewhere else to obfuscate.  And it was in order to promote

2    the illegal gambling business that was running in the United

3    States.

4           Binance, Your Honor, is probably one of the largest

5    cases involving transmission of billions of dollars of --

6    includes billion dollar transactions between US and sanctioned

7    entities including Iran.

8           It includes Binance helping these people not only

9    anonymize their transactions, but also to cash out those

10   transactions.  It helped these people take the funds and move

11   them from cryptocurrency to cash, whatever cash they wanted.

12   That is significantly more help than just anonymization.

13          And I understand, Judge, the conduct is egregious.

14   It it was harmful and we are not denying that.  But there are

15   other comparable cases in this district and in other districts

16   that warrant a much lower sentence than what the government

17   recommends which is frankly draconian and not in line with any

18   of the principles of sentencing.  And it really goes against

19   who -- the necessity of such a sentence.  You know, who is

20   Mr. Sterlingov as a person?  You know, we wrote a lot about it

21   in the sentencing memo.  There is lot of information in the

22   PSR.  There is letters that were submitted from friends and

23   family members.  He doesn't have a lot of family in the US.

24   The only family he has is his cousin, who is sitting back

25   there.  And he support him, but his cousin lives in Boston,

1    Your Honor.  He can't commute to see him every other weekend.

2    His mother, she is elderly.  She has her own health conditions.

3    She is not going to come to the United States, because she has

4    never been to the United States in the last four years to see

5    her son.  Not because she doesn't want to, but because she

6    can't.  And I think that is a major issue.

7         And in terms of Mr. Sterlingov's background.  He

8    never knew his father and he was raised by his mother in poor

9    conditions.  Not just economically poor, but meaning he was

10   assaulted.  He was robbed.  He was living in the post-Soviet

11   era.  He had no father figure.  The only person that helped his

12   mother was his abusive grandfather.  When they had the chance

13   to escape when he was 14 years old, he took that chance and

14   they went to Sweden.  And life wasn't easy in Sweden.  You are

15   an outsider.  You don't know the language.  You don't have any

16   friends.  You are a teenager starting high school without

17   knowing anything and that is difficult.

18        And he developed horrible depression, Judge, he

19   couldn't get out of bed.  And the only thing that helped was

20   really computers and, you know, trying to learn them, working

21   on them.  And he kind of got into this community.  And when

22   Bitcoin Fog started, he was only 22 or 23 years old, Judge.  He

23   was a really young kid.

24        And what has he done?  You know, taking aside Bitcoin

25   Fog, he has really tried to help other people.  You know, in

1    some of the letters that we submitted, people in their times of

2    crises, they turned to him and he supports them in any way he

3    can.  He has dealt with depression.  He has overcome it.  He

4    tries to use whatever he knows to help people on an individual

5    basis and more broadly by starting a YouTube channel, Judge.

6    And I think that speaks to him.  Otherwise, he has lived a very

7    humble life.  I don't think there is any need for specific

8    deterrence.  He is a first-time offender, never arrested, never

9    charged before.  And it doesn't seem to me that he would ever

10   go back to this lifestyle because he has lived a very humble

11   life before this.

12           THE COURT:  How do I know that?  I mean, particularly

13   where if he were in the United States on supervision, I could

14   impose monitoring with respect to his computer use.  But if he

15   is in Sweden or Russia, how do I know he is not going to just

16   engage in further cyber-related crime?

17           MR. NEMTSEV:  Your Honor can order it, certainly.

18           THE COURT:  But how could I enforce it?

19           MR. NEMTSEV:  I have had individuals in similar

20   positions be order to supervised release where there is a unit,

21   at least in the District of Mass there is a unit of probation

22   that still continues to monitor them.  And, you know, they

23   essentially certify compliance and they talk to these

24   individuals.  You are right, Judge, if he does something wrong,

25   then we are relying on the government to use their MLAT powers

1    to get him here or an extradition request potentially depending

2    on what it is.  It would be a little more difficult.  Your

3    Honor, I don't see him doing anything wrong.  He is just not

4    the type of individual -- he knows he has a lot to lose.  He

5    knows that, you know, a short sentence would be a break for

6    him.

7              You know, he would obviously use it to go back and be

8    with his family and be with his mother, because that is who

9    really needs him.  And he feels terrible that he wasn't there

10   when his stepfather -- the only father figure that he has had

11   his entire life died while he was incarcerated, because of his

12   actions and he couldn't do anything.  And he believes that he

13   could have done something to help him, maybe not save his life,

14   but at least prolong it, at least make it more comfortable.

15   And that dwells on you, Judge.  You know, why would you ever

16   want to put yourself in that position again?

17             So in terms of general deterrence, Judge, I think

18   this case was widely publicized.  There is a lot of other

19   cases, the Binance case, there is Tornado Cash, the Samourai

20   Wallet cases.  I think the government got their point across

21   that international domicile, being in a foreign country --

22             THE COURT:  Although it does strike me that is an

23   important consideration, just because this is one of those

24   crimes where it is just very hard to catch somebody.  It

25   requires somebody to make a mistake to catch them.  And it may

1    be that in this context the general deterrence is more

2    important than other context just because it is so difficult to

3    actually catch someone.

4            MR. NEMTSEV:  Well, it is difficult to catch someone,

5    Your Honor, but from what I see everyone is getting caught.

6            THE COURT:  I am betting there are a lot of other

7    folks out there.

8            MR. NEMTSEV:  I am sure there are.  But I have a

9    feeling that people realize they are going to get prosecuted.

10   The US government is going to use all of their resources

11   including their international partners who go after individuals

12   who start these services.  You know, to the extent that

13   somebody could be deterred, I think they have been adequately

14   deterred.  The fact he spent almost 4 years already in Northern

15   Neck or at least two years of four in Northern Neck where he

16   wasn't getting any programming, any mental health care.  His

17   physical ailments worsened, including his dentist needs and

18   including his tinnitus that he developed there.  You know, now

19   he is finally in a facility, the DC Jail that kind of provides

20   some programming.  But for two years he was just sitting by

21   himself not doing anything, Judge.

22           You know, given the opportunity, I promise you, you

23   are not going to see this man before you again.  And I think he

24   will use his second chance very wisely.  So I would ask and

25   urge this Court to give him a sentence that is consistent with

1    *Patel,* taking into account that he didn't take a plea, taking

2    into account Your Honor's finding that he obstructed justice

3    through his testimony, but I think it should be a small

4    multiple of *Patel.* You know, Mr. Fernich suggested two and a

5    half times of 7 and a half years. I think probably less is

6    appropriate, in all honesty, Judge. But I don't think it

7    should be significantly higher than that. It is just not

8    necessary for this defendant, not necessary for this case.

9               Thank you, Judge.

10              THE COURT: All right. Would Mr. Sterlingov like to

11   address the Court?

12              THE DEFENDANT: Your Honor --

13              THE COURT: Good afternoon or evening.

14              THE DEFENDANT: -- it is very stressful being here.

15   I had to write this down.

16              THE COURT: However you want to proceed.

17              THE DEFENDANT: I am sorry for any harm that may have

18   come from my actions. I never intended to cause anyone harm.

19   I also apologize for this Court that this matter has taken up

20   so much time and attention. It has been a really long time.

21              I am also sorry for the pain I have caused those who

22   relied on me, most of all my mother, who now struggles living

23   alone as an immigrant. She will need to work past her

24   retirement age to support herself. She has no other close

25   relatives after the loss of my stepfather during my time here,

1    who was her support system.

2          To me, he was the only caring father figure that I

3    have ever had.  It pains me the most that every day, knowing

4    that I let him down and he might have lived a little bit longer

5    if I was there to give him medical support that he needed that

6    we talked about.

7          For a long time, I struggled with depression which

8    worsened as I moved to Sweden.  The challenges of adjusting to

9    new culture, making friends and finding my place took a big

10   toll on me.  I do not wish to present my depression as an

11   excuse for anything.  But I can see that it has undeniably

12   affected my choices and the people that I kept around me.  I

13   recognize that I needed to do something about it before it got

14   even worse, so I sought help.  Over time, I began to see that

15   there are many other people around me with similar problems

16   that I could use my experiences to help them as well.

17         It has become my passion and I found great

18   fulfillment in coaching and supporting such people.  It is the

19   greatest thing that I know that when somebody tells me that my

20   help has helped them through very difficult problems.

21         While I am being locked up, I have tried to better

22   myself, learn something to contribute with something positive.

23   Once I came to my current facility, I took up all of the

24   classes that were offered.  And I have been trying to help

25   others with my mental health coaching with their struggles.  My

1    first two years I was held in Northern Neck Regional Jail as I

2    know you have heard a lot about it already.  It was during

3    COVID.  I lacked access to any classes or any activities nor

4    exercise.  I couldn't get books for most of the time.  And

5    other conditions there also affected my hearing and my mental

6    health.

7              I am fully committed to becoming a better person.  I

8    understand that this conviction and its financial and other

9    consequences will impact me forever.  I will carry lasting debt

10   that I will most likely never be able to repay fully.  But I

11   know that I will be working for the rest of my life to try to

12   repay it and redeem myself, try to improve things for people

13   around me.

14             It is my hope to eventually return to my home country

15   and live a life dedicated to supporting my mother and helping

16   others, if I can.  I pray that I can -- that I will get a

17   chance to have a family of my own one day.  The last three and

18   a half years were so far the worst years of my life.  And I

19   will never do anything to repeat any of it or really risk being

20   away from my family, which has been the worst thing so far.

21             Thank you for your time, Your Honor.

22             THE COURT:  Thank you.

23             Does the defense have anyone else you want me to hear

24   from or anything else you want to offer?

25             MR. FERNICH:  Nothing further, Judge.

1              THE COURT:  Anything else from the government?

2              MR. BROWN:  Nothing.

3              THE COURT:  I know it is late, but I would like to

4     step off the bench for a minute and think about what I just

5     heard and I will come back and impose sentence.

6              (Recess taken at 4:54 p.m.)

7              THE COURT:  One question before I impose sentence.

8     Is there a request with respect to any programming that I

9     should make?

10             MR. NEMTSEV:  Judge, so we would request this, Your

11    Honor, to keep -- to make a recommendation for the government

12    to keep him at the DC Jail, because he is in active programming

13    there right now.

14             THE COURT:  I am not sure that is possible.  It is

15    not a Bureau of Prisons facilities.  It is a contract with the

16    Marshals Service.

17             MR. NEMTSEV:  Yeah.

18             THE COURT:  The Marshals Service, not the Bureau of

19    Prisons.

20             MR. NEMTSEV:  Yes.

21             THE COURT:  I am not sure.  I have never heard of

22    anyone serving their sentence there other than just on a

23    temporary basis.

24             MR. NEMTSEV:  Mr. Sterlingov says at least he has

25    heard some other people were allowed to remain there while they

1    were doing educational courses.

2         THE COURT:  I am happy to include anything by way of

3    recommendation in my judgment, but you may want a backup on

4    that because I am just not sure that is possible.

5         MR. NEMTSEV:  Okay.  I guess the backup would be any

6    facility in the northeast consistent with whatever designation.

7         THE COURT:  Okay.

8         MR. NEMTSEV:  That he gets from the BOP.

9         THE COURT:  Okay.  All right.  So I have assessed the

10   particular facts of this case in light of the relevant 3553(a)

11   factors and I want to provide some remarks for the record, for

12   Mr. Sterlingov and others with respect to my decision.  And I

13   recognize that there are not many benchmarks frankly in this

14   area, so maybe providing a little bit more detail in my

15   thinking will be helpful in future cases as well.

16        Sentencing is never an easy process.  And, quite

17   frankly, I have been thinking about this sentence for the past

18   several months and have really been stewing on it, because I

19   find it very, very hard.  I find it hard because there are

20   great benchmarks.  And for the reasons that I have already

21   provided, I have considered the guidelines, but I don't think

22   they are terribly helpful in this case.  Because a life

23   sentence to me seems inconsistent with the level of

24   culpability.  And it is driven so much by the dollar figure in

25   ways that I don't think are sufficiently tied to the actual

1    culpability of the conduct.

2         I realize that the larger the amount of funds that

3    are laundered does have a clear connection with respect to the

4    damage that is done.  And I don't mean to the understate that.

5    I just mean to suggest that I think that the guidelines are

6    excessive in this case.

7         But let me start with the nature of the offense here.

8    I think I agree with everything that Mr. Brown said to me with

9    respect to the severity of the offense here.  And this is

10   something that took place over a period of 10 years with tens

11   of millions of dollars in transactions.  And we'll never know

12   exactly what the ultimate consequences were, but the service

13   was intended to and did, in fact, facilitate a huge number of

14   unlawful transactions over a period of many, many years.  And

15   some of those were drug transactions.  We don't know whether

16   anyone who was involved in any of those transactions died of an

17   overdose.  But it is pretty certain that there were lives that

18   were ruined because of the unlawful drug transactions and drug

19   addiction that was facilitated through this service.

20        And although I take the defense's point that the

21   number of transactions or the dollar figure relating to the

22   Ready for Video site is small, but even a small amount when you

23   are dealing with something of that nature is horrific.  And it

24   may be -- and I don't doubt that Mr. Sterlingov didn't support

25   the idea and was not happy to see people using Bitcoin to

1    purchase child pornography that was the result of horrific,

2    horrific abuse of young children.  But I also think that he

3    certainly was aware of the possibility that his site would be

4    used for that purpose.  And it did cause that, even in small

5    amounts, but even small amounts of that type of transaction is

6    devastating in its seriousness.

7         I have also thought about the fact that this is an

8    area where general deterrence is important.  It is hard to

9    catch people.  The whole goal is to avoid being caught.  And it

10   may be that law enforcement takes two steps forward, but then

11   when they do that, those who are trying to hide transactions on

12   the internet take three steps forward.  And the government has

13   to take another two steps forward.  And it is always an effort

14   to come up with new ways and new ideas of how to hide things.

15   And it is part of the process, but I think people need to

16   understand that if they do get caught, the consequences are

17   grave consequences.

18        Considering the characteristics of the offender.

19   Mr. Sterlingov was very young when he started this business.

20   He was 23 years old.  He has no criminal record.  And I think

21   the record supports the notion that he is somebody who other

22   than the crimes that he has been convicted of here is somebody

23   who is concerned about helping others and has gone out of his

24   way to help others.  He has talked about his own depression.

25   And he was serious in his efforts to reach out and try to help

1    other people suffering from depression.  And I actually have no

2    doubt that he is going to try and do that during his period of

3    incarceration and thereafter of reaching out to help other

4    people.

5            I also think it is fairly devastating that somebody

6    who was in many respects a father to him passed away while he

7    has been incarcerated and he wasn't able to be with him and

8    helpful to him and that he is so far away from his family, from

9    his mother.  And I can imagine the pain that he must suffer

10   thinking about his mother being so far away and in a role in

11   which he is not able to be helpful to her.

12           With respect to the types of sentences available, the

13   guidelines range is life.  The Government has requested 30

14   years.  Probation has recommended 20 years.  The defense has

15   recommended something I think in the neighborhood of 7 or 7 and

16   a half years of incarceration.

17           And I have also considered other cases and tried to

18   avoid unwarranted sentencing disparity.  I have to say, I don't

19   think any of the comparators I have seen are terribly helpful.

20   I don't think *Ross Ulbricht* is terribly comparable to the

21   present circumstances, nor by the same token do I think *Patel*

22   was.  And in particular, Patel was a (c)(1)(C) plea.  And Judge

23   Jackson imposed a sentence that was within the (c)(1)(C) plea

24   range.  And I think the case is also distinguishable for some

25   of the reasons that Mr. Brown has provided.

1          So I think that this is, to my mind, a very difficult

2     case.  And I think it is important that I impose a sentence

3     that is serious enough to send a clear message that this type

4     of conduct is unacceptable.  And that if you get caught, you

5     are in big trouble.  But I also don't think that this is a case

6     that ought to, for all intents and purposes, end

7     Mr. Sterlingov's life.

8          And I think that he is somebody who deserves another

9     chance in life and an opportunity as he admitted perhaps to

10    have his own family to try and rebuild his life.  So that is

11    the balance that I have tried to strike here.

12         Give me one second here.  So I am going to vary

13    downward fairly substantially in this case.  What I am going to

14    do is, I would ordinarily impose a sentence of 156 months, but

15    as I indicated, I am going to provide a Smith departure of 6

16    months.  So what I am going to do is I am going to impose a

17    sentence of 150 months.

18         Pursuant to the Sentencing Reform Act of 1984 and in

19    consideration of the provisions of 18 U.S.C. section 3553 and

20    as well as the advisory guidelines, it is the judgment of the

21    Court that you, Roman Sterlingov, are hereby committed to the

22    custody of the Bureau of Prisons for a term of 150 months,

23    which consists of 150 months on Counts 1 and 2, to run

24    concurrently, as well as a sentence of 60 months on Counts 3

25    and 4 with those sentences to run concurrently both among

1    themselves as well as concurrently with 1 and 2.  So it is all

2    for a total sentence for all counts of 150 months.

3           Followed by -- does anyone think that I should impose

4    a term of supervised release in this case?  I don't know if

5    probation has a view on this.

6           I know you recommended it, but if he is going to be

7    removed --

8           MS. FIELD:  We would ultimately defer to the Court on

9    that issue.

10           THE COURT:  Does the government have a view on that?

11           MR. BROWN:  Your Honor, we are not asking for a term

12    of supervised release, given that he is likely to be removed

13    following the sentence.

14           THE COURT:  All right.  And I assume the defense is

15    not seeking that?

16           So I am not going to impose a term of supervised

17    release.  All of the terms, as I indicated, will run

18    concurrently.  In addition, you are ordered to pay a special

19    assessment of $400 in accordance with 18 U.S.C. 3013.  And

20    under the DC law as well, I will -- there is not going to be

21    any supervision.

22           Well, actually, do I need to impose any term of

23    supervised release with respect to compliance with removal or

24    will he just go immediately to the custody of ICE?  I think he

25    probably goes immediately to ICE custody.

1          MR. BROWN:  Your Honor, I am not sure.  I think

2     actually in the Firoz Patel example, he was set to be released

3     directly from BOP custody to ICE.  So I think that it is likely

4     to be the case.

5          THE COURT:  All right.  So I am not going to impose

6     any term of supervised release for those purposes as well.

7          In light of my extremely large forfeiture order,

8     which I will enter, the Court concludes that Mr. Sterlingov

9     doesn't have the ability to pay a fine.  And, therefore, I

10    waive the imposition of a fine in the case.

11         The financial obligations for Counts 1 through 3 are

12    immediately payable to the Clerk of the Court for the United

13    States District Court, 333 Constitution Avenue Northwest,

14    Washington, DC 20001.  Within 30 days of any change of address

15    you shall notify the Clerk of the Court of the change until

16    such time as the final obligation is paid in full.

17         And the financial obligation as to Count 4 is

18    immediately payable to the District of Columbia Superior Court,

19    attention Budget and Finance Office, 500 Indiana Avenue

20    Northwest Suite 4002, Washington, DC 20001, for deposit into

21    the Crime Victim Compensation Fund.  Within 30 days of any

22    change of address, you shall notify the Budget and Finance

23    Office of the DC Courts of any change until such time as that

24    obligation is paid in full.

25         The probation office shall release the presentence

1    investigation report and/or judgment and commitment order to

2    the Bureau of Immigration and Customs Enforcement to facilitate

3    any removal or deportation proceedings.

4         Pursuant to Rule 32.2(a) of the Federal Rules of

5    Criminal Procedure, the preliminary order of forfeiture is now

6    final.  Pursuant to rule 32.2(a) of the Federal Rules of

7    Criminal Procedure, you, Roman Sterlingov, shall forfeit the

8    money judgment for the sum of money set forth in the primary

9    order of forfeiture.

10         You shall also forfeit the following specific

11    property:  $349,625.72 seized from Kraken account AA68 N84G

12    QUXT DGNW in the name of Roman Sterlingov and AA24N84GWW46KQ5Y

13    held in the name of To The Moon LTD Roman.

14         Approximately .10877 Bitcoin cryptocurrency after

15    required fees received from Kraken account AA68 N84G QUXT DGMY

16    held in the name of Roman Sterlingov and AA24N84GWW46KQ5Y held

17    in the name of To the Moon LTD Roman.

18         Approximately 205.962 Ethereum cryptocurrency, after

19    required fees, seized from Kraken account AA68 N84G QUXT DGMY,

20    held in the name of Roman Sterlingov and AA24N84GWW46KQ5Y held

21    in the name of To The Moon LTD Roman.

22         Approximately 9,371.52683 Stellar XLM cryptocurrency,

23    after required fees, seized from Kraken account AA68 N84G QUXT

24    DGMY held in the name of Roman Sterlingov and AA24N84GWW46KQ5Y,

25    held in the name of To The Moon LTD Roman.

1          Approximately 35.9998 Monero XMR cryptocurrency,

2    after required fees, seized from Kraken account number AA68

3    N84G QUXT DGMY, held in the name of Roman Sterlingov, and

4    AA24N84GWW46KQ5Y, held in the name of To The Moon Roman.

5          And finally, approximately 1,354 Bitcoin

6    cryptocurrency held in the Bitcoin Fog wallet identified by

7    root beginning with 1YZJKAAX and I won't read the entire root

8    there, but it is the one in the preliminary order.

9          Pursuant to 18 U.S.C. section 3742(a) you have a

10   right to appeal your sentence to the D.C. Circuit.  Under

11   certain circumstances, including if you think the sentence was

12   imposed in violation of law or the result of incorrect

13   application of the sentencing guidelines or is more severe than

14   the maximum established in the guidelines range.  You may also

15   appeal your sentence on any other appropriate ground.

16         Pursuant to 28 U.S.C. section to 2255 you also have a

17   right to challenge the conviction entered or sentence imposed

18   to the extent permitted by statute.  And you also have a right

19   to appeal your conviction to the D.C. Circuit.  And any notice

20   of appeal must be filed within 14 days of entry of judgment or

21   within 14 days of a filing of notice of appeal by the

22   government.  If you are unable to afford the cost of appeal,

23   you may request permission from the court to file an appeal

24   without cost to you.  On appeal you may also apply for

25   court-appointed counsel.

1          Let me ask, Mr. Brown, whether there are any

2    objections to the sentence imposed that have not already been

3    noted for the record?

4          MR. BROWN:  No, Your Honor.

5          THE COURT:  All right.  And, Mr. Fernich, anything

6    from the defense that has not been noted for the record

7    already?

8          MR. FERNICH:  No, none beyond anything previously

9    discussed.

10          THE COURT:  Anything else we need to address today?

11          MR. BROWN:  No, Your Honor.

12          THE COURT:  Anything -- I see you are looking at your

13    code there.  Is there anything you want a minute to check

14    something?  I want to make sure I get things right.  I don't

15    want to make any mistakes.

16          MR. BROWN:  Your Honor, in announcing the entry of

17    the forfeiture order, the Court did not -- the Court entered

18    the order into the record.  It didn't refer to the property

19    forfeited as substitute property.  The Court didn't read that

20    aloud.  But we were just checking Rule 32.2.  As long as it is

21    announced by --

22          THE COURT:  My intention is to enter everything that

23    is in the preliminary order of forfeiture.  And if someone

24    wants me to simply sign a final version of that order, I will

25    be happy to do that.  Maybe I should just do that and attach it

1    to my judgment.

2            MR. BROWN:  Yes, Your Honor.  That is fine with the

3    government.

4            THE COURT:  All right.  I will do that.

5            Anything else from the defense before we part?

6            MR. FERNICH:  No, Judge.  Thank you.

7            THE COURT:  I will say just by final words and I

8    actually meant to say some of this in explaining the imposition

9    of sentence.  You know, I don't get to know individuals

10   appearing in front of me.  There is obviously some distance

11   between me and the defendant in a case for good reasons.

12           It is very much my impression that Mr. Sterlingov is

13   actually an extraordinary person and that he is exceptionally

14   intelligent and thoughtful and articulate.  And I know that a

15   sentence of this length for anybody may not be as bad as it

16   could have been, but it is also not good news.  It is going to

17   be a tough thing for him to endure.  But I very much hope and

18   expect that he will actually make a contribution while he is

19   incarcerated to others.  And if there are other programming you

20   want me to include in the judgment, you can still send me an

21   email or send an email to the deputy clerk, copying the

22   government, letting us know what that is.

23           But I really do think he is somebody who still has an

24   awful lot to offer in life.  And I just wish him well in that

25   regard.  And I'm sorry that he is in the circumstances that he

1    is in today, because I think he could have taken a very

2    different life path and been in a very different position.  So

3    it is painful to see given the fact that he seems to be such an

4    extraordinary person himself.

5              MR. FERNICH:  That is a very unusual statement.  We

6    appreciate that.  Thank you.

7              THE COURT:  All right.  Thank you all.

8              (Proceedings concluded at 5:26 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I, SHERRY LINDSAY, Official Court Reporter, certify

4   that the foregoing constitutes a true and correct transcript of

5   the record of proceedings in the above-entitled matter.

6

7

8

9

10                  Dated this 20th day of November, 2024.

11

12                  _____
                    Sherry Lindsay, RPR
13                  Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

**MR. BERMAN: [2]** 51/13 51/16
**MR. BROWN: [56]** 3/6 4/9 5/20 6/3
6/13 6/23 8/14 8/19 8/21 9/11
9/23 10/6 10/17 10/24 11/7 15/3
15/13 16/10 17/14 17/7 24/23 25/2
25/21 26/23 27/2 34/10 34/16
34/24 35/22 42/6 46/20 46/23 47/2
47/20 48/24 49/20 52/8 53/11 55/1
55/4 55/7 58/22 59/1 59/8 59/13
59/22 61/13 63/4 63/20 76/2 82/11
83/1 86/4 86/11 86/16 87/2
**MR. EKELAND: [5]** 7/8 10/14 11/5
35/3 38/8
**MR. FERNICH: [39]** 3/9 4/11 4/15
7/2 7/10 7/16 8/2 9/6 9/20 10/4
11/6 11/11 19/5 20/5 20/10 27/7
27/13 27/19 28/14 28/23 32/4 32/9
33/12 33/15 33/23 41/18 43/12
47/6 47/16 47/19 48/23 49/17 59/6
62/15 62/18 75/25 86/8 87/6 88/5
**MR. NEMTSEV: [21]** 63/22 63/24
64/19 64/25 65/5 65/13 66/13
66/17 66/20 67/2 67/14 70/17
70/19 72/4 72/8 76/10 76/17 76/20
76/24 77/5 77/8
**MS. FIELD: [2]** 3/25 82/8
**MS. PELKER: [2]** 61/14 62/12
**THE COURT: [128]**
**THE COURTROOM DEPUTY: [3]** 3/2
52/3 62/17
**THE DEFENDANT: [7]** 11/15 12/6
12/11 12/14 73/12 73/14 73/17

**$**
**$1,000 [1]** 28/17
**$1,800 [2]** 54/20 54/21
**$1,835 [2]** 55/5 55/7
**$100 [1]** 50/14
**$100,000 [1]** 18/15
**$11 [2]** 52/25 53/1
**$11 million [2]** 52/25 53/1
**$12,500 [1]** 49/6
**$160 [1]** 67/20
**$160 million [1]** 67/20
**$17 [1]** 54/7
**$17 million [1]** 54/7
**$183 [1]** 58/5
**$24 [1]** 60/5
**$24 million [1]** 60/5
**$250 [1]** 23/6
**$250 million [1]** 23/6
**$250,000 [1]** 49/5
**$300 [1]** 49/10
**$349,625.72 [1]** 84/11
**$35 [2]** 54/3 54/4
**$35 million [1]** 54/3
**$4.6 [1]** 67/10
**$4.6 million [1]** 67/10
**$400 [4]** 58/6 61/6 67/12 82/19
**$400 million [2]** 61/6 67/12
**$400,000 [1]** 18/17
**$47 [1]** 19/24
**$47 million [1]** 19/24
**$487,290.78 [1]** 25/15
**$5,000 [1]** 49/12
**$500,000 [2]** 49/4 49/7
**$60 [1]** 27/3
**$900 [1]** 66/7

**'**
**'93 [1]** 29/5

**.**
**.10877 [1]** 84/14

**0**
**02116 [1]** 2/10

**1**
**1,354 [1]** 85/5

**10 [5]** 26/15 26/16 37/11 58/8
**100 [4]** 26/15 26/16 27/4 49/11
**1000 [1]** 2/10
**10005 [1]** 2/4
**10022 [1]** 2/7
**1023 [2]** 3/20 13/15
**108-482 [2]** 44/21 45/3
**11-year [1]** 62/19
**112 [5]** 6/14 6/14 6/15 6/20 7/6
**113 [2]** 8/19 9/8
**114 [3]** 9/10 9/11 9/21
**115 [7]** 6/15 6/15 8/13 9/22 9/23
10/3 10/5
**117 [1]** 10/6
**117A [2]** 10/16 11/3
**12 [1]** 47/15
**12-point [1]** 22/11
**12th [1]** 3/14
**1301 [1]** 1/20
**1355 [1]** 25/12
**14 [3]** 69/13 85/20 85/21
**14th [1]** 5/16
**15 [1]** 66/3
**150 [4]** 81/17 81/22 81/23 82/2
**156 [1]** 81/14
**18 [14]** 3/16 3/18 5/11 13/8 13/10
13/12 44/15 44/16 47/23 48/15
50/17 81/19 82/19 85/9
**1956 [9]** 3/15 3/17 13/8 13/10
15/16 15/18 30/1 33/25 34/2
**1957 [1]** 15/16
**1960 [4]** 3/18 13/13 13/21 13/22
**1984 [1]** 81/18
**1YZJKAAX [1]** 85/7

