No. 24-3161

In the United States Court of Appeals for the
District of Columbia Circuit

————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,
*Defendant-Appellant.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
D. CT. NO. 1:21-CR-399 (MOSS, J.)

————————

APPELLEE'S BRIEF FOR THE UNITED STATES

————————

JEANINE FERRIS PIRRO
United States Attorney
District of Columbia

JEFFREY PEARLMAN
C. ALDEN PELKER
Trial Attorneys
Computer Crime and
    Intellectual Property Section
Criminal Division
U.S. Department of Justice

A. TYSEN DUVA
Assistant Attorney General

JOSH A. GOLDFOOT
Deputy Assistant Attorney General

JENNY C. ELLICKSON
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave. NW, Ste. 1264
Washington, DC 20530
(202) 305-1674
jenny.ellickson@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), the undersigned certifies as follows:

## A.    Parties and Amici

The parties that appeared in the district court and that are now before this Court are the United States (appellee) and Roman Sterlingov (defendant-appellant). The amicus curiae that has appeared in this Court is ChainArgos.  No amici curiae appeared in district court, and there are no intervenors.

## B.    Rulings Under Review

Sterlingov seeks review of following rulings of the district court (Moss, J.): (1) the denial of his motion to dismiss the indictment for improper venue and based on the statute of limitations, App.2627-45; (2) the denial of his motions for judgment of acquittal, App.5388, 6140-41; (3) the jury instruction on venue for the money-laundering-conspiracy count, App.6288-89; (4) the admission of expert testimony from three government witnesses, App.2358-59, 3629-31, 4522, 6951-81; (5) the denial of his motion for leave to issue a subpoena to Chainalysis under Federal Rule of Criminal Procedure 17(c), App.1951-76; (6) the decision to preclude him from personally reviewing one of Chainalysis's disclosures, App.6930-41; (7) the admission of evidence relating to Welcome to Video, App.4082-85, 4089-94, 4401-16, 5203-04; (8) the admission of testimony from two cooperating witnesses, App.4364-65, 4395-96, 4434-36, 4930-31, 5083-85; (9) the alleged admission of

unspecified statements under Federal Rule of Evidence 801(d)(2)(E); (10) the decision to instruct the jury on willful blindness, App.6109-10; and (11) the calculation of the value of the laundered funds under U.S.S.G. § 2S1.1(a)(2), Supp.App.350-51.

## C.    Related Cases

This case has not previously been before this Court or any other court, apart from the district court below.  Counsel for the government is not aware of any related cases currently pending in this court or any other court.

/s/ Jenny C. Ellickson
JENNY C. ELLICKSON
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF AUTHORITIES .................................................................... vii

GLOSSARY OF ABBREVIATIONS .................................................... xiv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ....................................................................1

PERTINENT STATUTES AND REGULATIONS..................................2

STATEMENT OF THE CASE................................................................2

    I.     Procedural History................................................................2

    II.    Statement of Facts ...............................................................2

          A.     Bitcoin Fog was a cryptocurrency mixer created and operated to launder criminal proceeds and facilitate criminal activity ...........................................................3

          B.     Sterlingov launches Bitcoin Fog...................................6

          C.     Sterlingov promotes illegal activities on the darknet ...............10

          D.     Sterlingov makes millions of dollars through Bitcoin Fog.......12

          E.     Bitcoin Fog mixes funds for an undercover agent located in Washington, D.C....................................................14

          F.     Sterlingov is arrested...................................................16

SUMMARY OF ARGUMENT ..............................................................17

ARGUMENT .......................................................................................19

    I.     Sufficient evidence supports the jury's determinations regarding venue and the statute of limitations .....................................19

          A.     Background ...............................................................19

          B.     Standard of review ....................................................20

C.      The trial evidence sufficiently established venue ....................21

    1.      Substantive money laundering .........................................21

    2.      Money-laundering conspiracy .........................................24

    3.      Section 1960(a) offense ...................................................27

    4.      D.C. licensing offense ....................................................30

D.      The trial evidence sufficiently established conduct
        occurring within the statute of limitations ................................32

E.      Sterlingov has waived any other sufficiency-of-the-
        evidence challenges .....................................................................35

II.     The district court properly exercised its discretion in allowing
        expert testimony from three government witnesses ...........................35

A.      Standard of review .......................................................................36

B.      The district court acted within its discretion in admitting
        testimony about Reactor evidence ...........................................36

    1.      Background .......................................................................36

    2.      The district court correctly determined that Reactor
            is reliable ..........................................................................40

    3.      The four *Daubert* factors do not cast doubt on
            Reactor's reliability ........................................................44

    4.      The admission of the Reactor evidence was
            harmless ...........................................................................51

C.      The district court acted within its discretion in admitting
        Mazars' IP-address testimony ..................................................52

    1.      Background .......................................................................52

    2.      Mazars' testimony rested on reliable principles and
            methods ............................................................................55

    3.      Mazars' IP-address testimony was harmless ..................58

III.  The district court properly denied some of Sterlingov's requests for access to Chainalysis's proprietary information ...........................59

    A.  Background ...................................................................59

    B.  Standard of review ......................................................62

    C.  The district court did not abuse its discretion in denying Sterlingov's request for a Rule 17(c) subpoena........................63

    D.  The district court did not abuse its discretion in prohibiting Sterlingov from personally reviewing the heuristics production ...................................................................66

    E.  The Confrontation Clause did not require further Reactor disclosures or preclude expert testimony about Reactor's results ........................................................................69

    F.  Any error was harmless ............................................71

IV.  The Welcome to Video evidence did not violate Federal Rule of Evidence 403 or constructively amend the indictment..................72

    A.  Background ...................................................................72

    B.  Standard of review ......................................................73

    C.  Rule 403 did not require the Welcome to Video evidence's exclusion ......................................................................73

    D.  The Welcome to Video evidence did not constructively amend the money-laundering-conspiracy count.......................79

V.  The district court acted within its discretion in admitting the cooperating witnesses' testimony ........................................................80

    A.  Background ...................................................................80

    B.  Standard of review ......................................................81

    C.  The district court properly exercised its discretion in admitting the cooperators' testimony .......................................81

    D.  Any error was harmless ............................................82

VI.    Sterlingov has waived his challenge to the admission of co-conspirator statements, and his challenge lacks merit in any event ................................................................................. 82

    A.    Background ...................................................................... 82

    B.    Standard of review .......................................................... 83

    C.    Sterlingov has waived his Rule 801(d)(2)(E) claim by failing to specify the statements to which he objects .............. 83

    D.    Sterlingov's Rule 801(d)(2)(E) arguments lack merit ............. 84

VII.   The district court properly gave a willful-blindness instruction ........ 86

    A.    Background ...................................................................... 86

    B.    Standard of review .......................................................... 86

    C.    The trial arguments and evidence justified a willful-blindness instruction ................................................... 87

        1.    Sterlingov claimed a lack of guilty knowledge at trial .................................................................... 87

        2.    The trial evidence supported an inference of deliberate ignorance ...................................... 89

    D.    Any error was harmless .................................................. 91

VIII.  The district court properly calculated the value of the laundered funds at sentencing ................................................ 93

    A.    Background ...................................................................... 93

    B.    Standard of review .......................................................... 94

    C.    The district court correctly determined that the value of the laundered funds exceeded $250 million ................... 94

    D.    Any error was harmless .................................................. 96

CONCLUSION ....................................................................... 98

# TABLE OF AUTHORITIES

**Cases**

*Allison v. McGhan Med. Corp.*,
  184 F.3d 1300 (11th Cir. 1999) ..........................................................45

*Bullcoming v. New Mexico*,
  564 U.S. 647 (2011).................................................................. 69, 70

*Crawford v. Washington*,
  541 U.S. 36 (2004)............................................................................69

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)................................................ 35, 45, 48, 49, 51

*Eastman Kodak Co. of New York v. So. Photo Materials Co.*,
  273 U.S. 359 (1927)..........................................................................31

*FDIC v. Mallen*,
  486 U.S. 230 (1988)..........................................................................68

*Frye v. United States*,
  54 App. D.C. 46 (1923) .....................................................................49

*Global-Tech Appliances, Inc.* v. *SEB S.A.*,
  563 U.S. 754 (2011)..................................................................... 87, 89

*GTE New Media Services Inc. v. BellSouth Corp.*,
  199 F.3d 1343 (D.C. Cir. 2000) ........................................................30

*Johnston v. United States*,
  351 U.S. 215 (1956)..........................................................................29

*Klimas v. Comcast Cable Comms., Inc.*,
  465 F.3d 271 (6th Cir. 2006) ............................................................55

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999)......................................... 36, 44, 45, 47, 49, 57

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) ..........................................45

*Molina-Martinez v. United States*,
  578 U.S. 189 (2016)..........................................................97

*Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*,
  158 F.3d 1335 (D.C. Cir. 1998) ........................................50

*Old Chief v. United States*,
  519 U.S. 172 (1997)..........................................................76

*Rumely v. McCarthy*,
  250 U.S. 283 (1919)..........................................................29

*S.E.C. v. Savoy Indus. Inc.*,
  587 F.2d 1149 (D.C. Cir. 1978) ........................................29

*Smith v. United States*,
  568 U.S. 106 (2013)..........................................................32

*Smith v. United States*,
  599 U.S. 236 (2023)..........................................................21

*State v. Chun*,
  943 A.2d 114 (N.J. 2008) ..................................................49

*State v. Olenowski*,
  289 A.3d 456 (N.J. 2023) ..................................................49

*State v. Pickett*,
  246 A.3d 279 (N.J. Super. Ct. App. Div. 2021) ................49

*United States v. Adamo*,
  882 F.2d 1218 (7th Cir. 1989) ..........................................84

*United States v. Alston-Graves*,
  435 F.3d 331 (D.C. Cir. 2006)............................. 86, 89, 91

*United States v. Barnes*,
  681 F.2d 717 (11th Cir. 1982) ..........................................26

*United States v. Bell*,
795 F.3d 88 (D.C. Cir. 2015) ...................................................................78

*United States v. Bostick*,
791 F.3d 127 (D.C. Cir. 2015) .......................................................... 34, 63

*United States v. Brooks*,
966 F.2d 1500 (D.C. Cir. 1992) ..............................................................62

*United States v. Brown*,
892 F.3d 385 (D.C. Cir. 2018) .................................................................92

*United States v. Celentano*,
126 F.4th 680 (D.C. Cir. 2025) ...............................................................97

*United States v. Celis*,
608 F.3d 818 (D.C. Cir. 2010) .................................................................83

*United States v. Clark*,
156 F.4th 664 (D.C. Cir. 2025) ................................... 20, 21, 26, 81, 86

*United States v. Cordova*,
806 F.3d 1085 (D.C. Cir. 2015) ................................................ 62, 67, 71

*United States v. Denney*,
98 F.4th 327 (D.C. Cir. 2024) .................................................................94

*United States v. Flores*,
454 F.3d 149 (3d Cir. 2006) ...................................................................90

*United States v. Gallegos*,
784 F.3d 1356 (10th Cir. 2015) ..............................................................84

*United States v. Gewin*,
471 F.3d 197 (D.C. Cir. 2006) .................................................................82

*United States v. Gissantaner*,
990 F.3d 457 (6th Cir. 2021) ..................................................... 46, 49, 51

*United States v. Green*,
149 F.4th 733 (D.C. Cir. 2025) ................................................ 76, 78, 79

*United States v. Guerrero,*
    76 F.4th 519 (6th Cir. 2023) .............................................25

*United States v. Heredia,*
    483 F.3d 913 (9th Cir. 2007) (en banc) ...........................87

*United States v. Kearney,*
    672 F.3d 81 (1st Cir. 2012).............................................55

*United States v. Lam,*
    924 F.2d 298 (D.C. Cir. 1991).........................................26

*United States v. Lieu,*
    963 F.3d 122 (D.C. Cir. 2020).........................................74

*United States v. Lighty,*
    616 F.3d 321 (4th Cir. 2010) ...........................................92

*United States v. Lizarraga-Tirado,*
    789 F.3d 1107 (9th Cir. 2015) .........................................70

*United States v. Loughry,*
    660 F.3d 965 (7th Cir. 2011) ...........................................78

*United States v. Machado-Erazo,*
    47 F.4th 721 (D.C. Cir. 2018)..........................................51

*United States v. Mackey,*
    143 F.4th 129 (2d Cir. 2025) ...........................................27

*United States v. Martínez-Hernández,*
    118 F.4th 72 (1st Cir. 2024)............................................84

*United States v. McGoff,*
    831 F.2d 1071 (D.C. Cir. 1987)........................................33

*United States v. Miller,*
    953 F.3d 804 (D.C. Cir. 2020)........................... 33, 35, 81

*United States v. Miller,*
    982 F.3d 412 (6th Cir. 2020) ...........................................70

*United States v. Moore*,
651 F.3d 30 (D.C. Cir. 2011) ...............................................................70

*United States v. Morgan*,
393 F.3d 192 (D.C. Cir. 2004) .............................................................27

*United States v. Morgan*,
45 F.4th 192 (D.C. Cir. 2022) ..................................... 35, 36, 44, 48, 51, 57, 73

*United States v. Nektalov*,
461 F.3d 309 (2d Cir. 2006) ................................................................22

*United States v. Nixon*,
418 U.S. 683 (1974) ...........................................................................63

*United States v. Nji*,
159 F.4th 259 (4th Cir. 2025) ............................................................87

*United States v. Riley*,
115 F.4th 604 (D.C. Cir. 2024) .................................................. 73, 79

*United States v. Rodriguez-Moreno*,
526 U.S. 275 (1999) ...........................................................................21

*United States v. Sitzmann*,
893 F.3d 811 (D.C. Cir. 2018) ........................................... 21, 24, 25

*United States v. Slatten*,
865 F.3d 767 (D.C. Cir. 2017) .................................................. 20, 21

*United States v. Spann*,
997 F.2d 1513 (D.C. Cir. 1993) .........................................................93

*United States v. Stone*,
9 F.3d 934 (11th Cir. 1993) ...............................................................92

*United States v. Stover*,
329 F.3d 859 (D.C. Cir. 2003) ...........................................................83

*United States v. Straker*,
800 F.3d 570 (D.C. Cir. 2015) ............................................. 48, 62, 63

*United States v. Webster*,
   102 F.4th 471 (D.C. Cir. 2024) ...........................................................91

*United States v. White*,
   810 F.3d 212 (4th Cir. 2016) .............................................................55

*United States v. Wilson*,
   605 F.3d 985 (D.C. Cir. 2010) ...........................................................71

## Statutes, Rules, and Constitutional Provisions

U.S. Const. amend. VI ..........................................................................21

18 U.S.C. § 1956 ..................................................................... 2, 19, 22, 24

18 U.S.C. § 1960 ............................................................. 2, 19, 27, 28, 29

18 U.S.C. § 3231 ....................................................................................1

18 U.S.C. § 3237 ..................................................................................21

18 U.S.C. § 3282 ..................................................................................32

18 U.S.C. § 3742 ....................................................................................1

28 U.S.C. § 1291 ....................................................................................1

D.C. Code § 23-113 ..............................................................................32

D.C. Code § 26-1001 ............................................................................31

D.C. Code § 26-1023 ................................................................... 2, 19, 30

Fed. R. App. P. 28 ................................................................................84

Fed. R. Crim. P. 16 ..............................................................................66

Fed. R. Evid. 403 ........................................................................... 73, 76

Fed. R. Evid. 702 ........................................................................... 1, 35, 36

Fed. R. Evid. 801 ........................................................................... 1, 82

U.S.S.G. § 2S1.1 ................................................................ ii, 1, 19, 93, 94, 95, 96

U.S.S.G. Ch. 5, Pt. A.............................................................................97

**Other Authorities**

Acting Assistant Att'y Gen. Matthew R. Galeotti, Remarks at the American
    Innovation Project Summit in Jackson, Wyoming (Aug. 21, 2025) .................23

Kelvin Lubbertsen et al., *Ghost Clusters: Evaluating Attribution of Illicit
Services through Cryptocurrency Tracing*, Proceedings of the 34th
USENIX Security Symposium (2025)...............................................................47

Kristen E. Eichensehr, *The Cyber-Law of Nations*, 103 Geo. L. J. 317 (2015) ......56

Sarah Meiklejohn et al., *A Fistful of Bitcoins: Characterizing Payments
Among Men with No Names* (Oct. 2013) ...................................................... 46, 47

## GLOSSARY OF ABBREVIATIONS

App.               Defendant-Appellant's Appendix

Br.                Defendant-Appellant's opening brief

ChainArgos.Br.     Brief of amicus curiae ChainArgos

IP address         Internet Protocol address

Supp.App.          Plaintiff-Appellee's Supplemental Appendix

VPN                Virtual private network

## JURISDICTIONAL STATEMENT

Defendant-appellant Roman Sterlingov appeals from his judgment of conviction. The district court (Moss, J.) had jurisdiction under 18 U.S.C. § 3231. The judgment was entered on November 15, 2024, and Sterlingov filed a timely notice of appeal on November 20, 2024. App.69, 7214. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF ISSUES

1.      Whether sufficient evidence supported the jury's venue and statute-of-limitations findings.

2.      Whether expert testimony from three government witnesses was admissible under Federal Rule of Evidence 702(c).

3.      Whether the district court properly declined to grant some of Sterlingov's requests for access to Chainalysis's proprietary information.

4.      Whether the Welcome to Video evidence was admissible.

5.      Whether testimony from two cooperating witnesses was admissible.

6.      Whether unspecified statements were admissible under Federal Rule of Evidence 801(d)(2)(E).

7.      Whether the district court properly gave a willful-blindness instruction.

8.      Whether the value of the laundered funds exceeded $250 million under U.S.S.G. § 2S1.1(a)(2).

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes appear in an addendum bound with this brief.

## STATEMENT OF THE CASE

### I.    Procedural History

Following a jury trial, Sterlingov was convicted of money-laundering conspiracy, in violation of 18 U.S.C. § 1956(h); money laundering, in violation of 18 U.S.C. § 1956(a)(3)(A); operating an unlicensed money-transmitting business, in violation of 18 U.S.C. § 1960(a); and money transmission without a license, in violation of D.C. Code § 26-1023(c).  App.91-92.  The district court sentenced him in pertinent part to 150 months of imprisonment.  App.93.

