# 24-3161

# United States Court of Appeals for the District of Columbia

THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROMAN STERLINGOV,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
Hon. Randolph D. Moss
United States District Court Case 1-21-cr-00399-RDM-1

## REPLY BRIEF FOR DEFENDANT-APPELLANT

TOR EKELAND, ESQ.
TOR EKELAND LAW PLLC
*Attorneys for Defendant-Appellant*
30 Wall Street, 8th Floor
New York, New York 10005
(718) 737-7264
tor@torekeland.com

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
*Attorneys for Defendant-Appellant*
800 Third Avenue, 20th Floor
New York, New York 10022
(212) 446-2346
maf@fernichlaw.com

MAKSIM NEMTSEV, ESQ.
MAKSIM NEMTSEV PC
*Attorneys for Defendant-Appellant*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
max@mnpc.law

AARON DANIEL, ESQ.
ASYMMETRIC LEGAL
*Attorneys for Defendant-Appellant*
11900 Biscayne Blvd, Suite 400
Miami, Florida 33181
(305) 979-9296
aaron@asymmetric.legal

*(See Inside Cover for Additional Counsel)*

3807



ELECTRONIC PARALEGAL

AMY C. COLLINS, ESQ.
THE LAW OFFICE OF
    AMY C. COLLINS
*Attorneys for Defendant-Appellant*
888 17th Street, NW, Suite 1200
Washington DC 20006
(228) 424-0609
amy@amyccollinslaw.com

**TABLE OF CONTENTS**

*Page*

INTRODUCTION ...................................................................................1

SUMMARY OF THE ARGUMENT .....................................................6

ARGUMENT

   I.  NO CRIME OR ACT IN FURTHERANCE OCCURRED IN D.C. ..............9

      A.  The Government Ignores the Key Venue Cases ......................................10

      B.  Count 1 Fails as There Was No Conspiratorial Conduct in D.C. ............12

      C.  Count 2 Fails Because There was No Communicated Representation ....13

      D.  Counts 3 & 4 Fail Because Bitcoin Fog Did Not Do Business in D.C. ...14

   II.  THE GOVERNMENT'S EXPERT EVIDENCE VIOLATES *DAUBERT* AND RULE 702 ..........................................................16

      A.  The District Court Abused Its Discretion in Admitting the Government's Blockchain and IP-Overlap Expert Evidence ..................16

      B.  Chainalysis Reactor Is Not the Product of Reliable Methodologies ........17

      C.  Mazars Used an Unreliable, Unvalidated, Ad Hoc Methodology ...........20

      D.  Chainalysis Reactor is Unreliable ...........................................................23

      E.  Elizabeth Bisbee – No Attribution, No Peer-Review, No Error Rates ....25

      F.  Luke Scholl – No Private Keys & No Definitive Attribution ..................26

   III. DENIAL OF FULL ACCESS TO CHAINALYSIS REACTOR'S SOURCE CODE AND COMPLETE HEURISTICS VIOLATED THE SIXTH AMENDMENT AND DUE PROCESS ................................27

IV. THE "WELCOME TO VIDEO" EVIDENCE VIOLATED RULE 403 ......31

V. THE CO-CONSPIRATOR STATEMENTS VIOLATED RULE 801(d)(2)(E) .................................................................35

VI. THE WILLFUL BLINDNESS INSTRUCTION WAS IMPROPER ...........37

VII. THE STATUTE OF LIMITATIONS HAS RUN ........................................40

VIII. THE DISTRICT COURT MISCALCULATED THE VALUE OF LAUNDERED FUNDS .......................................................................42

IX. ADMITTING COOPERATING WITNESS TESTIMONY WAS ERROR .......................................................................................44

CONCLUSION .................................................................................................45

CERTIFICATE OF COMPLIANCE .............................................................47

CERTIFICATE OF SERVICE .........................................................................48

# TABLE OF AUTHORITIES

*Page(s)*

**Cases:**

*Bourjaily v. U.S.*,
  483 U.S. 171 (1987)...................................................................35, 37

*Brown v. U.S.*,
  299 F.2d 438 (D.C. Cir. 1962)..............................................39

*Bullcoming v. New Mexico*,
  564 U.S. 647 (2011)................................................................28

*Cooter & Gell v. Hartmarx Corp.*,
  496 U.S. 384 (1990)................................................................34

*Cox Commc'ns, Inc. v. Sony Music Entm't*,
  146 S.Ct. 959 (2026)..............................................................32

*Crawford v. Washington*,
  541 U.S. 36 (2004)..................................................................28

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)................................. 2, 6, 16, 17, 19, 20, 21, 24, 25, 30

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011)................................................................32

*In re Sealed Case*,
  552 F.3d 841 (D.C. Cir. 2009)..............................................42

*Jewell v. Boughton*,
  90 F.4th 1199 (7th Cir. 2024)..............................................39

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999)....................................................17, 20, 21

*McGill v. U.S.*,
  815 F.3d 846 (D.C. Cir. 2016)..............................................36

*Melendez-Diaz v. Massachusetts*,
557 U.S. 305 (2009).................................................................28

*Molina-Martinez v. U.S.*,
578 U.S. 189 (2016).................................................................43

*Old Chief v. United States*,
519 U.S. 172 (1997)............................................................32, 45

*Price v. D.C.*,
792 F.3d 112 (D.C. Cir. 2015).................................................34

*Pullman-Standard v. Swint*,
456 U.S. 273 (1982).................................................................42

*Rosales-Mireles v. U.S.*,
585 U.S. 129 (2018).................................................................44

*Smith v. Arizona*,
602 U.S. 779 (2024).................................................................28

*Toussie v. U.S.*,
397 U.S. 112 (1970).................................................................40

*U.S. v. Abouammo*,
122 F.4th 1072 (9th Cir. 2024).................................................10

*U.S. v. Arditti*,
955 F.2d 331 (5th Cir. 1992).....................................................14

*U.S. v. Auernheimer*,
748 F.3d 525 (3d Cir. 2014)...........................................9, 10, 11

*U.S. v. Bapack*,
129 F.3d 1320 (D.C. Cir. 1997).................................................42

*U.S. v. Barnes*,
158 F.3d 662 (2d Cir. 1998).....................................................39

*U.S. v. Beckham*,
968 F.2d 47 (D.C. Cir. 1992)..................................................................36

*U.S. v. Bell*,
795 F.3d 88 (D.C. Cir. 2015)..................................................................33

*U.S. v. Bostick*,
791 F.3d 127 (D.C. Cir. 2015)................................................................41

*U.S. v. Cabrales*,
524 U.S. 1 (1998)..........................................................................10, 11

*U.S. v. Celentano*,
126 F.4th 680 (D.C. Cir. 2025)..............................................................42

*U.S. v. Cessa*,
785 F.3d 165 (5th Cir. 2015) .................................................................43

*U.S. v. Falcone*,
311 U.S. 205 (1940)............................................................................36

*U.S. v. Fortenberry*,
89 F.4th 702 (9th Cir. 2023) ............................................................11, 14

*U.S. v. Gatling*,
96 F.3d 1511 (D.C. Cir. 1996)...............................................................35

*U.S. v. Gewin*,
471 F.3d 197 (D.C. Cir. 2006)...............................................................35

*U.S. v. Guerrero*,
76 F.4th 519 (6th Cir. 2023) .................................................................13

*U.S. v. Hitt*,
249 F.3d 1010 (D.C. Cir. 2001)..............................................................40

*U.S. v. Jackson*,
627 F.2d 1198 (D.C. Cir. 1980)..............................................................35

*U.S. v. Johnson*,
   323 U.S. 273 (1944)...................................................................................9

*U.S. v. Klat*,
   213 F.3d 697 (D.C. Cir. 2000)..............................................................40

*U.S. v. Lam Kwong-Wah*,
   924 F.2d 298 (D.C. Cir. 1991).............................................................13

*U.S. v. Leonzo*,
   50 F.3d 1086 (D.C. Cir. 1995)..............................................................42

*U.S. v. McGoff*,
   831 F.2d 1071 (D.C. Cir. 1987)............................................................41

*U.S. v. Morgan*,
   45 F.4th 192 (D.C. Cir. 2022)...............................................................20

*U.S. v. Nelson*,
   66 F.3d 1036 (9th Cir. 1995) ................................................................14

*U.S. v. Rodriguez-Moreno*,
   526 U.S. 275 (1999)................................................................................9

*U.S. v. Sitzmann*,
   893 F.3d 811 (D.C. Cir. 2018)..............................................................13