**2**
**2-level [4]** 32/24 33/3 35/1 46/14
**2.0 [1]** 53/6
**20 [9]** 2/7 2/9 13/8 13/10 13/15
24/4 47/22 65/22 80/14
**200 [1]** 23/13
**20001 [3]** 2/14 83/14 83/20
**20005 [1]** 1/21
**2001 [10]** 18/13 20/24 20/25 21/5
21/6 21/10 21/12 24/9 26/5 28/24
**2005 [1]** 66/1
**2011 [2]** 52/18 52/20
**2013 [1]** 54/1
**2014 [1]** 37/1
**2018 [1]** 66/2
**2020 [1]** 66/2
**2021 [2]** 54/5 54/7
**2024 [4]** 1/5 3/14 5/16 89/10
**204 [1]** 44/21
**205.962 [1]** 84/18
**20530 [2]** 1/14 1/17
**20th [1]** 89/10
**21-399 [3]** 1/4 3/2 52/4
**22 [6]** 22/17 24/4 24/5 24/7 32/15
69/22
**22-level [1]** 14/19
**2255 [2]** 59/22 85/16
**23 [2]** 69/22 79/20
**240 [1]** 50/10
**250-plus [1]** 65/16
**26-1023 [2]** 3/20 13/15
**26-20 [1]** 13/15
**27 [1]** 49/24
**28 [5]** 22/16 31/8 31/20 44/23
85/16
**28-level [1]** 14/18
**2:06 [1]** 1/6
**2B1.1 [3]** 13/19 13/24 15/2
**2S1.1 [14]** 13/17 13/20 14/14 15/9
15/14 16/16 17/4 17/7 19/1 26/6
32/17 33/4 33/5 34/11
**2S1.3 [2]** 13/21 13/23

**3**
**30 [7]** 2/3 52/9 52/11 64/16 80/13
83/14 83/21

**3013 [1]** 82/19
**325 [1]** 53/25
**333 [2]** 2/13 83/13
**340 million [1]** 65/19
**35.9998 [1]** 85/1
**3553 [9]** 5/12 22/14 41/21 42/3
49/15 50/17 52/12 77/10 81/19
**3559 [5]** 42/9 42/12 44/15 44/17
45/22
**3561 [1]** 48/15
**3583 [1]** 47/24
**359 [1]** 45/22
**36 [3]** 23/8 50/13 65/23
**3742 [1]** 85/9
**395 million [3]** 15/24 16/14 18/3
**399 [3]** 1/4 3/2 52/4
**3:26 [1]** 52/2
**3:30 [1]** 51/11
**3B [1]** 30/13
**3C1.4 [4]** 33/3 41/16 45/25 46/8

**4**
**4-level [2]** 32/21 33/4
**4002 [1]** 83/20
**43 [2]** 47/9 47/9
**44 [1]** 46/16
**45 [1]** 67/6
**46 [3]** 47/1 47/3 47/5
**47 million [5]** 20/2 20/2 20/13
24/5 26/24
**482 [2]** 44/21 45/3
**4:54 [1]** 76/6

**5**
**5-minute [1]** 51/24
**5.1527 [1]** 1/17
**50 [2]** 47/2 49/7
**500 [1]** 83/19
**52 [2]** 64/17 65/22
**52-month [1]** 64/15
**55A [1]** 55/15
**586 [1]** 17/17
**5:26 [1]** 88/8
**5D1.2 [1]** 48/4
**5K2.0 [1]** 50/3

**6**
**6-level [2]** 32/17 33/4
**6-point [1]** 21/20
**60 [1]** 81/24
**601 [2]** 1/16 52/23
**649 [1]** 49/25
**6710 [1]** 2/13

**7**
**726 [1]** 17/16

**8**
**800 [2]** 2/6 54/24
**8th [1]** 2/4

**9**
**9,371.52683 [1]** 84/22
**900 [1]** 54/24
**944 [1]** 44/23
**950 [1]** 1/14
**982 [1]** 15/19

**A**
**AA24N84GWW46KQ5Y [5]** 84/12 84/16
84/20 84/24 85/4
**AA68 [5]** 84/11 84/15 84/19 84/23
85/2
**abetting [4]** 24/16 35/9 37/14
39/6
**ability [1]** 83/9
**able [5]** 31/4 44/18 75/10 80/7
80/11
**about [75]** 6/5 7/14 8/13 8/21
10/7 11/20 12/9 13/6 14/22 14/23

about... **[65]** 15/4 15/21 17/19
19/17 20/4 20/14 20/25 23/16 25/3
25/4 25/10 25/25 26/1 26/24 27/4
27/14 27/18 27/20 30/1 31/17 32/7
33/2 33/16 34/19 34/20 36/12
36/15 37/21 38/11 39/12 40/3 40/3
40/10 41/6 41/14 41/19 41/23 42/4
43/9 44/7 45/17 45/19 51/9 52/25
54/12 54/20 55/5 56/4 57/19 58/18
59/5 62/5 63/10 63/12 66/21 68/20
74/6 74/13 75/2 76/4 77/17 79/7
79/23 79/24 80/10
above **[3]** 23/18 47/9 89/5
above-entitled **[1]** 89/5
abuse **[5]** 34/14 54/18 55/7 56/3
79/2
abused **[1]** 55/11
abusive **[1]** 69/12
accept **[5]** 12/18 22/8 24/1 55/23
62/13
accepted **[1]** 23/9
access **[4]** 63/11 67/16 67/17 75/3
accessing **[1]** 55/12
accomplish **[1]** 56/5
accordance **[1]** 82/19
according **[2]** 10/24 11/3
account **[15]** 18/10 25/17 53/9
53/14 53/21 56/15 60/7 60/7 73/1
73/2 84/11 84/15 84/19 84/23 85/2
accounted **[1]** 29/11
accounts **[1]** 37/8
accurate **[4]** 10/18 10/18 10/19
10/23
across **[2]** 67/5 71/20
Act **[1]** 81/18
acted **[1]** 53/12
Action **[1]** 1/3
actions **[3]** 54/11 71/12 73/18
active **[4]** 58/7 58/8 61/17 76/12
activities **[1]** 58/12 75/3
activity **[9]** 21/22 29/4 31/3
32/19 40/9 41/22 54/8 55/14 56/23
acts **[1]** 45/10
actual **[2]** 26/2 77/25
actually **[21]** 5/12 8/14 31/5 32/7
35/11 38/12 38/14 45/20 57/7
59/20 62/14 62/24 63/25 65/17
72/3 80/1 82/22 83/2 87/8 87/13
87/18
add **[8]** 16/15 23/10 24/9 26/24
27/2 33/16 48/22 55/4
added **[6]** 14/17 21/19 21/20 21/22
31/8 67/14
addiction **[2]** 54/16 78/19
adding **[1]** 23/23
addition **[2]** 51/1 82/18
additional **[2]** 4/6 67/14
address **[19]** 5/7 15/7 18/4 23/3
23/12 29/22 30/14 49/15 50/2
53/15 57/1 57/5 58/1 59/16 61/14
73/11 83/14 83/22 86/10
addressed **[1]** 25/13
addresses **[2]** 16/16 16/20
addressing **[1]** 15/1
adduced **[1]** 6/17
adequate **[1]** 50/23
adequately **[2]** 50/6 72/13
adjusting **[1]** 74/8
adjustment **[3]** 31/14 32/17 32/21
administered **[1]** 40/13
administering **[1]** 36/8
administrating **[4]** 35/11 35/14
38/10 39/8
administration **[1]** 35/19
administrator **[2]** 36/5 39/21
admitted **[1]** 81/9
adopt **[1]** 7/24
Adrenal **[1]** 9/12
advised **[1]** 67/6
advisory **[2]** 13/3 81/20

affected **[2]** 74/12 75/5
affirmatively **[1]** 39/18
afford **[2]** 50/23 85/22
after **[12]** 26/7 41/7 44/4 44/25
48/13 49/14 72/11 73/25 84/14
84/18 84/23 85/2
afternoon **[6]** 3/6 3/8 3/9 3/12
3/13 73/13
again **[14]** 6/8 20/22 21/7 23/11
24/7 25/11 34/6 36/20 38/14 39/7
60/21 61/3 71/16 72/23
against **[3]** 35/18 61/25 68/18
age **[1]** 73/24
aggravating **[2]** 50/4 60/22
aggregating **[2]** 18/7 18/11
aggregation **[1]** 25/4
ago **[1]** 4/13
Agora **[1]** 53/6
agree **[14]** 9/8 13/17 13/25 14/13
30/12 30/24 32/13 32/23 43/14
43/24 43/25 44/8 47/5 78/8
agreed **[1]** 43/23
agreeing **[1]** 32/7
agreement **[1]** 4/24
ahead **[2]** 14/23 55/23
aiding **[4]** 24/16 35/9 37/14 39/6
ailments **[1]** 72/17
Akemashite **[1]** 56/7
Alaniz **[1]** 17/16
Alden **[1]** 3/7
alien **[1]** 48/8
all **[77]** 3/8 3/12 4/17 4/23 9/3
9/18 10/15 10/19 11/9 11/20 12/15
14/4 18/20 19/6 19/16 20/19 21/2
21/5 21/11 22/6 24/13 24/21 25/4
26/22 29/9 29/25 29/16 29/17
29/18 31/3 31/3 31/16 35/2 35/6
35/14 36/7 36/14 37/9 37/22 38/15
38/20 39/10 41/16 44/10 46/15
49/9 49/14 50/9 50/10 52/5 54/14
56/6 56/11 57/9 61/12 63/21 63/23
64/3 65/19 65/20 67/5 72/10 73/6
73/10 73/22 74/23 77/9 81/6 82/1
82/2 82/14 82/17 83/5 86/5 87/4
88/7 88/7
allocuting **[1]** 34/19
allow **[1]** 61/11
allowed **[1]** 76/25
almost **[4]** 58/6 60/19 61/5 72/14
alone **[3]** 7/16 7/20 73/23
along **[1]** 10/2 22/20
aloud **[1]** 86/20
AlphaBay **[1]** 53/6
already **[9]** 22/21 30/25 46/18
48/20 72/14 75/2 77/20 86/2 86/7
also **[35]** 4/3 8/7 13/20 20/3
32/20 32/23 34/13 41/2 48/2 50/1
50/13 50/23 51/10 54/12 55/22
60/15 62/12 67/3 67/19 68/9 73/19
73/21 75/5 79/2 79/7 80/5 80/17
80/24 81/5 84/10 85/14 85/16
alter **[1]** 56/7
although **[6]** 31/25 46/7 48/9
64/14 71/22 78/20
always **[2]** 46/22 79/13
am **[60]** 4/12 4/22 12/1 12/2 12/22
12/24 14/5 14/22 17/1 17/2 17/6
20/10 21/10 28/17 28/18 29/12
29/21 32/7 38/13 38/13 39/12
41/16 44/20 46/8 46/13 50/8 51/10
51/24 52/5 52/6 52/14 59/2 59/10
59/23 60/23 61/14 63/5 63/12
63/17 73/21 74/21 75/7 76/14
76/21 77/2 77/4 81/12 81/13 81/15
81/16 81/16 82/16 83/1 83/5
amend **[3]** 6/11 11/3 45/4
amended **[2]** 6/12 19/9 26/1
amendment **[4]** 12/15 26/5 29/7
43/15
amendments **[7]** 18/13 20/25 24/12

25/20 26/7 28/24 45/2
amendquist **[1]** 39/7
Amanda **[3]** 36 39 45
amnesia **[2]** 37/23 57/17
among **[2]** 51/6 81/25
amount **[16]** 16/23 17/13 17/21
19/15 23/15 25/14 25/16 26/16
30/18 30/19 30/21 32/14 65/11
65/16 78/2 78/22
amounts **[3]** 16/9 79/5 79/5
analysis **[1]** 28/12
announced **[1]** 86/21
announcing **[1]** 86/16
anonymization **[1]** 68/12
anonymize **[1]** 68/9
another **[5]** 27/3 44/1 53/1 79/13
81/8
answers **[1]** 38/1
anxious **[1]** 4/22
any **[65]** 4/6 4/19 4/25 5/3 5/17
5/17 5/21 5/23 7/10 8/2 8/4 9/3
9/18 10/2 11/4 11/8 11/9 14/3
16/3 17/24 29/16 31/6 32/14 37/21
39/8 41/1 45/6 45/12 46/9 46/16
50/8 53/12 56/15 56/15 57/3 57/3
57/24 58/18 62/14 66/4 68/17
69/15 70/2 70/7 72/16 72/16 73/17
75/3 75/3 75/19 76/8 77/5 78/16
80/19 82/21 82/22 83/6 83/14
83/21 83/23 84/3 85/15 85/19 86/1
86/15
anybody **[1]** 87/15
anyone **[14]** 5/7 10/3 35/15 45/12
48/12 48/22 49/15 63/13 63/14
73/18 75/23 76/22 78/16 82/3
anything **[24]** 14/21 14/25 24/21
27/8 46/17 47/15 48/21 51/21 66/6
69/17 71/3 71/12 72/21 74/11
75/19 75/24 76/1 77/2 86/5 86/8
86/10 86/12 86/13 87/5
anyway **[3]** 8/8 9/5 59/10
apologize **[1]** 73/19
appeal **[8]** 85/10 85/15 85/19
85/20 85/21 85/22 85/23 85/24
appearance **[1]** 3/24
APPEARANCES **[3]** 1/12 1/23 2/1
appearing **[1]** 87/10
appears **[1]** 14/6
appellate **[1]** 43/13
applicable **[5]** 13/17 14/7 15/19
45/5 52/11
application **[13]** 15/13 16/15
16/16 16/20 17/1 17/2 17/3 17/7
19/1 30/13 32/13 62/1 85/13
applied **[1]** 42/8
applies **[14]** 13/4 13/20 13/21
14/10 14/11 14/11 32/1 32/1 39/18
41/21 42/20 44/15 46/3 46/5 50/8
apply **[17]** 5/4 22/10 31/21 33/7
34/6 39/11 41/13 41/15 42/17
42/18 42/19 44/14 44/17 46/8
46/13 49/22 85/24
applying **[5]** 31/13 31/20 39/12
43/6 43/10
appointed **[1]** 85/25
apposite **[1]** 58/2
appreciate **[1]** 88/6
approach **[1]** 3/4
appropriate **[11]** 16/7 16/13 24/5
31/11 46/12 48/10 49/22 60/13
63/8 73/6 85/15
approximate **[1]** 21/8
approximately **[6]** 67/10 84/14
84/18 84/22 85/1 85/5
April **[1]** 54/7
are **[132]**
area **[2]** 77/14 79/8
areas **[1]** 13/6
arguably **[1]** 25/24
argue **[4]** 33/8 34/7 34/19 45/22
argued **[2]** 35/5 38/15
argues **[2]** 14/17 44/13
arguing **[1]** 11/25

**A**

argument [7] 18/4 19/5 30/12 34/1 35/4 39/22 59/7
arguments [1] 64/2
around [6] 38/25 67/8 67/24 74/12 74/15 75/13
arrest [7] 6/20 7/6 8/7 8/9 9/14
arrested [3] 54/5 66/1 70/8
articulate [1] 87/14
as [103]
aside [2] 32/24 69/24
ask [5] 4/6 26/13 62/5 72/24 86/1
asked [5] 36/2 36/10 37/3 38/2 39/20
asking [19] 6/11 7/14 12/1 12/2 18/21 18/23 22/14 26/12 26/15 26/17 42/18 42/19 42/21 43/3 44/3 44/7 44/7 52/9 82/11
aspects [1] 23/24
assaulted [1] 69/10
assessed [1] 77/9
assessment [4] 49/10 49/11 50/14 82/19
assets [6] 10/8 10/12 10/25 11/4 57/19 67/18
assigned [3] 59/20 59/23 59/24
assistance [6] 11/14 11/17 11/22 11/25 12/4 67/17
associated [1] 20/3
assume [1] 82/14
assumed [1] 10/10
astronomical [2] 64/22 64/22
attach [1] 86/25
attempted [4] 26/20 58/23 59/3 59/4
attempts [2] 39/17 57/14
attend [1] 59/6
attention [4] 35/23 65/14 73/20 83/19
Attorney's [1] 60/9
audience [1] 44/1
August [1] 5/16
August 14th [1] 5/16
Australia [1] 62/18
Australian [1] 62/18
authorities [3] 56/18 56/19 57/2
authority [3] 4/12 22/22 61/8
available [2] 51/8 80/12
Ave [2] 1/14 1/20
Avenue [4] 2/6 2/13 83/13 83/19
avoid [3] 51/5 79/9 80/18
aware [5] 59/25 60/1 60/23 66/11 79/3
away [8] 16/9 51/19 62/9 63/14 75/20 80/6 80/8 80/10
awesome [1] 55/18
awful [1] 87/24

**B**

back [8] 8/14 28/13 41/24 51/24 68/24 70/10 71/7 76/5
background [2] 13/7 69/7
backup [2] 77/3 77/5
bad [1] 87/15
balance [1] 81/11
banging [1] 22/9
bank [5] 18/8 18/9 18/10 18/15 18/15
Bankruptcy [1] 2/12
base [5] 13/18 13/23 14/10 21/2 21/24
based [10] 24/5 25/16 39/23 41/9 46/10 50/14 56/1 60/7 60/19 61/8
basic [1] 58/9
basically [1] 53/7
basis [4] 34/12 54/1 70/5 76/23
be [97]
bear [1] 18/2
bears [1] 26/19
because [63] 4/19 11/18 14/10 16/10 16/11 18/17 20/14 20/16

21/15 22/21 23/14 23/22 24/11 32/18 32/21 32/23 33/8 34/22 36/16 38/14 38/20 39/13 39/14 40/13 41/22 42/8 42/20 43/13 44/3 44/14 47/9 48/8 52/14 52/19 53/21 59/23 60/15 62/7 62/8 64/21 65/7 65/10 66/10 69/3 69/5 70/10 71/8 71/11 71/23 72/2 76/12 77/4 77/18 77/19 77/22 78/18 88/1
become [2] 67/11 74/17
becoming [1] 75/7
bed [1] 69/19
been [27] 4/5 5/25 19/9 28/11 31/2 40/14 42/25 43/20 44/18 44/19 46/18 51/6 51/9 60/10 69/4 72/13 73/20 74/24 75/20 77/17 77/18 79/22 80/7 86/2 86/6 87/16 88/2
before [21] 1/9 18/13 21/6 25/19 26/6 27/21 31/24 32/24 38/12 42/1 44/6 47/22 49/16 54/22 60/11 70/9 70/11 72/23 74/13 76/7 87/5
began [1] 74/14
beginning [5] 44/25 53/4 57/20 66/18 85/7
behalf [1] 4/5
being [15] 4/2 17/19 19/17 21/4 29/3 33/19 40/4 42/24 45/17 71/21 73/14 74/21 75/19 79/9 80/10
belabor [2] 17/22 52/13
believe [6] 8/24 20/15 43/15 43/15 43/23 67/1
believed [1] 37/19
believes [1] 71/12
belongs [1] 42/3
below [2] 31/20 32/15
bench [1] 76/4
benchmarks [2] 77/13 77/20
benefit [1] 31/25
best [3] 7/3 14/20 26/18
better [2] 74/21 75/7
betting [1] 72/6
between [10] 15/15 47/14 48/5 49/7 49/11 60/3 61/17 65/22 68/6 87/11
beyond [4] 43/2 43/19 57/2 86/8
big [3] 23/3 74/9 81/5
billion [1] 65/21 68/6
billions [1] 68/5
Binance [3] 68/4 68/8 71/19
binding [1] 19/1
bit [4] 7/22 35/25 74/4 77/14
Bitcoin [81] 9/2 9/15 9/16 17/5 15/24 16/4 16/5 16/10 17/24 18/21 26/14 26/14 26/16 27/21 28/8 28/19 33/19 35/12 35/15 35/16 36/3 36/5 36/9 36/11 36/12 36/14 36/16 36/19 36/23 37/3 37/6 37/7 37/12 37/24 38/11 38/21 39/1 39/8 39/20 39/21 40/4 40/13 40/23 40/24 41/1 41/2 52/18 52/22 52/22 52/25 53/3 53/5 53/10 53/15 53/17 53/22 53/25 54/2 54/6 54/20 55/16 56/1 56/5 56/8 56/10 56/12 56/22 57/21 58/5 58/7 61/4 65/25 66/3 66/7 66/18 69/22 69/24 78/25 84/14 85/5 85/6
BitcoinFog [1] 20/18
Bitcoins [2] 37/9 55/23
Bitstamp [1] 37/9
blind [3] 39/6 40/3 40/8
blindness [6] 35/8 39/23 39/24 39/25 40/2 40/10
blizzard [1] 37/23
boils [1] 22/1
Booker [1] 41/25
books [1] 75/4
BOP [2] 77/8 83/3
borne [1] 18/1
Boston [2] 2/10 68/25
both [5] 17/10 25/23 32/21 58/15

81/25
bottom [3] 16/21 16/22 55/21
Braxtonbrown [6] 16/7 16/13 19/2 25/11 25/12 25/24
Braxtonbrown-Smith [6] 16/7 16/13 19/2 25/11 25/12 25/24
break [7] 19/21 19/24 20/12 51/14 51/17 51/24 71/5
breaks [1] 53/25
brief [5] 19/20 20/11 20/19 20/21 43/5
briefed [1] 27/13
briefly [1] 38/8
bring [2] 11/25 24/13
broader [1] 30/4
broadly [1] 70/5
Brodie [1] 1/15
Broken [1] 32/9
Brooklyn [1] 2/4
brought [1] 57/9
Brown [18] 1/15 3/6 4/7 5/19 8/13 14/24 24/21 29/13 34/9 35/21 42/5 52/7 60/2 63/3 64/7 78/8 80/25 86/1
Budget [2] 83/19 83/22
built [1] 61/4
bump [2] 21/20 21/22
burden [8] 17/12 17/17 17/20 18/1 18/2 19/20 26/19 51/20
Bureau [5] 63/17 76/15 76/18 81/22 84/2
business [20] 3/18 8/22 8/24 9/1 9/14 13/12 21/4 21/22 29/2 32/22 33/22 33/24 37/15 37/16 60/17 61/1 61/3 61/5 68/2 79/19
businesses [1] 67/23
Buster [1] 29/12
buy [1] 67/25
buys [1] 28/5

**C**

calculate [1] 26/4
calculating [1] 25/17
calculation [9] 13/3 15/1 15/5 21/24 24/24 34/18 34/22 46/19 46/24
calculus [1] 62/14
call [1] 58/15
called [2] 43/25 59/17
Calling [1] 3/2
came [7] 19/24 20/12 21/5 21/11 35/13 67/21 74/23
can [33] 11/15 12/17 13/5 15/12 16/8 20/8 23/10 29/23 31/4 32/15 34/19 39/22 42/1 42/12 42/13 45/22 48/10 51/21 51/22 51/25 56/20 61/18 61/21 63/14 63/19 67/17 70/3 70/17 74/11 75/16 75/16 80/9 87/20
can't [6] 29/5 37/23 53/20 67/8 69/1 69/6
candidly [1] 22/21
cannot [2] 18/2 37/18
Capo [2] 6/6 9/25
care [1] 72/16
career [1] 22/12
caregiver [1] 63/9
caring [1] 74/2
carried [1] 45/6
carries [2] 17/12 67/15
carry [2] 50/11 75/9
carrying [1] 45/10
case [81] 3/2 5/5 5/13 7/22 7/23 11/14 13/4 19/2 19/6 19/11 19/13 19/13 21/9 21/21 22/2 22/19 23/1 23/2 23/4 25/5 25/15 25/19 27/21 29/5 30/15 32/12 35/17 38/14 39/12 40/19 40/24 41/3 42/1 42/12 42/15 43/5 43/11 44/2 49/2 49/22 52/3 56/3 56/6 57/13 58/2 58/4 58/14 58/18 58/20 58/25 59/19 59/22 59/25 60/12 60/14

C

case... [25] 60/21 61/3 61/24
62/16 62/24 64/12 64/13 64/16
64/16 64/21 67/19 71/18 71/19
73/8 77/10 77/22 78/6 80/24 81/2
81/5 81/13 82/4 83/4 83/10 87/11
cases [21] 18/5 18/6 18/18 19/11
20/24 28/14 28/23 31/18 42/22
44/19 58/10 59/17 62/2 64/9 65/6
68/5 68/15 71/19 71/20 77/15
80/17
cash [4] 68/9 68/11 68/11 71/19
catch [5] 71/24 71/25 72/3 72/4
79/9
category [1] 47/8
cater [1] 61/4
catered [1] 60/19
Catherine [1] 1/13
caught [4] 72/5 79/9 79/16 81/4
cause [2] 73/18 79/4
caused [1] 73/21
causes [1] 42/16
causing [1] 45/13
cautious [1] 39/12
Ccips [1] 1/19
cease [1] 67/4
certain [2] 78/17 85/11
certainly [10] 10/19 23/22 43/22
51/16 59/3 61/18 61/24 66/5 70/17
79/3
certify [2] 70/23 89/3
cetera [1] 15/15
chain [2] 18/22 26/13
challenge [1] 85/17
challenges [1] 74/8
chance [6] 29/21 69/12 69/13
72/24 75/17 81/9
change [4] 83/14 83/15 83/22
83/23
changed [2] 21/18 67/7
channel [1] 70/5
character [1] 59/12
characteristic [2] 21/20 24/25
characteristics [4] 21/3 51/3
58/9 79/18
characterization [2] 6/1 9/24
charged [8] 24/14 24/15 25/14
41/22 42/14 66/1 66/2 70/9
chart [4] 19/20 54/24 65/12 65/13
charts [1] 23/25
check [1] 86/13
checking [1] 86/20
cheeky [1] 42/2
child [10] 34/13 54/18 55/7 55/11
55/20 56/2 66/6 66/13 66/22 79/1
children [2] 63/10 79/2
choice [2] 33/23 56/25
choices [1] 74/12
chose [2] 40/7 44/5
Chris [1] 3/6
Christopher [1] 1/15
chronic [1] 54/17
Circuit [18] 16/6 17/17 19/1 19/6
19/13 19/14 22/3 26/3 26/3 29/6
30/6 42/25 43/4 47/12 59/5 59/8
85/10 85/19
Circuit's [1] 25/12
circumstance [3] 28/2 30/14 50/5
circumstances [9] 31/19 46/9 51/3
60/23 63/9 64/11 80/21 85/11
87/25
circumstantial [2] 35/19 39/9
cite [1] 17/15
cited [5] 19/12 20/14 22/2 43/5
59/1
cites [2] 18/5 18/18
citing [1] 19/11
claimed [2] 41/7 57/20
clarification [1] 34/11
clarifications [1] 46/17
clarify [2] 42/6 47/15

clarity [1] 34/16
classroom [2] 75/5 75/6
clean [3] 17/19 17/21 17/24
clear [13] 19/14 20/24 21/25 31/2
34/22 38/4 42/25 43/4 43/12 45/16
51/19 78/3 81/3
clearcut [2] 35/24 37/17
clearly [2] 19/21 38/3
clearnet [5] 35/7 36/14 36/17
37/25 57/1
clerk [3] 83/12 83/15 87/21
client [1] 23/10
clients [1] 67/8
clocks [1] 32/9
close [4] 46/7 63/18 67/12 73/24
closed [1] 57/6
closely [1] 21/14
closer [2] 63/15 65/19
closing [2] 35/5 38/15
coaching [2] 74/18 74/25
cocaine [3] 53/18 53/19 54/14
cocounsel [1] 47/16
cocounsels' [1] 41/20
code [3] 3/20 13/15 86/13
Coinbase [2] 53/21 53/21
coincidence [1] 28/16
colleagues [1] 31/16
COLUMBIA [3] 1/1 37/16 83/18
come [12] 17/20 20/22 24/10 32/11
37/19 42/12 51/24 53/11 69/3
73/18 76/5 79/14
comes [5] 21/4 21/21 53/14 53/21
61/23
comfortable [1] 71/14
coming [5] 18/24 26/19 40/4 40/6
40/8
commentary [1] 15/10
commingled [11] 16/9 16/21 17/10
17/19 18/25 19/17 26/17 26/18
29/15 29/16 30/20
commingling [4] 15/21 18/7 25/22
30/16
commission [8] 22/24 44/24 44/25
45/4 45/9 45/11 45/24 45/24 46/1
Commission's [1] 14/7
commit [1] 38/5
commitment [1] 84/1
committed [3] 60/8 75/7 81/21
communications [2] 9/25 35/15
community [1] 69/21
commute [1] 69/1
companies [2] 67/23 67/24
company [2] 65/25 67/7
comparable [4] 58/1 59/17 68/15
80/20
comparators [1] 80/19
compensate [1] 24/11
Compensation [1] 83/21
complex [1] 29/14
compliance [2] 70/23 82/23
complicated [1] 23/6
complicating [2] 17/14 30/22
comply [1] 50/19
computer [1] 70/14
computers [1] 69/20
concede [1] 31/12
conceded [1] 64/20
conceived [1] 60/17
conceptually [2] 25/7 26/9
concern [1] 63/10
concerned [1] 79/23
concerns [1] 32/8
conclude [6] 31/7 34/5 46/5 46/11
48/10 49/21
concluded [2] 41/10 88/8
concludes [1] 83/8
concurrently [6] 48/1 50/11 81/24
81/25 82/1 82/18
conditions [3] 69/2 69/9 75/5
conduct [18] 21/14 22/4 23/24
23/25 24/1 24/14 24/15 42/9 44/4
50/23 51/7 59/14 64/10 65/15