### II.    Statement of Facts

Sterlingov created and operated Bitcoin Fog, a cryptocurrency mixer that combined bitcoin deposits from multiple users and allowed those users to withdraw funds from the mixed pool.  Posting under the user name "Akemashite Omedetou," Sterlingov promoted Bitcoin Fog as a service that would help its users conceal their bitcoin transactions from law enforcement, and he promised that Bitcoin Fog would not cooperate with authorities.  Darknet-market participants, including vendors who sold illegal drugs, flocked to Bitcoin Fog, and from its October 2011 launch until Sterlingov's April 2021 arrest, Bitcoin Fog received bitcoin deposits worth almost $400 million.  At trial, the jury found Sterlingov guilty after hearing evidence of the

following facts.

**A.   Bitcoin Fog was a cryptocurrency mixer created and operated to launder criminal proceeds and facilitate criminal activity**

The "darknet," or dark web, is a "dark recess of the internet" that is accessible with the Tor Browser.  App.2765-66; *see* App.3083.  Darknet markets sell illegal drugs and other illicit goods, typically in exchange for cryptocurrency.  App.4024-25.  Bitcoin is the most common form of cryptocurrency, App.3641, and most people obtain it through cryptocurrency exchanges, which allow customers to buy or trade cryptocurrency.  App.2752.  The sending and receiving addresses for every bitcoin transaction are recorded on the blockchain, a publicly accessible ledger.  App.2757-58.

To conceal their bitcoin transactions, users engaged in criminal activity sometimes use cryptocurrency "mixers."  App.3674-75.  A mixer is a service that allows users to transfer cryptocurrency in a manner designed to conceal or obfuscate the source or destination of the funds, App.2763-64, 3702, typically by combining deposits from multiple users and allowing those users to later withdraw funds from the mixed pool, making it difficult to trace a specific deposit to a later withdrawal.  App.3675.

Bitcoin Fog was mixer that operated on the darknet.  App.2750.  Bitcoin Fog debuted on October 27, 2011, when someone identifying himself as "Akemashite Omedetou" ("Happy New Year" in Japanese) announced its launch on the online

forum BitcoinTalk. App.2772, 3149-50; *see* App.3618-19. The launch post explained that Bitcoin Fog could help provide anonymity for bitcoin transactions by making them difficult to trace. App.2774-75. In that post, "Akemashite Omedetou" described Bitcoin Fog as a service that would "never be found" and would "not cooperate with any authorities." App.2777. The post explained that Bitcoin Fog purged its records every week and that its fees—from one to three percent of each transaction—were "[r]andomized for obscurity." App.2777-78. By randomizing the fees, Bitcoin Fog prevented investigators from calculating the precise withdrawal amount for a specific Bitcoin Fog deposit, which thwarted tracing efforts. App.3784.

The launch post provided a link to www.bitcoinfog.com, a public website (*i.e.*, clearnet site) that included the same information about Bitcoin Fog. App.2773, 3168. Bitcoin Fog's clearnet site also explained that "interested parties," including "authorities," could use blockchain analysis to connect bitcoin transactions to a user's true identity. App.3720-21. The site said that Bitcoin Fog's mixing service "provid[ed] a solution" for that problem by "making it impossible to prove any connection between a deposit and a withdraw[al]." App.3721. And the site provided specific tips about how users could best use Bitcoin Fog to provide the least amount of information to law enforcement. App.3724.

To access Bitcoin Fog's mixing service, users needed to visit Bitcoin Fog's site on the Tor network. App.2786-87. When a user created a Bitcoin Fog account,

Bitcoin Fog provided the user with a bitcoin address for deposits, and after the user sent funds to that address, Bitcoin Fog transferred the funds to a consolidation address that pooled deposits from individual users, thereby making them difficult to trace. App.3731-32; *see* App.3725-26. The user could then schedule withdrawals from Bitcoin Fog. App.3732. Government investigators identified 925,743 Bitcoin addresses belonging to Bitcoin Fog. App.3756. Those addresses made up the Bitcoin Fog "cluster." App.3661, 3756.

After Bitcoin Fog's launch, "Akemashite Omedetou" continued to use BitcoinTalk to post updates about Bitcoin Fog and respond to questions about the service. App.3150-51. "Akemashite Omedetou" also shared suggestions about how users could avoid making mistakes that might allow law enforcement to trace their transactions through Bitcoin Fog. App.3742-46. And he continued to promote Bitcoin Fog as a service that would not cooperate with law-enforcement authorities and would help Bitcoin users hide their transactions from those authorities. App.3156-60, 3747-48, 3752-55.

From 2011 through 2021, the Bitcoin Fog cluster received 521,042 deposits consisting of 1,284,251 bitcoin worth approximately $395.5 million. App.3771-72. There were also 692,224 withdrawals from the Bitcoin Fog cluster, consisting of 1,280,935 bitcoin worth approximately $402.8 million. App.3771-72. The value of the withdrawals exceeded the value of the deposits because the price of bitcoin

fluctuates over time and has generally increased.  *See* App.4475.

**B.     Sterlingov launches Bitcoin Fog**

At trial, Sterlingov acknowledged using Bitcoin Fog, App.5841-43, but he denied operating or administering the service, App.5791.  The government's proof that Sterlingov created and operated Bitcoin Fog included evidence of the following facts.

In 2011, Sterlingov lived in Gothenburg, Sweden, and worked as a web developer.  App.3464-65, 5828.  He was also an active poster on BitcoinTalk under the name "Killdozer."  App.3336.  In early October 2011, he sent a private message to Duncan Townsend, a BitcoinTalk user who had created the Blind Bitcoin mixer earlier that year and then shut it down.  App.3219-20, 3617-21.  Sterlingov said that he wanted "to discuss taking over" Blind Bitcoin, claiming that he had "all the needed technical qualifications."  App.3220.  Sterlingov told Townsend that he thought that Blind Bitcoin was "great" and that "operating such a website would be very interesting."  App.3220.  Townsend did not respond immediately and did not hear from Sterlingov again.  App.3221-22, 3624.  In later BitcoinTalk posts about Bitcoin Fog, "Akemashite Omedetou" repeatedly referenced Blind Bitcoin, admitted that he had "been following the Blind Bitcoin project," and acknowledged that "many of the ideas in [Bitcoin Fog] originated in" Blind Bitcoin.  App.3227; *see also* App.2775-76, 3224.

6

Four weeks before Bitcoin Fog's launch, Sterlingov used his true name to create accounts at the digital-currency exchanges Liberty Reserve and Mt. Gox. App.3907-08; *see* App.3235, 3241-42. He also created a Google document whose Russian-language title translated to "putting money" or "depositing money." App.3279-83; *see* App.3211. That document described transferring funds through the following process: (1) a bank transfer to a Mt. Gox account; (2) selling Euros for bitcoin and then bitcoin for dollars; and (3) transferring funds to Liberty Reserve through AurumXChange, another digital-currency exchange. App.3287; *see* App.3241. On October 3, 2011, Sterlingov's Mt. Gox and Liberty Reserve accounts engaged in a series of transactions that mirrored the steps in the "putting money" document. App.3819-29.

Four days later, the shormint@hotmail.com email account (Shormint email) and the Shormint Liberty Reserve account were created. App.3191-92, 3238. Over the next two days, three new Mt. Gox accounts were also created: the Volf.prius account, the Kolbasa account, and the NFS9000 account (also called the Peternfs account). App.3255-56; *see* App.3299. On October 8, 2011, the same IP address logged into Sterlingov's Liberty Reserve account and the Volf.prius account, and Sterlingov's Liberty Reserve account transferred $100 to the Volf.prius account. App.3865-66, 4627. The Volf.prius account used those funds to purchase bitcoin, and over the next day, those funds flowed through two bitcoin addresses, the

NFS9000 account, and the Kolbasa account. App.3867-71. The Kolbasa account then converted the bitcoin to dollars and transferred those dollars to AurumXChange. App.3872-73. Collectively, those transactions were consistent with "layering," a money-laundering technique that involves passing funds through multiple accounts to make tracing the funds more complicated. App.3874.

A few days later, Sterlingov's Mt. Gox account received a deposit of euros. App.3276. On October 19 and 20, 2011, those funds traveled from Sterlingov's Mt. Gox account to the Shormint Liberty Reserve account via a series of transactions that included all of the steps in the "putting money" document and some additional steps. App.3809-10. During those transactions, the funds flowed through two bitcoin addresses, the NFS9000 account, and the Kolbasa account. App.3298-99. During a six-minute period near the end of those transactions, the same IP address accessed the Kolbasa account and the Shormint Liberty Reserve account. App.3263-65, 3303. A few minutes later, AurumXChange transferred $77.60 in Liberty Reserve dollars to the Shormint Liberty Reserve account. App.3241. Based on that flow of funds, law-enforcement investigators believed that one person—Sterlingov—carried out all of those transactions. App.4209-11, 4350-51.

On October 25, 2011, two days before Bitcoin Fog's launch, someone using an IP address in Gothenburg, Sweden, accessed the Shormint Liberty Reserve account. App.4635-37; *see* Supp.App.477 (Exhibit 401, at History_Sheet_0). The

same day, someone identifying himself as "Akemashite Omedetou" used the Shormint email to register the domain name for Bitcoin Fog's clearnet site (bitcoinfog.com) with the hosting service highhosting.net. App.3229-32. "Akemashite Omedetou" used the Shormint Liberty Reserve account to pay for the hosting and registration of that domain. App.3235, 3240. On the same day, the user "Akemashite Omedetou" registered with the BitcoinTalk forum. App.3910.

Two days later, on October 27, 2011, Sterlingov's Mt. Gox account made the first deposit of funds into the Bitcoin Fog cluster. App.3898, 3910-11. Later that day, "Akemashite Omedetou" posted the message on BitcoinTalk announcing Bitcoin Fog's launch, and Bitcoin Fog's Twitter account (created that day using the Shormint email) posted another message announcing Bitcoin Fog's launch. App.3910-11; *see* App.3166-67

After paying for the Bitcoin Fog domain, the Shormint Liberty Reserve account made a payment to CryptoVPN, which controlled an IP address ending in .123. App.3240, 4616-17. Between November 20 and 30, 2011, that IP address accessed the following accounts, in this order: Shormint Liberty Reserve, Volf.prius, Sterlingov's Liberty Reserve, NFS9000, Shormint Liberty Reserve, NFS9000, Kolbasa, Shormint Liberty Reserve. App.4620-23. That pattern of activity indicated that the same user accessed many of those accounts. App.4623-24. During the same period, Sterlingov's Liberty Reserve account sent funds to the Volf.prius account,

which transferred the funds, via an intermediary bitcoin address, to the Bitcoin Fog cluster. App.3877-78. Sterlingov's Liberty Reserve account also sent funds to Sterlingov's Mt. Gox account, which then transferred the funds, via an intermediary bitcoin address, to Sterlingov's account with Silk Road, a darknet marketplace that sold drugs and other illicit goods.[1] App.3880-81. Over the next day, that bitcoin traveled through the NFS9000 account to the Kolbasa account, which then transferred funds to the Bitcoin Fog cluster. App.3891-93. The Volfprius, NFS9000, and Kolbasa accounts did not engage in any transactions other than the transactions described above. App.3894-98.

## C. Sterlingov promotes illegal activities on the darknet

Sterlingov had an account ("Meth!") on Exploit, a Russian-language cyber-criminal forum. App.3534-35. A few weeks after Bitcoin Fog's launch, Sterlingov posted a message on Exploit that recommended buying illegal drugs on Silk Road. App.3545-47. In January 2012, Sterlingov posted another Exploit message, in which he recommended "get[ting] a Tor hidden service." App.3541-43. He stated that drugs "and, unfortunately, child pornography" were distributed through Tor, and he explained that a correctly configured Tor server would be impossible to find, "no matter how hard one tries." App.3543. "Thank me later! :D," he wrote.

---

[1] Sterlingov created his Silk Road account in July 2011, App.3883-84, and he purchased drugs on Silk Road multiple times, App.5238-40.

Supp.App.459; *see* App.3543.

Hundreds of Silk Road users sent funds to and from Bitcoin Fog. App.4041. For example, eight Silk Road drug sellers collectively transferred bitcoin worth more than $3 million directly from Silk Road to Bitcoin Fog. App.4048, 4052-55; *see* App.5242-62, 5268-75. After law enforcement shut Silk Road down in 2013, Silk Road 2.0 took its place. App.4055-56, 4286. Six Silk Road 2.0 drug sellers collectively transferred bitcoin worth more than $1.6 million directly from Silk Road 2.0 to Bitcoin Fog. App.4058-73; *see* App.5279-86, 5292-5307.

Government investigators determined that Bitcoin Fog engaged in transactions with the following darknet markets of bitcoin worth the following approximate amounts:

| Darknet market | Sent to Bitcoin Fog | | Received from Bitcoin Fog | |
|---|---|---|---|---|
| | Directly | Indirectly | Directly | Indirectly |
| Silk Road | $9,724,911 | $10,340,446 | $2,321,637 | $1,471,025 |
| Silk Road 2.0 | $12,582,929 | $6,463,629 | $5,852,300 | $2,534,628 |
| AlphaBay | $3,062,842 | $1,868,844 | $1,679,212 | $1,342,528 |
| Agora | $14,231,729 | $8,624,142 | $8,588,675 | $3,389,947 |
| Nucleus | $1,438,077 | $886,452 | $802,798 | $400,639 |
| Abraxas | $1,027,249 | $558,194 | $516,058 | $229,535 |

| | | | | |
|---|---|---|---|---|
| Pandora | $1,254,828 | $238,695 | $299,141 | $260,550 |
| Sheep | $2,788,483 | $1,494,597 | $361,895 | $551,001 |
| Black Bank | $912,669 | $1,043,156 | $427,255 | $280,495 |
| Welcome to Video | $0 | $0 | $989 | $846 |

Supp.App.478; *see* App.4034-36. The "sent" funds were generally funds that darknet-market vendors had obtained by selling products, and the funds that darknet markets "received" from Bitcoin Fog were generally funds that darknet-market buyers used to buy products. App.4037. Some transfers from darknet-market addresses to Bitcoin Fog were indirect, with the funds flowing through one or more intermediary addresses before reaching Bitcoin Fog. App.4034.

After the darknet markets listed above stopped operating, Bitcoin Fog continued mixing funds. App.4357.

### D.     Sterlingov makes millions of dollars through Bitcoin Fog

From December 2011 on, Bitcoin Fog charged a variable service fee of one-to-three percent on all deposits. App.3781-84. Assuming an average two-percent fee, Bitcoin Fog would have earned almost $8 million from 2011 through 2021, with a high of over $1.8 million in 2014. App.3787-88. Bitcoin Fog earned at least $500,000 every year from 2013 to 2020 and approximately $346,000 in 2021. App.3787-88.

About five months after Bitcoin Fog's launch, Sterlingov told an acquaintance that he had largely stopped working on a side project because "some other things" had come up that "seemed to yield more cash." App.3501-02. In 2013, he deposited bitcoin worth approximately $260,000 into his accounts, App.4475-76, and in 2014 and 2015, he spent approximately $40,000 each year on prepaid financial cards, App.4479. From 2010 to 2014, Sterlingov's gross annual salary from his job was between $30,000 and $42,000, and in 2017, he claimed that he was self-employed with an annual salary of $50,000. App.3463-65, 6121-22.

In a Reddit post, Sterlingov stated that it was "very naïve to think that there are no ways to hide assets nowadays," and he claimed to have "100 trusts and 200 corporations registered in 15 different jurisdictions." App.4006. The government later identified approximately 40 financial accounts belonging to Sterlingov, and from 2011 to 2021, those accounts received bitcoin deposits worth approximately $1.8 million. App.4462-65, 4476. Those accounts included cryptocurrency-exchange accounts whose funds came primarily from Bitcoin Fog. App.3984; *see* App.3949-50, 3956-63. If Sterlingov were simply a Bitcoin Fog user, he should have made deposits into Bitcoin Fog that matched his withdrawals, but his accounts did not make large deposits into Bitcoin Fog that would be consistent with a user's activity. App.4355-56.

In 2016, Sterlingov sought to withdraw bitcoin from his account with the cryptocurrency exchange Bitstamp, and Bitstamp asked him a number of questions about those funds. App.3404-11. In response, Sterlingov stated that he did not know whether he had mixed "the specific funds" in his Bitstamp account, but that it was "not impossible" because he "did a lot of experimenting with Bitcoin back in the day." App.3412. He claimed, however, that he had not used mixers "recently." App.3412. When Sterlingov made that statement in 2016, "a significant amount of money" was flowing between Bitcoin Fog and his financial accounts. App.4353.

In 2018, Bitstamp asked Sterlingov more questions about a deposit into his Bitstamp account, App.3987-91, and told him that its analysis indicated that "the bulk" of his bitcoin deposits "originate[d] from mixing services," App.3992. In response, Sterlingov again stated that it was "possible" that he had used some mixing services "years ago," when "Bitcoin was a new thing," but that he did not "really remember." App.3993. Sterlingov stopped using Bitstamp after Bitstamp asked him for further information. App.3419-20.

### E. Bitcoin Fog mixes funds for an undercover agent located in Washington, D.C.

In 2019, Special Agent Matthew Price conducted multiple undercover transactions with Bitcoin Fog from his office in Washington, D.C. App.2833-34. That September, he created a Bitcoin Fog account, deposited bitcoin worth approximately $250 into Bitcoin Fog, and then withdrew most of that bitcoin the

next day.  App.2834-53.  When he submitted his withdrawal request, the Bitcoin Fog site displayed the following notice: "Instant payment was completed successfully.  Please wait several minutes for the network to register.  Record of this transaction will be removed from our logs."  App.2853.

Agent Price conducted another undercover transaction with Bitcoin Fog in November 2019.  App.2857.  On November 18, 2019, he sent bitcoin to his Bitcoin Fog account from an account that he had created on a darknet market.  App.2857-67.  The next day, he accessed the support page on Bitcoin Fog's Tor site, which included a function for sending messages to Bitcoin Fog's administrators.  App.2866-70.  Using that function, Agent Price sent a message to Bitcoin Fog that stated in part, "I created my account to clean my coins from selling ecstasy.  I sold Molly on Apollon. . . . I have more coins I need cleaned.  But how do I know I can trust you?"  App.2870-71.