*U.S. v. Starke*,
   62 F.3d 1374 (11th Cir. 1995) ..............................................................14

*U.S. v. Swann*,
   441 F.2d 1053 (D.C. Cir. 1971).............................................................12

*U.S. v. Tedder*,
   403 F.3d 836 (7th Cir. 2005) ................................................................43

*U.S. v. Wilson*,
   605 F.3d 985 (D.C. Cir. 2010)..............................................................29

**Rules, Laws & Statutes:**

18 U.S.C. § 1960(a) ....................................................................................15

D.C. Code § 26-1023(c)................................................................................15

Federal Rule of Evidence 702........................... 2, 6, 7, 17, 18, 19, 21, 22, 24, 25, 45

Federal Rule of Evidence 801 ......................................3, 5, 6, 7, 35, 36, 37

U.S. Const. amend. VI ...................................................................................9

U.S. Const. art. III, § 2, cl. 3 .........................................................................9

U.S.S.G. § 2B1.1.........................................................................................42

U.S.S.G. § 2S1.1 ..................................................................................8, 42, 46

## INTRODUCTION

This case should never have been tried in the District of Columbia. The Government's own facts identify no act by Roman Sterlingov in the District, no act by any alleged co-conspirator in the District, no Bitcoin Fog server or infrastructure in the District, and no private user in the District. The only D.C. conduct in the record was the Government's own: in November 2019, an IRS-CI in D.C. sent an unanswered message to Bitcoin Fog and withdrew licit funds from the service, after having deposited licit funds a couple days before. If this unilateral Government act is enough, then the Constitution's Venue Clauses impose no meaningful constraint in internet cases.[1]

The Government's case was entirely circumstantial. No percipient witness testified that Sterlingov operated Bitcoin Fog. In fact, the Government presented no percipient witnesses at all. The Government never introduced any Bitcoin Fog servers, source code, logs, ledger, private keys, or administrator credentials. It introduced no communications between Sterlingov and any Bitcoin Fog operator or co-conspirator. And despite arresting Sterlingov while he was traveling with laptops and storage devices, the Government found no evidence on his devices tying him to the operation of Bitcoin Fog. The evidence is insufficient to support the verdict.

---

[1] *See* Appellant's Br. 17-27.

The Government's speculative attribution of Sterlingov as the pseudonymous Bitcoin Fog creator Akemashite Omedetou rests on Valérie Mazars de Mazarin's ("Mazars") novel ad hoc "IP Overlap Analysis."[2] She created the methodology for this case, had never used it before, testified it could not be validated, and said it was not a "scientific construct."[3] It should not have been admitted under *Daubert* or Federal Rule of Evidence 702 ("Rule 702").

Without its *Daubert*-deficient forensic evidence, the Government has no case. Its case depended on novel blockchain-analysis testimony derived from untested and untestable proprietary software, alongside Mazars's ad hoc IP Overlap Analysis, to create a speculative link between anonymous internet activity and Sterlingov. The record is indisputable that the novel proprietary software - Chainalysis Reactor - had no known error rate, no demonstrated rate of false positives or false negatives, and no peer-reviewed validation. Mazars's ad hoc methodology was likewise untested, unreviewed, and arbitrary. The District Court nevertheless admitted both. In a case with no direct proof, those rulings were not marginal.

Sterlingov was denied meaningful access to independently test Reactor's reliability. The District Court allowed the Government to withhold Reactor's source code, its full heuristics, and the off-chain intelligence inputs that drove Reactor's

---

[2] *Id.* 46-49.
[3] A. 1405.

2

output. This was conviction by black box. The Sixth Amendment and Due Process require more where forensic software becomes a central accuser, particularly when it is novel and untested.

The District Court's other evidentiary rulings intensified the prejudice. The Government introduced irrelevant and inflammatory "Welcome to Video" CSAM evidence even though no money flowed from Welcome to Video into Bitcoin Fog, and no evidence tied Sterlingov to the minimal post-mix transfers by unidentified third parties. It allowed irrelevant and highly prejudicial cooperating witness testimony from Larry Dean Harmon and Ilya Lichtenstein, who denied knowing or communicating with Sterlingov, and did not identify him as Bitcoin Fog's operator. The District Court also admitted highly prejudicial alleged co-conspirator statements without the necessary Federal Rule of Evidence 801(d)(2)(E) predicates. And it gave a willful blindness instruction even though the Government's theory at trial was one of actual knowledge and actual operation, while Sterlingov's defense was that he did not operate Bitcoin Fog at all.

This was a wholly circumstantial case built on speculative digital attribution, guilt by association, inflammatory evidence unrelated to the charged conduct, and a venue theory that depends entirely on Government-created contact with the forum. The question on appeal is not whether each inference, viewed in isolation, could be imagined away in the Government's favor. Rather, the question is whether these

errors, considered cumulatively, can sustain a conviction on this record. They cannot.

The Government's misattributions at the trial level continue on appeal. The Government's Opposition claims to quote Sterlingov saying that he has "100 trusts and 200 corporations registered in 15 different jurisdictions."[4] In reality, a review of the record shows that Sterlingov's cited Reddit post was quoting something John McAfee said.[5] This mirrors Mazars's erroneous attribution at trial - retracted only after cross-examination - of a money-laundering comment to Sterlingov even though the comment was actually authored by another person and published in an e-book.[6]

The Government similarly overstates the BlindBitcoin evidence.[7] The record shows that Duncan Townsend offered BlindBitcoin's source code to the public, but never provided it to Sterlingov.[8] (This was in 2011 while Sterlingov was in Sweden). The Government likewise miscasts routine 2011 notes in the "putting money" document about converting Bitcoin into cash as evidence of wrongdoing, even though those notes were buried in a voluminous collection that nowhere mention

---

[4] Gov't Br. 13.
[5] *See* A. 4006; *see also* Gov't Ex. 54 (showing the Reddit quote of J. McAfee).
[6] Appellant's Br. 10-11.
[7] Gov't Br. 6.
[8] A. 3626.

Bitcoin Fog. [9]  The Government's case thus remains what it was at trial: a chain of speculative inferences, insufficient to support a guilty verdict.

This Court should therefore reverse. It should hold:

1.  that venue in the District of Columbia was unconstitutional;

2.  that the evidence was insufficient to prove that Sterlingov operated Bitcoin Fog or joined any charged conspiracy;

3.  that the District Court committed constitutional error and abused its discretion in admitting the Government's expert evidence and in denying meaningful access to Reactor's source code and heuristics;

4.  that the challenged Rules 403 and 801 rulings, including the admission of the Welcome to Video evidence and alleged co-conspirator statements, were erroneous and prejudicial;

5.  that the willful-blindness instruction was improper and prejudicial;

6.  that the charges are barred by the statute of limitations; and

7.  that the sentence must be vacated and remanded because the District Court miscalculated the value of laundered funds and failed to make adequate factual findings supporting that calculation.

---

[9] Gov't Br. 7; A. 3907-08; *see* A. 3235, 3241-42.

**First**, venue in the District of Columbia was unconstitutional on every count. The Government identified no act by Sterlingov in the District, no act by any alleged co-conspirator there, no Bitcoin Fog server or infrastructure there, and no private user there. The only D.C. conduct in the record was the Government's own: an agent deposited licit Government funds into Bitcoin Fog, sent an unanswered message the next day expressing an ambiguous desire to launder money, and withdrew Bitcoin the day after that. The Constitution does not permit the Government to manufacture venue through its own unilateral acts. [10]

**Second**, the evidence was insufficient to prove that Sterlingov operated Bitcoin Fog or joined any charged money-laundering conspiracy. The Government presented no eyewitnesses, no communications with any alleged co-conspirator, no server evidence, no source code, no logs, no administrator credentials, and no incriminating evidence recovered from Sterlingov's devices. Its case rested entirely on speculative inferences, the prejudicial effect of unreliable forensic evidence, and evidence admitted in violation of Rules 403 and 801. [11]

**Third**, the District Court abused its discretion under *Daubert* and Rule 702 by admitting unreliable Government expert evidence. The prosecution depended on

---

[10] Appellant's Br. 17-27; *see below* Part I.
[11] Appellant's Br. 87, 97-101.

two novel forensic methodologies - Chainalysis Reactor and Mazars's ad hoc "IP Overlap Analysis" - yet failed to show that either satisfied Rule 702. [12]

**Fourth**, the District Court violated the Sixth Amendment and Due Process by allowing the Government to rely on Reactor's inculpatory outputs while denying Sterlingov meaningful access to the source code, heuristics, and underlying methodology needed to test them. [13]

**Fifth**, the District Court committed multiple prejudicial evidentiary errors. It admitted inflammatory Welcome to Video CSAM evidence under Rule 403 even though that evidence did not tie Sterlingov to the site or show any funds flowing from Welcome to Video into Bitcoin Fog. It admitted alleged co-conspirator statements without requiring the Government to satisfy Rule 801(d)(2)(E). And it allowed the irrelevant and highly prejudicial testimony of cooperating witnesses Harmon and Lichtenstein, neither of whom identified Sterlingov as Bitcoin Fog's operator or described any communication with him. [14]

**Sixth**, the willful-blindness jury instruction was improper. The Government tried the case on a theory of actual knowledge and actual operation, while

---

[12] *Id.* 27-50; *see below* Part II.
[13] Appellant's Br. 50-61; *see below* Part III.
[14] Appellant's Br. 51-70; *see below* Part IV; Appellant's Br. 89-93; *see below* Part V. Appellant's Br. 88-89; *see below* Part IX.