65/15 68/13 78/1 81/4
conducts [1] 50/6
confer [1] 12/3
confirms [1] 17/17
Congress [7] 5/10 45/1 45/2 45/17
45/23 46/1 50/16
connection [1] 78/3
consequences [4] 75/9 78/12 79/16
79/17
consider [6] 4/8 50/16 51/2 58/25
63/8 65/9
consideration [3] 50/6 71/23
81/19
considered [2] 77/21 80/17
considering [2] 25/13 79/18
consistent [6] 35/10 38/24 38/25
39/5 72/25 77/6
consistently [1] 15/20
consists [1] 81/23
conspiracy [4] 3/15 13/8 37/13
60/6
constitutes [1] 89/4
Constitution [2] 2/13 83/13
constitutional [2] 43/9 44/9
consultants [1] 67/5
consultation [1] 7/17
contact [3] 42/11 45/8 45/14
contemporaneous [1] 55/15
contested [1] 60/22
context [3] 50/2 72/1 72/2
continue [1] 48/11
continued [3] 1/23 2/1 53/5
continues [1] 70/22
contract [2] 58/19 76/15
contribute [1] 74/22
contribution [1] 87/18
control [1] 37/10
converts [2] 18/9 18/11
convict [1] 35/6
convicted [9] 3/14 44/16 45/6
45/12 45/17 45/19 58/23 62/23
79/22
conviction [6] 45/21 45/24 46/6
75/8 85/17 85/19
copying [1] 87/21
correct [4] 7/25 7/25 10/13 89/4
correspondence [1] 56/10
cost [2] 85/22 85/24
could [29] 8/14 8/17 10/10 18/4
18/17 24/14 24/15 24/23 36/15
37/19 38/17 40/11 41/22 42/6 44/5
46/4 47/16 63/4 65/19 66/13 67/1
67/25 70/13 70/18 71/13 72/13
74/16 87/16 88/1
couldn't [6] 37/24 37/25 38/1
69/19 71/12 75/4
counsel [14] 3/4 3/5 5/6 5/7
10/25 11/14 11/18 11/20 12/1 12/4
12/5 12/9 51/12 85/25
count [25] 3/14 3/15 3/17 3/19
13/19 16/7 16/14 18/14 18/17
18/20 18/22 18/23 20/16 25/8
25/25 26/12 26/13 27/10 47/13
48/2 48/18 49/5 49/6 49/12 83/17
counted [1] 18/3
country [5] 61/21 61/21 62/12
71/21 75/14
counts [20] 13/16 13/25 14/8
14/12 17/11 36/7 47/21 47/23
47/25 48/6 48/19 49/3 49/8 49/10
50/11 50/11 81/23 81/24 82/2
83/11
couple [3] 4/13 48/20 60/4
course [7] 19/9 29/12 33/7 35/8
52/24 57/16 57/18
courses [1] 77/1
court [77] 1/1 2/11 2/12 4/12 5/7
5/9 10/7 14/9 17/8 17/16 18/20
18/22 18/23 19/22 20/11 21/6
21/23 22/20 22/23 22/23 22/25
23/7 23/9 23/12 23/17 23/17 23/19
23/21 25/11 25/13 26/12 26/13

**C**

court... **[45]**   27/4 34/11 35/4
35/7 39/4 42/18 42/19 42/21 43/13
44/8 45/18 47/24 48/1 48/2 50/4
51/2 52/14 53/24 54/22 55/8 55/14
57/15 59/9 59/10 59/19 59/25 63/5
64/5 72/25 73/11 73/19 81/21 82/8
83/8 83/12 83/13 83/15 83/18
85/23 85/25 86/17 86/17 86/19
89/3 89/13
**Court's [4]**   6/9 35/22 41/20 61/13
**court-appointed [1]**   85/25
**courts [5]**   2/12 18/12 48/8 50/3
83/23
**cousin [2]**   68/24 68/25
**cover [1]**   60/9
**covered [1]**   46/18
**COVID [1]**   75/3
**created [5]**   19/20 56/22 57/5
58/11 67/24
**creates [1]**   28/25
**creating [2]**   54/11 64/4
**crime [5]**   25/24 57/10 62/23 70/16
83/21
**crimes [3]**   50/24 71/24 79/22
**criminal [22]**   1/3 17/10 17/10
43/8 47/7 47/8 50/23 52/3 52/17
54/8 54/11 56/23 58/11 58/12
58/14 60/6 60/18 60/19 61/6 79/20
84/5 84/7
**criminally [6]**   16/23 17/14 30/17
30/19 30/21 37/12
**criminals [1]**   61/5
**crises [1]**   70/2
**CRM [1]**   1/19
**cross [2]**   10/20 38/2
**cross-examination [1]**   10/20
**cryptocurrency [6]**   68/11 84/14
84/18 84/22 85/1 85/6
**CSAM [1]**   32/19
**culpability [4]**   31/18 33/9 77/24
78/1
**culture [1]**   74/9
**current [1]**   42/2 74/23
**custodial [2]**   8/12 53/13
**custody [4]**   81/22 82/24 82/25
83/3
**Customs [1]**   84/2
**cyber [1]**   70/16
**cyber-related [1]**   70/16
**cybercrime [1]**   55/17

**D**

**D.C [15]**   3/20 13/14 16/6 19/1
19/6 25/12 26/3 26/3 29/6 30/6
42/25 43/4 47/12 85/10 85/19
**damage [1]**   78/4
**dark [3]**   66/14 66/15 66/22
**darknet [13]**   15/25 16/9 19/25
20/9 28/13 28/15 28/16 28/21
52/20 52/24 53/17 55/25 60/20
**date [2]**   36/25 57/23
**Dated [1]**   89/10
**dates [1]**   6/16
**day [6]**   28/4 36/25 44/9 74/3
75/17 89/10
**days [5]**   4/13 83/14 83/21 85/20
85/21
**DC [15]**   1/5 1/14 1/17 1/21 2/14
47/13 48/3 48/6 49/8 72/19 76/12
82/20 83/14 83/20 83/23
**deal [15]**   18/5 18/6 18/18 40/18
42/22
**dealing [1]**   78/23
**deals [1]**   25/21
**dealt [2]**   56/17 70/3
**debate [1]**   41/23
**debt [1]**   75/9
**deceive [1]**   39/4
**decide [3]**   34/21 49/14 61/8
**decided [1]**   44/19

**decision [3]**   25/12 62/3 77/12
**decisions [2]**   51/19 78/23
**dedicated [1]**   75/15
**default [3]**   16/21 17/8 17/13
**defendant [35]**   1/7 2/2 6/20 8/6
8/10 9/1 9/14 9/25 10/21 10/25
11/3 17/12 17/18 17/20 18/1 18/5
26/18 30/20 31/18 33/9 36/16
37/18 43/9 45/6 48/15 50/24 51/4
54/11 55/13 55/15 56/4 62/19 63/9
73/8 87/11
**defendant's [9]**   6/16 16/2 18/4
35/25 37/21 37/22 55/12 59/15
63/11
**defendants [2]**   51/6 64/9
**defense [19]**   4/4 9/4 10/25 11/3
11/10 16/8 18/18 33/6 39/15 42/22
54/19 59/18 60/1 61/16 75/23
80/14 82/14 86/6 87/5
**defense's [1]**   78/20
**defer [1]**   82/8
**defined [4]**   15/9 15/9 15/13 30/25
**defraud [1]**   65/21
**degree [1]**   50/5
**deliberate [2]**   57/10 57/14
**deliberately [1]**   57/5
**demonstrated [1]**   56/20
**dentist [1]**   72/17
**denying [1]**   68/14
**depart [1]**   50/4
**DEPARTMENT [5]**   1/13 61/9 61/19
61/25 62/2
**departure [8]**   5/5 22/14 31/11
34/8 49/22 49/23 52/10 81/15
**departures [2]**   22/13 49/16
**depending [1]**   71/1
**deportation [1]**   84/3
**deposit [2]**   26/14 53/13 53/20
83/20
**deposited [4]**   15/24 17/24 26/16
40/4
**deposits [2]**   28/7 40/8
**depression [6]**   69/18 70/3 74/7
74/10 79/24 80/1
**Dept [1]**   1/20
**deputy [1]**   87/21
**derived [6]**   16/23 17/14 30/17
30/17 30/19 30/21
**description [1]**   9/12
**descriptions [1]**   55/8
**deserves [2]**   23/13 81/8
**design [2]**   56/24 57/7
**designation [1]**   77/6
**designed [2]**   22/6 22/7 24/7
**desist [1]**   67/4
**destroyed [1]**   54/16
**detail [2]**   31/20 77/14
**detailed [1]**   20/16
**detected [1]**   67/8
**detention [1]**   67/21
**deter [1]**   45/9
**determination [4]**   6/9 7/12 34/20
45/18
**determinative [1]**   32/12
**determine [7]**   5/4 17/13 30/21
43/18 43/19 44/18 45/9
**determined [1]**   14/11
**deterred [2]**   72/13 72/14
**deterrence [7]**   50/23 58/15 60/13
70/8 71/17 72/1 79/8
**devastating [2]**   79/6 80/5
**developed [2]**   69/18 72/18
**DGMY [4]**   84/15 84/19 84/24 85/3
**DGNW [1]**   84/12
**did [21]**   4/14 12/8 12/12 18/21
21/17 23/9 25/13 28/18 35/4 36/3
36/14 37/20 37/25 38/11 53/11
59/2 59/3 76/9 78/13 79/4 86/17
**didn't [17]**   23/10 23/14 24/16
24/17 29/7 36/16 40/1 41/1 46/1
59/5 64/20 66/1 66/5 73/1 78/24
86/18 86/19

**died [2]**   71/11 78/16
**difference [3]**   33/10 59/11
64/25
**differences [2]**   4/20 59/14
**different [26]**   7/22 14/2 14/8
14/8 18/5 18/6 19/7 22/4 22/6
22/9 22/15 23/23 25/6 25/7 25/22
26/9 27/10 29/7 39/17 53/10 53/15
58/4 58/21 61/19 88/2 88/2
**differently [2]**   39/15 58/18
**difficult [11]**   16/23 23/20 29/14
62/20 62/25 69/17 71/2 72/2 72/4
74/20 81/1
**difficulty [1]**   29/1
**direct [11]**   6/11 8/9 21/13 26/24
35/13 35/22 36/2 39/7 53/1 55/2
55/14
**directly [8]**   15/25 16/8 20/12
24/13 36/22 40/19 53/22 83/3
**dirty [7]**   17/19 19/15 19/23 20/12
27/10 27/22 60/16
**disaggregate [1]**   16/12
**disagree [5]**   14/25 15/5 32/1 32/2
33/2
**disagreeing [2]**   32/5 65/3
**disagreement [5]**   5/1 13/5 13/6
14/3 15/4
**disagreements [4]**   5/1 6/5 12/25
13/1
**disagrees [1]**   33/6
**disambiguate [3]**   17/18 19/18
26/20
**discuss [1]**   32/16
**discussed [1]**   86/9
**discussions [1]**   12/23
**disparities [1]**   51/6
**disparity [1]**   80/18
**disposed [1]**   62/25
**dispute [4]**   8/23 14/16 15/21 22/5
**disputes [5]**   6/1 6/4 6/8 11/8
11/10
**distance [1]**   87/10
**distinct [2]**   25/7 32/25
**distinguishable [2]**   60/15 80/24
**distinguished [1]**   31/1
**distributed [1]**   55/20
**district [11]**   1/1 1/1 1/10 2/12
23/21 37/16 64/12 68/15 70/21
83/13 83/18
**districts [1]**   68/15
**do [55]**   6/9 7/5 7/21 7/23 11/2
11/16 14/16 14/21 18/13 22/6
23/17 24/17 24/17 25/6 25/7 26/20
30/12 31/7 31/24 33/17 34/18
38/16 39/11 39/18 42/1 42/2 42/21
43/14 44/1 44/8 48/6 48/9 48/10
48/13 49/21 61/9 61/21 63/1 70/12
70/15 71/12 74/10 74/13 75/19
79/11 79/16 80/2 80/21 81/14
81/16 82/22 86/25 86/25 87/4
87/23
**document [1]**   10/25
**does [23]**   5/17 10/22 15/5 23/15
30/13 31/18 31/21 31/21 34/6
34/15 34/25 39/11 41/13 43/7 46/8
49/15 59/11 70/24 71/22 75/23
78/3 82/3 82/10
**doesn't [10]**   20/23 31/9 44/8
44/14 44/16 66/20 68/23 69/5 70/9
82/10
**dog [3]**   28/5 28/5 28/6
**doing [8]**   22/10 38/25 42/7 43/9
56/22 71/3 72/21 77/1
**DOJ [2]**   1/16 1/19
**DOJ-CRM [1]**   1/19
**DOJ-USAO [1]**   1/16
**dollar [3]**   68/6 77/24 78/21
**dollars [11]**   15/23 18/9 27/4
36/22 54/4 54/13 54/14 54/15
65/21 68/5 78/11
**domain [18]**   35/7 36/8 36/14 36/17
37/25 38/9 38/12 38/16 40/17

## D

**domain...** [9]  40/20 41/15 42/7
42/10 45/7 45/14 46/25 47/3 57/1
**domicile** [1]  71/21
**don't** [65]  5/21 6/4 6/8 7/2 7/10
8/2 8/4 8/8 8/6 8/23 11/2 11/7 14/2
14/23 17/22 20/1 20/7 20/13 26/8
27/8 27/13 27/19 28/10 30/9 30/10
30/24 31/5 31/16 32/2 32/7 34/1
34/17 34/21 39/2 39/13 39/25
40/11 40/22 44/9 49/8 51/11 51/17
51/18 51/19 51/20 52/13 62/14
63/5 64/1 64/21 69/15 69/15 70/7
71/3 73/6 77/21 77/25 78/4 78/15
78/24 80/18 80/20 81/5 82/4 86/14
87/9
**done** [6]  19/18 40/14 41/7 69/24
71/13 78/4
**double** [2]  23/13 42/17
**doubt** [5]  37/21 43/2 43/19 78/24
80/2
**down** [14]  11/24 15/12 19/21 19/24
20/13 22/1 24/13 27/5 32/14 47/9
53/5 53/25 73/15 74/4
**downstream** [2]  20/17 27/15
**downward** [2]  52/10 81/13
**dozen** [6]  37/4 37/6 37/10 38/18
38/25 49/17
**dozens** [2]  55/10 55/10
**draconian** [2]  64/8 68/17
**draw** [2]  31/6 53/10
**driven** [1]  77/24
**driver** [1]  21/2
**drives** [1]  27/23
**drop** [6]  7/15 8/8 8/10 9/8 9/21
47/9
**dropping** [5]  9/4 9/19 10/3 46/24
47/2
**drug** [14]  21/4 21/21 34/12 40/6
40/9 53/4 54/13 55/25 56/2 58/5
66/5 78/15 78/18 78/18
**drugs** [3]  52/21 54/15 55/19
**due** [1]  8/12
**duration** [2]  52/17 59/15
**during** [11]  9/24 10/20 10/21
52/24 53/12 57/9 57/16 57/17
73/25 75/2 80/2
**dwell** [1]  59/4
**dwells** [1]  71/15

## E

**each** [5]  18/14 18/17 18/22 46/11
55/10
**earlier** [1]  52/19
**early** [1]  22/12
**easy** [2]  69/14 77/16
**economically** [1]  69/9
**economy** [2]  55/25 56/1
**ecosystem** [1]  53/4
**edification** [1]  41/20
**educational** [1]  77/1
**effective** [1]  42/11
**effort** [1]  79/13
**efforts** [1]  79/25
**ego** [1]  56/7
**egregious** [1]  68/13
**eight** [1]  67/23
**Eighth** [1]  19/13
**either** [4]  15/24 31/11 42/17
45/23
**Ekeland** [10]  2/2 2/3 3/10 6/25
7/5 10/13 23/3 23/11 35/2 38/7
**Ekeland's** [1]  39/22
**elderly** [1]  69/2
**element** [1]  46/11
**Eleventh** [1]  19/14
**eligible** [3]  46/14 48/16 48/17
**else** [16]  5/8 24/21 27/8 31/24
35/16 36/15 46/17 47/15 48/21
55/22 68/1 75/23 75/24 76/1 86/10
87/5

## E (second column)

**email** [4]  57/5 66/17 87/21 87/21
**emails** [1]  57/16
**empirically** [1]  24/19
**employed** [6]  6/21 7/7 7/9 8/6
8/10 9/25
**employment** [3]  6/16 8/7 8/15
**enable** [1]  53/3
**end** [6]  22/17 28/4 31/10 44/9
67/11 81/6
**endure** [1]  87/17
**enforce** [1]  70/18
**enforcement** [3]  29/1 79/10 84/2
**engage** [2]  61/2 70/16
**engaged** [3]  40/14 60/8 65/18
**engaging** [2]  28/22 37/15
**enhance** [1]  46/3
**enhanced** [1]  39/14
**enhancement** [24]  23/2 23/20 33/3
33/4 33/5 33/21 34/6 34/11 35/1
39/11 39/13 39/18 41/13 41/15
42/8 42/19 43/6 44/14 44/17 46/3
46/5 46/12 46/13 46/24
**enhancements** [10]  21/10 22/4 22/6
22/16 23/23 24/8 24/12 29/18
45/11 64/3
**enough** [8]  11/19 12/3 12/8 12/12
21/10 27/25 28/1 81/3
**ensure** [2]  45/5 50/17
**enter** [3]  48/25 83/8 86/22
**entered** [2]  85/17 86/17
**entire** [8]  7/23 8/15 16/14 17/11
18/2 35/17 71/11 85/7
**entirely** [5]  35/10 38/10 38/24
39/5 45/16
**entirety** [1]  16/4
**entities** [2]  67/20 68/7
**entitled** [1]  89/5
**entry** [2]  85/20 86/16
**equally** [1]  57/8
**equates** [1]  19/15
**era** [1]  69/11
**error** [1]  25/13
**escape** [1]  69/13
**especially** [3]  27/9 36/25 52/16
**essential** [1]  53/22
**essentially** [6]  17/8 18/16 46/23
62/3 64/5 70/23
**established** [1]  85/14
**et** [1]  15/15
**et cetera** [1]  15/15
**Ethereum** [1]  84/18
**Euros** [1]  84/19
**evaluate** [1]  61/22
**even** [20]  26/20 31/12 32/12 34/8
36/7 36/13 37/14 48/13 54/4 55/24
57/4 57/21 59/3 62/2 62/20 67/16
74/14 78/22 79/4 79/5
**evening** [1]  73/13
**event** [2]  32/14 46/9
**eventually** [1]  75/14
**ever** [13]  10/22 11/24 20/1 36/3
37/3 39/7 39/20 44/2 58/19 66/3
70/9 71/15 74/3
**every** [8]  25/8 26/13 26/13 28/11
35/25 67/3 69/1 74/3
**everyone** [4]  31/23 47/5 63/23
72/5
**everything** [8]  24/25 31/24 38/17
38/22 51/20 52/13 78/8 86/22
**evidence** [31]  6/17 8/6 8/25 12/23
15/22 16/1 17/21 17/23 24/6 33/18
35/13 35/18 36/21 36/24 37/7
38/25 39/7 39/8 40/18 40/21 40/22
40/22 41/3 41/10 43/21 58/18 66/6
66/8 66/11 66/24 66/25
**exact** [1]  22/15
**exactly** [3]  22/20 60/12 78/12
**examination** [1]  10/20
**example** [8]  6/5 18/8 39/18 40/6
40/15 41/4 60/13 83/2
**examples** [3]  31/4 35/24 36/2
**exceeding** [1]  48/17

**except** [2]  63/8 66/7
**exception** [1]  66/11
**exceptions** [1]  66/13
**excerpt** [1]  20/15
**excessive** [3]  29/25 31/15 78/6
**exchange** [1]  52/21
**exclusively** [1]  60/20
**excuse** [1]  74/11
**exercise** [1]  75/4
**exercised** [1]  65/1
**Exhibit** [3]  52/23 53/25 55/15
**Exhibit 325** [1]  53/25
**Exhibit 55A** [1]  55/15
**Exhibit 601** [1]  52/23
**exhibits** [2]  54/22 56/6
**exist** [2]  36/16 66/13
**exists** [1]  50/4
**expect** [2]  67/11 87/18
**experiences** [1]  74/16
**expert** [1]  19/19
**explain** [3]  11/15 31/10 36/10
**explained** [1]  27/14
**explaining** [1]  87/8
**explains** [1]  30/14
**Exploit.in** [2]  55/17 56/8
**exploiting** [1]  58/13
**explored** [1]  10/20
**exposure** [1]  43/8
**extensive** [1]  24/1
**extent** [6]  23/19 30/1 43/14 63/10
72/12 85/18
**extra** [1]  24/7
**extradition** [1]  71/1
**extraordinarily** [1]  62/22
**extraordinary** [2]  87/13 88/4
**extreme** [2]  57/8 65/7
**extremely** [1]  83/7
**eye** [2]  21/15 22/18
**eye-popping** [1]  22/18
**eyes** [1]  57/6

## F

**F.3d** [2]  17/17 49/24
**face** [1]  39/14
**facilitate** [2]  78/13 84/2
**facilitated** [3]  45/7 54/10 78/19
**facilitating** [2]  56/23 66/15
**facilities** [1]  76/15
**facility** [3]  72/19 74/23 77/6
**fact** [12]  7/25 12/20 20/4 25/7
40/8 41/8 44/4 66/7 72/14 78/13
79/7 88/3
**factor** [1]  65/10
**factors** [10]  5/10 46/2 49/15
50/16 52/12 52/13 61/20 61/25
63/8 77/11
**facts** [8]  4/25 7/24 12/18 12/20
42/20 42/23 64/7 19 77/10
**factual** [11]  5/18 6/1 6/4 6/5 6/8
7/10 11/8 11/9 37/17 38/4 38/4
**factually** [1]  7/20
**fair** [5]  5/10 27/25 28/13 28/15
52/12
**fairly** [3]  22/18 80/5 81/13
**false** [6]  40/16 42/7 42/10 45/8
45/14 46/25
**familiar** [3]  59/19 59/23 63/6
**families** [1]  54/17
**family** [10]  63/7 63/18 68/23
68/23 68/24 71/8 75/17 75/20 80/8
81/10
**fanciful** [2]  27/7 27/11
**far** [8]  14/21 44/2 44/18 59/14
75/18 75/20 80/8 80/10
**fashion** [1]  5/9
**father** [5]  69/8 69/11 71/10 74/2
80/6
**father's** [1]  60/7
**favorably** [1]  62/24
**February** [1]  52/20
**February 2011** [1]  52/20
**federal** [3]  44/5 84/4 84/6
**feeling** [1]  72/9

**F**

feels [1] 7/19
fees [4] 84/15 84/19 84/23 85/2
feigned [2] 37/23 57/17
Feliks [1] 60/21
felony [2] 45/6 45/12
fentanyl [1] 54/14
Fernch [1] 6/24
Fernich [13] 2/5 2/6 3/10 4/10 19/4 31/25 46/10 59/18 63/21 63/25 65/11 73/4 86/5
few [5] 37/4 37/5 37/10 38/18 52/15
Field [1] 3/25
Fields [1] 43/5
Fifth [1] 17/17
figure [6] 65/8 69/11 71/10 74/2 77/24 78/21
figuring [1] 40/5
file [1] 85/23
filed [3] 5/15 8/16 85/20
filing [1] 85/21
final [7] 5/15 9/21 67/11 83/16 84/6 86/24 87/7
finally [2] 72/19 85/5
Finance [2] 83/19 83/22
financial [9] 10/8 10/24 30/15 57/19 57/23 62/23 75/8 83/11 83/17
financially [1] 9/15
find [13] 16/14 23/17 33/17 33/20 35/6 38/16 38/17 39/11 41/12 42/23 56/19 77/19 77/19
finding [8] 34/12 37/12 39/5 40/12 43/2 44/4 73/2 74/9
findings [3] 7/24 12/20 12/25
finds [2] 23/12 50/4
fine [13] 9/6 11/12 24/18 49/3 49/5 49/6 49/7 49/9 49/9 57/25 83/9 83/10 87/2
finer [1] 31/6
fines [1] 29/25
fingertips [1] 63/5
firm [1] 9/25
Firoz [6] 59/18 59/19 59/25 60/1 60/12 83/2
first [16] 9/23 14/9 20/19 27/23 32/4 32/6 33/12 35/2 36/10 52/6 52/16 52/20 56/20 65/25 70/8 75/1
first-time [1] 70/8
fits [1] 42/9
five [1] 6/7
flight [1] 6/7
Floor [2] 2/4 2/7
flowing [1] 37/8
focus [2] 14/15 65/14
focuses [1] 66/10
Fog [61] 9/2 9/17 15/24 16/4 16/5 16/10 17/24 18/21 26/14 26/17 27/21 28/19 33/19 35/12 35/15 35/16 36/3 36/5 36/9 36/11 36/12 36/15 36/19 36/23 37/4 37/6 37/12 37/24 38/11 38/21 39/1 39/8 39/20 39/21 40/4 40/13 40/23 40/24 41/2 52/18 52/22 52/25 53/3 53/5 53/17 53/22 54/2 54/20 55/16 56/5 56/8 56/22 58/5 61/4 65/25 66/3 66/7 66/18 69/22 69/25 85/6
Fog's [2] 53/25 54/6
folks [1] 55/18 72/7
Followed [1] 82/3
following [4] 9/13 11/4 82/13 84/10
follows [2] 19/22 19/22
food [3] 28/5 28/5 28/6
foregoing [1] 89/4
foreign [1] 71/21
forever [1] 75/9
forfeit [3] 67/9 84/7 84/10
forfeited [1] 86/19
forfeiture [11] 15/18 15/19 48/21 48/22 49/2 67/11 83/7 84/5 84/9

formulating [1] 50/7
Forrest [3] 59/2 59/9 62/24
forth [6] 5/18 7/24 12/18 46/2 50/15 84/8
forum [1] 55/17
forward [5] 17/20 26/19 79/10 79/12 79/13
found [5] 17/5 56/17 74/17
four [8] 18/16 35/24 36/2 37/2 37/17 38/4 69/4 72/15
frame [1] 9/24
frankly [6] 41/10 45/22 57/18 68/17 77/13 77/17
free [1] 17/7
Friedrich [1] 60/11
friend [1] 43/14
friends [3] 68/22 69/16 74/9
front [4] 9/1 16/18 54/24 87/10
fueled [1] 56/1
fulfillment [1] 74/18
full [2] 83/16 83/24
fully [6] 11/13 12/4 30/10 30/11 75/7 75/10
functional [1] 8/24
Fund [1] 83/21
fundamental [1] 58/21
funds [68] 15/8 15/8 15/10 15/14 15/22 16/11 16/21 16/23 17/10 17/10 17/12 17/14 17/19 17/19 17/21 17/24 19/8 19/10 19/10 19/15 19/23 21/1 21/7 21/7 21/18 21/21 21/23 22/17 25/17 25/18 25/24 26/4 26/6 26/7 26/16 26/18 26/18 26/20 27/22 27/24 28/7 29/16 30/5 30/17 30/17 30/18 30/19 30/20 30/21 31/1 31/1 32/18 32/22 33/13 33/20 33/22 33/24 36/13 36/18 36/25 39/1 41/1 53/13 53/16 53/20 67/9 68/10 78/2
further [6] 5/22 28/22 30/9 47/19 70/16 75/25
furthered [2] 45/12 45/20
future [2] 50/24 77/15

**G**

gambling [2] 67/21 68/2
games [1] 38/19
gave [1] 23/8
general [6] 39/12 58/15 66/21 71/17 72/1 79/8
generally [4] 34/19 48/9 61/19 63/7
generated [2] 41/7 41/11
get [27] 4/23 14/14 16/18 23/1 23/9 24/7 28/7 28/24 29/1 29/2 29/3 29/8 31/19 31/24 41/23 49/16 55/19 65/5 69/19 71/1 72/9 75/4 77/19 78/16 81/4 86/14 87/9
gets [2] 44/2 77/8
getting [6] 21/3 22/22 62/10 67/4 72/5 72/16
give [12] 12/1 22/16 22/23 23/14 28/1 29/19 29/21 29/22 44/10 72/25 74/5 81/12
given [6] 3/23 60/2 61/22 72/22 82/12 88/3
gives [1] 23/19
go [18] 4/21 4/23 6/2 8/17 12/22 13/6 14/23 27/5 27/20 28/18 52/6 55/23 56/16 65/1 70/10 71/7 72/11 82/24
goal [1] 79/9
goes [9] 7/19 26/15 28/3 28/4 28/6 41/21 45/3 68/18 82/25
going [37] 4/21 6/8 11/19 18/24 21/23 22/16 24/9 28/8 28/17 28/18 28/21 29/12 29/18 29/21 33/15 41/18 46/13 51/9 51/24 63/22 67/12 69/3 70/15 72/9 72/10 72/23 80/2 81/12 81/13 81/15 81/16