Two days later, on November 21, 2019, Agent Price logged into his Bitcoin Fog account and saw that his message had received no response.  App.2874-76.  He then accessed Bitcoin Fog's withdrawal page and entered the amount of bitcoin that he wanted to withdraw, along with a destination address.  App.2876-78.  After he confirmed the withdrawal, the Bitcoin Fog site displayed a message stating that the payment was complete.  App.2878.

**F.     Sterlingov is arrested**

On April 27, 2021, law-enforcement officers arrested Sterlingov at Los Angeles International Airport.  App.2897-99.  At the time of his arrest, Sterlingov was carrying a laptop computer, App.2961-62; three computer hard drives, App.2963-64; a mobile network modem connected to four USB devices and two mini computers, App.2912-13; and numerous other electronic-storage devices, App.2907-12, 2969-70.  Sterlingov's phone had a Mycelium Bitcoin wallet that stored bitcoin worth more than $500,000.  App.3924-26.  The wallet had 16 separate accounts, and most of its bitcoin was in an account that Sterlingov named "Straight outta mint."  App.3931-32.  The previous year, Sterlingov had used bitcoin from that wallet to purchase a Tesla Model X for approximately $151,000.  App.3940-42.

Sterlingov's electronic devices showed at least one attempted administrator login to a Tor server, which was indicative of someone who managed the site logging in as a privileged user.  App.4722-24.  His laptop also contained additional evidence that he was connecting to other computers.  App.4752-54.  His devices contained notes that demonstrated knowledge of the Tor network and examined the effectiveness of Tor's anonymity.  App.4727-29; *see* App.4724-35.  The notes mentioned "making sure that a good plausible deniability was in place."  App.4732.

The last withdrawal from Bitcoin Fog occurred two days after Sterlingov's arrest, and Bitcoin Fog stopped operating after that date.  App.3772-74.  At the time

of Sterlingov's trial, bitcoin worth approximately $70 million remained in the Bitcoin Fog cluster, App.3777.

## SUMMARY OF ARGUMENT

1.      Sufficient evidence supported the jury's venue and statute-of-limitations findings.  D.C. was an appropriate venue for the money-laundering offenses because Bitcoin Fog transferred bitcoin to Agent Price in D.C. after Agent Price represented those funds to be drug-crime proceeds.  D.C. was also an appropriate venue for the licensing offenses because the jury could reasonably find that Sterlingov operated a money-transmitting business in D.C. and that Bitcoin Fog was unlicensed because of conduct occurring in D.C.  And the evidence sufficiently established that Sterlingov committed each offense within the relevant statute-of-limitations periods.

2.      The district court properly exercised its broad discretion in allowing expert testimony from three government witnesses.  The testimony of blockchain-analysis experts Luke Scholl and Elizabeth Bisbee rested in part on their use of the software product Chainalysis Reactor, and the district court reasonably determined that Reactor was reliable under Federal Rule of Evidence 702(c).  The court also properly admitted Valerie Mazars de Mazarin's IP-address analysis under Rule 702(c).  And any Rule 702(c) error was harmless.

3.    The district court properly denied some of Sterlingov's requests for Chainalysis's proprietary information.  The court acted within its discretion in denying Sterlingov's request to subpoena Reactor's source code because Sterlingov failed to show that he needed that code to prepare for trial.  The court also did not plainly err in not ordering Chainalysis to produce certain heuristics data that Sterlingov never requested, and the court reasonably precluded Sterlingov from personally reviewing Chainalysis's heuristics production.  Sterlingov also had no Confrontation Clause right to any of these disclosures, and in any event, the district court's decisions regarding those disclosures did not prejudice Sterlingov.

4.    The district court appropriately exercised its discretion in determining that Federal Rule of Evidence 403 allowed the admission of evidence relating to Welcome to Video, a darknet market that distributed child-sexual-abuse material. Moreover, any Rule 403 error was harmless.  And Sterlingov has failed to show that the Welcome to Video evidence constructively amended the indictment.

5.    Sterlingov has not developed his perfunctory challenges to the admission of testimony from two cooperating witnesses.  In any event, that testimony was relevant and admissible under Rules 403 and 702, and its admission was harmless.

6.    Sterlingov has waived his challenge to the admission of co-conspirator statements because he fails to identify any specific statement that he believes was

improperly admitted. His arguments about the district court's application of Federal Rule of Evidence 801(d)(2)(E) also lack merit.

7.     The district court properly gave a willful-blindness instruction because Sterlingov claimed a lack of guilty knowledge at trial, and the trial evidence supported an inference of deliberate ignorance. Moreover, any instructional error was harmless, given the abundant evidence of actual knowledge.

8.     At sentencing, the district court properly determined that "the value of the laundered funds" under U.S.S.G. § 2S1.1(a)(2) exceeded $250 million, and that finding was harmless in any event because it did not affect Sterlingov's sentence.

## ARGUMENT

## I. Sufficient evidence supports the jury's determinations regarding venue and the statute of limitations

### A.     Background

The initial indictment, returned on June 14, 2021, charged Sterlingov with money laundering, in violation of 18 U.S.C. § 1956(a)(3)(A); operating an unlicensed money-transmitting business, in violation of 18 U.S.C. § 1960(a); and money transmission without a license, in violation of D.C. Code § 26-1023(c). App.6557-59. The superseding indictment, returned on July 18, 2022, included those three counts and a fourth count charging Sterlingov with money-laundering conspiracy, in violation of 18 U.S.C. § 1956(h). App.6561-65. Each count alleged that Sterlingov committed the relevant offense "in the District of Columbia and

elsewhere." App.6561-65. The substantive money-laundering count rested on the transfer of bitcoin from Bitcoin Fog to Agent Price on November 21, 2019, App.6563, and the other counts alleged that Sterlingov committed the charged offenses from approximately October 27, 2011, until at least April 27, 2021, App.6561, 6563-64.

Before trial, Sterlingov moved to dismiss all counts for improper venue, App.6575-78, and based on the statute of limitations, App.6580-82. The district court denied both motions. App.2627-45. Sterlingov moved for a judgment of acquittal at the close of the government's case and again at the close of all evidence, and the district court denied both motions. App.5386-88, 6140-41. The district court instructed the jury that the government had to prove venue by a preponderance of the evidence, App.6287-89, and had to prove that each offense occurred at least in part within the applicable statute-of-limitations period, App.6289-90.

## B.    Standard of review

This Court reviews sufficiency-of-the-evidence claims de novo and will affirm a conviction where any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *United States v. Clark*, 156 F.4th 664, 679 (D.C. Cir. 2025). When a defendant challenges venue, however, the government bears the burden of establishing venue only by a preponderance of the evidence. *United States v. Slatten*, 865 F.3d 767, 786 (D.C. Cir. 2017). In either circumstance,

the Court views the evidence in the light most favorable to the government. *Ibid.*; *Clark*, 156 F.4th at 679.

During the proceedings below, Sterlingov did not challenge the district court's venue instructions. *See* App.6064-73, 6090-6117. This Court accordingly reviews those instructions only for plain error. *See Clark*, 156 F.4th at 675.

### C.    The trial evidence sufficiently established venue

A crime must be prosecuted in a "district wherein the crime shall have been committed." U.S. Const. amend. VI. A single criminal offense may be "committed" in more than one district, *see United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999), and venue is appropriate "where any part of a crime can be proved to have been done," *Smith v. United States*, 599 U.S. 236, 244 (2023) (quotation marks omitted); *accord* 18 U.S.C. § 3237(a). Because Sterlingov preserved his venue objections below, venue was a factual question for the jury to resolve. *See United States v. Sitzmann*, 893 F.3d 811, 824 (D.C. Cir. 2018). Sufficient evidence supported the jury's venue findings.

### 1.    Substantive money laundering

D.C. was an appropriate venue for the substantive money-laundering count, which rested on Bitcoin Fog's transfer of bitcoin to Agent Price on November 21, 2019. App.6563. For venue purposes, that transfer "constitute[s] a single, continuing transaction," and a person who conducts any portion of the transaction

"may be charged in any district in which the transaction takes place." 18 U.S.C. § 1956(i)(3). Here, the evidence established that Agent Price was in Washington, D.C., when he received Bitcoin Fog's transfer, *see* App.2833, which confirms that the transaction took place in part in D.C. The jury thus reasonably determined that venue was proper for the substantive money-laundering count.

Sterlingov does not dispute that this transfer had the requisite nexus to D.C. Instead, he contends (Br.24-25) that venue is improper because the transaction did not violate Section 1956(a)(3) at all. He does not explain why alleged deficiencies in the evidence of non-venue elements would make venue improper, but in any event, sufficient evidence supports the non-venue elements that he challenges.

Section 1956(a)(3) imposes criminal penalties on anyone who, with the requisite intent, conducts "a financial transaction involving property *represented to be* the proceeds of specified unlawful activity," where the term "represented" includes "any representation made by a law enforcement officer." 18 U.S.C. § 1956(a)(3) (emphasis added). Agent Price made the requisite representation here: he stated in a message to Bitcoin Fog that he had obtained the funds in his Bitcoin Fog account by selling illegal drugs. App.2873. And as the statutory text indicates, Section 1956(a)(3) did not require proof that the transferred bitcoin was actually "illicit" (Br.24). *See United States v. Nektalov*, 461 F.3d 309, 314 (2d Cir. 2006).

The evidence also allowed the jury to infer that Sterlingov read Agent Price's message. Agent Price sent that message through Bitcoin Fog's messaging function, which provided a way to communicate with Bitcoin Fog's administrator. App.2868-72. On BitcoinTalk, "Akemashite Omedetou" repeatedly touted that messaging function and stated, "[W]e have been using [it] for all customer contacts." App.2782; *see* App.2780-82. Based on that evidence, as well as the substantial evidence indicating that Sterlingov was both "Akemashite Omedetou" and Bitcoin Fog's administrator, *see* pp. 6-17, *supra*, a reasonable jury could infer that Sterlingov read Agent Price's message before the November 21 transfer.

Ample evidence, including online posts by "Akemashite Omedetou" and Sterlingov, also showed that Sterlingov operated Bitcoin Fog with the intent to promote illegal drug crimes and to conceal and disguise the source of funds that he believed to be the proceeds of such crime.[2] *See, e.g.*, pp. 3-5, 10-11, *supra*. Based

---

[2] Although Sterlingov repeatedly suggests (Br.xx, 25, 84, 92) that this prosecution is contrary to Department of Justice policy postdating his convictions, that policy does not disfavor money-laundering charges against mixer operators who act with this knowledge and intent. *See* App.7217-19. That policy also does not disfavor Section 1960 charges against mixer operators who mix funds that they know were derived from criminal conduct or are intended to be used to promote or support unlawful activity. *See* App.7219 n.2. "When it comes to criminal prosecution, involvement in the digital asset ecosystem should not and will not subject individuals to a different level of scrutiny. It also does not provide someone with any more or any less protection from money laundering, sanctions evasion, and other criminal offenses." Acting Assistant Att'y Gen. Matthew R. Galeotti, Remarks at the American Innovation Project Summit in Jackson, Wyoming (Aug. 21, 2025), https://www.justice.gov/opa/speech/acting-assistant-attorney-general-matthew-r-

on that evidence, the jury could reasonably infer that Sterlingov acted with the same intent when he caused Bitcoin Fog to transfer funds to Agent Price in D.C.

Finally, Sterlingov's contention (Br.25) that the government improperly "manufactur[ed] venue" lacks merit. This Court has declined to decide whether "manufactured venue" is a viable theory and has suggested that, at most, "such a theory may only apply in cases involving extreme law enforcement tactics." *Sitzmann*, 893 F.3d at 823 (quotation marks omitted). Sterlingov has identified no such tactics here. In particular, the record contains no suggestion that he "had even the slightest tendency to balk" at the prospect of committing a crime in D.C., and there was nothing "reprehensible" about Agent Price's "decision to pose as a drug dealer from Washington, D.C." *Ibid.* (quotation marks omitted).

### 2. Money-laundering conspiracy

D.C. was also an appropriate venue for the money-laundering-conspiracy count. By statute, venue for that offense is proper in any district where an act in furtherance of the conspiracy took place. 18 U.S.C. § 1956(i)(2). Here, the evidence allowed the jury to find that Sterlingov committed multiple acts of that kind in D.C.

To start, the jury could reasonably find that Sterlingov caused Bitcoin Fog to transfer funds to Agent Price in D.C., knowing that Agent Price had represented that

---

galeotti-delivers-remarks-american. And in any event, that policy confers no rights on Sterlingov. *See* App.7217 n.1.

those funds were his profits from illegal drug sales. That act furthered both the laundering of those specific funds and the larger conspiracy, insofar as Bitcoin Fog's demonstrated willingness to launder apparent drug proceeds signaled an ongoing willingness to launder the future drug proceeds that Agent Price referenced in his message to Bitcoin Fog. Encouraging those future deposits advanced the overall conspiracy because Bitcoin Fog operated by pooling deposits from multiple users, *see* App.3729-31, and future deposits from Agent Price would therefore facilitate the laundering of other users' funds.

Moreover, Bitcoin Fog's Tor site sent status updates to Agent Price in Washington, D.C., *see* App.2850-53, 2877-78, and based on the evidence that Sterlingov was Bitcoin Fog's administrator, the jury could reasonably infer that Sterlingov caused the site to send those updates. Because those communications also furthered the conspiracy to launder drug proceeds, they provided an additional basis for venue in D.C., even though Agent Price himself was not a co-conspirator. *See, e.g.*, *Sitzmann*, 893 F.3d at 820, 826 (affirming district court's venue finding based on wire transfer to government informant in D.C.); *United States v. Guerrero*, 76 F.4th 519, 528-29 (6th Cir. 2023) ("[P]hone communications, made in furtherance of a conspiracy, from a conspirator to a government agent located in a district 'take place' in that district and so establish venue there as to any co-conspirator.") (citing cases).

Agent Price's involvement in the transfer and communications does not, as Sterlingov contends (Br.21-22), negate the acts that Sterlingov undertook in D.C. in furtherance of the conspiracy. *See United States v. Lam*, 924 F.2d 298, 301 (D.C. Cir. 1991) (venue for drug-distribution-conspiracy charge rested on co-conspirators' negotiations with undercover agent in D.C.); *United States v. Barnes*, 681 F.2d 717, 724 (11th Cir. 1982) (phone call to government informant located in the charging district was sufficient to establish venue for charge of using telephone to facilitate a drug conspiracy). Sterlingov also fails to show that the district court plainly erred in instructing the jury that venue can rest on an overt act that was "completed by a government agent." App.6288-89. Although Sterlingov contends (Br.22) that this instruction was plainly erroneous because the indictment's money-laundering-conspiracy count did not "mention[]" Agent Price's involvement in the acts occurring in D.C., he cites no authority to support that granular theory of venue pleading and thus fails to carry his plain-error burden of showing "'clear or obvious'" instructional error. *Clark*, 156 F.4th at 675.

Finally, the government did not establish venue through "[s]peculative digital traces and attributions alone." Br.22. The venue evidence included Agent Price's testimony about his interactions with Bitcoin Fog in D.C., along with screenshots and videos showing his computer activity there. *See* App.2833-34, 2850-85. And contrary to Sterlingov's contention (Br.22-23), *United States v. Mackey*, 143 F.4th

129 (2d Cir. 2025), does not cast doubt on the jury's venue findings: *Mackey* reversed a defendant's conspiracy conviction for insufficient evidence without reaching that defendant's venue arguments. *See id.* at 131 n.3.

### 3. Section 1960(a) offense

Venue was also proper in D.C. for the Section 1960(a) count. Because Section 1960 does not contain its own venue provision, a court determines where venue is appropriate by identifying "the conduct constituting the offense" and then discerning where those criminal acts occurred. *United States v. Morgan*, 393 F.3d 192, 196 (D.C. Cir. 2004) (quotation marks omitted). Section 1960(a) imposes criminal penalties on anyone who "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business." 18 U.S.C. § 1960(a). A Section 1960(a) offense thus involves two principal types of conduct: (1) operating a money-transmitting business, and (2) engaging in conduct that makes that business "unlicensed." In Sterlingov's case, the evidence allowed the jury to find that both types of conduct occurred in D.C.

First, a reasonable jury could find that Sterlingov operated a money-transmitting business, *i.e.*, Bitcoin Fog, in D.C. Bitcoin Fog and its clearnet site were both accessible in D.C. App.4356. Moreover, two government witnesses—Agent Price and a Federal Bureau of Investigation (FBI) analyst—testified that they

conducted undercover transactions with Bitcoin Fog while located in D.C. App.2833, 5208-26.

Second, the evidence allowed the jury to find that Bitcoin Fog was "unlicensed" because of conduct occurring in D.C.  For purposes of Section 1960(a), a money-transmitting business is "unlicensed" in any of three circumstances: (1) it "involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity," 18 U.S.C. § 1960(b)(1)(C); (2) it is "operat[ing] without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony," 18 U.S.C. § 1960(b)(1)(A); and (3) it fails to comply with federal registration requirements for money-transmitting businesses, 18 U.S.C. § 1960(b)(1)(B).  The jury found that Bitcoin Fog was "unlicensed" in all three ways, App.6348-49, and the evidence sufficiently showed that all three of those licensing failures involved conduct in D.C.

To start, the jury reasonably could find that Bitcoin Fog was "unlicensed" based on its November 2019 transactions with Agent Price, which showed that Bitcoin Fog "involve[d] the transportation or transmission of funds" that Sterlingov knew were "derived from a criminal offense."  18 U.S.C. § 1960(b)(1)(C).  Because those transactions occurred in part in D.C., they were sufficient to establish venue for the Section 1960(b)(1)(C) charge.