Sterlingov's defense was that he did not operate Bitcoin Fog at all. The instruction invited conviction on an impermissible mens rea. [15]

**Seventh**, the statute of limitations bars the charges. Most of the darknet markets on which the Government relied shut down outside the limitations period, and the Government's asserted in-period conduct does not establish a timely offense by Sterlingov. [16]

**Eighth**, the sentence must be vacated because the District Court miscalculated the value of laundered funds under U.S.S.G. § 2S1.1 and failed to make the findings necessary to support that calculation. [17]

In short, this was an entirely circumstantial case tried in the wrong district, built on unvalidated forensic methods, closed-source black-box software, prejudicial evidence, foundational hearsay error, and an inflated Guidelines range. The judgment should be reversed.

---

[15] Appellant's Br. 70-89; *see below* Part VI.
[16] Appellant's Br. 97-101; *see below* Part VII.
[17] Appellant's Br. 93-97; *see below* Part VIII.

**ARGUMENT**

## I. NO CRIME OR ACT IN FURTHERANCE OCCURRED IN D.C.

The Government's Opposition identifies no act by Sterlingov in the District of Columbia, no act by any alleged co-conspirator in the District, no Bitcoin Fog server or infrastructure in the District, no private user in the District, and no evidence that Sterlingov directed any conduct toward the District. On the Government's own telling, D.C. enters this case only because of the unilateral acts of its own agents.[18] None of which were criminal and none of which there is any evidence Sterlingov knew about.

Venue is a fundamental constitutional protection against prosecutorial forum choice, not a technicality to be relaxed whenever online conduct is alleged.[19] The Supreme Court has long emphasized that "[q]uestions of venue in criminal cases ... raise deep issues of public policy."[20] Where Congress has not supplied a specific statutory venue provision, courts determine venue by examining the nature of the

---

[18] *Compare* Appellant's Br. 17-27 *with* Gov't Br. 21-32.

[19] *See* U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI; *U.S. v. Johnson*, 323 U.S. 273, 276 (1944); *U.S. v. Auernheimer*, 748 F.3d 525, 529 (3d Cir. 2014) ("Venue in criminal cases is more than a technicality….this is especially true of computer crimes in the era of mass interconnectivity.").

[20] *Johnson*, 323 U.S. at 276.

offense, identifying its essential conduct elements, and locating the acts constituting those elements.[21] The Government's theory cannot survive that test.

The Supreme Court's recent grant of certiorari in *U.S. v. Abouammo* underscores how aggressive the Government's venue theory is.[22] As the March 2026 oral arguments reflect, several Justices appear skeptical of anchoring venue where investigators happened to sit rather than where a defendant acted.[23] Even in *Abouammo*, however, the defendant at least allegedly knew of the Government's actions and, with respect to one charge, acted in response to agents interviewing him in person. Here, by contrast, the Government identifies no offense conduct by Sterlingov in D.C. and relies instead on its own unilateral acts in D.C. - acts the record does not show Sterlingov ever saw or knew about - to unconstitutionally manufacture venue.

## A. The Government Ignores the Key Venue Cases

The Government's Opposition ignores the cases contrary to its position cited in Appellant's Opening Brief.[24] Notably, it does not engage *U.S. v. Auernheimer,*

---

[21] *See U.S. v. Rodriguez-Moreno*, 526 U.S. 275, 279–80 (1999); *U.S. v. Cabrales*, 524 U.S. 1, 6–7 (1998).

[22] *U.S. v. Abouammo*, 122 F.4th 1072, 1089–96 (9th Cir. 2024), cert. granted in part, No. 25-5146 (U.S. 2025).

[23] *See* Marco Poggio, *Justices Doubt Gov't Venue Theory in Twitter Employee Case*, LAW360 (Mar. 30, 2026).

[24] Appellant's Br. 17-27.

because *Auernheimer* rejects the elastic internet-venue theory the Government advances here.[25] In *Auernheimer* the Third Circuit held venue improper because neither the defendant nor any alleged co-conspirator committed an essential conduct element in the charging district.[26] The court further explained that cybercrimes do not occur in some "metaphysical location" that permits courts to disregard constitutional venue limits.[27] If venue may be created wherever agents choose to log on, send an unanswered message, receive a status notification, or route Government funds, without any knowledge on the part of a defendant or co-conspirator, then the Constitution's venue clauses in internet cases like this one are erased.

The Government's Opposition also ignores the recent Ninth Circuit case *U.S. v. Fortenberry* which rejects venue predicated on where federal investigators happened to be located rather than tying it to the defendant's conduct.[28] The United States Supreme Court requires that venue be based on the acts constituting the charged offense, not on antecedent circumstances or investigative convenience.[29] And this Court made a similar point in *U.S. v. Swann*, rejecting venue in this District

---

[25] *See U.S. v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014).
[26] *Id.* at 533–38.
[27] *Id.* at 541.
[28] *See U.S. v. Fortenberry*, 89 F.4th 702, 705, 709–13 (9th Cir. 2023).
[29] *See Cabrales*, 524 U.S. at 6–8.

even though the alleged out-of-district conduct was aimed at affecting a D.C. proceeding.[30] The Government's silence as to these cases is telling.

### B. Count 1 Fails as There Was No Conspiratorial Conduct in D.C.

Count One, the § 1956(h) conspiracy count, is unconstitutional in this District because there is no evidence of any conspiratorial conduct here. IRS-CI Price's unilateral acts - only mentioned in Count 2 of the indictment - are not sufficient to support Count 1's conspiracy charge because he was not a conspirator. He was not listed in the Government's Bill of Particulars as a co-conspirator, and the Government admits he was not.[31] Nor were the funds Price deposited into Bitcoin Fog, and later withdrew, illicit. The Government does not dispute this point. Instead, it relies entirely on § 1956(a)(3)'s sting provision and Agent Price's ambiguous, unanswered message to Bitcoin Fog - a message the record does not show Sterlingov ever saw. This is constitutionally insufficient for venue because it is based on the unilateral action of a government agent, and no evidence of the defendant's knowledge of conduct in the District.

The Government's cases do not carry the weight it assigns them. Each involves venue grounded in conduct that the defendant, or an actual co-conspirator, knowingly used to advance the charged offense - not in unilateral acts by

---

[30] *U.S. v. Swann*, 441 F.2d 1053, 1055–56 (D.C. Cir. 1971).
[31] Appellant's Br. 21-23; Gov't Br. 25.

Government agents unknown to the defendant, or a co-conspirator.[32] This case is fundamentally different. Venue turns on the Government's own conduct in the District, primarily an unanswered, ambiguous message. The record does not establish Sterlingov, nor any co-conspirator, ever saw or knew about any of the Government's conduct. Appellant is aware of no case sustaining venue on that basis alone.