81/16 82/6 82/16 82/20 83/5 87/16 85/7 86/9 87/3 87/12 87/25
gone [3] 4/16 41/5 79/23
good [10] 3/6 3/8 3/9 3/12 4/18 44/2 46/22 73/13 87/11 87/16
goods [1] 30/3
Gorsuch [1] 43/24
got [9] 22/15 22/24 23/7 27/21 55/2 62/22 69/21 71/20 74/13
government [51] 3/5 3/7 4/4 4/7 5/6 5/17 7/14 7/18 7/18 8/5 8/16 10/8 14/1 14/17 15/5 15/22 30/25 31/2 31/7 31/12 32/13 32/20 32/23 35/5 38/15 38/20 39/2 44/13 47/20 52/6 52/9 52/23 55/24 57/15 64/14 64/15 64/20 66/9 67/16 68/16 70/25 71/20 72/10 76/1 76/11 79/12 80/13 82/10 85/22 87/3 87/22
government's [6] 5/21 12/10 15/20 17/25 30/7 30/12
grandfather [1] 69/12
grave [2] 59/15 79/17
great [7] 7/4 40/18 41/25 43/21 60/12 74/17 77/20
greater [2] 31/19 50/18
greatest [1] 74/19
grew [1] 52/22
ground [4] 22/13 60/17 61/4 85/15
grounds [3] 5/5 9/4 9/19
group [2] 14/11 47/13
grouped [4] 14/1 14/4 14/6 14/10
grouping [4] 14/2 14/8 15/4 15/5
guess [1] 10/23 34/17 63/24 77/5
guidance [1] 14/7
guideline [11] 13/17 17/3 18/14 26/1 27/10 29/11 43/7 43/10 44/13 46/24 64/4
guidelines [60] 4/25 5/4 13/2 13/4 13/16 13/20 14/9 15/9 16/22 19/7 21/16 23/17 25/20 26/11 31/8 31/14 31/21 32/2 32/13 34/18 34/22 41/24 41/24 42/9 42/19 43/16 44/3 45/2 45/4 45/5 46/18 47/8 47/9 47/10 47/12 47/14 48/4 48/6 48/18 49/7 49/8 50/3 50/6 50/7 51/1 51/5 52/11 63/7 64/1 64/20 64/22 65/6 65/9 65/17 77/21 78/5 80/13 81/20 85/13 85/14
guilty [5] 36/7 38/17 51/7 60/11 65/1
guy [1] 23/5

**H**

habeas [1] 11/25
had [23] 11/19 12/3 22/21 25/6 27/20 36/18 38/15 40/14 41/7 41/7 56/12 62/1 62/15 62/19 62/21 66/9 67/3 69/11 69/12 70/19 71/10 73/15 74/3
half [9] 23/19 38/1 49/17 62/10 65/21 73/5 73/5 73/5 75/18 80/16
Hana [1] 3/25
hand [2] 39/16 56/19
happen [1] 67/1
happened [2] 59/6 61/1
happy [8] 14/22 41/16 52/7 61/14 66/21 77/2 78/25 86/25
hard [7] 23/22 24/3 44/12 71/24 77/19 77/19 79/8
harder [1] 65/7
harkens [1] 41/24
harm [8] 28/25 29/9 29/10 29/10 54/10 64/10 73/17 73/18
harmful [1] 68/14
Harmon [1] 20/6
harsher [3] 62/7 62/8 63/15
has [61] 4/12 5/11 7/18 10/8 11/1 11/4 15/22 18/1 19/9 19/10 23/17 24/10 30/25 31/2 42/25 43/1 46/10 46/17 47/7 50/9 50/16 52/14 54/24 57/23 60/10 60/10 61/8 66/22

**H**

has... [33]  67/16 68/24 69/2 69/3
69/24 69/25 70/3 70/3 70/6 70/10
71/4 71/10 73/19 73/20 73/24
74/11 74/17 74/20 75/20 76/24
79/12 79/20 79/22 79/23 79/24
80/7 80/13 80/14 80/14 80/25 82/5
86/6 87/23
hasn't [1]  62/9
Hassard [2]  2/2 3/10
have [117]
haven't [3]  26/20 27/14 61/23
he [221]
health [5]  54/17 69/2 72/16 74/25
75/6
heaps [1]  36/21
hear [14]  5/6 5/8 14/22 14/22
31/23 34/20 35/23 41/16 41/16
49/14 51/25 52/5 52/7 75/23
heard [9]  14/20 32/4 36/11 36/15
49/13 75/2 76/5 76/21 76/25
hearing [2]  10/12 75/5
heartily [1]  43/24
held [12]  53/13 75/1 84/13 84/16
84/16 84/20 84/20 84/24 84/25
85/3 85/4 85/6
help [11]  68/12 69/25 70/4 71/13
74/14 74/16 74/20 74/24 79/24
79/25 80/3
helped [7]  53/3 65/20 65/20 68/10
69/11 69/19 74/20
helpful [6]  65/6 77/15 77/22 80/8
80/11 80/19
helping [4]  67/20 68/8 75/15
79/23
helps [1]  62/15
her [5]  69/2 69/5 73/23 74/1
80/11
here [44]  3/13 4/2 10/22 11/8
14/7 15/21 16/25 18/19 20/22 22/1
25/10 26/3 30/24 31/19 37/22
38/13 38/19 38/20 39/3 39/11 42/7
42/8 42/18 42/24 43/3 44/10 46/11
50/8 51/12 59/10 59/14 59/14 62/6
62/8 64/23 65/4 71/1 73/14 73/25
78/7 78/9 79/22 81/11 81/12
hereby [1]  81/21
herself [1]  71/4
hidden [3]  28/7 55/19 60/20
hide [1]  60/7 79/11 79/14
hiding [3]  29/1 29/13 41/12
high [2]  31/22 69/16
higher [1]  73/7
highest [1]  14/13 14/14
highlight [2]  52/15 52/17
highly [1]  24/5
him [40]  4/16 22/7 22/9 22/16
23/8 23/14 23/19 24/14 24/16
29/19 35/11 35/15 36/13 37/12
38/17 38/24 38/25 39/7 61/11
62/25 65/23 67/6 68/25 69/1 70/2
70/6 71/1 71/3 71/6 71/9 71/13
72/25 74/4 74/5 76/12 80/6 80/7
80/8 87/17 87/24
himself [4]  9/15 23/12 72/21 88/4
hired [1]  67/5
his [81]  6/6 6/7 6/20 7/6 8/7 8/9
8/12 9/1 9/14 9/15 9/16 36/13
36/25 37/8 37/8 37/10 38/5 38/23
39/1 39/4 41/5 44/4 53/20 54/11
55/13 55/16 56/6 56/8 56/8 56/9
56/10 56/10 56/24 57/8 57/14
57/14 57/17 57/17 57/18 57/19
57/21 60/7 60/11 61/1 61/12 62/9
62/9 63/11 65/1 65/25 67/7 67/18
68/24 68/25 69/8 69/8 69/8 69/11
69/12 70/14 71/8 71/8 71/10 71/11
71/11 71/13 72/16 72/17 72/18
72/24 73/3 79/3 79/19 79/24 79/25
80/2 80/8 80/9 80/10 81/10 81/10
history [3]  47/7 47/8 51/3

hit [1]  20/19
hobbyist [1]  86/23
Hold [1]  17/5
holding [1]  25/22
holdings [1]  57/22
home [6]  28/4 62/9 63/14 63/16
63/19 75/14
honesty [1]  73/6
Honor [60]  3/6 3/9 3/25 4/9 5/20
6/3 6/13 6/23 8/14 10/17 11/7
12/6 15/3 16/15 17/22 18/8 22/20
24/23 25/2 25/21 26/2 34/10 34/24
35/3 35/22 36/13 38/8 42/6 43/13
43/20 44/4 46/20 47/20 48/24
49/20 51/13 52/8 53/11 55/4 58/22
59/1 59/13 59/22 61/15 63/4 63/20
68/4 69/1 70/17 71/3 72/5 73/12
75/21 76/11 82/11 83/1 86/4 86/11
86/16 87/2
Honor's [3]  65/14 67/10 73/2
HONORABLE [1]  1/9
hop [1]  16/8 18/22 26/14
hope [2]  75/14 87/17
Hopefully [1]  51/21
hopper [2]  41/21 42/3
hops [2]  28/8 28/22
horrible [1]  69/18
horrific [3]  78/23 79/1 79/2
hour [1]  51/9
housed [1]  63/18
how [12]  14/16 23/13 31/17 32/11
36/10 37/3 40/11 42/24 70/12
70/15 70/18 79/14
however [3]  8/10 31/9 73/16
huge [2]  22/7 78/13
humble [2]  70/7 70/10

**I**

I'm [5]  7/8 16/18 16/25 17/2
87/25
ICE [3]  82/24 82/25 83/3
idea [1]  46/22 55/18 78/25
ideas [1]  79/14
identification [1]  42/11
identified [1]  85/6
identify [1]  16/8
identifying [1]  32/8
identity [1]  57/8
illegal [7]  16/5 32/19 33/19
34/23 54/15 67/21 68/2
illegally [1]  67/6
illegitimate [1]  25/17
illicit [5]  29/17 30/3 31/1 53/3
56/1
images [1]  55/8
imagine [2]  65/19 80/9
immediately [4]  82/24 82/25 83/12
83/18
immigrant [1]  73/23
Immigration [1]  84/2
impact [1]  75/9
impacted [1]  54/17
implementing [1]  44/21
important [6]  16/1 40/21 71/23
72/2 79/8 81/2
impose [16]  51/2 47/24 48/2 48/9
49/24 50/18 70/14 76/5 76/7 81/2
81/14 81/16 82/3 82/16 82/22 83/5
imposed [6]  50/20 51/4 80/23
85/12 85/17 86/2
imposes [1]  48/1
imposition [4]  48/7 49/9 83/10
87/8
impossible [1]  19/17
impracticable [1]  16/24
impression [1]  87/12
imprisonment [2]  50/10 52/10
improbable [1]  28/17
improve [1]  75/12
inability [1]  57/24
inaccurate [1]  8/5
incarcerated [3]  71/11 80/7 87/19

incarceration [3]  61/10 80/3
80/11
incident [1]  9/14
include [5]  16/9 30/4 50/20 77/2
87/20
includes [3]  30/3 57/17 57/18
68/6 68/8
including [5]  68/7 72/11 72/17
72/18 85/11
income [1]  41/12
incompatible [5]  36/6 36/20 37/7
37/11 37/17
incomplete [1]  36/1
inconsistent [2]  6/17 77/23
incorrect [1]  85/12
increase [8]  14/18 14/19 42/16
42/21 42/23 43/1 43/7 44/15
increases [3]  25/5 43/6 62/11
increasing [1]  43/10
independent [1]  45/18
Indiana [1]  83/19
indicated [3]  30/24 81/15 82/17
indicted [1]  60/10
indigency [1]  57/21
indirect [7]  20/5 27/2 27/14
27/15 27/20 53/2 55/3
indirectly [4]  15/25 20/11 20/14
36/23
individual [2]  70/4 71/4
individually [1]  70/17
individuals [4]  70/19 70/24 72/11
87/9
indulgence [1]  61/13
ineffective [1]  11/25
inference [2]  28/15 28/20
inflated [1]  23/8
influence [1]  7/19
information [10]  17/13 26/19
30/21 45/8 45/14 50/15 56/15 57/4
57/24 68/21
initially [1]  27/10
initiate [1]  62/20
injected [2]  19/16 19/23
input [1]  16/12
inserted [1]  26/5
instance [1]  27/23
instead [1]  22/16
instruction [4]  35/8 35/9 40/3
40/10
instructs [1]  14/8
instrument [2]  15/11 15/14
instrumentality [1]  58/14
intelligent [1]  87/14
intended [5]  30/2 31/6 45/24
73/18 78/13
intending [1]  39/4
intent [3]  37/22 37/22 38/5
intention [1]  86/22
intentional [1]  57/11
intentionally [2]  39/19 40/16
intents [1]  81/6
interesting [1]  20/25
internal [1]  18/20
international [2]  71/21 72/11
internet [2]  38/9 79/12
interpretation [1]  32/1
interpreting [3]  19/7 29/7 44/20
interrupted [1]  54/16
interrupting [2]  51/25 54/6
intimidated [1]  55/24
intricacy [1]  28/25
investigation [2]  7/17 84/1
investments [2]  9/15 9/17
invoices [2]  41/6 41/11
involved [12]  15/11 15/15 15/16
19/8 23/5 25/14 25/23 27/22 49/4
56/2 65/15 78/16
involves [3]  17/10 45/21 56/2
involving [3]  30/3 61/2 68/5
Iran [1]  68/7
is [490]
isn't [1]  28/2

**I**

**issue [13]**   8/3 8/5 15/8 24/22
25/10 30/9 32/25 34/4 42/22 50/8
61/14 69/6 82/9
**issued [2]**   22/23 48/20
**it [292]**
**item [1]**   28/17
**its [11]**   22/23 22/24 31/2 31/2
31/13 53/7 54/12 57/6 57/6 75/8
79/6
**itself [4]**   9/7 9/9 9/19 56/24

**J**

**Jackson [3]**   60/2 64/7 80/23
**jail [5]**   56/16 60/5 72/19 75/1
76/12
**January [1]**   54/7
**Jeff [1]**   3/7
**Jeffrey [1]**   1/18
**job [2]**   6/6 36/25
**Jones [2]**   42/1 43/23
**judge [48]**   1/10 4/11 7/2 7/10 9/6
11/5 11/6 11/11 19/5 21/21 22/2
27/7 28/14 28/23 32/5 32/9 41/18
43/19 47/6 48/23 49/18 59/2 59/6
59/9 60/2 60/11 62/15 62/24 63/22
64/7 65/5 65/23 67/2 67/15 68/13
69/18 69/22 70/5 70/24 71/15
71/17 72/21 73/6 73/9 75/25 76/10
80/22 87/6
**judges [2]**   7/2 58/24
**judgment [2]**   77/3 81/20 84/1 84/8
85/20 87/1 87/20
**judicial [1]**   26/8
**jury [17]**   3/14 35/5 35/8 35/9
37/18 38/3 38/15 39/5 39/17 41/9
42/14 42/23 43/1 43/18 43/18 44/6
57/16
**jury's [6]**   36/6 36/20 37/11 39/23
40/12 41/3
**just [103]**
**justice [11]**   1/13 1/20 22/25 23/7
23/21 43/24 61/9 61/19 62/1 62/2
73/2
**justices [2]**   43/23 43/25

**K**

**keep [3]**   57/3 76/11 76/12
**kept [1]**   74/12
**Ketanji [1]**   60/2
**kid [1]**   69/23
**Killdozer [1]**   56/9
**kind [3]**   50/5 69/21 72/19
**knew [14]**   32/18 33/13 33/18 40/5
55/13 55/25 56/2 56/4 56/12 56/22
58/12 66/8 66/24 69/8
**know [68]**   4/19 5/24 6/25 7/18
13/5 15/23 16/8 18/9 20/13 20/25
21/23 23/1 23/7 23/10 24/14 26/8
27/13 27/19 28/10 29/9 29/24 30/6
30/9 32/7 33/11 39/2 39/3 40/7
40/11 44/6 50/9 51/11 54/19 55/8
58/24 59/19 59/20 61/7 61/9 67/16
68/19 68/20 69/15 69/20 69/24
69/25 70/12 70/15 70/22 71/5 71/7
71/15 72/12 72/18 72/22 73/4
74/19 75/2 75/11 76/3 78/11 78/15
82/4 82/6 87/9 87/9 87/14 87/22
**knowing [3]**   21/4 69/17 74/3
**knowingly [2]**   45/13 45/13
**knowledge [5]**   21/21 29/3 33/12
34/12 34/13
**known [1]**   53/17
**knows [6]**   6/25 7/3 24/16 70/4
71/4 71/5
**Kraken [7]**   37/9 53/21 84/11 84/15
84/19 84/23 85/2

**L**

**lack [2]**   57/13 58/11
**lacked [1]**   75/3

**laid [1]**   58/2
**language [8]**   14/8 26/11 33/5 34/3
38/19 45/16 45/25 46/4 69/15
**large [4]**   21/9 22/7 31/14 83/7
**largely [1]**   65/10
**larger [1]**   78/2
**largest [1]**   68/4
**last [6]**   5/9 5/12 9/13 26/23 69/4
75/17
**lasting [1]**   75/9
**late [1]**   76/3
**later [5]**   25/1 31/10 32/16 55/21
60/4
**Lauersen [6]**   22/2 22/12 23/22
24/11 24/20 64/2
**launched [1]**   52/21
**launder [2]**   9/1 33/19
**laundered [22]**   15/8 15/8 17/12
19/9 19/10 19/15 19/23 21/1 21/7
21/19 21/22 22/17 25/18 26/4 26/5
26/7 27/23 30/18 32/18 33/13 60/5
78/3
**launderer [2]**   21/13 21/13
**laundering [33]**   3/15 3/16 13/7
13/9 15/17 16/10 17/9 18/12 18/13
18/21 18/23 18/24 21/5 21/16 22/8
23/4 23/6 25/8 25/9 25/23 29/3
29/10 32/22 33/22 33/24 37/13
40/14 58/6 60/8 60/18 60/19 60/24
65/16
**law [21]**   2/3 2/6 4/25 27/8 27/21
29/1 30/6 32/1 32/5 42/2 43/16
44/13 44/21 45/3 48/3 50/21 56/13
56/14 79/10 82/20 85/12
**layer [1]**   18/17
**layered [2]**   18/7 23/5
**layering [8]**   18/7 18/14 20/20
20/23 25/4 25/8 25/25 26/12
**layers [3]**   18/12 18/16 20/18
**lays [1]**   13/3
**lead [1]**   34/25
**leads [5]**   22/18 32/16 41/14 46/16
47/1
**learn [2]**   69/20 74/22
**learned [1]**   36/11
**least [16]**   6/13 20/2 22/11 27/18
31/17 32/14 33/14 43/2 44/19
65/17 66/25 70/21 71/14 71/14
72/15 76/24
**leave [2]**   7/16 51/22
**ledgers [1]**   35/17
**left [1]**   7/20
**legal [1]**   67/17
**legitimate [7]**   16/3 16/12 28/11
29/25 36/24 61/1 67/23
**legitimately [1]**   30/16
**length [1]**   87/15
**less [5]**   52/9 54/2 62/7 65/6
73/5
**let [12]**   4/6 10/2 13/4 17/8 29/22
32/24 33/3 43/12 44/24 74/4 78/7
86/1
**let's [2]**   5/14 6/19
**letters [4]**   4/4 67/4 68/22 70/1
**letting [1]**   87/22
**level [22]**   13/18 13/23 14/11
14/13 14/14 14/18 14/19 15/2 21/2
21/20 21/24 32/17 32/21 32/24
33/3 33/4 33/4 35/1 46/14 46/16
64/4 77/23
**levels [7]**   13/19 13/24 14/16 31/8
31/20 32/15 44/15
**liberal [1]**   43/25
**license [2]**   33/3 13/14
**licit [4]**   25/24 29/16 30/5 31/1
**Lichtenstein [1]**   20/6
**lie [2]**   38/5 57/15
**life [17]**   47/11 64/4 69/14 70/7
70/11 71/11 71/13 75/11 75/15
75/18 77/22 80/13 81/7 81/9 81/10
87/24 88/2
**lifespan [1]**   52/25

**lifestyle [1]**   70/10
**light [6]**   58/13 70/7 70/10 83/7
**like [19]**   5/7 5/8 7/3 29/12 34/8
34/17 34/20 49/13 51/14 51/15
53/12 53/18 55/22 61/4 61/24
62/21 66/20 73/10 76/3
**likely [6]**   31/3 41/9 61/10 75/10
82/12 83/3
**likes [1]**   54/19
**Lindsay [3]**   2/11 89/3 89/12
**line [3]**   4/23 14/3 68/17
**lines [2]**   22/21 31/6
**linked [1]**   40/19
**linking [3]**   40/23 40/23
**listening [1]**   41/10
**literally [3]**   23/25 31/21 65/12
65/13 67/24
**little [5]**   7/22 42/2 71/2 74/4
77/14
**live [1]**   75/15
**lived [3]**   70/6 70/10 74/4
**lives [3]**   54/16 68/25 78/17
**living [2]**   69/10 73/22
**Local [1]**   37/8
**locked [1]**   74/21
**log [1]**   57/3
**log-in [1]**   57/3
**logs [2]**   35/16 57/3
**long [4]**   63/1 73/20 74/7 86/20
**longer [2]**   65/24 74/4
**look [6]**   14/9 26/2 52/22 61/19
64/9 64/19
**looking [3]**   44/22 45/25 86/12
**looks [2]**   20/11 53/24
**lose [1]**   71/4
**loss [2]**   65/10 73/25
**lost [1]**   16/25
**lot [11]**   20/23 63/24 65/8 68/20
68/21 68/23 71/4 71/18 72/6 75/2
87/24
**lower [1]**   68/16
**LTD [4]**   84/13 84/17 84/21 84/25
**lump [1]**   64/3

**M**

**MA [1]**   2/10
**machine [1]**   20/20
**made [7]**   12/16 37/3 37/5 37/18
37/22 61/18 67/9
**magnitude [1]**   21/8
**main [1]**   22/19
**major [2]**   59/11 69/6
**make [26]**   3/23 4/24 11/17 11/21
12/24 17/1 20/23 21/23 21/25 31/9
31/23 34/19 43/1 43/12 44/4 63/17
64/20 64/21 65/7 71/14 71/25 76/9
76/11 86/14 86/15 87/18
**makes [4]**   10/7 35/1 45/18 65/7
**making [2]**   12/24 74/9
**Maksim [2]**   2/8 2/9
**man [1]**   72/23
**mandatory [2]**   49/10 49/11
**manifest [1]**   37/22
**manner [2]**   42/11 61/11
**many [7]**   14/16 37/3 74/15 77/13
78/14 78/14 80/6
**Marc [3]**   2/5 2/6 3/9
**March [1]**   3/14
**March 12th [1]**   3/14
**market [3]**   9/25 16/9 52/21
**markets [2]**   15/25 52/24
**Marknadskommunikation [1]**   6/6
**Marshals [2]**   76/16 76/18
**Martin [2]**   19/6 19/11
**Mass [1]**   70/21
**material [11]**   5/18 6/4 6/9 7/11
8/8 9/5 11/8 11/9 38/14 54/18
56/3
**materially [3]**   27/9 45/8 45/14
**materials [1]**   4/7
**math [1]**   46/20
**matter [9]**   33/20 34/5 34/15 39/17

**M**

matter... [5]  46/4 51/12 63/15
73/19 89/5
Max [2]  3/10 57/21
maxes [1]  43/11
maximum [16]  13/7 13/9 13/11
13/13 42/16 42/21 42/24 43/1 43/8
47/22 47/23 49/3 49/5 49/6 50/13
85/14
may [25]  5/25 22/9 28/10 28/11
29/24 30/8 33/8 41/4 43/17 45/1
45/7 47/18 47/24 50/3 61/15 62/7
71/25 73/17 77/3 78/24 79/10
85/14 85/23 85/24 87/15
maybe [13]  8/17 23/14 32/6 35/1
37/4 40/1 42/1 43/23 43/24 60/1
71/13 77/14 86/25
me [51]  4/6 5/4 5/6 5/8 6/11 7/6
10/2 10/3 13/4 16/9 16/25 17/8
29/22 32/5 32/24 33/3 34/19 35/2
43/12 44/10 44/24 46/22 48/13
54/24 55/21 59/11 59/20 63/22
65/11 70/9 71/22 73/22 74/2 74/3
74/10 74/12 74/15 74/19 75/9
75/13 75/23 77/23 78/7 78/8 81/12
86/1 86/24 87/10 87/11 87/20
87/20
me striking [1]  7/6
mean [14]  5/24 10/23 15/10 15/14
22/25 29/5 44/8 47/10 47/13 51/18
62/22 70/12 78/4 78/5
meaning [2]  19/10 69/9
means [6]  19/23 21/19 33/25 34/2
42/10 43/22
meant [1]  87/8
measure [1]  64/17
measures [1]  57/8
mechanism [1]  18/21
medical [1]  74/5
Medvedev [2]  60/21 67/19
meet [1]  19/20
meets [1]  39/3
Meetup [2]  36/16 38/12
Meetups [1]  36/12
members [1]  68/23
memo [4]  35/23 52/14 56/11 68/21
memoranda [1]  4/3
memorandum [1]  12/10
mental [3]  72/16 74/25 75/5
mentioned [3]  47/22 59/3 59/18
merely [1]  39/14
message [1]  81/3
Meth [1]  56/9
methamphetamine [1]  54/14
Michael [1]  2/2
Microphone [1]  62/17
might [5]  17/25 28/16 48/11 56/16
74/4
Mike [1]  3/10
miles [1]  63/14
million [26]  15/24 16/14 18/3
19/24 20/2 20/2 20/13 23/6 24/5
26/24 27/3 27/4 52/25 53/1 54/3
54/4 54/7 58/5 58/6 60/5 61/6
65/16 65/19 67/10 67/12 67/20
millions [7]  15/23 36/22 36/22
54/13 54/14 54/15 78/11
mind [1]  81/1
minor [1]  63/10
minus [2]  47/2 47/3
minute [4]  47/17 51/24 76/4 86/13
mirrors [1]  15/16
misguided [1]  58/11
mislead [5]  38/3 39/17 57/14
57/16 60/9
misleading [1]  36/1
misrepresentations [1]  57/18
misstatements [1]  38/5
mistake [1]  71/25
mistakes [1]  86/15
mitigating [1]  50/5

mix [1]  36/13
mixing [1]  33/8
MLAT [1]  70/25
moment [2]  44/10 59/21
Monero [1]  85/1
monetary [3]  15/10 15/14 30/16
money [44]  3/15 3/16 3/17 3/19
13/7 13/9 13/11 13/14 15/17 16/10
17/9 18/13 18/23 18/24 18/25
19/15 19/23 20/12 20/18 21/4
21/16 22/8 23/4 25/14 27/10 28/7
28/19 29/10 29/13 37/13 37/15
37/16 40/3 40/14 53/8 53/9 60/8
60/16 60/19 60/24 60/25 65/16
84/8 84/8
monies [4]  27/14 27/15 27/20
67/24
moniker [1]  56/7
monitor [1]  70/22
monitoring [1]  70/14
month [1]  64/15
months [15]  47/15 49/23 50/10
50/13 60/4 64/17 65/23 77/18
81/14 81/16 81/17 81/22 81/23
81/24 82/2
Moon [7]  8/22 8/25 83/13 84/17
84/21 84/25 85/4
morality [1]  58/11
more [19]  5/25 21/14 24/13 28/19
34/19 34/20 37/10 48/2 59/14
63/13 63/16 66/3 68/12 70/5 71/2
71/14 72/1 77/14 85/13
MOSS [1]  1/9
most [10]  8/16 14/6 14/12 19/11
58/2 64/13 73/22 74/3 75/4 75/10
mother [10]  62/3 63/11 69/2 69/8
69/12 71/8 73/22 75/15 80/9 80/10
mountain [1]  37/7
move [5]  67/7 67/20 67/24 67/24
68/10
moved [4]  21/1 21/11 21/17 74/8
Mr [6]  59/18 63/21 65/11 73/4
76/24 86/5
Mr. [71]  3/11 4/5 4/7 4/10 4/16
4/21 5/19 6/6 6/24 6/25 7/5 8/13
10/13 11/13 14/18 14/24 19/4 20/6
20/6 23/3 23/11 24/21 31/25 32/18
32/22 33/18 33/21 34/9 35/2 35/6
35/10 35/14 35/18 35/21 38/7
38/11 38/23 39/19 39/22 40/12
40/19 40/23 40/24 40/25 41/5 42/5
44/16 44/17 47/8 52/7 58/19
61/10 63/3 63/25 64/6 65/1 66/4
67/3 68/20 69/7 73/10 77/12 78/8
78/24 79/19 80/25 81/7 83/8 86/1
87/12
Mr. Brown [13]  4/7 5/19 8/13
14/24 24/21 34/9 35/21 42/5 52/7
63/3 78/8 80/25 86/1
Mr. Ekeland [7]  6/25 7/5 10/13
23/3 23/11 35/2 38/7
Mr. Ekeland's [1]  39/22
Mr. Fernch [1]  6/24
Mr. Fernich [5]  4/10 19/4 31/25
46/10 63/25
Mr. Harmon [1]  20/6
Mr. Lichtenstein [1]  20/6
Mr. Patel [1]  67/3
Mr. Sterlingov [35]  3/11 4/5 4/16
4/21 6/6 11/13 14/18 32/18 32/22
33/18 33/21 35/6 35/14 35/18
38/11 39/19 40/12 40/19 40/23
40/24 41/5 46/14 47/7 48/8 58/19
64/6 65/1 66/4 68/20 73/10 77/12
78/24 79/19 83/8 87/12
Mr. Sterlingov's [6]  35/10 38/23
40/25 61/10 69/7 81/7
much [10]  23/13 24/19 51/21 63/12
65/7 68/16 73/20 77/24 87/12
87/17
multiple [1]  73/4
murder [4]  58/20 58/23 59/3 59/4

music [1]  9/12
must [8]  17/23 39/17 80/9 80/9
85/20
mutual [1]  67/17
my [55]  7/24 9/4 9/18 11/18 12/19
12/20 22/12 22/12 28/1 29/22
29/24 30/8 31/16 33/5 41/8 41/9
41/10 41/19 43/14 46/7 47/16
48/20 49/2 62/19 63/5 73/18 73/22
73/25 73/25 74/12 74/16 74/12
74/16 74/17 74/19 74/23 74/25
74/25 75/5 75/5 75/11 75/14 75/14
75/15 75/17 75/18 75/20 77/3
77/12 77/14 81/1 83/7 86/22 87/1
87/12
Mycelium [1]  37/8
myself [2]  74/22 75/14
mystery [1]  56/4