A reasonable jury could also find that Bitcoin Fog was "unlicensed" within the meaning of 18 U.S.C. § 1960(b)(1)(A) and (B) because it was required to obtain licenses in D.C. but failed to do so.  Specifically, the evidence established that, under federal law, money-services businesses must register with the Financial Crimes Enforcement Network, located in D.C., but that neither Bitcoin Fog nor Sterlingov submitted such a registration.  App.2999-3000, 3020-23, 4912.  The evidence also showed that D.C. law requires a money-transmitting business to obtain a license from D.C.'s Department of Insurance, Securities and Banking, but that neither Bitcoin Fog nor Sterlingov obtained such a license.  App.3023-25.

Both the Supreme Court and this Court have determined that "the place where a document is to be filed may be regarded as the place where any asserted non-filing or misfiling occurred."  *S.E.C. v. Savoy Indus. Inc.*, 587 F.2d 1149, 1155 (D.C. Cir. 1978) (citing cases); *see Rumely v. McCarthy*, 250 U.S. 283, 289 (1919) (holding that D.C. was a proper venue for charge of failing to make a report to the Alien Property Custodian, whose office was in D.C.); *cf. Johnston v. United States*, 351 U.S. 215, 220 (1956) ("[W]here the crime charged is a failure to do a legally required act, the place fixed for its performance fixes the situs of the crime.").  In accordance with that precedent, the district court correctly instructed the jury that, for venue purposes, the conduct constituting the Section 1960(a) offense included "the failure to register or to obtain a license in the jurisdiction where doing so is required."

App.6289.  And based on the evidence above, the jury could reasonably find venue on that ground.

Sterlingov suggests (Br.26) that, for online money-transmitting businesses, venue is appropriate only in districts where the defendant engaged in "targeted commercial conduct, such as local advertising or solicitation."  Sterlingov bases that contention on civil cases addressing personal jurisdiction, *see* Br.26 n.96, but those cases apply legal principles that are inapposite in the criminal context.  In civil cases, the plaintiff must show "'minimum contacts'" between the defendant and the forum, and "courts must insure that 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).  In criminal cases, by contrast, the venue inquiry focuses on where the offense was committed, not on the defendant's contacts with the district.  As explained above, those principles show that venue is proper for Sterlingov's Section 1960(a) offense.

### 4.    D.C. licensing offense

Sufficient evidence also supports the jury's venue finding for the D.C. licensing count.  A person commits that D.C. offense by "engag[ing] in the business of money transmission without a license," D.C. Code § 26-1023(c), where "money transmission" includes "engaging in the business of receiving money for

transmission or transmitting money within the United States, or to locations abroad, by any and all means," D.C. Code § 26-1001(10). Like Section 1960(a), this D.C. licensing offense involves two principal types of conduct: (1) engaging in the business of money transmission, and (2) engaging in conduct that makes that business "unlicensed." As with the Section 1960(a) count, the evidence allowed the jury to find that both types of conduct occurred in D.C. Specifically, the undercover transactions allowed a reasonable jury to find that Sterlingov engaged in the business of money transmission in the district, and Sterlingov's failure to obtain a license for Bitcoin Fog also occurred in D.C. *See* pp. 27-30, *supra*.

Sterlingov contends (Br.27) that D.C. is an improper venue for this licensing count on the theory that the D.C. statute encompasses only money-transmitting businesses that are physically located in the district. But the statute's text does not include a physical-presence requirement, and in ordinary parlance, a person "engages in [a] business" in a particular location when he transacts business in that location, even if he does so only from afar. *Cf. Eastman Kodak Co. of New York v. So. Photo Materials Co.*, 273 U.S. 359, 372-73 (1927) (recognizing that antitrust venue statute for suit against a corporation establishes venue both "in a district in which the corporation resides or is 'found,' but also in any district in which it 'transacts business'—although neither residing nor 'found' there"). Venue was therefore proper for the D.C. licensing count.

### D. The trial evidence sufficiently established conduct occurring within the statute of limitations

Sterlingov's federal charges were each subject to a five-year statute of limitations, 18 U.S.C. § 3282(a), and his D.C. charge was subject to a six-year statute of limitations, D.C. Code § 23-113(a)(4). Because Sterlingov raised a statute-of-limitations defense below, the government had to prove that the indictment on each count was returned within the applicable limitations period. *See Smith v. United States*, 568 U.S. 106, 113 (2013). The government could satisfy that burden for the money-laundering-conspiracy count, which was first brought in the superseding indictment returned on July 18, 2022, by proving that the offense continued on or after July 18, 2017. *See* App.6561-63. The government could satisfy that burden for the other counts, which were first brought in the initial indictment returned on June 14, 2021, by proving that the money-laundering and federal licensing offenses occurred or continued on or after June 14, 2016, and the D.C. licensing offense continued on or after June 14, 2015. *See* App.6557-59. Sufficient evidence supported the jury's findings that each of those offenses occurred or continued on or after those critical dates.

To start, Agent Price's undercover transaction with Bitcoin Fog occurred in November 2019, less than five years before both indictments were returned. Because that transaction formed the basis of the substantive money-laundering charge, Sterlingov was indicted on that count within the limitations period. The

money-laundering-conspiracy and licensing offenses were continuing offenses, which means that the statute of limitations for those offenses began to run only when those offenses ceased. *See United States v. McGoff*, 831 F.2d 1071, 1078-79 (D.C. Cir. 1987). Based on Agent Price's transaction alone, the jury could reasonably infer that as of November 2019, Bitcoin Fog was still operating and the money-laundering conspiracy remained ongoing. Moreover, other evidence allowed the jury to infer that the money-laundering conspiracy and licensing offenses continued until Sterlingov's April 2021 arrest: Bitcoin Fog earned over $500,000 in service fees every year from 2016 to 2020 and more than $300,000 in 2021, App.3787-88, and the last withdrawal from Bitcoin Fog occurred two days after Sterlingov's arrest, App.3772.

Sterlingov contends (Br.97-99) that any reasonable jury had to find that Bitcoin Fog's money-laundering conspiracy included only the 10 specific darknet markets identified at pp. 11-12, *supra*, most of which closed more than five years before his arrest.[3] But Agent Price's undercover transactions occurred less than five years before the superseding indictment, as did some of the Welcome to Video

---

[3] Sterlingov also briefly suggests (Br.99) the district court erred in admitting evidence regarding those 10 darknet markets, but he cites no law to support that assertion, and with the exception of the Welcome to Video evidence, *see* pp. 72-79, *infra*, he has failed to develop that evidentiary claim. This Court should therefore deem it waived. *See United States v. Miller*, 953 F.3d 804, 810 (D.C. Cir. 2020).

transactions, *see* pp. 75-76, *infra*. Furthermore, multiple witnesses used the present tense when describing the darknet's illegal activities, *see, e.g.*, App.4024-25, 5229-30, indicating that those activities remain ongoing. A rational jury could therefore infer that darknet vendors continued to distribute illegal drugs and launder their drug proceeds through Bitcoin Fog well after the critical dates in 2015, 2016, and 2017. The fact that Bitcoin Fog continued to mix large quantities of bitcoin through 2021 bolsters that inference.

Finally, the government did not have to present "direct evidence" (Br.100) of Sterlingov's ongoing involvement in the Bitcoin Fog conspiracy through the date of his arrest because "participation in a conspiracy '*within the statute-of-limitations period* is not an element of the conspiracy offense' that requires proof beyond a reasonable doubt." *United States v. Bostick*, 791 F.3d 127, 143 (D.C. Cir. 2015). "Rather, 'a defendant's membership in the conspiracy, and his responsibility for its acts, endures even if he is entirely *inactive* after joining it.'" *Ibid.* Here, the evidence allowed a rational jury to conclude that Sterlingov created and operated Bitcoin Fog. *See* pp. 3-17, *supra*. Sterlingov accordingly had the burden of establishing that he withdrew from the conspiracy, *Bostick*, 791 F.3d at 143, but he made no attempt to develop a withdrawal defense, and a rational jury could readily infer that he continued to operate Bitcoin Fog until his arrest, especially because Bitcoin Fog

stopped operating two days after that, with $70 million still sitting in the Bitcoin Fog cluster at the time of trial. *See* App.3772-74, 3777.

**E. Sterlingov has waived any other sufficiency-of-the-evidence challenges**

Sterlingov's opening brief also includes a one-paragraph section (Br.87-88) that generally asserts that the trial evidence was insufficient. For the reasons set forth above, the government's evidence was sufficient as to venue and the statute of limitations. And to the extent that Sterlingov seeks to rely on "a single conclusory sentence" to challenge other aspects of the government's proof, this Court should deem such claims waived because Sterlingov's opening brief raised them "only summarily, without explanation or reasoning." *United States v. Miller*, 953 F.3d 804, 810 (D.C. Cir. 2020) (quotation marks omitted).

**II. The district court properly exercised its discretion in allowing expert testimony from three government witnesses**

Under Federal Rule of Evidence 702(c), a party seeking to offer expert testimony must demonstrate that it is "more likely than not" that "the testimony is the product of reliable principles and methods." In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court identified factors that "can inform the reliability analysis," but those factors "'do *not* constitute a definitive checklist or test' applicable in every case." *United States v. Morgan*, 45 F.4th 192, 200 (D.C. Cir. 2022) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526

U.S. 137, 150 (1999)); *see also* Fed. R. Evid. 702 advisory committee notes (2000 amendments) (explaining that post-*Daubert* amendments to Rule 702 did not "'codify'" the *Daubert* factors and that "*Daubert* itself emphasized that the factors were neither exclusive nor dispositive").

A trial judge thus has "considerable leeway" in deciding how to evaluate reliability, *Kumho Tire*, 526 U.S. at 152, and "broad latitude" in determining "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case," *id.* at 153. Here, the district court appropriately exercised its broad discretion in determining that three government experts' testimony satisfied Rule 702(c).

## A.  Standard of review

This Court reviews for abuse of discretion a district court's decision to admit expert testimony, granting the district court "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Morgan*, 45 F.4th at 200 (quotation marks omitted).

## B.  The district court acted within its discretion in admitting testimony about Reactor evidence

### 1.  Background

Before trial, the government provided notice of its intent to present expert testimony from FBI Staff Operations Specialist Luke Scholl and Chainalysis Director of Investigation Solutions Elizabeth Bisbee.  Supp.App.3-8.  In forming

their opinions, both Scholl and Bisbee relied in part on Reactor, a proprietary software product from Chainalysis. App.6951-52. Reactor can be used to "cluster" bitcoin addresses that are likely controlled by the same entity and to tie those clusters to particular entities. App.6956.

Reactor clusters addresses primarily using three "heuristics." App.6957; *see* App.6963 n.2. Heuristic 1 recognizes that when a bitcoin transaction contains multiple input addresses (*i.e.*, addresses sending the bitcoin), a single person or entity "very likely" controls all of those addresses. App.6957-58. Heuristic 2 rests on the theory that every large-scale participant in the blockchain leaves a digital "fingerprint" that can be discerned by looking at publicly available information on the blockchain ledger and conducting test transactions with addresses known to belong to the target entity. App.6959-60. Once those behaviors have been identified, an algorithm can cluster addresses that engage in transactions matching that pattern. App.6960. Heuristic 3 refers to information that Chainalysis gathered outside the blockchain from sources like data leaks, court documents, and data partnerships. App.6963.

Using the heuristics described above, Reactor identified 925,743 bitcoin addresses in the Bitcoin Fog cluster and traced the total deposits into, and withdrawals from, that cluster. App.3756, 6956-57. Reactor also clustered and

attributed thousands of bitcoin addresses to eight darknet markets and traced the flow of funds between each market and Bitcoin Fog.  App.6957.

Scholl and Bisbee each testified at a pretrial *Daubert* hearing.  App.541-640. Scholl testified that he has worked on virtual-currency matters for the FBI since 2015, App.543, and he described steps that he and his FBI colleagues took to validate Chainalysis's clusters and attributions, App.555-56, 560-63.  Bisbee testified that, beginning in 2014, she worked as an intelligence research specialist for the Drug Enforcement Administration (DEA) on approximately 400 cases involving cryptocurrency, App.596, 599, and used Chainalysis and other commercial tools in her blockchain analysis, App.601.  She described steps that she and her DEA colleagues took to verify those tools' reliability, and she reported that Chainalysis demonstrated "the most reliability" and "was the primary tool that [she] leveraged" at the DEA.  App.601-02.

Bisbee also testified that, in 2021, she moved from the DEA to a position at Chainalysis, where 75 percent of her work involved blockchain analysis.  App.602-03.  Bisbee said that Chainalysis customers rely on Reactor's accuracy and would alert Chainalysis if they received "a false hit" through the program, App.615-16, but that she was aware of no such false positives, App.639.  Bisbee reported that customer feedback indicated that, if anything, Reactor's clustering was underinclusive, which she attributed to Chainalysis's "conservative approach" to

clustering.  App.618; *see* App.6971.  Bisbee confirmed that law enforcement uses Reactor in thousands of investigations in the United States, App.635, and that she and her Chainalysis team have worked on thousands of clusters and addresses, App.639.  In a supplemental declaration, Bisbee provided additional information about the research underlying Chainalysis's heuristics and the efforts that Chainalysis has undertaken to cross-validate its clustering and attributions. Supp.App.229-32.  At the district court's request, the government also submitted a supplemental filing with additional information about Reactor's reliability. Supp.App.276-92.

Sterlingov sought to challenge Reactor's reliability by presenting evidence from his own proposed expert, Jonelle Still of Ciphertrace.  App.6738-40. Ciphertrace was a direct competitor of Chainalysis and had its own tools that used proprietary clustering algorithms.  App.1186-88, 6885.  In her expert report and *Daubert* testimony, Still acknowledged that Ciphertrace used Heuristic 1 and its own version of Heuristic 3, App.1189-90, 6791, but she claimed that Ciphertrace did not use Heuristic 2 "because it is inaccurate, error-prone, and over inclusive," App.6771. Still reported that Ciphertrace had identified 527,731 addresses in Reactor's Bitcoin Fog cluster that were not clustered by Heuristic 1, and based on that number, she calculated that "the discrepancy rate between Ciphertrace and Chainalysis Bitcoin

Fog attribution is roughly 67%." App.6791. She also provided "discrepancy rates between Ciphertrace and Chainalysis's dark market attributions." App.6798.

Shortly before trial, Ciphertrace's counsel informed the district court that Ciphertrace had determined that parts of Still's expert report were "unreliable," Supp.App.313, and Sterlingov told the court that he was "withdraw[ing]" Still's expert report and would not be calling Still to testify at trial. Supp.App.316-17.

After reviewing the parties' submissions, and following multiple hearings, the district court determined in a 31-page written opinion that Reactor, and Scholl's and Bisbee's testimony based on Reactor, satisfied Rule 702(c). App.6951-81. The court found that "substantial evidence supports the government's submission that the software is highly reliable—and, if anything, conservative—in clustering (and then attributing) bitcoin addresses." App.6953; *see* App.6969-74. The court also rejected Sterlingov's contention that Reactor "'doesn't meet any of the *Daubert* factors.'" App.6975; *see* App.6975-80.

> ## 2. The district court correctly determined that Reactor is reliable.

The district court acted well within its discretion in determining that Reactor satisfies Rule 702(c)'s reliability requirement. During their *Daubert* hearings, Scholl and Bisbee both testified that they and their law-enforcement colleagues have personally validated Reactor's clusters and attributions on many occasions. App.556, 601-02. As both witnesses explained, investigators can evaluate Reactor's

accuracy by comparing Reactor's clusters and attributions to evidence obtained through legal process or seizures. App.556, 601. For example, if Reactor attributes a cluster of addresses to a particular cryptocurrency exchange, that exchange's subpoena responses or seized records can confirm or refute that attribution by revealing whether the exchange does or does not control those addresses. *See* App.556.

Scholl estimated that he and his FBI colleagues compare Reactor's attributions to subpoena responses "a thousand times a day," App.556, and at trial, he testified that he could not recall a time when he "reviewed a subpoena where Chainalysis attribution wasn't correct," App.4137. During her *Daubert* hearing, Bisbee similarly testified that, during her seven years at the DEA and two years at Chainalysis, she was not aware of any instances where Reactor incorrectly included a bitcoin address in a cluster. App.638-39. As the district court found, Scholl's and Bisbee's testimony was "both probative and persuasive" as to Reactor's reliability. App.6969. Moreover, the government's supplemental filing provided additional corroboration of Reactor's reliability, explaining that one cooperator had reviewed a large number of addresses that Reactor had clustered and confirmed that Reactor had correctly clustered and attributed 99.9146 percent of them. Supp.App.283.

As the district court found, the investigation in Sterlingov's case further demonstrated Reactor's reliability. The government identified 43 transactions that

sent funds from 148 bitcoin addresses within the Bitcoin Fog cluster to Sterlingov's personal accounts, and a tool from Chainalysis's competitor, TRM Labs, corroborated Reactor's attribution of all of those addresses to Bitcoin Fog. App.563, 6410. Moreover, Sterlingov himself partially corroborated that attribution in pretrial testimony, confirming that he "mixed most, if not all, of the deposits into [his] Kraken account through Bitcoin Fog before depositing them." App.243.

In addition, through the government's undercover transactions with Bitcoin Fog, Scholl identified five bitcoin addresses that Bitcoin Fog controlled, and four of those addresses were in Reactor's Bitcoin Fog cluster. App.560-63. Although Reactor did not include the fifth address in that cluster, Scholl testified that this lack of attribution was consistent with Chainalysis's "reliable and conservative" approach to clustering, which ensures that Reactor will include an address in a cluster only if Chainalysis is "sure" about that attribution.[4] App.562; *see also* App.3767.

As the district court recognized, Reactor's "deliberately conservative and thus underinclusive" approach to clustering "is hardly a reason to discount its reliability." App.6972. Moreover, because Scholl and Bisbee used Reactor "to gauge the general

---

[4] Scholl did not state in his expert report that Reactor "should have" flagged the fifth address as Bitcoin Fog or that Reactor "erred" in not making that attribution. Br.38-39; *see* App.6410 (Scholl's report).

magnitude of the transactions involving Bitcoin Fog and various darknet sites," the relevant Rule 702(c) question is whether Reactor "reliably clusters hundreds of thousands of addresses," not "whether it has correctly identified a single address (or handful of addresses)." App.6967. The district court reasonably determined that, in the large-scale context in which Scholl and Bisbee were using Reactor, "a handful of errors (if any) among hundreds of thousands of addresses is likely immaterial." App.6967.