### C. Count 2 Fails Because There was No Communicated Representation

Count Two is even weaker. Section 1956(a)(3) is a sting statute. It criminalizes a transaction involving property "represented to be" criminal proceeds. That representation is not complete the instant an agent types words into a computer, regardless of whether the defendant ever perceives them. The cases treat the representation element as a communicated one: the Government must at least make

---

[32] *See U.S. v. Sitzmann*, 893 F.3d 811, 823–26 (D.C. Cir. 2018) (upholding venue where an actual co-conspirator wired funds into the District in furtherance of the conspiracy); *U.S. v. Guerrero*, 76 F.4th 519, 528–29 (6th Cir. 2023) (explaining that Government agents cannot be conspirators and that their acts alone cannot establish conspiracy venue); *U.S. v. Lam Kwong-Wah*, 924 F.2d 298, 301–02 (D.C. Cir. 1991) (requiring venue to be established as to each count based on conduct tied to the charged offense).

the defendant aware of circumstances from which a reasonable person would infer that the property was represented to be criminal proceeds.[33]

Here there is no evidence that Price's message was ever read. That defeats the Government's theory twice over. First, it defeats the representation element. Second, it defeats venue, because the only District-based conduct was the Government's own sending of the unanswered message and a handful of licit deposits and withdrawals from Government Bitcoin Fog accounts. There is no evidence of anyone laundering any money through Bitcoin Fog in D.C. If no representation was communicated to Sterlingov, then Count Two cannot be laid in the District merely because Price happened to be sitting there. The Ninth Circuit's recent decision in *Fortenberry* reinforces this.[34]

### D. Counts 3 & 4 Fail Because Bitcoin Fog Did Not Do Business in D.C.

Counts Three and Four fail for the same basic reason. The Government says Bitcoin Fog "operated" an unlicensed money-transmitting business in the District because agents accessed it from D.C. But that theory would effectively create

---

[33] *See U.S. v. Starke*, 62 F.3d 1374, 1382–84 (11th Cir. 1995) (representation satisfied where Government made defendant aware of circumstances indicating drug proceeds); *U.S. v. Nelson*, 66 F.3d 1036, 1041–42 (9th Cir. 1995) (same; focusing on defendant's understanding); *U.S. v. Arditti*, 955 F.2d 331, 339 (5th Cir. 1992) (upholding conviction where jury could find representation was made and understood).

[34] *U.S. v. Fortenberry*, 89 F.4th 702, 705, 709–13 (9th Cir. 2023).

universal venue for any globally accessible online service. If Bitcoin Fog was operating a business in D.C., how come after six years of Government investigation and three years of pretrial proceedings, there is not a single piece of evidence regarding any D.C. resident, or anyone else in D.C., using the service? In short, if Bitcoin Fog was running a business in D.C., why is there no evidence of any D.C.-based customers?

Count Three under § 1960 contains no special venue provision. The question, then, is where Sterlingov allegedly " knowingly conduct[ed], control[led], manage[d], supervise[d], direct[ed], or own[ed]" the business, not where the Government later chose to access the internet site from.[35] There is no evidence that Bitcoin Fog had servers in the District, personnel in the District, infrastructure in the District, customers in the District, or affirmative business operations directed at the District. On the Government's own account, the only D.C. user was the Government.

Count Four under the municipal D.C. Code § 26-1023(c) is no different. The Government cannot convert a globally accessible internet site into a business "engaged in" money transmission in D.C. simply because an investigator in D.C. accessed it. The Government's reading would give the D.C. municipality an effectively global criminal jurisdiction over any online money-transmission service

---

[35] 18 U.S.C. § 1960(a).

anywhere in the world. Nothing in the text of the D.C. statute suggests such a boundless assertion of local power, and nothing in the Constitution tolerates it.

No crime occurred in the D.C. No act in furtherance of any charged crime occurred there. There is no evidence that Sterlingov saw Price's message, operated Bitcoin Fog from D.C., targeted D.C., or directed any conduct toward D.C., or that any co-conspirators did. The Constitution does not permit the Government to manufacture venue like it did in this case. This Court should vacate the conviction because venue is unconstitutional.

## II. THE GOVERNMENT'S EXPERT EVIDENCE VIOLATES *DAUBERT* AND RULE 702

### A. The District Court Abused Its Discretion in Admitting the Government's Blockchain and IP-Overlap Expert Evidence

The Government essentially argues three theories: first, that Chainalysis Reactor should be treated as reliable unless Sterlingov can prove otherwise; second, that Mazars's IP-overlap analysis rested on a commonplace networking proposition and therefore required little or no *Daubert* scrutiny; and third, that gaps in testing, peer review, error rates, and transparency may be excused because these techniques

are useful to investigators and accepted by their law enforcement users.[36] None of those propositions is consistent with Rule 702, *Daubert*, or *Kumho Tire*.[37]

This appeal challenges the admission of case-specific novel forensic methodologies used to turn those premises into inculpatory conclusions. The Government was required to show, by a preponderance, that those methodologies were reliable, that they were based on sufficient facts or data, and that the witnesses reliably applied them to the facts of this case. It did not do so.

### B. Chainalysis Reactor Is Not the Product of Reliable Methodologies

The Government identifies no controlled testing validating the specific clustering and attribution methods used here. It does not identify peer review of the specific heuristics that matter in this case. It does not identify a known or potential error rate for the attribution and clustering outputs on which its trial proof depended. And it does not identify an independent scientific community that has validated those methods. Instead, it argues that the *Daubert* factors do not cast doubt on Reactor's reliability, points to anecdotal validation by investigators, and invokes widespread law-enforcement and industry adoption. That is not enough.

---

[36] Gov't Br. 35-58.

[37] *See* Fed. R. Evid 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Kumho Tire v Carmichael*, 526 U.S. 137 (1999).

Because the Government was the proponent of the Reactor testimony, it bore the burden in the District Court under Rules 702 and 104(a) to establish, by a preponderance of the evidence, that the testimony was admissible. Rule 702 does not presume that a proprietary forensic product is reliable unless the defense proves otherwise. Yet that is effectively how the Government frames the issue on appeal. Its argument proceeds as though the testimony should have been admitted absent a definitive showing of unreliability. That inverts the Rule 702 inquiry and the District Court's gatekeeping role. The question is not whether Sterlingov disproved Reactor's reliability; it is whether the Government carried its burden to establish reliability. It did not.

Nor can the Government fill that gap with testimony from end users and the vendor itself. IRS-CI Scholl's testimony showed, at most, that when he subpoenaed known exchanges, some exchange attributions could be confirmed. But confirming the easiest category of attribution does not validate the much harder analytical task that mattered here: clustering thousands of addresses to Bitcoin Fog and attributing activity to anonymous or defunct illicit services.[38] Those are not the same inference. The Government never bridged that gap.

---

[38] *See, e.g.,* Appellant's Br. 29-35.

18

Bisbee's testimony is no substitute.[39] A for-profit vendor's claim that it is unaware of false positives is not an error-rate study. The absence of reported complaints is not peer review. And customer satisfaction is not scientific validation. If those proxies were enough, any commercially successful forensic product marketed to law enforcement would effectively be insulated from *Daubert* scrutiny. That is precisely what Rule 702 forbids.

As the Opening Brief discusses, the Government collapses commercial, or law-enforcement use into "general acceptance."[40] But adoption by paying customers is not the same thing as acceptance in a relevant scientific community. The relevant question is whether independent experts in the pertinent analytical field have tested, evaluated, and accepted the method. The Government points instead to the fact that agencies and financial institutions use Reactor. That proves the product is influential. It does not prove the methodology is reliable under *Daubert*.

The same problem appears in the Government's response on testability and transparency. The defense was never allowed to examine the source code or the undisclosed external intelligence underlying key attributions. Running the tool is not the same thing as auditing the method. A black-box system cannot be meaningfully tested from the outside merely by observing outputs. The Government's position

---

[39] *Id.*
[40] *Id.* 27-50.

would allow a proprietary vendor to shield the operative method from scrutiny and then invoke the opacity of that method as a reason to relax *Daubert* review. *Kumho Tire* does not permit that.[41] It gives district courts flexibility in how to assess reliability, not license to accept secret and unvalidated methodology on trust alone.

The Government's reliance on *U.S. v. Morgan* does not rescue the ruling.[42] *Morgan* does not stand for the proposition that any novel or proprietary investigative technique may bypass ordinary reliability scrutiny so long as it is useful or relatively new.[43] At most, *Morgan* holds that the *Daubert* inquiry is context-specific. But context-specific review still requires objective indicia of reliability. Here there were none for the critical inferences the Government told the jury to accept.

### C.  Mazars Used an Unreliable, Unvalidated, Ad Hoc Methodology

Mazars applied a bespoke system of variable overlap windows, ranging from minutes to months, across different categories of IP infrastructure, and then used select temporal coincidences to support identity inferences across pseudonymous accounts. The Government cannot bootstrap admissibility for that method by pointing to cases recognizing the unremarkable proposition that IP addresses appear in internet records.[44]

---

[41] *See Kumho Tire v Carmichael*, 526 U.S. 137 (1999).
[42] *See U.S. v. Morgan*, 45 F.4th 192 (D.C. Cir. 2022).
[43] *Id.*
[44] Gov't Br. 55.