**N**

N.W [1]  1/16
N84G [5]  84/11 84/15 84/19 84/23
85/3
name [27]  3/5 35/7 38/9 38/12
38/16 40/17 40/20 41/15 42/7
42/10 45/7 45/14 46/25 47/3 53/14
60/8 67/7 84/12 84/13 84/16 84/17
84/20 84/21 84/24 84/25 85/3 85/4
narcotics [5]  32/19 33/14 33/19
33/20 34/23
narrow [1]  63/8
nature [6]  5/25 6/7 33/9 51/2
78/7 78/23
necessary [5]  50/19 51/18 51/19
73/8 73/8
necessity [1]  68/19
Neck [3]  72/15 72/15 75/1
need [20]  4/23 5/1 5/23 6/2 6/2
7/25 30/10 31/16 33/11 34/18
34/21 50/10 50/14 51/4 51/5 70/7
73/23 79/15 82/22 86/10
needed [4]  35/6 53/17 74/5 74/13
needs [3]  42/23 71/9 72/17
neighborhood [1]  80/15
Nemtsev [4]  2/8 2/9 3/10 57/21
network [4]  8/22 56/25 57/2 57/3
never [21]  8/23 8/23 8/25 10/8
36/4 37/25 39/21 40/13 54/2 56/17
66/4 69/4 69/8 70/8 70/8 73/8
75/10 75/19 76/21 77/16 78/11
new [6]  1/20 2/7 58/13 74/9 79/14
79/14
news [1]  87/16
next [4]  1/23 8/11 10/5 11/18
nicely [1]  22/18
nine [1]  55/1
nineties [1]  21/15
no [43]  1/4 4/9 9/11 10/4 11/5
11/6 11/11 16/1 16/11 29/21 35/13
35/15 35/16 35/17 36/4 36/18
36/23 39/7 39/21 43/9 43/20 43/21
44/19 44/19 47/7 48/18 48/23
48/24 49/9 49/20 57/23 60/22 66/6
66/8 66/24 69/11 73/24 79/20 80/1
86/4 86/8 86/11 87/6
non [1]  17/10
non-criminal [1]  17/10
none [1]  86/8
nonsupport [1]  62/2
northeast [1]  77/6
Northern [3]  72/14 72/15 75/1
Northwest [2]  83/13 83/20
not [131]
note [12]  12/24 16/1 16/16 16/16
16/20 17/2 17/3 17/7 30/13 30/13
31/24 50/1
noted [4]  5/20 29/24 86/3 86/6
notes [3]  15/13 17/2 56/11
nothing [7]  33/16 35/17 47/19
47/20 60/18 75/25 76/2
notice [4]  4/11 22/22 85/19 85/21
notify [2]  83/15 83/22

**N**

notion [1]  79/21
novel [1]  58/12
November [2]  1/5 89/10
now [20]  12/1 14/23 15/21 17/6
  19/9 21/9 22/16 24/18 26/10 27/18
  28/20 35/25 48/20 50/16 60/12
  62/9 72/18 73/22 76/13 84/5
Nucleus [1]  53/6
number [14]  3/2 4/22 13/18 13/24
  22/3 36/2 36/10 36/18 36/25 37/2
  52/3 78/13 78/21 85/2
numbers [1]  23/8
NW [3]  1/14 1/20 2/13
NY [2]  2/4 2/7

**O**

obfuscate [1]  68/1
object [4]  9/13 9/16 9/23 10/17
objection [7]  6/21 7/5 9/3 9/11
  9/18 10/2 11/4
objections [8]  5/3 5/17 5/21 6/10
  7/11 8/16 46/16 86/2
obligation [3]  83/16 83/17 83/24
obligations [2]  63/7 83/11
obscure [2]  28/9 28/22
observation [1]  66/21
obstructed [1]  73/2
obstruction [3]  23/2 32/25 35/1
obviously [7]  24/2 40/21 50/11
  62/6 64/25 71/7 87/10
October [1]  52/18
odds [1]  41/2
off [5]  23/25 24/10 65/12 65/13
  76/4
offender [4]  46/15 47/3 70/8
  79/18
offense [26]  13/18 13/19 13/23
  13/24 14/11 14/13 14/14 15/2 21/2
  21/3 21/20 21/24 24/24 33/9 43/20
  45/6 45/12 45/17 45/19 46/16
  47/13 50/21 50/22 51/3 78/7 78/9
offenses [4]  14/4 14/5 14/10
  64/18
offer [2]  75/24 87/24
offered [2]  40/16 74/24
office [11]  2/6 3/22 7/17 14/1
  50/9 50/13 60/9 61/8 83/19 83/23
  83/25
office's [1]  13/3
officer [1]  32/20
Official [3]  2/12 89/3 89/13
often [1]  63/16
oh [3]  17/2 28/16 28/18
okay [24]  4/18 6/24 8/13 8/18
  10/5 11/9 11/13 12/8 12/12 16/19
  17/2 17/5 17/6 19/4 27/6 34/25
  35/20 38/6 48/25 49/19 63/2 77/5
  77/7 77/9
old [4]  21/10 69/13 69/22 79/20
older [1]  62/10
Omedetou [1]  56/7
once [2]  62/15 74/23
one [46]  6/2 6/2 6/19 6/24 8/17
  14/12 16/8 16/19 17/2 20/21 26/23
  28/11 29/23 30/10 33/12 33/16
  33/17 33/21 34/1 36/2 36/12 36/21
  40/11 40/15 40/20 42/13 42/13
  42/17 46/4 47/17 49/17 55/9 59/23
  59/24 61/15 64/3 65/10 65/17
  65/18 66/20 68/4 71/23 75/17 76/7
  81/12 85/8
ones [1]  20/8
ongoing [1]  41/23
onion [1]  57/1
online [1]  45/6
only [22]  21/1 21/17 25/5 25/16
  27/10 30/2 37/5 40/22 46/5 54/20
  58/4 60/24 60/24 64/14 67/19 68/8
  68/24 69/11 69/19 69/22 71/10
  74/2
onward [1]  54/1
operated [7]  36/4 36/7 39/20
  39/21 40/13 65/24 66/3
operating [15]  3/17 13/11 35/11
  35/14 35/16 36/8 37/14 38/10 39/8
  40/1 40/1 40/2 58/3 60/25 67/6
operation [9]  8/23 8/24 22/8
  35/18 37/14 40/24 42/15 65/25
  67/22
operations [1]  54/6
opinion [3]  4/20 29/25 30/8
opinions [3]  26/8 41/25 48/20
opportunity [5]  3/23 66/9 67/3
  72/22 81/9
oppose [1]  61/16
opposed [2]  24/25 43/19
order [20]  28/8 43/1 48/21 49/1
  49/1 49/1 64/10 67/11 68/1 70/17
  70/20 83/7 84/1 84/5 84/9 85/8
  86/17 86/18 86/23 86/24
ordered [2]  67/9 82/18
ordinarily [1]  81/14
original [2]  19/12 27/22
originally [2]  19/16 19/23
ostensibly [1]  29/4
other [45]  5/20 11/8 15/3 16/2
  17/24 18/8 21/3 22/19 24/8 25/8
  29/11 29/18 34/1 39/16 40/9 49/17
  50/7 53/12 56/19 57/4 57/12 59/17
  61/20 62/12 62/13 64/3 68/15
  68/15 69/1 69/25 71/18 72/12 72/6
  73/24 74/15 75/5 75/8 76/22 76/25
  79/21 80/1 80/3 80/17 85/15 87/19
others [8]  25/1 29/23 74/25 75/16
  77/12 79/23 79/24 80/3
otherwise [5]  34/3 42/3 51/22
  61/1 70/6
ought [1]  81/6
our [20]  7/12 11/11 19/20 20/14
  21/25 22/11 23/10 23/16 23/18
  35/4 35/23 41/18 42/4 43/5 48/23
  49/18 52/14 56/11 61/23 62/3
out [37]  10/7 13/3 15/23 18/24
  19/13 19/13 20/21 22/12 32/11
  33/25 35/13 35/24 37/19 40/5 45/6
  45/10 46/24 53/9 53/10 53/11
  53/23 57/9 57/21 58/2 58/10 58/22
  62/4 63/4 64/8 65/8 65/20 68/9
  69/19 72/7 79/23 79/25 80/3
outcome [1]  32/12
outre [1]  43/22
outsider [1]  69/15
outstanding [1]  5/3
over [14]  4/16 7/19 20/19 20/21
  20/21 31/16 37/5 37/11 53/25 54/8
  56/6 74/14 78/10 78/14
overcome [1]  70/3
overcounting [1]  46/10
overdose [1]  78/17
overdoses [1]  54/17
overlapping [1]  22/3
overstate [2]  31/18 33/8
overstatement [1]  22/11
overwhelming [1]  41/3
own [10]  12/19 19/19 39/1 39/15
  53/8 57/8 69/2 75/17 79/24 81/10
owns [2]  28/3 28/5

**P**

p.m [4]  1/6 52/2 76/6 88/8
page [5]  1/23 19/19 20/11 25/12
  26/23
paid [2]  83/16 83/24
pain [2]  73/21 80/9
painful [1]  88/3
pains [1]  74/3
pair [1]  29/13
Paley [5]  19/13 19/22 25/3 25/3
  27/9
papers [10]  7/12 11/11 19/12
  20/14 33/16 34/3 35/4 41/19 42/4
  48/23
paragraph [2]  7/15 9/14 6/15
  6/15 6/20 7/6 8/17 8/19 9/4 9/11
  9/23 10/6 16/22
paragraphs [2]  6/16 8/16
paraphrase [1]  17/8
Park [1]  2/9
part [8]  5/12 18/22 22/12 24/4
  32/7 49/2 79/15 87/5
partial [2]  54/5 54/6
participate [1]  66/5
participated [2]  66/4 66/6
particular [6]  12/24 20/3 20/8
  30/13 77/10 80/22
particularly [1]  41/5 70/12
parties [12]  13/17 13/25 14/13
  14/16 14/20 14/22 33/2 34/6 38/22
  49/13 52/6 61/2
partners [1]  72/11
party [1]  56/16
passed [2]  42/1 80/6
passion [1]  74/17
password [2]  57/4 57/5
past [3]  61/8 73/23 77/17
Patel [23]  22/19 23/9 23/21 24/19
  59/18 59/19 59/25 60/1 60/12
  64/12 64/14 64/21 64/25 65/15
  65/24 67/3 67/15 67/19 73/1 73/4
  80/21 80/22 83/2
path [2]  28/12 88/2
pattern [1]  25/7
pause [2]  28/11 44/11
pay [3]  57/24 82/18 83/9
payable [2]  83/12 83/18
paying [1]  57/21
payments [2]  54/21 55/23
Payza [2]  60/6 60/16
PC [1]  2/9
PDA [1]  25/17
Pearlman [2]  1/18 3/7
peel [2]  18/22 26/13
Pelker [2]  1/13 3/7
pending [1]  60/11
Pennsylvania [1]  1/14
people [23]  32/5 39/13 39/15
  56/12 56/13 56/16 63/19 69/8
  68/10 69/25 70/1 70/4 72/9 74/12
  74/15 74/18 75/12 76/25 78/25
  79/9 79/15 80/1 80/4
per [1]  54/4
performing [1]  53/7
perhaps [2]  58/10 81/9
period [7]  48/11 54/9 60/2 60/3
  78/10 78/14 80/2
perjured [2]  16/2 23/12
perjury [8]  23/15 23/20 35/24
  38/5 39/3 57/14 59/16 60/23
permission [1]  85/23
permitted [1]  85/18
person [9]  28/3 28/5 28/6 42/12
  68/20 69/11 75/7 87/13 88/4
persona [1]  56/9
perspective [1]  49/18
persuaded [1]  14/5
pertinent [1]  19/11
petition [1]  11/25
phrase [2]  15/17 19/7
physical [1]  72/17
piece [1]  40/21
pieces [1]  40/20
Pizano [7]  19/12 19/22 21/6 25/3
  25/6 25/6 29/6
place [3]  57/2 74/9 78/10
plain [2]  45/25 46/4
Plaintiff [2]  1/4 1/13
playing [1]  38/19
Plaza [1]  2/9
plea [9]  23/1 51/10 51/25 60/21
  61/15 65/22 73/1 80/22 80/23
plead [1]  23/14
pleasant [1]  62/8
please [4]  3/4 11/15 15/12 62/17

**P**

pled [4]   23/9 60/10 60/16 65/1
PLLC [1]   2/3
plotted [1]   58/19
plus [5]   13/18 13/23 42/17 46/24 65/16
plus-2 [1]   46/24
podium [1]   3/4
point [28]   10/7 17/23 20/15 21/6 21/12 21/13 21/20 22/11 22/19 24/11 24/12 25/11 26/23 34/10 35/13 35/24 46/15 47/3 48/22 51/10 52/16 54/19 57/12 58/22 63/4 66/23 71/20 78/20
pointed [2]   30/8 31/4
pointing [1]   57/1
points [5]   24/7 24/10 29/19 34/1 52/15
policy [2]   45/4 63/6
Ponzi [3]   23/5 65/18 65/20
pooling [1]   16/11
poor [2]   69/8 69/9
popping [2]   21/15 22/18
pornography [5]   55/20 66/7 66/13 66/22 79/1
portion [2]   25/16 61/12
position [9]   8/2 8/4 15/20 22/1 22/1 23/18 31/3 71/16 88/2
positions [1]   70/20
positive [1]   74/22
possibility [1]   79/3
possible [3]   38/11 76/14 77/4
post [2]   61/15 69/10
post-Soviet [1]   69/10
postdating [1]   36/25
posting [1]   55/16
postings [1]   56/8
potentially [3]   23/2 23/11 71/1
pound [1]   29/18
powers [1]   70/25
practical [1]   63/13
practice [1]   61/9
pray [1]   75/16
pre [1]   41/25
pre-Booker [1]   41/25
precedent [3]   16/6 19/1 43/4 61/9
precedential [1]   64/13
precedents [1]   24/3
predetermined [1]   61/23
prejudice [1]   11/24
preliminary [6]   48/21 49/1 67/10 84/5 85/8 86/23
prepared [1]   22/22
preponderance [3]   28/20 43/3 43/21
prerogative [1]   24/17
present [3]   9/5 74/10 80/21
presentence [11]   3/21 5/2 5/14 5/15 5/18 6/14 11/20 12/9 12/19 13/2 83/25
pretty [5]   20/24 31/2 44/2 45/23 78/17
prevailing [2]   15/4 26/10
prevent [1]   66/9
prevents [1]   42/11
preview [1]   41/19
previously [1]   86/8
price [1]   25/5
primary [2]   21/2 84/8
principle [1]   42/25
principles [1]   68/18
prior [2]   9/14 64/17
prison [2]   47/11 64/5
prisoner [1]   61/17 62/3 62/13
prisons [5]   62/7 63/17 76/15 76/19 81/22
private [3]   8/22 56/10 56/10
probably [8]   3/23 8/8 14/20 64/12 65/21 68/4 73/5 82/25
probation [16]   3/22 4/1 7/17 13/3 14/11 32/20 32/23 48/16 48/17

**Q**

quarter [1]   51/9
query [1]   22/24
question [21]   11/15 11/18 16/17

48/18 50/9 50/13 70/21 80/14 82/5
problem [1]   19/5 53/15
problematic [1]   56/21
problems [5]   54/17 56/13 56/13 74/15 74/20
Procedure [2]   84/5 84/7
proceed [4]   11/21 13/1 51/15 73/16
proceeding [3]   4/21 12/2 12/21
proceedings [3]   84/3 88/8 89/5
proceeds [5]   25/23 32/18 33/14 60/6 61/6
process [11]   17/15 18/12 18/15 18/23 18/24 25/9 30/23 62/20 62/25 77/16 79/15
processed [6]   16/5 52/25 54/20 58/4 58/5 61/5
produced [1]   15/22
Productions [1]   9/12
proffered [1]   24/6
profits [2]   9/2 28/4
programming [5]   72/16 72/20 76/8 76/12 87/19
prolong [1]   71/14
prolonged [1]   54/8
prolonging [2]   17/15 30/22
promise [1]   72/22
promote [3]   50/21 50/25 68/1
promulgate [1]   45/1
proof [1]   41/23
proper [1]   56/17
property [7]   15/7 15/10 15/14 49/4 84/11 86/18 86/19
proportion [1]   25/16
proposed [1]   49/1
proposing [1]   18/20
proposition [4]   30/25 33/6 43/22 65/3
propounded [1]   24/9
prosecuted [2]   60/10 72/9
prosecution [1]   57/19
prosecutors [2]   59/24 67/18
protect [2]   50/24 57/8
prove [2]   31/5 56/20
provide [6]   13/20 45/11 48/6 50/22 77/11 81/15
provided [6]   10/25 45/13 46/10 57/23 77/21 80/25
provides [5]   13/18 13/23 30/14 30/20 72/19
providing [2]   45/13 77/14
provision [7]   44/20 44/20 44/22 44/24 45/3 46/2 49/9
provisions [2]   33/7 81/19
PS [1]   20/19
PSR [11]   4/15 5/21 6/12 7/11 7/19 7/20 7/24 15/6 46/23 50/15 68/22
public [3]   44/21 45/3 50/24
publicized [1]   71/18
pull [1]   44/24
pulled [1]   20/21
punish [3]   22/4 22/7 24/9
punished [1]   23/13
punishment [5]   42/22 43/8 50/22 58/16 67/15
purchase [1]   79/1
purely [5]   27/7 29/17 35/19 39/9 50/14
purpose [3]   12/21 56/23 79/4
purposes [13]   5/24 9/5 12/2 24/2 34/21 36/7 41/8 41/12 47/21 50/19 50/20 81/6 83/6
pursuant [7]   14/17 44/23 81/18 84/4 84/6 85/9 85/16
put [10]   4/12 28/18 32/24 43/16 44/6 53/8 56/25 61/16 65/11 71/16

17/19 18/5 18/6 25/3 30/1 30/7 30/7 36/2 36/21 37/21 41/21 36/2 41/14 43/9 44/13 46/7 61/7 76/7
questioning [1]   38/13
questions [1]   38/2
quit [2]   6/6 36/25
quite [7]   19/14 19/21 40/11 41/9 45/22 46/5 77/16
quote [5]   8/21 19/16 20/20 37/2 55/17
quoted [1]   56/11
QUXT [5]   84/12 84/15 84/19 84/23 85/3

**R**

raised [1]   69/8
ramped [1]   54/1
RANDOLPH [1]   1/9
range [10]   27/4 31/15 43/7 45/5 51/5 52/11 65/22 80/13 80/24 85/14
raped [1]   55/11
rare [1]   44/3
rather [1]   25/15
rationale [2]   22/15 24/20
rationalize [1]   24/3
reach [2]   57/2 79/25
reaching [1]   80/3
read [8]   15/20 26/6 26/7 26/8 27/9 67/21 85/7 86/19
reading [2]   27/8 29/24
reads [1]   21/6
ready [3]   22/23 52/5 78/22
real [4]   8/25 52/20 56/12 56/13
realize [4]   7/22 40/2 72/9 78/2
really [23]   6/4 20/23 20/24 22/1 22/4 23/23 24/10 25/3 25/5 27/3 39/24 53/3 57/12 64/1 68/18 69/20 69/23 69/25 71/9 73/20 75/19 77/18 87/23
reason [5]   24/4 48/12 58/19 62/5 66/25
reasonable [3]   28/19 43/2 43/19
reasonably [3]   41/9 45/23 46/5
reasons [7]   10/20 31/10 32/15 46/9 77/20 80/25 87/11
rebuild [1]   81/10
Recalling [1]   52/3
recalls [1]   35/5 35/8
received [4]   3/21 11/18 36/22 84/15
receiving [1]   11/23
recess [3]   52/2 64/11 76/6
recognize [4]   50/3 65/10 74/13 77/13
recognized [2]   22/13
recollection [1]   41/8
recommend [4]   47/10 47/14 49/7 49/8
recommendation [6]   3/22 5/15 31/13 61/24 76/11 77/3
recommended [7]   43/7 48/5 48/19 50/10 80/14 80/15 82/6
recommends [2]   50/13 68/17
reconcile [1]   40/12
record [28]   3/5 4/15 7/1 8/15 9/6 9/9 9/19 12/24 16/2 16/4 17/23 18/2 19/2 31/25 33/18 34/16 36/24 39/7 43/13 46/17 50/1 77/11 79/20 79/21 86/3 86/6 86/18 89/5
records [1]   51/6
recovery [1]   57/5
redacted [1]   54/23
redeem [1]   75/12
reduction [1]   46/15
refer [3]   6/15 30/2 86/18
reference [1]   35/4
referring [2]   10/11 10/15
reflect [1]   50/20
Reform [1]   81/18
regard [1]   87/25
regarding [2]   48/7 63/25

**R**

Regional [1]  75/1
register [1]  36/14
registered [4]  35/7 38/12 38/16 45/8
registering [4]  38/8 40/17 42/10 42/10
registers [1]  42/12
registrar [1]  45/15
registration [4]  40/20 41/15 42/7 46/25
regular [1]  44/25
regulators [1]  67/5
rehabilitation [1]  50/25
related [4]  34/13 57/14 66/6 70/16
relating [2]  39/8 78/21
relation [1]  35/18
relative [1]  24/19
relatives [1]  73/25
release [13]  47/25 48/3 48/5 48/7 48/9 50/14 70/20 82/4 82/12 82/17 82/23 83/6 83/25
released [1]  83/2
relevant [3]  4/24 52/16 77/10
relied [1]  73/22
relying [4]  19/19 24/6 25/5 70/25
remain [1]  76/25
remarks [1]  77/11
remember [7]  8/6 21/11 37/23 37/24 38/1 38/1 61/15
remorse [1]  57/13
removable [1]  48/8
removal [2]  82/23 84/3
removed [3]  48/13 82/7 82/12
renders [1]  42/14
repay [2]  75/10 75/12
repeat [3]  31/16 64/1 75/19
report [11]  3/21 5/2 5/14 5/15 5/18 6/14 11/20 12/9 12/19 13/2 84/1
reported [1]  44/19
Reporter [4]  2/11 2/12 89/3 89/13
representations [2]  8/21 10/7
represents [1]  8/5
request [11]  4/7 61/16 61/18 61/23 63/17 63/17 67/17 71/1 76/8 76/10 85/23
requested [1]  80/13
require [1]  57/3
required [4]  84/15 84/19 84/23 85/2
requirement [1]  48/7
requires [1]  71/25
reside [1]  48/11
resolve [7]  5/1 5/3 5/24 6/2 12/25 30/11 33/10
resolved [1]  30/10
resources [1]  72/10
respect [27]  6/13 11/23 12/5 14/25 24/24 25/2 28/10 31/13 32/2 34/3 34/23 40/17 40/25 46/10 46/12 46/18 48/21 48/22 49/14 50/21 70/14 76/8 77/12 78/3 78/9 80/12 82/23
respects [1]  80/6
respond [1]  24/23
responded [1]  39/20
responding [1]  66/23
response [2]  22/24
responsibility [1]  23/10
responsible [1]  37/12
rest [2]  7/12 75/11
rests [2]  17/18 17/20
result [3]  31/21 79/1 85/12
results [3]  22/10 30/16 31/14
retirement [1]  73/24
return [1]  75/14
reveal [1]  56/15
review [2]  12/12 45/4
reviewed [4]  3/21 4/3 4/15 52/14
reviewing [1]  46/20
reviews [1]  46/19

**right [46]**  3/8 3/12 7/2 9/3 9/18 10/14 11/9 12/15 15/1 20/12 22/12 24/21 26/22 27/1 27/12 28/10 31/7 39/10 43/17 44/10 47/1 47/6 52/5 54/25 58/24 60/12 63/21 63/23 64/24 65/1 65/9 66/19 67/13 70/24 73/10 76/13 77/9 82/14 83/5 85/10 85/17 85/18 86/5 86/14 87/4 88/7
risk [1]  75/19
road [18]  11/24 27/5 37/22 52/21 52/22 53/2 53/5 53/6 53/7 53/12 53/15 53/19 53/22 55/23 56/20 58/3 58/4 58/7
Road's [1]  52/25
robbed [2]  18/15 69/10
robber [2]  18/9 18/15
robbery [1]  18/9
role [1]  80/10
ROMAN [16]  1/6 3/3 3/13 54/5 81/21 84/7 84/12 84/13 84/16 84/17 84/20 84/21 84/24 84/25 85/3 85/4
Room [1]  2/13
root [2]  85/7 85/7
Ross [4]  58/3 58/20 58/23 80/20
roughly [2]  27/3 38/25
RPR [1]  89/12
ruined [1]  78/18
rule [6]  15/4 16/21 17/9 84/4 84/6 86/20
Rules [2]  84/4 84/6
run [4]  50/11 81/23 81/25 82/17
running [4]  22/7 28/21 48/1 68/2
Russia [2]  61/3 70/15
Russian [1]  55/17

**S**

safe [1]  28/3
Safeway [1]  28/3
said [14]  14/21 20/1 20/2 23/7 31/16 36/4 41/1 43/14 44/7 55/17 62/1 63/24 66/24 78/8
same [14]  9/20 14/4 15/16 22/4 22/10 22/15 22/21 23/23 23/24 24/8 38/9 65/16 66/3 80/21
Samourai [1]  71/19
sanctioned [3]  61/2 67/20 68/6
sat [1]  7/22
satisfied [6]  11/14 11/17 11/22 12/4 42/20 64/22
save [1]  71/13
saw [2]  54/22 55/8
say [26]  10/22 11/3 14/5 17/22 17/25 19/21 20/7 20/8 20/19 24/12 27/8 28/1 28/23 29/5 31/9 32/10 44/12 44/16 46/1 53/17 58/17 61/22 62/14 80/18 87/7 87/8
saying [3]  38/20 38/22 38/24
says [20]  6/20 8/9 8/11 10/24 25/24 26/3 27/9 27/21 28/16 28/18 44/14 44/22 44/25 45/3 45/10 46/3 55/19 55/21 55/22 76/24
scale [7]  21/8 22/7 23/3 54/8 54/10 54/12 54/25 55/8
Scalia [1]  41/25
scheme [10]  19/16 19/24 19/25 21/8 23/5 23/6 46/11 52/17 60/9 65/24
schemes [3]  65/18 65/20 66/4
school [1]  69/16
seat [1]  12/17
second [14]  4/19 5/4 16/19 17/5 18/10 22/3 32/6 32/24 33/21 59/5 59/8 59/25 72/24 81/12
secondary [1]  21/13
section [34]  3/16 3/18 3/19 3/20 5/11 8/15 13/8 13/10 13/12 13/13 13/17 13/20 13/23 13/24 14/9 14/14 15/15 17/3 32/17 35/23 41/16 44/15 44/21 44/23 45/1

45/21 46/6 47/24 48/4 48/15 50/17 81/19 83/24
see [16]  4/14 14/9 39/15 52/24 53/21 55/22 69/1 69/4 71/3 72/5 72/23 74/11 74/14 78/25 86/12 88/3
seeing [1]  63/23
seeking [1]  82/15
seem [1]  70/9
seems [4]  28/17 31/12 77/23 88/3
seen [3]  10/9 62/9 80/19
segues [1]  22/18
seized [4]  84/11 84/19 84/23 85/2
self [3]  16/3 60/3 60/5
self-surrendered [1]  60/5
selling [1]  53/18
send [3]  81/3 87/20 87/21
sends [1]  18/10
sense [7]  20/23 30/4 32/11 35/1 36/9 64/20 64/21
sensitive [1]  51/21
sentence [60]  5/10 5/13 8/9 8/11 9/13 9/21 22/18 23/18 31/22 39/14 47/11 47/14 47/22 47/23 48/1 49/2 49/23 50/10 50/18 50/20 50/22 51/4 52/12 60/13 61/12 61/20 62/6 62/11 62/19 62/21 63/13 63/15 63/16 64/5 64/11 64/15 65/9 68/16 68/19 71/5 72/25 76/5 76/7 76/22 77/17 77/23 80/23 81/2 81/14 81/17 81/24 82/2 82/13 85/10 85/11 85/15 85/17 86/2 87/9 87/15
sentenced [5]  60/1 60/4 60/24 60/25 65/23
sentences [6]  21/15 50/12 51/7 58/1 80/12 81/25
sentencing [52]  1/9 3/13 3/22 4/3 5/24 6/9 7/11 8/12 11/20 11/22 11/23 12/3 12/5 12/10 13/19 14/7 16/21 17/15 19/7 22/24 24/2 24/18 30/22 31/13 31/15 35/23 43/6 43/20 44/23 45/11 45/11 45/24 46/1 50/19 51/1 51/5 52/14 56/11 58/3 58/25 59/2 59/8 59/10 60/11 63/6 63/25 68/18 68/21 77/16 80/18 81/18 85/13
separate [3]  25/8 45/18 53/10
separately [1]  29/22
series [2]  6/3 6/5
serious [5]  14/12 23/25 62/23 79/25 81/3
seriousness [3]  50/21 64/18 79/6
serve [2]  61/11 63/13
served [3]  53/22 61/20 62/21
server [1]  35/16
service [20]  8/22 8/23 16/10 53/13 53/17 53/23 54/11 55/13 55/19 56/12 57/6 58/11 58/13 60/18 60/19 76/16 76/18 78/12 78/19
serviced [1]  53/6
services [4]  53/8 55/12 60/20 72/12
serving [4]  16/3 62/6 63/15 76/22
session [1]  45/1
set [9]  5/18 7/24 12/18 36/16 37/24 46/2 50/15 83/2 84/8
setting [3]  36/8 55/16 56/5
seven [1]  22/15
several [2]  20/18 27/20 77/18
severe [1]  85/13
severity [2]  62/11 78/9
sexual [4]  34/14 54/18 55/7 56/3
sexually [1]  55/11
shall [8]  45/4 45/11 48/2 83/15 83/22 83/25 84/7 84/10
share [1]  55/18
she [11]  59/3 59/3 62/24 69/2 69/2 69/3 69/3 69/5 69/5 73/23 73/24
shell [1]  67/23
Sherry [3]  2/11 89/3 89/12