The district court also reasonably found that Still—Sterlingov's own proposed expert—provided further evidence of Reactor's reliability. As the court observed, Still agreed that Heuristic 1 provides an appropriate basis for clustering and attribution, and she also acknowledged that her employer Ciphertrace used its own version of Heuristic 3.[5] App.6973. And although Still claimed that Heuristic 2 was unreliable, Sterlingov's counsel subsequently told the district court that Ciphertrace was "currently developing its own version of Heuristic 2." App.6973. As the district court found, that information cast "substantial doubt" on Still's criticism of Heuristic 2. App.6973.

---

[5]   Contrary to Sterlingov's contention (Br.38), Still did not say that Ciphertrace "eschew[ed]" Heuristic 3 "as 'unreliable and not a true representation of the flow of funds on chain.'" *See* App.6784 (Still's expert report) (applying this characterization only to Heuristic 2).

In addition, Still confirmed that Ciphertrace had validated almost 400,000 addresses that Reactor had attributed to the Bitcoin Fog cluster, App.1228, and she admitted that she had not identified a single address in Reactor's Bitcoin Fog cluster that Reactor had misattributed to Bitcoin Fog, App.1215-18. Although Reactor attributed more addresses to Bitcoin Fog than Ciphertrace did, the district court reasonably found that "the fact that Ciphertrace was even more conservative (or arguably less adroit) in its analysis does not cast doubt on the reliability of Reactor's results." App.6974. And the record also supports the district court's finding that Ciphertrace and Reactor "largely align[ed]" with respect to the cluster attributions for four darknet markets. App.6974; *see* App.6798.

### 3. The four *Daubert* factors do not cast doubt on Reactor's reliability

The district court also reasonably rejected Sterlingov's contention that the *Daubert* factors cast doubt on Reactor's reliability. To start, and as the district court recognized, the *Daubert* factors "'may or may not be pertinent in assessing reliability' in specific circumstances," *Morgan*, 45 F.4th at 203, and "do *not* constitute a 'definitive checklist or test'" that Reactor had to satisfy, *Kumho Tire*, 526 U.S. at 150. *See* App.6975. Because Sterlingov's district-court challenge to Reactor's reliability rested on the *Daubert* factors, however, the district court carefully reviewed each factor and explained why it either corroborated Reactor's reliability or was not pertinent to assessing reliability in these circumstances. *See*

App.6975-80.  In so doing, the court appropriately exercised its "broad latitude" in determining the "reasonable measures of reliability" in this case.  *Kumho Tire*, 526 U.S. at 153.

a.  With respect to the first *Daubert* factor, *i.e.*, whether Reactor "can be (and has been) tested," 509 U.S. at 593, the district court found that Reactor's clustering "can be and has been tested," App.6976.  The evidence described above amply supports that finding.  And contrary to Sterlingov's contention (Br.35-36), that extensive and replicable testing is not the kind of "'[u]ncontrolled anecdotal information'" that the Eleventh Circuit has previously found unreliable.  *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005) (evaluating "reports reflect[ing] complaints called in by product consumers without any medical controls or scientific assessment"): *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316 (11th Cir. 1999) (evaluating "anecdotal" case studies that contradicted "controlled, population-based epidemiological studies").  The extensive testing in this case also refutes Sterlingov's contention (Br.36) that no one could "truly test" Reactor's reliability without "complete access" to the proprietary information that Chainalysis used to develop Reactor, including Reactor's source code.

As previously explained, the district court also reasonably determined that Still's testing corroborated Reactor's reliability.  But even if Reactor's results were in some tension with Still's findings, such a conflict would not undercut Reactor's

reliability because Ciphertrace acknowledged that Still's work in this case was "unreliable," at least in part. Supp.App.313. In light of that revelation, Sterlingov withdrew Still's expert report and declined to call her as a trial witness. Supp.App.316-17. Although Sterlingov now seeks to resurrect Still's opinions on appeal, he provides no basis for concluding that any "discrepancies" (Br.37) between Reactor's results and Still's admittedly flawed analysis cast doubt on Reactor's reliability, rather than Still's. And even if a viable dispute existed on that question, that dispute "provide[d] grist for adversarial examination, not grounds for exclusion." *United States v. Gissantaner*, 990 F.3d 457, 464 (6th Cir. 2021) (reversing district court's decision to exclude the DNA-sorting software STRmix as unreliable).

b. The second *Daubert* factor asks whether the relevant theory or technique "has been subjected to peer review and publication." 509 U.S. at 593. In this case, the district court correctly found that Heuristic 1 "has received widespread academic approval" and has "been widely discussed and relied upon in academia." App.6976 (citing Sarah Meiklejohn et al., *A Fistful of Bitcoins: Characterizing Payments Among Men with No Names*, at 6 (Oct. 2013), https://cseweb.ucsd.edu/~smeiklejohn/files/imc13.pdf). Although the district court identified only one of those academic papers in its opinion, that paper explains that Heuristic 1 "has already been used many times in previous work" and provides four citations to such works.

46

*See* Meiklejohn 6.  In addition, the government submitted a second research paper that provided additional confirmation of Heuristic 1's academic approval.  *See* Supp.App.234.

As the district court recognized, Heuristics 2 and 3 have not been the subject of similar academic study.[6]  But the court reasonably found that "[t]he notion of 'peer review'" is "an odd fit" for Heuristic 2 because that heuristic "varies from case-to-case and entity-to-entity."  App.6976.  Given that circumstance, it is "neither surprising nor dispositive" that the specific Heuristic 2 algorithms that Chainalysis developed for the entities in this case have not undergone peer review.  App.6976; *see Kumho Tire*, 526 U.S. at 151.  The court also reasonably determined that the concept of "peer review" was an "inapt" measure of reliability for Heuristic 3, which consists of data and information that Chainalysis obtained from non-blockchain sources.  App.6977.

Sterlingov appears to contend (Br.39-41) that only theories or techniques that have undergone peer review are reliable under Rule 702(c).  But *Daubert* itself

---

[6]  Since trial, academics have presented at least one research paper evaluating the reliability of Chainalysis's attributions.  *See* Kelvin Lubbertsen et al., *Ghost Clusters: Evaluating Attribution of Illicit Services through Cryptocurrency Tracing*, Proceedings of the 34th USENIX Security Symposium (2025), https://www.usenix.org/system/files/usenixsecurity25-lubbertsen.pdf, at 1370 (finding that, for three illicit services, Chainalysis "provid[ed] a reliable lower bound with very few false positives").

explained that the Rule 702(c) inquiry is "flexible" and that "[t]he fact of publication (or lack thereof) in a peer reviewed journal" is "not dispositive." 509 U.S. at 594. The district court thus was not required "to 'automatically exclude evidence because it is too new, or of too limited outside interest, to generate extensive independent research or peer-reviewed publications.'" *Morgan*, 45 F.4th at 203.

c. The third *Daubert* factor is whether the theory or technique at issue "has a high 'known or potential rate of error.'" *Morgan*, 45 F.4th at 200 (quoting *Daubert*, 509 U.S. at 594). Although Chainalysis had not formally compiled an error rate for Reactor, *see* Supp.App.231, other evidence indicates that Reactor's error rate is low. Scholl and Bisbee each testified that, in their extensive experience with Reactor, they have never seen Reactor return a "false positive," App.638-39, 4137-38, and TRM Lab's and Ciphertrace's competitor tools corroborated many of Reactor's attributions in this case, App.6972-74. The district court reasonably determined that "[n]othing more is required," App.6978, and had no obligation to undertake a more "specific inquiry" into error rates, *United States v. Straker*, 800 F.3d 570, 631-32 (D.C. Cir. 2015) (rejecting defendant's contention that expert testimony is admissible only if the expert articulates a rate of human error for her methodology).

Sterlingov appears to suggest (Br.41-42) that, in the absence of peer review and a formally compiled error rate, the district court should have undertaken its own

"exhaustive evaluation" of Reactor's source code to determine its reliability. As previously explained, however, the district court had "considerable leeway" in deciding how to assess Reactor's reliability, *Kumho Tire*, 526 U.S. at 152, and Sterlingov identifies no court that has concluded that either Rule 702 or *Daubert* mandates the kind of source-code evaluation that he describes. *Cf. Gissantaner*, 990 F.3d at 463-70 (cited at Br.40-41) (evaluating reliability of software without reviewing source-code evidence).

Instead, Sterlingov cites two New Jersey state cases that evaluated reliability under the test outlined in *Frye v. United States*, 54 App. D.C. 46 (1923), an "austere standard" that *Daubert* determined was "incompatible with" the Federal Rules of Evidence and "should not be applied in federal trials." 509 U.S. at 589. *See State v. Pickett*, 246 A.3d 279, 298 & n.10 (N.J. Super. Ct. App. Div. 2021); *State v. Chun*, 943 A.2d 114, 136 (N.J. 2008). New Jersey itself has since replaced the *Frye* standard with a *Daubert*-type standard, *State v. Olenowski*, 289 A.3d 456, 467-69 (N.J. 2023), and its earlier *Frye* cases necessarily shed no light on the proper application of the *Daubert* standard.

Sterlingov also appears to suggest (Br.43-45) that "draconian non-competition provisions" prevented his experts from reviewing certain heuristics information that Chainalysis disclosed in this case. *See* pp. 60-61, *infra* (describing that production). But the five-year non-compete clause that Sterlingov identifies in his brief (Br. 44)

appeared only in a *proposed* protective order, *see* App.6860, 6867, and the protective orders that the district court actually entered did not contain that language, *see* App.74-77, 6877-83. Furthermore, Sterlingov informed the district court that Ciphertrace and Still were declining to review Chainalysis's heuristics disclosure "regardless of the scope of any protective order," App.6884, and the court subsequently found that Still and Ciphertrace had refused to review the information "based on their own competitive concerns and not based on the protective order, whatever form it might take," App.6924. The district court thus correctly rejected Sterlingov's contention that its protective orders had prevented Still from reviewing the heuristics production. App.6913-24.

Finally, amicus curiae ChainArgos raises numerous additional reliability arguments that Sterlingov did not include in his opening brief. This Court "ordinarily do[es] not entertain arguments not raised by parties," *Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335, 1338 (D.C. Cir. 1998), and it should decline to do so here. Moreover, to the extent that ChainArgos's arguments rest on the factual premise that Reactor does not account for "CoinJoins," the record establishes that Chainalysis "ha[s] controls in place to identify coinjoins," App.621, and does, in fact, "screen for CoinJoins," App.3704. *See* App.3702-04 (explaining CoinJoins).

d.    The final *Daubert* factor asks whether the relevant theory or technique enjoys "'general acceptance'" within "a relevant scientific community." 509 U.S. at 594.    Sterlingov acknowledges "Reactor's widespread adoption by law enforcement and financial institutions," Br.45, and does not dispute that Reactor is "'an industry standard tool,'" App.6979.  This Court determined that the district court in *Morgan* reasonably found that similar considerations—*i.e.*, wide industry acceptance and law-enforcement usage—sufficiently established the reliability of the technique at issue there, despite "the lack of independent studies of th[at] relatively newer practice."  45 F.4th at 203.  That analysis also rebuts Sterlingov's suggestion (Br.45-46) that the relevant expert community, for *Daubert* purposes, should not include law-enforcement or private-sector specialists who use and purchase Reactor.  *See also Gissantaner*, 990 F.3d at 466 (finding that the relevant scientific community accepts STRmix because "[m]ore than 45 [forensic] laboratories use it, including the FBI and many state law enforcement agencies").

### 4.    The admission of the Reactor evidence was harmless

In any event, the admission of Reactor-based evidence would not warrant reversal because that evidence did not affect Sterlingov's substantial rights.  *See United States v. Machado-Erazo*, 47 F.4th 721, 732-33 (D.C. Cir. 2018) (describing applicable harmless-error standard).  As Sterlingov argued below, Chainalysis was only "a minor witness" in this case and "ma[de] no attribution regarding [him] at

51

all." Supp.App.298-99. Scholl and Bisbee principally used Reactor "to gauge the general magnitude of the transactions involving Bitcoin Fog and various darknet sites," App.6967, but Sterlingov's charges did not require the jury to find that Bitcoin Fog was a large-scale operation. Rather, as previously explained, the jury merely needed to decide whether Sterlingov engaged in money laundering in connection with Agent Price's November 2019 undercover transaction; whether Sterlingov conspired to launder money; and whether he was operating an unlicensed money-transmitting business and engaging in the business of money transmission without a license. The jury would have found Sterlingov guilty of each of those offenses even without the Reactor evidence.

### C. The district court acted within its discretion in admitting Mazars' IP-address testimony

#### 1. Background

Before trial, the government provided notice of its intent to present testimony from former FBI computer scientist Valerie Mazars de Mazarin (Mazars) about IP addresses that Sterlingov used and "her analysis of those IP addresses and overlap across accounts." Supp.App.10-11; *see* App.1357. An IP address is an identifier that a computer uses when connecting to the Internet, App.1363-64, and when a user accesses an online account, the account's logs typically record the IP address associated with that login, App.1371-72.

Mazars uses the same general methodology in almost all of her cases: she looks for common IP addresses in different data sources and reviews how close in time those IP-address events are. App.4853. Here, the Internal Revenue Service (IRS) provided her with IP-address data for online accounts associated with either Sterlingov or Bitcoin Fog, and she reviewed that data to identify IP addresses that appeared in multiple accounts' logs. App.1391, 6532-33. When her initial review revealed "numerous instances" of the same IP address accessing multiple accounts, she sought to reduce that number to allow her to "focus on the connections that were closest in time." App.1375. Accordingly, she applied "time cutoffs" to filter the data down to instances when the same IP address accessed multiple accounts within a shorter timeframe. App.1375.

Mazars determined what timeframe, or "overlap window," to apply to a given IP address by using Whois and Passive DNS directories—standard tools of cybersecurity professionals, App.1367—to categorize the IP address. App.1376-77. For IP addresses that appeared to be residential, she applied a 12-month overlap window because "[t]hose IPs tend to be more fixed." App.1376-77. For IP addresses that appeared to be proxy servers, she applied a 10-minute overlap window because, in her experience, a person using a proxy server tends to "have longer browsing sessions." App.1378; *see* App.1376-77. And for IP addresses that might be VPNs or Tor nodes, she applied a five-minute overlap window because those addresses can

"cycle more quickly" than proxy servers. App.1378-79. Using those filters, Mazars identified eight IP addresses that logged into two or more relevant accounts within the overlap windows that she had identified. App.6534-38.

After hearing Mazars' *Daubert* testimony, the district court allowed her to testify as an expert on several topics, including IP-address analysis. App.4522. During her trial testimony, Mazars explained that she had identified several occasions when the same IP address accessed multiple accounts at issue in this case close in time. App.4611. She showed the jury spreadsheets that she had prepared that set forth those IP addresses, the dates and times of the relevant logins, and the online accounts associated with those logins. App.4612-14; *see* Supp.App.476 (Exhibit 364). She also identified several sets of logins whose proximity and circumstances suggested that the same user had used the relevant IP address to access multiple accounts within a short period of time, App.4620-34.

Sterlingov presented his own expert witness, Jeffrey Fishbach, who testified that "maybe [he] did agree with" some of Mazars' conclusions, although he disagreed with the term "overlap." App.5647. On cross-examination, Fishbach confirmed that, if a person accesses two different accounts from the same computer at the same time, the same IP address would likely appear in the access logs for each account. App.5724-26.

### 2. Mazars' testimony rested on reliable principles and methods

Mazars' IP-address analysis was the product of a standard methodology. She reviewed the IP-address logs for online accounts connected to Sterlingov or Bitcoin Fog to identify IP addresses that appeared in the logs for more than one account. App.1391, 6532-33. When the same IP address accessed multiple accounts, she looked at the times of those IP-address events to see how close in time they were. App.6534-38. If those events were sufficiently close, she was sometimes able to determine that the same user had probably accessed the different accounts. *See* App.4620-34, 6538.

Mazars' analysis thus rested on an uncontroversial principle: that a person who uses the same computer to access two different online accounts at approximately the same time will probably use the same IP address for both accesses. *See, e.g.*, *United States v. White*, 810 F.3d 212, 228-29 (4th Cir. 2016); *United States v. Kearney*, 672 F.3d 81, 89 (1st Cir. 2012); *Klimas v. Comcast Cable Comms., Inc.*, 465 F.3d 271, 273 (6th Cir. 2006). Sterlingov's own expert agreed with that principle at trial, *see* App.5724-25, and Sterlingov does not appear to challenge its reliability on appeal.

Instead, Sterlingov observes (Br.47-48) that many users can use the same IP address at the same time, and he suggests that this circumstance means that Mazars could not reliably determine whether a single user probably used that IP address to

access multiple accounts. Here, however, Mazars knew that another potential connection existed between the accounts she reviewed: all of those accounts were associated with either Sterlingov or Bitcoin Fog. App.6532. Because there are billions of IP addresses, *see* Kristen E. Eichensehr, *The Cyber-Law of Nations*, 103 Geo. L. J. 317, 350 (2015), the chances are vanishingly small that unrelated users would use the same IP address to access those related accounts within a short period of time.

Mazars did not create her methodology out of whole cloth for purposes of this case. Rather, in "almost every case," she reviews different data sources to identify common IP addresses and examines how close in time those IP-address events are. App.4853; *see also* App.1374. She also testified that she has previously used overlap windows to filter her data, although this case was the first where she used different overlap windows in the same analysis. App.1404-05. In that respect, Mazars conducted her analysis in this case in a "specific way" that she "designed for the data set" that she received, App.4853, but she explained why those different overlap windows were appropriate based on the different types of IP addresses that appeared in the logs, *see* App.1376-79.

Sterlingov contends that Mazars' testimony was unreliable based on the theory that her analytical approach did not satisfy the *Daubert* factors. As previously explained, however, the *Daubert* factors are not "a 'definitive checklist or test'" and

"may or may not be pertinent in assessing reliability." *Kumho Tire*, 526 U.S. at 150. For example, it not "surprising" that no one has peer-reviewed the specific overlap windows that Mazars applied in this case, which were both "too new, [and] of too limited outside interest, to generate extensive independent research or peer-reviewed publications." *Morgan*, 45 F.4th at 203 (quotation marks omitted). The *Daubert* factors were thus not especially illuminating in Mazars' case, and the district court could reasonably focus instead on her "personal knowledge or experience" in determining reliability. *See Kumho Tire*, 526 U.S. at 150. As explained above, those considerations confirmed the reliability of Mazars' analytical approach.