The Rule 702 problem lies in Mazars' concession, among other things, that the specific attributive methodology she devised for this case could not be tested.[45] She further testified that she had never used the IP Overlap Analysis before, could not validate it, admitted it was not a "scientific construct", and did not attribute control of Bitcoin Fog to Sterlingov.[46] The Government says that the *Daubert* factors were "not especially illuminating."[47] And that we should turn to "personal knowledge or experience."[48] The Government cites *Kumho Tire* for this proposition.[49] But *Kumho Tire* stands for the unremarkable proposition that *Daubert's* factors are not written in stone. It does not stand for the proposition that they are meaningless, and any meaningful application of the *Daubert* factors to Sterlingov's case demonstrates the unreliability of the methodologies in question.[50]

But when a methodology is untested, unreviewed, without an error rate, and unsupported by any accepted standards, the factors are not just unilluminating; they are uniformly negative. The Constitution demands more.

A significant issue with Mazars' overlap windows is that the parameters driving the analysis were selected through personal judgment rather than validated

---

[45] *See* Appellant's Br. 48.
[46] *See* A. 1404-05; A. 1397; A. 1387-89; A. 4846-50.
[47] Gov't Br. 57.
[48] *Id.*
[49] *Id.*
[50] *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

standards. In this sense they were arbitrary. That matters because the overlap windows were not peripheral housekeeping choices. They determined which supposed overlaps counted, which did not, and how much inculpatory force the resulting pattern would appear to have. A methodology whose core filters are selected without testing, standards, or peer review is not made reliable by the analyst's confidence in her own experience. Particularly when the analyst made a misattribution at trial that required her to retract some of her testimony.[51]

The underlying data problems compound the unreliability. Mazars did not work from original server logs. The timestamps on which the overlap analysis depended were subject to unresolved time-zone ambiguity.[52] And the analysis was agnostic to the nature of the events being compared, meaning the supposed overlap could reflect entirely different kinds of user activity by different people on shared infrastructure. Those defects go directly to Rule 702(b) and (d):  whether the testimony was based on sufficient data and whether the method was reliably applied.

The Government's probabilistic rhetoric does not help. The Opposition says it is "vanishingly" unlikely that unrelated users would access related accounts from the same IP address within a short period of time.[53] But that assertion assumes the

---

[51] Appellant's Br. 10.
[52] *Id.* 48.
[53] *See* Gov't Br. 56.

very point in dispute. The relevant question is not the probability that two random people anywhere on the internet would share any IP address; it is the probability that multiple users of the same proxy, VPN, Tor node, or other shared service would generate the logged events that Mazars treated as meaningful. Mazars did not calculate that probability. She could not, because she lacked the information necessary to do so. A claim of improbability without a supporting probabilistic analysis is unreliable argument, not reliable expertise.

### D.     Chainalysis Reactor is Unreliable

On the one hand, the Government tries to minimize its experts as merely technical witnesses describing background analytical tools. On the other hand, the Government's own trial presentation depended on those tools to do the most important work in the case:  to connect anonymous public blockchain activity and pseudonymous online accounts to Sterlingov. Reactor furnished the clustering and attribution framework from which the Government traced Bitcoin Fog-related activity. Mazars's IP-overlap analysis supplied the bridge from known accounts to the pseudonymous accounts allegedly associated with Bitcoin Fog. Without those methods, the Government had nothing supporting its speculative attributions.

That is why the District Court's gatekeeping role matters. This is not a case in which challenged expert testimony was at the margins. Rather it was central to the case. There were no eyewitnesses. The experts, with the imprimatur of the Court,

supplied the pseudoscientific architecture for the prosecution. This case is comprised nearly entirely of speculative digital forensic evidence. There is no direct corroborating evidence in the record for the Government's key forensic inferences. When a criminal conviction turns on opaque, novel, proprietary, or bespoke methods that have not been adequately tested, reviewed, or validated, Rule 702 demands rigor, not deference.

The Government's response lacks this rigor. For Reactor, it substitutes anecdotal experience, vendor assurances, and customer adoption in the place of testing, peer review, error rate analysis, and independent validation.[54] For Mazars, it substitutes a generic networking premise for a valid digital forensic methodology, then asks the Court to treat the total absence of traditional reliability markers as beside the point. Both arguments fail for the same reason: they confuse use of a methodology with the distinct question of that methodology's reliability. Often, Junk Science gets used extensively before it's shown to be unreliable, at which point it's too late for many.[55] Sterlingov has been incarcerated for five years now.

*Daubert* and Rule 702 do not prohibit innovative forensic methods. But they do require that those methods are reliable. This Court should reject the

---

[54] *Compare* Appellant's Br. 27-49, *with* Gov't Br. 45-46.
[55] *See, e.g.,* M. Chris Fabricant, *Junk Science and the American Criminal Justice System* (Akashic Books 2023); Peter W. Huber, *Galileo's Revenge: Junk Science in the Courtroom* (Basic Books 1993).

Government's invitation to dilute Rule 702 whenever forensic evidence is proprietary, novel, or widely used by investigators. The District Court failed in its gatekeeping function by allowing novel, pseudoscientific evidence into what was an entirely circumstantial case. No direct evidence corroborated any of the critical forensic inferences in this case. This Court should hold that the District Court's admission of the challenged expert evidence was an abuse of discretion, and unconstitutional.[56]

**E.    Elizabeth Bisbee – No Attribution, No Peer-Review, No Error Rates**

Government expert witness from Chainalysis, Elizabeth Bisbee, likewise testified that neither she nor Chainalysis were making any attribution of Sterlingov as the operator of Bitcoin Fog, and testified both at the *Daubert* Hearings and at trial that Chainalysis Reactor had no known error rates, had never done an internal error rate analysis, that Chainalysis' rate of false positives and false negatives was unknown, and that there was no peer-reviewed scientific papers attesting to the software's accuracy.[57] The USENIX paper that the Government cites to in its Opposition Brief, as well as includes in its supplemental appendix, comes after the fact and only speaks to blockchain tracing generally.[58] The record is closed as to

---

[56] *See generally* Appellant's Br. 27-49.
[57] *Id.* 33; *see also*, A. 619; A. 639-40; *see also* A. 622-23; A. 627-28.
[58] Gov't Br. 47.

evidence relating to Reactor's reliability for the simple reason that Sterlingov has no meaningful opportunity to confront any new evidence being proffered as to Chainalysis Reactor's purported reliability at the appellate level.

Bisbee also testified that Chainalysis Reactor does not make geographical attributions in relation to transactions. There is no evidence from Chainalysis Reactor tracing of any criminal transactions in D.C. Nor does Reactor identify definitively whether a particular transaction involves illicit funds or not.

### F.     Luke Scholl – No Private Keys & No Definitive Attribution

Scholl's testimony underscored the limits of the Government's proof:  he agreed that whoever controls private keys to a blockchain address controls the address.[59] The Government introduced no private keys anywhere in their case that would corroborate any of their attributions. Definitive corroboration of any of the Government's critical inferences in this case is entirely lacking. Scholl also acknowledged that nearly all of the darknet markets at issue were shut down well outside the limitations period.[60]

---

[59] Appellant's Br. 13.
[60] *See id.* 97-99.

## III. DENIAL OF FULL ACCESS TO CHAINALYSIS REACTOR'S SOURCE CODE AND COMPLETE HEURISTICS VIOLATED THE SIXTH AMENDMENT AND DUE PROCESS

This case was tried without any eyewitnesses or definitive proof. The Government's money laundering case depended heavily on Chainalysis Reactor, a proprietary, closed-source forensic tool whose clustering and attribution outputs were presented through Government witnesses. Sterlingov was denied any access to the source code, the full heuristic framework, and the external intelligence inputs that drove those outputs.[61] The constitutional problem consists in the use of inculpatory forensic conclusions generated by a secret process that Sterlingov was not allowed to examine in any meaningful way.[62] The Government would not have this problem if it used open source software and fully disclosed its methodologies.

The Government responds that Reactor's outputs were merely "machine-generated data," that the Confrontation Clause does not require access to the underlying methodology, and that the defense had "ample information" anyway.[63] But those arguments collapse once Reactor is described accurately. Reactor did not simply record objective facts from the blockchain. It generated attribution conclusions by applying human-designed heuristics, threshold choices, weighting

---

[61] *Id.* 50-61.
[62] *Id.* 55-56.
[63] Gov't Br. 70-71.

decisions, and undisclosed off-chain intelligence related to public blockchain data.[64] As the Opening Brief argues, those outputs were therefore not raw measurements but forensic judgments conveyed through software and then repeated by Scholl and Bisbee.[65] And the Government's appellate position would permit conviction based on algorithmic conclusions that neither the defendant nor the jury could meaningfully test.