**S**

**shipped [1]** 67/25
**shoe [2]** 28/6 29/13
**shoes [1]** 29/13
**short [1]** 71/5
**shorter [1]** 50/12
**should [36]** 3/23 7/16 7/20 13/25
14/4 14/6 14/9 14/16 14/18 14/19
15/20 16/14 18/3 24/12 31/8 32/17
32/21 32/23 33/2 33/8 33/10 34/7
36/13 39/13 41/15 42/2 43/17
50/23 64/11 64/16 64/17 73/3 73/7
76/9 82/3 86/25
**shouldn't [1]** 20/16
**show [1]** 17/21
**showed [1]** 28/12
**showing [3]** 17/13 36/24 37/7
**shows [2]** 38/2 38/4
**sign [1]** 86/24
**significant [6]** 26/2 26/9 52/19
53/24 57/13 58/16
**significantly [3]** 31/22 68/12
73/7
**Silk [17]** 38/22 52/21 52/22 52/25
53/2 53/5 53/6 53/7 53/12 53/16
53/19 53/22 55/23 56/20 58/3 58/4
58/6
**similar [7]** 51/6 51/7 58/9 64/9
64/10 70/19 74/15
**similarly [3]** 40/25 64/9 64/10
**simple [1]** 35/3
**simply [3]** 19/11 43/6 86/24
**since [3]** 7/22 14/7 20/24
**Singapore [1]** 67/25
**single [2]** 26/13 26/14
**site [5]** 20/7 28/16 35/7 78/22
79/3
**sites [3]** 20/3 28/13 28/21
**sitting [4]** 23/7 38/13 68/24
72/20
**situated [2]** 64/9 64/10
**situation [2]** 18/19 18/19
**six [2]** 22/9 49/17
**Sixth [1]** 43/15
**slightly [1]** 14/2
**slow [1]** 15/12
**small [5]** 73/3 78/22 78/22 79/4
79/5
**smiley [1]** 55/22
**Smith [11]** 16/7 16/13 19/2 25/11
25/12 25/24 49/21 49/23 49/24
50/7 81/15
**so [111]**
**so-called [1]** 59/17
**societal [1]** 29/10
**society [1]** 64/10
**sold [2]** 52/21 55/20
**sole [1]** 63/9
**solely [2]** 34/12 61/4
**solid [1]** 62/22
**solves [1]** 29/6
**some [37]** 5/25 7/2 12/23 13/5
17/18 20/5 25/16 28/5 28/11 28/17
28/22 30/6 37/18 41/17 32/11 36/1
36/9 43/22 43/25 48/11 48/12
58/10 59/14 59/19 59/13 65/6
66/11 66/25 67/15 70/1 72/20
76/25 77/11 78/15 80/24 87/8
87/10
**somebody [13]** 36/12 36/15 58/10
58/20 71/24 71/25 72/13 74/19
79/21 79/22 80/5 81/8 87/23
**someday [2]** 11/24 43/17
**somehow [1]** 39/6
**someone [8]** 28/2 28/16 39/16
45/19 63/16 72/3 72/4 86/23
**someone's [1]** 59/12
**something [13]** 23/11 23/14 24/10
42/13 70/24 71/13 74/13 74/22
74/22 78/10 78/23 80/15 86/14
**sometimes [2]** 17/9 39/15

**somewhere [4]** 24/10 41/4 63/18
**son [1]** 69/5
**sophisticated [6]** 21/5 21/19 23/4
29/14 33/25 34/2
**sophistication [2]** 28/25 29/9
**sorry [7]** 7/8 16/18 16/25 17/2
73/17 73/21 87/25
**sort [6]** 38/19 43/22 55/14 57/24
58/10 58/14
**sorts [2]** 6/7 54/15
**sought [2]** 64/15 74/14
**sound [1]** 66/20
**source [4]** 9/16 36/24 40/25 41/12
**sourced [2]** 36/19 41/2
**Soviet [1]** 69/10
**speak [2]** 9/7 9/9
**speaking [2]** 6/25 24/19
**speaks [2]** 9/19 70/6
**special [4]** 49/10 49/11 50/14
82/18
**specific [10]** 21/3 21/19 24/24
26/10 38/4 42/8 58/15 60/13 70/7
84/10
**specifically [3]** 16/16 25/13 64/2
**specified [4]** 5/11 15/25 29/4
50/17
**speed [1]** 10/2
**spend [1]** 28/17
**spent [1]** 72/14
**square [2]** 23/20 23/22
**staggering [2]** 54/8 54/12
**stand [7]** 6/10 11/11 33/15 34/3
41/18 42/3 48/23
**standard [3]** 26/10 39/3 41/23
**start [6]** 5/2 5/14 14/23 33/3
72/12 78/7
**started [4]** 52/18 65/25 69/22
79/19
**starting [3]** 3/5 69/16 70/5
**starts [1]** 57/20
**stat [1]** 43/11
**state [1]** 3/4
**statement [6]** 10/8 10/11 10/18
12/18 63/6 88/5
**statements [5]** 37/18 37/19 45/5
51/2 56/9
**states [20]** 1/1 1/3 1/10 3/3
17/16 22/25 48/12 48/14 49/24
61/18 62/6 62/8 67/5 67/6 67/22
68/3 69/3 69/4 70/13 83/13
**status [1]** 8/12
**statute [11]** 5/11 15/17 15/18
15/19 30/2 42/16 42/16 43/16
43/18 44/5 85/18
**statutes [1]** 26/8
**statutory [14]** 13/7 13/9 13/11
13/13 15/17 42/16 42/21 42/24
43/1 43/8 44/14 46/3 49/3 50/12
**Ste [1]** 2/7
**Stellar [1]** 84/22
**step [7]** 5/4 5/6 5/9 5/12 18/14
25/9 76/4
**stepfather [2]** 71/10 73/25
**steps [6]** 4/22 4/24 27/20 79/10
79/12 79/13
**STERLINGOV [47]** 1/6 3/3 3/11 3/13
4/5 4/16 4/21 6/6 11/13 14/18
32/18 32/22 33/18 33/21 35/6
35/14 35/18 38/11 39/19 40/12
40/19 40/23 40/24 41/5 46/14 47/7
48/8 54/5 58/19 64/6 65/1 66/4
68/20 73/10 76/24 77/12 78/24
79/19 81/21 83/8 84/7 84/12 84/16
84/20 84/24 85/3 87/12
**Sterlingov's [6]** 35/10 38/23
40/25 61/10 69/7 81/7
**stewing [1]** 77/18
**still [9]** 36/8 37/19 47/1 53/16
53/17 62/3 70/22 87/20 87/23
**stock [1]** 25/4
**stop [3]** 55/18 66/1 67/4

**store [4]** 28/5 28/6 28/6 29/13
**story [1]** 35/10 45/2
**straightforward [2]** 18/25 19/10
**Street [2]** 1/16 2/3
**stressful [1]** 73/14
**strike [3]** 59/11 71/22 81/11
**striking [1]** 7/6
**stringent [1]** 45/9
**struggled [1]** 74/7
**struggles [2]** 73/22 74/25
**struggling [1]** 55/18
**studio [1]** 9/12
**stuff [5]** 7/13 21/5 21/11 29/19
41/25
**sub [1]** 16/20
**submit [2]** 35/10 45/2
**submitted [4]** 4/5 10/11 68/22
70/1
**subsection [3]** 14/6 30/18 45/10
**subsequently [1]** 66/2
**subsites [1]** 20/9
**substantial [1]** 7/19
**substantially [1]** 81/13
**substantiate [1]** 57/24
**substitute [1]** 86/19
**subsumed [1]** 20/10
**such [9]** 45/10 60/23 62/1 63/9
68/19 74/18 83/16 83/23 88/3
**suffer [1]** 80/9
**suffering [1]** 80/1
**sufficient [6]** 17/13 17/21 26/19
30/20 33/18 50/18
**sufficiently [2]** 45/9 77/25
**suggest [2]** 32/21 78/5
**suggested [2]** 31/22 73/4
**Suite [3]** 1/17 2/10 83/20
**sum [2]** 20/7 84/8
**summarize [1]** 13/4
**sun [1]** 24/25
**Superior [1]** 83/18
**supervised [12]** 47/24 48/3 48/5
48/7 48/9 50/13 70/20 82/4 82/12
82/16 82/23 83/6
**supervision [2]** 70/13 82/21
**supplemental [2]** 4/11 22/22
**supplemented [1]** 12/19
**support [6]** 30/7 68/25 73/24 74/1
74/5 78/24
**supported [2]** 9/15 19/3
**supporting [3]** 62/1 74/18 75/15
**supports [4]** 8/25 30/9 70/2 79/21
**suppose [2]** 14/19 33/5
**supposed [2]** 21/8 51/10
**supposedly [1]** 16/12
**Supreme [3]** 22/25 23/7 23/21
**sure [18]** 4/12 4/22 4/24 11/17
11/21 12/22 17/1 20/10 31/23
52/14 59/2 63/5 72/8 76/14 76/21
77/4 83/1 86/14
**surrender [1]** 60/3
**surrendered [1]** 60/5
**Sweden [9]** 61/11 61/12 61/18
61/21 67/16 69/14 69/14 70/15
74/8
**Swedish [1]** 67/18
**Symbiosis [3]** 53/18 53/19 53/20
**system [1]** 74/1

**T**

**table [8]** 13/19 13/24 14/17 26/23
31/17 31/17 51/20 52/23
**tag [1]** 7/3
**take [15]** 6/19 8/2 8/4 51/11
51/14 51/17 51/22 51/24 51/24
64/1 68/10 73/1 78/20 79/12 79/13
**takeaway [1]** 28/24
**taken [6]** 50/6 52/2 53/5 73/19
76/6 88/1
**takes [3]** 28/4 32/3 79/10
**taking [3]** 69/24 73/1 73/1
**talk [9]** 11/19 12/8 13/5 19/17
20/3 23/16 56/10 59/5 70/23

talked [2]   74/6 79/24
talking [7]   20/14 25/10 27/3
27/18 27/19 45/17 54/12
tax [1]   41/8
teamed [1]   7/3
technical [4]   15/3 33/10 33/20
34/5
technically [3]   22/10 33/7 41/21
technology [1]   58/13
teenager [1]   69/16
tell [2]   20/22 64/5
tells [1]   74/19
temporary [1]   76/23
ten [1]   37/5
tend [1]   7/21
tends [1]   30/7
tens [5]   15/23 54/12 54/13 54/15
78/10
term [13]   15/9 47/24 48/3 48/5
48/9 48/17 48/18 81/22 82/4 82/11
82/16 82/22 83/6
termination [1]   9/13
terms [10]   38/18 42/9 47/25 61/15
65/2 65/16 67/3 69/7 71/17 82/17
terrible [1]   71/9
terribly [3]   77/22 80/19 80/20
test [1]   44/2
testified [7]   10/1 36/18 37/2
37/4 37/5 37/24 41/6
testify [1]   39/14
testimony [13]   16/3 19/19 20/16
35/10 36/1 38/23 39/4 40/16 41/6
41/10 53/12 57/17 73/3
text [3]   15/17 15/18 55/8
than [27]   5/20 15/3 16/2 17/24
19/7 25/15 31/6 37/10 48/2 50/7
50/12 50/19 52/19 54/2 57/4 63/15
63/16 65/6 65/25 66/3 68/12 68/16
72/2 73/7 76/22 79/22 85/13
Thank [16]   3/25 4/2 4/14 12/17
34/24 35/20 38/6 39/10 55/21 63/2
73/9 75/21 75/22 87/6 88/6 88/7
that [661]
That's [2]   7/2 47/6
their [20]   19/5 19/12 19/19 19/20
20/19 20/20 24/17 39/14 63/14
63/17 63/18 63/18 68/9 70/1 70/25
71/20 72/10 72/11 74/25 76/22
them [16]   6/2 8/1 23/17 31/1
57/16 63/14 65/8 67/24 68/11
69/20 69/21 70/2 70/22 71/25
74/16 74/20
themselves [2]   28/22 82/1
then [40]   6/2 6/19 7/25 8/13 11/2
12/15 16/13 18/10 18/11 18/14
18/16 28/6 28/18 28/18 29/23
32/16 34/25 41/14 42/15 44/17
45/2 45/10 45/18 46/2 46/14 46/16
47/12 47/21 48/25 53/4 53/9 54/18
55/19 55/21 55/22 55/23 60/2 66/2
70/25 79/10
theories [1]   14/2
theory [1]   39/23
there [131]
thereafter [1]   80/3
therefore [1]   83/9
these [30]   4/23 6/4 6/19 8/15
8/16 20/8 20/25 21/2 22/6 23/8
24/8 24/12 28/12 29/7 31/19 36/1
36/12 37/9 38/4 38/21 46/8 52/24
59/16 64/3 65/24 67/8 68/8 68/10
70/23 72/12
they [88]   6/8 7/25 19/12 19/17
19/18 19/20 19/21 19/21 19/24
20/1 20/2 20/3 20/7 20/8 20/12
20/13 20/17 20/17 20/18 20/19
21/1 21/11 21/17 21/17 21/17
21/19 21/20 21/22 22/9 24/6 24/14
24/15 24/16 24/17 25/5 26/20
27/14 27/15 27/17 27/18 27/19

27/21 31/3 31/4 31/4 31/6 35/6
39/2 39/6 39/23 39/25 39/25 40/10
42/1 42/2 44/3 44/5 44/6 44/9
44/17 53/16 53/17 54/22 56/6 56/8
56/9 59/6 63/18 63/19 64/5 64/16
64/21 64/22 65/7 65/11 67/8 67/17
68/11 69/12 69/14 70/2 70/22
70/23 72/9 72/13 76/25 77/22
79/11 79/16
they tell [1]   64/5
thing [7]   20/25 22/10 24/8 69/19
74/19 75/20 87/17
things [10]   12/22 22/2 29/8 40/15
40/23 41/4 51/22 75/12 79/14
86/14
think [119]
thinking [5]   22/20 63/12 77/15
77/17 80/10
thinks [1]   64/15
third [3]   2/6 5/6 38/21
this [143]
those [39]   5/1 6/7 6/10 6/16
12/25 14/4 15/20 20/3 24/3 24/9
28/20 29/22 33/6 38/3 36/24 37/17
37/19 38/23 40/8 40/14 40/20 41/7
42/20 47/25 50/19 52/13 54/22
55/8 55/9 56/11 58/10 68/9 71/23
73/21 78/15 78/16 79/11 81/25
83/6
though [6]   10/22 28/2 32/10 32/12
40/22 53/15
thought [6]   10/15 48/12 56/4
64/16 66/25 79/7
thoughtful [1]   87/14
thousands [1]   63/13
three [7]   36/18 43/22 55/9 58/7
62/10 75/17 79/12
through [30]   4/22 4/23 6/2 7/23
9/15 12/22 13/25 18/16 20/18
26/15 27/20 28/8 29/2 29/2 29/3
29/8 29/9 38/21 39/1 45/7 45/12
49/8 52/13 54/7 55/21 67/18 73/3
74/20 78/19 83/11
throughout [1]   57/18
thus [1]   14/21
tie [2]   21/14 24/13
tied [2]   29/17 77/25
time [34]   6/19 6/20 6/22 7/6 8/7
8/9 8/11 8/17 9/24 10/19 11/19
12/3 12/8 12/12 14/21 20/17 24/19
32/4 32/6 48/11 54/9 60/3 63/1
60/7 70/8 73/20 73/20 73/25 74/7
74/14 75/4 75/21 83/16 83/23
times [5]   23/13 26/16 67/7 70/1
73/5
tinnitus [1]   72/18
Title [1]   44/23
today [10]   4/8 6/25 10/19 12/22
15/1 30/11 31/10 63/23 86/10 88/1
today's [2]   4/21 12/21
together [2]   14/4 29/19
token [1]   80/21
told [4]   36/11 36/12 38/15 57/20
toll [1]   74/10
too [3]   24/19 31/22 51/21
took [5]   53/9 63/1 69/13 74/9
74/23 78/10
top [3]   29/19 64/3 67/15
topic [1]   63/25
Tor [9]   2/2 2/3 3/19 55/19 56/1
56/25 57/1 57/3 60/19
Tor-based [1]   56/1 60/19
Tornado [1]   71/19
total [8]   20/2 20/7 25/14 30/19
43/7 46/16 54/20 82/2
totally [1]   37/6
tough [1]   87/17
toward [1]   62/25
towards [1]   57/1
trace [2]   20/8 31/5
traceable [2]   15/25 36/23
traced [1]   28/13

trafficking [7]   34/13 53/4 53/20
54/7 54/15 56/6 56/7 56/7
training [1]   6/7
transacted [1]   54/2
transaction [17]   15/11 15/15
16/13 17/9 17/11 19/8 25/23 25/25
27/22 30/4 30/15 30/15 30/16
37/13 37/16 49/5 79/5
transactions [48]   16/4 16/5 17/25
18/7 20/17 25/15 26/15 26/25
27/15 27/17 28/8 28/9 28/21 30/2
30/3 32/19 34/13 34/23 37/3 37/6
37/10 38/18 38/21 38/23 39/1 40/6
40/9 52/23 53/1 53/2 53/25 54/3
54/13 58/5 58/6 61/2 65/17 66/16
68/6 68/9 68/10 78/11 78/14 78/15
78/16 78/18 78/21 79/11
transcript [4]   1/9 59/2 67/21
89/4
transfer [3]   18/10 61/17 62/20
transferred [2]   61/11 62/4
transfers [1]   61/21
transmission [4]   3/19 13/14 37/15
68/5
transmitting [4]   3/18 13/12 60/16
60/25
treaties [1]   67/17
treaty [1]   61/17
trial [16]   6/17 7/23 8/25 10/1
12/20 12/23 15/22 20/15 27/16
35/14 37/2 57/9 57/16 59/16 60/22
65/2
tried [6]   60/6 67/7 69/25 74/21
80/17 81/11
tries [1]   70/4
trouble [2]   40/5 81/5
true [5]   10/17 35/25 37/18 40/18
89/4
truthful [1]   41/11
try [5]   75/11 75/12 79/25 80/2
81/10
trying [6]   38/3 56/5 65/8 69/20
74/24 79/11
turn [4]   4/18 25/1 29/23 32/24
turned [1]   70/2
turning [3]   13/2 13/16 58/13
turns [1]   33/25
twice [1]   49/4
two [15]   19/11 22/2 24/3 36/10
42/13 43/23 55/9 58/7 66/21 72/15
72/20 73/4 75/1 79/10 79/13
type [3]   71/4 79/5 81/3
types [2]   51/7 80/12
Typically [1]   7/23

U

U.S [2]   1/13 2/12
U.S.C [15]   3/16 3/18 5/11 13/8
13/10 13/12 44/15 44/16 47/24
48/15 50/17 81/19 82/19 85/9
85/16
UK [1]   60/7
UK-based [1]   60/7
Ulbricht [4]   58/3 58/20 58/23
80/20
ultimate [4]   20/20 22/1 23/18
78/12
ultimately [4]   21/25 23/16 49/24
82/8
unable [1]   85/22
unacceptable [1]   81/4
unauthorized [1]   56/16
undeniably [1]   74/11
under [47]   14/13 15/2 15/9 15/9
16/6 16/13 16/15 16/21 18/2 18/25
21/16 22/14 24/19 24/25 29/11
31/8 31/21 32/17 33/3 33/4 33/5
37/9 41/24 42/1 43/4 43/16 44/14
45/1 45/8 46/6 46/8 47/8 47/12
47/23 48/3 48/4 48/15 48/18 49/24
50/2 52/12 56/8 63/8 63/11 64/1
82/20 85/10

**U**

undercover [2]  17/25 37/13
underlying [5]  21/14 24/14 24/15 29/4 41/22
undersigned [1]  59/24
understand [7]  12/6 39/22 48/25 67/2 68/13 75/8 79/16
understanding [1]  12/20
understate [1]  78/4
understood [1]  39/24
undoubtedly [1]  21/9
unduly [2]  17/14 30/22
unemployed [2]  6/22 8/11
unfortunately [2]  21/10 55/20
unfreeze [1]  10/12
unit [2]  70/20 70/21
UNITED [18]  1/1 1/3 1/10 3/3 17/16 22/25 48/12 48/13 49/24 61/17 62/6 62/8 67/22 68/2 69/3 69/4 70/13 83/12
unlawful [8]  29/4 31/3 32/19 40/6 40/9 40/9 78/14 78/18
unless [1]  17/12
unlicensed [4]  3/17 13/11 37/15 60/25
unravel [1]  29/14
unsustainable [1]  64/4
until [5]  36/16 62/21 66/1 83/15 83/23
untimely [1]  24/15
untruthful [1]  39/19
unusual [1]  88/5
unwarranted [2]  51/5 80/18
up [28]  8/14 12/1 22/17 26/24 27/2 29/17 36/8 36/17 37/24 42/12 44/24 47/25 51/18 52/22 54/1 55/4 55/16 56/5 60/9 60/17 61/4 61/23 62/12 64/1 73/19 74/21 74/23 79/14
upon [2]  36/22 55/10
upshot [1]  23/24
upstream [1]  27/17
urge [1]  72/25
us [17]  1/20 4/1 19 19/18 20/13 20/18 20/22 32/3 33/24 47/1 55/24 56/19 60/9 63/1 68/6 68/23 72/10 87/22
USAO [1]  1/16
use [10]  36/13 45/7 65/8 70/4 70/14 70/25 71/7 72/10 72/24 74/16
used [8]  18/13 20/6 33/19 42/24 55/13 58/12 67/22 79/4
username [1]  57/4
users [4]  53/16 54/21 55/11 57/7
uses [2]  26/3 26/9
using [3]  46/23 55/12 78/25
Usually [1]  7/21

**V**

value [22]  15/7 15/8 16/8 17/11 19/8 19/9 19/14 19/22 21/1 21/7 21/18 21/18 22/17 25/17 26/4 26/6 26/7 27/23 29/8 29/20 30/17 49/4 52/10
variance [4]  31/11 34/7 46/12 52/10
variances [2]  49/14 50/2
various [1]  28/8
vary [4]  31/14 32/14 33/8 81/12
vendor [2]  53/18 53/19
vendors [1]  53/15
verbiage [2]  15/16 26/3
verdict [10]  22/8 24/1 36/6 36/20 37/12 37/20 39/23 40/12 41/3 42/14
version [1]  86/24
versus [4]  3/3 17/16 33/24 49/24
very [36]  23/3 23/20 23/20 24/1 24/3 24/3 38/3 40/21 53/4 57/20 58/17 58/17 58/21 60/15 60/15 62/20 62/20 62/24 62/25 62/25

**W**

waive [1]  83/10
walk [1]  52/12
Wall [1]  2/3
wallet [3]  37/8 71/20 85/6
wallets [1]  37/9
want [36]  4/19 10/6 11/16 11/16 11/21 14/20 14/22 16/15 16/18 17/1 17/22 21/25 25/11 31/23 31/24 34/18 49/13 49/15 51/20 52/13 52/15 58/1 59/16 64/1 65/14 69/5 71/16 73/16 75/23 75/24 77/3 77/11 86/13 86/14 86/15 87/20
wanted [3]  11/24 52/16 68/11
wants [4]  23/9 48/22 52/6 86/24
warrant [2]  68/16
was [200]
Washington [7]  1/5 1/14 1/17 1/21 2/14 83/14 83/20
wasn't [11]  10/18 25/19 53/7 55/9 60/24 61/3 67/23 69/14 71/9 72/16 80/7
way [22]  13/6 16/11 26/4 28/7 29/8 34/1 36/1 37/10 39/18 40/6 43/21 47/12 47/12 48/18 45/23 51/25 57/6 58/21 63/13 70/2 77/2 79/24
ways [8]  22/5 22/9 29/11 31/5 32/13 59/14 77/25 79/14
we [120]
we'll [6]  5/2 11/11 31/9 34/3 42/3 78/11
wealth [2]  9/16 41/1
web [3]  66/14 66/15 66/22
website [4]  38/9 38/10 55/11 66/8
weekend [1]  69/1
weigh [1]  61/25
weight [1]  67/15
welcome [4]  33/7 50/2 54/21 54/22
well [35]  3/19 3/24 4/4 7/1 10/24 12/13 14/23 15/1 15/18 19/3 20/7 34/6 35/9 39/11 41/5 41/17 41/20 43/12 43/17 44/1 44/24 46/13 49/21 59/15 64/19 72/4 74/16 77/15 81/20 81/24 82/1 82/20 82/22 83/6 87/24
went [10]  8/23 8/24 18/16 20/17 20/18 38/21 40/5 57/7 66/7 69/14
were [39]  5/15 5/25 16/3 17/24 18/11 21/15 22/21 22/22 24/8 26/12 27/5 28/13 31/1 31/3 31/4 32/18 33/13 36/21 40/8 41/1 41/1 54/23 55/12 56/15 57/7 58/18 64/22 65/21 68/22 70/13 74/24 75/18 76/25 77/1 78/12 78/15 78/17 78/18 86/20
western [1]  67/22

whack [1]  64/8
what [86]  7/14 7/25 7/25 7/25 7/14 7/19 7/21 7/23 8/13 10/5 10/10 11/16 14/15 16/16 16/12 18/12 20/13 21/17 21/25 22/5 23/15 25/9 25/10 26/1 26/17 27/13 27/14 27/18 27/19 28/1 28/12 28/14 28/23 30/25 31/16 32/10 33/11 38/20 39/24 40/10 42/20 43/3 43/14 44/7 44/7 44/22 45/20 56/4 56/4 56/5 56/5 56/22 58/2 58/9 60/13 61/23 64/5 65/8 68/16 69/4 71/2 72/5 76/4 78/12 81/13 81/16 87/22
whatever [8]  19/18 29/6 38/22 44/6 49/23 68/11 70/4 77/6
whatsoever [1]  16/2
when [31]  6/6 12/24 21/11 22/12 22/23 36/10 37/3 39/19 41/6 43/16 46/6 52/20 53/5 53/9 53/14 53/19 54/5 55/15 57/20 60/3 60/4 61/23 63/16 69/12 69/13 69/21 71/10 74/19 78/22 79/11 79/19
where [29]  5/25 14/8 17/1 22/3 28/2 28/3 31/4 32/2 39/16 40/3 41/4 44/3 48/11 53/13 54/19 56/3 58/15 62/2 63/9 63/14 64/4 64/11 65/15 66/23 70/13 70/20 71/24 72/15 79/8
whether [27]  4/6 5/5 10/12 11/19 21/12 28/11 29/15 29/15 29/16 29/17 30/3 32/16 33/2 33/6 39/20 40/5 40/7 41/14 42/23 43/18 45/16 45/19 45/20 45/23 61/10 78/15 86/1
which [41]  4/12 5/11 6/15 6/18 9/24 13/18 17/3 19/8 21/9 22/3 22/9 22/19 23/3 25/7 25/15 30/1 30/9 30/15 31/15 31/20 31/22 41/14 42/10 42/20 43/4 43/6 44/5 44/21 44/23 45/21 54/2 56/20 57/13 58/2 67/11 68/17 74/7 75/20 80/11 81/23 83/8
while [6]  13/21 71/11 74/21 76/25 80/6 87/18
who [30]  3/14 6/25 23/7 28/3 28/5 42/12 51/6 55/11 56/12 56/13 57/6 58/10 62/9 62/10 68/19 68/19 68/24 71/8 72/12 72/21 73/22 74/1 78/16 79/11 79/21 79/23 80/6 81/8 87/23
whoever [3]  7/3 28/18 28/21
whole [12]  20/23 21/6 21/12 21/13 22/6 25/25 29/7 57/19 58/25 60/8 62/13 79/9
why [9]  11/2 14/23 20/16 24/4 29/5 34/15 51/17 65/14 71/15
widely [1]  71/18
wildly [1]  23/8
will [57]  4/7 4/18 4/19 5/3 5/9 5/12 7/23 8/8 9/6 9/8 9/9 9/21 11/2 12/18 12/23 12/24 12/25 14/15 17/22 23/3 23/11 23/17 25/1 28/1 31/9 31/10 32/10 41/19 48/25 49/14 49/22 50/1 53/21 55/18 55/24 56/17 61/19 61/20 61/22 72/24 73/23 75/9 75/10 75/10 75/11 75/16 75/19 76/5 77/15 82/17 82/20 82/24 83/8 86/24 87/4 87/7 87/18
willful [6]  35/8 39/23 39/24 39/25 40/2 40/10
willfully [4]  39/3 39/6 40/3 40/7
willing [1]  62/13
wire [1]  18/10
wisely [1]  72/24
wish [2]  74/10 87/24
withdraw [1]  53/14
withdrawing [2]  53/16 53/19
within [5]  80/23 83/14 83/21 85/20 85/21
without [8]  3/20 11/24 13/14 17/14 30/22 51/25 69/16 85/24