Sterlingov briefly suggests (Br.48-49) that Mazars' analysis was unreliable because some of the IP-address data she reviewed did not specify a time zone.[7] But Mazars explained that, when logs do not specify a time zone, "the convention is to use UTC," *i.e.*, Coordinated Universal Time, and that she used that time zone for those records. App.4610-11; *see also* App.1399-1400, 4852. Because Mazars' time-zone approach was consistent with industry standards, the district court acted within its discretion in finding it admissible under Rule 702(c). *See Kumho Tire*, 526 U.S.

---

[7] Sterlingov also repeatedly observes (Br.47-48) that Mazars did not use "original logs" in her analysis, but he does not dispute that the data that she reviewed replicated information contained in those logs.

at 152 (explaining that an expert should employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

### 3. Mazars' IP-address testimony was harmless

In any event, the admission of Mazars' IP-address testimony was harmless because the jury would have found Sterlingov guilty even without that testimony. To start, ample other evidence established that Sterlingov created and operated Bitcoin Fog.[8] *See* pp. 3-17, *supra*. Furthermore, Sterlingov's challenges to Mazars' testimony do not cast doubt on the reliability of her IP-address spreadsheet, which simply summarized IP-address records that she reviewed. *See* App.4612-14; Supp.App.476 (Exhibit 364). Because that spreadsheet thus would have been admissible even if other parts of her testimony were not, the jury necessarily would have known that, on several occasions, the same IP address accessed multiple relevant accounts within a short period of time. Based on that evidence, and even without Mazars' other IP-address testimony, the jury would have drawn the common-sense inference that the same person was likely controlling those accounts.

---

[8] This evidence included Sterlingov's Exploit posts. Although Sterlingov contends (Br.75-76, 79) that the government relied on Mazars' IP-address testimony to connect him to the "Meth!" Exploit account, Mazars discussed that account only in other testimony. *See* App.4715-17, 4805-10.

### III. The district court properly denied some of Sterlingov's requests for access to Chainalysis's proprietary information

#### A. Background

As explained, Scholl's and Bisbee's testimony relied in part on Reactor, a proprietary software product from Chainalysis that clusters bitcoin addresses using three heuristics (Heuristics 1, 2, and 3). *See* pp. 36-38, *supra*. Before trial, Sterlingov issued subpoenas under Federal Rule of Evidence 17(c) to Chainalysis and three of its executives, demanding the production of 19 categories of documents and objects. Supp.App.174-224. The subpoenas were "extremely overbroad and burdensome," App.1953, and during a June 2023 hearing, the district court granted, without prejudice, Chainalysis's motion to quash the subpoenas, App.377; *see* App.371-76.

At that hearing, Sterlingov's counsel clarified that Sterlingov wanted Reactor's source code. App.372. The court said that it was "sympathetic to the notion" that Sterlingov might need specific information for his defense, but that he needed to explain why that code was "material and relevant in the criminal case" and why he needed access to it. App.375-76; *see* App.372-74. After Sterlingov's counsel confirmed that the defense had an expert who could review Reactor's code and identify a problem with it, the court asked that the expert prepare a statement identifying "the particular facts" that he needed for his analysis. App.376. Sterlingov's counsel replied, "[T]hat's an excellent idea. We're happy to do that."

App.377.  Over the next two months, the court repeatedly requested that expert statement, but the defense never provided it.[9]  App.1004-05, 1051-54, 1060, 1957-59, 1964; Supp.App.273.

Instead, Sterlingov filed a motion for leave to issue a Rule 17(c) subpoena that would require Chainalysis to produce Reactor's source code, among other items. Supp.App.250, 268.  During an August 2023 hearing attended by Chainalysis's counsel, the district court said that it believed that Sterlingov was entitled to understand "what heuristics applied in this case and any assumptions that applied." App.1474.  In response, Chainalysis offered to provide more information about those heuristics.  App.1480.  The court asked Sterlingov's counsel to identify the information that Sterlingov was seeking regarding those heuristics, and after Sterlingov's counsel did so, the court ordered Chainalysis to provide the heuristics information that the defense had requested.  App.1489-94.

The following week, Sterlingov requested the production of numerous items, including "Chainalysis source code, broadly."  App.6846; *see* App.6846-56.  His new request encompassed "software beyond Chainalysis Reactor."  App.6850; *see*

---

[9]  It later became clear that the defense did not have a computer-code expert at the time of the June 2023 hearing.  *See* App.1004-05.  In late August 2023, the defense proposed a potential expert, but without providing a statement of any kind from that expert.  Supp.App.273.  After the district court expressed concerns about that expert, *see* Supp.App.273-75, the defense proposed another expert but again failed to provide a statement from that expert, App.1964, 6843-57.

App.6846, and provided a two-paragraph "[j]ustification" for that request, App.6850-51. Meanwhile, Chainalysis compiled the heuristics information that Sterlingov had requested. App.1899, 1909.

On September 13, 2023, the district court denied Sterlingov's motion for leave to issue a Rule 17(c) subpoena for Reactor's source code. App.1951-52. Observing that Sterlingov's most recent request for the source code had become "massively broader," App.1964, the court found that Sterlingov had not shown that he needed the source code, especially in light of Chainalysis's recent heuristics production. App.1970; *see* App.1965-69. The court found that Chainalysis's disclosure would allow the defense to "run the particular heuristics at issue here" to evaluate their accuracy, which was the only reason that Sterlingov had ever identified as a basis for needing access to the source code. App.1970.

Following that hearing, Sterlingov's counsel asked defense expert Still to review Chainalysis's heuristics production subject to a protective order, App.1875, 2003, and the district court did "everything in its power to accommodate the needs of Still and Ciphertrace and to assuage their concerns" about reviewing that production, App.6923-24; *see* App.6913-24. Despite those efforts, Still and Ciphertrace ultimately concluded that they were unwilling to review the heuristics production. App.6914, 6924.

Sterlingov subsequently sought authorization to review Chainalysis's heuristics production himself. App.6912-13. After briefing and argument, the district court found that the government had shown good cause to restrict Sterlingov from personally reviewing production and that the defense had failed to offer any countervailing justification supporting disclosure. App.6930-31; *see* App.6932-41.

## B. Standard of review

This Court reviews for abuse of discretion the district court's denial of Sterlingov's request to issue a Rule 17(c) subpoena. *See United States v. Brooks*, 966 F.2d 1500, 1505 (D.C. Cir. 1992). The Court generally reviews for abuse of discretion the district court's decision to limit Sterlingov's personal access to Chainalysis's heuristics production, *United States v. Cordova*, 806 F.3d 1085, 1090 (D.C. Cir. 2015), but reviews de novo whether that decision violated Sterlingov's Fifth Amendment right to present a complete defense, *see Straker*, 800 F.3d at 629; App.6902 (preserving that claim below).

For the first time on appeal, Sterlingov argues (Br.50-58) that Reactor's outputs were testimonial and that the alleged denial of discovery regarding Reactor therefore violated his Confrontation Clause rights. Sterlingov also argues for the first time on appeal (Br.58-61) that the denial of his request for a Rule 17(c) subpoena violated his right to present a complete defense and that the district court should have required Chainalysis to disclose "the external intelligence data"

underlying Heuristic 3. Because Sterlingov did not raise those claims below, this Court reviews them only for plain error. *See Bostick*, 791 F.3d at 149.

### C. The district court did not abuse its discretion in denying Sterlingov's request for a Rule 17(c) subpoena

Sterlingov appears to contend (Br.51, 60) that the district court should have authorized a Rule 17(c) subpoena to Chainalysis for Reactor's source code and "the external intelligence data" underlying Heuristic 3. The district court correctly declined to authorize a Rule 17(c) subpoena for those items, and that decision did not violate Sterlingov's Fifth Amendment right to present a complete defense.

A Rule 17(c) subpoena is "not intended to provide a means of discovery for criminal cases." *United States v. Nixon*, 418 U.S. 683, 698 (1974). Rather, to require production under Rule 17(c), Sterlingov had to show, among other things, that (1) the items he sought were relevant evidence; (2) he could not properly prepare for trial without their production; and (3) his application was "made in good faith" and "not intended as a general 'fishing expedition.'" *Id.* at 699-700. Because Sterlingov did not make this showing for either the source code or the Heuristic 3 data, the district court correctly declined to issue a Rule 17(c) subpoena for those items. And because Sterlingov has failed to demonstrate that he suffered "any material impairment of his defense" without those items, he also has not shown a due-process violation. *See Straker*, 800 F.3d at 629-30.

1.    Sterlingov has never established that he needed Reactor's source code to prepare for trial. Despite the district court's repeated instructions, Sterlingov never provided the court with a statement from a computer-code expert that explained what the expert needed to review in the code and why the expert needed to do so. *See* App.1955-64. Instead, Sterlingov asserted that he needed the source code because it contained "embedded" information about Reactor's heuristics and because he needed to challenge Reactor's "output." Supp.App.254. In response, the district court directed Chainalysis to disclose the specific heuristics information that Sterlingov requested, App.1489-94, and the court also offered to authorize funding to allow the defense to obtain a license to operate the Reactor software, App.1064-72. Chainalysis subsequently provided the defense with an "extremely extensive" disclosure about its heuristics, including "an enormous amount of information" that would allow the defense to "run the particular heuristics at issue here" and assess their accuracy. App.1970.

The district court accordingly ensured that Sterlingov had the information he needed to test and evaluate Reactor's output and heuristics, which was the only basis that Sterlingov offered below to justify his request for the source code. *See* App.1970. On appeal, Sterlingov again speculates (Br.59) that "[t]he source code and heuristics" might somehow reveal errors in Reactor's clustering and attributions, but the concerns that he raises involve Reactor's heuristics, about which the defense

received extensive discovery. As the district court found, that heuristics production was "more helpful to the defense than the source code would have been" for evaluating Reactor's heuristics, insofar as reading the source code would have required the defense to "try[] to work backwards" to the heuristics information. App.2195. Sterlingov has thus failed to show that he needed the source code to prepare his defense, and the district court appropriately exercised its discretion in declining to require Chainalysis to disclose it.

2. Sterlingov also contends (Br.51, 60) that the district court should have required Chainalysis to produce the "external intelligence data" underlying Heuristic 3. In the district court, however, Sterlingov did not seek disclosure of that information, much less attempt to satisfy the Rule 17(c) standard for its production. Instead, when the district court asked Sterlingov's counsel to identify the information that the defense was seeking regarding Heuristic 3, counsel requested only information about whether Reactor's implementation of that heuristic involved any "manual modification" or "corrections." App.1491; *see* App.6963. Sterlingov does not explain how the district court erred, much less plainly erred, in declining to require a third party to produce information that he never sought below.

The record also refutes Sterlingov's unexplained assertion that Chainalysis's extensive heuristics production was "of limited use" (Br.51) without Heuristic 3's external data. Heuristic 3 played only a small role in this case, helping Reactor to

cluster addresses for the darknet market AlphaBay. App.6963. Reactor relied only on Heuristics 1 and 2 in clustering addresses for Bitcoin Fog and other darknet markets, App.6963-64, and those two heuristics did not use the external data that Sterlingov now seeks on appeal, *see* App.6957-63. And the fact that Sterlingov never requested Heuristic 3's external data below confirms that he did not need that information to prepare his defense.

### D. The district court did not abuse its discretion in prohibiting Sterlingov from personally reviewing the heuristics production

Sterlingov also appears to challenge (Br.51, 56-57) the district court's decision to preclude him from personally reviewing Chainalysis's heuristics production. The district court appropriately exercised its discretion under Federal Rule of Criminal Procedure 16(d)(1) in imposing that restriction, which applied only to the heuristics production and only to Sterlingov himself, not to his counsel or qualified experts. *See* App.6937.

Under Rule 16(d)(1), a district court "may, for good cause, deny, restrict, or defer discovery or inspection." The party seeking a discovery restriction bears the burden of showing "good cause," and "[a]mong the considerations to be taken into account by the court will be the safety of witnesses and others, a particular danger [of] perjury or witness intimidation, the protection of information vital to the national security, and the protection of business enterprises from economic reprisals." Fed. R. Crim. P. 16 advisory committee notes (1966 amendment); *see*

*Cordova*, 806 F.3d at 1090. Here, the district court reasonably found good cause to preclude Sterlingov from having personal access to the heuristics production because disclosure would pose a risk to ongoing criminal and national-security investigations. *See* App.6931-37.

As the district court found, the heuristics production provided new details about Reactor's heuristics that previous discovery had not revealed, including information about "'what behavior would cause Chainalysis *not* to cluster'" a given bitcoin address. App.6932. If that information were disclosed to "those bent on preventing the government . . . from clustering addresses, and thereby identifying their owners and connecting them to potentially illicit transactions," those persons "could readily adjust their conduct to evade detection." App.6932; *see* App.6933-34. The court reasonably determined that, in light of that risk, the government had a "valid and substantial" concern about giving Sterlingov personal access to the heuristics production. App.6934. As the court explained, Bitcoin Fog "was itself designed and employed to help bitcoin users avoid clustering and tracing of their on-chain activities," and Sterlingov was "the alleged administrator of Bitcoin Fog." App.6934. Those circumstances supported a reasonable inference that, if Sterlingov obtained personal access to the heuristics production, there was a risk that he would improperly use that information to continue his efforts to help other bitcoin users evade government investigation.

Contrary to Sterlingov's contention, the district court's good-cause finding did not rest on an "assumption" that he was guilty as charged or that he would engage in future criminal activity. Br.57. Rather, the court specifically recognized that "every criminal defendant is presumed innocent unless and until the government carries its burden of proof." App.6936. Moreover, Sterlingov cites no legal authority to support his suggestion that, in evaluating the potential risks of disclosing sensitive information to a defendant, a court may not consider the possibility that the defendant committed the charged offenses, especially where, as here, a grand jury has already made a probable-cause finding. *See, e.g.*, *FDIC v. Mallen*, 486 U.S. 230, 244 (1988) (finding "little likelihood" that FDIC's suspension of bank official was "without basis" where grand jury had found probable cause to believe that the official had committed a crime).

The district court also correctly determined that Sterlingov's claimed need for access to the heuristics production neither trumped the government's good-cause showing nor demonstrated a Fifth Amendment violation. Sterlingov had personal access to "reams" of other information relating to Reactor's clustering and attributions in this case, App.6940, and the less sensitive information in the heuristics production was already in Bisbee's expert report, App.6935-36. Sterlingov also did not claim below, and has not argued on appeal, that he needed personal access to the heuristics production so that he could actively assist in his

own defense.  *See* App.6937-38.  Moreover, as the district court found, the heuristics production was not evidence that the government intended to offer against Sterlingov; in fact, that production did not exist until Chainalysis created it for the defense.  *See* App.6938-39.

### E.    The Confrontation Clause did not require further Reactor disclosures or preclude expert testimony about Reactor's results

On appeal, Sterlingov argues for the first time (Br.50-56) that the Sixth Amendment's Confrontation Clause entitled him to the Reactor disclosures described above, based on the theory that Reactor's outputs are "testimonial." Sterlingov further argues that, without those Reactor disclosures, the Confrontation Clause precluded Scholl and Bisbee from testifying about Reactor's clustering and attributions.  That plain-error claim lacks merit.

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the government may not offer into evidence a "testimonial" statement of an absent witness in a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination.  *Id.* at 68.  In *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the Court held that the Confrontation Clause did not allow the admission of an analyst's forensic report certifying the results of a blood-alcohol test when offered through the trial testimony of another scientist who "did not sign the certification or perform or observe the test" and who had no "'independent opinion'" about its results.  *Id.* at 652, 662; *see id.* at 661-65.

*Bullcoming* made clear that the statements at issue there were actual statements made by the analyst in his report that addressed "more than a machine-generated number." *Id.* at 660. *Bullcoming* concluded that "[*t*]*hese* representations"—not the raw data— were testimonial statements for Confrontation Clause purposes because the analyst's representations "relat[ed] to past events and human actions *not* revealed in raw, machine-produced data." *Ibid.* (emphases added); *accord United States v. Moore*, 651 F.3d 30, 73-74 (D.C. Cir. 2011).

Here, Reactor automatically generated the clustering and attribution data that Scholl and Bisbee discussed at trial. That kind of machine-generated data does not constitute testimonial "statements" of any "witness" and thus does not implicate the Confrontation Clause. *See, e.g.*, *United States v. Miller*, 982 F.3d 412, 437 (6th Cir. 2020) ("A computer system that generates data and inputs the data into a report cannot be described as a 'witness' that gives 'testimony.'"); *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109-10 (9th Cir. 2015) (determining that satellite images and other data "automatically generated" by software program were not testimonial statements).

Sterlingov has accordingly failed to show that Reactor's machine-generated outputs were testimonial. Moreover, he cites no legal authority to support his related assertion (Br.55-56) that the Confrontation Clause gives him some right to "confront" Reactor's analysis by examining Reactor's source code and other

information.  That assertion conflicts with this Court's precedent, which establishes that "the Confrontation Clause did not create 'a constitutionally compelled rule of pretrial discovery' of information that might be useful to the defense in preparing for trial."  *United States v. Wilson*, 605 F.3d 985, 1004 (D.C. Cir. 2010).  Sterlingov has thus failed to show any Confrontation Clause error, let alone a plain error.

### F.    Any error was harmless

In any event, Sterlingov suffered no prejudice from the district court's decisions regarding the disclosure of Reactor-related information.  The defense had access to ample information regarding Reactor, including Chainalysis's heuristics production and the Reactor software.  That information enabled the defense to "run the particular heuristics at issue here" to evaluate their accuracy, App.1970, and to run Reactor itself and compare its results to other software, App.1968-69.  And although Sterlingov himself did not have personal access to the heuristics production, his counsel could review that information and has never identified anything in the production that Sterlingov himself needed to review in order to assist counsel in preparing his defense.  App.6940-41; *see Cordova*, 806 F.3d at 1091 (finding no prejudice in similar circumstances).  Finally, even a successful challenge to Reactor's reliability would not have changed the outcome of Sterlingov's trial because the jury would have found him guilty on all counts even if it had disregarded all Reactor evidence.  *See* pp. 51-52, *supra*.