The Confrontation Clause exists to secure the reliability of the evidence against a criminal defendant through rigorous testing in an adversary proceeding, not blind acceptance of impressive-looking forensic outputs.[66] And under *Smith v. Arizona*, the Government may not evade the Confrontation Clause by presenting a testifying expert as a conduit for the conclusions of a non-testifying analyst.[67] That is functionally what happened here: Scholl and Bisbee did not independently generate Reactor's clustering and attribution conclusions; they accepted and used them. Sterlingov could not meaningfully probe the process because Chainalysis withheld the source code, the complete heuristics, and the external intelligence underlying key attributions. Operating the software is not auditing it; high-level

---

[64] Appellant's Br. 50-58.
[65] *Id.*
[66] *See Crawford v. Washington*, 541 U.S. 36 (2004); *Bullcoming v. New Mexico*, 564 U.S. 647 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009).
[67] *See Smith v. Arizona*, 602 U.S. 779, 783-86 (2024).

heuristic descriptions are not source code; and neither is a substitute for access to the actual method that produced the inculpatory output.

The Opening Brief squarely challenged the denial of access to both Reactor's source code and the complete set of heuristics, and the issue was heavily litigated before trial.[68] The Government is incorrect to say that Sterlingov did not seek the relevant material below.[69] And its reliance on *U.S. v. Wilson* does not help it.[70]

Sterlingov does not claim a free-standing right to generalized pretrial discovery.[71] Sterlingov claims the Government may not introduce inculpatory conclusions generated by proprietary, closed-source forensic software while denying the defense any meaningful ability to examine the method that produced them. That is an admissibility, Confrontation Clause, and Due Process problem, not a mere discovery complaint.

The Government downplays the draconian effect of Chainalysis' five year non-compete protective order clause by saying it was only proposed.[72] But the reason the five-year non-compete protective order was never finalized was because it was rejected outright by everyone who was asked to sign it, and scared Defense experts

---

[68] *See, e.g.,* Appellant's Br. 36-37.
[69] Gov't Br. 65.
[70] *Id.* 71; *see U.S. v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010).
[71] *See Wilson*, 605 F.3d at 1004.
[72] Gov't Br. 49-50.

away from the case.[73] Nobody wanted to risk future litigation from the multi-billion-dollar corporation Chainalysis Inc.[74] Every step of the way, Chainalysis fought disclosure of the underlying fundamentals of its proprietary software. By ruling in its favor, the District Court put a corporation's financial interest over a criminal defendant's constitutional liberty interests. Chainalysis chose to enter the law enforcement marketplace, that it was caught off guard by Sterlingov's *Daubert* cross-examination shows how little thought was put into their forensic methodology. The interests of justice should come before the interests of profit.

For the same reasons, the denial of full access independently violated Due Process. Sterlingov could not present a complete defense to black-box proprietary forensic evidence because he was denied the material necessary to determine whether the software contains coding errors, undocumented assumptions, skewed thresholds, or tainted external inputs. Here, that prejudice was especially acute because Reactor's outputs were foundational to the Government's case. The District Court erred in permitting the Government to use Reactor as a black-box accuser while denying Sterlingov the information necessary to confront and challenge it.

---

[73] Appellant's Br. 37, 44-45.
[74] *Id.*; *see also* Gov't Br. 49-50.

## IV. THE "WELCOME TO VIDEO" EVIDENCE VIOLATED RULE 403

Just as a drop of ink spoils a glass of milk, a small amount of highly inflammatory evidence can taint the entire case. Here, the Welcome to Video child pornography evidence was among the darkest ink possible, and the Government made sure to stir it through the case in summation.[75]

The Government's defense of the Welcome to Video evidence fails because it never confronts the fundamental gap between its alleged probative value and its extraordinary prejudicial effect.

The evidence showed only that unidentified Bitcoin Fog users, after withdrawing funds, sent approximately $989 in direct transfers and approximately $846 in indirect, more attenuated transfers, to Welcome to Video.[76] It did not show that any funds moved from Welcome to Video to Bitcoin Fog.[77] Nor did the Government offer evidence tying Sterlingov to those post-mix transfers. That should have ended the inquiry. Evidence that unidentified users made post-mix payments to a third-party site does not meaningfully prove Sterlingov's knowledge, intent, or willful blindness. It proves only what others did with funds after they left Bitcoin Fog. No bank would be held liable under this theory, and the Supreme Court recently

---

[75] Appellant's Br. 61-70.
[76] Gov't Br. 72; App. 4085.
[77] *Id.*

rejected a similarly expansive theory of secondary copyright liability based solely on an internet service provider's furnishing a service that others used to infringe.[78] And because those downstream uses were inherently unknowable to the mixer operator, the Government cannot transform an absence of possible knowledge into deliberate avoidance of knowledge.[79]

To shoehorn in this largely irrelevant evidence, the Government now invokes "evidentiary richness and narrative integrity."[80] But Rule 403 is not a license to use the most inflammatory proof available so long as it makes the Government's story more vivid.[81] Here, the Government introduced voluminous evidence arguing its case.[82] Once that evidence was before the jury, the Welcome to Video evidence added little legitimate value. Its principal effect was to invite conviction based on Sterlingov's supposed association with child exploitation rather than on proof of the charged elements. That is exactly the kind of unfair prejudice Rule 403 forbids.

Nor could the Welcome to Video evidence legitimately bear on the conspiracy count.[83] The charged conspiracy concerned Bitcoin Fog's alleged laundering for darknet drug-market vendors and administrators, not Welcome to Video users or

---

[78] *See Cox Commc'ns, Inc. v. Sony Music Entm't*, 146 S.Ct. 959 (2026).
[79] *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769-71 (2011).
[80] Gov't Br. 76 (citing *Old Chief v. United States*, 519 U.S. 172, 183 (1997)).
[81] *See Old Chief*, 519 U.S. at 180, 183.
[82] Gov't Br. 32-34.
[83] *Id.* 75.

consumers of CSAM. The Government therefore could not use attenuated, post-withdrawal transfers by unidentified third parties to Welcome to Video to redefine the object of the charged conspiracy or to extend its temporal scope. To the extent the Government did so at trial, and continues to do so now in its brief, it broadens the basis for conviction beyond the conspiracy charged in the indictment and thus effects a constructive amendment.[84]

Nor does the Government's "small volume" argument help it.[85] The District Court reasoned that the "minimal amount" of Welcome to Video transfers was "favorable to the defense" and therefore not a Rule 403 problem.[86] But that reasoning turns Rule 403 on its head. A tiny amount does not diminish prejudice; it diminishes probative value. And where the evidence attempts to associate the defendant with one of the most reviled categories of criminal conduct, the prejudice remains immense regardless of dollar value. *Bell* does not say otherwise.[87] This was not merely more of the same. Evidence of darknet drug transactions is not remotely equivalent, in emotional force or stigma, to evidence attempting to associate a defendant with child exploitation.

---

[84] Appellant's Br. 68-69.
[85] Gov't Br. 77.
[86] Appellant's Br. 65; Appx. 4084.
[87] *See U.S. v. Bell*, 795 F.3d 88, 99-100 (D.C. Cir. 2015).

The Government cannot dismiss the error as harmless. In closing, it used the Welcome to Video evidence exactly as Rule 403 warns against, arguing that Sterlingov set up Bitcoin Fog to help "Billy Bob 1337 and Slammer 88 who used Bitcoin Fog to buy access to child sexual abuse material on sites like Welcome to Video," and relying on their conduct as proof of his criminal purpose.[88] That was not passing reference or background context. It was an explicit appeal to guilt by association. This Court should reject the Government's attempt to recast inflammatory, minimally probative evidence as mere "context." And because the District Court misapplied Rule 403, its ruling is not entitled to deference.[89] The court therefore abused its discretion in admitting the evidence, and a new trial is required. Alternatively, the Government's reliance on this evidence to justify conviction on the conspiracy count effects a constructive amendment of the indictment, independently requiring a new trial.

---

[88] Appellant's Br. 61-62; Appx. 6163.

[89] *Price v. D.C.*, 792 F.3d 112, 114 (D.C. Cir. 2015) ("An abuse of discretion occurs by definition when the district court does not apply the correct legal standard or misapprehends the underlying substantive law, and we examine de novo whether the district court applied the correct legal standard."); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("[a] district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.").