63/8 70/6 70/10 71/24 72/24 73/14 87/12 87/17 88/1 88/2 88/5
Victim [1]  83/21
victims [1]  65/20
video [4]  54/21 54/22 55/10 78/22
videos [3]  55/9 55/9 55/10
view [12]  14/19 22/11 23/16 30/7 30/9 31/2 41/9 46/7 46/8 50/8 82/5 82/10
views [2]  28/1 29/22
violated [2]  43/18 44/5
violates [1]  43/15
violating [2]  33/25 44/16
violation [15]  3/15 3/16 3/18 3/20 13/9 13/12 13/14 13/21 13/21 15/15 18/16 34/2 45/21 85/12
virtual [1]  8/22
virtually [1]  35/25
visit [2]  63/14 63/19
voluntary [2]  47/12 47/14
VPN [2]  8/22 8/25
vs [1]  1/5

**won't [1]**  85/7
**wondering [1]**  38/13
**word [4]**  8/10 26/5 30/1 47/16
**words [7]**  18/8 25/8 56/6 56/7
56/24 64/7 87/7
**work [2]**  42/7 73/23
**worked [1]**  16/11
**working [2]**  69/20 75/11
**world [1]**  39/15
**worse [1]**  74/14
**worsened [2]**  72/17 74/8
**worst [2]**  75/18 75/20
**worth [6]**  54/16 54/21 58/5 58/6
60/5 61/6
**would [63]**  3/4 5/7 5/8 7/3 7/11
7/12 17/15 18/14 18/16 26/13
26/15 27/3 30/4 32/14 34/8 34/17
34/20 35/13 35/22 41/9 43/24
43/25 45/21 46/11 46/12 46/25
47/10 47/10 47/13 47/14 48/10
49/13 49/22 50/12 51/14 51/15
53/8 53/10 53/10 55/13 58/12
58/17 58/22 60/14 61/11 61/16
61/22 61/24 61/25 61/25 70/9 71/2
71/5 71/7 71/15 72/24 73/10 76/3
76/10 77/5 79/3 81/14 82/8
**wouldn't [1]**  40/13
**write [1]**  73/15
**wrong [4]**  10/10 17/3 70/24 71/3
**wrote [1]**  68/20

**X**

**XLM [1]**  84/22
**XMR [1]**  85/1

**Y**

**Yeah [7]**  8/20 11/16 27/25 33/15
65/13 67/2 76/17
**year [9]**  48/2 52/19 53/23 53/23
54/2 54/4 54/5 54/7 62/19
**yearly [1]**  54/1
**years [40]**  13/9 13/10 13/13 13/15
23/19 31/17 37/5 37/11 47/22
47/23 47/25 48/3 48/5 48/16 48/17
52/9 52/11 55/19 58/7 58/8 62/10
62/21 64/16 66/3 69/4 69/13 69/22
72/14 72/15 72/20 73/5 75/1 75/18
75/18 78/10 78/14 79/20 80/14
80/14 80/16
**Yep [1]**  55/6
**yes [24]**  4/14 4/14 6/23 10/14
12/7 12/11 12/14 25/2 32/10 34/9
47/3 47/4 47/18 51/13 52/8 53/11
55/4 58/22 59/1 59/13 59/22 63/20
76/20 87/2
**York [2]**  1/20 2/7
**you [189]**
**you're [1]**  33/7
**young [3]**  69/23 79/2 79/19
**your [85]**  3/4 3/6 3/9 3/23 3/25
4/9 5/5 5/6 5/20 6/3 6/13 6/23
8/14 10/17 11/7 11/14 11/19 12/3
12/4 12/6 12/9 15/3 16/15 17/22
18/8 18/16 22/20 24/23 25/2 25/21
26/2 34/10 34/24 35/3 35/22 36/13
38/8 42/6 43/13 43/20 44/3 46/20
47/20 48/24 49/20 51/13 51/22
52/8 53/8 53/9 53/11 53/14 55/4
58/22 59/1 59/13 59/22 61/7 61/14
63/4 63/20 64/2 65/14 66/23 67/10
68/4 69/1 70/17 71/2 72/5 73/2
73/12 75/21 75/21 76/10 82/11
83/1 85/10 85/15 85/19 86/4 86/11
86/12 86/16 87/2
**yourself [2]**  12/13 71/16
**YouTube [1]**  70/5

**Z**

**zero [3]**  17/23 46/15 47/3
**zero-point [2]**  46/15 47/3

### Meth!

gigabyte

●●●●



User

⊕ **9**

158 posts

Joined
09/22/11 (ID: 39892)

Activity
другое

Posted October 5, 2011

Report post ⮜

Посоветуете какой-нибудь актуальный, и не задающий слишком много вопросов сервис где можно приобрести Virtual Visa Card (ну или мастеркард) за Liberty Reserve или другую анонимную валюту?
Сама физическая карта не нужна, просто номер которым можно оплачивать в интернете.
Пока нашёл только один который вроде это делает - Aurum Exchange Company, но они сейчас не принимают новые регистрации карточек...

✚ Quote

Supp.App.426

**Meth!**

gigabyte

●●●●



User

 **9**

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted October 5, 2011                                        Report post 

Can you recommend any up-to-date service that does not ask too many questions where you can buy a Virtual Visa Card (well, or mastercard) for Liberty Reserve or another anonymous currency?
The physical card itself is not needed, just a number that can be used to pay on the Internet.
So far, I've found only one that seems to be doing this – Aurum Exchange Company, but they don't accept new card registrations now...

➕    Quote

Meth!

gigabyte

●●●●

User

✪ 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted November 14, 2011 (edited)

Report post ↗

При беглом просмотре форума полноценного обзора я не нашёл, а темы которые есть довольно старые. Проведём ещё одну попытку познакомить эксплойтовцев в этой валютой.

Итак, bitcoin – это ~~пирамида~~ криптовалюта. Надеюсь, все знают что такое шифрование публичным ключом. На таком шифровании и построен биткойн. Представьте себе базу данных обычного банка в которой лежат все счета пользователей. В обычных банках или сервисах каждому счету присваивается свой пароль или другой способ идентификации, доказательства того что пользователь – хозяин счёта. В биткойне всё точно также, только для идентификации пользователя используется его сигнатура, сделанная его секретным ключом, которая может быть легко проверена ключом публичным.

Как результат этого, секретный ключ пользователя может всегда оставаться у него и не пересылаться ни в банк, ни вообще никуда, и тем не менее, всегда можно проверить что именно он хозяин этого счёта. Когда нужно перевести деньги на другой счёт, пользователь просто посылает в банк приказ о переводе денег на такой-то счёт, и подписывает его своим секретным ключом. Банк проверяет сигнатуру и переводит деньги.

А теперь внимание – поскольку ключи которыми можно проверить сигнатуру – публичные, то защищать базу данных счетов от чужих глаз не обязательно. Она может быть публичной. Да и не только публичной, а вообще распределённой! И тогда банк вообще не нужен!

Именно так и построен биткойн. Каждый участник сети проверяет все переводы других участников, благо проверить легко – надо всего лишь проверить сигнатуру публичным ключом. У каждого участника есть копия всей базы и все публичные ключи. Когда мне надо послать перевод денег, я просто пересылаю его некоторым участникам, и поскольку сеть рапределённая, он под конец распространится до всех участников.

Пока всё легко, да и вообще не использует никаких крутых идей кроме самого шифрования с публичным ключом.

Но теперь начинается интересное – скажем я злой негодяй и решил обмануть систему, и посылаю разным нодам два разных приказа. В одном я перевожу все свои деньга со счёта 1 на счёт 2, а в другом со счёта 1 на счёт 3. И оба приказа подписываю своим секретным ключом. А поскольку подпись верна, то другие ноды должны подтвердить эту транзанкцию, и теперь у меня вместо 100 баксов есть 200, по 100 на двух разных счетах!

Но и об этом подумал великий ~~и могучий~~ анонимный Satoshi Nakomoto, придумав цепочку блоков.
Идея довольно проста – мы вместо того чтобы тупо иметь кучу счетов, имеем вместо этого кучу тразанкций, причём и не кучу вовсе, а упорядоченный список, в котором каждая тразанкция должна быть основана на предыдущей. А в упордоченном списке уже легко проверить, были ли деньги которые собираются перевести уже переведены куда-то ещё другой транзанкцией. Но как же заставить сотни тысяч нодов в распределённой сети договориться о порядке транзанкций? Ведь я могу одновременно подключиться к двум разным нодам, и им одновременно перевести две конфликтующие транзанкции?

Фактически для каждого блока (небольшого списка тразанкций) во всей сети будет только один нод который "выиграет лотерею" и сможет решить порядок трананкций. Лотерея настраивается математически спецальным алгоритмом который подстраивается под количество играющих таким образом, что во всей сети в среднем будет один выигрыш каждые 10 минут. Иногда быстрее, иногда медленнее, но в среднем время будет одинаковым.

Лотерея эта построена тоже криптографически, и чтобы в неё играть нужны очень большие вычислительные мощности, а проверить настоящий ли это выигрыш, очень легко. (примерно как с публичным ключом, в детали влезать сейчас не буду). Так вот, когда один из нодов выигрывает, он решает в каком порядке будут производиться новые транзанкции, выдаёт этот порядок в сеть, со своим выигршем (специальным значением). Остальные проверяют, настоящий ли выигрыш, и если да, то соглашаются, если нет то ~~немного смеются над придурками пославшими этот пакет в сеть, которые решили "скакать" биткойн до конца не разобравшись в протоколе~~, просто выкидывают неправославный блок и продолжают играть в лотерею, вдруг им улыбнётся удача?

Главное что здесь надо понять это то что ЛОТЕРЕЯ НУЖНА САМОЙ СЕТИ. Она – единственный известный способ достоверно выбрать один единственный нод в сети для каждого блока который будет создавать ~~порядок и демократию из хаоса и анархии~~ решать порядок транзанкций.

И поскольку лотерея нужна, нам надо заставить ноды в неё играть! И вот для этого протокол разрешает тому ноду который выигрывает лотерею, присвоить себе заранее оговорённое, установленное количество денег (увидев которое все другие ноды тоже согласятся что да, молодец, тебе полагается именно столько, и не выбросят блок). Именно для этого люди и "майнят", строят майнерские станции с десятками графических карточек, заточенных на игру в лотерею и вентилятором от ТУ-124 для охлаждения, а другие вообще делают собственные программируемые микросхемы с ~~блэкджеком и шлюхами~~ которые по слухам майнят потребляя в 100 раз меньше электроэнергии чем геймерские карты.

Итак, уже много теории, теперь о практике. Рассказать можно много, поэтому просто перечислю факты. Если вы не верите чему-то или у вас вопросы, пишите ниже, разъясню.

1. поскольку количество биткойнов решается генерацией, а генерация происходит раз в 10 минут и ни от чего внешнего не зависит – биткойн это своя валюта, а не "счёт в долларах" или в другой валюте.

2. А раз это своя валюта, то у неё есть свой курс, который устанавливается спросом и предложением, и в связи с пока что бурным детством биткойна, иногда ~~нихуёво так~~ сильно варьируется. Хотя в последнее время немного стабилизировался.

3. Вот в связи с этой вариацией многие и начали говорить что на биткойне можно заработать, а потом ещё другие, ничего не заработав, начали кричать что биткойн это пирамида, враньё ~~и вообще у меня брат от этого погиб~~. Люди, помните: биткойн это ВАЛЮТА. Также как и доллары или любая другая. Никто никогда не говорил что вы на ней просто так заработаете ничего не делая.

Заработок майнингом - это вообще не основная причина почему был создан биткойн, это просто маленькая деталь, особенность сети (которая к сожалению получила слишком много огласки и привела к непониманию), которая необходима биткойну чтобы сеть была защищённой.

4. Биткойну и вообще тем кто его используют в принципе (ну по крайней мере в идеальном случае) совершенно пофиг какой у него курс в долларах, пока какой-то курс есть. Мне пофиг, куплю я 10 биткойнов за доллар и передам их васе, или куплю 1000 биткойнов за доллар и передам васе. Потому что вася потом просто будет либо платить ещё кому-то, либо продавать их за туже цену... То что люди вообще покупают числа в распрделённой сети - за любую цену – это уже восхищяет и позволяет биткойну работать как и было задумано.

5. Нету никакого центрального сервера или компании которую какое бы то нибыло государство может закрыть. Все тразанкции – в распределённой сети. Закройте интернет – закроете и биткойн.

6. Ваш счёт – в распределённой сети, но ваш ключик к счёту – у вас на компе, в файле ключей (в терминологии биткойна wallet). Любой человек с вашим ключиком сможет получить доступ к вашему счёту. Охраняйте его! Фактически наступило время когда можно сказать как герои не самых лучших киберпанковских фильмов многолетней давности, "у меня миллион на этом диске".

### Ну и наконец, что это всё значит для нас, эксплойтовцев ?

Если у вас счёт на webmoney – его могут закрыть, переводы могут отменить, чтобы зарегестрироваться нужно имя и т.д.

Счёт на биткойне – он в вашем компе, это просто ключ. Его никто не сможет закрыть. Оплаты никто не сможет отменить. Более того, нету ни чистых ни грязных биткойнов, это всё числа.

Чисто практически на данный момент – биткойн свободно переводится в Liberty Reserve, и много других онлайн платёжных систем. Также с банковскими переводами. Чуть-чуть туже с кредитками, ведь на кредитках есть charge-backs, а в биткойне просто некому будет жаловаться на продавца, никто вам денег не вернёт если что. Но с другой стороны, ведь и у вас не отнимут.

При всём при этом, при соблюдении должных мер, биткойн абсолютно анонимен! (используйте mixing services, иначе можно проследить с каких счетов на какие шли деньги. С другой стороны, слежка пока ни к чему не приведёт. Ни в одной стране мира официально биткойны даже за деньги не считаются, и ни одного случая доказательства чего-либо с их помощью пока не было. (В будущем может быть поменяется)).

### Можно ли bitcoin для чего-то использовать кроме обмена?

~~Канешна~~ Для того чтобы биткойн стал настолько же большим как либерти резерв и можно было за биткойны купить что угодно, понадобится больше времени. Но ведь и доллары не за год и не за 10 лет становились! Просто это было очень давно и никто в таком ракурсе об этом не думает.
Но уже сейчас за биткойны можно купить к примеру – хостинг, впн, сервера, оплатить работу некоторых чуваков в интернете, на них можно играть в казино, да и вообще много чего купить в онлайн магазинах, для полного списка смотрите официальный сайт bitcoin wiki. Вот здесь есть один список, я вроде бы где-то видел ещё, но конечно есть и куча сервисов которых пока нет в таких списках https://en.bitcoin.it/wiki/Trade

Да, и не забываем, на биткойны можно затовариться интересными вещами на Silk Road – ну к примеру LSD, кокаином или тем же meth и другие труднодоступные вещи. Да что там, почти все труднодоступные вещи! При этом всё ~~совершенно законно : )~~ отменного качества, что достигается системой отзывов. Таже трава там по слухам в 100 раз лучше чем от вашего локального дилера неизвестно откуда что берущего и неизвестно когда попавшегося в лапы доблестных копов с вашим адресом в записной книжке. Сайт этот доступен только через Tor, если тор у вас есть, просто зайдите на линк http://ianxz6zefk72ulzz.onion/

Кстати и от того что этот сайт уже так долго существует, становится спокойнее. В америке уже куча сенаторов недвумысленно объявили что ~~я твой силкроуд труба шатал~~ там это нарушение всех законов, против конституции, мы всё закроем, биткойн исчезнет, силк роад запрём в гуантанамо бей, и т.д.

И что? Tor как был так и есть, silk road тоже никуда не делся, и bitcoin только наращивает базу пользователей. Наступило время в котором мы создали нечто сильнее чем государства и страны. И причём если речь о биткойне - не просто сильнее в том смысле что "ахаха, я продаю картон за webmoney, и меня пока не нашли", а в том что "я продаю картон, меня нашли и знают на какой адрес я принимаю оплату, а мне пофиг!", они просто ничего не могут сделать.

Пусть не всё так гладко, пусть курс немножко варьируется и цепочка блоков только растёт, это всё временное, но сама идея и то что становится с ней возможно - бесценно.

**Edited November 15, 2011 by Meth!**

 Quote



**Meth!**
gigabyte
●●●●



User
⊕ 9
158 posts
Joined
09/22/11 (ID: 39892)
Activity
другое

Posted November 14, 2011 (edited)

Report post ⏍

At a cursory glance at the forum, I did not find a full review, and the topics that are in it are quite old. Let's make another attempt to introduce exploiters to this currency.

So, bitcoin is a ~~pyramid~~ cryptocurrency. I hope everyone knows what public key encryption is. Bitcoin is built on such encryption. Imagine a database of a regular bank in which all user accounts are stored. In conventional banks or services, each account is assigned its own password or other method of identification, that are a proof that the user is the owner of the account. In bitcoin, everything is exactly the same, only to identify the user, his signature is used, made by his secret key, which can be easily verified by the public key.

As a result of this, the user's secret key can always remain with him and not be sent either to the bank or anywhere at all, and nevertheless, you can always check that he is the owner of this account. When a user needs to transfer money to another account, the user simply sends an order to the bank to transfer money to a certain account, and signs it with his secret key. The bank checks the signature and transfers the money.</p>

And now attention – since the keys with which you can check the signature are public, it is not necessary to protect the database of accounts from prying eyes. It can be public. And not only public, but actually distributed! And then you don't need a bank at all!

This is exactly how Bitcoin is constructed. Each member of the network checks all the translations of other participants, since it is easy to check – you just need to compare the signature with the public key. Each participant has a copy of the entire database and all public keys. When I need to send a money transfer, I just forward it to some participants, and since the network is distributed, it will eventually spread to all participants.

So far, everything is easy, and indeed does not use any cool ideas except for the encryption itself with a public key.

But here comes the interesting part – let's say I'm an evil scoundrel and decided to deceive the system, and I send two different orders to different nodes.

In one, I transfer all my money from account 1 to account 2, and in the other, from account 1 to account 3. And I sign both orders with my secret key. And since the signature is correct, the other nodes must confirm this transaction, and now instead of 100 bucks I have 200, 100 each on two different accounts!

But this was also thought of by the great ~~and the mighty~~ anonymous Satoshi Nakomoto, who came up with a chain of blocks.

The idea is quite simple – instead of stupidly having a bunch of accounts, we have instead a bunch of transactions, and it is not a bunch at all, but an orderly arranged list in which each transaction should be based on the previous one. And in the orderly arranged list, it is actually easy to check whether the money that is going to be transferred has already been transferred somewhere else by another transaction. But how do you get hundreds of thousands of nodes in a distributed network to agree on the order of transactions? After all, I can connect to two different nodes at the same time, and transfer two conflicting transactions to them at the same time?

In fact, for each block (a small list of transactions) in the entire network there will be only one node that will "win the lottery" and will be able to decide the order of transactions. The lottery is set up mathematically by a special algorithm that adjusts to the number of players in such a way that the entire network will have an average of one win every 10 minutes. Sometimes faster, sometimes slower, but on average the time will be the same.

This lottery is also built cryptographically, and to play it you need a lot of computing power, and it is very easy to check whether this is a real win. (Like with a public key, I won't go into details now). So, when one of the nodes wins, it decides in what order new transactions will be made, issues this order to the network, with its winning (special value). The rest check if the win is real, and if so, they agree, if not, then ~~laugh a little at the idiots who sent this package to the network, who decided to "grab" bitcoin without fully understanding the protocol to the end~~</span>, just throw out the unorthodox block and continue to play the lottery, bidding that and if they get lucky?

The main thing to understand here is that the LOTTERY IS NEEDED BY THE NETWORK ITSELF. It is the only known way to reliably select one single node in the network for each block, which will create ~~order and democracy from chaos and anarchy~~ to solve the order of transactions.

And since the lottery is needed, we need to get the nodes to play it! And for this, the protocol allows the node that wins the lottery to appropriate a pre-agreed, set amount of money (seeing which all other nodes will also agree that yes, well done, you are entitled to just that amount and they will not throw away the block). That is why people "mine", build mining stations with dozens of graphic cards designed for playing the lottery and with a fan from the TU-124 for cooling, while others generally make their own programmable chips ~~with blackjack and bridges~~ that are rumored to mine, consuming 100 times less electricity than gaming cards.

So, there is already a lot of theory, now about practice. There is a lot to tell, so I'll just list the facts. If you do not believe something I say or you have questions, write below, I will explain.

1. Since the number of bitcoins is decided by generation process, and generation occurs once every 10 minutes and does not depend on anything external, bitcoin is its own currency, and not an "account in dollars" or in another currency.

2. And since it is its own currency, it has its own exchange rate, which is set by supply and demand, and due to the still turbulent childhood of bitcoin, sometimes ~~fucking~~ fluctuates ~~so~~ a lot. Although it has stabilized a little lately.

3. In connection with this fluctuation, many began to say that you can make money on bitcoin, and then others, without earning anything, began to shout that bitcoin is a pyramid, lies ~~and actually my brother died because of this~~. Folks, remember: Bitcoin is a CURRENCY. Just like dollars or any other. No one has ever said that you simply will make money on it without doing anything.

Making money by mining is not the main reason why Bitcoin was created at all, it's just a small detail, a feature of the network (which unfortunately received too much publicity and led to misunderstandings) that Bitcoin needs for the network to be secure.

4. Bitcoin and in general those who use it in principle (well, at least in the ideal case) do not care at all what its exchange rate is in dollars, as long as there is some rate. I don't care if I buy 10 bitcoins for a dollar and give them to some guy called Vasya, or buy 1,000 bitcoins for a dollar and give them to Vasya. Because then Vasya will simply either pay someone else, or sell them for the same price ... The fact that people on the distributed network actually buy numbers  – at any price – is already admirable and allows bitcoin to work as intended.

5. There is no central server or company that any government can shut down. All transactions are in a distributed network. By shutting down the Internet – you will shut down the bitcoin as well.

6. Your account is in a distributed network, but your account key is on your computer, in a key file (wallet – in bitcoin terminology). Anyone with your key will be able to access your account. Guard it! In fact, the time has come when you can declare, like the heroes of not the best cyberpunk movies from many years back, "I have a million on this disc."

And finally, what does all this mean for us exploiters?

If you have a webmoney account, they can shut it down and transfers can be canceled, also, you need a name to register, etc.

A bitcoin account is in your computer, it's just a key. No one will be able to shut it down. No one will be able to cancel payments. Moreover, there are no clean or dirty bitcoins, they are all just numbers.

Purely practically at the moment – bitcoin is freely transferred to Liberty Reserve, and many other online payment systems. The same with bank transfers. A little tighter with credit cards, because there are charge-backs on credit cards, and in bitcoin there will simply be no one to complain to about the seller, no one will return your money if anything. But on the other hand, no one can take it away from you either.

With all this, subject to following proper measures, bitcoin is absolutely anonymous! (Use Mixing Services, otherwise one can track from which and to which accounts the money is transferred. On the other hand, tracking it will not lead to anything as of yet. No country in the world officially even considers bitcoins as money, and there has not yet been a single case of proving anything using bitcoins. (It may change in the future)).

Can bitcoin be used for anything other than exchange?

~~Of course~~ It will take longer for bitcoin to become as large as the liberty reserve, and such that one can buy anything with bitcoins. After all, it took a year or 10 for a dollar to become an established currency! It's just that this was a very long time ago, and no one thinks about it from this perspective.
However, even now you can use bitcoins to buy, for example, hosting, vpn, servers; pay for the work of some dudes on the Internet; you can use them for gambling in casinos, and generally buy a lot of things in online stores; for a complete list, see the official bitcoin wiki website. There is one list here, I seem to have seen it somewhere else too, but of course there are also a bunch of services that are not yet on such lists  https://en.bitcoin.it/wiki/Trade

Also, do not forget that you can buy interesting things on Silk Road with bitcoins - well, LSD, cocaine or meth and other hard-to-find things, as an example. Well, what am I talking about, almost any hard-to-get things! At the same time, everything ~~perfectly legal: )~~ is of excellent quality, which is achieved by the feedback system. The weed there is rumored to be 100 times better than you get from your local dealer; the dealer who gets it from god knows where and who perhaps is on the valiant cops' radars with your address in their notebook. This site is accessible only through Tor, if you have tor, just go to the link http://ianxz6zefk72ulzz.onion/

By the way, the mere fact that this site has been existing for so long is reassuring. In America, a bunch of senators have already unequivocally announced that ~~I will fuck your silkroad~~ [*sic*] this is a violation of all laws over there, it is against the constitution, we will shut down everything, bitcoin will disappear, silk road will be locked up in Guantanamo Bay, etc.

And what? Tor still exists, and the silk road has not gone away either, and the bitcoin has been only increasing its user base. The time has come in which we have created something stronger than governments and countries. And if we are talking about bitcoin - it is not just stronger in the sense that "ahaha, I sell credit cards for webmoney, and I have not yet been found", but in the sense that "I sell credit cards, they found me and they know to what address I accept payment, but I don't care!" - they simply won't be able to do anything.

Even if not everything is so smooth, even if the rate fluctuates only a little bit and the blockchain is still just growing - all of this is temporary; but the idea itself and what becomes possible using it is priceless.

**Edited November 15, 2011 by Meth!**

+   *Quote*    2 



### Meth!

gigabyte

●●●●

**User**

☉ 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted November 14, 2011

> **joligin said:**
>
> проще зарегай кипер мини и проведи оплату с дедика :)

А дедик как анонимно купить? :lol:

А если серьёзно, то вот поэтому я и люблю Liberty Reserve, там всё через браузер...

**＋** Quote



### Meth!

gigabyte

●●●●

User

⊕ 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted November 14, 2011

> **joligin said:**
>
> *It would be simpler to register a keeper mini and make a payment from a dedicated server :)*

And how to buy a dedicated server anonymously?  :lol:
But seriously, that's why I love Liberty Reserve, it's all through the browser …

**+**    Quote

### Meth!
gigabyte
●●●●



User
 9
158 posts
Joined
09/22/11 (ID: 39892)
Activity
другое

> ◎ **Quote**
>
> Можно ли её самому нагенерировать вроде слышал об этом там 0.3 биткойнка в день идет с одного компа

Ок, бегло на тему того как майнить и сколько можно зарабатывать. (Это действительно бегло, вообще наука целая :D ).

Что такое фактически майнинг? Это считание хэшей блоков. Нам даётся блок (ну массив байтов грубо говоря), в нём можно менять одно значение (nonce). Чего мы пытаемся добиться - это подобрать такое значение nonce, при котором хэш блока будет соответствовать определённому значению. Как вы понимаете, алгоритмы хэшей отчасти для того и были созданы и проверены криптографами чтобы просто так узнать значение входящего блока данных который будет приводить к определённому хэшу было нельзя. Поэтому единственное что нам остаётся - брутфорсить.
1) считаем хэш, если правильный то радуемся (но шанс маленький как вы понимаете) 2) увеличиваем значение nonce на 1 (пофиг на сколько увеличивать или уменьшать, хэш всё равно будет непредсказуем. Но с большой вероятностью будет другим чем до этого). 3)опять на шаг 1.

То есть операция майнинга требует очень много вычислительных ресурсов, хотя сама операция хэширования не очень сложная, и не требует особо много памяти, свопов и т.д. Поэтому графические карты гораздо быстрее считают такие хэши на своих шейдерных процессорах, которые очень простые но которых МНОГО. Практически в среднем раз в 100 быстрее считать на хорошей видеокарточке чем на процессоре. (Это просто общее значение, сильно зависит от того какой процессор и какая карточка естественно).

И в связи с какими-то особенностями которых я технически точно не знаю, гораздо лучше для майнинга подходят карточки ATI чем NVIDIA. Разница вроде бы раз в 10 примерно. Ну как-то по другому они построены. Во всех серьёзных майнерских станциях используется только ATI.

Майнерами для майнеров была даже составлена точная таблица, какого рода майнинга можно достичь на каждом процессоре и на каждой карточке - https://en.bitcoin.it/wiki/Mining_hardware_comparison

Можно точно проверить как быстро ваша машина будет считать хэши. Измеряется в килохэшах/с, мегахэшах/с и т.д.

## Но что такое хэши в секунду? Сколько от этого будет денег?

Для этого давайте вспомним что ради справедливосте во всей сети блоки генерируются примерно каждые 10 минут, и только в таких случаях генерируются биткойны, причём одно и тоже количество, на данный момент (и где то ещё год) 50 биткойнов.

То есть каждые 10 минут один участник сети получит 50 биткойнов, тот кто первым найдёт нужный хэш и выиграет. Чтобы это всегда было так, и не зависело от того сколько человек играет, сеть сама поправляет сложность поиска этих хэшей, подгоняя её как раз под значение 1 блок/10 минут.

Из этого выходит, что чем больше майнеров майнят, и чем больше их совокупная мощность в хэшах в секунду, тем сложнее найти новый блок и тем меньше каждый отдельный майнер будет получать биткойнов на свои гигахэши.

Как вы понимаете, таких умных стало очень много, майнинг теперь не особо прибыльное дело. Дошло до того что уже нужно думать не столько сколько стоит новая карточка в закупочную цену, а сколько электричества эта карточка будет потреблять на каждый гигахэш в секунду. Более того, на данный момент, если вы живёте в стране с дорогим электричеством, вам вообще не выгодно майнить, будете за электричество платить больше чем получите биткойнов если их перевести в доллары. А всё потому что очень большая конкурренция, в том числе из стран в которых электричество дешёвое. Но если электричество у вас бесплатное - тогда может быть и прибыльное.