## IV. The Welcome to Video evidence did not violate Federal Rule of Evidence 403 or constructively amend the indictment

### A. Background

Welcome to Video was a darknet site dedicated to child-sexual-abuse material, and it allowed users pay to download that material. App.4082. Welcome to Video sent no funds directly or indirectly to Bitcoin Fog, but it received direct transfers from Bitcoin Fog worth approximately $989 and indirect transfers worth approximately $846. App.4085.

In 2018, law enforcement shut down Welcome to Video and seized its records. App.4086; *see* App.6416. Those records included information about 10 users who had purchased child-sexual-abuse material on the site using funds withdrawn from Bitcoin Fog. App.4087-89, 4094-95; *see* App.7222-52. Each user record included titles and descriptions of the specific videos that the user had downloaded. App.4089-90, 4401. Following Welcome to Video's shutdown, law enforcement attempted to locate and charge as many of the site's users as possible. App.4095. Law enforcement identified some of those users through blockchain analysis but could not trace the funds of Bitcoin Fog users. App.4095-96.

Sterlingov moved to exclude all evidence about darknet markets, including all Welcome to Video evidence, arguing in part that it was inadmissible under Federal Rule of Evidence 403. App.6942-47. The district court denied the motion, finding the evidence "highly probative" and not more prejudicial than probative. App.5204;

*see* App.4084-85, 4406-09.  The district court was more receptive to Sterlingov's Rule 403 objection to the "disturbing" video titles and descriptions in Welcome to Video's user records.  App.4091; *see* App.4089-93.  The government offered to redact those titles and descriptions if Sterlingov agreed to stipulate that each of those users had committed a federal offense involving child-sexual-abuse material, App.4410-12, and the parties ultimately agreed to such a stipulation, App.5312; *see* App.4415-16.

The government presented the redacted Welcome to Video evidence described above through the testimony of Scholl and FBI Agent Steven Santell.  App.4082, 4085-89, 4094-96, 5310-12, 5317-18, 5363-69.

### B.    Standard of review

This Court reviews the district court's application of Rule 403 for abuse of discretion.  *Morgan*, 45 F.4th at 204.  Because Sterlingov did not argue below that the Welcome to Video evidence constructively amended the indictment, this Court reviews this new claim only for plain error.  *United States v. Riley*, 115 F.4th 604, 615 (D.C. Cir. 2024).

### C.    Rule 403 did not require the Welcome to Video evidence's exclusion

Under Rule 403, a district court may exclude relevant evidence if its probative value "is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  This Court gives

"great deference" to a district court's determination that evidence is admissible under Rule 403, reversing "only for grave abuse of discretion." *United States v. Lieu*, 963 F.3d 122, 128 (D.C. Cir. 2020) (quotation marks omitted). Here, the district court acted well within its discretion in finding that Rule 403 allowed the Welcome to Video evidence's admission, and the evidence's admission was harmless in any event.

1. The district court correctly recognized the probative value of the Welcome to Video evidence. The government's overarching theory in this case was that Sterlingov designed and operated Bitcoin Fog as a money-laundering site, intending to help Bitcoin Fog users launder funds for illegal purposes so that those users could engage in illicit activities without detection. *See* App.4406-07. The Welcome to Video evidence helped to prove that Bitcoin Fog was, in fact, facilitating the distribution of child-sexual-abuse material and helping Bitcoin Fog users to avoid detection. *See* App.4407.

As Sterlingov concedes (Br.63), the Welcome to Video evidence therefore helped to prove his guilt on the federal licensing count, which charged him with operating an unlicensed money-transmitting business. That count alleged that Bitcoin Fog was unlicensed in part because it involved the transportation and transmission of funds that Sterlingov knew were "intended to be used to promote and support unlawful activity," without limiting that unlawful activity to drug

crimes. App.6564. Based on other trial evidence, the jury could reasonably infer that Sterlingov was, at minimum, willfully blind to the fact that the funds flowing through Bitcoin Fog included funds intended to promote the distribution of child-sexual abuse material. *See* pp. 89-91, *infra* (discussing willful blindness).

The Welcome to Video user records were also probative because they helped to prove that, in 2018, Bitcoin Fog was still laundering funds to facilitate its users' illegal activities. *See* App.5365-68. That temporal evidence was significant because the money-laundering-conspiracy count required the government to prove that the conspiracy continued on or after July 18, 2017. *See* p. 32, *supra*. Although the government presented extensive evidence about large quantities of funds flowing between Bitcoin Fog and nine darknet markets that distributed illegal drugs, *see* pp. 11-12, *supra,* those nine darknet markets each shut down before that date. *See* App.6411-16. The Welcome to Video evidence thus helped to prove that Bitcoin Fog's money-laundering activities continued after that date.

Relatedly, the Welcome to Video evidence identified specific Bitcoin Fog users who used Bitcoin Fog to engage in illegal activity and evade detection from law enforcement. Most of the other darknet markets discussed at trial were not seized by law enforcement, and the government thus was unable to present similar user records for those darknet markets. *See* App.1592-93. The government did have seized user records from Silk Road and Silk Road 2.0, *see, e.g.*, App.4040-74, but

Sterlingov argued that those records shed little light on Bitcoin Fog's more recent operations because law enforcement shut down Silk Road and Silk Road 2.0 in 2013 and 2014, respectively, *see* App.4314-15. The Welcome to Video evidence thus added to the "evidentiary richness and narrative integrity" of the government's case, *Old Chief v. United States*, 519 U.S. 172, 183 (1997), because it provided concrete examples of individual users whose criminal conduct Bitcoin Fog facilitated.

2. The district court appropriately exercised its discretion in determining that the Welcome to Video evidence's probative value was not "substantially outweighed" by a danger that the evidence was needlessly cumulative or would unfairly prejudice Sterlingov. Fed. R. Evid. 403. As explained above, that evidence was not needlessly cumulative. The evidence also presented little risk of unfair prejudice. Such a risk "can arise when 'some concededly relevant evidence [could] lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.'" *United States v. Green*, 149 F.4th 733, 751 (D.C. Cir. 2025) (quoting *Old Chief*, 519 U.S. at 180). Here, however, Bitcoin Fog's facilitation of its users' purchases of child-sexual-abuse-materials was "proof specific to the offense[s] charged," *Old Chief*, 519 U.S. at 180, especially with respect to the federal licensing count. The evidence was therefore prejudicial in the sense that it helped to prove Sterlingov's guilt, but that form of prejudice is not "unfair" and does not justify exclusion under Rule 403. *See ibid.*

Contrary to Sterlingov's contention (Br.61), the Welcome to Video evidence was not "highly inflammatory." The jury heard general testimony that Welcome to Video distributed child-sexual-abuse material, and the parties' stipulation informed the jury that the redacted video titles and descriptions in Welcome to Video's user records established that each user had committed a crime involving obscene child-sexual-abuse material. *See* pp. 72-73, *supra*; App.5312. The government presented no other evidence about the videos' contents, such as evidence that some of the videos depicted prepubescent children and children engaging in sexual acts. *See* App.4089-90. The district court acted well within its discretion in determining that the evidence's generalized references to child-sexual-abuse material, divorced from any graphic details, did not present a risk of unfair prejudice that substantially outweighed the evidence's probative value.

As the district court found, the Welcome to Video evidence was also minimally prejudicial because it established that only "a very small amount" of funds flowed from Bitcoin Fog to Welcome to Video and that no funds flowed in the opposite direction. App.4084. In contrast, other darknet-market evidence showed that Bitcoin Fog laundered millions of dollars of funds from illegal drug trafficking. *See* Supp.App.478; App.4034-35. The comparatively small volume of Welcome to Video transactions thus meant that the Welcome to Video evidence "'did not involve conduct any more sensational or disturbing than the [other]' conduct attributed to"

Bitcoin Fog, which "tends to reduce the danger of unfair prejudice." *United States v. Bell*, 795 F.3d 88, 99-100 (D.C. Cir. 2015).

3.      In any event, any Rule 403 error was harmless because the Welcome to Video evidence "did not have a substantial and injurious effect or influence in determining the jury's verdict." *Green*, 149 F.4th at 756 (quotation marks omitted). The presentation of that evidence was a tiny part of the government's case against Sterlingov, occupying approximately 20 transcript pages during his 18-day trial. *See* App.4082, 4085-89, 4094-96, 5310-12, 5317-18, 5363-69. The jury also did not hear that evidence "shortly before [it] was excused to deliberate," *United States v. Loughry*, 660 F.3d 965, 974 (7th Cir. 2011) (cited by Br.66 n.231); rather, the government presented the last of the Welcome to Video evidence before Sterlingov's three-day defense case and the brief testimony of the government's lone rebuttal witness (Mazars), who did not reference the evidence. *See* App.5437, 6140, 6143-49. Most importantly, and as Sterlingov acknowledges, the government presented "abundant, alternative evidence of Bitcoin Fog users mixing illicit funds," Br.66; *see, e.g.*, pp. 11-12, *supra*, which was the principal fact that the Welcome to Video evidence established.

Finally, Sterlingov never requested a limiting instruction, nor did he disagree when the government argued that such an instruction would be inapt. *See* App.4397. The record therefore indicates that he made a tactical decision not to seek a limiting

instruction and thus "bears at least some responsibility for [any] risk of prejudice the instruction might have averted." *Green*, 149 F.4th at 757. The lack of a limiting instruction accordingly does not preclude a harmless-error finding. *See ibid.*

### D. The Welcome to Video evidence did not constructively amend the money-laundering-conspiracy count

Sterlingov also contends (Br.68-69) that the Welcome to Video evidence constructively amended the indictment's money-laundering-conspiracy count, which charged him with conspiring to launder the proceeds of illegal drug crimes, *see* App.6562. No constructive amendment occurred, much less a plain one.

To establish a constructive amendment, Sterlingov "must 'show that the evidence presented at trial *and* the instructions given to the jury so modified the elements of the offense charged that [he] may have been convicted on a ground not alleged by the grand jury's indictment.'" *Riley*, 115 F.4th at 615. Here, the district court's instructions comported with the indictment because they allowed the jury to find Sterlingov guilty of money-laundering conspiracy only if he conspired to launder money or property from drug crimes. *See* App.6272, 6275. Because the jury instructions thus precluded a money-laundering-conspiracy conviction based on the theory that Sterlingov conspired to launder money for "patrons of a child-pornography site," Br.69, Sterlingov's forfeited constructive-amendment claim "fails at the gate," *Riley*, 115 F.4th at 615.

**V.** **The district court acted within its discretion in admitting the cooperating witnesses' testimony**

**A.** **Background**

The district court repeatedly overruled Sterlingov's objections to the admission of testimony from cooperating witnesses Ilya Lichtenstein and Larry Harmon. App.4364-65, 4395-96, 4434-36, 4930-31, 5083-85.

Lichtenstein testified that he had obtained bitcoin by hacking the currency exchange Bitfinex, App.4363-64, 4424-28, and had employed various techniques to conceal the source of that bitcoin. App.4429-4431. He said that he used Bitcoin Fog about five to ten times, App.4437, and he described his experiences with Bitcoin Fog, App.4431-38. He also acknowledged pleading guilty to money-laundering conspiracy in connection with the Bitfinex hack. App.4363-64.

Harmon testified that he obtained bitcoin by selling ads to darknet markets and later by creating and operating his own mixer, Helix. App.4933-36, 5078-79. He said that he usually mixed his bitcoin because otherwise most of it could be traced back to the dark web. App.5078-79. He testified that he used Bitcoin Fog about eight to ten times, App.5082, and he described his experiences with Bitcoin Fog, App.5079-82. He acknowledged that he had pleaded guilty to money-laundering conspiracy based on his administration of Helix, App.4921, and on cross-examination, he confirmed that he had also been charged with two additional licensing counts, App.5090.

### B.     Standard of review

This Court reviews a district court's evidentiary decisions for abuse of discretion. *Clark*, 156 F.4th at 688.

### C.     The district court properly exercised its discretion in admitting the cooperators' testimony

Sterlingov's opening brief includes a one-paragraph section (Br.88-89) that purports to challenge the admission of Lichtenstein's and Harmon's testimony based on relevance, Rule 403, and Rule 702. Apart from a single reference to Rule 702, Sterlingov cites no law in this section and provides little argument in support of these claims. This Court should therefore deem these perfunctory claims waived. *See Miller*, 953 F.3d at 810.

In any event, the district court appropriately allowed these cooperators' testimony. That testimony was relevant and probative because both witnesses described their personal experiences using Bitcoin Fog to launder the proceeds of illegal activity, which helped to prove that Bitcoin Fog was, in fact, laundering such proceeds. The evidence also rebutted Sterlingov's contention that Bitcoin Fog was a privacy-protection service with law-abiding users. *See* pp. 87-88, *infra*.

Lichtenstein's and Harmon's admissions about their own crimes presented no danger of "taint[ing] Sterlingov with their criminality," Br.89, especially because both witnesses testified that they did not know Sterlingov, App.4423, 4441, 4930, 5089. Moreover, the district court rejected Sterlingov's contention that he bore "a

close physical resemblance" to Lichtenstein. App.4364, 4396. And that court also acted within its discretion in determining that Lichtenstein's and Harmon's testimony, which addressed their personal experiences with Bitcoin Fog and other mixers, did not constitute expert testimony.

## D. Any error was harmless

In any event, the admission of Lichtenstein's and Harmon's testimony was harmless. Those witnesses' testimony was just one strand of evidence among many showing that Bitcoin Fog was laundering criminal proceeds, and because neither witness knew Sterlingov, their testimony played no role in the jury's determination that he was involved in Bitcoin Fog.

## VI. Sterlingov has waived his challenge to the admission of co-conspirator statements, and his challenge lacks merit in any event

### A. Background

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is admissible and not hearsay if it is offered against an opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy." *Ibid.* When a defendant objects to the admission of evidence under Rule 801(d)(2)(E), "the district court must find by a preponderance of the evidence that a conspiracy existed and that the defendant and declarant were members of that conspiracy." *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006).

During Sterlingov's 18-day trial, the government presented hundreds of exhibits, and Sterlingov raised hearsay objections to many of them, including evidence relating to darknet markets. *See, e.g.*, App.3138-46, 3375-85 (BitcoinTalk posts); App.3193-99 (Shormint email messages); App.4043, 4058, 4066-67, 5254, 5261, 5274, 5277-78, 5293, 5297-5305 (Silk Road and Silk Road 2.0 user records); App.5231 (Silk Road home page). Near the close of the government's case, the district court observed that Sterlingov had made "categorical hearsay objections to virtually every document that has been coming in in this case." App.5315.

### B. Standard of review

This Court reviews for abuse of discretion a district court's decision to admit evidence under Rule 801(d)(2)(E), *United States v. Stover*, 329 F.3d 859, 869 (D.C. Cir. 2003), and reviews for clear error the court's determination that a particular statement was made during and in furtherance of a conspiracy, *United States v. Celis*, 608 F.3d 818, 843 (D.C. Cir. 2010).

### C. Sterlingov has waived his Rule 801(d)(2)(E) claim by failing to specify the statements to which he objects

Sterlingov broadly asserts that the district court improperly admitted "hearsay evidence of darknet markets and operator statements" under Rule 801(d)(2)(E), Br.89, but he fails to identify any specific statement that he clams was improperly admitted. The four record citations in his Rule 801(d)(2)(E) argument also do not point to any specific statements, *see* Br.89-92 (citing App.2652-53, 3927-29, 6832,

7217), and his certificate of the rulings under review (Br.iii) provides one non-exclusive citation—"[s]ee, e.g., A. 5227 *et seq.*"—to the beginning of Agent Santell's direct examination, which occupied almost 100 transcript pages and featured numerous hearsay objections. *See* App.5227-5318, 5363-69. Sterlingov's Rule 801(d)(2)(E) argument accordingly fails to comply with Federal Rule of Appellate Procedure 28(e), which requires "[a] party referring to evidence whose admissibility is in controversy" to "cite the pages of the appendix or of the transcript at which the evidence was identified, offered, and received or rejected." *See also* Fed. R. App. P. 28(a)(8)(A).

Sterlingov is responsible for specifying the statements to which he objects, both to enable this Court to "assess the claim of error" and to allow the Court to "determine whether any error detected was harmless." *United States v. Martínez-Hernández*, 118 F.4th 72, 97-98 (1st Cir. 2024). Because Sterlingov has "failed to 'put flesh on [the] bones' of his hearsay argument," this Court should view his Rule 801(d)(2)(E) argument as "waived for lack of 'developed argumentation.'" *Id.* at 98. *Accord United States v. Gallegos*, 784 F.3d 1356, 1359 (10th Cir. 2015); *United States v. Adamo*, 882 F.2d 1218, 1230 (7th Cir. 1989).

### D.    Sterlingov's Rule 801(d)(2)(E) arguments lack merit

If Sterlingov had identified specific statements that he claims were erroneously admitted under Rule 801(d)(2)(E) and prejudicial, the government could

address Rule 801(d)(2)(E)'s application to each statement. For each statement, the government could also address whether (1) Sterlingov preserved an objection to the statement's admission; (2) the statement was admitted for the truth of the matter; (3) the district court actually admitted the statement under Rule 801(d)(2)(E); (4) the statement was also admissible under another evidentiary rule; and (5) the statement's admission was harmless. Because Sterlingov has failed to identify any challenged statements in his brief, however, the government cannot develop such arguments.

In any event, Sterlingov's generalized Rule 801(d)(2)(E) arguments fail to show that the district court clearly erred in finding that the government established by a preponderance of the evidence that a conspiracy existed and that Sterlingov was a member. The jury found that the government proved both of those facts beyond a reasonable doubt, as evidenced by its verdict that Sterlingov was guilty of money-laundering conspiracy. *See* App.6269 (jury instructions). Sterlingov has waived any challenge to the evidence's sufficiency regarding those elements of his conspiracy conviction, *see* p. 35, *supra*, and regardless, the trial evidence sufficiently established that he operated Bitcoin Fog and conspired with others, including darknet-market vendors and administrators, to launder the proceeds of illegal activities, *see generally* pp. 3-17, *supra*.