## V. THE CO-CONSPIRATOR STATEMENTS VIOLATED RULE 801(d)(2)(E)

Sterlingov did not waive this issue. The Opening Brief squarely argued that the District Court admitted, over objection, all alleged co-conspirator statements under Rule 801(d)(2)(E) without making the findings Rule 104(a) or Rule 801(d)(2)(E) require.[90] That preserves the issue. And the point is meritorious. Under Rule 801(d)(2)(E), the Court must find by a preponderance of the evidence that a conspiracy existed, that the defendant and the declarant were members of that conspiracy, and that the statement was made during and in furtherance of the conspiracy. In this Circuit, there must also be independent evidence of the conspiracy apart from the statement itself.[91] Those preliminary facts had to be established by a preponderance of the evidence, and the District Court had to make that determination for itself.[92]

That did not happen here. The District Court provisionally admitted the statements and later sustained their admission on the view that the Government's conspiracy theory was "tenable" and that the evidence was "intrinsic."[93] But a

_____

[90] Appellant's Br. 89-93.

[91] *See U.S. v. Gatling*, 96 F.3d 1511, 1520–21 (D.C. Cir. 1996); *U.S. v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006); *Bourjaily v. U.S.*, 483 U.S. 171, 175–76 (1987).

[92] *Bourjaily* 483 U.S. at 175–76; *Gewin*, 471 F.3d at 201–02; *U.S. v. Jackson*, 627 F.2d 1198, 1217 (D.C. Cir. 1980).

[93] Appellant's Br. 92.

"tenable" theory is not a factual finding, and intrinsic evidence is not exempt from the hearsay rules.[94] Rule 104(a) requires the court to decide whether the Government has proved the Rule 801(d)(2)(E) predicates; it does not permit the court to accept plausibility in place of proof.

The Government offered no direct evidence that Sterlingov agreed with any identified person to commit money laundering - no communications, no joint planning, no witness testimony describing coordination, and no documents tying him to any shared unlawful objective. Instead, it relied on speculative forensic inferences and the fact that some users may have used Bitcoin Fog for illicit purposes. But mere association or conduct equally consistent with lawful behavior is not enough.[95]

The error was not harmless. The Government had no eyewitnesses, no confession, and no evidence that Sterlingov entered into any agreement with any alleged co-conspirator. In that evidentiary setting, the District Court's admission of the challenged statements gave the Government the very evidentiary weight it otherwise completely lacked on the existence of a conspiracy involving Sterlingov. And *Bourjaily* makes clear that this threshold admissibility inquiry is distinct from the burden of proof at trial: before admitting alleged co-conspirator statements, the

---

[94] *See McGill v. U.S.*, 815 F.3d 846, 879 (D.C. Cir. 2016).
[95] *See, e.g., U.S. v. Falcone*, 311 U.S. 205, 210–11 (1940)*; cf. U.S. v. Beckham*, 968 F.2d 47, 50–51 (D.C. Cir. 1992).

court itself had to find the Rule 801(d)(2)(E) predicates established by a preponderance.[96] Because the court admitted those statements without making the foundational findings required by Rules 801(d)(2)(E) and 104(a), the convictions should be reversed.

## VI.   THE WILLFUL BLINDNESS INSTRUCTION WAS IMPROPER

In seeking to rescue its successful push for a willful blindness charge, the Government willfully blinds itself - and aims to blind the Court - to core tenets of conscious avoidance law in this circuit.

For one, the Government - while conceding that Sterlingov's "frontline" and "principal defense" was that "he was not Bitcoin Fog's administrator" or "operat[or]"[97] - mines a vast trial record for what it calls a few stray "suggest[ions]" in Sterlingov's testimony that he "lacked guilty knowledge."[98] That characterization of the cited excerpts is far from obvious, if not strained and suspect. And the defense never argued that Sterlingov lacked guilty knowledge, based on the excerpts or otherwise.[99] But leave those frailties aside. If self-serving spins on a handful of

---

[96] *See Bourjaily* 483 U.S. at 175–76.
[97] Gov't Br. 87.
[98] *Id.* 87-89.
[99] *Cf. id.* 87 (claiming Sterlingov "repeatedly invited the jury to find that he did not know that Bitcoin Fog was laundering criminal proceeds and promoting unlawful

cherrypicked snippets sufficed, willful blindness charges would become routine instead of rare, sparing and cautiously given,[100] turning settled circuit law on its head.[101]

Similarly, despite indisputably premising and hinging its case on actual knowledge,[102] the Government observes that it also passingly "[mis]described the willful-blindness standard in closing and argued that Sterlingov satisfied it."[103] But again, defaulting to deliberate ignorance as a "backup or supplement" - tacking it on as a virtually automatic footnote or afterthought - runs squarely counter to precedent.[104]

Next, the Government glosses over the requirement that the defendant take deliberate actions or proactive steps *in order to* avoid – or *for the purpose of* avoiding - guilty knowledge.[105] Nothing in the record or the Government's brief[106] begins to

---

activity"); *id.* 88 (claiming he "invited the jury to infer that he created and operated Bitcoin Fog to help law-abiding bitcoin owners protect their privacy and assets from predatory criminals").

[100] *See* Appellant's Br. 71 & n.71 and authorities cited.

[101] Elsewhere, the defense did elicit that most people use mixers for privacy purposes (*see* Gov't Br. 88) – but only to establish for the lay jury that mixing is presumptively legal activity. *See* Appellant's Br. 77 & n.262, 81 & n.276, 83 & nn. 283-84.

[102] *See* Appellant's Br. 73-76, 79-80.

[103] Gov't Br. 89; see also *id.* 91.

[104] *See* Appellant's Br. 77 & n.263.

[105] *See id.* 77-80.

[106] *See* Gov't Br. 89-90.

show that Sterlingov *intentionally* contrived to avoid learning or confirming what, by its own account, he "absolutely" and "certainly knew": that Bitcoin Fog was being or could be used to launder "huge amounts" of "dirty money."[107] In fact, Judge Moss expressly found to the contrary, going out of his way to stress he was "*not saying that it was done here.*"[108] And that finding belies the Government's disclaimer that the court effectively devised a *per se* rule condoning ostrich instructions in all crypto mixing cases.[109]

Finally, the Government mistakes harmless error analysis for sufficiency of evidence review[110] and misses the point in protesting – too much – that it had no "responsibility to seek a special verdict on the knowledge issue."[111] Whether or not so *required*, the Government undoubtedly *could have* requested a special verdict if it wished to dispel a prejudice claim on appeal. Having spurned that course, the

---

[107] Appellant's Br. at, *e.g.*, 73 & n.249.

[108] *Id.* 80 & n.273, 82 n.278.

[109] *See* Gov't Br. 91.

[110] Compare *id.* ("if insufficient evidence of willful blindness existed, the jury could not have found that Sterlingov was willfully blind and instead must have found him guilty based on the [actual knowledge] theory amply supported by the evidence") with, e.g., *Jewell v. Boughton,* 90 F.4th 1199, 1204 (7th Cir. 2024) ("Time and again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict.") (cleaned up).

[111] Gov't Br. 92; *but see*, e.g., *U.S. v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998) ("it is the government's responsibility to seek special verdicts") (citing, among other authorities, *Brown v. U.S.*, 299 F.2d 438, 440 n.3 (D.C. Cir. 1962)).

Government cannot meet its burden to rule out any "reasonable possibility … the error complained of might have contributed to the conviction."[112] This is especially true where the Government's summation grossly misstated the crux of the willful blindness doctrine,[113] its pat denial here[114] notwithstanding.

## VII. THE STATUTE OF LIMITATIONS HAS RUN

The Government's statute-of-limitations argument asks the Price sting to do work it cannot bear. As to Count Two, the November 2019 interaction is timely only if it established a valid § 1956(a)(3) offense, and for the reasons already given, it did not. As to Counts One, Three, and Four, the Government similarly assumes that because Agent Price could access Bitcoin Fog in 2019, the charged conspiracy and licensing offenses necessarily continued into the limitations period. But that confuses the continued existence or accessibility of an internet site with the continued commission of the charged crimes by Sterlingov. A continuing-offense theory still requires proof that the charged offense, as defined by the indictment, continued into the limitations period.[115] The Government's supposed in-period proof

---

[112] *U.S. v. Klat*, 213 F.3d 697, 702-03 (D.C. Cir. 2000) (cleaned up).
[113] *See* Appellant's Br. 85-86.
[114] *See* Gov't Br. 92.
[115] *See, e.g., U.S. v. Hitt*, 249 F.3d 1010, 1016–17, 1023–25 (D.C. Cir. 2001); *Toussie v. U.S.*, 397 U.S. 112, 115 (1970) (explaining that criminal limitations statutes are to be liberally interpreted in favor of repose).

does not satisfy that standard. Price's interaction was unilateral Government use of the service. Welcome to Video never sent Bitcoin into Bitcoin Fog. And the later evidence that Bitcoin Fog continued to earn fees, mix bitcoin, or process withdrawals through 2021 proves, at most, that something bearing that name may have remained online or operational - not that the charged criminal agreement and licensing offenses remained ongoing. Particularly given the fact that there is no direct evidence ever showing Sterlingov operating Bitcoin Fog.