Чтобы точно всё расчитать, используйте специальный калькулятор - например вот этот http://tpbitcalc.appspot.com/ Он вам скажет сколько биткойнов будете генерировать в единицу времени.

Чтобы точно всё расчитать, используйте специальный калькулятор - например вот этот http://tpbitcalc.appspot.com/ Он вам скажет сколько биткойнов будете генерировать в единицу времени.

## Ну и наконец важный момент - пулы

Поскольку сложность сейчас настолько высокая что найти блок имея даже весь гараж карточек ати - очень сложно. Ведь всё базируется на статистике, и вы можете ждать ГОДА пока сами найдёте хэш. И при этом пока вы его не найдёте, будут только счета за электричество и сожжённые карточки. Биткойн выплачивает 50 койнов одному единственному участнику, он не делит поровну.

В связи с этим появились пулы - они собирают на одном сервере по распределённой модели вычислительный мощности очень многих майнеров, и весь пул целиком находит хэши гораздо быстрее. То есть майните вы у себя дома на вашем железе, а результаты шлются на сервер, который уже в свою очередь говорит с самой биткойн сетью.

Когда хэш находится, то выигрыш идёт хозяину пула, а он уже в свою очередь делит её между всеми участниками, в зависимости от того кто сколько нахэшировал. Таким образом вам не нужно будет ждать свои 50 биткойнов, вы будете получать выплаты гораздо чаще (но они будут меньше естественно). Обмануть тут довольно сложно, все цифры из пула проверяются, ведь вся сеть распределённая и текущая сложность точно всем известна. (И пулу сложно вас обмануть, и наоборот вам его, они придумали всякие хитрые схемы и правила для этого.) Ну чуть-чуть выигрыша пул берёт себе за неудобства, но обычно очень мало.

## Насчёт FPGA

FPGA - это специальные чипы, которые вы можете какбы программировать. Ну там просто набор двоичной логики, и определёнными командами этот набор может перестраиваться и переключаться так как вам надо. Естественно что если вы попробуете в FPGA запрограммировать настоящий процессор, ну то есть тупо скопировать схему уже существующего, он не будет настолько же быстрым как оригинал, иначе всё на FPGA делалось бы. Но оказывается, для майнинга биткойнов на самом деле не нужен весь процессор или вся карточка, всё можно сделать гораздо проще. И если это проще сделать в такой вот программируемой микросхеме, то она будет работать довольно быстро. Во-первых, такакя схема будет считать быстрее чем обычный радеон, а во-вторых, будет потреблять ОЧЕНЬ мало электричества, в разы меньше чем карточка если пересчитать всё на мегахэши.

Когда хэш находится, то выигрыш идёт хозяину пула, а он уже в свою очередь делит её между всеми участниками, в зависимости от того кто сколько нахэшировал. Таким образом вам не нужно будет ждать свои 50 биткойнов, вы будете получать выплаты гораздо чаще (но они будут меньше естественно). Обмануть тут довольно сложно, все цифры из пула проверяются, ведь вся сеть распределённая и текущая сложность точно всем известна. (И пулу сложно вас обмануть, и наоборот вам его, они придумали всякие хитрые схемы и правила для этого.) Ну чуть-чуть выигрыша пул берёт себе за неудобства, но обычно очень мало.

## Насчёт FPGA

FPGA - это специальные чипы, которые вы можете какбы программировать. Ну там просто набор двоичной логики, и определёнными командами этот набор может перестраиваться и переключаться так как вам надо. Естественно что если вы попробуете в FPGA запрограммировать настоящий процессор, ну то есть тупо скопировать схему уже существующего, он не будет настолько же быстрым как оригинал, иначе всё на FPGA делалось бы. Но оказывается, для майнинга биткойнов на самом деле не нужен весь процессор или вся карточка, всё можно сделать гораздо проще. И если это проще сделать в такой вот программируемой микросхеме, то она будет работать довольно быстро. Во-первых, такая схема будет считать быстрее чем обычный радеон, а во-вторых, будет потреблять ОЧЕНЬ мало электричества, в разы меньше чем карточка если пересчитать всё на мегахэши.

Поэтому сейчас все говорят о том что FPGA схемы - будущее майнинга. Пока что они довольно дороги для обычного Васи, и в отличие от карточек ATI ни на что больше не будут годиться (ну если вы сами для них какое-то применение не придумаете и не сделаете схему). Поэтому пока основной гигахэш идёт с карточек, но говорят уже через год всё будет на FPGA.

*Edited November 15, 2011 by Meth!*

 Quote



## Meth!

gigabyte

●●●●



User

● 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted November 15, 2011 (edited)

Report post <

> ✓ **Quote**
>
> *Is it possible to generate it yourself, like I heard about it there 0.3 bitcoin per day comes from a single  computer*

Ok, a cursory look at how to mine and how much you can earn. (It's really a cursory look; there is actually a whole science behind it :D).

What is actually mining? It is calculating the hashes of blocks. We are given a block (well, an array of bytes, roughly speaking), in which you can change one value (nonce). What we are trying to achieve is to find a nonce value at which the hash of the block will correspond to a certain value. As you understand, in part, hash algorithms were created and verified by cryptographers, so that it was impossible to simply find out the value of the incoming block of data that will lead to a certain hash. Therefore, the only thing left for us is to use brute force.

1) we calculate the hash, if it is correct, then we rejoice (but the chance is small as you understand) 2) increase the value of the nonce by 1 (it does not matter how much to increase or decrease, the hash will still be unpredictable. But it is highly likely to be different than before. 3) step 1 again.

That is, the mining operation requires a lot of computing resources, although the hashing operation itself is not very complicated, and does not require a lot of memory, swaps, etc. Therefore, graphics cards are much faster at calculating such hashes on their shader processors, that are very simple but there are a LOT of them around. In practice, on average, a good video card calculates 100 times faster than a processor. (This is just a general value, naturally it depends a lot on which processor and which card).</p>

And due to some features that I technically do not know for sure, ATI cards are much better suited for mining than NVIDIA. The difference seems to be about 10 times. Well, somehow they are built differently. In all serious mining stations, only ATI is used.

Miners even compiled a precise table for miners of what kind of mining can be achieved on each processor and on each card – https://en.bitcoin.it/wiki/Mining_hardware_comparison

You can check exactly how fast your machine will calculate hashes. It is measured in kilohashes/s, megahashes/s, etc.

## But what are hashes per second? How much money will it make?

To do this, let's remember that for the sake of fairness in the entire network, blocks are generated approximately every 10 minutes, and only in such cases bitcoins are generated, and the same amount, at the moment (and for about one more year) 50 bitcoins.

That is, every 10 minutes, one participant of the network will receive 50 bitcoins, the one who first finds the desired hash and wins. To ensure that this is always the case regardless of how many people play, the network itself corrects the difficulty of finding these hashes, adjusting it just to the value of 1 block / 10 minutes.

It can be deduced from this that the more miners mine, and the greater their total power in hashes per second, the more difficult it is to find a new block and the less each individual miner will receive bitcoins for their gigahashes.

As you understand, there are a lot of such smart people, mining is no longer a particularly profitable business. It got to the point that you no longer need to think as much about how much a new card costs, but rather about how much electricity this card will consume for each gigahash per second. Moreover, at the moment, if you live in a country with expensive electricity, it is not profitable for you to mine at all, you will pay more for electricity than you get bitcoins if you convert them into dollars. And it's all because there is a lot of competition, including from countries where electricity is cheap. But if your electricity is free for you, then it can be profitable.

To calculate everything accurately, use a special calculator – for example, this one  http://tpbitcalc.appspot.com/

It will tell you how many bitcoins you will generate per unit of time.

To calculate everything accurately, use a special calculator – for example, this one  http://tpbitcalc.appspot.com/
It will tell you how many bitcoins you will generate per unit of time.

## And finally, an important point – pools

Given such a high level of complexity now, it is very difficult to find a block, even if you have an entire garage full of ati cards. After all, everything is based on statistics, and you can wait a YEAR until you find the hash yourself. And at the same time, there will only be electricity bills and burned cards until you find it. Bitcoin pays 50 coins to a single participant, it does not divide equally.

Therefore, pools were created – they combine the computing power of many miners on a single server according to a distributed model, thus the unified pool finds hashes much faster. That is, you mine at home by using your own hardware, and the results are sent to the server, which in turn talks to the bitcoin network itself.

When the hash is found, the winnings go to the owner of the pool, and he, in turn, divides it among all participants, depending on who hashed how much. That way, you won't have to wait for your 50 bitcoins, you'll get payouts much more often (but they'll be smaller naturally). It is quite difficult to deceive here, all the numbers from the pool are checked, because the entire network is distributed and the current complexity is known to everyone. (And it's hard for the pool to deceive you, and vice versa for you, they came up with all sorts of tricky schemes and rules to handle this.) Well, the pool keeps a little bit of winnings to compensate for the inconvenience, but usually very little.

## About FPGAs

FPGAs are special chips that you can kind of program. Well, there's just a set of binary logic, and with certain commands this set can be reassembled and switched over as you need. Naturally, if you try to program a real processor in an FPGA, well, that is, bluntly copy the existing scheme, it will not be as fast as the original one, otherwise everything would be done on the FPGA. Well it turns out that you don't really need the entire processor or the entire card to mine bitcoins, everything can be done much easier. And if it is easier to do in such a programmable chip, then it will work quite fast. Firstly, such a scheme will count faster than a regular radeon, and secondly, it will consume VERY little electricity, several times less than a card if you count everything into megahashes.

When the hash is found, the winnings go to the owner of the pool, and he, in turn, divides it among all participants, depending on who hashed how much. That way, you won't have to wait for your 50 bitcoins, you'll get payouts much more often (but they'll be smaller naturally). It is quite difficult to deceive here, all the numbers from the pool are checked, because the entire network is distributed and the current complexity is known to everyone. (And it's hard for the pool to deceive you, and vice versa for you, they came up with all sorts of tricky schemes and rules to handle this.) Well, the pool keeps a little bit of winnings to compensate for the inconvenience, but usually very little.

## About FPGAs

FPGAs are special chips that you can kind of program. Well, there's just a set of binary logic, and with certain commands this set can be reassembled and switched over as you need. Naturally, if you try to program a real processor in an FPGA, well, that is, bluntly copy the existing scheme, it will not be as fast as the original one, otherwise everything would be done on the FPGA. Well it turns out that you don't really need the entire processor or the entire card to mine bitcoins, everything can be done much easier. And if it is easier to do in such a programmable chip, then it will work quite fast. Firstly, such a scheme will count faster than a regular radeon, and secondly, it will consume VERY little electricity, several times less than a card if you count everything into megahashes.

Therefore, now everyone is talking about the fact that FPGA chips are the future of mining. So far, they are quite expensive for the average guy Vasya, and unlike ATI cards, they will not be suitable for anything else (well, unless you yourself come up with some kind of application and create a scheme for that matter). Therefore, the main gigahash comes from the cards for the time being; but they say in a year everything will be on the FPGA.



### Meth!
gigabyte
●●●●

**User**
✪ 9
158 posts
Joined
09/22/11 (ID: 39892)
Activity
другое

Posted November 25, 2011

Почему про Tor никто не пишет? Используйте впн+проксик или впн+Tor и Good Luck Have Fun ;)

➕  Quote

## Meth!

gigabyte

●●●●



User

⊕ 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted November 25, 2011

Why doesn't anyone write about Tor? Use VPN+PROXY or VPN+Tor and Good Luck Have Fun ;)

➕  Quote

## Meth!

gigabyte

●●●●



User

🔄 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted December 3, 2011

> ⊘ **Quote**
>
> Были статьи в интернете, авторы делали свои деды тор нодами и снифали траффик. Он же там с последней ноды идёт уже нешифрованый. Ну и в их дампах оказывалась почта чья то, они там пишут что дипломатов разных, ещё кого то..... Это они так сделали и отписались об этом, а любой точно так же может молча сделать, а потом будет сидеть и парсить логи.

Блин да это же совершенно разные вещи.

Мы говорим об анонимности, то есть что не вычислят твой IP адрес по соединению. В этом плане тору действительно больше доверия, там алгоритмы выбирают 3 разных хоста через которые идёт трафик, и всё между ними зашифровано по 10 раз. Первые два могут хоть каждый бит логать, всё равно зашифровано всё, причем на сетевом уровне, всё равно к чему и как ты подключаешься, даже адресов не видно.

Последний, выходной нод может логировать твой трафик, как впрочем и любая впн. Но на что SSL как если не для таких случаев? Почти все сервисы которые представляют хоть какой-то интерес поддерживают SSL. (Естественно надо сертификаты проверять, но если кто-то думает о безопасности и при этом клал на сертификаты, тут уже не с законом проблема :D) Даже если ты посылаешь что-то не по SSL, выходной нод даже не видит твоего настоящего IP адреса...

Чтобы при таком раскладе что-то реально сосниффать, надо чтобы больше половины всех нодов тора было под контролем, в такое слабо верится...

 Quote

### Meth!

gigabyte

● ● ● ●



User

✪ 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted December 3, 2011

 **Quote**

> *There were some articles on the Internet; the authors turned their dedicated servers into tor nodes and sniffed traffic. It flows unencrypted from the last node over there. Well, someone's mail turned out to be in their dumps, they are writing about all kind of diplomats and someone else ..... This is what they did and reported it, while anyone can do the same quietly, and then sit parsing the logs*

Oh come on, those are completely different things.
We are talking about anonymity, that is, that they will not figure out your IP address based on connection. In this regard, the Tor is really more trustworthy, where the algorithms pick 3 different hosts through which the traffic runs, and everything between them is encrypted 10 times. The first two can even log every bit, everything is encrypted anyway, that is at the network level, it doesn't matter to what and how you connect, even the addresses are not visible.

The last exit node can log your traffic, as well as any VPN. But what is SSL for, if not for such cases? Almost all services that are of any interest, support SSL. (Naturally, one needs to check the certificates, but if someone worries about security and at the same time screws with certificates, this is no longer a problem with the law :D) Even if you send something using another way – not SSL, the exit node will not even see your real IP address ...

In order to really sniff something in this setting, it is necessary that more than half of all Tor nodes are under control, something that is hard to believe ...

➕ Quote

### Meth!

gigabyte

●●●●



User

 **9**

158 posts

Joined

09/22/11 (ID: 39892)

Activity

*другое*

Для чего и для кого?

Мы живём в хаотичном мире и 100% защиты ни от чего вообще не бывает. Бывают только уровни и вероятности того что тебя найдут/посадят/пристрелят. (насколько я понимаю ты именно из-за этого хочешь впн).

Чем больше денег ты отмываешь, чем более чёрные схемы проворачиваешь, чем больше информации о тебе уплаывает в сеть, и т.д., тем эта вероятность выше.

Чем больше проксиков, впнов и торов исопльзуешь, чем больше умных схем, чем больше думаешь что делаешь и чем меньше общаешься и вообще болтаешь, тем эта вероятность ниже.

Так что решать тебе.

**+** Quote

### Meth!

gigabyte





User

➕ 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

For what and for whom?
We live in a chaotic world and there is no 100% protection from anything at all. There are only levels and probabilities that you will be found / imprisoned / shot. (as far as I understand, that's why you want VPN).
The more money you launder, the darker the schemes you crank out, the more information about you is leaking to the network, etc., the higher is this probability.
The more proxies, vpns and tors you use, the more clever schemes you utilize, the more you think about what you are doing, and the less you communicate and chatter in general, the lower is this probability.
So it's up to you.

 Quote

### Meth!

gigabyte

●●●●



User

✪ **9**

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted January 6, 2012

Взял несколько дедов, всё подключалось. Откровенных признаков того что деды продавались кому-то ещё типа открытых окон покера не наблюдалось.

В общем деды у ТС есть, общается адекватно.

➕ Quote

### Meth!

gigabyte

●●●●



User

➕ **9**

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted January 6, 2012

I bought a few dedicated servers, everything was getting connected. There were no clear signs that those dedicated servers were also sold to someone else, such as open poker windows.
Well, actually the TS has dedicated servers and communicates adequately.

➕ Quote

### Meth!

gigabyte

●●●●



User

✪ 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted January 16, 2012

Народ, спалю вам офигенную тему, перестаньте париться и сделайте Tor Hidden Service. :ph34r:
Через них уже годами и наркоту продают и детскую порнографию распространяют (к сожалению), а по ней как известно обычные сайты не только моментально обузят но и не каждый антиобузный хостинг берётся. А всё потому что если правильно настроить такой сервер то хоть об стену бейся не найдёшь нихера где он...

Спасибо потом скажешь! :D
Заодно принимай оплату bitcoinами как Silk Road, тогда тебе не страшнео будет даже правительство США )

➕   Quote

**Meth!**
gigabyte
●●●●



User
⊕ 9
158 posts
Joined
09/22/11 (ID: 39892)
Activity
другое

Folks, I will share with you an awesome idea, stop struggling and get a Tor Hidden Service.  :ph34r:

For years, drugs are sold and (unfortunately) child pornography distributed through it, while it is known that ordinary sites will not only get instant abuse reports, but also not every anti-abuse hosting dares it. And all because if you configure such a server correctly, then no matter how hard one tries, no one will fucking find where it is...

Thank me later!  :D
Also, like Silk Road, go ahead and accept payments in bitcoins; then, you will not be intimidated by even the U.S. Government)

➕  Quote

### Meth!

gigabyte

●●●●





User

➕ 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Полезно, хотя обычный google tor setup hidden service выдаст примерно тоже самое )
Ещё небольшая опечатка вроде под "Разкомментируйте строки по этому примеру" - вместо "HiddenServicePort 80
127.0.0.1:8" надо наверное "HiddenServicePort 80 127.0.0.1:80"?

➕   Quote

## Meth!

gigabyte

●●●●




User

⊕ **9**

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

---

Posted January 21, 2012

Useful, although the usual google tor setup hidden service will give about the same thing)
Looks like another small typo under "Leave comments on the lines according to this example" – instead of
"HiddenServicePort 80 127.0.0.1:8" perhaps it should be "HiddenServicePort 80 127.0.0.1:80"?

+    Quote

### Meth!

gigabyte





User

 **9**

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

HitBTC и так было понятно что биржа так себе, не очень надёжная. Когда MtGox рухнул, до этого полгода где-то ходили плохие слухи, там были постоянные проблемы, лаги и т.д. Если такое происходит с биржей, лучше сразу забирать оттуда деньги, переходить на более стабильную платформу. А KYC/AML сейчас везде, просто сканы посылайте аккуратно и всё нормал.

➕ Quote

## Meth!

gigabyte

● ● ● ●



User

⊕ **9**

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted December 31, 2017

HitBTC already made it clear that this exchange was so-so and not very reliable. When MtGox collapsed, there were bad rumors roughly six months prior to that; it had constant problems, lags, etc. If this is happening with an exchange, it is better to immediately withdraw money from that one and switch to a more stable platform. And KYC/AML is all over the place now, just send scans carefully and everything is fine.

＋ Quote

### Meth!

gigabyte

●●●●



User

✪ 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted April 24, 2018

В статье очень мало какой-то полезной информации, всё и так уже давно известно.

Бинанс не был куплен никаким банком или картелем банков, а просто с ними сотрудничает. Если не сотрудничать с банками - то не получится принимать банковские платежы, так устроена система.

KYC/AML разумеется, был есть и будет. (Но он и сейчас в Binance вроде есть?) В наше время никто не даст бирже без этих вещей нормально работать.

Только дело здесь не в банках, для банков эти KYC/AML - постоянная боль в жопе которую их заставляют делать регуляторы. То есть - государства и международная политическая общественность. Банки сливают кучу денег и времени на KYC постоянно. Один FATCA чего стоит...

KYC в биржах никуда не уходит. Но это не плохие новости, это хорошие новости. Это легитимизирует криптовалюты. Сами криптовалюты - как и были полуанонимыми (некоторые вообще анонимными), так и останутся. Да, иногда придётся попереводить слегка деньги в разные кошельки. Биржи - это просто шлюзы в мир банкинга, отмыва. Просто правильно и аккуратно их используйте. Чем больше сейчас таких бирж (с KYC, с задрачиванием вопросами, с блокировкой банковских переводов, со всей этой хренью) - тем больше идёт легитимизация чистых криптовалют. Тем больше вы сможете через 10,20,100 лет оплачивать всё и везде криптовалютами вообще не регистрируясь на биржах.

**+**   Quote 

**Meth!**

gigabyte

●●●●



User

● 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

There is very little useful information in the article, all that has been known for a long time.

Binance was not bought by any bank or cartel of banks, but simply cooperates with them. If you do not cooperate with banks, you will not be able to accept bank payments, this is how the system works.

The KYC/AML, of course, has been around, it exists now and will exist in the future. (Nevertheless it still seems to be in Binance?) Nowadays, no one will allow the exchange to work normally without these things.

The only thing is - it's not about banks; the KYC / AML are a constant pain in the ass for banks, forced onto them for implementation by regulators. Namely - governments and international political community. Banks waste a lot of money and time on KYC all the time. FATCA alone is worth so much...

The KYC in exchanges is not going anywhere. But that's not bad news, it's good news. This legitimizes crypto-currencies. Crypto-currencies themselves - as they were semi-anonymous (some even anonymous), will remain as such. Yes, sometimes you have to transfer a little money to different wallets. Exchanges are just gateways to the world of banking and laundering. Just use them correctly and carefully. The more such exchanges there are now (with KYC, jerking around with questions, with blocking bank transfers, with all this crap), the more pure crypto-currencies get legitimacy. The more you will be able in 10,20,100 years to pay for everything and everywhere with crypto-currencies without registering on exchanges at all.

**+**  Quote

### Meth!

gigabyte

●●●●



User

⊕ 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted January 5, 2019

> **Quote**
>
> Вот такой вариант присмотрел epaymentsquote

Такие сервисы будут всегда блокировать - лучше брать карту в банке на дропа. Если потихоньку снимать, не заходить со странных айпи и т.д. - может долго прожить.

➕ Quote

## Meth!

gigabyte

●●●●



User

♦ 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted January 5, 2019

> **Quote**
>
> *I found this variation epaymentsquote*

Such services will always be blocked – it is better to get a card from a bank for a drop. If you withdraw little–by–little and if you don't access it from odd IPs and so on, it can survive for a long time.

**+**   Quote

## Meth!
gigabyte
●●●●



User
**⊕ 9**
158 posts
Joined
09/22/11 (ID: 39892)
Activity
другое

В зависимости от того насколько серьёзный противник, но в принципе это довольно сложно. Нужны какие-то специализированные хардварные решения которые будут вырубать или перезагружать комп... В самом простом варианте сделать скрипт который будет отслеживать новые включенные устройства USB. Или например может поставить там вебкамеру которая смотрит на сам комп и когда будет зафиксировано движение, он будет перезагружаться? Сложность заключается в том что физический доступ к компу позволяет атаковать его множеством разных способов. В самом простом случае если придёт какой-нибудь обычный мент, если он не отключит просто комп (что было бы самым лучшим вариантом так как активизируется шифрование диска), он скорее всего сначала попробует подвигать обычную мышку/клавиатуру, чтобы понять не открыт ли доступ тупо через консоль. Если сделать скрипт который будет реагировать на движение физической мышки и клавиатуры - это уже будет защита по крайней мере от самого простого противника.

 Quote

### Meth!
gigabyte
●●●●



User
158 posts
Joined
09/22/11 (ID: 39892)
Activity
другое

It depends on how serious the enemy is, but in principle, it is quite difficult. One needs some specialized hardware solutions, which would shut down or reboot the computer… In the simplest option, one can create a script that will track the newly enabled USB devices. Or, for example, perhaps one can set up a webcam there, such that it looks at the computer itself and, when a movement is sensed, the computer will reboot?
The difficulty lies in the fact that physical access to the computer allows attacks against it in many different ways. In the simplest case, if a regular cop shows up and does not just turn off the computer (which would be the best option, since disk encryption will be activated), then, most likely, he will first try to move the mouse / keyboard to see if access is available through the console. If one creates a script that will respond to the movement of a physical mouse and keyboard, this will already provide a protection, at least from the simplest enemy.

 Quote

### Meth!

gigabyte

●●●●





User

➕ 9

158 posts

Joined
09/22/11 (ID: 39892)

Activity
другое

Posted June 15, 2020

Ещё например работает "бизнес-аналитик" или "финансовый аналитик". Собираешь какую-то информацию для каких-то компаний, которым это зачем-то надо чтобы зарабатывать много денег, вот они и платят. Много времени проводишь за компом потому что просматриваешь много информации... Так и не подкопаешься особо, да и переустанавливать виндоус никто не попросит. Если спросят советов куда вкладывать, можно туманно размышлять о разных инструментах и вбрасывать непонятные слова пока не отстанут...

➕ Quote

### Meth!

gigabyte

●●●●



User

**+ 9**

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

For example, "business analyst" or "financial analyst" also works. You collect some information for some companies that need it for some reason to make a lot of money, so they pay you. You spend a lot of time at the computer because you look through a lot of information ... This way they won't find anything to drill you on and no one will ask you to reinstall Windows. In case they ask you where would you suggest to invest, you can vaguely blabber about various tools and throw in some gibberish until they leave you alone ...

➕ Quote

### Meth!
gigabyte





User
 9
158 posts
Joined
09/22/11 (ID: 39892)
Activity
другое

Posted November 14, 2020

Если надёшь хорошего человека вживую, который готов обменять просто на кеш, это самый лучший вариант. Чтобы увеличить безопасность, можешь просто начинать с маленьких сумм чтобы проверить человека. Встретившись с ним пару раз, уже начинаешь понимать кто это и чем занимается, и возможно построить долгосрочные отношения.

➕ Quote



## Meth!

gigabyte

●●●●





User

➕ 9

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Posted November 14, 2020

If you will find a good person, who is real and ready to exchange just for cash, that would be the best option. To be on the safe side, simply start with small amounts to test the person. Having met him a couple of times, you already begin to understand who he is and what he does, and it is possible to build a long-term relationship.

➕ Quote

### Meth!

gigabyte

••••



User

**↑ 9**

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Report post ⤴

Tether используется для ввода/вывода денег между криптой и обычным миром. Для этого он работает хорошо. Держать какие-то значительные деньги в Tether конечно не надо.

Это как PerfectMoney/LibertyReserve. Мы же все не задаёмся вопросам скам это или нет. Конечно же скам. Но суть в том что это скам для вполне определённой цели, и для неё его и нужно использовать, тогда всё будет работать чётко.

 Quote

## Meth!

gigabyte

●●●●



User

⊕ **9**

158 posts

Joined

09/22/11 (ID: 39892)

Activity

другое

Report post ⤴

Tether is used for depositing/withdrawing money between crypto and the conventional world. It works well for this purpose. Of course, is not advisable to keep any significant money in Tether.

It's like PerfectMoney/LibertyReserve. We all don't ask ourselves whether it's a scam or not. But of course, it is a scam. But the bottom line is that this is a scam for a very specific purpose, and you need to use it exactly for that specific purpose, then everything will work just fine.

➕ Quote

# GOVERNMENT EXHIBIT 364

**This exhibit is a spreadsheet and can be located on the attached disc.**

# GOVERNMENT EXHIBIT 401

**This exhibit is a spreadsheet and can be located on the attached disc.**

| Counterparty Name | | Directly Sent to BITCOIN FOG | Indirectly Sent to BITCOIN FOG | Directly Received from BITCOIN FOG | Indirectly Received from BITCOIN FOG |
|---|---|---|---|---|---|
| SILK ROAD | BTC | 377102.7388 | 101783.57 | 106522.7697 | 51273.39 |
| | USD | $9,724,911 | $10,340,446 | $2,321,637 | $1,471,025 |
| SILK ROAD 2.0 | BTC | 22863.74065 | 12438.155 | 11274.31369 | 4320.23 |
| | USD | $12,582,929 | $6,463,629 | $5,852,300 | $2,534,628 |
| ALPHABAY | BTC | 5700.845981 | 2826.69 | 3651.443827 | 2638.945 |
| | USD | $3,062,842 | $1,868,844 | $1,679,212 | $1,342,528 |
| AGORA | BTC | 41972.36366 | 25679.985 | 26398.44487 | 10027.08 |
| | USD | $14,231,729 | $8,624,142 | $8,588,675 | $3,389,947 |
| NUCLEUS | BTC | 5240.193979 | 2820.15 | 2829.752662 | 1463.475 |
| | USD | $1,438,077 | $886,452 | $802,798 | $400,639 |
| ABRAXAS | BTC | 4116.93734 | 1895.51 | 2066.420789 | 903.39 |
| | USD | $1,027,249 | $558,194 | $516,058 | $229,535 |
| PANDORA | BTC | 2032.569964 | 418.28 | 553.2503671 | 401.155 |
| | USD | $1,254,828 | $238,695 | $299,141 | $260,550 |
| SHEEP | BTC | 7646.828974 | 2747.84 | 1547.522515 | 1925.09 |
| | USD | $2,788,483 | $1,494,597 | $361,895 | $551,001 |
| BLACK BANK | BTC | 2918.068006 | 2146.795 | 1632.1633 | 947.065 |
| | USD | $912,669 | $1,043,156 | $427,255 | $280,495 |
| WELCOME TO VIDEO | BTC | 0 | 0 | 2.47269674 | 1.675 |
| | USD | $0 | $0 | $989 | $846 |