The record also refutes Sterlingov's contention that the district court "abdicated its gatekeeping role" in admitting evidence under Rule 801(d)(2)(E).

Br.92 (capitalization altered and emphasis omitted). Sterlingov bases that contention on a few words from the district court's oral decision denying his motion to exclude darknet-market evidence under Rules 401 and 403. *See* App.2651-53, 6942-47. That decision did not address Rule 801(d)(2)(E), and other parts of the record confirm that the court was well aware of Rule 801(d)(2)(E)'s requirements and carefully applied them. *See, e.g.*, App.3143, 3146, 3197, 3379-80, 4066, 5281-83, 5287-92, 5312-16.

## VII. The district court properly gave a willful-blindness instruction

### A. Background

The government asked the district court to instruct the jury on willful blindness, Supp.App.18, 89, 99, 104, and Sterlingov opposed such an instruction. App.6069-70, 6683-85. After hearing argument, the district court determined that Sterlingov's case warranted a willful-blindness instruction, App.6109-10; *see* App.6092-6109, and the court instructed the jury accordingly, App.6265, 6275.

### B. Standard of review

This Court generally reviews the propriety of a submitted jury instruction de novo. *Clark*, 156 F.4th at 675. As far as the government can determine, however, this Court has not decided what standard of review applies when a defendant claims that the trial arguments and evidence did not support a willful-blindness instruction. *See United States v. Alston-Graves*, 435 F.3d 331, 336-42 (D.C. Cir. 2006).

Sterlingov concedes that, in this context, abuse-of-discretion review is appropriate. *See* Br.72 n.245. The government agrees. *See United States v. Heredia*, 483 F.3d 913, 921-22 & n.11 (9th Cir. 2007) (en banc) (citing cases).

## C. The trial arguments and evidence justified a willful-blindness instruction

"The doctrine of willful blindness is well established in criminal law." *Global-Tech Appliances, Inc.* v. *SEB S.A.*, 563 U.S. 754, 766 (2011). Under this doctrine, a defendant is "willfully blind" if he "takes deliberate actions to avoid confirming a high probability of wrongdoing" and thus "can almost be said to have actually known the critical facts." *Id.* at 769. Sterlingov agrees (Br.71-72) that a willful-blindness instruction is warranted when a defendant claims a lack of guilty knowledge and the trial evidence supports an inference of deliberate ignorance. *See, e.g.*, *United States v. Nji*, 159 F.4th 259, 271 (4th Cir. 2025). The district court correctly determined that Sterlingov's case met both of those requirements.

### 1. Sterlingov claimed a lack of guilty knowledge at trial

Sterlingov's principal defense at trial was that he was not Bitcoin Fog's administrator, but in the event that the jury rejected that frontline defense and found that he operated Bitcoin Fog, Sterlingov suggested that he lacked guilty knowledge of Bitcoin Fog's activities. Specifically, he repeatedly invited the jury to find that he did not know that Bitcoin Fog was laundering criminal proceeds and promoting unlawful activity.

For example, during his trial testimony, Sterlingov asserted that he was not Bitcoin Fog's administrator, App.5791, but he also made a series of statements suggesting that, if he were Bitcoin Fog's administrator, he lacked guilty knowledge of Bitcoin Fog's illegal activities. For example, he testified that he believed that mixers were "a privacy tool." App.5841; *see also* App.5839-40. He also claimed that a fellow bitcoin trader told him that bad actors had been using blockchain information to find bitcoin owners and then "come to [their] apartments" to rob them. App.5840-41. Sterlingov testified that this risk prompted him to adopt a "general practice" of mixing his bitcoin. App.5841-43; *see also* App.5847, 5849, 6034. Sterlingov's testimony thus invited the jury to infer that he created and operated Bitcoin Fog to help law-abiding bitcoin owners protect their privacy and assets from predatory criminals.

Sterlingov also suggested that Bitcoin Fog's administrator could reasonably believe that Bitcoin Fog was mixing legitimate funds, rather than laundering criminal proceeds. During opening statements, Sterlingov's counsel asserted that "90 percent of people who use mixers use them for privacy purposes," including protecting themselves from potential robbers. App.2728-29. One of Sterlingov's experts provided testimony supporting that claim, *see* App.5465, 5534, 5550-52, and Sterlingov's counsel pressed similar themes during Scholl's cross-examination, App.4157. And Sterlingov also suggested that he lacked guilty knowledge regarding

Agent Price's undercover transaction and the Welcome to Video transactions. *See* App.3038, 4320-21, 5381-82, 6211.

Finally, the government's case below did not rest solely on an actual-knowledge theory: the government described the willful-blindness standard in closing and argued that Sterlingov satisfied it. *See* App.6201-02.

## 2. The trial evidence supported an inference of deliberate ignorance

To justify a willful-blindness instruction, the trial evidence must raise two inferences: (1) Sterlingov was aware of a high probability that a fact existed, and (2) he took deliberate actions to avoid learning that fact. *See Global-Tech Appliances*, 563 U.S. at 769-70; *cf. Alston-Graves*, 435 F.3d at 341. The district court correctly recognized that the evidence here raised both inferences.

To start, the jury could infer that Sterlingov was, at minimum, aware of a high probability that Bitcoin Fog was laundering criminal proceeds. When Bitcoin Fog launched, "Akemashite Omedetou" promoted the service as a tool to conceal bitcoin transactions from law enforcement. *See* pp. 3-5, *supra*. Based on the evidence that Sterlingov himself created and launched Bitcoin Fog, *see* pp. 6-17, *supra*, the jury could reasonably infer that he was "Akemashite Omedetou" and was thus aware of a high probability that at least some Bitcoin Fog users were laundering the proceeds of illegal activity. Sterlingov's Exploit posts bolstered that inference. Those posts established that he knew that "drugs are sold and, unfortunately, child pornography

distributed through" Tor, App.3543, and that he encouraged the purchase of illegal drugs on Silk Road, App.3545-47. He also recommended accepting payments in bitcoin, "like Silk Road," to avoid "be[ing] intimidated by even the U.S. government," App.3543, which shows that he was aware of a high probability that at least some Bitcoin users were seeking to avoid detection by law enforcement.

The evidence also supported an inference that Sterlingov took deliberate actions to avoid learning the criminal origins of the funds flowing through Bitcoin Fog. The jury heard that other services dealing in bitcoin, such as Bitstamp, sought to avoid processing illicit funds and accordingly asked their customers questions about the origin of their bitcoin deposits. *See* App.3992, 4039-40; p. 14, *supra*. Bitcoin Fog, however, took no such steps: it had no account-verification process, did not require its users to provide their true names, and asked no questions about how users had obtained the funds that they deposited into Bitcoin Fog. App.2837, 2841-53. The jury could reasonably infer that Sterlingov intentionally chose not to ask those "natural follow-up question[s]" to avoid confirming that Bitcoin Fog was laundering criminal proceeds. *See United States v. Flores*, 454 F.3d 149, 156 (3d Cir. 2006) (quotation marks omitted). In addition, Bitcoin Fog claimed to purge its records every week, App.2777, thus suggesting that Sterlingov himself had limited access to the scant user information that Bitcoin Fog collected. And as Sterlingov

acknowledges (Br.78), the government argued below that these circumstances supported an inference of willful blindness. *See* App.6201-02.

Finally, the district court did not announce "a blanket rule" (Br.83) that would require a willful-blindness instruction in any criminal case involving a mixer. Rather, the court found that "the facts of *this case*" justified the instruction and that "the alleged conspiracy and alleged criminal conduct *here*" rested on "the notion of blindness and not knowing who you are dealing with." App.6109-10 (emphases added). Those remarks alluded to Bitcoin Fog's practices of not obtaining or retaining information about its users, and as explained, those practices supported willful-blindness instruction.

### D. Any error was harmless

Even if the district court erred in giving a willful-blindness instruction, any error was harmless. This Court presumes that the jury followed the court's instructions. *United States v. Webster*, 102 F.4th 471, 488 (D.C. Cir. 2024). Accordingly, if insufficient evidence of willful blindness existed, the jury could not have found that Sterlingov was willfully blind and instead must have found him guilty based on the alternative theory amply supported by the evidence—namely, that he actually knew that Bitcoin Fog was laundering criminal proceeds. *See Alston-Graves*, 435 F.3d at 342 (giving willful-blindness instruction was harmless

error); *United States v. Lighty*, 616 F.3d 321, 379-80 (4th Cir. 2010) (same); *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993) (same).

No conflict existed between the willful-blindness instruction and the government's closing argument, *see* App.6201-02, 6265, and in any event, the other instructions ensured that the jury based its understanding of willful blindness only on the court's instruction and not on the government's argument. *See* App.2665, 6251. And the jury's lone question asked whether the D.C. licensing count required "knowledge of the location," App.6326, without mentioning willful blindness or suggesting that the jury was "confus[ed]" or "troubled" (Br.86) by the willful-blindness instruction.

Finally, the government had no "responsibility to seek a special verdict on the knowledge issue." Br.86. In arguing otherwise, Sterlingov seems to assume (Br.86-87) that the jury had to agree unanimously on its basis for finding each knowledge element in the case—*i.e.*, whether he had actual knowledge of the relevant facts or was willfully blind to them. But he identifies no court that has required either a unanimity instruction or a special verdict in this context. He also rightly does not claim that the district court plainly erred in not giving such a unanimity instruction sua sponte. *See United States v. Brown*, 892 F.3d 385, 393 (D.C. Cir. 2018) (finding no plain error where "no precedent of the Supreme Court or this court requir[es] a district court to give a special unanimity instruction sua sponte in circumstances like

those in this case"). In these circumstances, no special verdict was required. *Cf. United States v. Spann*, 997 F.2d 1513, 1515 (D.C. Cir. 1993) (recognizing that special verdicts are generally disfavored in criminal cases).

## VIII. The district court properly calculated the value of the laundered funds at sentencing

### A. Background

In calculating Sterlingov's advisory range under the Sentencing Guidelines, the district court grouped the three federal counts and used the "most serious" count—the money-laundering-conspiracy count—to determine Sterlingov's offense level. Supp.App.333; *see* App.7129. To establish the base offense level for that count under U.S.S.G. § 2S1.1(a)(2), the court had to determine "the value of the laundered funds." *Ibid.*; *see* Supp.App.333-34. The government argued that the value of the laundered funds was approximately $400 million, corresponding to 28 levels, App.7130-31, and Sterlingov argued that the value was no greater than $47 million, corresponding to 22 levels, App.7172-74.

The district court adopted the government's view and added 28 levels to Sterlingov's base offense level. Supp.App.350. The court clarified, however, that this finding "doesn't make a difference in the end" because the court would be "vary[ing] down." Supp.App.350-51. The court ultimately determined that Sterlingov's total offense level under the Sentencing Guidelines was 43, which corresponded to a recommended life sentence. Supp.App.366.

The district court sentenced Sterlingov to 150 months of imprisonment. Supp.App.400-01. The court said that, in selecting that sentence, it had considered the Guidelines but determined that the recommended life sentence was "excessive in this case" and was "driven so much by the dollar figure" in ways that were not "sufficiently tied to [Sterlingov's] actual culpability." Supp.App.396-97. The court accordingly decided to "vary downward fairly substantially" to 156 months, with an additional six-month downward departure based on Sterlingov's immigration status. Supp.App.400; *see* Supp.App.368.

## B.    Standard of review

When reviewing a district court's application of the Sentencing Guidelines, this Court reviews legal questions de novo, accepts factual findings unless clearly erroneous, and gives "'due deference'" to the district court's application of the Guidelines to facts. *United States v. Denney*, 98 F.4th 327, 331 (D.C. Cir. 2024).

## C.    The district court correctly determined that the value of the laundered funds exceeded $250 million

Under § 2S1.1(a)(2), Sterlingov's base offense level includes offense levels corresponding to "the value of the laundered funds." When a transaction "results in the commingling of legitimately derived funds with criminally derived funds," the Guidelines provide two ways to calculate the "value of the laundered funds." U.S.S.G. § 2S1.1 n.3(B). "[I]f the defendant provides sufficient information to determine the amount of criminally derived funds without unduly complicating or

prolonging the sentencing process," then the "value of the laundered funds" is the amount of the criminally derived funds alone. *Ibid.* "If the amount of the criminally derived funds is difficult or impracticable to determine," however, the value of the laundered funds is the total amount of the commingled funds. *Ibid.*

Here, the trial evidence established that Bitcoin Fog mixed bitcoin worth approximately $395 million. App.3771. As the district court recognized, the government's position was those funds "were all or likely all from unlawful activity." Supp.App.350; *see* App.7129-31. Sterlingov accordingly bore the burden of providing "sufficient information to determine the amount of criminally derived funds" in that $395 million pool "without unduly complicating or prolonging the sentencing process." U.S.S.G. § 2S1.1 n.3(B). He failed to carry that burden.

At sentencing, Sterlingov argued that the only criminally derived funds were the approximately $47 million that Bitcoin Fog received *directly* from 10 specific darknet markets, and he asked the court to treat the additional $31.5 million that those darknet markets *indirectly* sent to Bitcoin Fog as legitimately derived funds. Supp.App.338-39, 346; App.7172-78. But he presented no information about the other funds that Bitcoin Fog mixed—*i.e.*, bitcoin worth more than $315 million— that the government had not traced back to those 10 darknet markets. Because Sterlingov therefore failed to carry his burden of providing "sufficient information to determine the amount of criminally derived funds" that Bitcoin Fog mixed, it was

"difficult or impracticable" for the district court to determine the amount of criminally derived funds in the $395-million pool, and the Guidelines directed the district court to include all of those funds in "the value of the laundered funds." U.S.S.G. § 2S1.1 n.3(B). The district court thus correctly determined that the value of the laundered funds was more than $250 million.

In arguing otherwise, Sterlingov contends (Br.93-94) that the district court's calculation was incorrect based on the theory that the government failed to establish that he knew that any funds flowing through Bitcoin Fog were criminally derived. But Sterlingov's conviction for money-laundering conspiracy shows that the jury found that he conspired to launder funds that he knew were the proceeds of unlawful activity. *See* App.6271-73. Sterlingov has waived any claim that insufficient evidence supported that jury finding, *see* p. 35, *supra*, and the district court would not have clearly erred in sharing the jury's view of the evidence.

### D. Any error was harmless

Even if the district court erred in calculating the value of the laundered funds, any error was harmless. Although Guidelines calculation errors ordinarily require resentencing, the Supreme Court and this Court have recognized "that '[t]here may be instances when, despite application of an erroneous Guidelines range, a reasonable probability of prejudice does not exist,' as when the district court 'thought the sentence . . . was appropriate irrespective of the Guidelines range.'"

*United States v. Celentano*, 126 F.4th 680, 691 (D.C. Cir. 2025) (quoting *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016)).

The record here confirms that the district court would have imposed the same sentence even if it had adopted Sterlingov's position on the value of the laundered funds. Sterlingov contends that a "proper computation" of that value would have yielded a total offense level "between 40 and 42." Br.96. Because Sterlingov's criminal-history category was I, Supp.App.366, a total offense level of 40 would have corresponded to a recommended sentencing range of 292 to 365 months. *See* U.S.S.G. Ch. 5, Pt. A. But the district court varied downward substantially even from that range, imposing a sentence of only 150 months. Supp.App.400-01. The court also explained that its Guidelines calculation did not "make a difference" in its sentencing decision and was "not outcome determinative," Supp.App.350-51, and it observed that the value of the laundered funds (*i.e.*, "the dollar figure") had "driven" the Guidelines calculation and led to an "excessive" recommended sentence, Supp.App.396-97. The record thus confirms that the Guidelines did not have an anchoring effect on the district court's sentencing decision, and no reasonable probability exists that the court would have imposed a lower sentence if it adopted Sterlingov's value calculation.

# CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney
District of Columbia

A. TYSEN DUVA
Assistant Attorney General

JOSH A. GOLDFOOT
Deputy Assistant Attorney General

/s/ Jenny C. Ellickson

JEFFREY PEARLMAN
C. ALDEN PELKER
Trial Attorneys
Computer Crime and
    Intellectual Property Section
Criminal Division
U.S. Department of Justice

JENNY C. ELLICKSON
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave. NW, Ste. 1264
Washington, DC 20530
(202) 305-1674
jenny.ellickson@usdoj.gov

February 18, 2026

## CERTIFICATE OF COMPLIANCE

1.    On February 11, 2026, this Court issued an order authorizing the government to file an answering brief containing no more than 21,500 words.  This brief complies with that order because it contains 21,472 words, not including the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

3.   This brief complies with the privacy redaction requirement of Fed R. App. 25(a)(5) because it contains no personal data identifiers.

/s/ Jenny C. Ellickson
JENNY C. ELLICKSON
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice

Dated:  February 18, 2026

# STATUTORY ADDENDUM

18 U.S.C. § 1956(a) ......................................................................Add. 1

18 U.S.C. § 1956(i) .......................................................................Add. 2

18 U.S.C. § 1960 ..........................................................................Add. 3

# 18 U.S.C. § 1956. Laundering of monetary instruments

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or
>
> (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
>
> (B) knowing that the transaction is designed in whole or in part--
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
>
> (ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--

> (A) with the intent to promote the carrying on of specified unlawful activity; or
>
> (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form

of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part--

> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

> (ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.

(3) Whoever, with the intent--

> (A) to promote the carrying on of specified unlawful activity;

> (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

> (C) to avoid a transaction reporting requirement under State or Federal law,

conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

* * *

(i) Venue.--(1) Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in--

(A) any district in which the financial or monetary transaction is conducted; or

(B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

(2) A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.

(3) For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.

* * *

## 18 U.S.C. § 1960. Prohibition of unlicensed money transmitting businesses

(a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

(b) As used in this section--

(1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and--

(A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;

(B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or

(C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity;

(2) the term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier; and

(3) the term "State" means any State of the United States, the District of Columbia, the Northern Mariana Islands, and any commonwealth, territory, or possession of the United States.