Nor do *McGoff* and *Bostick* cure that failure of proof. Sterlingov does not dispute the general principle that, once the Government proves a conspiracy continued into the limitations period, membership may persist absent withdrawal.[116] But that principle presupposes the very showing the Government never made here: that the charged conspiracy itself continued into the statutory window. The Government cannot invoke *Bostick* to shift the burden to Sterlingov before first proving a timely conspiracy. Almost all of the darknet markets on which its theory depended had shut down well outside the limitations period, and its later examples do not help. No Welcome to Video Bitcoin ever entered Bitcoin Fog, and the Government introduced no evidence that Sterlingov used AlphaBay or

---

[116] *See U.S v. McGoff*, 831 F.2d 1071, 1077–78 (D.C. Cir. 1987); *U.S. v. Bostick*, 791 F.3d 127, 144–45 (D.C. Cir. 2015); Gov't Br. 33-34.

communicated with its administrators. This Court should reverse because the statutes of limitations have run.

## VIII.  THE DISTRICT COURT MISCALCULATED THE VALUE OF LAUNDERED FUNDS

Remand for resentencing is required because the District Court miscalculated the value of laundered funds under U.S.S.G. § 2S1.1 and, in doing so, materially inflated the advisory range.[117] The court applied a 28-level increase under U.S.S.G. § 2B1.1(b)(1)(O) on the premise that nearly all bitcoin allegedly flowing through Bitcoin Fog - roughly $395 million - should be treated as criminally derived.[118] But the record does not support that conclusion, and the court never made the findings necessary to justify resort to § 2S1.1 cmt. n.3(B), which by itself requires remand for resentencing.[119]

At sentencing, the Government bore the burden to prove by a preponderance of the evidence the facts necessary to support the specific § 2S1.1 amount used.[120] And if it sought to rely on Application Note 3(B), it had to show not only that some

---

[117] *U.S. v. Celentano*, 126 F.4th 680, 689–90 (D.C. Cir. 2025) (reaffirming that Guidelines error affecting the advisory range requires resentencing).
[118] Appellant's Br. 93.
[119] *See, e.g., In re Sealed Case*, 552 F.3d 841, 842-43 (D.C. Cir. 2009) (citing *Pullman-Standard v. Swint,* 456 U.S. 273, 291-92 & n. 22 (1982)).
[120] *See U.S. v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997); *U.S. v. Leonzo*, 50 F.3d 1086, 1088 (D.C. Cir. 1995).

funds were criminally derived, but also that those illicit proceeds were commingled with legitimate funds and that the amount of criminally derived funds was difficult or impracticable to determine.[121]

Government Exhibit 601 purports to trace approximately $47,023,717 as directly sent to Bitcoin Fog, and approximately $31,518,155 as indirectly sent from darknet markets.[122] Even assuming all those traced funds were illicit proceeds, that yields a figure far below the roughly $395 million the District Court used. The court erroneously jumped from roughly $78.5 million to $395 million without explaining why the entire balance of untraced funds should be treated as criminally derived. The Government's answer - that "all or likely all" of the funds came from unlawful activity - is speculation, not proof, especially because Bitcoin mixing is not inherently unlawful and the District Court itself recognized as much. [123]

The error was prejudicial. An erroneous Guidelines range is not rendered harmless simply because the district court varied downward.[124] The Guidelines remain the starting point and anchor of the sentencing process, and the Supreme Court has recognized that an incorrect Guidelines range will, in the ordinary case,

---

[121] *See U.S. v. Tedder*, 403 F.3d 836, 842-43 (7th Cir. 2005); *U.S. v. Cessa*, 785 F.3d 165, 210–11 (5th Cir. 2015).
[122] *See* A. 7115.
[123] Gov't Br. 95; A. 6705 ("[S]terlingov is correct that it is not per se unlawful to mix cryptocurrency….," Moss, J.).
[124] *See Molina-Martinez v. U.S.*, 578 U.S. 189, 200–01 (2016).

affect substantial rights.[125] The record confirms as much here: the District Court itself observed that the value-of-funds calculation had "driven" the Guidelines analysis and produced an "excessive" recommendation.[126] If that erroneous figure drove the Guidelines range, it necessarily distorted the framework within which the court exercised sentencing discretion. There is thus at least a reasonable probability that the error affected the sentence imposed, and resentencing is required.

## IX. ADMITTING COOPERATING WITNESS TESTIMONY WAS ERROR

The District Court's admission, over objection, of the irrelevant and highly prejudicial testimony of Government witnesses Larry Dean Harmon and Ilya Lichtenstein was error.[127] Whatever slight relevance their testimony had to show that Bitcoin Fog existed and was used by some criminals, it had no probative value on the disputed issues here - whether Sterlingov operated Bitcoin Fog as part of a money laundering conspiracy - while posing an obvious risk of unfair prejudice under Rule 403.[128] Both men testified that they did not know Sterlingov, had never communicated with him, and had never interacted with anyone they could identify

---

[125] *See id.* at 198–201(explaining that an incorrect Guidelines range ordinarily establishes a reasonable probability of a different result); *Rosales-Mireles v. U.S.*, 585 U.S. 129, 138-41 (2018) (holding Guidelines miscalculations ordinarily warrant correction because of their systemic effect on sentencing).

[126] *See* Gov't Br. 97.

[127] Appellant's Br. 88-89.

[128] *See* Fed. R. Evid. 403.

as Bitcoin Fog's operator.[129] That stripped their testimony of any meaningful tendency to prove identity, knowledge, or control. What remained was impermissible guilt by association: two notorious criminals describing their own limited use of Bitcoin Fog and thereby inviting the inference that Sterlingov must have been the criminal behind it.[130] Additionally, the District Court should have barred their testimony under Rule 702 because it effectively was expert opinion in the guise of lay testimony. Harmon and Lichtenstein were fact witnesses recounting their own criminal exploits unrelated to Sterlingov and had no relevant reliable specialized knowledge about how Bitcoin Fog operated.[131] Their testimony should have been excluded.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of conviction. The record does not support venue in the District of Columbia, the evidence was insufficient to sustain the verdicts, and the District Court committed reversible constitutional and evidentiary error in admitting the Government's expert and other challenged evidence and in instructing the jury on willful blindness. Alternatively, the Court should vacate the sentence and remand for resentencing

---

[129] Appellant's Br. 88-89.
[130] *See Old Chief v. U.S.*, 519 U.S. 172, 180–85 (1997).
[131] *See* Fed. R. Evid. 702.

because the District Court miscalculated the value of laundered funds under U.S.S.G. § 2S1.1 and relied on an erroneous Guidelines range.

Dated: April 10, 2026

Respectfully submitted:

/s/ Tor Ekeland
Tor Ekeland Law, PLLC
30 Wall Street
8th Floor
New York, NY 10005
(718) 737-7264
tor@torekeland.com
*Attorneys for Appellant-Defendant*
*Roman Sterlingov*

**CERTIFICATE OF COMPLIANCE**

Certificate of Compliance with Type-Volume Limit, Typeface Requirements and Type-Style Requirements.

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 9,656 words under the limit per Court's Order, dated August 14, 2025.

2. This document complies with the typeface requirements of Fed. S. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word (2019/Office) in 14-point font, Times New Roman.

Dated: April 10, 2026

/s/ Tor Ekeland
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY 10005
(718) 737-7264
tor@torekeland.com
*Attorney for Appellant-Defendant*
*Roman Sterlingov*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the Corrected Brief for Appellant with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system on April 10, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF System.

Dated: April 10, 2026

Respectfully submitted:

/s/ Tor Ekeland
Tor Ekeland Law, PLLC
30 Wall Street
8th Floor
New York, NY 10005
Tel: (718) 737-7264
tor@torekeland.com

*Attorney for Appellant-Defendant Roman Sterlingov*